# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br>ECF Case |

This document relates to:
*All Actions*

## PLAINTIFFS' AVERMENT OF FACTS AND EVIDENCE IN SUPPORT OF THEIR CLAIMS AGAINST THE KINGDOM OF SAUDI ARABIA AND DALLAH AVCO IN RESPONSE TO ECF NOS. 9362 and 9368

### [CORRECTED]

Robert T. Haefele
Jodi Westbrook Flowers
Donald A. Migliori
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, South Carolina 29464
Tel.: (843) 216-9184
Email: rhaefele@motleyrice.com

*Liaison Counsel and Co-Chairs for the Plaintiffs' Executive Committee for Personal Injury and Death Claims on behalf of the Plaintiffs*

Sean P. Carter
Stephen A. Cozen
Scott Tarbutton
COZEN O'CONNOR
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
Tel.: (215) 665-2105
Email: scarter@cozen.com

*Co-Chairs and Liaison Counsel of the Plaintiffs' Executive Committee for Commercial Claims on behalf of Plaintiffs*

Steven R. Pounian
Andrew J. Maloney
James Gavin Simpson
Megan Benett
KREINDLER & KREINDLER LLP
485 Lexington Avenue
New York, New York 10017
Tel.: 212-687-8181
Email: spounian@kreindler.com

*Attorneys for Ashton Plaintiffs*

Originally filed December 20, 2023
Corrected and filed January 17, 2024

REDACTED FOR PUBLIC FILING

**I.     U.S. FEDERAL LAW ENFORCEMENT AGENCIES DETERMINED THAT SAUDI ARABIA'S GOVERNMENT ESTABLISHED AND SUPPORTED A SUNNI-WAHHABI EXTREMIST NETWORK INSIDE THE U.S. THAT PROVIDED MATERIAL SUPPORT TO THE 9/11 HIJACKERS.**

1.      The December 2004 FBI/CIA Joint Assessment ("2004 FBI/CIA Joint Assessment") found "evidence [that] official Saudi entities, chiefly the Ministry of Islamic Affairs and associated nongovernmental organizations (NGOs), provide financial and logistical support to individuals in the United States…some of whom are associated with terrorism-related activity."  Ex. 2, EO 3416.

2.      The 2004 FBI/CIA Joint Assessment determined that "[t]he Saudi Government and many of its agencies have been infiltrated and exploited by individuals associated with or sympathetic to al-Qa'ida."  Ex. 2, EO 3416.

3.      The 2004 FBI/CIA Joint Assessment cited efforts by "suspected Saudi intelligence officers and cooptees" and "Saudi-funded clerics" to obtain intelligence inside in the U.S.  Ex. 2, EO 3416.

4.      The 2004 FBI/CIA Joint Assessment also stated that "[t]he Saudi Government and private Saudi individuals support the propagation of the conservative Wahhabi-Salafi sect of Sunni Islami in the United States.  Jihadists adhere to and interpret this sect's beliefs to justify their actions."  Ex. 2, EO 3416.

5.      The 2004 FBI/CIA Joint Assessment concluded that the Saudi Government's actions regarding Al Qaeda put it in a "precarious situation" because it was "treating the group [al Qaeda] with special consideration."  Ex. 2, EO 3416.

6.      The 2004 FBI/CIA Joint Assessment states that the Al Haramain Islamic Foundation ("Al Haramain") was led by two Saudi government cabinet members. The Joint

1

REDACTED FOR PUBLIC FILING

Assessment found that among the "stated goals" of Al Haramain are to "establish the Salafist Wahhabi fundamentalist form of Sunni Islam." Ex. 2, EO 3435.

7. The 2004 FBI/CIA Joint Assessment found that:

> Two Saudi cabinet members officially supervise [Al Haramain's] activities. The Minister of Islamic Affairs, Sheikh Saleh Bin Abdul Aziz Bin Mohammed Bin Ibrahim Al Shaykh, is the titular head and superintendent of [Al Haramain]. The foundation is part of the Saudi Joint Relief Committee, which is headed by the Minister of Interior, Prince Nayif bin Abdul-Aziz al-Sau'd, a member of the Saudi royal family and head of Mabahith.

Ex. 2, EO 3435.

8. The 2004 FBI/CIA Joint Assessment indicated that some Al Haramain offices "provided material support to the terrorist activities of al-Qa'ida around the world," including support for the Al Qaeda cells responsible for the 1998 U.S. Embassy bombings. Ex. 2, EO 3435.

9. The 2004 FBI/CIA Joint Assessment also observed that Prince Nayif "maintained for months after 11 September 2001 that no Saudis or Arabs had been involved in the attacks, but rather that the attacks were plots by the CIA and Israel's Mossad." Ex. 2, EO 3423.

10. In addition to the 9/11 investigations conducted by the FBI, codenamed PENTTBOM and OPERATION ENCORE, the FBI established a separate Arabian Peninsula Squad ("AP Squad") which conducted a nearly two-decade long investigation of the role of Saudi Arabia, specifically its Embassy, personnel, and broader government infrastructure in providing either direct or indirect support for terrorism, including Al Qaeda. Ex. 13, Weidner Decl. ¶¶ 2-18; Ex. 2, EO 3434 (AP Squad established 2002); Ex. 2, EO 3482-83.

11. The FBI prepared a July 23, 2021 Electronic Communication ("July 2021 FBI EC") titled "Connections to the Attacks of September 11, 2001." Ex. 2, EO 3479. The purpose

REDACTED FOR PUBLIC FILING

of this EC was to provide analysis that was "deemed essential for future case agents" of the

FBI's counterterrorism program "to understand the origin of the investigation" conducted by the

FBI of Saudi Arabia after the 9/11 Attacks.  Ex. 2, EO 3479.

12.    The July 2021 FBI EC contained a series of specific factual findings made by the

FBI addressing Saudi Arabia's "creation of and support and direction for a network of offices

and personnel involved with militant Salafi Islamic activities and proselytization within the

United States."  Ex. 2, EO 3482.

13.    The July 2021 FBI EC found that a "Saudi (Wahhabi) / Salafi / militant

network…was created, funded, directed and supported by the KSA [Kingdom of Saudi Arabia]

and its affiliated organizations and diplomatic personnel within the U.S."  Ex. 2, EO 3480.

14.    The July 2021 FBI EC determined that "[a]s Saudi government officials and

intelligence officers were directly operating and supporting the entities involved with this

network, their involvement with the activities of these organizations/individuals would logically

be supposed to have the knowledge or concurrence of the KSA government."  Ex. 2, EO 3480.

15.    In addition, the July 2021 FBI EC stated that:

> …there was located within the EKSA [Embassy of the Kingdom of Saudi
> Arabia] the offices of the Islamic Affairs Department and the office of
> Dawa (or Propagation).  Investigation of the 9/11 hijackers and their
> support networks identified significant connections to these offices either
> directly or via the Saudi Arabian Consulate in Los Angeles.

Ex. 2, EO 3480. The FBI determined that Islamic Affairs Deputy Musaed Al Jarrah was a Saudi

diplomat and "high level employee" who was "heavily involved with the movement and support

of the Saudi Salafi network within the U.S. to include those members of the 9/11 hijacker

support network in Southern California."  Ex. 2, EO 3496.

REDACTED FOR PUBLIC FILING

16. In a May 2021 Electronic Communication ("May 2021 FBI EC"), the FBI confirmed the role of the Embassy in overseeing an extremist network of Saudi propagators inside the U.S., in particular the Southern California-based network led by Fahad Al Thumairy. Ex. 2, EO 0001-0014. The May 2021 FBI EC finds that Islamic Affairs Deputy Musaed Al Jarrah was "heavily connected/linked to Saudi Sunni extremists operating inside the United States, specifically with the Southern California based network of Mohammed al-Muhannah[] and [Fahad Al] Thumairy." Ex. 2, EO 0004. The EC states that "Al-Jarrah is in fact a controlling, guiding and directing influence on all aspects of Sunni extremist activity in Southern California and had been directing, controlling and funding Muhannah and Thumairy since their arrival in the United States." Ex. 2, EO 0004.

**A. Saudi Arabia's Wahhabi Islam preached violent jihad against non-believers.**

17. Saudi Arabia follows a branch of Sunni Islam known as Wahhabism, named after the 18th Century religious scholar Muhammad ibn Abd Al-Wahhab, as its state religion. Saudi Arabia's government is based on a centuries-old religious-political pact between the ruling al-Saud dynasty, the King and royal family which rules the Saudi political regime and its military, and the descendants of Abd Al-Wahhab, the Ash-Shaikh, who dictate the norms of Saudi religious, moral, educational, and cultural life. Ex. 149, Nakhleh Rpt. ¶¶ 26-28.

18. The term "Wahhabism" is an appropriate description of the sect of Islam followed in Saudi Arabia. Saudi Arabia holds the view that Wahhabi Islam is the *only* legitimate Islam and therefore should not be labeled as a sect of Islam. KSA Aver. at ¶ 4 n. 1 (describing the term Wahhabism as "misleading and derogatory"). As Plaintiffs' expert Nakhleh explains:

> The Saudis regard the term [Wahhabism] as pejorative because it appears to characterize "their" Islam as merely one branch or version of Islam, as opposed to the Saudi belief that Wahhabism is *the only Islam* and represents Islam *in its entirety*. One can often hear it said among scholars

4

> of Islam, in relation to such designations: every Wahhabi is a Salafi, but
> not every Salafi is a Wahhabi.

Ex. 149, Nakhleh Rpt. ¶ 26 n. 7.

19.    A fundamental tenet of Wahhabism is the duty of all Muslims to wage "jihad"
against the perceived "enemies" of Islam.  Ex. 149, Nakhleh Rpt. ¶ 30.  Wahhabism is based on
the notion of a millenarian violent struggle for the soul and survival of Islam, set to continue
until the "end of days" when Islam will emerge victorious.  Ex. 149, Nakhleh Rpt. ¶ 31.
Wahhabis believe jihad must be done by every possible means, from the pen to the sword and
with money from their pockets.  Ex. 149, Nakhleh Rpt. ¶ 34.  Salafi Wahhabi clerics – almost
exclusively members of the religious establishment of Saudi Arabia – have long preached that
violent jihad is the *only* recourse available to Muslims if they are to prevail in their existential
struggle with the "enemies" of Islam. Ex. 149, Nakhleh Rpt. ¶ 35.

20.    During the 20th Century, there was a doctrinal evolution in Wahhabism toward
violent extremism inspired, at least in part, by the influence of foreign radical thinkers, whom the
Saudi religious establishment embraced and came to regard as their own.  Ex. 149, Nakhleh Rpt.
¶ 36.  The most prominent of those thinkers, Egyptian Sayyid Qutb, represented the radical
extreme of the Muslim Brotherhood.  Ex. 149, Nakhleh Rpt. ¶ 37.  Sayyid Qutb ultimately had a
totemic bearing on Wahhabi jihadist thinking.  Ex. 149, Nakhleh Rpt. ¶ 37.  Sayyid Qutb's works
of the 1950s and 1960s promoted violent jihad against the "far enemy" and "infidel" nations
such as the United States, France, Britain, and Israel.  Ex. 149, Nakhleh Rpt. ¶ 37.  After Sayyid
Qutb was arrested and executed in Egypt in 1966, his brother Mohamed Qutb took up residence
in Saudi Arabia, where he was warmly welcomed and given a position as a professor at a leading
Saudi state university.  Ex. 149, Nakhleh Rpt. ¶ 40.  With Saudi government assistance,

REDACTED FOR PUBLIC FILING

Mohamed Qutb was able to get his brother's books published and widely circulated.  Ex. 149, Nakhleh Rpt. ¶¶ 36-40.

21.     Syrian Muhammad Surur built on Sayyid Qutb's legacy by advocating for the military-style organizational framework used by the Muslim Brotherhood to provide the political means to carry out jihad against the enemies of Islam.  Ex. 149, Nakhleh Rpt. ¶¶ 41-42.  Like Mohamed Qutb, Surur was given a prominent platform by Saudi Arabia as a university professor in Mecca.  Ex. 149, Nakhleh Rpt. ¶ 41.  Surur helped transition Wahhabi ideology out of quietism into bold activism.  This extremist ideology in Saudi Arabia in the early 1990s was referred to as "Sururi-Qutbi Wahhabism."  Ex. 149, Nakhleh Rpt. ¶¶ 41-43.

22.     The prevalence and acceptance by Saudi government of Wahhabi extremism is demonstrated by the violent jihadist literature widely distributed by Saudi Arabia inside and outside the Kingdom prior to the 9/11 Attacks.

23.     As a first example, Saudi government standard student textbooks from grade school through college (approved by the Ministry of Islamic Affairs ("MOIA")) included radical and violent Wahhabi jihadi doctrine. Ex. 149, Nakhleh Rpt. ¶¶ 55-60.  Even when the U.S. government complained to Saudi Arabia about the textbooks after the 9/11 Attacks, Saudi Arabia refused to remove the violent jihadist material for at least a decade.  Ex. 149, Nakhleh Rpt. ¶¶ 55-60; Ex. 2, EO 3604 (FBI cites CIA findings that Saudi government texts contain doctrine which "jihadists often advocate" which "teach hatred" and "promotes hostility toward non-Muslims").

24.     As a second example, the Saudi government published violent jihadist materials used in the Kingdom's worldwide *da'wa* propagation efforts.  ███████████████████
████████████████████████████████████████████ recovered a copy of a

████████████████████████████████████████████

REDACTED FOR PUBLIC FILING

pamphlet called "THE BOOK OF (Jihad)" published in 1997-1998 by the "Kingdom of Saudi Arabia – Islamic Guidance Center" under the Ministry of Islamic Affairs.  Ex. 528, FBI 004139-45.  The pamphlet is in English and is "FOREIGNERS GUIDANCE" to carry out violent jihad of war against all non-believers, including suicide missions.  It described the preferred type of jihad when "[s]truggling against the people of injustice, innovation, and evil doers.  This type of *Jihad* is best done through force if possible…."  Ex. 528, FBI 004139-45 at 4144.  "As for Jews, Christians and Magians, they have three choices: embrace Islam, pay the *jizya* or the war."  Ex. 528, FBI 004139-45 at 4145.  The Saudi pamphlet describes how a man who dies fighting for jihad is considered a martyr who will find his place in "the Jannah" (heaven), be given a wife "from the *Hoor al*-Een" (maidens of paradise) and receive other rewards.  Ex. 528, FBI 004139-45 at 4145.

25.     As a third example, a 1995 official publication of the MOIA found at the King Fahad Mosque in Los Angeles after the 9/11 Attacks contains a sermon of Saudi Sheikh bin al-Uthaymeen preaching the policy that all non-Muslims should be put to death:

> "[O]ur doctrine states that if you accept any religion other than Islam, like Judaism or Christianity, which are not acceptable, you become an unbeliever.  If you do not repent, you are an apostate and you should be killed because you have denied the Qur'an."

Ex. 149, Nakhleh Rpt. ¶ 188.

26.     Further, prior to 9/11, the version of the Qur'an published by Saudi Arabia and distributed by the Kingdom inside the U.S. included annotations which described jihad in a warlike, violent manner and advocated violent jihad against non-believers.  Ex. 72, Madha Decl., Ex. 1 at 3 (annotation in footnote 1 describes jihad as "holy fighting…with full force of numbers and weaponry" as of "the utmost importance in Islam").

REDACTED FOR PUBLIC FILING

27. In 1998, Osama Bin Laden issued a fatwah stating that to "…kill the Americans and their allies – civilians and military – is an individual duty for every Muslim who can do it in any country in which it is possible to do it … kill the Americans and plunder their money wherever and whenever they find it." Ex. 3, 1998 fatwah by Osama bin Laden, "Declaration of the World Islamic Front for Jihad Against the Jews and Crusaders," Foreign Broadcast Information Services Report, Compilation of Usama Bin Ladin Statements 1994 – January 2004 ("FBIS Rpt.") 58.

28. An elite group of religious leaders constituted a core group within the government of Saudi Arabia. Ex. 149, Nakhleh Rpt. ¶ 46. Saudi Arabia has a *de facto* power sharing arrangement between its political leaders — the al Saud royal family, led by the King — and the Kingdom's *'ulama* of Wahhabi religious scholars, also known as its Council of Senior Scholars, led by the Ash-Shaikh family. Ex. 149, Nakhleh Rpt. ¶ 46. The Ash-Shaikh are the keepers of the Wahhabi faith and act as the moral guides and guardians of the Saudi state and society, domestically and globally. Ex. 149, Nakhleh Rpt. ¶ 46. They have led the *'ulama* class and dominated the religious (Islamic) institutions of the Kingdom. Throughout its history the Saudi royal family based its very legitimacy to govern on edicts of the Kingdom's religious leaders, and there was a longstanding interdependence between the political and religious leadership of Saudi Arabia. Ex. 149, Nakhleh Rpt. ¶¶ 44-46, Ex. 150A, Kohlmann 2022 Rpt. ¶ 23.

29. The very legitimacy of the monarchy rests on an alliance between the Saudi royal family and the *'ulama*, who serve as consultants. Ex. 149, Nakhleh Rpt. ¶ 44. The monarchy has institutionalized religious organizations within the state power structure. Ex. 149, Nakhleh Rpt. ¶ 49. The most powerful religious body is the state-funded Council of Senior Scholars, which provides religious approval for policies determined by the government. Ex. 149, Nakhleh

8

REDACTED FOR PUBLIC FILING

Rpt. ¶ 47-48 (citing EO 3413-3442); Ex. 316, Oxford Dictionary of Islam (entry on "ulama"); Ex. 2, EO 3417 (the 2004 FBI/CIA Joint Assessment states that the Saudi royal family rely on Saudi religious leaders to "underwrite[] their legitimacy").

30.     Saudi Arabia's religious leaders (including its Ministry of Islamic Affairs) are not "quietist" or peaceful in their religious beliefs, despite Saudi Arabia's highly misleading and incorrect assertions. KSA Aver. ¶¶ 5-7.  The Saudi *'ulama* promoted the radical teachings of Sayyid Qutb and Muhammad Surur with a bolder more active philosophy.  Ex. 149, Nakhleh Rpt. ¶¶ 37-43.

31.     This extremist ideology in Saudi Arabia in the early 1990s was referred to as "Sururi-Qutbi Wahhabism."  Ex. 149, Nakhleh Rpt. ¶ 42.

32.     Wahhabi Islam as practiced by Saudi Arabia's religious elite includes violent jihad against non-believers as one of its foundational tenets, as demonstrated by numerous examples.  Ex. 149, Nakhleh Rpt. ¶¶ 55-61; 188 (describing Saudi government publications defining Islam); Ex. 528, FBI 004139-45 ("Book of Jihad" collected from Omar Al Bayoumi's office, discussed at *infra* ¶¶ 890, 1276, 1333.)

33.     Contrary to Saudi Arabia's incorrect assertions, KSA Aver. at ¶¶ 5-6, Plaintiffs' experts adopted the use of the term "quietist" as defining the *political stance* of showing deference to the King inside Saudi Arabia, and not as the *religious* views of the Wahhabists.  Ex. 149, Nakhleh Rpt. ¶ 42 ("Surur…transitioned Wahhabi ideology out of quietism and into bold activism.").

34.     Receiving funding and diplomatic support overseas, Wahhabist religious leaders employed by the Saudi government were permitted and encouraged to promote their violent views in foreign countries through the Saudi embassies via the MOIA that served to quell overt

9

REDACTED FOR PUBLIC FILING

criticism of the Saudi monarchy inside the Kingdom.  Ex. 149, Nakhleh Rpt. ¶¶ 89-98; Ex. 102, Meleagrou-Hitchens Dep. 93:5-93:16 (while the Saudi religious establishment did not officially and openly advocate for the jihadism practiced by Osama Bin Laden, there are "examples of [the] Saudi religious establishment encouraging or helping disseminate works in the West that do come much closer to supporting violence against non-Muslims in Western countries.").

35. The term Saudi/Wahhabi or Sunni extremism is defined by the FBI (and herein) as an ideology to carry out terror attacks to advance a goal of establishing an Islamic caliphate over the entire world.  Ex. 105, Youssef Dep. at 281:6-16.

**B. The creation of the Saudi Ministry of Islamic Affairs in 1993 allowed the Saudi government's religious elite to promote Wahhabi Islam overseas, in an attempt to keep peace inside the Saudi homeland.**

36. The presence of U.S. and other foreign troops inside Saudi Arabia to fight the Gulf War against Iraq at the invitation of the Saudi King had spurned a movement among the Saudi religious leaders known as *al-Sahwa al-Islamiyya*, the Islamic Awakening.  Ex. 149, Nakhleh Rpt. ¶¶ 67-88.

37. The *al-Sawha* movement led in July 1992 to the Memorandum of Advice (*Muthakkarat al-Nasiha*) signed by 107 Saudi clerics, religious activists, and intellectuals and delivered to the Saudi King.  The Memorandum contained a series of demands which sought, *inter alia*, to strengthen the role of religious leaders and institutions inside Saudi Arabia and take steps to promote the propagation of Wahhabi Islam overseas through Saudi Embassies and Consulates and Islamic "charities".  Ex. 149, Nakhleh Rpt. ¶¶ 67-69, 88-98.

38. The *al-Sahwa* and the Memorandum of Advice demonstrated that Saudi religious leaders had a radical agenda of intolerance and hostility toward the United States.  Ex. 149, Nakhleh Rpt. ¶¶ 70-73.

REDACTED FOR PUBLIC FILING

39.     The *al-Sawha* movement exposed a significant rift among the political and religious leaders of Saudi Arabia.  Ex. 149, Nakhleh Rpt. ¶ 101.  It reflected the anger against the King because of the presence of U.S. soldiers in Saudi Arabia because of the Gulf War.  Ex. 149, Nakhleh Rpt. ¶ 101.

40.     King Fahd needed to grant some concessions to the religious leaders, given the breadth and potency of *al-Sahwa.*  Ex. 149, Nakhleh Rpt. ¶ 93.  King Fahd acquiesced to their demands to enhance and fund *da'wa outside* the Kingdom and accepted the radical agenda of the religious establishment to expand the promotion of Wahhabi Islam outside of the Kingdom — with a particular focus on Muslim-minority countries, led by the United States.  Ex. 149, Nakhleh Rpt. ¶¶ 89-94.

41.     King Fahd then agreed to the creation of the Saudi Ministry of Islamic Affairs and *Waqf* (Islamic Endowment), *Da'wa* (Propagation), and *Irshad* (Guidance) in 1993 to quell an uprising among Saudi Arabia's governing religious leaders.  Ex. 149, Nakhleh Rpt. ¶ 88.  As part of this new Ministry, the King agreed to the clerics' plan for a massive expansion of the Saudi government's *da'wa* operations to promote Wahhabism worldwide.  This included a new Ministry of Islamic Affairs Da'wa office at the Saudi Embassy in Washington D.C.  Ex. 149, Nakhleh Rpt. ¶¶ 50, 81, 89—90.

42.     The King's strategy in establishing the Ministry and giving it permission to propagate Wahhabism in foreign countries was made to protect the royal family from internal strife and export the risk of violent jihad outside of the Kingdom's borders.  Ex. 149, Nakhleh Rpt. ¶ 94; Ex. 150A, Kohlmann 2022 Rpt. ¶ 23 ("Wahhabi / Salafi fundamentalists in the Kingdom were willing to focus their ire on external enemies so long as the royal family supported their causes.")

11

REDACTED FOR PUBLIC FILING

43.     The *da'wa* programs overseas were a powerful populist tool to promote the legitimacy of the Saudi royal family; advance its objective to be perceived as leader of the Islamic world; and win its ongoing religious and political competition against Shia Iran. Ex. 150A, Kohlmann 2022 Rpt. ¶ 23.

44.     Saudi government official Khalil al Khalil testified that "particularly at that time, Iran was really a big issue to Saudi Arabia, and they were really preaching the Khomeinism. And Saudis were so concerned that they may have an influence on the Muslims of the United States, whether Arabs or not Arabs."  Ex. 113, Khalil Dep. 24:10-25:8; Ex. 188, KFM 0376-78 at 77 (letter from the Ibn Taymiyah Foundation to Saudi Arabia's coordinator for the King Fahad Mosque project, stating that the Foundation "since its inception has being [sic] established in line with the Kingdom of Saudi Arabia politically and spiritually" and was "born out of our deep conviction of the Kingdom's sacred role as the leader in the Muslim world.").

45.     Saudi Arabia's policy to allow MOIA to operate without restriction *outside* of Saudi Arabia is demonstrated by a February 1999 letter sent by the MOIA's Washington, D.C., Embassy Head Khalid Al Sowailem to MOIA Propagator in San Diego, Omar Abdi Mohamed ("Abdi Mohamed" aka Omar Al Khatib).  Ex. 132, DOJ 0001-32 at 013-015. The letter spells out an "advisory" to MOIA Propagators, directing them not to solicit any donations *inside* Saudi Arabia without proper authority.  Ex. 132, DOJ 0001-32 at 013-015. The letter states that "collecting funds inside the Kingdom of Saudi Arabia is subject to certain regulations that must be observed."  Ex. 132, DOJ 0001-32 at 013. By contrast, *no* restrictions or safeguards were placed by MOIA on fundraising activities inside the U.S., and MOIA propagators in the U.S. (including Abdi Mohamed himself) were actively involved in collecting funds for a variety of extremist groups.

REDACTED FOR PUBLIC FILING

46.     The February 1999 letter of Sowailem was not produced by Saudi Arabia (though the Kingdom was required to produce any and all records that pertained to propagators it employed in Southern California who were under the supervision of Fahd al Thumairy) — it was only obtained because the FBI raided the home of Abdi Mohamed and produced the letter to Plaintiffs.

47.     Another example of Saudi Arabia exporting extremism to avoid trouble inside the Kingdom comes from the 2004 FBI/CIA Joint Assessment, which reports that "in some instances, extremists who are troublesome to the regime in the Kingdom but not involved in punishable offenses are sent overseas on proselytizing or education missions."  Ex. 2, EO 3429.

**C.  Prior to 9/11 Attacks, the Saudi government's religious leadership supported Al Qaeda, and Saudi Arabia made an implicit or explicit agreement with Osama Bin Laden to allow Al Qaeda to operate overseas, so long as they did not conduct attacks inside the Kingdom.**

48.     Around the same time that it created MOIA and authorized Saudi Arabia's religious leadership to propagate Wahhabism overseas, Saudi Arabia made a similar bargain with Osama bin Laden and Al Qaeda.  The 2004 FBI/CIA Joint Assessment stated that prior to the 9/11 Attacks the Saudi Government was in a "precarious position" concerning Al Qaeda and Osama Bin Laden.  Ex. 2, EO 3416.  Bin Laden was powerfully advancing religious arguments citing Ibn Taymiyah and others as the basis for opposing the presence of "infidel" U.S. and other foreign troops inside the Kingdom.  Ex. 3, Foreign Broadcast Information Service ("FBIS") Compilation of Bin Laden Statements at 111 (PDF page 123) ("Muslim scholars of the world and Saudi Arabia have issued a fatwa [religious decree] for a Jihad against these forces that have dared to occupy our sacred places.  The Holy Prophet, peace be upon him, said that infidels should be ousted from the Arab lands.")

REDACTED FOR PUBLIC FILING

49. The 2004 FBI/CIA Joint Assessment found that while "on the one hand it [Saudi Arabia] was denouncing al-Qa'ida as a threat, yet on the other hand it was underestimating al-Qa'ida's vitality within the Kingdom and treating the group with special consideration." Ex. 2, EO 3416. The Assessment goes on to explain that the Saudi government's "primary course of action to counter al-Qa'ida prior to 11 September was to co-opt or coerce extremists in an effort to bring them into the fold, possibly with an implicit or explicit understanding that al-Qa'ida would not strike on Saudi soil." Ex. 2, EO 3417. The Joint Assessment cites reporting that Osama Bin Laden banned Al Qaeda operatives from carrying out proposed terror attacks inside Saudi Arabia prior to 9/11. Ex. 2, EO 3417.

50. Plaintiffs' expert Steve Simon similarly explained how in the years before the 9/11 Attacks Saudi Arabia and the U.S. had a "serious disagreement" over strategy regarding Al Qaeda and bin Laden. Ex. 127, Simon Dep. 37:8-18. Saudi Arabia decided "to keep bin Laden away from the kingdom and enter into an implicit – or as the FBI says, explicit or implicit, they weren't sure – bargain with Al-Qaeda and bin Laden such that the Saudis would not go after them if they did not go after the royal house of Saudi Arabia." Ex. 127, Simon Dep. 37:19-38:8.

51. Saudi Arabia faced an internal threat from Bin Laden "that entailed keeping bin Laden out of the kingdom, and that entailed a certain tolerance for the activities of Al-Qaeda. And it was important for its other external interests to keep that side of things under wraps and undisclosed from the United States." Ex. 127, Simon Dep. 40:8-41:5.

52. Saudi Arabia's position was that of "Dr. Jekyll and Mr. Hyde": while it presented itself to the U.S. as an ally, Saudi Arabia appeased the religious extremists and allowed MOIA to export its virulently anti-American and pro-jihadist agenda inside the U.S. Ex. 149, Nakhleh Rpt. ¶¶ 144-45.

REDACTED FOR PUBLIC FILING

53.     In the decade prior to the 9/11 Attacks there was a marked convergence of views between Osama bin Ladin and Saudi religious authorities, including senior *'ulama*, regarding the waging of jihad against the United States.  Ex. 149, Nakhleh Rpt. ¶ 130.  Bin Ladin's views against the presence of the U.S. military on Saudi territory were consistent with the Hanbali-Ibn Taymiyah-Wahhabi doctrine of jihad and were widely shared among the senior religious leadership of Saudi Arabia.  Ex. 149, Nakhleh Rpt. ¶¶ 117 - 118.

54.     Osama Bin Ladin drew on the "long tradition of extreme intolerance" within one stream of minority-tradition Islam, from Ibn Taimiyyah, through the founders of Wahhabism and the Muslim Brotherhood, to Sayyid Qutb.  Ex. 149, Nakhleh Rpt. ¶ 121 (quoting the findings of the 9/11 Commission); *See* 9/11 Commission Report at 362.

55.     Bin Ladin presented his obligatory jihad as a continuation of Ibn Taymiyya's definition and practice of jihad, saying that Islam was under attack and that the response must be by waging jihad, by all your means.  Ex. 149, Nakhleh Rpt. ¶ 117; Ex. 2, EO 3417 (the "presence of Western military, particularly American forces" was a factor which "strained" the relationship between the Saudi royal family and Saudi religious community).

56.     Prior to the 9/11 Attacks, this view of the United States as an "enemy" of Islam and the religious requirement to do jihad against America was at the time prevalent and widely accepted in Saudi Arabia.  Ex. 149, Nakhleh Rpt. ¶ 136.

57.     Many Saudi officials at the MOIA and graduates of the government-run Imam Mohamed Ibn Saud Islamic University ("Imam Mohamed University") believed in bin Laden's cause of jihad and in helping jihadists carry out violent and "spectacular" attacks against the American symbols of power.  Ex. 149, Nakhleh Rpt. ¶ 119.

15

REDACTED FOR PUBLIC FILING

58.     Many *'ulama* had animosity against the United States and shared bin Laden's views that the presence of U.S. troops in Saudi Arabia gave territory to a crusader infidel force and was an "insult" to the sanctity of the state and Islam that warranted the waging of jihad in response. Ex. 149, Nakhleh Rpt. ¶¶ 129, 132.

**D.  Saudi government-run Imam Mohamed University educated and employed many of the elite group of MOIA officials deployed into the U.S. and three 9/11 hijackers.**

59.     Imam Mohamed University was operated by Saudi Arabia under the Saudi Ministry of Higher Education. Ex. 294, KSA 7795 (Muhammad bin Saud al Salem, Chancellor of Imam Mohamed University, was empowered to stipulate the extension of Jarrah's work in the Islamic Affairs Department of the Embassy in Washington, D.C.).

60.     Imam Mohamed University was based in Riyadh and had a branch in Buraidah, Qassim. Ex. 115, Mersal Dep. 14:24-15:4; Ex. 149, Nakhleh Rpt. ¶ 62.

61.     Before the 9/11 Attacks, Imam Mohamed University also had a U.S. branch located in Fairfax, Virginia, known as the Institute of Islamic and Arabic Sciences in America (IIASA). Ex. 118, Jarrah Dep. 73:8-74:5; Ex. 5, Youssef Rpt. 31.

62.     Prior to the 9/11 Attacks, Imam Mohamed University was the leading religious training institution in Saudi Arabia and was used by Saudi Arabia to indoctrinate and spread Wahhabism and its concept of violent jihad against the West around the world. Ex. 149, Nakhleh Rpt. ¶¶ 62-66.

63.     Imam Mohamed University promoted anti-U.S. violent extremism prevalent among the Saudi government's religious elite and the course work at Imam Mohamed University taught that the use of violent jihad was necessary to win an ongoing war against non-believers

16

REDACTED FOR PUBLIC FILING

and to propagate Islam around the world.  Ex. 149, Nakhleh Rpt. ¶¶ 62-64; 72; 119; 132; 160; 162; 166; 212; 232.

64.     More than three dozen of the 107 signatories of the Memorandum of Advice were affiliated with Imam Mohamed University.  Ex. 149, Nakhleh Rpt. ¶¶ 67-69.

65.     Students at Imam Mohamed University, like Thumairy, were employees of the Saudi government.  On his February 1996 employment application for the Ministry of Islamic Affairs (submitted after he already had been chosen for the job), Thumairy confirmed that he "worked for the [Saudi] government" in an "official job" during his time at Imam Mohamed University and that he was paid a "monthly salary".  Ex. 270, KSA 2670.

66.     As detailed within, many of the key Saudi government officials involved in the Saudi extremist network inside the U.S. had a direct relationship with Imam Mohamed University, either because they were employed by Imam Mohamed University, and/or because they had attended Imam Mohamed University.

    a. Saleh Al Ash-Sheikh, MOIA Minister, Ex. 71, Al Ash-Sheikh Resume; Ex. 123, Ash-Sheikh Dep. 19:22-20:11; 20:18-21:18;

    b. Abdullah Al Turki, MOIA Minister and Rector of Imam Mohamed University, Ex. 97, Turki Dep. 23:20-25:4;

    c. Khalil Al Khalil, Ex. 113, Khalil Dep. 15:18-16:5;

    d. Majid Ghesheyan, employee, Ex. 236,  KSA 1305-6;

    e. Musaed Al Jarrah, , Ex. 236, KSA 1305-6; Ex. 118, Jarrah Dep. 59:9-61:8;

    f. Khalid Al Sowailem, Ex. 269, KSA 2649 (certificate of study);

    g. Saud Al Ghudaian, taught a course at the Imam Mohamed University, Ex. 126, Ghudaian Dep. 175:8-176:14;

    h. Fahad Al Thumairy, Ex. 270, KSA 2670;

REDACTED FOR PUBLIC FILING

    i. Omar Hamerman, Ex. 157, Hamerman LinkedIn at 4, identity confirmed by Bayoumi (see Ex. 120, Bayoumi Dep. 605:9-15); Ex. 2, ███████████████████████████████. *See also* Ex. 313, MPS 731_1-12 (Hamerman identity documents and other records, including medical certification "fit for employment," at 4, and Acknowledgment of Muslim Faith, at 12);

    j. Omar Abdi Mohamed, Ex. 561, FBI 009011 at 9016-7 (regarding certificates);

    k. Adel Al Sadhan, Ex. 149, Nakhleh Rpt. ¶ 74 n. 41;

    l. Mutaeb Al Sudairy, Ex. 149, Nakhleh Rpt. ¶ 74 n. 41;

    m. Majed Al Mersal, Ex. 115, Mersal Dep. 14:20-16:13;

    n. Abdullah Al Jaithen, Ex. 149, Nakhleh Rpt. ¶ 74 n. 41;

    o. Hamdan Al Shalawi, Ex. 2, EO 3585;

    p. Mohamed Al Qudhaieen, Ex. 2, EO 3585.

67.    Of the 15 9/11 hijackers who were from Saudi Arabia, three attended Imam Mohamed University:

    a. Saeed Al Ghamdi, Ex. 82, CIA 0242-304 at 290 (Ghamdi, hijacker on UAL flight 93, was educated at Imam Mohamed University);

    b. Abd Al-Aziz Al-Umari, *See* 9/11 Commission Report at p. 232; Ex. 82, CIA 0242-304 at 278 (Umari, hijacker on AA flight 11, "Graduated Imam Mohamed University"); and

    c. Muhammad Al Shehri, Ex. 82, CIA 0242-304 at 270 (Shehri, hijacker on UAL flight 175, "began his studies at [Imam Mohamed University's] branch in Abha and studied in Riyadh for a short time but returned to the university in Abha after failing his exams in Riyadh.").

**E.  During the decade prior to the 9/11 Attacks, Saudi Arabia exported Sunni extremism through MOIA, Al Haramain, and other means, and ignored specific U.S. pleas to stop supporting terror, thereby putting America at grave risk.**

68.    Plaintiffs' expert Steve Simon served as the Senior Director for Counterterrorism on the National Security Council between 1995 and October 1999 during the Clinton Administration.  As Senior Director, Simon received information on all relevant issues involving

████████████████████████████████████████

REDACTED FOR PUBLIC FILING

Saudi Arabia through diplomatic and intelligence channels and received detailed, intensive, and continuous information about Saudi Arabia's cooperation on counterterrorism efforts. Simon traveled on U.S. Government delegations to Saudi Arabia to discuss matters related to terrorism and counterterrorism and was present at meetings with representatives of the Saudi Royal Court. Simon was one of two officials in the U.S. Government policy apparatus whose full-time job was to prepare responses to the terrorism threat to the United States, including Al Qaeda, its affiliates, and its enablers. Simon took part in the approval and coordination process for counterterrorism operations from the Situation Room, briefed the President, Vice President, and National Security Advisor as required, and monitored telephone calls from the Oval Office when counterterrorism issues were on the agenda. Ex. 153, Simon Rpt. ¶¶ 2-6.

69. Throughout the 1990s Simon remained engaged in counterterrorism, threat assessment and relations with Saudi Arabia at a high level. Simon returned to government service as the National Security Council's Senior Director responsible for the Middle East and North Africa for the years 2011 and 2012, during the Obama Administration. Simon has 38 years' experience working on Middle Eastern security issues for the U.S. Government, U.S. Government contractors, academia, research organizations and the private sector. His experience includes being appointed as an associate of the National Intelligence Council; consulting foreign governments on counterterrorism; and co-authoring a classic book on the rise of Al Qaeda. Ex. 153, Simon Rpt. ¶¶ 7-9.

70. Saudi Arabia was not an "ally" of the United States, and the U.S. relationship with Saudi Arabia, while long-lasting, should be understood as transactional. The relationship is one of "mutual dependency" that includes episodes of extreme tension between the two nations. Prior to the 9/11 Attacks, the interests of the U.S. and Saudi Arabia materially diverged on

REDACTED FOR PUBLIC FILING

significant matters involving counterterrorism and the response to the threat posed by Al Qaeda. On matters of counterterrorism and Al Qaeda prior to the 9/11 Attacks, Saudi Arabia effectively disregarded U.S. interests to advance its own political goals.  Ex. 153, Simon Rpt. ¶¶ 13-14.

71.     While a member of the National Security Council during the 1990s Simon sat in on bilateral meetings with high-level officials of the Saudi Government, which were conducted both in person and over the telephone.  These meetings included several phone calls from the Oval Office, between President Clinton and Saudi King Fahd bin Abdulaziz Al Saud.  Ex. 153, Simon Rpt. ¶ 15.

72.     During high-level meetings between President Clinton and King Fahd bin Abdulaziz Al Saud, Simon witnessed the United States tell Saudi Arabia about the security risk entailed by Saudi Arabia's propagation of religious-ideological doctrine that provided justifications for jihad, and the mobilization of terrorist recruits pitted against American (and Israeli) interests.  The United States gave Saudi Arabia's leadership an explicit message: Saudi Arabia was empowering jihadists through its support and funding of groups such as Al Haramain and Hamas and through its Ministry of Islamic Affairs; and we, the U.S., need you, Saudi Arabia, to stop.  Ex. 153, Simon Rpt. ¶ 15.

73.     Despite this explicit warning, however, Saudi Arabia refused to change course and instead systematically evaded and denied the U.S. requests.  At a time when the United States demanded a Saudi bulwark against Osama bin Laden and the escalating menace of Al Qaeda, Saudi Arabia, in effect, "played handmaiden to the 9/11 attacks."  Ex. 153, Simon Rpt. ¶¶ 14.

74.     More than once during these high-level discussions in the second half of the 1990s, the U.S. laid down a "marker" for the record, to make it clear to Saudi Arabia that it was

REDACTED FOR PUBLIC FILING

playing with fire, and that its actions were dangerous and that more Americans would end up being the victims of terrorist attacks. Saudi Arabia was unresponsive to, and apparently unmoved by, these U.S. warnings. Saudi Arabia refused to act to assist the U.S. in countering the threat emanating from religiously motivated terrorism. Ex. 153, Simon Rpt. ¶ 16.

75. A stark example of this is that "[d]espite high-level intervention by the U.S. government in early 1997, the Saudis universally refused to allow U.S. personnel access to al Qaeda's senior financial figure, al-Ghazi Madani al Tayyib, who had turned himself in to Saudi authorities." Ex. 7, 9/11 Commission's Terrorist Financing Monograph, at 39.

76. Simon testified that following the August 1998 bombing of U.S. Embassies in Kenya and Tanzania, Vice President Gore urged the Saudis to put in place the kind of cooperation that had been lacking until then. Ex. 127, Simon Dep. 91:7-92:2.

77. Following the murder of 19 U.S. Air Force personnel and injuries to many others in the June 1996 bombing of the Khobar Towers housing complex inside Saudi Arabia, the Saudi Government obstructed and misled the U.S. authorities about the Khobar bombing to avoid being forced to confront Iran, which plotted the attack. Simon states that "the Saudi [government] strategy was to run out the clock" and that "in the hours and days and weeks immediately after the bombing" which killed and injured scores of U.S. military personnel that "the Saudis were quite concerned to impede a U.S. understanding of the actual attack, its mechanisms, and most importantly, its perpetrators." Ex. 127, Simon Dep. 93:17-97:10. According to Simon, this was a harbinger for Saudi Arabia's failure to act robustly in countering the direct and burgeoning threat posed to the United States by Bin Laden and Al Qaeda. Ex. 153, Simon Rpt. ¶ 19.

78. After the Khobar attacks, Osama bin Laden observed "[t]he Saudi people have remembered now what the ulema told them and they realise America is the main reason for their

REDACTED FOR PUBLIC FILING

problems" and "[n]ow the people understand the speeches of the ulemas in the mosques—that our country has become an American colony. They act decisively with every action to kick the Americans out of Saudi Arabia. What happened in Riyadh and Khobar [when 24 Americans were killed in two bombings] is clear evidence of the huge anger of Saudi people against America. The Saudis now know their real enemy is America." Ex 3, FBIS Compilation of Bin Laden Statements at 12 (PDF page 24).

79.     Nevertheless, Saudi Arabia specifically failed to cooperate with the United States on matters relating to Osama Bin Laden. The 2002 Joint Congressional Inquiry Report relied on the testimony of the former Chief of the CIA's "Alec Station" to conclude "it was clear from about 1996 that the Saudi Government would not cooperate with the United States on matters relating to Usama Bin Ladin." Ex. 84, Report of the US Senate Select Cttee on Intelligence and the US House Permanent Select Cttee on Intelligence (hereinafter "Congressional Joint Inquiry") Excerpt – "The 28 Pages" at 438. Specifically, the 2002 report states:

> In a June 1997 memo to the DCI, Alec Station reemphasized the lack of Saudi cooperation and stated that there was little prospect of future cooperation regarding Bin Ladin. The former Chief of Alec Station thought that the U.S. Government's hope of eventually obtaining Saudi cooperation was unrealistic because Saudi assistance to the U.S. Government on this matter was contrary to Saudi national interests.

*Id.* According to Simon, these statements are an accurate portrayal of Saudi Government policy in the 1990s, as they mirror his own experiences of dealing with Saudi Arabia at the National Security Council and reflect the prevailing U.S. perception of Saudi Arabia's values and interests in the run-up to the 9/11 Attacks. Ex. 153, Simon Rpt. ¶¶ 17-18.

80.     Saudi Arabia provided support for the Taliban in Afghanistan prior to the 9/11 Attacks. In late 1995, the son of Saudi King Fahd, Abdul Aziz bin Fahd, personally arranged for a $100 million payment to the Taliban, "which was supporting Osama bin Laden at the time and

REDACTED FOR PUBLIC FILING

prepared the way for Osama bin Laden to go to Afghanistan." Ex. 166, Robert Baer, Statement before the U.S. Commission on International Religious Freedom hearing, "Is Saudi Arabia a Strategic Threat: The Global Propagation of Intolerance," November 18, 2003, p. 10.

81. Contrary to its claim, KSA Aver. ¶ 71, Saudi Arabia did not terminate diplomatic relations with the Taliban until two weeks after the 9/11 Attacks. KSA Aver. ¶ 71. A September 1998 State Department Cable shows that Saudi-Taliban relations deteriorated after Taliban leader Mullah Omar told a Saudi delegation that "the Saudi Government was 'illegitimate' because it was allowing U.S. troops to remain in the country." Ex. 134, State Department Cable – Islamabad, September 28, 1998, at 3. While Saudi Arabia recalled its Charge D'Affairs in Kabul and asked the Taliban's main representative to leave Saudi Arabia, diplomatic relations were not severed. Ex. 134, State Department Cable – Islamabad, September 28, 1998, at 3. A December 1998 State Department Cable shows that Saudi Arabia continued to allow the Taliban to staff their embassy in Riyadh. Ex. 135, State Department Cable – Islamabad December 21, 1998 at 2. Contemporaneous documents show that the Taliban continued to staff an embassy and a consulate in KSA until at least 2001. Ex. 136, Islamic Emirate of Afghanistan Communications at 2, 6. A CNN press account confirmed that it was not until September 25, 2001 — two weeks after 9/11 (and three days after Bayoumi's arrest in the U.K.) — that Saudi Arabia terminated diplomatic relations with the Taliban government. Ex. 137, Saudis Break Diplomatic Ties with Afghanistan.

82. Plaintiffs' expert Steve Simon concluded that "[i]n the decade leading up to 9/11, Saudi Arabia exported propagators on overseas missions for its Ministry of Islamic Affairs, including in the United States. During that time, Saudi Arabia was made aware that it was stoking the fires of extremism through its support and funding of charities such as Al Haramain,

REDACTED FOR PUBLIC FILING

as well as its intensive and extensive propagation of its radical religious doctrine through its Ministry of Islamic Affairs, which justified the use of violence against impious Muslims and non-Muslims. Yet when the U.S. implored Saudi Arabia to desist from its actions fueling international terrorism, Saudi Arabia only poured more gasoline into the inferno." Ex. 153, Simon Rpt. ¶ 20.

83.     The CIA met with Saudi counterparts and warned Saudi Arabia of the risk of violence resulting from Saudi Arabia's policy to pursue promote violent jihad outside of Saudi Arabia. Nevertheless, the Saudis downplayed the link between the Kingdom's own *da'wa* activities and violent jihad. Ex. 149, Nakhleh Rpt. ¶¶ 97; 142.

84.     It was only after Saudi Arabia itself was attacked by Al Qaeda in May 2003 that the Saudi government policy changed. Ex. 2, EO 3416 (2004 FBI/CIA Joint Assessment states that Saudi "policy has changed" after the May 2003 bombings by Al Qaeda inside Saudi Arabia); Ex. 127, Simon Dep. 98:14-99:21 (expert Simon citing how Saudi Arabia only started to address the dangers from Al Haramain and other terror issues "[a]fter 9/11, when it was too late.").

85.     In an interview published in 2021, Saudi Arabia's current ruling Prince publicly admitted the fact that radical Sunni extremists working for Saudi Arabia played a major role in supporting extremist groups. Saudi Prince Mohamed bin Salman stated that:

> "I am having problems with the mosques in Saudi Arabia going on auto-pilot," he [Prince Mohamed bin Salman] said. "The country [Saudi Arabia] was hijacked years ago by a lot of extremist groups, and we are working hard to change that. We have a new minister of Islamic affairs. The man is fearless. He has already fired a thousand imams.

Ex. 133, Joel C. Rosenberg, Enemies and Allies 173 (Tyndale House 2021).

REDACTED FOR PUBLIC FILING

## II.      SAUDI ARABIA'S NETWORK OF SUNNI EXTREMISM INSIDE THE U.S.

### A. The Saudi Embassy was the nerve center for the Saudi government extremist network inside the U.S.

86.      The Saudi Embassy Islamic Affairs Deputy Musaed Al Jarrah admitted in July 2001 that "there are fifty propagators all over the United States under the supervision of the Embassy…." Ex. 293, KSA 7791.

87.      After the 9/11 Attacks, the July 2021 FBI EC confirmed that the FBI "obtained a list of 50 US based clerics who were supported" by the Saudi Embassy. Ex. 2, EO 3491.

88.      Saudi government propagators reported to two offices located at the Saudi Embassy: 1) the Da'wa Office of the Ministry of Islamic Affairs ("MOIA") and 2) the Islamic Affairs Office of the Ministry of Foreign Affairs ("MOFA"). Ex. 2, EO 3480 (the July 2021 FBI EC found that "there was located within the EKSA [Saudi Embassy] the offices of the Islamic Affairs Department and the [MOIA] office of Dawa (or Propagation).")

89.      The two offices occupied the entire second floor of the four floor Saudi Embassy in Washington, D.C. and shared office space, phone numbers, switchboard, and administrative support staff. Ex. 129, Afifi Dep. 15:1-3(MOIA and Islamic Affairs Department located on same floor and section at the Embassy), 53:2-55:4 (Embassy offices for MOIA and Islamic Affairs Department used same phone number); Ex. 41 at 5-6 (Jarrah Dep. Ex. 753) (listing MOIA and Islamic Affairs Department Embassy personnel as part of same department with same main phone numbers); Ex. 118, Jarrah Dep. 44:17-55:2.

90.      The Embassy phone directory listed a single main Embassy number for "Islamic Affairs," 202-342-3700, and calls to that main Islamic Affairs number could be transferred to either MOIA Embassy officials or to the officials of MOFA's Islamic Affairs Department. Ex. 129, Afifi Dep. 53:2-55:4; Ex. 354, KSA 8440 (MOIA stationary listing 3700 number as official

25

REDACTED FOR PUBLIC FILING

number in Embassy office); Ex. 118, Jarrah Dep. 135:2-137:21 (receptionist would transfer calls from 3700 main number); Ex. 118, Jarrah Dep. 141:4-143:17 (calls to Sowailem and Jarrah could both come in through main 3700 number); Ex. 41 (Jarrah Dep. Ex. 753) (Embassy phone directory).

### B. The MOIA Da'wah Office at the Embassy was responsible for MOIA propagators in the U.S. including Fahad Al Thumairy.

91.     MOIA's Da'wah Office at the Embassy was established after MOIA was created in 1993.  Ex. 113, Khalil Dep. 34:19-37:8.

92.     In 1995, Khaled Al-Sowailem, the General Director of MOIA's operation in Europe, the U.S., and Asia, was delegated to the newly established MOIA office at the Embassy in Washington D.C by MOIA Minister Abdullah Al-Turki.  Ex. 269, KSA 2649 (Sowailem's graduation from Imam Mohamed University High School); Ex. 264,  KSA 2405 (Sowailem's graduation from Imam Mohamed University); Ex. 265, KSA 2420 (Employment Notice); Ex. 268, KSA 2643 (promotion referral for General Director of the Department of Dawa Abroad); Ex. 63, KSA 2614 approval from MOIA Minister Al Turki); Ex. 267, KSA 2609 (showing that Sowailem was the MOIA's Director for Europe, America, and Australia, when he was sent to direct MOIA's U.S. operations).

93.     The importance that the MOIA attached to its U.S. office is demonstrated by the fact that the MOIA appointed Sowailem, who already held a position of higher standing, as its first Director.

94.     Sowailem was responsible for overseeing the day-to-day work of MOIA propagators, including Fahad al Thumairy in Los Angeles, and other Saudi government officials involved in Da'wah activities inside the U.S. Sowailem:

REDACTED FOR PUBLIC FILING

a. issued work rules, Ex. 382, DOJ 0010 (propagators in California directed to report to and cooperate with Thumairy); Ex. 132, DOJ 0001-32 at 011-0012 (propagators ordered to get written authorization "from the relevant authority" before leaving their post or taking a leave); Ex. 132, DOJ 0001-32 at 013-015 (propagators instructed not to solicit donations inside Saudi Arabia without express authorization);

b. provided work assignments and instructions, Ex. 132, DOJ 0001-32 at 021-023 (advisory concerning daily religious edicts issued by IIASA and available by telephone); ECF 4265, Ex. 32 at 16-17 (directing propagators to "strive to do the utmost" to convert "non-Muslims" inside the U.S., in particular "pilots");

c. requested and reviewed reports from the propagators, Ex. 301, KSA 8506 (Thumairy Oct 24, 1996 report); Ex. 132, DOJ 0001-32 at 018-020 (form filed by propagator with Embassy detailing his activities in San Diego);

d. prepared performance evaluations of the propagator's work, Ex. 297, KSA 8364 (Ghudaian 440), Ex. 206, KSA 2695-97;

e. interacted on a regular basis with propagators by phone, Ex. 12C ███████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████ Ex. 107, Thumairy Dep. 119:24-120:3 (the only individual at the Embassy Thumairy recalled having contact with was Sowailem).

f. made personal visits to propagators, including visits to Los Angeles and San Diego Ex. 95, Awad Dep. 22:3 – 29:8 (Deputy Consul General Awad testified that he met Sowailem on a work related matter in Los Angeles but refused to describe the substance of that work, citing diplomatic immunity); Ex. 139, *U.S. v. Omar Abdi Mohamed*, Memorandum of Points and Authorities at 95 (propagator Abdi Mohamed admits that Sowailem visited him in San Diego); Ex. 285, KSA 5248 (Sowailem travels to Orange County);

g. recommended job bonuses and promotions, bonuses for "good work", Ex. 132, DOJ 0001-32 at 016-017 (awarding propagators a bonus "in appreciation of your efforts and activities") Ex. 298, KSA8427, Ex. 299, KSA8495;

h. approved work travel, Ex. 2, EO 0688 (Letter signed by Sowailem, stating "no propagator should leave his post or takes leave without first obtaining written authorization" and warning that "[w]hoever violates this guideline will be subject to disciplinary action[.]")

REDACTED FOR PUBLIC FILING

i. helped plan Ramadan visits of propagators to the U.S. Ex. 416, KSA 7591 (Bayoumi letter to Minister thanking Sowailem for his "excellent cooperation and coordination");

j. oversaw the payments made to the MOIA propagators around the United States, which were sent out from the Embassy account. *E.g.,* Ex. 262, KSA 1576, 1602; Ex. 57, *U.S. v. Mohamed*, Case No. 03CR3433-JAH, Gov. Ex. 28 & 29 (Qattan Dep. Ex. 418) (U.S. Government exhibit summary of checks paid by Saudi Arabia to San Diego propagators Abdi Mohamed); Ex. 132, DOJ 0001-32; ECF 4265, Ex. 32 at 7-8.

95.     Prior to the 9/11 Attacks, MOIA propagators in the U.S. supervised by Sowailem were associated with and provided material support to a variety of Sunni extremists and Sunni extremist organizations inside the U.S., including Al Qaeda, Al-Ittihad Al-Islamia, and Al Gama'a. Ex. 2, EO 0563 (money sent to Thumairy went to AIAI); and Ex. 542, FBI 0███

██████████████████████████████

96.     The 2004 FBI/CIA Joint Assessment found that "a number" of MOIA propagators inside the U.S. "are either subjects of or are tied to counterterrorism investigations involving al-Qa'ida, Jama'at al-Tabigh (JT), or HAMAS."  Ex. 2, EO 3431.

97.     The 2004 FBI/CIA Joint Assessment states "[c]onverting professional Americans to Islam was urged as a priority in order to help make inroads into American society and gain influence."  This is because "[i]nformation on prominent American converts" was "most likely to help recruit individuals who might be helpful to Saudi interests."  Ex. 2, EO 3431; Ex. 132, DOJ 0001-32 at 018 (report of Abdi Mohamed recording the number of "people converted to Islam").

**C. The Islamic Affairs Department at the Embassy also supervised MOIA propagators, including Thumairy.**

98.     The Islamic Affairs Department at the Embassy was led by Dr. Majed Al Ghesheyan and his Deputy Musaed Al Jarrah.  Both Ghesheyan and Jarrah were Imam Mohamed University officials assigned to work at the Embassy.  Ex. 236, KSA 1305-6.

28

██████████████████████████████

99. Jarrah first started work at the Embassy in 1991. Ex. 118, Jarrah Dep. 72:9-13; Ex. 42, KSA 8594-8607 (Jarrah Dep. Ex. 782)(). The FBI concluded that Jarrah held a high-level position at the Embassy and was "closely associated with [Saudi Ambassador] Bandar bin Sultan." Ex. 2, EO 3496.

100. Jarrah's immediate predecessor at the Embassy was Khalil Al Khalil, who was an Imam Mohamed University official and the Chairman of the Ibn Taymiyah Foundation which operated the Ibn Taymiyah Mosque from 1987-1999 in Los Angeles and its nearby successor, the King Fahd Mosque, which opened in 1999 in Culver City, California. Ex. 49, KFM 381 (Ex. 195 showing Khalil as the Chairman of the Board of Trustees of the Ibn Taymiyah Foundation and agreeing to name change to King Fahd Mosque).

101. In 1995, Khalil left his work at the Embassy and was appointed by the Saudi government to serve as the "General Supervisor" for the construction of the new King Fahad Mosque. Ex. 192, KFM 0403 (Ex. 198, Khalil signed letter as "General Supervisor on the construction of the 'King Fahd Mosque' in Los Angeles"); Ex. 129, Afifi Dep. 35:17-24.

102. The FBI concluded that Jarrah was "a controlling, guiding and directing influence on all aspects of Sunni extremist activity in Southern California and had been directing, controlling and funding Muhanna and Thumairy since their arrival in the United States." Ex. 2, EO 0004. Jarrah had "numerous contacts with terrorism subjects throughout the U.S." Ex. 2, EO 3496.

103. The 2004 FBI/CIA Joint Assessment found that "Al-Jarrah's official position is listed in USDS [State Department] records as embassy accountant, but his responsibilities are to manage and control all assignments of Saudi Imams in the United States and facilitate the issuance of diplomatic visas for these individuals." Ex. 2, EO 3431.

REDACTED FOR PUBLIC FILING

104.    King Fahad Mosque Manager Usman Madha testified that Khalil and another Saudi government employee, MOIA propagator Tajuddin Shuaib, independently confirmed to him that Fahad Al Thumairy reported to Musaed Al Jarrah at the Saudi Embassy.  Ex. 72, Madha Decl. ¶ 12; Ex. 128, Madha Dep. 31:14-32:12.

105.    One of Jarrah's main tasks was the establishment and growth of Imam Mohamed University's U.S. branch in Fairfax, VA, the Institute for Islamic and Arabic Sciences in America (IIASA).  Ex. 2, EO 0422-23; Ex. 42, KSA 8594-8607 (Jarrah Dep. Ex. 782); Ex. 220, KSA 7741.

106.    The IIASA sent out daily religious edicts via a phone link to MOIA propagators.  Ex. 132, DOJ 0001-32 at 021-023.

107.    Khalil was replaced as Deputy of the Islamic Affairs Office at the Embassy by Musaed Al Jarrah.  Ex. 129, Afifi Dep. 35:17-36:1 (Jarrah joined Embassy after Khalil left).  Jarrah held a high-level position at the Embassy and was closely associated with Saudi Ambassador Bandar.  Ex. 5, Youssef Rpt. 31; Ex. 2, EO 3496.

**D.  Additional Saudi government agents worked inside the U.S. as part of the network and reported to the Embassy.**

108.    Saudi Arabia had numerous other officials inside the U.S. engaged in fueling and supporting religious extremism.  Ex. 13, Weidner Decl. ¶¶ 4, 6, 11-18.

109.    Dr. Soliman Al-Ali aka Sulaiman Al-Ali aka Soliman Ali Elay was President of International Islamic Relief Organization inside the U.S. and ran the Sanabel Al-Khair organization.  Al-Ali was an Embassy official who was assigned to work in San Diego with Bayoumi and reported directly to Prince Bandar.  Ex. 13, Weidner Decl. ¶ 15.

REDACTED FOR PUBLIC FILING

110.    Abdullah Al Noshan was employed through the Saudi Embassy at the IIASA in Virginia and handled Saudi government funding of religious officials working inside the U.S. Ex. 13, Weidner Decl. ¶¶ 14-15.

111.    Muhammad Al Qahtani was a Saudi government religious official who worked in San Diego and attended the welcome party for the 9/11 hijackers hosted by Omar Al Bayoumi on February 17, 2000.  Ex. 10K, MPS2023-059 Video Exhibit and MPS2023-059-TR Video Transcript at 14:27, 17:50.

### E.  Omar Al Bayoumi was an agent of the Saudi government who provided material support and assistance to the hijackers.

112.    A June 14, 2017 FBI report indicated that Bayoumi "was paid a monthly stipend as a cooptee of the Saudi General Intelligence Presidency (GIP) via then Ambassador Prince Bandar bin Sultan Alsaud."  The FBI report states that

> [t]he information Albayoumi obtained on persons of interest in the Saudi community in Los Angeles and San Diego and other issues, which met certain GIP intelligence requirements, would be forwarded to [Ambassador Prince] Bandar. Bandar would then inform the GIP of items of interest to the GIP for further investigation/vetting or follow up[.]

Ex. 2, EO 2638-39. A "cooptee" is a person who is not an official employee of a foreign government's intelligence service but who is given and agrees to carry out specific covert assignments to conduct intelligence for a foreign government inside the U.S. Ex. 344, U.S. Department of Defense publication "Hostile Intelligence Threat" DoD 5200.1-PH-2 (Nov. 1988) at 19.

### F.  Islamic Affairs section at the Saudi Consulate in Los Angeles.

113.    Within the Los Angeles Consulate there was a Ministry of Foreign Affairs, Islamic Affairs section that was managed in 2000 by Deputy Consul General Abdullah al Awad and staffed by one Consulate official, a Sunni extremist named Ismail Mana.  Ex. 95, Awad Dep.

REDACTED FOR PUBLIC FILING

75:12-77:16; Ex. 306, KSA 7119 (Ex. 605, fax sent by Mana from the Islamic Affairs section of the Consulate); Ex. 110A, Mana Dep. 51:15-55:16; 64:4-20; 138:17-141:24; Ex. 72, Madha Decl. ¶¶ 19-20 (Mana was a member of Thumairy's radical, anti-U.S. group).

### G. Saudi Arabia knowingly engaged in a long running illegal scheme to violate U.S. and international laws and diplomatic policy to establish its extremist network of MOIA officials inside the U.S.

114.    Prior to 9/11, Saudi Arabia knowingly engaged in a long-running scheme to violate international law and U.S. diplomatic accreditation policy to secure false diplomatic and consular level status to provide its MOIA officials with the cover they needed to reside and carry out their mission inside the U.S.  Plaintiffs submit that the United States Government would not have extended diplomatic privileges to MOIA officials to enter the U.S., let alone reside and work for Saudi Arabia, had their actual jobs and status been disclosed by Saudi Arabia.  These individuals include Sowailem himself and all the Saudi MOIA propagators given diplomatic status to enter and work inside the U.S.  Ex. 152, Dunham Rpt. 12; *See also* Ex. 317, Senate Hearing, Testimony of Simon Henderson, PEC-KSA001302-PEC-KSA001339 at PEC-KSA001314 ("The Saudi Foreign Ministry and its network of embassies provides a crucial structure for the propagation of Wahhabism and distributing state funds to support the growth of Wahhabism across the world.  Until 9/11 it was not widely realized that Saudi embassies had Islamic affairs departments charged with this role.  Saudi Arabia depicts this role of their embassies in innocent terms.  But here in Washington, funds from the ambassador's wife were reaching Saudi individuals in California linked to 9/11.  And several countries, including the US, have withdrawn diplomatic credentials from Saudis working in Islamic affairs departments because of links with terrorism.").

REDACTED FOR PUBLIC FILING

115.    In September 1995, when MOIA Minister al-Turki brought Khalid Al Sowailem to the U.S. to head MOIA's new Da'wah office in America, the Kingdom falsely described Sowailem to the U.S. as a diplomatic agent with the title of Attaché at its Embassy.  Ex. 2, EO 1438 (describing Sowailem as an "attaché"); Ex. 26, Letter dated August 24, 2021 from Acting Director, Office of Foreign Missions, US State Department to Megan W Benett, Esq.

116.    According to U.S. State Department records, Sowailem served in that capacity from September 14, 1995 until September 14, 2003.  Ex. 26, Letter dated August 24, 2021 from Acting Director, Office of Foreign Missions, US State Department to Megan W Benett, Esq.; U.S. State Department website, copies of the DIPLOMATIC LIST from 1997 – 2002.

117.    However, Sowailem's actual job titles with the Kingdom were "Manager of Da'wah Europe and U.S." and "Director of the Da'wah Office in America."  Ex. 59, KSA 1307-1309 (Sadhan Dep. Ex. 498).  In this capacity, Sowailem was not a diplomat but was, instead, responsible for promoting Saudi Arabia's religious agenda, overseeing MOIA's illegal network of propagators deployed throughout the U.S., and reporting back to his superiors in Riyadh.  Ex. 152, Dunham Rpt. 11; Ex. 266, KSA 2512; Ex. 297, KSA 8364; Ex. 206, KSA 2695-97; Ex. 286, KSA 5250; Ex. 287, KSA 6673; Ex 289, KSA 6995; Ex. 107, Thumairy Dep. 52:16-21 ("[H]e [Sowailem] was the...administrative personnel who is responsible for us."). Given this misrepresentation, Sowailem should not have been allowed to enter the U.S.

118.    A 1986 internal Saudi government "High Order" established rules for a secret Kingdom program to use false diplomatic titles and passports to open and staff new propagation offices inside foreign countries including the United States.  Among other things, the High Order stipulated that the managers of propagation offices "…shall be diplomats and shall be given

33

REDACTED FOR PUBLIC FILING

diplomatic passports, whereas the remaining Saudi employees and propagators shall be given special passports." (Emphasis added.). Ex. 61, KSA 8756-67 (Ex. 398A).

119. Plaintiffs' expert Lawrence Dunham determined that Saudi Arabia evaded U.S. diplomatic accreditation rules requiring that diplomatic privileges would be granted only to individuals who supported the work of the embassy or consulate, and not for other work or purposes unrelated to diplomatic functions. Ex. 152, Dunham Rpt. 2.

120. Dunham also concluded that, based on his experience, Saudi Arabia was instructed it could not accredit an embassy or consular officer or employee to work at a location other than at an embassy or consulate; perform duties outside the embassy or consulate unrelated to diplomatic work; work at a separate entity such as an international organization, mosque, school, charity, or similar establishment; or be a full-time student. Ex. 152, Dunham Rpt. 10.

121. Based on his examination of the evidence, Dunham deduced that Saudi Arabia falsely represented to the U.S. that its MOIA officials would work on diplomatic business at an Embassy or Consulate, and had those officials illegally conduct their non-diplomatic assignments for MOIA at various locations inside the U.S. Ex. 152, Dunham Rpt. 3, 15; Ex. 212, KSA 6679.

122. For example, Saudi Arabia registered MOIA propagators Mutaeb Al-Sudairy and Adel Al-Sadhan, as members of the Embassy's administrative and technical staff (entitled to the higher level of privileges and immunities conferred by the Vienna Convention on Diplomatic Relations), but Sowailem assigned the two propagators to work in Missouri and Oklahoma, hundreds of miles away from the Saudi Embassy in Washington, D.C. Ex. 152, Dunham Rpt. 12, 20-21; Ex. 2, EO 0599 (Al-Sudairy was living in Missouri with Al-Qaeda member Ziyad Khaleel).

34

REDACTED FOR PUBLIC FILING

123.    Saudi Arabia's intent to violate the rules is shown by a 2002 Saudi Royal Committee Report, which concluded that the Kingdom should expand on its sham diplomatic accreditation policy by obtaining even "better cover" and "legal official cover" for MOIA officials by giving them false titles at an embassy rather than a consulate:

> …the Committee finds it useless for consulates to provide the services currently provided to Muslims by the delegates of Ministry of Islamic Affairs for the Islamic work abroad… the consular immunities and privileges are limited unlike the diplomatic immunities and privileges afforded by the Vienna Convention of 1961 which provides a better cover to the Ministry of Islamic Affairs' employees.  It is also noted that the consular immunities have many drawbacks because they allow the local authorities to monitor and interfere and therefore do not provide the legal official cover that allows the Islamic work… Consequently, it is better to introduce the employees of Ministry of Islamic Affairs, Endowments, Da'wah and Guidance as attachés in the embassy's diplomatic corps…."

Ex. 61, KSA 8756-67 at 62.

124.    Thus, following the 9/11 Attacks, rather than reconsidering whether it was an appropriate policy to fraudulently provide diplomatic cover for its religious personnel, the Saudi government decided to continue and expand its policy.  Ex. 152, Dunham Rpt. 13

125.    Saudi Arabia further violated U.S. law by routinely hiring non-Saudi propagators to work for MOIA inside the U.S. without disclosing those propagators as Saudi government employees.  18 U.S.C. § 951 (anyone "other than a diplomatic or consular officer or attaché" who "acts in the United States as an agent of a foreign government" must provide "prior notification to the Attorney General."); Ex. 152, Dunham Rpt. 10.  These MOIA propagators included all the individuals who were assigned to work under Fahad al Thumairy in California, including Omar Abdi Mohamed and ███████████ in San Diego.  Ex. 152, Dunham Rpt. 17, n. 24; Ex. 2, EO 0690, 0692-0695; Ex. 415, KSA 8503 (Sowailem's letter nominating Thumairy to supervise California propagators).

REDACTED FOR PUBLIC FILING

126.    According to Plaintiffs' expert Lawrence Dunham, these additional MOIA propagators, placed under the supervision of at least one Saudi propagator (Thumairy) as well as Sowailem, compounded Saudi Arabia's abuse in using diplomatic cover for its MOIA officials by adding a group of additional, nondisclosed, and illegal Saudi government employees to carry out assignments for Sowailem, Thumairy, and likely other MOIA officials inside the U.S.  Ex. 152, Dunham Rpt. 17.

127.    Dunham further found, based on his experience, that it was illegal for Saudi Arabia to direct Sowailem and Thumairy to supervise a group of other Saudi Government officials working inside the U.S. or to pay a salary to MOIA propagators to work inside the U.S. for Saudi Arabia.  Ex. 152, Dunham Rpt. 17.

128.    In addition to MOIA, Saudi Arabia's Imam Mohamed University secured false diplomatic status for its officials working inside the U.S. to provide them with cover to reside and carry out their mission inside the U.S.  Ex. 2, EO 3534 ("The EKSA [Saudi Embassy] was known to finance the IIASA and its primary administrators and teachers were Saudi Arabian diplomats.").

129.    Musaed Al Jarrah, the Embassy's Islamic Affairs Deputy who was responsible to "manage and control all assignments of Saudi Imams in the United States" was listed by Saudi Arabia to the State Department as "embassy accountant."  Ex. 2, EO 3431.

130.    A letter written after the 9/11 Attacks in April 2002 by the Saudi Ambassador confirms that certain MOIA and other Saudi Government personnel in Washington, D.C. improperly worked as diplomats in locations that had not been registered with the Department of State.  Ex. 203, KSA 1219.  Plaintiffs' expert Dunham further concluded this demonstrates how

REDACTED FOR PUBLIC FILING

prior to the 9/11 Attacks Saudi Arabia abused the system to allow MOIA personnel and

representatives of other agencies to illegally work inside the U.S.  Ex. 152, Dunham Rpt. 18.

>   **H.  From at least 1992-1993, the Saudi government funded and ran the Ibn
>       Taymiyah Mosque on Venice Boulevard in Los Angeles and provided support
>       for two operational Sunni extremist cells in Southern California linked to the
>       "Blind Sheikh", Al Qaeda, and other terror groups.**

131.    In the early 1980's, Khalil al-Khalil worked for the Saudi government in Los

Angeles, California and was the first and only chairman of the Islamic Foundation of Sheikh Ibn

Taymiyah ("Ibn Taymiyah Foundation").  Ex. 113, Khalil Dep. 11:19-24, 18:3-14.

132.    That Mosque's board of directors and members comprised a group of individuals

who were Sunni extremists or at the very least sympathetic to their cause, including Khalil,

Turkish businessman Osman Kaldirim (who met Osama bin Laden in the 1980s, Ex. 121,

Kaldirim Dep. 207:21 – 208:1), several of the founders of the Holy Land Foundation (ultimately

designated a terrorist organization and shut down), and various individuals associated with the

Egyptian Muslim Brotherhood, including Mohamed al Morsi, who would later become Egypt's

President.  Ex. 121, Kaldirim Dep. 16:1-17 (the mosque was called the "Muslim Student House"

prior to being named the Ibn Taymiyah Mosque and eventually the King Fahd Mosque). *See also*

Ex. 113, Khalil Dep. 12:1-10; Ex. 327, Muslim Student House.

133.    Ibn Taymiyah Foundation's ideology sprang from the Muslim Brotherhood

movement in Egypt and its anti-U.S. writings, and particularly Sayyid Quib's book "Milestones."

Ex. 5, Youssef Rpt. 25.

134.    The Foundation was named after the medieval Islamic scholar Ibn Taymiyah, who

provides the basis for Wahhabi religious beliefs.  Ibn Taymiyah is known for his extensive

writings on the role of jihad in not only defending Muslim lands but of taking the fight to the

homelands of the aggressor.  Ex. 149, Nakhleh Rpt. ¶¶ 8, 10, 43-45, 60; Ex. 121, Kaldirim Dep.

REDACTED FOR PUBLIC FILING

19:14 – 20:7.  Osama Bin Laden cited Ibn Taymiyah for justification for terror attacks.  *See* 9/11 Commission Report at 362 ("Usama Bin Ladin and other Islamist terrorist leaders draw on a long tradition of extreme intolerance within one stream of Islam (a minority tradition), from at least Ibn Taimiyyah, through the founders of Wahhabism, through the Muslim Brotherhood, to Sayyid Qutb.").

135.    The Foundation opened the Ibn Taymiyah Mosque on Venice Boulevard in Los Angeles in 1987, the same year that Khalil started and was assigned by Saudi Arabia to work as the Embassy's Islamic Affairs Deputy.  Ex. 113, Khalil Dep. 12:11-13:11; Ex. 121, Kaldirim Dep. 21:8-22.

136.    The Ibn Taymiyah Mosque was funded and operated by Saudi Arabia.  Ex. 121, Kaldirim Dep. 47:22-52:8 (describing assignment of Muhammad al-Turki to coordinate the Ibn Taymiyah and controlling donations via the Embassy); Ex. 72, Madha Decl. 13. The FBI found that its founding board member and director/Iman Tajuddin Shuaib was one of the "U.S. Based Clerics Paid by Saudi Arabia."  Ex. 2, EO 3555-56.

137.    Saudi government official Ibrahim Al Hiber was the Imam of the Ibn Taymiyah Mosque and continued in that role until MOIA sent Fahad al Thumairy to replace Hiber.  Ex. 72, Madha Decl. ¶ 3.

138.    The Mosque's operations were overseen by two other Saudi government officials, Embassy Islamic Affairs Deputy Khalil and his protégé, Tajuddin Shuaib.  Ex. 72, Madha Decl. ¶¶ 4, 8, 12; Ex. 121, Kaldirim Dep. 86:12 – 19 (Tajuddin Shuaib was the founding board member and director/Imam appointed by the board of the foundation).

REDACTED FOR PUBLIC FILING

I. **The Los Angeles extremist cell led by followers of the Blind Sheikh had direct links to Al Qaeda.**

139.    In 1992-1993, the Ibn Taymiyah Mosque was identified by FBI investigators as a "radicalized" mosque and an operations hub for Sunni extremists.  According to Plaintiffs' expert Bassem Youssef, the former FBI Counterterrorism Communications Unit Chief, "a 'radicalized' Mosque is one where extremist activity takes place with the knowledge and approval of the mosque's Imam and leadership."  Ex. 5, Youssef Rpt. 19.

140.    The FBI determined that the Ibn Taymiyah Mosque was the operations hub for a terrorist network in Southern California led by the "Blind Sheik" Omar Abdel Rahaman.  The network had two operational extremist cells: one at the Ibn Taymiyah Mosque, and a second, satellite cell at the Islamic Center of San Diego.  The two California extremist cells were part of a larger Islamic extremist terrorist network in other cities of the U.S. and abroad.  The network was made up of various Sunni extremists, including members of Rahman's group, Al Gama'a Al Islamiyah ("Al Gama'a"), also known as "the Islamic Group."  Ex. 5, Youssef Rpt. 16, 19-21.

141.    Prior to the 9/11 Attacks, Al Gama'a was a close ally of Al Qaeda and the two groups worked in partnership with Al Qaeda on various terror operations.  As explained by Plaintiffs' expert Youssef,  Al Gama'a and Al Qaeda espoused the same extremist brand of Islamic religious fundamentalism which was aimed at the establishment of a caliphate imposing Islamic governance over the entire globe.  Ex. 5, Youssef Rpt. 16.  In October 1997, Al Gama'a was on the first list of foreign terrorist organizations designated by the U.S. Al Qaeda was added to that list in October 1999.  Ex. 19A (from website at: https://www.state.gov/foreign-terrorist-organizations).

142.    FBI investigators led by then Special Agent Youssef, who personally observed and investigated activities of Al Gama'a operatives who attended the Ibn Taymiyah Mosque,

REDACTED FOR PUBLIC FILING

"determined that members of Al Gama'a, including Sheikh Omar Abdel Rahman himself, held covert meetings at the Ibn Taymiyah Mosque, thus establishing it as a trusted operational hub for Sunni extremist activities and planning of future terrorist attacks." Ex. 5, Youssef Rpt. 19-20.

143.    Abdel Rahaman visited California several times during 1992-1993 and his main base of operations during his visits to California was at the Ibn Taymiyah Mosque. Such visits required significant advance preparation with Saudi government official Imam Hiber, as well as the other Saudi government leadership of the Mosque. During one visit in 1993, following the February 1993 World Trade Center bombing, Abdel Rahaman lectured at the Ibn Taymiyah Mosque to a selected group of his followers. On several occasions, Abdel Rahaman also led the public prayers at the Ibn Taymiyah Mosque, including the Friday prayer. Ex. 5, Youssef Rpt. 20-21.

144.    Plaintiffs' expert Youssef concluded that the operations of Al Gama'a and Abdel Rahaman at the Ibn Taymiyah Mosque had to be carried out with the express knowledge and approval of Imam Hiber, his Saudi Government superiors, and the leadership of the Mosque's Foundation. Abdel Rahaman's visit to California in April 1993, following the February 26, 1993 World Trade Center bombing, was widely reported by several news outlets, including CNN. Ex. 5, Youssef Rpt. 21.

145.    The intense level of support that was provided to Abdel Rahaman by Imam Hiber and the Mosque showed that they all shared the same extremist ideology. Based on his first-hand observations, Plaintiffs' expert Youssef agreed with a 2004 FBI Report determining that "Al Hiber supported the spread of radical fundamentalist Islam." Ex. 5, Youssef Rpt. 21; Ex. 2, EO 0659.

REDACTED FOR PUBLIC FILING

146.    Hiber worked for Saudi Arabia at all relevant times and became a MOIA propagator soon after MOIA was formed in 1993.  Ex. 244, KSA8509-10 at 8509 (Hiber identified by MOIA in March 1996 as propagator at Ibn Taymiyah Mosque); Ex. 296, KSA 8042-43 (explaining in March 1997 that Hiber was now working for MOIA in Riyadh and had been assigned to work as MOIA's Da'wah Director in Nairobi, Kenya); Ex. 5, Youssef Rpt. 1-2 and 21, n.12 (Hiber was the Imam of Ibn Taymiyah Mosque during Plaintiffs' expert Youssef's Al Gama'a Al Islamiyah investigation which began in 1992 and ended in 1996); Ex. 149, Nakhleh Rpt. ¶ 50 (MOIA formed in 1993).

147.    While working for Saudi Arabia in Los Angeles, Hiber was assigned "tasks" by Saudi Prince Abdulaziz, including funding various individuals and groups in California.  Ex. 296, KSA 8042-43.  Thumairy later provided funding to one of those same individuals who was "associated with members of the Somali-based terrorist organization, Al-Ittihad Al-Islamia (AIAI)", Ex. 2, EO 0563, a group with ties to Osama Bin Laden.  Ex. 542, FBI 007516-REV2021.

148.    According to Plaintiffs' expert Youssef, the Ibn Taymiyah Mosque arranged for Abdel Rahman to stay at the homes of persons associated with the Mosque during at least one of Abdel Rahaman's visit to Los Angeles.  Abdel Rahman was escorted around Southern California by ███████████████████████ Abdo Ghanem and Khaled Cherif.  Ex. 5, Youssef Rpt. 21; Ex. 165B, https://www.latimes.com/archives/la-xpm-2002-mar-17-me-mosque17-story.html. Over the ensuing years until the 9/11 Attacks, Ghanem and Cherif remained at the Ibn Taymiyah Mosque and its successor, the King Fahad Mosque, as members of that same extremist group, which in time became led by Fahad al Thumairy.  Ex. 72, Madha Decl. ¶ 19 (naming Ghanem and Cherif as part of Thumairy's group); Ex. 686, *U.S. v. Abdel*

REDACTED FOR PUBLIC FILING

*Rahman* Tr. at 9629-31; Ex. 566, FBI 011752-11767 at 11764 ("Ghanem was a driver for …Rahman during the Blind Sheikh's visit [sic] Los Angeles").

### J. Rahman and Bin Laden had a close relationship and worked together on terror plots.

149. Abdel Rahman was a prominent religious authority who was revered by Sunni extremists and notorious for the fatwa he issued to justify the 1981 assassination of Egyptian President Anwar Sadat that led to his imprisonment in Egypt. Ex. 5, Youssef Rpt. 17.

150. Saudi Arabia played a key role in allowing Rahman to continue to promote his violent brand of jihad: Rahman was hosted in Saudi Arabia following his exile from Egypt. Rahman then travelled to Afghanistan to take part in jihad along with Osama Bin Laden and Egyptian Ayman Al Zawahiri. Al Zawahri and Abdel Rahman had shared a prison cell in Egypt in the mid-eighties. Ex. 5, Youssef Rpt. 17; Ex. 75, State Dept Cable 88 Cairo 21161 (While in Saudi Arabia in 1988, Rahman spoke on clashes between Islamic extremist groups).

151. According to Plaintiffs' expert Youssef, "[a]lthough Abdel Rahman was the spiritual leader of Al Gama'a and Zawahiri the leader of the Egyptian Islamic Jihad, both men consolidated their 'armies' in support of the mission of Bin Laden's Al Qaeda in Afghanistan." Ex. 5, Youssef Rpt. 17.

152. Abdel Rahman and Bin Laden formed a close working relationship while leading mujahedin soldiers in Afghanistan in the 1980s, with Abdel Rahman serving as Bin Laden's trusted advisor and mentor. Their relationship was mutually beneficial as Abdel Rahaman's religious support conferred a legitimacy to Bin Laden and his cause, leading Bin Laden to provide funding for Abdel Rahman in the U.S. and for specific terror plots. Ex. 5, Youssef Rpt. 17. A State Department report addressed the close working relationship among various terror groups, including Al Gama'a, and how a "circle of mutual admiration nurtures the network of safe

42

REDACTED FOR PUBLIC FILING

havens, bases, and logistical support." Ex. 16, State Dept INR Weekend Edition August 21, 1993. The report states that Osama Bin Laden "maintains financial and ideological ties to Sheikh Abdel-Rahman" and "Bin Ladin has funneled money to Abdel-Rahman through Sudanese NIF [Sudanese National Islamic Front] sources." Ex. 16, State Dept INR Weekend Edition August 21, 1993

153. Through the 1990s, Abdel Rahman and Bin Laden remained in contact using intermediaries. Despite his arrest in 1993, Abdel Rahman continued to issue fatwas in support of jihad and correspond with Bin Laden and others by way of messages carried by his visitors in prison. Abdel Rahman's longstanding, close association with Ayman al Zawahiri, the leader or Egyptian Islamic Jihad was a significant factor in Zawahiri's decision to join Al Qaeda and Bin Laden and eventually become Bin Laden's successor as the leader of Al Qaeda. Ex. 5, Youssef Rpt. 17-18.

154. Al Gama'a members in California and elsewhere in the U.S. worked with members of other Sunni extremist groups to further their common jihadi goals. Ex. 5, Youssef Rpt. 22.

155. As an example, Al Qaeda and Al Gama'a plotters sought Abdel Rahman's approval for a failed terrorist plot targeting "landmarks" in New York City, Also, the Los Angeles Al Gama'a members proposed an attack on a site in the Los Angeles area and sought Abdel Rahman's approval and Bin Laden's funding. This too was a foiled plot. Ex. 5, Youssef Rpt. 22.

156. Al Gama'a and Al Qaeda members engaged in regular communication and coordination of their operational objectives. In 1993, Plaintiffs' expert Youssef successfully recruited a source close to Abdel Rahman. The source "was part of a communications chain that

REDACTED FOR PUBLIC FILING

linked Abdel Rahman and Bin Laden and revealed how Abdel Rahman and Bin Laden worked together," providing "specific details about a planned terror bombing of a Masonic Lodge in West Los Angeles and disclosed how Abdel Rahman approved the attack and instructed his operatives to contact Bin Laden to obtain funding for the terror attack." Ex. 5, Youssef Rpt. 22. The source helped establish that Abdel Rahman and Bin Laden's partnership sought to use violence to achieve their common cause of establishing an Islamic caliphate. Ex. 5, Youssef Rpt. 22.

157. In June 1993, U.S. authorities arrested Abdel Rahman, and in 1995, he was convicted in the Southern District of New York for, "leading a conspiracy to wage a war of urban terrorism against the U.S." Ex. 5, Youssef Rpt. 18. The conviction determined Abdel Rahman engaged in a terrorist conspiracy and was responsible for the February 26, 1993 bombing of the World Trade Center that killed six people and injured hundreds. He was also found guilty of leading the 1993 "landmarks plot" against various New York City targets, including the Lincoln and Holland Tunnels, and George Washington Bridge, which if successful, would have caused indescribable deaths and destruction. Ex. 5, Youssef Rpt. 18; Ex. 343, Indictment, *U.S. v. Omar Ahmad Ali Abdel Rahman*, S5 93 Cr. 181 (MBM) (S.D.N.Y. 1994); Ex. 688, *U.S. v. Omar Ahmad Ali Abdel Rahman*, S5 93 Cr. 181 (MBM) (S.D.N.Y. 1994), Tr. 20659:2 – 20664:17.

158. The Second Circuit affirmed the conviction of Abdel Rahman based on evidence that, *inter alia*, in January 1993 Rahman publicly announced his support of "violent jihad"; that Rahman sponsored the February 1993 bombing of the World Trade Center; and that Rahman led a group of co-conspirators planning a "Spring 1993 bombing campaign" throughout New York City. Ex. 338, *United States v. Rahman*, 189 F.3d 88, 107, 124, 140 (2d Cir. 1999).

159. Based on Plaintiffs' expert Youssef's experience, he concluded that:

REDACTED FOR PUBLIC FILING

Bin Laden and his army of mujahedin fighters which came to be known as "Al Qaeda" played a

supporting role for these 1993 terror plots against New York City targets and were closely linked

not only to Abdel Rahman but to the terrorists who carried out the attacks.  Ramzi Yousef, the

"mastermind" of the 1993 World Trade Center bombing — a terrorist operation that was carried

out by Al Gama'a operatives with the approval of Abdel Rahman — was the nephew of Khalid

Sheikh Mohamed, who helped Al Qaeda organize the 9/11 Attacks that targeted the same

buildings for destruction.  Ex. 5, Youssef Rpt. 18; Ex. 343, *U.S. v. Omar Ahmad Ali Abdel

Rahman,* S5 93 Cr. 181 (MBM) (S.D.N.Y. 1994), Indictment.

160.    The 9/11 Commission states that "Yousef's instant notoriety as the mastermind of

the 1993 World Trade Center bombing inspired [Khalid Sheikh Mohamed] to become involved

in planning attacks against the United States." *See* 9/11 Commission Report at 147.

161.    In separate interrogations, Ramzi Yousef and Khalid Sheikh Mohamed

independently revealed their close and direct communications involving various terrorist plots,

which included the 1994-95 "Bojinka" plot to bomb multiple aircraft flying from Asia to the U.S,

a plan to crash a plane into CIA headquarters, and a plot to assassinate Pope John Paul II.  Ex. 5,

Youssef Rpt. 18, n. 11.

162.    According to Plaintiffs' expert Youssef:

> The ties between Bin Laden and Abdel Rahman are also reflected in Bin
> Laden's actions after Abdel Rahman's arrest and imprisonment in the
> United States.  On May 26, 1998, Bin Laden and Zawahiri held a press
> conference to announce that they were joining forces with Islamic groups
> to form the "International Islamic Front" that would "do jihad against the
> Crusaders and Jews." Zawahiri introduced Abdel Rahman's two sons, who
> distributed a card entitled "The Fatwa" of the imprisoned Abdel Rahman,
> which urged the indiscriminate killing of Americans.  Ex. 5, Youssef Rpt.
> 23-24.

REDACTED FOR PUBLIC FILING

163.    The fatwa stated "[c]ut off all relations with [the Americans, Christians, and Jews], tear them to pieces, destroy their economies, burn their corporations, destroy their peace, sink their ships, shoot down their planes and kill them on air, sea, and land."  Ex. 5, Youssef Rpt. 24, n. 18; Ex. 322, Peter L. Bergen, The Osama Bin Laden I Know: An Oral History of al Qaeda's Leader (Free Press 2006), 204-05.

164.    On May 28, 1998, Bin Laden told journalists that he held the American government, "responsible for its attack on that symbol of Islam, Sheikh Omar Abdel Rahman, one of the most prominent Islamic scholars whom God gave the courage to speak the truth….The imprisonment of Sheikh Omar is an attack on the Muslim religion and on Muslim countries.  We hold the United States completely responsible for his imprisonment and the imprisonment of other Muslims in America."  Ex. 5, Youssef Rpt. 24; Ex. 18B (from website at: https://www.meforum.org/435/usama-bin-ladin-american-soldiers-are-paper-tigers)

165.    The December 4, 1998 Presidential Daily Briefing to then President Clinton cited intelligence reporting that "Bin Laden and his allies are preparing for attacks in the US, including an aircraft hijacking to obtain the release of [Abdel Rahman]. …"  *See* 9/11 Commission Report at 128-29.

166.    The weaponization of aircraft was not a new terror tactic in 2001.  The homicidal use of aircraft was both "imaginable, and imagined." *See* 9/11 Commission Report at 345;  Ex. 4, 9/11 Families United to Bankrupt Terrorism Foreseeability Timeline – Foreseeability of the September 11, 2001 Attacks on the U.S. Homeland.

**K.  The second Sunni extremist cell at the Islamic Center of San Diego.**

167.    According to Plaintiffs' expert Youssef, in 1993, the FBI investigation "identified a second, related extremist cell for Al Gama'a and Al Qaeda in San Diego operating at the

46

REDACTED FOR PUBLIC FILING

Islamic Center of San Diego (ICSD), also known as the Abu Bakr Mosque," with "two principal active members of that cell at the ICSD: (1) Mohamed Zaky, a leader of that cell, and (2) ███████ ██████████████████████████" Ex. 5, Youssef Rpt. 21.

168.    The FBI investigation learned that the ICSD also received support from Saudi Arabia.  In fact, during the 1990s, the ICSD's former Imam and influential leader, ████████ ████████ was a MOIA employee paid through the Saudi Embassy, eventually reporting to Thumairy.  Ex. 5, Youssef Rpt. 88.

169.    According to Plaintiffs' expert Youssef, the FBI became aware that, during one of Abdel Rahman's visits to California, members of the Sunni extremist cell at the ICSD attended a meeting with the "Blink Shiekh" at the Los Angeles Ibn Taymiyah Mosque.  Ex. 5, Youssef Rpt. 21.

170.    As Plaintiffs' expert Youssef explained, the FBI investigation "revealed that Sunni extremist cells in Los Angeles and San Diego brought together individuals from various groups and nationalities who pledged allegiance to the same goal of an Islamic caliphate and worked together as an Islamic fundamentalist army targeting the U.S. as their primary enemy."  Ex. 5, Youssef Rpt. 22.

171.    Furthermore, according to Plaintiffs' expert Youssef:

> The common cause of the various Sunni extremist groups is evidenced by the fact that members of those groups fought side-by-side in Bosnia in the mid-nineties, believing that they were joining together to participate in Jihad in the name of Islam.  In 1993 and 1994, Sherif Kamel Eid, a prominent member of the Al Gama'a cell at the Ibn Taymiyah Mosque, and Mohamed Zaky, a leader of a radical Sunni extremist cell at the ICSD, traveled from California to Bosnia along with other California-based Sunni extremists to be part of the same Islamic fundamentalist army as Al Qaeda members Nawaf al Hazmi and Khalid al Mihdhar, who also fought in Bosnia in 1995.  Eid and Zaky were both killed while fighting. Zaky's death occurred in 1995 in Chechnya.

47

REDACTED FOR PUBLIC FILING

Ex. 5, Youssef Rpt. 22-23; Ex. 21, *U.S. v Jayyousi*, 04cr3565 (S.D. Fla. Dec. 1, 2004), Complaint at ¶ 8 ("Zaky participated in fighting with Bosnian Muslims on two occasions between 1993 and 1994. He specialized in making videotapes of the fighting which he then used as part of his fundraising activities in the United States to support violent jihad. In May 1995, Zaky was killed while fighting against the Russians in Chechnya.").

172.    After Zaky's death, Omar (aka "Forge") Hamerman took over a leadership role in the Sunni extremist cell in San Diego, managing Zaky's organization in San Diego called the Islamic Information Center of the Americas. Ex. 5, Youssef Rpt. 23; Ex. 69, Articles of Incorporation, Islamic Information Center of the Americas (May 4, 1993) (California Secretary of State entity information for the Islamic Information Center of the Americas, which lists Hamerman as the agent).

173.    Shortly before his death, Zaky confided to his close associate that he used the Islamic Information Center of the Americas as a cover for funding jihadist activity. Ex. 5, Youssef Rpt. 23; Ex. 691, *US v Jayyousi*, 04 Cr 3565 (S.D.Fla. Dec. 1, 2004) Complaint, Kavanaugh Affidavit at ¶ 17.

174.    At a February 1995 meeting of the San Diego cell, during a discussion about which jihadist groups to financially support, one of the participants stated, "as long as there is slaughtering, we're with them. If there's no slaughtering, there's none ... that's it, buzz off." They also talked about their plans to publish a booklet titled "Terrorism Is A Duty and Force Is An Obligation" and have it distributed world-wide. Ex. 691, *US v Jayyousi*, 04 Cr 3565 (S.D.Fla. Dec. 1, 2004) Complaint, Kavanaugh Affidavit at ¶ 10, 16.

REDACTED FOR PUBLIC FILING

III.     **SAUDI ARABIA BUILT THE KING FAHAD MOSQUE IN LOS ANGELES, TOOK STEPS TO ENSURE THAT IT WOULD BE CONTROLLED BY THE KINGDOM'S RELIGIOUS LEADERSHIP, PAID ITS EXPENSES, AND INSTALLED THUMAIRY AS ITS IMAM**

175.     In September 1993, shortly after Abdel Rahman's last visit to California, Prince Abdelaziz, the son of then Saudi King Fahad, visited the Ibn Taymiyah Mosque in Los Angeles with his entourage and met with Dr. Khalil al Khalil, who at the time was the Saudi Embassy's Islamic Affairs Deputy. Ex. 187, KFM 0091-92. The Prince pledged to obtain funds to purchase land for a new mosque in honor of his father. This began the project that led to the building of the King Fahad Mosque. Shortly thereafter, the Saudi Embassy provided $1 million to the Ibn Taymiyah Foundation to purchase land. Ex. 188, KFM 0376-78; Ex. 191, KFM 0400; Ex. 121, Kaldirim Dep. 34-40.

**A.  Saudi Arabia successfully negotiated for total control of the Mosque, including 9 of 12 Board members and the appointment of the Imam.**

176.     In June and July 1995, the Ibn Taymiyah Foundation was informed that the first $4 million in funding for construction of the new mosque was in a Saudi Embassy bank account and that Dr. Mohamed Abdel-Mohsen Al-Turki, an Imam Mohamed University professor and the brother of MOIA's Minister Abdullah Al-Turki, had been appointed by Saudi Arabia as its coordinator for the new mosque project. Ex. 189, KFM 0379-82; Ex. 190, KFM 0391.

177.     Mohamed al-Turki held up the funding for the mosque until he could negotiate terms with the Ibn Taymiyah Foundation over the religious control of the mosque. Ex. 121, Kaldirim Dep. 41:22-42:20. Al-Turki's role was to make sure that the new mosque "does not go off of Islamic movements or Islamic preachings and things like that." Ex. 121, Kaldirim Dep. 44:10-45:2.

REDACTED FOR PUBLIC FILING

178.     In July 1995, Khalil wrote two letters to Saudi Prince Abdulaziz to assure him that the Ibn Taymiyah Foundation was an arm of Saudi Arabia and that the Ministry of Islamic Affairs would appoint a Saudi imam to manage and supervise the Foundation's Mosque.  In the first letter, which Khalil signed as "your loyal son," Khalil stated that Ibn Taymiyah Foundation was "the extension of the activities of the Kingdom and it is part of its organizations."  Ex. 193, KFM 0420-21.

179.     In his second letter to the Saudi Prince, Khalil described the Ibn Taymiyah Foundation as "Saudi since birth" and offered "visions" to restructure the board of the Ibn Taymiyah Foundation and the new King Fahad Mosque "because the important thing is to choose what serves the interest of the Da'wah and the interest of the country, and what has the approval of Your Highness and the acceptance and support of His Highness Prince Bandar bin Sultan [then Saudi Ambassador Bandar]."  Ex. 189, KFM 0379-82 at 380-81.

180.     Khalil also spelled out that Saudi Arabia "may choose, in cooperation with His Excellency Minister of Islamic Affairs or any other agency, those who can manage it and supervise its activities from among the Saudi propagators…."  This confirmed that MOIA would appoint the propagator to manage and supervise the new mosque.  Ex. 189, KFM 0379-82 at 380-81

181.     The final negotiations took place in a meeting in Riyadh attended by Mohamed al Turki, Khalil, and Prince Abdelaziz's lawyer and religious advisor Saad al Buraik, who was an outspoken anti-U.S. critic and proponent of violent jihad.  Buraik came to Los Angeles to visit the Ibn Taymiyah Mosque and the King Fahad Mosque and met with Consulate officials.  Ex. 113,  Khalil Dep. 179:13-180:17; Ex. 85, Congressional Record May 7, 2002, National Review; Ex. 95, Awad Dep. 168:11-170:13.

REDACTED FOR PUBLIC FILING

182.    An agreement was reached in which seven additional Saudi government officials were added to the Ibn Taymiyah Foundation Board.  Six of the new board members represented Saudi Arabia's religious leadership, from its Ministry of Islamic Affairs at the Embassy and Riyadh headquarters; the Islamic Affairs Department of the Embassy; and Imam Mohamed University.  The seventh board member was the Consul General in Los Angeles.  As a result, the Board now had a total of 12 members, 9 of whom were Saudi government officials.  Ex. 113, Khalil Dep. 180:18-182:21; Ex. 179, Certificate of Amendment of Articles of Incorporation of Islamic Foundation of Sheikh Ibn Taimiyyah (Kaldirim Dep. Ex. 179).

183.    After the agreement was reached in December 1995 the initial construction funds of $4 million were disbursed to the Ibn Taymiyah Foundation by Saudi Ambassador Prince Bandar.  Ex. 191, KFM 0400.

184.    The seven new board members were made effective in a Certificate of Amendment of the Articles of Incorporation of the Ibn Taymiyah Foundation which was filed with the California Secretary of State on January 6, 1997.  (Ex. 179, Kaldirim Dep. Ex. 179, Certificate of Amendment of Articles of Incorporation of Islamic Foundation of Sheikh Ibn Taimmiyyah).

185.    The King Fahad Mosque had its "Grand Opening" in July 1998, but was not yet completed at that time.  The King Fahad Mosque did not open for services until the fall of 1999.  Ex. 72, Madha Decl. ¶¶ 6, 8.

186.    An Ibn Taymiyah Foundation board resolution purportedly dated August 17, 2001 sought to remove all of the seven Saudi Government officials added in 1997 from the Ibn Taymiyah Foundation Board.  Ex. 186, KFM 0082.

REDACTED FOR PUBLIC FILING

187.    The Mosque's manager Usman Madha, however, testified that it was not until after the 9/11 Attacks that the Foundation acted to change its filings to remove all Saudi Government officials from the Board.  Ex. 72, Madha Decl. ¶ 30.

188.    The Ibn Taymiyah Foundation did not file an amendment with the California Secretary of State to remove the officials until over a year later, on September 17, 2002.  Ex. 178 (Kaldirim Dep. Ex. 186) (Certificate of Amendment of Articles of Incorporation of Islamic Foundation of Sheikh Ibn Tammiyyah).

189.    The circumstances demonstrate that it is likely that the Ibn Taymiyah Foundation Board resolution removing all Saudi officials' involving in the Mosque was initially prepared after the 9/11 Attacks and backdated to August 17, 2001 as an effort by the Saudi government to avoid responsibility for the Mosque's involvement in the 9/11 Attacks.  Ex. 5, Youssef Rpt. 29, n. 48.

### B.  Saudi Arabia paid the expenses for the construction and day-to-day operation of the Mosque.

190.    Saudi Arabia established accounts at the Saudi Embassy and Saudi Consulate to pay the mosque's expenses.  Ex. 72, Madha Decl. ¶13.

191.    The Kingdom provided all the funding for the construction of the King Fahad Mosque as well as the purchase of a building across the street for the Mosque's offices.  Ex. 72, Madha Decl. ¶ 13; Ex. 194, KFM 0401-2; Ex. 192, KFM 0403; Ex. 258, KSA 1258 ($2 million Embassy check sent to Khalil for the Mosque's inauguration).

192.    In July 1998, Prince Abdulaziz pledged that Saudi Arabia would pay the operating expenses for the mosque, which were estimated at $500-600,000 annually.  Ex. 121, Kaldirim Dep. 111:3- 112:18, 119:21-120:2.  Prior to the 9/11 Attacks, the Saudi Embassy opened an account with $1 million under the name of the Mosque and transferred that account to

52

REDACTED FOR PUBLIC FILING

the Consul General's office in Los Angeles. Ex. 72, Madha Decl. ¶ 13. A Board member also recalls that $500,000-$600,000 was received by the Consulate in 2000-2001 that was used to pay for the Mosque's expenses. Ex. 121, Kaldirim Dep. 110:3-113:8; Ex. 72, Madha Decl. ¶ 13.

193. The Saudi Consul General Salloum instructed the Consulate's Islamic Affairs Secretary Ismail Mana to oversee the dispersal of funds from this account to the Mosque. Ex. 72, Madha Decl. ¶ 13; Ex. 121, Kaldirim Dep. 121:14-122:20, 125:2-20; Ex. 110A, Mana Dep. 110:12-111:6, 113:9-114:8, 254:6-255:15.

194. Prior to the 9/11 Attacks, King Fahad Mosque expenses were routinely paid by Saudi Arabia through the Consulate. A Letter of Agreement dated December 8, 2000 and signed by the Saudi Consul General Salloum, Ibn Taymiyah Foundation Board member Kaldirim, and Thumairy (referenced as "Sheikh Fahad Althumairy"), shows that they met at the Saudi Consulate with a construction company and that the Consulate paid approximately $650,000 in additional construction costs for the Mosque, Ex. 34, KSA 7319-7320 at 7320 (Awad Dep. Ex. 466), and a separate letter shows that the funds were received by the Consulate from MOIA's Minister Sheikh, *Id.* at 7319. *See also* Ex. 680L, KSA 7304 (February 2001 bank check for KFM taxes of $7,051.09 paid by funds from the Minister of Islamic Affairs together with a contribution from the Consul General); Ex. 680M, KSA 7325 (February 2001 letter from Embassy Islamic Affairs Head Ghesheyan to Consul General Salloum with $30,000 check for payment of Mosque salaries).

**C. Thumairy was handpicked by MOIA's highest leaders to expand MOIA's operations in California, including the Sunni extremist cell in Los Angeles, and to take the helm of the new Mosque named after the Saudi King.**

195. The selection of Thumairy for a five-year post to lead MOIA's expansion into California and become the first religious leader of the planned King Fahad Mosque in Los

REDACTED FOR PUBLIC FILING

Angeles was an extraordinary, highly prized Saudi government appointment. Ex. 2, EO 3487 (MOIA offices "worldwide and in the U.S. played a key role in supporting the Saudi Arabian Government's objective to be perceived as the leader of the Islamic world"). Saudi Arabia and its Ministry of Islamic Affairs was particularly focused on the importance of its religious propagation efforts in California and wanted to increase its religious influence there. Ex. 256, KSA 1234 (Khalid al-Sowailem, Director of the Da'wah Office in America, wrote to Saudi Ambassador Prince Bandar regarding Thumairy's appointment pursuant to Bandar's directives and instructions about the importance of having qualified propagators in the US. Sowailem stated that Thumairy had been appointed to work in Los Angeles due to the "importance of this territory and the lack of official Saudi Islamic propagators in it.").

196.     Khalil stated that "[t]he King Fahd Mosque is very well known in Saudi Arabia" and that the "inauguration of the mosque was publicized on TV, and was attended by Crown Prince Abdullah." Ex. 90, Snell Decl., Ex. 5 at 8.

197.     Thumairy was granted Saudi Embassy and Consulate diplomatic titles that could only be issued pursuant to directions from high-level Saudi officials in the Ministry of Islamic Affairs and the Ministry of Foreign Affairs. Ex. 256, KSA 1234. (Sowailem wrote to Saudi Ambassador Prince Bandar requesting Bandar order a Saudi officer to register Thumairy as a member of the Saudi Consulate in Los Angeles to "give him diplomatic immunity and formalize his presence).

198.     Minister Turki testified that he did not think Thumairy would get diplomatic credentials because he was not a politician and that only a VIP with seniority would get diplomatic credentials. Nonetheless, Turki admitted that he could request that MOFA grant diplomatic credentials to a MOIA employee and that his life in the U.S. would be much easier as

REDACTED FOR PUBLIC FILING

a bearer of a diplomatic passport.  Ex. 97, Turki Dep. 86:6-18; 371:4-20; 375:21-376:16; 379:18-380:5; 383:11-23; 384:1-385:21; 386:24-387:24.

199.    Thumairy would never have been hired by the MOIA for this high-profile position in Los Angeles without the approval and support of the MOIA's Minister Abdullah al Turki.

200.    Saudi Government officials adhered to a strict hierarchical and patriarchal structure over its government officials with tight management controls that demanded strict loyalty.  The recommendation of a trusted government official is practically mandatory for any position of importance and/or responsibility in the Saudi government.  Ex. 64, KSA 2686-89 (Letter from Turki's MOIA Assistant Undersecretary, Ali Bin Fahad Al Ghaith, indicating Thumairy's appointment) (Turki Dep. Ex. 38); Ex. 97, Turki Dep. 123:18-124:20.

201.    Thumairy made false statements to hide his relationship with Minister Al Turki.  Despite eyewitness testimony which showed that the two men had a close relationship, Thumairy testified that he never had a conversation with Al Turki; that he had not met or spoken to Al Turki before and didn't remember seeing Turki in California; and knew of Turki only "from the media."  Ex. 72, Madha Decl. ¶ 6; Ex. 107, Thumairy Dep. 28:14-17, 30:12-31:7.  Thumairy testified that he could not even recall whether Al Turki was MOIA's Minister when he was first hired, even though he applied and obtained his MOIA job through Minister Al Turki.  Ex. 107, Thumairy Dep. 28:4-13) ("I don't remember whether he was the minister at the time I applied…").

202.    Similarly, Turki claimed he did not even know Thumairy or where Thumairy was stationed in the U.S., Ex. 97, Turki Dep. 124:21-125:1; 144:19-145:8; 157:20-23, even though Thumairy had a high-profile position in California, Turki visited Thumairy in California, and

REDACTED FOR PUBLIC FILING

Turki knew Thumairy on a first name basis. Ex. 72, Madha Decl. ¶ 6; Ex. 563, FBI 009071-REV2021 at 9072.

203.    Thumairy repeatedly gave other incredible, false testimony to protect Turki and other MOIA superiors.  As set forth in the next section, this included his claims that he decided to go to Los Angeles and run the Ibn Taymiyah Mosque on his own — when Thumairy knew that he was chosen and assigned to go to that Mosque by MOIA's leadership.  Thumairy had no prior experience, work skills, or knowledge of English.  The circumstances show that MOIA's highest officials selected Thumairy for the MOIA job in Los Angeles because of his skills in interacting with and providing leadership to Arabic-speaking men and his deep-rooted Wahhabi radical beliefs. Ex. 5, Youssef Rpt. 41.

**D.  Thumairy at Imam Mohamed University**

204.    In 1992, Thumairy received his Bachelors' Degree from Imam Mohamed University.  In May 1995, Thumairy received his Masters' Degree in Sharia (Islamic Law) from Imam Mohamed University's Judiciary Higher Institute.  Ex. 680D, KSA 6927; Ex. 680H, KSA 6929; Ex. 107, Thumairy Dep. 24:17-25:5; Ex. 270, KSA 2670; Ex. 275, KSA 2829.

205.    Imam Mohamed University was operated by Saudi Arabia under the Saudi Ministry of Higher Education.  Ex. 294, KSA 7795.

206.    Students at Imam Mohamed University were deemed employees of Saudi Arabia. On his February 1996 employment application for the Ministry of Islamic Affairs (submitted after he already had been chosen for the job), Thumairy confirmed that he "worked for the [Saudi] government" in an "official job" during his time at Imam Mohamed University and that he was paid a "monthly salary."  Ex. 270, KSA 2670.

REDACTED FOR PUBLIC FILING

207.    During his time at Imam Mohamed University, Thumairy went on two trips, a trip to Islamabad, Pakistan in 1990 and a five-week trip to Los Angeles, California during Ramadan in February-March 1994, the year before Thumairy received his Masters' degree and was nominated to become a MOIA Propagator in the U.S. to work in Los Angeles.  Ex. 107, Thumairy Dep. 68:7-70:15, 74:9-75:23. Thumairy admitted that the trip to Pakistan was part of his schooling but claimed that his five-week trip to Los Angeles during the school year was a personal trip.  Thumairy denied going to Ibn Taymiyah Mosque on that trip and could not remember whether he went to *any* mosque during the trip.  Ex. 107, Thumairy Dep. 56:5-14.

208.    Thumairy's studies at Imam Mohamed University for both his degrees were in Islamic Studies, Islamic Jurisprudence and Hadiths, and his Masters' dissertation was on the topic of what was permissible in Islam.  Thumairy testified that his studies at Imam Mohamed University lasted six-and-a-half years or maybe a little bit longer.  Ex. 107, Thumairy Dep. 473:8-474:18, 483:19-485:8.

209.    Both the undergraduate and graduate curriculum in the 1990s that Thumairy studied at Imam Mohamed University included such topics as what is permissible in jihad, Dar al Harb (realm of war) and Dar al Islam (realm of peace), and the teachings of medieval Islamic scholar Ibn Taymiyah on jihad.  These concepts are integral to Saudi religion and all-pervasive in Saudi textbooks from high school forward and would have been covered in depth in Thumairy's undergraduate and graduate level courses at Imam Mohamed University.  Ex. 149, Nakhleh Rpt. ¶¶ 58-62, 160.

210.    At his deposition in this case, Thumairy denied that he had any knowledge of these topics, even though they were the foundation of his studies at Imam Mohamed University. Ex. 149, Nakhleh Rpt. ¶¶ 160-61; Ex. 107, Thumairy Dep. 473:8- 483:2.  Thumairy claimed that

REDACTED FOR PUBLIC FILING

he could not remember whether he had even studied Ibn Taymiyah at Imam Mohamed University.  Ex. 107, Thumairy Dep. 65:17-66:2, 482:20-483:2.

### E.  MOIA Minister Turki and other high-level MOIA officials handpicked Thumairy to be the first Imam of the King Fahad Mosque.

211.    Minister Turki and MOIA made a deliberate, carefully thought-out decision to pick Thumairy to work in the United States and send him to Los Angeles.  A MOIA Deputy Minister wrote in April 1997 that the MOIA "spares no effort in sending propagators abroad with diligent accuracy to place the appropriate person in the appropriate workplace."  Ex. 254, KSA 1168-73 at 1173.

212.    In 1995, following his graduation from Imam Mohamed University, Thumairy submitted a job application with the Minister of Islamic Affairs Abdullah al Turki.  Ex. 126, Ghudaian Dep. 83:20-84:1 (the "job application…would be submitted to the minister").  The Minister made the hiring decision and referred Thumairy to the Propagators' Review Committee. Ex. 126, Ghudaian Dep. 85:16-86:5 ("The person would apply to the minister, and then the minister would find him fit, refer him to the committee for hiring. That's the way it works."), 92:15-23 (same).

213.    The October 1995 record of the "Propagators' Review Committee" shows that "Thumairy, Saudi national…was nominated for Da'wah in America."  Ex. 669, KSA 6877-79 at 6878.  This means that Minister Al Turki nominated and approved Thumairy to be hired as a MOIA propagator in the United States and that Al Turki or his Deputy forwarded the formal nomination to the committee for hiring.

214.    Saudi Arabia failed to produce Thumairy's original job application for the MOIA position or the formal nomination of Thumairy for the U.S. position that was prepared by

REDACTED FOR PUBLIC FILING

Minister Al Turki.  Those documents likely included information about how and why Minister Al Turki chose Thumairy to work for MOIA in America.

215.    Minister Turki formally confirmed Thumairy's appointment to "work in America" in December 1995.  Ex. 234, KSA 0603.

216.    Saudi government official and Ibn Taymiyah Foundation Chairman Khalil al Khalil testified that he first met Thumairy in Saudi Arabia in 1996 when Thumairy paid him a visit. Khalil claimed that Thumairy merely wanted advice about studying English in the United States but hadn't yet made plans to go to the U.S. and never discussed going to Los Angeles.  Ex. 113, Khalil Dep. 62:13-64:10.  Yet by the time that Khalil and Thumairy met in 1996, MOIA had already decided to send Thumairy to the United States, and Thumairy was chosen to work in Los Angeles in or before March 1996.

217.    Thumairy told the 9/11 Commission that he "never met al-Khalil prior to coming to the U.S."  Ex. 90, Snell Decl., Ex. 3 at 7.

218.    When asked when he first met Khalil at his deposition, Thumairy initially testified that he first met Khalil "in Riyadh, prior to the travel [to the United States]….," Ex. 107, Thumairy Dep. 56:21-57: 3, but when confronted with his contradictory statement to the 9/11 Commission, Thumairy testified that he could not remember whether he met Khalil before he left Saudi Arabia. Ex. 107, Thumairy Dep. 57:8-59:10.

219.    Embassy Islamic Affairs Office Deputy Jarrah was consulted on the decision to post Thumairy to Los Angeles.  Ex. 2, EO 0422 (Jarrah "reportedly assigned Saudi imams in the United States, including assigning [Thumairy] to the King Fahad Mosque.")

220.    In May 2003, Thumairy told the FBI that he:

was recruited to work for the Saudi Consulate by an individual, Saud Al

REDACTED FOR PUBLIC FILING

> Abdullah, with whom he studied at the Mohamed Bin Al Saud University.
> At this University, Fahad obtained his Masters in Islamic Studies.  Saud
> Al Abdullah is currently employed at the Islamic Ministry in Saudi
> Arabia.

Ex. 154, FBI 000001-000006-REV2021 at 2.  "Saud al Abdullah" is Saud Al Abdullah Al Ghudaian, a senior MOIA official in charge of Da'wah abroad, the head of the department where Thumairy first reported to work at MOIA on March 25, 1996.  Ex. 290, KSA 7016.

221.    At his 9/11 Commission interview in February 2004, however, Thumairy "denied that he was sponsored for this particular position by any specific individual."  Ex. 90,  Snell Decl., Ex. 3 at 2.

222.    The normal job requirements were waived for Thumairy to get the MOIA job. MOIA filed a request with Saudi Arabia's Director General of Civil Service in order to grant Thumairy a special waiver to exempt Thumairy from the competition requirement for the MOIA job in the United States.  The waiver was granted but was subject to a mandatory condition: "provided he [Thumairy] is fluent in one of the foreign languages."  Ex. 250, KSA 0600.

223.    At the time, however, Thumairy could not speak English or any other language aside from Arabic.  Ex. 107, Thumairy Dep. 75:24-76:4; Ex. 113, Khalil Dep. 134:21:135:3. (Khalil admitted that Thumairy "doesn't speak English…" even *after* Thumairy had been in the U.S. for several years and supposedly studied English).  Nevertheless, MOIA went ahead and ignored the language requirement and assigned Thumairy to the U.S. without the required job competition – demonstrating that Thumairy had special connections to get the MOIA job.

### F.  Thumairy had a close personal relationship with the MOIA Minister Abdullah Al-Turki.

224.    King Fahad Mosque employee Usman Madha testified that he observed Thumairy and Turki together in California and that it appeared from their interactions that Minister Turki

REDACTED FOR PUBLIC FILING

and Thumairy knew each other well.  Madha heard Minister Turki address Thumairy as "Fahad".  Ex. 72, Madha Decl. ¶ 6.

225.  MOIA Propagator Tajuddin Shuaib, who worked at the King Fahad Mosque and reported to Thumairy, admitted to the FBI that Thumairy was "very connected" to MOIA Minister Turki, and that Turki would visit Thumairy in the U.S.  Ex. 563, FBI 009071-REV2021 at 9072.

226.  Al-Turki was the Rector in charge of Imam Mohamed University when Thumairy attended that school as part of the Saudi Ministry of Education, from 1975 to 1993.  Ex. 97, Turki Dep. 23:15-24:19.  Thumairy received his bachelor's degree from Imam Mohamed University in June 1992 and continued to study at Imam Mohamed University.  Ex. 680D, KSA 6927; Ex. 680H, KSA 6929; Ex. 270, KSA 2670.

227.  Turki attended the "Grand Opening" of the King Fahad Mosque in 1998 as the MOIA's Minister at a time when Thumairy was MOIA's U.S. delegate in charge of California; the Imam of the Mosque; and the person responsible to handle high ranking Saudi visiting dignitaries such as Turki.  Ex. 382, DOJ 0010; Ex. 107, Thumairy Dep. 89:14-96:7 (at his deposition, Thumairy denied both working at the Saudi Consulate and working as the official Imam of the Mosque); Decl. of Gregory G. Rapawy (Doc No. 9370) ¶ ("In 1998, the King Fahad Mosque in Los Angeles opened, and Al Thumairy became a full-time imam there."; Ex. 121, Kaldirim Dep. 114:23-115:2.

### G. MOIA told Thumairy that he was being assigned to work at the Ibn Taymiyah Foundation in Los Angeles before he started work at MOIA.

228.  A MOIA document shows that it was at least two weeks *before* Thumairy started work that MOIA selected and assigned Thumairy to work at the Ibn Taymiyah Foundation in Los Angeles, which at that time ran the Ibn Taymiyah Mosque and was constructing the King Fahad

REDACTED FOR PUBLIC FILING

Mosque.  On March 11, 1996, Minister Turki's Deputy in charge of Da'wah wrote to MOIA's

Director at the Saudi Embassy in Washington, Khalid Al Sowailem, that: "I bring you the good

news that a decision was made to hire Sheikh Fahad bin Ibrahim Al Thumairy as a successor to

Sheikh Ibrahim Al Hiber at the Ibn Taymiyyah Foundation."  Ex. 244, KSA 8509-10; Ex. 126,

Ghudaian Dep. 273:15-274:21 (showing that the message was sent from the office of the

Minister's Deputy in charge of Da'wah); Ex. 290, KSA 7016 (showing Thumairy first reported

to work on March 25, 1996 at the Da'wah Department Abroad headed by Saud bin Abdullah al

Ghudaian at MOIA's headquarters in Riyadh, Saudi Arabia).

229.    The March 11, 1996 MOIA communication also shows that before Thumairy was

in communication with Minister Turki's Deputy and before he started work at MOIA, he already

knew he was going to Los Angeles to replace Hiber.  The MOIA communication shows that

Thumairy was advised of his assignment and that Thumairy made a specific personal request for

a tax exemption to live in Los Angeles.  Ex. 244, KSA 8509-10 at 8510 ("brother Fahad

[Thumairy] asks whether he may get tax exemption noting that he will reside in Los Angeles as

required by work.")

### H.  Saudi Arabia awarded Thumairy a fictitious diplomatic title to allow him to enter and stay in the U.S.

230.    The March 1996 MOIA fax message also shows that before Thumairy started

work, Minister Turki's Deputy made the determination that Thumairy would be given a

diplomatic title.  The fax message asks MOIA Embassy Head Sowailem to confirm the name of

the "job title that will be written in the passport" and proposes that Thumairy be given the

diplomatic personnel job title "'Administrative Attaché' *as usual*."  (emphasis added).  Ex. 244,

KSA 8509-10 at 8510.

REDACTED FOR PUBLIC FILING

231.    The message shows that MOIA was routinely authorized by Saudi Arabia to use false diplomatic cover to allow MOIA personnel to travel and facilitate their stay inside the United States while they engaged in the performance of MOIA work that was inconsistent with their stated reason for being here. Ex. 152, Dunham Rpt. 13-14.

232.    In April 1996, Saudi Arabia provided Thumairy with false identification as an Embassy official; it issued a special passport for Thumairy which stated that Thumairy was an "Administrative Official" at the Saudi Embassy in Washington.  Ex. 213, KSA 6882-6902 at 6884.

233.    In stark contrast to his testimony to the 9/11 Commission, in the instant case, Thumairy testified that he never worked at the Embassy.  Ex. 90, Snell Decl., Ex. 3 at 2 (Thumairy lied and said he was sent to the Saudi Embassy which, in turn, assigned him to the Saudi Consulate in Los Angeles where his role was to deal with any religious issues that arose at the Consulate); Ex. 107, Thumairy Dep. 83:11-13. Thumairy also testified he only visited the Embassy only once during his time in the U.S. for a quick visit and met MOIA Embassy Head and Director of Da'wah in the United States, Khalid Al Sowailem, the person consulted by Minister Turki's Deputy about giving Thumairy the "usual" Embassy "Administrative" title that Saudi Arabia used for MOIA officials.  Ex. 101 Thumairy 443:17-444:8; 444:22-445:3.

234.    Thumairy said that he couldn't remember how the "administrative official" title was put in his passport; all that he claimed to know was that the title was given by Saudi Arabia to "everyone who works in America" in their Special Passport.  Ex. 244, KSA 8509-10; Ex. 107, Thumairy Dep. 81:21-82:9.

235.    Prior to the 9/11 Attacks, Saudi Arabia obtained five separate A-2 visas for Thumairy in May 1996, September 1996, July 1997, October 1998, and July 2000.  Each of

REDACTED FOR PUBLIC FILING

those visas obtained by Saudi Arabia falsely represented that Thumairy was an "Official" at the Saudi Embassy in Washington, D.C.  Ex. 213, KSA 6882-6890 at 6884 at 87-88; Ex. 680G, at KSA 6892-93, 6896.  Two of these visas also described Thumairy as an "Officer" at the Saudi Embassy.  *See* Ex. 680G, at KSA 6888, 6892.  All of the visas were issued by the U.S. based on information Saudi Arabia provided to the State Department.  Ex. 152, Dunham Rpt. 14.

236.     Thumairy used the special passport and the visas containing false information that he was performing diplomatic work on repeated occasions to gain entry into the U.S. prior to the 9/11 Attacks.  Ex. 213, KSA 6882-6890 at 6887-88; Ex. 680G, at KSA 6892-93, 6896.  It was a criminal offense to knowingly use identification documents containing such false information to enter the U.S. 18 U.S.C. §1546.  Ex. 152, Dunham Rpt. 14.

237.     Saudi Arabia never intended for Thumairy to work at its Embassy or Los Angeles Consulate.  Rather, according to Plaintiffs' expert Dunham, "Saudi Arabia abused the system by giving Thumairy a diplomatic work title as cover to gain entry and perform non-diplomatic work for Saudi Arabia inside the U.S." Ex. 152, Dunham Rpt. 13.

238.     As Plaintiffs' expert Dunham explained, Saudi Arabia knew that "the State Department required a foreign state's embassy and consular personnel to work on a full-time basis exclusively at an embassy or consulate and perform only the accepted functions of that embassy or consulate," noting that "Embassy officers and employees were subject to the additional requirement that they reside in the Washington, D.C. area. The specific locations of each embassy or consulate are approved by and registered with the State Department. Consular personnel were required to reside in the area in which their duties were being performed." Ex. 152, Dunham Rpt. 9.

REDACTED FOR PUBLIC FILING

239.    Plaintiffs' expert Dunham confirmed that, despite this knowledge and its obligations under the Vienna Convention, in late 1996, Saudi Arabia obtained "sham accreditation" for Thumairy as a diplomatic employee, registering "Thumairy with the State Department by filing a Notification of Appointment form DSP-111, which had to be signed by the Saudi Embassy's Chief of Mission or authorized deputy and authenticated with the Embassy's seal."  Ex. 152, Dunham Rpt. 14-15.  Though Dunham determined the form submitted by the Saudi Embassy for Thumairy was not produced by Saudi Arabia or the State Department, nevertheless, the December 5, 1996 response letter from the State Department confirmed that Saudi Arabia filed a DSP-111 which "represented to the U.S. that Thumairy was working with the title of Administrative Officer at the Consulate General in 'Los Angeles, CA.'" Thumairy never was an "administrative officer" and never worked in that role at either the Embassy or the Consulate.  Ex. 152, Dunham Rpt. 9, 14-15; Ex. 212, KSA 6679 (State Department acknowledgement that the Embassy submitted Thumairy as an "administrative officer"); Ex. 107, Thumairy Dep. 83:11-13 (Q: "Did you ever work in the Saudi Embassy in the United States?" Thumairy: "No."); 100:7-10 (Q: "I take it, sir, you did not work as an administrative officer at the Saudi Consulate in Los Angeles?" Thumairy: "Yes, correct.").

240.    From 1996 through the 9/11 Attacks, Saudi Arabia failed to comply with its continuing obligations to advise the State Department that Thumairy was not working at the Saudi Embassy or Consulate or to inform the U.S. about Thumairy's actual work for MOIA inside the U.S. Had Saudi Arabia complied with its obligations, Thumairy would not have been allowed to remain in the U.S.  Instead, over a five-year period, Saudi Arabia continued to improperly use diplomatic cover to conceal and facilitate Thumairy's actual religious propagation work inside the U.S.  Ex. 152, Dunham Rpt. 16.

REDACTED FOR PUBLIC FILING

241.    Thumairy's work for MOIA in the U.S. constituted illegal, non-diplomatic activity outside the authorized diplomatic reporting structures of the Embassy and Consulate. Embassy and Consulate officials testified that they did not oversee Thumairy's work.  Ex. 100, Qattan Dep. 33:7-36:13, and 63:24-64:20; Ex. 213, KSA 6882-6890 at 6884 (Thumairy Passport stating Thumairy is an administrative official at the Embassy). As Plaintiffs' expert Dunham explained, "[w]hether or not this is true, the Saudi Ambassador was responsible to exercise authority over all persons accredited as Embassy and Consular officials in the U.S. and was ultimately accountable to the U.S. Government for the actions of Embassy and Consulate staff, including Thumairy." Ex. 152, Dunham Rpt. 18.

242.    Plaintiffs' expert Dunham concluded that because Saudi Arabia brought:

> "Thumairy into the United States fraudulently under diplomatic cover and facilitated his residence in the country...," and,  "based on his registration as a consular employee, Thumairy received a State Department consular identification card, a State Department issued driver's license, both of which are official United States Government forms of identification, and a tax exemption card."  A consular identification card and driver's license "attested to his legitimacy in this country and could be used for identification in myriad situations," allowing Thumairy to avoid sales tax and exempting him from income tax.

Ex. 152, Dunham Rpt. 18; Ex. 107, Thumairy Dep. 100:7-101:22 (confirming he did not work as an administrative officer at the LA consulate but nevertheless had a diplomatic visa and diplomatic privileges).

243.    According to Plaintiffs expert Dunham, after it obtained Thumairy's fraudulent accreditation as a consular official, "Saudi Arabia evaded the rules for motor vehicle use by consular personnel inside the U.S. that were established by the State Department," requiring consular personnel "to use a State Department (not private) driver's license; register any personal use vehicle with the State Department; and use diplomatic (not state) license plates."  As

66

Dunham noted, "[t]hese rules, however, were not followed in Thumairy's case" and, instead, Thumarairy "also obtained a California driver's license; registered his vehicle with the State of California; and used California license plates." Ex. 152, Dunham Rpt. 18-19; Ex. 107, Thumairy Dep. 108:16 – 111:24; Ex. 46, State 33-40 (Awad Dep. Ex. 460) (Thumairy Car Registration Document).

244.    According to Plaintiffs expert Dunham, "Thumairy continued to enjoy official 'cover' and privileges and immunities until May 2003 when the United States Government determined that he was engaged in activities incompatible with his status and his appointment at the Los Angeles Consulate General was terminated by the U.S." Ex. 152, Dunham Rpt. 19; Ex 334, State 43 (State Department Communication to Saudi Embassy, May 23, 2003.)

**I.    Thumairy had no prior work experience and received no MOIA training before reporting for work at MOIA headquarters and being sent to the U.S.**

245.    When he started work with the MOIA at the end of March 1996, Thumairy had no prior work experience or training other than attending Imam Mohamed University. Thumairy testified that he did not receive any work training before he started his MOIA job, nor did he receive any work training from the Ministry after he was hired. Ex. 107, Thumairy Dep. 475:14-476:1.

246.    Thumairy first reported to work on March 25, 1996 at the Da'wah Department Abroad headed by Saud bin Abdullah al Ghudaian at MOIA's headquarters in Riyadh, Saudi Arabia. Ex. 290, KSA 7016. Ghudaian was the MOIA official who Thumairy identified to the FBI in May 2003 as the individual who recruited him to work at MOIA. Ex. 154, FBI 000001-000006-REV2021 at 2.

247.    At his deposition, Thumairy said that he could not remember Saud al Abdullah al Ghudaian at all, even though when he started at MOIA he worked directly under Ghudaian at

REDACTED FOR PUBLIC FILING

MOIA's headquarters in Riyadh for nearly two months before he departed for the United States. Ex. 107, Thumairy Dep. 44:13-17; Ex. 290, KSA 7016 (Ex. 434, showing the Thumairy first appeared for work under Ghudaian).  Nor could Thumairy recall the name of anyone else he worked with at MOIA headquarters.  Ex. 107, Thumairy Dep. 44:18-23 ("I don't recall anybody.").

248.    Ghudaian himself recalled knowing Thumairy but said he did not remember recruiting him for the MOIA job, as Thumairy had told the FBI in May 2003.  Ex. 126, Ghudaian Dep. 52:15-17, 53:1-24, 88:5-90:17.  Ex. 154, FBI 000001-000006-REV2021 at 2; *see infra*. ¶¶ 220, 246.

### J.   Thumairy arrived in the U.S., went to the Saudi Embassy, and then to Los Angeles.

249.    MOIA's Personnel Office recorded that Thumairy began work inside the U.S. on May 22, 1996.  Thumairy entered the U.S. based on Saudi Arabia's representation that he was a Saudi Embassy official in Washington, D.C.  Ex. 249, KSA 0597.

250.    Thumairy told the 9/11 Commission in 2004 that the first place he went upon his arrival in the U.S. was the Saudi Embassy in Washington, D.C., and that "[t]he Embassy assigned him to the Saudi consulate in Los Angeles":

> Al-Thumairy said he wanted to go to a place where he could learn English, so he chose the U.S.  He stated that he did not choose Los Angeles, though.  Once he was chosen to serve in the U.S., al-Thumairy said he was sent to the Saudi Embassy in Washington, D.C.  The Embassy then assigned him to the Saudi consulate in Los Angeles.…

> When asked who at the Saudi Embassy in Washington, D.C. made the decision to send him to Los Angeles, al-Thumairy said he could not recall, but noted that it was the person in charge of Islamic Affairs, who was new at the time.

> Ex. 90, Snell Decl., Ex. 3 at 2.

REDACTED FOR PUBLIC FILING

251.    Thumairy's statement to the 9/11 Commission is belied by the internal MOIA document from Minister Turki's Deputy which shows that Thumairy knew that he was appointed to work in Los Angeles based at the Ibn Taymiyah Mosque *before* he ever started work. Ex. 244, KSA 8509-10 (Ex. 433) (on March 11, 1996, MOIA's Riyadh HQ wrote to Sowailem, stating: "I bring you the good news that a decision was made to hire Sheikh Fahad bin Ibrahim Al Thumairy as a successor to Sheikh Ibrahim Al Hiber at the Ibn Taymiyyah Foundation."), Ex. 5, Youssef Rpt. 38.

252.    Saudi Arabia's June 2018 Answers to Interrogatories confirmed that Thumairy went to the Embassy in Washington, D.C. when he first arrived in the United States: "Thumairy visited the Saudi Embassy at or around the time he initially arrived in the United States to pick up an identification card…."  Ex. 24,  June 12, 2018 KSA Responses to Interrogatories 27 (Interrogatory 15).

253.    Although Thumairy told the Commission that he "could not recall" the name of the person in charge of Islamic Affairs who made the decision to send him to Los Angeles, when later "asked if there was anybody at the Saudi Embassy in Washington, D.C. to whom he reported, al-Thumairy said that he had the most contact with Dr. Majid, who was responsible for Islamic Affairs at the Embassy." Ex. 90, Snell Decl., Ex. 3 at 3-4. "Dr. Majid" Ghesheyan was head of the Islamic Affairs Department at the Saudi Embassy.  Ex. 295, KSA 7930-33 at 933 (Ex. 424), identifying himself as Head of Islamic Affairs at MOFA).  Ghesheyan's deputy was Musaed Al Jarrah, who was "new at the time" in his role in Islamic Affairs and had replaced Khalil Al Khalil.  Ex. 2, EO 3487-3488 (Khalil Al Khalil was Ghesheyan's "deputy"); Ex. 129, Afifi Dep. 35:6-36:6.

REDACTED FOR PUBLIC FILING

254.    Thumairy also told the 9/11 Commission that "before he started working [in Los Angeles], he was a full-time student at UCLA" and that "only after that time did he start his job at the consulate…."  Ex. 90, Snell Decl., Ex. 3 at 3.  Thumairy told the Commission that "he spent about 60-70% of his time at the consulate, and about 20% at the KFM [King Fahad Mosque]," Ex. 90, Snell Decl., Ex. 3 (February 23, 2004, Memorandum for Record) at 3.  Thumairy also told the Commission that he "wanted to clearly express that he did not consider his activities at the mosque to be 'work.'" Ex. 90, Snell Decl., Ex. 3 at 3.  Rather, Thumairy told the Commission that "he volunteered his services" at the mosque.  Ex. 90, Snell Decl., Ex. 3 at 3.  At his deposition, Thumairy admitted that his statements to the Commission were false.  Ex. 107, Thumairy Dep. 268:3 -269:13.  He never worked at the Consulate and his activities at the Mosque were part of his MOIA work.  Ex. 107, Thumairy Dep. 96:4-97:3, 98:18-99:9.  Thumairy claims that that "[w]hat I believe is that I said that the Consul General was in charge of all Saudi citizens in general."  Ex. 107, Thumairy Dep. 107:11-108:9.

255.    In addition, Thumairy initially testified at his deposition that "I don't remember how it happened" that he went to California but then stated "…it is my personal decision.  I choose the place where to go."  Ex. 107, Thumairy Dep. 47:15-48:6.  But Thumairy told the 9/11 Commission that "he did not choose Los Angeles, though."  Ex. 90, Snell Decl., Ex. 3 at 2.  Moreover, Thumairy claimed he could not recall having a discussion with anyone at the Ministry of Islamic Affairs about going to California or when such a discussion first took place.  Ex. 107, Thumairy Dep. 48:7-10, 54:17-55:3.

256.    Thumairy further testified at his deposition that the only person he remembered speaking with was his Embassy MOIA supervisor Khalid Al Sowailem, who he did not know before traveling to the U.S.  Ex. 107, Thumairy Dep. 51:6-54:9.

REDACTED FOR PUBLIC FILING

257.    When asked by the 9/11 Commission about "to whom he reported" at the Embassy, Thumairy never mentioned Sowailem and only mentioned Islamic Affairs department head (Dr. Majed) Ghesheyan.  Ex. 90, Snell Decl., Ex. 3 at 3-4. However, at his deposition, Thumairy claimed that he dealt with "Sowailem only" and had no recollection of Ghesheyan. Ex. 107, Thumairy Dep. 117:16-23.  Thumairy testified "I don't remember but Khalid Al Sowailem."  Ex. 107, Thumairy Dep. 52:22-53:9.

258.    Contrary to the documentary evidence which showed that he was assigned by MOIA to work at the Ibn Taymiyah Foundation, Thumairy testified that "[w]hen I first went [to Los Angeles], I did not know which mosque would be there."  Ex. 107, Thumairy Dep. 62:1-7. He claimed that he first decided to attend the Ibn Taymiyah Mosque "[a]fter I arrived to Los Angeles…" and further stated that: "I chose it because of the location and it was convenient." Ex. 107, Thumairy Dep. 64:4-12, 64:24-65:9.  Thumairy testified that he "went and checked out the neighborhood and…saw the mosque" and "ended up getting an apartment nearby the mosque."  Ex. 107, Thumairy Dep. 89:6-13.

259.    When asked if he spoke to anyone at the Mosque about working there he initially said "[n]o, I don't remember…" and then testified "[i]t was a spontaneous thing" and that after attending the Mosque "I would speak to the Imam" and that "at times when the Imam was not there" Thumairy "would lead the prayers and people recognized me."  Ex. 107, Thumairy Dep. 89:14-22.

### K.  Thumairy was assigned to replace another MOIA Propagator in California, Ibrahim Al Hiber, but claimed he could not recall meeting him.

260.    The man that Thumairy was assigned to replace, Ibrahim Al Hiber, was a MOIA propagator and the Imam of the Ibn Taymiyah Mosque who hosted Sheikh Omar Abdul Rahman, the "Blind Sheikh" at the Mosque in 1993.  Ex. 72, Madha Decl. ¶ 3; Ex. 5, Youssef Rpt. 20

REDACTED FOR PUBLIC FILING

("We determined that during one visit in 1993 after the February 1993 World Trade Center bombing, Abdel Rahman gave a lecture at the Ibn Taymiyah Mosque to an invitation-only audience comprising a select group of his followers. Abdel Rahman also led the public prayers at the Ibn Taymiyah Mosque on several occasions, including the Friday prayer."). According to Plaintiffs' expert Youseff, "operations of Al Gama'a and Abdel Rahman at the Ibn Taymiyah Mosque had to be carried out with the express knowledge and approval of Imam Hiber, his Saudi Government superiors, and the leadership of the Mosque's Foundation." Ex. 5, Youssef Rpt. 21.

261. Thumairy admitted that he spoke "to the Imam" of the Ibn Taymiyah Mosque. Ex. 107, Thumairy Dep. 89:14-22. While the Imam immediately prior to Thumairy was Ibrahim Al Hiber, Thumairy testified that "I don't remember that I met him [Hiber] or talked to him." When asked about his knowledge of Ibrahim al-Hiber, Thumairy testified "I heard of him. He was in Los Angeles before I went there …. I think he [Hiber] was an Imam at the Ibn Taymiyah Mosque." When asked whether Hiber worked for the Ministry of Islamic Affairs, Thumairy claimed: "I don't know." Ex. 107, Thumairy Dep. 86:16-87:7; Ex. 244, KSA 8509-10 (Ex. 433, Thumairy was the "successor" to Hiber); Ex. 72, Madha Decl. ¶ 3 (Hiber was Imam prior to Thumairy); Ex. 5, Youssef Rpt. 21 (FBI investigation conducted by Plaintiffs' expert Youssef identified Hiber as Imam of Ibn Taymiyah Mosque prior to Thumairy's arrival).

262. Contrary to record evidence, Thumairy testified that he was never the Imam at the Ibn Taymiyah Mosque. Ex. 107, Thumairy Dep. 91:13-20 ("No, I was not an official Imam"). Thumairy further testified that he was not appointed by the Ministry of Islamic Affairs to work as the Imam at the Ibn Taymiyah Mosque but rather "was all preoccupied with studies" of the English language and "dedicated [all of his] time for studies." Ex. 107, Thumairy Dep. 61:1-63:5; *see also* 88:15-22, 92:22-94:9.

REDACTED FOR PUBLIC FILING

263. Thumairy's testimony directly contradicts the MOIA communication which showed that he was appointed as the "successor" of Ibrahim Al Hiber at the Ibn Taymiyah Mosque. Ex. 244, KSA 8509-10 (Ex. 433).

264. Usman Madha was a member of the congregation at the Ibn Taymiyah Mosque and testified that Thumairy was the Imam at the Mosque and that it was "common knowledge" that Thumairy worked for the Saudi Ministry of Islamic Affairs. Ex. 72, Madha Decl. ¶ 3. Similarly, Saudi Consulate official Ismail Mana testified that Thumairy was the Imam at the Ibn Taymiyah Mosque in Los Angeles. Ex. 110A, Mana Dep. 66:3-22. In February 1999, Omar Al Bayoumi confirmed Thumairy's role in his letter to MOIA's Minister Turki, which referred to Thumairy as "Sheikh Fahad al Thumairy, from the Ibn Taymeya [Taymiyah] Mosque in Los Angeles" and thanked Thumairy for his "excellent cooperation and coordination." Ex. 416, KSA 7591 (Ex. 445).

265. Thumairy's testimony is contradicted by his own October 24, 1996 report to his supervisor, MOIA's Embassy Head Sowailem. Ex. 301, KSA 8506. That report shows that upon his arrival in Los Angeles, Thumairy immediately started work as a MOIA propagator and as Imam at the Ibn Taymiyah Mosque. Thumairy wrote "[i]n response to the forms sent for follow-up" to report that he "began actively participating in the management of the [Ibn Taymiyah] Foundation and carrying out its Da'wah missions" together with "the Foundation's administrative work and follow-up on the staff" and had also met with "Saudi brothers such as students and others" and made "visits…to some mosques and centers in the area to get to know them and those responsible for them." As for studying, Thumairy's letter shows that he merely had "taken time out" to make "some individual efforts" to study English. Ex. 301, KSA 8506.

REDACTED FOR PUBLIC FILING

266.     Saudi Arabia failed to produce any subsequent report prepared by Thumairy after

October 1996 for Sowailem or any other MOIA official about his work in California.

IV.     **THUMAIRY WAS AN AGENT IN THE SAUDI GOVERNMENT'S CHAIN OF COMMAND, WHO CONTROLLED A SUNNI EXTREMIST NETWORK, AND WAS IN CHARGE OF THE OPERATIONS OF THE SUPPORT NETWORK IN CALIFORNIA**

    A. **Thumairy interacted with Saudi Embassy officials regarding his work assignments.**

267.     Fahad Al Thumairy was from a well-known family in Saudi Arabia and had high

level connections within the Saudi government, including MOIA's Minister Abdullah Al Turki

and Saudi Prince Abdelaziz.  Ex. 97, Turki Dep. 125:2-9; Ex. 72, Madha Decl. ¶ 6; Ex. 563, FBI

009071-REV2021 at 9072; Ex. 483, FBI ███████████████████████████

███████████████████████████████████████).

268.     MOIA selected Thumairy to lead its efforts to expand its propagation to a key

location, California. In July 1996, MOIA U.S. Head Sowailem wrote to Ambassador Prince

Bandar that Thumairy had been appointed to work in Los Angeles, California "due to the

importance of the area." Ex. 302, KSA 8507.  In September 1997, Sowailem wrote to MOIA

headquarters stating that "due to the importance of California" he nominated Thumairy "to be

supervisor of propagators in California" Ex. 415, KSA 8503 (Ex. 439).

269.     The MOIA propagator position in Los Angeles brought with it the Imamate for

the new King Fahad Mosque, a highly prized appointment.  Ex. 5, Youssef Rpt. 36.

270.     Plaintiffs' expert Youssef had extensive interactions with the Saudi government

over the course of his career, including serving as the FBI's first legal Attache in Riyadh Saudi

Arabia from 1996-2000.  Ex. 5, Youssef Rpt. 3. Youssef stated that from his observations and

experience, "the Saudi Government employed a strict hierarchy over its officials, particularly

REDACTED FOR PUBLIC FILING

those working in a foreign country." Youssef concluded, based on applying his experience to the evidence, that "[d]uring the time Thumairy worked in Los Angeles he received directions and instructions from his government superiors on a regular basis and reported on his work to them." Ex. 5, Youssef Rpt. 42.

271.    According to Plaintiffs' expert Youssef, "Thumairy engaged in a regular pattern of phone calls to various offices at the Saudi Embassy in Washington, D.C. including the offices of his MOIA supervisor Khalid al Sowailem and the Islamic Affairs Department run by Musaed al Jarrah." Ex. 5, Youssef Rpt. 42-43; Ex. 12C (Thumairy Calls to Saudi Embassy).

272.    Thumairy admitted that Sowailem would call him on the phone.  Sowailem also called MOIA propagator Shuaib.  Ex. 107, Thumairy Dep. 150:6-21. Saudi Arabia did not produce any of its Embassy and Consulate phone call records of calls during the relevant time period which would show calls made to Thumairy — or Bayoumi.

273.    When the 9/11 Commission asked Thumairy "if there was anybody at the Saudi Embassy in Washington D.C. to whom he reported," Thumairy answered that "he had the most contact with Dr. Majid [Ghesheyan], who was responsible for Islamic Affairs at the Embassy." Ex. 90, Snell Decl., Ex. 3 at 3-4.

274.    At his deposition, however, Thumairy claimed that he did not know Ghesheyan. Ex. 107, Thumairy Dep. 116:15-18, 417:5-21, 419:16-23.  This is not credible, as it is contrary to Thumairy's statement to the 9/11 Commission statement – and Ghesheyan's role as a Board member of the King Fahad Mosque.

275.    In addition, at his deposition Thumairy claimed that the only Embassy office he knew was the MOIA Office led by Sowailem — and that he did not know of the Islamic Affairs department at the Embassy — despite previously identifying the "Islamic Affairs" department

REDACTED FOR PUBLIC FILING

led by Ghesheyan as his Embassy contact to the 9/11 Commission. Ex. 107, Thumairy Dep. 116:19-117:4.

276. By contrast, Consulate Islamic Affairs Secretary (and Thumairy's assistant) Ismail Mana testified at his deposition that he knew of the Islamic Affairs Department at the Embassy and identified Majid al Ghesheyan by name. Ex. 110A, Mana Dep. 53:11-22, 120:6-22.

277. The MPS production also revealed that in 1999, Bayoumi wrote letters to Ghesheyan, Sowailem, Thumairy, and MOIA Minister Turki, about the visit of MOIA propagators Mutaeb Al Sudairy and Adel Al Sadhan and lauded their "complete cooperation" and "advance coordination." Ex. 411, MPS 43_314; Ex. 678D, MPS 43_336; Ex. 413, MPS43_338, Ex. 414, MPS43_347 (faxed copy at Ex. 416, KSA 7591).

278. Thumairy made the unbelievable claim that he didn't remember *anyone* at the Embassy other than Sowailem and had contact with "Khalid Sowailem only." Ex. 107, Thumairy Dep. 52:22-53:9; 117:16-20; 443:10-15 (when asked "[w]ho else were you calling at the embassy other than Khalid Sowailem?" Thumairy claimed "I don't remember a thing.").

279. But Madha testified that Saudi government officials Shuaib and Khalil both admitted to him that Thumairy reported to Embassy Islamic Affairs Deputy Musaed Al Jarrah. Ex. 128, Madha Dep. 31:14-32:12.; Ex. 72, Madha Decl. ¶ 12.

280. A confidential human source reported to the FBI that Jarrah had "official responsibilities" from Saudi Arabia:

> to manage and control all assignments of Saudi Imams in the United States and facilitate the issuance of diplomatic visas to these individuals. Saudi Arabian Imams who were assigned to the United States through this process reported to Al- Jarrah and he served as the coordinator of their activity while they were inside the United States. Ex. 2, EO 0004.

REDACTED FOR PUBLIC FILING

281.    Jarrah requested Thumairy's 2001 extension at the King Fahad Mosque and handled various other matters regarding Thumairy and the Mosque.  Ex. 257, KSA 1256 (Ex. 423, March 2001 handwritten note of Jarrah requesting the urgent attention of the Ambassador to Thumairy's extension); Ex. 255, KSA 1204 (Ex. 425, Jarrah's initials on November 2001 letter urging that Thumairy be returned to Los Angeles after 9/11); Ex. 295, KSA 7930-33 (Ex. 424, discussing Jarrah's March 2002 trip to King Fahad Mosque to meet at Consulate with MOIA propagators Muhanna and Shuaib, members of Thumairy's extremist cell).

282.    As determined by Plaintiffs' expert Youssef, "Thumairy's claim that he could not remember Musaed al Jarrah is not credible given Jarrah's position at the Islamic Affairs Department at the Saudi Embassy; the work relationship between Jarrah and Thumairy; and the phone records." Thumairy made a minimum of "64 calls from his home and cell phone between 2000-2003 to Jarrah's personal cell phone ████████-6261)" Ex. 5, Youssef Rpt. 45. Given that there are missing phone records, the number of calls is potentially much greater.  Ex. 5, Youssef Rpt. 135. At his deposition, Jarrah confirmed that (████████-6261 was his personal cell number. Ex. 43, Phone bill for Jarrah (Jarrah Dep. Ex. 760); Ex. 118, Jarrah Dep. 133:8-22.

283.    According to Plaintiffs' expert Youssef's phone analysis, "Thumairy made 5 calls from his home to Jarrah's cell phone in July 30, August 13, September 1 (2 calls), and September 2, 2000" and then "used his cell phone (████████-0777 to call Jarrah's cell phone 2 times in February and July of 2001, and then 57 times from June 12, 2002 to February 3, 2003."  Ex. 12D (Thumairy calls to Jarrah).

284.    The FBI also found that Thumairy's assistant MOIA propagator Mohamed Al Muhanna "had numerous phone connections with AL-THUMAIRY… and with AL-JARRAH." Ex. 2, EO 0708-709.

REDACTED FOR PUBLIC FILING

285.    Regarding Sowailem, Thumairy claimed that Sowailem, the Director of Da'wah in the United States, only handled "administrative" functions like "vacations."  Ex. 107, Thumairy Dep. 114:23-115:5 ("there was only Al Sowailem, who was the administrative director for whom I dealt regarding vacations.")

286.    Thumairy claimed that he only remembered that Sowailem worked for the "Ministry of Islamic Affairs" and did not know that Sowailem held the job title as MOIA's Director of Da'wah in the U.S.  Ex. 107, Thumairy Dep. 131:8-20.  But MOIA Propagators such as Thumairy received regular correspondence from Sowailem with his full title.  Ex. 242, KSA 8479.

287.    Thumairy claimed that he only spoke to Sowailem "perhaps every two months or so."  Ex. 107, Thumairy Dep. 115:6-10.

288.    However, the number and pattern of Thumairy's phone calls to the Embassy are not consistent with his testimony or the times that Thumairy took his vacations and other "administrative" events.  Ex. 5, Youssef Rpt. 45-46; Ex. 12C(Thumairy Calls to Saudi Embassy).

289.    Thumairy testified that he usually took his vacation during the summer.  Ex. 107, Thumairy Dep. 273:12-14; Ex. 90, Snell Decl., Ex. 3 at 6-7.  Yet Thumairy made frequent calls to the Embassy throughout the year, including in the winter months. As Plaintiffs' expert Youssef's analysis demonstrated, "between same November 24, 1999 to February 29, 2000 period, Thumairy placed 54 calls to the Embassy, including calls to Sowailem (24 calls), as well as the general number of the Islamic Affairs department and other offices within the Saudi Embassy (30 calls)." Ex. 5, Youssef Rpt. 46, n. 117, Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).

78

REDACTED FOR PUBLIC FILING

290.    Plaintiffs' expert Youssef concluded that "[t]he calls demonstrate a routine of close interaction by Thumairy with his Saudi Government superiors," as shown "by the volume of calls made by Thumairy to Sowailem." Youssef cited, for example, "between September 15, 1999 – August 15, 2001, Thumairy placed 75 calls from his home phone to Sowailem" and "[o]f the 75 calls, 16 calls were to Sowailem's personal cell phone, 7 were made outside of normal business hours (3 to Sowailem's cell), and 9 were made on Saturday or Sunday." Youssef also concluded that "[i]n addition, during the same September 15, 1999 – August 15, 2001 period, Thumairy placed 164 calls to the general number for the Islamic Affairs department as well as other offices within the Saudi Embassy" and "[o]f those calls, 9 were made outside of business hours, and two were made on Saturday." Ex. 5, Youssef Rpt. 43; Ex. 12C (Thumairy Calls to Saudi Embassy).

291.    As Plaintiffs' expert Youssef opined, this pattern of calls to Sowailem and the Islamic Affairs Department "after business hours and on weekends, demonstrates that Thumairy had important matters to raise with Sowailem, justifying calls outside of normal business hours. Ex. 5, Youssef Rpt. 46.

292.    Both Thumairy and Bayoumi were contacting Sowailem and other Embassy officers (including Jarrah and Sudairy) and Consulate officers ███████ in tandem at the precise times of critical events when Thumairy and Bayoumi prepared to receive and assist Al Qaeda hijackers Nawaf Al Hazmi and Khalid Al Mihdhar. Thumairy, Bayoumi, Sowailem, and other Embassy officers were interacting among each other about specific work tasks that went beyond Thumairy's personal "administrative" issues.  Ex. 5, Youssef Rpt. 125-27.

79

REDACTED FOR PUBLIC FILING

**B. Thumairy worked directly with the nine Saudi government Board members of the King Fahad Mosque, all of whom participated in and were aware of Thumairy's work.**

293.    IFSIT Board Chairman Khalil al Khalil ("Khalil") was a Saudi government official who (from 1987 to 1995) ran the Islamic Affairs department at the Embassy, worked for Imam Mohamed University, and (after 9/11) was appointed by the King to the Saudi Shura Council, the Saudi government deliberative body which advises the King.  Ex. 187, KFM 0091-92 (Khalil Resume).

294.    Khalil led the Ibn Taymiyah Foundation and its Mosque's operations.  Ex. 72, Madha Decl. ¶ 9.  Khalil lived in Saudi Arabia and visited the Mosque sporadically.  Ex. 72, Madha Decl. ¶10.

295.    Khalil reported to MOIA's Deputy Minister Ammar on matters involving Thumairy.  Ex. 113, Khalil Dep. 75:5-78:1; 302:13-19.

296.    Board Secretary and Treasurer Osman Kaldirim worked alongside Khalil to oversee the Mosque.  Ex. 72, Madha Decl. ¶ 9.  Although Kaldirim was apparently not a Saudi government official, he carried a Saudi National Guard ID and had a work permit to pursue his business interests in Saudi Arabia.  Ex. 72, Madha Decl. ¶10.

297.    Board member Tajuddin Shuaib was a MOIA Propagator working under Thumairy and was given the title of "Director" of the Mosque.  Ex. 382, DOJ 0010; Ex. 72, Madha Decl. ¶ 8.

298.    Tajuddin Shuaib was also Khalil Al Khalil's protégé and "allegedly helped Muslims who were dedicating themselves to Jihad travel into Saudi Arabia or Yemen for advanced indoctrination."  Ex. 2, EO 0658.

REDACTED FOR PUBLIC FILING

299.     Thumairy was not an IFSIT Board member but had signature authority on IFSIT checks and entered contracts on behalf of the Mosque.  Ex. 680K, KSA 7272, 7275-7282 (Thumairy signed as "Imam" on Atlas carpets service contract); Ex. 34, KSA 7319-7320 at 7320 (Awad Dep. Ex. 466) (Thumairy co-signed Pert Construction contract).  Thumairy personally handled the cash in the Mosque's contributions box.  Ex. 680I, KSA 7104-5 (Saudi Ministry of Finance official noting that Thumairy opened the box and dispersed the cash).

300.     The 1997 amendment to IFSIT's Articles of Incorporation, Ex. 179 (Kaldirim Dep. Ex. 179) added the following seven members to the Mosque's board in addition to Khalil and Shuaib:

301.     (1) *MOIA's Deputy Minister of Islamic Affairs* and (2) *MOIA's Assistant Deputy for Da'wah - Abdulaziz al Ammar*.  Ammar was in the MOIA direct chain of command at MOIA above Thumairy and Sowailem.  Ex. 245, KSA 0553-54 (Ammar Dep. Ex. 448) (Ammar letter confirming that the delegation of Thumairy "has already been terminated" and that "[t]he delegation of all Saudi employees [in the America Office] was terminated as of [August 2003]").  Ammar visited the Mosque for its Grand Opening in July 1998 and again in September 2000.  Ex. 668, KSA 7362 [Sep. 2000]; Ex. 259, KSA 1261 (minutes of meeting discussing inauguration).  Khalil immediately contacted Ammar when issues were raised about Thumairy.  Ex. 113, Khalil Dep. 75:13-76:13, 77:1-8, 80:4-14.  Thumairy reported to Ammar when he returned to Saudi Arabia in 2001. Ex. 680F, KSA 6871 ("he has already started his work at the deputyship").

302.     (3) *MOIA's Director in the U.S. – Khalid Al Sowailem*.  Sowailem was Thumairy's direct MOIA supervisor at the Embassy who regularly communicated with Thumairy, visited Los Angeles and San Diego prior to the 9/11 Attacks, evaluated and promoted

81

REDACTED FOR PUBLIC FILING

Thumairy, and appointed Thumairy to supervise all MOIA propagators in California.  Ex. 214, KSA 6903 (Sowailem's letter to Thumairy confirming his "nomination to supervise the propagators of the State of California" and referring to Thumairy as "Ministry's Delegate in America"); Ex. 297, KSA 8364 (Thumairy received a promotion in 1998 at the recommendation of Khalid Al Sowailem); Ex. 205, KSA 2692 (Thumairy received another promotion in 2000 following his assistance to Hazmi and Mihdhar); Ex. 285, KSA 5248 (Sowailem travels to Orange County).

303.    (4) *MOFA's Islamic Affairs Department Director – Dr. Majed Ghesheyan*.  In his 9/11 Commission interview, Thumairy stated that he reported to "Dr. Majid" (Ghesheyan) in the Embassy's Islamic Affairs Department.  Ex. 90, Snell Decl., Ex. 3 at 3-4. Thumairy also reported to Ghesheyan's deputy in the Embassy, Musaed Al Jarrah.  Ex. 128, Madha Dep. 31:14-32:12; Ex. 72, Madha Decl. ¶ 12

304.    (5) *Saudi Consulate in Los Angeles Consul General* – Consul General Mohamed al Salloum oversaw the Mosque's finances and operation together with Thumairy, Mana, and Khalil.  Ex. 121, Kaldirim Dep. 111:3-112:1 (Consul General Salloum doled out finances to "dictate" and "control" the mosque); Ex. 235, KSA 1230-31 (Ex. 187, evidencing work with Thumairy and Khalil to control the mosque).

305.    (6) Imam Mohamed University's Director of Da'wah Abroad and (7) its Director at its Institute of Islamic and Arabic Sciences in America ("IIASA") – IFSIT Board Director Khalil worked for Imam University and made trips back and forth to Saudi Arabia to report on his activities.  Ex. 113, Khalil Dep. 19:4-20:10.  A group of senior Imam Mohamed University officials led by the school's Vice-Rector visited Thumairy in August 1999.  Ex. 240, KSA 8370.

REDACTED FOR PUBLIC FILING

In December 2000-January 2001, IIASA held an 8-day "Intensive Program" with "prominent scholars from [Imam Mohamed University]" at the Mosque. Ex. 535, FBI 4392-93, 4439.

306. Another longstanding member of the board was Saudi businessman Badr Al Aiban, who was an owner of Delta Oil, a large Saudi company who had worked together with Kaldirim. The Mosque's manager Usman Madha testified that he never saw Aiban at the Mosque. Ex. 72, Madha Decl. ¶10.

### C. Thumairy had frequent meetings in Los Angeles with Saudi government officials.

307. Until he left the U.S. shortly before the 9/11 Attacks, Thumairy established Southern California as a key operations hub for MOIA. In addition to his nearly daily contacts with Saudi Consulate officials, Thumairy hosted numerous high level Saudi government officials, MOIA Propagators, and Saudi government agents.

308. The July 1998 "Grand Opening" of the King Fahad Mosque (held over a year before the actual opening of the Mosque in the fall of 1999) brought Saudi Prince Abdulaziz, MOIA's Minister Abdullah Al Turki, Deputy Minister Ammar, and U.S. Director Khalid Al Sowailem, and numerous other high ranking Saudi Government dignitaries to Los Angeles. Thumairy was responsible for receiving the high-level guests. Ex. 72, Madha Decl. ¶¶ 6, 8; Ex. 121, Kaldirim Dep. 113:15-114:2; Ex. 74, MWL-IIRO 62626 (Ex. 797, Program for Inauguration of KFM); Ex. 107, Thumairy Dep. 150:22-151:4.

309. Prior to the 9/11 Attacks, according to Khalil, "30…preachers from the KSA [Kingdom of Saudi Arabia]…held useful seminars, courses, lectures, and lessons" at the King Fahad Mosque. Ex. 50, KFM 0439-40.

310. Khalid Al Sowailem visited Los Angeles and San Diego and met with MOIA propagator Omar Abdi Mohamed. Ex 95, Awad Dep. 103:11-104:9; Ex. 2, EO 0722 ("Sowailem

83

REDACTED FOR PUBLIC FILING

visited San Diego…with a group of about 9 other people…[and] met with [Abdi] Mohamed");
Ex. 682, Jan. 22, 2004 interview of Omar Abdi Mohamed by INS Officer Steven Schultz at
2490.

311.    MOIA Minister Abdullah al Turki visited with Thumairy in Los Angeles; on one
occasion, the two men went together to a local university, Ex. 72, Madha Decl. ¶ 6; Ex. 2, EO
2689 (Shuaib FBI statement).

312.    In December 1998 – January 1999, Thumairy hosted visiting MOIA propagators
Adel Al Sadhan, Mutaeb Al Sudairy, and Majed Al Mersal in Los Angeles and at the Ibn
Taymiyah Mosque and helped plan the visit of Sadhan and Sudairy with Bayoumi in San Diego
and at the Al Madinah Mosque, the ICSD, and the Al Ribat Mosque.  Ex. 304, KSA 9557-58
(Ex. 444); Ex. 416, KSA 7591 (Ex. 445); Ex. 119, Sudairy Dep. 78:1-15.

313.    In April 1999, four Saudi government officials - Khalil, Thumairy, Bayoumi, and
Soliman Al-Ali – participated in a "MANA" seminar organized by Bayoumi and Soliman Al-Ali
at the King Fahad Mosque offices. Ex. 10E, MPS902-CLIP Video Exhibit; Ex. 27, Madha Supp.
Decl. ¶¶ 4-10 & Ex. 1-6.

314.    In July-August 1999, MOIA held a training forum for its propagators in Los
Angeles and instructed its propagators to attend.  Ex. 204, KSA 1268-1270 at 1270 (Ex. 499);
Ex. 138, *U.S. v. Mohamed*, Ex. 23 (Saudi government document read into evidence at trial of
propagator Abdi Mohamed marked "urgent" instructing him to attend the propagator forum in
Los Angeles in July 1999).

315.    In August 1999, the Imam Mohamed University Vice-Rector and committee
members visited Thumairy.  Ex. 240, KSA 8370.

REDACTED FOR PUBLIC FILING

316.    In December 1999, Thumairy hosted MOIA Propagators Abdullah Al Jaithen and Majed Al Mersal in Los Angeles, and the men had dinner at the King Fahad Mosque. Ex. 5, Youssef Rpt. 139-141; Ex. 184, KFM 0021 (Thumairy wrote check to Mosque for "iftar" - the evening meal held during Ramadan - on day that Jaithen and Mersal were in Los Angeles); Ex. 96, Jaithen Dep. 115:5-12;

317.    Jaithan and Mersal also ate dinner at Thumaiy's house while in Los Angeles. Ex. 96, Jaithen Dep,125:3-18.

318.    As detailed below, Thumairy met on various occasions in person and had significant ▮▮▮▮ contacts with Omar Al Bayoumi and Consulate Secretary ▮▮▮▮▮, to establish and provide the support network for the 9/11 hijackers. Ex. 5, Youssef Rpt. 52, 184-185 (documenting contacts between Bayoumi and ▮▮▮).

319.    On February 1, 2000, Thumairy, Bayoumi, and Mana met at the King Fahad Mosque, immediately after Bayoumi held a meeting with the 9/11 hijackers. Ex. 92, Morgan Decl. ¶¶ 20, 21, 23, Ex. 112, Morgan Dep. 98:10-99:12.

320.    In September 2000, MOIA's Deputy Minister Ammar and his delegation visited Thumairy and Tajuddin Shuaib at the King Fahad Mosque. Ex. 668, KSA 7362.

321.    In October 2000, a former senior Saudi finance official visited the Mosque, met with Thumairy, and sent a report to Prince Abdulaziz. Ex. 680I, KSA 7104-5.

322.    The Imam of the Grand Mosque in Mecca, Sheikh Abdulrahman Al Sudais, visited Los Angeles during the summer of either 2000 or 2001. Ex. 50, KFM 0439 (Ex. 208).

323.    From December 29, 2000 – January 6, 2001, the Imam Mohamed University branch in the U.S., the Institute of Islamic and Arabic Sciences in America, held a program at the King Fahad Mosque "conducted by prominent scholars from [Imam Mohamed University]").

REDACTED FOR PUBLIC FILING

Ex. 535, FBI 4392-93, 4439. Saudi Arabia did not produce any documents about this program; it was only obtained because of an FBI search on Bayoumi's Office at Al Madinah Mosque. *Id.*

324. In August 2001, Thumairy hosted three men in Los Angeles who Khalil identified as extremists; one of the three men was a MOIA official who was invited by Thumairy invited to preach at the King Fahad Mosque. Ex. 113, Khalil Dep. 79:4-80:23.

### D. Thumairy worked with and was supervised by the Saudi Consulate on a daily basis.

325. Thumairy was visited regularly by the group of senior Consulate officials, led by Saudi Consul General Mohamed al Salloum, who attended the Mosque every week for Friday services. Ex. 107, Thumairy Dep. 106:19-107:6 (Consul General Salloum attended the Mosque every week); Ex. 95, Awad Dep. 33:11-34:9 (Deputy Consul General Awad regularly attended the Mosque), 40:23-41:15 (Thumairy was primary Imam); Ex. 124, Ibrahim Dep. 37:13-18, 67:12-23 (Sami Ibrahim attended Friday prayers).

326. Thumairy had frequent meetings with Saudi Consulate Islamic Affairs Secretary Mana. Ex. 72, Madha Decl. ¶ 19-20 (Thumairy and Mana were close and had meetings at the mosque); Ex. 110A, Mana Dep. 85:18-20.

327. *Consul General Salloum.* At his 2004 9/11 Commission interview, Thumairy admitted "[w]hen asked who was his superior, al-Thumairy said he reported to the Consul General." Ex. 90, Snell Decl., Ex. 3 at 3.Ex. 62, Thumairy Interview with 9/11 Commission at 6-7.

328. Consul General Salloum relied on Consulate Secretary Mana to be his eyes and ears at the King Fahad Mosque. Mana testified that he reported to Salloum about everything he observed at the Mosque: "[e]very detail that I received about the mosque, I brought to him [Salloum]." Ex. 110A, Mana Dep. 254:16-255:15.

REDACTED FOR PUBLIC FILING

329. Mana worked with Thumairy to oversee Saudi Arabia's funding of the Mosque and approve all expenditures. Ex. 72, Madha Decl. ¶ 13 (Usman Madha, the Mosque's financial employee testified that Saudi Arabia set up an expense account with $1 million under the name of the Mosque, and that "[t]he Consul General appointed a consulate employee, Ismail Mana, to oversee the account and approve any expenditures before authorizing payment…."); Ex. 110A, Mana Dep. 113:21-116:14, 256:2-257:19; Ex. 292, KSA 7193; Ex. 291, KSA 7146; Ex. 306, KSA 7119 (Ex. 605).

330. On January 31, 2000, Salloum wrote his own personal check for $12,000 to the Mosque with a note "King Fahad Mosque." Ex. 185, KFM 0034. That was the same date that Bayoumi travelled to the Los Angeles Consulate ostensibly to file for passports with his family. The following day, Bayoumi returned to the Consulate and met Mana, met the 9/11 hijackers at a restaurant, and went to the King Fahad Mosque to report to Mana and also Thumairy. Ex. 5, Youssef Rpt. 177-191.

331. *Deputy Consul General Ibrahim.* Thumairy told the 9/11 Commission that he worked alongside "Sami Ibrahim, Deputy Consul General" at the Saudi Consulate. Ex. 90, Snell Decl., Ex. 3 at 3. When the FBI asked Thumairy in May 2003 "who were his friends/associates in the Los Angeles area" Thumairy "identified the Consulate General, Sammy." Ex. 154, FBI 000001-000006-REV2021 at 4.

332. *Deputy Consul General Awad.* Thumairy also told the 9/11 Commission that "he worked most closely with two individuals" at the Consulate and named two different persons: "Said Jabreen and Abdullah Hawad [Awad]." Ex. 90, Snell Decl., Ex. 3 at 3.

333. Abdullah Al Awad oversaw the Consulate's Islamic Affairs section and its Secretary Ismail Mana. Awad and Sami Ibrahim served as members of the Grand Opening

REDACTED FOR PUBLIC FILING

committee for the King Fahad Mosque. Ex. 95, Awad Dep. 75:12-23, 76:9-77:16; Ex. 124, Ibrahim Dep. 108:16-109:5 (stating that he served on committee in consular capacity and is instructed not to answer further questions); Ex. 51, KFM 0426 (Ex. 209).

334.    *The Consulate Islamic Affairs Section and its Secretary* ████████.  Thumairy told the FBI in May 2003 that he "works with 2 other individuals," namely ████████ (misspelled ████████) and Abdul Karim Bin Baz (misspelled "Abdul Karim Bimbas") in "the Islamic Affairs [sic] /Media Section" at the Consulate.  Ex. 154, FBI 000001-000006-REV2021 at 2.

335.    Saudi Arabia obtained an A-2 diplomatic visa for Mana, an Algerian citizen, to work at the Consulate.  Ex. 110A, Mana Dep. 44:2-22.

336.    Mana was the Secretary and sole employee of the Consulate's Islamic Affairs section and reported to Salloum and Awad.  Ex 95, Awad Dep. 76:9-77:16; Ex. 306, KSA 7119. According to Mana, Bin Baz, who Thumairy identified to the 9/11 Commission in 2003, was "one of the vice consuls that handled the Islamic Affairs Department for a short period of time." Ex. 110A, Mana Dep. 75:3-7.

**E.  Thumairy received special assignments from Saudi Prince Abdulaziz to provide funding and other support to individuals and organizations linked to terror.**

337.    Saudi Arabia's Prince Abdulaziz was a senior member of Saudi Arabia's cabinet who had a leading role in Saudi Arabia's decision to build the King Fahad Mosque.  Prince Abdulaziz held the government titles of Minister of State, Member of the Council of Ministers, and Head of the Prime Minister's Office. Ex. 140, KSA 8784 (Ex. 414); Ex. 50, KFM 0439-40 (Ex. 208).

338.    Prince Abdulaziz wired significant sums to Thumairy for distribution to various individuals and charities.  The FBI produced a record showing that the Prince wired

REDACTED FOR PUBLIC FILING

approximately $120,000 to Thumairy on three separate occasions in June 1999, November 2000, and in June 2001 for a total of $360,000. Ex. 5, Youssef Rpt. 48; Ex. 483, FBI 001033 at 1034, 1036.

339.    Thumairy could not recall when the Prince's funding first started or who contacted him to start it. Ex. 107, Thumairy Dep. 195:2-196:21.

Thumairy was already involved in the funding scheme well prior to June 1999. A March 1997 document shows that Ibrahim Al Hiber (the MOIA propagator in Los Angeles prior to Thumairy), suggested to Prince Abdulaziz that Thumairy be assigned to oversee the funding. Ex. 296, KSA 8042-43 (Ex. 412).

340.    Portions of the funds were distributed by Thumairy to Somali-run organizations in San Diego that were associated with the Somali-based terrorist organization Al Ittihad Al Islamia (AIAI), an ally of Al Qaeda. Ex. 2, EO 0563; Ex. 542, FBI 007516-REV2021 (noting the ties of AIAI to Osama Bin Laden).

341.    According to a United Nations report:

AIAI began its alliance with Al-Qaida…in 1993 and Usama Bin Laden (deceased) devoted substantial funds towards the establishment of an AIAI-administered authority in Somalia, which supported the ultimate aim of setting up an Al-Qaida base of operations there. AIAI later supported Al-Qaida's bombing of the United States Embassies in Kenya and Tanzania on 7 August 1998.

Ex. 67B, UN Security Council Sanctions Listing for Al Ittihad Al Islamia.

342.    Recipients associated with AIAI, including MOIA propagator Sharif Battikhi, visited Thumairy in-person each month to collect their money. Ex. 107, Thumairy Dep. 206:4-207:4.

343.    An FBI source stated that the funds funneled through the King Fahad Mosque and being used by Thumairy originated with Osama Bin Laden. In 2004, the FBI questioned Saudi

REDACTED FOR PUBLIC FILING

Arabia on the origin of the funds, but Saudi Arabia did not respond to the inquiry. Ex. 2, EO 0693 ("SD is awaiting response from leads sent to Riyadh…").

344. In the wake of the Embassy bombings in Kenya and Tanzania, a foreign government advised the U.S. government that Bin Laden "pledged further financial support to AIAI and, in turn, the group is to work with UBL [Bin Laden] against Western interests and facilities." Ex. 2, EO 0361-0366 (at 0362).

345. Of the funds received from Prince Abdulaziz, Thumairy withdrew $81,000. Ex. 483, FBI 001033 at 1038. While Thumairy initially claimed that he gave the money to the King Fahad Mosque, he subsequently could not explain how he contributed the funds, and ultimately admitted he could not remember how much he contributed to the Mosque. Ex. 107, Thumairy Dep. 208:14-211:24.

346. Thumairy's initial claim that he donated the money to the Mosque was contradicted by other evidence. The King Fahad Mosque records contain only one $3,000 check from Fahad al Thumairy to the Mosque to pay for an iftar dinner. Ex. 5, Youssef Rpt. 149-50; Ex. 184, KFM 0021. Prior to the 9/11 Attacks, Thumairy received a total of approximately $40,000 from the King Fahad Mosque, and apparently negotiated for the Mosque to pay him $700 per month towards his rent. Ex. 292, KSA 7193; Ex. 183, KFM 0002 - 0122. (checks and other payments to Thumairy). These funds were in addition to Thumairy's monthly salary that he was paid by the Saudi Embassy. Ex. 59, KSA1307-1309 at 1308 (Sadhan Dep. Ex. 498) (showing Thumairy as Rank 9 and a monthly salary of $6,940).

347. A December 2002 letter from MOIA propagator Shuaib to Saudi Consul General Salloum confirms that Thumairy took money but never contributed funds to the Mosque:

Before him [Thumairy], there were two sheikhs from Saudi Arabia, who

REDACTED FOR PUBLIC FILING

> joined the Foundation and who didn't receive any money during their
> tenure from the Foundation. They instead gave the Foundation money and
> further collected large sums of funds to help foundation improve its
> charities and works. *That is something Fahad Thumairy never did*.

Ex. 680J, KSA 7137 (emphasis added).

348.    The full amount of money received and distributed by Thumairy for the Saudi

government is uncertain.  Thumairy's account records were not produced in this case by the FBI

or Saudi Arabia.  In February 2022, the Department of Justice advised Plaintiffs' counsel that

Thumairy's bank account records were obtained by the FBI but intentionally destroyed in August

2005.  Ex. 330, February 22, 2022 Email from Brian Netter.

349.    Saudi Arabia did not produce any documents concerning the funds sent to

Thumairy from Prince Abdulaziz to Thumairy until Plaintiffs filed a motion after receiving the

FBI report about those funds.  ECF No. 6577 at 34-36.  Even then, Saudi Arabia only produced

documents evidencing the wire transfers already documented by the FBI and did not provide

documents showing how Thumairy was directed to distribute the funds or how he distributed the

funds.  Ex. 680X, KSA 8570 (showing transfer to Wells Fargo account in Los Angeles titled

"AL BER Account." Ex. 225, KSA 8569 (showing Thumairy sending account name and number

to receive transfers).

350.    Thumairy also "supervised" the distribution of monthly salaries paid by Prince

Abdulaziz's office directly to a group of Imams and propagators inside the U.S.  Ex. 354, KSA

8440, (Thumairy June 2000 letter requesting the payment of $9,000 from Prince Abdulaziz of

"the monthly payments that are paid as salaries for some of the propagators and Imams who live

in the USA by the Office of His Highness…" and acknowledging that "their disbursement is

supervised by me.").

REDACTED FOR PUBLIC FILING

**F. After working in California for less than two years, Thumairy was named as the supervisor of MOIA propagators in California, many of whom had links to extremism.**

351.    On September 12, 1997, Sowailem sent a letter to MOIA headquarters,

nominating Thumairy to be the supervisor of MOIA's propagators in California. The letter stated:

> Based on the Office's interest in propagators' affairs since this is a top
> priority over all the office's work, in order to facilitate some matters and
> procedures related to propagators, and due to the importance of California,
> I deem it appropriate to nominate Sheikh Fahad bin Ibrahim al Thumairy
> to be supervisor of propagators in California.

Ex. 415, KSA 8503 (Ex. 439).  On September 24, 1997, MOIA headquarters approved Thumairy

to be "a supervisor of propagators in the State of California." Ex. 243, KSA 8502.

352.    On January 14, 1998, Sowailem instructed Thumairy with a written direction "to

supervise the propagators in the State of California" and specifically instructed Thumairy:

"Please provide the Office with periodic reports on the activity of propagators."  Ex. 214, KSA

6903 (Ex. 404).  The letter had an attachment which was not produced by Saudi Arabia.

353.    Three days later, on January 17, MOIA Embassy Director Sowailem wrote to

MOIA's propagators in California, telling them that Thumairy had been nominated and approved

"to supervise the propagators working in the state of California" instructed the propagators to

"[p]lease cooperate with him in everything that serves the *Da'wah* [propagation], in obedience to

the Lord's command (cooperate for the sake of righteousness and piety)."  Ex. 382, DOJ 0010.

Neither this letter, nor the letters that Sowailem sent to the other MOIA propagators in

California, were produced by Saudi Arabia.

354.    MOIA documents confirming Thumairy's supervisory role were first obtained

when the FBI raided the San Diego house of MOIA propagator Abdi Mohamed in 2004. Saudi

Arabia did not produce any of the documents concerning Thumairy's supervisory role compelled

REDACTED FOR PUBLIC FILING

to do so by this Court. ECF No. 6577 at 12-13. Saudi Arabia never produced the letters that

Sowailem sent to Abdi Mohamed and the other MOIA propagators in California directing them

to report to Thumairy.

355. The extremist MOIA propagators working for Thumairy in California included

Tajuddin Shuaib and Mohamed Al Muhanna in Los Angeles and Omar Abdi Mohamed, █████

███████ and Abdimagid Mohamed Omar in San Diego. Ex. 239, KSA 7377-78; Ex. 2, EO

3555-3557 (Shuaib, along with Abdi Mohamed, on FBI list of U.S. based clerics paid by Saudi

Arabia); Ex. 2, EO 0692 (listing three "Saudi government supported propagators in San Diego"

including Abdi Mohamed, ███████, and Omar).

356. Thumairy and several of the propagators working under him were paid through

the Saudi Embassy. Ex. 57 (Qattan Dep. Ex. 418) (Checks Sent by Embassy to Omar Abdi

Mohamed); Ex. 680P, KSA 7497-7511 (Embassy payroll list including payments to Thumairy,

KSA 7497, Abdi Mohamed, KSA 7498, Shuaib, KSA 7499, and Battikhi, KSA 7500).

357. Thumairy exercised strict day-to-day control over his group of propagators,

evidenced by the fact that Thumairy became angry when he learned that an individual working

under him had a second job. Ex. 2, EO 0676.

### G. While working under Thumairy, MOIA propagator Omar Abdi Mohamed became the U.S. leader of a terror group associated with Osama Bin Laden and ran a money laundering operation involving funds from two charities providing material support to Al Qaeda

358. Omar Abdi Mohamed was a MOIA propagator in San Diego from 1995 through

2004. Ex. 2, EO 0685-0695. In Aug 1998, Abdi Mohamed was issued a certificate by MOIA for

his attendance at religious training held in Saudi Arabia. Ex. 132, DOJ 0001-32 at 024-026.

359. Abdi Mohamed was an extremist religious leader associated with the Somali Al

Ittihad Al Islamia ("AIAI") group that was committed to Osama Bin Laden. Ex. 542, FBI

REDACTED FOR PUBLIC FILING

007516-REV2021; Ex. 2, EO 0345, 0362, 0648, 0576 ("MOHAMED was selected as the AIAI leader in the U.S. in the beginning of 2000.").

360.    Abdi Mohamed was trained in a school run by Saudi Arabia, would have to have been recommended for his MOIA job by an "influential Islamic scholar", and "bragged" about working for MOIA. Ex. 2, EO 0675.

361.    When Abdi Mohamed lived in Canada prior to being brought to work for Saudi Arabia in San Diego, he was "an outspoken proponent of jihad against non-Muslim movements in Somalia." Ex. 2, EO 0675, 0721.  Plaintiffs' expert Youssef found, based on his extensive experience dealing with the Saudi Government, that "MOIA would have been aware of the details about Abdi Mohamed's history and background" – including Abdi Mohamed's extremism and connections with terror organizations – "before assigning him to work inside the U.S. in San Diego."   Ex. 5, Youssef Rpt. 64.

362.    Thumairy's supervisor and the MOIA's Embassy Head, Khalid Al Sowailem, personally traveled to San Diego and visited with Abdi Mohamed.   Ex. 2, EO 0722; Ex. 682, Jan. 22, 2004 interview of Omar Abdi Mohamed by INS Officer ███████████ at 2490.

363.    Sowailem and his Saudi Embassy staff sent regular communications to Abdi Mohamed, including his monthly paychecks.   Ex. 57 (Qattan Dep. Ex. 418) (Summary of Checks Paid to Abdi Mohamed).

364.    In addition to working under Thumairy, Abdi Mohamed also had a close relationship with Bayoumi. FBI reports stated that Abdi Mohamed had a "'tight' connection" to Bayoumi, and that the two men regularly had lunch together.  Ex. 542, FBI 007516-REV2021 at 7517; Ex. 2, EO 0345 ("OMAR KHADIB has been seen having lunch with AL-BAYOUMI on numerous occasions.").

REDACTED FOR PUBLIC FILING

365.    Bayoumi had a listing for Abdi Mohamed in his phone book. The listing is for "Omar AlKhateeb 282-6013/286-9465". Ex. 12BB, MPS688_9 (January 2000 typed list in Bayoumi "green folder"); Ex. 12AA, MPS738_37, 38 (handwritten address book).

366.    Bayoumi placed two calls to Abdi Mohamed on the afternoon of January 25, 2000, while the hijackers were in Los Angeles and about to move to San Diego.  The FBI determined that one of Bayoumi's calls was made to ████████8695, which numerous FBI reports identified as a number used by Abdi Mohamed.  Ex. 2, EO 0647-649; Ex. 562, FBI 9041 at 9044; Ex. 560, FBI 8954-REV2021 at 8955 (Abdi Mohamed acknowledged his phone contact with Bayoumi).  The second call was made to ████████-9443. Ex. 515, FBI 3221 at 3228.  That phone number was listed on Abdi Mohamed's business card, which was among the items found in the FBI's search of ██████████████████████████████, and the FBI identified it as a contact number for the WSRA.  Ex. 558, FBI 8883; Ex. 2, EO 0647.

367.    Abdi Mohamed sent a WSRA fundraising letter to Bayoumi similar to a fundraising message he sent to Al Haramain in 2000.  Ex. 391, MPS 43_193 (WSRA fundraising letter to Bayoumi).

368.    Thumairy claimed that he did not even know of Abdi Mohamed, but MOIA documents confirm that Mohamed was a propagator working directly under Thumairy's supervision.  Ex. 107, Thumairy Dep. 159:10-19; Ex. 382, DOJ 0010.

369.    As Plaintiffs' expert Youssef detailed, shortly "after MOIA assigned Abdi Mohamed to work under Thumairy in January 1998, records produced in an immigration fraud trial in the Southern District of California show that Abdi Mohamed initiated a money laundering operation, using a California corporation he helped establish called the 'Western Somalia Relief Agency' (WSRA)."    Ex. 5, Youssef Rpt. 64-65.

95

REDACTED FOR PUBLIC FILING

370.    As Plaintiffs' expert Youssef explained due to "the Kingdom's strict reporting requirements, Abdi Mohamed would have reported his efforts and activities regarding WSRA to MOIA through Thumairy and Sowailem. Abdi Mohamed's WSRA activities were "precisely the type of activity he would be expected to perform as a MOIA employee." As Youssef further stated, "Abdi Mohamed had received specific written instructions from Sowailem not to solicit contributions inside Saudi Arabia without permission from MOIA, but no similar restriction was placed on his activities inside the U.S." Ex. 5, Youssef Rpt. 64-65, 65, n. 227. Ex. 132, DOJ 0001-32 at 013.

371.    As demonstrated at Abdi Mohamed's trial, WSRA received 16 checks between December 1998 to May 2001 from two charities directly associated with Al Qaeda-- the Global Relief Foundation and the Al Haramain Islamic Foundation. Ex. 5, Youssef Rpt. 65; Ex. 20, *US v. Mohamed*, 3:03-cr-03433-JAH, Doc. 39, filed 03/26/04, Indictment at 4; 108507 SVS (March 2, 2000 receipt for $5,000 check from Al Haramain to WSRA). After 9/11, The U.S. designated the Global Relief Foundation and Al Haramain as Specially Designated Global Terrorists for their support to Al Qaeda. Ex. 19B (U.S. Treasury Department statement regarding the designation of the Global Relief Foundation); Ex. 321, PEC-KSA003344 (U.S. Treasury Department designation of Al Haramain).

372.    Abdi Mohammed lied to the FBI about receiving funding from the Global Relief Foundation. Ex. 2, EO 0693-0694. About two years before WSRA received the Al Haramain check, Soliman Buthe, who was later designated as a terrorist financier by the U.S. Government based on his ties to Al Qaeda, personally met with Omar Bayoumi in San Diego. Then, in March 2000, while the 9/11 hijackers Hazmi and Mihdhar were living in San Diego, Al Haramain transferred $5,000 to Abdi Mohamed. Ex. 5, Youssef Rpt. 65, n. 229.

REDACTED FOR PUBLIC FILING

373.     WSRA then sent the Al Haramain funds by way of Dahab Shil, a known "hawala" money transfer agent frequently used by Al Qaeda.  Ex. 5, Youssef Rpt. 65.  In fact, Al Qaeda ran Dahab Shil's office in Karachi, Pakistan, handling terrorist financing transactions from Somali extremists in the U.S.  Ex. 5, Youssef Rpt. 65; Ex. 172, JTF-GTMO Detainee Assessment of Mohammed Soliman Barre dated September 1, 2008, at 3, 5.

374.     In March 2005, Abdi Mohamed was convicted for violations of federal law in the Southern District of California for lying to federal immigration officials to hide the facts of his employment with the Saudi Arabia's MOIA.  Ex. 22, *US v. Mohamed*, 3:03-cr-03433-JAH, Dkt. 153 [Jury Verdict].

375.     The Department of Justice, however, declined to prosecute Abdi Mohamed for his "failure to register as a foreign agent" under 18 U.S.C. § 951.  The reason given by the DOJ was "[d]ue to concerns of diplomatic relations" with Saudi Arabia.  Ex. 681, *In re Mohamed*, File No. A44917640 (US DOJ Exec. Office Immigration Rev. April 22, 2004) U.S. Government Response at 4.

376.     In Abdi Mohamed's appeal of his conviction on immigration fraud, the Ninth Circuit reviewed the evidence received in the sentencing phase, finding that the MOIA

propagator had received money from organizations that would later be designated Specially Designated Global Terrorists and that this money's destination was unknown, that he had undisclosed employment with the government of Saudi Arabia, and that he had extensive foreign travel despite no apparent income to support it.

*United States v. Mohamed*, 203 F.App'x 879, 880 (9th Cir. 2006). The Ninth Circuit found these circumstances were "mysterious" and justified Abdi Mohamed's sentence because they were "so

REDACTED FOR PUBLIC FILING

unusual as to differentiate his case from a normal case of immigration fraud." *United States v. Mohamed*, 203 F.App'x 879, 880 (9th Cir. 2006).

377.    The 2002 Congressional Joint Inquiry Report confirmed the FBI had uncovered the trail of funds originating with the Saudi Government, passing through the King Fahad Mosque to Somali organizations in San Diego and on to Al Qaeda. Ex. 84, Congressional Joint Inquiry Excerpt – "The 28 Pages" at 435 (referencing the KFM as the "Ibn Tamiyah Mosque").

378.    FBI reports state that Thumairy and other Saudi Embassy and Consulate officials funded extremists and terror organizations prior to 9/11, and specifically that "UBL [Usama Bin Laden] money" was "distributed" by Thumairy. Ex. 2, EO 0693.

**H.  While working under Thumairy, MOIA propagator and Saudi agent Sharif Battikhi was the leader of various extremist groups and handled funding.**

379.    Sharif Battikhi was a MOIA propagator ███████████████████ ███████████████████████ (█████████████████████████ ███████████████████; Ex. 245, KSA 0553 at 554, (Ammar Dep. Ex. 448, September 2003 letter from Deputy Minister Ammar listing Battikhi as a MOIA employee being "terminated"); ██████████████████████; Ex. 382, DOJ 0010.

380.    Battikhi visited Thumairy once a month and Thumairy handed funding checks to him.  Ex. 107, Thumairy Dep. 206:4-11, 206:23-207:12.

381.    ███████████████████████, and the MPS production includes a Bayoumi videotape in which Battikhi can be seen at the ICSD Mosque.  Ex. 2, EO ███; Ex. 10B (MPS890-CLIP Video Exhibit) 30:15; Ex. 5, Youssef Rpt. at ██████.

REDACTED FOR PUBLIC FILING

382. ███████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████.

383. ███████████████████████ Battikhi received funds from MOIA propagator Ibrahim Al Hiber, Thumairy's predecessor at the King Fahad Mosque. According to a report from Hiber, Battikhi worked for MOIA to propagate Wahhabi Islam in local jails and at the U.S. Naval Base in San Diego. Ex. 296, KSA 8042-43 (Ex. 412).

384. ████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████

385. Battikhi was named as an unindicted co-conspirator in the Holy Land Foundation case. Ex. 341, *U.S. v. Holy Land Foundation for Relief and Development, et al.*, CR No. 3:04-CR-240-G, Doc No. 656, Prosecution's Trial Brief and Attachment A (List of Unindicted Co-Conspirators), May 29, 2007 (Sharif Battikhi identified as an "HLF employee[], director[], officer[] and/or representative[] in Attachment A.").

386. ██████████████████████████████████████████

████████████████████████████████████████

387. Battikhi was still working for MOIA in September 2003; at that time MOIA shut down its U.S. operations and terminated Battikhi as a MOIA employee. Ex. 245, KSA 0553-54 (Ex. 448).

99

REDACTED FOR PUBLIC FILING

388. Plaintiffs were not allowed to conduct discovery of Sharif Battikhi, his work relationships with Thumairy and Bayoumi, his ties to Al Qaeda and other terror groups, and his involvement in the support network for the hijackers.

### I. MOIA propagator and Saudi agent Tajuddin Shuaib worked under Thumairy at the King Fahad Mosque.

389. MOIA propagator Tajuddin Shuaib, who was a longstanding Ibn Taymiyah Foundation board member, was Khalid AlKhalil's "protégé" at the King Fahad Mosque.  Ex. 72, Madha Decl. ¶ 8; Ex. 2, EO ███.

390. Shuaib was given the title of "Director" of the King Fahad Mosque, while Thumairy held the title of "Imam."  Ex. 72, Madha Decl. ¶ 8.  In January 1998 Thumairy was appointed as supervisor for "propagators in the State of California," which included Shuaib. Ex. 214, KSA 6903 (Ex. 404).

391. The FBI reported that Shuaib "allegedly helped Muslims who were dedicating themselves to Jihad travel into Saudi Arabia or Yemen for advanced indoctrination."  Ex. 2, EO 0658.

392. Although Shuaib was a MOIA propagator working at the King Fahad Mosque alongside Thumairy, Saudi Arabia did not produce his personnel files.

### J. MOIA propagator and Saudi agent Mohamed Al Muhanna worked as Thumairy's assistant.

393. In late 2000, as Thumairy's five-year appointment in Los Angeles was coming to an end, MOIA had picked Mohamed Al Muhanna to be Thumairy's assistant.  In November 2000, Sowailem sent a letter urging that Thumairy's term be extended, stating that Thumairy "is one of the best and distinguished propagators." Ex. 289, KSA 6995 (Ex. 461).  Muhanna, like Thumairy, was well-connected to the Saudi Arabian Government. Ex. 566, FBI 011752-11767 at

REDACTED FOR PUBLIC FILING

11754 (Muhanna and Thumairy used their "influence" to keep ████████ at the Saudi

Consulate). At the urging of MOIA Embassy Director Khalid Al Sowailem and Embassy

Deputy Musaed Al Jarrah, however, MOIA decided to extend Thumairy's term in Los Angeles.

Ex. 257, KSA 1256 (Ex. 423, handwritten note of Jarrah requesting the urgent attention of the

Ambassador to Thumairy's extension). In March 2001, Ambassador Bandar wrote to MOIA's

Minister Sheikh to request that Thumairy's term be extended and that a second MOIA

propagator be named to "assist" Thumairy. Ex. 248, KSA 0589 (Ex. 204).

394. Muhanna, the man that MOIA chose as Thumairy's assistant and planned-

successor, was an Imam Mohamed University graduate who King Fahad Mosque employee

Usman Madha described as "a young, hot-headed, radical man who was a devoted follower of

Mr. Al-Thumairy." Ex. 72, Madha Decl. ¶18-22; Ex. 128, Madha Dep. 61:24-62:4 (Muhanna

was "always in the company of Mr. Thumairy").

395. Shortly after the 9/11 Attacks, Muhanna gave a sermon at the King Fahad Mosque

in support of the 9/11 hijackers which led to his removal from the Mosque's management. Ex. 2,

EO 3504; Ex. 128, Madha Dep. 68:3-70:22.

396. Saudi Arabia provided diplomatic privileges for Muhanna like those arranged for

Thumairy, even though he did not work at the Embassy or Consulate. MOIA records show that

Muhanna formally started work at the Mosque on April 3, 2001 (although it is unclear how long

he was in Los Angeles prior to that date). Ex. 72, Madha Decl. ¶ 19; Ex. 680N, KSA 7349;

Ex. 680R, KSA 7711.

397. The FBI's July 2021 EC concluded that Muhanna was "a leader and spiritual

guide amongst a militant group that separated from the King Fahad Mosque"; "a close associate

of Althumairy"; and "a Sunni Islamic extremist associated with a radical form of the Salafi

REDACTED FOR PUBLIC FILING

ideology." Ex. 2, EO 3504. The EC also confirmed that after the 9/11 Attacks, Muhanna gave an "inflammatory speech at the King Fahd Mosque" that was "calling for jihad." Ex. 2, EO 3504-5.

398.    The FBI's May 2021 EC found that Muhanna and Thumairy, were under the direction of the Embassy and part of the Saudi government's extremist network in Southern California.  Ex. 2, EO 0004.

399.    The EO production also disclosed that the FBI concluded that Muhanna "was trained by ALTHUMAIRY but was not as savvy." Ex. 2, EO 3613.

**K. Saudi Consulate Islamic Affairs Secretary, agent and official Ismail Mana was assigned to assist Thumairy at the Mosque and was a core member of Thumairy's extremist group.**

400.    ██████████████████████████████████

████████████████████████████████████████████

Mosque employee Usman Madha testified that he observed that Mana and Thumairy were close, and that Mana was part of Thumairy's extremist group which regularly met in the library of the Mosque.  Ex. 72, Madha Decl. ¶ 19.  Mana had "a fierce hatred of non-Muslims and held anti-America beliefs."  Ex. 72, Madha Decl. ¶¶ 19-20.

401.    ██████████████████████████████████

████████████████████████

402.    ██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

102

██████████████████████████████████████

403. 

404.     The Mosque's Board President Khalil al Khalil admitted that Mana embraced such conservative views that in 1998 the Mosque's Board decided to bar Mana from participating in Mosque activities.  Ex. 113, Khalil Dep. 235:23-236:18.

405.     Khalil testified that even several years before the 9/11 Attacks the Board was concerned about behavior or thinking when it comes to the Islamic ideologies, we were so concerned about anybody will be active or will be conducting some activities, because we didn't see him [Mana] as a good example."  Ex. 113, Khalil Dep. 235:23-238:24, 240:10-23.

406.     The documentary proof and other testimony, however, show that no restrictions were placed on Mana's activities at the King Fahad Mosque until well *after* the 9/11 Attacks.  To the contrary, before the 9/11 Attacks, Mana was assigned by Saudi Consul General and Board Mosque member Salloum to handle various activities at the Mosque.  These included overseeing the Mosque's finances and distributing the money provided by Saudi Arabia to pay the bills and employee salaries of the Mosque.  Ex. 72, Madha Decl. ¶ 13; Ex. 217, KSA 7194 (Ex. 609, spreadsheet prepared by Mana related to Mosque employees and expenses); Ex. 292, KSA 7193 (Ex. 608, memo from Mosque to "Sheikh Ismail Mana" concerning Mosque employees).

REDACTED FOR PUBLIC FILING

407.     In addition, prior to the 9/11 Attacks, Mana performed numerous tasks for Thumairy at the Mosque, including leading the Mosque prayers on occasion, sitting at the Mosque's reception desk, and serving as Thumairy's translator.  Ex. 72, Madha Decl. ¶¶ 13, 20; Ex. 110A, Mana Dep. Decl. 84:8-85:20; Ex. 217, KSA 7194 (Ex. 609, spreadsheet prepared by Mana related to Mosque employees and expenses); Ex. 95, Awad Dep. 40:10-20 (Friday prayers).

408.     Mana's ongoing roles at the Mosque are demonstrated by the March 2001 memo from the Mosque and Ibn Taymiyah Foundation which was addressed to "Sheikh Ismail Mana," in recognition of Mana's religious work at the Mosque.  Ex. 292, KSA 7193 (Ex. 608).

409.     Khalil claimed that the giving the title "Sheikh" to Mana in March 2001 memo was a "mistake" and "wrong" because "he [Mana] doesn't have the credential to be sheikh, and we are not recognize [sic] him to be sheikh."  Ex. 113, Khalil Dep. 239:14-240:3. Yet Usman Madha and Deputy Consul General Awad acknowledged that prior to the 9/11 Attacks they saw Mana leading the Friday prayers and giving sermons at the King Fahad Mosque. Ex. 72, Madha Decl. ¶ 20; Ex. 95, Awad Dep. 40:10-20.

410.     Indeed, in March 2002, Consul General Salloum wrote to MOIA Deputy Minister Abdulaziz Ammar to support Mana's request for funding from MOIA, citing an "appointment" that Ammar had with Mana during Ammar's visit to the King Fahad Mosque, which occurred in September 2000.  Ex. 291, KSA 7146 (Ex. 607).  Mana asked Ammar for money to allow Mana to pursue "propagation" activities inside California.  Ex. 110A, Mana Dep. 93:1-6.

411.     Mana stated that it was not until about 2005 that he was terminated by the Mosque's Foundation from mosque activities.  This was around the same time that Mana was fired from the Saudi Consulate.  Ex. 110A, Mana Dep. 223:4-15; 233:9-234:21.

REDACTED FOR PUBLIC FILING

**L. Thumairy led the extremist cell at the King Fahad Mosque with Consulate Secretary Mana and Muhanna joined the group once he arrived in Los Angeles.**

412.    Thumairy was the leader of a group that "held extreme, radical, and anti-American views" and Thumairy himself was "hostile to Americans and Western culture, as well as anyone, including other Muslims, who did not follow Wahhabi beliefs." Ex. 72, Madha Decl. ¶ 18.

413.    Thumairy's extremist group "included Khaled Al Cherif (aka Khaled Abu Suleiman), Abdu Ghanem, Mustapha Kamel, Khalid Jalloud, Gamal Nagy, Abdul Hafiz Kebhaj (aka Abu Suhaib), Ismail Mana, and Mohamed Al Muhanna." Ex. 72, Madha Decl. ¶ 26.

414.    ███████████████████████████████████████████ ███████████████████████████████████ At that time, the cell was led by the "Blind Sheikh" Abdul Rahman. ████████ ███ ██████ escorted Rahman around Los Angeles weeks before he was arrested for a wide-ranging terror conspiracy involving the 1993 World Trade Center bombing and other planned attacks on New York City resulting in his conviction and life imprisonment.  Ex. 5, Youssef Rpt. 21, n.13.

415.    ████████████ was described by the FBI as "close associate of Thumairy" and a "hardcore, militant individual who supported the events of 9/11." Ex. 566, FBI 0████████████ at ████. The FBI also identified ████████████████████████████████████ ████████████████████████████████████████████ ██████████. Ex. 566, FBI 0████████████ (2016 FBI Operation Encore report).

416.    Plaintiffs' expert ████████████████████████████████ ████████████████████████████████████████ ██████████ Ex. 5, Youssef Rpt. 53-54.  The 2016 FBI Operation Encore report cites the "close connectivity" of ████████ to Abdel Rahman. Ex. 566, FBI ████████████████████.

████████████████████████████████████████████

REDACTED FOR PUBLIC FILING

417.    Khalil admitted to the 9/11 Commission that "[t]he Blind Sheikh…visited the mosque [the Ibn Taymiyah Mosque]" and that his followers "attempted to radicalize the mosque." Ex. 90, Snell Decl., Ex. 5 at 7.

418.    Khalil stated that "not too long before 9/11" there was a group of individuals at the King Fahad Mosque who "were extreme." Ex. 90, Snell Decl., Ex. 5 at 8. Khalil specifically recalled several names of the members of the extremist group: "a Libyan named 'Abu Sulaiman,'" and "a Yemeni named 'Abdu'" and Khalil also provided the name of "Khalid Cherif." *Id.*

419.    The two individuals Khalil identified – "Khalid Cherif" aka "Abu Sulaiman," and "Abdu" Ghanem – match the members of extremist group led by Thumairy according to Madha. Ex. 72, Madha Decl. ¶ 26. ████████████████████████ the Ibn Taymiyah Mosque when Thumairy's immediate predecessor Ibrahim Al Hiber was the Imam. Ex. 5, Youssef Rpt. 20-21.

420.    Khalil also independently confirmed, as Madha described, that the extremists met in the library at the King Fahad Mosque. Ex. 113, Khalil Dep. 55:22-58:7. Khalil stated that "[t]hose extremists were… thinking that if they have their hands in the mosque, they could really get more recruitment for their camps or for their ideology." Ex. 113, Khalil Dep. 56:9-14.

421.    Khalil claimed that the extremists started "immediately after the inauguration" (in July 1998) and "[t]hat they were really growing..." and that "[w]e tried to work to identify the names and to understand who were the guys who were dangerous or leading those groups…." Ex. 113, Khalil Dep. 58:13-21: 114:24 -115:1 (the inauguration was in July 1998).

422.    Thumairy's leadership of the extremist cell at the King Fahad Mosque was the continuance of operations of the Sunni extremist cell at the Ibn Taymiyah Mosque that Plaintiffs

REDACTED FOR PUBLIC FILING

expert ████████████████████████████████████████████████████

██████████████████████ Thumairy inherited and further developed the existing Sunni

extremist cell when he became the Imam for the MOIA in Los Angeles in 1996.  Ex. 5, Youssef

Rpt. 35.

423.    Thumairy was "hostile to Americans and Western culture" and only catered to "a

small group of men who shared his particular extreme worldview."  Ex. 72, Madha Decl. ¶ 18.

424.    Thumairy "would come to the Mosque, lead prayers, meet with his group of male

followers, and leave."  Ex. 72, Madha Decl. ¶ 18

425.     "Thumairy generally appeared distant and closed minded to the majority of

worshippers and their opinions" and "was hostile to Americans and Western culture, as well as

anyone, including other Muslims, who did not follow Wahhabi beliefs." Ex. 72, Madha Decl. ¶

18. Thumairy "espoused a strict, virulent form of Wahhabist dogma."  Ex. 72, Madha Decl. ¶ 18.

426.    Usman Madha testified that Thumairy "did not have an office or keep regular

hours at the King Fahad Mosque like a typical Imam serving his congregation."  Ex. 72, Madha

Decl. ¶ 18. Thumairy himself could not name a single member of the Mosque's congregation.

Ex. 107, Thumairy Dep. 214:18-24.

427.    Mana, a member of Thumairy's extremist group, identified a picture of the King

Fahad Mosque library at his deposition, the site of the extremist cell's meetings.  Ex. 110A,

Mana Dep. 133:8-134:2. (discussing Ex. 610).

428.    Plaintiffs' expert Youssef explains that "the clandestine practices of Thumairy's

group as described by Madha and Khalil are similar to the practices of the extremist group ████

████████████████████████████████████████████████████ " Ex. 5, Youssef

Rpt. 51.

████████████████████████████████████████████████████

REDACTED FOR PUBLIC FILING

429. Despite his claim that he studied English full time in Los Angeles, Thumairy would not speak English while leading prayers and communicated only in Arabic with his trusted group. Ex. 107, Thumairy Dep. 216:12-24; Ex. 113, Khalil Dep. 134:1-5 (Thumairy "doesn't speak English").

430. Plaintiffs' expert Youssef stated that he "learned that Islamic terror groups relied on their ability to communicate in Arabic to avoid detection by law-enforcement/intelligence agencies believing that these agencies have no Arabic speaking officers or agents who would be able to decipher their communications." Youssef also stated that "[a ] dditionally, terrorist operatives utilized their familiarity of cultural, tribal and dialectical differences within the Arab world to vet individuals who would be considered outsiders." Ex. 5, Youssef Rpt. 51, n.147.

431. The FBI found that "ALTHUMAIRY was very smart and everything he did was camouflaged." Ex. 2, EO 3613.

432. Saudi Arabia claims that Madha's testimony should be discarded because he understands little Arabic and was not part of the private discussions held among the members of Thumairy's group. KSA Aver. ¶ 240. Madha was at the Mosque working and attending services every day and had close firsthand knowledge of the Mosque community and the members of Thumairy's group. Ex. 128, Madha Dep. 33:2-6; 58:18-23.

433. Madha heard them express fierce hostility to Americans, non-Muslims, and anyone who did not follow their extremist dogma. Ex. 72, Madha Decl. ¶ 18.

434. Madha personally witnessed the meetings that Thumairy led in the Mosque library with his small group and their exclusionary behavior towards others at the Mosque. Ex. 72, Madha Decl. ¶ 18.

REDACTED FOR PUBLIC FILING

435. Madha also witnessed the members of Thumairy's group go public immediately after the 9/11 Attacks by leading protests in support of the 9/11 hijackers and trying to take over the Mosque. Ex. 72, Madha Decl. ¶ 26.

436. Saudi Arabia ignores that Madha's testimony is confirmed by Khalil who admitted that extremists were meeting in the Mosque library since it opened and that the two individuals Khalil identified as part of the extremist group were independently identified by Madha to be part of Thumairy's group. Ex. 113, Khalil Dep. 56:20-58:17; Ex. 72, Madha Decl. ¶ 19.

437. Saudi Arabia also ignores that ███████████████████████████ identified by Plaintiffs' expert Youssef, ████████████████████████████████ ████████████████████████████████████████████████ the Sunni extremist cell first organized by the "Blind Sheikh" at the Ibn Taymiyah Mosque. Ex. 5, Youssef Rpt. 50-51.

438. Mosque Manager Madha found jihadist literature in the Mosque Foundation's office building across the street from the Mosque that Madha believed must have belonged to Thumairy. Madha testified that: "The booklets advocated acts of violent jihad with pictures of guerilla fighters and guns. I did not see who placed those booklets inside the that [sic] building but believed, based on the specific location where I found the booklets and the limited group of people with access (including Mr. Al Khalil and Mr. Kaldirim) to that area, that the booklets must have been brought there by Mr. Al Thumairy." Ex. 72, Madha Decl. ¶16.

439. Madha was questioned about the booklets at his deposition and repeated his opinion that given where he found the booklets, they likely belonged to Thumairy. Ex. 128,

REDACTED FOR PUBLIC FILING

Madha Dep. 75:15-76:3; 78:20-79:17. Madha told Khalil and Shuaib about the booklets; neither of them could explain how the booklets ended up inside the Mosque office. *Id.*

440.    Madha's eyewitness testimony was confirmed by the FBI reports in the Executive Order production that Thumairy (together with Muhanna) shipped 2000 boxes of extremist literature ████████ at the Saudi Consulate in 2003.  Ex. 2, EO 3470.

441.    The King Fahad Mosque library had a 1995 official publication of the Ministry of Islamic Affairs containing a Saudi Sheikh's sermon preaching the policy that all non-Muslims should be put to death:

> "[O]ur doctrine states that if you accept any religion other than Islam, like Judaism or Christianity, which are not acceptable, you become an unbeliever. If you do not repent, you are an apostate and you should be killed because you have denied the Qur'an."

442.    The Qur'an distributed by Saudi Arabia at the King Fahad Mosque prior to the 9/11 Attacks was a translation and annotation of that holy book which defines "Al-Jihad" as "holy fighting" with "full force of numbers and weaponry" and states that such jihad is given the utmost importance in Islam and is one of its pillars.  Ex. 72, Madha Decl. ¶ 16 & Ex. 1.

443.    It states that "[b]y abandoning Jihad…Islam is destroyed and the Muslim fall into an inferior position; their honour is lost, their lands are stolen, their rule and authority vanish. Jihad is an obligatory duty in Islam on every Muslim, and he who tries to escape from this duty, or does not in his innermost heart wish to fulfill this duty, dies with one of the qualities of a hypocrite."  Ex. 72, Madha Decl. ¶ 16 & Ex. 1.

REDACTED FOR PUBLIC FILING

## V. THUMAIRY HAD EXTENSIVE AND LONG-STANDING CONTACTS WITH EXTREMISTS IN CALIFORNIA AND ELSEWHERE

### A. Thumairy had links to other radicalized Mosques in California.

444.    Plaintiffs' expert Youssef observed that Thumairy maintained links with other radicalized mosques in San Diego resembling what Youssef observed during his 1992-1996 investigations of the ties between Los Angeles and San Diego Sunni extremist cells.  This included the "significant phone contacts related to the 9/11 hijackers with Anwar Al Aulaqi, Imam of the Al Ribat Mosque, and ███████████████████████████████" Ex. 5, Youssef Rpt. 52; Ex. 12A (Phone calls Nov. 1999 – Feb. 2000)

445.    For instance, Thumairy called Anwar Al Aulaqi aka Awlaki in San Diego prior to the arrival of the hijackers.  Ex. 5, Youssef Rpt. 52 n. 150; Ex. 476, FBI 000548-58 at 56; Ex. 474, FBI 000512-21 at 19; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). Anwar Aulaqi, prior to the 9/11 Attacks, had already been identified by the FBI as a radical Sunni extremist with direct ties to with Al Qaeda.  Ex. 5, Youssef Rpt. 109, 137; Ex. 566, FBI 011752-11767 at 11764 (FBI opened investigation against Aulaqi in 1999 due to his phone contact with an Al Qaeda agent); Ex. 2, EO 2804 (Aulaqi's communications also linked him to Hamas in 1999).

446.    Thumairy's calls to Aulaqi occurred as part of what Plaintiffs' expert Youssef determined were "Calling Circles" among Bayoumi and the Saudi Embassy on December 18-19, 1999 and December 27-29, 1999. Ex. 5, Youssef Rpt. 52, n. 150; Ex. 476, FBI 000548-58 at 56; Ex. 474, FBI 000512-521 at 0519; Ex. 12A (Phone Calls Nov. 1999 – Feb. 2000). A Calling Circle is a pattern of brief calls among various individuals which show familiarity beyond casual acquaintance between the participants. Ex. 5, Youssef Rpt. 14.  The December 27-29 Calling Circle included a unique set of calls by Thumairy to ███████████ in San Diego, who would assist the hijackers after their arrival in San Diego. Ex. 5, Youssef Rpt. 52 n. 150; Ex. 474, FBI

REDACTED FOR PUBLIC FILING

000512-21 at 19. Nine weeks after Thumairy's call to ███████ s phone, that same phone was used to call Al Qaeda's operations base in Yemen. Ex. 5, Youssef Rpt. 52, n. 150; Ex. 2, EO 2801.

447.    As Plaintiffs' expert Youssef determined, "Thumairy also placed a unique set of calls to ███████████ Imam of the Islamic Center of San Diego (ICSD) on February 3, 2000 when Hazmi and Mihdhar first moved from Los Angeles to San Diego and attended the ICSD." Ex. 5, Youssef Rpt. 52, n. 150; Ex. 477, FBI 000559-72 at 0564; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).

448.    When asked about Aulaqi, Thumairy claimed that he had "never heard of him" and could not remember calling Aulaqi on the phone. Ex. 107, Thumairy Dep. 350:23-351:8.

449.    Similarly, Thumairy claimed that he did not know of Imam Mezgouri of the Islamic Center of San Diego and could not recall speaking with him on the phone. Ex. 107, Thumairy Dep. 351:9-17.

**B.  Thumairy hosted radical Sheikh Al Wadi at the King Fahad Mosque.**

450.    In 2000, Fahad al Thumairy had substantive, significant in-person meetings and other contacts in California with Sheikh Muqbil Al Wadi, who founded "the most radical Islamic movement ever to be active in Yemen." Ex. 5, Youssef Rpt. 59. Sheikh al Wadi died in July 2001 in Saudi Arabia. Ex. 5, Youssef Rpt. 59, n 191; Ex. 350, Yemen Times Issue 30, July 24-30, 2000.

451.    The U.S. Department of Defense (DOD) classified Wadi as a "Radical religious figure[]" and listed him in a chart of al Qaeda network leaders, network operatives, and key members ("Chart of Al Qaeda Key Players"), including Osama Bin Laden. Ex. 175, JTF-GTMO Matrix of Threat Indicators at 7-8. A detainee's association with an individual from the Chart of

112

Al Qaeda Key Players was a primary indictor for assessing a detainee's membership or affiliation with al Qaeda. Ex. 175, JTF-GTMO Matrix of Threat Indicators at 7-8.

452.   Wadi was trained and educated in Saudi Arabia and during the 1980s and 1990s and while in Yemen was financed by Saudi private and government funds. At a 1996 conference, Wadi asked God to destroy America and claimed his group was "preparing the people to fight America through jihad." Ex. 305, Laurent Bonnefoy, Institut Français du Proche-Orient. "Violence in Contemporary Yemen: State, Society and Salafism"  at 339.

453.   As explained by Plaintiffs' expert Youssef, "[n]umerous jihadists were recruited for Al Qaeda from the various religious institutes that Wadi established in Yemen including, Abdu Ali Sharqawi aka 'Riyadh the Facilitator.'"  Ex. 5, Youssef Rpt. 59.  Sharqawi was a senior Al Qaeda member close to Bin Laden, who recruited Bin Laden's bodyguards, worked closely with 9/11 attack planner Mohamed Atef, and knew at least eleven of the September 11th hijackers.  Ex. 174, JTF-GTMO Detainee Assessment of Mohammed Zarnuqi dated June 18, 2008 at 3, 11; Ex. 173, JTF-GTMO Detainee Assessment of Abdu Ali Sharqawi dated July 7, 2008 at 2, 9.

454.   In 2000, Akram Alzamari observed Thumairy hosting Sheikh Wadi at the King Fahad Mosque. Ex. 101, Alzamari Dep. 125:23-126:5.  Alzamari recalled seeing Thumairy greet Wadi on his arrival and invite Wadi to lunch. Ex. 101, Alzamari Dep. 126:23-127:5. Alzamari also remembered that he saw Thumairy and Wadi together on multiple occasions in the library of the Mosque.  *Id*. Pursuant to this Court's Order, Alzamari's deposition was conducted by written questions.  Plaintiffs were not allowed to watch the testimony live and had no opportunity to ask Alzamari follow-up questions.  ECF No. 6322 (July 7, 2020 Order of Magistrate Judge Netburn denying Plaintiffs' motion for oral deposition after deposition by written questions).

REDACTED FOR PUBLIC FILING

455.    The arrangements that Thumairy made for Sheikh Wadi were similar to the logistical support that Hiber and the Ibn Taymiyah Mosque provided for the "Blind Sheikh" Abdel Rahman when he visited Los Angeles in 1993.  ████████████████ ████████████████████████████████, who was identified as a member of Thumairy's extremist cell at the Mosque.  ████ handled rental leases and utilities for Wadi and told ████████ to limit his contacts with Wadi.  Ex. 2, EO 0143; Ex. 72, Madha Decl. ¶ 19.

456.    According to Plaintiffs' expert Youssef, "[o]ne of Sheikh al Wadi's supporters in the US posted on the internet contemporaneous information about [Wadi's] visit to California in 2000 and provided contact numbers for Wadi, including one in San Francisco, ████-2791. Ex. 5, Youssef Rpt. 59-60. Ex. 39A, Internet Archive Affidavit at 23.

457.    Between January 2000 and September 2000, Thumairy used his home phone in Los Angeles to place 12 calls to this same Wadi contact number—████-2791—posted by Wadi's supporter.  Ex. 5, Youssef Rpt. 60; Ex. 477, FBI 000559-72 at 0564; Ex. 471, FBI 000591-601 at 0599; Ex. 480, FBI 000625-000633 at 0629, 0630, Ex.482 FBI 000645-000653 at 0650, 0651.

458.    Between May 18 and 29, 2000, Thumairy traveled to San Francisco on a MOIA work trip authorized and paid for by the MOIA.  Ex. 261, KSA 1535.

459.    On May 16, 2000, just prior to departing on this trip to San Francisco, Thumairy made two phone calls to ████-2791.  Ex. 479, FBI 000591-601 at 599.

460.    Despite the evidence of Thumairy's personal contacts with Sheikh Wadi and Wadi's recognized religious stature, Thumairy claimed that he did not know Wadi.  Ex. 107, Thumairy Dep. 351:18-352:18.

REDACTED FOR PUBLIC FILING

### C. Thumairy had numerous phone contacts with radical extremists.

461.     In May and July 2000, Thumairy made multiple phone calls to individuals at  in Santa Ana, CA, who were identified in an ███████████████████████

████████████████████████████████████████████████████████████████

███████. Ex. 566, FBI 0██████████████████. The LIFG was listed by the United Nations on October 6, 2001 as being associated with Al Qaida and Osama Bin Laden. *See* Ex. 67C, UN Security Council Sanctions Listing for Libyan Islamic Fighting Group.

462.     Thumairy also had "phone connectivity with fundraisers for the LIFG." Ex. 566, FBI 011752-011767 at 11763.

463.     An employee of the ██████████████ was a leader of the LIFG in Canada and a suspected accomplice of Al Qaeda operative Ahmed Ressam, who planned the "Millennium Bombing" of the Los Angeles Airport at end of December 1999. Ex. 5, Youssef Rpt. 52-53; Ex. 566, FBI 011752-011767 at 011762.   On December 14, 1999, U. S. custom agents foiled Ressam's plot when he attempted to enter the U.S. from Canada on a ferry boat to Washington State.  Ex. 5, Youssef Rpt. 52; Ex. 566, FBI 011752-011767 at 11762-63.

464.     The FBI noted the concerning nature of "Thumairy's phone connectivity to ██████████████, associated with Ressam's AQ [Al Qaeda] plot …." and concluded, "Thumairy's nexus to this earlier LA-based network linked to Ressam, LIFG and other AQ-associated elements is relevant in assessing his later assistance in arranging the meeting between the 9/11 hijackers and Bayoumi." Ex. 566, FBI 011752-011767 at 11763.

465.     Plaintiffs' expert Youssef agreed with the FBI's reasoning, stating that Thumairy had a "nexus to terrorism  from his personal and phone contacts that [was] confirmed by his

115

contacts with the hijackers and the actions that he took to provide them with support." Ex. 5, Youssef Rpt. 53.

466.     Thumairy's passport, for example, shows that on August 26, 1999 he crossed the land border from the U.S. into Canada at Douglas, Canada, south of Vancouver, near where Ressam had moved in the fall of 1999 in advance of his planned Millennial attacks. Ex. 213, KSA 6882-6902 at 6894; Ex. 339, *U.S. v. Ressam*, 679 F.3d 1069, 1073 (9th Cir. 2012). Despite this hard proof of his travel near to where Ressam was based shortly before Ressam relocated there to put his attack plans into place, however, Thumairy told the 9/11 Commission that he never traveled outside of California except a trip to Disneyworld. Ex. 5, Youssef Rpt. 53, n. 13; Ex. 213, KSA6882-6902 at 6894; Ex. 90, Snell Decl., Ex. 3 at 8.

467.     Thumairy contacted other extremists tied to Al Qaeda in 1999.  On August 20, 1999, Thumairy placed a seven-minute call to the home phone in Saudi Arabia of two brothers who would subsequently become Guantanamo Bay detainees. Ex. 566, FBI 011752-011767 at 11762.  The FBI noted that the elder of the two detainee brothers was linked to Al Qaeda's murder of Paul Johnson, a U.S. government contractor. Johnson's severed head was found in the older brother's residence following a shoot-out with Saudi security forces. in Saudi Arabia in 2004. Ex. 566, FBI 011752-011767 at 11762.

**D.  Thumairy hosted extremists at the Mosque in July 2001.**

468.     Khalil admitted that Thumairy hosted three Saudi extremists in Los Angeles in July-August 2001 and brought them to the King Fahad Mosque.  Ex. 113, Khalil Dep. 78:10-86:12.  Khalil said he wasn't happy because Thumairy had hosted the men and allowed one of them to preach at the Mosque.  Ex. 113, Khalil Dep. 80:15-19.

REDACTED FOR PUBLIC FILING

469.     Khalil said that he had dinner with the three men and Thumairy at an apartment complex located near the corner of Sepulveda and Venice Boulevard in Los Angeles.  Ex. 113, Khalil Dep. 83:22-85:7.

470.     Khalil called MOIA Deputy Minister Abdulaziz Ammar to make a report and get information about the three men hosted by Thumairy.  Ex. 113, Khalil Dep. 80:4-7.  Ammar told Khalil that the Mabahith (the Saudi equivalent of the FBI) were looking for the men.  Ex. 113, Khalil Dep. 80:4-10.  Ammar identified one of the three men as a MOIA employee.  Ex. 113, Khalil Dep. 83:1-3.  Khalil also asked if the men were on vacation, and Ammar told him no.  Ex. 113, Khalil Dep. 80:11-14.

471.     After speaking with Ammar, Khalil claimed that on August 19, 2001, he instructed Thumairy not to host any Saudis preaching at the Mosque without Khalil's permission. Ex. 113, Khalil Dep. 78:10-24.

472.     In July 2001, Thumairy and Faisal Al Muhanna jointly leased two short term rental apartments, units 2-120 and 1-135, at the Avalon Westside apartment complex in Los Angeles located on Sepulveda Boulevard.  Ex. 484, FBI 001042-REV2021 (FBI report detailing Thumairy's Los Angeles apartment rentals at Avalon complex).  Both Muhanna and Thumairy were listed as the residents of the apartments.  Ex. 484, FBI 001042-REV2021 at 1044-46.

473.     The location of that apartment complex and the dates of Thumairy's lease match Khalil's testimony that he witnessed Thumairy host three extremists and had dinner with them at an apartment near Sepulveda and Venice in Los Angeles in August 2001.  Ex. 113, Khalil Dep. 83:22-85:7.

474.     To secure the apartment for the extremists that Thumairy was hosting, MOIA Embassy Head Sowailem provided Thumairy with a July 5, 2001 letter stating that Thumairy

REDACTED FOR PUBLIC FILING

was employed at the Embassy in Washington, D.C. and earned $60,000 per year.  Ex. 484, FBI 001042-REV2021 at 1045; Ex. 222, KSA 8414.

475.    In the lease application, Faisal Al Muhanna wrote that he worked at the Saudi Embassy.  Ex. 484, FBI 0001042-REV2021 at 1044-45.  He listed "▮▮▮▮-3574" as his Saudi Embassy work phone number.  Ex. 484, FBI 001042-REV2021 at 1045.  That Embassy number was Sowailem's direct line at MOIA's Embassy Office.  Ex. 484, FBI 0001042-REV2021 at 1044-45.

476.    On the lease application, Thumairy wrote down his home address of "▮▮ Huron Avenue, Culver City."  Ex. 484, FBI 001042-REV2021-001046-REV2021 at 1045.  That Huron Avenue rental home, just a block from the King Fahad Mosque, is the residence address that Thumairy had on file with the Embassy.  Ex. 224, KSA 8454.

477.    Thumairy claimed that he had no recollection of hosting the three men, Khalil's instruction to him, or having dinner with Khalil.  Ex. 107, Thumairy Dep. 397:10-398:22.  Thumairy claimed that the only lodging he ever obtained was for a "sick man" who was named "al-Shamik or al-Shema or something along the lines."  Ex. 107, Thumairy Dep. 400:1-8, 402:2-8.

478.    Thumairy's statements and testimony about the "sick man" were inconsistent.  When interviewed by investigators for the 9/11 Commission, Thumairy first said he saw the sick father and son at the Consulate; then, during his deposition, said the sick man called the Mosque.  Ex. 90, Snell Decl. Ex. 3 at 5; Ex. 107, Thumairy Dep. 331:8-333:15.  When first asked by the 9/11 Commission, Thumairy stated that he could only recount one occasion "around 1999" when he helped a "a man…with his sick father" and "Thumairy volunteered that he did not find an apartment for these visitors or make any reservation for them."  Ex. 90, Snell Decl., Ex. 3 at 4.

REDACTED FOR PUBLIC FILING

Thumairy changed his testimony regarding the nature of his assistance to the sick man, admitting at his deposition that he helped a "old man" reserve an apartment to be rented on a month-to-month basis. Ex. 107, Thumairy Dep. 333:16-335:2.

479. Thumairy's claimed detailed recollection of information about an "old man" he supposedly met on one occasion (used as a substitute for the three Saudi extremists he was witnessed and documented as hosting) is at odds with the fact that he could repeatedly not remember names of persons, such as Musaed Al Jarrah, Ismail Mana, and Omar Al Bayoumi, individuals that he worked with closely over the course of years in the Saudi government, or the hijackers, Nawaf Al Hazmi and Khalid Al Mihdhar. Ex. 107, Thumairy Dep. 424:23-427:2 (Thumairy denies knowing Jarrah and denies calling him despite 64 calls made by Thumairy to Jarrah's personal cell phone from 7/30/2000 to 2/3/2003 and despite Jarrah being instrumental in Thumairy extension to serve in Los Angeles in 2001.); Ex. 107, Thumairy Dep. 219:7-221:13; 224:17:225:23 (Thumairy claims to not remember Mana ███████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████ ████████████████████████████████████████████████); Ex. 107, Thumairy Dep. 307:20-308:15 (Thumairy denies knowing Bayoumi and denies meeting with Bayoumi at the King Fahad mosque even after being confronted with Dr. Khalil's testimony to the 9/11 Commission that Bayoumi came to the KFM on a number of occasions and used to frequently come to visit Thumairy); Ex. 107, Thumairy Dep. 331:5-335:8; 343:19-347:1 (Thumairy confronted over his specific memory of the name and other details about a man he allegedly helped in Los Angeles, while he could not recall interaction with Hazmi and Mihdhar).

119

480.     Neither Thumairy nor Faisal Al Muhanna could provide any explanation for their joint apartment rentals documented in the apartment complex records with dates corresponding precisely to Khalil's testimony about the visit from the Saudi extremists.  Ex. 107, Thumairy Dep. 328:12-21; Ex. 108, Muhanna Dep. 60:13-18, 62:6-20.

481.     The FBI learned that in 2000-2001, groups Saudi males "like Sadhan and Sudairy" traveled to California, went to camps in Arizona, and met Thumairy privately.  The FBI reported that Thumairy "always met them at a house to pray, but not at the Mosque, except for Friday prayers."  The FBI further reported that "many at the King Fahd Mosque became concerned about this unusual trend, and the fact that the Mosque had no control over the travelers."  Ex. 2, EO 0528.

482.     According to Plaintiffs' expert Youssef, Khalil's immediate call to senior MOIA official Ammar in Riyadh to provide a report and get information about the three men that Thumairy was hosting is "consistent with detailed Saudi Government oversight practices" of its officials working abroad.  Ex. 5, Youssef Rpt. 62; *See also* Ex. 113, Khalil Dep. 79:7-80:23.  Khalil said that Ammar was quickly able to identify one of the men as a MOIA employee and the others as subjects being sought by the Mabahith (Saudi FBI counterpart).  Ex. 113, Khalil Dep. 80:8-10; 82:10-22.  Youssef concluded, "[t]his shows how the MOIA was intimately aware of the activities and nature of the work of its officials and others inside the U.S."  Ex. 5, Youssef Rpt. 62.

483.     As stated by plaintiffs' expert Youssef, "Evidently no action was taken by the MOIA in response to Khalil's report to Ammar about the extremists hosted by Thumairy" because "Saudi Arabia did not produce documents about the communications between Khalil and Ammar or the names of the MOIA employee or the other persons visiting Thumairy" that

120

REDACTED FOR PUBLIC FILING

Khalil and Ammar discussed at the time the three Saudi men visited Thumairy. Ex. 5, Youssef

Rpt. 62.

## VI.    THUMAIRY LEFT LOS ANGELES JUST PRIOR TO THE 9/11 ATTACKS AND NEVER RETURNED TO THE KING FAHAD MOSQUE, BUT CONTINUED TO WORK IN CALIFORNIA TO PROMOTE THE SAUDI EXTREMIST NETWORK.

### A. Thumairy suddenly and unexpectedly left Los Angeles shortly before the 9/11 Attacks and likely had some foreknowledge of the attacks.

484.    Thumairy suddenly left California for Saudi Arabia shortly before the 9/11

Attacks.  According to the testimony of Usman Madha, who worked at the King Fahad Mosque

for the Islamic Foundation of Sheikh Ibn Taymiyah from 1998 to 2013, the timing of Thumairy's

departure was unexpected.  Ex. 72, Madha Decl. ¶¶ 5, 7, 24.

485.    Thumairy had already taken his annual summer vacation two months earlier; he

sent a letter to MOIA requesting his "normal vacation" on May 8, 2001, and his passport shows

that he was in Saudi Arabia on June 17, 2001 and did not return to the U.S. until July 1, 2001.

Ex. 680T, KSA 8423; Ex. 273, KSA 2783; Ex. 680G, at KSA 6895-96.

486.    Nevertheless, Thumairy testified that he decided to take a second personal

vacation that summer and was in Europe on September 11, 2001.  Ex. 107, Thumairy Dep.

360:17-22.

487.    MOIA propagator Shuaib admitted to Mosque manager Madha that Thumairy left

the Mosque unexpectedly without telling Shuaib and that Shuaib had to scramble to find

replacements for Thumairy in the Mosque's prayer schedule.  Ex. 128, Madha Dep. 80:9-82:11.

488.    MOIA records show that Thumairy's request for leave was made at the last

minute, with Thumairy asking on August 28, 2001 for the leave to begin the next day, less than

two weeks before the 9/11 Attacks.  Ex. 272, KSA 2767.

REDACTED FOR PUBLIC FILING

489.     Thumairy was in Saudi Arabia on September 3, 2001, when he obtained a private visa to exit Saudi Arabia. Ex. 680G, at KSA 6896.

490.     Thumairy's sudden, unexpected departure from Los Angeles prior to the 9/11 Attacks shows that he had some foreknowledge of those Attacks.  Phone records show that Thumairy received two calls on his cell phone from ████████████, whom Bayoumi had introduced to Hazmi and Mihdhar and who became close to the two hijackers.  Ex. 670, FBI 008565-8566 at 8566.  ████████████'s phone list (recovered by the FBI) included a listing for Thumairy's cell number ██████-0777.  Ex. 559, FBI 008913-14 at 14, *See also* Ex. 2, EO 0566 (number identified to Al Thumairy).  On August 4, 2001, ████████████ called Thumairy on that cell number, ██████-0777, two times at 10:37am and 11:11am, both for three minutes. Ex. 670, FBI 008565-66. The two calls are the only calls that ████████████ placed to Thumairy in the records produced by the FBI.  Ex. 670, FBI 008565-8566 at 8566.

**B.  Saudi Arabia gave Thumairy two excellent performance reviews, a quick promotion, and an extension to continue serving in Los Angeles.**

491.     Thumairy's Saudi Government superiors clearly approved of Thumairy's work as part of the extremist network. Thumairy received outstanding performance reviews, was commended for his "considerable Da'wah efforts," and his term in Los Angeles was extended. Ex. 297, KSA 8364; Ex. 300, KSA 8496-98; Ex. 206, KSA 2695-97.

492.     While in Los Angeles, MOIA rewarded Thumairy with a promotion at the first available opportunity in 2000.  Ex. 205, KSA 2692 (confirms Thumairy's promotion in February 2000 to a level 9 "Propagator" and describes his job as "Field propagation of Islam (Da'wah), in addition to supervising the programs of the Islamic Foundation of Shaikh Ibn Taymiyyah").

493.     Prior to his promotion, Thumairy was given at least two performance reviews by his superior at the Embassy, Sowailem.  Ex. 206, KSA 2695-97; Ex. 300, KSA 8496-98. One

REDACTED FOR PUBLIC FILING

month after Sowailem assigned Thumairy to supervise all MOIA propagators in California, Sowailem nominated Thumairy for an extraordinary early promotion in February 1998 based on what Sowailem described as Thumairy's "considerable Da'wah efforts." Ex. 297, KSA 8364; Ex. 5, Youssef Rpt. 47-48.

494. Sowailem's nomination letter for Thumairy enclosed a "request" from Thumairy in support of his promotion. Ex. 297, KSA 8364. Saudi Arabia, however, did not produce Thumairy's request.

495. Thumairy's job evaluations – both signed by Sowailem –evaluated Thumairy's work with the highest rating – "excellent." Plaintiffs' expert Youssef concluded that the evaluation with a missing or illegible date, Ex. 206, KSA 2695-97, was likely prepared immediately prior to Thumairy's promotion. Ex. 206, KSA 2695-97 (undated); Ex. 300, KSA 8496-98 (dated February 1998); Ex. 5, Youssef Rpt. 47-48, n.123.

496. In late 2000 and into early 2001, Sowailem and Jarrah both worked to submit requests to extend Thumairy's appointment in Los Angeles and to get an assistant (Mohamed Al Muhanna) assigned to help Thumairy. Ex. 289, KSA 6995 (Sowailem's 2000 request to extend Thumairy's appointment); Ex. 257, KSA 1256 (Jarrah's 2001 request to extend Thumairy's appointment, Ambassador Bandar's furtherance of that request to Shaikh Saleh Al Ash Shaikh). In November 2000, Sowailem sent a letter urging that Thumairy's term be extended. Ex. 289, KSA 6995. His letter demonstrated his work relationship with Thumairy, who he described as someone who was: "one of the best and distinguished propagators"; "widely accepted by the Muslim community"; "praised by the officials at the Saudi Consulate in Los Angeles." Ex. 289, KSA 6995.

REDACTED FOR PUBLIC FILING

497.     Thumairy, however, was not "widely accepted" as Sowailem stated; rather, he was "distant and closeminded to the majority of worshippers" and catered only to his a "small group of men who shared his particular extreme worldview."  Ex. 72, Madha Decl. ¶ 18.  Nor was Thumairy "praised by [Consulate] officials"; both senior Consulate officials who were deposed claimed they didn't know Thumairy (contrary to what Thumairy told investigators in 2003-2004) and didn't know of any praise for him.  Ex. 124,  Ibrahim Dep. 74:19-75:8; Ex. 95, Awad Dep. 97:23-98:19.

498.     In March 2001, Embassy Islamic Affairs Deputy Jarrah sent a handwritten note four days before the expiration of Thumairy's term to urge the Ambassador to file the formal request for Thumairy's extension.  Ex. 257, KSA 1256.

499.     Ambassador Bandar signed and approved that request in March 2001 to keep Thumairy in place "until the mosque matters are settled because of his [Thumairy's] knowledge of all the matters."  Ex. 248, KSA 0589.

**C.  Thumairy attended a MOIA event in Denmark on September 11, 2001.**

500.     Although the MOIA records produced by Saudi Arabia show that Thumairy went to Saudi Arabia for a second vacation in late August 2001, Thumairy left Saudi Arabia on September 6, 2001 and went on a MOIA "work trip" to attend a MOIA propagation conference in Denmark alongside Sowailem and other high level MOIA officials.  Thumairy was at the conference with Sowailem on September 11, 2001.  Ex. 272, KSA 2767; Ex. 680G, KSA 6895-96; Ex. 107, Thumairy Dep. 361:6-365:12.

501.     Thumairy testified that "I don't remember anyone" at the conference other than Sowailem, couldn't recall details about the conference, and claimed that his role at the

REDACTED FOR PUBLIC FILING

conference was "[j]ust attending" and that he did not give a lecture as reported in the newspaper article.  Ex. 107, Thumairy Dep. 361:6-365:12

502.     Khalil recalled that when he saw Thumairy for the last time — in Saudi Arabia several weeks after the 9/11 Attacks — that Thumairy had just returned from yet another conference held in Budapest.  Ex. 113, Khalil Dep. 68:20-70:10.

503.     MOIA procedures required that work trips of MOIA officials be approved in writing in advance.  Ex. 285, KSA 5248 (December 1996 approval by MOIA for Sowailem to attend conference in Orange County).  In addition, the extent of MOIA's control over its propagators is evidenced in a November 18, 1996 letter that was discovered in the possession of Abdi Mohamed during a search pursuant to a warrant served during his arrest. The letter affirmed that "no propagator should leave his post or take leave without first obtaining a written authorization from the relevant authority." It further warned that "Whoever violates this guideline will be subject to disciplinary action to include termination of service." The letter was signed by Sowailem. Ex. 2, EO 0356.

504.     The facts of the MOIA event in Copenhagen in September 2001 became known only because of an article Plaintiffs discovered in an Arabic newspaper.  Ex. 47, Ghudaian Ex. 453 (September 7, 2001 Al Jazirah article about MOIA program in Copenhagen, Denmark attended by various MOIA officials, including Thumairy, who scheduled was to deliver a lecture on September 11, 2001).

505.     Saudi Arabia produced no documents about Thumairy's work trip to the MOIA forum in Denmark or to Budapest.

REDACTED FOR PUBLIC FILING

### D.  Following the 9/11 Attacks, Thumairy's extremist group, including his MOIA assistant Muhanna, protested in support of the 9/11 hijackers.

506.    Usman Madha testified that on "[t]he Friday after the 9/11 Attacks" he "observed Tajuddin Shuaib give a sermon denouncing the horrendous terrorist acts" and that members of Thumairy's extremist group – including Khalid Cherif and Abdu Ghanem –started to protest the sermon and tried to provoke a physical altercation with Shuaib.  Ex. 72, Madha Decl.at ¶ 26; Ex. 128, Madha Dep. 63:20-66:8.

507.    Then, several weeks later Thumairy's assistant Muhanna delivered a Friday sermon at the Mosque that led MOIA propagator Shuaib, who was visibly upset, to admit to Madha that Muhanna was "incendiary and extremist", that "Muhanna made statements in support of the 9/11 terrorists", and that Muhanna claimed that "they [the 9/11 hijackers] had legitimate reasons to carry out the attack."  Ex. 72, Madha Decl. ¶ 27; Ex. 128, Madha Dep. 68:3-69:9.

508.    Consul General Salloum likely witnessed Muhanna's sermon; Thumairy testified that Consul General Salloum "came every Friday to pray with us" at the Mosque.  Ex. 107, Thumairy Dep. 105:21-106:4, 106:19-107:6 ("What I do remember is the Consul General Salloum….I remember him coming every Friday to pray Friday with us at the mosque.")

509.    Madha reported to Mosque Board member Kaldirim about what Muhanna said in his sermon and recommended that immediate action be taken.  Ex. 72, Madha Decl. ¶ 27.  Madha attested that "[i]t was clear that Mr. Al Thumairy's fanatical group, now led by Mohamed Al Muhanna, were [sic] trying to take over the Mosque" and the decision was "[e]ventually" made that the "entire group including [Muhanna] were expelled from the Mosque."  Ex. 72, Madha Decl. ¶ 28.

REDACTED FOR PUBLIC FILING

510.     At his deposition, Kaldirim described the sermon as "very conservative and…not fitting with our understanding as an organization" and when asked what he meant said that Muhanna "was talking about September 11, I believe. And he was blaming different people, different things" for the 9/11 Attacks contrary to "our understanding" and the facts of what happened.  Ex. 121, Kaldirim Dep. 178:11--181:12.

511.     Madha was "responsible for handling the removal of several of those men [who were part of Thumairy's "fanatical" group] from the Mosque, including enlisting the help of the Culver City police." Ex. 72, Madha Decl. ¶ 28.

512.     Madha heard Muhanna tell Kaldirim that his expulsion from the Mosque for supporting the 9/11 hijackers "was not acceptable because it was the King of Saudi Arabia who had sent him to the Mosque."  Ex. 72, Madha Decl. ¶ 28.

513.     Madha testified that after Muhanna's expulsion, he and Kaldirim were "summoned" by Saudi Consul General and Mosque Board member Salloum to attend a meeting at the Consulate.  Ex. 72, Madha Decl. ¶ 29.  At the meeting, Salloum "complained to Mr. Kaldirim about the removal of Mr. Al Muhanna."  Salloum told them that he "did not believe that Mr. Al Muhanna had done anything wrong, or that there was any basis to remove him from the Mosque."  Ex. 72, Madha Decl. ¶ 29.  Salloum also told them that "no action should have been taken by the Mosque against [Muhanna] without consulting first with the Consul General."  Ex. 72, Madha Decl. ¶ 29; Ex. 128, Madha Dep. 71:22-72:8 (Consul General Salloum said that "he didn't believe there was any reason to remove Mr. Muhanna from the mosque" and that "he didn't believe that Mr. Muhanna had done anything wrong.")

514.     Khalil initially claimed at his deposition that local police were called and the extremists banned several weeks *before* 9/11, Ex. 113, Khalil Dep. 56:6-19, 59:7-60:21, but

REDACTED FOR PUBLIC FILING

when questioned further Khalil admitted that he had no personal knowledge: he couldn't recall

when the calls were made because "the management is there taking care of that" meaning

"Sheikh Shuaib…and other stuff [staff] with him." Ex. 113, Khalil Dep. 60:22-61:9.

515. The "staff" member referenced by Khalil must have been Usman Madha, who

testified that he "personally was responsible" for handling the removal of the members of

Thumairy's extremist group and that he called the Culver City police weeks *after* the 9/11

Attacks. Ex. 72, Madha Decl. ¶ 26-28.

516. On October 8, 2001, Khalil was in Saudi Arabia when he wrote a letter to Prince

Abdulaziz which reported that there were "threats *after* the September 11 attacks" at the Mosque

and noted that "[t]he police, however, were very cooperative." Ex. 50, KFM 0439-40 at 440,

(emphasis added). Khalil's October 2001 letter confirms Madha's testimony that the police were

contacted after the 9/11 Attacks because of the protests of Thumairy's extremist group led by

MOIA propagator Muhanna.

### E. Despite information about his extremism and connection to the hijackers, Saudi Arabia did nothing to investigate Thumairy.

517. About five weeks after the 9/11 Attacks, MOIA propagator and Mosque Director

Shuaib called Khalil in Saudi Arabia to tell him that a team of people, including CIA and FBI

agents, had come to the King Fahad Mosque and shown Shuaib a photograph of Thumairy with

the two hijackers. The photo was of Thumairy and the hijackers standing at the door, in front of

the mosque on the Huron Street side. Ex. 113, Khalil Dep. 68:20-72:5.

518. On October 19, 2001 Khalil once again contacted MOIA's Deputy Minister

Ammar about Thumairy — this time to inform Ammar about Shuaib's report that the FBI had

shown him a photograph of Thumairy with the two hijackers in front of the King Fahad Mosque.

Ex. 113, Khalil Dep. 70:11-16; 76:8-16. It was exactly two months earlier that Khalil contacted

REDACTED FOR PUBLIC FILING

Ammar to tell him that Thumairy was hosting three extremists at the Mosque and that Khalil claimed he warned Thumairy not to invite other Saudi preachers to the Mosque. Ex. 113, Khalil Dep. 76:8-78:1, 85:8-86:12.

519. At the time that Khalil contacted Ammar on October 19, 2001, Thumairy was working in Deputy Minister Ammar's office in Riyadh. Ex. 247, KSA 0580.

520. Shortly thereafter, Thumairy and Khalil met in Saudi Arabia, and Khalil told him about Shuaib's report about the FBI visiting the Mosque and the photograph. Ex. 113, Khalil Dep. 69:7-70:10. Khalil said that Thumairy "was denying" that the photograph was accurate. Ex. 113, Khalil Dep. 72:19-73:5.

521. Despite the serious allegations linking Thumairy to the hijackers at the Mosque, which came shortly after a separate report that Thumairy hosted three extremists at the Mosque in August 2001, Saudi Arabia conducted no investigation of Thumairy to find out whether he met or assisted the 9/11 hijackers. According to Thumairy, MOIA raised only one question to him: Deputy Minister Ammar stated to Thumairy that "the FBI visited the Mosque in Los Angeles and inquired about the Imam" and that Ammar "was just asking me [Thumairy] what that was all about." Ex. 107, Thumairy Dep. 21:4-22:14. MOIA Minister Shaikh asked Thumairy to prepare a statement for the file. Ex. 123 Ash-Shaikh Dep. 212:8-214:7; Ex. 246, KSA 0566 (Thumairy handwritten statement). Nothing more was done by Saudi Arabia, despite the questions raised about Thumairy's role with the hijackers. Ex. 123, Ash-Shaikh Dep. 212:8-214:7; Ex. 100, Qattan Dep. 225:8-227:10; Ex. 98, Shahri Dep. 98:1-5, 112:11-113:20.

522. When asked if he had been questioned about the report that the FBI had photographs of Thumairy standing with the hijackers, Thumairy testified it "never" happened and, regarding a discussion about the fact that there were photographs of Thumairy and the

REDACTED FOR PUBLIC FILING

hijackers at the mosque, "No one told me something like that at all.".  Ex. 107, Thumairy Dep. 407:5-20.

523.    Embassy Islamic Affairs Deputy Musaed Al Jarrah drafted the letter sent by the Embassy on November 9, 2001 to the Ministry of Foreign Affairs in Saudi Arabia, which stated that Thumairy was "far from being a suspect" and that "it is necessary that he returns now to his work as an Imam at the [King Fahad Mosque], especially with the advent of the month of Ramadan."  Ex. 255, KSA 1204. The letter was signed by Vice Ambassador Qattan with Jarrah's initials, which show that Jarrah drafted the letter.  Ex. 255, KSA 1204; Ex. 100, Qattan Dep. 217:13-222:4; Ex. 123, Ash-Shaikh Dep. 212:8-214:7; Ex. 118, Jarrah Dep. 545:16-546:23.

524.    On November 28, 2001, the King of Saudi Arabia himself approved the Embassy's request finding that Thumairy "may return to resume his work" because it had been "ascertained that he is clear" and "[t]he Embassy thinks it is important for him [Thumairy] to return and resume his work as the Imam of the mosque during this holy month."  Ex. 251, KSA 0605.

### F.  After 9/11, Thumairy returned to Los Angeles to continue his assignment to support the Sunni extremist network.

525.    Contrary to the November 2001 message, it was never "ascertained that he [Thumairy] is clear" and Thumairy never returned to "work as the Imam of the mosque…."  Ex. 251, KSA 0605.  Madha, an employee and daily worshipper at the King Fahad Mosque, testified that Thumairy never returned to the Mosque after the 9/11 Attacks.  Ex. 72, Madha Decl. ¶ 25.

526.    Indeed, a U.S. government report, which was reviewed and commented on by Saudi Ambassador Prince Bandar, found that Thumairy was "expelled" from the King Fahad Mosque. Ex. 680E, KSA 6860-61.

REDACTED FOR PUBLIC FILING

527. Thumairy did return to Los Angeles, however, on December 23, 2001, over a week after Ramadan ended. Ramadan 1422 ended December 15, 2001. Ex. 2, EO 3457 (reliable Los Angeles sources reported that Thumairy returned to Saudi Arabia in mid-August 2001 and did not return to Los Angeles until 12/24/2001); Ex. 680G, at KSA 6896 (Thumairy's passport confirms he entered the United States on 12/23/2001).

528. Saudi Arabia cites Mosque Foundation Chairman Khalil's claim that Thumairy was not "expelled" from the Mosque, KSA Aver. ¶ 239. Khalil, however, testified that the last time he ever saw Thumairy was "a month and a week after September 11th" in Saudi Arabia. Ex. 113, Khalil Dep. 68:20-70:4. Khalil *never* saw Thumairy again in Los Angeles after the 9/11 Attacks. Ex. 113, Khalil Dep. 68:20-69:4 (The last time Khalil saw Thumairy was in October 2001 in Saudi Arabia). Khalil also repeatedly and falsely testified that Thumairy had not been named by Saudi Arabia as the Imam at the Mosque in the first place. Ex. 113, Khalil Dep. 99:23-104:8; 111:19-114:9; 163:18-165:7, 244:1-17, 284:3-285:16, 286:16-288:7, 288:10-21; 290:21-291:24; 310:2-15.

529. Numerous documents show that Thumairy did not return to the King Fahad Mosque after the 9/11 Attacks:

a. In March 2002, Consul General Salloum wrote to Deputy MOIA Minister Ammar that "no one is working now in the mosque except for the Foundation's Director [Shuaib] and another person[.]" The other "person" referenced by Salloum was Usman Madha. Ex. 291, KSA 7146; Ex. 72, Madha Decl. ¶ 7 (Madha worked at the Mosque from 1999 until 2013).

b. A March 2002 letter from Embassy Ambassador Qattan stated that Tajuddin Shuaib is the person managing the King Fahad Mosque — and did not mention Thumairy. Ex. 238, KSA 7366.

c. An April 2002 letter from the Embassy's Islamic Affairs department to Ambassador Bandar stated that Shuaib was the Director of the Mosque and referred to Mohamed Al

REDACTED FOR PUBLIC FILING

Muhanna as the "Imam of the Mosque" but explains that Muhanna was not allowed "to interfere with management" of the Mosque. Ex. 295, KSA 7930-33 at 31, 33.

d. Documents show that while in Los Angeles after the 9/11 Attacks Thumairy did not use King Fahad Mosque stationery or the Mosque's stamp as he did in correspondence he sent prior to 9/11. Compare Ex. 140, KSA 8784 (August 2001 letter from Thumairy to Prince Abdulaziz) to Ex. 226, KSA 8571 (December 2002 letter from Thumairy to Prince Abdulaziz).

e. The MOIA Embassy Office payroll records from November 2001 through 2003 show that while Muhanna was on the payroll, Thumairy was removed from the payroll and was compensated via some other means. Ex. 263, KSA 1782, 1800.

530. Thumairy continued to work as MOIA Propagator for the Kingdom in Los Angeles after the 9/11 Attacks but had no longer had the King Fahad Mosque to use as his platform for his extremist activities. Shuaib admitted to Madha that Thumairy returned to Los Angeles and "officiate[d] at other mosques." Ex. 128, Madha Dep. 41:10-13, 42:5-19.

531. One week after Thumairy returned to Los Angeles, Hamad Badr, Imam of the Long Beach Mosque, sent a December 30, 2001 letter to MOIA Minister Sheikh. Badr's letter proposed that Thumairy or Muhanna be delegated by MOIA to serve as the Imam of the Long Beach Mosque. Ex. 303, KSA 8532.

532. Badr was a "Saudi Sunni who follow[ed] an extremist Salafi ideology" and had direct ties to members of Thumairy's extremist group, specifically Saudi Consulate Secretary ███████████████████ Badr and ██████ were attempting to install Sunni extremist leadership at the Long Beach Mosque. Ex. 2, EO 3470.

533. Badr likely prepared his letter to Minister Sheikh, sent one week after Thumairy's return to Los Angeles, after consulting with Thumairy. Phone records show that Thumairy called Badr 61 times from September 3, 1999 to July 20, 2001. Ex. 12H (Thumairy calls to Hamad Badr).

REDACTED FOR PUBLIC FILING

534. Thumairy denied knowing Badr or the Long Beach Mosque and remembered nothing about Badr's request to MOIA for Thumairy to take the helm of that Mosque. Ex. 107, Thumairy Dep. 323:6-22

535. On January 14, 2002, MOIA Deputy Minister and Al Haramain Board member Tawfiq Al Sudairy, wrote to Sowailem to get an update on Badr's proposal to Minister Sheikh. Ex. 680U, KSA 8531. This shows that there were efforts underway inside MOIA to get Thumairy a Mosque assignment to use as a platform for his extremist activities.

536. Thumairy falsely claimed that he was at the King Fahad Mosque for a "whole year after the 9/11 events" and "I went to the mosque every day." Ex. 107, Thumairy Dep. 405:7-19. But Thumairy could not name anyone who saw him at the Mosque after 9/11. Nor when asked could he identify the name of a single worshipper who attended the mosque. Ex. 107, Thumairy Dep. 408:2-14.

537. When detained at Los Angeles Airport in May 2003, Thumairy told the FBI that he "works as an Imam for various Mosques including the King Fahad Mosque (KFM) and the Omar Al Katab Mosque." Ex. 154, FBI 000001-000006-REV2021 at 2. The statement that Thumairy made to the FBI was false because (a) Thumairy no longer worked at the King Fahad Mosque after 9/11; and (b) as Thumairy admitted at his deposition, he never worked as an Imam at the Omar Al Khattab Mosque. Ex. 107, Thumairy Dep. 408:24-409:8.

538. There was a small grain of truth to Thumairy's statement to the FBI that he worked at "various mosques": he was working at an "underground" mosque in Los Angeles. Following the 9/11 Attacks, Thumairy and Muhanna "established an underground mosque in Los Angeles" where they promoted "extremist / militant / fundamentalist teachings" and oversaw the

133

REDACTED FOR PUBLIC FILING

distribution of materials obtained from the MOIA that promoted "an extremist Sunni Salafi ideology" to Mosques around Los Angeles. Ex. 288, KSA 6861; Ex. 2, EO 3465-71.

539. Khalil confirmed that a Mosque at Overland and Venice Boulevard was established by the extremists who were banned from the King Fahad Mosque. Ex. 113, Khalil Dep. 60:17-21 ("they went and they established a small mosque, Overland with Venice Boulevard, for them, because they were banned. They were not welcomed."). One of the "banned" individuals identified by Khalil at his deposition was Khalid Cherif



; Ex. 113, Khalil Dep. 61:10-18 (referring to Khalid Charif as "Abu Soleiman").

540. Further, *after* Thumairy was denied entry to the U.S. in May 2003, Thumairy, along with Muhanna, continued to send extremist materials from Saudi Arabia to ▮▮▮▮ at the Saudi Consulate:

> The overland mosque is receiving compact discs, books, pamphlets and audio and videotapes from Sunni Salafi extremists Muhammad Al-Muhanna and Fahad Al-Thumairy in Saudi Arabia. These materials, which advocate an extremist Sunni Salafi ideology, are being disseminated and left at moderate, mainstream Islamic mosques throughout the southern California area, almost always without the permission of the management of these mainstream mosques. [REDACTED] The discs are narrated by Al-Muhanna and contain Islamic sermons. [REDACTED] Al-Thumairy and Al-Muhanna recently sent 2000 boxes of the above listed material to ▮▮▮ at the Saudi Consulate in Los Angeles. These items were obtained by Al-Muhanna and Al-Thumairy from the Saudi Ministry of Islamic Affairs, who employed both of the individuals while they were in Los Angeles.

Ex. 2, EO 3470.

REDACTED FOR PUBLIC FILING

## VII. THE ATTEMPTS OF SAUDI GOVERNMENT OFFICIALS TO HIDE THUMAIRY'S EXTREMIST ACTIVITIES

### A. Senior Saudi official and agent Jarrah went to the King Fahad Mosque in 2002 to meet with and provide support for the members of Thumairy's extremist group, including Cherif and Muhanna

541.     In February 2002, the Saudi Embassy received a complaint from members of Thumairy's extremist group, including Khalid Cherif and Abdo Ghanem, that MOIA propagator Shuaib had been put in charge of the King Fahad Mosque and had thrown them out of the Mosque.  Ex. 238, KSA 7366; Ex. 72, Madha Decl. ¶¶ 26-28.

542.     In March 2002, Saudi Embassy Deputy Musaed Al Jarrah traveled to Los Angeles to meet with the Consul General Salloum, MOIA propagator Muhanna, and MOIA propagator Shuaib to address the "complaint" made by Cherif and other members of Thumairy's extremist group.  Ex. 295, KSA 7930-33; Ex. 72, Madha Decl. ¶¶ 26-28.

543.     Salloum, Muhanna, Shuaib, and Jarrah refused to meet a "subgroup of three men" who they claimed were engaged in a personal dispute with Khalil, but they did meet with Khalid Cherif.  Ex. 295, KSA 7930-33 at 32 (they met with a "second subgroup" which consisted "of one person named Khalid Sherif [Cherif].")

544.     Jarrah then later met in private with Cherif.  Ex. 295, KSA 7930-33 at 32 ("[a] closed meeting was held between Assistant Head of Islamic Affairs [Jarrah] and Mr. Khaled al Sharif [Cherif].").

545.     Jarrah's report on the meeting describes Cherif — a longstanding extremist cell member who attended the Mosque — as someone who "cares about the Mosque and is one of the most prominent Mosques-goers."  Ex. 295, KSA 7930-33 at 32.

135

REDACTED FOR PUBLIC FILING

546.    Jarrah also reported that "[h]e [Cherif] maintains a relationship with the Imam of the Mosque."  Ex. 295, KSA 7930-33 at 32.  At that time, Thumairy and the Embassy still asserted that Thumairy was the King Fahad Mosque's Imam, even though he never returned to the Mosque after the 9/11 Attacks.  And the record, ███████████████████████ ██████████████████████████████████████████ Ex. 12G (███████████ ██████████████.

547.    Saudi Arabia asserted diplomatic immunity every time plaintiffs asked Jarrah questions about his trip to Los Angeles and the King Fahad Mosque.  Indeed, Jarrah repeatedly asserted that his trips to Los Angeles were in his "diplomatic capacity."  Ex. 118, Jarrah Dep. 157:16-158:3, 172:20-173:19.

548.    Jarrah's report of his March 2002 trip to Los Angeles acknowledged that Muhanna was "not allowed by the Mosque's management to interfere with management…."  Ex. 95, KSA 7930-33 at 33.

549.    After these events, however, in July 2002, Muhanna received his MOIA performance evaluation: he was rated at the highest performance level of "excellent" by his MOIA superiors receiving all excellent marks and Muhanna was specifically lauded for "winning the trust of Muslim Community surrounding him" for the time period which included his notorious sermon at the King Fahad Mosque in support of the 9/11 hijackers and the huge controversy it engendered.  Ex. 680V, KSA 8511-14.

550.    In October 2002, Ambassador Prince Bandar wrote to Saudi Prince Abdulaziz to inform him that Muhanna had been given a formal termination letter by the Ibn Taymiyah Foundation Board.  Ex. 239, KSA 7377-7378.  The Ambassador's letter continued to defend Muhanna's support for the 9/11 hijackers, stating that the Mosque's budget was furnished by

136

REDACTED FOR PUBLIC FILING

Saudi Arabia and that necessary measures should be taken because Muhanna's termination "would offend the Saudis in general" and that Muhanna should be returned to the Mosque "because he was wronged without any basis." Jarrah's name is handwritten on the letter. Ex. 239, KSA 7377-78.

### B. Findings of Thumairy's extremism

551.     The FBI May 2021 EC describes Thumairy as part of a "Southern California based network" of "Saudi Sunni extremists operating inside the United States…." Ex. 2, EO 0004.

552.     Madha's account of the radical group he witnessed Thumairy lead at the Mosque is confirmed by the findings the report that the U.S. Government provided to the Saudi Embassy. The report stated that Thumairy and Mohamed Al Muhanna "held extremist views and cultivated extremist followers. These followers praised and supported the terrorist attacks of 11 September 2001." Ex. 237, KSA 6863-65; *See also*, KSA Aver. ¶ 239, Ex. 142.

553.     Plaintiffs' expert Youssef explained that this document was likely produced by the State Department's Bureau of Intelligence and Research based on the lack of classification markings. Ex. 5, Youssef Rpt. 51, n. 148. Saudi Arabia did not provide any response or question the findings in the U.S. report; however, Saudi Ambassador Prince Bandar did forward the report to Saudi Minister of Foreign Affairs, Prince Saud al-Faisal, advising him to, "…please review and be advised, and take whatever action you see fit." Ex. 237, KSA 6863-65 at 6864, *See also*, KSA Aver. ¶ 239, Ex. 142. Based on Thumairy's testimony at deposition, as described above, the action Prince Saud al-Faisal chose to take was no action.

554.     Similarly, the 9/11 Commission Report cited "Thumairy's reported leadership of an extremist faction at the [King Fahad] mosque[;]" described Thumairy as "reputed to be an

REDACTED FOR PUBLIC FILING

Islamic fundamentalist and a strict adherent to orthodox Wahhabi doctrine[;]" and confirmed that "Thumairy appears to have been associated with a particularly radical faction within the local worshippers[.]" *See* 9/11 Commission Report at 216-17

555.    As of September 2003, the FBI had determined that Fahad al Thumairy was a radical Islamic extremist, identifying him as "part of the Al-Qaida linked extremist Suroori network in Saudi Arabia."  Ex. 2, EO 3469. The Suroori are described by the FBI as "violent jihadists" and a splinter extremist group aligned with Al Qaeda.  Ex. 2, EO 3468-69.

556.    As Plaintiffs' expert Emile Nakhleh explained, the "Surrori" were named after Muhammad Surur (1938-2016), a leading cleric and favorite among the Saudi government religious elite, whether intellectual or jihadi, who advocated "strict organizational discipline" and military tactics as a means of "operationalizing jihad."  Ex. 149, Nakhleh Rpt. ¶¶ 41-43.

557.    The 9/11 Commission stated that "[a]fter 9/11, Thumairy's conduct was a subject of internal debate among some Saudi officials…" and that "arguments arose within the Saudi government over whether to allow reputedly radical imams, including Thumairy, to work for the Saudi government in the United States."  *See* 9/11 Commission Report at 217, 514, n. 12. The Commission observed that "[i]n May 2003, the U.S. government settled the matter, at least in Thumairy's case, by refusing to let him back into the country."  *See* 9/11 Commission Report at 514, n. 12.

558.    Saudi Arabia cites to the testimony of three individuals to suggest that Thumairy did not express extremist views.  KSA Aver. ¶¶ 237-240.  Two of those individuals — Saudi Consulate Secretary Mana and ▄▄▄▄▄▄▄▄▄ — were directly involved with the support network for the two hijackers, and ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

REDACTED FOR PUBLIC FILING

████████████████████████████. The third individual, Alzamari,

described himself as a friend of Thumairy. Ex. 101, Alzamari Dep. 18:22-21:16. He testified by

written questions without genuine cross examination.

### C. Saudi officials who worked with Thumairy prior to the 9/11 Attacks sought to distance themselves from Thumairy and MOIA's extremist network.

559. Saudi Consulate Deputy Consul General Ibrahim was identified by Thumairy to

the FBI as his "friend" at the Consulate and Thumairy called Ibrahim's home number, his cell

number, and his wife's cell phone. Ex. 154, FBI 000001-000006-REV2021 at 4; Ex. 124,

Ibrahim Dep. 96:3-100:11. Yet:

a. Ibrahim claimed that he attended the King Fahad Mosque around two Fridays each
   month. Ex. 124, Ibrahim Dep. 37:13-21. Ibrahim testified that "I know of him
   [Thumairy]" but claimed that he did not remember meeting Thumairy. Ex. 124,
   Ibrahim Dep. 39:4-8, 40:5-14.

b. When asked to describe his relationship with Thumairy, Ibrahim used one word:
   "Zero." Ibrahim testified that he could not recall meeting Thumairy. Ex. 124, Ibrahim
   Dep. 39:22-24, 40:5-14.

c. Ibrahim claimed he did not know that Thumairy was working for Saudi Arabia or its
   Ministry of Islamic Affairs. Ex. 124, Ibrahim Dep. 59:3-18.

560. Ibrahim said he did not recall having phone conversations with Thumairy despite

numerous records of telephone calls from Thumairy's phone number to Ibrahim's home number,

his cell phone and his wife's cell phone. Ex. 124, Ibrahim Dep. 96:3-100:11. Shown MOIA

Embassy Head Sowailem's November 2000 letter to extend Thumairy's term in Los Angeles,

which claims that Thumairy "is praised by the officials at the Saudi Consulate in Los

Angeles…," Ex. 289, KSA 6995, Ibrahim testified that he had no knowledge of praise within the

Consulate for Thumairy. Ex. 124, Ibrahim Dep. 74:19-75:8.

139

561.    Saudi Consulate Deputy Consul General Awad, who led the Consulate's Islamic

Affairs Section, was named by Thumairy to the 9/11 Commission as one of two persons he

worked with most closely at the Consulate.  Ex. 90, Snell Decl., Ex. 3 at 3 ("Al-Thumairy said he

worked most closely with two individuals named Said Jabreen and Abdullah Hawad, both of

whom helped him with administrative matters.").  Yet:

a. Awad claimed he never met Thumairy in person and could not recall having any
   conversations with him.   Ex. 95, Awad Dep. 48:15-49:15.

b. Awad acknowledged that Thumairy was the Imam at the King Fahad Mosque but
   claimed that he did not know that Thumairy was working as a Kingdom official or
   that he was paid by Saudi Arabia.  Ex. 95, Awad Dep. 41:8-15, 48:7-13, 84:23-85:20,
   98:21-99:11.

c. Awad claimed he did not know that Saudi Arabia registered Thumairy as a Consulate
   officer.   Ex. 95, Awad Dep. 52:6-53:18, 56:8-19, 217:24-218:11.

d. Awad denied that he was one of the Consulate officials who had "praise" for
   Thumairy as stated by Sowailem.  Ex. 95, Awad Dep. 98:11-19.

562.    Thumairy's employment by the Kingdom was common knowledge among

persons who attended the Mosque, not only the Saudi Government officials who were

Thumairy's co-employees assigned to handle Islamic Affairs.  Ex. 72, Madha Decl. ¶ 3, 13.

563.    When Plaintiffs' expert Youssef investigated the Ibn Taymiyah Mosque from

1992-1996, he immediately learned that Ibrahim Al Hiber, the mosque's Imam and Thumairy's

predecessor, worked for Saudi Arabia.  Al Hiber's Saudi government connection was common

knowledge in the Mosque community.  Ex. 5, Youssef Rpt. 70.

564.    Based on his experience with the Saudi Arabia government, it's strict

governmental structure and the manner in which its Embassies and Consulates operated,

Plaintiffs' expert Youssef concluded "it is implausible that high-ranking Saudi Consulate

officials such as Ibrahim and Awad were not aware of the identity of every diplomat associated

REDACTED FOR PUBLIC FILING

with the Consulate as well as the Embassy." Youssef noted that "Awad was responsible for the Consulate's Islamic Affairs section, and it is implausible to believe that he did not know that Thumairy worked for MOIA." Ex. 5, Youssef Rpt. 70.

565. Consulate Secretary Ismail Mana was responsible for the Islamic Affairs section at the Consulate and was a regular attendee at the King Fahad Mosque.

566. Mana claimed that he did not know that Thumairy was employed by Saudi Arabia and its Ministry of Islamic Affairs. Ex. 110A, Mana Dep. 66:23-67:4. Rather, Mana claimed that he believed Thumairy was a Mosque "employee" working "under the supervision of Mr. Tajuddin Shuaib." Ex. 110A, Mana Dep. 89:4-90:5. Yet Shuaib was a MOIA propagator who reported to Thumairy.

567. Usman Madha, an employee of the Ibn Taymiyah Foundation who was responsible for the Mosque's financial affairs and administration, worked with Mana on a regular basis because Mana was appointed by the Consul General to oversee the Mosque's expenditures. Madha testified, "I know from my meetings with Mr. Mana that he knew that Mr. Al Thumairy was paid by the Kingdom." Ex. 72, Madha Decl. ¶ 13.

568. Imam Mohamed University faculty member and Mosque Board Chair Khalil, as well as Board member Kaldirim, testified at their depositions that Thumairy was not the Imam of either the Ibn Taymiyah Mosque or the King Fahad Mosque; was not working for the Ministry of Islamic Affairs at the Mosque; but that Thumairy was one of the "students" who attended those mosques. Ex. 113, Khalil Dep. 97:7-100:18; Ex. 121, Kaldirim Dep. 84:3-20; 105:14-24, 258:24-259:22.

REDACTED FOR PUBLIC FILING

569. Khalil, however, previously admitted to the 9/11 Commission that Thumairy was part of the Mosque's "leadership." Ex. 90, Snell Decl., Ex. 5 at 6 (Khalil named Fahad al-Thumairy and Tajjudin Shuaib when asked to name the mosque leadership).

570. Khalil claimed that he did not know that Thumairy was a MOIA propagator. Ex. 113, Khalil Dep. 120:2-121:1. Khalil and Kaldirim made the remarkable claim that they had no idea that Saudi Arabia employed and appointed Thumairy (and Muhanna) to work at the Mosque. Ex. 121, Kaldirim Dep. 93:1-94:2, 130:3-17.

571. Usman Madha testified that Khalil and Kaldirim knew that Thumairy was the Mosque's Imam and a Saudi government official — it was common knowledge that Thumairy worked for MOIA — and that it was Khalil who told him that Thumairy reported to Embassy Islamic Affairs Deputy Jarrah. Ex. 72, Madha Decl. ¶¶ 12; Ex. 128, Madha Dep. 30:15-32:12.

572. It was Khalil himself who in 1995 confirmed to the Saudi government — in consideration of their funding of the King Fahad Mosque's construction — that the MOIA Minister would choose a MOIA propagator to "manage…and supervise [the Mosque's] activities." Ex. 189, KFM 0379-0382 at 381.

573. MOIA Minister Abdullah Turki had a close relationship with Thumairy and called him "Fahad." Ex. 72, Madha Decl. ¶ 6; Ex. 2, EO 2687-90 at 2689 (according to MOIA propagator Shuaib, Thumairy was "very connected" to Turki and Turki would visit Thumairy in the U.S.). Turki, however, testified that while he "may have come across him [Thumairy]" he didn't know him personally. Ex. 97, Turki Dep. 124:10-125:1.

574. Embassy Islamic Affairs Deputy Jarrah was identified by two Saudi government employees at the Mosque as the person to whom Thumairy reported. Madha testified that Saudi government officials Shuaib and Khalil both admitted to him that Thumairy reported to Embassy

REDACTED FOR PUBLIC FILING

Islamic Affairs Deputy Jarrah.  Ex. 72, Madha Decl. ¶ 12; Ex. 128, Madha Dep. 31:14-32:12; ].
This was confirmed by the FBI's determination that Jarrah was "heavily connected to Saudi
Sunni extremists operating inside the United States, specifically with the Southern California
based network of [Muhanna] and Thumairy…." And "had been directing, controlling and
funding…Thumairy…."  Ex. 2, EO 0004.

575.    Jarrah testified that he could only remember one phone call with Thumairy in
2003 when Thumairy was in Saudi Arabia and "wanted to come back to his job [in the U.S.]."
Ex. 118, Jarrah Dep. 166:24-170-7.   But the available phone records show that while he was in
the U.S. Thumairy called Jarrah's personal cell phone over 60 times.  Ex. 12D (Thumairy calls to
Jarrah). Ex. 471, FBI 000410-29 at 25-26

576.    Despite this documentary evidence, Jarrah testified that he didn't have any
relationship with Thumairy and could not remember having any phone calls with Thumairy when
Thumairy was working in the U.S. Ex. 118, Jarrah Dep. 150:15-151:20; 165:9-166:22; 176:23-
177:7; Ex. 12D (Thumairy calls to Jarrah); Ex. 471,  FBI 000410-29 at 425-426.

577.    MOIA Director of Da'wah Abroad Saud Ghudaian was identified by Thumairy as
the MOIA official and Imam Mohamed University professor who recruited him to work at
MOIA.  Ex. 154, FBI 000001-000006-REV2021 at 2.  Ghudaian testified that all he knew was
that Thumairy was a MOIA employee in America, but he could not remember anything else,
including if he ever met Thumairy.  Ex. 126, Ghudaian Dep. 52:15-54:24.

578.    Deputy Chief of Mission Ahmed Al Qattan, second-in-command behind
Ambassador Bandar,  ran Saudi Embassy operations for over two decades, and testified that he
had never heard of MOIA's Fahad al Thumairy, Ex. 100, Qattan Dep. 30:1-7; did not know how
Thumairy received an Embassy title in his passport, Ex. 100, Qattan Dep. 36:4-13; did not know

REDACTED FOR PUBLIC FILING

eight-year Embassy veteran MOIA Director Khalid Al Sowailem, Ex. 100, Qattan Dep. 24:22-25:1, 47:15-20; and, did not know that MOIA had a Da'wah office in America at the Embassy — or that MOIA had propagators working in the U.S. before the 9/11 Attacks.  Ex. 100, Qattan Dep. 44:22-46:7.

579.    When shown the May 2000 letter from Embassy Director Khalid Al Sowailem to MOIA propagator Omar Abdi Mohamed in San Diego enclosing an award bonus check to Abdi Mohamed from the Embassy, Qattan agreed that Sowailem's letter showed that the MOIA had propagators working in the U.S. prior to the 9/11 Attacks, yet still insisted that he had no knowledge of such MOIA propagators in the U.S.  Ex. 100, Qattan Dep. 115:5-116:10; Ex. 56, *U.S. v. Mohamed*, Case No. 3:03-cr-03433-JAH, ECF 153 at19-20 (Qattan Dep. Ex. 416)..

580.    Plaintiffs' expert Youssef stated that based on his experience, "someone in Qattan's position was responsible for the day to day operation of the Saudi Embassy and Saudi Consulates in the U.S. and had to know about the MOIA's role in the U.S. (including its propagators); its Director Sowailem; and how Saudi Arabia shut down the MOIA in the U.S. in 2003." Youssef additionally concluded Qattan also would have known the "MOIA had propagators working inside the U.S. and in particular would have known about Thumairy because of Thumairy's Consulate title and role at the King Fahad Mosque, which was a key U.S. posting; the extraordinary events involving the FBI investigation of Thumairy's involvement in providing support to the 9/11 hijackers; Thumairy's detention at LAX in 2003; and the U.S. expulsion of Thumairy."  Ex. 5, Youssef Rpt. 71-73.

REDACTED FOR PUBLIC FILING

## VIII.  THUMAIRY'S IMPLAUSIBLE DENIALS OF HIS RELATIONSHIPS WITH SAUDI GOVERNMENT OFFICIALS, THE HIJACKERS AND OTHERS

### A.  Thumairy makes incredible claims that he cannot remember Bayoumi, Mana, Jarrah, Cherif, Hazmi, Mihdhar, and others.

581.    As detailed below, Fahad al Thumairy claimed to have no memory of most of the people he met and interacted with while in Los Angeles. For instance, Thumairy could not name a single worshipper from his time as Imam of the King Fahad Mosque.  Ex. 107, Thumairy Dep. 214:9-215:16.

582.    Further, Thumairy could not recall the name of any of his co-workers or supervisors during this time working at the MOIA in Riyadh. Nor could he recall ever talking to anyone about applying for a Ministry job in the United States.  Ex. 107, Thumairy Dep. 36:22-44:23.

583.    Thumairy denied knowing Omar Al Bayoumi and denied meeting with Bayoumi at the King Fahad Mosque, even after being confronted with Khalil's testimony to the 9/11 Commission that Bayoumi came to the Mosque a number of times, often to visit Thumairy.  Ex. 107, Thumairy Dep. 307:20-308:15.

584.    Thumairy denied telling the FBI in a May 2003 interview that he was employed by the Saudi Consulate since 1996, that his assignment to the Consulate was recently extended for one year, and he worked with Ismail Mana and Abdul Karim Bin Baz in the Islamic Affairs media section. Thumairy testified, "I don't remember that statement."  Ex. 107, Thumairy Dep. 218:12-219:6.

585.    Subsequently, Thumairy claimed to not remember Ismail Mana despite Mana stating that he translated for Thumairy during his sermons at the King Fahad Mosque.  Thumairy claimed not to know Mana ████████████████████████

145

REDACTED FOR PUBLIC FILING

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

███████ Ex. 107, Thumairy Dep. 219:7-221:13, 224:17-225:23; ████████████████████████

████████████████████.

586.     In the same vein, Thumairy claimed to not remember Khalid Cherif. █████

████████████████████████████████████████████████

███████████████████████████████ Ex. 107, Thumairy

Dep. 254:22-257:8; Ex. 12G ████████████████████).

587.     Similarly, Thumairy denied knowing Jarrah and denied calling Jarrah despite

dozens of calls from Thumairy to Jarrah's phone in 2000.  Ex. 107, Thumairy Dep. 424:23-

427:1.

588.     Thumairy also denied knowing Nawaf Al Hazmi and Khalid Al Mihdhar. He also

denied meeting with either of them.  Ex. 107, Thumairy Dep. 340:15-348:9.

589.     Thumairy said he did not know Abdi Mohamed, a propagator working in

California for Saudi Arabia during the time Thumairy was appointed to oversee all Saudi

propagators in California.  Ex. 107, Thumairy Dep. 159:10-18. Incredibly, Thumairy claimed he

did not know he had been appointed supervisor of propagators until his deposition and claimed

he had never seen the letter addressed to him by Sowailem and produced by Saudi Arabia to

Plaintiffs in this litigation.  Ex. 107, Thumairy Dep. 144:5-147:10; Ex. 214, KSA 6903 (shown to

witness as al-Shahri Ex. 404). In fact, when Mohamed's residence was searched pursuant to his

arrest, among Mohamed's belongings was correspondence from MOIA, dated January 17, 1998,

146

informing him of Thumairy's nomination to supervisor of California propagators.  Ex. 2, EO

0358.

### B. Thumairy evaded any inquiry about his relationships with the Saudi government agents and officials who formed and supported the Southern California extremist network.

590.    Regarding Saudi government agent Omar Al Bayoumi, Al Thumairy claimed "I

do not know Bayoumi" and that he did not have any relationship with Bayoumi.  Ex. 107,

Thumairy Dep. 306:2-308:15, 348:15-23.

591.    Thumairy, however, regularly worked with Bayoumi and knew him well:

a. Bayoumi and Thumairy exchanged 67 phone calls in the available phone records.   Ex. 2, EO 2757-59; Ex. 5, Youssef Rpt. 102 n. 413.

b. Bayoumi admitted that he knew Thumairy and the two men met each other in person in Los Angeles at the King Fahad Mosque and Ibn Taymiyah Mosque, and once in San Diego.  Ex. 120,  Dep. 215:18-217:4; Ex. 90, Snell Decl., Ex. 2 at 6 (Bayoumi saw Thumairy in San Diego).

c. Bayoumi wrote correspondence to MOIA and Thumairy himself about the "coordination" and "cooperation" between Bayoumi and Thumairy for visiting MOIA propagators. Ex 414, MPS43_347 (February 1999 letter to MOIA Minister); Ex. 678D, MPS43_336 (1999 letter to Thumairy praising their "coordination"); Ex. 413, MPS43_338 (January 1999 letter to Sowailem giving thanks to Thumairy and praising his "complete cooperation" and "coordination").

d. Thumairy's own MOIA Embassy supervisor Khalil Al Sowailem admitted to the FBI that he met and knew Bayoumi and that Bayoumi was in San Diego and associated with the Al Madinah Mosque. Ex. 454, FBI 000012-14.

e. The Saudi government Board director of the King Fahad Mosque Khalil Al Khalil knew Bayoumi.  Khalil told the 9/11 Commission that he knew Bayoumi because "Bayoumi used to come frequently to the mosque to see Fahad Al  Thumairy" and testified that Bayoumi stopped by on two or three occasions asking for Thumairy.  Ex. 90, Snell Decl., Ex. 5 at 8; Ex. 113, Khalil Dep. 116:16-118:14, 311:2-8.

f. Bayoumi had home, work, fax, and cell phone listings for Thumairy in his handwritten address book and the January and October 2000 typed phone lists.  Ex 12AA, MPS738_35; Ex. 12BB, MPS688_3; Ex 421, FBI 345.

147

REDACTED FOR PUBLIC FILING

g. As detailed herein, the testimony, phone records and correspondence show that Bayoumi and Thumairy shared the same network of contacts, including Sowailem; Shuaib; █████; Khalil; Abdi Mohamed; Aulaqi; and various individuals from San Diego at the February 2000 welcome party for the hijackers, including ICSD ████ ████████████████████████████████████████████████████

592.    Saudi Consulate Islamic Affairs official Smail Mana Thumairy testified that he did not know Mana or that Mana worked at the Saudi Consulate.  Ex. 107, Thumairy Dep. 216:23-218:2; 220:23-221:13; 226:1-5; 246:2-10.  Thumairy also claimed that he could not recall *anyone* who worked at the Consulate's Islamic Affairs section.  Ex. 107, Thumairy Dep. 219:14-220:1.

593.    Thumairy, however, regularly worked with Mana and knew him well:

a. ████████████████████████████████████████████████████ ████████████████████████████████████████ Mana was the sole full-time employee of the Islamic Affairs section at the Consulate and would answer questions from visitors and students about Islam. Ex. 110A, Mana Dep. 55:2-56:13; Ex. 95, Awad Dep. 76:9-77:8.

b. Thumairy also admitted to the 9/11 Commission that he worked "closely" with Abdullah Awad — who ran the Consulate's Islamic Affairs section where Mana worked.  Ex. 90, Snell Decl., Ex. 3 at 3.

c. Mana worked with Thumairy at the Ibn Taymiyyah Mosque and King Fahad Mosque and two men shared a close relationship.  Ex. 72, Madha Decl. ¶ 20.

d. Mana was one of a group of men at the Mosque who had regular meetings together with Thumairy and espoused extreme, radical, and anti-American views.  Ex. 72, Madha Decl. ¶ 19.

e. Thumairy asked Mana to lead Friday prayers at the Mosque.  Ex. 72, Madha Decl. ¶ 20.  Mana translated Thumairy's speeches at the mosque. Ex. 110A, Mana Dep. 73:4-18.

f. ████████████████████████████████████████████████ ████████████████████████████████████████

████████████████████████████████████████████

REDACTED FOR PUBLIC FILING

■■■■■■■■■■■■■■■■■
■■■■

g. The Saudi Consul General Salloum appointed Mana Thumairy to oversee Saudi Arabia's funding of the King Fahad Mosque and approve all expenditures, and Mana was aware that Thumairy was being paid by the Kingdom. Ex. 72, Madha Decl. ¶ 13.

h. Mana and Thumairy were both at the King Fahad Mosque when Bayoumi went there immediately after his meeting with the two hijackers on February 1, 2000 at the Mediterranean Cafe. Ex. 92, Morgan Decl. ¶¶ 20-21 (Kaysan Morgan Dep. Exhibit 0789).

i. 

j. ■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■
■■■■■■■

594.     **Khalid Al Sowailem** Thumairy claimed that he dealt with "Sowailem only" or "only Sowailem" at the Embassy. Ex. 107, Thumairy Dep. 117:16-23; 118:17-21; 431:12-23. When asked who else he called at the Embassy other than Sowailem, Thumairy offered: "I don't remember a thing." Ex. 107, Thumairy Dep. 443:5-15.

595.     Yet when asked in February 2004 by the 9/11 Commission who he reported to at the Embassy, Thumairy did not mention Sowailem and claimed that he had the "most contact" with Islamic Affairs Head Ghesheyan. Ex. 90, Snell Decl. Ex. 3 at 3-4. Thumairy now claims not to remember Ghesheyan, Ex. 107, Thumairy Dep. 417:17-21; 419:16-23, and that Sowailem was the only person he communicated with about administrative matters. Ex. 107, Thumairy Dep. 131:8-20.

149

596. Thumairy also made the incredible claim that he could not remember that Sowailem was the director of Da'wah at the Embassy. Ex. 107, Thumairy Dep. 130:21-131:20.

597. Sowailem worked closely with Thumairy on a regular basis and oversaw Thumairy's work in California:

a. Thumairy made frequent calls to the Embassy and Sowailem's direct line which demonstrate that the men were discussing work matters. Ex. 5, Youssef Rpt. 45-46.

b. Sowailem nominated and in January 1998 appointed Thumairy as supervisor of MOIA propagators in California. Ex. 382, DOJ 0010 ; Ex. 243, KSA 8502-03 (Sageman Dep. Exh. MS-5).

c. Sowailem gave Thumairy two excellent performance reviews for his work as a MOIA propagator and supervisor in California. Ex. 300, KSA 8496-98 (Thumairy Exh. 0836) (Sowailem's February 1998 evaluation gave Thumairy perfect scores for management, observing work times, assuming higher responsibilities, appearance, and his relationship with "Bosses, Coworkers, and Reviewers" and mentioned his knowledge of English); Ex. 206, KSA 2695-97 (undated evaluation of Sowailem likely from 2000 prior to Thumairy's promotion that gives Thumairy perfect scores for skill in implementation, ability to assume higher responsibilities, and good management, and maintaining good relationships with his co-workers).

d. Sowailem nominated Thumairy for an early promotion based on "his considerable Da'wah efforts." Ex. 297, KSA 8364 (Ghudaian Dep. Exh. 440).

e. Based on Sowailem's performance review, Thumairy received a promotion in 2000 as the "best and most competent employee, who met the promotion requirement." Ex. 680W, KSA 8547; Ex. 271, KSA 2693.

f. Sowailem observed in a November 2000 letter that Thumairy was "praised by the officials at the Saudi Consulate" and was "one of the best and distinguished propagators…." Ex. 289, KSA 6995 (Awad Dep. Exh. 461).

g. Thumairy admitted that Sowailem was his "boss." Ex. 107, Thumairy Dep. 305:11-306:9.

h. On September 11, 2001, Thumairy attended a MOIA work conference that Sowailem also attended in Copenhagen. Ex. 107, Thumairy Dep. 364:18-365:7.

REDACTED FOR PUBLIC FILING

598. **Embassy Islamic Affairs Department Deputy Musaed Al Jarrah** Thumairy claimed that he did not know Jarrah. Ex. 107, Thumairy Dep. 417:5-7. He did not remember if he ever spoke to Jarrah on the telephone. Ex. 107, Thumairy Dep. 424:5-8.

Thumairy worked with Thumairy and the Islamic Affairs Department on a regular basis:

a. The FBI found that Jarrah "was heavily connected to Saudi Sunni extremists operating inside the United States, specifically with the Southern California based network of…Al Thumairy." Ex. 2, EO 0004.

b. Thumairy made 64 phone calls to Jarrah from July 30, 2000-February 3, 2003. Ex. 5, Youssef Rpt. 45 & n. 114.

c. Jarrah admitted knowing Thumairy in his "diplomatic capacity" in the context of his work for Saudi Arabia, and if he spoke to Thumairy and gave him a project, that was on behalf of Saudi Arabia. Ex. 118, Jarrah Dep. 156:7-157:5. He recalled that MOIA sent Thumairy to work in Los Angeles at the King Fahad Mosque. Ex. 118, Jarrah Dep. 176:23-177:4.

d. In March 2001, Jarrah wrote an urgent note to obtain an extension for Thumairy to continue work in Los Angeles. Ex. 257, KSA 1256, (Quattan Dep. Exh. 423). Thumairy claimed that he did not know about an extension or why Jarrah would be involved in getting his extension. Ex. 107, Thumairy Dep. 427:20-429:22. He did not remember speaking to anyone at the Embassy about his extension, Ex. 107, Thumairy Dep. 430:19-431:7, but then claimed that "the extension was based on my request" and that he made the request to Sowailem –"[h]e's the one I talked to." Ex. 107, Thumairy Dep. 431:12-23. Saudi counsel cited diplomatic immunity to block questions to Jarrah about his role in obtaining the emergency extension for Thumairy. Ex. 118, Jarrah Dep. 187:4-189:19.

e. Jarrah, Thumairy, Sowailem, Sadhan and Sudairy each received a Prince Abdullah bonus in 2001. Ex. 145, KSA 7506-22, (Jarrah Dep. Exh. 770); Ex. 118, Jarrah Dep. 289:7-290:13. Saudi counsel blocked any questions concerning the bonus given to both Islamic Affairs and MOIA personnel. Ex. 118, Jarrah Dep. 314:23-315:22.

f. Jarrah held a closed-door meeting in 2002 with Khalid Cherif, a member of Thumairy's extremist group. Ex. 58, KSA 7930-7933 at 7932 (Qattan Dep. Ex. 424); Ex. 72, Madha Decl. ¶ 19.

g. The FBI identified Jarrah as the Embassy official responsible to place and oversee Saudi Imams at mosques in the US. Ex. 478, FBI 000569 at 574.

REDACTED FOR PUBLIC FILING

599. **Embassy Islamic Affairs Department Head Dr. Majid Ghesheyan** Thumairy claimed he did not know Dr. Majid Ghesheyan. Ex. 107, Thumairy Dep. 417:17-21; 419:16-23.

600. When the 9/11 Commission asked "if there was anybody at the Saudi Embassy in Washington, D.C. to whom he reported, al-Al Thumairy said that he had the most contact with Dr. Majid, who was responsible for Islamic Affairs at the Embassy." Ex. 90, Snell Decl., Ex. 3 at 3-4. "Dr. Majid" was Majid Ghesheyan who was the head of the Islamic Affairs department at the Embassy. Ex. 90, Snell Decl. Ex. 3 at 3-4.

601. **MOIA Minister Turki and Deputy Minister Ammar** Thumairy claimed not to remember any MOIA officials visiting Los Angeles while he was there. Ex. 107, Thumairy Dep. 272:6-14; 274:11-24. "I only remember Sowailem who showed up for the inauguration….Otherwise I don't remember" Ex. 107, Thumairy Dep. 339:22-340:5. Thumairy claimed he did not remember the visit of Deputy Minister Ammar to Los Angeles in September 2000. Ex. 107, Thumairy Dep. 340:6-11. Yet:

   a. Thumairy and MOIA Minister Turki knew each other well, and Turki visited Thumairy in Los Angeles. Ex. 72, Madha Decl. ¶ 6; Ex. 2, EO 2689 (MOIA propagator Shuaib admits to FBI that "Turki would visit Althumairy when he visited the United States" and that Thumairy "has a very good reputation with Turki.")

   b. Thumairy met and had dinner with the MOIA Deputy Minister Ammar in September 2000. Ex. 540, KSA 7362.

602. **Visiting Saudi propagators Sudairy, Sadhan, Jaithen, and Mersal** Thumairy claimed that he could not remember any MOIA propagators who visited the Mosque, and that he never had advance knowledge that propagators planned to visit. Ex. 107, Thumairy Dep. 297:5-298:23; 344:4-8.

REDACTED FOR PUBLIC FILING

603.    Thumairy could not remember Majid Al Mersal, who visited the King Fahad

Mosque twice during December 1998-January 1999 and again in December 1999, Ex. 107,

Thumairy Dep. 287:14-291:6; Abdullah Al Jaithen, who was with Mersal in December 1999, Ex.

107, Thumairy Dep. 290:1-4, 294:5-23; or Adel Al Sadhan or Mustaeb Al Sudairy.  Ex. 107,

Thumairy Dep. 301:7-18.

604.    Thumairy worked closely with the visiting propagators and knew them well:

a. Thumairy placed a series of five phone calls to Mersal in January-April 2000 during
   the time that the two hijackers were in Los Angeles and then San Diego.  Ex. 12A
   (Phone calls Nov. 1999 – Mar. 2000).

b. In early 1999, Bayoumi wrote Thumairy to commend him for his "kind efforts in
   providing us with brothers Musaeb al-Sudairy and Adel al-Sadhan" and observed "that
   coordination will be the starting point…."  Ex. 678D, MPS43_336.

c. Bayoumi wrote to MOIA's Minister Turki about the visit of Sadhan and Sudairy and
   expressed that he wished to thank Thumairy for his "full cooperation and
   coordination."  Ex. 414, MPS43_347.

605.    Thumairy claimed he did not remember Omar Abdi Mohamed, a MOIA

propagator who worked in San Diego.  Ex. 107, Thumairy Dep. 159:10-19.  Nor could Thumairy

recall the organization which Abdi Mohamed used to launder money for groups associated with

Al Qaeda, the Western Somali Relief Agency, or that he had contacts with any Somali or other

charities.  Ex. 107, Thumairy Dep. 160:1-13.

606.    Thumairy worked directly with Abdi Mohamed and knew him well:

a. Abdi Mohamed reported directly to Thumairy.  Ex. 382, DOJ 0010.

b. Sowailem came out to San Diego and visited with Abdi Mohamed.  Ex. 139, U.S. v.
   Omar Abdi Mohamed, Memorandum of Points and Authorities.

c. Thumairy funded Somali charity organizations tied to terror groups with money
   provided to him by Saudi Prince Abdulaziz.  Ex. 483, FBI 001033-41; Ex. 5, Youssef
   Rpt. 48.

153

REDACTED FOR PUBLIC FILING

607.   **Anwar Al Aulaqi**  Thumairy claimed that he had "never heard of him [Aulaqi]" and "I do not know him."  Ex. 107, Thumairy Dep. 350:23-351:8.  But  Thumairy knew Aulaqi, who was a prominent Imam in San Diego with a wide reputation.  Thumairy, as well as Bayoumi, called Aulaqi concerning the preparations for the two hijackers and during the time they were getting settled in San Diego.  Ex. 12J (Thumairy-Bayoumi Calls to Aulaqi).

608.   **Abduljalil Mezgouri**  Thumairy claimed that he did not know the Imam of the Islamic Center of San Diego, and specifically did not know Abdeljalail Mezgouri.  Ex. 107, Thumairy Dep. 351:9-17.  But The ICSD had a longstanding relationship with the King Fahad Mosque and its predecessor Mosque, and ███████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████

609.   **Khalid Cherif**  Thumairy claimed he did remember or know Cherif, or that Cherif had been expelled from the King Fahad Mosque for being an extremist.  Ex. 107, Thumairy Dep. 254:22-255:4; 421:9-424:3.  But Thumairy knew Cherif very well:

a.███████████████████████████████████████████████
███████████████████████████████████████████████
████████████

b. Cherif was identified as a member of the extremist group that Thumairy led at the King Fahad Mosque. Ex. 72,  Madha Decl. ¶ 19.

c. Khalil described Cherif as a prominent extremist at the King Fahad Mosque who was expelled from the Mosque before the 9/11 Attacks.  Ex. 113, Khalil Dep. 61:10-62:4.

d. Jarrah wrote an April 2002 letter concerning a private meeting he held with Cherif. Jarrah reported that Cherif "maintains a relationship with the Imam of the Mosque…" which was a reference to Thumairy.  Ex. 295, KSA 7930-7933 at 7932.  Although Thumairy was no longer at the Mosque, he still described himself as the Mosque's Imam in his correspondence.  Ex. 680Z, KSA 8795-97.

████████████████████████████████████

REDACTED FOR PUBLIC FILING

610. **Abdo Ghanem** Thumairy claimed that he did not know Abdo Ghanem. Ex. 107, Thumairy Dep. 243:20-23. But Ghanem was another member of Thumairy's extremist group at the King Fahad Mosque expelled from the Mosque after the 9/11 Attacks. Ex. 72, Madha Decl. ¶¶ 19; 27-28.

611. **Akram Al Zamari** Thumairy claimed that he did not know Akram Al Zamari. Ex. 107, Thumairy Dep. 339:8-20. But the evidence showed:

   a. Al Zamari was a good friend of Thumairy, and Thumairy asked Al Zamari to do favors from time to time. Ex. 101, Alzamari Dep. 112:9-114:12 (help referrals purchase electronics ███████████, take a sick man to the hospital, bring cash to a person in Yemen).

   b. Al Zamari spoke with Thumairy about Sheikh Muqbil al-Wadi'I and knew about Thumairy's meeting and lunch with him. Ex. 101, Alzamari Dep. 125:23-127:5.

   c. Al Zamari was with Thumairy when he met with Hazmi and Mihdhar at the King Fahad Mosque on June 9, 2000, ██████████████████████████████████ ██████, and Al Zamari observed Thumairy with Hazmi coming out of the library. Ex. 101, Alzamari Dep. 128:17-23 ("… if… they were in the library with Sheikh Fahad and Nawaf al-Hazmi, that means they know each other.")

612. **Hamad Al Badr** In December 2001, less than a week after Thumairy returned to Los Angeles after the 9/11 Attacks, Badr wrote to MOIA to request that Thumairy be assigned as an Imam at the Islamic Center of Long Beach. Ex. 303, KSA 8532 (Faisal Al Muhanna Dep. Ex. 677). Thumairy needed a new base of operations at the time because he never returned to the King Fahad Mosque after the 9/11 Attacks. Ex. 72, Madha Decl. ¶ 25; Ex. 128, Madha Dep. 35:17-36:1. Thumairy claimed that he could not remember Badr or the Islamic Center. Ex. 107, Thumairy Dep. 322:12-323:22.

613. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

155

614. ████████████████████ Thumairy claimed that he did not know ████████ or his father ████. Ex. 107, Thumairy Dep. 243:24-244:13.

615. The evidence shows, however:

a. ████████████████████ and Al Zamari stated that the two hijackers "came through" Thumairy. ████████ ████████; Ex. 101, Alzamari Dep. 49:12-19; 132:2-10.

b. Alzamari testified that ████ and Thumairy had a religious relationship and friendship. Ex. 101, Alzamari Dep. 45:20-46:13 and that ████ wanted to introduce Alzamari to Hazmi and Mihdar who came through Thumairy. Ex. 101, Alzamari Dep. 49:12-19.

c. Madha testified that he observed Thumairy and Mana speaking to ████████ on numerous occasions and that the three men knew each other well. Ex. 72, Madha Decl. ¶ 31.

616. **Nawaf Al Hazmi and Khalid Al Mihdhar** Thumairy claimed that he did not know the two Al Qaeda hijackers. Ex. 107, Thumairy Dep. 340:15-341:3; 491:4-6. Thumairy explained that "I do not meet people that I do not know. I would not sit with someone I don't know. I would not convene with someone I don't know. I would not go somewhere with someone I don't know." Ex. 107, Thumairy Dep. 341:7-343:5.

617. The facts herein show, however, that Hazmi and Mihdhar "came through" Thumairy and that he provided essential help to them upon and after their arrival to get settled in Southern California. Ex. 107, Thumairy Dep. 49:12-19; 132:2-10.

618. ████████████ Thumairy claimed that he did not know ████████. Ex. 107, Thumairy Dep. 339:5-7; 535:8-10, 555:10-16.

619. The evidence is to the contrary:

a. The 9/11 Commission concluded "Thumairy's claim not to know ████████ is belied by ████'s contrary assertion." *See* 9/11 Commission Report at 217. According to one individual, ████ visited the mosque frequently and was "very close" to radical followers of Thumairy. *See* 9/11 Commission Report at 514-15 n. 13.

REDACTED FOR PUBLIC FILING



b. ████████████████████████████████████████
████████████████████████████

c. ████████████████████████████████████████
████████████████████████████████████
████████████████████████

d. ████████ kept Thumairy's -0777 cell phone number in his phone contact list, and called Thumairy in early August 2001, shortly before Thumairy decided to leave the United States to return to Saudi Arabia just prior to the 9/11 Attacks. Ex. 559, FBI 008913-14 at 14; Ex. 670, FBI 8566 (two calls from ████████ to Thumairy on August 4, 2001 at 10:37 a.m. (3 mins.) and 11:11 a.m. (3 mins.).

620. **Saudi Embassy Cultural Mission.** Thumairy made 103 phone calls to the Saudi Cultural Mission, but he could not remember who he called or why. Ex. 107, Thumairy Dep. 439:13-23; Ex. 12C (Thumairy calls to Saudi Embassy).

621. **Institute of Islamic and Arabia Sciences in America (IIASA).** Thumairy claimed that he did not know the IIASA, which the FBI identified as a part of the Saudi government extremist network. Ex. 107, Thumairy Dep. 131:21-132:0; Ex. 2, EO 3534-42; Ex. 13, Weidner Decl. ¶¶ 11-18. But, Thumairy knew IIASA well:

a. Phone records also show that Thumairy called the number of the IIASA 39 times between November 24, 1999 and September 21, 2000. Ex. 12F (Thumairy calls to IIASA).

b. IIASA held a 9-day "intensive program" at the King Fahad Mosque in December 2000. Ex. 535, FBI 4392-93, 4439.

c. A member of the IIASA sat on the Board of the King Fahad Mosque. Ex. 179 at 2 (Kaldrim Dep. Ex. 179).

d. IIASA was the U.S. branch of Imam Mohamed University where Thumairy attended college and graduate school. Ex. 107, Thumairy Dep. 132.

622. **Thumairy's post 9/11 activities.** Thumairy claimed that he was at the Mosque for a "whole year after the 9/11 events" and "I went to the mosque every day." Ex. 107, Thumairy Dep. 405:7-19. But Thumairy never returned to the Mosque after the 9/11 Attacks:

████████████████████████████████████

REDACTED FOR PUBLIC FILING

a. Usman Madha, who worked and attended services at the Mosque daily, testified that Thumairy never returned to the Mosque after the 9/11 Attacks. Ex. 72, Madha Decl. ¶ 24-25; Ex. 72, Madha Dep. 35:17-36:1.

b. Saudi government documents show that Thumairy did not return to the Mosque. Ex. 291, KSA 7146, Ex. 238, KSA 7366.

c. Khalil testified that the last time he saw Thumairy was in Saudi Arabia shortly after the 9/11 Attacks. Ex. 113, Khalil Dep. 68:20-70:10.

d. A U.S. government document produced by Saudi Arabia states that Thumairy was expelled from the King Fahad Mosque after the 9/11 Attacks because he held extremist views and cultivated extremist followers...] who "praised and supported the terrorist attacks of 11 September 2001." Ex. 288, KSA 6861 (Khalil Dep. Ex. 211).

e. Thumairy could not name *anyone* who saw him at the Mosque after 9/11. Ex. 107, Thumairy Dep. 407:22-408:23.

623. **Thumairy's evolving explanation of his work in Los Angeles** In his first interview with the U.S. investigators at Los Angeles airport in May 2003, Thumairy told the FBI that he had been employed by the Saudi consulate since 1996 and worked with ██████████ and Abdul Karim Bin Baz in the Islamic Affairs media section. Ex. 154, FBI 000001-000006-REV2021 at 02.

624. The 9/11 Commission and the FBI traveled to Riyadh, and in the presence of the Saudi Mabahith, interviewed Thumairy on February 23, 2004, and Thumairy stated that he worked at the Consulate in L.A. to deal with religious issues and spent 60-70% of his time working at the Consulate, and that for about 20% of his time "he volunteered his services at the KFM." Ex. 90, Snell Decl., Ex. 3 at 3. Thumairy claimed he reported to the Consul General at the Saudi Consulate and that his contact at the Embassy in Washington was "Dr. Majid, who was responsible for Islamic Affairs at the Embassy." Ex. 90, Snell Decl., Ex. 3 at 3-4.

158

REDACTED FOR PUBLIC FILING

625. At his deposition in June 2021, Thumairy claimed that he did not remember making the statements to U.S investigators that he worked at the Consulate. Ex. 107, Thumairy Dep. 218:8-219:6.

626. Thumairy now claimed that "[t]here was no work that I would perform at the consulate. It was just visits, and sporadic ones." Ex. 107, Thumairy Dep. 95:17-21. Thumairy admitted that he had a diplomatic visa and diplomatic card but claimed not to know that he was registered as an administrative officer at the L.A. Consulate. Ex. 107, Thumairy Dep. 100:7-24. He claimed he had not read the diplomatic card that he carried for many years that afforded him immunity and did not obtain diplomatic license plates (as required) when he bought and registered his car in California. Ex. 107, Thumairy Dep. 101:17-22; 110:18-111:24.

## IX. THE SAUDI GOVERNMENT ESTABLISHED ITS AGENT BAYOUMI INSIDE THE U.S.

### A. Saudi Arabia bent rules to send Bayoumi to the U.S. on a work assignment.

627. Omar al-Bayoumi began working in the Jeddah office of the Presidency of Civil Aviation (PCA), a branch of the Saudi Ministry of Defense, in 1977 and remained on the books as an employee until his retirement in April 2014. Ex. 195, KSA 0629.

628. In August-September 1993, Bayoumi took his first trip to the U.S. Bayoumi claimed this was a solo, personal vacation in Florida for two months to study English. Ex. 120, Bayoumi Dep. 35:4-37:14. On August 25, 1993, while Bayoumi was in Florida, Mohamed al Salmi, the Director General of the PCA's Airways Engineering Department, requested Bayoumi be transferred from the Finance Department to the Airways Engineering Department. According to Salmi, Bayoumi was needed to help "implement the financial procedures and financial contracts." Ex 201, KSA 1054; Ex. 120, Bayoumi Dep. 38:15-43:11; Ex. 94, Anqari Dep. 24:18-27:17.

REDACTED FOR PUBLIC FILING

629.     That was clearly not the actual reason for Bayoumi's transfer, however, because within four months after Bayoumi returned to Saudi Arabia from his Florida trip, Director Salmi began making arrangements for Bayoumi's move to San Diego. Ex. 87, DA 2267. From the outset, Bayoumi's Saudi Government work in California was handled surreptitiously and outside normal channels. In January 1994, the PCA prepared, and Director Salmi signed a "Purchase Requisition" for a "factory acceptance test" for an "air navigation project" with a PCA subcontractor; however, the funds were actually earmarked to pay for Bayoumi's travel to California, a weekly living allowance, and English training in San Diego starting in August 1994. Ex. 88, DA 2268; Ex. 87, DA 2267; Ex. 94, Anqari Dep. 30:9-31:13; 156:3-23. Saudi Arabia gave Bayoumi special treatment and permission to live and stay in California under unusual circumstances. According to Abdul Aziz Abdul Kreem Al Anqari, the PCA's Assistant to the President of Civil Aviation, a Saudi Government employee such as Bayoumi could take only 30 days of leave per year. Alternatively, the 30 days could be saved each year and then combined for a single leave of absence, but under no circumstances could an employee take more than 90 days of leave in one year. Any further leave would require an "exceptional leave" that if granted, would be unpaid. Ex. 94, Anqari Dep. 238:21-240:16.

630.     The Saudi Government granted Bayoumi three times as much leave as the maximum permitted under its own regulations. In August - September 1993, Bayoumi took a 51 day leave from the PCA Finance Dept, and from August 1994 to May 1995, Bayoumi was granted a 90-day leave and then *two* more 90-day exceptional leaves. Ex. 283, KSA 4503, Ex. 207, KSA 4499; Ex. 208, KSA 4500; Ex 209, KSA 4501; Ex. 94, Anqari Dep. 253:4-254:25. No explanation was provided by Saudi Arabia for this unusual accommodation for Bayoumi. PCA Assistant President Anqari and head of human resources testified that Bayoumi was "an

REDACTED FOR PUBLIC FILING

ordinary, low-level employee" and Bayoumi's job "was not of any special attention." Ex. 94, Anqari Dep. 166:21-25, 196:5-11, 248:1-21, 319:3-320:19, 322:11-323:12, 327:18-329:25.

**B. The Saudi Government made extraordinary arrangements to fund Bayoumi inside the U.S. through Ercan, its principal Magdi Hanna, and Dallah Avco.**

631.    Bayoumi moved to California in August 1994.  Five months earlier in March 1994, Saudi Arabia specifically directed Avco Overseas, a Saleh Kamel affiliated company, to pay Bayoumi's tuition for a 27-week English language course plus a weekly living allowance for 30 weeks.  Ex. 87, DA 2267.  From the time of Bayoumi's arrival in August 1994, Saudi Arabia provided him with substantial funding through its longstanding agent in Newport Beach, California, a company called Ercan (aka Ercan Engineering, Inc. or Ercan, Inc.), which was owned by Magdi Hanna.  Ex. 86, Coombs Decl. 3-4. ████████████
████████████████████████████████████████████████████
████████████████████████████████████

632.    Saudi Arabia was known to funnel kickbacks through Ercan and another Saudi contractor Dallah Avco Trans Arabia Company ("Dallah Avco" or "Dallah") to conceal the origin of funds and improperly pay Saudi officials.  Ex. 544, FBI 7995-REV2021 at 96. For example, ████████████████████ supervisor under the PCA's Air Navigation System Support ("ANSS") project reported money "regularly siphoned from PCA and diverted to upper management of PCA by manipulating invoices from subcontractors like Dallah Avco." Ex. 544, FBI 007995-REV2021 at 96. He further stated that "[t]hese invoices would be covered or marked on the books as local procurement." Ex. 544, FBI 7995-REV2021 at 96. He detailed a process where the President of the PCA may call Mohamed al-Salmi, Director General of Airways Engineering at the PCA and request cash. Al-Salmi would approach ████ to create a

161

fictitious purchase order which was then approved by Salmi. ▇▇ described this practice as "common at PCA, Dallah, and AVCO." Ex. 544, FBI 7995-REV2021 at 96. ▇▇ also described "other allowances" at PCA that was basically providing a bonus or raise outside of the payroll system. Ex. 544, FBI 7995-REV2021 at 96.

633. The Metropolitan Police Service recovered files belonging to Bayoumi including a May 1998 letter of recommendation Bayoumi obtained from Hanna stating that Hanna had known Bayoumi since August 1994, the same month that Bayoumi arrived in California. Ex. 678U, MPS 732_21. In November 1994, during his nine-day trip to Ercan's Newport Beach Offices, PCA Logistics Manager Samuel Coombs, a former U.S. Army Logistics Major hired by the Saudi PCA, held meetings with Hanna and Bayoumi. Ex. 86, Coombs Decl. 1 and 3.

634. When Coombs arrived at Ercan's office, he was met by Ercan's owner Magdi Hanna who took Coombs to an Ercan conference room where Hanna introduced Coombs to Bayoumi. Ex. 86, Coombs Decl. 4.

635. Coombs reached out to greet Bayoumi, but Bayoumi refused to shake Coombs's hand, instead, condescendingly asking Coombs if he was Jewish. Coombs said that Bayoumi was "pleased" to learn that Coombs was not Jewish. Ex. 86, Coombs Decl 4.

636. Coombs testified that "Bayoumi asked me about a request that he had placed for one new car for himself." Coombs was unaware of Bayoumi's request and told Bayoumi that he would need to contact Director Salmi about the car. Ex. 86, Coombs Decl. 4.

637. Hanna and Bayoumi had already been working together for some time. Hanna told Coombs that Bayoumi was at Ercan that day because Bayoumi and his wife "wanted some additional furniture…" Ex. 125, Coombs Dep. 171:14-21. Hanna complained to Coombs that Bayoumi had been ordering Hanna around. Ex. 86, Coombs Decl. 4. Coombs testified that

162

Hanna showed him an apartment complex in Costa Mesa, CA where Bayoumi had an apartment, and that Bayoumi "was nagging Mr. Hanna to get the apartment furnished with some nice furniture." Ex. 86, Coombs Decl. 4.

638. Bayoumi's name was always the first name in the list of students contained in the logistics budget because his expenses were significantly higher than the rest of the students, Bayoumi claimed unusual additional expenses, and he was considerably older in age than the other students and a married man with children. Ex. 86, Coombs Decl. 2; Ex. 125, Coombs Dep. 58:1-24 (stating that Bayoumi and his wife and kids were living with him in Southern California when he drove past their apartment years before Bayoumi's fake promotion to a "married status" position).

639. Saudi Government supervisor PCA Director Salmi and another PCA officer both instructed Coombs to pay Bayoumi with funds from the PCA Logistics Department expense budget through Dallah Avco and Ercan in California. Under this arrangement Saudi Arabia paid Bayoumi $60,000 per year through Ercan and Dallah Avco in 1996, when the annual amount paid to Bayoumi was raised to $90,000. Ex. 86, Coombs Decl. 3; Ex. 125, Coombs Dep. 59:12-60:12.

640. Coombs remembered the specific amount of Bayoumi's pay because Coombs's own salary at the time was $60,000 and Bayoumi was being paid the same amount for "expenses." Ex. 125, Coombs Dep. 59:12-21.

641. The amounts that Saudi Arabia was paying Bayoumi "amazed" Coombs and made him think "I…wish I had [Bayoumi's] job." Ex. 125, Coombs Dep. 59:22-60:12.

642. Bayoumi was paid "significantly higher" amounts than actual students being funded by the PCA. Ex. 86, Coombs Decl. 2.

REDACTED FOR PUBLIC FILING

643.    Bayoumi also sought reimbursement of unusual additional expenses, including payments for his wife to travel back and forth to Saudi Arabia, and cars for him and his wife. Ex. 86, Coombs Decl. 3.

644.    When Coombs complained to PCA Director Mohamed al-Salmi that Bayoumi's expenses were unusual and exorbitant, Coombs immediately "got corrected" by Salmi. Salmi told Coombs that Salmi wanted Bayoumi to stay in America, and instructed Coombs not to raise questions, because: "that's not for you to worry about." Ex. 125, Coombs Dep. 131:14-20, 139:17-20.

645.    In April 1995, PCA Director Salmi issued a letter to Hanna of Ercan outlining the financial support to be provided to Bayoumi by Ercan. Ex. 125, Coombs Dep. 147:13-23.

646.    ███████████████████████████████ ██████████████ to support Bayoumi inside the U.S. At Saudi Arabia's suggestion, ████████ ████████████████████████ mark up the cost of goods Ercan sold to Saudi Arabia to cover the added expenses for supporting Bayoumi. Ex. 125, Coombs Dep. 148:13-21.

647.    Saudi Arabia also arranged for Hanna to pay Bayoumi personally and directly in cash, rather than by check through Ercan. Ex. 544, FBI 7995-REV2021 (PCA supervisor ██████████████ describes how Hanna paid Ercan funds via cash payments).

648.    In March 1996, PCA Director Salmi instructed that all checks payable by the PCA to Ercan should be issued instead to Ercan's principal, Magdi Hanna. On that occasion, Salmi redirected a total of nearly $800,000 in funding for Ercan to Hanna personally. Ex. 440, DA 10582; ████████████████████.

649.    ███████████████████████████ a PCA supervisor who worked under ██████, admitted to the FBI that PCA Director Salmi instructed Ercan to pay

164



REDACTED FOR PUBLIC FILING

Bayoumi $10,000 per month in cash. ███ was personally aware that Hanna provided Bayoumi approximately $10,000 in cash each month at the request of PCA Director Salmi during the period Hanna had the contract with the Saudi PCA. According to ███, Hanna laundered money through businesses in California to "funnel...payments" to Bayoumi. ███ also told the FBI that PCA Director Salmi provided Bayoumi a "stipend" of $5,000 per month but was unsure whether that stipend was paid simultaneously with the other monthly amounts. Ex. 544, FBI 7995-REV2021.

### C. Bayoumi had substantial dealings with his Saudi government funding agents, Hanna and Ercan, in California.

650. Coombs testified based on his personal observations that it was "clear…that Mr. Bayoumi knew Mr. Hanna" and explained that the two men "knew each other because Al-Salmi had hooked them up because that's where he [Bayoumi] was getting his money, was through them, and his apartment and stuff like that that was all being paid through Ercan." Ex. 125, Coombs Dep. 171:22-172:4.

651. Bayoumi's handwritten address book, and Bayoumi's typed January 2000 and October 2000 phone lists, each contain Ercan's office and fax numbers and Magdi Hanna's home and cell numbers. Ex. 12AA, MPS738_26; Ex. 12BB, MPS 688_7 (January 2000 typed list); Ex. 421, FBI 000345-49 at 0347 (Omar's Phone Book October 4, 2000).

652. Within his typed January and October 2000 phone number lists, Bayoumi also included driving instructions to the office of Ercan and Hanna in Newport Beach, California. Ex. 421, FBI 000345-49 at 347 (October 2000 typed list).

653. The available phone records show that Bayoumi made 21 calls ████████ ████████ and Ercan's office numbers in 1999-2000. Bayoumi, Hanna, and Ercan likely exchanged numerous additional calls as the production did not include calls placed by Ercan or

165

Magdi Hanna and included only a fraction of the time that Bayoumi worked with Magdi Hanna between 1994 and 2001.  Ex. 12R (Bayoumi calls to ERCAN and Magdi Hanna).

654.    At his deposition, Bayoumi claimed he did not know Magdi Hanna and could not recall meeting or speaking with him, collecting any money from Ercan, or having any contact with Ercan or employees of Ercan.  Ex. 120, Bayoumi Dep. 101:13-102:1, 102:21-103:7, 104:16-105:3. Bayoumi also claimed that he could not recall driving to Ercan's offices and had never been to Newport Beach, CA — even though Bayoumi had written down the driving instructions to the Ercan office in both his January 2000 and October 2000 phone lists and Samuel Coombs met Bayoumi and Hanna at Ercan's Newport Beach office in 1994, during Coombs only trip to Ercan in Southern California during his employment with PCA. and.  Ex. 120, Bayoumi Dep. 103:15-104:15; Ex. 86, Coombs Decl. 3-4.

655.    In July 1997, Bayoumi signed his U.S. Department of Justice Immigration and Naturalization Service immigration form to maintain his student visa.  Bayoumi certified on that form that he had $27,858 for his costs to maintain himself as a student for nine months in the U.S. and that he was receiving the "[f]unds from another source" specifically: "Sponsor: ERCAN".  Ex. 311, MPS720_6.

656.    In May 1998, Hanna wrote Bayoumi a letter of recommendation on Ercan stationery stating that he had known him since August 1994.  Ex. 678U, MPS 732_21.

657.    Coombs, who personally met Bayoumi and Hanna together and saw their interactions, testified that Bayoumi's claim that he did not know Magdi Hanna was a lie and that "[h]e [Bayoumi] knew him [Hanna]."  Ex. 125, Coombs Dep. 171:11-172:16.  In February and September 1997, Bayoumi submitted INS Form I-20, Certificate of Eligibility for Non-Immigrant (F-1) Student Status, confirming his enrollment at United States International

REDACTED FOR PUBLIC FILING

University ("USIU") and claiming that he was receiving funding from Ercan for tuition and living expenses. Ex. 36, Bayoumi INS Form I-20 (Bayoumi Dep. Ex. 680); Ex. 488, FBI 001370-73 (Bayoumi's INS Forms I-20 listing Ercan as his "means of support" in February and again in September 1997, indicating Ercan was providing support in the amount of $27,858).

658.     In March 2000, Bayoumi prepared an INS Form I-20 stating he would receive $29,535 in funding from Ercan for his tuition and living expenses, Ex. 211, KSA 6642-65 at 61, and shared that INS form with his work colleagues at the Saudi Consulate in Los Angeles. Ex. 211, KSA 6642-65 at 61.

659.     The FBI recovered "numerous copies of communications between PCA and ERCAN dealing with purchase requests for procurement actions" including a letter from Saudi Arabia to Hanna requesting that he pay for Bayoumi's expenses. Ex. 523, FBI 003891 (noting the attachment of copies of these numerous communications).

660.     █████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████

**D.  Saudi Arabia provided additional funding for Bayoumi to work in the U.S. through Dallah Avco.**

661.     While Saudi Arabia was providing Bayoumi with funding through Ercan and Dallah, the Saudi government also placed Bayoumi on Dallah Avco's payroll. Ex. 2, EO 3326 ("Al-Bayoumi's rental application form listed his occupation as Assistant to the Director of Finance, DALLAH AVCO, Jeddah, Saudi Arabia.").

REDACTED FOR PUBLIC FILING

662.    Dallah Avco is a subsidiary of Dallah Al Baraka Group LLC ("DABG") and Saudi government contractor specializing in providing services to Saudi Arabia's civil aviation agency, the Presidency of Civil Aviation ("PCA"). *In re Terrorist Attacks on September 11, 2001*, 11-3294-cv(L), Appellee Dallah Avco Trans Arabia Co. Ltd.'s Brief with Respect to Personal Jurisdiction, ECF No. 479 at 1-2; Ex. 111, Khalifa Dep. 22:16-25:17.

663.    DABG was founded by Saleh Kamel, who the CIA has identified as a key figure in the al-Qaeda support network that provided widespread funding to al-Qaeda, National Islamic Front, Hamas and various mujahidin groups.  Ex. 83, CIA-SUB_0020-30 at 0024; Ex. 78, CIA 720-804 at 741; Ex. 79, CIA 807-848 at 809, 823.

664.    Dallah generally filled vacancies, payroll processing, and administrative support for the PCA's ANSS project, in Saudi Arabia.  Ex. 111, Khalifa Dep.  30:3-34:14, 51:16-52:21. Dallah had no role in recruiting local (Saudi) recruits for the PCA, such as Omar Al Bayoumi, as the PCA would handle that themselves.  Ex. 111, Khalifa Dep. 39:4-20.

665.    Saudi Arabia used Ercan and Dallah Avco to sustain Bayoumi in the United States. Saudi Arabia purportedly could not second Bayoumi to an American company under Saudi law. *See* Ex. 448, MPS 727_176; Ex. 678Q, MPS 727_178; Ex. 678P, MPS 727_145.[1] So while Ercan would have attracted less attention as a cover for Bayoumi to carry out his true mission as a Saudi government agent, given its physical presence in the United States, Dallah

---

[1] The May 11, 1995 letter from Ercan owner Magdi Hanna requesting that Bayoumi be seconded to Ercan should be understood as originating from the PCA.  That is Saudi Arabia's general practice with respect to its contractors. Ex. 180, Kamel Exhibit 127; Ex. 103, Kamel Dep. 171:17-23, 196:13-207:23.  This is further supported here because Hanna "was very frustrated" by Bayoumi, "that he didn't want to take orders from him.  He didn't want to do what he wanted him to do. And everything in -- Omar would come to him and tell him things that he wanted, and ANSS didn't want to do."  Ex. 125, Coombs Dep. 168:21-169:6; Ex.86, Coombs Decl. 4.

REDACTED FOR PUBLIC FILING

was chosen instead because of its ongoing relationship with a U.S. subcontractor through the

ANSS project in the United States. ECF No. 2927-2, para. 7-9; Ex. 5, Youssef Rpt. 73-75.

666. Bayoumi was apparently not the only Saudi government official assigned to work

in San Diego who was separately paid through Dallah Avco. The EO production included an

FBI report that in September 1998, Dr. Soliman Al-Ali aka Soliman Ali Elay, together with

Bayoumi, submitted a joint lease application for an apartment in La Jolla, California where

Al-Ali would live in 1998-1999. On the joint lease application Al-Ali and Bayoumi listed Dallah

Avco as their employer. ("Elay listed his business occupation as a consultant for DALLA Co.,

Saudi Arabia."); Ex. 2, EO 3553 ("During this time Albayoumi and Alali listed their

employment with Dalla Company, Saudi Arabia"); Ex. 543, FBI 007968-REV2021 (realtor had

seen the name "Omar AL-BAYOUMI" on the rental application). At this time, Al-Ali was also

an employee on the payroll of the Saudi Embassy in Washington, D.C. Ex. 145, KSA 7506-

7522 at 7521 (showing Al-Ali receiving a 2000 bonus). *See also* Ex. 2, EO 1609 (fraudulently

listing "Mana Life" as his employer).

667. Bayoumi's arrangement with Dallah Avco began in June 1995 and was renewed

annually and approved each year by the Saudi Deputy Minister of Defense. Ex. 277, KSA 4345

(PCA decides to extend in 1999), Ex. 278, KSA 4346 (no objection from Deputy Minister of

Defense), Ex. 279, KSA 4350 (1998 extension), Ex. 280, KSA 4353 (noting 1999 is the "fourth

extendable year"). FBI records describe the arrangement as "an informal agreement" between

Dallah and the PCA. Ex. 469, FBI 000281 at 282.

668. On May 24, 1995, Alawi Mohamed Saeed Kamel (Managing Director of Dallah

Avco and nephew of Saleh Kamel) sent a letter to the President of Civil Aviation, informing that

REDACTED FOR PUBLIC FILING

Dallah Avco is currently in an "urgent need of the services of employee Mr. Omar Ahmed Mustafa al Bayoumi as an accountant." Ex. 181, Kamel Exhibit 121 (KSA 1029).

669. Dallah's 30(b)(6) witness, Ammar Kamel believes that despite the letter seemingly coming from Dallah "the PCA must have initiated the secondment" and "understands the reference in the letter to an 'urgent need' for Al-Bayoumi to refer to the PCA's urgent need to have Al-Bayoumi placed on the ANSS Project." Ex. 180, Kamel Exhibit 127; Ex. 103, Kamel Dep. 171:17-23; 196:13-207:23.

670. The ANSS project is based in Saudi Arabia, and nearly all of those who worked on that project were PCA employees working in Saudi Arabia. Ex. 111, Khalifa Dep. 30:14-34:21, 55:11-23, 76:3-21. There is no part of the ANSS project that would entail an employee performing work in the United States over a period of years. Ex. 111, Khalifa Dep. 76:23-77:5. Further, no Dallah Avco employees servicing the ANSS project would involve any work in the United States. Ex. 111, Khalifa Dep. 90:16-24. In fact, according to Dallah's chairman of the board, Dallah "has never been licensed or registered to do business in the United States," "never carried any activity at any time in the U.S.A.", "has never owned or leased property in the United States," "has never offered or advertised any activities or services within the United States," "has never had a branch office" in the United States, and has never had "a representative, an employee or an agent in the United States." ECF No. 1712-2.

671. PCA Director Salmi never informed PCA Logistics Manager Coombs that Bayoumi was also on Dallah Avco's payroll and thus receiving a salary and benefits on top of the other funds that he received from Ercan and Dallah Avco.

672. When shown the records of Bayoumi's arrangement, Coombs described it as "outside of the box" and "double-dipping." Ex. 125, Coombs Dep. 39:21-40:22; 45:16-22,

REDACTED FOR PUBLIC FILING

159:17-160:14.  Coombs had never heard of such an arrangement being made for a PCA official.
Ex. 86, Coombs Decl. 3.  Coombs testified that these payments were made through a U.S. bank
to Bayoumi.  Ex. 125, Coombs Dep. 36:8-37:25.  Coombs also testified before the 9/11
Commission and FBI about his time at the PCA that "something didn't seem right to me. It was
out of line." Ex. 125, Coombs Dep. 67:24-68:10.

673.    Saudi Arabia claims that Bayoumi's arrangement with Dallah Avco was a
"secondment," KSA Aver. ¶¶ 20, 21, 24, but Bayoumi's arrangement was atypical and barred by
Saudi Arabia's own procedures.

674.    Saudi Arabia's policy was to forbid Saudi Government officials (such as
Bayoumi) to be "seconded" to pursue their education if that education was paid for by the Saudi
government.  Ex. 94, Anqari Dep. 245:3-8, 269:1-270:22, 387:9-388:1.  Saudi Arabia paid for
Bayoumi's education, not Dallah Avco; therefore, secondment would not normally have been
allowed.  Ex. 103, Kamel Dep. 114:3-14; Ex. 427, DA 0092 ("the cost of [Bayoumi's] studies
were not charged to Dallah Avco but to the [PCA]").  PCA Director Salmi issued his first
direction to Dallah Avco in July 1995 (effective June 6, 1995), for Dallah Avco to add Bayoumi
to its payroll as a full-time employee working as a "Senior Data Processing Technician" on an
Air Navigation System Support (ANSS) airport project located in "JED" - Jeddah, Saudi Arabia.
Ex. 433, DA 1016; Ex. 94, Anqari Dep. 88:20-89:14.

675.    However, as Dallah itself knew, Bayoumi performed no work for Dallah Avco.
*See* 9/11 Commission Rpt. at 515 n. 18; Ex. 429, DA 0329; Ex. 125, Coombs Dep. 155:16-
157:9; Ex. 120, Bayoumi Dep. 73:7-75:11.  FBI documents further confirm that Dallah had at
least 50 "ghost employees" on its books to conceal their mission in foreign countries, including

REDACTED FOR PUBLIC FILING

Saudi embassy officer Dr. Soliman Al-Ali aka Soliman Ali Elay. Ex. 319, PEC-KSA 000441 at 43; Ex. 125, Coombs Dep. 48:6-49:4; Ex. 2, EO 3326; Ex. 293, KSA 7791.

676. Director Salmi entered similar orders to Dallah Avco to pay Bayoumi for ANSS jobs in the Kingdom in each year that Bayoumi continued to work for Saudi Arabia in the U.S. These jobs included not only Senior Data Processing Technician, but also "PCA/AE Budget Coordinator" and "DSS Programmer." Dallah Avco had none of these positions, and Bayoumi's role within the ANSS project did not change. Ex. 111, Khalifa Dep. 89:3-91:23. And there would be no need to second a PCA employee to Dallah Avco to work in the United States. Ex. 111, Khalifa Dep. 98:10-99:20.

677. Bayoumi, together with another PCA official Alp Karli, routinely prepared false time records to show that Bayoumi was working in Jeddah, Saudi Arabia on these jobs when in fact he was working as a clandestine agent for the Saudi Government in San Diego. Bayoumi signed these false records but never held any of these jobs. Ex. 429, DA 0329, Ex. 125, Coombs Dep. 155:16-157:9; Ex. 120, Bayoumi Dep. 73:7-75:11.

678. The PCA determined the job titles that Bayoumi would receive, and all the amounts paid to Bayoumi by Dallah Avco, including Bayoumi's salary, housing allowance, other allowance, and transportation. The PCA directed Dallah Avco to pay those amounts to Bayoumi. Ex. 122, Khan Dep. 51:21-52:6, 152:3-154:9, 163:7-164:1; Ex. 428, DA 0099 (Khan Dep. Ex. 86).

679. In April 1999, however, the Chairman of the Board of Dallah Avco wrote to the Saudi Arabia to terminate the secret arrangement and informed Saudi Arabia that it would no longer pay Bayoumi. Ex. 435, DA 1101; Ex. 436, DA 1102.

REDACTED FOR PUBLIC FILING

680.     Saudi Arabia, via PCA Director General Salmi, immediately issued an order to Dallah Avco to take the steps necessary to keep Bayoumi on the payroll so that Bayoumi could "complete the task" assigned to him by the Kingdom.  Ex. 437, DA 1104; Ex. 182, Kamel Ex. 119 (DA 1110); Ex. 103, Kamel Dep. 180:10-182:3, 183:10-23. That same day, Kamel wrote to the President of the PCA requesting another extension of Bayoumi's purported secondment to Dallah. Ex. 182, Kamel Ex. 119 (DA 1110). On April 17, 1999, Dr. Ali Abdul Rahman al Khalaf, President of Civil Aviation, wrote to the Assistant Minister of Defense and Civil Aviation requesting that he approve the extension of Bayoumi's purported secondment for a fifth year starting on April 24, 1999. Ex. 439, DA 1357. On May 3, 1999, Anqari approved the purported secondment for another year. Ex. 439, DA 1357.

681.     From May 1999 through March 2000, Bayoumi attended seven continuing education short-courses run by ESI International (in association with George Washington University).  Ex. 678AA, MPS732_821.  Paperwork submitted to the Saudi Embassy indicated that these seven short-courses, each lasting two to five days, amounted cumulatively to a "Master's Certificate in Project Management." Ex. 680C, KSA 906-907.  Bayoumi's certificates show that only two of the short-courses were held in Washington, D.C., both in late June 1999, Ex. 680A, KSA 734, 736 (Bayoumi Washington, D.C. certificates), whereas most of them were held in San Diego, Ex. 680B, KSA 735, 737, 1835 (Bayoumi San Diego certificates). Bayoumi completed his final short-course in San Diego between February 28 and March 3, 2000.  *Id.* at KSA 735.  Documents in the MPS production confirm that Bayoumi attended daily at a hotel in San Diego, Ex. 678Y, MPS732_361-368 (Bayoumi course paperwork, 02/28/00-03/03/00 in San Diego, CA), contrary to Bayoumi's claimed alibi that he went to Washington, D.C. for several

REDACTED FOR PUBLIC FILING

weeks in February and March 2000. Ex. 120, Bayoumi Dep. 474:21-476:16; Ex. 90, Snell Dec, Ex. 2 at 5.

682. Bayoumi returned to Saudi Arabia at the end of March 2000, as the funding arrangements that Saudi Arabia had made to pay Bayoumi through Dallah Avco were set to end, and reported in to PCA Director Salmi. Ex. 94, Anqari Dep. 104:15-105:20.

683. PCA Director Salmi, reported that on April 15, 2000, Bayoumi was "back in service" at his job for the Kingdom in Saudi Arabia. Ex. 233, KSA 0989.

684. Bayoumi, Director Salmi, and the PCA's President, continued to work on the Saudi Government's plan for Bayoumi to return to the U.S and on May 9, 2000, Bayoumi submitted a formal request to PCA Airways Engineering Director Mohamed al Salmi requesting an "unpaid study leave" to "complete my postgraduate study, PhD, in the United States of America." Ex. 228, KSA 0902.

685. Simultaneously, Bayoumi was filing documents with the PCA to attend a PhD program in the U.S. and filing visa paperwork with the U.S. Consulate in Jeddah. Bayoumi did not reapply for a student visa but for a "B1/B2" business/tourist visa. That visa was issued by the U.S. Consulate to Bayoumi on May 10, 2000. Ex. 276, KSA 4337 (secondment); Ex. 66, KSA 0901 (Ex. 384); Ex. 452, KSA 8001.

686. Bayoumi's request to PCA Director Salmi for an "unpaid study leave" was supported by a forged document purporting to be a May 8, 2000, letter from George Washington University (GWU) accepting Bayoumi for its Ph.D. program. Ex. 229, KSA 0903.

687. The forged letter was faxed on May 8, 2000 from a 703 area code number in Virginia to Bayoumi in Saudi Arabia. The circumstances show that it is likely that Bayoumi

REDACTED FOR PUBLIC FILING

called someone he worked with at the Saudi Embassy in Washington, D.C. to ask them to prepare the forged letter that Bayoumi needed to apply for the study leave.

688.    The GWU Registrar testified that the address on the letter did not belong to GWU, but to a separate company that ran a "Certificate Program" under GWU's name. That Certificate Program included the 2–3-day lectures for which Bayoumi had previously received certificates.  Ex. 196, KSA 0734-7.  The GWU Registrar confirmed that the company operating the Certificate Program did not run any Ph.D. program for GWU and that the letter did not come from GWU.  Ex. 162, GWU Registrar Decl. ¶ 7-11.

689.    Bayoumi had other forged documents purporting to be from GWU that were recovered by the MPS.  Ex. 678X, MPS 732_307 (the MPS found in Bayoumi's possession an August 1999 letter on GWU "Law School" stationery signed by someone claiming to be the "Coarse [sic] Counselor" stating that Bayoumi "is enrolled in ESI International's Project Management Program and will be attending classes starting in September.").

690.    On May 11, 2000, Salmi wrote to the PCA's Director of Personnel Affairs and Salaries stating that he had no objection to Bayoumi's 2-year educational leave request. Ex. 66, KSA 0901 (Ex. 384).

691.    Bayoumi's atypical activities in the U.S. is demonstrated by the fact that his unpaid study leave request was promptly denied by PCA's Assistant President Anqari and Human Resources department on May 16, 2000.  Ex. 94, Anqari Dep. 145:25-149:10; Ex. 200, KSA 0889, Ex. 199, KSA 0888.

692.    In rejecting the leave request, Anqari stated that Bayoumi had "enough leaves" and cited the money that PCA spent on Bayoumi's purported education as well as the job

REDACTED FOR PUBLIC FILING

vacancy Bayoumi left open at the PCA in Saudi Arabia.  Ex. 94, Anqari Dep. 149: 21- 15:23, 153:15-23, 162:20-23.

693.    But the highest-level officials at the PCA immediately intervened to provide Bayoumi with special treatment outside of PCA's normal practices.  Anqari's denial of Bayoumi's study leave "was overruled" by the PCA's President Ali Al-Khalaf, the "head of Civil Aviation."  Ex. 94, Anqari Dep. 163:19-164:2.  On May 23, 2000, the PCA issued a decree granting Bayoumi a two-year educational leave. Ex. 431, DA 0548.

694.    PCA Director Salmi also approved Bayoumi's study leave.  The applicable rules required that Bayoumi could only request and obtain an "*unpaid* study leave,"  Ex. 228, KSA 0902 (emphasis added); Ex. 94, Anqari Dep. 238:21-240:16.

695.    But on May 29, 2000, PCA Director Salmi ordered that Bayoumi receive a "promotion" and substantial pay increase for a new job as a "Senior DSS Programmer" with Dallah Avco backdated to an effective date of April 13, 2000.  Ex. 425, DA 0082.

696.    Plaintiffs' expert Youssef determined "[a]though Bayoumi had no actual accounting or other work to show for it, and had not been attending school, yet his total pay from Dallah Avco more than doubled from SAR (Saudi Riyals) 11,546 per month (U.S. $3,078) in March 2000, to SAR 24,075 ($6,420) in April 2000, to SAR 26,304 ($7,014) for each month in July through December 2000."  The exchange rate of Saudi Riyals to U.S. Dollars is 3.75 Riyals to a Dollar. Ex. 5, Youssef Rpt. 80; Ex. 430, DA 0457-83 at 61-70.

697.    Saudi Arabia did not produce any documents concerning Bayoumi's work or pay while he was at PCA headquarters for two months in April-May 2000.  PCA's Logistics Manager Samuel Coombs testified that the PCA office led by Salmi handled and used large

REDACTED FOR PUBLIC FILING

amounts of cash in ways that were not always transparent or free of suspicion. Ex. 86, Coombs Decl. 2.

698.	Bayoumi was paid SAR 24,885 ($6,636) per month from January 2001 to August 2001, which covered the time Bayoumi still lived in San Diego. Bayoumi and his family moved out of their San Diego apartment on June 23, 2001. Ex. 91, Ratchford Decl. ¶ 20.

699.	Bayoumi's pay from Dallah Avco sharply decreased, reflected in his pay stubs, *after* September 2001. September 2001 (SAR 12,033 - $3,209) Ex. 430, DA 0457-83 at 79 October 2001 (SAR 16,467 - $4,391) Ex. 430, DA 0457-83 at 80; November 2001 (SAR 16,467 - $4,391) Ex. 430, DA 0457-83 at 81; December 2001 (SAR 13,300 - $3,547) Ex. 430, DA 0457-83 at 82; January 2002 (SAR 12,667 - $3,378) Ex. 430, DA 0457-83 at 83.

700.	In sum, Bayoumi received at least three separate streams of regular funding from the Saudi government through Saudi contractors (in addition to other funding sources): his ANSS salary through Dallah Avco payroll, his $90,000 per year education stipend through Dallah Avco and Ercan and ultimately paid out of the PCA logistics budget to cover expenses, and at least $15,000 a month in cash through Ercan. Ex. 86, Coombs Decl. 3; Ex. 125, Coombs Dep. 23:7:14, 58:25-60:12; Ex. 35, FBI 007995-7998 (Bayoumi Dep. Ex. 679); Ex. 320, PEC-KSA1-000001-98 at 31; Ex. 36, Bayoumi INS Form I-20 (Bayoumi Dep. Ex. 680).

701.	Saudi Arabia pressured Ercan and Dallah to continue paying and maintaining Bayoumi's cover in the United States or risk losing substantial lucrative contracts with the Saudi government. Ex 319, PEC-KSA 000441-43 at 42; Ex. 84, Congressional Joint Inquiry Excerpt – "The 28 Pages" at 423 (stating that Bayoumi was receiving money from Ercan, and that when he ██████ refused to pay Bayoumi a monthly salary for doing nothing, he was told that Ercan would lose its contract if it did not pay Bayoumi); Ex. 435, DA 1101; Ex. 436, DA 1102; Ex.

177

REDACTED FOR PUBLIC FILING

437, DA 1104; Ex. 182, Kamel Ex. 119 (DA 1110); Ex. 439, DA 1357; Ex. 125, Coombs Dep. 143:7-148:21. Given Bayoumi's recurring access to substantial funds through Dallah Avco, sources confirm that Bayoumi had "seemingly unlimited" funds.  Ex. 9, Joint Inquiry at 174.

702.    In January 2002, United States government officials from the Departments of Justice and Treasury met with PCA representatives in Saudi Arabia.  A report prepared by the PCA concerning the meeting shows that the PCA misled the U.S. government by claiming that "Bayoumi worked under contract for Dallah Avco."  Ex. 426, DA 0089-90.  In a letter to the PCA, Dallah Avco stated that Bayoumi was at all times a PCA employee. Dallah Avco also stated that one of the participants in this meeting, Alp Karli, "signed the minutes of [the] meeting as a representative of Dallah Avco" but that this was "incorrect" because Karli was "a coordinator and supervisor over the contractor Dallah Avco on behalf of the [PCA]."  Ex. 426, DA 0089-90, Ex. 427, DA 0092-93. According to Dallah Avco, "at all times they're PCA subordinates" and "PCA says what are their positions. PCA says the job descriptions, their salaries, who gets to leave, when do they leave, who gets --whatever administrative thinks -- how it comes from the PCA." Ex. 103, Kamel Dep. 23:19-25:3.

703.    After the 9/11 Attacks the FBI received information concerning a connection between Dallah Avco and Osama bin Laden.  On October 10, 2001 the FBI San Diego office received information that "[a]s of 1998, Dallah Avco Trans Arabia Ltd was reportedly a subsidiary of the Al Baraka Investment and Development Company in Jeddah. … [It was also known as] Avco Dallah Company aka Dallah Avco Company [and] was linked to UBL. [Redacted] UBL was instructed to contact the company in June of 1998."  Ex. 2, EO 2565. On October 13, 2001, the Director of the FBI did a trace of companies Bayoumi claimed to work for and "established" a "connection between Bin Laden and Dallah Avco" that warranted further

178

REDACTED FOR PUBLIC FILING

investigation and potential declassification of evidence by the U.S. counterintelligence community. Ex. 2, EO 2549.

### E. Bayoumi received the highest possible job performance ratings from Saudi Arabia during the time he was working to establish the Saudi government's California extremist network of support to the 9/11 hijackers.

704.     Bayoumi received job performance evaluations from Saudi Arabia, and an extraordinary salary increase in May 2000, that coincided with the time that he established the Saudi government's extremist network inside Southern California that provided material support to 9/11 hijackers Hazmi and Mihdhar in San Diego. Ex. 434, DA 1054.

Saudi Arabia prepared two performance reviews of Bayoumi dated April 1999 and March 2000, as an "accountant" for the "Contracts and Financial Control Division" of the "Airways Engineering" Division of Saudi Arabia's Presidency of Civil Aviation. These reviews covered the time when Bayoumi was supposedly "seconded" as a "student" and while he was being paid by both Ercan and Dallah Avco. Ex. 198, KSA 0882; Ex. 197, KSA 0879.

705.     In these evaluations, Bayoumi was described by the Kingdom as "persistent and hard working" and "known for his continuous ambitions toward development and better efforts" and he received the highest possible ratings from Saudi Arabia for his work. Ex. 198, KSA 0882; Ex. 197, KSA 0879.

### F. Saudi Arabia had Bayoumi use the cover of a student visa and "Saudization" to carry out his work for Saudi Arabia inside the U.S.

706.     Foreign government officials living and working inside the U.S. are required to file a notification with the U.S. Attorney General. 18 U.S.C. § 951. No such notification was filed for Bayoumi during the seven years he lived and worked in the U.S.

707.     As cover, Saudi Arabia had Bayoumi obtain and use a full-time student visa to enter, reside, and work in the U.S. from 1994 through 2000 and a business/tourist visa to enter,

179

reside, and work in the U.S. from May 2000 through June 2000. Ex. 452, KSA 8001; Ex. 36, Bayoumi INS Form I-20 (Bayoumi Dep. Ex. 680).

708.    Ercan was used by Saudi Arabia to support Bayoumi's immigration status with the INS. Bayoumi's immigration forms filed in February and September 1997 stated that Bayoumi was pursuing educational programs in San Diego and that Ercan would pay support to Bayoumi at the rate of $4,000 per month until the year 2000. Ex. 36, Bayoumi INS Form I-20 (Bayoumi Dep. Ex. 680); Ex. 211, KSA 6642-65 at 61; Ex. 340, USIU production at 31; Ex. 488, FBI 001370-73 at 373.

709.    Bayoumi enrolled at San Diego State University ("SDSU"). Ex. 320, PEC-KSA1-000001-98 at 71. Following his enrollment at SDSU, Bayoumi would enroll in English courses at ELS Language Centers in San Diego until mid-August 1995, but Bayoumi failed to attend classes at all between March 25, 1995 and April 23, 1995 and received "failure" or "poor" grades in about a third of his classes. Ex. 320, PEC-KSA1-000001-98 at 35-36.

710.    While SDSU records appear to state that Bayoumi had attendance rates in his English coursework ranging from 88.5% to 92%, Ex. 320, PEC-KSA1-000001-98 at 71, that is misleading and grossly overestimates his actual attendance. Bayoumi missed the first few weeks of both the fall and winter sessions and attended just 147 hours of class in total while enrolled out of a possible 480 "base" hours of class. In other words, Bayoumi missed 333 hours of coursework out of a total of 480 possible "base" hours while he was enrolled. Ex. 320, PEC-KSA1-000001-98 at 74 (noting that fall session began on August 30, 1994 but no Bayoumi attendance records until September 12, 1994); Ex. 320, PEC-KSA1-000001-98 at 72-73 (noting enrollment date of August 30 1994, but date Bayoumi began classes as September 22, 1994); Ex. 320, PEC-KSA1-000001-98 at 75 (comment noting that Bayoumi "[e]ntered the class late in the

180

REDACTED FOR PUBLIC FILING

term"); Ex. 320, PEC-KSA1-000001-98 at 81 (no hours of attendance for first three weeks of

spring 1995 session); Ex. 320, PEC-KSA1-000001-98 at 71 (noting that coursework was

measured in hours, that there was a "base of 20 hours of instruction per week" divided into

"general English" and "oral communication"); Ex. 320, PEC-KSA1-000001-98 at 74, Ex. 320,

PEC-KSA1-000001-98 at 78, Ex. 320, PEC-KSA1-000001-98 at 81 (noting hours attended for

"G" i.e. general English, "OC" i.e., oral communication, and "T" which is "Total" though at

times the subtotal of G and OC does not add to T, which was likely the result of short hand); *id.*

(20 hours per week over the sessions and including the first two weeks of fall session classes

Bayoumi missed equals 480 hours and adding up the "T" amounts yields 147 hours).

711.    From November 1995 through mid-1997 Bayoumi enrolled in classes at West

Coast University ("WCU") and United States International University in San Diego ("USIU"). In

December 1996, Bayoumi wrote to USIU requesting a transfer to finish his degree because WCU

had financial problems.  Ex. 38 (Bayoumi Dep. Ex. 683). And he enrolled in USIU beginning in

the Winter Quarter of 1997.  Ex. 320, PEC-KSA1-000001-98 at 29.

712.    Bayoumi enrolled and attended 15 classes during this time, but the classes were

only two months long in duration, and he was taking only 1-2 courses at a time.  Ex. 320, PEC-

KSA1-000001-98 at 44-46. Foreign intelligence officers often pose as students because they can

easily obtain a student visa, pay tuition, enroll in classes with a light and flexible schedule but

rarely attend classes (many of which do not take regular attendance) and have the freedom to

conduct other activities without U.S. government officials noticing, *see* 9/11 Commission Report

at 272; Ex. 5, Youssef Rpt. 74, as Bayoumi had already been doing for almost two years at this

point. Bayoumi continued to have ample time to perform his true function in the United States

REDACTED FOR PUBLIC FILING

while in school. And his business studies were unrelated to his original reason for being here—to pursue English language coursework.

713.    An October 2000 email recovered by the FBI shows that during this time Bayoumi engaged in a pattern of fraud by paying a USIU professor named ███████████ to prepare his coursework for him.  Ex. 567, FBI 011777-011783 at 011782 (Bayoumi agrees to pay ████████ "what ever you suggest" to help him prepare "some assignments" and states to ████████ that he "helped me [Bayoumi] in the beginning….”); Ex. 340, USIU production at 50.

714.    During this time, in April 1996, Dallah Avco requested to extend Bayoumi's purported secondment for another year and the request is granted.  Ex. 282, KSA 4468; Ex. 253, KSA 1019, Ex. 252, KSA 0710. The extension required coordination at the highest levels including the President of the PCA, the Deputy Minister of Defense and Aviation and the Assistant Minister of Defense and Aviation.  Ex. 282, KSA 4468; Ex. 253, KSA 1019, Ex. 252, KSA 0710; Ex. 94, Anqari Dep. 101:24-103:19. And again, even though Dallah purportedly made the request, the request truly originated from Saudi Arabia but was made on Dallah letterhead.  Ex. 180, Kamel Exhibit 127; Ex. 103, Kamel Dep. 171:17-23, 196:13 – 207:23.

715.    In early 1997, Dallah again requested to extend Bayoumi's purported secondment for another year.  Ex. 443, KSA 4462. Again, this request should be understood as coming from the Saudi government.  Ex. 180, Kamel Exhibit 127, Ex. 103, Kamel Dep. 171:17-23, 196:13 – 207:23. This time before extending the purported secondment, the PCA human resources department requested additional information: The reasons for extending the secondment for a third time? The reasons for Bayoumi's stay in the USA? For completing studies or other reasons? What type of study, major, or qualification does Bayoumi want to obtain, and when will he be done? Will Bayoumi continue in his position after returning, or will he leave his work? Ex.

182

281, KSA 4466. Mohammed al Salmi responded that the further secondment related to Saudization and that Bayoumi would pursue a master's degree in business administration that would be complete by the end of the secondment year (early 1998). Ex. 424, DA 0044. On May 6, 1997, Anqari authorizes the continued secondment for another year to complete a Master's in International Business Administration. Ex. 424, DA 0044.

716. In July 1997, Bayoumi was placed on academic probation at USIU for failing to maintain a minimum G.P.A. Ex. 2, EO 1762; Ex. 340, USIU production at 49. Bayoumi was nevertheless awarded a master's degree from USIU in December 1997. Ex. 340, USIU production at 60 (showing graduation fee.). The academic record shows that despite being on probation in July 1997, Bayoumi did not return to take classes but took an "independent study" course on marketing in the Arabian Gulf to obtain his USIU degree. Ex. 340, USIU production at 61.

717. After the summer of 1997 Bayoumi did not complete any regular school courses. In its 2014 Operation Encore report, the FBI concluded that "Omar Bayoumi was living in San Diego on a student visa, despite not attending classes, and receiving a salary from the Kingdom of Saudi Arabia for job duties he never performed." Ex. 2, EO 0226. The few classes he did attend after the initial English courses had nothing to do with replacing Alp Karli, the purported reason for Bayoumi being in the U.S. in the first place, and Alp Karli confirmed Bayoumi was *overqualified* for Karli's job and would only need six months training to take over. Ex. 469, FBI 000281 at 283. In fact, Bayoumi never took over Karli's position despite his multiple years of education that were supposedly to facilitate this promotion. *Compare* Ex. 469, FBI 000281 (listing Alp Karli as "Director of Finance" at PCA) *with* Ex. 37, Bayoumi Ex. 682 (Resume of Bayoumi not listing Director of Finance of similar senior position).

REDACTED FOR PUBLIC FILING

718.    In April 1998, the President of the PCA asked the Assistant Minister of Defense and Civil Aviation to extend the purported secondment another year to May 1999.  Ex. 438, DA 1126.  Again, the request came from the highest levels of the PCA in close coordination with the Saudi defense ministry.  On May 12, 1998, Anqari approved the purported secondment for another year.  Ex. 438, DA 1126.

719.    A May 20, 1998, letter from Dr. Jamil Shami, the "Director, Academic Affairs" at the "National Guard Office" of the Saudi Embassy in Washington, DC falsely represented that "Al-Bayoumi was a candidate for a full scholarship from the Government of Saudi Arabia" including a "monthly living allowance."  Ex. 678Z, MPS 732_449. Another letter dated September 21, 2000 from Jamil Al Shami of the Saudi Embassy was similarly drafted to support Bayoumi's cover. Ex. 678I, MPS 82_19.

720.    To maintain his cover, Bayoumi enrolled for two semesters of classes at Keller School of Management in San Diego from November 1998 to June 1999.  The school's records show that Bayoumi earned no credit for any classes at Keller. The November sessions indicate that he withdrew, and the June sessions are marked "unsatisfactory."  Ex. 320, PEC-KSA1-000001-98 at 67-70.

721.    Bayoumi claimed at his deposition that he attended classes in the Fall at Keller but did not sit for his exams "because the subjects were dry" and then enrolled in the same courses again the following Spring, saying that he was "not too ashamed to try again," and once again did not sit for his exams.  Ex. 120, Bayoumi Dep. 772:1-7, 804:3-15.

722.    In early 2000, Bayoumi enrolled in a second master's program at USIU on January 21, 2000, for the "Winter Quarter 2000," then withdrew on February 7, 2000, but nevertheless obtained a March 5, 2000 certification from USIU to support his student visa that he

184

REDACTED FOR PUBLIC FILING

was a business administration student in a "full course of study." Ex. 340, USIU production at 54-55; Ex. 211, KSA 6642-65 at 61.

723. Omar Al-Bayoumi was not part of a "Saudization" program, as suggested at KSA Aver. ¶¶ 17, 18. There is no evidence of other individuals working for Saudi Arabia who were given special treatment and funding similar to what was provided to Bayoumi or allowed to continue in that program for years without actually attending courses.

## X.     PHONE CALL RECORDS

### A. Bayoumi regularly maintained his relevant work information and contacts in a handwritten address book and "green folder."

724. In September 2001, the Metropolitan Police Service ("MPS") seized a handwritten address book prepared by Bayoumi which constituted over 150 individual pages. Ex 12AA, (Bayoumi handwritten address book, transcribed with certified English translation; full version produced by MPS, including material found with the book). The entries in that phone book show that Bayoumi prepared and updated that handwritten address book during the course and scope of his job as a Saudi government agent in San Diego.

725. In September 2001, the MPS also seized a "green folder" from Bayoumi which comprised a rolodex of work contacts that Bayoumi prepared and assembled during this time in San Diego. Ex. 12BB, MPS 688 at 2-15. The green folder included the typed list of "Omar's Phone Book" dated "January 26, 2000" and included numerous handwritten annotations and additions prepared by Bayoumi and kept in his green folder.

726. For example, Bayoumi's green folder has a typed entry for "Al Ghatani, Mohed Gen [Muhammad Al Qahtani]" in Omar's Phone Book with a San Diego phone number. Ex.12BB, MPS 688 at 3. On the reverse side of one of the typed pages, Bayoumi added handwritten contact information for Qahtani in Saudi Arabia. Ex.12BB, MPS 688 at 10 ("Sheikh

185

REDACTED FOR PUBLIC FILING

Muhammad Al-Qahtani).  Similarly, Bayoumi added a handwritten note to his green folder with Mutaeb Al Sudairy's contact information in Missouri.  Ex. 12BB, MPS 688 at 2.

727.    Bayoumi confirmed in written correspondence that his work was to "coordinate" and "cooperate" with other Saudi government officials.  Ex. 411, MPS 43_314 (letter to Islamic Affairs Director Ghesheyan); Ex. 413, MPS 43_338 (letter to MOIA Embassy Director Sowailem).  Bayoumi prepared his handwritten address book and green folder to record the names, numbers, and additional information about Saudi government officials and others with whom he was in regular contact as part of his work with the Saudi government and its extremist network inside the U.S.

728.    For Plaintiffs' expert Youssef, Bayoumi's handwritten address book and green folder provide a "Rosetta Stone" to the phone numbers shared and used among the Saudi government officials involved in the extremist network inside the U.S.  Ex. 5, Youssef Rpt. 120.

729.    After the 9/11 Attacks, law enforcement also found a third document prepared by Bayoumi, a separate typed list also called "Omar's Phone Book" and dated "October 4, 2000" in his office desk at the Al Madinah Mosque.  Ex. 534, FBI 4377-4381.

## B.  The significance of short duration phone calls

730.    Short duration phone calls among Thumairy, Bayoumi, the Saudi Embassy, and others are significant, contrary to Saudi Arabia's allegation.  KSA Aver. ¶¶ 224, 227.  Plaintiffs' expert Youssef, the former FBI Counterterrorism Communications Unit Chief, testified that a patterns of short duration phone calls shortly before or after a significant event can evidence familiarity among the individuals and understanding of a common scheme.  Ex. 5, Youssef Rpt. 14-15.

REDACTED FOR PUBLIC FILING

731. Youssef found that it was highly significant that there was a large volume of short duration calls among Thumairy, Bayoumi, Saudi Embassy officials, Saudi Consulate officials, and others shortly prior to and following the arrival of the 9/11 hijackers in Los Angeles and at the same time as events related to logistical planning and support for the hijackers. Ex. 5, Youssef Rpt. 14-15.

### C. Thumairy had two cell phone numbers

732. There is evidence that Thumairy used the ███████-3362 ("-3362") number as his mobile phone during the period from December 1999 through October 2000, contrary to Saudi Arabia's claim, KSA Aver. ¶ 229. The FBI found that Thumairy used at least two cell phone numbers while he was in Los Angeles: first the -3362 number, and then, after October 2000, █████-0777 ("-0777"). FBI reports determined that both the -3362 and -0777 cell numbers were used by Thumairy. Ex. 2, EO 2757-59; Ex. 2, EO 0552 (noting, at the time, "inexplicable…telephonic connections between Thumairy and a number of San Diego-based individuals prior to the arrival of AL MIHDHAR and AL-HAZMI...").

733. The -3362 number was recorded by Bayoumi as Thumairy's cell phone number in three different documents: Bayoumi's handwritten address book; the Bayoumi January 2000 green folder typed phone list; and Bayoumi's October 2000 typed phone list. Ex. 12AA, MPS738_35; Ex. 12BB, MPS 688_3 (January 2000); and Ex. 421, FBI 000345-349 (October 2000). Saudi Arabia does not address Bayoumi's handwritten address book. The records prepared, maintained and updated by a Saudi employee for purposes of his work and in furtherance of the Saudi extremist network and the support plot do not constitute "inadmissible hearsay" as Saudi Arabia claims. KSA Aver. ¶ 231.

REDACTED FOR PUBLIC FILING

734. Plaintiffs' expert Youssef analyzed all the phone records including from Thumairy's landline to cross-check that the -3362 and -0777 numbers were used by Thumairy to make and receive calls. Ex. 5, Youssef Rpt. 6-8, 14-15, 120-122. Saudi Arabia did not hire a communications expert and has not done such an analysis. There is no evidence of a single call which is misattributed.

735. The FBI and Plaintiffs' expert Youssef independently found a total of 67 calls between Thumairy and Bayoumi. Ex. 2, EO 2757-59; Ex. 5, Youssef Rpt. 102 n. 413. Those calls show various instances where Thumairy's landline and cell phones were used interchangeably by the two men to get in touch with each other, including:

> • On December 19, 1999, Bayoumi used his Mosque office phone to call Thumairy's -3362 cell at 9:10pm (1 min.); at 10:17pm (3 mins.) Thumairy's landline called Bayoumi's cell;

> • On January 19, 2000, Bayoumi used his cell phone to call Thumairy's landline at 8:23pm (1 min.); at 10:13pm (5 mins.) Thumairy used his -3362 cell to call Bayoumi's cell;

> • On December 17, 2000, Thumairy used his landline to call Bayoumi's Mosque office at 1:52pm (36 secs.); at 2:04pm (6 mins.), Bayoumi's Mosque office called Thumairy's -0777 cell phone; at 2:30pm (1 min. 29 secs.) Thumairy's landline called Bayoumi's landline.

Ex. 2, EO 2757-58.

736. Thumairy submitted a July 2001 joint lease application in which he admitted that he was using the -0777 number. Ex. 484, FBI 001042-REV2021 at 1045. A phone list seized by the FBI from ██████████ shortly after the 9/11 Attacks listed the -0777 number as belonging to Thumairy. Ex. 559, FBI 008913-008914 at 8914. In January 2002, shortly after he returned to Los Angeles following the 9/11 Attacks, Thumairy instructed the phone company to forward calls from his home phone number to the -0777 number. Ex. 472, FBI 000508.

188

REDACTED FOR PUBLIC FILING

737.     Plaintiffs' expert Youssef determined that the calls made from the -0777 number from December 10, 2000 to August 15, 2001 match those of locations and phone numbers for individuals that were part of Thumairy's calling circle.  Ex. 5, Youssef Rpt. 121-22.  The timing of the calls on both the -3362 and -0777 numbers match the periods when Thumairy was in the U.S.  Ex. 5, Youssef Rpt. 121-22.

738.     The -3362 and -0777 numbers were subscribed to by Saudi Arabia or its agents for Thumairy's use.  A 2005 FBI report found that the -3362 number was "used by Al-Thumairy but subscribed to Faisal Al-[Muhanna]" and that the -0777 number was "subscribed to Salah Al-Hatlani but used by Al-Thumairy…."  Ex. 2, EO 2757.  The -3362 and -0777 numbers both were subscribed to by Muhanna and Hatlani using the identical Long Beach, California apartment address at ███████████████.  Ex. 552, FBI 008123-008152 at 8132..  The -0777 number was activated on October 3, 2000.  Ex. 505, FBI 001591-001593 at 1593.

739.     Plaintiffs' expert Youssef opined that Saudi Arabia used Faisal Al Muhanna and Hatlani as logistics agents for Thumairy and other Saudi government officials in California to obtain covert cell phone numbers for those officials.  Muhanna and Hatlani subscribed to -3362 and -0777 and additional phone numbers at the same Long Beach, California address in this logistics role.  Ex. 5, Youssef Rpt. 121-122 n. 508, 124-25.

740.     The subscribers to -3362 and -0777, Muhanna and Hatlani, worked for (or claimed to work for) the Saudi government and had direct ties to Thumairy.  Faisal Al Muhanna, the subscriber for the -3362 number, signed a July 2001 joint lease agreement with Thumairy for two apartments in a complex near the King Fahad Mosque.  In that agreement, Muhanna represented that he was a "trainer" for the Saudi Embassy.  Ex. 484, FBI 001042-1046 at 1044-1045- (FBI report memorializing details of Thumairy's Los Angeles apartment rentals at Avalon

REDACTED FOR PUBLIC FILING

complex). Muhanna provided the phone number for Khalid Al Sowailem at the Saudi Embassy as his contact number. *Id.*; Ex. 5, Youssef Rpt. 123, n. 512. Saleh Al Hatlani, the subscriber for the -0777 number, was a Saudi Consulate "Employee Affairs/Auditor" official during the same period that Thumairy was accredited as a Consulate officer. Ex. 680O, KSA 7492; Ex. 218, KSA 7341 (Hatlani listed on Consulate fax sheet).

741.    Thumairy made 503 calls from the landline at his home, number (████-0638, between September 1, 1999 and August 16, 2001 to phones subscribed to by Faisal Al Muhanna. Ex. 12E (Thumairy calls to Muhanna). The numbers called from Thumairy's landline include: ████-2666, ████-7776, ████-9966, (████-7110, and (████3777. *Id.* Two of those numbers — ████-2666 and ████-7776 — were listed as belonging to Faisal Al Muhanna on the joint lease applications that Thumairy and Muhanna filed. Ex. 484, FBI 001042-REV2021 at 1043-1044. The remaining numbers – ████-9966, ████-7110, and ████-3777 – were each identified as associated with Faisal Al Muhanna based on publicly available sources. Ex. 53 (PeopleMap Report on Faisl Almuhanna "████-7110") (Muhanna Dep. Ex. 674); Ex. 54 (PeopleMap Report on Faisal A Almuhana "████9966") (Muhanna Dep. Ex. 675); Ex. 55 (Trans Union People Search on Faisal Ahmed Almuhana "██-██-3777") (Muhanna Dep. Ex. 676).

742.    From December 3, 2000 to August 4, 2001, Thumairy made approximately 200 calls from his -0777 cellphone, which was subscribed to by Consulate Employee Affairs/Auditor official Hatlani, to number ████-2666, which was also subscribed to by Hatlani. Ex. 505, FBI 001591-001593 at 1591-1592; Ex. 663, FBI 001594-001693; Ex. 506, FBI 001708-1711 at 1710; Ex. 12E (Thumairy calls to Faisal Al Muhanna).

REDACTED FOR PUBLIC FILING

743.    The numerous calls Thumairy made to other phone numbers for which Faisal Al Muhanna and Salah al Hatlani were the subscribers were likely calls to other Saudi government agents for whom Muhanna and Hatlani had obtained a cell phone number, and thus were listed as the subscribers. As plaintiffs' expert concluded, "[i]t is also reasonable to conclude that as a logistics agent for Saudi Arabia, Faisal al Muhanna was assigned to assist Thumairy" with their joint apartment rental. Ex. 5, Youssef Rpt. 124-25.

744.    At his deposition, Faisal Al Muhanna claimed that all he could recall about his relationship with Thumairy was that they spoke together about religious matters. Ex. 108, Muhanna Dep. 139:9-140:17. Thumairy said that Muhanna was "just one of the students who came on Fridays to pray at the [King Fahad M]osque" and that he may have spoken to Muhanna on the phone but could not recall anything else. Ex. 107, Thumairy Dep. 317:7-21, 318:5-321:20.

745.    Muhanna claimed he could not remember any of the various phone numbers subscribed to under his name, including the -3362 number used by Thumairy. Ex. 108, Muhanna Dep. 62:21-63:4 (-7776); 89:6-20 (-2666); 91:19-21 (-3362); 110:11-13 (-7110); 116:3-5 (-9966); 118:8-17 (-3777).

746.    Plaintiffs' expert Youssef explained that Muhanna and Hatlani are examples of a "front man" technique used by foreign governments to provide work telephones to operatives such as Thumairy who were employed abroad. Ex. 5, Youssef Rpt. at 125. Saudi Arabia only offers its improper attempt to use Muhanna and Hatlani as cover for Thumairy's acts. KSA Aver. ¶¶ 229-31.

191

REDACTED FOR PUBLIC FILING

### D. Bayoumi Office phone records

747.     Bayoumi used his title as "The General Supervisor" of the Al Madinah Mosque in his correspondence with Saudi government officials, including MOIA's Minister and used his office at the Mosque to conduct Saudi government business. *E.g.*, Ex. 414, MPS 43_347 (Bayoumi letter to Minister); Ex. 411, MPS43_314 (Bayoumi letter to Islamic Affairs Department head Ghesheyan); Ex. 413, MPS43_338 (Bayoumi letter to MOIA Embassy Director Sowailem).

748.     Bayoumi had his own private office on the second floor of the Mosque with its own phone. Ex. 10C (MPS893-COMP Video Exhibit) from 01:53; Ex. 2, EO 1828-30 at 1829 (the FBI visited the Mosque in September 2001 and found the doorway from the hall into Bayoumi's office locked). Bayoumi subscribed to his office phone number ███████-3142 (-3142") under the name OMAR ALBAYOUMI DBA MASJEDALMEDIANAH [sic]." Ex. 529, *e.g.,* FBI 004182-004185 (Bayoumi DBA MASJEDALMADINAH July 9, 1998 Pacific Bell Statement).

749.     Saudi Arabia's claim that Bayoumi registered the phone for the Mosque and "not for his personal use", KSA Aver. ¶ 225.a., is incorrect. As shown by the calls he made on the phone, Bayoumi used the phone primarily for his Saudi government work in San Diego. Bayoumi used his phone at the Mosque to call the Saudi Embassy, Saudi Consulate, and various Saudi government officials, including Thumairy, Sudairy, and ████████. Ex. 12A (Phone calls Nov. 1999 – Mar. 2000); Ex. 12B (Calls between Bayoumi and Thumairy); Ex. 12K (Bayoumi calls to Saudi Embassy); Ex. 12L (Bayoumi calls to Saudi Counsulate); Ex. 12M (Bayoumi calls to IIASA); Ex. 12U (Bayoumi Mosque calls); Ex. 5, Youssef Rpt. 81-84 (Youssef concludes that "[b]ased on my review of the calls, the number and intensity of the calls show that Bayoumi is

REDACTED FOR PUBLIC FILING

actively working and reporting on a day-to-day basis with other Saudi officials stationed in the U.S. including at the Embassy and Consulate.").

750.    On the few occasions when Bayoumi let someone else in his office make a call on his phone, Bayoumi kept records of the calls made by others on his office phone.  The MPS production showed that Bayoumi noted on his office phone bill that three calls had been made by visiting Al Haramain operatives in August 1998.  Ex. 678G, MPS 43_433 (annotation showing "calls made by representatives of Al Haramain Foundation").  The fact that Bayoumi noted calls made by Al Haramain on his office phone bill is evidence that he carefully regulated the use of his office phone.

751.    Bayoumi's files and a videotape prepared by Bayoumi at the Al Madinah Mosque show that from the time that the Mosque opened in August 1998, Bayoumi specifically arranged for a payphone to be installed at the Mosque for the use of the congregants.  Ex. 678F, MPS43_400-402 (August 1998 agreement for public payphone and Bayoumi's notes about it); Ex. 10C, MPS 893-COMP Video Exhibit and 10C-TR Video Transcript at 23:29-23:56.

752.    Plaintiffs' expert Youssef specifically reviewed Bayoumi's claims that "anyone" could use Bayoumi's office phone by comparing the call usage patterns on Bayoumi's office phone to the call usage on Bayoumi's cell phone, to Bayoumi's own phone book, and relevant events.  Youssef determined that in making calls to the Saudi Embassy "Bayoumi interchangeably used his Mosque office phone and cell phone to call the same Saudi Government numbers."  Ex. 5,  Youssef Rpt. 83 n. 325.  Youssef found that Bayoumi made calls from his Mosque office to various Saudi government officials ahead of the trip of MOIA propagators Sadhan and Sudairy to San Diego.  Ex. 5, Youssef Rpt. 102-3, n. 416-7.  While Bayoumi claimed that "it could have been another person who called" MOIA propagator Sudairy in January-

REDACTED FOR PUBLIC FILING

February 2000 (Ex. 120, Bayoumi Dep. 585:21-586:2), Youssef determined that "[t]he calls to Sudairy were placed from Bayoumi's Mosque phone and Bayoumi's cell phone" and that "[i]t would be a strange and unlikely coincidence for 'another person' as described by Bayoumi, to be calling Sudairy from both of those phones over this discrete two-week period." Ex. 5, Youssef Rpt. 172. Similarly, calls were made from Bayoumi's cell phone and office phone to Magdi Hanna, who represented the Saudi government contractor funding Bayoumi's work for Saudi Arabia in San Diego. Ex. 5, Youssef Rpt. 77 n. 295.

753.    Plaintiffs' expert Youssef's careful analysis is demonstrated by the fact that he noted certain specific calls on Bayoumi's Mosque office phone that may have been made by someone other than Bayoumi based on the timing of those calls, other events occurring at that time, and the phone numbers being called. Ex. 5, Youssef Rpt. 98 n. 401 (August 1998 call to ██████████'s parents may have been made by ██████████ himself); Ex. 5, Youssef Rpt. 157 n. 642 (January 2000 call from Bayoumi's office phone to a visiting MOIA propagator's relative). Ex. 496, FBI 001456 at 01459 (A call was made from Bayoumi's Mosque office to the Columbus, Ohio number of the husband of Jaithen's niece, Mohamed Bejadi); Ex. 48 (Trans Union People Search on Mohammad A Albejadi"██████-2175") ( Jaithen Dep. Ex. 581); Ex. 96, Jaithan Dep. 240:2-244:9 (Jaithen admitted that Bejadi was his niece's husband and that he was visiting his niece at the time the call was made; however, Jaithen denied that he knew Bayoumi). Youssef cautiously weighed all attendant circumstances when attributing calls from the office phone to Bayoumi.

754.    Saudi Arabia's claim that the "phone line was available for the entire congregation of the mosque to use", KSA Aver. ¶ 225.b. is incorrect, as the phone was in Bayoumi's private office; the pattern of calls shows that the phone was used by Bayoumi and not

REDACTED FOR PUBLIC FILING

by the "entire congregation"; and Saudi Arabia does not point to any actual calls or other evidence showing that the line was regularly used by others and was generally "available."

### E. Bayoumi's calls to the King Fahad Mosque

755.    Saudi Arabia's suggestion that Plaintiffs' expert Youssef "asserted that calls to and from" three King Fahad Mosque phone numbers "were also calls to and from Thumairy" is highly misleading and incorrect.  KSA Aver. ¶ 228.  Youssef explained how he considered in his analysis eight calls made by *Bayoumi* to the King Fahad Mosque. These calls were *in addition to* the 67 calls between Bayoumi and Thumairy on non-King Fahad Mosque numbers.  Ex. 5, Youssef Rpt. 102 n. 413.  Bayoumi's additional contact with the Mosque is relevant to various issues in the case and Bayoumi listed the Mosque numbers as contact numbers for Thumairy in his handwritten address book and on a sheet of paper that the FBI found in Bayoumi's desk. Ex. 12AA, MPS738_35; Ex. 532, FBI 4270.  Youssef explained how Bayoumi's calls to the Mosque were related to specific times and events; for example, in December 1998, Bayoumi made three calls to the Mosque just before making a call to Thumairy's home phone, and within days of the arrival of two MOIA propagators who visited both Thumairy and Bayoumi as part of an advance trip to Los Angeles and San Diego.  Ex. 5, Youssef Rpt. 102 n. 413.  Bayoumi would later write MOIA and Thumairy to thank them for Thumairy's cooperation and coordination. Ex. 414, MPS43_347 (Bayoumi's letter to MOIA); Ex. 678D, MPS43_336 (Bayoumi's letter to Thumairy).

### F. Bayoumi's missing cell phone records

756.    The EO production also revealed that Bayoumi used another cell phone with the phone number ████-6662 ("-6662") subscribed to by his wife.  Ex. 2, EO 2797-2798.

REDACTED FOR PUBLIC FILING

757.     The FBI prepared a 42-page "target-to-target phone analysis" of Bayoumi's use of that -6662 number as part of "the Yemeni/Saudi support cell in San Diego…." *Id.*

758.     Bayoumi used the -6662 cell phone number himself or lent that phone to others. The phone was used to call Anwar Aulaqi on the first day that it was in use, on November 20, 1998.  The phone also called Aulaqi on April 20, 2000, when Bayoumi was in Saudi Arabia, indicating that Bayoumi had lent the phone to someone to use while Bayoumi was away.  Ex. 2, EO 2759

759.     The FBI has records of the -6662 phone from November 20, 1998 through September 20, 2000, Ex. 2, EO 2749.

760.     In addition, the phone calls of Saudi Consulate ███████████ have not been produced (except where the FBI made a record of specific calls made by ████ in its reports).

**G.  Bayoumi used calling cards to make phone calls.**

761.     Omar Al Bayoumi obtained and used calling cards to make phone calls in 1999-2000.  Calling cards purchased by persons who already have their own cell, office and home phones, are typically used to avoid leaving a digital footprint of their calls to others committing criminal activities. The MPS production shows that Bayoumi was buying calling cards through Khalid Al Yafai aka Abdul Rab (Yafai).  In November and December 1999 Bayoumi paid Yafai by check for "calling cards."  Ex. 446, MPS 724_40, 56.

762.     On January 9, 2000, Bayoumi was in Los Angeles with Yafai, and Bayoumi placed a call from his cell phone to ████████-0034, the phone number of ██████████████ of 9278 Communications at ████████████████, Los Angeles, a business that sells calling cards.  Ex. 2, EO 3676.

196

REDACTED FOR PUBLIC FILING

763. On the evening of January 9, 2000, Bayoumi stayed overnight in Los Angeles with Yafai at the Half Moon Motel. Ex., 525, FBI 004009-004010; MPS 899-CLIP. During that night a series of calls were made on Bayoumi's cellphone to a 1-800 number into the early morning of January 10, 2000. Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). These calls show that Bayoumi had just purchased new calling cards from 9278 Communications and was trying to familiarize himself with the use of those calling cards. Ex. 2, EO 0631 (Bayoumi either checking minutes or "learning how to use them by listening to automated prompts").

764. The FBI determined that ██████████ was in possession of a calling card from the same 9278 Communications in Los Angeles and that ██████ used that calling card to make phone calls to Yemen. Ex. 2, EO 1119.

765. It is likely that Bayoumi provided 9278 Communications calling cards to ██████ ██████. ██████ admitted to the FBI that he made calls on behalf of the hijackers – including to flight schools –using calling cards. It is likely that ██████ made these phone calls using calling cards that he had been given by Bayoumi. Ex. 2, EO 1119.

766. The FBI has records of the calling card calls made by Bayoumi and others. Ex. 515, FBI 3221-34 at 23-24. Those records have not yet been produced.

REDACTED FOR PUBLIC FILING

XI.      **BAYOUMI'S WORK FOR SAUDI ARABIA INSIDE THE U.S.**

    A.  **Bayoumi coordinated and worked with high-ranking Saudi Embassy, Consulate, and MOIA officials to manage and promote the Saudi extremist network in San Diego**

767.    Bayoumi had scores of phone contacts with Saudi officials from the MOIA and other Saudi Government agencies while he was in the United States.  Ex. 5, Youssef Rpt. 81; Ex. 12K (Bayoumi calls to Saudi Embassy); Ex 12B (Calls between Bayoumi and Thumairy); Ex 12A (Phone calls Nov. 1999 – Mar. 2000).

768.    The MPS recovered Bayoumi's handwritten address book, comprising more than 150 pages prepared in his own handwriting, which he compiled mainly during his time working for Saudi Arabia inside the United States.  Ex. 12AA, .

769.    Bayoumi's handwritten address book was produced by the MPS in late March 2022, well after Bayoumi's deposition was conducted and only days before the filing of Plaintiffs' expert reports.   The handwritten address book is mostly in Arabic and required time consuming, detailed review, transcription, translation and cross-checking for correspondence with the original entries by certified translators.  Ex. 12AA, MPS738.

770.    Bayoumi's handwritten address book is evidence of Bayoumi's extraordinary contacts at all levels of the Saudi government, including within the highest levels of its religious elite.  Bayoumi's role and capacity as a Saudi government official involved significant dealings with a variety of Embassy, Consulate, and MOIA officials.  Ex. 12AA, MPS738.

771.    Bayoumi's handwritten address book contains a page entitled "Our Sheikhs and Scholars" comprised of contact information for fifteen of the most senior religious clerics in

REDACTED FOR PUBLIC FILING

Saudi Arabia, including Sheikh Muhammad bin al-Uthaymeen and Sheikh Abdulaziz Bin Baz. Ex. 12AA, _82.

772. The FBI previously produced Bayoumi's January 2000 and October 2000 phone lists – but not Bayoumi's personal, handwritten address book. The FBI obtained Bayoumi's January 2000 phone list from the MPS; since it was the MPS who seized it from Bayoumi in September 2001. Ex. 2, EO 2425 (Bayoumi's residence and office locations were searched incident to his arrest and detention on September 21, 2001). The FBI obtained Bayoumi's October 2000 phone list from its search of Bayoumi's office at the Al Madinah Mosque in El Cajon, CA. Ex. 470, FBI 000335-344 at 339-340 ("On September 27, 2001, a federal search warrant was executed at the Masjid Al-Madina Al-Munawara during which a copy of Bayoumi's October 4, 2000 phone book was seized.").

773. Bayoumi testified at his deposition that he initially prepared the typed January 2000 phone list entitled "Omar's phone book" but claimed that "helpers, young men, volunteers" at the Mosque "would add names or take off names….." and that he "did not enter all of it" but that "[a]nybody can add or take off." Ex. 120, Bayoumi Dep. 71:24-73:10 and 81:7-84:20.

774. Bayoumi's claim is belied by the fact that Bayoumi's handwritten address book is more comprehensive and complete than the typed phone list, and that nearly all the names and phone numbers typed into the January 2000 and October 2000 phone lists also appear in Bayoumi's handwritten address book. Ex. 12AA, MPS738; Ex. 12BB, MPS688; Ex. 421, FBI00345-49.

775. The MPS seized extensive photographs and videos of Bayoumi showing him meeting with and greeting various individuals, including Anwar Aulaqi, and hosting Saudi government religious officials in San Diego. Exhibits 10A through 10M (13 separate video

REDACTED FOR PUBLIC FILING

exhibits dating from January 1998 through 2001); Exhibits 11A through 11N (numerous video screenshots from 10A-M, as well as individual photographs seized from Bayoumi). None of these photographs or videos were produced by Saudi Arabia during discovery, resulting in substantial delay as Plaintiffs were forced to get the materials by letters of request to the U.K. Those photographs and videos show that Bayoumi had a central coordinating role for the Saudi government in San Diego to manage and provide support to Sunni extremist elements in California. Ex. 5, Youssef Rpt. 108, 111, 174-75; Youssef Decl. 28-36, 40, 45-59, 73.

776. The MPS also seized extensive correspondence that Bayoumi wrote to numerous Saudi government officials including the Minister of Islamic Affairs. Ex. 414, MPS43_347 (Letter from Bayoumi to MOIA Minister Turki; *see also* Ex. 416, KSA 7591 for faxed copy). Ex. 678D, MPS 43_336 and Ex. 413, MPS 43_338 (letters from Bayoumi to Thumairy and Embassy MOIA Director Khalid Al Sowailem thanking them for sending Sudairy and Sadhan); Ex. 408, MPS 43_387 (Bayoumi's December 2000 personal letter addressing Consul Sami Al Ibrahim, Vice Consul Saad Al Jabreen, and "Sheikh" Ismail Mana). Most of the relevant correspondence was never produced by Saudi Arabia during discovery.

### B. Bayoumi's work relationship with the Saudi Embassy

777. Based on the record to date, Plaintiffs' expert Youssef determined "Bayoumi had significant contacts with officials of the Saudi Embassy in Washington, D.C. and the Saudi Consulate in Los Angeles," noting that "[f]rom the date of his first call to the Saudi Embassy on January 19, 2000 through the last call on that phone on March 29, 2000 (immediately before Bayoumi left on his trip to Saudi Arabia), over a period of 70 days, Bayoumi made at least 99 calls to various numbers at the Saudi Embassy and 11 calls to the Los Angeles Consulate, apart from his other calls to Saudi Government officials such as Thumairy and Mutaeb al Sudairy."

REDACTED FOR PUBLIC FILING

Ex. 5, Youssef Rpt. 82; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). Youssef further determined that "Bayoumi made at least 30 cell phone calls to the MOIA/Islamic Affairs Department between January 19, 2000 and March 24, 2000" and that "Bayoumi's calls to the Embassy and Consulate correspond to the time the hijackers arrived in Los Angeles and were relocated and settled in San Diego." Ex. 5, Youssef Rpt. 82-83.

778.    Plaintiffs' expert Youssef's analysis of Bayoumi's calls also revealed that he used his office phone at the Al Madinah Mosque to call the Embassy. Ex. 5, Youssef Rpt. 83. Bayoumi testified that calls from his Mosque office phone could have been made by any of the attendees of the Kurdish Mosque where his office was located. Ex. 120, Bayoumi Dep. 176:13-177:1; 180:15-19; 181: 18-182:7. Youssef, however, analyzed the calls and determined that Bayoumi interchangeably used his Mosque office phone and cell phone to call the same Saudi Government numbers. The calls made on Bayoumi's office phone were clearly made by Bayoumi to his fellow Saudi Government officials. Ex. 5, Youssef Rpt. 83, n. 325. In addition, a Mosque employee informed the FBI in September 2001 that the phone in Bayoumi's office had a separate number from the Mosque's number, that Bayoumi's office was locked and not used by others, and that "[n]obody normally goes into Al-Bayoumi's office...." Ex. 10G (MPS906-CLIP Video Exhibit) 00:00-01:12 (footage of Bayoumi and other individuals meeting in Bayoumi's office at Al Madinah Mosque showing the layout including the office door).

779.    Bayoumi also had significant work correspondence with numerous Embassy MOIA and other Saudi government officials, most of which was withheld by Saudi Arabia and only produced by the MPS. *E.g.* Ex. 678D, MPS43_336 (Bayoumi letter to Thumairy; Ex. 413, MPS43_338 (January 1999 Bayoumi letter to MOIA Director Sowailem); Ex. 412, MPS43_337 (November 1998 Bayoumi letter to Los Angeles Saudi Consul General Salloum).

201

REDACTED FOR PUBLIC FILING

780.     According to Plaintiffs' expert Youssef's analysis, Bayoumi's contacts with Saudi government officials "are not of the type that would be made by someone who was an 'accountant' or a 'student' pursuing business studies in San Diego."   Ex. 5, Youssef Rpt. 83. Instead, the contacts "show a detailed, repeated pattern of interactions that Bayoumi had with Embassy officials related to specific tasks." Ex. 5, Youssef Rpt. 83.

781.     Based on a review of all calls between Embassy officials, Bayoumi and Thumairy, Plaintiffs' Expert Youssef determined that "the number and intensity of the calls show that Bayoumi [was] actively working and reporting on a day-to-day basis with other Saudi officials stationed in the U.S. including at the Embassy and Consulate." Ex. 5, Youssef Rpt. 84; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).

**C.  MOIA's Embassy Office**

782.     *MOIA's Embassy Director Sowailem.*  Bayoumi's handwritten address book listed Sowailem's phone numbers for his office (the general number and direct line), fax, and cell. Ex.12AA, _53. Bayoumi's January and October 2000 typed phone books contained similar listings under "Khalid Asswailem" for the Embassy, including Sowailem's general office number "████ 3700" and Sowailem's cell number ████-2777," but had Sowailem's direct office number listed as "████-3120" – which was crossed out in the handwritten address book and replaced with ████-3547".  Ex. 12AA, MPS738_53; Ex. 12BB, MPS 688_11; Ex. 421, FBI 349 (Oct.).  Bayoumi's January 2000 typed phone book contained a separate listing for Sowailem not present in the handwritten address book with the phone number "████-0211." Ex. 12BB, MPS 688_7.

783.     A January 28, 1999 letter from Bayoumi to Sowailem (which Saudi Arabia failed to produce and was only first uncovered in the MPS production) shows that Bayoumi and

REDACTED FOR PUBLIC FILING

Sowailem had a work relationship related to the Saudi government's extremist network. Bayoumi thanked Sowailem for the "attentiveness" that he had devoted to the Al Madinah Mosque, noted the "complete cooperation" of Thumairy, MOIA and the Embassy Islamic Affairs Department and Saudi Consulate officials in handling the visit of MOIA propagators Adel Al Sadhan and Mutaeb Al Sudairy, and lauded the "complete cooperation" among the various Saudi government officials, stating that "coordination was the factor that made the greatest mark[.]" Ex.413, MPS 43_338.

784.    As detailed below, Sowailem and others at the Embassy directed Bayoumi to fire the management of the Al Madinah Mosque, install a new Board, and hire a new radical Imam, who would attend the welcome party for Hazmi and Mihdhar.

785.    The FBI seized a note from Bayoumi's Mosque office listing the names of Sowailem, Sadhan, and Sudairy, Thumairy's name and phone information, a reference to "90%" next to "(the League)," and a reference to the Secretary General of the Muslim World League in Mecca, Saudi Arabia.  Ex. 532, FBI 4270. Bayoumi's handwritten address book also contained a list that included Imam Mohamed University's U.S. branch, "Khalid Al-Sowailem," and the "Muslim World League.".  Ex. 12AA, MPS738_48. The FBI found that prior to the 9/11 Attacks that Saudi Arabia used the Muslim World League and its officer Abdullah Al Noshan to fund Al Qaeda and related groups, and that Noshan was tied financially to Sudairy, who worked under Sowailem.  Ex. 13, Weidner Decl. ¶¶ 12-16.

786.    The MPS discovered a personal note of Bayoumi showing that he had spoken to Sowailem about Deputy Consul Abdullah Al Awad at the Saudi Consulate in Los Angeles. Ex. 678V, MPS 732_212-214 at 213.

REDACTED FOR PUBLIC FILING

787.    When the FBI sought to question MOIA's U.S. Director Sowailem shortly after the 9/11 Attacks on October 8, 2001, he asserted diplomatic immunity but later agreed to answer some questions.  Ex. 2, EO 3582.   On October 25, 2001, Sowailem admitted to the FBI that he "knows Omar Ahmed Al Bayoumi professionally," had regular phone conversations with Bayoumi "every three to four months," and gave Bayoumi a tour of the Islamic section at the Saudi Embassy.  Ex. 44 , FBI 000012-14. Sowailem claimed that Bayoumi was a "student" that his discussions with Bayoumi were "about his education" and Bayoumi's request for a "scholarship from the government of Saudi Arabia." *Id.*

788.    Saudi Arabia has provided no evidence to explain why MOIA's senior religious official in the U.S. would have regular discussions with Bayoumi about his alleged studies in business and finance.  Also, as detailed below, the timing of the contacts and phone calls among Bayoumi, Thumairy, and Sowailem was not random but was tied in time to specific events, including the support that Thumairy and Bayoumi provided to the 9/11 hijackers.  For example, Bayoumi called Sowailem's personal cell phone—"(██████-2777,"— immediately after the welcome party that Bayoumi hosted for the 9/11 hijackers in February 2000.  Ex. 12BB, MPS 688_11; Ex. 421, FBI 349; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000) (Bayoumi called Sowailem's personal cell on 2/18/2000 at 7:58 p.m. and 2/19/2000 at 10:56 a.m.).

789.    Bayoumi claimed not to remember Sowailem at all, despite visiting him at the Embassy, and having numerous contacts with him. Ex. 120, Bayoumi Dep. 170-:19-171:1; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000) (Bayoumi called Sowailem's personal cell on 2/18/2000 at 7:58 p.m. (PST) when it was nearly 11 p.m. in Washington; and 2/19/2000 at 10:56 a.m

REDACTED FOR PUBLIC FILING

790. *MOIA Embassy Propagators Mutaeb Al Sudairy and Adel Al Sadhan.* Bayoumi had contact information for both Sadhan and Sudairy in his handwritten address book. However, he claimed he could not remember where he was when he met the two MOIA propagators. Ex. 120, Bayoumi Dep. 231:11-21. The information Bayoumi possessed on Sadhan and Sudairy included their phone and address information in Saudi Arabia, as well as phone numbers in locations where Sadhan and Sudairy were assigned by Saudi Arabia to work inside the U.S. Ex.12AA, MPS738_24, 34, 76 (Sadhan contacts in Oklahoma, Virginia, and Saudi Arabia); Ex. 12AA, MPS738_24 (Sudairy contacts in Missouri, Virginia). In Bayoumi's January 2000 phone number list, Sadhan is listed twice, as "Adel Assduhan," Ex. 12BB, MPS 688_3, and as "Assadhan, Adel." Ex. 12BB, MPS 688_5. In the same document, Sudairy is listed as "Assodairy, Muteiab." Ex. 12BB, MPS 688_5.

791. In June 1999, Saudi Arabia obtained diplomatic positions at the Saudi Embassy in Washington, D.C. for both men. Sadhan and Sudairy were then reassigned to other locations inside the U.S. Ex. 119, Sudairy Dep. 221:6-222:8. According to Sudairy, he moved to Missouri around mid-2000. Ex. 119, Sudairy Dep. 222:9-223:5. Sadhan claimed that he lived in the Washington, D.C. area and then after two to three months moved to Oklahoma. Ex. 99, Sadhan Dep. 209:16-19.

792. On December 19, 1998, a call was made from Bayoumi's phone at the Al Madinah Mosque to one of the numbers for Sadhan that appears in Bayoumi's phone list- "■■■-2849," which according to a Riyadh phone directory is the number for Sadhan's father. Ex. 5, Youssef Rpt. 102, n. 416; Ex. 44, Riyadh Telephone Directory (Sadhan Dep. Ex. 494). Even after being confronted with the local Riyadh telephone directory identifying his father as the individual associated with the number, Sadhan insisted that the number was unfamiliar to

REDACTED FOR PUBLIC FILING

him and that he did not give the number to Bayoumi. Further, Sadhan insisted that he did not

know Bayoumi. Ex. 99, Sadhan Dep. 186:11-188:5. According to his own testimony, Bayoumi

maintained personal contacts with both Sadhan and Sudairy during their time in the U.S.

Bayoumi testified that when he met Sudairy in person, Sudairy gave him his phone number in

Missouri (███████ 7326") and email address, which Bayoumi wrote down on a slip of paper.

Ex. 12BB, MPS688_2 (in "green folder"); Ex. 120, Bayoumi Dep. 278:11-12, 23, 279:1-23.

Bayoumi wrote down Adel al-Sadhan's *kunya* – "Abu Malik" – together with Sadhan's home

telephone number in Saudi Arabia on a piece of paper that he kept in his desk. Ex. 533, at

FBI 4286. Phone records produced by MPS evidence a telephone call made on March 31, 2001,

from Bayoumi to Sudairy's Missouri phone number (███████ 7326") that lasted thirty minutes.

Ex. 314, MPS 118_23 (Bayoumi's Broadwing communication phone record).

### D. MOFA's Islamic Affairs Department

793.    Bayoumi had contact information in his handwritten address book for all four

officials who led the Embassy's Islamic Affairs Department: (a) Dr. Majid Al Ghesheyan,

(b) Sheikh Abdulaziz Al Saleh, (c) Musaed Al Jarrah, and (d) Abdulaziz Al Sultan. Ex. 12AA,

MPS738_52. The office number for the Islamic Affairs Department was listed as "██████

3700" which was the same office number for the MOIA office. Embassy pay records show that

Ghesheyan, Saleh, Jarrah, and Sultan worked at the Saudi Embassy. Ex. 145, KSA 7506-22 at

7510.

794.    *Embassy Islamic Affairs Department Chief Ghesheyan.* Bayoumi admitted that he

"wrote to the Embassy over and over, until they sent a check" for the seed money for the Al

Madinah Mosque. Ex. 678C, MPS 43_138-9 (Bayoumi's report to Habib). Ghesheyan sent

Bayoumi the letter with the check in November 1998. Ex. 404, MPS 43_382. Bayoumi also

REDACTED FOR PUBLIC FILING

wrote Ghesheyan in January 1999 about the visit of MOIA propagators Sadhan and Sudairy and expressed "hope that the advance coordination continues." Ex. 411, MPS 43_314.

795.    When asked to whom he reported, Thumairy told the 9/11 Commission that "he had the most contact [at the Saudi Embassy] with Dr. Majid [Ghesheyan], who was responsible for Islamic Affairs at the Embassy." Ex. 90, Snell Decl., Ex. 3 at 3-4.

### E.  Embassy Islamic Affairs Official Sheikh Abdulaziz Al Saleh

796.    As a result of their communications, Ghesheyan directed Bayoumi to send Sheikh Abdulaziz al Saleh the receipt for the Embassy's check for the Mosque – together with information demanded by the Embassy, including a data sheet listing all the names and nationalities of the Mosque board members.  Ex. 375, MPS 43_381.  According to a note written by Bayoumi and seized by the FBI from Bayoumi's office at the Al Madinah Mosque, "Sheikh Abdulaziz Al Saleh" was described as a "coordinator of the affairs of imams and propagators via the Ministry of Islamic Affairs." Ex. 531, FBI 4259.   Bayoumi also sent letters to MOIA officials thanking Saleh for his coordination and assistance in planning the trip of MOIA propagators Sadhan and Sudairy to San Diego.  Ex. 413, MPS 43_338.

797.    *Embassy Islamic Affairs Department Deputy Musaed Al Jarrah.*  Bayoumi wrote an undated letter (likely July 1998) to Jarrah describing the Al Madinah Mosque and imploring Jarrah "to determine what can be sent according to the available resources."  Bayoumi tells Jarrah "your door is open" and "I place this matter in your hands." Ex. 393, MPS 43_219.   Bayoumi also wrote a letter to Jarrah dated July 21, 1998 expressing hope that "the scale of good deeds will weigh more heavily with the rewards from Allah Almighty, in favor of all those who joined in the call." Ex. 394, MPS 43_220.

REDACTED FOR PUBLIC FILING

798.    Bayoumi falsely claimed at his deposition that his relationship with Jarrah was like that of "[a]ny student who needs anything would call the embassy" Ex. 120, Bayoumi Dep. 157:10-158:2.

**F.  Other Saudi Embassy religious officials**

799.    *Saudi Embassy Official Abdullah Al Noshan.*  Bayoumi had an entire page in his handwritten address book for Noshan under the caption "Sheikh Abdullah Al Noshan."  The page included an account number at Saudi American Bank and a "$" symbol, phone numbers for Noshan and "his office manager" in "Washington," phone and fax numbers for Noshan in New York City, and Noshan's email address.  The address book listing for Noshan includes a reference to "Case Western."  Ex. 12AA, MPS738_12.  Bayoumi obtained a letter in May 1998 from the Embassy's National Guard Office to Case Western Reserve University in Cleveland stating that he had a full Saudi government scholarship and living allowance.  Ex 678Z, MPS 732_449.

800.    Noshan (like Bayoumi) entered the U.S. on an F-1 (student) visa, but was employed in several capacities by the Embassy of the Kingdom of Saudi Arabia in Washington, including the the Institute for Islamic and Arabic Studies in America (IIASA) associated with Imam Mohamed University.  Ex. 13, Weidner Decl. ¶ 14-15. IIASA maintained links to suspected terrorist organizations and their supporters according to an FBI investigation and several of its staff members were Saudi nationals employed in an official capacity as administrative officers at the Embassy.  Ex. 2, EO 3437. Noshan himself was the subject of FBI surveillance and was observed to be acting "in a manner consistent with a foreign intelligence officer."  Ex. 2, EO 3437.

REDACTED FOR PUBLIC FILING

801.    Noshan channeled large amounts of Saudi government funding to religious officials working inside the U.S. and was a "purchasing agent" for the Saudi Embassy and an associate of Saudi Embassy Islamic Affairs Deputy Jarrah and MOIA propagator Sudairy.  Ex. 13, Weidner Decl. ¶ 15.  Noshan was on the board of Sanabel al-Kheer (aka Sana Bell, Inc.) which invests money in businesses in order to raise money for charities.  He was also affiliated with of a number of Saudi charities, including the Muslim World League.  Ex. 2, EO 3437.  Noshan was connected, through monetary transactions, to an FBI subject in Kentucky whose name, address, and telephone numbers were recovered in an al Qaeda safehouse in Karachi.  Ex. 2, EO 3437.

802.    *Saudi Embassy official Soliman Al-Ali*   Dr. Soliman Al-Ali aka Soliman Ali Elay worked for Saudi Arabia in a capacity similar to Al Noshan.  Ex. 13, Weidner Decl. ¶ 15.  Bayoumi was a close work associate of Al-Ali, who moved to the San Diego area in September 1998 and lived there for about one year.  The two were so close that in 1998, Al-Ali used Bayoumi's address on his own bank information and listed Bayoumi as his emergency contact.  In addition, on a California rental application, Al-Ali listed Bayoumi as a "co-tenant/friend" during a time when Al-Ali and Bayoumi both claimed to be employed with Dallah Company in Saudi Arabia.  Ex. 2, EO 3553

803.    Al-Ali was a senior Saudi government official on the payroll of the Saudi Embassy.  Ex. 145, KSA 7506-7522 at 7521 (showing Al-Ali receiving a 2000 bonus).  Al-Ali was the President of the International Islamic Relief Organization ("IIRO") in the U.S.  Ex. 2, EO 3478 at EO 3553.  He was also a principal and member of the board of directors of Sanabel Al-Khair, the investment arm of the IIRO.  Ex. 325, Sanabell 00090 (letter addressed to Al-Ali as a member of Sanabel's "Investment Committee."); Ex. 2, EO 3552 (Al-Ali was paid by

REDACTED FOR PUBLIC FILING

Sanabell); Ex. 2, EO 3318 (According to Al-Ali's landlord, a number of Al-Ali's monthly rental bills were paid for by Sana Bell Co. checks).

804.     The FBI July 2021 EC found that the IIRO and Sanabel had "connections…to terrorism," including employing Al Qaeda members and "utiliz[ing] funding for terrorism support…."  Ex. 2, EO 3532; Ex. 13, Weidner Decl. ¶13; EO 3084 (FBI report cites links of Al-Ali and Sanibel to Hamas terrorist organization).  The FBI also reported that Al-Ali's son, Amro, was known to have become a member of Al Qaeda in the Arabian Peninsula.  Ex. 2, EO 3553.

805.     Al-Ali and Bayoumi worked together to file a report on the activities and investments of IIRO-Sanabel to Ambassador Prince Bandar.  The MPS production of Bayoumi's files included a December 15, 1998 letter from Al-Ali addressed directly to Ambassador Bandar, by which AlAli provided Bandar with a "report on what happened" with regard to the IIRO and Sanabel projects for which he was responsible.  Al-Ali concluded: "I kindly request your review and direction as you [Ambassador Bandar] see fit."  Ex. 374, MPS 43_348.

806.     Before sending the letter and IIRO-Sanabel report to Ambassador Bandar, Al-Ali sent his signed, handwritten draft of the letter by his fax ███████-0973) to Bayoumi.  Bayoumi made edits and typed up both the letter and an accompanying one-page summary of accomplishments for transmission to Ambassador Bandar.  One of Bayoumi's edits was to remove the Saudi Embassy from the letter's address line, indicating that this correspondence was being transmitted directly to Bandar.  The phone records show Bayoumi used his Mosque office phone to call Al-Ali on December 14, 1998, the day before the letter was sent.  Bayoumi then called Al-Ali on two further occasions on December 15, 1998 at 1:38pm and 2:28pm, before connecting to the main telephone line at the Mosque to fax the final letter to Al-Ali's fax

REDACTED FOR PUBLIC FILING

number. Ex. 503, FBI 001531 at 1535; Ex. 2, EO 3327; Ex.679L, at FBI 9126. The report was sent to Ambassador Bandar the same day.

807. Bayoumi was paid for his work on the Saudi government's IIRO-Sanabel extremist financing scheme. Just five days before the report to Ambassador Bandar was filed, on December 10, 1998, Bayoumi received a payment of $3,000 from an account at the First Virginia Bank in the name of "Sana-Bell Co." Ex. 2, EO 3326. The FBI found that "Bayoumi received approximately $15,000 from multiple transactions with [Al-Ali]." Ex. 2, EO 3084; Ex. 666, FBI 11624; Ex. 565, FBI 11489 (check from Al-Ali to Bayoumi); Ex. 564, FBI 010253 at 10254 (check from Al-Ali to Bayoumi's wife, Manal Bagader). For his part, Al-Ali was "largely funded by monies from Sana-Bell." Ex. 2, EO 3084. The payments to Bayoumi contemporaneous with his co-reporting with Al-Ali to Ambassador Bandar demonstrate that Bayoumi's efforts to advance the activities and "investments" of the Sanabel Al-Khair Company were part of his paid Saudi government job.

808. Bayoumi had multiple entries of Soliman Al-Ali's contact information in his handwritten address book, including one that identified Al-Ali as "President of the Islamic Relief Organization." Ex. 12AA, MPS738_16L; Ex. 12AA, MPS738_50R.

809. As an Embassy official, Saudi Arabia was responsible to ensure that Al-Ali resided in the Washington, D.C. area and worked only on Embassy business. Ex. 152, Dunham Rpt. 10. But Saudi Arabia assigned Al-Ali to live in San Diego and work alongside Bayoumi for nearly a year in 1998-1999. Ex. 2, EO 3325-6. Bayoumi helped Al-Ali get settled in San Diego upon his arrival. Ex. 2, EO 3325-6. Al-Ali opened his bank account upon his arrival in September 1998 using Bayoumi's home mailing address and Bayoumi was listed on Al-Ali's

REDACTED FOR PUBLIC FILING

September 1998 house lease as his "co-tenant /applicant / friend" and emergency contact. Ex. 2, EO 3325-6.

810. Al-Ali and Bayoumi were involved together in a Saudi government project called "Mana Co." or "Mana Life" used to recruit and train Saudi students as well as congregants of the King Fahad Mosque, including Ramez Noaman, who helped the 9/11 hijackers with flight lessons and other tasks. Ex. 10E, MPS902-CLIP Video Exhibit (showing training activity at offices of the King Fahad Mosque; includes distribution of "Mana" certificates and features Bayoumi reading aloud "Mana Co. We create the change for an amazing life."); Ex. 27, Madha Supp. Decl. ¶¶ 4-8 & Ex. 1-4.

811. Both Bayoumi and Al-Ali listed that "Mana" entity – as well as Dallah Avco – on leases and other financial documents as their employer. Ex. 2, EO 3325-6, 3553. The credit check run by the Parkwood apartments on February 4, 2000, for Bayoumi to act as the co-signer and guarantor of the hijackers' lease, showed that Bayoumi had listed "Mana Life" as his employer. Ex. 91, Ratchford Decl. Exhibit A, p. 31 (PDF page 38).

812. *Sheikh Muhammad Al Qahtani.* Bayoumi's handwritten address book contains a listing for "Sheikh Muhammad Al-Qahtani" with a phone number of ▮▮▮▮▮-0896. Ex. 12AA, MPS738_75. That San Diego phone number was listed by Bayoumi in his October 2000 typed phone book for "Al Ghatani, Mohed Gen" and on a Bayoumi handwritten page with the heading "Consulate General of Saudi Arabia." Ex. 421, FBI 000345; Ex. 679H, FBI 4243. That number is a San Diego number and publicly available information shows that it was associated with the same apartment complex on ▮▮▮▮▮▮▮▮▮▮ in San Diego where ▮▮▮▮▮▮▮▮ lived. Ex. 2, EO 37 (▮▮▮▮▮ lived at apartment at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, EO 540 (Bayoumi lived at ▮▮▮▮▮▮▮▮▮▮▮▮). Bayoumi also had a listing for "Sheikh

212

REDACTED FOR PUBLIC FILING

Muhammad Al Qahtani" handwritten on the back of one of the pages of his January 2000 typed phone list with Qahtani's home and cell numbers in Saudi Arabia, which Bayoumi kept in his "green folder."  Ex. 12BB, MPS 688_10.

813.    Qahtani was a Saudi government religious official working in San Diego in the period 1998-2000.  Bayoumi referenced "Sheikh Mohamed" in an August 1998 message to Hamerman, which shows that Qahtani was an associate of Hamerman.  Ex. 383, MPS43_216; ███████████████. Saudi official Abdullah Al Noshan sent a check to a Mohamed Al Qahtani for over $15,000 in May 1998.  Ex 315, MWL-IIRO 64943; Ex. 13, Weidner Decl. ¶ 15 (regarding the role of Al Noshan).  Muhammad Al Qahtani was a featured guest at the welcome party for the 9/11 hijackers on February 17, 2000 and was at the event with Fathi Aidarus. Section XXII *infra*; Ex. 10K, MPS2023-059 Video Exhibit and 10K-TR Transcript 14:27, 17:50; Ex. 694, Youssef Decl. ¶¶ 73-76.

### G.  Other Embassy Departments

814.    *Jameel Al-Shami.*  Bayoumi listed Dr. Jameel Al-Shami ████████3344 of the Embassy's National Guard office in his handwritten address book, and in his phone lists. Ex. 678W,  MPS732_226 (copy of earlier page from Bayoumi's handwritten address book listing Shami at National Guard office); Ex. 12BB, MPS 688_4 (January 2000 typed phone list). Shami provided Bayoumi with fraudulent letters to support his student status inside the U.S., claiming that Bayoumi had a "scholarship.  Ex. 12; Ex. 552, FBI 8143; Ex. 678Z, MPS 732_449 (Shami letter to Case Western Reserve University).

815.    The Saudi Embassy Cultural Affairs department helped supervise and fund Saudi Student Clubs.  Bayoumi had references in his handwritten address book to the Saudi Students Club and to the Cultural Affairs department at the Embassy.  Ex. 12AA, MPS738_51, 53.

REDACTED FOR PUBLIC FILING

816. Bayoumi met, associated with, befriended numerous students and young men less than half his age even though he had not earned a credit for a regular course since early 1997. Ex. 2, EO 2228 (Bayoumi indicated that he was the President of a Saudi Arabian Club at the university he attended). Bayoumi worked to recruit these younger men to assist him to carry out assignments and missions. Thumairy was also heavily involved in Saudi Student Clubs. Bayoumi and Thumairy both participated in a student event at the King Fahad Mosque in April 1999. Ex. 90, Snell Decl. Ex. 2 at 6 (Bayoumi recalls seeing Thumairy at Saudi Students Club event in San Diego); Ex. 301, KSA 8506 (October 1996 report of Thumairy); Ex. 144, KSA 8785-87 (September 2002 report of Thumairy filed with Los Angeles President of Saudi Students Club).

817. Grossmont College records were collected by the FBI regarding membership forms for the Muslim Student Association; the records indicated that Mohdar Abduallah was a member. Ex. 2, EO 1298. Bayoumi's handwritten address book inexplicably contained contact information for Grossmont College despite this not being an institution with which he was ever affiliated. Ex. 12AA, MPS738_34.

818. Among Bayoumi's belongings seized by the MPS were various personal and business documents, business cards and scraps of paper with names and telephone numbers of individuals. Included in this information were telephone numbers associated with the Saudi Cultural Mission in Washington, D.C. including Mohammad Al-Sheikh and Abed Al-Sulieman with the following phone numbers: ████████ 8869, 8817, 8850, and 8738. Ex. 552, FBI 8143. Mohamed Al Sheikh's direct work and personal phone numbers were also recorded in Bayoumi's handwritten address book. Ex. 12AA, MPS738_52.

REDACTED FOR PUBLIC FILING

### H.  Bayoumi's work relationship with the Saudi Consulate in Los Angeles

819.    At his deposition, Bayoumi claimed that "I do not know anyone at the consulate [the Saudi Consulate in Los Angeles]."  Ex. 120, Bayoumi Dep. 297:3-7.  When asked "is there anyone at the consulate who you knew?" Bayoumi answered "No."  Ex. 120, Bayoumi Dep. 298:18-20.

820.    As detailed below, Bayoumi's claim is belied by evidence from Bayoumi's handwritten address book; his phone calls with Consulate officials; Bayoumi's personal trips to the Consulate and meetings with Consulate officials, including Bayoumi's videos; and documents, including relevant correspondence of Bayoumi that was not produced by Saudi Arabia but revealed for the first time in the MPS production.  Bayoumi made multiple visits to the Consulate in preparation for the hijackers' arrival including on January 9, 2000, January 31, 2000 and February 1, 2000.

821.    *Saudi Consul General Salloum.*  Bayoumi's handwritten address book had contact information for Salloum.  Ex. 12AA, MPS738_50, 52. The MPS production showed that on November 30, 1998, Bayoumi wrote to Saudi Consul General Mohamed Al Salloum about the establishment of Al Madinah Mosque and "the major role played by the [Saudi] government" in the establishment of the Mosque.  Ex. 412, MPS 43_337.  Bayoumi mentioned in his letter that he had "already spoken to brother [Consulate official] Saad al-Jabreen" about the project.  *Id.* Thumairy told the 9/11 Commission that Salloum was his superior and the individual to whom he reported.  Ex. 90, Snell Decl., Ex. 3 at 3.

822.    On January 26, 1999, Bayoumi wrote again to Salloum to thank him for "the beautiful reception bestowed upon myself, Sheikh Mutaeb Al-Sudairy, and Sheikh Adel Al-Sadhan (guests from the Ministry of Islamic Affairs) by your Deputy….as well as the efforts

REDACTED FOR PUBLIC FILING

of the brothers in the Islamic Affairs (Brother Saad Al-Jabreen) in providing us with some copies of the Qur'an…." Ex. 373, MPS 43_345. Bayoumi signed the letter "The General Supervisor." The letter demonstrates the high status that Bayoumi held among senior Consulate officials, and Bayoumi's role as chaperone of the important visiting MOIA propagators.

823. *Saad Al Jabreen.* Bayoumi's handwritten address book has Jabreen's name and Consulate extension number under the title "Islamic affairs" along with the contact information for Deputy Consul General Awad and Consulate Secretary Ismail Mana. Ex. 12AA, MPS738_52. Bayoumi's personal notes include references to Jabreen with the Consulate's phone number. Ex. 533, FBI 4286. Bayoumi's January 1999 letter to MOIA Embassy Director Sowailem thanks "Saad Al-Jabreen" of the Saudi Consulate – who Bayoumi describes as "Islamic Affairs' Los Angeles" – for his "complete cooperation" and "coordination" with Bayoumi, Thumairy, and Embassy Islamic Affairs Department official Saleh to organize a trip of MOIA propagators to San Diego. Ex. 413, MPS 43_338. Also in January 1999, Bayoumi corresponded with Jabreen at "Islamic Affairs / Consulate" thanking him for his assistance. Ex. 398, MPS 43_346. Thumairy admitted to the 9/11 Commission that Jabreen (and Abdullah Awad before him) was the individual he worked "most closely" with at the Consulate. Ex. 90, Snell Decl., Ex. 3 at 3.

824. *Sami Al Ibrahim.* In December 2000, Bayoumi wrote to Saudi Deputy Consul Sami Al Ibrahim (who Bayoumi addressed as "Consul"), Jabreen, and Ismail Mana, which, according to Plaintiffs' expert Youssef's review, demonstrated a obvious closeness, "addressing them as 'brothers' and writing to them in a style and manner which showed that Bayoumi had a familiar relationship and intimacy with each of them." Ex. 408, MPS 43_387; Ex. 5, Youssef Rpt. 81 (Youssef providing his assessment of the Arabic used by Bayoumi). Saudi Arabia did

REDACTED FOR PUBLIC FILING

not produce Bayoumi's December 2000 letter to the Consulate in its document production.

Thumairy identified "Sammy" Ibrahim to the FBI in 2003 as his friend. Ex. 154, FBI 000001-000006-REV2021 at 4.

825. Bayoumi was also found in possession of various Consulate business cards, including those of Ibrahim, Jabreen and Sami Al Sadhan, and a note written by Bayoumi with contact information for ███ and Jabreen. Ex. 678J, MPS 95_72, 704_73, 713_139 (three cards of Deputy Consul General Sami Al Ibrahim); Ex. 678L, MPS 95_106, 713_22 (two cards of Vice Consul Sami Al Sadhan); Ex. 444, MPS 713_11 (one card of Saad Al Jabreen); Ex. 120, Bayoumi Dep. 301:8-303:2; Ex. 533, at FBI 4286 (Bayoumi's handwritten note with ███ and Jabreen's names and Consulate phone number).

826. *Abdullah Al Awad.* Bayoumi had multiple listings for "Abdullah Al-Awad" and "Al-Awad" in his handwritten address book, together with Awad's extension at the Consulate. Ex. 12AA, MPS738_52. Awad was in charge of Islamic Affairs at the Consulate and oversaw Consulate Secretary Ismail Mana. Ex. 95, Awad Dep. 75:12-77:16. Bayoumi had Awad's name in his handwritten address book next to Mana's name and Saad Al-Jabreen. Bayoumi also had a handwritten note stating Awad's name and containing the notion "Consulate, through [MOIA's Embassy Director] Khalid Al Sowailem." Ex 678V, MPS 732_212-214 at 213. MOIA's Propagator Supervisor Thumairy admitted to the 9/11 Commission that Awad (followed by Jabreen in the same position) was the individual with whom he worked "most closely" with at the Consulate. Ex. 90, Snell Decl., Ex. 3 at 3.

827. On January 31, 2000, Awad met with Bayoumi and his family at the Saudi Consulate when they filed for passports. Awad's signature is on the passports issued for Bayoumi and his family dated February 1, 2000. Ex. 211, KSA 6642-6665 at 43; Ex. 143, KSA

REDACTED FOR PUBLIC FILING

7996-8000 at 7996 (Bayoumi passport) (Awad Dep. Ex. 464); Ex. 95, Awad Dep. 127:11-128:22.

828.     *Ismail Mana*.  In a page with his Saudi Embassy and Consulate contacts, Bayoumi had listings for "Mana Islamic Affairs" and "Islamic affairs Ismail Mana" with Mana's extension number and fax number.  Ex. 12AA, MPS738_53.  ███████████████████████

████████████████████████████████████████████.  Bayoumi flatly denied knowing Mana at his deposition. Ex. 120, Bayoumi Dep. 302:15-17.

829.     In a December 2000 letter to Mana, Bayoumi referred to Mana as "Sheikh," demonstrating that Bayoumi knew of Mana's role to lead the prayers at the King Fahad Mosque despite Bayoumi's assertion that he had only been the KFM between one and three time total. Ex. 120, Bayoumi Dep. 347:22-348:16.  Consul General Salloum, who attended the King Fahad Mosque every week, similarly referred to Mana as "Sheikh" in correspondence to MOIA Deputy Minister Ammar.  Ex. 216, KSA 7150.  King Fahad Mosque employees also wrote to Mana as "Sheikh."   Ex. 292, KSA 7193 (March 2001 memo of Mosque to "Sheikh Ismail Mana" forwarded to the Embassy Islamic Affairs Department).  Thumairy admitted to the FBI in May 2003 that he worked with ██████████, who Thumairy acknowledged was part of the Consulate's Islamic Affairs Section.  Ex. 154, FBI 000001-000006-REV2021 at 2.

830.     During two interviews with the FBI in November 2015, ██████████ stated that Bayoumi was a Saudi citizen who was treated with great respect inside the Saudi Consulate in Los Angeles, was well regarded by the people in the Consulate, and held a "very high status" when he entered the building.  Ex. 2, EO 0044, Ex. 566, FBI 11755.  ██████ further stated that "Bayoumi's status was higher than many of the Saudi persons in charge of the Consulate."  Ex. 2, EO 0044.  ██████ also stated that "Bayoumi had more clout at the Consulate than either

218

Mohamed al-Muhanna or Thumairy, and that Bayoumi was considered higher in rank than the Consul General." Ex. 457, FBI 47; Ex. 345, Vasquez Decl. ¶20; Ex. 89, Gonzalez Decl. 20 (p. 7, two paragraphs erroneously numbered '20').

### I. MOIA Propagators working in California

831.    *MOIA's California Supervisor Thumairy.*  Bayoumi's handwritten address book included Thumairy's phone numbers at the Mosque, and Thumairy's home, fax numbers and cell number (████-3362").  Ex. 12AA, MPS738_35.  Bayoumi had separate listings for Thumairy in his January and October 2000 phone lists, and on a sheet of paper in his desk. Ex. 12BB, MPS688_3 (January 2000); Ex. 421, FBI 000345 (October 2000); Ex. 532, FBI 4270 (paper seized from Bayoumi's Mosque Office).

832.    Bayoumi and Thumairy spoke to each other 67 times between December 16, 1998 and December 20, 2000, and the timing of the calls closely match their joint work assignment to provide support for Hazmi and Mihdhar.  Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). Bayoumi began contacting the King Fahad Mosque on December 8, 1998 and called Thumairy directly—his first known contact directly with Thumairy—on December 16, 1998, just prior to the assignment of three MOIA propagators—Sudairy, Sadhan, and Mersal—to California at the beginning of Ramadan 1419 on December 20, 1998. Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).

833.    The close contacts between the two men are shown by the fact that when Thumairy started using a new cell phone (████-0777) in December 2000, Bayoumi shifted his calls to Thumairy over to that number.  Ex. 5, Youssef Rpt. 122.

834.    Bayoumi sent Thumairy a letter thanking him for "providing" MOIA propagators and in other documents seized by the MPS, Bayoumi was found to have written Thumairy's

REDACTED FOR PUBLIC FILING

name in his handwritten notes. Ex. 678D, MPS 43_336; Ex. 678V, MPS 732_212-214 at 214. In

addition, Bayoumi had Thumairy arrange a donation for Al Madinah Mosque. Ex. 678C,

MPS 43_138-9 at 139 ("Another check was delivered to them through Fahad Al Thumairy,

Imam of *Masjid Al-Malik Fahad* [King Fahad Mosque], in the amount of 10,000 Riyals").

Bayoumi also frequently travelled to Los Angeles to meet with Thumairy, similar to Thumairy's

practice to have his propagators working under him report directly in person on a regular basis.

Ex. 90, Snell Decl., Ex. 5 at 8; Ex. 107, Thumairy Dep. 204:14-206:1, 207:22-208:10; (███████

came each month to meet with Thumairy and pick up a check); Ex. 483, FBI 001033 at 1034

(███████ received fourteen checks totaling $66,000).

835. *MOIA Propagator Omar Abdi Mohamed.* Bayoumi had phone, pager, and cell

numbers for MOIA Propagator Omar Abdi Mohamed aka Omar Al-Khatib in his handwritten

address book. Ex. 12AA, MPS738_37-38. Abdi Mohamed's relationship with Bayoumi was

such that he addressed Bayoumi by his familial name "Abu Emad" (the name of Bayoumi's son)

and as "His Eminence" within a fundraising letter. Abdi Mohamed requested funding for his

Western Somali Relief Agency for "supporting and aiding our afflicted brethren everywhere."

Ex. 391, MPS 43_193.

836. *MOIA Propagator* ███████. Bayoumi also had a relationship with MOIA

Propagator ███████ who had previously served as Imam of the ICSD Mosque. Ex. 2, EO

1759, 0692.

837. *MOIA Propagator Tajuddin Shuaib.* Shuaib was named in Bayoumi's

handwritten address book as "Ahmad Tajuddin" and Bayoumi listed Shuaib's home, car, and

office numbers in Saudi Arabia. Ex. 12AA, MPS738_35L. Shuaib received warm, familiar

correspondence from Bayoumi. Ex. 405, MPS 43_384.

REDACTED FOR PUBLIC FILING

### J. Bayoumi's work relationship with senior officials in Saudi Arabia

838. *Minister of Islamic Affairs.* Bayoumi's phone book contained the number for the Minister's office at MOIA. Ex. 12AA, MPS738_14. Bayoumi wrote directly to MOIA's Minister to thank MOIA Director Sowailem, the Embassy's Islamic Affairs Department official Saleh, and Thumairy for their coordination and cooperation in arranging the trip. Ex. 411, MPS 43_314.

839. *MOIA Cooperative Office for Propagating to Communities.* This office under MOIA's supervision sent two clerics to meet with Bayoumi in June 1999. Ex. 399, MPS 681-2.

840. *Ahmed Al Hamdan.* Bayoumi's handwritten address book and typed phone lists had phone numbers for Hamdan's home, cell, office, and fax. Ex. 12AA, MPS738_83; Ex. 12BB, MPS688_3 (January 2000); Ex. 421, FBI 3485 (October 2000). Hamdan was a "high-ranking Saudi official who works as a Director within the Ministry of Finance." Ex. 2, EO 0483.

841. Hamdan provided Bayoumi with funds for the Al Madinah Mosque after the Embassy approved the Mosque for funding. Ex. 371, MPS 43_320 (on November 24, 1998, Bayoumi sends wire instructions to Saudi Ministry of Finance Director Hamdan for a donation of nearly $25,000); Ex. 678C, MPS 43_138-9 at 139 (after Embassy contribution, Bayoumi arranged a check through Thumairy for 10,000 Saudi Riyals, and a check from Hamdan for $20,000); Ex. 678H, MPS 43_476 (Bayoumi ledger accounting for $20,000 from Hamdan).

### K. MOIA and Saudi government religious propagators

842. Bayoumi hosted at least 15 MOIA propagators in San Diego, many for a month or more at a time. These trips required significant work, coordination, and contacts with Embassy and other MOIA officials, including Thumairy.

REDACTED FOR PUBLIC FILING

843. *MOIA Sheikh Ibrahim Al Zamil.* Bayoumi had phone listings for Sheikh Ibrahim Al Zamil, including his phone numbers and email address. Ex. 12AA, MPS738_79. Zamil was in San Diego at the same time as a group of four MOIA propagators sent by Saudi Arabia to lay the groundwork for establishing the Al Madinah Mosque and placing Bayoumi in charge of that Mosque. Ex. 370, MPS 43_310. Bayoumi took a videotape of those propagators visiting his home with leaders of the Al Ribat and ICSD Mosques. Ibrahim Al Zamil can be seen on that video. Ex. 11B, MPS890 Video Screenshots; Ex. 10B, MPS890-CLIP Video Exhibit at 28:25.

844. While Zamil was visiting San Diego, Bayoumi was his primary host and liaison. Ex. 2, EO 0788.

845. Zamil can be seen on Bayoumi's video of the paintball war games organized by Bayoumi and Anwar Aulaqi. Ex. 2, EO 4042; Ex. 11A (FBI 013459 Video Screenshots) 01:21:08, 01:22:02.

846. Bayoumi suggested to Habib that Zamil would be suitable to serve as an Imam at the Mosque. Ex. 410, MPS 43_225-28 at 226 (in August 1998, Bayoumi suggests to Habib that Shuwayhani serve as an Imam at the Al Madinah Mosque).

847. Bayoumi also sent messages to the Minister through Thumairy, as well as through the Minister's nephew Sudairy. Ex. 389, MPS 43_375 (Bayoumi asking Sudairy to send fax to Minister); Ex. 416, KSA 7591 (Ex. 445).

848. *Shaikh Abdullah Bin Saleh Al Ghassan.* Ghassan visited Bayoumi in San Diego during the year from September 1998 – August 1999 while Bayoumi and Soliman Al-Ali worked together there. Ex. 2, EO 0786, 0788.

849. While Ghassan was visiting San Diego, Bayoumi was his primary host and liaison. Ex. 2, EO 0788.

REDACTED FOR PUBLIC FILING

850. *Abdullah Al Jaithen and Majed Al Mersal.* Bayoumi had contact information for both Jaithen and Mersal on the same page in his handwritten address book. Ex. 12AA, MPS738_59. In coordination with Thumairy, Bayoumi hosted these two propagators in December 1999-January 2000 shortly before the arrival of Hazmi and Mihdhar and took them to various locations in San Diego and also to Los Angeles. Ex. 304, KSA 9557-58; Ex. 10H (MPS896-CLIP Video Exhibit) various times including 5:13 (Bayoumi hosting Jaithen and Mersal at Sea World in San Diego).

851. *Mutaeb Al Sudairy and Adel Al Sadhan.* As detailed above, Bayoumi had extensive contact information for both Sadhan and Sudairy, who worked in MOIA's Riyadh headquarters when they were assigned to visit Bayoumi and Thumairy in California in December 1998-January 1999. Ex. 5, Youssef Rpt. 105-107. Bayoumi had contact information for both Sadhan and Sudairy in his handwritten address book. Ex. 12AA, MPS738_24, 34, 76 (Sadhan contacts in Oklahoma, New York, Virginia, and Saudi Arabia); Ex. 12AA, MPS738_24 (Sudairy contacts in Missouri, Virginia). And captured on video. Ex. 10D MPS894-CLIP Video Exhibit (with Ex. 11D Screenshots and Photos); and Ex. 10F MPS2023-003 Video Exhibit (with Ex. 11F Screenshots).

852. As discussed below, in April 1999, Bayoumi sent correspondence to Sudairy and Sadhan in Saudi Arabia via fax to MOIA headquarters, stating at the top of Sadhan's letter that it was "urgent" and was to be delivered to the Sheikh immediately. Ex. 388, MPS 43_374; Ex. 389, MPS 43_375.

853. *Sheikh Awad al Harbi.* MOIA propagator Awad Al Harbi is listed in Bayoumi's handwritten address book with landline and cellphone numbers in Saudi Arabia. Ex. 12AA, MPS738_37. Harbi visited Bayoumi in San Diego in September 1998, and Bayoumi's letter to

223

Harbi shows that the two men were together at the Al Madinah Mosque and Anwar Aulaqi's Al Ribat Mosque. Ex. 396, MPS 43_335; Ex. 369, MPS 43_309.

854.    *Four MOIA propagators.*  In December 1997-January 1998, Bayoumi hosted a visit of MOIA propagators to San Diego who laid the groundwork for establishing the Al Madinah Mosque and placing Bayoumi in charge of that Mosque.  Ex. 370, MPS 43_310. Bayoumi took a videotape of those propagators visiting his home with leaders of the Al Ribat and ICSD Mosques.  Ex. 10B, MPS890-CLIP Video Exhibit.

855.    Ibrahim Al Zamil was present.  Ex. 10B, MPS890-CLIP Video Exhibit.  Bayoumi reported that three of the visiting propagators were from Imam Mohamed University and another one was from Umm Al-Qura University.  Ex. 353, MPS727_202.  Bayoumi had contact information in his handwritten address book for a MOIA propagator and Umm Al-qura professor named Sheikh Mohamed Al Barak, who was called from Bayoumi's Mosque phone in August 1998 by Al Haramain representatives.  Ex. 12AA, MPS738_79; Ex. 678G, MPS 43_433.

856.    *Sheikh Yusuf Ali Al-Naqidan.*  Naqidan is listed in Bayoumi's handwritten address book with multiple cell phone and landline numbers in Riyadh.  Ex. 12AA, MPS738_8. Naqidan was a MOIA propagator who visited Bayoumi in San Diego in August 1999.  Ex. 678H, MPS 43_476, 485 (Bayoumi's receipts and ledger confirm August 1999 visit of Naqidan).

857.    *Sheikh Hamud bin Muhammad Al-Shumaymari.*  Shumaymari was a MOIA propagator who visited with Bayoumi in San Diego in June 1999. Ex. 399, MPS 681-2. Multiple numbers for Shumaymari in Saudi Arabia are listed in Bayoumi's handwritten address book. Ex. 12AA, MPS738_66.

858.    *Dr. Ahmad Al Abdulatif.*  Abdulatif, a MOIA propagator, accompanied Shumaymari on the 1999 trip to San Diego.  Ex. 399, MPS 681-2.

REDACTED FOR PUBLIC FILING

859. *Sheikh Al Sabeel.* Bayoumi made a note in his handwritten address book that he got a message from Islamic Affairs Department Head Ghesheyan and Jarrah that Sabeel would be visiting Bayoumi "in the 10th month" – i.e. the month of Shawwal after Ramadan. Ex. 12AA, MPS738_52.

860. *MOIA propagator Ghanim Saad Al Ghanim.* Ghanim's address and phone numbers in Saudi Arabia are listed in Bayoumi's handwritten address book. Ex. 12AA, MPS738_38. Bayoumi made a video recording of Ghanim prior to August 14, 1998, in which Bayoumi describes MOIA religious official Ghanim as the "first visiting brother" to the Al Madinah Mosque. Ex. 10C (MPS893-COMP Video Exhibit); Ex. 10C-TR (MPS893-COMP-TR Video Transcript).

861. *Abdul Hamid Al Saudi.* Bayoumi's records show that Saudi visited him in San Diego for Ramadan 1421, which was in November-December 2000. Ex. 376, MPS 698_151.

**L. Bayoumi's work relationship with Imam Mohammad University**

862. *Khalil Al Khalil.* Khalil was a longstanding official of Imam Mohammad University and Chairman of the Ibn Taymiyah Foundation who previously worked in the Islamic Affairs Department at the Embassy. Ex. 113, Khalil Dep. 20:4-17, 45:18-46:13; Ex. 189, KFM 0379-0382 (Khalil Dep. Ex. 195) (Correspondence on letterhead from the Islamic Foundation of Sheikh ibn Taymiyyah signed by Khalil).

863. Bayoumi had a close familiarity with Khalil, as shown in the video of them together with Thumairy and Soliman Al-Ali in April 1999. Ex. 10E (MPS902 Video Exhibit); Ex. 11E (MPS902 Video Screenshots); Ex. 27, Madha Supp. Decl. ¶ 8-9 & Ex. 4-5. Khalil admitted to the 9/11 Commission that Bayoumi "used to come frequently to the mosque to see Fahad Al-Thumairy." Ex. 90, Snell Decl., Ex. 5 at 8. In his 2019 testimony, Al Khalil

225

REDACTED FOR PUBLIC FILING

confirmed Bayoumi's visits to the KFM to see Thumairy. Ex. 113, Khalil Dep. 117:24-118:14. Bayoumi's handwritten address book also has Khalil's cell number in Saudi Arabia.  Ex. 12AA, MPS738_59.

864.    *Sheikh Yusuf al-Shuwayhani.*  Shuwayhani's contact information is in Bayoumi's handwritten address book with a PO Box address in Saudi Arabia – including a landline number and one marked "cellular."  Ex. 12AA, MPS738_8.

865.    Bayoumi had a close work relationship with Sheikh Yusuf al-Shuwayhani, Dean of Admission and Matriculation at Imam Muhammad University in Riyadh.  Ex. 678S, MPS 732_4, 6 (July 1996 letter from Shuwayhani to Bayoumi); Ex. 678T, MPS 732_5 (July 1996 joint letter to Shuwayhani from Hamerman and Bayoumi); Ex. 410, MPS 43_225-28 at 226 (in August 1998, Bayoumi suggested to Habib that Shuwayhani serve as an Imam at the Al Madinah Mosque).  Shuwayhani and Bayoumi worked together to arrange Hamerman's position at Imam Mohamed University, and Shuwayhani visited Bayoumi in San Diego.  MPS732_4, 6.

866.    *Omar "Forge" Hamerman.* Bayoumi had phone listings and an address in Saudi Arabia in his handwritten address book.  Ex. 12AA, MPS738_37R.  As shown in Section XI. C. below, ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

867.    *Institute of Islamic and Arabic Sciences in America (IIASA).* Bayoumi had listings in his handwritten address book for Imam Mohammed University's branch in the U.S. Ex. 12AA, MPS738_48; Ex. 2, EO 0640 (IIASA is a subsidiary of Imam Mohammad University). Those listings for IIASA included references to MOIA's Embassy Director Sowailem and

REDACTED FOR PUBLIC FILING

Embassy Islamic Affairs Department official Abdulaziz Al Saleh. Ex. 12AA, MPS738_48.

Thumairy sent Bayoumi the information for an IIASA event held at the King Fahad Mosque in

December 2000.  Ex 535, FBI 4392-4394 (English version); Ex 679, FBI 4439 (Arabic version).

### M. A June 2017 FBI report concluded that Bayoumi worked for Saudi Arabia in San Diego as a paid "cooptee" of Saudi intelligence and reported to the Saudi Embassy

868.     The EO production contained a June 2017 FBI EC prepared by the FBI's

Washington Field Office entitled "Albayoumi / GIP Cooptee" which found that in the late 1990's

until the 9/11 Attacks, Bayoumi was working inside the U.S. as a paid "cooptee" of Saudi

Arabia's General Intelligence Presidency ("GIP").  Ex. 2, EO 2638-43.  The FBI concluded that:

> In the late 1990's and up to September 11, 2001, Omar Albayoumi was paid a
> monthly stipend as a cooptee of the Saudi General Intelligence Presidency (GIP)
> via then Ambassador Prince Bandar bin Sultan Alsaud.  The information
> Albayoumi obtained on persons of interest in the Saudi community in Los
> Angeles and San Diego and other issues, which met certain GIP intelligence
> requirements, would be forwarded to [Ambassador Prince] Bandar.  Bandar would
> then inform the GIP of items of interest to the GIP for further investigation/vetting
> or follow up[.] Omar Albayoumi was a source of investigative interest following
> the 9/11 attacks for his support of 9/11 hijackers while living in California.
> Allegations of Albayoumi's involvement with Saudi intelligence were not
> confirmed at the time of the 9/11 Commission Report. The above information
> confirms these allegations.

Ex. 2, EO 2638-39.

869.     Another June 15, 2017 FBI report from the Washington Field Office stated that,

while at the time of the 9/11 Commission Report it was suspected Bayoumi had "some type of

affiliation with Saudi Arabian intelligence" that "[r]ecent source information confirmed that

227

REDACTED FOR PUBLIC FILING

Albayoumi was, at the time of the 9/11 attacks, employed as a paid cooptee of Saudi Arabian intelligence services."  Ex. 2, EO 3282-83.[2]

870.    A "cooptee" is a person who is not an official employee of a foreign government's intelligence service but who is given and agrees to carry out specific covert assignments to conduct intelligence for a foreign government inside the U.S. The U.S. Department of Defense defines a "co-optee" as a "[f]oreign official or visitor tasked to do particular tasks, such as spotting potential recruits or servicing drops."  Ex. 344, U.S. Department of Defense publication "Hostile Intelligence Threat," DoD 5200.1-PH-2 (Nov. 1988), at 19.

871.    Plaintiffs' expert Youssef observed, "[t]he payments the Saudi Government made to Bayoumi via various private entities, as discussed herein, are a classic example of how a foreign government would provide funds for one of its agents working covertly in a foreign country." Ex. 5, Youssef Rpt. 85.

872.    In addition, Bayoumi's contacts with the Kingdom's diplomatic missions, and elements of the Ministry of Islamic Affairs, were pervasive and extended to numerous Saudi Government institutions across the United States and abroad. The extent and scope of these communications and contacts are not consistent with simply calling his local embassy or consulate on occasion for information, and instead reflect a pattern of reporting evidencing his status as a covert agent of the Saudi Government, working under the direction of personnel in those diplomatic missions.

---

[2] Spies have regularly been used to support terrorists and assassination attempts in foreign countries, including by the Kingdom of Saudi Arabia. The most prominent example was the murder of Jamal Khashoggi, a prominent Saudi journalist who was critical of his country's government, see: Jamal Khashoggi: Saudi murder suspect had spy training, BBC (Oct. 19, 2018), https://www.bbc.com/news/world-middle-east-45918610 ("Turkish media identified Maher Abdulaziz Mutreb as being part of a 15-member team of suspected Saudi agents who flew into and out of Istanbul on the day of Mr Khashoggi's disappearance from the city's Saudi consulate on 2 October.")

REDACTED FOR PUBLIC FILING

873. Further, Bayoumi's frequent, irregular trips back to Saudi Arabia and to the Saudi Embassy in Washington D.C. every one to two months, particularly when considered in light of his other contacts with Saudi Government institutions and personnel, indicate a pattern of travel undertaken for purposes of operational meetings with superiors in the Saudi Government.

### N. Bayoumi's contacts with Dallah Avco and PCA were related to his work inside the U.S. supporting the extremist network

874. Bayoumi's Mosque phone records show that he made one call to Dallah Avco on January 10, 1999 at 5:06am. Ex 504, FBI 1542. That early morning call to Dallah Avco was the only call in Bayoumi's records to Dallah Avco. The call was immediately preceded by calls to the PCA Airways Engineering Department at 3:21am and 4:59am and followed by a call to PCA at 5:11am. Ex 504, FBI 1542. Bayoumi made a total of 13 calls to the PCA in July 1998, November 1998, January 1999, April 1999, and for the final time in January 2000. Ex. 12V (Bayoumi calls to Presidency Civil Aviation).

875. The timing of these calls show that they are related to ongoing events concerning to Bayoumi's work as a Saudi agent in San Diego. For example, Bayoumi called the PCA days after Dallah balked at extending Bayoumi's 'ghost employment' term and the PCA directed Dallah to extend Bayoumi's "secondment" to complete his "task" in San Diego. Ex. 435, DA 1101; Ex. 436, DA 1102; Ex. 215, KSA 705; Ex. 94, Anqari Dep. 114:5-124:25.

### O. Upon his arrival in San Diego, Bayoumi assumed a leadership role in the Sunni extremist network in San Diego.

876. When Omar Al Bayoumi first came to San Diego in 1994, the first place he went was the Islamic Center of San Diego (ICSD) Mosque. Ex. 120, Bayoumi Dep. 59:21-60:22. Bayoumi immediately met with ███████████████████ helped Bayoumi find an apartment near the ICSD. Ex. 120, Bayoumi Dep. 60:23-64:7, 824:4-10; ███████████████

REDACTED FOR PUBLIC FILING

( ██████████████████████████████████████████████ Ex. 5,
Youssef Rpt. 85.

877.    Bayoumi's apartment application listed his emergency contact and personal

reference as ████████████████████, San Diego, California, telephone ██-1493.

Bayoumi described his relationship with ████████ as a "family friend."  Ex. 2, EO 1511, 1615.

878.    An FBI investigation of the extremist cell at the ICSD was ongoing in 1994, when

Bayoumi arrived in San Diego.  The FBI identified ████████, together with the cell's leader

Mohamed Zaky, as principal active members of that extremist cell.  Ex 5, Youssef Rpt. 21-23;

see also, Ex. 120, Bayoumi Dep. 147:16-24.

879.    Bayoumi met and associated with ████████ during the same time that

████████ was directly linked to this extremist cell and a San Diego based entity known as the

American Islamic Group ("AIG").  The ICSD cell was related to the extremist cell at the Ibn

Taymiyah Mosque and members of the ICSD cell travelled to Los Angeles in 1993 to attend a

covert meeting with "Blind Sheikh" Omar Abdel Rahman held at the Ibn Tayimiyah Mosque.

Ex. 5, Youssef Rpt. 19, 21-23, 85; Ex. 150A, Kohlmann 2022 Rpt. ¶28.

880.    The FBI observed that ████████ was extremely close to the leader of the ICSD

extremist cell, Mohamed Zaky, who the FBI "identified as an International Radical

Fundamentalist…leader."  The U.S. Department of Justice labeled Zaky as a follower and

supporter of Omar Abdul Rahman.  ████████ was interviewed by the FBI in August 1995 and

told them that he met Zaky at the ICSD in 1992.  Ex. 150A, Kohlmann 2022 Rpt. ¶30; Ex. 2,

EO 2572.

881.    Zaky and ████████ were the key organizers behind AIG which, according to

Plaintiffs' expert Evan Kohlmann, "remains arguably the most radical jihadi political faction to

REDACTED FOR PUBLIC FILING

exist within U.S. borders in this past 30 years." Ex. 150A, Kohlmann 2022 Rpt. ¶28. Hamerman served as the "Vice President" of AIG's charitable arm, 'American World Wide Relief' (AWWR)." Ex. 693, FFX 0146.

882.    Zaky fought in the same Islamic fundamentalist army as Al Qaeda members Hazmi and Mihdhar in Bosnia and was killed in the Spring of 1995 while "fighting with the Mujahadeen in Chechyna." Ex. 5, Youssef Rpt. 23; Ex. 2, EO 2572; Ex. 150A, Kohlmann 2022 Rpt. ¶31.

883.    After Zaky's death, ▮▮▮▮▮▮ assumed a leadership role of the extremist cell at the ICSD. Ex. 5, Youssef Rpt. 85; Ex. 150A, Kohlmann 2022 Rpt. ¶32.

884.    In a February 1999 letter prepared by Bayoumi and seized by the MPS, Bayoumi specifically referred to Hamerman as "Al Emir." Ex. 384, MPS 43_217.

885.    Plaintiffs' expert Youssef states that from his knowledge and experience investigating Islamic extremist cells, t▮▮▮▮▮▮▮▮▮" is given to the leader of an extremist cell and was "an acknowledgement and sign of respect by Bayoumi of ▮▮▮▮▮▮ position as leader of the ICSD cell." Ex. 5, Youssef Rpt. 86. Youssef elaborated "that Omar Abdel Rahman was described as the 'Amir' of the Al Gama'a extremist group," and noted the FBI describes "a MOIA propagator in San Diego, ▮▮▮▮▮▮▮ as the 'Emir in charge' of Muslim Brotherhood cells in the U.S." Ex. 5, Youssef Rpt. 86, n.335; Ex. 75, State Dept Cable 88 Cairo 21161; Ex. 2, EO 3557.

886.    The MPS found a photograph of Hamerman in Bayoumi's possession with the time stamp date of January 19, 1999, which is consistent with Hamerman's trip to the U.S. Ex. 11D (MPS726 Photo Exhibits) (photo showing Hamerman, Bayoumi, Sadhan and others).

REDACTED FOR PUBLIC FILING

887.     Plaintiffs' expert Youssef states that from his knowledge and experience investigating Islamic extremist cells, the clothing "worn by Hamerman in this photo — his thobe, sash, and turban — is consistent with … Hamerman's role as leader of the extremist cell."  Ex. 5, Youssef Rpt. 86, n. 335.

888.     In 1994, Bayoumi also met a friend of Hamerman's, a man from Saudi Arabia named Saad Al Habib, at the ICSD. Ex. 120, Bayoumi Dep. 145:24-146:2, 147:5-24, 277:20-24.

889.     Given Bayoumi's connections with Hamerman and the ISCD extremist cell, "Bayoumi's name had first surfaced at the FBI in 1995 in connection with other investigations." Ex. 131, DOJ Inspector General's November 2004 Review at 331.

890.     The FBI raid on Bayoumi's San Diego office after the 9/11 Attacks found extremist materials including a "Book of Jihad" published by the Islamic Guidance Center of Saudi Arabia which provides religious justification for martyrdom and suicide attacks.  Ex 528, FBI 4139-45.

891.     Bayoumi immediately recognized the book from his files as an extremist text, as he made the claim that he must have removed the book from a message board at the Mosque and to "keep it in a file for it to be destroyed later on."  Ex. 120, Bayoumi Dep. 303:20-309:13. A witness told the FBI a month after the 9/11 Attacks that Bayoumi was "always talking about how the Islamic community needs to take action" and that on several occasions Bayoumi told the witness that "they were 'at Jihad.'"  Ex.566, FBI 11759.  As explained by Plaintiffs' expert Youssef, "[t]he term 'jihad' [as] used …in the book found in Bayoumi's office and Bayoumi's comments" were understood as a call "to war against those who are perceived to be enemies of Islam."  Ex. 5, Youssef Rpt. 86, n. 338.

REDACTED FOR PUBLIC FILING

### P. Through Bayoumi, Saudi Arabia recruited Hamerman as a Saudi government asset and Al Haramain operative

892.     The circumstances show that Bayoumi's initial meeting and subsequent handling of Hamerman did not occur by chance but was part of a planned Saudi government operation to recruit Hamerman and support the Sunni extremist network in California.

893.     On July 11, 1996, Bayoumi received a letter from Yusuf Al Shuwayhani, Dean of Admission and Matriculation at Imam Muhammad University in Riyadh, which sets forth what it calls the "complete story of brother Omar Hamerman." In the letter Shuwayhani confirms that the Saudi government's goal is for Hamerman to "become a *Da'aih* [Propagator]...." Ex. 678S, MPS 732_4,6.

894.     Shuwayhani asked Bayoumi to call him with Hamerman to get some information, and then stated: "I [Shuwayhani] need to give you [Bayoumi] some instructions."  Shuwayhani thanked Bayoumi for his "personal efforts and dedication to this matter."  Shuwayhani's letter shows that he had previously visited San Diego when Bayoumi was there: Shuwayhani asks Bayoumi to convey his greetings and regards to "[the beloved ones] and the brothers" at the ISCD and the Al Ribat Mosque, where Anwar Aulaqi was the Imam.  Shuwayhani also shows the depth of his relationship with Bayoumi, signing the letter as "Your brother and *Mohebukom* [the one who loves you]."  Ex. 678S, MPS 732_4,6.

895.     On July 27, 1996, Hamerman and Bayoumi sent a joint letter responding to Sheikh Shuwayhani.  Hamerman expressed his thanks for "admitting me as a student" at Imam Mohamed University and stated that he called the Saudi Embassy to get his visa and tickets. Bayoumi wrote a greeting to the Shuwayhani at the bottom of the letter and asked for information about a rumor Bayoumi heard about Shuwayhani returning to the U.S. Ex. 678T, MPS 732_5.

REDACTED FOR PUBLIC FILING

896. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

897.    The MPS found Bayoumi in possession of the materials evidence that he worked to assemble for Hamerman's position at Imam Mohammad University: a copy of Hamerman's U.S. passport; a 1992 "Acknowledgement of Faith" of Hamerman to "declare that I am a Muslim"; and a Saudi Embassy Medical Report form for Hamerman finding that Hamerman was "fit for employment."  Ex. 313, MPS 731_1-12.

898.    Upon his arrival in Saudi Arabia, Hamerman immediately met with Saad al Habib and, over the years, Bayoumi communicated with Habib concerning Hamerman.  Ex. 353, MPS 727_202; Ex. 361, MPS 43_114; Ex. 364, MPS 43_136.  ████████████████

████████████████████████████████████████

████████████████████████████

899.    Bayoumi's handwritten address book contained phone and address information for Hamerman which shows that Saudi Arabia provided housing for Hamerman in Riyadh at the Imam Mohammad University.  Ex. 12AA, MPS738_35.

900.    While Hamerman was ostensibly brought to Saudi Arabia as a student, he apparently did not take classes for years after he first arrived in Riyadh, Saudi Arabia in the Fall of 1996 to accept his position at Imam Mohammad University.  Hamerman's online resume shows that he did not start coursework at Imam Mohammad University until five years later in the Fall of 2001 and received a degree in 2005.  Ex. 157, Hamerman LinkedIn.

234

901.    A student at Imam Mohammad University is deemed to be an employee of Saudi Arabia's government.  Ex. 270, KSA 2670 (Thumairy confirming that he was employed by Saudi Arabia while he was a student at Imam Mohammad University).

902.    Al Haramain emails from 2000 produced in this litigation show that Hamerman was an Al Haramain operative who participated in Al Haramain strategy and planning meetings in Saudi Arabia about Al Haramain's operations in the U.S.  The Al Haramain e-mails are from Abdulaziz Alshoumar in Saudi Arabia, who identified himself as part of Al Haramain's "USA Dawah Group." Alshoumar sent the e-mails using his e-mail address with Aramco, a Saudi Government owned entity. The e-mails show that Hamerman was a member of a 4-5 person Al Haramain committee that held regular meetings concerning Al Haramain's U.S. operations. Alshoumar writes that he could arrange a meeting together along with "Darwood, Nbil and Omar Hammerman."  A February 19, 2000 Al Haramain e-mail from Abdulaziz Alshoumar in Saudi Arabia stated that:

> Last Thursday we had a meeting at Al-Haramain office, brothers: Omar Hammerman, Dawood Rogers, Ali Jomaa, Khaleel and myself were there. In the meeting we discussed several things, however, the main topics were:
>
> §    Our Dawah's strategy in the USA.
> §    Activities Plan.

903.    A February 25, 2000 Al Haramain e-mail from Alshoumar in Saudi Arabia states that Hamerman participated in an Al Haramain meeting where they "discussed our proposed plan for the coming 5 years."  Ex. 33, Feb. 19, Feb. 25, & May 30, 2000 e-mails as PST file produced by Al Haramain.

904.    ██████████████████████████████

████████████████████████████████████████████

235

████████████████████████████████████████

REDACTED FOR PUBLIC FILING

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████

905.   █████████████████████████████████████████

██ June 27, 1997, days before senior Al Haramain member and Saudi government official

Soliman al Buthe reported that he went to Oregon to establish of Al Haramain's U.S. operations.

Ex. 2, EO 2573, 3435 (FBI/CIA Joint Assessment).

906.   ██████████████████████████████████████August 13, 1998, the date

that the three-man Al Haramain delegation – including ███████████ and Buthe – arrived in San

Diego to meet with Bayoumi to discuss the Imam, religious control, and operation of the recently

opened Al Madinah Mosque.  Ex. 410, MPS43_225-228 (Bayoumi letter to Habib); Ex. 120,

Bayoumi Dep. 186:11-192:2, 195:16-24, 197:10-20; Ex. 2, EO 2573.

907.   ████████████████████████████████████January 3, 1999, when

███████████ came back to the Al Madinah Mosque and met with Bayoumi, and two visiting

MOIA propagators, Adel Al Sadhan and Mutaeb Al Sudairy, who (as detailed below) were an

advance team for the 9/11 hijackers.  The MPS production included a date stamped photograph

("19 1 '99" or January 19, 1999) which included Bayoumi, Omar Hamerman, Adel Al Sadhan.

Ex. 11D (MPS894-CLIP Video Screenshots); Ex. 11D (MPS 726 Photographs); Ex. 2, EO 2573.

908.   ███████████████████████████June 25, 2000, when Saudi Arabia sent

███████████ back to San Diego to meet with Bayoumi as Bayoumi was providing key assistance

for the 9/11 hijackers. Ex. 2, EO 2573.

REDACTED FOR PUBLIC FILING

909.    Hamerman's recruitment for Al Haramain, an organization directly linked to Al

Qaeda and Osama Bin Laden, ███████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

███████████████████████████

910.    Plaintiffs' expert Youssef also states that based on his knowledge and experience,

including four years as FBI Legal Attache in Saudi Arabia between 1996-2000, that Bayoumi's

conduct shows that he was "acting at the direction of his Saudi superiors to groom Hamerman as

a Saudi Government operative."  Ex. 5, Youssef Rpt. 87.

### Q.  Bayoumi establishes himself as a leader within the Sunni extremist network in San Diego, which included Anwar Aulaqi, a radical extremist tied to Al Qaeda

911.    The FBI investigation conducted by Plaintiffs' expert Youssef in the mid 1990's

found that the ICSD was supported by Saudi Arabia and that ███████████████, a MOIA

propagator, was the ICSD's former Imam and influential leader.  Ex. 5, Youssef Rpt. 88; Ex.

210, KSA 0554; Ex. 2, EO 0692.  Upon his arrival in California in 1994, Bayoumi immediately

connected with the Sunni extremist cell at the ICSD through Hamerman and used Saudi

government funding to establish himself as a prominent member at the ISCD.  Ex. 120, Bayoumi

Dep. 59:21-60:22, 61:23-62:17 (Bayoumi immediately went to ISCD and connected with

Hamerman upon entering the United States) Ex. 355, MPS 727_142 (December 1994 ICSD

letter thanking Bayoumi for his "abundant generosity").

912.    The July 1996 letter of Sheikh Shuwayhani of Imam Mohammad University to

Bayoumi shows that Bayoumi had previously hosted Shuwayhani in San Diego and introduced

him to "beloved ones" and "the brothers" at the ICSD and the Al Ribat Mosque, where Anwar

Aulaqi was the Imam.  Ex. 678S, MPS 732_4,6.

REDACTED FOR PUBLIC FILING

913.     Saudi funds helped found and support the Al Ribat Mosque and members of the San Diego extremist cell including Mohamed Zaky and Kifa Jayyousi who had been leaders of the Al Ribat Mosque before Aulaqi arrived.  Ex. 5, Youssef Rpt. 88-89; Ex. 147, Hitchens Rpt. ¶ 27; Ex. 2, EO 0727.

914.     As evidenced below, Saudi Arabia worked with Al Haramain to establish, fund, and operate the Al Madinah Mosque in El Cajon through Bayoumi, Thumairy, numerous MOIA Propagators, Imam Mohammad University employee Omar Hamerman, Saudi officials Sowailem, Jarrah, and Ghesheyan, at the Saudi Embassy in Washington D.C. and Consulate in Los Angeles.

915.     Bayoumi sent a letter to Saad Al Habib dated "Ramadan 1998," referring to Ramadan 1418, which started on December 31, 1997 and ended on January 28, 1998.  Therein, Bayoumi stated that he hosted a group of Saudi government propagators:

> [F]our propagators arrived with us this year, three of whom are from the Imam [Muhammad Ibn Saud] University and the fourth is from Umm Al-qura University.  I gathered them together with about thirty other persons from the Masjid al Ribat and Masjid Abu Bakr [the ICSD] in my house.

Ex. 353, MPS 727_202.

916.     The MPS production included Bayoumi's videotape of the January 1998 gathering at his home, then located on Beadnell Way in San Diego, showing his Saudi government visitors and persons from Aulaqi's Al Ribat Mosque as well as the ICSD.  Ex. 10B, MPS890-CLIP Video Exhibit.

917.     In November 1999, Bayoumi subsequently sent a report to a senior Saudi government Ministry of Finance official, Ahmed Al Hamdan, which described how four Saudi government propagators sent to San Diego by the Ministry of Islamic Affairs and Imam Mohammad University for Ramadan 1418 played an instrumental role in the decision to

REDACTED FOR PUBLIC FILING

purchase the Al Madinah Mosque.  Ex. 370, MPS 43_310; Ex. 2, EO 0483 (describing Hamdan as "a high-ranking Saudi official who works as a Director within the Ministry of Finance").

918.    Along with the MOIA propagators who visited San Diego over Ramadan 1418, and participating in the decision to purchase the Al Madinah Mosque, was Ibrahim Al Zamil. Ex. 370, MPS 43_310.  Zamil would return to San Diego and assist Bayoumi in running the Mosque.  Ex. 365, MPS 43_137 (August 1999 joint letter of Bayoumi and Zamil describes how they are working together on the Mosque project).

919.    As shown by later visits of MOIA propagators, Bayoumi necessarily had numerous interactions with MOIA officials, including Thumairy and the Islamic Affairs Department at the Saudi Embassy, before and after the Ramadan 1418 visit of four propagators to San Diego.  Ex. 120, Bayoumi Dep. 223:12-225:12 (Bayoumi testified that he called the Islamic Affairs Department at the Embassy to arrange for the propagators' visits); Ex. 411, MPS 43_314; Ex. 373, MPS 43_345; Ex. 413, MPS 43_338.  Saudi Arabia did not produce any documents about that visit.

920.    Bayoumi maintained a videotape report of a large Ramadan 1418 service held in San Diego that was led by Anwar Aulaqi and attended by Bayoumi and the four visiting MOIA and other Saudi government propagators.  Ex. 10B (MPS890-CLIP Video Exhibit); Ex. 11B (MPS890-CLIP Video Screenshots).

921.    Bayoumi claimed at his deposition that "I knew he [Aulaqi] was an Imam" but when asked "had you met him [Aulaqi] in person?" Bayoumi answered: "No."  When asked if he had contact with Aulaqi "either in person or on the phone" Bayoumi claimed: "I don't remember."  Ex. 120, Bayoumi Dep. 482:12-24.

REDACTED FOR PUBLIC FILING

922. Bayoumi had Anwar Aulaqi's personal cell phone number and email address in his handwritten address book. Ex. 12AA, MPS738_82 ("4651917" and "Aulaqi@aol.com"). Bayoumi also had phone numbers for the Al Ribat Mosque in his handwritten address book. Ex. 12AA, MPS738_26. Bayoumi also kept Aulaqi's number in San Diego, 465-1917, as well as the Al Ribat Mosque numbers, in his January 2000 phone list. Ex. 12BB, MPS 688_3; Ex. 5, Youssef Rpt. 138.

923. Bayoumi's claim that he never met Aulaqi in person was false. A video found in Bayoumi's possession by Scotland Yard shows Bayoumi and Aulaqi in January 1998 after an Eid sermon given by Aulaqi to mark the end of Ramadan 1418. The video shows a warm embrace and words of mutual recognition between Bayoumi and Aulaqi, demonstrating that the two men knew each other well. Ex. 147, Hitchens Rpt. ¶ 65; Ex. 10B (MPS890-CLIP Video Exhibit) 40:35-40:45; Ex. 11B (MPS890-CLIP Video Screenshots).

924. Aulaqi and Bayoumi organized a paintball war game event where the participants wore military fatigues and engaged in battle simulations. The participants included members of the ICSD and Al Ribat Mosques. Ex. 2, EO 4042. ███████████ and a visiting MOIA propagator attended. Bayoumi made a video of the event and took video footage of Aulaqi, who was addressed as "Sheikh Anwar." Bayoumi can be seen and heard talking to Aulaqi. Ex. 10A (FBI013E459-CLIP Video Exhibit); Ex. 11A (FBI013459-CLIP Video Screenshots).

925. On May 2, 2002, shortly before Bayoumi left England to return to Saudi Arabia, he went to the MPS in London, England and retrieved many of the original materials that had been seized from him in September 2001 including the videotape of him with other Saudi government officials and Anwar Aulaqi. Ex. 441, FMT Receipt 69/2002. The evidence receipt record signed by Bayoumi was produced by MPS in November 2023. The correspondence,

REDACTED FOR PUBLIC FILING

videotapes, and other materials constitute Bayoumi reporting on his work for the Saudi government in the U.S. but not were produced by Saudi Arabia, despite their clear relevance.

926.    The 9/11 Commission recorded that during his interview "[Bayoumi] conceded having had contact with Anwar Aulaqi, with whom he claimed discussed religious matters and ideas similar to those he would discuss with other imams."  Ex. 90, Snell Decl., Ex. 2 at 6.  The statements to the 9/11 Commission took place in October 2003, before Aulaqi had been publicly designated as an Al Qaeda terrorist by the U.S.  At his deposition in this litigation however, Bayoumi first claimed he had not met Aulaqi in person:

> Q:    Sir, did you know Anwar Aulaqi?
> A:    Anwar Aulaqi was a mosque Imam.
> Q:    Did you know him when you were in San Diego?
> A:    I knew he was an Imam, yes.
> Q:    And did you know him – had you met him in person?
> A:    No.
> Q:    Did you have contact with him either in person or on the phone?
> A:    I don't remember.

Ex. 120, Bayoumi Dep. 482:12-24.

927.    Bayoumi next claimed the interview statement about him recorded by the 9/11 Commission about contacting Aulaqi was not correct, stating "No. It might have been a question. But discussion in religious matters, no. I did not have time, to begin with, to discuss religious matters.  I was busy with my studies."  Ex. 120, Bayoumi Dep. 484:11-15.

928.    As detailed below, two years after the videotape, Bayoumi and Aulaqi worked together to provide help to the 9/11 hijackers Hazmi and Mihdhar immediately after the hijackers arrival in San Diego.  By the time Bayoumi was deposed in June 2021, Aulaqi had been designated by the U.S. as an Al Qaeda terrorist recruiter and supporter and was targeted and killed in a U.S. drone strike in Yemen in 2011 receiving much media coverage at the time.

REDACTED FOR PUBLIC FILING

929.     Bayoumi's longstanding, close relationship with Aulaqi is significant. During his work at the FBI, Plaintiffs' expert Youssef became familiar with the history and ideology of Aulaqi, including his time as the Imam at the Al Ribat Mosque in San Diego and at the Dar al Hijrah Mosque in Falls Church, VA.  Based on his background and knowledge, Youssef found that Aulaqi was a radical extremist with ties to Al Qaeda and other terror groups.  In Youssef's opinion, Aulaqi had "a jihadist anti-U.S. mindset and world view similar to Omar Abdel Rahman ['Blind Sheikh']". Ex. 5, Youssef Rpt. 137-8.

930.     In 1999 and 2000, Aulaqi had numerous connections with fundraisers for members of Islamic terror groups, including Al Qaeda.  Ex. 2, EO 2804; *See* 9/11 Commission Report at 517 n. 33. This included phone contact with Ziyad Khaleel, who, according to Plaintiffs' Expert Youssef, was "an Al Qaeda operative who obtained communications equipment used by Osama Bin Laden and arranged fund transfers from a charity to accounts controlled by Bin Laden." Ex. 566,  FBI 11764; Ex. 5, Youssef Rpt. 137, n. 551.

931.     In early 2000, Aulaqi held a meeting with a close associate of Omar Abdel Rahman.  Ex. 170, Joint Congressional Inquiry at 178-9.

932.     In 2000, Aulaqi was the Vice President and California representative of a Yemen-based organization charity, the Charitable Society for Social Welfare, that was a front for funding terrorists.  In 2004 a Brooklyn federal jury convicted the director of that charity's Brooklyn office for making false statements about his 1999 fundraising activities for the organization. The Government presented proof that "a majority" of the money collected by the Charitable Society for Social Welfare was "not for charity but for terrorist organizations." Ex. 342, *US v. Mafhahi*, 03 Cr 412 (E.D.N.Y. February 17, 2004) Transcript at 460; Ex. 329, 1999

REDACTED FOR PUBLIC FILING

Form 999 filed May 14, 2000, Charitable Society for Social Welfare, Inc. at 4 (listing "Anwar Al Awlaqi" as "Vice President/CA"); Ex. 147, Hitchens Rpt. ¶ 32.

933.    Dr. Alexander Meleagrou-Hitchens (Hitchens) is a lecturer on Terrorism and Radicalization at King's College London, and a leading expert on Anwar Aulaqi who has conducted extensive research and compiled one of the world's most comprehensive repositories of all Aulaqi's writings and available recordings of his sermons, speeches, and other public utterances. He also authored the 2020 book *Incitement: Anwar al-Awlaki's Western Jihad,* published by Harvard University Press. Ex. 147, Hitchens Rpt. ¶¶ 1, 5, & Annex A.

934.    Hitchens provided his opinion that at the time that Aulaqi was in San Diego in 2000 he was a committed Salafi extremist and a proponent of violent jihad.  Aulaqi adopted the same worldview as Al Qaeda that was highly antisemitic and saw Western culture as a violent and sinister force targeting the fabric of Muslim society and faith.  Aulaqi's preaching was closely aligned with the basic religious training that Al Qaeda operatives received.  Aulaqi justified the use of suicide bombings by adopting the same arguments crafted by Al Qaeda's leadership.  Hitchens also observed that Aulaqi "converged closely in ideological and operational terms with Saudi Arabia's official program of da'wa (propagation) as implemented by its Ministry of Islamic Affairs at the time."  Ex. 147, Hitchens Rpt. ¶¶ 10, 22, 73-93, 104, 123. Saudi Arabia's claim that Aulaqi was "known as a politically moderate Islamic preacher", KSA Aver. at ¶ 135, ignores the reality of Aulaqi's extremism prior to the 9/11 Attacks and the fact that Aulaqi was "misunderstood and underestimated by Western observers and analysts."  Ex. 147, Hitchens Rpt. ¶ 123.

935.    Hitchens also detailed Aulaqi's long-standing direct and indirect relationship with elements of the Saudi state.  One of Aulaqi's major benefactors was an Imam Mohammad

REDACTED FOR PUBLIC FILING

University classmate of Thumairy who was in phone contact with Thumairy in 1999-2000. Ex. 147, Hitchens Rpt. ¶¶ 27-29; Ex 475, FBI 527; Ex 476, FBI 555; Ex 481 FBI 000634 at 639.

936.    Osama Bassnan: Bayoumi also had a close relationship with Osama Bassnan in San Diego: the two men had frequent phone contact. Ex 566 FBI 11761; Ex. 84, Congressional Joint Inquiry Excerpt – "The 28 Pages" at 426.

937.    Bassnan lived across the street from Hazmi and Mihdhar's apartment in San Diego; was introduced to them by Bayoumi; and bragged to an FBI source that he did more for the hijackers than Bayoumi. Ex. 84, Congressional Joint Inquiry Excerpt – "The 28 Pages" at 426.

938.    On October 17, 1992, while Bassnan was working at the Saudi Embassy in Washington, D.C., Bassnan hosted a party to honor the "Blind Sheikh" Omar Abdel Rahman. Ex 566, FBI 11761. That same year the FBI and the State Department searched Bassnan's car and found jihadist and Al Qaeda related material. Ex. 9, Congressional Joint Inquiry at 176-77; Ex. 84, Congressional Joint Inquiry Excerpt – "The 28 Pages" at 428 (regarding Bassnan's affection for Osama Bin Laden). FBI reports show that Bassnan had a long history as "an extremist and supporter of Usama Bin Laden." Bassnan admitted that he knew and regularly spoke with members of Bin Laden's family in Saudi Arabia and the United States. Ex 566, FBI 11761.

939.    In 1999, Bassnan moved to San Diego and during this period eyewitnesses reported to the FBI that Bassnan was a fervent supporter of Osama Bin Laden and an advocate for suicide bombings to advance an extremist, anti-U.S. Islamic agenda. In a recorded conversation in September 2001, Bassnan referred to the hijackers, Hazmi and Mihdhar, in

REDACTED FOR PUBLIC FILING

affectionate terms generally reserved for referring to one's own children. Ex. 2, EO 1754-55, 1774.

940.    In September 2000, Bassnan or an associate had phone and email contacts with Ramzi Binalshibh, a member of Al Qaeda's Hamburg cell. Ex. 29, 9/11 Commission Memorandum for the Record re: Interview of an FBI Agent, November 17, 2003 at 4.

941.    In January 1998, Saudi Ambassador Bandar sent Bassnan's wife a check for $10,000 and in May 1998 Saudi Ambassador Bandar sent Bassnan himself a check for $15,000. In February 1999, shortly after Bassnan and his wife moved to San Diego, Bassnan's wife began to receive checks for $2,000 per month from an account controlled by Princess Haifa, the wife of the Saudi Ambassador Prince Bandar. The checks were sent pursuant to a "standing order" on the account and continued through March 2002, for a total of $74,000.  Ex. 84, Congressional Joint Inquiry Excerpt – "The 28 Pages" at 427.

### R.  Saudi Arabia and Bayoumi help Al Haramain establish the Al Madinah Mosque in San Diego

942.    In January 1998, Bayoumi hosted a group of four MOIA propagators in San Diego who helped devise the plans for the new Al Madinah Mosque, which would be funded by Al Haramain.  Bayoumi confirmed these facts in letters to a senior Saudi government Finance official and the Consul General in Los Angeles.  Ex. 370, MPS 43_310 (letter to Saudi Ministry of Finance official Hamdan confirming the four MOIA propagators laid groundwork for the mosque); Ex. 412, MPS 43_337 (Bayoumi states: "[w]e recognize the major role played by the [Saudi] government…" in the Mosque's development).

943.    In his testimony, Bayoumi did not mention the visit of the four propagators but claimed that his connection to the Al Madinah Mosque project started when he was contacted by Saad Al Habib, a friend of Hamerman and someone Bayoumi had known at the ICSD, who

REDACTED FOR PUBLIC FILING

"showed interest in buying a property in the community so they can pray at." Bayoumi stated that Habib called over the phone from Saudi Arabia and then visited him in San Diego. Ex. 120, Bayoumi Dep. 148:4-149:2.

944.    On April 19, 1998, Saad Al Habib sent Bayoumi a check for $10,000 drawn on an account at the Al Rajhi Bank. Ex. 357, MPS43_102-103.

945.    The MPS production included a letter from Saad Al Habib to Bayoumi stating that he was travelling to the U.S.,"arriving on Monday[,]" and going to "another city in America on Friday." The letter stated that Habib was working with the Saudi Embassy to get necessary documents for the real estate transaction to buy the building. Ex. 357, MPS43_102-103.

946.    On April 30, 1998, Saad Al Habib's brother Mohamed Al Habib gave Omar Al Bayoumi a Power of Attorney to spend $545,000 to purchase a building for a mosque in El Cajon, California. Ex 664 FBI 4221-4222.

947.    Al Haramain was in contact with the Al Habib brothers in Riyadh in April 1998, just before the funds were sent to Bayoumi. Ex. 158, FPDUS 22307 at 10.

948.    Bayoumi received the funds from the Habib brothers and arranged for the purchase of the building. The building was to become a new Mosque for the Kurdish community in the San Diego. Although the Kurdish community's existing mosque was known as the Kurdish Community Islamic Center, the new building was renamed as Masjid al Madina al Munawara, after the holy city of Madina in Saudi Arabia. Ex. 120, Bayoumi Dep. 152:15-154:23, 155:11-16; Ex. 530, FBI 004224-004227 [receipt of funds].

949.    Despite handling over half a million dollars of money, Bayoumi claims to know virtually nothing about the Habib business or the origin of the funds. Ex. 120, Bayoumi Dep. 198:16-199:9.

REDACTED FOR PUBLIC FILING

950. Saad Al Habib made it clear from the outset that it was his intention to have the new Al Madinah Mosque controlled by Saudi Arabia and to join forces with the radicalized Mosque in Los Angeles led by the MOIA's Fahad al Thumairy. On May 3, 1999, Saad Al Habib sent Bayoumi an authorization for the Al Madinah Mosque to be managed by the Saudi government-run Ibn Taymiyah Mosque, where Thumairy was Imam and nine Saudi government officials served on the Board. Further, Saad al Habib wrote to Bayoumi (whom Habib addressed as the "Mosqe [sic] Director" of the Al Madinah Mosque) regarding "Autherization [sic] for Mosque Service Management." The letter said "to insure contiouse [sic] serveces [sic]" that Habib authorized Bayoumi to contact "Ibn Taymiyah Est." "to look after and mange [sic]" the Al Madinah Mosque "because of their famouse [sic] name and good experinc [sic] in this field." Ex. 678B, MPS 43_128-129 (authorization in Arabic and English, faxed May 4, 1999).

951. Bayoumi assumed the title of "General Supervisor" of the Mosque and made business cards. *See, e.g.* Ex. 678A, MPS 43_72; Ex. 574, FBI 004273. Immediately after the building was purchased, Bayoumi moved in before anyone else and took the best office. Ex. 2, EO 2067- 2068. Saad Al Habib prepared a formal letter dated declaring that Bayoumi was "*Mushrif Al Alaam*" - "The General Supervisor" - in charge of the Mosque. Ex. 417, MPS 43_202. Bayoumi got business cards with the title "General Supervisor." Ex. 11N Screenshot (MPS713_11 copy of Bayoumi's business card).

952. Bayoumi initially testified that he did not call the Embassy about the Mosque before it opened, but after being shown a handwritten letter, he wrote to Islamic Affairs Department Deputy Musaed Al Jarrah stating that such a call did occur, Bayoumi conceded: "Perhaps that transpired, yes." Ex. 120, Bayoumi Dep. 156:7-158:16.

REDACTED FOR PUBLIC FILING

953.    The handwritten note shows that prior to the opening of the Mosque, Bayoumi spoke on the phone and then wrote Embassy Islamic Affairs Department Deputy Musaed Al Jarrah.  Ex. 393, MPS 43_219.

> Bayoumi wrote another letter to "His Excellency the generous brother / Musaed Al Jarrah" Jarrah on July 21, 1998 requesting funding for the mosque stating that "the scale of good deeds will weigh more heavily with the rewards from Allah Almighty, in favor of all those who joined in the call…."  Ex. 394, MPS 43_220.

954.    Bayoumi also had Mosque Board Chairman Mohamed Al Doski send a July 10, 1998 letter to Jarrah's superior Islamic Affairs Department Head Dr. Majed Ghesheyan.  That letter requested that "you…commission your specific office responsible, to kindly send the furnishings / carpets, just as was done for the other mosques here."  Ex. 392, MPS 43_218.

955.    Bayoumi's phone records show that he made five calls to the Saudi Embassy in July 1998 from the phone in his Mosque office.  Four of the calls were made to ██████3700, the main number for the Embassy Islamic Affairs office.  The other call was made to a fax line for the Islamic Affairs.   Ex. 5, Youssef Rpt. 132-35; Ex. 12K (Bayoumi calls to Saudi Embassy); Ex.499, FBI 1516; Ex. 500, FBI 1521. The calls made to the main number ██████ 3700 were typically answered by a receptionist and could have been forwarded to Musaed Al Jarrah or Khalid Al Sowailem.  Bayoumi, Jarrah, and the receptionist Zeinab al Afifi all deny knowledge of this call and the ensuing 55 calls made by Bayoumi to the Islamic Affairs Department over the following 18 months.  Ex. 120, Bayoumi Dep. 168:23-176:12; Ex. 118, Jarrah Dep. 57:12-58:19; 195:11-196:9; Ex. 12AA, MPS738_53R (Bayoumi's handwritten address book containing numbers for the Embassy Islamic Affairs office and Sowailem); Ex. 169 (Jarrah Dep. Ex. 764); 12K (Bayoumi calls to Saudi Embassy); Ex. 12B (Calls between Bayoumi and Thumairy); Ex. 129, Afifi Dep. 209:22-214:6.

REDACTED FOR PUBLIC FILING

956. In his September 2001 interviews with Scotland Yard, Bayoumi told the investigators that the Saudi Embassy and Consulate were directly involved in decisions concerning the operation of the Al Madinah Mosque and that "they told me that they are happy with what's going on." Ex. 450, MPS 365-401 Tr. 242:18-243:4.

957. Bayoumi told the investigators:

> And also the government of Saudi Arabia yeah I mean the Embassy because I open file over there and the Embassy and the Consulate and they send some sheikhs, I mean some leaders and Commandant for example to lead prayer over there. And they are happy with what's going on. Yeah, they told me that they are happy with what's going on.

Ex. 450, MPS 365-401 Tr. 241:16-243:4.

958. During those 2001 interviews, Bayoumi specifically identified Musaed Al Jarrah at the Embassy. Ex. 450, MPS 365-401 Tr. 494:14-495:2. At his deposition in June 2021, however, Bayoumi denied that he had any relationship with Musaed Al Jarrah. Ex. 120, Bayoumi Dep. 797:22-798:1.

**S. Days after the August 1998 Embassy bombings carried out by Al Qaeda with Al Haramain's support, Bayoumi hosted and met with Al Haramain's leaders and worked with them to secure Saudi religious and operational control, supervision, and influence over the Al Madinah Mosque**

959. From the very outset, Bayoumi asserted Saudi Arabia's religious authority over the Al Madinah Mosque. One of Bayoumi's videos, recovered by MPS, shows that on August 14, 1998, visiting MOIA religious official Ghanim Saad Al Ghanim travelled from Saudi Arabia to deliver one of the first *khutbahs* (Friday sermons) at the Mosque. The tape can be dated by reference to a conversation on the tape with a contractor, who reads aloud and signs an invoice for renovation work; the invoice was found among Bayoumi's papers and shows that the contractor signed the invoice at the Mosque on Friday, August 14, 1998. Ex. 10C (MPS893-

249

REDACTED FOR PUBLIC FILING

COMP Video Exhibit); Ex. 10C-TR (MPS893-COMP-TR Video Transcript); Ex. 11C (MPS893-COMP Video Screenshots).

960.    On a separate video report Bayoumi made prior to August 14, 1998, Bayoumi describes MOIA religious official Ghanim Saad Al Ghanim as the "first visiting brother" to the Al Madinah Mosque.  Ex. 10C (MPS893-COMP Video Exhibit); Ex. 10C-TR MPS893-COMP-TR Video Transcript.

961.    On August 7, 1998, Al Qaeda carried out the bombings of the U.S. Embassies in Nairobi, Kenya and Dar es Salaam, Tanzania, killing hundreds and wounding thousands of people.  Ex. 690, FBI.gov, FBI Famous Cases report on "East African Embassy Bombings."

962.    The Riyadh-based Al Haramain Islamic Foundation provided essential help to the Al Qaeda cells responsible for the Embassy bombings and provided material support to the terrorist activities of Al Qaeda around the world.  Ex. 67A, UN Security Council Sanctions Listing on Al-Haramayn Foundation, Kenya ("When viewed as a single entity, Al-Haramain was one of the principal NGOs active throughout the world providing support for the Al-Qaida network."); Ex 19E,  U.S. Treasury, "Treasury Designates Al Haramain Islamic Foundation."

963.    In August 1998, Saleh Al Sheikh was MOIA's Vice Minister and second-in-command and, as such, supervised the operations of Al Haramain.  Ex. 123, Ash-Sheikh Dep. 38:9-39:5; Ex. 73, Affidavit of Khalid Bin Obaid Azzahri ("Azzahri Decl.") ¶ 3 (PEC-KSA002765).

964.    On the day of the bombing, MOIA was holding a propagators conference in Nairobi.  The conference was attended by MOIA propagator Majed Al Mersal, who would subsequently be assigned to visit Thumairy in Los Angeles in December 1998, and return to visit Thumairy and Bayoumi in December 1999-January 2000, immediately before the arrival of

REDACTED FOR PUBLIC FILING

hijackers Hazmi and Mihdhar.  Ex. 115, Mersal Dep. 52:15-63:14, 80:15-22, 82:9-83:5, 84:3-8, 91:2-17, 172:24-178:4.

965.    On August 13, 1998, less than a week after the U.S. Embassy bombings, a delegation of Al Haramain representatives from Saudi Arabia arrived in San Diego to meet with Bayoumi.  The date of the arrival of the Al Haramain delegation is demonstrated by various evidence further discussed below, including an Al Haramain travel log, Al Haramain phone records, Bayoumi's Mosque Office phone records, Bayoumi's correspondence, FBI records, and a business travel document.  Ex.463, FBI 000145-REV2021 at 156; Ex. 500, FBI 001521; Ex. 2, EO 2573.  The business card of senior Al Haramain officer Soliman Al Buthe, who also worked for the Saudi government, was found in Bayoumi's possession by the MPS.  Ex. 11N Screenshot (MPS704_70 copy of Buthe's business card).

966.    Bayoumi remembered that there were three persons from Al Haramain but claimed he didn't know their names or titles and when asked to describe them testified: "Honestly, I don't remember them."  Bayoumi claimed that he did not know if the men spoke English and heard them all speak Arabic.  Ex. 120, Bayoumi Dep. 190:1-190:7, 190:17-191:1, 194:24-195:15.

967.    Bayoumi admitted that the three men had all spoken to Saad al Habib in advance about their trip to San Diego but was unsure whether he had talked to Habib himself. Ex. 120, Bayoumi Dep. 191:16-192:6, 194:19-23.

968.    Bayoumi claimed that he did not know how the Al Haramain meeting was planned or who made the arrangements, saying "I don't think there was a previous appointment." Ex. 120, Bayoumi Dep. 207:12-24.

REDACTED FOR PUBLIC FILING

969. Bayoumi claimed that "they showed up to the masjid and they expressed that they are from Al-Haramain organization, and they expressed their interest in taking care of the Imamate and the maintenance and all these matters. Ex. 120, Bayoumi Dep. 191:16-192:2.

970. Bayoumi admitted that the Al Haramain representatives came to supervise and control the Mosque: "So the purpose of their presence was for them to appoint an Imam and also to overlook – to oversee the maintenance, the remodeling and the operation." Ex 487 FBI 1349-52; Ex. 120, Bayoumi Dep. 191:2-8.

971. The circumstances show that Bayoumi must have had advance notice of Al Haramain's visit, and that Al Haramain arrived to take over the Al Madinah Mosque immediately after its opening because Al Haramain provided the funding for the Mosque through Saad al Habib and his family. As Plaintiffs' expert Youssef determined, "[t]he Foundation delegation was led by two of its most senior members, Soliman al Buthe and Mansour al Kadi." Ex. 28, Al-Buthe 0026; Ex. 442, FPDUS 14024; Ex. 487, FBI 001349 at 1350; Ex. 487, FBI 001349 at 1352; Ex. 5, Youssef Rpt. 93 and 98.

972. Kadi was head of Al Haramain's Africa Committee and a Board Director of Al Haramain-U.S. Kadi had direct ties to Wadih el Hage, who was convicted for his lead role as a conspirator in the 1998 U.S. Embassy bombings and served as a secretary to Osama Bin Laden. Evidence from the Embassy Bombings trial showed that Hage carried Kadi's business card and knew Kadi as "Abu Omar". Ex. 451 (photograph of business cards including for Al Kadi, admitted in evidence as Ex. 307 at 34 in *US v. Bin Laden*, S(7) 98 Cr. 1023 (S.D.N.Y. March 7, 2001)); Ex. 70, Al Haramain Islamic Foundation, Inc. Articles of Incorporation at 3.

973. Buthe was a Saudi Government official, a member of Al Haramain-Saudi Arabia's Europe and USA Committee and a Board Director of Al Haramain-U.S. Ex. 331, Buthe

REDACTED FOR PUBLIC FILING

Declaration of Dec 9, 2009; Ex. 684, SVS 109191; Ex. 70, Al Haramain Islamic Foundation, Inc. Articles of Incorporation; Ex. 332, Buthe business cards [Ex. 96]; Ex. 335, State Dept. Memo. [Ex. 105].

974.     In September 2004, Buthe was designated by the U.S. Treasury Department for his links to terror based on his work for the U.S. branch of Al Haramain.  As support for the designation, the Treasury Department cited that "[t]he investigation shows direct links between the U.S. branch [of Al Haramain] and Usama bin Laden." Ex. 19C, U.S. Treasury Press Release Sept 9, 2004, https://home.treasury.gov/news/press-releases/js1895.

975.     The third member of the Al Haramain delegation was Omar Hamerman, the radical Sunni leader of the ICSD extremist cell that the FBI had previously investigated, and an Al Haramain operative ███████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
████████████████

976.     Bayoumi's claim that he could not remember the names of the Al Haramain representatives is not credible, because of Bayoumi's longstanding, close Saudi government work and personal relationship with ████████ and also because Bayoumi wrote the name of the lead member of the delegation "Brother Mansour [Kadi]" in his letter to Saad al Habib about Al Haramain's visit.  Ex. 487, FBI 1350; Ex 487, 1352.

977.     The two other Al Haramain representatives also arrived in San Diego on August 13, 1998 as shown by their travel log and Bayoumi's notation on his Mosque phone records of calls made by the Al Haramain representatives on August 13.  Ex. 28, Al-Buthe 0026;

REDACTED FOR PUBLIC FILING

Ex. 678G, MPS43_433. These circumstances show that Kadi, Buthe, and Hamerman likely travelled to San Diego together.

978. The MPS production showed that Bayoumi made a handwritten notation on his August 1998 phone bill next to three calls: two made on Aug 13, 1998 and another on August 19, 1998. Ex. 678G, MPS43_433. The notation reads: "calls made by representatives of Al Haramain Foundation." Ex. 678G, MPS 43_433.

979. The first of these phone calls listed by Bayoumi as being made by the Al Haramain representatives on August 13, 1998 from Bayoumi's private office at the Al Madinah Mosque by Al Haramain was a 15-minute call to Saad Al Habib's cell number ███████5580) in Saudi Arabia at 10:40am. This call upon arrival by the Al Haramain representatives to report to Saad Al Habib further demonstrates that Al Haramain was involved in the funding for the Al Madinah Mosque through Habib. Ex. 5, Youssef Rpt. 98, n. 401; Ex. 120, Bayoumi Dep. 194:19-23.

980. The second phone call listed as being made by the Al Haramain representatives on August 13, 1998 was an 8-minute call to Sheikh Mohamed Al Barak ███████6050) in Saudi Arabia at 11:17am. Ex. 12AA, MPS738_79L (Barak's number appears in Bayoumi's handwritten address book).

981. Bayoumi had Barak's phone numbers in his handwritten address book, including the cell phone number called on August 13. Ex. 12AA, MPS738_79. Barak was a Saudi government religious official and professor at Um al-Qura University in Makkah, Saudi Arabia who, according to news reports, was arrested and detained in 2017 in Saudi Arabia.

982. On August 14, 1998, Buthe rented a car in San Diego. Ex. 442, FPDUS 14024.

REDACTED FOR PUBLIC FILING

983. On Monday, August 17, 1998, the Al Haramain representatives met with Bayoumi and members of the Kurdish community that attended the Al Madinah Mosque. Ex. 487, FBI 001349.

984. Plaintiffs' expert Youssef's phone call analysis found that same day, a call was placed from Bayoumi's Mosque office phone "to the number of the San Diego home of ██████ ████████'s family, ███████████, at 1:20 p.m. (1 min.)." Ex. 500, FBI 001517 at 1519; Ex. 5, Youssef Rpt. 97-98. Bayoumi used his cell phone to call that same number on August 5, 2000, at 12:29 p.m. (4 min.), when ███████ was in the U.S. on another trip. Ex.490, FBI 1393; Ex. 2, EO 2573.

985. Early in the next morning on August 18, 1998 Bayoumi wrote a "report at 3:10 a.m." to "[m]y beloved brothers Muhammad / Saad / Saleh [al Habib]." The first page of the letter was addressed to Saad Al Habib, but at the end of the letter, Bayoumi made his plea to all three Habib brothers. Ex. 410, MPS 43_225-28 at 225, 228.

986. Bayoumi stated that Al Haramain had "talked about appointing a full-time Imam of Saudi nationality" and wanted to install "one half" of the Mosque's board and choose the Mosque's director and secretary. The community members objected because "99% of the worshippers are Kurds, most of whom don't know the Arabic language" and that Al Haramain was "interfering in our affairs…" Ex. 410, MPS 43_225-28 at 225-26.

987. Bayoumi stated that if the management is "forcibly installed by Al-Haramain and other entities, it will lead to a financial and moral burden, and it may cause division….." Ex. 410, MPS 43_225-28 at 226-27.

988. Bayoumi was concerned that the funding for the Mosque would end if Al Haramain's requests were not respected. Bayoumi wrote that "I hope I won't hear that this

REDACTED FOR PUBLIC FILING

mosque was closed as a result of not properly understanding the situation… I have delivered this message, O Allah be my witness."   Ex. 410, MPS 43_225-28 at 228.

989.    Based on Plaintiffs' expert Youssef's analysis, it is reasonable to conclude under all the circumstances, including "Al Haramain's demands that to name the Mosque's Imam and other leaders, and Bayoumi's concerns that the Mosque might be closed because of the community's reaction to those demands, that Al Haramain controlled the funding for the Mosque provided through Saad al Habib to Bayoumi."  Ex. 5, Youssef Rpt. 98.

990.    Shortly after the Al Haramain visit, the FBI opened a preliminary inquiry into Bayoumi. The FBI did not interview Bayoumi because they did not want to jeopardize "a large sensitive counterterrorism investigation involving an alleged terrorist organization."  This was the second FBI investigation encompassing Bayoumi. The investigation was closed the following year. Ex. 170, Joint Congressional Inquiry at 174; Ex. 131, DOJ Review 257, 333.

991.    During their 12-day trip in August 1998, the Al Haramain representatives rented a car and put over 2000 miles on it.  Ex. 442, FPDUS 14024 (rental record showing that Buthe picked up car in San Diego on August 14, 1998 and returned on August 25). According to Plaintiffs' expert Youssef, Buthe and Kadi:

> ...travelled to the al Haramain office in Ashland, Oregon and back to San Diego – an approximately 1600-mile round trip drive.  During the time that Buthe and Kadi traveled to Oregon, the Al Haramain office in Ashland placed a call to the San Diego family home of Omar Hamerman, the third member of the Al Haramain delegation sent by Saudi Arabia to the U.S. in August 1998, on August 19 at 7:38 p.m. (4 min.). Buthe and Kadi were either calling Hamerman family home, or Hamerman accompanied Buthe and Kadi to Oregon and placed the call to his parents.

Ex. 5, Youssef Rpt. 99-100.

992.    Significantly, during Buthe and Kadi's visit, Al Haramain offices called Thumairy at home from Al Haramain on August 22, 1998 at 7:58 p.m. (1 min.) and 9:30 p.m. (2 min.) and

REDACTED FOR PUBLIC FILING

August 25, 1998 at 2:13 p.m. (3 min.). Ex. 5, Youssef Rpt. 100; Ex. 159, FPDUS 22329; Ex. 442, FPDUS 14024; Ex. 28, Al-Buthe 0026. In May 1999, Saad Al Habib would send Bayoumi his authorization (in Arabic and English) to have Bayoumi, as Mosque "Director," contact Thumairy's Ibn Taymiyah Mosque (also referring to Saudi Arabia's Ibn Taymiyah Foundation that ran the King Fahad Mosque) to take over the management and control of the Al Madinah Mosque. Ex. 678B, MPS 43_128-9 at 129 (Habib "Autherization [sic] for Mosque Service Management" faxed on May 4, 1999, authorizing Bayoumi to "contact Ibn Taimiah Est. to look after and mange [sic] this mosque").

993.    The timing of the Al Haramain calls to Thumairy in August 1998, coinciding with the visit of Buthe and Kadi, who both were later to have proven links to Al Qaeda; the visit of Hamerman, a known Sunni extremist leader and Al Haramain operative; and Al Haramain's meeting with Bayoumi at the Al Madinah Mosque, is significant. Plaintiffs' expert Youssef concluded that the "calls demonstrate a nexus among Thumairy, Bayoumi, Hamerman, and Al Haramain that would reoccur in several months with the arrival in California of two MOIA propagators sent as an advance team for the 9/11 hijackers." Ex. 5, Youssef Rpt. 100.

994.    On September 24, 1998, Bayoumi wrote again to Saad al Habib to report that some members of the community were "very upset" about Al Haramain's involvement and were considering leaving the Mosque. Bayoumi suggested that he should meet with Al Haramain in advance of any additional meetings with the community to avoid a further problem. Ex. 409, MPS 43_224-221 at 224.

995.    Bayoumi suggested to Habib that the names of the Board members of the Mosque "be requested and identified" so that the members could be "validated officially" by Habib. Ex. 409, MPS 43_224-221 at 223. Less than two months later, in November 1998, the Saudi

REDACTED FOR PUBLIC FILING

Embassy Islamic Affairs Department would make a contribution to the Mosque and coordinate with Bayoumi to get a list of the Mosque's Board members. Ex. 404, MPS43_382 (Ghesheyan letter to Bayoumi transmitting $5,000 donation); Ex. 403, MPS43_376-379 (Saudi Embassy receipt and forms collecting information and "administrative data," including Board members' names); Ex. 375, MPS43_381-380 (Bayoumi letter to Al Saleh acknowledging the initiative).

996.    Bayoumi's letter shows that Bayoumi was working to find the right means to bring Al Haramain into the Mosque.  Bayoumi stated that while there was no need for a "a full-time Imam who does not speak the language of the people" that Al Haramain could send visiting Imams "every now and then…."  Ex. 409, MPS 43_224-221 at 223. Bayoumi also said that "a dedicated office can be given to them [Al Haramain]" at the Mosque, and that "[t]hey [Al Haramain] can also be in charge of the library, and they will have the right to supervise the Da'wah [propagation] activities and the library." *Id.*  Bayoumi asked Habib to call him to discuss additional matters.  Ex. 409, MPS 43_224-221 at 221 (Bayoumi noted with an asterisk, "please get in touch with me after reading this letter").

997.    As detailed below, Tawfiq Sudairy, a MOIA Deputy Minister and Al Haramain Board member, sent two visiting MOIA propagators to the Al Madinah Mosque in December 1998, and in June-July 1999 Bayoumi would visit the Saudi Embassy and be instructed to take steps to appoint a new Board at the Mosque and install a radical Imam handpicked and approved by Al Haramain, who welcomed the two 9/11 hijackers after Bayoumi brought them to San Diego.  Ex. 368, MPS43_152, 144 (Bayoumi letter to Mahmoud Doski).

REDACTED FOR PUBLIC FILING

# XII. AL QAEDA METICULOUSLY PLANNED FOR LOS ANGELES, CALIFORNIA AS THE ENTRY POINT INTO THE U.S. FOR ITS OPERATIVES NAWAF AL HAZMI AND KHALID AL MIHDHAR

998.     Al Qaeda carried out the 1998 Embassy bombings by utilizing "the resources of a potent local network in place for almost a decade." Ex. 81, CIA 0017-36 at 31 (Meticulous and Adaptable).

999.     Al Qaeda forged partnerships with other terror groups, including AIAI and Al Gama'a, to carry out terror attacks. Ex. 80, CIA 0001-16 at 02 (CIA Analytic Report, "How Bin Ladin Commands a Global Terrorist Network," January 27, 1999).

1000.   While working as a special agent for the FBI, Plaintiffs' expert Youssef's investigation of Sunni extremist cells in Los Angeles an00d San Diego, found that those cells brought together individuals from various groups and nationalities, including AIAI and Al Gama'a, who pledged allegiance to the same goal of an Islamic caliphate and worked together as an Islamic fundamentalist army targeting the U.S. as their primary enemy. Ex. 5, Youssef Rpt. 16 (Al Gama'a), 48 (AIAI).

1001.   Al Gama'a was led by the "Blind Sheikh" Omar Abdel-Rahman. Ex. 5, Youssef Rpt. 1-2.

1002.   In November 1997 Al Qaeda provided funding and tactical planning support to Al Gama'a to carry out the Luxor Attacks. Ex. 80, CIA 0001-16 at 03 (Bin Laden is the "linchpin for the operations of the Zawahiri faction of the Egyptian Islamic Jihad"). Terror plots in Canada and Jordan "attest[ed] to Bin Ladin's success in enlisting the aid of more loosely organized Sunni extremist networks." Ex. 81, CIA 0017-36 at 29 (Meticulous and Adaptable). The mid-1990s Masonic Lodge terror plot in Los Angeles was a joint Al Gama'a – Al Qaeda operation successfully thwarted by the FBI. Ex. 5, Youssef Rpt. 2, 22.

259

REDACTED FOR PUBLIC FILING

1003.   Prior to the 9/11 Attacks, a November 2000 CIA report found that Al Qaeda was highly adaptable to the requirements of each specific mission, and was "a highly skilled, resilient network with a wide range of methods of attack at its disposal."  Al Qaeda observed "sound operational practices, making use of meticulous contingency planning completed far in advance of an operation."  Ex. 81, CIA 0017-36 at 19 (CIA Analytic Report, "Bin Laden's Terrorist Operations: Meticulous and Adaptable," Nov. 2, 2000).

1004.   The 9/11 Commission sought to determine the genesis of the 9/11 Attacks based on interviews of Khalid Sheikh Mohamed and other detainees.  The Commission acknowledged that statements of Al Qaeda operatives and their supporters who were enemies of the U.S. could not be taken at face value and must be carefully evaluated and compared to other statements and evidence to determine the truth.  *See* 9/11 Commission Report at 146.

1005.   During questioning, Khalid Sheikh Mohammed ("KSM") was "protecting operatives in the United States" which "appeared to be a 'major part' of KSM's resistance efforts" and he carefully guarded his most important secrets by "withholding or lying about terrorist plots and operatives targeting the United States."  *See* 9/11 Commission Report at 514 n. 4, citing CIA report, Intelligence Community Terrorist Threat Assessment (IICT), "Khalid Shaykh Muhammed's Threat Reporting – Precious Truths, Surrounded by a Bodyguard of Lies," Apr. 3, 2003, 4 – 5; SSCI Committee Study at 93, under the heading *"After the Use of the CIA's Enhanced Interrogation Techniques Against KSM Ends, the CIA Continues to Assess That KSM is Withholding and Fabricating Information."*

1006.   Ramzi Yousef, who planned the 1993 World Trade Center bombing, was a nephew of Khalid Sheikh Mohamed and the two men were in close contact and operated as "freelance" terrorists. *See* 9/11 Commission Report at 59, 276. ("There were also rootless but

REDACTED FOR PUBLIC FILING

experienced operatives, such as Ramzi Yousef and Khalid Sheikh Mohammed, who—though not necessarily formal members of someone else's organization—were traveling around the world and joining in projects that were supported by or linked to Bin Ladin, the Blind Sheikh, or their associates."). Plaintiffs' expert Youssef determined "Khalid Sheikh Mohamed had direct lines of communication with Al Gama'a and other Sunni extremist groups and would have information about the Sunni extremist cells at the Ibn Taymiyah Mosque and the ICSD in San Diego." Ex. 5, Youssef Rpt. 18, 101-2.

1007. "[A] common thread r[an] between the first attack on the World Trade Center in February 1993 and the attacks on 11 September 2001" because Khalid Sheikh Mohamed "provided financial and logistic support for the 1993 operation" planned by his nephew. Ex. 82, CIA 0242-304 at 252.

1008. Al Qaeda had been considering various hijacking plots starting in 1996, and Khalid Sheikh Mohamed claimed that he and Osama Bin Laden discussed a plot to hijack planes and crash them into buildings that same year. *See* 9/11 Commission Report at 154, 491 n. 34, 35.

1009. In 1995, Ramzi Yousef was extradited to the U.S. for his role in the 1993 World Trade Center Bombing. Yousef's arrest reveals financial and logistical connections to Bin Laden, and Philippines authorities revealed Yousef's role in a plot to kill the Pope and to explode bombs on multiple U.S. airlines flying to the U.S from Asia (known as the "Bojinka" Plot). Ex. 419, Terry McDermott, "Early Scheme to Turn Jets Into Weapons," Los Angeles Times, June 24, 2002; Ex. 17, Philip, Shenon. "Broad Terror Campaign is Foiled by Fire in Kitchen, Officials Say." New York Times, Feb 12, 1995.

REDACTED FOR PUBLIC FILING

1010.  The 9/11 Plot was an adaptation of a component attack of the earlier "Bojinka" plot conceived by KSM and Ramzi Yousef in 1994 while in the Philippines. Ramzi Yousef, KSM's nephew, was behind the 1993 World Trade Center bombing. KSM divulged to U.S. interrogators after his capture in 2003 that Ramzi Yousef's successful attack on the World Trade Center inspired him to begin planning attacks against the United States.  Ex. 151, Winer Rpt. ¶ 6.6.6.6; *See* 9/11 Commission Report at 147-148.

1011.  In an interview by British journalist Robert Fisk in 1997, Bin Laden warned of future attacks against the U.S. Bin Laden admitted to having supported fighters in street battles with U.S. forces in Somalia. Bin Laden further claimed that he sent faxes to King Fahd and heads of Saudi government agencies informing them of his intent to pursue jihad against Americans and that some Saudi Royals agreed with his position to expel Americans from the Gulf.  Ex. 18, Fisk, Robert. "Muslim Leader Warns of a New Assault on U.S. Forces." The Independent, March 22, 1997.

1012.  On December 4, 1998, the Presidential Daily Brief to President Clinton stated that "Bin Ladin and his allies are preparing for attacks in the US, including an aircraft hijacking to obtain the release of [Shaikh Omar Abdul Rahman]...." a "senior Bin Ladin operative from Saudi Arabia" had plans to visit with his counterparts in the Al Gama'a organization tied to Rahman "to discuss options."  *See* 9/11 Commission Report at 129.

1013.  Khalid Sheikh Mohamed "provided inconsistent information about whether Bin Ladin first approved his proposal for what became the 9/11 attacks in late 1998 or in early 1999." *See* 9/11 Commission Report at 492 n. 38.

REDACTED FOR PUBLIC FILING

1014.    Bin Laden's final decision to proceed with the 9/11 plot devised by Khalid Sheikh Mohamed had been made before March 1999 or April 1999.  *See* 9/11 Commission Report at 154-55.

1015.    In early 1999, Osama Bin Laden directed Khallad Bin Attash to obtain a United States visa so that he could travel to the United States and obtain pilot training for the 9/11 Attacks.  Ex. 423, Charge Sheet, *United States v. Khalid Shaikh Mohammad, et. al.*, Referral dated 4 April 2012, at 2, ¶ 6.

1016.    On or about April 3, 1999, Khallad Bin Attash traveled to San'a, Yemen, and applied for a visa to travel to the United States but was denied. Ex. 423, Charge Sheet, *United States v. Khalid Shaikh Mohammad, et. al.*, Referral dated 4 April 2012, at 2, ¶ 7.

1017.    On or about April 3, 1999, Nawaf Al Hazmi applied for and obtained a visa at the U.S. Consulate in Jeddah, Saudi Arabia which listed Los Angeles, California as his intended point of visitation and address in the U.S.  Ex. 155, FBI 9/11 Hijacker Timeline at row 478.

1018.    On or about April 7, 1999, Khalid Al Mihdhar applied for and obtained a visa at the U.S. Consulate in Jeddah, Saudi Arabia which listed Los Angeles, California as his intended point of visitation and address om the U.S.  Ex. 155, FBI 9/11 Hijacker Timeline at row 483.

1019.    The close coordination carried out independently by Attash, Hazmi, and Mihdhar in applying for their visas demonstrates that at the time they were all acting on Osama Bin Laden's instructions to take the necessary steps to participate in what would become the 9/11 Attacks.

1020.    Of the selected hijackers, Hazmi and Mihdhar had the most established extremist credentials and had come into Al Qaeda's orbit as early as the mid-1990s.  Ex. 82, CIA 0242-304 at 253 ("The Plot and the Plotters").

REDACTED FOR PUBLIC FILING

1021. Mohamed Atta would be designated leader of the 9/11 Attacks, and Nawaf Al Hazmi would be designated as the deputy and second-in-command. Ex. 82, CIA 0242-304 at 262 ("The Plot and the Plotters" stating Atta was the "head" of the "council" in charge of the operation and al-Hazmi was his "deputy").

1022. Plaintiffs' expert Bassem Youssef applied his extensive FBI experience investigating Islamic terror groups to the evidence and concluded that the choice of Los Angeles, California, as the initial destination of 9/11 hijackers Hazmi and Mihdhar would only have been made by Al Qaeda after detailed planning and discussion. Al Qaeda and other Islamic terrorist groups, as Youssef explained, "conducted substantial research, sometimes over several years in advance of an attack" and "would place operatives in a location to carry out an attack before all details about the attack itself had been determined." Ex. 5, Youssef Rpt. 100-101.

1023. Youssef concluded that Al Qaeda and its planners would never have decided on Los Angeles and San Diego as "the destination for Hazmi and Mihdhar unless there was an entrenched, verified support structure in place to ensure that its operatives would not be discovered and had sufficient help to safely carry out their plans." Ex. 5, Youssef Rpt. 101.

As Youssef further explained:

> It is commonly known among counterterrorism and counterintelligence professionals that terrorist groups will deploy "advance teams" to a location to get the lay of the land in person before committing to send their operatives. The operatives themselves typically were not from the area where they planned to conduct their mission and needed assistance from persons on the ground familiar with the local area and customs.

Ex. 5, Youssef Rpt. 101.

1024. When Hazmi and Mihdhar travelled to Malaysia in January 2000, just prior to their arrival in California, they received lodging at an apartment and other support from members of an extremist network associated with the Jemaah Islamiah terrorist group. This "lodging and

REDACTED FOR PUBLIC FILING

travel assistance" in Malaysia for the hijackers was "precisely" analogous to the kind of support Hazmi and Mihdhar would likely have received in California.  *See* 9/11 Commission Report at 514 n. 5.

## XIII.  SAUDI GOVERNMENT OFFICIALS COORDINATED IN ADVANCE TO SEND MOIA PROPAGATORS TO SOUTHERN CALIFORNIA AS A TEST-RUN FOR AL QAEDA

1025.  Youssef found that "[t]he Ramadan 1419 (December 1998 – January 1999) visits of the MOIA Propagators Mutaeb Al Sudairy, Adel Al Sadhan, and Majed Al Mersal to California are a textbook example of an 'advance team.'" Ex. 5, Youssef Rpt. 101.

1026.  Based on his expert analysis of the evidence, Youssef determined the advance teams' assignment:

> …the MOIA propagators were assigned by their MOIA superiors to confirm the location where the hijackers would enter the U.S.; to scout out various places where the hijackers would ultimately live in California; and meet with the persons who would be responsible for the hijackers.  In Los Angeles, they visited Thumairy, the King Fahad Mosque, and Ibn Taymiyah Mosque; and in San Diego, they visited Bayoumi, the Masjid Madina, the Islamic Center of San Diego, the Al Ribat Mosque (where Anwar al Aulaqi was the Imam), and the home of Abdussattar Shaikh, where Bayoumi sent the hijackers to live after they left his apartment complex.

Ex. 5, Youssef Rpt. 101-102.

1027.  As discussed above, Khalid Sheikh Mohamed communicated directly with Al Gama'a and other Sunni extremist groups and would know about the Sunni extremist cells at the Ibn Taymiyah Mosque and the ICSD in San Diego. Ex. 5, Youssef Rpt. 101.

### A.  Bayoumi coordinated with the Saudi Embassy, Saudi Consulate, Thumairy, and Aulaqi to plan for the visit of the two MOIA propagators.

1028.  FBI documents first disclosed in the EO production show that Sadhan and Sudairy arrived in the U.S. on December 15, 1998.  Ex. 2, EO 0629.

REDACTED FOR PUBLIC FILING

1029.   Bayoumi's available phone records together with his correspondence show that, in advance of the arrival of Sadhan and Sudairy, Bayoumi made a series of calls with Saudi government officials related to the Al Madinah Mosque and the preparations for the visits of the MOIA propagators to Southern California.  Ex. 5, Youssef Rpt. 103.

1030.   On November 5, 1998, Bayoumi had a 10-minute call with Saad Al Habib, who organized the funding for the Al Madinah Mosque and a second call from Bayoumi to Habib for 19 minutes on November 30, and a third time for 9 minutes on December 19, immediately after MOIA propagators Sadhan and Sudairy arrived in San Diego.  Ex. 5, Youssef Rpt. 103; Ex. 12Y (Bayoumi calls to Saad Al Habib).

1031.   Between Bayoumi's calls to Habib, and before the hijackers arrived, he placed 24 calls to the Saudi Embassy in Washington, D.C. including 9 calls to the Embassy's Islamic Affairs number for a total of 61 minutes.  During this same period, Bayoumi also placed 4 calls to the Saudi Consulate in Los Angeles for a total of 33 minutes. Ex. 12K (Bayoumi calls to Saudi Embassy); Ex. 12L (Bayoumi calls to Saudi Consulate).

1032.   Bayoumi correspondence recovered by the MPS shows that in January 1999 he sent three separate letters to Thumairy, Embassy Islamic Affairs Department Head Ghesheyan, and Embassy MOIA Office Head Sowailem that lauded their "coordination" and "advance coordination" to help arrange the visits of the MOIA propagators.  Ex. 411, MPS 43_314 (January 28, 1999 letter to Ghesheyan); Ex. 413, MPS 43_338 (January 28, 1999 letter to Sowailem); Ex. 678D, MPS 43_336 (undated letter to Thumairy likely sent at same time).  These documents were not produced by Saudi Arabia.

1033.   Bayoumi stated that he coordinated with Thumairy in advance of the December 1998-January 1999 MOIA propagator visit.  Ex. 120, Bayoumi Dep. 271:10-274:22 (Bayoumi

REDACTED FOR PUBLIC FILING

testified that Thumairy was "part of the group that got us a Hatip or somebody to preach during the month of Ramadan").

1034.   On November 15, 1998, Bayoumi expressed the Al Madinah Mosque's "urgent need of a propagator" in a letter "To Whom it May Concern." This letter is likely in response to the October 27, 1998 letter of MOIA Deputy Minister Tawfiq Al Sudairy to MOIA's Embassy Director Sowailem asking that requests for propagator assignments be sent to his office. Ex. 219, KSA 7595 (Tawfiq Al Sudairy's letter).  Bayoumi's letter cited the fact that another MOIA propagator visited the Mosque in September 1998, stating that "brother Awad al-Harbi was here in town two months ago" and "has the knowledge of the lessons and preachings needed by the community…." Ex. 396, MPS 43_335 (Bayoumi letter). Bayoumi also wrote to Al Harbi on the same date, in a letter confirming that Harbi was at the Masjid Al Madinah and the Masjid Al Ribat during his visit. Ex. 369, MPS 43_309.

1035.   Awad Al Harbi is listed in Bayoumi's handwritten address book with landline and cellphone numbers in Saudi Arabia.  Ex. 12AA, MPS738_37; *See also* Ex. 2, EO 2114.

1036.   The EO production revealed that on November 20, 1998, Bayoumi obtained a new cell phone with the phone number ███-6662. Ex. 2, EO 2749.  The FBI found that the 6662 number "was subscribed to by MANAL A. BAGADER [Bayoumi's wife], and used by her spouse, hijackers-associate OMAR AL-BAYOUMI, from 11/20/1998 to 03/09/2001….although tolls were only available through 9/20/2000."  Ex. 2, EO 2798.

1037.   The FBI states that they performed a "target-to-target phone analysis…for the Yemeni/Saudi support cell in San Diego, with particular emphasis on phone connectivity involving the number ███-6662."  Ex. 2, EO 2798.  To date, despite multiple requests from

267

REDACTED FOR PUBLIC FILING

the Plaintiffs, the FBI has not produced the records of the calls. Plaintiffs have served a

subpoena on the FBI to produce the records of calls made from the -6662 number.

1038. On November 20, 1998, the first day that Bayoumi obtained his new cell phone,

he placed a call to Anwar Aulaqi. Ex. 2, EO 2759. The two visiting propagators, Sadhan and

Sudairy, would later go to Aulaqi's Al Ribat Mosque during their month in San Diego,

evidencing that Bayoumi was likely communicating without Aulaqi about their imminent arrival.

Ex. 5, Youssef Rpt. 108-109 (discussing Sadhan and Sudairy being shepherded to Bayoumi and

going to the Al Ribat Mosque).

1039. In November 1998, Bayoumi arranged for the Saudi Embassy in Washington,

D.C. to provide direct financial assistance to the Al Madinah Mosque. On November 25, 1998,

Embassy Islamic Affairs Department Head Majed Al Ghesheyan wrote a letter to Bayoumi with

a $5,000 check for the Mosque. Ex. 404, MPS 43_382. Saudi Arabia did not produce any of

these documents in its production.

1040. The receipt for the funds was signed by Ghazi M. Ahmad, the Finance Director

for the Al Madinah Mosque. Ex. 403, MPS 43_376-379.

1041. █████████'s business card was among the items seized from Bayoumi's office

at the Al Madinah Mosque and it lists his telephone number in Chula Vista, CA as ██-2080.

Ex. 679I, FBI 4528.

1042. Bayoumi called the phone number on ████████'s card on November 17,

1998 at 3:26 p.m. (2 mins.) and 3:40 p.m. (3 mins.) and again on January 2, 1999 at 11:11 a.m.

(1 min.) Ex. 503, FBI 1532; Ex. 679L, at 9125.

1043. As a condition for receipt of the funds, the Embassy's Islamic Affairs Department

required the Al-Madinah Mosque to complete an "Information Form" which asked about the

REDACTED FOR PUBLIC FILING

Mosque's "activities" and for "Administrative Data" which included a list of the Board Members of the Mosque. Bayoumi collected the information, including the names, titles, and citizenship of eight Mosque leaders, and sent it to "Saleh" at the Embassy. Ex. 403, MPS43_376-379 (Saudi Embassy receipt and forms); Ex. 375, MPS43_381-380 (Bayoumi letter to Al Saleh).

1044. Three of the Mosque leaders whose names were provided to the Saudi Embassy – Ghazi Ahmad, Hussein Al-Hilali and Omar Al-Barzanji – were invited by Bayoumi to the welcome party for 9/11 hijackers Hazmi and Mihdhar that Bayoumi hosted in February 2000. Ex. 10K MPS2023-059 Video Exhibit and 10K-TR Video Transcript, at 17:25, 17:14, 17:37.

1045. The $5,000 contribution by the Embassy provided "seed money" for the Mosque that led to additional contributions to be made to the Mosque. Ex. 371, MPS 43_320 (on November 24, 1998, Bayoumi sends wire instructions to Saudi Ministry of Finance Director Hamdan for a donation of nearly $25,000); Ex. 678C, MPS 43_138-9 at 139 (after Embassy contribution, Bayoumi arranged a check through Thumairy for 10,000 Saudi Riyals, and a check from Hamdan for $20,000).

1046. Bayoumi correspondence recovered by the MPS shows that on November 30, 1998, Bayoumi wrote to Consul General Mohamed al Salloum at the Saudi Consulate in Los Angeles describing the establishment of the Al Madinah Mosque and stating that "[w]e recognize the major role played by the [Saudi] government…." Ex. 412, MPS 43_337. This document was not produced by Saudi Arabia.

1047. Bayoumi made a series of calls immediately prior to the arrival of the two MOIA propagators: he called the Saudi Consulate on December 9, 1999 at 2:29pm for 7 minutes and then sent a fax to the King Fahad Mosque at 2:37pm. FBI 1537.

REDACTED FOR PUBLIC FILING

1048.   On December 14, 1998, the day before the arrival of Sadhan and Sudairy, Bayoumi called the Embassy Islamic Affairs number for 32 minutes at 12:55pm and then made two calls at 1:27pm (1 min.) and 1:30pm (2 mins.) to the ▮▮▮▮-1250, the number Bayoumi listed in his handwritten address book for Fahad Al Thumairy in Los Angeles, where Sadhan and Sudairy would arrive the next day.  FBI 1537; Ex. 12AA, MPS738_35.

## XIV.   MOIA SENT AN ADVANCE TEAM OF PROPAGATORS SUDAIRY AND SADHAN TO CALIFORNIA TO EVALUATE AND PREPARE THE SAUDI EXTREMIST NETWORK FOR AL QAEDA OPERATIVES

### A. Saudi Agents Sudairy and Sadhan were Sunni extremists chosen for their California assignment by MOIA's leadership and Al Haramain.

1049.   MOIA Deputy Minister Tawfiq Al Sudairy, the brother of Mutaeb Al Sudairy, was in charge of MOIA's Ramadan program and assigned MOIA propagators to travel to the U.S. for Ramadan 1419 (starting December 20, 1998) and Ramadan 1420 (starting December 9, 1999).  Ex. 119, Sudairy Dep. 14:4-14; Ex. 141, KSA 9538 (Tawfiq Al Sudairy signed letter as the "supervisor" of the MOIA's Ramadan 1420 program); Ex. 219, KSA 7595; Ex. 680Q, KSA 7597 (Tawfiq Al Sudairy letter to Sowailem coordinating plans for Ramadan 1419 program).  Saudi Arabia produced MOIA's list of assignments made by Tawfiq Al Sudairy for Ramadan 1420 – but not for Ramadan 1419.  Ex.221, KSA7805-08, Ex. 417 (telegram to Saudi Embassies with MOIA's Ramadan 1420 assignments).

1050.   MOIA Deputy Minister Tawfiq Al Sudairy was a Board member of SDGT organization Al Haramain. Ex. 39B Al Haramain Website, p. 5 (Exhibit 0477, Ash-Sheikh); Ex. 123, Ash-Shaikh Dep. 154:18-155:8 (MOIA's Minister claims that "[b]eing a deputy minister [of MOIA]" meant Tawfiq Al Sudairy was on the "prospective" board of directors of Al Haramain).

REDACTED FOR PUBLIC FILING

1051.   Beginning in 1998, the United States raised Al Haramain's involvement in terrorist financing with the Saudi government repeatedly, in different forms and through different channels. Ex. 7, 9/11 Commission's Terrorist Financing Monograph at 12.

1052.   Tawfiq and Mutaeb Al Sudairy both worked in the same MOIA building and Mutaeb had previously been assigned by his brother Tawfiq to a Ramadan assignment in London for Ramadan 1418.  Nevertheless, Mutaeb Al Sudairy claimed he did not know that his brother Tawfiq oversaw the Ramadan program or played any role in his assignment to California, or if his brother previously had an affiliation with Al Haramain.  Ex. 119, Sudairy Dep. 39:8-19 (assignment to London), 59:4-17 (assignment in 1419), 335:13-336:4 ("I don't know anything" about Tawfiq Sudairy's relationship with Al Haramain).

1053.   Sudairy was the nephew of MOIA Minister Abdullah bin Turki. Ex. 2, EO 0789.

1054.   Mutaeb Al Sudairy also taught Sharia courses for Al Haramain in the United States and Canada, according to a May 2001 list published in Saudi Arabia by Middle East news website Al Jazirah. Despite the evidence in the Saudi press document, Sudairy flatly denied involvement in Al Haramain at his deposition.  Ex. 45, Al Jazirah news article (Sudairy Ex. 532), Ex. 119, Sudairy Dep. 328:17-334:14.

1055.   As a result of this close relationship, MOIA's decision to send Sudairy and Sadhan to Bayoumi's Al Madinah Mosque was likely coordinated with Al Haramain.  MOIA's senior leadership supervised Al Haramain and appointed all its senior officials, including Tawfiq Sudairy, who sent Sadhan and Sudairy to California.  Ex. 2, EO 3435.

1056.   In August and September 1998 Bayoumi's letters to Saudi investor Saad Al Habib discussed how Bayoumi negotiated for Al Haramain to provide an Imam for the Mosque during Ramadan.  Ex. 487, FBI 001349-52 at 1349 ("if the Imam [from Al Haramain] is going to come

REDACTED FOR PUBLIC FILING

every now and then, like in the month of Ramadhan and on some holidays to hold some lessons, then there is no disagreement on that"); Ex 409, MPS43_224-221 at 223 (confirming "as I have mentioned to you before, it is fine" for Al Haramain to send an Imam "every now and then").

1057.   Thus, Sadhan and Sudairy were sent to San Diego at the first Ramadan after Al Haramain controlled the mosque. Ex. 5, Youssef Rpt. 105.

1058.   Bayoumi was in constant contact with Habib as the plans to send Sadhan and Sudairy materialized and was also in contact upon their arrival in San Diego. *See supra* ¶¶ 945, 950, 1030, 1056.

1059.   Bayoumi arranged for Saudi government employee, Sunni extremist leader, and Al Haramain operative Omar Hamerman to travel from Saudi Arabia to San Diego on January 3, 1999 (two weeks before the end of Ramadan 1419) to meet with the visiting MOIA propagators Sudairy and Sadhan. ███████████████████████████████████████████ ███████████████████████████ Ex. 120, Bayoumi Dep. 277:20-278:5 (Bayoumi confirms Hamerman was "with us" at the Mosque when Sudairy and Sadhan were there); Ex. 11, MPS 726_149 (photo 302, 305, showing Bayoumi with Hamerman and Sadhan).

1060.   MOIA's policy for its Ramadan program was to send only one propagator to a particular mosque for Ramadan.  Ex. 221, KSA 7805-08.  Contrary to protocol, MOIA sent both Sadhan and Sudairy to California.  Sudairy claimed that this was because he found the program "extremely exhausting" and made a special request for Sadhan to accompany him to California. Ex. 119, Sudairy Dep. 80:9-83:17. No documents were produced by Saudi Arabia regarding Sadhan and Sudairy's assignment.

REDACTED FOR PUBLIC FILING

1061.  Bassem Youssef stated that he was familiar with Ramadan evening prayers and that leading those prayers did not involve difficult or "exhausting" work.  Ex. 5, Youssef Rpt. 106.

1062.  Like Jarrah and Thumairy, Adel Al Sadhan and Mutaeb Al Sudairy graduated from Imam Mohamed University and were recruited to work at MOIA. Ex. 337, Sudairy CV; Ex. 99, Sadhan Dep. 23:14-24:6, 46:16-47:1; Ex. 119, Sudairy Dep. 58:6-59:3.

1063.  FBI investigators concluded that Sudairy and Sadhan had a "nexus to al-Qa'ida" Ex. 2, EO 0585, and that Sadhan was "a believer in a radical form of Sunni Salafiyism." Ex. 2, EO 3511.

1064.  Sudairy lived with Al Qaeda agent Ziyad Khaleel in Missouri for four months in 2000, when Sudairy was supposed to be working at the Saudi Embassy in Washington.  Ex. 2, EO 0599.

1065.  Sudairy and Khaleel opened a joint Post Office box together in Columbia, Missouri. Ex. 2, EO 3509.  Sudairy met again with Al Qaeda agent Khaleel after 9/11 on two occasions in Saudi Arabia, where Khaleel resided after leaving the U.S. Ex. 2, EO 0599 ("Following Al Sudairy's return to Saudi Arabia in 2001 he met with Khaleel twice."). Sudairy's association with Ziyad Khaleel is significant because, while in Missouri, Khaleel purchased the satellite phone equipment and the phone minutes used by Osama Bin Laden to coordinate and carry out Al Qaeda's attacks against the United States.  Ex. 5, Youssef Rpt. 104-5; Ex. 420, US v. bin Laden Ex. 592 (showing Khaleel's address in Columbia, Missouri when he purchased the phone for Bin Laden); Ex. 689, U.S. v. Osama Bin Laden, S(7) 98 Cr. 1023, (S.D.N.Y), May 1, 2001, Tr. at 5290:3 – 5292:20.

REDACTED FOR PUBLIC FILING

1066. Khaleel also "managed wire transfers from IARA [the Islamic American Relief Agency] to a [sic] bank accounts controlled by UBL [Osama Bin Laden]." Ex. 566, FBI 11764.

1067. Until 1999, the Islamic American Relief Agency was known as the Islamic African Relief Agency. According to the U.S. Treasury Department, the "U.S.-based branch" of the organization "is located in Columbia, Missouri, and was founded in 1985 as the 'Islamic African Relief Agency, United States Affiliate.' In 1999, the charity substituted 'American' for 'African' in its name." Ex. 5, Youssef Rpt. 104, n. 426.

1068. The U.S. Treasury designated IARA in October 2004 for its support of terrorism prior to the 9/11 Attacks, and specifically for supporting Al Qaeda, Osama Bin Laden, and AIAI, which MOIA propagator Omar Abdi Mohamed led in the U.S. Ex. 5, Youssef Rpt. 104; Ex. 19C, https://home.treasury.gov/news/press-release/js2025 (last accessed November 22, 2023).

1069. Prior to the 9/11 Attacks, IARA's Los Angeles office listed phone number (███) ███-1250 as one of its office numbers. Ex. 5, Youssef Rpt. 104, n. 428.

1070. That phone number ████████-1250 was listed in Bayoumi's handwritten address book and his January and October 2000 phone lists alternatively as the number for the Ibn Taymiyah Mosque, Fahad Al Thumairy, and the King Fahad Mosque. Ex. 12AA, MPS738_35 (Bayoumi handwritten address book); Ex.12BB, MPS 688_9 (Bayoumi "green folder" including January 2000 phone list) and Ex. 421, FBI 348 (Bayoumi October 2000 phone list), both showing "Masjid Al Malik Fahad", *i.e.* the King Fahad Mosque.

1071. One FBI report states that Sudairy "attended [an] intensive English program" but that "faculty members were suspicious of him since he didn't appear interested in learning English and his peers believed that he was a Saudi Arabian intelligence agency officer." EO 0632. Two of Sudairy's teachers in Columbia, Missouri testified that Sudairy did not regularly

REDACTED FOR PUBLIC FILING

attend classes and left for weeks at a time and acted so suspiciously that they called the FBI. Ex.

77, Chmielewski Decl. 2-3.

    **B. Sadhan and Sudairy are hosted by Thumairy and Bayoumi and went to the locations where the hijackers ultimately lived in California and met the persons who were responsible for them.**

    1072. Sadhan and Sudairy used their special Saudi government work passports to enter

the U.S. Ex. 99, Sadhan Dep. 60:10-11; Ex. 119, Sudairy Dep. 181:21-23.

    **C. Sadhan and Sudairy hold a prearranged meeting with Thumairy and see the new King Fahad Mosque in Los Angeles, where the 9/11 hijackers will be received.**

    1073. Sadhan and Sudairy had advance arrangements to meet with Thumairy upon their

arrival in the U.S. The FBI recorded that on his I-94 immigration form to enter the U.S., Sadhan

listed Fahad Al Thumairy's phone number as his contact inside the U.S. Ex. 2, EO 0629.

    1074. Before this documentary evidence was produced, Sudairy and Sadhan both falsely

claimed they had not planned to meet Thumairy.

    1075. Sadhan claimed that they arrived in Los Angeles and he "wanted to visit the King

Fahad Mosque." When asked why, Sadhan said he "[j]ust felt like it" but had "[n]o" reason to

visit the Mosque. When asked what he had heard about the Mosque he claimed "[n]othing." Ex.

99, Sadhan Dep. 59:2-14.

    1076. The King Fahad Mosque was closed when Sadhan and Sudairy arrived, so they

next went to the Ibn Taymiyah Mosque. Ex. 99, Sadhan Dep. 59:15-22. Sadhan could not recall

how they found the Ibn Taymiyah Mosque. Ex. 99, Sadhan Dep. 55:9-17 (went to Ibn

Taymiyah); Ex. 99, Sadhan Dep. 62:8-24 (Sadhan and Sudairy took a taxi but don't remember

where). Sadhan claimed that he met Thumairy "[a]ccidentally . . . during one prayer." Ex. 99,

REDACTED FOR PUBLIC FILING

Sadhan Dep. 151:15-19. After prayer, the three men had dinner together. Ex. 99, Sadhan Dep.

66:2-5; Ex. 119, Sudairy Dep. 100:21-104:13, 105:8-21.

1077. Thumairy claimed to have no recollection of Sadhan or Sudairy, even though

documents, phone calls, and Bayoumi's testimony show that Thumairy coordinated with

Bayoumi and the Embassy concerning the two propagators and hosted them in Los Angeles. Ex.

107, Thumairy Dep. 301:7-18 (asked about the visit of Sadhan and Sudairy, Thumairy stated "I

don't remember, and I don't know them").

1078. Sadhan acknowledged that Fahad Al Thumairy was a "known name" within

MOIA, and Sadhan had learned about Thumairy from his immediate supervisor, Saud Al

Ghudaian, and Ghudaian's superior, MOIA Deputy Minister Abdulaziz Ammar. Ex. 99, Sadhan

Dep. 154:20-155:24. Sadhan confirmed that Ammar was the "boss of my boss [Ghudaian]." Ex.

99, Sadhan Dep. 155:21-24.

1079. Sadhan and Sudairy's testimony regarding their time in Los Angeles is not

credible given their admitted inability so speak English while they traveled in the United States.

Sadhan claimed they took "[p]ublic" transportation such as "[b]uses," which he also claimed

they used "many times…" to get around Los Angeles. He also claimed they took a taxi but could

not remember where they travelled by either bus or taxi. Sadhan and Sudairy also found a motel

(which they could not identify) and located the King Fahad Mosque, the Ibn Taymiyah Mosque,

and the Saudi Consulate, without any help. Ex. 99, Sadhan Dep. 62:8-63:3, 66:9-70:13, 99:10:16

(stayed in motel).

1080. Because the Kingdom did not produce documents about Sadhan and Sudairy or

their assignment by MOIA to visit California, and the FBI did not produce the information that

Sadhan's I-94 form listed Thumairy's phone number until the EO production, Plaintiffs did not

REDACTED FOR PUBLIC FILING

have an opportunity to properly question Sadhan and Sudairy about their advance plans to meet with Thumairy.

1081.   Plaintiffs' expert Youssef concluded, based on his knowledge of Saudi Government operations, that Sadhan and Sudairy were instructed to meet "with Thumairy immediately upon their arrival in Los Angeles to discuss their mission." Ex. 5, Youssef Rpt. 107.

1082.   As MOIA's lead official in California, Thumairy "would have been informed in advance that two MOIA Propagators were assigned to work in Thumairy's area of responsibility." Ex. 5, Youssef Rpt. 107.  In arriving at this conclusion, Plaintiffs' expert Youssef reasoned that "Sudairy and Sadhan flew directly to Los Angeles, rather than San Diego, …and the first person they met upon arrival in California was Thumairy." *Id*. The record of Sadhan's I-94 immigration form, as well as Bayoumi's photographs and videos of the two men in San Diego discussed below, confirm Youssef's opinion.

1083.   Sadhan's and Sudairy's false testimony that they met Thumairy by accident, in light of the I-94 record and the evidence of the coordination among Bayoumi, Thumairy, Sowailem, and the Islamic Affairs Department in advance of their visit, evidences their attempt to conceal the purpose of their trip.

   **D.  Thumairy, Bayoumi, the Saudi Embassy, and the Saudi Consulate coordinated to move Sadhan and Sudairy from Los Angeles to San Diego, in preparation to do the same for the 9/11 hijackers.**

1084.   Bayoumi's phone usage after the arrival of Sadhan and Sudairy demonstrates the "advance coordination" that he described in his correspondence with Thumairy, and with the Saudi Embassy's most senior religious officials.

REDACTED FOR PUBLIC FILING

1085.   On December 16, 1998, the day after the arrival of Sadhan and Sudairy, Bayoumi made two calls to the Saudi Consulate at 3:23pm (2 mins.) and 3:26pm (6 mins.).   Ex. 12L (Bayoumi calls to Saudi Consulate).

1086.   Both Sadhan and Sudairy stated they went to the Consulate that day, and it is likely that Bayoumi called the Consulate to speak with them or to a Consulate official about their arrival.  Ex. 119, Sudairy Dep. 120:13-121:9; Ex. 99, Sadhan Dep. 59:23-60:2.

1087.   Later that same day, at 7:27pm (1 min), Bayoumi placed a call from his Mosque phone to Thumairy's home phone.  This is the first known phone contact between Bayoumi and Thumairy.  Ex. 12B (Calls between Bayoumi and Thumairy); Ex. 12K (Bayoumi calls to Saudi Embassy).

1088.   Sudairy claimed that he and Sadhan stayed in Los Angeles for "A few days. Exactly how many, I don't remember."  Ex. 119, Sudairy Dep. 99:11-14.  Sadhan said it was "about two days" and they did "nothing." Ex. 99, Sadhan Dep. 60:12-19.

1089.   On December 18, 1998 at 11:34am, a call was placed from Bayoumi's Mosque Office phone to the Saudi Embassy Islamic Affairs number (15 mins.). Ex. 12K (Bayoumi calls to Saudi Embassy). Bayoumi would have spoken to either Islamic Affairs Department Deputy Jarrah or MOIA Office Head Sowailem.

1090.   Both Sadhan and Sudairy stated that they spoke with Sowailem about going to San Diego.  Ex. 99, Sadhan Dep. 74:7-13; Ex. 119, Sudairy Dep. 64:17-65:11.

1091.   Bayoumi was in contact with Jarrah about the Al Madinah Mosque at this time, and he had just secured funding for the Mosque from the Saudi Embassy through the Islamic Affairs Department. Ex. 5, Youssef Rpt. 92 ("He spoke to and wrote Musaed al Jarrah, the

REDACTED FOR PUBLIC FILING

Deputy who was running the Embassy's Islamic Affairs Department."); Ex. 12K (Bayoumi calls to Saudi Embassy).

1092. Bayoumi placed calls to phone numbers in Saudi Arabia for Sadhan's family home on December 19, 1998, at 5:39pm (1 min.) and to Sudairy's family home at 5:46pm (2 mins.), evidencing Sadhan and Sudairy's afternoon arrival. The first call was placed to the same number that Bayoumi entered in his handwritten address book for Adel Al Sadhan in Saudi Arabia ▮▮▮▮▮2849). Ex. 12AA, MPS738_24R. That same number is also in Bayoumi's January and October 2000 phone lists. Ex. 12BB, MPS 688_9 (January 2000) and Ex. 421, FBI 345 (October 2000), both showing "Adel Assduhan [sic].". Youssef identified this number from a 1998 copy of a Riyadh phone book that he obtained when he was in Saudi Arabia working as FBI Legal Attache. Ex. 44 (Riyadh Telephone Directory) (Sadhan Dep. Ex. 494); Ex. 5, Youssef Rpt. 102, n. 416. According to that Riyadh phone book, the number is subscribed to Mohamed Abdelrahman Mohamed Al Sadhan, whom Sadhan acknowledged was his father. Ex. 99, Sadhan Dep. 177:9-14.

1093. The arrival date of December 19, 1998, is also supported by the fact that the month of Ramadan started the next day, December 20, and that when asked if he "met [Bayoumi] before Ramadan had started" Sudairy answered: "Yes, about." Ex. 119, Sudairy Dep. 143:19-23.

1094. Significantly, at 2:20pm on December 19, 1998, Bayoumi placed a call from Mosque office phone to Saad Al Habib (9 mins.) in Saudi Arabia. Ex. 5, Youssef Rpt. 103. Thus, Habib was in the chain of information about the two visiting propagators and while he coordinated with Bayoumi about Hamerman's visit to San Diego of Hamerman, who would occur 2 weeks later.

279

1095.   Sadhan claimed that he and Sudairy were taken from Los Angeles to a hotel in San Diego by a car provided by "one of the community members".  Ex. 99, Sadhan Dep. 73:5-74:13, 87:23-88:12.

1096.   Sudairy claimed he didn't know that they would be assigned to the Al Madinah Mosque until a day or two after he arrived in San Diego.  Ex. 119, Sudairy Dep. 83:23-84:18. Sudairy said that he and Sadhan were driven from Los Angeles to San Diego and told to call MOIA's Embassy Office upon arrival for further instructions. Ex. 119, Sudairy Dep. 85:12-86:17. When they arrived, they called the MOIA Office. Ex. 119, Sudairy Dep. 89:17-23. Sudairy claimed that "[a] day or two after" their arrival, they were contacted by someone from the Kurdish community from the Al Madinah Mosque to pick them up and bring them to the Mosque.  According to Sudairy, that was the first time he knew he was going to the Al Madinah Mosque.  Ex. 119, Sudairy Dep. 86:4-17, 127:15-18, 129:10-17, 139:19-140:7.

1097.   Sadhan claimed that he had "no contact" with Bayoumi while in San Diego, "except saying hello after the prayer…." and then testified "I don't remember him [Bayoumi] clearly"; "I don't know his name except from the news only…"; and that "I don't know the man [Bayoumi]." Ex. 99, Sadhan Dep. 90:4-91:20, 186:17-187:7.  When asked if he had a plan to meet someone at the Mosque when he first went there, Sadhan testified: "I don't remember." Ex. 99, Sadhan Dep. 90:9-12.

1098.   Sudairy recalled meeting Bayoumi at the Mosque but could not recall seeing him anywhere other than the Mosque.  Ex. 119, Sudairy Dep. 139:19-140:7, 148:1-149:17.

1099.   Plaintiffs' expert Youssef concluded, based on his expertise, that the "visiting MOIA propagators Sadhan and Sudairy were shepherded from their visit with Thumairy in Los

280

REDACTED FOR PUBLIC FILING

Angeles directly to their host in San Diego, Omar al Bayoumi," and that Sadhan and Sudairy knew that Omar Al Bayoumi was their host in San Diego. Ex. 5, Youssef Rpt. 108.

1100.  This was reaffirmed by the MPS production, which contains a photograph found in Bayoumi's possession of Bayoumi and Sudairy in the lobby of the hotel where Bayoumi arranged for Sadhan and Sudairy to stay upon their arrival in San Diego, with travel brochures on a stand and an elevator. There is a date stamp on the photo of '21 12 98 – December 21, 1998.' As explained below, a later photo recovered by the MPS from Bayoumi taken at the Eid Al Fitr service on January 19, 1999 after the end of Ramadan shows the camera date stamp is accurate. Ex. 11D (MPS726 Photo Exhibit).

1101.  A second photo in Bayoumi's possession shows Bayoumi with Sudairy at an observation deck overlooking San Diego harbor. This photo has the same date stamp of 21 12 98 and was taken on the same day. Ex. 11D (MPS726 Photo Exhibit).

1102.  Contrary to the testimony of Sadhan and Sudairy, and contrary to Bayoumi's claims that he could not recall where he first saw Sadhan and Sudairy or where they stayed in San Diego, the photos obtained by the MPS evidence that Bayoumi was acting as host for the two MOIA propagators in San Diego. Ex. 120, Bayoumi Dep. 230:24-231:3, 231:11-17 (when asked "[w]here did Sadhan and Sudairy stay when they were in San Diego?" Bayoumi claimed: "I don't remember. I don't remember.").

### E. Bayoumi brings Sadhan and Sudairy to stay at the Lemon Grove rooming house of Dr. Abdussattar Shaikh, the future safe house for three 9/11 hijackers.

1103.  Shortly after their arrival, Bayoumi arranged for Sadhan and Sudairy to stay at the small rooming house of Dr. Abdussattar Shaikh on ███████████. in Lemon Grove, CA. Dr. Shaikh told the FBI that it was Bayoumi who introduced Sadhan and Sudairy to him. Ex. 537, FBI 7339. The rooming house in Lemon Grove was located on a back flag lot accessible by

281

REDACTED FOR PUBLIC FILING

a driveway off a residential street and was 7.5 miles away from the Al Madinah Mosque at ███

██████████. in El Cajon, CA. Ex. 694, Youssef Decl. ¶ 42.

1104.   Bayoumi knew Dr. Abdussattar Shaikh, had him for dinner at his home, and kept

Dr. Shaikh's phone numbers in his handwritten address book.  Ex. 120, Bayoumi Dep. 230:14-

18; Ex. 12AA, MPS738_61 ("Dr. Abdussattar" with number "███8808").

1105.   The FBI found a note in Bayoumi's Mosque office that Bayoumi prepared for

Sadhan and Sudairy when they were sent to stay at Abdussattar Shaikh's house. The note had

Bayoumi's business card as "General Supervisor" of the Mosque attached by tape, and included

other information handwritten by Bayoumi in Arabic, including Dr. Shaikh's address and phone

number, as well as information for the San Diego mosques visited by Sadhan and Sudairy.  Ex.

574, FBI 004273.

1106.   Bayoumi claimed that this note was taped up at the Al Madinah Mosque as

contact information in the event of an "extreme emergency."  Ex. 120, Bayoumi Dep. 512:9-

514:3.

1107.   Bayoumi's explanation is nonsensical, as there is no reason to provide Shaikh's

home phone number to the Al Madinah Mosque community, and the information was in Arabic,

which was not the language used by the Mosque's congregation. Ex 410, MPS43_225-225 at 225

(Bayoumi letter states "99% of the worshippers are Kurds, most of whom don't know the Arabic

language"); and Ex 409, MPS43_224-221 at 223 (Bayoumi letter states that it "doesn't make

sense" for Al Haramain to provide a full-time Saudi, Arabic-speaking Imam "who does not

speak the language of the people").

1108.   Bayoumi later arranged for hijackers Hazmi and Mihdhar to stay at Abdussattar

Shaikh's house, just as he did for Sadhan and Sudairy, as shown by the note in the hijackers'

REDACTED FOR PUBLIC FILING

lease records written by Bayoumi that listed Shaikh's address and phone number as the forwarding contact information for the hijackers.  Ex. 91, Ratchford Decl. ¶ 17; Ex 551, FBI 8059.

1109.   The two MOIA propagators stayed at Abdussattar Shaikh's house for about four weeks during December 1998-January 1999. Ex. 99, Sadhan Dep. 100:6-101:5 (Sadhan recalls they stayed with Dr. Shaikh for "28 or 29 days.").

1110.   Sudairy recalled that he met Abdussattar Shaikh at the Al Madinah Mosque but could not remember if Bayoumi introduced him to Shaikh.  Sadhan claimed that he and Sudairy met Shaikh by chance at the Mosque and told Shaikh they wanted to leave their motel to which Shaikh offered a place for them to stay at his home for no cost. Ex. 119, Sudairy Dep. 170:8-16; Ex. 99, Sadhan Dep. 99:2-101:5.

1111.   Sadhan and Sudairy's story is not credible. Dr. Abdussattar Shaikh did not regularly attend the Al Madinah Mosque in El Cajon, CA.  Rather, he founded, ran, and lived nearby the Uthman Mosque over seven miles away in Lemon Grove, CA.  Bayoumi testified that Dr. Shaikh "has the Masjid Uthman bin Affan" and when asked "Did he [Abdussattar Shaikh] attend the Masjid Madina?" Bayoumi responded: "Rarely. Rarely that I would see him there.". Ex. 120, Bayoumi Dep. 241:14-22.

### F.  Dr. Shaikh was hired to perform tasks for the Saudi government.

1112.   As described below, Bayoumi worked with Dr. Shaikh to provide secure lodging for individuals in San Diego for the Saudi government.

1113.   The FBI reported that "Abdusattar Shaikh was a Saudiphile who strived to be included in Arabian society."  Ex. 2, EO 0727.

REDACTED FOR PUBLIC FILING

1114.   Saudi Arabia's claim that Dr. Shaikh "did not see anything unusual", KSA Aver.

¶ 144, but ignores Shaikh's admission to the FBI *after* the 9/11 Attacks that he had seen

Bayoumi and the hijackers acting together in a suspicious manner:

> In Shaikh's opinion if anyone knew of Al-Hazmi and Al-Mihdhar's plans
> to conduct a terrorist attack it would have been Al-Bayoumi given the
> body language and hushed tones he used when speaking to Al-Hazmi and
> Al-Mihdhar which indicated to Shaikh a secret understanding.

Ex. 540, FBI 007362-REV2021 at 7364.  Dr. Shaikh also admitted to the FBI that he believed

that Bayoumi "was an Agent of the government of Saudi Arabia."  Ex. 2, EO 0279.

1115.   Sudairy testified that while he and Sadhan were staying at Dr. Shaikh's home in

December 1998 – January 1999, that Dr. Shaikh left them alone in his own home and travelled to

Saudi Arabia.  Ex. 119, Sudairy Dep. 254:5-19. After Sudairy returned to Saudi Arabia from San

Diego, he hosted Dr. Shaikh in Riyadh in January 1999. Ex. 119, Sudairy Dep. 254:23-255:6.

1116.   Bayoumi's handwritten address book had a phone number for Dr. Shaikh in Saudi

Arabia.  Ex. 12AA, MPS738_60.

1117.   Dr. Shaikh maintained contact with MOIA propagators Sadhan and Sudairy long

after they left California.  On November 27 and 28, 1999 Dr. Shaikh called "██████6003" - the

Oklahoma number Bayoumi had in his handwritten  address book for Sadhan.  Ex. 12AA,

MPS738_34. On December 5, 1999, Dr. Shaikh called "(██████0998" – the Virginia number

Bayoumi had in his handwritten address book for Sudairy. Ex. 12AA, MPS738_24; Ex. 575,

FBI 9691. Sadhan testified that he ran into Dr. Shaikh in Riyadh, Saudi Arabia "[b]y chance"

two or three years later.  Ex. 99, Sadhan Dep. 164:5-165-1.

1118.   Bayoumi urgently corresponded with Sadhan and Sudairy in April 1999 to get

approval from MOIA's Minister for a project for Dr. Shaikh's Mosque in Lemon Grove, CA,

while Saudi Arabia was providing funding for other mosques in San Diego. Ex. 392, MPS

REDACTED FOR PUBLIC FILING

43_218 (July 1998 letter requesting Saudi Embassy to make donation for Al Madinah Mosque "just as was done for the other mosques here.")

1119. Photographs show that in May 1999, Bayoumi brought Dr. Shaikh to Los Angeles to meet with two additional Saudi government officials: Khalil Al Khalil and Thumairy. Ex. 11E (MPS Photographs); Ex. 27, Madha Supp. Decl. ¶¶ 7-10. These photographs show that the Saudi officials did additional vetting of Dr. Shaikh ahead of his assignment to harbor the extremist operatives who would become the 9/11 hijackers.

1120. Saudi Arabia's general assertions that during the relevant time Dr. Shaikh was an "FBI asset or informant" KSA Aver. ¶ 141, are belied by the evidence of Dr. Shaikh's active relationship in 1998-2000 with agents of Saudi Arabia and MOIA. Further, there is no evidence that Dr. Shaikh told the FBI anything about Sadhan, Sudairy, Hazmi, Mihdhar, or Bayoumi before the 9/11 Attacks.

1121. The evidence is clear that the Saudi government was providing Dr. Shaikh with paying tenants and potentially funding his Uthman Mosque.

### G. Bayoumi introduces Sadhan and Sudairy to the members of the local community that the hijackers would meet one year later.

1122. Bayoumi reported to MOIA's Minister Abdullah Al Turki that Sadhan and Sudairy visited not only the Al Madinah Mosque but the "Abu Bakr [ICSD] Mosque" that Hazmi and Mihdhar would later attend; the "Al Ribat Mosque" where Anwar Al Aulaqi was the Imam; and the Uthman Mosque that Dr. Sheikh founded and operated. Ex. 414, MPS 43_347.

1123. Aulaqi, like Sudairy, had close contacts with Al Qaeda agent, Ziyad Khaleel, who lived in Columbia, Missouri. The FBI opened an investigation into Aulaqi in 1999 after Aulaqi had been contacted by Khaleel. Ex. 566, FBI 11764 ("KHALEEL's phone contact with AULAQI was a key substantiation to the FBI opening an investigation of AULAQI in June of 1999….").

REDACTED FOR PUBLIC FILING

1124.   Bayoumi had photographs, obtained by the MPS, of Bayoumi and Sudairy on a mountain trip.  The pictures show Bayoumi with his arm around Sudairy and holding hands with Sudairy.  These pictures conclusively disprove Sudairy's testimony that he only saw Bayoumi at the Mosque. Ex. 119, Sudairy Dep. 148:24-149:3 (when asked "[w]here, other than the mosque, did you see him [Bayoumi]?" Sudairy responded "I don't remember other than the mosque.") Ex. 11D (MPS726 Photo Exhibit).

1125.   Ghazi Ahmad, the Finance Director for the Al Madinah Mosque, is also included in the second photo. His inclusion is significant because Ahmad signed the paperwork for the donation received by the Mosque from the Saudi Embassy, and because Ahmad would be invited by Bayoumi to the welcome party for the 9/11 hijackers a little over a year later in February 2000. *See infra* 1680.

### H.   Saudi government employee, Sunni extremist leader, and Al Haramain operative Omar Hamerman returned to San Diego to meet with Bayoumi, Sudairy and Sadhan.

1126.   On January 3, 1999, less than five months after Saudi Arabia sent Hamerman to San Diego as part of the Al Haramain delegation to visit the King Fahad Mosque, Hamerman was sent back to San Diego █████████████████████████████████████████████ ████████████████████████████████ Ex. 120, Bayoumi Dep. 277:20-278:5 (Bayoumi states that Hamerman was "with us" at the Mosque over Ramadan when MOIA propagators Sudairy and Sadhan were there).

1127.   The MPS production contains photographs in Bayoumi's possession of Hamerman, who Bayoumi addressed as "Al-Amir" visiting the Al Madinah Mosque.  Ex. 393, MPS 43_219.  One of the photographs shows Bayoumi in a jacket and tie flanked by Hamerman

REDACTED FOR PUBLIC FILING

to Bayoumi's right and MOIA propagator Sadhan to Bayoumi's left (looking at the camera). Ex. 5, Youssef Rpt. 88, n. 347. Ex. 11, MPS 726_149 (photo 302).

I. **Saudi Arabia and its state controlled "charity" organization Al Haramain arrange for extremist Sheikh Abdulrahman Barzanjee to lead services and meet Sudairy and Sadhan, and to install Barzanjee as Imam in preparation for the arrival of the 9/11 hijackers.**

1128.   In addition to Sadhan and Sudairy, a visiting Imam – Sheikh Abdulrahman Barzanjee – was leading prayer services at the Al Madinah Mosque during Ramadan 1419.

1129.   Photographs and videotape found in Bayoumi's possession show Barzanjee at the Al Madinah Mosque in January 1999.  On one video, Barzanjee can be seen delivering the sermon at the Al Madinah Mosque on Eid Al Fitr, the celebration following the end of the month of Ramadan.  Ex. 10D (MPS894-CLIP Video Exhibit) 58:22; Ex. 11D (MPS894-CLIP Video Screenshots).

1130.   Ramadan ended on January 18, 1999.  The date of the Eid Al Fitr service was the first day of the next month, Shawwal, or January 19, 1999.  This aligns with the date stamp on the photos from the same event recovered by the MPS.

1131.   As detailed below, the congregants at the Mosque were captured on the video and include various individuals who, together with Barzanjee, would be invited by Bayoumi to attend his welcome party for 9/11 hijackers Hazmi and Mihdhar in February 2000.  Ex. 10D (MPS894-CLIP Video Exhibit) 54:08; Ex. 11D (MPS894-CLIP Video Screenshots); Ex. 694, Youssef Decl. ¶¶ 60-100.

1132.   One of the congregants attending Barzanjee's sermon was Hamerman.  Ex. 10D (MPS894-CLIP Video Exhibit) 59.17; Ex. 11D (MPS894-CLIP Video Screenshots).

1133.   Like Hamerman, Barzanjee was an Islamic extremist aligned with Al Qaeda's anti-U.S. world view.  Barzanjee became the European leader of Ansar Al-Islam, an Al Qaeda

REDACTED FOR PUBLIC FILING

ally which was designated a foreign terrorist organization by the U.S. on March 22, 2004. It was first designated under Executive Order 13224 on February 23, 2003 for providing a safe haven to Al Qaeda in Northern Iraq. Ex. 2, EO 0423, 2798-99, 3519; Ex. 150A, Kohlmann 2022 Rpt. ¶¶ 72-74.

1134.   According to a U.S. Treasury Department and U.N. Security Council reports, the Ansar al Islam group "came into being with the blessing of Bin Laden," who "participated in the foundation and funding" of the group. Ex. 150A, Kohlmann 2022 Rpt. ¶26 n. 139; Ex. 67, U.N. Security Council on Ansar Al-Islam. Ansar al Islam had "close links to and support from Al-Qaida"; and "received training and logistical assistance from Al-Qaida." Ex. 67, U.N. Security Council on Ansar Al-Islam.

1135.   In less than a year, the joint efforts of Bayoumi, MOIA, the Saudi Embassy Islamic Affairs Department, together with Saad Al Habib and Hamerman (working for Al Haramain) would lead to the installation of Barzanjee as the Imam of the Al Madinah Mosque and make Barzanjee the senior religious cleric representing the Mosque at the welcome party Bayoumi hosted for the 9/11 hijackers. Ex. 10K, MPS2023-059 Video Exhibit, 13:28-43, 16:52.

1136.   Documents found in Bayoumi's possession show that Barzanjee reported to Saad Al Habib, as Barzanjee wrote to Habib in January 2001 when he decided to relinquish his Imam position at the Al Madinah Mosque and leave the U.S. when certain of his family members were barred from entering the country. Ex. 418, MPS 95_114-116.

1137.   Photos in Bayoumi's possession include one of Bayoumi with his arms around MOIA propagator Sudairy and Barzanjee at the Al Madinah Mosque. The time stamp on the photo is "19 1 99", or January 19, 1999, which is the date of the Eid Al Fitr service conducted on the videotape. Ex. 11D (MPS Photographs).

REDACTED FOR PUBLIC FILING

1138.   Screenshots from videos recovered by the MPS show Bayoumi with Hamerman and Sudairy at the event.  Ex. 10D, MPS894-CLIP Video Exhibit, 1:00:38-39; Ex. 11D, MPS894-CLIP Video Screenshots.

1139.   Further photos were taken inside Bayoumi's Mosque office, and in one photograph, Sudairy is sitting behind Bayoumi's desk, with Sadhan sitting facing the desk to the left.  Ex. 11D (MPS Photographs).

1140.   In another photo, Bayoumi is sitting behind his desk, with Sadhan is sitting facing the desk (hand raised next to his face) and Hamerman is sitting behind Sadhan.  Ex. 11D (MPS Photographs).

1141.   In another photo, three men including Sudairy (center) and Bayoumi (right) are standing together with a child, while Sadhan is standing to the left with his back to the camera.  Ex. 11D (MPS Photographs).

**J.   MOIA Propagator Majed Mersal visited Thumairy in Los Angeles and would return to visit Bayoumi in San Diego the following year, immediately before the arrival of the 9/11 hijackers.**

1142.   MOIA propagator Majed Al Mersal was a 1994 graduate of Imam University's branch in Qassim province who was assigned to visit the Ibn Taymiyah Mosque in Los Angeles for Ramadan 1419 when Sadhan and Sudairy were visiting San Diego.  Ex. 52, Mersal CV; Ex. 304, KSA 9557-58.

1143.   While all MOIA visiting propagators were instructed to file a "detailed report" about their trips, Mersal's 1999 report was the only one produced by Saudi Arabia.  Ex. 141, KSA 9538 (requesting a "detailed report").  None of the 1999 reports of San Diego visiting propagators Sadhan and Sudairy or the 2000 reports of Los Angeles visiting propagators Jaithen and Mersal (when he returned to California to visit Bayoumi in San Diego) were produced.

REDACTED FOR PUBLIC FILING

1144.   Mersal claimed to not remember anything about this trip, which was his first to the U.S. Ex. 115, Mersal Dep. 92:3-14, 96:2-97:16, 100:18-101:2, 102:9-15, 107:2-8, 111:14-112:18, 124:8-20, 137:19-138:1.

1145.   About his own report, Mersal claimed to have no memory of it and said "I don't know whether this report is an actual report." Ex. 115, Mersal Dep. 131:8-17.

1146.   Mersal insisted at his deposition that he spent Ramadan 1419 at the King Fahad Mosque, even though Mersal's report confirmed that he went to the "Sheikh Ibn Taymiyyah Mosque in Los Angles [sic]." The King Fahad Mosque did not open until the Fall of 1999. Ex. 115, Mersal Dep. 118:14-121:5; Ex. 72, Madha Decl. ¶ 8.

1147.   Mersal's deposition claims are at odds with his own report, showing that he led numerous prayers and gave the Friday service at the Ibn Taymiyah Mosque. Ex. 304, KSA 9557-58.

1148.   Mersal's letter further thanked Thumairy for his "good hospitality, coordination, and follow up." Ex. 304, KSA 9557-58.

1149.   At his deposition, however, Mersal claimed that Thumairy "didn't pay me much attention." Ex. 115, Mersal Dep. 102:6-103:15.

1150.   Thumairy testified that he had no memory of Mersal or Mersal's visits to California or his phone calls with Mersal. Ex. 107, Thumairy Dep. 287:8-16, 290:2-20, 293:13-16.

REDACTED FOR PUBLIC FILING

XV.     **BASED ON THE ADVANCE TEAM'S VISITS TO LOS ANGELES AND SAN DIEGO, SAUDI GOVERNMENT OFFICIALS, AL HARAMAIN, AND AL QAEDA MADE REPORTS AND TOOK INITIAL PREPARATORY STEPS FOR THE ARRIVAL OF THE TWO HIJACKERS IN CALIFORNIA**

A.  **"The General Supervisor" Bayoumi reported to his Saudi government counterparts at MOIA in Riyadh, the Embassy's MOIA Office and Islamic Affairs Department, and Thumairy about MOIA propagators Sadhan and Sudairy**

1151.    Bayoumi sent three separate letters (not produced by Saudi Arabia) to Thumairy, Embassy Islamic Affairs Department Head Ghesheyan, and Embassy MOIA Office Head Sowailem in January 1999.  Ex. 678D, MPS 43_336 (Thumairy); Ex. 411 MPS 43_314 (Ghesheyan); and Ex. 413, MPS 43_338 (Sowailem).  None of those documents was produced by Saudi Arabia.

1152.    Bayoumi's undated letter to Thumairy states that he is "glad to congratulate you [Thumairy] on the occasion of the blessed Eid al-Fitr" a holiday which started on January 18, 1998.  Ex. 678D, MPS 43_336.

1153.    The letter goes on to say "it is my honor to thank you [Thumairy] for your kind efforts in providing us with brother Mutaeb al-Sudairy and Adel al-Sadhan, who made a good mark, not only in Masjid al-Madinah but also in the other *Masadjid* [mosques] abu Bakr [ICSD]. Omar Bin al-Khatab, uthman [Dr. Shaikh's Mosque], and al-Ribat [Aulaqi's Mosque]". Bayoumi ends by saying "coordination will be the starting point" and signs the letter as "The General Supervisor."  Ex. 678D, MPS 43_336.

1154.    Bayoumi's letter to Embassy MOIA Director Khalid Al Sowailem is dated January 28, 1999.  He expresses thanks to Sadhan and Sudairy and also to Abdulaziz al-Saleh, Thumairy, and Saad Al-Jabreen of the Saudi Consulate in Los Angeles – "all of whom

REDACTED FOR PUBLIC FILING

demonstrated complete cooperation" and that "coordination was the factor that made the greatest mark…."  Ex. 413, MPS 43_338.

1155.   Bayoumi then tells Sowailem "I surely hope that the advance coordination continues…." and signs his letter "[f]aithfully" as "The General Supervisor."  Ex. 413, MPS 43_338.

1156.   Bayoumi's letter to Islamic Affairs Department Head Ghesheyan thanks him for "the attentiveness you [Ghesheyan] have devoted to this mosque [Al Madinah] and the other mosques in San Diego….." Bayoumi expresses his thanks to Sadhan and Sudairy and states "that coordination and moral support were the factors that made the greatest mark" and that "I surely hope that the advance coordination continues…."  He signs his letter "The General Supervisor." Ex. 411, MPS 43_314.

1157.   On February 7, 1999, Bayoumi also wrote to MOIA Minister Abdullah Al Turki thanking him for authorizing the Ramadan 1419 visit of Sadhan and Sudairy (al Turki's nephew) to the Masjid Al Madina.  The letter also thanked "Sheikh Khalid Al Sowailem and Sheikh Abdulaziz Al-Saleh, from Washington D.C." as well as Thumairy for their "excellent cooperation and coordination."  Bayoumi signs as "General Supervisor".  Ex. 414, MPS43_347; Ex. 416, KSA 7591.

1158.   It was Bayoumi's practice to fax his letters to Saudi Arabia and to send letters to MOIA's Minister via MOIA propagators. Ex. 388, MPS 43_374; Ex. 389, MPS 43_375. The copy of the Bayoumi letter to Minister Al Turki produced by Saudi Arabia shows that Bayoumi faxed the letter to someone else at MOIA first who then faxed it to the Minister.  Ex. 416, KSA 7591.  The Panasonic fax header on the document produced by Saudi Arabia matches the fax header from Thumairy's fax machine demonstrating that Bayoumi coordinated with MOIA

REDACTED FOR PUBLIC FILING

propagators, including Thumairy, on joint work assignments. *See, e.g.,* Ex, 223, KSA 8441 (letter from Thumairy showing same Panasonic watermark), Ex. 273, KSA 2783 (same), Ex. 274, KSA 2794 (same).

### B. Bayoumi reported to his Al Haramain contact Saad Al Habib about Sadhan and Sudairy

1159.   On February 12, 1999, Bayoumi wrote an "extremely urgent" request to his "dear brother" Saad al Habib asking him to contact Sudairy, Sadhan, and Omar Hamerman for information.  Ex. 384, MPS 43_217 (produced by the FBI as Ex. 485, FBI 1338).

1160.   Bayoumi wrote the note after he was unable to reach Habib on the phone. Ex. 384, MPS 43_217, Ex. 485, FBI 1338 ("I tried continuously to respond and to call, but I don't know if the cellphone was out of service or what.").

1161.   In his letter to Habib, Bayoumi wrote " Two brothers from the Ministry of Islamic Affairs visited with us... *Wakanat qaedatuhum masjidana* [their base was our mosque]. And I was coordinating with those who were responsible for them." Ex. 384, MPS 43_217.  Bayoumi provided the names and phone numbers of the two MOIA propagators:

> Mutaeb al-Sudairy.      Telephone        ███-4059
> Adel al-Sadhan.      Telephone        ███-2849
> Bayoumi then told Habib:

>> I want you to call them, and to take Al-Qurs [the disk] from Al-Khabbaz [the baker]. I have a lot to tell you, but the paper cannot handle it. Al-Amir [Emir] Omar Hamerman can convey a clear picture as well.

Ex. 384, MPS 43_217.

1162.   Plaintiffs' expert Youssef, a native-level Arabic speaker (*see* Ex. 5, Youssef Rpt. 5), concluded that the Arabic words used by Bayoumi conveyed "a cautious, coded message to Habib to assure the safe, prompt relay of key information obtained by Sudairy and Sadhan from their trip to California as the advance team for the 9/11 hijackers."  Ex. 5, Youssef Rpt. 112.

REDACTED FOR PUBLIC FILING

1163.  Bayoumi declared: "*Wakanat qaedatuhum masjidana*" which means (referring to Sadhan and Sudairy's time in San Diego): "Their base was our mosque." MPS43_217.  If Bayoumi intended to convey that Sadhan and Sudairy were hosted at their mosque (Al-Madinah), he would have used the Arabic word for "hosted". However, inserting the word "qaedatuhum" demands that it be read in light of the plot to bring Al-Qaeda to San Diego, specifically because Bayoumi's choice of the word "qaedatuhum" for "their base" denotes not simply a place to situate oneself or hang one's hat, but rather a source or hub from which further activity will follow.  The nature of that activity can be confirmed by what Bayoumi signalled in his message: their "Qaeda," or base, had been approved for "Al-Qaeda." Ex. 694, Youssef Decl. ¶ 56.

1164.  Bassem Youssef opined that the Arabic words contain the message that during their trip to the Al-Madinah Mosque, Sadhan and Sudairy represented the agenda of Al Qaeda, and that Al Qaeda was established and welcome at the Al Madinah Mosque.  Bayoumi was conveying to Habib that the plans for the Al Qaeda operatives in California could safely proceed. Ex. 5, Youssef Rpt. pp. 13, 112; Ex. 694, Youssef Decl. ¶¶ 56-57.

1165.  Bayoumi further instructed that Habib should "take the disc from the baker," which Youssef noted was "a cryptic reference to getting closely held information directly from the source, i.e., Sadhan and Sudairy."  Ex. 5, Youssef Rpt. 112. For Youssef, Bayoumi's covert nature using the phrase "the paper can't handle it," meant that some information was too sensitive to be written. Ex. 5, Youssef Rpt. 112.

1166.  In addition, Bayoumi included another code in his February 12, 1999 letter to Habib, one which used frequently by Bayoumi: *Al-Amur taseer ala ma yuram*, or "[t]hings are going well."  A prior translation of these words, which is also correct in literal terms, stated that

REDACTED FOR PUBLIC FILING

"matters are going as they should." However, upon examining the Arabic words from a larger series of Bayoumi's letters from across the MPS production, Bassem Youssef identified a significant number of instances in which Bayoumi deploys this same phrase in a series of letters that he writes to Habib. Ex. 364, MPS43_136; Ex. 409, MPS43_224-221; and Ex. 390, MPS43_229-230. As Youssef stated in his report, this wording demonstrates that Habib and Bayoumi shared a common understanding about certain operational matters of a high degree of sensitivity. Ex. 5, Youssef Rpt. 112.

1167. Bayoumi's repeated use of the phrase was his means of updating those to whom he reported on the "plan" they were jointly pursuing and confirming that things were proceeding according to that plan. This evidence is supplemented by the video of Bayoumi's casing report on the Capitol, during which Bayoumi referred to certain items he filmed being "in the plan.".

1168. Youssef's additional analysis identified Bayoumi's reference to "*Al Amir*" ███ ███████ confirmed that Habib was close with ███████ and recognized ████████ role as the extremist cell "Emir" or leader. Bayoumi's statements demonstrate that he knew already how to contact █████████, and that "he had a covert relationship of trust with ████████," an Al Haramain operative. Ex. 5, Youssef Rpt. 112. As Youssef points out, Bayoumi also wrote that "everyone here is doing well" followed later by the claim that "matters are going as they should," indicating to Youssef, that they "share a common understanding about certain covert matters." Ex. 5 Youssef Rpt. 112.

1169. Bayoumi gave Habib Sudairy's phone number in Saudi Arabia--"441-4059," which Sudairy confirmed as his number. Sudairy said it was possible that he gave his number to Bayoumi or that Bayoumi got the number "from the community." Ex. 119, Sudairy Dep. 172:3-173:18.

REDACTED FOR PUBLIC FILING

1170. Sadhan denied knowing Bayoumi and giving him his phone number. Ex. 99, Sadhan Dep. 186:24-187:5 ("I don't know the man. How would I give him my number?"). Sadhan continued "I didn't give my number to anyone in the community because I don't like to be disturbed." Ex. 99, Sadhan Dep. 190:16-24.

1171. Bayoumi's handwritten address book contained the phone numbers for Sadhan and Sudairy next to each other. Ex. 12AA, MPS738_24. The phone number 462-2849 that Bayoumi gave to Habib was subscribed to by Sadhan's father in Riyadh, Saudi Arabia. That number had been written down by Bayoumi in his handwritten address book and then crossed out. Ex. 12AA, MPS738_24; Ex. 44 (Riyadh Telephone Directory) (Sadhan Dep. Ex. 494); Ex. 5, Youssef Rpt. 102, n. 416; Ex. 99, Sadhan Dep. 176:4-10.

1172. This crossed out phone number for Sadhan evidences that Bayoumi and Sadhan kept their contact information current from 1998 up until Bayoumi's handwritten address book was seized by the MPS in September 2001 that had Sadhan's current number.

1173. Sadhan further claimed he did not recognize the work number "W████0401" listed by Bayoumi for Sadhan in Bayoumi's handwritten address book and in Bayoumi's January and October 2000 phone lists. Ex. 99, Sadhan Dep. 193:7-10; Ex. 12AA, MPS738_35; Ex. 12BB, MPS 688_3; Ex. 421, FBI 345. Documents produced by Saudi Arabia confirm that this is the main number at MOIA's headquarters used by the Da'wah Department abroad where Sadhan worked for MOIA in Riyadh. Ex. 254, KSA 1168-73 at 72; Ex. 230, KSA 9450, Ex. 141, KSA 9538.

1174. Bayoumi claimed at his deposition that he wrote his February 12, 1999 letter because he wanted Habib to know about a "problem" with having sermons at the Mosque translated from Arabic into English and Kurdish. Ex. 120, Bayoumi Dep. 263:7-264:14.

REDACTED FOR PUBLIC FILING

1175.   Bayoumi's explanation does not point to any text in the letter that addresses any translation problem at the Mosque and does not account for the cryptic language and careful secrecy if the letter had such a benign purpose. Plaintiffs' expert Youssef concluded that, in fact, Bayoumi's explanation shows that the letter's true purpose is for "Habib to get information from Sadhan and Sudairy about the suitability of Los Angeles and San Diego for Al Qaeda's 9/11 operatives." Ex. 5, Youssef Rpt. 113.

**C.   On April 7, 1999, Al Qaeda hijackers Hazmi and Mihdhar applied for their U.S. visas to Los Angeles, California; Bayoumi wrote urgent letters to Sadhan and Sudairy to take steps to prepare the safe house; and Saudi Arabia issued instructions to keep Bayoumi in San Diego to complete his work on the extremist network.**

1176.   After returning to Saudi Arabia, Sudairy, Sadhan, and Mersal were all assigned by MOIA to travel to Mecca, Saudi Arabia for several weeks surrounding the 1419 hajj which took place during the last week of March 1999.  Ex. 119, Sudairy Dep. 182:14-183:1; Ex. 231, KSA 9480-81 (MOIA assignment of Mersal to Mecca in March 1999 for hajj).

1177.   9/11 hijackers Hazmi and Mihdhar were residing in Mecca at the same time as Sudairy and Sadhan visited for the hajj. Ex. 5, Youssef Rpt. 113-14.

1178.   Plaintiffs' expert Youssef concluded that in "March 1999 Al Qaeda had collected information about the California network from Sadhan and Sudairy, reviewed its options, and decided to send Hazmi and Mihdhar to California as there was a trusted support network in place on the ground to assist the two men upon their arrival and allow them to safely live undetected in the U.S. for a substantial period of time."  Ex. 5, Youssef Rpt. 113-14.

1179.   On April 3 (Hazmi) and April 7, 1999 (Mihdhar), applied for and were granted U.S. travel visas at the U.S. Consulate in Jeddah, Saudi Arabia. The applications of Hazmi and Mihdhar stated that their destination and address in the U.S. was Los Angeles, California.  Prior

REDACTED FOR PUBLIC FILING

to filing for their visas, the two hijackers had obtained new passports from Saudi Arabia on March 21 (Hazmi) and April 6, 1999 (Mihdhar) in Mecca. Ex. 155, FBI hijackers Timeline at 40; Ex. 30, 9/11 Commission Monograph on Terror Travel at 9-10; Ex. 309, Government Exhibit SD00103, *US v Moussaoui*, 1:01-cr-00455 (E.D.Va.) ; Ex. 8, FBI Summary of Pentbomb Investigation, Feb. 29, 2004, p. 41 for Mihdhar's 2001 passport; Ex. 2, EO 0605 (stating Hazmi and Mihdhar were issued visas in April 1999 in Jeddah, Saudi Arabia).

1180. On April 7, 1999, the time in Jeddah, Saudi Arabia was 10 hours ahead of the time in San Diego. Ex. 694, Youssef Decl. ¶ 44.

1181. On April 7, 1999 in San Diego, hours after the two hijackers received their U.S. travel visas, Bayoumi wrote and faxed letters to both Sadhan and Sudairy. Bayoumi's letters to both men reference that Bayoumi had previously faxed letters to them for the attention of "His Excellency the Minister," MOIA's Minister Abdullah Al Turki. Ex. 388, MPS 43_374; Ex. 389, MPS 43_375; Ex. 120, Bayoumi Dep. 263:10-1 (Bayoumi faxed letters overseas). None of this Bayoumi correspondence to MOIA was produced by Saudi Arabia.

1182. Bayoumi's initiative to write to the two MOIA propagators about a request that Bayoumi had made directly to MOIA's Minister shows that Bayoumi had a high, acknowledged status within the Saudi government and was working on project(s) together with MOIA. Ex. 694, Youssef Decl. ¶ 97.

1183. Bayoumi's letter to Sudairy states that his fax for the Minister was about "the matter of Masjid Uthman Ibn Affan" – the small Lemon Grove, CA Mosque run by Dr. Abdussattar Shaikh. Ex.694, Youssef Decl. ¶ 46; Ex. 12AA, MPS738_26 (listing phone number "███1135 Masjid Uthman Dr. Abdussattar"); Ex. 328, 9/11 Commission List of

REDACTED FOR PUBLIC FILING

Mosques; Ex. 574, FBI 004273; Ex. 120, Bayoumi Dep. 513:2-3 ("Dr. Abdussattar…had the Uthman Mosque").

1184.   Bayoumi's interaction with MOIA and its highest official regarding Dr. Shaikh and his small, local Mosque was extraordinary.  Bayoumi expected that his communication would be understood and acted upon.  Bayoumi's unique efforts are also apparent from other letters in the MPS production, which show that Bayoumi helped arrange MOIA propagator visits to the Uthman Mosque and reported to high level MOIA officials about those visits. Ex. 414, MPS43_347 (Bayoumi's February 1999 letter to Minister); Ex. 413, MPS43_338 (Bayoumi's January 1999 letter to Sowailem); Ex. 694, Youssef Decl. ¶ 46.

1185.   Bayoumi's letter to Sadhan was marked "very urgent" and specified that it must be delivered immediately by hand "to the Sheikh himself."  Bayoumi wrote to Sadhan "[d]o not procrastinate...you are precious to us." Ex.  388, MPS 43_374.

1186.   It is significant that Bayoumi stated in his letter to Sudairy that "I heard that you went to Hajj" and "May your Hajj be rewarded."  Ex. 389, MPS 43_375.  The Hajj occurred in Mecca in mid-March 1999.  Ex. 5, Youssef Rpt. 113.  Hazmi and Mihdhar were in Mecca at the same time that Sudairy and Sadhan attended Hajj.  *Id.*  Bayoumi did not say in the letter how he learned that Sudairy was at Hajj, which indicates that it was a matter of common understanding between the two men.  Bayoumi likely gained that knowledge from Habib or Hamerman, who were in contact with Sadhan and Sudairy based on Bayoumi's February 1999 letter. Ex. 384, MPS 43_217; ███████████ Hamerman had met with Sadhan and Sudairy, including during a reception in Bayoumi's private Mosque office, in San Diego in January 1999. Ex 11, MPS 726_147 (photo 298).

299

REDACTED FOR PUBLIC FILING

1187.  Before making his urgent, extraordinary plea for Sadhan and Sudairy to get

MOIA's Minister to act on Bayoumi's request concerning Dr. Shaikh's Mosque, Bayoumi stated

to both Sadhan and Sudairy his hope that they would be "rewarded for being among *Al-*

*Mujtahideen* [those who strive most diligently]". Ex. 388, MPS 43_374; Ex. 389, MPS 43_375.

The Arabic term *Mujtahideen* is derived from the root word jihad and means the subject is

striving or struggling towards a particular goal, with diligent purpose.  In the context of

Bayoumi's letter, the jihad that Bayoumi invokes here is their shared mission to provide support

for the Al Qaeda operatives.  Bayoumi's letter then conveyed the specific need - through

reference to Masjid Uthman – for Saudi government officials to complete the arrangements that

were being made for Dr. Shaikh to provide the safehouse accommodation in San Diego for the

Al Qaeda operatives. Ex. 694, Youssef Decl. ¶ 49.

1188.  Bayoumi's letter to Sudairy asking him to follow-up on the request to MOIA's

Minister about "the matter" of Dr. Sheikh's Mosque was made immediately after the 9/11

hijackers were cleared to travel into the U.S., demonstrating that Bayoumi was anxious to

finalize arrangements that he, Sadhan, and Sudairy had made with Dr. Shaikh to host the two

hijackers.  Ex 694, Youssef Decl., Ex. 389, MPS 43_375.

1189.  On the same day (April 7, 1999) that the second visa for the two hijackers was

received, and Bayoumi wrote to Sadhan and Sudairy, PCA Director Salmi wrote a "Top Urgent"

note to Dallah Avco, rejecting their request to end Bayoumi's "secondment" and instructing

them to extend Bayoumi's term for another year because he needs "to complete the task under

which the Presidency approved of his Secondment."  Ex. 432, DA 1004.  That same day, Kamel

wrote to the President of the PCA requesting another extension of Bayoumi's purported

secondment to Dallah. Ex. 182, Kamel Ex. 119 (DA 1110). On April 17, 1999, Dr. Ali Abdul

REDACTED FOR PUBLIC FILING

Rahman al Khalaf, President of Civil Aviation, wrote to the Assistant Minister of Defense and Civil Aviation requesting that he approve the extension of Bayoumi's purported secondment for a fifth year starting on April 24, 1999. Ex. 439, DA 1357. On May 3, 1999, Anqari approved the purported secondment for another year. Ex. 6, DA 1119.

1190.    Two days later, on April 9, 1999, Bayoumi placed four calls to Saudi government offices at the Presidency of Civil Aviation, presumably to ensure that payments would continue through Dallah Avco after the PCA had intervened to ensure his extension. Ex. 12V (Bayoumi calls to Presidency Civil Aviation).

**D.   On April 11, 1999, four Saudi government officials - Bayoumi, Thumairy, Khalil, and Soliman Al-Ali - met at the King Fahad Mosque's offices in Culver City, CA, held a recruiting and training event, and identified at least one further individual to provide support to the 9/11 hijackers.**

1191.    Video footage, obtained by the MPS, shows an April 11, 1999 event held at the King Fahad Mosque's offices in Culver City, CA, just four days after the hijackers obtained their visas and Bayoumi sent his urgent requests concerning Dr. Shaikh's Mosque to Sadhan, Sudairy, and MOIA Minister Turki.  The video confirms that Bayoumi met with the two Saudi government officials leading the King Fahad Mosque – Thumairy and Khalil Al Khalil – precisely where Hazmi and Mihdhar would be received upon their arrival in Los Angeles. Ex. 10E, MPS902 Video Exhibit; Ex. 11E, MPS902 Video Screenshots; Ex. 27, Madha Supp. Decl. ¶¶ 4-8 & Ex. 1-4.

1192.    Photographs taken at the same event and showing the final stages of the construction at the King Fahad Mosque are date stamped April 11, 1999, a Sunday.  Ex. 27, Madha Supp. Decl. ¶ 6, Ex. 2.

1193.    Thumairy attended the event.  Ex. 10E, MPS902 Video Exhibit; Ex. 11E, MPS902 Video Screenshots; Ex. 27, Madha Supp. Decl. ¶ 7, Ex. 3 image 4.

301

REDACTED FOR PUBLIC FILING

1194.   A fourth senior Saudi Embassy official was there: Soliman Al-Ali, who led the IIRO and Sanabel Al-Khair "charity" organizations in the U.S., reported to Ambassador Bandar, and was assigned to work alongside Bayoumi in San Diego.  Ex. 374, MPS 43_348-351 (letter recovered by MPS in Bayoumi's possession sent from Al-Ali to Prince Bandar discussing his work at IIRO and Sanabel). Al-Ali is identified by his nametag at the event, and Bayoumi's statement that the seminar was "[p]repared and presented by Dr. Soliman bin Ali Al-Ali."

1195.   Bayoumi and Khalil can be seen exchanging friendly banter with each other, and at another point Thumairy gets up from his seat at the back of the room, and Bayoumi comes and sits in the same seat.  Ex. 10E, MPS902 Video Exhibit; Ex. 11E, MPS902 Video Screenshots; Ex. 27, Madha Supp. Decl. ¶¶7-9 7 & Ex. 3-4.

1196.   The event involving the four Saudi government officials was "Seminar #2" in a "self-help" training course called "Mana Co." to "unleash the power within."  The course was held in Arabic and was used by Saudi Arabia to recruit and train individuals for its extremist network.  The participants were involved in various exercises, including breaking wooden boards.  They each earned a certificate at the end of the event.  Ex. 10E, MPS902 Video Exhibit; Ex. 11E, MPS902 Video Screenshots.

1197.   A day before the April 11, 1999 "Seminar #2" event in Los Angeles, Bayoumi received a certificate issued in his name and signed by Soliman Al-Ali, which stated that he completed the "unleash the power within" program on "April 10, 1999" evidencing that Bayoumi also attended the same course the day before.  Ex. 12, MPS 681_41 (Mana Program Certificate).

1198.   One of the attendees at the event can be identified by his nametag as Ramez Noaman.  Ex. 10E, MPS902 Video Exhibit; Ex. 11E, MPS902 Video Screenshots.

REDACTED FOR PUBLIC FILING

1199.   Noaman later moved from Los Angeles to San Diego and would help the two 9/11 hijackers in San Diego with translations, flight lessons and other tasks. Ex. 2, EO 0307-0320 at 0308-0309 (Noaman was introduced to Mihdhar and Hazmi by ███████ and provided interpretation services and aided them in obtaining flying lessons).  After the 9/11 Attacks, Noaman was deported from the U.S. to his native Yemen. Ex. 2, EO 4030.

1200.   Another participant at the event was Abdul Hafiz Kebhaj.  Ex. 27, Madha Supp. Decl. ¶ 7, Ex. 3 & Ex. 6.  Kebhaj was a member of Thumairy's extremist group that regularly met in the library of the Mosque. Ex. 72, Madha Decl ¶ 7.

### E.   On May 10, 1999, Bayoumi returned to Los Angeles and introduced Abdussattar Shaikh to Thumairy and Khalil, who vetted Dr. Shaikh to undertake assignments for the Saudi government.

1201.   In August 2003, Bayoumi told the FBI that he "visited the King Fahad Mosque with his eldest son…and Dr. Abdusattar Sheikh."  Ex. 2, EO 0251.

1202.   In his deposition, Bayoumi watered down his statement to the FBI, claiming he could only remember going to the Mosque with his son, "[b]ut with Dr. Shaikh, no, I don't remember." Ex. 120, Bayoumi Dep. 230:14-23.  When shown his prior statement to the FBI that he visited the King Fahad Mosque with Dr. Shaikh, Bayoumi stated that it did not refresh his recollection.  Ex. 120, Bayoumi Dep. 498:20-499:7.

1203.   Photographs from Bayoumi's May 10, 1999, trip to the King Fahad Mosque show that Bayoumi brought Dr. Shaikh with him.  Khalil gave Bayoumi, a man named Joe Averna, and Bayoumi's son a tour of the Mosque.  Khalil then held a sit-down meeting with Dr. Shaikh in Khalil's his private office across the street from the Mosque.  Ex. 27, Madha Supp. Decl. ¶¶ 9-10 & Ex. 5.

REDACTED FOR PUBLIC FILING

1204.   Bayoumi then took Dr. Sheikh to the Ibn Taymiyah Mosque where Thumairy was the Imam at the time.  A photo recovered by the MPS shows Bayoumi pictured outside the Ibn Taymiyah Mosque with Joe Averna, and Bayoumi's son.  Ex. 27, Madha Supp. Decl. ¶ 10, & Ex. 5; MPS646(1)_6.  In addition, Bayoumi's handwritten address book has contact information for the "Ibn Taymiyah Mosque" next to Thumairy's name.  Ex 12AA, MPS738_35.

1205.   When Bayoumi was deposed in this case in June of 2021, the MPS materials had not yet been produced. At his deposition Bayoumi denied that he ever went to "a mosque on Venice Boulevard in Los Angeles called the Imam [Ibn] Taymiyyah Mosque."  Ex. 120, Bayoumi Dep. 220:8-11.  However Bayoumi's notes, seized from his office, contained the address of the Ibn Taymiyah Mosque, "10915 Venice," and driving instructions from the 405 Freeway.  Ex. 678V, MPS 732_212-214 at 214.

1206.   Bayoumi told the 9/11 Commission that he visited the King Fahad Mosque during a visit with Dr. Joe [Averna] and REDACTED [Dr. Shaikh] and that "[a]ll 3 of them met Al-Thumairy at that time….".  Ex. 90, Snell Decl., Ex. 2 at 6.

1207.   At his deposition, Bayoumi demurred when asked about Dr. Shaikh, answering "no" and "I don't remember" when asked if he brought Dr. Shaikh to the Mosque. Ex. 120, Bayoumi Dep. 230:19-23. This dissembling was strategic. Bayoumi brought Dr. Shaikh to meet with Thumairy and Khalil to coordinate with them about the plan – submitted by Bayoumi via Sadhan and Sudairy to MOIA's Minister – to have Saudi Arabia fund Dr. Shaikh to host Saudi government visitors in San Diego.

REDACTED FOR PUBLIC FILING

**XVI.  BAYOUMI MEETS WITH MOIA OFFICIALS SADHAN, SUDAIRY, AND SOWAILEM IN WASHINGTON, D.C. AND PREPARES A CASING VIDEO OF THE U.S. CAPITOL BUILDING TO ASSIST AL QAEDA IN SELECTING ITS TARGETS FOR THE "PLANES OPERATION" THAT WOULD BECOME THE 9/11 ATTACKS**

1208.   Bayoumi travelled from San Diego to Washington, DC on June 20.  Ex. 312, MPS 724_126.  Bayoumi placed a handwritten note on his travel itinerary which had a Virginia phone number ████████-4510" and the name of Mutaeb Al Sudairy: "Assudairi."  Ex. 312, MPS 724_126; Ex. 12BB, MPS 688_5 (in October 2000 typed phone book, Bayoumi similarly translated Sudairy's name as "Assodairy").

1209.   In December 2023, the MPS produced video footage contained on a VHS videotape that the MPS seized from Bayoumi in September 2001 and produced as Ex. 11, MPS2023-003.  The MPS record photograph of the actual VHS cassette shows that Bayoumi handwrote a small label on the videotape which read: "Washington trip 23, June 1999 – 4 July." Ex. 11, MPS2023-056, Record of Photography at DSC_0005.

1210.   The VHS tape contained video footage lasting 1 hour 6 minutes 55 seconds, which was produced by the MPS in .MOV digital file format.  The certified exhibit version of this file, with its accompanying label and timer is an exact copy of the footage produced.  Ex. 10F (MPS2023-003 Video Exhibit) ("Bayoumi Washington trip videotape"); Ex 694, Youssef Decl. ¶ 6.

1211.   Plaintiffs' expert Bassem Youssef served as an FBI Special Agent investigating terror groups in St. Louis and Southern California in the 1990s, and as the Chief of the FBI's Digital Media Exploitation Unit from 2003 to 2005 and Chief of the FBI's Communications Analysis Unit, from 2005 to 2014.  His work at the FBI included the review and analysis of video and other media evidence in major terrorism investigations. Ex. 694, Youssef Decl. ¶ 7.

REDACTED FOR PUBLIC FILING

1212.   Youssef reviewed the Bayoumi Washington trip videotape.  In his opinion, the Bayoumi Washington trip videotape contains Omar Al-Bayoumi's casing report of the U.S. Capitol Building in Washington, D.C. for the purpose of planning a future terrorist attack against the United States.  According to Youssef, a casing report would not only seek to define the strengths and vulnerabilities of a target itself but would help determine the importance of a building as a symbol, its status or role in the society, and the perceived impact of attacking or destroying it.  Youssef found that the Bayoumi Washington trip videotape was made for each of these aims. Ex. 694, Youssef Decl. ¶¶ 8-9.

1213.   The Bayoumi Washington trip videotape contains nearly 30 minutes of footage during which the Capitol Building is the principal or sole focus of his filming.  The report runs from 33:12 (the first point at which Bayoumi declares "Capitol Hill – which is the American Congress") through 1:01:35 (where he signs off by stating his name and zooming in on the U.S. flag flying on the Capitol dome). Youssef Decl. ¶ 10; Ex. 10F (MPS2023-003 Video Exhibit); Ex. 10F-TR (MPS2023-003-TR Video Transcript): Ex. 11F (MPS2023-003 Video Screenshots).

1214.   The video images are accompanied by Bayoumi's verbal commentary, mainly in Arabic with some words in English.  As a native Arabic speaker, Youssef carefully studied the words used by Bayoumi in narrating the video.  Youssef reviewed a full certified transcription and translation of the words spoken on Bayoumi Washington trip videotape.  Ex. 10F-TR (MPS2023-003-TR Video Transcript).  Youssef also reviewed the English captions on the certified Exhibit version. Ex. 10F (MPS2023-003 Video Exhibit, Ex. 694, Youssef Decl. ¶ 12.

1215.   Youssef is fluent in Arabic and confirmed that the transcription and translation of the words spoken are accurate, and that the captions correspond precisely with when the words are heard on the video.  The certified video exhibit includes a time which allows precise

REDACTED FOR PUBLIC FILING

timecodes to be captured. Every item of speech is accompanied by corresponding text in English. Youssef also observed that some speech is inaudible, largely due to background noise and Bayoumi's use of a hushed voice. Ex. 694, Youssef Decl. ¶ 13.

1216.   According to Youssef, the video bears the hallmarks of terror planning operations identified by law enforcement and counterterrorism investigators in operational videos seized from terror groups including Al Qaeda that he has personally reviewed throughout his FBI career. Bayoumi's video footage and his narration are not that of a tourist. Ex. 694, Youssef Decl. ¶ 14.

1217.   The Bayoumi Washington trip videotape addresses the structure of the Capitol, including its interior columns; the means of ingress and egress including staircases, front and rear entrances and exits; and the windows on all sides of the building. Bayoumi collected footage from various distances around the Capitol, from outside and inside the building, and from both sides. He documented other structures and areas around the building. Bayoumi also films and comments on the number of people in the building and on security personnel conducting patrols, including the Capitol police. Ex. 10F (MPS2023-003 Video Exhibit); Ex. 10F-TR (MPS2023-003-TR Video Transcript).

1218.   Bayoumi did not prepare the video for his personal use or to share with his family. Rather the video was prepared as a report to a specific audience, whom Bayoumi addresses on the video as his "esteemed brothers." Bayoumi announces on the tape: "We greet you, the esteemed brothers, and we welcome you from Washington." Ex. 10F-TR (MPS2023-003-TR Video Transcript) 38:38. Bayoumi says: "This is the Congress. Here is where the decisions are made and the procedures are effected." Ex. 10F-TR (MPS2023-003-TR Video Transcript) 38:51; Ex. 694, Youssef Decl. ¶ 16.

307

REDACTED FOR PUBLIC FILING

1219.   While viewing several people climbing scaffolding set up on the Mall, Bayoumi states "They say that our kids are demons.  However, these are the demons of the White House." Ex. 10F-TR (MPS2023-003-TR Video Transcript) 39:06.

1220.   Bayoumi then states: "In front of the Congress.  There is no Power nor Strength except through Allah!" Ex. 10F-TR (MPS2023-003-TR Video Transcript) 39:36.

1221.   Bayoumi focuses on a building next to the Capitol and states "we come back once more to this building, whose name I don't know as of yet."  Bayoumi then adds: "However, I will provide you with the results soon." Ex. 10F-TR (MPS2023-003-TR Video Transcript) 40:47-55.  Bayoumi's statement indicates that Bayoumi was likely given a specific assignment to identify and provide a report about the Capitol and its immediate vicinity.  Ex. 694, Youssef Decl. ¶ 19.

1222.   Bayoumi estimated that "approximately 500" congregate in the Congress and stated: "500 plus.  500.  Deciding the fate of the nation here."  Ex. 10F-TR (MPS2023-003-TR Video Transcript) 41:15.

1223.   Bayoumi observes the Capitol Building: "It has two entrances.  One entrance is from this side."  Ex. 10F-TR (MPS2023-003-TR Video Transcript).  He addresses the structure and architectural features supporting the building: "And here you notice the columns." Ex. 10F-TR (MPS2023-003-TR Video Transcript) 46:09.  Bayoumi films the Capitol dome from the outside, and from beneath it on the inside.  He also focuses on a scale model of the Capitol, capturing its features as if from in the sky above.

1224.   Bayoumi films official vehicles parked next to the building, which he identifies as "[t]heir cars" and remarks: "You said that in the plan." Ex. 10F-TR (MPS2023-003-TR Video Transcript) 58:18.

REDACTED FOR PUBLIC FILING

1225. Bayoumi collected video footage of security personnel inside and outside the building: "Here are some security officers, walking around the most important building." Ex. 10F-TR (MPS2023-003-TR Video Transcript) 1:00:52. Youssef observed that Bayoumi was ranking the building as a target. Ex. 694, Youssef Decl. ¶ 24. Bayoumi characterized the Capitol and its inhabitants: "It is a workshop. Indeed, it is a workshop. Senators, employees, security personnel, visitors. All of them respectable." Ex. 10F-TR (MPS2023-003-TR Video Transcript) 58:18.

1226. At one point on the video, Bayoumi appears before the camera to deliver a greeting to his audience: "Peace, mercy and blessings of Allah be upon you. From the United States of America. Omar Al-Bayoumi from the Capitol Hill. -- the Capitol Building." Ex. 10F-TR (MPS2023-003-TR Video Transcript) 58:50-59:16. Bayoumi then states: "Once again, my esteemed viewers, I greet you and I welcome you from the Capitol Hill." Ex. 10F-TR (MPS2023-003-TR Video Transcript) 59:21-59:25.

1227. Bayoumi's Washington trip videotape shows that Bayoumi was with the same two officials, Adel Al Sadhan and Mutaeb Al Sudairy, who had been sent to California by Saudi Arabia's Ministry of Islamic Affairs (MOIA) in December 1998-January 1999 as an "advance team" for the 9/11 hijackers. Bayoumi addressed Sudairy as "Sheikh Mutaeb" and states "He is the leader, he is our Emir for this trip." Ex. 10F-TR (MPS2023-003-TR Video Transcript) 58:50-59:21. The presence of Sadhan and Sudairy together with Bayoumi is highly significant given Bayoumi's 1999 correspondence recovered by the MPS which (as discussed above) shows that Sadhan and Sudairy and their boss Sowailem were working together with Bayoumi to support Al Qaeda. Ex. 388, MPS 43_374; Ex. 389, MPS 43_375; Ex. 694, Youssef Decl. ¶ 36.

REDACTED FOR PUBLIC FILING

1228.   At the time Bayoumi's Washington trip videotape was filmed, Sadhan and

Sudairy had just moved to Washington, D.C. and were designated by Saudi Arabia as Embassy

diplomats with full diplomatic immunity.  Ex. 26, Letter dated August 24, 2021 from Acting

Director, Office of Foreign Missions, US State Department to Megan W Benett, Esq.  An FBI

report shows that Sadhan and Sudairy returned to the U.S. on June 13, 1999. Ex. 2, EO  0630.

Bayoumi addressed a question to Sudairy as to how he was feeling "on this day" in Washington,

D.C. adding "of course, this is the tenth day for you."  Ex. 10F-TR (MPS2023-003-TR Video

Transcript) 03.46-03.50.  This exchange was typical of the method used by Bayoumi in his

videotapes to document his operational activities and memorialize dates and times.  Ex. 694,

Youssef Decl. ¶ 34.

1229.   MOIA Embassy Director Khalid Sowailem admitted to the FBI that he met

Bayoumi at the Saudi Embassy and spent time with him in the Islamic Affairs office. Ex. 454,

FBI 000012-14 at 0012.  Sowailem acknowledged that his contact with Bayoumi went beyond

student affairs, addressing issues concerning the Al-Madinah Mosque. Ex. 454,  FBI 000012-14

at 12; Ex. 2, EO 1438.  This meeting between Sowailem and Bayoumi necessarily took place

during Bayoumi's June-July 1999 Washington trip. Ex 454, FBI 000012-14.  There is no

evidence of another trip by Bayoumi to Washington.  Bayoumi claimed he could not remember

Sowailem.  Ex. 120, Bayoumi Dep. 170:19-171:1

1230.   Bassem Youssef concludes that Sowailem was involved with Bayoumi, Sadhan,

and Sudairy in a joint plan to assist Al Qaeda to carry out its "planes operation."  Ex.694 Youssef

Decl. ¶ 36.  Youssef previously found that Sowailem was part of the phone calls held among

Thumairy, Bayoumi, Sudairy (who worked under Sowailem), Aulaqi, and others preparing for

the hijackers and assisting them upon and after their arrival.  Ex. 5, Youssef Rpt. 218-219. Of

REDACTED FOR PUBLIC FILING

note, Bayoumi called Sowailem's personal cell phone on Friday, February 18, 2000 (2 mins.) and Saturday February 19, 2000 (6 mins.) immediately following the welcome party Bayoumi hosted for the two hijackers in San Diego. Ex. 516, FBI 03235-49 at 3242; Ex. 12A (Phone calls Nov. 1999 – March 2000). Seated at the party among Bayoumi's close associates, being introduced by name to the hijackers, was another Saudi government religious official, Muhammad Al Qahtani. Ex. 10K-TR (MPS2023-059-TR Video Transcript) 14:27 (Bayoumi mentioned "Sheikh Muhammad Al-Qahtani"), 17:50 (Qahtani introduces himself); Ex. 694 Youssef Decl. ¶¶ 36, 73-5.

1231. The timing of Bayoumi's Washington trip videotape, as well as the choice of the Capitol as its focus, is highly significant. Ex.694, Youssef Decl. ¶ 25. Bayoumi's trip to Washington, D.C., his meetings with MOIA's Sadhan, Sudairy, and Sowailem, and his casing of the Capitol Building, occurred at or around the same time that Al Qaeda was considering targets in Washington, D.C. for its "planes operation." *See* 9/11 Commission Report at 155. The 9/11 Commission found that Al-Qaeda's "planes operation" was discussed at a "series of meetings in the spring of 1999" near Kandahar in Afghanistan. *See* 9/11 Commission Report at 155. The "initial list of targets" included landmarks in Washington, D.C. and New York: "Bin Ladin wanted to destroy the White House and the Pentagon, KSM wanted to strike the World Trade Center, and all of them wanted to hit the Capitol." *See* 9/11 Commission Report at 155.

1232. The Commission concluded that United Flight 93, which took off from Newark bound for San Francisco, was intended to strike the Capitol or the White House. *See* 9/11 Commission Report at 44-45. The Commission wrote: "We are sure that the nation owes a debt to the passengers of United 93. Their actions saved the lives of countless others, and may

REDACTED FOR PUBLIC FILING

have saved either the Capitol or the White House from destruction." *See* 9/11 Commission Report at 45.

1233.   Based on all the evidence, Bassem Youssef opined from his background and experience that the video footage Bayoumi prepared in Washington, D.C. was intended to be shown to Al Qaeda for the purposes of targeting the Capitol in its "planes operation."  Ex. 694, Youssef Decl. ¶¶ 5-28. Bayoumi signed his video report with a personal "greeting" to the "esteemed brothers," an Islamic blessing, and a lingering image of the American flag: Omar Al-Bayoumi's visual prospectus for a terrorist attack on the U.S. Ex.694, Youssef Decl. ¶ 28.

1234.   Bayoumi claimed he visited Washington to attend a "professional development" non-credit "certificate program" course run by a company named ESI International, which contracted to use the name of George Washington University Ex. 120, Bayoumi Dep. 131:20 – 132:133:14; Ex. 93, Korn Ferry Decl. ¶¶ 7-8; Ex. 162, GWU Decl. ¶¶ 7-8.  Bayoumi had ESI International's phone and address in his handwritten address book.  Ex. 12AA, MPS738_67. Bayoumi received two course certificates for this program.  Ex. 680A, at KSA 736 (June 21-25, 1999); Ex. 196, and at KSA 0734 (June 28-30, 1999).  Bayoumi claimed that he "enrolled [and] got a degree from George Washington University…."  Ex. 120, Bayoumi Dep. 129:3-6.  This was verifiably not true.  Ex. 162, GWU Decl. ¶¶ 6, 8.

1235.   On July 4, 1999, immediately after returning to San Diego from visiting the Embassy, Bayoumi wrote a "Very Urgent and Important" letter to Mahmoud Doski, the Chairman of the Board of the Al Madinah Mosque, instructing him to "provide us with a full report" on various issues "as soon as possible" including the names of everyone on the Mosque Boards and "the work being done by each on to serve this facility in detail"; the "achievements in the field of Da'wah"; and the relations of the mosque with the ICSD, Al Ribat Mosque, the

312

Uthman Mosque [Dr. Shaikh's Mosque], and others. Bayoumi signed the letter as "General Supervisor" of the Al Madinah Mosque. Ex. 368 MPS 43_152,144 (Bayoumi letter to Doski).

1236. The timing and urgency of this letter evidences that Bayoumi acted pursuant to instructions he received from the Saudi Embassy to take immediate, decisive steps to put Al Haramain in control of the Al Madinah Mosque, which he did.

1237. Bayoumi's letter brought about the removal of Mahmoud Doski and the installation of a "new board" led by Sami Doski (who is not related to Mahmoud). Ex 367, MPS 43_150-51; Ex. 366, MPS 43_145-48. As detailed below, on February 17, 2000, Sami Doski (but not Mahmoud) would attend the welcome party for Hazmi and Mihdhar hosted by Bayoumi.

1238. Bayoumi's July 23, 1999, letter to Saad Al Habib stated that after his removal from the Board, Mahmoud Doski spoke out at a Mosque meeting that "he would not want anyone to be appointed by Habib" at the Mosque. Bayoumi responded to Mahmoud Doski, stating that "Habib is an owner who invested money…and he has the right to choose whom he wants to sponsor this facility…." Bayoumi also reported to Habib that he told Mahmoud that he "is not a member of the new board" and had no standing. Ex. 366, MPS 43_145-48.

1239. Striking a different tone, just one year earlier Bayoumi lauded Mahmoud Doski as a leader at the Mosque and suggested to Habib that Doski be "given an encouraging bonus." Ex. 410, MPS 43_225-28 at 227.

1240. Bayoumi's June 23, 1999 letter to Habib revealed that the goal in changing the Board was to replace the Imam of the Mosque, Ameer Bajelori. Bayoumi's letter cited complaints about "brother Amir" including his style of preaching, difficulty understanding him, the feeling that the Mosque was a "one-party headquarters", his failure to "call for the non-

313

REDACTED FOR PUBLIC FILING

Muslims", and the general cleanliness and maintenance of the Mosque.  Ex. 366, MPS 43_145-148 at 148.

1241.   Similar to Mahmoud Doski, less than one year earlier, Bayoumi had lauded Bajelori, reporting to Saad Al Habib that "he's a more persuasive and articular orator than many of those in our mosques in Saudi Arabia."  Ex. 410, MPS 43_225-28 at 226.  Bayoumi's change in position about the Mosque Board and Imam Bajelori show that he was acting in response to the directions of his Saudi Embassy superiors and acting quickly to carry out their orders.

1242.  Bayoumi's June 23, 1999, letter to Saad Al Habib showed that questions were raised at the Mosque meeting about Bayoumi's practice of photographing and videotaping events.  Bayoumi responded by telling the Mosque members that:

> photographing conveys a clear picture of what is going on here.  If you are an investor in a company, you will need to know the company's level of profit and loss.  Is it too much for us to take some photos using our camera to reassure the owner about what is taking place on their property?

Ex. 410, MPS 43_225-28 at 226.

1243.  Bayoumi then requested Habib send the Mosque a direct letter by fax confirming that Bayoumi was the Mosque's "general supervisor" and that Bayoumi "must be referred to regarding everything related to the mosque's affairs," directing that Bayoumi be allowed to photograph and record lectures and sermons at the Mosque.  Ex. 4 10, MPS 43_225-28 at 226.

1244.  In the summer of 1999, the Saudi Embassy ensured Bayoumi's extremist coup at the Al Madinah Mosque was complete by sending more Saudi officials to back him in San Diego.  Two MOIA propagators came to San Diego, including Sheikh Ibrahim Al Zamil, who had previously worked with Bayoumi to make the initial arrangements for the Mosque.  Ex. 365, MPS 43_137; Ex. 2, EO 2069-2070.

REDACTED FOR PUBLIC FILING

1245.  In an August 28, 1999 letter to Habib, Bayoumi reported that Zamil helped Bayoumi counter attacks made against him in the local community. Bayoumi reported that "Sheikh Ibrahim participates with the team." Ex. 365, MPS 43_137.  Bayoumi stated that their efforts in defeating their opponents were successful; Bayoumi quoted from the Qur'an that: "*They planned, but Allah also planned. And Allah is the best of planners.*"  Ex. 365, MPS 43_137. (italics in original).  Zamil signed Bayoumi's letter "to bear witness" to what Bayoumi had told Habib. Ex. 365, MPS 43_137.

1246.  With the new Board of the Mosque installed, Ameer Bajelori was demoted and extremist Sheikh Barzanjee was named as the Imam of the Al Madinah Mosque, and Barzanjee was the senior religious cleric who represented the Mosque at the welcome party Bayoumi hosted for the 9/11 hijackers.  Ex. 10K, MPS2023-059 Video Exhibit at 13:28-43, 16:52.

**XVII.  PHONE CALL PATTERNS EVIDENCING COOPERATION OCCURRED DURING THE PERIOD FROM NOVEMBER 1999-FEBRUARY 2000 AMONG THUMAIRY, BAYOUMI, THE SAUDI EMBASSY, THE SAUDI CONSULATE (INCLUDING ▌▌▌▌), ANWAR AULAQI, AND OTHERS INVOLVED IN SUPPORTING THE PLOT**

1247.  Phone activity between November 1999 – February 2000 among the individuals — Thumairy, Bayoumi, ▌▌▌, the Saudi Embassy (Sowailem and/or Jarrah), ▌▌▌▌ (Jaithen and Mersal), Sudairy, Aulaqi and ▌▌▌ — evidences collaboration to support 9/11 hijackers Hazmi and Mihdhar after their arrival in California.

1248.  According to Plaintiffs' expert Bassem Youssef, the former FBI Chief of the Communications Analysis Unit of the FBI's Counterterrorism Division, there were spikes in calling activity involving Bayoumi, Thumairy, and the Saudi Embassy just before and immediately after the 9/11 hijackers Hazmi and Mihdhar arrived in Los Angeles and San Diego. Ex. 5, Youssef Rpt. 4, 125-127.

REDACTED FOR PUBLIC FILING

1249. Former FBI Chief Youssef determined that the calls were made to discuss arrangements for the 9/11 hijackers' arrival and immediate care once they arrived. Ex. 5, Youssef Rpt. 125-126.

1250. Youssef determined:

> The calls among these Saudi Government officials are directly related to key events associated with the operational support for the 9/11 hijackers, including:
>
> the late 1999 visit of MOIA Propagators Abdullah al Jaithen and Majed al Mersal to Los Angeles and San Diego, who former FBI Special Agent and Unit Chief Youssef concluded were a second advance team (following Sadhan and Sudairy) sent by MOIA and its Deputy Tawfiq Sudairy to provide a secure in-person communications link between the support network in California and Al Qaeda to ensure that the final arrangements were in place in California shortly before sending Hazmi and Mihdhar to Los Angeles;
>
> the arrival of Hazmi and Mihdhar on January 15, 2000 in Los Angeles, and the support provided by Thumairy, ███████████ to the hijackers through the Sunni extremist cell that was long supported by Saudi Arabia and led by Thumairy at the King Fahad Mosque;
>
> the transfer of the hijackers from Los Angeles to San Diego arranged by Thumairy, Bayoumi, ██████, and Sowailem on or about February 2, 2000 to furnish the hijackers with support through the Sunni extremist cell supported by Saudi Arabia and led by Bayoumi at the ICSD, Al Ribat, and Al Madinah Mosques.

Ex. 5, Youssef Rpt. 126.

1251. The FBI's findings echoed those of Plaintiffs' expert Youssef. The FBI found that:

> [a]nalysis of al-Bayoumi and al-Thumairy's call activity indicates that the assistance provided to the hijackers likely involved a network of people including al-Bayoumi, al-Thumairy, Anwar al Aulaqi and an individual at the EKSA [Saudi Embassy] in Washington, D.C.

Ex. 2, EO 0584.

1252. The FBI also concluded that:

REDACTED FOR PUBLIC FILING

Telephone numbers assigned to the Saudi Arabian Embassy (SAE) in Washington, D.C., where Musaed al-Jarrah was the director of the Islamic Affairs Department, had significant telephonic contact with al-Thumairy and al-Bayoumi while the hijackers were in the Los Angeles and San Diego areas. There is evidence that al-Jarrah had possible links to al Qaeda and tasked al-Thumairy and al-Bayoumi with assisting the hijackers.

Ex. 2, EO 0227.

1253.   Like the FBI, Youssef concluded that "based on the phone contacts there was an official or officials at the Embassy more senior to Thumairy who were involved in the plans to provide assistance to Hazmi and Mihdhar."  Ex. 5, Youssef Rpt. 132.  Youssef, however, further determined that Khalid Al Sowailem or Musaed Al Jarrah, and possibly both, assigned Thumairy and Bayoumi to aid Hazmi and Mihdhar. Ex. 5, Youssef Rpt. 132-133.  The FBI concluded that Jarrah was the Embassy official involved in the November 1999 – January 2000 planning calls simply because he was the "director of the Islamic Affairs Department." Ex. 2, EO 0227. However, the FBI failed to consider Sowailem's role as MOIA Director at the Embassy working next to Jarrah in the same Islamic Department office on the Embassy's second floor. Ex. 5, Youssef Rpt. 133.  The FBI determined the main office number for the Islamic Department, ███████-3700, which was answered by the Department's receptionist and could be transferred to *either* Jarrah or Sowailem was in "significant telephonic contact" with Bayoumi and Thumairy.  Ex. 5, Youssef Rpt. 133.

### A.  Thumairy-Bayoumi telephone records

1254.   On December 6, 1999, Thumairy made a call from his home phone to Bayoumi's cell phone.  This December 6th call is the second known call between the two men in phone records produced by the FBI.  The first known call occurred one year earlier, prior to the December 1998 arrival of MOIA Propagators Sadhan, Sudairy, and Mersal in California.  Ex. 5,

REDACTED FOR PUBLIC FILING

Youssef Rpt. 127. As Youssef's call analysis determined, "[f']rom December 6, 1999 through February 4, 2000 — the day that Bayoumi finally arranged the payment and paperwork necessary for the hijackers to rent their apartment in San Diego — there was an unusually high volume of calling activity between Bayoumi and Thumairy" — 27 calls, evidencing coordination between the two men. Ex. 5, Youssef Rpt. 127. Ex. 12B (Calls between Bayoumi and Thumairy).

1255. The volume of calls between the two is potentially even higher, as there are no records for Thumairy's cell phone calls or Bayoumi's cell phone calls prior to January 9. Ex. 5, Youssef Rpt. 127.

### B. Thumairy-Bayoumi calls to the Embassy

1256. *Bayoumi's calls.* As Youssef determined, between January 19, 2000, and March 24, 2000, Bayoumi made 110 calls to the Saudi Embassy. Ex. 5, Youssef Rpt. 134. Of these 110 calls, Bayoumi made at least 39 calls from his cell phone to officials at the Islamic Affairs office at the Embassy. According to Youssef's analysis, the 39 calls include:

    a. 32 calls to (██████-3700, which is the main number for MOIA's Islamic Affairs Department, which, according to Jarrah, incoming calls to that number could be transferred to Khalid Al Sowailem or Musaed Al Jarrah. Ex. 5, Youssef Rpt. 134; Ex. 118, Jarrah Dep. 137:8-21, 143:4-16 (receptionist would transfer calls to the -3700 number to the intended recipient);

    b. Bayoumi made 2 calls to MOIA Director and Embassy official Sowailem's personal cell phone number on February 18 and 19, 2000; Ex. 5, Youssef Rpt. 134.

    c. Bayoumi made 5 calls to the phone number for MOIA and Embassy official Mutaeb Al Sudairy (who reported to Sowailem) on January 24, 26, 30, and February 2 and 7, 2000. Ex. 5, Youssef Rpt. 134.

Ex. 12A (Phone calls Nov. 1999 – Mar. 2000); Ex. 12K (Bayoumi calls to Saudi Embassy).

1257. Bayoumi did not provide any explanation for the extraordinary number of calls that he made to officials of the Islamic Affairs office. Ex. 120, Bayoumi Dep. 319:8-320:9 ("Q:

318

REDACTED FOR PUBLIC FILING

Can you remember the name of anyone you spoke with at the Islamic Affairs department? A: No.").

1258. *Thumairy's calls.* Between November 18, 1999 and February 16, 2000, Thumairy placed 33 calls from his home phone to officials of the Islamic Affairs office at the Embassy. Ex. 5, Youssef Rpt. 134. According to Youssef's analysis, these calls include:

a. Thumairy made 8 calls to (███████3700 the main number for the MOIA/Islamic Affairs Department; Ex. 5, Youssef Rpt. 134.

b. Thumairy placed 12 calls to the direct line for his supervisor, Khalid Al Sowailem; Ex. 5, Youssef Rpt. 134.

c. Thumairy made 6 calls to Sowailem's cell phone on December 7, 12, 25 and 27 (3 calls), 1999; Ex. 5, Youssef Rpt. 134.

d. Thumairy made 7 calls to MOIA numbers identified as fax numbers, all but one of which was to Sowailem's fax number. Ex. 5, Youssef Rpt. 135.

1259. Thumairy testified in his deposition that he did not report to anyone at the Embassy and his contacts with Khalid Sowailem were "sporadic," "every two months or so" and about administrative like vacations. Ex. 107, Thumairy Dep. 114:23-115:10; 117:16-23; 118:6-13; Ex. 5, Youssef Rpt. 135. Thumairy's phone calls, however, show that he had regular interactions with his Saudi government superiors at key times just prior to and after the arrival of Hazmi and Mihdhar in California. Ex. 12C (Thumairy calls to Saudi Embassy).

1260. Saudi Arabia did not produce faxes that Thumairy sent to the Embassy, despite the phone record evidence that Thumairy used his own phone to placed 27 calls to the Embassy's fax numbers. Ex. 12C (Thumairy calls to Saudi Embassy).

**C. Thumairy-Saudi Consulate Secretary Mana**

1261. ██████████████████████████████████

████████████████████████████████████

████████████████████████████████████

REDACTED FOR PUBLIC FILING

███████████████████████████████████████████████

██████████████████████████████████

1262.   █████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████ Ex. 110A, Mana Dep. 134:8-135:22; █████████

████████████████████████

1263.    Additionally, Youssef raised concerns that "[t]The FBI produced only toll call records and not records of the local calls made from Thumairy's phone to nearby locations, so Plaintiffs are unaware of calls that Thumairy may have made to the Saudi Consulate where █████ worked or individuals in the neighborhood around the King Fahad Mosque." Ex. 5, Youssef Rpt. 135-6.

1264.   ███████████████████████, Mana frequently visited the King Fahad Mosque and met with Thumairy regularly. Ex. 110A, Mana Dep. 39:20-25 (stating he attended "[b]efore it was even established"); 84:20-85:17 (describing situations where he saw Thumairy).

## D. Calls to individuals assisting Thumairy and Bayoumi in providing support to the hijackers

1265.   As detailed below, Bayoumi, Thumairy, and █████ not only called each other but also called other individuals who directly supported the hijackers. For instance, █████ called █████████████; Thumairy called █████████, Aulaqi, Faisal Muhanna, █████████████, and ██████████████ and Bayoumi called Khalid Al Yafai, Hashim Al Attas, █████████████, ████████████, █████████████, and Abdullah Al Jaithen. Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).

320

██████████████████████████████████████████

REDACTED FOR PUBLIC FILING

XVIII.    SAUDI ARABIA THROUGH ITS AGENCY MOIA ASSIGNED ABDULLAH
          AL JAITHEN AND MAJED AL MERSAL TO VISIT CALIFORNIA TO
          COORDINATE WITH THUMAIRY AND BAYOUMI ON THE PLANNING
          FOR THE ARRIVAL OF THE FIRST 9/11 HIJACKERS IN 2000.

1266.   Hazmi and Mihdhar were longstanding and committed Al Qaeda fighters

personally selected by Osama Bin Laden to be part of the 9/11 plot. Ex. 82, CIA 0242-304 at

249, 253, 262 (CIA Report, *11 September: The Plot and Plotters* (June 1, 2003)).

1267.   Hazmi and Mihdhar each played a central role in carrying out the 9/11 Attacks.

Hazmi was part of the council in charge of the 9/11 Attacks and served as deputy and "second-

in-command" of the entire operation.  Ex. 82, CIA 0242-304 at 262.  Hazmi was the only

non-pilot hijacker who participated in the series of final planning meetings of the four pilots for

the 9/11 Attacks in mid-2001. Ex. 82, CIA 0242-304 at 261; Ex. 683, September 26, 2002

testimony of Mueller at 526.  Mihdhar's role was likely as a coordinator and organizer of the

non-pilot hijackers. Ex. 170, Joint Congressional Committee Inquiry (JICI 09/25/02),

Declassified June 18, 2002 Statement of FBI Director Robert Mueller, at 3.

1268.   In the Fall of 1999, Bin Attash, Hazmi, Mihdhar, and other Al Qaeda operatives

personally selected by Bin Laden attended a terrorist training camp near Kabul.  Bin Ladin visited

the camp to meet with the elite group.  *See* 9/11 Commission Report at 156-57; Ex. 423, May 31,

2011 Charge Sheet for Khalid Sheikh Mohamed, Walid Muhammad Salih Mubarak Bin 'Attash

and other accused individuals, Charge I at ¶¶ 9-12, 22 (Mihdhar and Hazmi trained with Bin

Attash in September 1999 and Hazmi alone in November 1999 in Karachi, Pakistan); Ex. 171,

JTF-GTMO Detainee Assessment of Zohair Mohammed Said dated Nov. 25, 2008 (YM 569).

1269.   In early December, upon completion of the training, Hazmi and other trainees

went to Karachi for an additional 1–2-week course taught by Khalid Sheikh Mohammed on

various matters encompassing aircraft hijackings and aviation security. Ex. 423, Charge Sheet for

321

REDACTED FOR PUBLIC FILING

Khalid Sheikh Mohamed, Walid Muhammad Salih Mubarak Bin 'Attash and other accused individuals, Charge I at ¶ 10-11. Hazmi learned that he and Mihdhar were to be involved in a martyrdom operation in the U.S. involving planes. *See* 9/11 Commission Report at 158; Ex. 31, Defense Exhibit 941 at 7 (¶ 10), *US v Moussaoui*, 1:01-cr-00455 (E.D.Va.).

1270. Contemporaneously, MOIA was finalizing the assignments of its propagators to various destinations for Ramadan 1420. MOIA Deputy Minister Tawfiq Al Sudairy oversaw the Ramadan 1420 propagator assignments. Ex. 141, KSA 9538; Ex. 5, Youssef Rpt. 105, n. 432.

1271. On November 29, 1999, Tawfiq Al Sudairy wrote a letter to Jaithen, assigning Jaithen to "Kismayo, Kenya" for the MOIA Ramadan program. Ex. 141, KSA 9538. Kismayo is not in Kenya but is a town in the south of Somalia, which borders Kenya. In turn, MOIA instructed Jaithen to "cooperate with the employees of the . . .Embassy." Ex. 141, KSA 9538.

1272. On December 4, 1999, the Saudi Ministry of Foreign Affairs sent MOIA a list of propagator assignments for Ramadan 1420 to the Saudi Embassy in Washington, D.C. The list stated that Majed Al Mersal was assigned to visit the Al Madinah Mosque in San Diego and that Jaithen was assigned to visit the Mosque of the "Islamic Studies College" in Kismayo. Ex. 680S, KSA 7807-08. Saudi Arabia instructed its Embassy to take "the necessary action…in order to facilitate the mission" of the visiting propagators. Ex. 221, KSA 7805.

1273. On December 11, 1999, however, Saudi Arabia instead obtained an A-2 official government business visa for Abdullah Al Jaithen to join Majed Al Mersal to visit Thumairy and Bayoumi in California. Ex. 571, FBI 004675-REV2021 - 04676-REV2021. Bayoumi confirmed at his deposition that "[t]he two Sheikhs who visited Masjid Al-Madina were Abdullah Al Jaithen and Majed Al Mersal." Ex. 120, Bayoumi Dep. 353:12-24.

322

REDACTED FOR PUBLIC FILING

## A. Al Jaithen was an Al Qaeda extremist with ties to Al Haramain.

1274. MOIA propagators Majed Al Mersal and Abdullah Al Jaithen were both graduates of Imam Mohamed University and were both subsequently recruited to work at MOIA's office in Buraydah, Qassim. Ex. 52, Mersal CV; Ex. 40, Jaithen CV.

1275. "[Qassim] province was at the very heart of the strict Wahhabi movement in Saudi Arabia" and that several of the 9/11 hijackers were recruited through contacts at local universities and mosques there. The 9/11 Commission noted that one mosque in Qassim was known as a "terrorist factory." *See* 9/11 Commission Report at 233; Ex. 149, Nakhleh Rpt. ¶ 227.

1276. The English version of the "Book of Jihad" pamphlet that Bayoumi kept in his office at the Al Madinah Mosque was published by MOIA in Qassim Province. Ex.528, FBI 4139-45 ('Al Oasseem Zone'); Ex. 5, Youssef Rpt. 86.

1277. Jaithen was recommended for his position at MOIA by Sheikh Abdullah Uthaymeen, a leading Saudi religious scholar who taught at Imam Mohamed University in Qassim. Ex. 422, KSA 8927; Ex. 142, KSA 8921. Uthaymeen was Abdullah Al Jaithen's teacher, mentor, and colleague at Imam Mohamed University for years. Ex. 96, Jaithen Dep,29:2-31:23, 35:9-36:12. Jaithen taught for many years at Imam Mohamed University alongside Uthaymeen. Ex. 96, Jaithen Dep,20:15-21:12; 30:8-15.

1278. Uthaymeen was, until his death in 2001, one of Saudi Arabia's most prominent and influential religious leaders and interpreter of Wahhabi-Salafi-Hanbali Islam. Ex. 149, Nakhleh Rpt. ¶ 183. Uthaymeen promoted a narrow, intolerant, exclusivist, and jihadist interpretation of Sunni Islam which advocated violent confrontation towards non-Wahhabi-Salafi adherents to Islam, including Shia Muslims and, of course, Christians, Jews, and others. Ex. 149,

REDACTED FOR PUBLIC FILING

Nakhleh Rpt. ¶¶ 183-89. Uthaymeen was a prominent supporter of future SDGT designee Al Haramain organization. Ex. 39A, Internet Archive Affidavit at 11.(Uthaymeen states: "I was very pleased with what the [Al Haramain] Foundation has done both domestically and internationally….").

1279.   Uthaymeen's recommendation of Jaithen was clearly understood by MOIA religious officials to mean that Jaithen would promote the narrow and jihadist interpretation of Sunni Islam advocated by Uthaymeen. Ex. 149, Nakhleh Rpt. ¶¶ 186-7.

1280.   While in San Diego, hijacker Nawaf Al Hazmi listened to the recordings of Sheikh Uthaymeen and according to eyewitness Ramez Noaman, respected him. Ex. 2, EO 1277 (translated as "Binothimen").

1281.   Due to Uthaymeen's recommendation, MOIA gave Jaithen special treatment. Jaithen did not have to appear before the MOIA interviewing committee that reviewed and approved the Minister's recommendations for new propagators before they were hired. Ex. 142, KSA 8921 ("the two recommendations by the two sheikhs are enough and…he does not have to be interviewed at the Committee"). A senior member of MOIA and a member of the Interviewing Committee could not recall any other case when this happened. Ex. 126, Ghudaian Dep. 295:9-20.

1282.   In March 2003, Jaithen was one of 32 Saudi Sheikhs, many of whom were influential members of the Saudi clerical establishment, whose name was on a statement published on the website "Islam Today." The statement described the U.S. as "devoted to aggression and injustice"; that cooperation with America "is an act recognized as a major sin"; and that "jihad is the highest honor in Islam." Ex. 149, Nakhleh Rpt. ¶¶ 193-200; Ex. 167, Islam Today Article, March 2003. Jaithen denied making the statement yet could not explain why it

REDACTED FOR PUBLIC FILING

was published with his name. Ex. 167, Islam Today Article, March 2003; Ex. 96, Jaithen Dep. 271:22-274:18.

1283.   The FBI reported that Jaithen's name and phone numbers were found on a contact list seized from the residence of the spiritual adviser of Al Qaeda leader Abu Zubaidah, who was Osama Bin Laden's lieutenant and who is now detained at Guantanamo prison.  Ex. 566, FBI 11760-61.

1284.   Jaithen's name and phone number were also found on a contact list located on a hard drive seized from an Al Haramain office. The materials were apparently seized by Saudi Arabia after the 9/11 Attacks, but not produced by the Kingdom in this litigation.  Ex. 566, FBI 11760-61.

1285.   MOIA allowed Jaithen to continue working as an Imam even after Jaithen made public statements in support of extremism, including the Muslim Brotherhood, in 2018. Ex. 227, KSA 8875.

1286.   Majed Al Mersal also studied under Sheikh Mohamed Uthaymeen and Jaithen at Imam Mohamed University.  Ex. 115, Mersal Dep. 24:17-25:7.

## B.   MOIA made extraordinary arrangements to send Jaithen with Mersal at the last minute in coordination with Thumairy.

1287.   Jaithen stated that he received a letter from MOIA assigning him to go to "America" but that he was not given any specific location to go inside the U.S.  Ex. 96, Jaithen Dep. 66:21-67:7, 69:19-70:8, 71:8-15.

1288.   There was an undated handwritten note added to Tawfiq Sudairy's letter to Jaithen which penciled out "Kismayo, Kenya" and wrote "Minneapolis, U.S.A."  Ex. 141,  KSA 9538.  There is no indication of when this note was added to the letter.

REDACTED FOR PUBLIC FILING

1289.   Contradicting the documentary evidence produced by Saudi Arabia, Jaithen denied that he was ever assigned by MOIA to go to Kismayo, Kenya, Somalia, or Minneapolis. Ex. 141, KSA 9538; Ex. 96, Jaithen Dep. 64:14-66:5, 195:18-196:3.

1290.   Jaithen claimed that he received a letter instructing him to travel to the U.S. and decide on his own, without reporting to his MOIA supervisors, where and when he would go in the U.S.  Ex. 96, Jaithen Dep. 71:8-18, 294:8-17, 295:4-9.  Saudi Arabia has not produced this alleged letter.

1291.   Each propagator assigned for a Ramadan visit, however, was given a specific assignment to visit a named city and mosque.  That information was then provided in a list that was sent to the Saudi Embassy.  Ex. 680S, KSA 7807-08.

1292.   Propagators on Ramadan visits were instructed to travel at least two days before Ramadan began so that they would be at their assigned location before the start of the month.  Ex 141, KSA 9538, (Nov. 29, 1999 letter of Tawfiq Al Sudairy to Jaithen states "make sure to travel at least two days before the month of Ramadan.")

1293.   The first day of the month of Ramadan 1420 was December 9, 1999. Ex. 14, 1420 Hijri Calendar.  Therefore, Jaithen and Mersal were required to leave Saudi Arabia by December 7, 1999 for their Ramadan postings.

1294.   On December 6, 1999, Thumairy placed a call to Bayoumi's cell phone at 10:58pm (1 min.)  This was the first known phone contact between Bayoumi and Thumairy since December 16, 1998, which was just prior to the Ramadan 1419 (December 1998-January 1999) visit of Sadhan and Sudairy to California. Ex. 5, Youssef Rpt. 126 and "Calls Between Bayoumi and Thumairy".

REDACTED FOR PUBLIC FILING

1295.   On Tuesday, December 7, 1999, Thumairy placed calls from his home landline (310-202-0638) to:

- Saudi agent Bayoumi's cell phone at 7:17pm (2 mins.);

- MOIA Embassy Director Sowailem's cell phone at 8:28pm (1 min.); and

- MOIA propagator Mersal's cell phone at 8:30pm (3 mins.)

Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).

1296.   Thumairy's 8:30 pm call to Mersal was the first known contact between Thumairy and Mersal in the records produced by the FBI.  Ex. 5, Youssef Rpt. 139.  Thumairy dialed '██████1671' for Mersal, which begins with the country code prefix for dialing Saudi Arabia of '966.'  The phone number ██████1671" was listed by Bayoumi in his handwritten address book and his January and October 2000 typed phone lists as Mersal's cell phone.  Ex. 12AA, MPS738_59; Ex. 12BB, MPS688_3 (January 2000); Ex. 421, FBI 0345-49 at 345.

1297.   The next day, December 8, 1999, Thumairy placed calls from his home landline to:

- the fax line for MOIA's Minister at 8:36am (1 min.);

- Saudi agent Bayoumi at 11:24am (1 min.), and;

- Consulate Secretary ████ at 2:25pm (1 min.).

Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).

1298.   Saudi Consulate employee ██████████ home phone number at the time was (██████████████████████████

1299.   Youssef explained that the "calls on December 7 and 8, 1999 comprise a 'call circle' showing that Thumairy contacting Mersal, Bayoumi, the Saudi Embassy and MOIA about the preparations for the trip of Mersal and Jaithen." Ex. 5, Youssef Rpt. 140; Ex. 5,  Youssef Rpt.

REDACTED FOR PUBLIC FILING

5 and 14 (p. 5: "[t]he 'Calling Circle' investigative technique relies on the analysis of calls made by a subject to other telephone numbers on a regular basis."; p. 14: ""Calling Circles" are frequent calls of short duration between two or more individuals or entities and they indicate familiarity between those individuals beyond casual acquaintance. A pattern of calls between individuals or entities shortly before or following a significant event is indicative of familiarity with and discussion of such event." ).

1300.   On December 11, 1999, Thumairy sent four faxes between 2:15 a.m. and 2:29 a.m. Los Angeles time to MOIA's Deputy Minister in Riyadh, Abdelaziz Al Ammar. Ex. 476, FBI 555. This fax number was listed as MOIA in Bayoumi's handwritten address book and typed phone list.  Ex. 12AA, MPS738_14R ("The Minister / Ministry of Islamic Affairs" in Bayoumi handwritten address book); Ex. 12BB, MPS688_9 ("Ministry of Islamic Affairs F/473-0285/477-3508" in January 2000 list). The faxes were not produced by Saudi Arabia.

1301.   MOIA delayed Mersal's departure beyond its December 7, 1999, mandate and instead instructed Jaithen and Mersal to travel together to California on the third day of Ramadan, Saturday, December 11, 1999. Saudi Arabia authorized and obtained an A-2 visa for Jaithen at the U.S. Embassy in Riyadh in order for him to enter the U.S. on official Saudi government business.  Ex. 571, FBI 004675-REV2021 (showing that Jaithen had an "A-2" visa).

1302.   To obtain Jaithen's A-2 visa, Saudi Arabia was required to prepare and file a diplomatic note with the Department of State containing "the government official's or employee's name, date of birth, position and title, place of assignment or visit, purpose of travel, a brief description of his or her duties, travel date, and the anticipated length of the tour of duty or stay in the United States." Ex. 346, State Department Visa Requirements.

REDACTED FOR PUBLIC FILING

1303.   U.S. immigration records show that Saudi Arabia provided Jaithen's "intended address" inside the U.S. on his A-2 visa application as "Holiday Inn, Los Angeles, CA 90001." Ex. 571, FBI 004675-REV2021.

1304.   As it did for Jaithen, Saudi Arabia must have also authorized and assisted Mersal to obtain an A-2 visa to enter the U.S. on official Saudi government business.  Ex. 346, State Department Visa Requirements. Saudi Arabia did not produce the visas either MOIA propagator obtained from the U.S., or its A-2 visa submissions for either Jaithen or Mersal.

1305.   Saudi government procedures required that its officials file formal trip reports before conducting official work travel.  Ex. 285, KSA 5248 (December 1996 approval by MOIA for Sowailem to attend conference in Orange County).  Saudi Arabia did not produce the trip reports or travel documents for either Jaithen or Mersal.

1306.   Pursuant to their instructions from MOIA, Jaithen and Mersal left Saudi Arabia on the fourth day of the month of Ramadan – December 12, 1999 – contrary to the rules which requiring visiting propagators to leave at least two days prior to Ramadan and arrive in their assigned location before Ramadan. Ex 680AA,  KSA 9638.  This trip also contradicted MOIA's practice to send only one propagator for a Ramadan visit - not two.  Ex. 221, KSA 7805-08.

1307.   The only other known instance where two propagators were sent together on a Ramadan visit was when Sadhan and Sudairy visited Bayoumi during the prior year.  Ex. 5, Youssef Rpt. 141-42.  These and other facts set out below show that the Ramadan visit itself was not the purpose of the trip made by Jaithen and Mersal to California.

1308.   Jaithen and Mersal arrived in the U.S. on December 12, 1999, and used their A-2 visas to enter the U.S.  Ex. 571, FBI 004675-REV2021 - 04676-REV2021 (Jaithen's I-94 form

329

REDACTED FOR PUBLIC FILING

arrival information); Ex. 232, KSA 9550 (Saudi Arabia Ministry of Interior record of Jaithen's departure from Saudi Arabia on the fourth day of Ramadan, 1420, December 12, 1999).

1309. Plaintiffs' expert Youssef concluded, based on his experience working with the Saudi Government, that Jaithen would not have been assigned to travel to Los Angeles and San Diego without written instructions from MOIA. Ex. 5, Youssef Rpt. 142. The instructions would have come from Deputy Minister Tawfiq Sudairy, the person in charge of the Ramadan program. Ex. 680AA, KSA 9638.

### C. On December 12, 1999, Mersal and Jaithen arrived in Los Angeles, stayed there for several days and met Thumairy.

1310. Jaithen and Mersal remembered meeting Thumairy on their trip to California, despite their limited recollection of any other details. Ex. 96, Jaithen Dep. 102:2-21, 210:3-9; Ex. 115, Mersal Dep. 246:20-247:2.

1311. Jaithen claimed that, after their arrival on December 12, 1999, he and Mersal stayed in Los Angeles for 5-6 days at a motel near the King Fahad Mosque and that he went to the Mosque and taught lessons. Ex. 96, Jaithen Dep. 84:8-16, 85:6-9, 18-21.

1312. Mersal, who had visited Thumairy the year before, confirmed that he stayed in Los Angeles but could not recall how long. Ex. 115, Mersal Dep. 194:24-195:3. Mersal testified that he and Jaithen did not work in Los Angeles, and he had no memory of being at the King Fahad Mosque with Jaithen. Ex. 115, Mersal Dep. 199:24-200:14. According to Mersal, the two men were "just passing through" on their way to San Diego. Ex. 115, Mersal Dep. 195:15-19

### D. On December 12, 1999, Bayoumi held a meeting at the Al Madinah mosque with Khalid Al Yafai and Fathi Aidarus, both of whom would provide support for and attend the welcome party for the 9/11 hijackers.

1313. The day that Mersal and Jaithen arrived in the U.S., Bayoumi held and videotaped a meeting in his private office at the Al Madinah Mosque. Ex. 10, MPS906 MPS Video Exhibit.

REDACTED FOR PUBLIC FILING

The date of the meeting is known because Bayoumi announces: "[s]o to you, the beloved of the Prophet Muhammad, we welcome you on this day, the 5th of the Holy Month of Ramadan, the year 1420 Hijri.". Ex. 10G, MPS906 MPS Video Exhibit at 00:17. The 5th day of Ramadan 1420 started at sunset on December 12, 1999, and ended at sunset on December 13, 1999. Ex. 14, 1420 Hijri Calendar.

1314. In the video, Bayoumi states that "we are transmitting this gathering from the *Masjid al-Madinah al-Munawara* in San Diego." Ex. 10G, MPS906 MPS Video Exhibit 00:43. The location of the meeting, as confirmed by Bayoumi, is "[i]n Omar's office" at the Mosque. *Id.* at 00:51.

1315. Bayoumi confirms the names of the individuals present, including a man who Bayoumi describes as "our dear brother, the visitor from Canada, our brother Fathi" and "Fathi Aidarus," who is sitting on the left of the frame (in grey thobe). Bayoumi also introduces Khalid Al Yafai, who is sitting on the right of the frame (in white thobe). Ex. 10G, MPS906 MPS Video Exhibit 00:56-1:06.

1316. Bayoumi describes Yafai as "Imam of the mosque, who leads us in the *Taraweeh* prayer." Ex. 11G, MPS906-CLIP Video Exhibit at 1:06. The Taraweeh prayer is the evening prayer during Ramadan. Ex. 164, Taraweeh Prayer. Thus, Yafai's presence in Bayoumi's office shows that the videotape was likely filmed during the evening of December 12, 1999.

1317. At his deposition, Bayoumi claimed that he could not recall Fathi Aidarus. Ex. 120, Bayoumi Dep. 349:11-350:11. Yet the videotape clearly shows that Bayoumi described Aidarus as his "dear brother…from Canada" and ███████████████████████ ████████████████████ Ex. 10G, MPS906-CLIP Video Exhibit at 00:56; Ex. 12AA, MPS738_35; Ex. 12BB, MPS688_7; ██████████████.

331

████████████████████████████████████████████
REDACTED FOR PUBLIC FILING

1318.   Yafai and Aidarus were two of the young men whom Bayoumi had befriended and recruited in San Diego to serve as his subagents.  Bayoumi would arrange for both Yafai and Aidarus to provide assistance for Hazmi and Mihdhar upon their arrival and invited them both to the welcome party held for the hijackers in the hijackers' apartment in Bayoumi's Parkwood housing complex. Ex. 10G, MPS906-CLIP Video Exhibit at 17:53, 18:58.

**E.  Bayoumi hosted Jaithen and Mersal in San Diego.**

1319.   Three days after the arrival of Jaithen and Mersal, on Wednesday, December 15, 1999, Thumairy called Bayoumi at 2:23pm (4 mins.).  Phone records and videotape show that Jaithen and Mersal were in San Diego within days after Thumairy's call.

1320.   Both Jaithen and Mersal denied having any memory of Bayoumi.  Ex. 96, Jaithen Dep. 131:12-132:4 ("I don't know that man."); Ex. 115, Mersal Dep. 231:19-24.

1321.   Jaithen and Mersal's claims are not credible. Jaithen and Mersal were assigned to visit Bayoumi at the Al Madinah Mosque and were hosted by Bayoumi during their trip to California.  Ex. 120, Bayoumi Dep. 353:21-24 ("[t]he two Sheikhs who visited Masjid Al-Madina were Abdullah Al Jaithen and Majed Al Mersal.")

1322.   Bayoumi's handwritten address book and his January and October 2000 typed phone lists contained contact information for both Jaithen and Mersal, including their cell phone, home phone, and work fax numbers.  Ex. 12AA, MPS738_59; Ex. 12BB, MPS 688_3, 5; Ex. 421, FBI 0345-49.

**F.  On December 18, and 19, 1999, there was a call chain among Thumairy, Bayoumi, Aulaqi, and the Days Inn, where Jaithen and Mersal were staying in San Diego.**

1323.   As Youssef's call analysis determined, on December 18, 1999, Thumairy called Bayoumi's cell phone from his home phone at 4:08pm (2 mins.), followed by a call to a Days Inn

REDACTED FOR PUBLIC FILING

Motel in San Diego at 4:10. (13 mins.). Ex. 5, Youssef Rpt 145; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). Thumairy's call to the Days Inn Motel, which was located at ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ in San Diego is his first known call to the motel. The Day's Inn was within walking distance of the Islamic Center of San Diego, the mosque where Bayoumi led an entrenched Sunni extremist cell. Ex. 5, Youssef Rpt. 145-46; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).

1324. Youssef further identified that after calling Bayoumi and the Days Inn, "Thumairy called from his home to the home of Anwar al Aulaqi at 4:27pm" for 6 minutes. The 4:27pm call from Thumairy was the first call to Aulaqi in the FBI records. Ex. 5, Youssef Rpt. 146; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).

1325. As Youssef made clear "this type of calling activity is known as 'call chaining' where one call between two individuals is shortly followed by another call by one of the two individuals to a third individual. Ex. 5, Youssef Rpt. 146. Evidence of "call chaining," according to Youssef, "generally indicates that all the participants of the calling activity know one another and are communicating something in common to one another." Ex. 5, Youssef Rpt. 146.

1326. The connections, according to Youssef, are clear, "[I]n this case, Thumairy, Bayoumi, and Aulaqi knew one another well," as established by Thumairy's "four additional calls with Aulaqi on December 28-29, 1999 and January 12, 2000"; Bayoumi had six calls with Aulaqi in February 2000, "including three calls on the day that Bayoumi and Aulaqi worked together to make the arrangements for the hijackers to move into the Parkwood apartments in San Diego"; and Aulaqi featured in various videotapes prepared by Bayoumi. Ex. 5, Youssef Rpt. 146; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000); Ex. 10A (FBI 013459 Video Exhibit) ("Paintballing"); Ex. 10B (MPS890-CLIP Video Exhibit).

REDACTED FOR PUBLIC FILING

1327. The Bayoumi-Thumairy call chain continued the following day, December 19. Bayoumi called from his Al Madinah Mosque office to Thumairy's home at 9:10pm (1 min.). Thumairy called Bayoumi back on Bayoumi's cell phone at 10:17pm (3 mins.), followed again by a call from Thumairy to the same Days Inn Motel in San Diego at 11:40pm (16 mins.). Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).

1328. Plaintiffs' expert Youssef opined, based on his expertise in communications analysis, that "Mersal and Jaithen were staying at the Days Inn Motel in San Diego on December 18 and 19, 1999, and that Thumairy's calls to the Days Inn Motel on those days were to Mersal and Jaithen." Ex. 5, Youssef Rpt. 146. Youssef's opinion was based on "the timing of the calls to the Days Inn Motel in San Diego immediately after Thumairy's calls to Bayoumi; the lack of other calls by Thumairy to that Motel; the location of that Motel near the ICSD; the presence of the visiting MOIA propagators Mersal and Jaithen in San Diego ostensibly to spend Ramadan at Bayoumi's mosque; Thumairy's welcome visit in Los Angeles with Mersal and Jaithen several days earlier; Thumairy's supervisory role over MOIA propagators in California; and the testimony that Mersal and Jaithen stayed at a San Diego motel." Ex. 5, Youssef Rpt. 146-147. All of which, according to Youssef, is "further confirmed by records from the Travelodge Hotel in Culver City, CA from the next day." Ex. 5, Youssef Rpt. 147.

1329. A July 2009 FBI Report released in the EO production also concluded that "[i]t appears there was an important visitor staying at the Days Inn, Golden Triangle during this time…" and that given the phone calls it seems that ALBAYOUMI, AULAQI, ALTHUMAIRY, and ALMUHANNA [the subscriber of the cell phone used by Thumairy, as described above] were all involved with this visitor." Ex. 2, EO 0271. The FBI suggested that the important visitor could be Abdullah al Jaithen. Ex. 2, EO 0271.

334

REDACTED FOR PUBLIC FILING

### G.  The videotape of Jaithen and Mersal hosted by Bayoumi at Sea World in San Diego

1330.   On December 19, 1999, Bayoumi took Jaithen and Mersal on a side trip to Sea World in Mission Bay in San Diego.  The MPS production produced in late March 2022 included a videotape of that trip.  Ex. 10H (MPS896-CLIP Video Exhibit); Ex. 11H (MPS896-CLIP Video Screenshots).  The date is stated by Bayoumi on the videotape.  The videotape shows that Bayoumi's son Emad was also there and operated the camera.

1331.   The videotape shows Bayoumi acting as the host for Jaithen and Mersal during their trip to California.   The videotape also shows Jaithen and Mersal playing a vigorous game of air hockey at Sea World with Bayoumi acting as the play-by-play announcer.  Ex. 10H (MPS896-CLIP Video Exhibit); Ex. 11H (MPS896-CLIP Video Screenshots).

1332.   The videotape also includes the three men joining in a prayer next to a garden with colorful plants at Sea World in San Diego.  After consulting with Jaithen, Mersal observed that "this garden is their paradise in this life."  Mersal continued, referring to the garden, – "it is for them in this life, and for us in the hereafter."  Ex. 10H (MPS906-CLIP Video Exhibit) 04.27, 04.35.

1333.   Mersal's invocation of an "us" versus "them" dogma, and the afterlife rewards for Wahhabi purists, represent the same exclusionary extremist views set forth in *Al-Jihad*, the "Book of Jihad" published by MOIA in Qassim Province, Saudi Arabia that Bayoumi kept in his desk at the Al-Madinah Mosque.  Ex.528, FBI 4139-45.

### H.  The audiotape recovered by the FBI from Bayoumi's office

1334.   An audiotape recovered from Bayoumi's office at the Al Madinah Mosque, dated Ramadan 12, 1420 (which began at sunset on December 19, 1999 and ended at sunset on

REDACTED FOR PUBLIC FILING

December 20, 1999), states that it contains "Sheikhs Majid / Abdullah / Khalid". Ex. 573, FBI 4114. Those Sheikhs likely are Majid Al Mersal, Abdullah Al Jaithen and Khalid Al Yafai.

1335.   Based on a record kept by Bayoumi at the Mosque, Majid Al Mersal and Abdullah Al Jaithen likely led the prayers on the evening of December 19 at the Al Madinah Mosque together with Khalid Al Yafai. Ex. 377, MPS698_145 (Abdullah Al Jaithen handwritten entry and signature in Bayoumi's ledger at Al Madinah Mosque).

1336.   The audiotape, together with the videotape recorded one week earlier of Yafai and Aidarus in Bayoumi's office, shows that Bayoumi prepared Yafai to pray alongside the MOIA clerics and introduced Mersal and Jaithen to Yafai in advance of the assistance that Yafai would provide for the 9/11 hijackers. Ex. 10G (MPS906-CLIP Video Exhibit) 00:00-20:45. Yafai sat next to Hazmi and Emad Bayoumi at the welcome party that Bayoumi held for the hijackers on February 17, 2000. Youssef Decl. ¶ 70.   Only a copy of the audiotape was produced by the FBI; Plaintiffs have subpoenaed the FBI to produce the actual audiotape. Ex. 11G (MPS906-CLIP Video Screenshots).

1337.   On December 20, 1999 at 10:43 a.m., according to the Travelodge Hotels' computerized hotel register, "Abdullah A S Al Jraithen" and "AlBayoumi, Omar" checked into Room 214 at the Travelodge at 11180 Washington Place in Culver City, CA. In addition to their names, the record also states that the number of "guests" in the room was "2". Bayoumi's home address is listed as: "█████████████. San Diego, CA 92111" and the phone number listed on the record — "██████5941" — was Bayoumi's cell phone number. Ex 665, FBI 4012.

1338.   Jaithen claimed he did not remember checking into the Travelodge with Bayoumi and denied knowing Bayoumi, stating that he had departed before the date of the Travelodge stay Ex. 96, Jaithen Dep. 132:6-23, 135:8-137:21, 138:10-139:6. Bayoumi, while conceding it was

336

possible he reserved the Travelodge hotel, denied going to the Travelodge Hotel with Jaithen, even after being confronted with evidence of his presence in the vicinity of the Travelodge during the day in question. Ex. 120, Bayoumi Dep. 339:2-340:1 341:22-342:23.

1339.   The Travelodge records of Jaithen and Bayoumi were only found because the FBI did a canvas of hotels to search for locations where the hijackers and others may have stayed in the Los Angeles area. Ex. 468, FBI-000238-REV2021, FBI Canvas of Motels Jan. 15, 2002.

1340.   Jaithen provided Travelodge with his passport identification upon check-in at the hotel.  Travelodge's record contains a guest's passport number: "Passport # ███████." Jaithen's immigration records for his entry into the U.S. confirm that this number, ███████, was Jaithen's Saudi Arabia passport number in December 1999.  Ex. 527, FBI 4013; Ex. 571, FBI 004675-REV2021 - 04676-REV2021.

1341.   Bayoumi's records show that he was in Los Angeles and Culver City on December 20, 1999.  Bayoumi made a purchase on that date in Los Angeles at a "Danny K. Designs" shop. Ex. 511, FBI 2804.

1342.   Bayoumi's debit card banking record shows that he made a purchase for $15.73 on "12/20 [1999]" from the "Chevron #0███████ in Culver City, CA".   That is a gas station located at ███████████████ Culver City, CA, which is directly across the street from the Travelodge.  Ex. 511, FBI 2804; Ex. 76, Chevron Gas Station Culver City, CA.

1343.   The price of gas in Los Angeles in December 1999 was approximately $1.36 per gallon.  Ex. 161, Gasoline Prices in Los Angeles County.

1344.   This means that Bayoumi purchased approximately 11.5 gallons of gas.  The Days Inn Motel in San Diego is about 120 miles from the Travelodge in Culver City and about 2 ½ to 3 hours away by car.  Ex. 5, Youssef Rpt. 148.

REDACTED FOR PUBLIC FILING

1345.   Thumairy told the FBI in 2003 that the Travelodge was the hotel where he customarily made reservations for visitors because of its close location to the King Fahad Mosque and its affordable rates.  The Mosque is .3 miles from the Travelodge.  Ex. 154, FBI 000001-000006-REV2021 at 04; Ex. 5, Youssef Rpt. 148.

1346.   After Jaithen and Bayoumi checked into the Travelodge at 10:43 a.m., Thumairy called Saudi Arabia's Institute for Islamic and Arabic Sciences in America in Virginia at 12:00 (1 min.) and 12:02 (4 mins.), followed by a call to Embassy Islamic Affairs Saleh at 12:06 (4 mins.), and a third call to IIASA at 12:27 (11 mins.). Ex. 5, Youssef Rpt. 150; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).  Later in the afternoon, Thumairy placed a call from his home to Bayoumi's cell phone at 3:35pm (3 mins.) and then called Bayoumi again at 11:04pm (9 mins.).  Ex. 5, Youssef Rpt. 150; Ex. 12B (Calls between Bayoumi and Thumairy).  After that call, Thumairy used his home phone to call a number in Riyadh, Saudi Arabia from 11:49pm (37 mins.). Ex. 12A (Phone calls Nov. 1999 – Mar. 2000)

**I.   Jaithen, Mersal, and Bayoumi were at the King Fahad Mosque.**

1347.   On December 20, the day that Jaithen stayed at the Travelodge, Thumairy wrote a check from his personal account to the King Fahad Mosque for $3,000, noting "iftar," and designating the money for an Iftar meal at the Mosque during Ramadan. Ex. 184, KFM 0021; Ex. 5, Youssef Rpt. 149.

1348.   Based on the document production from the Mosque, this is the only occasion when Thumairy wrote a check to the Mosque.   The timing and the uncharacteristic nature of this donation during the visit of Jaithen and Mersal during Ramadan indicate it was for a special meal that Thumairy wanted to provide to his guests.  Indeed, both Jaithen and Mersal said they

338

attended an Iftar meal at the King Fahad Mosque. Ex. 115, Mersal Dep. 200:20-201:20; Ex. 96, Jaithen Dep. 115:5-12.

1349.   On December 21, Bayoumi and Jaithen checked out of the Travelodge at 1:22 p.m. Ex. 665,  FBI 4012-13.

1350.   On the evening of December 21, Thumairy placed a call from his home to Bayoumi's cell phone at 10:50 (3 mins.).  Ex. 12B (Calls between Bayoumi and Thumairy); Ex. 477, FBI 000559 at 568.

1351.   As Youssef's analysis shows, December 21, 1999 was "the fourth day in a row that Thumairy and Bayoumi had called each other" and that the next call between the men occurred on December 27, 1999.  Ex. 5, Youssef Rpt. 150; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000); Ex. 478, FBI 000559 at 568.

### J.   Jaithen, Mersal, Bayoumi, and Thumairy gave incredible testimony to deny their relationships and hide the true purpose of their visit.

1352.   Jaithen claimed that MOIA instructed him to visit "America" but did not assign him to visit a specific location.  Ex. 96, Jaithen Dep. 69:19-70:5. According to Jaithen, he decided on his own to visit California for personal reasons to seek medical treatment for an alleged headache condition.  Ex. 96, Jaithen Dep. 60:16-21, 70:6-8.  Jaithen claimed that he didn't even tell his MOIA superiors about his trip to California.  Ex. 96, Jaithen Dep. 76:19-77:1. By contrast, Mersal claimed that MOIA assigned Jaithen to work in another U.S. city (Mersal could not recall where) and that Jaithen went with Mersal to California for several days before heading to his destination. Ex. 115, Mersal Dep. 188:4-23 ("Dr. Jaithen came to be with me a day or two before he leaves for that other destination.").

1353.   Jaithen said that upon their arrival he and Mersal stayed in Los Angeles for 5-6 days at a motel near the King Fahad Mosque while Jaithen sought out the name of a neuro and

REDACTED FOR PUBLIC FILING

brain specialty doctor for his headache condition, made an appointment, and received treatment. Jaithen, however, could not provide any identifying details, including the name of the doctor or whether the doctor's practice was a private or located within a hospital. Ex. 96, Jaithen Dep. 84:8-16, 85:6-9, 18-21, 112:2-115:4.

    1354.   Despite his alleged headache condition, Jaithen is shown on Bayoumi's videotape (released by the MPS after his deposition) enjoying a spirited game of air hockey at Sea World in San Diego with Mersal. Ex. 10, MF-6.m4v (4:46-8:22).

    1355.   In response to questions, Mersal testified he could not remember more than 300 times in his deposition, including that he could not recall:

    • which mosque he and Jaithen went to in San Diego;

    • whether he and Jaithen went to any mosque other than the one to which he was assigned;

    • whether he went with Jaithen to the King Fahad Mosque;

    • the name of the Al Madinah Mosque that he was assigned to visit;

    • anything about the congregants of that Mosque (including that they were predominantly Kurdish); or

    • a single person he met at the Mosque or in San Diego (including Bayoumi).

Ex. 115, Mersal Dep. 141:13-142:21, 211:1-9, 212:1-213:24, 224:17-226:5, 231:19-233:7; Ex. 5, Youssef Rpt. 144 n. 582 (Mersal claimed he could not remember when he went to college, being in Nairobi when the US Embassy was bombed, who sent him to the United States twice, his own signature, the first time or even how many times he went on the hajj. In addition, he claimed he could "not remember" in response to over 60 questions regarding his time in Los Angeles.).

    1356.   Despite his claimed lack of memory on these subjects, Mersal vividly recalled that Jaithen "suffered from severe chronic headaches" when they were in California and the

REDACTED FOR PUBLIC FILING

name of the painkiller medication that Jaithen was supposedly taking for his claimed condition. Ex. 115, Mersal Dep. 217:6-218:9.

1357.   Jaithen recalled that Thumairy hosted him and Mersal for dinner at Thumairy's home near the King Fahad Mosque.  Ex. 96, Jaithen Dep. 125:3-24.  Mersal did not recall having dinner with Thumairy or being at Thumairy's home.  Ex. 115, Mersal Dep. 200:16-201:5, 201:6-10.

1358.   Jaithen claimed that he went to San Diego for only one night and prayed at a Mosque he could not identify.  Ex. 96, Jaithen Dep. 123:3-7.  But Bayoumi admitted said that Jaithen gave a khutbah — the Friday sermon — at his Al Madinah Mosque.  Ex. 120, Bayoumi Dep. 334:9-13, 335:10-13.  The Fridays during Ramadan 1420 when Jaithen could have delivered a khutbah were December 17, 24, and 31, 1999 or January 7, 2000.  Ex. 14, 1420 Hijri Calendar.

1359.   Despite the clear evidence that Bayoumi brought the two MOIA propagators to Los Angeles and that he and Jaithen checked in to the Travelodge near the King Fahad Mosque on December 20, 1999, Jaithen claimed that he did not stay at the Travelodge — and that he did not know Bayoumi.  Ex. 96, Jaithen Dep. 131:12-132:23. Mersal also denied knowledge of the Travelodge or ever being with Jaithen at the King Fahad Mosque.  Ex. 115, Mersal Dep. 198:18-22, 199:12-20, 273:4-275:4.

1360.   Bayoumi flatly denied during his deposition that he arranged a place to stay for Jaithen or Mersal: "The answer is no."  Ex. 120, Bayoumi Dep. 335:19-22.  Bayoumi also said that "I do not stay in hotels unless I am with my family or if I'm alone on my own for studying purposes."  Ex. 120, Bayoumi Dep. 342:24-343:15.

REDACTED FOR PUBLIC FILING

1361. Bayoumi claimed that he did not remember traveling anywhere with Jaithen and Mersal when they were in California. Ex. 120, Bayoumi Dep. 335:23-336:2. But as addressed above, the three men went to Sea World together and Bayoumi took them to Los Angeles on December 20.

1362. Jaithen claimed he only spent 6-7 days in California and then decided on his own — without telling anyone at the Ministry other than his colleague Mersal — to go to Columbus, Ohio on a personal trip to visit his niece for the rest of the month of Ramadan. Ex.96, Jaithen Dep. 88:15-89:1. According to Jaithen, Mersal accompanied him from San Diego to Los Angeles airport, where the two men "split" and Jaithen boarded a flight. Ex. 96, Jaithen Dep. 87:24-89:9, 160:20-161:21. Mersal, however, testified that he "remained in San Diego" and did not go to any airport with Jaithen. Ex. 115, Mersal Dep. 219:10-220:2.

1363. There is no documentary evidence to show that Jaithen went to Columbus, Ohio. Propagators such as Jaithen had to file a request to take personal leave and were not permitted to leave their posts without permission. *E.g.* Ex. 680T, KSA 8423 (Thumairy vacation request). Based on Youssef's experience, a Saudi government official travelling inside the U.S. on government business "would [not] disobey his written instructions and travel to a location in the U.S. without close consultation with his MOIA superiors." Ex. 5, Youssef Rpt. 142.

1364. According to Jaithen, he attended the Omar Ibn al Khattab Mosque (which Jaithen described as a "famous mosque" in Columbus); met the Imam (who Jaithen could not name); and for the remainder of Ramadan gave lessons to worshippers there. Ex. 96, Jaithen Dep. 86:16-24, 93:1-94:11. Jaithen's story was contradicted by the fact that MOIA documents showed that another MOIA propagator worked at that same Omar Ibn al Khattab Mosque during Ramadan

REDACTED FOR PUBLIC FILING

1420.  Ex. 680S, KSA7807-08.  Jaithen claimed he never heard of that propagator or saw him during the time he allegedly was at that Mosque.  Ex. 96, Jaithen Dep. 87:15-23.

1365.  Neither Jaithen nor Mersal could explain why Bayoumi had their contact information in his phone book.  Jaithen suggested that Bayoumi may have found his numbers from the internet.  Ex. 96, Jaithen Dep. 229:20-230-6.  Mersal said he didn't know, and that Bayoumi was only someone he had heard about "from the media."  Ex. 115, Mersal Dep. 257:2-258:22.

1366.  Skeptically, Youssef noted, "Bayoumi claimed that he had no idea how the visit of the two propagators to the Mosque was arranged even though he was part of the call circle on December 7-8, 1999 with Thumairy, Mersal, and the Embassy to set up the plans for their trip."  Ex. 5, Youssef Rpt. 149; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000); Ex. 120, Bayoumi Dep. 331:16-333:13, 335:19-336:2.

1367.  Thumairy denied any knowledge of Mersal, Jaithen, or Bayoumi whatsoever and claimed that he could recall nothing.  Ex. 107, Thumairy Dep. 294:5-14 (no memory of Jaithen); 290:2-291:6 (no memory of Mersal); 306:10-307:1 ("I do not know Bayoumi."); 307:14-19 ("I don't remember anything…" about Bayoumi).  Contrary to Bayoumi's letters to Thumairy and other MOIA officials praising Thumairy for his cooperation and coordination, Thumairy claimed he had "nothing to do" with hosting visiting MOIA propagators and could not "remember anyone in particular."  Ex. 107, Thumairy Dep. 294:24-295:10.

1368.  Jaithen testified that before he arrived in Los Angeles, he had never heard of the King Fahad Mosque or Thumairy and did not even know that Thumairy was a MOIA employee.  Ex. 96, Jaithen Dep. 72:15-73:6, 103:12-104:1, 104:10-24.

REDACTED FOR PUBLIC FILING

1369.   Jaithen's statement is not credible. Mersal was his travelling companion and work colleague from the MOIA's Qassim office and had been posted to Thumairy's mosque the previous Ramadan. Further, Mutaeb Al Sudairy knew of Thumairy and that he was Imam of the King Fahad Mosque due to "an abundance of news" about that Mosque in Saudi Arabia.  Ex. 119, Sudairy Dep. 108:21-109:8.

1370.   MOIA instructed its propagators Mersal and Jaithen to "provide a detailed report" about their trip and to fill out a form providing details about "every organization" visited. Mersal acknowledged that preparing a report of the Ramadan visit was the "procedure" and "protocol." Ex. 141, KSA 9538; Ex. 115, Mersal Dep. 236:2-237:17.

1371.   Neither man could recall if they prepared these documents, and no documents were produced, indicating that the true nature of their trip could not be set forth in an official report due to its sensitive and covert nature.  Ex. 115, Mersal Dep. 112: 23-113:4; Ex. 96, Jaithen Dep. 168:13-22.

## XIX.     DURING THE FINAL WEEKS BEFORE THE ARRIVAL OF THE TWO 9/11 HIJACKERS, BAYOUMI, THUMAIRY, SOWAILEM, ███████, JAITHEN, MERSAL, AND OTHERS INCLUDING AULAQI WORK TOGETHER ON THEIR PLAN TO ASSIST HAZMI AND MIHDHAR

1372.   Weeks before the January 15, 2000 arrival of Hazmi and Mihdhar, during the second half of December 1999, the evidence shows supporters of the plot organized through a series of phone calls and meetings.

1373.   Plaintiffs' expert Youssef concluded, based on his analysis of "phone records, hotel registration documents, and evidence collected by the FBI," that the "purpose of the trip of Jaithen and Mersal was to use the cover of an official Saudi Government MOIA Ramadan 1420 trip to connect in person with the support network that Thumairy, Bayoumi, ██████, Aulaqi, and

REDACTED FOR PUBLIC FILING

others had established on the ground in California and confirm the final preparations for the

arrival of Hazmi and Mihdhar in California." Ex. 5, Youssef Rpt. 145.

**A. During the last week of 1999, Saudi Government officials coordinate among themselves, Aulaqi, and ██████ to make arrangements for the 9/11 hijackers.**

1374.   On December 25, 1999, Thumairy made repeated calls to MOIA propagator

████████, who worked under Thumairy.   ██████ was the "former Imam" of the ICSD and

one of "three Saudi supported propagators living in San Diego…"  Ex. 5, Youssef Rpt. 150, n.

614; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000); Ex. 473, FBI 0518-519; Ex. 476, FBI

000548 at 551; Ex. 2, EO 0692-93.

1375.   On December 25, Thumairy called ██████ at 11:35am (1 min.), after which he

called Consulate Secretary ████ at 11:43am (5 mins.)  Later that day, Thumairy again called

██████ at 3:46pm (5 mins.) with two subsequent call to ██████ at 3:51pm (1 min.) and 3:52pm (3

mins.), and a call to MOIA Embassy Director Sowailem's cell phone at 3:56pm (1 min.) Ex. 5,

Youssef Rpt. 150, n. 614; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).

1376.   As determined by Youssef, Monday, December 27, 1999, began "a three-day

period of unique phone activity involving Thumairy, Bayoumi, Aulaqi, the Saudi Embassy, and

the San Diego apartment of ████████" who is the ██████████████) that

Bayoumi had befriended.  Ex. 5, Youssef Rpt. 150.  Bayoumi would record ██████ on videotape

at the Al Madinah Mosque together with Khalid Al Yafai.  The ██████ apartment was then

located at ██████████, San Diego, CA, almost directly across the street from

the ICSD and Bayoumi's apartment.  Ex. 2, EO 2781, 2792; Ex. 5, Youssef Rpt. 150-51.

1377.   While at home, Thumairy called the San Diego number ██████-4293 ("-4293")

eight times on the consecutive days of December 27, 28, and 29.  Ex. 5, Youssef Rpt. 151. The

REDACTED FOR PUBLIC FILING

FBI confirmed that the -4293 number corresponded to the San Diego apartment of ▮▮▮▮▮▮ on Beadnell Way.  Ex. 2, EO 0057, 0548-49, 0559-60, 2781, 2812, 2971-72.

1378.   The FBI asked ▮▮▮▮▮ about calls made from his phone to Thumairy, Bayoumi, and Aulaqi, which (as detailed below) were part of a chain of calls involving those individuals and the MOIA Embassy Director Sowailem.  Ex.455, FBI 33.

1379.   Bayoumi recorded the number dialed by Thumairy "▮▮-4293" in his handwritten address book next to the name "Fathi" and on the same page just above another listing for "Fathi Al-Aidarus" Ex. 12AA, MPS738_35.  In his January 2000 typed phone list, Bayoumi had an entry for "Fathi Al Aidaroos" with the number "(▮▮▮▮▮-4293".  Ex. 12BB, MPS688_7.  ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

1380.   The evidence shows that Thumairy made no other calls to ▮▮▮▮▮▮▮▮ ▮▮▮, before or after. Thumairy claimed that he did not know ▮▮▮▮ and could not remember why he placed phone calls to ▮▮▮▮ in December 1999.  Ex. 107, Thumairy Dep. 350:15-22.

1381.   The phone records show that Bayoumi used his cell phone to call ▮▮▮▮ at his -▮▮▮ number before and during the hijacker's arrival. Bayoumi's cell phone records produced by the FBI to date start on January 9, 2000, and include a phone call from Bayoumi to ▮▮▮▮ on January 11, 2000.  Ex. 12Q (Bayoumi calls to ▮▮▮▮▮▮); Ex. 515, FBI 3224.

1382.   As determined by Youssef, less than two months after Thumairy's call to ▮▮▮▮, "Bayoumi would introduce ▮▮▮▮ to Hazmi and Mihdhar and ask ▮▮▮▮ to look after them" ...hosting "the two hijackers at his apartment and help[ing] them navigate life in San Diego."  Ex. 5, Youssef Rpt. 151.

REDACTED FOR PUBLIC FILING

1383.   Significantly, on March 2, 2000, the ███ number of ███ received one call from and placed two calls to the Yemen phone number ███0578.  Ex. 2, EO 2812, 2790. That Yemen number was connected to Al Qaeda's bombing of U.S. Embassies in East Africa and was identified as one used operationally by Al Qaeda.  Ex. 2, EO 0006; 4052.

1384.   According to the FBI interview of ███ in December 1999 Bayoumi asked ███ to host two visiting Saudi Sheikhs at his apartment during Ramadan. ███ said that Bayoumi asked if the two Sheikhs could stay for the last ten days of Ramadan; ███ also recounted the Sheikhs stayed for the month, from mid-December to mid-January. Ex. 455, FBI 000032-38 at 38; Ex. 536, FBI 000069.  ███ said that the two visiting Sheikhs were "well known Scholars of Islam who had traveled from Saudi Arabia to San Diego to visit and attend the ICSD."  Ex. 455, FBI 000032.  At his first interview, ███ could not remember the names of the two men and in his second interview described them as "Imam Muhammed" and "Imam Khalid." Ex. 455, FBI 000032-33; Ex. 536, FBI 000069.  ███ considered it a distinct honor to be asked to host the two Sheikhs at his home. Ex. 455, FBI 000032 at 38.

1385.   WExhen asked about series of calls made to and from his phone involving Thumairy, Bayoumi, and Aulaqi on December 27-29, 1999, ███ ultimately claimed that the calls were made by the two visiting Sheikhs from Saudi Arabia.  Ex. 455, FBI 000032 at 33.

1386.   This Court ordered Saudi Arabia to provide documents about the "two Sheikhs" who visited San Diego in December 1999 as described by ███. ECF 4696, July 22, 2019 Sealed Opinion & Order on PECs Motion to Compel. Saudi Arabia stated that "[a]fter a reasonable search, Saudi Arabia was unable to locate any documents regarding a trip to San Diego by two Sheikhs during the time period from November 1999 to January 2000."  ECF 5200 at App. 5 ¶ 15.  Saudi Arabia's response failed to even acknowledge the presence of MOIA

REDACTED FOR PUBLIC FILING

propagators Jaithen and Mersal in San Diego during that period, who Bayoumi himself described as "Sheikhs" Majed and Abdullah. Ex. 573, FBI 4114.

1387. Thumairy claimed that he did not know ███████ and had no explanation for the phone calls made from his home in Culver City to ███████ in San Diego. Ex. 107, Thumairy Dep. 350:15-22.

1388. Plaintiffs' expert Youssef concluded, "based on his analysis of all the telephonic activity among Thumairy, Bayoumi, Aulaqi, the Days Inn, ███████, and Sowailem, that Thumairy called the Days Inn (on December 18-19, 1999) and ███████ (on December 27-29, 1999) to speak with his fellow visiting MOIA propagators Jaithen and Mersal." Ex. 5, Youssef Rpt. 152. The circumstances show that ███████ apartment was being used for operational purposes and that Thumairy was calling ███████'s number to reach other Saudi government officials visiting San Diego who were coordinating with Thumairy, Bayoumi, and the Embassy to make arrangements for the arrival of the Al Qaeda operatives.

1389. Thumairy's calls to the ███████ occurred around the same time as calls he made to Sowailem, Aulaqi, and Bayoumi, which Youssef identified were "call chaining patterns in the December 27-29 contacts when Thumairy called the members of the group in succession" and included the following calls:

December 27

12:40pm (1 min.) – Thumairy calls Sowailem (cell)
12:42pm (1 min.) – Thumairy calls Sowailem (cell)
2:26pm (1 min.) – Thumairy calls ███████
2:41pm (1 min.) -Thumairy calls Sowailem (cell)
6:27pm (9 mins.) – Thumairy calls Bayoumi (cell)
11:36pm (1 min.) – Thumairy calls ███████
11:36pm (6 mins.) – Thumairy calls Bayoumi (cell)

December 28

REDACTED FOR PUBLIC FILING

11:42pm (1 min.) – Thumairy calls Embassy
11:43pm (2 mins.) - Thumairy calls Embassy Islamic Affairs
1:57pm (1 min.)  – Thumairy calls ████
10:24pm (1 min.) – Thumairy calls ████
11:02pm (1 min.) – Thumairy calls Bayoumi (cell)
11:05pm (1 min.) – Thumairy calls ████ (home)
11:07pm (1 min.)  – Thumairy calls ████ (home)

December 29

12:20am (2 mins.) – Thumairy calls Sowailem (fax)
12:35am (3 mins.)  – Thumairy calls ████
12:39am (2 mins.) – Thumairy calls ████
1:06pm (1 min.)  – Thumairy calls ████
1:07pm (1 min.) – Thumairy calls Aulaqi (home)
1:07pm (1 min.)  – Thumairy calls Al Ribat Mosque

Ex. 5, Youssef Rpt. 152; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000); Ex. 477, FBI 000559 at

568; Ex. 495, FBI 001453 at 1455.

1390.   The FBI found that "there was a unique pattern of telephonic contact" that they

labeled as "The Set-Up Calls" meaning that they were "calls that occurred between a number of

individuals who would later play an important role in assisting the hijackers."  Ex. 2, EO 0631.

1391.   Plaintiffs' expert Youssef concluded, based on his communications analysis

expertise, that "this pattern of calls made by Thumairy, together with the sudden reengagement

between Thumairy and Bayoumi; the history of calls of Thumairy, Bayoumi, Jaithen, Mersal,

Aulaqi, and Sowailem (and other Embassy officials); and the coordinated activities that would

shortly be carried out by Thumairy, Bayoumi, Aulaqi, and others for the hijackers in Los

Angeles and San Diego was highly significant."  Ex. 5, Youssef Rpt. 153.

1392.   Youssef determined these facts demonstrate "that the participants in the calls —

Thumairy, Bayoumi, Sowailem, Jaithen, Mersal, and Aulaqi — were all working/coordinating on

an important matter/project that warranted the international travel of Jaithen and Mersal from

349

Saudi Arabia to the U.S. to meet in person." Ex. 5, Youssef Rpt. 153. Youssef noted, "[t]he convergence of the events described herein and the date/time stamp of calls between the various individuals cannot be attributed to random events or happenstance." Ex. 5, Youssef Rpt. 153-54.

1393. Based on his analysis, Youssef conclude:

> ... that the meetings and contacts were for the express purpose of planning and coordinating an event or events involving these men. When viewed in context of the events occurring before and after these contacts, the project that these individuals must be working on is to handle the arrival of Hazmi and Mihdhar in California. The subsequent interactions of Hazmi and Mihdhar with the various members of this calling circle shows that the men are their advance team and support network, to assist in their preparation to participate in a mission inside the U.S. The inclusion of Aulaqi, a notorious terrorist recruiter and supporter, in this group makes this conclusion all the more obvious.

Ex. 5, Youssef Rpt. 153-54.

1394. A 2009 FBI Operation Encore Report opening the full investigation of Thumairy confirms that Thumairy's calls "[d]uring a three day period at the end of 1999 [December 27-29, 1999] … are significant in that the pattern of contact, including individuals and frequency, does not appear to have been duplicated prior to nor after this date." The Report defines the 3-day period as from "12/27/1999" to "12/29/1999." Ex. 2, EO 0559-60; 2971.

## B. Al Qaeda holds a meeting in Malaysia shortly before sending Hazmi and Mihdhar to California in early January 2000.

1395. After receiving their training, Hazmi and Mihdhar had a final planning meeting with other Al Qaeda members in Malaysia before heading to the U.S. Bin Attash arrived in Malaysia ahead of Hazmi and Mihdhar for the meeting. Bin Attash travelled to Kuala Lumpur, Malaysia in the second half of December 1999. Bin Attash was followed about ten days later by Hazmi and Mihdhar. *See* 9/11 Commission Report at 158-9; Ex. 171, JTF-GTMO Detainee Assessment of Zohair Mohammed Said dated Nov. 25, 2008 at 4.

REDACTED FOR PUBLIC FILING

1396.   Bin Attash had trained with both Hazmi and Mihdhar and was Bin Laden's trusted phone communications person. Ex. 5, Youssef Rpt. 155 -56; Ex. 105, Youssef Dep. 123:10-22.

1397.   When Hazmi, Mihdhar, and Bin Attash travelled to Malaysia for their meetings in December-January 2000 Al Qaeda had arranged in advance for a local support network to assist them.  They received lodging and other support from members of an extremist network associated with the Jemaah Islamiah group.  *See* 9/11 Commission Report at 151.  The lodging was provided at the apartment of a Jemaah Islamiah member who made his home available at the request of the group's leader.  *See* 9/11 Commission Report at 159; 490 n. 25 (citing an interview that "the al Qaeda guests were lodged at [a] condominium, an apartment on the outskirts of Kuala Lumpur").

1398.   Al Qaeda meetings in Malaysia involving Hazmi and Mihdhar were held at the apartment arranged through Jemaah Islamiah.  Ex. 82, CIA 0242-304 at 258 (CIA report entitled "11 September: The Plot and Plotters" dated June 1, 2003).  The CIA found that arrangements were made for Mihdhar to be met at the airport upon his arrival in Malaysia.  Ex. 82, CIA 0242-304 at 258 (CIA report entitled "11 September: The Plot and Plotters" dated June 1, 2003).

1399.   Law enforcement investigators determined that Bin Attash used a pay phone near the apartment where he was staying to make calls to Bangkok and Yemen, including to Mihdhar's in-laws' home in Yemen to instruct Mihdhar to proceed to Malaysia.  Ex. 5, Youssef Rpt. 156; Ex. 170, Joint Congressional Inquiry at 13 (attended the Malaysia meeting with Hazmi and Mihdhar).

REDACTED FOR PUBLIC FILING

1400. Based on his FBI knowledge from the relevant time, former Special Agent Youssef stated that Bin Attash had access to fraudulent passports and could have easily bypassed the normal legal systems to enter the U.S. himself. Ex. 105, Youssef Dep. 29:19-30:7.

1401. In December 1999 "the KFM [King Fahad Mosque] received a phone call from an individual in Malaysia." Ex. 2, EO 0520. The caller wanted to "speak with AL-THUMAIRY. . . regarding the imminent arrival of two brothers ... who needed their assistance." Those "two brothers" were Nawaf al Hazmi and Khalid al Mihdhar. Ex. 2, EO 0520.

1402. Plaintiffs' expert Youssef concluded that from his experience at the FBI that the FBI assessed this information as credible. Ex. 5, Youssef Rpt. 155, n. 629.

1403. Thumairy admitted that he received calls at the King Fahad Mosque. Ex. 107, Thumairy Dep. 102:22-103:4.

1404. Thumairy had the flight information for Hazmi and Mihdhar in advance and sent ████████████, a KFM worshiper and family friend of Saudi Consulate official ████████ to LAX on January 15, 2000 to meet the two hijackers at LAX and bring them to the Mosque to see Thumairy. Ex. 2, EO 0520.

1405. Plaintiffs' expert Youssef's report detailed the evidence corroborating this information, including that the hijackers attended an Al Qaeda meeting in Malaysia immediately before traveling to California; ████ met the hijackers and brought them to meet Thumairy at the King Fahad Mosque their first day in Los Angeles ; the support, including lodging, that ████ provided for the hijackers after they left their meeting with Thumairy; Bayoumi and Aulaqi's meetings with and support for the hijackers; and the relevant phone contacts among the various participants. Ex. 5, Youssef Rpt. 155, 160-70.

REDACTED FOR PUBLIC FILING

1406.   Plaintiffs' expert Youssef testified at his deposition that senior Al Qaeda operative and current Guantanamo detainee Bin Attash was likely the individual who made the phone call to Thumairy because Attash was in Malaysia at the time to attend a meeting with Hazmi and Mihdhar; had trained with both of them; and was Bin Laden's communications person.  Ex. 105, Youssef Dep. 123:10-22.  Youssef also stated based on his FBI knowledge that at the time Attash had access to fraudulent passports and could have easily bypassed the normal legal systems to enter the U.S.  Ex. 105, Youssef Dep. 30:1-7.

1407.   Early in the morning on January 2, 2000, Bayoumi made two calls from his Mosque office to Saudi Arabia at 4:54am (2 mins.) and 4:56am (6 mins.) followed by a call to Thumairy at his home at 5:06am (3 mins.)  Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).

1408.   As Youssef's analysis determined, no other calls between Thumairy and Bayoumi had occurred at any time close to this early morning hour, demonstrating the urgency of the call, such that "[ o ] f their 43 calls in the records produced to date, there were only four other morning calls, and the earliest other morning call was at 11:24 a.m."  Ex. 5, Youssef Rpt. 156.

1409.   On January 4 - 5, 2000, Hazmi and Mihdhar arrived in Kuala Lumpur, Malaysia for their meetings with Bin Attash.  Ex. 155,  FBI Hijackers Timeline at 52 (Mihdhar takes January 5 flight from U.A.E. to Malaysia); *See* 9/11 Commission Report at 181.

1410.   On January 4, 2000, Thumairy used his cell phone to make six calls to the Travelodge in Culver City, CA between 3:19am and 3:44pm.  Late that evening, Thumairy placed a call to Anwar Aulaqi's home number at 11:00pm (1 min.) followed by a call to the Al-Ribat Mosque where Aulaqi was the Imam at 11:04pm (3 mins.).  Ex. 2, EO 0608.

1411.   About an hour after Thumairy's calls to Aulaqi, on Wednesday, January 5, 2000, ███████ telephoned Thumairy at 12:12am (8 mins.)  Five minutes into their eight-minute

REDACTED FOR PUBLIC FILING

call, ██ phoned Omar Al Bayoumi at 12:17am (2 mins.)  This means there was a conference call among the three men lasting 2-3 minutes.  Ex. 2, EO 0609, Ex. 566, FBI 011752 at 11754.

1412.   The late-night timing of the call demonstrates the urgency of the men to make the final preparations for Hazmi and Mihdhar to travel to the U.S., and for Bayoumi to visit ██ at the Saudi Consulate and Thumairy at the King Fahad Mosque.

1413.   This contact evidence that Bayoumi and ██ had a relationship prior to and apart from their in-person meeting on February 1, 2000 at the Saudi Consulate and at the King Fahad Mosque.

1414.   The FBI concluded that "[c]ommunications analysis of telephone number associated with ██ show contact with multiple individuals who assisted Hazmi and Mihdhar…."  Ex. 566, FBI011752 at FBI 11754.

1415.   In addition to Bayoumi, the FBI recorded that ██ had significant phone calls with ████████, who would host the two hijackers at his apartment.  Ex. 566, FBI 11757.

1416.   On January 6, 2000, just after midnight (recorded by the FBI as "00:53"), Thumairy used his cell to called Bayoumi's cell (5 mins.).  Ex. 2, EO 2757. Later that day Bayoumi used his Mosque office phone to call Thumairy's cell at 6:15pm (1 min.); Thumairy's cell called Bayoumi's cell at 6:21pm (1 min.); and Bayoumi used his Mosque office phone to call Thumairy at 6:30pm (4 mins.).  Ex. 12B (Calls between Bayoumi and Thumairy); Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).

1417.   On January 6, 2000, using his Mosque office phone, Bayoumi called Thumairy and then placed a call at 7:02pm (3 mins.) to a number in Columbus, Ohio of the husband of Jaithen's niece.  Ex. 5, Youssef Rpt. 157 n. 641 & 642; Ex. 12A (Phone calls Nov. 1999 – Mar.

354

REDACTED FOR PUBLIC FILING

2000); Ex. 495, FBI 001453 at 1455 (Trans Union information for phone number of husband of

Jaithen's niece).

1418.   Ramadan 1420 ended at sunset on January 7, 2000.  Ex. 14, 1420 Hijri Calendar.

1419.   On January 7, 2000 at 7:29 pm (2 mins.), Bayoumi made a call from his Mosque

office phone to the same number in Columbus, Ohio of the husband of Jaithen's niece.  Ex. 5,

Youssef Rpt. 157, n. 641; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000); Ex. 496,  FBI 001456

at 01459. At his deposition, Jaithen claimed "I don't know Omar al-Bayoumi."  Ex. 96, Jaithen

Dep. 227:2-5.

1420.   On January 8, 2000, the Eid holiday, Hazmi and Mihdhar traveled from Kuala

Lumpur, Malaysia to Bangkok.  Ex. 155,  FBI Hijackers Timeline at 52.

**C.  The final preparations for the hijackers' arrival**

1421.   On **Saturday, January 8, 2000**, Hazmi and Mihdhar traveled from Kuala Lumpur,

Malaysia to Bangkok, continuing their preparations to enter the United States.  Ex. 155, FBI

Hijackers Timeline at 52.

1422.   On **Sunday January 9, 2000**, just six days before Hazmi and Mihdhar took their

flight in to LAX, Bayoumi took a trip from San Diego to Los Angeles.  Bayoumi stayed

overnight together with two other people at a hotel in Culver City, CA.  Hotel records recovered

by the FBI showed that Bayoumi checked in a total of three guests (No. in Party: 3) to a room at

the Half Moon Motel (address: ███████████., Culver City, CA). Ex. 525, FBI 004009-

004010.

1423.   Bayoumi filled out the Motel registration card in his own handwriting and paid

for the room on his bank debit card.  He filled in his address as "██████████████" which was

his actual current address in January 2000.  The time of Bayoumi's check-in was not recorded on

REDACTED FOR PUBLIC FILING

the Motel's record. Ex. 120, Bayoumi Dep. 355:1-8; Ex. 512, FBI 002805-002807 at 002806 (Bank of America record for "Half Moon Motel Culver City CA" for $47.04"); Ex. 525, FBI 004009-004010 at 004009 (Bayoumi Half Moon Motel guest registration card showing rate plus tax of $47.04 and "3" as "No. in Party") (Bayoumi Dep. Ex. 702).

1424.  The Half Moon Motel where Bayoumi stayed was within walking distance of the King Fahad Mosque.  It was also a just a one-minute walk from the Deano's Motel (address: ████████████████, Culver City, CA) where, as described below, Hazmi, Mihdhar, and █████████████ would stay in June 2000 when they visited Los Angeles and met with Thumairy.  Ex. 2, EO 0896 (2004 FBI report on its canvassing of "hotels and motels within walking distance of the King Fahad Mosque," including Deano's and the Half Moon Motel).

1425.  Bayoumi videotaped six minutes from his January 9, 2000 trip to Los Angeles which was recovered by the MPS and produced in this litigation.  Ex. 10I, MPS899-CLIP Video Exhibit.  Plaintiffs prepared a certified transcript and translation of the tape.  Ex. 10I-TR, MPS899-CLIP-TR Video Transcript. The video shows that Bayoumi was in Los Angeles with two Saudi men: Khalid Al Yafai and Hisham Al Kaaki.  As detailed below, Bayoumi tasked Yafai to assist Hazmi and Mihdhar in their early weeks in the United States and Yafai attended the welcome party for the hijackers.  Bayoumi would call Yafai 27 times from January 10 to February 20, 2000, when Yafai travelled to Saudi Arabia – and Yafai would return to San Diego in July 2000.  Ex. 12N (Bayoumi calls to Khalid Al Yafai and Broadway Pizza); Ex. 11N Video Screenshots at 4 (image of Yafai in July 2000).

1426.  The tape shows that Bayoumi arranged for the three men to go to the Consulate; Kaaki states that "we took everything from the Saudi National Consulate with us in the trunk of the car."  Ex. 10I, MPS899-CLIP Video Exhibit at 01:06.  In addition, the men went to the King

REDACTED FOR PUBLIC FILING

Fahad Mosque, as they discuss attending a prayer led by Imam Shuaib, the MOIA propagator at the Mosque working under Thumairy. *Id.* at 04:26.

1427.   Bayoumi coordinated his trip to LA on January 9, 2000 with Fahad Al-Thumairy. Bayoumi used his cell phone at 12:21 p.m. (1 min.), to call Thumairy's cell phone.  Ex. 515, FBI 003221 at 23.  Bayoumi's call to Thumairy shows that his stay was likely related to Bayoumi's trip to Los Angeles since it occurred on the same day.  Ex. 5, Youssef Rpt. 158.

1428.   On the same night that Bayoumi paid for a room at the Half Moon Motel for him, Yafai, and Kaaki, Bayoumi also checked into another room at a different Culver City hotel that both Bayoumi and Thumairy knew well: the Travelodge.  Bayoumi had been to the Travelodge just three weeks earlier, on December 20, 1999, together with MOIA propagator Jaithen. Thumairy told the FBI he liked the Travelodge and made reservations there for Mosque visitors. Ex. 154, FBI 000001-000006-REV2021 at 04. Thumairy had extensive phone contacts with someone at the Travelodge in the days immediately preceding Bayoumi's January 9 visit.  On Tuesday January 4, Thumairy called █████-1111, the number for the Travelodge, six times from his cell phone in a single day, Ex. 2, EO 0620-0621, indicating that he was connecting with a hotel guest there.

1429.   The circumstances show that Bayoumi's January 9, 2000 visit to the Travelodge had an operational purpose involving Thumairy.  An incoming call on Bayoumi's cellphone at 8.24 p.m. was likely made to confirm the meeting approximately one hour later.  Bayoumi used his room at the Travelodge for a short time: he checked into a third-floor room at 9:28 p.m. and checked out at 9:50 p.m., 22 minutes later.  Ex 526, FBI 004011.  This suggests he held a meeting in the room, likely with Thumairy.   The check-in record shows that Bayoumi gave the Travelodge his old "███████████ address, FBI 4011, while 3 weeks earlier Bayoumi

357

REDACTED FOR PUBLIC FILING

used his current "████████████████" address to register with Jaithen. Ex. 526, FBI004011; Ex. 665, FBI004012; Ex. 527, FBI004013.

1430.   Bayoumi had another task to fulfil on his January 9 trip: getting calling cards.  At 5.42 p.m. Bayoumi used his cell phone to call ██████-0034 (1 min.), which the FBI identified as the number for 9278 Communications (subscribed to ████████████, "a business that sells calling cards."  Ex. 2, EO 3676-77.  Phone records show that Bayoumi made a series of calls to 1-800 numbers associated with calling cards, beginning at 10:53 p.m. into the early morning hours of January 10 (last call at 3.28am).  Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). The FBI assessed that Bayoumi was "either checking the minutes" on the cards, "or learning how to use them by listening to the automated prompts."  Ex. 2, EO 0631.  Bayoumi was likely initiating the account balances and setting up his associate Yafai to use the cards.

1431.   Bayoumi stated at his deposition that he did not know and could not remember why he was in Culver City, CA on January 9, 2000.  Ex. 120, Bayoumi Dep. 344:23-345:2.

1432.   Bayoumi initially claimed that he traveled "[w]ith my family…" but had no recollection of being at the Travelodge ("#Guests: 1") or at the Half Moon Motel ("No. in Party: 3").  Ex. 526, FBI 004011; Ex. 525, FBI 004009; Ex. 120, Bayoumi Dep. 344:20-22; 356:2-6.  Bayoumi insisted: "I do know that I travel with my family. I do not travel with anyone else."  Ex. 120, Bayoumi Dep. 356:2-10.  Yet Bayoumi's family consisted of five people at the time. Ex. 120, Bayoumi Dep. 356:2-357:2. When confronted with the fact that he had stayed overnight in a group of three persons, Bayoumi suggested he often took his children on his own "for some amusement park entertainment."  Ex. 120, Bayoumi Dep. 356:2-357:2.

1433.   Yafai was questioned by the 9/11 Commission but, like Bayoumi, he withheld information about the Los Angeles trip: he claimed that he "went by himself" and visited the

REDACTED FOR PUBLIC FILING

Saudi Consulate "to deal with a visa issue" and also visited the King Fahad Mosque – but told the Commission that he couldn't remember who he met on the trip.  Ex. 308, MFR 9/11 Commission Interview of Yafai, February 24, 2004 at 2, 7-8.

1434.  **On January 10, 2000**, MOIA propagator Abdullah al Jaithen arrived back in Saudi Arabia from the U.S. Ex. Ex. 232, KSA 9550.

1435.  **On Tuesday, January 11, 2000**, Bayoumi used his cell phone to call the San Diego number for Saud Al Sudairy – the brother of Mutaeb Al Sudairy – at 3:07 p.m. (2 mins.). Bayoumi had the number for Saud Al Sudairy in his handwritten address book and his typed phone book.  Ex. 12A (Phone calls Nov. 1999 – Mar. 2000); Ex. 12AA, MPS738_49; Ex. 12BB, MPS688_9; Ex. 522, FBI 3510 (Saud Alsudairy was the brother of Mutaeb and a Saudi Embassy official).

1436.  The call to Saud Al Sudairy was followed by a call at 3:10 p.m. (1 min.) to San Diego student ██████████. This is the first known call from Bayoumi to ██████ in the records that have been produced.  Ex. 12Q (Bayoumi calls to ██████. Bayoumi's January 11 cell call to ██████ comes after the December 27 – 29, 1999 phone circle that included a flurry of 8 calls from Thumairy in Los Angeles to ██████ in San Diego. Ex. 5, Youssef Rpt. 159; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).  As addressed later, ██████ was invited by Bayoumi to the welcome party for the hijackers and ██████ told the FBI that Bayoumi asked him to help Hazmi and Mihdhar. Ex. 455, FBI 000032-38 at 35-36.

1437.  The phone records show that Bayoumi also called ██████ in February 2000 (4 calls) and March 2000 (2 calls) during the time that ██████ was providing support to the hijackers, and a call was placed in March 2000 from ██████'s phone to the number for the Al Qaeda operations center in Yemen.  Ex. 5, Youssef Rpt. 159.

REDACTED FOR PUBLIC FILING

1438.  **On Wednesday January 12, 2000**, Thumairy used his home phone to call Anwar Al Aulaqi at home at 9:40 (3 mins.)  Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).  This is the last of a series of 5 calls made by Thumairy to Aulaqi (including one call to the Al Ribat Mosque) between December 18, 1999 and January 12, 2000.  Ex. 5, Youssef Rpt. 159.

1439.  **On Thursday, January 13, 2000**, Thumairy made two calls from his home to ██████████ at home at 9:38-9:41 p.m (3 mins.) and 9:47-9:52 p.m. (5 mins.)  Ex. 5, Youssef Rpt. 159; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).   These calls continue the unique group of calls from Thumairy to ████ that would culminate on January 15, 2000 with the arrival of the hijackers.  Ex. 5, Youssef Rpt. 159.

1440.   Plaintiffs' expert Youssef concluded that the timing calls support his opinion that the Saudi government officials at the Embassy and in California, together with Anwar Al Aulaqi, were having discussions about their final preparations for the arrival of the Al Qaeda operatives.  Ex. 5, Youssef Rpt. 159.

### D. Al Qaeda used meticulous preparation and would only have sent Hazmi and Mihdhar to California with a verified support structure to receive them and provide support to them.

1441.   U.S. intelligence and law enforcement found that Al Qaeda worked routinely with other like-minded groups such as Al Gama'a, AIAI, and Jemaah Islamiah, to achieve the specific geographical, logistical, and tactical goals necessary for each operation.  The CIA found that Al Qaeda had a wide network in some 60 countries," "relationships with sympathetic groups and individuals," and "exploitation of contacts in certain Islamic relief organizations."  Ex. 80, CIA 0001-0016 at 0002 (CIA Analytic Report produced in EO production entitled: "How Bin Ladin Commands a Global Terrorist Network," January 27, 1999).

REDACTED FOR PUBLIC FILING

1442. A CIA report of November 2000 found that Al Qaeda used detailed advance planning and was highly adaptable to the requirements of each specific mission, depicting it as a "a highly skilled, resilient network with a wide range of methods of attack at its disposal." Ex. 81, CIA 0017-36 at 19 (CIA Analytic Report produced in EO production entitled: "Bin Laden's Terrorist Operations: Meticulous and Adaptable," Nov. 2, 2000). The CIA concluded that Al Qaeda observed "sound operational practices, making use of meticulous contingency planning completed far in advance of an operation;" Ex. 81, CIA 0017-36 at 19. The CIA determined that Al Qaeda carried out the 1998 Embassy bombings using "the resources of a potent local network in place for almost a decade." The CIA found that separate plots in Canada and Jordan that "attest to Bin Ladin's success in enlisting the aid of more loosely organized Sunni extremist networks." Ex. 81, CIA 0017-36 at 19, 29, 31.

1443. The 9/11 Commission found that when Hazmi, Mihdhar, and Attash travelled to Malaysia for their meetings in December-January 2000 Al Qaeda had arranged in advance for a local support network to assist them. They received lodging and other support from members of an extremist network associated with the Jemaah Islamiah group. *See* 9/11 Commission Report at 151. The lodging was provided at the apartment of a Jemaah Islamiah member who made his home available at the request of the group's leader. *See* 9/11 Commission Report at 159; 490 n. 25 (citing an interview that "the al Qaeda guests were lodged at [a] condominium, an apartment on the outskirts of Kuala Lumpur").

1444. A June 2003 CIA report found that the Al Qaeda meetings involving Hazmi and Mihdhar in Malaysia were held at the apartment arranged through Jemaah Islamiah. Ex. 82, CIA 0242-304 at 258 (CIA report entitled "11 September: The Plot and Plotters" dated June 1, 2003). The CIA found that arrangements were made for Mihdhar to be met at the airport upon his

REDACTED FOR PUBLIC FILING

arrival in Malaysia.  Ex. 82, CIA 0242-304 at 258 (CIA report entitled "11 September: The Plot and Plotters" dated June 1, 2003).

1445.   The 9/11 Commission found that the "lodging and travel assistance" arrangements made by Al Qaeda through Jemaah Islamiah in Malaysia as "precisely" analogous to the kind of support Hazmi and Mihdhar would likely have received upon their arrival in California.  *See* 9/11 Commission Report at 514 n. 5.

1446.   The 9/11 Commission concluded that Hazmi and Mihdhar would not have been sent to Los Angeles without a support network in place. "We believe it is unlikely that Hazmi and Mihdhar—neither of whom in contrast to the Hamburg group, had any prior exposure to life in the West—would have come to the United States without arranging to receive assistance in advance from one or more individuals informed in advance of their arrival."  *See* 9/11 Commission Report at 215.

1447.   9/11 Commission Staff Member Dietrich Snell testified that "[w]e determined that because Hazmi and Mihdhar were unfamiliar with the West and unable to speak and understand English, it was likely that arrangements had been made in advance for them to receive assistance upon their arrival in California."  Ex. 90, Snell Decl. ¶ 8.  Saudi Arabia chose not to cross-examine Snell.

1448.   The FBI's July 2021 EC concluded that:

> Due to the lack of preparedness of Alhazmi and Almihdar for the operation and residing in the West without arousing suspicion the existence of a support network would make operational sense.  Investigation determined that a significant portion of the network assisting these two hijackers centered on offices affiliated with the KSA [Kingdom of Saudi Arabia] to include the Saudi Arabian Los Angeles Consulate, the King Fahd Mosque as well as multiple individuals associated with these locations and/or the Saudi Arabian government.

Ex. 2, EO 3486.

REDACTED FOR PUBLIC FILING

1449.   Consistent with the conclusions of the 9/11 Commission and the FBI, Plaintiffs'

expert Youssef determined that that Al Qaeda used a "support network for 9/11 hijackers Hazmi

and Mihdhar was provided by Saudi Government officials through the longstanding Sunni

extremist cells in California that were supported by Saudi Arabia."  Ex. 5, Youssef Rpt. 161.

1450.   Youssef concluded, that based on his:

> experience and knowledge of Al Qaeda's tradecraft, it is inconceivable
> that Al Qaeda would send its two longstanding operatives Nawaf al Hazmi
> and Khalid al Mihdhar, who had never been to the West and did not speak
> English, to Los Angeles without having a detailed plan for their arrival.
> This plan would have included a support network with trusted individuals
> on the ground ready to help Hazmi and Mihdhar with transportation,
> lodging, translation, and other assistance from the moment that they
> arrived in Los Angeles. Where Hazmi and Mihdhar went and who they
> met upon their arrival provides a key to understanding the plan that Al
> Qaeda must have devised in advance for the two men.

Ex. 5, Youssef Rpt. 160.

1451.   Furthermore, according to Youssef, "Al Qaeda would have arranged for Hazmi

and Mihdhar to be met upon their arrival at LAX, particularly since they had never been to the

U.S. and could not speak English" and that "[w]ithout someone to provide them with guidance,

there was a much higher risk that the two operatives would be noticed as suspicious and come to

the attention of law enforcement."  Ex. 5, Youssef Rpt. 160. Youssef stated based on his

knowledge from "other investigations that Al Qaeda operatives arriving in a new location for the

first time would be trained to trust and work only with a person who was part of an established

network with bona fides already verified by the organization" and "[s]uch arrangements would

be made well in advance."  Ex. 5, Youssef Rpt. 160.  For Al Qaeda, "[n]othing would be left to

chance, as even casual contacts, if not properly handled, could risk the entire mission."  Ex. 5,

Youssef Rpt. 160.

REDACTED FOR PUBLIC FILING

1452.   Plaintiffs' expert Youssef further believed:

> The actions of the hijackers Nawaf al Hazmi and Khalid al Mihdhar show that Al Qaeda arranged in advance for Fahad al Thumairy and members of his extremist cell at the King Fahad Mosque to meet and provide support for the two hijackers upon their arrival. The first person known to have met Hazmi and Mihdhar in Los Angeles was ███████████ who regularly attended the King Fahad Mosque. ████ then immediately brought Hazmi and Mihdhar to Fahad al Thumairy at the King Fahad Mosque where the two hijackers had a private conversation with Thumairy. As detailed below, the two hijackers lived in █████ apartment during their time in Los Angeles. Ex. 5, Youssef Rpt. 160-61.

1453.   The EO production included a February 2010 Report on a FBI-CIA meeting to discuss Operation Encore, which concluded that: "HIJACKERS AL-HAZMI AND AL-MIHDHAR LANDED IN LOS ANGELES ON 15 JANUARY 2000. THE FIRST PLACE THEY VISITED WAS THE KING FAHAD MOSQUE IN CULVER CITY, CA WHERE AL-THUMAIRY WAS THE IMAM." Ex. 2, EO 0632.

1454.   Saudi Arabia's claim that it considered Al Qaeda as a "declared…enemy" is misleading and incorrect. KSA Aver. At ¶ 62. Saudi Arabia cites the Joint CIA-FBI Assessment, but that Assessment found that Saudi Arabia failed to act against Al Qaeda prior to the 9/11 Attacks because of "an implicit or explicit understanding that al-Qa'ida would not strike on Saudi soil." Ex. 2, EO 3417. Moreover, the Assessment found that Saudi Arabia's senior officials provided support for terror organizations including Al Qaeda outside Saudi Arabia and specifically in the U.S. and led the Al Haramain organization which provided key assistance to Al Qaeda. Ex. 2, EO 3416, 3435. The Assessment showed that it was not until after the May 2003 bombings in Saudi Arabia itself that Saudi Arabia took steps to crack down against Al Qaeda. Ex. 2, EO 3416, 3420.

1455.   Saudi Arabia's claim that Al Qaeda was an "enemy" of Saudi Arabia is belied by the fact that upon their arrival in California Hazmi and Mihdhar went to the King Fahad Mosque.

REDACTED FOR PUBLIC FILING

If Saudi Arabia's claim was correct, it made no sense for the Al Qaeda operatives to commence their terror operation inside the U.S. by going to a Mosque named after the reigning Saudi King, operated by Saudi Arabia, and led by the Saudi government's diplomat-Imam Thumairy.

**XX.     FROM THE MOMENT OF THEIR ARRIVAL IN LOS ANGELES ON JANUARY 15, 2000, THE HIJACKERS RECEIVED SUPPORT FROM THE EXTREMIST NETWORK ESTABLISHED AND LED BY SAUDI GOVERNMENT OFFICIALS**

1456.   The support network for the hijackers was organized on the ground in California by three Saudi government officials, each working for a different Saudi government Ministry – Thumairy from MOIA; ████, a Consulate Islamic Affairs employee working for MOFA; and Bayoumi, an agent working under the PCA and Ministry of Defense.  As detailed below, the MPS production revealed that another Saudi government official was directly involved with the hijackers: Sheikh Mohamed Al Qahtani, attended the welcome party for the hijackers held at their apartment.

1457.   Phone records show that at the key times Thumairy and Bayoumi coordinated their support for the hijackers with each other and MOIA's Embassy Director Khalid Al Sowailem; the Embassy Islamic Affairs office run by Musaed Al Jarrah; and MOIA propagators working under Sowailem and for MOIA in Saudi Arabia.

1458.   Thumairy, ████, and Bayoumi provided support to the hijackers through two longstanding and active Sunni extremist cells that operated in Los Angeles and San Diego with the support of Saudi Arabia for almost a decade.

1459.   The 9/11 Commission identified Thumairy as "a logical person to consider as a possible contact for Hazmi and Mihdhar" and stated that the hijackers "appear to have obtained assistance from the Muslim community, specifically the community surrounding the King Fahd

365

REDACTED FOR PUBLIC FILING

Mosque in Culver City, one of the most prominent mosques in Southern California." *See* 9/11 Commission Report at 216-17.

1460.  The 9/11 Commission investigation, however, was not able to penetrate Al Qaeda's tradecraft.  The Commission stated that: "[a]fter the pair cleared Immigration and Customs at Los Angeles International Airport, we do not know where they went . . . We do not pick up their trail until February 1, 2000, when they encountered Omar al Bayoumi . . ." *See* 9/11 CommissionReport at 217.

1461.  As Youssef point out, the 9/11 Commission "did not know (as the FBI would later learn and acknowledge in various reports, including the FBI's July 2021 EC) that the 'first place' where Hazmi and Mihdhar went was the King Fahad Mosque where they met Thumairy immediately after they arrived on January 15, 2000."  Ex. 5, Youssef Rpt. 161.  As late as November 2005, FBI Los Angeles was still actively trying "to establish where the 9/11 hijackers stayed from 01/15-02/04/2000, prior to relocating to San Diego."  Ex. 2, EO 3700.

1462.  Plaintiffs' expert Youssef concluded from the evidence he reviewed that "Thumairy was the MOIA's main designated contact person for Al Qaeda and the hijackers in Los Angeles and that Thumairy employed members of his extremist cell at the King Fahad Mosque, including Consulate official ███████ and ███████████ to provide a support network for the hijackers."  Ex. 5, Youssef Rpt. 162.

## A. The Saudi government support network arranged for Hazmi and Mihdhar to be picked up at the airport.

1463.  The FBI 2016 Operation Encore report concluded that "███████████████ was taked by THUMAIRY to assist HAZMI and MIDHAR [sic] while they were in Los Angeles."  Ex. 566, FBI 11757.

REDACTED FOR PUBLIC FILING

1464.   Thumairy, Bayoumi, and ███ arranged for Hazmi and Mihdhar to be met upon arrival by ███ or another member of the Saudi government support network at Los Angeles airport and brought to the King Fahad Mosque.  Hazmi and Mihdhar would not have been sent into the United States for the first time without being met and escorted from the airport.  Ex. 5, Youssef Rpt. 160-63.

1465.   As expert Youssef identified, the phone records demonstrate Thumairy made calls from his home related to the travel of Hazmi and Mihdhar to Los Angeles.  For example, on Saturday, January 15, 2000, Thumairy called an unknown number in Saudi Arabia at 12:42 a.m. (3 min.).  This call coincides with the hijackers flying on United Airlines from Hong Kong to Los Angeles, a non-stop 13-hour flight, that arrived at 1:27 p.m. in Los Angeles.  Ex. 5, Youssef Rpt. 162; Ex. 2, EO 0609 (Youssef's report inadvertently cited to EO 0629; however, EO 0609 is the correct citation).

1466.   On January 15, 2000 Bayoumi received two incoming calls at 1:41 p.m. (1 min.) and 1:43 p.m. (1 min).   An FBI report from the EO production shows that the FBI identified these calls as coming from phone number ███-6662 ("-6662").  Ex. 515, FBI 3225; Ex. 2, EO 2750.  The FBI determined that the -6662 number was subscribed to by Bayoumi's wife Manal Bagader but used by Bayoumi from November 1998 through September 2000.  Ex. 2, EO 2798 (noting the cessation in activity coincides with Bayoumi's move to the United Kingdom). The calls from the -6662 number to Bayoumi shortly after the arrival of Hazmi and Mihdhar show that Bayoumi lent his  -6662 phone to someone, likely the person who was assisting the hijackers or a trusted communications person.

REDACTED FOR PUBLIC FILING

1467.   Thumairy called an unknown number in Santa Ana, California at 1:35 p.m. (1 min), and then called the home of Saudi Consulate Secretary ███████ at 1:59 p.m. (1 min.). Ex. 474, FBI 000513, 000518.

1468.   The January 15, 2000 call from Thumairy to ████ at 1:59 p.m. is significant.  The FBI's reports show that there were phone contacts between ████ and ███████ "prior to and directly following the key events of logistic assistance provided by ████ to HAZMI and MIDHAR."  Ex. 566, FBI 011757.

1469.   ████████████████████████████ ████████████.  Ex. 72, Madha Decl. ¶ 31; ████████████████.  After prevaricating, ████████ admitted he knew ████████ aka Abu Khalid and his son ████████████, and that his (████'s) wife knew ████████'s wife.  Ex. 110A, Mana Dep. 20:24-39:8.

1470.   ████████████████████████████ ████████████████████████████ Ex. 5, Youssef Rpt. 163-164; Ex. 116, ████████████.  According to expert Youssef, "the number and nature of the contacts that ████ had with the two hijackers, and the time they spent with him, shows that ████ was part of the support network."  Ex. 5, Youssef Rpt. 64.

1471.   The FBI found that "communications analysis of telephone numbers associated with ████ show contact with multiple individuals who assisted HAZMI and MIDHAR…including a phone call to Bayoumi on 1/5/2000."  Ex. 566, FBI 011752 at 11754.  The 2014 FBI Operation Encore Report stated that ████ "never provided adequate explanation" for "his role aiding Bayoumi in facilitating the hijacker's arrival and settlement in California."  Ex. 2, EO 0224.

REDACTED FOR PUBLIC FILING

**B. Hazmi and Mihdhar were brought to the King Fahad Mosque to meet with Thumairy.**

1472.  Akram Alzamari, who attended the King Fahad Mosque in 2000, testified at his deposition by written questions that he was a good friend of Thumairy and described ████ ████ as his best friend.  Ex. 101, Alzamari Dep. 38:22-39:4, 45:21-46:15, 47:9-12, 47:16-20, 20:17-21:16.

1473.  ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

1474.  At his deposition by written questions, Alzamari did not recall that ████ used the phrase "look after" or the word "significant" but testified that ████ "told me exactly as this: They [Hazmi and Mihdhar] came through Sheikh Fahad. I wanted to -- I want to introduce you to two people."  Ex. 101, Alzamari Dep. 132:2-18.  Alzamari's confirmation that ████ told him that the hijackers "came through" Thumairy shows that Thumairy was overseeing the arrangements for Hazmi and Mihdhar and tasking ████ to provide them with support.

1475.  ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ This is consistent with the 1:27pm arrival time of the hijackers in Los Angeles on January 15, 2000.

1476.  ████████████████████████████████████████████████████████████████████████████████████████████████████████

369

████████████████████████████████████

REDACTED FOR PUBLIC FILING

1477. ███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████ ████████████████████████████████

█████████

1478. ████████████████████████████████████

████████████████ ███████████████████████████

████████████████████████████ ████████████████

████████████████████████████████████████████

███████████████████████████; █████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████ Ex. 14, 1420 Hijri Calendar.

1479. ████████████████████████████████████

███████████████████████████████████████; ██████

████████████████████████████████████████████

1480. ████████████████████████████████

████████████████████████████████████████████████; ███

████████████████████████████████████████████

████████████████████████████████████████████

REDACTED FOR PUBLIC FILING

████████████████████████████████████████████ █

██████████████████████████████████████

██████████████████████ ███████████████████████

██████████████████ █████████████████ ; Ex. 461, ██████████

█████████████████████

1481. Plaintiffs' expert Youssef assessed that "█████ statement that he brought Hazmi and Mihdhar to Thumairy and then waited nearby out of earshot while the men talked, shows that ████ knew Thumairy, Hazmi, and Mihdhar had confidential matters to discuss, and that ████ knew he was supposed to wait for Thumairy and the hijackers to finish their discussion because he was taking them to the place where they would be staying." Ex. 5, Youssef Rpt. 166.

**C. Hazmi and Mihdhar lived with ████ and were under his care during their time in Los Angeles.**

1482. ████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

1483. At his deposition based on written questions, Alzamari claimed he was uncertain about how long the hijackers stayed with ████, saying that ████ admitted to him that the hijackers "spend the night," which he interpreted as "a night or two." Ex. 101, Alzamari Dep. 58:2-59:2. Alzamari testified that ████ admitted to him that "he was having visitors stay with him and need [sic] the space in the house." Ex. 101, Alzamari Dep. 61:9-13. As a result, Alzamari stated that "he [████] told me that…[his] sister went to spend the night with her other sister" who lived in the building next door so that the hijackers could stay with ████. Ex. 101, Alzamari Dep. 60:22 - 61:8; ███████████████████████████████████████

███████████████████████████

371

████████████████████████████████████████

REDACTED FOR PUBLIC FILING

1484.   When the hijackers met Bayoumi and Kaysan Morgan at a restaurant on Venice Boulevard in Los Angeles on February 1, 2000, they told them that "they were living in an apartment nearby" that was "around the corner" from the restaurant.  Ex. 92, Morgan Decl. ¶¶ 18-19.  ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████; Ex. 114, Sultan Dep. 29:6-30:3, 30:21-31:13.

1485.   Based on his experience, Youssef explained that one technique he would "frequently use in studying a support network was to place himself in the shoes of the terror group's operatives, here Hazmi and Mihdhar," and using this technique, Youssef determined that it was "possible that the hijackers could have had a casual contact with an individual such as ████, but they would never have spent the amount of time they did with ████ or stayed at ████ house unless they knew that ████ had been vetted and was a trusted member of their support network."  Ex. 5, Youssef Rpt. 163-164.

1486.   ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

1487.   ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

372

████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████.

1488.   ███████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

1489.   Bassem Youssef opined that the Al Qaeda trained hijackers would never have had this amount of contact with ██████ unless he was a known, trusted member of their support network.  Ex. 5, Youssef Rpt. 164.

373

█████████████████████████████████████

REDACTED FOR PUBLIC FILING

1490. Bassem Youssef opined that "the two trained Al Qaeda operatives would never agree to live with random roommates or ask a stranger to recommend roommates for them to live with." Ex. 5, Youssef Rpt. 165-66.

1491. Bassem Youssef opined that it was "highly unlikely that Al Qaeda's planners would allow Hazmi and Mihdhar, who did not speak English and had never been to the U.S. or any Western country, to stay unaccompanied at a hotel upon their arrival in Los Angeles." Ex. 5, Youssef Rpt. 169. Yossef further concluded that leaving the hijacker's unaccompanied "would have exposed the two men and the plot to substantial risk of discovery," stating "that the modus operandi of Al Qaeda was to arrange for its newly placed operatives to stay in a private home of a trusted associate, and the evidence here supports his opinion that Thumairy or ███, both of whom who were well acquainted with the ███████, asked ████ to host the hijackers in his apartment." Ex. 5, Youssef Rpt. 169; Ex. 72, Madha Decl. ¶ 31.

1492. Both the FBI and the 9/11 Commission staff canvassed hotels and motels in the neighborhood surrounding the King Fahad Mosque. Neither found any indication that Hazmi and Mihdhar stayed at a hotel or motel in January 2000. Ex. 2, EO 0896-97, 1891-93; Ex. 307, MFR June 23-24, 2004. They did locate Bayoumi's hotel stays in December 1999 and January 2000, as well as the hijackers' stay in June 2000. Ex. 665, FBI 4012-13.

1493. While Thumairy denied meeting the hijackers, ████, or his father ███████ aka Abu Khaled, ████ admitted to Alzamari that the hijackers "came through Sheikh Fahad" Thumairy, Ex. 101, Alzamari Dep. 132:2-18, and Usman Madha testified that Thumairy (and Mana) knew ███████ very well. Ex. 72, Madha Decl. ¶31, at Ex. 2 (identifying photographs of ███████ aka Abu Khaled as a regular congregant at the King Fahad

374

Mosque who frequently spoke with Thumairy and knew him well); Ex. 107, Thumairy Dep.

243:24-244:13, 556:1-557:9.

1494. ██████████, who was tasked by Bayoumi in San Diego to help Hazmi and

Mihdhar and became the hijackers' friend, coworker, and confidant, ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

1495. ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

1496. ██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

██████ ██████████████████████████████████████████

███████████████████████████████████████████████

████████████████████ ██████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████

1497. The 2014 FBI Summary Report found that "Al-Thumairy immediately assigned

an individual to take care of them during their time in Los Angeles." The evidence indicates that

individual is ██████ Ex. 2, EO 0226.

375

1498.   As Youssef stated, this conclusion is further supported by the phone calls between ▬ and ▬ around the time of ▬'s support to the hijackers.  Although the call records themselves have not yet been produced, the 2016 FBI Report analyzed the records and found:

> …significant phone connectivity between ▬ and ▬ prior to and directly following key events of logistic assistance provided by ▬ to HAZMI and MIDHAR.  This pattern of phone connectivity between ▬ and ▬ is not identifiable prior to the hijacker's arrival in Los Angeles and does not occur between ▬ and ▬ after the hijackers depart California.

Ex. 5, Youssef Rpt at 165; Ex. 566, FBI 011752 at 57.

1499.   Plaintiffs' expert Youssef explained that "the description in the FBI report is consistent with the type of communications analysis" that he regularly conducted with the FBI, and that "pattern and timing of phone calls between two individuals in relation to known events is routinely used to reach conclusions about the substance of the conversations of those individuals."  Based on this analysis, Youssef determined that "[h]ere, the FBI identified a significant pattern of phone calls between ▬ and ▬ that was linked to the times when ▬ provided assistance to Hazmi and Mihdhar" and "that ▬ provided such assistance in January 2000, immediately after the hijackers' arrival, and in June 2000, when Hazmi and Mihdhar returned and had dinner at ▬'s older sister's apartment, and on a later occasion several weeks later when Hazmi returned and met with Akram Alzamari."  Ex. 5, Youssef Rpt. 169-170, n.694.

1500.   Plaintiffs' expert Youssef opined that the FBI's "report of phone connectivity [between ▬ and ▬] ties in directly with other phone calls made by Thumairy and Bayoumi, and ▬" and that based on this evidence "▬ and ▬ were discussing matters pertaining to the two hijackers."  Ex. 5, Youssef Rpt. 170.

376

1501. █████████████████████████████

████████████████████████████████████

██████████████████

1502. █████████████████████████████

████████████████████████████████████

███████████████████████

1503. ██████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████

Plaintiffs' expert Youssef determined that █████████████ "confirms that ██████ had a unique, lasting relationship of trust with Hazmi and Mihdhar" and that "[t]wo trained Al Qaeda operatives would not have left a bag with someone and returned to pick it up unless they knew that person was part of their support network."  Ex. 5, Youssef Rpt. 170.

### D. Phone calls of Thumairy and Bayoumi show that they were coordinating their support for Hazmi and Mihdhar with Saudi government officials including MOIA Director Sowailem and the MOIA advance teams.

1504.  The convergence of contacts among Saudi government officials after the arrival of Hazmi and Mihdhar in Los Angeles and during the planning for their move to San Diego demonstrate that Thumairy and Bayoumi were coordinating with various MOIA officials about the arrangements for the Al Qaeda operatives.  This is shown by review of calls in January and February 2000, Ex. 12A, including:

a. Thumairy calls to MOIA Embassy Director Sowailem and the Embassy Ex. 12C;

b. Bayoumi calls to MOIA Embassy Director Sowailem and the Embassy, Ex. 12K;

████████████████████████████

REDACTED FOR PUBLIC FILING

c. Bayoumi calls to MOIA Embassy propagator/advance team member Sudairy, Ex. 12X;

d. Thumairy/Bayoumi calls to MOIA propagator/advance team member Mersal, Ex. 12X;

e. Bayoumi calls with the Consulate, likely to Consulate Secretary ███, Ex. 12L; and

f. Thumairy's calls with Bayoumi, Ex. 12B.

1505.   Youssef determined these call patterns were "significant because they occur while Thumairy and Bayoumi were providing assistance to Hazmi and Mihdhar and reveal the links among the hijackers, Thumairy, Bayoumi, the advance team visit of Mersal who traveled with Abdullah al Jaithen to California in December 1999 – January 2000, and the advance team visit of Sudairy who traveled with Adel al Sadhan to California in December 1998 – January 1999." Ex. 5, Youssef Rpt. 171.  As previously discussed, in the spring of 1999, Sudairy and Sadhan returned to the U.S. as MOIA propagators and diplomats under the direction of the Saudi Embassy. These calls occurred while the pair were in the U.S.  Sudairy and Sadhan stayed in the U.S. until after the 9/11 Attacks.  Ex. 5, Youssef Rpt. 171, n. 697.

1506.   **Monday January 17** Thumairy placed a call from his home phone to Bayoumi's cell phone at 10:59pm (6 min.).   Ex. 5, Youssef Rpt. 170; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).

1507.   **Tuesday January 18** Thumairy phoned the Saudi Arabia cell phone number of MOIA propagator Majid Al Mersal at 11:20pm (2 min.).  Mersal had just visited Los Angeles and San Diego with MOIA propagator Abdullah al Jaithen meeting with Thumairy and Bayoumi. Ex. 5, Youssef Rpt. 170-71; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000); Bayoumi had a listing in his handwritten address book "Mobile ███-1553 Majid" right under his listing for Jaithen, and his green folder typed list dated January 26, 2000 listed: "Al Mersal, Majid ███ 1553 C ███-71671 F ███ 0309." Ex. 12AA, MPS738_59; Ex. 12BB, MPS688_3.

378

REDACTED FOR PUBLIC FILING

1508.   This was the second [not first] Thumairy-Mersal call in the phone records and Thumairy would call Mersal again on February 8 (12 min.), March 3 (12 min.), March 12 (1 min.), and April 24 (8 min.).  According to Youssef, the FBI may have been unaware of and did not investigate MOIA propagator Majed Al Mersal.  Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).

1509.   **Wednesday January 19** Bayoumi called Embassy Islamic Affairs at 8:27am (7 mins.)  Thumairy used his cell phone to call Bayoumi at 10:13pm (5 mins.).  Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).

1510.   **Thursday January 20** Bayoumi called Embassy Islamic Affairs at 11:03am (2 mins.).  Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).

1511.   **Monday January 24** Thumairy called the direct line of Khalid Al Sowailem at 11:10am (1 min.) followed by a call to Embassy Islamic Affairs at 1:05pm (7 mins.) followed by calls to the direct line of Khalid Al Sowailem at 1:15pm (1 min.) and 1:18pm (22 mins.).  Ex. 5, Youssef Rpt. 173; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).

1512.   That evening, Bayoumi placed a call from his Mosque office to Mersal at Mersal's Saudi Arabia office at 6:06pm (1 min.), followed by a call to Thumairy at 6:09pm (1 min.), followed by a call to the Virginia phone of Mutaeb Al Sudairy at 6:26pm (2 min.).  Ex. 5, Youssef Rpt. 171; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).

1513.   Based on Youssef's analysis, these were the first calls Bayoumi made to Mersal and Sudairy in the phone records.  Bayoumi would call Sudairy another four times over the next two weeks, on January 26 (2 min.), January 30 (12 min.), February 2 (2 min.), and February 7 (5 min.).  According to Youssef,  he Bayoumi to Sudairy calls "are timed with the various

REDACTED FOR PUBLIC FILING

preparations and actions made by Bayoumi and Thumairy for the move of the hijackers from Los Angeles to San Diego." Ex. 5, Youssef Rpt. 171.

1514. The FBI found that the Bayoumi-Sudairy calls were "significant" and "coincide with significant logistic support of the hijackers." Ex. 2, EO 0593, 0598; Ex. 566, FBI 11765. The FBI found that Bayoumi reported to Sudairy once "the hijackers' affairs were in order." Ex. 2, EO 0598-99. The FBI determined that the "final phone call between SUDAIRY and BAYOUMI occurs 02/07/00 immediately after HAZMI and MIDHAR's apartment lease and living arrangements have been finalized and funds fronted by BAYOUMI." Ex. 566, FBI 11765.

1515. Youssef carefully reviewed the phone records "in context and agreed" with the conclusions reached by the FBI, stating the "discrete group of calls from Bayoumi to Sudairy in the last week of January and first week of February 2000, together with the absence of similar phone contacts between Bayoumi and Sudairy until a single additional call in March 2001, shows that the calls are likely related to a work project shared by the two men." Ex. 5, Youssef Rpt. 172. Youssef further concluded, "[t]he timing of the calls from Bayoumi to Sudairy just before and after the hijackers' move from Los Angeles to San Diego, together with the facts surrounding Sudairy's prior visit to Los Angeles and San Diego [in December 1998-January 1999] and another call from Bayoumi to Sudairy in March 2001 tied to the cross-country trip of Hazmi and another 9/11 hijacker...strongly indicate that Bayoumi is reporting to Sudairy about Hazmi and Mihdhar." Ex. 5, Youssef Rpt. 172.

1516. As Youssef pointed out, Bayoumi had no explanation for his calls to Sudairy but testified that "it could have been another person who called" Sudairy. Ex. 5, Youssef Rpt. 172; Ex. 120, Bayoumi Dep. 585:10-586:2.

REDACTED FOR PUBLIC FILING

1517.   Youssef determined the "calls to Sudairy were placed from Bayoumi's Mosque phone and Bayoumi's cell phone" and "[i]t would be a strange and unlikely coincidence for 'another person' as described by Bayoumi to be calling Sudairy from both of those phones over this discrete two-week period.  Ex. 5, Youssef Rpt. 172.

1518.   **Wednesday January 26** Bayoumi called the Saudi Consulate at 11:25 (5 mins.) followed by a call to Sudairy at 11:35am (2 mins.), who at the time was working in MOIA's Embassy office under Sowailem.  Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).  Bayoumi's handwritten address book and pattern of calls to the Islamic Affairs office at the Embassy shows that his calls to the Consulate were likely to Islamic Affairs and its sole employee Ismail Mana.  Ex. 12AA, MPS738_52.

1519.   **Thursday January 27** Bayoumi called the Embassy Islamic Affairs number at 10:55am (6 mins.)  Over a span of six consecutive workdays from Thursday January 27 through Thursday February 3, Bayoumi called the Embassy's Islamic Affairs number every day for a total of 10 calls.  Bayoumi also called other Embassy numbers on January 27 at 11:04 (3 mins.) and 11:55 (3 mins.).  Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).

1520.   **Friday January 28** Bayoumi called Embassy numbers at 9:08am (1 min.) and 9:09am (2mins.); called the Saudi Consulate in Los Angeles at 9:13am (3mins.); called the Embassy at 9:15am (7 mins.); and called the Saudi Consulate again at 9:33am (1 min.) and 9:35am (10 mins.).  Bayoumi then called the Embassy Islamic Affairs number at 10:59am (3 min.) and 11:02am (1 min.).  Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).

1521.   **Sunday January 30** Bayoumi called MOIA Embassy propagator Sudairy at 3:15pm (10 mins.).  Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).

REDACTED FOR PUBLIC FILING

1522.   **Monday January 31** Bayoumi called the Embassy Islamic Affairs number at 9:54am (1 min.) and 9:56am (1 min.) and the Consulate at 9:58am (2 mins.), 10:00am (10 mins.) and 10:50am (3 mins.)  Just before making the call to the Consulate at 10:50am, Bayoumi called Kaysan Morgan at 10:47am (3 mins.)  Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).

1523.   On January 31, Bayoumi drove to Los Angeles and went to the Saudi Consulate with his family to file their passport applications and visited the King Fahad Mosque.  The trip was a rehearsal for Bayoumi's return trip to Los Angeles the following day with Kaysan Morgan.

1524.   **Tuesday February 1** Bayoumi called the Saudi Consulate at 9:32am (5 mins.) and 9:53am (3 mins.).  Ex. 12A (Phone calls Nov. 1999 – Mar. 2000)

1525.   As discussed below in Section XX. F.-J., Bayoumi drove to Los Angeles with Kaysan Morgan on February 1.

1526.   Bayoumi used his cell phone to call the Embassy Islamic Affairs number at 12:09pm (6 mins.).  Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).

1527.   **Wednesday February 2** Bayoumi called the Embassy Islamic Affairs number at 9:04am (4 mins.); the Saudi Consulate at 9:21am (2 mins.); and MOIA Embassy propagator Sudairy at 10:53am (2 mins.).  Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).

1528.   As discussed below in Section XXI. B., Hazmi and Mihdhar arrived in San Diego on February 2 or February 3, 2000.

1529.   **Thursday February 3** As Bayoumi was making arrangements for the hijackers in San Diego, Bayoumi called the Embassy Islamic Affairs number at 9:20am (5 mins.), 11:53am (2 mins.) and 12:09pm (3 mins.)  With the hijackers now safely moved to San Diego, Thumairy reported in MOIA Embassy Director Sowailem at 11:41am (12 mins.).  Ex. 5, Youssef Rpt. 193; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).

REDACTED FOR PUBLIC FILING

1530.   As Youssef determined, Bayoumi would not contact the Islamic Affairs number again until March 9, 2000.  He did, however, make calls to the personal numbers of the Embassy's Islamic Affairs officials, including Mutaeb Al Sudairy (Bayoumi called Sudairy on February 7, 2000), and MOIA Embassy Director Sowailem (Bayoumi called Sowailem on February 18 and 19, 2000).  Ex. 5, Youssef Rpt. 173; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). The calls occurred around the time Bayoumi arranged a welcome party for the two hijackers.  Ex. 5, Youssef Rpt. 201.

1531.   Bassem Youssef, former FBI Counterterrorism Communications Unit Chief, opined that "the call pattern closely matches the actions being made by Thumairy and Bayoumi to arrange and provide assistance to Hazmi and Mihdhar and shows that Thumairy and Bayoumi are receiving instructions from officials at Embassy's Islamic Affairs department about the assistance being provided for Hazmi and Mihdhar."  Ex. 5, Youssef Rpt. 174.  Youssef concluded that "Bayoumi's calls occur during the time Bayoumi is preparing for the arrival of the two hijackers in San Diego, and end once Hazmi and Mihdhar were in San Diego under Bayoumi's care."  Ex. 5, Youssef Rpt. 174-175.  Thumairy's calls to Mersal and Bayoumi's connection with Embassy MOIA propagator Sudairy provide additional  validation. Sudairy and Mersal were part of the advance teams that visited California. Sudairy was tied to Al Qaeda by the FBI; Bayoumi's February 1999 correspondence with Habib marks Sudairy as an Al Qaeda representative; and Sudairy was sent by Sowailem.  Ex. 5, Youssef Rpt. 174-75.

**E.  On Monday, January 31, 2000 Bayoumi brought his wife and their children to Los Angeles, went to the Saudi Consulate to renew their passports, and also went to the King Fahad Mosque.**

1532.   Saudi Arabia incorrectly claims that Bayoumi went to Los Angeles "[o]n January 31…*or* February 1," KSA Aver. ¶ 90 (emphasis added), when Bayoumi went on January 31 with

REDACTED FOR PUBLIC FILING

his family to renew their passports *and* on February 1, 2000 to meet Hazmi and Mihdhar. Ex. 5, Youssef Rpt. At 177-79.

1533. Bayoumi took his wife and children to get passport photos and the family then went together to the Saudi Consulate on January 31, 2000 to renew their passports. Ex. 10J (MPS892-CLIP Video Exhibit); Ex. 11J (MPS Photographs) (MPS726_8-12, photos 14-16, and 18-22). Photographs and videos taken that day of Bayoumi's family show Emad and Firas wearing the same collared button-down dress shirts as in their passport photos. Ex. 11J (MPS Photographs) (MPS703_97, photo 26; MPS703_102, photo 42); Ex. 211, KSA6642-65 at 6651, 6653 (Emad and Firas Bayoumi passports).

1534. Saudi Government records support that Bayoumi and his family went to the Saudi Consulate in Los Angeles on January 31, 2000. According to a July 2003 "special report" on Bayoumi prepared by the Consulate, "[t]he said person [Bayoumi] checked with the consulate in Los Angeles and met with colleague Abdullah Al Awad on 24/10/1420 AH (January 31, 2000 AD), requesting renewal of his passport and passports of his family members because they expired." Ex. 211, KSA 6642-6665 at 43.

1535. Saudi Arabia's answers to interrogatories state that Bayoumi made a separate trip "on or around February 1, 2000" to Los Angeles with "Caysan Bin Don [Kaysan Morgan]" to "*pick up* a renewed passport." Ex. 24, June 12, 2018 KSA Responses to Interrogatories 10, 13, 16; Ex. 25, Aug. 14, 2018 KSA Responses, Interrogatory 10 (emphasis added). Saudi Arabia prepared its interrogatory answers after interviewing Bayoumi in 2018, but before the 2022 MPS production revealed that the Consulate sent out the Bayoumi family's passports to them by registered mail. Ex. 678K, MPS95_106 (registered mail envelope addressed to Bayoumi from Saudi Consulate, dated February 2, 2000); also at Ex. 449.

REDACTED FOR PUBLIC FILING

1536.   Bayoumi's visits to Los Angeles on both January 31 and January 1 are independently confirmed by the phone records, which show that on February 1, 2000 Bayoumi called his home at 7:11 p.m. (3 mins.) as he was returning to San Diego with Kaysan Morgan after visiting the Saudi Consulate and meeting Mana; meeting the hijackers at a restaurant; and meeting Mana (a second time) and Thumairy at the King Fahad Mosque.  There is no similar call on January 31, which supports that Bayoumi was with his family. Ex. 515, FBI 3221 at 3230; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000); Ex. 92, Morgan Decl. ¶¶ 11-22 (¶22: "On the way home to San Diego, Mr. al-Bayoumi called his wife to tell her we were returning.")

1537.   Bayoumi and his family also visited the King Fahad Mosque on January 31, 2000. Bayoumi's wife took a photograph of Bayoumi with his three children in front of the King Fahad Mosque.  Ex. 11J, MPS703_97 (photo 26).

1538.   Bayoumi and his family went to the Beverly Hills shopping district and visited the Bijan store, as Hisham Kaaki discussed with Bayoumi three weeks earlier on their January 9, 2000 trip to Los Angeles.  Ex. 11, MPS726_8-12 (photos 14-16, 18-22) (photos of Bayoumi family visiting stores in Beverly Hills including Bijan).

1539.   Bayoumi can also be seen in the video footage with his cellphone kept in a small holster attached to his belt on his right hip. Ex. 10J, MPS892-CLIP Video Exhibit 58:19.   Phone records show that Bayoumi used his cellphone on the morning of January 31, 2000 to call the Saudi Embassy Islamic Affairs number twice, at 9:54 a.m. (1 min.) and 9:56 a.m. (1 min.), and to make three additional calls to the LA Consulate at 9:58 a.m. (2 mins.), 10:00 a.m. (10 mins.) and 10:50 a.m. (3 mins.).  Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).

1540.   Just before making his third call to the Consulate at 10:50 a.m. on January 31, 2000, Bayoumi placed a call to Kaysan Morgan at 10:47 a.m. (3 mins.).  Ex. 515,  FBI 3221 at

385

REDACTED FOR PUBLIC FILING

3230; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). These calls show that Bayoumi was engaged in coordinating arrangements for his return February 1, 2000 trip to Los Angeles with Morgan. Bayoumi was likely calling Smail Mana at the Consulate to confirm that Morgan would be joining Bayoumi the next day.

1541.  Bayoumi planned well in advance to make the two trips to Los Angeles on January 31 and February 1, 2000. For several months, Bayoumi had regularly attended Tuesday morning Toastmasters Club meetings at a San Diego hotel. Ex. 678R, at MPS732_2 (showing time and place of weekly meetings), and at MPS 732_308 (showing Bayoumi's membership since June 1999). But Bayoumi was missing from the "Schedule of Assignments" for the Club on Tuesday, February 1, 2000 and did not attend the meeting that day. Ex. 678R, at MPS 732_309 (showing schedule for January 4 through February 1, 2000). Instead, Bayoumi travelled to Los Angeles with Morgan to meet the hijackers.

### F.  February 1, 2000: Bayoumi visits Los Angeles to set up Kaysan Morgan as his cover and meets Hazmi, Mihdhar, Mana (twice), and Thumairy.

1542.  On February 1, 2000, Bayoumi returned to Los Angeles and visited the Saudi Consulate for a second day in a row, this time with Kaysan Morgan (then known as Kaysan Bin Don). Ex. 24, June 12, 2018 KSA Responses to Interrogatories 10, 13, 16; Ex. 25, Aug. 14, 2018 KSA Responses, Interrogatory 10; *See* 9/11 Commission Report at 217.

1543.  Morgan was a 22-year-old native Californian who converted to Islam in 1999 at the Saudi Mosque operated by the Saudi Embassy in Washington, DC. Morgan was cut off by his family because of his conversion to Islam and moved back to San Diego in late 1999. Bayoumi befriended Morgan at the Islamic Center of San Diego. Ex. 92, Morgan Decl. ¶¶ 5-7; Ex. 260, KSA 1403 (Washington Mosque was operated by the Saudi Embassy). In his interview with Scotland Yard Bayoumi referred to Morgan by his Islamic name "Osama" and described

REDACTED FOR PUBLIC FILING

him as "white…[y]ou know, American…" and claimed that "I don't know his real name.  I mean the American name."  Ex.450, MPS393 at 191:7-22.

### G.  Bayoumi planned days in advance to bring Morgan on the trip to Los Angeles.

1544.   As some point in January 2000, Bayoumi told Morgan that Bayoumi needed "to resolve his I-94 visa issue" and was "thinking about going across the border to Mexico to reset something or do something."  Ex. 112, Morgan Dep. 95:20-97:5.  According to Morgan, he "reacted very strongly in opposition" to Bayoumi going to Mexico.  Bayoumi subsequently contacted Morgan and told him "that he decided to go to the Saudi Consulate to resolve his I-94 visa issue..." and asked Morgan to join him on the trip to Los Angeles.  Ex. 112, Morgan Dep. 95:20-97:9.

1545.   Morgan testified that Bayoumi invited him on the trip to Los Angeles one or two days before they went there together.  Morgan stated that Bayoumi told him they could visit a "halal restaurant" and "also asked if I had ever seen the new mosque in Culver City, the King Fahad Mosque, and that we could visit the mosque which was close to the Consulate and the restaurant."  Ex. 92, Morgan Decl. ¶ 8-9; Ex. 112, Morgan Dep. 95:20-97:9.

1546.   In his September 2001 interviews with Scotland Yard, Bayoumi admitted that he invited Morgan to join him on the trip the day before the two men went to Los Angeles.  Bayoumi told investigators that he asked Morgan: "if you have time tomorrow can you come with me to the Embassy?" and according to Bayoumi, Morgan said "okay.'  Ex. 450, MPS 393 at 687:20-24.

1547.   Bayoumi also admitted that he discussed with Morgan in advance going to the King Fahad Mosque during their trip to Los Angeles.  Bayoumi told Scotland Yard that "[t]he

REDACTED FOR PUBLIC FILING

reason why he [Morgan] come with me, he want to see, also, the new King Fahad Mosque in Los Angeles, big one." Ex. 450, MPS393 at 689:18-20.

1548. In his 2003 statement to the 9/11 Commission Bayoumi admitted that he spoke to Morgan at the ICSD Mosque in San Diego on the morning of their trip to Los Angeles and told him that he needed to make a stop to get passport photos before heading to the Saudi Consulate. Ex. 90, Snell Decl., Ex. 2 at 3.

1549. Bayoumi's cell phone records show that he called Morgan three times on January 31, 2000 at 10:47am (3 mins.), 11:54am (1 min.), and 11:59am (1 min.). Ex. 12, FBI 03230; Ex. 2, EO 2751. The 10:47am call to Morgan was made immediately before Bayoumi made a call to the Saudi Consulate at 10:50am (3 mins.) This shows that Bayoumi called Mana at the Consulate immediately after confirming his plans to bring Morgan with him to Los Angeles on February 1.

1550. Bayoumi made one call to Morgan on February 1, 2000 after the two men had returned to San Diego at 9:50pm (1 min.). Ex. 2, EO 2751.

1551. At his June 2021 deposition, Bayoumi contradicted his prior statements to Scotland Yard and the 9/11 Commission and the documentary evidence by claiming that he planned to go to Los Angeles "by myself, alone" and that he was driving his car down the street on his way to the Consulate in Los Angeles when he happened "by chance" to meet Morgan "on the road…[n]ext to my house." Bayoumi claimed that he stopped his car, told Morgan that he "was going to Los Angeles" and that Morgan "said he was free, let me come with you." Ex. 120, Bayoumi Dep. 364:21-366:19, 367:15-368:11. At the time Bayoumi gave that testimony, his prior statement to the MPS had not yet been produced.

REDACTED FOR PUBLIC FILING

1552.   Morgan testified at his 2021 deposition about Bayoumi's claim that the two men met by chance on the morning of the day that they went to Los Angeles: "No, that is not a true statement."  Ex. 112, Morgan Dep. 95:1-19.

### H.   Bayoumi brings Morgan to the Consulate as the set-up for their meeting with the hijackers and holds a private meeting with ██████.

1553.   Bayoumi invited Morgan to join him on the trip to Los Angeles as tradecraft to establish a plausible excuse for Bayoumi to meet the two Al Qaeda operatives and bring them to San Diego.  With the help of Consulate Secretary ██████, ██████, and Thumairy, Morgan and Bayoumi would go to the Saudi Consulate, the King Fahad Mosque, and then a Los Angeles restaurant, where Morgan would witness Bayoumi meeting the hijackers by "coincidence" – when that meeting was a set-up, and Morgan was being duped.  Ex. 5, Youssef Rpt. 192.

1554.   On September 23, 2001, when first asked by Scotland Yard about the purpose of his trip to Los Angeles with Morgan, Bayoumi stated: "first of all, to bring some books to the mosque."  Ex. 450, Tr. 195:6-10.  Bayoumi did not mention anything about going to the Consulate to get a passport renewed.  Bayoumi said "[a]fter we gave the books, we went to - - tried to go to the King Fahad Mosque to pray there…. And I think we got lost at that time and we went to eat and we met these people [Hazmi and Mihdhar]."  Ex. 450, Tr. 195:14-21.

1555.   Two days later, on September 25, 2001, after Bayoumi talked with his solicitor, Bayoumi changed his story to claim that he went to the Consulate with Morgan to "renew my passport."  Bayoumi told the MPS that "I remember I talked to my solicitor, not just book to bring, I went to Los Angeles to – first to renew my passport."  Ex. 450, Tr. 540:14-17. Bayoumi's statement was false because Bayoumi had just been to the Consulate the day before with his family to renew their passports.

REDACTED FOR PUBLIC FILING

1556.   Saudi Arabia prepared its answers to interrogatories after interviewing Bayoumi in May 2018.  December 21, 2018 Opposition of Kingdom of Saudi of Arabia to Plaintiffs' Motion to Compel, Add. 2 (filed under seal).  Saudi Arabia stated in its interrogatory answers that it "currently understands that Al Bayoumi visited the Saudi Consulate in Los Angeles on or around February 1, 2000, to pick up a renewed passport and religious materials (Qurans)."  Ex. 24, June 12, 2018 KSA Responses to Interrogatories 10, 13; Ex. 25, Aug. 14, 2018 KSA Responses, Interrogatory 10.  Saudi Arabia also stated that Morgan "visited the Saudi Consulate in Los Angeles on or around February 1, 2000, accompanying Al Bayoumi."  Ex. 24, June 12, 2018 KSA Responses to Interrogatories 16.

1557.   Bayoumi did not "pick up a renewed passport" at the Saudi Consulate as stated in Saudi Arabia's answers to interrogatories.  Bayoumi had already been to the Consulate the day before with his family to get new passports, and he admitted to Scotland Yard that the Saudi Consulate "send it [the new passport] by mail to me later."  Ex.450, MPS 764:20-21.  The MPS production confirmed that Bayoumi had in his possession a return receipt requested envelope with $4.96 postage from the Saudi Consulate in Los Angeles addressed to Bayoumi in San Diego and postmarked February 2, 2000, together with the Consulate business card of Vice Consul Sami Alsadhan. Ex. 678K, MPS 95_106. According to Plaintiffs' expert Youssef, that envelope probably contained Bayoumi's passports, which were issued at the Consulate on February 1. Ex. 5, Youssef Rpt. 179-80; Ex. 211, KSA 6642-6665 at 43.

1558.   Before arriving at the Consulate, Bayoumi went through the charade of insisting to Morgan that he needed to get new passport photos.  As a result, Bayoumi stopped at a photographic shop in Los Angeles, supposedly to get additional photos.  Ex. 92, Morgan Decl. ¶ 11. Bayoumi made no credit or debit card charges for photos (or any other items) while he was in

REDACTED FOR PUBLIC FILING

Los Angeles on February 1, 2000. Ex. 509, FBI 2388, Ex. 513, FBI 002808 at 2809. Bayoumi's claim to Morgan that he needed new passport photos is belied by the facts that (1) Bayoumi had already submitted his passport photos at the Consulate on the day before, January 31, 2000; and (2) Bayoumi gave the Consulate a print of the identical five-year-old photo of Bayoumi used in Bayoumi's May 1995 Saudi passport. Bayoumi's 2000 passport used the same photo as his 1995 passport. Ex. 211, KSA 6642-65; Ex. 120, Bayoumi Dep. 408:23-409:5, 410:9-411:24. Bayoumi did not need new photos but told Morgan he did to reinforce his cover story about the reason for his trip to Los Angeles and to hide the fact that he had been to the Consulate the day before. Ex. 5, Youssef Rpt. 180.

1559. On February 1, 2000, Bayoumi pulled up to the gate of the Saudi Consulate in Los Angeles, spoke via an intercom in Arabic, and was given access to the private parking garage underneath the Consulate. Knew From the garage, Bayoumi and Morgan entered the Consulate from the garage into a private reception area. At his deposition, Mana was shown a chart of the Consulate and identified the "small lobby" off the garage where he met Morgan. Vice Consul Awad confirmed that the public entered the Consulate through the front door, while Consulate staff entered through the private parking area beneath the Consulate that was off limits to the public. Ex. 92, Morgan Decl. ¶11; Ex. 110A, Mana Dep. 170:3-6; Ex. 110B at 3 (Mana Dep. Ex. 611); Ex. 95, Awad Dep. 121:7-16.

1560. There was no receptionist present in the Consulate's small back lobby off the parking area. Morgan saw Bayoumi use a phone to announce his presence. As shown in Bayoumi's handwritten address book, Bayoumi knew the Islamic Affairs extension of Consulate Secretary Mana. Bayoumi called Mana, and Mana greeted Bayoumi and Morgan in the small lobby. Bayoumi mentioned to Mana in Morgan's presence that he had not been at the Consulate

REDACTED FOR PUBLIC FILING

for at least three months—even though Bayoumi had just been there the day before.  Bayoumi's statement, along with the earlier passport photo charade, was tradecraft by Bayoumi to deceive Morgan into believing that the Consulate visit was a one-time event and to hide Bayoumi's activities in Los Angeles on the prior day, January 31. Mana, of course, likely saw Bayoumi on the prior day in Los Angeles and was a party to Bayoumi's deception of Morgan.  The immunity afforded by the Consulate was impenetrable by law enforcement and provided cover for Bayoumi's plan.  Ex. 5,Youssef Rpt. 181-82; Ex. 92, Morgan Decl. ¶¶ 12-15; Ex. 211, KSA 6642-6665 at 43; Ex. 12AA, MPS738_52L; Ex. 110A, Mana Dep. 169:20-170:8 (confirming that he met Morgan in the "small lobby, not the one by the entrance" of the Consulate, as Mana showed on Ex. 110B at 3 (Mana Dep. Ex. 611)).

1561.   After meeting Mana, Bayoumi followed Mana into an interior, private room of the Consulate while Morgan waited in the small back lobby area.  Mana identified the interior location of the office where he met Bayoumi on a floorplan of the Consulate.  Bayoumi and Mana met inside the Saudi Consulate for about 20-30 minutes with Morgan waiting.  Bayoumi returned to Morgan in the reception area carrying a box of Qur'ans and other religious materials. Morgan and Bayoumi then left the consulate in Bayoumi's car.  Ex. 92, Morgan Decl. ¶15; Ex. 110A, Mana Dep. 145:15-16 (stating that he saw Bayoumi "inside the office of the Saudi affairs department" at the Consulate), 170:9-20; Ex. 110B at 3 (Mana Dep. Ex. 611).  Bayoumi gave incredible testimony that he and Morgan entered through the front door of the Consulate, met with the receptionist in the public front reception room, and that he filled out passport forms in Morgan's presence.  Ex. 120, Bayoumi Dep. 377:7-13, 381:11-382:24.

1562.  Bayoumi's access to the Consulate's private garage and private reception area and internal offices, as well as his frequent phone contacts and correspondence with Consulate and

REDACTED FOR PUBLIC FILING

Embassy officials, demonstrate his status was that of a Saudi government official and not that of an average Saudi citizen visiting the Consulate for consular business. Ex. 5, Youssef Rpt. 181-85.

1563. Bayoumi brought religious materials from the Consulate from the Islamic Affairs section at the Consulate. Bayoumi had already been to the Consulate earlier that month on January 9 with Khalid Al Yafai and obtained religious materials at that time. Ex. 10I, MPS899-CLIP Video Exhibit and 10I-TR Transcript, at 01:06 (participant on trip with Bayoumi and Yafai confirms that they went to Consulate).

1564. According to Plaintiffs' expert Youssef, "Bayoumi visited the Consulate on January 31, 2000 and February 1, 2000 and made a total of 12 calls to the Consulate number ██████-6000 from January 26, 2000 to February 10, 2000." Youssef determined:

> ...the volume and timing of these calls shows that Bayoumi was engaged in a project with individual(s) at the Consulate that was much more involved than getting new passports; indeed, Bayoumi continued calling the Consulate after the passport application was filed on January 31 and even after he visited the Consulate a second time with Kaysan Morgan on February 1. It is likely that some or all of the calls that Bayoumi placed to ██████-6000 were made to ████████, because ████ identified Bayoumi to the FBI in his interviews.

Ex. 5, Youssef Rpt. 184.

1565. Additional connections between Bayoumi and ████ include Bayoumi had a listing for ████ in his handwritten address book; ████████████████ employee at the Consulate; ████ identified a photograph of Bayoumi to the FBI in his interviews; Bayoumi met ████ at the Consulate and the King Fahad Mosque on February 1, 2000; ████ called Bayoumi on January 5, 2000; and ████ received a series of calls from Thumairy leading up to the date of the hijackers' arrival on January 15, 2000, and another call from Thumairy on

393

REDACTED FOR PUBLIC FILING

February 14, 2000. Ex. 5, Youssef Rpt. 184; Ex. 566, FBI 011752 at 11754; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).

1566. While Morgan and Bayoumi were together on February 1, 2000, Morgan observed that Bayoumi used his cell phone several times during the day. Ex. 92, Morgan Decl. ¶ 22. One call made by Bayoumi was at 12:09pm (6mins.) to the Islamic Affairs number ((202) 342-3700) at the Saudi Embassy in Washington, which was the fourth workday in a row that Bayoumi reported into the Islamic Affairs. Ex. 5, Youssef Rpt. 185; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). That call was at about the same time that Bayoumi claimed he was at the Consulate. Ex. 120, Bayoumi Dep. 375:11-13.

## I. Bayoumi, with Morgan as his American eyewitness, holds his staged "by chance" meeting with the hijackers.

1567. After leaving the Consulate, Bayoumi and Morgan went to the nearby King Fahad Mosque for prayer. While at the Mosque, Morgan recalled that Bayoumi spoke to someone about a nearby place to eat. The two men then drove from the Mosque and parked in front of what Bayoumi stated was the restaurant – but turned out to be a halal meat market. The restaurant was a very short walk away, however. Ex. 92, Morgan Decl. ¶16.

1568. The Mediterranean Café was owned by Mustafa Ram Ram, who attended the King Fahad Mosque and who was a longstanding friend of Ismail Mana. Mana often ate at the Mediterranean Café and knew it well. ███████████ that he may have told Bayoumi about the restaurant, and said that if he had been asked about a place to eat, he would have recommended the Mediterranean Café. The EO production disclosed that █████████ is ███████████████████. Ex. 110A, Mana Dep. 99:25-100:13, 101:2-8; Ex.

████████████

████████████████████████████

REDACTED FOR PUBLIC FILING

1569.   As previously discussed, ██████ admitted that Hazmi and Mihdhar stayed at his apartment around the corner from the Mediterranean Café.  Ex. 101, Alzamari Dep. 57:20- 58:2- 7 – 59;1, 61:7-8, 132:2-18 (the two men "came through" Thumairy, stayed at ██████'s apartment, and ██████'s younger sister went to stay with her older sister next door).

1570.   ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

1571.   The circumstances show that that Mana served as communications link between Thumairy and Bayoumi on one hand, and ██████ on the other, and that Mana likely coordinated with ██████ to bring Hazmi and Mihdhar to the restaurant to meet Bayoumi.  ████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████

1572.   ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

395

████████████████████████████████

REDACTED FOR PUBLIC FILING

███████████████████████████████

███████████████████████████████

███████████████████████████████

██████████████████

1573. Youssef determined:

> ████ did not enter the restaurant with Hazmi and Mihdhar even though it would be normal and expected for him to go inside with them and help them out. ████ actions were similar to the time he stepped aside out of earshot when he brought the two hijackers to Thumairy at the Mosque. His conduct demonstrates his understanding that Hazmi, Mihdhar, and Bayoumi were engaged in some covert activity separate from ████ role. Ex. 5, Youssef Rpt. 187.

1574. Morgan and Bayoumi ordered food at the counter and sat at a table while the food was prepared. While they were waiting, Hazmi and Mihdhar entered the restaurant. Ex. 92, Morgan Decl. ¶16.

1575. Bayoumi engaged Hazmi and Mihdhar in a conversation in Arabic and asked them to sit down with them. Morgan testified that the men met for "[a]t least 30 minutes" and discussed various matters, with Bayoumi providing translations for Morgan, concerning their home in Saudi Arabia; their current living arrangements in a nearby apartment; their arrival in the U.S. and plan to study English; their unhappiness in Los Angeles; Bayoumi's invitation to visit San Diego to see if they would want to move there; and phone numbers. Ex. 92, Morgan Decl. ¶16, 18-19; Ex. 112, Morgan Dep. 97:15-19.

1576. Saudi Arabia's claim that Morgan "did not participate in the conversation at the restaurant," KSA Aver. ¶ 102, is incorrect, as Bayoumi translated the conversation for Morgan. Ex. 112, Morgan Dep. 82:14-84:4.

████████████████████

1577.   Saudi Arabia incorrectly states that Bayoumi and the hijackers had a "short conversation," KSA Aver. ¶ 101, based on Bayoumi's claim that his encounter with Hazmi and Mihdhar lasted about two minutes.  Ex. 120, Bayoumi Dep. 402:10-13 ("There was not much of a conversation. It was, like, a two-minute conversation.").  Morgan testified that Bayoumi claim was wrong and that the meeting lasted "[a]t least 30 minutes."  Ex. 112, Morgan Dep. 97:20-98:4. It is not possible that the various topics mentioned —with Bayoumi providing translation for Morgan — could have been addressed in less time.  There are other contradictions in Bayoumi's description of the meeting between Bayoumi's 2021 deposition testimony and September 2001 during his con interview.  For instance, Bayoumi told Scotland Yard that he ordered food or drinks after his conversation with Hazmi and Mihdhar had begun.  Ex. 450, MPS365-401 Tr. 548:10-13.  At his deposition, when asked if Hazmi and Mihdhar were eating, Bayoumi claimed that: "They finished, like us. They were getting done like us."  Ex. 120, Bayoumi Dep. 397:13-14.

1578.   Bayoumi admitted to Scotland Yard that he told the two hijackers: "I'm not from this city. And we going back now to San Diego.  But if you need help or something like that, just call me. I think I gave them my phone number."  Ex.10, MPS 193:11-16.  Morgan stated that Bayoumi invited Hazmi and Mihdhar to visit San Diego to see if they would want to move to San Diego and that Bayoumi gave them his phone number.  Ex. 92, Morgan Decl. ¶ 18.  Saudi Arabia's claims (based solely on Bayoumi's answers to Saudi Arabia's leading deposition questions) that "[a]t no time during his conversation with Al Hazmi and Al Mihdhar did Al Bayoumi offer to help them in any way" and "at no time…did Al Bayoumi invite them to San Diego…" is contrary to Bayoumi's admissions and Morgan's testimony. KSA Aver. ¶¶103-104.

REDACTED FOR PUBLIC FILING

1579.   As Hazmi and Mihdhar were leaving, Bayoumi asked Hazmi and Mihdhar if they wanted a ride home, but they said no, because they could walk.  Morgan testified that Hazmi and Mihdhar stated (with Bayoumi translating) that "they were living in an apartment nearby" that was "around the corner" from the restaurant.  Ex. 92, Morgan Decl. ¶18-19.  The 9/11 Commission confirmed those facts.  *See* 9/11 Commission Report at 217 ("They [Hazmi and Mihdhar] said they were living in an apartment near the restaurant but did not specify the address.").

1580.   ████'s apartment meets that description of the apartment where the hijackers (through Bayoumi) said they were staying: ████████████████████████
████████████████████████████████

1581.   That apartment building is located on the same city block as the restaurant.  No street had to be crossed to get from ████'s apartment to the restaurant; it was several buildings down from Venice Boulevard and around the corner from the restaurant. Morgan had no knowledge of ████, or that ████ and his family lived in two apartments around the corner from the restaurant.  The hijackers and Bayoumi admitted that they were staying at an apartment around the corner, not a hotel or motel, and as noted above, the FBI canvassed all nearby motels in January 2002 and found no trace of Hazmi and Mihdhar staying at any motel.

1582.   The MPS production shows that Saudi Arabia's claim that Bayoumi disclosed his restaurant meeting with the hijackers to investigators is highly misleading. KSA Aver. ¶107. Bayoumi was arrested by British police and questioned about various matters, including whether he had ever been a guarantor for anyone.  Ex. 450, MPS 365-401 Tr. 118:12-15.  It was only after lengthy back and forth with the police that Bayoumi finally told his story about meeting the hijackers at a restaurant.  Ex. 450, MPS 365-401 Tr. 192:21. The MPS interview shows that

REDACTED FOR PUBLIC FILING

Bayoumi tried to avoid discussing his ties with the hijackers until he knew that his relationship with them had been discovered.

### J. After meeting the hijackers, Bayoumi visited the King Fahad Mosque and reported to Thumairy and Mana before returning home to San Diego.

1583. After the restaurant, Bayoumi and Morgan went to the King Fahad Mosque for the sunset prayer. Ex. 92, Morgan Decl. ¶20.

1584. At the Mosque, Morgan saw Bayoumi meet Mana for a second time that day. Bayoumi and Mana went into a conference room for a private talk for a few minutes. Ex. 92, Morgan Decl. ¶21; Ex. 460, FBI 000096 at 103 (May 17, 2010 interview of Morgan).

1585. After Bayoumi came out of the conference room with Mana, Bayoumi then spoke separately with Thumairy. Ex. 92, Morgan Decl. ¶21.

1586. According to Youssef, "[t]he type of brief private meetings that Morgan described between Mana, Thumairy, and Bayoumi shows that the men were familiar with each other" and "got directly to their work and did not need to spend time to introduce themselves or exchange pleasantries." Ex. 5, Youssef Rpt. 188-89.

1587. Based on what happened before and after Bayoumi's meetings with Mana and Thumairy at the Mosque, Bayoumi reported to Mana and Thumairy on his meeting with the hijackers and confirmed the plans to bring the hijackers to San Diego, which likely occurred the very next day, February 2. After Bayoumi met Mana and Thumairy, Morgan and Bayoumi left the Mosque before the evening prayer and headed back to San Diego. The approximate time of the sunset prayer that day was 5:26 p.m., and the evening prayer was 6:49 p.m. Ex. 14, 1420 Hijri Calendar.

REDACTED FOR PUBLIC FILING

1588.  Bayoumi admitted to Scotland Yard investigators at his interview that the Mediterranean restaurant where he met with the 9/11 hijackers was "close to the King Fahad Mosque."  Ex. 450, MPS365-401 Tr. 194:12-13.

1589.  Bayoumi was familiar with the neighborhood surrounding the King Fahad Mosque and had repeatedly been to that neighborhood in the weeks prior to meeting the hijackers.  Documentary evidence places Bayoumi at the King Fahad Mosque and/or the Ibn Taymiyah Mosque on the following days:

1999

a. January, Ex. 373, MPS43_345 (Bayoumi letter thanking Salloum for reception for MOIA guests Sadhan and Sudairy);

b. April 10, Ex. 10E, MPS902-CLIP Video Exhibit; Ex. 27, Madha Supp. Decl. ¶¶ 4-8 & Ex. 1-4 (Bayoumi at Mosque premises with Thumairy and Khalil);

c. May 10, Ex. 27, Madha Supp. Decl. ¶¶ 9-10 & Ex. 5 (Bayoumi with Khalil and Dr. Shaikh at King Fahad Mosque and Ibn Taymiyah Mosque); Ex. 90, Snell Decl. Ex. 2 at 6 (Bayoumi met Thumairy on visit);

d. December 20, Ex. 527, FBI 4012-13 (check-in at Travelodge, Culver City at 10:43 a.m.);

e. December 21, Ex. 527, FBI 4012-13 (check-out at Travelodge, Culver City at 1:22pm);

2000

f. January 9, Ex. 525, FBI 4009-10 (check-in at Half Moon Motel, Culver City); Ex. 526, FBI 4011, (check-in at Travelodge, Culver City at 9:28pm and check-out at 9:50pm); Ex.10I, MPS899-CLIP-TR 04:26 (transcript of video of Bayoumi in Los Angeles discussing going to King Fahad Mosque);

g. January 10, Ex. 525, FBI 4009-10 (check-out at Half Moon Motel, Culver City), and

h. January 31, Ex. 11J, MPS703_97 (photo 26) (photos of Bayoumi with wife and children at Mosque).

REDACTED FOR PUBLIC FILING

1590. Bayoumi claimed that he had never been to the Ibn Taymiyah Mosque on Venice Boulevard a few blocks south of the Mediterranean Restaurant, but the MPS found in Bayoumi's possession a photograph of Bayoumi at that Mosque on May 10, 1999. Ex. 120, Bayoumi Dep. 220:8-11; Ex. 27, Madha Supp. Decl. ¶¶ 9-10 & Ex. 5. The name of the Mosque was next to Thumairy's name in Bayoumi's handwritten address book. Ex. 12AA, MPS738_35.

1591. Bayoumi testified at his deposition that "Los Angeles was close to us. We could just take a ride there and come back. I wouldn't remember how many times we went." Ex. 120, Bayoumi Dep. 357:8-11.

1592. Bayoumi told Scotland Yard investigators in September 2001 that "I usually go to Los Angeles" and "if I go to there [Los Angeles], I go to the - - Embassy or to the King Fahad Mosque." Ex. 408, MPS 815:3, 817:22-818:1. By "Embassy," Bayoumi meant the Saudi Consulate in Los Angeles. Ex.450, MPS 873:1-4. Bayoumi told the investigators that sometimes he would meet "sheikhs and visitors, scholars…from Saudi Arabia" at the King Fahad Mosque. Ex. 450, Tr. 817:8-13.

1593. Khalil told the 9/11 Commission that he knew Bayoumi because "Bayoumi used to come frequently to the mosque to see Fahad Al Thumairy." Ex. 90, Snell Decl., Ex. 5 at 8.

1594. The King Fahad Mosque is a major landmark and "one of the most prominent Mosques in Southern California" and an easy two-minute drive only "a few blocks away" from the Mediterranean Café. *See* 9/11 Commission Report at 216-17.

1595. Bayoumi gave alternate versions of his story about getting lost trying to find the King Fahad Mosque, first claiming that it occurred *before* he and Morgan went to the restaurant (because they were "hungry") and later claiming that it was *after* they left the restaurant (because they were "exhausted"). In September 2001, Bayoumi told Scotland Yard investigators that he

REDACTED FOR PUBLIC FILING

got lost trying to find the King Fahad Mosque *before* going to the restaurant. Ex. 10, MPS 195:15-21("we went to -- tried to go to the King Fahad Mosque to pray there….[a]nd I think we got lost at that time and we went to eat and we met these people [the hijackers]."); Ex. 10, MPS 545:12-17 ("I think I got lost…[a]nd we were hungry… [a]nd then we went to the restaurant to eat."); Ex.450, MPS 765:6-11 ( "I get lost…. we were hungry at that time, and we went to eat."). In October 2003, Bayoumi told the 9/11 Commission that it was *after* leaving the restaurant that he got lost: "After leaving the restaurant, OAB [Bayoumi] tried to find the KFM [King Fahad Mosque]…but they could not find it…" Ex. 90, Snell Decl., Ex. 2 at 4. At his June 2021 deposition, Bayoumi claimed that it was *after* leaving the restaurant that he got lost: "On our way back to San Diego, we wanted to stop by King Fahad Mosque. But I got lost and we were exhausted, so I decided just to head home." Ex. 120, Bayoumi Dep. 405:12-16.

1596. Morgan testified that Bayoumi was not telling the truth, because he and Bayoumi went to the King Fahad Mosque after their restaurant meeting with the two hijackers. Ex. 112, Morgan Dep. 98:10-99:12; Ex. 92, Morgan Decl. ¶¶ 20, 21, 23.

1597. Youssef determined that "Bayoumi's story about being unable to find the Mosque is evidence of his culpability as Bayoumi had a strong motive to hide the private meetings he had with Mana and Thumairy at the King Fahad Mosque." Youssef further explained, "[t]hose meetings, coming immediately after Bayoumi met with Hazmi and Mihdhar at the restaurant, demonstrate how the three men were working together to provide support for the hijackers." Ex. 5, Youssef Rpt. 191-92.

1598. Kaysan Morgan testified that he and Bayoumi left Los Angeles as it was getting dark and that Bayoumi called his wife on the trip home to San Diego. Ex. 92, Morgan Decl. ¶22. The phone records show that Bayoumi called home on February 1 at 7:11pm (3 mins.), around

REDACTED FOR PUBLIC FILING

the time described by Morgan. On January 31, Bayoumi made no calls home during the late

afternoon or early evening hours. The call provides further confirmation that Morgan and

Bayoumi travelled to Los Angeles on February 1. Ex. 515, FBI 3230; Ex. 5, Youssef Rpt. 178, n.

720, Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).

    1599. Plaintiffs' expert Youssef determined:

> Bayoumi's charge records confirm that he purchased fuel on January 30,
> 2000 ($18.48 at Texaco in San Diego) and February 1, 2000 ($19.42 at
> Shell in San Diego). These charges show that Bayoumi filled up his fuel
> tank. Based on the approximate cost of gasoline in Los Angeles in
> January 2000 ($1.32/gal) and February 2000 ($1.41) and the approximate
> driving distance of 125 miles from Bayoumi's home in San Diego to the
> Saudi Consulate in Los Angeles, these fuel purchases are consistent with
> Bayoumi making two roundtrip visits to the Consulate on January 31,
> 2000 and February 1, 2000. Ex. 5, Youssef Rpt. 178 n. 720; Ex. 509, FBI
> 002388.

**K. Mana and Bayoumi had an established Saudi government agency relationship.**

    1600. Contrary to Saudi Arabia's claim that Mana and Bayoumi had "no relationship,"

KSA Aver. ¶ 96, Bayoumi's contemporaneous documents recovered by the MPS confirm the

work relationship between Mana and Bayoumi, including Bayoumi's handwritten address book,

Ex. 12AA, MPS738_52 (containing the Consulate phone number with notations "Mana Islamic

Affairs" and Mana's extension "Ex 240" and "Islamic affairs Ismail Mana 240" – the underscore

is in the original); Bayoumi's green folder of contacts, Ex. 12BB, MPS688_9, 11 (containing

listings for Mana's Islamic affairs number, extension, and fax); ██████████████████

████████████████████████████████████████████████████

███████████████████████ and the personal letter Bayoumi wrote to Mana and other

Consulate officials which addressed Mana alone as "Sheikh," demonstrating Bayoumi's

acknowledgement of Mana's religious role with Thumairy at the King Fahad Mosque. Ex. 408,

MPS 43_387. The EO production disclosed that the FBI found ███████████████████

403

████████████████████████████████████████████████

REDACTED FOR PUBLIC FILING

████████████████████████████████████████ Ex. 2, EO 0609. ████ admitted to

the FBI during two interviews that Bayoumi enjoyed special status and rank at the Consulate.

████████████████████████████████████

1601.   The relationship between Mana and Bayoumi is also shown by Bayoumi's

meeting with Mana at the King Fahad Mosque after meeting the hijackers; Bayoumi's statement

to Morgan in Mana's presence that Bayoumi had not been to the Consulate for three months

when, in fact, Bayoumi had been at the Consulate the day before; and the coordination among

Bayoumi, Thumairy, ████, and ████ to provide support for the hijackers.  Ex. 5, Youssef Rpt.

184-5.

1602.   Mana admitted at his deposition that he saw Bayoumi and Morgan together at the

King Fahad Mosque, ████████████████████████████████████████████████████

████████████████████████████████████████████████ Ex. 110A,

Mana Dep. 144:2-25; ████████████████████████████ The only date Mana

could have seen Bayoumi and Morgan at the Mosque was February 1, 2000, when, as Morgan

testified, he saw Bayoumi meet Mana at the Mosque.  Morgan had never been to the King Fahad

Mosque until Bayoumi took him there on February 1, 2000; there is no evidence that Morgan

and Bayoumi ever returned to the Mosque together after February 1; and Morgan left San Diego

in late February or March 2000 and has not seen Bayoumi since.  Ex. 92, Morgan Decl. ¶¶ 9, 30.

1603.   Mana further admitted his relationship with Bayoumi by stating in his declaration

that the "only reason I recall" the February 1, 2000 encounter with Morgan was "because this

was the first time I have met a Jewish convert to Islam."  Ex. 168, Mana Decl. ¶ 11.  When

confronted at his deposition with questions about whether Bayoumi told Mana that Morgan was

a Jewish convert, Mana said: "I'll claim my Fifth Amendment for this."  After being instructed

REDACTED FOR PUBLIC FILING

by his lawyer to continue his answer, Mana claimed that he first heard that Morgan was Jewish years after February 1, 2000 from an individual Mana could not name. Ex. 110A, Mana Dep. 150:15-154:22. Mana's explanation made no sense; his testimony that the "only reason" he remembered meeting Morgan on February 1, 2000 was that Morgan was a Jewish convert means that Bayoumi — who invited Morgan on the trip — must have shared that information with Mana in advance of their meeting. Morgan did not mention the subject to Mana and the only person who could have provided Mana with that information was Bayoumi. Ex. 92, Morgan Decl. ¶¶ 12-15.

1604. ███████████████████████████████████
███████████████████████████████████████████ But earlier in 2004 or in late 2003, Mana had run into Morgan at a shopping mall in Anaheim, CA. At that time, Mana and Morgan specifically discussed "the negative consequences to Mr. al-Bayoumi of his trip to the Consulate." Ex. 92, Morgan Decl. ¶ 13. Mana confirmed meeting with Morgan at that mall. Ex. 168, Mana Decl. ¶ 17. Moreover, at his deposition, Mana claimed that he and others at the Consulate were in a "state of shock" after reading press accounts in 2003 about Bayoumi. Ex. 110A, Mana Dep. 193:7-194:16. The Consulate did an investigation immediately after that press report and sent a 31-page report to the Embassy on July 21, 2003. Ex. 211, KSA 6642-65. Mana clearly knew about Bayoumi and Morgan ████████████████████████
███████████████████████████████████████████████
████████████████████████████████

1605. According to Morgan, at the time, the whole restaurant encounter seemed to him to be coincidental, but, according to Plaintiffs' expert Youssef, "[t]his is exactly what Bayoumi intended as part of his tradecraft" as "Bayoumi knew that he needed a plausible excuse for

REDACTED FOR PUBLIC FILING

meeting two Al Qaeda operatives and bringing them to San Diego." Based on his experience, Youssef surmised that "Bayoumi had to fear and assume that Hazmi and Mihdhar could be discovered by law enforcement at any time" and that "[i]nviting Morgan to join him on his trip to Los Angeles provided Bayoumi with his cover for meeting the hijackers" where "[i]f the two men were discovered, Bayoumi would (and ultimately did) claim that his meeting with them was a 'coincidence' and use Morgan as his witness." While Morgan believed Bayoumi for some time about the seeming nature of the meeting, Morgan "now acknowledges that the meeting may not have been the coincidence he was led to perceive, and he now believes that preparations had been made for the arrival of Hazmi and Mihdhar in California outside of his knowledge." Ex. 5, Youssef Rpt. 192; Ex. 92, Morgan Decl. ¶ 30.

### L. Bayoumi made advance arrangements for an apartment for Hazmi and Mihdhar before they arrived in San Diego.

1606. Before Hazmi and Mihdhar ever arrived in San Diego, Bayoumi visited the rental office at the Parkwood Apartments complex in San Diego about 5-6 times to see if apartments were available. Bayoumi told Parkwood Manager Holly Ratchford that he wanted an apartment that was in "close proximity" to Bayoumi's own apartment in the same Parkwood complex. When Kaysan Morgan saw Hazmi and Mihdhar in San Diego and expressed his "surprise at their sudden arrival" Bayoumi admitted to Morgan "that he discussed setting up an apartment with his apartment complex manager prior to the arrival of al-Hazmi and al-Mihdhar in San Diego." Ex. 91, Ratchford Decl. ¶6; Ex. 92, Morgan Decl. ¶ 25. Bayoumi's admission to Morgan about his actions regarding setting up an apartment in San Diego before his purported first meeting with the hijackers at the Mediterranean Restaurant in Los Angeles, shows that his meeting with hijackers was a planned event and not just "a coincidence."

REDACTED FOR PUBLIC FILING

1607.   Phone records support the fact that Bayoumi began investigating another possible apartment for Hazmi and Mihdhar before their arrival.  From January 12, 2000 to February 14, 2000, Bayoumi made a series of 15 phone calls to Hashim Attas, who was leaving his San Diego apartment.  Bayoumi called Attas on January 12, January 15 (3 calls), January 16, January 17 (2 calls), January 19, January 25 (2 calls), January 27, January 28, February 9, February 11 (3 calls), February 14 (2 calls).  The calls to Attas ended on February 14, 2000, the same day that Bayoumi placed a call to Attas's landlord, ██████████ who called Bayoumi back the next day.  Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).

## XXI.     BAYOUMI AND THUMAIRY ARRANGE FOR HAZMI AND MIHDHAR TO MOVE TO SAN DIEGO

### A.  Hazmi and Mihdhar are transported by car from Los Angeles to San Diego.

1608.   Thumairy and Bayoumi likely arranged for Hazmi and Mihdhar to be driven by car from Los Angeles to San Diego.  Plaintiffs' expert Youssef opined that "Al Qaeda would use extraordinary care when operatives such as Hazmi and Mihdhar travelled from one location to another," choosing "a mode of transportation that would not allow their operatives to make a mistake, get lost, or be exposed to scrutiny."  According to Youssef, the "operatives would be handled by trusted individuals at each stage of the process" and '[t]here would be a clear plan to avoid unnecessary risks."  Ex. 5, Youssef Rpt. 193-4.

1609.   Thumairy and Bayoumi had previously arranged car transportation for the advance teams of MOIA visiting propagators between Los Angeles and San Diego was by car.  Abdullah Al Jaithen recalled that he and Majid Mersal travelled from Los Angeles to San Diego by car.  Ex. 96, Jaithen Dep. 123:17-124:15, 170:19-21.  Sadhan and Sudairy also traveled the same Los Angeles-San Diego route by car driven by "someone from the community" (the King

REDACTED FOR PUBLIC FILING

Fahad Mosque) through MOIA. Ex. 99, Sadhan Dep. 73:12-77:10. It is likely that Thumairy and Bayoumi made similar arrangements for Hazmi and Mihdhar.

1610. ▬▬▬▬▬▬ told the FBI that Bayoumi himself drove Hazmi and Mihdhar to San Diego. Ex. 455, FBI 000032 at 35.

1611. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬'s claim does not make sense for several reasons. First, it is implausible, as Youseff explained, that the two hijackers would be dropped off at a bus station to take a bus to San Diego, as that "would gamble that the two men would have difficulty with getting tickets or getting off at the wrong station and becoming lost." Ex. 5, Youssef Rpt. 194; Ex. 567, FBI 11758.

1612. Second, there is no evidence that there was a bus station in Santa Monica in 2000 or bus service from Santa Monica to San Diego; a press report shows that Santa Monica's bus station closed in 1994. Ex. 165A, https://www.latimes.com/archives/la-xpm-1994-10-01-me-45234-story.html.

1613. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬.

408

1614.   The 2016 FBI Operation Encore Report reviewed ████'s claims about taking Hazmi and Mihdhar to catch a bus and found them at odds with the fact that the hijackers would need assistance to obtain tickets and directions.  Ex. 567, FBI 11758

**B.  While coordinating with Embassy and MOIA officials, Bayoumi claims to have a second "by chance" meeting with Hazmi and Mihdhar within a 1–2-day period, this time in San Diego.**

1615.   Hazmi and Mihdhar likely arrived in San Diego on February 2, 2000, the day after they met Bayoumi and Morgan in Los Angeles, or February 3.  Hazmi and Mihdhar were in San Diego by no later than February 3, 2000, based on a Parkwood Apartments document they signed on that date.  Ex. 91, Ratchford Decl. ¶ 10; Ex. 679J, at 8024-5, 8035.

1616.   According to Bayoumi, he first saw Hazmi and Mihdhar in San Diego when he happened to run into them at the ICSD.  Ex. 90, Snell Decl., Ex. 2 at 3-4; KSA Aver. ¶ 109. Bayoumi's account relies on a second unlikely "by chance" meeting between Bayoumi and the hijackers and is contrary to the evidence that Bayoumi was already searching for a suitable apartment in San Diego for Hazmi and Mihdhar before the two men arrived in San Diego.  Ex. 91, Ratchford Decl. ¶ 6; Ex. 5, Youssef Rpt. 195.

1617.   As the hijackers transitioned to San Diego, Bayoumi reported to the Saudi Embassy Islamic Affairs officials.  On February 2, 2000, Bayoumi called the Saudi Embassy Islamic Affairs for the fifth workday in a row at 9:04am (4 min.). He then called the Saudi Consulate at 9:21am (2 min.), and, subsequently, called Mutaeb Al Sudairy at 10:53am (2 mins.). Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).

1618.   On February 3, Bayoumi called the Saudi Embassy Islamic Affairs number for the sixth workday in a row at 9:20am (5 mins.)  Thumairy also called Sowailem's direct line at the Islamic Affairs department at 11:41am (12 mins.), and as Thumairy's call ended, Bayoumi called

REDACTED FOR PUBLIC FILING

the Islamic Affairs number twice at 11:53am (2 mins.) and again at 12:09pm (3 mins.)  Now that

the hijackers had safely transitioned to San Diego and were under Bayoumi's care, Bayoumi's

repeated string of calls to the Embassy Islamic Affairs over the last six days ended.  Ex. 5,

Youssef Rpt. 193; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).

1619.   Thumairy made several calls to San Diego to confirm arrangements for the

hijackers.  On February 3, 2000, Thumairy called ████████████, the Imam of the ICSD, at

11:39pm (2 mins.) and 11:43pm (2 mins.)  These calls came after Thumairy's meetings with

Hazmi and Mihdhar and occurred precisely with their arrival in San Diego and attendance at the

ICSD Mosque, indicating Thumairy communicated with the ICSD's Imam about the two

hijackers. According to Youssef's analysis, "[t]here is no other apparent reason why Thumairy,

an Imam in Los Angeles, would call ████████, an Imam of the ICSD Mosque in San Diego, so

late at night" and "[t]here were no prior calls between the two men and no subsequent calls until

July."  Ex. 5, Youssef Rpt. 5, 200; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).

1620.   As detailed below, Mezgouri attended the February 17, 2000 welcome party for

Hazmi and Mihdhar hosted by Bayoumi.  Ex. 10K (MPS2023-059 Video Exhibit); Ex. 11K

(MPS2023-059-CLIP Video Screenshots); Ex. 694, Youssef Decl. ¶ 87-88.

### C.  Hazmi and Mihdhar stayed with Bayoumi in San Diego for 2-3 days before Bayoumi helped get them their apartment.

1621.   Holly Ratchford, the Manager of the Parkwood Apartments complex in San

Diego, testified that she first met Hazmi and Mihdhar when Bayoumi brought them to her office.

Ratchford knew Bayoumi as a resident of the Parkwood complex.  Ratchford stated that before

Bayoumi came to the manager's office with the two hijackers, Bayoumi had already visited the

office 5-6 times to see what apartments were available.  Ex. 91, Ratchford Decl. ¶ 6.

410

REDACTED FOR PUBLIC FILING

1622.   Parkwood Manager Ratchford testified that "Bayoumi introduced al-Hazmi and al-Mihdhar to me, telling me that they were his friends…" and that the two men "were staying with him because they had just arrived in the United States and…that they needed to rent an apartment right away."  Ex. 91, Ratchford Decl. ¶ 7.

1623.   Parkwood Manager Ratchford testified that she knew Bayoumi as generally polite and never in a rush — but that on this occasion Bayoumi appeared rushed, intense, and under pressure.  Ratchford testified that Bayoumi's demeanor was "out of character" for him.  Ex. 91, Ratchford Decl. ¶¶ 4, 7.  In his September 2001 statement to Scotland Yard, Bayoumi confirmed the Parkwood "manager knows me" and identified her as "Holly."  Ex. 450, Tr. at 202:20, 203:7-8.

1624.   Ratchford testified that Bayoumi brought Hazmi and Mihdhar to her office "at least three days before they moved into the apartment…" on February 5 and recalled seeing the hijackers on "three different days…."  Ex. 91, Ratchford Decl. ¶ 8.

1625.   During the 2–3-day period before Hazmi and Mihdhar obtained their apartment, the two hijackers stayed with Bayoumi at his apartment.  Bayoumi admitted to Ratchford that Hazmi and Mihdhar were "staying with him" and Bayoumi wrote down on the Parkwood's application forms that the "present address" of Hazmi and Mihdhar was Bayoumi's own apartment #152 at the Parkwood complex.  Ex. 91, Ratchford Decl. ¶7, 12.  There is no evidence that the hijackers stayed anywhere other than at Bayoumi's apartment, as Bayoumi himself admitted.

1626.   The 9/11 Commission stated that it would accept Bayoumi's denial of the statement he wrote down in the lease that the hijackers were staying at his apartment, 9/11 Commission at 516 n. 24, but the Commission did not have the additional evidence here,

411

REDACTED FOR PUBLIC FILING

including Ratchford's testimony that Bayoumi admitted that the two men were "staying with him" and the proof that the hijackers stayed in ███'s apartment in Los Angeles and that ███ had his sister stay with her other sister. Ex. 91 Ratchford Decl. ¶ 7, Ex. 101, Alzamari Dep. 60:21 - 61:8; ███████████████████████████████.

### D. Bayoumi, with help from Aulaqi, provided material support and assistance to obtain an apartment for the hijackers.

1627.   Bayoumi worked together with Anwar Al Aulaqi, the Imam of the Al Ribat Mosque in San Diego, to make the necessary arrangements for the two hijackers to obtain their apartment. As expert Youssef determined, Parkwood Manager Ratchford "recounted that on one occasion Hazmi and Mihdhar came into the rental office with a man who helped translate for them," stating the translator "wore a skull cap and had beatnik glasses, both of which are Aulaqi trademarks, and identified a photograph of Aulaqi as the person who likely accompanied Hazmi and Mihdhar." The manager also testified she saw Aulaqi and Bayoumi together occasionally. Ex. 91, Ratchford Decl. ¶8; Ex. 5, Youssef Rpt. 196.

1628.   Aulaqi's involvement is further confirmed by phone records which show various direct contacts among Bayoumi, Thumairy, and Aulaqi during the relevant times, as well as a call by Aulaqi to the bank where Bayoumi took the hijackers an hour later to obtain a check and establish proof of assets necessary to rent an apartment. Ex. 5, Youssef Rpt. 196-97; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).

1629.   Bayoumi identified his own handwriting on the lease agreement documents, which Bayoumi prepared for himself, Hazmi, and Mihdhar. Ex. 120, Bayoumi Dep. 432:19-439:23; Ex. 679J, FBI 8023-60; Ex. 555, FBI 8276; Ex. 556, FBI 8278; Ex. 557, FBI 8280. Hazmi and Mihdhar signed various lease documents on February 3, 4, and 5, 2000. Ex. 91, Ratchford Decl. ¶10, 11, 15.

REDACTED FOR PUBLIC FILING

1630.   Bayoumi prepared two Parkwood "Application to Rent" forms, one for Hazmi and the other for Mihdhar, which included their names and their "present address" of "████████; SD CA 92111" and "previous address" of "Saudi Arabia."  Ex. 545, FBI 8026; Ex. 555 & 556, FBI 8276, 8278.The present address that Bayoumi listed for Hazmi and Mihdhar was Bayoumi's apartment (# 152) at the Parkwood complex.   Bayoumi wrote his own name, address, and phone number as the sole person listed as "Personal References" for Hazmi and Mihdhar. Bayoumi described his "relationship" with Hazmi and Mihdhar as "friend."  Bayoumi also wrote his name, address, and phone under "In Case of Emergency" on the forms, and again described his relationship to Hazmi and Mihdhar as "friend."  Ex. 545, FBI 8027; Ex. 555, FBI 8277. Hazmi and Mihdhar signed both application forms prepared by Bayoumi.  Ex. 555 & 556, FBI 8277, 8279.

1631.   Because Hazmi and Mihdhar had no credit or employment history, they needed a qualified guarantor to co-sign the lease.  Ex. 91, Ratchford Decl. ¶ 13.  Bayoumi filled out his "Application to Rent" form to co-sign the lease.   Bayoumi listed "██████," a reference to ██████████████ as his personal reference on the lease application for the hijackers' apartment.   Bayoumi stated that ██████ was his "friend" and gave ██████ address as the Parkwood complex.  Bayoumi put down his own phone number as ██████  Ex. 557, FBI 008280 at 8281; MPS 389:10-16 (Bashir lived in Parkwood complex).  As detailed below, Bashir attended the February 17, 2000 welcome party for Hazmi and Mihdhar hosted by Bayoumi.

1632.   On February 4, 2000, Bayoumi signed a credit check agreement and paid a $30 fee to permit Parkwood Apartments to obtain the credit report of Bayoumi necessary for him to qualify as guarantor. Ex. 547, FBI 8040; Ex. 91, Ratchford Decl. ¶ 13.  The credit check was run that day and included in the Parkwood file.

REDACTED FOR PUBLIC FILING

1633.   Bayoumi's credit check showed that Bayoumi previously listed "Mana Life" at

████████████████████ in La Jolla, CA as his employer.  Ex. 549, FBI 8053-56.  Bayoumi was

shown the reference to Mana Life and claimed not to know what it was.  Ex. 120, Bayoumi Dep.

436:8-14.  The MPS production included Bayoumi's business card listing him as a "Consultant"

at Mana at the very same Fay Ave. La Jolla address listed on the credit check.  Ex. 678O,

MPS713_139 (Bayoumi's Mana business card, including email address manalifesa@aol.com).

1634.   Parkwood Manager Ratchford testified that Hazmi and Mihdhar had a large

amount of cash with them but were told (with Bayoumi or Aulaqi translating) they had to open a

bank account in their own name, show sufficient proof of assets to pay the rent, and pay the

initial deposit and rental payment by cashier's check, not cash.  Ex. 91, Ratchford Decl. ¶¶ 9, 11,

14.

1635.   On February 4, 2000, at approximately 2:33pm, Aulaqi placed a call to ███████-

8400 (recorded by the FBI as one minute or two minutes).  Ex. 2, EO 0612.  That same phone

number was listed on the business cards of Bank of America employees at its Balboa-Genessee

branch in San Diego – where Bayoumi took the hijackers – recovered by the MPS from

Bayoumi's personal files. Ex. 678N, MPS 712_15, MPS 713_138.  Bayoumi also had an October

2000 letter in his files bearing the signature of an employee of that same Bank of America

branch, which purported to confirm that Bayoumi "has been a customer of Bank of America

since February, 1994" and that "his average balance is $20,000."  Ex. 310, MPS 720_16.  That

letter is likely another forged document by Bayoumi since he did not arrive in San Diego until

September 1994.

1636.   Approximately one hour after Aulaqi's call to the Bank of America's Balboa-

Genessee branch in San Diego, Bayoumi walked Hazmi and Mihdhar from the Parkwood

████████████████████████████████████

REDACTED FOR PUBLIC FILING

complex to that bank branch. Bayoumi translated for the two men as Mihdhar opened an account. Ex. 120, Bayoumi Dep. 440:14-441:19, 442:10-12.

1637. The Bank of America receipt for the cash shows that the hijackers' account was opened at 3:40 p.m. with the amount of $9,900. Ex. 550, FBI 8057. That receipt was shown to the Parkwood Apartments and placed in their file as the proof of funds to support their lease. Ex. 91, Ratchford Decl. ¶ 11. The $9,900 cash deposit made by Mihdhar was $100 less than the $10,000 amount that would trigger the bank to file a Currency Transaction Report with the U.S. government. 31 CFR 1010.311 (https://www.ecfr.gov/current/title-31/subtitle-B/chapter-X/part-1010/subpart-C/section-1010.311).

1638. In addition, Bayoumi had the bank prepare the necessary certified check drawn in his name and payable to the Parkwood Apartments for $1,558 for Hazmi and Mihdhar's first month's rent, security deposit, and application fee. Ex. 91, Ratchford Decl. ¶ 14. Bayoumi returned along with Hazmi and Mihdhar to the Parkwood and handed Ratchford the check. Ex. 120, Bayoumi Dep. 443:14-444:1.

1639. After Bayoumi helped Hazmi and Mihdhar make these banking arrangements, he made several repeated calls to Aulaqi beginning at 4:40pm (1 min.). Next, he called Aulaqi's Mosque at 4:42pm (1 min.) and 4:43pm (1 min.). Finally, at 4:55p, (2 mins.), Bayoumi called Thumairy's cell phone. Ex. 5, Youssef Rpt. 197; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).

1640. Bayoumi testified at his deposition that he could not remember why he called Thumairy at the same time he was wrapping up the living arrangements for the hijackers in San Diego. Ex. 120, Bayoumi Dep. 447:3-22.

1641. When asked about why he spoke to Thumairy 22 times between December 6, 1999 to February 4, 2000, Bayoumi suggested that the calls that he made to Thumairy would

REDACTED FOR PUBLIC FILING

have been requests for "mushaffs" (Qurans) or because "someone in the mosque was asking a question to which I needed an answer." Ex. 120, Bayoumi Dep. 452:5-17.

1642.   Bayoumi also suggested that the calls to Thumairy on his phone may have been made by one of the worshippers in his mosque rather than himself.  Bayoumi made the unlikely claim that his cell phone could have been used by "tens of people," none of whom Bayoumi could identify.  Ex. 120, Bayoumi Dep. 452:19-453:12, 522:23-523:23.

1643.   As to the 22 calls between Thumairy to Bayoumi between December 6, 1999 and February 4, 2000, Bayoumi said that he could not remember them.  Ex. 120, Bayoumi Dep. 454:12-22.  Bayoumi's testimony does not make sense and is contrary to the call pattern and sequence of events.

1644.   Bassem Youssef opined that the:

> calls show the relationships of Bayoumi, Aulaqi, and Thumairy to provide
> support for Hazmi and Mihdhar and are directly related to the
> arrangements being made by Bayoumi for Hazmi and Mihdhar.
> Bayoumi's call to Thumairy came immediately after Bayoumi obtained
> the bank check from his account and the Parkwood apartments had run a
> credit check of Bayoumi (at Bayoumi's expense).  With the handoff of the
> hijackers to Bayoumi successfully made, Bayoumi did not place another
> call to Thumairy until July 11, 2000, the day before Bayoumi received a
> ticket for a moving violation in Culver City, California while turning onto
> a road in the direction of the King Fahad Mosque.

Ex. 5, Youssef Rpt. 198; Ex. 554, FBI 8238 (July 12, 2000 Culver City police ticket issued to Bayoumi).

1645.   The hijackers could not move into their apartment until Bayoumi, Hazmi, and Mihdhar signed the Parkwood's guaranty contract on February 5, 2000.  Pursuant to the guaranty, Bayoumi agreed "to guarantee unconditionally to Landlord…prompt payment by Resident [Hazmi and Mihdhar] of the rent, late charges, and all other charges, expenses and costs of every kind and nature, which are or may be due now or in the future to Landlord pursuant to

REDACTED FOR PUBLIC FILING

the terms of the Rental Agreement." The guaranty specified that it "is a continuing one"; that Bayoumi's "liability…is direct, immediate, absolute, continuing, unconditional and unlimited"; provided for the recovery of attorney's fees and costs against Bayoumi in the event of a breach; and extended the guarantee to include "all renewals of the original lease term and month to month extensions…until the tenancy is terminated." Ex. 548, FBI 8047.

1646. Hazmi and Mihdhar moved into Parkwood Apt. 150 that same day, February 5, 2000. Ex. 91, Ratchford Decl. ¶ 16; Ex. 546, FBI 008030. Their apartment was in Parkwood's 6401 Mt. Ada Rd. building, just to the east and a short walk from Bayoumi's building in the same complex at 6333 Mt. Ada Rd.

1647. Plaintiffs' expert Youssef concluded that "[i]t is highly implausible that Bayoumi would co-sign the lease, sign the credit agreement, pay for the credit report, use his personal bank account to issue a check payable to the Parkwood, and designate himself personally responsible for all lease payments for an apartment for two individuals he claims he never met before and just happened to run into by chance at a Los Angeles restaurant." Ex. 5, Youssef Rpt. 198-99.

1648. Bayoumi himself admitted this fact during his deposition. When asked about Abdussattar Shaikh's statement that Bayoumi arranged for Sudairy and Sadhan to stay at Dr. Shaikh's house, Bayoumi said he would not make housing arrangements for individuals he did not know well, testifying "How do I not know them [Sudairy and Sadhan] well and how am I looking for a residence for them?" Ex. 120, Bayoumi Dep. 229:13-230:6.

1649. As expert Youssef concluded, "[d]espite his denials, Bayoumi had every reason to help Sudairy and Sadhan with their travel arrangements." Ex. 5, Youssef Rpt. 199. The photographs, videotapes, and correspondence show that Bayoumi acted as Saudi government

REDACTED FOR PUBLIC FILING

host for Sudairy and Sadhan during their visit to San Diego. Bayoumi's own contemporaneous letters to Minister Turki, MOIA Director Sowailem, Embassy Islamic Affairs Head Ghesheyan, and MOIA Propagator Supervisor Thumairy reference cooperation and coordination among the Saudi officials, including Bayoumi, concerning the trip of Sudairy and Sadhan. Ex. 414, MPS43_347 (Minister Turki); Ex. 411, MPS 43_314 (Ghesheyan); Ex. 413, MPS 43_338 (Sowailem); Ex. 678D, MPS 43_336 (Thumairy).

1650.  And in contrast, as expert Youssef further concluded, "[a]s to Hazmi and Mihdhar, Bayoumi's admission is apt — there was no reason for Bayoumi to take the steps that he did for Hazmi and Mihdhar unless he already knew who they were." Ex. 5, Youssef Rpt. 199.

1651.  Bayoumi admitted at his deposition that "I don't remember helping anyone" other than Hazmi and Mihdhar with an apartment rental nor could he recall ever signing a personal guaranty for anyone else. Ex. 120, Bayoumi Dep. 823:5-824:3. The assistance he provided for Hazmi and Mihdhar was planned and arranged in coordination with Sowailem, Thumairy, Aulaqi, and likely others.

1652.  Saudi Arabia's claim that it was "customary to help newcomers," KSA Aver. ¶ 117.a., is contrary to Bayoumi's own admission that the steps he took for individuals he supposedly did not know were extraordinary, not customary. Saudi Arabia claims that Bayoumi himself received help from an "American person" but omits the detail that Bayoumi was connecting with Omar Hamerman, the leader in the extremist cell at the ICSD mosque – just as Bayoumi was connecting with Hazmi and Mihdhar upon their arrival. Ex. 5, Youssef Rpt. 85 ("shortly after his arrival in San Diego he met Forge aka Omar Hamerman at the ICSD and that Hamerman helped Bayoumi find an apartment near the ICSD").

REDACTED FOR PUBLIC FILING

1653.   Bayoumi had no basis to expect a "referral fee" for an apartment he rented himself by co-signing a lease as guarantor for the two hijackers, contrary to Saudi Arabia's contention.  KSA Aver. ¶ 117.b.  There is no basis for such a fee to be paid to someone who signs the rental agreement.  Nor is there any mention of such a fee being paid for the hijackers' rental in the testimony of apartment manager Ratchford; the Parkwood apartment records; in any of the prior investigative statements of Bayoumi; the 9/11 Commission report; or any of the FBI reports.  Ex. 91, Ratchford Decl. ¶¶ 4-16.

1654.   Plaintiffs' expert Youssef observed that:

> ...from the perspective of Hazmi and Mihdhar, the story told by Bayoumi makes no sense unless the two men knew that Bayoumi was a member of their support network.  The known and established discipline of trained terror operatives such as Hazmi and Mihdhar makes it highly implausible that they would meet a stranger by chance at a restaurant in Los Angeles, follow him to San Diego to meet him a second time, spend substantial time with him, and rely on him to the extent that they did.  Hazmi and Mihdhar would never take such risks with a stranger.  The nature and duration of the contacts that Hazmi and Mihdhar had with Bayoumi shows that they knew that Bayoumi was a trusted member of their network. Ex. 5, Youssef Rpt. 199-200.

1655.   On February 6, 2000 two calls were made from the pay phone across the street from the Parkwood Apartment to the home of ██████████.  The Bayoumi family had previously used this phone.  On the same day ██████████ called the home of ██████████, the brother-in-law of ██████████  Ex. 2, EO 0613.

REDACTED FOR PUBLIC FILING

## XXII. BAYOUMI HELD A WELCOME PARTY FOR HAZMI AND MIHDHAR TO INTRODUCE THEM TO INDIVIDUALS WHO WOULD PROVIDE SUBSTANTIAL SUPPORT AND ASSISTANCE FOR THEM IN SAN DIEGO

1656.   Bayoumi held a welcome party for the hijackers shortly after their arrival in San Diego. Ex. 92, Morgan Decl. ¶ 24. Bayoumi used the get-together to introduce Hazmi and Mihdhar to members of the local Muslim community who would help them assimilate.  The party was held at the apartment of the hijackers, located at ███████████████████, San Diego, CA.  Ex. 5, Youssef Rpt. 200-202; Ex. 694, Youssef Decl. ¶¶ 60-102; Ex. 455, FBI 000032 at 35-36 (███████ told the FBI that Bayoumi "went in person to ███████" apartment in which [sic] Al Bayoumi personally invited ███████ to the party for Al Mihdhar and Al Hazmi.").

1657.   Bayoumi asked Kaysan Morgan to videotape the party using Bayoumi's video camera.  Ex. 92, Morgan Decl. ¶ 27.

1658.   The MPS seized a copy of the videotape of the party from Bayoumi in September 2001.  The MPS immediately shared a copy of the party videotape with the FBI.  The copy of the party video produced in this litigation by the FBI was incomplete and did not include all the footage of the party seized by the MPS.  The 9/11 Commission also viewed that incomplete version of the party video.  Ex. 694, Youssef Decl. ¶ 61-62.

1659.   The MPS returned the bulk of the materials it seized from Bayoumi, including the original party videotape, to Bayoumi in May 2002.  Ex. 678DD, MPS2023-100_20-22 (FMT Receipt 69/2002 showing restoration of seized materials to Bayoumi).

1660.   In December 2023, the MPS released a copy of the complete party footage that it seized from Bayoumi in September 2001.  The MPS 2023 production includes a video file, MPS2023-059, which the MPS identified as "a complete copy of the [MF/18] video in a .MOV

420

REDACTED FOR PUBLIC FILING

format." ECF 9461-3 at 5. The digital file contains video footage lasting approximately 30 minutes. A certified copy of the file, with its accompanying label and timer and an exact copy of the footage produced is filed with the Court. Ex. 10K (MPS2023-059 Video Exhibit).

1661. Ex. 10K-TR (MPS2023-059-TR Video Transcript), is a transcript of the party video in Arabic that also contains translations of the Arabic words spoken on the party video. The transcription and translation of the words spoken are accurate. In addition, captions of the certified translations were added to the party video. Those captions correspond precisely with the certified translations and have been placed on the video at the time when the words are being spoken on the video. Every frame of the video has a time stamp, which is used as the basis for citing both the video and the transcript. Ex. 694, Youssef Decl. ¶ 13, 62-64.

1662. Ex. 11K (MPS2023-059 Video Screenshots) contains screenshots from Ex. 10K (MPS2023-059 Video Exhibit), each with its own time stamp.

1663. Plaintiffs retained William Adams, a digital visualization expert with a production studio in the United Kingdom with extensive experience in producing demonstrative exhibits based on video evidence and image analysis. Ex.10K-Adams, Adams Decl. ¶¶ 1-4 & Annex 1. Mr. Adams applied standard, well-accepted techniques and software used in his field to produce a reconstruction of events based on the physical facts and available video footage. Mr. Adams explained the software and processes he applied in detail and how he cross-checked his work at each step. Ex. 10K-Adams, Adams Decl. ¶¶ 31-41. The work of Mr. Adams has previously been admitted into evidence by courts and governmental commissions in a variety of different types of matters. Adams Decl. ¶ 4. Based on his review of Ex. 10K (MPS2023-059 Video Exhibit), Mr. Adams successfully identified everyone who attended the party and was able to depict the position of each individual in the apartment at specific, defined times during the party with a

REDACTED FOR PUBLIC FILING

high level of certainty.  Ex. 10K-Adams, Adams Decl ¶¶ 30-35.  Mr. Adams prepared a set of

Schematics which depict the presence and position of everyone who attended the party.

Ex.  10K-Adams, Adams Decl. & Annexes 2-8.

    1664.   The Schematics are an accurate depiction of the presence and positioning of all

the people who attended the party.  Ex. 694, Youssef Decl. ¶ 65.

    1665.   The FBI's review of the phone call activity, including Bayoumi's calls to the

caterer he hired to prepare and deliver the food for the party, determined that the party likely

occurred on Thursday, February 17, 2000.  Ex. 2, EO 2754-55.

    1666.   A total of twenty-nine people attended the party and appear on Bayoumi's video

footage.  Those 29 people are identified on digital visualizations prepared by Mr. Adams of

everyone in the room, with labels containing the names by which they are identified. Ex. 10K-

Adams, Adams Decl., Annexes 2-6. Mr. Adams also prepared 29 information graphics with the

title "Individuals" to show everyone in the room was identified on the videotape.  *Id.*, Annex 8.

    1667.   **Omar Al-Bayoumi** is referred to throughout the video footage as "Abu Emad."

Ex. 10K-Adams, Adams Decl., Annexes 2-8, Person 1 ("Abu Emad" Bayoumi).  Bayoumi's

eldest son **Emad Bayoumi** also attended the party.  *Id.*, Person 26 (Emad).

    1668.   9/11 hijacker **Nawaf Al-Hazmi**, introduced himself at the party as "Nawaf

Muhammad" (Ex. 10K Video Exhibit at 18:41), while seated next to Bayoumi's son in the corner

of the room.  Ex. 10K-Adams, Adams Decl., Annexes 2-8, Person 25 ('Nawaf' Al-Hazmi).

Hazmi appears on the video footage multiple times, wearing a baseball cap, black dress-shirt and

light-colored pants.  There are seven (7) separate sightings of Hazmi and his movements through

the apartment on the party video, as shown in Mr. Adams' schematics.  Ex. 10K-Adams, Adams

Decl., Annex 7 (diagram of movements), 'Nawaf' Al-Hazmi, N1-N7.

REDACTED FOR PUBLIC FILING

1669.   Emad Bayoumi and **Khalid Al Yafai** sat next to Hazmi at the party.  Ex. 10K-Adams, Adams Decl., Annexes 2-8, Person 27 (Khalid Al "Yafai").   The MPS tape shows Yafai smiling at Hazmi and openly encouraging "Nawaf" to introduce himself.  Ex. 10K (MPS2023-059 Video Exhibit); Ex. 11K (MPS2023-059 Video Screenshots).  It is clear from the interaction between the two men that Yafai and Hazmi had developed a close relationship during the time that the hijackers were in California. Bayoumi admitted to the MPS that Yafai knew and spent time with Hazmi and Mihdhar in February 2000.  Bayoumi's recounted an anecdote involving Yafai's stereo system.  Bayoumi said that Yafai owned a "stereo for, you know, music and… said [to Hazmi and Mihdhar] I'll give you the stereo in your apartment.  When I come back again, I will get it."  Ex. 450, Tr. 233:20-234:1.

1670.   9/11 hijacker **Khalid Al-Mihdhar** is seen multiple times on the video footage, wearing a white, long-sleeved polo-shirt and dark-colored pants with belt.  Ex. 10K-Adams, Adams Decl., Annexes 2-8, Person 22 (Khalid Al Mihdhar).  Mihdhar appears in the main room as well as in the kitchen.  There are three (3) separate sightings of Mihdhar and his movements through the apartment.  Ex. 10K-Adams, Adams Decl., Annex 7 (diagram of movements), Khalid Al-Mihdhar, K1-K3.

1671.   The video evidence shows that both Al-Qaeda operatives moved freely and frequently through the living room of the apartment, at ease among the guests.  *Id.*, Annex 7 ("Diagram of movements of 'Nawaf' Al-Hazmi and Khalid Al-Mihdhar during the Bayoumi party video"). Hazmi and Mihdhar can be seen acting as co-hosts together with Bayoumi of the welcome party held in their apartment.

1672.   Both hijackers help to prepare and serve the food for the party.  Hazmi is shown serving a plate of dates to Sheikh Abdulrahman Barzanjee, Imam of Al-Madinah Mosque.  *Id.*,

REDACTED FOR PUBLIC FILING

Annex 7, N2. Mihdhar is shown preparing the salad in a large dish on the counter in the kitchen. *Id.*, Annex 7, K3.

1673. Both hijackers are shown standing at the front, alongside and at the shoulder of Bayoumi, during the main ceremonies Bayoumi orchestrated at the party. *Id.*, Annex 7, *e.g.* N3 and K1. Apart from the camera operator, Kaysan Morgan, who was tasked by Bayoumi to film the event, Ex. 92, Morgan Decl. ¶27, all the other attendees of the party were sitting during those ceremonies. This indicates the hijackers' distinctive and special status at the party.

1674. Hazmi introduces himself (first name and father's name) in the round of introductions as "Nawaf Muhammad" (Ex. 10K Video Exhibit at 18:41). Hazmi is shown engaging in conversation with others including Khalid Al-Yafai and Bayoumi's son Emad, and is encouraged by other guests, on a first-name basis, to show himself more prominently and to speak to the gathering. Ex. 10K (MPS2023-059 Video Exhibit); Ex. 10K-TR (MPS2023-059-TR), *e.g.* at 18:35-18:43 ("Let Nawaf speak!", "Nawaf, Nawaf… show your face!").

1675. A Saudi religious official, **Sheikh Muhammad Al-Qahtani**, whom Bayoumi gave special billing in front of all those gathered (Ex. 10K Video Exhibit at 14:27), attended the party. Qahtani introduced himself at the party as "Muhammad Salem from Saudi Arabia" (Ex. 10K Video Exhibit at 17:50). Ex. 10K-Adams, Adams Decl., Annexes 2-8, Person 14 (Sheikh Muhammad Al-Qahtani). On the video, Bayoumi describes Qahtani as a guest of honor, saying "*even* Sheikh Muhammad Al-Qahtani," – had not yet shown up, "he appears to be bailing on us, you know". Ex. 10K-TR (MPS2023-059-TR) 14:27-14:29; Ex. 694, Youssef Decl. ¶ 73. Qahtani later arrived at the party (an unseen speaker recognizes him and announces: "It's Sheikh Muhammad") in time to take part in the introductions. Ex. 10K-TR (MPS2023-059-TR) 16:58.

424

REDACTED FOR PUBLIC FILING

1676.   Qahtani sat against the wall on the left side of the room, and shortly after Qahtani's arrival at the party, Bayoumi can be seen motioning to the camera operator Kaysan Morgan and heard instructing him, in English, not to film that side of the room.   This shows that Bayoumi's intention was to keep evidence of Saudi official Qahtani's presence at the party off the videotape.  Ex. 694, Youssef Decl. ¶ 73.   Nonetheless, at a later moment, Morgan swung the camera round and captured a short sequence of the left side of the room, Ex. 10K (MPS2023-59 Video Exhibit) 28:36 (showing Qahtani engaged in conversation with Fathi Al-Aidarus, who was sitting next to him); Ex. 10K-Adams, Adams Decl., Annexes 2-8, Person 15 (Fathi Al-Aidarus).

1677.   Bayoumi had listings for Sheikh Muhammad Al-Qahtani in his handwritten address book, and in his green folder found by the MPS.  Ex. 12AA, MPS738_75R; Ex. 12BB, MPS688_10.  Bayoumi's entries for Qahtani included a San Diego phone number, 858-565-0896, which public records show was associated with Qahtani's name under an address listing at ████ Beadnell Way in San Diego, across Balboa Avenue and a short walk from the Islamic Center of San Diego ("ICSD") and Bayoumi's apartment.  Ex. 694, Youssef Decl. ¶ 75. ████ lived in the same Beadnell Way complex as Qahtani.  Ex. 2, EO 2781, 2792 (█████████ Beadnell Way).  Bayoumi also made handwritten notes in his green folder of Qahtani's phone numbers in Saudi Arabia.  Ex. 12BB, MPS688_10.

1678.   The Muslim World League production in this case shows that Qahtani received a $15,000 check from Saudi government funding agent Abdullah Al Noshan dated May 22, 1998.  Ex. 315, MWL-IIRO 64943.  The description and address of Qahtani as "Sheikh" by Bayoumi and others; Qahtani's introduction of himself as being "from Saudi Arabia;" and the funding from Noshan, all show that Qahtani was a Saudi government religious official and was likely working inside the United States for MOIA. Ex. 694, Youssef Decl. ¶ 76.

REDACTED FOR PUBLIC FILING

1679.   Several individuals at the party associated with the Al Madinah Mosque had financial dealings with Saudi Arabia.  **Sheikh Abdulrahman Barzanjee**, was paid as Imam at the Al Madinah Mosque by personal checks from Bayoumi.  Ex. 5, Youssef Rpt. 201-2; Ex. 10K-Adams, Adams Decl., Annexes 2-8, Person 2 (Sheikh Barzanjee); Ex. 678E, MPS43_390, MPS527_17 (Bayoumi checks paid to Barzanjee).

1680.   **Ghazi Ahmad**, Finance Officer at Al Madinah Mosque, signed the receipt for a $5,000 donation from the Saudi Embassy arranged by Bayoumi in November 1998, along with two Mosque Board Members present at the party who were also signatories to the Embassy's vetting paperwork: **Hussein Al Hilali** and **Omar Barzanji**. Ex. 403, MPS43_376-379;  Ex. 10K-Adams, Adams Decl., Annexes 2-8, Person 7 (Ghazi Ahmad), Person 4 (Hussein Al-Hilali), and Person 12 (Omar Barzanji).

1681.   **Sami Doski**, was installed with Bayoumi's help as Chairman of the Al Madinah Mosque's Board of Trustees in July 1999 in direct coordination with the Saudi Embassy. Ex. 367, MPS43_150-151; Ex. 10K-Adams, Adams Decl., Annexes 2-8, Person 9 (Sami Doski).

1682.   ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

1683.   Ex. 10K (MPS2023-059 Video Exhibit) contains the complete sections of footage from two particularly important moments at the party, where Bayoumi speaks to the whole group in his role as host.  Plaintiffs' expert Youssef listened to these sections carefully in their original Arabic and reviewed the faithful English translation of Bayoumi's words.  The first speech, when Bayoumi is kneeling in the center of the room, is Bayoumi's statement of the purpose of the party: "We are welcoming the brothers, in fact… whom we have not yet had the pleasure of

426

meeting". Ex. 10K (MPS2023-059 Video Exhibit); Ex. 10K-TR (MPS2023-059-TR Video Transcript) at c. 14:19.

1684.   In the second speech, when Bayoumi stands at the front of the room next to the two Al Qaeda operatives and instigates a round of introductions, Bayoumi then tells the group: "Everyone should just state his name, so that the brothers will get to know his name". Ex. 10K (MPS2023-059 Video Exhibit); Ex. 10K-TR (MPS2023-059-TR Video Transcript) at c. 16:28.

1685.   Based on the words in Arabic spoken by Bayoumi and others at the party, Hazmi and Mihdhar were "the brothers" that Bayoumi was talking about in these two moments. The others at the party were already familiar with one another: they would meet each other regularly at their Mosques, community festivals and holiday celebrations like Eid, soccer games, or other events in the San Diego area. Hazmi and Mihdhar were the only individuals whom the local community had "not yet had the pleasure of meeting." Ex. 694, Youssef Decl. ¶ 82.

1686.   Notwithstanding Hazmi's introduction of himself, several other men in the main room can be heard addressing "Nawaf" directly, including Bayoumi himself who is trying to move along the proceedings. Bayoumi is heard clearly repeating Nawaf's name to the group, before Bayoumi offers his own welcome to Hazmi in the form of a religious greeting: "Nawaf, may God greet you, Nawaf." Ex. 10K (MPS2023-059 Video Exhibit); Ex. 10K-TR (MPS2023-059-TR Video Transcript) at c. 18:54.

1687.   Similarly, Bayoumi's request that everyone at the party should "state his name" was clearly orchestrated for the benefit of Hazmi and Mihdhar. It would have been totally redundant for the guests who already knew each other to announce their names in such a manner, some of them including the places they were from. The party was Bayoumi's means not only of introducing Hazmi and Mihdhar into the local community for the first time, but also of setting

REDACTED FOR PUBLIC FILING

them up with, and documenting, a local support network of named and known individuals whom Bayoumi, their handler, could vouch for. It was clearly part of Bayoumi's operational strategy to record on video the members of this network as they announced their names aloud. Ex. 694, Youssef Decl. ¶ 84.

1688.   The video shows that Bayoumi likely instructed Morgan not to film Hazmi or Mihdhar. While Mihdhar's face can be seen in several brief sequences when he is walking past, or the camera is being moved, Mihdhar's voice is not heard on the tape. Hazmi can be heard speaking on the tape, and while his face is not seen, the film captures Hazmi's black shirt, light-colored pants, arm, hand, and the bill of his baseball cap. Ex. 10K-Adams, Adams Decl., Annex 7 (diagram of movements). N1-7. As noted above in respect of Qahtani, Bayoumi is heard instructing Morgan about where and what to film at the party. Shortly after Bayoumi gave that instruction, as the persons on the left-hand side of the room could be heard introducing themselves, the camera was pointed up towards the ceiling. Ex. 10K (MPS2023-059 Video Exhibit) from c. 17:51.

1689.   It is significant that Bayoumi invited to the party several persons who went on to provide substantial support for Hazmi and Mihdhar during their time in San Diego. Bayoumi hand-picked these individuals because he knew and assessed that they were well-suited to provide the Al Qaeda operatives with important forms of support. Ex. 694, Youssef Decl. ¶ 86.

1690.   The two Imams from the ICSD aka "Abu Bakr Mosque"were among those most regularly present at the Mosque premises. The hijackers regularly attended the ICSD Mosque, which was close to the Parkwood Apartments complex where they lived. **Sheikh Fouad Hamouda**, the elder or senior Imam, sits next to Barzanjee at the party, recites a parable, and

428

REDACTED FOR PUBLIC FILING

introduces himself as "Fouad Hamouda." Ex. 10K-Adams, Adams Decl., Annexes 2-8, Person 29 (Sheikh Fouad); Ex. 694, Youssef Decl. ¶ 87.

1691.    **Sheikh Abduljalil Mezgouri**, the second Imam from the ICSD Mosque is addressed by Bayoumi at the beginning of the video as "Sheikh" and introduces himself in the round of introductions as "Abduljalil Muhammad."  Ex. 10K (MPS2023-059 Video Exhibit); Ex. 10K-TR (MPS2023-059-TR Video Transcript) 00:10, 17:35; Ex. 10K-Adams, Adams Decl., Annexes 2-8, Person 11 (Sheikh Abduljalil).  Youssef was able to confirm the identity and appearance of Mezgouri at the party based on the statements made on the videotape and his review of additional Bayoumi videos from the MPS production in which Mezgouri appears. Ex. 694, Youssef Decl. ¶¶ 88-89; Ex. 10L, MPS910-CLIP Video Exhibit.   Mezgouri sat at the party on the left side of the room, wearing his white robe and cap (Ex. 10K Video Exhibit at 28:36). When Bayoumi was interviewed by the MPS upon his arrest in September 2001, he stated that it was Mezgouri who first spoke to the two Al Qaeda operatives upon their arrival in San Diego and arranged for them to meet up with Bayoumi.  Ex. 450, Tr. 694:17-696:9 ("they asked the Imam 'where is Omar?'… And then I showed up").

1692.    ██████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

1693.    Thumairy had phone contact with at least six persons who attended the party, including Bayoumi and ████████.  Ex. 12W (Thumairy calls to persons at Bayoumi's welcome party).  It is significant that Thumairy had contacts with the same group of individuals that

429

REDACTED FOR PUBLIC FILING

Bayoumi invited to welcome Hazmi and Mihdhar to San Diego. Ex. 694, Youssef Decl. ¶¶ 91-97.

1694. Thumairy called █████████ on August 6, 2000 at 12:43 p.m. and 2:22 p.m.. Ex. 12W (Thumairy calls to persons at Bayoumi's welcome party). ████ lived in the Parkwood Apartments and was named by Bayoumi as his friend and reference in the lease application that Bayoumi prepared for Hazmi and Mihdhar. Ex.557, FBI 008280 at 8281.

1695. Bayoumi placed numerous calls to █████████ between June 21, 2000 and September 15, 2000. Ex. 12Z (Bayoumi calls to █████████

1696. ████████████████████████████████ ████████████████████████████████ Alkhawaja attended the party. Ex. 10K-Adams, Adams Decl., Annexes 2-8, Person 24 (Maen); Ex. 694, Youssef Decl. ¶ 91. Allkhawaya is seen talking and gesturing to Hazmi at the party Ex. 10K Video Exhibit at c. 18:42-18:47.

1697. Alkhwaja was identified in Bayoumi's handwritten address book as "Maen for car rental." Ex. 12AA, MPS738_25L. █████████████████ that Hazmi had approached him "interested in purchasing a used vehicle." Ex. 2, EO 1423. Although ████████ "did not have a vehicle to fit [Hazmi's] budget… he referred him to an individual of Moroccan descent known to ████████ as "████████." ████████ sold to [Hazmi] a blue Toyota Corolla." Ex. 2, EO 1423.

1698. Bayoumi had a close personal relationship with ████████, the man who sold his Toyota Corolla to the hijackers. Bayoumi knew ████ on first name terms as ████████ ████ and can be heard referring to this name in a video recorded conversation at the mosque in which both men shared Eid greetings in Arabic for wellness in life "and in the hereafter." Ex. 10L, MPS910-CLIP Video Exhibit at ████. Bayoumi's handwritten address book contained

430

a two-part entry for ████████ listing both his cellphone and his pager.  Ex 12AA,

MPS738_15R.

1699. ████████████████████████████████████

████████████████████████████████████████

Tarabishi attended the party.  Ex. 10K-Adams, Adams Decl., Annexes 2-8, Person 28 (Dr. Saad).

██████████████████████████████████████████████

█████████████████████████

1700. ██████████████████████ who introduces himself as "Fathi Al-Aidarus."

Ex. 10K-Adams, Adams Decl., Annexes 2-8, Person 15 (Aidarus).  ████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

████████████████

1701.  Aidarus sat next to Saudi official Qahtani at the party.  Qahtani's first name was

"Mohamed." ████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████

1702.  The phone records contain 13 calls from Bayoumi's cell phone to ████ starting

on January 11, 2000 through June 25, 2000.  Ex. 12Q (Bayoumi calls to ████████.

1703.  **Adel Muhammad Rafeea**, an administrator and Secretary at the ICSD,

introduces himself on the party video as "Adel Muhammad."  Ex. 10K-Adams, Adams Decl.,

██████████████████████████████████████

REDACTED FOR PUBLIC FILING

Annexes 2-8, Person 18 (Adel); Ex. 694, Youssef Decl. ¶ 99 (Youssef determined Rafeea's

identity based on his family name and other information on the video and public records, and

document produced in the case). ████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

1704.  **Hashim Al-Attas** introduces himself on the video and Bayoumi describes him as

as one of the brothers present at the party, along with Yafai, who was imminently "travelling"

(Ex. 10K Video Exhibit at c. 13:58). Ex. 10K-Adams, Adams Decl., Annexes 2-8, Person 6

(Attas). Attas' apartment was arranged by Bayoumi as backup accommodation. Ex. 5, Youssef

Rpt. 208.

1705.  The phone records show that Bayoumi called Attas 15 times from January 12,

2000 through February 14, 2000.  Ex. 12O (Bayoumi calls to Hashim Al Attas).  Bayoumi made

various several calls to the landlord for Attas, evidently to inquire about the availability of his

apartment.  Bayoumi Rpt. 208.

1706.  **Ahmad Mustafa** introduces himself on the video and recites a poem in Arabic at

Bayoumi's prompting.  Ex. 10K-Adams, Adams Decl., Annexes 2-8, Person 23 (Ahmad

Mustafa).  Bayoumi arranged for Mustafa to move in with the hijackers for two weeks in March

2000, and Mustafa proceeded to set up internet and phone service for them.  Ex. 5, Youssef Rpt.

209; Ex. 2, EO 2361.

1707.  It was from this phone that Hazmi and Mihdhar made at least one call to the Al

Qaeda operations number in Yemen.  Ex. 520, FBI 3348; Ex. 2, EO 0506 (the July 2004 FBI

████████████████████████████████

REDACTED FOR PUBLIC FILING

Inspector General Report states that "[o]n March 20, 2000, a long-distance telephone call was placed from Mihdhar and Hazmi's Mount Ada apartment [the Parkwood apartment rented by Bayoumi] to the known terrorist logistics phone number in Yemen").  Musafa told the FBI that Bayoumi "was a frequent visitor" to the apartment of Hazmi and Mihdhar and that Bayoumi was "often bringing food." Ex. 2, EO 2366.

1708.   The FBI determined that Ahmad Mustafa was "the son of the founder of the violent Islamist organization, PIK [Partiya Islamiya Kurdistan], which is closely allied with ANSAR AL-ISLAM." Ex. 2, EO 2798.  As described elsewhere, Ansar Al-Islam was the designated terrorist organization that would be led in Europe by Abdel Rahman Barzanjee, who attended the February 2000 party at the hijackers' apartment.

1709.   **Nino Mawazini** also attended the party. Ex. 10K-Adams, Adams Decl., Annexes 2-8, Person 10 ('Nino' Mawazini).

1710.   Bayoumi placed  calls to ████████ from January 9, 2000 to August 6, 2000. Ex. 12S (Bayoumi calls to ████████).

1711.   Bayoumi falsely told the 9/11 Commission that he "gave the dinner to honor Barzanjee…."  Ex. 90, Snell Decl. Ex. 2 at 5.  The 9/11 Commission Report cited the fact that "Bayoumi maintains that a visiting sheikh was the party's principal honoree," *See* 9/11 Commission Report at 516, n. 25.

1712.   Sheikh Barzanjee, however, was not "a visiting sheikh."  To the contrary, precisely because of Bayoumi's efforts dating back to 1998, Barzanjee had become the permanent Imam of the Al Madinah Mosque.  Ex. 10K Video Exhibit at c. 13:28-13:43 (Bayoumi states that Barzanjee "has become" and "is now the Imam of Masjid AlMadinah AlMunawarah [AlMadinah Mosque].") Correspondence found in Bayoumi's possession showed

433

REDACTED FOR PUBLIC FILING

that Barzanjee remained in place at the AlMadinah Mosque throughout the time the hijackers were in San Diego, through the end of 2000. Ex. 418, MPS95_114-16 (Barzanjee letter to Habib dated January 8, 2001). Given Bayoumi's role in installing Barzanjee at the Al Madinah Mosque, and his role as General Supervisor of that mosque, Bayoumi plainly knew that Barzanjee was not a "visiting sheikh" and thus plainly sought to mislead the 9/11 Commission about the party through his statement.

1713. Bayoumi also told the 9/11 Commission that the party was moved to the hijackers' apartment because one of the men brought their wife to the party. Ex. 90, Snell Decl. Ex. 2 at 5. There is no basis for this story other than Bayoumi's say-so and the video shows that the individuals attending the party went directly to the hijackers' apartment to attend the event.

1714. The 9/11 Commission stated that "[a]lthough [Morgan] has recalled that the party was intended to welcome Hazmi and Mihdhar to the community, this is belied by the hijackers' apparent decision to sequester themselves in the back room, and by the account of another party attendee." The other "party attendee" cited by the 9/11 Commission was Yafai. *See* 9/11 Commission Report at 517 n. 25. Yafai told the 9/11 Commission that "he did not talk to him [Hazmi] at the party"; "Hazmi may have been in the back room of the party" because "he doesn't recall seeing him [Hazmi] in the living room area"; and that he "had never met them [Hazmi and Mihdhar] before." Ex. 308, MFR 9/11 Commission Interview of Yafai, February 24, 2004 at 3.

1715. The Commission also stated that there is only one brief sighting of Mihdhar on the tape. *See* 9/11 Comm Rpt. 516 n. 25 (██████████ "appears briefly"). The 9/11 Commission, however, never reviewed the complete party tape seized by the MPS.

1716. While the 9/11 Commission discounted Kaysan Morgan's statement that Bayoumi held the party to welcome Hazmi and Mihdhar, the more comprehensive footage in Exhibit 10K,

434

the MPS2023-059 Video Exhibit, shows that Morgan was correct. Bayoumi's contacts with and use of Morgan were part of his scheme to support the hijackers. The EO production identified that Morgan was using cellphone number ███████-6525 at the relevant time. Ex. 2, EO 2751. The phone call records show that Bayoumi placed 18 calls to Morgan on that cell phone number in January-February 2000, coinciding with Bayoumi's arrangements to have Morgan accompany him to Los Angeles to meet the hijackers, and to film the party at which they would be welcomed and introduced. Ex. 12P (Bayoumi calls to Kaysan Morgan).

1717. Bayoumi immediately reported to MOIA Director Sowailem at the Saudi Embassy after the party attended by Hazmi, Mihdhar, Qahtani and other Sheikhs. Bayoumi called Sowailem's personal cell phone on Friday, February 18, 2000 at 7:58 p.m. (2 mins.) and Saturday February 19, 2000 at 10:56 a.m. (6 mins.). Ex. 516, FBI 003242; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000). The Friday evening and weekend calls show that Bayoumi felt some urgency to report to Sowailem and confirm that everything was going according to plan.

## XXIII. BAYOUMI AND THUMAIRY PROVIDED SUBSTANTIAL ADDITIONAL MATERIAL SUPPORT FOR THE AL QAEDA OPERATIVES

### A. Bayoumi and Aulaqi arranged for ███████████ to provide support for Hazmi and Mihdhar.

1718. The evidence shows that Bayoumi and Thumairy coordinated with Anwar Aulaqi in advance of the arrival of Hazmi and Mihdhar in San Diego, and that Bayoumi and Aulaqi worked in tandem to provide support to the two hijackers. Bayoumi introduced Hazmi and Mihdhar to Aulaqi, as Aulaqi appeared with the two hijackers at the Parkwood Apartments office shortly after Bayoumi first introduced the two men to the Parkwood Manager Ratchford. Ex. 91, Ratchford Decl. ¶¶ 6, 8. Hazmi and Mihdhar "reportedly respected Aulaqi as a religious figure and developed a close relationship with him." *See* 9/11 Commission Report at 211.

435

REDACTED FOR PUBLIC FILING

1719. 

1720.

1721. ▮▮▮▮▮▮▮▮ was first interviewed by the FBI eight days after the 9/11 Attacks, on September 19, 2001. Ex. 458, FBI 000050-57. Over the course of more than a decade, ▮▮▮▮ provided statements to the FBI that Bayoumi introduced him to Hazmi and Mihdhar and asked him to "look out" for the two men and help them acclimate to the area. Ex. 458, FBI 000050-57 at 50, 51 ; Ex. 464, FBI 000172-177 at 173 ; Ex. 467, FBI 0000208-222 at 209 (▮▮▮▮ Ex. 1F) ; Ex. 453, FBI 000007-11 at 0010, ▮▮▮▮ Ex. 1I (December 2013) ; Ex. 89, Gonzalez Decl. ¶20.

1722. In his August 2011 statement, ▮▮▮▮ told the FBI that Bayoumi invited him to an evening meal at the Al Madinah Mosque (▮▮▮▮ described it as "the mosque where Bayoumi was an administrator and had an office"). Ex. 467, FBI 000208-222 at 209 (May 18-19, 2011 interview of ▮▮▮▮). Anwar Aulaqi was also there. After Aulaqi and Bayoumi spoke, Bayoumi introduced ▮▮▮▮ to "Hazmi and Mihdhar as two Saudi students who did not speak English and were new to San Diego." Ex. 467, FBI 0000208 at 209 (▮▮▮▮ Ex. 1F). Bayoumi "asked ▮▮▮▮ if he could help Hazmi and Mihdhar." Ex. 467, FBI 0000208 at 209 (▮▮▮▮ Ex. 1F). The 2014 FBI Operation Encore Report concluded that

REDACTED FOR PUBLIC FILING

"█████████████ played a key role facilitating the daily lives and assisting future Flight 77 hijackers Nawaf al-Hazmi and Khalid al-Mihdhar. Shortly after February 4, 2000, al-Bayoumi tasked █████████████ to assist al-Hazmi and al-Mihdhar." Ex. 2, EO 0225.

1723. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████

1724. ████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████.

████████████████████████████████████████

████████████████████████████████████████

████████████████████

1725. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████

437

████████████████████████████████████████

REDACTED FOR PUBLIC FILING

1726. ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████

1727. ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████

███████████

1728. █████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

1729. ███████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

REDACTED FOR PUBLIC FILING



1730. ████████████████████████████████

████████████████████████████████████

██████████████████████████████████.

1731. ████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

██████████████████████████████.

1732.   The 9/11 Commission concluded that "During the operatives' critical first weeks in San Diego, ███████████ helped them. Translating between English and Arabic, he assisted them in obtaining California driver's licenses and with applying to language and flight schools. *See* 9/11 Commission Report at 220.

1733.   ██████ visited King Fahd Mosque and knew Thumairy. *See* 9/11 Commission Report at 217. As detailed below, ██████ would bring Hazmi and Mihdhar to Los Angeles to meet with Thumairy on June 9, 2000.

1734.   ██████ told the FBI that Thumairy officiated at an Islamic wedding at the King Fahad Mosque held for ██████'s employer, who owned the San Diego gas station where Hazmi also worked in 2000.  Ex. 464, FBI 000172-177 at 176. ████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████

REDACTED FOR PUBLIC FILING

**B. Bayoumi worked to assist Hazmi in an effort to obtain a student visa through Mahmoud Firas.**

1735.   Bayoumi told U.K. investigators that he helped Hazmi and Mihdhar begin English language lessons at a local community college.  Ex. 450, MPS389_560-61.

1736.   Mahmoud Firas operated a fraudulent scheme in which Firas took tests for Saudi nationals attempting to receive "Test of English as a Foreign Language" – "TOEFL" – accreditation.  Ex. 687, *U.S. v. Firas*, 2:02-cr-00404-DRD-1 (D.N.J. 2002). Firas entered a guilty plea and was sentenced to 27 months imprisonment.  2:02-cr-00404-DRD-1, ECF No. 36, 37 (D.N.J. 2002); Ex. 336, "Student Visa Fraud Ring Broken by 58 Arrests, Government Says" *New York Times*, May 8, 2002.  https://www.nytimes.com/2002/05/08/national/student-visa-fraud-ring-broken-by-58-arrests-government-says.html.

1737.   The Bayoumi green folder typed phone list seized by the MPS contained 2 phone numbers for Mahmoud Firas.  Bayoumi wrote down in his own handwriting the name "Faris" and the phone numbers ████-8383 and ████-2222 next to the typed listings under the letter "F".  Immediately above the listing, Bayoumi wrote "GMAT" and the name in Arabic "Abu Nasser" as the kunya for Mahmoud Firas.  Ex. 12BB, MPS688_7 (reference to "Firas"); Ex. 120, Bayoumi Dep. 92:1-6 (Bayoumi admits his handwriting);

1738.   ████████████████████████████

REDACTED FOR PUBLIC FILING

1739.   Between March 10 and March 15, 2000, ███████████████████

███████ Bayoumi placed 20 calls to the -6662 cell number which (as discussed below) the

FBI determined was at the center of the support network for the two hijackers.  Ex. 2, EO 2797-

98; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).

1740.   On March 15, 2000, Bayoumi made two calls to both of ██████ numbers listed in

his phone book: Bayoumi called ████████-8383 at 8:48am (1 min.), and Bayoumi called (909)

███-2222 at 8:49am (1 min.).  Bayoumi then called █████████ at 9:08am (1 min.).  Ex

517, FBI 3255; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).  Bayoumi had introduced the

hijackers to ██████ and asked ████████ to help them. Afterwards, ████████ was with Hazmi

daily.  Ex. 89, Gonzalez Decl. ¶ 12-20; Ex. 467, FBI 000208-222 at 209, 211 (May 18-19, 2011

interview of ████████).

1741.   Bayoumi then placed three calls to ████ at 9:40am (1 min.), 11:40am (1 min.),

and 12:54pm (2 min.).  Ex. 517, FBI 003250 at 3256; Ex. 12A (Phone calls Nov. 1999 – Mar.

2000).

1742.   On March 15, 2000 at 1:33pm, Nawaf Al Hazmi placed a call to (████████-3640

(2 mins.).  Ex. 520, FBI 3339.  The number (████████-3640 was a TOEFL Testing Center.  Ex.

685, TOEFL Informational Bulletin (Educational Testing Service 2001) at 44.

1743.   After Hazmi's call to the TOEFL Testing Center, Bayoumi called ████ 7

additional times on March 15, 2000.  Ex. 517, FBI 3256.

1744.   Hazmi's 6-month visitor visa expired on April 2, 2000, and the length of stay

granted by the immigration inspector (which controlled Hazmi's legal status) was set to expire

on July 14, 2000.  Ex. 30, 9/11 Commission Monograph Terrorist Travel at 10, 12.  The timing

of the Bayoumi's calls to ████, when compared to Hazmi's call to the TOEFL center, shows that

441

Bayoumi's calls were likely made to assist Hazmi get the English language certification necessary to obtain a student visa to stay in the U.S. past July 2000.  Ex. 5, Youssef Rpt. 211.

1745.  Firas submitted a letter in advance of the sentencing hearing which stated that he "agreed to cooperate with the government in this [TOEFL] investigation, and in some farther-reaching aspects of the activities of the Middle Eastern community with which he had contacts at a time when the latter aspect seemed very important in light of the then recent events of September 11, 2001."  Ex. 687, *U.S. v. Firas*, 2:02-cr-00404-DRD-1, ECF No. 35 at 1.

### C.  Bayoumi rented a hotel suite in San Diego for a work assignment related to Hazmi and ████.

1746.  During the peak of Bayoumi's contacts with ████, Bayoumi rented a penthouse suite for six nights at the Residence Inn by Marriott on ████████████████ in San Diego, CA.  That hotel was a 3-mile drive from Bayoumi's home at the Parkwood Apartments.  The room was rented for one person.  The hotel record shows that Bayoumi checked in on the night of Friday, March 10 at 8:28pm, and checked out on the afternoon of Thursday, March 16, 2000 at 3:21pm.  Ex. 679M, FBI 13492-13496 at 13495.  The FBI records concerning Bayoumi's hotel room were not produced until March 2023, well after Bayoumi's deposition.  Ex. 323, "FBI's Response to March 1, 2023, Letter from Kreindler & Kreindler", Item 7, received May 10, 2023.

1747.  The room was charged to Bayoumi's American Express credit card ($1,054.20), with his signature on file.  Ex. 679M, at FBI 13495.  Over the six-day period that the room was rented, the telephone in the hotel suite was used to make a total of eight (8) calls on four separate days.  The charges for those calls were paid in cash upon check-out on March 16, 2000. Ex. 679M, at FBI 13496.

REDACTED FOR PUBLIC FILING

1748.   Seven of the eight calls were made to ██████-4265.   Ex. 679M, at FBI 13496.

That number was "subscribed to AOL [America Online]" showing that internet was being used.

Ex. 2, EO 2755;  Ex. 679M, at FBI 13496.  The remaining call was made on March 15, 2000 to

██████-6442, a number subscribed to Southwestern Communications, Ex. 2, EO 2755.  That

call to Southwestern was billed by the hotel as a long-distance call at $4.24.   Ex. 679M, at

FBI 13496.

1749.   The circumstances show that Bayoumi used the hotel suite for some operational

purpose related to Hazmi and ████ and that ████ was likely visiting San Diego and stayed in the

room.  The Southwestern Communications number dialed from the hotel room was dialed again

by Bayoumi on March 17, 2000, the day after he checked out of the room, shortly after Hazmi

called Bayoumi on his cell.  Ex. 2, EO 2755.

### D.  Hazmi called Bayoumi's cell phone on March 17, 2000

1750.   On Thursday, March 17, 2000, Nawaf Al Hazmi used his home number at the

Parkwood Apartments # 150 to call Bayoumi on his cell phone at 1:47pm (1 min.).  Ex. 2, EO

2755.

1751.   Shortly after receiving that call from Hazmi, Bayoumi made a call on his cell

phone at 1:57pm (1 min.) to the same ██████-6442 number for Southwestern Communications

that had been called from the Residence Inn hotel suite two days earlier.  Ex. 2, EO 2755; Ex.

518, FBI 3257.  This evidences that Bayoumi likely made both calls and that the calls had

something to do with arrangements that Bayoumi was making for Hazmi.

REDACTED FOR PUBLIC FILING

**E. Bayoumi's operational -6662 cell phone was used to support the hijackers while Bayoumi was in Saudi Arabia.**

1752.   The 9/11 Commission concluded that Bayoumi allowed the hijackers to make and receive calls on his cell phone for some period.  *See* 9/11 Commission Report at 219 & 516 n. 26.

1753.   Bayoumi traveled to Saudi Arabia on March 31, 2000 for two months but made arrangements for Aulaqi, Thumairy, and other members of the support network to watch over Hazmi and Mihdhar while he was away.  The circumstances show that Bayoumi gave his "operational phone" (███████-6662) to Hazmi or Mihdhar so that they could be in touch with other members of the support network in Bayoumi's absence.  Ex. 2, EO 2759, 2798.

1754.   The FBI concluded that "phone connectivity involving the number ████████ 6662" ("-6662") warranted "particular emphasis" in its analysis of the connections between subjects who provided support to Hazmi and Mihdhar from February to December 2000 and referred to this facet of the Saudi government support network for the hijackers as "the Yemeni-Saudi support cell in San Diego."  Ex. 2, EO 2798.  The principal "hijackers-associate" on whom the FBI focused was Omar Al-Bayoumi, as the FBI's detailed "analy[sis] for interconnectivity" – including a 42-page spreadsheet, and findings displayed in tabular and link chart formats – found that the -6662 number was "used by" Bayoumi for a period of at least two years, beginning November 20, 1998. Ex. 2, EO 2798. The FBI noted that activity on the -6662 number ceased when Bayoumi travelled to the U.K. in the fall of 2000.  Ex. 2, EO 2798.

1755.   The Yemeni connection in the FBI-reported "Yemeni-Saudi support cell" was principally to and through Bayoumi's close associate Anwar Al-Aulaqi.  Bayoumi introduced to Hazmi and Mihdhar to Aulaqi upon their arrival and he became a "'spiritual advisor' to the terrorists in San Diego."  Ex. 2, EO2802; Ex. 91, Ratchford Decl. ¶¶ 6, 8.  The FBI found that

444

REDACTED FOR PUBLIC FILING

the -6662 number "made five calls to telephone number ▮▮▮▮-1917 (Aulaqi's home telephone number). The calls were made on November 20, 1998; February 26, 1999; May 7, 1999; October 3, 1999; and April 19, 2000." Ex. 2, EO 2759.

1756.   The dates of the calls from the -6662 number to Aulaqi are significant and demonstrate that the number was used as an operational phone at the center of the Saudi government support network for Hazmi and Mihdhar.  Ex. 2, EO 2798. The first call to Aulaqi, November 20, 1998, was on the same day that Bayoumi activated the number.  FBI investigation found that while the number was "subscribed to" Bayoumi's wife, Manal Bagader, it was being "used by" Bayoumi.  Ex. 2, EO 2798.  That first call to Aulaqi was just a few weeks before the visit to San Diego of the advance team of MOIA propagators, Sadhan and Sudairy.

1757.   The fifth and final -6662 call to Aulaqi, was on April 19, 2000, the day of two important milestones in the advancement of the 9/11 plot, namely: (1) Hazmi received his California Drivers' License from the DMV in San Diego, Ex. 679N, FBI 13538-13551, at FBI 13548 (listing "APP DATE" as 04/19/2000); Ex. 553, FBI 8202 (Hazmi License showing Issue Date of 04/19/2000); and (2) Hazmi received a $5,000 USD wire transfer from Al-Qaeda, via the bank account of Bayoumi's associate ▮▮▮▮▮▮ (who attended the February 2000 welcome party hosted by Bayoumi).  Ex. 2, EO 2798; Ex. 679O, FBI 13582-13588, at FBI 13583 (Hazmi was "alongside ▮▮▮▮ at the bank counter when the money was withdrawn"); Ex. 679O, at FBI 13588 (▮▮▮▮ Union Bank Statement showing 04/19 Withdrawal # ▮▮▮▮▮▮ in the amount of $4,980.50 USD, the identical amount having been received by wire the previous day); Ex. 2, EO 2759 (call to Aulaqi).

1758.   The FBI noted that "Travel records and interview reports show that Al-Bayoumi was in Saudi Arabia on April 19, 2000," Ex. 2, EO 2759, so it was not Bayoumi who placed the

REDACTED FOR PUBLIC FILING

April 19, 2000 call to Aulaqi. The April 19 call to Aulaqi shows that Bayoumi gave his -6662 phone to Hazmi or Mihdhar so that they could be in touch with other members of the support network, including Aulaqi, in Bayoumi's absence. It is significant that upon Bayoumi's return from Saudi Arabia on May 31, 2000 (arriving in San Diego on BA2289 at 4.55pm, Ex. 678BB, MPS783_3), the first call Bayoumi made from his cellphone was to the -6662 number. FBI3269 (call at 6.38pm from Bayoumi's cellphone ████-7623 to the 6662 number). Wednesday, May 31, 2000, was the last day of the hijackers' lease at the Parkwood Apartments, and the same day they moved into Dr. Abdussattar Shaikh's boarding house in Lemon Grove, CA that Bayoumi had arranged for them. Ex. 155, FBI Hijackers' Timeline at 66; Ex. 91, Ratchford Decl. ¶ 19.

1759. There was significant telephone contact between Aulaqi and Fahad Al-Thumairy following the April 19, 2000 call Aulaqi received from the -6662 number likely used by Hazmi and Mihdhar and the FBI reported in 2005 that: "Telephone ████-0638, subscribed to by AL-THUMAIRY at 4133 Huron Ave, Culver City, CA, received five calls from ANWAR NASSER AULAQI's San Diego telephone ████-1917 between 12/18/1999 and 04/25/2000." Ex. 2, EO 2802. This means that FBI identified a call from Aulaqi to Thumairy on April 25, 2000.

1760. The April 25, 2000 call from Aulaqi to Thumairy is consistent with the call in the phone records produced by the FBI of a call from Thumairy to Aulaqi on April 25, 2000 at 11:16pm (11 mins.) Ex. 479, FBI 000591-000601 at 0597; Ex. 12J (Thumairy-Bayoumi calls to Aulaqi). Aulaqi was likely reporting to Thumairy about Hazmi and Mihdhar's activities based on the April 19, 2000 call that Aulaqi received from them on the -6662 number, and the events involving Hazmi on that date.

446

REDACTED FOR PUBLIC FILING

1761.   Two other known calls from the -6662 number (among very few for which we have records) were calls made to the payphone ("████9563") opposite the Parkwood Apartments at the Alta Dena Dairy store.  The FBI described that payphone as "a phone the hijackers are believed to have used to call ████████… on 02/07/00 [*i.e.* a few days after the hijackers moved into the Parkwood Apartments]."  Ex. 2, EO 0606.

1762.   On October 9, 1999, the -6662 number called Alta Dena payphone "about two hours after the ALTHUMAIRY call [to an unidentified number in the UK]." Ex. 2, EO 0606.  The FBI highlighted the unidentified UK number ████████1899 in its analysis because Thumairy made four calls to that number on December 5, 1999 – and it was at the start of the intense period of phone contact among Thumairy, Bayoumi, ████, Aulaqi, and the Saudi Embassy prior to the arrival of Hazmi and Mihdhar in Los Angeles.  Ex. 2, EO 0606-0610.

1763.   On March 14, 2000 there was another "call from 6662 to 9563 [Alta Dena Drive-in Dairy]…duration 1 minute."  Ex. 2, EO 0606.  This call fell in the middle of a ten-day period, March 10 through March 20, 2000, in which Bayoumi made 28 separate calls to the -6662 number and rented a room at the Marriott Residence Inn in San Diego.  The calls and the hotel room rental are linked to Bayoumi's support to the hijackers, as, among other reasons, Bayoumi received a call from Hazmi on March 17, 2000.  Ex. 2, EO2755.

1764.   Bayoumi's listing for his wife Manal, from the October 4, 2000 version of the typed phone list he kept in his Mosque office, contains the following listing: "Manal ████ 0429."  Ex. 534, FBI 4380.  The -0429 cell number listed in that document, and not the -6662 number, was recorded by Bayoumi as the number for his wife in Bayoumi's handwritten address book.  Ex. 12AA, MPS738_29R.

447

1765. The FBI originally assigned the -6662 number to "Manal" – Bayoumi's wife – in an October 2001 review of various documents seized during its search of Bayoumi's Mosque office. Ex. 2, EO 2113-2115. However, no item of evidence shows that Bayoumi recorded -6662 as his wife's phone number, and nowhere else in the production in this litigation has that attribution been made by any other party. The production range FBI 4113-4637 contains the FBI's "'1B' Evidence Items Seized During the Execution of a Search Warrant on Bayoumi's Office at the Masjid at Madina Kurdish Mosque in El Cajon, California."

1766. Nowhere in the production in this litigation did Bayoumi include his -6662 number on a note or list. This demonstrates that the -6662 number was part of Bayoumi's tradecraft to establish an operational phone for Al-Qaeda's operatives inside the United States. The number is like the cell phone numbers that Faisal Al Muhanna and Saleh Al Hatlani procured for Thumairy. Thumairy used his cell phones to place numerous calls to other numbers subscribed to by Faisal Al Muhanna and Saleh Al Haatlani that were likely being used by other Saudi government officials working in California. Ex. 5, Youssef Rpt. 124-25.

### F. Bayoumi returned to San Diego before Hazmi and Mihdhar moved to Dr. Shaikh's rooming house.

1767. The MPS found in Bayoumi's possession a copy of his airplane ticket for his return trip to San Diego. Bayoumi transited through London's Heathrow and Gatwick Airports on his way to San Diego but did not stay for a month in England, as Bayoumi testified. Ex. 2, EO 2411-12 (showing that Bayoumi returned to the U.S. on May 31, 2000 via British Airways flight 2289 from London/Gatwick to Phoenix). The ticket shows that Bayoumi returned to the U.S. from Saudi Arabia on May 31, 2000 with his final flight into San Diego scheduled to arrive at 4:55pm. Ex. 678BB, MPS783_3; Ex. 678CC, MPS797_1.

REDACTED FOR PUBLIC FILING

1768. The phone records show that immediately upon his arrival back in the U.S., Bayoumi placed a call to the -6662 cell number on May 31, 2000 at 6:38pm (1 min.), as well as the following evening, June 1 at 9:33pm (1 min.). Ex. 519, FBI 03264-3271 at 3269. This was the operational phone that Bayoumi used for his support of the two hijackers. *See supra*. 1753.

1769. At his deposition, Bayoumi under a leading examination by Saudi Arabia's counsel, denied that he returned to San Diego and gave false testimony that he was in the United Kingdom and did not return to San Diego until July 2000. Ex. 120, Bayoumi Dep. 746:5-751:21. Saudi Arabia's counsel stated that Bayoumi's passport "says there's an entry into the United States of July 1, 2000" and had Bayoumi agree that he stayed "in the United Kingdom from May 31, 2000 until approximately July 1, 2000…." Ex. 120, Bayoumi Dep. 751:8-21.

1770. Bayoumi claimed that he spent over a month in the United Kingdom from May 31 until July 2000. When asked by Saudi counsel, "[W]hat were you doing in the United Kingdom during this time period?" Bayoumi replied: "I was preparing for starting my doctorate degree project." Ex. 120, Bayoumi Dep. 751:17-752:2.

1771. Bayoumi later confirmed that he stayed in England for that month, and further testified "I lived at a dormitory, at the students' housing" which he said was located at "Aston University," which was in Birmingham, England. Ex. 120, Bayoumi Dep. 809:16-21, 811:24-812:8. Bayoumi claimed that "I had a course – or not a course, something similar, called a prerequisite to prepare for the Ph.D." Ex. 120, Bayoumi Dep. 811:16-23.

1772. While Bayoumi initially testified that the U.S. arrival stamp in his passport showed that he returned in July 2000, when later shown the document on cross-examination he admitted that the stamp was illegible. Ex. 120, Bayoumi Dep. 751:8-15 (statement by Saudi

REDACTED FOR PUBLIC FILING

counsel Shen claiming the stamp read July 2000), 811:6-15 (Bayoumi could not read the U.S.

entry date stamped in his passport); Ex. 95, Awad Dep. Ex. 464 at 01.

1773.   When confronted with his banking and phone records which showed charges on

his personal card (which was different than the related card his wife held) made in the U.S. and

call records for his personal cellular phone made from within the U.S. during the dates he

previously testified he was in the U.K., Bayoumi changed his testimony and stated that he could

not remember whether or not went to England that month.  Ex. 120, Bayoumi Dep. 814:6-821:9;

818:23-819:15.

1774.   Bayoumi's testimony that he was in the UK throughout this critical period,

elicited by Saudi counsel based on counsel's own representation about the entry stamp, and

embellished by Bayoumi in real time with fabricated details about an ambiguous "prerequisite to

prepare for the PhD" and unverifiable "student housing," was untrue.  Ex. 120, Bayoumi Dep.

818:23-819:15.

### G.  Hazmi and Mihdhar return to Los Angeles and meet with Thumairy.

1775.   █████████████████████████████████████████████████████

███████████████████████████████████

1776.   On Friday, June 9, 2000, █████████████, drove the two men to Los Angeles

and rented a room at Deano's Motel, a short walk from the King Fahad Mosque.  Ex. 524, FBI

4007, Ex. 3B; █████████████████████████████████████████

██████████████████████████████.

1777.   ███████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████

450

████████████████████████████████████████

REDACTED FOR PUBLIC FILING

1778. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████; Ex. 5, Youssef Rpt. 212-13.

1779. ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████

1780. ███████████████████████████████████

███████████████████████████████████

████████████████████.

1781. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████ ██████████

1782. ███████████████████████████████████

███████████████████████████████████████

███████████████████████

1783. ███████████████████████████████████

████████████████ Abdullah previously told the FBI that Thumairy met with Hazmi and

Mihdhar at a location near the Mosque for approximately two hours outside of Abdullah's

451


earshot. ████████████████████████████████████████████

████████████ Ex. 467, FBI 000208-222 at 212-213 (May 18-19, 2011 interview of ████████).

1784.   The private meeting that Thumairy held with Hazmi and Mihdhar shows that he knew the two men well. Thumairy testified:

> I don't meet people that I don't know. I would not sit with someone I don't know. I would not convene with someone I don't know. I would not go somewhere with someone I don't know. I would not meet with people I don't know.

Ex. 107, Thumairy Dep. 342:24-343:5.

1785.   As Plaintiffs' expert Youssef determined, "[t]his meeting employed a similar modus operandi to the prior instances when Thumairy met Hazmi and Mihdhar at the Mosque while █████ stood nearby waiting for further instructions or when █████ left the hijackers at the restaurant for their rendezvous with Bayoumi."  Ex. 5, Youssef Rpt. 213.

1786.   Alzamari testified that he was introduced to the two hijackers in front of the King Fahad Mosque by ███████████, who at the time was his best friend.  Ex. 101, Alzamari Dep. 61:18-62:3, 46:13-15, 47:16-20.  Alzamari later testified that it was "███████████", ███████████ ████'s father, who introduced him to the hijackers, and then "███████████ introduced us by first name."  Ex. 101, Alzamari Dep. 129:17-130:8. Alzamari testified by written questions and Plaintiffs had no opportunity for follow up questioning.

1787.   Around the time that he was introduced to the two hijackers, Alzamari testified that he saw Thumairy leaving the Mosque library together with Hazmi.  Ex. 101, Alzamari Dep. 62:11-63:8, 128:7-16.  Alzamari testified that it was obvious from the fact the two men were meeting in the library that they knew each other.  Ex. 101, Alzamari Dep. 128:17-23.

1788.   ███████ told the FBI that after the private meeting, ████, ████████, and Thumairy had dinner together with Hazmi and Mihdhar, at the apartment of ███████████, who

452

REDACTED FOR PUBLIC FILING

was out of town. Ex. 467, FBI 000208-222 at 214 ("Thumairy was also present at the dinner, having arrived on his own.").



1789. ████████████████████████████

████████████████████████████

████████████████████████

1790. ████████████████████████████

████████████████████████████████

████████████████████████████████████; ██████████

████████████████ Ex. 92, Morgan Decl. ¶ 18.

1791. ██████ told the FBI that on the next day, Saturday, June 10, 2000, Hazmi and Mihdhar met again with Thumairy in the morning at the "library across the street from the King Fahad Mosque" before ██████ drove to the airport to drop off Mihdhar who was traveling to Yemen. Ex. 467, FBI 000208-222 at 214 (May 18-19, 2011 interview of ██████).

1792. A videotape taken at Los Angeles airport on June 10, 2000 shows Hazmi, Mihdhar, and ██████ going through security to walk Mihdhar to the airport gate for his trip to Yemen. Mihdhar was returning to report back in person to Al Qaeda about the knowledge he gained from his five months in California. Mihdhar would be the last of the 19 hijackers to arrive in the U.S. prior to the attacks. He likely played a role to help coordinate and organize the non-pilot hijackers. Ex. 5, Youssef Rpt. 213-4.

453

1793.   Saudi Arabia's claim that "contemporaneous documents show that Al Thumairy could not have been in Los Angeles during the evening of June 9, 2000 or at any time on June 10, 2000," KSA Aver. ¶ 152, is incorrect.  Two witnesses – ███████████ and Akram Alzamari – independently testified that Thumairy was in Los Angeles on June 9, 2000 and met with Hazmi and Mihdhar.  Saudi Arabia claims that Thumairy was in Washington, D.C. on June 9, KSA Aver. ¶ 152. A., but Saudi Arabia's Answers to Interrogatories say otherwise.  Saudi Arabia was asked to "[s]tate the date of each visit of Thumairy to the Saudi Embassy" and additional details about such visits.  Ex. 24, June 12, 2018 KSA Responses to Interrogatories 27.  Saudi Arabia's June 2018 Answers – prepared after Saudi Arabia's counsel met with Thumairy – stated that "Saudi Arabia currently understands that Al Thumairy visited the Saudi Embassy at or around the time that he initially arrived in the United States to pick up an identification card…." Ex. 24, June 12, 2018 KSA Responses to Interrogatories 27.   The record shows that Thumairy arrived in the U.S. in May 1996.  Saudi Arabia never amended its answers to interrogatories to state that Thumairy ever visited the Saudi Embassy at another time.

1794.   Thumairy testified that during the entire time he was in the U.S. he only made one visit to the Embassy but claimed he could not recall when he made that visit.  Ex. 107, Thumairy Dep. 67:9-15, 443:17-444:8.  Proof in addition to Saudi Arabia's answers to interrogatories shows that Thumairy's claimed sole Embassy visit occurred upon his arrival in the U.S. in 1996.  Thumairy told the 9/11 Commission in February 2004 that "he was sent to the Saudi Embassy in Washington, D.C." when he first arrived in the U.S.  Ex. 90, Snell Decl. Ex. 3 at 2.  Thumairy testified that he first met Sowailem at the Embassy – which necessarily occurred before Thumairy admits he saw Sowailem at the July 1998 King Fahad Mosque inauguration.  Ex. 107, Thumairy Dep. 71:2-6, 339:22-340:5.

REDACTED FOR PUBLIC FILING

1795.   Saudi Arabia's date conversion of Thumairy's passport stamp into Saudi Arabia ("dated 8 Rabi 'Al-awwal 1421, corresponding to June 10, 2000") and claim that it "would have been impossible" for Thumairy to arrive is incorrect.  KSA Aver. ¶ 152.b. The correct Gregorian date conversion of the Hijri date 8 Rabi 'Al-awwal 1421 is June 11, 2000 – *not* June 10.  Ex. 15, 1421 Hijri Calendar.

1796.   Flight schedules from June 2000 show that Thumairy could had numerous different options to take connecting flights from Los Angeles to Riyadh, Saudi Arabia that would have departed on June 10, 2000, and arrived on 8 Rabi 'Al-awwal 1421, June 11, 2000.  Ex. 177, June 2000 OAG Itinerary.  Saudi Arabia failed to produce any travel records for Thumairy's trip home to Saudi Arabia other than Thumairy's passport.

## H.  Dr. Shaikh helped Hazmi prepare and submit his July 2000 visa extension request.

1797.   In a supplemental FBI production on December 14, 2023, the DOJ produced a copy of the I-539 form visa extension request that Dr. Abdussattar Shaikh prepared and submitted on behalf of Nawaf Al Hazmi in July 2000.  Ex. 692, FBI 013591-013594. Dr. Shaikh signed the form as the preparer of the document for Hazmi and sent the form by registered mail to the INS on July 7, 2000.  Ex. 692, FBI 013591-013594.

## I.  Bayoumi visited Los Angeles on July 12, 2000.

1798.   On 6:15 p.m. on July 12, 2000, Bayoumi was ticketed by Culver City, CA police for a moving violation, making an illegal right turn on red, at the corner of Robertson and Washington Blvd.  Bayoumi was turning onto Washington Boulevard in the direction of the King Fahad Mosque, which was about a mile and a half ahead on that street.  The police noted that Bayoumi had one male passenger. Bayoumi kept a copy of the ticket in a file recovered by the MPS.  Ex. 445, MPS715_6.

REDACTED FOR PUBLIC FILING

1799. At the time, Bayoumi was not driving his own vehicle but a Geo Metro car rented from San Diego Car Rental. Ex. 445, MPS715_6; Ex. 2, EO 2087, 3954-55. The FBI recorded that a man named ████████████████, an English language student in San Diego, rented the vehicle being driven by Bayoumi. Ex. 2, EO 3954-55.

1800. The police officer wrote on the ticket the date for Bayoumi to appear at the Culver Municipal Court – August 23, 2000 – and the phone number: "████████-3160." Ex. 445, MPS715_6. Bayoumi called that number from his cell phone the next day, July 13, 2000 at 4:30pm (6 mins.). Ex. 12, FBI 3284. Bayoumi called that number again on August 15, 2000 at 11:39am (5 mins.). Ex. 491, FBI 1398.

1801. The following day, August 16, Bayoumi wrote a letter to change his address on file with the court. Ex. 445, MPS715_5. Bayoumi's notes show that he learned the amount owed for the ticket and sent a $132.00 check dated September 28 to the Culver court. Ex. 445, MPS715_4, 5. Bayoumi kept these records in his files and they were found by the MPS in September 2001.

1802. Bayoumi claimed that he had no recollection of the ticket. He also claimed that he could not remember making a phone call to the Culver City court about the ticket. Ex. 120, Bayoumi Dep. 456:6-457:13, 458:17-459:6.

1803. Bayoumi's testimony that he couldn't remember getting the ticket is unbelievable given the fact that he was pulled over driving a car rented by someone else and had a series of interactions with authorities over more than two months to resolve the ticket.

REDACTED FOR PUBLIC FILING

**J. Bayoumi arranged in August 2000 for Yazeed Al Salmi to stay at Dr. Shaikh's house with Hazmi.**

1804.   Another resident at Shaikh's rooming house in August 2000 was Yazeed Al Salmi, the nephew of Bayoumi's superior, Director Mohamed Al Salmi at the Saudi civil aviation bureau.  *See* 9/11 Commission Report at 518 n. 41.

1805.   On August 8, 2000, Yazeed Al Salmi arrived in San Diego and checked into the Comfort Inn La Mesa.  Ex. 2, EO 0198; Ex. 2, EO 0987.

1806.   Phone records show that in August 2000 Bayoumi placed three calls to Dr. Abdussattar Shaikh's home in Lemon Grove where Hazmi was living.  The first call was on the day that Salmi arrived in San Diego, August 8, 2000, at 9:09pm (1 min.).  Ex. 490, FBI 1393.

1807.   On August 10, 2000, Bayoumi called the Comfort Inn La Mesa where Salmi was staying at 12:27pm (3 mins.)  After that call, Bayoumi called Dr. Abdussattar Shaikh's house twice, once at 12:51pm (1 min.), and again at 12:52pm (1 min.). Ex. 491, FBI 1397

1808.   Salmi checked out of the Comfort Inn La Mesa on August 10, 2000.  Ex. 2, EO 0987.  Salmi told the FBI that Bayoumi took him to Dr. Shaikh's house and that he moved in there on Aug 10.  Ex. 2, EO 0193.

1809.   During his deposition, Bayoumi denied knowing about anyone who stayed at Shaikh's rooming house, despite Bayoumi's ties to Hazmi, Mihdhar, Sudairy, Sadhan, and Salmi.  Ex. 120, Bayoumi Dep. 510:2-14.

1810.   Salmi told the FBI that he knew Bayoumi and his family, and that Bayoumi knew Nawaf Al Hazmi "well."  Ex. 2, EO 1900.  Salmi stated that Bayoumi's son told him "that he [Bayoumi's son] had gone to Los Angeles for a day with Nawaf Alhazmi in September of 2000."  Ex. 2, EO 1900.

REDACTED FOR PUBLIC FILING

1811.   On September 5, 2000, Hazmi deposited $1,900 in travelers checks in his Bank of America account.  Hazmi received those travelers checks from Yazeed Al Salmi.  Salmi had purchased $4,000 in the travelers checks in July 2000 in Saudi Arabia and he signed over $1,900 of his $4,000 traveler's checks to Hazmi.  *See* 9/11 Commission Report at 222; Ex. 156, FBI Hijacker Financial Transaction Spreadsheet at PDF 45.

**K.  Bayoumi had significant contact with ██████████ a close friend of Hazmi.**

1812.   The EO production included FBI reports which showed that in August – October 2000, Bayoumi had significant phone contact with ██████████ when ██████ was socializing with Nawaf Al Hazmi.  An FBI report states that "██████…moved to Balboa Arms Drive, Apartment ██, San Diego, California, telephone number ██████-0339 from approximately August 8, 2000 through January 1, 2001…."  Ex. 2, EO 2761.  The report states that: "From August 18, 2000 through October 1, 2000, Al-Bayoumi's cellular phone made thirteen calls to ██████-0339, the phone number for ██████ apartment on Balboa Arms Drive."  Ex. 2, EO 2761.  A spreadsheet of those calls is attached.  Ex. 12T (Bayoumi calls to ██████).

1813.   Bayoumi wrote down the listing for phone number ██-0339 in his handwritten address book under "Farouq Al-Zouman and Nayef Al-Madi" Ex. 12AA, MPS738_36; the number is also in Bayoumi's typed phone list that the FBI found in Bayoumi's Mosque office "Omar's [Bayoumi's] Phone Book October 4, 2000" under the listing "██████████ ██████-0339 [sic]."  Ex. 421, FBI 000345-49 at 347.

1814.   A later phone number for ██████ (a different number than the one called by Bayoumi) was found in Hazmi's car after 9/11.  *See* 9/11 Commission Report at 220.  ██████

458

███████ was a San Diego student who socialized with Hazmi and instructed Hazmi in the use of his computer, showing him how to surf the internet.  Ex. 541, FBI 7417-REV2021 at 7418-19.

## XXIV.   BAYOUMI, THUMAIRY, SOWAILEM, AND SUDAIRY OVERSEE THE 9/11 HIJACKERS' MOVE FROM SAN DIEGO TO VIRGINIA, AND SAUDI ARABIA ESTABLISHED AULAQI AT THE DAR AL HIJRAH MOSQUE IN VIRGINIA TO SERVE AS THE HIJACKERS' NEW EAST COAST BASE

1815.   Bayoumi enrolled as a graduate student at Ashton University in Birmingham, England in October 2000.  Ex. 2, EO 0256.  On October 23, 2000, Bayoumi wrote an e-mail to a San Diego university professor at USIU from Birmingham, asking the professor to write a school paper for Bayoumi. Bayoumi offered to pay the professor "what ever [sic] you suggest for your time not for your help.  You helped me in the beginning and I want to continue to be in the right truck [sic]."  Ex. 567, FBI 11782.  Bayoumi's reference to the help provided by the USIU professor "in the beginning" is presumably a reference to similar cheating of Bayoumi when he was registered at USIU in 1997.

1816.   Excerpts of another e-mail from August 2000 produced by the FBI show that Bayoumi asked someone else to "finish writing Omar's thesis" but was turned down because it was "cheating."  Ex. 2, EO 1913.

1817.   Bayoumi made a sudden decision to return to San Diego from England in early December 2000 before the end of the school term.  On November 30, 2000, Bayoumi bought a flight ticket in Birmingham, UK, and flew to San Diego the next day, December 1. Ex. 514, FBI 002832 at 2833.

1818.   These circumstances show that Bayoumi was returning to California to deal with an important work assignment.  On December 2, 2000, Bayoumi went to his office at the Al Madinah Mosque and placed only two calls: one to the personal cell phone of MOIA Embassy Director Khalid Al Sowailem at 6:49pm (14 min.), and a second call at 8:53pm (1

459

min.) to the home number of Fahad Al Thumairy. Ex. 497, FBI 001488-001491 at 1491. Ex. 12K (Bayoumi calls to Saudi Embassy); Ex. 12B (Calls between Bayoumi and Thumairy).

1819. This was the first call between Bayoumi and Thumairy since September 18, 2000. The next day, December 3, at 2:36pm (1 min.), Thumairy used his home phone to call Bayoumi's cell phone. Ex. 2, EO 2758. Ex. 12B (Calls between Bayoumi and Thumairy).

1820. Over the next three weeks, Bayoumi and Thumairy would call each other on the phone at least 20 more times. Ex. 12B (Calls between Bayoumi and Thumairy).

1821. Nevertheless, Bayoumi falsely claimed at his deposition that he did not speak to Thumairy after going to England in October 2000. Ex. 120, Bayoumi Dep. 791:7-16. Bayoumi testified that he and Thumairy had "no conversations." Ex. 120, Bayoumi Dep. 790:23-791:6.

1822. Plaintiffs' expert Youssef concluded that "Bayoumi's quick return to San Diego, Bayoumi's call to Sowailem's cell phone, and the sharp spike in calls between Bayoumi and Thumairy, are likely related to [a] discussion of the arrangements being made to provide support for the arrival of 9/11 hijacker Hani Hanjour in San Diego on December 8, 2000, and the departure of Hanjour together with Nawaf al Hazmi from San Diego on December 11, 2000." Ex. 5, Youssef Rpt. 219.

1823. Hanjour spent three nights in San Diego likely with Nawaf Al Hazmi at Dr. Abdussattar Shaikh's house. Dr. Shaikh told the FBI that Hazmi had brought someone to the house just before Hazmi left in December, but Shaikh could not identify Hanjour's photo. Ex. 538, FBI 007342-REV2021 at 7346; *See* 9/11 Commission Report at 223 (Hani Hanjour arrived in San Diego on December 8, 2000 and left with Hazmi a few days later).

1824. The FBI found that after Hazmi left San Diego that Dr. Shaikh corresponded with Hazmi via email. The FBI recorded that in December 2000, Shaikh sent an email to Hazmi in

REDACTED FOR PUBLIC FILING

which he added greeting "to Hani." Ex. 539, FBI 007353-REV2021 at 7355. Shaikh told the FBI that "he knows many individuals named Hani"; "does not…know any Hanis which Alhazmi might know"; but "was not able to offer any explanation for the reference to Hani in his communication with Alhazmi." Ex. 539, FBI 007353-REV2021 at 7355.

1825. On Dec 11, 2000, Hanjour made a Citbank ATM withdrawal of $101.50 at Bank of America in Lemon Grove, CA where Dr. Shaikh's rooming house was located. Ex. 679A, JICI 04/19/02 (FBI 0393) (excerpt from FBI Hani Hanjour Timeline). On the same morning Hazmi withdrew $300 from the same location. Ex. 155, FBI Hijackers Timeline at 111. Hazmi and Hanjour visited the Texaco station where they informed ████████████ they would be leaving San Diego, which they did on December 11, 2000. Ex. 458, FBI 000050-57 at 56; *See* 9/11 Commission Report at 223.

1826. Shortly after Hazmi and Hanjour left, Bayoumi invited Dr. Shaikh to his home for dinner. Bayoumi videotaped Dr. Shaikh at the dinner. The date of that dinner can be set by the fact that Bayoumi is congratulated on the birth of his daughter, which occurred on ████████, 2000. Ex. 10M (MPS911-CLIP Video Exhibit); Ex. 11M (MPS911-CLIP Video Screenshots).

1827. In early January 2001, Bayoumi convened a large gathering at the ICSD Mosque framed as an Aqiqa party for the recent birth of his daughter. The blessing was given by Sheikh Abduljalil Mezgouri and many of the same members of Bayoumi's cell at the ICSD Mosque were in attendance including Saad Tarabishi, Maen Alkhawaja, and Fathi Aidarus, all of whom had been at the welcome party for the hijackers. Ex. 11L (MPS910-CLIP Video Screenshots).

1828. Also filmed at the Aqiqa party on Bayoumi's video camera was another Saudi resident of the Parkwood Apartments and former Saudi Embassy employee Osama Bassnan. Ex. 11L (MPS910-CLIP Video Screenshots). As discussed above, while working at the Saudi

REDACTED FOR PUBLIC FILING

Embassy, Bassnan, hosted a party to honor the "Blind Sheikh" Omar Abdel Rahman in October

1993 just a few months before the Blind Sheikh visited the Ibn Taymiyah Mosque in Los

Angeles. Ex 5, Youssef Rpt. 20, 90.

1829. Bayoumi and Thumairy had five phone calls on December 9; three calls on

December 10; and one call on December 11, the day that Hazmi and Hanjour left San Diego.

Ex. 12B (Calls between Bayoumi and Thumairy).

1830. Hanjour and Hazmi travelled to Arizona, where they stayed until late March 2001.

Ex. 5, Youssef Rpt. 219; Ex. 155, FBI Hijackers Timeline at 127-131.

1831. In addition to being in frequent contact with Thumairy, Bayoumi was also in

touch with the Saudi Government Institute for Islamic and Arabic Studies in America (IIASA).

Between December 29, 2000 and January 6, 2001, IIASA held a "Shari'ah Intensive Program" at

the King Fahd Mosque "conducted by prominent scholars from [Imam University in Saudi

Arabia] and the US." A copy of the flyer for that program, faxed on Dec. 17, 2000, was found in

the FBI's raid on Bayoumi's Mosque office. Ex. 535, FBI 4392-4394 (English version), and

FBI 4439 (Arabic version).

1832. According to Plaintiffs's expert Youssef, "[o]n the afternoon of December 14,

2000, Bayoumi called Thumairy and then immediately called IIASA." Ex. 5, Youssef Rpt. 220:

Ex.498, FBI 001492-1496 at 1496. Youssef further determined "Bayoumi called IIASA twenty

more times over the next two months." Ex. 2, EO 2763; Ex. 12M (Bayoumi calls to IIASA) and

"Thumairy called IIASA nineteen times during the same period." Ex. 12F (Thumairy calls to

IIASA); Ex. 5, Youssef Rpt. 220-21.

1833. Also leaving San Diego around the same time as Hazmi and Hanjour was Anwar

Al Aulaqi, the Imam of the Al Ribat Mosque who worked with Bayoumi to provide support

REDACTED FOR PUBLIC FILING

Hazmi and Mihdhar. During the second half of November 2000 through December 2000, concurrent with the Ramadan 1421 holiday (Nov. 27, 2000 – Dec. 26, 2000), Aulaqi travelled to Saudi Arabia. Ex. 68, [September 21, 2001 Interview of Anwar Al Aulaqi] at 2 ("AULAQI reiterated that he had attended Ramadan in Saudi Arabia during mid-November through mid-December 2000").

1834. While on this trip Aulaqi received an offer to become the Imam of the high-profile Dar al Hijrah Mosque in Falls Church, VA. Aulaqi's new position was brokered (and possibly funded) by the Riyadh-based World Assembly of Muslim Youth (WAMY). WAMY was led by Abdullah Al Turki, who served as MOIA's Minister until 1999. Ex. 349, WAMY SA2444. Aulaqi's contract with the Dar Al Hijrah Islamic Center for the Imam position was found in WAMY's records. Ex. 348, WAMY Intl 015165.

1835. Aulaqi's contract is undated, but Aulaqi started his new job at the Dar Al Hijrah Mosque soon after returning from his Ramadan trip. Aulaqi's credit card records show that he did not use his card at any locations between Nov. 11, 2000, and Jan. 6, 2001, when he made his first charge in Falls Church, VA, where the Dar Al Hijrah Mosque was located. Ex. 508, FBI 1845-51.

1836. The U.S. branch of WAMY that arranged for Aulaqi's new position at the Dar al Hijrah Mosque was in the same town of Falls Church, VA, and was run by a Saudi Embassy officer who worked for MOIA inside the U.S.: Abdullah Bin Laden, a nephew of Osama Bin Laden. Saudi Arabia assigned Abdullah Bin Laden to work for MOIA inside the U.S. and teach at the Saudi Government's IIASA in Northern Virginia. Ex. 349, WAMY SA2444. Abdullah Bin Laden held the same position of "Administrative Officer" given by Saudi Arabia to Fahad Al Thumairy and other MOIA officials. Ex. 333, Affidavit of Abdullah Awad Binladin (Nov. 19,

REDACTED FOR PUBLIC FILING

2005) at 1. Throughout his time in the U.S., Saudi Arabia provided diplomatic cover for Bin

Laden as an Administrative Officer even though he worked outside of the Saudi Embassy. *Id.*

**A. Bayoumi called Sudairy on March 31, 2001 to discuss the arrangements for Hanjour and Hazmi's cross-country trip from Arizona to reconnect with Aulaqi in Virginia.**

1837. At the end of March 2001, 9/11 hijackers Hani Hanjour and Nawaf Al Hazmi left

Arizona in Hazmi's Toyota Corolla and started heading east. Ex.155, FBI Hijackers Timeline at

130-31; Ex. 521, FBI 3380-81. Hanjour and Hazmi's apartment rental in Mesa, AZ outside of

Phoenix ended on March 31, 2001. Ex. 155, FBI Hijackers Timeline at 131; Ex. 156, FBI

Hijacker Financial Transaction Spreadsheet at 46.

1838. On March 30, Hanjour contacted the local Arizona utility company and advised

that he was leaving. The utility company's records contained a forwarding address for Hanjour

at 3159 Row Street in Falls Church, Virginia, the address of the Dar Al Hijrah Mosque – where

Anwar Aulaqi had moved from San Diego and was now the Imam. Ex. 155, FBI Hijackers

Timeline at 131; *See* 9/11 Commission Report at 517 n. 35 ("Aulaqi took a position at the Dar al

Hijra mosque in early 2001"); Ex. 2, EO 2805, 3401, 3404 (Dar Al Hijrah Mosque where Aulaqi

was Imam located at ███████████ in Falls Church, VA).

1839. A Broadwing Communications phone record produced by the MPS shows that

Bayoumi placed a phone call on March 31, 2001 to "Columbia MO" number "████ 7326"

(30 min.). Ex. 314, MPS118_23 (Broadwing communications phone record of Bayoumi).

1840. The number dialed by Bayoumi was that of MOIA propagator Mutaeb Al

Sudairy. The MPS recovered a note in Bayoumi's green folder of contacts with the information

"Mutaeb al-Sudairy ████ 7326 Columbia MO." Ex. 12BB, MPS688_2.

REDACTED FOR PUBLIC FILING

1841.   Bayoumi confirmed that he prepared the note in his handwriting.  Ex. 120, Bayoumi Dep. 278:11-23.  Bayoumi admitted that Sudairy gave him his Missouri contact phone number "when he come, when he arrive" in California.  Ex. 120, Bayoumi Dep. 279:1-10 (Q: And did Mutaeb al-Sudairy give you his contact information? A. (In English) Yes. When he come, yes.").

1842.   Sudairy must have given Bayoumi the information after he arrived in the U.S. in June 1999.  Sudairy claimed that he was not sent by Saudi Arabia to Missouri until the summer of 2000.  Ex. 119, Sudairy Dep. 281:15-21.  A February 2001 MOIA document confirmed that Sudairy's workplace was in Missouri.  Ex. 59, KSA 1307-1309 (Sadhan Dep. Ex. 498).

1843.   Plaintiffs' expert Youssef determined the last known time that Bayoumi and Sudairy had "phone contact... was their series of 5 calls in the last week of January and first week of February 2000, when Bayoumi was coordinating with Thumairy, Consulate diplomat █████████, and others for Hazmi and Mihdhar to move from Los Angeles to San Diego."  Ex. 5, Youssef Rpt. 221-22; Ex. 12A (Phone calls Nov. 1999 – Mar. 2000).

1844.   At the time of Bayoumi's call to Sudairy on March 31, 2001, Hazmi and Hanjour were either on the road or about to depart from Arizona on their cross-country car trip to Virginia.  On April 1, 2001 at 6:59 p.m., Hazmi was ticketed for speeding in Clinton, Oklahoma while heading east on U.S. Interstate 40.  Ex 155, FBI Hijackers Timeline at 131.  The driving distance from Mesa, Arizona to Clinton, Oklahoma is approximately 860 miles.  The driving time is approximately 13 hours.

1845.   Clinton is located about 86 miles west of Oklahoma City.  Hazmi and Hanjour arrived in Front Royal, VA, about 61 miles west of Falls Church, VA, on April 3, 2001.  Ex. 155,

REDACTED FOR PUBLIC FILING

FBI Hijackers Timeline at 131 (showing that Hani Hanjour made ATM withdrawal at a "Handy Mart" in Front Royal, VA).

1846.   Based on the hijackers' location, heading, and destination, the timing of Bayoumi's call to Sudairy shows that Bayoumi made the call to coordinate the arrangements for Hazmi and Hanjour to meet with Sudairy and possibly also Sadhan. That meeting took place in Oklahoma, Missouri, or the hijackers met Sadhan in Oklahoma on April 1 and Sudairy in Missouri on April 2.

1847.   At the time, Sudairy's close MOIA associate Adel Al Sadhan was working for MOIA in Norman, Oklahoma.  Ex. 59, KSA 1307-1309 at 1309 (Sadhan Dep. Ex. 498) (February 2001 MOIA record shows that Sadhan's "workplace" is Oklahoma); Ex. 99, Sadhan Dep. 323:22-324:5, 328:24-329:19 (Sadhan had an apartment and registered his car in Oklahoma).  Norman, Oklahoma was about 103 miles east of where Hazmi and Hanjour were pulled over by the police at about 7:00pm.

1848.   Bayoumi had Sadhan's contact information, including his phone number in Oklahoma ("███████-6003") in his handwritten address book right next to his listing for Sudairy.  Ex. 12AA, MPS738_24.  Bayoumi had drawn a line through Sadhan's Oklahoma number.  Sadhan left Oklahoma that April and was in Kansas on April 12, 2001.  Ex. 60, KSA 5461.

1849.   The shortest driving route from Oklahoma City to Falls Church, VA was through Missouri.  That route went about 100 miles south of Columbia, MO, where Sudairy was located, and would have required only a short detour.  Ex. 155, FBI Hijackers Timeline 130-31; FBI 3380-81; Ex. 5, Youssef Rpt. 222, n. 934.

REDACTED FOR PUBLIC FILING

## XXV.  THE CONNECTIONS BETWEEN THE CALIFORNIA SUPPORT CELL AND THE EAST COAST NETWORK FOR THE HIJACKERS ARE EVIDENCE OF A COORDINATED MATERIAL SUPPORT SYSTEM

1850.   FBI phone analysis found that the home phone number of Saudi Consulate

██████████████████████████████-6549) received a call on June 14, 2001 at 9:31

a.m. (3 mins.) from the Falls Church, VA phone number used by Eyad Rababah and ████

██████ ██████4290).  Ex. 2, EO 2703-5; Ex. 566, FBI 11756-57.  As Plaintiffs' expert

Youssef concluded, "[t]he call is significant" because, as discussed below Rababaah and

██████ were part of the East Coast network for the hijackers and, as discussed above, "...██

played a key role along with Thumairy, Bayoumi, and Anwar Al Aulaqi in the California support

network for hijackers Hazmi and Mihdhar."  Ex. 5, Youssef Rpt. 222.

1851.   The FBI concluded that it "ascribes a high level of confidence that either

ALRABABAH or ██████████ made the phone call to ████████ based upon call patterns from

target number ████████-4290 directly before and after the call to ████████."  Ex. 2, EO 2705.

The FBI concluded that "[c]ommunications exploitation indicates ████████ had direct contact

with known 9/11 facilitators before the September 11th attacks in New York and Washington

DC."  Ex. 2, EO 3703.

1852.   A March 2016 FBI Electronic Communication obtained the toll records of calls

and presented the FBI's phone call analysis.  The EC concluded that:

> ALRABABAH and ██████████ provided logistics assistance to 9/11
> Hijackers HANJOUR and HAZMI, helping them find lodging and driving
> them between Virginia, Connecticut and New Jersey. In interviews,
> ALRABABAH and ██████████ described the assistance they provided
> the Hijackers as emanating from a 'chance encounter,' neither pre-planned
> nor coordinated in advance. This communications exploitation analysis
> shows ALRABABAH and ██████████ phone in Virginia in direct
> communication with the home phone of ██████████ ████████ met with
> Omar AL BAYOUMI, approximately one hour before BAYOUMI had a
> 'chance encounter' with HAZMI and MIDHAR in Los Angeles and then

467

REDACTED FOR PUBLIC FILING

assisted them with travel and lodging in California.
Ex. 2, EO 2704.

1853.   Rababah, a Jordanian, and ████████, a Syrian, lived in Riyadh, Saudi Arabia

before emigrating to the U.S. and settling in Virginia.  Ex. 2, EO 1440-41.  While living in

Riyadh, ████████ worked for Saudi government as a teacher and had numerous high-level

contacts with Saudi Government officials who reached out on his behalf to the Saudi Embassy in

Washington.  Ex. 2, EO 1302; ████████████████████████████████████████

████████████████████████████████████████

1854.   The Saudi Embassy offered Chehazeh a teaching position at the Islamic Saudi

Academy, the Arlington, VA school operated by Saudi Ministry of Education and the Embassy.

████████████████ Ex. 324, *Chehazeh v. Holder*, Civ. No. 09-cv-5684 (FSH) (Nov. 10,

2009), Ex. 324, Declaration of David Rush, Ex. A, ECF 2-1 at 2-4, 45, 133, 173.

1855.   In March 2001, Chehazeh moved to Falls Church (along with his friend Rababah)

to take the teaching job.  ████████████████ Ex.324, *Chehazeh v. Holder*, Civ. No. 09-cv-

5684 (FSH) (Nov. 10, 2009), Declaration of David Rush, Ex. A, ECF 2-1 at 2-4, 45, 133, 173.

1856.   ████████'s contacts at the Saudi Embassy included Saudi Attaché Abdul Rahman

Alhosain.  Ex. 2, EO 2619, 2622, 2623.  In 2001, Abdulrahman Alhosain was on the U.S. State

Department's list representing Saudi Arabia's Embassy in Washington D.C.  Ex. 130, U.S. State

Department Diplomatic List Fall 2001 at 7.

1857.   ████████ also had contacts with the Director General of the Islamic Saudi

Academy, Suliman Naser Alfareh aka Sulaiman al Fraih.  Ex. 2, EO 2622-23 (Business cards of

Fraih and Alhosain were found in ████████'s wallet when seized by the FBI in October 2001.);

Ex. 160, Fraih Letter from Islamic Saudi Academy.

REDACTED FOR PUBLIC FILING

1858.  █████████ also had contacts with the Saudi Consulate in Los Angeles where Mana worked; according to Rababah, █████████ placed phone calls to the Consulate "throughout 2000 and 2001."  Ex. 2, EO 2695.

1859.  █████████ address book had the phone number for Saudi Embassy official Omar Abu Ali, father of Al Qaeda terrorist Ahmed Omar Abu Ali who attended the Islamic Saudi Academy where █████████ was going to work.  █████████ was an old friend of Omar Abu Ali.  Ex. 2, EO 0402, 3601, 3619-3620.

1860.  Shortly after moving to Falls Church, Rababah and █████████ aided several of the 9/11 hijackers in Virginia and New Jersey by arranging lodging, providing transportation, helping them obtain official state identification, and contacting flight schools.  Ex. 2, EO 1471-77, 1302-10; 2471-2474, 2618-24; *See* 9/11 Commission Report at 230.

1861.  The FBI found that Rababah and █████████ first described their initial encounter with the hijackers "at a 7-11 convenience store during a 'chance meeting', in a "uniquely similar fashion to the way that Bayoumi described his 'chance meeting' with Hazmi and Mihdhar in Los Angeles."  Ex. 566, FBI 11756.  But Rababah and █████████ ultimately admitted that they met the 9/11 hijackers Nawaf Al Hazmi and Hani Hanjour at the Dar Al Hijrah Mosque in Falls Church, VA where Anwar Aulaqi had moved and was now working as the Imam.  *See* 9/11 Commission Report at 230 & 523 n. 75 (citing FBI report re interview of Rababah, June 10, 2002).

1862.  The 9/11 Commission found that it shared the suspicion of investigators that Anwar Al Aulaqi tasked Rababah to help Hazmi and Hanjour "given the remarkable coincidence of Aulaqi's prior relationship with Hazmi."  *See* 9/11 Commission Report at 230.

REDACTED FOR PUBLIC FILING

1863.   Anwar Al Aulaqi, who worked together with Thumairy and Bayoumi to support Hazmi and Mihdhar in California, left San Diego in late 2000, moved to Virginia, and became the Imam of the Dar Al Hijrah Mosque two months before Rababah and █████ met the hijackers there. As stated earlier, Aulaqi's position at the Dar al Hijrah Mosque was brokered for Aulaqi by the U.S. branch of the Riyadh-based organization the World Assembly of Muslim Youth, Ex. 348, WAMY Intl 015165, which was managed by Saudi Embassy and MOIA official Abdullah Bin Laden.  Ex. 349, WAMY SA2444.

1864.   █████ and Rababah moved into an apartment within walking distance of Dar Al Hijrah Mosque.  █████ sent Rababah to the Mosque to "contact the Emam for possible work."  Ex. 2, EO 1468.  On a Friday in late March 2001, Rababah met with Aulaqi in Aulaqi's office.  On the same day, Rababah met Hazmi and Hanjour following services at the Mosque.  When first questioned by the FBI, Rababah claimed that he met Hazmi and Hanjour at a convenience store, not Aulaqi's Mosque.  He later admitted that he met the two hijackers at the Mosque and that he lied "to protect the mosque." Ex. 2, EO 1304, 1470; *See* 9/11 Commission Report at 523 n. 76.

1865.   In May 2001, Rababah and █████ helped the four hijackers to relocate to Paterson, New Jersey.  On a May 9, 2001 trip to Paterson with the hijackers, Rababah "pointed out the public library, a pay phone located on the street which was reliable for cheap phone calls and also received incoming calls."  Ex. 2, EO 1476.

1866.   On June 14, 2001, at 9:31 a.m. (Eastern time), █████ made the call to █████ in California.  The FBI states that the call to █████ "lasted for 3 minutes."  Ex. 2, EO 2705.  After that call, █████ called Rababah.  Ex. 55, FBI 11756 (the FBI cites "other call activity

470

on 6/14/2001" including a call to "RABABAH's work phone…").  That same evening Rababah called the payphone in Paterson, NJ.  Ex. 2, EO 3152.

1867.   On the prior day, June 13, 2001, Khalid al Mihdhar received his U.S. visa in Jeddah, Saudi Arabia to return to the U.S.  Ex. 30, 9/11 Commission Monograph on Terror Travel at 24.  Also on June 13, Bayoumi obtained his tickets to travel from San Diego to England on June 23, 2001, and would fly from England to Jeddah, Saudi Arabia on June 29, 2001.  Ex. 2, EO 1861; Ex. 450, MPS365-401 Tr. 887:8-17.

1868.   During May and June 2001, ██████ made over 30 calls to Saudi Arabia.  Ex. 2, EO 0839.

1869.   At the end of June and early July 2001, Bayoumi was in Jeddah, Saudi Arabia at same time as Mihdhar.  ████████ visited Bayoumi in Jeddah during this period.  Ex. 2, EO 1621.

1870.   Plaintiffs' expert Youssef concluded "[i]t is certainly conceivable that Mihdhar, who lived in Southern California for five months in 2000, used a known and trusted communications channel through ██████ to pass a simple message to Hazmi and Hanjour about getting his visa and his upcoming travel back to the U.S."  Ex. 5, Youssef Rpt. 225.

1871.   Plaintiffs' expert Youssef observed that "the June 2001 call from Rababah and ██████ to ████ and the evidence of other calls establishes a direct link between the East Coast network (including Rababah, ██████, and Aulaqi) and the West Coast network (including Thumairy, Bayoumi, ████, and Aulaqi) for the 9/11 hijackers.  There was no formal discovery permitted of Saudi Government support of the 9/11 hijackers' East Coast network, including phone calls between the East Coast and West Coast networks; ██████'s contacts and employment relationship with Saudi Arabia, and the involvement of Embassy official Abdullah

471

Bin Laden in sponsoring Aulaqi to become the Imam of the Dar Al Hijrah Mosque. In Plaintiffs'

expert Youssef's opinion, the connections between the East Coast network and the Southern

California network are significant and require further investigation. Ex. 5, Youssef Rpt. 225.

1872. Bayoumi and his family moved out of their San Diego apartment on June 23,

2001. Ex. 91, Ratchford Decl. ¶ 20. They departed for England that day. Ex. 2, EO 1861.

1873. On June 29, 2001, Bayoumi flew from England to Jeddah, Saudi Arabia.

Hijacker Khalid al Mihdhar, who Bayoumi had not seen since the previous year, was also in

Jeddah preparing to return to the U.S. to carry out the 9/11 Attacks. Scotland Yard detectives

questioned Bayoumi's story that it was "pure coincidence that you've met these people some

months before in Los Angeles…you just happened to meet them there, and then suddenly again

you're travelling to the country where they depart. That's, with everything else put together,

Omar…you are a very unlucky person, or you are involved." Ex. 450, MPS365-401 Tr. 887:19-

888:10.

## XXVI.  IN THE FINAL DAYS LEADING UP TO THE 9/11 ATTACKS, BAYOUMI CALLED THUMAIRY AS THE FINAL PLANS FOR THE 9/11 ATTACKS WERE BEING MADE.

1874. The commercial passenger flights targeted for the 9/11 Attacks were likely chosen

in meetings held by Hazmi and Mohammed Atta on and before August 23, 2001. Ex.6,  9/11

Commission Rpt. 249. All 19 hijackers booked and purchased their tickets for the 9/11 Attacks

between August 25 and September 5, 2001. *See* 9/11 Commission Rpt. 249.

1875. On Sunday, August 26, 2001, Khalid Al Mihdhar booked and purchased his ticket

for American Airlines Flight 77 departing Washington Dulles at 8:10am on September 11, 2001.

Ex. 679G, FBI 3984-5 (Mihdhar email showing flight booking). The next day, August 27, 2001,

Hazmi purchased his ticket. *See* 9/11 Commission Rpt. 539 n. 85.

REDACTED FOR PUBLIC FILING

1876.   One week later, Sunday September 2, 2001, Omar Al Bayoumi used a "Go Bananas" calling card to place a call at 6:23pm (2 minutes 40 seconds) from Birmingham, England to Fahad Al Thumairy's home number in California.  The phone record of this calling card call was produced by the MPS in December 2023.  Ex.10, MPS2023-67_4.  The time in California in September 2001 was 8 hours behind England – it was 10:23am in Culver City, CA.

1877.   The reconnection between the two men nine days before the 9/11 Attacks shows that Bayoumi and Thumairy shared a joint work assignment to support the Al Qaeda hijackers and that Bayoumi checked in with Thumairy just before the 9/11 Attacks.

1878.   Bayoumi's handwritten address book seized by the MPS in September 2001 contained the Go Bananas calling card with "PIN" number "8284 602 093".  Ex. 12AA, MPS738_2-3.  The MPS retrieved and produced Bayoumi's calling records from this phonecard, Ex. 12-AMH0128, MPS2023-88_3 showing that the card was used by Bayoumi to make international calls (to the USA and Saudi Arabia) in the period September 2–18, 2001.  Bayoumi used that same Go Bananas calling card on September 2, 2001 to dial the "home" number written down by Bayoumi in his address book for Thumairy.  Ex. 12AA, MPS738_35.  The handwritten address book also contained various contacts Bayoumi collected on looseleaf notepad pages, business cards, bank statements, and other scraps of paper.  Ex. 12AA, MPS738_2-6, Ex. 12AA, MPS738_86-95.

1879.   On September 2, 2001, Hani Hanjour, Nawaf Al Hazmi, and Khalid Al Mihdhar relocated from New Jersey to Maryland.  Ex. 155, FBI Timeline at 247.

1880.   On September 8, 2001, Anwar Al Aulaqi left Virginia and flew to San Diego. Ex. 16, Judicial Watch FOIA at 29.  On September 9, 2001, Aulaqi made a purchase at the Texaco gas station in La Mesa, CA where ████████████ worked and where Hazmi had a job the year

REDACTED FOR PUBLIC FILING

before.  Ex. 507, FBI 1763.  The next day, ███████ and others who had known the hijackers were observed behaving suspiciously at the La Mesa Texaco.  According to a witness, one of the group said "it is finally going to happen" as the others celebrated by giving each other high fives.  *See* 9/11 Commission Report at 250.

1881.   In Maryland on September 9, 2001, two days before the hijackings, Hazmi and Mihdhar left their personal possessions at the Ayah Islamic Center in Laurel MD.  Ex. 155, FBI Timeline at 273.  Ayah was the mosque in Laurel, MD run by the MOIA-led World Assembly of Islamic Youth. A WAMY employee and student at IIASA, Said Rageah, operated the Mosque.  Ex. 347, WAMY Intl 163-164, 1535, 12439. The FBI recovered the bags on September 12, and they contained fruit, clothing, flight logs, and various other materials and a note that read "A Gift for the Brothers".  Ex. 7, 9/11 Commission's Monograph on Terrorist Financing at 100.

1882.   **The 9/11 Attacks**  On September 11, 2001, Al Qaeda carried out its coordinated attack on the United States and its Government by hijacking four commercial aircraft: American Airlines Flight 11 from Boston to Los Angeles; United Airlines Flight 175 from Boston to Los Angeles; American Airlines Flight 77 from Washington Dulles to Los Angeles; and United Airlines Flight 93 from Newark to San Francisco.

1883.   Hazmi, Mihdhar, Hani Hanjour, and two other hijackers boarded American Flight 77 from Washington Dulles Airport to Los Angeles.  The flight took off at 8:20am.  About one-half hour into the flight, the five Al Qaeda hijackers stormed the cockpit, took control of the aircraft, and crashed the plane into the Pentagon in Virginia at 9:37:46am.  *See* 9/11 Commission Rpt. 33.

REDACTED FOR PUBLIC FILING

1884.  American Flight 11 took off from Boston at 7:59am and about twenty minutes into the flight was commandeered by five Al Qaeda hijackers and crashed into the North Tower of the World Trade Center in New York City at 8:46:40am.  *See* 9/11 Commission Rpt. 32.

1885.  United Flight 175 took off at 8:14am from Boston and was taken over by five Al Qaeda hijackers about thirty minutes into the flight and crashed into the South Tower of the World Trade Center in New York City at 9:03:11am.  Ex.6, 9/11 Commission Rpt. 32.

1886.  United Flight 93 took off at 8:42am from Newark and about 45 minutes into the flight four Al Qaeda hijackers stormed the cockpit and the diverted plane toward its intended target, likely the U.S. Capitol Building in Washington.  About 30 minutes after the plane was hijacked, the passengers fought back to regain control of the aircraft and Flight 93 crashed in a field in Shanksville, Pennsylvania at 10:03:11am.  *See* 9/11 Commission Rpt. 33, 243-4, 326, 530 n. 141.

1887.  The coordinated attacks by Al Qaeda injured and killed all the passengers and crew aboard the four flights and thousands of people in New York City and at the Pentagon and caused massive property damage.  Nawaf Al Hazmi, Khalid Al Mihdhar, and Al Qaeda could not have been able to get safely established inside the U.S. to carry out their 9/11 plot undetected by law enforcement without the help of the Sunni extremist support network sponsored and led by Saudi Government officials in California.  Plaintiffs' expert Youssef concluded that Al Qaeda chose Southern California as the beachhead for the 9/11 Attacks because of the longstanding Sunni extremist cells in Los Angeles and San Diego supported by the Saudi government through the Saudi Embassy, Consulate, Mana, Thumairy, and Bayoumi.  Ex. 5, Youssef Rpt. 226.

REDACTED FOR PUBLIC FILING

1888. As recently as 2009, then-Secretary of State Hillary Clinton wrote "Saudi Arabia remains a critical financial support base for al-Qaida, the Taliban, LeT and other terrorist groups…." Ex. 23, 12/30/2009 Secretary of State Hillary Clinton Cable.

## XXVII. BAYOUMI PREPARED AN AIRPLANE SKETCH AND VARIOUS FLIGHT PLANNING CALCULATIONS WHICH EVIDENCE HIS ASSISTANCE TO THE 9/11 HIJACKERS AND ADVANCE KNOWLEDGE OF THE 9/11 PLOT

1889. On September 20, 2001, the Metropolitan Police Service ("MPS") seized various materials from the garage of Bayoumi's U.K. residence at 34 Dymoke Street, Birmingham, United Kingdom that Bayoumi brought from the U.S. Ex. 2, EO 2179-2181, 2289, 3805-06; *see* MPS production Ex. , MPS 43 *et seq.* (financial papers seized by MPS from garage at 34 Dymoke Street).

1890. Among the items recovered by the MPS was a "Note Pad" belonging to Bayoumi. Ex. 678M, MPS696_1-7 (copy of pages of PSS/34 "Note Pad" produced by MPS); *see* also Ex. 679B, FBI 1331-1337 (copy produced by FBI).

1891. That note pad was a "5" x 8" Junior Pad" with "100 Canary Sheets" made by a company named "TOPS" from "St. Charles, IL" and stated it was "MADE IN USA." Ex. 678M, MPS696_7 (cover page of PSS/34 "Note Pad").

1892. The notepad included a handwritten sketch of an airplane along with an equation, notes, and calculations. Ex. 11N, MPS 999x_X0417 at 6 (West Midlands Police Print No. 2) (color photograph of "Bayoumi Airplane Sketch"); *see* also Ex. 678M, MPS696_4; and Ex. 679B, FBI 1331-1337 at 1334 (copies of page with airplane sketch).

1893. The entire original notepad including the airplane sketch page was returned to Bayoumi on May 2, 2002. Ex. 678DD, MPS2023-100 FMT Receipt (slides 20-22; showing item no. 32 returned to Bayoumi as the "Notepad" marked "PSS/34"). The notepad was not produced

REDACTED FOR PUBLIC FILING

by Saudi Arabia or Bayoumi in this litigation. Saudi Arabia should make the original notepad available in its entirety for inspection by the Plaintiffs.

1894. It was not until March 2012, a decade later, that the FBI included Bayoumi's airplane sketch in its reports, well into the Operation Encore investigation. Ex. 2, EO 3659-3668, 3965-3967.

1895. At his deposition, Bayoumi was questioned — apparently for the first time — about his note pad. Ex. 120, Bayoumi Dep. 290:7-292:9. Bayoumi had never been previously questioned about the note pad by the MPS, FBI, or 9/11 Commission.

1896. Saudi Arabia's security and intelligence agency, the Mabahith, did not mention Bayoumi's note pad or the airplane sketch page in the letter it sent the FBI in November 2002. Ex. 2, EO 3978-80.

1897. Bayoumi admitted, under oath, that this page was in his handwriting. Ex. 120, Bayoumi Dep. 289:16-290:9. That page, as shown in a color photograph at Ex. 11N, includes:

- Bayoumi's sketch of an airplane;

- an equation written by Bayoumi, together with numbers inputted by Bayoumi into the equation;

- Bayoumi's description of variables for the equation of "h" the "hight" [sic] the plane from the earth in mile" [sic] and "d" as "distance from the plane to "hurrizen" [sic];

- and additional numbers and calculations of Bayoumi.

Ex. 11N, MPS999_X0417 at 6.

1898. Plaintiffs' expert Captain Barry Schiff applied his extensive aviation experience to determine the aviation and piloting significance, if any, of Bayoumi's handwritten airplane sketch page. Ex. 148, Schiff Report at 1-2.

REDACTED FOR PUBLIC FILING

1899.  Cpt. Schiff's aviation experience includes 69 years of piloting 363 different types of aircraft, including the Boeing 757 and 767, the aircraft flown by the hijackers in the attacks, and serving as a Captain on major airlines. He served as an FAA designated check captain and instructor. He has published over 1,900 aviation-related articles and books.  Ex. 148, Schiff Report at 1.

1900.  Cpt. Schiff determined that the equation "is used in aviation to determine the line-of-sight distance to the horizon from an airplane at a given altitude."  Ex. 148, Schiff Report at 2.

1901.  Cpt. Schiff testified that he used the equation as a pilot "to know at what altitude [he would] be able to see [an] airport" from a certain distance and had on occasion taught the equation and its use to student pilots.  Ex. 104, Schiff Dep. 36:6-19, 38:9-19.

1902.  Contrary to Saudi Arabia's claim, KSA Aver. ¶ 243.a., that the equation is not used by pilots in-flight for aviation "navigation," Cpt. Schiff explained that the equation is used on the ground for pre-flight planning purposes.  Ex. 104, Schiff Dep. 118:7-17, 180:4-17, 181:20-182:4, 185:4-10.

1903.  Cpt. Schiff's core opinion, formulated using his expertise, is: "that the airplane sketch, equation, and calculations made by Mr. Bayoumi on Figure 1 [Ex. 11N, MPS999_X0417 at 6] are consistent with preparations made as part of the planning for the 9/11 attacks and were made to assist the 9/11 hijackers in carrying out those attacks." Ex. 148, Schiff Report at 2.

1904.  Cpt. Schiff analyzed the circumstances surrounding Bayoumi's involvement with the hijackers and Bayoumi's explanation of the sketch and formula, as well as the significance of the numbers used in the calculation.  Ex. 148, Schiff Report at 10-11.

1905.  First, Cpt. Schiff determined that the "[k]ey pieces of information for the hijackers' planning the attacks to know would be from what distances and altitudes they would

478

REDACTED FOR PUBLIC FILING

be able to see their targets[]" and that information was necessary to provide the hijackers "with the visual cues needed to fly the hijacked jetliners into their targets." Ex. 148, Schiff Report at 5.

1906. Cpt. Schiff also determined that Bayoumi inserted two "distance variables" of 50 and 70 miles into his aviation equation to calculate the minimum altitudes at which an aircraft would have to be flown to see a target. Ex. 148, Schiff Report at 4.

1907. According to Cpt. Schiff, the variables chosen by Bayoumi to calculate the minimum altitudes at which an aircraft would fly to see a ground target from 50 and 70 miles away are significant from a piloting perspective to the hijackers who carried out the 9/11 Attacks. Ex. 148, Schiff Report at 4. Based on his extensive knowledge at the helm of the same commercial aircraft piloted by the hijackers, Cpt. Schiff concluded that the hijackers would plan to see their targets from 50-70 miles away to have sufficient time to successfully steer the aircraft into the targets. Ex. 148, Schiff Report at 4-6. Cpt. Schiff stated the figures of 50- and 70-miles inputted by Bayoumi constitute a "reasonable…range of distances to consider for the 9/11 attacks" that would "provide them [the 9/11 hijackers] with the visual cues needed to fly the hijacked jetliners into their targets." Ex. 148, Schiff Report at 4-6.

1908. Second, Cpt. Schiff reviewed the available flight data and radar of the hijacked planes. He determined that the actions of the 9/11 hijackers in steering their aircraft were consistent with the 50–70-mile range that Bayoumi input into his equation. Cpt. Schiff found that American Flight 11 began its descent about 67 miles north of the World Trade Center, which Cpt. Schiff concluded was "a point from which the hijacker/pilot would have been able to see the target or surrounding landmarks." Ex. 148, Schiff Report at 6.

1909. Bayoumi struggled to explain his own equation, stating that it answered the question of "what is the distance of the road between San Diego to LA or Washington to other

REDACTED FOR PUBLIC FILING

places. It's just an equation to measure distance. To Baltimore." Ex. 120, Bayoumi Dep. 291:21-292:9. But even according to both Bayoumi and Cpt. Schiff, the sketch determines a straight-line distance from an altitude, not a road on the ground which would not typically proceed in a straight line for 50 to 70 miles as the Bayoumi Airplane Sketch depicted. Ex. 120, Bayoumi Dep. 291:16-20; Ex. 148, Schiff Report at 2.

1910. According to Cpt. Schiff, Bayoumi's calculations allowed the hijackers of UAL Flight 93, which ultimately crashed in Shanksville, Pennsylvania, to understand when and at what minimum altitude they would be able to visually acquire their target. Ex. 148, Schiff Report at 8.

1911. For the final portion of the flight path, the hijackers of UAL Flight 93 selected an altitude of 5,000 feet which, Capt. Schiff explained, comports with the minimum altitude of 3,300 feet required to see a ground target at 70 miles that Bayoumi included in his calculations. Ex. 148, Schiff Report at 8.

1912. Capt. ▓▓▓▓ told the FBI that a reasonable basis existed to believe the drawings and equations were used as part of the preparations of the al-Qaeda terrorists to carry out the 9/11 attacks. Ex. 148, Schiff Report at 8.

1913. Bayoumi's calculation of "52-8=44" next to the line-of-sight equation "matches up with the final portion of UAL Flight 175, which navigated abeam the Robbinsville VOR and then toward the LaGuardia VOR." Ex. 148, Schiff Report at 8-9.

1914. The Robbinsville VOR, which was 44 miles from the World Trade Center, was a ground radio navigation aid located in Robbinsville, New Jersey that the hijackers of UAL Flight 175 were navigating towards as they made their approach to the World Trade Center. Ex. 148,

REDACTED FOR PUBLIC FILING

Schiff Report at 8-9; Ex. 104, Schiff Dep. 90:3-18; 118:2-119:4, 149:19-150:3, 175:1-8; Ex. 326, Schiff Dep. Ex. 8.

1915.   Capt. Schiff concluded that Bayoumi's calculation of the distance of 44 miles from the Robbinsville VOR to the World Trade Center, together with the results of Bayoumi's line-of-sight equation, provided a practical flight planning tool for the 9/11 hijackers to know where and how a plane heading towards New York City from the southwest would "visually acquire the World Trade Center" to carry out the attacks.  Ex. 148, Schiff Report at 9; Ex. 104, Schiff Dep. 182:9-21; Ex. 326, Schiff Dep. Ex. 8.

1916.   Bayoumi prepared the various calculations himself and admitted that his calculations had some relevance to Washington, D.C., one of the key targets of the 9/11 Attacks:

Q.  And what was the purpose of preparing this document?
A.  Perhaps to remember, memorize the equation.
Q.  And what equation is that?
A.  (In English) It's over there. I think -- (Through Interpreter) So I'm somebody who likes to read. I'm somebody who likes to be exposed to things. Perhaps this was an equation that we studied before in high school, and I was trying to remember whether I'm going to be able to figure out and solve it or not.
Q.  And what is the equation for?
A.  (In English) I don't know. (Through Interpreter) I don't know. It's just an equation.
Q.  And what are -- there's a series of numbers on the bottom here. It says, 52 minus 8 is 44. And then there's a number of lines next to that, 44, 25, 80, 76, adding up to 225 and 20 -- what do these numbers mean, sir?
A.  I don't remember.
Q.  And the equation says, The height of the plane from the earth in miles. Do you see that, sir?
A.  (In English) Yes.
Q.  And what was the reason you were calculating the height of the plane from earth in miles?

MR. SHEN: Objection. For the record.

THE WITNESS: So, it's an equation like any other equation. Like, say, when they say what is the distance of the road between San Diego to LA or **Washington to other places**. It's just an equation to measure distance. To Baltimore.

REDACTED FOR PUBLIC FILING

Ex. 120, Bayoumi Dep. 290:13-292:9 (emphasis added).

1917.   Bayoumi's drawing included an airplane sketch and memorialized in writing that the equation was for the "height the plane" and the ground target's "distance from the plane..." Ex. 11N, MPS999_X0417 at 6; *see* also Ex. 678M, MPS696_4.

1918.   American Airlines Flight 77, the hijacked plane that was flown into the Pentagon by 9/11 hijackers Hazmi and Mihdhar, who Bayoumi met and supported in California, had a planned flight path from Dulles Airport outside Washington, D.C. to Los Angeles. *See* 9/11 Commission Report at 2-3, 217-219.

1919.   Saudi Arabia's counsel chose not to ask Bayoumi a single question about his aviation sketch page.  Ex. 120, Bayoumi Dep. 721:15-798:12.

1920.   Having failed to ask any questions themselves, Saudi Arabia's counsel now suggest that the airplane sketch page may have been prepared because "Al Bayoumi had a teenaged son during the relevant period," KSA Aver. at ¶ 245.  Bayoumi said no such thing, Ex. 120, Bayoumi Dep. 290:13-292:9, and Saudi Arabia's counsel did not raise the issue with Bayoumi when they had an opportunity to do so, which would have also provided an opportunity to cross examine Bayoumi on counsel's suggested explanation.

1921.   Saudi Arabia's claim that Schiff "conceded that the equation, standing alone, has no apparent connection to the 9/11 attacks," KSA Aver. ¶ 242, takes Schiff's testimony completely out of context, as Schiff explained that his opinions were not based upon the equation "standing alone" but the evidence in its entirety — the equation, together with the specific numbers of 50 miles and 70 miles that Bayoumi used in the equation; the altitude and distances measurements that Bayoumi obtained from the calculation, Bayoumi's airplane sketch, and his

REDACTED FOR PUBLIC FILING

notes and calculations of distances — which showed that Bayoumi's aviation sketch page had a direct relationship to the 9/11 Attacks. Ex. 148, Schiff Report at 11.

1922. Saudi Arabia's claim that a pilot could not see buildings such as the World Trade Center from 50 miles and could only identify them from "within at least 5 to 10 miles," KSA Aver. ¶ 243.b., c., is wrong as a matter of empirical fact. Captain Schiff's experience is that a target like the World Trade Center could be seen by pilots from significantly more than 50 miles. Ex. 148, Schiff Report at 6; Ex. 104, Schiff Dep. 179:16-19 (from his experience, the World Trade Center could be seen from upwards of 70 miles).

1923. Saudi Arabia's pilot expert Douglas Moss agreed that the formula used by Bayoumi provided "a limiting theoretical floor" for where a pilot could first see an object on the horizon, Ex. 106, Moss Dep. 83:17-21 and knew of no other formula which provided such information. Ex. 106, Moss Dep. 68:4-8.

1924. Moss was unfamiliar with the New York skyline; did not know that the twin towers of the World Trade Center had been New York's tallest landmark; and mistakenly believed that a pilot had to be within 5-10 miles of those towers to identify them. Ex. 106, Moss Dep. 94:18-95:15; Ex. 163, Heavey Decl. ¶¶ 3-8 (the World Trade Center towers were clearly visible by naked eye from the ground 30 miles away in Greenwich, Connecticut).

REDACTED FOR PUBLIC FILING

## XXVIII. SAUDI ARABIA'S STATE-RUN AL HARAMAIN AND OTHER "CHARITY" ORGANIZATIONS PROVIDED FINANCIAL AND MATERIAL SUPPORT AND ASSISTANCE FOR VIOLENT JIHAD CARRIED OUT BY AL QAEDA

1925.  As set forth in Plaintiffs' complaints, pleadings, and other submissions to this Court, the Kingdom of Saudi Arabia's material support to Osama bin Laden and al Qaeda also included the tortious acts of the da'wah organizations established by the Saudi government to propagate the Wahhabi Islamist ideology throughout the world as a core function and duty of the Saudi state.

1926.  The Kingdom's Basic Law of Governance, expressly provides that "[t]he State shall … undertake its duty regarding the propagation of Islam (Da'wah)." Consolidated Amended Complaint ("CAC"), ECF No. 3463, at ¶ 59.

1927.  Statements by the Saudi king and other senior Saudi officials confirm and reinforce this foundational principle that the global propagation of Wahhabi Islam is both a core function and duty of the Kingdom. *See id.* at ¶ 107 (King Fahd bin Abdul Aziz al Saud stating in a 1992 speech that "the Propagation of Islam is one of the most important functions of an Islamic state"); ¶ 108 (testimony from a senior Saudi government official explaining that the Saudi state's da'wah activities have been a "core policy and function of the Kingdom since its founding"). See also 9/11 Commission Final Report at p. 372 (confirming the "dedication of the [Saudi] government to propagating the Islamic faith, particularly the Wahhabi sect that flourishes in Saudi Arabia").

1928.  To comply with this obligation, the Kingdom established several Saudi state da'wah organizations to serve as the principal instruments for conducting proselytizing activities and otherwise advancing the Wahhabi agenda across the globe, including but not limited to the

REDACTED FOR PUBLIC FILING

Al Haramain Islamic Foundation, Muslim World League ("MWL"), International Islamic Relief Organization ("IIRO") and the World Assembly of Muslim Youth ("WAMY").

1929. From the formation of al Qaeda in 1998 through the attacks of September 11, 2001, and even beyond that tragic day, these Wahhabi proselytizing organizations established, funded, directed, and controlled by the Saudi government and the Kingdom's Ministry of Islamic Affairs, Endowments, Da'wah and Guidance ("Ministry of Islamic Affairs"), acting in accordance with the policies set by the Saudi government, were responsible for providing extensive financial, material, logistical, ideological, and other forms of critical support that were essential to al Qaeda's development and transformation into a sophisticated, global terrorist organization with the ability to carry out large-scale attacks in countries around the world.

1930. Indeed, the tortious acts of the da'wah organizations in support of Osama bin Laden and al Qaeda, undertaken simultaneously as agents and alter-egos of the Kingdom in furtherance of their core mission to spread Wahhabi doctrine and practice, aided and abetted al Qaeda's attack of the United States on September 11, 2001.

1931. Recently declassified U.S. government investigation records originating from the Federal Bureau of Investigation ("FBI"), the Central Intelligence Agency ("CIA"), the U.S. Department of the Treasury and the Office of Foreign Assets Control ("OFAC"), and other sources, as well as deposition testimony and materials produced in discovery proceedings, provide new details documenting (1) the Kingdom's control and influence over the da'wa organizations at the highest levels of the state, including the Council of Ministers; (2) the Ministry of Islamic Affairs' extensive control, supervision, and direct involvement in the funding, operations, and activities of the da'wah organizations in the Kingdom and abroad; (3) the da'wah organizations' massive funding of al Qaeda, intimate involvement in all aspects of al

REDACTED FOR PUBLIC FILING

Qaeda's operations, and the broad use of their infrastructures and resources to advance al Qaeda's terrorist agenda; and (4) U.S. intelligence assessments that senior Saudi government officials, as well as Saudi embassy staff around the world, were aware of and condoned the da'wah organizations' global support for al Qaeda and terrorism, as described herein.

1932.   The evidence presented herein is supplemental to, but does not displace, the facts and evidence relating to the Saudi charities set forth in the Consolidated Amended Complaint ("CAC") (ECF Nos. 3463, 3463-1 through 3463-5), the *Ashton* Plaintiffs' Complaint, and all materials submitted by Plaintiffs in opposition to the Kingdom's motion to dismiss on November 9, 2017. *See* ECF Nos. 3780-3785.

## A.  Al Haramain Islamic Foundation

1933.   Defendant Al Haramain Islamic Foundation ("Al Haramain") was a Saudi-based ostensible charity, with dozens of branch offices spread throughout the world, "whose stated goals are to spread Islam, aid Muslims in difficulty, propagate the faith among non-Muslims, and establish the Salafist Wahhabi fundamentalist form of Sunni Islam." Ex. 2, EO 3414-3442 at 3435, *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States, December* 2004.

1934.   Al Haramain served as an agent and alter-ego of the Kingdom of Saudi Arabia, controlled and directed by the highest levels of the Saudi government. Two members of the Saudi Council of Ministers officially supervise Al Haramain's operations and activities. *See id.* The Council of Ministers, also referred to as the "Cabinet," consists of the Prime Minister (the Saudi King), the Deputy Prime Minister (the Crown Prince), and 28 other ministers. Ex. 605, *Council of Ministers System*, https://www.saudiembassy.net/council-ministers-system-0 at Ex. 605. The Council, which meets weekly, and is attended by the King and/or his deputy, advises

REDACTED FOR PUBLIC FILING

the King and is responsible for drafting and overseeing implementation of the internal, external, financial, economic, education, and defense policies as well as the general affairs of the State. *Id.*

1935.  According to the U.S. government, Al Haramain's total expenditures in 2000 exceeded $56 million. "The Government of Saudi Arabia provided more than one-half of this money via direct contributions and grants through various religious foundations." Ex. 608, TREASURY00009; Ex. 614, CIA 0675-679 at 675, *Al Haramain in Africa: Supporting Al-Ittihad Al-Islami and Other Terrorists*, March 22, 2002 (CIA reporting that Al Haramain is funded by the Saudi government); Ex. 620, CIA-SUB_0007-19 at 14, *Al-Haramain: Support for Extremists and Terrorists* [REDACTED], August 28, 2002 (CIA explaining that Al Haramain receives support from the Saudi government by submitting periodic reports to the Minister of Islamic Affairs).

1936.  In conjunction with the Council's oversight, Saudi Arabia's Ministry of Islamic Affairs played a critical role in supervising, managing, and directing the operations and activities of Al Haramain, both in the years leading up to the attacks of September 11, 2001 and in the years that followed. ██████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

487

████████████████████████████████

██████████████████████████████████████████

███████████████████████

1937. Ash-Sheikh was appointed to the role of Minister of Islamic Affairs in 1999, and continued to oversee the activities of Al Haramain through the September 11th attacks and in the years following that tragedy. Ex. 71, "Brief Resume" for Saleh bin Abdul Aziz bin Mohammed Al ash-Sheikh); Ex. 2, EO 3414-3442 at 3435 (According to the joint assessment of the FBI and CIA, "[t]he Minister of Islamic Affairs, Sheikh Saleh Bin Abdul Aziz Bin Mohammed Bin Ibrahim Al Shaykh, is the titular head and superintendent of HIF.").

1938. ████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

██████████ *See also* Ex. 123, Ash-Sheikh Dep. 154:18-155:8 (testifying that Tawfiq Sudairy, a Deputy Minister at the Ministry of Islamic Affairs, served on Al Haramain's board of directors).

488

1939. ████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████

███████████████████████████████

1940. ███████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

489

████████████████████████████████

REDACTED FOR PUBLIC FILING

██████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████

████████████████████

1941.   █████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

███████████████████████████

1942.   During this same time period, while under the leadership and oversight of Ash-Sheikh, the Director of Al Haramain, Aqeel al Aqeel, and his deputy, Mansour al Kadi, used their personal accounts at Al Rajhi Bank to conduct business on behalf of Al Haramain, moving millions of dollars through those accounts in support of the charity's global activities. Ex. 593, TREASURY00021 (stating that Kadi, "al-Aqil's deputy and one of AHF's main leaders," is "implicated in working with al Aqil to support al Qaida terrorist activity"). Between 1998-2002, seven Al Rajhi Bank accounts belonging to Aqeel and Kadi took in a total of 89,677,415.00 SR in deposits (approximately $23.9 million), and transferred in excess of 88,062,240.00 SR (approximately $23.5 million).

490

1943.  ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

1944.   The CIA concluded that Aqeel was "providing funds to [Al Haramain] offices with terrorist ties in ways that will avoid foreign government scrutiny, such as using personal bank accounts." Ex. 620 CIA-SUB_0007-19 at 0008, *Al-Haramain: Support for Extremists and Terrorists [REDACTED]*, August 28, 2002; *id.* at 0013 ("Al-Haramain increasingly sends money to individuals' personal accounts in addition to transferring funds to branch office accounts. We have also noted transfers originated from senior HIF officials' personal accounts in Saudi Arabia to personal accounts of known HIF affiliates."). *See also* Ex. 593, TREASURY00017-29 at 0027, *Designation of Al-Haramain Foundation (AHF) branches in Afghanistan, Albania, Bangladesh, Ethiopia, and The Netherlands, and the AHF's leader Al-Aqil pursuant to the authorities of E.O. 13224*, (stating that Aqeel was an "Al Qaida supporter that handled the collection of funds for 'freedom fighters' in areas including Afghanistan, Bosnia, Chechnya, Kosovo, and Somalia, [REDACTED]").

1945.  ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

491

████████████████████████████████████████

REDACTED FOR PUBLIC FILING

1946. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

█████████████████████

1947. ████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████

████████████████████████████████████

492

███████████████████████████

1948.   Notwithstanding the evidence of Ash-Sheikh's personal involvement on behalf of the Ministry of Islamic Affairs in supervising Al Haramain's work and activities, his relationship with Al Haramain's high-ranking officials, and his direct oversight of Al Haramain's banking activities, Ash-Sheikh adamantly denied any relationship with Al Haramain during his March 23-24, 2021 deposition in this litigation.

1949.   On the first day of his deposition, Ash-Sheikh was asked a series of questions concerning his relationship with Al Haramain, including: (1) "Did you hold a position with the Al-Haramain Islamic Foundation;" (2) "Sir, were you ever involved in any activities of the Al-Haramain Islamic Foundation;" and (3) "Sir, did you serve as chairman of the Al-Haramain Islamic Foundation?"  In response to each of those questions, Ash-Sheikh answered "no."  Ex. 123, Ash-Sheikh Dep. 137:14-138:10.

1950.   Ash-Sheikh was also asked:  "And is it your testimony that you have absolutely no relationship whatsoever with the Al-Haramain Islamic Foundation." Ash-Sheikh replied: "Yes. I do not recall every having any relationship with Al-Haramain Foundation." *Id.* at pp. 139-140.

1951.   On the second day of his deposition, Ash-Sheikh again denied his involvement with Al Haramain. During his testimony, Ash-Sheikh was provided with a copy of Al Haramain's webpage from 2003 at Ex. 39B (Exhibit 0477, Ash-Sheikh), which identifies Al Haramain's administration at p. 3:

> **Foundation Administration** – The superintendent of all Foundation activities is the honorable **Shaykh Saleh Ibn Abdul-'Azeez Aal Shaykh**, Minister of Islamic Affairs, Endowments, Call and Guidance. He is the chairman of the administration board which follows the activities of the Foundation. The members of this board are a select number of outstanding scholar, students of knowledge and those involved in da'wah to Allah. The director of Al-Haramain Foundation is **Sh. 'Aqeel 'Abdul-'Azeez Al-'Aqeel**."

493

REDACTED FOR PUBLIC FILING

1952. The webpage further identifies the composition of Al Haramain's "new administrative board" and indicates that the first meeting of the board was held in Ash-Sheikh's office at the Ministry of Islamic Affairs. Ex. 39B, Al Haramain's webpage from 2003 (Exhibit 0477, Ash-Sheikh), pp. 3-4:

> **New Administrative Board for Al-Haramain Charitable Foundation** –
> Among the steps toward advancement of the work of Al-Haramain Charitable
> Foundation is the establishment of an Administrative Board which held its first
> meeting on Tuesday 24 if Dhul-Hijjah in the office of his eminence the Minister
> of Islamic Affairs, Endowments, Call and Guidance and the General Supervisor
> of the Foundation under his chairmanship. This was announced by the Foundation
> Director General, Sh. 'Aqeel Al-'Aqeel.

1953. When asked about the webpage and the information indicating his direct association with Al Haramain, Ash-Sheikh claimed "That's incorrect." Ex. 123, Ash-Sheikh Dep. 178:13-180:7. Ash-Sheikh further denied holding a meeting of Al Haramain's administrative board in his office at any time. *Id*. at p. 187:5-12.

1954. Ash-Sheikh was also asked a series of questions concerning his relationship with Al Haramain's Director General, Aqeel al Aqeel (a/k/a Aqil al Aqil), including: (1) "Sir, when did you first meet Sheikh Al-Aqeel;" (2) "Was it before or after the 9/11 attacks;" and (3) "Could it have been before the 9/11 attacks, sir?" Ash-Sheikh responded to each question with "I don't remember." *See id*. at pp. 186:1-14. When asked if he was "involved with Sheikh Al-Aqeel in the operation of the Al-Haramain Islamic Foundation for years prior to the 9/11 attacks," Ash-Sheikh denied any such relationship with Aqeel, testifying: "Like I said yesterday, I answered it yesterday, the answer is negative. No." *Id*. at pp. 186:16-187:3.

1955. Newly declassified documents originating from the U.S. Department of the Treasury and the Office of Foreign Assets Control ("OFAC"), released pursuant to Executive

494

REDACTED FOR PUBLIC FILING

Order 14040, detail previously classified evidence relied upon by the U.S. government in support of its determination to designate Al Haramain's Saudi headquarters and multiple overseas branch offices as Specially Designated Global Terrorist ("SDGT") entities pursuant to Executive Order 13224. This new evidence not only describes Al Haramain's provision of material, financial, logistical, and ideological support directly to al Qaeda, associated terrorist organizations, and Islamic extremists across the globe, but makes clear that Al Haramain's support for Osama bin Laden and al Qaeda was essential to al Qaeda's development and transformation into a sophisticated terrorist organization and its ability to carry out large-scale global attacks, including attacking the United States on September 11, 2001.

1956. First, in a Treasury Department document titled, *Al-Haramayn Islamic Foundation – Bosnia-Herzegovina, see* Ex. 608, TREASURY00009-11, the U.S. government explains that both confidential and unclassified information provided clear linkages between Al Haramain and terrorist groups and their activities in the Balkans region, thereby supporting the decision to designate Al Haramain in Bosnia-Herzegovina as an SDGT pursuant to Executive Order 13224.

> Statement of the Case: Based upon information available to the United States government, there is a reasonable basis to believe that the Al-Haramayn Islamic Foundation in Bosnia-Herzegovina (HIF) receives financial support from, and is acting for or on behalf of, is providing financial and material support for, or financial or other services to or in support of, or is otherwise associated with, terrorists and terrorist-related organizations listed in the Annex to Executive Order 13224. While much of the information concerning HIF comes from sensitive sources that cannot be disclosed, the following unclassified information clearly establishes HIF's links to terrorist activity. We believe that this information is generally reliable and, taken as a whole, supports the decisions to block the assets of the Al-Haramayn Islamic Foundation in Bosnia-Herzegovina (and its directors).

Ex. 608, TREASURY00009.

REDACTED FOR PUBLIC FILING

1957.   According to the U.S. government, Al Haramain's offices in Bosnia-Herzegovina were infiltrated by terrorist elements, which in turn provided financial and material aid to terrorist activities and terrorist organizations in the region, often with the active support of Al Haramain's leadership.

> *Al-Haramayn Islamic Foundation's Ties to Terrorists:* [REDACTED] Additionally, HIF offices in Bosnia-Herzegovina have employed personnel with affiliations to or membership in an SDGT (Gama'at Al Islamiyya), indicating that the offices of HIF are widely infiltrated by terrorist elements.
>
> Given our understanding of the relationship between the Al-Haramayn Islamic Foundation and Specially Designated Global Terrorists (SDGT) and its potential for exploitation by employees with affiliations to or membership in SDGTs, it is reasonable to believe the Al-Haramayn Islamic Foundation is acting for or on behalf of, and providing financial and material support for, or financial or other services to or in support of terrorist activities and terrorist-related organizations, and doing so with the consent if not active support, of the NGO's leadership.

Ex. 608, TREASURY00011; Ex. 604 (Treasury Department's March 11, 2002 press release detailing the designation of the Bosnia-Herzegovina branch for "supporting terrorist activities and terrorist organizations such as al-Qaida, AIAI, (al-Itihaad al-Islamiya), and others").

1958.   Second, in a Treasury Department memorandum concerning the *Designation of Al-Haramain Foundation-Pakistan, see* Ex. 603, TREASURY00012-16, the U.S. government describes Al Haramain's global support for Osama bin Laden, al Qaeda, and related terrorist organizations via its branch offices and representatives in Africa, Asia, Europe, and North America.

> The Al-Haramayn Foundation (AHF) is one of the principal Islamic NGOs active throughout the world. AHF has been infiltrated by Al-Qaeda and has been used by al-Qaeda for cover and concealment of assets and material, according to military reporting. AHF "belongs to" the Usamah Bin Ladin-established "World Front of the Jihad Against Jews and Christians," which includes the Egyptian Gama Al-Islamiya, the Egyptian Islamic Jihad (EIJ), the Abu Sayyaf Group (ASG) and the

496

Harakat Ul Ansar of Pakistan, according to military reporting. All these organizations are Specially Designated Global Terrorists pursuant to E.O. 13224. Prior to the removal of the Taliban from power in Afghanistan, AHF had links to the UBL-financed Makhtab al-Khidemat (MK). [REDACTED] MK is a Specially Designated Global Terrorist pursuant to E.O. 13224.

As of January 2003, it appears that numerous AHF field offices and representatives operating throughout Africa, Asia, Europe, and North America appeared to be providing financial and logistical support to Al-Qaeda. Terrorist organizations including Al-Itihaad Al-Islamiya, Egyptian Islamic Jihad, Lashkar I-Tayyiba were receiving funding from AHF and using AHF as a front for fundraising and operational activities.

In one instance later in 2003, a journalist suspected of meeting with Al-Qaeda and Taliban members in Afghanistan was also suspected of transferring funds on behalf of the Al-Qaeda-affiliated AHF, and forwarding videotapes from Al-Qaeda leaders to Al-Jazeera TV for broadcast.

Ex. 603, TREASURY00013.

1959.   According to the United States, Al Haramain's office in Pakistan employed individuals with ties to al Qaeda and provided financial support to Executive Order 13224 SDGTs Jamiat al Dawa ("JUD") and Laskhar E-Taibah ("LET").

At least two former AHF employees that worked in Pakistan are suspected of Al-Qaeda ties. One AHF employee in Pakistan is detained at Guantanamo Bay on "suspicion of financing Al-Qaeda operations."

* * *

AHF in Pakistan also supports Jamiat al Dawa (JUD) and Lashkar E-Taibah (LET), both Specially Designated Global Terrorist organizations pursuant to the authorities of E.O. 13224. After LET was officially banned in Pakistan on January 12, 2002, LET began using the name JUD to continue operating in Pakistan, [REDACTED].

A detained political official and admitted member of JUD, identifying AHF as one of three Non Governmental Organizations (NGO) financially supporting JUD, provided details about how JUD receives financial support, according to Department of Defense reporting. When JUD requires financial assistance, an estimate is sent to one of the three NGO's, among then AHF. Funds are then provided to JUD either in personal meetings, in which representatives from the NGO and JUD discuss the proposed estimate and reach an agreement, or by wire transfers, to a bank account in the name of the Sheikh in charge of JUD,

REDACTED FOR PUBLIC FILING

according to Department of Defense reporting. During 1998-2001, the JUD detainee conducted four or five meetings with representatives from AHF.

Ex. 603, TREASURY00014-15.

1960. The memorandum concludes that the designation of Al Haramain's offices in Pakistan pursuant to Executive Order 13224 is warranted based on the following:

> Directed by an individual that is an Al-Qaeda facilitator, AHF in Pakistan is controlled by Al Qaeda.

> By employing Al-Qaeda members suspected of supporting Al-Qaeda operations, AHF in Pakistan is controlled by or acting on behalf of, or is assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of Al-Qaeda.

> By financially supporting LET in Pakistan, AHF is assisting, sponsoring or providing financial, material, or technological support for, or financial or other services to or in support of LET.

> By maintaining bank accounts controlled by the MK Director, AHF in Pakistan is controlled by or acting on behalf of, or is assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of MK.

Ex. 603, TREASURY00015-16. *See also* Ex. 606 (Treasury Department's January 22, 2004 press release detailing the designation of Al Haramain in Pakistan for providing advanced weaponry to al Qaeda and affiliated militants).

1961. Third, in a Treasury Department memorandum concerning the Designation of Al-Haramain Foundation (AHF) branches in Afghanistan, Albania, Bangladesh, Ethiopia, and The Netherlands, and the AHF's leader Al-Aqil pursuant to the authorities of E.O. 13224, see Ex. 593, TREASURY00017-29, the United States describes the support for al Qaeda and associated terror groups provided by Al Haramain's Saudi headquarters and its branch offices.

> As of March 2004, information set forth below provides reason to believe that AHF, including its headquarters and all its branch offices, is one of the principal Islamic NGO's active throughout the world providing support for the Al Qaida network and promoting militant Islamic doctrine worldwide. AHF has been

498

infiltrated by Al Qaida and has been used by al Qaida for cover and concealment of assets and material, according to military reporting.

\*\*\*

Prior to the removal of the Taliban from power in Afghanistan, AHF was linked to Makhtab al-Khidemat (MK), [REDACTED]. MK, co-founded and financed by Usama bin Ladin (UBL), is an SDGT pursuant to the authorities of E.O. 13224 and the pre-cursor organization of Al Qaida. [REDACTED].

\*\*\*

[REDACTED] In mid-April, AHF was "involved with" a group of sixty Afghan persons "trained to attack Westerners, [REDACTED]. Reportedly, one AHF employee believed to belong to Al Qaida is currently detained in Guantanamo, Cuba, [REDACTED].

Ex. 593, TREASURY00019-20. *See also* Ex. 671 (Treasury Department's June 2, 2004 press release detailing the designation of Al Haramain branches in Afghanistan, Albania, Bangladesh, Ethiopia, and The Netherlands, including Al Haramain's Director Aqil al Aqil).

1962.   The U.S. government further details the Ministry of Islamic Affairs' supervision over Al Haramain and its branch offices, and Al Haramain Director Aqeel al Aqeel's use of personal bank accounts to transfer Al Haramain funds to branch offices with connections to terrorism, in ways that avoided government scrutiny.

According to the homepage for AHF in September 2002, AHF is headquartered in Riyadh, Saudi Arabia and maintains 14 offices in Saudi Arabia and is active in over 50 countries. At the time, the "superintendent of all [AHF] activities" was identified as the Honorable Shaykh Saleh Ibn Abdul-Azeez Ali Shaykh, Minister of Islamic Affairs, Endowments, and Call and Guidance. This Shaykh was also the Chairman of AHF's Administrative Board which "follows the activities of [AHF]." AHF's Director, at least until late 2003 or early 2004, was Aqeel Abdul-Azeel [Al-Aqil].

As of January 2003, the U.S. judged that AHF's Director Al-Aqil, who at the time managed AHF's business on a day-to-day basis, was providing funds to offices with terrorist ties in ways that avoided foreign government scrutiny, such as using personal bank accounts to transfer official AHF funds, according to diplomatic reporting.

REDACTED FOR PUBLIC FILING

Ex. 593, TREASURY00020-21.

1963.   Aqeel is also described as an "Al Qaida supporter that handled the collection of funds for 'freedom fighters' in areas including Afghanistan, Bosnia, Chechnya, Kosovo, and Somalia." Ex. 593, TREASURY00027.

1964.   The Treasury Department memorandum further identifies a senior Al Haramain official, Hisham Al-Mashari, as a "known operative in UBL's terrorist support network," who was involved in an initiative to "field a platform in Iraq, which extremists could use to support anti-U.S. activities." Ex. 593, TREASURY00021-22; Ex. 672, TREASURY00037-54 at 53, stating that "[f]ollowing the designation of the Al Qaida-affiliated AHF Bosnian branch, and the subsequent raid of the Bosnian AHF office by Bosnian authorities on June 3, 2002, Al-Mashari ordered all AHF employees to say little and answer only specific questions in their area of expertise."  In 2000, an individual in Turkey charged by the United Nations as a terrorist, and who reportedly admitted to engaging in militant preaching, received Al-Mashari's agreement to assist him relocate to Turkey. *Id.* at TREASURY00052.

1965.   Al Haramain also established an office in Iran to move weapons into Afghanistan in 2001.

> An AHF official that reportedly coordinated arms deals with the Al Qaida-affiliated Al-Zarqawi, was instrumental in establishing a branch of AHF in Iran [REDACTED]. The AHF branch in Iran was linked to efforts by "WAFA" to move weapons related items through Pakistan into Afghanistan during the conflict in Afghanistan in late 2001. [REDACTED] WAFA Humanitarian Organization is a Specially Designated Global Terrorist pursuant to the authorities of E.O. 13224.

Ex. 593, TREASURY00024.

500

REDACTED FOR PUBLIC FILING

1966.   According to the U.S. government, Al Haramain official Perouz Sedaghaty, who worked in Al Haramain's U.S. branch office in Ashland, Oregon, admitted to the FBI that he had received $500,000.00 from Osama bin Laden.

> In late 2001, the senior AHF official in the U.S., Perouz [Seda] Ghaty, sought a license from OFAC to purportedly assist Afghan refugees in border camps in Iran on the Iranian/Afghanistan border. Following the dual-U.S. Embassy bombing attacks in East Africa in August 1998, Seda reportedly confided to an FBI source that he was "in trouble." When asked by the FBI source to elaborate, Seda said that he received $500,000 from UBL--"through Bosnia." Seda was described as a "fundamentalist" who has sought to convert prison inmates to the Islamic faith. As part of Seda's request to OFAC in November 2001, he reported that Shaykh Al-Aqil, identified as the President of AHF, agreed to Seda's proposal to fund $500,000 for assistance to Afghan refugees in border camps in Iran. On the U.S. AFH's tax form 990 for 2001 filed with the IRS, Al-Aqil is identified as the President, Al-Kadi as the Vice President, Al-Buthe as the Treasurer, and Seda as the Secretary.  The U.S. AHF branch's Articles of Incorporation and application to the IRS for tax-exempt status also list Al-Aqil and Al-Kadi as members of the board of directors.

> As of March 2003, due to pressure from the U.S. on Saudi authorities to close AHF, Al-Aqil and Al-Kadi reportedly resigned from the U.S. AHF office, [REDACTED].

Ex. 593, TREASURY00024.

1967.   The Treasury memorandum also reports that Al Haramain's branch office in Albania was directly linked to Osama bin Laden and Egyptian Islamic Jihad ("EIJ").

> UBL reportedly financed the establishment of AHF in Albania, which has been used as cover for terrorist activity in Albania and in Europe, [REDACTED]. In 1998, the head of Egyptian Islamic Jihad (EIJ) in Albania was reportedly also the "accountant" for AHF in Albania, according to a French news report. This individual, Ahmed Ibrahim al-Nagar, was reportedly extradited from Albania to Egypt in 1998. At this trial in Egypt, al-Nager reportedly voiced his support for UBL and Al Qaida's terrorist attacks against the U.S. Embassies in Tanzania and Kenya.

Ex. 593, TREASURY00025.

REDACTED FOR PUBLIC FILING

1968.   As of early June 2000, Al Haramain's office in Ethiopia was providing support to the Al Ittihad Al Islamiya ("AIAI") terrorist organization that was engaged in attacks against Ethiopian defense forces. Ex. 593, TREASURY00026.

1969.   In a fourth Treasury Department document, *Al-Haramayn Islamic Foundation – Somalia, see* Ex. 673, TREASURY00030-36, the U.S. government discusses Al Haramain's ties to al Qaeda and the Al Ittihad Al Islamiya ("AIAI") terrorist organization in Somalia.

> The U.S. has assembled evidence that shows a history of ties between Al-Haramain Somalia and Usama bin Laden's al-Qaida network, Al-Itihaad al-Islamiya (AIAI), and other associated entities and individuals. For example, over the past few years, Al-Haramain Somalia has provided a means of funneling money to AIAI by disguising funds as intended to be used for orphanage projects or the construction of Islamic schools and mosques. The organization has also employed and provided salaries to AIAI members. [REDACTED].

> The evidence indicates that even after AIAI was named in the Annex to E.O. 13224 and subsequently designated by the United Nations under UNSCR 1333, Al-Haramain Somalia has continued to provide financial support and cover for AIAI operatives, and conceal their activities.

Ex. 673, TREASURY00030. *See also* Ex. 604 (Treasury Department's March 11, 2002 press release detailing the designation of Al Haramain in Somalia).

1970.   As of late September 2000, Al Haramain was one of the four most active NGO's in Somalia, and its activities included sending relief food to members of AIAI in AIAI military training camps and offices in Al Waq and Qoryoly, Somalia. Al Haramain further provided AIAI foreign trainers with food and medicine, and provided cover for AIAI operatives and concealed their activities. Ex. 673, TREASURY00033-35.  According to the United States, the Al Haramain office in Mogadishu "is connected to Al-Qaida." Ex. 673, TREASURY00035.

1971.   In a fifth Treasury Department memorandum concerning the Designation of Al-Haramain Foundation (AHF) locations in the United States, the Comoros Islands, and AHF

REDACTED FOR PUBLIC FILING

official Soliman Al-Buthe pursuant to the authorities of E.O. 13224, *see* Ex. 672, TREASURY00037-54, the United States reveals that in 1998 it had received a list of seven suspected al Qaeda members in the Comoros, two of which were associated with Al Haramain. Ex. 672, TREASURY00043.

1972.   As to Soliman al Buthe (a senior Al Haramain official, Treasurer of Al Haramain's office in Ashland, Oregon, and chairman of Al Haramain's U.S. Committee with broad legal authority to act on behalf of Al Haramain in the United States), the U.S. government specifies that al Buthe (i) worked closely with individuals providing material support for terrorism, (ii) provided support to Islamic extremists advocating jihad, (iii) served as a "clearinghouse" for moving Al Haramain funds from Saudi Arabia to the United States, and (iv) engaged in activities to prevent the dissolution of Al Haramain notwithstanding multiple Executive Order 13224 designations of Al Haramain branch offices and officials.

> FBI investigation revealed that Al-Buthe, on behalf of AHF, entered into agreements to work closely with alleged terrorist supporter Sami Omar Al-Hussayen, who was charged by Federal prosecutors in Idaho with material support for terrorism. According to the Superseding Indictment, Al-Hussayen allegedly provided Internet and computer expertise to support and recruit for violent Jihad. This support was allegedly provided to AHF, Hamas, and a list of extremist websites, one or more of which contained explicit calls for violence against non-Muslims and urged visitors to participate in, or make financial contributions to support violent Jihad.

> ***

> FBI investigation of one of the extremist websites revealed that Al-Buthe provided support to radical Saudi Shaykh Salman Al-Awdah. A government exhibit entered into evidence in the Idaho trial identifies al Buthe as the owner, Chairman/Managing Director, and billing contact for islamtoday.com. This website is identified as "owned" and "under the supervision of" Al-Awdah, according to public Internet sources.

> ***

REDACTED FOR PUBLIC FILING

As of April 2004, Al-Buthe appeared to be functioning as a clearinghouse for moving AHF funds from Saudi Arabia to the U.S. [REDACTED] Al-Buthe has been acting as the conduit for sending funds on behalf of AHF to the U.S. to pay at least $515,316 in legal fees between June 2003 and April 2004. These funds reportedly were to assist in the legal defense of himself, AHF, AHF leader Aqeel Al-Aqil and others, including Muhammad Jumal Khalifa.

\*\*\*

As of mid-March 2004, Al-Buthe was working hard to prevent the "total dissolution" of AHF, [REDACTED].

Ex. 672, TREASURY00047-50. *See also* Ex. 674 (Treasury Department's September 9, 2004 press release detailing the designation of Al Haramain branches in the United States, the Union of Comoros, and Al Haramain official Soliman al Buthe).  *See also* Ex. 675, Affidavit in Support of an Application for Search Warrant, In the Matter of the Search of One story residential building located at 3800 S. Highway 99 in Ashland, Oregon, Case No. 04-4009, filed in Case No. 6:05-crd-60008-AA, Document No. 183-3, June 19, 2009, at ¶ 42 (stating that al Buthe entered the United States at least thirteen times between October 1997 and April 2001, transporting a total of $777,845.00 into the country); Ex. 2, 3414-3442 at 3435, *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States, December 2004*, EO14040-003414-3442 at 3435 (stating that al Buthe "provided over $700,000 to the US-based offices of HIF," and that "[a]pproximately $600,000 of these funds came from al-But'he's personal account at the al-Rajhi Bank and Trust").

1973. [REDACTED]

[REDACTED]

504

1974. Sheikh al Awda "was the shaykh of Saudi-based Salafi extremists Mohammed Al-Muhanna and Fahd Al-Thumairy, aka Fahd Al-Thumairi." Ex. 2, EO 0637-0641 at 640. According to the U.S. government, Thumairy "provided substantial assistance to 9/11 hijackers Nawaf al-Hazmi and Khalid al-Midhar during their time in California, prior to the attacks." Ex 607, 2012 FBI Summary Report at pp. 3-4 (ECF No. 6292-1).

1975. Next, a Treasury Department memorandum concerning *Additional Designations Pursuant to E.O. 13224: Al-Haramain, Indonesia, see* Ex. 619, TREASURY00087-92, the U.S. government states that "Al-Haramain, Indonesia provides financial support to the Indonesian NGO KOMPAK which, as described below, has multiple links to Jemaah Islamiyah (SDGT)." "KOMPAK was founded by senior Jemaah Islamiyah (JI) leader Agus Dwikarna (SDGT)." *See also* Ex. 606 (Treasury Department's January 22, 2004 press release detailing the designation of Al Haramain in Indonesia for providing "financial, material and logistical support to Usama bin Laden's (UBL) al-Qaida network and other terrorist organizations").

1976. Finally, a Treasury Department memorandum concerning *Additional Designations Pursuant to E.O. 13224: Al-Haramayn Kenya and Tanzania,* Ex. 676, TREASURY00094-101, states that "[t]he entire Al-Haramayn organization has long been suspected of providing various types of support to terrorist groups including Al-Qaeda, and its offices in Bosnia and Somalia were designated on March 11, 2002, pursuant to E.O. 13224, for providing support to Al-Qaeda. Al-Haramayn's offices in Kenya and Tanzania are similarly being recommended for designation for providing financial and material support to Al-Qaeda and Al-Itihaad Al-Islamiya, both of which were designated on September 23, 2001 as part of the Annex to E.O. 13224."

REDACTED FOR PUBLIC FILING

1977.   The memorandum further indicates that "AHF officials in Kenya and Tanzania have been actively involved in supporting the planning and carrying out of terrorist attacks against US and Western targets, as well as other acts of violence. AHF's role appears to be to provide financial and logistical assistance to those who intend to conduct the attacks." Ex. 676, TREASURY00097.

1978.   According to the U.S. government, Al Haramain employees affiliated with the branch office in Kenya, were arrested in November 1997 for plotting an attack on the U.S. Embassy in Nairobi (prior to the 1998 U.S. Embassy bombings).

> In late November 1997, based on information that Islamic activists associated with AHF were planning to an attack on the U.S. Embassy in Nairobi, Kenyan authorities arrested ten AHF staff members and deported them. The ten, including Abu Abdul Malik, an Algerian serving as an AHF project manager, were reportedly suspected of aiding the Al Itihaad Al Islamiya (AIAI), an organization designated as a Specially Designated Global Terrorist pursuant to E.O. 13224. According to Embassy contacts, AHF's numerous charitable activities in northeast Kenya provide a useful cover for sending funds and supplies to AIAI. These activities included the use of mosques in Garissa and Mandera where the imam or other officials allegedly have ties to AIAI. One Embassy contact was told by [REDACTED] AHF sent weapons and ammunition to AIAI during the August 1996 fighting near the town of Luuq in Somalia. AHF allegedly transported the material on board relief flights that took off from Nairobi's Wilson Airport.

Ex. 676, TREASURY00099. *See also* Ex. 606 (Treasury Department's January 22, 2004 press release detailing the designation of Al Haramain in Kenya and Tanzania).

1979.   The Kingdom of Saudi Arabia validated the Treasury Department's findings concerning Al Haramain's global support for terrorism, describing one of its principal da'wah organizations as "one of the biggest terror-financing operations in the world."

> After the terrorist attacks on September 11, 2001, the U.S. Department of the Treasury initiated the Terrorist Finance Tracking Program (TFTP) to identify, track, and pursue terrorists and their networks. By 2004, the U.S. Department of the Treasury and Saudi Arabia eliminated four branches of the Al-Haramain

REDACTED FOR PUBLIC FILING

charity, one of the biggest terror-financing operations in the world and the funding organ and channel for the Nairobi, Kenya and Dar es Salaam bombings in 1998.

***

Saudi Arabia, in joint investigations with the U.S., has identified 17 prominent financial facilitators that are directly associated with Daesh. These sources, and others like them, are being shut down. We have also succeeded in dissolving groups such as Al-Furqan, a charity that was a major conduit of financial and material support for terrorist groups, and the charity front Al-Haramain Islamic Foundation, notoriously tied to Osama bin Laden, the Taliban and Al Qaeda's terror campaigns.

Ex. 677, The Kingdom of Saudi Arabia and Counterterrorism (2016), pp. 13, 86.

1980.   The CIA has assessed that senior Saudi government officials, including but not limited to the Minister of Interior, Prince Nayef bin Abdul Aziz al Saud, as well as Saudi embassy staff around the world, were aware of and condoned Al Haramain's global support for terrorism. Ex. 620, CIA-SUB_0007-19, *Al-Haramain: Support for Extremists and Terrorists [REDACTED]*, August 28, 2002. According to the CIA:

Some Saudi Government officials—such as Saudi Minister of Interior Prince Nayif bin Abd al-Aziz and some Saudi Embassy personnel—condone or ignore the activities of al-Haramain headquarters, field offices, and representatives that support terrorist and militant groups."

We judge that the large number of field offices and individuals linked to al-Qa'ida and associated terrorist groups and their connections within the Saudi Government—both in Saudi Arabic and abroad—contradict Riyadh's claim of ignorance of al-Haramain's activities.

"[REDACTED] that Prince Nayif is aware of al-Haramain's illicit activities in the Balkans [REDACTED]. Individuals working in Saudi Embassies in several countries appear to be witting of—and sometimes assist—HIF branch offices that support extremist groups."

Ex. 620, CIA-SUB_0008, CIA-SUB_0014 ("Several US officials discussed al-Haramain with Prince Nayif in February and March 2002, undermining any claim of ignorance by the Interior

507

REDACTED FOR PUBLIC FILING

Minister, [REDACTED].”); Ex. 153, Expert Report of Steven Simon, ¶ 15 (Mr. Simon explains

that as a member of the National Security Council during the Clinton Administration, the United

States explicitly told the Saudis that "the KSA was empowering jihadists through its support and

funding of groups such as Al Haramain and Hamas and through its Ministry of Islamic Affairs;

and we, the U.S., need you, the KSA, to stop."); *id.* at ¶ 20 ("The KSA was made aware that it

was stoking the fires of extremism through its support of funding of charities such as Al

Haramain, as well as its intensive and extensive propagation of its radical religious doctrine,

which justified the use of violence against impious Muslims and non-Muslims. Yet when the

U.S. implored the KSA to desist from its actions fueling international terrorism, Saudi Arabia

only poured more gasoline into the inferno.").

    1981.   According to the joint assessment of the FBI and CIA, Prince Nayef "maintained

for months after 11 September 2001 that no Saudis or Arabs had been involved in the attacks, but

rather that the attacks were plots by the CIA and Israel's Mossad." Ex. 2, EO 3414-3442 at 3423.

    1982.   In a separate report, *Saudi-Based Financial Support for Terrorist Organization*

*[REDACTED],* November 14, 2002, Ex. 609, CIA_000143-158, the CIA concluded that Saudi

government officials were aware of, but turned a blind eye to, the Saudi da'wah organizations'

support for terrorism.

> Riyadh appears reluctant to pursue donors and police its NGOs. Domestic
> political considerations may also be preventing Riyadh from taking a harder line
> against terror finance.

> Donors who are members of prominent merchant families often have business
> dealings or frequent interactions with the Saudi royal family, suggesting that
> Riyadh may be hesitant [to] move against their businesses and bank accounts,
> [REDACTED].

REDACTED FOR PUBLIC FILING

A few Saudi Government officials, such as Prince Nayif and Saudi Embassy personnel, have condoned or ignored the activities of NGO representatives that support terrorist and militant groups, [REDACTED].

See Ex. 609, CIA_000145.

1983.   The CIA again emphasized Prince Nayef's knowledge of Al Haramain's support

for terrorist organizations and militant groups, and the Saudi government's reluctance to clean up

the Saudi charities.

**Al Haramain Islamic Foundation (HIF)** had field offices in some 50 countries, at least 20 of which are used by some officers to provide logistical, organizational, and financial support to al-Qa'ida and other extremist groups. A few Saudi Government officials, such as Prince Nayif and Saudi Embassy personnel, have condoned or ignored the activities of al-Haramain headquarters, field offices, and representatives that support terrorist and militant groups, [REDACTED].

\*\*\*

The Saudis have agreed to track the flow of charitable funds to foreign projects. Riyadh needs to establish an effective mechanism to monitor domestic and foreign charitable donations in order to uncover funding diverted to terrorists. Despite this progress, Riyadh appears reluctant to pursue donors and clean up its NGOs.

Ex. 609, CIA_000150-151, 154-155.

1984.   Sheikh Saleh bin Abdul Aziz bin Mohammed bin Ibrahim al Ash-Sheikh,

Minister of Islamic Affairs, also condoned Al Haramain's involvement in terrorist activities.

509

███████████████████████████████

███████████████████████████

████████████████████ By March 13, 2004, the United States and Saudi Arabia had jointly designated Al Haramain's offices in Somalia and Bosnia-Herzegovina (March 11, 2002), its offices in Indonesia, Kenya, Tanzania, and Pakistan (January 22, 2004), and three months later jointly designated the Al Haramain offices in Afghanistan, Albania, Bangladesh, Ethiopia, Netherlands, and Aqeel al Aqeel (June 2, 2004). The designations of Al Haramain in the United States, Union of Comoros, Soliman al Buthe (September 9, 2004), and the Saudi headquarters (June 19, 2008), would follow thereafter. *See* Exs. 604, 606, 671, 674, 610.

1985.   Moreover, following the designation of Al-Haramain in Bosnia-Herzegovina, Ash-Sheikh purposely engaged in efforts to mislead the international community concerning Al Haramain's activities in the Balkans, as part of a scheme to evade economic sanctions imposed upon the organization.

> Saudi Government officials also have tried to circumvent the asset freeze imposed on HIF's Balkans office by supporting a misleading claim by HIF headquarters. Riyadh reacted to the US demarche in February on al-Haramain by issuing an official statement acknowledging "reports" of abuses by individuals affiliated with foreign offices of HIF. Riyadh publicly committed to take actions to prevent the abuses and jointly froze al-Haramain's assets in Bosnia and Somalia in March. Saudi Minister of Islamic Guidance Shaykh Salih then claimed to the press in early April that the al-Haramain office in Sarajevo was not engaged in illicit activities.

> Riyadh also cooperated with HIF's plan in April 2002 to deflect international criticism by claiming there are two Saudi organizations with the name al-Haramain—al-Haramain al-Khayriyya and al-Haramain al-Masjed al-Aqsa Charity Foundation—and that only one is involved in questionable activities. Shaykh Salih supported this claim by telling the press that the US government apologized to the NGO for confusing the names after Riyadh froze the branch's assets jointly with the United States.

510

Ex. 620, CIA-SUB_0007-19 at 15, *Al-Haramain: Support for Extremists and Terrorists [REDACTED]*, August 28, 2002.

1986. Importantly, Ash-Sheikh was overseeing and directing the operations and financial activities of Al Haramain notwithstanding the fact that it did not have a proper license from the Saudi government authorizing it to conduct charitable work and open bank accounts in the Kingdom. During his deposition, Ash-Sheikh conceded that Al Haramain "did its work without a legal permit or a license." Ex. 123, Ash-Sheikh Dep. 136:23-137:12. *See also* pp. 144:24-149:11 (stating that "Al-Haramain worked without a permit," and that "it was not a licensed society"). Ash-Sheikh testified that after September 11, 2001, a prospective board of directors was established "to study the situation of Al-Haramain Foundation," and "the recommendation from the Ministry of Islamic Affairs at that time was to shut down Al-Haramain charity." *Id.* at 154:4-16. But Al Haramain was never shut down as Ash-Sheikh suggested. Ex. 610, Treasury Department's June 19, 2008 press release regarding the designation of Al Haramain's Saudi headquarters (stating that as of 2008, "AHF leadership has attempted to reconstitute the operations of the organization, and parts of the organization have continued to operate").

1987. Other high-ranking Al Haramain officials were also aware of, condoned, and participated in the organization's ongoing material, financial, logistical, and ideological support for terror groups and Islamic extremists. According to the CIA:

> We judge that HIF Director Shaykh Aqil Ibn 'Abdul-'Aziz al-'Aqil, who manages al-Haramain's business on a day-to-day basis, is aware that funds in several field offices are being used to support terrorist and militant groups. [REDACTED] he almost certainly has been involved in suspicious money movements since 11 September.

511

REDACTED FOR PUBLIC FILING

[REDACTED] April 1999, al-Haramain used a centralized system that prohibits individuals from allocating funds without the personal approval of the foundation's director.

[REDACTED] Shaykh Aqil, other senior managers, and individuals at branch offices are at least aware that several branch offices provide logistic support to Islamic extremists.

[REDACTED] Shaykh Aqil may have received funds from an unspecified organization [REDACTED] with extremist ties in the last few months. [REDACTED].

*Mujahidin* leaders frequently have coordinated funding support with senior al-Haramain managers, who were aware that their donations were being used for military support, [REDACTED]. The organization reportedly also has issued visas and identity papers to *mujahidin*, funded their recruitment and travel, and provided health care for wounded *mujahidin*, [REDACTED]. [REDACTED] 2001, Chechen *mujahidin* [REDACTED] received about [REDACTED] from al-Haramain, [REDACTED].

Ex. 620, CIA report, CIA-SUB 0007-19 at 14, *Al-Haramain: Support for Extremists and Terrorists [REDACTED]*, August 28, 2002. *See also* Ex. 614, CIA_000675-679 at 675, CIA report, *Al Haramain in Africa: Supporting Al-Ittihad Al-Islami and Other Terrorists*, March 22, 2002, ("Most of Al-Haramain's field office directors in East Africa are aware of and support the organization's aid to militant extremists, and at least some top-level officials from HIF's headquarters condone the funding of extremist groups.").

1988.   The Saudi Arabian Monetary Authority ("SAMA") (a/k/a "Saudi Central Bank"), the Saudi government's central authority responsible for oversight and regulation of all banks and financial institutions in the Kingdom, not only condoned the activities of Al Haramain, but provided cover for Al Haramain to launder and transfer hundreds of millions of dollars to destinations throughout the world via numerous accounts at Saudi banks, without fear of government scrutiny and/or sanctions.

REDACTED FOR PUBLIC FILING

1989. ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████

1990. ███████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████

1991. ██████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

1992. ███████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

REDACTED FOR PUBLIC FILING

█████████████████████████████████

█████████████████████████████████

██████████████ As previously discussed, as of the date of the Minister's statement (March 21, 2004), six Al Haramain offices had been designated by the United States and United Nations for their support for al Qaeda and other terror groups, with an additional five offices and the head of Al Haramain (Aqeel al Aqeel) to be designated three months later.

1993.  CIA reporting released pursuant to Executive Order 14040, dating to both prior to and after the 9/11 attacks, additionally provides a wealth of new evidence demonstrating Al Haramain's global support for al Qaeda.

1994.  For instance, in *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact [REDACTED]*, January 11, 1999, Ex. 79, CIA 000807-848, the CIA assessed that al Qaeda infiltrated and used Al Haramain's overseas offices for funding and other resources for years prior to the 9/11 attacks.

> [REDACTED] al-Qa'ida has infiltrated offices of several Saudi-based nongovernmental organizations – especially NGOs in Afghan and Pakistan offices. Usama's familiarity with NGOs in this region no doubt stems from his operation of the Maktab al-Khidamat in Pakistan, which probably had numerous contacts with Saudi and other Gulf charities with respect to aiding Arabs in Afghanistan…. All-source intelligence suggests that several Saudi NGOs are funding conduits for al-Qa'ida or have been penetrated by Usama's network. Those of greatest concern include … Al-Haramayn Islamic Foundation.
>
> ***
>
> [REDACTED] offices of Al Haramayn in Albania, Azerbaijan, Bosnia, Kenya, and Tanzania have been used by al-Qa'ida.

Ex. 79, CIA_000808, 817.

1995.  The report further details Al Haramain's support for Osama bin Laden, certain terror groups, and the mujahideen in the Balkans.

████████████████████████████████

REDACTED FOR PUBLIC FILING

Employees at Al Haramayn offices in Albania, Azerbaijan, Kenya, and possibly Tanzania, have been funded by or have acted on behalf of Usama Bin Ladin: [REDACTED].

\*\*\*

[REDACTED] the Al-Haramayn office in Nairobi was a front for the Al-Ittihad Al-Islami, an Usama Bin Ladin-backed Islamic insurgent group engaged in politically motivated violence in Somalia and Ethiopia.

\*\*\*

Al Haramayn offices have supported other terrorist groups. [REDACTED] for example, it has been particularly involved in providing financial and logistical support to the Bosnian mujahedin. [REDACTED] the NGO also has associated with Egyptian terrorists. Ayman Al-Zawahiri – the [blank] was a onetime Al Haramayn leader.

Ex. 79, CIA_000819-820.

1996.   In a report titled, *How Bin Ladin Commands a Global Terrorist Network [REDACTED]*, January 27, 1999, Ex. 80, CIA_00002-16, the CIA describes how Osama bin Laden and al Qaeda used Al Haramain and other purported charities for funding, travel assistance, covert employment, and weapons smuggling.

In addition to support from other groups, Bin Ladin taps into the resources of some international Islamic nongovernmental organizations (NGOs) for financial and logistical support. Employees—ranging from accountants to directors—of a few NGO branch offices have diverted resources to benefit Bin Ladin and his associates, although we are unable to determine if the organizations' home offices are witting. Bin Ladin exploits these NGO ties to channel funds and obtain cover employment and travel assistance for his associates. He also uses the NGOs' distribution network to move weapons and supplies.

Employees of the Azerbaijan-based al-Haramayn office, for example, have regularly diverted resources to Bin Ladin and his associates since 1995, [REDACTED]. The former head of the Baku office and its logistical chief, both associated with Bin Ladin, directed much of this activity, including channeling funds and weapons.

Ex. 80, CIA_000007.

REDACTED FOR PUBLIC FILING

1997.   In a subsequent report titled, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, Ex. 613, CIA_000210-236, , the CIA further describes the use of purported charitable organizations, like Al Haramain, by Osama bin Laden for critical resources in support of terrorist activities.

> The logistical support NGOs offer includes cover employment, false documentation, travel facilitation, training, and in some cases, weapons. Most Islamic terrorist groups maintain relationships with several NGOs, which protects them from the closure of any one organization. Terrorists typically penetrate NGOS by finding individual sympathizers who divert resources in support of the group, but in a few instances, entire NGO offices, including senior management positions, are staffed by extremists.
>
> ***
>
> Usama Bin Ladin has established close relationships with employees in several al-Haramayn offices, [REDACTED] and has used these ties to divert resources to support his terrorist agenda, [REDACTED].  Some of these employees probably [blank] either planted or coopted by Bin Ladin after they began working for the NGO.

Ex. 613, CIA_000210-211, 217.

1998.   In *Al Haramain in Africa: Supporting Al-Ittihad Al-Islami and Other Terrorists,* March 22, 2002, Ex. 614, CIA_000675-679, the CIA details Al Haramain's extensive support for terror groups in Africa.

> In Africa, HIF maintains a presence in about a dozen countries and supports several extremist groups, particularly Somalia's al-Ittihad al-Islami (AIAI), [REDACTED]. Al-Haramain employees also provide cover and logistic support for al-Qa'ida cells, including those involved in the 1998 U.S. Embassy bombings in Kenya and Tanzania. Most of Al-Haramain's field office directors in East Africa are aware of and support the organization's aid to militant extremists, and at least some top-level officials from HIF's headquarters condone the funding of extremist groups.
>
> ***
>
> **Backing Somalia-Based AIAI** – Al-Haramain's top priority in Africa is supporting the Somali AIAI faction, [REDACTED]. AIAI—designated by the

516

U.S. Government as a foreign terrorist group—seeks to establish an Islamic state in "Greater Somalia" including parts of Ethiopia, Djibouti, and Kenya. HIF offices worldwide collect funds to provide AIAI with financial support to establish Islamic schools, courts, and other institutions in AIAI-influenced territory. HIF has also helped the faction develop its insurgent and terrorist capabilities.

In 2002, HIF arranged travel for AIAI members to Saudi Arabia, probably to help them avoid anticipated U.S. military action in Somalia.
In 2001, HIF provided humanitarian cover for unidentified Arabs traveling to Somalia to train AIAI military recruits, [REDACTED].

In 1999, HIF maintained villas in Somalia used to store explosives and train AIAI members for jihad operations, [REDACTED].

Al-Haramain also supports AIAI from its offices and refugees camps in Kenya.

Ex. 614, CIA_000675-676.

1999.   The CIA report further explains Al Haramain's role in the 1998 U.S. Embassy

bombings and the aid it provided to al Qaeda fighters.

**Providing Cover for al-Qaida** – In addition to its support of African Islamic terrorist groups, Al-Haramain's field offices in Tanzania and Kenya have aided al-Qa'ida cells, including those responsible for the 1998 U.S. Embassy bombings.

In 2002, Al-Haramain's office in Tanzania hid 14 extremists—at least some of whom were probably al-Qa'ida fighters fleeing Afghanistan—in the Kiwalani mosque in Dar es Salaam, [REDACTED]. While staying at the mosque, the fighters provided training to local extremists.

In 1998, the Kenyan Government deregistered HIF for providing support to the terrorist cells that planned and carried out the bombing of the US Embassy in Nairobi, [REDACTED]. HIF and other NGOs diverted funds and helped import materials needed to build the bombs.

Ex. 614, CIA_000676.

2000.   The CIA also discloses that Al Haramain's humanitarian activities in Africa were

undertaken with the goal of recruiting young men for jihad.

REDACTED FOR PUBLIC FILING

**Humanitarian, but With a Militant Agenda** – Even Al-Haramain's ostensibly legitimate activities in Africa, such as building mosques and Islamic schools, are undertaken with the goal of creating an environment conducive to militancy.

HIF's limited relief operations and infrastructure construction projects in Africa are targeted to help only Muslim communities and propagate the fundamentalist Salafist brand of Sunni Islam.

HIF's schools, mosques, and publications espouse Salafism's rigid orthodoxy and attack opposing secular and religious—including other Islamic doctrines—[REDACTED]. These efforts complement HIF employees' efforts to recruit young Africans for the jihad against the enemies of Islam.

Ex. 614, CIA_000675.

2001. In *Al-Qa'ida Still Well Positioned to Recruit Terrorists [REDACTED],* July 1, 2002, Ex. 615, CIA_000178-189, the CIA assessed that Al Haramain was also recruiting young men for jihad and terrorist activities in the Balkans region.

In the Balkans, local offices of NGOs such as the World Assembly of Muslim Youth, al-Haramayn, Society for the Revival and Islamic Heritage, and al-Waqf al-Islamiya were actively involved in spotting and assessing suitable terrorist recruits from among young men who seek assistance from humanitarian organizations, [REDACTED].

Ex. 615,CIA_000186.

2002. In an August 28, 2002 CIA report, *Al-Haramain: Support for Extremists and Terrorists [REDACTED]*, Ex. 620, CIA-SUB 0007-19, the CIA provides extensive evidence of Al Haramain's support for Islamic extremists and terrorists, and connections to al Qaeda and other militant groups.

**Ties to al-Qa'ida** – [REDACTED] at least 20 al-Haramain field offices and representatives operating in 50 countries in Africa, Asia, Europe, and North America, as well as its headquarters in Saudi Arabia, appear to be providing financial and logistic support to al-Qa'ida. In some cases, [REDACTED] financial support or collusion in terrorist plots. [REDACTED].

Some of the ties are to key al-Qa'ida officials or ongoing plots.

REDACTED FOR PUBLIC FILING

[REDACTED] November 2001, unspecified al-Haramain officials met with the leadership of Wafa, an NGO with close ties to al-Qaʻida.

[REDACTED] HIF offices in Indonesia and Pakistan support al-Qaʻida and other extremist groups [REDACTED].

Documents seized during SFOR raids in the Balkans [REDACTED] suggest that employees at HIF offices in Albania, Bosnia, Croatia, and Kosovo support al-Qaʻida and affiliated groups. Individuals in each of these offices have been funded by or worked with Bin Ladin, [REDACTED].

Bosnian authorities found e-mails in June 2002 from al-Qaʻida members on computers confiscated from the al-Haramain office in Travnik, Croatia. The e-mails contained instructions to attack an SFOR base in Tuzla, according to press reporting.

Al-Haramain offices in at least five African countries—Comoros Islands, Djibouti, Kenya, Somalia, Tanzania, and probably in Ghana—support al-Qaʻida and affiliated terrorist groups.

[REDACTED] former HIF director in Tanzania Mummar al-Turki Abdul Wahab Dahil helped coordinate involvement in the 1998 US Embassy bombing in that country.

[REDACTED] Dr. Omar Shams Idris, the HIF director in Tanzania, may have provided funds for a possible terrorist attack in Mombasa, Kenya, as of April 2002.

Al-Haramain's Saudi headquarters delivered [REDACTED] cash [REDACTED] to Ramzi ben Mizauni Benfraj, the head of the Tanga, Tanzania office. Mizauni reportedly threw a party in Dar es Salaam to celebrate the 11 September attacks and, as of May, was attempting to gain Tanzanian citizenship illegally through the purchase of false documents.

Elias Ali Noor, a Somali employee of Al-Haramain in Somalia, may have ties to USS Cole suspects, [REDACTED].

Ex. 620, CIA-SUB_0010-11.

2003.   Al Haramain provided financial and logistic support to other terrorist groups, such as al-Ittihad al-Islamiya ("AIAI"), an Islamic terror group in Somalia, HAMAS, and Egyptian Islamic Jihad. Ex. 620, CIA-SUB_0011.

REDACTED FOR PUBLIC FILING

2004.   Al Haramain provided similar support to Islamic extremists and foreign fighters

in Bosnia and Chechnya.

> The HIF in Bosnia during the 1990s funded and supported the foreign *mujahidin*
> battalion in Zenica, transported *mujahidin*, provided logistic and financial support
> for its members, and conducted propaganda activities, [REDACTED].

> [REDACTED] HIF provided about one-third of the total funds being funneled
> from the Persian Gulf to support the Chechen insurgency in the Caucuses.

Ex. 620, CIA-SUB_0012.

2005.   The CIA report provides additional details concerning Al Haramain's activities in

Africa, Asia, and Europe.

> [REDACTED] al-Haramain's top priority in Africa is supporting the AIAI
> faction, [REDACTED]. AIAI—designated by the US Department of Treasury
> under Executive Order 13224 as a foreign terrorist group—seeks to establish an
> Islamic state in "Greater Somalia" including parts of Ethiopia, Djibouti, and
> Kenya. HIF offices worldwide collect funds to provide AIAI financial support to
> establish Islamic schools, courts, and other institutions in AIAI-influenced
> territory. HIF has also helped the faction develop its insurgent and terrorist
> capabilities. [REDACTED]. Ex. 620, CIA-SUB_0017.

> In addition to its support of African Islamic terrorist groups, al-Haramain's field
> offices in Tanzania and Kenya have aided al-Qaʻida cells, including those
> responsible for the 1998 US Embassy bombings. *Id.*

> Al-Haramain also misuses its status as a charitable organization to fund Islamist
> political parties and civic groups in East African countries—including Tanzania,
> Djibouti, and Comoros Islands. In some instances, the funding extends to
> supporting sectarian violence, [REDACTED]. Ex. 620, CIA-SUB_0018.

> Al-Haramain uses its presence in Indonesia to support extremist groups and is
> poised for expansion in the region. [REDACTED]. *Id.*

> [REDACTED] Ahmad al-Amoudi—the Jakarta office director who served tours
> for al-Haramain in Pakistan, Bangladesh, and Azerbaijan in the 1990s—may have
> been involved in *mujahidin* recruitment. *Id.*

> [REDACTED] al-Amoudi met [REDACTED] with Jafar Umar Thalib, leader of
> the Indonesian extremist group Laskar Jihad; al-Amoudi also noted that al-
> Haramain was working with Thalib on several ongoing "projects." *Id.*

520

REDACTED FOR PUBLIC FILING

Al-Haramain has built 25 mosques and schools in Indonesia and asserted control over mosque leadership positions to radicalize the local population. *Id.*

[REDACTED] funds were transferred from an HIF headquarters account in Saudi Arabia at al-Rajhi bank to an al-Ansar Welfare Trust in Kashmir. [REDACTED] al-Ansar Welfare Trust is a front for Lashkar-e-Tayyiba (LT) and Tehrik ul-Mujandin, which have been listed by the United States as terrorist groups. Id. [REDACTED] individuals in the HIF offices in the Balkans are supporting extremist groups. *Id.*

Employees at HIF offices in Albania, Bosnia, Croatia, and Kosovo have been funded by or have acted on behalf of Usama Bin Ladin, [REDACTED]. *Id.* Employees at al-Haramain have a long history of supporting the Chechens and foreign *mujihidin* movement … an al-Haramain employee, provided funds and supplies to Chechen *mujahidin* leaders. including several individuals tied to al-Qa'ida. Ex. 620, CIA-SUB_0019.

[REDACTED] al-Haramain officials have couriered funds to Chechnya for both World Assembly for Muslim Youth and the International Islamic Relief Organization. *Id.*

2006. A November 14, 2002 CIA report, *Saudi-Based Financial Support for Terrorist Organizations [REDACTED],* Ex. 609, CIA_000143-158, indicates that an Al Haramain official served on a committee of Jemaah Islamiyah, an al Qaeda linked terrorist group in Indonesia, dedicated to funding the training of jihadists and amassing weapons to wage a religious war that will create an Islamic state in Indonesia. Ex. 609, CIA_000152.

2007. More recent intelligence reporting by the U.S. government, declassified and released pursuant to Executive Order 14040, further reinforces the findings of U.S. and international investigations that Al Haramain's support for Osama bin Laden and al Qaeda was essential to al Qaeda's development into a sophisticated terrorist organization capable of attacking the United States on September 11, 2001.

2008. For instance, a July 23, 2021 FBI report, Connections to the *Attacks of September 11, 2001*, Ex. 2, 3478-3608, asserts the following about Al Haramain.

REDACTED FOR PUBLIC FILING

Alharamain foundation is a Saudi Arabian Islamic "NGO" or "charity" who had multiple offices worldwide designated as terrorist supporting entities by the United States for their support of AQ related groups. Within the U.S. the Alharamain office was located in Portland, Oregon and was later specifically designated along with its primary operator Suliman Albouthe.

The Al Haramayn or Al Haramain Islamic Foundation (AIF) has been reported as a Saudi Arabian funded Islamic charitable organization that distributes books, video/cassette tapes and leaflets which espouse radical Islamic thoughts. AIF has been utilized as a front organization for supporting and facilitating the movement of Islamic Mujahadin into areas of Kosovo, Chechnya, Pakistan, Afghanistan and Bosnia. [REDACTED].

In [REDACTED] is identified as [REDACTED] of the Al Haramain Foundation. It is further stated in [REDACTED] that "an African chapter of the Jeddah, based group was identified in a 1999 State Department report as one of the suspect terrorist groups operating in Nairobi, Kenya, before the bombing of the U.S. Embassy there in 1998.

Ex. 2, 3567-3568.

2009.   Al Haramain is also linked to various members of the Sunni-Wahhabi extremist network established in the United States by the Saudi government to provide material support to the September 11 hijackers.

2010.   Omar Abdi Mohamed (a/k/a Omar al Khateeb), an employee of the Ministry of Islamic Affairs, established the Western Somali Relief Organization ("WSRO") in San Diego, CA, which he allegedly used to launder money for charities associated with al Qaeda. According to the U.S. government, Mohamed "has been specifically 'tasked' by the Saudi Arabian government in intelligence gathering missions in his employment as a 'propagator' for that government" and "received over $100,000 as payment for his employment." Ex. 616, *In the Matter of Omar Abdi Mohamed – Government Response to Respondent's Brief in Support of Bond*, ECF No. 3930-1, pp. 2, 4; *see also* p. 7 (stating that Mohamed "also received $5,000 from

REDACTED FOR PUBLIC FILING

the Al-Haramain Foundation"). Abdi Mohamed's activities during this relevant time period were supervised and directed by Fahad al Thumairy. *See* Ex. 382, DOJ 0010.

2011.   Abdullah Al Jaithen, an official from the Ministry of Islamic Affairs in Saudi Arabia, traveled to Los Angeles, CA in December 1999 and met with Omar Al Bayoumi and Fahad al Thumairy, just weeks prior to the arrival of 9/11 hijackers Nawaf Al Hazmi and Khalid Al Mihdhar in the United States on January 15, 2000 at the Los Angeles International Airport. Ex. 468, FBI 000238-REV2021. "A review of Bayoumi's telephone book showed an entry for Dr. Abdullah Al Joaithen, with the numbers ▇▇ 0877 and C (cell) ▇▇4240." Ex. 586, FBI report, Encore Investigation Update, Review and Analysis: Interview [REDACTED] (Nov. 2015), p. 9. "Additional analysis of '▇▇0877' yielded information from another government service reporting "Dr. 'Abdallah Al-Juhayn ▇▇0877' was found on a confiscated hard drive from an October 6, 2001 raid on the Al-Harramayan [a Tier 1 Terrorist Support Entity' offices in [REDACTED]." *Id.* at 10.

### B.  Muslim World League

2012.   Established by the Kingdom of Saudi Arabia in 1962, the Muslim World League ("MWL") has for years served as an important instrument through which the Saudi government has propagated Wahhabi Islam throughout the Islamic world, providing it and other Saudi-based da'wah organizations with extensive funding and resources in support of that objective. Ex. 2, 3478-3608 at 3541-3542, FBI report, *Connections to the Attacks of September 11, 2001*, July 23, 2021 ("Many of these charities were known to have supported AQ and related groups both financially and operationally throughout the world. MWL was the organization under which the International Islamic Relief Organization (IIRO) and others such as World Assembly of Muslim Youth (WAMY) operated at an international level."). *See also* Ex. 2, 3414-3442 at 3436,

523

REDACTED FOR PUBLIC FILING

*Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States*, December 2004 (stating that Saudi Arabia used the MWL "to spread Wahhabi ideology throughout the world").

2013. The MWL is a controlled agent and alter-ego of the Kingdom of Saudi Arabia. Deposition testimony and documents produced in the MDL litigation demonstrate that the Kingdom (the Saudi king) appoints MWL leadership (who are themselves high-ranking government officials with years of service to the Kingdom), provides the MWL with nearly all of its funding, and oversees and directs the MWL's operations and activities in accordance with the policies of the Saudi government.

2014. Senior officials of the MWL have acknowledged that the MWL receives virtually all of its funding from the Saudi government. Dr. Abdullah al Turki, who served as Secretary General of the MWL from approximately 2000 through 2016, acknowledged that the MWL received 80,000,000.00 Saudi riyals ("SR") annually from the Saudi government. Ex. 97, Turki Dep. 223:19-224:11; Ex. 617, Turki Exhibit 44 (MWL Secretariat General report indicating the MWL received an annual 80,000,000.00 subsidy from the Saudi government). *See also* Ex. 97, Turki Dep. 91:4-23 (confirming that the Saudi government provided funding for the MWL).

2015. The CIA has also assessed that the MWL "is funded exclusively by the Saudi government and has served as an umbrella for other Saudi-based NGOs." Ex. 613, CIA_000210-236, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999.

2016. The Ministry of Defense and Aviation has also financed the activities of the MWL and International Islamic Relief Organization. Ex. 2, 3478-3608 at 3580-3581, FBI report, *Connections to the Attacks of September 11, 2001,* July 23, 2021.

REDACTED FOR PUBLIC FILING

2017.   Dr. Abdullah al Turki further testified that as Secretary General of the MWL, he and other officials of the MWL were issued Saudi diplomatic passports for travel outside of the Kingdom in support of MWL activities. Ex. 97, Turki Dep. 75:5-76:21; *see also* p. 79:4-12 (Turki asked the Saudi king to grant diplomatic passports for seven officials of the MWL). Ex. 618, Transcript, September 17, 2018 Deposition of Dr. Abdullah al Obaid (Obaid Dep.) 120:10-123:9 (Dr. Obaid traveled with a diplomatic passport during his tenure as MWL Secretary General.); Ex. 618, Obaid Dep. 174:19-175:3 (testifying that former MWL Secretary General Abdullah Omar Naseef submitted requests to the Saudi government to issue diplomatic passports to representatives of the MWL).

2018.   Dr. Abdullah al Obaid, who served as Secretary General of the MWL from 1995 through 2000, testified that King Fahd bin Abdul Aziz al Saud nominated him for the Secretary General position. Ex. 618, Obaid Dep. 26:5-23 (when asked who nominated him to serve as Secretary General of the MWL, Obaid responded "the Saudi government, King Fahd.").

2019.   During his tenure as MWL Secretary General, Dr. Obaid testified that he simultaneously served as a member of the Supreme Council of Islamic Affairs, which has the "responsibility for Saudi Arabia's Islamic policies in other countries." Ex. 618, Obaid Dep. 27:5-28:14; Ex. 621, ¶ 5 (Obaid Dep. Ex. 55). In particular, the Supreme Council for Islamic Affairs makes recommendations to the Saudi government concerning the provision of financial support to Islamic organizations operating outside of the Kingdom. Ex. 618, Obaid Dep. 37:6-24. *See also* Ex. 622, at ¶ 8 (Turki Dep. Ex. 45 (describing the Supreme Council of Islamic Affairs as "an arm of the government of Saudi Arabia, which carries out part of the foreign policy of the Kingdom"). As a member of the Supreme Council of Islamic Affairs, "an arm of the government

REDACTED FOR PUBLIC FILING

of Saudi Arabia," Dr. Obaid oversaw and directed the activities of the MWL in support of the foreign policies of the Kingdom.

2020.   Dr. Obaid confirmed that the MWL received 80,000,000.00 SR annually from the Saudi government, acknowledging that the annual grant was "the principal source of funding for the Muslim World League." Ex. 618, Obaid Dep. 133:9-13. Obaid testified that the 80,000,000.00 SR was "everything to the League," and indicated that any other sources of money received by the MWL were de minimus. *Id.* 133:9-134:12.

2021.   Dr. Obaid additionally confirmed that the MWL had received more than 5 billion SR from the Saudi government since it was established. Ex. 618, Obaid Dep. 135:11-137:14; Ex. 623, (Obaid Dep. Ex. 59. *See also* Ex. 624, Expert Report of Dr. Matthew Levitt, March 9, 2020, p. 30 ("David Aufhauser, former General Counsel at the U.S. Treasury Department, stated in Congressional testimony to the Senate Committee on Homeland Security and Governmental Affairs, that by some estimates … Saudi funding for the MWL had exceeded $75 billion.").

2022.   Consistent with the Kingdom's obligation to spread Wahhabi doctrine and practice across the globe, the MWL has for many years published and distributed numerous booklets, newsletters, and periodicals in multiple languages, including English and Arabic, that have focused on the proselytization of Saudi Arabia's (and al Qaeda's) Wahhabi Islamist ideology. In this respect, the MWL publications have promoted a hardline Wahhabi creed, including overt support for violent jihad and calling on Muslims to "commit to sacrificing their souls, money, family members, and children for the sake of Allah." Ex. 150B, Kohlmann 2020 Rpt. ¶¶ 36 and 42.

2023.   For instance, in the September 1981 edition of The Muslim World League Journal, Ex. 625, an article titled *Rabita-Sponsored Auqaf Conference Resolutions,* pp. 59-64,

REDACTED FOR PUBLIC FILING

reports on the MWL's third annual conference held jointly with the Ministers of Auqaf and Islamic Affairs in Mecca, Saudi Arbia. The participants in the conference adopted multiple resolutions memorialized in writing by the MWL, including calling on "Muslim countries to promote the spirit of Jihad in the Muslim armies, determine ways and means of coordinating among themselves in the field of joint military industries, so that the Muslim Ummah may be able to defend itself against any aggression." According to the MWL:

> The Conference appeals to all Islamic governments to prepare all sections of the Ummah for Jihad, with special reference to the youth who must be given special training in Jihad in all its aspects, i.e. Jihad through self-sacrifice, sacrifice of property and life. To achieve this aim, scientific methods should be adopted and applied with the help of experts in this field.

> The Conference appeals to all Islamic governments to extend assistance and support to Ulema and teachers so as to enable them to play an effective role in mobilizing the Ummah for Jihad and to lead the Ummah back to the fold of Allah through wisdom and good exhortation.

> Appeals to all Muslim countries to establish training camps for Mujahideen in countries that are capable of organizing these camps. Camps belonging to the Palestine Liberation Organization and other Islamic Jihad organizations may be utilized in this regard and Muslim youth exhorted upon to join these camps which should be provided with adequate number of qualified Dawah workers for religious orientation and guidance.

> *** 

> Appeals to Muslim countries to encourage preparation of in-depth studies on Jihad and other Islamic military theories as a comparative study with modern military system. Military terminology must be unified so also the methods of military training and coordination in all Muslim countries. This factor is indispensable for a unified Islamic Jihad.

> ***

> Appeals to Islamic countries to extend their support to Muslim "Mujahideen" who are struggling against colonialism, aggression, and tyranny and also to provide them with all that may be required to help in achieving their Islamic goals through every possible and legitimate means. Special emphasis should be given to

REDACTED FOR PUBLIC FILING

Mujahideen in Palestine, Afghanistan, Western Somalia, Eritrea, Moro, Patani,
etc., etc.
Appeals to Islamic countries to intensify mass-media programmes on the
obligation of Jihad and its methods. Efforts should also be made by the mass-
media to highlight the activities of the Mujahideen.

Ex. 625, pp. 62-63.

2024.  In the July/August 1991 edition of The Muslim World League Journal, Ex. 626,

an article titled *Jihad With Money in the Way of Allah, see* pp. 62-63, the author explains that the

participation in jihad with one's wealth and one's life is essential to the teachings of Islam.

This doctrine of "Jihad" is characterized by its clear objective, which is "for God"
and "for upholding the word of God".... Jihad with wealth and lives is
emphasized in the Holy Qur'an and Hadith (Tradition) (quoting verses).

\*\*\*

It is thus quite clear that Jihad with one's wealth and with one's life is an essential
part of the teachings of Islam. Yet Jihad with one's wealth "takes precedence"
over Jihad with life in several verses of the Holy Qur'an, calling the Believers to
Jihad, because of finance being indispensable for supplying the army with its
needs (and on many occasions its requirements may far exceed its demand for
manpower). Hence, in view of the unlimited material needs of war, a person may
contribute money towards Jihad if he does not personally join it for reasons of
physical weakness, illness or distance from the scene of confrontation with the
enemy.

\*\*\*

Since Jihad with wealth and life is an obligatory duty, the believers will respond
to the call to Jihad by offering their wealth and lives and will not take leave from
performing what is incumbent on them by virtue of their faith.

Ex. 626, pp. 62-63.

2025.  In the June 29, 1992 edition of the Al Alam Al Islami, an Arabic publication of

the MWL, Ex. 627, an article titled *The Lessons to be Learned from the Immigration of the*

*Prophet*, authored by Sheikh Abdullah al Aqeel who served as the MWL Deputy Secretary

General and the Secretary General of the MWL Supreme Mosque Council, also calls on Muslims

528

REDACTED FOR PUBLIC FILING

to "commit to sacrificing their souls, money, family members, and children for the sake of Allah."

2026. Just a month later, in the August 31, 1992 edition of the Al Alam Al Islami, the MWL acknowledged the role it and other Saudi charities played in providing weapons and ammunition in support of the jihad during Soviet-Afghan conflict. *See More than a Million and a Half a Million of Martyrs and Thousands of Widows are the Price of Victory in Afghanistan*, Ex. 628:

> Through the Saudi Red Crescent, the Islamic Relief Organization, and the Muslim World League, the government and people of Saudi Arabia provided in-kind and financial support to the Afghani mujahideen, purchased arms and ammunition, and paid the costs of transporting them even inside Afghanistan.

2027. The February 1994 edition of The Muslim World League, Ex. 629, in an article titled *Child Upbringing in Islam, see* pp. 30-34, advocates for children participating in jihad.

> A child should be made to be aware that participating in Jihad is worship in itself and running away from the battle field is a great sin. Taking part in the battle fought in Allah's cause can be done by sacrificing one's life and wealth.

Ex. 629, p. 34. *See also* Ex. 629, *Palestine: The Blessed Land*, pp. 40-43 at 43 ("When the enemy occupies the land of Islam, Jihad becomes obligatory on every Muslim.").

2028. In the November 2, 1992 edition of the Al Alam Al Islami, Ex. 631, an article titled *Calling For Their Victory in Their Jihad Against the Serbs: Bin Baz Called to the Islamic Governments and Peoples to Support the Muslims in Bosnia and Herzegovina*, Sheikh Abdul Aziz bin Baz, Grand Mufti of the Kingdom of Saudi Arabia and Chairman of the Councils of the Muslim World League in Mecca, calls for all Islamic governments and Muslims around the world "to support Muslims in Bosnia and Herzegovina so that they are enabled to strike their enemy, the Serbs, and their enemy's supporters with men, money, arms, and supplication."

REDACTED FOR PUBLIC FILING

> There are so many verses and hadiths about the obligation of exercising Jihad
> against the enemies and about supporting the oppressed. It is the duty of all
> Islamic governments and peoples to support the oppressed with men, arms,
> money, and supplication as much as possible.

2029.   Sheikh Abdul Aziz bin Baz issued a similar call in 1994 for money and arms for

Bosnian Muslims. See the January 1994 edition of The Muslim World League Journal, Ex. 632,

*Bosnia Issue Top of the Agenda, GCC Summit, MWL Meeting and Bosnia Solidarity Day*, pp. 17-

20 at 19 ("A similar appeal was made by Sheikh Abdul Aziz bin Baz, Chairman of the 60

member MWL Constituent Assembly. It is the duty of Muslims to support the Bosnian Muslims

with arms, money, and whatever they can provide, he said.").

2030.   In the September 1995 edition of The Muslim World League Journal, Ex. 633,

*Latest Developments in Bosnia, Croatia's Stunning Success and its Implication,* pp. 26-31, a

MWL spokesman echoed Sheikh Abdul Aziz bin Baz's call to help the Muslims of Bosnia-

Herzegovina with money and arms.

> A spokesman of the MWL called on the Muslim states to rush to the support of
> the Bosnia people who were facing single-handed the barbaric Serb aggression
> abandoned by the world and its organizations to receive the barbaric bloody blows
> alone from the Serb aggressors. It supported the call of Shaikh Abdul Aziz bin
> Baz, Chief Mufti of Saudi Arabia, urging the Muslims to back the Bosnian people
> with whatever means they can by way of money, arms and prayers.

Ex. 633, p. 27.

2031.   In the August-September 1993 edition of Al Alam Al Islami, Ex. 634, *Imam of*

*Holy Haram Calls for Assistance to Kashmiris*, the MWL called on the Islamic world to provide

all out support to the Muslims in Kashmir. "The Muslims should supply the Kashmiris with

material and moral support, including money, military hardware and men in order to protect

themselves against the heretic Indian occupation and regain all their legitimate rights." *Id.*

REDACTED FOR PUBLIC FILING

2032. Finally, the MWL maintains a subsidiary organization known as the "Fiqh Council," which was established in 1977 by the MWL Constituent Council. Overseen by the Secretary General of the MWL, the Fiqh Council is comprised of Sunni clerics who are responsible for parsing religious rulings and issuing resolutions and recommendations. Like the MWL Journal and the Al Alam Al Islami publications, the MWL Fiqh Council has also endorsed both the concept of armed jihad generally, as well as specifically the obligation to support armed fighters with financial support through charitable channels. Ex. 150B, Kohlmann 2020 Rpt. ¶ 49.

2033. The Fiqh Council's *Fourth Resolution on Collection and Distribution of Zakah and Oshr in Pakistan*, Ex. 635, admonishes readers to carry out "armed jihad" in the face of an "ideological and intellectual onslaught by athiests, Jews, Christians, and other enemies… It is the duty of Muslims as well to confront them with the same arms and equipments that are used against Islam… Since the purpose of armed Jihad is to raise the word of Almighty Allah high as this purpose is achieved through fighting in the cause of Allah, it is also achieved through the work of Da'wah to the religion of Almighty Allah, and preparation of preachers and their assistance in order to carry out their mission, so both words would be considered as Jihad."

2034. Other MWL Fiqh Council resolutions emphasize the importance of aiding refugees who "so that Mujahideen are assured that their families behind them are not lost and they can continue their Jihad with strength and steadfastness. No doubt, any disturbance or weakness on this front will have a damaging impact of Jihad." *See* the Fiqh Council's *Seventh Resolution on Payment of Zakah's Portion of Mujahideen for Their Education, Health and Media Projects*, Ex. 636.

2035. The United States-based operations of the MWL have been a target of FBI investigations for the MWL's links to al Qaeda and Hamas, advocacy of jihad, and connections

REDACTED FOR PUBLIC FILING

to Saudi intelligence and members of the Sunni-Wahhabi extremist network established in the United States by the Saudi government to provide material support to the September 11 hijackers upon their arrival in the U.S.

2036. A telephone directory from the Saudi Embassy in Washington, D.C. obtained by the FBI in 2002 lists the New York office of the MWL as one of its "additional offices under the title 'Saudi Arabian Offices:' Muslim World League (MWL), 134 26th Street, New York NY." Ex. 2, EO 3478-3608 at 3532-3533, FBI report, *Connections to the Attacks of September 11, 2001*, July 23, 2021.

2037. The registered president of the MWL in the United States was Abdullah al Noshan. Noshan is connected through monetary transactions and telephone calls to an FBI subject in Kentucky whose name, address, and telephone number were found in an al Qaeda safehouse in Karachi. Ex. 2, 3414-3442 at 3437, *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States*, December 2004.

2038. Noshan was also associated with the Saudi government funded Institute of Islamic and Arabic Sciences of America ("IIASA") in the United States. Ex. 2, EO 3478-3608 at 3536, FBI report, *Connections to the Attacks of September 11, 2001*, July 23, 2021. IIASA, which received financial support from Ambassador Bandar bin Sultan bin Abdul Aziz al Saud and the Saudi Embassy in Washington, D.C., operated as a satellite campus of the Al Imam Muhammad Ibn Saud University in Riyadh, Saudi Arabia ("Imam University"). *Id.* at 3534 (stating that "IIASA was one of the many pieces of Saudi proselytizing activity in the U.S.").

2039. According to the FBI, IIASA "maintains links to suspected terrorist organizations and their supporters," Ex. 2, EO 3414-3442 at 3437, and individuals that worked at IIASA were "recruiting individuals into extremist views." Ex. 2, EO 3478-3608 at 3535.

REDACTED FOR PUBLIC FILING

2040.   During a search of MWL's office space in New York in 2005, the FBI discovered a document titled *First Annual Ijtima of Mujahideen and Jhaad Conference*, dated 1991. This document was from Tehreek-E-Jihaad, Sherpur House, Karachi, Pakistan, and included sign-up sheets. The conference was: "To publicize Jihad on an international and inter-Islamic level." Ex. 2, EO 3478-3608 at 3542, FBI report, *Connections to the Attacks of September 11, 2001*, July 23, 2021. *See id.* at 3565-3566 (indicating that the MWL office in Falls Church, VA is also home to several Hamas front organizations).

2041.   According to the FBI, Noshan was an associate of Musaed Al Jarrah from the Ministry of Islamic Affairs division in the Saudi Embassy in Washington, D.C. Ex. 2, EO 3478-3608 at 3542. Jarrah was a known Saudi intelligence officer in the Islamic Affairs division, *id.* at 3488, and "provided substantial assistance to 9/11 hijackers Nawaf al-Hazmi and Khalid al-Midhar during their time in California, prior to the attacks" along with Fahad al Thumairy and Omar al Bayoumi. Ex. 607, 2012 FBI Summary Report at pp. 3-4 (ECF No. 6292-1).

2042.   Noshan was observed by FBI surveillance acting in a manner consistent with a foreign intelligence officer. Ex. 2, EO 3414-3442 at 3437. *See also id.* at 3487 ("One of the roles of the Islamic Affairs office was to provide intelligence on local Islamic populations and to provide cover for the movement of [REDACTED]. Saudi Arabian 'non-governmental organizations' (NGO), i.e. 'charities', supplemented this activity with large funding streams as well as cover for personnel.").

2043.   CIA reporting released pursuant to Executive Order 14040 provides additional details concerning the MWL's support for Osama bin Laden and al Qaeda while acting as an arm of the Saudi government.

REDACTED FOR PUBLIC FILING

2044. For instance, in the CIA report, *Sketch of a South Asia-Based Terrorist Training and Logistic Network [REDACTED],* Ex. 637, CIA_000058-62 at 60, the CIA states that "the MAK [Maktab al-Khidmat] is funded by the Saudi-based Muslim World League and International Islamic Relief Organization, the Muwafaq Foundation, and Saudi-born financier Usama Bin Ladin." MAK, also known as the "Bureau of Services," was established by Osama bin Laden and Abdullah Azzam to provide logistical support to mujahideen forces in Afghanistan and channel recruits into the country during the Soviet-Afghan conflict. *See* 9/11 Commission Final Report at pp. 56, 434.

2045. A November 14, 2002 CIA report, *Saudi-Based Financial Support for Terrorist Organizations [REDACTED]*, Ex. 609, CIA_000143-158, indicates that al Qaeda members Wa'el Hamza Jelaidan and Mohammed Jamal Khalifa served in official roles with the MWL.

> Some reporting indicated the MWL is the parent organization of the International Islamic Relief Organization (IIRO) and the World Assembly of Muslim Youth (WAMY), is affiliated with more than a dozen other NGOs worldwide, and has its own offices in more than 30 countries. Several of Bin Ladin's associates, including Wa'il Julaydan and Muhammad Jamal Khalifah, were MWL representatives, according to [REDACTED] press reporting. [REDACTED] funds destined for al-Ittihad al-Islamiyya (AIAI) in Somalia were funneled through several Saudi NGOs, including MWL.

Ex. 609, CIA_000150.

2046. In another CIA report, *Islamic Terrorists: Using Nongovernmental Organizations Extensively,* April 9, 1999, Ex. 613, CIA_000210-236, the CIA describes the resources that da'wah organizations like the MWL can provide to a terrorist organization.

> The availability of funds, cover, and logistics networks makes NGOs an appealing resource for terrorist groups. NGOs typically are awash in money – the Muslim World League's budget is more than $26 million annually, and the annual budget of the International Islamic Relief Organization has never dipped below $50 million – and tapping into the funds offers terrorist some independence from traditional state sponsors, who often attempt to control such groups for their own

REDACTED FOR PUBLIC FILING

purposes. The logistical support NGOs offer includes cover employment, false documentation, travel facilitation, training, and in some cases, weapons.

Ex. 613, CIA_000210.

2047. In the CIA report, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED],* October 18, 2001, Ex. 638, CIA_000500-563, the CIA describes how al Qaeda member Wa'el Hamza Jelaidan used his high-ranking positions in the Saudi da'wah organizations like the MWL and IIRO to divert money to al Qaeda.

> Wa'el Hama A. Julaydan. Longtime Bin Ladin associate and IFTSC senior official Wa'el Hamza Julaydan (alias Abu Hasan al-Madani), a veteran of the Islamic charity circuit, has held high-level positions at the International Islamic Relief Organization (IIRO), Muslim World League (MWL), the Saudi Joint Relief Committee (SJRC), the Saudi Red Crescent Society (SRCS), and lately at two Bin Ladin-affiliated charities, al-Waqf al-Islami, and as secretary general of Rabita Trust coordinating financial activities and overseeing the budget. Julaydan has provided support since the 1990s to Muslims in Bosnia and Chechnya – hotbeds of mujahidin activity – and may be using his position and influence at these organizations to divert funds and resources to al-Qa'ida.

Ex. 638, CIA_000544.

2048. Lastly, in *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact [REDACTED]*, January 11, 1999, Ex. 79, CIA_000807-848 at 823, the CIA assessed that the MWL was "used as a cover organization for several of Usama's associates: [REDACTED]."

2049. Dr. Matthew Levitt, a former counterterrorism intelligence analyst with the FBI and Deputy Assistant Secretary for Intelligence and Analysis at the Department of the Treasury, has offered additional details concerning the MWL's material and financial support for Osama bin Laden, Islamic militants, and terror organizations around the globe.

- According to an unclassified CIA document released in 1996, the MWL has been tied to supporting a variety of terrorist groups. This report stated that the head of the MWL office in Pakistan supplied Muslim World League documentation and arms to Afghani and Tajik militants.

REDACTED FOR PUBLIC FILING

- The Somali terrorist group Al Itihaad Al Islaami, designated under Executive Order 13224, derived part of its revenue from the MWL and its subsidiary, the IIRO.

- The MWL has sent cash to Islamic guerillas in the Philippines.

- Osama bin Laden himself covertly funded several terrorist organizations through the MWL.

- The MWL also provided non-financial material support such as arms and documents to "militants in Afghanistan and Tajikistan," according to a CIA report.

Ex. 624, Expert Report of Dr. Matthew Levitt, March 9, 2020, pp. 31-32.

2050. The MWL was directly responsible for and involved in the establishment of the Rabita Trust for the Repatriation of the Pakistanis Stranded in Bangladesh ("Rabita Trust"), which was designated as an Executive Order 13224 Specially Designated Global Terrorist ("SDGT") entity by the U.S. government immediately following the September 11 attacks. Ex. 150B, Kohlmann 2020 Rpt. ¶¶50, 51, 57.

2051. Documents produced in this litigation by defendants MWL, IIRO, and Wa'el Hamza Jelaidan make clear that the MWL appointed senior MWL and IIRO officials to serve as Rabita Trust's corporate officers and Board of Trustees, held significant oversight and control over Rabita Trust's operations and activities, and exerted executive authority over Rabita Trust's leaders, including Jelaidan, an Executive Order 13224 designee. *Id.* at ¶ 51.

2052. The founding "deed" of the Rabita Trust indicates that the initial Board of Trustees for the organization included: Saudi Prince Talal bin Abdul Aziz al Saud (Co-Chairman), MWL Secretary General Dr. Abdullah Omar Naseef (Vice-Chairman), and MWL Assistant Secretary General Syed Amin Aqeel Attas (Director General). An amendment in March 2000 included MWL Secretary General Dr. Abdullah bin Saleh al Obaid and International

536

REDACTED FOR PUBLIC FILING

Islamic Relief Organization (IIRO) Secretary General Dr. Adnan Khalil Basha to leadership roles. *Id.* at ¶ 52.

2053.   An October 14, 2000 letter issued on Rabita Trust letterhead lists the following individuals as board members of the organization: Prince Talal bin Abdul Aziz al Saud (Co-Chairman), MWL Secretary General Dr. Abdullah bin Saleh al Obaid (Vice Chairman), Wa'el Jelaidan (Director General), IIRO Secretary General Dr. Adnan Khalil Basha, IIRO Eastern Province office Supervisor General Prince Turki bin Fahd bin Jalawy al Saud, and MWL Riyadh Office chief Mohammed bin Abdallah al Dubaiban. *Id.* at ¶ 53.

2054.   Jelaidan's resume, produced in this litigation, acknowledges in 1992 becoming a "Project Director of the Rabita Trust... As a Project Director, I supervised the construction of 1000 residential units in the province of Punjab." According to Jelaidan's account, "in 1998, I was appointed as the Secretary General of the Rabita Trust by the Muslim World League." In February 2000, Jelaidan was appointed to the Rabita Trust Board of Trustees. *Id.* at ¶ 54.

2055.   Rabita Trust and its employees operated out of the MWL's office in Mecca, Saudi Arabia and the MWL's branch office in Pakistan. For instance, an October 29, 1992 letter concerning a Rabita Trust office in Lahore is addressed to "*Mr. Wa'el H. Jelaidan, Project Director, Rabita Trust, Muslim World League, H-8/1, Islamabad.*" A December 29, 1997 letter co-authored by MWL Secretary General Abdullah al Obaid on Rabita Trust letterhead identifies Rabita Trust offices operating from the MWL offices in Mecca, Saudi Arabia and Islamabad, Pakistan: *Makkah Office: c/o Muslim World League, P.O. Box 537, Makkah; and Islamabad Office: c/o Muslim World League, H-8/1, Islamabad.* Finally, a series of letters dated October 22, 2001 letter concerning Rabita Trust account balances are addressed to "*The Secretary General,*

REDACTED FOR PUBLIC FILING

*Rabita Trust for Stranded Pakistanis, World Muslim League, P.O. Box 1030, Makkah Al Mukrmah, Saudi Arabia.*" *Id.* at ¶ 55.

2056. Rabita Trust and its employees also operated out of the IIRO's branch office in Islamabad, Pakistan. A series of letters dated October 11, 2001 concerning Rabita Trust are addressed to "*Mr. Rahmat Ullah Nazir Kahn, Project Director, Rabita Trust for Rehabilitation of Stranded Pakistanis, Pitrus Bokari Road, H-8/1, Islamabad.*" An October 12, 2001 letter authored by Mr. Khan in his capacity as the office director of the IIRO branch office in Islamabad identifies the same address as "*H-8/1 - Pitrus Bokari Road.*" *Id.* at ¶ 56.

2057. On October 12, 2001, the U.S. government designated Rabita Trust as a SDGT "for its close ties to senior al Qaida leadership and for providing logistical and financial support to al Qaida." *Id.* at ¶ 57. *See also* ¶¶ 58-62 (explaining Rabita Trust's coordinated efforts to limit its exposure following the September 11 attacks).

2058. The MWL and its senior leadership also played key roles in facilitating the activities of another Executive Order 13224 SDGT known as the Al Haramain Al Masjed Al Aqsa Foundation, which the MWL acknowledged in its 2002 annual report was founded in 1990 and "started its activities under the banner of the Muslim World League in 1419 AH" [corresponding to 1998]. *Id.* at ¶ 64.

2059. Officials of Al Haramain Al Masjed Al Aqsa Foundation simultaneously served as members of IIRO's Board of Directors. Minutes of the 8th Session of the IIRO's Board of Directors held on May 27, 2001 indicate that Al Haramain Al Masjed Al Aqsa Foundation officials Mohammed bin Abdullah al Debyban and Mohammed bin Abdullah Taibah were IIRO board members along with IIRO Secretary General Adnan Basha. Debyban and Taibah were also

538

REDACTED FOR PUBLIC FILING

serving as IIRO board members in 1999, as indicated in the Minutes of the 2nd Meeting of the IIRO Board of Directors held on May 8, 1999. *Id.* at ¶ 65.

2060.   An undated organizational chart of the MWL lists six key sub-entities within the MWL umbrella that report directly to the MWL Secretary General, including the Al Haramain Al Masjed Al Aqsa Foundation. *Id.* at ¶ 66.

2061.   In May 2004, the U.S. government designated Al Haramain Al Masjed Al Aqsa Foundation pursuant to Executive Order 13224 for "funneling dollars to Al-Qaida." According to the Treasury Department:

> The Al-Haramain & Al Masjed Al-Aqsa Charity Foundation (AHAMAA) has significant financial ties to the Bosnia-based NGO Al Furqan, and al Qaida financier Wael Hamza Julaidan… As a member of the Board of Directors for AHAMAA, Julaidan opened three bank accounts on behalf of the NGO between 1997 and 2001 and continued to have authorization to handle two of their accounts as a signatory on two the NGO's Bosnian accounts.

*Id.* at ¶ 67.

### C.  International Islamic Relief Organization

2062.   Defendant International Islamic Relief Organization ("IIRO"), a subsidiary body of the Muslim World League ("MWL") and an agent and alter ego of the Saudi government, was similarly used as an instrument by the Saudi government to spread Wahhabi-Salafi Islam. Ex. 618, Obaid Dep. 75:9-76:12 (explaining that the IIRO works under the umbrella of the MWL); Ex. 621, ¶ 12 (Obaid Dep. Ex. 55).

2063.   The MWL sought approval from the Saudi government to establish the IIRO in 1978. Ex. 618, at pp. 73:6-74:6. *See also* Ex. 639, p. 5 (Basha Exhibit 134) (stating that Royal Approval No. 4834 was issued on January 29, 1979). The Constitution of the IIRO was later approved during the 35th session of the MWL Constituent Council, the legislating council of the MWL, held between October 7-10, 1997. Ex. 639, p. 5 (Basha Exhibit 134).

REDACTED FOR PUBLIC FILING

2064.   The MWL Secretary General is designated to serve as the Chairman of the IIRO Board of Directors, and also serves as the Chairman of the IIRO General Assembly. Ex. 618, Obaid Dep. 70:12-71:2; *see also* Exs. 640 & 653, Transcript, February 20-21, 2019 Deposition of Adnan Basha (Basha Dep.), 54:1-20, 99:10-21. The Secretary General of the MWL, a position equivalent to that of a Saudi government "minister," is also responsible for nominating individuals to serve as the IIRO Secretary General. Ex. 640, Basha Dep. 100:4-10.

2065.   The IIRO Board of Directors is the highest policy-making body of the IIRO and its decisions are binding upon the executive body. Ex. 639, p. 6 (Basha Exhibit). MWL officials, including the MWL Secretary General, hold a number of seats on the IIRO Board of Directors and directly influence the policies and activities of the IIRO. Ex. 640, Basha Dep. 128:18-130:14. *See also* Ex. 642, (Basha Dep. Ex. 137) (identifying 7 MWL officials serving on the IIRO Board of Directors, including the MWL Secretary General, the Assistant MWL Secretary General, the MWL Director General of Finance and Administration, and four members of the MWL Constituent Council).

2066.   The Council of Ministers, advisors to the Saudi king, also hold seats on the IIRO Board of Directors and exercise control and influence over the IIRO's budget, operations, and activities. Ex. 642, (Basha Dep. Ex. 137) (Sheikh Mostafa bin Mohamed Idris, identified as "Royal Court Advisor, Acting head of the Special Committee of the Council of Ministers," served as an IIRO board member from at least 1998-2001.).

2067.   The IIRO's domestic offices in Saudi Arabia are headed by members of the Saudi Royal Family, who are themselves officials of the Saudi government. Ex. 643, pp. 12-13 (Basha Dep. Ex. 133); Ex. 639, pp. 9-16 (Basha Dep. Ex. 134. As heads of those offices, Saudi Royal Family members directed and supervised the operations and activities of the IIRO, and provided

REDACTED FOR PUBLIC FILING

annual generous donations to the offices. *Id.* at p. 11 (Prince Saud bin Abdul Mohsin contributed 11,000,000.00 SR); *id.* at p. 33 (Prince Sultan bin Abdul Aziz al Saud provided 5,000,000.00 SR to the IIRO office in Somalia, more than half of the total funds earmarked for projects in Somalia that year).

2068.   Prince Sultan provided 500,000.00 SR to the IIRO every six months. Ex. 640, Basha Dep. 78:14-18.

2069.   The IIRO has been clear that the central focus of the organization since its establishment has been Islamic propagation on behalf of the Saudi state. Ex. 644, (Basha Dep. Ex. 138), September 12, 2000 letter from IIRO Secretary General Adnan Basha to the Minister of Islamic Affairs, Saleh al Ash-Sheikh, advising that "*your* Organization, the International Islamic Relief Organization in the Kingdom of Saudi Arabia, has placed at the top of its priorities since its establishment to make the Islamic propagation a central foundation of its activities and a targeted goal of its programs." (Emphasis added).

2070.   Secretary General Basha explains that all of the activities of the IIRO are directly connected to the "propagation mission," including supporting 1,000 propagators in countries around the world.

> Therefore, all the activities of the Organization, such as supporting of the orphans, relief of the affected, sheltering of the refuges, as well as providing health and educational care and seasonal programs, etc., were connected with the propagation mission. This also applies to the Organization's programs of supporting the propagators, which now included about 1,000 propagators in more than 20 countries.

*Id.*

2071.   Secretary General Basha further seeks to coordinate propagation activities with the Ministry of Islamic Affairs, and additionally asserts that all of the IIRO's propagation

REDACTED FOR PUBLIC FILING

activities are properly attributed to the Saudi government. *See id.* (stating that "all of our efforts are attributed to our beloved Kingdom which raised the banner of the Islamic propagation and undertook the propagation duties").

2072.   The Ministry of Islamic Affairs has exercised significant and repeated control over the IIRO's operations and banking activities. Documents produced by the IIRO make clear that (1) Ministry representatives headed IIRO overseas branch offices and held signatory authority over the IIRO's bank accounts in those countries; (2) Ministry representatives chaired committees responsible for supervising the activities of IIRO overseas branch offices; and (3) the IIRO cooperated and coordinated with the Ministry of Islamic Affairs on overseas activities and projects. *See, e.g.,* Ex. 645, (Basha Dep. Ex. 140) (June 2, 2001 administrative notification from IIRO Secretary General Adnan Basha announcing the establishment of a committee to manage the IIRO branch office in Mauritania. The committee members include Ahmad bin Gharm Allah al Zaharani, the supervisor of the Ministry of Islamic Affairs office at the Saudi Embassy in Mauritania, who is given signatory authority over the office's bank account.); Ex. 646, (Basha Dep. Ex. 139) (January 16, 2002 notification from IIRO Secretary General Adnan Basha regarding Administrative Decision No. 185, establishing an executive committee to oversee the activities of the IIRO branch office in Chad. Jalwai Abd al Karim al Ashqar, from the Islamic Affairs office in the Saudi Embassy in Chad, will act as the chairman of the committee and have signatory authority over the IIRO's bank accounts.); Ex. 647, IIRO 35077-35081 (April 2, 2002 meeting minutes discussing a committee established at the request of the Minister of Islamic Affairs for the purpose of distributing a million dollars in aid, donated by the Saudi King, for flood victims in Indonesia. The committee is headed by the Ministry of Islamic Affairs, and members include the representative of the Saudi Embassy in Jakarta, the manager of the Al

REDACTED FOR PUBLIC FILING

Haramain Islamic Foundation branch office in Jakarta, and the manager of the IIRO branch office in Jakarta.); Ex. 648, (Basha Dep. Ex. 145 (January 15, 1999 administrative notice from IIRO Secretary General Adnan Basha announcing that based on the approval of the Minister of Islamic Affairs, Abd as Samd Muhammad al Barada'ei al Ansari will be seconded to the IIRO to serve as the manager of the IIRO branch office in Albania for one year and the Ministry will continue to pay his salary and allowances.); Basha Exhibit 141 at Ex. 649 (September 18, 2001 letter from IIRO Secretary General Basha to Ibrahim bin Mohammed al Habar, the religious affairs attaché at the Saudi Embassy in Addis Ababa, Ethiopia, serving simultaneously as the chairman of the Supervising Committee supervising the IIRO office in Ethiopia. The letter attests to the direct involvement of representatives of the Ministry of Islamic Affairs in the IIRO Ethiopia office and the organization's activities.); Ex. 650, (Basha Dep. Ex. 146) (June 24, 1999 letter from IIRO Secretary General Adnan Basha to Sa'uud bin Abd Allah bin Talib, Advisor and Supervisor for Financial and Administrative Affairs at the Ministry of Islamic Affairs, expressing thanks for the Ministry's cooperation with the IIRO and sending Abd as Samd Muhammad al Barada'ei al Ansari to work as the manager of the IIRO branch office in Albania for one year.).

2073. IIRO overseas branch offices and their employees have also received diplomatic immunity in the host country. Ex. 643, p. 32 (Basha Exhibit 133) ("Some of the external offices of the IIRO enjoy diplomatic immunity and exemption from customs and excise.").

2074. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

REDACTED FOR PUBLIC FILING

██████████████████████████████████

██████████████████████████████████

██████ Those transactions occurred during periods when U.S. intelligence assess that the IIRO was actively supporting al Qaeda, the Taliban, Hamas, Egyptian Islamic Jihad, and affiliated terrorist groups in Southeast Asia such as Abu Sayyaf Group and Jemaah Islamiya, to name a few.

2075.   Newly declassified documents originating from the U.S. Department of the Treasury and the Office of Foreign Assets Control ("OFAC"), released pursuant to Executive Order 14040, detail previously classified evidence relied upon by the U.S. government in support of its determination to designate the IIRO's branch offices in the Philippines and Indonesia, and the IIRO Executive Director of the IIRO's Eastern Province branch, Abd al Hamid Sulaiman al Mujil, as Specially Designated Global Terrorists ("SDGTs") pursuant to Executive Order 13224. This new evidence not only describes IIRO's provision of material, financial, logistical, and ideological support directly to al Qaeda, associated terrorist organizations, and Islamic extremists across the globe, but makes clear that IIRO's support was essential to al Qaeda's development and transformation into a sophisticated global terrorist organization and its ability to carry out global attacks.

2076.   In a Treasury Department memorandum concerning the Additional Designations Pursuant to E.O. 13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches, Ex. 652, TREASURY00102-121, the U.S. government explains the bases for the designations of Mujil and the branch offices as SDGTs pursuant to Executive Order 13224.

██████████████████████████████████

REDACTED FOR PUBLIC FILING

Bases for Designation of Individual and Two Entities – Background Information
– The International Islamic Relief Organization [IIRO], which is headquartered in
Jeddah, Saudi Arabia and maintains numerous branch offices, is one of the
primary non-governmental organizations [NGOs] active worldwide associated
with and providing financial, material and logistical support to designated terrorist
organizations, including al Qaida and UBL, the Taliban, and Hamas, as well as al
Qaida affiliates, *inter alia,* the Abu Sayyaf Group (ASG), Jemaah Islamiyah (JI),
and Al Ittihad Al Islamiya (AIAI). The IIRO's parent organization is the Muslim
World League [MWL], also headquartered in Saudi Arabia.

\*\*\*

[REDACTED] with its official activities to support Muslims in need, the IIRO
provides assistance to radical Islamic movements. Indeed, IIRO's support for
terrorist organizations began in the early 1990s and continues through to at least
the first half of 2006, as discussed below.

\*\*\*

Bases for Designation of Dr. Abd Al-Hamid Al-Mujil – Dr. Abd Al-Hamid Al-
Mujil [Al-Mujil] has served as director of the IIRO Eastern Province branch
[IIRO-EP] since at least April 2004.

\*\*\*

**Al-Mujil Provides Financial Support to Al Qaida, JI, and the ASG** –
[REDACTED] Al-Mujil has a long history of providing support to terrorist
groups. Al-Mujil provided donor finds directly to al Qaida, particularly for
Islamic fighters, according to a report [REDACTED].

In the late 1990s, Al-Mujil provided direct financial assistance to ASG leaders
Abdurajak Janjalani and Ustadz Ibrahim Ali [Ali] via ASG supporter Mahmoud
Abd Al-Jalil Afif.

Ex. 652, TREASURY00106-108.

2077.   The memorandum further describes Mujil's control over the Philippines and

Indonesia branch offices and their support for terrorist organizations Abu Sayyaf Group and

Jemaah Islamiyah.

**Al-Mujil Asserts Control Over IIRO Southeast Asia Branches** –
[REDACTED] IIRO-EP's Al-Mujil reportedly has exercised decision-making
authority over a number of IIRO offices, including IIRO-PHL, IIRO-IND,

545

REDACTED FOR PUBLIC FILING

proposed for designation herein, and IIRO's Thailand branch [IIRO-THA]. These offices supported by Al-Mujil are implicated in supporting the ASG and/or JI. In line with Al-Mujil's decision-making responsibilities, in Feb 2006 IIRO-EP's Al-Mujil planned to visit Thailand in order to inspect IIRO-THA, [REDACTED]. In addition, Al-Mujil often "adjudicated" (possibly meaning authorize payment transfers, mosque and well construction, school curricula and orphan care programs for these branches, [REDACTED] in January 2006.

Ex. 652, TREASURY00109.

2078.  According to the U.S. government, IIRO's branch in the Philippines was (1) headed by Osama bin Laden's brother-in-law and al Qaeda official, Mohammed Jamal Khalifa, who maintained closed relationships with other senior al Qaeda members and financiers; (2) provided Abu Sayyaf Group members with transit assistance to Afghanistan for military training; and (3) additionally provided support for terrorist attacks conducted by Abu Sayyaf Group.

**Bases for Designation of the IIRO Philippines Branch [IIRO-PHL] – Background on Al Qaida Control of IIRO-PHL** – [REDACTED]  The Philippine branch of the IIRO [IIRO-PHL] was founded some time in the [blank]ly 1990s by UBL's brother-in-law and senior al Qaida member Muhammad Jamal Khalifah [Khalifah]. While working as the director of IIRO-PHL, Khalifah maintained close relations with UBL and al Qaida and has maintained close ties to senior al Qaida figures Abdullah Azzam and Abdulhassan al-Midani a.k.a. Wa'el Hamza Julaidan, a long-time senior official of the IIRO (and the Muslim World League). [REDACTED] Khalifah came to the Philippines from Afghanistan to establish the IIRO office there at the suggestion and facilitation of Julaidan.

[REDACTED] Khalifah also maintained ties to ASG officials while in the Philippines [REDACTED].

***

[REDACTED] as of 2005, the IIRO-PHL, maintained offices in Manila and in various cities in the Mindanao region of the Philippines.

[REDACTED] **IIRO-PHL Senior Official Provided Support for Recent ASG Terrorist Attack** – [REDACTED].  This bombing killed three people and wounded 41.

546

REDACTED FOR PUBLIC FILING

[REDACTED] **IIRO-PHL Provides Financial and Material Support to ASG**
– [REDACTED] According to July 2004 Department of Defense reporting, IIRO
was believed to have [illegible] [REDACTED] in the Southern Philippines for
extremists transiting to and from Indonesia. The IIRO also provided
documentation and other aid to assist these extremists.

***

According to the Umog interrogation report, IIRO-PHL, under the direction of
Khalifah, also sent ASG and MILF members to Afghanistan to train with the
"mujahidin." Khalifah stated that he wanted the ASG and the MILF to train
together to establish alliances among the groups.

Ex. 652, TREASURY00110-113.

2079. Abd al Hamid Sulaiman al Mujil served under the leadership of Prince Turki bin

Jalwai al Saud, who was the head of the IIRO's Eastern Province branch in Saudi Arabia.

According to the deposition testimony of IIRO Secretary General Adnan Basha, (1) the IIRO

became aware of financial irregularities at the Eastern Province branch and formed a committee

to investigate; (2) an audit revealed that the Eastern Province branch was willfully violating IIRO

financial regulations by sending money to the accounts of overseas IIRO branch offices

(including Pakistan) to implement projects without advising or seeking permission from IIRO

headquarters and/or the IIRO General Secretariat; (3) the audit further discovered that IIRO

Eastern Province officials were paying cash for projects without expense vouchers or receipts,

also in violation of IIRO regulations; and (4) Secretary General Basha asked Prince Turki to

cease these practices, but the Prince refused to comply with his request. Ex. 653, Basha Dep.

265:13-278:19.

2080. Secretary General Basha explained that Prince Turki resigned as the head of the

Eastern Province branch following the auditor's findings. Prince Turki resigned "[b]ecause he

did not wish to implement the recommendations of the auditor." According to Basha, "I recall

547

that the auditor's report connected all the violations to requests from the Prince." Ex. 653, Basha

Dep. 271:19-274:1.

2081. According to the U.S. government, Prince Turki was an important al Qaeda donor

with links to Khalid Sheikh Mohammed ("KSM"), the "principal architect of the 9/11 attacks."

*See* 9/11 Commission Final Report at p. 145.

> A limited body of uncorroborated CIA reporting from [REDACTED] separate
> sources suggests [REDACTED] the youngest of [REDACTED] full brothers, and
> Turki Bin Fahd Jiluwi, have had contact with individuals tied to al-Qa'ida and
> other terrorist organizations.
>
> ***
>
> In early 2003, KSM identified an individual name Bin Jiluwi, who may be
> identifiable with Turki Bin Fahd Jiluwi, an important al-Qa'ida donor who hails
> from a minor line in the Saudi royal family. Separate sensitive reporting indicates
> that Bin Jiluwi is a key leader of the Eastern Province office of the International
> Islamic Relief Organization (IIRO), and NGO. According to foreign government
> service sensitive reporting, Riyadh suspects Bin Jiluwi has embezzled more than
> $3 million from IIRO. The Mabahith has been investigation his activities.

Ex. 2, EO 3414-3442 at 3418-3419, *Assessment of Saudi Arabian Support to Terrorism and the

Counterintelligence Threat to the United States,* December 2004.

2082. CIA reporting released pursuant to Executive Order 14040 provides new evidence

detailing the IIRO's global support for al Qaeda while serving as an agent and alter-ego of the

Saudi government.

2083. For instance, in *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact

[REDACTED],* January 11, 1999, Ex. 79, CIA_000807-848, the CIA assessed that al Qaeda

infiltrated and used IIRO overseas offices in Afghanistan, Pakistan, Yemen, Azerbaijan, and

other countries for funding, travel documents, and other resources for years leading to the

September 11 attacks.

548

REDACTED FOR PUBLIC FILING

[REDACTED] foreign offices of several Saudi-based NGOs have been infiltrated by al-Qa'ida operatives.  [REDACTED].  As a result, funds from several Saudi NGOs continue to be diverted to al-Qa'ida and other Islamic extremists.  Saudi NGOs with the strongest links to Usama include:

> The International Islamic Relief Organization (IIRO) funds a military camp associated with Usama, [REDACTED].

***

[REDACTED] al-Qa'ida has infiltrated offices of several Saudi-based nongovernmental organizations – especially NGOs in Afghan and Pakistan offices. Usama's familiarity with NGOs in this region no doubt stems from his operation of the Maktab al-Khidamat in Pakistan, which probably had numerous contacts with Saudi and other Gulf charities with respect to aiding Arabs in Afghanistan…. All-source intelligence suggests that several Saudi NGOs are funding conduits for al-Qa'ida or have been penetrated by Usama's network. Those of greatest concern include the International Islamic Relief Organization (IIRO), Al-Haramayn Islamic Foundation, Lajnat Al-Birr Al-Islamiya (LBI), and the Muwafaq Foundation.

***

[REDACTED] offices of Al Haramayn in Albania, Azerbaijan, Bosnia, Kenya, and Tanzania have been used by al-Qa'ida.

***

International Islamic Relief Organization.  Based in Jeddah, IIRO is a subsidiary of the Muslim World League (MWL) and one of the most prominent Islamic NGOs based in the Gulf….  Usama Bin Ladin apparently has extensive contact with Afghani and Pakistani offices of the IIRO.

[REDACTED] 1997, [REDACTED], Usama employed an Algerian named Abu Zayid who worked at an IIRO office, presumably in Yemen.

Usama uses the IIRO office in Baku, Azerbaijan to obtain travel documents for mujahedin to fight in Chechnya.

Ex. 79, CIA_000808, 817; 818. *See also* Ex. 79, CIA_000811 (*Usama Bin Ladin: Possible Saudi Contacts and Financial Links*, identifying the IIRO as one of the Saudi-backed charities "of

549

REDACTED FOR PUBLIC FILING

primary concern," along with Al Haramain, Muslim World League, and World Assembly of

Muslim Youth.).

2084. In a subsequent report titled, *Islamic Terrorists: Using Nongovernmental*

*Organizations Extensively*, April 9, 1999, Ex. 613, CIA_000210-236, the CIA further describes

the use of purported charitable organizations, like IIRO, by al Qaeda and other terrorists for

material, financial and logistical assistance in support of their extremist activities.

> Usama Bin Ladin's brother-in-law, Muhammad Jamal Khalifa, who directed the
> IIRO in the Philippines, provided funding and some logistics support to [Ramzi]
> Yousef and his associate in 1995 as they plotted to bomb at least 12 U.S. airliners
> in East Asia.
>
> ***
>
> Despite Saudi efforts to curb terrorist use of the IIRO, its personnel in local
> branch offices continue to channel funds to terrorists and provide them with
> logistical support – such as cover employment, documentation, travel assistance
> and access to training – [REDACTED]. The director of the IIRO office in Baku,
> Azerbaijan diverted approximately $1.5 million to the Egyptian Islamic Jihad,
> acted after Riyadh had adopted control measures over the IIRO.
>
> **A Closer Look: IIRO's Ties to Terrorism** – Individuals with militant
> sympathies are exploiting their positions in the Saudi-based IIRO to provide
> financial and logistical support to terrorists and other extremists,
> [REDACTED]…. IIRO offices in regions with military conflicts, such as
> Afghanistan and Bosnia, gravitate toward more extremist activities,
> [REDACTED]…. Most IIRO funding is drawn from private donations,
> collections campaigns in mosques and schools, and small IIRO-run retail shops
> throughout Saudi Arabia, according to [REDACTED. Major donors include
> members of the Saudi royal family, [REDACTED]…. A few IIRO branches have
> turned to illegitimate means of financing their operations – including narcotics
> trafficking and counterfeiting – further increasing their independence and ability
> to support terrorism, [REDACTED].

Ex. 613, CIA_000216, 220, 221.

2085. In the CIA report, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators*

*[REDACTED],* October 18, 2001, Ex. 638, CIA_000500-563, the CIA describes the IIRO as one

REDACTED FOR PUBLIC FILING

of the "Islamic Charities Supporting Al-Qa'ida," and further indicates that al Qaeda member and financier, Wa'el Hamza Jelaidan, used his position at the IIRO and other da'wah organizations to fund al Qaeda.

> *Wa'el Hama A. Julaydan*.  Longtime Bin Ladin associate and IFTSC senior official *Wa'el Hamza Julaydan* (alias Abu Hasan al-Madani), a veteran of the Islamic charity circuit, has held high-level positions at the International Islamic Relief Organization (IIRO), Muslim World League (MWL), the Saudi Joint Relief Committee (SJRC), the Saudi Red Crescent Society (SRCS), and lately at two Bin Ladin-affiliated charities, al-Waqf al-Islami, and as secretary general of Rabita Trust coordinating financial activities and overseeing the budget. Julaydan has provided support since the 1990s to Muslims in Bosnia and Chechnya – hotbeds of mujahidin activity – and may be using his position and influence at these organizations to divert funds and resources to al-Qa'ida.

Ex. 638, CIA_000525, 544.

2086.   A November 14, 2002 CIA report, *Saudi-Based Financial Support for Terrorist Organizations* [REDACTED]*,* Ex. 609, CIA_000143-158, indicates that the IIRO office in the Philippines, founded by al Qaeda member Mohammed Jamal Khalifa, was used to fund the Abu Sayyaf Group and recruit Muslims for military training.

> Muhammad Jamal Khalifa, a brother-in-law of Bin Ladin, was based in the Philippines from 1988 to 1995 and was involved in recruiting Muslims for training in Pakistan as mujahidin fighters. Khalifah founded several Islamic charities and served as the director of the International Islamic Relief Organization (IIRO) NGO in Manila, according to press [REDACTED] reporting. Khalifah was a close associated of World Trade Center bomber Ramzi Yousef until his arrest. [REDACTED] Khalifah currently runs several Asian and African construction and gem businesses [REDACTED] which we believe he is using to launder money for al-Qa'ida.

> ***

> ASG probably also receives funds from Saudi-based NGOs, including the Dar Al-Hijra Foundation and IIRO. Dar Al-Hijra is headquartered in Riyadh and focuses on mobilizing Islamic activities in the Philippines, [REDACTED]. It has links to al-Qa'ida and other extremist groups in the Philippines, including the Moro Islamic Liberations Front, according to sensitive reporting. IIRO has used its field offices [for] cover, travel, and funding to support extremists worldwide.

REDACTED FOR PUBLIC FILING

> [REDACTED] the Philippines offices was opened by Bin Ladin's brother-in-law Khalifah.

Ex. 609, CIA_000149, 152.

2087.   In CIA report, *Sketch of a South Asia-Based Terrorist Training and Logistic Network [REDACTED]*, Ex. 637, CIA_000058-62 at 60, the CIA states that "the MAK [Maktab al-Khidmat] is funded by the Saudi-based Muslim World League and International Islamic Relief Organization, the Muwafaq Foundation, and Saudi-born financier Usama Bin Ladin." MAK, also known as the "Bureau of Services," was established by Osama bin Laden and Abdullah Azzam to provide logistical support to mujahideen forces in Afghanistan and channel recruits into the country during the Soviet-Afghan conflict. *See* 9/11 Commission Final Report at pp. 56, 434.

2088.   FBI investigations have targeted the IIRO's office in Northern Virginia and its officers. According to the FBI, Tariq Al Suwaidan, who is listed in the public records as the Secretary/Treasurer for the IIRO in Falls Church, VA, is a Muslim Brotherhood leader and an unindicted coconspirator in the Holy Land Foundation terrorism financing case.

> Al Suwaidan is believed to be the leader of the Muslim Brotherhood and has "extremist inclinations." Al-Suwaidan was banned from the U.S. in 2000 following his comments "Palestine will not be liberated but through Jihad. Nothing can be achieved without sacrificing blood. The Jews will meet their end at our hands." In 2007, Al-Suwaidan was listed by the U.S. federal prosecutors, along with a group of U.S. Muslim Brotherhood members, as an unindicted co-conspirator in the terrorism financing case against the Holy Land Foundation for Relief and Development which was convicted along with its leaders of financing Hamas. Al-Suwaiden is known for his anti-Semetic remarks, hate for Jews, and push for electronic Jihad among youth.

Ex. 2, EO 3478-3608 at 3547-3578, FBI report, *Connections to the Attacks of September 11, 2001*, July 23, 2021.

REDACTED FOR PUBLIC FILING

2089.   Soliman Al-Ali, who served as the director of the IIRO office in Northern Virginia, has been linked to members of the Sunni-Wahhabi extremist network established in the United States by the Saudi government that provided material support to the September 11 hijackers, including Omar Al Bayoumi. According to the U.S. government, Bayoumi "provided substantial assistance to 9/11 hijackers Nawaf al-Hazmi and Khalid al-Midhar during their time in California, prior to the attacks." Ex. 607, 2012 FBI Summary Report at pp. 3-4 (ECF No. 6292-1).

> Sulaiman Alali – Summary:  Sulaiman Alali was associated with IIRO and other "charities" and global investment entities such as Global Chemical [REDACTED]. Alali was paid by Sanabell and had a physical and financial connection to Omar Albayoumi. Alali returned to Saudi Arabia prior to 9/11 but has at least one son, Amro, who joined Alqaeda. According to open source, Alali was the president of IRO and a major shareholder of Global Chemical. Alali's son Amro is a known AQAP member.

> Sulaiman Al-Ali, who is the Director of the International Islamic Relief Organization's (IIRO) in the United States. Al-Ali is believed to be a friend of Al-Gama al-Islamiyya supporter Zahir 'Abd Al-'Aziz, who reportedly has ties to Islamic extremist circles throughout the Balkans.  Al-Ali reportedly maintains a telephone number of [REDACTED], which is subscribed to by the "International Relief Organization," [REDACTED] Falls Church, VA 22046-4417.  A corporate record for International Relief Organization, Inc., at [REDACTED] Falls Church, VA 22041 with [REDACTED] (Alali) listed as President.

Ex. 2, EO 3478-3608 at 3552-3553, FBI report, *Connections to the Attacks of September 11, 2001*, July 23, 2021.

2090.   FBI records further describe the close relationship between Soliman Al-Ali and Omar Al Bayoumi, including payments to Bayoumi.

> Alali used an address associated with Albayoumi on banking information in 1998. At a business in La Jolla, CA Alali listed Albayoumi (Omar Baymi) as his emergency POC. While residing in California at one address Albayoumi was

REDACTED FOR PUBLIC FILING

> listed as Alali's rental application as a co-tenant/friend. During this time Albayoumi and Alali listed their employment with Dalla Company, Saudi Arabia.
>
> Banking records from 10/21/1998 to 08/05/1999 noted that Alali deposited 32 checks from Sanabell totaling over $128,000. Sanabell also directly paid rent and other expenses. During the same period Alali paid Albayoumi almost $7000.

Ex. 2, EO 3478-3608 at 3553, FBI report, *Connections to the Attacks of September 11, 2001*, July 23, 2021.

2091.    A telephone directory from the Saudi Embassy in Washington, D.C. obtained by the FBI in 2002 lists the Northern Virginia office of the IIRO as one of its "additional offices under the title 'Saudi Arabian Offices:' International Islamic relief Organization (IIRO), Falls Church." Ex. 2, EO 3478-3608 at 3532-3533, FBI report, *Connections to the Attacks of September 11, 2001*, July 23, 2021.

2092.    FBI investigations concluded that the IIRO branch in the United States was also operating as the "Success Foundation," itself linked to al Qaeda and Hamas.

> The Success Foundation and its management, like many Saudi-based charities operating in the United States, appear to be connected to a number of individuals and organizations associated with subjects of al-Qa'ida investigations, and with individuals associated with militant Palestinian causes. According to USIC, the foundation may also be involved in money laundering for HAMAS.

Ex. 2, EO 3414-3442 at 3436, *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States*, December 2004.

2093.    Sheikh Saleh al Buraik, who served as the religious advisor to Prince Abdul Aziz bin Fahd al Saud (son of the late King Fahd bin Abdul Aziz al Saud), and has issued anti-American lectures and advocated for violent jihad, has stated that the IIRO is involved in all areas of jihad which can be trusted with money "to buy a thousand missiles."

> May the peace and blessings of Allah be upon him. I hope that you will reach an understanding with the company's management in order to state the good,

REDACTED FOR PUBLIC FILING

beneficial Islamic point of view. Praise be to Allah, we know that the Islamic Relief Organization is an official agency under the command, care, and sponsorship of the country. It has big, clear, and strong projects in all areas of Jihad, in addition to the relief projects and orphan sponsorship projects. This also applies to the trusted people whom we know. This means that if someone comes to you and gives you money saying, 'Oh, brother, take this. You are going to Afghanistan,' just take it and hand it over to Sayyaf, or hand it over to Hekmatyar. Or, use it to buy a thousand missiles and take them there. If you can hold the trust, we say, 'May Allah reward you with goodness'. And if you come and hand it over to the Islamic Relief Organization, it is a reliable and well-known agency and we do not doubt about it.

Ex. 654, The Islamic Library, Lessons of Sheikh Saad Buraik, *Explaining the Meaning of Jihad for Support*, p. 3095.

### D. World Assembly Of Muslim Youth

2094.    Along with the Al Haramain Islamic Foundation, Muslim World League ("MWL"), and International Islamic Relief Organization ("IIRO"), defendant World Assembly of Muslim Youth ("WAMY") is a controlled agent and alter-ego of the Kingdom of Saudi Arabia, sponsored and funded by the Saudi government for the purpose of spreading the conservative form of Wahhabi Islam across the globe and in the United States. Ex. 2, EO 3414-3442 at 3430, *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States*, December 2004.

2095.    WAMY's leadership is dominated by high-ranking officials of the Saudi government, including the Minister of Islamic Affairs who simultaneously served as the president of WAMY for over twenty years. Ex. 655, Transcript, October 23, 2019 Deposition of Dr. Saleh al Wohaibi (Wohaibe Dep.) 28:16-19 (testifying that the president of WAMY is appointed by the Saudi government); *id.* at 29:1-30:17 (stating that the Minister of Islamic Affairs served as the president of WAMY from the establishment of the Ministry of Islamic Affairs in 1993, until 2013-2014); *id*. at 70:6-72:18 (testifying that WAMY Secretary General,

REDACTED FOR PUBLIC FILING

Maneh bin Hammad al Johani, simultaneously served as a member of the Shura Council, the formal advisory body of the Saudi government, also referred to as the Consultative Assembly of Saudi Arabia).

2096. WAMY consistently received annual funding from the Saudi government in the amount of 5,250,000.00 Saudi riyals ("SR"), between 1995 through 2002. Ex. 655, Wohaibi Dep. 31:2-8, 35:23-36:13. That payment was transmitted to WAMY's Secretary General from the Minister of Islamic Affairs. *Id.* at 31:13-32:8; *see* Ex. 656, (Wohaibi Dep. Ex. 316) (Letter from the Minister of Islamic Affairs and President of WAMY, Abdullah bin Abdul Mohsen al Turki, to the WAMY Secretary General, enclosing a check for 5,250,000.00 SR, described as "the annual financial support for the Word Assembly of Muslim Youth."); Ex. 657, (Wohaibi Dep. Ex. 317) (February 21, 2001 letter from the Minister of Islamic Affairs and President of WAMY, Saleh bin Abdul Aziz bin Mohamed al Ash-Sheikh, to the WAMY Secretary General, enclosing a check for 5,250,000.00 SR, "which represents the annual report for the World Assembly of Muslim Youth."); Ex. 658, (Wohaibi Dep. Ex. 318) (Letter from the Minister of Islamic Affairs and President of WAMY, Saleh bin Abdul Aziz bin Mohamed al Ash-Sheikh, to the WAMY Secretary General, enclosing a check for 5,250,000.00 SR, described as "the annual financial support for the Word Assembly of Muslim Youth."). *See also* E. 659, (Wohaibi Dep. Exhibit 319)(May 10, 1994 letter indicating that WAMY would report to the Ministry of Islamic Affairs at the end of each fiscal year with a closing statement identifying the amounts spent by the organization).

2097. In addition to the annual grants, the Ministry of Islamic Affairs made other financial contributions to WAMY in support of da'wah activities, often approved by royal decree. Ex. 660, (Wohaibi Dep. Ex. 322) (500,000.00 SR contribution from the Ministry for

REDACTED FOR PUBLIC FILING

"Da'wah activities of the World Assembly as approved in the Royal Order No. 9/B/25515"); Ex. 661, (Wohaibi Dep. Ex. 323) (indicating that the 500,000.00 SR contribution was the first payment of a 1,000,000.00 SR donation to WAMY).

2098.   During the 1992-2002 time period, the Supreme Council for Islamic Affairs also provided funding to WAMY. Ex. 655, Wohaibi Dep. 43:7-44:15.

2099.   Prior to the establishment of the Ministry of Islamic Affairs, WAMY was funded by the Ministry of Higher Education and its predecessor, the Ministry of Education. Ex. 655, Wohaibi Dep. 41:5-42:22. *See also* Ex. 576, (Wohaibi Dep. Ex. 320) (indicating that WAMY received 105,750,000.00 SR from the Saudi government).

2100.   WAMY also received financial contributions from the Saudi king in support of WAMY's activities. Ex. 577, (Wohaibi Dep. Ex. 321) (November 2, 2002 letter from Dr. Saleh bin Soliman al Wohaibi acknowledging receipt of a 400,000.00 SR check from the king in support of a WAMY program.); Ex. 661, (Wohaibi Dep. Ex. 323) (3,500,000.000 SR financial contribution to WAMY from the king in support of shariah courses). Ex. 655, Wohaibi Dep. 46:15-47:20 (Dr. Wohaibi testified that there were other contributions to WAMY from the king prior to 2002.).

2101.   CIA and FBI reporting released pursuant to Executive Order 14040 provides new evidence demonstrating WAMY's role in terrorism funding and recruiting, sponsoring military training camps, facilitating the movement of funds in support of Islamic extremism, and funding terrorist groups and Executive Order 12334 Specially Designated Global Terrorists ("SDGT"), as illustrated by the following reports.

2102.   In a CIA report titled*, Saudi-Based Financial Support for Terrorist Organization [REDACTED]*, November 14, 2002, Ex. 609, CIA_000143-158, the CIA states that WAMY's

REDACTED FOR PUBLIC FILING

global influence among Muslim youth established the organization as a prominent recruiting hub for Islamic extremists. Ex. 609, CIA_000151 ("WAMY's global reach and influence among Muslim youth has made it an excellent conduit of recruits for many extremist groups."). *See also* Ex. 615, CIA_000178-189 at 186, *Al-Qa'ida Still Well Positioned to Recruit Terrorists [REDACTED],* July 1, 2002 ("In the Balkans, local offices of NGOs such as the World Assembly of Muslim Youth, al-Haramayn, Society for the Revival and Islamic Heritage, and al-Waqf al-Islamiya were actively involved in spotting and assessing suitable terrorist recruits from among young men who seek assistance from humanitarian organizations, [REDACTED]."); *id.* at 185 ("Groups such as the World Association for Muslim Youth observe students in schools and offer scholarships for religious training in the Middle East.").

2103.   In addition to recruiting, WAMY has sponsored and funded military training camps for Muslim youth.

> [REDACTED] paramilitary training camps [REDACTED] including a large camp near [REDACTED] have offered Muslim youths training. [REDACTED] training at such camps included weapons handling, firing, and explosives [REDACTED]. Training appears to be sponsored by various NGOs, including the World Association of Muslim Youth and the Foundation of Islamic Tarbiya (education).

Ex. 615, CIA_000178-189 at 185, CIA report, *Al-Qa'ida Still Well Positioned to Recruit Terrorists [REDACTED]*, July 1, 2002.

2104.   The CIA has further assessed that WAMY facilitated the transfer of money to overseas destinations in support of the proliferation of Islamic extremism. Ex. 78, CIA_000720-804 at 744, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions.*

> [A] Saudi NGO whose personnel often pursue an extremist agenda, [REDACTED] WAMY officials have couriered private Saudi donations to Islamic groups in Afghanistan and Bosnia. In some cases, WAMY puts foreigners requesting aid in direct contact with Saudi donors who are looking for worthwhile

REDACTED FOR PUBLIC FILING

Islamic causes; WAMY sometimes will broker requests with potential donors if the NGO has an ideological interest.

Ex. 78, CIA_000744. *See also* Ex. 79, CIA_000807-848 at 827, CIA report, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact [REDACTED]*, January 11, 1999:

> WAMY has long been alleged to be a financier of Islamic extremists. [REDACTED]. WAMY provides funding for the Palestinian Islamic Resistance Movement (HAMAS), operated extensively in Albania and Macedonia. The latter office was al-Islamiyya; and an Islamic movement in Kurdistan. WAMY also supports the Dutch office of the Saudi-supervised Al-Waqf Al-Islami; WAMY Secretary General Dr. Mani Al-Gohani (a.k.a. al-Jihani) and Imad al-Din Ismail Bakri, a representative of the Waqf office in Eindoven, are longtime friends. [REDACTED] WAMY has an office in Macedonia, [REDACTED] which has received financial support from the SHC and other Saudi NGOs.

> [REDACTED] the Stalk of Goodness, an NGO established in 1991 by WAMY members, operated extensively in Albania and Macedonia. The latter office was shut down in February 1995 because the charity was channeling funds from Al Haramayn, the IIRO, and Waqf al-Islami to spread Islamic fundamentalism throughout Macedonia.

Ex. 2, EO 3414-3442 at 3438, *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States*, December 2004, ("WAMY offices in other countries are directly funding HAMAS-affiliated NGOs, including the UK-based charity Interpal and the Palestinian zakat (tithing) committees.").

2105.   Part of WAMY's funding went to the Taibah International Aid Association in Bosnia-Herzegovina, designated as a Specially Designated Global Terrorist ("SDGT") entity by the U.S government on May 6, 2004 for funneling money to al Qaeda. See Treasury Department press release at Ex. 578. According to the CIA:

> The Sarajevo Taibah office has received regular funding from banks and individuals with ties to al-Qa'ida…. The office received approximately $140,000 from WAMY-Jeddah, probably the World Association for Muslim Youth, in May 2001. [REDACTED].  WAMY is suspected of supporting terrorists.

REDACTED FOR PUBLIC FILING

Ex. 585, CIA-SUB_0031-33 at 32, CIA report, *Taibah: Linking Extremists in the Balkans and the United States [REDACTED]*, December 12, 2002.

2106. Additional CIA reporting has tied WAMY to Osama bin Laden. Ex. 79, CIA_000807-848 at 820-821, CIA report, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact [REDACTED],* January 11, 1999 (stating Osama bin Laden has funded offices of Lajant al Bir al Islamiya, which is closely affiliated with WAMY); *id.* at 826 (describing "WAMY Chairman Abdallah al Muhaidib as a supporter of Usama Bin Ladin").

2107. The United States-based branch office of WAMY, headed by Abdullah bin Laden, has been targeted by U.S. authorities for its ties to al Qaeda, Islamic extremism, and recruitment. Ex. 79, CIA_000807-848 at 826, CIA report, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact [REDACTED]*, January 11, 1999 ("The Bin Ladin family probably contributed to WAMY, especially given that Abullah Bin Ladin, Usama's half-brother, heads the WAMY office in Falls Church, Virginia.").

2108. A telephone directory from the Saudi Embassy in Washington, D.C. obtained by the FBI in 2002 lists WAMY as one of its "additional offices under the title 'Saudi Arabian Offices:' World Assembly of Musim Youth (WAMY), 4516 Old Columbia Pike, PO Box 8096, Falls Church, VA." Ex. 2, EO 3478-3608 at 3532-3533, FBI report, *Connections to the Attacks of September 11, 2001*, July 23, 2021.

2109. Ibrahim Abdullah, who served as director of WAMY's office in Virgina after Abdullah bin Laden, was the subject of an FBI investigation for his association with al Qaeda and Hamas.

> Ibrahim S. Abdullah, until recently the director of the World Assembly of Muslim Youth (WAMY) US office in Annandale, VA, was a Saudi-funded graduate student at George Mason University. FBI investigation determined that Abdullah

REDACTED FOR PUBLIC FILING

holds a Saudi passport and is associated with subjects of FBI al-Qa'ida and Islamic Resistance Movement (HAMAS) investigations through his WAMY activities and phone records.

Ex. 2, 3414-3442 at 3429, *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States*, December 2004.

2110.  The FBI also investigated Mohammed Rafique Quaidr Harunani, a WAMY official in the United States, for his connections to al Qaeda.

A FBI source reports that Mohammed Rafique Quaidr Harunani, of Orlando, FL, is expected to manage and lead [WAMY's] five-year plan's implementation in the United States.

Harunani, a Uganda-born Kenyan citizen of Pakistani origin, is under investigation for his ties to WAMY and al-Qa'ida subjects in the United States.

FBI information also links Harunani to Abdullah Bin Ladin and WAMY through his company, Discover Islam, reportedly one of the linchpins of the five-year plan.

Ex. 2, EO 3414-3442 at 3438.

2111.  WAMY's office in Virginia was also closely associated with the Saudi government funded Institute of Islamic and Arabic Sciences of America ("IIASA") in the United States. Ex. 2, EO 3478-3608 at 3535. FBI report, *Connections to the Attacks of September 11, 2001*, July 23, 2021. IIASA, which received financial support from Ambassador Bandar bin Sultan bin Abdul Aziz al Saud and the Saudi Embassy in Washington, D.C., operated as a satellite campus of the Al Imam Muhammad Ibn Saud University in Riyadh, Saudi Arabia ("Imam University"). *Id.* at 3534 (stating that "IIASA was one of the many pieces of Saudi proselytizing activity in the U.S."). Several of IIASA's staff members have been Saudi nationals employed in an official capacity as administrative officers at the Embassy. Ex. 2, EO 3414-3442

REDACTED FOR PUBLIC FILING

at 3437, *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States*, December 2004 ("IIASA is funded by the Embassy.").

2112.   According to the FBI, IIASA "maintains links to suspected terrorist organizations and their supporters," Ex. 2, EO 3414-3442 at 3437, and individuals that worked at IIASA were "recruiting individuals into extremist views." Ex. 2, EO 3478-3608 at 3535.

2113.   A raid of an al Qaeda safehouse uncovered "an address utilized by an individual that listed their employer as the IIASA and their supervisor as being Abdullah Bin Laden." Ex. 2, EO 3478-3608 at 3535.

2114.   FBI's investigations have also targeted WAMY for recruiting at U.S. schools and universities. Ex. 2, 3414-3442 at 3437, *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States*, December 2004 ("The FBI is also examining the possibility that al-Qa'ida or other radical Islamic extremists are recruiting at U.S. schools and universities. State-sponsored Islamic student organizations, such as WAMY, are specifically targeting students at universities and public schools in the United States to promote their Islamic ideology.").

2115.   Indeed, WAMY youth camps in the United States were used to advocate for violent extremism and jihad and indoctrinate young Muslims.

> In July 1996, WAMY held a youth camp in Okeechobee, Florida that included seminars overseen by senior WAMY officials in the United States. As part of the program, an operations manager for WAMY charitable activities named Suleman Ahmer presented a lecture to campers titled, "Jihad, The Misunderstood Word." Ahmed professed to have "spent some months in Bosnia, and I've spent some time in Chechnya where we have active wars going on, and there are certain things I've come across they're very educational and also very motivational, they'll motivate you. You've been hearing negative things about jihad right, so you should hear something positive also.... If the Chechens come up and they fight, if the Bosnians come up and they fight you call them terrorists! This is unfair... without jihad the evil forces will overwhelm you and that's why Allah

REDACTED FOR PUBLIC FILING

has given you so much promises to you, to people who do jihad, to people who struggle." Ahmer described the challenge during the Bosnian war of indoctrinating non-Arabic-speaking European Muslims in fundamentalist Islamic principles: "the Bosnians were well away from Islam…. They couldn't even say the word 'jihad.' They used to call 'mujahedin,' 'muhajedin.' It took them many months to learn the right word." According to Ahmer, after witnessing the dramatic entrance of mujahideen fighters into the Bosnian conflict, local Bosnian Muslims vowed, "'if this is really, if this is what Islam teaches you, we are fools if we don't practice Islam.' See, jihad, how it establishes Islam?" In response to criticisms of the violent extremist indoctrination taking place at WAMY summer youth camps inside Saudi Arabia, WAMY Secretary General al-Wohaibi has insisted that it is "not possible to control" all of the content being disseminated during the presentations at the camps.

Ex. 150B, Kohlmann 2020 Rpt.

2116.   Sheikh Anwar Al Aulaqi, a senior member of al Qaeda and spiritual member to

9/11 hijackers Nawaf Al Hazmi, Khalid Al Mihdhar, Hani Janjour, Ahmed Al Ghamdi, and

Majed Moqed while they were in the United States plotting and preparing for the September 11

attacks, simultaneously had a close association with WAMY's branch office in the United States

and its officers. According to deposition testimony in this litigation, WAMY invited Al Aulaqi to

give lectures at WAMY summer camps in the U.S. on multiple occasions, distributed audio tapes

featuring Al Aulaqi's sermons, and further WAMY coordinated with Al Aulaqi in his capacity as

Imam of the Dar al Hijrah Mosque in Northern Virginia. *See* Transcript, October 21, 2019

Deposition of Ibrahim Abdullah, Ex. 579, at pp. 71-72, 75-78, 82, 87-88. *See also* Ex. 580,

WAMY SA 1519 (Abdullah Dep. Ex. 283); Ex. 581, WAMY Int'l EO15165-15168 (Abdullah

Dep. Ex. 285).

2117.   Sheikh Saleh al Buraik, a WAMY employee who provided anti-American lectures

at WAMY summer youth camps, has urged Muslims to engage in violent jihad on the battlefield

or become a financial supporter of jihad.

REDACTED FOR PUBLIC FILING

May the peace and blessings of Allah be upon him. The most sublime favor of Jihad is that it is the pillar and peak of religion. The five pillars are: Shahadah [Declaration of faith], prayer, Zakat, Hajj, and fasting. And Jihad for the sake of Allah is the pillar that guards, preserves, and governs them. Bear in mind that Jihad is the pillar and peak of religion. Brothers, I would say: Jihad has a high status, which is neither attainable nor accessible by everyone. It is a very, very great status. Do not be surprised by the lack of the Mujahideen or those who make their way to Jihad. Why? Because no people were found qualified to obtain the high status. But least of all, if you are not in the battlefield frontline, in the right side, in the rear, or in the left side, you could be at least a supporter of Jihad, a collector of donations for Jihad, an advocate of Jihad. You should keep your prayer at night and day for Jihad and for the Mujahideen.

Ex. 582, The Islamic Library, Lessons of Sheikh Saad Buraik, *The Favor of Jihad Over Other Acts*, p. 3091. *See also* Frontpage Magazine; *Saudis Spread Hate Speech in the U.S.*, September 16, 2002, Ex. 583 (identifying Buraik as an employee of WAMY, and discussing the dissemination of hate literature in the U.S. by Saudi officials via WAMY's Virginia office, IIASA, and the Saudi Embassy, Islamic Affairs Office).

2118.   Sheikh Buraik has also advocated for using jihad to spread the Islamic faith.

O brothers, Islam spread when the blood of its companions was shed on the land of Jihad. The Islamic conquests expanded when the blood of the companions, the followers, and the Muslim soldiers was shed on the land of the East and the West. This is the Sunnah of Allah, and Jihad goes on until the judgment day. This religion will only spread by Jihad for the sake of Allah, the Sharia of the nation, the Sharia of immortality, and the Sharia of survival. If you are alive, you are happy, and if you die in the land, in the land of Jihad, you are with the martyrs. The Muslims live this way. O servants of Allah, many people were known for their thought, good intention, and sincerity only after they died. Their name spread and their status was known. Sayyid Qutb, may Allah have mercy on his soul, was known to you. On his way for execution, he was asked to apologize or to say something to please those around him or to get his death sentence changed to life imprisonment or something like this. What did he say? "The index finger, which testifies to Allah's monotheism five times a day, refuses to apologize to the tyrants." Allah is the greatest, O servant of Allah. This is how religions spread. This is how religion and doctrines spread. Without this, no idea spreads unless its people water it with their own blood.

Ex. 584, Sheikh Saad Buraik, *The Martyr of Jihad, Abdullah Azzam*.

REDACTED FOR PUBLIC FILING

Originally filed December 20, 2023
Corrected and filed January 17, 2024

Dated:  January 17, 2024                    Respectfully submitted,

MOTLEY RICE LLC                             COZEN O'CONNOR

By:  /s/ Robert T. Haefele                  By:  /s/ Sean P. Carter
Robert T. Haefele                           Sean P. Carter
Jodi Westbrook Flowers                      Stephen A. Cozen
Donald A. Migliori                          Scott Tarbutton
28 Bridgeside Boulevard                     One Liberty Place
Mount Pleasant, South Carolina 29464        1650 Market Street, Suite 2800
Tel.: (843) 216-9184                        Philadelphia, Pennsylvania 19103
Email: rhaefele@motleyrice.com              Tel.: (215) 665-2105
                                            Email: scarter@cozen.com
*Liaison Counsel and Co-Chairs for the*
*Plaintiffs' Executive Committee for Personal*   *Co-Chairs and Liaison Counsel of the*
*Injury and Death Claims on behalf of the*       *Plaintiffs' Executive Committee for*
*Plaintiffs*                                       *Commercial Claims on behalf of Plaintiffs*

KREINDLER & KREINDLER LLP

By: /s/ Steven R. Pounian
Steven R. Pounian
Andrew J. Maloney
James Gavin Simpson
Megan Benett
485 Lexington Avenue
New York, New York 10017
Tel.: 212-687-8181
Email: spounian@kreindler.com

*Attorneys for Ashton Plaintiffs*

565

REDACTED FOR PUBLIC FILING