# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Certain 03 MDL 1570 PLAINTIFFS<br><br>**ASHTON** Plaintiffs et al.,<br><br>v.<br><br>THE REPUBLIC OF SUDAN,<br>NATIONAL ISLAMIC FRONT,<br>HASSAN AL TURABI, and<br>OMAR HASSAN AHMED AL BASHIR,<br><br>Defendants. | 02 CV 6977 (GBD) (SN)<br><br>**AMENDED COMPLAINT**<br><br>03 MDL 1570 (GBD) (SN) |

## <u>ASHTON AMENDED COMPLAINT AS TO SUDAN DEFENDANTS</u>

*This document relates to*:  *Ashton et al. v. Al Qaeda, and the Republic of Sudan et al., 02 cv 6977(GBD)(SN).*

ASHTON Plaintiffs filed a Consolidated Master Complaint on March 6, 2003 that named as defendants al Qaeda, the Republic of Sudan and others.  Service was effectuated upon the Sudanese Ministry of Foreign Affairs, as transmitted by the Embassy of the United States of America, in Khartoum, Sudan on April 29, 2003 in accordance with the Foreign Sovereign Immunities Act, 28 U.S.C. § 1608 et seq.  The action was consolidated under 03 MDL 1570 In re 9/11 Terror Attack.  That complaint was amended several times as to other defendants and additional plaintiffs were also added with the Court's permission and order that no additional service on the same defendants was required (ECF No. 247, CMO #2 6/16/04, ¶12).  The Court set a deadline for the filing of all amended complaints in 2005, and the last amendment was the 6th Amended Complaint, 02 cv 6977, filed on September 30, 2005.  When Sudan failed to answer or appear, default was entered by the Court Clerk on December 22, 2011 (02 cv 6977 ECF No. 652).

1

The instant amended complaint incorporates allegations and identity of plaintiffs pled in the 6th Amended Complaint and supplements those allegations herein as to the Sudan defendants only in order to update the prior pleading with changes in the law, along with conclusions of law and evidentiary disclosures made by U.S. Courts, the U.S. government and other parties. This amended pleading is not intended to replace or supplant the operative 6th Amended Complaint, 02 cv 6977, filed on September 30, 2005, as the allegations and claims are substantially the same. Plaintiffs accordingly respectfully request a trial by default seeking judgment against Sudan.

## THE PARTIES

1.      Plaintiffs are the surviving spouses, children, parents, siblings and estate representatives of the victims murdered in the September 11, 2001 terrorist attacks on the United States (the "September 11th Attacks") and individuals who suffered personal injuries in the September 11th Attacks identified in the 6th Amended Complaint.

2.      The defendant REPUBLIC OF SUDAN ("Sudan") is a foreign sovereign state within the meaning of 28 U.S.C. § 1391(f) and 1603(a) and is located on the continent of Africa and borders the Red Sea west of Saudi Arabia and south of Egypt. Sudan maintains an Embassy in Washington, D.C. located at 2210 Massachusetts Avenue, N.W., Washington, D.C. 20008-2831.

3.      The defendant Sudan has, since 1993 and at all relevant times herein, been designated by the United States Department of State as a foreign state that sponsors terrorism within the meaning of the Export Administration Act of 1979, 50 U.S.C. App. § 2405(j); the Foreign Assistance Act of 1961, 22 U.S.C. § 2371(b); and 18 U.S.C. § 2333. The defendant Sudan by and through its agents and instrumentalities has supported, encouraged, sponsored, aided and abetted, and conspired with a variety of groups that use terror to pursue their goals.

2

The defendant Sudan has provided financing, training, safe haven, and weapons for terrorist groups including the defendants al Qaeda and Osama Bin Laden, through its officials, officers, employees and agents, including but not limited to its political entity, defendants the National Islamic Front, its leader Hassan al Turabi, and Omar Hassan Ahmad al Bashir, the President of Sudan.

## JURISDICTION AND VENUE

4.     Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1330, as the claims against Sudan fall within the exceptions to foreign sovereign immunity set forth at 28 U.S.C. §§ 1605(a)(5), 1605A, and 1605B of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 et seq., as well as the exception to immunity formerly set forth at 28 U.S.C. § 1605(a)(7).

5.     Plaintiffs further bring this action against the defendant Sudan under the 2016 Justice Against Sponsors of Terrorism Act (JASTA), which Congress enacted over a Presidential veto

> to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against…foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States…

28 U.S.C. §2333 note; as a result, JASTA establishes federal court jurisdiction over the tortious acts of a foreign state anywhere in the world that cause injury and death in a terrorist attack in the United States.

6.     The defendant Sudan is a foreign state within the meaning of 28 U.S.C. §1603(a), and "Sudan" as used hereinafter refers to its government ministries and other bodies (including but not limited to the National Islamic Front, its  Ministry of the Interior, Ministry of Foreign

Affairs, Ministry of Defense, Military Intelligence, State Security, Popular Defense Force, Revolutionary Security Services, and its Embassies throughout the world), its alter-egos, and its officials, employees, or agents while acting within the scope of their office, employment, or agency, including but not limited to defendants Hassan al Turabi ("Turabi"), and Omar Hassan Ahmad al Bashir ("Bashir").

7.     The defendant Sudan is subject to jurisdiction pursuant to 28 U.S.C. §1330 and JASTA's 28 U.S.C. §1605B, in that, as set forth in detail below, this action seeks money damages against Sudan for injury and death caused by the September 11th Attacks, which constitute an act of "international terrorism" in the United States as defined in 18 U.S.C. §2331, alleges that the September 11th Attacks and the resulting injuries and deaths were caused by a tortious act or acts by Sudan, by providing material support and resources to and facilitating the al Qaeda leaders, planners and hijackers responsible for the September 11th Attacks, and that such act or acts constitute more than mere negligence, and were intentional, knowing, reckless, willful and/or grossly negligent.

8.     The defendant Sudan is also subject to jurisdiction pursuant to 28 U.S.C. §1330 and 28 U.S.C. §1605(a)(5) and the exception to immunity previously set forth at 28 U.S.C. §1605(a)(7), in that, as set forth in detail below, this action seeks money damages against Sudan for injury and death occurring in the United States and caused by the tortious act or omission of Sudan and/or one or more of its officials or employees acting within the scope of their office or employment.

9.     Venue is proper in this District pursuant to the Air Transportation Safety and System Stabilization Act, (Pub. Law 107-42, 115 Stat. 230), 49 U.S.C. § 40101, Title IV, § 408(b)(3), designating the Southern District of New York ("S.D.N.Y.") as the exclusive venue

4

for all civil litigation arising out of, or related to the September 11th Attacks, and 28 U.S.C.

1391(b)(2) and 1391(f)(1) because a substantial number of acts, occurrences, injuries and deaths

occurred in the Southern District of New York.

## SUMMARY OF ALLEGATIONS

10.     Plaintiffs seek such relief against Sudan for the attributable acts of Sudan's

governmental ministries and bodies, alter-egos, and officers, employees and agents acting within

the scope of their office, employment or agency, including but not limited to the National Islamic

Front, Hassan al Turabi and Omar Hassan Ahmed al Bashir, by knowingly providing material

support and resources to the al Qaeda terrorist organization and facilitating the September 11th

Attacks, in that, as set forth in detail herein, they:

a.      raised, laundered and paid substantial financial support to al Qaeda to fund its

budget and terrorist activities, including the preparation and execution of the September 11th

Attacks;

b.      funded and sponsored the terrorist training camps where al Qaeda indoctrinated

and taught their hijackers the skills they used to carry out the September 11th Attacks;

c.      provided critical logistical support and resources to al Qaeda around the world,

funding safe houses, furnishing false passport and travel documents, transferring al Qaeda

money, weapons and equipment across international borders and other assistance, all of which

enabled al Qaeda to conduct the September 11th Attacks;

d.      actively supported al Qaeda in its preparations for the September 11th Attacks

through a network of the Sudan's officers, employees and/or agents who aided al Qaeda

terrorists, including the hijackers, providing them with money, cover, advice, contacts,

transportation, and other assistance, including militant and terror training and other material support and resources.

11. The plaintiffs who are the estate representatives of a decedent and are listed as such in the caption, have been duly appointed by a court prior to the commencement of this action and have the legal authority to bring this action to recover the damages set forth herein, including wrongful death damages on behalf of all legally entitled beneficiaries of the decedent and survival damages for the decedent's personal injuries.

**Al Qaeda's Move to Sudan**

12. Osama Bin Laden, with the assistance of Saudi government sponsored charities, created al Qaeda in Pakistan and Afghanistan in the late 1980s as the Jihad against the Soviet Union for its invasion of Afghanistan began winding down.

13. In 1989, Hassan al Turabi, Omar Hassan Ahmed al Bashir, and the National Islamic Front installed an extremist government in Sudan via a *coup d'etat.* Within weeks of taking power, emissaries of the new government in Sudan traveled to Pakistan and Afghanistan where they met with Bin Laden and al Qaeda. Sudan invited Bin Laden and al Qaeda to relocate their operations to Sudan. Members of al Qaeda travelled to Sudan for an assessment mission. They returned to Pakistan and Afghanistan and made a positive report to Bin Laden and al Qaeda. By the end of 1990 members of al Qaeda were working jointly with Sudan preparing the infrastructure for al Qaeda's move to Sudan. A member of the Sudanese Intelligence service bought five farms in Sudan for the use of al Qaeda as training camps.

14. A CIA report indicated that "Bin Ladin moved al-Qaida to Sudan, at the behest of the National Islamic Front."

15.     In 1991, Osama Bin Laden relocated his terrorist operation from Afghanistan and Pakistan to Sudan and began to use the country as a base for al Qaeda's business operations and preparation for jihad.  Sudan's intelligence agency provided personal security for Bin Laden. During this time period, Sudan abandoned visa requirements for Arabs and actively encouraged representatives of Islamic militant organizations to live within its borders. Sudan and al Qaeda jointly vetted representatives of these organizations.

16.     A 1996 State Department fact sheet on Osama Bin Laden described his operations in the country beginning in 1991:

> "Bin Laden relocated to Sudan in 1991, where he was welcomed by National Islamic Front (NIF) leader Hasan Al Turabi. . . . [bin Laden] embarked on several business ventures in Sudan in 1990, which began to thrive following his move to Khartoum. Bin Laden also formed symbiotic business relationships with wealthy NIF members by undertaking civil infrastructure development projects on the regime's behalf."

**Al Qaeda and Sudan's Symbiotic Relationship**

17.     The symbiotic relationship between al Qaeda and Sudan allowed al Qaeda a safe haven in which it grew into a complex multi-faceted terrorist organization with global reach.  For its role in the symbiotic relationship, the Sudanese government gained the prestige of hosting a renowned mujahideen leader who came from a prominent Saudi family that owned one of the largest construction companies in Saudi Arabia, a cadre of trained fighters useful for the war it was waging on its own people in southern Sudan, and well-funded charities that would support Sudan's military, political and religious goals and provide sorely needed investment funds from the wealthiest country in the region, Saudi Arabia.

18.     The CIA wrote, "While based in Sudan from 1992-96, al-Qa'ida was transformed from an only partially realized idea to an international organization ready to operate on its own.

A major factor in this development was the education al-Qa'ida members received working with officials of Sudan's National Islamic Front."

19.    In a report for the Congressional Research Service, a former CIA analyst wrote that after Bin Laden left Sudan, Hassan al Turabi, "Continues to be politically and ideologically close to Usama Bin Laden, even though Turabi acquiesced in bin Ladin's expulsion from Sudan in 1996. Bin Ladin sees Turabi as a mentor and an ideological source of inspiration."

20.    As detailed below, from its Sudan base, al Qaeda planned and trained for attacks against U.S. interests in Yemen, Somalia, Kenya, Tanzania and in the United States itself.  The first planning for the 9/11 Attacks took place at the al Qaeda headquarters in Khartoum.

21.    As detailed below, Bin Laden and al Qaeda's construction projects provided developmental showcases for Sudanese government and provided international cover for al Qaeda operatives to move people and money around the world.

22.    As detailed below, Sudan also made use of emergency relief projects implemented by al Qaeda-affiliated charities in the war zones of Southern Sudan.

23.    Central to implementing the symbiotic relationship was the role of the al Shamal Islamic Bank, founded in 1983 by the State Government of Northern Sudan.  Bin Laden made his first trip to Sudan in the same year ostensibly for business and agricultural investment purposes.

24.    The Chairman of the Board of Directors of al Shamal Islamic Bank was Abdel Wahab Osman, Sudan's Minister of Industry, Minister of Energy and later Minister of Finance & National Economy.

25.    The Sudan-based Faisal Islamic Bank also became a shareholder of al Shamal. The parent company of the Faisal Islamic Bank was Dar al Maal al Islami, registered in the

Bahamas but operating out of Switzerland. These two entities were chaired by Saudi Prince

Mohammed Bin Faisal al Saud, son of the former King and brother of the head of Saudi

Intelligence. Hassan al Turabi held a seat on the board of directors of Dar al Maal al Islami.

Turabi's office was the penthouse of the Faisal Islamic Bank building in Khartoum. Faisal

Islamic Bank knowingly and willingly held accounts for al Qaeda.

26.    In 1991, Sudan's Finance Minister Abdelrahim Hamdi hosted an international

conference in Khartoum regarding foreign investment in Sudan. Numerous Saudi businessmen

as well as members of al Qaeda attended. One of the results of the conference was the infusion

of capital to al Shamal Islamic Bank and the creation of shares held by or on behalf of Bin Laden

and al Qaeda.

27.    In 1996, coincident with Bin Laden's departure from Sudan, Adel Abdul Jalil

Batterjee, a Saudi businessman with no prior experience in banking, became al Shamal's

chairman. Batterjee did, however, have experience with al Qaeda. Batterjee was the founder of

Saudi charity Lajnat al Bir and its successor the Benevolence International Foundation (BIF).

Both were affiliated with Saudi-based World Assembly of Muslim Youth. Lajnat al Bir

supported al Qaeda in Pakistan and as noted below BIF supported al Qaeda in Sudan. BIF

became the largest shareholder of al Shamal Islamic Bank and kept its account there. Batterjee

and the Benevolence International Foundation were eventually listed as Specially Designated

Global Terrorists by the U.S. Government for their roles as supporters of al Qaeda.

28.    An al Qaeda defector told U.S. law enforcement that Bin Laden and at least six al

Qaeda operatives held bank accounts in al Shamal Islamic Bank. In testimony at the criminal

trial of the 1998 African Embassy bombers, the same defector, Jamal al Fadl, testified that al

Qaeda members received monthly checks from al Shamal Islamic Bank and that he transferred

funds from al Shamal Islamic Bank to support al Qaeda's overseas operations and procurement, including transfers to the United States. In 1993, $250,000 was wired from the al Shamal Islamic Bank account of al Qaeda's corporate entity, Wadi al Aqiq, via Bank of New York, to a Bank of America account in Dallas, Texas held by an associate of Bin Laden – where he used it to buy a plane in Tucson, Arizona. The plane was then flown to Khartoum.

29.     Al Shamal Islamic Bank held accounts for al Qaeda companies including Wadi al Aqiq, Rowad Development and al Hijrah Construction. These businesses enriched the National Islamic Front and solidified its hold on power while at the same time providing employment to the al Qaeda Afghan veterans. The corporate entities also provided the perception of a legitimate front which masked al Qaeda's preparations for terror.

30.     While al Shamal Bank was used largely for international transactions, al Qaeda also needed a domestic bank to handle its local business. In 1991 the NIF and Bin Laden established Bank al Muzare aka Farmers Commercial Bank. As detailed below, the Farmers Commercial Bank implemented al Qaeda-related transactions during the time period of the preparation for the 9/11 Attack.

31.     Along with senior members of the NIF, Bin Laden founded Wadi al Aqiq, termed "the mother company". According to the United States State Department, Wadi al Aqiq and another Bin Laden company, Taba Investments Ltd., "secured a near monopoly over Sudan's major agricultural exports of gum, corn, sunflower and sesame products." The State Department also noted that the Bin Laden company al Hijra Construction worked with Sudanese military officials to transport and provide provisions to Bin Laden's terrorist training camps in northern Sudan.

32.     Bin Laden's al Hijra Construction built the Tahaddi a/k/a Challenge Road linking Khartoum to Port Sudan. President Bashir led a public ceremony to open the first phase.

33.     Joining in the Tahaddi road project was the Saudi Bin Laden Group (SBG), a Bin Laden family company in which Osama was a founding shareholder, and created in 1989 just as al Qaeda began moving to Sudan.  SBG provided support and contributions to projects in Sudan via its Public Buildings and Airports Division.

34.     SBG constructed the Port Sudan Airport. SBG boasted of this:

> Over the years the Division has undertaken various challenging projects, large and medium scale, including complete airports and roads. . . . The projects executed include-. . Port Sudan Airport. SBG's skills- . . . has been recognized and utilized in the United Arab Emirates, Jordan, Yemen and Sudan.

The agreement for the construction of an airport in Port Sudan was between the Republic of Sudan and the Saudi Bin Laden Group.  The relationship among Osama Bin Laden, the Republic of Sudan, and the SBG were highlighted during the inauguration ceremony of the Port Sudan airport:

> Meanwhile, Osama Bin Laden, was the first guest invited to attend the inauguration of the new Port Sudan Airport. He sat in the front row and was the guest of honor in this ceremony. It was a group of Bin Laden's companies that carried out the project of the new and modern airport that cost huge amounts of money.

35.     Another company jointly controlled by Bin Laden, Sudan and Saudi businessman Yasin Kadi, was the Khartoum-based Rowad Development and Investment (Rowad).  Rowad was co-located with al Shamal Bank.  Rowad's shareholders included al Shamal Bank, as represented by the Sudan Minister of Finance, two companies owned by Yasin Kadi, an Executive Order 13324 Specially Designated Global Terrorist, and Wadi al Aqiq, Bin Laden's holding company.  Rowad's corporate documents contain the signature of Bin Laden as the representative of Wadi al Aqiq.  Rowad's corporate officers included the chairman of al Shamal,

an officer of Yasin Kadi's Muwafaq Foundation, and a former employee of the Saudi Embassy in Washington DC.

36.     Rowad was involved in the agricultural sector including the processing and sale of sesame seeds.  As noted above, Sudan gave al Qaeda a monopoly on the export of sesame products and other agricultural commodities.

37.     As detailed below, after Bin Laden left Sudan in 1996, several of the principals involved in Rowad continued the trade in sesame from Sudan.

38.     Al Qaeda and Sudan also cooperated under the cover of so-called charitable activity.  Al Dawa al Islamiya (Islamic Call) was instrumental in helping establish al Qaeda in Sudan.  Senior officers of Islamic Call were members of the National Islamic Front. They opened bank accounts for al Qaeda and helped with the founding of the al Qaeda's mother company Wadi al Aqiq.

39.     The Islamic African Relief Agency (IARA), a charity based in Khartoum with fund-raising subsidiaries in many countries including the United States, supported al Qaeda and Bin Laden. NIF members founded and directed IARA.  Senior Sudanese intelligence officers together with Bin Laden senior aides, ran the IARA branch in Pakistan and Afghanistan in support of Bin Laden's activities.  IARA officials regularly met with President Bashir to plan strategy regarding fighting the Sudanese civil war, including plans to attack Western humanitarian organizations attempting to help the victims of that war.  IARA facilitated the NIF's financing of al Qaeda's attack on U.S. armed forces in Somalia.

40.     As noted below IARA provided significant financial assistance to al Qaeda during the planning and implementation of the 9/11 Plot.

41.     In October 2004, IARA was listed as a Specially Designated Global Terrorist by the U.S. Department of the Treasury for providing "direct financial support" for Bin Laden.

42.      The Third World Relief Agency (TWRA) was founded and operated by Sudanese intelligence officials and assisted al Qaeda in moving its personnel and weaponry internationally. TWRA's weapons trafficking to al Qaeda in Bosnia was coordinated with Hassan al Turabi.

43.     As noted above, Lajnat al Bir al Islami (LBI) was a Saudi-based charity affiliated with the World Assembly of Muslim Youth.  LBI operated closely with al Qaeda during its formative years in Pakistan and Afghanistan.  As part of the agreement establishing the symbiotic relationship between al Qaeda and Sudan, LBI was renamed the Benevolence International Foundation (BIF) and began operating inside Sudan.

44.     BIF presented a public face of humanitarian action in support of victims of war but internally declared that its main role was to support jihad.  BIF assisted al Qaeda and Sudan with military, logistical support and medical care for the mujahidin and also cared for their families.

45.     From its Sudan base, BIF facilitated the movement of al Qaeda operatives around the world.  One such operative was Mahmdou Mahmoud Salim.  Salim was a Sudanese citizen though born in Iraq and was one of the original founders of al Qaeda.  Salim was key to brokering the agreement between Bin Laden and Sudan that led to their symbiotic relationship. As noted below, from his Sudanese base Salim helped al Qaeda establish an international support structure.

46.     Under cover of humanitarian aid programs, BIF supported the Sudan government in prosecuting a war of aggression against the non-Arab and Christian population in the southern

regions of the country. According to its own document, BIF "formed a close union with the Popular Defense Force".

47.     Sudan's militia was known as the Popular Defense Force (PDF).  Al Qaeda, fresh from the war against the Soviets in Afghanistan, trained the PDF in guerilla tactics and purchased weapons for them.  In a State Department Cable, the PDF was later praised for "fixing the spirit of jihad among the mujahidin."

48.     The Muwafaq Foundation was a Saudi-founded organization supporting al Qaeda in Pakistan, Bosnia and Sudan and was run by Yasin Kadi.  Its Khartoum office was staffed with Sudanese government employees.  In 1994, the State Department called it a 'de facto agent of the Government of Sudan.'

49.     Bin Laden praised Muwafaq for its support of the PDF in the al Qaeda supported military efforts of Sudan.  Bin Laden provided funds to Muwafaq to assist the PDF.  In one instance, Muwafaq provided 100 tanker trucks to the PDF to keep them supplied with water and fuel.

50.     Al Qaeda delegated a representative to Muwafaq to maintain adequate funding. The Khartoum office was run by a Sudanese national whose previous position had been at the Embassy of Saudi Arabia in Washington, D.C.

**The Growth of al Qaeda**

51.     In summing up al Qaeda's time in Sudan, the CIA wrote,

 "While based in Sudan from 1992-96, al-Qa'ida was transformed from an only partially realized idea to an international organization ready to operate on its own; A major factor in this development was the education al-Qa'ida members received working with officials of Sudan's National Islamic Front (NIF) to strengthen Sudan—some reporting says to build an international jihad infrastructure".

14

52.     Hassan al Turabi created the Popular Arab and Islamic Congress in Sudan and held conferences throughout the 1990s attended by the PLO, Hamas, Hezbollah, government representatives of Iraq, Afghanistan, Libya and Iran and militant groups from Pakistan, Algeria and Tunisia, as well as al Qaeda.

53.     During one of these conferences hosted by Turabi in Khartoum, Sudan in 1993, Osama bin Laden and a deputy met with Hezbollah and Iranian government terror chief Imad Mughniyah and Iranian Military Brigadier General Mohamed Bagr Zolqadr and struck a deal to work and train together in the safe havens of Sudan and Iran.  They established a tripartite agreement between al Qaeda, Sudan, and elements of the government of Iran and Hezbollah to work together against the United States, Israel and other western countries.  According to the CIA, this agreement was intended for al Qaeda members "to gain the necessary expertise in terrorist operations."

54.     In finding Iran liable for the September 11th Attacks, based in part on the meetings and agreements between al Qaeda and Iran that were originally brokered by Sudan, this Court found that the agreements were significant in moving al Qaeda forward and growing it into an international terrorist organization that enjoyed state support.  Prior to the Court's holding on Iran in 2011, however, other courts had already found Sudan liable for its support for al Qaeda and its role in supporting both the bombing of two U.S. Embassies in East Africa in 1998 and the bombing of the U.S.S. Cole in Yemen in 2000.  Both Sudan and Iran were, and still are, listed as state sponsors of terrorism and each were al Qaeda sponsors.

55.     Between 1990 and 1993, members of al Qaeda in Sudan undertook the task of writing the Encyclopedia of the Afghan Jihad.  The members also wrote a book on terrorism,

called Military Studies in the Jihad against the Tyrants. Both manuals were used in al Qaeda training courses.

56.     Bin Laden organized al Qaeda into camps throughout Sudan, the main one being a 20-acre site near Soba, 10 kilometers south of Khartoum. Camps provided training for al Qaeda's operatives as well as training for the Sudan's Popular Defense Forces, the para-military force terrorizing the population in the south of Sudan.

57.     Sudan provided 200 passports to al Qaeda so that its members could travel with new identities. Al Qaeda used these passports for two purposes: to establish an international procurement network and to support waging of jihad. At least some of these were Diplomatic Passports which allowed al Qaeda to avoid any scrutiny entering and exiting Sudan and reduced scrutiny when entering other countries.

58.     Sudan was placed on the State Sponsors of Terrorism List in 1993. In order to avoid suspicion during international travel, Sudan provided a special customs service for al Qaeda operatives to avoid having Sudanese stamps placed in their passports.

59.     Sudan benefited from al Qaeda's international procurement network when al Qaeda purchased communications equipment, radios, and rifles for Sudan.

60.     One key al Qaeda member was Mahmdou Mahmoud Salim, who, as noted above, was a founder of al Qaeda and a key interlocutor between al Qaeda and Sudan of which he was a citizen. Salim worked with a senior NIF official to obtain communications equipment for the Sudanese intelligence service.

61.     Salim was able to travel freely for al Qaeda with his Sudanese passport to attend meetings and deal with al Qaeda affairs in Turkey, Bosnia, and China.

62. On September 14, 1998, the U.S. requested the extradition of Salim from Germany for conspiracy to commit the terror bombings of two U.S. Embassies in East Africa the previous month, and stated that during the period 1992-1996, while Bin Laden lived in Sudan, al Qaeda and the Sudanese government worked closely together on training and arming terrorists. While awaiting trial in the S.D.N.Y., Salim stabbed a prison guard at the M.C.C. and was later convicted of attempted murder and sentenced to life in prison.

63. Bin Laden and al Qaeda were allowed to operate freely in Sudan, particularly for training and planning terror attacks against U.S. targets and Americans.

64. Lieutenant General Omar Hassan Ahmed al Bashir was the President of Sudan, and as head of Sudan, Bashir was responsible for formulating and executing Sudan's policy of supporting terrorism, Bin Laden and al Qaeda.

65. President Bashir signed a letter authorizing al Qaeda to freely pass through Sudanese customs allowing unhindered entry and exit of people and goods through Port Sudan. Bashir's letter also allowed al Qaeda free travel through police checkpoints for the transport of people and goods within Sudan.

66. With the assistance of Sudan's intelligence service, al Qaeda smuggled weaponry into Egypt via the use of camels and from Port Sudan shipped weapons and explosives to an affiliated group in Yemen.

67. Al Qaeda and the Sudanese Army planned the joint manufacture of chemical weapons and practiced mounting chemical agents on artillery shells. Al Qaeda at this time also began to conduct experiments on dogs that were injected or gassed with cyanide.

68. During its stay in Sudan, al Qaeda had grown from a group of mujahidin with military experience into a full-blown terrorist organization with fund raising, propaganda, training and operations' departments.

69. In May 1996, after the United States pressured Sudan, Bin Laden departed Khartoum and returned to Afghanistan. The U.S. State Department called it an "alleged expulsion" and "an amicable separation." Bin Laden continued to maintain his substantial business interests and facilities in Sudan even after his departure to Afghanistan in 1996. As noted below, Sudan continued active and energetic support to Bin Laden and al Qaeda.

**Sudan's Support to al Qaeda attacks on the United States**

70. In 1991, 1992, and 1993 al Qaeda issued fatwas calling for attacks on the United States.

71. The 1992 fatwa included a call for attacks on U.S. military forces in Yemen.

72. Al Qaeda carried out the attacks on U.S. personnel in Yemen in December 1992. Sudan knew that al Qaeda carried out this attack and supported it.

73. The 1993 fatwa advocated violence against Americans based in Mogadishu, Somalia. Sudan's intelligence service was aware of these fatwas and supported them.

74. In October, 1993 al Qaeda assisted the Somali warlords who shot down two U.S. Black Hawk helicopters in Mogadishu, killing 18 U.S. service members and led to the subsequent withdrawal of U.S. forces from the Somali humanitarian mission in early 1994.

75. An April 1997 CIA report stated that al Qaeda went to Somalia "with the NIF's knowledge and encouragement, in order to kill U.S. troops, incite violence against U.S. personnel and undermine the success of the U.S. mission."

76.     Bin Laden told CNN that one of his proudest achievements during the period of time al Qaeda was based in Sudan was al Qaeda's role in the October 1993 killing of more than a dozen American soldiers stationed in Somalia who had been taking part in Operation Restore Hope, a UN-sponsored emergency relief mission.

77.     Omar Abdel Rahman, a/k/a the Blind Sheikh, was a radical Egyptian cleric who joined the jihad against the Soviet Union in Afghanistan.  During the Afghan war, Abdel Rahman became very close to Bin Laden.  Abdel Rahman subsequently moved to the United States.  Bin Laden financially supported Abdel Rahman in New York via Sudan and NIF logistical channels.  Abdel Rahman encouraged Islamic terrorist Ramzi Yousef and others to bomb the World Trade Center on February 26, 1993 killing six people.  Yousef had trained in al Qaeda camps and is the nephew of al Qaeda 9/11 mastermind Khalid Sheikh Mohamed.  Abdel Rahman was arrested in June 1993, four months after the WTC bombing and charged in another plot to blow up New York City landmarks known as the Bridges and Tunnels Plot or the Landmark Plot.  In October, 1995 Abdel Rahman was convicted in the Southern District of New York for his role in this plot.

78.     The Sudan Embassy to the United Nations in New York and its Ambassador intended to assist Omar Abdel Rahman in this plot by arranging the entrance of a bomb-laden car into the underground parking garage of the U.N.  According to the U.S. government terrorism expert who testified in the E.D.VA, Lorenzo Vidino:

>       A. [I]n the follow-up operation after the ['93] World Trade Center attack, a cell made mostly of Sudanese nationals operating in the New York area, started planning a follow-up attack where the targets were the U.N., the Holland Tunnel and probably the FBI headquarters in New York.  This was supposed to be, as I said, a follow-up attack to the '93 attack which, in their view, was a botched attack….

A. Phone calls were intercepted by U.S. Intelligence between some of the operatives in which they talk about the fact that officials at the Sudanese embassy were going to provide them with diplomatic passports once the operation was carried out so that they could leave the country freely the night after the attack was to take place.

At the same time for the bombing of the U.N. headquarters, the truck loaded with explosives was supposed to come in, go into the garage of the U.N. using documents provided by the Sudanese delegation. Pretty much the Sudanese delegation would write the letter and use plates. Actually the plates that were supposed to be put on the truck were plates given by the Sudanese delegation.

So there were different indications that the Sudanese delegation there was closely supporting this attempt. Two individuals that were actually directly linked to the plot were, U.S. intelligence indicated that they were actually members of Sudanese intelligence, but they were of course not identified as such at the United Nations, but were actually members of the Sudanese military intelligence.

When the U.N., the Sudanese ambassador to the U.N., who was apparently not aware that this plot was taking place, called Turabi to complain about this, Turabi pretty much told him to literally to mind his own business. So it was clear there was involvement of the highest-ranking members of the Sudanese government that had dispatched intelligence officers at the Sudanese embassy to provide support to the cell to carry out this attack in the United States. So this attack was botched, was thwarted, but it was really the final straw that led to the designation of Sudan as a state sponsor of terrorism by the United States State Department.[1]

79. As a result of these terrorist acts and plots, Sudan was designated in 1993 as a foreign state that sponsors terrorism within the meaning of the Export Administration Act of 1979, 50 U.S.C. App. §2405(j), and the Foreign Assistance Act of 1961, 22 U.S.C. §2371(b) and 28 U.S.C. §2333.

---

[1] Testimony of Lorenzo Vidino, *Rux v. Republic of Sudan*, Case No. 2:04-cv-0428, (E.D.Va.), March 13, 2017, at pp. 90-91.

80.      In May 1996 Bin Laden left Sudan for Afghanistan. The U.S. State Department called it an "alleged expulsion" and said "Bin Ladin's National Islamic Front colleagues probably would have wanted an amicable separation, in part because Khartoum did not want to alienate the radical terrorist financier and his small army of trained mujahidin. Any arrangement may have included allowing bin Ladin to run his Khartoum-based businesses through Sudanese intermediaries."

81.      In August 1996, Bin Laden and al Qaeda issued a public Declaration of Jihad calling for attacks on the United States.

### 1998 Bombing of U.S. Embassies in East Africa

82.      In early 1998, several of the principal operatives in this al Qaeda bombing plot travelled back and forth between Khartoum and Nairobi, the site of one of the U.S. Embassy attacks.  On August 7, 1998, al Qaeda operatives carried out near simultaneous truck bombings of the U.S. Embassies in Nairobi, Kenya and Dar es Salaam, Tanzania, killing 224 people, including 12 Americans, and injuring over 4,500.

83.      Sudan assisted al Qaeda in carrying out the planning and execution of the 1998 bombings of the U.S. Embassies in Kenya and Tanzania.  Beginning in 1993, al Qaeda dispatched its operatives from Sudan to Kenya to begin setting up the logistical network necessary to surveil, plan and carry out the attacks.  In 1997, funding in U.S. dollars for the Embassies' bombing plot was transferred from Sudan to al Qaeda operatives with the assistance of Sudanese authorities.   The operatives used Sudan as their home base and held Sudanese passports and documents issued by the Sudanese government that allowed them to freely cross international borders.

84. In the aftermath of the Embassy attacks, Sudan's President Bashir defended Osama bin Laden. "I met him. . . He's a very normal person who is very religious."

85. On August 20, 1998, "To preempt additional attacks, the United States launched military cruise missile strikes against terrorist targets in Afghanistan and Sudan." One of those targets was a Sudanese government chemical factory north of Khartoum.

86. Several Al Qaeda terrorists were eventually captured, prosecuted and convicted in the S.D.N.Y, including Osama bin Laden in absentia. Many of the bombing victims and their survivors brought civil suits against al Qaeda, Sudan and others. Sudan hired counsel in the action but later abandoned the litigation. The D.C. District granted a default judgment against Sudan and conducted an evidentiary hearing. The court found that Sudan provided material support to al Qaeda and was responsible for the bombings of the two U.S. Embassies in East Africa. The D.C. Circuit Court of Appeals affirmed the District Court in Owens v. Republic of Sudan, 864 F.3d 751, 794-95 (D.C. Cir. 2017), finding that Sudan was responsible for supporting the al Qaeda bombings:

> The record shows that after al Qaeda started its businesses, Sudan fostered their growth through tax exceptions and customs privileges. This allowed al Qaeda nearly to monopolize the export of several agricultural commodities, plowing its profits back into its broader organization. Again, after al Qaeda opened its training camps, Sudanese intelligence shielded their operations from the local police despite complaints from nearby residents. This preferential treatment certainly qualifies as material support, even if Sudan played no role in creating the underlying businesses and training camps.

87. The D.C Court of Appeals further stated that:

The district court noted, bin Laden's $50 million investment in the partially state-owned al Shamal Islamic Bank gave al Qaeda "access to the formal banking system," which proved useful for "laundering money" and "financing terrorist operations." 826 F.Supp. 2d 128, at 144. Al Qaeda operatives, including bin Laden himself, held accounts in their real names in al Shamal bank, demonstrating the impunity with which the group operated in Sudan. Id. at p.795.

88.     In summarizing Sudan's deep and long-lasting relationship with al Qaeda, the

D.C. Court of Appeals found that:

> The plaintiffs have offered sufficient admissible evidence that establishes that Sudan's material support of al Qaeda proximately caused the 1998 embassy bombings.

89.     The issue of punitive damages and its retroactive application was challenged by

Sudan and its on-again, off-again U.S. counsel at White & Case, and certiorari was granted.  In

May 2020, the Supreme Court not only unanimously sustained the judgment against Sudan for

the embassy bombings, but also determined that Congress could, and ultimately did, legislate

that punitive damages against a sovereign state in a terror action were permitted.  Opati v.

Republic of Sudan, 590 U.S. p. 5 (May 2020).  Justice Gorsuch wrote that:

> "District Judge John Bates offered detailed factual findings explaining that Sudan had knowingly served as a safe haven near the two United States Embassies and allowed al Qaeda to plan and train for the attacks. The court also found that Sudan had provided hundreds of Sudanese passports to al Qaeda, allowed al Qaeda operatives to travel over the Sudan-Kenya border without restriction, and permitted the passage of weapons and money to supply al Qaeda's cell in Kenya. See Owens v. Republic of Sudan, 826 F. Supp. 2d 128, 139–146 (DC 2011)."

### 2000 Bombing of U.S.S. Cole

90.     Two years later, the U.S.S. Cole was bombed by al Qaeda in the port of Sanaa,

Yemen in October 2000.  One of the main architects of the bombing trained in the al Qaeda

camps in Sudan.

91.     On July 25, 2007, in finding Sudan liable for the Cole bombing, the Federal Court

in the Eastern District of Virginia, after weighing trial evidence stated, "the Court FINDS as a

fact, that the explosives used in the Cole attack were sent by Al Qaeda operatives in Sudan."

92.     The Court further stated that,

"[t]his finding is corroborated by the testimony of one of Bin Laden's lieutenants in Sudan, Jamal Al-Fadl, who testified in criminal proceedings against Bin Laden arising

out of the 1998 embassy bombings. (Ex. 32, *United States v. Bin Laden,* Case No. 198CR1023, Trial Tr. Feb. 6, 2001). Mr. Al-Fadl stated in sworn testimony in a trial before the United States District Court for the Southern District of New York that he worked under Bin Laden in Sudan; that he stored four crates of weapons and explosives at a farm in Sudan owned by Bin Laden; and that he shipped the four crates in an Al Qaeda-owned boat from a facility owned by the Sudanese military in Port Sudan to Yemen, where they were to be used to "fight the Communists."

93.     The Virginia District Court further found that:

"Based on the expert testimony and documentary evidence, the Court FINDS as a fact that Sudan, beginning in the early 1990s and continuing at least until 2000, actively provided Al Qaeda with the support, guidance, Sudanese diplomatic passports and resources that allowed it to transform into a sophisticated, worldwide terrorist network, and that such support was critical to Al Qaeda developing the expertise, networks, military training, munitions, and financial resources necessary to plan and carry out the attack that killed the seventeen American sailors on the U.S.S. Cole. Each of the expert witnesses testified that the strike against the Cole would likely not have occurred without Sudan's support and assistance to Al Qaeda in the form of safe haven, military training, diplomatic passports, business partnerships, and lax banking and accounting systems that facilitated money laundering." *Rux* at 553.

94.     In addition, the Rux Court stated that,

"[t]he Court FINDS as a fact by substantial evidence that Sudan's material support to Al Qaeda led to the murders of the seventeen American servicemen and women on October 12, 2000, in the territorial waters of Yemen." *Id*. at 554.

95.     Relying on exceptions to foreign sovereign immunity pre-JASTA, the District

Court held that:

"Sudanese Government officials, employees, or agents acting within the scope of their office provided various forms of "material support" as defined in 18 U.S.C. § 2339A(b), including lodging, safe houses, financial services, false documentation, and transportation, to Al-Qaeda, whose operatives planned and carried out the Cole bombing. *See* 18 U.S.C. § 2339A(b)(1) (defining "material support or resources").[10] The deliberate murder of the seventeen American sailors qualifies as an "extrajudicial killing."[11] Jurisdictional causation under 28 U.S.C. § 1605(a)(7) is satisfied, as the evidence establishes a "reasonable connection between [Sudan's] provision of material support to [Al Qaeda] and the damage arising out of [the] terrorist attack" against the Cole. *Rux,* 461 F.3d at 473. Since 1993, the U.S. Department of State has designated Sudan as a state sponsor of terrorism in accordance with § 6(j) of the Export Administration Act, 50 U.S.C. § 2405(j). 58 Fed.Reg. 52523-01 (Oct. 8, 1993). Id. at 554-55.

96.     The USS Cole bombing took place on October 12, 2000, after the 9/11 hijackers had already begun arriving in the United States in preparation for the attack that would take place a mere 11 months later.

**Sudan's Support of the 9/11 Attack**

97.     According to the Report of the 9/11 Commission, the first planning for the 9/11 Attacks took place at the al Qaeda headquarters in Khartoum, Sudan.

98.     From 1996 to 1998, numerous telephone calls were made to the Khartoum offices of the al Qaeda companies from al Qaeda telephones in London, Kenya and Afghanistan.

99.     In its December 4, 1998 daily briefing of the President, the CIA wrote "A Bin Ladin associate in Sudan late last month told a colleague in Kandahar that he had shipped a group of containers to Afghanistan.  Bin Ladin associates also talked about the movement of containers to Afghanistan before the East Africa bombings."

100.    According to the Canadian Intelligence Service, in a 1998 meeting with al Qaeda's number two official, Ayman al Zawahiri, Sudanese government officials agreed to use their embassies in western capitals to act as fund-raisers for al Qaeda and to provide passports to al Qaeda to further al Qaeda's terrorist agenda and the ability of its operatives to move about the globe.

101.    As noted above, the Islamic African Relief Agency (IARA), an NIF charity based in Khartoum with fund raising subsidiaries in many countries including the United States, has long supported al Qaeda and Bin Laden.

102.    In 1999, IARA's overseas offices provided hundreds of thousands of dollars to Bin Laden.  For instance, IARA's office in Dublin, Ireland was raided in 2001 and documents

recovered related to Mustafa al Hawsawi and the al Qaeda network. Al Hawsawi was a major source of funds for the 9/11 hijackers. IARA Dublin provided support to the European based cell of al Qaeda during the same time that al Qaeda recruited the 9/11 hijackers in Hamburg, Germany and other parts of Europe. The Director of IARA Dublin visited Afghanistan in the year 2000 to facilitate the flow of money and support to al Qaeda terrorists in Afghanistan and Europe.

103.     In 2000, representatives of IARA Afghanistan and al Qaeda's main support group Mahktab al Khidmat, traveled to Sudan and neighboring countries on a fundraising trip, in which they raised $5 million for al Qaeda. Outside of Afghanistan, government officials in Sudan and Saudi Arabia provided critical financial and logistical support to al Qaeda as the organization was conducting the final phases of training for the 9/11 Attack. The Director of IARA Afghanistan was a top aide to Bin Laden. During the year 2000, from its base in Afghanistan, al Qaeda directed the financial support to the 9/11 Plot.

104.     IARA had representatives in several U.S. cities. One representative, Ziyad Khalil, procured a satellite phone for the use of Osama Bin Laden in Afghanistan. Another IARA representative, Ahmed Al-Hebr, was based in the King Fahad Mosque in Culver City, California. Al-Hebr had helped organize the Grand Opening of the mosque in 1998. Out of the fifty mosques operating in Southern California in January 2000, hijackers Nawaf al Hazmi and Khalid al Mihdhar went to this mosque upon their arrival in the U.S, and received assistance from the mosque management. On October 13, 2004, the U.S. government listed IARA as a Specially Designated Global Terrorist ("SDGT") entity, along with five senior officials for providing direct support to bin Laden and al Qaeda.

105.     As stated above, after Bin Laden left Sudan in May 1996, Saudi businessman and charitable supporter of al Qaeda, Adel Batterjee, became the Chairman of al Shamal Islamic Bank, despite his having no prior banking or financial experience.  His charity, the Benevolence International Foundation (BIF), which supported both al Qaeda and Sudan, became the largest shareholder in the bank.

106.     A document recovered from the 2011 raid on Bin Laden's Abbottabad compound revealed that in 1999, Bin Laden declared that he had between 26 and 28 million dollars still left in Sudan and was attempting to find a way to access the funds from Afghanistan. One of the money laundering mechanisms used to access these funds is described below.

107.     As detailed above, Rowad Development was an agricultural joint venture owned by Bin Laden, al Qaeda, Saudi businessman Yasin Kadi, and al Shamal Islamic Bank. Sudan's Minister of Finance was on the Board of Directors. One of its primary commodities was sesame for which Sudan gave al Qaeda a monopoly on exports. In 1999-2000, several of the principals involved in Rowad continued the trade in sesame from Sudan, albeit under a different corporate name, in order to provide funding and cover for al Qaeda operatives.

108.     During the summer of 1999, using about $1 million originating from the Saudi Royal Family, a newly established company named Solano was formed by Rowad shareholders to ostensibly purchase sesame seeds in Sudan in order to market them internationally.

109.     In 1999-2000, Solano bought sesame seeds from a related Sudanese company, Adyat.  To pay for the sesame seeds, Solano transferred approximately $1 million from its Swiss bank account to Adyat's account in al Shamal Bank via Dubai Islamic Bank.  The funds were then transferred on to the Farmers Commercial Bank, another Sudanese bank founded by Bin

Laden and the NIF. The Farmers Commercial Bank was a US Treasury Designated National at the time of the transfers.

110.     An intermediary company in these transactions was Dan Fodio, a Sudanese company owned by the National Islamic Front which helped al Qaeda trade in sesame seeds at the time al Qaeda had a 'near monopoly' on export of sesame products. In May 2000, 1,000 tons of sesame seeds were exported from Port Sudan but Solano records do not show any revenue from the sale of these sesame seeds.

111.     Simultaneously, Solano itself held an account at al Shamal.  The account began with a balance of $9 million, though there is no indication of the origin of these funds.  Between October 1999 and February 2000, in a series of transactions, al Shamal drained the Solano account to zero.  An additional thirty-four checks totaling $27 million were presented for payment but according to al Shamal records, there were insufficient funds to cover the checks. The figure is nearly identical to the $26-28 million Bin Laden wanted to extract from Sudan as noted above.

112.     As the State Department said in a cable of June 20, 2000, "Several Bin Ladin businesses . . . are run by al-Qaida lieutenants and still operate in Sudan. . . Sudan maintains a financial stake in some of these companies and has tried to obscure Bin Ladin's commercial ties by changing the name of at least one of his companies."  In the summer of 2000, on several occasions the United States Department of State noted that Sudan continued to knowingly allow al Qaeda staff and corporate entities to function within its borders.

113.     Abdelrahim Mohamed Hamdi was Sudan's Minister of Finance in 1991 and was instrumental in raising funds, including from Bin Laden, to capitalize al Shamal Islamic Bank. Hamdi was also the Chair of the Khartoum Stock Exchange and Chair of the National

Committee for the Division of National Wealth in the late 1990s. In early 1996, Abdelwahab Osman was appointed Sudan's Minister of Finance. Osman was also Chairman of the al Shamal Islamic Bank and a Board Director of Rowad Development. Hamdi and Osman had regulatory authority over all banks in Sudan as well as controls on foreign exchange.

114. These two fund-raising schemes on behalf of al Qaeda by IARA and Solano took place simultaneously with al Qaeda's major expenditures on the 9/11 Plot.

115. The funds generated by Sudan were critical to al Qaeda's 9/11 Plot by supporting al Qaeda's training camps in Afghanistan which the 9/11 hijackers attended, the infrastructure of al Qaeda in Afghanistan, Pakistan and other countries necessary for the 9/11 Plot to be carried out, the travel, living, and the training expenses of the hijackers and their supporters as they moved overseas in preparation for the attack.

116. In describing Sudan's relations with al Qaeda after the departure of Bin Laden, an official of the US State Department's Bureau of Intelligence and Research reported, after 1996 "there were still persistent links with Al Qaida. The facilitators were still in Khartoum and . . . Sudanese government officials knew it. Al Qa'ida front companies were still in play. . . . Sudan was trying to give the impression that they were changing without surrendering Islamic radicals. They were trying to have it both ways."

117. In another cable, the United States Department of State noted they had a "list of 26 associates of Bin Laden who continue to reside in Sudan."

118. The United States Department of State issues annual reports titled Patterns of Global Terrorism. The 1998 annual report stated "Sudan continued to serve as a meeting place, safe haven, and training hub for a number of international terrorist groups, particularly Usama Bin Ladin's al-Qaida organization." The 1999 annual report stated "Sudan continued to serve as

a meeting place, safe haven, and training hub for members of Bin Ladin's al-Qaida, Lebanese

Hezbollah, al-Jihad, al-Gama 'at, PIJ, HAMAS, and the Abu Nidal organization (ANO)." The

2000 annual report noted that Sudan "continued to be used as a safe haven by members of various

groups, including associates of Usama Bin Ladin's al-Qaida organization, Egyptian al- Gama'a al-

Islamiya, Egyptian Islamic Jihad, the Palestine Islamic Jihad, and HAMAS. Most groups used

Sudan primarily as a secure base for assisting compatriots elsewhere." The 2001 report, issued a

few months after the September 11th attack, stated, "[a] number of intentional terrorist groups

including al-Qaida, the Egyptian Islamic Jihad, Egyptian al-Gama'a al-Islamiya, the Palestine

Islamic Jihad, and Hamas continued to use Sudan as a safe haven, primarily for conducting

logistics and other support activities."

119. The United States Secretary of State continues to designate the Republic of Sudan

as a state sponsor of international terrorism.

## FIRST CAUSE OF ACTION TO RECOVER PERSONAL INJURY AND WRONGFUL DEATH DAMAGES PURSUANT TO SECTION 1605A OF THE FOREIGN <u>SOVEREIGN IMMUNITIES ACT, 28 U.S.C. § 1605A</u>

120. Plaintiffs incorporate herein by reference the averments contained in the

preceding paragraphs as though fully set forth herein at length.

121. At all relevant times, defendant Sudan was and remains to be a foreign state

designated as a state sponsor of terrorism as required by 28 U.S.C. § 1605A(a)(2)(A)(i) to

maintain an action under § 1605A of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C.

§ 1605A(a)(2)(A)(i).

122.     Plaintiffs herein initially brought suit against defendant Sudan pursuant to 28

U.S.C. § 1605(a)(7) and Pub.L. 104-208, Div. A, Title I, § 101(c), 110 Stat. 3009-172 (reprinted

at 28 U.S.C. § 1605 note (West Supp.)).

123.     Congress, in the National Defense Authorization Act for Fiscal Year 2008 (P.L.

110-181, § 1083), which was enacted January 29, 2008 (the "NDAA"), amended the Foreign

Sovereign Immunities Act ("FSIA") by adding a new § 1605A to Chapter 97 of Title 28 of the

U. S. Code. The new Section 1605A unequivocally creates a federal private right of action

against foreign state sponsors of terrorism.  Subsection (c) of § 1605A, provides:

> **(c) Private right of action.**--A foreign state that is or was a state sponsor of terrorism as described in subsection (a)(2)(A)(i), and any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, shall be liable to--
>
> > **(1)** a national of the United States,
> >
> > **(2)** a member of the armed forces,
> >
> > **(3)** an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or
> >
> > **(4)** the legal representative of a person described in paragraph (1), (2), or (3), for personal injury or death caused by acts described in subsection (a) (1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages. In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages. In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents.

Section 1605A applies to the pending actions of each of the Plaintiffs herein pursuant to Pub.L. 110-181, Div. A, Title X, § 1083(c), Jan. 28, 2008, 122 Stat. 342, which provides that:

> **(1) In general.**--The amendments made by this section [enacting this section and amending 28 U.S.C.A. §§1605, 1607, 1610, and 42 U.S.C.A. § 10603c] shall apply to any claim arising under section 1605A of title 28, United States Code [this section].
>
> * * *

31

**(3) Related actions.**--If an action arising out of an act or incident has been timely commenced under section 1605(a)(7) of title 28, United States Code, or section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 (as contained in section 101(c) of division A of Public Law 104-208), any other action arising out of the same act or incident may be brought under section 1605A of title 28, United States Code [this section], if the action is commenced not later than the latter of 60 days after--

    (A) the date of the entry of judgment in the original action; or

    (B) the date of the enactment of this Act [Jan. 28, 2008].

124.    As a result of the conduct of defendant Sudan and its agencies, instrumentalities, officials, employees and agents that violated the federal laws cited above, all Plaintiffs suffered damages as fully set forth in the paragraphs herein which are incorporated here by reference.

125.    The surviving personal injury and death victims were seriously and severely injured, shocked, bruised and wounded and suffered great physical, mental and emotional pain and injury and they were rendered sick, sore, lame and disabled, and were otherwise injured or killed, or were confined to a hospital, bed, and/or home for a period of time. Those surviving personal injury victims and the estates of those killed are entitled to recover damages from defendant Sudan for their personal injuries and deaths sustained in and as a result of the September 11, 2001 terrorist attacks.

126.    Decedents killed in the September 11, 2001 terrorist attack are survived by family members entitled to recover damages from defendant Sudan for wrongful death. These family members are among the Plaintiffs who are entitled to damages deemed as a fair and just compensation for the injuries resulting from the deaths of the Decedents.

127.    The injuries and damages suffered by the Plaintiffs by virtue of personal injury and wrongful death, and the consequences resulting there from, were proximately caused by the intentional, reckless and negligent acts, omissions, and other tortious conduct of defendant Sudan as described herein.

128.     As a direct and proximate result of intentional, reckless and negligent acts, omissions, and other tortious conduct of defendant Sudan, the surviving personal injury plaintiffs suffered serious and permanent personal injuries, severe mental and emotional anguish and suffering, impairment of their respective earning capacities, which impairment will continue indefinitely into the future, as well as financial losses and expenses, were obligated to receive and undergo medical attention and care and to incur various expenses for the treatment of their injuries.

129.     As a direct and proximate result of the deaths of the Decedents, their heirs have been deprived of future aid, assistance, services, comfort, and financial support and suffered damages including pain and suffering, trauma, emotional distress, loss of life and life's pleasures, loss of earnings and earning capacity, loss of accretion to their estates and other items of damages as fully set forth in the paragraphs above which are incorporated herein by reference.

130.     Plaintiffs also bring this action for damages suffered by the Decedents and caused by the defendant's conduct.  As a result of the intentional, reckless and negligent acts of defendant Sudan as described above, the Decedents endured pain, suffering, and trauma; were placed in apprehension of harmful and offensive bodily contact (assault), suffered offensive and harmful bodily contact (battery), suffered extreme fear, anxiety, emotional and psychological distress (intentional/negligent infliction of emotional distress), and were mentally and physically harmed, trapped, and falsely imprisoned (false imprisonment) prior to their ultimate deaths.

131.     The actions of defendant Sudan, its agencies, instrumentalities, officials, employees and agents, acting in concert to carry out their unlawful objectives, were malicious, outrageous and in willful, wanton, and reckless disregard of the rights of all the Plaintiffs.  The defendant intended to carry out actions that would end the lives of the Decedents.

132.     As a result of their intentional, malicious, outrageous, willful and wanton conduct, all defendants are jointly and severally liable to all Plaintiffs for punitive damages.

**WHEREFORE**, Plaintiffs demand judgment in their favor against defendant Sudan jointly, severally, and/or individually, in an amount authorized by governing law to be determined at trial, for compensatory damages, together with punitive damages, plus pre- and post-judgment interest, costs, attorney fees, and such other monetary and equitable relief as this Honorable Court deems appropriate under the circumstances and to prevent Sudan from ever again committing such heinous acts.

### SECOND CAUSE OF ACTION TO RECOVER PERSONAL INJURY AND WRONGFUL DEATH DAMAGES PURSUANT TO SECTION 1605B OF THE FOREIGN SOVEREIGN IMMUNITIES ACT, 28 U.S.C. § 1605B (JASTA) AND THE ANTI-TERRORISM ACTS

133.     Plaintiffs repeat and reallege all of the preceding paragraphs as if fully set forth herein.

134.     This action is also brought pursuant to 28 U.S.C. § 1605B of the Foreign Sovereign Immunities Act known as JASTA and 18 U.S.C. § 2333(a) for the injuries and deaths suffered by U.S. nationals in the September 11th Attacks.

135.     Those attacks constituted acts of international terrorism pursuant to JASTA and 18 U.S.C. §2331 that violated federal and state laws against murder, kidnapping, assault and aircraft hijacking, including but not limited to 18 U.S.C. §2332b (prohibiting terrorist acts of kidnapping, assault and murder) and 49 U.S.C. §46502 (prohibiting aircraft hijacking), and at the time those acts were committed, planned and authorized, al Qaeda was designated as a Foreign Terrorist Organization under section 219 of the Immigration and Nationality Act, 8 U.S.C. §1189.

34

136. Pursuant to 18 U.S.C. §2333(a), (d), Sudan aided and abetted al Qaeda through numerous acts detailed herein by knowingly providing it with substantial assistance to prepare and carry out an act or acts of international terrorism.

137. Pursuant to 18 U.S.C. §2333(a), (d), Sudan conspired with al Qaeda and others to provide it with substantial material support and resources, with the shared understanding, knowledge and intent that said support and resources would be used by al Qaeda to prepare and carry out an act or acts of international terrorism.

138. The others in the conspiracy currently known to plaintiffs are named herein, and include Sudan's officials, employees and agents, Sudan's banks, businesses and charity organizations, Osama Bin Laden and al Qaeda operatives; the names of additional persons involved in the conspiracy await discovery and further investigation.

139. Pursuant to §2333(a), Sudan committed an act or acts of international terrorism, as defined in 18 U.S.C. § 2331(1)(A), in violation of federal and state criminal laws, or that would have been a criminal violation if committed within the United States or any state, including but not limited to a violation of the following:

- 18 U.S.C. §2(a) – Aiding, abetting, counseling, commanding, inducing or procuring a federal crime;
- 18 U.S.C. §371 – Conspiring to commit a federal crime;
- 18 U.S.C. §2332 – Conspiring to attempt to kill or kill a U.S. national;
- 18 U.S.C. §2332a – Conspiring to use a weapon of mass destruction;
- 18 U.S.C. §2332b – Conspiring to commit an act of terrorism;
- 18 U.S.C. §2339A – Providing material support to terrorists;
- 18 U.S.C. §2339B – Providing material support or resources to designated foreign terrorist organizations;
- 18 U.S.C. §2339C – Prohibitions against the financing of terrorism;
- 49 U.S.C. §46502 – Conspiring to commit aircraft piracy;
- N.J.S.A. §2C:2-6 – Accomplice liability;
- N.Y. Penal Law §20.00 – Criminal liability for conduct of another;
- N.Y. Penal Law §115.00 – Criminal facilitation in the fourth degree;
- Mass. Gen. Laws ch. 274, §2 – Accessory or aiding in the commission of a felony;
- 18 Pa. C.S. §306 – Accomplice liability; and

· Va. Code Ann. §18.2-18 – Accessory before the fact.

140.   Sudan's conduct amounted to a violation of 18 U.S.C. §2(a) because Sudan intentionally aided, abetted and counseled the commission of a criminal act or acts of international terrorism by al Qaeda, by providing the terrorist organization with material support, resources and funding with the knowledge that al Qaeda would use such assistance to prepare for and commit such a criminal act or acts.

141.   Sudan's conduct amounted to a violation of 18 U.S.C. §371 because it conspired with al Qaeda and others to provide it with substantial material support and resources with the shared understanding, knowledge and intent that said support and resources would be used by al Qaeda to prepare for and carry out a criminal act or acts of international terrorism.

142.   Sudan's conduct amounted to a violation of 18 U.S.C. §2339A in that on and prior to September 11, 2001, it provided material support or resources for al Qaeda and/or conspired with al Qaeda and others to provide material support or resources for al Qaeda, with the knowledge or intent that they would be used in preparation for, or in carrying out a violation of the statutes specified in 18 U.S.C. §2339A, including 18 U.S.C. §2332b (prohibiting terrorist acts of kidnapping, assault and murder) and 49 U.S.C. §46502 (prohibiting aircraft hijacking).

143.   Sudan's conduct amounted to a violation of 18 U.S.C. § 2339A in that on and prior to September 11, 2001, it concealed or disguised the nature, location, source, or ownership of al Qaeda's material support or resources and/or conspired with Sudan's intelligence apparatus, military, police, border and customs officials, government officials, employees and agents, Sudan's banks, businesses, charity organizations, al Qaeda, al Qaeda operatives and sympathizers and others, known and unknown, to conceal or disguise the nature, location, source or ownership of al Qaeda's material support or resources, with the knowledge or intent that they

36

would be used in preparation for, or in carrying out a violation of the statutes specified in 18 U.S.C. §2339A, including 18 U.S.C. §2332b (prohibiting terrorist acts of kidnapping, assault and murder) and 49 U.S.C. §46502 (prohibiting aircraft hijacking).

144. Sudan's conduct amounted to a violation of 18 U.S.C. §2339B in that on and prior to September 11, 2001, it knowingly provided material support or resources to al Qaeda, and/or Sudan conspired to knowingly provide material support or resources to al Qaeda with Sudan's intelligence apparatus, military, police, border and customs officials, government officials, employees and agents, Sudan's banks, businesses, charity organizations, employees and agents, al Qaeda, al Qaeda operatives and sympathizers and/or others, known and unknown, with the knowledge that al Qaeda was a designated Foreign Terrorist Organization, has engaged or engages in terrorist activity or has engaged or engages in terrorism.

145. Sudan's conduct amounted to a violation of 18 U.S.C. §2339C in that on and prior to September 11, 2001, as detailed within, it provided safe haven and training camps, introductions and meetings with other established terror organizations, military and terror training, passports and other travel documents, weapons and explosives, recruitment screening, intelligence information, and provided or collected funds for al Qaeda and/or conspired with Sudan's intelligence apparatus, military, police, border and customs officials, government officials, employees and agents, Sudan's banks, businesses, charity organizations, al Qaeda, al Qaeda operatives and sympathizers and others, known and unknown, to provide or collect funds for al Qaeda, with the intention that such funds be used, or with the knowledge that such funds were to be used, in full or in part, to carry out an act or acts of international terrorism.

146.     Sudan's conduct amounted to a violation of relevant state criminal laws on facilitating, aiding and abetting a crime, and conspiracy, including but not limited to those cited above, in that it:

a.     intentionally aided, abetted and counseled al Qaeda by providing it with material support, resources and funding with the knowledge that al Qaeda would use such assistance to commit an act or acts of international terrorism; and/or

b.     believing it was probably rendering aid in the form of material support or resources and funds to al Qaeda to engage in a crime, provided al Qaeda with the means or opportunity for the commission thereof and which in fact aided al Qaeda to commit the September 11th Attacks; and/or

c.     conspired with Sudan's intelligence apparatus, military, police, border and customs officials, government officials, employees and agents, Sudan's banks, businesses, charity organizations, al Qaeda, al Qaeda operatives and sympathizers and others known and unknown, to violate relevant state criminal laws on facilitating and aiding and abetting a crime and committing an act or acts of terrorism, including assault, hijacking, kidnapping and murder.

147.     As detailed herein, the aforesaid act or acts of international terrorism:

a.     involve a violent act or acts dangerous to human life, as demonstrated by the known and foreseeable outcomes of injury and death resulting from providing substantial assistance to al Qaeda terrorists;

b.     were committed primarily outside the territorial jurisdiction of the United States and also transcended national boundaries in terms of the means by which they were accomplished, the persons they appear intended to intimidate or coerce, and the locales in which their perpetrators operated; and

c. appeared to be intended to intimidate or coerce a civilian population; to influence the policy of a government by intimidation or coercion; or, to affect the conduct of a government by mass destruction, kidnapping or assassination.

148. The aforesaid acts of Sudan were not mere negligence, but each act individually and/or in combination with one or more acts constituted conduct that was intentional, reckless, willful and/or grossly negligent and each of those acts individually and/or in combination with one or more of those acts was a proximate cause of the September 11th Attacks and the resulting injuries and deaths of plaintiffs' decedents.

149. The September 11th Attacks could not have occurred absent the knowing and substantial assistance provided to al Qaeda by Sudan. Those attacks and resulting injuries and deaths were a natural, probable and reasonably foreseeable consequence of Sudan's conduct.

150. As a result, Sudan is liable to plaintiffs for all damages resulting from the injuries and deaths in the September 11th Attacks.

151. Plaintiffs, the surviving family members of each decedent, the decedents and their Estates have suffered and will continue to suffer past and future damages as a result of the injuries and deaths sustained in the September 11th Attacks, including but not limited to: personal injury damages, wrongful death damages, survival damages, economic damages, pecuniary loss, non-economic damages, pain and suffering, torture, imprisonment, kidnapping, fear of impending death, physical trauma, mental anguish, mental distress, grief, loss of enjoyment of life, loss of earnings, financial support, services, companionship, care, guidance, consortium, solatium, burial costs, medical and other expenses and other provable damages allowed by law.

WHEREFORE, plaintiffs pray that judgment(s) for relief in the form of an award or awards of monetary damages for personal injury, wrongful death, all recoverable losses under 28 U.S.C. §1605B and 18 U.S.C. §2333 and other appropriate relief be entered on their first cause of action in favor of the plaintiffs individually and as estate representatives and against the defendant Sudan and other named Sudanese defendants, with separate awards for each plaintiff, where appropriate, plus interest, costs, punitive damages, treble damages, attorney's fees, and such other relief as the Court deems just and proper.

## THIRD CAUSE OF ACTION FOR PERSONAL INJURY AND WRONGFUL DEATH DAMAGES PURSUANT TO STATE TORT LAW

152.     Plaintiffs repeat and reallege all of the preceding paragraphs as if fully set forth herein.

153.     On March 10, 2004, a class action complaint seeking damages for a class defined as the spouses, children, parents, siblings and legal representatives of those individuals killed in the September 11th Attacks (excluding the 19 hijackers) was timely filed against Sudan and others under the caption, *O'Neill v. Kingdom of Saudi Arabia, et al*, 04-CV-01922 (GBD), and new complaint *O'Neill v. Republic of Sudan*, 18-CV-12114 (GBD) also naming Sudan as a defendant requesting class certification and updating the cause of actions based on changes in the law under the FSIA and ATA.  The *O'Neill* case currently remains pending before this Court.

154.     *O'Neill* asserted state tort law claims against Sudan for causing the deaths of plaintiffs' decedents in the September 11th Attacks, including claims for wrongful death, survival, aiding and abetting, conspiracy and negligence, including intentional, knowing, reckless, willful, wanton, grossly negligent and/or negligent tortious acts and omissions.

40

155.    Plaintiffs herein include members of the class defined in *O'Neill*, but to date no determination regarding class certification has been made by this Court.

156.    This cause of action is brought before that determination and plaintiffs present these state tort law claims to assert and protect their rights to pursue such claims, for example, in the event that the *O'Neill* class is not certified by this Court.

157.    Pursuant to the doctrine first declared by the Supreme Court in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), the time for plaintiffs who are members of the *O'Neill* class to bring their state law claims has been tolled from the date the *O'Neill* action was brought until this Court makes its determination on class certification.

158.    For years prior to and including September 11, 2001, Sudan, through its officials, officers, employees, agents and others, participated and associated with al Qaeda in its terrorist agenda as set forth herein; provided al Qaeda and its hijackers with substantial material support, financing and resources; knew that it was assisting a terrorist organization that had conducted and was actively planning attacks against the United States; and committed tortious acts and omissions that were intentional, knowing, reckless, willful, wanton, grossly negligent and/or negligent.

159.    Sudan's conduct was a proximate cause of the deaths, injuries and resulting damages suffered by plaintiffs, as it furnished the essential support networks, cover and funding used by al Qaeda to successfully plan and execute the September 11th Attacks.

160.    Sudan tortiously conspired, aided and abetted al Qaeda by providing substantial assistance in the form of funding, support and resources to al Qaeda and its hijackers with the knowledge that they planned to use such assistance to prepare for and conduct terrorist attacks

against the United States and its citizens and/or with reckless disregard of the known probable risk that such assistance would be used for those terrorist purposes.

161. Sudan tortiously conspired with al Qaeda and others to provide al Qaeda and its hijackers with substantial material support and resources, with the shared agreement, understanding, knowledge and intent that said support and resources would be used by al Qaeda to plan and carry out terrorist acts against the United States.

162. For years prior to and including September 11, 2001, Sudan knew that its officers, employees and agents, and Sudan's charitable organizations were engaging in illegal and/or criminal activity by using Sudan's offices, equipment and other resources to provide substantial material support and resources to al Qaeda and, that Sudan's officers, employees and agents, were al Qaeda operatives or sympathizers who were using their government positions to provide substantial assistance to al Qaeda.

163. Despite such knowledge, Sudan intentionally and/or recklessly and/or carelessly failed to properly supervise its officers, employees and agents and Sudan's charitable organizations to stop them from using Sudan's offices, equipment and other resources to provide substantial assistance to al Qaeda despite the known and/or foreseeable risk that such assistance was being used by al Qaeda to prepare and conduct a terrorist attack against the United States and its citizens.

164. Moreover, Sudan intentionally and/or recklessly and/or carelessly selected, hired and retained as its officers, employees, agents and various individuals, who Sudan knew and/or should have known, were al Qaeda operatives or sympathizers, despite the known and/or foreseeable risk that those employees and agents would use and/or were using their government

positions to provide substantial assistance to al Qaeda to prepare and conduct a terrorist attack against the United States and its citizens.

165.    The aforesaid intentional, criminal, knowing, reckless, willful, wanton, grossly negligent and/or negligent acts and/or omissions of Sudan were individually and/or in combination with one or more of those acts and/or omissions a proximate, substantial cause of the September 11th Attacks and the plaintiffs' injuries, deaths and resulting damages.

**WHEREFORE**, plaintiffs pray that judgment(s) for relief in the form of an award or awards of monetary damages for personal injury, wrongful death and other appropriate relief be entered on their second cause of action in favor of the plaintiffs individually and as estate representatives and against the defendant Sudan and other Sudanese defendants, with separate awards for each plaintiff, where appropriate, plus interest, costs, punitive damages, treble damages, attorney's fees, and such other relief as the Court deems just and proper.

## FOURTH CAUSE OF ACTION FOR PERSONAL INJURY AND WRONGFUL DEATH DAMAGES PURSUANT TO THE ALIEN TORT CLAIMS ACT

166.    Plaintiffs repeat and reallege all of the preceding paragraphs as if fully set forth herein.

167.    *O'Neill* asserted claims under the Alien Tort Claims Act against Sudan for causing the deaths of plaintiffs' decedents in the September 11th Attacks based on violations of international law resulting in injury and death in the September 11th Attacks.

168.    Plaintiffs herein include members of the class defined in *O'Neill*, but to date no determination regarding class certification has been made by this Court.

169.     This cause of action is brought before that determination and plaintiffs present these Alien Tort Claims Act claims to assert and protect their rights to pursue such claims, for example, in the event that the *O'Neill* class is not certified by this Court.

170.     The Alien Tort Claims Act, 28 U.S.C. §1350, allows aliens to sue for torts committed in violation of the law of nations, international law or a treaty of the United States.

171.     The conduct of Sudan as detailed herein to provide substantial material support, resources and sponsorship for al Qaeda and its acts of international terrorism resulting in the September 11th Attacks constitutes a clear violation of the law of nations and international law, which includes international legal norms prohibiting crimes against humanity, mass murder, genocide, torture, extrajudicial killing, air piracy, financing of terrorism, and terrorism, which can be found in and derived from, among other things, the following conventions, agreements, U.N. declarations and resolutions, and other documents:

(1)     Charter of the International Military Tribunal, Aug. 8, 1945, 59 Stat. 1544, 82 U.N.T.S. 279;

(2)     Allied Control Council Law No. 10 (Dec. 20, 1945);

(3)     Convention on the Prevention and Punishment of the Crime of Genocide, Dec. 9 1948, 78 U.N.T.S. 277;

(4)     Geneva Convention (IV) Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 75 U.N.T.S. 287;

(5)     Hague Convention for the Suppression of Unlawful Seizure of Aircraft (Hijacking), Dec. 16, 1970, 22 U.S.T. 1641, 860 U.N.T.S. 105;

(6)     International Convention for the Suppression of Terrorist Bombings, Dec. 15, 1997, 2149 U.N.T.S. 284 (entered into force May 23, 2001);

(7)     International Convention for the Suppression of the Financing of Terrorism, Dec. 9, 1999, 2178 U.N.T.S. 229 (entered into force Apr. 10, 2002);

(8)     U.N. Security Council Resolution 1267, U.N. Doc. S/RES/1267 (Oct. 15, 1999);

(9)     U.N. Security Council Resolution 1373, U.N. Doc. S/RES/1373 (Sept. 28, 2001);

(10)     Protocol Additional (I) to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflict, June 8, 1977, 1125 U.N.T.S. 3;

(11)     Protocol Additional (II) to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of Non-International Armed Conflicts, June 8, 1977, 1125 U.N.T.S. 609;

(12) Statute of the International Criminal Tribunal for the Former Yugoslavia (ICTY), in Report of the Secretary-General pursuant to paragraph 2 of S.C. Res.808, May 3, 1993, U.N. Doc. 8/25704, adopted unanimously by S.C. Res. 827, U.N. SCOR, 48th Sess., 3217th mtg., 16, U.N. Doc. S/PV.3217 (1993);

(13) The Convention on the Prevention and Punishment of Crimes Against International Protected Persons, Including Diplomatic Agents, 28 U.S.T. 1975, T.I.A.S. No. 8532 (1977), implemented in 18 U.S.C. § 112l;

(14) The General Assembly Resolutions on Measures to Prevent International Terrorism, G.A. Res. 40/61 (1985) and G.A. Res. 42/159 (1987); and

(15) The Convention on the High Seas, April 29, 1958, arts. 14-22 (piracy), 13 U.S.T. 2312, 450 U.N.T.S. 11.

172. Sudan's conduct was a substantial cause of the September 11th Attacks and the plaintiffs' injuries, deaths and resulting damages.

**WHEREFORE**, plaintiffs pray that judgment(s) for relief in the form of an award or awards of monetary damages for personal injury, wrongful death and other appropriate relief be entered on their third cause of action in favor of the plaintiffs individually and as estate representatives and against Sudan, with separate awards for each plaintiff, where appropriate, plus interest, costs, punitive damages, treble damages, attorney's fees, and such other relief as the Court deems just and proper.

### FIFTH CAUSE OF ACTION FOR PUNITIVE DAMAGES

173. Plaintiffs reallege the above paragraphs as if fully set forth herein. For the reasons stated above, and pursuant to § 28 U.S.C. § 1606, Sudan is liable jointly and severally, to each plaintiff for punitive damages.

## SIXTH CAUSE OF ACTION FOR
## PROPERTY DAMAGE

174.     Plaintiffs re-allege the above paragraphs as if fully set forth herein. As a direct and proximate result of defendants' intentional, willful and malicious acts of terrorism on September 11, 2001, defendants have caused property damage plaintiffs severe and extensive damage in that their building became blighted; physical damage was caused to the building by parts of the World Trade Center which struck the building; asbestos and other materials from the World Trade Center struck plaintiffs' building; the building had become unsafe until the asbestos has been cleaned up; plaintiffs were required to perform extensive asbestos clean-up and clean- up for other toxic materials from the World Trade Center; the plaintiff's building has been closed for a substantial period since September 11, 2001; tenants have not paid rent; many tenants have abandoned and will abandon the building since they claim the building cannot currently safely be occupied as required by the tenants' leases; the exterior and interior of the building will have to be replaced; carpeting in the building has to be torn up and replaced; the value of the building has been blighted and diminished; and plaintiffs have been otherwise damaged, all of which damages are continuing into the future.

175.     By reason of the foregoing, property damage plaintiffs are entitled to recover all of their damages from the defendant.

## DEFAULT TRIAL DEMAND

Plaintiffs demand trial by default on all issues so triable.

Dated: New York, New York
           November 19, 2020

KREINDLER & KREINDLER LLP
By: ___/s/ James P. Kreindler_____
James P. Kreindler (JK7084)
Andrew J. Maloney, III (AM8684)
Steven R. Pounian (SP5795)

*Attorneys for Ashton Plaintiffs and*
*Plaintiffs Executive Committee for*
*Death and Injury Cases*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

KATHLEEN ASHTON, as Administrator
of the Estate of Thomas Ashton, Deceased
and on behalf of all survivors of Thomas Ashton;

JOSEPHINE ALGER and FREDERICK ALGER, as Co-
Executors of the Estate of David D. Alger, Deceased
and on behalf of all of survivors of David D. Alger;

ANGELICA ALLEN, as Administrator
of the Estate of Eric Allen, Deceased
and on behalf of all survivors of Eric Allen;

GEORGE ANDRUCKI and MARY ANDRUCKI, as co-
Administrators of the Estate of Jean Andrucki, Deceased
and on behalf of all survivors of Jean Andrucki;

ALEXANDER PAUL ARANYOS and
WINIFRED ARANYOS, as co-Administrators
of the Estate of Patrick Michael Aranyos, Deceased
and on behalf of all survivors of Patrick Michael Aranyos;

MARGARET ARCE, as Administrator
of the Estate of David Gregory Arce, Deceased
and on behalf of all survivors of David Gregory Arce;

VICKIE ROSE ARESTEGUI, as Legal Representative
of the Estate of Barbara Jean Arestegui, Deceased
and on behalf of all survivors of Barbara Jean Arestegui;

MARGIT ARIAS, as Administrator
of the Estate of Adam Peter Arias, Deceased,
and on behalf of all survivors of Adam Peter Arias;

EVELYN ARON, as Executor
of the Estate of Jack Charles Aron, Deceased
and on behalf of all survivors of Jack Charles Aron;

NANCY BADAGLIACCA, as Administrator
of the Estate of John J. Badagliacca, Deceased

**03 MDL 1570(RCC)**

**SIXTH AMENDED
CONSOLIDATED
MASTER COMPLAINT**

**02 CV 6977(RCC)**

**Kreindler & Kreindler LLP**

U.S. DISTRICT COURT
S.D.N.Y.
05 SEP 30 PM 5:43
RECEIVED

1

and on behalf of all survivors of John J. Badagliacca;

CHRISTINA BAKSH, as Executor
of the Estate of Michael S. Baksh, Deceased
and on behalf of all survivors of Michael S. Baksh;

JOANNE BARBARA, as Executor
of the Estate of Gerard Barbara, Deceased
and on behalf of all survivors of Gerard Barbara;

DANIEL F. BARKOW, as Administrator
of the Estate of Colleen Ann Barkow,  Deceased
and on behalf of all survivors of Colleen Ann Barkow;

NINA BARNES, as Administrator
of the Estate of Durrell Pearsall, Deceased
and on behalf of all survivors of Durrell Pearsall;

JEANNINE P. BARON, as Executor
of the Estate of Evan J. Baron, Deceased
and on behalf of all survivors of Evan J. Baron;

JANE BARTELS, as Executor
of the Estate of Carlton Bartels, Deceased
and on behalf of all survivors of Carlton Bartels;

KIMBERLY KAIPAKA BEAVEN, as Executor
of the Estate of Alan Beaven, Deceased
and on behalf of all survivors of Alan Beaven;

MICHELLE BEDIGIAN, as Administrator
of the Estate of Carl Bedigian, Deceased
and on behalf of all survivors of Carl Bedigian;

SUSAN BERGER, as Administrator
of the Estate of Steven Howard Berger, Deceased
and on behalf of all survivors of Steven Howard Berger;

MADELINE BERGIN, as Administrator
of the Estate of John Bergin, Deceased
and on behalf of all survivors of John Bergin;

MIRIAM M. BIEGELEISEN, as Administrator
of the Estate of Shimmy D. Biegeleisen, Deceased

2

and on behalf of all survivors of Shimmy D. Biegeleisen;

CHRISTINE BINI, as Administrator,
of the Estate of Carl Bini, Deceased
and on behalf of all survivors of Carl Bini;

NEIL B. BLASS, as Administrator
of the Estate of Craig M. Blass,  Deceased
and on behalf of all survivors of Craig M. Blass;

KRIS A. BLOOD, as Executor
of the Estate of Richard M. Blood, Deceased
and on behalf of all survivors of Richard M. Blood;

DOROTHY ANN BOGDAN, as Administrator
of the Estate of Nicholas Andrew Bogdan, Deceased
and on behalf  of all survivors of Nicholas Andrew Bogdan;

MARIA TERESA BOISSEAU, as Proposed Personal
Representative of the Estate of Lawrence Boisseau, Deceased
and on behalf of all survivors of Lawrence Boisseau;

TRACI  BOSCO, as Administrator
of the Estate of Richard Edward Bosco, Deceased
and on behalf of all survivors of Richard Edward Bosco;

KATHLEEN BOX, as Administrator
of the Estate of Gary R. Box, Deceased
and on behalf of all survivors of Gary R. Box;

JAMES BOYLE, as Administrator
of the Estate of Michael Boyle, Deceased
and on behalf of all survivors of Michael Boyle;

DAVID BRACE, as Administrator
of the Estate of Sandra Conaty Brace, Deceased
and on behalf of all survivors of Sandra Conaty Brace;

JENNIFER E. BRADY, as Administrator
of the Estate of David B. Brady, Deceased
and on behalf of all survivors of Jennifer E. Brady;

CURTIS FRED BREWER, as Executor
of the Estate of Carol Keyes Demitz, Deceased

3

and on behalf of all survivors of Carol Keyes Demitz;

HILLARY A. BRILEY, as Administrator
of the Estate of Jonathan E. Briley, Deceased
and on behalf of all survivors of Jonathan E. Briley;

URSULA BROGHAMMER, as Executor
of the Estate of Herman C. Broghammer, Deceased
and on behalf of all survivors of Herman C. Broghammer;

JoANNE  BRUEHERT, as Administrator
of the Estate of Richard G. Bruehert, Deceased
and on behalf of all survivors of Richard G. Bruehert;

JUAN B. BRUNO, as Administrator
of the Estate of Rachel Tamares, Deceased
and on behalf of all survivors of Rachel Tamares;

SUSAN E. BUHSE, as Administrator
of the Estate of Patrick Joseph Buhse, Deceased
and on behalf of all survivors of Patrick Joseph Buhse;

ELIZABETH R. BURNS, as Administrator
of the Estate of Donald J. Burns, Deceased
and on behalf of all survivors of Donald J. Burns;

JAMES C. CAHILL, as Administrator
of the Estate of Scott Walter Cahill, Deceased
and on behalf  of all survivors of Scott Walter Cahill;

JAMES W. CAHILL and KATHLEEN CAHILL, as co-
Administrators of the Estate of Thomas Cahill, Deceased
and on behalf of all survivors of Thomas Cahill;

DEBORAH CALDERON, as Administrator
of the Estate of Edward Calderon, Deceased
and on behalf of all survivors of Edward Calderon;

JANET CALIA, as Administrator
of he Estate of Dominick Enrico Calia, Deceased
and on behalf of all survivors of Dominick Enrico Calia;

JACQUELINE CANNIZZARO, as Administrator
of the Estate of Brian Cannizzaro, Deceased

4

and on behalf of all survivors of Brian Cannizzaro;

TONI ANN CARROLL, as Executor
of the Estate of Peter J. Carroll, Deceased
and on behalf of all survivors of Peter J. Carroll;

JUDITH CASORIA, as Administrator
of the Estate of Thomas Anthony Casoria, Deceased
and on behalf of all survivors of Thomas Anthony Casoria;

TRACY ANN TABACK CATALANO, as Executor
of the Estate of Harry Taback, Deceased
and on behalf of all survivors of Harry Taback;

SANTA CATARELLI, as Executor
of the Estate of Richard G. Catarelli, Deceased
and on behalf of all survivors of Richard G. Catarelli;

GINA CAYNE, as Administrator
of the Estate of Jason Cayne, Deceased
and on behalf of all survivors of Jason Cayne;

SUK TAN CHIN, as Administrator
of the Estate of Robert Chin, Deceased
and on behalf of all survivors of Robert Chin;

EDWARD P. CIAFARDINI, as Administrator
of the Estate of Christopher Ciafardini, Deceased
and on behalf of all survivors of Christopher Ciafardini;

LISA DiLALLO CLARK, as Administrator
of the Estate of Thomas R. Clark, Deceased
and on behalf of all survivors of Thomas R. Clark;

YUKO CLARK, as Personal Representative
of the Estate of Gregory A. Clark, Deceased
and on behalf of all survivors of Gregory A. Clark;

MARYANN COLIN, as Administrator
of the Estate of Robert Dana Colin, Deceased
and on behalf of all survivors of Robert Dana Colin;

JULIA COLLINS, as Administrator
of the Estate of Thomas J. Collins, Deceased

5

and on behalf of all survivors of Thomas J. Collins;

PATRICIA COPPO and JOHN R. BRENNAN, as
Co-Executors of the Estate of Joseph J. Coppo, Jr., Deceased
and on behalf of all survivors of Joseph J. Coppo, Jr.;

PATRICIA COUGHLIN, as Personal Representative
of the Estate of John Coughlin, Deceased
and on behalf of all survivors of John Coughlin;

EDITH CRUZ, as Administrator
of the Estate of Angela Rosario, Deceased
and on behalf of all survivors of Angela Rosario;

ILDEFONSO A. CUA, as Administrator
of the Estate of Grace Alegre Cua, Deceased
and on behalf of all survivors of Grace Alegre Cua;

LINDA CURIA, as Executor
of the Estate of Laurence Curia, Deceased
and on behalf of all survivors of Laurence Curia;

DAVID EDWARD CUSHING, as Administrator
of the Estate of Patricia Cushing, Deceased
and on behalf of all survivors of Patricia Cushing;

LOUISA D'ANTONIO, as Administrator
of the Estate of Mary D'Antonio, Deceased
and on behalf of all survivors of Mary D'Antonio;

BERIL SOFIA DeFEO, as Administrator
of the Estate of David DeFeo, Deceased
and on behalf of all survivors of David DeFeo;

VINCENT J. DELLA BELLA, as Administrator
of the Estate of Andrea Della Bella, Deceased
and on behalf of all survivors of Andrea Della Bella;

MICHAEL DELOUGHERY, as Personal Representative
of the Estate of Colleen Ann Deloughery, Deceased
and on behalf of all survivors of Colleen Ann Deloughery;

TODD DeVITO, as Administrator
of the Estate of Jerry DeVito, Deceased

6

and on behalf of all survivors of Jerry DeVito;

MILAGROS DIAZ, as Administrator
of the Estate of Lourdes Janet Galletti, Deceased
and on behalf of all survivors of  Lourdes Janet Galletti;

ANDY DINNOO and DHANMATEE SAM, as
co-Administrators of the Estate of Rena Sam-Dinnoo, Deceased
and on behalf of all survivors of Rena Sam-Dinnoo;

MARIA DiPILATO, as Administrator
of the Estate of Joseph DiPilato, Deceased
and on behalf of all survivors of Joseph DiPilato;

STACEY FRAN DOLAN, as Executor
of the Estate of Brendan Dolan, Deceased
and on behalf  of all survivors of Brendan Dolan;

JOSEPH DOWNEY, as Administrator
of the Estate of Raymond M. Downey, Deceased
and on behalf of all survivors of Raymond M. Downey;

JAY CHARLES DUNNE, as Personal Representative
of the Estate of Christopher Joseph Dunne, Deceased
and on behalf of all survivors of Christopher Joseph Dunne;

STANLEY ECKNA, as Personal Representative
of the Estate of Paul Robert Eckna, Deceased
and on behalf of all survivors of Paul Robert Eckna;

DENISE ESPOSITO, as Administrator
of the Estate of Michael Esposito, Deceased
and on behalf of all survivors of Michael Esposito;

DENNIS EULAU, as Executor (Ad Prosequendum)
of the Estate of the Michele Coyle Eulau, Deceased
and on behalf of all survivors of Michele Coyle Eulau;

JEANNE M. EVANS, as Personal Representative
of the Estate of Robert Evans, Deceased
and on behalf of all survivors of Jeanne M. Evans;

AMY FARNUM, as Personal Representative
of the Estate of Douglas Jon Farnum, Deceased

7

and on behalf of all survivors of Douglas Jon Farnum;

MARYANNE FARRELL, as Administrator
of the Estate of John Farrell, Deceased
and on behalf of all survivors of John Farrell;

MELISSA VAN NESS FATHA, as Administrator Ad
Prosequendum of the Estate of Syed Abdul Fatha, Deceased
and on behalf of all survivors of Syed Abdul Fatha;

STEVEN FEIDELBERG, as Administrator
of the Estate of Peter Adam Feidelberg, Deceased
and on behalf of all survivors of Peter Adam Feidelberg;

WENDY FEINBERG, as Executor
of the Estate of Alan Feinberg, Deceased
and on behalf of all survivors of Alan Feinberg;

CHARLENE FIORE, as Administrator
of the Estate of Michael Fiore, Deceased
and on behalf of all survivors of Michael Fiore;

BRIAN FLANNERY, as Personal Representative
of the Estate of Christina Donovan Flannery, Deceased
and on behalf of all survivors of Christina Donovan Flannery;

LORI FLETCHER, as Personal Representative
of the Estate of Andre G. Fletcher, Deceased
and on behalf of all survivors of Andre G. Fletcher;

CLAUDIA FLYZIK and NANCY WALSH, , as co-
Administrators of the Estate of Carol Flyzik, Deceased
and on behalf of all survivors of Carol Flyzik;

ROBERT T. FOLGER, as Administrator
of the Estate of Jane Claire Folger, Deceased
and on behalf of all survivors of Jane Claire Folger;

KURT FOSTER, as Executor
of the Estate of Claudia Foster, Deceased
and on behalf of all survivors of Claudia Foster;

CAROL FRANCOLINI, as Personal Representative
of the Estate of Arthur Joseph Jones, III, Deceased

and on behalf of all survivors of Arthur Joseph Jones, III;

HELEN FRIEDLANDER as Executor
of the Estate of Alan W. Friedlander, Deceased
and on behalf of all survivors of Alan W. Friedlander;

LISA FRIEDMAN, as Administrator
of the Estate of Andrew Friedman, Deceased
and on behalf of all survivors of Andrew Friedman;

ANNE GABRIEL, as Executor
of the Estate of Richard Gabriel, Deceased
and on behalf of all survivors of Richard Gabriel;

MONICA M. GABRIELLE, as Administrator
of the Estate of Richard Gabrielle, Deceased
and on behalf of all survivors of Richard Gabrielle;

KRISTIN GALUSHA-WILD, as Executor
of the Estate of Michael Stewart, Deceased
and on behalf of all survivors of Michael Stewart;

KATHLEEN GANCI, as Executor
of the Estate of Peter J. Ganci, Jr., Deceased
and on behalf of all survivors of Peter J. Ganci, Jr.;

DOROTHY GARCIA, as Executor
of the Estate of Andrew Garcia, Deceased
and on behalf of all survivors of Andrew Garcia;

HECTOR GARCIA and CARMEN GARCIA, as co-
Administrators of the Estate of Marlyn C. Garcia, Deceased
and on behalf of all survivors of Marlyn C. Garcia;

ELIZABETH GARDNER, as Administrator
of the Estate of Thomas Gardner, Deceased
and on behalf of all survivors of Thomas Gardner;

MATHILDA GEIDEL, as Personal Representative
of the Estate of Gary Geidel, Deceased
and on behalf of all survivors of Gary Geidel;

DIANE GENCO, as Administrator
of the Estate of Peter Genco, Deceased

9

and on behalf of all survivors of Peter Genco;

PHILIP GERMAIN, as Proposed Administrator
of the Estate of Denis Germain, Deceased
and on behalf of all survivors of Denis Germain;

CAROL GIES, as Administrator
of the Estate of Ronnie Gies, Deceased
and on behalf of all survivors of Ronnie Gies;

JOHN J. GILL, as Administrator
of the Estate of Paul John Gill, Deceased
and on behalf of all survivors or Paul John Gill;

SERINA GILLIS, as Prospective Administrator
of the Estate of Rodney Gillis, Deceased
and on behalf of all survivors of Rodney Gillis;

ARMINE GIORGETTI, as Personal Representative
of the Estate of Steven A. Giorgetti, Deceased
and on behalf of all survivors of Steven A. Giorgetti;

ANGELA GITTO, as Administrator
of the Estate of Salvatore Gitto, Deceased
and on behalf of  all survivors of Salvatore Gitto;

MEG BLOOM GLASSER, as Executor
of the Estate of Thomas Glasser, Deceased
and on behalf of all survivors of Thomas Glasser;

SHARON COBB-GLENN, as Administrator
of the Estate of Harry Glenn, Deceased
and on behalf of all survivors of Harry Glenn;

HELENE PARISI-GNAZZO, as Administrator
of the Estate of John T. Gnazzo, Deceased
and on behalf of all survivors of John T. Gnazzo;

JODIE GOLDBERG, as Administrator
of the Estate of Brian Goldberg, Deceased
and on behalf of  all survivors of Brian Goldberg;

MIA GONZALEZ, as Administrator
of the Estate of Lydia Bravo, Deceased

10

and on behalf of all survivors of Lydia Bravo;

DEBORAH GRAZIOSO, as Personal Representative
of the Estate of Timothy Grazioso, Deceased
and on behalf of all survivors of Timothy Grazioso;

CLAUDETTE B. GREENE, as Executor
of the Estate of Donald F. Greene, Deceased
and on behalf of all survivors of Donald F. Greene;

PETER GREENLEAF, as Administrator
of the Estate of James Arthur Greenleaf, Deceased
and on behalf of all survivors of James Arthur Greenleaf;

REGAN GRICE-VEGA , as Personal Representative
of the Estate of Peter Vega, Deceased
and on behalf of all survivors of Peter Vega;

JOANNE GROSS, as Administrator
of the Estate of Thomas Foley, Deceased
and on behalf of all survivors of Thomas Foley;

MARY HAAG, as Fiduciary
of the Estate of Gary Haag, Deceased
and on behalf of all survivors of Gary Haag;

GORDON G. HABERMAN, as Administrator
of the Estate of Andrea Lyn Haberman, Deceased
and on behalf of all survivors of Andrea Lyn Haberman;

PATRICIA HAN, as  Administrator
of the Estate of Frederic K. Han, Deceased
and on behalf of all survivors of Frederic K. Han;

RENE BACOTTI HANNAFIN, as Administrator
of the Estate of Thomas Hannafin, Deceased
and on behalf of all survivors of Thomas Hannafin;

RACHEL R. HARRELL, as Administrator
of the Estate of Harvey Harrell, Deceased
and on behalf of all survivors of Harvey Harrell;

ELINORE HARTZ, as Personal Representative
of the Estate of John Clinton Hartz, Deceased

11

and on behalf of all survivors of Elinore Hartz;

JENNIFER L. HARVEY, as Administrator
of the Estate of Emeric Harvey, Deceased
and on behalf of all survivors of Emeric Harvey;

KELLY HAYES, as Executor
of the Estate of Scott J. O'Brien, Deceased
and on behalf of all survivors of Scott J. O'Brien;

VIRGINIA HAYES, as Executor
of the Estate of Philip Thomas Hayes, Deceased
and on behalf of all survivors of Philip Thomas Hayes;

ANN R. HAYNES, as Administrator
of the Estate of William Ward Haynes, Deceased
and on behalf of all survivors of William Ward Haynes;

THERESA HEALEY, as Administrator
of the Estate of Michael Healey, Deceased
and on behalf of all survivors of Michael Healey;

SHIRLEY HENDERSON and HASHIM A. HENDERSON,
as co-Administrators of the Estate of Ronnie Lee Henderson,
Deceased and on behalf of all survivors of Ronnie Lee Henderson;

KAREN HINDS, as Administrator
of the Estate of Neil Hinds, Deceased
and on behalf of all survivors of Neil Hinds;

DENNIS L. HOBBS and DIXIE M. HOBBS,
as co-Administrators of the Estate of Tara Yvette Hobbs,
Deceased and on behalf of all survivors of Tara Yvette Hobbs;

PAMELA HOHLWECK, as Administrator
of the Thomas W. Hohlweck, Jr., Deceased
and on behalf of all survivors of Thomas W. Hohlweck, Jr.;

KATHLEEN HOLLAND, as Administrator
of the Estate of Joseph F. Holland, III, Deceased
and on behalf of all survivors of Joseph F. Holland, III;

RUBINA COX-HOLLOWAY, as Administrator
of the Estate of Darryl Leron McKinney, Deceased

and on behalf of all survivors of Darryl Leron McKinney;

COLLEEN HOLOHAN, Administrator
of the Estate of Thomas P. Holohan, Deceased
and on behalf of all survivors of Thomas P. Holohan;

JOANN T. HOWARD, as Administrator
of the Estate of Joseph Howard, Deceased
and on behalf of all survivors of Joseph Howard;

BRIDGET HUNTER , as Administrator
of the Estate of Joseph Hunter, Deceased
and on behalf of all survivors of Joseph Hunter;

KATHRYN J. HUSSA, as Executor
of the Estate of Robert R. Hussa, Deceased
and on behalf of all survivors of Robert R. Hussa;

YESENIA IELPI, as Administrator
of the Estate of Jonathan Ielpi, Deceased
and on behalf of all survivors of Jonathan Ielpi;

FREDERICK IRBY, as Administrator
of the Estate of Stephanie Irby, Deceased
and on behalf of all survivors of Stephanie Irby;

MARGARET P. ISKYAN, as Executor
of the Estate of John Francis Iskyan, Deceased
and on behalf of all survivors of John Francis Iskyan;

JENNIFER RUTH JACOBS, as Administrator
of the Estate of Ariel Louis Jacobs, Deceased
and on behalf of all survivors of Ariel Louis Jacobs;

KAZIMIERZ JAKUBIAK, as Personal Representative
of the Estate of Maria Jakubiak, Deceased
and on behalf of all survivors of Maria Jakubiak;

LEILA M. JOSEPH and WOODLY JOSEPH, as co-
Administrators of the Estate of Karl Joseph, Deceased
and on behalf of all survivors of Karl Joseph;

PAUL KAUFMAN, as Executor
of the Estate of Scott Martin McGovern, Deceased

13

and on behalf of all survivors of Scott Martin McGovern;

ELIZABETH H. KELLER, as Administrator of
the Estate of Chandler Raymond Keller, Deceased
and on behalf of all survivors of Chandler Raymond Keller;

ROBERTA KELLERMAN, as Personal Representative
of the Estate of Peter Kellerman, Deceased
and on behalf of all survivors of Peter Kellerman;

PATRICIA KELLETT, as Administrator
of the Estate of Joseph P. Kellett, Deceased
and on behalf of all survivors of Joseph P. Kellett;

EMMET P. KELLY, as Administrator
of the Estate of Thomas Richard Kelly, Deceased
and on behalf of all survivors of Thomas Richard Kelly;

ROSEMARY KEMPTON, as Administrator
of the Estate of Rosemary A. Smith, Deceased
and on behalf of all survivors of Rosemary A. Smith;

DONALD FRANCIS KENNEDY, as Executor
of the Estate of Yvonne Estelle Kennedy, Deceased
and on behalf of all survivors of Yvonne Estelle Kennedy;

THERESA KING, as Administrator
of the Estate of Robert King, Jr., Deceased
and on behalf of all survivors of Robert King, Jr.;

VERONICA KLARES, as Executor
of the Estate of Richard J. Klares, Deceased
and on behalf of all survivors of Richard J. Klares;

RICHARD I. KLEIN, as Executor
of the Estate of Julie Lynne Zipper, Deceased
and on behalf of all survivors of Julie Lynne Zipper;

FRANCES LaFORTE, as Executor
of the Estate of Michael P. LaForte, Deceased
and on behalf of all survivors of Michael P. LaForte;

EDLENE C. LaFRANCE, as Administrator of the
Estate of Alan Charles LaFrance, Deceased

14

and on behalf of all survivors of Alan Charles LaFrance;

COLETTE M. LAFUENTE, as Fiduciary
of the Estate of Dr. Juan M. Lafuente, Deceased
and on behalf of all survivors of Dr. Juan M. Lafuente;

MORRIS D. LAMONSOFF, as Administrator
of the Estate of Amy Hope Lamonsoff, Deceased
and on behalf of all survivors of Amy Hope Lamonsoff;

LAURIE S. LAUTERBACH, as Personal Representative
of the Estate of Carlos Cortes a/k/a Carlos Cortes-Rodriguez,
Deceased and on behalf of all survivors of Carlos Cortes
a/ka Carlos Cortes-Rodriguez;

ANDREA N. LeBLANC, as Administrator
of the Estate of Robert G. LeBlanc, Deceased
and on behalf of all survivors of Robert G. LeBlanc;

DONALD LEISTMAN, as Executor
of the Estate of David R. Leistman, Deceased
and on behalf of all survivors of David R. Leistman;

INGRID M. LENIHAN, as Executor
of the Estate of Joseph Anthony Lenihan, Deceased
and on behalf of all survivors of Joseph Anthony Lenihan;

ELAINE LEINUNG, as Administrator
of the Estate of Paul Battaglia, Deceased
and on behalf of all survivors of Paul Battaglia;

ROBERTA J. LEVINE, as Administrator Ad Prosequendum
of the Estate of Robert M. Levine, Deceased
and on behalf of all survivors of Robert M. Levine;

JERLINE LEWIS, as Personal Representative
of the Estate of Sherry Ann Bordeaux, Deceased
and on behalf of all survivors of Sherry Ann Bordeaux;

JEFFREY LOVIT, as Executor
of the Estate of Jacqueline Norton, Deceased
and on behalf of all survivors of Jacqueline Norton;

JEFFREY LOVIT, as Executor

15

of the Estate of Robert G. Norton, Deceased
and on behalf of all survivors of Robert G. Norton;

KATHLEEN KEELER LOZIER, as Executor
of the Estate of Garry W. Lozier, Deceased
and on behalf of all survivors of Garry W. Lozier;

ANNE MacFARLANE, as Administrator
of the Estate of Marianne MacFarlane, Deceased
and on behalf of all survivors of Marianne MacFarlane;

LISANNE MacKENZIE, has been or will be
appointed as Personal Representative
of the Estate of James P. O'Brien, Deceased
and on behalf of all survivors of James P. O'Brien;

ANDREA MAFFEO, as Administrator
of the Estate of Jennieann Maffeo, Deceased
and on behalf of all survivors of Jennieann Maffeo;

PAMELA ANN MAGGITTI, as Administrator
for the Estate of Joseph Vincent Maggitti, Deceased
and on behalf of all survivors of Joseph Vincent Maggitti;

NATALIE MAKSHANOV, as Administrator
of the Estate of Jason M. Sekzer, Deceased
and on behalf of all survivors of Jason M. Sekzer;

REBECCA L. MARCHAND, as Personal Representative
of the Estate of Alfred G. Marchand, Deceased
and on behalf of all survivors of Alfred G. Marchand;

BETTYANN MARTINEAU, as Executor
of the Estate of Brian Martineau, Deceased
and on behalf of all survivors of Brian Martineau;

LORI MASCALI, as Administrator
of the Estate of Joseph Mascali, Deceased
and on behalf of all survivors of Joseph Mascali;

DOROTHY MAURO, as Administrator
of the Estate of Charles A. Mauro, Deceased
and on behalf of all survivors of Charles A. Mauro;

16

MERYL MAYO, as Executor
of the Estate of Robert Mayo, Deceased
and on behalf of all survivors of Robert Mayo;

MARGARET DONOGHUE McGINLEY, as Executor
of the Estate of Daniel Francis McGinley, Deceased
and on behalf of all survivors of Daniel Francis McGinley;

ILIANA McGINNIS, as Administrator of the
Estate of Thomas Henry McGinnis, Deceased
and on behalf of all survivors of Thomas Henry McGinnis;

CYNTHIA F. McGINTY, as Administrator
of the Estate of Michael Gregory McGinty, Deceased
and on behalf of all survivors of Michael Gregory McGinty;

VIRGINIA McKEON, as Personal Representative
of the Estate of Barry J. McKeon, Deceased
and on behalf of all survivors of Barry J. McKeon;

PATRICIA H. McDOWELL, as Administrator
of the Estate of John F. McDowell, Deceased
and on behalf of all survivors of John F. McDowell;

THERESA McGOVERN, as Executor
of the Estate of Ann McGovern, Deceased
and on behalf of all survivors of Ann McGovern;

JOANN MEEHAN, as Administrator
of the Estate of Damian Meehan, Deceased
and on behalf of all survivors of Damian Meehan;

OLGA MERINO, as Personal Representative
of the Estate of George C. Merino, Deceased
and on behalf of all survivors of George C. Merino;

FRYDERYK MILEWSKI and ANNA MILEWSKI, as co-
Administrators of the Estate of Lukasz Milewski, Deceased
and on behalf of all survivors of Lukasz Milewski;

AMBER MILLER and JAMIE MILLER, as co-Administrators
of the Estate of Karen Juday, Deceased
and on behalf of all survivors of Karen Juday;

17

DIANE MILLER, as Administrator
of the Estate of Henry Miller, Deceased
and on behalf of all survivors of Henry Miller;

FAITH MILLER, as Executor
of the Estate of Robert Alan Miller, Deceased
and on behalf of all survivors of Robert Alan Miller;

BARBARA MINERVINO, as Executor
of the Estate of Louis J. Minervino, Deceased
and on behalf of all survivors of Louis J. Minervino;

JOANNE MODAFFERI, as Administrator
of the Estate of Louis Modafferi, Deceased
and on behalf of all survivors of Louis Modafferi;

ANNA MOJICA, as Administrator
of the Estate of Manuel Mojica, Deceased
and on behalf of all survivors of Manuel Mojica;

SARADHA MOORTHY, as Administrator
of the Estate of Krishna Moorthy, Deceased
and on behalf of all survivors of Krishna Moorthy;

ELIZABETH ANN MOSS, as Personal Representative
of the Estate of Linda Oliva, Deceased
and on behalf of all survivors of Linda Oliva;

EMILY MOTRONI, as Administrator
of the Estate of Marco Motroni, Deceased
and on behalf of all survivors of Marco Motroni.

LAUREN MURPHY, as Administrator
of the Estate of Matthew T. O'Mahony, Deceased
and on behalf of all survivors of Matthew T. O'Mahony;

ELVIRA  P. MURPHY, as Administrator
of the Estate of Patrick Sean Murphy, Deceased
and on behalf of all survivors of Patrick Sean Murphy;

RICHARD B. NAIMAN, as Administrator
of the Estate of Mildred R. Naiman, Deceased
and on behalf of all survivors of Mildred R. Naiman;

18

EDWARD NAVARRO, as Administrator
of the Estate of Karen Susan Navarro, Deceased
and on behalf of all survivors of Karen Susan Navarro;

WILLIAM NELSON, as Administrator
of the Estate of Theresa Risco, Deceased
and on behalf of all survivors of Theresa Risco;

MERRILLY E. NOETH, as Administrator
of the Estate of Michael Allen Noeth, Deceased
and on behalf of all survivors of Michael Allen Noeth;

DANA NOONAN, as Administrator
of the Estate of Robert Walter Noonan, Deceased
and on behalf of all survivors of Robert Walter Noonan;

WILLIAM B. NOVOTNY and MICHAEL J. NOVOTNY,
as co-Administrators of the Estate of Brian C. Novotny, Deceased
and on behalf of all survivors of Brian C. Novotny;

WILLIAM O'CONNOR, as Executor
of the Estate of Diana O'Connor, Deceased
and on behalf of all survivors of Diana O'Connor;

JAMES WALLACE O'GRADY, as Executor
of the Estate of James Andrew O'Grady, Deceased
and on behalf of  all survivors of James Andrew O'Grady;

SHERYL J. OLIVER, as Administrator
of the Estate of Edward Kraft Oliver, Deceased
and on behalf of all survivors of Edward Kraft Oliver;

HARRY ONG, JR., as Legal Representative
of the Estate of Betty Ann Ong, Deceased
and on behalf of all survivors of Betty Ann Ong;

LISA PALAZZO, as Administrator
of the Estate of Jeffrey Palazzo, Deceased
and on behalf of all survivors of Jeffrey Palazzo;

DONNA PAOLILLO, as Administrator
of the Estate of John Paolillo, Deceased
and on behalf of all survivors of John Paolillo;

19

HELENE S. PASSARO, as Administrator
of the Estate of Suzanne H. Passaro, Deceased
and on behalf of all survivors of Suzanne H. Passaro;

MARY GOLA PEREZ, as Executor
of the Estate of Anthony Perez, Deceased
and on behalf of all survivors of Anthony Perez;

LINDA PICKFORD, as Administrator
of the Estate of Christopher Pickford, Deceased
and on behalf of all survivors of Christopher Pickford;

NANCY PICONE, as Administrator
of the Estate of Arturo Sereno, Deceased
and on behalf of all survivors of Arturo Sereno;

JEAN OSLYN POWELL, as Administrator
of the Estate of Shawn E. Powell, Deceased
and on behalf of all survivors of Shawn E. Powell;

KAREN PRINCIOTTA, as Legal Representative
of the Estate of Vincent Princiotta, Deceased
and on behalf of all survivors of Vincent Princiotta;

MICHAEL PUCKETT, as Administrator
of the Estate of John F. Puckett, Deceased
and on behalf of all survivors of John F. Puckett;

DOMINIC J. PUOPOLO, SR., as Administrator
of the Estate of Sonia Mercedes Morales Puopolo, Deceased
and on behalf of all survivors of Sonia Mercedes Morales Puopolo;

PATRICIA QUIGLEY, as Executor
of the Estate of Patrick Quigley, Deceased
and on behalf of all survivors of Patrick Quigley;

FRANCINE RAGGIO, as Administrator
of the Estate of Eugene Raggio, Deceased
and on behalf of all survivors of Eugene Raggio;

DEBORAH RANCKE, as Proposed Personal Representative
of the Estate of Alfred Todd Rancke, Deceased
and on behalf of all survivors of Alfred Todd Rancke;

20

MARYANN RAND, as Administrator
of the Estate of Adam David Rand, Deceased
and on behalf of all survivors of Adam David Rand;

SADIQ RASOOL, as Administrator
of the Estate of Amenia Rasool, Deceased
and on behalf of all survivors of Amenia Rasool;

SUSAN RASWEILER, as Administrator
of the Estate of Roger Rasweiler, Deceased
and on behalf of all survivors of Roger Rasweiler;

CATHERINE T. REGENHARD, as Administrator
of the Estate of Christian Michael Regenhard, Deceased
and on behalf of all survivors of Christian Michael Regenhard;

ELIZABETH REGO, as Administrator
of the Estate of Leah E. Oliver, Deceased
and on behalf of all survivors of Leah E. Oliver;

WILLIAM D. ROBBINS, as Personal Representative
of the Estate of Clarin Schwartz, Deceased
and on behalf of all survivors of Clarin Schwartz;

EVELYN RODRIGUEZ, as Administrator
of the Estate of Anthony Rodriguez, Deceased
and on behalf of all survivors of Anthony Rodriguez;

MARTIN ROSENBAUM, as Administrator
of the Estate of Brooke David Rosenbaum, Deceased
and on behalf of all survivors of Brooke David Rosenbaum;

GLENNA M. ROSENBERG, as Administrator
of the Estate of Lloyd Daniel Rosenberg, Deceased
and on behalf of all survivors of Lloyd Daniel Rosenberg;

JILL ROSENBLUM, as Executor
of the Estate of Andrew I. Rosenblum, Deceased
and on behalf of all survivors of Andrew I. Rosenblum;

JUDI A. ROSS, as Executor
of the Estate of Richard Ross, Deceased
and on behalf of all survivors of Richard Ross;

21

CLAUDIA RUGGIERE, as Administrator
of the Estate of Bart Joseph Ruggiere, Deceased
and on behalf of all survivors of Bart Joseph Ruggiere;

GILBERT RUIZ, JR., as Administrator
of the Estate of Gilbert Ruiz, Deceased
and on behalf of all survivors of Gilbert Ruiz;

ANDREA RUSSIN, as Administrator
of the Estate of Steven Russin, Deceased
and on behalf of all survivors of Steven Russin;

DIANE RYAN, as Administrator
of the Estate of Edward Ryan, Deceased
and on behalf of all survivors of Edward Ryan;

MARGARET RYAN, as (Ad Prosequendum)
of the Estate of Matthew Ryan, Deceased
and on behalf of all survivors of Matthew Ryan;

DELPHINE SAADA, as Administrator
of the Estate of Thierry Saada, Deceased
and on behalf of all survivors of Thierry Saada;

PEDRO SALAME, as Administrator, and
MARY LYNN SANTOS, Individually,
of the Estate of Carmen Milly Rodriguez, Deceased
and on behalf of all survivors of Carmen Milly Rodriguez;

BARBARA SCARAMUZZINO, as Administrator
of the Estate of Nicholas Rossomando, Deceased
and on behalf of all survivors of Nicholas Rossomando;

JANLYN SCAUSO, as Administrator
of the Estate of Dennis P. Scauso, Deceased
and on behalf of all survivors of Dennis P. Scauso;

PHYLLIS SCHREIER, as Administrator
of the Estate of Jeffrey H. Schreier, Deceased
and on behalf of all survivors of Jeffrey H. Schreier;

NANCY SHEA, as Personal Representative
of the Estate of Joseph P. Shea, Deceased
and on behalf of all survivors of Joseph P. Shea;

MAUREEN SHERRY, as Administrator
of the Estate of John Anthony Sherry, Deceased
and on behalf of all survivors of John Anthony Sherry;

LORI SHULMAN, as Executor
of the Estate of Mark Shulman, Deceased
and on behalf of all survivors of Mark Shulman;

HOLLI SILVER, as Personal Representative
of the Estate of David Scott Silver, Deceased
and on behalf of all survivors of David Scott Silver;

EILEEN SIMON, as Executor
of the Estate of Michael J. Simon, Deceased
and on behalf of all survivors of Michael J. Simon;

DHANRAJ SINGH, as Administrator
of the Estate of Khamladai K. Singh, Deceased
and on behalf of all survivors of Khamladai K. Singh;

MARK J. SISKOPOULOS, as Administrator
of the Estate of Muriel F. Siskopoulos, Deceased
and on behalf of all survivors of Muriel F. Siskopoulos;

DONNA SMITH, as Executor
of the Estate of James Gregory Smith, Deceased
and on behalf of all survivors of James Gregory Smith;

BARBARA SOHAN, as Administrator
of the Estate of Astrid Elizabeth Sohan, Deceased
and on behalf of all survivors of Astrid Elizabeth Sohan;

ROBERT SPADAFORA, ESQ., as Executor
of the Estates of Mary B. Trentini and James A. Trentini,
Deceased and on behalf of all survivors of Mary B.
Trentini and James A. Trentini;

LAURIE SPAMPINATO, as Administrator
of the Estate of Donald Spampinato, Deceased
and on behalf of all survivors of Donald Spampinato;

THERESA A. STACK, as Administrator (Ad Prosequendum)
of the Estate of Lawrence T. Stack, Deceased
and on behalf of all survivors of Lawrence T. Stack;

GREGORY STEVENS, as Executor
of the Estate of Lisa Terry, Deceased
and on behalf of all survivors of Lisa Terry;

EDWARD J. SWEENEY, Administrator
of the Estate of Brian E. Sweeney, Deceased
and on behalf of all survivors of Brian E. Sweeney;

EILEEN TALLON, as Fiduciary
of the Estate of Sean Patrick Tallon, Deceased
and on behalf of all survivors of Sean Patrick Tallon;

PATRICIA TARASIEWICZ, as Administrator
of the Estate of Allan Tarasiewicz, Deceased
and on behalf of all survivors of Allan Tarasiewicz;

EVELYN TEPEDINO, as Administrator
of the Estate of Jody Nichilo, Deceased
and on behalf of all survivors of Jody Nichilo;

RAJ THACKURDEEN & SAT THACKURDEEN, as co-
Administrators of the Estate of Goumatie Thackurdeen, Deceased
and on behalf of all survivors of Goumatie Thackurdeen;

ROBIN THEURKAUF, Personal Representative
of the Estate of Thomas F. Theurkauf, Jr., Deceased
and on behalf of all survivors of Thomas F. Theurkauf, Jr.;

ROSANA THOMPSON, as Administrator
of the Estate of Nigel Bruce Thompson, Deceased
and on behalf of all survivors of Nigel Bruce Thompson;

JOSEPH A. TIESI, as Personal Representative
of the Estate of Mary Ellen Tiesi, Deceased
and on behalf of all survivors of Mary Ellen Tiesi;

KIMBERLY TRIMINGHAM-AIKEN, as Administrator
of the Estate of Terrance Aiken,  Deceased
and on behalf of all survivors of Terrance Aiken;

MARIE TWOMEY, as Administrator
of the Estate of Robert T. Twomey, Deceased
and on behalf of all survivors of Robert T. Twomey;

24

VICTOR UGOLYN, as Administrator
of the Estate of Tyler V. Ugolyn, Deceased
and on behalf of all survivors of Tyler V. Ugolyn;

FELICIANA UMANZOR, as Administrator
of the Estate of Elsy C. Osoria, Deceased
and on behalf of all survivors of Elsy C. Osoria;

VIRGINIA LORENE ROSSITER VALVO, as Administrator
of the Estate of Carlton F. Valvo, II, Deceased
and on behalf of all survivors of Carlton F. Valvo, II;

JASMINE VICTORIA and DAWN TORRES BROWN, as co-
Administrators of the Estate of Celeste Torres Victoria,
Deceased and on behalf of all survivors of
Celeste Torres Victoria;

RICHARD VILLA, as Administrator
of the Estate of Sharon Christina Milan, Deceased
and on behalf of all survivors of Sharon Christina Milan;

ANTHONY VINCELLI, as Administrator
of the Estate of Chantal Vincelli, Deceased
and on behalf of all survivors of Chantal Vincelli;

LUCY VIRGILIO, as Administrator
of the Estate of Lawrence J. Virgilio, Deceased
and on behalf of all survivors of Lawrence J. Virgilio;

BENHARDT  R. WAINIO, as Personal Representative
of the Estate of Honor Elizabeth Wainio, Deceased
and on behalf of all survivors of Honor Elizabeth Wainio;

DIANE WALL, as Executor
of the Estate of Glen J. Wall, Deceased
and on behalf of all survivors of Glen J. Wall;

DIANNE M. WALSH, as Administrator
of the Estate of Christine J. Barbuto, Deceased
and on behalf of all survivors of Christine J. Barbuto;

AMY L. WEAVER, as Administrator
of the Estate of Todd Christopher Weaver, Deceased
and on behalf of all survivors of Todd Christopher Weaver;

DELIA WELTY, as Administrator
of the Estate of Timothy Matthew Welty, Deceased
and on behalf of all survivors of Timothy Matthew Welty;

LENA WHITTAKER, as Administrator
of the Estate of Karen E. Hagerty, Deceased
and on behalf of all survivors of Karen E. Hagerty;

PATRICIA WISWALL, as Executor
of the Estate of David Wiswall, Deceased
and on behalf of all survivors of David Wiswall;

ANNE M. WODENSHEK, as Administrator
of the Estate of Christopher W. Wodenshek, Deceased
and on behalf of all survivors of Christopher W. Wodenshek;

CELLA WOO-YUEN, as Administrator
of the Estate of Elkin Yuen, Deceased
and on behalf of all survivors of Elkin Yuen;

SIEW-SIM YEOW, as Administrator
of the Estate of Michael Waye, Deceased
and on behalf of all survivors of Michael Waye;

MADELEINE A. ZUCCALA, as Personal Representative
of the Estate of Joseph J. Zuccala, Deceased
and on behalf of all survivors of Joseph J. Zuccala;

ERICA ZUCKER, as Executor
of the Estate of Andrew Zucker, Deceased
and on behalf of all survivors of Andrew Zucker;

NANCY LYNN ZUCKERMAN, as Administrator
of the Estate of Alan Jay Lederman, Deceased
and on behalf of all survivors of Alan Jay Lederman;

ALDO ADISSI; EDWARD ARANCIO and
KATHLEEN M. ARANCIO; LEONARD ARDIZZONE
and BARBARA ARDIZZONE; THOMAS BAEZ;
JOSEPH BELTRANI; ANDREW BRAUN; ANDRZEJ
CIESLIK; JAMES CIZIKE; THOMAS CONROY, JR.;
GIBSON A. CRAIG; BRADLEY DALY; DOMENICK
DAMIANO; ROBERT J. D'ELIA;  THOMAS
DONNELLY;  CHARLES DOWNEY;  JOSEPH R.

DOWNEY;  TIMOTHY L. FROLICH and IRENE
FROLICH; STEVEN M. GILLESPIE; JOSEPH
HANDS; JOHN HASSETT; WARREN HAYES;
JAMES D. HODGES, II; NETTA ISSACOF;
ARNOLD LEDERMAN and PHYLLIS LEDERMAN;
MICHAEL J. LINDY; SANDY AMRITA MAHABIR;
WILLIAM MARTIN; KEVIN McARDLE; JAMES
McGETRICK; OWEN McGOVERN; WARREN
MONROE; KEVIN MOUNT;
KEVIN G. MURPHY;  JANICE O'DELL; TIMOTHY
PARKER; KEVIN QUINN; HOWARD RICE; LOUIS
SCHAEFER; CHARLES SCHMID; SCOTT
SCHRIMPE; RICHARD TING; GEORGE LUIS
TORRES; ROBERT V. TRIVIGNO; RUSSELL J.
VOMERO; EDWARD WALSH; PHILIP J. ZEISS;


EMILY AMARANTO, as Administrator
of the Estate of Angelo Amaranto, Deceased
and on behalf of all survivors of Angelo Amaranto;

LORI ANN ARCZYNSKI, as Executor
of the Estate of Michael G. Arczynski, Deceased
and on behalf of all survivors of Michael G. Arczynski;

LOUANNE BAILY, as Administrator
of the Estate of Brian Paul Dale, Deceased
and on behalf of all survivors of Brian Paul Dale;

MONICA BARBELLA, as Administrator
of the Estate of James Barbella, Deceased
and on behalf of all survivors of James Barbella;

MARCEL BIRNBAUM, as Personal Administrator
of the Estate of Joshua Birnbaum, Deceased
and on behalf of all survivors of Joshua Birnbaum;

SHARON BOOKER, as Administrator
of the Estate of SEAN BOOKER, Deceased
and on behalf of all survivors of Sean Booker;

FREDERICK BOWERS, JR., as Administrator
of the Estate of Kimberly S. Bowers, Deceased
and on behalf of all survivors of Kimberly S. Bowers;

27

JEAN BRACA, as Administrator
of the Estate of Alfred J. Braca, Deceased
and on behalf of all survivors of Alfred J. Braca;

RODNEY CALLUM, as Administrator
of the Estate of Michell Robotham, Deceased
and on behalf of all survivors of Michell Robotham;

NANCY E. CARROLL, as Administrator
of the Estate of Michael T. Carroll, Deceased
and on behalf of all survivors of Michael T. Carroll;

DAVID J. CHAZIN, as Administrator
of the Estate of Ruth Lapin, Deceased
and on behalf of all survivors of Ruth Lapin;

MARIANNE CRUIKSHANK, as Administrator
of the Estate of Robert L. Cruikshank, Deceased
and on behalf of all survivors of Robert L. Cruikshank;

TANYA KIM DAVIS, as Administrator
of the Estate of Mannie Leroy Clark, Deceased
and on behalf of all survivors of Mannie Leroy Clark;

JOAN E. DINCUFF and FRANK DINCUFF, as co-Administrators
of the Estate of Christopher M. Dincuff, Deceased,
and on behalf of all survivors of Christopher M. Dincuff;

NGORAN DJE, as Administrator
of the Estate of Irina Buslo, Deceased
and on behalf of all survivors of Irina Buslo;

SAM ELLIS, as Representative
of the Estate of Valerie Silver Ellis, Deceased
and on behalf of all survivors of Valerie Silver Ellis;

EILEEN ERWIN, as Representative
of the Estate of William John Erwin, Deceased
and on behalf of all survivors of William John Erwin;

MARY L. FERGUSON, as Executor
of the Estate of George J. Ferguson, Deceased
and on behalf of all survivors of George J. Ferguson;

28

TIERNEY FRAWLEY, as Administrator
of the Estate of Kevin Frawley, Deceased
and on behalf of all survivors of Kevin Frawley;

LARRY GIUGLIANO, as Administrator
of the Estate of Cynthia Giugliano, Deceased
and on behalf of all survivors of Cynthia Giugliano;

MARY JO GRILLO, as Administrator
of the Estate of Joseph Grillo, Deceased
and on behalf of all survivors of Joseph Grillo;

DIGNA HERNANDEZ, as Administrator
of the Estate of Raul Hernandez, Deceased
and on behalf of all survivors of Raul Hernandez;

KATHERINE M. HOORN and DENNIS J. HOORN,
as Administrators of the Estate of Bradley Hoorn, Deceased
and on behalf of all survivors of Bradley Hoorn;

JOSEPH WALTER HROMADA, as Administrator
of the Estate of Milagros Hromada, Deceased
and on behalf of all survivors of Milagros Hromada;

KAREN R. HUGHES, as Administrator
of the Estate of Timothy Hughes, Deceased
and on behalf of all survivors of Timothy Hughes;

YELENA ILKANAYEV, as Personal Representative
of the Estate of Daniel Ilkanayev, Deceased
and on behalf of all survivors of Daniel Ilkanayev;

EMILY LIZCANO, as Administrator
of the Estate of Harold Lizcano, Deceased
and on behalf of all survivors of Harold Lizcano;

JEANNE McALARY, as Administrator
of the Estate of James J. McAlary, Deceased
and on behalf of all survivors of James J. McAlary;

ANN McCARTHY, as Administrator
of the Estate of Robert Garvin McCarthy, Deceased
and on behalf of all survivors of Robert Garvin McCarthy;

29

DEBRA McSWEENEY, as Administrator
of the Estate of Timothy McSweeney, Deceased
and on behalf of all survivors of Timothy McSweeney;

LLOYD C. MAIR, as Personal Representative
of the Estate of Linda Catherine Mair Grayling, Deceased
and on behalf of all survivors of Linda Catherine Mair Grayling;

MARY JEAN McCARTHY O'LEARY, as Administrator
of the Estate of Gerald Thomas O'Leary, Deceased,
and on behalf of all survivors of Gerald Thomas O'Leary;

DEBORAH OPPERMAN, as Administrator
of the Estate of Michael Opperman, Deceased
and on behalf of all survivors of Deborah Opperman;

PERRY S. ORETZKY, as Personal Representative
of the Estates of David L. Angell and Lynn E. Angell, Deceased
and on behalf of all survivors of David L. Angell and Lynn E. Angell;

KANTILAL PATEL, as Representative
of the Estate of Manish Patel, Deceased
and on behalf of all survivors of Manish Patel;

NICOLE REDA, as Administrator
of the Estate of Gregory Reda, Deceased
and on behalf of all survivors of Gregory Reda;

NILSA RIVERA, as Executrix
of the Estate of Isaias Rivera, Deceased
and on behalf of all survivors of Isaias Rivera;

RICKY VIDER RIVERS, as Administrator
of the Estate of David E. Rivers, Deceased
and on behalf of all survivors of David E. Rivers;

EILEEN A. SHANAHAN, as Administrator
of the Estate of Earl R. Shanahan, Deceased
and on behalf of all survivors of Earl R. Shanahan;

SAMANTHA TAYLOR, as Legal Representative
of the Estate of Sandra Carol Taylor, Deceased
and on behalf of all survivors of Sandra Carol Taylor;

30

BARBARA TIRADO, as Administrator
of the Estate of David L. Tirado, Deceased
and on behalf of all survivors of David L. Tirado;

ANNE VANDEVANDER, as Administrator
of the Estate of Jon Vandevander, Deceased
and on behalf of all survivors of Jon Vandevander;

REMA WAISER, as Administrator
of the Estate of SIMON V. WEISER, Deceased
and on behalf of all survivors of Simon V. Weiser;

JANICE C. WILLIAMS, as Administrator
of the Estate of Louis Calvin Williams, III, Deceased
and on behalf of all survivors of Louis Calvin Williams, III;

DEBBIE WILLIAMS, as Administrator
of the Estate of Pauline Francis, Deceased
and on behalf of all survivors of Pauline Francis;

JOHN CITARELLA; DOUGLAS F. COPP;
BRIAN ROCOVICH; STEVE SULLIVAN;
WILLIAM WALSH;

EDELMIRO ABAD, as Personal Representative
of the Estate of Lorraine Abad, Deceased
and on behalf of all survivors of Lorraine Abad;

MARY ELIZABETH ADDERLEY and
TERENCE E. ADDERLEY, as Co-Administrators
of the Estate of Terence E. Adderley, Jr., Deceased
and on behalf of all survivors of Terence E. Adderley, Jr.;

CARMEN AGNES, as Personal Representative
of the Estate of David S. Agnes, Deceased
and on behalf of all survivors of David S. Agnes;

MILTIADIS AHLADIOTIS, as Personal Representative
of the Estate of Joanne Maria Ahladiotis, Deceased
and on behalf of all survivors of Joanne Maria Ahladiotis;

DONNA ALBERT, as Executor
of the Estate of Jon Albert, Deceased

31

and on behalf of all survivors of Jon Albert;

JOSEPH BERARDI, as Personal Representative
of the Estate of Dominick J. Berardi, Deceased
and on behalf of all survivors of Dominick J. Berardi;

VALERIE BETHKE, as Legal Representative
of the Estate of William R. Bethke, Deceased
and on behalf of all survivors of William R. Bethke;

DEBORAH BLANDING, as Administrator
of the Estate of Harry A. Blanding, Deceased
and on behalf of all survivors of Harry A. Blanding;

GAIL BRENNAN, as Administrator
of the Estate of Edward A. Brennan, Deceased
and on behalf of all survivors of Edward A. Brennan;

DAWN BRYFOGLE, as Administrator
of the Estate of Mark Bruce, Deceased
and on behalf of all survivors of Mark Bruce;

JULIE BURKE, as Administrator
of the Estate of Thomas Daniel Burke, Deceased
and on behalf of all survivors of Thomas Daniel Burke;

MARTHA C. BUTLER, as Administrator
of the Estate of Thomas M. Butler, Deceased
and on behalf of all survivors of Thomas M. Butler;

SHARON CAHILL, as Executor
of the Estate of John B. Cahill, Deceased
and on behalf of all survivors of John B. Cahill;

SUSAN CALCAGNO, as Personal Representative
of the Estate of Philip V. Calcagno, Deceased
and on behalf of all survivors of Philip V. Calcagno;

MICHELLE and VINCENT CANGELOSI, as
Personal Representatives of the Estate of
Vincent A. Cangelosi, Deceased and on behalf
of all survivors of Vincent A. Cangelosi;

LORI CAPORICCI, as Personal Representative

32

of the Estate of Louis Caporicci, Deceased
and on behalf of all survivors of Louis Caporicci;

JEAN CAREY, as Administrator
of the Estate of Dennis M. Carey, Deceased
and on behalf of all survivors of Dennis M. Carey;

CATHY CARILLI-SINTON, as Administrator
of the Estate of Thomas E. Sinton, III, Deceased
and on behalf of all survivors of Thomas E. Sinton;

PATRICIA CARRINGTON, as Administrator
of the Estate of Jeremy Carrington, Deceased
and on behalf of all survivors of Jeremy Carrington;

LEONARD A. CASTRIANNO, as Administrator
of the Estate of Leonard M. Castrianno, Deceased
and on behalf of all survivors of Leonard M. Castrianno;

GERALDINE CEFALU, as Administrator
of the Estate of Jason Cefalu, Deceased
and on behalf of all survivors of Jason Cefalu;

BOB CHEATHAM, as Personal Representative
of the Estate of Delrose Cheatham, Deceased
and on behalf of all survivors of Delrose Cheatham;

JOHN FRANCIS CLARKE, as Personal Representative
of the Estate of Michael J. Clarke, Deceased
and on behalf of all survivors of Michael J. Clarke;

ROBERT CLARK, as Personal Representative
of the Estate of Eugene Clark, Deceased
and on behalf of all survivors of Eugene Clark;

CHARLES CLYNE, as Personal Representative
of the Estate of Susan M. Clyne, Deceased
and on behalf of all survivors of Susan M. Clyne;

VINCENT J. COAKLEY and CAROLINE COAKLEY, as
Administrators of the Estate of Steven Coakley, Deceased
and on behalf of all survivors of Steven Coakley;

FELICIA A. CORBETT, as Personal Representative

33

of the Estate of Joseph A. Corbett, Deceased
and on behalf of all survivors of Joseph A. Corbett;

PAULA COTTOY, as Administrator
of the Estate of Conrod Cottoy, Sr., Deceased
and on behalf of all survivors of Conrod Cottoy, Sr.;

MARIANN COYLE, as Personal Representative
of the Estate of Andrew Gilbert, Deceased
and on behalf of all survivors of Andrew Gilbert;

JOHN CRANT, as Administrator
of the Estate of Denise Crant, Deceased
and on behalf of all survivors of Denise Crant;

LISA B. CRAWFORD, as Personal Representative
of the Estate of James L. Crawford, Jr., Deceased
and on behalf of all survivors of James L. Crawford;

MARIA CRIFASI, as Administrator
of the Estate of Lucy Crifasi, Deceased
and on behalf of all survivors of Luch Crifasi

JOANN CROSS, as Administrator
of the Estate of Dennis Cross, Deceased
and on behalf of all survivors of Dennis Cross;

MARIA CRUZ, as Personal Representative
of the Estate of Eduvigis Reyes, Jr., Deceased
and on behalf of all survivors of Eduvigis Reyes, Jr.;*

FREDERICK CURRY, as Personal Representative
of the Estate of Beverly Crew Curry, Deceased
and on behalf of all survivors of Beverly Crew Curry;

PATRICIA DeANGELIS, as Administrator
of the Estate of Thomas DeAngelis, Deceased
and on behalf of all survivors of Thomas DeAngelis;

MARION S. DeBLASE, as Personal Representative
of the Estate of James V. DeBlase, Jr., Deceased
and on behalf of all survivors of James V. DeBlase, Jr.;

VIOLETTA a/k/a VIVI DEMAS, as Personal Representative

34

of the Estate of Anthony Demas, Deceased
and on behalf of all survivors of Anthony Demas;

BROOKE DEMING, as Personal Representative
of the Estate of Francis X. Deming, Deceased
and on behalf of all survivors of Francis X. Deming;

CHRISTEL DeSIMONE, as Personal Representative
of the Estate of Christian DeSimone, Deceased
and on behalf of all survivors of Christian DeSimone;

ROBERT P. DEVITT, SR., as Administrator
of the Estate of Robert Devitt, Jr., Deceased
and on behalf of all survivors of Robert Devitt, Jr.;

DONNA DiAGOSTINO, as Personal Representative
of the Estate of Michael L. DiAgostino, Deceased
and on behalf of all survivors of Michael L. DiAgostino;

DAVID A. DiSTEFANO, as Personal Representative
of the Estate of Douglas F. DiStefano, Deceased
and on behalf of all survivors of Douglas F. DiStefano;
DAVID EGAN, as Personal Representative
of the Estate of Lisa Egan, Deceased
and on behalf of all survivors of Lisa Egan;

DAVID EGAN, as Personal Representative
of the Estate of Samantha Egan, Deceased
and on behalf of all survivors of Samantha Egan;

GAIL EAGLESON, as Administrator
of the Estate of John Bruce Eagleson, Deceased
and on behalf of all survivors of John Bruce Eagleson;

LUIS ESPINOZA, as Personal Representative
of the Estate of Fanny Espinoza, Deceased
and on behalf of all survivors of Fanny Espinoza;

LAURA FALLON, as Executor
of the Estate of William L. Fallon, Jr., Deceased
and on behalf of all survivors of William L. Fallon, Jr.;

PATRICIA FALLONE, as Personal Representative
of the Estate of Anthony J. Fallone, Deceased

35

and on behalf of all survivors of Anthony J. Fallone;

MAUREEN FANNING, as Administrator
of the Estate of John Fanning, Deceased
and on behalf of all survivors of John Fanning;

JEANINE LONG FRAZIER, as Administrator
of the Estate of Clyde Frazier, Jr., Deceased
and on behalf of all survivors of Clyde Frazier, Jr.;

ROBIN A. FREUND, as Fiduciary
of the Estate of Peter L. Freund, Deceased
and on behalf of all survivors of Peter L. Freund;

KENNETH R. FRIED, as Administrator
of the Estate of Arlene E. Fried, Deceased
and on behalf of all survivors of Arlene E. Fried;

MEREDITH FRY, as Executor
of the Estate of Peter C. Fry, Deceased
and on behalf of all survivors of Peter C. Fry;

FRANCINE GALLAGHER, as Administrator
of the Estate of John Patrick Gallagher, Deceased
and on behalf of all survivors of John Patrick Gallagher;

CANDY GLAZER, as Administrator
of the Estate of Edmund Glazer, deceased
and on behalf of all survivors of Edmund Glazer;

ANTONIA GARGANO, as Personal Representative
of the Estate of Rocco Nino Gargano, Deceased
and on behalf of all survivors of Rocco Nino Gargano;

JILL GARTENBERG, as Administrator
of the Estate of James M. Gartenberg, Deceased
and on behalf of all survivors of James M. Gartenberg;

MICHELLE GELINAS, as Personal Representative
of the Estate of Peter Gelinas, Deceased
and on behalf of all survivors of Peter Gelinas;*

DEBRA GELLER, as Administrator
of the Estate of Steven Paul Geller, Deceased

36

and on behalf of all survivors of Steven Paul Geller;

SONDRA GIACCONE, as Personal Representative
of the Estate of Joseph Giaccone, Deceased
and on behalf of all survivors of Joseph Giaccone;

LACHANZE GOODING, as Personal Representative
of the Estate of Calvin Joseph Gooding, Deceased
and on behalf of all survivors of Calvin Joseph Gooding;

ROXANNE GREEN, as Administrator
of the Estate of Wade Green, Deceased
and on behalf of all survivors of Wade Green;

SUSAN MALLERY GURIAN, as Personal Representative
of the Estate of Douglas Brian Gurian, Deceased
and on behalf of all survivors of Douglas Brian Gurian;

THOMAS HANNON, as Personal Representative
of the Estate of Dana R. Hannon, Deceased
and on behalf of all survivors of Dana R. Hannon;

CAROL HARAN, as Personal Representative
of the Estate of James Haran, Deceased
and on behalf of all survivors of James Haran;

SHEILA G. HARRIS, as Executor
of the Estate of Stewart D. Harris, Deceased
and on behalf of all survivors of Stewart D. Harris;

WANDA HERNANDEZ, as Administrator
of the Estate of Monique DeJesus, Deceased
and on behalf of all survivors of Monique DeJesus;

ALLISON HOBBS, as Personal Representative
of the Estate of Thomas A. Hobbs, Deceased
and on behalf of all survivors of Thomas A. Hobbs;

JAMES S. HOFFMAN, as Personal Representative
of the Estate of Marcia Hoffman, Deceased
and on behalf of all survivors of Marcia Hoffman;

ROSEMARIE HOHMANN, as Executor
of the Estate of Jonathan R. Hohmann, Deceased

and on behalf of all survivors of Jonathan R. Hohmann;

CHRISTOPHER HOWARD, as Administrator
of the Estate of George Howard, Deceased
and on behalf of all survivors of George Howard;

BARRY JABLONSKI, as Administrator
of the Estate of Virginia Jablonski, Deceased
and on behalf of all survivors of Virginia Jablonski;

ROBERT B. JACKMAN, as Personal Representative
of the Estate of Brooke Alexandra Jackman, Deceased
and on behalf of all survivors of Brooke Alexandra Jackman;

JU-HSIU JIAN, as Administrator
of the Estate of Hweidar Jian, Deceased
and on behalf of all survivors of Hweidar Jian;

JAN L. KANDELL, as Personal Representative
of the Estate of Shari Kandell, Deceased
and on behalf of all survivors of Shari Kandell;

GEORGE KATSIMATIDES, as Personal Representative
of the Estate of John Katsimatides, Deceased
and on behalf of all survivors of John Katsimatides;

JUDITH KEANE, as Personal Representative
of the Estate of Richard Keane, Deceased
and on behalf of all survivors of Richard Keane;

JULIE E. KELLY, as Personal Representative
of the Estate of Timothy C. Kelly, Deceased
and on behalf of all survivors of Timothy C. Kelly;

SUSAN KELLY, as Personal Representative
of the Estate of Joseph Anthony Kelly, Deceased
and on behalf of all survivors of Joseph Anthony Kelly;

PAUL KIEFER, as Personal Representative
of the Estate of Brian Warner, Deceased
and on behalf of all survivors of Brian Warner;

DONNA KLITZMAN & SUSAN KLITZMAN, as
Personal Representatives of the Estate of Karen

38

Klitzman, Deceased and on behalf of all survivors
of Karen Klitzman;

HARLENE LARRY, as Administrator
of the Estate of Hamidou Larry, Deceased
and on behalf of all survivors of Hamidou Larry;

ANN LEAVY, as Personal Representative
of the Estate of Neil Leavy, Deceased
and on behalf of all survivors of Neil Leavy;

KAREN LEE, as Personal Representative
of the Estate of Richard Yun-Choon Lee, Deceased
and on behalf of all survivors of Richard Yun-Choon Lee;

DELORES LEGREE, as Personal Representative
of the Estate of Anthony Hawkins, Deceased
and on behalf of all survivors of Delores Legree;

MARIA LEGRO, as Personal Representative
of the Estate of Adriana Legro, Deceased
and on behalf of all survivors of Adriana Legro;

SUSAN LENOIR, as Executor
of the Estate of John Robinson Lenoir, Deceased
and on behalf of all survivors of John Robinson Lenoir;

CHRISTINE E. LeVEEN, as Personal Representative
of the Estate of Jeffrey E. LeVeen, Deceased
and on behalf of all survivors of Jeffrey E. LeVeen;

MARIE LUKAS, as Personal Representative
of the Estate of Marie Lukas, Deceased
and on behalf of all survivors of Marie Lukas;

MICHELLE LUNDEN, as Administrator
of the Estate of Michael Patrick Lunden, Deceased
and on behalf of all survivors of Michael Patrick Lunden;

LORRAINE MARCHESE, as Personal Representative
of the Estate of Laura A. Giglio a/k/a
Laura Marchese, Deceased, and on behalf of all
survivors of Laura A. Giglio a/k/a Laura Marchese;

JUAN MARTINEZ, as Personal Representative
of the Estate of Waleska Martinez, Deceased
and on behalf of all survivors of Waleska Martinez;

PEARL MAYNARD, as Representative
of the Estate of Keithroy Maynard, Deceased
and on behalf of all survivors of Keithroy Maynard;

BETTY ANN McCARTHY, as Personal Representative
of the Estate of Justin McCarthy, Deceased
and on behalf of all survivors of Justin McCarthy;

WILLIAM McCARTHY, as Personal Representative
of the Estate of Michael McCarthy, Deceased
and on behalf of all survivors of Michael McCarthy;

SUSAN McDERMOTT, as Personal Representative
of the Estate of Matthew J. McDermott, Deceased
and on behalf of all survivors of Matthew J. McDermott;

MARY BETH McERLEAN, as Personal Representative
of the Estate of John T. McErlean, Jr., Deceased
and on behalf of all survivors of John T. McErlean, Jr.;

MARY S. McGOVERN, as Administrator
of the Estate of William McGovern, Deceased
and on behalf of all survivors of William McGovern;

GEORGE McLAUGHLIN, as Personal Representative
of the Estate of George McLaughlin III, Deceased
and on behalf of all survivors of George McLaughlin III;

ANNE McNEIL, as Executor
of the Estate of Martin Michelstein, Deceased
and on behalf of all survivors of Martin Michelstein;

KOULA MERKOURIS, as Administrator
of the Estate of George Merkouris, Deceased
and on behalf of all survivors of George Merkouris;

DIANE MONAHAN, as Personal Representative
of the Estate of John Monahan, Deceased
and on behalf of all survivors of John Monahan;

ROBERTA MORELL, as Personal Representative
of the Estate of George Morell, Deceased
and on behalf of all survivors of George Morell;

NANCY MORONEY, as Administrator
of the Estate of Dennis Moroney, Deceased
and on behalf of all survivors of Dennis Moroney;

LORRAINE MOSICAL, as Personal Representative
of the Estate of William Mosical, Deceased
and on behalf of all survivors of William Mosical;

ELIZABETH MURPHY, as Personal Representative
of the Estate of Charles A. Murphy, Deceased
and on behalf of all survivors of Charles A. Murphy;

JUDITH BRAM MURPHY, as Personal Representative
of the Estate of Brian Murphy, Deceased
and on behalf of all survivors of Brian Murphy;

GAIL MYHRE, as Personal Representative
of the Estate of Richard Todd Myhre, Deceased
and on behalf of all survivors of Richard Todd Myhre;

ENRICA NACCAROTO, as Personal Representative
of the Estate of Lorraine Lisi, Deceased
and on behalf of all survivors of Lorraine Lisi;

DAVID DWIGHT NELSON and SHARON
BAKER-GUAL, as co-Personal Representatives
of the Estate of Kerene Gordon, Deceased
and on behalf of all survivors of Kerene Gordon;

MANUELA OCTAVIA NITA-GALLO, as Administrator
of the Estate of Cono Gallo, Deceased
and on behalf of all survivors of Cono Gallo;

ARLINE NUSSBAUM, as Personal Representative
of the Estate of Jeffrey Nussbaum, Deceased
and on behalf of all survivors of Jeffrey Nussbaum;*

DENNIS O'CONNOR, as Administrator
of the Estate of Dennis O'Connor, Jr., Deceased
and on behalf of all survivors of Dennis O'Connor, Jr.

41

LYNNE O'CONNOR, as Personal Representative
of the Estate of Richard O'Connor, Deceased
and on behalf of all survivors of Richard O'Connor;

JOSEPH O'KEEFE, as Administrator
of the Estate of Lesley Thomas, Deceased
and on behalf of all survivors of Lesley Thomas;

HOLLY D. O'NEILL, as Administrator
of the Estate of Sean Gordon O'Neill, Deceased
and on behalf of all survivors of Sean Gordon O'Neill;

SHEILA MARIE G. ORNEDO, as Representative
of the Estate of Ruben S. Ornedo, Deceased
and on behalf of all survivors of Ruben S. Ornedo;

TRACY ORR, as Administrator
of the Estate of Alexander Steinman, Deceased
and on behalf of all survivors of Alexander Steinman;

JOANNA OSTROWSKI, as Administrator
of the Estate of James Robert Ostrowski, Deceased
and on behalf of all survivors of James Robert Ostrowski;

KENNETH OSWALD, as Personal Representative
of the Estate of Jason Oswald, Deceased
and on behalf of all survivors of Jason Oswald;

SUSAN OU, as Personal Representative
of the Estate of Michael Ou, Deceased
and on behalf of all survivors of Michael Ou;

KATHLEEN OWENS, as Personal Representative
of the Estate of Peter Owens, Deceased
and on behalf of all survivors of Peter Owens;*

YVETTE PABON, as Personal Representative
of the Estate of Angel Pabon, Deceased
and on behalf of all survivors of Angel Pabon;

BLANCA GUTIERREZ DE PAZ, as Personal Representative
of the Estate of Victor Hugo Paz Gutierrez, Deceased
and on behalf of all survivors of Victor Hugo Paz Gutierrez;

42

BOBBIE CATHERINE PEAK, as Administrator
of the Estate of Stacey Peak, Deceased
and on behalf of all survivors of Stacey Peak;

SOPHIE PELLETIER, as Personal Representative
of the Estate of Mike Pelletier, Deceased
and on behalf of all survivors of Mike Pelletier;

LOURDES PEREZ-BERKELEY, as Personal Representative
of the Estate of Michael J. Berkeley, Deceased
and on behalf of all survivors of Michael J. Berkeley;

PATRICIA PERRONCINO, as Administrator
of the Estate of Joseph Perroncino, Deceased
and on behalf of all survivors of Joseph Perroncino;

JOSEPH PERROTTA, as Personal Representative
of the Estate of Edward Joseph Perrotta, Deceased
and on behalf of all survivors of Edward Joseph Perrotta;

BERNARD PHAIR, as Personal Representative
of the Estate of Joann Cregan, Deceased
and on behalf of all survivors of Joann Cregan;

MURRAY C. PITT and ERIN PITT RICHARDS,
as Co-Administrators of the Estate of Gregory
Richards, Deceased and on behalf of all survivors
of Gregory Richards;

SUSAN PRUNTY, as Administrator
of the Estate of Richard Prunty, Deceased
and on behalf of all survivors of Richard Prunty;

JODI RIVERSO, as Administrator
of the Estate of Joseph R. Riverso, Deceased
and on behalf of all survivors of Joseph R. Riverso;

ELAINE RIZZA, as Administrator
of the Estate of Paul Rizza, Deceased
and on behalf of all survivors of Paul Rizza;

KATHERINE ROBSON, as Personal Representative
of the Estate of Donald A. Robson, Deceased
and on behalf of all survivors of Donald A. Robson;

43

ESTHER RODRIGUEZ, as Public Administrator
of the Estate of Peter A. Bielfeld, Deceased
and on behalf of Brittany Bielfeld, a minor and
Therese Clarner, individually and as guardian
ad litem for Brittany Bielfeld;

RONALD R. ROHNER, as Administrator
of the Estate of Scott W. Rohner, Deceased
and on behalf of all survivors of Ronald R. Rohner;

ALISSA ROSENBERG-TORRES, ad Administrator
of the Estate of Luis Eduardo Torres, Deceased
and on behalf of all survivors of Luis Eduardo Torres;

MICHELE SAND, as Personal Representative
of the Estate of Eric Sand, Deceased
and on behalf of all survivors of Eric Sand;

JOSEPH SANTO, as Administrator
of the Estate of Susan Santo, Deceased
and on behalf of all survivors of Susan Santo;

SHEILA SCANDOLE, a Personal Representative
of the Estate of Robert L. Scandole, Deceased
and on behalf of all survivors of Robert L. Scandole;

KENNETH G. SCHIELKE, as Personal Representative
of the Estate of Sean Schielke, Deceased
and on behalf of all survivors of Sean Schielke;

JEFFREY SCHORPP, as Administrator
of the Estate of Marisa DiNardo, Deceased
and on behalf of all survivors of Marisa DiNardo;

PATRICIA B. SCHWARTZ, as Administrator
of the Estate of Mark Schwartz, Deceased
and on behalf of all survivors of Mark Schwartz;

CHARLES SCIBETTA, as Personal Representative
of the Estate of Adrianne Scibetta, Deceased
and on behalf of all survivors of Adrianne Scibetta;

CATHERINE SCULLIN, as Personal Representative

44

of the Estate of Arthur Warren Scullin, Deceased
and on behalf of all survivors of Arthur Warren Scullin;

LEONOR SHAHID and SYED SHAHID, as
co-Administrators of the Estate of Khalid Shahid, Deceased
and on behalf of all survivors of Khalid Shahid;

JYOTHI SHAH, as Administrator
of the Estate of Jayesh Shah, Deceased
and on behalf of all survivors of Jayesh Shah;

BENJAMIN SHAMAY, as Administrator
of the Estate of Gary Shamay, Deceased
and on behalf of all survivors of Gary Shamay;

JANINE SNYDER, as Administrator
of the Estate of Leonard Snyder, Deceased
and on behalf of all survivors of Leonard Snyder;

LAWAN SRINUAN and CHALERMCHAI SRINUAN,
as Co-Administrators of the Estate of Saranya Srinuan
and on behalf of all survivors of Saranya Srinuan;

DANIEL STAN, as Administrator
of the Estate of Alexandru Stan, Deceased
and on behalf of all survivors of Alexandru Stan;

PATRICIA A. STRAINE, as Personal Representative
of the Estate of James J. Straine, Jr., Deceased
and on behalf of all survivors of James J. Straine;

SUZANNE SWAINE, as Personal Representative
of the Estate of John F. Swaine, Deceased
and on behalf of all survivors of John F. Swaine;

MIDORI TAKAHASHI, as Personal Representative
of the Estate of Keiji Takahashi, Deceased
and on behalf of all survivors of Keiji Takahashi;

EMILY TERRY, as Personal Representative
of the Estate of Andrew Kates, Deceased
and on behalf of all survivors of Andrew Kates;

THOMAS EDWARD TIGHE, as Personal Representative

45

of the Estate of Diane T. Lipari, Deceased
and on behalf of all survivors of Diane T. Lipari;

KATHLEEN TRANT, as Administrator
of the Estate of Daniel Trant, Deceased
and on behalf of all survivors of Daniel Trant;

MARY TSELEPIS, as Personal Representative
of the Estate of William P. Tselepis, Deceased
and on behalf of all survivors of William P. Tselepis;

JULIE UMAN, as Personal Representative
of the Estate of Jonathan Uman, Deceased
and on behalf of all survivors of Jonathan Uman;

PATRICIA VILARDO, as Administrator
of the Estate of Joseph Vilardo, Deceased
and on behalf of all survivors of Joseph Vilardo;

STANLEY WEINSTEIN, as Administrator
of the Estate of Lisa Karen Orfi-Ehrlich, Deceased;
and on behalf of all survivors of Lisa Karen Orfi-Ehrlich;

CAROL WISNIEWSKI, as Administrator
of the Estate of Frank Thomas Wisniewski, Deceased
and on behalf of all survivors of Frank Thomas Wisniewski;

KATHLEEN M. WIK, as Administrator
of the Estate of William J. Wik, Deceased
and on behalf of all survivors of William J. Wik;

CHARLES WOLFE, as Administrator
of the Estate of Katherine Wolfe, Deceased
and on behalf of all survivors of Katherine Wolfe;

KAREN WORTLEY, as Administrator
of the Estate of Martin Wortley, Deceased
and on behalf of all survivors of Martin Wortley;

DYAN ZINZI, as Personal Representative
of the Estate of Michael Zinzi, Deceased
and on behalf of all survivors of Michael Zinzi;

CAROL ZION, as Personal Representative

46

of the Estate of Charles A. Zion, Deceased
and on behalf of all survivors of Charles A. Zion;


WILLIAM STEVEN GOLDSTEIN
TIMOTHY MOLCZYK
JOHN DRISCOLL
LADWIN BRISSETT*
ELLEN McQUEEN*
MARIE POLITE*
CHRISTOPHER SPARACIA*
JILL FENWICK*
SEAN GENOVESE
DANIEL J. PRITZKER
BRIAN J. SULLIVAN
THOMAS McHUGH
JAMES J. BARANEK
ROBERT RENODE, JR.
GREGORY E. MANNING
HILDA VALENTINE
HARRY WAIZER
MARIA WARD
PETER MOLNAR
* Co-Counsel Soberman & Rosenberg


DEBORAH AMATO, as Personal Representative
of the Estate of James A. Amato, Deceased
and on behalf of all survivors of James A. Amato;

SANDRA BURNSIDE, as Personal Representative
of the Estate of John P. Burnside, Deceased
and on behalf of all survivors of John P. Burnside;

WARREN COLODNER, as Executor
of the Estate of Patricia M. Colodner, Deceased
and on behalf of all survivors of Patricia M. Colodner;

JEAN C. FISCHER, as Personal Representative
of the Estate of John R. Fischer, Deceased
and on behalf of all survivors of John R. Fischer;

LISA PALAZZO, as Personal Representative
of the Estate of Thomas Palazzo, Deceased

and on behalf of all survivors of Thomas Palazzo;

RICHARD A. PITINO, as Executor
of the Estate of William G. Minardi, Deceased and
on behalf of all survivors of William G. Minardi;

WILLIAM F. REILLY, as Administrator of the
Estate of James Brian Reilly, Deceased and on
behalf of all survivors of James Brian Reilly;

LINDA SARLE, as Administrator of the
Estate of Paul F. Sarle, Deceased and on
behalf of all survivors of Paul F. Sarle;

ELLEN SHEA, as Executor of the Estate of Daniel
James Shea, Deceased, and on behalf of all survivors of
Daniel James Shea;

LORRAINE SPEAR, as Personal Representative
of the Estate of Robert W. Spear, Deceased
and on behalf of all survivors of Robert W. Spear;

DIANE STARITA, as Personal Representative of
the Estate of Anthony Starita, Deceased and on behalf of
all survivors of Anthony Starita;

HARUMI TAKAHASHI, as Personal Representative of
the Estate of Keiichiro Takahashi, Deceased
and on behalf of all survivors of Keiichiro Takahashi,

MARIA ARYEE, as Administrator
of the Estate of Japhet Aryee, Deceased
and on behalf of all survivors of Japhet Aryee;

JoANN ATLAS, as Personal Representative
of the Estate of Gregg Arthur Atlas, Deceased
and on behalf of all survivors of Gregg Arthur Atlas;

VLADIMIR BASIN, as Administrator
of the Estate of Inna Basin, Deceased
and on behalf of all survivors of Inna Basin;

48

PAULINE and CHARLES LESLIE BERKELEY,
as Personal Representatives of the Estate of
Graham Berkeley, Deceased  and on behalf of all
survivors of Graham Berkeley;**

PAULA BERRY, as Administrator
of the Estate of David S. Berry, Deceased
and on behalf of all survivors of David S. Berry;

JOLANTA BOYARSKY, as Administrator
of the Estate of Gennady Boyarsky, Deceased
and on behalf of all survivors of Gennady Boyarsky;

PHILIP G. BRADSHAW, as Executor
of the Estate of Sandra W. Bradshaw, Deceased
and on behalf of all survivors of Sandra W. Bradshaw;

SUSAN CARROLL, as Administrator
of the Estate of Kevin Colbert, Deceased
and on behalf of all survivors of Kevin Colbert;

PATRICIA DEAN, as Personal Representative
of the Estate of WILLIAM DEAN, Deceased
and on behalf of all survivors of William Dean;

WILLIAM A. DREIER and MARY WRIGHT, as
Co-Administrators of the Estate of Neil Wright, Deceased
and on behalf of all survivors of Neil Wright;

IRINA DUBENSKAYA, as Administrator
of the Estate of Eugueni Kniazev, Deceased
and on behalf of all survivors of Eugueni Kniazev;

ZHANNA GALPERINA, as Administrator
of the Estate of Arkady Zaltsman, Deceased
and on behalf of all survivors of Arkady Zaltsman;

RANULFO and RENEE GAMBOA, as Personal
Representatives of the Estate of David R. Brandhorst
Gamboa, Deceased and on behalf of all survivors of

David R. Brandhorst**

RACHEL W. GOODRICH, as Personal Representative
of the Estate of Peter M. Goodrich, Deceased
and on behalf of all survivors of Peter M. Goodrich;

BOBBY GRIFFIN, as Personal Representative
of the Estate of Tawanna Griffin, Deceased
and on behalf of all survivors of Tawanna Griffin;**

GWYNETTA HURST, as Personal Representative
of the Estate of Shannon Lewis Adams, Deceased
and on behalf of all survivors of Shannon Lewis Adams,

LILLIAN ILOWITZ, as Administrator
of the Estate of Abraham Ilowitz, Deceased
and on behalf of all survivors of Abraham Ilowitz;

ELLA KHALIF, as Administrator
of the Estate of Boris Khalif, Deceased
and on behalf of all survivors of Boris Khalif;

JIN HEE KIM, as Personal Representative of the
Estate of Hyun Joon Lee, Deceased, and
on behalf of all survivors of Hyun Joon Lee;

PAUL KIM, as Personal Representative of the
Estate Andrew Jay-Hoon Kim, Deceased, and
on behalf of all survivors of Andrew Jay-Hoon Kim;

ARSEN KOLPAKOV, as Administrator
of the Estate of Irina Kolpakova, Deceased
and on behalf of all survivors of Irina Kolpakova;

NADADUR S. KUMAR, as Administrator
of the Estate of Pendyala Vamsikrishna, Deceased
and on behalf of all survivors of Pendyala Vamsikrishna;

NADADUR S. KUMAR, as Administrator
of the Estate of Prasanna Kalahasthi, Deceased

50

and on behalf of all survivors of Prasanna Kalahasthi;

NATALYA LOGINOVA, as Administrator
of the Estate of Alexey Razuvaev, Deceased
and on behalf of all survivors of Alexey Razuvaev;

SHARI MAIO, as Personal Representative
of the Estate of Joseph Daniel Maio, Deceased
and on behalf of all survivors of Joseph Daniel Maio;**

RAYNETTE MASCARENHAS, as Executor
of the Estate of Bernard Mascarenhas, Deceased
and on behalf of all survivors of Bernard Mascarenhas
including Sven Herman Mascarenhas and
Jaclyn Anne Marie Mascarenhas;

MARJORIE BETH MILLER, as Administrator
of the Estate of Joel Miller, Deceased
and on behalf of all survivors of Joel Miller;

SURI MORGENSTERN, as Administrator
of the Estate of Nancy Morgenstern, Deceased
and on behalf of all survivors of Nancy Morgenstern;

CATHY MUROLO, as Personal Representative
of the Estate of Marc Murolo, Deceased
and on behalf of all survivors of Marc Murolo,

MARY NICHOLSON, as Personal Representative
of the Estate of M. Kathleen Shearer, Deceased
and on behalf of all survivors of M. Kathleen Shearer;

MARY NICHOLSON, as Personal Representative
of the Estate of Robert Shearer, Deceased
and on behalf of all survivors of Robert Shearer;

GEORGE NICOSIA, as Administrator
of the Estate of Kathleen Anne Nicosia, Deceased,
and on behalf of all survivors of Kathleen Anne Nicosia,

51

FRANK K. PEZZUTI, as Personal Representative
of the Estate of Kaleen E. Pezzuti, Deceased
and on behalf of all survivors of Kaleen E. Pezzuti,

VIVIAN BETH REUBEN, as Personal Representative
of the Estate of Todd H. Reuben, Deceased
and on behalf of all survivors of Todd H. Reuben;**

VASILIY RIJOV, as Administrator
of the Estate of Tatiana Ryjova Deceased
and on behalf of all survivors of Tatiana Ryjova;

ILIA RODRIGUEZ, as Personal Representative
of the Estate of Carlos R. Lillo, Deceased
and on behalf of all survivors of Carlos R. Lillo;**

LAUREN ROSENZWEIG, as Administrator
of the Estate of Philip Rosenzweig, Deceased
and on behalf of all survivors of Philip Rosenzweig

MARIA L. RYAN, as Administrator
of the Estate of Jonathan S. Ryan, Deceased
and on behalf of all survivors of Jonathan S. Ryan;

KIM STATKEVICUS, as Administrator of
the Estate of Derek J. Statkevicus, Deceased
and on behalf of all survivors of Derek J. Statkevicus,

JILL K. TARROU, as Personal Representative
of the Estate of Michael C. Tarrou, Deceased
and on behalf of all survivors of Michael C. Tarrou;**

FRANK TAYLOR, as Personal Representative
of the Estate of Lorisa Taylor, Deceased
and on behalf of all survivors of Lorisa Taylor;

KIMBERLY TRUDEL, as Administrator
of the Estate of Fred Rimmele, Deceased
and on behalf of all survivors of Fred Rimmele;

**Co-Counsel Podhurst Orseck

LAURA BACARELLA
ISRAEL HALPERN,

**Stand Alone Complaint Filed 9/10/03**

ERNESTO BARRERA, as Personal Representative
of the Estate of Ana Gloria DeBarrera, Deceased
and on behalf of all survivors of Ana Gloria DeBarrera;

SHARLENE M. BECKWITH and
JAMES A. REED, as Co-Administrators of
the Estate of Michele M. Reed, Deceased
and on behalf of all survivors of Michele M. Reed;

BENITO COLON, as Administrator
of the Estate of Soledi Colon, Deceased
and on behalf of all survivors of Soledi Colon;

VICTORIA HIGLEY, as Administrator
of the Estate of Robert Higley, Deceased
and on behalf of all survivors of Robert Higley;

MAUREEN KELLY, as Administrator
of the Estate of Mark Ludvigsen, Deceased
and on behalf of all survivors of Mark Ludvigsen;

MARION KNOX, as Administrator
of the Estate of Andrew Knox, Deceased
and on behalf of all survivors of Andrew Knox;

LAURA J. LASSMAN, as Administrator
of the Estate of Nicholas Lassman, Deceased
and on behalf of all survivors of Nicholas Lassman;

PHILIP LEE and MEI JY LEE, as Co-Administrators
of the Estate of Yang Der Lee, Deceased
and on behalf of all survivors of Yang Der Lee;

MELVIN LEWIS & JOHN LEWIS, as
Co-Personal Administrators of the Estate

**COMPLAINT**
**Civil Action No. 03CV 7036**

53

Margaret Lewis, Deceased and on behalf
of all survivors of Margaret Lewis;

JOHN A. MARTIN and PAUL R. MARTIN,
as Co-Administrators of the Estate of
Karen Ann Martin, Deceased and on behalf
of all survivors of Karen Ann Martin;

JOVIANA MERCADO, as Administrator
of the Estate of Steve Mercado, Deceased
and on behalf of all survivors of Steve Mercado;

LINDA PASCUMA, as Personal Representative
of the Estate of Michael J. Pascuma, Jr., Deceased
and on behalf of all survivors of Michael J. Pascuma, Jr.;

SEAN PASSANANTI, as Executor
of the Estate of Horace Passananti, Deceased
and on behalf of all survivors of Horace Passananti;

HELEN PFEIFER, as Personal Representative
of the Estate of Kevin Pfeifer, Deceased
and on behalf of all survivors of Kevin Pfeifer;

DANIEL POLATSCH, as Personal Representative
of the Estate of Laurence Polatsch, Deceased
and on behalf of all survivors of Laurence Polatsch;

THERESA REGAN, as Personal Representative
of the Estate of Donald Regan, Deceased
and on behalf of all survivors of Donald Regan;**

ARMAND REO, as Administrator
of the Estate of John A. Reo, Deceased
and on behalf of all survivors of John A. Reo;

ALEXANDER & MAUREEN SANTORO, as
Personal Representatives of the Estate of Christopher Santoro,
Deceased and on behalf of all survivors of Christopher Santoro;**

NARASIMHA SATTALURI, as Administrator
of the Estate of Deepika Kumar Sattaluri, Deceased
and on behalf of all survivors of Deepika Kumar Sattaluri;

CYNTHIA TUMULTY, as Administrator
of the Estate of Lance Tumulty, Deceased
and on behalf of all survivors of Lance Tumulty;

YUN YU ZHENG, as Administrator
of the Estate of Kui Fai Kwok, Deceased
and on behalf of all survivors of Kui Fai Kwok;

DAVID ZIMINSKI, as Administrator
of the Estate of Ivelin Ziminski, Deceased
and on behalf of all survivors of Ivelin Ziminski;

ROBERT BERMINGHAM;**

MARK BERNHEIMER;**

DONALD DiDOMENICO;

JOSEPH DONOVAN;**

WILLIAM ELLIS;**

MICHAEL ENDRIZZI;**

THOMAS FLETCHER;**

MARK GOLDWASSER;**

RON HARDING;**

JEREMIAH HARNEY;**

PETER IOVENO;**

JURGIEL KAZIMIERZ;**

ROBERT KEANE;**

RAYMOND LACHHMAN;**

GEORGE LANTAY;**

HOUSSAIN LAZAAR;**

JOYCE LEIGH;**

VINCENT LeVIEN;**

JEFF LEVER;**

JERZY MROZEK;**

ANDREW QUINN;**

DENNIS QUINN;**

KEVIN ROGERS;**

CARMEN ROMERO;**

CHRISTINE SAKOUTIS;**

KEMRAJ SINGH;**

GARY WENDELL;**

** Barasch McGarry Salzman Penson & Lim Attorneys

**Plaintiffs added as of March 10, 2004**

ANNE ANGELINI, as Administrator
of the Estate of Joseph Angelini, Sr., Deceased
and on behalf of all survivors of Joseph Angelini, Sr.;

KATHLEEN G. APOSTOL, as Administrator
of the Estate of Faustino Apostol, Jr., Deceased
and on behalf of all survivors of Faustino Apostol;

LOWELL L. BELL and PATRICIA BELL, as co-
Administrators of the Estate of Nina P. Bell, Deceased
and on behalf of all survivors of Nina P. Bell;

LINDA BOWMAN, as Personal Representative
of the Estate of Larry Bowman, Deceased
and on behalf of all survivors of Larry Bowman;

56

RICHARD PETER CARNEY, as Executor
of the Estate of Mark Stephen Carney, Deceased
and on behalf of all survivors of Mark Stephen Carney;

FRANCES M. COFFEY, as Personal Representative
of the Estate of Daniel M. Coffey, Deceased
and on behalf of all survivors of Daniel M. Coffey;

FRANCES M. COFFEY, as Personal Representative
of the Estate of Jason M. Coffey, Deceased
and on behalf of all survivors of Jason M. Coffey;

ANGELA DANZ, as Administrator
of the Estate of Vincent Danz, Deceased
and on behalf of all survivors of Vincent Danz;

GERALDINE DAVIE, as Administrator
of the Estate of Amy O'Doherty, Deceased
and on behalf of all survivors of Amy O'Doherty;

CHRISTOPHER V. DELLA PIETRA, as Administrator
of the Estate of Joseph A. Della Pietra, Deceased
and on behalf of all survivors of Joseph A. Della Pietra;

MARIAN FONTANA, as Administrator
of the Estate of David J. Fontana, Deceased
and on behalf of all survivors of David J. Fontana;

ELISABET GARDNER, as Administrator
of the Estate of William Arthur Gardner, Deceased
and on behalf of all survivors of William Arthur Gardner;

ROXANN GIORDANO, as Administrator
of the Estate of John Giordano, Deceased
and on behalf of all survivors of John Giordano;

JOHN F. GREGORY, as Administrator
of the Estate of Florence Moran Gregory, Deceased
and on behalf of all survivors of Florence Moran Gregory;

JOANNE HATTON, as Administrator
of the Estate of Leonard Hatton, Jr., Deceased
and on behalf of all survivors of Leonard Hatton, Jr.;

MARIE HUNCHAK, as Administrator
of the Estate of Andrew Lacorte, Deceased
and on behalf of all survivors of Andrew Lacorte;

MARY JEANETTE JONES, as Executrix
of the Estate of Charles Jones, Deceased
and on behalf of all survivors of Charles Jones;

MAUREEN KENNEDY, as Administrator
of the Estate of Robert Kennedy, Deceased
and on behalf of all survivors of Robert Kennedy;

SHERI ANNE LADLEY, as Executrix
of the Estate of James P. Ladley, Deceased
and on behalf of all survivors of James P. Ladley;

KIMBERLEY S. LAMANTIA, as Administrator
of the Estate of Stephen Lamantia, Deceased
and on behalf of all survivors of Stephen Lamantia;

CAROL LAEITA, as Administrator
of the Estate of Vincent A. Leita, Deceased
and on behalf of all survivors of Vincent A. Leita;

KIM L. LASKO, as Executrix
of the Estate of Gary E. Lasko, Deceased
and on behalf of all survivors of Gary E. Lasko;

MELVIN LEWIS and JOHN LEWIS, as Co-
Administrators of the Estate of  Margaret Lewis, Deceased
and on behalf of all survivors of Margaret Lewis;

DENISE LYNCH, as Administrator
of the Estate of Michael Lynch, Deceased
and on behalf of all survivors of Michael Lynch;

58

ANNE MARIE MCCANN, as Administrator
of the Estate of Thomas McCann, Deceased
and on behalf of all survivors of Thomas McCann;

MICHELLE MCCRANN, as Administrator
of the Estate of Charles A. McCrann, Deceased
and on behalf of all survivors of Charles A. McCrann;

LIDIA MELENDEZ, as Administrator
of the Estate of Mirna A. Duarte, Deceased
and on behalf of all survivors of Mirna A. Duarte;

ENRICA NACCARATO, as Administrator
of the Estate of Lorraine Lisi, Deceased
and on behalf of all survivors of Lorraine Lisi;

MARY NICHOLSON, as Administrator
of the Estate of Robert Shearer, Deceased
and on behalf of all survivors of Robert Shearer;

ANDREA O'HAGAN, as Administrator
of the Estate of Thomas G. O'Hagan, Deceased
and on behalf of all survivors of Thomas G. O'Hagan;

JOHN ERIC OLSON, as Administrator
of the Estate of Maureen Lyons Olson, Deceased
and on behalf of all survivors of Maureen Lyons Olson;

ALREDO F. ORTIZ, as Administrator
of the Estate of Alexander Ortiz, Deceased
and on behalf of all survivors of Alexander Ortiz;

SAMPATH PAKKALA, as Administrator
of the Estate of Deepa Pakkala, Deceased
and on behalf of all survivors of Deepa Pakkala;

EDWARD RADBURN, as Administrator
of the Estate of Bettina Browne, Deceased
and on behalf of all survivors of Bettina Browne;

CARMEN RODRIGUEZ, as Administrator
of the Estate of Angel Perez, Deceased
and on behalf of all survivors of Angel Perez;

GRISSEL RODRIGUEZ-VALENTIN, as Administrator
(Ad Prosequendum) of the Estate of Benito Valentin, Deceased
and on behalf of all survivors of Benito Valentin;

SUSAN ROSSINOW, as Administrator
of the Estate of Norman Rossinow, Deceased
and on behalf of all survivors of Norman Rossinow;

DAE JIN RYOOK, as Administrator
of the Estate of Christina S. Ryook, Deceased
and on behalf of all survivors of Christina S. Ryook;

ARLENE SACERDOTE, as Administrator
of the Estate of Joseph Sacerdote, Deceased
and on behalf of all survivors of Joseph Sacerdote;

PAULA SHAPIRO, as Co-Administrator
of the Estate of Eric Eisenberg, Deceased
and on behalf of all survivors of Eric Eisenberg;

JERRI SMITH, as Administrator
of the Estate of Kevin Smith, Deceased
and on behalf of all survivors of Jerri Smith;

MARY E. TADDEI, as Voluntary Administrator
of the Estate of Norma C. Taddei, Deceased
and on behalf of all survivors of Norma C. Taddei;

CONSUELO VELAZQUEZ, as Administrator
of the Estate of Jorge Velazquez, Deceased
and on behalf of all survivors of Jorge Velazquez;

FLOYD WEIL, as Administrator
of the Estate of Joanne Weil, Deceased
and on behalf of all survivors of Joanne Weil;

60

DARREN WILLIAMS, as Administrator
of the Estate of Debbie Williams, Deceased
and on behalf of all survivors of Debbie Williams;

KENNETH WILLIAMS, as Administrator
of the Estate of Brian Patrick Williams, Deceased
and on behalf of all survivors of Brian Patrick Williams;

HELEN ZACCOLI, as Administrator
of the Estate of Joseph Zaccoli, Deceased
and on behalf of all survivors of Joseph Zaccoli;

JILL ZANGRILLI, as Administrator
of the Estate of Mark Zangrilli, Deceased
and on behalf of all survivors of Mark Zangrilli;

DOROTA ZOIS, as Personal Representative
of the Estate of Prokopias (Paul) Zois, Deceased
and on behalf of all survivors of Prokopias (Paul) Zois;

RONALD DE FRANCESCO

DENNIS SIRJUESINGH

GUY ROSBROOK

TAMAR ROSBROOK

MARIA WARD

**Plaintiffs added as of September 10, 2004**

CHRISTY FERER, as Personal Representative
of the Estate of Neil Levin, Deceased
and on behalf of all survivors of Neil Levin

JULIO CESAR FERNANDEZ, as Personal Representative
of the Estate of Julio Fernandez, Deceased
and on behalf of all survivors of Julio Fernandez

CAROL LAIETA, as Administrator
of the Estate of Vincent A. Laieta, Deceased
and on behalf of all survivors of Vincent A. Laieta

JUAN MARTINEZ, as Personal Representative
of the Estate of Waleska Martinez, Deceased
and on behalf of all survivors of Waleska Martinez

MICHAEL RAMBOUSEK, as Representative
of the Estate of Luke Rambousek, Deceased
and on behalf of all survivors of Luke Rambousek;

LAURIE WEINBERG, as Administratrix
of the Estate of Steven Weinberg, Deceased
and on behalf of all survivors of Steven Weinberg;*

SUSAN WOHLFORTH, as Executor
of the Estate of Martin Wohlforth, Deceased
and on behalf of all survivors of Martin Wohlforth

Danny Ray Johnson
Frank Maisano

Co-counsel Soberman & Rosenberg


-----------------------------------------------------------------x
ARLENE BEYER, as Representative
of the Estate of Arlene Beyer, Deceased
and on behalf of all survivors of Arlene Beyer;            **02 CV 6978 (RCC)**

SUSAN CORREA, as Representative                            **Kreindler & Kreindler LLP**
of the Estate of Ruben Correa, Deceased                    **Barasch McGarry Salzman**
and on behalf of all survivors of Ruben Correa;           **Penson & Lim**

EILEEN GERATY, as Administrator
of the Estate of Suzanne Geraty, Deceased
and on behalf of all survivors of Suzanne Geraty;

DONNA HICKEY, as Representative
of the Estate of Brian Hickey, Deceased
and on behalf of all survivors of Brian Hickey;

JENNIFER MINGIONE, as Representative
of the Estate of Thomas Mingione, Deceased
and on behalf of all survivors of Thomas Mingione;

PATRICK J. MULLAN, as Representative
of the Estate of Michael Mullan, Deceased

and on behalf of all survivors of Patrick J. Mullan;

JENNIFER REILLY, as Representative
of the Estate of Kevin Reilly, Deceased
and on behalf of all survivors of Kevin Reilly;

MARY ILL, as Representative
of the Estate of Frederick J. Ill, Jr., Deceased
and on behalf of all survivors of Frederick J. Ill, Jr.;

MARCELLA LEAHY, as Representative
of the Estate of James P. Leahy, Deceased
and on behalf of all survivors of James P. Leahy;

JOY & WILLIAM JOHNSON, as Representatives
of the Estate of William Johnson, Jr., Deceased
and on behalf of all survivors of William Johnson, Jr.;

STEPHEN SAUCEDO, as Representative
of the Estate of Gregory Saucedo, Deceased
and on behalf of all survivors of Gregory Saucedo;

DENA SMAGALA, as Representative
of the Estate of Stanley Smagala, Deceased
and on behalf of all survivors of Stanley Smagala;

CARMEN SUAREZ, as Representative
of the Estate of Ramon Suarez, Deceased
and on behalf of all survivors of Ramon Suarez;

PAULETTE ROBERTS and THOMAS ROBERTS as
Co- Representatives of the Estate of Michael E. Roberts,
Deceased and on behalf of all survivors of Michael E. Roberts

BARBARA ANN SWAT, as Representative
of the Estate of Gerald Thomas Atwood, Deceased,
and on behalf of all survivors of Gerald Thomas Atwood

LAURA WEINBERG, as Representative
of the Estate of Richard Aronow, Deceased,
and on behalf of all survivors of Richard Arnow

**FDNY**
ANTHONY ACCARDO, LUIS ACEVEDO, PETER
ACQUAFREA, MICHAEL AGOVINO, KENNETH
AHLERS, THOMAS AKERBERG, RICHARD ALLES,

ROBERT ANNUNZIATO, VINCENT ANDERSON,
ANDREW ANSBRO, HARRY ANTONOPOULOS,
SALVATORE ANZALONE, LAWRENCE ARCHER,
JOSEPH ASTARITA, CHRISTOPHER ATTANASIO,
ANTHONY AUCIELLO, JOSEPH BACHERT,
MICHAEL  BAILEY, AUGUSTIN BALARAM,
WEST BALLOU, RICHARD BANAT, PAUL
BARBARA, PAUL BARDO, THOMAS BAROZ,
ROBERT BARRETT, BRUCE BARVELS, STEVEN
BASCELLI, PAUL BASSO, ANDREW BEARD,
MARIO BELL, JOHN BELMONTE, TIMOTHY
BENNETT, JOSEPH BENNETT, JAMES BERGEN,
JOSEPH BERING, CHARLES BERNARDI, DANIEL
BEYAR, GEORGE BEYER, GREGORY BIERSTER,
JOSEPH BISERTA, WILLIAM BLAICH, PETER BLAICH,
SUSAN BLAKE, MARK BLANCHARD, GODFREY BLYTHE,
JOHN BONGIORNO, REGINALD BONNER, MARK
BONSANTI, ROBERT BORNHOEFT, NICHOLAS BORRILLO,
GEORGE BRAADT, MANUEL BRACERO, JAMES BRADY,
THOMAS BRADY, JOSEPH BREEN, GERALD BRENKERT,
JAMES BRENNAN, RONALD BRENNEISEN, VITO
BRINZO, MICHAEL BRODY, CHRISTOPHER
BROUGHTON, PETER BROWN, RAYMOND BROWN,
JAMES BRUNO, GREG BRUNO, DAVID BRUNSDEN,
JOHN BYRNES, MICHAEL BUCKLEY, VINCENT
BUONOCORE, MATTHEW BUONO, JAMES BURKE,
WILLIAM BURKE, THOMAS BURKE, ROBERT BURNS,
FRANCIS CALABRO, ROBERT CALISE, RICHARD
CAMIOLO, ERNANDO CAMACHO, RONALD
CAMMARATA, RICHARD CAMPBELL, BRYAN
CAMPBELL, ATTHEW CAMPISI, VINCENT CANALE,
VICTOR CANTELMO, MICHAEL CAPASSO,
CHARLES CAPLE, DAVID CAPUTO, HARRY
CARDIO,  PATRICK CAREY, PETER CARINO,
WILLIAM CARLSON, ANGEL CARRERO,
WILLIAM CARLSON, WILLIAM CARROLL,
JOHN CARROLL, ROBERT CARUSO, JOSEPH
CASALIGGI, DONALD CASEY, JAMES CASH,
STEPHEN CASSE, JOHN CASSIDY, STEPHEN
CASSIDY, GREGORY CASTELLANO,  JOSEPH
CESTARI, ANTHONY CHAIMOWITZ, DINO CHIRCO,
SHERWIN CHOW, JEFFREY CHRISTENSEN,
ROBERT CHRISTY, FRANK CIARAVINO, RAYMOND
CLANCY, DONALD CLARK, DENNIS CLARKE,
BRIAN CLARO, JAMES CODY, ROBERT COLLIGAN,
CARMELO COMPOSTO, STEPHEN CONKLIN,
DAVID CONLIN, KEVIN CONNELLY, THOMAS

CONNOLLY, MICHAEL CONNOLLY, WILLIAM
CONNOLLY, STEVEN CONNOR, KENNETH COOK,
MICHAEL J.CORRIGAN, JR., MICHAEL CORRIGAN,
CHRISTOPHER CORSI, EDWARD COSTELLO,
ROY COTIGNOLA, PATRICK COTTON, JOHN
COUGHLIN, CHRISTOPHER COUGHLIN, RICHARD
COYLE, OMAR CRISOSTOMO, CHARLES CROCCO,
PATRICK CULLEN, RICHARD CURIEL,
EDWARD CUTTING, DENNIS CZECZOTKA,
KENNETH D'ALBERO, PETER D'ANCONA,
DOMINIC D'ARRIGO, STEVEN DAHLSTROM,
JOHN DALY, DANIEL DALY, THOMAS DAMORE,
ARTHUR DARBY, KEVIN DARCY, GERARD DAVAN,
JOSEPH DAWSON, RODNEY DECORT, FRANCIS
DEFEO, WILLIAM DELEHANTY, JAMES DePAOB,
ROBERT DeSANDIS, RAYMOND DIAZ, MARK
DiMAGGIO, RICHARD DIORIO, CHARLES DiRICO,
KEVIN DOHERTY, THOMAS DOHERTY, MICHAEL
DOLAN, MICHAEL DONOHUE, WILLIAM DONOHUE,
MICHAEL DONOVAN, MICHAEL DORGAN, JAMES
DORMAN, JOHN DOUGHERTY, LEONARD DRAVES,
JOSEPH DRISCOLL, RICHARD DRISCOLL, KEVIN
DUFFY, JOHN DUNN, JOSEPH DUNN, THOMAS DUNN,
WILLIAM DUNN, JAMES EFTHIMIADES, ERNEST
EHLBERG, GREG EINSFELD, JAMES ELMENDORF,
KENNETH ERB, DAVID FARRAN, FRANCIS FEEHAN,
JAMES FEELEY, TERRY FELRICE, DANIEL FENNELL,
THOMAS FERRANOLA, TERENCE FINNERMAN,
FRANK FIORE, CHRISTOPHER FISCHER, ROBERT
FITHIAN, DAVID FITTON, MIKE FITZPATRICK,
PATRICK FITZSIMMONS, WILLIAM FLAHERTY,
THOMAS FLEMING, DONALD FLORE, DANIEL
FLORENCO, MICHAEL FLYNN, JOHN FLYNN,
JOSEPH FLYNN, RICHARD FLYNN, WILLIAM FODER,
GREGORY FODOR, DANIEL FOLEY, FRANK
FONTAINO, WARREN FORSYTH, CHARLES
FORTIN, ANTHONY FRACHIOLLA, PETER FRANK,
SCOTT FRAZIER, FREDERICK FUCHS, ALFREDO
FUENTES, DANIEL FURLAND, JOHNNY GAGLIANO,
JOHN GAINE, JACK GALANTE, ANDREW GALASSO,
JAMES GALLICCHIO, ANTHONY GALLO, EDWARD
GANASSA, ANDREW GARGIULO, WAYNE GARGIULO,
JOHN GARNETT, ROBERT GAROFOLO, STEPHEN
GAUDUT, CHRISTOS GEORGE, PAUL GERMANN,
THOMAS GERRISH, PETER GIAMMARINO,
KENNETH GIANNELLI, SALVATORE GIGANTE,
JOSEPH GILDEN, MICHAEL GIMPEL, CRAIG

GIUFFRE, ROBERT GLEASON, WILLIAM
GLEASON, KEVIN GLOCK, PETER GLOWACZ,
DONALD GOLLER, TONY GONZALEZ, JOHN
GORGONE, MICHAEL GORMAN, PATRICK
GORMAN, WILLIAM GORMAN, RICHARD GOULD,
MICHAEL GRACE, CHRISTOPHER GREEN,
WILLIAM GREEN, ROBERT GRELL, DANIEL
GROGUL, KEITH GROSS, KRISTEN GROSS,
DANIEL GROSSI, MICHAEL GUARDINO, FRANK
GUNTHER, MICHAEL GURNICK, LUIS GUTIERREZ,
PAUL HAARMAN, JAMES HALABY, PAUL HALEY,
KENNETH HANSEN, SCOTT HANSON, MICHAEL
HARRIS, ROBERT HARTIE, BRIAN HARVEY,
LEROY HAYNES, MELFORD HAZEL, JAMES HEAL,
GEORGE W. HEAR, STEPHEN HEAVEY, GREGORY
HELFER, EUGENE HENDERSON, THOMAS HENRY,
JOHN HENRICKSEN, JOHN HENRY, WILLIAM HERLIHY,
HERBERT HICKEY, SEAN HICKEY, PATRICK HICKEY,
JOSEPH HIGGINS, WILLIAM HOAG, ROBERT HOFER,
JOHN HOLOHAN, TIMOTHY  HOPPEY, BRYAN HORAN,
MICHAEL HORAN, ANDREW HORNBUCKLE,
ROBERT HOURICAN, EDWARD HRONEC,
ROBERT HUMPHREY, JAMES HURON, MICHAEL
IANNAZZO, MICHAEL INCANTALUPO, LLOYD
INFANZON, WILLIAM INGRAM, EDWARD IRELAND,
PETER JAKUBOWSKI, JOSEPH JANKUNIS, RICHARD
JANOSCAK, MATTHEW JASKO, WILLIAM
JENNERICH, LAWRENCE JENSEN, PETER
JENSEN, STANLEY JESSAMINE, PAUL JOHNSEN,
KEITH JOHNSON, NATHANIAL JOHNSON,
ROBERT JOHNSTON, JEFFREY JONES,
NIELS JORGENSEN, JOHN JOYCE, WILLIAM JUTT,
JOSEPH KADILLAK, GARY KAKEH, WILLIAM,
KALLETTA, THOMAS KANE, JAMES KAY,
DANIEL KEANE, KENNETH KEARNS,
ROBERT KEATING, WILLIAM KEEGAN,
THOMAS KEERY, ROBERT KELLER, JAMES
KELLY, JOHN KELLY, MICHAEL KELLEHER,
JOHN KELTON, DANIEL KEMMET, SR.,
DANIEL KEMMET, JR., MICHAEL KEMPER,
JOSEPH KENNEDY, DENNIS KERBIS, KENNETH
KERR, JOHN KIELTY, JOSEPH KILLEEN,
CHRISTOPHER KING, JOHN KIRK, WINFIELD
KLUTH, WILLIAM KNOTH, ERIC KNUTSEN,
CRAIG KOBES, CHARLES KOTOV, WALTER
KOWALCEZYK, MICHAEL KOZAK, STEVEN
KRAKOWER, RICHARD KUERNER, JOHN

LaBARBERA, ROBERT LACEY, ERIK LAHODA,
LANCE LaMAZZA, RAYMOND LAMBDIN,
RICHARD LANG, MICHAEL LaROSA,
JOSEPH LAVIN, PATRICK LAVIN,
WILLIAM LEAHY, FRANK LEANDRO,
EDWARD LEE, CHRISTOS LEFKADITIS,
JAMES LEIBMAN, JOSEPH LEMBO,
RICHARD LeMONDA, KEVIN LENAHAN,
JOHN LENIHAN, HUGH LENNON,
JOHN LEVENDOSKY, RONALD LITTLEJOHN,
LANCE LIZZUL, ROBERT LODATO, EDWARD
LOEHMANN, FRANK LOMBARDI, MICHAEL
LOMBARDI, GEORGE LONERGAN, STEPHEN
LONERGAN, ROBERT LOPEZ, MICHAEL
LoPORCARO, VINCENT LOUIS, JOHN LOVETT,
VINCENT LUISI, STEVEN LUISI, ADAM LUTFI,
J. DAVID LYNN, THOMAS LYONS, GREGORY
MACAGNONE, JACK MACALUSO, PATRICK
MAHONEY, ANDRE MAJORS, CECIL MALONEY,
TIMOTHY MALONEY, ROBERT MANDIA,
THOMAS V. MANGUS, WILLIAM MANNION,
DANIEL MANOCHIO, LEON MARASHAJ,
EDMOND MARCOUX, ROBERT MARCOUX,
RICHARD  MARGINO, JOHN MARR, MICHAEL
MARTORANA, DANIEL MATTEO, SHAWN MAY,
ROBERT MAYNES, GARY MAZALATIS,
JOSEPH MAZZARELLO, SEAN McBRIEN,
JAMES McBURNEY, EDWARD McCABE,
KEVIN McCABE, STEVEN McCAFFERY,
THOMAS McCAFFREY, EDWARD McCAMPHILL,
JOHN McCANN, NEIL McCARTHY, IRVING
McCOY, HAROLD McCLUTCHY, JOHN
McDONALD, KELLY McDONALD, KEVIN
McDOWELL, CHARLES McELHONE, PATRICK
McEVOY, JoANN McFARLAND, PATRICK
McGIVNEY,  JOHN McGONIGLE, CORNELIUS
McGOVERN, KEVIN McGOWAN, ROBERT
McGUIRE, BRIAN McGUIRE,  THOMAS
McKENNA, SHAWN McKEON, JOHN McLAUGHLIN,
CHRISTOPHER McLAUGHLIN, WILLIAM
McLAUGHLIN, PAUL McMENAMY, JAMES
McNAMARA, JOHN McNAMARA, GARY
McNULTY, GERARD McPARLAND, ROBERT
MEADOWS, VINCENT MEDORDI, PAUL
MEDORDI, KEVIN MEEHAN, KEVIN MELODY,
JAMES MELVIN, RICHARD MEO, JOSEPH
MEOLA, NEIL MILLER, MICHAEL MILNER,

DERRICK MILONE, DONALD MIMNAUGH,
LOUIS MINUTOLI, MARK MISSALL,
JOHN MIXON, JOSEPH MIYNARCZYK,
ANTHONY MODICA, FRANK MOLLICA,
JOHN MONGIELLO, JOSE MONTALVO,
KENNETH MOODY, GARY MOORE,
JAMES MORAN, WILLIAM MORAN,
DONALD MORMINO, ROBERT MORRIS,
EDWARD MORRISSEY, JOHN MORRONGIELLO,
JOSEPH MOTTOLA, ANTHONY MUIA,
MARK MULLADY, KEVIN MULLANE,
WILLIAM MULLER, HUGH MULLIGAN,
KENNETH MULLIGAN, JAMES MULLINS,
DANIEL MULLINS, BRIAN MULRY,
LEONARD MUNDA, MICHAEL MUNOZ,
JONATHAN MURATH, JESSE MURPHY,
KEVIN MURPHY, ROBERT MURPHY,
PATRICK MURPHY, THOMAS MURPHY,
DANIEL MURRAY, KEVIN MURRAY,
GERARD MURTHA, ARTHUR MYERS,
RICHARD NAPLES, JOSEPH NAPOLI,
REYNALDO NARVAEZ, JOSEPH NARDONE,
ROBERT NEBEL, RALPH NEGRON,
JOHN NEWELL, STEVEN NEWMAN,
GERARD NICOLETTI, ALEXANDER NONEY,
RICHARD O'BRIEN, JOHN O'BRIEN,
SEAN O'BRIEN, JOSEPH O'BRIEN,
JOHN O'CONNOR, PATRICK O'CONNOR,
THOMAS O'CONNOR, WILLIAM O'CONNOR,
ROBERT O'DOWD, JOSEPH O'HARA,
BRIAN O'LEARY, THOMAS O'LEARY,
MICHAEL O'ROURKE, THOMAS O'ROURKE,
MICHAEL O'SULLIVAN, SEAN O'SULLIVAN,
RICHARD OBERMAYER, ROBERT OPALECKY,
JOSE ORTIZ, ARTHUR OSCHMANN, HARRY
OSTER, LUIS OSTOLOZAGA, GERARD PACE,
THOMAS PAIR, VINCENT PALMIERI,
RONALD PARKER, GREGORY PARR, SCOTT
PASKEWITZ, JOSEPH PASQUARELLO,
MICHAEL PASQUARELLO, DENNIS
PATTI, CHARLES VAN PELT, GEORGE PEPE,
FRANK PEREZ, GREGORY PICCONI, ROBERT
PILLARELLA, GLEN PILLARELLA, CHRISTOPHER
PISANO, PERRY PIZZOLO, LEWIS PIZZULLI,
THOMAS PLANE, DEDIE PLASENCIA,
BRYAN PLATT, DOMINICK POMA,
SALVATORE POMA, STEPHEN POSE,

LARRY PRATHER, KIRK PRITCHARD,
DENNIS PROSICK, ROBERT PUGLIESE,
RICHARD PULZONE, TIMOTHY QUIN,
JOSEPH QUINN, GLENN RADERMACHER,
ANDREW RASAVONGSZUK, LOUIS RAIMONDI,
DAVID RAYMOND, STEVEN RAZICKAS,
JOSUE RECIO, JAMES REDMOND, ROBERT REEG,
SHAUN REEN, JOHN REGAN, ROBERT REGAN,
STEPHEN REILLY,  KEVIN REILLY, MICHAEL
RELAY, MICHAEL REUTTER, ROBERT RICCIARDI,
MICHAEL RICCIARDI, STEPHEN RICCIO, JOHN
RICE, STEPHEN RICE, EUGENE RICE, ROCCO
RINALDI,  DAVID RIVAS, ALFRED RIVERA,
ROBERT RIVERA, THOMAS RIVICCI,
MATTHEW ROACH, GARY ROBBINS,
THOMAS ROBISKY, ROBERT ROCHFORD,
WILLIAM RODGERS, PETER  RODRIGUEZ,
STEVE ROGERS, BRUCE ROSS, DONALD ROZAS,
KEITH RUBY,  STEWART RUETER, JOSEPH
RUGGIRELLO, JAMES RULAND, BRIAN RUSSO,
SALVATORE RUSSO, VITO RUVOLO,  KEVIN
RYAN,  DENIS RYAN, HENRY RYAN,
EDWARD RZEMPOLVCH,JOSEPH SALADIS,
RUDY SANFILIPPO, JOHN SANJURJO,
JOSEPH SAPIENZA, JOSEPH SARDO, ARTHUR
SARTOR, MARK SARNES, LOUIS SARTINI,
PETER SAVARESE,  MICHAEL SCALARD,
THOMAS SCALLY, THOMAS SCAMBONE,
SALVATORE SCARENTINO, JOHN SCARSELLA,
RICHARD SCHLUECK, CLINTON  SCHMITTERER,
MICHAEL SCHREIBER, ROBERT SCHULZ,
VICTOR SCIARAPPA, ROBERT SCOTT,
MICHAEL SCULLY, JOSEPH SEENEY,
RICHARD SERE, WILLIAM SESSELMAN,
DAVID SGROMO, JAMES SHANNON,
MATTHEW SHANNON,  JAMES  SHEA,
KEVIN SHEEHAN, EDWARD SHEEHY,
ALPHONSE SICIGNANO, VINCENT SIMEONE,
DAVID SIMMS, AUGUSTINE SIMONCINI,
DENNIS SIRY, SCOTT SIVERT, ANTHONY
SKOMINA, JOSEPH SKONIECZNY, LEO
SKORUPSKI, GARY SLATTERY,  JAMES
SMAGALA, GERARD SMITH, JAMES SMITH,
MICHAEL SMITH, PATRICK SMITH, WARREN
SMITH, WILLIAM SMITH, GERALD SNELL,
RICHARD SNYDER, MARK SOLARI,
GERARD SOMERVILLE, STEVEN SORGER,

WALTER SORRENTI, DEAN SPADARO,
WILLIAM SPADE, ROBERT SPELLMAN,
ROBERT SPINELLI, BRIAN SPISTO,
THOMAS SPITZBARTH, FRANK SPRING,
BERTRAM SPRINGSTEAD, ROBERT SPUTH,
MICHAEL SPYNTIUK, ANTHONY SROUR,
EUGENE ST. JOHN, CLIFFORD STABNER,
BERTRAM STAHLBERG, JOHN STAIANO,
JAMES STANG, ROBERT STANTON,
JAMES STASIO, LOUIS STRANDBERG,
KEVIN STEININGER, BRIAN STRENGE,
RAY STRONG, BRIAN SULLIVAN, JAMES SULLIVAN,
PATRICK SULLIVAN, STEPHEN SULLIVAN,
STEVEN SUPEK, ERIC SUTTON, EDWARD
SWEENEY, JOSEPH SYKES, DENNIS TAAFFE,
DAVID TANZMAN, JOHN TEDESCO, MICHAEL
TENTEROMANO, LUIS THOMAS, THOMAS
THOMASEN, JAMES THOMPSON, ROBERT
THOMPSON, SCOTT THOMSON, ROBERT
TILEARCIO, THOMAS TILLOTSON, DONALD
TOMM, KEVIN TONKIN, STEVEN TONREY,
RUSSELL TOUHEY, CHARLES TOZZO,
PETER TRAUT, LOUIS TREGLIA, MICHAEL
TREZZA, MICHAEL TRIGLIANOS, JOHN
TROIANIELLO, EDWARD TURNER,
LEONARD TYRELL, THOMAS UBERTINI,
NEIL VAILLANCOURT, SALVATORE
VENTIMIGLIA, CHARLES VAN PELT,
DONALD VASTOLA, STEVEN VERDEROSA,
RICHARD VETLAND, ROBERT VINCIGUERRA,
FREDERICK WALKER, ROBERT WALLEN,
DANIEL WALSH, WILLIAM WALSH,
THOMAS WARD, KEITH WARD, CHRISTOPHER
WARD, GARY WASHINGTON, ALBERT WEBER,
JOHN WEBER, PAUL WEIS, STEVEN WEISNER,
JAMES WELDON, RICHARD WELDON, WILLIAM
WELSH, JAMES WERNER, MICHAEL WERNICK,
JAMES WHITE, ROBERT WIEDMANN, ROBERT
WILDAY, JOHN WILLADSEN, KEVIN WILLIAMS,
VANDON WILLIAMS, TYRONE WILLIAMS,
VINCENT WILLIAMS, THOMAS WILLIAMS,
JOHN WILSON, LIEUTENANT JOHN WILSON,
ROBERT WILSON, JAMES WINTERS, DENNIS
WIRBICKAS, MICHAEL WITKOWSKI,
JOHN WROBEL, JOHN YORKS, MARK YOUNGBERG,
STEPHEN ZASA, MICHAEL ZECHEWYTZ,
THOMAS ZELIOS, PATRICK ZODA,

MICHAEL ARMETTA, CHRISTOPHER BACH,
MICHAEL BEHETTE, JAMES BEUERMAN,
HOWARD BISCHOFF, THOMAS BOCCAROSSA,
KENNETH BOHAN, MICHAEL BOYLE,
MICHAEL BROCATO, MICHAEL BROSCHART,
JAMES BROWN, MICHAEL BUDISCHEWSKY,
JOHN BYNRES, EDWARD CACHIA, THOMAS
CANN, FRANK CAPUTO, DAVID CARDINALE,
RICHARD CARLINO, CHRISTOPHER CARRI,
THOMAS CASCIO, GERARD CASEY, JOHN
CATATANO, ANTHONY CATERA, JAMES
CIZIKE, DERMOTT CLOWE, CHRISTOPHER
COEN, JONATHAN COLEMAN, JEFFREY CONTI,
JAMES COONEY, BRIAN CORCORAN, JOHN
COTTON, BRIAN COYLE, JOHN COYLE, GEORGE
CRISCITIELLO, FRANK CSEKO, MARK DAVINO,
GEORGE DEGEWORTH, KEVIN DELANO, FRED
DELGROSSO, JOSEPH DELGROSSO, PHILIP
DEMARIA, RUDOLF DENT, ETIENNE DEVILLIERS,
ROBERT DISANZA, VICTOR DIZ, STEPHEN
DOMINICK, ROBERT DORRITIE, JOSEPH
DREXLER, RICHARD DRISCOLL, DANIEL
DUDDY, KEVIN DUNCAN, JOHN ENGEL,
JOSEPH ENIA, KEVIN FARRELL, THOMAS
FARRELL, ELIZABETH FEATHERSTON,
ROSARIO FERLISI, JAMES FILOMINO,
JAMES FINN, DAVID FISCHBEIN, LEE
FISCHER, LIAM FLAHERTY, JAMES
FLANAGAN, JAMES M. FLANAGAN,
ROBERT FOLEY, VINCENT FORRAS,
LUIS FRAGOSO, CHARLES GAFFNEY,
PETER GANNON, DENNIS GILHOOLY,
JOHN GIUFFRIDA, STEPHEN GRABNER,
STEVEN GUISE, KEVIN GUTFLEISCH,
KEVIN GUY, DOUGLAS HARKINS,
KIRK HARRINGTON, PATRICK HAYDEN,
WILLIAM HENDERSON, MICHAEL
HENNIGNA, JOHN HOGAN, JOHN IAMMATTEO,
ANDREW ISOLANO, JOSEPH JABLONSKI,
JOHN JERMYN, BRIAN JOHNSON, KEITH
KAISER, GERARD KENNEDY, RICHARD KENNY,
ROGER KILFOIL, MARTIN LANG, CHAD
LEACH, DANIEL LIND, THOMAS LONEGAN,
CHARLES LOSACCO, JOHN CUCCIOLA,
CHRISTIAN LYSY, THOMAS LYONS,

MICHAEL MACDONALD, JOSEPH MAGGI,
FRANK MANETTA, CHARLES MANISCALCO,
JAMES MANITTA, WAYNE MANZIE,
WILLIAM MARTINEZ, MICHAEL MAYER
THOMAS MCAREE, JAMES MCCARTHY,
KEVIN MCCUTCHAN, DAVID MCGOVERN,
JAMES MCKAY, WALTER MCKEE, JOHN
MCNAMARA, DENNIS MEYERS, STEVE
MODICA, PAUL MONFRE, JOSEPH
MONTANARO, ROBERT MOORE, JOHN
MUCCIOLA, MICHAEL MURPHY, STEVEN
MURPHY, THOMAS NEWMAN, ALBERT
NOCELLA, DANIEL NOONAN, MICHAEL
O'GORMAN, MICHAEL O'SHEA, GIRARD
OWENS, ROBERT PARKER, FRANK PEPE,
DANIEL PERITORE, RICHARD PICCIOTTO,
JOSEPH POMA, JAMES POWERS, FREDERICK
PREVETE, WILLIAM QUICK, MICHAEL QUINN,
RICHARD RAMAIZEL, THOMAS RAPPE,
DANIEL REDDAN, GERARD REILLY,
LEONARD REINA, JOHN REMENTERIA,
WILLIAM RENDINO, MICAHEL RICCIARDI,
ROGER RICHES, JOSEPH ROCHA, ALAN
ROCKEFELLER, JOHN ROGERS, MICHAEL
ROY, STEPHEN RUSSACK, ROBERT SACCHI,
PETER SANTELLI, JOHN SCHILLINGER,
ROBERT SCHMIDT, ROBERT SCHMUCK,
MICAHEL SFORZA, JOHN SIGNORELLI,
FRANK SOMMA, FRANK SPALDO,
DOUGLAS SPANO, ROBERT STANLEWICZ,
EUGENE ST. JOHN, PETER STRAHL,
DANIEL SURAT, ANGEL TORRES,
JOSEPH TORRILLO, FRANCIS TRAPANI,
JAMES TOZZO, VICTOR TROISI, RICHARD
WATTS, CHARLES WEINSHEIMER, JOHN
WHOLIHAN, HERMAN WILLIAMS, VINCENT
YORKS, ROBERT ZAJKOWSKI

THOMAS CALLAGHAN, RAYMOND ARCOS,
KEVIN CALHOUN, HENRY J. CERASOLI,
PATRICK CONNOLLY, THOMAS COURTENAY,
TERENCE COYLE, EDWARD COYLE,
WILLIAM CRAWFORD, KEVIN GRACE,
KENNETH HAMILTON, WILLIAM HARRIS,
THOMAS HARRINGTON, MICHAEL HART,
WILLIAM HENNESSY, ROBERT HOYT,
ROBERT MADDEN, GERARD McMAHON,

JAMES O'DONNELL,GEORGE O'DOHERTY,
CHARLES O'NEILL, CHRISTOPHER G. O'SULLIVAN,
JASON PERRONE, GEORGE PICKETT,
JOHN A. REGAN, TERENCE RIVERA,
JOHN RIZZI, KEVIN SHEROD, JAMES SPENCER,
MICHAEL TORRES, GREGORY WYCKOFF

**NYPD**
RICHARD AGUGLIARO, NICHOLAS BALSAMO,
IRENE BLAICH, IRWIN JOSEPH BRODSKY,
ROBERT  CAPOLONGO, STEPHEN DONNELLY,
SHARON GATTO, MICHAEL GINTY, TODD
HEIMAN, CHRISTOPHER HUNT, ANITA JOHNSON,
FRANK KROPF, MICHAEL KULL, DORIS MARTINEZ,
DARIO MARTINEZ, SHAUN MCGILL, WILLIAM
McNALLY, JEFFREY NIX, MICHELE PAOLINI,
CHRISTOPHER PHILLIPS,

RAYMOND CASCIO, WALTER COOK,
ALAN FORCIER, CHARLES GALLOGY,
PATRICIA LEWIS, VINCENT MEDORDI,
CLARE O'CONNELL, STEPHEN SPINELLI,
JAMES ZADROGA

RICHARD MAYRONNE, PAUL MOLONEY,
PETER NEWEN, SUSAN A. SCOTT

**EMERGENCY MEDICAL SERVICES**
PAUL ADAMS, ROGER AHEE, STEPHEN
ANDERSON, ANTHONY ANDERSON,
FRANK  ANDINO, MARYLOU AURRICHIO,
ANGEL AYALA, BENJAMIN BADILLO,
ARTURO BANCHS,  KEVIN BARRETT,
LORI-ANN BENINSON, RUBEN BERRIOS,
MARVIN BETHEA, ENIS BOYER,  MARTIN BRAUN,
JOZETTE BROWN, JACQUELINE BURTON,
MICHAEL CAHILL, H. CARLTON SMITH,
RICHARD CASALETTO, DAVID CLINGAIN,
STEVEN COSCIA, JOSE COTTI, STEVEN CUEVAS,
KIRK DELNICK, ROLAND DIAZ, MICHAEL DiNATALE,
JAMES DOBSON, BOBBY DUDLEY, RICHARD ERDEY,
ALBERT ESTRADA, JOSEPH FAZZINO,
NICOLE FERRELL, SALVADOR FERRER,
DAVID GEORGE RESTUCCIO, BONNIE GIEBERIED,
NORMAN GILLARD, BRIAN GLEASON,

MICHAEL GLENN, AWILDA GOMEZ,
GLORIA-GIGI GORDON, LLOYD GROSSBERG,
MORRIS HUBBARD, PAIGE HUMPHRIES,
RAFAEL IGLESAIS, EARTHA INGRAM,
VERONICA JACOBS, ABRAHAM LEVINSON,
VERONICA LYNN JACOBS, STEVE MARION,
MARC MASTROS, LORI MAZZEO, BRIAN MCGUIRE,
ALWISH MONCHERY, PHILIP MEDEIROS,
YVETTE MONTALVO, KEVIN MONTGOMERY,
BLANCA MORRONE, KEVIN MORRONE,
BRENDAN MULROY, MURRAY MURAD,
MICHAEL MUSTO, ANDREA NANNA-MONTGOMERY,
NANCY NOBLE, WALTER ODINOKOW,
TROISI ONOFRIO, LUIS PEREZ, OSVALDO PEREZ,
DARRYL PETTIGREW, RON PFEFFER, LORRAINE
PIRILLO, MICHELLE POHL, ROBIN PFEFFER,
ROBIN PRINTY, FRANK PUMA, PABLO QUESADA,
MICHAEL RAIMER, DAVID REEVE, MARK REILLY,
DANIEL RIVERA,  TIMOTHY ROBERTS, DAVID
RUSSELL, PARIS SALEM, STEVEN SAMMIS,
BOBBY SANTIAGO, JEREMY SASSMAN,
PATRICIA SCADUTO-SOTO, PATRICK SCARINGELLO,
STEVEN SCARINZI, JOHN SCHAEFER,
JOHN SCOTCH, II LISA SECKLER- OODE,
RAYMOND SIMONS, GARY SMILEY,
PHILIP SOTO, SYLVESTER STEWART,
MARK STONE,  ISA SWEDIN, MAURICE T. ZUNIGA,
JAMES THOMPSON,  ALVIN TORO, EDITH TORRES,
BARRY TRAVIS, TINA TRESCA, BETTY VIOLETA-LLANO,
CHARLES WELLS,  SPIRO YIORAS,


KEVIN CONNELLY, BENJAMIN FOGEL,
LUIS GUTIERREZ, JOHN JAGODA,
JILL KELLY, WALTER KOWALCZYK,
DANIEL LEFEBVRE, CHRISTOS LEFKADITIS,
JOANN MCFARLAND

**TRADES**
DAVID AROCHO, GEORGE COLUCCI, GERARD
CRAWFORD, WILLIE B. HENDERSON, ELROY
PAGAN, ANTHONY ROCCHIO, GEORGE SMITH,

MICHAEL BURKE, STEPHEN BURKE,
STEVEN BILICH, RICHARD CARLINO,
RICHARD COYNE, SEAN DONAHUE,
CARL FISHER, JOHN GRAHAM, WALTER

JENSEN, JOHN MURPHY, RICHARD
RACCIOPPI, RAINFORD ROBERTS,
JAMES WILLIS

KEVIN DORRIAN, BROOK BUDD,
MICHAEL DePIETRO, RICHARD MULHERN,
JAMES PICONE, DAVID RAPP
**CIVILIAN**
EDITH BEAUJON, RICHARD DuBOIS, ANDREA
HOWELL, SCOTT SCHIELDS,

ALBERT GREENE, JILL KELLEY,
MANUAL LOPEZ, FRANK MYERS,
DEBORAH MANDELL, MARY
MARINELLI

KHEMRAJ SINGH

**FIRE MARSHAL CLIENTS**
WERNER COOK, JOHN COYLE
EMIL HARNISCHFEGER, JOSEPH
MCMAHON, PETER PATTERSON,
JOHN VERACKA

**SANITATION CLIENTS**
SALVATORE ANNERINO, FRANK
BERRAN, PAUL BROWN, CHARLES
BURGE, PETER CIAPPA, LAWRENCE
MARCELIS CLARK, JOSEPH CURRAN,
ALBERT D'ALLESANDRO, JIMMIE
DAVIS, ANTHONY GREENE, RAYMOND
HAYWOOD, JEFF HESTNES, WILLIAM
KING, ROCCO MASCIOLO, HENRY
MORRISON, KEVIN MELFI, DAVID
O'NEIL, WILLIAM OROZCO, MARTIN
PROKUP, ANTHONY QUARANTI,
ALCIDES RIVERA, FELIX SANCHEZ,
PETER SHANLEY, ALPHA TARAWALLY,
ERIC TVEDT

**CORRECTIONS**
DANIEL OLIVERI

MICHAEL O'CONNELL, MICHAEL SCHNITZER

**<u>Plaintiffs added as of March 10, 2004</u>**

Joseph Gibney; Patrick Lanza; Bozena Kajewska Pielarz;
Ruth Fenner; David Ianelli ;Amon Modine;
Pasquale Abatangelo; Edward M. Alfarano; Michael Banker;
Robert E. Baran; Matthew Blaskovich; Michael Boland;
Charles Bonar; Andrew Borgese; Donald Brierley;
Thomas Calkins; Gary Carpentier; Kevin Cassidy;
Robert J. Colacino; Bruce R. Collister; Christopher Connor;
Michael Costa; Brian R. Coyle; Paul Cresci;
Brent Crobak; John Cronley; Donald Csorny;
Leonard Curcio; Edward Curley; John Curley;
James Dalton; Vincent DeCicco; Vincent T. DeMarinis;
Dominick Devito; Christopher Edwards; Dennis Farrell;
Joseph Felle; Hollis Flanagan; Michael Flanagan;
Leo Fragapano; Danial Fucella; Howard Flugmacher;
Michael Grillo; Thomas A. Guarnieri; Timothy Harrigan;
Brian Healy; Thomas Hughes Jr.; Paul C. Germann;
John R. Graziano; Lanaird Granger; Michael Gregory;
Joseph Harris; Clifford Hollywood; Daniel Jackson;
Brian K. Janelli; Thaddeus Jankowski; Daniel Karp;
Robert Kelly; Joseph Lasher; Christopher LaRocca;
James Lauer; John Layton; Michael Leamy;
Joseph LeClair; Woody Ledwith; John Lennon;
Dennis Linehan; Mark Lotito; Edward Luciani;
James Mahon; Patrick Maloney; Lawrence Marley;
James Martin; Anthony Mattone; Thomas J. May, Jr.;
Brian McAvoy; Daniel McDonough; Gregory McEnroe;
Terrence McGann; Joseph P. McGovern; Brain McKeever;
James Miller; Frank Mondelli; Dominick Montalto;
William Morris; Michael Moore; John Murray;
John Moran; Keith Murphy; Joseph Murphy;
Raul Muniz; John Najmy; James Neville;
Stephen A. Nichols; Robert Niebler; Paul Nigro;
William C. Nolan; John Oddo; Joseph O'Sullivan;
Jeffrey Pawlicki; Robert Pesce; Vincent Picciano;
William Pollack; Andrew Polinsky; Philip Quattrocchi;
Henry Quevedo; Kenneth M. Rallis; Richard Rattazzi;
Stephen G. Rasweiler; Kenneth J. Rogers; John Rubino;
John Rhatigan; Hector Rivera; Richard Ruiz;
Robert Ryan; David Santise; Kevin Scanlon;
Gilbert Scarazzini; James Schwicke; Vincent Scialpi;
Gregory Sclafani; Vincent Sepe; Brian Shea;
Gary C. Sheridan; James Sherwood; Thomas M. Silvestri;

Michael Sorrentino; Joseph Spagnola; Vincent J. Tesoriero;
Walter Torres; Ralph Tufano; Joseph Tustin;
Philip Vincenzo; Kevin Williams; Gary Wood;
Barry Goffred; Stephen Bruno; Joseph Cotter;
Michael Corr; Paul Daly; James Garcia;
Aurelio Grillo Jr.; Gary Hanley; Gary Hall;
Alberto Morrales; Patrick McCormack; Jacqueline Padilla;
Robert Reip; John Rinciari; Henry Speicher;
Joseph A. Toscano; Daniel Velazquez; Robert Williamson;
Anthony Greene; David Healy; Felix Sanchez;
Theodorus Adrichem; Christopher Amato; Patrick P. Camacho;
Vincenzo Calla; Biagio Cantatore; John Cavaelli;
John Clinton; Harrold A Daver; John Diaz;
Timothy Donnery; Jody Dupuis; Philip Gambino;
Francine A. Goodman; James Haley; Terrence Holt;
Scott Hughes; William Humphrey; Richard Hutra;
Desmond D. Jhagroo; John Kilcoyne; Robert Kmak;
Michael Lally; Haussain Lazaar; Patrick Lanza;
Robert LaStella; James Lewis; Glen Makuch;
Frank Motyka; Gregory N O'Brien; Nicholas Pucciarelli;
John Reilly; Carmen Romero; Richard Ryan;
Angelo Scifo; Anthony Signorile; Samba Sinera;
William Sohmer; William Smith; Felicia Taylor;
John VanWagoner; Onelia Vazquez

**Plaintiffs added September 10, 2004**

Joseph Accetta; Alamo Agustino; Stanley Andrusyczyn
Thomas Asher; Candiace Baker; Christopher Barrett
John Belford; Joseph Bertolino; Donald Bigi
Richard J. Bittles; Peter Brunaes; James Bruno
Richard Bylicki; Nelson Caban; Gary Cali
William Chesney; Gerald Chiavelli; Bundy Chung
William T. Collins; James Connolly; John Coombs
Richard Coyne; Chris Craven; Peter Curcio
Frank Curnyn; Alan Dagistino; Philip Dagostino
Nicholas DeMasi; Raymond Denninger; Dominick Devito
John Devlin; Robert DiGiovanni; Andrew DiGiugno
John Dixon; Thomas J. Doherty; Francis Donahue
Richard DuBowy; Brian Duffy; Joseph Dunn
George Edgeworth; William Edwards; William Ellis
Steven Fedorczuk; Manuel Fernandez; Edward Ferraro
Michael Fitzmaurice; George Foris; Nicholas Fornario
Gregory Forsyth; Michael Fossati; James Freer
John Fullam; Dennis Gallagher; Robert Gallagher

Anne Garcia; Rafael Garcia; Rudolph Geiger
Bruce Gerrie; Garry Giannandrea; Guerino Giannattanasio
Thomas Gillam; Philip Guarnieri; Leakat Hanif
Darren Harkins; Eugene Harris; Richard Harrison
Francis Haskell; Michael Heffernan; Joseph Hickey
Donald Hoffman; James Hurson; Salvatore J. Isabella
Byron Johnson; Leroy Jonas; Robert Jones
Kazimierz Jurgiel; James Kadnar; Patrick Kissane
Carlos Kuper; Richard Lacerra; Stephen P. Lee
Artie Leecock; Thomas Lent; Salvatore Lumia
Charlie Lyons; Michael Mackl; Frank Macri
Frank Maisano; Andrew Majors; Felipe Marcano
John Mark; Erik Marrero; Antonio Martino
John Massarotti; Christopher Massaria; Thomas Mastrodomenico
Mark Mastros; Garry Maurice; Christopher McCormack
David McDonough; Michael McFarland; James McHugh
Tim McInerney; Michael Melillo; James Miller
Richard Miranda; John Miskanic; Elizardo Montes
Frank Moore; Michael Moore; Thomas Moore
Audrey Mosley Marcus; Raul Muniz; Joseph Murphy
Michael Musto; Paul Nigro; Joseph O'Brien
Christopher O'Donnell; Joseph O'Donnell; Howard O'Hringer
Edward Parker; Ronald Pascucci; Hilton Pearce
Frank Perry; Michael Perry; Freedman Pfeil
Joseph Piccininni; Andrew Porrazzo; Carl Punzone
John Quevado; James Ragarn; Sebastian Raspanti
Herman Reyes; Vito Ribaudo; Louie Rios
Hector Rivera; Robert Ryan; Thomas Ryan
Eric Scaknoff; James Schiavone; William Schillinger
Robert Schor; Angel Serrano; Luis Serrano
Giuseppe Sibilla; Jeffrey Simms; Gerard Simpson
Joseph Skonieczny; Adolph Stampfel; Jimmie D. Sullivan
Michael Suwalski; Gary Suson; Keith Tanico
Peter Tartaglione; Jeff Tesoriero; Donald Thompson
John Tiska; Edgar Torres; Peter Tracy
Brian Urban; Anthony Valetta; Thomas VanRossem
Mario Vascon; Jose Velazquez; Guy Villano
Gregory Voce; Ed Wallace; Christopher Wanker
Mack Washington; Michael Welsh; John Whyte
Derek Williams; Martin Zoller

--------------------------------------------------------------------x
SHERI G. BURLINGAME, in her capacity as
Administratrix of the Estate of CHARLES FRANK
BURLINGAME, III, Deceased, and in her personal capacity
and as the personal representative of the Estate of

CHARLES F. BURLINGAME, III;                    **02 CV 7230(RCC)**

RUDY ABAD, Individually, as Personal Representative          **Speiser, Krause, Nolan &**
of the Estate of MARIA ROSE ABAD, Deceased,          **Granito**
and on behalf of all survivors of MARIA ROSE ABAD;

CYNTHIA LYNN BARKWAY, Individually,
as Personal Representative of the Estate of
DAVID MICHAEL BARKWAY, Deceased, and on
behalf of all survivors of DAVID MICHAEL BARKWAY;

MAUREEN BASNICKI, Individually, as
Personal Representative of the Estate of
KENNETH BASNICKI, Deceased, and on behalf of
all survivors of KENNETH BASNICKI;

BHOLA AND BASMATTIE BISHUNDAT, Individually,
and as Personal Representatives of the Estate of
KRIS ROMEO BISHUNDAT, Deceased, and on behalf of
all survivors of KRIS ROMEO BISHUNDAT;

THOMAS BOCCHINO, Individually,
as Personal Representative of the Estate of
MICHAEL BOCCHINO, Deceased, and on behalf of
all survivors of MICHAEL BOCCHINO;

IRENE BOEHM, Individually, as Personal Representative
of the Estate of BRUCE BOEHM, Deceased,
and on behalf of all survivors of BRUCE BOEHM;

MANUEL BOURDIER, Individually,
as Personal Representative of the Estate of
FRANCISCO BOURDIER, Deceased, and on behalf of
all survivors of FRANCISCO BOURDIER;

KRISTEN BREITWEISER, Individually,
as Personal Representative of the Estate of
RONALD BREITWEISER, Deceased, and on behalf of
all survivors of RONALD BREITWEISER;

ERICA BRENNAN, Individually, as
Personal Representative of the Estate of
PETER BRENNAN, Deceased, and on behalf of
all survivors of PETER BRENNAN;

KATHLEEN BRUNTON, Individually,
as Personal Representative of the Estate of
VINCENT BRUNTON, Deceased, and on behalf of
all survivors of VINCENT BRUNTON;

DEBORAH RAZZANO, Individually,
as Personal Representative of the Estate of
ANTHONY COLADONATO, Deceased,
and on behalf of all survivors of ANTHONY COLADONATO;

THERESA COVE, Individually, as
Personal Representative of the Estate of
JAMES E. COVE, Deceased, and on behalf of
all survivors of JAMES E. COVE;

JAMES CUDMORE, Individually,
as Personal Representative of the Estate of
NEIL CUDMORE, Deceased, and on behalf of
all survivors of NEIL CUDMORE;

AMY WATERS, Individually, as Personal Representative
of the Estate of SCOTT DAVIDSON, Deceased,
and on behalf of all survivors of SCOTT DAVIDSON;

LORRAINE DELAPENHA, Individually,
as Personal Representative of the Estate of
DONALD A. DELAPENHA, Deceased, and on
behalf of all survivors of DONALD A. DELAPENHA;

VIRGINIA DiCHIARA, Individually;

IRENE DICKEY, Individually, as Personal Representative
of the Estate of JOSEPH DICKEY, Deceased,
and on behalf of all survivors of JOSEPH DICKEY;

ROSEMARY DILLARD, Individually,
as Personal Representative of the Estate of
EDDIE DILLARD, Deceased, and on behalf of
all survivors of EDDIE DILLARD;

LESLIE DIMMLING, Individually,
as Personal Representative of the Estate of
WILLIAM DIMMLING, Deceased, and on behalf of
all survivors of WILLIAM DIMMLING;

MARGUERITA DOMANICO, Individually,
as Personal Representative of the Estate of
JAMES DOMANICO, Deceased, and on behalf of
all survivors of JAMES DOMANICO;

CHRISTOPHER DOWLING, Individually,
as Personal Representative of the Estate of
MARY YOLANDA DOWLING, Deceased, and on
behalf of all survivors of MARY YOLANDA DOWLING;

CYNTHIA M. DROZ, Individually,
as Personal Representative of the Estate of
CHARLES DROZ, Deceased, and on behalf of
all survivors of CHARLES DROZ;

JACQUELINE EATON, Individually,
as Personal Representative of the Estate of
ROBERT EATON, Deceased, and on behalf of
all survivors of ROBERT EATON;

KEVIN FARRELL, Individually;

CHONG P. FARRELL, Individually;

CATHERINE ANN FAUGHNAN, Individually,
as Personal Representative of the Estate of
CHRISTOPHER FAUGHNAN, Deceased, and on
behalf of all survivors of CHRISTOPHER FAUGHNAN;

MARCO CALLE, Individually,
as Personal Representative of the Estate of
HENRY HOMERO FERNANDEZ, Deceased, and on behalf
of all survivors of HENRY HOMERO FERNANDEZ;

MARY AND FRANK FETCHET, as
Personal Representatives of the Estate of
BRADLEY FETCHET, Deceased, and on behalf of
all survivors of BRADLEY FETCHET;

ERIN FINNEGAN, Individually,
as Personal Representative of the Estate of
MICHAEL FINNEGAN, Deceased, and on behalf of
all survivors of MICHAEL FINNEGAN;

CARLOS GAMBOA, Individually,
as Personal Representative of the Estate of
GIANN F. GAMBOA, Deceased, and on behalf of
all survivors of GIANN F. GAMBOA;

CATHY GEYER, Individually, as Personal Representative
of the Estate of JAMES G. GEYER, Deceased,
and on behalf of all survivors of JAMES G. GEYER;

GERALD GOLKIN, Individually, as Personal Representative
of the Estate of ANDREW H. GOLKIN Deceased,
and on behalf of all survivors of ANDREW H. GOLKIN;

ANA RALEY, Individually, as Executrix
of the Estate of IAN GRAY, Deceased,
and on behalf of all survivors of IAN GRAY;

RAYMOND HABIB, Individually,
as Personal Representative of the Estate of
BARBARA HABIB, Deceased, and on behalf of
all survivors of BARBARA HABIB;

THOMAS P. HEIDENBERGER, Individually,
as Personal Representative of the Estate of
MICHELE HEIDENBERGER, Deceased, and on behalf of
all survivors of MICHELE HEIDENBERGER;

BRENDAN RYAN, Individually, as
Personal Representative of the Estate of
KRISTIN IRVINE RYAN, Deceased, and on behalf of
all survivors of KRISTIN IRVINE RYAN;

SHERI ANN ISKENDERIAN, Individually, as
Personal Representative of the Estate of
ARAM ISKENDERIAN, Deceased, and on behalf of
all survivors of ARAM ISKENDERIAN;

JENNIFER L. JARDIM, Individually, as Administratrix
of the Estate of MARK S. JARDIM, Deceased,
and on behalf of all survivors of MARK S. JARDIM;

ELIZABETH JORDAN, Individually, as
Personal Representative of the Estate of
ROBERT JORDAN, Deceased, and on behalf of
all survivors of ROBERT JORDAN;

GEOFFREY JUDGE, Individually, as
Personal Representative of the Estate of
ANN JUDGE, Deceased, and on behalf of
all survivors of ANN JUDGE;

JANET KELLEY, Individually, as Personal Representative
of the Estate of FREDERICK KELLEY, Deceased,
and on behalf of all survivors of FREDERICK KELLEY;

JOANNE KELLY, Individually, as Personal Representative
of the Estate of JAMES KELLY, Deceased,
and on behalf of all survivors of JAMES KELLY;

PAUL AND VIVIAN KOLPAK, Individually, and
as Co-Administrators of the Estate of
VANESSA KOLPAK, Deceased, and on behalf of
all survivors of VANESSA KOLPAK;

ELIZABETH KOVALCIN, Individually,
as Personal Representative of the Estate of
DAVID P. KOVALCIN, Deceased, and on behalf of

all survivors of DAVID P. KOVALCIN;

SANDRA LANG, Individually, as Personal Representative
of the Estate of BRENDAN LANG, Deceased,
and on behalf of all survivors of BRENDAN LANG;

DONNA CABALLERO, and WILLIAM M. LANG,
Individually, as Personal Representatives of the Estate of
ROSEANN LANG, Deceased, and on behalf of
all survivors of ROSEANN LANG;

CAROLANN LARSEN, Individually, as
Personal Representative of the Estate of
SCOTT LARSEN, Deceased, and on behalf of
all survivors of SCOTT LARSEN;

CAROLE LEAVEY, Individually, as
Personal Representative of the Estate of
JOSEPH GERARD LEAVEY, Deceased, and on behalf of
all survivors of JOSEPH GERARD LEAVEY;

SUSAN LENOIR, Individually, as Personal Representative
of the Estate of JOHN ROBINSON LENOIR, Deceased, and
on behalf of all survivors of JOHN ROBINSON LENOIR;

JOSEPH J. REITANO, Individually, as
Personal Representative of the Estate of
VINCENT LITTO, Deceased, and on behalf of
all survivors of VINCENT LITTO;

ELIZABETH DAVILA-LOPEZ, Individually, as
Personal Representative of the Estate of
DANIEL LOPEZ, Deceased, and on behalf of
all survivors of DANIEL LOPEZ;

EILEEN LYNCH, Individually, as Personal Representative
of the Estate of FARRELL LYNCH, Deceased,
and on behalf of all survivors of FARRELL LYNCH;

BLANE MAGEE, Individually, as Personal Representative
of the Estate of BRIAN MAGEE, Deceased,
and on behalf of all survivors of BRIAN MAGEE;

BRINLEY MALONEY, Individually, as
Personal Representative of the Estate of
EDWARD F. MALONEY, III, Deceased, and on behalf of
all survivors of EDWARD F. MALONEY, III;

MEGAN MANNING, Individually, as
Personal Representative of the Estate of

TERENCE JOHN MANNING, Deceased, and on behalf
of all survivors of TERENCE JOHN MANNING;

LYNN McGUINN, Individually, as Personal Representative
of the Estate of FRANCIS McGUINN, Deceased, and on
behalf of all survivors of FRANCIS McGUINN;

TARYN McHALE, Individually, as
Personal Representative of the Estate of
THOMAS McHALE, Deceased, and on behalf of
all survivors of THOMAS McHALE;

ELIZABETH McLAUGHLIN, Individually,
as Personal Representative of the Estate of ROBERT
McLAUGHLIN, Deceased, and on behalf of
all survivors of ROBERT McLAUGHLIN;

MARK MORABITO, Individually, as Personal
Representative of the Estate of  LAURA LEE
MORABITO, Deceased, and on behalf of all
survivors of LAURA LEE MORABITO;

CATHERINE MORAN, Individually, as
Personal Representative of the Estate of
KATHLEEN MORAN, Deceased, and on behalf of
all survivors of KATHLEEN MORAN;

KIMBERLY A. MARTONE, Individually, as
Personal Representative of the Estate of
CHRISTOPHER M. MORRISON, Deceased, and on
behalf of all survivors of CHRISTOPHER M. MORRISON;

PATRICK MULLAN, Individually, as
Personal Representative of the Estate of
MICHAEL D. MULLAN, Deceased, and on behalf of
all survivors of MICHAEL D. MULLAN;

AMY NACKE, Individually, as Personal Representative
of the Estate of LOUIS J. NACKE, Deceased,
and on behalf of all survivors of LOUIS J. NACKE;

AMY NEWTON, Individually, as Executrix
of the Estate of CHRISTOPHER NEWTON, Deceased,
and on behalf of all survivors of CHRISTOPHER NEWTON;

SUSAN NEWTON-CARTER, Individually, as
Personal Representative of the Estate of
CHRISTOPHER NEWTON-CARTER, Deceased,
and on behalf of all survivors of
CHRISTOPHER NEWTON-CARTER;

EDWARD NICHOLLS, Individually;

STACIE NICHOLLS, Individually;

LISA O'BRIEN, Individually, as Personal Representative
of the Estate of TIMOTHY O'BRIEN, Deceased,
and on behalf of all survivors of TIMOTHY O'BRIEN;

ANTOINETTE D. OGNIBENE, Individually, as
Personal Representative of the Estate of
PHILLIP PAUL OGNIBENE, Deceased, and on behalf of
all survivors of PHILLIP PAUL OGNIBENE;

DANIEL ORTH, Individually, as Personal Representative
of the Estate of JANE MARIE ORTH, Deceased,
and on behalf of all survivors of JANE MARIE ORTH;

WANDA GARCIA-ORTIZ, Individually, as
Personal Representative of the Estate of
EMILIO ORTIZ, Deceased, and on behalf of
all survivors of EMILIO ORTIZ;

CAROLYN PANATIER, Individually, as
Personal Representative of the Estate of
CHRISTOPHER M. PANATIER, Deceased, and on behalf
of all survivors of CHRISTOPHER M. PANATIER;

NAVILA PATTERSON, Individually, as
Personal Representative of the Estate of
BERNARD E. PATTERSON, Deceased, and on behalf of
all survivors of BERNARD E. PATTERSON;

MICHAEL QUINN, Individually, as Personal
Representative of the Estate of JAMES QUINN, Deceased
and on behalf of all survivors of JAMES QUINN;

MARILYN REICH, Individually, as
Personal Representative of the Estate of
HOWARD REICH, Deceased, and on behalf of
all survivors of HOWARD REICH;

JAMES J. RICHES, Individually, as
Personal Representative of the Estate of
JAMES C. RICHES, Deceased, and on behalf of
all survivors of JAMES C. RICHES;

BERNARD P. SALAMONE, Individually,
as Executor of the Estate of  MARJORIE C.
SALAMONE, Deceased, and on behalf
of all survivors of MARJORIE C. SALAMONE;

DANIELLE SALERNO, Individually, as
Personal Representative of the Estate of
JOHN SALERNO, Deceased, and on behalf of
all survivors of JOHN SALERNO;

SALLY CALVIN, Individually,
as Personal Representative of the Estate of
FRANK SALVATERRA, Deceased, and on behalf of
all survivors of FRANK SALVATERRA;

LYNNE SAN PHILLIP, Individually,
as Personal Representative of the Estate of
MICHAEL V. SAN PHILLIP, Deceased, and on behalf of
all survivors of MICHAEL V. SAN PHILLIP;

DARA SEAMAN, Individually, as Personal Representative
of the Estate of MICHAEL SEAMAN, Deceased,
and on behalf of all survivors of MICHAEL SEAMAN;

MARIA SILVERSTEIN, Individually, as
Personal Representative of the Estate of
CRAIG SILVERSTEIN, Deceased, and on behalf of
all survivors of CRAIG SILVERSTEIN;

LAURIE SIMOWITZ, Individually, as
Personal Representative of the Estate of
BARRY SIMOWITZ, Deceased, and on behalf of
all survivors of BARRY SIMOWITZ;

JAMES P. SLATTERY, Individually, as
Personal Representative of the Estate of
CHRISTOPHER PAUL SLATTERY, Deceased,
and on behalf of all survivors of
CHRISTOPHER PAUL SLATTERY;

SUSAN M. SLIWAK, Individually, as
Personal Representative of the Estate of
ROBERT F. SLIWAK, Deceased, and on behalf of
all survivors of ROBERT F. SLIWAK;

MICHAEL T. JAMMEN, Individually, as
Personal Representative of the Estate of
HEATHER L. SMITH, Deceased, and on behalf of
all survivors of HEATHER L. SMITH;

CHRISTINE SPENCER, Individually, as
Personal Representative of the Estate of
ROBERT A. SPENCER, Deceased, and on behalf of
all survivors of ROBERT A. SPENCER;

BARBARA STECKMAN, Individually, as
Personal Representative of the Estate of
WILLIAM STECKMAN, Deceased, and on behalf of
all survivors of WILLIAM STECKMAN;

LORRAINE SZOCIK, Individually, as
Personal Representative of the Estate of
KEVIN T. SZOCIK, Deceased, and on behalf of
all survivors of KEVIN T. SZOCIK;

BASIL G. THORPE AND VALDA M. BINNS,
Individually, and as Co-Administrators of the Estate of
NICHOLA ANGELA THORPE, Deceased, and on behalf
of all survivors of NICHOLA ANGELA THORPE;

ANNE TODISCO, Individually, as
Personal Representative of the Estate of
RICHARD TODISCO, Deceased, and on behalf of
all survivors of RICHARD TODISCO;

TANJA TOMASEVIC, Individually, as
Personal Representative of the Estate of
VLADIMIR TOMASEVIC, Deceased, and on behalf of
all survivors of VLADIMIR TOMASEVIC;

DORRY GROH-TOMPSETT, Individually, as
Personal Representative of the Estate of
STEPHEN TOMPSETT, Deceased, and on behalf
of all survivors of STEPHEN TOMPSETT;

MARY ELIZABETH TUCKER, Individually,
as Personal Representative of the Estate of
MICHAEL P. TUCKER, Deceased, and on behalf of
all survivors of MICHAEL P. TUCKER;

JENNIFER VAUK, Individually, as
Personal Representative of the Estate of
L. COL. RONALD VAUK, Deceased, and on behalf of
all survivors of L. COL. RONALD VAUK;

NAYDA VOSKERIJIAN, Individually, as
Personal Representative of the Estate of
GARO H. VOSKERIJIAN, Deceased, and on behalf of
all survivors of GARO H. VOSKERIJIAN;

ALLISON WALLICE, Individually, as
Personal Representative of the Estate of
JOHN WALLICE, JR., Deceased, and on behalf of
all survivors of JOHN WALLICE, JR.;

MICHELLE GARTNER, Individually, as
Personal Representative of the Estate of
DINAH WEBSTER, Deceased, and on behalf of
all survivors of DINAH WEBSTER;

MARCIA WEISS, Individually, as Personal Representative
of the Estate of DAVID T. WEISS, Deceased
and on behalf of all survivors of DAVID T. WEISS;

PATRICK WELSH, Individually, as
Personal Representative of the Estate of
DEBORAH ANNE WELSH, Deceased, and on behalf of
all survivors of DEBORAH ANNE WELSH;

BENJAMIN WONG, Individually, as Personal
Representative of the Estate of
JENNIFER Y. WONG, Deceased, and on behalf of
all survivors of JENNIFER Y. WONG;

PAMELA WORKS, Individually, as
Personal Representative of the Estate of
JOHN BENTLEY WORKS, Deceased, and on behalf of
all survivors of JOHN BENTLEY WORKS;

ELAINE M. CHEVALIER, as Administrator
of the Estate of Swede Chevalier, Deceased
and on behalf of all survivors of SWEDE CHEVALIER;

MAUREEN S. DOMINGUEZ, as Administrator
of the Estate of Carlos Dominguez, Deceased,
and on behalf of all survivors of CARLOS DOMINGUEZ;

PHYLLIS GILLY and JOSEPH GILLY, as
Administrators of the Estate of Laura Gilly, Deceased,
and on behalf of all survivors of LAURA GILLY;

YONGJIN L. SONG, HYUNGSHIN K. SONG, as
Administrators of the Estate of Daniel W. Song AKA
Won-Hyeong Song, Deceased, and on behalf of all
survivors of DANIEL W. SONG AKA WON-HYEONG SONG;

MARC TADDONIO, as Executor of the Estate
of Michael Taddonio, Deceased, and on behalf of all
survivors of MICHAEL TADDONIO;

ERNST H. BUCK and JOSEPHINE BUCK, as Parents
and Natural Guardians of GREGORY J. BUCK, Deceased
and on behalf of all survivors of Gregory J. Buck;

KENNETH CHU, as Administrator

of the Estate of Pamela Chu, Deceased
and on behalf of all survivors of Pamela Chu;

LOUISA D'ANTONIO, as Administrator
of the Estate of Mary D'Antonio, Deceased
and on behalf of all survivors of Mary D'Antonio;

KATHRYN R. DENNIS, as Administrator
of the Estate of Thomas F. Dennis, Deceased
and on behalf of all survivors of Thomas F. Dennis;

TERESA GOMEZ, as Administrator
of the Estate of Enrique A. Gomez, Deceased
and on behalf of all survivors of Enrique A. Gomez;

BLANCA GOMEZ, as Administrator
of the Estate of Jose B. Gomez, Deceased
and on behalf of all survivors of Jose B. Gomez;

SANDRA MUNRO, as Administrator
of the Estate of Elvira Granitto, Deceased
and on behalf of all survivors of Elvira Granitto;

MARY JEAN HELLER, as Administrator
of the Estate of H. Joseph Heller, Deceased
and on behalf of all survivors of H. Joseph Heller;

EDWARD HENRY AND ALICE HENRY, Individually;

EDWARD HENRY AND ALICE HENRY, as Administrators
of the Estate of Joseph Patrick Henry, Deceased
and on behalf of all survivors of Joseph Patrick Henry;

DOHEE KANG, as Administrator
of the Estate of Joon Koo Kang, Deceased
and on behalf of all survivors of Joon Koo Kang;

ALISON M. KINNEY, as Administrator
of the Estate of Brian Kinney, Deceased
and on behalf of all survivors of Brian Kinney;

ANNA M. KREN, as Executor
of the Estate of John J. Kren, Deceased
and on behalf of all survivors of John J. Kren;

DENNIS LEVI and JENNIFER LISITSIN, as
Administrators of the Estate of John Levi, Deceased
and on behalf of all survivors of John Levi;

ERIC LEVINE, individually;

CHRISTINA LYNCH, as Administrator
of the Estate of Richard D. Lynch, Deceased
and on behalf of all survivors of Richard D. Lynch;

NICHOLAS MAOUNIS, as Administrator
of the Estate of James Maounis, Deceased
and on behalf of all survivors of James Maounis;

SHEILA MARTELLO, as Executor
of the Estate of James Martello, Deceased
and on behalf of all survivors of James Martello;

MADELINE LEW MOY, as Personal Representative
of the Estate of Teddington H. Moy, Deceased
and on behalf of all survivors of Teddington H. Moy;

HEIDI NAPLES, as Administrator
of the Estate of Frank J. Naples, Deceased
and on behalf of all survivors of Frank J. Naples;

MARY DUFF-ORTALE, as Administrator
of the Estate of Peter Keith Ortale, Deceased
and on behalf of all survivors of Peter Keith Ortale;

ALEXANDRA M. ORTIZ, as Administrator
of the Estate of Sonia M. Ortiz, Deceased
and on behalf of all survivors of Sonia M. Ortiz;

MEGAN P. PELINO, as Administrator
of the Estate of Todd Douglas Pelino, Deceased
and on behalf of all survivors of Todd Douglas Pelino;

JANE POLLICINO, as Executor
of the Estate of Steven Pollicino, Deceased
and on behalf of all survivors of Steven Pollicino;

BARBARA ROPITEAU-GALLOWAY, as Administrator
of the Estate of Eric Thomas Ropiteau, Deceased
and on behalf of all survivors of Eric Thomas Ropiteau;

EUGENIA BOGADO, as Administrator
of the Estate of Carlos A. Samaniego, Deceased
and on behalf of all survivors of Carlos A. Samaniego;

JACQUELINE GALLERON, as Executor
of the Estate of Selina Sutter, Deceased
and on behalf of all survivors of Selina Sutter;

JANE TERRENZI, as Executor
of the Estate of Brian Terrenzi, Deceased

and on behalf of all survivors of Brian Terrenzi;

CAROL WALDIE, as Administrator
of the Estate of Kenneth Waldie, Deceased
and on behalf of all survivors of Kenneth Waldie;

LING N. YOUNG and DONALD M. YOUNG, Individually;

PATRICIA FITZSIMONS, as Executor
of the Estate of Richard Fitzsimons, Deceased
and on behalf of all survivors of Richard Fitzsimons;

CHRISTINE O'BERG, as Administrator
of the Estate of Dennis O'Berg, Deceased
and on behalf of all survivors of Dennis O'Berg;

DENNIS O'BERG, individually

JEAN M. PALOMBO, as Administrator
of the Estate of Frank A. Palombo, Deceased
and on behalf of all survivors of Frank A. Palombo;

CORRINE J. EVANS and CHARLES R. EVANS,
as Co-Administrators of the Estate of Eric B. Evans, Deceased
and on behalf of all survivors of Eric B. Evans;

NANCY H. KIMBELL, as Administrator
of the Estate of Mary Booth, Deceased
and on behalf of all survivors of Mary Booth;

CHRISTINA L. KMINEK, as Personal Representative
of the Estate of Mari-Rae Sopper, Deceased
and on behalf of all survivors of Mari-Rae Sopper;

LORRAINE LYNCH, as Administrator
of the Estate of Sean Lynch, Deceased
and on behalf of all survivors of Sean Lynch;

ELIZABETH McNALLY, as Administrator
of the Estate of Edmund McNally, Deceased
and on behalf of all survivors of Edmund McNally;

JOSEPH RICHARD MICKLEY, as Executor
of the Estate of Patricia E. Mickley, Deceased
and on behalf of all survivors of Patricia E. Mickley;

ELAINE P. MILLER and CORRINE KRACHTUS, as
Personal Representatives of the Estate of Daphne Pouletsos,
Deceased and on behalf of all survivors of Daphne Pouletsos;

ARJAN MIRPURI, as Personal Representative
of the Estate of Rajesh Mirpuri, Deceased
and on behalf of all survivors of Rajesh Mirpuri;

SUSANNE MLADENIK, as Executor
of the Estate of Jeffrey P. Mladenik, Deceased
and on behalf of all survivors of Jeffrey P. Mladenik;

JANICE KAY PUNCHES, as Executor
of the Estate of Capt. Jack D. Punches, USN, Retired, Deceased
and on behalf of all survivors of Capt. Jack D. Punches, USN, Retired;

ABRAHAM SCOTT, as Administrator
of the Estate of Janice M. Scott, Deceased
and on behalf of all survivors of Janice M. Scott;

KATHY A. CORDERO,
VALENCIA L. PARKER,


**Plaintiffs Added as of March 10, 2004**

DENNIS VIANNA and MARILYNDA VIANNA,
Individually and as Administrators of the Estate
of Mathew G. Gianna, Deceased and on behalf of
all survivors of Mathrew G. Gianna;

NANCY HOLZHAUER, Individually and as
Administratrix of the Estate of Gerard P. Rauzi, Deceased
and on behalf of all survivors of Gerard P. Rauzi;

ELIZABETH ANN PAYNE, Individually and as
Executrix of the Estate of William Wilson, Deceased
and on behalf of all survivors of William Wilson;

PATRICIA WREN, Individually and as Administratrix
of the Estate of William Wren, Deceased
and on behalf of all survivors of William Wren;

MARGARET MATHERS, Individually and as
Executrix of the Estate of Charles Mathers, Deceased
and on behalf of all survivors of Charles Mathers;

CHRISTINE JEAN-PIERRE, Individually and as
Executrix of the Estate of Francois Jean-Pierre, Deceased
and on behalf of all survivors of Francois Jean-Pierre;

PATRICIA GREENE-WOTTON, Individually and as
Executrix of the Estate of Rodney Wotton, Deceased
and on behalf of all survivors of Rodney Wotton;

**Plaintiffs added September 10, 2004**

PATRICIA CUBAS-BIELFELD, Individually

ROBERT EICHELE and CARMELA EICHELE, Individually,

MICHAEL HENRY and REBECCA HENRY, Individually

JAMES B. LEACH and CARRIE LEACH, Individually,

JAMES McCAFFREY and AGNES McCAFFREY, Individually

KEVIN WARD, Individually,

------------------------------------------------------------------x

VIRGINIA BAUER, Individually and as
Executrix of the Estate of W. DAVID BAUER,
Deceased,

**02 CV 7236(RCC)**

CATHY ANN BONNETT, Individually
and as Administratrix of the Estate of
COLIN BONNETT, Deceased,

**Baumeister & Samuels, P.C.**

DEBORAH BOWDEN, Individually and
as Executrix of the Estate of THOMAS
BOWDEN, Deceased,

JENNIFER BOWMAN, Individually and as
Administratrix of the Estate of SHAWN E.
BOWMAN, Deceased,

ELIZABETH CANDELA, Individually and
as Administratrix of the Estate of JOHN
CANDELA, Deceased,

TOMOKO T. SCHLAG, Individually and
as Executrix of the Estate of STEVEN F.
SCHLAG, Deceased,

BETH MURPHY, Individually and as
Administratrix of the Estate of KEVIN J.
MURPHY, Deceased,

ROSEANN ZISA, Individually and as
Administratrix of the Estate of SALVATORE
ZISA, Deceased,

MICHELE JONES, Individually and as Executrix

of the Estate of DONALD JONES, Deceased,

AMY VASEL, Individually and as Administratrix
of the Estate of SCOTT VASEL, Deceased,

MARGARET MEYER, Individually and as
Executrix of the Estate of DAVID R. MEYER,
Deceased,

BARBARA GALLUCCI, Individually and as
Administratrix of the Estate of VINCENZO
GALLUCCI, Deceased,

ARLENE ORSINI, Individually and as
Administratrix of the Estate of RONALD
ORSINI, Deceased,

EILEEN HANNAFORD, Individually and as
Administratrix of the Estate of KEVIN
HANNAFORD, Deceased,

JILL GOLDSTEIN, Individually and as
Administratrix of the Estate of STEVEN
GOLDSTEIN, Deceased,

AUDREY MAGNUSON, Individually and as
Executrix of the Estate of RONALD E.
MAGNUSON, Deceased,

KAREN D'AMBROSI, Individually and as
Executrix of the Estate of JACK L. D'AMBROSI,
Deceased,

SUSAN MAGAZINE, Individually and as
Administratrix of the Estate of JAY MAGAZINE,
Deceased,

KATHERINE MAHER, Individually and as
Executrix of the Estate of DANIEL L. MAHER,
Deceased,

ELLEN ROBB, Individually and in her capacity
as Proposed Co-Administrator of the
Estate of KRISTEN MONTANARO, Deceased,

MICHELLE TANNER, Individually and as
Executrix of the Estate of MICHAEL TANNER,
Deceased,

MARIE CARLINO, Individually and as Executrix

of the Estate of EDWARD CARLINO, Deceased,

PANDORA PO BHARVANEY, Individually and
as Administratrix of the Estate of ANIL T.
BHARVANEY, Deceased,

DEBRA ZEPLIN, Individually and as Executrix of
the Estate of MARC SCOTT ZEPLIN, Deceased,

LAURA BUSTILLO, Individually and as
Administratrix of the Estate of MILTON BUSTILLO,
Deceased,

CAROLE DiFRANCO, Individually and as
Administratrix of the Estate of CARL DiFRANCO,
JR., Deceased,

CAMERON F. MACRAE, III, Individually and as
Administrator of the Estate of CATHERINE
FAIRFAX MACRAE, Deceased,

DONALD MAURO, Individually and as Administrator
of the Estate of NANCY T. MAURO, Deceased,

JOHN SANDERS, Individually and as Administrator
of the Estate of STACEY L. SANDERS, Deceased,

JENNIFER PRICE, Individually and as Executrix
of the Estate of JEAN ELIZABETH HOADLEY
PETERSON, Deceased,

SANDRA VALDEZ FELT, Individually and as
Executrix of the Estate of EDWARD P. FELT,
Deceased,

ROSE KELLER, Individually and as Administratrix
Administratrix of the Estate of JOSEPH KELLER,
Deceased,

LYZBETH GLICK, Individually and as Administratrix
of the Estate of JEREMY GLICK, Deceased,

ELSA STRONG, Individually and as Executrix of the
Estate of LINDA GRONLUND, Deceased,

JOHN DiMEGLIO, Individually and as Administrator
of the Estate of DAVID DIMEGLIO, Deceased,

BARBARA RATCHKO, Individually and as
Administratrix of the Estate of BRYAN JACK,

Deceased,

MICHAEL GIORDANO, Individually and as
Administrator of the Estate of DONNA GIORDANO,
Deceased,

ROSA CAICEDO, as Mother and Legal Guardian
of LESLIE VARGAS and KEVIN VARGAS, the
Natural Children of DAVID VARGAS, Deceased, and
as Proposed Administratrix and/or personal
representative of the Estate of DAVID
VARGAS, Deceased,

JILL SWIFT, Individually and as Executrix of the
Estate of THOMAS SWIFT, Deceased,

LISA BEAMER, Individually and as Executrix
of the Estate of TODD BEAMER, Deceased,

JENNIFER G. BRENNAN, Individually and as
Administratrix of the Estate of THOMAS M. BRENNAN,
Deceased,

SUSAN BEATINI, Individually and as Administratrix
of the Estate of PAUL F. BEATINI, Deceased,

MARY DANAHY, Individually and as Executrix of
the Estate of PATRICK W. DANAHY, Deceased,

KATHLEEN M. WISNIEWSKI, Individually and as
Administratrix of the Estate of ALAN L. WISNIEWSKI,
Deceased,

TERESA CUNNINGHAM, Individually and as
Administratrix of the Estate of MICHAEL J.
CUNNINGHAM, Deceased,

BEVERLY ECKERT, Individually and as Executrix
of the Estate of SEAN ROONEY, Deceased,

PATRICIA RYAN, Individually and as Executrix
of the Estate of JOHN J. RYAN, Deceased,

LORI KANE, Individually and as Administratrix
of the Estate of HOWARD L. KANE, Deceased,

SUZANNE SISOLAK, Individually and as
Administratrix of the Estate of JOSEPH M.
SISOLAK, Deceased,

THOMAS S. JOHNSON, Individually and as
Administrator of the Estate of SCOTT M. JOHNSON,
Deceased,

H. MICHAEL KEDEL, as Executor of the Estate of
Adam Jay Lewis, Deceased,

NANCY FOSTER, as Personal Representative of
the Estate of Noel John Foster, Deceased,

CHIEMI YORK, as Administrator of the
Estate of Kevin Patrick York, Deceased,

JENNIFER TARANTINO, as Executor of the
Estate of Kenneth J. Tarantino, Deceased,

**Plaintiff added September 10, 2004**

MARY SMITH, Individually and as Administratrix
of the Estate of Daniel Laurence Smith, Deceased

-----------------------------------------------------------------------x

CHERYL SCHNEIDER, in her own right and as
the Executrix of the ESTATE OF IAN
SCHNEIDER, Deceased                                    **02 CV 7209(RCC)**

NANCY DIMINO, in her own right and as                  **Law Firm of Aaron J. Broder**
the Executrix of the ESTATE OF STEPHEN                 **& Jonathan C. Reiter**
DIMINO, Deceased

MATILDE SALCEDO, in her own right and
as the Personal Representative of the ESTATE
OF ESMERLIN SALCEDO, Deceased

SUSAN CONNORS, in her own right and as the
Executrix of the ESTATE OF JONATHAN M.
CONNORS, Deceased

GERARD JEAN BAPTISTE, in his own right and
as the Proposed Personal Representative of the
ESTATE OF GERARD BAPTISTE, Deceased

DEBORA ANN CRISMAN, in her own right and
as Administratrix of the ESTATE OF DANIEL
HAL CRISMAN, Deceased

-----------------------------------------------------------------x

MAYORE ESTATES, LLC and
80 LAFAYETTE ASSOCIATES, LLC                    **02 CV 7214(RCC)**

                                                **Jaroslawicz & Jaros, Esqs.**

                              Plaintiffs,

          - against -

**AL QAEDA  ISLAMIC ARMY**

**TERRORIST HIJACKERS**
THE ESTATE OF AHMED, FAYEZ
THE ESTATE OF AL-GHAMDI, AHMED
THE ESTATE OF AL-GHAMDI, HAMZA
THE ESTATE OF AL-GHAMDI, SAEED
THE ESTATE OF AL-HAZMI, NAWAF
THE ESTATE OF AL-HAZMI, SALEM
THE ESTATE OF AL-HAZNAWI, AHMED IBRAHIM A.
THE ESTATE OF AL-MIDHAR, KHALID
THE ESTATE OF AL-NAMI, AHMED
THE ESTATE OF AL-OMARI, ABDULAZIZ
THE ESTATE OF AL-SHEHHI, MARWAN
THE ESTATE OF AL-SHEHRI, MOHAND
THE ESTATE OF AL-SHEHRI, WAIL
THE ESTATE OF AL-SHEHRI, WALEED M.
THE ESTATE OF AL-SUQAMI, SATAM M. A.
THE ESTATE OF ATTA, MOHAMMED
THE ESTATE OF HANJOUR, HANI
THE ESTATE OF JARRAH, ZIAD SAMIR
THE ESTATE OF MOQED, MAJED
MOUSSAOUI, ZACARIAS

**THE REPUBLIC OF SUDAN**
AL-BASHIR, OMAR HASSAN AHMAD
AL-TURABI, HASSAN
NATIONAL ISLAMIC FRONT

**ISLAMIC REPUBLIC OF IRAN**
BLOKIAN, GENERAL ALI
FALAHYAN, ALI
ISLAMIC REVOLUTIONARY GUARD CORPS a/k/a IRGC
LASHKAR FEDAYAN-E-ISLAMI a/k/a Islamic Martyrs Brigade
KHAMEINI, AYATOLLAH ALI
MINISTRY OF INTELLIGENCE AND SECURITY a/k/a MOIS
NAJAF-ABADI, QORBAN ALI
OL-ESLAM, HOSEYN SHAYKH
RAYSHARI, MOMAMMED MOHAMMADI
REZA'I, GENERAL MOHSEN
SAFAVI, GENERAL YAHYA RAHIM
SALIM, AHMAD SALAH

SAVEHI, MAHDI CHAMRAN

**THE REPUBLIC OF IRAQ**
AL-ANI, AHMED KHALIL IBRAHIM SAMIR
AL-HIJAZI, FARUQ
HUSSEIN, SADDAM
RAMADAN, TAHA YASSIN

**CO-CONSPIRATOR**
ABU ZUBAYDAH a/k/a Zayn al Abidin Muhammad Husayn Tariq
AHMAD, MUSTAFA MUHAMMED a/k/a Mustafa Ahmed Al-Hasawi
AKIDA BANK PRIVATE LIMITED a/k/a Akida Islamic Bank International Limitied a/k/a Iksir
International Bank Limited
AL-ADEL, SAIF
AL-ALI, SULAIMAN
AL-AQEEL, AQEEL
AL-BAYOUMI, OMAR  a/k/a Abu Imard
AL-BUTHE, SOLIMAN H.S.
AL-HARAMAIN ISLAMIC FOUNDATION
AL-HIJRAH CONSTRUCTION AND DEVELOPMENT LTD.
AL-KADI, MANSOUR
AL-NASHIRI, ABD AL-RAHIM a/k/a Bilal Bin Marwan a/k/a Umar Mohammed al-Harazi
AL-QADI, YASSIN  a/k/a Yassin al-Kadi
AL-QARDAWI, SHEIKH YUSUF
AL-RAJHI BANKING & INVESTMENT CORPORATION
AL-RAJHI, ABDULLAH SULAIMAN
AL-RAJHI, SALEH ABDULAZIZ
AL-RAJHI, SULAIMAN ABDULAZIZ
AL-RASHID TRUST
AL-SHAMAL ISLAMIC BANK
AL-TALIB, HISHAM
AL-TURKI, ABDULLAH BIN ABDUL MUHSEN
AL-ZAWAHIRI, AYMAN
ALAMOUDI, ABDURAHMAN
ARADI, INC.
ARNAOUT, ENAAM M.
ASAT TRUST REGISTERED
ASHRAF, M. OMAR
ASHRAF, MUHAMMAD
BAHAJI, SAID
BAHARETH, MOHAMMED
BAHFZALLAH, HASSAN A.A.
BANK AL TAQWA LIMITED, a/k/a Al Taqwa Bank
BARZINJI, JAMAL
BASHA, ADNAN
BATTERJEE, SHEIK ADEL GALIL
BAYAZID, MOHAMED
BENEVOLENCE INTERNATIONAL FOUNDATION, INC.
BIHEIRI, SOLIMAN S.

BIN LADEN, ABDULA
BIN LADEN, BAKR M
BIN LADEN, OSAMA
BIN MAHFOUZ, ABDUL RAHMAN KHALID
BIN MAHFOUZ, KHALED
BINALSHIBH, RAMZI MOHAMMED ADBULLAH a/k/a  Ramzi Mohamed Abdallah Omar
DALLAH AL BARAKA GROUP LLC
DALLAH AVCO TRANS ARABIA CO. LD.
DAR-AL-MAAL AL ISLAMI TRUST
DARKAZANLI, MAMOUN
EGYPTIAN ISLAMIC JIHAD
EL-HAGE, WADIH
EL-MOTASSADEQ, MOUNIR
FAISAL ISLAMIC BANK
GHATY, PEROUZ SEDA
GLOBAL DIAMOND RESOURCE
GLOBAL RELIEF FOUNDATION, INC.
GROVE CORPORATE, INC.
GUM ARABIC CO. LTD.
HAMDI, TARIK
HEKMATYAR, GULBUDDIN
HIMMAT, ALI GHALEB
HUBER, ARMAND ALBERT FRIEDRICH a/k/a Ahmed Huber
INTERNATIONAL INSTITUTE OF ISLAMIC THOUGHT (IIIT)
INTERNATIONAL ISLAMIC RELIEF ORGANIZATION (IIRO)
JAGHLIT, MOHAMMED
JULAIDAN, WA'EL HAMZA a/k/a Al Hasan al Madani
KAMEL, SALEH ABDULLAH
KHALIFA, MOHAMMED JAMAL
MAMOUN DARKAZANLI IMPORT-EXPORT COMPANY
MANSOUR, MOHAMED
MANSOUR, ZEINAB a/k/a Zeinab Mansour Fattouh
MAR-JAC INVESTMENTS, INC.
MAR-JAC POULTRY
MIGA – MALAYSIAN SWISS, GULF AND AFRICAN CHAMBER,  a/k/a Camera di
Commercio, Industria e Turismo per Gli Stati Arabi del Golfo e la Svizzera a/k/a Gulf Center
MIRZA, M. YAQUB
MOHAMMED, KHALID SHEIKH
MUHAMMAD, SHEIKH OMAR BAKRI
MULLAH OMAR
MUSLIM BROTHERHOOD
MUSLIM WORLD LEAGUE
MUWAFFAQ FOUNDATION a/k/a Blessed Relief Foundation
NADA MANAGEMENT ORGANIZATION SA, a/k/a al Taqwa Management Organization
NADA, YOUSSEF MUSTAFA
NASCO NASREDDIN HOLDING SA
NASEEF, ABDULLAH OMAR
NASREDDIN, AHMED IDRIS, a/k/a Nasreddin Ahmed Idris
NATIONAL COMMERCIAL BANK OF SAUDI ARABIA
NEW DIAMOND HOLDINGS

PIEDMONT POULTRY
PRINCE MOHAMMED AL FAISAL AL SAUD
PRINCE NAYEF BIN ABDULAZIZ AL SAUD
PRINCE SALMAN BIN ABDULAZIZ AL SAUD
PRINCE SULTAN BIN ABDULAZIZ AL SAUD
PRINCE TURKI AL FAISAL AL SAUD
RABITA TRUST
RASHID, MUFTI MOHAMMED
SAAR FOUNDATION
SAFA TRUST
SANABEL AL-KHEER, INC.
SANA-BELL, INC.
SANABIL AL-KHAIR
SAUDI BIN LADEN GROUP
SAUDI HIGH COMMISSION a/k/a The Saudi High Relief Commission)
SAUDI JOINT RELIEF COMMITTEE
SAUDI RED CRESCENT COMMITTEE
SEDKY, SHERIF
SUCCESS FOUNDATION
TADAMON ISLAMIC BANK
TAIBAH INTERNATIONAL AID ASSOCIATION
THE TALIBAN
TOTONJI, AHMED
WORLD ASSEMBLY FOR MUSLIM YOUTH
YOUSSEF M. NADA ESTABLISHMENT
YUNUS, IQBAL
ZARQAWI, ABU MUSAB
ZOUAYDI, MUHAMMED GALEB KALAJE a/k/a Abu Talha

Defendants.

-----------------------------------------------------------------x

Plaintiffs, by their attorneys Kreindler & Kreindler, Barasch, McGarry Salzman Penson & Lim, Speiser, Krause, Nolan & Granito, Baumeister & Samuels, P.C., Law Firm of Aaron J. Broder & Jonathan C. Reiter and Jaroslawicz & Jaros, Esqs.,  as and for their Sixth Amended Consolidated Master Complaint, hereby allege:

1.      Plaintiffs listed in the caption of this action are U.S. citizens, residents or foreign citizens who are or will be appointed either the Executors, Administrators or Personal Representatives of the Estates of persons killed, or are persons injured in the September 11, 2001 terrorist attacks perpetrated by some of the defendants with the support

and assistance of the other defendants, in which four United States' commercial aircraft were caused to crash into the World Trade Center Towers, the Pentagon and a field in Shanksville, Pennsylvania (hereinafter "September 11th Attacks") or representatives of property that was damaged in the attacks.   Plaintiffs' decedents were passengers or crew members on board American Airlines Flights 11 and 77, United Airlines Flights 175 and 93, and persons present at both Towers of the World Trade Center in New York, or present at the Pentagon in Virginia and includes personal injury victims and those persons or entities who suffered property damage at those locations.

## JURISDICTION AND VENUE

2.      Jurisdiction arises pursuant to 28 U.S.C. §§ 1330(a) (actions against foreign states), 1331 (federal question), 1332(a)(2), 1350 ("Alien Tort Act"), 1605(a)(2), 1605(a)(5), 1605(a)(7) (the Foreign Sovereign Immunities Act), and the Torture Victim Protection Act, PL 102-256, 106 Stat. 73 (reprinted at 28 U.S.C.A. § 1350 note (West 1993)), and violation of the International Anti-Terrorism Act, 18 U.S.C. §2333.

3.      Venue is proper in this district pursuant to the Air Transportation Safety and System Stabilization Act, (Pub. Law 107-42, 115 Stat. 230), 49 U.S.C. § 40101, Title IV, § 408(b)(3), designating the Southern District of New York ("S.D.N.Y.") as the exclusive venue for all civil litigation arising out of, or related to the September 11th Attacks, and 28 U.S.C. 1391(b)(2) and 1391(f)(1) because a substantial number of acts, occurrences, injuries and deaths occurred in the Southern District of New York.

4.      This action for wrongful death, personal injury and related claims perpetrated by the foreign states of IRAQ, the SUDAN, and IRAN through their instrumentalities and their official and unofficial employees, agents and servants alleged herein, falls within the

exceptions to immunity under 28 U.S.C. §§ 1605(a)(5) and 1605(a)(7) (the Foreign Sovereign Immunities Act).

**DEFENDANTS**

5. Defendants are co-conspirators who intentionally, willfully and knowingly conspired, planned, financed, supported, executed and carried out a plan to murder, maim and injure United States' citizens, residents and others on September 11, 2001; and all participated directly or indirectly in the September 11, 2001 terrorist attacks on the United States of America. Defendants fall into three primary categories, (1) AL QAEDA and its members and associates, (2) IRAQ, the SUDAN and IRAN, State Sponsors of AL QAEDA's terrorist activities, and (3) entities or individuals who provided logistical, material, financial or other support to AL QAEDA and its terrorist activities.

6. Defendant AL QAEDA, a/k/a Islamic Army, is an unincorporated association organized to perpetrate acts of international terrorism, including murder, mayhem, bombings and hijackings against the United States, its citizens and its allies. AL QAEDA has also encouraged, financed and supported other terrorist groups who targeted U.S. citizens. AL QAEDA, as of September 11, 2001, was headquartered in Afghanistan, but has a network of terrorist cells and affiliated groups throughout the world.

7. Defendant OSAMA BIN LADEN a/k/a Usama Bin Laden, Abu Abdullah, Mujahid Shaykh Hajjs and Abdul Hay, ("BIN LADEN") was formerly a national of Saudi Arabia with Yemen as his ancestral home, but who is now an alien of unknown nationality. He is last known to have been living in Afghanistan. At all relevant times, BIN LADEN has headed and directed the terrorist activities of AL QAEDA.

8. Defendants OSAMA BIN LADEN, MUHAMMAD ATEF, AYMAN AL

ZAWAHIRI, ABU ZUBAYDAH, SAIF AL ADEL, KHALID SHEIKH MOHAMMED, RAMZI BINALSHIBB, MOHAMED BAYAZID, and others named herein are or were natural persons who, on or before September 11, 2001, were leaders or members of AL QAEDA who conspired, acted in concert with, aided and abetted, sponsored and assisted directly and indirectly, in the September 11th terrorist attacks against the United States of America.

9.    MOHAMMED ATTA, MARWAN AL SHEHHI, FAYEZ AHMED, AHMED AL GHAMDI, HAMZA AL GHAMDI, MOHAND AL SHEHRI, SATAM M. A. AL SUQAMI, ABDULAZIZ AL OMARI, WALEED M. AL SHEHRI, WAIL AL SHEHRI, KHALID AL MIDHAR, NAWAF AL HAZMI, HANI HANJOUR, SALEM AL HAZMI, and MAJED MOQED hijacked three commercial aircraft on September 11, 2001 and committed mass murder by deliberately flying the aircraft into the World Trade Center and the Pentagon. ZIAD SAMIR JARRAH, AHMED IBRAHIM A. AL HAZNAWI, SAEED AL GHAMDI, and AHMED AL NAMI hijacked United Airlines Flight 93 and attempted to deliberately fly the aircraft into the White House or another prominent Washington D.C. landmark but were thwarted by the efforts of heroic passengers, resulting in the aircraft crashing to the ground in Shanksville, Pennsylvania. The "twentieth hijacker," ZACARIAS MOUSSAOUI, was in custody on September 11, 2001, and thus unable to participate in the attacks perpetrated that fateful day. Plaintiffs have named as defendants, the estates of various AL QAEDA members who were killed on September 11th or in armed conflict with allied forces since September 11, 2001.

10.    Defendant TALIBAN, as of September 11, 2001, was an unincorporated association that served as the *de facto* government of Afghanistan from approximately 1996

until shortly after September 11, 2001. The TALIBAN, as of September 11, 2001, was headquartered in Kandahar, Afghanistan and had declared itself to constitute the government of Afghanistan.

11.    Defendant MUHAMMAD OMAR ("OMAR") founded the TALIBAN and since 1996 OMAR was the leader of the TALIBAN's six member ruling council and was responsible for the TALIBAN's financial activities. OMAR, individually and through the TALIBAN organization that he controlled, supplied material and logistical support to AL QAEDA and BIN LADEN in furtherance of their terrorist plans to attack the United States of America and murder U.S. citizens.

12.    AL QAEDA and the TALIBAN were closely linked. OMAR and the TALIBAN afforded BIN LADEN special status in Afghanistan; and BIN LADEN was the *de facto* head of TALIBAN intelligence and security. BIN LADEN acted on OMAR's behalf, by providing soldiers to crush opposition to the TALIBAN's ruthless rule inside Afghanistan. OMAR enabled BIN LADEN to export terrorism to the United States and elsewhere by allowing him to construct and maintain camps in Afghanistan and train AL QAEDA members and other terrorists from around the world in the deadly and depraved methods of committing acts of violence, murder, destruction and mayhem. OMAR refused to turn BIN LADEN over to the United States after the September 11th attacks and instead, continued to offer sanctuary to BIN LADEN and AL QAEDA members.

13.    Defendant REPUBLIC OF IRAQ ("IRAQ") at all relevant times prior to and including September 11, 2001, was a foreign sovereign state located in the Middle East and shares borders with Saudi Arabia, Jordan, Syria, Turkey, IRAN and Kuwait.

14.    Defendant IRAQ for many years and at all relevant times, was designated

by the United States Department of State as a foreign state that sponsors terrorism within the meaning of the Export Administration Act of 1979, 50 U.S.C. § 2405(j); the Foreign Assistance Act of 1961, 22 U.S.C. § 2371(b) and 18 U.S.C. § 2333.

15.     Defendant IRAQ sponsored terrorism through its officials, officers, employees and agents, including but not limited to defendants, SADDAM HUSSEIN, TAHA YASSIN RAMADAN, FARUQ AL HIJAZI, and AHMED KHALIL IBRAHIM SAMIR AL ANI,  who are natural persons, subjects and citizens of IRAQ and leaders, agents/or employees of IRAQ and/or its intelligence agency, who participated in the acts and conspiracy described below while acting in the course and scope of their employment.

16.     The defendant REPUBLIC OF SUDAN ("SUDAN") is a foreign sovereign state within the meaning of 28 U.S.C. § 1391(f) and 1603(a) and is located on the continent of Africa and borders the Red Sea west of Saudi Arabia and south of Egypt.  The United States does not have formal diplomatic relations with the current government of the defendant SUDAN, which maintains an Embassy in Washington, D.C. located at 2210 Massachusetts Avenue, N.W., Washington, D.C. 20008-2831.

17.     The defendant SUDAN has, for many years and at all relevant times, been designated by the United States Department of State as a foreign state that sponsors terrorism within the meaning of the Export Administration Act of 1979, 50 U.S.C. App. § 2405(j); the Foreign Assistance Act of 1961, 22 U.S.C. § 2371(b); and 18 U.S.C. § 2333. The defendant SUDAN, by and through its agents and instrumentalities has supported, encouraged, sponsored, aided and abetted and conspired with a variety of groups that use terror to pursue their goals.  The defendant SUDAN has provided financing, training, safe-haven, and weapons for terrorist groups including the defendants AL QAEDA and BIN

LADEN, through its officials, officers, employees and agents, including but not limited to the NATIONAL ISLAMIC FRONT, HASSAN TURABI, and OMAR HASSAN AHMAD AL BASHIR, the President of Sudan.

18.     Defendant, the ISLAMIC REPUBLIC OF IRAN (hereinafter referred to as "IRAN"), is a foreign state within the meaning of 28 U.S.C. §1391(f) and 1603(a) and borders Afghanistan to its east and IRAQ to its west.  IRAN maintains an Interest Section within the United States at 2209 Wisconsin Avenue, N.W., Washington, D.C. 20007.

19.     Defendant IRAN has for many years, and at all relevant times, been designated as a foreign state that sponsors terrorism within the meaning of the Export Administration Act of 1979, 50 U.S.C.App.§ 2405(I), and the Foreign Assistance Act of 1961, 22 U.S.C. §2371(b) and 18 U.S.C. § 2333.

20.      Defendant IRAN has been found to be liable as a state sponsor of international terrorism under 28 U.S.C. §1605(a)(7), especially in connection with acts perpetrated by its state sponsored paramilitary terrorist organization known as Hezbollah in various cases, including *Anderson v. the Islamic Republic of Iran, 90* F. Supp.2d 107 D.D.C. 2000), and *Cicippio* v. *The Islamic Republic of Iran,* 18 F.Supp 2d 62 (D.D.C. 1998).

21.     Defendant IRAN through its officials, officers, agents and employees, including but not limited to, its MINISTRY OF INTELLIGENCE AND SECURITY ("MOIS"),  IRANIAN REVOLUTIONARY GUARD  ("IRGC"), AYATOLLAH ALI KHAMENEI, Spiritual Leader of IRAN, MOMAMMED MOHAMMADI RAYSHAHRI, special advisor to the Spiritual Leader, QORBAN ALI NAJAF-ABADI, Minister of Intelligence, ALI FALAHYAN, Director of Public Intelligence, GENERAL ALI BLOKIAN, former advisor to Hezbollah, AHMAD SALAH (SALIM), member of

committee of three of International Hezbollah, MAHDI CHAMRAN SAVEHI, Iranian External Intelligence chief, GENERAL MOHSEN REZA'I, Iranian security director HOSEYN SHAYKH OL-ESLAM, former Assistant Foreign Minister, GENERAL MOHSEN REZA'I, former commander of the IRANIAN REVOLUTIONARY GUARD'S CORPS (IRGC), GENERAL YAHYA RAHIM SAFAVI, head of the IRGC, provided material support and resources to defendants AL QAEDA and BIN LADEN both directly and through its surrogate, Hezbollah. The support provided by IRAN to BIN LADEN and AL QAEDA assisted in or contributed to the preparation and execution of the plans that culminated in the September 11 Attacks.

22.     The co-conspirator sponsor defendants are individuals, organizations, banks and charities located in Saudi Arabia and other parts of the world including the United States who conspired with BIN LADEN, AL QAEDA, and the TALIBAN to raise, launder, transfer, distribute and hide funds for BIN LADEN and AL QAEDA in order to support and finance their terrorist activities, including, but not limited to, the September 11th attacks. Some of the individuals, businesses, banks and charities operate legitimate businesses but also maintain a dual role as an AL QAEDA co-conspirator and have actively supported its terrorist activities; while others, including some of the individuals, are a sham front for AL QAEDA or are full fledged members of AL QAEDA.


**THE BIRTH OF AL QAEDA**

23.     Starting in 1989, an international terrorist group emerged dedicated to opposing non-Islamic governments with brutal force and terrifying violence.  This organization grew out of  the "Mekhtab al Khidemat" (the "Office of Services") which

maintained offices in Peshawar, Pakistan and received funds from Islamic charities, wealthy Saudi families, mosques, legitimate businesses and criminal enterprises, among others during the Soviet-Afghan war.

24.    Under the leadership of BIN LADEN, MUHAMMAD ATEF, a/k/a Abu Hafs al Masry, together with Abu Ubaidah al Banshiri, AYMAN AL ZAWAHIRI and others, the Office of Services expanded, creating terrorist cells in various parts of the world, including Afghanistan, Pakistan and the United States. Their role was to recruit fighters and raise funds to support a new terrorist group, AL QAEDA (the Base).

25.    At all relevant times, AL QAEDA was led by BIN LADEN. Members of AL QAEDA pledged an oath of allegiance (called a "bayat") to BIN LADEN and AL QAEDA, committing themselves to become martyrs in their depraved cause.

26.    AL QAEDA actively and vehemently opposed the United States for several reasons. First, it regarded the United States as a "kafir" or "infidel" nation governed in a manner inconsistent with the group's interpretation of Islam. Second, it believed the United States was providing essential support for other "infidel" nations and organizations, particularly Egypt, Israel and the United Nations, which AL QAEDA regarded as enemies. Third, AL QAEDA opposed the involvement of the United States armed forces in the Gulf War in 1991 and its presence in the Middle East afterwards as illustrated by Operation Restore Hope in Somalia in 1992 and 1993. In particular, AL QAEDA opposed the continued presence of American military forces in Saudi Arabia and elsewhere on the Arabian peninsula following the Gulf War. Fourth, AL QAEDA opposed the United States Government because of the arrest, conviction and imprisonment of AL QAEDA members or other terrorists with whom it worked, including the Islamic Group's Sheik Omar Abdel

Rahman who was convicted of planning to bomb bridges and tunnels in New York City. Fifth, AL QAEDA believed United Nation sanctions against IRAQ killed millions of IRAQI children and were orchestrated by the United States out of "eagerness to destroy IRAQ".

27.    One of the AL QAEDA's principal goals was to use violence to drive the United States armed forces out of Saudi Arabia and Somalia. Members of AL QAEDA and its supporters issued fatwas (rulings on Islamic law) stating that attacks on the United States were both proper and necessary.

28.    At least as early as 1991, BIN LADEN and AL QAEDA began working closely with AYMAN AL ZAWAHIRI, a/k/a "Abdel Muaz," a/k/a "Dr. Ayman al Zawahiri," a/k/a "the Doctor," a/k/a "Nur," a/k/a "Ustaz," a/k/a "Abu Mohammed," a/k/a "Abu Mohammed Nur al-Deen," whose EGYPTIAN ISLAMIC JIHAD terrorist group shared BIN LADEN and AL QAEDA's goals. BIN LADEN had met ZAWAHIRI in Peshawar, Pakistan in 1987 during the Afghan-Soviet War.

29.    From in or about 1987, until in or about December 1997, AYMAN AL ZAWAHIRI, led the EGYPTIAN ISLAMIC JIHAD, a group dedicated to the forceful overthrow of the Egyptian Government and committing violence against the United States. Members of EGYPTIAN ISLAMIC JIHAD pledged allegiance to AL ZAWAHIRI. Many of the leading members of the EGYPTIAN ISLAMIC JIHAD ultimately became influential members of AL QAEDA, including AYMAN AL ZAWAHIRI and MUHAMMAD ATEF. By February 1998, the EGYPTIAN ISLAMIC JIHAD led by AL ZAWAHIRI and MUHAMMAD ATEF, had effectively merged with AL QAEDA and had joined with AL QAEDA in targeting United States' citizens.

30.    AL QAEDA had a command and control structure which included a majalis

al shura (or consultation council) that discussed and approved major undertakings, including terrorist operations.   BIN LADEN, MUHAMMAD ATEF, AYMAN AL ZAWAHIRI, SAIF AL ADEL, among others, sat on the consultation council of AL QAEDA.

31.    AL QAEDA also maintained a "military committee" which considered and approved "military" matters. MUHAMMAD ATEF sat on the military committee and was one of BIN LADEN's two principal military commanders together with Abu Ubaidah al Banshiri, (until his death in May 1996).   MUHAMMAD ATEF had the principal responsibility for supervising the training of AL QAEDA members.  SAIF AL ADEL also served on the military committee reporting to MUHAMMAD ATEF.

32.    Defendant ABU HAMZA AL MASRI was in contact with BIN LADEN lieutenant defendant ABU ZUBADYA. AL MASRI recruited people for Bin Laden terror training camps and for AL QAEDA's acts of terror, including ZACARIAS MOUSSAOUI, suspected of helping to plan the 9-11 attacks and Richard Reid the "shoe bomber" arrested in December 2001. Both terrorists were worshipers at the British mosque controlled by AL MASRI.

33.    BIN LADEN and AL QAEDA also forged alliances with the NATIONAL ISLAMIC FRONT in the SUDAN and with representatives of the government of IRAN, and its associated terrorist group Hezbollah, for the purpose of working together against their perceived common enemies in the West, particularly the United States.

34.    At various times from as early as 1989, BIN LADEN, and others known and unknown, ran terrorist training "camps and guesthouses" in various areas, including Afghanistan, IRAQ , IRAN, Pakistan, the SUDAN, Somalia, Kenya, Malaysia, Philippines and Germany for the use of AL QAEDA and its affiliated groups.

35.    Since 1991, BIN LADEN, AL QAEDA and many of their co-defendants unlawfully, wilfully and knowingly combined, conspired, confederated and agreed to murder and injure United States citizens throughout the world, including in the United States, and to conceal their activities and methods by, among other things, establishing front companies, providing false identity and travel documents, financing terrorist operations, engaging in coded correspondence, providing false information to the authorities in various countries and seeking to detect and kill informants.

## THE SUDAN

36.    In 1989, Defendants HASSAN AL TURABI, OMAR HASSAN AHMED AL BASHIR, and the NATIONAL ISLAMIC FRONT installed an extremist government in SUDAN via a *coup d'etat*.  Within weeks of taking power, emissaries of the new government in SUDAN traveled to Afghanistan where they met with BIN LADEN and AL QAEDA.  AL QAEDA was invited to relocate their operations to SUDAN.  By the end of 1989, members of AL QAEDA were in SUDAN preparing the infrastructure for the move to SUDAN.  In 1991, BIN LADEN relocated to the SUDAN.  He centered his AL QAEDA operations there for the next four years while maintaining offices and orchestrating terrorist recruitment, training and launching attacks in various parts of the world.

37.    A 1996 State Department fact sheet on OSAMA BIN LADEN described his operations in the country beginning in 1991:

> *Bin Laden relocated to SUDAN in 1991, where he was welcomed by National Islamic Front (NIF) leader Hasan Al Turabi. . . .  [bin Laden] embarked on several business*

> *ventures in SUDAN in 1990, which began to thrive following his move to Khartoum. Bin Laden also formed symbiotic business relationships with wealthy NIF members by undertaking civil infrastructure development projects on the regime's behalf.*

38.    OSAMA BIN LADEN's close relationship with the new extremist Sudanese regime became symbiotic and he conducted several business projects with or on behalf of the NIF.  These businesses including defendants AL HIJRAH CONSTRUCTION AND DEVELOPMENT and GUM ARABIC enriched the NATIONAL ISLAMIC FRONT and solidified its hold on power.  The AL QAEDA owned businesses provided employment to the Afghan veterans as well as providing the perception of a legitimate front which masked their preparations for terror, AL QAEDA'S true mission in SUDAN.  One of BIN LADEN'S  investments was the Defendant AL SHAMAL ISLAMIC BANK, as reported by the State Department:

> *Bin Laden and wealthy NIF members capitalized al-Shamal Islamic Bank in Khartoum. Bin Laden invested $50 million in the bank.*

39.    OSAMA BIN LADEN's involvement in business transactions in the SUDAN including the AL SHAMAL ISLAMIC BANK, was confirmed by a 2002 Congressional Research Service Report:

> *In 1991, bin Laden relocated to SUDAN with the approval of SUDAN National Islamic Front (NIF) leader Hasan Al Turabi. There, in concert with NIF leaders, [bin Laden] built a network of businesses, including an Islamic Bank (al Shamal), an import-export firm, and firms that exported agricultural products. An engineer by training, bin Laden also used his family connections in the construction business to help SUDAN build roads and airport facilities. The business in SUDAN . . . enabled him to offer safe haven and employment in SUDAN to AL QAEDA members, promoting their involvement in radical Islamic movements in their*

> *countries of origin (especially Egypt) as well as anti-U.S.*
> *terrorism.*

40.    Defendant AL SHAMAL ISLAMIC BANK was founded in 1983 by three individuals or entities: (1) Al Shamal for Investment and Development, a Sudanese company; (2) Defendant SALEH ABDULLAH KAMEL, Chairman of the DALLAH AL BARAKA GROUP LLC; and (3) the Sudanese Government of Northern State, then controlled by Governor Mutasim Abdul-rahim, Secretary General of the NATIONAL ISLAMIC FRONT in Khartoum, and representative of HASSAN AL TURABI.

41.    In April 1984, the AL SHAMAL ISLAMIC BANK issued shares to its main founders. They included the Sudanese Government of Northern State, the Defendant FAISAL ISLAMIC BANK – SUDAN, Defendant SALEH ABDULLAH KAMEL, his brother Omar Abdullah Kamel, and Al Baraka Investment and Development, a wholly owned subsidiary of DALLAH AL BARAKA GROUP.

42.    Among the shareholders of the AL SHAMAL ISLAMIC BANK was Defendant FAISAL ISLAMIC BANK – SUDAN, whose parent company is Defendant DAR-AL-MAAL AL ISLAMI TRUST, registered in the Bahamas but operating out of Switzerland. These two entities are chaired by Defendant PRINCE MOHAMMED AL FAISAL AL SAUD, and controlled by Saudi investors.  AL SHAMAL ISLAMIC BANK and FAISAL ISLAMIC BANK SUDAN have common shareholders as well as common corporate officers.

43.    AL SHAMAL ISLAMIC BANK Chairman and shareholder, Defendant ADEL ABDUL JALIL BATTERJEE, is the Chairman of Al Bir Al Dawalia, whose United States branch, BENEVOLENCE INTERNATIONAL FOUNDATION ("BIF"), is also a

front for AL QAEDA sponsorship. Both BATTERJEE and BIF have been listed as Specially Designated Global Terrorists by the US Department of the Treasury.

44.     AL SHAMAL ISLAMIC BANK General Manager, Mohammad S. Mohammad, acknowledged in a November 2001 report to the United Nations that OSAMA BIN LADEN had two accounts in the bank, opened on March 30, 1992 in the name of AL-HIJRAH CONSTRUCTION AND DEVELOPMENT LTD. This company, according to the United States Department of State, worked directly with Sudanese military officials to transport and provide provisions to terrorists training in OSAMA BIN LADEN's terrorist training camps in northern SUDAN.

45.     A third AL SHAMAL ISLAMIC BANK account was opened in 1993 in the name of OSAMA BIN LADEN's company, Wadi Al Aqiq, a company registered in Saudi Arabia. The import-export firm, in conjunction with OSAMA BIN LADEN's Taba Investment Company Ltd., secured a near monopoly over SUDAN's major agricultural exports of corn, sunflower, and sesame products in cooperation with prominent Sudanese NIF members.

46.     AL SHAMAL ISLAMIC BANK has repeatedly been used to fund criminal and terrorist activities. Jamal Ahmed Al Fadl (or "Al Fadl"), was the first person called in the trial of four men charged with participating in a terrorism conspiracy led by OSAMA BIN LADEN, that being the 1998 bombings of the American Embassies in Kenya and Tanzania. Al Fadl testified, that OSAMA BIN LADEN and at least six AL QAEDA operatives held bank accounts in AL SHAMAL ISLAMIC BANK under their real names.

47.     Jamal Ahmed Al Fadl also testified that AL QAEDA operatives received monthly checks of several hundred dollars from AL SHAMAL ISLAMIC BANK accounts

and that he transferred $100,000.00 from AL SHAMAL ISLAMIC BANK to an AL QAEDA representative in Jordan.

48.    Defendant BENEVOLENCE INTERNATIONAL FOUNDATION ("BIF") (*infra*) held accounts at AL SHAMAL BANK from 1991 until 2002. These accounts were used for the beneift of AL QAEDA.

49.    Defendant FAISAL ISLAMIC BANK – SUDAN , was one of the five main founders of AL SHAMAL ISLAMIC BANK in April 1984 and became member of the board in July 1988. PRINCE MOHAMMED AL FAISAL AL SAUD is heavily involved in the sponsorship of terror through FAISAL ISLAMIC BANK – SUDAN.

50.    Defendant FAISAL ISLAMIC BANK – SUDAN was also implicated as an AL QAEDA sponsor during the 2001 United States trial on the 1998 embassy bombings in Africa as managing bank accounts for AL QAEDA operatives. Al Fadl, testified:

> Q. Where were the accounts [of AL QAEDA ] held? In what countries?
> A. . . . we got account in Bank Faisal Islami [Faisal Islamic Bank].
> Q. Is that also in Khartoum?
> A. Yes."

51.    Under Sudanese banking regulations, AL SHAMAL ISLAMIC BANK is considered as a joint ownership commercial bank, and therefore subject to the Central Bank of SUDAN review, supervision and control, according to the provisions of the Banks' Practice Act of 1991.

52.    In February of 2001, Al Fadl's testimony described OSAMA BIN LADEN's global banking network, naming institutions in SUDAN, Malaysia, The United Kingdom, Hong Kong and Dubai where OSAMA BIN LADEN and his international terrorist organization kept money. He also gave a detailed account of OSAMA BIN LADEN's

agricultural, construction, transportation and investment companies in SUDAN, which are fronts for terrorist activities.

53.     Al Fadl testified that he helped OSAMA BIN LADEN pay the employees of his companies and AL QAEDA, and that he was sent out to buy five farms in SUDAN for the group to use as training camps. Al Fadl testified one farm cost $250,000 and another $180,000.

54.     After OSAMA BIN LADEN moved his group to SUDAN, Al Fadl testified, its activities were greatly aided by SUDAN'S intelligence agencies and by other government officials. Al Fadl described several arms shipments, including AL QAEDA's smuggling of Kalishnikov rifles into Egypt from SUDAN on two separate occasions. Al Fadl also recalled a shipment of four large crates of weapons and explosives to an extremist group in Yemen, carried on a boat owned by AL QAEDA and accomplished with the help of a Sudanese Intelligence officer as well as paperwork provided by the President of SUDAN, defendant OMAR HASSAN AHMED AL BASHIR.

55.     Defendant TADAMON ISLAMIC BANK was formed in Khartoum, SUDAN on November 28, 1981 and started operations on March 24, 1983. The TADAMON ISLAMIC BANK is active across the Sudanese territory, through twenty-one different establishments and has several subsidiaries there.

56.     Shareholders of the TADAMON ISLAMIC BANK included SALEH ABDULLAH KAMEL and FAISAL ISLAMIC BANK SUDAN, a main shareholder of TADAMON ISLAMIC BANK until at least 1995.

57.     TADAMON ISLAMIC BANK facilitated, materially sponsored, aided and abetted, and/or conspired with AL QAEDA and its international terrorists and financial

operations. According to testimony of Al Fadl, during the 2001 trial regarding the 1998 Embassy bombings in Africa, TADAMON ISLAMIC BANK managed accounts of AL QAEDA operatives:

> Q "Do you recall anyone else that had bank accounts in their name for AL QAEDA?
> A. Abdouh al Mukhlafi.
> Q. Who was this person named Abdouh al Mukhlafi?
> A. He is from Yemen.
> Q. What role did he play for Bin Laden?
> A. He goes with Bin Laden when Bin Laden travel outside or inside SUDAN.
> Q. What role did he play for Bin Laden when Bin Laden traveled?
> A. He is like bodyguard for him, and also if Bin Laden, he needs bank something, he use account for that.
> Q. Did he handle money during the travel?
> A. Yes.
> Q. Where were the accounts held? In what countries?
> A. In Sudan and is in Bank Tadamon Islami [Tadamon Islamic Bank]."

58.    TADAMON ISLAMIC BANK is also a shareholder of Defendant AL SHAMAL ISLAMIC BANK, a bank formed in SUDAN and extensively used for AL QAEDA operations. TADAMON ISLAMIC BANK joined the provisional Board of Directors of AL SHAMAL ISLAMIC BANK on July 1988 and has been a major shareholder of AL SHAMAL ISLAMIC BANK since March 26, 1986.

59.    During the 1991-1996 time period, SUDAN abandoned visa requirements for Arabs and actively encouraged militants to live within its borders. By the end of 1991, there were between 1,000 and 2,000 members of AL QAEDA in the SUDAN. OSAMA BIN LADEN established a headquarters in the Riyadh section of Khartoum, SUDAN, an area heavily populated by Saudis.

60.    OSAMA BIN LADEN was able to establish a powerful military and political presence in the SUDAN in the early 1990s, using a variety of business ventures to finance

his activities, aided and abetted and materially sponsored by Defendants and co-conspirators named herein.

61.    In SUDAN, between the years 1990 and 1993, members of AL QAEDA undertook the task of writing the *Encyclopedia of the Afghan Jihad*. AL QAEDA wrote another terrorist work entitled *Military Studies in the Jihad against the Tyrants*. It was during this period that OSAMA BIN LADEN and AL QAEDA became fully operational, expanding their terrorist network.

62.    OSAMA BIN LADEN organized AL QAEDA into camps dedicated to the exportation of terrorism; the main Sudanese training site being a 20-acre site near Soba, 10 kilometers south of Khartoum. OSAMA BIN LADEN and AL QAEDA were sponsored, encouraged and allowed to operate freely in SUDAN.

63.    AL QAEDA purchased communications equipment, radios, and rifles for the Sudanese NIF, while the Sudanese government in exchange provided 200 passports to AL QAEDA allowing terrorists to travel internationally with new identities.

64.    In or about the early 1990s, Jamal Al Fadl went to Hilat Koko, a suburb of Khartoum, where he met with representatives of AL QAEDA and the Sudanese army to discuss the joint manufacture of chemical weapons. AL QAEDA and the Sudanese army cooperated in efforts to mount chemical agents on artillery shells. AL QAEDA at this time also began to experiment with biological warfare – injecting or gassing dogs with cyanide.

65.    In 1993, AL QAEDA paid $210,000.00 for an airplane in Tucson, Arizona, that was then flown to Khartoum, SUDAN. The funds were transferred to the United States from an account at AL SHAMAL BANK. This plane was intended to transport American stinger anti-aircraft missiles from Pakistan to SUDAN, although that missile transport did

not take place as the plane was damaged before the operation could take place.

66.    Beginning in 1991 defendant HASSAN AL TURABI hosted annual meetings of terrorist and militant groups from IRAQ, IRAN, Pakistan, Algeria and Tunisia, as well as Palestinian Islamic Jihad and Hamas.  These meetings named the Pan Arab Islamic Conference included AL QAEDA.  During the time that AL QAEDA was based in SUDAN, it also forged alliances with EGYPTIAN  ISLAMIC  JIHAD and other global jihad groups in becoming an international sponsor of terrorism.

67.    SUDAN, HASSAN AL TURABI, and OMAR HASSAN AHMED AL BASHIR under pressure from the United States, the United Nations and others, finally expelled OSAMA BIN LADEN from SUDAN in 1996, but allowed him to relocate and regroup in Afghanistan.

68.    Even after BIN LADEN left SUDAN, AL QAEDA maintained operations in SUDAN.  According to the US Department of State, "bin Ladin reportedly has made numerous surreptitious return trips to Sudan."

69.    According to the US State Department's annual report, Pattern of Global Terrorism, right up to September 11, 2001 SUDAN allowed AL QAEDA to provide financial and logistical support from its Sudanese base to other AL QAEDA cells worldwide.

70.    SUDAN also provided other help to AL QAEDA after BIN LADEN had relocated to Afghanistan.  According to the Canadian Intelligence Service, in a 1998 meeting with AL QAEDA #2 official, AYMAN AL ZAWAHIRI, SUDAN government officials agreed to use their embassies in western capitals to act as fund raisers for AL QAEDA and to provide passports to AL QAEDA to further AL QAEDA's terrorist agenda.

71.    Islamic African Relief Agency a/k/a "IARA", a charity based in Khartoum with fund raising subsidiaries in many countries including the United States, has long supported AL QAEDA and BIN LADEN. IARA had very close ties to the NATIONAL ISLAMIC FRONT and the Government of SUDAN. Senior members of AL QAEDA were also officers of IARA. IARA's office in Dublin, Ireland was raided in 2001 and evidence was found demonstrating a financial link to MUSTAFA AHMED AL HASAWI. AL HASAWI was a major source of funds for the 9/11 hijackers during their stay in the United States in 2000 and 2001. IARA has been listed as a Specially Designated Global Terrorist by the US Department of the Treasury.

72.    The SUDAN continues to be one of the governments that the United States has designated as a State sponsor of international terrorism. SUDAN serves as a safe-haven for members of AL QAEDA, the Lebanese-Iranian Hezbollah, Egyptian Al-Gama'a Al-Islamiyya, EGYPTIAN ISLAMIC JIHAD, the Palestine Islamic Jihad, and Hamas and continued to provide financial support to AL QAEDA through September 11, 2001. Defendants SUDAN, HASSAN AL TURABI, OMAR HASSAN AHMED AL BASHIR, and the NATIONAL ISLAMIC FRONT, knowingly provided resources and expertise to AL QAEDA and OSAMA BIN LADEN to carry out terrorist attacks against Americans, including the attacks on September 11, 2001..

73.    AL QAEDA operative Jamal Al Fadl testified that his terrorist activities were greatly aided by Sudanese intelligence and by other Sudanese officials. He also testified that AL QAEDA members were granted Sudanese passports and diplomatic privileges by the government. Such material support constitutes the sponsoring of international terrorism.

74.    These facts fall under the scope of the 1999 International Convention for the

Suppression of the Financing of Terrorism, signed by SUDAN on February 29, 2000, and entered in force on April 10, 2002. THE REPUBLIC OF SUDAN's course of conduct contradicts the General Assembly Resolution 51/210 of December 17, 1996 calling upon the States to "prevent and counteract . . . the financing of terrorists and terrorist organizations, whether such financing is direct or indirect," the United Nations Security Council Resolution 1373 of September 28, 2001 and the United Nations Security Council Resolution 1269 of October 19, 1999, calling upon all States to "prevent and suppress in their territories through all lawful means the preparation and financing of any acts of terrorism."

### The Agencies and Instrumentalities of the Republic of Sudan

75.     As described above, SUDAN acted through its officials, officers, agents, employees and instrumentalities in aiding, abetting, and providing material support and resources to OSAMA BIN LADEN, AL QAEDA and international terrorism. The support provided by the REPUBLIC OF SUDAN to OSAMA BIN LADEN and AL QAEDA assisted in, or contributed to, the preparation and execution of plans that culminated in the attacks on September 11, 2001 and to the damages to the Plaintiffs herein.

76.     Lieutenant General OMAR HASSAN AHMAD AL BASHIR is the President of SUDAN, and is an instrumentality of SUDAN for the purposes of liability and damages under the Foreign Sovereign Immunities Act. As head of SUDAN, Lieutenant General OMAR HASSAN AHMAD AL BASHIR is responsible for formulating and executing SUDAN's policy of supporting terrorism and OSAMA BIN LADEN and AL QAEDA .

### IRAN

77.    Powerful government officials in IRAN provided long-term assistance to OSAMA BIN LADEN and his army of allied Islamists. IRAN's support enabled BIN LADEN to maintain a steady course of violent activities against America and American interests culminating on September 11, 2001.

78.    In 1996 when OSAMA BIN LADEN left the SUDAN and enjoyed sanctuary in largely TALIBAN controlled Afghanistan, he notably maintained a relationship with the Iranian-supported TALIBAN opposition leader, defendant GULBUDDIN HEKMATYAR. BIN LADEN and HEKMATYAR met in the 1980s while the Afghani HEKMATYAR was leading Hezb-e-Islami, a Pakistan-based group fighting the Soviet occupation of Afghanistan. Their cooperative relationship lasted over a decade.

79.    In the mid nineties this cooperation consisted of joint training camps and drug smuggling operations in Afghanistan that provided funding for both Hezb-e-Islami and AL QAEDA.

80.    In the mid nineties, IRAN as a Shia Muslim nation was actively competing with Saudi Arabia for influence in the fledgling Islamic nation of Afghanistan. At the same time IRAN was competing with Afghanistan to be the site of a planned gas pipeline from Central Asia to the Caspian Sea.

81.    According to a September 26, 2002 interview with Salauddin Safi, a military commander under HEKMATYAR living in Pakistan, IRAN "is helping with money and weapons," for suicide attacks on Americans in Afghanistan. Safi explained the relationship between IRAN and HEKMATYAR saying, "IRAN needs HEKMATYAR because IRAN is an enemy of the United States and HEKMATYAR is too."

82.    In addition to HEKMATYAR, BIN LADEN maintained associations with

other terrorists sponsored by IRAN. The International Policy Institute for Counter Terrorism reports that in 1995 and 1996, BIN LADEN approached IRAN'S MINISTRY OF INTELLIGENCE AND SECURITY (MOIS) and offered to join forces against America. This was followed by a number of meetings between BIN LADEN, operatives from IRAN and leaders of the government of IRAN's proxy army, Hezbollah. BIN LADEN met with Imad Mughniyeh, Hezbollah's director of operations at a meeting sponsored by the Iranian MOIS in IRAN in 1996, but it was not the first or only meeting between those two terrorists.

83.    A witness at the United States Federal court trial in New York against some of the United States Embassy terrorist bombers reported that contacts between BIN LADEN and Mughniyeh began before BIN LADEN even left the SUDAN in 1996. The former AL QAEDA member, Ali Mohammed testified,

> *I arranged security for a meeting in the SUDAN between Mughniyeh, Hezbollah's chief, and Bin Laden.*
>
> *Hezbollah provided explosives training for al-Qaeda and al-Jihad…Iran also used Hezbollah to supply explosives that were disguised to look like rocks.*

84.    In June 1996 IRAN hosted a meeting of international terrorists. At this meeting, a "Committee Of Three" was created to preside over an International Hezbollah . Leading the committee were Imad Mughniyeh, BIN LADEN and Ahmad Salah (Salim), of the EGYPTIAN ISLAMIC JIHAD. An Iranian leader, MAHDI CHAMRAN SAVEHI, would direct the committee's work in sponsoring terrorist attacks against the United States and others.

85.    At an October 1997 meeting between terrorist organizations and high-level

officials from IRAN, including GENERAL MOHSEN REZA'I, former commander of the ISLAMIC REVOLUTIONARY GUARD CORPS (IRGC); GENERAL YAHYA RAHIM SAFAVI, head of the IRGC; QORBAN ALI NAJAF-ABADI, Information Minister; former minister ALI FALAHYAN; MOHAMMED MOHAMMADI RAYSHAHRI, special adviser to IRAN's supreme leader ALI KHAMENEI; and HOSEYN SHAYKH OL-ESLAM, former assistant foreign minister, plans were made to increase support of anti U.S. terrorism. The report stated:

> "Reza'i informed the participants that IRAN would double the amount of material and logistical support for those organizations engaged in defending the revolution."

"Defending the revolution" is a rallying cry for acts of violence against the west.

86. On September 14, 1998, the U.S. requested from Germany the extradition of AL QAEDA member Mamdouh Mahmud Salim, and stated that during the period 1992-1996, while BIN LADEN lived in SUDAN, AL QAEDA and the Sudanese government worked closely together on training and arming terrorists. According to the FBI, AL QAEDA "agreed to put aside its differences with Shi'a Muslim terrorist organizations, including the Government of IRAN and its affiliated terrorist group Hezbollah, to cooperate against the perceived common enemy, the United States and its allies."

87. In 1998, prior to the bombings of the U.S. embassies in East Africa, a representative of BIN LADEN reportedly met again with an official of IRAN in order to establish an "anti-U.S. alliance." By this time, communication between OSAMA BIN LADEN and Iranians was regular and frequent. 10% of the calls made from BIN LADEN's satellite phone were to IRAN.

88.     Running parallel to their interest in anti-American activities, BIN LADEN and IRAN were active in promoting an Islamic government in Albania and Kosovo. According to the *Times of London* in February 1998, BIN LADEN and the IRANIAN REVOLUTIONARY GUARDS signed a pact consolidating their operations in Albania and Kosovo. They created financial support networks by setting up banks and humanitarian organizations.

89.     MOHAMED ZARQAWI founded a terrorist group called Al Tawhid and he assisted a hundred or more AL QAEDA fighters who were fleeing Afghanistan by arranging for funds, passports, escape routes (sometimes through IRAN) and sanctuary. Defense Secretary Donald Rumsfield confirmed the flight of AL QAEDA members to or through IRAN.

90.     According to the 9/11 Commission Report, 8 to 10 of the 'muscle hijackers' traveled in or out of IRAN on their way to or from Afghanistan between October 2000 and February 2001. Senior Hezbollah operatives were often on the same flights. Defendant BINALSHIBH, a key organizer of the Hamburg cell, also traveled to Afghanistan to help further the planning for the 9/11 attacks via Tehran.

91.     After the September 11 attacks, IRAN provided an escape route for two Egyptian AL QAEDA members on the FBI's most wanted list, SAIF AL ADEL and Mahfouz Walad Al Walid. Additionally, American intelligence reports that AL ADEL and top AL QAEDA leader Mahfouz Walad Al Walid, were in Eastern IRAN where, the Washington Post reported they might be planning further AL QAEDA operations.

92.     Haji Mohamad Akram, a captured BIN LADEN aide told an interviewer from the Christian Science Monitor that BIN LADEN fled Afghanistan to IRAN in

November 2001. Akram said that at the time, BIN LADEN had offers of sanctuary from IRAQ and from IRAN. Akram claimed that IRAN distributed money to AL QAEDA for distribution to terrorist soldiers and that he himself had received the equivalent of $1400.

93. Other AL QAEDA terrorists have been located in a dozen camps around Tehran that serve as underground railroads for terrorists and their families en route through IRAN for Beirut and Syria as well as a route for the smuggling of AL QAEDA and Hezbollah assets, gold and diamonds from Pakistan to SUDAN.

94. A U.S. government report in 2000, Patterns of Global Terrorism alleged that IRAN remained the most active state sponsor of terrorism."

> Its Revolutionary Guard Corps (IRGC) and Ministry of Intelligence and Security (MOIS) continued to be involved in the planning and the execution of terrorist acts and continued to support a variety of groups that use terrorism to pursue their goals.

95. IRAN'S pattern of support to terrorism has been ongoing for many years. Indeed, by providing training, facilities, planning, logistics, escape routes and leadership, IRAN enabled BIN LADEN's army to carry out acts of terrorism it otherwise would be incapable of accomplishing. Likewise, without terrorists like BIN LADEN and Hezbollah, IRAN would lose a most effective weapon against the United States and the West.

## IRAQ

96. Since the early 1990s, IRAQ has used both Iraqi agents and independent "contractors" to commit terrorist acts against the United States in revenge for IRAQ's Gulf War defeat. AL QAEDA was an Iraqi partner in terror.

97. While AL QAEDA's presence was growing in the SUDAN in 1992, the Government of IRAQ also had close ties with the Sudanese government. HASSAN AL

TURABI has often boasted of his frequent contact with and immense respect for, SADDAM HUSSEIN.  SUDAN supported IRAQ during the Gulf War and allowed IRAQ to establish a major Iraqi intelligence center in the SUDAN.  During the time that AL QAEDA was in SUDAN, IRAQ brought 35 intelligence officers to the SUDAN to establish a base for Iraqi operations.

98.    During the early 1990s, HASSAN AL TURABI arranged meetings between BIN-LADEN and Iraqi Intelligence officials.  BIN LADEN met with FARUQ AL HIJAZI, an Iraqi Intelligence agent in the SUDAN who would later head Iraqi Intelligence for SADDAM HUSSEIN.  BIN LADEN again met with Iraqi Intelligence officers in 1994 and 1995 in the SUDAN.

99.    During his time in SUDAN, BIN LADEN became interested in using Iraqi chemical and biological weapons and explored plans to use crop dusting aircraft to disperse toxins as the Iraqi military had done earlier in Kurdistan.

100.    AYMAN AL ZAWAHIRI met with Iraqi agents in Baghdad, over several days in 1992.  An Iraqi serving with the TALIBAN who fled Afghanistan in the fall of 2001, was captured in Kurdistan and has corroborated this meeting and confirmed that Iraqi contacts with AL QAEDA began in 1992.

101.    In February 1997, BIN LADEN publicly expressed his support for IRAQ in its conflict with the United States stating:

> *The hearts of the Muslims are filled with hatred towards the United States of America and the American president for American conduct towards IRAQ.*

102. In their February 22, 1998 fatwas, BIN LADEN and AL QAEDA expressly referenced the United States' "continuing aggression" towards IRAQ as one of their reasons for calling on all Muslims to kill Americans "wherever and whenever" they are found:

> The best proof of this is the Americans' continuing aggression against the Iraqi people using the [Arabian] Peninsula as a staging post, even though all its rulers are against their territories being used to that end, still they are helpless.

The BIN LADEN and AL QAEDA fatwas also cited the alleged "great devastation inflicted on the Iraqi people" by the United States, as well as the United States alleged "eagerness to destroy Iraq."

103. Iraqi intelligence officials met with BIN LADEN in Afghanistan several more times. A second group of BIN LADEN and AL QAEDA operatives from Saudi Arabia were then trained by Iraqi intelligence in IRAQ to smuggle weapons and explosives into Saudi Arabia and other countries, which they later accomplished in an effort to carry out future terrorist acts of violence. A third group of BIN LADEN and AL QAEDA operatives received a month of sophisticated guerrilla operations training from Iraqi intelligence officials later in the Summer of 1998.

104. Despite philosophical and religious differences with SADDAM HUSSEIN, BIN LADEN continually sought to strengthen and reinforce the support he and AL QAEDA received from IRAQ. In mid-July 1998, BIN LADEN sent Dr. AYMAN AL ZAWAHIRI, the Egyptian co-founder of AL QAEDA, to IRAQ to meet with senior Iraqi officials, including Iraqi vice president TAHA YASSIN RAMADAN. Upon information and belief, the purpose of this meeting was to discuss and plan a joint strategy for a terrorist campaign

129

against the United States.

105.    On January 22, 2001, the Arab language newspaper Al Wotan Al Arabi, reported that SADDAM HUSSEIN and his sons had called for an Arab alliance to "launch a global terrorist war against the United States and its allies." The newspaper characterized HUSSEIN's statement as calling for an uncompromising campaign and "scorched earth policy."

106.    Upon information and belief, Iraqi news columnist Naeem Abd Mulhalhal has been connected with Iraqi Intelligence since the early 1980s.  He comments on matters of Iraqi political interest for the Al Nasiriyah newspaper, a weekly paper published in the provincial capital city of Al Nasiriyah. On September 1, 2001 he was honored for his "documentation of important events and heroic deeds that proud Iraqis have accomplished" and praised by SADDAM HUSSEIN.

107.    On July 21, approximately six weeks before the September 11th attacks, Iraqi columnist Mulhalhal reported that BIN LADEN was making  plans to "demolish the Pentagon after he destroys the White House."

108.    Mulhalhal's July 21 article further informed that BIN LADEN would strike America "on the arm that is already hurting."  Upon information and belief, this references the 1993 attack on the World Trade Center.  This interpretation is further bolstered by another reference to New York as "[Bin Laden] will curse the memory of Frank Sinatra every time he hears his songs." (e.g., "New York, New York")  identifying New York, New York as a target.

109.    Mulhalhal further indicated, "The wings of a dove and the bullet are all but one and the same in the heart of a believer."  This appears to be a reference to the use of commercial aircraft as a weapon. The information was reported in an Iraqi newspaper whose editor-in-chief serves as secretary to Uday Hussein's Iraqi Syndicate of Journalists. Uday Hussein is the son of SADDAM HUSSEIN.  The article expressed Iraqi admiration and support for BIN LADEN's plans and its appearance in the newspaper would clearly have to be endorsed by SADDAM HUSSEIN himself.

## THE 1993 WTC BOMBING

110.    On February 26, 1993 a bomb was detonated in the World Trade Center underground parking lot, killing six U.S. citizens.  The 1993 WTC bombing, took place on the Friday before the two year anniversary of IRAQ's defeat in Kuwait, which was February 28, 1991.  The anniversary in 1993, was a Sunday and few people would have been working at the World Trade Center that day; and the terrorists wanted to maximize the number of American casualties.

111.    During the initial planning of the WTC bombing, Mohammed Salameh (who was later convicted for his role in the bombing) was in regular and frequent contact with his uncle Kadri Abu Bakr, who lived in IRAQ and had been a member of a PLO faction allied with SADDAM HUSSEIN.  Shortly after these calls, the mastermind of the bombing, Ramzi Ahmed Yousef a/k/a Abdul Basit, traveled to the United States using identification documents obtained in Kuwait during the Iraqi occupation of that country in 1991.

112.    Ramzi Yousef arrived in New York on September 1, 1992 using an Iraqi passport and requesting asylum. While in New York, Yousef led the team which constructed the bomb used in the attack. In fleeing the United States after the bombing, Yousef first traveled through Baluchistan, an uncontrolled region straddling the border of IRAN and Pakistan. By the following year, 1994, Yousef was living in the Phillippines.

113.    He left the Phillippines however, after authorities discovered a plan he was working on to bomb United States' airliners. Yousef fled to Pakistan. He was arrested in February 1995 in Pakistan while being sheltered at an AL QAEDA guesthouse. Yousef was extradited to the U.S. for prosecution and was eventually convicted in the 1993 World Trade Center bombing conspiracy. Following his arrest, Yousef told U.S. investigators that his intent was to create an explosion that would cause one of the World Trade Center Towers to fall over onto the other, destroying both and causing massive casualties.

114.    During the worldwide hunt for fugitive Yousef, he was living in the Phillippines with KHALID SHEIKH MOHAMMED. KHALID SHEIKH MOHAMMED's involvement in terror activities became known when law enforcement authorities interrupted a plot to blow up a dozen U.S. commercial airliners flying to the United States from Asian cities. Philippines authorities found chemicals, bomb making instructions and timing devices in the apartment and they seized those items along with a computer containing the details of the airliner bombing plans. MOHAMMED and Yousef fled the country, before they could be arrested.

132

115.    MOHAMMED eventually found sanctuary in Doha, Qatar.  In early 1996, MOHAMMED was visited in Qatar by BIN LADEN.  Around the same time, FBI director, Louis Freeh, wrote to the Qatari government requesting that it surrender MOHAMMED to U.S. authorities.  Not long after the FBI request, with the assistance of  Qatari officials, MOHAMMED fled to Prague, Czech Republic, foiling U.S. attempts to arrest him.

116.    MOHAMMED's whereabouts after his escape to Prague in May 1996 were not known until his capture in Pakistan in March 2003, but documents and AL QAEDA members captured in Afghanistan identified MOHAMMED as a leader in the AL QAEDA terror network and actively involved in the planning, logistics and financing of the September 11th attacks.  MOHAMMED is a close associate of ABU ZUBAYDAH, a top BIN LADEN associate who was fully aware of the targets of the September 11th hijackers.

117.    Abdul Rahman Yasin  was born in the United States to Iraqi parents and raised in IRAQ.  Within days of the 1993 bombing he was questioned in New York and New Jersey in connection with the World Trade Center bombing, but was released after appearing to cooperate with U.S. officials.  He fled the country the next day and traveled to Baghdad, IRAQ.  U.S. prosecutors later learned that he, along with others, had prior training in bomb making, and had mixed the chemicals and constructed the bomb that was used in the World Trade Center.  Iraqi intelligence  knew of Yasin's presence in IRAQ and provided him refuge.  On August 4, 1993 Yasin was indicted in absentia for the World Trade Center bombing.

118.    In June 1994 Yasin was seen in Baghdad by an ABC news correspondent

133

who was told that Yasin worked for the Iraqi government. U.S. law enforcement officials confirmed that fugitive Yasin has been sheltered in IRAQ, a continuing violation of United Nationals Security Council Resolution 687 which makes it unlawful to harbor a suspected terrorist. In June 2002, Yasin was interviewed in Baghdad by Leslie Stahl from CBS.

## SOMALIA

119.    In 1992 and 1993, AL QAEDA trained terrorists in Somalia and from nearby SUDAN attempted to incite an Islamic jihad against U.S. military forces stationed in Mogadishu, Somalia by working with Somali warlord, General Farah Adid. BIN LADEN issued a fatwas urging Muslims to attack the U.S. and U.N. military forces stationed there during Operation Restore Hope. BIN LADEN, MUHAMMAD ATEF, SAIF AL ADEL, along with Abu Ubaidah Al Banshiri, provided weapons, military training and assistance to the Somali tribes working for Adid who were opposed to the U.N. intervention in Somalia and urged them to attack U.S. military personnel. On October 3 and 4, 1993, these forces did attack U.S. military personnel in Mogadishu and killed 18 U.S. servicemen.

## AL QAEDA during 1994-1996

120.    In 1994, AL QAEDA member Mohamed Sadeek Odeh and others established a cell in Nairobi and Mombasa, Kenya and followed BIN LADEN's SUDAN model by setting up seemingly legitimate businesses and aid organizations to facilitate their terrorist mission. These businesses and aid organizations included, but were not limited to, the Asthma, Ltd., Tanzanite King and the Help African People organization. MOHAMED

ATEF, Khalid Al Fawaz, WADIH EL HAGE, Fahid Mohammed Ally Msalam, Anas Al Liby and Ali Mohamed spent considerable time in Kenya from 1993 through August 1998 solidifying this AL QAEDA cell.

121.    In or about 1994, BIN LADEN, working together with Khalid Al Fawaz, set up a media information office in London, England hereafter the ("London office"), which was designed both to publicize BIN LADEN's statements and to provide a cover for activity in support of AL QAEDA's "military" activities, including the recruitment of trainees, the disbursement of funds and the procurement of equipment and services. In addition, the London office served as a communication center for reports on military, security and other matters from various AL QAEDA cells to AL QAEDA's headquarters.

122.    In November 1995, upon information and belief, AL QAEDA terrorists conspired with IRANIAN INTELLIGENCE and with the Hezbollah to bomb the Khobar Towers in Saudi Arabia, killing five U.S. servicemen. Fearing further attacks by BIN LADEN and AL QAEDA, some Saudi government officials and businessmen agreed to provide financial support to AL QAEDA and to continue funneling millions of dollars to charities that would then forward the money to AL QAEDA.

## RETURN TO AFGHANISTAN

123.    In 1996, BIN LADEN was asked to leave the SUDAN by Sudanese officials pressured by the United States and the United Nations to crack down on terrorism. BIN LADEN returned to Afghanistan after the TALIBAN had seized control of most of that

country.   BIN LADEN and Defendant MULLAH OMAR developed a very close relationship.

124.   From 1996 until 2001, BIN LADEN with the financial and logistical support of MULLAH OMAR, the TALIBAN and governments, individuals, companies, and charities outside of Afghanistan, created, supplied and operated at least five training camps in order to form an "Islamic Foreign Legion" capable of attacking enemies throughout the world. These camps trained men from at least 15 nations in guerrilla warfare, terrorist activities, rocket warfare, demolition and bombing, including the use of mines, grenades, TNT, nitroglycerine and plastic explosives.   Classes were also given in "how to kill a policeman" and "traps, murder and terrorist moves."  The 9/11 Commission notes that BIN LADEN and AL QAEDA received financial backing from the 'Golden Chain' a group of wealthy Saudi and other Gulf businessmen, to re-establish themselves in Afghanistan.

125.   On August 23, 1996, a strengthened BIN LADEN issued a fatwas declaring a jihad against Americans present in Muslim lands.   The message was disseminated throughout all AL QAEDA cells and associated terrorist groups, such as the EGYPTIAN ISLAMIC JIHAD.  The London AL QAEDA cell, run by Khalid Al Fawaz under the name Advice and Reformation Committee, and the Egyptian cell, run by AL ZAWAHIRI and Abdel Bari, were used to send the fatwas to Muslims living in the Western World.  WADIH EL HAGE was also used by BIN LADEN to deliver messages, money and terrorist material to AL QAEDA operatives in the U.S. and U.K.  In his fatwas BIN LADEN said to the US; "Terrorizing you, while you are carrying arms on our land, is a legitimate and morally

136

demanded duty."

## U.S. EMBASSY BOMBINGS

125.    On February 22, 1998, BIN LADEN, Khalid Al Fawwaz and AYMAN AL ZAWAHIRI of the EGYPTIAN ISLAMIC JIHAD issued a fatwas published in the Arabic newspaper Al-Quds stating:

> The ruling to kill the Americans and their allies - civilians and military - is an individual duty for every Muslim who can do it in any country in which it is possible to do it. . . .

126.    After years of preparation, by July and early August 1998, AL QAEDA personnel were stationed in Dar es Salaam, Tanzania and Nairobi, Kenya. They purchased trucks and outfitted them with oxygen, acetylene tanks, TNT, batteries, detonators, fertilizer and sand bags, creating massive bombs to be driven into the U.S. Embassies.   Participants in the bombings had been with BIN LADEN since the early 1990s and BIN LADEN's days in the SUDAN.

127.    On July 30, 1998, IRAQ warned it would take action unless the United Nations embargo was lifted. IRAQ blamed the United States for the United Nations embargo.  On August 4, 1998, IRAQ refused to cooperate with the United Nations weapons inspectors in IRAQ and talks for a resolution of the crisis collapsed, causing U.N. inspectors to leave.

128.    Three days later, on August 7, 1998, at approximately 10:30 a.m., an individual known as Azzam drove a Toyota Dyna truck (outfitted similarly to the Nissan Atlas truck in Dar Es Salaam) to the U.S. Embassy in Nairobi, Kenya and detonated a large

bomb damaging the Embassy and demolishing a nearby Secretarial College building and Cooperative Bank building, resulting in the more than 213 deaths (12 Americans) and injuries to more than 4,500 people.

129.    On August 7, 1998 at approximately 10:40 a.m., ten minutes after the bombing in Kenya, Khalfan Khamis Mohamed and Ahmed the German detonated the Dar Es Salaam bomb in the vicinity of the U.S. Embassy in Dar Es Salaam, Tanzania severely damaging the Embassy building and resulting in the death of 11 people and injuries to more than 85 people.

130.    On August 7, 1998 shortly *before* the bombing, an AL QAEDA member in London, sent a letter to news organizations in Paris, Doha, and Dubai claiming responsibility for the Embassy bombings.

131.    At the trial in New York of some of the U.S. Embassy bombers, defendants cited the poor living conditions in IRAQ. They blamed those conditions on the U.S.- U.N. sanctions, and used it as motivation and explanation for the AL QAEDA attacks on the Embassies.

## THE 1998 U.S. AIR STRIKES ON AL QAEDA

132.    On August 20, 1998, the United States initiated a retaliatory air strike with cruise missiles on AL QAEDA training camps in Khost, Afghanistan and a factory in Khartoum, SUDAN, believed to be a chemical weapons plant used by the Sudanese and Iraqi governments to manufacture weapons for their use and that of AL QAEDA.

133.    On August 20, 1998 President Clinton issued a statement on the air strike

138

> *Our target was terror . . . our mission was clear to strike at the network of radical groups affiliated with and funded by BIN LADEN, perhaps the preeminent organizer and financier of international terrorism in the world today.*

134.    In December 1998, after a stand off between the U.N. and IRAQ and a discovery of weapons violations in IRAQ, the U.S. led U.N. allies in a four-day air strike on IRAQ.  Iraqi Trade Minister Muhammad Mahdi Salah then stated that he expected terrorist activities against the United States to *increase* as a result of the bombing of IRAQ. The Arabic language daily newspaper Al-Quds Al-Arabi, about which the US Government says, "tends to be sympathetic to Bin Laden," cited the cooperation between IRAQ, BIN LADEN and AL QAEDA in a late December 1998 editorial, which predicted;

> *President Saddam Hussein, whose country was subjected to a four day air strike, will look for support in taking revenge on the United States and Britain by cooperating with Saudi oppositionist Osama Bin-Laden, whom the United States considers to be the most wanted person in the world.*

The editorial noted that this type of cooperation was already taking place, considering that "Bin-Laden was planning on moving to IRAQ before the recent strike."

135.    Following the December 1998 air strikes on IRAQ, SADDAM HUSSEIN dispatched FARUQ AL HIJAZI to Kandahar, Afghanistan in order to meet with BIN LADEN and plot their revenge.

136.    To demonstrate IRAQ's commitment to BIN LADEN and AL QAEDA, HIJAZI presented BIN LADEN with a pack of blank, official Yemeni passports, supplied to Iraqi Intelligence from their Yemeni contacts.  HIJAZI's visit to Kandahar was followed

by a contingent of Iraqi Intelligence officials who provided additional training and instruction to BIN LADEN and AL QAEDA operatives in Afghanistan.

## MILLENNIUM PLOT

137.    On December 14, 1999, Ahmed Ressam, an AL QAEDA operative, was arrested while driving a truck from Canada into the United States at Port Angeles, Washington. The truck was loaded with bomb making materials and detonators. Ressam later confessed to, and was convicted of conducting an AL QAEDA plan to detonate a large bomb at Los Angeles International Airport on New Year's Day 2000. AL QAEDA terrorist Mahfouz Walad Al Walid was identified as orchestrating the so called "Millennium Plot."

## ATTACK ON U.S.S. COLE

138.    On October 12, 2000, members of AL QAEDA carried out their plan to bomb the U.S.S. Cole by ramming a small boat loaded with explosives into the side of the ship as it was anchored in the harbor at Aden, Yemen, resulting in the deaths of 17 American sailors and injuring an additional 39.

139.    The Yemeni government investigation reported that the terrorists behind the attack were extremists who fought the Soviets in the Afghan War and who were tied to the EGYPTIAN ISLAMIC JIHAD and AL QAEDA and who were trained in Afghanistan. Four were arrested in Yemen.

140.    On June 20, 2001, in a videotape released to the press, BIN LADEN appears to boast that his followers bombed the U.S.S. Cole. The 100-minute tape depicts BIN LADEN, wearing a Yemeni dagger on his belt and reciting a poem to show that he and AL

QAEDA were not afraid of attacking the United States military:

> And in Aden, they charged and destroyed a destroyer that
> fearsome people fear, one that evokes horror when it docks
> and when it sails.

Video of the damaged destroyer was superimposed with the words in Arabic, "the destruction of the American Destroyer Cole."

141.    AL QAEDA leader ABD AL RAHIM AL NASHIRI, the network's operations chief in the Persian Gulf, was recently captured by United States officials. AL NASHIRI is a known high level AL QAEDA operative who carried out spectacular acts of international terrorism including the attack on the U.S.S. Cole in October 2000, the near-simultaneous bombing of two U.S. embassies in Kenya and Tanzania. AL NASHIRI was involved in the planning of other attacks for AL QAEDA some of which were foiled.

## PREPARATION FOR SEPTEMBER 11TH ATTACKS

142.    According to Czech intelligence sources, on June 2, 2000, MOHAMMAD ATTA a pilot in training and the operational leader of the September 11, 2001 terrorist attacks traveled to Prague to meet other co-conspirators. The following day, ATTA arrived at Newark International Airport in the United States.

143.    According to the FBI, from July 2000 through March 2001, ATTA, SHEHHI, HANJOUR, JARRAH and HAMZI traveled to the U.S. where they resided and took pilot courses to learn to fly the Boeing 747, 757, 767 and Airbus A320 in furtherance of the AL QAEDA conspiracy to hijack U.S. aircraft to commit terrorist acts.

144.    Upon information and belief, sometime between April 8-11, 2001, ATTA left Florida where he was a flight student, to again meet in Prague with Iraqi INTELLIGENCE agent AHMED KHALIL IBRAHIM SAMIR AL ANI.  Later in 2001, AL ANI was expelled from the Czech Republic for espionage activities.

145.    Sometime between April 23, 2001, and on or about June 29, 2001, SATAM AL SUQAMI (Flt. 11), WALEED AL SHEHRI (Flt. 11), AHMED AL GHAMDI (Flt. 175), MAJED MOQED (Flt. 77),  AHMED AL NAMI (Flt. 93), HAMZA AL GHAMDI (Flt. 175), MOHAND AL SHEHRI (Flt. 175), WAIL AL SHEHRI (Flt. 11), AHMED AL HAZNAWI (Flt. 93), and FAYEZ AHMED (Flt. 175),  traveled from various points in the world to the United States.

146.    The FBI reported that in furtherance of his participation in the hijacking conspiracy, ZACARIAS MOUSSAOUI purchased flight deck videos for the Boeing 747 on June 20, 2001 and took a three day Boeing 747 simulator course in Minneapolis, Minnesota on August 13-15, 2001.  He also purchased two knives in Oklahoma City, Oklahoma on August 3, 2001.   MOUSSAOUI received approximately $14,000 from RAMZI BINALSHIBH on August 1-3, 2001.

147.    U.S. government officials reported that in the summer of 2001, FAYEZ AHMED (Flt. 175), SAEED ALGHAMDI (Flt. 93), HAMZA AL GHAMDI (Flt. 175), WALEED AL SHEHRI (Flt. 11), ZIAD JARRAH (Flt. 93),  SATAM AL SUQAMI (Flt. 11), MOHAND AL SHEHRI (Flt. 175), AHMED AL GHAMDI (Flt. 93), and AHMED AL HAZNAWI (Flt. 93) each opened a Florida Sun Trust Bank account with a cash deposit.

142

These and other bank accounts were used by the 9/11 hijackers for living expenses, travel, pilot training, weapons and other incidentals and served as places where AL QAEDA operatives could wire money to support the terrorist conspiracy in the months and weeks leading up to September 11, 2001.

## SEPTEMBER 11TH  ATTACKS

148.    On September 11, 2001, defendants MOHAMMED ATTA, ABDUL ALZIZ AL OMARI, WAIL AL SHEHRI, WALEED AL SHEHRI, and SATAM AL SUQAMI hijacked American Airlines Flight 11 carrying 92 persons, bound from Boston to Los Angeles, and at approximately 8:46 a.m., crashed it into the North Tower of the World Trade Center in New York.

149.    On September 11, 2001, defendants MARWAN AL SHEHHI, FAYEZ AHMED, AHMED AL GHAMDI, HAMZA AL GHAMDI, and MOHAND AL SHEHRI hijacked United Airlines Flight 175 carrying 65 persons, bound from Boston to Los Angeles, and at approximately 9:02 a.m., crashed it into the South Tower of the World Trade Center in New York.

150.    On September 11, 2001, defendants KHALID AL MIHDHAR, NAWAF AL HAZMI, HANI HANJOUR, SALEM AL HAZMI, and MAJED MOQED hijacked American Airlines Flight 77 carrying 64 persons, bound from Virginia to Los Angeles, and at approximately 9:37 a.m., crashed it into the Pentagon.

151.    On September 11, 2001, defendants ZIAD JARRAH, AHMED AL

HAZNAWI, SAEED AL GHAMDI, and AHMED AL NAMI hijacked United Airlines Flight 93 carrying 45 persons, bound from Newark to San Francisco with the intention of crashing it into a target in Washington, D.C., such as the White House or the Capitol. At approximately 10:10 a.m, because of the heroic intervention of Flight 93's passengers, the aircraft crashed into a field in Shanksville, Pennsylvania.

152.    At approximately 9:50 a.m., the South Tower of the World Trade Center collapsed; at approximately 10:29 a.m., the North Tower of the World Trade Center collapsed. Defendants intentionally caused the deaths of and injuries to thousands of innocent persons.

153.    The hijackings referenced above were the culmination of a conspiracy among defendants to attack the United States and murder United States citizens.

## POST SEPTEMBER 11TH

154.    On two videotapes made by AL QAEDA in September and October 2001, BIN LADEN took credit for the September 11th attacks and stated that the attacks went better than expected.

155.    SADDAM HUSSEIN is the only national leader in the world who publicly praised the attacks and said that the United States of America deserved them. IRAQ has offered sanctuary to BIN LADEN and TALIBAN leaders. Abu Zeinab Al Quarairy, an Iraqi defector who was an officer in the Iraqi Intelligence and was familiar with its operations, reported that when he learned about the World Trade Center attacks on September 11th, he

turned to a friend and said, "That's ours."

156.     ABU ZUBAYDAH was arrested in April 2002 in Pakistan near the border of Afghanistan, along with other AL QAEDA members.  Documents and other evidence were found at the scene of the arrest that demonstrate AL QAEDA plans for past and future terrorist activities.  ABU ZUBAYDAH has made self-incriminating statements about his high level role in AL QAEDA and his close connection to BIN LADEN.  He has further identified several high level AL QAEDA officers, including, but not limited to, KHALID SHEIKH MOHAMMED.

157.     On April 22, 2002 during a court appearance in the Eastern District of Virginia, ZACARIAS MOUSSAOUI stated that his Court appointed lawyers had "no understanding of terrorism, Muslims, Mujahideen," that he wanted to "fight against the evil force of the [U.S.] federal government" and called for the destruction of the United States and Israel.

158.     In September 2002, al Jazeera  television ran an interview in which KHALED SHEIKH MOHAMMED and RAMZI BINALSHIBH admitted  their involvement in the 9/11 terrorist attacks.

## HAMBURG AL QAEDA CELL

159.     In August, 2005, a German court convicted MOUNIR EL MOTASSADEQ (or "MOTASSADEQ"), of being an AL QAEDA member and as part of the Hamburg cell, helping to prepare the September 11, 2001 terrorist attacks.

160.     MOUNIR EL MOTASSADEQ is an AL QAEDA co-conspirator.  His

indictment was the first formal criminal charge brought by German authorities in connection with the September 11, 2001 attacks. MOTASSADEQ was arrested in November of 2001 on evidence that he had access to the bank account of one of the suicide hijackers and arranged wire transfers to hijackers while they were learning to fly in the United States.

161.    When arrested in 2001, prosecutors said MOTASSADEQ was a close associate of MOHAMED ATTA, a ringleader of the plot.  In 1996, MOTASSADEQ was one of the witnesses who signed Mr. ATTA's will.  MOTASSADEQ managed the finances of another hijacker, MARWAN AL SHEHHI, and that money was used to help AL SHEHHI pay for his flight lessons in the United States and cover living expenses here. According to the criminal indictment, these funds were used to support members of AL QAEDA .

162.    In July 2000, MOTASSADEQ traveled to Karachi, Pakistan for a 'vacation.' The Pakistanis later confirmed that he had been in the country at this time and that there were indications that he had visited an AL QAEDA camp in Afghanistan.

163.    The German investigation revealed that in summer of 1999 or earlier, a group of Muslim students in Hamburg joined forces with the express goal of carrying out, especially in the United States, a Holy War or Jihad,  by means of international terror.  The group's members included MOHAMMED ATTA, MARWAN YOUSEF MOHAMED RASHED AL SHEHHI (or "SHEHHI"),  ZIAD SAMIR JARRAH (or "JARRAH"), RAMZI MOHAMMED ABDULLAH BINALSHIBH (a/k/a Ramzi Mohamed Abdallah Omar), SAID BAHAJI, as well as MOUNIR EL MOTASSADEQ.

164.    Initially, the principal meeting point of the Hamburg cell was the apartment rented by ATTA, BAHAJI and BINALSHIBH in Hamburg-Marburg, which temporarily served as AL SHEHHI's residence, too.  EL MOTASSADEQ and JARRAH convened for meetings of the group at this location.  In September 1999, the apartment AL SHEHHI rented nearby served as an alternative base of operations.  In October of 1999, after AL SHEHHI and ATTA moved into the second apartment, it also became the primary address of EL MOTASSADEQ.

165.    In October of 1999 or earlier, the group's members finalized their terrorist scheme, which called for the use of airplanes in "jihad" to kill as many "infidels" in the United States as possible.  In order to coordinate details and logistical support with the responsible representatives of the international terrorism network, they resolved to travel to Afghanistan in two groups.

166.    In late November of 1999, the three hijackers (ATTA, AL SHEHHI and JARRAH) and BINALSHIBH traveled to an AL QAEDA training camp.  Aside from providing training in military operations, the camps served to fuel radical extremist ideology and foster an inner resolve among recruits to sacrifice their own lives fighting the "godless enemies."  AL SHEHHI went back to Hamburg in early January 2000. JARRAH did not return to Hamburg until late January.  ATTA stayed in Afghanistan until late February and BINALSHIBH re-entered Germany in March 2000.

167.    In spring of 2000, a second group traveled to Afghanistan. EL MOTASSADEQ flew from Hamburg to Karachi on May 22, 2000, and returned on August

147

1, 2000. In the meantime, he underwent military training in a camp near Kandahar, Afghanistan.

168.    In accordance with the plans for the attacks discussed in Afghanistan, members of the Hamburg cell began making arrangements for pilot training in the United States upon their return.  Accordingly, in March 2000, ATTA contacted 31 flight schools in the United States via email from Hamburg, inquiring about the possibilities and conditions of flight training for two or three men from different Arab countries.  On March 26, 2000, JARRAH signed an agreement to receive pilot training at the Florida Flight Training Center in Venice, Florida, and on March 30, 2000, transferred the amount of 349 German Marks to the account of the flight school's Munich representative.

169.    On May 25, 2000, JARRAH applied for a United States entry visa, which he received without difficulty, as ATTA had before him, on May 18, 2000. AL SHEHHI had received his United States entry visa from the United States consulate in Dubai, United Arab Emirates (U.A.E.), on January 10, 2000.  All three terrorists had previously obtained new passports.

170.    Following their entry into the United States (AL SHEHHI arrived on May 29, 2000, ATTA on June 3, 2000), AL SHEHHI and ATTA opened a joint bank account on July 18, 2000 with Sun Trust Bank in Venice, Florida, through which they obtained financing and material support for their stay in the United States from backers within the international terrorist network.  On July 7, 2000, they started taking flight lessons together at the flight school Hoffman Aviation in Venice, Florida. By December 21, 2000, they had

successfully completed their training, receiving professional pilot licenses from the Federal Aviation Administration.

171.    ATTA and AL SHEHHI then put their acquired skills to the test on a Boeing 727 flight simulator at the Simulations Center in Opa-Locka, Florida, in December 2000, and by taking several exercise flights at the Advanced Aviation Flight Training School in Lawrenceville, Georgia, and at the flight school in Decatur, Georgia, in January and February 2001, respectively.

172.    JARRAH entered the United States on June 26, 2000, and, until January 13, 2001, underwent pilot training at the Florida Flight Training Center (F.F.T.C.) in Venice, Florida, where he obtained a private pilot license. Between December 15, 2000, and January 5, 2001, he took flight lessons at the Aeroservice Aviation Center in Virginia Gardens, Florida.

173.    BINALSHIBH's applications for a non-immigrant visa for the United States were denied and he was unable to train in Florida with JARRAH..

174.    To take BINALSHIBH's place, Zakariya Essabar was to be sent to the United States to undergo pilot training. Like ATTA, AL SHEHHI and JARRAH before him, Essabar attempted to obscure his visit to Pakistan from U.S. authorities by obtaining a new passport from the Moroccan embassy in Berlin on October 24, 2000.  United States authorities however, denied Essabar's visa applications.  His plan to become a suicide hijacker could not be realized.  Instead, ZACARIAS MOUSSAOUI (currently detained and indicted in the United States for his involvement in the preparations for the attacks of

149

September 11, 2001), traveled to the United States following an eight-week visit to Pakistan, and enrolled in flight school. However, due to MOUSSAOUI's arrest on August 17, 2001, he was not able to take part in the attack.

175.    EL MOTASSADEQ and the other AL QAEDA co-conspirators who stayed in Hamburg, remained involved in the preparing for the attacks. In particular, they were responsible for ensuring that the terrorists and ZACARIAS MOUSSAOUI had sufficient funds for their stay and training in the United States.

176.    Several meetings were held for group members in Germany and Spain for the purpose of coordinating those who remained in Hamburg and those who had traveled to the United States. Accordingly, BINALSHIBH and JARRAH met on January 4, 2001, in Bochum or Dusseldorf. Later, BINALSHIBH traveled to Berlin to meet ATTA, who had arrived there no later than January 6, 2001, after spending time in Spain. ATTA returned to the United States on January 10, 2001. Another meeting between ATTA and BINALSHIBH on July 17 or July 18, 2001, in Tarragona, Spain, served the purpose of coordinating the exact times of the attacks.

177.    EL MOTASSADEQ, together with BAHAJI, acted as the resident administrator of the terror organization in Hamburg. EL MOTASSADEQ's chief responsibility consisted of securing funding for the group's terrorist activities. He made use of AL SHEHHI's bank account. EL MOTASSADEQ made sure that the account received sizeable support payments from sources in the United Arab Emirates and elsewhere. He also transferred tuition money to maintain the status of AL SHEHHI as a student. Shortly

before AL SHEHHI left for Afghanistan, in late November 1999, EL MOTASSADEQ gained control over the AL SHEHHI's bank account and bank card which he used to transact financial and other personal business on behalf of AL SHEHHI and cover up the latter's absence.    EL MOTASSADEQ transferred funds from AL SHEHHI's to BINALSHIBH's account which the latter passed on to AL SHEHHI in the United States, this money was used to finance AL SHEHHI's flight training.    After AL SHEHHI left Germany, several cash withdrawals were made to provide funding for the intended flight training of BINALSHIBH and Essabar and to benefit other cell members.

178.    Evidence recovered by the Spanish authorities shows that MUHAMMED GALEB KALAJE ZOUAYDI, a Syrian born businessman, along with several associates in Spain and Europe, funneled money from the Saudi-based company, Mushayt for Trading Establishment (or "Mushayt"), through Spanish corporations to entities and individuals known to be associated with the AL QAEDA terrorist organization in Europe.

179.    According to Spanish authorities, Mushayt received funds and donations from other companies and individuals in Saudi Arabia that were funneled to AL QAEDA through Spain.    This fraudulent scheme provided material, financial support to the GLOBAL RELIEF FOUNDATION in Spain, to Abdul Fattah Zammar and MAMOUN DARKAZANLI in Germany, who maintained the bank accounts of hijacker MOHAMED ATTA and other members of the Hamburg AL QAEDA cell.

180.    Ghasoub Al Abrash Ghalyoun (a/k/a Abu Musab), an associate of ZOUAYDI's in Spain, was observed filming future targets of AL QAEDA in the United

States.  In his videotapes, Spanish authorities found pictures of the World Trade Center taken on August 9, 1997.

181.    Defendant ABDULLAH BIN ABDUL MUHSEN AL TURKI (or "AL TURKI") is the former rector of the University of Riyadh,  former minister of Waqf and Islamic Affairs until 2000, and advisor to KING FAHD.  AL TURKI is also Secretary General of the MUSLIM WORLD LEAGUE.

182.    Defendant ABDULLAH BIN ABDUL MUHSEN AL TURKI is a counselor to the government of Saudi Arabia and was in contact with AL QAEDA financier ZOUAYDI.  AL TURKI acted as Saudi Minister of Islamic Affairs for many years and was in a position where he knew or should have known about the reach of international terrorism and AL QAEDA.  AL TURKI later became a shareholder in the front organization known as Promociones which bought real estate but did no actual construction work, although listing itself as a construction company.  Instead, that company made direct payments to AL QAEDA cells.

183.    On October 10, 1999, AL TURKI and ZOUAYDI, a senior AL QAEDA financier for Europe, agreed to participate as business partners in a construction project in Madrid, Spain.  A contract was written by ZOUAYDI'S Company in Spain stating that both parties would finance 50% of the project.  The incomes would be split 70/30 between AL TURKI and ZOUAYDI.

184.    ZOUAYDI was part of an international terrorist movement for global jihad which encompassed the AL QAEDA  network.  This network channeled money directly to

the perpetrators of September 11, 2001.

185.    Several faxes in support of this enterprise, scheme and conspiracy were sent by ZOUAYDI to AL TURKI.  As a guaranty for the Spanish company, ZOUAYDI sent a check of 191 million Pesetas on September 15, 1999 to AL TURKI as beneficiary from Banco Sabadell in Madrid. In a fax sent on October 15, 1999, ZOUAYDI asked AL TURKI to send the money through AL RAJHI BANK (which hold his accounts in Saudi Arabia). On October 22, 1999, a fax was sent to AL TURKI by Prol & Asociados law firm in Madrid referring to a telephone conversation with someone acting on behalf of AL TURKI, named Waleed O. Houssainy, about a project of AL TURKI's to buy 100% of ZOUAYDI's Spanish company.

186.    On February 4, 2000, ZOUAYDI sent a fax to AL TURKI, referring to him as "advisor to KING FAHD."   In his declarations to the Spanish judge on April 26, 2002, ZOUAYDI referred to AL TURKI as "advisor to KING FAHD."

## SAUDI ARABIAN DEFENDANTS

187.    There were and are, a large number of Saudi citizens and members of the Saudi Royal Family who support BIN LADEN.  High-ranking officials in the Saudi government and Saudi businessmen have provided money to support BIN LADEN and AL QAEDA.  Money to support BIN LADEN and AL QAEDA was transferred using charitable institutions, businesses and banks.  In many cases, these entities shared management and or offices, creating an interlocking financing structure that obscures the movement, source

and ultimate destination of money.

188.    OSAMA BIN LADEN was born in Saudi Arabia to a wealthy Saudi family which operates a large multi-national construction company.  He and many other Saudis reacted to the Soviet invasion of Afghanistan by taking up arms in the name of Islam. Throughout the 1980's and 1990's and continuing today, many Saudis support and attend the religious schools that preach hatred toward the West.  Indeed, 15 of the 19 September 11th hijackers were from Saudi Arabia.

189.    The close relationship between OSAMA BIN LADEN and certain of the highest members of the Saudi Royal Family stretches back for a long period of time and continues to this day.

190.    OSAMA BIN LADEN met with Defendant PRINCE SULTAN BIN ABDULAZIZ AL SAUD (or "PRINCE SULTAN") after IRAQ invaded Kuwait in August 1990.  PRINCE SULTAN is the Second Deputy Prime Minister, Minister of Defense and Aviation, Inspector General, and Chairman of the Board of Saudi Arabian Airlines, which does business in the United States and internationally. In the meeting, OSAMA BIN LADEN offered the engineering equipment available from his family's construction company and suggested bolstering Saudi forces with Saudi militants who BIN LADEN was willing to recruit.

191.    This offer was also made to Defendant PRINCE TURKI AL FAISAL AL SAUD (or "PRINCE TURKI"), the then Chief of Saudi Intelligence, or Istakhbarat. PRINCE TURKI had an ongoing relationship with OSAMA BIN LADEN from the time

that they first met in Islamabad, Pakistan at the Saudi embassy, during the Soviet Union's occupation of Afghanistan.

192.    Defendant PRINCE MOHAMMED AL FAISAL AL SAUD (or "PRINCE MOHAMMED" or "PRINCE MOHAMMED AL FAISAL") is involved in the financing, aiding and abetting and material support of OSAMA BIN LADEN, AL QAEDA, and international terrorism in part through FAISAL ISLAMIC BANK and AL SHAMAL ISLAMIC BANK in the Sudan.  PRINCE NAYEF BIN ABDULAZIZ AL SAUD (or "PRINCE NAIF") is also engaged in the aiding and abetting or material sponsorship of OSAMA BIN LADEN, AL QAEDA, and international terrorism as described herein. PRINCE SALMAN BIN ABDULAZIZ  (or "PRINCE SALMAN") has also provided material support to OSAMA BIN LADEN, and AL QAEDA.

193.    PRINCE TURKI was head of Saudi Arabia's Department of General Intelligence (Istakhbarat) from 1977 until 2001.  As such, he was in a position to know the threat posed by BIN LADEN, AL QAEDA, the TALIBAN, and the extremist and violent perversion of jihad and hatred that the Saudi religious schools were encouraging  in young students.  PRINCE TURKI abruptly left his position in or around August 30, 2001, when he was dismissed as chief of Saudi Intelligence just prior to the September 11, 2001 attacks.

194.    PRINCE TURKI met personally with BIN LADEN at least five times while in Pakistan and Afghanistan during the mid-eighties to mid-nineties.  PRINCE TURKI also had meetings with the TALIBAN in 1998 and 1999.  In 1995, while the Saudi Istakhbarat was headed by PRINCE TURKI, he decided to give massive financial and material support

155

to the TALIBAN.

195.    In 1996, according to various intelligence sources, a group of Saudi princes and prominent Saudi business leaders met in Paris and agreed to continue contributing, sponsoring, aiding and abetting BIN LADEN's terrorist network.

196.    Born in Riyadh, Saudi Arabia in 1924, PRINCE SULTAN is the son of Abdulaziz Bin Abdul Rahman Al Saud, founder of the modern Kingdom of Saudi Arabia and Hussa Bin Ahmad Sudairi.  He is one of the six full brothers of King Fahd Bin Abdulaziz Al Saud.  These seven brothers are referred to as the Sudairi seven.  PRINCE SULTAN was appointed Governor of Riyadh in 1947.

197.    PRINCE SULTAN has been the Second Deputy Prime Minister, Minister of Defense and Aviation since 1962 and Inspector-General of the Kingdom of Saudi Arabia. In addition, PRINCE SULTAN is Chairman of the Supreme Council for Islamic Affairs which has oversight and control over charities in Saudi Arabia.

198.    Beginning with the Gulf War, PRINCE SULTAN took radical stands against western countries and publicly supported and funded several Islamic charities that were sponsoring OSAMA BIN LADEN and AL QAEDA operations, including the Defendants INTERNATIONAL ISLAMIC RELIEF ORGANIZATION ("IIRO"), MUSLIM WORLD LEAGUE, WORLD ASSEMBLY OF MUSLIM YOUTH and AL-HARAMAIN.  He was appointed head of the Supreme Council of Islamic Affairs which was responsible for charitable financing.

199.    PRINCE SULTAN has been involved in the sponsorship of international

terrorism through the IIRO and other Saudi-funded charities.  Defendant IIRO is a direct arm of the Saudi Royal family, according to Arafat Al Asahi, the Director of the Canadian branch of the IIRO.   Dr. ADNAN AL BASHA, the Secretary General of the IIRO publicly thanked PRINCE SULTAN on December 22, 2000, for his support and aid.

200.    PRINCE SULTAN personally funded several Islamic charities over the years that sponsor, aid, abet or materially support BIN LADEN and AL QAEDA: the IIRO (and its financial fund SANABEL EL-KHAIR), AL-HARAMAIN, MUSLIM WORLD LEAGUE, and the WORLD ASSEMBLY OF MUSLIM YOUTH.  All of these charities are and/or were involved in the financing of international terrorism. The total of PRINCE SULTAN's personal donations to these entities since 1994 amounts to at least $6,000,000, according to official and public reports.

201.    PRINCE SULTAN's role in the IIRO's financing is of significance.  Since the IIRO's creation in 1978, PRINCE SULTAN donated various gifts to the charity. In 1994 alone, he donated $266,652 to the IIRO.  Since 1994, the amount funneled by PRINCE SULTAN into IIRO alone is reported to be $2,399,868.  PRINCE SULTAN's role in directly contributing to and in the oversight of IIRO evidences his material sponsorship, aiding and abetting of international terrorism.  PRINCE SULTAN maintains close relations with the IIRO organization headquarters and knew or should have known these assets were being diverted to AL QAEDA.

202.    PRINCE SULTAN is also a large financial contributor of the MUSLIM WORLD LEAGUE.  PRINCE SULTAN donated during a television fund-raising campaign

for MWL :

> The total collection made as a result of the television campaign was SR 45,000,000, with the Emir of Riyadh, PRINCE SULTAN, donating a million Saudi Royals ($533,304).

203.   PRINCE SULTAN is also a regular donator to the WORLD ASSEMBLY OF MUSLIM YOUTH (or "WAMY"). WAMY was founded in 1972 by AHMED TOTONJI with Saudi backing in order to prevent the "corrupting" ideas of the western world influencing young Muslims. It grew to embrace 450 youth and student organizations with 34 offices worldwide.

204.   Shortly after the September 11, 2001 attacks, PRINCE SULTAN publicly accused the "Zionist and Jewish lobby" of orchestrating a "media blitz" against the Saudi Kingdom. PRINCE SULTAN argued against the United States use of Saudi bases to stage military strikes on Afghanistan after the September 11, 2001 attacks, stating that his government "will not accept in [Saudi Arabia] even a single soldier who will attack Muslims or Arabs." Saudi Minister of Defense PRINCE SULTAN also stated in 2002 that his country would not permit allied aircraft to launch preventive or major retaliatory strikes against IRAQ from bases in Saudi Arabia. PRINCE SULTAN expressed the hope that the Arab Nationals who have fought alongside the TALIBAN and AL QAEDA will be allowed to return safely to their respective countries.

205.   PRINCE MOHAMMED is engaged in the sponsorship of international terrorism through DAR AL MAAL AL ISLAMI, the FAISAL ISLAMIC BANK SUDAN and AL SHAMAL ISLAMIC BANK in the Sudan. As detailed *supra*, until 1983, DMI was

under M. Ibrahim Kamel's chairmanship. On October 17, 1983, PRINCE MOHAMMED became CEO of DMI. Under PRINCE MOHAMMED's chairmanship, DMI developed banking, investment and insurance activities in approximately twenty offices across the world. DMI was founded in 1981 to foster the spread of Islamic banking across the Muslim world and its Board of Directors included Haydar Mohamed Bin Laden, a half-brother of OSAMA BIN LADEN. FAISAL ISLAMIC BANK SUDAN was one of the five main founders of AL SHAMAL ISLAMIC BANK.

206. As the head of DMI, PRINCE MOHAMMED knew or should have known of these and other activities and acted as an aider and abettor and material sponsor of AL QAEDA, BIN LADEN, and international terrorism.

207. PRINCE NAYEF is Saudi Minister of Interior and heads the Saudi Committee for relief to Afghans, which supervises the activities of Defendant AL-HARAMAIN FOUNDATION whose sponsorship of terrorism is detailed *infra*. The Minister of Interior, by function, controls the activities of Islamic Charities and is empowered to verify their legality and conduct.

208. PRINCE NAYEF is the Chairman of the Saudi Arabian Committee for Support of the Intifada al Quds. According to documents captured by the Government of Israel in the Palestinian territories during operation Defensive Shield, this committee knowingly transferred large sums of money to the families of Hamas terrorists who had executed murderous attacks against Israelis. PRINCE NAYEF, along with others in Saudi Arabia, supports suicide martyrs.

209.    PRINCE NAYEF has engaged in a pattern of conduct that aids, abets, and materially sponsors international terrorism and AL QAEDA.  As with PRINCE SULTAN and PRINCE TURKI, PRINCE NAYEF has engaged in material support, including but not limited to monetary payoffs, to OSAMA BIN LADEN's AL QAEDA.

210.    PRINCE SALMAN was named Chairman of the General Donation Committee for Afghanistan (a/k/a Afghan Jihad Support Committee) in 1980 and has a history of funding Islamic extremism.  In 1981, the General Donation Committee for Afghanistan gave $39 million dollars to aid the Afghan Mujahideen.  PRINCE SALMAN stated the donation was made to "our Afghan brothers."

211.    In 1999, PRINCE SALMAN made a donation of $400,000 during a fund-raising event organized for Bosnia Herzegovina and Chechnya by Defendants INTERNATIONAL ISLAMIC RELIEF ORGANIZATION, WORLD ASSEMBLY OF MUSLIM YOUTHS, and AL-HARAMAIN FOUNDATION.

212.    A letter seized by the Israeli Defense Forces during Operation Defensive Shield, further evidenced the involvement of PRINCE SALMAN in financing terrorist organizations.  The letter dated December 30, 2000, was issued by the Embassy of the State of Palestine in Riyadh to PRINCE SALMAN IBN ABDUL AZIZ, Chairman of the Popular Committees for Support of the Palestinian Fighters.  The Palestinian ambassador expresses the concern of Yasser Arafat regarding funding of radical organizations.

> *I wish to inform you that [Yasser Arafat] called me and asked to convey his request to mediate and intervene and express his opinion about what is happening in our homeland. The Saudi committee responsible for transferring*

> *contributions to beneficiaries is sending large sums to radical committees and associations, including the Islamic Association which belongs to Hamas, the Al-Salah Association, and brothers belonging to the Jihad in all areas. This has a bad affect on the domestic situation and also strengthens these brothers and thus has a bad impact on everybody.*

213.    The role of certain Saudis in the sponsorship of AL QAEDA is evidenced in the AL QAEDA organization's own words.  Confiscated AL QAEDA documents state that among all the  governments in the world, the government of Saudi Arabia is the only representative model Islamic government, the greatest center of Islam as AL QAEDA moves to expel the Jews and Christians from Arab lands through mass murder.

214.    Information found in the possession of AL QAEDA terrorists indicates that financial support of international terrorism by wealthy Saudis is designed to undermine moderate Arab regimes and movements while providing support for Saudi legitimacy as the strict guardians of Mecca and Medina.

215.    These acts described herein constitute a pattern of conduct in sponsoring and promoting radicals and international terrorism generally, as well as AL QAEDA and OSAMA BIN LADEN, specifically.

216.    Certain members of the Saudi Royal family, along with other wealthy Saudi supporters, contributed to the IIRO and related charities as a way to support AL QAEDA without suffering from the social (and legal) ramifications that such contributions bring.  The IIRO received funds which were passed on to terrorists in part from the Zakat payments from individuals and companies in the kingdom of Saudi Arabia.  The Saudi Royal family

members own substantial assets in the United States of America, and do substantial business in the United States of America, the profits of which in part, are used to fund international terrorist acts, including those which led to the murderous attacks of September 11, 2001.

217.    As the 2002 Report on terrorist financing by the independent task force of the Council on Foreign Relations pointed out: "it is worth stating unambiguously what official U.S. government spokespersons have not: [F]or years, individuals and charities based in Saudi Arabia have been the most important source of funds for AL QAEDA; and for years, Saudi officials have turned a blind eye to this problem."  The report goes on to note that this is hardly surprising given that the Saudis possess the greatest concentration of wealth in the area.

## THE MUSLIM WORLD LEAGUE

218.    The MUSLIM WORLD LEAGUE ("MWL") was founded in 1962 in Saudi Arabia, to "disseminate Islamic Dawah and expound the teachings of Islam." One of its founders was Said Ramadan, senior member of the MUSLIM BROTHERHOOD.  Other members of the MUSLIM BROTHERHOOD were also among the founders.  The MWL is the parent organization of the charity INTERNATIONAL ISLAMIC RELIEF ORGANIZATION (or "IIRO").  MWL uses the IIRO as an operational arm to perform many of its charitable activities.

219.    The MWL is an organization funded, supported, and financed by persons or entities of Saudi Arabia. According to the testimony of Arafat El-Asahi, a MWL

representative in Canada:

Q. During those eight years that you have been with the IIRO here in Canada, have you ever heard anything to the effect that the Canadian government has any concern whatsoever with respect to your office?

A. Let me tell you one thing. The Muslim World League, which is the mother of IIRO, is a fully government funded organization. In other words, I work for the Government of Saudi Arabia. I am an employee of that government. Second, the IIRO is the relief branch of that organization which means that we are controlled in all our activities and plans by the Government of Saudi Arabia. Keep that in mind, please.

Q. I will. Thank you. When you say you work for the Government of Saudi Arabia, are you also paid by that government?

A. I am paid by my organization which is funded by the government. Let me tell you one little thing. Whenever the Saudi Embassy in Ottawa required anything, to ask about any Muslim project all over Canada, they come to us. They ask us about the people who are doing this project. Do you get this point?

Q. Yes.

A. Whatever we say is acceptable, fully acceptable, by the Saudi Embassy and by the government of Saudi Arabia.

Q. Is the Muslim World League the type or organization that would actually have physical offices in countries throughout the world?
A. Of course. I said in the beginning that we have over 30 offices all over the world? One is here; one is in Washington, D.C. They are spread all over, in Europe, in Asia.

Q. When you speak of an office that is an IIRO office, that counts as a Muslim World League office as well?

A. What happens is that sometimes the IIRO and the Muslim World League office is one, but sometimes they have two

different offices, although the umbrella organization is the same, which is the Muslim World League.

220.    The MWL has at least two offices in the United States. The New York City office is currently active, while its main office in Falls Church, Virginia, was the target of federal raids in early March 2002.  Its officers at the Virginia office are President Abdullah Bin Saleh Al Obaid, Vice President HASSAN A. A. BAHAFZALLAH, and Secretary/Treasurer YAQUB M. MIRZA.

221.    YAQUB MIRZA, the secretary and treasurer of the MWL in the United States, is at the financial center of the SAAR network (founded by the AL RAJHI family). YAQUB MIRZA'S house was raided in March, 2002 by federal authorities investigating his alleged connections to AL QAEDA  and September 11, 2001.

222.    The MWL has numerous connections with AL QAEDA.  MOHAMMED BAYAZID, an AL QAEDA operative who fought alongside OSAMA BIN LADEN and the other Mujahideen in Afghanistan (and has been implicated in a plot to get nuclear materials for AL QAEDA), described how Defendant MOHAMMED JAMAL KHALIFA, OSAMA BIN LADEN's brother-in-law, opened a MWL office in Pakistan for the use of the founders of AL QAEDA :

> *Brother Jamal Khalif (Abu-l-Bara) was the one who started the educational project, both in the interior of Afghanistan and abroad. Thanks to Dr. Abdullah Azzam's efforts he succeeded in getting the approval of the Muslim World League to open an office for the League in Peshawar as an umbrella under which the brothers could work and move in Pakistan freely.*

223.    Several employees of the MWL have explicitly worked with AL QAEDA.

OSAMA BIN LADEN's associates from Afghanistan infiltrated and propagated MWL offices around the world. The RABITA TRUST, another branch of the MWL, had its assets frozen as a Specially Designated Global Terrorist Entity (or "SDGT") of the United States Treasury. WA'EL JULAIDAN, as head of the RABITA TRUST and MWL office in Peshawar, Pakistan has repeatedly aided and abetted terrorists. JULAIDAN has been branded a SDGT by the United States Treasury Department and his assets have been frozen. WA'EL JULAIDAN operated MWL offices that served in the early days of AL QAEDA to attract and train holy warriors from around the world for the war in Afghanistan.  He had contact with BIN LADEN lieutenants, defendants AYMAN AL ZAWAHIRI and ABU ZUBAYDAH.  The MWL initially was funded by OSAMA BIN LADEN, then the government of Saudi Arabia took over the funding.

224.    WADIH EL HAGE, convicted for his role in the 1998 United States Embassy bombings in Africa, stated at his trial that he worked at the MWL in Peshawar, Pakistan in the 1980s.  It was while working at the MWL that EL HAGE met Abdullah Azzam, the mentor of OSAMA BIN LADEN, and a co-founder of AL QAEDA .

225.    Ihab Ali, another AL QAEDA  operative in prison in the United States on perjury charges, also went to work for the MWL in 1987.  Ihab Ali played a large role in the embassy bombings, facilitating communication between OSAMA BIN LADEN and other AL QAEDA members and also piloting OSAMA BIN LADEN's personal jet.  In 1993, Ihab Ali took flight lessons at the Airman Flight School in Norman, Oklahoma—the same school ZACARIAS MOUSSAOUI attended and which MOHAMMED ATTA

scouted as a possibility for his flight training.

226.    In conjunction with the attempted assassination of Egyptian President Hosni Mubarak in 1995, one of the would-be assassins admitted: "The Muslim World League bought our travel tickets and gave us spending money before we arrived at the [OSAMA BIN LADEN's] farm in Suba region in southern SUDAN."

## INTERNATIONAL ISLAMIC RELIEF ORGANIZATION

227.    The INTERNATIONAL ISLAMIC RELIEF ORGANIZATION (or "IIRO") has materially supported terror around the globe, including providing support to OSAMA BIN LADEN and AL QAEDA . IIRO's office in the Philippines was headed by OSAMA BIN LADEN's brother-in-law, Defendant MOHAMMED JAMAL KHALIFA and has acted as a center of terrorist financing and training activity – across the globe.   From the IIRO office in the Philippines, KHALIFA supported the MUSLIM BROTHERHOOD in the Philippines.   IIRO then evolved into a vast independent terrorist machine – funding, recruiting and aiding and abetting AL QAEDA.   IIRO was involved with the plot to assassinate former President William Jefferson Clinton and Pope John Paul II, the plot to blow up twelve American airplanes simultaneously, and the 1998 Embassy bombings in East Africa.

228.    According to the Arabic periodical publication *Rose Al-Yusuf*, the IIRO is firmly entrenched with OSAMA BIN LADEN's AL QAEDA organization. As one example, the IIRO supported an AL QAEDA guest house in Egypt.

166

229.    MOHAMAD KHALIFA, as the head of IIRO in the Philippines, used the organization to collect and launder money for AL QAEDA operations. IIRO funded the terrorist group Moro Islamic Liberation Front.   A former member of Abu Sayyaf, another Philippines based terror group stated: "Less than 30% of the IIRO funds went to legitimate public works, the rest going toward the purchase of weapons." MOHAMAD KHALIFA's branch of the IIRO served as a base to plan and finance AL QAEDA and international terrorism.

230.    IIRO built its office in Khartoum, SUDAN in the same residential neighborhood as OSAMA BIN LADEN's personal office, and near the office of BENEVOLENCE INTERNATIONAL FOUNDATION, another AL QAEDA front according to the testimony of a former AL QAEDA member, Jamal Ahmed Mohammed Al Fadl.

231.    The IIRO was implicated in the bombing of the United States Embassies in Kenya and Tanzania in 1998.   Kenya deregistered the IIRO after the bombing. IIRO Tanzania was reportedly working with AL QAEDA immediately before the United States Embassy bombing.   IIRO went on to plot to destroy United States Consulates in India in 1999.

232.    According to Canadian intelligence documents, IIRO funded EGYPTIAN ISLAMIC JIHAD. Mahmoud Jaballah, an EGYPTIAN ISLAMIC JIHAD member tried in Canada, was an IIRO employee. EGYPTIAN ISLAMIC JIHAD, is led by AL QAEDA's second-in-command, AYMAN AL ZAWAHIRI.   Another employee of IIRO Canada,

Mohammed Khatib founded the Canadian branch of BENEVOLENCE INTERNATIONAL FOUNDATION.

233.   IIRO works with numerous other AL QAEDA affiliated charities. IIRO shares the same address in the UNITED KINGDOM as the International Development Foundation, a charity affiliated with Defendant KHALID BIN MAFOUZ, a senior AL QAEDA financier (*supra)*.  The SUCCESS FOUNDATION, IIRO's namesake, is also funded by KHALID BIN MAFOUZ. IIRO aids and abets the SAUDI JOINT RELIEF COMMITTEE, an AL QAEDA charity in Bosnia and elsewhere.  IIRO, through KHALIFA, sponsors, aids and abets BENEVOLENCE INTERNATIONAL FOUNDATION, the AL QAEDA sponsoring charity front.  IIRO provides funding for other alleged humanitarian organizations that have materially sponsored, aided and abetted and conspired with AL QAEDA: GLOBAL RELIEF FOUNDATION (or "GRF"), TAIBAH International, Islamic African Relief Agency, and the WORLD ASSEMBLY OF MUSLIM YOUTH  (or "WAMY").

234.   IIRO also extensively funded the TALIBAN regime.  As stated by Dr. ADNAN BASHA, Secretary-General of IIRO, the IIRO donated more than Sixty Million ($60,000,000) dollars to the TALIBAN Regime and AL QAEDA in Afghanistan.  The TALIBAN Regime was a known material sponsor, aider and abettor of AL QAEDA terrorists. After September 11, 2001, Pakistan deported 89 Arab aid workers from the IIRO and other organizations because they were aiding, abetting, funding, otherwise conspiring with, sponsoring and/or supporting AL QAEDA.

235.    There are three similarly named entities affiliated with IIRO.  SANABIL AL-KHAIR is an endowment fund established and located in Saudi Arabia in order to provide stable financing for the activities of the IIRO. SANA-BELL INC was registered in the District of Columbia in July 1989.  It was also registered at 555 Grove St, in Herndon, Virginia in March 2000.  SANABEL AL-KHEER INC was registered at 555 Grove St, in Herndon, Virginia in August 2000, and received its non-profit tax status from the Internal Revenue Service in 2001. The only declared activity of SANABEL AL-KHEER INC was receiving as a donation, the land and the building at 360 S. Washington St where its office and several other defendant charities are located.

236.    HASSAN A.A. BAHFZALLAH, YAQUB M. MIRZA, and Abdullah Al Obaid are the officers/directors of SANABEL AL KHEER INC.  BAHFZALLAH and MIRZA are also officers/directors of SANA-BELL INC.  These men are also the officers and directors of defendant, MUSLIM WORLD LEAGUE ("MWL"), the parent of IIRO.  Al Obaid is the secretary general of MWL worldwide. MWL's Pakistani branch is RABITA TRUST, an entity named by the United States and the United Nations as associated with AL QAEDA.

237.    BAHFZALLA represented defendant BENEVOLENCE INTERNATIONAL FOUNDATION in Saudi Arabia in the 1990s.  BAHFZALLA founded the German companies Tatex and Triple-B, which provided assistance to AL QAEDA Hamburg cell.  MIRZA is an officer and board member of numerous companies and charities involved in sponsoring terror who are defendants in this action and elsewhere.

238.    The IRO in the US was managed by SULAIMAN BIN ALI AL ALI, a member of IIRO's executive committee in Saudi Arabia.

239.    SOLIMAN S. BIHEIRI is an Egyptian born businessman active in the US, Europe, and the Middle East.  From 1992-1998, SANA-BELL INC invested $3.7 million with SOLIMAN S. BIHEIRI and companies he controlled in the US. This investment originated from IIRO in Saudi Arabia and was handled by M. YAQUB MIRZA.

240.    In 1986, while in the US on a tourist visa, BIHEIRI established Beit Ul-Mal Inc (BMI) in New Jersey.  BMI acted as an investment bank focused on real estate and real estate development along the North East seaboard.

241.    An agent for the Department of Homeland Security alleges that BMI knowingly transferred funds for terrorists.  The Department's investigation showed financial transactions between BMI and three people designated as terrorists by the United States government, YASSIN AL KADI, Mousa Abu Marzook, and Mohammad Salah.  AL KADI was the head of MUWAFFAQ/BLESSED RELIEF, a charity involved in funneling millions of dollars to OSAMA BIN LADEN and AL QAEDA.  Federal officials allege that an accountant with BMI said it's funds being transferred overseas "may have been used to finance the embassy bombings in Africa."  After September 11, BIHEIRI's wife claims that she saw BIHEIRI destroying records.

242.    BIHEIRI was involved in suspicious financial transactions, in the United States with several members of the Bin Laden family, including the mother and sister of OSAMA BIN LADEN as well as with defendant ABDULLAH BIN LADEN.

243.    On BIHEIRI's computer authorities discovered contact information for defendants YOUSEF NADA and ALI GHALEB HIMMAT, sponsors of AL QAEDA terror through the MUSLIM BROTHERHOOD, BANK AL TAQWA and other entities. The computer also contained the name and address for Sami Al Arian, another person designated by the United States as a terrorist.

244.    Currently BIHEIRI is on supervised release in Virginia, charged with Unlawful Procurement of Naturalization. SOLIMAN S BIHEIRI knowingly facilitated the transfer of funds to terrorists and sponsors of terror.

245.    In the United States the IIRO operates under the name of The INTERNATIONAL RELIEF ORGANIZATION (IRO). The IRO and the MWL maintain offices at the same address, 360 South Washington Street, Falls Church, Virginia. The IRO sends money back and forth with IIRO. IIRO sends money to other organizations that sponsor terror. Another IIRO sister company, the SUCCESS FOUNDATION, made dozens of money transfers back and forth with the IRO. The SUCCESS FOUNDATION also sent money to other organizations who sponsor terror, including TAIBAH and the GLOBAL RELIEF FOUNDATION.

246.    ABDURAHMAN ALAMOUDI, the Secretary of the SUCCESS FOUNDATION, has openly stated his support for Hamas and Hezbollah, both designated terrorist organizations. ALAMOUDI is the President of the American Muslim Foundation (or "AMF"), which receives thousands of dollars from the SUCCESS FOUNDATION, as stated on the income tax Form 990s for the SUCCESS FOUNDATION. Mohammed

Omeish, President of the United States branches of IIRO and IRO, as well as their sister organization the United States-based SUCCESS FOUNDATION, is also Vice-President of the American Muslim Foundation.

247.    Mohammed Omeish is Vice President of American Muslim Foundation which according to its tax form 990, filed in 1999,  gave money to TARIK HAMDI. HAMDI helped OSAMA BIN LADEN get a satellite phone and other electronic equipment which was used to coordinate acts of international terrorism.  After September 11, 2001, IIRO's offices in Virginia were raided by the FBI as a result of AL QAEDA  sponsorship.

248.    One of the September 11, 2001, hijackers claimed to be going to work for IIRO's Fazeh Ahed.

249.    According to public records, SULAIMAN AL ALI shared two addresses with a direct financial and logistical supporter of the 9/11 hijackers, OMAR AL BAYOUMI.

250.    Additional co-conspirators, material sponsors and/or aiders and abettors and members of the terrorist enterprise of the INTERNATIONAL ISLAMIC RELIEF ORGANIZATION include Defendants: SUCCESS FOUNDATION, INC.,, ABDURAHMAN AL AMOUDI, SULAIMAN AL ALI, HASSAN A.A. BAHFZALLAH, and M. YAQUB MIRZA, all located, doing business or registered to do business in the United States.

## THE SAAR FOUNDATION

251.    The SAAR FOUNDATION was named after SULAIMAN ABDUL AZIZ AL RAJHI, head of the Saudi Arabian AL RAJHI family. In the early 1980s, SULAIMAN AL RAJHI asked AHMED TOTONJI, JAMAL BARZINJI and HISHAM AL TALIB to go to the United States and start-up the SAAR FOUNDATION as well as other entities.  Over the ensuing two decades, AHMED TOTONJI, JAMAL BARZINJI, HISHAM AL TALIB and others including M. YAQUB MIRZA, MOHAMED ASHRAF, M. OMAR ASHRAF, and IQBAL YUNUS established over 100 entities including non-profits, charities, and businesses.  By the early 1990s, this SAAR Network was headquartered at 555 Grove Street in Herndon, Virginia.   SULAIMAN AL RAJHI had asked them to set up the network surreptitiously.  From the outset; the SAAR Network was intended to be a source of funds to support terror as well as provide the mechanism by which the funding trail could be laundered and obscured. AHMED TOTONJI was well suited for the task as he had previously worked for SULAIMAN AL RAJHI at the AL RAJHI BANK as a financial consultant. SAAR was incorporated in Herndon, Virginia and was granted 501c(3) non-profit status by the IRS on July 29, 1983, and dissolved as of December 28, 2000. The Saudi Arabian AL RAJHI family is the foundation's biggest donor.   The SAAR network financially supports terrorism and its main contributors, the AL RAJHI Family, has a long history of supporting terrorism.

252.    Virginia Secretary of State corporate records indicate that there are more than one hundred affiliated organizations registered or doing business at SAAR Network addresses in Virginia.  Most of these organizations do not maintain a physical presence at

these addresses, or elsewhere. The SAAR FOUNDATION and network is a sophisticated arrangement of non-profit and for-profit organizations that serve as front-groups for terrorist organizations.

253.    Officers of the SAAR FOUNDATION and SAAR network entities have a long term relationship with YOUSEF NADA, a Specially Designated Global Terrorist, who according to the United States Department of the Treasury, provided financial assistance to OSAMA BIN LADEN and AL QAEDA, prior to and even after September 11, 2001.

254.    JAMAL BARZINJI, HISHAM AL TALIB and AHMED TOTONJI worked for YOUSEF NADA prior to being dispatched to the United States to secretly found the SAAR FOUNDATION and network.

255.    In 1988, when AL QAEDA was founded, YOUSEF NADA founded BANK AL TAQWA. BANK AL TAQWA is designated a Specially Designated Global Terrorist, for financially supporting AL QAEDA and according to the US Treasury, "appeared to be providing a clandestine line of credit for a close associate of Usama Bin Laden." JAMAL BARZINJI, HISHAM AL TALIB and AHMED TOTONJI recommended two of their SAAR Network fellow officers to YOUSEF NADA as prospective officers of BANK AL TAQWA. YOUSEF NADA has visited the headquarters of the SAAR Network at 555 Grove Street, Herndon, Virginia.

256.    In 2000, JAMAL BARZINJI arranged for a loan from the SAAR Network to YOUSEF NADA. In February 2001, Mena Estates, a SAAR Network entity loaned $500,000 to YOUSEF NADA. At that time, there were only three people affiliated with

Mena Estates. They were JAMAL BARZINJI, president, M. YAQUB MIRZA, vice-president, and HISHAM AL TALIB, secretary-treasurer. Much of the loan was provided in cash and was sent to the lawyer and financial agent for BANK AL TAQWA in Nassau, Bahamas. A document which describes the loan and believed by US Customs agents to be written by NADA, was recovered by US officials in a March 2002 raid of the SAAR network premises. The document begins by saying "The eggs are in several baskets." and later says; "to avoid crimes we have to perfect information (terrorism, money-laundering.)"

257. JAMAL BARZINJI has signatory rights over at least 18 SAAR Network bank accounts and M. YAQUB MIRZA is the predominant signatory for the SAAR Network with signatory authority over at least 27 accounts. HISHAM AL TALIB has signatory authority over at least 21 accounts. AHMED TOTONJI and MOHAMED JAGHLIT also signed SAAR Network checks that were issued to terror sponsoring organizations. 258. AHMED IDRISS NASREDDIN, a Specially Designated Global Terrorist is personally acquainted and maintained relationships with SAAR Network officers, JAMAL BARZINJI, HISHAM AL TALIB, AHMED TOTONJI, MOHAMED ASHRAF, and YAQUB MIRZA. NASREDDIN had a business relationship with M YAQUB MIRZA and considered him to be the financial advisor and the controller of finances for the SAAR FOUNDATION and the SAAR Network. NASREDDIN was aware of the loan made to YOUSEF NADA.

259. YOUSEF NADA and GHALEB HIMMAT, both Specially Designated Global Terrorists, also worked with MOHAMED ASHRAF and IQBAL YUNUS in another

SAAR entity, the International Islamic Charitable Organization.

260.   AHMED IDRISS NASREDDIN was also a major shareholder and officer of the Specially Designated Global Terrorist, BANK AL TAQWA.   AHMED IDRIS NASREDDIN appointed SULAIMAN AL RAJHI to the Board of Directors at AKIDA BANK in the Bahamas.   NASREDDIN and AKIDA BANK are listed as Specially Designated Global Terrorists by the US Department of the Treasury.   AL RAJHI BANK was a correspondent bank for BANK AL TAQWA.   YOUSEF NADA held an account at AL RAJHI BANK until at least December, 2002.

261.   TAIBAH INTERNATIONAL AID ASSOCIATION   (*infra*) is another Virginia based charity in the SAAR network.   Two of its officers Samir Salah and ABDURAHMAN ALAMOUDI are also officers of other SAAR entities.   Another officer and founder was ABDULLAH BIN LADEN. TAIBAH'S branch in Bosnia was found to have obscured its financial records in order to fund AL QAEDA.   TAIBAH'S Bosnia branch has been listed as a Specially Designated Global Terrorist by the US Department of the Treasury.   ABDURAHMAN ALAMOUDI is currently serving a 23 year sentence in federal prison for sanctions busting and tax violations.

262.   The GLOBAL RELIEF FOUNDATION (GRF) (*infra*) was an Illinois based charity with branches in Bosnia and Kosova amongst other locales.   The SAAR network provided funding to GRF on several occasions.   In December 14, 2001 US authorities raided the office and froze their assets and listed GRF as a Specially Designated Global Terrorist due to support for terror and al Qaeda.

263.    One of the companies involved with the terror financing SAAR network is ARADI, INC.   ARADI's corporate officers were defendants ABDULLAH SULAIMAN AL RAJHI, HISHAM AL TALIB, and CHERIF SEDKY, a close associate of defendant KHALID BIN MAHFOUZ.

264.    The WORLD ASSEMBLY OF MUSLIM YOUTH (WAMY) is another SAAR network entity.   Two SAAR network officers, AHMED TOTONJI and JAMAL BARZINJI were original founders of WAMY in Saudi Arabia.   The President of the Virginia branch, WAMY International, was ABDULLAH BIN LADEN.   WAMY and TAIBAH share several corporate officers.

265.    On March 20-21, 2002, the offices of many SAAR network organizations, along with the residences of their top executives, were raided by the United States Government's joint terrorism task-force, Operation Greenquest.

266.    The SAAR FOUNDATION reported revenues of over $1.7 billion for the year 1998 to the IRS, which represents more than any other United States charity has ever generated in a single year.   This despite that the SAAR FOUNDATION and its affiliated charities keep a low profile in that they do not conduct fund-raising events or publicly reach out to potential donors like most charities.

267.    The SAAR network and the more than one-hundred businesses and individuals that comprise it are fronts for, and a sponsor of, AL QAEDA and international terror.   As an example of the operation of the network, over two-thirds of the funds received by the charities originated from other members of the network.   84% of the charities

disbursements went to other members of the network. Half of the SAAR network funds were sent to off shore financial centers such as the Isle of Man and the Bahamas, venues not used by traditional charitable organizations.

268. These organizations are closely inter-twined with Defendants IIRO, MWL and their related "charities." The connections between the AL RAJHI family, the SAAR network, and the terrorist front-groups extends past the financial network to a repetitious pattern of overlapping officers. The United States branches of the MWL and its subsidiaries are a part of the SAAR Network. The MWL and SAAR share officers and addresses. Both play an intermediary role between wealthy Saudi financiers and terrorist groups.

269. Co-conspirators, material sponsors, and/or aiders and abettors of the SAAR network include Defendants: AHMED TOTONJI, HISHAM AL TALIB, IQBAL YUNUS, JAMAL AL BARZINJI, M. OMAR ASHRAF, MOHAMMED JAGHLIT, MUHAMMAD ASHRAF, TARIK HAMDI, YAQUB MIRZA, CHERIF SEDKY, ARADI, INC., GROVE CORPORATE, INC., INTERNATIONAL INSTITUTE OF ISLAMIC THOUGHT, MAR-JAC INVESTMENTS, INC., MAR-JAC POULTRY, INC., PIEDMONT POULTRY, SAAR FOUNDATION, SAFA TRUST, TARIK HAMDI, SUCCESS FOUNDATION, TAIBAH INTERNATIONAL, ABDURAHMAN ALAMOUDI, INTERNATIONAL ISLAMIC RELIEF ORGANIZATION, MUSLIM WORLD LEAGUE, WORLD ASSEMBLY OF MUSLIM YOUTH, SULAIMAN ABDULAZIZ AL RAJHI, SALEH ABDULAZIZ AL RAJHI, ABDULLAH SULAIMAN AL RAJHI, AL RAJHI BANKING AND INVESTMENT CORPORATION all located doing business or registered to do

business in the United States.

## THE GLOBAL RELIEF FOUNDATION

270.    The GLOBAL RELIEF FOUNDATION (or "GRF") was incorporated in January 1992 in Illinois. According to its website, GRF "is a non-profit humanitarian organization working to provide care, support and relief to people in need throughout the world."

271.    GRF is active all over the world, providing relief in several locales, including the United States, Afghanistan, Kosova, Lebanon, Bosnia, Kashmir, Turkey, Belgium, and Chechnya, among others.

272.    On December 14, 2001, federal authorities raided the offices of the GRF as well as the residences of several of its directors. Simultaneously, the United States Treasury froze GRF's assets. A spokesman for the Treasury Department noted that GRF is aiding terrorism:

> There was coordinated action to block the assets, because this group is suspected of funding terrorist activities.

The Treasury spokesman added that the public's safety was at risk if GRF were allowed to continue to operate:

> This extraordinary action was taken because it's relevant to the health and safety of the American public.

273.    On the same day as the raids in the United States, the NATO-led task force in Kosova, in the former Yugoslavia – KFOR raided two GRF offices in Yugoslavia and

Serbia. A statement from KFOR explaining the raids detailed why:

> This afternoon KFOR soldiers, working in close cooperation with UNMIK-Police, carried out a coordinated search operation on the offices of the Global Relief Foundation in Pristine / Pristina and Dakovice/Dakovica, after receiving credible intelligence information that individuals working for this organization may have been directly involved in supporting worldwide international terrorist activities.

274.    This action was an orchestrated element of a worldwide operation coordinated with governments and law enforcement agencies against the offices of the GLOBAL RELIEF FOUNDATION.

275.    The head of the GLOBAL RELIEF FOUNDATION branch in Belgium received over $200,000 from MUHAMMED GALEB KALAJE ZOUAYDI (a/k/a Abu Talha) (or "ZOUAYDI"), a high level AL QAEDA financier. ZOUAYDI, was arrested by Spanish authorities on April 23, 2002. A top financier for AL QAEDA, he fought with OSAMA BIN LADEN and the other original founders of AL QAEDA during the Afghanistan war.

276.    ZOUYADI was closely connected to the AL QAEDA cell in Germany that participated in the September 11, 2001 attacks. ZOUYADI sent money to MAMOUN DARKAZANLI. DARKAZANLI and his company, MAMOUN DARKAZANLI IMPORT-EXPORT COMPANY were listed as Specially Designated Global Terrorists by the United States government shortly after September 11, 2001. DARKAZANLI is suspected of being a key AL QAEDA point man in Europe, as is described in more detail *infra*.

277.    Documents provided by the United States government in defense of its

freezing of GRF's assets indicate that known AL QAEDA terrorist WADIH EL HAGE was in direct contact with GRF officials while he was planning international terrorism attacks. Specifically, the government noted in its supporting documents that the FBI reported that evidence introduced at EL HAGE's trial demonstrated that, in the late 1990s, GRF maintained communications with WADIH EL HAGE.

> *Furthermore, the government indicated:*

> *At the time, el Hage was in contact with GRF, he resided in Kenya, and played an "active role" in an AL QAEDA terrorist cell operating there. . . .*

278.    During this same period, 1996 and 1997, EL HAGE was also in contact with GRF offices in Belgium and Bridgeview, Illinois. In particular, documents recovered in a search in Kenya showed that EL HAGE was in contact with GRF in Bridgeview, Illinois after returning from a visit with AL QAEDA leadership in Afghanistan in February 1997.

279.    Evidence provided by the government in freezing GRF's assets corroborates GRF's promotion of martyrdom to kill the "enemies of Islam." The government assessed:

> *Newsletters distributed by GRF and published in 1995 by the Central Information News Agency Network (CINAN), which, like GRF, is operated via a Bridgeview post office box, encourage "martyrdom through JIHAD." The newsletters, written in Arabic and translated by the FBI, include an article soliciting funds for the Bosnian relief effort to assist those suffering from the prolonged agony due to atrocities imposed by the "enemies of Islam." The article refers to the Jihad (struggle) that should be carried out by Muslims and states: "It seems that the Prophet (Mohammad) had linked religion with JIHAD. So when do we awake? When can we take revenge for God and his religion? When can we rise to defend our rights and self respect?" The article continued, "God had equated martyrdom through JIHAD with*

> *supplying funds for the JIHAD effort," and concluded, "All*
> *contributions should be mailed to: GRF.*

280.    GRF newsletters implored individuals to donate money to their organization

for the purposes of buying weapons. The government explained:

> *Other GRF newsletters and publications encourage readers*
> *to give their Zakat, or charitable tithe, to GRF to assist in*
> *the purchase of, inter alia, weaponry. "[F]or God's cause*
> *(the Jihad, they [the Zakat Funds] are disbursed for*
> *equipping the readers for the purchase of ammunition and*
> *food, and for their [the Mujahideen's] transportation so that*
> *they can raise God the Almighty's word and protect the*
> *gaps…." The article concluded by exhorting Muslims "to*
> *make the Global Relief Foundation your messenger of*
> *goodness, and we will, God willing, disburse it as specified*
> *in Bosnia, Kashmir, Afghanistan, Tajikistan, and Lebanon.*

281.    Since GRF's assets were blocked, information gathered about GRF,

according to the government, has only reaffirmed that GRF works closely with and in

support of terrorist organizations:

> *In addition to this unclassified evidence, the classified*
> *material gathered since the date of the blocking has greatly*
> *amplified OFAC's [Office of Foreign Asset Control] belief*
> *that GRF may have acted in concert with, and in support of,*
> *terrorists and terrorist entities.*

282.    Several photographs obtained at GRF's offices in Chicago indicate that GRF

used its humanitarian cover as means to send expensive communications equipment abroad.

The government described what exactly was found during the raids on GRF's offices:

> *A set of photographs and negatives discovered at GRF's*
> *Chicago offices indicate types of "humanitarian" supplies*
> *that GRF has sent abroad. The photographs display large*
> *shipping boxes arrayed under a GRF banner.   Other*
> *photographs reveal that the boxes contain sophisticated*
> *communications equipment: approximately 200 handheld*

> *radio transceivers, long range radio antennas, and portable*
> *power packs, with an estimated total value of $120,000.*
> *Arrayed near the communications equipment are a tool kit,*
> *a box of Bushnell binoculars, saddles, and ropes.*

283.    Other photographs found in the raids indicate that GRF had an specific

interest in munitions:

> *Other photographs in this same set depict fighters armed*
> *with automatic rifles, a sand-bagged bunker with a radio*
> *mounted outside, and mutilated corpses with the name*
> *"KPI" (Kashmiri Press International) printed alongside.*
> *Finally, one photograph displays two dead men with the*
> *caption "HIZBUL MUJAHIDEEN," a known terrorist*
> *organization operating in the Kashmir region between India*
> *and Pakistan. On the reverse side of the photograph was*
> *handwritten in Arabic, "two martyrs killed by the Indian*
> *government.*

## TAIBAH INTERNATIONAL AID ASSOCIATION

284.    TAIBAH INTERNATIONAL AID ASSOCIATION (or "TAIBAH") is a

charitable organization headquartered in Falls Church, Virginia. Established in 1991,

TAIBAH's IRS Form 1023, which serves as an application to the United States Government

for tax exempt status, lists ABDULLAH A. BIN LADEN, OSAMA BIN LADEN's half-

brother, as a founding officer.  The same form also lists TAIBAH's stated goals as a

humanitarian organization. TAIBAH's Bosnia branch has been listed as a Specially

Designated Global Terrorist by the US Department of the Treasury.  TAIBAH's office in

Virginia determined who was to head the office in Bosnia.

285.    From its headquarters in the United States, TAIBAH has a presence around

the world through offices, mosques, and educational centers in the following locales: Albania, Bosnia-Herzegovina, Bulgaria,, Kazakhstan, Kosova, Uzbekistan, Russia, Tajikistan and Tataristan, among others.

286.    Despite a well developed website, TAIBAH does not solicit funding through this channel. According to its IRS Form 1023, TAIBAH relies on fund-raising trips to the Middle East and mailings sent to Muslims in the United States for its revenue. As a result, roughly half of the United States arm of TAIBAH's revenue comes from Saudi Arabia. On its year 2000 IRS Form 990, TAIBAH lists a four year aggregate contribution of nearly $150,000 dollars in fund raising from Saudi Arabia. Also, TAIBAH's Bosnian branch relies on Saudi Arabia for funding. The Saudi Arabian SAUDI HIGH COMMISSION has been identified by Bosnian intelligence as a source of TAIBAH's funds.

287.    Although it purports to be a humanitarian organization, the TAIBAH INTERNATIONAL AID ASSOCIATION furthers the aims and materially supports OSAMA BIN LADEN and AL QAEDA. Through the actions of its agents, officers and employees, TAIBAH has provided financial and material support to AL QAEDA. The strong affiliation that TAIBAH maintains with many other AL QAEDA front-groups demonstrates its place as a highly connected component of OSAMA BIN LADEN's financial and logistical support network.

288.    TAIBAH's support of international terrorism and AL QAEDA is ongoing. One of the individuals involved in the October 2001 threat to the American and British Embassies in Bosnia was Mustafa Al Kadir, who was granted Bosnian citizenship based on

his employment with TAIBAH. Al Kadir was still working with TAIBAH at the time of this foiled terrorist attack and ensuing arrests.

289.    On December 13, 2001, Bosnian police searched the offices of TAIBAH. Following the raid, an audit and investigation of TAIBAH's financial records was conducted on January 25, 2002. This audit reveals that TAIBAH's financial records were managed in a way that obscured its true financial status. The financial records contained flagrant abuses in TAIBAH's allocation of donations and in the manner its expense accounts were maintained. A March, 2002, Bosnian Intelligence Memo from the Agency for Investigation & Documentation that summarizes the audit described the illegal management of TAIBAH's funds by its executives:

> It is also noteworthy that large cash sums were withdrawn by management individuals at the organization which were never accounted for by any record of expenditure, and which indicates a wide scope for possible illegal spending of money. It is clear that each of these items is for more than 10 thousand marks.

290.    Other discrepancies noted in the audit were the misuse of automobiles, supplying of fictitious declarations of affiliation and employment, as well as suspicious requests for visas.

291.    Some of the funding for the Bosnian office of TAIBAH originates from bank accounts at the AL-RAJHI ISLAMIC BANK. The flow of money begins with the AL-RAJHI ISLAMIC BANK in Saudi Arabia, then to TAIBAH via wire transfers through Hypobank in Germany and Commerce Bank in Bosnia. The AL-RAJHI ISLAMIC BANK, its agents, officers, directors, and so-called charities, members of the AL RAJHI family are

185

significant financial supporters of terrorism as is discussed *supra*.

292.    In Bosnia, TAIBAH works closely with another AL QAEDA front-group, the charitable organization and Defendant GLOBAL RELIEF FOUNDATION (or "GRF"). Key staff, including the director of TAIBAH in Bosnia, simultaneously worked for GRF. According to the 2002 Bosnian Intelligence Memo, when GRF was initially registered, it operated in Bosnia under the auspices of TAIBAH. TAIBAH's close working relationship with GRF is in accord with both charities' role as AL QAEDA sponsors and front groups.

293.    The 2002 Bosnian Intelligence Report on non-profit organizations affirms that TAIBAH's Bosnian office received its revenues from another Saudi Arabian charity, the SAUDI RELIEF COMMISSION (a/k/a Saudi High Relief Commission) (or "SRC"). TAIBAH has been implicated in the 1998 United States embassy bombings along with the SRC.

294.    Two officers from TAIBAH's United States branch, Samir Salah and ABDULRAHMAN ALAMOUDI, play a large role with United States organizations that have come under scrutiny for their ties to AL QAEDA. Both of them are officers of a number of organizations in the SAAR network. ABDULRAHMAN ALAMOUDI, TAIBAH's Vice-President, is a past employee of the SAAR FOUNDATION, the hub of the SAAR Network, and currently heads some of the SAAR network charities. One of these is the SUCCESS FOUNDATION, which provided funding to TAIBAH. ALAMOUDI was Secretary of the SUCCESS FOUNDATION, with bank signatory rights and at the same time was vice-president of TAIBAH. While ALAMOUDI was an officer of both charities,

SUCCESS FOUNDATION entered into a co-operation agreement whereby TAIBAH would implement SUCCESS projects internationally. While ALAMOUDI was an officer of both charities, SUCCESS FOUNDATION funded TAIBAH. The above allegations demonstrate how ABDURAHMAN ALAMOUDI and the SUCCESS FOUNDATION financially supported AL QAEDA prior to the September 11 attacks.

## BENEVOLENCE INTERNATIONAL FOUNDATION, INC. AND BATTERJEE

295.    BENEVOLENCE INTERNATIONAL FOUNDATION ("BIF") a/k/a al Bir al Dawalia was originally founded in the 1980's by ADEL ABDUL JALIL BATTERJEE, an associate of OSAMA BIN LADEN since the war in Afghanistan. Defendant BATTERJEE later transferred control of the organization to ENAAM M. ARNAOUT. Defendant ENAAM ARNAOUT has been affiliated with BIF since at least 1992, and was criminally indicted for his role in sponsoring AL QAEDA through diversion of charitable funds to sponsor AL QAEDA.

296. ADEL ABDUL JALIL BATTERJEE is the Chairman of AL SHAMAL BANK in SUDAN (*infra.*) AL SHAMAL BANK was capitalized by BIN LADEN. BIN LADEN and AL QAEDA also held accounts there. BIF had extensive programs in SUDAN from 1991 until 2002. BIF held accounts at AL SHAMAL BANK and used them for the benefit of AL QAEDA. The US Treasury Department said that BIN LADEN "confirmed to an associate that BIF was one of the non-governmental organizations providing funds to al Qaida."

297.    In the mid to late 1980s, Defendant ENAAM ARNAOUT, using various aliases including "Abu Mahmoud," "Abu Mahmoud al Suri," "Abu Mahmoud al Hamawi," and "Abdel Samia," worked for Mekhtab al Khidemat (the Office of Services) to provide assistance to various mujahideen including those under the command of OSAMA BIN LADEN.

298.    Within that same time frame, Defendant ARNAOUT served as director of communications in the "al Masada" mujahideen camp in Jaji, Afghanistan, under the direction of OSAMA BIN LADEN. Defendant ARNAOUT distributed resources, including weapons, at the direction of OSAMA BIN LADEN and others.

299.    BATTERJEE originally met ARNAOUT in 1987 when ARNAOUT was a teenager studying Islam in Pakistan. BATTERJEE appointed ARNAOUT as the head of the Bosnian branch of BIF in the early 1990s. According to BENEVOLENCE INTERNATIONAL FOUNDATION's 1992 articles of incorporation, ADEL BATTERJEE is one of the three founders of BIF in the United States. In 1993, BATTERJEE moved the BIF headquarters to Chicago, Illinois and brought ARNAOUT in from Bosnia to run the organization. BATTERJEE officially transferred control of the organization to ENAAM ARNAOUT on September 15, 1997, and ARNAOUT assumed the position of Executive Director.

300.    BATTERJEE commissioned the writing of a biography specifically about OSAMA BIN LADEN and the origins of the AL QAEDA network in Arabic. This biography, *The Arab Volunteers in Afghanistan*, was jointly published in 1991 by the

BENEVOLENCE INTERNATIONAL FOUNDATION and the WORLD ASSEMBLY OF MUSLIM YOUTH. The book details OSAMA BIN LADEN's life, including the creation of BIN LADEN's terrorist network, AL QAEDA. On the back cover is a written statement that expresses the ideology of the book, "This is the jihad in Afghanistan. What we see now, it is a blessed river. The Arab people are the people that feed the jihad river."

301.    The conspirators of the first World Trade Center bombing in February 1993 had in their possession several terrorist training manuals when they were caught. Ahmad Ajaj had in his possession an AL QAEDA manual that detailed how to be an effective terrorist, teaching proper ways to make bombs and remain covert.  It was found in an envelope that had both the WAMY and Lajnat al-Birr, a BIF affiliate logos on it. Ajaj has been convicted for participating in the first World Trade Center attack.  WAMY and BIF were co-located in Peshawar, Pakistan.  In 2002 a joint team of Pakistani intelligence and US FBI raided the WAMY office.  A WAMY employee of that office was suspected of being an accomplice of OSAMA BIN LADEN.

302.    On or about June 10, 1995, BIF caused the delivery of an X-ray machine and currency from the BIF Enterprise to a representative of the Chechen mujahideen in Baku, Azerbaijan.

303.    In or about November 1995, Defendant ARNAOUT and other members of the BIF conspiracy caused the shipment of anti-mine boots to Baku, Azerbaijan, ultimately destined for the Chechen mujahideen.  Defendant ARNAOUT and BIF members solicited donations from the public to purchase additional anti-mine boots for the mujahideen, falsely

189

claiming that the project was for the benefit of civilians.

304.    In or about May 1998, BIF and ARNAOUT facilitated the travel of an influential founding member of the AL QAEDA Network, Mamdouh Mahmud Salim (a/k/a Abu Hajer al Iraqi), to Bosnia-Herzegovina by indicating that Salim was a director of BIF.

305.    MOHAMED JAMAL KHALIFA, alias "Abu Baraa," (*infra*) is referenced on a document recovered in the searches of BIF locations in Bosnia in March 2002.  On or about November 19, 1998, telephone toll records indicate that BIF's Illinois office was in telephone contact with a telephone number in Saudi Arabia used by KHALIFA.

306.    In the latter part of the 1990's, with Defendant ARNAOUT's knowledge, Saif Al Islam El Masry, a member of AL QAEDA's majalis al shura (consultation council), as well as a top military expert and instructor, served as an officer of the BIF.

307.    In or about October 2001, Defendant ARNAOUT relayed to the BIF founder ADEL BATTERJEE in Saudi Arabia via telephone ARNAOUT's concern that ARNAOUT was under scrutiny of the United States government and in particular the fact that Defendant ARNAOUT had been searched at the airport upon his return to the United States.

308.    On December 14, 2001, searches were conducted of the offices of BENEVOLENCE INTERNATIONAL FOUNDATION in Palos Hills, Illinois, and in Newark, New Jersey, along with the home of its chief executive officer, ENAAM M. ARNAOUT, removing materials from each place.

309.    Also on December 14, 2001, the Treasury Department's Office of Foreign Asset Control (or "OFAC") issued an order blocking BENEVOLENCE INTERNATIONAL

FOUNDATION's assets and records, pending further investigation into BIF's ties to terrorists

310.    In January 2002, following the blocking of BIF's bank accounts by the United States Department of the Treasury, Defendant ARNAOUT spoke via telephone to ADEL BATTERJEE in Saudi Arabia, and BATTERJEE requested Defendant ARNAOUT to relocate with his family to Saudi Arabia.

311.    On February 12, 2002, the United States Government recorded a telephone conversation of the then jailed ENAAM ARNAOUT, with his brother in Saudi Arabia. During this conversation, ARNAOUT discusses "Abu Sulafa" with his brother. The United States government has identified the name "Abu Sulafa" as an alias for ADEL BATTERJEE. Using BATTERJEE's alias, ARNAOUT stated that BATTERJEE has been sending money to BENEVOLENCE INTERNATIONAL FOUNDATION's branches.

312.    One Justice Department AL QAEDA expert suggested that this telephone conversation may further elucidate BATTERJEE's role as the source of the "mysterious set of wire transfers" that contributed $30,000 to $40,000 to BIF each month. Investigators have tracked the wire transfers to a Swiss Bank account registered to a Cayman Islands corporation.

313.    Financial records obtained from Citibank indicate that in the four month period from January 4, 2000, to April 11, 2000, BIF sent nineteen (19) wire transfers from its checking account, number 980110435, in the amount of $685,560.

.    314.    On or about March 19, 2002, law enforcement authorities in Bosnia-

Herzegovina searched eight locations affiliated with BIF, including BIF's offices in that country. The documents recovered established direct communication between ENAAM ARNAOUT and OSAMA BIN LADEN beginning in the late 1980s.

315. Beginning at a time unknown through in or about March 2002, Defendant ARNAOUT, and employees of the BIF Enterprise, possessed, and attempted to erase in part, in Bosnia-Herzegovina, among other items, an archive of documents and photographs concerning OSAMA BIN LADEN and AL QAEDA, including:

> I. a chart of an organization involved in military activity headed by OSAMA BIN LADEN;

> ii. notes summarizing several meetings during which AL QAEDA was formed in Afghanistan in August 1988 (indicating that Osama BinLaden, Abu Ubaidah al Banshiri and Mamdouh Salim, a/k/a "Abu Hajer al Iraqi," among others, were in attendance), and specifying the text of the original bayat (oath of allegiance) made by prospective AL QAEDA members to AL QAEDA ;

> iii. notes reflecting the commencement of AL QAEDA 's "work" on or about September 10, 1988;

> iv. personnel files of the mujahideen trained in the al Masada camp in Jaji, Afghanistan, in or about 1988, which contained the true names and aliases and military experience of the trainees;

> v. a list of wealthy sponsors from Saudi Arabia including references to OSAMA BIN LADEN and ADEL BATTERJEE, the founder of the BIF Enterprise. These funders of AL QAEDA were known as the Golden Chain;

> vi. various documents reflecting Defendant ARNAOUT's involvement in the acquisition and distribution of hundreds of rockets, hundreds of mortars, offensive and defensive bombs, and dynamite, as well as disguised explosive devices in connection with the al Masada camp;

vii. various documents in a separate folder reflecting Defendant ARNAOUT's participation in obtaining missiles, bombs and mortars in 1989 and 1990 in connection with Hezb e Islami;

viii. various newspaper articles including a 1988 article with a photograph depicting OSAMA BIN LADEN, Defendant ARNAOUT, and one of the founders of the BIF Enterprise; as well as 1998 articles concerning OSAMA BIN LADEN's threats against the United States and the State Department's 1997 list of designated terrorist organizations; and

ix. a handwritten organizational chart placing Defendant ARNAOUT at the top of a jihad organization involved with weapons.

316.    In describing this archive, the US Government wrote in its Evidentiary Proffer in

USA v. Enaam Arnaout;

> BIF had in its Sarajevo office a computer file labeled *"Tareekh Osama,"* or *"Osama's History."* The file contains scanned images of documents which chronicles Usama Bin Laden's activities in Afghanistan which led to the formation of al Qaeda and even includes later reports of the danger BinLaden poses to the U.S.
> BIF possessed in the file a handwritten draft list of the people referred to within al Qaeda as the *"Golden Chain,"* wealthy donors to mujahideen efforts. Ex. 5. At the top of the list is a Koranic verse stating: *"And spend for God's cause."* Id. The list contains twenty names, and after each name is a parenthetical, likely indicating the person who received the money from the specified donor. Id. *"Usama"*appears after seven of the listings, including the listing *"Bin Laden Brothers."* Id. *"Baterji"*, LBI's and BIF's founder, appears after six of the listings. Id. Only three other persons are listed in the parentheses.

317.    On or about April 15, 2002, ARNAOUT spoke to the BIF director in Pakistan and

advised him to avoid government scrutiny in Pakistan by fleeing to Afghanistan with the BIF's money and to evade detection by refraining from the use of banks, telephones or electronic mail.

318.    Defendant ARNAOUT and his co-conspirators fraudulently solicited and obtained funds from prospective donors to the BIF Enterprise by falsely representing that the BIF Enterprise would use donated funds solely for humanitarian purposes, with a small amount being used for administrative expenses, while concealing the fact that a portion of the money raised by the BIF Enterprise was being used to support groups engaged in armed confrontations and violence overseas.

319.    Defendant BIF and ARNAOUT and co-conspirators used BIF's status as a charity and a tax-exempt organization to lessen scrutiny by various governments concerning the financial and other activities of the BIF Enterprise's employees and agents, the BIF Enterprise's overseas offices, and the travel of the BIF Enterprise employees, agents, and associates.

320.    Defendant ARNAOUT and BIF co-conspirators kept secret from governments and the general public, including a significant number of donors, facts about Defendant ARNAOUT's relationship with organizations engaging in violence, including AL QAEDA and OSAMA BIN LADEN.

321.    BIF and ARNAOUT engaged in a conspiracy, the method and means of the conspiracy included the following, among other illegal activities.

322.    ENAAM M. ARNAOUT conspired with others to provide material support and resources to persons, groups and organizations engaged in violent terrorist activities, including AL QAEDA, and persons engaged in violent confrontations and to conceal and disguise the nature,

194

location, source and ownership of material support and resources, knowing and intending that they be used in preparation for and in carrying out acts of international terrorism.

323.    Defendant ARNAOUT and other members of the BIF conspiracy agreed to transfer by wire funds from BIF's checking accounts to bank accounts in various locations, including New Jersey and accounts outside the United States, which involved the proceeds of specified unlawful activities.

324.    ARNAOUT initially denied knowing BIN LADEN, but a March 19, 2002, police raid at Bosnian offices and homes related to BIF, uncovered photographs of ARNAOUT with a rifle in his hands and BIN LADEN at his side at what appeared to be an AL QAEDA training facility. Documents found in the raid detail a relationship between ARNAOUT and BIN LADEN going back 15 years. Both BIF and ARNAOUT have had their assets frozen and are believed, by the United States Department of Justice, to be AL QAEDA co-conspirators.

325.    Terrorists who had direct contact with BIF include: Mamdouh Mahmud Salim, an Iraqi who established links between AL QAEDA and groups in IRAQ, SUDAN and Lebanon. He was a key BIN LADEN aide who tried to obtain nuclear and chemical weapons for AL QAEDA. He was arrested in the 1998 AL QAEDA Embassy bombings and was at one time listed as a BIF director. Other terrorists linked to BIF include: MOHAMED BAYAZID, who also assisted AL QAEDA attempts to acquire nuclear material; MOHAMAD JAMAL KHALIFA, BIN LADEN's brother-in-law who has been linked to the 1993 World Trade Center bombing and the disrupted plot to bomb 12 American airliners in 1995; and Wali Khan Amin Shah who was convicted for his participation in the plot to bomb American airliners.

326.    Upon information and belief, BIF assisted these and other AL QAEDA terrorists with housing, travel documents and/or funding in the United States and abroad.  AL QAEDA members were given jobs with the Foundation and used the charity to transfer money to AL QAEDA members.

327.    Federal agents stated that BIN LADEN and AL QAEDA members withdrew funds to support terrorist activities from bank accounts held by the charity and that BIF accounts in offices around the world provided a cover for the movement of terror funds.

328.    Co-conspirators, aiders and abettors of the BENEVOLENCE INTERNATIONAL FOUNDATION (a/k/a al-Birr al-Dawalia), include Defendants:  BENEVOLENCE INTERNATIONAL FOUNDATION,  ENAAM MAHMOUD ARNAOUT (a/k/a Abdel del Samia, a/k/a Abu Mahmoud), ADEL BATTERJEE, all located, doing business or registered to do business in the United States

## THE SAUDI HIGH COMMISSION

329.    THE SAUDI HIGH COMMISSION, (a/k/a the Saudi High Relief Commission) (or "SHC") was founded in 1993 by PRINCE SALMAN BIN ABDULAZIZ  (or "PRINCE SALMAN"), the Mayor of Riyadh.  Hailed as the largest fund-raising effort in the Arab and Muslim world, the SAUDI HIGH COMMISSION claims to have spent more than $600 million in aid to Bosnian Muslims impoverished by the country's recent civil war.

330.    SHC has been widely criticized by aid agencies and Bosnian intellectuals for importing the extreme form of Saudi Islam, Wahhabism, which is alien to the more moderate, secular form of Islam found in Bosnia. Bosnian officials claim that the Wahhabis' intolerant and

196

anti-Western form of Islam contradicts and offends Bosnian tradition and undermines the country's rich and diverse religious heritage.

331.    On October 21, 2001, five Algerians were arrested in Bosnia Herzegovina on criminal charges of international terrorism following a threat to the United States embassy. The incident resulted in the five day closure of the United States and British embassies for what both embassies called "a credible security threat." The plot was discovered when United States intelligence intercepted a telephone conversation between two of the accomplices about the mission. During this telephone conversation, one of the terrorists said, "American interests would be jeopardized within 48 hours."

332.    This group of Algerians is suspected to be a part of the AL QAEDA network. The NATO Secretary-General, George Robertson, stated that at least one of the five had "direct links with AL QAEDA and BIN LADEN." The leader of the group, Bensayah Belkacem, has been identified as a top AL QAEDA lieutenant. In October, 2001, Belkacem was arrested at his apartment in Zenica, Bosnia, where authorities found phony passports and a mobile telephone listing for ABU ZUBAYDAH, AL QAEDA's third-in-command. According to phone transcripts, Belkacem was also in phone contact with an AL QAEDA military commander Abu Al Maid.

333.    One of the six Algerian terror suspects, Sabir Lamar, worked for the SAUDI HIGH COMMISSION as an Arabic language teacher. Sabir Lamar fought in Afghanistan with the Mujahideen. He is married to the daughter of a former local employee at the United States embassy in Sarajevo.

334.    In October, 2001, United States forces raided the Sarajevo branch of the SAUDI

197

HIGH COMMISSION and found computer hard drives with photographs of the World Trade Center before and after its collapse as well as photos of United States embassies in Kenya and Tanzania and the U.S.S. Cole. Additionally, United States forces discovered files on pesticides and crop dusters, information about how to make fake State Department badges as well as photographs and maps of Washington D.C., with government buildings marked. About $100,000 worth of local currency was found in a safe, as well as anti-Semitic and anti-United States computer material geared toward children.

335.    The Financial Police of the Federation of Bosnia Herzegovina Ministry of Finance analyzed the documents seized from the offices of the SAUDI HIGH COMMISSION and described the organization as a front for radical and terrorism-related activities:

> Members of the SFOR have on premises of the SAUDI HIGH COMMISSION Relief for Bosnia and Herzegovina confiscated some documentation for which it can be claimed with certainty that it does not belong in the scope of work of a humanitarian organization (various photographs of the World Trade Center, sketches of military bases, certain photographs of military ships, civil airplanes, certain specially protected facilities, and other).

336.    In October 2001, a Bosnian spokesman announced that between 100,000 DM and 200,000 DM in cash were also seized in the offices of the Saudi High Commission. The SAUDI HIGH COMMISSION used 24 vehicles with diplomatic plates to transport members and material inside Bosnia Herzegovina.

337.    Given its level of financing, the SAUDI HIGH COMMISSION does not provide adequate financial aid to the needy. The SAUDI HIGH COMMISSION was functioning at least until February 2001, when the announcement was made that the organization provided in a nine-

year period a total of $560,900,000 in donations. Since at least year 2000, funds sent to help Bosnia Herzegovina were diverted for terrorist activities and not charity. For instance, in September 2000, PRINCE SALMAN was alerted by a letter from the Bosnian association "Mothers of Srebrenica and Podrinje" in which it was clearly claimed that the SAUDI HIGH COMMISSION in Bosnia Herzegovina did not provide charitable assistance.

338.    This Bosnian association stated that while PRINCE SALMAN announced that 200 million DM were collected in only one day after Srebrenica's fall in July 1995, none of the Saudi assistance reached the Srebrenica people. United States investigative forces are currently reviewing suspicious financial records of the SAUDI HIGH COMMISSION which fail to account for $41 million dollars.

339.    PRINCE SALMAN knowingly failed to take appropriate actions regarding the management and use of funds of the SAUDI HIGH COMMISSION in Bosnia Herzegovina, as proven by the evidence of non-charitable work discovered in the raids conducted in the Sarajevo office of the organization.

## MUWAFFAQ-BLESSED RELIEF; AL QADI AND BIN MAHFOUZ

340.    On October 12, 2001, one month after the September 11, 2001 attacks, with Executive Order 13224, President George W. Bush designated Saudi businessman YASSIN AL QADI as a terrorist sponsor for financially supporting AL QAEDA. As stated in a United States Department of Treasury Press Release on October 12, 2001:

> *Yassin Al Qadi (heads) the Saudi-based MUWAFFAQ (or "Blessed Relief") Foundation, an AL QAEDA front that*

> *transfers millions of dollars from wealthy Saudi businessmen
> to bin Laden.*

341.    Defendant MUWAFFAQ (or "BLESSED RELIEF") was registered in the Channel Islands in 1992 but run from Jeddah, Saudi Arabia.  The BLESSED RELIEF charity had an international presence with offices in Europe, Ethiopia, Pakistan, SUDAN, Somalia as well as the United States.  BLESSED RELIEF purported to conduct traditional relief work such as the distribution of food, clothing and medical equipment to victims of war or famine. MUWAFFAQ-BLESSED RELIEF was endowed by Defendant KHALID BIN SALIM BIN MAHFOUZ, an AL QAEDA financier, and run by YASSIN AL QADI. KHALID BIN SALIM BIN MAHFOUZ's son, ABDUL RAHMAN KHALID BIN SALIM BIN MAHFOUZ, was also a director of the BLESSED RELIEF charity.

342.    YASSIN AL QADI ran BLESSED RELIEF from 1992 with $15 to $20 million of his own money, along with contributions from other wealthy associates and according to a June 1998 U.S. Justice Department report, sent $820,000 to buy weapons for Hamas.  Millions of dollars have been transferred to OSAMA BIN LADEN and AL QAEDA through BLESSED RELIEF. During the 1990s an audit of the Defendant NATIONAL COMMERCIAL BANK OF SAUDI ARABIA which was then run by KHALID BIN SALIM BIN MAHFOUZ and his son ABDURAHMAN BIN MAHFOUZ, revealed the transfer of $3 million for OSAMA BIN LADEN that was moved from the accounts of wealthy Saudi businessmen to BLESSED RELIEF.

343.    In a 1995 interview, OSAMA BIN LADEN identified BLESSED RELIEF's place in his support network, "The bin-Laden Establishment's aid covers 13 countries . . . this aid comes in particular from the SAUDI HIGH COMMISSION ."  OSAMA BIN LADEN went on to list a

number of the Human Concern International Society's branches, including the BLESSED RELIEF SOCIETY.

344.    YASSIN AL QADI incorporated the United States branch of BLESSED RELIEF in Delaware in 1992, along with Talal M. M. Badkook and Dr. Mohamed Ali Elgari.

345.    YASSIN AL QADI is a Director of GLOBAL DIAMOND RESOURCES, based in Nevada.  He sits on the board as a representative of NEW DIAMOND HOLDINGS, a foreign investor firm that has a controlling interest in GLOBAL DIAMOND.  Along with YASSIN AL QADI, serving on the board of directors are representatives of the BIN LADEN family who invested in GLOBAL DIAMOND RESOURCES.  YASSIN AL QADI was introduced to GLOBAL DIAMOND RESOURCE's Chairman by an executive at the SAUDI BIN LADEN GROUP. In regards to the company's decision to let AL QADI join as an investor, the Chairman said, "I relied on the representations of the BIN LADEN family.  They vouched for him."

## AL-HARAMAIN

346.    The Saudi Arabian-based AL-HARAMAIN ISLAMIC FOUNDATION INC. (or "AL-HARAMAIN") is a private charitable organization that is supposed to provide a variety of humanitarian services for Muslims worldwide. Established in Riyadh in 1992, AL-HARAMAIN quickly developed a vast network of offices and representatives that now spans over fifty countries, including the United States. AL-HARAMAIN raises most of its funds from Saudi Arabia where it oversees the distribution of its resources across the world.

347.    Although AL-HARAMAIN operates in many countries they are still controlled

primarily from AL-HARAMAIN's headquarters in Riyadh, Saudi Arabia. The President and Vice-President of the United States branch, AQEEL AL AQEEL and MANSOUR AL KADI, both reside in Riyadh, Saudi Arabia where they run  AL-HARAMAIN worldwide.  Defendant AL-HARAMAIN ISLAMIC FOUNDATION, INC., is a Saudi charity front that has exploited its non-profit status for the benefit of OSAMA BIN LADEN and his terrorist network AL QAEDA, in the furtherance of international terrorism.  In doing so, AL-HARAMAIN has developed an extensive worldwide network. Many of AL-HARAMAIN's foreign branches have been exposed for providing direct and material support to AL QAEDA.  The United States Department of the Treasury has designated two of AL-HARAMAIN's branches located in Bosnia and Somalia, as terrorist entities and frozen the assets of both.  The leaders of AL-HARAMAIN have direct links to AL QAEDA.

348.    In December of 1999, AL-HARAMAIN conducted a joint fund-raising event with a known AL QAEDA front, the Defendant INTERNATIONAL ISLAMIC RELIEF ORGANIZATION (IIRO) and the WORLD ASSEMBLY OF MUSLIM YOUTH (WAMY) in Riyadh, Saudi Arabia.  AL-HARAMAIN and its co-conspirators also solicit and operate widely in the United States.

349.    Co-conspirators, aiders and abettors of the AL-HARAMAIN ISLAMIC FOUNDATION doing business or registered to do business in the United States include Defendants: AL HARAMAIN FOUNDATION, AL HARAMAIN ISLAMIC FOUNDATION, INC.,  AQEEL ABDUL AZEEL AL AQEEL, MANSOUR AL KADI, SOLIMAN H.S. AL BUTHE, and PEROUZ SEDA GHATY.

350.    Intelligence officials throughout the world have acknowledged that AL-HARAMAIN exploited its non-profit status by providing secret aid to terrorist groups.  In referring to AL-

HARAMAIN in a speech given on March 11, 2002, United States Treasury Secretary Paul O'Neill, stated:

> *Few deceits are more reprehensible than the act of collecting charity from well-intentioned donors, and then diverting those funds to support hatred and cruelty. As I said during my visit to the Gulf, misusing charity funds to support terrorism harms the people who gave the donation, harms the people who should have received it and is dangerous to us all. Organizations that pervert the name of charity are an affront to us all, and we will find them, expose them, and shut them down.*

351. After the June 2, 2002, raids of AL-HARAMAIN offices in Bosnia, the Commander of the NATO-led forces in Bosnia, Lieutenant General John Sylvester stated:

> *We detected a pattern here . . . for terrorist cells and those who aid and harbor them to operate behind the shield of legitimate humanitarian . . . organizations…. They were preaching good, and sometimes doing good, while plotting evil.*

352. On March 11, 2002, the United States froze the funds of the Bosnia-Herzegovina and Somalia branches of the AL-HARAMAIN Islamic Foundation. These branches of AL-HARAMAIN were "diverting charitable funds to terrorism." The United States Treasury Department issued a Press Release about the designations that stated:

> *The branch offices of al Haramain in Somalia and Bosnia are clearly linked to terrorist financing.*

353. Although AL-HARAMAIN in Saudi Arabia was not included in this designation, the Bosnian and Somalian branches receive their funding and guidance from the AL-HARAMAIN headquarters in Riyadh, Saudi Arabia.

354. AL-HARAMAIN's Bosnia and Somalian offices and the rest of AL-HARAMAIN are closely intertwined. AL-HARAMAIN's headquarters provides the funding, management, and direction of the Somalian and Bosnian branches. The headquarters also maintains one website that

covers AL-HARAMAIN worldwide and, on occasion, devotes certain pages of its website to certain individual branches.

355.    A United States Treasury Department Press Release stated that AL-HARAMAIN worked with the AL QAEDA-linked Somali-based terrorist group Al Itihad Al Islamiya (or AIAI). This like-minded Islamic fundamentalist group operated in the AL QAEDA orbit as it sought to establish an Islamic state in Somalia and moved into a terrorist force in the mid 1990s. AIAI's involvement in September 11 includes sharing of training and personnel with AL QAEDA using money provided by the Saudis through defendant AL HARAMAIN's offices in Bosnia and Somalia. The Al Barakaat Bank was a financial vehicle for AL QAEDA.. The press release states:

> *The Somalia office of AL-HARAMAIN is linked to Osama Bin Laden's Al Qaeda network and Al-Itihad Al-Islamiya (AIAI), a Somali terrorist group. Al-Haramain Somalia employed AIAI members and provided them with salaries through Al Barakaat Bank, which was designated on November 7, 2001 under E.O. 13224 because of its activities as a principal source of funding, intelligence and money transfers for Osama Bin Laden.*

356.    The cooperation between AL QAEDA and Al-itihad Al-islamiya has not ceased. The 2002 United States Department of State's Patterns on Global Terrorism report states that Al-itihad Al-islamiya is a terrorist group that maintains ties to AL QAEDA. The Treasury Department Press Release about the designation also states that AL-HARAMAIN's support of Al-itihad Al-islamiya has been concealed under its humanitarian cover:

> *Over the past few years, Al-Haramain Somalia has funneled money to AIAI by disguising funds as if they were intended for orphanage projects or Islamic school and mosque construction. The organization has also employed AIAI members and provided them with salaries through Barakaat*

*Banks and Remittances, a subsidiary of al-Barakaat Bank.*

357.    This concert of action, aiding and abetting of terror and material sponsorship of international terrorism is precisely the hallmark of the offensive upon the United States that culminated on September 11, 2001.

358.    The AL-HARAMAIN Islamic Foundation was banned from Kenya for national security concerns following the 1998 embassy bombings. OSAMA BIN LADEN and AL QAEDA were convicted by the United States in 2001 for plotting and executing these dual attacks in Nairobi, Kenya, and Dar Es Salaam, Tanzania, which killed 224 people, including 12 Americans, and injured more than 4,000.  These indictments and convictions demonstrate the United States government's belief that both OSAMA BIN LADEN and AL QAEDA have committed acts within and outside the United States which trigger the United States District Courts' jurisdiction over such entities.

359.    The United States Treasury Department Press Release following the March 11, 2002, designation of AL-HARAMAIN's Bosnian and Somalian offices, stated the following about its connection to the terrorist group Al-Gama'a Al-Islamiyya:

> *The Bosnia office of Al-Haramain is linked to Al-Gama'a Al-Islamiyya, an Egyptian terrorist group. Al-Gama'a Al-Islamiyya was designated on November 2, 2001 and it is a signatory to Osama Bin Laden's fatwas dated February 23, 1998, targeting Americans and their allies.*

360.    In March 2002, Bosnian officials raided AL-HARAMAIN's Sarajevo office and discovered more proof of AL-HARAMAIN using its humanitarian image as a cover for terrorism. A Bosnian intelligence report explains how investigators discovered that AL-HARAMAIN's financial records from 1994 through 1998 had been destroyed and that $1.59 Million dollars had been inexplicably withdrawn from the charity between 1999 and 2001.  The Bosnian intelligence

report about the March 2002 raids also stated: "We believe that the clear lack of any concrete humanitarian projects indicates that the existence of this organization was a fictitious cover for probable links with terrorism." In 2001, the Saudi-based AL-HARAMAIN aided AL QAEDA terrorists groups in Chechnya and elsewhere by providing them with recruits, weapons, and money.

361.    AL-HARAMAIN's website used to have a direct link to the AL QAEDA site about the Chechnya operations (qoqaz.com). The website was one of several AL QAEDA websites, including qoqaz.com, qoqaz.net, and azzam.com (among others) that are part of the AL QAEDA propaganda effort of Azzam Publications. The government of the United States has been tracking the domains of azzam.com and qoqaz.com in an ongoing effort to shut down the sites for their role as an AL QAEDA sponsor, promoter and mouthpiece. FBI Special Agent Robert Walker described qoqaz.net, the English language equivalent of qoqaz.com, in his April 29, 2002, Affidavit in Support of Complaint Against BENEVOLENCE INTERNATIONAL FOUNDATION, Inc. and ENAAM M. ARNOUT. In his Affidavit, Walker stated that qoqaz.net leverages its relationship with charities:

> *In or about early 2000, a website (www.qoqaz.net) dedicated to the cause of Chechen mujahideen identified the leaders of the military fight in Chechnya as including Ibn al Khattab and included pictures of mujahideen training as well as killed mujahideen. CW-1 has identified Ibn al Khattab as a well-known mujahideen leader with links to Osama Bin Laden. . . . The website condemned America . . .*

362.    Shortly after the merger of EGYPTIAN ISLAMIC JIHAD with OSAMA BIN LADEN's AL QAEDA, Ahmed Ibrahim Al Najjar, initially a member of the EGYPTIAN ISLAMIC JIHAD, was sent on a new mission to Albania to work for AL-HARAMAIN. After al Najjar was

deported from Albania to Egypt in 1999, he was sentenced to death for acts of terrorism.  In his testimony, al Najjar admitted to being a full-fledged AL QAEDA member who entered Albania with a false passport and who, like many other AL QAEDA operatives, was engaged in purported humanitarian activities while waiting for orders to participate in terror activities.  The case of Al Najjar is but one example of a senior AL QAEDA operative who not only found refuge from authorities with AL-HARAMAIN, but a platform from which to wage war and promote the use of terror.

363.    AL-HARAMAIN took part in a committee of charitable organizations that formed the SAUDI JOINT RELIEF COMMITTEE (or "SJRC").  Along with AL-HARAMAIN, the SJRC is comprised of the IIRO, WAMY, the SAUDI RED CRESCENT, and the MUSLIM WORLD LEAGUE, among others.  The SJRC has been connected to OSAMA BIN LADEN and two of his top operatives, WA'EL HAMZA JULAIDAN and Adel Muhammad Sadiq bin Kazem.  The United States Treasury Department has branded JULAIDAN a Specially Designated Global Terrorist Entity [SDGT], stating that JULAIDAN is "an associate of Osama bin Laden and a support of al-Qa'ida terror."  AL-HARAMAIN has been able to continue its cooperation with AL QAEDA  for years in large part due to its ostensible appearance as a humanitarian organization.

364.    In the United States, AL-HARAMAIN has three business entities in Ashland, Oregon: AL-HARAMAIN FOUNDATION,  AL-HARAMAIN Islamic Foundation, and AL HARAMAIN Islamic Foundation, Inc.  All three of these separately filed businesses are at the same address and under the same management.  These three businesses are one and the same as AL-HARAMAIN's headquarters in Riyadh, Saudi Arabia.  The President and Vice-President of the

United States branch, AQEEL AL AQEEL and MANSOUR AL KADI, are the Secretary General and Deputy General, respectively, of the Riyadh office. The AL-HARAMAIN branch in Ashland, Oregon, is specifically linked to AL QAEDA operations.

365.    AL-HARAMAIN Ashland states in its year 2000 Form 990 that it operates an Islamic center in Springfield, Missouri. Corporate records reveal that AL-HARAMAIN owns property in Springfield, Missouri.

366.    AL-HARAMAIN has been implicated as providing funds for the bombing of a night club in Bali in 2002. AL-HARAMAIN continues in its illicit pattern of conduct in sponsoring acts of international terrorism.

367.    Umar Faruq, an admitted terrorist co-conspirator and a member of the AL QAEDA terrorist organization, was arrested in or about May 2002. According to the confession of ABU ZUBAYDAH, a top AL QAEDA leader detained by the United States authorities, Umar Faruq was a senior AL QAEDA representative in Southern Asia. An interrogation of Umar Faruq was conducted by United States authorities at the United States Air Force Base in Baghram, Afghanistan, on May 23, 2002.

368.    During a custodial interview on Sept 9, 2002, Umar Faruq confirmed that he was AL QAEDA's senior representative to Southeast Asia and was initially sent to the region by ABU ZUBAYDAH and Ibn Sheik Al Libi to plan large-scale attacks against United States interests in Indonesia, Malaysia, Philippines, Singapore, Thailand, Taiwan, Vietnam and Cambodia. In particular, Faruq prepared a plan to conduct simultaneous car/truck bomb attacks against United States embassies in the region to take place on or about September 11, 2002.

369.    During an interrogation conducted by United States authorities at the United States air force base in Baghram, Afghanistan, on May 23, 2002,  Umar Faruq confessed that AL-HARAMAIN was the main financial mechanism for funding terrorists operations in the region, through its Indonesian office director in Jakarta, Ahmed Al  Moudi.  The AL-HARAMAIN organization is said to have planned terrorist attacks in Indonesia.

> *Al Haramayn was the funding mechanism of all operations in Indonesia.  Money was laundered through the foundation by donors from the Middle East.  Money was given to [him] to al Haramayn's branch in Jakarta, which he said is connected to Kompak [Crisis Center Committee or Committee for Crisis Handling of the Dewan Dakwah Islamiyah organization, Islamic Propagation Council in Indonesia].  The two groups plan terrorist activity in Indonesia. The foundation had an office in Makassar where Faruq was introduced to the foundation's head by Agus Dwikarna [Director of Kompak].  Faruq was given orders by Rashid [al-Qaida senior officer] to get money transferred to the foundation's office in Jakarta through Ahmed Al Moudi [head of al Haramayn's office in Jakarta].*

370.    Umar Faruq further stated that AL-HARAMAIN received money from a Saudi, Sheikh Bandar.  Sheikh Bandar gave $99,000 to Faruq to give to Al Moudi.  Faruq said Sheikh Bandar was the head of AL HARAMAIN in Saudi Arabia.

371.    Furthermore, during a custodial interview on September 9, 2002, Umar Faruq stated that terrorist operations of Jemaah Islamiya, founded by Abu Bakar Bashir and directed by his top commander Nurjaman Riduan Ismuddin a/k/a Hambali , and Mohammed Iqbal Abdurrahman a/k/a Abu Jibril, were funded by donations channeled through AL HARAMAIN ISLAMIC FOUNDATION.  Jemaah Islamiya is an  extremist group closely associated with AL QAEDA.  It's terror activities with AL QAEDA included planning the

Bojinka attack, a foiled attempt to bomb 12 American airliners traveling over the Pacific, and cooperation in the bombing of the U.S.S. Cole in 2000. Hambali is also believed to have arranged a meeting of September 11 hijackers with other AL QAEDA members in Malaysia in 2000:

> AL QAEDA encourages Basyir's [Abu Bakar Bashir] goal to spark a religious civil war in Indonesia in order to achieve his vision of a pure Islamic state under Islamic law. Basyir's plan of training jihadists and massing weapons and ammunition has been coordinated with Rashid, a senior lieutenant of Osama bin Ladin. Rashid also acts as a representative of a committee of Gulf-state sheiks who are Al Qa'ida financiers and who have committed ample funds, weapons, ammunition and computers to support this war. Funds are channeled through the Al-Haramain NGO.

372.    AL-HARAMAIN is engaged in unlawful aiding, abetting, conspiring with and offering material support to AL QAEDA which constitutes an unlawful pattern of conduct, illicit scheme and enterprise.


## RABITA TRUST

373.    RABITA TRUST  is a charitable organization which was created to organize the repatriation and rehabilitation of stranded Pakistanis (Biharis) from Bangladesh. Founded in 1988, the trust fund was started jointly by the government of Pakistan and the Saudi-based charity, the MUSLIM WORLD LEAGUE.  RABITA TRUST received the majority of its funding from the MWL and the Saudis.

374.    RABITA TRUST was initially granted 250 million Rupees from the Pakistani government as well as 50 million Rupees from the MWL to help relocate some 250,000 displaced

Pakistani refugees in Bangladesh. In its 15 years of existence, the RABITA TRUST has only managed to relocate a few hundred Biharis.

375.    RABITA TRUST is an AL QAEDA front, and the Head of RABITA TRUST is a known AL QAEDA member. A Treasury Department press release issued when RABITA TRUST's assets were frozen indicated that:

> *Rabita Trust is headed by Wa'el Hamza Julaidan, one of the founders of al-Qaida with bin Laden. He is the logistics chief of bin Laden's organization and fought on bin Laden's side in Afghanistan.*

376.    According to a biography of BIN LADEN and the original members of AL QAEDA, the head of RABITA TRUST, WA'EL JULAIDAN, fought alongside OSAMA BIN LADEN and championed his cause. The biography, written by a fellow compatriot of BIN LADEN, noted how AL QAEDA's key founders fought against the Soviets in Afghanistan during the Soviet-Afghan war of the 1980s.

> *One of the men who led the Arab Afghan Jihad forces came from one of the wealthiest Saudi families; he was influenced by the Afghan struggle, who would live together with them and sacrifice everything for the Afghani jihad. This man was Osama Bin Laden, a young, tall man who followed Dr. Abdullah Azzam to fight in Afghanistan. Another Saudi joined together with them; his name was Wa'el Julaidan, a US student who was studying agriculture and left to fight jihad in Afghanistan. These three: Osama Bin Laden (a.k.a. 'Abu Abdallah'), Dr. Abdullah Azzam (a.k.a. Abu Muhammed), and Wa'el Julaidan (a.k.a. Abu Al Hassen al Madani), gathered together in December 1979 to create the new Islamic revolution in Afghanistan.*

377.    RABITA TRUST is the sibling organization of the IIRO as they are both subsidiaries of the MWL.

378.    RABITA TRUST is connected to the SAAR network (*infra*), through two officers,

211

Dr. ABDULLAH OMAR NASEEF and Abdullah Al Obaid.

379.    On October 12, 2001, RABITA TRUST was listed as a Specially Designated Global Terrorist Entity.  Its chairman is Defendant ABDULLAH OMAR NASEEF who founded the Defendant RABITA TRUST in July 1988 and is currently its chairman.

380.    ABDULLAH OMAR NASEEF ( or "NASEEF") also served as Secretary-General of the MWL during the time he created RABITA TRUST and has attempted to spread MWL offices around the world. Part of his global efforts are found in his involvement in a SAAR network charity. NASEEF is an officer of Makkah al-Mukarramah, Inc., registered in Virginia as a non-profit organization. A second shared executive is the Vice-Chairman of the Board of Trustees of RABITA TRUST, Abdullah Al Obaid, who is also an officer at two of the SAAR network businesses that were raided, the MWL and SANABEL AL-KHEER.


## AL RASHID TRUST

381.    The AL RASHID TRUST a/k/a the Aid Organization of the Ulema was established in Pakistan in 1996 at the time the TALIBAN took control in Afghanistan.  The trust was established by MUFTI MOHAMMED RASHID to carry out welfare projects with funds raised in the Pakistani Muslim Community.  This organization remains active and headquartered in Pakistan where it operates offices.   Upon information and belief, the Trust provides financial aid to jailed terrorists around the world and is closely aligned to the TALIBAN and BIN LADEN.   The AL RASHID TRUST has been raising funds for the TALIBAN since 1999.   The Trust helped fund radio, newsprint and madrassas (schools) that teach a view of Islam that endorses violence and martyrdom

in the name of Allah. Upon information and belief, the group conspired with AL QAEDA and Pakistani terrorists to kidnap, torture and murder Wall Street Journal reporter Daniel Pearl, holding him hostage in a two room hut in the AL RASHID compound. The AL RASHID TRUST and MUFTI MOHAMMED RASHID provided money and logistical support to the TALIBAN and AL QAEDA and both have been listed as Specially Designated Global Terrorists.

## THE MUSLIM BROTHERHOOD

382.    The MUSLIM BROTHERHOOD was founded in Egypt in 1928 to promote radical Islam. It was crushed by the Egyptian government causing its members to seek refuge in other countries in the Middle East and elsewhere. Many went to Saudi Arabia where they were welcomed and funded. The MUSLIM WORLD LEAGUE, WORLD ASSEMBLY OF MUSLIM YOUTH and their many offshoots and branches were founded and supported by the MUSLIM BROTHERHOOD. The association is an umbrella organization which supports and sponsors AL QAEDA and other terror groups both before and after September 11, 2001.

383.    YOUSEF NADA helped finance and structure the MUSLIM BROTHERHOOD after fleeing Egypt. He created ASAT TRUST in 1970 in Liechtenstein to finance the MUSLIM BROTHERHOOD's objectives by opening numerous entities under ASAT TRUST's direction and control. AHMED IDRIS NASSREDDIN an Ethiopian banker who went on to join YOUSEF NADA in many business enterprises under ASAT TRUST was already doing business in Liechtenstein. YOUSEF NADA employed a cadre of accountants and lawyers including Liechtenstein residents, Erwin and Martin Wachter, Engelbert Schreiber Sr. and Englebert Schreiber Jr., to create and operate

sophisticated funding mechanisms.

384.    Over the years ASAT added dozens of companies, foundations, Islamic religious groups and financial institutions with offices located around the world. ASAT TRUST became a global network of financial, religious, business and charitable institutions for the MUSLIM BROTHERHOOD. This structure however, also financed extremist organizations, including OSAMA BIN LADEN and AL QAEDA and moved and laundered funds for terrorist activities.

385.    BANK AL TAQWA is a company founded by NADA and NASREDDIN. Its other principals are: ALI GHALEB HIMMAT, ALBERT FRIEDRICH ARMAND HUBER a/k/a AHMED HUBER, and YUSUF AL QARDAWI. Its main office is 10 Deveux Street, PO Box 4877, Nassau Bahamas. An affiliated company in Lugano, Switzerland AL TAQWA MANAGEMENT ORGANIZATION a/k/a NADA MANAGEMENT ORGANIZATION performed much of the actual administrative work for BANK AL TAQWA. BANK AL TAQWA shares an address with AKIDA ISLAMIC BANK and DAR AL MAAL AL ISLAMI TRUST in the Bahamas.

386.    AHMED HUBER has publicly expressed support for AL QAEDA, has acknowledged that he met with members of OSAMA BIN LADEN's terrorist network in Lebanon and claims he funneled money from wealthy Saudi families to BANK AL TAQWA. In 1996 and 1997, Italian authorities with assistance from Switzerland first began investigating BANK AL TAQWA and NADA links to terrorists.

387.    Defendants JAMAL BARZINJI and HISHAM AL TALIB worked for NADA (*infra*), the head of BANK AL TAQWA. Two other SAAR network officers were also affiliated with BANK AL TAQWA. SULAIMAN AL RAJHI was on the Board of Directors of AKIDA BANK in the

Bahamas.

388.    Defendant BAKR MUHAMAD BIN LADEN and his brother, Ghalib M. Bin Laden,

brothers of defendant OSAMA BIN LADEN were investors and account holders in BANK AL

TAWQA. Ghalib Bin Laden made an original deposit of $1 million U.S. in BANK AL TAQWA.

389.    Defendant SHEIKH YUSUF AL QARDAWI has long been a member of the

MUSLIM BROTHERHOOD.    YUSUF AL QARDAWI is a major shareholder of BANK AL

TAQWA and sits on its Islamic Legal Control Committee. YUSUF AL QARDAWI, in May 2001,

just months before the terror attacks on America, said; "The suicide mission is the loftiest form of

jihad."    YUSUF AL QARDAWI is also an officer of three DAR AL MAAL AL ISLAMI TRUST

companies (*infra*.)

390.    MOHAMED MANSOUR and ZEINAB MANSOUR-FATTOUH, as officers of AL

TAQWA MANAGEMENT must have been aware of the sources of funding for BANK AL TAQWA

as well as where was funds were disbursed.

391.    The United States Department of the Treasury has listed the following people and

organizations as Specially Designated Global Terrorists; AKIDA BANK PRIVATE LTD aka Akida

Islamic Bank, ASAT TRUST, BANK AL TAQWA, MALAYSIAN SWISS GULF AND AFRICAN

CHAMBER aka Gulf Center aka MIGA, ALI GHALEB HIMMAT, ALBERT FRIEDRICH

ARMAND HUBER aka AHMED HUBER, MOHAMED MANSOUR, ZEINAB MANSOUR-

FATTOUH, NADA MANAGEMENT ORGANIZATION a/k/a al Taqwa Management

Organization, YOUSEF NADA, NASCO NASREDDIN HOLDINGS, AHMED IDRISS

NASREDDIN.  All are participants or associated with ASAT TRUST's activities and operations,

which knowingly facilitate and support AL QAEDA's financial network for terror activities.

392.    HIMMAT, HUBER, MANSOUR, MANSOUR-FATTOUH, AL QARDAWI, NASREDDIN and NADA are aiders, abettors, material sponsors and/or co-conspirators of international terrorism, including AL QAIDA.


**SAUDI BIN LADEN GROUP**

393.    THE SAUDI BIN LADEN GROUP (or "SBG"), is a global conglomerate, based in Saudi Arabia.

394.    THE SAUDI BIN LADEN GROUP's website details its history in the following manner:

> *The history of bin Laden began in 1931 when Mohammed bin Laden founded the company. From its humble beginnings as a general contractor, the company has grown and prospered in parallel with the growth and prosperity of the Kingdom of Saudi Arabia. Over the years the company has been entrusted with many major construction projects, projects that helped the Kingdom to develop its resources and expand its infrastructure.*

395.    The group is a privately held company wholly owned by the descendants of Mohammed Awad Bin Laden, father of OSAMA BIN LADEN. The international conglomerate is active in the areas of construction, engineering, real estate, distribution, telecommunications and publishing. Construction accounts for more than half of SBG's gross revenue.

396.    SBG or its predecessor in interest, was the first private contractor in Saudi Arabia. SBG's status as an organization makes it exempt from publishing its financial records. For several

years, it was the official and exclusive contractor of the holy sites of Mecca and Medina.

397.    SAUDI BIN LADEN GROUP is run by BAKR M BIN LADEN, son of Mohammed Bin Laden and brother of OSAMA BIN LADEN.  At the time of the death of Mohamed Bin Laden, MOHAMED BAHARETH was appointed by the King of Saudi Arabia to run the SAUDI BIN LADEN GROUP until Salem Bin Laden could take over.  Salem ran the group until his accidental death in 1998. SBG's board of directors include Saleh Gazaz, MOHAMMED BAHARETH, Abdullah Bin Said, Mohammed Nur Rahimi, and Tarek M. Bin Laden.  Until recently, the SAUDI BIN LADEN GROUP had an address in Rockville, Maryland.  MOHAMED BAHARETH also sits on the board of FAISAL ISLAMIC BANK. (*Infra*)

398.    OSAMA BIN LADEN used SBG support and assistance to build necessary infrastructure in Afghanistan as he did in SUDAN.  In the introduction of his Declaration of War against the Americans in 1996, OSAMA BIN LADEN admitted this family support:

> *Then in 1979, just after he graduated from King Abdul Aziz University in Afghanistan, and the Mujahideen put out an international plea for help, Osama bin Laden responded by packing himself and several of his family's bulldozers off to Afghanistan.*

399.    The SAUDI BIN LADEN GROUP provided material support and financing to OSAMA BIN LADEN in Afghanistan, as reported by the United States State Department:

> *Under Al Qaida auspices, Bin Laden imported bulldozers and other heavy equipment to cut roads, tunnels, hospitals, and storage depots Afghanistan's mountainous terrain to move and shelter fighters and supplies.*

400.    After the Soviets withdrew from Afghanistan in 1989, OSAMA BIN LADEN returned to work in the SAUDI BIN LADEN GROUP's Jeddah-based construction business.  He

continued to support militant groups until his departure to SUDAN in 1991. After his relocation

to SUDAN the same year, OSAMA BIN LADEN maintained close relationships with the SAUDI

BIN LADEN GROUP and they remained his sponsor.

401. The relationships between Osama Bin Laden and his family continued, despite

claims to the contrary. Dr. Saad Al Fagih, Saudi dissident living in London, and former Afghan

combatant, who kept close relationship with Osama Bin Laden for many years, stated in 1994:

There's a very interesting thing in Islamic structure of the family: you are obliged to support your

family members. Even if they are distant members. If it's a cousin or a niece or a nephew, especially

a brother, you have to support them if you are a capable person. And the people feel sinful if they

don't let this money go to its real owner, in this case, Osama Bin Laden.

402. The notion that OSAMA BIN LADEN had been somehow "disowned" by the BIN

LADEN's family is not supported by the facts or by the realities of Saudi culture. In a 1997

interview, OSAMA BIN LADEN revealed that on nine different occasions, his mother, uncle and

brothers had visited him in Khartoum in SUDAN even though he had been exiled. The SAUDI BIN

LADEN GROUP provided OSAMA BIN LADEN financial assistance and engineering support in

Sudanese construction projects. Various sources confirmed that the Sudanese construction

company set up by OSAMA BIN LADEN, AL-HIJRA FOR CONSTRUCTION AND

DEVELOPMENT, was a subsidiary of the SAUDI BIN LADEN GROUP. This information is

confirmed by an Intelligence Newsletter:

> These are Wadi al Aqiq, an agricultural company with an investment
> arm; Al Timar Al Mubarikah, a sugar concern; Al Hijra a building
> and public works company . . . an affiliate of the powerful Saudi
> group headed Bin Laden's father.

403.    In SUDAN, OSAMA BIN LADEN participated in the construction of the Tahaddi road and the Port Sudan Airport.  The SAUDI BIN LADEN GROUP provided support and contributions to these public works through two subsidiaries.  The Public Buildings and Airports Division of the SAUDI BIN LADEN GROUP participated in the construction of the Port Sudan Airport, and the Mohamed Bin Laden Organization (a subsidiary of SBG) provided technical assistance on the road construction in the Sudan with OSAMA BIN LADEN.  The SAUDI BIN LADEN GROUP confirmed publicly these two collaborations:

> Over the years the Division has undertaken various challenging projects, large and medium scale, including complete airports and roads. . . . The projects executed include . . . Port Sudan Airport. SBG's skills . . . has been recognised and utilized in the United Arab Emirates, Jordan, Yemen and Sudan.

404.    The agreement for the construction of an airport in Port Sudan was between the Republic of SUDAN and the SAUDI BIN LADEN GROUP.  In 1993, OSAMA BIN LADEN stated that he was involved in the construction of the road linking Khartoum to Port Sudan with some of the former Afghan fighters who became part of AL QAIDA.

405.    Relationships between the three entities: OSAMA BIN LADEN, the Republic of SUDAN, and the SAUDI BIN LADEN GROUP were stressed during the inauguration ceremony of the Port Sudan airport:

> Meanwhile, Osama Bin Laden, was the first guest invited to attend the inauguration of the new Port Sudan Airport. He sat in the front row and was the guest of honor in this ceremony. It was a group of Bin Laden's companies that carried out the project of the new and modern airport that cost huge amounts of money.

406.    Moreover, while OSAMA BIN LADEN was constructing the Tahaddi Road with

219

SAUDI BIN LADEN GROUP's technical assistance, his own company, AL-HIJRA, was headed by AL QAIDA members. The testimony of Jamal Ahmed Al Fadl during the 2001 trial of the 1998 African Embassy Bombings further revealed the nature of AL-HIJRA executives in SUDAN:

> Q.    Do you know who ran the Al-Hijra Company while it was in the Sudan?
> A.    At the time, few people. The first one Dr. Sharif al Din Ali-Mukhtar.
> Q.    Who else?
> A.    Abu Hassan al Sudani, and Abu Hamman Al Saudi, Abu Rida Suri and Abu Hajer.

407.    Other AL-HIJRA agents, officers, or executives were directly involved in AL QAIDA and terrorist operations. Mamdouh Mahmud Salim, an AL QAIDA co-conspirator, was on the AL-HIJRA board of directors and is a founding member of AL QAIDA.

408.    The SAUDI BIN LADEN GROUP sheltered and directly supported operatives of the AL QAIDA terrorist organization.  MOHAMMAD JAMAL KHALIFA is a key figure in the network of OSAMA BIN LADEN and has been implicated as a central AL QAIDA figure in several international terrorist plots. Yet KHALIFA was taken in by a branch of SAUDI BIN LADEN GROUP, the Mohammed Bin Laden Organization, headed by OSAMA BIN LADEN's brothers. The address listed on KHALIFA's visa application was the Mohammed Bin Laden Organization in Jeddah, Saudi Arabia.

409.    The Mohammed Bin Laden Organization is a wholly-owned subsidiary of the SAUDI BIN LADEN GROUP.  The board members include Saleh Gazaz, MOHAMED BAHARETH, Abdullah Bin Said, Mohamed Nur Rahimi, BAKR M. BIN LADEN, Tarek M. Bin Laden, Omar M. Bin Laden, and Yeslam M. Bin Laden.

410.    In the early 1990s, Tarek Bin Laden served as the general supervisor of the IIRO,

a charity that has aided and abetted and materially supported AL QAIDA and international terrorism (*supra)*.  During this time, IIRO was rapidly becoming AL QAEDA's foremost charity used as a means to transfer funds, personnel, and other means of material support.  The CIA reported:

> The former head of the IIRO office in the Philippines, Muhammad Jamal Khalifa, has been linked to Manila-based plots to target the pope and U.S. airlines; his brother-in-law is Osama Bin Laden.

And

> The IIRO helps fund six militant training camps in Afghanistan.

411.    According to an Arabic publication, Tarek Bin Laden had a prominent role in 1990 at the IIRO:

> Tarek bin Laden has been a member of the IIRO in MWL for ten years.  He has been working quietly for the orphans and the immigrants in the Islamic world. In the past two years the operation of IIRO has grown thanks to the support of the Saudi Royal family. Tarek says that the IIRO relies on donations of the Saudi people and some donations from the Islamic world.

412.    OSAMA BIN LADEN's name is still listed in the SAUDI BIN LADEN GROUP's corporate records.


## **AL-RAJHI BANK**

413.    Officially founded in 1987, Defendant AL-RAJHI BANKING & INVESTMENT CORPORATION, (or "AL-RAJHI BANK") has a network of nearly 400 branch offices throughout Saudi Arabia and manages seventeen subsidiaries around the world.  Defendant SULAIMAN ABDULAZIZ AL RAJHI is the Managing Director of AL-RAJHI BANKING & INVESTMENT CORPORATION. Defendant SALEH ABDULAZIZ AL RAJHI is the Chairman.  Defendant

ABDULLAH SULAIMAN AL RAJHI is the General Manager.

414.    The AL-RAJHI BANKING & INVESTMENT CORPORATION is the primary bank for a number of charities that serve as AL QAIDA supporters. AL-HARAMAIN ISLAMIC FOUNDATION, THE MUSLIM WORLD LEAGUE ("MWL"), and the IIRO all funnel terrorism financing and support through the AL-RAJHI BANKING & INVESTMENT CORPORATION financial system.  AL RAJHI BANK promoted fund raising for the SAUDI JOINT RELIEF COMMITTEE, a charity headed by AL QAIDA founder and Specially Designated Global Terrorist, WA'EL JULAIDAN, by setting up a special account.  Specially Designated Global Terrorist YOUSEF NADA maintained a bank account at AL RAJHI BANK until at least December 2002. One of the American Airlines Flight 11 hijackers, ABDULAZIZ AL OMARI, held an account with AL-RAJHI BANKING & INVESTMENT CORPORATION.

415.    Defendant SULAIMAN ABDUL AZIZ AL RAJHI has a history of financially supporting AL QAIDA terrorists. The AL RAJHI family is also the primary financier of the SAAR FOUNDATION  (*infra*) and, as such, is implicated by the SAAR Network's sponsorship of terrorism and OSAMA BIN LADEN.  SALEH ABDULAZIZ AL RAJHI has been closely linked to OSAMA BIN LADEN's personal secretary and convicted terrorist, WADIH EL HAGE.  When the Kenyan house of OSAMA BIN LADEN's personal secretary, WADIH EL HAGE, was raided in 1997, contact information regarding SALEH ABDULAZIZ AL RAJHI was discovered.  WADIH EL HAGE is an AL QAIDA member who was convicted for the 1998 United States Embassy bombings in Kenya and Tanzania.

416.    The SAAR FOUNDATION made grants/allocations directly from a Chase

222

Manhattan Bank account that was in the name of AL RAJHI BANKING & INVESTMENT CORPORATION.

417.    AL RAJHI BANK issued travelers checks to AL HARAMAIN ISLAMIC FOUNDATION, a Specially Designated Global Terrorist.  AL RAJHI BANK cashed travelers checks for AL HARAMAIN.  These actions facilitated the surreptitious movement of funds to Chechnya.

418.    AL RAJHI BANK operated one of the few correspondent accounts for BANK AL TAQWA, a Specially Designated Global Terrorist (*infra.*)  Without these correspondent accounts, BANK AL TAQWA would not have been able to financially support AL QAIDA.

419.    In an interview with the FBI, an AL QAIDA informant stated that AL RAJHI "is the name of a bank in which al Qaida had funds on deposit."

420.    AL RAJHI BANK was a major creditor to the fraudulent and terror sponsoring BCCI.  AL RAJHI BANK attempted to cover up its exposure to BCCI and during the ensuing uproar, US Ambassador to Saudi Arabia, Charles Freeman, noted AL RAJHI BANK's reputation for "loan shark practices."

421.  AL RAJHI BANKING & INVESTMENT CORPORATION knowingly assisted AL QAIDA through: providing services to the Spanish and Hamburg AL QAIDA cells; allowing SAAR network to use its correspondent account with a US bank to launder money for terror; providing bank services to AL QAIDA directly; acting as a correspondent bank for BANK AL TAQWA; providing banking services for YOUSEF NADA; providing banking services for AL HARAMAIN to launder money for terror; and providing banking services for numerous AL QAIDA sponsoring

charities.

422.    Co-conspirators, agents, aiders and abettors of the AL RAJHI banking scheme to fund or otherwise materially support terrorism include: SULAIMAN ABDULAZIZ AL RAJHI, SALEH ABDULAZIZ AL RAJHI, and ABDULLAH SULAIMAN AL RAJHI.   All of these Defendants do business in and have a significant business presence in the United States, including but not limited to, through Al-Watania Poultry, one of the world's largest poultry businesses, and through Defendants MAR-JAC POULTRY, INC., MAR-JAC INVESTMENTS, INC. and PIEDMONT POULTRY.   They are also material sponsors of international terrorism.

### NATIONAL COMMERCIAL BANK AND BIN MAHFOUZ

423.    The defendant NATIONAL COMMERCIAL BANK (or "NCB") was founded in 1950 by Salim Bin Mahfouz.  KHALID BIN SALIM BIN MAHFOUZ is the son of Salim Bin Mahfouz.  The NATIONAL COMMERCIAL BANK ("NCB") was the first commercial bank of Saudi Arabia, based in Jeddah. After Salim Bin Mahfouz's death in 1986, his son KHALID BIN MAHFOUZ became President and CEO of the NATIONAL COMMERCIAL BANK and remained in that position until 1999, becoming its principal shareholder with control over more than 50% of the bank's capital.  KHALID BIN MAHFOUZ's son ABDULRAHMAN BIN MAHFOUZ was Deputy General Manager, Deputy Chairman of the Executive Committee, and until at least 2002, was on the Board of Directors.  The NCB has several wholly-owned subsidiaries, including SNCB Corporate Finance Ltd. In London, SNCB Securities Ltd. In London, and SNCB Securities Ltd. in New York City through which it operates an international banking enterprise.

424.    The NATIONAL COMMERCIAL BANK was implicated between 1986 and 1990

224

in the fraudulent schemes and practices of the Bank of Credit and Commerce International (or "BCCI" scandal). NCB Chairman KHALID BIN SALIM BIN MAHFOUZ became Chief Operating Officer and major shareholder of BCCI. A 1992 United States Senate Report on the BCCI scheme detailed the role of NCB in hiding assets, money laundering, the cover-up and obstruction of a Senate investigation, and sponsoring international terrorism. The NCB was used by OSAMA BIN LADEN and AL QAIDA as a financial arm, operating as a financial conduit for OSAMA BIN LADEN's operations. As a former CIA counter-terrorism expert explained in October 2001:

> *How does the Al Qaida organization fund its worldwide network of cells and affiliated groups? Several businessmen in Saudi Arabia and in the Gulf contribute monies. Much of the money is paid as 'protection' to avoid having the enterprises run by these men attacked. There is little doubt that a financial conduit to Bin Laden was handled through the National Commercial Bank, until the Saudi government finally arrested a number of persons and closed down the channel. It was evident that several wealthy Saudis were funneling contributions to Bin Laden through this mechanism. Now, it appears, that these wealthy individuals are siphoning off funds from their worldwide enterprises in creative and imaginative ways.*

425. The BIN MAHFOUZ family businesses are organized through a series of "holding" companies, including a Conglomerate, Saudi Economic and Development Company LLC (SEDCO), founded in 1976 and based in Jeddah, and a petroleum company which is chaired by KHALID BIN MAHFOUZ's son.

426. Between 1986 and 1990, KHALID BIN SALIM BIN MAHFOUZ was a director of the Bank of Credit and Commerce International (BCCI). After several fraudulent practices were discovered, KHALID BIN SALIM BIN MAHFOUZ was indicted on July 1, 1992, on charges of participation in a Scheme to Defraud in the First Degree in violation of New York Penal Law §

190.65, in connection with certain acts and omissions relative to BCCI Holdings and certain related entities. The indictment alleged a series of misrepresentations, sham loans, and fraudulent conduct in failing to disclose the status of his interest in BCCI.

427.    Under KHALID BIN SALIM BIN MAHFOUZ, BCCI was also implicated in supporting international terrorism, as reported by the United States Senate:

> *In the course of targeting BCCI for laundering drug money, the CIA learned of BCCI's involvement in manipulating certain financial markets, in arms trafficking, and in supporting international terrorism, including handling the finances of Sabri al Bannah or Abu Nidal, and his terrorist organization.*

428.    The 1992 Senate investigative Report detailed the initial involvement of BCCI in terrorism financial supporting terrorism:

> *BCCI's support of terrorism and arms trafficking developed out of several factors. First, as a principal financial institution for a number of Gulf sheikhdoms, with branches all over the world, it was a logical choice for terrorist organizations, who received payment at BCCI-London and other branches directly from Gulf-state patrons, and then transferred those funds wherever they wished without apparent scrutiny. Secondly, BCCI's flexibility regarding the falsification of documentation was helpful for such activities. Finally, to the extent that pragmatic considerations were not sufficient of themselves to recommend BCCI, the bank's pan-third world and pro-Islam ideology would have recommended it to Arab terrorist groups.*

429.    A bank audit of the defendant NATIONAL COMMERCIAL BANK conducted in 1998 revealed that over a 10 year period $74 million dollars was funneled by its Zakat Committee to the IIRO, headed by OSAMA BIN LADEN's brother-in-law.

430.    The defendant NCB audit report also stressed various irregularities due to "unreported expenses and loans." It states that "without knowledge of the Zakat Committee, NCB Directors established over the years credit and loans facilities for several charitable organizations, along with

226

banking facilities that were not reviewed by the Committee." Direct donations were received through NCB facilities to the SAUDI RED CRESCENT, IIRO and the MUWAFFAQ Foundation. NATIONAL COMMERCIAL BANK, its agents and employees knew or should have known they were materially sponsoring, aiding and abetting AL QAIDA, OSAMA BIN LADEN, and international terrorism.

431.    The NCB audit report reflects a $3 million dollar transfer to MUWAFFAQ-BLESSED RELIEF FOUNDATION. KHALID BIN SALIM BIN MAHFOUZ was dismissed from the NCB in 1999 soon after the release of the bank's audit report and placed under house arrest. KHALED BIN MAHFOUZ set up various charity organizations around the world since 1991. Every one of these foundations were linked to AL QAIDA and involved in the financing and material sponsorship of OSAMA BIN LADEN's international terrorist operations.

432.    The BIN MAHFOUZ family controlled the NATIONAL COMMERCIAL BANK in Saudi Arabia, until 1999 when the Saudi Government bought the majority of its ownership. Upon information and belief that bank has financed the operations of BIN LADEN and reports from Saudi Arabia's NATIONAL COMMERCIAL BANK show that in 1998 MUWAFFAQ provided BIN LADEN with $3 million. At the time of the transfers of money to OSAMA BIN LADEN via NCB, ABDULRAHMAN KHALED BIN MAHFOUZ was the Deputy General Manager of the bank as well as Deputy Chairman of the Executive Committee.

433.    ABDULRAHMAN KHALED BIN MAHFOUZ served on the board of directors of MUWAFFAQ FOUNDATION. ABDULRAHMAN BIN MAHFOUZ worked closely with YASIN AL QADI in managing MUWAFFAQ. From his positions as an officer of both NATIONAL

COMMERCIAL BANK and MUWAFFAQ, ABDURAHMAN BIN MAHFOUZ provided financial and other support to OSAMA BIN LADEN and AL QAIDA.

434.    Upon information and belief, KHALED BIN MAHFOUZ, is also linked to the SAAR FOUNDATION and its related charities. Offices of the SAAR FOUNDATION, a Saudi financed entity in Herndon, Virginia were searched by Treasury Department investigators in March 2002. SAAR shares a mailing addresses with many  organizations with overlapping offices, donors, directors and significantly, overlapping goals.

## DAR AL MAAL AL ISLAMI

435.    DAR AL MAAL AL ISLAMI TRUST a/k/a DMI is involved in Islamic banking, investment and insurance activities.  DMI is registered in the Bahamas and  operates from Geneva, Switzerland under the name DMI Administrative Services SA.  DMI was founded in 1981.  Until 1983, DMI was operated under M. Ibrahim Kamel's chairmanship.  On October 17, 1983, PRINCE MOHAMMED AL FAISAL AL SAUD became CEO.  Under PRINCE MOHAMMED AL FAISAL AL SAUD's chairmanship, DMI developed banking, investment and insurance activities in approximately twenty offices around the world.  DMI is currently chaired by Abdulkarim Khaled Yusuf Abdulla who replaced PRINCE MOHAMED AL FAISAL AL SAUD in early 2002.

436.    DMI has held substantial investments in three Sudanese banks which have been active supporters of OSAMA BIN LADEN and AL QAIDA; FAISAL ISLAMIC BANK SUDAN, TADAMON ISLAMIC BANK, and AL SHAMAL ISLAMIC BANK *(infra.*)

437.    DMI has had long running business relations with YOUSEF NADA.  NADA has been

listed by the United States Department of the Treasury as a Specially Designated Global Terrorist for his financial backing of AL QAIDA. NADA was a large shareholder in FAISAL ISLAMIC BANK SUDAN, an associated company of DMI, and over which DMI exercises significant influence.

438. BANK AL TAQWA, a terror financing bank controlled by YOUSEF NADA is registered in the Bahamas at the same address as DMI. The attorney in whose office DMI and BANK AL TAQWA are registered took an active role in both entities. For DMI, the attorney provides corporate officers and shareholders. For BANK AL TAQWA, the attorney provided cash handling services.

439. DMI's wholly owned subsidiary, Faisal Finance held 23 accounts for WA'EL JULAIDAN and YASIN AL KADI. Swiss authorities froze these accounts in November 2001. JULAIDAN has been listed by the United States Department of the Treasury as a Specially Designated Global Terrorist for his activities in founding and supporting AL QAIDA. AL KADI has been listed for his financial support to AL QAIDA as well as his actions with the AL QAIDA front charity MUWAFFAQ.

440. In 1998, the FBI's Counter Terrorism Task Force identified a Faisal Finance account of YASSIN AL QADI as being a source of funding for Hamas terrorist, Mohamed Saleh. In 1999, OSAMA BIN LADEN, on al Jazeera TV, acknowledged his close ties to WA'EL JULAIDAN. Nevertheless, DMI, via its wholly owned subsidiary, Faisal Finance, knowingly and intentionally continued to provide numerous accounts to WA'EL JULAIDAN and YASSIN AL QADI, financial supporters of terror. In fact, the Hamas financing account identified in 1998, was one of the accounts

frozen after September, 11, 2001.

441.    Defendant YUSUF AL QARDAWI is an official of three DMI companies.  AL QARDAWI is a significant shareholder of BANK AL TAQWA, a bank listed as a Specially Designated Global Terrorist.

442.    Defendant HASSAN AL TURABI, who invited and hosted OSAMA BIN LADEN and AL QAIDA in SUDAN, was on the Board of Supervisors of DMI at the time he seized power in SUDAN.

443.    DMI via its subsidiaries was a major depositor with the fraudulent and terror sponsoring Bank of International Credit and Commerce, BCCI.

444.    DMI's actions and breach of duty have aided, abetted and provided material sponsorship of the spread of international terrorism and AL QAIDA.

## AL BARAKA INVESTMENT AND DEVELOPMENT CORP.

445.    AL BARAKA INVESTMENT & DEVELOPMENT CORPORATION (or "AL BARAKA"), a wholly owned subsidiary of DALLAH ALBARAKA GROUP LLC (or "DALLAH ALBARAKA"), is based in Jeddah, Saudi Arabia. Its investments include 43 subsidiaries, mainly banks in Arab and Islamic countries.  Most of them are known as or registered as "al Baraka Bank." United States assets include Al Baraka  Bancorp Inc. in Chicago, Illinois, and Al Baraka Bancorp Inc. in Houston, Texas.

446.    A memo from the Russia Federation's Security Service details the AL BARAKA Bank's role in funding Defendant AL-HARAMAIN:

> *On existing knowledge, part of the obtained financing comes from the charitable collections (Zakat) and goes to the personal foreign accounts of field commanders, including Khattab and Basayef.*

447.    AL BARAKA provided OSAMA BIN LADEN with financial infrastructure in SUDAN beginning in 1983.  For example, the use of AL BARAKA Bank by AL-HARAMAIN was confirmed by a statement from AL-HARAMAIN chairman, AQEEL AL AQEEL, who declared that the charity maintained accounts at AL BARAKA Bank in Saudi Arabia.

448.    AL BARAKA INVESTMENT & DEVELOPMENT is present in the Sudanese banking sector, through assets held in Algharb Islamic Bank, AL SHAMAL ISLAMIC BANK, FAISAL ISLAMIC BANK, Sudanese Islamic Bank and TADAMON ISLAMIC BANK. AL BARAKA is also affiliated with the National Development Bank in SUDAN.

449.    Defendant SALEH ABDULLAH KAMEL was born in Makkah, Saudi Arabia, in 1941.  After being the adviser to the Saudi Minister of Finance, in 1969 he founded DALLAH ALBARAKA GROUP LLC, quickly establishing himself as one of the leading promoters of an Islamic financial and banking system capable of rivaling large Western institutions.

450.    DALLAH ALBARAKA GROUP LLC, a diversified conglomerate based in Jeddah, Saudi Arabia, is involved in various industries, services and financial activities.  The group includes twenty-three banks in Arab and Islamic countries, in addition to several investment and financial companies.

451.    DALLAH ALBARAKA GROUP LLC's portfolio includes a wholly owned subsidiary specializing in aviation-services, DALLAH AVCO  TRANS-ARABIA CO LTD (or DALLAH AVCO.)  The company was formed in 1975 and is based in Jeddah, Saudi Arabia.

452.    OMAR AL BAYOUMI, a Saudi national, was Assistant to the Director of Finance for DALLAH AVCO, a position he gave as a reference in an application for admission to Case Western Reserve University in Cleveland, Ohio in 1998. During his time in the United States, OMAR AL BAYOUMI received a monthly salary and living allowance from DALLAH AVCO.

453.    On May 5, 1998, OMAR AL BAYOUMI registered a fictitious company name called Masjed al Madinah al Munawarah based in San Diego, California.

454.    Two of the hijackers of American Airlines Flight 77, NAWAF AL HAZMI and KHALID AL MIHDHAR, were assisted by AL BAYOUMI. Upon the arrival of the future hijackers in the United States in January 2000, AL BAYOUMI invited them to San Diego, housed them, found them an apartment, paid for the apartment, organized a welcoming party for them, introduced them to his local mosque, arranged driver's licenses, credit cards, car insurance and social security cards. During this period of time, AL BAYOUMI's living allowance was increased 800% by DALLAH AVCO. It was via AL BAYOUMI that DALLAH AVCO financially supported the 9/11 hijackers with an estimated $30,000.

455.    Based on US Immigration and Naturalization Service records, the 9/11 commission reported that AL BAYOUMI's passport contained evidence of ties to AL QAIDA. According to the 9/11 Commission, the passports of at least three of the hijackers, including the two that AL BAYOUMI directly assisted, also contained these "indicators of Islamic extremism."

456.    SALEH ABDULLAH KAMEL, Chairman of DALLAH AL BARAKA and AL BARAKA BANK, was one of the three founding members of AL SHAMAL ISLAMIC BANK. SALEH ABDULLAH KAMEL founded the bank in 1983, along with a Sudanese company, Al

Shamal Investment and Development, and the Government of Northern State, then controlled by Governor Mutasin Abdel-rahim, representative of HASSAN AL TURABI.

457.    The practice and policy of DALLAH ALBARAKA GROUP LLC and AL BARAKA BANK is to provide financial support and material assistance to international terrorist organizations including AL QAIDA.

458.    In 1998, Al Aqsa Islamic Bank was established with $20 million in capital.  The main shareholders were DALLAH AL BARAKA  GROUP LLC and the Jordan Islamic Bank. Jordan Islamic Bank, a DALLAH AL-BARAKA LLC subsidiary, owns 14 percent of Al-Aqsa Islamic Bank.  SALEH ABDULLAH KAMEL acknowledged that DALLAH AL-BARAKA Group LLC owns another twelve percent directly.

459.    Since 1998, Israel has refused to approve the bank, citing its obvious ties with known terrorists. At the beginning of 2001, several antiterrorist authorities from Israel visited Citibank's headquarters in New York to warn its directors of the nature of the bank's activities with respect to international terrorism.

460.    AL BARAKA provided support to the "charity" AL-HARAMAIN. As reported by the Bosnian Intelligence Agency (Agency for Investigation and Documentation – AID) in a memorandum titled "Some illegal activities of humanitarian organizations investigated by the relevant investigative bodies of the Federation of Bosnia Herzegovina (FbiH)":

> Records available for 1998 show a flow of money into the so-called "operating" account of the HO [Humanitarian Organization] at the Deposit Bank, Sarajevo, from the "main" account, sent from Saudi Arabia via the Deutsche Bank and the Albaraka Bank in Turkey. The amount is 1,059,687 DEM [$2.13 million].

461.    A Bosnian Intelligence memo regarding the activities of AL-HARAMAIN states the

following:

> Given all the above security factors, we believe that the clear lack of
> any concrete humanitarian projects indicates that the existence of
> this HO [Humanitarian Organization] was a fictitious cover . . .

462.    The report establishes AL-HARAMAIN's role in financing and assisting OSAMA

BIN LADEN's operations.

> [t]he Saudi HO [Humanitarian Organization] al-Haramain, . . . has
> acted as a channel for financing the activities of terrorist
> organizations. . . . According to available intelligence, the Sarajevo
> office assisted the terrorist organization Gama al Islamija, while
> members of bin Laden's el Itihad al Islamija (AIAI) terrorist groups
> were employed at the Somalia offices, which also financed their
> operations.

234

## COUNT ONE

## <u>WRONGFUL DEATH BASED ON INTENTIONAL MURDER</u>

463.    Plaintiffs repeat the allegations of the paragraphs above as if fully set forth at length.

464.    As a direct and proximate result of defendants' intentional, willful and malicious acts of terrorism on September 11, 2001, defendants have caused plaintiffs' decedents' family members to suffer severe and permanent injuries, damages and losses, including but not limited to the following:

465.    Economic damages, including but not limited to, the pecuniary losses suffered by plaintiffs and decedents' remaining survivors, as a result of decedents' deaths, including but not limited to, loss of support, loss of services, loss of parental care and guidance, and loss of prospective inheritance; and

466.    Non-economic damages, including but not limited to, the loss of consortium, solarium, society, companionship, care, comfort and love suffered by plaintiffs and decedents' other survivors.

467.    WHEREFORE, by reason of the foregoing, defendants are liable jointly and severally to each wrongful death plaintiff in the sum of FIFTY MILLION ($50,000,000.00) DOLLARS, exclusive of interests, costs and fees.

## COUNT TWO

## <u>SURVIVAL</u> <u>DAMAGES</u> <u>BASED</u> <u>ON</u> <u>INTENTIONAL</u> <u>MURDER</u>

468.     Plaintiffs repeat the allegations of the paragraphs above as if fully set forth at length.

469.     As a result of their deaths, decedents lost the enjoyment of life that they would have had if they had not been killed.

470.     Before their deaths, decedents suffered conscious pain and suffering and fear of their impending deaths, entitling their estates to compensatory damages under governing law.

471.     WHEREFORE, by reason of the foregoing, defendants are liable jointly and severally to each of the decedents' estates in the sum of TWENTY FIVE MILLION ($25,000,000.00) DOLLARS.

## COUNT THREE

## <u>ASSAULT</u> <u>AND</u> <u>BATTERY</u>

472.     Plaintiffs repeat the allegations of the paragraphs above as if fully set forth at length.

473.     As a result of the September 11, 2001 hijackings and attacks, plaintiffs' decedents and/or personal injury plaintiffs were placed in apprehension of harmful and/or offensive bodily contact, and suffered harmful, offensive bodily contact, from which they ultimately died or suffered serious permanent personal injury.

474.     By reason of all of the foregoing, the surviving personal injury plaintiffs were seriously and severely injured, shocked, bruised and wounded and suffered great physical, mental and emotional pain and injury, and they were rendered sick, sore, lame and disabled, and were otherwise injured, and they were confined to a hospital, and/or to bed and home for a period of time

by reason thereof, and required and received medical care and treatment, and incurred medical expenses and will continue to incur future expenses therefor, and the surviving personal injury plaintiffs were prevented from attending to the duties of their employment and prevented from pursuing the furthering their careers and lost salary and earnings and will lose future salary and earnings thereby.

475.    WHEREFORE, by reason of the foregoing, defendants are liable jointly and severally to each of the personal injury plaintiffs in an amount in excess of FIFTEEN MILLION ($15,000,000.00) DOLLARS.

## COUNT FOUR

## VIOLATION OF ANTI-TERRORISM ACT, 18 U.S.C. § 2333

476.    Plaintiffs reallege above paragraphs as if fully set forth herein.

477.    Personal injury plaintiffs and plaintiffs' decedents, who are and were at all relevant times citizens of the United States, suffered substantial injuries to their persons, property, and business by reason of the acts of international terrorism perpetrated by defendants on September 11, 2001 that resulted in the death of plaintiffs' decedents and serious permanent injury to personal injury plaintiffs, a substantial portion of the planning, training and preparation for which occurred primarily outside the territorial jurisdiction of the United States.

478.    Defendants provision of material support and assistance to BIN LADEN and AL QAIDA in Afghanistan, IRAQ and other places as well as their provision of a safe haven and base of operations to BIN LADEN and AL QAIDA in Afghanistan and other countries from which they carried out terrorist attacks on the United States, including the September 11, 2001 terrorist attacks

that resulted in the death of plaintiffs' decedents, also constitutes acts of international terrorism that caused substantial injuries to the persons, property, and business of plaintiffs and plaintiffs' decedents.

479.    WHEREFORE, plaintiffs each demand judgment be entered in favor of plaintiffs acting individually and as the personal representatives of decedents' estates and in favor of the personal injury plaintiffs personally and against defendants, jointly and severally, for an amount THREE TIMES each plaintiff's compensatory damages, plus interests, costs, attorneys fees, and such other relief as the Court deems just and proper.

## COUNT FIVE

## TORTURE VICTIM PROTECTION ACT

480.    The Alien Tort Act, 28 U.S.C. § 1350, also known as the Torture Victim Protection Act, creates a cause of action in favor of plaintiffs in this action who are not nationals of the United States, and against the defendants for their violation of international law in torturing and killing the passengers and crew of the aforesaid Flights and victims on the ground.

481.    The Torture Victim Protection Act, 28 U.S.C. § 1350, creates a cause of action for all plaintiffs in this action against the defendants, for the torture and extrajudicial killing of the decedents and injury to plaintiffs.

482.    The plaintiffs and the estates of each decedent are entitled to recover wrongful death damages, including pecuniary losses, and damages for loss of support, consortium, society, companionship, prospective inheritance, care, love, guidance, training, education, solatium and services, and damages for grief and mental anguish, moral damages, burial expenses and other

damages.

483.    By reason of the foregoing, defendants are jointly and severally liable to each plaintiff and each decedent's estate in the sum of FIFTY MILLION ($50,000,000) DOLLARS.

**COUNT SIX**

**ANTI TERRORISM AND EFFECTIVE DEATH PENALTY ACT CLAIM, 28 U.S.C. § 1605(A)(7) -- IRAQ, IRAN AND THE SUDAN**

484.    Plaintiffs reallege the paragraphs above as if fully set forth herein.

485.    The death of plaintiffs' decedents and injury to personal injury plaintiffs, who were citizens of the United States at the time, resulted from acts of extrajudicial killing, torture and aircraft sabotage.

486.    These acts of extra judicial killing, torture and aircraft sabotage were perpetrated by agents of BIN LADEN and AL QAIDA, who received material support and resources from defendants, TALIBAN, IRAQ, SUDAN, and IRAN.

487.    Agents, officials or employees of defendants, TALIBAN, IRAQ, IRAN and the SUDAN provided material support and resources to BIN LADEN and AL QAIDA while acting in the scope of their offices, agencies, or employment.  Similar conduct, if committed by agents, officials or employees of the United States, would be actionable.

488.    At all relevant times, defendants IRAQ, SUDAN and IRAN were and are designated by the U.S. Government as a state sponsor of terrorism.

489.    The activities of the Islamic Emirate of Afghanistan under the TALIBAN regime, as described in this Complaint, were effectively deemed terrorist activities pursuant to former President Clinton's July 4, 1999, Executive Order No. 13129 and the continuation Order of June 30, 2001,

239

issued by President George W. Bush. In addition, after the terrorist acts on September 11, 2001, President George W. Bush and other senior U.S., officials clearly designated the Islamic Emirate of Afghanistan as having sponsored and supported the terrorists. For example, see President George W. Bush's September 24, 2001, Executive Order on Terrorist Financing (Executive Order No. 13224).

490.    WHEREFORE, plaintiffs demand judgment be entered in favor of plaintiffs individually and as personal representatives of their decedents' estates and in favor of the personal injury plaintiffs personally and against defendants IRAQ, IRAN and SUDAN and their instrumentalities and agents for an amount in excess of FIFTY MILLION  ($50,000,000.00) DOLLARS for each plaintiff, plus interest, costs, punitive damages, attorneys fees, and such other relief as the Court deems just and proper.

## COUNT SEVEN

## **PUNITIVE DAMAGES**

491.    Plaintiffs reallege the above paragraphs as if fully set forth herein.

492.    For the reasons stated above, and pursuant to § 28 U.S.C. § 1606, defendants each are liable jointly and severally, to each plaintiff for punitive damages in the amount in excess of THREE HUNDRED MILLION ($300,000,000.00) DOLLARS.

## COUNT EIGHT

## **PROPERTY DAMAGE**

493.    Plaintiffs reallege the above paragraphs as if fully set forth herein.

494.    As a direct and proximate result of defendants' intentional, willful and malicious acts

of terrorism on September 11, 2001, defendants have caused property damage plaintiffs severe and extensive damage in that their building became blighted; physical damage was caused to the building by parts of the World Trade Center which struck the building; asbestos and other materials from the World Trade Center struck plaintiffs' building; the building has become unsafe until the asbestos has been cleaned up; plaintiffs were required to perform extensive asbestos clean-up and clean-up for other toxic materials from the World Trade Center; the plaintiff's building has been closed for a substantial period since September 11, 2001; tenants have not paid rent; many tenants have abandoned and will abandon the building since they claim the building cannot currently safely be occupied as required by the tenants' leases; the exterior and interior of the building will have to be replaced; carpeting in the building has to be torn up and replaced; the value of the building has been blighted and diminished; and plaintiffs have been otherwise damaged, all of which damages are continuing into the future.

495. By reason of the foregoing, property damage plaintiffs are entitled to recover all of their damages from the defendant in an amount not to exceed the sum of ONE HUNDRED MILLION ($100,000,000.00) DOLLARS.

## JURY DEMAND

Plaintiffs demand trial by jury on all issues so triable.

WHEREFORE, plaintiffs and each decedents' estate demand

(a)    Count One - Wrongful Death Based on Intentional Murder the total sum of FIFTY MILLION ($50,000,000) DOLLARS for each wrongful death plaintiff;

(b)    Count Two - Survival Damages Based on Intentional Murder the total sum of TWENTY FIVE MILLION ($25,000,000) DOLLARS for each

wrongful death plaintiff;

(c)     Count Three - Assault and Battery the total sum of FIFTEEN MILLION ($15,000,000) DOLLARS for each plaintiff;

(d)     Count Four - Violation of Anti-terrorism Act, 18 U.S.C. § 2333 for treble damages;

(e)     Count Five - Torture Victim Protection Act the total sum of FIFTY MILLION ($50,000,000) DOLLARS for each plaintiff;

(f)     Count Six - Anti Terrorism and Effective Death Penalty Act Claim, 28 U.S.C. § 1605(a)(7) – Defendants IRAQ, Iraqi INTELLIGENCE and the TALIBAN the total sum of FIFTY MILLION ($50,000,000) DOLLARS   for each plaintiff;

(g)     Count Seven - Punitive Damages the total sum of THREE HUNDRED   MILLION ($300,000,000) DOLLARS for each plaintiff; and

(h)     Count Eight - Property damage the total sum of ONE HUNDRED MILLION ($100,000,000.00) DOLLARS for each plaintiff.


plus interests, costs and attorneys fees.

Dated: New York, New York
September 30, 2005


KREINDLER & KREINDLER
Plaintiffs Liaison Counsel

By: _____
James P. Kreindler (JK7084)
Marc S. Moller (MM0143)
Justin T. Green (JG0318)
Andrew J. Maloney, III (AM8684)
100 Park Avenue
New York, NY  10017-5590
(212) 687-8181
(212) 972-9432 (Fax)


242

Barasch McGarry Salzman Penson & Lim
11 Park Place
New York, NY 10007
(212) 385-8000
(212) 385-7845 (fax)

Baumeister & Samuels, P.C.
One Exchange Plaza
New York, NY 10006
(212) 363-1200
(212) 363-1346 (fax)

Speiser, Krause, Nolan & Granito
Two Grand Central Tower
140 East 45th Street (34th Floor)
New York, NY 10017
(212) 661-0011
(212) 953-6483 (fax)

Law Firm of Aaron J. Broder & Jonathan C. Reiter
350 Fifth Avenue, Suite 2811
New York, NY 10118
(212) 244-2000


Jaroslawicz & Jaros, Esqs.
150 William Street
New York, NY 10038
(212) 227-2780