# Arnold & Porter

Marcus A. Asner
+1 212.836.7222 Direct
Marcus.Asner@arnoldporter.com

November 12, 2024

**VIA ECF**

The Honorable Sarah Netburn
United States Magistrate Judge
Southern District of New York
40 Foley Square, Room 219
New York, New York 10007

      Re:    *In Re: Terrorist Attacks on September 11, 2001*, 1:03-md-01570-GBD-SN

Dear Judge Netburn:

      We write on behalf of Defendants the World Assembly of Muslim Youth and the World Assembly of Muslim Youth-U.S. (collectively, "WAMY") in response to the Court's Order dated October 11, 2024 granting WAMY an opportunity to respond to the allegations set forth in the anonymous letter received by counsel for the PECs regarding WAMY's expert witness Jonathan Marks, formerly of Baker Tilly (the "Letter"). *See* ECF Nos. 10416-1, 10421, 10477. As the Court is aware, WAMY retained our firm to conduct an investigation into the Letter's allegations, while Baker Tilly retained Daniel Flaherty of Godfrey & Kahn, S.C., to investigate the same allegations.

      This letter sets forth our response to the Letter, on behalf of WAMY, following our firm's investigation. Our response is also informed by information received from Godfrey & Kahn that their team gathered in their own investigation. In addressing the allegations set forth in the Letter, WAMY does not intend to waive the attorney-client privilege and work product protections that apply to the communications, interviews, and attorney work product that informed this response, particularly given that—due to the nature of the allegations against WAMY's counsel and retained expert—this investigation focused in part on the thought processes, mental impressions, and privileged communications of WAMY's litigation counsel in this ongoing litigation. Thus, we have prepared this letter in a manner that responds to the Letter's allegations but that does not waive the applicable protections, disclose protected information, or provide abnormal and additional expert discovery to WAMY's litigation adversary. Should the Court require additional information about our investigative steps and our findings, we would be happy to respond to any of the Court's questions and, should the Court deem it necessary and appropriate, provide such information on an *ex parte* basis for the Court's review.

      1.   *Executive Summary/Scope of Investigation*

      As part of our investigation, we reviewed relevant communications from, and conducted interviews with, the three attorneys for WAMY with primary responsibility for its engagement of Jonathan Marks: Omar Mohammedi of the Law Firm of Omar T.

Arnold & Porter Kaye Scholer LLP
250 West 55th Street  |  New York, NY 10019-9710  |  www.arnoldporter.com

**Arnold & Porter**

The Honorable Sarah Netburn
November 12, 2024
Page 2

Mohammedi; Jill Mandell, formerly of the Law Firm of Omar T. Mohammedi; and Frederick Goetz of Goetz & Eckland (collectively, the "WAMY Attorneys"). In addition, we interviewed one of two former Baker Tilly employees referenced in the Letter, Andy Guzman. We have been unsuccessful in our effort to talk with the other employee referenced, Steven Goldberg, although we sought to reach him on multiple occasions. We also reviewed the deposition transcript and video from Marks's deposition, and other filings from this case's docket.

As we noted above, our investigation also was informed by the separate investigation conducted by Godfrey & Kahn. As part of its investigation, Godfrey & Kahn interviewed current and former Baker Tilly employees, including Jonathan Marks (on multiple occasions), John Scaccia, based in Baker Tilly's Dubai office (who had the largest number of hours recorded on the WAMY engagement by any Baker Tilly employee) and Fred Massanova, the managing partner of Baker Tilly's Philadelphia office in July 2021. Additionally, Godfrey & Kahn reviewed the files created and maintained by Marks and his team on the WAMY engagement to see if any evidence exists within those files to support the allegation that Baker Tilly "buried" evidence. Finally, Godfrey & Kahn reviewed Baker Tilly billing and timekeeping records regarding the WAMY matter and interviewed Baker Tilly representatives involved with the response to concerns regarding billing practices.

Our investigation focused on the three categories of allegations set forth in the Letter, namely: (1) allegations regarding Baker Tilly's alleged discovery and burial of evidence damaging to WAMY; (2) allegations regarding the alleged coaching of Marks and deposition misconduct; and (3) allegations regarding the amount of work spent by Marks on the WAMY engagement. As detailed below, our investigation, and the investigation conducted by Godfrey & Kahn, failed to uncover any evidence substantiating the allegations that Baker Tilly or WAMY buried damaging evidence or that there was any improper coaching of Marks during the deposition. The investigations did substantiate that Goldberg and Guzman were in the conference room during the deposition, and that their appearances were not put on the deposition record. As detailed below, however, the failure to list Goldberg and Guzman on the deposition record appears to have been an oversight by all counsel present, as well as the court reporter, and we uncovered no evidence that the omission was intentional or that it led to any improper coaching. Finally, the investigations did substantiate that there were disputes internal to Baker Tilly regarding billing practices. We understand that Baker Tilly looked into those disputes and resolved them internally. WAMY's counsel had no knowledge of such internal disputes. Moreover, we uncovered no evidence supporting a conclusion that the internal Baker Tilly billing disputes impacted the substance of the conclusions drawn in Marks's report or at his deposition.

**Arnold & Porter**

The Honorable Sarah Netburn
November 12, 2024
Page 3

2. *Allegations Regarding Baker Tilly's Alleged Discovery of Damaging Evidence*

The Letter alleges that, in the course of its engagement, Baker Tilly uncovered and hid evidence that would support a conclusion that WAMY had engaged in terrorism financing. In particular, the Letter makes the following allegations:

- "Baker Tilly did find very damaging evidence against WAMY, Goldberg and Guzman were told by BT management to not share this evidence." (Allegation No. 12).

- "BT did not disclose what they really found in its review. BT found things that would draw to a conclusion that WAMY was involved in financing the 9/11 terrorist attacks, and with the help of BT and its partner, purposely hide [sic] these facts." (Final Paragraph).

Neither our investigation nor that conducted by Godfrey & Kahn uncovered any evidence supporting the allegations that Marks and his team uncovered and hid evidence that WAMY had engaged in terrorism financing. None of the witnesses interviewed agreed with that allegation, and we uncovered no evidence that would contradict their positions. On the contrary, consistent with expert witness standard practices, Marks and his team did not conduct any independent search for or review of evidence outside of their analysis of materials that were provided to them by the WAMY Attorneys, all of which were documents that we understand were produced in the litigation (and that were therefore available to the PECs). We uncovered no evidence that any Baker Tilly employee ever expressed to the WAMY Attorneys, or to anyone else, any view or suspicion that WAMY may have engaged in terrorism financing, and we understand from Godfrey & Kahn's investigation that no such views were expressed internally at Baker Tilly.

Accordingly, our investigation did not substantiate either of the allegations described above regarding Baker Tilly's alleged discovery and burial of evidence that would support a conclusion that WAMY engaged in terrorism financing.

3. *Allegations Regarding the Alleged Deposition Misconduct*

The Letter contains a number of allegations regarding the alleged coaching of Marks during his deposition. In particular, the Letter makes the following allegations:

- "There was a total of five people in the deposition room, you were told of only three. The other two were Steven Goldberg and Andy Guzman, both employees

**Arnold & Porter**

The Honorable Sarah Netburn
November 12, 2024
Page 4

> of Baker Tilly.  Steven Goldberg was the AML and Terrorism expert in the room to coach Marks thru his answers.  This was done because Marks had spent very little time on this case.  There was a large whiteboard where both Guzman and Goldberg would write answers on, that Marks would tell during the deposition." (Allegation 1).

- "Guzman and Goldberg were there because the Lawyer knew Marks was not qualified."  (Allegation 2).

- "Marks was coached during the live deposition."  (Allegation 8).

- "The Lawyers from the office of Law Firm of Omar T. Mohammedi, LLC, were in the room and were part of the coaching, this was witnessed by the Managing Partner of the Philadelphia office who was down the hall from the deposition, and he came to see what the yelling was about during the breaks."  (Allegation 9).

Neither our investigation nor that conducted by Godfrey & Kahn uncovered any support for the allegations that Marks was coached during his deposition or that those present for the deposition otherwise engaged in misconduct.  First, although Goldberg and Guzman did attend Marks's deposition in person, there is no indication that their presence was intentionally hidden from counsel for the PECs, as the Letter implies.  The Court's Deposition Protocol Order does require that each witness, attorney, and other person attending the deposition be identified on the record at the commencement of the deposition, *see* ECF No. 3894, ¶ 51, and neither Goldberg nor Guzman is listed in the transcript as being present.  The transcript and video of the deposition make plain that neither the court reporter nor counsel for any party raised the question of who, in addition to counsel, was in the room with Marks during the deposition.  *See* Marks Dep. Tr. 8:10–10:13 (no request from court reporter for appearances or identification of attendees, followed only by introduction of deposing counsel).  There likewise is no indication that appearances were requested or taken off of the record.  Neither side seems to have raised the issue.  This practice, while contrary to the Deposition Protocol Order, appears to have also been followed in other depositions taken in the case (by both sides) in instances where neither the deposing attorney nor the court reporter requested that full appearances be made.  *See, e.g.*, Barron Dep. Tr. 8:10–1:15 (no request for appearances or identification of attendees, with only deposing attorney introducing himself on record); Brown Dep. Tr. 11:10–13:14 (same); Jenkins Dep. Tr. 7:1–9:14 (request that counsel identify themselves, followed by identification of deposing and defending attorneys only, but no request for identification of attendees); Levitt Dep. Tr. 6:2–9:12 (request that counsel identify themselves, followed by introduction of deposing attorney, the deposing attorney's team, and defending attorney, but no request for identification of attendees);

**Arnold & Porter**

The Honorable Sarah Netburn
November 12, 2024
Page 5

Winer Dep. Tr. 13:5–14:8 (no request for appearances or identification of attendees). Although, as noted, this practice plainly did not follow the Court's Deposition Protocol Order, the evidence gathered in our investigation was that the failure to place on the record everyone present in the deposition room was an oversight by all involved, and in any event was not intended as a means of improperly influencing Marks's testimony.

Second, we uncovered no evidence supporting the allegations that Marks was coached during the deposition or that answers were written out for him on a whiteboard. No witness substantiated that allegation. Contrary to the Letter's allegation, Goldberg and Guzman were brought to the deposition by Marks (as members of his team), not at the request of the WAMY Attorneys. During the deposition, Marks was seated at the end of a long table, with a glass wall and entrance door behind him and two screens in front of him. Counsel for WAMY was seated on either side of the table (both partially obstructed by the screens), while Goldberg and Guzman were seated on the opposite end of the table (obstructed at least in part by the screens). The deposition was defended by Frederick Goetz (seated on Marks's left), while Omar Mohammedi witnessed the deposition while attending to other matters, breaking in only occasionally (as reflected in the transcript). Neither Goldberg nor Guzman appears to have communicated with Marks while he was testifying, and there is likewise no indication that WAMY's counsel participated in coaching of the witness as the letter alleges.

Third, while Marks communicated with WAMY's counsel and his team during breaks, there is no indication that those conversations crossed the line into improper witness coaching or included yelling, as the Letter alleges. There is likewise no indication that the managing partner of Baker Tilly's Philadelphia office "came to see what the yelling was about," and we understand from Godfrey & Kahn that the managing partner (Fred Massanova) was not in the Philadelphia office on the date of the deposition.

Finally, neither the deposition transcript nor the video appear to substantiate the Letter's allegations regarding the alleged coaching of Marks. In the PECs' letter to the Court dated October 9, 2024, counsel for the PECs wrote that they had identified what they believe to be "multiple instances where Marks' behavior, demeanor or testimony— as well as other visual or audio indicia—are consistent with the allegations in the Whistleblower Letter." ECF No. 10416, at 2. In particular, the PECs claimed that the deposition video showed (1) "indications that at least two undeclared persons were in the deposition room, situated behind the camera on the left-hand side of the frame (*i.e.*, to Marks' right)"; (2) instances where "Marks' eyes can be seen glancing persistently at additional individuals to Marks' right in the deposition room"; (3) instances where, especially during tense questioning, Marks "persistently appears to look at, gesture to, and receive prompts from others in the room"; (4) instance(s) where "at least one

**Arnold & Porter**

The Honorable Sarah Netburn
November 12, 2024
Page 6

unidentified voice is picked up on Marks' microphone"; and (5) upon close examination of the deposition video, "images of persons reflected in the glass behind Marks, perhaps even collaborating on a whiteboard." On October 23, 2024, we asked counsel for the PECs to provide us with the transcript citations for the indicia they referenced (and offered to provide the Court) so that we could consider them during our review. Counsel for the PECs elected not to provide us with the information we requested. Our letter to the PECs dated October 23, 2024, and the PECs' response dated October 25, 2024, are included herewith as Appendices A and B.

Our own review of the transcript and video does not support the characterization of the video described by counsel for the PECs. First, there is no indication in the video that "two undeclared individuals were . . . situated behind the camera on the left-hand side of the frame (*i.e.*, to Marks' right)." The deposition video reflects that one person was seated to Marks's right (slightly removed and down the table from Marks), at times visible in the reflection wearing a white dress shirt and tie. *See, e.g.*, Marks Vid. 10:38:51–40:15, 10:48:59–49:14, 4:02:27–06:52.[1] That person is shown to be WAMY attorney Omar Mohammedi when the reflected person leaves his seat shortly before exiting the deposition room through the door behind Marks (and takes his seat again shortly after reentering the room). *See id.* 9:43:46–43:55; 9:47:25–47:46. Second, while Marks at times looks left while he appears to be thinking, he also looks above camera and at times to his right, seemingly to avoid the screens that were placed in front of him, including in response to questions regarding his own background. *See* 9:31:58–33:13, 9:35:40–37:05, 9:41:24–42:18. Third, we identified only two instances where "unidentified" voices can be heard—one appears to be a statement made by a member of the PECs' litigation team (given that the voice appears to have better audio quality than statements made by WAMY's counsel, *see id.* at 9:51:42–52:23), *see id.* at 11:33:57–34:48, while the other appears while Marks is confirming that he has the right paragraph in a document and without any apparent connection to the questioning, *see* 12:54:37–55:35. We identified no instance in which Marks appears to take prompts from individuals seated next to him (other than to signal that he has a document already and to confirm that he can answer a question, *see id.* at 9:57:20–57:36, 11:20:43–21:19, 1:05:06–05:35), and no indication of individuals in the reflection "perhaps even collaborating on a whiteboard."

---

[1] All citations to the video from Marks's deposition refer to the video's time stamp, which is visible at the bottom of the screen while playing the video. Contemporaneous with the filing of this letter, we will send the Court an FTP link at which the four MPG video files (.mpg) comprising the deposition video can be downloaded.

**Arnold & Porter**

The Honorable Sarah Netburn
November 12, 2024
Page 7

Accordingly, our investigation did not substantiate any of the allegations described above regarding the alleged coaching of Marks during his deposition.

4. *Allegations Regarding Marks's Time and Work on Expert Report*

The Letter contains a number of allegations regarding the amount of time that Marks spent working on the WAMY engagement and the amount of time that he billed to it. In particular, the Letter asserts the following:

- Steven Goldberg attended the deposition as "the AML and Terrorism expert in the room to coach Marks thru his answers . . . because Marks had spent very little time on this case." (Allegation No. 1).

- "Marks lied about the amount of time he spent on the engagement and when asked about this during the deposition, he lied. There is proof if this in the BT system of time." (Allegation No. 3).

- "Marks changed the final bill to reflect time that did not match with Baker Tilly official records. He did this to show as if he spent 100's of hours, but he actually spent very little time on the engagement. He did this and then signed a sworn statement that the bills were correct, this is a lie." (Allegation No. 4).

- "Baker Tilly's time records do not match the records provided to you and the courts." (Allegation No. 5).

- "The time records in Baker Tilly[']s system will show how little Marks worked on the case, it will also show that Marks changed Goldberg and Guzman's hours to himself." (Allegation No. 6).

- "Mr. Marks, when asked about the billing, was not telling the truth, he did not state that Baker Tilly refunded the client tens of thousands of dollars because of poor work and missed billings." (Allegation No. 10).

- "Mr. Marks changed the time booked by Guzman and Goldberg to be reflected as his own." (Allegation No. 11).

- "Goldberg and Guzman both went to senior management at Baker Tilly with [the alleged billing-related] claims, gave them evidence, and wrote a letter and a whistleblower hotline complaint to BT management. Guzman wrote a 10-page letter, whistleblower accusation and send it to the operating committee, General

**Arnold & Porter**

The Honorable Sarah Netburn
November 12, 2024
Page 8

- Counsel and Chairman. Guzman and Goldberg were never talked to by management. They were told that this would cause great damage to the firm and to stop bringing it up."

- "Marks lied under oath, he lied about his hours in the deposition, Baker Tilly never reached out to the courts or to you. Baker Tilly never spoke to Guzman or Goldberg after they made various complaints about these lies. The attorneys were aware of the lies because they knew Marks refunded the client money." (Final Paragraph).

Our investigation uncovered conflicting evidence regarding these specific allegations. First, neither our investigation nor that of Godfrey & Kahn substantiated the allegations above regarding Marks's bills, the time he spent on the matter, or his preparedness to testify. While Marks relied on a team of Baker Tilly professionals in preparing his report—as the Court noted in its denial of the PECs' motion to preclude his testimony, *see* ECF No. 9060, at 34–35—we found that Marks was personally involved in the report. Among other things, he participated in discussions with the WAMY Attorneys regarding the preparation of the report, communicated with the WAMY Attorneys regarding its progress, and was kept apprised throughout its preparation. We understand from Godfrey & Kahn's investigation that Marks likewise played an active role internally at Baker Tilly in preparing the report. In addition, Marks met with the WAMY Attorneys on several occasions to prepare for his deposition.

The investigation did reveal that there were disputes internal to Baker Tilly regarding Marks's general billing practices that were not known to WAMY's counsel. We understand from Godfrey & Kahn's inquiries that these issues were escalated to Baker Tilly management, which looked into the issue and handled it internally. We uncovered no evidence that the reported dispute regarding billing practices within Baker Tilly impacted the substance of either Marks's report or his deposition testimony.

Finally, our investigation did not substantiate the Letter's allegations that "Baker Tilly refunded the client tens of thousands of dollars because of poor work and missed billings" or that the WAMY Attorneys were aware of Marks's alleged lies regarding his involvement "because they knew Marks refunded the client money." The investigation did not uncover any evidence supporting the allegation that WAMY was refunded money for "poor work and missed billings," or that WAMY was provided a refund of any amount at all. The investigation showed that the WAMY Attorneys provided direct feedback regarding initial drafts of Baker Tilly's work product and the process of working with Baker Tilly, and negotiated with Baker Tilly regarding the amount of their fees, including an agreement to cap the amount of fees at a set amount for the deposition

**Arnold & Porter**

The Honorable Sarah Netburn
November 12, 2024
Page 9

preparation phase of the engagement. WAMY ultimately paid Baker Tilly the full amounts invoiced to it, with the exception of a write-off for the duplicative work of two Baker Tilly employees (Paul Zikmund and Melissa Dardani) who departed the firm after their early-stages work on the engagement, and for a few hours of work billed by Baker Tilly as having been conducted after the report had been issued. That write-off had no relation to the number of hours that Marks worked on the matter, how he billed his time, or whether Marks was truthful at his deposition about his time.

We thank the Court for its consideration of this letter. We of course are available to address any questions that the Court may have.

Respectfully,

*/s/ Marcus A. Asner*
Marcus A. Asner
Benjamin Wolverton

Cc:     All counsel of record (via ECF)