LAW FIRM OF
**OMAR T. MOHAMMEDI, LLC**

233 BROADWAY, SUITE 820
WOOLWORTH BUILDING
NEW YORK, NY 10279
PHONE (212) 725-3846
FACSIMILE (212) 202-7621
WWW.OTMLAW.COM

OMAR T. MOHAMMEDI, ESQ.
DIRECT DIAL: (212) 725-3846 x101
EMAIL: OMOHAMMEDI@OTMLAW.COM

ADMITTED: NEW YORK, EIGHTH CIRCUIT
SECOND CIRCUIT,
US COURT ON INTERNATIONAL TRADE

November 12, 2024

**VIA ECF**

The Honorable Sarah Netburn
Magistrate Judge, United States District Court
Thurgood Marshall U.S. Courthouse
40 Foley Square, Room 219
New York, NY 10007

    **Re**:    *In Re: Terrorist Attacks on September 11, 2001*, 03 MDL 1570 GBD-SN
               WAMY's Response to PEC's 10/9/24 Inflammatory Letter:

Dear Judge Netburn:

    Defendants World Assembly of Muslim Youth and World Assembly of Muslim Youth-International (USA) ("WAMY"), write pursuant the Court's Order of October 11, 2024 (ECF No. 10421) in response to the Plaintiffs' Executive Committees ("PECs") letter application of October 9, 2024. (ECF No. 10416).

    The allegations of obstructive wrongdoing during expert discovery, though serious, are demonstrably false. Outside investigations conducted at the behest of both WAMY and Baker Tilly show that any allegations of wrongdoing are unfounded.[1] Further, a review of the allegations compared against the record in this case shows that whichever unknown person made them, they are unreliable, uncorroborated, and likely lifted from the public record to parrot and bolster PECs' previously rejected attacks on the same expert.

    Allowing PECs to reopen expert discovery based solely on the claims in the anonymous allegations letter PECs filed[2] (the "allegations letter") without any knowledge as to who wrote it, the provenance of their claims, or their biases or prejudices will establish a dangerous precedent and invite further unsubstantiated anonymous letters. This Court should be wary of establishing such a precedent and wary that PECs never considered the concerns posed here. PECs' request for further relief should be denied.

---

[1] WAMY's counsel took it upon themselves to retain Marcus Asner, a former federal prosecutor, and the well-known law firm of Arnold & Porter, to conduct an in-depth investigation into the allegations as well as to communicate with Baker Tilly and its independent counsel. Daniel Flaherty, also an Assistant United States Attorney, of the firm of Godfrey & Kahn. WAMY expects that a separate report will be filed describing the two investigations and the findings.

[2] ECF 10416-1, The anonymous allegations letter.

PECs instant efforts to gain a tactical litigation advantage based on unreliable information from a shadowy source is something they have done repeatedly during this litigation and something this Court should reject now as it has done before. PECs' intent is not to seek the truth, but to gain tactical advantage in this litigation. PECs use flawed assumptions and distortions of the record in an attempt to give the false allegations of wrongdoing credence. They filed the false and defamatory allegations publicly to create mistrust between this Court, WAMY's counsel and their expert and to further attack WAMY in the court of public opinion; clearly to create a public belief that WAMY financed the 9/11 terrorist attacks when over two decades of investigations has uncovered no such evidence.

I. **The Claims Contained in The July 2024 Letter Are Demonstrably False.**

   a. **Marks deposition testimony was his own and no one provided him any answers to pending questions by writing anything on a white-board or otherwise.**

The allegations letter first contends, in sum, that the expert Jonathan Marks was being provided answers in real-time during his deposition. This was allegedly done by other people in the room with him during the deposition who would write answers on a whiteboard that Marks would then "tell during the deposition."[3] Such allegation is absurd, unfounded, and outrageous. WAMY's counsel categorically deny such unfounded claims.

At no time did anyone present in the deposition room provide any answers to Marks, or give him any prompt or coaching during the deposition as to how to answer any pending question. No one wrote any answer on a whiteboard, including Guzman or Goldberg, that Marks would "tell" during the deposition. This is confirmed by everyone who was in the deposition room who was interviewed as part of the investigations into the allegations.[4] The allegations that Marks was provided answers to pending questions during his deposition in the anonymous letter are false and unfounded. No improper coaching occurred as claimed in the allegations letter. Finally, as the investigation has shown, the managing partner was not even in the Philadelphia office,[5] as alleged by the anonymous letter, for him to witness the deposition, or the false allegations of this wrongdoing.[6]

WAMY's counsel could not recall how many people were present during the deposition when PECs and Kreindler lawyers first ambushed them with questioning.[7] It has been over three years since the deposition was held. Following extensive inquiries, WAMY's counsel confirm that while two members of Marks' team at Baker Tilly ("BT"),

---

[3] ECF 10416-1, at pg. 2, ¶1.
[4] See also. ECF November 12, 2024 Letter from Marcus A. Asner, Esq., 10529 at pg. 2 and 5 (Identifying those interviewed as Omar Mohammedi, Frederick Goetz, Jonathan Marks, and Andrew Guzman).
[5] ECF 10416-1, at pg. 3, ¶9.
[6] See, ECF 10529 at pg. 5.
[7] ECF 10418-2 WAMY's October 2, 2024 letter in response to October 1, 2024 phone conversation with PECs and Kreindler regarding the allegations but WAMY was not yet in possession of the anonymous letter.

Steven Goldberg and Andy Guzman, were in the room, they were there as observers, not at WAMY's counsel's request, and most certainly did not provide Marks with any answers to questions during the deposition. WAMY accepts that they should have been identified on the record but the failure to do so was an oversight.

Your Honor's directives[8] allowed people participating in this litigation to be present during video depositions as long as they are identified on record.[9] There was nothing improper about Guzman and Goldberg being in the room, though their presence should have been noted on the record. During Marks's deposition no appearance of attorneys or identification of other people present was done on the record.[10] There was no "unidentified" person as PECs claim because no one ever identified themselves on the record.

WAMY's counsel own their oversight and accept that, nevertheless, the presence of Guzman and Goldberg in the room should have been noted on the record. However, this was not something that WAMY's counsel sought to keep a secret or be hidden. To the contrary, Guzman's and Goldberg's presence would readily have been noted had anyone asked. This is not to shift responsibility for not identifying them on the record, but to explain that the failure to do so was not by any means deliberate or part of any plan of wrongdoing, as the PECs would have this Court believe. PECs know very well that WAMY's counsel did not misrepresent who was in attendance at the deposition. However, their submission to this Court appears intended to magnify false allegations to smear and harass WAMY's counsel.

In addition, your Honor's protocol was not followed in most expert video depositions. There were no appearances or identification of persons present made on the record during other depositions as well.[11] In the deposition video Plaintiffs allegedly reviewed, they must have seen that no attendance or appearance were done on the record,[12] yet they persist that somehow WAMY hid appearances. The important question is not whether there were additional people from the Baker Tilly team in the room[13] -there were- but, did anyone provide the answers for the witness? The answer to that question based on the video recording of the deposition as well as the investigations by WAMY and Baker Tilly is emphatically "no!"

---

[8] ECF 3894 at ¶ 60 (Deposition Protocol Order allowed for any "person who is assisting in the litigation," to appear.).
[9] Id.
[10] See Deposition video at 9:00:33-9:01:29.
[11] A review of introductory remarks of other deposition videos show that in one deposition, appearances are requested and made on the record (Ex. 1, Levitt June 7-8, 2021 deposition) while in others there are no requests for appearances on the record except that counsels names, only, appear in the written transcript, i.e: "counsel will be noted on the stenographic record" – (Ex. 2) Roy April 20, 2021, (Ex. 3) Sidel April 27, 2021, (Ex. 4) Benthall July 20, 2021; "the remainder of our counsel will appear on the stenographic record only" – (Ex. 5) Jenkins April 12, 2021; "our counsel will be noted on the stenographic record" – (Ex. 6) Brown May 25, 2021, (Ex. 7) Jackson June 2, 2021; "counsel appearing remotely will have their appearances noted on the stenographic record" – (Ex. 8) Gurule July 7, 2021, (Ex. 9) Kohlmann August 5-6, 2021.
[12] See Deposition video at 9:00:33-9:01:29 (WAMY is prepared to submit a copy of the deposition video upon request).
[13] ECF 10416 at 2 of 6.

PECs suggests that evidence of witness steering[14] is Marks "glancing persistently at additional individuals,"[15] or that he "gesture[s] to, and receive[s] prompts from others in the room"[16] are refuted by the video record and the evidence from the people actually in the room.[17] Marks' eyes could have just as easily been normally wandering as is the case in the entire video. There is nothing unusual about that. Given the experience and tenacity of PECs lawyers, and the sheer number of them, certainly one of them would have said something in real-time if they thought anyone was providing Marks with any answers to pending questions or prompting him in any way. This never happened.

Claims of unidentified voices during a deposition where multiple people are present also raise no indication of wrongdoing unless you wish for that to be the case. There is no indication of what the unidentified voice said except that the PECs want the court to believe it was something improper. In fact, there is no indication at all of when this unidentified voice appears in the video.[18] These unfair and unfounded assumptions only further demonstrate the frivolity and bias of PECs' arguments.

### b. The allegation that Baker Tilly "found" evidence that WAMY provided financial assistance towards the terrorist attacks of 9/11 which was then buried is false.

The Baker Tilly team reviewed documents and materials produced in this litigation. Baker Tilly was not tasked with seeking out or finding documents or materials beyond those provided. Whatever Marks and his team reviewed and relied on as the basis for his opinions in his rebuttal report was produced to PECs.[19] Plaintiffs' have these records. They and their experts were free to scrutinize and analyze them for years. If there was any evidence that WAMY financed the terrorist attacks of 9/11, PECs certainly would have found it. What "smoking gun" did WAMY hide? PECs unfounded and disingenuous allegation ignores decades of litigation including years of discovery.

In addition, if such evidence exists, the 9/11 Commission or one of the many U.S. Government agencies that investigated the terrorist attacks for years would surely have uncovered it. PECs have not only conducted years of their own discovery from WAMY but they have access to an incredible trove of investigative reports and data. No "smoking gun" of WAMY being involved in financing the terrorist attacks of 9/11 has been found because the evidence does not exist. Neither WAMY, their counsel, nor Baker Tilly

---

[14] See PECs October 25, 2024 letter to Marcus Asner, Ex. 10 (Even when asked to provide video time stamp of the absurd claims of "coaching" PECs refused to do so); see also, ECF 10529 at pg. 6 (confirming Asner's letter to PECs and PECs' response).

[15] ECF 10416 pages 2-3 of 6.

[16] Id.

[17] ECF 10529 at pg. 5-6 (noting that a review of the video evidence does not support PECs characterization of the video); see also fn 4, supra addressing the people interviewed.

[18] ECF 10529 at pg. 6 (noting that only two unidentified voices were discovered and one appears to be a PECs person while the other is unknown but nothing nefarious was identified from it).

[19] ECF 7344-15 (Marks reliance material).

"found" anything "that would draw to a conclusion that WAMY was involved in financing the 9/11 terrorist attacks" or hid or buried anything.

### i. WAMY did not withhold any evidence.

PECs extrapolate from the false claim that BT "found things that would draw to a conclusion that WAMY was involved in financing the 9/11 terrorist attacks, and with the help of BT and its partner, purposefully hide these facts,"[20] that WAMY's counsel is "in possession of evidence" of WAMY's involvement in financing the 9/11 attacks. As they have done before, PECs seek to overcome their lack of evidence that WAMY was involved in financing the terrorist attacks of 9/11 by falsely claiming that WAMY is "withholding" evidence that does not exist. In 2013 PECs claimed "severe sanctions are warranted given the egregious and continuing conduct the defendant has engaged in to purposely withhold the production of responsive (and likely damaging) documents from plaintiffs."[21] As WAMY argued over a decade ago, PECs' allegations are "offensive, baseless, and indicative of Plaintiffs' ongoing hostility towards WAMY."[22] Their frivolous and unfounded claims should be stopped.[23]

### ii. Marks never provided inconsistent testimony to hide claims of WAMY's wrongdoing, though Plaintiffs' experts have provided inconsistent testimony to support their opinions.

PECs argument that the false allegation of burying "very damaging evidence against WAMY" is supported by Marks providing "inconsistent" testimony at his deposition on redirect examination is factually and legally wrong. Marks testified at his deposition that he was asked to perform a comprehensive review to identify any potential "red flags: with respect to WAMY, in any of its branch offices during the period at issue.[24] When asked if he developed a comprehensive list of things he saw as red flags, Marks answered "not a formal list, no" and "that list would be small."[25] Later in his testimony, Marks was questioned about an article he wrote concerning "red flags."[26] The questioning attorney, Sean Carter questioned Marks about common warning signals or red flags of

---

[20] ECF 10415-1, Anonymous Letter, at pg. 3 of 3.
[21] See December 19, 2013 PEC Letter Motion to Compel, page 7, Ex. 11.
[22] See WAMY's February 4, 2014 Letter Opposition to PEC's December 19, 2013 Letter Motion to Compel, Ex. 12.
[23] While the anonymous letter writer and PECs' falsely claim that WAMY and BT have hidden evidence, PECs in fact chose not to share important WAMY related financial documents with their expert, Jonathan Winer, that may have changed his conclusions. Winer Dep. Tr. 47:22-49:18 (Ex. 13). When asked in a series of questions who assigned Winer the questions he opined on, he said "Motley Rice. Mr. Haefele," Id. Winer then testified that though he requested all audit material from Plaintiff's attorneys, he did not receive them.
[24] See, Ex. 14, Marks Dep. Tr. 105: 14-17.
[25] Id.
[26] Ex. 14 at 278: 17-281: 17.

potential fraud discussed in the article.[27] However, when Marks wanted to further explain an answer to a question about a "red flag," Mr. Carter denied him the opportunity to do so.

> (Whereupon, Exhibit Marks-970, No Bates, A violation of Trust: Fraud Risk in Nonprofit Organizations, Marks, was marked for identification.)
> …
> Q. And towards the bottom of Page 4 of this document, you identify a list of common warning signals or red flags of potential fraud?
> A. Yes.
> Q. And in the section under data, you identify as a red flag accounts with many large round numbers or transactions that are unusually large or small, correct?
> A. Yes.
> Q. And on the next page – I'm sorry, on Page 6, you identify the failure to reconcile documents in a timely manner as a red flag, correct?
> A. On Page 6? Yes?
> Q. And you include that in a section on lack of controls, correct?
> A. Correct.
> Mr. Carter: Mr. Marks, that's all I have at the moment, but I believe my colleague, Mr. Haefele, has some brief follow-up.
> THE WITNESS: Well, I have a couple – I want to respond to this.
> MR. CARTER: I don't have any questions pending. If you want to do something with this, your counsel can ask you questions, Mr. Marks. But we are going to move on with our questions.[28]

Marks protested, stating "Well, Mr. Carter, that's not fair. Because you just laid out things in an article, and you didn't allow me to explain at all."[29] Therefore, on redirect examination, WAMY's counsel gave the witness the opportunity to provide the explanation he previously wanted to give but that Mr. Carter did not allow him the opportunity to provide. Marks clarified that the presence of a particular red flag is not itself indicative of fraud,[30] which requires a more holistic appraisal of documentary evidence. Marks' testimony about warning signals and red flags was not new but entirely consistent with his August 7, 2020 report. [31]

Incredibly, PECs allege that Marks "changed his answer" after having time to discuss the matter with WAMY counsel, and that Marks agreed with WAMY counsel's

---

[27] Id.
[28] Ex. 14 at 278:17-281:1.
[29] Id. at 281: 2-6.
[30] Id. at 309: 10-312: 7.
[31] See, ECF 7351-4, Expert Report of Jonathan T. Marks, August 7, 2020, at pg. 7.

"premise" on redirect.[32] PECs accuse WAMY's counsel without any foundation of wrongdoing. Indeed, PECs had previously acknowledged that Marks' testimony on redirect was clarifying his prior testimony.[33]

It is absurd for PECs to suggest frivolously that Marks' testimony proves that there exist documents damaging to WAMY. In addition, WAMY's counsel are within their right to redirect the witness, especially, when he was not allowed to provide his complete answer. Mr. Goetz' redirect questioning gave Marks the opportunity to discuss "red flags" with context, an opportunity that Mr. Carter denied him,[34] and which Marks protested against.[35] PECs' arguments are made in bad faith to insinuate that Marks only "changed his answer" to "[agree] with WAMY counsel's premise."[36] PECs' attempt to frame context as inconsistency reveals their intent to weaponize the anonymous letter. We note that PECs' examination of Marks concluded at 3:56 p.m., and Mr. Goetz commenced his redirect examination at 4:00 p.m., with the record reflecting a break of just a few minutes.[37]

PECs' accusation that these clarification questions on redirect examination are evidence of improper coaching is ironic and refuted by the conduct of Plaintiff's counsel, Robert Haefele, during the deposition of expert Jonathan Winer ("Winer"). During Winer's deposition, Mr. Mohammedi asked Winer whether TWRA was designated.[38] Winer responded that "TWRA has not been designated by the United States government or by the UN as providing terrorist finance."[39] After an approximately fifteen-minute recess from 6:40 p.m. through 6:54 p.m., the parties went back on the record.[40] After the recess, but before a new question was pending, Mr. Haefele stated a prompt for Winer into the record, testifying and coaching the witness to supplement his prior answer to add a caveat to his prior responsive answer. Mr. Haefele coached Winer thus:

> Mr. Haefele: 6:54, David?
> Before we went off, there was an exchange where the witness got cut off in his answer. The question was, my question was—quote: My question, was it designated—the witness was TWRA designated? I believe it was out of business by that time is the answer. He got cut off again by Mr. Mohammedi when he was saying: My question wasn't designated. And I think that Mr. Winer has indicated—

---

[32] ECF 10416, October 9, 2024 Letter from Robert Haefele, at pg. 3.
[33] ECF 7346, p, 45, fn 234. Contrary to the allegations of "inconsistent" or changing testimony plaintiffs' make now, they previously acknowledged that "(i)n subsequent redirect by WAMY's counsel, Marks clarified his earlier statement regarding identifying a small list of potential red flags for WAMY, saying, after further review, they were not red flags."
[34] Ex. 14 at Marks Dep. Tr. 309: 10-312: 7.
[35] Id. at 281: 2-6.
[36] Id. at 309: 10-312: 7.
[37] Id. at 308: 20-309: 3.
[38] Ex. 13 at 299:23.
[39] Id. at 300:7.
[40] Id. at 300:12-17.

> You know, I read the transcript and its clear that he was cut off. I think Mr. Winer needs to finish answering that question."[41]

There is no record that Winer was "cut off" and Mr. Haefele's comment that he was served merely as a pretext for the prompt Mr. Haefele crafted during the fourteen-minute break. Now prompted by Mr. Haefele to supplement his prior answer, Winer testified:

> A. It was out of business at the time the U.S. was designating charities for terrorist finance, so it could not be designated or would not be designated because it was no longer in operation at that time. It was the same issue with the Rabita Trust. Rabita Trust.[42]

PECs can point to nothing in the transcript or video, that Mr. Goetz made any speaking objections or engaged in any suspicious activity to allow Marks to correct any responses. The same cannot be said about Mr. Haefele. In contrast to PECs' false claim that WAMY influenced Marks' redirect testimony,[43] Mr. Haefele impermissibly[44] testified on the record[45] to the testimony he wanted Winer to give and Winer obliged.

### c. The Baker Tilly time records are believed to be accurate and have been thoroughly examined by plaintiffs.

There was no refund to Baker Tilly or economic advantage as PECs egregiously claim. PECs claims are frivolous as there is no foundation to such matter. WAMY's counsel have no reason to believe the Baker Tilly time records are inaccurate. Jonathan Marks was extensively involved in the project from the analysis phase, through the report writing phase, up to his deposition. WAMY's counsel have no reason to believe that the invoices showing the time that Marks and other members of his team spent on the case are inaccurate. All of the billing records were disclosed[46] to and thoroughly examined by PECs.

---

[41] Id. at 300:18- 301:6.
[42] Id. at 301:12-17.
[43] ECF 10416, October 9, 2024 Letter from Robert Haefele, at pg. 3.
[44] See, *Morales v. Zondo*, Inc. 204 FRD 50 (granting sanctions where counsel was disruptive, instructed client on how to answer and engaged in ad hominin attacks); *Brignoli v. Balch, Hardy & Scheinman, Inc.*, 126 FRD 462, 466 (S.D.N.Y. 1989) (sanctioning an attorney for egregious action that included testifying on "substantive issues on behalf of his client"); *Veckinburg v. Equifax Credit Info*. 2005 U.S. Dist. LEXIS 63103, *3 (E.D.N.Y. 2005) (sanctioning counsel for instructing the witness on how to answer questions. "Near the end of the June 17 deposition, justified this conduct by stating that if defense counsel were "asking a question that is confusing to my client I have a right to give my client a guide." Pl.'s Dep. at 141. However, witness confusion does not warrant an objection or any other statement from the witness's counsel at a deposition. "[I]t is not counsel's place to interrupt if a question is perceived to be potentially unclear to the witness. Rather, the witness should make the determination as to whether a question is clear and answer to the best of his or her ability").
[45] Id. at 300:12-17.
[46] See, ECF 7602 at pgs. 29-30, citing Ex. AR (ECF 7604-18), Marks Dep. Tr. at 77:3-81:9, 54, 56:9-70:9, 84, 283-284.

Ironically, while PECs make false claims of inaccurate records, Evan Kohlmann's (Plaintiffs' expert) invoices were submitted fully redacted.[47]

### d. Marks testimony regarding his expertise and engagement in this case is accurate, was the subject of intense scrutiny and criticism by the plaintiffs, and reviewed by the Court.

This Court has already found that Marks was well qualified to opine in his rebuttal report.[48] As demonstrated below, PECs attempted extensively, without success to disqualify Marks during his deposition and in their *Daubert* application. PECs are now exploiting the false allegations in this anonymous letter to improperly relitigate this matter.

PECs questioned Marks extensively about his engagement, covering nearly sixty-five deposition transcript pages, about Marks' invoices and work performed (15 pages),[49] documents Marks reviewed according to the invoice (30 pages),[50] Marks' process of drafting and writing his report (9 pages),[51] audit documents that he reviewed and who reviewed the "tens of thousands of documents"[52] (5 pages), and whether he reviewed documents from different WAMY offices (4 pages). This court reviewed PECs' motion to exclude Marks as an expert and WAMY's opposition. At his deposition, Marks, a qualified forensic account[53], was clear that while he himself did not review "tens of thousands of documents,"[54] he supervised a team that assisted with the review and reported to him.[55] Your Honor already addressed this matter: "[Marks's] inability to respond to operational questions or identify gaps in financial documentation can be explained by the volume of evidence he and his team reviewed. Reviewing that evidence single-handedly would be impractical, and experts are permitted [to] rely on analyses by others."[56] The anonymous letter simply resurrects claims the PECs made before against Marks; claims which this Court has rejected.

---

[47] Ex. 15, -Evan Kohlmann's heavily redacted Invoices (the invoice does not reveal any billing narratives at all, only final fees charged. All other fields in Kohlmann's invoices are totally redacted. From Kohlmann's extensively redacted invoices, we have no way of discerning what work he did, what documents—if any—he reviewed, and whether any discounts or fee reductions were applied to final total charges).
[48] ECF 9060 (Daubert decision finding that "Marks is qualified to testify as a rebuttal expert, but may not offer his opinion about WAMY's state of mind).
[49] Ex. 14 at 54:2-69:14.
[50] Id at 69:15-79:19 and 286:8-307:9 (Here Steve Goldberg is discussed several times).
[51] Id at 79:20-89:20.
[52] Id at 90:15-95:1.
[53] ECF 9060 at 33 (This court's bellwether order acknowledging that Marks is certified as a financial forensics and fraud examiner).
[54] Ex. 14 at 78:13-79:9.
[55] Ex. 14 at 76:10-77 (testifying that while he prepared the report, Marks was helped by his team).
[56] ECF 9060 at 34-35.

II. **PECs Request to Reopen Expert Discovery is Part of Plaintiffs Pattern and Practice of Unfair Tactics Seeking Litigation Advantage Based on Dubious Evidence of Unknown Provenance As Well as Personal Attacks Against Opposing Experts and Counsel.**

PECs seek to exploit false allegations in the anonymous letter to reopen expert discovery in a clear effort to relitigate their previously denied motion to exclude Marks as an expert witness. This is part of a pattern of seeking an unfair litigation advantage based on dubious, anonymous and unfounded evidence of unknown provenance. This also seems part of a broader effort to publicly smear the defendants in this high-profile litigation and unfairly attack the credibility of WAMY's counsel.

The instant letter raises several questions about its credibility that PECs intentionally ignore and then weaponize. The letter makes major claims of impropriety against the Law Firm of Omar T. Mohammedi and WAMY's counsel which PECs accept outright to gain whatever tactical advantage they can. PECs then use the letter in an improper way to try to reopen discovery[57] and revisit their *Daubert* application against Marks.[58] WAMY denies each and every one of these baseless claims.

The instant request for relief is part of PECs' pattern of seeking litigation advantage by unfair means including by using unreliable documents, improperly litigating this case in the court of public opinion, and engaging in *ad hominem* attacks against defendants, their experts, and defense counsel. Indeed, WAMY requests that this Court closely examine the PECs' conduct in the instant situation and compare it to the other conduct detailed below.

In 2015, the Muslim World League (MWL) confronted PECs about their reliance on possible forged documents. MWL challenged the documents as unreliable and brought the issue to the attention of Judge Frank Maas.[59] In a November 3, 2015 order, Judge Frank Maas denied PECs request,[60] instead ruling that "(t)he Plaintiffs will be obliged to

---

[57] ECF 10416 and 10416-1 (Whereas the letter alleges that "BT" allegedly found evidence damaging to WAMY and BT purportedly withheld the document from PEC (¶12), PEC's October 9, 2014 letter suggests that "Marks, BT and WAMY's counsel" (fn 1 and 2) withholding the same evidence. (emphasis added).

[58] See ECF 10416 at pages 2 of 6 to 3 of 6 (PEC's October 9, 2014 letter opining without good reason that Marks was not just coached to give certain answers to coach to change them as well); See March 22, 2016 hearing transcript excerpts at 123:1-11 (MWL asserts that contrary to PEC's claim that the errors in the document was minor, MWL's expert found over 90 "elementary Arabic grammar errors" that made the document unlikely to have originated from a native Arab speaker as claimed).

[59] ECF No. 3086 at 2 of 3 (MWL's October 28, 2015 letter to Judge Mass regarding the possible forged document and discovery disputes concerning it).

[60] ECF No. 3098 at 3 of 3(PECs responsive letter to MWL's challenge to the forged documents. Instead of acknowledging the unreliability of the document, PECs requested in their letter: "(1) an explanation of the process used to verify that the documents do not exist among the Defendants' files, and (2) an explanation of the process used to verify the employment history of the individuals identified in the documents, (3) including the production of any employment files of such individuals or other documents authored by the identified individuals (productions that likely should have been made previously)."

disclose information in their possession concerning the provenance of the documents. MWL/IIRO's request to view the originals of the documents also strikes me as reasonable."[61] Rather than comply with this directive, PECs then claimed that "investigate source [of the possibly forged documents] could likely compromise that person's safety."[62] Judge Maas therefore, in an Order of August 31, 2016,[63] rescinded his prior ruling[64] ordering discovery on the question of the provenance of the letter but also ruled that "Plaintiffs not be permitted to rely further on the documents for any purpose related to this multi-district litigation."[65] Similar to Judge Maas's common-sense finding that a document with no author cannot be relied on, the anonymous allegation letter should not be a basis for reopening discovery in this litigation or for any other purpose.

Yet, despite Judge Maas equitably restricting the use of the aforementioned possibly forged documents, PECs then took the same documents Judge Maas excluded and turned them over to their experts – Matthew Levitt ("Levitt"),[66] Brian Jenkins ("Jenkins"),[67] Jonathan Winer ("Winer"), and Evan Kohlmann ("Kohlmann")[68]. Though it defies logic to suggest that the PECs did not give the documents to their experts to influence their opinion (Levitt concedes the documents factored into his opinion),[69] PECs denied that this was so and then steered Winer's testimony from revealing his reliance on the documents with prompts like, we've covered this in the previous depositions [,] or [w]e've covered this [,] [t]hese are not documents that any of our experts are using."[70] Even worse, as they have done here and is their pattern, PECs then accused MWL's counsel of misleading the witness when the witness was told of the unreliability of the documents and the fact they were excluded.[71] It was not until Kohlmann's August 5, 2021 deposition that PECs finally stipulated that "those are documents not relied upon by the expert,[72] though we know certainly at least Levitt relied on them.[73]

In 2022, then members of PECs took to the public to litigate this case by breaching this court's protective[74] order and leaking protected documents to the press. Yahoo! News

---

[61] ECF No. 3104 at 1 of 2.

[62] Id at 1 of 2.

[63] ECF 3338.

[64] See, ECF 3104.

[65] Id.

[66] See, Ex. 1 at 214:3-13; 216:17-25 (At Levitt's April 7, 2021 deposition, he testified that the excluded documents were part of his reliance material, that Plaintiffs turned the documents over to him, and that the documents factored into his opinion.).

[67] Ex. 5 at 276:2-280:24 (confronting Jenkins with the prospect that his reliance material contained the questionable documents Judge Maas expunged).

[68] Ex. 9 at 477:4-9 (acknowledging that the documents appear in Kohlmann's reliance material).

[69] Ex. 1 at 216:17-217:9.

[70] Ex. 13 at 521:5-24; C.F. Levitt Dep. Tr. at 217:2-9 (Levitt testifying that "I think it's safe to say yes," they factored into his opinion).

[71] Ex. 13 at 522:3-5 ("...its misleading to go down this path to make a supposition that doesn't exist.") but see entire exchange from 521:18-522:11.

[72] Ex. 9 at 477:3-24.

[73] Ex. 1 at 217:2-9 (Levitt testifying that "I think it's safe to say yes," they factored into his opinion); contravening the stated stipulation that the experts did not rely on the forged documents.

[74] ECF 7134 - Judge Netburn's Opinion and Order denying Oath Inc's motion to intervene at page 2 of 24.

published an article containing portions of Musaed Jarrah's protected deposition transcript which Yahoo! News had come in "exclusive[]" possession of through an unnamed person.[75] PECs, more specifically its leading law firm Kreindler & Kreindler denied any involvement in the leak until it was later discovered that they were the source. as part of their "long-standing litigation strategy to pressure the Kingdom of Saudi Arabia into settlement."[76] While this court, in its September 21, 2022 opinion and order removed Kreindler from PECs and stripped John Fawcett, the main culprit in the leak, of "access to any documents designated as confidential and barred from any further participation in this case,"[77] this was the second of two protective order breaches by PECs, the first being the 2017 leaking of confidential documents related to WAMY to a reporter."[78]

The actions of the PECs in filing the highly inflammatory and defamatory allegations letter publicly rather than filing it under seal is yet another attempt by the PECs to litigate this case in the court of public opinion and is an obvious attempt to discredit WAMY and its counsel. Just days after the filing, two separate online news sites published articles about the allegations letter and PECs' added claims against WAMY and its counsel. The October 23, 2024 Florida Bulldog article[79] reflects first on the pending Kingdom of Saudi Arabia motion to dismiss then immediately pivots into "serious allegations have emerged that a global accounting firm covered up evidence that a co-defendant was involved in financing the 9/11 terrorist attacks." (internal quotations omitted). The article names WAMY several times and cites directly to PECs' claim that "Baker Tilly U.S. LLP, with WAMY and its counsel, engaged in wrongful conduct during Marks' engagement with WAMY." Just as PECs hoped to invoke by publishing the accusatory letter, the article names Omar Mohammedi, includes his photograph, and repeats the claims of involvement in the wrongdoing from the allegations letter.[80] Under the newspaper section "Firm Watch," Going Concerns News Week repeats the Florida Bulldog article under the tagline *Baker Tilly Did What!?*[81] How Florida Bulldog came to learn of PECs filing is a matter that we believe this court should open for investigation. More concerning however is that the smear campaign is spreading.

Other instances of seeking unfair tactical advantages come in the form of personal attacks against WAMY's own experts. For instance, during the July 1, 2021 deposition of Marc Sageman, M.D., Ph.D., Mr. Robert Haefele engaged in inappropriate questioning to harass Mr. Sageman by calling him names with the attempt to distract him. Mr. Haefele hurled personal attacks, made insulting insinuations, and made jab after jab at Dr. Sageman. Mr. Haefele degraded Marks' professional background as a psychologist and treated him

---

[75] ECF 8544 page 2-3 of 65.
[76] ECF 8544 at page 2 of 65 (finding that Kreindler had a "long-standing litigation strategy to pressure the Kingdom of Saudi Arabia into settlement.").
[77] ECF 8544 at 2.
[78] ECF 8544 at 5.
[79] Christensen, D., *Whistleblower says big accounting firm hid evidence that a Saudi co-defendant helped finance 9/11*, The Florida Bulldog, October 23, 2024, last viewed November 8, 2024. Ex. 16.
[80] Id. at pdf page 5. ("The whistleblower also accused WAMY and its lawyers of active involvement in the scheme").
[81] *Baker Tilly Did What?* Going Concerns News Desk, October 25, 2024, last viewed November 8, 2024. Ex. 17.

in an outrageous and hostile fashion to intimidate him when he accused Dr. Sageman of trying to "get into [his] mind."[82] Mr. Haefele repeatedly accused Dr. Sageman of representing himself as James Bond,[83] implied that Dr. Sageman's CIA training necessitates that he is deceitful[84], and made inappropriate comments about Dr. Sageman's relationship with his wife.[85] Clearly, PECs are not above engaging in underhanded intimidation tactics, making reckless accusations, or resorting to extreme ends to "throw off" their adversary.[86]

### III. Far From Showing the Author of The Allegation Letter Had Inside Information, The Letter is a Rehashing of PECs' Claims.

**a. The contents of the letter, the circumstances surrounding its writing, and nature of the allegations strongly suggest the false allegations in the letter were tailored to improperly bolster plaintiffs' case against WAMY based upon filings in the public record.**

Accepting that the letter's author knew who was in the room, the veracity of the claims of wrongdoing is further undermined when viewed in the larger context of this litigation. This Court is well-aware that September 11th litigation is of great public interest, and the substance and outcome of this litigation is emotionally evocative. This litigation draws considerable media attention, and attentive members of the public rightly follow proceedings to see that justice is done for the victims of the September 11th attacks and their families. Members of the public can be employed by people, firms or companies participating in this litigation. Such positions may offer them an advantage to masquerade as a so-called whistleblower, making their claims more believable and more prejudicial.

PECs made no efforts to obtain the provenance of this letter. What little of the letter that may lead to discovery of the author, Plaintiffs redacted. Sent to PECs in July 2024[87], the letter is written three years from the date of the claims alleged in it, to coincide with

---

[82] See, Sageman Dep. Tr. 526:8 (Ex. 18).

[83] Ex. 18 at 250:4- 263:11, where Mr. Haefele repeatedly accused Dr. Sageman of representing himself as James Bond. See also, Sageman Dep. Tr. 256:12-20, where Mr. Haefele. pedantically and inappropriately posed questions such as whether Dr. Sageman drives an Aston Martin and drinks martinis, as James Bond does.

[84] Id. at 172:17-173-22, where Mr. Haefele questioned Dr. Sageman about his CIA training. See also, Sageman Dep. Tr. 173:8, where Mr. Haefele inquired about whether Dr. Sageman was trained to deceive people to get information, and how to lie to people to get information.

[85] Id. at 125:1, where Mr. Haefele questioned Dr. Sageman about his consulting company—Dr. Sageman answered that his wife handles the administrative aspects of his practice. See also, Ex. 18 at 125:23-126:1, where Mr. Haefele quipped that this was not the first time that Dr. Sageman has "thrown [his] wife under the bus."

[86] In 2019, one of plaintiffs' lawyers, Allen Gerson, had improper personal contact with WAMY witness Abdul Wahab Noorwali while both were on a train in Madrid following Dr. Noorwali's deposition. See, Ex.19, August 9, 2019 Letter from Omar Mohammedi to Messrs. Haefele, Carter, Malone, and Gerson regarding improper contact with 30(b)(6) witness.

[87] ECF 10416 at 1.

heightened public interest in this MDL litigation, creating an added element of dubiousness. Biases and motives of the author were matters PECs never considered.[88] Although Frederick Goetz defended Marks' deposition, finger pointing to The Law Firm of Omar Mohammedi, LLC creates another suspicious element as to motive, including possible racial and religious animus.[89]

### b. Information alleged to be "details" in the letter pointing to credibility can be found within the public record.

Far from showing the author of the allegation letter had inside information as PECs claim,[90] the details of the letter and nature of the allegations strongly suggest the letter was written by an unknown person based on their review of documents and filings in the public record towards the specific goal of helping the plaintiffs' cause against WAMY.

For example, the letter claims WAMY's counsel and BT employees coached Marks in answering his deposition questions.[91] This is consistent with PECs claim that WAMY retained Marks as a rebuttal expert on accounting issues and then guided him to an opinion.[92] The same is true of the letter's claim that Marks was "not qualified" to answer questions regarding terrorism financing.[93] In their Daubert moving papers PECs likewise claim that "Marks has no professional training or experience in investigating terrorist financing or material support."[94] Marks' terror financing expertise was also a major topic discussed in the publicly filed deposition transcripts.[95]

---

[88] This lack of consideration to bias seems to be PECs' pattern and practice which can also be exemplified in PECs use of their experts as advocates such as Jonathan Winer (See, ECF 7647, at pg. 3)—In a decision to exclude Winer's supplemental declaration, this Court found that sections of "Winer's declaration more closely resembled an advocate's brief than a statement of facts."); ( See ECF 9060 at 21) – In excluding Winer's state of mind statements that the court found to be "trafficking in stereotypes" that are "self-evidently improper and prejudicial," this court writes: [a]nd in a disturbing turn, [Winer] alleges that 'people and institutions' in the Middle East often 'intend to avoid direct conflict with the West through duplicity, or engaging in a double game.'").
Some of PECs attorneys and experts also have established past-relationships with individuals and entities with a demonstrated anti-Muslim bias. (See, Kohlmann Dep. Tr, at 142:13-25) (Noting Evan Kohlmann worked with Steve Emerson's Investigative Project along with attorney John Eubanks in 1999) (See, Kohlmann Dep. Tr. at 40:22-41:12), counsel for Plaintiffs' firm Motley Rice. Kohlmann's association with the Investigative Project, founded by his mentor (See, Kohlmann Dep. Tr. at 146:22-147:9) and known Islamophobe Steve Emerson, (See, Kohlmann Dep. Tr. at 149:8-149:22), noting that Emerson has made inflammatory and Islamophobic public comments—including speculating on broadcast television that the Oklahoma City Bombing exhibited "a middle-eastern trait," prior to the identification and apprehending of Timothy McVeigh).
[89] The recent events in the Middle East may have fostered campaigns against Muslims to ruin their reputations, especially when the finger pointing is against a Muslim attorney representing a Muslim organization.
[90] ECF No. 10416 at p. 2.
[91] 10416-1 at ¶¶1, 8-9.
[92] ECF 7346 at 7.
[93] ECF 10416-1 at ¶¶1-2.
[94] ECF No 7346 at 15-16 (describing Marks's lack of expertise in terror finance).
[95] ECF 7351-10 – Excerpts of Marks Deposition transcript: Marks Dep. Tr. at 36:7-40:12 (questioning Marsk on terrorism finance expertise); 41:19-42:17 (Marks conceding he has not worked in counterterrorism or

Showing their hand, PECs regard the letter's remark about the withholding of "very damaging evidence against WAMY,"[96] as a reference to "red flags,"[97] though the words themselves do not appear in the letter. The question of "red flags" featured in both PECs Daubert papers[98] as well as during the deposition.[99] In his report, attached as document ECF No. 7351-4 to PECs Daubert motion, Marks's makes it clear at the outset that

> [t]he Law Firm of Omar T. Mohammedi, LLC, on behalf of its client, the World Assembly of Muslim Youth, engaged Baker Tilly US, LLP to provide litigation support services and identified Jonathan T. Marks to serve as the rebuttal financial expert in the matter."[100]

The allegation letter restates this publicly available information: "You deposed Jonathan Marks (Marks), Partner at Baker Tilly as an expert witness. He was an expert for the Law Firm of Omar T. Mohammedi, LLC, Attorneys for Defendant WAMY."[101]

All questions raised in the letter about invoices related to time Marks spent reviewing documents[102] are reflected in Marks' deposition[103] and PECs motion to exclude Marks' testimony[104] All of these were filed publicly, including the full deposition transcript in PECs Daubert application against Marks. The allegations letter was addressed to "Sean Carter of Cozen O'Connor. This firm's Philadelphia office is in the same building as Baker Tilly, where the deposition was held[105] Whoever wrote the letter likely reviewed the transcript and saw that it was Sean Carter who was the lead counsel for PECs at the deposition.[106]

Moreover, the fact that the letter's author notes not only that Sean Carter is involved in the case but that the case was "on going" suggests strongly that whoever wrote the letter viewed the public record in this case at or near the time when the letter was written, July of 2024. Many important motions were then pending before the court including KSA's motion to dismiss, and PECs' objection to the Court's ruling on its Daubert motion with respect to Marks. The timing of the allegations letter and how the nature of the allegations

---

studying al Qaeda specific funding); 161:12-163:12 (Marks remarks that though he does not have expertise in refugee and orphan support specific programs, he is fully aware of the nature of financial controls).
[96] ECF 10416-1 at ¶12.
[97] ECF 10416 at 3, fn 2 (seizing the opportunity, PECs remind the court that they raised the same argument in their Daubert papers).
[98] ECF 7346 at 44-45.
[99] ECF 7351-10 at 105:3-10.
[100] ECF 7351-4 at 1 (internal quotations and parentheticals omitted).
[101] ECF 10416-1 at introductory paragraph.
[102] ECF 10416-1 at ¶¶3-4, 6-7, 10, 13.
[103] ECF 7691-4 at 72:18-24.
[104] ECF 7346 at 7.
[105] Compare ECF 10430 attachment (the envelope addressed to Sean Carter at 1650 Market Street, Suite 2800, Philadelphia, PA) with ECF 7351-4 (Marks report with the business address 1650 Market Street, Suite 4500, Philadelphia, PA).
[106] See ECF 7351-10 at 183:2-5.

would clearly support the PECs' pending motions concerning both the KSA and WAMY raise many concerns as to the author's motives and PECs' own involvement in this matter.

\* \* \* \* \* \* \*

The inquiry ordered by the Court in its Order (ECF No. 10421) is sufficient to address the allegations in the allegation letter. WAMY and Baker Tilly have complied with this Order. The investigations show that the allegations of wrongdoing have no merit. PECs' request for further relief should be denied. WAMY's counsel hereby reserve their rights to seek appropriate remedies concerning PECs' conduct.

Respectfully Submitted,

*/s/ Omar Mohammedi*
_____
Omar T. Mohammedi

*/s/ Fredrick Goetz*
_____
Frederick Goetz

Cc: The Honorable Judge Daniels (via ECF)
      All Counsel of Record (via ECF)