# EXHIBIT 9

Page 1

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 03-MDL-1570 (GBD) (SN)

5    -----------------------------------x.

6    IN RE: TERRORIST ATTACKS ON

7    SEPTEMBER 11, 2001

8    -----------------------------------x

9                    August 5, 2021

10                   9:09 a.m.

11

                     Videotaped Deposition via Zoom

12   of EVAN KOHLMANN, pursuant to Notice,

13   before Jineen Pavesi, a Registered

14   Professional Reporter, Registered Merit

15   Reporter, Certified Realtime Reporter and

16   Notary Public of the State of New York.

17

18

19

20

21

22

23

24

25

Page 2

```
1
2  A P P E A R A N C E S :
3  COZEN O'CONNOR PC
     1650 Market Street, Suite 2800
4  One Liberty Place
     Philadelphia, Pennsylvania 19103
5     Attorneys for Plaintiffs
     BY:  J. SCOTT TARBUTTON, ESQ.
6        scarter@cozen.com
7
     ANDERSON KILL P.C.
8  1251 Avenue of the Americas
     New York, New York 10020
9     Attorneys for Plaintiff O'Neill and
        Plaintiffs' Executive Committee
10 BY:  BRUCE STRONG, ESQ.
        bstrong@andersonkill.com
11
12 MOTLEY RICE, LLC
     28 Bridgeside Boulevard
13 Mount Pleasant, South Carolina 29465
     Attorneys for Attorneys for
14    Plaintiffs in Burnett Case and
        Plaintiffs' Executive Committee for
15    Personal Injury and Death Claims
     BY:  ROBERT T. HAEFELE, ESQ.
16       rhaefele@motleyrice.com
        C. ROSS HEYL, ESQ.
17       rheyl@motleyrice.com
        JODI FLOWERS, ESQ.
18       jflowers@motleyrice.com
        RICHARD CASHON, ESQ.
19
20 KREINDLER & KREINDLER, LLP
     750 Third Avenue
21 New York, New York 10017
     Attorneys for Plaintiffs' Executive
22    Committee
     BY:  ANDREW J. MALONEY, III, ESQ.
23       amaloney@kreindler.com
24
25
```

Page 4

```
1
2  A P P E A R A N C E S (continued):
3  OMAR T. MOHAMMEDI LLC
     233 Broadway, Suite 820
4  New York, New York 10279-0815
     Attorneys for World Assembly of
5     Muslim Youth
     BY:  OMAR T. MOHAMMEDI, ESQ.
6        omohammedi@otmlaw.com
        JILL MANDELL, ESQ.
7        jmandell@otmlaw.com
8
     GOETZ & ECKLAND
9  615 First Avenue NE, Suite 425
     Minneapolis, Minnesota 55413
10    Attorneys for WAMY - World Assembly
        of Muslim Youth
11 BY:  FREDERICK GOETZ, ESQ.
        fgoetz@goetzeckland.com
12
13 SALERNO & ROTHSTEIN
     221 Schultz Hill Road
14 Pine Plains, New York 12567
     Attorneys for Yassin Kadi
15 BY:  AMY ROTHSTEIN, ESQ.
        amyrothsteinlaw@gmail.com
16    PETER SALERNO, ESQ.
        peter.salerno.law@gmail.com
17
18
19 ALSO PRESENT:
20 TOM DEVINE, The Video Technician
21 MICHAEL TOTH, Veritext Concierge Tech
22
23
24
25
```

Page 3

```
1
2  A P P E A R A N C E S (continued):
3  LEWIS BAACH KAUFMANN MIDDLEMISS PLLC
     1101 New York Avenue NW, Suite 1000
4  Washington, DC 20005
     Attorneys for Muslim World League and
5     International Islamic Relief
        Organization, Dr. Abdullah Al Turki,
6     Dr. Adnan Basha, Dr. Abdullah Al
        Obaid and Dr. Abdullah Naseef
7  BY:  ERIC LEWIS, ESQ.
        eric.lewis@lbkmlaw.com
8     AISHA BEMBRY, ESQ.
        aisha.bembry@lbkmlaw.com
9     NOUR SOUBANI, ESQ.
        nour.soubani@lbkmlaw.com
10    SUMAYYA KHATIB, ESQ.
        sumayya.khatib@lbkmlaw.com
11    WALEED NASSAR, ESQ.
        waleed.nassar@lbkmlaw.com
12
13 BERNABEI & KABAT PLLC
     1400 16th Street NW, Suite 500
14 Washington, DC 20009
     Attorneys for Abdullah Al Turki,
15    Dr. Adnan Basha, Dr. Abdullah Al
        Obaid and Dr. Abdullah Naseef
16 BY:  ALAN KABAT, ESQ.
        kabat@bernabeipllc.com
17
18 JONES DAY
     51 Louisiana Avenue NW
19 Washington, DC 20001
     Attorneys for Dubai Islamic Bank
20 BY:  STEVEN T. COTTREAU, ESQ.
        scottreau@jonesday.com
21    GABRIELLE PRITSKER, ESQ.
        gpritsker@jonesday.com
22    AUDREY BECK, ESQ.
        abeck@jonesday.com
23    ERIC SNYDER, ESQ.
        esnyder@jonesday.com
24
25
```

Page 5

```
 1
 2          S T I P U L A T I O N S
 3
 4       IT IS HEREBY STIPULATED AND AGREED by
 5  and between the Attorneys for the
 6  respective parties hereto that filing and
 7  sealing be and the same are hereby waived.
 8       IT IS FURTHER STIPULATED AND AGREED
 9  that all objections except as to the form
10  of the question, shall be reserved to the
11  time of the trial.
12       IT IS FURTHER STIPULATED AND AGREED
13  that the within examination may be signed
14  and sworn to before any notary public with
15  the same force and effect as though signed
16  and sworn to before this Court.
17
18
19
20
21
22
23
24
25
```

1
2      THE VIDEO TECHNICIAN: Good
3 morning.
4      We're going on the record at
5 9:09 a.m. on August 5, 2021.
6      This is media unit 1 of the
7 video recorded deposition of Evan Kohlmann
8 taken by counsel for the defendant in the
9 matter of In re Terrorist Attacks on
10 September 11, 2001, filed in the U.S.
11 District Court, Southern District of New
12 York, Civil Action No. 03-MDL-1570 (GBD)
13 (SN).
14      This deposition is being held
15 on-line as a Zoom video conference with
16 all parties appearing remotely.
17      My name is Thomas Devine from
18 the firm Veritext New York and I am the
19 videographer; the court reporter is Jineen
20 Pavesi, also with Veritext New York.
21      I am not authorized to
22 administer an oath, I am not related to
23 any party in this action nor am I
24 financially interested in the outcome.
25      Counsels appearing remotely

1
2 will have their appearances noted on the
3 stenographic record.
4      The court reporter will now
5 please swear in the witness and we may
6 proceed.
7 E V A N   K O H L M A N N,
8 having first been duly sworn by a Notary
9 Public of the State of New York, was
10 examined and testified as follows:
11 EXAMINATION BY
12 MR. LEWIS:
13     Q.    Good morning, you and I have
14 both been doing this for quite a while so
15 I won't give you the usual tips and just
16 ask you to state your name for the record,
17 please.
18     A.    Sure, my name is Evan  Francois
19 Kohlmann, K-O-H-L-M-A-N-N.
20     Q.    And you are in New York today?
21     A.    Correct, I am.
22     Q.    Mr. Kohlmann, can you tell me
23 what you have done in preparation for
24 today's deposition.
25     A.    Sure.

1      KOHLMANN
2      I reviewed both my original
3 report as well as my rebuttal report.
4      I have reviewed a list of
5 reliance materials that either I used in
6 preparation of my report or I was simply
7 provided or made access to, and I spoke
8 briefly with plaintiff's counsel.
9     Q.    Did you read any transcripts of
10 other experts' depositions that were taken
11 in this case?
12     A.    I was able to review some of --
13 at least one other expert.
14     Q.    Which expert was that?
15     A.    It was Marc Sageman.
16     Q.    Did you read any of the experts
17 on plaintiffs' sides transcripts of their
18 depositions in this case?
19     A.    I can't recall that I did, no.
20     Q.    Did you speak to any of the
21 other experts on plaintiffs' side in this
22 case in preparation for your deposition?
23     A.    No.
24     Q.    Mr. Kohlmann, when were you
25 hired as an expert in this case?

1      KOHLMANN
2     A.    That's a difficult question to
3 answer.
4      I first began doing work for --
5 on this investigation, on this case, on
6 behalf of plaintiffs' counsel I believe in
7 January of 2004, December of 2003.
8     Q.    How did it come to pass that
9 you began to do work for plaintiffs'
10 counsel in this case in or around late
11 2003 or early 2004?
12     A.    I had been conducting extensive
13 research into the means by which Al Qaeda
14 and other terrorist groups were financing
15 themselves, I was researching both
16 individuals as well as organizations who
17 were allegedly contributing funds either
18 to Al Qaeda, Al Qaeda allies or other
19 terrorist organizations.
20      I don't recall exactly how we
21 first came into contact, but plaintiffs'
22 counsel obviously was interested in the
23 means by which Al Qaeda was receiving
24 financing and I was put on retainer.
25     Q.    Did plaintiffs' counsel reach

1          KOHLMANN
2  out to you or did you reach out to
3  plaintiffs' counsel?
4      A.    I did not reach out to
5  plaintiffs' counsel.
6      Q.    Who was the first counsel to
7  contact you with respect to this case?
8      A.    I don't recall, it likely was
9  Michael Elsner, but I don't recall.
10     Q.    Was it someone from Motley
11 Rice?
12     A.    I believe so, yes.
13     Q.    At the time in late 2003, early
14 2004, you would have been a third year in
15 law school, is that correct?
16     A.    I was finishing my third year
17 in law school, that's correct, yes.
18     Q.    And you finished in or around
19 May of 2004?
20     A.    Correct, yes.
21     Q.    At the time that you were
22 retained, you were still working for the
23 Investigative Project, is that correct?
24     A.    No, that's not correct.
25     Q.    When did you stop working for

1          KOHLMANN
2  the Investigative Project?
3      A.    Approximately two months before
4  I was retained by Motley, so probably
5  around November, December 2003.
6      Q.    I think in your resume it says
7  2004; does that refresh your recollection?
8      A.    If it says that it's probably
9  incorrect, because of the fact I believe I
10 was doing work for Motley before I
11 finished law school, but I would have to
12 check, it's almost 20 years ago, I'm not
13 sure.
14     Q.    Did there come a time when you
15 put in an affidavit in connection with
16 this case in or around the time that you
17 were retained?
18     A.    I believe I was asked to
19 provide multiple affidavits at that time.
20     Q.    Beginning at what period in
21 time?
22     A.    I'm sorry, I don't recall, it
23 was shortly after I was retained.
24     Q.    So it would be in or around
25 2004, to the best of your recollection?

1          KOHLMANN
2      A.    I think that's a fair -- yes,
3  that's a fair assessment.
4      Q.    And were you still on a monthly
5  retainer at that time?
6      A.    I believe -- I am not sure.
7      Q.    I am not trying to give you a
8  memory test --
9      A.    I'm sorry, yeah --
10     Q.    You were on a monthly retainer
11 until 2007 and it appears to go hourly;
12 I'm just trying to determine whether there
13 were different arrangements in the same
14 time period or whether there was just a
15 single change.
16     A.    No, you're right, you're -- my
17 recollection is refreshed by what you're
18 saying.
19          Initially I was paid by
20 retainer and afterwards I was paid an
21 hourly rate, that's correct, yes.
22     Q.    Did you review the complaint in
23 this action before it was filed, the first
24 complaint?
25     A.    I don't believe so, but I don't

1          KOHLMANN
2  recall.
3      Q.    Did you provide any information
4  to plaintiffs' counsel with respect to
5  that complaint, if you know?
6      A.    You mean information that would
7  have led them to help file the complaint?
8      Q.    Information that would have
9  been put in as allegations in the
10 complaint or that would have informed
11 their process, if you know.
12     A.    I don't know.
13     Q.    At the time that you were
14 hired, were you also working for an entity
15 called the 9/11 Finding Answers
16 Foundation, which I will call NEFA?
17     A.    I was -- okay.
18          So I worked for NEFA Foundation
19 at the same time I was doing work for
20 Motley, but there was an overlap, but it's
21 not the same period.
22          I only started doing work for
23 NEFA, my recollection was it was at least
24 a year or two after I began doing work for
25 Motley, maybe even more.

4 (Pages 10 - 13)

Page 38

1           KOHLMANN
2    A.    Yeah --
3         MR. HAEFELE:  Objection to
4 form.
5    A.    I was in regular communication
6 with him, so I am assuming he was
7 reviewing that stuff, yes, as were Claudio
8 Franco, who was another investigator
9 employed by NEFA, focuses on the Taliban
10 and Afghanistan, also reviewed by, you
11 know -- again, I don't want to hazard
12 names.
13        If you give me a paper, I will
14 tell you who I shared it with.
15    Q.    We will see where we get to and
16 see how much time we have.
17    A.    Okay.
18    Q.    And that's why I am going to
19 try to show you as little as necessary so
20 we can cover the ground we need to.
21        You testified in the Haroun
22 case that only two of your publications
23 had been through a formal peer review
24 process, your book and article called Room
25 of Africa, Bringing Global Jihat to the

Page 39

1           KOHLMANN
2 Horn of Africa, and that you were the
3 third author on that with Dr. Vidino and
4 Mr. Pantucci, correct?
5         MR. HAEFELE:  Objection to
6 form.
7    A.    I think there is another paper
8 there somewhere, but I have to dig it up,
9 it is 20 years of stuff, I'd have to dig
10 it up.
11    Q.    You testified Haroun, there was
12 only two and that is just a couple of
13 years ago?
14    A.    If you're asking were those two
15 things peer-reviewed, absolutely they were
16 peer-reviewed, formally peer-reviewed,
17 yes.
18    Q.    You don't know who formally
19 peer-reviewed it, correct?
20    A.    In the case of my book --
21    Q.    Let's deal with the Vidino
22 article --
23    A.    No, no.
24    Q.    I will come onto your book in
25 time.

Page 40

1           KOHLMANN
2    A.    No, no, no, I do not  -- I
3 mean, I was peer-reviewed, I know there
4 was a formal peer review process, I know
5 because I was involved in it and I had to
6 go through the comments and make
7 adjustments and respond to questions and
8 all this stuff, it was a lot of peer
9 review, it took a long time.
10        But I don't know the identities
11 of people that did it, no.
12    Q.    Do you know whether they were
13 academic reviewers or nonacademic
14 reviewers?
15    A.    It is my understanding that at
16 least some of them were academic
17 reviewers, but, again, I don't know their
18 exact identities, I only know what I was
19 told.
20        I was specifically told that
21 academic was the word that was used.
22    Q.    You published an article with
23 John Eubanks in 1999, do you recall that?
24    A.    In the Journal of
25 Counterterrorism and Security

Page 41

1           KOHLMANN
2 International?
3    Q.    I guess you do recall it, yes.
4    A.    Yes, I do.
5    Q.    Was Mr. Eubanks a colleague of
6 yours at the time with the Investigative
7 Project?
8    A.    That's correct, yes, he was.
9    Q.    And he is now counsel for
10 plaintiff in this case?
11    A.    I believe he is, at least the
12 last time I checked, yes, he is.
13    Q.    What were the circumstances
14 under which you came in 1999 to prepare an
15 article in conjunction with Mr. Eubanks?
16    A.    I was working at the
17 Investigative Project, I was conducting
18 research, I had conducted research into
19 several particular areas that were germane
20 to what we were doing and John was also
21 working on those areas, so we co-authored
22 this together.
23        I'm sorry, maybe I'm not
24 understanding what you're driving at.
25    Q.    I am not really driving at

11 (Pages 38 - 41)

Page 42

1        KOHLMANN
2 anything, I'm just trying to understand
3 it, it is unusual that counsel and someone
4 else -- just trying to figure out how it
5 happened.
6    A.    It is not unusual.
7        I have a lot of friends of mine
8 who are lawyers, I have friends of mine
9 that work for firms that are present here
10 today, so it is not really unusual at all.
11    Q.    Have you authored an article
12 with any other lawyers?
13        MR. HAEFELE:  Objection to
14 form.
15    A.    With lawyers, he wasn't a
16 lawyer when -- I mean, I am sure he
17 passed the bar exam, but he wasn't working
18 as a lawyer when he was working on the
19 Investigative Project.
20        Again, it would be very
21 difficult for me to look forward in time
22 when I am writing an article with someone
23 and saying 20 years from now they are
24 going to be working for a law firm, that's
25 not how it works.

Page 43

1        KOHLMANN
2    Q.    I am not asking you that and,
3 as you said, he was a lawyer then but not
4 working in that capacity.
5        Have you stayed in touch with
6 Mr. Eubanks with respect to this case?
7        MR. HAEFELE:  Objection to
8 form.
9    A.    I have spoken I think with
10 John, he is a great guy, friend of mine,
11 but honestly I have spoken with him I
12 think two times since his wedding back in
13 2004, so, no.
14    Q.    I'd like to come onto to NEFA;
15 you were a senior investigator at NEFA?
16    A.    Correct, yes.
17    Q.    And were there any other
18 investigators at NEFA?
19    A.    Yes, there were.
20    Q.    How large was NEFA when you
21 joined?
22    A.    I think there were three other
23 investigators that were employed at that
24 point, two or three.
25        I worked closely with one of

Page 44

1        KOHLMANN
2 the other investigators, so that's the
3 person I worked most closely with.
4    Q.    Who was that?
5    A.    Claudio Franco.
6    Q.    How did you come to be hired by
7 NEFA?
8    A.    I came into contact with David
9 Draper, I don't remember who introduced
10 us, David explained to me that they were
11 looking to start a research organization
12 think tank to help, you know, progress
13 forward research about Al Qaeda, 9/11 and
14 terrorist financing and I spoke with
15 Claudio, who was another researcher
16 involved in this, I had a great respect
17 for his work, he seemed to be doing work
18 that was very interesting and relevant and
19 so I joined.
20    Q.    How did you know David Draper
21 -- this was in or around 2006?
22    A.    Yes, something like that.
23    Q.    2005?
24    A.    Something like that, yeah.
25    Q.    It was after you were hired as

Page 45

1        KOHLMANN
2 an expert in this case, correct?
3    A.    Correct, that's right.
4    Q.    Did you know David Draper
5 before he hired you?
6    A.    No, I think I met him probably
7 a couple of months before they hired me, I
8 don't remember.
9        I remember being introduced to
10 David, but I don't remember exactly who --
11 I don't remember -- I can't remember who
12 exactly introduced us.
13    Q.    Would it have been someone at
14 Motley Rice?
15    A.    It might have been, but I can't
16 remember.
17    Q.    You are aware, are you not,
18 that Mr. Draper had worked for Motley
19 Rice, correct?
20        MR. HAEFELE:  Objection to
21 form.
22    A.    Yeah, I believe he did and I
23 think that's where I first came into
24 contact with him.
25    Q.    Was he still working for Motley

12 (Pages 42 - 45)

Page 142

KOHLMANN

1      KOHLMANN
2   Q.   You have been excluded in
3 particular cases, correct?
4     MR. HAEFELE: Objection to
5 form.
6   A.   I have been excluded in a
7 couple of cases, yes, that's correct.
8   Q.   I guess my question for you is,
9 do you inquire as to why a court has
10 excluded you?
11   A.   I don't know that I do it
12 universally, but I have, yeah, sure.
13   Q.   Let me move on.
14     You worked for the
15 Investigative Project from approximately
16 1998, I thought your resume had said 2004,
17 but I think you suggested --
18   A.   It was really December of 2003;
19 by early 2004 I was already on my own.
20   Q.   December 2003, okay.
21     Let's go back to 1998, in
22 February 1998, so you would have been a
23 freshman in college?
24   A.   Yeah, my second semester,
25 freshman year, that's right.

Page 143

1      KOHLMANN
2   Q.   Your resume says senior
3 terrorism consultant, I presume you didn't
4 start as a senior terrorism consultant?
5   A.   Correct.
6   Q.   Did you start as an intern?
7   A.   That's accurate.
8   Q.   How many people did
9 Investigative Project employ more or less
10 at the time that you started?
11   A.   In the office in D.C., it was
12 about, probably about a dozen, and then
13 overseas there were I think three or four
14 different individuals and there were a
15 couple of other folks that kind of, like,
16 they weren't based in D.C., they kind of
17 -- they were in different places.
18   Q.   When did you become a senior
19 terrorism consultant?
20   A.   20 years ago this is, but my
21 recollection is this was around the time
22 of 9/11, at that time I had already given
23 briefings at the White House, I had
24 already given briefings to the F.B.I., I
25 was speaking with law enforcement.

Page 144

1      KOHLMANN
2     I want to say it was, like, I
3 think it was May of 2002 was the first
4 time I appeared on television talking
5 about this stuff, so it was approximately
6 around that time.
7   Q.   Was it after September 11?
8   A.   It was -- you know, look, it
9 was an informal promotion, it was
10 basically, like, you know more about this
11 than almost anyone so you're in charge,
12 right.
13   Q.   Did there come a time when you
14 received a salary?
15   A.   I don't think I ever did, I
16 think I was always paid hourly.
17   Q.   Were you paid hourly as an
18 intern?
19   A.   Yeah.
20   Q.   Good gig.
21   A.   It was great; at the time I
22 was, like, this is great, I got to study
23 terrorism, they're even paying me, it was
24 unusual.
25   Q.   Did you research the

Page 145

1      KOHLMANN
2 organization before you started work
3 there?
4   A.   Yes.
5   Q.   Did you consider it a reputable
6 organization?
7   A.   There wasn't that much
8 information out there in early 1998 about
9 this.
10     I had watched I think it was a
11 60 Minutes special that had been showing
12 some of the video that he had recovered
13 and some of the investigations he had
14 done, I spoke with someone who worked
15 there that was very enthusiastic about
16 working there.
17     In fact, the only reason I
18 worked -- I didn't know what it was when I
19 got the job there, right, basically what
20 happened was that I had wanted to work in
21 a terrorism think tank or I wanted to work
22 somewhere studying terrorism and I
23 contacted a bunch of people at Georgetown
24 that I knew who had similar interests and
25 I said do you know of any place that I can

37 (Pages 142 - 145)

Page 146

1          KOHLMANN
2 go for internship to study this stuff.
3          Someone suggested this, they
4 were working there and they invited me in
5 and I didn't know too much about Steve or
6 the think tank, the Investigative Project,
7 I just watched some of the TV shows that
8 he had done and I watched his movie Jihad
9 in America, and I felt like it was
10 interesting work.
11     Q.     Did you read some of his
12 articles or news clips about Steve
13 Emerson?
14          MR. HAEFELE:  Objection to
15 form.
16     A.     About him or by him?
17     Q.     Either.
18     A.     After -- well, while working
19 there obviously, yes, I read tons of stuff
20 that he wrote or he said and then other
21 people saying about him, sure.
22     Q.     Were you aware -- would you
23 consider Steve Emerson a mentor of yours?
24          MR. HAEFELE:  Objection, form.
25     A.     That's a difficult question.

Page 147

1          KOHLMANN
2          I had my disagreements with
3 Steve; I credit Steve with giving me
4 opportunity to research this stuff and
5 having exposed me to a lot of information
6 that nobody really knew about back then.
7          But I would say that my
8 philosophy and my approach are
9 significantly different than Steve.
10     Q.     In your book you called him "a
11 good friend with whom I'm proud to share
12 the field" and you also talk about a
13 special thanks to various people,
14 including Steve Emerson.
15          Did he help you with your book?
16     A.     Not really, no.
17          And just to be very clear, that
18 was written before I left the
19 Investigative Project.
20     Q.     So he was -- was he a good
21 friend before you left the Investigative
22 Project but not after, I am not
23 understanding what you're trying to say?
24     A.     I am just going to put it this
25 way; he is someone who I respect the

Page 148

1          KOHLMANN
2 amount of commitment he has put in, he did
3 a lot of very, very interesting work early
4 on.
5          The work that he did on Makhtab
6 and Al-Kisah is still among the best work
7 anyone has done, the documents he
8 recovered from those institutions, nobody
9 else has them and they're tremendously
10 important.
11          I would say there are some
12 decisions that he does that I don't agree
13 with, some opinions that he has I don't
14 agree with obviously.
15          But I would say that his
16 critics have gotten some things right and
17 some things wrong and I think one thing
18 that they have gotten wrong is that, you
19 know, he has his own personal opinions
20 about this, but he does have very good
21 research and he has done an admirable job
22 of getting that research against very long
23 odds and he has gotten research that
24 nobody else has and that is absolutely
25 authentic and credible.

Page 149

1          KOHLMANN
2          So I can disagree with his
3 opinions and I can disagree with this and
4 that, but I think the information that he
5 has gathered, the research he has
6 gathered, is top notch, at least for the
7 time that I was there.
8     Q.     At the time that you began work
9 in 1998 at the Investigative Project, were
10 you aware that Mr. Emerson had stated on
11 television in 1995 that, with respect to
12 the Oklahoma City bombing, that "the bomb
13 was done with the intent to inflict as
14 many casualties as possible and that is,"
15 quote, "a middle eastern trait."
16          Were you aware that he had said
17 that when you started work at the
18 Investigative Project?
19     A.     No, I found -- that statement
20 I discovered later.
21     Q.     While you were there?
22     A.     Yes, yes.
23     Q.     He also said, "Oklahoma City I
24 can tell you is probably considered one of
25 the largest centers of Islamic radical

38 (Pages 146 - 149)

1          KOHLMANN
2  activity outside the Middle East."
3          You're aware that he said that
4  as well?
5     A.    Well, he had a reason for
6  saying it, but, yeah, I'm vaguely familiar
7  with why he said that, yeah, or that he
8  did say that, excuse me.
9     Q.    Did you talk about it with him?
10    A.    No.
11    Q.    Did you view those as the
12  statements of an anti-Muslim bigot?
13         MR. HAEFELE:  Objection.
14    A.    The first thing, I think, it
15  was a stupid statement, I don't think it
16  was a racist statement, I think it was a
17  stupid statement.
18         I think in general when you
19  look at terrorism incidents, you have to
20  be very careful to guess who the
21  perpetrator is just based on how it's
22  carried out, you really have to see more
23  than that, right, so I think that was a
24  hasty thing to say.
25         As far as the bit about

1          KOHLMANN
2  Oklahoma City, I mean, he's right in the
3  sense that Oklahoma and Oklahoma City were
4  hosts to a lot of Islamic conferences that
5  took place in the early-to-mid 1990s and
6  several of those conferences hosted people
7  who were very radical, including in
8  Norman, Oklahoma, including people like
9  Abu Abdel Aziz Barbaros, you know, there
10  were actual -- mujahideen representatives
11  coming there and giving presentations.
12         Now, whether or not that's
13  germane to the Oklahoma City bombing, you
14  know, it's not irrelevant to mention,
15  obviously in retrospect it wasn't
16  Jihadist, it wasn't an Islamic group, and
17  I think it is probably fair to say Muslims
18  have been subject to, you know, a lot of
19  vitreal because of the fact that people
20  assume that every terrorist attack is
21  carried out by Muslims and there are
22  plenty of terrorist attacks carried out by
23  non-Muslims.
24    Q.    I think we have gone a little
25  far afield.

1          KOHLMANN
2          I am going to share with you,
3  which I almost never do with anyone, let
4  alone in my practice, but I can tell you
5  if somebody said to me it was a Jewish
6  trait to inflict as many casualties, I
7  wouldn't consider that a stupid statement,
8  I would consider that an anti-semitic
9  statement; wouldn't you, sir?
10    A.    Well, I know --
11         MR. HAEFELE:  Objection to
12  form.
13    A.    I know Steve pretty well and
14  Steve, probably a lot of people don't know
15  this, but Steve has a lot of Muslim
16  friends and is actually close to a lot of
17  Muslims --
18    Q.    Some of his best friends are
19  Muslim?
20    A.    I don't think that Steve would
21  deliberately insult people of the Muslim
22  faith like that, I think it was a stupid
23  statement, I think he should have thought
24  about what he was saying before he said
25  it, but I don't think it was intentionally

1          KOHLMANN
2  racist and I don't think he is
3  intentionally racist.
4          However, again, I can't speak
5  for him, I can only speak for myself.
6          As far as the Investigative
7  Project, I did not work directly
8  underneath Steve, I worked with a team of
9  other people who were very talented, very
10  sophisticated folks, who knew a lot about
11  this and they were certainly not as
12  knowledgeable.
13         I also -- the other point I
14  would note is that while Steve has said a
15  variety of things over the years that I
16  just don't agree with, right, I wouldn't
17  tell you that I necessarily agree with him
18  because I don't know, but I would also say
19  that Steve has been subject to criticism
20  sometimes where people have accused him of
21  being an Islamaphobe or a racist or this
22  or that and I don't think that those
23  criticisms are really, like -- if you're
24  arguing is he pro-Israeli, yeah, sure, I
25  would say so; am I pro-Israeli, not

39 (Pages 150 - 153)

Page 470

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 03-MDL-1570 (GBD)(SN)

5    ------------------------------------x.

6

7    IN RE: TERRORIST ATTACKS ON

8    SEPTEMBER 11, 2001

9

10

     ------------------------------------x

11                    August 6, 2021

                      9:04 a.m.

12

13

14        Continued Videotaped Deposition of

15    EVAN KOHLMANN, taken by Defendants,

16    pursuant to Notice, held via Zoom

17    videoconference, before Todd DeSimone, a

18    Registered Professional Reporter and Notary

19    Public of the State of New York.

20

21

22

23

24

25

Page 471

```
1
2  A P P E A R A N C E S :
3  COZEN O'CONNOR PC
     1650 Market Street, Suite 2800
4  One Liberty Place
     Philadelphia, Pennsylvania 19103
5     Attorneys for Plaintiffs' Executive
        Committee
6  BY:  J. SCOTT TARBUTTON, ESQ.
        starbutton@cozen.com
7
8
     ANDERSON KILL P.C.
9  1251 Avenue of the Americas
     New York, New York 10020
10     Attorneys for Plaintiff O'Neill and
        Plaintiffs' Executive Committee
11  BY: BRUCE STRONG, ESQ.
        bstrong@andersonkill.com
12
13
     MOTLEY RICE, LLC
14  28 Bridgeside Boulevard
     Mount Pleasant, South Carolina 29465
15     Attorneys for Plaintiffs in Burnett
        Case and Plaintiffs' Executive
16     Committee for Personal Injury and
        Death Claims
17  BY:  ROBERT T. HAEFELE, ESQ.
        rhaefele@motleyrice.com
18     C. ROSS HEYL, ESQ.
        rheyl@motleyrice.com
19     JODI FLOWERS, ESQ.
        jflowers@motleyrice.com
20
21
     SPEISER KRAUSE, P.C.
22  800 Westchester Ave, Ste. S-608
     Rye Brook, New York 10573
23     Attorneys for Plaintiffs' Executive
        Committee
24  BY:   JEANNE M. O'GRADY, ESQ.
        jog@speiserkrause.com
25
```

Page 473

```
1
2  A P P E A R A N C E S : (Continued)
3  JONES DAY
     51 Louisiana Avenue NW
4  Washington, DC 20001
        Attorneys for Dubai Islamic Bank
5  BY:   STEVEN T. COTTREAU, ESQ.
        scofttreau@jonesday.com
6     GABRIELLE PRITSKER, ESQ.
        gpritsker@jonesday.com
7     AUDREY BECK, ESQ.
        abeck@jonesday.com
8     ERIC SNYDER, ESQ.
        esnyder@jonesday.com
9
10
11  OMAR T. MOHAMMEDI LLC
     233 Broadway, Suite 820
12  New York, New York 10279-0815
        Attorneys for World Assembly of
13     Muslim Youth
     BY: OMAR T. MOHAMMEDI, ESQ.
14     omohammedi@otmlaw.com
        JILL MANDELL, ESQ.
15     jmandel@otmlaw.com
16
17
     GOETZ & ECKLAND
18  615 First Avenue NE, Suite 425
     Minneapolis, Minnesota 55413
19     Attorneys for World Assembly
        of Muslim Youth
20  BY:  FREDERICK GOETZ, ESQ.
        fgoetz@goetzeckland.com
21
22
23
24
25
```

Page 472

```
1
2  A P P E A R A N C E S : (Continued)
3  KREINDLER & KREINDLER, LLP
     750 Third Avenue
4  New York, New York 10017
        Attorneys for Plaintiffs' Executive
5     Committee
     BY:  ANDREW J. MALONEY, III, ESQ.
6     amaloney@kreindler.com
7
8  LEWIS BAACH KAUFMANN MIDDLEMISS PLLC
     1101 New York Avenue NW, Suite 1000
9  Washington, DC 20005
        Attorneys for Muslim World League and
10     International Islamic Relief
        Organization, Dr. Abdullah Al Turki,
11     Dr. Adnan Basha, Dr. Abdullah Al
        Obaid and Dr. Abdullah Naseef
12  BY:  WALEED NASSAR, ESQ.
        waleed.nassar@lbkmlaw.com
13     AISHA BEMBRY, ESQ.
        aisha.bembry@lbkmlaw.com
14     NOUR SOUBANI, ESQ.
        nour.soubani@lbkmlaw.com
15     SUMAYYA KHATIB, ESQ.
        sumayya.khatib@lbkmlaw.com
16
17
18
     BERNABEI & KABAT PLLC
19  1400 16th Street NW, Suite 500
     Washington, DC 20009
20     Attorneys for Dr. Abdullah Al Turki,
        Dr. Adnan Basha, Dr. Abdullah Al
21     Obaid and Dr. Abdullah Naseef
     BY:  ALAN KABAT, ESQ.
22     kabat@bernabeipllc.com
23
24
25
```

Page 474

```
1
2  A P P E A R A N C E S : (Continued)
3  SALERNO & ROTHSTEIN
     221 Schultz Hill Road
4  Pine Plains, New York 12567
        Attorneys for Yassin Kadi
5  BY:   AMY ROTHSTEIN, ESQ.
        amyrothsteinlaw@gmail.com
6     PETER SALERNO, ESQ.
        peter.salerno.law@gmail.com
7
8
     ALSO PRESENT:
9     RICHARD CASHON, Paralegal, Motley Rice
10     THOMAS DEVINE, Videographer
11     MICHAEL TOTH, Concierge Tech
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 471 - 474)

Page 475

1          KOHLMANN
2          THE VIDEOGRAPHER: Good morning.
3 We are going on the record at 9:04 a.m. on
4 August 6th, 2021.
5          This is Volume II of the
6 video-recorded deposition of Evan Kohlmann
7 taken by counsel for the defendant in the
8 matter of In Re Terrorist Attacks of
9 September 11th, 2001 filed in the U.S.
10 District Court, Southern District of New
11 York, case number 03-MDL-1570 (GBD) (SN).
12 This deposition is being held online as a
13 Zoom video conference with all parties
14 appearing remotely.
15          My name is Thomas Devine from
16 the firm Veritext New York and I am the
17 videographer.  The court reporter is Todd
18 DeSimone also with Veritext New York.  I am
19 not authorized to administer an oath, I am
20 not related to any party in this action,
21 nor am I financially interested in the
22 outcome.
23          Counsel appearing remotely will
24 have their appearances noted on the
25 stenographic record.  Now the court

Page 476

1          KOHLMANN
2 reporter will swear in the witness and we
3 may proceed.
4          THE COURT REPORTER:
5 Mr. Kohlmann, I'll just remind you that
6 you're still under oath.
7          THE WITNESS:  Yes, thank you.
8     *   *   *
9 E V A N  K O H L M A N N,
10 having been previously duly sworn,
11 testified further as follows:
12 EXAMINATION BY MR. NASSAR:
13     Q.    Good morning, Mr. Kohlmann.
14     A.    Good morning.
15     Q.    I hope you had a restful
16 evening.
17     A.    Some of it, yes.
18     Q.    My name is Walid Nassar.  I'm a
19 colleague of Mr. Lewis, who led the
20 questioning yesterday.  I represent the
21 Muslim World League, the IIRO, as well as
22 four of their former Secretaries General
23 who are named as individual defendants in
24 this litigation.  Mr. Lewis had a personal
25 family emergency and that's why I'm

Page 477

1 carrying on the questioning this morning.
2          MR. NASSAR:  Before we begin, I
3 have -- I wanted to direct your attention
4 or, more appropriately, your counsel's
5 attention to three entries in your reliance
6 materials that appear on page 13, and they
7 are a July 12th, 1999 letter, a March 20,
8 2000 letter, and a March 13, 1999 letter,
9 and I believe counsel will put a
10 stipulation onto the record in relation to
11 those three entries.
12          MR. HAEFELE:  Yeah.  As we have
13 in the past with other expert witnesses for
14 plaintiffs' counsel or for plaintiffs,
15 those are items that plaintiffs' counsel
16 provided to the experts, they were part of
17 a larger document that was already in the
18 ECF record, and it is my understanding that
19 none of the experts, including
20 Mr. Kohlmann, relied on them for their
21 opinions.  So we would stipulate that those
22 are documents not relied upon by the
23 expert.
24          MR. NASSAR:  I would like to at

Page 478

1          KOHLMANN
2 this time mark the report, your expert
3 report, and I believe it is 102 in the tab,
4 and it is going to be marked as Exhibit
5 1024.
6          (Exhibit 1024 marked for
7 identification.)
8          MR. NASSAR:  Can we cue it up.
9     Q.    If we just scroll through, it
10 is the report that we have been going over,
11 it is your expert report.  I just want to
12 make sure that it looks to you like your
13 expert report.
14     A.    Yeah, I have a copy right in
15 front of me.  It does appear to be.
16     Q.    Okay, great.
17          MR. NASSAR:  I would next like
18 to put up the rebuttal, your rebuttal
19 report, which is tab 8, and we are going to
20 mark that as Exhibit 1025.
21          (Exhibit 1025 marked for
22 identification.)
23          MR. NASSAR:  We can pull down
24 the report.  I think we have the wrong tab
25 up.  Let's pull this one down.  Is it tab

3 (Pages 475 - 478)

1          KOHLMANN
2  8?  Michael, is this --
3          THE CONCIERGE:  Actually, I
4  think you are looking for tab 9.
5          MR. NASSAR:  Okay.  It should
6  be the expert rebuttal report, yes, tab 9,
7  and this is going to be marked as Exhibit
8  1025.
9      Q.    If we could scroll through it
10 again, and the same exercise, does this
11 look like the rebuttal report that you
12 provided in this case?
13     A.    Yeah.  I have a copy right
14 here.  It appears to be.
15     Q.    And are all of your opinions
16 contained in the four corners of these
17 two -- these two reports?
18     A.    For this case, yeah, as far as
19 I'm aware, yes.
20         MR. NASSAR:  We can pull it
21 down.  Next I would like to mark as an
22 exhibit, I think it is -- it is document 4,
23 and these are the invoices that were
24 provided to us by counsel for plaintiffs.
25         (Exhibit 1026 marked for

1          KOHLMANN
2  identification.)
3      Q.    And we can just scroll through
4  these as well.  Do these look like the
5  invoices that you provided, Mr. Kohlmann?
6      A.    They do.  They do.
7      Q.    Except I imagine your invoices
8  were not redacted, correct?
9      A.    Yeah, they are not redacted,
10 and obviously this is now for like 16 years
11 ago, so they might look a little bit
12 different now.  But this is basically,
13 yeah, about right.
14     Q.    Okay.  And I see that you
15 switched from, and I believe you testified
16 to this yesterday as well, you switched
17 from a monthly retainer in or around
18 December 2007/January 2008 and you moved to
19 an hourly rate -- I'm sorry, that will be
20 Exhibit 1026.
21         In January 2008 you moved to an
22 hourly rate of $225 per hour; is that
23 correct?
24     A.    That's correct, yeah.
25         MR. NASSAR:  And we can pull

1          KOHLMANN
2  this down.  I think that's all I was going
3  to do with this.
4      Q.    And you testified yesterday
5  that around the same time you did some work
6  for the Department of Defense and that your
7  rate for them was $350 an hour; is that
8  correct?
9      A.    Yeah, yeah, I believe so, yeah.
10     Q.    In other reports that we have
11 seen where you have testified, I believe we
12 have seen rates in the $400 range for your
13 testimony and your work.  Does that sound
14 accurate?
15     A.    Yeah.  It just depended when
16 the contract started.  I mean, obviously my
17 rates went up over time.
18     Q.    Why is there a discount for
19 your work on this case relative to the work
20 you do for other cases?
21         MR. HAEFELE:  I object to the
22 form.
23     A.    I wouldn't describe it as a
24 discount.  It is simply that they retained
25 me when I was -- back in 2004 and I hadn't

1          KOHLMANN
2  updated my rates with them.  But that's, I
3  mean, it's just a function of time.
4      Q.    So these were locked in and
5  then you haven't updated the rates?
6      A.    I don't know if I'm locked in
7  or not.  Honestly, how do I put this, it is
8  a terrible thing to admit, my focus is not
9  really on the business side, that's why I
10 have business partners.  My focus is really
11 on substance.
12         MR. HAEFELE:  Walid, do you
13 want him to update his rates for the
14 deposition?
15         THE WITNESS:  I would be happy
16 to ask for more.  That's not something I
17 usually do.
18     Q.    And so when you were retained
19 at the inception of this litigation in
20 2004, that's when the $225 was decided, not
21 when it transitioned in 2008?
22     A.    I don't -- I think it was
23 around 2004-2005.  I don't remember when
24 the exact hourly rate was set.  I don't
25 remember.  But, again, I can tell you this,

4 (Pages 479 - 482)

Page 543

KOHLMANN

2   Q.   And "Police officials," in the
3   next paragraph, "say that WAMY has presence
4   in Delhi, Mumbai," I'm not even going to
5   try to pronounce the next city, "Lucknow,
6   Aligarh, besides Hyderabad." And then it
7   said "It had its offices in Mumbai and
8   Delhi which were closed soon after the
9   Centre imposed a ban on SIMI."
10          Did I read that correctly?
11      A.   As best as I could, because I
12  can't pronounce Thirvuanathapuram either.
13      Q.   All right.  So it doesn't state
14  in here, in this article, the point that
15  you cite it for, "The Indian government
16  shuttered WAMY's offices in that country
17  for allegedly financing banned terrorist
18  groups including Laskhar-e-Toiba and
19  Jaish-e-Mohammed."
20          As I read the article, it says
21  that two offices were closed soon after the
22  Centre imposed a ban on SIMI.  Would you
23  agree that there is somewhat of a
24  disconnect between your report and the
25  article?

Page 544

KOHLMANN

2       MR. HAEFELE:  Objection to
3   form.
4       A.   No, I disagree with that.
5       Q.   All right.  Well, certainly
6   would you agree that your report seems to
7   indicate that -- well, there is no
8   distinction in your report as to whether
9   any WAMY offices were left open after that,
10  and there is no clarification in your
11  report as that the offices in Mumbai and
12  Delhi were closed soon after the Centre
13  imposed a ban on SIMI, that part of the
14  article did not carry over to your report,
15  did it?
16          MR. HAEFELE:  Objection to
17  form.
18      A.   The last part I don't know
19  about.  The first part I think -- I think
20  it is correct, I didn't say whether or not
21  other WAMY offices had not been closed,
22  although I don't know that that's relevant
23  to the point I was making.  But it is true,
24  I didn't say that there were other offices
25  that might have stayed open, sure.

Page 545

KOHLMANN

2       Q.   Did you have any primary or
3   secondary sources or did you consider any
4   primary or secondary sources as to whether
5   any WAMY office in India was ever closed by
6   the government?
7       A.   I don't think so, but I can't
8   recall, honestly.  I might have looked at
9   other sources from within my own archive on
10  this, but I don't recall.
11      Q.   All right.  But, again, it is
12  our only opportunity to ask you questions
13  about this, and for this proposition, this
14  claimed link, the only source that you cite
15  is this one Times of India article, right?
16      A.   That's correct, yeah, but I
17  can't recall if there are other sources.
18  I -- sorry, I can't recall off the top of
19  my head.  This is the only source that I
20  cited.
21      Q.   The article represents
22  intelligence agencies are planning to
23  submit a report on their findings about
24  WAMY's activities by the city -- or
25  activities the city to the Centre by the

Page 546

KOHLMANN

2   end of this month.
3           Did you ever get a copy of that
4   report if it was ever issued?
5       A.   I don't know that I was ever
6   able to get a copy of that report, no.
7       Q.   Was there a report even issued;
8   do you know?
9       A.   I wasn't able to get a copy of
10  any such report, so honestly I can't say
11  whether it was or it wasn't.
12      Q.   Are you aware that a former
13  WAMY official has testified under oath in
14  this case that WAMY never had an office in
15  India?
16      A.   I am not familiar with that,
17  no.
18      Q.   So in preparing your report in
19  this case, you make this factual claim.
20  Did you ever reach out to the plaintiffs'
21  counsel and say well, I'm making this
22  claim, are there any other evidence or
23  information that was learned during
24  discovery that I could use to compare and
25  contrast this article to?

20 (Pages 543 - 546)

Page 547

1           KOHLMANN
2      A.   Well, just because of the fact
3  that someone denies something, that doesn't
4  mean it's not true.  WAMY has denied lots
5  of things over the years.  I just don't
6  have any faith in the affirmations made by
7  WAMY officials.  They have made
8  affirmations about lots of things that have
9  turned out not to be true.
10          So I think my, you know,
11 comparative analysis is based on evaluating
12 sources that are reliable.  Taking the word
13 of WAMY saying that something didn't, I
14 can't, I'm sorry, you know, I -- I didn't
15 note in here that WAMY said it didn't
16 happen, but I don't know that that's
17 relevant to my analysis because I don't
18 trust WAMY.  I don't trust anything that
19 WAMY says.
20     Q.   Mr. Kohlmann, that wasn't my
21 question.  My question was simply, and I'm
22 going to ask it again, so please listen
23 carefully, did you ever ask plaintiffs'
24 lawyers if there was any information about
25 WAMY's offices in India that was

Page 548

1           KOHLMANN
2  inconsistent with your information in this
3  Times of India report?
4          MR. HAEFELE:  I object to the
5  form and asked and answered.
6      A.   Yeah, I --
7      Q.   Do you even make the inquiry?
8      A.   I think I can answer this again
9  which is that I was provided with certain
10 materials.  I looked up anything I could
11 not find.  Some materials were unavailable
12 to me.  And as far as WAMY, I don't trust
13 what their officials say, I can't take
14 those affirmations because they have made
15 those affirmations before and --
16         MR. MOHAMMEDI:  That is not
17 responsive.
18         MR. HAEFELE:  It actually is
19 responsive.
20     Q.   Just finish your answer,
21 please.
22     A.   Sure.  Once again, as I said,
23 unfortunately, the affirmations of WAMY
24 officials don't carry that much weight when
25 they are denying aspects of, you know,

Page 549

1           KOHLMANN
2  accusations of terrorism because they have
3  made those denials before and they weren't
4  true.
5      Q.   So the answer to my question is
6  no, you never asked about this claim,
7  whether there was any contrary information;
8  is that right?
9          MR. HAEFELE:  Objection to
10 form, asked and answered.
11     A.   I think the answer is that I
12 never asked whether or not WAMY officials
13 denied a charge that I would have expected
14 them to have denied to begin with.
15         I mean, again, you know, this
16 is the same thing about asking someone in
17 prison whether or not they did it.  Of
18 course they are going to tell you they are
19 innocent.  That doesn't mean anything.  I
20 mean, that's what -- this is -- that's not
21 a relevant -- a relevant -- now, if a U.S.
22 government agency or a British government
23 agency or some other reliable foreign
24 government had come forward and said WAMY
25 didn't have an office there, that is all a

Page 550

1           KOHLMANN
2  lie, dot dot dot, I would be more than
3  willing to consider that, sure, a
4  subjective source, sure, of course, sure.
5      Q.   Mr. Kohlmann --
6      A.   Not -- excuse me, Mr. Goetz,
7  again, I've got to finish.  If it is from a
8  WAMY official denying they did anything
9  wrong, I don't know that that's something
10 that I can rely on.
11     Q.   Mr. Kohlmann, would you agree
12 that irrespective of whether somebody is in
13 prison or not, everyone has biases, would
14 you agree with that?
15     A.   Yeah, absolutely.  I think I
16 have said that previously, that all human
17 beings have some form of bias.  You have to
18 treat every source as having some form of
19 bias.  You have to assume that you have
20 some form of bias, and any kind of analysis
21 that you are doing you have to be
22 continuously and rigorously examining for
23 bias, both bias for and bias against,
24 which, again, I think it is a very fair
25 point.

21 (Pages 547 - 550)