# Exhibit 97

This Transcript Contains Confidential Material

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE: TERRORIST        )
ATTACKS ON              )   03-MDL-1570
SEPTEMBER 11, 2001      )   (GBD)(SN)
_____ )


TUESDAY, JUNE 22, 2021

THIS TRANSCRIPT CONTAINS
CONFIDENTIAL MATERIAL

- - -

Remote videotaped deposition of
Samuel G. Coombs, held at the location of the
witness in Alabama, commencing at 11:33 a.m.
Central Time, on the above date, before
Carrie A. Campbell, Registered Diplomate
Reporter, Certified Realtime Reporter,
Shorthand Reporter, Certified Court
Reporter.


- - -


GOLKOW LITIGATION SERVICES
877.370.3377 ph| 917.591.5672 fax
deps@golkow.com

This Transcript Contains Confidential Material

## Page 2

```
 1    R E M O T E   A P P E A R A N C E S :
 2
 3
      COZEN O'CONNOR P.C.
 4    BY:  SEAN P. CARTER
           Scarter1@cozen.com
 5         SCOTT TARBUTTON
           starbutton1@cozen.com
 6    1650 Market Street, Suite 2800
      Philadelphia, Pennsylvania 19103
 7    (215) 665-2000
 8
 9         and
10
      MOTLEY RICE LLC
11    BY:  ROBERT T. HAEFELE
           rhaefele@motleyrice.com
           JODI FLOWERS
12         jflowers@motleyrice.com
      28 Bridgeside Boulevard
13    Mount Pleasant, South Carolina 29464
      (843) 216-9000
14
15         and
16
      KREINDLER & KREINDLER LLP
17    BY:  STEVEN POUNIAN
           spounian@kreindler.com
18         ANDREW J. MALONEY III
           amaloney@kreindler.com
19         MEGAN BENETT
           mbenett@kreindler.com
20         JAMES P. KREINDLER
           jkreindler@kreindler.com
21    750 Third Avenue
      New York, New York  10017
22    (212) 687-8181
23
           and
24
25
```

## Page 3

```
 1    ANDERSON KILL
      BY:  BRUCE STRONG
 2         bstrong@andersonkill.com
      1251 Sixth Avenue
 3    New York, New York 10020
      (212) 278-1000
 4
 5         and
 6
      BAUMEISTER & SAMUELS, PC
 7    BY:  DOROTHEA CAPONE
           tcapone@baumeisterlaw.com
 8    140 Broadway
      New York, New York  10005
 9    (212) 363-1200
      Counsel for the Plaintiffs
10
11
      CAHILL GORDON & REINDEL
12    BY:  GRACE MCALLISTER
           GMcAllister@cahill.com
13    32 Old Slip
      New York, New York 10005
14    (212) 701-3000
      Counsel for Swiss Re International
15    S.E., et al.
16
17    SHEPS LAW GROUP P.C.
      BY:  ROBERT SHEPS
18         rsheps@shepslaw.com
      25 High Street
19    Huntington, New York  11743
      (516) 909-1228
20    Counsel for Charter Oak Insurance
      Company
21
22
23
24
25
```

## Page 4

```
 1    KELLOGG, HANSEN, TODD, FIGEL &
      FREDERICK PLLC
 2    BY:  DANIEL DORRIS
           ddorris@kellogghansen.com
 3         MICHAEL KELLOGG
           mkellogg@kellogghansen.com
 4         CHRISTOPHER M. YOUNG
           cyoung@kellogghansen.com
 5    1615 M Street, N.W., Suite 400
      Washington, D.C.  20036
 6    (202) 326-7900
      Counsel for the Kingdom of Saudi
 7    Arabia
 8
 9    JONES DAY
      BY:  GABRIELLE E. PRITSKER
10         gpritsker@jonesday.com
           ERIC SNYDER
11         esnyder@jonesday.com
      51 Louisiana Avenue, N.W.
12    Washington, D.C.  20001-2113
      (202) 879-3939
13    Counsel for Dubai Islamic Bank
14
15    MOLOLAMKEN, LLP
      BY:  ROBERT K. KRY
16         rkry@mololamken.com
           ERIC R. NITZ
17         enitz@mololamken.com
      600 New Hampshire Avenue, N.W.
18    Washington, D.C. 20037
      (202) 556-2011
19
20         and
21    LAW OFFICES OF GEORGE R. SALEM, PLLC
      BY:  GEORGE SALEM
22         gsalem@georgesalem.com
      500 8th Street NW, Suite 210
23    Washington, DC  20004
      (202) 863-7260
24    Counsel for Dallah Avco
25
```

## Page 5

```
 1    LEWIS BAACH KAUFMANN MIDDLEMISS PLLC
      BY:  AISHA BEMBRY
 2         aisha.bembry@lbkmlaw.com
      1101 New York Avenue, NW, Suite 1000
 3    Washington, D.C. 20005
      (202) 833-8900
 4
 5         and
 6    THE LAW FIRM OF OMAR T. MOHAMMEDI, LLC
      BY:  JILL MANDELL
           jmandell@otmlaw.com
 7    233 Broadway, Suite 801
      New York, New York 10279
 8    (212) 725-3846
      Counsel for The Muslim World League,
 9    the International Islamic Relief
      Organization
10
11
      AGRICOLA LAW, LLC
12    BY:  BARBARA H. AGRICOLA
      127 South 8th Street
13    Opelika, Alabama  36801
      (334) 610-1064
14    Counsel for the Witness
15
      ALSO PRESENT:
17    JOHN FAWCETT, staff, Kreindler &
      Kreindler
18
      NOUR SOUBANI, staff, Lewis Baach
19
      RAYMOND RIVERA, staff, Cozen
20    O'Connor
      ABDELGADER HASHIM
21    In-house Counsel for Dallah Avco
22
      HANNAH LEE, paralegal, MoloLamken
23
      MARWAN ABDEL-RAHMAN, interpreter
24
25
```

2  (Pages 2 to 5)

This Transcript Contains Confidential Material

Page 6

1    TRIAL TECHNICIAN:
        BRIAN FRONZAGLIA,
2        Precision Trial Services
3
4    VIDEOGRAPHER:
        DEVYN MULHOLLAND,
5        Golkow Litigation Services
6            – – –
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1    817    Contract PCA-93-017 for Operations    107
            and Maintenance of ANSS IV
2            Program, KSA0000002127 -
            KSA0000002141
3
        818    Ercan Engineering purchase    109
4            requests, US Transmittal #0013
            (ANSS III),
5            DA010725 - DA010752
6    819    October 27, 1994 Selection of    119
            Direct Supply Support Company,
7            DA010842
8    820    Dallah Avco, Contract to Ercan    121
            Consulting Engineers,
9            DA010841
10   821    FBI Document,    134
            FBI009923-009927
11
        822    FBI Document,    143
12           FBI009928-009929
13   823    FBI Document,    148
            FBI009918-009919
14   824    FBI Document,    149
            FBI008098-008103
15
16   (Exhibits attached to the deposition.)
17   CERTIFICATE....................................180
18   ACKNOWLEDGMENT OF DEPONENT...................182
19   ERRATA.......................................183
20   LAWYER'S NOTES...............................184
21
22
23
24
25

Page 7

1            INDEX
2                    PAGE
3    APPEARANCES..................................    2
4    EXAMINATIONS
5    BY MR. DORRIS...............................    10
6    BY MR. KRY..................................    76
7    BY MR. POUNIAN.............................   153
8    BY MR. DORRIS..............................   173
9    BY MR. KRY.................................   177
10
11           EXHIBITS
12   No.    Description    Page
13   810    Declaration of Samuel G. Coombs    12
14   811    Request for modification and/or    25
            authorization of
15           contract/agreement No. 1616
16   812    Avco Overseas Services payment    25
            guarantee - Omar Al-Bayoumi,
17           DA002267
18   813    Presidency of Civil Aviation    25
            Regular Time Report,
19           DA000398
20   814    Notice of Deposition and Rule 45    72
            Subpoena
21
22   815    October 23, 1995 letter to Ercan    88
            Incorporated,
            DA010695 - DA010722
23
24   816    Request for Payment (OKL),    100
            DA010334 - DA010346
25

Page 9

1            VIDEOGRAPHER:  We are now on
2    the record.
3            My name is Devyn Mulholland.
4    I'm a videographer with Golkow
5    Litigation Services.
6            Today's date is June 22, 2021.
7    The time is 11:33 a.m. Central Time.
8            This remote video deposition is
9    being held In the Matter of Terrorist
10   Attacks on September 11, 2001.
11           The deponent is Samuel G.
12   Coombs.
13           All parties to this deposition
14   are appearing remotely and have agreed
15   to the witness being sworn in
16   remotely.
17           Due to the nature of remote
18   reporting, please pause briefly before
19   speaking to ensure all parties are
20   heard completely.
21           All counsels' appearances will
22   be noted on the stenographic record.
23           The court reporter is Carrie
24   Campbell and will now swear in the
25   witness.

3  (Pages 6 to 9)

This Transcript Contains Confidential Material

Page 10

1    SAMUEL G. COOMBS,
2  of lawful age, having been first duly sworn
3  to tell the truth, the whole truth and
4  nothing but the truth, deposes and says on
5  behalf of the Defendant Kingdom of Saudi
6  Arabia, as follows:
7
8    DIRECT EXAMINATION
9  QUESTIONS BY MR. DORRIS:
10   Q.   Good afternoon, Mr. Coombs.  My
11  name is Dan Dorris.  I represent Saudi Arabia
12  in this case.
13   How are you today?
14   A.   I'm doing good.
15   Q.   Have you been deposed before,
16  Mr. Coombs?
17   A.   Excuse me?
18   Q.   Have you been deposed before,
19  Mr. Coombs?
20   A.   Have I been under oath before?
21   Q.   Have you given a deposition
22  before?
23   A.   I've given a deposition to the
24  Highway Commission.
25   Q.   This may be a little different

Page 11

1  than you're used to, so -- {audio
2  interruption} -- explain --
3    There's a little bit of an echo
4  on your side.  I don't know if there's a way
5  to fix that, Barbi.  I can work through it,
6  if possible.
7    VIDEOGRAPHER:  I believe they
8  might be having a lag of Internet
9  connection.  That's why it's coming in
10  as an echo.
11    Do you want to go off the
12  record to see if they can switch to a
13  phone?
14    MS. AGRICOLA:  Yes.  Yeah,
15  let's see if we can -- {audio
16  interruption} -- here.  We'll see if
17  we can get this fixed.
18    VIDEOGRAPHER:  Off the record
19  at 11:35 a.m.
20    (Off the record at 11:35 a.m.)
21    VIDEOGRAPHER:  Back on the
22  record at 11:38 a.m.
23  QUESTIONS BY MR. DORRIS:
24   Q.   I hope we've resolved our
25  technical problems for the morning.

Page 12

1    Mr. Coombs, I'll just go over
2  some ground rules of the deposition.  Let me
3  know if these are fair to you.
4    The court reporter is going to
5  try and take a transcript of everything you
6  say, which makes it important that we not
7  speak over one another.  I'll do my best to
8  make sure you finish your answers, and if you
9  could wait until I finish my questions, it
10  will be much easier for the court reporter
11  and she'll be a happier person today.
12    If you ever need to take a
13  break during the day, please let me know.
14  The only thing that I would ask is if there's
15  a question pending, that you finish the
16  current question.  But take a break at your
17  leisure if you need to.
18    All right.  Brian, can you
19  please pull up Tab 01.
20    (Coombs Exhibit 810 marked for
21  identification.)
22  QUESTIONS BY MR. DORRIS:
23   Q.   Mr. Coombs, is this the
24  declaration you submitted in this case?
25   A.   Yes.

Page 13

1   Q.   Can you please turn to page 3
2  of the declaration, Brian?
3    MR. KRY:  Dan, could we get the
4  exhibit number for the record, please?
5    MR. DORRIS:  Yes.  Let's enter
6  this as Exhibit 810.
7  QUESTIONS BY MR. DORRIS:
8   Q.   Mr. Coombs, your declaration
9  states that you met Omar Bayoumi in November
10  of 1994, correct?
11   A.   Yes.
12   Q.   How long was this encounter
13  with Mr. Bayoumi?
14   A.   Less than ten minutes.
15   Q.   This ten-minute meeting
16  occurred approximately 25 years ago, correct?
17   A.   Yes, sir.
18   Q.   Is it correct that this meeting
19  was your only personal interaction with Omar
20  Al-Bayoumi?
21   A.   Yes.
22   Q.   You had no responsibility for
23  overseeing Omar Al-Bayoumi, correct?
24   A.   Not directly.
25   Q.   You had no responsibility for

This Transcript Contains Confidential Material

Page 14

1  overseeing Omar Al-Bayoumi's work with PCA,
2  correct?
3       A.   No, I did not.
4       Q.   You had no responsibility for
5  overseeing the progress of Mr. Al-Bayoumi's
6  studies, correct?
7       A.   No.  No.  You're correct, no.
8       Q.   You had no responsibility for
9  hiring Omar Al-Bayoumi?
10      A.   Right, I did not.
11      Q.   You have no knowledge about
12  Omar Al-Bayoumi's work qualifications,
13  correct?
14      A.   I did not.
15      Q.   You have no knowledge about
16  Mr. Omar Al-Bayoumi's job experience,
17  correct?
18      A.   Say again, please?
19      Q.   You have no knowledge about
20  Omar Al-Bayoumi's work history, correct?
21      A.   No, I did not.
22      Q.   You have no knowledge Mr. Omar
23  Al-Bayoumi's educational experience, correct?
24      A.   No, I did not.
25      Q.   Mr. Coombs, you started in the

Page 15

1  logistics department at PCA in the summer
2  of 1994, correct?
3       A.   Yes.
4       Q.   And PCA stands for the -- what
5  does PCA stand for?
6       A.   Presidency of Civil Aviation.
7       Q.   You worked in Jeddah, Saudi
8  Arabia, while you were at PCA, correct?
9       A.   Yeah.
10      Q.   You left --
11      A.   Yes, that was my main office.
12      Q.   You left your position as
13  logistical manager with PCA in June 1997,
14  correct?
15      A.   Correct.
16      Q.   And when you left your position
17  in -- with the PCA in June 1997, you also
18  left Jeddah, correct?
19      A.   No.
20      Q.   Did you stay in Jeddah after
21  June 1997?
22      A.   Yes.
23      Q.   How long did you stay in Jeddah
24  after June 1997?
25      A.   For three years working for

Page 16

1  Al-Hekma medical.
2       Q.   Can you say that again?
3  Working for what?
4       A.   I left them.  I left the
5  Presidency of Civil Aviation and went to work
6  for Al-Hekma medical.
7       Q.   Prior to the summer of 1994,
8  you had no involvement with PCA, correct?
9       A.   No, I was with Kawasaki
10  Helicopter.  Presidency -- it was -- it was
11  Civil Defense.
12      Q.   Prior to the summer of 1994,
13  you had no firsthand knowledge of
14  Mr. Bayoumi's employment relationship with
15  either PCA or Dallah Avco, correct?
16      A.   That's correct.
17      Q.   You had no knowledge of whether
18  he was a student prior to the summer of 1994,
19  correct?
20      A.   No.
21      Q.   You had no knowledge of what
22  his job responsibilities were prior to the
23  summer of 1994, correct?
24      A.   That's correct.
25      Q.   Prior to the summer of 1994,

Page 17

1  you had no firsthand knowledge of any
2  payments made by either PCA or Dallah Avco to
3  Omar Al-Bayoumi, correct?
4       A.   Correct.
5       Q.   After June 1997, you had no
6  involvement with PCA, correct?
7       A.   No, I did not.
8       Q.   After June 1997, you would --
9  you have no firsthand knowledge of
10  Mr. Al-Bayoumi's employment relationship with
11  either PCA or Dallah Avco, correct?
12      A.   No, I did not.
13      Q.   After June 1997, you have no
14  firsthand knowledge of whether Omar
15  Al-Bayoumi was a student, correct?
16      A.   No, I did not.
17      Q.   After June 1997, you have no
18  firsthand knowledge of any job
19  responsibilities that Omar Al-Bayoumi had,
20  correct?
21      A.   Correct.
22      Q.   I'm sorry, I couldn't hear your
23  answer.
24           Did you say correct?
25      A.   That's correct.

This Transcript Contains Confidential Material

Page 18

```
 1        Q.    After June 1997, you have no
 2   firsthand knowledge of any payments made by
 3   either PCA or Dallah Avco to Omar Al-Bayoumi,
 4   correct?
 5        A.    That's correct.
 6        Q.    During your time at PCA, your
 7   responsibility was related to logistics
 8   department, correct?
 9        A.    Yes.
10        Q.    Can you describe for me what
11   your job responsibilities were with the
12   logistics department?
13        A.    Well, in logistics I started
14   out, I had a staff mixed between the
15   warehouse and administrative staff.  I had a
16   traveling staff that went around to inventory
17   the -- the navigation systems all around the
18   Kingdom.
19             We had eight different
20   maintenance sites, and I was responsible to
21   make sure that the logistics in all those
22   different eight locations were maintained.
23   And they were at primary airports in Saudi
24   Arabia.
25             Okay.  From that, the parts
```

Page 19

```
 1   flow, I worked with the Federal Aviation
 2   Administration out of Oklahoma getting parts
 3   for the older navigation systems that had
 4   been purchased through the federal
 5   government, US federal government.  Then I
 6   had to work out the payments and so on direct
 7   from Dallah Avco who was handling the payment
 8   process through their contract with PCA.
 9   They would do the direct payment.
10             They were behind four years on
11   one payment of $860,000.  I got that
12   processed in FAA.  Then they released again
13   and we could start ordering parts again.
14             I smoothed out some of the
15   logistics problems that they were having with
16   Italy and France.  And there was just some
17   things that were shuffling back and forth.
18             The French were trying to bid
19   on replacing some of the systems, and the
20   Italians were bidding on it, so I had to go
21   to Belisi {phonetic}, France, and sit there
22   and listen to them.
23             And then they bypassed me for
24   Italy, so I didn't go there, but I went to
25   London, and that didn't -- it didn't last but
```

Page 20

```
 1   a half a day and I came back.
 2             And then a decision was made
 3   without me even knowing about it, but that's
 4   normal.  So I started ordering parts through
 5   France and continued through the FAA.
 6        Q.    The logistics department was
 7   part of -- I'm sorry, if I cut you off,
 8   please continue.
 9             Were you finished?
10             MS. AGRICOLA:  You were saying
11   something about logistics.  Did he cut
12   you off?
13             THE WITNESS:  Okay.  The
14   logistics department, for the most
15   part, had sufficient funding because
16   of what they had advertised to the
17   International Aviation Authority, ICAO
18   out of Montreal, Canada.  They had to
19   show they had so much money in
20   logistics and so on like that because
21   they were part of ICAO, International
22   Aviation Authority, around the world.
23   So I had to have some contact with
24   them, too.  I never went to Montreal,
25   but I still had contact with them.
```

Page 21

```
 1   QUESTIONS BY MR. DORRIS:
 2        Q.    Thank you.
 3        A.    That was just the last part of
 4   it.
 5        Q.    The logistics department was
 6   one department of the Airways Engineering
 7   division, correct?
 8        A.    Yes.
 9        Q.    There were other departments at
10   airways -- at the Airways Engineering
11   division, correct?
12        A.    Yes.
13        Q.    What were some of those other
14   departments?
15        A.    There was engineering.  There
16   was development.  There was outside
17   contracting for different sites because each
18   site was leased and everything, so they had
19   people who were managing that.
20             They had -- the engineering
21   department was huge because they were trying
22   to do upgrades and things like this.  And so
23   that engineering department was very, very
24   high upgrade.  They had a lot of people in
25   the engineering department.
```

This Transcript Contains Confidential Material

Page 22

1    They had a -- software
2  development was -- was there. They had a
3  software program of their own that they were
4  working on. They hired people out of England
5  and out of Germany for that.
6    And they were in the PCA
7  headquarters building, which is right next to
8  where I was at, and I was in the other
9  building.
10    Q.    You were the manager for the --
11  for the logistics department, correct?
12    A.    Yes.
13    Q.    And the logistics department
14  was just one department of the Airways
15  Engineering division, correct?
16    A.    That's correct.
17    Q.    You were not responsible for
18  the budgets of the other departments within
19  the Airways Engineering division, correct?
20    A.    No, I was not.
21    Q.    You were not responsible for
22  payments coming from those other departments
23  within Airways Engineering division, correct?
24    A.    No, I was not.
25    Q.    Brian, can you put back up

Page 23

1  Mr. Coombs' declaration, page 3?
2    I'm just putting this on the
3  screen, Mr. Coombs, because I'm going to ask
4  you some specific statements within this
5  declaration, just as an aid for you to review
6  during my questions.
7    In the third paragraph,
8  Mr. Coombs, the last sentence, do you see
9  where it says -- or sorry, the second to last
10  sentence. Do you see where it says,
11  "Mr. Al-Bayoumi's tuition and expenses were
12  paid through the logistics department funding
13  through the Dallah Avco/PCA arrangement"?
14    A.    Yes.
15    Q.    Do you see that portion?
16    A.    (Witness nods head.)
17    Q.    Okay. One other thing --
18    A.    You see --
19    Q.    I know -- I know you would nod
20  in a normal conversation, but just so we can
21  have a clear transcript, can you make sure
22  when you're nodding to say "yes" or
23  "correct"?
24    A.    That is correct.
25    Q.    You further state, "At the

Page 24

1  time, I was not aware of any other funds
2  going to Mr. Al-Bayoumi," correct?
3    A.    That is correct.
4    Q.    During your tenure at PCA, you
5  had no firsthand knowledge of any payments
6  being made to Al-Bayoumi other than those
7  made through the logistics department,
8  correct?
9    A.    That is correct.
10    Q.    Now, the next paragraph states
11  that you were shown some documents by the
12  Kreindler & Kreindler firm, correct?
13    A.    Yes.
14    Q.    Do you understand that the
15  Kreindler & Kreindler firm is representing
16  the plaintiffs in this action who have sued
17  Saudi Arabia?
18    A.    (Witness nods head.)
19    Q.    And can you give a verbal
20  answer? I'm sorry.
21    A.    Yes, I did.
22    Q.    This states that they showed
23  you three specific documents, and they're
24  given the titles DA1016, DA2267 and DA398.
25    Were you shown any other

Page 25

1  documents by the Kreindler & Kreindler firm?
2    A.    No. Those forms, DA, I thought
3  they were Department of the Army forms, but
4  they weren't. They had their own format, and
5  they were authorized amounts that I had never
6  even imagined. I could not even imagine it.
7    Q.    Were you shown any other --
8    A.    Because it appeared like --
9    Q.    My apologies. I think we were
10  talking past one another there.
11    Were you shown any other
12  documents, other than the three listed here,
13  DA1016, DA2267 and DA398?
14    A.    No.
15    Q.    So to the best of your
16  recollection, the Kreindler & Kreindler firm
17  showed you three specific documents, correct?
18    A.    Correct.
19    (Coombs Exhibits 811, 812 and
20    813 marked for identification.)
21  QUESTIONS BY MR. DORRIS:
22    Q.    Let's mark each of these as
23  exhibits. We will mark DA1016 as
24  Exhibit 811, and, Brian, that is Tab 17.
25    We'll mark DA2267 as

7 (Pages 22 to 25)

This Transcript Contains Confidential Material

Page 26

1    Exhibit 812, and that is Tab 16, Brian.
2        And we will mark DA398 as
3    Exhibit 813, and that is Tab 18, Brian.
4        MR. HAEFELE: Dan, just so the
5    record's clear, the first two exhibits
6    were previously marked in other
7    depositions in the litigation.
8        MR. DORRIS: If anyone has
9    those exhibit numbers off the top of
10   their head, we can refer back to those
11   or we can reintroduce them. I don't
12   have the prior exhibit numbers with
13   me.
14       MR. POUNIAN: I think 811 is
15   Exhibit 371, and 813 is page 70 of
16   Exhibit 108.
17       MR. DORRIS: Let's just remark
18   them.
19       MR. KRY: For the record, I
20   think 2267 is also Exhibit 115.
21       MR. DORRIS: All right. Let's
22   just remark them now so we don't have
23   to go back and make certain. I don't
24   want to make a mistake on that.
25

Page 27

1    QUESTIONS BY MR. DORRIS:
2        Q.    Now, Mr. Coombs, based on the
3    documents, these three documents provided to
4    you by the Kreindler firm, in paragraph 3
5    your declaration -- or in the fourth
6    paragraph your declaration states, "The
7    documents clearly demonstrate that
8    Mr. Al-Bayoumi was receiving a salary and
9    benefits paid by Dallah Avco for working as a
10   PCA employee, in addition to and at the same
11   time that Mr. Al-Bayoumi was being paid
12   education and other expenses from my
13   logistics department budget."
14       Correct?
15       A.    Yes.
16       Q.    Now, you had never seen these
17   three documents prior to being shown them by
18   the Kreindler & Kreindler firm, correct?
19       A.    No, I had not.
20       Q.    When were you shown them by the
21   Kreindler & Kreindler firm?
22       A.    It was when I -- a couple of
23   days before I did this. They came here and
24   interviewed me, and it was -- it was in
25   January, third week of January, like that.

Page 28

1        Q.    For your declaration, Brian,
2    can you scroll to the last page of
3    Exhibit 810?
4        Did you sign your declaration
5    on January 25, 2021?
6        A.    Yes, I did.
7        Q.    The Kreindler & Kreindler firm,
8    to the best of your recollection, came to
9    meet with you in January of 2021?
10       A.    Yeah, they came directly here.
11       Q.    Who did you meet with?
12       A.    Keith -- Keith Williams.
13       Q.    Was there anyone else at that
14   meeting?
15       A.    No.
16       Q.    Was there one meeting or
17   multiple meetings?
18       A.    Multiple.
19       Q.    How many meetings did you have
20   with the Kreindler & Kreindler firm?
21       A.    As we were putting this
22   together, I think it was five. They were
23   short because it was during -- I was doing my
24   bus routes.
25       Q.    Each of these meetings occurred

Page 29

1    in January 2021?
2        A.    Right. Yes.
3        Q.    And each of these meetings was
4    between yourself and Keith Williams?
5        A.    Correct.
6        Q.    There was no one else at any of
7    the meetings?
8        A.    Not physically present. We
9    were on a conference call on one of them.
10       Q.    Okay. So for each of the five
11   meetings, you physically met with Keith
12   Williams, correct?
13       A.    That's correct.
14       Q.    And for one -- and he was the
15   only other person physically present,
16   correct?
17       A.    Correct.
18       Q.    For one of the meetings, other
19   people participated by telephone, correct?
20       A.    Correct.
21       Q.    Who participated by telephone?
22       A.    I don't remember.
23       Q.    Do you know how many people
24   participated by telephone?
25       A.    I heard multiple voices and

8 (Pages 26 to 29)

This Transcript Contains Confidential Material

Page 30

1   things like that, but I'm not really sure.
2        Q.    Returning to the fourth
3   paragraph of your declaration -- you could
4   put that back on the screen, Brian.
5        When you state that "the
6   documents clearly demonstrate that
7   Mr. Al-Bayoumi was receiving a salary and
8   benefits paid by Dallah Avco for working as a
9   PCA employee in addition to and at the same
10  time that Mr. Al-Bayoumi was being paid
11  education and other expenses from my
12  logistics department budget," you are basing
13  that statement solely on your review of the
14  three documents provided by the Kreindler &
15  Kreindler firm, correct?
16       A.    Correct.
17       Q.    Prior to being shown those
18  documents, you had no reason to believe that
19  Mr. Al-Bayoumi was receiving any salary and
20  benefits apart from what the doc -- apart
21  from any payments through the logistics
22  department, correct?
23       A.    No, I was not aware of it at
24  all.
25       Q.    Okay.  Let's look at these

Page 31

1   three documents.
2        Brian, can you pull up Tab 17
3   first, Exhibit 811, DA1016?
4        Mr. Coombs, this is one of the
5   documents shown to you by the Kreindler &
6   Kreindler firm, correct?
7        A.    Yes.
8        Q.    And you had never seen this
9   document before being shown it by the
10  Kreindler & Kreindler firm?
11       A.    Never.
12       Q.    This document came from a
13  separate department than the one -- than the
14  logistics department, correct?
15       A.    That's correct, because it
16  doesn't have my signature on it.
17       Q.    What in this document
18  demonstrates that Omar Al-Bayoumi was
19  receiving any payment other than through the
20  logistics department?
21       A.    Mohammed Al-Salmi's signature
22  at the bot -- initials, at the bottom.
23       Q.    Why do Mr. Al-Salmi's initials
24  indicate that Al-Bayoumi is receiving any
25  payment other than through the logistics

Page 32

1   department?
2        A.    It means it had to go to
3   someone else for approval.
4        Q.    Why does the fact that it went
5   to someone else for approval indicate that
6   Omar Al-Bayoumi is receiving any payment
7   other than through the logistics department?
8        A.    In the Presidency of Civil
9   Aviation, they had several flows that I
10  didn't even participate in, and I didn't
11  know.
12       Q.    Right.
13       You were one aware of this
14  document, correct?
15       A.    That's correct.  Never saw it
16  before.
17       Q.    And you were unaware of the
18  meaning of this document, correct?
19       A.    That's correct.
20       Q.    Let's look at Tab 16,
21  Exhibit 812, DA398.  Or did I mess that up?
22  So tabs --
23       BRIAN FRONZAGLIA:  Tab 16 was
24  identified as 812.
25       MR. DORRIS:  Tab 16812, DA2267.

Page 33

1        Let's go to -- sorry, my apologies.  I
2   got them out of order.
3        Let's go to Exhibit 813 first,
4   Tab 18.
5   QUESTIONS BY MR. DORRIS:
6        Q.    And this is DA398.
7        Mr. Coombs, this is another one
8   of the documents you were shown by the
9   Kreindler & Kreindler firm, correct?
10       A.    Yes, that's correct.
11       Q.    You had never seen this
12  document prior to being shown it by the
13  Kreindler & Kreindler firm?
14       A.    No, I had not.
15       Q.    This was not a document you
16  encountered in your job duties at the
17  logistics department, correct?
18       A.    In my department, we had -- it
19  was a similar timesheet that I had to do for
20  every employee.
21       Q.    What in this document
22  demonstrates that Omar Al-Bayoumi was
23  receiving any payment other than through the
24  logistics department?
25       A.    Well, it showed his hours and

9 (Pages 30 to 33)

This Transcript Contains Confidential Material

Page 34

1  consistency with the timing. That's inside
2  Saudi Arabia. The timing -- the money that I
3  sent, I didn't send it based on work hours.
4  I sent it based on requests of sums of money,
5  not for employment.
6      Q.  Correct.
7          The document shows work hours,
8  right?
9      A.  Yes, it shows work hours.
10     Q.  So it does not show any
11 payments to Omar Al-Bayoumi, correct?
12     A.  No, it doesn't show any
13 payments, but it's the -- what the finance
14 people use as an authorization for payment.
15     Q.  So this document by itself does
16 not show any payments, correct?
17     A.  No, it doesn't.
18     Q.  Let's turn to Tab 16,
19 Exhibit 812.
20         This is another one of the
21 documents shown to you by the Kreindler &
22 Kreindler firm, correct?
23     A.  Yes.
24     Q.  You had not seen this document
25 before being shown it -- shown it by the

Page 35

1  Kreindler & Kreindler firm?
2      A.  No, I've never seen that
3  before. Yeah. Well, at that point I did,
4  but, no, I didn't see it before.
5      Q.  This documents is dated
6  March 30, 1994, correct?
7      A.  Yeah, that's prior to my --
8      Q.  That's prior to when you joined
9  PCA, correct?
10     A.  Yes.
11     Q.  Can you zoom back out, Brian?
12         This letter requests that Avco
13 Overseas pay tuition for Al-Bayoumi in the
14 amount of $4,430 and a weekly living
15 allowance of $600 per week, correct?
16     A.  Yeah.
17     Q.  The tuition was for the
18 American Language Institute at San Diego
19 State University.
20         Do you see that?
21     A.  Yes, I see it.
22     Q.  Does this document state how
23 those payments were to be made to Omar
24 Al-Bayoumi?
25     A.  Maybe one of the reasons that

Page 36

1  Avco was irritated with this process in --
2  because they wouldn't talk to me. Avco was
3  being dropped off the list when I came on
4  board as the assistant manager. When I was
5  the assistant manager, they were -- they got
6  dropped off the list during that year, so I
7  didn't know much about it.
8      Q.  Mr. Coombs, does this document
9  state how those payments were to be made to
10 Omar Al-Bayoumi?
11     A.  Not that I can see.
12     Q.  Do you have any firsthand
13 knowledge of how these payments, if they were
14 made, were made to Omar Al-Bayoumi?
15     A.  An authorization document is
16 signed off by Al-Salmi. It would go to
17 Dallah Avco -- or go to Dallah, okay? Then
18 Dallah would process the funds and transfer
19 the funds to the US bank, or they would do it
20 through the American side of Dallah Avco.
21         But during that period of time
22 there was some questions, and as I took over,
23 it stopped going to Dallah Avco and it went
24 to this Dallah. And then they made direct
25 deposits from the bank there in Jeddah, Saudi

Page 37

1  Arabia, to his bank in the US.
2      Q.  Do you have any firsthand
3  knowledge of which department at Dallah Avco
4  would have made these payments to Omar
5  Al-Bayoumi, if they were made?
6          MR. KRY: Objection to form and
7  foundation.
8          THE WITNESS: No, I don't.
9  Because like I said, when I came on
10 board, they had -- they had broken
11 their ties with -- with our contract.
12 QUESTIONS BY MR. DORRIS:
13     Q.  Do you have any firsthand
14 knowledge of which department at either PCA
15 or Dallah Avco would have made these payments
16 to Omar Al-Bayoumi if they were made?
17         MR. KRY: Objection. Form.
18         THE WITNESS: Down at the
19 department level, you know, once it's
20 approved by Al-Salmi, it goes up to
21 the payment process with -- it would
22 go to Alp Karli, and then he'd take it
23 to Dallah. Alp Karli was our
24 financial transfer guy.
25

10  (Pages 34 to 37)

This Transcript Contains Confidential Material

Page 38

1    QUESTIONS BY MR. DORRIS:
2       Q.    Right.
3             And, Mr. Coombs, my questions
4    are about your declaration and your
5    statements that Mr. Al-Bayoumi had received
6    payments through the logistics department and
7    your belief that he received payments through
8    other departments besides the logistics
9    department.
10            Do you understand that?
11      A.    I only stated that he made --
12   we made payments to him because I would sign
13   off on what Al-Salmi would send me, then
14   I would send it back over to him and he'd
15   send it to Alp Karli.  Alp Karli would then
16   go process it.
17            And that's the process we went
18   through.  Al-Salmi would send me the initial
19   sheet.  He had already initialed it.  I'd
20   sign it because that means it comes out of my
21   budget.
22            Then it would go to -- back to
23   Al-Salmi, then to Alp Karli, and then to
24   whomever is making the payments.  Dallah.
25            It was not done outside the

Page 39

1    box.  It was not direct, to the best of my
2    knowledge.
3       Q.    Looking back at Exhibit 813 on
4    the screen, does anything in this document --
5    I'm sorry, the prior exhibit, 8 -- the one we
6    were just on, 812.
7             Does anything in this document
8    indicate whether the payments mentioned in
9    this letter were made through the logistics
10   department or by any other means?
11      A.    (Witness shakes head.)
12      Q.    Was that a no, Mr. Coombs?
13      A.    No.
14      Q.    Nothing in this document
15   indicates whether the payments were made
16   through the logistics department or some
17   other department, correct?
18      A.    No, it doesn't show the
19   department.  It shows authorization, a direct
20   authorization.
21      Q.    Going back to page 3 of your
22   declaration, you state in the fourth
23   paragraph, "I find that PCA's handling of
24   Mr. Al-Bayoumi is way outside of the box and
25   not consistent with Mr. Al-Salmi's normal

Page 40

1    operating practices.  Mr. Al-Salmi always
2    stressed to me that an individual had to be
3    specifically qualified for a position before
4    they would be hired by the PCA."
5             Do you see that?
6       A.    Yes.  And that was the verbiage
7    that he consistently used to me.  They had to
8    be qualified to get a salary.  I did not ever
9    know that he was drawing a salary.
10      Q.    Is it correct that you -- I
11   believe you may have answered this, but I
12   just want an answer for the record.
13            Is it correct that you
14   considered PCA's handling of Mr. Al-Bayoumi
15   to be way outside the box because of your
16   belief that he was paid as a student through
17   the logistics department and also paid as an
18   employee?
19      A.    Yes.  That seems -- you know,
20   after I see these documents, then I made this
21   statement.  And until I saw those documents,
22   I didn't know about it.
23      Q.    Well, Mr. Coombs, we just went
24   through each one of the documents, and
25   correct me if I'm wrong, but for each one of

Page 41

1    those documents you did not state -- you
2    stated that the document did not indicate how
3    any of the payments were to be made, whether
4    they were through the logistics department or
5    any other department.
6             MR. POUNIAN:  Objection.
7             THE WITNESS:  If it was the
8    logistics department, it would have
9    "logistics department" on it, and it
10   would have my initials on it.  Then
11   they can withdraw the money from my
12   budget.
13            Without my initials, it didn't
14   come from my budget.
15   QUESTIONS BY MR. DORRIS:
16      Q.    Okay.  Let's go back to the
17   documents.  Let's look at Exhibit 811 again.
18            Does this document indicate
19   that any payment was made to Omar Al-Bayoumi?
20      A.    I can't see proof of it except
21   that Mohammed Al-Salmi -- and obviously
22   somebody had to have translated it.
23      Q.    You see no proof of any payment
24   to Omar Al-Bayoumi from this document,
25   correct?

11  (Pages 38 to 41)

This Transcript Contains Confidential Material

Page 42

1    A.    Not that I can see.
2    Q.    This is one of the three
3    documents you relied on for your statement
4    that Omar Al-Bayoumi was paid a salary,
5    correct?
6    A.    It was my impression.
7    Q.    But you see no proof of that
8    payment from this document, correct?
9         MS. AGRICOLA:  Object to form.
10   QUESTIONS BY MR. DORRIS:
11   Q.    Is that a no, Mr. Coombs?
12   A.    No.
13   Q.    All right.  Let's look at
14   Exhibit 813.
15        Do you see any proof of a
16   payment to Omar Al-Bayoumi from this
17   document?
18   A.    I see support for a payment
19   because it's got his name on it and his hours
20   on it, a timesheet.
21   Q.    Do you see any indication in
22   this document that Omar Al-Bayoumi was paid a
23   salary?
24   A.    He would have to be getting a
25   salary if he had a timesheet signed by

Page 43

1    Al-Salmi.
2    Q.    Who is responsible for paying
3    salaries at Dallah Avco?
4         MR. KRY:  Objection to form.
5         THE WITNESS:  Alp Karli took
6    all the documentation over to Avco.
7    QUESTIONS BY MR. DORRIS:
8    Q.    That was not -- paying salaries
9    was not part of your job responsibilities,
10   correct?
11   A.    No.  I couldn't even get my
12   own.  It came through Dallah.  They didn't
13   make direct payments to me.
14        But without my timesheet, I
15   couldn't get paid.  So he got a timesheet,
16   obviously he got paid.  I can't see a denial.
17   Q.    But you were not responsible
18   for paying that salary, correct?
19   A.    No.  Because look at the job
20   description up in the right-hand corner.
21   Q.    You had no involvement in
22   paying that salary, correct?
23   A.    That's -- that was a tech side.
24   No.  I never even saw these timesheets.
25   Q.    Can we go to Tab 16,

Page 44

1    Exhibit 812?
2         This document does not state
3    that Omar Al-Bayoumi received a salary of any
4    kind, correct?
5    A.    It was prior to my tenure, and
6    it was sent directly to the United -- to Avco
7    Overseas Services in Houston.  And this would
8    have been sufficient authorization for them
9    to take it out of whatever was -- contract
10   they had been awarded.  There had to be lines
11   in that contract, okay, for them to make
12   payments.
13        And so then they would get a
14   request, the financial guy would go in and
15   deduct it from that line and pay it.  That's
16   all this is, is an authorization.  That is --
17   Q.    As we discussed earlier, this
18   document states that Omar Al-Bayoumi would --
19   strike that.
20        This letter requests that Avco
21   Overseas would pay tuition for Omar
22   Al-Bayoumi in the amount of $4,430 and weekly
23   living allowance of $600 per week, correct?
24   A.    Correct.  That's what it says.
25   Q.    This was a request for a

Page 45

1    payment of educational expenses, not a
2    salary, correct?
3    A.    That's correct.
4    Q.    And so is it correct that this
5    document does not request any salary to be
6    paid to Omar Al-Bayoumi?  Correct?
7    A.    It doesn't request salary, no,
8    it doesn't.
9    Q.    And this is one of the three
10   documents you relied on for your belief that
11   Omar Al-Bayoumi was receiving a salary,
12   correct?
13        MR. POUNIAN:  Objection to the
14   form of the question.
15   QUESTIONS BY MR. DORRIS:
16   Q.    Is that correct, Mr. Coombs?
17   A.    When you take a look at this,
18   it shows that he had benefits above -- what I
19   was authorizing out of my budget was almost
20   the same thing.
21   Q.    Mr. --
22   A.    So he was double-dipping.
23   Q.    Mr. Coombs, does this document
24   predate your time at --
25   A.    Yes, it does.

12  (Pages 42 to 45)

This Transcript Contains Confidential Material

Page 46

1    Q.    So at the time of this
2  document, you were not authorizing anything
3  for Mr. Al-Bayoumi, correct, because you were
4  not --
5    A.    No.  No, I was not.
6    Q.    Okay.  Going back to your
7  declaration, Mr. Coombs, the last sentence of
8  the fourth paragraph you state that
9  "Mr. Al-Salmi always stressed to me that an
10  individual had to be specifically qualified
11  for a position before they would be hired by
12  the PCA."
13        Do you see that?
14    A.    Yes.
15    Q.    And as you testified earlier,
16  you had no knowledge of Mr. Omar Al-Bayoumi's
17  qualifications, correct?
18    A.    No, I did not.  I assumed he
19  was in the States going to school.
20    Q.    Given that testimony, you have
21  no basis to know one way or another whether
22  Omar Al-Bayoumi was qualified for any
23  position at PCA, correct?
24    A.    No, I had no idea at all who he
25  was.

Page 47

1    Q.    I just want to make sure the
2  court reporter correctly transcribed that.
3        Your statement was, "No, I had
4  no idea at all who he was."
5        Was that what you said?
6    A.    I had never met him.  He was
7  just another name on the list.
8    Q.    And given that you had never
9  met him, you had no basis one way or another
10  to know whether he was qualified for any
11  position at PCA, correct?
12    A.    That's correct.  I had never
13  seen a résumé.  I had never seen a list of
14  qualifications or anything.  It was just his
15  name stuck out to me when I looked down the
16  list.  It was always higher than everyone
17  else.
18    Q.    Brian, can we please pull back
19  up the declaration and go to page 2?
20        In the third to the last
21  paragraph, I want to focus on the last
22  sentence.  You state, "The budget was also
23  used, among other things, for paying Saudi
24  Arabian students studying abroad who were PCA
25  employees or aspiring employees of the PCA."

Page 48

1    A.    Yes.
2    Q.    This refers to the logistics
3  department budget that you were responsible
4  for, correct?
5    A.    That's correct.
6    Q.    How many students were a part
7  of this arrangement where the logistics
8  department budget would be used to pay
9  their -- pay for their studies?
10    A.    It fluctuated between 45 and
11  50, and some of them are like interns.  They
12  would come on board temporarily in Saudi, and
13  then they'd apply for it.
14        They were young, and one of my
15  job -- when I took over that job because it
16  was a -- I was sitting in a Saudi government
17  position.  Logistics manager was not to be
18  filled by a foreigner.  I was in a Saudi
19  government position, and we were preparing
20  and teaching the Saudis on how to do the job.
21  There's a lot of -- there was a lot of things
22  fluctuating in and out.
23        And if their name was on the
24  list, it was already signed off on by
25  Mohammed Al-Salmi, I signed it and forwarded

Page 49

1  it on to Alp Karli.  And I would either take
2  it up to Mohammed Al-Salmi or I'd take it
3  directly to Alp Karli, but it would go --
4  then it would go for payment.
5    Q.    You referred to a program to
6  teach Saudis how to do certain jobs.
7        Are you familiar with the term
8  "Saudization"?
9    A.    Yes.  Very much.
10    Q.    Was the Saudization program a
11  program where non-Saudi workers would be
12  replaced by Saudi workers?
13    A.    Yes.
14    Q.    A component of the Saudization
15  program was to pay for the education of the
16  potential replacement Saudi employees,
17  correct?
18    A.    That's correct.
19    Q.    It was not out of the ordinary
20  in your experience at the PCA for -- for
21  payment for the tuition for potential Saudi
22  replacements to be paid by PCA or Dallah
23  Avco, correct?
24    A.    That's correct.
25    Q.    And there were in fact anywhere

13  (Pages 46 to 49)

This Transcript Contains Confidential Material

Page 50

1  from 45 to 50 individuals who were part of
2  the Saudization program who had their
3  educational expenses paid for them?
4          MR. KRY:  Objection to the form
5  of this question and the prior one.
6          THE WITNESS:  Like I said, to
7  the best of my knowledge, it's all I
8  saw.  Okay?
9          Other companies that I worked
10 with over there were doing exactly the
11 same thing.
12 QUESTIONS BY MR. DORRIS:
13     Q.     There were other companies in
14 Saudi Arabia who were also paying for
15 students' tuition --
16     A.     Yes.
17     Q.     -- so they could replace
18 non-Saudi workers, correct?
19     A.     That's correct.
20     Q.     This was a common practice not
21 only at PCA but at other Saudi businesses,
22 correct?
23     A.     That's correct.
24     Q.     You saw this practice
25 throughout your time in Saudi Arabia?

Page 51

1      A.     At least in the late '80s and
2  '90s.
3      Q.     Where else do you see this
4  practice of Saudization where Saudi students'
5  tuition was paid so that they could replace
6  non-Saudi workers?
7      A.     SIYANCO-SOCP, it was a Saudi
8  Ordnance Corps, and there were Saudis in the
9  Saudi Ordnance Corps that we were training.
10 Now, that was all -- all their payments were
11 done by the Saudi Ordnance Corps.  That's a
12 job prior to when I went to Kawasaki
13 Helicopter, the Civil Defense Aviation.
14 Okay?
15         And then afterwards when I went
16 to Al-Hekma medical, I had Saudis in every
17 department.  As the operations and logistics
18 manager, I had Saudis in every department.
19 They were being trained for new jobs.
20     Q.     And this -- I just want to make
21 sure I understood the name of the places
22 where this occurred.
23         You said Sokol {sic}?
24         Can you spell that for the
25 record?

Page 52

1      A.     SIYANCO.
2      Q.     Oh, SIYANCO.
3      A.     SIYANCO.
4      Q.     Okay.  And SIYANCO is
5  S-I-Y-A-N-C-O, correct?
6      A.     Yes.  All capital letters.
7      Q.     What was SIYANCO?
8      A.     SIYANCO was contracted to the
9  Saudi Ordnance, okay, and we repaired
10 vehicles.  We had mechanics come in from
11 Italy, Germany, from the States, from
12 Germany, all over the place, training them on
13 how to repair vehicles and everything else.
14 Trucks, tankers, everything.
15     Q.     And how many --
16     A.     And right --
17     Q.     How frequent was it at SIYANCO
18 for Saudi trainees' educational expenses to
19 be paid so that they could replace non-Saudi
20 employees?
21     A.     Now, in SIYANCO, that was all
22 done by the Saudi Ordnance Corps direct, not
23 by SIYANCO, us.  We knew that they were
24 students, okay?  We knew that they were
25 going, but we never saw any of their

Page 53

1  expenses.  We never saw any of their -- any
2  of their provision at all.
3      Q.     Was it a frequent occurrence --
4      A.     We knew about it.
5      Q.     Sorry.  Sorry for not letting
6  you finish.
7          Was it --
8      A.     It was a consistent occurrence.
9      Q.     Consistent occurrence.  Thank
10 you.
11         You also mentioned this
12 practice of Saudization occurring at Kawasaki
13 Helicopter, and that was the position you
14 held immediately --
15     A.     Kawasaki Helicopter?
16     Q.     Correct.
17     A.     Just prior.  Okay?  And that
18 was Civil Defense Aviation, okay?  And they
19 were -- Kawasaki Helicopter built the CA46
20 Marine helicopter.  Okay?  Saudis bought
21 them.
22         They had five -- eight bases in
23 Saudi.  Every base -- I was the manager, but
24 I reported to the base commander.  I had
25 mechanics that were training Saudi mechanics

14  (Pages 50 to 53)

This Transcript Contains Confidential Material

Page 54

1  to work on the helicopters.
2      Q.   Was it a frequent --
3      A.   It went on consistently.
4      Q.   Was it a consistent occurrence
5  at Kawasaki Helicopter to pay Saudi trainees'
6  educational expenses to train them to replace
7  non-Saudi workers?
8      A.   It was not the way the defense
9  aviation department did it.  Okay?
10         How they did that part, I don't
11  know, because I was just managing the base
12  and making sure those facilities were
13  operational, making sure that the hangar was
14  working, that they had parts, stuff like
15  that, for the facilities.  Like maintaining
16  the base.  So that didn't make it where I
17  knew any of the details.
18     Q.   Understood.
19         You didn't know the details of
20  the payments, but it was your experience that
21  it was a consistent practice to train Saudi
22  employees to replace non-Saudi employees,
23  correct?
24     A.   Yes.
25     Q.   Now, you also mentioned

Page 55

1  experiencing this at Al-Hekma.
2         Was it a -- is that correct?
3      A.   Yes.
4      Q.   And at Al-Hekma, was it a
5  consistent practice to train non -- sorry, to
6  train Saudi employees to replace non-Saudi
7  employees?
8      A.   Yes.
9      Q.   And --
10     A.   I was training Saudis to take
11  my position.
12     Q.   Al-Hekma --
13     A.   Al-Hekma medical.
14     Q.   At Al-Hekma, was it your
15  experience that the training for these Saudi
16  replacements would be paid for those Saudi
17  replacements?
18     A.   For the most part, yes.
19     Q.   Brian, can -- or you still have
20  it up.
21         Can we turn to -- I want you to
22  focus again on the declaration on the screen,
23  Exhibit 810, page 2, and the last full
24  paragraph of page 2.
25         You state, "Mr. Al-Bayoumi's

Page 56

1  name always headed the list of students
2  contained in the financial directives because
3  his expenses were significantly higher than
4  the rest of the students."
5         This refers to Omar
6  Al-Bayoumi's living expenses, correct?
7      A.   His living expenses plus his
8  monthly amount.  I had the complete list in
9  front of me, and his was always higher than
10  everyone else's.
11         Everyone -- most of the other
12  students were four years younger than him,
13  and he was married.  None of the other
14  students were married, and most of them lived
15  in like a dormitory, two of them to an
16  apartment or four to an apartment or -- but
17  he didn't, of course.  He had his wife there.
18     Q.   Like you just said, Omar
19  Al-Bayoumi was married, correct?
20     A.   Yes.
21     Q.   Do you know whether Omar
22  Al-Bayoumi had any children?
23     A.   No.
24     Q.   Do you know what Omar
25  Al-Bayoumi's actual living expenses were?

Page 57

1      A.   What his actuals were?
2      Q.   Yeah.
3      A.   No.  The amounts that were on
4  those lists, that was on those discs that I
5  gave to the FBI.
6      Q.   You were aware of the amount of
7  living expenses that were paid to Omar
8  Al-Bayoumi, correct?
9      A.   That was out of my budget, yes.
10     Q.   My question was slightly
11  different.
12         Omar Al-Bayoumi had expenses in
13  his personal life.  Do you know what those
14  living expenses were?
15     A.   No.
16     Q.   Now, you mentioned that other
17  students were typically younger and
18  unmarried, correct?
19     A.   Correct.
20     Q.   And you stated that most of
21  them lived in dormitories, correct?
22     A.   Dormitories or joint apartments
23  like that, yeah.
24     Q.   Do you know where
25  Mr. Al-Bayoumi lived?

This Transcript Contains Confidential Material

Page 58

1    A.   Magdi Hanna drove me past the
2  apartment complex.  I didn't see the
3  apartment that he was renting in, and it was
4  a nice -- really a nice area.  He wasn't
5  living downscale.
6    Q.   Omar Al-Bayoumi --
7    A.   It was like --
8    Q.   Omar Al-Bayoumi was not living
9  in a dormitory like the other young,
10 unmarried individuals, correct?
11   A.   No.  Him and his wife were
12 there together.
13   Q.   Can we turn to page 3 of the
14 declaration, Brian?
15        Sorry, one follow-up question.
16        You stated that you didn't know
17 what Omar Al-Bayoumi's actual living expenses
18 were in his day-to-day life, correct?
19   A.   That's correct.
20   Q.   So it's also true that you
21 don't know whether the living expenses paid
22 to him, how they related to his actual living
23 expenses in his personal life, correct?
24   A.   That's correct.
25   Q.   Now, the third full paragraph

Page 59

1  of the declaration, you state that you recall
2  in 1996 that Al-Bayoumi received
3  approximately 60,000 per year for tuition and
4  expenses, and that amount decreased --
5  increased by approximately $30,000 to total
6  $90,000 per year.
7        Do you see that?
8    A.   Yes.
9    Q.   This occurred 25 years ago,
10 correct?
11   A.   Yes.
12   Q.   When you wrote this portion of
13 your declaration, did you base it off any
14 documents in front of you, or were you going
15 purely off your memory?
16   A.   I'm going off my memory because
17 that's what I was being paid at the time.
18 That was my base pay.
19   Q.   Your base pay was $60,000,
20 correct?
21   A.   Yes.
22   Q.   And your -- the next sentence,
23 the fact that -- or the statement that Omar
24 Al-Bayoumi's payments to him increased by
25 $30,000 per year, you're basing that off

Page 60

1  purely your memory of an event that occurred
2  25 years ago, correct?
3    A.   The next year's budget, I saw
4  it.  I remembered it.  I said, wow, I wish I
5  had him, had his job.  I mean, I was just
6  amazed because it had already been initialed
7  by Al-Salmi to go ahead for me to authorize
8  it to come out of my budget.  It just said
9  that that -- and what Al-Salmi sent me,
10 that's what it listed as the expense, as
11 tuition.  And, you know, it just -- it just
12 jumped out at me.  That's all.
13   Q.   I want to turn back to the
14 process for creating your declaration.
15        Do you understand that your
16 declaration was submitted in connection with
17 a lawsuit against Saudi Arabia by various
18 plaintiffs alleging that Saudi Arabia should
19 be held liable for the 9/11 attacks?
20   A.   Yes.
21   Q.   And as we discussed earlier,
22 prior to submitting your declaration, you
23 communicated with plaintiffs' counsel,
24 correct?
25   A.   Prior to making my declaration,

Page 61

1  we sat down and we talked through the
2  declaration.
3    Q.   Okay.
4    A.   Okay?  Based on the documents,
5  you know, that I can remember and so on.
6    Q.   How did you come to be
7  acquainted with the Kreindler & Kreindler
8  firm?
9    A.   They called me.
10   Q.   When did they call you, to the
11 best of your recollection?
12   A.   In January.  In January.
13   Q.   And when they called you, what
14 did they ask of you?
15   A.   They asked me if they could
16 interview me.
17   Q.   Did they ask --
18   A.   I'm giving you the date.  I
19 turned my phone --
20   Q.   What -- say that again?  They
21 knew the date.  I turned my phone.  I didn't
22 catch that.
23   A.   I said, I'm turning my phone
24 on, and I'll give you the date they called
25 me.

This Transcript Contains Confidential Material

Page 62

1     Q.   Sure, go ahead.  Yeah, please
2  review your phone.  Can you check when they
3  called you?
4     A.   Yeah.
5         It's not letting me see it.
6     Q.   That's okay, Mr. Coombs.
7         Do you have any text messages
8  from the Kreindler & Kreindler firm?
9     A.   Do I have any what?
10     Q.   Text messages.
11     A.   Just when he made an
12  appointment to see me, that's all.
13     Q.   So you have some text --
14     A.   Ken Williams, he --
15     Q.   Sorry.  Go ahead.  Sorry for
16  interrupting you.
17         Can you please give your
18  answer?
19     A.   He called me, and then I -- no,
20  he called me.  I'll check that.
21     Q.   When you say "he," are you
22  referring to Keith Williams or somebody else?
23     A.   Yeah.
24     Q.   And is it Keith or Ken
25  Williams?

Page 63

1     A.   Kenneth.
2     Q.   Kenneth.  Okay.
3         And you said that you did have
4  text messages with the Kreindler & Kreindler
5  firm for the purpose of scheduling meetings?
6     A.   That's what I'm looking for.  I
7  can't remember.  Because he talked to me over
8  the phone quite a while.
9         Yeah, the first text message
10  was on January 1st.
11     Q.   And can you read that text
12  message?
13     A.   Yeah.  "Good morning.  Let's
14  get some breakfast before we get started.
15  Cracker Barrel, Waffle House, Huddle House,
16  Dunkin' Donuts or whatever.  I will be there
17  at 8:30."
18     Q.   So they approached you sometime
19  before January 1, 2021, and your first
20  meeting occurred with them on January 1,
21  2021, correct?
22     A.   Yeah.
23     Q.   So the Kreindler & Kreindler
24  firm interviewed you about this case.
25         How did it come to be that you

Page 64

1  submitted a declaration in this case?
2     A.   Personally?  Okay, I feel like
3  it's what needs to be done right.
4     Q.   Did they ask you to submit a
5  declaration in this case?
6     A.   They didn't ask me.  They just
7  asked me if I would participate and assist,
8  and I said yes.
9     Q.   You're currently represented by
10  Barb Agricola with respect to your
11  declaration, correct?
12         MS. AGRICOLA:  Barbara.  Not
13  Barb.
14         MR. DORRIS:  Sorry.
15         MS. AGRICOLA:  It's okay.
16  QUESTIONS BY MR. DORRIS:
17     Q.   You're currently represented
18  Barbara Agricola, correct?
19     A.   Yes.
20     Q.   Has any other attorney
21  represented you in connection with your
22  declaration?
23     A.   No.
24     Q.   Who drafted your declaration?
25     A.   Ken.

Page 65

1     Q.   So Ken provided you with a
2  draft of your declaration?
3     A.   Again, I sat down and worked it
4  out word for word.
5     Q.   And I'm sorry, is it Ken or
6  Keith?
7     A.   Ken.
8     Q.   Ken.  Okay.
9         Do you have a copy of the draft
10  that was prepared by Ken?
11     A.   I didn't have a copy of the
12  final.  I just got it today.  I just -- he
13  brought -- he brought the hard copy and I
14  initialed on it, but I didn't make a copy
15  because my printer in my -- my printer/copier
16  doesn't work at home.  So I just handed it to
17  him and said, okay, go ahead.
18     Q.   Did you make any edits to the
19  draft that Ken prepared?
20     A.   No.
21     Q.   So your declaration was drafted
22  by Ken Williams, provided to you in hard
23  copy, and you signed it as provided to you?
24         MR. HAEFELE:  Objection.  Form.
25         THE WITNESS:  Yeah.  Well,

17  (Pages 62 to 65)

This Transcript Contains Confidential Material

Page 66

1  we -- okay. We went over it. He had
2  a draft. Okay? We looked at it, he
3  edited it, and then he created it, and
4  I signed it.
5  QUESTIONS BY MR. DORRIS:
6      Q.   How many meetings did you have
7  where you reviewed your declaration with Ken
8  Williams?
9      A.   From the 21st to the 25th,
10 four, five -- yeah, five.
11     Q.   You had five meetings to review
12 your declaration with Ken Williams?
13     A.   Yeah, just to get together.
14 Yeah, they were short. I'm a school bus
15 driver.
16     Q.   Okay. How long was each one of
17 these meetings, approximately?
18     A.   Approximately an hour to two
19 hours.
20     Q.   And you said -- you gave some
21 dates, 21st to the 25th. You met with Ken
22 Williams each day, the 21st through the 25th?
23     A.   Yeah.
24     Q.   So you met with Ken Williams
25 for about an hour or two on the 21st, the

Page 67

1  22nd, the 23rd, the 24th and the 25th; is
2  that accurate?
3      A.   Well, on the 25th was
4  finalization, and I just signed off on it. I
5  just stopped off and had a cup of coffee and
6  initialed off on it.
7      Q.   Now, in the process of
8  reviewing this declaration, were there any
9  portions of the declaration that you took
10 out?
11     A.   Not really.
12     Q.   Were there any edit -- so you
13 were -- on the 21st, you saw a draft of the
14 declaration prepared by Ken Williams; is that
15 accurate?
16     A.   No.
17     Q.   Okay. Explain to me --
18     A.   No. He started putting
19 together pieces. I talked about, you know,
20 going there. I talked about the other stuff,
21 and he made a whole bunch of lists and
22 everything. And then he had -- so I just
23 took it from there.
24         And I told him I had been --
25 you know, they had flown me to New York to

Page 68

1  testify before the 9/11 Commission. I gave
2  the 9/11 Commission and the FBI people the
3  cassettes that had my spreadsheets on them
4  because I was suspicious of the spreadsheets
5  when I was in PCA. Something didn't seem
6  right to me. It was out of line.
7         When something is out of
8  line -- I'm a retired military officer.
9  Something is out of line, I just felt like I
10 had to keep track of it. That's all.
11     Q.   Mr. Coombs, it would -- can
12 you -- I know it's difficult in a deposition
13 setting, but can you please focus on my
14 question?
15         My question was: On the 1st,
16 you saw a draft of the declaration prepared
17 by Ken Williams; is that accurate? Can you
18 answer that question, please?
19     A.   He did an outline of a
20 declaration, yes, but it wasn't what it ended
21 up.
22     Q.   Okay.
23     A.   Took more meetings to complete
24 it.
25     Q.   All right. And I'm trying to

Page 69

1  understand the process by which the
2  declaration was made. That's all I'm
3  interested in right now.
4         On the 21st you met with Ken
5  Williams, and you discussed a declaration
6  with him.
7         Is that accurate?
8      A.   Yes, that's correct.
9      Q.   At that meeting, did he come
10 prepared with a draft of the declaration for
11 you to sign?
12     A.   No.
13     Q.   So you discussed with him the
14 declaration on the 21st, correct?
15     A.   I discussed them. I showed him
16 passports where I'd come in and out of Saudi
17 Arabia and everything. I showed him my
18 business cards from the Presidency of Civil
19 Aviation, from Al-Hekma, because I had those
20 in my personal files at home. It was about
21 all I had.
22     Q.   When was the first time --
23     A.   And so --
24     Q.   When was the first time that
25 Ken Williams provided you with a draft of

18  (Pages 66 to 69)

This Transcript Contains Confidential Material

Page 70

1  your declaration?
2      A.   Probably the 22nd, 23rd.  I
3  was -- he had built a frame, and then I
4  started talking to him about the details.
5      Q.   Now, once he provided you with
6  a draft of the declaration, are there any
7  other portions of the draft that he provided
8  that you asked to be taken out of the draft?
9      A.   No.
10     Q.   Mr. Coombs, who is paying for
11 your legal representation today?
12         MS. AGRICOLA:  I'm going to
13 object to that.
14         MR. DORRIS:  On what grounds?
15 On what grounds?  What's the
16 objection?
17         THE WITNESS:  I object.  I'm
18 authorized to have my own
19 representation into a subject.
20 QUESTIONS BY MR. DORRIS:
21     Q.   Yeah.  Who is paying for your
22 legal representation, Mr. Coombs?
23     A.   I'm a retired Title 10 federal
24 officer, okay?  Title 10.
25     Q.   Are you paying for --

Page 71

1      A.   I just told you --
2      Q.   Are you paying --
3      A.   I just told you --
4      Q.   I'm sorry, sir.  Go ahead.
5      A.   I just told you, I am not
6  obligated to answer that question.
7      Q.   If there's no objection, you
8  are obligated to answer the question.
9      A.   Okay.  I'll tell you what.  Is
10 this the last step?  Is this the last step?
11     Q.   Is this the last step?  I'm not
12 sure what you're referring to.
13     A.   Okay.  Why are you asking that
14 question?
15     Q.   Mr. Coombs, the deposition
16 format really has me ask the questions.  I
17 believe it's clearly relevant to bias of the
18 witness, including any payments you're
19 receiving, so it's obviously relevant.
20         MR. POUNIAN:  Objection to the
21 form.
22 QUESTIONS BY MR. DORRIS:
23     Q.   And I'll ask the question
24 again.
25         Mr. Coombs, who is paying for

Page 72

1  your representation?
2      A.   Kinder and Kinder {sic}.
3      Q.   That's Kreindler & Kreindler?
4      A.   Yeah.
5      Q.   Okay.  Have you received any
6  compensation or other reimbursement from
7  plaintiffs' counsel for anything you have
8  done in connection with your declaration?
9      A.   No.  Not a penny.
10     Q.   Okay.  Brian, can you pull up
11 Tab 19 and mark it as Exhibit 814?
12         (Coombs Exhibit 814 marked for
13 identification.)
14 QUESTIONS BY MR. DORRIS:
15     Q.   Mr. Coombs, have you seen this
16 document before?
17     A.   Notice of deposition?  Yeah.
18     Q.   Okay.  Can we please turn to
19 the last page of this document?
20         Do you see the heading titled
21 "Document Requests"?
22     A.   Yeah.
23     Q.   And you see two requests
24 underneath that?
25     A.   Yes.

Page 73

1      Q.   Have you undertaken any effort
2  to search for all communications with
3  plaintiffs during the relevant time period
4  relating to the actions?
5      A.   No.
6      Q.   Do you have any communications
7  with plaintiffs during the relevant time
8  period relating to the actions?
9      A.   No.
10     Q.   I believe we just discussed
11 that you have some text messages with the
12 plaintiffs; is that correct?
13     A.   I have the text messages for
14 the meetings.  That's all.
15     Q.   Okay.  Do you have --
16     A.   They're not relative to the
17 statements.
18     Q.   Apart from text messages with
19 the Kreindler & Kreindler firm, do you have
20 any e-mails with the Kreindler & Kreindler
21 firm?
22     A.   No.
23     Q.   Okay.  So you have some text
24 messages and no e-mails; is that accurate?
25     A.   I just have text messages here

19 (Pages 70 to 73)

This Transcript Contains Confidential Material

Page 74

1  that show where we were meeting and at what
2  time.
3      Q.    Okay.  Do you have any hardcopy
4  documents exchanged with the Kreindler &
5  Kreindler firm?
6      A.    They made copies of my business
7  cards.  They made copies of front pages of my
8  passport, and that was it.  To show the
9  cover -- that was it.
10     Q.    In your meetings with Ken -- in
11 your meetings with Ken Williams, did you
12 retain any hardcopy documents?  Any notes,
13 any papers, anything he provided to you?
14     A.    No.
15     Q.    Now, for Request Number 2, did
16 you search for all documents relating to any
17 declarations that you have signed related to
18 the actions, including, but not limited to,
19 any drafts, outlines or summaries of such
20 declarations?
21     A.    I went online and looked at the
22 9/11 Commission statement, and that was all I
23 looked at, referencing my name in that 9/11
24 Commission outline.
25     I just looked at it online.  I

Page 75

1  did not print it.  Shut it back down because
2  it didn't cover enough information.
3      Q.    Do you have any copies --
4      A.    That was the only research --
5      Q.    Sorry.  Sorry to interrupt.
6      Do you have any copies of any
7  drafts, outlines or summaries of the
8  declaration that you prepared?
9      A.    No.
10     Q.    Do you -- when you met with Ken
11 Williams, did you jot down any notes on a
12 notepad and keep those?
13     A.    No.
14     MR. DORRIS:  We've been going
15 for about an hour and a half.  I think
16 now is a good time for a quick break.
17     And just for your -- for
18 everybody's benefit, I may have a few
19 additional questions, but I don't
20 anticipate going much longer.
21     MR. KRY:  Just to be clear,
22 we'll have some pretty extensive
23 questions after Dan's done on behalf
24 of Dallah Avco.
25     VIDEOGRAPHER:  Off the record

Page 76

1  at 1:02 p.m.
2      (Off the record at 1:02 p.m.)
3      VIDEOGRAPHER:  Back on the
4  record at 1:19 p.m.
5      MR. DORRIS:  Good news for you,
6  Mr. Coombs.  I have no further
7  questions.  Thank you for your time.
8      CROSS-EXAMINATION
9  QUESTIONS BY MR. KRY:
10     Q.    Mr. Coombs, my name is Robert
11 Kry.  I'm one of the lawyers that represents
12 Dallah Avco in this case, and so I have some
13 questions for you as well.
14     If we could put back up on the
15 screen your declaration, which was previously
16 marked Exhibit 810.
17     In the second paragraph, you
18 state, "I first applied to work at Dallah
19 Avco in 1983 and began working for them in
20 Jeddah, Saudi Arabia, in 1983 as a chief
21 procurement officer at the King Khalid
22 Military City."
23     Mr. Coombs, how long did you
24 work at the King Khalid Military City?
25     A.    I was only up there until --

Page 77

1  about ten months.  I got it set up and
2  everything, and they turned it over to a guy
3  from the US Army Corp of Engineers.  And I
4  had trained everybody, wrote out all their
5  initial procedures, and got it set
6  up, and I came back -- and came back to the
7  States.
8      Q.    And did that job relate to
9  Civil Aviation in any way?
10     A.    No, that -- that was -- it was
11 King Khalid Military City.  It was a base up
12 there by Hafar Al-Batin.  It was a military
13 base that they launched out into Iraq.  It
14 had tanks.  It had Air Force.  It had
15 everything.  And basically, I was helping
16 them finalize the support element.
17     Q.    Are you sure that that --
18     A.    Go ahead.
19     Q.    Are you sure that that position
20 was with Dallah Avco as opposed to a
21 different company within the broader Dallah
22 group of companies?
23     A.    No.  It was Dallah Avco out of
24 Houston, Texas, and then I went to -- to
25 Dallah.  I lived -- I was paid by Dallah in

This Transcript Contains Confidential Material

Page 78

1    Jeddah.  Sheik Saleh Kamel, the originator,
2    was still there.
3           I went from there, as a part of
4    the initial team, into Hafar Al-Batin because
5    they had hired me to set things up.  I was
6    the chief of procurement for about ten
7    months.  I got everything set up, and then
8    the contract that they offered me after that
9    was considerably less, and so I came back
10   home.
11          Q.    You referred in your answer to
12   Dallah Avco out of Houston, Texas.
13          Are you referring to Avco
14   Overseas?
15          A.    Yeah.  Yeah.
16          Q.    Do you know whether Avco
17   Overseas has a subcontractor relationship
18   with Dallah Avco or a corporate affiliate
19   relationship to Dallah Avco?
20          A.    At that time it seemed to me
21   like Saleh Kamel was very close connected.
22   He was way above me in understanding that
23   portion.
24          When I came back to the States,
25   I actually out-processed in Houston.

Page 79

1           Q.    Did you have any firsthand
2    knowledge of the nature of the corporate
3    affiliation relationship, if any, between
4    Avco Overseas and Dallah Avco and how that
5    might have changed over the years?
6           Is that a no?
7           A.    I knew there was changes -- I
8    knew there was changes going on because they
9    were visible.  I didn't have any -- I didn't
10   know how it was going on inside.
11          Q.    Okay.  And other than that ten
12   months -- other than the ten months at King
13   Khalid Military City, did you ever work for
14   any Dallah entity between when you left King
15   Khalid and when you started work at the PCA
16   in 1994?
17          A.    No.
18          Q.    Further down in your
19   declaration you state, "In the summer
20   of 1994, I visited Dallah Avco and became
21   aware that Dallah Avco was recruiting for
22   positions within the Saudi Arabia Presidency
23   of Civil Aviation's Airways Engineering
24   department.  I applied for and received a
25   position as assistant logistical manager

Page 80

1    within the AED."
2           Are those statements accurate?
3           A.    That is totally accurate.
4           Q.    Who did you submit your
5    application to?
6           A.    I submitted the application to
7    Dallah.
8           Q.    Who interviewed you?
9           A.    I took my résumé up there.
10          Q.    Who interviewed --
11          A.    They --
12          Q.    I apologize for interrupting.
13          Who interviewed you for the
14   position at the PCA?
15          MR. POUNIAN:  Objection to
16   form.
17          THE WITNESS:  I don't remember.
18   They just -- they just knew that they
19   needed a logistics, and I was
20   qualified.  I had a -- I had a good
21   work record with them from before, and
22   basically I went in, was with them for
23   an hour, and I was hired.
24   QUESTIONS BY MR. KRY:
25          Q.    Do you know whether someone at

Page 81

1    the PCA had to ultimately approve your
2    hiring?
3           A.    No, I don't.
4           Q.    In your declaration, the next
5    few sentences state, "Within a few months, my
6    immediate supervisor resigned, and I was
7    appointed manager of the logistics department
8    of AED.  I stayed in this position until
9    leaving the Presidency of Civil Aviation in
10   June 1997."
11          Is that all accurate?
12          A.    That is 100 percent accurate.
13          Q.    What was the name of the
14   immediate superior who resigned?
15          A.    I can't remember.
16          Q.    Would it --
17          A.    He was retired military, and
18   that's all -- I can't remember.  I'm sorry.
19          Q.    That's fine.
20          Do you recognize the name A.L.
21   Jones?
22          A.    Yeah, there it is.  Got it.
23          Q.    That was him?
24          A.    Yeah.  Okay.
25          Q.    And was he the logistics

This Transcript Contains Confidential Material

---

Page 82

1 manager before you -- you took over that
2 position in 1995?
3    A.   Yes.  Yes.
4    Q.   Do you know who took over as
5 logistics manager after you left in 1997?
6    A.   Yes.  Tom Wallace.
7    Q.   Back to your declaration.  A
8 little bit later it states, "I was paid by
9 Dallah Avco, though I had no other
10 substantial contact with Dallah Avco aside
11 from people working for the AED who were also
12 recruited by Dallah Avco.  All of my
13 day-to-day duties were as manager of
14 logistics for the PCA/AED."
15         Are those statements accurate?
16    A.   Accurate.
17    Q.   So it is correct that you had
18 no substantial contacts with Dallah Avco,
19 other than your paycheck, while you were
20 working as logistics manager at Airways
21 Engineering?
22    A.   True.
23    Q.   Did anyone from Dallah Avco
24 direct or supervise your day-to-day work at
25 Airways Engineering?

---

Page 83

1    A.   No way.  No.
2    Q.   Do you know whether the PCA
3 ultimately reimbursed Dallah Avco for the
4 salary that you received from Dallah Avco?
5    A.   They -- as a part of the
6 contract that they had with Dallah, which I
7 was under, I did a timesheet every month,
8 just like everybody else did, and it
9 processed and then they paid me.
10    Q.   Right.
11         So I understand that Dallah
12 Avco processed your paycheck and issued --
13    A.   Yeah.
14    Q.   -- a salary to you.
15         My question is, do you know one
16 way or the other whether the PCA reimbursed
17 Dallah Avco for those salary payments?
18    A.   It's a part of the contract.
19 I'm sure they did.
20    Q.   Back to the declaration.  The
21 next paragraph states, "My boss was Mohammed
22 Al-Salmi, AED's director general.  Al-Salmi
23 approved all of my vacation and personal
24 leave as well as anything else related to my
25 job duties and administrative procedures."

---

Page 84

1         Are those statements all
2 accurate?
3    A.   That's correct.
4    Q.   Was Al-Salmi in fact your boss?
5    A.   Yes.
6    Q.   And did Al-Salmi direct and
7 supervise your day-to-day work at Airways
8 Engineering?
9    A.   He directed me -- basically he
10 would call me in and talk to me about what he
11 wanted done, and then he'd just turn me
12 loose.  I was kind of independent.
13         But, yes, if something was
14 outside of the norm, I did go clear it with
15 him.
16    Q.   Did Al-Salmi evaluate your job
17 performance at Airways Engineering?
18    A.   Yes.
19    Q.   Did Al-Salmi play a role in
20 setting your salary and benefits at Airways
21 Engineering?
22    A.   I'm sure he did, because I had
23 no idea how it was done.
24         I just know that I got an
25 increment in my contract, said that I would

---

Page 85

1 get so much.  It was in my contract.
2    Q.   On the next page of your
3 declaration, there's a paragraph that says,
4 "All of PCA's offices and warehouses in
5 Jeddah were located within the same PCA
6 complex.  The main AED office was located
7 directly across the street from my office at
8 the AED logistics department.  I visited the
9 various AED offices as my job
10 responsibilities required me to do so."
11         Are those statements all
12 accurate?
13    A.   That's correct.  That's
14 correct.
15    Q.   When you were a logistics
16 manager at Airways Engineering, did you work
17 in one of the Airways Engineering offices at
18 the PCA?
19    A.   I was only in the logistics
20 building.  I -- yes, it was one of their
21 offices, but it was the building -- I wasn't
22 in the headquarters building.  I was in,
23 like, the building that had a warehouse off
24 to the side.  We had offices on the end, and
25 the rest of it was warehouses.

---

22 (Pages 82 to 85)

This Transcript Contains Confidential Material

Page 86

1        Q.    So I understand that building
2   is not PCA headquarters, but is it still a
3   PCA office building?
4        A.    Yes. Yeah.
5        Q.    Are you aware that Dallah Avco
6   had its own corporate offices, separate from
7   the PCA's Airways Engineering offices?
8        A.    Yes, they had the tower just up
9   the road.
10        Q.    Did you ever do any of your
11   day-to-day work for Airways Engineering from
12   Dallah Avco's corporate offices?
13        A.    No.
14        Q.    Okay. I'm going to put up a
15   different exhibit. This one was previously
16   marked Anqari Exhibit 369, produced at
17   KSA3168.
18              This is an organization chart
19   that the Kingdom produced in this litigation
20   for the PCA's Airways Engineering
21   directorate. And if you look at the chart,
22   there's a box at the top labeled "Director -
23   General Airways Engineering."
24              Was that the position that
25   Mohammed Al-Salmi held at the PCA?

Page 87

1        A.    Yes. Yes.
2        Q.    At the bottom of the chart
3   there's a box labeled "Logistics Manager."
4              Was that the unit that you
5   managed from 1995 to 1997?
6        A.    Yes.
7        Q.    And then at the side of the
8   chart on the right, there's a box labeled
9   "Contracts and Finance Control."
10              And do you know who managed
11   that unit in the 1995 --
12        A.    Alp Karli. Alp Karli.
13        Q.    Does this chart correctly
14   reflect that as logistics manager you
15   reported to Al-Salmi?
16        A.    Yes.
17        Q.    And does the chart correctly
18   reflect that Alp Karli, as the head of the
19   CFC, reported to Al-Salmi?
20        A.    Yes.
21        Q.    A bit earlier you testified
22   that Dallah Avco recruited you to work at
23   Airways Engineering and that Dallah Avco
24   processed your payroll at Airways
25   Engineering.

Page 88

1              Have you heard of something
2   called the Air Navigation System Support
3   project, or ANSS project?
4        A.    That was something that was
5   underway, that they were structuring while I
6   was there, but I never had any details.
7        Q.    Do you know whether the ANSS
8   project was the government contract under
9   which Dallah Avco provided recruiting and
10   payroll services for Airways Engineering?
11        A.    No.
12              (Coombs Exhibit 815 marked for
13   identification.)
14   QUESTIONS BY MR. KRY:
15        Q.    All right. I'm going to put up
16   another document. We will mark this one as
17   Exhibit 815. It's produced at DA10695.
18              This is an October 23, 1995
19   letter from Al-Salmi at Airways Engineering
20   to Magdi Hanna at Ercan, Incorporated,
21   listing some purchase requests together with
22   some attachments.
23              One of the requests listed here
24   is PR number 76224. You can see it as
25   number 9.

Page 89

1              I'm going to ask you some
2   questions about this particular purchase
3   request just to better understand the
4   logistics department's procurement process,
5   but just to be clear, I don't think there's
6   anything special about this particular
7   request. We just picked it as an example.
8              So if we can go first to the
9   attachment to this document at page 10716,
10   this is a Presidency of Civil Aviation
11   purchase requisition. At the top left, the
12   document has the requisition number, PR
13   76224, and at the top right there's a date
14   prepared of October 18, 1995.
15              And if you look at the body of
16   the requisition, there's some items listed
17   which include 10 disc drive upper heads, 10
18   disc drive lower heads, and then the next
19   page, 10 disc plotters.
20              Do you recall seeing documents
21   like this purchase requisition when you
22   worked as logistics manager?
23        A.    Yes, I had to sign them.
24        Q.    Would this type of document be
25   used to initiate the procurement process at

23  (Pages 86 to 89)

This Transcript Contains Confidential Material

Page 90

1  Airways Engineering?
2      A.   I would sign it and Al-Salmi
3  would sign it, and then we would process it.
4      Q.   Was the purpose of this
5  document to initiate the procurement process
6  when Airways Engineering needed to obtain
7  parts or other goods or services?
8      A.   Yes.
9      Q.   Who would decide what parts
10 Airways Engineering needed to purchase
11 through this process?
12     A.   We had a department -- we set
13 up -- we have so many pieces of equipment,
14 and you have to have parts for each piece of
15 equipment.  So the maintenance people would
16 put in requests, and based on demand and
17 turnover, we would order parts for stockage,
18 okay, which would be a stock level.  And then
19 sometimes if it was high priority, that meant
20 that the equipment was down, and so it would
21 process quicker and I'd hand-carry it
22 through.
23         But this is normal, and this
24 was processed through to order parts from the
25 States for the equipment that is physically

Page 91

1  in Saudi Arabia.  And we'd process it, they
2  would buy it, they would ship it, then I'd
3  get a customs clearance form pre-arrival in
4  Saudi Arabia.
5         Then I would take that over to
6  the -- to Dallah because they had a customs
7  team.  And they would pick it up and deliver
8  it to us when it arrived.
9      Q.   You referred to maintenance
10 people that would put in requests like these.
11         Are those maintenance people
12 other --
13     A.   Well, they don't put them in.
14 They put the -- it's like they're step one.
15 They fill out a small request form, and it
16 goes to the clerks, okay, the administrative
17 portion of stockage, ordering spare parts.
18         Okay.  From ordering spare
19 parts, then they look and see how many they
20 need, and then they make a purchase order for
21 what they need.
22         Then they -- we process that
23 from the administrative side of logistics,
24 okay?  We would process it for it to be
25 ordered to the contractor.

Page 92

1      Q.   The individuals that would put
2  in those requests to have these forms
3  prepared, would those be other employees at
4  the PCA?
5      A.   Yeah, but they were mechanics
6  and people working in the shops and things
7  like that.
8      Q.   Right.
9         In the middle of the document,
10 there's a line labeled "approved" that lists
11 Mohammed Basharahil, yourself and Al-Salmi.
12         Do you recognize Al-Salmi's
13 signature on the document?
14     A.   Yes.  He's to the right, I'm in
15 the center, and Mohammed was a part of the
16 administrative side of things on the supply
17 side.
18     Q.   And so you recognize your
19 signature in the middle of that document
20 there?
21     A.   Yes, that's my signatures.
22     Q.   Do you recognize Mohammed
23 Basharahil's signature on the left?
24     A.   Yes.
25     Q.   Was he part of the logistics

Page 93

1  department, or was he in a different PCA
2  department?
3      A.   Oh, he was a part of the
4  logistics department, but he would -- because
5  he was fluent, very fluent, in several
6  dialects of Arabic, very fluent in English
7  and everything, he was sort of a go-between.
8  I'd send him out to do some things, you know,
9  I'd send him out to London.  I'd send him out
10 to, you know, other places because he was
11 very efficient at doing it.
12     Q.   So he would report to you when
13 you were the logistics manager?
14     A.   Yes.
15     Q.   Who would actually prepare the
16 information that we see on this form listing
17 the specific parts that need to be ordered?
18 Would that be one of you in the logistics
19 department or would it be one of the other
20 PCA employees that submitted the request that
21 you mentioned earlier?
22     A.   It's one of the clerks in the
23 supply -- basically the supply office would
24 prepare the request from a -- a handwritten
25 request, whatever they get from the

This Transcript Contains Confidential Material

Page 94

1    mechanics.
2        You see, if they need -- if
3    they need a part, an electronic item, then
4    they would -- the mechanic -- the people
5    doing the repairs would write up a request
6    for the part, would go to his supervisor.
7    Then he would bring it in to Mohammed's
8    department, the supply -- the supply
9    department.
10       They'd put it together, okay,
11   identify it.  Then they'd give it to me, and
12   I'd sign off on it.  Then go to Mohammed
13   Al-Salmi, sign off on it, and then it would
14   go to the -- to the contractor.
15       Q.    Okay.  With regard to those
16   first steps where the mechanics and the
17   clerks would submit this information, to your
18   knowledge, did anyone at Dallah Avco have any
19   role in submitting that information about
20   what parts needed to be purchased?
21       A.    No.
22       Q.    And then at the stage of the
23   process where Al-Salmi, you and Basharahil
24   sign off on this purchase requisition, did
25   anyone at Dallah Avco have any role in --

Page 95

1        A.    No, not -- no.
2        Q.    Okay.  At the bottom right
3    there's a stamp that says, "Received,
4    purchasing PCA logistics" dated October 21,
5    1995, which is three days after the purchase
6    requisition was dated.
7        Does that stamp indicate that
8    the requisition was sent to PCA -- excuse me,
9    purchasing PCA logistics after you and
10   Al-Salmi approved it?
11       A.    Yes.
12       Q.    Is the purchasing PCA logistics
13   also a component of Airways Engineering?
14       A.    It just meant that it was
15   cleared to be purchased.  That's all.
16       Q.    And to your knowledge, did
17   Dallah Avco have any role in that step of the
18   process?
19       A.    Yes.  A lot of this stuff they
20   already had.  They may have some in stock or
21   whatever like that, but the -- Alp Karli
22   would take boxes of these things over, they'd
23   take a look at them, and then they would go
24   off to contractors and whatever like that.
25       Q.    Other than Alp Karli, though,

Page 96

1    would anyone at Dallah Avco have any role in
2    the stage of the process where purchasing PCA
3    logistics receives a copy of the --
4        A.    No.  No.
5        Q.    Okay.
6        A.    No.
7        Q.    So we'll turn now back to the
8    first page of the document, which is DA10695.
9    This is the letter dated October 23, 1995,
10   two days later, from Al-Salmi to Magdi Hanna
11   at Ercan.
12       It states, "Enclosed please
13   find the following purchase requests for
14   procurement action" against the indicated
15   document numbers.  One of those is PR 76224,
16   the one for the disc drive components we were
17   just looking at.
18       Do you recognize Al-Salmi's
19   signature on this document?
20       A.    Yes, absolutely.
21       Q.    Next to --
22       A.    Guess what?
23       Q.    Next to --
24       A.    Look down at the lower right
25   hand.  I mean, left hand --

Page 97

1        Q.    I was just about to ask.
2        Do you see your initials there?
3        A.    Those are my initials.
4        Q.    Do those initials indicate that
5    you prepared this document for Al-Salmi to
6    sign?
7        A.    That indicates that -- yes.
8        Q.    Who selected which vendor would
9    receive a purchase request like this?
10       A.    It was based on the -- they had
11   a list of manufacturers and everything.  If
12   the parts came out of the States, it would go
13   to who was supporting us in the States.  So
14   it would go to Ercan, and then Ercan would
15   purchase it in the States.  If it was like in
16   England, then it would be processed --
17   they -- they had other departments to process
18   it through.
19       Q.    And in selecting that vendor,
20   is that something you would personally decide
21   or would it be decided by people acting under
22   your direction?
23       A.    No.  No, it was -- this would
24   be a list of the equipment he was supporting.
25   Okay?  In other words, this stuff came from

This Transcript Contains Confidential Material

Page 98

1  the States.  The equipment was from the
2  States.  Okay?
3              If it was from England, then
4  they had a separate operation for England.
5  Okay?  I can't remember the name of it.
6  But -- off the top of my head right now, I'm
7  sorry, I can't remember.  But each one would
8  be processed to the supplier of the country.
9              We had suppliers in Italy.  We
10  had suppliers in France.  We had suppliers in
11  Germany and Italy.  It was all over the
12  place.
13      Q.    So my question, though, is,
14  if -- so if you had a purchase requisition
15  that you had approved for a particular
16  component like disc drive upper/lower heads,
17  who was responsible for looking at these
18  vendor lists and identifying the vendor that
19  would supply those parts?
20      A.    You take the part and the
21  country that it came from, and that's how it
22  was determined.  It was determined.  It
23  wasn't selected.  It was determined that the
24  parts came -- the equipment came from this
25  country, so they got the contract.  Because

Page 99

1  it's more efficient than going through
2  another party to then get to them and then
3  come to us, because then you're adding
4  another step to the process.
5      Q.    Okay.  To your knowledge, did
6  Dallah Avco have any role in identifying
7  particular vendors that should receive
8  purchase requests like these?
9      A.    In some cases they did, if they
10  had somebody that was doing the support
11  element.
12              It wasn't anything I could
13  call.  Sometimes it would change.
14      Q.    Would that be -- would that
15  happen most of the time or would that be an
16  unusual occurrence?
17      A.    No, it was -- it was an
18  intermediate {sic} thing.  It just depended
19  on the availability of the equipment and the
20  supplies.  We contact them and said, we need
21  this, and they said, well, we don't have it.
22              Then we put out a request to
23  find out where it was and then issue a
24  purchase order -- order based on that.
25  Request for quote.  That's how we would do

Page 100

1  it.
2              (Coombs Exhibit 816 marked for
3  identification.)
4  QUESTIONS BY MR. KRY:
5      Q.    All right.  Let's take a look
6  at another document which we will mark as
7  Exhibit 816, produced at DA10334.
8              This is a February 22, 1997
9  request for payment letter from you, Samuel
10  G. Coombs, to Fareed Bogary at Dallah Avco,
11  together with some attachments again.  And
12  the body of the letter indicates that it
13  relates to PR number 76224, which is the
14  same -- the same purchase requisition we were
15  just looking at.
16      A.    Yes.
17      Q.    We're going to turn, first of
18  all, to DA10338.
19              Do you recognize this as the
20  exact same document we were just looking at,
21  the purchase requisition from --
22      A.    Yes.
23      Q.    Okay.  And then we'll turn next
24  to page DA10335.
25              This is an invoice from Ercan

Page 101

1  for PR number 76224, listing the same disk
2  drive components that were on the purchase
3  requisition.
4              At the top right, there's a
5  line that says, "Date shipped, March 29,
6  1996."
7              What do you understand that
8  that date to refer to?
9      A.    The date shipped is from them
10  to -- that was the date shipped from the US.
11      Q.    At the top left -- at the top
12  left --
13      A.    Yeah.
14      Q.    At the top left the invoice
15  says, "Sold and shipped to Dallah Avco Trans
16  Arabia, Presidency of Civil Aviation, Airways
17  Engineering ANSS III program, PO Box 15441."
18              Do you recognize that PO Box
19  address as the Airways Engineering offices
20  where you worked?
21      A.    Yes.  I don't remember the
22  number, but it is there, yeah.
23      Q.    If we can just flip up to the
24  first page of the document for a moment.
25              At the very bottom line, do you

26  (Pages 98 to 101)

This Transcript Contains Confidential Material

Page 102

1    see it says, "Please reply to director
2    general Airways Engineering, PO Box 15441"?
3         Does that refresh your
4    recollection that that is the PO box for the
5    Airways Engineering?
6         A.   Yeah.
7         Q.   In the body of the invoice on
8    page 10355, there's a unit price of $895 and
9    a total price of $27,520.
10        To your knowledge, who
11   determined what price Ercan would charge for
12   parts like these?
13        A.   Off the top of my head, it was
14   a cost-plus process.
15        Q.   So to your knowledge, did
16   Dallah Avco have any role in determining the
17   prices that Ercan put on its invoices?
18        A.   No.
19        Q.   At the bottom of the invoice
20   there's a stamp that says, "Approved for
21   payment, PR 76224."
22        Do you see your initials on
23   that stamp?
24        A.   Yeah.
25        Q.   Does that indicate that you had

Page 103

1    approved payment of this invoice?
2         A.   That meant that it had arrived,
3    that it had -- had come into the warehouse,
4    and then I just -- {audio interruption} --
5    stamp on it and go.
6         Q.   Did Dallah Avco have any role
7    in that step of the process where you --
8         A.   Oh, no, huh-uh.
9         Q.   We'll turn next to page
10   DA10336.  This is a Presidency of Civil
11   Aviation material receiving report --
12        A.   Yes.
13        Q.   -- for PR 76224.  It includes a
14   few signatures dated February 16, 1997.  And
15   if we go down to the second page, we can see
16   that the receiving report relates to the same
17   parts, the ten disc drive upper heads, ten
18   disc lower heads and ten disc plotters.
19        Would PCA employees fill out
20   this material receiving report once they
21   actually received shipment of the parts?
22        A.   When the parts came to the
23   warehouse, the receiving in the warehouse
24   would break them down and pass it off.  And
25   basically they'd say, okay, we got this.

Page 104

1         Q.   Okay.  Based on the dates, it
2    seems like there were some pretty significant
3    delays both before Ercan issued its invoice
4    and before the PCA received those parts.
5         Were delays like those common
6    in your experience, working with vendors like
7    Ercan?
8         A.   Well, it may not -- go up to
9    the page with the stamp on it.
10        Q.   Does the invoice --
11        A.   Right there.  That's customs
12   clearance right there.
13        Q.   Okay.
14        A.   See that, that stamp on there?
15   Go back down.  Go back down.  No, stop right
16   there.
17        Where it says "receiving" and
18   that stamp on there, that means that it went
19   through customs.
20        Q.   Okay.  So it may take some time
21   for part shipments like these to go through
22   customs?
23        A.   Yeah.  In other words, it was
24   picked up from customs on 2/16.  That custom
25   stamp had to be on there, okay, for us to get

Page 105

1    it.  It had to go through Saudi customs.
2         Q.   Okay.  Finally, we'll turn back
3    to the first page, which was DA10334.  This
4    is the request for payment letter that you,
5    Samuel Coombs, sent to Fareed Bogary at
6    Dallah Avco on February 22, 1997, six days
7    after the material receiving report.
8         And it says, "Please provide
9    payment of US dollar $27,520.96 to our
10   vendor, Ercan, Inc., against the following
11   document," and then it lists the PR
12   number 76224.
13        Do you recognize your signature
14   at the bottom of this document?
15        A.   Yes, that's my signature.
16        Q.   And below that are the initials
17   MB.
18        Do you recognize those as
19   Mohammed Basharahil's initials?
20        A.   Yes.
21        Q.   Was one of Dallah Avco's
22   responsibilities to pay subcontractor
23   invoices like this one from Airways
24   Engineering?
25        A.   Depending on how they worked --

27 (Pages 102 to 105)

This Transcript Contains Confidential Material

Page 106

1  see, after I signed off on this and
2  everything, it would go to Alp Karli.  Or if
3  Mohammed Al-Salmi was available, I'd take it
4  to him and then he'd give it to Karli.
5      Q.    And once Alp Karli or Al-Salmi
6  had received the document, would it be sent
7  to Dallah Avco?
8      A.    And then he would take it to
9  Dallah.  He'd go to the Dallah tower.
10     Q.    And Dallah tower, is that where
11 Fareed Bogary had his offices?
12     A.    Have you ever seen the Dallah
13 building in Jeddah, Saudi Arabia?
14     Q.    I have.
15     A.    Huh?
16     Q.    I have, actually.
17     A.    Okay.  That's the reason I call
18 it the Dallah tower.
19     Q.    Very good.
20     A.    All their administrative
21 offices and everything else were in the
22 tower.
23     Q.    To your knowledge, when Dallah
24 Avco received a request for payment like this
25 from Airways Engineering, did Dallah Avco

Page 107

1  have any responsibility for reviewing or
2  auditing the reasonableness of the prices
3  that were reflected on the invoices?
4      A.    No.  No.
5      Q.    Did Dallah Avco have any
6  responsibility for reviewing or auditing
7  whether Airways Engineering actually needed
8  the goods or services that were reflected on
9  the invoices?
10     A.    No.
11     Q.    Did Dallah Avco have any
12 responsibility for reviewing or auditing
13 Airways Engineering's selection of a vendor
14 to provide those goods and services?
15     A.    No.
16     Q.    Was Dallah Avco's job
17 essentially just to pay the invoices
18 according to the terms that Airways
19 Engineering had approved?
20     A.    Yes.
21     Q.    To your knowledge, was Dallah
22 Avco entitled to be reimbursed by the PCA
23 after it paid a vendor invoice like this one?
24     A.    Yeah.
25         (Coombs Exhibit 817 marked for

Page 108

1  identification.)
2  QUESTIONS BY MR. KRY:
3      Q.    We'll take a look at another
4  exhibit.  We'll mark this one Exhibit 817,
5  produced at KSA2127.
6         This is an excerpt from the
7  financial condition section of the contract
8  between Dallah Avco and the PCA called the
9  ANSS 4 contract, and we'll look at, in
10 particular, Section 3-3-1-1 on page KSA2135.
11        That provision is titled
12 "Entitlement," and it says, "The contractor
13 shall be entitled each month to be paid for
14 logistics support purchases made during
15 previous months and for special cost items as
16 described in Section 4, scope of services,
17 Article 4-3."
18        Is that provision consistent
19 with your understanding that Dallah Avco was
20 entitled to be reimbursed by the PCA for the
21 vendor invoices that it paid?
22     A.    Yes.
23     Q.    All right.  During your
24 testimony earlier today, you had mentioned
25 that -- well, no, strike that.

Page 109

1         (Coombs Exhibit 818 marked for
2  identification.)
3  QUESTIONS BY MR. KRY:
4      Q.    We'll mark as Exhibit 818 a
5  document produced at DA10725.
6         This is a different and
7  unrelated purchase request from Al-Salmi to
8  Ercan dated September 26, 1995, and I'm going
9  to turn to one of the purchase requisitions
10 that's on page DA10731.
11        Do you recognize your signature
12 on this document?
13     A.    Yes.
14     Q.    So this purchase requisition
15 is -- lists items described as Defense
16 Language Institute.  And if we scroll to the
17 third page of the requisition, it identifies
18 the manufacturer as Defense Language
19 Institute, English Language Center, based at
20 Lackland Air Force base in Texas.
21        Do you remember sending
22 requisitions for educational materials from
23 the English Language Center in Texas during
24 your time at logistics?
25     A.    I used to call them sidebars.

28  (Pages 106 to 109)

This Transcript Contains Confidential Material

Page 110

1	In other words, that was something that --
2	they were paying for something, and I
3	wouldn't even know what it was, but it was
4	given to me to do it.
5	Q.	When you received purchase
6	requisitions like this, did you think there
7	was anything inappropriate about the PCA
8	using logistics funds for English language
9	education materials?
10	A.	I didn't ask questions about
11	it. I just -- I just knew that they were
12	going to do it whether I approved or not.
13	Inside the Presidency of Civil
14	Aviation, there was direct payments all over
15	the world that I had no clue. What was
16	inside my department I could do. If it came
17	in direct -- and Mohammed would come in with
18	a handful of them, and he'd say, we got to
19	process this. And we weren't getting
20	anything in logistics like.
21	Q.	When you saw a requisition like
22	this that related specifically to English
23	language education materials, did you have
24	concerns that there was something illegal
25	with processing a purchase requisition for

Page 111

1	materials like this?
2	MR. CARTER:  Objection to form
3	and foundation.
4	THE WITNESS:  I was so used to
5	seeing it, it was normal. Okay?
6	Because they would give gifts. A
7	gift, money under the table. Okay?
8	Called baksheesh in Arabic. This was
9	normal. They may be paying for
10	somebody to get in, that they wanted
11	in.
12	So we just processed it. We
13	didn't question it.
14	QUESTIONS BY MR. KRY:
15	Q.	Would English language skills
16	be an important job qualification for PCA
17	employees or prospective PCA employees?
18	A.	Well, see, you'll notice this
19	is an Air Force base. Okay? And the Saudi
20	Air Force and folks were all connected,
21	because the Presidency of Civil Aviation was
22	right down the street. Saudi Air Force was
23	under them.
24	And then on the other side of
25	them was Kawasaki Helicopter, where I had

Page 112

1	worked before. They were all connected.
2	Some of the stuff would just come in, and I'd
3	just do it.
4	Q.	My question is, were English
5	language skills a helpful qualification for
6	certain individuals who worked at the PCA?
7	A.	Yeah.
8	MR. CARTER:  Objection to form.
9	QUESTIONS BY MR. KRY:
10	Q.	And so at the time did you
11	perceive that there was something
12	inappropriate about the PCA funding education
13	skills that were going to be relevant to the
14	job qualifications of the people that work
15	there?
16	A.	It was normally the younger
17	students that didn't speak any Arabic, and
18	they would like -- just down the road where
19	I'm at is Fort Benning, Georgia. They'd send
20	them money to pay for the students to be
21	trained there, the Saudi students there.
22	Okay?
23	Where are you at?
24	You know, they -- there's
25	schools in all of the military bases here in

Page 113

1	the States that train foreign military in the
2	United States, and that can be what that was.
3	I didn't question -- I didn't
4	question it.
5	Q.	Right.
6	And you didn't see any reason
7	to question it because it wasn't anything
8	that you --
9	A.	Yes.
10	Q.	Did you believe that there was
11	anything improper with the PCA funding
12	English studies education for its own
13	employees?
14	A.	No.
15	Q.	To your knowledge, who decided
16	to spend Airways Engineering logistics' funds
17	on English language educational materials
18	like these?
19	MR. CARTER:  Objection to form.
20	THE WITNESS:  Normally it
21	was -- normally it was the Presidency
22	of Civil Aviation down to Al-Salmi,
23	who was assigned above him.
24	QUESTIONS BY MR. KRY:
25	Q.	And to your knowledge, did

29 (Pages 110 to 113)

This Transcript Contains Confidential Material

Page 114

1    Dallah Avco have any role in deciding to
2    spend logistics' funds on English language
3    education materials?
4        A.    No, not that I know of.
5            MR. KRY: All right.  Why
6    don't -- how long have we been going
7    for?
8            VIDEOGRAPHER: 42 minutes.
9            MR. KRY: Okay.  We can keep
10   going.
11           Do you need a break, or are you
12   going to keep going, Mr. Coombs?
13           THE WITNESS:  Keep going.
14   QUESTIONS BY MR. KRY:
15       Q.    Great.
16           Let's put up a document that
17   was previously marked Exhibit 812.  This is
18   DA2267, the March 30, 1994 letter from
19   Al-Salmi to Avco Overseas in Texas.
20       A.    Yes.
21       Q.    It says, "You are hereby" --
22   I'm sorry.  It says, "You are requested to
23   pay the tuition for Mr. Omar Al-Bayoumi of US
24   $4,430 to the American Language Institute."
25           And then it says, "In addition,

Page 115

1    you are requested to pay weekly living
2    allowance up to 30 weeks of US $600 to
3    Mr. Al-Bayoumi and invoice the ANSS III
4    project account."
5            I think you testified earlier
6    that this letter is dated March 30, 1994,
7    which is before you began work at Airways
8    Engineering; is that correct?
9        A.    Yeah.
10       Q.    Is that a yes?
11       A.    Yes.
12       Q.    Have you seen this document
13   before today?
14       A.    No.
15       Q.    Is that a no?  Unfortunately,
16   we need to get yeses or nos for the record.
17       A.    No.
18       Q.    And we mentioned Avco Overseas
19   a bit earlier.
20           Do you recall them as a former
21   subcontractor for Airways Engineering?
22       A.    They were a subcontractor
23   through Dallah Avco.
24       Q.    Right.
25           Do you recognize Al-Salmi's

Page 116

1    signature at the bottom of the document?
2        A.    Yes, that's Al-Salmi's
3    signature.
4        Q.    And down and to the left there
5    are some initials which are hard to see, but
6    to me it looks like a A on top of a J.
7            Do you recognize those as the
8    initials of A.L. Jones?
9        A.    Alp Karli.  It looks like Alp
10   Karli.
11       Q.    You think those are Alp Karli's
12   initials?
13       A.    Yeah.
14       Q.    Okay.  In your declaration, you
15   mentioned that there were financial
16   directives, was the term you used, that
17   Al-Salmi would periodically send directing
18   the payment of educational expenses for PCA
19   employees.
20           Is this letter an example of
21   one of those financial directives that you
22   were referring to?
23       A.    Yes.
24       Q.    And to your knowledge, did
25   Dallah Avco have any role in preparing

Page 117

1    financial directives like this one?
2        A.    No.
3        Q.    Earlier today you testified
4    that when Dallah Avco settled payments for
5    invoices for expenses like this, it would
6    either pay the funds from Jeddah to a US bank
7    or it would handle the payment through -- and
8    then you referred to something called the
9    American side of Dallah Avco.
10           When you used that term, were
11   you referring to Avco Overseas?
12       A.    Well, yeah.  See, I -- I called
13   them Dallah Avco because that was who I had
14   originated with, and then they cut it off to
15   Avco.  But my thinking was still that way.
16           And I'm sorry I said it that
17   way, but it was Avco Overseas Services, yes.
18       Q.    Okay.  Let's put up a document
19   previously marked Al-Bayoumi Exhibit 726,
20   produced at DA2281.
21           This is a fax from Al-Salmi to
22   Avco Overseas dated September 10, 1994, and
23   it states, "Request you pay Mr. Omar
24   Al-Bayoumi in advance all his weekly living
25   allowances instead of three installments and

This Transcript Contains Confidential Material

Page 118

1    invoice the ANSS III project account."
2         Is this another example of a
3    financial directive from Al-Salmi?
4         A.   Yes.
5         Q.   Do you recognize Al-Salmi's
6    signature at the bottom?
7         A.   Yes, and my initials.
8         Q.   And in addition to your
9    initials, do you also recognize Mohammed
10   Basharahil's initials?
11        A.   Yes.
12        Q.   Did you prepare this document
13   for Al-Salmi to sign?
14        A.   No.  It was normally prepared
15   over at the headquarters and then given to us
16   because we had to cost it out of our budget.
17        Q.   Do you have any recollection of
18   this specific document?
19        A.   No.
20        Q.   Do you know why Al-Salmi wanted
21   Omar Al-Bayoumi to be paid all his weekly
22   living allowances in advance rather than in
23   three installments?
24        A.   No, but -- it's just
25   favoritism.  I'm sorry, but it's favoritism.

Page 119

1    And if it was like this, we did it.
2         (Coombs Exhibit 819 marked for
3         identification.)
4    QUESTIONS BY MR. KRY:
5         Q.   Let's mark as Exhibit 819 a
6    document produced at DA10842.
7         This is an October 27, 1994
8    letter from Al-Salmi at the PCA to Samir
9    Magboul at Dallah Avco.  And it states,
10   "Pursuant to your memo of the 3rd of August,
11   1994, this office dispatched a team to
12   evaluate several prospective companies in the
13   United States of America to replace Avco
14   Overseas Services of Houston, Texas.
15        "Upon completion of our
16   evaluation, it was decided Ercan Consulting
17   Engineers of Newport Beach has the present
18   ability to provide PCA Airways Engineering
19   with needed spare parts, equipment and
20   personnel.
21        "To this end, please effect
22   procedures to close out Avco Overseas
23   Services and transfer their responsibility of
24   spare parts procurement and personnel
25   recruitment to Ercan Consulting Engineers."

Page 120

1         Do you recognize Al-Salmi's
2    signature at the bottom of this document?
3         A.   Yes, and my initials, too.
4         Q.   Did you prepare this document
5    for Al-Salmi to sign?
6         A.   No.
7         Q.   Do you know who prepared it?
8         A.   I don't remember who prepared
9    it.  I think it was -- no, I don't remember.
10        Q.   The letter refers to a team
11   that Airways Engineering sent to evaluate the
12   potential replacements for Avco Overseas.
13        Do you recall being a part of
14   that team?
15        A.   See, that was one of the things
16   that I went to -- yes, I was a part of the
17   team.  I went to Louisville, Kentucky, okay?
18   I went to Atlanta, went to New York, went to
19   Chicago.  There were several companies that
20   we searched out all over the States.
21        Q.   And was that a team of
22   individuals from Airways Engineering?
23        A.   It would normally be a team of
24   four people.
25        Q.   Which four people were those?

Page 121

1         A.   Normally myself and three
2    Saudis.
3         Q.   Would Alp Karli be a member of
4    that team with you?
5         A.   No, Alp -- Hamad Al-Rashid
6    would go with me, and I can't remember -- it
7    would fluctuate on the others depending on
8    who was available and their expertise.
9         Q.   Do you know who made the
10   decision that Ercan would replace Avco
11   Overseas as the subcontractor?
12        A.   I have no idea.
13        Q.   To your knowledge, did Dallah
14   Avco have any role in deciding to have Ercan
15   replace Avco Overseas Services?
16        A.   I don't know.
17        Q.   Do you know if Dallah Avco in
18   fact recommended that the PCA should engage a
19   different company instead?
20        A.   I wasn't in the inner side of
21   that.  I didn't -- I don't know how it came
22   about.
23        (Coombs Exhibit 820 marked for
24        identification.)
25

This Transcript Contains Confidential Material

Page 122

```
 1    QUESTIONS BY MR. KRY:
 2       Q.    Let's mark as Exhibit 820 a
 3    document produced at DA10841.  This was
 4    previously marked as Kamel Exhibit 110, but
 5    this is a more legible copy and also includes
 6    a translation.
 7            This is a letter from Al-Salmi
 8    to Samir Magboul at Dallah Avco dated
 9    6/6/1415 on the Hijri calendar, which
10    corresponds to November 10, 1994, concerning
11    contract to Ercan Consulting Engineers.
12            Do you recognize Al-Salmi's
13    signature at the bottom of that letter?
14       A.    Yes.
15       Q.    And below the signature, if we
16    can zoom --
17       A.    Below the signature, Alp Karli
18    to the left and my initials to the right.
19       Q.    Okay.  The third paragraph
20    states, "In light of the above, the following
21    Airways Engineering personnel will represent
22    this office during the contract and
23    changeover from Avco Overseas Services to
24    Ercan Consulting Engineers," and then it
25    lists four people:  Hamad Al-Rashid, Alp
```

Page 123

```
 1    Karli, yourself and Najib Mustafa.
 2            Who was Hamad Al-Rashid?
 3       A.    Hamad Al-Rashid was -- he
 4    worked over at the main building.  He was
 5    responsible for the contracts for all the
 6    compounds where we had the navigation systems
 7    all around the Kingdom, and he was
 8    responsible for the maintenance of the
 9    fencing and, you know, things like that.  And
10    he would normally buy large quantities of,
11    like, fencing, you know, roofing, air
12    conditioners, stuff like that.
13       Q.    Was he a civil servant at the
14    PCA?
15       A.    Pardon?
16       Q.    Was he a civil servant at the
17    PCA?
18       A.    Yes, he was definitely that.
19       Q.    And what about Najib Mustafa,
20    was he another civil servant at the PCA?
21       A.    Yes.
22       Q.    Did anyone from Dallah Avco
23    accompany the four of you on this trip?
24       A.    No.
25       Q.    To your knowledge, did Dallah
```

Page 124

```
 1    Avco have any role in directing your
 2    activities on this trip?
 3       A.    No.
 4       Q.    Earlier today we looked at some
 5    financial directives that Al-Salmi sent to
 6    Avco Overseas directing it to pay education
 7    and living expenses to Al-Bayoumi.
 8            After Ercan took over as
 9    subcontractor for Avco Overseas, did Al-Salmi
10    issue similar financial directives to Ercan
11    directing it to pay Al-Bayoumi's education
12    and living expenses?
13       A.    Yes, yes.
14       Q.    Did you ever see a letter from
15    Al-Salmi directing Ercan to make those
16    payments?
17       A.    I saw two, but -- I remember it
18    coming across my desk.  That's all I
19    remember.
20       Q.    Do you remember the approximate
21    time frame when you saw those letters?
22       A.    It was after I had gone out to
23    visit them.
24       Q.    Would it have been in the 1995
25    time frame?
```

Page 125

```
 1       A.    I think so, yeah.
 2       Q.    Do you have any role in
 3    preparing or approving those two letters?
 4       A.    No.
 5       Q.    Do you know who prepared those
 6    letters?
 7       A.    I'm not really sure.  It could
 8    have been Alp Karli or -- no, I can't
 9    remember.
10       Q.    Were both letters over
11    Al-Salmi's signature?
12       A.    Yes.
13       Q.    To your knowledge, did Ercan in
14    fact make the payments for education and
15    living expenses to Al-Bayoumi that were
16    directed in those letters?
17            MR. DORRIS:  Objection to form.
18            THE WITNESS:  I'm certain they
19    did.
20    QUESTIONS BY MR. KRY:
21       Q.    Do you know why Al-Salmi
22    arranged for subcontractors like Avco
23    Overseas and Ercan to pay education and
24    living expenses rather than just paying those
25    expenses from the PCA directly?
```

32 (Pages 122 to 125)

This Transcript Contains Confidential Material

1      A.    Convenience.  It was quicker.
2      Q.    Why is that --
3      A.    Sometimes -- sometimes the
4   internal process could take as much as two
5   months if it was paid to -- so he would pass
6   it off to the contractors to pay it and then
7   pay the commission.
8      Q.    Were there any other reasons
9   why it was more convenient to have the
10  expenses paid through subcontractors rather
11  than directly from the PCA?
12     A.    Like I said, the approvement
13  process for the government itself to send the
14  money was a very long process.  Okay?  If
15  they had to go to the Presidency of Civil
16  Aviation.  So he ran most of the stuff
17  through subcontractors because it was
18  quicker.
19     Q.    All right.  Let's take a look
20  again at your declaration, please, which was
21  marked Exhibit 810.
22         Page 2 of that declaration
23  says, "The logistics budget" -- there it is.
24  "The logistics department budget was used for
25  the purchase of equipment and logistical

1   support for the numerous aeronautical
2   navigation systems located throughout the
3   Kingdom of Saudi Arabia.  The navigational
4   systems were for both aircraft and
5   ground-based systems such as air traffic
6   control towers.  The budget was also used,
7   among other things, for paying Saudi Arabian
8   students studying abroad who were PCA
9   employees or aspiring employees of the PCA."
10     A.    Yeah.
11     Q.    Is that all accurate?
12     A.    Yes.
13     Q.    Was Al-Bayoumi an example of
14  one of those PCA employees studying abroad?
15     A.    Yes.
16     Q.    And were the financial
17  directives that Al-Salmi sent to Avco
18  Overseas and Ercan examples of Al-Salmi using
19  the logistics budget to pay Saudi Arabian
20  students studying abroad who were PCA
21  employees or aspiring employees of the PCA?
22     A.    Yes.  Yes.
23     Q.    Do you know whether Al-Bayoumi
24  was in fact studying abroad?
25     A.    Well, I know that he was in

1   California.  I don't know what he was
2   studying.
3      Q.    Do you know whether he was
4   studying something?
5      A.    No.
6      Q.    Do you know whether -- well,
7   strike that.
8         Did you ever learn any
9   information that caused you to doubt that
10  Al-Salmi {sic} was pursuing some sort of
11  educational studies in the United States?
12     A.    I didn't doubt it, you know,
13  but everybody said he was in school, so I
14  just didn't question it.
15     Q.    When you say "everybody said he
16  was in school," who are you referring to as
17  "everybody"?
18     A.    The people talking around
19  the -- inside the -- you know, like when
20  they said, yeah, he's in the States.  You
21  know, I'd ask a question, and they'd say,
22  yeah, he's in the States going to school.
23     Q.    Approximately how many people
24  made comments like that to you?
25     A.    Four or five.  You know, Alp

1   Karli and Hamad Rashid -- Hamad Al-Rashid.
2   There's several of them that would say things
3   like that to me.  So I just quit asking.
4      Q.    And at any time did anyone tell
5   you that Al-Bayoumi actually was not pursuing
6   educational studies in the United States?
7      A.    No.
8      Q.    Did anyone tell you whether
9   Al-Bayoumi's studies in the United States
10  were related to his job skills or
11  qualifications at the PCA?
12     A.    No.
13     Q.    To your knowledge, did anyone
14  at Dallah Avco have any role in deciding to
15  use logistics funds to fund the educational
16  payments for Saudi students that you referred
17  to in your declaration?
18     A.    No.  No.
19     Q.    On page 3 of the declaration,
20  you say that "Mr. Al-Bayoumi regularly
21  claimed unusual additional expenses that were
22  not provided to other students.  I can recall
23  payments for his wife's frequent travel to
24  and from Saudi Arabia and the United States.
25  Also, on one occasion I saw a request that

This Transcript Contains Confidential Material

Page 130

1    Mr. Al-Bayoumi wanted to get one new car for
2    himself so that his wife could take
3    possession of his car that was only a year
4    old."
5         In what sense were those
6    expenses unusual in your view?
7         A.   Well, the other students didn't
8    have cars.
9         Q.   Was there any other respect in
10   which the expenses were unusual?
11        A.   It just seemed that, you
12   know -- I told him that Mr. Al-Salmi had to
13   approve that.  I didn't have the authority
14   to.
15        Q.   So is it fair to say that the
16   reason you considered the expenses unusual
17   was just that they were -- gave Al-Bayoumi a
18   higher standard of living than the other
19   Saudi students that were being funded through
20   logistics?
21        A.   Yes.
22        Q.   Other than travel expenses for
23   Al-Bayoumi's wife to go back and forth to
24   Saudi Arabia and the new car so that
25   Al-Bayoumi's wife could use his old car, do

Page 131

1    you recall any other specific examples of
2    Al-Bayoumi's expenses that you considered
3    unusual?
4         A.   I couldn't detail it, but I
5    just thought that they were all quite high.
6    That's all.
7         Q.   My only question is, are there
8    any specific expenses that you recall
9    standing out as being qualitatively unusual,
10   other than the travel for Mr. Al-Bayoumi's
11   wife back to Saudi Arabia and the new car for
12   Al-Bayoumi?
13        A.   No.
14        Q.   Did you ever complain to
15   Al-Salmi that Al-Bayoumi's expenses were
16   unusual?
17        A.   Yes, and I got corrected.
18        Q.   What did Al-Salmi tell you?
19        A.   What he told me is, he said,
20   that's not for you to worry about.
21        Q.   Did you ever complain to Dallah
22   Avco that Al-Bayoumi's expenses were unusual?
23        A.   No.  Dallah was the
24   subcontractor.  I didn't talk to them about
25   that.

Page 132

1         Q.   To your knowledge, would Dallah
2    Avco have had any authority to refuse to pay
3    a logistics invoice from Airways Engineering
4    just because Dallah Avco had made its own
5    determination that particular expenses were
6    too high?
7         MR. DORRIS:  Objection.  Form.
8         THE WITNESS:  No, not if they
9    were signed off on, no, they couldn't.
10   QUESTIONS BY MR. KRY:
11        Q.   At any time did you ever learn
12   that Al-Bayoumi was using his educational
13   funding to plan terrorist attacks or engage
14   in other criminal activity in the United
15   States?
16        A.   No.  No.
17        Q.   At any time did you even
18   suspect that Al-Bayoumi was using his
19   educational funding to plan terrorist attacks
20   or engage in other criminal activity in the
21   United States?
22        A.   No.
23        Q.   If you had learned that
24   Al-Bayoumi was using his student funding to
25   plan terrorist attacks or engage in other

Page 133

1    criminal activity, would you have reported
2    that information to Al-Salmi?
3         A.   I first would have gone to the
4    military attache at the embassy, and then I
5    would have reported it to him.
6         Q.   Would you have reported that
7    information to law enforcement?
8         A.   Not directly.  Military attache
9    at the US Embassy would be who I would
10   contact first.
11        Q.   Would you understand that they
12   would report the information to law
13   enforcement as appropriate?
14        A.   Through the chain of command,
15   yes, they would.
16        Q.   Okay.  Okay.  We are going to
17   need to go on the FBI record for the next few
18   exhibits.  If we can ask the tech to remove
19   anyone who's not cleared for FBI documents
20   from the room, please, and let me know when
21   we're ready.
22        VIDEOGRAPHER:  I have the six
23   counsel who are not cleared in the
24   breakout room.
25   ***BEGIN FBI CONFIDENTIAL PORTION***

34  (Pages 130 to 133)

This Transcript Contains Confidential Material

Page 134

1    (Coombs Exhibit 821 marked for
2    identification.)
3    QUESTIONS BY MR. KRY:
4        Q.    So we will mark as Exhibit 821
5    a document produced at FBI 9923.  This is the
6    FBI's summary of an interview that occurred
7    on -- an interview that occurred with you on
8    April 3, 2002.
9        First of all, Mr. Coombs, have
10   you seen these FBI summaries of their
11   interviews with you?
12       A.    No, I haven't seen this.
13       Q.    Okay.  Do you recall giving a
14   number of interviews to the FBI back in 2002
15   and 2004?
16       A.    Yes.  Yeah, my -- Tom Wallace,
17   who replaced me, went with me over there.
18       Q.    Okay.  On page 2 of this
19   interview, the FBI's summary of its interview
20   states, "Avco Overseas was based in Houston,
21   Texas, and had dropped the contract in part
22   because of the presence of ghost employees
23   which Avco had paid for under the contract.
24   Coombs explained that the director general of
25   PCA at that time, Mohammed A. Al-Salmi, had

Page 135

1    side deals regarding some of these ghost
2    employees with Avco whereby Avco paid the
3    expenses related to these individuals.  Omar
4    Al-Bayoumi was one of these ghost employees.
5    Coombs estimated that there were
6    approximately 50 such individuals being
7    carried on the books at PCA or Dallah being
8    paid for doing nothing."
9        Do you recall providing that
10   information to the FBI during your April 2002
11   interview?
12       A.    Yes.
13       Q.    Did you in fact tell the FBI
14   that Al-Salmi had side deals in which Avco
15   Overseas paid expenses for ghost employees
16   who were paid for doing nothing?
17       A.    Yes.
18       Q.    And are those ghost employees
19   the same individuals you referred to in your
20   declaration when you said that Al-Salmi had
21   used the logistics budget that pays Saudi
22   Arabian students studying abroad who were PCA
23   employees or aspiring employees of the PCA?
24       A.    Yes.
25       Q.    So you used the terms "ghost

Page 136

1    employees" and "students" to refer to the
2    same people?
3        A.    Yes.
4        Q.    And when you said that those
5    individuals were paid for doing nothing, did
6    you mean that they were being paid to pursue
7    educational studies rather than being paid to
8    perform other types of work at Airways
9    Engineering?
10       A.    I saw some of the students come
11   back and never go to work.  That was the
12   reason I started calling them ghost
13   employees, the students.
14       Q.    With respect to the -- what
15   they were doing during the time that they
16   were having their educational studies funded,
17   did you understand that they were actually
18   pursuing educational studies?
19       A.    I couldn't tell from my end.
20       Q.    Did you ever have a basis for
21   saying that they were doing nothing during
22   the time period that they were supposed to be
23   pursuing educational studies?
24       A.    I didn't know.  The only thing
25   I saw was several of them come back and never

Page 137

1    do anything.  They would just disappear.
2        Q.    Right.
3        So setting aside what they may
4    have done after they came back to Saudi
5    Arabia, during -- during the time that those
6    individuals were outside the Kingdom in other
7    countries, did you have any firsthand
8    knowledge of whether they were pursuing
9    educational studies or instead doing nothing?
10       A.    No.
11       Q.    The first sentence of this
12   paragraph refers to Avco Overseas based in
13   Houston, Texas.  And I think we discussed
14   earlier that Avco Overseas was a
15   subcontractor of Dallah Avco.
16       Do you recall that testimony?
17       A.    Yes.
18       Q.    And so when you refer to
19   Al-Salmi having side deals with Avco and Avco
20   paying expenses related to these individuals
21   in this paragraph, you're referring to Avco
22   Overseas there rather than Dallah Avco; is
23   that correct?
24       A.    To me, they were the same
25   company until I saw the split.  When the

This Transcript Contains Confidential Material

Page 138

1  split happened, they were no longer the same
2  company.  But I had talked to some of the
3  people, and they said that, you know, they
4  couldn't believe all that stuff.
5      Q.   Okay.  Do you recall testifying
6  earlier that you didn't have any firsthand
7  knowledge, though, of whether that was just a
8  subcontractor relationship or a -- some sort
9  of corporate affiliation?
10     A.   No, I didn't have any firsthand
11  knowledge of it myself.  It was secondhand.
12     Q.   Later on page 2, this FBI
13  interview says, "Al-Salmi told Coombs that
14  he, Al-Salmi, wanted Al-Bayoumi to stay in
15  America and that Al-Bayoumi was a student
16  employed as an auditor."
17         Do you recall making that
18  statement to the FBI?
19     A.   I don't recall calling him an
20  auditor until I saw one -- or Tom Wallace
21  told me that he was on a list, student list,
22  as an auditor.  And that's all I know.  And
23  he said "student list."
24     Q.   Okay.  So apart from the --
25     A.   And then -- it's hard to

Page 139

1  remember.  I just can't remember all the
2  details.
3      Q.   That's fine.
4          But apart from -- so apart from
5  the last three words specifying that -- that
6  he was an auditor, is the rest of that
7  sentence consistent with your recollection of
8  what you told the FBI?
9      A.   Yeah, that's what -- see, when
10  I would talk to Al-Salmi about things, he
11  would, you know -- he would correct me, and I
12  would settle down.  I knew better than to
13  confront him if there was a question.  I
14  questioned things, and when I would
15  questioned it, I would get -- I never went
16  back.  I just left it alone.
17     Q.   Is it an accurate statement
18  that Al-Salmi told Coombs that he, Al-Salmi,
19  wanted Al-Bayoumi to stay in America and that
20  Al-Bayoumi was a student?
21     A.   Yes.
22     Q.   Did Al-Salmi ever tell you that
23  Dallah Avco wanted Al-Bayoumi to stay in
24  America?
25     A.   No.

Page 140

1      Q.   Did Al-Salmi ever tell you that
2  Bayoumi was not a student?
3      A.   Say again?
4      Q.   Did Al-Salmi ever tell you that
5  Bayoumi was not a student?
6      A.   No.
7      Q.   Turning to page 4 of this
8  interview memo, the FBI summary indicates
9  that you told them that ███████,
10  project manager for Dallah, later was caught
11  embezzling $18 million from Dallah.  Magboul
12  ██████████████████.  The owner
13  of Dallah, Sheik Kamel, forgave the debt and
14  transferred Magboul to another division of
15  Dallah."
16         My question is, do you have any
17  personal knowledge at all about ████
18  ████'s alleged embezzlement of funds from
19  the company?
20     A.   I don't know how he did it.  I
21  was only aware.  But whenever it all took
22  place, it took place so fast, I couldn't
23  touch it.
24     Q.   Did that incident have anything
25  to do with Omar Al-Bayoumi's activities in

Page 141

1  the United States?
2      A.   I have no idea.
3      Q.   Later on page 4 the -- there's
4  a paragraph that says, "Coombs understood
5  Saudization to mean the program by which
6  non-Saudi workers in Saudi companies and
7  government were replaced by Saudi workers.
8  The program generally entailed the
9  replacement worker to spend an extended
10  period of time in an English-language-
11  speaking country.  During this sojourn, the
12  Saudi's living expenses, tuition and salary
13  are paid by their company or Agency."
14         Do you remember providing that
15  description of Saudization to the FBI?
16     A.   Yes.
17     Q.   And is that description correct
18  in your view?
19     A.   In my view, yes.
20     Q.   On page 5, the summary states,
21  "Coombs advised" -- it's in the second full
22  paragraph.
23         "Coombs advised that the
24  moneys" -- further up.  It's five lines into
25  that paragraph.

36 (Pages 138 to 141)

This Transcript Contains Confidential Material

Page 142

1    "Coombs advised that the moneys
2  represented as paid by Al-Bayoumi were
3  significantly higher than he expected, and
4  Coombs expressed surprise at the amount
5  listed under the category 'other
6  allowances.'"
7        And then dropping down a couple
8  of sentences, it says, "In April of 2000, the
9  other allowance jumps to 14,271 riyals and
10  stays at that level until December 2000."
11        Do you remember discussing
12  those other allowances with the FBI?
13      A.    No, I didn't -- I didn't even
14  know the numbers.
15      Q.    Okay.  And in fact, April 2000
16  is three years after you left the company,
17  right?
18      A.    Yeah.  Yes.
19      Q.    And I think you testified
20  earlier that the -- the department of the PCA
21  that would be responsible for setting
22  salaries and allowances for project employees
23  was a different department of the Airways
24  Engineering than your logistics department;
25  is that right?

Page 143

1      A.    Yes.
2      Q.    All right.  We'll take that
3  down.
4        (Coombs Exhibit 822 marked for
5  identification.)
6  QUESTIONS BY MR. KRY:
7      Q.    And we'll mark as Exhibit 822 a
8  document produced at FBI 9928.  This is a
9  summary of another interview that you had
10  with the FBI that took place on July 16,
11  2002.
12        On page 1, the second paragraph
13  states, "Coombs stated Avco Overseas, a
14  Houston-based company, purchased its
15  contracts with the Saudi Arabian Presidency
16  of Civil Aviation, PCA, through contacts with
17  Sheik Saleh Kamel."
18        Have you ever personally met
19  Sheik Saleh Kamel?
20      A.    Yes.
21      Q.    On how many occasions?
22      A.    I met him in 1984.  I met his
23  son, Abdullah Kamel, shook hands with him
24  there in the tower after it had been
25  dedicated, and had tea with him.

Page 144

1      Q.    Was the tea also in 1984, or
2  was that on a different occasion?
3      A.    That was in '84.  I met his
4  son.  I met -- and I had tea with him.
5      Q.    Okay.  So other than that
6  hand-shaking and tea-having in 1984, was
7  there any other occasion where you met Sheik
8  Saleh Kamel?
9      A.    Not met him personally.  I saw
10  him.
11      Q.    Did you -- was there any other
12  occasion where you had any discussions with
13  him?
14      A.    No.
15      Q.    Did you ever have any
16  discussions over the telephone with Sheik
17  Saleh Kamel?
18      A.    No.
19      Q.    Do you have any personal
20  knowledge about the circumstances in which
21  Avco Overseas became a PCA subcontractor?
22      A.    That was all done outside my
23  box.  I had no idea what happened.
24      Q.    So when you -- when you told
25  the FBI that Avco Overseas purchased its

Page 145

1  contracts with the Saudi Arabian Presidency
2  of Civil Aviation through contacts with
3  Sheikh Saleh Kamel, is that based on any
4  personal knowledge that you have?
5      A.    It was just -- what I said was
6  the impression of influence, and they wanted
7  to keep the cash flow going.  And that was
8  the way I -- I presented it, that Avco
9  Overseas Services did not want to lose that
10  contract.
11        But there was some problems
12  because they were having some ethical
13  problems inside of Dallah Avco with some
14  people requesting it that didn't feel like it
15  was right.  Inside Dallah Avco in Houston.
16      Q.    Okay.  And I'm sorry to
17  constantly correct you on this, you talk
18  about Dallah Avco Houston, you mean Avco
19  Overseas?
20      A.    Yes.
21      Q.    All right.  Did the portion of
22  this statement that refers to contacts with
23  Sheikh Saleh Kamel -- do you have any
24  personal knowledge that Avco Overseas
25  purchased its contracts with the PCA through

37 (Pages 142 to 145)

This Transcript Contains Confidential Material

Page 146

1    contacts with Sheikh Saleh Kamel
2    specifically?
3         A.   No.
4         Q.   Do you know when Avco Overseas
5    became a subcontractor of the PCA?
6         A.   No, I don't remember.
7         Q.   Do you know whether it was in
8    the 1980s?
9         A.   I think it was in the '90s, but
10   it may have been in the '80s because there
11   was a lot of -- there was a lot of stuff
12   still in balance in the mid-'90s.
13        Q.   Were you working -- were you
14   even working for the PCA or Dallah Avco at
15   the time Avco Overseas became a PCA
16   subcontractor?
17        A.   No.  It was done prior to me
18   coming on board.
19        Q.   All right.  Later on page 1,
20   discussing some meetings that Avco Overseas
21   in Texas convened, the report states, "Coombs
22   explained that the representatives for Avco
23   had an unexplained interest in awarding of
24   the new contracts.  Coombs speculated that
25   this was the result of the corrupt

Page 147

1    relationship that existed between Saleh Kamel
2    and the Avco representatives."
3         My question is, do you have any
4    personal knowledge of any facts showing that
5    there was any corrupt relationship between
6    Avco Overseas and Sheikh Saleh Kamel?
7         A.   Not directly.
8         Q.   So in this memo you
9    characterized your belief as speculation.
10        Is that an accurate
11   description?
12        A.   Yes, it was speculation.
13        Q.   Later on this page, the report
14   says, "The third meeting was held at Ercan
15   during the month of April 1995.  At this
16   meeting, Coombs remembers a letter being
17   issued by Mohammed Al-Salmi of PCA to Magdi
18   Hanna of Ercan outlining the financial
19   support of Omar Al-Bayoumi by Ercan and
20   guaranteed by PCA/AE ANSS project account."
21        A.   Yes.
22        Q.   Is that statement accurate?
23        A.   Yes.
24        Q.   And on page 2 of the report it
25   states, "Coombs was not aware of other

Page 148

1    individuals who were involved in funding
2    Al-Bayoumi."
3         Is that statement accurate?
4         A.   Yes.
5         (Coombs Exhibit 823 marked for
6    identification.)
7    QUESTIONS BY MR. KRY:
8         Q.   All right.  We'll mark as
9    Exhibit 823 a document produced at FBI 9918.
10   This is the FBI's summary of another
11   interview they had with you on January 16,
12   2004.
13        At page 1, further down on the
14   page, there's a paragraph that reads, "At the
15   beginning of the contract, Hanna had to agree
16   to support Al-Bayoumi to get the contract.
17   Coombs told Hanna to either bill direct or
18   mark up the goods and let PCA know.  Hanna
19   chose to mark up the goods."
20        Is that statement accurate?
21        A.   Yes.
22        Q.   Did you ever tell anyone at
23   Dallah Avco that Ercan had marked up the
24   goods on its invoices to account for the
25   financial support it was providing to

Page 149

1    Al-Bayoumi?
2         A.   No.
3         (Coombs Exhibit 824 marked for
4    identification.)
5    QUESTIONS BY MR. KRY:
6         Q.   And the last document.  We'll
7    mark this as Exhibit 824, I believe.  This is
8    produced at FBI 8098.  This is a slightly
9    different version than the FBI summary of
10   your first interview that we looked at the
11   very beginning of this line of questioning,
12   dated April 3, 2002.
13        Unlike the other summary of
14   this same interview, this copy of the summary
15   contains at the top a header that the FBI
16   agent added that says, "Omar Al-Bayoumi
17   employed by Dallah Al-Baraka."
18        And if you look down at
19   subsequent pages of this version of the
20   summary, each page has a header, Omar
21   Al-Bayoumi, Dallah Al-Baraka.
22        My question is, did you ever
23   tell the FBI that Al-Bayoumi was an employee
24   of Dallah Al-Baraka?
25        A.   No, I didn't even...

38 (Pages 146 to 149)

This Transcript Contains Confidential Material

Page 150

1    Q.    All right.  We can take that
2  document down.  Just a couple last few
3  questions.
4            MR. DORRIS:  Before -- I don't
5  think the court reporter got the
6  entire answer to that question.
7            "No, I didn't even" -- it
8  trailed off.  I just couldn't hear.
9            MR. KRY:  Was that the correct
10  recording of your answer, Mr. Coombs?
11  I think the transcript's
12  accurate.
13            MR. DORRIS:  Okay.
14  ***END FBI CONFIDENTIAL PORTION***
15  QUESTIONS BY MR. KRY:
16    Q.    Mr. Coombs, throughout your
17  time at Airways Engineering, did you
18  understand that Omar Al-Bayoumi was pursuing
19  educational studies in the United States?
20    A.    Yes.
21    Q.    Did you ever tell Dallah Avco
22  that Al-Bayoumi was doing something other
23  than pursuing educational studies in the
24  United States?
25    A.    No.

Page 151

1    Q.    Did you understand that the
2  payments that Al-Salmi had arranged for
3  Al-Bayoumi were intended to fund his
4  education and living expenses in the United
5  States?
6    A.    That's what I reasoned to be,
7  yeah.
8    Q.    Did you ever believe that
9  Al-Bayoumi was using the payments to fund
10  terrorism or other criminal activity?
11    A.    No.
12    Q.    Did you ever tell Dallah Avco
13  that Al-Bayoumi was using the payments to
14  fund terrorism or other criminal activity?
15    A.    No.
16    Q.    Did you ever tell Dallah Avco
17  that Al-Bayoumi was using the payments for
18  anything other than educational and living
19  expenses?
20    A.    No.
21            MR. KRY:  Great.  Why don't we
22  take a ten-minute break.  I suspect
23  I'm done, but I'll just confer with my
24  team to see if we have any more
25  questions.

Page 152

1            VIDEOGRAPHER:  Off the record
2  at 2:45 p.m.
3    (Off the record at 2:45 p.m.)
4            VIDEOGRAPHER:  Back on the
5  record at 3:02 p.m.
6            MR. KRY:  Mr. Coombs, those are
7  all the questions we have for you at
8  this point.  Thank you very much for
9  your time today.
10            THE WITNESS:  You're welcome.
11            MS. PRITSKER:  This is
12  Gabrielle Pritsker, counsel on behalf
13  of defendant Dubai Islamic Bank.  I
14  just wanted to make a statement on the
15  record that DIB counsel was excluded
16  from the deposition at approximately
17  3:24 p.m. Eastern Standard Time and
18  then was brought back into the
19  deposition after it had already gone
20  off record on a break.  And now we are
21  back, and Dallah Avco has completed
22  their questioning.
23            We ask that moving forward in
24  all depositions that the videographer
25  and the court reporter give two or

Page 153

1  three seconds for all counsel that are
2  getting excluded to make a brief
3  statement before and after the
4  exclusion.
5            Thank you.
6            CROSS-EXAMINATION
7  QUESTIONS BY MR. POUNIAN:
8    Q.    Mr. Coombs, my name is Steve
9  Pounian.  I'm with the law firm Kreindler &
10  Kreindler in New York, and we represent --
11  we're part of the committee that represents
12  the 9/11 families in this litigation.  I just
13  have a few questions to ask you to follow up
14  on some of the subjects that have been raised
15  today.
16            First, sir, could you just tell
17  us about your career in the US Army?  How
18  long did you serve -- how long did you serve
19  in the Army?
20    A.    It was 22 years.
21    Q.    And what rank did you achieve
22  in the Army, sir?
23    A.    I started when I was a private
24  in August 1960.  I moved up to sergeant, went
25  to flight school, became a warrant officer,

This Transcript Contains Confidential Material

Page 154

1    helicopter pilot. Went back to -- then on my
2    third tour, got commissioned to first
3    lieutenant, then to captain. I retired as a
4    major in logistics.
5        Q.    And what year did you retire?
6        A.    1982.
7        Q.    Now, you've been asked some
8    questions, sir, about money that's been paid
9    to Omar Al-Bayoumi, and you said that you
10   paid -- you directed payment of -- to
11   Mr. Bayoumi according to instructions that
12   were given to you.
13           Is that right, sir?
14       A.    Yes, I paid only by
15   instructions.
16       Q.    And that was through the
17   logistics department budget that you paid
18   those moneys to Mr. Bayoumi that you
19   described?
20       A.    Yes.
21       Q.    And I think you described it
22   started at $60,000 a year and then it jumped
23   up to $90,000 a year; is that right?
24       A.    Yeah, the -- over the period of
25   that year, it increased from 60 to 90.

Page 155

1        Q.    And when you say "that year,"
2    you're talking about 1996; is that right?
3        A.    Yeah, '95, '96, yeah.
4        Q.    And then there was some
5    discussion about Mr. Bayoumi earning also a
6    salary and benefits through the Dallah Avco.
7           Were you aware of that at the
8    time that you were sending out payments in
9    your logistics department budget?
10           MR. KRY: Objection to form.
11           MR. DORRIS: Objection to form.
12           THE WITNESS: It didn't come
13       out of my budget, 'cause I didn't see
14       it.
15   QUESTIONS BY MR. POUNIAN:
16       Q.    I just want to put before you
17   again what was marked as Exhibit 811, if we
18   could.
19           And this was one of the
20   documents that was referenced in your
21   declaration, sir. And it's signed by
22   Mr. Salmi, and it's dated -- it's dated July,
23   but it's effectively dated as of June 6,
24   1995.
25           Do you see that, sir?

Page 156

1        A.    Yeah.
2        Q.    And it's hiring Mr. Bayoumi at
3    a job with a -- with a certain job title of
4    SNR data processing tech.
5           Do you see that, sir?
6        A.    Yes.
7           MR. DORRIS: Objection to form.
8    QUESTIONS BY MR. POUNIAN:
9        Q.    And where was that -- do you
10   know where that job was located?
11           MR. KRY: Objection to form and
12       lack of foundation.
13           THE WITNESS: That would have
14       been across the street at the PCA
15       headquarters.
16   QUESTIONS BY MR. POUNIAN:
17       Q.    And --
18       A.    The technical department was
19   over there.
20       Q.    And you're saying "across the
21   street." That's in Jeddah, Saudi Arabia; is
22   that right?
23       A.    Yeah, in Jeddah. The tech --
24   the data collection area was there. Finance
25   was over there. The only thing that was in

Page 157

1    my building was the maintenance and the
2    supplies, logistics.
3        Q.    So Mr. Salmi was directing that
4    Mr. Bayoumi be given a job in Jeddah, while
5    at the same time Mr. Bayoumi was supposedly a
6    student in the United States; is that right?
7           MR. DORRIS: Objection to form.
8       Lack of foundation.
9           THE WITNESS: Yes.
10          MR. KRY: Join.
11   QUESTIONS BY MR. POUNIAN:
12       Q.    If we could show the witness
13   Exhibit 86, please, that I just sent over to
14   the technician. It's from the Khan
15   deposition.
16           BRIAN FRONZAGLIA: We're
17       marking this as 825?
18          MR. POUNIAN: No, this is
19       already an exhibit. It's already
20       marked as Exhibit 86, so we're going
21       to reference it as Exhibit 86.
22   QUESTIONS BY MR. POUNIAN:
23       Q.    Sir, if you could see, this is
24   the same date of June 6, 1995, the date that
25   Mr. Salmi ordered that Mr. Bayoumi be hired

40 (Pages 154 to 157)

This Transcript Contains Confidential Material

Page 158

1    at this particular job in Jeddah.
2          And if we could scroll down,
3    please.
4          It provides for salary and
5    various other benefits.
6          Sir, were you aware at any time
7    that Mr. Bayoumi was receiving a salary and
8    benefits that was ordered by Mr. Salmi?
9       A.   No.
10         MR. KRY:  Objection to form.
11   QUESTIONS BY MR. POUNIAN:
12      Q.   Was the amounts being paid to
13   Mr. Bayoumi through Dallah Avco separate from
14   any of the amounts that you were paying him
15   through the logistics department?
16         MR. DORRIS:  Objection to form.
17   Lack of foundation.  Assumes facts.
18         MR. KRY:  Same objection.
19         MR. DORRIS:  Also going to
20   object that this is outside the scope
21   of the direct examination.
22         MR. POUNIAN:  You can have all
23   of those objections.
24   QUESTIONS BY MR. POUNIAN:
25      Q.   Sir, maybe I could rephrase my

Page 159

1    question.
2          Did you hear my question?
3       A.   Say it again.
4       Q.   Okay.
5          Were the amounts that were
6    being paid to Mr. Bayoumi pursuant to this
7    directive of Mr. Salmi separate from the
8    amounts that you were paying him pursuant to
9    a separate directive of Mr. Salmi through the
10   logistics department?
11         MR. DORRIS:  Objection to form.
12   Lack of foundation.
13   QUESTIONS BY MR. POUNIAN:
14      Q.   You can answer, sir.
15      A.   This is a normal salary.  This
16   is a normal salary document.
17      Q.   And were you, through the
18   logistics department, paying -- what were you
19   paying Mr. Bayoumi through that department?
20      A.   I was paying it based on the
21   other documentation, not on salary.
22      Q.   And when you say "the other
23   documentation," what are you referring to?
24      A.   The other documentation is what
25   I would authorize, you know, for the payments

Page 160

1    going through -- that I've already signed off
2    on.
3       Q.   Okay.  And those -- those
4    payments that you were making were directed
5    by Mr. Salmi also?
6       A.   Yes.  Yes.
7       Q.   Can you describe, sir -- I
8    think you described this as double-dipping in
9    your testimony; is that right?
10         MR. DORRIS:  Objection to form.
11   Incorrectly states the witness'
12   testimony.
13         THE WITNESS:  Yes, that would
14   be double-dipping.
15   QUESTIONS BY MR. POUNIAN:
16      Q.   Because he's making a salary,
17   and at the same time you're paying him
18   expenses through a separate budget.
19         Is that right, sir?
20         MR. DORRIS:  Objection to form.
21   Lack of foundation.
22         THE WITNESS:  I did not know
23   about this.
24   QUESTIONS BY MR. POUNIAN:
25      Q.   Now, you said that the

Page 161

1    amounts -- we can take this down.  Thank you.
2          You said that the amounts that
3    you paid -- that were paid to Mr. Bayoumi
4    through the logistics department budget, that
5    you had kept spreadsheets on that that you
6    provided to the FBI.
7          Is that right, sir?
8       A.   Yes, I provided it to the -- to
9    the -- to the 9/11 Commission with the FBI in
10   New York when they flew me there to testify.
11      Q.   And did you give them -- did
12   you give them documents that were on discs at
13   that time?
14      A.   I had my -- my budget
15   spreadsheets that were in question that I
16   didn't feel right about, I would save them --
17   save two discs.  I left one behind, and I
18   took one with me.
19      Q.   And --
20      A.   This, I took with me.  I gave
21   them to the -- to the 9/11 Commission and the
22   FBI.
23      Q.   And they retained those discs
24   that you gave to them?
25         MR. DORRIS:  Objection.  Lack

41 (Pages 158 to 161)

This Transcript Contains Confidential Material

Page 162

1  of foundation.
2          THE WITNESS: They kept them,
3  yes. They kept them.
4  QUESTIONS BY MR. POUNIAN:
5      Q.   And the information on these --
6  that you had on these discs should also be
7  maintained by the PCA; is that right?
8          MR. KRY: Objection.
9          MR. DORRIS: Objection. Lack
10  of foundation.
11          THE WITNESS: Yes.
12  QUESTIONS BY MR. POUNIAN:
13      Q.   And these documents that the
14  PCA should have which showed the amounts that
15  were actually paid to Mr. Bayoumi?
16      A.   What I had was the
17  spreadsheets, not documents. They were
18  spreadsheets of the budget, each line, who it
19  was directed to and the amounts, and then
20  totaled up at the bottom. So I could build
21  my spreadsheets on a graph. Okay?
22          His name was listed four times,
23  in four different lines. Okay? He was the
24  only student with more than two.
25          MR. KRY: Same objections.

Page 163

1  QUESTIONS BY MR. POUNIAN:
2      Q.   And when you say "his name,"
3  who are you referring to?
4      A.   Omar Al-Bayoumi.
5      Q.   And when you say "he was the
6  only student with more than two," what does
7  that mean?
8      A.   Okay. Most of the students had
9  a cost of living amount and tuition. Okay?
10  There was always additions. There was
11  tuition, cost of living allowance, and there
12  was always additions. They were not
13  specified sometimes. In that -- in the
14  papers that you saw, I listed those as
15  unspecified.
16          MR. DORRIS: Objection. And
17  this all goes outside both the scope
18  of the direct and the declaration.
19          You had an obligation to
20  produce a declaration from the witness
21  by a certain date, and now you're
22  asking him to elicit testimony outside
23  of that. That's quite objectionable.
24          MR. POUNIAN: You've stated
25  your objection.

Page 164

1  QUESTIONS BY MR. POUNIAN:
2      Q.   And these -- this information
3  would be held by the PCA in its files also,
4  sir?
5          MR. DORRIS: Objection. Lack
6  of foundation. Beyond the scope of
7  the direct, and untimely with the
8  declaration.
9          THE WITNESS: These were --
10  would probably not be in PCA records
11  now.
12  QUESTIONS BY MR. POUNIAN:
13      Q.   All right.
14      A.   Because it was Lotus 1-2-3.
15  They converted to Excel. Okay? These were
16  old formats, so I doubt that they're still
17  there.
18      Q.   Well, I'm not -- I'm not
19  questioning whether you think that they're
20  still there, sir.
21          I'm just saying that they were
22  PCA records; is that right?
23      A.   Not official records. They
24  were my records of what I was doing.
25      Q.   And they reflected other

Page 165

1  records that would be held within -- by PCA?
2      A.   Yes.
3      Q.   Okay.
4      A.   They reflected -- they
5  reflected what you've already seen, the cost,
6  and I put a line number on it.
7      Q.   And what I'm asking you, sir,
8  is that the PCA should have documents
9  reflecting the amounts that were paid through
10  the logistics department to Omar Al-Bayoumi,
11  as we've been discussing, the 60 and the
12  $90,000 amounts that were being paid to him?
13          MR. DORRIS: Objection. Form.
14  Foundation.
15          THE WITNESS: They should have,
16  but I don't know if they would after
17  this many years.
18  QUESTIONS BY MR. POUNIAN:
19      Q.   Okay. But they should have
20  them; is that right?
21      A.   Yes.
22          MR. DORRIS: Objection. Form.
23  QUESTIONS BY MR. POUNIAN:
24      Q.   Mr. Coombs, you said that you
25  drove -- you drove with Magdi Hanna past an

This Transcript Contains Confidential Material

Page 166

1  apartment complex where Mr. Bayoumi lived,
2  you said, sir?
3      A.   He told me -- I was in the
4  right seat, and he was taking me out to
5  lunch. And he drove me past an apartment
6  complex and he said, "That's where he lives."
7  It was a very nice apartment complex.
8      Q.   And --
9      A.   And a parking area.
10     Q.   And when he said "that's where
11 he lives," who was he referring to?
12     A.   Omar Al-Bayoumi.
13     Q.   And where were you at the time
14 when he pointed that out?
15     A.   I was in California.
16     Q.   Okay. And where specifically
17 in California?
18     A.   I was -- we were going from
19 lunch at Ercan over -- across the street from
20 Disney World to the restaurant. And I can't
21 give you -- I've been to California quite a
22 few times, but in that area, not very often.
23     Q.   And Ercan's offices were
24 located in Newport Beach; is that right?
25     A.   Yeah. Yeah.

Page 167

1      Q.   And you were driving to
2  Disneyland, and then you saw this apartment
3  complex, and Mr. Hanna pointed it out to you?
4      A.   He was driving. He pointed it
5  out to me and just kept going.
6      Q.   And why did he point that
7  complex out to you, sir?
8      A.   He was just telling me that's
9  where he lived.
10     Q.   If we could put up, please,
11 Exhibit 810. And go to page 4, please.
12          And if we just go to the last
13 paragraphs, the first two sentences at the
14 very bottom.
15          It just says -- the next --
16 yeah, down to -- yeah.
17          Is this a description, sir, of
18 that particular occasion in which you were
19 with Mr. Hanna?
20     A.   Yeah.
21     Q.   And you say you were driving
22 from the Ercan office to a restaurant across
23 the street from Disneyland.
24          Do you see that, sir?
25     A.   Yeah. Mr. Hanna was driving; I

Page 168

1  wasn't. But, yeah, that's -- I don't
2  remember the name of the restaurant. It was
3  just a nice apartment complex as we drove
4  past it, and it was very upscale. It was
5  nice.
6      Q.   Okay. And if we go to the next
7  sentence here, sir, it says, "On the way to
8  the restaurant, we drove by an apartment
9  complex." If we could highlight that,
10 please.
11          And do you recall that the
12 apartment complex was in Costa Mesa,
13 California?
14     A.   Yes.
15     Q.   And he said that Mr. Bayoumi
16 had an apartment at that complex?
17     A.   Yes.
18     Q.   And did Mr. Hanna talk to you
19 about Mr. Bayoumi and his relationship with
20 Mr. Bayoumi?
21     A.   He did not detail it, but he
22 was very frustrated, so he didn't like
23 talking about him.
24     Q.   And what was he frustrated
25 about?

Page 169

1      A.   That he didn't want to take
2  orders from him. He didn't want to do what
3  he wanted him to do. And everything in --
4  Omar would come to him and tell him things
5  that he wanted, and ANSS didn't want to do
6  it.
7          And I stayed out of the fray.
8  I didn't get into it with him. I just
9  listened to him. I didn't say a word.
10     Q.   Now, there came a time, sir,
11 when you met Mr. Bayoumi; is that right?
12     A.   Yeah.
13     Q.   Yeah, if we could go to the top
14 of this page, please.
15          The very first paragraph
16 right -- and the first two sentences, three
17 sentences, if we could highlight those.
18          And it states that you were at
19 the Ercan office, and you met Mr. Hanna
20 there; is that right?
21     A.   Mr. Hanna took me, had picked
22 me up, took me to the office, took me by --
23 {audio interruption} -- and I had never met
24 him before.
25     Q.   You had never met who before?

This Transcript Contains Confidential Material

Page 170

1    Mr. Bayoumi are you referring to?
2        A.    I never met Al-Bayoumi.
3        Q.    And you met him on this
4    occasion with Mr. Hanna; is that right?
5        A.    Yes.
6        Q.    And did Mr. Hanna introduce you
7    to Mr. Bayoumi?
8        A.    Yeah.  He said, I want to
9    introduce you to him.
10       Q.    And did you have occasion to
11   speak to Mr. Bayoumi at that time?
12       A.    No.  I reached out to shake his
13   hand, and he didn't do it.  And he just sort
14   of, you know -- and then he asked me my name.
15            He said, "isem?"  What's your
16   name?
17            I said, "Samuel."
18            And then he asked me if I was a
19   Jew.
20            I said, "la," no.  "Ana
21   almani."  I am a German.
22            And then he shook my hand.
23       Q.    Well, let's go down to the next
24   paragraph here.  It's -- if we could just
25   highlight the next paragraph.

Page 171

1            It says that he asked you your
2    name, and you replied Samuel, and then he
3    asked if you were Jewish.
4            And then did Mr. Bayoumi ask
5    you about a request that he had placed for a
6    new car for himself?
7        A.    Yes.  And I had told him that I
8    could not approve anything like that, that he
9    had to go to Mohammed Al-Salmi.  And that was
10   the end of the subject on it.
11       Q.    And was Mr. Bayoumi at
12   Mr. Hanna's office --
13       A.    Yes, he was that day.
14       Q.    Okay.  And he had been there
15   before you arrived?
16       A.    No, he was there -- Hanna told
17   me he was there because he wanted to get some
18   furniture for the apartment that he had
19   pointed out to me.  His wife wanted some
20   additional furniture, and then he added a car
21   when I walked up to him.
22       Q.    And -- all right.  So was it
23   clear to you that Mr. Bayoumi knew Mr. Hanna?
24       A.    Oh, yeah.  They -- they knew
25   each other because Al-Salmi had hooked them

Page 172

1    up because that's where he was getting his
2    money, was through them, and his apartment
3    and stuff like that that was all being paid
4    through Ercan.
5        Q.    Now, we just took the testimony
6    of Mr. Bayoumi last week, and he said he
7    didn't know Magdi Hanna.
8            Is that a true statement, sir?
9            Would that be a true statement
10   if Mr. Bayoumi said he didn't know Magdi
11   Hanna?
12       A.    That is not a true statement.
13       Q.    And he also --
14       A.    He knew --
15       Q.    I'm sorry.
16       A.    He knew him.
17       MR. DORRIS:  Objection.
18   Foundation.
19       MR. POUNIAN:  I have no further
20   questions.
21       MR. DORRIS:  Give me two
22   seconds.  I'm going to ask some
23   additional questions.  One second.
24            We don't need to take a full
25   15-minute break, but, like, two

Page 173

1    minutes would be good.
2            VIDEOGRAPHER:  Off the record
3    at 3:26 p.m.
4            (Off the record at 3:26 p.m.)
5            VIDEOGRAPHER:  Back on the
6    record at 3:28 p.m.
7            REDIRECT EXAMINATION
8    QUESTIONS BY MR. DORRIS:
9        Q.    Brian, can you please pull back
10   up Exhibit 810, the declaration?
11            Please turn to page 3, the
12   fourth full paragraph.
13            Now, with respect to Bayoumi's
14   salary, you testified earlier today that you
15   reviewed three documents shown to you by
16   Kreindler & Kreindler - DA1016, DA2267 and
17   DA398, correct?  Mr. Coombs?
18       A.    Yes.
19       Q.    And those were the only three
20   documents you were shown and reviewed by
21   Kreindler & Kreindler, as you testified
22   earlier, correct?
23       A.    Yes.
24       Q.    Can we bring up Exhibit 86 that
25   was displayed during Mr. Pounian's

This Transcript Contains Confidential Material

Page 174

1  questioning?
2         This document is DA99, correct?
3  You see the lower right, there's a labeling
4  that says DA99?
5      A.   Yes.
6      Q.   This was not one of the
7  documents shown to you by Kreindler &
8  Kreindler, correct?
9      A.   No.
10     Q.   You had never seen this
11  document before today, correct?
12     A.   No.
13     Q.   This was not a document that
14  you would have seen in your employment as
15  manager of the logistics department, correct?
16     A.   No, it was -- that's personnel.
17     Q.   And you had no responsibility
18  for paying salaries to Omar Al-Bayoumi,
19  correct?
20     A.   No.
21     Q.   And you had no knowledge during
22  your time at Dallah Avco from 1994 to 1997 of
23  whether Omar Al-Bayoumi received any salary
24  or not, correct?
25         MR. KRY:  Objection to the form

Page 175

1      of the question.
2         THE WITNESS:  That's correct.
3         MR. KRY:  Objection.  Misstates
4      the facts.
5         MR. DORRIS:  Sure, I'll reask
6      it.
7  QUESTIONS BY MR. DORRIS:
8      Q.   And you had no knowledge during
9  your time at the logistics department from
10  1994 to 1997 of whether Omar Al-Bayoumi
11  received any salary or not, correct?
12     A.   Normal salary?  No, I didn't
13  know.  I just knew about what was coming
14  through my office.
15     Q.   Now, you -- in Mr. Pounian's
16  questioning you were asked some questions
17  about Magdi Hanna's relationship with Omar
18  Al-Bayoumi, correct?
19     A.   Yeah.
20     Q.   And all of the statements you
21  made were -- the basis for those were things
22  that Magdi Hanna told you, correct?
23     A.   Yeah.
24     Q.   The statement about where Omar
25  Al-Bayoumi lived was told to you by Magdi

Page 176

1  Hanna, correct?
2      A.   Yes.  Yes.
3      Q.   Apart from what Magdi Hanna
4  told you, you had no knowledge of where Omar
5  Al-Bayoumi lived, correct?
6      A.   No, I did not.
7      Q.   You were also asked about Magdi
8  Hanna's relationship with Omar Al-Bayoumi,
9  and I believe you said he was frustrated by
10  Bayoumi; is that correct?
11     A.   He did not like to talk about
12  him, and obvious frustration because of the
13  requests that were coming in like for
14  furniture and stuff like that and...
15     Q.   Your understanding of Omar
16  Al-Bayoumi's relationship with Magdi Hanna
17  came from statements made by Magdi Hanna,
18  correct?
19     A.   Yes.
20     Q.   It was not something you
21  yourself personally experienced -- knew
22  about?
23     A.   No.
24     Q.   You testified about whether
25  Magdi Hanna knew Omar Al-Bayoumi, correct?

Page 177

1      A.   He did know him, yes.
2      Q.   The only time you saw Magdi
3  Hanna and Omar Al-Bayoumi interact was the
4  one encounter at Ercan, correct?
5      A.   Yes.
6      Q.   And any other information you
7  have about a relationship between Magdi Hanna
8  and Omar Al-Bayoumi came from Magdi Hanna,
9  correct?
10     A.   That's correct.  That's
11  correct.
12     Q.   The only thing you experienced
13  yourself was the one encounter, which I think
14  you testified was at most ten minutes and
15  25 years ago, correct?
16     A.   Yes.
17         MR. DORRIS:  Thank you.  That's
18     all my questions.
19         MR. KRY:  I just have one or
20     two questions.
21         RECROSS EXAMINATION
22  QUESTIONS BY MR. KRY:
23     Q.   Mr. Coombs, you testified about
24  a Lotus 1-2-3 spreadsheet that you created at
25  Airways Engineering to track the educational

45 (Pages 174 to 177)

This Transcript Contains Confidential Material

Page 178

1  funding payments to students at the direction
2  of Al-Salmi.
3           Do you remember that testimony?
4       A.   Yeah, I --
5       Q.   Did you ever send a copy of
6  that spreadsheet to Dallah Avco?
7       A.   No.  It was -- it was -- it was
8  what I was doing personally to track things.
9  I could make myself spreadsheets so that when
10 I went to brief about my budget, I could draw
11 it out and everybody was -- this is before we
12 had all the software we have now.
13      Q.   And so --
14      A.   But I knew how to build
15 spreadsheets.  But I knew how to do it.  I
16 knew how to build the spreadsheets and
17 things, and so I did it myself.
18           And then I would -- I would
19 build it and everything so I could brief --
20 I'd stand up -- they'd ask me to stand up and
21 show my budget and everything else, and then
22 I'd brief it.  And then they'd tell me to sit
23 down, and then they'd tell me to leave.
24      Q.   Okay.  The "they" you're
25 referring to there is Airways Engineering?

Page 179

1       A.   Huh?
2       Q.   The "they" you were referring
3  to there was Airways Engineering?
4       A.   Yeah.  Yeah.
5           MR. KRY:  I have no further
6  questions.  Thank you.
7           MR. POUNIAN:  Thank you,
8  Mr. Coombs.
9           VIDEOGRAPHER:  This concludes
10 today's deposition.  The time is
11 3:35 p.m.  We're off the record.
12 (Deposition concluded at 3:35 p.m.)
13           - - - - - - -
14
15
16
17
18
19
20
21
22
23
24
25

Page 180

1                CERTIFICATE
2
3       I, CARRIE A. CAMPBELL, Registered
   Diplomate Reporter, Certified Realtime
4  Reporter and Certified Shorthand Reporter, do
   hereby certify that prior to the commencement
5  of the examination, Samuel G. Coombs, was
   duly sworn by me to testify to the truth, the
6  whole truth and nothing but the truth.
        I DO FURTHER CERTIFY that the
7  foregoing is a verbatim transcript of the
   testimony as taken stenographically by and
8  before me at the time, place and on the date
   hereinbefore set forth, to the best of my
9  ability.
10
        I DO FURTHER CERTIFY that I am
11 neither a relative nor employee nor attorney
   nor counsel of any of the parties to this
12 action, and that I am neither a relative nor
   employee of such attorney or counsel, and
13 that I am not financially interested in the
   action.
14
15
17 _____
   CARRIE A. CAMPBELL,
18 NCRA Registered Diplomate Reporter
   Certified Realtime Reporter
19 Notary Public
20
21
22
23 Dated:  July 12, 2021
24
25

Page 181

1         INSTRUCTIONS TO WITNESS
2
3       Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the
6  appropriate space on the errata sheet for any
7  corrections that are made.
8       After doing so, please sign the
9  errata sheet and date it.  You are signing
10 same subject to the changes you have noted on
11 the errata sheet, which will be attached to
12 your deposition.
13      It is imperative that you return
14 the original errata sheet to the deposing
15 attorney within sixty (60) days of receipt
16 of the deposition transcript by you.  If you
17 fail to do so, the deposition transcript may
18 be deemed to be accurate and may be used in
19 court.
20
21
22
23
24
25