# Exhibit 101

```
                                                                          1
     H1i1tera
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     In Re: Terrorist Attacks on
 3   September 11, 2001
                                            03 MD 1570 (GBD)(SN)
 4
                                            Oral Argument
 5   ------------------------------x
                                            New York, N.Y.
 6                                          January 18, 2017
                                            11:39 a.m.
 7
     Before:
 8
                         HON. SARAH NETBURN,
 9
                                            Magistrate Judge
10
                              APPEARANCES
11
     COZEN O'CONNOR
12        Attorneys for Plaintiffs' Executive Committee
     BY:  SEAN P. CARTER, ESQ.
13        J. SCOTT TARBUTTON, ESQ.

14   KREINDLER & KREINDLER LLP
          Attorneys for Plaintiffs' Executive Committee
15   BY:  JAMES P. KREINDLER, ESQ.

16   ANDERSON KILL
          Attorneys for Plaintiffs' Executive Committee
17   BY:  JERRY S. GOLDMAN, ESQ.

18   BAUMEISTER & SAMUELS, P.C.
          Attorneys for Plaintiffs' Executive Committee
19   BY:  MICHEL F. BAUMEISTER, ESQ.

20   THOMAS E. MELLON, III, ESQ.
          Attorney for Plaintiffs Havlish and Hoglan
21
     MoloLAMKEN LLP
22        Attorneys for Defendant Dallah Avco
     BY:  ROBERT K. KRY, ESQ.
23        ERIC R. NITZ, ESQ.

24   LAW FIRM OF OMAR T. MOHAMMEDI, LLC
          Attorneys for Defendants Wamy International,
25                             World Assembly of Muslim Youth
     BY:  OMAR T. MOHAMMEDI, ESQ.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```

1   documents that were put back in Dallah City.  When the Dallah
2   City search was conducted, one of the things we located was the
3   set of Mr. Kamel's documents, and those were among the hard
4   copy documents that were searched.
5            THE COURT:  And were they produced?
6            MR. KRY:  Anything related to al-Bayoumi, yes.
7            THE COURT:  What if there was a notation in a calendar
8   entry, you know, two weeks before the letter to the PCA asking
9   for his secondment, if there was a calendar entry that said,
10  meeting with PCA minister, or whoever you would be meeting
11  with?
12           MR. KRY:  I'm not aware of a document like that
13  existing, but I do know those files were retrieved, they were
14  searched for anything related to al-Bayoumi, whether or not
15  they expressly referred to al-Bayoumi, and any responsive
16  documents located as a result of that process were produced.
17           THE COURT:  Okay.
18           MR. KRY:  Turning back to another issue you mentioned,
19  and this is the issue of the disarray in the warehouse, because
20  I think those two are different issues that are being combined
21  here.  When the project ended in 2005, the boxes with the ANSS
22  files were put in the warehouse, and then over the intervening
23  I guess 12 years now, you know, it's undeniable that other
24  affiliated companies within the Dallah Avco group put
25  additional stuff there and the warehouse fell into a bit of

1   disarray.  But there's no evidence and there's no reason to
2   think that that disarray in the warehouse somehow meant that
3   the files themselves became disorganized or lost, because the
4   files are in boxes, and those boxes had to be dug out, but they
5   were.  Two searches of the warehouse were done.  The ANSS boxes
6   were retrieved.  And that was a lot of work because of the
7   disarray in the warehouse.  But there's no reason to think that
8   once those boxes were taken out, that the files within those
9   boxes somehow became incomplete or documents got lost.  And so
10  I'm not arguing that the state of disarray in the warehouse is
11  an excuse for Dallah Avco not having to comply with its
12  discovery demands.  Obviously the litigation has been pending
13  since then.  What creates the undue burden is the fact that the
14  files within those boxes are very voluminous, and for some of
15  the things they're asking for, it's very difficult to identify
16  responsive documents.
17          And I want to turn to the Ercan and Avco Overseas
18  documents, because those are important.
19          THE COURT:  Right.  Can you tell me how large the
20  Ercan file is.
21          MR. KRY:  Right.  So there's no single Ercan file.
22  Unlike With Avco Overseas, Ercan was actually in their document
23  requests, so when we were going through the Dallah City boxes,
24  and that's like, you know, 2 or 3 million-some pages of hard
25  copy documents that were gone through manually, because we were

aware that that request was outstanding, we did segregate files relating to Ercan, whether or not they related to al-Bayoumi. Our search did not identify any documents that related to Ercan and al-Bayoumi. There is a reference in one FBI document that says that -- where an anonymous source who's not even identified claims that someone at PCA told Ercan to put al-Bayoumi on Ercan's payroll and said their contract would be jeopardized if that didn't happen. Our files didn't find anything, anything whatsoever to do with that. Now Ercan is another ANSS contract vendor and so there are documents relating to Ercan that are totally unrelated from Omar al-Bayoumi. And to give you an example, there's a bunch of documents where, for example, Ercan supplies a piece of electronics equipment, a piece of hardware to the ANSS project, and then the PCA wants to bill that back to the project and so they say, you know, Dallah Avco, pay Ercan for the expense it incurred, and then we'll pay you to the ANSS project contract. So there are a bunch of documents like that, but that has nothing whatsoever to do with this case. That said, we were mindful this request was out, so we went through Dallah City, we set this aside, so we have in total, going through those 3 million pages, we came across about 900 pages of documents relating to Ercan. That's what Mr. Carter's referring to when he says it would be no burden to produce those if that's what the Court orders, and in fact, during the course of this, we

1    had offered to produce that as part of our larger compromise.

2              The situation With Avco Overseas is different in a

3    very important way.  Their document request, despite the fact

4    that they have I think 56 different requests covering

5    everything under the sun, never once requested Avco Overseas,

6    and that's despite the fact that they knew it was a potentially

7    relevant entity.  And in fact, if you look at Exhibit J,

8    page 30 of the motion in this case, this is the FBI report.  It

9    says at the end -- there's a redaction, but I think everyone

10   agrees that at least plaintiffs contend that refers to

11   Mr. Bayoumi.

12             THE COURT:  Where are you?  Sorry.

13             MR. KRY:  This is page 31 of 32 on the ECF header at

14   the top, but it's page 30 on the bottom of the document.

15             THE COURT:  Yes.

16             MR. KRY:  So it says, redacted, "identified" redacted

17   "as a ghost employee Of Avco Overseas.  Estimated that there

18   were approximately 50 individuals carried on the books and PCA

19   or Dallah and being paid for doing nothing."  So this is not a

20   company that came out of nowhere.  It's just not true that the

21   first time they found out about this was from our papers.  Avco

22   Overseas was absolutely referenced in the 9/11 report -- I'm

23   sorry, not the 9/11 report, this FBI document.  Had they made

24   that request, we could have done the same thing for Avco

25   Overseas that we did with Ercan.  We could have set aside the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:03-md-01570-GBD-SN   Document 10549-5   Filed 11/20/24   Page 7 of 8   33
H1i1tera


...


1  stuff we came across so that we could resolve it now without
2  having to redo the entire search.  But because they never had
3  an Avco Overseas document request, we had no reason to do that.
4  We had no reason to expect that they would want those
5  documents.  The documents we did find for Avco Overseas, and
6  these are the ones from 1994, where there was a period, a brief
7  period before Mr. al-Bayoumi was seconded to the ANSS project.
8  Those documents we came across, and that was the proverbial
9  needle in the haystack.  I mean, that we came up with at the
10 very end of this manual, laborious review of 2 or 3 million
11 documents.  If we had found that at the beginning of that
12 review, then maybe we would have said, well, maybe this is
13 relevant after all and we could have started to set aside
14 documents relating to it.  But this came at the very end, your
15 Honor.
16         So the result of all this is that there's simply no
17 way to find documents relating to Avco Overseas unrelated to
18 al-Bayoumi other than repeating this incredibly laborious,
19 time-consuming, expensive, resource-intensive process that
20 Mr. Yamani describes in his declaration.
21         One of the basic requirements for a motion to compel
22 is that if you're compelling production, it has to be documents
23 you've actually asked for.  They didn't ask for these
24 documents.  We've suffered enormous prejudice as a result of
25 the fact that they didn't ask for the documents because now the

H1i1tera

1   only way to find them would be to redo a process that's been
2   incredibly laborious and time-consuming.  And so for that
3   reason, I just think there's a fundamental distinction between
4   the Ercan documents on the one hand and the Avco Overseas
5   documents on the other hand, because the Avco Overseas
6   documents have just this enormous undue burden issue.
7          THE COURT:  Okay.  I have a couple of targeted
8   questions for you.  The first has to do with the bank wire
9   transfers or checks.  It sounds like there's evidence of I
10  guess maybe paystubs, some type of payment evidence of Dallah
11  Avco to al-Bayoumi, but there's not evidence of the actual
12  transfer of funds.
13         MR. KRY:  No, there is.  I don't think there's
14  evidence -- I mean, I believe the complaint was just, it's not
15  a complete record of everything.  But there's certainly plenty
16  of documents we've produced along those lines reflecting that
17  those amounts were paid.
18         THE COURT:  I thought Mr. Carter said that there was
19  no bank transfer information.
20         MR. KRY:  We produced wire transfer applications,
21  among other documents.  There's plenty of that.  Dallah Avco's
22  function was payroll processing, and so they asked for a
23  million things that we wouldn't be expected to have.  That's
24  certainly something we would be expected to have, and we've
25  produced whatever we have.  It's definitely not a hundred