**MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES**
In re: Terrorist Attacks on September 11, 2001 (S.D.N.Y.)

**VIA ECF**

November 26, 2024

The Honorable Sarah Netburn, U.S. Magistrate Judge
U.S. District Court for the S.D.N.Y.
Thurgood Marshall U.S. Courthouse, Room 430
40 Foley Square
New York, NY 10007

      Re:    *In Re: Terrorist Attacks on September 11, 2001*, 03-md-1570 (GBD) (SN)

Dear Judge Netburn:

      The Plaintiffs' Executive Committees ("PECs") write in response to the two items filed by WAMY's counsel (ECF Nos. 10529, 10533) and in furtherance of the PECs' initial request (ECF No. 10416) that the Court authorize further inquiry to investigate the allegations in the letter that was initially docketed at ECF No. 10416-1 (the "allegations letter"). The PECs oppose the substance, assumptions, and conclusions in WAMY's letters, and contend that the assessments described in those letters are wrong, inconclusive, and unable to satisfy the Court's inquiry. The PECs also seek to provide additional context and guidance to the Court in examining the deposition video WAMY's counsel provided. Based on the existing evidence and outstanding allegations of wrongdoing, the PECs renew the PECs' previous request for the Court to authorize further inquiry to investigate the allegations and determine whether sanctions are warranted.[1]

      In considering this matter, the Court should not credit Mr. Mohammedi's untrue insinuations that the PECs had an agenda apart from resolving the serious allegations of wrongdoing. The PECs' October 9, 2024 letter (ECF No. 10416) was premised on the PECs' receipt of an unsolicited letter that raised serious allegations of improper conduct. The purpose of that letter was (a) to bring the serious allegations to the Court's attention, (b) to determine whether those allegations had merit, and (c) to consider what sanctions might be appropriate if the allegations had merit. Rather than taking the allegations as true and seeking sanctions at the outset, the PECs proposed the measured approach of asking the Court to authorize an "inquiry to investigate the allegations and determine whether sanctions are warranted." ECF No. 10416 at 4. Contrary to Mr. Mohammedi's characterizations of the PECs conduct (ECF No. 10533), the PECs received unsolicited but serious allegations, brought those to the attention of defense counsel, and then brought them to the Court's attention to determine

---

[1] Although this letter addresses both letters from two sets of lawyers retained by WAMY—viz., the November 12, 2024 letter from Marcus A. Asner of Arnold & Porter (ECF No. 10529) and the second letter from WAMY's longtime MDL counsel, Omar T. Mohammedi, also filed on November 12, 2024 (ECF No. 10533)—we do not address the multiple extraneous, tangential issues raised in Mr. Mohammedi's letter. By not addressing them, we do not accede to the truth of Mr. Mohammedi's extraneous assertions. Instead, we view them to be a distraction from the important issue addressed to the Court's attention, unnecessarily complicating what should be a straightforward inquiry into the issue surrounding the engagement of Mr. Marks and the conduct of his July 22, 2021 deposition. If the Court finds any merit to connecting any aspect of the various issues Mr. Mohammedi raised to the allegations the Court is investigating, the PECs ask for the opportunity to address those to the Court's attention separately.

The Honorable Sarah Netburn
November 26, 2024
Page 2

_____

whether the allegations have merit and warrant sanctions. The PECs had no other agenda, notwithstanding Mr. Mohammedi's insinuations.

The two advocacy letters that WAMY's retained counsel filed pursuant to the Court's permission to respond to the allegations of wrongdoing do not come close to demonstrating a sufficient inquiry into those allegations. The Court authorized WAMY to respond to the allegations and required WAMY to include in its response "a complete description of any related investigation conducted by Baker Tilly, who participated in such investigation, and the findings, if any." ECF No. 10421. The PECs contend that neither of the letters WAMY submitted demonstrates an adequate, or independent, investigation into the allegations raised in the allegations letter, or the observations made from the video of Mr. Marks' deposition, as addressed below.

**A.     The assessments WAMY's counsel reported are flawed, inconclusive, and fail to resolve the allegations.**

At least ten major flaws with the assessments WAMY's counsel reported show why the assessments are wrong and do not satisfy the Court's inquiry. WAMY's proposal that the Court should rely upon their one-sided, interest-laden "investigation" should be rejected outright. While WAMY certainly should have conducted its own review of the circumstances, and surely had good advocacy reasons to submit its assessment to the Court, the Court should not accept WAMY's self-interested assessment as the end of the inquiry. It has too many flaws and leaves too many questions unanswered.

Among the many flaws are those summarized below.

1.     **The advocacy letters do not substitute for the adversarial system or for an independent inquiry**. The letters from the two retained counsel are advocacy, setting forth only WAMY's response to the serious allegations. Mr. Asner and Mr. Flaherty are retained counsel, with obligations to represent their clients' interests, conducting and presenting their investigations and their results with the advocacy necessary to protect those interests. Mr. Mohammedi is also retained counsel for WAMY, with similar interests. But in addition, because the allegations include alleged wrongdoing attributable to Mr. Mohammedi, individually, he writes as a lawyer with his own interests to protect, as well.

Although Mr. Asner's letter (ECF Nos. 10529) is framed in a manner that might suggest the investigations and reporting by Mr. Asner and Mr. Flaherty should be viewed as independent investigations that suffice to answer the Court's inquiry, that cannot be so. Accounts of investigations conducted by retained counsel at the behest of interested parties and recounted to the Court in advocacy letters cannot substitute for the adversarial process that would allow for the relevant facts to be ferreted and tested.

2.     **The language throughout Mr. Asner's letter ultimately dodges any finding; instead, simply acknowledging that based on their own review done for clients whose interests they represent, they could not verify the allegations**. The letter from Mr. Asner is rife with language that hedges the "findings" in the letter. For example, throughout the letter he couches "findings" with terms such as "failed to uncover," "uncovered no evidence," "did not substantiate," "uncovered no support," "no witness substantiated," "we identified no instance," "no indication of," "did not uncover," and "no *improper* coaching" ECF No. 10529 (emphasis added). The last example, that the

investigation "uncovered no evidence" of "*improper* coaching," parses words unnecessarily to beg the question as to what evidence of "*proper* coaching" was identified but discarded from consideration. More generally, though, where the inquiries were conducted by retained counsel for interested parties, and presented in advocacy form, with the numerous biases and investigatory limits and flaws identified here, the investigators' failure to "uncover" damaging evidence or to "substantiate" allegations provides the Court with no affirmative information to address the allegations in the letter or the conduct that appears to have occurred during the July 22, 2021 deposition of Mr. Marks.

3. **In contrast to Mr. Asner's cautious hedging, Mr. Mohammedi's letter (in addition to being prone to tangents) is rife with an interested party's blanket denials and assertions**. Despite the caution Mr. Asner exercised, Mr. Mohammedi characterizes Mr. Asner's letter as making more concrete findings: using phrases like: "[o]utside investigation … show that the allegations … are unfounded," asserting that the investigations' findings as to whether anyone provided Marks answers was "emphatically 'no!'", "noting that [Mr. Asner's] review of the video evidence does not support PECs [sic] characterization." ECF No. 10533 at 1, 3, 4 n. 17. Mr. Mohammedi does, however, hedge his language in certain places. For example, when he suggests that the interviews Mr. Asner and Mr. Flaherty conducted "confirmed" that "[n]o one wrote any answer on a white board," he states it was "confirmed by everyone … who was interviewed as part of the investigations into the allegations." But Mr. Mohammedi is careful to omit that no one interviewed Mr. Goldberg, who was also present at the deposition. But even this statement mischaracterizes Mr. Asner's more cautious phrasing, which actually says "[n]o witness substantiated that allegation" ECF No. 10529 at 5. Without having more knowledge about the interview process—*e.g.*, knowing what questions were and were not asked of the interviewees, or whether answers were tested—it is impossible to know whether the absence of "substantiation" means anything.

4. **Mr. Mohammedi makes unreasoned assertions that the entire allegations letter is "unreliable," "uncorroborated," and that it is cobbled from the public docket to bolster the Plaintiffs' arguments**. His assertions ignore that (1) the allegations letter was unsolicited, (2) the letter came from an anonymous source, and (3) the letter contains two key facts that were neither public nor known to any Plaintiffs' counsel and that have already been corroborated. Before the PECs received the letter, it was unknown to the public or to any Plaintiffs' counsel that two unidentified people were in the deposition room, or that those two people were Guzman and Goldberg. Only someone with internal knowledge would have had that information. That alone destroys Mr. Mohammedi's absurd conspiracy-theory characterization of the allegations letter. In addition, the PECs contend that this corroboration provides support for the reliability of the other serious allegations in the allegations letter.

5. **WAMY's accounts of the investigations do not demonstrate that the investigations were conducted in a manner to reach a reliable conclusion on any of the allegations.** None of the "interviews" recounted in the letters were conducted under oath, leaving each of the interviewed subjects able to avoid telling the truth without consequence. Nearly all the interviewees had self-interest in the allegations not being substantiated, and there is no indication that this self-interest was recognized, addressed, or accounted for in the process. The accounts of the interviews do not recount what questions were asked of the interviewees, what may not have been asked, what "cross-examination" or fact-checking was conducted to ensure that the interviewees told the truth, and what follow-up questions and responses ensued.

The Honorable Sarah Netburn
November 26, 2024
Page 4

_____

In addition, almost nothing is known about the investigation purportedly conducted by Baker Tilly or its retained counsel, notwithstanding the Court's Order requiring WAMY to provide "a complete description of any related investigation conducted by Baker Tilly." ECF No. 10421. The frailties associated with the WAMY assessments also apply to what Baker Tilly did, but with the added challenge that what Baker Tilly is purported to have done was reported to the Court only indirectly through WAMY, leaving uncertainties about the accuracy of the reporting.

6. **Not every witness identified in the allegations letter was interviewed—specifically, Mr. Goldberg was not contacted**. A significant omission from the list of individuals who were interviewed by WAMY's counsel is one of the Baker Tilly employees who was present, but not identified on the record, at the deposition: Mr. Goldberg. Accordingly, neither the PECs nor the Court know what he saw, or how his account may call into question the statements of the other interviewees.

7. **Nothing reported in either letter indicated that the investigating lawyers identified or spoke to the author of the allegations letter**. Without speaking to the author of the allegations letter, neither the PECs nor the Court knows the evidence that caused the author to assert the allegations in the allegations letter, or how his or her account may call into question the statements of the other interviewees.

8. **Neither Mr. Asner nor Mr. Flaherty has the knowledge of the 20-year-old ongoing litigation, nor the subject area, nor of the specific claims against WAMY, to properly assess the records reviewed to make any "finding" as to whether information considered was damaging to WAMY**. For example, they lack the experience to fully assess: (a) whether any information in the records reviewed identified financial improprieties consistent with terrorism, terror financing, or other material support; (b) what information the author of the letter would have considered "damaging evidence against WAMY," or (c) what the author would have considered "things that would draw to a conclusion that WAMY was involved in financing the 9/11 terrorist attacks." (ECF No. 10416-1). Relatedly, relying on either WAMY counsel or Baker Tilly to identify for counsel evidence that they are alleged to have been responsible for withholding —disclosure of which would be against the penal interest of both WAMY and Baker Tilly— would lead to a deficient investigation.

9. **Relatedly, neither Mr. Asner nor Mr. Flaherty has knowledge of the history of the litigation to fact-check information provided in the interviews**. For example, Mr. Asner's letter (as does Mr. Mohammedi's letter) goes to extraordinary lengths to excuse WAMY's lawyers for violating the Court's Deposition Protocol[2] by not identifying Guzman and Goldberg as being present at the deposition. Both suggest that the reporter and Plaintiffs' counsel had the obligation to affirmatively ensure defense counsel's obligation to comply with the Protocol, and insist that WAMY's lawyers inadvertently violated the Protocol.

_____

[2] ECF No. 3894, ¶ 51 requires that "[e]ach witness, attorney, and other person attending the deposition (in person, electronically, or telephonically) shall be identified on the record at the commencement of the deposition" and ¶ 72, requires that "all persons present in the location with the deponent shall be identified on the deposition record and shall not by word, sign, or other means coach or suggest answers to the deponent and shall act in accordance with applicable Federal Rules of Civil Procedure and rules of professional conduct governing interaction with the deponent."

The Honorable Sarah Netburn
November 26, 2024
Page 5

_____

     The extreme measures taken to exculpate WAMY's counsel for admitted Protocol violations is telling. The comment in Mr. Asner's letter that "[t]here … is no indication that appearances were requested or taken off of the record" (ECF No. 10529 at 4) reveals the inadequacy of the lawyers' inquiry. It shows that the questioning of the interviewees was inadequate to address the issue, that the WAMY lawyers did not reveal the practice applied throughout MDL depositions, and that the review of the transcripts did not identify the obvious indications that the court reporter and counsel complied with the Protocol (except, tellingly, WAMY's lawyers' failure here).

     Thorough investigation would have shown that the reporter and counsel regularly complied with the Protocol. For example, WAMY counsel could have inquired of the court reporter or other counsel in the litigation. Either approach would have disclosed (as inquiry of WAMY's own MDL lawyers should have revealed) the practice throughout the litigation has been for the reporter to take appearances before the start of the deposition to be placed on the record, either at the start of the Zoom meetings before the video starts or the reporter begins transcribing (similar to what happens in court hearings), or in the chat feature of Zoom, or via e-mail. Where lawyers had additional persons present, the lawyers (as officers of the Court) were obligated to make the presence of additional persons known so that the reporter could note their presence on the record. The court reporter and questioning counsel had no obligation to second guess the compliance of each of the other counsel. Here, the only attorneys aware of the presence of Guzman and Goldberg were WAMY's counsel, who admit that they did not comply with the Protocol.

     Evidence of general compliance with the Protocol is contained in the records that WAMY counsel submitted for the Court's consideration. For example, for the July 22, 2021 Marks deposition, in addition to the appearance of WAMY's own counsel, Jill L. Mandell (who appeared remotely and did not speak on the record), the transcript notes the appearances of seven additional lawyers who are noted as appearing but who do not speak on the record (ECF No. 10533-14, at 2-5)(noting the appearances of Jill L. Mandell, J. Scott Tarbutton, Jerry S. Goldman, Jodi Westbrook Flowers, C. Ross Heyl, Eric Snyder, Gabrielle Pritsker, and Sumaayya Khattib). The transcript also notes that the individuals "ALSO PRESENT" at the deposition included "Linda Hoffman, Legal Assistant, Jones Day." (*Id.* at 4). The practice of noting appearances, even of counsel who did not speak at depositions, is represented throughout the depositions WAMY counsel provided for the Court's consideration. *See generally* ECF Nos. 10533-1 to -18. Even more to the point, the samples WAMY provided also show that the court reporter and counsel adhered to the Protocol by identifying others who were "ALSO PRESENT." *See, e.g.,* ECF Nos. 10533-1 at 3; 6; 10533-5 at 3; 10533-6 at 3-4; 10533-7 at 3; 10533-8 at 3; 10533-9 at 4, 12; 10533-13 at 6; 10533-18 at 6.

     WAMY counsel's knowledge of the Protocol, knowledge of its application, coupled with its acknowledged noncompliance and misleading attempts to excuse and conceal the breach are strong evidence of intent. First, when initially confronted with the discovery that the Protocol was violated, WAMY counsel responded that "absolutely nothing improper occurred" (ECF No. 10418-2) and instead accused Plaintiffs' counsel of engaging in "gamesmanship" (ECF No. 10418-4). From the moment Plaintiffs' counsel brought the issue to WAMY counsel's attention, and continuing throughout the inquiry, WAMY's response has been to attack Plaintiffs' counsel. Even after they eventually acknowledged the breach, WAMY's counsel falsely represent that their conduct was the norm throughout the litigation. It was not. Moreover, the fact that Guzman and Goldberg, the two individuals secretly at the deposition, are positioned to not be (intentionally) seen or heard on the

The Honorable Sarah Netburn
November 26, 2024
Page 6

_____

video and are never referenced as being in the room (despite Goldberg being referenced 19 times in Mark's testimony), is too convenient to suggest this was unintentional. Finally, Marks' furtive gestures, quick glances, and at times long looks, to check with others in the room (summarized *infra*) are strong evidence that the violation of the Protocol was intentional.

10.  **The investigation does not adequately address the 10-page letter and whistleblower accusation identified in item 13 of the allegations letter**. Although Mr. Asner's letter inserts additional text to suggest that the whistleblower accusation at Baker Tilly concerned only the time and billing issue raised in the allegations letter, the allegations letter does not suggest that and the context of the allegations letter suggests that when the author referred, in item 13, to going to Baker Tilly senior management "with these claims," the author was referring to all (or most) of the preceding claims in items 1-12, and not just the time and billing references interspersed in items 3, 4, 6, 7, 10, and 11, along with the other "claims" of wrongdoing. An investigation of the allegations must include physical review of the 10-page letter and whistleblower accusation identified in items 13 of the allegations letter. We should not be required to rely on second-hand accounts of those physical (or electronic) letters.

B.     **Examination of the deposition video demonstrates multiple indicia consistent with the allegations in the allegations letter.**[3]

Based on review of the four videos, the PECs' assessment of the orientation of the room is mostly consistent with Mr. Asner's description at ECF No. 10529 at 5. The video shows Marks seated at one short side of a long table, with a glass wall and entrance door behind him, and two video screens in front of him.[4] WAMY counsel Fred Goetz, who defended Marks in the deposition, was seated to Marks' left, at the long side of the table closest to Marks' left, partially obstructed from Marks' view by one of the screens.[5] WAMY counsel Omar Mohammedi was seated on the opposite side of the table from Goetz (on Marks' right side), farther away from Marks, toward the opposite side of the table from Marks.[6] The PECs differ slightly from Mr. Asner's description of the seating location of

_____

[3] The videos cited here are the four MPG video files (.mpg) that WAMY's counsel made available to the Court on November 12, 2024, via an FTP link. Citations are made in the following two formats: Video:Hour:Minute:Second, corresponding to the time on the MPG file and Hour:Minute:Second AM/PM, corresponding to the time of day shown on the screen.

[4] For reference to where Marks' line of sight is when he looks at the screen for the deposition, *see, e.g.*, 1:0:40:49 (9:41:21 AM) (*i.e.*, the first .mpg file, at 0:40:49). A screen capture of this reference point is attached as **Exhibit A**. Also, for reference to where his line of sight is when Marks looks at the hard copy of his own report, *see, e.g.* 1:0:38:47 to 1:0:39:17 (9:39:18 AM to 9:39:49 AM). A screen capture of this reference point is attached as **Exhibit B**.

[5] Goetz' position relative to Marks can be discerned based on the following segments of the video: 1:0:00:22 to -33 (9:00:53 AM to 9:01:02 AM); 1:0:22:42 to -58 (9:23:14 AM to 9:23:30 AM) (Marks looks to his left to Goetz, showing point of reference for line of eyesight to Goetz); 1:0:23:11 to -14 (9:23:43 AM to 9:23:45 AM) (Marks looks to his left to speak to Goetz); 1:0:46:22 to -47 (9:46:54 AM to 9:47:19 AM) (Goetz appears on screen from Marks' left); 2:1:01:45 to -47 (11:20:54 to 11:20:57 AM) (Marks leans to his right to look left to speak to Goetz).

[6] Mohammedi's position relative to Marks can be discerned based on the following segments of the video: 1:0:43:06 to -23 (9:43:38 AM to 9:43:54 AM) (Mohammedi appears in reflection over Marks' right shoulder,

The Honorable Sarah Netburn
November 26, 2024
Page 7

---

the other two men. Although the video does not clearly depict which man sat in which seat, it shows that one of the two men sat at the opposite end of the table, near Mr. Mohammedi, and the other sat near Marks to his right.[7]

In our review of the video, we identified hundreds and hundreds of instances of Marks looking to his right seemingly to look for help. Because all the material essential to the deposition—the computer screens, his hard copy papers, and the defending lawyer—are all from the center of his eyeline to his left, his persistent attention to his right is suspicious. The glances are often quick; other times they are long. But the conduct is pervasive—not isolated—throughout the deposition. In our review, the PECs saw, but sought to omit from our assessment, instances where Marks appeared to be randomly looking in a direction to collect thoughts, as WAMY's counsel characterized the looks at others in the room. But the instances we identified were too many and inconsistent with WAMY's counsels' characterization, with Marks' darting his eyes, craning his neck, looking long down the table.

Attached as **Exhibit C** to this letter is a collection of still screen captures that show 837 instances of Marks looking right, appearing to look for help. Each screen capture shows Marks looking either down the long table or to the seat next to him, where Mohammedi, Goldberg, and Guzman were situated, or (in a few instances) at the table surface next to him, where he appears to have been

---

stands, moves around the opposite end of the table from Marks' position as seen in a second reflection over Marks' left shoulder, then passes behind Marks from his left, and exits the room, with the starting point indicating where Mohammedi is reflected during the deposition); 1:0:46:54 to 1:0:47:13 (9:47:25 AM to 9:47:44 AM) (Mohammedi returns to the room and to his seat, showing where he re-seats at 1:0:47:09 to -13 (9:47:25 AM to 9:47:44 AM)); 1:0:51:34 to -43 (9:52:08 AM to 9:52:14 AM) (Marks looks to his right at Mohammedi as Mohammedi speaks, showing Marks' line of sight to Mohammedi); 2:1:20:22 to -37 (11:39:32 AM to 11:39:47 AM) (Mohammedi appears in the reflection over Marks' right shoulder, standing, moving directly to the door, passing behind Marks from his right and exits the room); 2:1:23:25 to -28 (11:42:34 AM to 11:42:38 AM) (Mohammedi returns to the room, passing behind Marks to Marks' right); 3:0:30:40 to -42 (12:36:53 PM to 12:36:55 PM) (Marks looks at Mohammedi when Mohammedi objects); 3:0:33:46 to -59 (12:39:59 PM to 12:40:12 PM) (Marks looks at Mohammedi when Mohammedi interjects, and exchanges words with Mohammedi).

[7] The position of one man, Goldberg or Guzman, is most discernable based on the segment while Mohammedi left the room, between 2:1:20:41 (11:39:51 AM) and 2:1:23:26 (11:42:35 AM). During that period, a second figure is seen moving in the reflection near where Mohammedi had been seated, and Marks continues to look in that direction. The position of a second man, Guzman or Goldberg, is discernable based on the following sample segments: 1:0:51:40 to -55 (Marks' attention is diverted from looking at Mohammedi as Mohammedi speaks, farther to the right of his line of sight with Mohammedi, and from 1:0:51:43 to -55 (9:52:15 AM to 9:52:26 AM) he leans to his right, appearing to look at and communicate with someone in the seat to his right); 1:0:41:55 to -57 (9:42:26 AM to 9:42:29 AM) (Marks looking toward the seat to his right); 1:1:07:18 to -21 (10:07:50 AM to 10:07:53) (same); 1:1:09:45 to -48 (10:10:16 AM to 10:10:20 AM) (same); 2:0:02:44 (10:21:53 AM) (same); 2:0:51:40 (11:10:50 AM) (same); 2:0:52:38 (11:11:48 AM) (same); 2:0:59:02 to -05 (11:18:11 AM to 11:18:15 AM) (same); 3:0:14:46 to -54 (12:21:00 PM to 12:21:08 PM) (same); 4:1:21:01 to -04 (3:21:17 PM to 3:21:20 PM) (same): 4:1:22:28 to -33 (3:22:44 PM to 3:22:49 PM) (same).

The Honorable Sarah Netburn
November 26, 2024
Page 8

---

looking at something on the table to his right.[8] The screen captures do not show *every* instance of Marks' looking to Mohammedi, Goldberg, and Guzman, but offer ample evidence of the conduct.

While the screen captures indicate the sheer numerosity of instances of Marks looking toward Mohammedi, Goldberg, and Guzman (which alone raises red flags), close assessment of the video surrounding these screen captures is important to observe the degree to which the video is consistent with the allegation that Marks was being helped by people in the room. Examining the video will allow a viewer to see Marks' eyes shift from one person to another,[9] his gestures such as nods,[10] smiles,[11] neck-craning,[12] and other gestures,[13] and other indicia[14] that Marks continued to communicate with others in the room throughout the deposition.

Although it is not feasible to address every instance of Marks' pervasive conduct, several of the segments help demonstrate the point. For example, one telling segment in the video includes a portion of the deposition where Marks struggles to respond to questions about passages his report attributes to Plaintiffs' experts, but which are not in Plaintiffs' experts' reports. *See* 2:1:10:49 to 2:1:23:26 (11:29:59 AM to 11:42:35 AM).

In the span of that approximately 12½ minute period, while struggling to answer why the text was attributed to Plaintiffs' experts, Marks looks to Goldberg, Guzman, and Mohammedi on at least 33 occasions,[15] at times appearing to stall to allow for help to come. In one instance, after a lengthy

---

[8] *See, e.g.*, 1:0:54:55 to -58 (9:55:27 AM to 9:55:30 AM); 3:0:31:56 to 3:0:32:01 (12:38:09 PM to 12:38:14 PM); 2:0:08:39 to -41 (10:27:48 AM to 10:27:50 AM) (looks to table surface to his right after rustling sound); 2:0:37:26 to -29 (10:56:36 AM to 10:56:39 AM) (same); *see also* 3:0:31:22 to -29 (12:37:35 PM to 12:37:42 PM) (Marks appears to scan up and down table surface to his right).

[9] *E.g.*, 1:0:50:51 to -52 (9:51:22 AM to 9:51:24 AM) (example showing Marks' eyes shifting to two different locations across the table); 2:0:52:45 to -50 (11:11:55 AM to 11:12:00 AM) (Marks' eyes shift to multiple locations before responding; compare 52:45 to -47, with 52:48 to -49, with 52:49 to -50); 3:0:32:58 to 3:0:33:01 (12:39:11 PM to 12:39:14 PM) (Marks' eyes shift to different locations before answering); 3:0:33:32 to -35 (12:39:45 PM to 12:39:48 PM) (same); 4:0:54:36 to -40 (2:47:12 PM to 2:47:15 PM) (Marks' eyes shift right before coming center to respond).

[10] *E.g.*, 2:0:38:22 to -29 (10:57:31 AM to 10:57:38 AM); 2:0:47:02 to -05 (11:06:13 AM to 11:06:14 AM); 3:0:22:37 to -39 (12:28:50 PM to 12:28:51 PM); 3:0:41:07 to -15 (12:47:20 PM to 12:47:28 PM); 3:0:47:55 to -57 (12:54:08 PM to 12:54:10 PM); 3:0:52:23 to -25 (12:58:36 PM to 12:58:38 PM); 4:1:10:59 to 4:1:11:00 (3:11:15 PM) (Marks does a double-take to the back of the room).

[11] *E.g.*, 2:0:27:15 to -18 (10:46:25 AM to 10:46:28 AM); 2:0:38:22 to -29 (10:57:31 AM to 10:57:38 AM).

[12] *E.g.*, 3:0:42:20 to -22 (12:48:33 PM to 12:48:36 PM); 4:1:11:18 to -20 (3:11:34 PM to 3:11:36 PM).

[13] *E.g.*, 3:0:59:09 to -13 (1:05:22 PM to 1:05:26 PM) (Marks gestures to person seated to his right); 4:0:14:02 to -03 (2:06:37 PM to 2:06:38 PM) (same); 4:0:35:05 to -07 (2:27:40 PM to 2:27:42 PM) (same).

[14] *E.g.*, 4:0:41:20 to -24 (2:33:40 PM to 2:34:00 PM) (when asked about a date, Marks pauses before answering, then starts to answer that the date may be 1994, but after a bang sound, he looks right and changes his answer to 1995); 2:0:52:42 to 2:0:53:00 (11:11:52 AM to 11:12:10 AM) (when asked whether he knew if an event he referenced in his report ever actually happened, Marks looked around the room appearing to look for help answering, before acknowledging that he did not know).

[15] *See* 2:1:10:54 (11:30:04 AM); 2:1:11:26 (11:30:35 AM); 2:1:11:36 (11:30:46 AM); 2:1:12:01 (11:31:10 AM); 2:1:12:05 (11:31:14 AM); 2:1:12:16 (11:31:25 AM); 2:1:12:23 (11:31:32 AM); 2:1:12:32 (11:31:41 AM); 2:1:12:55

The Honorable Sarah Netburn
November 26, 2024
Page 9

---

pause in answering, purportedly to address technical issues loading documents on the screen before him, Marks peers over his screen multiple times, before and while responding, to where others can be seen in the reflection. *See* 2:1:19:05 to -22 (11:38:15 AM to 11:38:32 AM); *see also* 2:1:19:24 to 2:1:26:16 (11:38:34 AM to 11:45:26 AM) (extended period during which Marks appears to stall and repeatedly glance toward Goldberg and Guzman for help). During this period of Marks' slow responses, the images in the reflection, where Marks was repeatedly glancing, were consistent with the allegations of a whiteboard being used to help Marks answer questions (2:1:18:34 to 2:1:19:48 (11:37:44 AM to 11:38:58 AM)).[16] Also, in two instances during this period of questioning, an additional voice presents (though not picked up on the transcript). *See* 2:1:12:54 to -55 (11:32:04 AM to 11:23:05 AM) (voice whispers, *possibly* "did you," questioning whether Marks saw the document being discussed); 2:1:16:25 to -29 (11:35:35 AM to 11:35:39 AM) (muffled voice speaks and Marks looks toward the opposite end of the long table, where Mohammedi and another person are); *see also* 1:0:50:13 to -15 (9:50:44 AM to 9:50:46 AM) (voice that sounds as though it was captured from Marks' microphone says "four months," confirming Marks' answer).

Perhaps the most telling segment is three minutes of the second .mpg file between 2:1:20:22 and 2:1:23:26 (11:39:32 AM to 11:42:35 AM). Just before the start of the segment, Marks is asked to locate in one of Plaintiffs' experts' reports text that Marks' report misattributes to Plaintiffs' expert. *See* 2:1:19:25 to -39 (11:38:34 AM to 11:38:49 AM). Just in the 14 seconds it took to ask the question, Marks looked twice toward help. 2:1:19:30 to -33 (11:38:40 AM to 11:38:43 AM); 2:1:19:37 to -38 (11:38:47 AM to 11:38:48 AM). Marks then began what seemed to be a lengthy stalling period, telling the questioning lawyer, "Give me just one second. I'm just – I'm looking at this." But even in the middle of making that comment, Marks steals another glance down the table for help. 2:1:19:58 to 2:1:20:00 (11:39:08 AM to 11:39:09 AM). Mohammedi stands and leaves the room (2:1:20:22 to -37 (11:39:32 AM to 11:39:46 AM) and remains absent until 2:1:23:26 (11:42:35 AM).

While Mohammedi is absent, the person across the room from Marks—Goldberg or Guzman—is seen moving in a manner that is, again, consistent with the allegations of someone writing on a whiteboard, 2:1:20:53 to 2:1:23:26 (11:40:02 to 11:42:35 AM),[17] while Marks appears to continue

---

(11:32:04 AM); 2:1:13:06 (11:32:16 AM); 2:1:13:09 (11:32:18 AM); 2:1:13:20 (11:32:30 AM); 2:1:13:51 (11:33:00 AM); 2:1:13:56 (11:33:05 AM); 2:1:13:58 (11:33:08 AM); 2:1:14:09 (11:33:18 AM); 2:1:15:03 (11:34:13 AM); 2:1:15:10 (11:34:19 AM); 2:1:16:59 (11:36:09 AM); 2:1:19:05 (11:38:15 AM); 2:1:19:13 (11:38:23 AM); 2:1:19:21 (11:38:31 AM); 2:1:19:30 (11:38:40 AM); 2:1:19:37 (11:38:47 AM); 2:1:19:41 (11:38:51 AM); 2:1:19:54 (11:39:04 AM); 2:1:19:58 (11:39:08 AM); 2:1:20:42 (11:39:52 AM); 2:1:20:52 (11:40:02 AM); 2:1:21:07 (11:40:16 AM); 2:1:22:17 (11:41:27 AM); 2:1:22:23 (11:41:33 AM); 2:1:23:21 (11:42:31 AM).

[16] Based on WAMY's previous submissions, the PECs anticipate WAMY's counsel will dispute that the image reflects a person using a whiteboard. The PECs' assessment, however, is that the activity seen in the image is consistent with the allegations in the allegations letter of whiteboard usage. A viewer could find that the person seen in the reflected image was writing on a whiteboard and Marks was looking at and reading what was on that board. Where there continue to be outstanding allegations from the allegations letter that the conduct occurred, WAMY's counsel should not be easily dismissive of what appears in the reflection.

[17] *See* n. 9. We end our citation at the point that Mohammedi re-entered the room at 2:1:23:26 (11:42:35 AM). When Mohammedi re-entered, he left the door ajar, which prevented the reflection from showing the activity for a period until the door was later closed. Although not intended as an all-inclusive list, additional segments with reflected images consistent with whiteboard use may appear at 2:0:16:18 to 2:0:17:42 (10:35:28 AM to 10:36:52 AM); 2:1:08:29 to -42 (11:27:39 AM to 11:27:52 AM); 3:0:39:15 to -22 (12:45:29 PM to 12:45:35 PM).

The Honorable Sarah Netburn
November 26, 2024
Page 10

_____

to stall and steal glances in that direction for help. Seconds after Mohammedi leaves the room, Marks' eyes dart right, toward the back of the room (2:1:20:42 to -45 (11:39:52 AM to 11:39:55 AM)), and he continues to steal at least eight more glances in the nearly seven minutes (1:19:33 to 1:26:16) he struggled to answer one question.[18] At one point during the questioning, while Marks is explaining that he is having trouble finding information in his own report, a banging sound is heard on the video recording. 2:1:22:17 to -22 (11:41:27 AM to 11:41:32 AM). Marks abruptly stops speaking, turns to look toward where the figure in the reflection is located. After spending time seemingly reading something (2:1:22:17 to -34 (11:41:27 AM to 11:41:44 AM)), Marks turns back to his report and begins reading from a location in his report that he thought responded to the question (2:1:22:34 to 2:1:23:22 (11:41:44 AM to 11:42:32 AM). In short, it appeared that the banging sound was to catch Marks' attention so that someone could show him where in his report to find an answer to the question.

**Conclusion**

Given the serious and outstanding nature of the allegations in the allegations letter, the inconclusiveness of the WAMY-reported inquiries, and the existing substantiating information from the deposition video, the PECs renew the request for the Court to authorize discovery to investigate the allegations and determine whether sanctions are warranted. WAMY's response about all the allegations in each area of inquiry (*e.g.*, deposition wrongdoing, evidence, and timekeeping) are all inconclusive. Thus far, each of WAMY's responses has been shown wrong, while the allegations in the letter have been shown to be correct. WAMY initially denied any of the alleged wrongdoing and has now said no available information "substantiates" the allegations. But the allegations about the two undisclosed deposition attendees (including their previously undisclosed identities) are true and the video provides ample substantiating evidence of the alleged wrongdoing during the deposition. Because the allegations have thus far been shown to be accurate, and the evidence continues to substantiate those allegations, the PECs ask that the Court authorize the inquiry the PECs previously requested.

Respectfully submitted,

MOTLEY RICE LLC

By: */s/ Robert T. Haefele*
ROBERT T. HAEFELE
28 Bridgeside Boulevard
Mount Pleasant, SC 29465
Tel.: (843) 216-9184
Email: rhaefele@motleyrice.com
*For the Plaintiffs' Executive Committees*

cc:     The Honorable George B. Daniels, via ECF
        All Counsel of Record (via ECF)

_____

[18] *See* 2:1:20:52 to -53 (11:40:02 AM to 11:40:03 AM); 2:1:21:07 to -08 (11:40:16 AM to 11:40:18 AM); 2:1:22:17 to -22 (11:41:27 AM to 11:41:32 AM); 2:1:22:23 to -34 (11:41:33 AM to 11:41:43 AM); 2:1:23:21 to -24 (11:42:31 AM to 11:42:33 AM); 2:1:23:52 to -56 (11:43:01 AM to 11:43:05 AM); 2:1:25:36 to -43 (11:44:46 AM to 11:44:52 AM); 2:1:26:15 (11:45:24 AM to 11:45:25 AM).