## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br>ECF Case |

This document relates to:

*Underwriting Members of Lloyd's Syndicate 2, et al. v. Al Rajhi Bank, et al.*, No. 16-cv-07853
*Addesso, et al. v. Kingdom of Saudi Arabia, et al.*, No. 16-cv-09937
*Aguilar, et al. v. Kingdom of Saudi Arabia, et al.*, No. 16-cv-09663
*Hodges, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-00117
*Aiken, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-00450
*Charter Oak Fire Insurance Co., et al. v. Al Rajhi Bank, et al.*, No. 17-cv-02651
*Abarca, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-03887
*Arrowood Indemnity Co., et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-03908
*Abedhajajreh, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-06123
*Muenchener Rueckversicherungs-Gesellschaft Aktiengesellschaft in Muenchen, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-07914
*Abbate, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-08617

## PLAINTIFFS' "CORRECTED" AVERMENT OF JURISDICTIONAL FACTS AND EVIDENCE AND/OR STATEMENT OF FACTS PURSUANT TO RULE 56.1

December 6, 2024

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br>ECF Case |

This document relates to:

*Underwriting Members of Lloyd's Syndicate 2, et al. v. Al Rajhi Bank, et al.*, No. 16-cv-07853
*Addesso, et al. v. Kingdom of Saudi Arabia, et al.*, No. 16-cv-09937
*Aguilar, et al. v. Kingdom of Saudi Arabia, et al.*, No. 16-cv-09663
*Hodges, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-00117
*Aiken, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-00450
*Charter Oak Fire Insurance Co., et al. v. Al Rajhi Bank, et al.*, No. 17-cv-02651
*Abarca, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-03887
*Arrowood Indemnity Co., et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-03908
*Abedhajajreh, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-06123
*Muenchener Rueckversicherungs-Gesellschaft Aktiengesellschaft in Muenchen, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-07914
*Abbate, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-08617

## PLAINTIFFS' "CORRECTED" AVERMENT OF JURISDICTIONAL FACTS AND EVIDENCE AND/OR STATEMENT OF FACTS PURSUANT TO RULE 56.1

Plaintiffs in the above-referenced actions ("Plaintiffs") submit this "CORRECTED" Averment of Jurisdictional Facts and Evidence, and/or Statement of Facts Pursuant to Fed. R. Civ. P. 56.1, in further support of their claims against Al Rajhi Bank ("ARB").

## I.     The Second Circuit's Decision and Mandate

1.      On October 15, 2019, the Second Circuit Court of Appeals reinstated Plaintiffs' claims against ARB and remanded ARB for jurisdictional discovery.

2.      The Second Circuit explained that Plaintiffs "principally allege that Al Rajhi Bank provided financial services and donations to charities that it knew financially supported al Qaeda and provided financial services to known extremist operatives. They further allege Al Rajhi Bank's provision of financial services was done with the specific intent to further al Qaeda's terrorism against the United States." *Underwriting Members of Lloyd's Syndicate 2 v. Al Rajhi Bank*, 779 F. App'x 66, 68 (2d Cir. 2019) ("Remand Order").

3.      The Second Circuit held that Plaintiffs had proffered facts sufficient to establish ARB's intent, for purposes of the Second Circuit's purposeful direction test in terrorism cases, finding that Plaintiffs' "allegations related to Al Rajhi Bank's specific intent to further terrorism in the United States, however, distinguishes the present case from those in which we have not granted personal jurisdiction and warrants jurisdictional discovery. Construing all reasonable inferences in favor of the Plaintiffs-Appellants, the support alleged here, in conjunction with this

1

*Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI*

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

specific intent, we believe is 'more direct and one step closer to al Qaeda' when compared to the support we have previously found inadequate." *Id.* at 68-69 (*citing In re Terrorist Attacks on September 11, 2001,* 714 F.3d 659, 678 (2d Cir. 2013) ("*Terrorist Attacks VII*")).

4.　　The Second Circuit directed that jurisdictional discovery should be conducted to develop the factual record on four issues: "'(1) when the alleged support was given to al Qaeda, (2) what support was given, (3) whether the support was 'earmarked' for use in specific schemes or attacks not directed at the United States, or (4) specifically how these defendants were involved in the process of providing support to al Qaeda.'" *Underwriting Members of Lloyd's Syndicate 2,* 779 F. App'x at 69 (*quoting Terrorist Attacks VII*, 714 F.3d at 678-79).

## II.　　Overview of ARB's Knowing, Intentional, Extensive, and Critical Support to Al Qaeda

5.　　Although discovery has afforded Plaintiffs only a limited window into ARB's relationships with a subset of al Qaeda's key fronts, and financial facilitators, *see infra* at § III, that limited discovery evidences that ARB served as a central, essential, critical, and knowing component of al Qaeda's funding and financial engine, in the years leading up to and through the September 11th attacks. As further detailed below:

6.　　ARB established, maintained, and operated *hundreds* of bank accounts for al Qaeda's principal sponsors and financial facilitators. These accounts were opened and operated in ways that violated international money laundering standards and ARB's own (nominal) Anti-Money Laundering ("AML") and Know Your Customer ("KYC") requirements.

7.　　ARB moved *billions* of Saudi Riyals ("SR") through those accounts during the critical period leading up to 9/11 on behalf of al Qaeda's principal sponsors and financial facilitators, to regional offices that operated as key interfaces with al Qaeda.

8.　　ARB afforded al Qaeda's principal sponsors and financial facilitators unfettered license to use their accounts to engage in highly irregular transactions and activities that violated international money laundering standards, thus facilitating al Qaeda's access to the global financial system in ways that would not have been possible via accounts at other banks.

9.　　ARB also allowed individual charity officials and proxies to move staggering sums of money through their personal accounts, where ARB plainly knew the accounts were being used to carry out transactions unrelated to the individuals' personal affairs, and were instead being used to carry out transactions for charities and supporters who had been implicated in terrorist activities. This activity intensified at moments when the charities were under scrutiny for their involvement in terrorism, and enabled al Qaeda and its sponsors to mask the origin of the funds.

10.　　ARB also maintained and operated accounts for the charity committee/foundation of ARB's Chairman, Suleiman al Rajhi, and some twenty accounts for employees of that committee/foundation, which were used to send funds to principal al Qaeda fronts and supporters.

11.　　ARB also played a central role in laundering funds for Suleiman al Rajhi, through a complex web of overlapping entities he established in the United States to fund terrorism, including through a "Payable Through" account ARB created at Chase Manhattan Bank in the

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

United States. These mechanisms operated to shroud the source and destination of funds transmitted to al Qaeda proxies, including funds originating from ARB Chairman Suleiman al Rajhi in particular.

## III. Jurisdictional Discovery

12. On remand, ARB initially resisted discovery altogether, filing a renewed motion to dismiss on alternative grounds. *See* ECF Nos. 5384-5385. This Court denied that motion. *See* March 26, 2021 Opinion & Order at ECF No. 6681.

13. On May 11, 2021, Plaintiffs served ARB with Plaintiffs' First Set of Consolidated Jurisdictional Requests for Production of Documents Directed to Al Rajhi Bank. *See* ECF No. 6996-3. On June 10, 2021, ARB served its Responses and Objections to Plaintiffs' First Set of Consolidated Jurisdictional Requests. ECF No. 6996-5. As this Court observed, "[o]f the 58 requests, ARB indicated that it would not conduct any searches for 47 of them," and "also limited what it would search for on the other 11." *See* November 22, 2021 Order, ECF No. 7378, at 2 ("Discovery Order No. 1").

14. The Court broadly overruled ARB's objections, holding that at least 38 of Plaintiffs' 58 discovery requests sought documents and information within the scope of the Remand Order.[1] Citing the principle that jurisdictional discovery is more "limited" than merits discovery, the Court held that discovery would generally be limited to the 1998-2002 time period, but would be extended to 2004 for certain requests related to post-9/11 terrorism-related investigations. *See* Discovery Order No. 1 at 8.

15. Nonetheless, the Court did not require ARB to conduct searches for all documents responsive to the requests and falling within those time periods, citing ARB's claims that its archived files are not indexed and that files from before 2015 are not digitally searchable. *See* Discovery Order No. 1 at ECF No. 7378 at 21-22. The Court found that requiring ARB to conduct fulsome searches of those physical files would be unduly burdensome. *Id.* at 22.

16. The Court held that resolving the competing interests of Plaintiffs in obtaining relevant discovery and ARB's burden assertions, in each instance, would require the Court to "micromanage" discovery, and that the parties should instead meet and confer on a program of discovery that accommodated ARB's burden claims with respect to searches of its physical files. *Id.* at 2, 22.

17. Given ARB's claims about its physical files and the Court's concerns about ARB's burden claims, discovery as to ARB's relationships with al Qaeda's charity fronts, key financial facilitators, and operatives was largely limited to information retrievable through searches of ARB's core banking system and digital KYC files.

18. For the most part, the account-related records provided by ARB consisted of account statements showing credit and debit transactions in those accounts. In many (if not most) cases, the account statements did not identify the destination or specific beneficiary of outgoing

---

[1] The Court denied 12 requests as redundant.

3

transactions.

19.     The KYC records included account opening documents, to the extent they existed, and, in some cases, limited correspondence with the accountholders and fragmentary internal ARB communications about changing the names on accounts and similar matters.

20.     Although ARB is known to have maintained relationships during the 1998-2002 time period with at least eight separate charities that have been identified as al Qaeda partners, Plaintiffs agreed to limit jurisdictional discovery to three of those charities – Al Haramain Islamic Foundation ("AHIF"), International Islamic Relief Organization ("IIRO"), and Muwafaq Foundation[2] – as a further means to address ARB's burden claims. *See* Plaintiffs' First Amended Complaint at ¶ 173;[3] *see also* Transcript, September 17, 2023 Deposition of Abdullah bin Sulaiman al Rajhi ("Al Rajhi Deposition"), Ex. 1, at 87-88 (Al Rajhi Bank Chairman Abdullah al Rajhi testified that ARB maintained accounts for "the Muslim World League, the International Islamic Relief Organization, the World Assembly of Muslim Youth, Saudi Joint Committee for Relief of the Muslims of Bosnia and Herzegovina and Somalia, the Saudi Joint Committee for the Relief of Muslims of Kosovo and Chechnya, and the Al Haramain Islamic Foundation.").

21.     Plaintiffs' discovery authorized by the Court also encompassed ARB's relationships with several individual officials of those charities that had been designated or otherwise identified by the United States as al Qaeda supporters and financiers. These included Executive Order 13224 Specially Designated Global Terrorists ("SDGTs") Aqil al Aqil (AHF), SDGT Soliman al Buthe (AHIF), SDGT Abd al Hamid Sulaiman al Mujil (IIRO), SDGT Wa'el Hamza Jelaidan (MWL/IIRO), SDGT Yassin Abdullah al Kadi, and Prince Turki bin Jalawi al Saud (IIRO). *See* Discovery Order No. 1 at 10-11; *see also* July 11, 2023 Opinion & Order, ECF No. 6681, at 11-12 ("Discovery Order No. 2").

22.     Based on evidence that certain of those charities were receiving donations and conducting financial activities through accounts held in the names of other individual officials of those charities, and that ARB founder and Chairman Suleiman al Rajhi similarly carried out "charitable" transactions through accounts of and transfers to individual employees of his charity committee, the Court authorized discovery, again over ARB's objections, as to the following additional individuals' accounts at ARB: Mansour al Kadi (AHIF), Abdul Rahman al Rajhi (Suleiman Bin Abdul Aziz Al Rajhi charity committee/foundation ("committee/foundation")), Saleh bin Sulaiman al Habdan ("committee/foundation"), and Abdullah bin Ibrahim al Misfer (committee/foundation/AHIF). *See* Discovery Order No. 2 at 11-12.

23.     Plaintiffs also sought discovery as to audits or similar reviews concerning the al Qaeda charity fronts and financial facilitators at issue in discovery, as well as audits addressing the sufficiency of ARB's AML and Combatting the Financing of Terrorism ("CFT") protocols and compliance with same. *See* ECF No. 6996-3 (Request Nos. 1, 47, 48, 51, 52, 54, 58); *see also*

---

[2] Muwafaq does not appear to have had an actual operational presence in Saudi Arabia.

[3] *Underwriting Members of Lloyd's Syndicate 2, et al. v. Al Rajhi Bank, et al.*, Case 1:16-cv-07853, Dkt. No. 56 (May 22, 2017) at ¶ 173 (identifying al Qaeda charity fronts Muslim World League ("MWL"), International Islamic Relief Organization ("IIRO"), World Assembly of Muslim Youth ("WAMY"), Benevolence International Foundation ("BIF"), Al Haramain Islamic Foundation, and the Saudi High Commission for Relief of Bosnia & Herzegovina ("SHC")).

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

Discovery Order No. 1 at 8-9, 17-19 (authorizing Plaintiffs' requests seeking audits).

24.     As part of this discovery, Plaintiffs specifically requested an alleged audit of ARB referenced in a September 27, 2004 U.S. Department of State diplomatic cable, summarizing a high level meeting between United States and Saudi officials, relating to U.S. terrorism financing concerns involving ARB. The diplomatic cable reports that Ali al Gaith, the Director of Banking Inspection, Insurance, and Financial Leasing at the Saudi Arabian Monetary Authority ("SAMA"), claimed that ARB hired Ernst & Young in August 2003 to conduct a "full scope examination" of the bank, and that the final report "did not indicate any wrong doings." *See* Ex. 2 (Pasley Exhibit 5), U.S. Diplomatic Cable, *Terrorist Financing: Al-Rajhi Bank*, September 27, 2004, at 1.

25.     Over the ensuing three months following Discovery Order No. 1, Plaintiffs engaged ARB in several meet and confers and prioritized the production of audits in the possession of ARB responsive to Requests Nos. 1, 47, 48, 51, 52, 54, and 58. ARB maintained that it would search the files of the Internal Audit Department, minutes of the Board of Directors meetings, and the records of the Board's Audit Committee. Notwithstanding ARB's production of over 40,000 pages of records, not a single audit was produced, including the August 2003 Ernst & Young audit. ARB maintained that it had searched for responsive documents and "produced what it found." Plaintiffs filed separate motions to compel at ECF Nos. 8903 and 9039 seeking an order from the Court directing ARB to produce the requested audits.

26.     In May 2023, Plaintiffs deposed ARB's Rule 30(b)(6) designee, James Galloway, who testified that ARB conducted or commissioned audits for compliance purposes between 1998 and 2002. *See* Transcript, May 11, 2023 Deposition of James Galloway ("Galloway Deposition"), Ex. 3, at 105-114. In an errata sheet correcting Mr. Galloway's deposition, the corrected testimony indicates that (1) "the branch audit team normally audited each branch annually," with "auditors check[ing] the account-opening documentation for a sample of accounts every year," including "sampled accounts opened before 1997;" (2) SAMA conducted "periodic thematic audits includ[ing] surprise and short-notice audits that also checked for compliance with onboarding requirements; (3) "the Bank's external auditor further checked for compliance with SAMA regulations;" and (4) the "Internal Audit department undertook to audit all branches, which would include branches where accounts for Al Haramain or IIRO had been opened." *See* Ex. 3, Errata at p. 108, Line 16; p. 112, Line 5; p. 113, Lines 1-9.

27.     Despite Galloway's testimony, no audits pertaining to or referencing any of the accountholders have been produced, whether for periods before or after September 11, 2001, indicating no such audits exist. *See* Expert Report of Jonathan Winer ("Winer Report"), Ex. 4 (Pasley Exhibit 3), at 7, 155; *see also* Winer Declaration, Ex. 5 (attesting to opinions in report).

## IV.     ARB, its Principals, and Related "Charity" Enterprises

28.     ARB is a Saudi Arabian Islamic bank, founded by Suleiman bin Abdul Aziz al Rajhi and his three brothers Saleh Abdulaziz al Rajhi, Abdullah Abdul Aziz al Rajhi, and Mohammed Abdul Aziz al Rajhi. *See* Ex. 1, Al Rajhi Deposition at 25.

29.     For many years preceding the September 11, 2001 terrorist attacks on the United States (the "September 11th attacks"), Suleiman al Rajhi served as Chairman and Managing

Director of ARB. *See id.* at 37, 42, 43; *See also* Ex. 6, ARB Annual Report for 1998 at 3; Ex. 7, ARB Annual Report for 1999 at 3; Ex. 8, ARB Annual Report for 2000 at 3.

30.     Abdullah bin Suleiman al Rajhi is Suleiman al Rajhi's son, and has served for many years as a senior official of ARB. During the 1998 through 2004 timeframe, he was ARB's General Manager and a member of its Board of Directors. *See* Ex.1, Al Rajhi Deposition at 37-38; *see also* 355 (explaining that the General Manager is the equivalent to the Chief Executive Officer).

31.     In his capacity as General Manager, Abdullah al Rajhi oversaw the day-to-day operations of the bank, and reported to the Managing Director (his father) and the bank's Board of Directors. *Id.* at 46.

32.     More recently, including as of the present date, Abdullah al Rajhi has served as ARB's Chairman of the Board of Directors and Chairman of the Executive Committee. *Id.* at 19, 20.

33.     During the period between 1998 and 2001, ARB's Board of Directors and Executive Committee were dominated by members of the Al Rajhi family, including Suleiman al Rajhi and Abdullah al Rajhi. *See* Ex. 6, ARB Annual Report for 1998 at 3 (listing members of Board of Directors and Executive Committee); Ex. 8, ARB Annual Report for 2000 at p. 3 (same); Ex. 9, CIA Intelligence Report, Office of Transnational Issues, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, CIA_000720-804 at 743 ("Riyadh-based [ARB], with some $8.6 billion in assets – is 80-percent owned by the secretive and religiously ultraconservative Al Rajhi family, [REDACTED].").

34.     According to a May 28, 2003 Central Intelligence Agency ("CIA") report, *Al-Rajhi Bank: Conduit for Extremist Finance*, prepared by the CIA's Counterterrorist Center's Office of Terrorism Analysis, addressing evidence of ARB's support for terrorism before and after September 11, 2001, "senior al-Rajhi family members control the banks' most important decisions and [] ARABIC's [ARB's] principal managers answer directly to Sulayman [Suleiman Al Rajhi]." *See* Ex. 10, CIA-SUB_0001-6 at 2; *see id.* at 4 ("Sulayman's tight control of ARABIC [ARB] activities suggests he is witting that his bank is attractive to extremists."). *See also* Ex. 11, *Islamic Banking: A Potential Economic Enabler in the Muslim World*, May 21, 2004, CIA-SUB_0020-30 at 24 (indicating that Suleiman al Rajhi has "provided widespread funding to al-Qa'ida, HAMAS, and various mujahidin groups").

35.     Between 1998 and 2001, ARB maintained correspondent banking relationships with counterparty financial institutions throughout the world. *See* Ex. 6, ARB Annual Report for 1998 at 11 (ARB's international banking operations carried out "through a network of 270 correspondent banks and other financial institutions spread over 60 countries"); Ex. 8, ARB Annual Report for 2000 at 8 ("In supporting its customers' services and financing requirements the Corporation [ARB] has continued to develop international banking relationships which enabled the Corporation to achieve presence at world-wide level and fulfill its customers' needs on international banking ensuring that high quality services are provided by the correspondents to the Corporation's customers.").

36.     Between 1998 and 2001, ARB maintained a "Payable Through" account with

Chase Manhattan Bank in New York. A Payable Through account is an account in which a foreign bank uses a domestic bank as a checking account for the customers of the foreign bank. *See* Ex. 4, Winer Report at 200; *see id.* (citing 31 CFR § 561.307 definition of payable through account).

37.     For decades, Payable Through accounts have been of serious concern for money laundering and terrorist finance due to the ability of those using them to circumvent the KYC obligations that domestic banks would otherwise have to apply to those customers. *See* Ex. 4, Winer Report at ¶ 10.42.

38.     By virtue of its status as an international financial institution and correspondent relationships with financial institutions throughout the world, ARB was required to adhere to international best practices with respect to AML, CFT, and KYC. ARB's own experts have admitted that guidelines issued by SAMA and governing ARB from 1995 through 2001 incorporated international best practices. *See* Ex. 4, Winer Report at 130-170.

39.     As Plaintiffs' expert Jonathan Winer explained at his deposition, adherence by international banks to international standards and best practices concerning AML, CFT, and KYC is essential to ensuring that there are no weak leaks in the chain of banking regulation and enforcement. *See* Transcript, January 12, 2024 Deposition of Jonathan M. Winer ("Winer Deposition"), Ex. 12, at 98 (analogizing the banking and financial system to a water system). As a sophisticated international financial institution, ARB and its principals, including in particular Suleiman al Rajhi and Abdullah al Rajhi, would have been deeply familiar with these aspects of the international banking system, and the means to exploit its vulnerabilities, including through ineffective AML and KYC procedures, the abuse of Payable Through accounts, and the exploitation of unregulated and underregulated financial activities.

40.     For years before and throughout the 1998-2002 time period, Suleiman al Rajhi also maintained and directed a sophisticated operation for distributing his purported "charitable" contributions to causes and organizations throughout the world. *See* Ex. 13 (Abdullah al Rajhi Exhibit 50) (Sulaiman Al-Rajhi Charitable Foundation webpage); *see also* Ex. 1, Al Rajhi Deposition at 256-258 (testifying that his father, Suleiman al Rajhi, was carrying out his charitable activities through his charity office during the 1998-2002 time period); *id.* at 262 (stating that he would have discussions with his father about entities or causes his father was thinking about supporting). *See* Ex. 9, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, CIA_000720-804 at 743 (stating that Suleiman al Rajhi "reportedly maintains a staff of 20 to manage his unpublicized charitable endeavors"); Winer Report, Ex. 4, at 109, 121, 122, 204.

41.     In Saudi Arabia, this operation was carried out under the auspices of an unlicensed "committee" that had no legal status (sometimes referred to as the al Rajhi "charity office" or foundation) from approximately 1983 until June 19, 2000, when the Saudi Ministry of Social Affairs issued a license authorizing it to operate as the Suleiman Bin Abdul Aziz Al Rajhi Charitable Foundation ("Foundation"). *See* Ex. 13 (Abdullah al Rajhi Exhibit 50) (Sulaiman Al-Rajhi Charitable Foundation webpage); *See also* Ex. 1, Al Rajhi Deposition at 256-258 (testifying that his father, Suleiman al Rajhi, was carrying out his charitable activities through his charity office during the 1998-2002 time period, but the Foundation was not formally licensed until 2000); *id.* at 271-272 (explaining that his father created a committee to assist him review the incoming

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

requests for financial assistance); Ex. 14 (Abdullah al Rajhi Exhibit 56) (NL 9625) (indicating that "the committee overseeing the Charity office in Riyadh has the set up to receive requests from various charities located throughout the world and then to review, investigate and decide if a charitable contribution will be made").

42.     Suleiman Al Rajhi's Saudi-based committee, and later Foundation, employed a full-time staff. *See* Ex. 9, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, CIA_000720-804 at 743 (stating that Suleiman al Rajhi "reportedly maintains a staff of 20 to manage his unpublicized charitable endeavors").

43.     During the 1998-2001 timeframe, the full time staff included al Rajhi family member Abdul Rahman bin Abdullah al Rajhi, Saleh bin Sulaiman al Habdan, and Abdullah bin Ibrahim al Misfer. *See* Ex. 1, Al Rajhi Deposition at 264 (testifying that Abdul Rahman al Rajhi and Saleh al Habdan were the two individuals in charge of his father's charity office); *id.* at 265-267 (stating that Saleh al Habdan served as the Imam at the al Rajhi family mosque). *See also* Ex. 14 (Abdullah al Rajhi Exhibit 56) (NL 9625) ("Currently the Charity office is managed by Abdul Rahman Bin Abdullah Al Rajhi, Saleh Bin Sulaiman Al-Habdan and Abdullah I. Al-Misfer," December 28, 2000.); Ex. 15, NL 9623 (August 24, 1999 letter from Abdullah bin Ibrahim Al-Misfer to the Executive Director of "Islamic Call at Universities," in Garden Grove, California, stating that he works for the "Al-Rajhi Charity Office"); Ex. 16, WAMYSA 102829 (October 14, 2001 letter from Foundation "General Supervisor" Abdul Rahman bin Abdullah al Rajhi to WAMY Secretary General Maneh al Johani, enclosing a donation of 131,250.00 Saudi Riyals ("SR")); Ex. 17, WAMYSA 502115 (June 17, 2002 letter from Abdul Rahman bin Abdullah al Rajhi to WAMY Secretary General Maneh al Johani, stating that the Foundation is providing a 130,000.00 SR donation for Shariah courses).

44.     The committee's advisors included Saleh al Hussayen, a Saudi religious scholar who also served as a member of ARB's shariah board, the General President of the Committee of the Two Holy Mosques, and further participated in overseas da'wah activities of the IIRO, along with other members of Suleiman al Rajhi's committee. *See* Ex. 1, Al Rajhi Deposition at 268-271 (stating that Hussayen worked on the bank's shariah committee beginning in 1988, was a senior government official prior to joining ARB, and later managed the Two Holy Mosques for the Saudi government); *see also* Ex. 18 (Abdullah al Rajhi Exhibit 63) (IIRO 315040) (May 30, 1995 letter from the Assistant Director of IIRO-Tanzania to the Chief of Protocol, Ministry of Foreign Affairs, Dar es Salaam, informing that the Director General of the IIRO is sending a six-man delegation to Tanzania for an official visit, which includes Hussayen, Abdul Rahman al Rajhi, Saleh al Habdan ("Imam of Al Rajhi Mosque"), and Abdullah al Misfer).

45.     Contemporaneous with the formation and growth of al Qaeda, Suleiman al Rajhi was himself establishing and overseeing a web of interrelated "charities" and institutions in the United States, including the U.S.-based SAAR (Suleiman Abdulaziz al Rajhi) Foundation, Inc. *See* Ex. 1, Al Rajhi Deposition at 294-295 (testifying that his father created the SAAR Foundation in the United States "to make an investment and use the proceed[s] of the investment to do charity work" and that he was a "major, major contributor" to the endeavor); Ex. 19, PEC-BARZ013145-13160 (Articles of Incorporation of the SAAR Foundation, Inc. identifying "Mr. Sulayman A. al-Salih" (Suleiman al Rajhi) and "Mr. Abdullah S. al-Abdulaziz" (Abdullah al Rajhi) as members of the Board of Trustees); Ex. 20, PEC-BARZ011521 (SAAR Foundation, Inc. Annual Report

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

identifying Directors "Mr. Sulayman Al Abdul Aziz" (Suleiman al Rajhi) and "Mr. Abdullah Al Sulaiman" (Abdullah al Rajhi)); Ex. 21, NL 0000693-713 (1987 IRS Form 990, SAAR Foundation, Inc., identifying Chairman "Shaikh Sulayman A. al-Salih" (Suleiman al Rajhi) and Board of Trustee Member "Mr. Abdullah S. Al-Abdulaziz" (Abdullah al Rajhi)). *See also* Ex. 22, PEC-BARZ013117-13127 (1996-2000 SAAR Foundation, Inc. Annual Reports identifying E.O. 13224 Specially Designated Global Terrorist ("SDGT") Cherif Sedky – linked to E.O. 13224 SDGTs Wa'el Hamza Jelaidan and Yassin al Kadi, and the Muwafaq Foundation – as a principal officer.); Ex. 23, PEC-BARZ012025-12041 (1987 IRS Form 990, SAAR Foundation, Inc., identifying Cherif Sedky as Trustee and Secretary.).

46.     Suleiman al Rajhi also oversaw the establishment and operations of Sana-Bell, Inc. ("Sana-Bell U.S."), and Humana Charitable Trust ("Humana") in the United States. Sana-Bell was incorporated in Washington, D.C. on July 28, 1989. *See* Ex. 24, SANA-BELL 0001-10 (Articles of Incorporation of the SANA-BELL, Inc., July 28, 1999). The initial Board of Trustees included Suleiman al Rajhi ("Solayman Alsalih Alrajhi"), Saleh Kamel and Ibrahim Afandi (al Qaeda's elite financial sponsors identified of the "Golden Chain"), Dr. Farid Yasin Qurashi (IIRO's Secretary General), Dr. Abdulrahim al Saati (MWL/IIRO official), ███████ (MWL), and others. *Id.* at 0007. *See also* Ex. 4, Winer Report at 50.

47.     In establishing the U.S.-based SAAR Foundation and related entities, Suleiman al Rajhi and Abdullah al Rajhi took deliberate steps to obscure and conceal their roles and involvement, including by intentionally and illegally using various false or misspelled names and fictitious addresses on official documents filed with the Commonwealth of Virginia. *See* Ex. 25 (Abdullah al Rajhi Exhibit 57), 1991-1994 Annual Reports for the SAAR Foundation, Inc. (identifying principal officers and directors); Ex. 1, Al Rajhi Deposition at 311 (confirming that the "Abdullah S. Al-Abdulaziz" on the second page of the 1994 Annual Report is him); *id.* at 311-313 (testifying that there was a conscious decision to identify him in a way that did not include the al Rajhi last name, out of privacy and security concerns); *id.* at 313 (stating that the "Salih Hussyyn" under his name appears to be the Saleh al Hussayen who served on ARB's Shariah board); *id.* at 313-314 (confirming that the "Abdullah S. Al-Abdulaziz" on the second page of the 1993 Annual Report is him); *id.* at 314 (confirming that the "Sulayman A. Al-Salih" on the second page of the 1993 Annual Report is his father, without including the al Rajhi last name; "this is Sulaiman A. Abdulaziz and Al-Saleh, which is his grandfather name"); *id.* at 314-315 (testifying that neither he nor his father ever maintained a residence at "11919 Safa Court, Herdon, VA 22070" as identified in the 1993 Annual Report, because they were in Saudi Arabia at the time).

48.     According to a joint Federal Bureau of Investigation ("FBI")-CIA assessment in December 2004, the U.S.-based SAAR Foundation and its associated entities were "a complex web of overlapping companies with parallel ideologies, personal relatonships, and financial associates that has exhibited numerous affiliations with entities known to support terrorism." *See* Ex. 26 (Lormel Exhibit 9), *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States*, December 2004, EO14040-003414-3442 at 3438; Ex. 4, Winer Report at 89, 93.

49.     At all times material, the U.S.-based SAAR Foundation and its web of related entities operated as a shell and cut-out for Suleiman al Rajhi and his Saudi-based committee. *See* Ex. 4, Winer Report at 184-200; Ex. 27, FED-PEC0001243-1369, *In the Matter of Searches*

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

*Involving 555 Grove Street, Herndon, Virginia, and Related Locations*, (Proposed Redacted) Affidavit in Support of Application for Search Warrant, District Court for the Eastern District of Virginia, October 2003 ("Kane Affidavit"); Ex. 28, Washington Post, *Finances Prompted Raids on Muslims*, March 24, 2002.

50.     For example, and as discussed in further detail below, documents obtained in discovery from ███████ who served as an officer of both the U.S.-based SAAR and Humana, show that, under an arrangement orchestrated by Suleiman al Rajhi and Abdullah al Rajhi, Suleiman al Rajhi distributed millions of dollars through his Saudi committee in 1999, to a range of Islamic causes throughout the world, including the United States, which were then attributed, as if actually paid, to Humana. Ex. 4, Winer Report at 184-200. *See* Ex. 29 (Galloway Exhibit 22), NL 15578 (October 18, 1999 letter from Suleiman al Rajhi to ███████ stating: "As we discussed and agreed during your visit in December 1998 that Humana Charitable Trust will joint in and pay part of these contributions. Attached is the list of grants made and paid by me to various entities sent for reimbursement for your part of the contribution."), and NL 0015043-15046 (listing of Suleiman al Rajhi's "Foreign and Domestic Aid for the Year 1419-1420 AH (1998-1999AD)").

51.     Communications between ███████ and Abdullah al Rajhi following Suleiman al Rajhi's October 18, 1999 letter confirm the payment arrangement between Humana Charitable Trust and Suleiman's Saudi committee. *See* Ex. 30, NL 20470 (October 26, 1999 email from ███ to Abdullah al Rajhi ("Abu Sultan") asking him to send "the copy of the registration of charities with a request to Humana to assist."); Ex. 31, NL 20452 (November 3, 1999 email from Abdullah al Rajhi to ███ suggesting that ███ "kindly transfer $3.0 mln in hand and then wait for the rest."); Ex. 32, NL 20453-20454 (November 3-4, 1999 email exchanges between ███ and Bushra Ahmed (on behalf of Abdullah al Rajhi) regarding payment of $2.8 million "from Humana Charitable Trust as contribution to the charity you are sending me the details."); Ex. 33, NL 15048 (November 22, 1999 email from ███ to Abdullah al Rajhi stating that "Humana Charitable Trust will transfer tomorrow $3.3 m. as advance for reimbursement for contributions made by your charity."); Ex. 34, NL 15551 (June 22, 2000 email from ███ to Abdullah al Rajhi stating that they "have received many more questions and requests from IRS to produce various documents" and that the IRS is starting a field audit next week, and asks Abdullah to "please send us supporting documents for disbursement made to Saudi institutions as soon as practicable."); Ex. 35, NL 15572 (October 31, 2000 email from ███ to Abdullah al Rajhi explaining that the IRS is requesting address and contact information for certain organizations who received contributions); Ex. 36, NL 15573-15576 (November 9, 2000 fax from ███ to Abdullah al Rajhi ("Abu Sultan") asking for copies of checks for contributions to a number of beneficiaries in 1999); Ex. 37, NL 15042 (February 14, 2001 email from ███ to Abdullah al Rajhi referencing the "on going audit by the IRS" and stating "[t]hat is why I suggest and you have agreed to make contributions from Humana's account directly to charities of choice, rather than thru Shaikh Sulaiman's account which may be questioned as IRS is raising doubts if Humana is really a charitable organization."); Ex. 4, Winer Report at 184-200.

52.     The available evidence shows that the transfers were funded via the Suleiman al Rajhi committee's account at ARB, and in many cases paid through the "Payable Through" account ARB established at Chase Manhattan Bank in New York, an arrangment that obscured the origins of the funds. *See also* Ex. 14 (Abdullah al Rajhi Exhibit 56) (NL 9625) ("In accordance with the established practice of the Charity office, as explained in the third paragraph

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

of this statement, the checks are processed without showing the contributor's name. These are processed by Al Rajhi Banking and Investment Corporation [Riyadh Saudi Arabia], having its account with Chase Manhattan and other correspondent banks."); Ex. 4, Winer Report at 4,5, 27, 100, 102, 103, 173, 188, 189, 191-193, 200-203.

## V. Al Qaeda and Its Pre-9/11 Funding

53. Al Qaeda is an international terrorist organization, founded in approximately September 1988, by Osama bin Laden and other foreign fighters who participated in the "jihad" against the Soviet Union in Afghanistan. *See* Ex. 38 (Pasley Exhibit 4), Expert Report of Evan Kohlmann ("Kohlmann Report") at 7; Ex. 39, Kohlmann Declaration (attesting to opinions in report); Ex. 40 (Lormel Exhibit 15), Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Report"), Chapter 2.

54. As is undisputed, al Qaeda planned, funded, and carried out the September 11th attacks. *See* Ex. 40, 9/11 Commission Report at 47-70, 145-173, 215-253, 365-366.

55. Al Qaeda was established to carry out "holy war," or "jihad," against perceived enemies of Islam and, in particular, the United States. *See* Ex. 38, Kohlmann Report at 7.

56. As the 9/11 Commission explained:

> April 1988 brought victory for the Afghan jihad. Moscow declared it would pull its military forces out of Afghanistan within the next nine months. As the Soviets began their withdrawal, the jihad's leaders debated what to do next.

> Bin Ladin and [Abdullah] Azzam agreed that the organization successfully created for Afghanistan should not be allowed to dissolve. They established what they called a base or foundation (al Qaeda) as a potential general headquarters for future jihad.

*See* Ex. 40, 9/11 Commission Report at 56.

57. From at least 1991 and throughout the ensuing years preceding the September 11th attacks, bin Laden made clear to his supporters, allies, and others that al Qaeda's primary goal and mission was to carry out attacks against the United States:

> Bin Ladin began delivering diatribes against the United States before he left Saudi Arabia [in 1991]. He continued to do so after he arrived in Sudan. In early 1992, the al Qaeda leadership issued a fatwa calling for jihad against the Western "occupation" of Islamic lands. Specifically singling out U.S. forces for attack, the language resembled that which would appear in Bin Ladin's public fatwa in August 1996. In ensuing weeks, Bin Ladin delivered an oft-repeated lecture on the need to cut off "the head of the snake."

*Id.* at 59; *see also id.* ("Bin Ladin concentrated [from al Qaeda's early years] on attacking the 'far

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

enemy' – the United States").

58.   To support and enhance its opportunities to attack the United States, al Qaeda established fronts and footholds in a variety of jurisdictions:

> Bin Ladin's impressive array of offices covertly provided financial and other support for terrorist activities. The network included a major business enterprise in Cyprus; a "services" branch in Zagreb; an office of the Benevolence International Foundation in Sarajevo, which supported the Bosnian Muslims in their conflict with Serbia and Croatia; and an NGO in Baku, Azerbaijan, that was employed as well by Egyptian Islamic Jihad both as a source and conduit for finances and as a support center for the Muslim rebels in Chechnya. He also made use of the already-established Third World Relief Agency (TWRA) headquartered in Vienna, whose branch office locations included Zagreb and Budapest. (Bin Ladin later set up an NGO in Nairobi as a cover for operatives there.)
>
> Bin Ladin now had a vision of himself as head of an international jihad confederation. In Sudan, he established an "Islamic Army Shura" that was to serve as the coordinating body for the consortium of terrorist groups with which he was forging alliances. It was composed of his own al Qaeda Shura together with leaders or representatives of terrorist organizations that were still independent. In building this Islamic army, he enlisted groups from Saudi Arabia, Egypt, Jordan, Lebanon, Iraq, Oman, Algeria, Libya, Tunisia, Morocco, Somalia, and Eritrea. Al Qaeda also established cooperative but less formal relationships with other extremist groups from these same countries; from the African states of Chad, Mali, Niger, Nigeria, and Uganda; and from the Southeast Asian states of Burma, Thailand, Malaysia, and Indonesia. Bin Ladin maintained connections in the Bosnian conflict as well. The groundwork for a true global terrorist network was being laid.
>
> Bin Ladin also provided equipment and training assistance to the Moro Islamic Liberation Front in the Philippines and also to a newly forming Philippine group that called itself the Abu Sayyaf Brigade, after one of the major Afghan jihadist commanders. Al Qaeda helped Jemaah Islamiya (JI), a nascent organization headed by Indonesian Islamists with cells scattered across Malaysia, Singapore, Indonesia, and the Philippines. It also aided a Pakistani group engaged in insurrectionist attacks in Kashmir. In mid-1991, Bin Ladin dispatched a band of supporters to the northern Afghanistan border to assist the Tajikistan Islamists in the ethnic conflicts that had been boiling there even before the Central Asian departments of the Soviet Union became independent states.

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

> This pattern of expansion through building alliances extended to the United States. A Muslim organization called al Khifa had numerous branch offices, the largest of which was in the Farouq mosque in Brooklyn. In the mid 1980s, it had been set up as one of the first outposts of Azzam and Bin Ladin's MAK. Other cities with branches of al Khifa included Atlanta, Boston, Chicago, Pittsburgh, and Tucson. Al Khifa recruited American Muslims to fight in Afghanistan; some of them would participate in terrorist actions in the United States in the early 1990s and in al Qaeda operations elsewhere, including the 1998 attacks on U.S. embassies in East Africa.

*See* Ex. 40, 9/11 Commission Report at 57-58.

59.     Al Qaeda's participation in the jihads in Bosnia, Chechnya, and elsewhere was directly aimed at facilitating and enhancing its opportunities to attack the United States. *See, e.g.*, Ex. 41 (Dean Exhibit 4), *Government's Evidentiary Proffer Supporting the Admissibility of Coconspirator Statements*, PEC-KSA002014-2114 at 2036 (Al Qaeda member Abdel Rahman al Dosari stated that "al Qaeda was seeking to establish training camps in Bosnia, forge relations with relief agencies in Bosnia and establish businesses to support al Qaeda economically," and "to establish a base of operations in Europe against al Qaeda's true enemy, the United States."); *id.* at 2030 (stating that "actions taken in Afghanistan, the Sudan, Bosnia, and Chechnya should not be viewed as disparate conduct but should instead be viewed as the conduct of an evolving enterprise"); Ex. 40, 9/11 Commission Report at 466, n. 21; 467, n. 25 and 26; 470, n. 79 and 80 (citing to the *Government's Evidentiary Proffer Supporting the Admissibility of Coconspirator Statements*); Ex. 42, August 29, 2002 Interview with Jamal al Fadl, PEC-KSA000329-352 at 344 ("Bin Laden felt it was important for Al Qaeda to assist the Bosnians in an effort to establish an Al Qaeda base of operations or presence in Europe from which they would have easy access to other European countries as well as the western nations."); Ex. 43 (Dean Exhibit 5), United Nations Sanctions Committee designation summary for the Islamic International Brigade (indicating that Osama bin Laden met with leaders of the IIB and "agreed to provide substantial military assistance and financial aid, including by making arrangement to send to Chechnya several hundred fighters to fight against Russian troops and perpetrate acts of terrorism").

60.     Relying on this infrastructure and operational footprint, "[p]lans to attack the United States were developed with unwavering singlemindedness throughout the 1990s." *See* Ex. 40, 9/11 Commission Report at 48.

61.     Among other plots, al Qaeda provided support for the 1993 attacks against U.S. soldiers in the battle of Mogadishu and for a 1995 Philippine-based plot to attack U.S. flag airliners mid-flight, and was responsible for the 1998 bombings of the U.S. Embassies in Kenya and Tanzania, the 2000 attack on the U.S.S. Cole, and, of course, the September 11th attacks. *See* Ex. 38, Kohlmann Report at 7; *see also* Ex. 40, 9/11 Commission Report at 68-70, 97, 147-148, 190-191, 215-253.

62.     As a global terrorist organization dedicated to carrying out jihad against the United States throughout the world, al Qaeda had extensive funding and fundraising needs.

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

63.     According to the 9/11 Commission Staff Monograph on Terrorist Financing, al Qaeda required $30 million in annual funding to support its operations in the years leading up to the September 11th attacks, an assessment that has been broadly endorsed by experts in the field. *See* Ex. 44 (Lormel Exhibit 12), *Monograph on Terrorist Financing*, Staff Report to the 9/11 Commission ("Monograph") at 4; Ex. 4, Winer Report at 82.

64.     To meet these fundraising needs, al Qaeda relied primarily on contributions from donors (primarily in the Gulf) who supported al Qaeda's global jihad, well-placed financial facilitators who raised funds for al Qaeda, and diversions of funds by Islamic charities that supported al Qaeda's cause. *See, e.g.,* Ex. 4, Winer Report at 21, 70-81, 112, 151, 205, 208, 211-214; Ex. 38, Kohlmann Report at 7, 12, 13, 18, 20, 25-27, 29, 30, 36; Ex. 44, Monograph at 4 ("al Qaeda was funded, to the tune of approximately $30 million per year, by diversions of money from Islamic charities and the use of well-placed financial facilitators who gathered money from both witting and un-witting donors, primarily in the Gulf region."). *See also* Ex. 45, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 147 ("[REDACTED] al-Qa'ida and several other terrorist and militant groups consider Saudi Arabia a key base of financial support. [REDACTED] we estimate that since the mid-1990s terrorist groups have received tens of millions of dollars a year from Saudi Arabia. Most of the money originates from wealthy donors, fundraisers who solicit smaller donations, and non-governmental organizations (NGOs)."); Ex. 46, *Identifying Al-Qa'ida's Donors and Fundraisers: A Status Report*, February 27, 2002, CIA_00193-199 at 194 (stating that "wealthy individuals in the Arabian Peninsula and grassroots supporters from around the world are critical sources for al-Qa'ida"); Ex. 47, *[REDACTED] Spectrum of Al-Qa'ida's Donors*, October 30, 2003, CIA_000659-667 at 661 ("[REDACTED] other donors are close to al-Qa'ida operatives and are witting that their funds are destined for operational purposes. Such donors often demand confirmation that their contributions reach the hands of al-Qa'ida's top leadership or that their donations fund attacks against specific targets.").

65.     As the 9/11 Commission explained, bin Laden's organization "included a financial support network that came to be known as 'the Golden Chain,' put together mainly by financiers in Saudi Arabia and Persian Gulf states. Donations flowed through charities and other non-governmental organizations (NGOs)." *See* Ex. 40, 9/11 Commission Report at 55. *See also* Ex. 4, Winer Report at 81, 96, 99, 100; Ex. 38, Kohlmann Report at 7.

66.     Following al Qaeda's move from Sudan to Afghanistan in 1996, "Bin Laden eventually enjoyed a strong financial position in Afghanistan, thanks to support from Saudi and other financiers associated with the Golden Chain." *See* Ex. 40, 9/11 Commission Report at 66; *id.* at 70 ("Al Qaeda appears to have relied on a core group of financial facilitators who raised money from a variety of donors and other fund-raisers, primarily in the Gulf countries and particularly in Saudi Arabia. Some individual donors knew, and others did not, the ultimate destination of their donations."). *See also* Ex. 4, Winer Report at 81, 96, 99, 100; Ex. 38, Kohlmann Report at 7; Ex. 45, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 148-149 (describing the support provided to the al Qaeda network by individuals identified on the Golden Chain, including Wa'el Jelaidan, Adel Batterjee, Bin Mahfouz, and al Rajhi).

67.     The United States gained considerable insights into this financial infrastructure

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

from Jamal Ahmed al Fadl, an al Qaeda financial manager who joined al Qaeda in 1988 and dealt directly with bin Laden and the al Qaeda leadership, until he defected and became a cooperating witness for the United States in 1996. *See* Ex. 40, 9/11 Commission Report at 62 (explaining that al Fadl, who had taken the oath of fealty to bin Laden and served as one of his business agents, "defected and became a star informant for the United States"); *id.* at 109 (stating that al Fadl "provided a major breakthrough of intelligence on the creation, character, direction, and intentions of al Qaeda"); *id.* at 185 ("[The CIA] knew relativity early, for example, about the loose affiliation of financial institutions, businesses, and wealthy individuals who supported extremist Islamic activities. Much of the earlier reporting on al Qaeda's financial situation and its structure came from Jamal Ahmed al Fadl."). *See also* Ex. 4, Winer Report at 81.

68.     In interviews with the FBI, al Fadl explained that the "'Golden Chain' consisted of wealthy individuals from the Gulf region who provided BIN LADEN and Al QAEDA with money on a regular basis." *See* Ex. 42, August 29, 2002 Interview with Jamal al Fadl, PEC-KSA00329-352 at 351. *See id.* at 352 (Al Fadl "noted that the name AL RAJHI listed next to number 7 on this document is the name of a bank in which Al QAEDA had funds on deposit."). *See also* Ex. 4, Winer Report at 99-100; Ex. 38, Kohlmann Report at 19-20 (Al Fadl describing the financial and material support the IIRO and its officials provided to al Qaeda).

69.     As indicated above, a number of purported Islamic "charities" played critical roles in collecting and facilitating transfers of funds to al Qaeda, including donations provided by al Qaeda's most prominent individual supporters, and in otherwise providing financial, logistical, and operational support to al Qaeda.

70.     These charities used banks, particularly in the Gulf, to move money on behalf of al Qaeda. *See* Ex. 4, Winer Report at 59; Ex. 44, Monograph at 4 ("Supporters and other operatives did use banks, particularly in the Gulf region, to move money on behalf of al Qaeda."); *id.* at 26 ("charities such as Wafa Humanitarian Organization had accounts at banks, which served as a means to move money for terrorists.); *id.* ("Fund-raisers for al Qaeda also used banks to store and move their money.").

71.     Several of al Qaeda's most important financial facilitators served as officials of these charities. *See* Ex. 4, Winer Report at 111-121 (discussing the E.O. 13224 designation of Al Haramain's leader, Aqil al Aqil, who "was responsible for all AHF activities, including its support for terrorism"); *id.* at 38 (discussing al Qaeda financier and SDGT Wa'el Jelaidan's official roles with the MWL, SJRC, and Rabita Trust); *id.* at 19, 87, 124, 125, 208 (discussing Abd al Hamid Sulaiman al Mujil, Executive Director of IIRO's Eastern Province branch, and his E.O. 13224 designation for using his position "to bankroll the al Qaida network in Southeast Asia"); *id.* at 97, 174-177 (discussing Al Haramain official Soliman al Buthe's E.O. 13224 designation in connection with his provision of military support to Chechen militants from an Al Haramain branch in the United States); Ex. 38, Kohlmann Report at 34-35 (WAMY Secretary General Maneh al Johani advocated for jihad in Kashmir and Chechnya and asked Muslims to provide "their moral, physical, and financial support [to] the cause of Jihad," including "money to buy weapons and gear."). *See also* Ex. 48 (Lormel Exhibit 18), *Additional Al-Haramain Branches, Former Leader Designated by Treasury as Al Qaida Supporters, Treasury Marks Latest Action in Joint Designation with Saudi Arabia*, June 2, 2004, at 3 ("Under Al Aqil's leadership of AHF, numerous AHF field offices and representatives operating throughout Africa, Asia, Europe and

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

**UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS**

North America appeared to be providing financial and material support to the al Qaida network."); Ex. 49, *Treasury Department Statement on the Designation of Wa'el Hamza Julidan*, September 6, 2022, at 1 ("Julaidan has been the head of various non-governmental organizations providing financial and logistical support to the al-Qa'ida network."); Ex. 50, *U.S.-Based Branch of Al Haramain Foundation Linked to Terror, Treasury Designates U.S. Branch, Director*, September 9, 2004, at 1 (indicating that under Soliman al Buthe's leadership of Al Haramain, "funds that were donated to AHF with the intention of supporting Chechen refugees were diverted to support mujahideen, as well as Chechen leaders affiliated with the al Qaida network"); Ex. 26 (Lormel Exhibit 9), *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States*, December 2004, EO14040-003414-3442 at 3419 (reporting that Khalid Sheikh Mohammed ("KSM") identified Prince Turki bin Jalawi, "a key leader of the Eastern Province office of the International Islamic Relief Organization (IIRO)," as "an important al-Qa'ida donor").

72.    In addition, al Qaeda operatives and members of associated terrorist organizations were frequently employed by offices of these charities, an arrangement that provided salaries to fund their terrorist activities, cover for those activities, and credentials and employment papers that enabled them to travel on behalf of al Qaeda, including to al Qaeda operational hubs in conflict zones. *See* Ex. 51, FBI Report, *Connections to the Attacks of September 11, 2001*, July 23, 2021, EO14040-003478-3608-UPDATED at 3532 ("AQ members were employed with these organizations and utilized funding for terrorism support and used the offices for cover for movement of personnel."); Ex. 52, *Al-Haramayn Islamic Foundation–Bosnia-Herzegovina*, TREASURY00009-11 at 11 ("HIF offices in Bosnia-Herzegovina have employed personnel with affiliations to or membership in an SDGT (Gama'at Al Islamiyya), indicating that the offices of HIF are widely infiltrated by terrorist elements."); Ex. 53, *Al-Haramain Islamic Foundation, Somalia*, TREASURY00030-36 at 30-31 ("The U.S. has assembled evidence that shows a history of ties between Al-Haramain Somalia and Usama bin Laden's al-Qaida network, Al-Itihaad al-Islamiya (AIAI), and other associated entities and individuals. For example, over the past few years, Al-Haramain Somalia has provided a means of funneling money to AIAI by disguising funds as intended to be used for orphanage projects or the construction of Islamic schools and mosques. The organization has also employed and provided salaries to AIAI members."); Ex. 54, *How Bin Ladin Commands a Global Terrorist Network [REDACTED]*, January 27, 1999, CIA_00002-16 at 7 ("Bin Ladin exploits these NGO ties to channel funds and obtain cover employment and travel assistance for his associates."); Ex. 55, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 210 ("The availability of funds, cover, and logistics networks makes NGOs an appealing resource for terrorist groups. NGOs typically are awash in money – the Muslim World League's budget is more than $26 million annually, and the annual budget of the International Islamic Relief Organization has never dipped below $50 million – and tapping into the funds offers terrorist some independence from traditional state sponsors, who often attempt to control such groups for their own purposes. The logistical support NGOs offer includes cover employment, false documentation, travel facilitation, training, and in some cases, weapons."); *id.* at 213 ("sympathizers within several affiliate organizations – including the International Islamic Relief Organization (IIRO) – have provided terrorists with funding and cover employment, documentation, and training"); *id.* at 220 ("Despite Saudi efforts to curb terrorist use of the IIRO, its personnel in local branch offices continue to channel funds to terrorists and provide them with logistical support – such as cover employment, documentation, travel assistance and access to training – [REDACTED].").

73.    Within this framework, Al Haramain Islamic Foundation ("AHIF"), the International Islamic Relief Organization ("IIRO"), and World Assembly of Muslim Youth ("WAMY"), were three of al Qaeda's most important charity fronts and partners. *See* Ex. 38, Kohlmann Report at 11-15 (Al Haramain), 16-30 (IIRO), 31-39 (WAMY). *See also* U.S. Department of the Treasury press releases detailing the E.O. 13224 designations of Al Haramain and IIRO at Ex. 56 (March 11, 2002 designation of Al Haramain's branches in Somalia and Bosnia-Herzegovina), Ex. 57 (January 22, 2004 designation of Al Haramain's branches in Indonesia, Kenya, Tanzania, and Pakistan), Ex. 48 (Lormel Exhibit 18) (June 2, 2004 designation of Al Haramain's branches in Afghanistan, Albania, Bangladesh, Ethiopia, and the Netherlands, including Aqil al Aqil), Ex. 50 (September 9, 2004 designation of Al Haramain's branches in the United States and Union of Comoros, including Soliman al Buthe), Ex. 60 (Abdullah al Rajhi Exhibit 27) (June 19, 2008 designation of Al Haramain's Saudi headquarters and the entirety of the Al Haramain organization), Ex. 170 (Abdullah al Rajhi Exhibit 28) (August 3, 2006 designation of IIRO's branches in the Philippines and Indonesia, including And al Hamid Sulaiman al Mujil).

74.    Al Haramain was a Saudi Arabia–based Islamic charity, dedicated to propagating an extreme and intolerant form of Islam throughout the world. Al Haramain had a presence in at least 50 countries. *See* Ex. 44, Monograph at 11; Ex. 4, Winer Report at 20-21; Ex. 38, Kohlmann Report at 11.

75.    According to the U.S. government, "[w]hen viewed as a single entity, Al-Haramain was one of the principal NGOs active throughout the world providing support for the Al-Qaida network." *See* Ex. 48 (Lormel Exhibit 18), *Additional Al-Haramain Branches, Former Leader Designated by Treasury as Al Qaida Supporters, Treasury Marks Latest Action in Joint Designation with Saudi Arabia*, June 2, 2004, at 3; Ex. 4, Winer Report at 21.

76.    Declassified documents originating from the U.S. Department of the Treasury and the Office of Foreign Assets Control ("OFAC"), released pursuant to E.O. 14040, detail previously classified evidence relied upon by the U.S. government in support of the designations of Al Haramain's Saudi headquarters and multiple overseas branch offices as Specially Designated Global Terrorist ("SDGT") entities pursuant to E.O. 13224. The evidence describes Al Haramain's provision of material, financial, logistical, and ideological support directly to al Qaeda, associated terrorist organizations, and Islamic extremists across the globe, but also makes clear that Al Haramain's support for Osama bin Laden and al Qaeda was essential to al Qaeda's development and transformation into a sophisticated terrorist organization and its ability to carry out large-scale global attacks, including attacking the United States on September 11, 2001.

77.    First, in a Treasury Department document titled, *Al-Haramayn Islamic Foundation – Bosnia-Herzegovina*, TREASURY00009-11 at Ex. 52, the U.S. government explains that both confidential and unclassified information provided clear linkages between Al Haramain and terrorist groups and their activities in the Balkans region, thereby supporting the decision to designate Al Haramain in Bosnia-Herzegovina as an SDGT pursuant to Executive Order 13224.

> Statement of the Case: Based upon information available to the United States government, there is a reasonable basis to believe that the Al-Haramayn Islamic Foundation in Bosnia-Herzegovina (HIF)

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

> receives financial support from, and is acting for or on behalf of, is providing financial and material support for, or financial or other services to or in support of, or is otherwise associated with, terrorists and terrorist-related organizations listed in the Annex to Executive Order 13224. While much of the information concerning HIF comes from sensitive sources that cannot be disclosed, the following unclassified information clearly establishes HIF's links to terrorist activity. We believe that this information is generally reliable and, taken as a whole, supports the decisions to block the assets of the Al-Haramayn Islamic Foundation in Bosnia-Herzegovina (and its directors).

*See* TREASURY00009.

78.     According to the U.S. government, Al Haramain's offices in Bosnia-Herzegovina were infiltrated by terrorist elements, which in turn provided financial and material aid to terrorist activities and terrorist organizations in the region, often with the active support of Al Haramain's leadership.

> *Al-Haramayn Islamic Foundation's Ties to Terrorists:* [REDACTED] Additionally, HIF offices in Bosnia-Herzegovina have employed personnel with affiliations to or membership in an SDGT (Gama'at Al Islamiyya), indicating that the offices of HIF are widely infiltrated by terrorist elements.

> Given our understanding of the relationship between the Al-Haramayn Islamic Foundation and Specially Designated Global Terrorists (SDGT) and its potential for exploitation by employees with affiliations to or membership in SDGTs, it is reasonable to believe the Al-Haramayn Islamic Foundation is acting for or on behalf of, and providing financial and material support for, or financial or other services to or in support of terrorist activities and terrorist-related organizations, and doing so with the consent if not active support, of the NGO's leadership.

*See* TREASURY00011.

79.     Second, in a Treasury Department memorandum concerning the *Designation of Al-Haramain Foundation-Pakistan*, *see* TREASURY00012-16 at Ex. 61, the U.S. government describes Al Haramain's global support for Osama bin Laden, al Qaeda, and related terrorist organizations via its branch offices and representatives in Africa, Asia, Europe, and North America.

> The Al-Haramayn Foundation (AHF) is one of the principal Islamic NGOs active throughout the world. AHF has been infiltrated by Al-Qaeda and has been used by al-Qaeda for cover and concealment of assets and material, according to military reporting. AHF "belongs

18

to" the Usamah Bin Ladin-established "World Front of the Jihad Against Jews and Christians," which includes the Egyptian Gama Al-Islamiya, the Egyptian Islamic Jihad (EIJ), the Abu Sayyaf Group (ASG) and the Harakat Ul Ansar of Pakistan, according to military reporting. All these organizations are Specially Designated Global Terrorists pursuant to E.O. 13224.

Prior to the removal of the Taliban from power in Afghanistan, AHF had links to the UBL-financed Makhtab al-Khidemat (MK). [REDACTED] MK is a Specially Designated Global Terrorist pursuant to E.O. 13224.

As of January 2003, it appears that numerous AHF field offices and representatives operating throughout Africa, Asia, Europe, and North America appeared to be providing financial and logistical support to Al-Qaeda. Terrorist organizations including Al-Itihaad Al-Islamiya, Egyptian Islamic Jihad, Lashkar I-Tayyiba were receiving funding from AHF and using AHF as a front for fundraising and operational activities.

In one instance later in 2003, a journalist suspected of meeting with Al-Qaeda and Taliban members in Afghanistan was also suspected of transferring funds on behalf of the Al-Qaeda-affiliated AHF, and forwarding videotapes from Al-Qaeda leaders to Al-Jazeera TV for broadcast.

*See* TREASURY00013.

80.     According to the United States, Al Haramain's office in Pakistan employed individuals with ties to al Qaeda and provided financial support to E.O. 13224 SDGTs Jamiat al Dawa ("JUD") and Laskhar E-Taibah ("LET").

At least two former AHF employees that worked in Pakistan are suspected of Al-Qaeda ties. One AHF employee in Pakistan is detained at Guantanamo Bay on "suspicion of financing Al-Qaeda operations."

***

AHF in Pakistan also supports Jamiat al Dawa (JUD) and Lashkar E-Taibah (LET), both Specially Designated Global Terrorist organizations pursuant to the authorities of E.O. 13224. After LET was officially banned in Pakistan on January 12, 2002, LET began using the name JUD to continue operating in Pakistan, [REDACTED].

A detained political official and admitted member of JUD, identifying AHF as one of three Non Governmental Organizations

19

(NGO) financially supporting JUD, provided details about how JUD receives financial support, according to Department of Defense reporting. When JUD requires financial assistance, an estimate is sent to one of the three NGO's, among then AHF. Funds are then provided to JUD either in personal meetings, in which representatives from the NGO and JUD discuss the proposed estimate and reach an agreement, or by wire transfers, to a bank account in the name of the Sheikh in charge of JUD, according to Department of Defense reporting. During 1998-2001, the JUD detainee conducted four or five meetings with representatives from AHF.

*See* TREASURY00014-15.

81.     The Treasury memorandum concludes that the designation of Al Haramain's offices in Pakistan pursuant to Executive Order 13224 is warranted based on the following:

> • Directed by an individual that is an Al-Qaeda facilitator, AHF in Pakistan is controlled by Al Qaeda.
>
> • By employing Al-Qaeda members suspected of supporting Al-Qaeda operations, AHF in Pakistan is controlled by or acting on behalf of, or is assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of Al-Qaeda.
>
> • By financially supporting LET in Pakistan, AHF is assisting, sponsoring or providing financial, material, or technological support for, or financial or other services to or in support of LET.
>
> • By maintaining bank accounts controlled by the MK Director, AHF in Pakistan is controlled by or acting on behalf of, or is assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of MK.

*See* TREASURY00015-16.

82.     Third, in a Treasury Department memorandum concerning the *Designation of Al-Haramain Foundation (AHF) branches in Afghanistan, Albania, Bangladesh, Ethiopia, and The Netherlands, and the AHF's leader Al-Aqil pursuant to the authorities of E.O. 13224*, *see* TREASURY00017-29 at Ex. 62, the United States describes the support for al Qaeda and associated terror groups provided by Al Haramain's Saudi headquarters and its branch offices.

> As of March 2004, information set forth below provides reason to believe that AHF, including its headquarters and all its branch offices, is one of the principal Islamic NGO's active throughout the world providing support for the Al Qaida network and promoting

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

militant Islamic doctrine worldwide. AHF has been infiltrated by Al Qaida and has been used by al Qaida for cover and concealment of assets and material, according to military reporting.

*\*\**

Prior to the removal of the Taliban from power in Afghanistan, AHF was linked to Makhtab al-Khidemat (MK), [REDACTED]. MK, co-founded and financed by Usama bin Ladin (UBL), is an SDGT pursuant to the authorities of E.O. 13224 and the pre-cursor organization of Al Qaida. [REDACTED].

*\*\**

[REDACTED] In mid-April, AHF was "involved with" a group of sixty Afghan persons "trained to attack Westerners, [REDACTED]. Reportedly, one AHF employee believed to belong to Al Qaida is currently detained in Guantanamo, Cuba, [REDACTED].

*See* TREASURY00019-20.

83.     Al Haramain also established an office in Iran to move weapons into Afghanistan in 2001.

An AHF official that reportedly coordinated arms deals with the Al Qaida-affiliated Al-Zarqawi, was instrumental in establishing a branch of AHF in Iran [REDACTED]. The AHF branch in Iran was linked to efforts by "WAFA" to move weapons related items through Pakistan into Afghanistan during the conflict in Afghanistan in late 2001. [REDACTED] WAFA Humanitarian Organization is a Specially Designated Global Terrorist pursuant to the authorities of E.O. 13224.

*See* TREASURY00024.

84.     The Treasury memorandum also reports that Al Haramain's branch office in Albania was directly linked to Osama bin Laden and Egyptian Islamic Jihad ("EIJ").

UBL reportedly financed the establishment of AHF in Albania, which has been used as cover for terrorist activity in Albania and in Europe, [REDACTED]. In 1998, the head of Egyptian Islamic Jihad (EIJ) in Albania was reportedly also the "accountant" for AHF in Albania, according to a French news report. This individual, Ahmed Ibrahim al-Nagar, was reportedly extradited from Albania to Egypt in 1998. At this trial in Egypt, al-Nager reportedly voiced his support for UBL and Al Qaida's terrorist attacks against the U.S. Embassies in Tanzania and Kenya.

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

*See* TREASURY00025.

85.    In a fourth Treasury Department document, *Al-Haramayn Islamic Foundation – Somalia*, *see* TREASURY00030-36 at Ex. 53, the U.S. government discusses Al Haramain's ties to al Qaeda and the Al Ittihad Al Islamiya ("AIAI") terrorist organization in Somalia.

> The U.S. has assembled evidence that shows a history of ties between Al-Haramain Somalia and Usama bin Laden's al-Qaida network, Al-Itihaad al-Islamiya (AIAI), and other associated entities and individuals. For example, over the past few years, Al-Haramain Somalia has provided a means of funneling money to AIAI by disguising funds as intended to be used for orphanage projects or the construction of Islamic schools and mosques. The organization has also employed and provided salaries to AIAI members. [REDACTED].

> The evidence indicates that even after AIAI was named in the Annex to E.O. 13224 and subsequently designated by the United Nations under UNSCR 1333, Al-Haramain Somalia has continued to provide financial support and cover for AIAI operatives, and conceal their activities.

*See* TREASURY00030.

86.    In a fifth Treasury Department memorandum concerning the *Designation of Al-Haramain Foundation (AHF) locations in the United States, the Comoros Islands, and AHF official Soliman Al-Buthe pursuant to the authorities of E.O. 13224*, *see* TREASURY00037-54 at Ex. 63, the United States reveals that in 1998 it had received a list of seven suspected al Qaeda members in the Comoros, two of which were associated with Al Haramain. *See* TREASURY00043.

87.    Next, a Treasury Department memorandum concerning *Additional Designations Pursuant to E.O. 13224: Al-Haramain, Indonesia*, *see* TREASURY00087-92 at Ex. 64, the U.S. government states that "Al-Haramain, Indonesia provides financial support to the Indonesian NGO KOMPAK which, as described below, has multiple links to Jemaah Islamiyah (SDGT)." "KOMPAK was founded by senior Jemaah Islamiyah (JI) leader Agus Dwikarna (SDGT)." *See* TREASURY00091.

88.    Finally, a Treasury Department memorandum concerning *Additional Designations Pursuant to E.O. 13224: Al-Haramayn Kenya and Tanzania*, *see* TREASURY00094-101 at Ex. 65, states that "[t]he entire Al-Haramayn organization has long been suspected of providing various types of support to terrorist groups including Al-Qaeda, and its offices in Bosnia and Somalia were designated on March 11, 2002, pursuant to E.O. 13224, for providing support to Al-Qaeda. Al-Haramayn's offices in Kenya and Tanzania are similarly being recommended for designation for providing financial and material support to Al-Qaeda and Al-Itihaad Al-Islamiya, both of which were designated on September 23, 2001 as part of the Annex to E.O. 13224." *See* TREASURY00095.

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

89.     The memorandum further indicates that "AHF officials in Kenya and Tanzania have been actively involved in supporting the planning and carrying out of terrorist attacks against US and Western targets, as well as other acts of violence. AHF's role appears to be to provide financial and logistical assistance to those who intend to conduct the attacks." *See* TREASURY00097.

90.     According to the U.S. government, Al Haramain employees affiliated with the branch office in Kenya, were arrested in November 1997 for plotting an attack on the U.S. Embassy in Nairobi (prior to the 1998 U.S. Embassy bombings).

> In late November 1997, based on information that Islamic activists associated with AHF were planning to an attack on the U.S. Embassy in Nairobi, Kenyan authorities arrested ten AHF staff members and deported them. The ten, including Abu Abdul Malik, an Algerian serving as an AHF project manager, were reportedly suspected of aiding the Al Itihaad Al Islamiya (AIAI), an organization designated as a Specially Designated Global Terrorist pursuant to E.O. 13224. According to Embassy contacts, AHF's numerous charitable activities in northeast Kenya provide a useful cover for sending funds and supplies to AIAI. These activities included the use of mosques in Garissa and Mandera where the imam or other officials allegedly have ties to AIAI. One Embassy contact was told by [REDACTED] AHF sent weapons and ammunition to AIAI during the August 1996 fighting near the town of Luuq in Somalia. AHF allegedly transported the material on board relief flights that took off from Nairobi's Wilson Airport.

*See* TREASURY00099.

91.     CIA reporting released pursuant to E.O. 14040, dating to both prior to and after the 9/11 attacks, also provides new evidence demonstrating Al Haramain's global support for al Qaeda.

92.     For instance, in *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact [REDACTED]*, January 11, 1999, CIA_000807-848, at Ex. 66, the CIA assessed that al Qaeda infiltrated and used Al Haramain's overseas offices for funding and other resources for years prior to the 9/11 attacks.

> [REDACTED] al-Qa'ida has infiltrated offices of several Saudi-based nongovernmental organizations – especially NGOs in Afghan and Pakistan offices. Usama's familiarity with NGOs in this region no doubt stems from his operation of the Maktab al-Khidamat in Pakistan, which probably had numerous contacts with Saudi and other Gulf charities with respect to aiding Arabs in Afghanistan…. All-source intelligence suggests that several Saudi NGOs are funding conduits for al-Qa'ida or have been penetrated by Usama's network. Those of greatest concern include … Al-Haramayn Islamic

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

Foundation.

\*\*\*

[REDACTED] offices of Al Haramayn in Albania, Azerbaijan, Bosnia, Kenya, and Tanzania have been used by al-Qa'ida.

*See* CIA_000808, 817.

93.　　The CIA report further details Al Haramain's support for Osama bin Laden, certain terror groups, and the mujahideen in the Balkans.

Employees at Al Haramayn offices in Albania, Azerbaijan, Kenya, and possibly Tanzania, have been funded by or have acted on behalf of Usama Bin Ladin: [REDACTED].

\*\*\*

[REDACTED] the Al-Haramayn office in Nairobi was a front for the Al-Ittihad Al-Islami, an Usama Bin Ladin-backed Islamic insurgent group engaged in politically motivated violence in Somalia and Ethiopia.

\*\*\*

Al Haramayn offices have supported other terrorist groups. [REDACTED] for example, it has been particularly involved in providing financial and logistical support to the Bosnian mujahedin. [REDACTED] the NGO also has associated with Egyptian terrorists. Ayman Al-Zawahiri – the [blank] was a onetime Al Haramayn leader.

*See* CIA_000819-820.

94.　　In a report titled, *How Bin Ladin Commands a Global Terrorist Network [REDACTED]*, January 27, 1999, CIA_00002-16, at Ex. 54, the CIA describes how Osama bin Laden and al Qaeda used Al Haramain and other purported charities for funding, travel assistance, covert employment, and weapons smuggling.

In addition to support from other groups, Bin Ladin taps into the resources of some international Islamic nongovernmental organizations (NGOs) for financial and logistical support. Employees—ranging from accountants to directors—of a few NGO branch offices have diverted resources to benefit Bin Ladin and his associates, although we are unable to determine if the organizations' home offices are witting. Bin Ladin exploits these NGO ties to channel funds and obtain cover employment and travel assistance for his associates. He also uses the NGOs' distribution network to

24

move weapons and supplies.

• Employees of the Azerbaijan-based al-Haramayn office, for example, have regularly diverted resources to Bin Ladin and his associates since 1995, [REDACTED]. The former head of the Baku office and its logistical chief, both associated with Bin Ladin, directed much of this activity, including channeling funds and weapons.

*See* CIA_000007.

95.     In a subsequent report, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236, at Ex. 55, the CIA further describes the use of purported charitable organizations, like Al Haramain, by Osama bin Laden for critical resources in support of terrorist activities.

The logistical support NGOs offer includes cover employment, false documentation, travel facilitation, training, and in some cases, weapons. Most Islamic terrorist groups maintain relationships with several NGOs, which protects them from the closure of any one organization. Terrorists typically penetrate NGOS by finding individual sympathizers who divert resources in support of the group, but in a few instances, entire NGO offices, including senior management positions, are staffed by extremists.

\*\*\*

Usama Bin Ladin has established close relationships with employees in several al-Haramayn offices, [REDACTED] and has used these ties to divert resources to support his terrorist agenda, [REDACTED]. Some of these employees probably [blank] either planted or coopted by Bin Ladin after they began working for the NGO.

*See* CIA_000210-211, 217.

96.     In *Al Haramain in Africa: Supporting Al-Ittihad Al-Islami and Other Terrorists*, March 22, 2002, CIA_000675-679, at Ex. 67, the CIA details Al Haramain's extensive support for terror groups in Africa.

In Africa, HIF maintains a presence in about a dozen countries and supports several extremist groups, particularly Somalia's al-Ittihad al-Islami (AIAI), [REDACTED]. Al-Haramain employees also provide cover and logistic support for al-Qa'ida cells, including those involved in the 1998 U.S. Embassy bombings in Kenya and Tanzania. Most of Al-Haramain's field office directors in East Africa are aware of and support the organization's aid to militant extremists, and at least some top-level officials from HIF's

25

headquarters condone the funding of extremist groups.

***

**Backing Somalia-Based AIAI** – Al-Haramain's top priority in Africa is supporting the Somali AIAI faction, [REDACTED]. AIAI—designated by the U.S. Government as a foreign terrorist group—seeks to establish an Islamic state in "Greater Somalia" including parts of Ethiopia, Djibouti, and Kenya. HIF offices worldwide collect funds to provide AIAI with financial support to establish Islamic schools, courts, and other institutions in AIAI-influenced territory. HIF has also helped the faction develop its insurgent and terrorist capabilities.

• In 2002, HIF arranged travel for AIAI members to Saudi Arabia, probably to help them avoid anticipated U.S. military action in Somalia.

• In 2001, HIF provided humanitarian cover for unidentified Arabs traveling to Somalia to train AIAI military recruits, [REDACTED].

• In 1999, HIF maintained villas in Somalia used to store explosives and train AIAI members for jihad operations, [REDACTED].

Al-Haramain also supports AIAI from its offices and refugees camps in Kenya.

*See* CIA_000675-676.

97.    The CIA report further explains Al Haramain's role in the 1998 U.S. Embassy bombings and the aid it provided to al Qaeda fighters.

**Providing Cover for al-Qaida** – In addition to its support of African Islamic terrorist groups, Al-Haramain's field offices in Tanzania and Kenya have aided al-Qa'ida cells, including those responsible for the 1998 U.S. Embassy bombings.

• In 2002, Al-Haramain's office in Tanzania hid 14 extremists—at least some of whom were probably al-Qa'ida fighters fleeing Afghanistan—in the Kiwalani mosque in Dar es Salaam, [REDACTED]. While staying at the mosque, the fighters provided training to local extremists.

• In 1998, the Kenyan Government deregistered HIF for providing support to the terrorist cells that planned and carried out the bombing of the US Embassy in Nairobi, [REDACTED]. HIF and other NGOs diverted funds and helped import materials needed to build the bombs.

26

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

*See* CIA_000676.

98.     The CIA also discloses that Al Haramain's humanitarian activities in Africa were undertaken with the goal of recruiting young men for jihad.

> **Humanitarian, but With a Militant Agenda** – Even Al-Haramain's ostensibly legitimate activities in Africa, such as building mosques and Islamic schools, are undertaken with the goal of creating an environment conducive to militancy.
>
> • HIF's limited relief operations and infrastructure construction projects in Africa are targeted to help only Muslim communities and propagate the fundamentalist Salafist brand of Sunni Islam.
>
> • HIF's schools, mosques, and publications espouse Salafism's rigid orthodoxy and attack opposing secular and religious—including other Islamic doctrines—[REDACTED]. These efforts complement HIF employees' efforts to recruit young Africans for the jihad against the enemies of Islam.

*See* CIA_000675.

99.     In *Al-Qa'ida Still Well Positioned to Recruit Terrorists [REDACTED]*, July 1, 2002, CIA_000178-189, at Ex. 68, the CIA assessed that Al Haramain was also recruiting young men for jihad and terrorist activities in the Balkans region.

> In the Balkans, local offices of NGOs such as the World Assembly of Muslim Youth, al-Haramayn, Society for the Revival and Islamic Heritage, and al-Waqf al-Islamiya were actively involved in spotting and assessing suitable terrorist recruits from among young men who seek assistance from humanitarian organizations, [REDACTED].

*See* CIA_000186.

100.     In an August 28, 2002 CIA report, *Al-Haramain: Support for Extremists and Terrorists [REDACTED]*, CIA-SUB 0007-19, at Ex. 69, the CIA provides extensive evidence of Al Haramain's support for Islamic extremists and terrorists, and connections to al Qaeda and other militant groups.

> **Ties to al-Qa'ida** – [REDACTED] at least 20 al-Haramain field offices and representatives operating in 50 countries in Africa, Asia, Europe, and North America, as well as its headquarters in Saudi Arabia, appear to be providing financial and logistic support to al-Qa'ida. In some cases, [REDACTED] financial support or collusion in terrorist plots. [REDACTED]
>
> Some of the ties are to key al-Qa'ida officials or ongoing plots.

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

• [REDACTED] November 2001, unspecified al-Haramain officials met with the leadership of Wafa, an NGO with close ties to al-Qaʻida.

[REDACTED] HIF offices in Indonesia and Pakistan support al-Qaʻida and other extremist groups [REDACTED].

Documents seized during SFOR raids in the Balkans [REDACTED] suggest that employees at HIF offices in Albania, Bosnia, Croatia, and Kosovo support al-Qaʻida and affiliated groups. Individuals in each of these offices have been funded by or worked with Bin Ladin, [REDACTED].

• Bosnian authorities found e-mails in June 2002 from al-Qaʻida members on computers confiscated from the al-Haramain office in Travnik, Croatia. The e-mails contained instructions to attack an SFOR base in Tuzla, according to press reporting.

Al-Haramain offices in at least five African countries—Comoros Islands, Djibouti, Kenya, Somalia, Tanzania, and probably in Ghana—support al-Qaʻida and affiliated terrorist groups.

• [REDACTED] former HIF director in Tanzania Mummar al-Turki Abdul Wahab Dahil helped coordinate involvement in the 1998 US Embassy bombing in that country.

• [REDACTED] Dr. Omar Shams Idris, the HIF director in Tanzania, may have provided funds for a possible terrorist attack in Mombasa, Kenya, as of April 2002.

• Al-Haramain's Saudi headquarters delivered [REDACTED] cash [REDACTED] to Ramzi ben Mizauni Benfraj, the head of the Tanga, Tanzania office. Mizauni reportedly threw a party in Dar es Salaam to celebrate the 11 September attacks and, as of May, was attempting to gain Tanzanian citizenship illegally through the purchase of false documents.

• Elias Ali Noor, a Somali employee of Al-Haramain in Somalia, may have ties to USS Cole suspects, [REDACTED].

See CIA-SUB_0010-11.

101.    Al Haramain provided financial and logistic support to other terrorist groups, such as al-Ittihad al-Islamiya ("AIAI"), an Islamic terror group in Somalia, HAMAS, and Egyptian Islamic Jihad. See CIA-SUB_0011.

102.    Al Haramain provided similar support to Islamic extremists and foreign fighters in Bosnia and Chechnya.

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

• The HIF in Bosnia during the 1990s funded and supported the foreign *mujahidin* battalion in Zenica, transported *mujahidin*, provided logistic and financial support for its members, and conducted propaganda activities, [REDACTED].

• [REDACTED] HIF provided about one-third of the total funds being funneled from the Persian Gulf to support the Chechen insurgency in the Caucuses.

*See* CIA-SUB_0012.

103.   The CIA report provides additional details concerning Al Haramain's activities in Africa, Asia, and Europe.

• [REDACTED] al-Haramain's top priority in Africa is supporting the AIAI faction, [REDACTED]. AIAI—designated by the US Department of Treasury under Executive Order 13224 as a foreign terrorist group—seeks to establish an Islamic state in "Greater Somalia" including parts of Ethiopia, Djibouti, and Kenya. HIF offices worldwide collect funds to provide AIAI financial support to establish Islamic schools, courts, and other institutions in AIAI-influenced territory. HIF has also helped the faction develop its insurgent and terrorist capabilities. [REDACTED]. *See* CIA-SUB_0017.

• In addition to its support of African Islamic terrorist groups, al-Haramain's field offices in Tanzania and Kenya have aided al-Qaʻida cells, including those responsible for the 1998 US Embassy bombings. *Id.*

• Al-Haramain also misuses its status as a charitable organization to fund Islamist political parties and civic groups in East African countries—including Tanzania, Djibouti, and Comoros Islands. In some instances, the funding extends to supporting sectarian violence, [REDACTED]. *See* CIA-SUB_0018.

• Al-Haramain uses its presence in Indonesia to support extremist groups and is poised for expansion in the region. [REDACTED]. *Id.*

• [REDACTED] Ahmad al-Amoudi—the Jakarta office director who served tours for al-Haramain in Pakistan, Bangladesh, and Azerbaijan in the 1990s—may have been involved in *mujahidin* recruitment. *Id.*

• [REDACTED] al-Amoudi met [REDACTED] with Jafar Umar Thalib, leader of the Indonesian extremist group Laskar Jihad; al-Amoudi also noted that al-Haramain was working with Thalib on several ongoing "projects." *Id.*

29

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

• Al-Haramain has built 25 mosques and schools in Indonesia and asserted control over mosque leadership positions to radicalize the local population. *Id.*

• [REDACTED] funds were transferred from an HIF headquarters account in Saudi Arabia at al-Rajhi bank to an al-Ansar Welfare Trust in Kashmir. [REDACTED] al-Ansar Welfare Trust is a front for Lashkar-e-Tayyiba (LT) and Tehrik ul-Mujandin, which have been listed by the United States as terrorist groups. *Id.*

• [REDACTED] individuals in the HIF offices in the Balkans are supporting extremist groups. *Id.*

• Employees at HIF offices in Albania, Bosnia, Croatia, and Kosovo have been funded by or have acted on behalf of Usama Bin Ladin, [REDACTED]. *Id.*

• Employees at al-Haramain have a long history of supporting the Chechens and foreign *mujihidin* movement … an al-Haramain employee, provided funds and supplies to Chechen *mujahidin* leaders. including several individuals tied to al-Qa'ida. *See* CIA-SUB_0019.

• [REDACTED] al-Haramain officials have couriered funds to Chechnya for both World Assembly for Muslim Youth and the International Islamic Relief Organization. *Id.*

104.    A November 14, 2002 CIA report, *Saudi-Based Financial Support for Terrorist Organizations [REDACTED]*, CIA_000143-158, at Ex. 45, indicates that an Al Haramain official served on a committee of Jemaah Islamiyah, an al Qaeda linked terrorist group in Indonesia, dedicated to funding the training of jihadists and amassing weapons to wage a religious war that will create an Islamic state in Indonesia. *See* CIA_000152.

105.    More recent intelligence reporting by the U.S. government, declassified and released pursuant to E.O. 14040, further reinforces the findings of U.S. and international investigations that Al Haramain's support for Osama bin Laden and al Qaeda was essential to al Qaeda's development into a sophisticated global terrorist.

106.    For instance, a July 23, 2021 FBI report, *Connections to the Attacks of September 11, 2001*, EO14040-003478-3608-UPDATED, at Ex. 51, asserts the following about Al Haramain.

Alharamain foundation is a Saudi Arabian Islamic "NGO" or "charity" who had multiple offices worldwide designated as terrorist supporting entities by the United States for their support of AQ related groups. Within the U.S. the Alharamain office was located in Portland, Oregon and was later specifically designated along with its primary operator Suliman Albouthe.

30

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

The Al Haramayn or Al Haramain Islamic Foundation (AIF) has been reported as a Saudi Arabian funded Islamic charitable organization that distributes books, video/cassette tapes and leaflets which espouse radical Islamic thoughts. AIF has been utilized as a front organization for supporting and facilitating the movement of Islamic Mujahadin into areas of Kosovo, Chechnya, Pakistan, Afghanistan and Bosnia. [REDACTED].

In [REDACTED] is identified as [REDACTED] of the Al Haramain Foundation. It is further stated in [REDACTED] that "an African chapter of the Jeddah, based group was identified in a 1999 State Department report as one of the suspect terrorist groups operating in Nairobi, Kenya, before the bombing of the U.S. Embassy there in 1998.

*See* EO14040-003567-3568.

107.    The Kingdom of Saudi Arabia validated the U.S. government's investigative findings concerning Al Haramain's global support for terrorism, describing the Saudi-based da'wah organizations as "one of the biggest terror-financing operations in the world."

> After the terrorist attacks on September 11, 2001, the U.S. Department of the Treasury initiated the Terrorist Finance Tracking Program (TFTP) to identify, track, and pursue terrorists and their networks. By 2004, the U.S. Department of the Treasury and Saudi Arabia eliminated four branches of the Al-Haramain charity, one of the biggest terror-financing operations in the world and the funding organ and channel for the Nairobi, Kenya and Dar es Salaam bombings in 1998.

> ***

> Saudi Arabia, in joint investigations with the U.S., has identified 17 prominent financial facilitators that are directly associated with Daesh. These sources, and others like them, are being shut down. We have also succeeded in dissolving groups such as Al-Furqan, a charity that was a major conduit of financial and material support for terrorist groups, and the charity front Al-Haramain Islamic Foundation, notoriously tied to Osama bin Laden, the Taliban and Al Qaeda's terror campaigns.

*See* Ex. 70 (Dean Exhibit 7), *The Kingdom of Saudi Arabia and Counterterrorism*, at 13, 86; Ex. 4, Winer Report at 21.

108.    Al Haramain's financial and material support for al Qaeda and terrorism were carried out under the direction and leadership of its senior officials, including Al Haramain Director Aqil al Aqil, Mansour al Kadi, Soliman al Buthe, and Perouz Sedaghaty. *See* Ex. 62, TREASURY00017-29 at 21 ("As of January 2003, the U.S. judged that AHF's Director Al-Aqil,

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

who at the time managed AHF's business on a day-to-day basis, was providing funds to offices with terrorist ties in ways that avoided foreign government scrutiny, such as using personal bank accounts to transfer official AHF funds, according to diplomatic reporting."); *id.* (stating that Kadi, "al-Aqil's deputy and one of AHF's main leaders," is "implicated in working with al Aqil to support al Qaida terrorist activity"); *id.* at 27 (stating that Aqil was an "Al Qaida supporter that handled the collection of funds for 'freedom fighters' in areas including Afghanistan, Bosnia, Chechnya, Kosovo, and Somalia, [REDACTED]").

109.    The CIA has assessed that Aqil was aware of, condoned, and participated in Al Haramain's ongoing material, financial, logistical, and ideological support for terror groups and Islamic extremists. According to the CIA:

> We judge that HIF Director Shaykh Aqil Ibn 'Abdul-'Aziz al-'Aqil, who manages al-Haramain's business on a day-to-day basis, is aware that funds in several field offices are being used to support terrorist and militant groups. [REDACTED] he almost certainly has been involved in suspicious money movements since 11 September.
>
> • [REDACTED] April 1999, al-Haramain used a centralized system that prohibits individuals from allocating funds without the personal approval of the foundation's director.
>
> • [REDACTED] Shaykh Aqil, other senior managers, and individuals at branch offices are at least aware that several branch offices provide logistic support to Islamic extremists.
>
> • [REDACTED] Shaykh Aqil may have received funds from an unspecified organization [REDACTED] with extremist ties in the last few months. [REDACTED].
>
> *Mujahidin* leaders frequently have coordinated funding support with senior al-Haramain managers, who were aware that their donations were being used for military support, [REDACTED]. The organization reportedly also has issued visas and identity papers to *mujahidin*, funded their recruitment and travel, and provided health care for wounded *mujahidin*, [REDACTED]. [REDACTED] 2001, Chechen *mujahidin* [REDACTED] received about [REDACTED] from al-Haramain, [REDACTED].

*See* Ex. 69, *Al-Haramain: Support for Extremists and Terrorists [REDACTED]*, August 28, 2002, CIA-SUB 0007-19 at 14. *See also* Ex. 67, *Al Haramain in Africa: Supporting Al-Ittihad Al-Islami and Other Terrorists*, March 22, 2002, CIA_000675-679 at 675 ("Most of Al-Haramain's field office directors in East Africa are aware of and support the organization's aid to militant extremists, and at least some top-level officials from HIF's headquarters condone the funding of extremist groups.").

110.    As to Soliman al Buthe (Treasurer of Al Haramain's office in Ashland, Oregon, and chairman of Al Haramain's U.S. Committee with broad legal authority to act on behalf of Al

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

Haramain in the United States), the U.S. government concluded that al Buthe (1) worked closely with individuals providing material support for terrorism, (2) provided support to Islamic extremists advocating jihad, (3) served as a "clearinghouse" for moving Al Haramain funds from Saudi Arabia to the United States, and (4) engaged in activities to prevent the dissolution of Al Haramain notwithstanding multiple Executive Order 13224 designations of Al Haramain branch offices and officials.

> FBI investigation revealed that Al-Buthe, on behalf of AHF, entered into agreements to work closely with alleged terrorist supporter Sami Omar Al-Hussayen, who was charged by Federal prosecutors in Idaho with material support for terrorism. According to the Superseding Indictment, Al-Hussayen allegedly provided Internet and computer expertise to support and recruit for violent Jihad. This support was allegedly provided to AHF, Hamas, and a list of extremist websites, one or more of which contained explicit calls for violence against non-Muslims and urged visitors to participate in, or make financial contributions to support violent Jihad.

> \*\*\*

> FBI investigation of one of the extremist websites revealed that Al-Buthe provided support to radical Saudi Shaykh Salman Al-Awdah. A government exhibit entered into evidence in the Idaho trial identifies al Buthe as the owner, Chairman/Managing Director, and billing contact for islamtoday.com. This website is identified as "owned" and "under the supervision of" Al-Awdah, according to public Internet sources.

> \*\*\*

> As of April 2004, Al-Buthe appeared to be functioning as a clearinghouse for moving AHF funds from Saudi Arabia to the U.S. [REDACTED] Al-Buthe has been acting as the conduit for sending funds on behalf of AHF to the U.S. to pay at least $515,316 in legal fees between June 2003 and April 2004. These funds reportedly were to assist in the legal defense of himself, AHF, AHF leader Aqeel Al-Aqil and others, including Muhammad Jumal Khalifa.

> \*\*\*

> As of mid-March 2004, Al-Buthe was working hard to prevent the "total dissolution" of AHF, [REDACTED].

*See* Ex. 63, TREASURY00037-54 at 47-50. *See also* Ex. 71, Affidavit in Support of an Application for Search Warrant, In the Matter of the Search of One story residential building located at 3800 S. Highway 99 in Ashland, Oregon, Case No. 04-4009, filed in Case No. 6:05-crd-60008-AA, Document No. 183-3, June 19, 2009, at ¶ 42 (stating that al Buthe entered the United States at least thirteen times between October 1997 and April 2001, transporting a total of

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

$777,845.00 into the country); Ex. 26 (Lormel Exhibit 9), *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States*, December 2004, EO14040-003414-3442 at 3435 (stating that al Buthe "provided over $700,000 to the US-based offices of HIF," and that "[a]pproximately $600,000 of these funds came from al-But'he's personal account at the al-Rajhi Bank and Trust").

111.    According to the U.S. government, Perouz Sedaghaty, who worked in Al Haramain's U.S. branch office in Ashland, Oregon, admitted to the FBI that he had received $500,000.00 from Osama bin Laden.

> In late 2001, the senior AHF official in the U.S., Perouz [Seda] Ghaty, sought a license from OFAC to purportedly assist Afghan refugees in border camps in Iran on the Iranian/Afghanistan border. Following the dual-U.S. Embassy bombing attacks in East Africa in August 1998, Seda reportedly confided to an FBI source that he was "in trouble." When asked by the FBI source to elaborate, Seda said that he received $500,000 from UBL--"through Bosnia." Seda was described as a "fundamentalist" who has sought to convert prison inmates to the Islamic faith.
>
> As part of Seda's request to OFAC in November 2001, he reported that Shaykh Al-Aqil, identified as the President of AHF, agreed to Seda's proposal to fund $500,000 for assistance to Afghan refugees in border camps in Iran. On the U.S. AFH's tax form 990 for 2001 filed with the IRS, Al-Aqil is identified as the President, Al-Kadi as the Vice President, Al-Buthe as the Treasurer, and Seda as the Secretary. The U.S. AHF branch's Articles of Incorporation and application to the IRS for tax-exempt status also list Al-Aqil and Al-Kadi as members of the board of directors.
>
> As of March 2003, due to pressure from the U.S. on Saudi authorities to close AHF, Al-Aqil and Al-Kadi reportedly resigned from the U.S. AHF office, [REDACTED].

*See* Ex. 62, TREASURY00017-29 at 24.

112.    Based on their roles in supporting al Qaeda, the United States government designated both Aqil al Aqil and Soliman al Buthe pursuant to E.O. 13224, and additionally indicted al Buthe for terrorist financing activities undertaken in connection with Al Haramain's U.S. branch. *See* Ex. 4, Winer Report at 112; Ex. 38, Kohlmann Report at 12. *See also* Ex. 48 (Lormel Exhibit 18) (June 2, 2004 designation of Aqil al Aqil); Ex. 50 (September 9, 2004 designation of Soliman al Buthe).

113.    As discussed below, Abdullah al Misfer, one of Suleiman al Rajhi's full time committee officials, was also an official of Al Haramain. *See* Ex. 4, Winer Report at 103, 121, 122-123; Ex. 38, Kohlmann Report at 12. *See also* Ex. 73, Al Jazirah and Al Minbar articles identifying "Sheikh Abdullah al Misfer" as "the Head of the Palestine Division" of Al Haramain;

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

Ex. 15, NL 9623 (August 24, 1999 letter from Abdullah bin Ibrahim Al-Misfer to the Executive Director of "Islamic Call at Universities," in Garden Grove, California, stating that he works for the "Al-Rajhi Charity Office").

114.    IIRO also is a Saudi-based Islamic charity, founded in 1978 as a subsidiary and operational arm of the Muslim World League ("MWL").

115.    Usama bin Laden and al Qaeda used the entire IIRO network for al Qaeda's terrorist activities. *See* Ex. 74, U.S. Diplomatic Cable, *Terrorist Finance: Post-Vetting of Human Appeal International (HAI)*, February 13, 2007, at 1 ("Usama bin Ladin used the entire IIRO network for his terrorist activities."); Ex. 75, *Additional Designations Pursuant to E.O. 13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches*, TREASURY00102-121 at 106 ("The International Islamic Relief Organization [IIRO], which is headquartered in Jeddah, Saudi Arabia and maintains numerous branch offices, is one of the primary non-governmental organizations [NGOs] active worldwide associated with and providing financial, material and logistical support to designated terrorist organizations, including al Qaida and UBL … the Taliban … Hamas … as well as a Qaida affiliates, inter alia, the Abu Sayyaf Group (ASG) … Jemaah Islamiyah (JI) … and Al Ittihad Al Islamiya (AIAI)."). *See also* Ex. 38, Kohlmann Report at 17-30; Ex. 4, Winer Report at 15, 19, 30, 35, 36, 38, 39, 49-50, 58, 59. 87, 97.

116.    Among other support, the IIRO was "the principal sponsor of terrorist training camps in Afghanistan during the Taliban regime." *See* Ex. 76, U.S. Diplomatic Cable, *Terrorist Finance: [REDACTED]*, June 2004, PEC-KSA001464-1466 at 1465. *See also* Ex. 66, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 808 ("The International Islamic Relief Organization (IIRO) funds a military camp associated with Usama [REDACTED]."); Ex. 77, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 972 ("The IIRO helps fund six militant training camps in Afghanistan."); Ex. 4, Winer Report at 16, 17, 50; Ex. 38, Kohlmann Report at 18, 20, 25, 26.

117.    In 2006, the United States formally designated two of IIRO's branches and a senior IIRO official from IIRO's Eastern Province Office in Saudi Arabia, Abd Al Hamid Sulaiman al Mujil, based on their roles in funding and providing support to al Qaeda. Ex. 170 (Abdullah al Rajhi Exhibit 28) (August 3, 2006 designation of IIRO's branches in the Philippines and Indonesia, including And al Hamid Sulaiman al Mujil); Ex. 75, *Additional Designations Pursuant to E.O. 13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches*, TREASURY00102-121.

118.    In issuing the designation, the United States confirmed that "Al-Mujil has a long record of supporting Islamic militant groups, and he has maintained a cell of regular financial donors in the Middle East who support extremist causes." Further:

> Abd Al Hamid Sulaiman Al-Mujil (Al-Mujil) is the Executive Director of the IIRO Eastern Province (IIRO-EP) branch office in the Kingdom of Saudi Arabia. Al-Mujil has been called the million dollar man for supporting Islamic militant groups.
>
> Al-Mujil provided donor funds directly to al Qaida and is identified

as a major fundraiser for the Abu Sayyaf Group (ASG) and Jemaah Islamiyah (JI). Both ASG and JI are al Qaida-associated terrorist groups in Southeast Asia designated pursuant to the authorities of E.O. 13224. These terrorist groups are also on the United Nations 1267 Committee's consolidated list of individuals and entities associated with the Taliban, al Qaida and/or Usama Bin Ladin.

In 2004, Al-Mujil invited a Philippines-based JI supporter to Saudi Arabia under the cover of traveling for the hajj (the Muslim pilgrimage), and planned to provide him with cash to carry back to the Philippines to support organizations including JI.

Al-Mujil was also present in Afghanistan in the late 1990s and personally knew Usama Bin Ladin and deceased al Qaida co-founder Abdallah Azzam. Al-Mujil traveled continuously to meet with members of Bin Ladin's organization in Arab countries. In the 1990s, Al-Mujil established a relationship with senior al Qaida operational planner Khalid Shaykh Muhammad.

Al-Mujil has a long history of providing support to terrorist organizations. He has contributed direct financial assistance to ASG leaders, including Abdurajak Janjalani (deceased).

The Indonesian and Philippines branches of IIRO have received support from IIRO-EP, which in turn is controlled by Al-Mujil. Indeed, he is often responsible for authorizing payment transfers for IIRO Philippines (IIRO-PHL) and IIRO Indonesia (IIRO-IDN).

*See* Ex. 75 at 1-2.

119.    Additional CIA determinations and other evidence show that the IIRO's support for al Qaeda was undertaken under the direction of additional members of IIRO's senior leadership in Saudi Arabia, including Prince Turki bin Jalawi al Saud, who was "an important al-Qa'ida donor who hails from a minor line in the Saudi royal family," and a "key leader of the Eastern Province office." *See* Ex. 26 (Lormel Exhibit 9), *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States*, December 2004, EO14040-003414-3442 at 3419.

120.    According to the deposition testimony of IIRO Secretary General Adnan Basha in this litigation: (1) the IIRO became aware of financial irregularities at the Eastern Province branch and formed a committee to investigate; (2) an audit revealed that the Eastern Province branch was willfully violating IIRO financial regulations by sending money to the accounts of overseas IIRO branch offices (including Pakistan) to implement projects without advising or seeking permission from IIRO headquarters and/or the IIRO General Secretariat; (3) the audit further discovered that IIRO Eastern Province officials were paying cash for projects without expense vouchers or receipts, also in violation of IIRO regulations; and (4) Secretary General Basha asked Prince Turki to cease these practices, but the Prince refused to comply with his request. *See* Ex. 78, Transcript, February 21, 2019 Deposition of Adnan Basha ("Basha Deposition"), at 265-278.

121.    Secretary General Basha explained that Prince Turki resigned as the head of the

Eastern Province branch following the auditor's findings. Prince Turki resigned "[b]ecause he did not wish to implement the recommendations of the auditor." According to Basha, "I recall that the auditor's report connected all the violations to requests from the Prince." *Id.* at 273.

122.    SDGT Wa'el Hamza Jelaidan also served as an official of IIRO, along with several other ostensible charities that funneled money and support to al Qaeda. *See* Ex. 38, Kohlmann Report at 19; Ex. 49, *Treasury Department Statement on the Designation of Wa'el Hamza Julidan*, September 6, 2022 at 1 ("Julaidan has been the head of various non-governmental organizations providing financial and logistical support to the al-Qa'ida network."); *id.* at 2 ("In February 2000, Julaidan was appointed to the Board of Trustees of the Rabita Trust and served as its Director General. The Rabita Trust is an NGO designated under President Bush's Executive Order as an organization that provided logistical and financial support to al-Qa'ida."). *See also* Ex. 41 (Dean Exhibit 4), *Government's Evidentiary Proffer Supporting the Admissibility of Coconspirator Statements*, PEC-KSA002014-2114 at 2031 ("By way of background, Usama Bin Laden and Abdallah Azzam formed *Mekhtab al Khidemat* ('MK') (the 'Office of Services') to support the *mujahideen* in Afghanistan engaged in a conflict with the Soviet Union at a time prior to the Soviet withdrawal in 1989. Various relief organizations – including LBI [Lajnat al Birr al Islamiya], the BIF [Benevolence International Foundation] forerunner – worked with MK to provide travel documents, funds and other logistical support to the *mujahideen*. MK also worked with a number of other charitable/relief organizations, especially with Wael Julaidan ("Abu Hassan al Madani") of the International Islamic Relief Organization … which was under the umbrella of *al Rabita al Alami al Islamiya*, also known as the Muslim World League ('MWL'). In many respects, Wael Julaidan was a leading supporter of the jihad through the relief organization network. Persons affiliated with charities provided logistical support to the *mujahideen* so integral to the success of the *mujahideen* that, as discussed below, Julaidan was featured in organizational charts as the person responsible for 'Jihad Support,' even dating to the time prior to the forming of *al Qaeda*.").

123.    A November 14, 2002 CIA report, *Saudi-Based Financial Support for Terrorist Organizations [REDACTED]*, CIA_000143-158, at Ex. 45, indicates that Jelaidan and Mohammed Jamal Khalifa (also an al Qaeda member) served in official roles with the MWL.

> Some reporting indicated the MWL is the parent organization of the International Islamic Relief Organization (IIRO) and the World Assembly of Muslim Youth (WAMY), is affiliated with more than a dozen other NGOs worldwide, and has its own offices in more than 30 countries. Several of Bin Ladin's associates, including Wa'il Julaydan and Muhammad Jamal Khalifah, were MWL representatives, according to [REDACTED] press reporting. [REDACTED] funds destined for al-Ittihad al-Islamiyya (AIAI) in Somalia were funneled through several Saudi NGOs, including MWL.

*See* CIA_000150.

124.    Jelaidan was a close associate of Osama bin Laden, and one of the most significant figures in the history of al Qaeda and its development into a global terrorist organization. *See* Ex. 4, Winer Report at 38, 86; Ex. 38, Kohlmann Report at 18 ("Julidan was one of Bin Laden's closest

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

friends"); Ex. 49, *Treasury Department Statement on the Designation of Wa'el Hamza Julidan*, September 6, 2022 at 2 ("Bin Laden himself acknowledged his close ties to Julaidan during a 1999 interview with al-Jazeera TV. When referring to the assassination of al-Qa'ida co-founder Abdullah Azzam, bin Ladin stated that 'We are all in one boat, as is known to you, including our brother, Wa'el Julaidan.'"). *See also* Ex. 79, *Additional Designation Pursuant to E.O. 13224*, TREASURY00001-8 at 4-5 (stating that "Julaidan is identified as one of the original founders of the al-Qa'ida organization and as bin Ladin's logistics chief," and also served on al Qaeda's shura council).

125.    Jelaidan played a key role in channeling support to al Qaeda from ostensible charities, including IIRO, MWL, Rabita Trust, Saudi Joint Committee for Relief of Chechnya and Kosovo, Saudi Red Crescent, and Rabita Trust. In the CIA report, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563, at Ex. 80, the CIA describes how Jelaidan used his high-ranking positions in the Saudi da'wah organizations to divert money to al Qaeda.

> *Wa'el Hama A. Julaydan.*  Longtime Bin Ladin associate and IFTSC senior official *Wa'el Hamza Julaydan* (alias Abu Hasan al-Madani), a veteran of the Islamic charity circuit, has held high-level positions at the International Islamic Relief Organization (IIRO), Muslim World League (MWL), the Saudi Joint Relief Committee (SJRC), the Saudi Red Crescent Society (SRCS), and lately at two Bin Ladin-affiliated charities, al-Waqf al-Islami, and as secretary general of Rabita Trust coordinating financial activities and overseeing the budget. Julaydan has provided support since the 1990s to Muslims in Bosnia and Chechnya – hotbeds of mujahidin activity – and may be using his position and influence at these organizations to divert funds and resources to al-Qa'ida.

*See* CIA_000544. *See also* Ex. 66, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact [REDACTED]*, January 11, 1999, CIA_000807-848 at 823 (the CIA assessed that the MWL was "used as a cover organization for several of Usama's associates: [REDACTED].").

126.    In connection with his role as one of al Qaeda's most important financiers and financial facilitators, Jelaidan was designated to receive contributions from members of al Qaeda's Golden Chain. *See* Ex. 4, Winer Report at 38; Ex. 81, Tareekh Osama "Golden Chain," FED-PEC0134953-134955 at 134954 (identifying "Wail" next to certain of the Golden Chain donors: Suleiman al Rashid, Abdel Qader Bakri, Salah al Din Abdel Jawad, and Abdel Hadi Taher); Ex. 42, August 29, 2002 Interview with Jamal al Fadl, PEC-KSA000329-352 at 351 (discussing Jamal al Fadl's review of the Golden Chain document ("Tareekh Osama, Folder 41, Document 108") with the FBI, which is the same document at Ex. 81 ("Tareekh Osama/41/Tareekh Osama 108")).

127.    Jelaidan was a close associate of Yassin al Qadi, an important al Qaeda donor and financial facilitator, with whom Jelaidan partnered on numerous commercial and ostensible charity enterprises, including Muwafaq Foundation. *See* Ex. 4, Winer Report at 86-87; Ex. 82, *Designation Pursuant to E.O. 13224 of Yasin Al-Qadi*, TREASURY00055-86 at 61 ("Al-Qadi hired Chafiq Ayadi, an SDGT designated at the same time as Al-Qadi on October 12, 2001, to head Muwafaq's

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

European operations upon the recommendation of Wa'el Julaidan in late 1992."); *id.* at 57, 61-63, 68 (detailing Qadi's relationship with Jelaidan); Ex. 77, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 975 (stating that the Muwafaq Foundation "helps fund the Egyptian Mujahedin Battalion in Bosnia," and "also funds at least one training camp in Afghanistan"); Ex. 45, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 148 ("In 1992, al-Qadi founded the Muwafaq Islamic charity, through which he funneled funds to al-Qaida and other extremist groups."). *See also* Ex. 83, November 29, 2001 letter from David D. Aufhauser, Treasury Department General Counsel, at 1 (stating that "Mr. Kadi has a long history of financing and facilitating the activities of terrorists and terrorist-related organizations"); *id.* at 2 ("The leader of the terrorist organization, Al-Gama'at Al-Islamiya, Talad Fuad Kassem, has said that the Muwafaq Foundation provided logistical and financial support for a mujahadin battalion in Bosnia."); *id.* at 3 ("The Muwafaq Foundation also provided support to HAMAS and the Abu Sayyaf Organization in the Philippines."); *id.* ("Following the dissolution of MK [Makhtab Al-Khidamat] in early June 2001 and its absorption into Al-Qa'ida, a number of NGOs formerly associated with MK, including Muwafaq, also merged with Al-Qa'ida."); *id.* ("The pattern of activity displayed by Mr. Kadi, and his foundation and businesses, is typical of the financial support network al Al Qa'ida and other terrorist organizations.").

128. Like Jelaidan, the United States designated al Qadi for his role in providing material support to al Qaeda. *See* Ex. 82, *Designation Pursuant to E.O. 13224 of Yasin Al-Qadi*, TREASURY00055-86 at 56 ("Al-Qadi, a Saudi businessman whose companies span the Middle East, Europe, North America and South Asia, has been consistently identified as a financial supporter of Usama bin Laden and other known Islamic extremists for nearly a decade."); *id.* at 57 ("Al-Qadi repeatedly used Muwafaq, as well as his own corporations and employees, to divert funds to Islamic extremists, supporting their terrorist and extremist activities."); *id.* ("Through Muwafaq, Al-Qadi provided funds or otherwise assisted the Egyptian Islamic Jihad, HAMAS, the Abu Sayyaf Group, the Revival of Islamic Heritage Society, and Al-Haramayn (Bosnia), each of which has been designated an SDGT pursuant to E.O. 13224."). *See also* Ex. 84, FBI Report, *Co-operating Witness Interview*, June 2, 2004, at 1 (Jamal al Fadl ("source") advised the FBI that "Al-Kadi would bring donated money from the Gulf areas, mainly Saudi Arabia, to Al-Qaida which was used to purchase weapons in Jalalabad, Afghanistan."); *id.* (Al Fadl further "advised that Al-Kadi also brought money to Khartoum for Al-Qaida."); *id.* at 1-2 (Al Fald also "advised that Al-Kadi also supported Al-Haramain in Zagreb, Croatia during the conflict in Bosnia. Like Afghanistan and Sudan, Al-Kadi brought donations from Saudi Arabia and other Gulf countries to Croatia to support the jihad.").

129. Lajnat al Birr al Islamiyya ("LBI" or "al Birr"), which also operated under the name Benevolence International Foundation, was founded by SDGT Adel Batterjee, another close associate of Osama bin Laden. *See* Ex. 4, Winer Report at 59, 75, 78, 169, 211-213; Ex. 45, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149 ("Shaykh Adil Batterjee was a close business associate of Bin Ladin during the early 1900s and a long-time al-Qa'ida donor and fundraiser, [REDACTED].").

130. Under the direction of Batterjee and Enaam Arnaout, LBI/BIF also operated as one of al Qaeda's most and important financial, logistical, and operational fronts. According to the United States:

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

Adel Batterjee has ranked as one of the world's foremost terrorist financiers, who employed his private wealth and a network of charitable fronts to bankroll the murderous agenda of al Qaida. A worldwide asset freeze, including in his home country of Saudi Arabia, will deal a serious blow to this key terrorist facilitator, said Stuart Levey, Treasury's Under Secretary for the Office of Terrorism and Financial Intelligence (TFI).

In the late 1980s, Batterjee founded the precursor to BIF, Lajnat al-Birr al-Islamiah (LBI), in Saudi Arabia and Pakistan. LBI provided financial and operational support to mujahideen elements in Afghanistan and around the world, including fighters associated with UBL and Gulbuddin Hekmatyer, who was named a SDGT by the Treasury on February 18, 2003. LBI was affiliated with Maktab Al-Khidamat (MK), which was co-founded and financed by UBL and is the precursor organization of al Qaida. LBI later joined al Qaida upon the dissolution of MK.

**\*\*\*\***

Batterjee subsequently resigned as Director of BIF and personally selected UBL confidant Enaam Arnaout to serve as the organization's head. Documents obtained by the U.S. Government demonstrate that Arnaout, while employed with LBI and BIF, worked with members of al Qaida to procure weapons for use in al Qaida training camps. While employed by Batterjee at LBI, Arnaout reported directly to Batterjee, which was outside the usual chain of command.

*See* Ex. 85, *U.S. Treasury Designates Two Individuals With Ties to Al Qaida, UBL Former BIF Leader and Al-Qaida Associate Named Under E.O. 13224*, December 21, 2004, at 1-2.

131.  Like Jelaidan, Batterjee was designated to collect and receive donations from members of bin Laden's Golden Chain. *See* Ex. 81, Tareekh Osama "Golden Chain," FED-PEC0134953-134955 at 134954 (identifying "Baterji" next to certain of the Golden Chain donors: Yousif Jameel, Ibrahim Afandi, Saleh Kamel, Al-Jumaih, Ahmad Turki Yamani, Mohammed Omar).

132.  WAMY also is a Saudi-based charity, which played an extensive role in supporting al Qaeda. *See* Ex. 38, Kohlmann Report at 31-41; *see also* Ex. 66, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 827; Ex. 68, *Al-Qa'ida Still Well Positioned to Recruit Terrorists [REDACTED]*, July 1, 2002, CIA_000178-189 at 185; Ex. 9, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, undated, CIA_00720-804 at 744.

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

## VI. CIA Finished Intelligence Findings and Assessments Concerning ARB, its Principals, and Related "Charity" Enterprises

133.　On September 3, 2021, President Biden issued Executive Order 14040 ("E.O. 14040"), requiring declassification reviews of certain documents concerning the terrorist attacks of September 11, 2001. Among other requirements, E.O. 14040 mandated that federal agencies conduct declassification reviews of "records that previously were withheld as classified, in full or in part, during discovery in *In re Terrorist Attacks on September 11, 2001*." *See* Ex. 86, E.O. 14040 at Section 2(b).

134.　On March 29, 2022, the Central Intelligence Agency ("CIA"), through the Department of Justice ("DOJ"), provided "copies of documents that the CIA is releasing pursuant to section 2(b) of Executive Order 14040, along with an index that specifies which documents are responsive to specific requests in the [June 5, 2018] subpoena," previously served by other Plaintiffs in this MDL, to be followed by a public posting on its website ("CIA Documents"). *See* Ex. 87 (March 29, 2022 email from Sarah S. Normand, Assistant U.S. Attorney). On April 1, 2022, the DOJ released an additional CIA document and revised index. *See* Ex. 88, Index of Documents Produced Pursuant to Section 2(b)(i) of E.O. 14040.

135.　The CIA intelligence reports responsive to the 9/11 MDL Plaintiffs' June 5, 2018 subpoena, and declassified pursuant to E.O. 14040, included finished intelligence reports cited by the 9/11 Commission, as authoritative sources concerning al Qaeda's sources of funding and financial infrastructure. *See, e.g.*, Ex. 89, *Al-Qa'ida in Sudan, 1992-1996: Old School Ties Lead Down Dangerous Paths*, March 10, 2003, CIA_00038-52; Ex. 45, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158; Ex. 46, *Identifying Al-Qa'ida's Donors and Fundraisers: A Status Report*, February 27, 2002, CIA_00193-199; Ex. 55, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_00210-236; Ex. 90 (Winer Exhibit 2), *Terrorism Finance: Custodial Interviews Providing Leads Into Al-Qa'ida Financial Network*, August 7, 2002, CIA_00306-315; Ex. 91, *Usama Bin Ladin's Finances: Some Estimates of Wealth, Income, and Expenditures*, November 17, 1998, CIA_00317-338; Ex. 9, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, undated, CIA_00720-804; Ex. 66, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848.

136.　Separately, on October 19, 2021, Plaintiffs issued a subpoena directed to the CIA for certain documents and reports relating to ARB, Suleiman al Rajhi, the Al Rajhi family, and certain ARB account holders, including 9/11 hijacker Abdulaziz al Omari and E.O. 13224 SDGT Soliman al Buthe.

137.　Following discussions between Plaintiffs and the DOJ concerning CIA objections to the subpoena, including state secrets and national security privilege claims, Plaintiffs agreed to modify the subpoena and CIA agreed to conduct a declassification review limited to four finished intelligence reports relating to ARB. *See* Ex. 92, June 7, 2022 email from Sarah S. Normand, Assistant U.S. Attorney. On July 25, 2022, the DOJ produced four CIA reports. *See* Ex. 10, *Al-Rajhi Bank: Conduit for Extremist Finance*, May 28, 2003, CIA-SUB_0001-6; Ex. 69, *Al-Haramain: Support for Extremists and Terrorists*, August 28, 2002, CIA-SUB_0007-19; Ex. 11, *Islamic Banking: A Potential Economic Enabler in the Muslim World*, May 21, 2004, CIA-

*Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI*

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

SUB_0020-30; Ex. 93, *Taibah: Linking Extremists in the Balkans and the United States, December 12, 2002*, CIA-SUB_0031-33.

138.    The CIA Reports referenced in paragraphs 135 and 137 above are "finished intelligence" reports, and the end-products of a rigorous CIA analytical process. As explained in the expert report of Jonathan Winer:

> The [CIA] reports were all "finished intelligence," meaning, that they were the end-products of a highly-developed process that has the goal of producing reports which can be relied on by senior U.S. policy makers, including the President. The intelligence process by which these reports were created ordinarily involves a series of steps. First is a tasking, or definition of the intelligence requirements or needs to protect U.S. national security. As mentioned, the White House prior to 9/11 was heavily focused on bin Ladin, and issued taskings to better understand his activities and sources of support, including sources of funding for terrorism. Next is implementing the tasking through defining the collection requirements for various forms of raw intelligence that will be used to produce finished intelligence, and then allocating resources to meet them. U.S. intelligence agencies then work together, and sometimes with intelligence and other components of other U.S. governmental agencies such as the State Department, Treasury Department and Justice Department, to collect the raw information based on the requirements through gathering information from individuals (human intelligence), carrying out technical (and sometimes physical) surveillance (signals intelligence), gathering information from other governments, gaining access to business records, such as financial records, and adding open source information from public reporting to those non-public sources. The CIA then integrates this data so that its analysts have access to it, undertaking any needed processing to decrypt encrypted data and translate information from other languages. This work in turn leads to the creation and build out of databases, so that the databases contain all relevant source material. The CIA analysts then integrate, evaluate, and analyze the data to prepare the final intelligence products, weighing and evaluating the information they have, to produce finished intelligence, connect the dots, and draw conclusions about what it all means. This finished intelligence is then distributed to the government consumers, who may ask questions about it, seek further information or analysis, raise queries about the particular sourcing that went into the document, and/or use the finished intelligence as the foundation for policy decisions.

*See* Ex. 4, Winer Report at 54. *See also id.* at 14, 29, 53-55.

139.    Underscoring the reliability of such finished intelligence reports, the 9/11

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

Commission specifically cited several of the CIA reports in support of its findings concerning al Qaeda's finances and financial network, and directed readers of its Final Report to a number of them for more information on those topics. *See, e.g.*, Ex. 40, 9/11 Commission Report at 467, n. 30, 35-7; 468, n. 44, 51; 470, n. 80 (citing CIA analytic report, *Al-Qa'ida in Sudan, 1992-96: Old School Ties Lead Down Dangerous Paths*); *id.* at 470, n. 77; 498, n. 115 (citing CIA analytic report, *Saudi-Based Financial Support for Terrorist Organizations*); *id.* at 498, n. 116-117 (citing CIA analytic report, *Identifying al-Qaida's Donors and Fundraisers: A Status Report*); *id.* at 498-499, n. 127 (citing CIA analytic report, *Usama Bin Ladin's Finances: Some Estimates of Wealth, Income, and Expenditures*); *id.* at 504, n. 84 (citing CIA analytic report, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*); *id.* at 504, n. 86 (citing CIA analytic report, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*); *id.* at 504, n. 86 (citing CIA analytic report, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*).

140.    More generally, the 9/11 Commission cited broadly to finished CIA and U.S. government intelligence reports in support of its findings and conclusions concerning al Qaeda's financing, history, objectives, and a range of other topics. *See, e.g.*, Ex. 40, 9/11 Commission Report at 466-471, Notes to Chapter 2 (citing "Intelligence reports" at n. 18, 22, 25, 31, 33, 35-37, 42-49, 52, 54-56, 59, 62, 63, 67-69, 71-76, 79, 80, 82, 85); *id.* at 500-513, Notes to Chapter 6 ("Intelligence reports" at n. 5, 8, 41-43, 50, 122, 123, 125-127).

141.    The finished CIA reports were finalized between 1997 and 2003; however, those that were finalized after September 11, 2001 largely discuss relationships, events, and financing activities that predated the September 11th attacks. *See* Ex. 4, Winer Report at 55, 69-81, 91-100, 105-106.

142.    As Plaintiffs' expert Jonathan Winer testified, when read collectively, the finished CIA reports reflect an increasing understanding and confidence in the CIA's assessments of ARB's critical role in supporting al Qaeda and associated terrorists, and recognition of the degree to which the terrorist support activities of ARB and its principals were directed at and presented a threat to the national security of the United States. *See* Ex. 12, Winer Deposition at 46-49.

143.    As reflected in the analyses presented in the Winer and Kohlmann expert reports, the finished CIA intelligence reports, along with related evidence, show that ARB, Suleiman al Rajhi, and other al Rajhi family members were key supporters of al Qaeda in the years leading up to the September 11th attacks. *See* Ex. 4, Winer Report at 27, 55-80, 85-99, 105, 106, 117, 123, 144, 169, 198, 203, 204, 207, 208, 210-214, 216; Ex. 38, Kohlmann Report at 6-8, 12, 15-17, 29. The key assessments and findings presented in those reports are summarized below.

144.    On November 17, 1998, the CIA's Office of Transnational Issues ("OTI"), prepared a report entitled: *Usama Bin Ladin s [sic] Finances: Some Estimates of Wealth, Income, and Expenditures*, at the request of Richard Clarke, the counterterrorism coordinator for the National Security Council. *See* Ex. 91, *Usama Bin Ladin's Finances: Some Estimates of Wealth, Income, and Expenditures*, November 17, 1998, CIA_00317-338; *see also* Ex. 4, Winer Report at 55.

145.    Much of the report discusses bin Laden's own wealth, but it also includes several assessments relating to al Qaeda's sources of outside financial support and relationships with banks:

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

Bin Ladin and Al-Qa'ida members control numerous bank accounts worldwide. [REDACTED] the choice of financial institutions has been based on personal contact with the bank, security concerns, and the bank's adherence to Islamic law.[4]

The major sources of outside financial support probably are wealthy family members, several of whom maintain contact with Usama or have similar militant views; wealthy Gulf sponsors, and Islamic NGOs.[5]

[Bin Ladin] has also been able to rely on major sources of funding during his 15-year career as a mujahaddin, especially from wealthy Gulf families; and he may continue to have access to his family's wealth.[6]

*Gulf Sponsors.* Bin Ladin probably maintains support from Gulf sympathizers, including some prominent merchants and government officials who reportedly contributed millions of dollars to his efforts during the Afghan war, [REDACTED].[7]

*Financial Support to Islamic NGOs.* While Bin Ladin receives NGO financial support diverted from Gulf sponsors, Bin Ladin also provides funding to sp[e]cific offi[c]es of these organizations, [REDACTED].[8]

**Appendix.** **Islamic Banks Possibly Harboring Bin Ladin's Wealth [REDACTED]** . . . Islamic financial institutions, nevertheless may be key repositories for Al-Qa'ida's liquid funds. Of some 180 Islamic banks operating worldwide, [REDACTED] a handful may house Bin Ladin-linked accounts:[9]

"Sheikh Rajhi," [REDACTED] deposited [REDACTED] into a [REDACTED] bank account controlled by Maktab al-Khidamat, an Islamic charity closely associated with Usama Bin Ladin since the early 1980's.[10]

146.    On January 11, 1999, the CIA's Office of Transnational Issues issued a 41-page report, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at Ex. 66. *See* Ex. 4, Winer Report at 57-60.

147.    The January 11, 1999 finished CIA intelligence report covers a range of sources of

---

[4] CIA_000318.
[5] *Id.*
[6] CIA_000321.
[7] CIA_000329.
[8] CIA_000336.
[9] CIA_000337.
[10] CIA_000338.

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

financial support for al Qaeda, reviewing bin Laden's own funds, support from family members, and "merchants, officially sponsored nongovernmental organizations (NGOs) and clerics based in Saudi Arabia." *See* Ex. 66 at 807; Ex. 4, Winer Report at 57.

148.    In addition to discussing the involvement of IIRO, AHIF, MWL, and WAMY in supporting al Qaeda, the January 11, 1999 report contains numerous relevant CIA assessments, prior to 9/11, of al Qaeda's reliance on sympathetic financiers and financial institutions to raise and move money prior to September 11, 2001, including the following:

> Usama may obtain financial support or be involved in commercial ventures with some members of the Jeddah business community— many of which have links to financial institutions:[11]

> • [REDACTED] al-Qa'ida members have held accounts at the Al Rajhi Banking and Investment Company. [REDACTED].[12]

> During [the 1980s and early 1990s], Usama also forged ties to Saudi-based nongovernmental organizations (NGOs), wealthy Jeddah-based businessmen, clerics, and government officials who were interested in aiding Afghan and other Islamic causes.[13]

149.    The January 11, 1999 report then includes a chart titled, *Usama Bin Ladin: Possible Saudi Contacts and Financial Links*. The chart shows four types of relationships – family, Saudi-backed charities, Saudi business community, and clerics. In the section on ties to the business community, the chart identifies five Saudi businessmen (Salah al din Ahmad Idris, Khalid bin Mahfouz, Muhammad Abdul Yamani, Saleh Abduallah Jamel, and Ahmed Saleh Jamjoom) and "the Al Rajhi family." *See* CIA_000811.

150.    A related section of the report titled, *Usama's Possible Links to the Saudi Business Community*, includes a substantial section dedicated to the al Rajhi Family, in which the following declassified assessments appear:

> Members of the ultra-wealthy Al Rajhi family, which owns the Riyadh-based Al Rajhi Banking and Investment Company, probably are a source of financial support for Usama's al-Qa'ida organization.[14]

> [A] "Shaykh Rajhi"—[REDACTED]—deposited [REDACTED] into the [REDACTED] bank accounts of the Maktab al-Khidamat.[15]

> [REDACTED] some Al-Rajhi branches in Saudi Arabia have been

---

[11] CIA_000809.
[12] *Id.*
[13] CIA_000810.
[14] CIA_000830.
[15] *Id.*

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

used by members of the al-Qa'ida organization.[16]

151.    On April 19, 1999, the CIA's Counterterrorist Center issued a sixteen-page finished intelligence report, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236, at Ex. 55. The Scope Note on the report states the following:

> This intelligence report provides an update and elaboration of the 26 July 1995 Intelligence Report, "International Islamic Charitable Organizations: Pursuing Multiple Agendas." This assessment examines specific foreign-based nongovernmental organizations (NGOs) that provide terrorists with infrastructure support independent of the NGO's legitimate, humanitarian, or charitable work.[17]

152.    Most of the April 19, 1999 report addresses the role of Islamic NGOs such as MWL, IIRO, MAK, and Al Haramain in providing financial and logistical support for al Qaeda and other terrorist groups, but it also discusses the role of sympathetic financiers in supporting terrorism. That discussion includes a finding that "[m]any prominent Saudi businessmen contribute generously to the IIRO through their *zakat* contributions, including the Al Rajhi family, which has an estimated wealth of $20 billion."[18]

153.    Based on information available as of November 20, 1997, the CIA's Office of Transnational Issues issued a finished intelligence report entitled "Funding Islamic Extremists: The Role of Islamic Financial Institutions," consisting of a 28-page report with four additional pages of Key Findings and a 49-page appendix. *See* Ex. 9, CIA Intelligence Report, Office of Transnational Issues, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, CIA_000720-804.

154.    The unclassified "Key Findings" section comprising the introduction to the report, indicates that the CIA examined approximately 130 Islamic financial entities, and singled out five as having "radical Islamic financial links," including "Al Rajhi Banking & Investment Company [ARB]":

> Several Islamic financial institutions—those that ascribe to the Koran's principles against the payment of interest—regularly serve as financial conduits and sources of financial support for a range of Islamic extremist groups, organizations, and political parties.[19]
>
> • The religiously ultraconservative Al Rajhi family—owners of the Al Rajhi Banking & Investment Company, with $8.6 billion of total assets—appears to be a key financial backer of the Afghan Mujahaddin, [REDACTED] The family and the bank purportedly also support NGOs who help finance the Bosnian Mujaheddin,

---

[16] CIA_000831.
[17] CIA_000212.
[18] CIA_000221.
[19] CIA_000722.

HAMAS, and other extremists.[20]

In addition to providing the ability to bank in accordance with their religious beliefs, Islamic activists—and militants—are attracted to Islamic banks for two other reasons:

• Top management affiliations with the MB, HAMAS, and NIF make Islamic banks a safe haven for extremist funds. [REDACTED] In addition, low-level bank employees at Islamic institutions—who are often hired on the basis of commitment to Islam—may turn a blind eye to money movements by extremist groups. Finally, a general lack of local regulatory scrutiny—as compared with regulation at conventional institutions—may offer additional confidence to extremists that their financial activities will not be closely examined."[21]

155.    The report includes a profile of bin Laden's relationships with financial institutions in a section titled, *Terrorist Financier Usama Bin Ladin: Background and Islamic Financial Ties*, which states that bin Laden's choice of financial institutions "probably is based on personal contacts at the banks and security concerns."[22]

156.    The November 20, 1997 CIA report also includes a dedicated section on ARB, under the heading, *Al Rajhi Banking & Investment Company*, discussing its links to and financial support for Islamic extremism, including the Afghan Mujahaddin in Pakistan, the MAK, and Islamic groups in Bosnia during the Bosnian conflict.[23]

157.    In that dedicated section, the CIA describes the Al Rajhi family as "secretive and religiously ultraconservative," and states that "[t]he most compelling [REDACTED] information on Islamic extremist links to the Al Rajhi family and ARABIC documents their financial support for the Afghan Mujahaddin in Pakistan via humanitarian organizations," including through the MAK.[24]

158.    The MAK was co-founded by Bin Ladin and the "pre-cursor" to al Qaeda. *See* Ex. 40, 9/11 Commission Report at 55-56; Ex. 4, Winer Report at 66; Ex. 97, Makhtab al-Khidamat, UN Sanctions Committee.

159.    As discussed below, the early support of ARB and the Al Rajhi family for the Afghan Mujahaddin was similarly a pre-cursor to their continuing support for al Qaeda through AHIF, IIRO, the SAAR committee and foundations, and other purported charities. *See* Ex. 4, Winer Report at 62, 65, 66, 90; Ex. 38, Kohlmann Report at 7, 17, *infra* at §§ XIII-XIV.

160.    The ARB section of the November 20, 1997 report also confirms high level

---

[20] CIA_000723.
[21] CIA_000723-724.
[22] CIA_000736.
[23] CIA_000743.
[24] *Id.*

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

relationships between the al Rajhis and WAMY, noting that "the Al Rajhis were routinely contacted" by officials at WAMY, which it described as "a Saudi NGO where personnel often pursue an extremist agenda."[25] The report states that "WAMY officials have couriered private Saudi donations to Islamic groups in Afghanistan and Bosnia" and put Saudi donors and foreigners in direct contact "for worthwhile Islamic causes" and would sometimes broker requests to donors when WAMY had "an ideological interest."[26]

161.    The November 20, 1997 report further documents that ARB maintained a close relationship with radical cleric Salman al Awdah, who endorsed ARB, after which "the Al Rajhi family [] became a major financial supporter of Awdah."[27] *See also* Ex. 4, Winer Report at 67; Ex. 38, Kohlmann Report at 16 (discussing al Awdah's links to militant jihad and bin Laden/al Qaeda).

162.    In a further section addressing terrorist and extremists, *Motivations for Using Islamic Banks*, the CIA concluded:

> Drug traffickers and other criminals seek out financial institutions that they believe will turn a blind eye to their activities or become discreet partners in their dealings. [] Islamic militants similarly bank with financial institutions that provide assurance that their deposits and financial activities will not be scrutinized by government or enforcement authorities. Islamic banks in may countries apparently provide such confidence. In addition, these banks offer financial services that are in line with religious beliefs and, sometimes, significant financial support for local Islamic movements.[28]

163.    The November 20, 1997 report also documents the CIA's determinations that "[a]lthough Gulf states acknowledge the problem of financial support to extremist groups via Islamic banks, they probably will do little to tackle the problem in the near term" and that "Gulf states are not likely to scrutinize the financial activities of powerful and wealthy merchants and royal family members owning shares in Islamic banks and holding director positions on their boards."[29]

164.    Finally, the Appendix to the November 20, 1997 report includes an entry for ARB, the unredacted portion of which states "*ARB in Riyadh, Saudi Arabia.* 'Used by some members of Usama Bin Ladin's Islamic Army to maintain accounts and transfer funds. [REDACTED} . . . the al Rajhis have financed radical Afghani and Kashmiri organizations in Pakistan and elsewhere. Some of the aid was provided under the guise of orphan relief and delivered to radical causes – possibly unwitting [sic] to the Al Rajhis.'"[30] *See* Ex. 4, Winer Report at 68-69.

165.    On February 27, 2002, the CIA's Counter-Terrorism Center Office of Terrorism Analysis issued a finished intelligence report, *Identifying Al-Qa'ida's Donors and Fundraisers: a*

---

[25] CIA_000744.
[26] *Id.*
[27] CIA_000748.
[28] CIA_000746.
[29] CIA_000753.
[30] CIA_000783.

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

*Status Report*, which includes a Key Finding that "[a]n array of fragmentary intelligence reporting indicates that wealthy individuals in the Arabian Peninsula and grassroots supporters from around the world are critical funding sources for al-Qa'ida." *See* Ex. 46, *Identifying Al-Qa'ida's Donors and Fundraisers: A Status Report*, February 27, 2002, CIA_00193-199 at 194.

166.    Although the report indicates that certain of the information on al Qaeda's key financiers remained fragmentary, it confirms that the CIA had had "identified several wealthy Saudi individuals and families we suspect of supporting al-Qa'ida – including Shaykh Adil Batarji, the al-Rajhi family, the Julaydan family, and Ahmad Salah Jamjoon."[31]

167.    The February 27, 2002 report's appendix includes "Three Al-Qa'ida Donor Case Studies," the subjects of which are Wa'el Jelaidan, Adel Batterjee, and, once again, the "Al-Rajhi Family."[32]

168.    The related discussion of the al Rajhis' "Illicit Activity," includes findings that "several Al-Rajhi family members donate money to businesses tied to terrorists and personally oversee transactions destined for terrorists," that "[a]s of [redacted] 2000, Sulaiman al-Rajhi was also one of 128 permanent members of International Islamic Relief Organization (IIRO)," and that "al Qa'ida has infiltrated some of IIRO's branches."[33]

169.    In an August 28, 2002 report, the CIA's Directorate of Intelligence addressed AHIF's intimate and extensive involvement in supporting terrorism and al Qaeda specifically, including AHIF cover and logistic support for the 1998 attacks on the U.S. Embassies in Kenya and in Tanzania and other al Qaeda plots. *See* Ex. 69, *Al-Haramain: Support for Extremists and Terrorists [REDACTED]*, August 28, 2002, CIA-SUB 0007-19.

170.    The CIA determined that "at least 20 al-Haramain field offices and representatives operating in 50 countries in Africa, Asia, Europe and North America, as well as is headquarters in Saudi Arabia, appear to be providing financial and logistic support to al-Qaida," including providing "financial support or collusion in terrorist plots," some of which were "ongoing plots."[34]

171.    The August 28, 2002 also documents AHIF's use of bank accounts to support its illicit activities, including the use of personal accounts to circumvent scrutiny and "prevent the money from being identified or seized by foreign officials."

> [Since 9/11] Al-Haramain increasingly sends money to individuals' personal accounts in addition to transferring funds to branch office accounts. We have also noted transfers originated from senior HIF officials' personal accounts in Saudi Arabia to personal accounts of known HIF affiliates.[35]

172.    As discussed below, discovery has confirmed that this misuse of personal accounts

---

[31] CIA_000195.
[32] CIA_000198-199.
[33] CIA-000198.
[34] CIA-SUB_0010. The CIA also found that "Individuals working in Saudi Embassies in several countries appear to be witting of, and sometimes assisting, HIF branch offices that support extremist groups." *See* CIA-SUB_0015.
[35] CIA-SUB_0013.

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

by AHIF officials to conceal the source and destination of funds was a common money laundering tactic AHIF employed extensively before 9/11, and which was also employed by IIRO and the SAAR committee/foundation, all with the knowing assistance of ARB. *See infra* at § IX.

173.    The August 28, 2002 report further details specific instances of AHIF's use of accounts at ARB for suspect transfers.[36]

174.    The CIA's Counter-Terrorism Center Office of Terrorism Analysis issued an additional report on November 14, 2002, *Saudi-Based Financial Support for Terrorist Organizations*, CIA_00143-158 at Ex. 45, which presented the following "Key Findings:"

> Saudi Arabia is a key base of financial support for al-Qa'ida and several other terrorist organizations. We estimate that since the mid-1990's several tens of millions of dollars a year has flowed to terrorists from a variety of sources in the Kingdom. Most of the money originates from wealthy individuals, fundraisers who solicit smaller donations, and diversions from non-governmental organizations (NGOs); a portion of the funding is derived from legitimate religious contributions.[37]
>
> Al-Qa'ida has relied on its node in Saudi Arabia for bulk fundraising for several years [REDACTED][.] Money that originates in the Kingdom is dispersed to al-Qa'ida members operating in Pakistan and Afghanistan, as well as Yemen, Iran, and other countries whose operatives have relocated following the loss of Afghanistan as a safe haven.[38]
>
> • Donors who are members of prominent merchant families often have business dealings or frequent interactions with the Saudi royal family, suggesting that Riyadh may be hesitant [to] move against their businesses and bank accounts, [REDACTED].[39]

175.    The remainder of the November 14, 2002 report elaborates on these Key Findings, including in relevant part as follows:

> **A Major [S]ource of Terrorist Funds.** [REDACTED] al-Qa'ida and several other terrorist and militant groups consider Saudi Arabia a key base of financial support. [REDACTED] we estimate that since the mid-1990s terrorist groups have received several tens of millions of dollars a year from Saudi sources. Most of the money originates from wealthy individuals, fundraisers who solicit smaller

---

[36] *Id.*
[37] CIA_000144.
[38] *Id.*
[39] CIA_000145.

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

donations, and non-governmental organizations (NGOs).[40]

• Most of the larger financiers, however, knowingly donate funds to al-Qa'ida and are witting the money finances terrorist activity [REDACTED] Several of these [apparent redaction]nships [sic, perhaps meaning 'relationships'] with Bin Ladin or other key al-Qa'ida operates since at least the 1990's.[41]

We estimate that half or more of al-Qa'ida's estimated pre-9/11 "budget" was raised in Saudi Arabia.[42]

**Key Financial Base for Al-Qa'ida.** Bin Ladin's network has relied on its node in Saudi Arabia for the bulk of its fundraising for several years [one inch, about six lines redacted]. Money that originates in the Kingdom is dispersed to al-Qa'ida members in Pakistan and Afghanistan, as well as Yemen, Iran, and other countries where key al-Qa'ida operatives have relocated over the past year following the loss of Afghanistan as a safehaven.[43]

• Al Qa'ida members in Yemen—the key platform for operational planning in the Gulf—get the majority of their financial support from Saudi Arabia. [REDACTED].[44]

• Some funding is also going from Saudi Arabia to finance al Qaeda operatives and al-Qa'ida linked terrorist groups in South East Asia.[45]

**Major Donors**   We have identified several wealthy Saudi individuals and families we suspect of support the al-Qa'ida network. Many of the donors come from prominent merchant families in Jeddah, and they probably account for the largest share of al-Qa'ida's income. These families usually have large, diversified business holdings or control non-governmental organizations within the Kingdom and the Middle East that provide vehicles for transferring funds to terrorists. [REDACTED][46]

176.   The "Major Donors" section of the CIA report then listed examples of these key sympathetic "major donors" to al Qaeda in dedicated sections,[47] including Yassin al Qadi [Kadi], Adel Batterjee, and "the Al-Rajhi family." The section on the "Al-Rajhi-family" states:

The Al-Rajhi family—owner of the Al-Rajhi Banking and

---

[40] CIA_000147.
[41] *Id.*
[42] *Id.*
[43] CIA_000148.
[44] *Id.*
[45] *Id.*
[46] *Id.*
[47] CIA_000148-150.

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

Investment Corporation—is a well-connected Saudi family from the central Najd region of the kingdom with a net worth of $12 billion. Al-Rajhi Bank has been a conduit for funds for Islamic extremists and for the 11 September hijackers [REDACTED] Sulayman al-Rajhi, the family patriarch, has been widely reported to support Islamic extremist policy and heled fund the U.S.-based SAAR foundation, which is the subject of US law enforcement investigations. Al-Rajhi Bank has maintained accounts for individuals linked to Usama bin Ladin, [REDACTED] and individuals with ties to the Egyptian Islamic Jihad. Islamic extremists in Yemen named Al-Rajhi Bank as a preferred bank for transactions. [REDACTED].[48]

177. The CIA noted the al Rajhi family's longstanding ties to bin Laden again in a March 10, 2003 report discussing the 1992 through 1996 period when al Qaeda was headquartered in Sudan, *Al-Qa'ida in Sudan, 1992-1996: Old School Ties Lead Down Dangerous Paths*, March 10, 2003, CIA_00038-52 at Ex. 89, which states that "merchants in Saudi Arabia who built business ties to Bin Ladin's companies in Sudan, and who also finance extremists, include Ibrahim Said Badoaoud, Adil Batarga, Yasin Qadi, and members of the Jamjun and al-Rajhi families."[49]

178. The importance the CIA assigned to ARB's role in supporting al Qaeda and other terrorist threats to the United States led the CIA's Counter-Terrorism Center Office of Terrorism Analysis to prepare a report dedicated entirely to ARB, *Al-Rajhi Bank: Conduit for Extremist Finance*, May 28, 2003, CIA-SUB_0001-6 at Ex. 10. The report's one paragraph Summary states:

Islamic extremists have used Al-Rajhi Banking and Investment Corporation (ARABIC) [ARB] since at least the mid-1990s as a conduit for terrorist transactions, probably because they find the bank's vast network and adherence to Islamic principles both convenient and ideologically sound. Senior al-Rajhi family members have long supported Islamic extremists and probably know that terrorists use their bank. [REDACTED] senior al-Rajhi family members control the banks' most important decisions and that ARABIC's principle managers answer directly to Sulayman. The al-Rajhis know they are under scrutiny and they have moved to conceal their activities from financial regulatory authorities. The 12 May bombings in Riyadh probably will make the Saudi Government more amenable to investigating the al-Rajhi family, as they have already begun to target other alleged al-Qa'ida donors. [REDACTED][50]

179. Among others, the May 28, 2003 CIA report includes the following assessments and findings:

---

[48] CIA_000149-150.
[49] CIA_000045.
[50] CIA-SUB_0002.

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

[REDACTED the al-Rajhis have a history of funding a broad array of Islamic causes, some of which have been associated with terrorists.[51]

**Extremists' bank of choice**. [REDACTED] since the mid-1990s [REDACTED] several extremists ordered operatives in Afghanistan, Indonesia, Pakistan, Saudi Arabia, Turkey and Yemen to use ARABIC [REDACTED].[52]

**Extremists' accounts.** Extremists use ARABIC [ARB] because its Islamic banking principles appeal to them and because it is one of the few banks with branches in outlying areas of Saudi Arabia, as well as good correspondent connections to remote locations abroad. Several al-Qa'ida linked individuals and organizations have held bank accounts at Al'Rajhi.[53]

• [REDACTED late 1990's, Bank al-Taqwa held a correspondent account at the Riyadh branch of Al-Rajhi Bank. The Department of Treasury listed Bank al-Taqwa's parent organization Al-Taqwa Management a.k.a. Nada Management) as a foreign terrorist organization in November 2001.[54]

Muhammed Ghaleb Kalaje Zouyadi [REDACTED] arrested in 2002 for his role as the financial planner for the Barakat Yarkas' al-Qa'ida cell, used his Al-Rajhi account [REDACTED] from 1993-1999.[55]

Haji Wali Mohammed Trading Establishment maintained an Al-Rajhi account for business transactions as of August 2000. [REDACTED] Afghan hawaladar Haji Wali Mohammed transferred money for Usama bin Ladin.[56]

[REDACTED] late 1990s Usama Bin Ladin may have used an account or accounts at Al-Rajhi Bank to pay al-Qa'ida operatives.[57]

---

[51] CIA-SUB_0003.
[52] *Id.*
[53] *Id.*
[54] *Id.*
[55] *Id. See also* Ex. 4, Winer Report at 92 (Barakat Yarkas was ultimately convicted in Spain of direct involvement in the 9/11 attacks in the United States, for organizing a meeting in Spain which was attended by Mohammed Atta, the lead hijacker on Sept. 11, and Ramzi bin al-Shibh, a high-ranking member of al Qaeda, which was used to plan the attacks. "Spain finds Qaeda cell chief guilty in 9/11 plot," New York Times, September 27, 2005, https://www.nytimes.com/2005/09/27/world/europe/spain-finds-qaeda-cell-chief-guilty-in-911-plot.html.).
[56] CIA-SUB_004.
[57] *Id.*

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

**Couriers**. Al-Rajhi has extensive money exchange operations, as well as representation in remote locations. In addition to traditional bank transactions, ARB has used couriers to move funds.[58]

• In 2000, ARABIC couriers delivered money to the Indonesian insurgent group Kompak to fund weapons purchases and bomb-making activities.[59]

• ARABIC in 1999 helped obtain a visa for a courier who collected money in Saudi Arabia for the Egyptian Islamic Jihad Organization, [REDACTED] Reporting does not indicate whether bank management was witting of the courier's EIJ affiliation.[60]

**Nongovernment organizations (NGOS).** [REDACTED] Gulf-based Islamic NGOs use ARABIC to transfer funds to their offices abroad some of which may be used to support terrorists. [REDACTED][61]

Saudi-based al-Haramain, which has come under close scrutiny by US and Saudi authorities for alleged terrorist ties, uses ARABIC and National Commercial Bank to fund its programs abroad.[62]

The International Islamic Relief Organization, a nongovernment organization with ties to al-Qa'ida, as of the late 1990s used Al-Rajhi to pay its employees.[63]

**Al-Rajhi Family Complicity and Control [REDACTED]** *Senior al-Rajhi family members have long supported Islamic extremists and probably know that terrorists use their bank.* Bank chairman Sulayman and several other al-Rajhis have given money to

---

[58] *Id.*

[59] *Id. See also* Ex. 4, Winer Report at 92 (Kompak was an Indonesian organization that grew out of terrorist group Jemaah Islamiyah ("JI"), an al-Qaida linked terrorist group with cells operating in several countries in Southeast Asia., as set forth in the terrorist designation of JI announced by then U.S. Secretary of the Treasury John Snow on September 5, 2003, which referenced Kompak and described JI's training by al Qaeda, its plans to attack Americans in Southeast Asia, and its involvement in the Bali bombing, which killed 202 people in October 2003. "Snow Announces Designation of 10 Jemaah Islamiyah (JI) Terrorists," Treasury Press Release, September 5, 2003 https://home.treasury.gov/news/press-releases/js700.).

[60] *Id. See also* Ex. 4, Winer Report at 93 (Egyptian Islamic Jihad was listed for sanctions by the UN on October 6, 2001 "as being associated with Al-Qaida, Usama bin Laden or the Taliban for 'participating in the financing, planning, facilitating, preparing or perpetrating of acts or activities by, in conjunction with, under the name of, on behalf or in support of', 'supplying, selling or transferring arms and related materiel to' or 'otherwise supporting acts or activities of Al-Qaida and Usama bin Laden." UN Sanctions Committee summary regarding its sanctions on Egyptian Islamic Jihad,https://www.un.org/securitycouncil/sanctions/1267/aq_sanctions_list/summaries/entity/egyptian-islamic-jihad).

[61] CIA-SUB_0004.

[62] *Id.*

[63] *Id.*

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

suspicious individuals and organizations worldwide. Moreover, Sulayman's tight control of ARABIC [ARB] activities suggest he is witting that his bank is attractive to extremists.[64]

• ARABIC Chairman Sulayman al-Rajhi and his brother Saleh al-Rajhi transferred $4 million to Germany and Pakistan in December 1998. [REDACTED] The brothers used a unique computer code to send funds at regular intervals to unspecified recipients.[65]

Senior al-Rajhi family members, including family patriarch Sulayman al-Rajhi, have donated money to NGOs suspected of supporting terrorism.[66]

• In the 1980's, the al-Rajhis established the SAAR Foundation – SAAR is an acronym for Salayman Abdul Aziz al-Rajhi—to manage the family's charitable contributions. US law enforcement has long suspected the SAAR Foundation of funding HAMAS.[67]

[REDACTED] March 2003, Sulayman al-Rajhi defended his donations to the al-Haramain Islamic Foundation, which has come under scrutiny for its support to extremists.[68]

[REDACTED] *senior al-Rajhi family members control the bank's most important decisions and that ARB's principle managers answer directly to Sulayman.* [sic] ARABIC historically granted branch managers substnatial autonomy in consolidating statements, transferring funds, and detecting fraud, but [REDACTED] the bank is looking to remedy its poor internal reporting systems by centralizing control in the main office in Riyadh.[69]

• Because the bank's headqarters has only minimal control over some of its branches, ARABICis developing a new platform for improved supervision. [REDACTED][70]

**Fighting Transparency and Oversight.** *The al-Rajhis know they are under scrutiny and have moved to conceal their activities from financial regulatory authorities.*[71]

---

[64] *Id.*
[65] *Id.*
[66] CIA-SUB_0005.
[67] *Id.*
[68] *Id.*
[69] *Id.*
[70] *Id.*
[71] *Id.*

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

• [REDACTED] Sulayman al-Rajhi in December 2002 directed ARB board members to explore financial instruments that would allow the bank's charitable contributions to avoid official Saudi scrutiny.[72]

180.     As further discussed in the expert report of Jonathan Winer, additional evidence indicates that redacted portions of the May 28, 2003 CIA report reflect CIA findings that:

• "The Al Rajhi name appeared on a list of regular financial contributors to al Qaeda that was discovered in Sarajevo, Bosnia, in 2002. The list was authenticated for the Federal Bureau of Investigation that year by America's top judicial witness against al Qaeda, a onetime al Qaeda business manager named Jamal Al Fadl, ███████████████████. He called the contributor list the "golden chain.""[73]

• "A 2003 German police report said Sulaiman Al Rajhi and other family members had contributed more than $200,000 in 1993 to a charity that financed weapons for Islamic militants in Bosnia, in addition to providing humanitarian aid."[74]

• "The report says extremists 'ordered operatives in Afghanistan, Indonesia, Pakistan, Saudi Arabia, Turkey and Yemen,' to use Al Rajhi Bank.[75]

• "Mamduh Mahmud Salim, convicted mastermind of the 1998 embassy bombings in Kenya and Tanzania, was carrying records of an Al Rajhi account (number 001424/4) when arrested in Germany in 1998, German police found."[76]

• "In 2000, the CIA report says, Al Rajhi Bank couriers 'delivered money to the Indonesian group Kompak to fund weapons purchases and bomb-making activities.'"[77]

• "According to a federal indictment in Oregon, a top Al-Haramain official in 2000 carried $130,000 in $1,000 traveler's checks from Portland to Riyadh and deposited them with Al Rajhi – funds the indictment says were for the ultimate benefot of al Qaeda fightres

---

[72] *Id.*
[73] *See* Ex. 94, *U.S. Tracks Saudi Bank Favored by Extremists Officials Debated What to Do About Al Rajhi, Intelligence Files Show*," Wall Street Journal, July 26, 2007.
[74] *Id. See also* Ex. 4, Winer Report at 96 (From the context, this information in the Wall Street Journal appears to reference material in the CIA Al Rajhi Report that is redacted from the version released in response to Plaintiffs' ARB subpoena to the CIA.).
[75] *Id.*
[76] *Id.*
[77] *Id.*

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

in Chechnya. The indicted official, Soliman Al-Buthe, now works for the city of Riyadh. In an interview, he confirmed carrying the checks and depositing them with Al Rajhi Bank and said they weren't for al Qaeda and he did nothing wrong."[78]

• "A Jiddah based charity called the International Islamic Relief Organization, or IIRO, arranges for donors to send their donations directly to the Al Rajhi Bank. . . .the U.N. has labelled two of the IIRO's branches and some of its officials as al Qaeda supporters."[79]

181.     At the conclusion of the May 28, 2003 ARB report, the CIA offered senior policymakers with several possible policy options for addressing the threat ARB's support for terrorism and militant extremism posed to U.S. national security.

182.     The options set forth in the CIA report were directed to the specific goal set by senior officials in the Bush Administration: "disrupting the family's aid to extremists both within and outside of Saudi Arabia." *See* Ex. 10, CIA-SUB_0006; Ex. 4, Winer Report at 97.

183.     These options included listing ARB as a supporter of terrorism or threatening to do so. The report states that implementation of either option "could cripple the bank." Additional options listed in the CIA report stated that the "al-Rajhi's wide-ranging US connections— financial, charitable, and diplmatic—expose the family to "domestic oversight, scrutiny, civil litigation, and criminal prosecution." The report further stated that other governments might be willing to help investigate "and stem al-Rajhi funding for extremists, even if the Saudis balk." Finally, it suggested "[i]dentifying and putting pressure on banks holding the family's offshore accounts could further disrupt the al-Rajhi's ability to send money to extremists. [REDACTED]"[80] *See* Ex. 4, Winer Report at 97.

184.     As discussed below, senior U.S. policymakers also deliberated covert action to interfere with ARB's operations, but ultimately elected to pursue remedial action to address the

---

[78] *Id. See also* Ex. 4, Winer Report at 97 (Al Buthe was named a Specially Designated Global Terrorist on September 9, 2004, in connection with his provision of military support to Chechen militants from a branch of Al-Haramain in the United States and remains on OFAC's sanctions list. https://sanctionssearch.ofac.treas.gov/Details.aspx?id=8591 He was also indicted, along with the head of the Al-Haramain U.S. branch, in the case of *U.S. v. Al-Haramain Islamic Foundation, Inc., Piroux Sedaghaty, and Soliman Hamd al-Buthe*, which ran into complex legal issues due to OFAC sanctions raising due process issues for U.S. persons when coupled with an asset seizure, and findings that due to the OFAC process, *Brady* material was improperly withheld from the defendants, resulting in a settlement in which the charity pled guilty to a tax offense, the previously convicted head of the charity was released from "pending criminal charges," and Buthe, who had left the U.S. for Saudi Arabia, remained under indictment. *See* "Specially Designated Global Terrorist Al-Haramain Islamic Foundation, Inc. Pleads Guilty to Tax Fraud," July 29, 2014, https://www.justice.gov/usao-or/pr/specially-designated-global-terrorist-al-haramain-islamic-foundation-inc-pleads-guilty. For a summary of the government's case against the U.S. branch of Al-Haramain see the original indictment, available at https://www.investigativeproject.org/documents/case_docs/480.pdf and the more detailed statement of facts by the prosecutors in "Government's Memorandum In Support Of Pretrial Detention, August 21, 2007, available at https://www.investigativeproject.org/case_docs/us-v-al-haramain-islamic-foundation-et-al/482/governments-memorandum-in-support-of-pretrial-detention.pdf.).
[79] *Id.*
[80] CIA-SUB_0006.

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

threat posed by ARB through counter-terrorism engagements and cooperation with Saudi Arabia. *See* Ex. 4, Winer Report at 97; Ex. 2 (Pasley Exhibit 5), U.S. Diplomatic Cable, *Terrorist Financing: Al-Rajhi Bank*, September 27, 2004; Ex. 95, (Pasley Exhibit 6), U.S. Diplomatic Cable, *Joint Examination of Al Rajhi Bank Through the Joint Terrorist Financing Task Force*, November 25, 2004.

185.    Further CIA reporting (and other evidence) confirms that U.S. intelligence remained concerned about ARB's involvement in sponsoring al Qaeda and related terrorists a year after the May 28, 2003 ARB report, as reflected by the discussion of ARB in the May 21, 2004 finished intelligence report issue by the CIA's Directorate of Intelligence, *Islamic Banking: A Potential Economic Enabler in the Muslim World*, CIA-SUB_0020-0030 at Ex. 11; Ex. 4, Winer Report at 79-81, 89, 98-99.

186.    In that report, the CIA noted that al Qaeda and related terrorist groups had largely moved away from using Islamic banks to move money "after 9/11, once tighter regulation and heightened scrutiny on financial institutions worldwide were put in place to guard against terrorist financial activities,"[81] and were instead increasingly using *hawalas* and cash couriers. *See* Ex. 4, Winer Report at 79-80.

187.    Even with that increased scrutiny and regulation, however, the CIA concluded that:

> Nevertheless, a few banks that operate under Islamic principles, such as the Al-Rajhi Banking and Investment Company in Saudi Arabia, are still of concern because of longtime use by al-Qa'ida operatives and other terrorists. The Saudi-based Bank al-Jazira and Saba Islamic Bank in Sanaa, Yemen, are also of concern because of their use by extremists.[82]
>
> • Some of the owners of these institution—such as Shayk Suleiman al-Rajhi in Saudi Arabia and Salih al-Kamel and Abdual Majid Zinani in Yemen—reportedly have provided widespread funding to al-Qa'ida, HAMAS, and various mujahadin groups."[83]

## VII.    U.S. Prioritization of ARB in Post-9/11 Counterterrorism Engagements With Saudi Arabia

188.    Consistent with the emphasis the intelligence community placed on the threat ARB's support for al Qaeda and terrorism posed to U.S. national security, senior U.S. policymakers prioritized action to interdict ARB's terrorist activities in post-9/11 counterterrorism engagements with the Saudi government.

189.    As noted above, the CIA presented a number of potential options to policymakers in its May 28, 2003 report, to address ARB's terrorist activities, including potential designations of ARB, which the CIA acknowledged "could cripple the bank." *See* Ex. 10, CIA-SUB_0006; Ex.

---

[81] CIA-SUB_0024.
[82] *Id.*
[83] *Id.*

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

4, Winer Report at 97.

190.    At the same time, the CIA's May 28, 2003 report acknowledged ARB's structural importance to the Saudi banking system, given its 400 branches in the Kingdom and correspondent relationships outside Saudi Arabia. *See* Ex. 10, CIA-SUB_0003; Ex. 4, Winer Report at 97-98.

191.    The deliberations about how to handle ARB's role in the funding and support of al Qaeda and other terrorist threats to the United States were undertaken amidst broader policy assessments about how best to address terrorist financing and sponsorship activities emanating from Saudi Arabia, which U.S. counterterrorism financing officials described as the "epicenter of terrorist financing." *See Saudi Arabia: Friend or Foe in the War on Terror*, Hearing Before the U.S. Senate Committee on the Judiciary (November 8, 2005), Statement of Senator Arlen Specter.

192.    Within the context of these post-9/11 deliberations, the evaluation of whether formal designation of a particular terror sponsor, or other possible action, would best serve U.S. national security interests involved a range of equities, including foreign policy, intelligence, diplomatic, law enforcement, and many other considerations. *See* Ex. 96, *Terrorism Financing: Origination, Organization, and Prevention*, Hearing Before the Committee on Governmental Affairs United States Senate (July 31, 2003), at 11 (R. Richard Newcomb, Director of the Office of Foreign Assets Control ("OFAC"), stating that all of the equities of the government come to the table, including law enforcement, intelligence, diplomatic, and military, among others).

193.    In addressing Saudi-based threats to U.S. national security in particular, U.S. policymakers broadly determined that pursuing cooperation and joint action with the Saudi government was critical to advancing the United States' overarching counterterrorism objectives, precisely because of the nature and scope of the problem emanating from Saudi Arabia.

194.    This policy approach often led U.S. officials to defer or delay formal designations or other actions against Saudi-based terror financiers and sponsors, as in the case of AHIF, IIRO, and others.

195.    Given the size of ARB and its structural importance to the Saudi banking system and economy, as well as the significance of the Al Rajhi family to the Saudi economy, sanctioning ARB and/or members of the Al Rajhi family for their support of terrorism and al Qaeda would have had profound consequences on the Saudi Arabian economy and Saudi Arabians who used the bank for legitimate purposes, as well as profound consequences in the U.S.-Saudi Arabian security relationship.

196.    In the end, the U.S. government did not formally designate or sanction ARB or al Rajhi family members, actions which would have "cripple[d] the bank," choosing instead to pursue joint action through high-level counterterrorism engagements with senior Saudi officials.

197.    To those ends, the U.S. sent a senior Treasury Department official, Juan Zarate, to meet with the Saudis and to formulate a plan for joint action between the United States and Saudi Arabia to deal with the continuing threat from the activities of ARB and the Al Rajhis three years after 9/11, as reflected in State Department cables about the initiative.

198.    During a meeting documented in a September 24, 2004 State Department Cable,

Zarate conveyed the U.S. government's "real concerns about the financial activities facilitated by Al-Rajhi," and that "[p]articular accounts of concern need to be investigated." *See* Ex. 2 (Pasley Exhibit 5), U.S. Diplomatic Cable, *Terrorist Financing: Al-Rajhi Bank*, September 27, 2004, at 1.

199.    As documented in a November 25, 2004 Diplomatic Cable, the U.S. thereafter "provided the Saudi government with information documenting specific instances of terrorists using the Al Rajhi Bank, including information about specific accounts and transactions of interest." *See* Ex. 95, (Pasley Exhibit 6), U.S. Diplomatic Cable, *Joint Examination of Al Rajhi Bank Through the Joint Terrorist Financing Task Force*, November 25, 2004, at 1.

200.    The U.S. presented a detailed proposal for a joint examination of ARB, which the U.S. requested its Saudi counterparts distribute to "appropriate officials at the Saudi Arabian Monetary Authority, Ministry of Interior, Ministry of Finance, and the [U.S.-Saudi] Joint Terrorism Taks Force." *See* Ex. 95, (Pasley Exhibit 6) at 1. The U.S. also distributed the proposal by hand in Washington to Adel al Jubeir, the foreign policy advisor to then Crown Prince Abdullah. *Id.*

201.    In addition to these discussions concerning ARB specifically, the United States was urging and pressuring Saudi officials to implement more effective oversight of financial institutions in the Kingdom. *See* Ex. 44, Monograph at 115-117; *see id.* at 116 ("The Saudis took little initiative with respect to their charities. They did not make tough decisions or undertake difficult investigations of Saudi institutions to ensure that they were not being used by terrorists and their supporters. Although the Saudis did institute 'Guidelines for Preventing Money Laundering' in 1995 and 'Regulations on Charitable Organizations and Institutions' in 1990, these were very loose rules whose enforcement was doubtful. Moreover, the regulations covered only domestic charities, through the Ministry of Labor and Social Affairs, and exempted all charities set up by royal decree.").

202.    Plaintiffs sought documents concerning the proposed joint inspection from ARB in discovery, as well as an alleged 2003 "full scope examination" of ARB that SAMA official al Gaith claimed, in his meeting with U.S. official Zarate, had been conducted by outside auditors.

203.    In response, ARB has represented that it could not locate any responsive documents or information, indicating that Saudi authorities declined any joint review of ARB's financial practices and suspect accounts, and that the "full scope examination" referenced by al Gaith does not exist.

## VIII.   Discovery Has Confirmed ARB's Status as Al Qaeda's Bank of Choice

204.    While limited jurisdictional discovery has provided only a partial window into ARB's relationships with terrorists, that discovery fully corroborates and confirms the CIA's findings that ARB was the "bank of choice" for al Qaeda and like-minded terrorists, and that al Qaeda and its financial facilitators and front charities broadly used ARB to move money in support of al Qaeda's global operations.

205.    ARB was the bank of choice for the Al Haramain Islamic Foundation ("AHIF") and its senior officials, throughout the time AHIF operated as "one of the principal NGOs active throughout the world providing support for the Al-Qaida network." *See* Ex. 48 (Lormel Exhibit

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

18), *Additional Al-Haramain Branches, Former Leader Designated by Treasury as Al Qaida Supporters, Treasury Marks Latest Action in Joint Designation with Saudi Arabia*, June 2, 2004, at 3.

206.    During the 1998-2002 time period covered by limited jurisdictional discovery, ARB maintained and operated at least 94 accounts for AHIF. *See* Ex. 4, Winer Report at 107, 203, 207; Ex. 3, Galloway Deposition at 80 (testifying that there were 95 separate AHIF accounts ARB was maintaining between 1998-2002); Ex. 1, Al Rajhi Deposition at 79; Ex. 98 (Abdullah al Rajhi Exhibit 31) (chart of 94 AHIF accounts at ARB).

207.    Between January 1, 1998 and December 31, 2002, ARB facilitated deposits into those AHIF accounts totaling 2,146,119,285.78 Saudi Riyals ("SR") (in excess of 2.1 billion SR), and withdrawals totaling 2,035,094,758.98 SR. *See* Ex. 4, Winer Report at 107, 203; Ex. 1, Al Rajhi Deposition at 79; Ex. 98 (Abdullah al Rajhi Exhibit 31) (chart of 94 AHIF accounts at ARB identifying deposits and withdrawals).

208.    Two billion riyals would convert to approximately $533 million, using the long term SR-USD exchange rate, and would represent nearly $950 million in current (2023) dollars, based on a conservative inflation calculator. *See* Ex. 4, Winer Report at 107.

209.    Based on the assessments of the 9/11 Commission Staff, the financial transactions facilitated by ARB for AHIF would represent essentially the entirety of AHIF's budget during the relevant period, although we now know that ARB enabled AHIF to carry out massive additional financial activity through alleged personal accounts of its officials, as discussed below.

210.    The AHIF accounts at ARB were used to send funds to AHIF's branch offices outside Saudi Arabia, a fact that was well known to ARB. *See* Ex. 4, Winer Report at 110, 119-21, 150-52; Ex. 38, Kohlmann Report at 11; *See also* Ex. 99 (Lormel Exhibit 20), ARB 38816; Ex. 100, ARB 38534-38535; Ex. 101, ARB 38998-39000.

211.    Those included branch offices located in locations where al Qaeda was known to be operating, and conflict zones where al Qaeda and jihadists associated with al Qaeda were known to be fighting, including Chechnya, Bosnia, and Kosovo. *See* Ex. 99 (Lormel Exhibit 20), ARB 38816; Ex. 4, Winer Report at 179-180.

212.    During the 1998-2002 period covered by limited jurisdictional discovery, ARB also maintained and operated a staggering 308 separate accounts for IIRO. *See* Ex. 4, Winer Report at 108; Ex. 3, Galloway Deposition at 87-88, 123.

213.    An analysis of the account statements for 287 of those accounts shows that ARB facilitated deposits totaling 2,974,279,291.71 SR, or just under 3 billion SR, and withdrawals totaling 2,914,284,820.75 SR, or about 2.9 billion SR. *See* Ex. 102 (Abdullah al Rajhi Exhibit 32) (chart of 287 IIRO accounts at ARB).

214.    3 billion SR would convert to approximately $800 million, using the long term SR-USD exchange rate, and would represent nearly $1.4 billion in current (2023) dollars, based on a conservative inflation calculator. *See* Ex. 4, Winer Report at 107.

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

215. Thus, between the AHIF and IIRO accounts alone, ARB facilitated the movement of approximately $1.3 billion, corresponding to roughly $2.3 billion in 2023 dollars, between 1998-2002, when those two purported charities were operating as al Qaeda's most important fronts and financial engines. *See id.*

216. As with the AHIF accounts, the IIRO accounts at ARB were used to send funds to IIRO's branch offices outside Saudi Arabia, a fact that was well known to ARB. *See, e.g.* Ex. 38, Kohlmann Report at 16; *See* Ex. 78, Transcript, February 21, 2019 Deposition of Adnan Basha ("Basha Deposition"), at 265-278.

217. Those included branch offices located in locations where al Qaeda was known to be operating, and conflict zones where al Qaeda and jihadists associated with al Qaeda were known to be fighting. *See, e.g.* Ex. 38, Kohlmann Report at 16.

218. While limited jurisdictional discovery as to ARB's relationships with al Qaeda's charity fronts was generally limited to the accounts it held for AHIF and IIRO, documents relating to ARB's post-9/11 dealings with SAMA show that it also maintained accounts for the following additional charities that provided funding and logistical support to al Qaeda: Muslim World League ("MWL"); World Assembly of Muslim Youth ("WAMY"); Saudi Joint Relief Committee for Kosovo and Chechnya ("SJRC"); Saudi High Commission for Bosnia-Herzegovina; and Lajnat al-Birr al-Islamiah (a/k/a Benevolence International Foundation).

219. Separate discovery proceedings as to WAMY indicate that ARB maintained over 116 accounts for WAMY, again during periods when WAMY was operating as a key front for al Qaeda. *See, e.g.*, Ex. 103, Declaration of Omar T. Mohammedi, ECF No. 4465, at 8-12 (identifying numerous WAMY bank accounts at ARB); Ex. 104, Exhibit 19 to Declaration of Omar T. Mohammedi, ECF No. 4465-19 (identifying 116 WAMY bank accounts at ARB); Ex. 105, WAMYSA 15516 (identifying additional WAMY accounts at ARB); Ex. 4, Winer Report at 204.

220. In the context of that prior discovery, WAMY requested that ARB provide copies of its account statements for periods at issue in that discovery, so that WAMY could produce them to the 9/11 MDL Plaintiffs, but ARB refused to do so. *See* Ex. 106, Declaration of Ibrahem Alshalan, ECF No. 4466, at 8.

221. In the case of Lajnat al-Birr al-Islamiah, the incidental information Plaintiffs received in discovery, contained in a document relating to a Self-Supervisory Committee established by SAMA to engage with ARB and other Saudi banks on terrorist financing issues after 9/11, indicate that ARB opened and operated unauthorized accounts for that al Qaeda front. *See* Ex. 107, ARB 39582-39585 (meeting notes of Self-Supervisory Committee, with notation "Al Birr Islamic Committee," followed by the sentence: "We authorized Al Rajhi to open one account; they opened many accounts."); *id.* at 39584 ("17 accounts with Al Rajhi"). *See also* Ex. 4, Winer Report at 168-169 (discussing ARB 39582-39585); *id.* at 59, 72, 211-213 (discussing Lajnat al-Birr); Ex. 108, United Nations Sanctions Committee designation summary for Benevolence International Foundation (discussing Lajnat al Birr); Ex. 45, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 151 (stating that Lajnat al Birr offices in Pakistan and Saudi Arabia are linked to terrorist and Islamic extremist activity); Ex. 85, *U.S. Treasury Designates Two Individuals With Ties to Al Qaida, UBL Former BIF Leader and*

*Al-Qaida Associate Named Under E.O. 13224*, December 21, 2004, at 1-2 (stating that Lajnat al Birr "provided financial and operational support to mujahideen elements in Afghanistan and around the world" and "later joined al Qaida"); Ex. 4, Winer Report at 169, 212.

222.     The scope of these relationships with AHIF, IIRO, WAMY, and al Qaeda's charity fronts, as described above, confirms that ARB was the "bank of choice" for al Qaeda's charity partners before 9/11.

223.     ARB also provided access to the international banking system to al Qaeda's most important individual financial facilitators, including senior officials of al Qaeda's most important charity fronts.

224.     SDGT and close bin Laden associate Wa'el Hamza Jelaidan maintained a longstanding banking relationship with ARB, opening accounts in 1986 and 1988, during the period that Jelaidan served as the key financial facilitator for contributions to bin Laden's participation in the Afghan jihad, and Suleiman al Rajhi was supporting bin Laden in that campaign. *See, e.g.*, *See* Ex. 4, Winer Report at 38, 86; Ex. 109, ARB 974-1019; Ex. 110, ARB 1183-1216; Ex. 111, ARB 1217-1226; Ex. 112, ARB 14465-14466; Ex. 113, Federal Office of Criminal Investigation, Expert Report Concerning the Third World Relief Agency ("TWRA Audit"), at 13-15 (identifying millions of dollars in transfers from Jelaidan to the TWRA); Ex. 40, 9/11 Commission Report at 58 (indicating that Bin Laden used the TWRA to provide financial and other support for terrorist activities).

225.     ARB allowed and enabled Jelaidan to use his accounts at ARB to carry out financial transactions bearing hallmarks of money laundering, until after the September 11th attacks, as further discussed below. *See* Ex. 109, ARB 974-1019 (referencing various deposits of "collection" checks and checks added from "clearinghouse"); *id.* at 999 (deposit of "Saudi Joint Committee" [SJRC] collection check).

226.     Throughout this period, Jelaidan was one of al Qaeda's most important funders and financial facilitators. *See* Ex. 38, Kohlmann Report at 19; Ex. 49, *Treasury Department Statement on the Designation of Wa'el Hamza Julidan*, September 6, 2022 at 1 ("Julaidan has been the head of various non-governmental organizations providing financial and logistical support to the al-Qa'ida network."); Ex. 80, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563, 544 (describing how Jelaidan used his high-ranking positions in the Saudi da'wah organizations to divert money to al Qaeda); Ex. 81, Tareekh Osama "Golden Chain," FED-PEC0134953-134955 at 134954 (Jelaidan was designated to receive contributions from members of al Qaeda's Golden Chain, including Suleiman al Rashid, Abdel Qader Bakri, Salah al Din Abdel Jawad, and Abdel Hadi Taher).

227.     ARB was also the bank of choice of AHIF Director and SDGT Aqil al Aqil, who held five accounts at ARB. *See, e.g.*, account statements at Ex. 114 (ARB 41454-41463); Ex. 115 (ARB 41464-41501); Ex. 116 (ARB 41502-41503); Ex. 117 (ARB 41506-41507). *See also* Ex. 4, Winer Report at 205; Ex. 118, Plaintiffs' Summary Spreadsheet of Al Rajhi Bank Customer Account Transactions (ARB Tranche 21).

228.     Between 1998-2002, Aqil used two principal accounts at ARB to carry out financial

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

transactions. *See* Ex. 114, ARB account ending with the four digits 3412 (the "3412 Account"); Ex. 115, ARB account ending with the four digits 5920 (the "5920 Account"). *See* Ex. 4, Winer Report at 112.

229.    The 3412 Account at ARB, purportedly opened and operated by Aqil as an individual for personal banking, facilitated deposits of just over 19,848,169.00 SR, or roughly $5.29 million (corresponding to about $9.4 million in 2023 dollars); and distributed nearly all of that money in withdrawals (leaving about 57,668 SR or $15,375 not withdrawn), during this period. *See id.*; Ex. 118, Plaintiffs' Summary Spreadsheet of Al Rajhi Bank Customer Account Transactions (ARB Tranche 21).

230.    These included concentrated large value cash deposits during an intensive approximate two month period exceeding 14 million SR, a one time check deposit of 5 million SR during the same period, followed by single-event withdrawals of 2,726,500.00 SR and 16,900,000.00 SR. *See* Ex. 114, ARB 41454-41463 at 41455-41461; Ex. 4, Winer Report at 112-113.

231.    During the 1998-2002 time period, ARB's 5920 Account for Aqil took in 21,640,672.00 SR in total deposits, and Aqil withdrew 21,809,050.49 SR. These amounted to roughly $5.77 million in additional transactions through individual accounts that ARB opened and operated for Aqil's alleged personal banking activities (corresponding to about $10.27 million in 2023 dollars). *See* Ex. 118, Plaintiffs' Summary Spreadsheet of Al Rajhi Bank Customer Account Transactions (ARB Tranche 21); Ex. 4, Winer Report at 112-13.

232.    Thus, through the two accounts ARB opened and operated for Aqil's purported personal banking activities, ARB faciliated transfers totaling roughly $11 million over the five year period, an amount equivalent to about $19.5 million today.[84] Ex. 4, Winer Report at 112-113.

233.    A considerable portion of this financial activity occurred in a concentrated period in 1999 and 2000, after AHIF had been publicly implicated in al Qaeda's bombing of the U.S. embassies in Kenya and Tanzania, and when AHIF was under international scrutiny for its support of al Qaeda. *See supra* at ¶ 103; Ex. 4, Winer Report at 40, 180.

234.    As discussed below, ARB allowed and enabled Aqil to use his accounts at ARB to carry out financial transactions bearing hallmarks of money laundering, until after the September 11th attacks.

235.    Throughout this period, Aqil was one of al Qaeda's most important funders and financial facilitators. *See* Ex. 4, Winer Report at 111-121 (discussing the E.O. 13224 designation of Al Haramain's leader, Aqil al Aqil, who "was responsible for all AHF activities, including its support for terrorism"); Ex. 48 (Lormel Exhibit 18) (June 2, 2004 designation of Al Haramain's branches in Afghanistan, Albania, Bangladesh, Ethiopia, and the Netherlands, including Aqil al Aqil), Ex. 48 (Lormel Exhibit 18), *Additional Al-Haramain Branches, Former Leader Designated by Treasury as Al Qaida Supporters, Treasury Marks Latest Action in Joint Designation with Saudi Arabia*, June 2, 2004, at 3 ("Under Al Aqil's leadership of AHF, numerous AHF field offices and

---

[84]    Plaintiffs use a figure of 1.78 as an inflation calculator for US dollar equivalents. *See* https://www.usinflationcalculator.com/.

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

representatives operating throughout Africa, Asia, Europe and North America appeared to be providing financial and material support to the al Qaida network."); Ex. 38, Kohlmann Report at 12; *See* Ex. 62, TREASURY00017-29 at 27 (stating that Aqil was an "Al Qaida supporter that handled the collection of funds for 'freedom fighters' in areas including Afghanistan, Bosnia, Chechnya, Kosovo, and Somalia, [REDACTED]").

236. ARB also maintained accounts and facilitated financial activities for several of AHIF's other most senior officers, including SDGT Soliman al Buthe, Mansour al Kadi, Abdullah Mohamad al Mohithif, Mohamed bin Marzuq al Harthi, Hussein bin Abdullah al Yami, Faisal bin Fayez al Ahmadi, Zayd Attia al Harithi, and Abdullah bin Salim al Shahri (in addition to Abdullah al Misfer, who worked for both AHIF and Suleiman al Rajhi's committee/foundation).[85]

237. As discussed below, ARB allowed and enabled al Buthe to use his accounts at ARB to carry out financial transactions bearing hallmarks of money laundering, until after the September 11th attacks.

238. Throughout this period, al Buthe was one of al Qaeda's most important funders and financial facilitators, and specifically engaged in using funds distributed via his account at ARB to support al Qaeda in the United States. *See* Ex. 4, Winer Report at 97, 174-177 (discussing Al Haramain official Soliman al Buthe's E.O. 13224 designation in connection with his provision of military support to Chechen militants from an Al Haramain branch in the United States); Ex. 38, Kohlmann at 15-16; Ex. 50, *U.S.-Based Branch of Al Haramain Foundation Linked to Terror, Treasury Designates U.S. Branch, Director*, September 9, 2004, at 1 (indicating that under Soliman al Buthe's leadership of Al Haramain, "funds that were donated to AHF with the intention of supporting Chechen refugees were diverted to support mujahideen, as well as Chechen leaders affiliated with the al Qaida network").

239. ARB maintained five accounts for Mansour al Kadi, AHIF's deputy director, which were used to facilitate transfers totaling 48,188,573.59 SR, and aggregate withdrawals in the amount of 46,462,688.08 SR. *See* Ex. 4, Winer Report at 204, 205, 207, 208; and SDGT Aqil al Aqil, who held five accounts at ARB. *See* Ex. 4, Winer Report at 205; Ex. 118, Plaintiffs' Summary Spreadsheet of Al Rajhi Bank Customer Account Transactions (ARB Tranche 21). *See also* Ex. 62, TREASURY00017-29 at 21 (stating that Kadi, "al-Aqil's deputy and one of AHF's main leaders," is "implicated in working with al Aqil to support al Qaida terrorist activity").

240. ARB also operated two accounts for SDGT Abdul Hamid bin Sulaiman bin Muhammed al Mujil, the IIRO official described as the "million dollar man" for his role in collecting and distributing funds to al Qaeda and affiliated terrorists. *See* Ex. 4, Winer Report at 19, 87, 124, 125, 208 (discussing Abd al Hamid Sulaiman al Mujil, Executive Director of IIRO's Eastern Province branch, and his E.O. 13224 designation for using his position "to bankroll the al Qaida network in Southeast Asia"); Ex. 38, Kohlmann Report at 26-28; Ex. 170 (Abdullah al Rajhi Exhibit 28) (August 3, 2006 designation of IIRO's branches in the Philippines and Indonesia,

---

[85] Plaintiffs know that ARB held accounts in the name or names of al Mohithif, al Harthi, al Yami, al Ahmadi, al Harithi, and al Shahri, because the limited documents ARB produced from AHIF's KYC/customer information file indicate that accounts held in the name or names of those AHIF officials were converted to accounts in the name of AHIF. Plaintiffs have not had the opportunity to obtain discovery of the financial activities in the accounts of those individuals, while held in their own names.

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

including And al Hamid Sulaiman al Mujil); Ex. 75, *Additional Designations Pursuant to E.O. 13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches*, TREASURY00102-121.

241.    Here again, the activity in both accounts involved numerous red flag transactions indicative of money laundering or other illicit activity, including after the September 11th attacks, as further discussed below. *See* Ex. 4, Winer Report at 87; Ex. 119, ARB 745-787; Ex. 120, ARB 788-810.

242.    This activity occurred at a time when Mujil was responsible for collecting donor funds for distribution to al Qaeda and associated terrorist organizations. *See* Ex. 4, Winer Report at 19, 87, 124, 125, 208; Ex. 38, Kohlmann Report at 26-28; Ex. 170 (Abdullah al Rajhi Exhibit 28) (August 3, 2006 designation of IIRO's branches in the Philippines and Indonesia, including And al Hamid Sulaiman al Mujil); Ex. 75, *Additional Designations Pursuant to E.O. 13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches*, TREASURY00102-121.

243.    IIRO official and bin Laden brother-in-law Mohamed Jamal Khalifa opened an account at ARB in 1987, granting power of attorney to Mohammed bin Laden, a relative of Osama bin Laden. *See* Ex. 4, Winer Report at 88; *See* Ex. 121, ARB 1098-1105 at 1104.

244.    The Khalifa account was opened near the end of the Afghan jihad, during which Khalifa was known to have worked alongside bin Laden, and specifically approved by Abdullah al Rajhi. *See* Ex. 121, ARB 1098-1105 at 1104.

245.    The opening of this account occurred at or around the time that Khalifa opened an IIRO office in the Philippines, to support the nascent al Qaeda organization. Ex. 38, Kohlmann Report at 24-27.

246.    According to the United States: "The Philippine branches of the IIRO were founded sometime in the late 1980s or early 1990s by Muhammad Jamal Khalifah, who is Usama bin Laden's brother-in-law and has been identified as a senior al Qaida member. . . While working as the director of IIRO-PHL, Khalifah maintained close connections with al Qaida through his relations with senior al Qaida supporters, including Specially Designated Global Terrorist (SDGT) Wa'el Hamza Julaidan." *See* Ex. 170 (Abdullah al Rajhi Exhibit 28), August 3, 2006 designation of IIRO's branches in the Philippines and Indonesia, including And al Hamid Sulaiman al Mujil); Ex. 75, *Additional Designations Pursuant to E.O. 13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches*, TREASURY00102-121; Ex. 4, Winer Report at 88; *id.* at 31, 38, 39, 50, 52, 61, 75, 88, 203, 211, Ex. 38, Kohlmann Report at 24-26, 29. *See also* Ex. 45, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149 (Khalifa "was based in the Philippines from 1988 to 1995 and was involved in recruiting Muslims for training in Pakistan as mujahidin fighters.")

247.    ARB also operated accounts for Wa'el Jelaidan, one of al Qaeda's premier financial facilitators, again processing large and high volume transactions during period when he was financing al Qaeda. *See supra* at ¶¶ 224-226 and documents cited therein.

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

248.    ARB also maintained and operated an account for its Founder and Chairman Suleiman al Rajhi's own "charity" committee/foundation, and for the individual officers of that committee/foundation who carried out its operations and financial activities under Suleiman al Rajhi's direction.

249.    The Suleiman al Rajhi "charity" committee/foundation used its account at ARB to transfer large sums to AHIF, including transfers directly to Aqil al Aqil. *See* Ex. 122, ARB 38079-38107 and ARB 39948-39959; Ex. 123, ARB 39960; Ex. 124, ARB 39961; Ex. 125, ARB 42183-42184; Ex. 126, ARB 42179-42180; Ex. 127, ARB 42181-42182; Ex. 29 (Galloway Exhibit 22), NL 15578, 15043-15046.

250.    These were payments from Suleiman al Rajhi's own funds, and the transfers occurred while he was the head of both his own committee/foundation and ARB itself. *See* checks to AHIF signed by Suleiman al Rajhi at Ex. 128, NL 10086 (150,000 SR), NL 10088 (300,000 SR), NL 10094 (12,500), NL 10245 (187,500 SR).

251.    Plaintiffs were not afforded discovery as to transactions carried out through the Suleiman al Rajhi charity committee/foundation account generally – ARB disclosed only transactions specifically benefitting AHIF or IIRO – and Plaintiffs thus have not had an opportunity to obtain discovery from ARB concerning all transactions initiated from that account and in favor of al Qaeda fronts and affiliates.

252.    Even in respect to AHIF and IIRO, the transactions from the Suleiman al Rajhi charity/foundation account do not capture the full scope of Suleiman al Rajhi's support for those entities through accounts at ARB, as discovery confirms that Suleiman al Rajhi carried out extensive financial activities through accounts held in the names of the individual officials of his charity committee/foundation, a practice that defies innocent explanation for a sophisticated international banker like Suleiman al Rajhi.

253.    ARB handled some twenty individual and joint accounts belonging to committee/foundation officials Abdul Rahman Al Rajhi, Saleh al Habdan, and Abdullal al Misfer, which had 187,181,580.14 SR in deposits and 174,974,641.36 SR in withdrawals over the five year period of January 1, 1998-December 31, 2002. *See, e.g.*, Ex. 129, ARB 40860-41153; Ex. 130, ARB 41176-41184; Ex. 131, ARB 41185-41278; Ex. 132, ARB 42185-42186; Ex. 133, ARB 42187-42188; Ex. 115, ARB 41464-41501; Ex. 134, ARB 41668-41720; Ex. 135, ARB 41441-41442; Ex. 136, ARB 41279-41283. *See also* Ex. 4, Winer Report at 204; Ex. 118, Plaintiffs' Summary Spreadsheet of Al Rajhi Bank Customer Account Transactions (ARB Tranche 21).

254.    180 million SR equates to about $48 million, corresponding to approximately $85 million in 2023 dollars.

255.    The scale and value of these transfers clearly indicates that they represented transfers of Suleiman al Rajhi's funds, and not those of his employees.

256.    ARB's statements for these accounts include details directly confirms that the accounts were being used to carry out transactions for Suleiman al Rajhi and his charity committee/foundation. *See, e.g.*, Ex. 129, ARB 40860-41153 at 40928, 40931, 40942, 40947, 40966, 40977, 40983, 40987, 40989, 40991, 41019, 41023, 41073, 41074, 41084, 41085, 41141,

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

41142, and 41143 (Abdul Rahman al Rajhi account documents including internal ARB notations confirming transactions undertaken for Suleiman al Rajhi committee/foundation).

257.    This use of nominee accounts by ARB's Founder and Chairman Suleiman al Rajhi, to distribute funds on his behalf but obscuring his status as the originating party, presents a quintessential money laundering paradigm. Ex. 4, Winer Report at 154.

258.    While the statements for these accounts do not identify the beneficiaries for many (indeed most) of the outgoing transfers, several do include notations showing that they involved transfers to or from AHIF, WAMY, and other entities and individuals closely associated with al Qaeda. *See* Ex. 129, ARB 40860-41153 at 40887 and 41116 (AHIF), 40901 (WAMY).

259.    Further, during the time period of this stunning financial activity through these accounts, Al Misfer was, in addition to his role as an official of Suleiman al Rajhi's charity committee/foundation, also an official of AHIF, serving as head of its Palestine Committee.

260.    In addition, Aqil's account records indicate that he received a total of 1,188,000 SR from Abdul Rahman Al Rajhi, equivalent to about $317,000 then and just under $564,000 today. *See* Ex. 115, ARB 41464-41501; Ex. 4, Winer Report at 113.

261.    The Aqil 5920 Account at ARB also facilitated withdrawals to Abdul Rahman Al Rajhi in an even greater amount during this period, totalling 2,495,917 SR, equivalent to more than $665,000 then, and approximately $1.18 million today. *See* Ex. 115, ARB-00041464-41501; Ex. 4, Winer Report at 113.

262.    Documents obtained from other parties in discovery also show that Suleiman al Rajhi frequently issued checks for large sums to officials of his charity committee/foundation, through ARB accounts, which those officials could then simply cash and distribute to unidentified recipients. *See* Ex. 4, Winer Report at 120-22.

263.    These include, by way of example, the following (*see* Ex. 4, Winer Report at 120-22):

> January 12, 1999 payment by ARB check to Abdullah bin Ibrahim al Misfer, 20,000, Account 6006, Currency S.R. Payor: Suleiman al Raji (listed on document as "Shiekh Suleiman al Abdel Aziz al Rajhi.")[86]
>
> February 6, 1999 payment by ARB check to Abdullah bin Ibrahim al Misfer, 5000, with purpose indicated in handwriting, "to be handed to propagator Qassim Mohamed from Mali." Account 6006, Currency S.R. Payor: Suleiman al Raji.[87]
>
> February 6, 1999 payment by ARB check to Abdullah bin Ibrahim al Misfer, 9375, with purpose indicated in handwriting, "received

---

[86] NL 0010327.
[87] NL 0010348.

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

for the benefit of propagators in Sierra Leone." Account 6006 Currency S.R. Payor: Suleiman al Raji.[88]

February 6, 1999 payment by ARB check to Abdullah bin Ibrahim al Misfer, 72,000, with handwritten note, "I received the check – Abdullah Ibrahim al Misfer," Account 6006 Currency S.R. Payor: Suleiman al Raji.[89]

April 5, 1999 payment by ARB check to Abdullah bin Ibrahim al Misfer, 23,375, with handwritten note, "The check was received – to be handed to Brother Abdullah al Misfer." Account 6006, Currency S.R. Payor: Suleiman al Raji.[90]

May 22, 1999 payment by ARB check to Abdullah bin Ibrahim al Misfer, 235,000, with handwritten note, "Accounts Division – I handed a copy to Omar – hand the check to Brother al Misfer." Account 6006, Currency S.R. Payor: Suleiman al Raji.[91]

[Date Truncated Number] 1999, payment by ARB check to Abdullah bin Ibrahim al Misfer, 104000, with handwritten note, "the check was received – to be handed to Brother Abdullah 8-11/13." Account 6006, Currency S.R. Payor: Suleiman al Raji.[92]

*See* Ex. 203.

264.     As discussed below, throughout the period ARB facilitated international banking activities for its Founder and Chairman Suleiman al Rajhi, his committee/foundation, and the officials of his committee/foundation, they were deeply involved in channeling resources to al Qaeda and affiliated anti-American jihadists, including through ARB's Payable Through account at Chase Manhattan bank. *See infra* at § IX-X.

265.     ARB also maintained and operated accounts for seven of the 9/11 hijackers, as well as Sheikh Soliman Nassir Abdullah al Alwan, a radical cleric who recruited several of the 9/11 hijackers.

266.     Al Alwan opened six separate accounts in the fall of 2000; three accounts on September 12, and another three accounts on October 9.

267.     The al Alwan accounts were not within the scope of jurisdictional discovery – Plaintiffs know of them only as a result of incidental references in post-9/11 communications with SAMA, indicating that they were the subject of interest after 9/11.

---

[88] NL 0010349.
[89] NL 0010350.
[90] NL 0010145.
[91] NL 0010423.
[92] NL 0010194.

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

268. While Plaintiffs did not obtain discovery as to the particular usage of those accounts, the opening of six separate accounts by an individual in such a concentrated period is itself a red flag for money laundering and criminal activity. *See infra* at ¶ 301 (discussing money laundering red flags).

269. As late as 2003, reporting indicates that al Alwan spewed violent anti-American rhetoric to an audience of hundreds *at the Al Rajhi Mosque*, funded and named for Suleiman al Rajhi, telling listeners "America and their allies, hell is their destination for the crimes they have committed," and calling them "invaders and colonists." *"Young Saudis Eager to Battle Americans,"* Kim Murphy, Los Angeles Times, April 5, 2003.

270. Osama bin Laden himself opened an account at ARB in 1991, and the limited documents provided by ARB indicate that he held as many as four accounts at ARB in total, including one that was used to hold U.S. dollars.

271. The fact that bin Laden chose ARB to open an account at ARB in 1991 is significant, as it coincided with bin Laden's early efforts to build al Qaeda into a global terrorist organization, and bin Laden was by that time already advocating for jihad against the United States.

272. Moreover, bin Laden's status as a militant jihadist was already well known in Saudi Arabia and to ARB and its principals at that time, including to Suleiman al Rajhi, who had provided financial support to bin Laden during the jihad against the Soviet Union.

## IX. ARB Broadly Violated International AML, CFT, and KYC Standards

273. ARB extensively violated international AML, CFT, and KYC standards, as well as SAMA guidelines and ARB's own (nominal) protocols, in in relation to its opening, maintenance, and operation of accounts of al Qaeda's charity fronts, financial facilitators, and Suleiman al Rajhi's own "charity" committee/foundation and its employees. Ex. 4, Winer Report at 130-203.

274. In carrying out financial transactions for those al Qaeda partners, ARB consistently ignored obvious red flags indicative of money laundering, terrorist financing, and other serious crimes, again in violation of international standards and other obligations ARB was required to follow. Ex. 4, Winer Report at 130-203.

275. Viewed collectively and in light of the other available evidence, ARB's treatment of these accounts and customers indicates that ARB knew that its accounts were being used to launder funds for al Qaeda and associated terrorists, and knowingly afforded al Qaeda's principal sponsors and financial facilitators unfettered license to use their accounts to engage in highly irregular transactions and activities, thus facilitating al Qaeda's access to the global financial system in ways that would not have been possible via accounts at other banks.

276. As a corollary, the manner in which the accounts were used by al Qaeda's principal sponsors and financial facilitators shows that they had absolute confidence that ARB would not report their highly irregular financial activities to regulators or authorities, and that they viewed ARB to be a trusted partner. *See* Ex. 9, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, CIA_000720-804 at 736 (al Qaeda's choice of banks based on "personal

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

contacts at the banks and security concerns."); *id.* at 746 ("Islamic militants similarly bank with financial institutions that provide assurance that their deposits and financial activities will not be scrutinized by government or enforcement authorities.").

277.  As noted previously, ARB was, throughout the decade and years immediately preceding the September 11th attacks, a large financial institution which engaged in international financial activities, through correspondent banking relationships with counterparty financial institutions throughout the world. *See supra* at ¶¶ 35-39.

278.  As an international bank with extensive correspondent relationships, including with banks in the United States, ARB was required to adopt and implement effective anti-money laundering and counter-terrorism financing protocols to prevent the financing of terrorism and other illicit financial activity through purported charities. Ex. 4, Winer Report at 42-48; *see also id.* at 28-42.; *see also* Ex. 9, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, CIA_000720-804 at 723-24, 736, 738 (explaining that terrorists and their sponsors actively seek out sympathetic partners in the banking sector to open accounts and thereby gain access to the international financial system, to move and launder funds for terrorist operations).

279.  At the global level, these obligations were set by the Financial Action Task Force ("FATF"), which established global standards for banks operating internationally as well as for countries participating in the FATF, which included ARB's home country of Saudi Arabia through the Gulf Cooperation Council ("GCC"), which represented Gulf countries in the FATF before the 9/11 attacks. Ex. 4, Winer Report at 42-48.

280.  International banks needed to meet these standards in order to maintain their correspondent banking relationships, such as ARB's one with the Chase Manhattan Bank, to avoid the risk that their correspondent banks would be facilitating money laundering or terrorist finance if ARB failed to meet its obligations in this field. Ex. 4, Winer Report at 26-27.

281.  These international AML and KYC standards and best practices were, in turn, adopted within Saudi Arabia by SAMA, ARB's regulator, which issued "Guidelines for Prevention and Control of Money Laundering Activities" in 1995 ("the 1995 Guidelines"). *See* Ex. 58, (Pasley Ex. 8), SAMA Guidelines for the Prevention of Money Laundering ("1995 Guidelines").

282.  The 1995 Guidelines were distributed by SAMA to the General Managers of all banks in the Kingdom, which, in ARB's case, was Abdullah al Rajhi (who reads and speaks English). *Id.* at 130.[93]

283.  During the years preceding the September 11th attacks, banks engaged in international financial activities, like ARB, were required to adhere to and implement these international (and in ARB's case, Saudi) KYC and AML standards and protocols to prevent all serious crimes, including the financing of terrorism. Ex. 4, Winer Report at 23-28, 42-48.

284.  Indeed, the Introduction section of the 1995 Guidelines expressly states, in the first

---

[93] The 1995 Guidelines include handwritten page numbers, beginning with 130. The page numbers used in this Averment refer to these handwritten page numbers.

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

paragraph of the document, as follows:

> By all accounts, world-wide money laundering activities, particularly those related to drugs, now constitute a multi-billion dollar business annually. However, money laundering could also encompass funds derived from theft, blackmail, extortion, ***terrorism*** [emphasis added], and other criminal activities. It is inconceivable and unlikely that such large amounts of money can be stored or moved without the cooperation or unwitting participation of many international banks and banking systems.

*See* Ex. 58, 1995 Guidelines at 134; Ex. 4, Winer Report at 133.

285.    Underscoring the threat posed by terrorist financing and the need to take effective steps to prevent the financing of terrorism, the UN General Assembly issued several resolutions prior to September 11, 2001, including through purported charitable organizations. *See* Ex. 4, Winer Report at 23-27.

286.    On January 16, 1997, the UN General Assembly, issued a new Resolution on "Measures to eliminate international terrorism," which included the commitment to "take steps to prevent and counteract, through appropriate domestic measures, the financing of terrorists and terrorist organizations, whether such financing is direct or indirect through organizations which also have or claim to have charitable, social or cultural goals." *See* Ex. 192, UN Resolution Adopted by the General Assembly [on the report of the Sixth Committee (A/51/631)], Fifty-first session, Agenda Item 151, January 16, 1997; Ex. 4, Winer Report at 23-24.

287.    On January 19, 1998, the UN reiterated the January 16, 1997 measures to eliminate international terrorism, and on January 26, 1999, the UN authorized the prompt development of a comprehensive international convention to provide a common set of requirements for its member states to stop terrorist financing, as an addition to the existing international instruments dealing with international terrorism. *See* Ex. 4, Winer Report at 23-24.

288.    Thereafter, on December 9, 1999, the UN General Assembly adopted its "International Convention for the Suppression of the Financing of Terrorism" ("Terrorist Finance Convention"). *See* Ex. 4, Winer Report at 24-25; Ex. 193, Terrorist Finance Convention, Adopted by the General Assembly of the United Nations in resolution 54/109 of December 9, 1999.

289.    These prominent actions by the UN, and related pronouncements of international bodies, underscored that terrorist financing was a serious concern at the international level well before 9/11, which financial institutions were required to guard against, through effective AML and KYC practices. *See* Ex. 4, Winer Report at 23-27.

290.    In addition, there was significant public reporting, prior to 9/11, on the involvement of purported charitable organizations, including AHIF and IIIRO in particular, in supporting terrorism. *See* Ex. 4, Winer Report at 32-40; Ex. 38, Kohlmann Report at 12-13, 14, 21-22, 25; Ex. 171, Transcript, January 11, 2024 Deposition of Evan F. Kohlmann ("Kohlmann Deposition"), at 92-93, 124-25 (discussing information about charities available in Saudi Arabia).

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

291.    Significantly, the public reporting concerning terrorists' use of ostensible charities to raise and launder funds for terrorism included a high profile 1997 Associated Press article *which implicated one of Suleiman al Rajhi's own alleged charities in financing terrorism.* *See* Ex. 190, *U.S.-Raised Money Plays Big Role in Financing Terror*, Richard Cole, Associated Press, May 26, 1997.

292.    The report discussed evidence that the International Institute for Islamic Thought ("IIIT"), one of the entities comprising the SAAR Foundation's complex web of "overlapping companies with parallel ideologies, personal relatonships, and financial associates," *supra* at ¶ 48, was part of an "international ring to financing Islamic terrorists," and noted that the U.S. had deported one of IIIT's officers after discovering he was an Islamic Jihad leader. *See* Ex. 190, *U.S.-Raised Money Plays Big Role in Financing Terror*, Richard Cole, Associated Press, May 26, 1997.

293.    As discussed below, Suleiman al Rajhi and Abdullah al Rajhi responded to this reporting, implicating their charities in financing terrorism, by initiating steps to move the SAAR Foundation operation to the Isle of Man, a notorious bank secrecy haven, confirming both their specific awareness of the reporting, and intent to exploit vulnerabilities in the international banking system to avoid further scrutiny of their financing activities. *See infra* at ¶¶ 400-407; Ex. 4, Winer Report at 184-200.

294.    Further still, Suleiman al Rajhi was a prominent donor to bin Laden's organization during the jihad in Afghanistan, who funded jihad through contributions to the MAK. *See, e.g.*, Ex. 66, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 830. Suleiman al Rajhi was thus specifically aware of bin Laden's longstanding use of ostensible charities to support his jihadist activities from the outset.

295.    ARB and its principals, including Suleiman al Rajhi and Abdullah al Rajhi, were thus well aware, prior to the September 11th attacks, of the risk of terrorist financing through purported Islamic charities, and ARB's obligations to guard against that activity through faithful adherence to international and domestic AML and KYC protocols.

296.    As noted, these AML and KYC requirements included those embodied in the FATF's 40 Recommendations, which SAMA implemented through the requirements of the 1995 Guidelines.

297.    In issuing the 1995 Guidelines, SAMA described their principal purposes as follows:

> In recognition of international legal and supervisory efforts to
> combat the spread of money-laundering, the Agency has prepared
> these Money Laundering Control Guidelines which provide basic
> information on the subject, along with information on measures to
> be taken for prevention, control, and detection of money
> laundering activities. Banks are required to make these Guidelines
> an integral part of their own systems and procedures aimed at
> detecting and controlling such illegal activities. The objectives of
> the Agency in issuing these Guidelines are as follows:

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

> To help Saudi Banks to comply with the Banking Control Law and SAMA regulations.
>
> To prevent Saudi Banks from being exploited as channels for passing illegal transactions arising from money-laundering and other criminal activity.
>
> To maintain and enhance the credibility of the Saudi Banking System.

*See* Ex. 58, 1995 Guidelines at 134; Ex. 4, Winer Report at 132-137.

298.     The 1995 Guidelines then explained the process of money laundering generally, and set forth specific policy requirements for Saudi banks to follow and implement, to prevent their accounts from being used to launder funds for criminal activities. *See* Ex. 58, 1995 Guidelines at 134-146; Ex. 4, Winer Report at 132-137.

299.     The requirements of the 1995 Guidelines are set forth in full in the Guidelines themselves, and discussed at length in the expert report of Jonathan Winer. They include the following obligations:

> **"General Policy Requirements."**
>
> "Detection and Prevention: Saudi Banks should train and educate their employees to enhance their understanding of money-laundering and its relationship with criminal activities. As employees become familiar with such activity, they can play an effective role in combating money laundering through prevention and detection measures."
>
> "Deposit of Fund Taking[:] Saudi Banks should take care when accepting deposits or other funds. If it is suspected that a deposit is, or forms part of funds obtained through illegal activities, then these funds should be accepted in the normal manner, following correct procedures. Under no circumstances should the customer be alerted to any suspicion. The suspicious deposit should be reporting to the Police and SAMA and no transfers or withdrawals should be allowed from account until authorized by the Police or SAMA."
>
> "Cooperation: Saudi Banks should cooperate locally and internationally to combat money-laundering through exchange of information with banking supervisors and appropriate law enforcement agencies, when they discover or suspect money laundering transactions. However, at the same time they must follow the legal and regulatory procedures that are aimed to protect customer confidentiality and banking secrecy."

74

**Specific Policies and Guidelines**

**"Internal Control Systems."**

"A Bank should design and develop internal control systems to combat money laundering transactions. Such system should include detailed written policies and procedures for preventing the use of the Bank's branches and operations by money launderers and for detecting such transactions."

"These policies and procedures should include special instructions on money [l]aundering and in particular emphasize the "know your customer" principle."

A Bank should develop a system for internal reporting of transactions and account movements that could facilitate detection of such transactions. A Bank should use specialized software that is available in the market to detect unusal patterns of transactions and trends to indicate criminal activities. These normally include the following:

\*\*\*

Signfiicant Transactions Report: This should include all telegraphic transfers affected via telex, Swift, and other means. The amount, currency, correspondent banks, and the beneficiary must be noted. The report should highlight number of transactions, and values for each correspondent bank, and highlight any trends etc.

Singificant Transactions Report: These should include all transactions which exceed SR 100,000. Significant transactions report should identify accounts to which these transactions are related and the sources of these large amounts.

**"Know Your Customer."**

"In general, this principle is aimed at ensuring that Banks are fully knowledgeable about their customers and are aware of their bank dealings. The application of this principle should not affect the relationship of a Bank with its reputable customers. Banks should apply the following procedure for implementing this principle."

"No account should be opened or banking services provided for customers without proper identification or under fictitious names."

"Identify any client who opens a new account or has a business relationship with the Bank."

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

"Identification should be made by reference to proper official documents in accordance with previous SAMA Circulars regarding customer identification."

"Identification is not limited to customers that have accounts with the banks; it should also include those who benefit from other bank services such as renting of safety deposit boxes and large cash transfers and foreign exchange transactions. . . ."

"The follow procedures should be followed as a minimum where opening a Personal Account for an individual (emphasis in original):

"The Bank should obtain proper identification of the customer as stipulated by SAMA Directives."

"The Bank should seek information on the customer's business, or job title and ascertain the accuracy of such information."

"The Banks [sic] should seek information on a customer's dealings with other banks with which he deals and seek information from such banks about their dealing with the customer. . . ."

"Procedures to be followed when opening a Current Account or a Joins [sic] account for a Business Entity:"

"The Bank should obtain original documents or authenticated copies which identify the legal identity of the customer, details about its activities etc. as prescribed in the customer agreement."

"The Bank should collect direct or indirect information about the business enterprise from other banks and sources . . ."

"The Bank should know the sources of deposits, specially large cash deposits when an account is being opened."

The Bank should obtain the following information when an enterprise is opening a significant account:

The financial structure of the enterprise and its annual financial statements.

Description of the services and business

List of significant suppliers, customers, and their locations.

Description of the geographical coverage where the enterpise carries out its activities.

76

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

Transactions with internal entities.

**"Referral of Business."**

"It is a recognized business objective that the Bank will cross-refer and cross-sell business, but this must be done in such a way as to comply with any local rules regarding "know your customer". These rules ordinarily require each office to[:]"

"Take all reasonable steps to identify fully customers bonafides, including beneficial customers."

"Take all reasonable steps to enable suspicious transactions to be recognized."

"Reasonable steps to enable suspicious transactions to be recognized will include:"

"Obtaining a reasonable understanding of the normal character of the customer's business; and"

"Having a reasonable understanding of the commercial basis of the transaction to be undertaken or the service to be provided. What is a reasonable understanding will depend upon the complexity of the business and transactions concerned. For example high value or high volume transactions, especially if the transactions or the customer type is one regarded as high risk from a laundering viewpoint will require customer and transaction information in considerable detail."

*See* Ex. 58, 1995 Guidelines at 134-142; Ex. 4, Winer Report at 132-137.

300.     The 1995 Guidelines also set forth key examples of money laundering indicators or "red flags," requiring specific action and investigation. These included:

**General Indicators**

The transaction whose general form is indicative of illegitimate or unknown purpose.

Existence of movements in the customer's account not related to his activities such as:

\* Continuous cash deposits in companies and establishment's accounts.

\* Abnormal purchase of cashiers cheques and payments orders against cash.

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

* Withdrawal of cash amounts after a short time of its deposit.

* Large deposits of cheques, incoming drafts and payment orders that are inappropriate to the nature of customer's activity.

* Large withdrawals or deposits inconsistent with customers activities.

Transactions for unknown objectives which do not adhere to activity of the company or its branches.

*See* Ex. 58, 1995 Guidelines at 150-151.

301.    Additional indicators of money laundering identified in the 1995 Guidelines included "[c]ash deposits of large amounts whose source is apparently one of the banks in the same region;" "[d]eposit of large number of cheques or cash amounts by the customer or others without any withdrawals;" "[o]pening of more than one account by a customer in his name in the same bank without a clear reason, and existence of inter account transfer among these accounts;" and "[p]ayments or transfers by many persons to a single account whether in cash or through internal drafts;" and "[c]ash transfers in large amounts;" and "[t]he bank is doubtful about the customer's identification for any reason." *See* Ex. 58, 1995 Guidelines at 151-153.

302.    The 1995 Guidelines were effective as of the date of their distribution to Abdullah al Rajhi and the other General Managers of banks in Saudi Arabia. *Id.* at 146.

303.    At least nominally, ARB implemented the 1995 Guidelines principally through sections of its Branch Manual ("ARB Branch Manual") that issued on January 1, 1997, and an Anti-Money Laundering Procedure Guide ("ARB AML Guide") issued in November 1998. *See* Ex. 188, ARB Branch Manual, Ex. 189, ARB AML Guide; Ex. 4, Winer Report at 137.

304.    The requirements of the ARB Branch Manual and ARB AML Guide are set forth in full in those documents, and discussed at length in the expert report of Jonathan Winer. *See* Ex. 4, Winer Report at 137-146; Ex. 188, ARB Branch Manual, Ex. 189, ARB AML Guide.

305.    Among other processes and requirements, the AML Guide indicated that ARB had implemented an automated suspicious activity reporting software program, as required by the 1995 Guidelines, which reported suspicious transactions to the AML Unit. Reported transactions were subject to mandatory investigations, and recordkeeping requirements. Ex. 189, ARB AML Guide at 737-738.

306.    ARB consistently and extensively failed to comply with the basic AML and KYC requirements imposed by international standards and the 1995 Guidelines, as well as ARB's own (nominal) procedures, in relation to the opening and operation of its accounts for al Qaeda's financial facilitators, charity fronts, Suleiman al Rajhi's committee/foundation, and the individual officials of the charities and committee/foundation. *See* Ex. 4, Winer Report at 146-203.

307.    As Plaintiffs' expert Jonathan Winer explains in his expert report, "[i]nstead of adhering to its regulatory obligations and its own policies and procedures, ARB permitted Da'wah

78

organizations and principals of those entities to engage in a broad range of financial activities that presented obvious red flags and terrorism financing concerns, with essentially no limitations or meaningful protections." *See* Ex. 4, Winer Report at 131; *id.* at 130-202.

308.    Jonathan Winer describes the nature and scope of these AML and KYC violations in detail in his expert report, which, as described more fully therein, include the following systematic departures that enabled the use of ARB's accounts for financing of al Qaeda. *See* Ex. 4, Winer Report at 146-203.

309.    For instance, in relation to its opening of nearly 100 separate accounts for AHIF and over 300 separate accounts for IIRO, ARB failed to comply with even the most basic account opening and KYC requirements. *See* Ex. 4, Winer Report at 146-148, 150-154.

310.    Indeed, to the extent ARB was even able to provide account opening documents for its ARB and IIRO accounts, the forms typically included only the minimal elements of providing contact information, such as an address to send mail, and a telephone number, and frequently omitted required data field such as "occupation," and "legal status." The level of care given the data entry for such fields was minimal. *Id.* at 146.

311.    Many AHIF accounts had no identifier to differentiate the use of any particular account as being for any specific project, or activity. Instead, the ARB documents are generally silent about the purposes of any new accounts opened by AHIF, and the uses to which funds flowing through them would be put. *Id.* at 147.

312.    Occasionally, the documents indicate that ARB did receive incidental information concerning a proposed new account. A handful of documents showed that some of the accounts related to broad areas of foreign activity, such as "Africa," or "Asia," or "Europe," and these sometimes listed non-inclusive examples of countries within that region, without defining the precise activities that would be undertaken in these specific countries. *Id.* at 150-152.

313.    For example, a document dated September 26, 1994, from al-Aqil as Director General of Al-Haramain advises the director of the ARB branch at Al Olaya Street that there are eleven accounts at his branch, which include the accounts for Al-Haramain's "General Account," "Europe Committee," "Africa Committee," "Zakat," "Continuous Alms (Inside the Saudi Kingdom), "Indian Subcontinent Committee," "Mosques Committee," "Middle East Committee," "Iftar of Fasting People Committee," "Sponsorships Committee," and "Islamic Book Publishing Committee." *Id.* at 150; Ex. 100, ARB 38534-38535.

314.    In another undated document from the ARB customer information file pertaining to AHIF, and AHIF official reports to ARB that AHIF then held at least 15 accounts at ARB, and affirmed that a number of them were being used for activities outside of Saudi Arabia. *See* Ex. 99 (Lormel Exhibit 20), ARB 38816 (undated AHIF document from ARB files that specifies 15 Committees associated with AHIF for which accounts were maintained at ARB); Ex. 4, Winer Report at 151-152.

315.    These included, for the Asia Committee, funding to Palestine and Chechnya, two conflict zones; miscellaneous activities that included animal sacrifice and vows; book printing Da'Wah; Institute sponsorship; Quran memorization; heath clinics; propagators, and orphans'

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

sponsorship. For the Africa Committee, there were similar categories of projects, plus chastity belts, but no country was mentioned. For Europe, similar categories of activities were listed, and three countries: Albania, Bosnia and Kosovo – again areas of active armed conflict where al Qaeda was active in the mid and late 1990s. For the Zakat Committee, the entry merely listed "Zakat outside of the Saudi Kingdom." *See* Ex. 4, Winer Report at 151-152; Ex. 99 (Lormel Exhibit 20), ARB 38816.

316.    ARB did not conduct required diligence or verification inquiries concerning the use or necessity of these accounts, despite the fact that the information available to ARB confirmed that these accounts were to be used to send money to foreign jurisdictions, including jurisdictions that raised particular money laundering and terrorist financing concerns. These included jurisdictions with lax or ineffective AML regulations and oversight, areas were terrorists were known to be active, and conflict regions. *See* Ex. 4, Winer Report at 151-156.

317.    Moreover, to the limited extent ARB's records indicated that it received any information about the alleged purpose of its accounts for AHIF and IIRO, the descriptions of the purposes for many of the accounts were identical, raising obvious questions about the necessity and true purpose of the accounts, which ARB was required to inquire about and resolve before opening and operating the accounts. *See* Ex. 78, Transcript, February 21, 2019 Deposition of Adnan Basha ("Basha Deposition"), at 265-278.

318.    In addition, the records produced by ARB indicate that it did not even obtain required copies of original or authenticated licenses verifying the charities' legal status and activities they were authorized to conduct, as required at the time of establishing customer relationships, opening any new account, and every three years thereafter. *See* Ex. 4, Winer Report at 111, 147-148.

319.    Instead, ARB's internal records and communications with the Saudi government indicate that it sought to obtain those licenses only after the September 11th attacks, amidst the heightened scrutiny of the charities' and ARB's roles in financing terrorism. *See* Ex. 4, Winer Report at 159-162; Ex. 1, Al Rajhi Deposition at 133-139; Ex. 59, (Abdullah al Rajhi Exhibit 33) ARB 39945-39946.

320.    Overall, the limited account opening and KYC information ARB did possess for the AHIF and IIRO accounts shows that:

> ARB failed to update the data of account holders periodically and continuously, or at least every three years prior to the 9/11 attacks, as required by ARB's policies and procedures.

> ARB failed to obtain the licensing documents of the charities prior to the 9/11 attacks.

> ARB failed to inquire about the charities with other banks or any other sources.

> ARB did occasionally receive authorization from Saudi government ministries, including the Ministry of Islamic Affairs, regarding

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

AHIF being approved to open a particular new account, indicating that ARB was aware of the need for such authorization, but failed to obtain such authorizations in most cases.

ARB failed to verify any data given by the charities when opening accounts, such as verifying the address or visiting the headquarters of the organizations.

ARB failed to undertake any verification to know the sources of the funds deposited by the charities at the time of opening accounts for them, or later, including when there were cash deposits.

ARB failed to obtain information on the charities financial structure and annual financial statements.

ARB failed to obtain any concrete information about the actual services the charities were providing and the actual uses of the funds that they were moving through ARB.

ARB failed to obtain a list of the charities' most important suppliers, dealers, contractors, or business locations.

ARB failed to obtain information about the charities' dealings with related parties.

ARB was in possession of information confirming that its accounts were being used to support activities of the charities in particular continents, as reflected in instances where the charities labeled the accounts with such names as "Africa" "Asia" and "Europe," and occasionally, specifying countries and purported activities, but ARB nonetheless failed to conduct due diligence or to verify whether the funds in these accounts were being used for the described purposes.

ARB failed ot obtain information on the actual foreign operations of the Da'Wah organizations.

*See* Ex. 4, Winer Report at 152-153.

321.    ARB also did not undertake any monitoring of public reporting concerning the charities, despite the known risks of terrorist financing through ostensible Islamic charities.

322.    Had ARB accessed readily available public reporting, that basic due diligence would have confirmed that AHIF's and IIRO's accounts presented high risks for terrorist financing. *Id.* at 153, 28-42.

323.    In reality, such steps were unnecessary to apprise ARB of the involvement of AHIF, IIRO, and Suleiman al Rajhi's own committee/foundation in supporting al Qaeda and terrorism: ARB's principals were expressly aware of those terrorist activities, by virtue of Suleiman al Rajhi's

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

own central role in supporting al Qaeda and militant Islamic causes, including through his charity committee/foundation and the U.S.-based SAAR Foundation; and Suleiman al Rajhi's close ties to AHIF, IIRO, WAMY and their leadership. *See infra* at § XIV.

324. These risks were known to Abdullah al Rajhi as well, through his direct involvement with the U.S.-based SAAR Foundation, including the initiative to move its operations to the Isle of Man following the public reporting implicating IIIT in funding terrorism. *See* Ex. 1, Al Rajhi Deposition at 295-300; Ex. 4, Winer Report at 198-199.

325. The circumstances thus indicate that ARB's lack of diligence and departure from AML and KYC requirements, with respect to the charities' accounts, was by design.

326. As Jonathan Winer explains in his expert report, "the ocean of anonymous, minimally documented transactions, including the apparent use of cash and couriers by the Da'Wah Organizations to transfer funds, meant that in reality, the accounts that ARB were providing to the Da'Wah Organizations functioned as anonymous accounts, in being able to provide funds throughout the world to people and for purposes that were not documented by ARB. ARB's failure to respond to this risk by taking the measures described by FATF is a further example of it not adhering to Know Your Customer Anti-Money Laundering, and Counter Terrorism best practdices and international standards prior to the 9/11 attacks." *See* Ex. 4, Winer Report at 154.

327. Meanwhile, ARB was also specifically aware that AHIF, IIRO, Suleiman al Rajhi's committee/foundation, and the officers of those entities, were improperly using personal accounts of the officials to carry out financial activities unrelated to their personal affairs, a practice that masked the true origin of funds transferred from those accounts and embodied a classic mechanism for carrying out financial crimes. *See* Ex. 4, Winer Report at 204-205.

328. In a series of communications between 1998 and 2001, AHIF officials expressly notified ARB that they had been using certain personal or joint personal accounts at ARB, to conduct financial activities of AHIF. *See* Ex. 101, ARB 38998-39000; Ex. 172, ARB 38920; Ex. 173, ARB 38885; Ex. 174, ARB 38878; Ex. 175, ARB 38994; Ex. 176, ARB 38995; Ex. 177, ARB 39001; Ex. 178, ARB 38996; Ex. 179, 38978; Ex. 180, ARB 38979; Ex. 181, ARB 39077; Ex. 182, ARB 38486. *See also* Ex. 4, Winer Report at 164-168.

329. For reasons that remain unclear, the AHIF officials requested that the accounts referenced in those letters be converted to accounts in the name of AHIF, even though they continued to conduct financial activities of AHIF through other, personal accounts, as discussed below. *See* Ex. 4, Winer Report at 164-168.

330. These requests to transfer the accounts into the name of AHIF contravened ARB's own rules, and in at least several cases, were referred to senior ARB officials, including the Head of the Legal Affairs Section and/or Abdullah al Rajhi's Deputy. *See id.*

331. In seeking special approval for one of the requests, an ARB branch manager asked ARB's Deputy Director General to endorse the request because the "donors" were familiar with the existing account number and because AHIF "is a distinguished client." *See* Ex. 179, ARB 38978; Ex. 4, Winer Report at 167.

82

332. These multiple requests to convert accounts held in the names of AHIF officials into accounts in the name of AHIF provided express notice to ARB that AHIF and its officials were using personal accounts to conduct financial transactions of AHIF, including the collection and distribution of funds. *See* Ex. 4, Winer Report at 164-168; *see also* Ex. 101, ARB 38998-39000; Ex. 172, ARB 38920; Ex. 173, ARB 38885; Ex. 174, ARB 38878; Ex. 175, ARB 38994; Ex. 176, ARB 38995; Ex. 177, ARB 39001; Ex. 178, ARB 38996; Ex. 179, 38978; Ex. 180, ARB 38979; Ex. 181, ARB 39077; Ex. 182, ARB 38486.

333. The content of ARB's account statements for its accounts for Aqil al Aqil, Soliman al Buthe, and Mansour al Kadi, and the nature of the transactions they reflect, further confirm this pattern of using personal accounts to carry out financial activities of AHIF.

334. As noted above, the sheer size of the funds ARB was depositing into and transferring from these accounts made clear to ARB that they were not personal funds of the account holders. *See supra* at ¶¶ 231-32, 239.

335. More directly, the statement for Aqil's 3412 account includes express notations that numerous of the large cash deposits into his personal account during the period of intensive and abnormal deposit activity in 1999 were from "Al Haramain Islamic Foundation." *See* Ex. 114, ARB 41454-41463 at 41456 (cash deposit of 443,836 SR from "Al Haramain Islamic Foundation"); *id.* at 41459-41460 (10 additional cash deposits from AHIF).

336. Aqil's 3412 account also received a 5,000,000 SR deposit of apparent AHIF funds via a check designated in the notes as a "collection check" and "Check of Head Office." *See* Ex. 114, ARB 41454-41463 at 41456.

337. Al Buthe's account ending in 9206 was similarly used to deposit funds from "Harameen Charity" and additional funds from "collection check," along with several large cash deposits that were plainly inconsistent with al Buthe's individual financial activities. *See, e.g.*, Ex. 187, ARB 858-959 at 882 (reflecting deposits from "Harameen Charity" and "collection check," cash deposit of 187,750 SR, traveler's checks deposit of 292,500 SR); *id.* at 900 (cash deposits of 184,795 and 70,000 SR); *Id.* at 901 (cash deposits of 101,385; 78,729; and 20,000 SR).

338. This practice presented clear money laundering and terrorist financing risks, including the risk that officials of the charities were using their personal accounts to prevent scrutiny of AHIF's financial activities when sending money abroad, and the potential diversion of funds by officials of AHIF to support terrorism and other crimes. Ex. 4, Winer Report at 165-168, 178, 183.

339. In fact, CIA reporting specifically confirms the use by AHIF and AHIF officials of personal accounts to circumvent scrutiny of AHIF's financial activities and "prevent the money from being identified or seized by foreign officials." *See* Ex. 69, *Al-Haramain: Support for Extremists and Terrorists [REDACTED]*, August 28, 2002, CIA-SUB 0007-19 at 13.

340. This tool for hiding terrorist financing activities was directly and knowingly enabled and facilitated by ARB.

341. ARB's account records for the accounts it operated for SDGT and IIRO official al

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

Mujil indicate that IIRO and Mujil similarly used al Mujil's "personal" accounts at ARB to carry out financial activities of IIRO, again with the knowledge and active assistance of ARB.

342.    Again by way of example, Al Mujil's account ending in 4608 reflects numerous large check deposits referencing IIRO specifically, myriad deposits from an apparent IIRO "clearinghouse," and a host of other transactions that plainly did not correspond to al Mujil's personal financial activities. *See* Ex. 119, ARB 745-787 (al Mujil 4608 extracted account information for 1998-2002); *id.* at 776 (120,000 SR check deposit from "Islamic Relief Organization"); *id.* at 781 (50,000 SR "clearinghouse" check deposit from "the Relief Organization"); *id.* at 784 (3,089,475 SR check deposit from "the Relief Organization"); *id.* at 745-755 (various check deposits from "clearinghouse"); *id.* at 752 (80,000 SR "collection" check deposit); *id.* at 772 (cash deposit of 100,000 SR); *id.* at 773 (check deposit of 355,000 SR); *id.* at 780 (200,000 SR "clearinghouse" check deposit).

343.    Throughout this period, ARB was also operating an account for the Suleiman al Rajhi charity committee/foundation, despite the fact that it had no legal existence prior to 2000, and ARB therefore was not permitted to open and operate an account in its name. *See* Ex. 4, Winer Report at 162.

344.    Meanwhile, the statements for ARB's alleged "personal" accounts for Suleiman al Rajhi charity/foundation officials Abdul Rahman al Rajhi, Saleh bin Sulaiman al Habdan, and Abdullah bin Ibrahim al Misfer, similarly reflect that Suleiman al Rajhi, ARB's Founder and Chairman, was abusing those personal accounts to distribute massive amounts of money throughout the world, thereby obscuring the fact that he was the actual source of the funds and circumventing oversight of his financial activities. *See supra* at ¶ 253.

345.    Most obviously, as a sophisticated international businessman, billionaire, and founder and chairman of an international bank, Suleiman al Rajhi knew explicitly that his use of the personal accounts of the officers of his committee/foundation to carry out Suleiman al Rajhi's financial activities involved a classic money laundering tactic, which violated governing AML and CFT laws and standards.

346.    Many of the individual transactions and patterns of transactions ARB facilitated through those "personal" accounts raised obvious additional red flags for money laundering as well, beyond the use of those accounts to carry out transactions for third parties.

347.    The concentrated pattern of transactions carried out through Aqil's 3412 account between May of 1999 and August of 2000 are emblematic of this alarming activity facilitated by ARB. *See* Ex. 114, ARB 41454-41463.

348.    During the period before May 1999 for which account information is available (January 1998-April 1999), the account reflects modest transaction activity, never exceeding 30,000 SR and dropping to as low as a negative balance of -1207 SR. *See* Ex. 114, ARB 41454-41463 at 41454-41455.

349.    Then, suddenly and without reasonable explanation, deposit activity in the account exploded, beginning with a 440,792 SR cash deposit (about $117,500) on May 5, 1999. *Id.* at 41455.

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

350.    Over the next two months, Aqil made near daily cash deposits of huge sums into his account, including a single cash deposit on May 8, 1999 of nearly 1.3 million SR, and numerous individual cash deposits in excess of 600,000 SR (among others). *Id.* at 41455-41460.

351.    Over the course of the roughly two month period (May 4, 1999-July 14, 1999), Aqil made 63 separate cash deposits into his 3412 account, totaling 14,773,760 SR, as well as a 5,000,000 SR check deposit. *Id.*

352.    The 19,773,760 SR deposited into the account equates to approximately $5.72 million, or roughly $9.3 million in 2023 dollars. *See* Ex. 4, Winer Report at 107 (providing formulas for SR-USD conversion and inflation calculator).

353.    During the same period, Aqil did not withdraw any funds from the account at all, and the balance swelled (from a negative balance of -1207.11 SR to 19,772,552.89 SR on July 14, 1999. *See* Ex. 114, ARB 41454-41463 at 41455-41460.

354.    Then, suddenly and again without reasonable explanation, the flow of transactions largely reversed, beginning with a single event check withdrawal of 2,726,500 SR on July 27, 1999. *Id.* at 41460.

355.    The bulk of the funds were then withdrawn via a single check, to an unknown beneficiary, in the amount of 16,900,000 SR, on August 20, 2000. *Id.* at 41461.

356.    These transactions presented myriad money laundering and illicit activity red flags, including dozens of large cash transactions that did not correspond with Aqil's personal finances; serial deposits without any corresponding withdrawal activity; and transactions for unknown purposes that do not correspond to the customer's own finances. *See* Ex. 58, 1995 Guidelines at 150.

357.    These red flags would have been obvious to ARB's managers and employees who directly interacted with Aqil at the time of the deposits, and plainly would have required "further investigation" in the event ARB was applying AML and CFT requirements to the charities and their officials. *Id.*

358.    While the money laundering red flags are obvious from the sheer value and concentration of the cash transactions, an understanding of what deposits on this scale would have looked like to the ARB personnel processing them helps underscore just how remarkable they were.

359.    To this end, attached as Annexes 2-4 to the Declaration of Ben T. Railsback, are images providing digital representations of what the nearly 1.3 million SR cash deposit on May 8, 1999 into Aqil's account would have looked like, under five deposit scenarios: a deposit comprised entirely of 500 SR notes; a deposit comprised entirely of 100 SR notes; a deposit compromised entirely of 50 SR notes, as well as two other views including: (1) a combination of this same amount in an even split of 50 and 100 SR notes, and (2) a combination of this same amount in an even three-way split of 50, 100 and 500 SR notes. These images in Annexes 2-4 provide different views and angles of what a bank teller would see in front of them when this large cash deposit occurred. *See* Ex. 183, Declaration of Ben T. Railsback, Annexes 2-4 and Exhibits thereto.

360. Using the same scenarios, Annex 5 to the Declaration of Ben T. Railsback provides digital representations of what the aggregate of the total cash deposits of 14,798,020 SR into Aqil's account between May 4, 1999 through July 14, 1999 would have looked like under five deposit scenarios: a deposit comprised entirely of 500 SR notes; a deposit comprised entirely of 100 SR notes, a deposit compromised entirely of 50 SR notes, as well as two other views including: (1) a combination of this same amount in an even split of 50 and 100 SR notes, and (2) a combination of this same amount in an even three-way split of 50, 100 and 500 SR notes. *See* Ex. 183, Declaration of Ben T. Railsback, Annex 5, and Exhibits thereto.

361. As these physical depictions convey, there is no way the ARB personnel who handled the case deposits into Aqil's account and interacted with him could have ignored the staggering money laundering and terrorism financing risks presented by those transactions.

362. Further still, under the 1995 Guidelines and ARB AML Guide, each of the Aqil transactions exceeding 100,000 SR (and certainly the very large deposits) should have been reported to ARB's AML Unit "through the unit's available automated programs," resulting in a required investigation concerning the client's historical volume of transactions and inquiry "to identify the client's sources of income and how the executed operations match with the client's activity." *See* Ex. 189, ARB AML Guide at ARB 738; *See* Ex. 184, Transcript, February 9, 2024 Deposition of Fawzi Al-Hobayb ("Hobayb Deposition"), at 197-203.

363. The ARB AML Guide further requires that all records relating to any suspicious activity report or inquiry be maintained, and states that the AML Unit had in place a program to retrieve information on such reports and inquiries without the need to paper search the archive files. *See* Ex. 189, ARB AML Guide at 737.

364. ARB was required to produce any suspicious activity reports or documents relating to money laundering investigations of the accountholders and accounts with the scope of discovery, and did not produce any, indicating they do not exist (whether for Aqil or any of the other accountholders in issue).

365. The record thus confirms that ARB took no action, and made no inquiry, with respect to the Aqil transactions, or the transactions involving other accountholders discussed below, in contravention of the 1995 Guidelines and ARB's own (nominal) AML procedures.

366. A series of transactions ARB executed through the personal account of another of AHIF's designated officials, Soliman al Buthe, provides additional examples of ARB's facilitation of highly suspicious transactions for one of al Qaeda's key financial facilitators. *See* Ex. 4, Winer Report at 174-177.

367. On June 20, 1999, al Buthe made a "cash deposit" of 187,750 SR in an account he had at ARB, and simultaneously deposited a "collection check" in the amount of 60,000 SR, suddenly increasing his funds on deposit from 21,779.37 SR to 269,529.37 SR – an increase of more than ten fold or 1000%. Al Buthe then immediately converted those funds into traveler's checks on the same date of June 20. 1999, leading to a debit to his ARB account of 300,000 SR – or more than the total funds he had in total on deposit. *See* Ex. 187, ARB 858-959 at 882.

368. The large deposit of cash, exceeding the 1995 Guidelines' significant transaction

threshold of 100,000 SR, and its immediate conversion into traveler's checks, raised obvious money laundering and suspicious activity red flags, particularly as al Buthe had never held nearly that much in his account, with historical balances typically in the thousands or tens or thousands of Saudi riyals, not in the hundreds of thousands. *See* Ex. 4, Winer Report at 174-176.

369. Then, ten days later, al-Buthe redeposited traveler's checks (presumably the same ones) of nearly the full amount he had withdrawn, that is 292,500 SR, on June 30, 1999, and then immediately withdrew most of these funds, totalling 247,630 SR, through a "telex entry debit note," or a bank-to-bank wire transfer, once again on the same day.

370. These inexplicable, and in certain respects circular, transactions were highly abnormal and plainly required money laundering investigation under the 1995 Guidelines and the ARB AML Guide. Once again, however, in the case of an AHIF official, ARB did nothing (aside from facilitating the abnormal transactions). *See* Ex. 4, Winer Report at 174-76; Ex. 58, 1995 Guidelines at 150 (indicators of money laundering include large deposits inconsistent with customer's activities, and abnormal purchase of cashier's checks and payment orders against cash).

371. ARB executed another set of overtly suspicious transactions for al Buthe the following year, in March and April.

372. At that time, ARB records indicate that al Buthe made a "cash deposit" of 184,795.00 SR on March 22, 2000, and a second "cash deposit" on March 27, 2000, of 70,000 SR, together rapidly increasing his balance from 311.39 SR (or less than $100) on March 21 to 236,358.39 on March 27, equivalent to a bit more than $63,000 (about $112,000 in 2023 dollars), and thus more than sixty-three times as much money as was previously held in the account. *See* Ex. 187, ARB 858-959 at 900-901.

373. A week later, on April 3, 2000, al Buthe transferred nearly half of those funds, 101,315 SR, via a "telex transfer" to an unspecified recipient – and then had slightly more than that amount – 101,385 SR deposited in his acccount the following day, thereby replenishing it. *Id.*

374. Five days after that, al Buthe received another "cash deposit" in the amount of 78,729 SR, characterized as coming from "external collections." *Id.*

375. These transactions coincide with the period when al Buthe was alleged by the U.S. government to have returned to Saudi Arabia from the United States, illegally carrying $130,000 in American Express traveler's checks and a $20,000 bank check provided to him by the AHIF branch in Oregon. *See* Ex. 4, Winer Report at 176.

376. Here again, the transactions ARB executed through al Buthe's personal account raised obvious red flags, as they involved large and inexplicable deposits and withdrawals that were inconsistent with al Buthe's personal finances, and withdrawals very shortly after deposit of the funds. *Id.*; *see also* Ex. 58, 1995 Guidelines at 150.

377. Within just one month of the previous set of suspicious transactions, al Buthe again made two unusually large "cash deposits" in his account at ARB, on May 9, 2000. The first was for 40,000 SR. The second was for 1,032,900 SR, equivalent to about $275,000 (corresponding to about $490,000 in 2023 dollars), an amount that dramatically exceeded the normal value of

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

deposits and account activity. *See* Ex. 187, ARB 858-959 at 903.

378. Four days later, on May 13, 2000, ARB's account for the al Buthe statement shows a "Debit Entry Note" with a "Traveler's Check Discount." *See id.* The amount deducted was 1,125,000 SR, which converts using 2000 exchange rates to about $275,000 – a match between ARB's production and the amount specified in the federal search warrant pertaining to al Buthe.

379. The sequence contains several money laundering and terrorist financing red flags. *See* Ex. 4, Winer Report at 177; Ex. 58, 1995 Guidelines at 150.

380. First, al Buthe made exceptionally large cash deposits, given the ordinary size of funds he maintained at ARB. *See* Ex. 4, Winer Report at 177; Ex. 58, 1995 Guidelines at 150.

381. Second, he created a balance that was a substantial multiple of the average balance he had maintained over months and years. *Id.*

382. Third, most of the funds remained in al Buthe's account at ARB for a period of just five days. *Id.*

383. Fourth, the funds – a great deal of money for an individual whose average account balances were far lower – were converted into traveler's checks. *Id.*

384. Here again, ARB took none of the required AML actions with respect to the extraordinary transactions it executed for one of al Qaeda's key financial facilitators.

385. The activity ARB facilitated through al Mujil's account reflect similar money laundering red flags involving large transactions that did not correspond to al Mujil's personal finances (many of which exceeded 100,000 SR and should have been flagged for further inquiry by ARB's automated AML software); and transactions with no apparent purpose that fit with al Mujil's personal finances and activities. *See supra* at ¶ 342 (listing abnormal transactions in al Mujil account); Ex. 58, 1995 Guidelines at 150; Ex. 189, ARB AML Guide at 738.

386. Throughout the time periods that ARB was enabling and facilitating these illicit and improper transactions via the accounts of Aqil, al Buthe, and al Mujil, they were serving as three of al Qaeda's most important funders and financial facilitators. *See supra* at ¶¶ 235, 238, 240.

387. The same money laundering red flags were raised and ignored in relation to the transactions ARB facilitated through the individual accounts of Abdul Rahman al Rajhi, Saleh bin Sulaiman al Habdan, and Abdullah bin Ibrahim al Misfer. *See supra* at ¶¶ 253, 256.

388. In addition to those discussed above, Jonathan Winer's expert report surveys a number of additional money laundering and terrorist financing red flags that were conspicuously ignored by ARB, involving and arising from the transfer of funds by the charities to areas where extremist and terrorist entities were known to have a substantial presence, *see* Ex. 4, Winer Report at 179-181; the existence of reliable information indicating that the charities and/or their representatives such as Aqil, were linked to third parties that were supporting or engaged in terrorist activity, *id.* at 181-82; the use of cash couriers to transfer funds from the charities into areas with known conflict and/or terrorist activit; *id.* at 182; actual direct evidence that customer

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

funds were being used for improper purposes, such as providing support for armed jihadists, *id.*; large amounts of funds withdrawn by the charities in cash, minimizing the evidentiary trail of the uses of the cash, *id.* at 182-83; and publications or statements of the charities expressly supporting paramilitary jihadist action, raising the question of whether the organizations are providing support for armed conflict or terrorism. *Id.* at 183-84.

389. Collectively, ARB's conspicuous and systematic disregard for AML, CFT, and KYC standards and requirements, including ARB's own (nominal) procedures, in relation to the opening, maintenance, and operation of the accounts for the charities and their officials, and the accounts of Suleiman al Rajhi's own committee/foundation and its officials, reflects a conscious decision by ARB to exempt them from those standards and requirements, and support the use of those accounts without limitations or restrictions. *See* Ex. 4, Winer Report at 131, *id.* at 130-203 (discussing myriad examples of ARB's KYC, AML and CFT violations and disregard of red flags).

## X. **ARB's Facilitation of Terrorist Financing In and Through the United States**

390. As discussed above, ARB maintained accounts and executed highly suspicious and improper transactions for Suleiman al Rajhi's committee/foundation, including during periods when it did not have any legal existence, and for individual officials of Suleiman al Rajhi's committee/foundation, including Abdul Rahman al Rajhi, Saleh bin Sulaiman al Habdan, and Abdullah bin Ibrahim al Misfer. *See supra* at ¶¶ 236, 248-53.

391. Plaintiffs have not yet been afforded discovery as to the financial activity carried out through the committee/foundation account at ARB generally, and therefore do not know the full extent of its use to finance al Qaeda and its intertwined charity fronts and financial facilitators, including through the United States.

392. However, discovery Plaintiffs received from defendant ███████ confirms that Suleiman al Rajhi, Abdullah al Rajhi, and ARB extensively coordinated the alleged "charitable" activities and transactions of Suleiman al Rajhi and his committee/foundation, with and through the U.S.-based SAAR Foundation enterprise, established by Suleiman al Rajhi, using ARB's Payable Through Account at Chase Manhattan. *See* Ex. 4, Winer Report at 184-203.

393. As the FBI and CIA concluded in their December 2004 Joint *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States*, the U.S.-based SAAR Foundation and its associated entities were "a complex web of overlapping companies with parallel ideologies, personal relationships, and financial associates that has exhibited numerous affiliations with entities known to support terrorism." *See* Ex. 26 (Lormel Exhibit 9), *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States*, December 2004, EO14040-003414-3442.

394. Suleiman al Rajhi began establishing this web of entities in the United States in the 1980's, deliberately creating an opaque and convoluted structure of intertwined companies, think tanks, foundations, and alleged charitable entities, the structure and financial activities of which defied logical explanation or legitimate purpose. *Id.*; Ex. 4, Winer Report at 185-189; *see also* Ex. 27, Kane Affidavit.

395. Records filed with the Commonwealth of Virginia show that Suleiman al Rajhi

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

established several of the entities comprising this web in connection with other members of al Qaeda's Golden Chain, and senior officials of IIRO and MWL. *See* Ex. 24, SANA-BELL 0001-10 at 7, Articles of Incorporation of the SANA-BELL, Inc., July 28, 1999 reflecting that the initial Board of Trustees included Suleiman al Rajhi ("Solayman Alsalih Alrajhi"), Saleh Kamel and Ibrahim Afandi ("Golden Chain"), Dr. Farid Yasin Qurashi (IIRO's Secretary General), Dr. Abdulrahim al Saati (MWL/IIRO official), and ███████ (MWL).

396.    These and other records and evidence also confirm Abdullah al Rajhi's active involvement in the U.S. SAAR Foundation enterprise. *See* Ex. 25 (Abdullah al Rajhi Exhibit 57), 1991-1994 Annual Reports for the SAAR Foundation, Inc. (identifying principal officers and directors); Ex. 1, Al Rajhi Deposition at 311 (confirming that the "Abdullah S. Al-Abdulaziz" on the second page of the 1994 Annual Report is him); *id.* at 295-296, 316-319, 324-325 (confirming correspondence with ████ and involvement in matters discussed in that correspondence); Ex. 4, Winer Report at 189-93, 196-200 (discussing Abdullah al Rajhi involvement). *See also* Exs. 30-37.

397.    As also noted above, Suleiman al Rajhi and Abdullah al Rajhi took deliberate steps to obscure and conceal their roles and involvement in the SAAR Foundation web of companies, including by intentionally and illegally using various false or misspelled names and fictitious addresses on official documents filed with the Commonwealth of Virginia. *See supra* at ¶ 47.

398.    U.S. counterterrorism officials assessed, and Plaintiffs' experts have opined, that the SAAR Foundation enterprise was established and operated to launder funds in support of terrorist causes. *See* Ex. 4, Winer Report at 184-203; Ex. 26 (Lormel Exhibit 9), *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States*, EO14040-003438; Ex. 27, Kane Affidavit at 7 ("I have seen evidence of the transfer of large amounts of funds from the *Safa* [SAAR Foundation] *Group* organizations directly to terrorist-front organizations since the early 1990's;"); *id.* at 8 ("The FBI, USCS, and IRS agents involved in this investigation at various times since 1998 suspect that, as a result of the 1995 searches in Tampa, the *Safa* [SAAR Foundation] *Group* engaged in the money laundering tactic of "layering" to hide from law enforcement authorities the trail of its support for terrorists. There appears to be no innocent explanation for the use of layers and layers of transactions between *Safa* [SAAR Foundation] *Group* companies and charities other than to throw law enforcement authorities off the trail.").

399.    This conclusion is strengthened by the evidence that, following the investigations and public reporting implicating IIIT, one of the SAAR Foundation entities, in the financing of terrorism in 1997, Suleiman al Rajhi and Abdullah al Rajhi (then the most senior officials of ARB), initiated steps to remove the SAAR Foundation and the related Humana Trust from the United States, as Abdullah al Rajhi acknowledged in his deposition. *See* Ex. 4, Winer Report at 198-99; *id.* at 196-97 (discussing communication about and Abdullah al Rajhi awareness of IRS investigation); Ex. 1, Al Rajhi Deposition at 294-300.

400.    The documentary evidence indicates that Suleiman al Rajhi and Abdullah al Rajhi initiated steps to move the SAAR Foundation web of companies' principal operations, via Humana Trust, to the Isle of Man, a notorious bank secrecy haven, and that such steps did in fact occur. *See* Ex. 4, Winer Report at 184-202, *id.* at 192 (discussing use of shell in Isle of Man); Ex. 27, Kane

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

Affidavit at FED-PEC0001249 (discussing money disappearing to Isle of Man); Ex. 140 (showing movement of funds to Isle of Man accounts by Sulieman al Rajhi, Humana, and SAAR Foundation in this time period).

401. Available evidence indicates that financial steps towards this move were undertaken via ARB's Payable Through Account at Chase Manhattan, as discussed below. *See infra* at ¶¶ 429-453; Ex. 27, Kane Affidavit at FED-PEC0001249 (discussing movement of money to Isle of Man); Ex. 140 (showing movement of funds to Isle of Man accounts by Sulieman al Rajhi, Humana, and SAAR Foundation in this time period).

402. Abdullah al Rajhi testified that the proposal to move the enterprise to the Isle of Man was not approved, and that a decision was instead made to move it "back to Saudi." *See* Ex. 1, Al Rajhi Deposition at 299-300.

403. As Jonathan Winer discusses in his expert report, Abdullah al Rajhi's testimony on this point is inconsistent with the documentary evidence, and apparently true only insofar as the Suleiman Bin Abdul Aziz al Rajhi Foundation was formally established in Saudi Arabia on June 19, 2000. *See* Ex. 4, Winer Report at 198-99; *supra* at ¶¶ 400-402; *see also supra* at ¶ 41 (discussing creation of Foundation in Saudi Arabia in 2000).

404. In any case, the documentary and other evidence confirms that Suleiman al Rajhi and his charity committee/foundation in Saudi Arabia used the U.S.-based SAAR Foundation as a proxy, conduit, and shell, to facilitate funds transfers throughout the world that were initiated by ARB and, in many cases, carried out through ARB's Payable Through Account at Chase Manhattan in New York.

405. Abdullah al Rajhi acknowledged at his deposition, and the documentary evidence shows, that Suleiman al Rajhi established the U.S.-based SAAR Foundation as a vehicle to carry out his alleged charitable activities, and that Suleiman al Rajhi was the major source of the SAAR Foundation's funding. *See* Ex. 1, Al Rajhi Deposition at 294-295; Ex. 29 (Galloway Exhibit 22), NL 15578, 15043-15046.

406. Following the investigations and derogatory reporting implicating SAAR Foundation, through IIT, in the financing of terrorism, steps were initiated in approximately 1997 to transfer the U.S.-based SAAR Foundation's assets to Humana Trust, and to relocate Humana Trust to the Isle of Man. *See* Ex. 4, Winer Report at 190-92; Ex. 14 (Abdullah al Rajhi Exhibit 56) (NL 9625); Ex. 1, Al Rajhi Deposition at 302-303.

407. These steps were prompted by a desire on the part of Suleiman al Rajhi to insulate himself from "potential other risk, you know, liability" following the public reporting implicating his alleged charity arms in supporting terrorism. *See* Ex. 1, Al Rajhi Deposition at 303; Ex. 14 (Abdullah al Rajhi Exhibit 56) (NL 9625) (SAAR Foundation/Humana business record stating "The donors became very concerned about linked to terrorist activities, of course with which they had nothing to do. A question was asked, "why do we want to continue to be in U.S.A.?" The trustees then decided to "re-locate" its operations. After seeking appropriate legal advice, steps were taken to create Human Chairtable Trust on 12th day of November 1997 as an Isle of Man trust. Saar Foundation then made a charitable contribution of assets to Human to be used solely

for charitable purposes. Dr. Cherif Sedky, which lives in Saudi Arabia and ████████ who lives in U.S.A. became the trustees of Humana."); Ex. 4, Winer Report at 189-200.

408.    During this same time period, in approximately 1997-1998, Suleiman al Rajhi and Abdullah al Rajhi then orchestrated an unusual arrangement, under which funds distributed by Suleiman al Rajhi and his committee/foundation in Saudi Arabia via accounts at ARB, and selected exclusively by Suleiman al Rajhi and his committee/foundation, would be attributed, after the fact, to Humana, as though Humana had made the contributions. *See* Ex. 29 (Galloway Exhibit 22), NL 15578, 15043-15046; Ex. 14 (Abdullah al Rajhi Exhibit 56) (NL 9625); Ex. 145, NL 15572 (October 31, 2000 email from ███████████ regarding IRS inquiry and indicating that Humana Trust did not know identity of beneficiaries); Ex. 4, Winer Report at 189-200; Ex. 1, Al Rajhi Deposition at 320-321 (acknowledging that payments from Suleiman al Rajhi charity committee/foundation made through ARB).

409.    ██████████ produced a number of business records of SAAR Foundation and Humana Trust (including documents reflecting communications among Suleiman al Rajhi, Abdullah al Rajhi, █████ and representatives of Suleiman al Rajhi and Abdullah al Rajhi) reflecting this arrangement. *See* Ex. 29 (Galloway Exhibit 22), NL 15578, 15043-15046; Ex. 14 (Abdullah al Rajhi Exhibit 56) (NL 9625); Ex. 145, NL 15572 (October 31, 2000 email from ███████████ regarding IRS inquiry and indicating that Humana Trust did not know identity of beneficiaries); Ex. 4, Winer Report at 189-200; Ex. 1, Al Rajhi Deposition at 320-321 (acknowledging that payments from Suleiman al Rajhi charity committee/foundation made through ARB); Exs. 30-37.

410.    These include a typewritten document, with handwritten edits made by █████, concerning a set of arrangements resulting from a 1998 in-person visit by Suleiman al Rajhi to the United States, in furtherance of the reordering of SAAR Foundation's affairs. *See* Ex. 14 (Abdullah al Rajhi Exhibit 56) (NL 9625).

411.    The original typewritten text reads as follows:

> *The donors became very concerned about linked to terrorist activities, of course with which they had nothing to do. A question was asked, "why do we want to continue to be in U.S.A.?" The trustees then decided to "re-locate" its operations.* After seeking appropriate legal advice, steps were taken to create Human Chairtable Trust on 12th day of November 1997 as an Isle of Man trust. Saar Foundation then made a charitable contribution of assets to Human to be used solely for charitable purposes. Dr. Cherif Sedky, which lives in Saudi Arabia and ████████████ who lives in U.S.A. became the trustees of Humana.
>
> Shaikh Sulaiman during his visit to U.S.A. in July 1998 made the suggestion to the trustees that to optimize the grant makng process we should consider working with the Charity office already in existence rather than setting up a new office. The offer was welcome because banks in Europe were not very cooperative in writing a lot

of checks, and also because the committee overseeing the Charity office in Riyadh has the set up to receive requests from various charities located throughout the world and then to review, investigate, and decide if a charitable contribution will be made.

*Currently the Charity office is managed by Abdul Rahman Bin Abdullah Al Rajhi, Saleh Bin Sulaiman Al-Hadbad and Abudalla I. Al-Misfer. In accordance with the established practice of the Charity office, as explained in the third paragraph of this statement, the checks are processed without showing the contributor's name. These are processed by Al Rajhi Banking and Investment Corporation, having its account with Chase Manhattan and other correspondent banks.*

*See* Ex. 14 (Abdullah al Rajhi Exhibit 56) (NL 9625) (emphasis supplied); Ex. 4, Winer Report at 191-92 (discussing text and identifying handwritten edits).

412.     Under the arrangement, Suleiman al Rajhi and his charity committee/office distributed funds from ARB accounts, including ARB's own Payable Through Account at Chase Manhattan in New York, to beneficiaries throughout the world, without any awareness or even knowledge of Humana, which were then attributed to Humana after the fact. *See* Ex. 29 (Galloway Exhibit 22), NL 15578, 15043-15046; Ex. 14 (Abdullah al Rajhi Exhibit 56) (NL 9625); Ex. 145, NL 15572 (October 31, 2000 email from ████ regarding IRS inquiry and indicating that Humana Trust did not know identity of beneficiaries); Ex. 4, Winer Report at 189-200; Ex. 1, Al Rajhi Deposition at 320-321 (acknowledging that payments from Suleiman al Rajhi charity committee/foundation made through ARB); Exs. 30-37.

413.     The scheme resulted in a crisis in 2000, when the IRS sought information from Humana Trust concerning its alleged charitable activities, and ████ lacked basic knowledge about the distributions or documents necessary to respond. *See* Exs. 30-37, Ex. 4, Winer Report at 196-197. *See* Ex. 34, NL 15551; Ex. 35, NL 15572; Ex. 36, NL 15573-15576; Ex. 37, NL 15042.

414.     In response, ████ sent an "urgent" request to Abdullah al Rajhi to provide information requested by the IRS concerning Humana Trust's alleged distributions, which had in fact been undertaken by Suleiman al Rajhi and his charity committee/office in Saudi Arabia, through ARB and its Payable Through Account at Chase Manhattan. *See* Ex. 34, NL 15551 (June 22, 2000 email from ████ to Abdullah al Rajhi stating that they "have received many more questions and requests from IRS to produce various documents" and that the IRS is starting a field audit next week, and asks Abdullah to "please send us supporting documents for disbursement made to Saudi institutions as soon as practicable."); Ex. 35, NL 15572 (October 31, 2000 email from ████ to Abdullah al Rajhi explaining that the IRS is requesting address and contact information for certain organizations who received contributions); Ex. 36, NL 15573-15576 (November 9, 2000 fax from ████ to Abdullah al Rajhi ("Abu Sultan") asking for copies of checks for contributions to a number of beneficiaries in 1999); Ex. 37, NL 15042 (February 14, 2001 email from ████ to Abdullah al Rajhi referencing the "on going audit by the IRS" and stating "[t]hat is why I suggest and you have agreed to make contributions from Humana's account directly to charities of choice, rather than thru Shaikh Sulaiman's account which may be

questioned as IRS is raising doubts if Humana is really a charitable organization.")

415.    The documents ███, SAAR Foundation, and Humana at some point received, concerning the distributions attributed to Humana Trust, included a list of "Foreign and Domestic Distributions for the Year 1419-1420," (encompassing one distribution in August 1998 and numerous donations between January-September 1999), and a selection of distribution checks issued by ARB via its Payable Through Account at Chase Manhattan in New York. *See* Ex. 29 (Galloway Exhibit 22), NL 15578, 15043-15046; Ex. 1, Al Rajhi Deposition at 315-335 (questioning concerning distributions through SAAR Foundation/Humana via ARB account and ARB Chase Manhattan Payable Through account).

416.    The payments reflected in those documents relate to distributions of Suleiman al Rajhi funds, under the auspices of his alter-ego charity office/foundation, from accounts at ARB and ARB's Payable Through Account at Chase Manhattan, which were being attributed to SAAR Foundation and Humana Trust after the fact. *See* Ex. 29 (Galloway Exhibit 22), NL 15578, 15043-15046; Ex. 1, Al Rajhi Deposition at 315-335 (questioning concerning distributions through SAAR Foundation/Humana via ARB account and ARB Chase Manhattan Payable Through account); Ex. 4, Winer Report at 194-202.

417.    The beneficiaries identified in those documents further corroborate that the SAAR Foundation and Humana Trust enterprise were established to move funds to terrorist fronts and causes, including key al Qaeda fronts, via structures that insulated Suleiman al Rajhi's involvement.

418.    Initially, the list of distributions and other business records reflect large contributions via the SAAR Foundation mechanism to AHIF (600,000 SR and $17,333). *See* Ex. 29 (Galloway Exhibit 22), at NL 15045, 15046; *see also* Ex. 128, NL 10245 (187,500 SR check, signed by Suleiman al Rajhi, to AHIF).

419.    They also reflect several donations to WAMY, at least one of which was made payable to a WAMY official directly. *See* Ex. 29 (Galloway Exhibit 22), NL 15044-10546 (37,500 SR and 338,500 SR donations to WAMY); Ex. 185, NL 10068 ($120,000 check payable to Dr. Maneh al Johani); Ex. 185, NL 10384 (112,500 SR check payable to Dr. Maneh al Johani); Ex. 186, NL 10333 (check from Suleiman al Rajhi payable to WAMY for 75,000 riyals).

420.    The list of distributions also reflects a 2,215,000 SR payment to MWL, the parent of IIRO. *See* Ex. 29 (Galloway Exhibit 22), NL 10546.

421.    Suleiman al Rajhi also provided support through the U.S.-based SAAR Foundation mechanism to Dar al Hijra Association in the Philippines, a front for the Abu Sayyef Group, a key al Qaeda affiliate. *See* Ex. 29 (Galloway Exhibit 22), NL 15043-10546; Ex. 38, Kohlmann Report at 30.

422.    Taibah International Aid Association also received an apparent 100,000 SR contribution from Suleiman al Rajhi, via ARB and the U.S.-based SAAR Foundation. *See* Ex. 29 (Galloway Exhibit 22), NL 15043-10546.

423.    Taibah's branch in Falls Church, VA, the apparent recipient of the contribution,

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

was co-founded by Abdullah bin Laden, Osama bin Laden's nephew. Taibah also had extensive ties to al Qaeda. Ex. 93, *Taibah: Linking Extremists in the Balkans and the United States, December 12, 2002*, at CIA-SUB_0031-33; Ex. 38, Kohlmann Report at 30-31.

424. The list of Suleiman al Rajhi's 1999 distributions attributed to SAAR Foundation/Humana Trust also reflects a July 12, 1999 payment of 45,000 SR to Kosovo Caravan. *See* Ex. 29 (Galloway Exhibit 22), at NL 15045.

425. Sometimes spelled "Karavan," this company was owned by SDGT Yassin al Qadi. According to the Office of Foreign Asset Controls ("OFAC"): "In 1996, AL-QADI promoted Karavan's Egyptian engineer, Amr Abd' al-Wahab Selem al-Zaii to be the director of Karavan and AL-QADI's financial representative in Albania. AL-QADI had al-Zaini provide unlimited support to Bin Ladin associate SDGT Julaidan during his visit to Albania for the Laprake hospital construction project in the late 1990s, according to information available to the US government. According to OFAC, Karavan also provided support to the Saudi Joint Relief Committee while under Jelaidan's leadership. *See* Ex. 82, Department of Treasury Memorandum to R. Richard Newcomb regarding the E.O. 13224 Designation of Yassin al Kadi at 9-10.

426. The 1999 distribution also reflects a 50,000 SR payment to the al Noor Mosque (more commonly al Nur Mosque) in Berlin, a facility favored by the al Qaeda Hamburg cell that included 9/11 hijackers Mohammed Atta, Marwan al Shehhi, and Ziad Jarrah. *See* Ex. 29 (Galloway Exhibit 22), NL 15043-10546; Ex. 72, David Crawford, *How a Diplomat From Saudi Arabia Spread His Faith*," Wall Street Journal (September 10, 2003).

427. Suleiman al Rajhi's contributions through this mechanism, during the brief window for which documents are available, also encompassed contributions to the head of the "Da'wah" Office of the Ministry of Islamic Affairs in the Saudi Embassy, and American Open University, as discussed in further detail below. *See infra* at ¶¶ 472, 480.

428. In sum, while the documents from ███████ provide only a brief and partial window into the entities supported by Suleiman al Rajhi, via payments originating from ARB and channeled through the U.S-based SAAR Foundation layering mechanism, even that limited picture shows his systematic and expansive support for al Qaeda fronts and support entities, in and through the States.

## XI. ARB Established and Systematically Used a Payable Through Account in the United States, Including to Carry Out Terrorist Financing Transactions For Suleiman Al Rajhi

429. From 1992 and continuing until at least 2015, ARB had a correspondent banking relationship with Chase Manhattan Bank, New York.

430. As noted above, ARB's correspondent banking account with Chase Manhattan Bank is what is known as a "Payable Through Account."

431. A "*payable-through account"* means a correspondent account maintained by a U.S. financial institution for a foreign financial institution by means of which the foreign financial institution permits its customers to engage, either directly or through a subaccount, in banking

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

activities usual in connection with the business of banking in the United States." *See* 31 C.F.R. 561.307; *see also* Ex. 4, Winer Report at 200.

432.    A payable through account (hereinafter "PTA") is a specialized correspondent banking relationship where a U.S.-based correspondent bank (Chase Manhattan Bank) provides checking writing privileges directly to the customers of the respondent bank (ARB).

433.    Starting in 1995, U.S. banking regulators, including the Federal Deposit Insurance Corporation ("FDIC") recognized that PTAs posed an increased hazard of money laundering and illicit criminal activity. *See* Ex. 137, Financial Institution Letter, FDIC Guidelines on the Use of Payable Through Accounts, FIL-30-95, March 30, 1995.

434.    According to the FDIC: "The recent use of payable through accounts as an account service being offered by U.S. banking entities to foreign banks involves the U.S. banking entity opening a checking account for the foreign bank. The foreign bank then solicits customers that reside outside of the United States who, for a fee, are provided with the means to conduct banking transactions in the United States through the foreign bank's account at the U.S. banking entity. Typically, the foreign bank will provide its customers, commonly referred to as 'sub-account holders,' with checks that enable the sub-account holder to draw on the foreign bank's account at the U.S. banking entity. The group of sub-account holders, which may number several hundred for one payable through account, all become signatories on the foreign bank's account at the U.S. banking entity. This results in individuals and businesses, who may not have been subject to the same requirements imposed on U.S. citizens or residents for opening an account at a U.S. banking entity, possessing the ability to write checks and make deposits at a U.S. banking entity, as if such individuals and businesses were the actual account holders at the U.S. banking entity." *Id.*

435.    The FDIC also warned that the "traditional use of payable through accounts by financial organizations in the United States (i.e., credit unions and investment companies) has not been a cause for concern by bank regulators. These organizations are regulated by federal or state agencies, or are otherwise subject to established industry standards; and they appear to have adopted adequate policies and procedures to establish the identity of, and monitor the activity of, sub-account holders--in essence the credit union's depositors or the investment company's mutual fund account holders. The same types of safeguards do not appear to be present in some U.S. banking entities that provide payable through account services to foreign banks. The agencies are concerned that the use of payable through accounts by foreign banks at U.S. banking entities may facilitate unsafe and unsound banking practices and other misconduct, including money laundering and related criminal activities. Unless a U.S. banking entity is able to identify adequately, and understand the transactions of, the ultimate users--all or most of whom are off-shore--of the foreign bank's account maintained at the U.S. banking entity, there is a potential for serious illegal conduct." *Id.*

436.    As highlighted by the FDIC in 1995, PTAs pose a heightened risk of money laundering and other illicit activity because PTAs provide terrorist organizations and their fundraising proxies access to USD dollars and the US banking system while at the same obscuring the sources and recipients of those dollars. *See* Ex. 4, Winer Report at 200-202.

437.    The use of PTAs as a way of avoiding regulatory oversight was a well-known

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

strategy for money laundering since the 1990's, because it allows foreign banks to use their correspondent banking relationship with U.S. banks to provide services to their customers without having those customers being subjected to U.S. money laundering controls. *Id.* at 201.

438.    ARB's PTA account with Chase Manhattan Bank was established no later than 1992. *See* Ex. 113, TWRA Audit at 36-37 (showing transfer of sums by ARB to Third World Relief Agency in 1992 using ARB's PTA account); Ex. 40, 9/11 Commission Report at 58 (indicating that Bin Laden used the TWRA to provide financial and other support for terrorist activities).

439.    ARB continued to systematically use its PTA with Chase Manhattan Bank until at least 2015. *See* Ex. 138,  JPMC 0001-228 at 199 (showing thousands of ARB's transactions using ARB's PTA with Chase Manhattan Bank in February and March of 2005).

440.    ARB maintained its relationship with Chase Manhattan Bank until at least 2020. *See id.* at JPMC 224-226 (communications between ARB and Chase Manhattan Bank concerning ARB's annual KYC renewal, KYC requirements, and concerns relating to penalties imposed on the bank by SAMA).

441.    From 1998 until at least 2005, ARB used its PTA with Chase Manhattan Bank to move billions of dollars via tens of thousands of transactions. *See id.* at JPMC 19 (showing monthly balances between 1999 and 2001); *Id. at* JMPC 118-120, 199-208 (showing thousands of transactions each month).

442.    In 2000, ARB's PTA with Chase Manhattan Bank had 9500 credit transactions for an average of 791 credit transactions per month. *See id.* at JPMC 26.

443.     For the month of September 2001, $550,638,901.79 in debit transactions and $546,124,219.77 in credit transactions were made using ARB's PTA with Chase Manhattan Bank. *See id.* at JPMC 18.

444.    In the first six months of 2001, tens of millions of dollars were transferred in and out of ARB's PTA with Chase Manhattan Bank. *See id.* at JPMC 120.

445.     In June 2001, ARB maintained an average daily balance of $14,691,150.00 in its main PTA with Chase Manhattan Bank. *See id.*

446.    In June 2001, ARB processed 966 travelers checks, 208 commercial checks, 2567 paid checks, and over 5000 Swift transactions through its PTA with Chase Manhattan Bank. *See id.* at JMPC 118-119.

447.    In the six month period, from January 2001 until June 2001, ARB processed 135,480 travelers checks, 1,356 commercial checks, 15,418 paid checks and over 25,000 Swift transactions using its PTA with Chase Manhattan Bank. *See id*.

448.    ARB continued to systematically use its PTA with Chase Manhattan Bank after the 9/11 attacks with ARB, processing 12,987 travelers checks transactions and 88 commercial check transactions using its Chase Manhattan Bank for the month of February of 2005. *See id.* at JMPC

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

221.

449.  As detailed above, from 1992 through at least 2005, ARB repeatedly and systematically used its PTA correspondent bank account with Chase Manhattan Bank in New York to access New York's dependable and transparent banking system.

450.  ARB authorized and provided Suleiman al Rajhi, his committee/foundation, and employees acting on his and its behalf, with check writing privileges for ARB's PTA with Chase Manhattan Bank.

451.  ARB authorized and provided the SAAR Foundation with check writing privileges for ARB's PTA with Chase Manhattan Bank.

452.  ARB authorized and provided Abdullah Rahman al Rajhi with check writing privileges for ARB's PTA with Chase Manhattan Bank.

453.  ARB authorized and provided the IIRO with check writing privileges to the IIRO for ARB's PTA with Chase Manhattan Bank. *See* Ex. 139, IIRO 109118-109119.

454.  As noted previously, Plaintiffs have not had an opportunity to conduct discovery as to ARB's PTA generally, or for that matter any discovery of ARB concerning its use by Suleiman al Rajhi, his charity committee/foundation, and the employees of that office.

455.  However, the limited information available from the discovery provided by ███████ and Plaintiffs' independent investigations indicates that the PTA was used to facilitate transfers by Suleiman al Rajhi, under the auspices of his alter-ego charity committee/foundation, to support terrorist causes in and outside of the United States, including individuals and entities associated with al Qaeda and the September 11th hijacker support network.

456.  The limited information available from the discovery provided by ███████ and ARB's al Buthe account statements further indicate that the PTA was used to facilitate al Qaeda terrorist financing transfers by al Buthe.

457.  The limited information available from the discovery provided by ███████ and documents produced by the IIRO also indicate that the PTA was used to facilitate transfers by IIRO to its operations in Afghanistan, which were extensively intertwined with al Qaeda.

458.  The limited information available from the discovery provided by ███████ and declassified pursuant to E.O. 14040 also indicates that the PTA was used to facilitate transfers to additional persons involved in the September 11th hijackers' support network.

459.  The earliest information available to Plaintiffs concerning the use of ARB's correspondent account at Chase Manhattan to support al Qaeda is found in the investigative and audit report of Germany's Federal Office of Criminal Investigation, conducted in response to a request for judicial assistance from the Office of the Prosecutor for the International Criminal Tribunal for the Former Yugoslavia ("TWRA Audit"), concerning the finances of the TWRA.

460.  The TWRA was an important al Qaeda front during the early 1990's.

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

461.    As the 9/11 Commission found, bin Laden "made use of the already-established Third World Relief Agency (TWRA) headquartered in Vienna, whose branch office locations included Zagreb and Budapest." *See* Ex. 40, 9/11 Commission Report at 58.

462.    The TWRA Audit revealed multiple donations to TWRA specifically attributable to Suleiman al Rajhi and other al Rajhi family members, along with a host of other prominent al Qaeda donor and financial facilitators, including Wa'el Jelaidan, Taibah International, and WAMY. *See* Ex. 113, TWRA Audit at 20-21 (Suleiman al Rajhi and family members); *id.* at 13-15 (Wa'el Hamza Jelaidan); *id.* at 46 (Taibah International Aid Association); *id.* at 58 (WAMY).

463.    The TWRA Audit also revealed two transfers from ARB itself, as payor, in favor of TWRA, via ARB's account at Chase Manhattan Bank, in 1992 and 1993, and an additional 1992 transfer initiated by ARB via its Chase Manhattan Bank correspondent account, from a sender identified as Ibrahim Ahmed al Sulaiman, of nearly $300,000. *See id.* at 36-37.

464.    Dr. Ahmed Totonji, a founding member of the SAAR Foundation in the United States, *see* Ex. 19, PEC-BARZ-13145-13160 at 13158, also used ARB's correspondent account with Chase Manhattan Bank, to transfer over 5.7 million Austrian Schillings (approximately $460,000.00 USD) to the TRWA in 1992. *See id.* at 56.

465.    Plaintiffs do not have information concerning the use of ARB correspondent accounts at Chase Manhattan during the period after those payments until the beginning of the jurisdictional discovery period, because of a lack of discovery, but the SAAR Foundation/Humana Trust business records produced by ███████ reflect extensive use of ARB's Payable Through Account to execute transactions on behalf of Suleiman al Rajhi, under the auspices of his charity committee/foundation and the SAAR Foundation mechanism in the United States. *See* Ex. 4, Winer Report at 102, 103, 188, 191, 192, 200-203.

466.    Moreover, Suleiman al Rajhi and ████, in furtherance of their money laundering scheme, used ARB's Chase Manhattan account to move $24,000,000.00 from banks in the United States and Switzerland to Suleiman al Rajhi's private account with Chase in the Channel Islands after the Al Rajhi's charity/foundation activities came under scrutiny for terror finance connections. *See* Ex. 140; Ex. 4, Winer Report at 184-203.

467.    Those records show that Abdul Rahman al Rajhi, Suleiman al Rajhi's relative and a full time employee of his committee/foundation, issued at least 20 payments written on ARB Chase Manhattan PTA checks between February and September 1999. *See* Ex. 141, NL0010447, 10455, 10456, 10457, 10458, 10460, 10462, 10463, 10464, 10466, 10467, 10470, 10471, 10472, 10473, 10474, 10475, 10483, 10485, 10491.

468.    As discussed above, these payments, which totaled in excess of $235,000.00, issued pursuant to the scheme orchestrated by Suleiman al Rajhi and Abdullah al Rajhi, to use the U.S.-based SAAR Foundation and Humana Charitable Trust to launder funds provided by Suleiman al Rajhi, in support of terrorist and extremist causes, in and through the United States.

469.    The beneficiaries of these payments included entities in the United States, Pakistan, India, the Philippines, and Kenya. *See* Ex. 141, NL0010447, 0010455, 0010456, 0010457, 0010458, 0010460, 0010462, 0010463, 0010464, 0010466, 0010467, 0010470, 0010471,

0010472, 0010473, 0010474, 0010475, 0010483, 0010485, 0010491.

470.    Given the extent of ARB's correspondent relationships, there does not appear to have been any need or legitimate reason to route payments for at least certain of those foreign beneficiaries through the United States. *See* Ex. 4, Winer Report at 202.

471.    Several of the beneficiaries of those ARB PTA have documented connections to terrorism, including al Qaeda operations in the United States and individuals associated with the support network for the 9/11 hijackers.

472.    For example, Abdul Rahman al Rajhi used the PTA at Chase Manhattan to send payments on behalf of Suleiman al Rajhi, to Khalid al Sowailem, the head of the Ministry of Islamic Affairs Da'wah Office in the Saudi Embassy in Washington, D.C. *See* Ex. 142, NL 10485 ($5,000.00 check, dated July 7, 1999, payable to "Khaled Bin Ibrahim A-Swailem;" "Amount from Abdul Rahman Al Rajhi" and "Drawn on Chase Manhattan Bank, 55 Water Street, New York, NY 10041.").

473.    The payment was one of several distributions Suleiman al Rajhi made in favor of al Sowailem and/or the Embassy's Ministry of Islamic Affairs offices during this time period. *See, e.g.*, Ex. 143, KSA 1685 ($726.67 check, dated December 11, 1998, payable to "Khaled I. Al-Sowailem;" "Drawn on Chase Manhattan Bank, 55 Water Street, New York, NY 10041."); Ex. 144, KSA 1687 ($398.14 check, dated December 14, 1998, payable to "Khaled I. Al-Sowailem;" "Drawn on Chase Manhattan Bank, 55 Water Street, New York, NY 10041."); Ex. 145, NL 15572 (October 31, 2000 email from ███████ identifying a February 16, 1999 transfer to "The Propagation Office in America (Khalid Ibrahim Swelim)"); Ex. 146, NL 10468 (ARB "Outward Payment Order" of $25,000.00 to the "Royal Embassy of Saudi Arabia IFTA #5," Riggs National Bank, Washington, D.C.). *See also* Ex. 29 (Galloway Exhibit 22), NL 15578, 15043-15046 at 15044 (93,750 SR contribution, dated February 16, 1999 to the "Dawah Office in America, Khaled Ibrahim al Suwailem"); *id.* at 15045 (18,750 SR contribution, dated July 7, 1999, to "Dawah Office in America").

474.    At the time of those payments, the offices of the Ministry of Islamic Affairs in the United States were extensively involved in funding terrorism in the United States, including elements of al Qaeda. *See* Ex. 26 (Lormel Exhibit 9), *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States*, December 2004, EO14040-003414-3442 at 3416, 3430-3432; Ex. 51, FBI Report, *Connections to the Attacks of September 11, 2001*, July 23, 2021, EO14040-003478-3608-UPDATED.

475.    Al Sowailem was, in turn, the direct supervisor of Fahad al Thumairy, an extremist Saudi government imam employed by the Ministry of Islamic Affairs, who, along with another Saudi agent named Omar al Bayoumi, is known to have provided substantial assistance to the 9/11 hijackers. *See* Ex. 147, 2012 FBI Summary Report (MDL ECF No. 6292-1) at 3-4.

476.    Bayoumi also received four payments via ARB's PTA at Chase Manhattan himself. *See* Ex. 167, ARB 39329; Ex. 168, ARB 13761, 13762, 1376; Ex. 169, ARB 13754-13755.

477.    In addition to his role in providing support for the hijackers, the FBI determined that Bayoumi had extensive ties to al Qaeda. Ex. 51, FBI Report, *Connections to the Attacks of*

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

*September 11, 2001*, July 23, 2021, EO14040-003478-3608-UPDATED.

478.     Although not necessary for jurisdiction, the evidence indicates that Suleiman al Rajhi, and thus ARB, knew well the terrorist nature of the Ministry of Islamic Affairs enterprise in the United States, at the time of the payments to Sowailem, the MOIA Office in the Saudi Embassy, and Bayoumi.

479.     Beyond the overall nature and extensiveness of Suleiman al Rajhi's connections to terrorism and militant jihadism, both Bayoumi and Thumairy were in telephone contact with Abdul Rahman al Rajhi and Abdullah al Misfer, two of the permanent employees of Suleiman al Rajhi's charity committee/foundation. *See* Ex. 204, Winer Report (FBI Protected Information Version) at 103, 104; Ex. 205, AT&T telephone records for Omar al Bayoumi; Ex. 206, NL 18775 (telephone directory identifying telephone numbers associated with Abdul Rahman al Rajhi and Abdullah al Misfer); Ex. 207, FBI 573-580 (telephone records for Fahad al Thumairy); Ex. 208, Kohlmann Report (FBI Protected Information Version) at 9-10.

480.     Abdul Rahman al Rajhi's checks via the PTA at Chase Manhattan also included a payment to American Open University. *See* Ex. 141, NL 10475.  According to the FBI, American Open University "is connected to the Moslem Brotherhood and arranges for paramilitary training in Pakistan." *See* Ex. 51, FBI Report, *Connections to the Attacks of September 11, 2001*, July 23, 2021, EO14040-003478-3608-UPDATED at 3563.

481.     Jaafar Idris, who worked out of the Ministry of Islamic Affairs' office in the Saudi Embassy in Washington, D.C. and also served as American Open University's president, is described by the FBI as "a close associate of jihadi groups operating with the U.S." *See id.* at 3562.

482.     In addition, between January 22, 2001 and March 14, 2001, Soliman al Buthe, a SDGT, executed six transactions totaling $45,000.00 via ARB's PTA at Chase Manhattan. *See* Ex. 148, ARB 39154, 39156, 39158, 39160, 39162, 39164.

483.     Two of those payments specifically identified AHIF in Oregon as the beneficiary. *See id.*

484.     As discussed already, throughout the time of those transfers, al Buthe was a key al Qaeda financial facilitator, who was engaged in financing al Qaeda operations via AHIF's Oregon office, which was itself an al Qaeda front. *See* Ex. 50, *U.S.-Based Branch of Al Haramain Foundation Linked to Terror, Treasury Designates U.S. Branch, Director*, September 9, 2004, at 1 (indicating that under Soliman al Buthe's leadership of Al Haramain, "funds that were donated to AHF with the intention of supporting Chechen refugees were diverted to support mujahideen, as well as Chechen leaders affiliated with the al Qaida network").

485.     In addition to the payments by al Buthe to AHIF via ARB's PTA with Chase Manhattan Bank, al Buthe also made payments using ARB's PTA at Chase Manhattan to Datapact, Inc. and Midway Networks, *see* Ex. 148, ARB 39154, 39156, 39158, which are internet service provider networks established by al Buthe and his AHIF partner, Pete Seda, on behalf of AHIF to facilitate password protected communications and a website know as Islam Today, which was used by radical clerics in the Middle East, including Salman al-Awdah, a well-known cleric who issued fatwas advocating violence against the United States and whose imprisonment by Saudi Arabia in

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

2004 prompted Osama bin Laden to take up arms against the United States. *See* Ex. 149, August 22, 2007 Transcript of Pretrial Detention Hearing for Pirouz Sedahaty (a/k/a Pete Seda), *U.S. v. Pirouz Sedaghaty*, Case No. 6:05-cr-60008-AA, Dkt. No. 46, September 19, 2007, at 8, 61, 62, 63, 71, 88, 89, 92 and 93.

486.     Finally with respect to ARB's correspondent and PTA at Chase Manhattan, discovery provided by the IIRO indicates that ARB authorized IIRO to issue a check via the PTA at Chase Manhattan, for the benefit of the Fatima al Zahraa Hospital in Jalalabad, Afghanistan. *See* Ex. 139, IIRO 109118-109119; Ex. 150, ARB 2477-2572 at 2543 (ARB account statement for Islamic Relief Organization-Health, identifying an August 19, 2001 transaction, 125,500.00 SR debit, "Issuance of bank checks.").

487.     The Fatima al Zahraa Hospital was an asset of the IIRO itself, and the IIRO's offices in Pakistan/Afghanistan were deeply tied to al Qaeda operations. *See* Ex. 151, IIRO 215526-215529; Ex. 152, IIRO 126173-126176; Ex. 153, IIRO 112761-112762; Ex. 154, IIRO 112745-112748; Ex. 155, IIRO 59410-59411; Ex. 156, IIRO 108937; Ex. 157, IIRO 105986; Ex. 158 (Basha Exhibit 134), IIRO 212-330 at 278. *See also* Ex. 66, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 818 (stating that Osama bin Laden "has extensive contact with Afghani and Pakistani offices of the IIRO"); *See also* Ex. 84, FBI Report, *Co-operating Witness Interview*, June 2, 2004, at 1 (indicating that al Qaeda members in the IIRO office in Peshawar, Pakistan, headed by Wa'el Jelaidan, were responsible for purchasing weapons).

488.     Confirming this close connection, Ayman al Zawahiri conducted eye surgeries at Fatima al Zahraa Hospital, which was located in close proximity to an al Qaeda funded jihad camp, at some point after 1996. *See* Ex. 159, Transcript, February 8, 2024 Deposition of Aimen Dean ("Dean Deposition"), at 308-309.

## XII.   ARB's Disturbing Connections to the 9/11 Hijackers and Support Network

489.     The FBI's investigations into the support network for the September 11th hijackers and limited discovery of ARB have revealed disturbing connections between ARB and its Founder and Chairman, Suleiman al Rajhi, and persons in close contact with the September 11th hijackers and support network.

490.     According to the FBI, an ARB employee named Towayan al Towayan "had significant direct and indirect contacts with several subjects and active participants in the World Trade Center (WTC) attacks," including Omar al Bayoumi and hijacker Hani Hanjour. *See* Ex. 160, FBI Report, September 27, 2001, EO14040-002857-2863 at 2857. *See also* Ex. 209, FBI Report, September 27, 2001, EO14040-002857-2863-MDL at 2857; Ex. 208, Kohlmann Report (FBI Protected Information Version) at 10-11.

491.     Nominally, Towayan was sent to the United States to study English, pursuant to an August 6, 2000 recommendation of Mohamed bin Saud al Osaimi, the Director of ARB's Shariah Supervision Division and a member of the ARB Shariah Board. *See* Ex. 161, ARB 40369.

492.     The study period was designated to begin just three weeks later, "from the beginning of September." *Id.*

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

493.    The ARB administrator who approved the deployment did so on condition that "all costs related to travel, accommodation, living, and study are at his personal expense," *id.*, but a series of unusual financial transactions between Towayan and Osaimi indicate a different arrangement.

494.    The day following approval of the study request, Osaimi transferred 100,000 SR into Towayan's ARB account, and Towayan then withdrew the entire amount the following day. *See* Ex. 162, ARB 42189-42216 at 42194. These transaction were suspicious on several levels, given the amount of money in issue and its immediate withdrawal.

495.    Towayan had received a separate 90,000 SR transfer from Osaimi a few weeks earlier, into a different account, which he then transferred immediately back to Osaimi four days later, another suspicious set of transactions. *See* Ex. 163, ARB 42217-42218 at 42217.

496.    Osaimi made a final 200,000 SR transfer to Towayan in June 13, 2002, which Towayan distributed to an unknown recipient via a payment order the same day. Once again, these transactions bore red flags for money laundering. *See* Ex. 162, ARB 42189-42216 at 42211.

497.    Towayan apparently spent time in Oregon after arriving in the United States, residing at a location in close proximity to the Oregon offices of AHIF. A witness interviewed by the FBI reported that he had a conversation with Towayan during this time, during which "Al-Towayan advised that the U.S. will never catch Bin Laden and that he would support the 'holy war' if it occurred. Al-Towayan stated that if this war became imminent, he would get on the next flight home and fight alongside his people…" *See* Ex. 160, FBI Report, September 27, 2001, EO14040-002857-2862 at 2861.

498.    Towayan's whereabouts for the next several months are unclear, but he arrived in San Diego in approximately early 2001, moving into the same apartment complex where Omar al Bayoumi lived and where hijackers Nawaf al Hazmi and Khalid al Mihdhar had resided the prior year. *See* Ex. 209, FBI Report, September 27, 2001, EO14040-002857-2863-MDL at 2858.

499.    Shortly before arriving in San Diego, Towayan received another 100,000 SR payment into one of his accounts at ARB, which he transferred to Osaimi three weeks later. *See* Ex. 163, ARB 42217-42218 at 42217.

500.    On June 23, 2001, Bayoumi vacated his apartment in San Diego, and submitted a change of address directing that future mail deliveries to him be forward to Towayan's apartment. *See* Ex. 160, FBI Report, September 27, 2001, EO14040-002857-2863 at 2858.

501.    A witness interviewed by the FBI reported seeing Towayan with an individual who resembled 9/11 hijacker Hani Hanjour during this time period, moving a desk from Bayoumi's apartment to Towayan's apartment. *See id.* at 2859.

502.    As noted above, Bayoumi had telephone contacts with Abdul Rahman al Rajhi and Abdullah al Misfer, indicating a relationship with Suleiman al Rajhi's charity committee/foundation. *See* Ex. 4, Winer Report at 103, 104; Ex. 38, Kohlmann Report at 9.

503.    Not long after the events involving Towayan, Saleh al Hussayen, the long-time

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

advisor to Suleiman al Rajhi's charity committee/foundation, who previously also served on the Shariah Board of ARB, arrived in the United States to visit the Muslim World League office at 360 S. Washington Street, Falls Church, VA,[94] the World Assembly of Muslim office in Falls Church, VA, including entities associated with the SAAR Foundation. *See* Ex. 164, Susan Schmidt, *Spreading Saudi Fundamentalism in the U.S.*, Washington Post (October 2, 2003); Ex. 165, Transcript, October 21, 2019 Deposition of Ibrahim Abdullah ("Ibrahim Deposition"), at 207-209 (Ibrahim Abdullah, who served as the head of the WAMY office in Virginia, testified that he met with Hussayen in the U.S. just prior to the September 11th attacks).

504.     The focus of the visit indicates his trip related to the U.S.-based SAAR Foundation's activities.

505.     On the night before the September 11th attacks, Hussayen suddenly switched hotels, moving to the same hotel where 9/11 hijackers Nawaf al Hazmi, Khalid al Mihdhar, and Hani Hanjour were staying. *See* Ex. 166,  Part Four of the Joint Congressional Inquiry Into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 ("the 28 Pages"), at 430-431.

506.     When interviewed by the FBI immediately after, Hussayen claimed not to know the hijackers, by the interviewing agents believed he was being deceptive. *See id.*

507.     The interview was terminated when Hussayen feigned a seizure. When he was released from the hospital, he fled the United States despite law enforcement efforts to re-interview him. *See id.* at 431.

508.     This collection of unusual contacts between individuals associated with ARB on the one hand, and the 9/11 hijackers and persons who provided support to them on the other, coupled with the unusual financial transactions involving Towayan and ARB's broader connections to terrorism, indicates a connection between ARB and the support network for the hijackers.

## XIII.     ARB Provided Essential and Extensive Assistance to Al Qaeda

509.     Through the activities and assistance described above, ARB provided essential and extensive assistance to al Qaeda, in support of its declared targeting of the United States.

510.     As reflected in the 9/11 Commission's findings, CIA assessments, and countless statements of U.S. counterterrorism officials, al Qaeda's strength and global strike capabilities leading up the September 11th attacks were made possible by its tremendous fundraising capabilities and the financial network that collected and delivered funds to al Qaeda.

511.     This funding, to the tune of $30 million per year, enabled al Qaeda to sustain its relationship with the Taliban and safe haven in Afghanistan; fund jihad camps to train, house, and indoctrinate terrorist operatives; pay salaries to and fund needs of al Qaeda members; develop and test plots; fund travel of operatives carrying out those plots and attacks; support like-minded terrorist organizations, thereby expanding al Qaeda's own reach and strike capabilities; and

---

[94] The IIRO also shared office space at the 360 S. Washington address.

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

support myriad other activities essential to its unwavering efforts to attack the United States.

512.    These funds were provided principally by donors (primarily in the Gulf) who supported al Qaeda's global jihad, well-placed financial facilitators who raised funds for al Qaeda, and diversions of funds by Islamic charities that supported al Qaeda's cause. *See supra* at ¶ 64.

513.    As noted previously, this financial network included the key donors comprising al Qaeda's "Golden Chain," among them Suleiman al Rajhi. *See supra* at ¶ 65.

514.    For many years leading up to 9/11, ARB was the bank of choice for al Qaeda's most important charity fronts and financial facilitators, including AHIF, IIRO, Suleiman al Rajhi's own charity/committee, and officials of those enterprises. *See supra* at ¶¶ 204-205.

515.    The evidence documents that ARB maintained at least 94 accounts for AHIF and at least 287 accounts for IIRO in the five year period of January 1, 1998-December 31, 2002. More than five billion Saudi riyals moved into and out of these accounts – some $660 million annually, amounting to more than $130 million per year in 2000 dollars, equivalent to about $230 million per year in 2023 dollars. *See supra* at ¶¶ 206-207, 213.

516.    The accounts at ARB were the principal vehicle AHIF and IIRO used to distribute funds throughout the world, and necessarily operated those charities primary vehicles to distribute funds to al Qaeda and finance operations of branch offices supporting al Qaeda. *See supra* at ¶¶ 212-217.

517.    The evidence documents that ARB also maintained 116 accounts for WAMY from 1992-2002, indicating that ARB also served as WAMY's principal bank and vehicle for moving funds, while WAMY was also serving as a key conduit for support to al Qaeda. *See supra* at ¶ 219.

518.    In addition, the evidence documents that ARB provided accounts to and enabled highly irregular fianncial transactions for senior al Haramain officials, including Aqil al Aqil, Mansour al Kadi, and Soliman al Buthe. The Aqil and al Kadi accounts enabled them to move an additional 89 million SR in deposits and 88 milllion SR in withdrawals between 1998-2002 – amounting to approximately another $23.5 million, or about $4.9 million per year, while they and AHIF were providing support to al Qaeda. *See supra* at ¶¶ 231-232, 236-239.

519.    ARB similarly executed highly improper transactions on behalf of SDGT and IIRO official Abd al Hamid Sulaiman al Mujil, while he was acting as al Qaeda's "million dollar man." *See supra* at ¶¶ 240-242.

520.    ARB also provided accounts and executed transactions for Suleiman al Rajhi's charity committee/foundation, including when it lacked any legal existence, and some 20 accounts for the individual officials who operated that committee/foundation under Suleiman al Rajhi's direction, while Suleiman al Rajhi was himself a "major donor" to al Qaeda, per the CIA and other sources. *See supra* at ¶¶ 176, 253, 343.

521.    The twenty individual and joint accounts belonging to Suleiman al Rajhi's charity committee/foundation officials Abdul Rahman Al Rajhi, Saleh al Habdan, and Abdullal al Miser, processed 187,181,580.14 SR in deposits and 174,974,641.36 SR in withdrawals over the five year

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

period of January 1, 1998-December 31, 2002, and ARB faciliated an additional 5 million SR in deposits and 7 million SR in withdrawals during that period through the account it maintained in the name of the committee/foundation itself. *See supra* at ¶ 253.

522.    Suleiman al Rajhi also used accounts at ARB, the bank he controlled, to carry out financial affairs for the U.S. based SAAR Foundation "web" of entities, established to launder funds in support of terrorism in and through the United States, including through ARB's Payable Through Account at Chase Manhattan. *See supra* at ¶¶ 393-404.

523.    The financial services ARB provided to these front charities, financial facilitators, and al Qaeda donors were anything but routine – to the contrary, ARB broadly violated applicable AML, CFT, and KYC standards and requirements, including ARB's own (nominal) protocols, in the opening, maintenance, and operation of these accounts, and regularly executed transactions that presented obvious and stark red flags for money laundering and terrorist financing. *See supra* at § IX.

524.    By doing so, ARB provided al Qaeda's front charities, financial facilitators, and donors with access to the international banking system that would not have been feasible through other banks. *See supra* at ¶¶ 223, 275.

525.    The minimalist nature of ARB's documentation of the uses of deposits and withdrawals for funds processed through these accounts reflects these realities. One important requirement of being able to provide financial support to al Qaeda was to maintain secrecy and to go about it through mechanisms that foreign governments would find difficult to detect, to penetrate, and to shut-down with sanctions, criminal cases, and/or political pressure forcing countries to change their regimes to shut-it down. ARB provided that protection. *See* Ex. 4, Winer Report at 206; Ex. 9, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, CIA_000720-804 at 736 (al Qaeda's choice of banks based on "personal contacts at the banks and security concerns."); *id.* at 746 ("Islamic militants similarly bank with financial institutions that provide assurance that their deposits and financial activities will not be scrutinized by government or enforcement authorities.").

526.    ARB has not provided documentation indicating that the banking services it provided to al Qaeda's charity fronts, financial facilitators, and key donors, or (with isolated and rare exception), that the fund transactions it executed for them were earmarked for particular schemes or attacks not directed at the United States. Ex. 4, Winer Report at 214-16.

527.    To the contrary, ARB provided services and executed transactions without limitation, indicating an intent to assist al Qaeda's charity fronts, financial facilitators, and donors to advance al Qaeda's principal goal, which was to attack the United States. Ex. 4, Winer Report at 155, 200-03; *see also id.* at 130-202 (discussing AML, KYC, CFT and red flag violations).

528.    Further, with very limited exceptions, the bulk of the individual transactions ARB carried out for those customers were minimally documented with regards to their specific uses for any particular purpose. Even where some region or purpose was nominally designated for an account, those descriptions were general in nature. See, Ex. 4, Winer Report at 214-16.

529.    Moreover, one of the few exceptions involves ARB's knowing facilitation of

106

terrorism transfers ARB knowingly conducted for the support of those involved in the Palestinian 2nd Intifada in Israel, which involved ongoing attacks, including suicide bombings, targetting Israelis and foreigners in Israel, including Americans. These transactions totalled 12,364,332.45 SR in withdrawals made for "Martyrs and Orphans" by the IIRO in its ARB account labeled as being for that purpose, over a two-year period at the time of the 2nd Intifada. *Id.*

530.     Save for this and a few isolated other examples, ARB's services for the charity fronts, financial facilitators, and donors, was undertaken without restriction or limitation, as were the transfers executed for them. *Id.*

531.     The importance of ARB's support to al Qaeda's operational capabilities is evidenced and underscored by the intensive focus and prioritization ARB's terrorist conduct received from the U.S. intelligence community and America's most senior policymakers in the aftermath of the September 11th attacks, when stemming the flow of funds to al Qaeda was an urgent national security imperative. *See supra* at ¶¶ 142-143.

532.     Within this context, ARB featured prominently and repeatedly in numerous CIA finished intelligence reports, prepared to enable policymakers to develop priorities and address the most important threats to U.S. national security, including a report dedicated entirely to ARB, which included a range of possible policy options to stem ARB's support for al Qaeda. *See supra* at ¶¶ 33, 137, 153-157, 178-187.

533.     The evidence shows that actions to interdict ARB's support for al Qaeda were debated at the highest levels of the U.S. government, and prioritized in high-level meetings and communications between U.S. officials and their Saudi counterparts. *See supra* at ¶¶ 181-201.

534.     In these and other respects described above, the evidence confirms that ARB provided critical support, and played a central and essential role in the process of providing that support, to al Qaeda. *See* Ex. 4, Winer Report at 203-14.

## XIV.  **ARB and Its Principals Held Unique Positions Within Al Qaeda's Financial Infrastructure**

535.     The Second Circuit already has held that Plaintiffs proffered facts sufficient to establish ARB's intent, for purposes of the Second Circuit's purposeful direction test in terrorism cases. *See supra* at ¶¶ 2-4.

536.     Although that issue has been resolved in Plaintiffs' favor for purposes of the jurisdictional inquiry, limited jurisdictional discovery has only reinforced and further corroborated the Second Circuit's conclusion.

537.     ARB's knowledge and intent is of course intertwined with that of its officers and employees, including its principals Suleiman al Rajhi and Abdullah al Rajhi, who dominated and controlled the bank throughout the period leading up to the September 11th attacks.

538.     As reflected in CIA findings, Jamal al Fadl's testimony to the FBI, and additional evidence surveyed above, Suleiman al Rajhi's support for bin Laden's militant activities dates to the period of the Afghan jihad and formation of al Qaeda, when Suleiman al Rajhi financially

supported bin Laden and Afghan jihadists "via humanitarian organizations," including through contributions to MAK. *See supra* at ¶¶ 67-68, 157.

539. In the ensuing years, Suleiman al Rajhi, the al Rajhi family, and ARB continued to fund and channel resources to al Qaeda and a range of other terrorist causes, as reflected by the CIA's determinations that "several Al-Rajhi family members donate money to businesses tied to terrorists and personally oversee transactions destined for terrorists." *See* Ex. 46, *Identifying Al-Qa'ida's Donors and Fundraisers: a Status Report*, at CIA-000198, among numerous other, similar, findings. *See supra* at ¶ 168; Ex. 38, Kohlmann Report at 6-41; Ex. 4, Winer Report at 85-103.

540. Indeed, in its November 14, 2002 finished intelligence report, the CIA identified the al Rajhi family as one of al Qaeda's "major donors," concluded that "[m]ost of the larger [al Qaeda] financiers, however, knowingly donate funds to al-Qa'ida and are witting the money finances terrorist activity," and reported that ARB has served as a "conduit for funds for Islamic extremists and the 11 September hijackers" and "maintained accounts for individuals linked to Usama bin Laden." *See* Ex. 45, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 147-148.

541. Against this backdrop, as surveyed more completely above, discovery has confirmed that ARB maintained accounts and moved huge sums of money for al Qaeda's most important charity fronts, financial facilitators, and donors, during periods when al Qaeda was known to have chosen banks based on "personal contacts at the banks" and "security" considerations. *See* supra at ¶ 155; Ex. 9, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, CIA_000720-804 at 736; Ex. 4, Winer Report at 104-30, 203-14.

542. ARB moved a sea of essentially anonymous money for those charity fronts and financial facilitators, consistently ignoring applicable money laundering obligations and red flags in doing so. *See supra* at ¶¶ 274, 326, 356-358; Ex. 4, Winer Report at 155, 200-03; *see also id.* at 130-202 (discussing AML, KYC, CFT and red flag violations).

543. The nature of these transactions indicates that al Qaeda's most important charity fronts and financial facilitators had confidence that ARB would execute and support their highly suspicious financial activities, and take no action to report those activities to authorities. *See* Ex. 9, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, CIA_000720-804 at 736 (al Qaeda's choice of banks based on "personal contacts at the banks and security concerns."); *id.* at 746 ("Islamic militants similarly bank with financial institutions that provide assurance that their deposits and financial activities will not be scrutinized by government or enforcement authorities."

544. Simultaneously, Suleiman al Rajhi maintained extensive and close connections to those same al Qaeda's charity fronts and their most senior officials, while also operating a complex "charity" enterprise of his own, established to launder funds in support of terrorist and Islamic extremist causes, including al Qaeda. *See supra* at ¶¶ 248-256; Ex. 4, Winer Report at 85-104; Ex. 38, Kohlmann Report at 6-41.

545. The available documents indicate that Suleiman al Rajhi contributed generously to

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

AHIF, although the full extent of this support is unknowable, given Suleiman al Rajhi's use of nominee accounts, payments to intermediaries and through checks written personally to officers of charities, and other structures used to obscure the origin and destinations of his funds. Ex. 4, Winer Report at 113-17; Ex. 194, (Abdullah al Rajhi Exhibit 51) ARB 39960 (payments from ARB charity committee/foundation account to AHIF); Ex. 195 (Abdullah al Rajhi Exhibit 52) at ARB 39961 (same); Ex. 196 (Abdullah al Rajhi Exhibit 55) NL 10086, 1088, 10094, 10245 (checks to AHIF and correspondence with Aqil).

546.    The evidence further shows that Suleiman al Rajhi had a close relationship with AHIF Director and SDGT Aqil al Aqil, as reflected by communications between Suleiman al Rajhi's charity committee/foundation and Aqil; the unusual payment Suleiman al Rajhi issued directly to Aqil, rather than AHIF itself; the extensive additional financial transactions between Abdul Rahman al Rajhi and Aqil; and Abdullah al Misfer's simultaneous roles as an official of Suleiman al Rajhi's charity committee/foundation and AHIF itself. Ex. 4, Winer Report at 113-17; Ex. 38, Kohlmann Report at 12; Ex. 194, (Abdullah al Rajhi Exhibit 51) ARB 39960 (showing committee/foundation payment to Aqil al Aqil); Ex. 196, (Abdullah al Rajhi Exhibit 55) at NL 10245 (correspondence with Aqil); Ex. 197, (Abdullah al Rajhi Exhibit 54) ARB 41464-41501 (Aqil account statement) at 41467, 41471-41473, 41476-41479 (transactions with Abdul Rahman al Rajhi).

547.    In addition, Suleiman al Rajhi was a member of the IIRO's permanent committee, at least as of 2000. *See* Ex. 46, *Identifying Al-Qa'ida's Donors and Fundraisers: A Status Report*, February 27, 2002, CIA_00193-199 at 198.

548.    Suleiman al Rajhi's appointment to the IIRO's permanent committee was likely a function (and requirement) of his status as a co-founder and shareholder of Sanabel al Kheir, a foundation established to make investments and generate income for IIRO. *See* Ex. 198, SANA-BELL 00037-38; *see also* Ex. 199, (Galloway Exhibit 24) at ARB 39596-39597 (letter from Suleiman al Rajhi referencing his invitation to the "Shareholders Meeting" and indicating intent to keep shares in Sanabel al Kheir).

549.    ARB has selectively produced a set of incomplete communications, allegedly found while searching for other records, which it has attempted to characterize as showing that Suleiman al Rajhi withdrew from the IIRO committee years before 9/11. *See* Ex. 199, (Galloway Exhibit 24) ARB 39593-39604.

550.    ARB's interpretation of these documents is incorrect, as it ignores that Suleiman al Rajhi's status as a member of the IIRO's board or permanent committee was apparently a function of and dictated by his ongoing status as a shareholder of Sanabel al Kheir, the IIRO's investment arm. Indeed, the one-sided subset of communications discuss Suleiman al Rajhi's shares in Sanabel al Kheir, which he makes clear he intends to keep, in relation to his status on the board/permanent committee. Ex. 199, (Galloway Exhibit 24) at ARB 39596-39597 (letter from Suleiman al Rajhi referencing his invitation to the "Shareholders Meeting" and indicating intent to keep shares in Sanabel al Kheir).

551.    The communications are revealing, insofar as Suleiman al Rajhi corresponds in several cases directly with the Secretary General of the MWL, IIRO's parent, underscoring his

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

high level relationship. *See* Ex. 199, (Galloway Exhibit 24) at ARB 39593, 39597, 39599, 39601.

552.  Evidence provided by ▮▮▮▮▮▮▮▮ also reflect sizeable donations from Suleiman al Rajhi to MWL. *See* Ex. 29, (Galloway Exhibit 22) at NL 10546. Given that MWL conducted alleged humanitarian operations through IIRO, Suleiman al Rajhi's donation to MWL was likely, in reality, a contribution to IIRO itself. Here again, it is not possible to know the full extent of Suleiman al Rajhi's contributions, given his use of nominee accounts, payments to intermediaries and through checks written personally to officers of charities, and other structures to obscure the origin and destinations of his funds.

553.  Documents also show that a delegation of employees and advisors from Suleiman al Rajhi's charity committee/foundation were "VIP" participants in an IIRO delegation to Tanzania in 1995, reflecting a close operational relationship between Suleiman al Rajhi's charity committee/office and IIRO. Ex. 200, IIRO 315040; Ex. 4, Winer Report at 122-23; Ex. 38, Kohlmann Report at 10.

554.  In addition, Suleiman al Rajhi incorporated a U.S. branch of Sanabel al Kheir, called Sana-Bell, Inc., in 1989, as part of the establishment of the U.S.-based SAAR Foundation web of enterprises. *See* Ex. 24, SANA-BELL 0001-10 (Articles of Incorporation of the SANA-BELL, Inc., July 28, 1999).

555.  The other founding directors included IIRO's then head, Dr. Farid Yasin Qurashi (IIRO's Secretary General), and two other MWL/IIRO officials. *See supra* at ¶ 46.

556.  As of 2000, Sana-Bell, Inc.'s Executive Director was MWL Secretary General Abdullah al Obaid, and its President was IIRO Secretary General Adnan Basha. *See* Ex. 198, SANA-BELL 00037.

557.  Meanwhile, ▮▮▮▮▮▮▮▮ who ran the SAAR Foundation enterprise under Suleiman al Rajhi's direction, was himself an official of both MWL and Sanabel al Kheir. *See supra* at ¶ 46.

558.  Suleiman al Rajhi also maintained personal contacts with WAMY leadership.

559.  As the CIA determined, "the Al Rajhis were routinely contacted" by officials at WAMY, which it described as "a Saudi NGO where personnel often pursue an extremist agenda." *See* Ex. 9, CIA Intelligence Report, Office of Transnational Issues, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, CIA_000720-804 at 744.

560.  Plaintiffs have not conducted discovery of ARB concerning its relationship with WAMY, but the business records produced by ▮▮▮▮▮▮▮▮ include communications with and payments from Suleiman al Rajhi to WAMY Secretary General Maneh al Johani, and separate payment to Dr. Saleh Omar Badahdah, a member of the WAMY Board of Trustees. *See* Ex. 38, Kohlmann Report at 32; Ex. 185, NL 10068, 10384. *See also* Ex. 186, NL 10333 (check from Sulaiman al Rajhi payable to WAMY for 75,000 SR); Ex. 29 (Galloway Exhibit 22), NL 15578, 15043-15046 at 15046 (338,500 SR payment to World Assembly of Muslim Youth).

561.  The fact that Suleiman al Rajhi made donations payable to Johani himself, rather

than WAMY, is significant. Again, Suleiman al Rajhi was a sophisticated international banker, who knew well the distinction between the organization WAMY and the person Johani, yet made his contribution payable to Johani. As the CIA noted, "WAMY officials have couriered private Saudi donations to Islamic groups in Afghanistan and Bosnia" and put Saudi donors and foreigners in direct contact "for worthwhile Islamic causes" and would sometimes broker requests to donors when WAMY had "an ideological interest." *See* Ex. 9, CIA Intelligence Report, Office of Transnational Issues, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, CIA_000720-804 at 744.

562.    Throughout this period, while ARB was providing expansive support for and facilitating the financial transactions of AHIF, IIRO, and WAMY, a broad spectrum of information was available to ARB, reflecting their involvement in paramilitary jihad and support for al Qaeda. *See* Ex. 4 Winer Report at 32-40; Ex. 38, Kohlmann Report at 12-13, 14, 21-22, 25; Ex. 171, Kohlmann Deposition at 92-93, 124-25 (discussing information about charities available in Saudi Arabia).

563.    Those sources of information were hardly necessary for ARB to discern their terrorist connections, however, given Suleiman al Rajhi's central status as a financial angel for al Qaeda and associated terrorist causes.

564.    Suleiman al Rajhi's position at the center of the global jihadist movement led by al Qaeda, and dedication to funding the most radical anti-American elements, is further reflected by his relationships with and support for a range of singularly extremist imams.

565.    For example, in the early 1990's, Suleiman al Rajhi funded and sent a Saudi trained and educated imam named Shaykh Abdullah al-Faisal to preach in the United Kingdom. Ex. 4, Kohlmann Report at 39.

566.    In February 2003, Abdullah al-Faisal was convicted in a U.K. court on charges of "soliciting to murder," defined as "encouraging, persuading, endeavoring to persuade or proposing to any person to murder any other person." The charges stemmed from lectures given by the militant cleric in which he openly called upon his followers to kill Americans, Jews, Hindus, and other perceived "enemies of Islam." *Id.*

567.    Suleiman al Rajhi and ARB also financially supported Salman al Awdah during this period. *See* Ex. 9, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, CIA_000720-804 at 748; Ex. 38, Kohlmann Report at 15-16.

568.    Al Awdah was a source of inspiration for and ally of Osama bin Laden. *See* Ex. 38, Kohlmann Report at 15-16; Ex. 4, Winer Report at 67.

569.    ARB discovery documents also reflect substantial payments from a "personal" account of Saleh bin Sulaiman al Habdan, of Suleiman al Rajhi's charity committee/foundation, to Sheikh Mohamed al Muhaisani in 1998 (87,750 SR) and 2002 (2,000,000 SR). *See* Ex. 134, ARB 41668-41720 at ARB 41715. Based on the nature and amount of the payments, along with other transactions clearly showing the Habdan account was used to send money for Suleiman al Rajhi, the payments were comprised of Suleiman al Rajhi's funds.

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI

570.     Al Muhaisani issued an infamous "dua" video after 9/11, in which he prayed for the success of the mujahideen and the liberation of Al Aqsa, the mosque referenced in al Qaeda's 1998 fatwa. The video featured photos of al Qaeda leaders Osama bin Laden and Ayman al Zawahiri, the 9/11 attacks, and Islamic fighters. *See* Ex. 201, Complaint, *USA v. Sohiel Omar Kabir,* United States District Court for the Central District of California, 2012, at 18.

571.     The 2 million SR payment to al Muhaisani issued after publication of his infamous dua.

572.     One of the "personal" accounts of Abdul Rahman al Rajhi, which again was plainly used to issue payments for Suleiman al Rajhi, similar reflects several financial transactions with Abdullah al Jibrin in 1999. *See* Ex. 129, ARB 40860-41153 at 40932, 40939, 41020.

573.     Around the time of those transactions, Jibrin, who preached at the Al Rajhi mosque, issued a prominent "fatwa" concerning the "State of the Mujahedin and the Muslims' obligation towards them," in which he called for Muslims to provide weapons and financial support to jihad fighters. *See* Ex. 202.

574.     As noted previously, Suleiman al Rajhi also designated Saleh al Hussayen to serve as a long-time "advisor" to his committee/foundation. *See supra* at ¶¶ 44, 503-507 (discussing Hussayen connections to 9/11 hijackers); Ex. 38, Kohlmann Report at 10.

575.     In sum, the expansive and enduring connections between ARB and its principals and al Qaeda's leadership, most prominent charity fronts, most important financial facilitators, and unwavering and unconditional support ARB and its principals provided to those terrorist elements, show that ARB and its principals were at the very center of al Qaeda's financial support network, from its inception through the date of the September 11th attacks.

576.     This evidence makes clear that ARB and its principals knew and specifically intended that their support for al Qaeda would be leveraged to achieve al Qaeda's targeting of the United States.

Dated:  May 7, 2024                         Respectfully submitted,

                                            By:  _/s/  Sean P. Carter_
                                            Sean P. Carter, Esq.
                                            J. Scott Tarbutton, Esq.
                                            COZEN O'CONNOR
                                            1650 Market Street, Suite 2800
                                            Philadelphia, PA 19103
                                            Tel:  (215) 665-2000


• Originally ECF Filed Under Seal on March 8, 2024 (ECF No. 9624).
• Corrected and ECF Filed Under Seal on May 7, 2024, per Order (ECF No. 9763).

Corrected Averment (Redacted Pursuant to FBI Protective Order) - DOJ/FBI