IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | Case No. 1:03-md-01570-GBD-SN |
| *This document relates to:* | ORAL ARGUMENT REQUESTED |
| *The Underwriting Members of Lloyd's Syndicate 2, et al. v. Al Rajhi Bank, et al.*, No. 16-cv-7853; *Aguilar, et al. v. Kingdom of Saudi Arabia, et al.*, No. 16-cv-09663; *Addesso, et al. v. Kingdom of Saudi Arabia, et al.*, No. 16-cv-09937; *Hodges, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-0117; *Aiken, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-00450; *Charter Oak Fire Insurance Co., et al. v. Al Rajhi Bank, et al.*, No. 17-cv-02651; *Abarca, et al., v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-03887; *Arrowood Indemnity Co., et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-03908; *Abedhajajreh v. Kingdom of Saudi Arabia*, No. 17-cv-06123; *Muenchener Rueckversicherungs-Gesellschaft Aktiengesellschaft in Muenchen, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-07914; and *Abbate, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-08617 | |

**MEMORANDUM OF LAW IN SUPPORT OF
AL RAJHI BANK'S RENEWED MOTION TO DISMISS**

**WHITE & CASE**
701 Thirteenth Street, NW
Washington, DC 20005

May 7, 2024

*Counsel for Al Rajhi Bank*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

AL RAJHI BANK BACKGROUND ....................................................................................3

PROCEDURAL HISTORY....................................................................................................4

      A.    This Court Dismissed Prior Actions Against Al Rajhi Bank For Failure To State A Claim In 2005, And The Second Circuit Affirmed...................................4

      B.    This Court Dismissed The Copycat Complaint Here In 2018 For Lack Of Personal Jurisdiction .......................................................................................5

      C.    Accepting Plaintiffs' Mischaracterization Of Their Amended Complaint, The Second Circuit Reversed This Court's Dismissal And Remanded For Jurisdictional Discovery..................................................................................6

      D.    Three Years Of Extensive Jurisdictional Discovery Confirm That Al Rajhi Bank Did Not Support Al Qaeda Or Known Extremist Operatives Or Have "Specific Intent" To Support Terrorist Attacks Against The United States ...........8

      E.    Plaintiffs' Averment Abandons Most Of The Allegations And Arguments Plaintiffs Presented To The Second Circuit...........................................................13

ARGUMENT ......................................................................................................................22

I.     PLAINTIFFS BEAR THE BURDEN OF ESTABLISHING PERSONAL JURISDICTION ..............................................................................................................22

II.    JURISDICTIONAL DISCOVERY CONFIRMS THAT THIS COURT LACKS SPECIFIC PERSONAL JURISDICTION UNDER THE "PURPOSEFUL DIRECTION" TEST..........................................................................................................24

      A.    To Satisfy The "Purposeful Direction" Test, Plaintiffs Must Show That Al Rajhi Bank "Expressly Aimed Intentional Tortious Acts" At The United States, And That Plaintiffs' Injuries Arose From Those Acts ..............................24

      B.    Jurisdictional Discovery Confirms That Al Rajhi Bank Did Not Have The Requisite "Specific Intent," And That The Bank's Conduct Did Not Have Any Nexus To The 9/11 Attacks .............................................................................28

            1.    Jurisdictional Discovery Confirms That Al Rajhi Bank Did Not "Provide[] Financial Services And Donations To Charities That It Knew Financially Supported Al Qaeda"..................................................29

                a.    The Bank Did Not Know Of Any Alleged Financial Support For Al Qaeda By Any Charity Or Charity-Official Customer ..............................................................................29

      b.     The Bank Did Not Make Any Donation To The Charities, Let Alone Any Donation That Supported The 9/11 Attacks ........31

   2.     Jurisdictional Discovery Confirms That Al Rajhi Bank Did Not Provide Financial Services, Let Alone "Direct Support," To "Known Extremist Operatives" ...............................................32

      a.     None Of The Bank's Customers Was A "Known Extremist Operative" .......................................................32

      b.     The Bank Did Not Provide "Direct Support" To The 9/11 Hijackers ..................................................34

   3.     Jurisdictional Discovery Confirms That Al Rajhi Bank Did Not Provide Financial Services With The "Specific Intent To Further Al Qaeda's Terrorism Against The United States".................................37

      a.     The Bank Provided Only Routine Banking Services To Its Customers ...................................................38

      b.     The Bank's Former Chairman Did Not Make Charitable Donations With The Intent To Support Terrorism, And His Donations Do Not Have Any Nexus To The 9/11 Attacks...........42

   4.     Jurisdictional Discovery Confirms That Plaintiffs' Injuries Did Not "Arise From" Or "Relate To" Services Provided By The Bank Or Donations Provided By Al Rajhi Family Members ..................................46

      a.     Plaintiffs Do Not Trace A Single Transaction Through Al Rajhi Bank To The 9/11 Attacks ....................................46

      b.     Plaintiffs Do Not Trace A Single Donation From The Bank Or Any Al Rajhi Family Member To The 9/11 Attacks...............49

      c.     Plaintiffs Do Not Trace A Single Transaction Through Al Rajhi Bank's U.S. Correspondent Account To The 9/11 Attacks ..................................................................49

CONCLUSION...................................................................................................50

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*,
    902 F.2d 194 (2d Cir. 1990)................................................................................22

*Brown v. Lockheed Martin Corp.*,
    814 F.3d 619 (2d Cir. 2016)................................................................................24

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985)............................................................................................25

*Calder v. Jones*,
    465 U.S. 783 (1984)............................................................................................24

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)............................................................................................23

*Chirag v. MT Marida Marguerite Schiffahrts*,
    604 F. App'x 16 (2d Cir. 2015) ..........................................................................23

*Daimler AG v. Bauman*,
    134 S. Ct. 746 (2014)..........................................................................................24

*Daou v. BLC Bank, S.A.L.*,
    42 F.4th 120 (2d Cir. 2022)................................................................................50

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*,
    722 F.3d 81 (2d Cir. 2013)............................................................................22, 23

*Est. of Henkin v. Kuveyt Turk Katilim Bankasi A.S.*,
    No. 19-cv-5394, 2023 WL 4850999
    (E.D.N.Y July 28, 2023) ....................................................................................50

*Fed. Ins. Co. v. Al Qaida (In re Terrorist Attacks on Sept. 11, 2001)*,
    No. 03-md-1570, 2023 WL 2430381
    (S.D.N.Y. Mar. 9, 2023) ............................................................................ *passim*

*Fed. Ins. Co. v. Al Qaida (In re Terrorist Attacks on September 11, 2001)*,
    2023 U.S. Dist. LEXIS 40001 (S.D.N.Y. Mar. 9, 2023) ....................................46

*Fid. Bank, Nat'l Ass'n v. Avrutick*,
    740 F. Supp. 222 (S.D.N.Y. 1990) .....................................................................43

*Honickman v. BLOM Bank SAL*,
    6 F.4th 487 (2d Cir. 2021) .............................................................................30, 39

*Licci v. Lebanese Canadian Bank,*
    732 F.3d 161 (2d Cir. 2013)....................................................................................49

*O'Neill v. Al Rajhi Bank,*
    714 F.3d 118 (2d Cir. 2013)............................................................................ *passim*

*O'Neill v. Asat Tr. Reg. ("Terrorist Attacks VII"),*
    714 F.3d 659 (2d Cir. 2013)............................................................................ *passim*

*Przewozman v. Qatar Charity,*
    No. 20-cv-6088, 2023 WL 2562537 (E.D.N.Y. Mar. 17, 2023)..............................50

*Robinson v. Overseas Mil. Sales Corp.,*
    21 F.3d 502 (2d Cir. 1994)....................................................................................22

*Sutton v. City of Yonkers,*
    No. 13-cv-801, 2015 WL 876459 (S.D.N.Y. Mar. 2, 2015)..................................23

*In re Terrorist Attacks on Sept. 11, 2001,*
    740 F. Supp. 2d 494 (S.D.N.Y. 2010)..................................................................17

*In re Terrorist Attacks on Sept. 11, 2001 ("Terrorist Attacks IV"),*
    718 F. Supp. 2d 456 (S.D.N.Y. 2010)............................................................. *passim*

*In re Terrorist Attacks on September 11, 2001,*
    538 F.3d 71 (2d Cir. 2008)....................................................................1, 6, 25, 42

*In re Terrorist Attacks on September 11, 2001 ("Terrorist Attacks I"),*
    349 F. Supp. 2d 765 (S.D.N.Y. 2005)....................................................4, 5, 43, 45

*Twitter, Inc. v. Taamneh,*
    598 U.S. 471 (2023)........................................................................................38, 39, 41

*Underwriting Members of Lloyd's Syndicate 2 v. Al Rajhi Bank,*
    779 F. App'x 66 (2d Cir. 2019) ....................................................................... *passim*

*Vasquez v. Hong Kong & Shanghai Banking Corp.,*
    477 F. Supp. 3d 241 (S.D.N.Y. 2020)....................................................................23

*Walden v. Fiore,*
    571 U.S. 277 (2014)........................................................................................26, 48

*Waldman v. Palestine Liberation Org.,*
    835 F.3d 317 (2d Cir. 2016)......................................................................25, 26, 48

## STATUTES AND RULES

Fed. R. Civ. P. 12(b) ................................................................................7, 22, 23, 50

Fed. R. Civ. P. 30(b)(6)................................................................................................9

Fed. R. Civ. P. 56....................................................................................................23

N.Y. C.P.L.R. § 302(a)(1).........................................................................................49

N.Y. Local R. 56.1...................................................................................................23

## PRELIMINARY STATEMENT

In 2018, this Court dismissed all claims against Al Rajhi Bank in this action, holding that Plaintiffs' allegations of *indirect* funding and financial services to "front organizations for al Qaeda" could not establish specific personal jurisdiction over the Bank.  Order 12-13 (Mar. 28, 2018), ECF No. 3947.  In their appeal to the U.S. Court of Appeals for the Second Circuit, Plaintiffs cast their allegations in a different light, arguing that the Bank had provided not only *indirect* support, but "*direct*" support to Al Qaeda *itself*, including the 9/11 hijackers, with the *specific intent* to further Al Qaeda's terrorism against the United States.  *See* Br. Pls.-Appellants 2, 55, *In re Terrorist Attacks on Sept. 11, 2001*, No. 18-1201 (2d Cir. Jan. 18, 2019), ECF No. 127 ("Pls. App. Br.").  These exaggerated assertions had no support in the Amended Complaint, and Plaintiffs had not presented them to this Court.  *See generally* Am. Compl., No. 16-cv-7853, ECF No. 56; Pls. Opp. to Mot. to Dismiss (Dec. 5, 2017), ECF No. 3835.  Nevertheless, Plaintiffs' assertions were sufficiently inflammatory that they caused the Second Circuit to reverse and remand.

In a Summary Order, the Second Circuit reiterated its binding precedent that "'[p]roviding indirect funding to an organization that was openly hostile to the United States does not constitute . . . intentional conduct' that is 'expressly aimed . . . at residents of the United States.'" *Underwriting Members of Lloyd's Syndicate 2 v. Al Rajhi Bank*, 779 F. App'x 66, 68 (2d Cir. 2019) ("Summary Order") (quoting *In re Terrorist Attacks on Sept. 11, 2001* ("*Terrorist Attacks III*"), 538 F.3d 71, 95 (2d Cir. 2008)).  But, referring to Plaintiffs' exaggerated assertions of purported "direct" and "operational" support with "specific intent," the Second Circuit found that "the support alleged here, in conjunction with this [purported] specific intent, we believe is 'more direct and one step closer to al Qaeda' when compared to the support we have previously found inadequate." *Id*. at 69.

The Second Circuit did not conclude that personal jurisdiction exists over Al Rajhi Bank, but remanded for personal-jurisdictional discovery into "(1) when the alleged support was given to al Qaeda, (2) what support was given, (3) whether the support was 'earmarked' for use in specific schemes or attacks not directed at the United States, or (4) specifically how the defendants were involved in the process of providing support to al Qaeda." *Id.* Three years of extensive jurisdictional discovery have ensued in this Court.

That extensive jurisdictional discovery has now concluded, and it only confirms that Al Rajhi Bank *never* gave *any* support — directly or indirectly — to Al Qaeda or to known extremist operatives, *never* targeted the United States in any way, and *never* had any knowledge that any of its customers supported Al Qaeda. The undisputed facts establish that at all relevant times:

- Al Rajhi Bank's senior leadership did not know or support Osama bin Laden.

- The Bank prevented Osama bin Laden from accessing his accounts at the Bank or using any Bank services since at least 1994, when he was stripped of his Saudi citizenship and his accounts were frozen.

- Al Rajhi Bank never processed any transaction for any customer that was designated by any government or the United Nations at the time of the transaction.

- Al Rajhi Bank never made donations of its own funds to any of the charities that Plaintiffs allege were "fronts" for Al Qaeda.

- Al Rajhi Bank had (and complied with) KYC and AML policies that met international best practices and the requirements of its banking regulator, including requirements for routine audits.

- After two decades of investigations into the 9/11 Attacks, no designation or enforcement action has ever been taken — by the United States, United Nations, or any other governmental body — against Al Rajhi Bank or any Al Rajhi family member for any connection to terrorism.

- Not a single transaction through Al Rajhi Bank, including through its U.S. correspondent account, has ever been traced to the planning, financing, or carrying out of the 9/11 Attacks.

Plaintiffs' 576-paragraph, 112-page Corrected Averment (ECF No. 9764) ("Pls. Aver.") obscures these essential facts, which establish that Al Rajhi Bank did not knowingly support Al Qaeda or intend to support any terrorist act against the United States, including the 9/11 Attacks, and that no conduct by the Bank caused the Attacks. The time has come to dismiss the unfounded and defamatory allegations against Al Rajhi Bank, once and for all.

## AL RAJHI BANK BACKGROUND

Al Rajhi Bank was founded in Saudi Arabia as a currency-exchange company in 1957, was incorporated as a bank in Saudi Arabia in 1988, and has always maintained its headquarters and principal place of business in Riyadh, Saudi Arabia. ARB Aver. ¶ 8. During the relevant period, Al Rajhi Bank was one of the largest banks in Saudi Arabia, with millions of customers, and it remains one of the largest banks in Saudi Arabia today. *Id*. at ¶ 12. The Bank is publicly owned, and its shares are listed and actively traded in Saudi Arabia. *Id*. at ¶ 9. The Bank is regulated by the Saudi Central Bank, known during the relevant period as the Saudi Arabian Monetary Authority ("SAMA"). *Id*. at ¶ 20. Until 2004, Al Rajhi Bank was the only fully Sharia-compliant bank in Saudi Arabia. *Id*. at ¶ 13. Al Rajhi Bank did not maintain any branch, representative office, or other presence in the United States during the relevant period. *Id*. at ¶ 10. Apart from holding a U.S.-dollar correspondent bank account, Al Rajhi Bank also did not conduct any banking business in the United States during the relevant period. *Id*. at ¶ 11. Neither Al Rajhi Bank nor

any member of the Al Rajhi family, has ever been designated, sanctioned, or prosecuted by the United States, United Nations, or any other governmental body, as having any connection related to terrorism. *Id.* at ¶¶ 118-23.

## PROCEDURAL HISTORY

A.    **This Court Dismissed Prior Actions Against Al Rajhi Bank For Failure To State A Claim In 2005, And The Second Circuit Affirmed**

Starting in 2002, hundreds of plaintiffs claiming losses or injuries resulting from the 9/11 Attacks filed actions against hundreds of defendants, mainly Saudi individuals and institutions, including Al Rajhi Bank. Without waiting to be served with process, Al Rajhi Bank appeared in the first case filed against it to clear its good name. The Bank moved to dismiss for lack of personal jurisdiction and failure to state a claim. In January 2005, this Court (then the Honorable Richard C. Casey) dismissed all claims against Al Rajhi Bank for failure to state a claim. *In re Terrorist Attacks on Sept. 11, 2001 ("Terrorist Attacks I")*, 349 F. Supp. 2d 765, 832-33 (S.D.N.Y. 2005). Having dismissed for failure to state a claim, the Court did not find it necessary to address personal jurisdiction. *See id.* at 837.

In 2013, the Second Circuit unanimously affirmed this Court's dismissal of all claims against the Bank. *O'Neill v. Al Rajhi Bank*, 714 F.3d 118, 124-25 (2d Cir. 2013). In 2014, the Supreme Court, following the recommendation of the United States Government, denied the plaintiffs' petition for a writ of certiorari. 134 S. Ct. 2870 (2014); *see* Br. for the United States as Amicus Curiae 17-18 ("U.S. Amicus Br.") ("[A]llegations that the *charities* played an important role in facilitating al Qaeda's operations, without more, do not indicate that petitioners' injuries were the foreseeable result of *respondents'* provision of assistance and services to those charities."); *id.* at 11 n.4 ("[A]llegations that the charities held themselves out as bona fide organizations that conducted government-sanctioned activities . . . undercut any inference that [Al

Rajhi] Bank was aware of the charities' alleged support for terrorism."). This Court also dismissed all claims against Sulaiman bin Abdulaziz Al Rajhi, a founder and former Chairman of Al Rajhi Bank, and Abdullah Al Rajhi, the Bank's current Chairman, for lack of personal jurisdiction; the Second Circuit affirmed that dismissal and the Supreme Court denied the plaintiffs' petition for a writ of certiorari. *See In re Terrorist Attacks on Sept. 11, 2001 ("Terrorist Attacks IV")*, 718 F. Supp. 2d 456, 485, 495 (S.D.N.Y. 2010) (finding that Plaintiffs' allegations failed to show Al Rajhi defendants "personally engaged in tortious conduct expressly aimed at the United States"), *aff'd sub nom. O'Neill v. Asat Tr. Reg. ("Terrorist Attacks VII")*, 714 F.3d 659, 675-76 (2d Cir. 2013), *cert denied* 134 S. Ct. 2870 (2014).

### B.   This Court Dismissed The Copycat Complaint Here In 2018 For Lack Of Personal Jurisdiction

On January 15, 2016, these consolidated actions commenced when the *Lloyd's* Plaintiffs filed a complaint against the Bank in the U.S. District Court for the Western District of Pennsylvania, an obvious gambit to avoid this Court, which had already dismissed the Bank. Plaintiffs' forum-shopping was upended, however, when the Judicial Panel on Multidistrict Litigation transferred the *Lloyd's* action to this Court — over Plaintiffs' vigorous objections — because "highly similar claims against [the Bank] previously have been adjudicated during the course of the MDL proceedings," and this Court's ruling dismissing the Bank had been "affirmed on appeal." Order 2 (Oct. 6, 2016), ECF No. 3351. Plaintiffs in ten subsequently filed actions joined the *Lloyd's* Plaintiffs in a consolidated amended complaint, which repeats allegations substantively identical to those underlying the claims that this Court dismissed in *Terrorist Attacks I. See* Mot. to Dismiss Ex. 1 (Aug. 21, 2017), ECF No. 3703-1 (comparing Amended Complaint allegations with those previously dismissed). Many of Plaintiffs' counsel here were also counsel for the plaintiffs in *Terrorist Attacks I*, having found new clients for their copycat actions.

As before, Al Rajhi Bank moved to dismiss all claims against it for lack of personal jurisdiction and failure to state a claim. This time, the Court addressed the Bank's personal-jurisdiction arguments first, dismissed all claims against the Bank on that basis, and denied Plaintiffs' request for jurisdictional discovery. Mar. 28, 2018 Order 4 n.5, 12-17 (not reaching failure-to-state-a-claim arguments). This Court held that Plaintiffs' allegations that the Bank provided indirect support to Al Qaeda, in the form of purported "funds and services to charities and individuals who supported al Qaeda," could not establish specific personal jurisdiction over the Bank. *Id.* at 12-13 ("[T]he Second Circuit has repeatedly held similar, if not identical, allegations concerning both the banks' and their principals' alleged funding of front organizations for al Qaeda insufficient to establish specific jurisdiction for claims arising out of the 9/11 Attacks." (citing *Terrorist Attacks VII*, 714 F.3d at 676; *Terrorist Attacks III*, 538 F.3d at 95)).

### C. Accepting Plaintiffs' Mischaracterization Of Their Amended Complaint, The Second Circuit Reversed This Court's Dismissal And Remanded For Jurisdictional Discovery

On appeal, Plaintiffs tried to avoid the Second Circuit's holdings in *Terrorist Attacks III* and *Terrorist Attacks VII* by mischaracterizing their Amended Complaint as having alleged that the Bank had "provided support directly to al-Qaeda in various ways." Pls. App. Br. 55; *see also, e.g.*, *id.* at 2 (stating the Bank and Al Qaeda had formed a purported "operational partnership"); *id.* at 7 ("ongoing and close operational relationship between ARB and al-Qaeda"); *id.* at 18 ("unusually close, substantial nexus between ARB and al-Qaeda"). Al Rajhi Bank protested to the Second Circuit that Plaintiffs were mischaracterizing their allegations and that their arguments lacked support in the Amended Complaint. *See, e.g.*, Br. for Def.-Appellee 20, ECF No. 153 ("ARB 2d Br.") (noting some assertions in Plaintiffs' brief were "not in the Amended Complaint at all"); *id.* at 31 ("[T]he Amended Complaint, stripped of the mischaracterizations in Plaintiffs' brief, fails even to allege 'facts that constitute strong circumstantial evidence of conscious

misbehavior' by the Bank."); *id*. at 35 (describing Plaintiffs' "implausible speculative leap" in characterizing testimony); *id*. at 41 (noting "mischaracteriz[ation]" in Plaintiffs' brief).

Nonetheless, in its Summary Order, the Second Circuit stated that Plaintiffs "principally allege" that (1) "Al Rajhi Bank provided financial services and donations to charities that it knew financially supported al Qaeda," (2) it "provided financial services to known extremist operatives," and (3) its "provision of financial services was done with the specific intent to further al Qaeda's terrorism against the United States." Summary Order 68. The Second Circuit stated that this alleged support, "in conjunction with" this purported "specific intent," is "'more direct and one step closer to al Qaeda' when compared to the support we have previously found inadequate." *Id*. at 69. The Second Circuit reversed this Court's dismissal for lack of personal jurisdiction and remanded for jurisdictional discovery. Although the Bank raised its failure-to-state-a-claim arguments under Rule 12(b)(6), *see* ARB 2d Br. 60, the Second Circuit did not reach them. *See* Summary Order 69.

On remand, the Bank moved this Court to decide the Bank's unresolved Rule 12(b)(6) motion. *See* Renewed Mot. (Dec. 19, 2019), ECF No. 5385. After all, this Court had dismissed the substantively identical complaints against the Bank under Rule 12(b)(6), and that dismissal had been affirmed. Nonetheless, Magistrate Judge Netburn issued an Order declining to consider the Bank's unresolved Rule 12(b)(6) motion and compelling the Parties to begin jurisdictional discovery. *See* Order 2, 10-12 (Mar. 26, 2021), ECF No. 6681. The Bank filed Objections to the Magistrate Judge's Order, urging this Court to dismiss all claims against the Bank because the prior decisions by this Court and the Second Circuit foreordained dismissal for failure to state a claim. Objs. 1-2 (Apr. 9, 2021), ECF No. 6724. Those Objections have not been resolved. In the meantime, the Bank has dutifully engaged in three years of jurisdictional discovery.

**D.    Three Years Of Extensive Jurisdictional Discovery Confirm That Al Rajhi Bank Did Not Support Al Qaeda Or Known Extremist Operatives Or Have "Specific Intent" To Support Terrorist Attacks Against The United States**

Between April 2021 and February 2024, the Parties engaged in jurisdictional discovery into the four areas outlined by the Second Circuit's Summary Order.  The relevant period for jurisdictional discovery stretched from January 1, 1998, to December 31, 2002 for most requests, to December 31, 2004 for requests related to post-9/11 investigations, and to December 31, 2008 for certain requests relating to the Bank's former Chairman.  *See* Nov. 22, 2021 Order 6; Order 8-9 (July 11, 2023), ECF No. 9210.

Plaintiffs served the Bank with two sets of document requests that included 124 distinct requests and subparts.  *See* Pls. 1st Mot. Compel Ex. A (Jul. 30, 2021), ECF No. 6996-3; Pls. 3d Mot. To Compel Ex. 1 (Apr. 19, 2023), ECF No. 9040-1.  The Bank produced 1,084 responsive documents, totaling 42,250 pages, including the following:

- 508 statements of accounts, including 440 charity customer accounts, covering every account request made by Plaintiffs and permitted by the Court.  Erb Decl. ¶ 5.  None of these account statements shows any transaction that has been traced to Al Qaeda or the financing of the 9/11 Attacks.

- 328 know-your-customer files, totaling 3,767 pages.  *Id*.  None of these files shows any connection between any Bank customer and terrorism before the 9/11 Attacks.

- 209 documents reflecting communications between the Bank and SAMA before and after 9/11.  *Id*.  None of these documents shows that the Bank was out of compliance with SAMA's guidelines or regulations, let alone that the Bank intended to support terrorism.  Instead, these documents establish that the Bank worked closely with SAMA before and after 9/11,

cooperated with SAMA's post-9/11 investigations, and carried out SAMA's instructions for reporting, monitoring, and blocking particular accounts. ARB Aver. ¶¶ 33-34, 124-129.

- Contemporaneous letters from the Bank's former Chairman, Sulaiman bin Abdulaziz Al Rajhi, establishing that he had resigned from the boards of IIRO and Sanabel, charities Plaintiffs contend were "fronts," *as early as 1992.* Resp. to Pls. Aver. ¶¶ 168, 547-48.

The Bank's searches — which Magistrate Judge Netburn held were "reasonable," *see* July 11, 2023 Order 4-7 — establish that, contrary to Plaintiffs' exaggerated arguments to the Second Circuit, during the relevant period:

- The Bank *did not* knowingly provide any services or support "directly" to Al Qaeda or its operatives.

- Osama bin Laden's accounts at the Bank had been frozen since at least 1994.

- *No* Al Rajhi Bank officer or director had *any* role with any of the purported "front" charities.

- The Bank *did not* make charitable donations to *any* of the purported "front" charities.

Plaintiffs deposed the Bank's Rule 30(b)(6) representative, who was dutifully prepared to answer questions on all 128 distinct topics and sub-topics that Plaintiffs noticed. *See* Ltr. (May 18, 2023), ECF No. 9096. His testimony establishes that the Bank *did not* know of any connection between any customer and terrorism. He testified that:

- Al Rajhi Bank implemented anti-money laundering policies and procedures according to SAMA's guidelines and regulations, and took corrective action as needed. Pls. Ex. 3 (Galloway Dep. Tr.) at 105:13-21, 106:6-8 and Errata at 105:15-16, 106:6-8.

- The Bank took steps before and after the 9/11 Attacks to confirm that its charity customers were government-licensed. *Id.* at 100:1-11, 115:23-25, 253:18-254:11 and Errata at 100:1-2, 100:5, 100:10, 115:24-25, 254:5.

- The Bank carried out SAMA's post-9/11 requests and instructions to report, monitor, or block accounts. *See, e.g.*, Pls. Ex. 3 (Galloway Dep. Tr.) at 243:11-19, 346:7-347:13 and Errata at 243:15-16, 243:18, 346:8, 346:11, 346:25, 347:2, 347:7-8, 347:12.

- Contrary to Plaintiffs' allegations that the former Chairman was forced aside under pressure relating the 9/11 Attacks (*see* FAC ¶ 168), the Bank's former Chairman did not retire until 2014, over a decade after the 9/11 Attacks, due to his advanced age (he was 86). Pls. Ex. 3 (Galloway Dep. Tr.) at 292:9-21.

Plaintiffs also took a seven-hour apex deposition of the Bank's current Chairman, Abdullah bin Sulaiman Al Rajhi. His testimony establishes that the Bank had *no specific intent* to support the 9/11 Attacks. He testified that:

- Contrary to Plaintiffs' unfounded, inflammatory assertions to the Court that the Chairman "likely . . . knew" bin Laden because they attended the same university (Pls. Opp. 3-4 (Apr. 24, 2023), ECF No. 9053), the Chairman has never met or supported bin Laden. Pls. Ex. 1 (Abdullah bin Sulaiman Al Rajhi Dep. Tr.) at 352:3-6; 353:7-10; 355:4-8; 356:4-10.

- The Chairman is unaware of any other Al Rajhi Bank officer, including the Bank's former chairman, Sulaiman bin Abdulaziz Al Rajhi (his father), ever knowing or supporting Osama bin Laden, Al Qaeda, or terrorism in any form. *Id*. at 351:3-353:5, 354:17-355:8.

- The Bank's officers and directors, including the Chairman and his father, were horrified by the 9/11 Attacks and viewed them as a crime. *Id*. at 350:4-352:2.

- Neither the Chairman nor Sulaiman bin Abdulaziz Al Rajhi follows extremist ideology. *Id.* at 352:13-21.

- The Bank coordinated closely with SAMA, before and after 9/11, and cooperated with SAMA's post-9/11 investigations. *Id*. at 369:8-370:16 and Errata at 369:22, 370:15.

- After 9/11, the Bank cooperated with U.S. government investigations, including by providing information through SAMA. *Id*. at 360:14-361:9.

Plaintiffs produced more than 2.4 million pages of documents that they have obtained over the course of the MDL proceedings through discovery from other parties and non-parties. *See* Ltr. Mot. 1 (Apr. 11, 2023), ECF No. 9002. Plaintiffs' collection of documents includes additional transactional records involving accounts at Al Rajhi Bank. Those records *did not* show a single transaction through any account at Al Rajhi Bank that can be traced to the financing, planning, or carrying out of the 9/11 Attacks.

Plaintiffs subpoenaed and obtained records from the FBI and CIA. Those records establish that *no* U.S. government agency has *ever* concluded that the Bank provided any support for the 9/11 Attacks. After years of exhaustive investigation into the 9/11 Attacks by multiple government agencies, the U.S. government has never sanctioned, charged, or taken any other action against Al Rajhi Bank or any Al Rajhi family member for connections to terrorism or the 9/11 Attacks. *See* ARB Aver. ¶¶ 118-20; *see also* ARB Ex. 7 (May 27, 2021 FBI EC) at 0011 (stating that "[a]fter nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged"). Plaintiffs also subpoenaed and obtained records from J.P. Morgan Chase, the Bank's correspondent bank in the United States during the relevant period. Those records *do not* show any transaction from the Bank's correspondent account that can be linked to the 9/11 Attacks. *See* Resp. to Pls. Aver. § XI (heading).

Plaintiffs served two expert reports totaling 258 pages. Pls. Exs. 4, 38. Plaintiffs' experts were forced to confirm that during the relevant period: the Bank did not process any transactions in violation of terrorism sanctions, Pls. Ex. 171 (Kohlmann Dep. Tr.) at 132:23-133:5; the Bank

did not permit any transactions through Osama bin Laden's long-frozen accounts, *id.* at 17:1-25, 209:2-15; *see also* Pls. Ex. 12 (Winer Dep. Tr.) at 53:5-55:2; and no Al Rajhi Bank customer during the relevant period was designated under any sanctions regime for connections to terrorism before the 9/11 Attacks (apart from Bin Laden, whose accounts at the Bank were long-since frozen), *id.* at 53:5-55:2; *see also* Pls. Ex. 171 (Kohlmann Dep. Tr.) at 126:12-13, 130:21-131:2. *Plaintiffs' experts could not trace a single transaction through any Al Rajhi Bank account to the planning, carrying out, or financing of the 9/11 Attacks.*

Meanwhile, the Bank's rebuttal experts established, among other things, that:

- After extensive investigation, the FBI could not verify the CIA reporting about the Bank, on which Plaintiffs' Averment relies heavily. ARB Ex. 4 (Lormel Rpt.) at 7, 18-20 ("My opinion is supported by my [FBI Terrorist Finance Operations Section] experience where I assigned a team of FBI agents and analysts to investigate Al Rajhi Bank. As stated earlier, the investigative team could not substantiate allegations involving Al Rajhi Bank.").

- The Bank could not have known if any foreign charity branches (which did not even have accounts at the Bank) "siphoned" charitable donations. ARB Ex. 1 (Dean Rpt.) at 7, 10-12. ("To the extent any of the charities' foreign branches siphoned charitable support to jihadist organizations, this was done covertly, without the knowledge of the charity headquarters in Saudi Arabia, and in a manner that Al Rajhi Bank would not have been able to detect.").

- The Bank was routinely audited internally, by external auditors, and by its regulator, SAMA, and there is no evidence that these audits revealed any material noncompliance. ARB Ex. 3 (Pasley Rpt.) at 8-9. Contrary to Plaintiffs' repeated assertion that they have not obtained any evidence of audits, the Bank's annual reports — which are public, and cited by the Bank's experts — discuss the audits and their findings. *See id.*

- Plaintiffs' experts fail to show any material noncompliance by the Bank with its own policies or SAMA regulations (both of which were aligned with international standards), and, in any event, the purported noncompliance averred by Plaintiffs does not signal complicity in *terrorism*. *Id*. at 12; Ex. 2 (Hobayb Rpt.) at 21-22.

Plaintiffs' Averment repeatedly tries to excuse Plaintiffs' lack of evidence by complaining that jurisdictional discovery was somehow not sufficiently extensive. *See, e.g.*, Pls. Aver. ¶¶ 5, 15-17, 204, 236 n.85, 251, 268, 391, 454, 465. Plaintiffs' excuses ring hollow given how comprehensive jurisdictional discovery was here (and how comprehensive government investigations were).

Jurisdictional discovery closed on February 9, 2024. No discovery motions are pending before the Court.

### E.    Plaintiffs' Averment Abandons Most Of The Allegations And Arguments Plaintiffs Presented To The Second Circuit

After three years of jurisdictional discovery, Plaintiffs have ignominiously abandoned the vast majority of the allegations they highlighted and mischaracterized to the Second Circuit. Indeed, a careful review of Plaintiffs' inflammatory charges at the Second Circuit shows just how baseless and defamatory they were.

**Plaintiffs' Averment abandons Plaintiffs' allegations that Al Rajhi Bank provided "direct" support to Al Qaeda, including "extensive and essential support" "directly to the September 11th hijackers":** In their briefing to the Second Circuit, Plaintiffs mischaracterized their Amended Complaint as having alleged "direct" support and financial services by the Bank to Al Qaeda, including "extensive and essential support provided directly to the September 11th hijackers and their immediate operational directors" Pls. App. Br. 43-44; *id*. at 11 ("direct and active sponsorship of ARB and its senior management"); *id*. at 12 (asserting Bank was only

–13–

"nominally a bank," but actually "functioned as an operational partner of al-Qaeda in carrying out al-Qaeda's terrorist objectives against the United States"); *id*. at 13 ("ARB also provided other direct support to al-Qaeda, such as funneling money and logistical assistance"); *id*. at 18 ("extensive financial support and services to al-Qaeda [and] its operatives"); *id*. ("ARB provided various forms of support to al-Qaeda operatives just before they carried out the September 11th attacks"); *id*. at 37 ("ARB in fact did provide extensive, ongoing support to al-Qaeda, through financial contributions directed to it and services provided to al-Qaeda operatives."); *id*. at 61 (Bank made its "own 'charitable' contributions to al-Qaeda"); *see also* Reply Br. Pls.-Appellants 17, ECF No. 162 ("Pls. App. Reply") (describing as "core allegations" that the Bank provided "support directly to the plotters of the September 11th attacks and the attackers themselves," and "directed Sharia payments directly to al-Qaeda, including through its officials in intimate contact with al-Qaeda operatives and the attackers"); *id*. at 22 (alleging the Bank provided its "own, direct support for al-Qaeda").  In fact, Plaintiffs had not alleged any "direct" support or "contributions" from the Bank to al Qaeda in their Amended Complaint or their briefing to this Court, let alone "support directly to the plotters" or "Sharia payments to al Qaeda."

Plaintiffs went on to assert to the Second Circuit that the Bank had "transferred the funds to al-Qaeda's Hamburg cell that launched the September 11th attackers on their U.S. mission," that "September 11th hijacker al Omari . . . received a wire transfer on September 7, 2001 from ARB," and that "Mohammed Atta himself made a transfer to this account held by Omari."  Pls. App. Br. 46.  In their Amended Complaint, Plaintiffs had not alleged that the Hamburg cell "launched" the attacks, nor had they alleged the purported Atta-to-Omari transaction.

Jurisdictional discovery confirms that the Bank *did not* provide support "directly to" the hijackers, and Plaintiffs' Averment abandons this baseless assertion.  Instead, Plaintiffs' Averment

makes only passing reference (at ¶¶ 136, 265, 540) to the fact that seven of the nineteen hijackers — none of whom was a known extremist before the 9/11 Attacks — were among the Bank's millions of accountholders.  Jurisdictional discovery *disproves* Plaintiffs' assertion that Omari received a wire transfer through the Bank on September 7, 2001, and shows that Atta *did not* make any transfer to Omari through the Bank during the relevant period.  Resp. to Pls. Aver. ¶ 265. Jurisdictional discovery shows *no* transfer of funds by Al Rajhi Bank to the "Hamburg cell."  Nor does jurisdictional discovery show that the Bank made "financial contributions" to Al Qaeda.

**Plaintiffs' Averment abandons Plaintiffs' allegations that Al Rajhi Bank donated "its own funds" to alleged charity fronts.**  Plaintiffs repeatedly argued to the Second Circuit that the Bank had supported Al Qaeda by donating "its own funds" to the Charities.  *See, e.g.*, Pls. App. Br. 48 ("ARB contributed its own funds to the charities in circumstances that ensured that they would support al-Qaeda's activities."); *id*. at 56 ("ARB's highest-ranking officers held key leadership roles in some of the most prominent 'charities' that provided direct aid to al-Qaeda, and to which ARB contributed funds."); *id*. at 7-8, 11-12, 13, 18, 37, 40, 61 (discussing alleged donations from the Bank to purported charity fronts); *see also* Pls. App. Reply 21 (same).

Jurisdictional discovery confirms that, in fact, the Bank *did not* donate *any* of its own funds to the charities identified in Plaintiffs' Amended Complaint or Averment.  Plaintiffs requested documents showing donations from the Bank to Al Haramain, IIRO, and the Muwaffaq Foundation.  The Bank completed a thorough search, affirmed by the Magistrate Judge, and found no record of any such donation during the relevant period.  *See* July 11, 2023 Order 4-5. Jurisdictional discovery also developed no evidence of the Bank making donations to the other charities identified in Plaintiffs' Amended Complaint or Averment (World Assembly of Muslim Youth ("WAMY"), Muslim World League ("MWL"), Saudi Joint Relief Committee for Kosovo

–15–

and Chechnya ("SJRC"), Saudi High Commission for Bosnia-Herzegovina ("SHC"), and Lajnat al-Birr al-Islamiah ("LBI") (collectively, with Al Haramain and IIRO, the "Charities")).

**Plaintiffs' Averment abandons, and jurisdictional discovery disproves, Plaintiffs' allegations that the Bank derived knowledge and intent to support Al Qaeda against the United States through its former Chairman:** Plaintiffs argued to the Second Circuit that the Bank "acted with knowledge" because it "was founded and controlled by an individual [Sulaiman bin Abdulaziz al Rajhi] who had intimate knowledge of al-Qaeda's reliance on ARB and sought himself to advance al-Qaeda's objectives." Pls. App. Br. 39. For this point, Plaintiffs asserted that Sulaiman bin Abdulaziz al Rajhi (i) had founded a U.S.-based charity, the SAAR Network, which allegedly supported Al Qaeda; (ii) was a board member of Akida Bank and had "close relationships with Ahmed Idris Nasreddin," and (iii) served on the boards of the charity IIRO and its alleged financial arm, Sanabel, Inc. *Id*. at 14, 39-40. Plaintiffs stressed that Akida Bank and Nasreddin were SDGTs, ignoring that the U.S government did not designate either of them until *after* the 9/11 Attacks. *See* ARB Ex. 10 (U.S. Treasury Press Release, Apr. 19, 2002); ARB Ex. 9 (U.S. Treasury Press Release, Aug. 29, 2002). Plaintiffs also argued that Sulaiman bin Abdulaziz Al Rajhi himself was a "major financial contributor to al-Qaeda," relying heavily on a document Plaintiffs call the "Golden Chain" and which they asserted was a list of Al Qaeda supporters on which the Bank's former Chairman's name appeared. Pls. App. Br. 42; *see also id*. at 9-10, 14, 42, 43, 49 (all discussing "Golden Chain").

Jurisdictional discovery disproves Plaintiffs' theory that the Bank derived knowledge and intent based on Sulaiman bin Abdulaziz Al Rajhi's purported "intimate knowledge" of Al Qaeda. In particular, jurisdictional discovery disproves Plaintiffs' allegations that Sulaiman bin Abdulaziz Al Rajhi served on IIRO or Sanabel boards in the years leading up to the 9/11 Attacks. The

undisputed facts establish that he resigned from both boards in 1992, as Plaintiffs' expert concedes. Resp. to Pls. Aver. ¶¶ 547-48; Pls. Ex. 4 (Winer Rpt.) at 71 n.191 ("These documents provide evidence that the IIRO had failed to remove SAAR's name from the list of its permanent members in response to his letters of resignation, a fact apparently not known to the CIA . . . ."). And Plaintiffs' Averment abandons allegations that Sualaiman Abdulaziz Al Rajhi had "relationships" with Akida Bank or Ahmed Idris Nasreddin.

Plaintiffs' Averment instead focuses on Sulaiman bin Abdulaziz Al Rajhi's charitable work through the U.S.-based SAAR Foundation and the Saudi-based Sulaiman bin Abdulaziz Al Rajhi Charitable Foundation ("Charitable Foundation"). But Plaintiffs fail to show *any* connection between either entity — let alone the Bank — and Al Qaeda. *See* Resp. to Pls. Aver. §§ IV, X (heading). And the undisputed facts establish that neither entity has ever been charged or designated in connection with terrorism. *Id.* Moreover, this Court has already dismissed all claims against Sulaiman bin Abdulaziz Al Rajhi for lack of personal jurisdiction, *see Terrorist Attacks VII*, 714 F.3d at 675-76 (affirming dismissal), and against the U.S.-based SAAR Foundation and the other so-called "SAAR Network" defendants for failure to state a claim, *In re Terrorist Attacks on Sept. 11, 2001*, 740 F. Supp. 2d 494, 523 (S.D.N.Y. 2010) ("*Terrorist Attacks V*") (dismissing claims against the U.S.-based SAAR Foundation and all but one of the other so-called "SAAR Network" defendants for failure to state a claim); *see also* Order (June 28, 2011), ECF No. 2438 (granting voluntary dismissal, with prejudice, of remaining "SAAR Network" defendant).

Plaintiffs fall back heavily on the deeply flawed and repeatedly discredited so-called "Golden Chain" document to try to establish that Sulaiman bin Abdulaziz Al Rajhi supported Al Qaeda. *See, e.g.*, Pls. Aver. ¶¶ 46, 65, 66, 68, 126, 131, 180, 226, 395, 513. This Court has repeatedly rejected the so-called "Golden Chain" as having no "probative significance." *See, e.g.*,

*Terrorist Attacks IV*, 718 F. Supp. 2d at 482-83, 485.  Moreover, the "Golden Chain" list does not name Al Rajhi Bank, any Al Rajhi family member, or even "Rajhi."  *See* Resp. to Pls. Aver. ¶ 65. The name on the list instead translates to "Raji," an entirely different name in Arabic.  *Id.*

**Plaintiffs' Averment abandons Plaintiffs' allegations that other Al Rajhi Bank officers had purported roles with the "front" charities.**  Plaintiffs repeatedly emphasized to the Second Circuit their allegations that, besides Sulaiman bin Abdulaziz Al Rajhi, other "senior ARB officials had significant roles in al-Qaeda affiliated entities."  Pls. 2d Br. 14-15 (alleging Bank and Charities had "interlocking leadership," which "provided ARB with detailed knowledge of how those entities used ARB's services and funds to benefit al-Qaeda"); *see also id.* at 56 ("ARB's highest-ranking officers held key leadership roles in some of the most prominent 'charities' that provided direct aid to al-Qaeda"); *id.* at 73, 76 (discussing alleged dual leadership roles at the Bank and the charities).  Jurisdictional discovery confirms that no Al Rajhi Bank officer or director had any role with any of the charities named in Plaintiffs' Amended Complaint or Averment during the relevant period, and Plaintiffs' Averment abandons these allegations.

**Plaintiffs' Averment abandons Plaintiffs' allegations that the U.S. government warned the Bank before 9/11.**  Plaintiffs argued to the Second Circuit that the Bank "clearly knew of its role as a supporter of al-Qaeda because the U.S. government *told* it so."  *Id.* at 42-43; *see also id.* at 15, 28 (repeating assertion of purported, non-specific pre-9/11 warning by U.S. government); Pls. App. Reply 20-21 (same).  Plaintiffs had not included this assertion in either their Amended Complaint or their briefing to this Court.  Jurisdictional discovery developed no support for this assertion, which Plaintiffs' Averment abandons.

**Plaintiffs' Averment abandons allegations that Al Rajhi Bank provided "on the ground support" to the hijackers through Saleh al Hussayen.**  Plaintiffs also focused the

Second Circuit on assertions relating to a former member of the Bank's Sharia Board, Saleh al Hussayen, whom Plaintiffs contended "directed ARB's funds to charitable organization fronts for al-Qaeda" (Pls. App. Reply 4-5) and provided "on-the-ground support for the attackers" (Pls. App. Br. 44). *See also* Pls. App. Br. 46-47, 49-50, 62-63, 76 (discussing Hussayen's alleged support for hijackers); Pls. App. Reply 15, 20-21, 25, 27-28 (same). Neither Plaintiffs' Amended Complaint nor their briefs to this Court mentioned Hussayen.

Jurisdictional discovery disproves Plaintiffs' theory that Al Rajhi Bank supported the hijackers through Hussayen, who until 1999 was a volunteer on the Bank's Sharia advisory board. Hussayen was never a paid employee or official of the Bank and had no role at the Bank at all after 1999, and the Bank had no role in his alleged September 2001 travel. He was not "direct[ing] ARB's funds to charitable organization fronts for al-Qaeda." Indeed, even during his time until 1999 as an unpaid member of the Sharia advisory board, that board did not "direct[] ARB's funds to charitable organization[s]" at all. *See* Resp. to Pls. Aver. § XII (heading). Moreover, as discussed above, discovery disproves Plaintiffs' unfounded allegations that the Bank made *any* donations to the purported "front" charities. Jurisdictional discovery also provided no support for Plaintiffs' assertions that Hussayen provided "on-the-ground support" for the hijackers. *See* Resp. to Pls. Aver. § XII (heading); *id*. at ¶ 505. Plaintiffs' Averment abandons these allegations.

**Plaintiffs' Averment abandons Plaintiffs' allegations that Al Rajhi Bank jointly fundraised with the charity "fronts."** Plaintiffs alleged to the Second Circuit that the Bank "undertook fundraising efforts with al-Qaeda-supporting organizations targeting the U.S. and using ARB accounts." Pls. App. Br. 44; *see also id*. at 47-48 (arguing alleged "joint" fundraising "suggests a high degree of coordination regarding how the accounts were to be used — including in support of al-Qaeda's activities"). None of the documents produced in jurisdictional discovery

shows that the Bank coordinated any fundraising efforts with the named "front" charities, and Plaintiffs' Averment abandons these allegations.

**Plaintiffs' Averment abandons reliance on Moussaoui's testimony.**  Plaintiffs argued to the Second Circuit that "the most senior and knowledgeable al-Qaeda officials and operatives have indicated that ARB acted with this design and intent in coordination with al-Qaeda itself." *Id.* at 38.  For this point, Plaintiffs relied on the deposition testimony of Zacarias Moussaoui stating that Bin Laden had described the Bank "as acting like a 'good brother' to al-Qaeda," and that the Bank "was responsible for 'moving money around' for al-Qaeda."  *Id.* at 12; *see also id.* at 18, 38, 44, 63, 73, 75 (all discussing Moussaoui testimony); Pls. App. Reply 21, 26 (same).  This Court had rejected Moussaoui's "vague and conclusory" testimony, finding that even if true, it "at most supports the inference that ARB provided funds and financial services to individuals and organizations that were affiliated with al Qaeda — an allegation that has been rejected by this Court and the Second Circuit time and again as insufficient to establish specific jurisdiction." Mar. 28, 2018 Order 14-15.  Jurisdictional discovery provided no support for Moussaoui's broken testimony or Plaintiffs' unfounded assertion to the Second Circuit that "the most senior and knowledgeable al-Qaeda officials" have said that Al Rajhi Bank "acted with this design and intent [to support terrorism] in coordination with al-Qaeda itself."

*    *    *

Unable to rely on the exaggerated arguments and unsupported allegations they presented to the Second Circuit, Plaintiffs now are left alleging that the Bank provided financial services to three categories of customers: (i) Osama Bin Laden and certain 9/11 hijackers, (ii) the Charities, and (iii) officials of the Charities.  But jurisdictional discovery confirms that:

- The Bank had frozen Bin Laden's accounts by at least 1994 when Bin Laden was stripped of his Saudi citizenship, and none of the hijackers was designated or known to be a terrorist before the 9/11 Attacks.  Furthermore, before the 9/11 Attacks, the Bank provided the then-future hijackers with only minimal, routine banking services, and Plaintiffs do not aver that any such service was used to plan or carry out the 9/11 Attacks.

- None of the Charities was designated before 9/11, nor did the Bank know of any alleged connection between any of the Charities and terrorism.  To the contrary, the Bank knew them as government-licensed charitable organizations.  The Bank provided the Charities with only routine banking services, none of which can be traced to the 9/11 Attacks.

- None of the Charity officials identified in Plaintiffs' Averment was designated before 9/11, nor did the Bank know of any alleged connection between any of those officials and terrorism.  Here again, the Bank provided the Charity-official customers with only routine banking services, none of which can be traced to the 9/11 Attacks.

The facts before the Court now are thus "materially different from the allegations on which" the Second Circuit remanded for jurisdictional discovery.  *See Fed. Ins. Co. v. Al Qaida (In re Terrorist Attacks on Sept. 11, 2001)*, No. 03-md-1570, 2023 WL 2430381, at *12 (S.D.N.Y. Mar. 9, 2023) (dismissing claims against DIB for lack of personal jurisdiction after discovery failed to substantiate allegations on which the Court previously held jurisdiction was established).  Gone are Plaintiffs' inflammatory assertions of *direct* support to Al Qaeda, "*known* extremists," and the 9/11 operatives.  Gone, too, are Plaintiffs' unsupported allegations of the Bank's purported knowledge and intent based on shared leadership and joint fundraising with the Charities.  Left are only the meager allegations of routine financial services to individuals that *no one* knew were terrorists before 9/11, and to government-licensed Charities that the Bank and the public knew

only for their charitable efforts.  As this Court and the Second Circuit have held time and again, these allegations cannot establish personal jurisdiction over Al Rajhi Bank.

## ARGUMENT

Three years of extensive jurisdictional discovery confirms that Al Rajhi Bank did not knowingly support Al Qaeda or its operatives and had no specific intent to support terrorism against the United States, including the 9/11 Attacks.  Accordingly, this Court lacks personal jurisdiction over the Bank.

## I.    Plaintiffs Bear The Burden Of Establishing Personal Jurisdiction

Plaintiffs bear the burden of showing that this Court has personal jurisdiction over Al Rajhi Bank.  *Robinson v. Overseas Mil. Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994).  Because Plaintiffs have been allowed to take jurisdictional discovery of the Bank, Plaintiffs must meet their burden through "an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant."  *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990), *cert. denied*, 498 U.S. 854 (1990)).  Plaintiffs' showing "must be 'factually supported'"; legally sufficient allegations, even if pleaded "in good faith," are not sufficient.  *Id.*  The Court may not consider any "legal conclusion couched as a factual allegation" or accept any "argumentative inferences" in assessing whether Plaintiffs' Averment would establish personal jurisdiction. *Terrorist Attacks VII*, 714 F.3d at 673 (internal citations and quotation marks omitted).

Al Rajhi Bank challenges Plaintiffs' Averment under each of the three alternative approaches available in this Circuit for defeating personal jurisdiction after jurisdictional discovery:  *First*, under Rule 12(b)(2), "assum[ing] the truth" of Plaintiffs' well-pleaded, averred facts, the Averment is insufficient to establish personal jurisdiction over the Bank.  *Dorchester*, 722 F.3d at 85.  *Second*, in the alternative under Rule 56, the "undisputed facts" — including those

set forth in the Bank's Averment — "demonstrat[e] the absence of" personal jurisdiction over the Bank. *Id.* Because Plaintiffs bear the burden to prove personal jurisdiction, the Court may enter summary judgment and dismiss the Bank (as under Rule 12(b)(2)) based solely on "the 'absence of evidence to support the [Plaintiffs'] case.'" *Sutton v. City of Yonkers*, No. 13-cv-801, 2015 WL 876459, at *3 (S.D.N.Y. Mar. 2, 2015) (Daniels, J.) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). In this posture, the Court should construe the materials "in the light most favorable to plaintiffs, resolving all doubts in their favor," *Dorchester*, 722 F.3d. at 85, but the Court need not accept Plaintiffs' characterization of any evidence. *See, e.g.*, *Chirag v. MT Marida Marguerite Schiffahrts*, 604 F. App'x 16, 19 n.2 (2d Cir. 2015) (declining Plaintiffs' characterization of proffered document). *Third*, although the undisputed facts leave no doubt as to the absence of personal jurisdiction, if the Court deems adjudication of any "disputed jurisdictional facts" necessary to determine whether Plaintiffs "prove[d] the existence of [personal] jurisdiction by a preponderance of the evidence," *Dorchester*, 722 F.3d. at 85, then the Bank respectfully requests an evidentiary hearing.

Under any of these approaches, the Court "may consider only *admissible* evidence." *Fed. Ins. Co.*, 2023 WL 2430381, at *6 (emphasis added); *see Vasquez v. Hong Kong & Shanghai Banking Corp.*, 477 F. Supp. 3d 241, 251 (S.D.N.Y. 2020) (holding the Rule 56 standard "guides the Court as to the documents it may consider outside of the pleadings"); Order (May 9, 2023), ECF No. 9077 ("Plaintiffs will submit a statement of the facts and evidence on which they will rely in meeting their burden to establish personal jurisdiction over ARB. That statement shall be consistent with the form contemplated by Local Civil Rule 56.1 and shall be accompanied by all supporting documents and deposition excerpts on which the Plaintiffs will rely to meet their

burden."); Local R. 56.1(d) ("Each statement by the movant or opponent . . . must be followed by citation to evidence which would be admissible  . . .").

Plaintiffs have never contended that the Bank is subject to *general* personal jurisdiction. That implicit concession is understandable, as the Bank has never been incorporated in the United States, and it has never maintained its principal place of business here.  *See Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 627 (2d Cir. 2016) (holding that a corporate defendant is subject to general personal jurisdiction "only where it is incorporated or maintains its principal place of business" (quoting *Daimler AG v. Bauman*, 134 S. Ct. 746, 760-61 & n.19 (2014))); *see also* ARB Aver. ¶ 8; Am Compl. ¶ 67 (conceding Al Rajhi Bank "is a Saudi-based international financial institution, with a principal place of business located at Olaya Street, Riyadh, Saudi Arabia").

Instead, Plaintiffs must establish that the Bank is subject to *specific* personal jurisdiction, which here requires a showing that the Bank "purposefully directed [its] activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." *Terrorist Attacks VII*, 714 F.3d at 674 (internal quotation marks and citations omitted). The record confirms that Plaintiffs cannot satisfy the "purposeful direction" test.

## II.    Jurisdictional Discovery Confirms That This Court Lacks Specific Personal Jurisdiction Under The "Purposeful Direction" Test

### A.    To Satisfy The "Purposeful Direction" Test, Plaintiffs Must Show That Al Rajhi Bank "Expressly Aimed Intentional Tortious Acts" At The United States, And That Plaintiffs' Injuries Arose From Those Acts

The Second Circuit has identified "two fundamental requirements" to establish specific personal jurisdiction over defendants in this MDL under the "purposeful direction" test. *Terrorist Attacks VII*, 714 F.3d at 674.  Plaintiffs must show that (i) a defendant "'expressly aimed' intentional tortious acts at residents of the United States," *id.* (quoting *Calder v. Jones*, 465 U.S. 783, 789 (1984)); and (ii) "their injuries 'arise out of or relate to those activities,'" *id.* (quoting

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73 (1985)). Satisfying the "purposeful direction" test thus "requires showing both intent and a nexus." *Fed. Ins. Co.*, 2023 WL 2430381, at *10.

**Specific Intent:** To meet the "expressly aiming" requirement, Plaintiffs must show that the Bank "specifically intended to aid al Qaeda in the commission of a terrorist attack against the United States and its citizens." *Id.* (alterations omitted) (quoting *Terrorist Attacks IV*, 718 F. Supp. 2d at 487). This requirement obligates Plaintiffs to prove that the Bank knew and intended that "the brunt of the injuries stemming from" its purported support of al Qaeda "would be felt on American soil." *Id.* (quoting *Terrorist Attacks IV*, 718 F. Supp. 2d at 480). Foreseeability of harm in the United States is insufficient. *Id.* (citing *Waldman v. PLO*, 835 F.3d 317, 339 (2d Cir. 2016)).

Even providing "indirect funding of Al Qaeda" through charities does not constitute expressly aiming intentional tortious acts at residents of the United States. *Terrorist Attacks III*, 538 F.3d at 94-95 (affirming dismissal for lack of personal jurisdiction where plaintiffs alleged defendants made "sizable contribution[s]" to charities *knowing* money would be diverted to Al Qaeda, and charities indeed "used the money to finance" 9/11 Attacks); *see also Terrorist Attacks IV*, 718 F. Supp. 2d at 487 ("The purported indirect funding of al Qaeda through the funneling of one's charitable donations is, under controlling Second Circuit law, of no jurisdictional import."). Nor can the "expressly aiming" requirement be satisfied by showing, without more, that a bank "(1) knowingly maintained bank accounts for individuals associated with al Qaeda as well as for purported front charities that aided al Qaeda, and (2) that those accounts were used for al Qaeda operations." *Terrorist Attacks VII*, 714 F.3d at 676. Plaintiffs' Averment establishes far less.

**Nexus:** To show their injuries "arise out of or relate to" the Bank's purported conduct, Plaintiffs must show that the Bank's alleged "support of al Qaeda" had a "'reasonable . . . temporal,

geographical or causal connection, or proximity to the 9/11 attacks.'" *Fed. Ins. Co.*, 2023 WL 2430381, at *11 (quoting *Terrorist Attacks IV*, 718 F. Supp. 2d at 482) (alteration in original). "Conduct that is 'too remote and attenuated' cannot support jurisdiction." *Id*. (quoting *Terrorist Attacks IV*, 718 F. Supp. 2d at 486-87). Instead, "the defendant's suit-related conduct must create a substantial connection with the forum State." *Waldman*, 835 F.3d at 335 (quoting *Walden v. Fiore*, 571 U.S. 277, 284 (2014)).

Applying this controlling law, this Court and the Second Circuit have rejected allegations and factual averments against other defendants in this MDL for failing to establish the requisite elements of intent and nexus. For instance, in granting DIB's post-discovery motion for summary judgment for lack of personal jurisdiction, this Court found insufficient that DIB "held accounts for individuals and entities involved in al Qaeda plots and provided 'routine banking services' for them," and that DIB's Chairman and members of its Sharia Board "harbored extremist views or maintained links to extremist groups." *Fed. Ins. Co.*, 2023 WL 2430381, at *12. Among DIB's purported accountholders were: a 9/11 hijacker; a "high-ranking member of al Qaeda 'in charge of most of Osama bin Ladin's money'" who "had a 'relationship' with" DIB's Chairman; and IIRO, allegedly "a front charity for al Qaeda." *Id*. at *4-5. This Court also considered, and found deficient, CIA assessments that: DIB was a "key financial conduit" for Al Qaeda that "stood out from other Islamic financial institutions because of [its] management's apparently witting involvement in the financial activities of Usama Bin Ladin's Islamic Army and other terrorist groups"; DIB's Chairman's "close friendship with bin Laden prompted" Al Qaeda members to open DIB accounts; and DIB's Chairman "personally authorized, stamped, and signed letters of credit for bin Laden associates." *Id*. at *6.

Even if true, these facts could not establish personal jurisdiction over DIB, because they merely made "clear" that "DIB's role was more akin to a 'passive conduit' through which funds were 'indirectly channeled to and from al Qaeda.'" *Id*. at *13 (citing *Terrorist Attacks IV*, 718 F. Supp. 2d at 489). The DIB plaintiffs put forward "no specific evidence that any of the accounts held by individuals or entities with links to al Qaeda provided funding for the terrorist organization's operations, let alone for the 9/11 Attacks." *Id*. at *12. Neither DIB nor any of the accountholders was designated before the 9/11 Attacks, and there was no evidence that DIB "was aware of the terrorist nature of the accountholders to whom it was providing routine banking services." *Id*. at *5, 12. Plaintiffs "offer[ed] no other support for the CIA's description of DIB management's apparently witting involvement in financing al Qaeda," nor did they show that its Chairman's actions were "anything more than standard bank policy." *Id*. at *12. And the evidence showed that DIB "offered its cooperation to the U.S. government" and was subject to regular audits and oversight by its regulator. *Id*.

Similarly, in *Terrorist Attacks IV*, this Court dismissed, again for lack of personal jurisdiction, claims against four banks that allegedly counted Bin Laden as a shareholder, maintained accounts for "individuals and entities involved in al Qaeda's plot[s]," and donated to "al Qaeda front charities." 718 F. Supp. 2d at 486. This support allegedly gave Bin Laden "funding, banking services and the financial infrastructure" to "establish al Qaeda training camps, train terrorists, and carry out terrorist attacks." *Id*. But this Court held that these contacts were "too remote and attenuated" to establish personal jurisdiction over the banks, explaining that "performing routine banking services for customers having terrorist ties, and having investors or shareholders who purportedly are sponsors of terrorism" did not satisfy the "purposeful direction" test." *Terrorist Attacks IV*, 718 F. Supp. 2d at 486-87.

**B.**    **Jurisdictional Discovery Confirms That Al Rajhi Bank Did Not Have The Requisite "Specific Intent," And That The Bank's Conduct Did Not Have Any Nexus To The 9/11 Attacks**

Plaintiffs' Averment fails to satisfy the "purposeful direction" test for jurisdiction at the first step, because Plaintiffs fail to show that Al Rajhi Bank expressly aimed intentional tortious conduct at the United States, i.e., that the Bank "specifically intended to aid al Qaeda in the commission of a terrorist attack against the United States and its citizens." *Fed. Ins. Co.*, 2023 WL 2430381, at \*10 (alterations omitted) (quoting *Terrorist Attacks IV*, 718 F. Supp. 2d at 487). The Second Circuit accepted Plaintiffs' characterization of their Amended Complaint as having alleged support "more direct and one step closer to al Qaeda" compared to other dismissed defendants, warranting jurisdictional discovery.  Summary Order 69.  But jurisdictional discovery is now complete, and it confirms that Al Rajhi Bank did not provide any "direct" services or support to Al Qaeda.  Indeed, jurisdictional discovery confirms that (1) Al Rajhi Bank did not "provide[] financial services and donations to charities that it knew financially supported al Qaeda," (2) the Bank did not "provide[] financial services to known extremist operatives," and (3) the Bank's "provision of financial services" was *not* "done with the specific intent to further al Qaeda's terrorism against the United States." *Id*. at 68.

Plaintiffs also fail, at the second step, to show that their injuries "arose from" the Bank's conduct, i.e., that the Bank's purported "support of al Qaeda" had a "reasonable . . . temporal, geographical, or causal connections, or proximity to the 9/11 attacks." *Fed. Ins. Co.*, 2023 WL 2430381, at \*11.

1.    **Jurisdictional Discovery Confirms That Al Rajhi Bank Did Not "Provide[] Financial Services And Donations To Charities That It Knew Financially Supported Al Qaeda"**

a.    **The Bank Did Not Know Of Any Alleged Financial Support For Al Qaeda By Any Charity Or Charity-Official Customer**

Plaintiffs' Averment fails to show that the Bank knew, or should have known, of any connection between any of the alleged charity "fronts" or their officials and Al Qaeda.

**Charities:**  None of the Charities identified in Plaintiffs' Averment was designated under any sanctions regime for connections to terrorism before 9/11.  ARB Aver. ¶ 40; *see also* Pls. Ex. 12 (Winer Dep. Tr.) at 57:7-12.  The Bank held accounts for Al Haramain Islamic Foundation in Saudi Arabia ("Al Haramain KSA"), which was not designated until 2008, but the Bank did not hold accounts for any Al Haramain branches.  ARB Aver. ¶¶ 41-42.  Likewise, the Bank held accounts for IIRO in Saudi Arabia ("IIRO KSA"), which was *never* designated, but not for any IIRO branches.  *Id*. at ¶¶ 54-55.  The Bank never held accounts for Muwaffaq.  *Id*. at ¶ 66. Plaintiffs do not point to any other evidence, such as public statements or other contemporaneous media sources from the relevant period, connecting any of the Bank's Charity customers to Al Qaeda before September 11, 2001.  *Id*. at ¶¶ 51, 63, 70, 76, 82, 88.

The undisputed facts also establish that, before the 9/11 Attacks, the Bank confirmed and knew that IIRO KSA and Al Haramain KSA (the Charity customers about whom Plaintiffs chose to focus their discovery efforts) were government-licensed, reputable charitable organizations doing bona fide benevolent work.  ARB Aver. ¶¶ 45-46, 57-58 (collecting licenses and information from the Bank's customer information files); *see also* Pls. Ex. 171 (Kohlmann Dep. Tr.) at 146:3-147:7 (acknowledging that IIRO provided worldwide humanitarian relief).

Plaintiffs repeatedly aver (*e.g.*, at ¶¶ 5, 73, 204, 215, 218, 273, 306, 523-30) that Al Qaeda used these charities as "fronts" to conceal any connection to terrorism, further undermining any

conclusion that the Bank somehow knew of the charities' (or their officials') alleged connections to Al Qaeda. *See Honickman v. BLOM Bank SAL*, 6 F.4th 487, 502 (2d Cir. 2021) (allegation that customers "maintained a 'cover' in public undermines the plausibility of Plaintiffs' theory that [defendant bank] understood these organizations' true nature and activities"); U.S. Amicus Br. 11 n.4 ("[A]llegations that the charities held themselves out as bona fide organizations that conducted government-sanctioned activities . . . undercut any inference that [Al Rajhi] Bank was aware of the charities' alleged support for terrorism."); Pls. Aver. ¶¶ 79, 82 (quoting Treasury Department memo stating that Al Qaeda used Al Haramain branches "for cover and concealment").

Plaintiffs argued to the Second Circuit that the Bank's knowledge of the Charities' alleged affiliations with Al Qaeda could be inferred from allegations that the Bank's former Chairman, Sulaiman bin Abdulaziz Al Rajhi, and "[s]everal other senior ARB officials also served as senior officers" of the Charities. Pls. App. Br. 14. But undisputed facts establish that Sulaiman bin Abdulaziz Al Rajhi *resigned* from the IIRO and Sanabel boards in 1992, nearly a decade before the 9/11 Attacks. Resp. to Pls. Aver. ¶¶ 547-48. Moreover, jurisdictional discovery confirms that no other Bank officer or director had any role at any of the Charities, *see* Resp. to Pls. Aver. § XIV (heading), and Plaintiffs' Averment abandons this allegation.

Plaintiffs falsely imply that the Charities were publicly implicated in terrorism *before* 9/11, averring (at ¶ 9) that the Bank carried out pre-9/11 transactions "for charities and supporters who *had been implicated* in terrorist activities" (emphasis added) and that these transactions "intensified at moments when the charities were under scrutiny for their involvement in terrorism." But the undisputed facts establish that the Charities had not "been implicated" in terrorism before 9/11, and there was no public information suggesting the Charities were under any such "scrutiny." *See, e.g.*, Pls. Ex. 44 (9/11 Commission Staff Rpt.) at 15, 116-17 (explaining that before 9/11, U.S.

officials did not "provide the Saudis with actionable intelligence about al Qaeda fundraising," and U.S. intelligence "did not rise to the level of being actionable against any specific charity").

**Charity Officials:**  Plaintiffs' Averment is egregiously misleading (at ¶ 21) in stating that the Bank had "relationships with several individual officials of those charities that *had been designated or otherwise identified* by the United States as al Qaeda supporters and financiers" (emphasis added).  The Charity officials discussed in Plaintiffs' Averment (including Aqil al Aqil, Soliman al Buthe, and Abd al Hamid Sulaiman al Mujil) were not designated under any sanctions regime for connections to terrorism until years after the 9/11 Attacks.  Resp. to Pls. Aver. ¶ 21. Just as the Bank knew the Charity customers to be government-licensed, reputable charitable organizations, the Bank knew these Charity officials for their roles in those Charities.  Resp. to Pls. Aver. § 5 (heading).  And just as Plaintiffs do not point to any other evidence connecting any of the Charity customers to Al Qaeda before 9/11, Plaintiffs likewise do not put forward any evidence connecting the Charity officials to Al Qaeda before the 9/11 Attacks.

### b.    The Bank Did Not Make Any Donation To The Charities, Let Alone Any Donation That Supported The 9/11 Attacks

Plaintiffs have abandoned their much-ballyhooed allegations (*see* Pls. App. Br. 12, 15, 40, 48, 56; Pls. App. Reply 21) that the Bank contributed its own "zakat and haram funds" to the Charities and "other al Qaeda fronts."  Undisputed facts establish that the Bank did not make *any* donation to the headquarters or any branch of Al Haramain, IIRO, or Muwaffaq (the Charities about which Plaintiffs sought discovery from the Bank).  ARB Aver. ¶¶ 102-04.  And Plaintiffs put forward no evidence showing any donations from the Bank to any of the other Charities.  ARB Aver. ¶ 105.  In another significant retreat, Plaintiffs do not aver that Al Rajhi Bank made *any* donation to *any* charity that was a purported an Al Qaeda "front," much less any donation that supported the financing, planning, or carrying out of the 9/11 Attacks.  ARB Aver. ¶¶ 106-07.

2.    **Jurisdictional Discovery Confirms That Al Rajhi Bank Did Not Provide Financial Services, Let Alone "Direct Support," To "Known Extremist Operatives"**

Undisputed facts establish that the Bank did not provide any services to any "known extremist operatives" during the relevant period.  The Bank did not provide any services to Osama Bin Laden, because his assets and accounts in Saudi Arabia were long-since frozen in 1994.  The Bank did not know, nor could it have known, that any of the future hijackers who held accounts at the Bank were affiliated with terrorism.  Plaintiffs' Averment abandons their argument to the Second Circuit that the Bank provided "direct," "operational" support to the hijackers.  Instead, Plaintiffs merely offer the vague conclusion that the Bank had "connections" to the hijackers, but this conclusion is belied by the facts, and in any event, fails to show any "specific intent" by the Bank.

a.    **None Of The Bank's Customers Was A "Known Extremist Operative"**

Plaintiffs' Averment points out that Bin Laden opened accounts at the Bank in 1991, but Plaintiffs' Averment is yet again egregiously misleading because it omits the undisputed fact that Bin Laden's accounts had been frozen since at least 1994, when the Saudi government "fr[oz]e his financial assets and revoke[d] his citizenship."  Pls. Ex. 40 (9/11 Commission Rpt.) at 57; *see also* ARB Ex. 8 (Ltr. fr. Al Rajhi Bank to SAMA) at ARB-39559 (showing all Bin Laden accounts "blocked").  Plaintiffs' own experts concede that Bin Laden did not use, and could not have used, his accounts at all after his assets were frozen in 1994.  *See* Pls. Ex. 12 (Winer Dep. Tr.) at 53:5-55:2; Pls. Ex. 171 (Kohlmann Dep. Tr.) at 17:1-25.  Moreover, Bin Laden was not designated until 1998, years after his Al Rajhi Bank accounts were frozen.  *See* ARB Ex. 73 Exec. Order No. 13,099, 63 Fed. Reg. 45,167 (Aug. 20, 1998).  Plaintiffs offer no evidentiary support for the conclusory allegations (at ¶¶ 271-72) that Bin Laden was "already advocating for jihad against the

United States" or that his "status" was "well known in Saudi Arabia and to ARB and its principals" in 1991. To the contrary, the admissible, undisputed evidence establishes that Bin Laden did not issue his first "public fatwa" against the United States until 1996. Pls. Ex. 40 (9/11 Commission Rpt.) at 59; *see also* Pls. Aver. ¶ 57 (noting Bin Laden's 1996 "public fatwa"); Pls. Ex. 44 (9/11 Commission Staff Rpt.) at 77 (noting Bin Laden was *not* included on January *1995* U.S. terrorist sanctions list).

None of the hijackers, including those who held accounts at the Bank, was designated before the 9/11 Attacks. ARB Aver. ¶ 95. And the Bank had no reason to be suspicious of the hijackers who held accounts at the Bank before the 9/11 Attacks. *See, e.g.*, *id*. at ¶ 94; Pls. Ex. 4 (9/11 Commission Staff Rpt.) at 140-41 ("No one at SunTrust or any other financial institution thought, or had any reason to think, that the hijackers were criminals, let alone terrorists bent on mass murder, and no financial institution had any reason to report their behavior to the government.").

Plaintiffs rely heavily on CIA reports, which are inadmissible under the record here for reasons not established in the *DIB* case. *See* Resp. to Pls. Aver. § VI (heading). Even if admitted, those reports likewise fail to show the Bank knew "extremist operatives" were using the Bank's services. Instead, those reports make clear that the CIA — after years of intelligence gathering — never found that the Bank, its senior officers, or Al Rajhi family members knew the Bank was "used by" terrorists, much less Al Qaeda. Critically, the CIA reached no conclusions about *the Bank's* knowledge or intent. And the CIA acknowledged its own uncertainty about the Al Rajhi family, stating that "Al Rajhi financial ties to Islamists is inconclusive," and the use of the Bank by extremists "probably denotes convenience rather than Al rajhi family involvement in financing radical groups." Pls. Ex. 9 at CIA_744; *see also id*. ("The bank's dominance of the foreign

remittance business, coupled with strong financial links to Africa and the Asian subcontinent, probably make ARABIC the *only choice* for transferring funds to some regions."); Pls. Ex. 10 at CIA_SUB_003 ("Extremists use ARABIC because its Islamic banking principles appeal to them and because it is one of the few banks with branches in outlying areas of Saudi Arabia, as well as good correspondent connections in remote locations abroad"). And indeed, the FBI concluded its twenty-year investigation into the 9/11 Attacks without ever charging the Bank, any Bank officer or director, or any Al Rajhi family member. *See* ARB Ex. 7 (May 27, 2021 FBI EC) at 0011.

### b. The Bank Did Not Provide "Direct Support" To The 9/11 Hijackers

Contrary to Plaintiffs' assertions to the Second Circuit, the undisputed facts establish that Al Rajhi Bank did not provide "direct support" to the 9/11 hijackers. Plaintiffs' Averment abandons these unsupported assertions. Instead, Plaintiffs aver (at ¶ 489) attenuated and unsupported "connections" between the Bank and two individuals whom Plaintiffs allege were "in close contact with" the hijackers and their "support network": Towayan al Towayan and Saleh al Hussayen. But Plaintiffs fail to show that either individual links the Bank to Al Qaeda or the 9/11 Attacks.

**Towayan:** Even crediting Plaintiffs' incorrect averments (at ¶¶ 489-502) that the Bank "sent" Towayan (then a Bank employee on leave) to the United States "to study English," and that while there, Towayan had "contacts" with the hijackers and their "support network," these allegations do not show any "specific intent" by the Bank. Plaintiffs do not aver that (i) the Bank "sent" Towayan to the United States with the intent to support any acts of terrorism; (ii) the Bank directed him to contact the hijackers or their "support network," or even knew of any contacts Towayan had in the United States; or (iii) Towayan provided any support to the hijackers, much less support received from or directed by the Bank. Plaintiffs (at ¶¶ 494-96) point to transactions

–34–

between Towayan and his supervisor at the Bank and conclude without support that these transactions were "suspicious," but Plaintiffs do not aver that these transactions were for terrorism, much less attacks on the United States.

Besides being legally deficient, Plaintiffs' conclusions find no support in the undisputed facts, which establish that:

- Towayan was not "sent to the United States" by Al Rajhi Bank. Resp. to Pls. Aver. ¶ 491. Rather, the Bank approved Towayan's request for full-time, six-month leave to study English, on the express condition "that all costs related to travel, accommodation, living, and study are at his personal expense." Pls. Ex. 161 (Approval of Request for Leave) at ARB-40369. Neither the request for Towayan's leave nor the Bank's approval even mention the United States. *Id.*

- Towayan was not acting in his capacity as a Bank employee while in the United States; rather, he was on leave from his role and responsibilities at the Bank. Resp. to Pls. Aver. ¶ 491. Plaintiffs point to no evidence showing the Bank knew of, much less directed, any contacts Towayan may have had while in the United States.

- Contrary to the inaccurate hearsay contained in the preliminary FBI report on which Plaintiffs rely (at ¶¶ 490, 501), the FBI's full reporting, along with the 9/11 Commission Report, make clear that Towayan did *not* arrive at the San Diego apartment complex until *after* the hijackers *had left*. *See* Resp. to Pls. Aver. ¶ 490; *see also* Pls. Ex. 209 (FBI Rpt.) at 2858-59 (describing rental records that show Towayan lived in San Diego apartment complex beginning April 6, 2001); *but see* ARB Ex. 11 (FBI Rpt.) at 2209 (rental records showing that Al Qaeda operatives Mihdar and Hazmi vacated apartment complex in May 2000); *id*. ("No records have been found that confirm Hanjour's presence at the apartment complex."); Pls. Ex. 40 (9/11 Commission Rpt.) at 220 (stating that Mihdar moved back to Yemen on June 9, 2000); *id*. at 223-27

(explaining that Hanjour arrived in Falls Church, Virginia on April 4, 2001, two days *before* Towayan arrived in San Diego). Plaintiffs persist in making misleading references to the preliminary FBI report, despite being repeatedly put on notice that the full record establishes that Towayan could not have crossed paths with the hijackers in San Diego. *See, e.g.*, Objs. to Pls. 2d Set of Requests for Production No. 13 (Apr. 24, 2023), ECF No. 9055-1; Opp. to Pls. 3d Mot. to Compel 4-5 (Apr. 24, 2023), ECF No. 9055; Mot. for Protective Order 3-4 (Apr. 19, 2023), ECF No. 9038.

- The Bank did not provide any support to Towayan during his time in the United States (while he was on leave from his role and responsibilities, and all costs were "at his personal expense"), much less support that reached the hijackers. Resp. to Pls. Aver. ¶¶ 491, 497-98, 500. Plaintiffs point to apparent loans to Towayan from his supervisor's personal funds, but the undisputed facts establish that Towayan returned the funds, and this relationship of borrowing and repaying money both predated and continued after Towayan's travel to the United States. *See* Resp. to Pls. Aver. ¶¶ 493-96, 499. Plaintiffs provide no evidence that the Bank knew about these loans, much less that the funds were used to support the hijackers.

- Towayan was never designated, and the FBI concluded its investigation without charging Towayan. *See, e.g.*, ARB Ex. 7 (May 27, 2021 FBI EC) at 0011; Pls. Ex. 44 (9/11 Staff Commission Rpt.) at 138 (stating "the FBI's investigation has not revealed any evidence that any person in the United States knowingly provided any funding to the hijackers," and "[e]xtensive investigation" by the 9/11 Commission staff "revealed nothing to the contrary").

**Hussayen:** The undisputed facts establish that Hussayen, previously an unpaid member of the Bank's Sharia Board, had no position or affiliation with Al Rajhi Bank after 1999. Resp. to Pls. Aver. ¶ 503. Neither the Bank nor any of its officers had any knowledge of Hussayen's

September 2001 trip, much less any role in facilitating his travel. Resp. to Pls. Aver. § XII (heading); *id*. at ¶ 503. Plaintiffs' speculation (at ¶ 504) that "the focus of [Hussayen's] visit indicates that his trip related to the U.S.-based SAAR Foundation's activities" is belied by Plaintiffs' own averment (at ¶ 503) that Hussayen visited the offices of the "Muslim World League" and the "World Assembly of Muslim" (presumably "World Assembly of Muslim *Youth*"), *not* the SAAR Foundation.

Putting aside the lack of *any* connection between the Bank and Hussayen's 2001 trip to the United States, Plaintiffs also do not aver that Hussayen had any contact with, or provided any support to, the hijackers. Plaintiffs' averment that Hussayen "suddenly switched hotels" on September 10, 2001 is cut out of whole cloth; the report that Plaintiffs cite does not say that Hussayen "switched hotels" at all. Pls. Ex. 166 ("The 28 Pages") at 430; Resp. to Pls. Aver. ¶ 505.

### 3. Jurisdictional Discovery Confirms That Al Rajhi Bank Did Not Provide Financial Services With The "Specific Intent To Further Al Qaeda's Terrorism Against The United States"

Because Plaintiffs' Averment fails to show that the Bank knew that any customer was affiliated with terrorism or Al Qaeda, Plaintiffs necessarily fail to show that by providing financial services to those customers, the Bank somehow intended to support Al Qaeda's terrorism against the United States. *See Fed. Ins. Co.*, 2023 WL 2430381, at *12 ("There is no evidence that DIB . . . was aware of the terrorist nature of the accountholders to whom it was providing routine banking services."). This Court need look no further. Nevertheless, Plaintiffs' other attempts to show the Bank's purported knowledge and intent also fail. Jurisdictional discovery confirms that the Bank provided only routine, generally available banking services to its customers, undermining any inference of "specific intent." Jurisdictional discovery further confirms that the Bank's former Chairman, in making charitable donations, had no intent to support terrorism against the United States, much less "specific intent" that could be imputed to the Bank.

### a.    The Bank Provided Only Routine Banking Services To Its Customers

Plaintiffs' Averment fails to put forward evidence that the Bank provided any non-routine services to its customers, much less in a manner that shows that the Bank expressly aimed intentional, tortious conduct at the United States. *See Fed. Ins. Co.*, 2023 WL 2430381, at \*12 (explaining that "[holding] accounts for individuals and entities involved in Al Qaeda plots and provid[ing] 'routine banking services' for them" cannot establish personal jurisdiction); *see also Twitter*, 598 U.S. at 498-99 (holding provision of "generally available" services insufficient to show "culpable" conduct for ATA aiding-and-abetting liability).

**Bin Laden and hijackers:**  Because Bin Laden's accounts at the Bank were frozen *for years* before the 9/11 Attacks, the undisputed facts establish that the Bank did not provide him with any services at all.  ARB Aver. ¶¶ 91-93; Pls. Ex. 12 (Winer Dep. Tr.) at 53:5-55:2; Pls. Ex. 38 (Kohlmann Dep. Tr.) at 17:1-25, 208:8-209:15.  Plaintiffs aver (at ¶ 265) that the Bank (with millions of customers) maintained accounts for seven of the nineteen 9/11 hijackers, but do not even try to show that the Bank provided unusual services to any of those individuals.   The hijackers' accounts had low balances and minimal activity during the relevant period.  ARB Aver. ¶ 96.

**Charity customers:**  Plaintiffs aver (at ¶¶ 207, 212-13) that Al Rajhi Bank "maintained and operated" accounts for Al Haramain KSA and IIRO KSA and "facilitated deposits" into those accounts, but do not attempt to show the Bank provided non-routine services to these customers.  At most, Plaintiffs allege that the Bank was "used by" purported charity "fronts" as a "financial conduit" for routine banking services, like holding accounts and making transfers.  *See, e.g.*, Pls. Ex. 9 at CIA_743 (reporting Bank "*apparently* has been a *conduit for funding* the Mujahaddin since the early 1990s"); Pls. Ex. 10 at CIA_SUB_002 (extremists "have used" Bank "as a

conduit"). This reporting, even if true, cannot establish jurisdiction over the Bank. *See Fed. Ins. Co.*, 2023 WL 2430381, at *13 (finding no personal jurisdiction where "DIB's role was more akin to a 'passive conduit' through which funds were 'indirectly channeled to and from al Qaeda'"). Nor does the number of accounts that IIRO-KSA and Al Haramain-KSA held at the Bank indicate, as Plaintiffs incorrectly suggest (e.g., at ¶ 6), that the Bank's services were out of the ordinary. In fact, no Saudi regulation limited the number of accounts a charity or individual could hold at Saudi banks pre-9/11, and even after 9/11, SAMA continued to permit charities to hold multiple "secondary accounts" for different charitable projects. *See* ARB Ex. 2 (Hobayb Rpt.) 24-25 ("The fact that the charities — like some commercial entities — held multiple accounts at multiple banks was normal, especially considering the specific needs of charities."); Resp. to Pls. Aver. § 9 (heading).

**Charity-official customers:** Plaintiffs dedicate 119 paragraphs of their Averment (including in §§ II, VIII-XIV) to discussing the Bank's alleged failure to stop certain individual charity officers' transactions that Plaintiffs assert were "red flags" for money laundering; but even if this disputed conclusion were true, such purported inaction does not amount to intentional, tortious conduct by the Bank expressly aimed at the United States. *See Twitter*, 598 U.S. at 489, 505 (holding that alleged assistance to FTO through "omissions, inactions, or nonfeasance" cannot show "affirmative and culpable misconduct").

Moreover, Plaintiffs do not show that the referenced Charity officials (Aqil, Buthe, and Mujil) or the Charities themselves were publicly affiliated with terrorism before the 9/11 Attacks. Plaintiffs thus fail to show that, even if the Bank had knowingly failed to stop these supposed red-flag transactions, the Bank was knowingly supporting *terrorism*. *See Honickman*, 6 F.4th at 499 (holding that "general awareness" prong of ATA aiding-and-abetting liability requires that

intermediary customers were "closely intertwined with [FTO's] violent terrorist activities"). Nor do Plaintiffs even try to show that any of the supposed red-flag transactions was used to support attacks against the United States, much less that in failing to stop these transactions, the Bank was "expressly aiming" its own conduct at the United States.

*Aqil (Al Haramain KSA)*: Plaintiffs' Averment is incorrect and lacks support in concluding (at ¶¶ 234-35, 347-65) that the Bank allowed Aqil to use his account for irregular transactions that violated AML standards and Bank policies. Plaintiffs erroneously conclude (at ¶ 234) that large cash transactions through Aqil's account necessarily "bear[] hallmarks of money laundering." In fact, cash transactions were the norm in Saudi Arabia during the relevant period, when the country's economy was almost entirely cash-based. Resp. to Pls. Aver. ¶ 234; *see also* ARB Ex. 2 (Hobayb Rpt.) at 30 (explaining prevalence of cash transactions in Saudi society during 1990s, especially for charities); Pls. Ex. 1 (Abdullah al Rajhi Dep. Tr.) at 218:7-17 (explaining that during the relevant period, Saudi Arabia was "very much [a] cash transaction country."). Al Rajhi Bank knew Aqil was a high-ranking official of Al Haramain, which was widely recognized during the relevant period as a reputable, government-licensed charity. ARB Aver. ¶¶ 44-46; *see also* ARB Ex. 2 (Hobayb Rpt.) at 30. Indeed, the Bank knew that Saudi government officials had explicitly urged potential donors to provide aid *directly* "to Aqil" for an Al Haramain fundraising effort. ARB Ex. 5 (Ltr. from KSA Gen. Pres. of Scholarly Research) at ARB-38775; *see also* Resp. to Pls. Aver. § VIII. Given that Al Haramain-KSA routinely handled countless cash donations dedicated to its worldwide charitable efforts, such large cash transactions would not have raised red flags. ARB Ex. 2 (Hobayb Rpt.) at 30 ("For Saudi banking auditors such as myself, other individuals familiar with Saudi society, large cash transactions in accounts associated with

charities would not have raised alarms before 9/11."); *id.* (explaining that before 9/11, charities in Saudi Arabia often provided their officials with charity funds to disburse).

Plaintiffs aver no support for their conclusion (at ¶¶ 362, 365, 370) that these transactions violated Saudi law. *See* ARB Ex. 2 (Hobayb Rpt.) at 31 ("Winer does not point to any evidence or context that would lead me to believe that the transactions in Aqil's accounts were used for any illegal purposes, let alone terrorist financing."). In any event, an alleged failure to flag purportedly "irregular" transactions by an official of a Saudi charity is not sufficient to show any specific intent to support *terrorism* against *the United States*. *See Twitter*, 598 U.S. at 489, 505.

Plaintiffs also point to requests from Aqil and Al Haramain KSA to convert certain individual accounts to charity accounts (*see* Pls. Aver. ¶¶ 328-32), but the undisputed facts establish that the Bank followed its routine procedures in processing these requests. *See* Resp. to Pls. Aver. ¶¶ 330-31; *see also* Pls. Ex. 3 (Galloway Dep. Tr.) at 176:16-19, 180:2-10, 189:25-190:8 and Errata at 176:19, 180:2-10 (testifying that Bank employees followed procedures in Al Rajhi Bank's Branch Manual for processing account-name-conversion requests, including by seeking approval from Deputy Director General of Banking Group); *see also* Pls. Ex. 188 (Al Rajhi Bank Branch Manual) at ARB-165, 173 (setting forth account-name-change requirements).

*Buthe (Al Haramain)*: Plaintiffs' Averment incorrectly asserts (at ¶¶ 370-71) that transactions through Buthe's accounts involving traveler's checks were "abnormal" and "suspicious." The use of traveler's checks was a common and normal banking transaction before the 9/11 Attacks. Resp. to Pls. Aver. ¶¶ 370-71; *see also* ARB Ex. 2 (Hobayb Rpt.) at 24 (explaining that the use of traveler's checks was not considered abnormal activity during the relevant period). Besides, the undisputed facts establish that the Bank knew Buthe was an officer

of Al Haramain KSA, a government-licensed and reputable charity that was not designated before the 9/11 Attacks. Resp. to Pls. Aver. ¶ 360; ARB Aver. ¶¶ 44-47.

*Mujil (IIRO)*: Plaintiffs' Averment asserts (at ¶ 341) that Mujil used Al Rajhi Bank accounts held in his name "to carry out financial activities of IIRO, again with the knowledge and active assistance of ARB," but the undisputed facts establish that the Bank knew Mujil was an officer of IIRO KSA, a government-licensed and reputable charity that was not designated before the 9/11 Attacks (or since). Resp. to Pls. Aver. ¶ 240; ARB Aver. ¶¶ 56-61. Based on this knowledge, the Bank would have had no reason to find cash transactions by Mujil or IIRO KSA abnormal, and processing these transactions would have been routine. *See id.*; *see also* ARB Ex. 2 (Hobayb Rpt.) at 23 ("An individual who was a principal or officer of a charity, and was not recognized to be on any sanctions list, would have the authority to authorize signatures on their charities' accounts. I do not see any violation by the Bank here. I only see routine banking services.").

> **b. The Bank's Former Chairman Did Not Make Charitable Donations With The Intent To Support Terrorism, And His Donations Do Not Have Any Nexus To The 9/11 Attacks**

Plaintiffs' allegations that the Bank's former Chairman, Sulaiman bin Abdulaziz Al Rajhi, made donations, including through his charitable foundations, to charity "fronts," and that the Bank processed those transactions, cannot establish that he, let alone the Bank, expressly aimed intentional, tortious conduct at the United States. *Terrorist Attacks III*, 538 F.3d at 94-95 (finding no personal jurisdiction even where defendants *knew* donations would be diverted to Al Qaeda); *Terrorist Attacks IV*, 718 F. Supp. 2d at 487 (explaining that alleged "indirect funding of al Qaeda" through "charitable donations is, under controlling Second Circuit law, of no jurisdictional import"). Jurisdictional discovery confirms that the "front" charities were not designated or

otherwise publicly affiliated with terrorism, and that neither the Bank nor its former Chairman had reason to know of any such affiliation. *See supra* § II.AB.2.a.

Furthermore, Sulaiman bin Abdulaziz Al Rajhi's donations, including through the U.S.-based SAAR Foundation and the Saudi-based Charitable Foundation, cannot be imputed to the Bank. This Court has held that "[b]eing a founder, officer, director or administrator of a foreign or domestic charitable organization that allegedly provides material support to al Qaeda, cannot alone serve as a basis to impute the acts of the organization upon the individual defendant himself, and certainly not upon a company owned by a defendant having no direct relationship to the charity." *Terrorist Attacks IV,* 718 F. Supp. 2d at 483-84. And whatever purported knowledge Plaintiffs speculate Sulaiman bin Abdulaziz Al Rajhi may have had cannot be imputed to the Bank, because Plaintiffs do not aver that any such knowledge was "gained within the scope of his activity with respect to [Al Rajhi Bank]." *Fid. Bank, Nat'l Ass'n v. Avrutick,* 740 F. Supp. 222, 237 (S.D.N.Y. 1990) (rejecting allegations that any knowledge gained by director of surety corporation could be imputed to a separate bank of which he was board chair and COO); *see also Terrorist Attacks I*, 349 F. Supp. 2d at 833 ("[A]llegations concerning the Al Rajhi family cannot support a claim against Al Rajhi Bank because there is no allegation that the family members were acting in furtherance of Al Rajhi Bank business.").

Plaintiffs also fail to show that the Bank, in processing the charitable donations, knew or intended that any of the funds would be diverted to Al Qaeda or to support terrorism. Plaintiffs have no evidence suggesting that the former Chairman shared any such purported knowledge with the Bank or directed the Bank to take any action in accordance with any such purported intent. *See* Resp. to Pls. Aver. § IV (heading). And the undisputed facts further establish that Al Rajhi Bank had no affiliation with the U.S.-based SAAR Foundation or the Saudi-based Charitable

Foundation. Resp. to Pls. Aver. § IV (heading); *see also* Pls. Ex. 3 (Galloway Dep. Tr.) at 278:23-279:7 ("None of [the Charitable Foundation officials] had any role at the bank, and the foundation has never been a parent, subsidiary, or affiliate of the bank."); *see* Nov. 22, 2021 Order 15-16 (noting Plaintiffs have not alleged "any direct connection between ARB and the SAAR Network" and finding a "lack of a reasonable connection between ARB and the SAAR Network").

Besides, Plaintiffs have failed to aver any facts sufficient to show that Sulaiman bin Abdulaziz Al Rajhi or his charitable foundations donated money to any charity knowing or intending that the donation would be used to support Al Qaeda or any terrorist attack on the United States, including the 9/11 Attacks. ARB Aver. ¶ 143. To the contrary, jurisdictional discovery confirms that Sulaiman bin Abdulaziz Al Rajhi: has never supported Al Qaeda or terrorism at all; is one of the world's most generous philanthropists, who has given billions of dollars to *hundreds* of charities around the world over many decades; and was shocked and saddened by the 9/11 Attacks, which he viewed as a terrible crime. *Id.* at ¶¶ 1, 130-34. Indeed, this Court has already dismissed all claims against Sulaiman bin Abdulaziz Al Rajhi for lack of personal jurisdiction based on nearly identical allegations to those in Plaintiffs' Averment. *Terrorist Attacks IV*, 718 F. Supp. 2d at 485 (holding that allegations of "official roles with suspect charities," "associations with individuals and entities designated as terrorist," and "personal donations to purported al Qaeda charities" failed to "demonstrate that [Sulaiman bin Abdulaziz Al Rajhi] personally engaged in tortious conduct expressly aimed at the United States"), *aff'd Terrorist Attacks VII*, 714 F.3d at 675-76.

Plaintiffs' Averment also fails to put forward any evidence that shows that either the U.S.-based SAAR Foundation or the Saudi-based Charitable Foundation ever made any donation with the intent to support Al Qaeda. To the contrary, the undisputed facts establish that after a thorough

investigation into the SAAR Foundation, U.S. investigators and prosecutors declined to designate, charge, or take any action against the SAAR Foundation or any SAAR Foundation officer, director, or employee.  *See* ARB Ex. 4 (Lormel Rpt.) at 33; *see also* Pls. Ex. 44 (9/11 Commission Staff Rpt.) at 24 (explaining "[t]he United States is not, and has not been, a substantial source of al Qaeda funding," and "there is little hard evidence of substantial funds from the United States actually going to al Qaeda").  And this Court has already dismissed claims against the so-called "SAAR Network" defendants for failure to state a claim.  *See also* Nov. 22, 2021 Order 16 (recounting dismissals and noting "weak allegations against the SAAR Network itself").

Plaintiffs are so lacking in evidence of any "specific intent" on the part of the former Chairman, much less the Bank, that they ignore this Court's repeated holdings and rehash the long-discredited, so-called "Golden Chain" document.  *See* Pls. Aver. ¶¶ 46, 65, 66, 68, 126, 131, 180, 226, 395, 513; *but see Terrorist Attacks I*, 349 F. Supp. 2d at 818 (disregarding alleged "Golden Chain" list as not probative of "involvement" of purported individuals on list "in a terrorist conspiracy culminating in the September 11 attacks," and as "not demonstrat[ing] that [they] purposefully directed [their] activities at the United States"); *id*. at 817 ("[W]ith no indication of who wrote the list, when it was written, or for what purpose, the Court cannot make the logical leap that the document is a list of early al Qaeda supporters."); *Terrorist Attacks IV*, 718 F. Supp. 2d at 482 ("[E]ven if the document is in fact what plaintiffs purport it to be, it alone does not render those listed therein subject to the jurisdiction of this Court under specific jurisdictional theories."); *id*. at 485 (holding "reference to 'al Rajhi' on the Golden Chain document" not to be "of any probative significance in establishing jurisdiction over [Al Rajhi family-member] defendants").  And the undisputed facts establish that the list, for whatever little it is worth, does not name the Bank, Sulaiman bin Abdulaziz Al Rajhi, or even "Rajhi," but properly translates to "*Raji*," an

–45–

entirely different name in Arabic. Resp. to Pls. Aver. ¶ 65; ARB Ex. 54 (providing accurate, certified translation of so-called "Golden Chain" document).

Plaintiffs also obscure the record in averring (at ¶¶ 260-61, 546) that donations were made from "Abdul Rahman Al Rajhi" to Aqil, a blatant attempt to mislead the Court into believing those donations were made by Abdulrahman *Abdullah* Al Rajhi, an officer of the Saudi-based Charitable Foundation. As the Bank's expert has already explained, those donations were made by "Abdulrahman *Abdulaziz* Al Rajhi," a different person with no alleged connection to the Saudi-based Charitable Foundation or Sulaiman bin Abdulaziz Al Rajhi, much less the Bank. *See* ARB Ex. 2 (Hobayb Rpt.) at 31-32.

### 4. Jurisdictional Discovery Confirms That Plaintiffs' Injuries Did Not "Arise From" Or "Relate To" Services Provided By The Bank Or Donations Provided By Al Rajhi Family Members

Putting aside allegations of the Bank's intent, Plaintiffs also fail to establish personal jurisdiction because they do not aver facts showing that their injuries "arise from" or "relate to" any service provided, or donation made, by Al Rajhi Bank or any Al Rajhi family member.

#### a. Plaintiffs Do Not Trace A Single Transaction Through Al Rajhi Bank To The 9/11 Attacks

Plaintiffs' Averment does not trace a single transaction from Al Rajhi Bank to any plot of terrorism against the United States, including the 9/11 Attacks. *See Fed. Ins. Co.*, 2023 WL 2430381, at *12 (dismissing where plaintiffs put forward "no specific evidence that any of the accounts held by individuals or entities with links to al Qaeda provided funding for the terrorist organization's operations, let alone for the 9/11 Attacks"). Plaintiffs make generalized, conclusory allegations that the Bank provided services to supposed Al Qaeda "fronts," "sponsors," and "financial facilitators" in the Middle East, Europe, and Asia. *See, e.g.*, Pls. Aver. ¶¶ 5-10. Those allegations are baseless, but even if credited, such "[g]eneralized allegations that a defendant

provided financial or other material support to al Qaeda, without the reasonable inference of the temporal, geographical or causal connection, or proximity to the 9/11 attacks, is an insufficient basis for the Court's exercise of jurisdiction over a foreign defendant." *Terrorist Attacks IV*, 718 F. Supp. 2d at 482. Plaintiffs likewise fail to trace any donation made by Sulaiman bin Abdulaziz Al Rajhi, his charitable entities, or any Al Rajhi family member to Al Qaeda, much less the 9/11 Attacks.

**Charity customers:** Plaintiffs have no evidence tracing any transaction from any of the Bank's Charity customers to Al Qaeda, much less for the 9/11 Attacks. ARB Aver. ¶¶ 53, 65, 72, 78, 84, 90, 108-09. Instead, Plaintiffs aver, at most, that funds from the Charity accounts went to the Charities' branches located in conflict zones, like Bosnia and Chechnya, and some of those finds were later diverted to extremists for use in those conflict zones. *See* Resp. to Pls. Aver. § V (heading). Plaintiffs have no evidence showing that any transaction made via the Bank to the Charities' overseas operations, including in conflict zones, went to Al Qaeda and then reached the United States, let alone for the 9/11 Attacks. *Id.*

**Charity-official customers:** Likewise, Plaintiffs have no evidence that any transaction from any Charity official's account was used in planning, carrying out, or financing the 9/11 Attacks. *See* Resp. to Pls. Aver. ¶ 21. Instead, Plaintiffs aver that funds from the Charity officials' accounts went to the same conflict areas where the Charities were operating — *not* to the United States, or for the 9/11 Attacks. *See* Pls. Aver. ¶ 235 (speculating that Aqil collected funds for "freedom fighters" in "Afghanistan, Bosnia, Chechnya, Kosovo, and Somalia"); ¶ 238 (averring that Buthe's financial support went to Chechnya); ¶ 484 (same).

Plaintiffs misrepresent the facts in desperate attempts to show guilt-by-association — attempts that only highlight Plaintiffs' dearth of evidence connecting any Bank conduct to the 9/11

Attacks.  For example, Plaintiffs aver (at ¶¶ 243-45) that *in 1987* the Bank opened an account for an "IIRO official" named Mohamed Khalifa, Khalifa granted power of attorney to "Mohammed bin Laden, a relative of Bin Laden," and the account opening was "specifically approved by Abdullah al Rajhi."  Plaintiffs do not allege that this account was used for IIRO purposes, the account was active in the relevant period, the Bin Laden "relative" granted power of attorney had any involvement in terrorism, this account had *any* connection to any terrorist activity, or there was any reason for the Bank to refuse to open the account.  Plaintiffs misleadingly give the false impression that the Bank's Chairman, Abdullah bin Sulaiman Al Rajhi, approved this account opening, even though the documents clearly show the power of attorney was approved by a branch manager named "Abdullah *A*. Al Rajhi," a different person entirely.  *See* Resp. to Pls. Aver. ¶¶ 243-44.

**Bin Laden and hijackers:**  Because Bin Laden's accounts were frozen by 1994, no nexus exists between those accounts and the 9/11 Attacks.  ARB Aver. ¶ 111.  Plaintiffs do not aver that any transaction in the hijackers' accounts was used to plan or carry out the 9/11 Attacks.  *See* Resp. to Pls. Aver. ¶ 265.  The evidence shows just two transactions, totaling SAR 875.59, or U.S. $233.43, in the hijackers' Al Rajhi Bank accounts while they were in the United States.  ARB Aver. ¶ 96.  By contrast, the 9/11 Staff Report concluded that the 9/11 plot "cost al Qaeda somewhere in the range of $400,000-500,000, of which approximately $300,000 passed through the hijackers' bank accounts in the United States."  Pls. Ex. 44 at 3.  As Plaintiffs effectively acknowledge by leaving the two transactions out of their Averment, such minimal activity does not show a "substantial connection" between the Bank's "suit-related conduct" and the United States, and cannot show that Plaintiffs' injuries "arose out of" the Bank's purported conduct.  *See Waldman*, 835 F.3d at 335 (quoting *Walden*, 571 U.S. at 284).

–48–

           **b.**       **Plaintiffs Do Not Trace A Single Donation From The Bank Or Any Al Rajhi Family Member To The 9/11 Attacks**

Private donations made by Sulaiman bin Abdulaziz Al Rajhi or other Al Rajhi family members cannot establish a nexus between Plaintiffs' injuries and *the Bank's* conduct, *see supra* § II.B.3.b, but in any event, Plaintiffs do not trace a *single* transaction from Sulaiman bin Abdulaziz Al Rajhi, the U.S.-based SAAR Foundation, the Saudi-based Charitable Foundation, or any Al Rajhi family member to the 9/11 Attacks. Plaintiffs point (at Pls. Aver. § ¶¶ 248-52) to donations from Sulaiman bin Abdulaziz Al Rajhi and his charitable entities to Al Haramain, but do not trace any donation to this government-licensed, well-known charity to *Al Qaeda*, let alone to the 9/11 Attacks. Plaintiffs' reliance on CIA reports discussing purported donations by Al Rajhi "family members" (of whom the CIA reported there were more than 700 male members in 2003, *see* Pls. Ex. 10 at CIA_SUB_003) are also unavailing, because the reports do not trace any such donation to Al Qaeda, much less the 9/11 Attacks.

           **c.**       **Plaintiffs Do Not Trace A Single Transaction Through Al Rajhi Bank's U.S. Correspondent Account To The 9/11 Attacks**

In a desperate measure, Plaintiffs now appear to be relying on a fallback theory of jurisdiction based on correspondent-account usage. Plaintiffs have never raised this theory before, and it is not within the scope of the Second Circuit's remand. Nonetheless, Plaintiffs cannot establish personal jurisdiction under this theory either.

To establish jurisdiction based on U.S. correspondent accounts under New York's long-arm statute, Plaintiffs must show that their injuries "arose from" the Bank's business activity in the state. N.Y. C.P.L.R. § 302(a)(1); *see Licci v. Lebanese Canadian Bank,* 732 F.3d 161, 168 (2d Cir. 2013). The long-arm statute thus requires showing that the Bank "used an actual, specific transaction through a New York correspondent account in the course of bringing about the injuries

on which the claims are predicated." *Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 130, 132 (2d Cir. 2022). Plaintiffs cannot satisfy this requirement with "general allegations of how [Al Qaeda] used money." *Przewozman v. Qatar Charity*, No. 20-cv-6088, 2023 WL 2562537, at *13 (E.D.N.Y. Mar. 17, 2023). Nor is it sufficient to show "transfers on behalf of" entities or individuals allegedly linked to Al Qaeda, without showing a substantial relationship between the transfers and the attacks at issue. *Est. of Henkin v. Kuveyt Turk Katilim Bankasi A.S.*, No. 19-cv-5394, 2023 WL 4850999, at *3-4 (E.D.N.Y July 28, 2023).

Jurisdictional discovery confirms that no transaction through Al Rajhi Bank's U.S. correspondent account with then-Chase Manhattan Bank reached Al Qaeda, let alone was used "in the course of" the 9/11 Attacks. The transactions cited in Plaintiffs' Averment are remote in time and location from the attacks, and involve individuals or entities with only attenuated or generalized purported links to Al Qaeda. None is traced to Al Qaeda or the hijackers, much less the 9/11 Attacks. Plaintiffs' description of the Bank's Chase account as a "payable-through account" is of no import and does not reveal any "specific intent" to support terrorism against the United States, because payable-through accounts were prevalent for their convenience during the relevant period. *See* ARB Ex. 2 (Hobayb Rpt.) at 32.

## CONCLUSION

For the foregoing reasons, this Court should grant the Bank's motion and should dismiss the Amended Complaint and all claims in the above-captioned actions as against Al Rajhi Bank, with prejudice (or, in the alternative, hold an evidentiary hearing, or grant the Bank's pending Objections to the Magistrate Judge's opinion declining to consider the Bank's renewed motion to dismiss for failure to state a claim under Rule 12(b)(6)).

Dated:  May 7, 2024
        Washington, DC

Respectfully submitted,

WHITE & CASE

/s/ *Christopher M. Curran*

Christopher M. Curran
Nicole Erb
Nicolle Kownacki (*pro hac vice*)
Reuben J. Sequeira
Michael Mahaffey (*pro hac vice*)
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC  20005
Telephone:     + 1 202 626 3600
Facsimile:     + 1 202 639 9355
ccurran@whitecase.com
nerb@whitecase.com
nkownacki@whitecase.com
rsequeira@whitecase.com
michael.mahaffey@whitecase.com

*Counsel for Al Rajhi Bank*