# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br>ECF Case |

This document relates to:

*Underwriting Members of Lloyd's Syndicate 2, et al. v. Al Rajhi Bank, et al.*, No. 16-cv-07853
*Addesso, et al. v. Kingdom of Saudi Arabia, et al.*, No. 16-cv-09937
*Aguilar, et al. v. Kingdom of Saudi Arabia, et al.*, No. 16-cv-09663
*Hodges, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-00117
*Aiken, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-00450
*Charter Oak Fire Insurance Co., et al. v. Al Rajhi Bank, et al.*, No. 17-cv-02651
*Abarca, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-03887
*Arrowood Indemnity Co., et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-03908
*Abedhajajreh, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-06123
*Muenchener Rueckversicherungs-Gesellschaft Aktiengesellschaft in Muenchen, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-07914
*Abbate, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-08617

# PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT AL RAJHI BANK'S RENEWED MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT FOR LACK OF PERSONAL JURISDICTION

(Previously Filed Under Seal at ECF No. 10152)

December 7, 2024

~~UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS~~

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br>ECF Case |

This document relates to:

*Underwriting Members of Lloyd's Syndicate 2, et al. v. Al Rajhi Bank, et al.*, No. 16-cv-07853
*Addesso, et al. v. Kingdom of Saudi Arabia, et al.*, No. 16-cv-09937
*Aguilar, et al. v. Kingdom of Saudi Arabia, et al.*, No. 16-cv-09663
*Hodges, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-00117
*Aiken, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-00450
*Charter Oak Fire Insurance Co., et al. v. Al Rajhi Bank, et al.*, No. 17-cv-02651
*Abarca, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-03887
*Arrowood Indemnity Co., et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-03908
*Abedhajajreh, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-06123
*Muenchener Rueckversicherungs-Gesellschaft Aktiengesellschaft in Muenchen, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-07914
*Abbate, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-08617

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT AL RAJHI BANK'S RENEWED MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT FOR LACK OF PERSONAL JURISDICTION

July 22, 2024

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

# TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT ........................................................................ 1

II.    FACTUAL AND PROCEDURAL BACKGROUND ......................................... 7

    A.    ARB's Motion Rests on Deep Mischaracterizations of the Second Circuit's Hearing and Procedural History of this Litigation ................................. 7

    B.    The Discovery Mandated by the Second Circuit and Directed by This Court Focused on a Subset of ARB's Relationships with Al Qaeda Front Charities, Financial Managers, and Core Al Qaeda Operatives ........................... 12

    C.    Discovery Confirms ARB's Central and Critical Role in Supporting and Promoting Al Qaeda's Targeting of the United States, Including from within the United States Itself ................................................................. 15

        1.    Al Qaeda's Targeting of the United States and Financial Engine ........... 15

        2.    ARB, the Suleiman Al Rajhi Charity Committee, and the SAAR Foundation ................................................................................. 19

        3.    CIA Finished Intelligence Assessments Document the Longstanding Involvement of ARB and Its Principals in Supporting Al Qaeda and Other Terrorist and Extremist Causes ................................. 21

        4.    ARB's Substantial and Essential Support for al Qaeda ........................... 24

        5.    ARB Broadly Violated AML, CFT, and KYC Standards in its Operation of Accounts for Al Qaeda Fronts, Financial Managers, and Members ................................................................................. 26

        6.    ARB's Facilitation of Al Qaeda Financing From Within and Through the United States ........................................................................... 30

        7.    ARB's Disturbing Connections to the 9/11 Hijackers and Support Network ..................................................................................... 31

        8.    ARB's Support for Al Qaeda was Knowing and Substantial ................... 33

III.   STANDARD OF REVIEW ........................................................................ 34

IV.    LEGAL ARGUMENT ................................................................................ 35

    A.    The Court's Exercise of Jurisdiction over ARB is Appropriate ........................... 35

1.  Jurisdictional Discovery Confirms that ARB Tortiously Directed Conduct at the United States .................................................... 37

2.  Jurisdictional Discovery Confirms that ARB is Subject to Jurisdiction as al Qaeda's Co-Conspirator and Aider and Abettor ........... 41

3.  Jurisdictional Discovery Confirms that ARB is Subject to Jurisdiction under a Correspondent Banking Theory of Personal Jurisdiction ................................................................................. 43

B.  ARB's Strawman Arguments Do Not Undermine the Jurisdictional Bases for Plaintiffs' Claims ................................................................. 47

1.  ARB's Misapplication of the Legal Authority ......................................... 47

2.  ARB's Misapplication of the Facts ......................................................... 49

C.  The Evidence ARB Offers to Challenge Jurisdiction Should be Stricken ........... 57

1.  ARB's Expert Testimony Should be Stricken ......................................... 57

2.  ARB's References to Mr. Galloway's Errata Should be Stricken ........... 58

CONCLUSION ........................................................................................... 59

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AEP-PRI, Inc. v. Galtronics Corp.*,
  2013 WL 4400833 (S.D.N.Y. Aug. 13, 2013) ........................................................35

*Allen v. Koenigsmann*,
  2023 WL 11803060 (S.D.N.Y. Mar. 30, 2023) ......................................................58

*Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*,
  436 F.3d 82 (2d Cir. 2006) ....................................................................................35

*Asahi Metal Indus. v. Cal. Super. Ct.*,
  480 U.S. 102 (1987) ..........................................................................................36, 43

*Averbach v. Cairo Amman Bank*,
  2023 WL 5016884 (S.D.N.Y. June 30, 2023) ..................................................35, 40

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*,
  902 F.2d 194 (2d Cir. 1990) ......................................................................34, 35, 50

*Brown v. Nat'l Bank of Pakistan*,
  2022 WL 1155905 (S.D.N.Y. Apr. 19, 2022) ........................................................50

*Cantanzaro v. Weiden.*,
  140 F.3d 91 (2d Cir. 1998) ....................................................................................43

*Charles Schwab Corp. v. Bank of Am. Corp.*,
  883 F.3d 68 (2d Cir. 2018) ..............................................................36, 41, 42, 43

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*,
  722 F.3d 81 (2d Cir. 2013) ..............................................................................35, 40

*Fuld v. Palestine Liberation Org. & the Palestinian Auth.*,
  2024 WL 2103762 (2d Cir. May 10, 2024) ............................................................36

*Ganino v. Citizens Utils. Co.*,
  228 F.3d 154 (2d Cir. 2000) ..................................................................................41

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983) ........................................................................40, 43

*Int'l Shoe Co. v. Washington*,
  326 U.S. 310 (1945) ......................................................................................2, 36, 43

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

*J. McIntyre Machinery, Ltd. v. Nicastro*,
    564 U.S. 873 (2011)..........................................................................................42

*Kaplan v. Bank Saderat PLC*,
    77 F.4th 110 (2d Cir. 2023) ...........................................................................44

*Kaplan v. Lebanese Canadian Bank, SAL*,
    999 F.3d 842 (2d Cir. 2021)...................................................................... *passim*

*King v. Habib Bank Ltd.*,
    2022 WL 4537849 (S.D.N.Y. Sept. 28, 2022).........................................44

*Lewis v. Mutond*,
    62 F.4th 587 (D.C. Cir. 2023) (Rao, J. concurring) .............................36

*Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013)...................................................................... *passim*

*Linde v. Arab Bank, PLC*,
    882 F.3d 314 (2d Cir. 2018).................................................................39, 43, 48

*In re Magnetic Audiotape Antitrust Litig.*,
    334 F.3d 204 (2d Cir. 2003)...........................................................................38

*Perma Research and Development Co. v. Singer Co.*,
    410 F.2d 572 (2d Cir. 1969)...........................................................................58

*In re Platinum and Palladium Antitrust Litigation*,
    61 F.4th 242 (2d Cir. 2023) ...........................................................................42

*Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp., PLC*,
    22 F.4th 103 (2d Cir. 2021) ...........................................................................42

*Spetner v. Palestine Inv. Bank*,
    70 F.4th 632 (2d Cir. 2023) .......................................................................44, 46

*Staples v. United States*,
    511 U.S. 600 (1994)........................................................................................41

*Strauss v. Credit Lyonnais, S.A.*,
    925 F. Supp. 2d 414 (E.D.N.Y. 2013) .........................................................55

*In re Terrorist Attacks on Sept. 11, 2001*,
    392 F.Supp.2d 539 (S.D.N.Y. 2005)............................................................48

*In re Terrorist Attacks on September 11, 2001*,
    714 F.3d 659 (2d Cir. 2013)..............................................1, 10, 35, 36, 37, 48

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

*The Berkshire Bank v. Lloyds Banking Group PLC*,
  2022 WL 569819 (2d Cir. Feb. 25, 2022)...............................................................42

*Underwriting Members of Lloyd's Syndicate 2 v. Al Rajhi Bank*,
  779 F. App'x 68 (2d Cir. 2019) ................................................................. *passim*

*United States v. Damrah*,
  412 F.3d 618 (6th Cir. 2005) ................................................................................55

*In re Vitamin C Antitrust Litig.*,
  2012 WL 12355046 (E.D.N.Y. Aug. 8, 2012).......................................................40

*Waldman v. Palestine Liberation Organization*,
  835 F.3d 317 (2d Cir. 2016)..................................................................38, 39, 47

*Water Res. Grp., LLC v. Powers*,
  2013 WL 5202679 (E.D.N.Y. Sept. 13, 2013) ......................................................40

*In re Weatherford Intl. Sec. Litig.*,
  2013 WL 4505259 (S.D.N.Y. Aug. 23, 2013) .......................................................59

*World-Wide Volkswagen Corp. v. Woodson*,
  444 U.S. 286 (1980)...........................................................................................36, 41

**Statutes and Rules**

18 U.S.C. 2339A(b)(1)...........................................................................................52

Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130
  Stat. 852 (Sept. 28, 2016)........................................................2, 37, 38, 39, 48

C.P.L.R. § 302(a)(1)...............................................................................................44

Fed. R. Civ. P. 12(b)(2)..........................................................................................34

Fed. R. Civ. P. 26...................................................................................................58

Fed. R. Civ. P. 26(a)(2)(ii).....................................................................................57

Fed. R. Civ. P. 56...................................................................................................35

Fed. R. Evid. 703...................................................................................................55

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

## I.   PRELIMINARY STATEMENT

On October 15, 2019, the Second Circuit Court of Appeals held that Plaintiffs' claims against Al Rajhi Bank ("ARB") were sufficient to defeat a motion to dismiss on jurisdictional grounds. The Second Circuit found that Plaintiffs "*principally allege that Al Rajhi Bank provided financial services and donations to charities that it knew financially supported al Qaeda and provided financial services to known extremist operatives. They further allege Al Rajhi Bank's provision of financial services was done with the specific intent to further al Qaeda's terrorism against the United States.*" *Underwriting Members of Lloyd's Syndicate 2 v. Al Rajhi Bank*, 779 F. App'x 68 (2d Cir. 2019) (emphasis supplied) ("*Al Rajhi Bank*"). The Second Circuit concluded that Plaintiffs' allegations "related to Al Rajhi Bank's specific intent to further terrorism in the United States, however, distinguishes the present case from those in which we have not granted personal jurisdiction and warrants jurisdictional discovery." *Id.* at 68-69. That is, the Court of Appeals held that the "support alleged here, in conjunction with this specific intent, we believe is 'more direct and one step closer to al Qaeda' when compared to the support we have previously found inadequate." *Id.* at 69 (*citing In re Terrorist Attacks on September 11, 2001,* 714 F.3d 659, 678 (2d Cir. 2013) ("*Terrorist Attacks VII*"). *See also* Corrected Averment ("CA") ¶¶ 1-4.

On those bases, the Second Circuit reinstated Plaintiffs' claims against ARB and remanded for jurisdictional discovery concerning four issues: "'(1) when the alleged support was given to al Qaeda, (2) what support was given, (3) whether the support was 'earmarked' for use in specific schemes or attacks not directed at the United States, or (4) specifically how these defendants were involved in the process of providing support to al Qaeda.'" *Id.* at 69 (*quoting Terrorist Attacks VII*, 714 F.3d at 678-79). Now that jurisdictional discovery has been substantially completed, ARB has renewed its bid for dismissal, again on jurisdictional grounds.

1

~~UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS~~

The discovery has confirmed that there is no merit to ARB's claim that it lacked "fair warning" that it may be held accountable in U.S. courts for its integral sponsorship of al Qaeda, or that requiring it to answer for that conduct would "offend traditional notions of fair play and substantial justice." *See Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945). To the contrary, given al Qaeda's relentless and avowed targeting of the United States for attack during the years leading up to the September 11th attacks, ARB unquestionably had "fair notice" that its support for, and joint action with, al Qaeda could lead to claims against it in U.S. courts following al Qaeda's attack against Americans. This conclusion is especially evident in the context of the present claims arising from a terrorist attacks on U.S. soil, where the United States' national security and related interests in providing a forum for Plaintiffs to seek redress could not be stronger. *See* Justice Against Sponsors of Terrorism Act ("JASTA") § 2(b), Pub. L. No. 114-222, 130 Stat. 852, 853 (2016) ("International terrorism threatens the vital interests of the United States"); *id.* at § 2(a)(4) ("Persons [] that knowingly or recklessly contribute material support or resources, to persons or organizations that pose a significant risk of committing acts of terrorism that threaten the security of nationals of the United States or the national security, foreign policy, or economy of the United States necessarily direct their conduct at the United States, and should reasonably anticipate being brought to court in the United States to answer for such activities).

As surveyed below, the discovery mandated by the Second Circuit and directed by this Court, which ARB has resisted at every turn, *infra* at § II.B, has confirmed that ARB was in fact al Qaeda's "bank of choice" and a deep and indispensable partner in al Qaeda's targeting of the United States. That partnership was anchored in ARB's ideological alignment with al Qaeda's mission. ARB's most-senior leadership, including in particular the bank's Founder and Chairman Suleiman Abdelaziz al Rajhi, had a long history of "support[ing] Islamic extremists," including al

Qaeda itself. Suleiman al Rajhi maintained high level relationships with al Qaeda's most notorious charity fronts and financial managers, and himself established a "complex web of overlapping" companies and ostensible charities in the United States, to launder funds in support of al Qaeda and related terrorist causes. Suleiman al Rajhi incorporated ARB as a key component of that U.S.-based terrorist financing scheme, directing that contributions issue from ARB's own Payable Through correspondent account at Chase Manhattan Bank in New York, to hide the identity of the donors.

During the critical period leading up to the September 11th attacks, ARB also broadly deployed its resources and capabilities to facilitate essential fund transfers for al Qaeda and provide Osama bin Laden's organization with access to the international financial system. It did so in several ways. ARB opened and operated *hundreds* of accounts for al Qaeda's most notorious and critical charity fronts, Al Haramain Islamic Foundation ("Al Haramain") and International Islamic Relief Organization ("IIRO"), with an awareness that those entities were operating as components of al Qaeda. Those accounts were used to transfer billions of Saudi Riyals ("SR") from Saudi Arabia to external offices that operated hand-in-glove with al Qaeda on the ground, and were opened and operated in ways that violated international money laundering standards. ARB also maintained accounts for al Qaeda's most important financial managers, and afforded them unfettered license to use their "personal" accounts to engage in highly irregular transactions involving large sums of money, that also violated international money laundering standards and bore obvious indicia of terrorist financing. This pattern of alarming transactions through ostensible personal accounts intensified at moments when the charities were under scrutiny for their involvement in terrorism, and enabled al Qaeda to further mask the source and destination of

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

contributions supporting its terrorist activities. The funds transferred through these mechanisms encompassed the core of al Qaeda's funding.

ARB also operated the principal operational account for Suleiman al Rajhi's own charity committee/foundation, and twenty accounts for officials of that charity committee/foundation working under Suleiman al Rajhi's direction. Suleiman al Rajhi's charity committee was extensively intertwined with al Qaeda's key financial nodes and most important financial managers, and provided extensive financial support to al Qaeda fronts and other terrorist causes. Here again, the transactions ARB facilitated were highly unusual and presented obvious red flags for terrorist financing, although ARB obviously did not need to be warned about the terrorist nature of transactions initiated by its own Founder and Chairman.

During the period leading up to the September 11th attacks, numerous core al Qaeda members also maintained accounts at ARB, including seven of the September 11th hijackers. CIA assessments reflect that terrorist leaders directed operatives to open their accounts at ARB, at a time when bin Laden was selecting banks based on "personal contacts" and "security concerns." The proliferation of al Qaeda members, financial managers, and charity fronts served by ARB, along with the scope and character of transactions ARB carried out for them, confirms that al Qaeda viewed ARB as a trusted partner.

Consistent with that status and role, ARB and its principals featured prominently in a series of CIA finished intelligence reports concerning al Qaeda's sources of funding and means for moving money, prepared between 1997 and 2003 for the United States' most senior national security officials. This CIA reporting culminated in an extraordinary 2003 report dedicated exclusively to ARB, which concluded by presenting America's senior-most national security officials with several policy options for interdicting ARB's pivotal role in al Qaeda's financial

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

engine, including potential covert action. The assessment as to how best to proceed involved a balancing of foreign policy, diplomatic, counterterrorism, and regional economic considerations, and in the end the United States elected to press for remedial action through engagements with the Saudi government.

The record confirms that ARB's terrorist activities were in fact a focus of high level diplomatic engagements with Saudi officials, aimed at securing reforms and oversight measures that would prevent ARB from continuing to provide financial services and support to al Qaeda, and that ARB's relationships with al Qaeda's principal charity fronts were at the very center of the United States' entreaties. These sensitive diplomatic engagements occurred at a time when interrupting and dismantling al Qaeda's financial engine, and funding from Saudi Arabia in particular, was a national security imperative of the highest order, underscoring the threat to U.S. interests that ARB's terrorist conduct posed.

Plaintiffs presented their evidence establishing jurisdiction via an Averment prior to the filing of ARB's renewed motion to dismiss, to allow ARB to respond directly to that evidence in its motion, but ARB instead dedicates most of its brief to efforts to distract from the content of the Averment and what it shows about ARB's intent to foster al Qaeda's targeting of the United States. *See* Plaintiffs' "Corrected" Averment of Jurisdictional Facts and Evidence and/or Statement of Facts Pursuant to Rule 56.1, ECF No. 9764 ("Averment" or "CA"). In service of this effort, ARB spends pages of its brief distorting prior proceedings as to ARB before this Court and the Second Circuit, and mischaracterizing the Second Circuit's decision reinstating the claims against ARB. Relying on these distortions, ARB then argues that Plaintiffs "abandoned" key claims that prompted the Second Circuit to reinstate ARB as a defendant. These claims are belied by the language of the Second Circuit's decision, the content of the appeal briefs and record resulting in

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

that decision, this Court's decisions applying it on remand, and the evidence surveyed in the Averment. Beyond this attempt to gaslight the Court, ARB offers little more than a series of strawman claims that fail to engage the content and jurisdictional force of the Averment, and legal arguments predicated upon misunderstandings of the applicable legal framework governing jurisdiction.

Plaintiffs' Averment very clearly confirms the conduct, relationships, and intent presented in Plaintiffs' Amended Complaint that led the Second Circuit to reinstate the claims against ARB, and shows that ARB's partnership with al Qaeda was far deeper and even more essential than previously understood. This evidence, amassed despite the fact that discovery was limited as a result of ARB's burden claims to only a subset of ARB's relationships with al Qaeda proxies and financial managers, confirms that ARB and its senior officials were quintessential insiders operating at the very center of al Qaeda's financial and logistical support structure during the critical period leading up to September 11, 2001, and acted with an intent to advance al Qaeda's targeting of the United States. In this case, the nature of al Qaeda's actions, and ARB's extensive support of al Qaeda and knowledge of its role in advancing al Qaeda's objective, leave no doubt that ARB had fair notice that its conduct could lead to claims against it in the U.S. courts following an al Qaeda attack against Americans. This requirement is satisfied because (1) ARB committed tortious acts directed at the United States by knowingly supporting al Qaeda and its key components, under circumstances evidencing an intent to advance al Qaeda's targeting of the United States; (2) ARB engaged in joint action with al Qaeda as a co-conspirator and aider and abettor; and (3) ARB's correspondent bank in the United Stats was used to facilitate fund transfers to al Qaeda, as part of the terrorist financing mechanism established by Suleiman al Rajhi in the

United States. On each of these bases, the Averment establishes that ARB is subject to this Court's jurisdiction for Plaintiffs' claims, and that ARB's motion should be denied.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     ARB's Motion Rests on Deep Mischaracterizations of the Second Circuit's Hearing and Procedural History of this Litigation

This Court's analysis of jurisdiction following discovery focuses on whether Plaintiffs' Averment presents facts that, if credited, would be sufficient to make a *prima facie* showing of jurisdiction. Given this framework, ARB's extensive arguments about separate proceedings against ARB in different cases, ECF No. 9786 at 4-6, fanciful claims that the Second Circuit was somehow duped into reinstating the claims against it, *id.* at 6-7, and inaccurate assertions that Plaintiffs have "abandoned" claims critical to jurisdiction, *id.* at 13-20, are largely or wholly irrelevant, as they do not engage the content or jurisdictional import of the Averment at all. Nonetheless, Plaintiffs briefly respond to correct the record and provide the Court with an accurate presentation of the jurisdictional inquiry directed by the Second Circuit on remand.

ARB's arguments about prior district court proceedings against it in the present case and separate actions rehash arguments it made to the Second Circuit in the appeal preceding remand, which the Second Circuit rejected in reinstating the claims against it. As it does here, and using nearly identical language, ARB urged the Second Circuit to conclude that the present case was a "copycat" of previously dismissed cases filed by the "same counsel." *Compare* Brief for Defendant-Appellee Al Rajhi Bank, No. 18-1201 (2d Cir. Dec. 6, 2018) ("The Bank now finds itself back in this Court, asking for affirmance of the dismissal of copycat claims, brought by many of the same counsel who brought claims previously rejected by this Court as deficient") *with* ECF No. 9786 at 5 ("Plaintiffs in ten subsequently filed actions joined the *Lloyd's* Plaintiffs in a consolidated amended complaint, which repeats allegations substantively identical to those

underlying the claims this Court dismissed in *Terrorist Attacks I . . .* Many of Plaintiffs' counsel here were also counsel for the plaintiffs in *Terrorist Attacks I,* having found new clients for their copycat actions"). The Second Circuit squarely rejected that claim, finding instead that the "support alleged [in the Amended Complaint] here, in conjunction with this specific intent, we believe is 'more direct and one step closer to al Qaeda' when compared to the support we have previously found inadequate." *Al Rajhi Bank*, 779 F. App'x at 69.

ARB attempts to explain away this clear holding by claiming, quite remarkably and contrary the plain language of the decision itself, that the Second Circuit was somehow tricked into reinstating ARB based on claims that did not actually appear in the Amended Complaint. ARB urges this Court to conclude that the Second Circuit was duped into reversing ARB's dismissal based on "inflammatory" assertions of "direct" and "operational" support with "specific intent." *See, e.g.,* ECF No. 9786 at 1, 10, 13, 21, 32. ARB posits that the Second Circuit's decision was narrowly predicated on these allegations, and that the Second Circuit's decision treated claims of "indirect" support as *per se* inadequate to support jurisdiction.

The answer to these gratuitous claims lies in the plain language of the Second Circuit's decision itself. Far from suffering from some misunderstanding of Plaintiffs' claims, the Second Circuit explained that Plaintiffs' "*principally allege that Al Rajhi Bank provided financial services and donations to charities that it knew financially supported al Qaeda and provided financial services to known extremist operatives.*" *Al Rajhi Bank*, 779 F. App'x at 68. This unambiguous statement captures the gravamen of Plaintiffs' claims accurately, and confirms that ARB's relationship with al Qaeda's charity fronts and financial officers were central to the Second Circuit's determination that the district court erred in dismissing the claims on jurisdictional grounds.

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

ARB's related arguments that Plaintiffs deceived the Second Circuit through "exaggerated assertions [that] had no support in the Amended Complaint," ECF No. 9786 at 1, are irresponsible and inaccurate. To begin with, the appeal addressed the district court's ruling on a motion to dismiss, and the record on appeal was therefore limited to the briefs and Amended Complaint itself. Given that posture, ARB's arguments insult the basic competency of the Second Circuit, by suggesting that it was for some reason incapable of reviewing the sufficiency of a complaint to make a *prima facie* showing of jurisdiction, and necessarily ask this Court to endorse that theory of ineptitude. More than that, these claims misstate the content and character of Plaintiffs' arguments to the Second Circuit.

Plaintiffs were very clear in the presentation of their appeal that the district court erred by treating "any 'indirect contributions' or provision of 'financial services' to a terrorist organization as showing only 'mere' foreseeability of harm, no matter what additional nexus existed . . . between ARB and al-Qaeda's anti-U.S. scheme and activities." Brief for Plaintiffs-Appellants, Case No. 18-1201 at 2 (2d Cir. Sept. 7, 2018). As Plaintiffs emphasized to the Second Circuit, case law confirms that "additional facts regarding the relationship [between a third party supporter and terrorist] may make even 'indirect' contributions serve as the basis for jurisdiction." *Id.* at 54. Stated simply, and contrary to ARB's claims, Plaintiffs' theories of "indirect" support were central to their appeal and the errors raised as to the district court's decision.[1]

ARB's mischaracterizations of the Second Circuit's decision also fly in the face of this Court's rulings applying it for purposes of directing jurisdictional discovery. At the outset of discovery, ARB sought to avoid any inquiry concerning its relationships with al Qaeda front charities and other individuals, by claiming, as it also seeks to do here, that the Second Circuit's

---

[1] Plaintiffs' Opening Brief in the appeal is included as Ex. E to the accompanying Declaration of J. Scott Tarbutton, and illustrates the intensive emphasis and focus the theories of so-called "indirect" support received in the appeal.

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

decision authorized discovery "only with respect to the allegations in the FAC that the Bank provided direct support to al Qaeda purportedly by 'providing financial services to known extremist operatives.'" *See* ECF No. 7086 at 4 (citations omitted). This Court rejected that interpretation, explaining that "jurisdiction [under the Second Circuit's decision] is assessed based on a combination of direct and indirect support alongside specific intent to target the United States." *See* ECF No. 7378 at 5-6. This Court further recognized that the support relevant to the jurisdictional inquiry mandated by the Second Circuit's decision encompassed both the "indirect support through 'financial services and donations to charities that it knew financially supported al Qaeda' and direct support through 'financial services to known extremist operatives.'" *Id.* at 6.

As ARB also well knows, the discovery directed by this Court pursuant to that framework centered extensively on ARB's relationships with two al Qaeda charity fronts, several al Qaeda financial managers associated with those charities, Suleiman al Rajhi's own support for al Qaeda through those charity fronts and linkages to their leadership, and ARB's financial services for several additional terrorist operatives. That discovery was authorized and undertaken because it was directly relevant to the four questions presented in the Second Circuit's decision: "'(1) when the alleged support was given to al Qaeda, (2) what support was given, (3) whether the support was 'earmarked' for use in specific schemes or attacks not directed at the United States, or (4) specifically how these defendants were involved in the process of providing support to al Qaeda.'" *Al Rajhi Bank,* 779 F. App'x. at 69 (*quoting Terrorist Attacks VII*, 714 F.3d at 678-79).[2]

ARB fares no better with its assertions that Plaintiffs have "abandoned" key claims that were essential to the Second Circuit's ruling. Once again, these arguments rest on a

---

[2] ARB's arguments further suggest that the entire course of discovery was misdirected, notwithstanding the fact that discovery was affirmed and directed by this Court, consistent with the Second Circuit's mandate. *See* ECF No. 9786 at 8-12.

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

mischaracterization of the Second Circuit's decision and the categories of support encompassed by it. The Second Circuit did not hold that jurisdiction depended on a showing of "direct support" to known terrorist operatives, but instead expressly recognized that ARB's support for al Qaeda via its relationships with key charity fronts provided an articulable basis for jurisdiction, given ARB's knowledge of their terrorist ties. ARB's "abandonment" arguments thus fail before they even begin.

Those arguments are also wrong as a factual matter and, more fundamentally, fail to acknowledge what the full record shows about ARB's central and essential role in al Qaeda's pre-9/11 financial engine. *See infra* at § II.C. As reflected by the evidence surveyed more fully below, the Averment and related expert opinions offer detailed evidence that ARB was the bank of choice of al Qaeda, and that al Qaeda and its financial facilitators and front charities broadly used ARB to move money in support of al Qaeda's global operations. ARB's arguments about  whether it donated its own funds to al Qaeda charity fronts ignore the limits on discovery resulting from its own burden claims, as well as evidence showing ARB funds were transferred to Al Haramain. More fundamentally, those claims fail to acknowledge that the material support it provided to those entities was even more expansive and extraordinary than Plaintiffs understood prior to discovery.

ARB also lacks credibility in its suggestion that Plaintiffs' Averment abandons allegations that ARB derived knowledge and intent to support al Qaeda through Suleiman al Rajhi, its Founder and then Chairman. The declassified CIA reports in particular speak directly to the evidence concerning his money laundering and terrorist connections, and the intimate relationships between Suleiman al Rajhi and the charities. CA ¶¶ 42, 43, 253, 344, 387, 521. The Averment very clearly describes Suleiman al Rajhi's key support of militant extremism, including his close relationships with al Qaeda facilitators and the mechanism he developed, through the use of al Qaeda fronts, to

channel support in furtherance of the efforts to attack the United States. CA ¶¶ 40-52. The Averment also augments the prior allegations relating to Saleh al Hussayen, and provides evidence reflecting that he served as a member of ARB's shariah board, an advisory member of Suleiman al Rajhi's "charity" operations, and had ties to the hijackers. CA ¶¶ 44, 503-507. So too, Plaintiffs did not "abandon" their reliance on the testimony of Zacarias Moussaoui; to the contrary, the Averment sets forth direct evidence from ARB's own account records confirming the partnership Moussaoui described.[3]

In sum, ARB dedicates the first twenty pages of its brief to efforts to distort the record and revise the Second Circuit's decision reinstating the claims against ARB, in the hopes of shifting this Court's analysis away from the actual inquiry mandated by the Second Circuit, and avoiding the content and jurisdictional import of Plaintiffs' Averment. That ARB believes it necessary to engage in this gaslighting exercise is telling. Having now corrected the record, Plaintiffs turn to the actual matter at hand, namely, the application of governing jurisdictional standards to the facts and evidence presented in the Averment. As discussed *infra* at §§ III-IV, application of the applicable standards confirms that this Court may exercise jurisdiction over ARB on at least three separate grounds.

**B.      The Discovery Mandated by the Second Circuit and Directed by This Court Focused on a Subset of ARB's Relationships with Al Qaeda Front Charities, Financial Managers, and Core Al Qaeda Operatives**

In response to the Second Circuit's decision reversing ARB's dismissal, ARB initially resisted the discovery mandated by the Second Circuit altogether, by filing a renewed motion to dismiss on alternative grounds. *See* ECF Nos. 5384-5385; CA ¶¶ 12-27. The district court denied

---

[3] Given that this Court previously declined to accept Moussaoui's testimony, Plaintiffs chose not to belabor the point, and omitted this testimony from the Averment. This decision cannot be viewed as an "abandonment" of the claims, but a strategic effort to focus the Court's attention on the evidence of material support and critical relationships that form the predicate for Plaintiffs' jurisdictional arguments.

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

that motion, and directed that discovery proceed. *See* ECF No. 6681; CA ¶ 12. As noted above, ARB then attempted to avoid responding to virtually all of Plaintiffs' jurisdictional document requests, based on a dubious interpretation of the Second Circuit's decision that this Court rejected. Based on the plain language of the Second Circuit's decision establishing that "jurisdiction is assessed based on a combination of direct and indirect support alongside specific intent to target the United States," ECF No. 7378 at 5-6, this Court found that nearly every one of Plaintiffs' document requests was proper and sought information relevant to the jurisdictional inquiry. CA ¶¶ 13-14.

Although the Court broadly overruled ARB's objections, it accepted ARB's claim that searches of its relevant files (which were for the most part physical records that were not indexed or digitized) would be unduly burdensome at the jurisdictional phase. CA ¶¶ 14-15. The Court therefore directed that the parties meet and confer on a program of discovery that accommodated ARB's burden claims. CA ¶ 16. The ensuing course of discovery pursuant to that directive was limited to a subset of ARB's relationships through which it provided support to al Qaeda. CA ¶¶ 20-21.

For example, although the Amended Complaint at issue in the Second Circuit appeal pointed to ARB's relationships with at least eight "charities that it knew financially supported al Qaeda," discovery of ARB was substantially concentrated on its relationships with just two of al Qaeda's most important charity partners – Al Haramain and IIRO. CA ¶ 20. The discovery pertaining to those fronts was, for the most part, limited to account statements retrievable from ARB's legacy account database, and basic "Know Your Customer" information. CA ¶¶ 17-19. Of the 40,000 pages of records that ARB produced in discovery, the vast majority consisted of account

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

statements showing credit and debit transactions for the more than 400 accounts ARB maintained for those al Qaeda fronts.[4] CA ¶¶ 18, 19, 25, 206, 212.

Beyond those records related to Al Haramain and IIRO, the authorized discovery also encompassed ARB's relationships with several individual officials of those charities, who served as financial managers for al Qaeda, and who were designated or otherwise identified by the United States as al Qaeda supports and financiers. CA ¶ 21. These included Executive Order 13224 Specially Designated Global Terrorists Aqil al Aqil, Soliman al Buthe, Abd al Hamid Sulaiman al Mujil, Wa'el Hamza Jelaidan, Yassin Abdullah al Kadi, and Prince Turki bin Jalawi al Saud. *Id.*

In the course of discovery, Plaintiffs developed evidence that certain of those charities were receiving donations and conducting financial activities through accounts held in the names of other individual officials of those charities, who also served as officials of Suleiman al Rajhi's own charity committee/foundation. CA ¶¶ 42, 43, 253, 344, 387, 521. This evidence indicated that ARB Founder and Chairman Suleiman al Rajhi carried out ostensible "charitable" transactions through accounts nominally held in the names of individual employees of his charity committee. CA ¶ 22. Based on this evidence, the Court also authorized discovery, over ARB's objections, as to the following individuals' accounts at ARB: Mansour al Kadi, Abdul Rahman al Rajhi, Saleh bin Sulaiman al Habdan, and Abdullah bin Ibrahim al Misfer. *Id.*

Plaintiffs also sought discovery as to investigations, audits or similar reviews concerning ARB accounts linked to terrorism, as well as audits addressing ARB's policies on Anti-Money Laundering ("AML"), Combatting the Financing of Terrorism ("CFT"), and "Know Your Customer" ("KYC") protocols aimed at preventing terrorists from accessing ARB financial

---

[4] As a general matter, the account statement information retrieved from ARB's legacy database did not identify the specific destinations or beneficiaries of outgoing transactions, CA ¶ 18, although the evidence definitively shows that the Al Haramain and IIRO accounts at ARB were the central accounts used to send funds to the external offices. CA ¶¶ 209-217.

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

services. Plaintiffs also sought discovery of any audits relating to the subject charities or terrorism finance concerns. ARB has not produced any such audits. CA ¶ 27.

C.   **Discovery Confirms ARB's Central and Critical Role in Supporting and Promoting Al Qaeda's Targeting of the United States, Including from within the United States Itself**

Plaintiffs' Averment surveys detailed facts and evidence concerning ARB's support for al Qaeda's targeting of the United States from a range of sources, including ARB's own discovery documents, deposition testimony of ARB's own witnesses, expert reports and testimony, discovery from other defendants that worked closely with ARB and its principals, FBI and CIA finished intelligence reports, and other governmental records. This diverse body of evidence provides a detailed portrait and showing concerning al Qaeda's unrelenting mission to direct violence against the United States and its interests; the financial engine and infrastructure that fueled al Qaeda's growth and provided it with the capabilities to successfully attack the United States; ARB's and its principals' longstanding alignment with anti-American jihadists, including al Qaeda; ARB's role as an intimate partner providing the financial infrastructure and services that were essential to al Qaeda's successful targeting of the United States, including through its role in a U.S.-based terrorist financing scheme established by ARB's Chairman that used ARB's U.S. correspondent bank accounts to launder terrorist funds; and the substantiality and essentiality of ARB's material support. Discovery has also documented a disturbing array of connections between individuals associated with ARB and the September 11th hijackers and the support network, which defy innocent explanation.

1.   **Al Qaeda's Targeting of the United States and Financial Engine**

Al Qaeda is an international terrorist organization, founded in 1988 by Osama bin Laden and other foreign fighters who participated in the jihad against the Soviet Union in Afghanistan. CA ¶ 53. Al Qaeda planned, funded, and carried out the September 11th attacks. CA ¶ 54. From at

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

least 1991 and throughout the ensuing years preceding the September 11th attacks, bin Laden made clear to his supporters, allies, and others that al Qaeda's primary goal and mission was to carry out attacks against the United States. CA ¶ 57. In furtherance of this objective, al Qaeda established fronts in a variety of jurisdictions. CA ¶¶ 58-61. As a global terrorist organization dedicated to carrying out jihad against the United States, al Qaeda had extensive funding and fundraising needs. CA ¶ 62. Indeed, according to the 9/11 Commission Staff Monograph on Terrorist Financing, and as further discussed by the parties' experts, al Qaeda required $30 million in annual funding to support its operations in the years leading up to the September 11th attacks. CA ¶ 63. As further confirmed by the 9/11 Commission's findings, CIA assessments, Plaintiffs' experts, and countless statements of U.S. counterterrorism officials, al Qaeda's strength and global strike capabilities leading up to the September 11th attacks were made possible by its tremendous fundraising capabilities and the financial network that collected and delivered funds to al Qaeda. CA ¶¶ 64-65.

Government records and finished intelligence reports, as well as analyses provided by Plaintiffs' experts, confirm that Al Qaeda's support network was based largely on contributions from donors (especially in Saudi Arabia) who supported al Qaeda's global jihad, well-placed financial facilitators who raised funds for al Qaeda, and diversions of funds by Islamic charities that supported al Qaeda's cause. CA ¶¶ 64-72, 144-152. A number of purported Islamic "charities" played critical roles in collecting and facilitating transfers of funds to al Qaeda, including donations provided by al Qaeda's most prominent individual supporters, and in otherwise providing financial, logistical, and operational support to al Qaeda. CA ¶¶ 69-70. Several of al Qaeda's most important financial managers, including Aqil al Aqil, Wa'el Jelaidan, Abd al Hamid Sulaiman al Mujil, Soliman al Buthe, and Maneh al Johani, served as officials of these charities. CA ¶ 71.

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

Reports from the FBI, CIA, and Treasury Department reflect that al Qaeda operatives and members of associated terrorist organizations were frequently employed by offices of these charities, and used the cover the charities provided to them to gain access to funding, credentials, and employment papers in furtherance of their terrorist activities. CA ¶ 72.

Within this framework, three of al Qaeda's most important charity partners were Al Haramain, IIRO, and World Assembly of Muslim Youth ("WAMY"). CA ¶ 73. The depth and scope of these entities' collaborations with al Qaeda are reflected by a broad spectrum of intelligence assessments, United States and United Nations terrorism designations and related government counterterrorism actions, and Plaintiffs' experts' reports. *See, e.g.*, Pls. Ex. 38, Expert Report of Evan Kohlmann at 11-39 (detailing the support provided to al Qaeda and other terror groups by Al Haramain, IIRO, and WAMY). According to the United States, "[w]hen viewed as a single entity, Al-Haramain was one of the principal NGOs active throughout the world providing support for the Al-Qaida network." CA ¶¶ 74-75. Al Haramain's partnership with al Qaeda was actively supported by all of its global offices, and went well beyond funding and logistics support, extending as well to direct participation in al Qaeda plots and attacks. CA ¶¶ 76-106. Eventually, even the Kingdom of Saudi Arabia was compelled to admit that Al Haramain, which operated under supervision of the Saudi government's own Ministry of Islamic Affairs, was "one of the biggest terror-financing operations in the world." CA ¶ 107.

U.S. intelligence reports, designations, and expert testimony further confirm that Al Haramain's financial and material support for al Qaeda and its terrorist objectives were carried out under the direction and leadership of its senior officials, including Aqil al Aqil, Mansour al Kadi, Soliman al Buthe, and Perouz Sedaghaty. CA ¶¶ 108-113. For example, at the time of Aqil's designation pursuant to Executive Order 13224, the United States affirmed that Aqil "was

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

responsible for all AHF activities, including its support for terrorism," and that "[u]nder Al Aqil's leadership of AHF, numerous AHF field offices and representatives operating throughout Africa, Asia, Europe and North America appear to be providing financial and material support to al-Qaida." CA ¶¶ 71, 100, 235; *see also* CA ¶¶ 71, 108.

IIRO was likewise a key charity front supporting al Qaeda's operations and targeting of the United States during the decade leading up to the September 11th attacks. CA ¶¶ 114-128. United States diplomatic cables and intelligence assessments reflect that "bin Laden used the entire IIRO network for his terrorist activities," that IIRO "[was] one of the primary non-governmental organizations [NGOs] active worldwide associated with providing financial, material and logistical support to designated terrorist organizations, including al Qaida and UBL," and that IIRO was "the principal sponsor of terrorist training camps in Afghanistan during the Taliban regime." CA ¶¶ 115-116. CIA determinations and expert testimony further establish that the IIRO's support for al Qaeda was undertaken at the direction of IIRO's senior leadership, including Prince Turki bin Jalawi al Saud, Wa'el Hamza Jelaidan, Abd Al Hamid Sulaiman al Mujil, and Mohammed Jamal Khalifa. CA ¶¶ 117-128, 243-246.

CIA assessments and expert testimony similarly confirm WAMY's extensive role in supporting al Qaeda. CA ¶ 132. The CIA described WAMY as "a Saudi NGO where personnel often pursue an extremist agenda," and found "WAMY officials have couriered private Saudi donations to Islamic groups in Afghanistan and Bosnia" and would sometimes broker requests to donors when WAMY had "an ideological interest." CA ¶ ¶ 160, 559, 561. Within this context, the CIA determined that "the Al Rajhis were routinely contacted" by officials at WAMY. CA ¶¶ 160, 559.

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

### 2. ARB, the Suleiman Al Rajhi Charity Committee, and the SAAR Foundation

ARB was founded by Suleiman bin Abdul Aziz al Rajhi and his three brothers. CA ¶¶ 28-52. For many years preceding the September 11th attacks, Suleiman al Rajhi served as Chairman and Managing Director of ARB. CA ¶ 29. During the period between 1998 and 2001, ARB's Board of Directors and Executive Committee were dominated by members of the Al Rajhi family, including Suleiman al Rajhi and his son, Abdullah al Rajhi, who served as ARB's General Manager and oversaw the day-to-day operations of the bank during the 1998-2004 time period. CA ¶¶ 30-33. According to the CIA, "senior al-Rajhi family members control the banks' most important decisions and [] ARABIC's principle [sic] managers answer directly to Sulayman." CA ¶¶ 34, 178, 179.

Between 1998 and 2001, ARB maintained correspondent banking relationships with counterparty financial institutions throughout the world, including a Payable Through Account ("PTA") with Chase Manhattan Bank in New York. CA ¶¶ 35-36. As an international financial institution, ARB was required to adhere to international best practices with respect to AML, CFT, and KYC regulations; ARB's own experts have acknowledged that guidelines issued by the Saudi Arabian Monetary Authority ("SAMA") and governing ARB through the relevant period incorporated international best practices. CA ¶¶ 38-39. As Plaintiffs' expert Jonathan Winer explained at deposition, adherence to international standards and best practices is essential to ensuring that there are no weak links in the chain of banking regulation and enforcement. CA ¶ 39. ARB and its principals, including in particular Suleiman al Rajhi and Abdullah al Rajhi, would have been deeply familiar with these aspects of the international banking system, and the means to exploit its vulnerabilities, including through ineffective AML and KYC procedures, the abuse of PTAs, and the exploitation of unregulated and underregulated financial activities. CA ¶ 39.

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

In addition to his role as Chairman of ARB, Suleiman al Rajhi maintained and directed a sophisticated operation for distributing donations to Islamic causes throughout the world. CA ¶ 40. Within Saudi Arabia, Suleiman al Rajhi carried out this operation under the auspices of an unlicensed "committee" from 1983 until 2000, when it was belatedly authorized to operate as the Suleiman Bin Abdul Aziz Al Rajhi Charitable Foundation. CA ¶ 41. Suleiman al Rajhi maintained a full time staff and advisors to review and investigate potential recipients of support which included Abdul Rahman bin Abdullah al Rajhi, Saleh bin Sulaiman al Habdan, Abdullah bin Ibrahim al Misfer, and Saleh al Hussayen, a Saudi religious scholar who also served as a member of ARB's shariah board. CA ¶¶ 42-44.

Contemporaneous with the formation and growth of al Qaeda, Suleiman al Rajhi established a web of interrelated "charities" and institutions in the United States, including the U.S.-based SAAR Foundation, Inc., Sana-Bell, Inc., and Humana Charitable Trust. CA ¶¶ 45-46 (collectively, the "SAAR Foundation"). Corporate records of these entities, along with the deposition testimony of Abdullah al Rajhi, establish that Suleiman al Rajhi and Abdullah al Rajhi took deliberate steps to obscure and conceal their involvement with these entities, including by intentionally and illegally using various false or misspelled names and fictitious addresses on official documents filed within the Commonwealth of Virginia. CA ¶¶ 47, 393-398. According to U.S. counterterrorism officials, and as further opined by Plaintiffs' experts, the SAAR Foundation enterprise was established and operated to launder funds in support of terrorist causes.[5] CA ¶ 398. Suleiman al Rajhi incorporated ARB itself as a component of that operation. CA ¶ 404.

---

[5] The Averment and related expert testimony discuss this mechanism at length. Based largely on discovery obtained by an official of several of SAAR Foundation entities, the Averment shows how Suleiman al Rajhi distributed millions of dollars through his committee/foundation in 1999, to a range of radical Islamic causes throughout the world, including the United States, which were then attributed, as if actually paid, to a SAAR Foundation entity called the Humana Charitable Trust. CA ¶ 50. The business records of Humana Charitable Trust and the SAAR Foundation document efforts to avoid inquiries by the IRS as to the true nature of the entities, the actual source of the transfers, and the purpose of the funds. CA ¶ 51. Evidence also indicates that the transfers were funded through Suleiman al

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

The Averment highlights, by way of example, the intricate relationship between ARB, Suleiman al Rajhi and purported charitable organizations by detailing expert testimony and investigations regarding circumstances, orchestrated by Suleiman al Rajhi and Abdullah al Rajhi, pursuant to which Suleiman al Rajhi distributed millions of dollars through his committee/foundation in 1999, to a range of Islamic causes throughout the world, including the United States, which were then attributed, as if actually paid, to the Humana Charitable Trust. CA ¶ 50. Documents obtained from ████████, who served as an officer of U.S.-based SAAR and Humana, reflect the use of the entities as charity front, and efforts to avoid inquiries by the IRS as to the charitable nature of the entities. CA ¶ 51. Evidence also indicates that the transfers were funded through Suleiman al Rajhi's committee's account at ARB, and in many cases paid through the PTA ARB established at Chase Manhattan Bank in New York, an arrangement that obscured the origin of the funds. CA ¶ 52.

> **3.    CIA Finished Intelligence Assessments Document the Longstanding Involvement of ARB and Its Principals in Supporting Al Qaeda and Other Terrorist and Extremist Causes**

Plaintiffs' Averment and expert reports survey a collection of CIA finished intelligence reports, declassified under Executive Order 14040 and in response to a subpoena in this case, documenting the longstanding involvement of ARB and its principals in support of militant jihadist causes, including those promoted by Osama bin Laden and al Qaeda. As Plaintiffs' expert Jonathan Winer testified, these finished intelligence assessments were the end-product of a "highly developed process which can be relied upon by senior U.S. policy makers, including the President." CA ¶ 138. Read collectively, the reports reflect an increased understanding and

---

Rajhi's committee's account at ARB, and in many cases paid through the PTA account ARB established at Chase Manhattan Bank in New York, an arrangement that obscured the origin of the funds. CA ¶ 52. In response to reporting implicating the operation in terrorist financing activities and the IRS investigation, Suleiman al Rajhi took steps to move Humana Trust to the Isle of Man, a notorious money laundering haven, with ARB's assistance. CA ¶¶ 399-403.

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

confidence between 1997 and 2003 in the CIA's assessment of ARB's critical role at the center of al Qaeda's financial engine. CA ¶¶ 133-187.

For example, based on information available as of November 20, 1997, the CIA's Office of Transnational Issues issued a finished intelligence report addressing the funding of Islamic extremists. CA ¶¶ 153-154. That report includes a dedicated section on ARB, discussing its links to and financial support for Islamic extremism, and describing the al Rajhi family's history of providing financial support for extremism through humanitarian organizations. CA ¶¶ 156-160. A February 27, 2002 CIA report similarly reports that the CIA had "identified several wealthy Saudi individuals and families we suspect of supporting al-Qa'ida – including . . . the al-Rajhi family. . ." and that "several Al-Rajhi family members donate money to businesses tied to terrorists and personally oversee transactions destined for terrorists." CA ¶¶ 166-168. An August 28, 2002 CIA report further confirms the extremist links between Al Haramain and IIRO, and Al Haramain's use of ARB accounts for suspect transfers. CA ¶¶ 169-173.

A November 14, 2002 reported prepared by the CIA's Counter-Terrorism Center Office of Terrorism Analysis also addresses sources of al Qaeda funding and identifies in the "Major Donors" section of the report "Yassin al Qadi [Kadi], Adel Batterjee, and 'the Al-Rajhi family.'" CA ¶ 176. The section on the Al-Rajhi family states:

> The Al-Rajhi family – owner of the Al-Rajhi Banking and Investment Corporation – is a well-connected Saudi family from the central Najd region of the kingdom with a net worth of $12 billion. Al-Rajhi Bank has been a conduit of funds for Islamic extremists and for the 11 September hijackers [REDACTED] Sulayman al-Rajhi, the family patriarch, has been widely reported to support Islamic extremist policy and helped fund the U.S.-based SAAR foundation, which is the subject of US law enforcement investigations. Al-Rajhi Bank has maintained accounts for individuals linked to Usama bin Laden, [REDACTED] and individuals with ties to the Egyptian Islamic Jihad. Islamic extremists in Yemen named Al-Rajhi Bank as a preferred bank for transactions.

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

*Id.* The CIA noted the al Rajhi family's longstanding ties to bin Laden again in a March 10, 2003 report discussing the 1992 through 1996 period when al Qaeda was headquartered in Sudan, which describes the al Rajhi families and their associates as merchants in Saudi Arabia who "finance extremists." CA ¶ 177.

The importance the CIA assigned to ARB's role in supporting al Qaeda and other terrorist threats to the United States led the CIA's Counter-Terrorism Center Office of Terrorism Analysis to prepare a report dedicated entirely to ARB, *Al-Rajhi Bank: Conduit for Extremist Finance,* May 28, 2003. CA ¶ 178. That report makes clear that the government's investigations had confirmed a pervasive and long-standing relationship between ARB and terrorism, including al Qaeda, such that the CIA determined that "[s]enior al-Rajhi family members have long supported Islamic extremists and probably know that terrorists use their bank." CA ¶ 178. These investigations revealed information identifying ARB as the "bank of choice" of extremists, and confirming that several of al Qaeda's key financial facilitators have held bank accounts at ARB, and used the organization and its correspondent banking connections to move funds in furtherance of terrorism objectives. CA ¶ 179. The report further confirms that Suleiman al Rajhi's "tight control of ARABIC [ARB] activities suggest he is witting that his bank is attractive to extremists." *Id.* At the conclusion of the May 28, 2003 report, the CIA offered senior policymakers with several possible policy options for addressing the threat ARB's support for terrorism and militant extremist posed to U.S. national security, and those policymakers ultimately elected to pursue remedial action to address the threat posed by ARB through counter-terrorism engagements and cooperation with Saudi Arabia. CA ¶¶ 181-187, 188-203.

The expert report of Jonathan Winer further contextualizes the CIA reporting, and the clear connections between ARB, its principals, and the knowing funneling of money to extremist

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

organizations in furtherance of terrorism objectives. CA ¶ 180. For example, Winer's report elaborates on CIA findings regarding specific deposits in ARB by Al Haramain and IIRO officials. And other evidence corroborating the CIA's assessments. *Id.*

### 4. ARB's Substantial and Essential Support for al Qaeda

Discovery fully corroborates and confirms the CIA's findings that ARB was the "bank of choice" for al Qaeda and like-minded terrorists, and that al Qaeda and its financial facilitators and front charities broadly used ARB to move money in support of al Qaeda's global operations. CA ¶¶ 204-205. During the 1998-2002 time frame covered by limited jurisdictional discovery, ARB maintained and operated at least 94 accounts for Al Haramain. CA ¶ 206. During that time, ARB facilitated deposits into those Al Haramain accounts totaling 2,146,119,285.78 SR, and withdrawals totaling 2,035,094,758.98 SR. CA ¶¶ 207-209. Expert reports confirm that the Al Haramain accounts at ARB were used to send funds to Al Haramain's branch offices outside Saudi Arabia, a fact that was well known to ARB, and that those included branch offices in locations where al Qaeda was known to be operating. CA ¶¶ 210-211. During that same period, discovery showed that ARB maintained and operated 308 separate accounts for IIRO, and that ARB facilitated deposits totaling just under 3 billion SR and withdrawals totaling about 2.9 billion SR, and that those accounts were similarly used to send funds to IIRO branch offices outside Saudi Arabia, in locations where al Qaeda was known to be operating. CA ¶¶ 212-217. Documents produced in discovery further reflect that ARB similarly maintained accounts for additional charities and charity fronts that provided funding and logistical support to al Qaeda. CA ¶¶ 218-222. For example, although Plaintiffs have not yet had an opportunity to conduct discovery of ARB concerning its relationship with WAMY, documents produced by WAMY itself indicate that ARB maintained over 116 accounts for that organization, during periods when WAMY was operating as a key front for al Qaeda. CA ¶¶ 219, 517.

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

ARB's documents also reflect that ARB provided access to the international banking system to al Qaeda's most important individual financial facilitators, including senior officials of al Qaeda's most important charity fronts, and that ARB allowed and enabled these individuals to use their accounts at ARB to carry out financial transactions bearing hallmarks of money laundering. CA ¶¶ 223-263, 341-388. For example, SDGT and close bin Laden associate Wa'el Hamza Jelaidan maintained a longstanding banking relationship with ARB during the period that Jelaidan served as the key financial facilitator for contributions to bin Laden's participation in the Afghan jihad, and Suleiman al Rajhi was supporting bin Laden in that campaign. CA ¶¶ 224-226. ARB was also the bank of choice of Al Haramain director and SDGT Aqil al Aqil, who maintained five accounts at ARB. CA ¶¶ 227. With respect to Aqil, the documents produced by ARB reflect that, during the 1998-2003 time period, through two accounts ARB opened and operated for Aqil's purported personal banking activities, ARB facilitated transfers totaling an amount that would be equivalent to about $19.5 million today. CA ¶¶ 228-232. This extraordinary banking activity included concentrated large cash deposits into one of Aqil's alleged "personal accounts," during an intensive approximate two-month period, exceeding 14 million SR, a one time check deposit of 5 million SR during the same period, followed by single-event withdrawals of 2,726,500 SR and 16,900,000 SR. CA ¶¶ 346-335.

ARB's documents reflect similar suspicious transfers and deposits through accounts maintained at ARB on behalf of other senior officials of Al Haramain, including SDGT Soliman al Buthe, Mansour al Kadi, Abdullah al Misfer, and others. CA ¶ 236. ARB's documents also reflect that ARB operated two accounts for SDGT Abdul Hamid bin Sulaiman bin Muhammed al Mujil, the IIRO official described as the "million dollar man" for his role in collecting and distributing funds to al Qaeda and affiliated terrorists. CA ¶ 240.

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

Although Plaintiffs were not afforded discovery as to transactions carried out through Suleiman al Rajhi's committee/foundation account generally, discovery did establish that the account was used to transfer large sums to Al Haramain, including transfers directly to Aqil. CA ¶¶ 248-252. The documents also reflect that ARB handled twenty individual and joint accounts belonging to committee/foundation officials, which had deposits and withdrawals over the relevant period in the amount of approximately $85 million in 2023 dollars. CA ¶¶ 253-256. The scale and value of these transfers clearly indicates that they represented transfers of Suleiman al Rajhi's funds, and not those of his employees, and the statements for these accounts confirm the accounts were being used to carry out transactions for the committee/foundation. *Id.* As described in further detail by Plaintiffs' expert, this use of nominee accounts by ARB's Chairman, to distribute funds on his behalf but obscure the status as the originating party, presents a quintessential money laundering paradigm. CA ¶ 257.

ARB also maintained and operated accounts for seven of the 9/11 hijackers, as well as Sheikh Soliman Nassir Abdullah al Alwan, a radical cleric who recruited several of the hijackers. CA ¶¶ 265-267. Osama bin Laden himself opened an account at ARB in 1991, at a time that coincided with bin Laden's early efforts to build al Qaeda into a global terrorist organization, and at which point bin Laden was already advocating for jihad against the United States, as known to ARB. CA ¶¶ 270-272.

### 5. ARB Broadly Violated AML, CFT, and KYC Standards in its Operation of Accounts for Al Qaeda Fronts, Financial Managers, and Members

As further addressed in the expert reports and testimony and the finished intelligence reports, the documents produced by ARB confirm that ARB broadly violated international AML, CFT, and KYC standards, as well as SAMA guidelines and ARB's own (nominal) protocols, in relation to its opening, maintenance, and operation of accounts of al Qaeda's charity fronts,

financial facilitators and Suleiman al Rajhi's foundation. CA ¶¶ 273, 306-322. In carrying out financial transactions for those al Qaeda partners, ARB consistently ignored obvious red flags indicative of money laundering, terrorist financing, and other series crimes, in violation of international standards. CA ¶ 274. Viewed collectively and in light of the other available evidence concerning ARB's terrorist connections, ARB's treatment of these accounts and customers indicates that ARB knew that its accounts were being used to launder funds for al Qaeda and associated terrorists, and knowingly afforded al Qaeda's principal sponsors and financial facilitators unfettered license to use their accounts to engage in highly irregular transactions and activities, thus facilitating al Qaeda's access to the global financial system in ways that would not have been possible via accounts at other banks. CA ¶ 275. As a corollary, the manner in which the accounts were used by al Qaeda's principal sponsors and financial facilitators shows that they had absolute confidence that ARB would not report their highly irregular financial activities to regulators or authorities, and that they viewed ARB to be a trusted partner. CA ¶ 276.

In this regard, the Averment and Plaintiffs' expert reports show that ARB opened and operated hundreds of accounts for AHIF, IIRO, and WAMY, without even asking for basic and required information. CA ¶¶ 514-517, 306-325. No rational purpose existed for the proliferation of accounts ARB opened and operated for the charities, and ARB did not bother to seek any. CA ¶¶ 309-311. The limited information ARB did receive about them reflected vague and identical descriptions for numerous separate accounts, and confirmed that they were being used to send money to foreign branches of the charities where al Qaeda and jihadists were known to be active. CA ¶¶ 312-317. ARB's records are conspicuously devoid of any due diligence, oversight, or regulation of these accounts, despite the obvious terrorist financing risks they posed. CA ¶¶ 306-325. As Plaintiffs' expert Jonathan Winer explains, "the ocean of anonymous, minimally

documented transactions, including the apparent use of cash and couriers by the Da'Wah Organizations to transfer funds, meant that in reality, the accounts that ARB were providing to the Da'Wah Organizations functioned as anonymous accounts, in being able to provide funds throughout the world to people and for purposes that were not documented by ARB." CA ¶ 326.

Meanwhile, ARB was also specifically aware that Al Haramain, IIRO, Suleiman al Rajhi's committee/foundation, and the officers of those entities, were improperly using personal accounts of the officials to carry out financial activities unrelated to their personal affairs, a practice that masked the true origin of funds transferred from those accounts and embodied a classic mechanism for carrying out financial crimes. CA ¶¶ 9, 110, 171, 172, 209, 327-356, 569. The sheer size of the funds ARB was depositing and transferring from these accounts made clear that they were being misused for purposes unrelated to the accountholders own financial affairs, as did the extraordinary character of cash deposits, one way transactions, and massive one-time withdrawals. *Id.*

The remarkable series of transactions conducted via one of Aqil's personal accounts during a roughly two month period in 1999 are indicative. CA ¶¶ 347-356. ARB's records reflect that between May 4, 1999 and July 14, 1999, Aqil made 63 separate cash deposits into his account at the same branch, totaling 14,773,760 SR, as well as a 5,000,000 SR check deposit. CA ¶ 351. This equates to $5.72 million, or $9.3 million in 2023 dollars. CA ¶ 352. After no corresponding withdraw activity, the flow of transactions suddenly reversed, and virtually all of the funds were then withdrawn through two massive transactions, to unknown beneficiaries. CA ¶¶ 353-356. The terrorist financing red flags relating to these transactions were obvious to ARB and the personnel who directly interacted with Aqil, as the demonstrative exhibits Plaintiffs have offered showing what the cash transactions would have looked like make clear. CA ¶¶ 357-361.

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

Critically, this misuse of alleged personal accounts to shroud the sources, destinations, and true purposes of funds transfers extended to Suleiman al Rajhi's own financial activities and those of his "charity" committee/foundation. The accounts statements for the twenty alleged "personal" accounts ARB operated for committee/foundation officials Abdul Rahman Al Rajhi, Saleh al Habdan, and Abdullal al Misfer reflect that ARB moved in excess of 180 million SR through those accounts between 1998 and 2002, equating to about $85 million in 2023 dollars. CA ¶¶ 253-254. This use of nominee accounts by ARB's Founder and Chairman Suleiman al Rajhi, to distribute funds on his behalf but obscuring his status as the originating party, presents a quintessential money laundering paradigm. CA ¶ 257. And while the statements for these accounts do not identify the beneficiaries for many (indeed most) of the outgoing transfers, several do include notations showing that they involved transfers to or from Al Haramain (and especially Aqil), WAMY, and other entities and individuals closely associated with al Qaeda.[6] CA ¶ 258. The evidence developed in discovery also shows that Suleiman al Rajhi frequently issued checks for large sums to officials of his charity committee/foundation, through ARB accounts, which those officials could then simply cash and distribute to unidentified recipients. CA ¶ 262-263.

Winer's expert report surveys a number of additional money laundering and terrorist financing red flags that were conspicuously ignored by ARB, involving and arising from the transfer of funds by the charities to areas where extremist and terrorist entities were known to have a substantial presence, the existence of reliable information indicating that the charities and/or their representations, such as Aqil, were linked to third parties that were supporting or engaged in terrorist activity, the use of cash couriers to transfer funds from the charities into areas with known

---

[6] During the time period of this stunning financial activity through these accounts, Al Misfer was, in addition to his role as an official of Suleiman al Rajhi's charity committee/foundation, also an official of Al Haramain, serving as head of its Palestine Committee. CA ¶ 259.

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

conflict and/or terrorist activity, actual direct evidence that customer funds were being used for improper purposes, such as providing support for armed jihadists, large amounts of funds withdrawn by the charities in cash, minimizing the evidentiary trail of the uses of the cash, and publications or statements of the charities expressly supporting paramilitary jihadist action. CA ¶ 388. This evidence makes clear that the lack of diligence and systematic departure from applicable requirements was by design. CA ¶¶ 323-325.

### 6. ARB's Facilitation of Al Qaeda Financing From Within and Through the United States

Discovery, government intelligence reporting, and expert opinion testimony also show that ARB played a central role in laundering funds in support of al Qaeda from within the United States, through its role as a member of the U.S.-based SAAR Foundation enterprise, and the related transactions fulfilled through ARB's U.S. PTA. CA ¶¶ 11, 390-428, 429-488. Once again, the CIA and FBI jointly concluded that SAAR Foundation and its associated entities were "a complex web of overlapping companies with parallel ideologies, personal relatonships, and financial associates that has exhibited numerous affiliations with entities known to support terrorism." CA ¶¶ 11, 48, 292, 393. Plaintiffs' experts have, in turn, affirmed that the SAAR Foundation enterprise was established and directed by Suleiman al Rajhi and Abdullah al Rajhi to launder funds in support of al Qaeda and other terrorist causes, and that those ARB principals took illegal actions to shroud their roles and involvement in the operation. CA ¶¶ 45-48. In practice, SAAR Foundation and its web of related entities operated as a shell and cut-out for Suleiman al Rajhi and his Saudi-based committee. CA ¶¶ 49-52, 404.

Suleiman al Rajhi incorporated ARB as a component of the SAAR Foundation terrorist financing mechanism, and directed that contributions be carried out through ARB's PTA at Chase Manhattan Bank. CA ¶¶ 11, 52, 392. PTAs are a form of correspondent account through which a

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

U.S.-based correspondent bank (Chase Manhattan Bank) provides check writing privileges directly to the customers of the respondent bank (ARB) and give the respondent bank access to New York's dependable and transparent banking system.  CA ¶ 432. These arrangements present a high risk of money laundering and illicit activity, particularly where the respondent bank is not adhering to AML and CFT obligations. CA ¶¶ 433-436. The evidence shows that Suleiman al Rajhi deliberately exploited this vulnerability for purposes of the SAAR Foundation money laundering operation, in order to conceal "the contributor's name." CA ¶¶ 52, 410-411.

Although Plaintiffs have not been afforded discovery of ARB concerning transfers carried out through the SAAR Foundation and the PTA, limited discovery provided by an officer of several of the SAAR entities shows the SAAR Foundation mechanism was used to transfer funds for Suleiman al Rajhi in support of al Qaeda. CA ¶¶ 392, 408-417. These include transfers in favor of Al Haramain, WAMY, Muslim Word League, and several other al Qaeda fronts and components, including but not limited to Dar al Hijra, Taibah International, Kosovo Caravan, the Al Noor Mosque (9/11 hijackers), the Da'wah Office of the Ministry of Islamic Affairs in the Saudi Embassy, and American Open University. CA ¶¶ 418-427, 472, 480, 481. The evidence also reflects broad use of ARB's PTA at Chase Manhattan to facilitate transfers associated with al Qaeda, including transactions undertaken for Suleiman al Rajhi, his committee, and officers of his committee. CA ¶¶ 459-468. Numerous al Qaeda fronts and financial managers also used ARB's PTA to conduct transactions in support of terrorism, including persons directly associated with the 9/11 hijackers and their support network. CA ¶¶ 472-479.

### 7.    ARB's Disturbing Connections to the 9/11 Hijackers and Support Network

The FBI's investigations into the support network for the September 11th attack hijackers and limited discovery of ARB have revealed disturbing connections among ARB and Suleiman al

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

Rajhi, and persons in close contact with the September 11th hijackers and support network. CA ¶¶ 489-508. According to the FBI, an ARB employee named Towayan al Towayan "had significant direct and indirect contacts with several subjects and active participants in the World Trade Center (WTC) attacks," including Omar al Bayoumi and hijacker Hani Hanjour. CA ¶ 490. Although Towayan was allegedly sent to the United States to study English on his own expense, records produced by ARB reveal that he received back-channel funding, to the tune of several hundred thousand Saudi Riyals, from a member of ARB's shariah board. CA ¶¶ 491-496. Separately, Omar al Bayoumi, the Saudi "intelligence cooptee" who provided essential support and assistance to the hijackers, was in telephone contact with officials of Suleiman al Rajhi's charity committee, Abdul Rahman al Rajhi and Abdullah al Misfer. CA ¶¶ 500-502. Bayoumi was also closely associated with Towayan, as reflected by the fact that he designated Towayan to receive Bayoumi's mail when he vacated his apartment in San Diego. CA ¶ 500. Abdul Rahman al Rajhi and Abdullah Misfer were also in contact with Fahad al Thumairy, who worked with Bayoumi to establish the essential support network for the 9/11 hijackers. CA ¶ 479. Further, Saleh al Hussayen, the former ARB shariah board member and long-time advisory official of Suleiman al Rajhi's committee, moved to the same hotel as the hijackers on the night before the September 11th attacks, and then feigned seizure and fled the United State to avoid the FBI's efforts to interview him. CA ¶¶ 503-507. Evidence indicates that Hussayen was in the United States under the auspices of the SAAR Foundation's activities. CA ¶¶ 503-504. This portfolio of contacts between persons closely associated with ARB and Sulieman al Rajhi on the one hand, and the September 11th hijackers and support network on the other, defies innocent explanation, especially when viewed in light of Sulieman al Rajhi's longstanding tied to terrorism.

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

### 8.    ARB's Support for Al Qaeda was Knowing and Substantial

Through the activities and assistance described above and discussed in more detail in the Averment and Plaintiffs' expert reports, ARB provided essential and substantial assistance to al Qaeda, in support of its declared targeting of the United States. The evidence shows that this support was undertaken knowingly, and with the specific intent to advance al Qaeda's targeting of the United States. CA ¶¶ 5-11. Several factors affirm this conclusions.

Initially, the funding and fundraising needs to support al Qaeda's targeting of the United States were immense, and required access to the international banking system to move funds from supporters to al Qaeda itself. CA ¶¶ 223, 275, 524. Within this context, discovery confirms that ARB was indeed al Qaeda's "bank of choice," and the bank where al Qaeda's most important charity partners, financial managers, and core members held their principal accounts. CA ¶¶ 273-389. The financial services ARB provided to these al Qaeda components and supporters were anything but routine – to the contrary, the opening and operation of these accounts broadly violated international money laundering standards and provided al Qaeda with access to the international banking system that would not have been feasible through other banks. CA ¶¶ 273-389. ARB moved billions in SRs through these accounts leading up to 9/11, confirming that the bulk of al Qaeda's funding moved through ARB. CA ¶¶ 7, 206-209, 212-215, 515, 518. The importance of ARB's support to al Qaeda's operational capabilities is evidenced and underscored by the intensive focus and prioritization ARB's terrorist conduct received from the U.S. intelligence community and America's most senior policymakers in the aftermath of the September 11th attacks, when stemming the flow of funds to al Qaeda was an urgent national security imperative. CA ¶¶ 181-187, 188-203.

The Averment also presents several categories of evidence demonstrating, especially when viewed collectively, that ARB was aware of its role in advancing al Qaeda's anti-U.S. agenda and

acted with the intent to do so. These facts are fully reflected in the CIA's findings and assessments of ARB's and Suleiman al Rajhi's longstanding support for Islamic extremists, including bin Laden and al Qaeda itself. CA ¶¶ 145, 148, 154, 156-159, 176-180, 276, 294, 540, 524, 543. Further, the evidence confirms the close operational and financial relationships among Suleiman al Rajhi, his charity committee, and the officials of that committee on the one hand, and al Qaeda's most notorious charity fronts and financial managers on the other. CA ¶¶ 10, 172, 236, 248-250, 259, 323, 404, 479, 553. Those relationships reflect direct operational partnerships, carried out through overlapping officials and direct contacts and financial dealings with the most senior leadership of al Qaeda's charity fronts. CA ¶¶ 535-576. Further, the very nature of the extraordinary financial services ARB provided to al Qaeda's fronts and financial managers, reflects a knowing commitment to assist them in carrying out illicit activity. CA ¶¶ 509-534. Meanwhile, Suleiman al Rajhi and Abdullah al Rajhi established their own enterprise for laundering funds in support of terrorism, incorporating ARB itself. CA ¶¶ 11, 36-39, 52, 429-488. Suleiman al Rajhi also supported and aligned himself and ARB with several notorious anti-American and pro jihadist religious scholars. CA ¶¶ 44, 161, 265-267, 485, 503-507, 567, 568, 574.

In sum, the expansive and enduring connections between ARB and its principals and al Qaeda's leadership, most prominent charity fronts, most important financial facilitators, and unwavering and unconditional support ARB and its principals provided to those terrorist elements, show that ARB and its principals were at the very center of al Qaeda's financial support network, from its inception through the date of the September 11th attacks.

## III.    STANDARD OF REVIEW

After jurisdictional discovery, CA ¶¶ 12-27, Plaintiffs seeking to defeat a motion to dismiss under Rule 12(b)(2) must make a *prima facie* showing that includes "an averment of facts that, if

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

credited by the trier, would suffice to establish jurisdiction over the defendant." *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990). "The plaintiff need persuade the court only that its factual allegations constitute a *prima facie* showing of jurisdiction" that is "factually supported." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.,* 722 F.3d 81, 85 (2d Cir. 2013); *Averbach v. Cairo Amman Bank,* 19-cv-0004, 2023 WL 5016884, *4 (S.D.N.Y. June 30, 2023). The court is obligated to "construe the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor." *Dorchester*, 722 F.3d at 85 (citations omitted).

Summary judgment under Rule 56 is proper only if, drawing all inferences in favor of the non-moving party, the jurisdictional facts are undisputed, and the undisputed facts are insufficient as a matter of law to sustain a finding of personal jurisdiction. *See* Fed. R. Civ. P. 56; *Ball*, 902 F.2d at 197. Here, Plaintiffs' jurisdictional showing is supported by both facts and evidence, and is sufficient to defeat ARB's motion, either on a renewed motion to dismiss or motion for summary judgment.[7]

## IV.    LEGAL ARGUMENT

### A.    The Court's Exercise of Jurisdiction over ARB is Appropriate

To establish personal jurisdiction, due process requires "certain minimum contacts with [the United States] such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Terrorist Attacks VII,* 714 F.3d at 673 (brackets in original; internal quotes omitted). For these purposes, the touchstone due process inquiry is whether "the defendant's

---

[7] With respect to ARB's alternative request that the Court hold an evidentiary hearing should it deem any material fact disputed, any such evidentiary hearing should properly be deferred given that the jurisdictional dispute is intertwined with the merits of Plaintiffs' claims against ARB. In this context, resolution of the jurisdictional issues must be left for trial. *See Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 (2d Cir. 2006) (where "overlap in the evidence is such that fact-finding on the jurisdictional issue will adjudicate factual issues required by the Seventh Amendment to be resolved by a jury, then the Court *must leave the jurisdictional issue for the trial*") (emphasis added); *see also AEP-PRI, Inc. v. Galtronics Corp.*, 12-cv-8981, 2013 WL 4400833, *7 (S.D.N.Y. Aug. 13, 2013) (recognizing Court's discretion to defer jurisdictional issues to trial where jurisdictional issues overlap with evidence on merits).

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

conduct and connection with the forum . . . are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980); *see Terrorist Attacks VII,* 714 F.3d at 673 (quoting passage). This evaluation of fair play and notice is based in part on the strength of the forum's interests at issue. *See Int'l Shoe Co. v. Washington,* 326 U.S. at 317-320; *Asahi Metal Indus. v. Cal. Super. Ct.*, 480 U.S. 102, 113 (1987).

Several independent jurisdictional theories support the Court's exercise of jurisdiction over ARB. Under the traditional analysis, the "fair warning requirement is satisfied if the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." *Terrorist Attacks VII,* 714 F.3d at 674. The exercise of jurisdiction is also appropriate under the concerted action test announced in *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68 (2d Cir. 2018) and the correspondent bank test adopted by *Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161 (2d Cir. 2013). Plaintiffs meet the jurisdictional threshold under each theory.

Before turning to those frameworks, Plaintiffs note that an emerging body of scholarship and jurisprudence supports the conclusion that the Due Process Clause of the Fifth Amendment allows for a more robust and expansive assertion of jurisdiction in this context than the Fourteenth Amendment. *See, e.g., Fuld v. Palestine Liberation Org. & the Palestinian Auth.,* 22-cv-76, 2024 WL 2103762, *217 (2d Cir. May 10, 2024) (Menashi, J., dissenting) (citing case law and "[r]ecent scholarship" showing that Fifth Amendment does not limit exercise of personal jurisdiction by federal courts); *see also Lewis v. Mutond,* 62 F.4th 587, 598 (D.C. Cir. 2023) (Rao, J. concurring) ("There is little (or no) evidence that courts and commentators in the Founding Era understood the Fifth Amendment's Due Process Clause to impose a minimum contacts requirement. On the contrary, the widespread assumption was that Congress could extend federal personal jurisdiction

by statute."). Consistent with this emerging authority, Plaintiffs submit that JASTA plainly authorizes the exercise of jurisdiction over ARB, in view of the express and vital national security interests underlying that statute's enactment. Plaintiffs recognize that the Second Circuit has not yet adopted this view, and has to this point accepted that the due process under the Fifth Amendment mirrors that applied in the Fourteenth Amendment context, but respectfully reserve their arguments on this point under the emerging authorities and scholarship.

### 1.    Jurisdictional Discovery Confirms that ARB Tortiously Directed Conduct at the United States

ARB's brief principally charges that Plaintiffs' Averment fails to satisfy the "purposeful direction" test for personal jurisdiction. ECF No. 9786 at 24-28. In support of this theory, ARB argues that so-called "indirect" support provided to al Qaeda's charity components and financial managers is legally insufficient to support jurisdiction. *Id.* It further claims that the Averment fails to show ARB's "intent" or an adequate "nexus" between ARB's tortious conduct and Plaintiffs' claims. . ECF No. 9786 at 25. As discussed below, these claims are contrary to governing legal standards, ignore the content and import of the Averment, and broadly rest on disputed interpretations of the evidence and pleas for inferences to which ARB is not entitled.

The "effects test" for establishing personal jurisdiction is "typically invoked . . . the conduct that forms the basis for the controversy occurs *entirely* out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff. In such circumstances, the exercise of personal jurisdiction may be constitutionally permissible if the defendant expressly aimed its conduct at the forum." *Licci,* 732 F.3d at 173 (emphasis added). Under this analysis, a defendant has "'purposefully directed' his activities at residents of [this] forum,'" if the defendant "took 'intentional, and allegedly tortious actions … expressly aimed' at the forum" or its residents, *Terrorist Attacks VII,* 714 F.3d at 674 (quoting *Calder v. Jones*, 465

~~UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS~~

U.S. 783, 789 (1984)), or was a "primary participant in intentional wrongdoing—albeit extra-territorially—expressly directed at [the] forum." *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 208 (2d Cir. 2003) (characterizing *Calder*'s requirement).

Since Congress's 2016 enactment of JASTA, the Second Circuit has substantially refined and clarified the standards governing jurisdiction under the purposeful direction test and for assessing facts in the terrorism context, and these most recent authorities (which ARB largely ignores or mischaracterizes), readily show that the exercise of jurisdiction over ARB is appropriate.

In *Waldman v. Palestine Liberation Organization*, 835 F.3d 317 (2d Cir. 2016), the Court considered the availability of jurisdiction over the Palestinian Liberation Organization and the Palestinian Authority for claims arising from various terror attacks *that took place in Israel*, and killed or injured United States citizens. Although the Second Circuit in *Waldman* declined jurisdiction, it did so on the basis that there was no "connection between the conduct on which the alleged personal jurisdiction is based and the forum." *Waldman* 835 F.3d at 342. The *Waldman* court emphasized the "random and fortuitous nature of the terror attacks" that took place outside of the United States and did not specifically target American citizens. *Id.* at 337-38. The *Waldman* court further explained that a defendant's provision of support to a foreign terrorist organization will not support jurisdiction in the absence of allegations that the terrorist organization was known to be targeting the United States. *Id.* at 340.

In reaching its decision, the *Waldman* court drew a stark contrast between the claims before it arising from support for Hamas attacks in Israel and cases arising from the witting sponsorship of al Qaeda. *Id.* at 338-41. In particular, the court emphasized that the "specific aim of the group receiving support" is critical to the personal jurisdiction analysis for claims arising under the ATA,

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

*id.* at 340, and confirmed that al Qaeda has long been known to be targeting the United States. *Id.* Where, as here, the claims arise from ARB's knowing support of al Qaeda's targeting of the United States, and the injuries directly arise out of that campaign, *Waldman* fully supports the exercise of jurisdiction. *Id.* at 343-44.

The Second Circuit's decisions in *Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018) and *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021), in turn, described when allegations regarding knowledge and intent are sufficient to show the terrorist supporter's intention and awareness that it is playing a role in a terrorist group's activities. In *Linde,* the Second Circuit explained the standards governing aiding and abetting liability under the ATA, pursuant to JASTA's amendments, and recognized that allegations satisfying the aiding and abetting standard (including through indirect support and financial services) can give rise to an inference of the defendant bank's own "intent to further [the organization's] terrorist activities." *Linde,* 882 F.3d at 330. *Linde* confirmed that one who aids and abets a terrorist group with the requisite awareness if "itself assuming a 'role' in terrorist activities" and thereby satisfying the due process requirement of "suit-related conduct." *Id.* at 329. And where that aiding and abetting involves an anti-American terrorist organization like al Qaeda, the nexus to U.S. harm is apparent. *See Waldman*, 835 F.3d at 339-40 (intentional support to organization "known to be targeting the United States" would establish link to U.S. harm).

The Second Circuit's decision in *Kaplan* further clarified the standards that must be applied in construing allegations of terrorist support and assessing a defendant bank's mental state. *See Kaplan,* 999 F.3d at 842. *Kaplan* instructs that the district court is required to assess the facts of record holistically. *Id.* at 875. Further, the Second Circuit expressly recognized that "'[t]he length of time an alleged aider-abettor has been involved with a tortfeasor almost certainly affects the

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

quality and extent of their relationship and probably influences the amount of aid provided as well; additionally, it may afford evidence of the defendant's state of mind.'" *Id.* at 857 (quoting *Halberstam v. Welch*, 705 F.2d 472, 484 (D.C. Cir. 1983)). *Kaplan* expressly recognized that a bank may aid and abet a terrorist organization and assume a role in its terrorist activities by supporting known intermediaries. *See Kaplan*, 999 F.3d at 856.

The Second Circuit's decision holding that Plaintiffs presented a *prima facie* showing of jurisdiction as to ARB embodies the very principles announced in these more recent decisions. As the Second Circuit held there, financial services provided to a charity intermediary can establish jurisdiction, where provided with knowledge of the intermediary's role in terrorism, and in circumstances evidencing intent. *See Al Rajhi,* 779 F. App'x at 68. The Averment presents facts showing those very elements, along with evidence of other support for al Qaeda, and is thus sufficient to establish personal jurisdiction at this posture. *See, e.g., Dorchester,* 722 F.3d at 84-85; *Averbach*, 2023 WL 5016884, at *4-7; *In re Vitamin C Antitrust Litig.*, 05-cv-453, 2012 WL 12355046, *12 (E.D.N.Y. Aug. 8, 2012) (effects test satisfied after jurisdictional discovery but prior to evidentiary hearing, where plaintiffs alleged a conspiracy and presented facts tending to show that defendant contributed to cartel with express purpose of inflicting supercompetitive prices in the U.S.); *see also Water Res. Grp., LLC v. Powers,* 12-cv-3779, 2013 WL 5202679, *5-6 (E.D.N.Y. Sept. 13, 2013) (effects test satisfied after jurisdictional discovery but prior to evidentiary hearing, where allegations of tortious conduct and averment of facts detailed communications in, to and from the jurisdiction, including wire transfers).

Several considerations confirm the sufficiency of Plaintiffs' Averment and evidence in this regard. First, the Averment offers evidence establishing al Qaeda's unrelenting mission to target the United States and its interests through acts of violence. CA ¶¶ 53-62. Second, it demonstrates

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

that ARB provided extensive and highly irregular financial services to al Qaeda's most important charity fronts and financial managers, operating as al Qaeda's bank of choice and providing access to the international banking system to move the bulk of al Qaeda's funds before 9/11, facts which confirm (to the extent even required) the substantiality of ARB's support for al Qaeda. CA ¶¶ 181-272. Third, the Averment offers a broad spectrum of evidence demonstrating that ARB and its principals were central figures in the financial engine that fueled al Qaeda before 9/11, and plainly acted with an awareness of their role in supporting al Qaeda and in ways that establish its intent to support al Qaeda's targeting of the United States. CA ¶¶ 7, 206-209, 212-215, 515, 518. *See, e.g., Staples v. United States*, 511 U.S. 600, 615 n. 11 (1994) ("knowledge can be inferred from circumstantial evidence"); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168-69 (2d Cir. 2000) (same). Fourth, the Averment here shows that ARB took actions from within the United States to support al Qaeda, through its role in the SAAR Foundation money laundering enterprise and deployment of its correspondent account. Under such circumstances, there is no doubt that ARB should "reasonably anticipate being haled into court" in the United States, *World-Wide Volkswagen,* 444 U.S. at 297, to answer for its conduct in this case arising from an al Qaeda attack on U.S. soil.

### 2.    Jurisdictional Discovery Confirms that ARB is Subject to Jurisdiction as al Qaeda's Co-Conspirator and Aider and Abettor

The Second Circuit's ruling remanding ARB recognized that Plaintiffs also advanced theories of jurisdiction based on ARB's role as a joint actor, pursuant to the Second Circuit's decision in *Schwab,* 883 F.3d 68. *See Al Rajhi Bank,* 779 F. App'x at 68. Despite this fact, ARB's brief does not address this basis for jurisdiction at all.

In *Schwab,* the Second Circuit recognized an additional basis for personal jurisdiction applicable where an out-of-forum party acts to advance the forum-directed activities of others who

cause harm in the forum. *Id.* at 86-87. Under that analysis, personal jurisdiction can be established if the defendant was a participant in a joint action and a co-participant's acts in furtherance of the joint objective created sufficient contacts with the forum. *Id.* at 87. The *Schwab* court cited and endorsed the point set out in *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873, 884 (2011), that personal jurisdiction can be asserted when "'a defendant has followed a course of conduct directed at [a specific] society or economy,'" and that action directed at the United States as a whole may "'subject [a defendant] to the jurisdiction of the courts of the United States … .'" *Schwab*, 883 F.3d at 88. To meet *Schwab*'s test, plaintiffs must show only that the defendant's co-conspirators took actions "in furtherance of the conspiracy" in the relevant forum, *Id.* at 87. Here, al Qaeda's anti-American agenda, advanced by ARB, reflects a "course of conduct directed at [U.S.] society", *id.* at 88, which culminated in a physical attack on U.S. soil.

"To assert a conspiracy theory of personal jurisdiction, a plaintiff must plausibly allege that (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a [forum] to subject that co-conspirator to jurisdiction in that [forum]." *See Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp., PLC,* 22 F.4th 103, 122 (2d Cir. 2021); *see also Schwab,* 883 F.3d at 87. The Second Circuit has reaffirmed its conspiracy-based personal jurisdictional analysis in subsequent decisions. *See, e.g., In re Platinum and Palladium Antitrust Litigation*, 61 F.4th 242, 271 (2d Cir. 2023) (finding "overt act" requirement is "not a difficult requirement to meet"); *The Berkshire Bank v. Lloyds Banking Group PLC*, 20-1987-cv, 2022 WL 569819 (2d Cir. Feb. 25, 2022) (finding plaintiffs alleged personal jurisdiction under conspiracy theory).

The evidence presented in the Averment satisfies *Schwab*'s concerted action test, based on ARB's status as both a co-conspirator and aider and abettor.[8] As to the former, the evidence concerning ARB's and its principals' longstanding ties to al Qaeda, pattern of dealings and support for key al Qaeda nodes and financial managers over many years, provision of irregular financial services to those parties, high level contacts with al Qaeda's most important components, and role in establishing a U.S.-based mechanism to launder their own contributions to al Qaeda, easily establish ARB's participation in al Qaeda's well-documented conspiracy to target the United States through acts of violence, and the related conspiracy to launder funds to support that effort. *See Halberstam*, 705 F.2d at 481 ("in most cases the court will have to infer a conspiracy from indirect evidence); *Id.* ("[m]utually supportive activity by parties in contact with one another over a long period suggests a common plan"); *Linde*, 882 F.3d at 330 ("'traditionally a jury resolves questions about a tortfeasor's state of mind.'") (quoting *Cantazaro v. Weiden*, 140 F.3d 91, 95 (2d Cir. 1998)). Finally, both ARB and al Qaeda itself carried out overt acts in furtherance of the conspiracy in the United States.

### 3.     Jurisdictional Discovery Confirms that ARB is Subject to Jurisdiction under a Correspondent Banking Theory of Personal Jurisdiction

The evidence showing that ARB's PTA correspondent account at Chase Manhattan Bank in New York was used in furtherance of the tortious conduct at issue in this case provides an

---

[8] Plaintiffs submit that *Schwab* also authorizes the exercise of jurisdiction over ARB as an aider and abettor. *See Halberstam*, 705 F.2d at 477 (aiding and abetting a form of joint and concerted action). Plaintiffs acknowledge that this Court previously declined to extend the *Schwab* concerted action theory to aiding and abetting, citing the Supreme Court's admonition that courts should exercise "[g]reat care and reserve . . . when extending our notions of personal jurisdiction into the international field." ECF No. 8911 at 27 (quoting *Asahi Metal,* 480 U.S. at 115). In the context of terrorism claims arising from an attack on U.S. soil, however, the U.S. interests in deterring the aiding and abetting of terrorism and providing the victims a forum to seek redress are especially strong. Thus, the extension of *Schwab* to aiders and abettors in this context is consistent with traditional notices of fair play and substantial justice. *See International Shoe*, 326 U.S. at 320. For the reasons already explained, the Averment easily satisfies the general awareness and substantial assistance required to establish ARB's status as an aider and abettor. *See infra* § II.C. Accordingly, Plaintiffs respectfully submit that ARB is subject to jurisdiction as an aider and abettor, pursuant to *Schwab*.

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

additional basis for exercising jurisdiction over ARB. Under Second Circuit authority, "courts may exercise personal jurisdiction over foreign banks that repeatedly use correspondent bank accounts located in New York when those transactions are substantially connected to the plaintiffs' underlying claims." *Kaplan v. Bank Saderat PLC,* 77 F.4th 110, 115 (2d Cir. 2023) (citing *Licci v. Lebanese Canadian Bank,* 732 F.3d 161, 171 (2d Cir. 2013)); *Spetner v. Palestine Inv. Bank*, 70 F.4th 632 (2d Cir. 2023) (further extending application of *Licci'*s correspondent bank theory to the "nested" correspondent banking, where defendant foreign bank used a correspondent account with Jordanian bank, which held three correspondent bank accounts in New York banks); *see also King v. Habib Bank Ltd.,* 20 Civ. 4322, 2022 WL 4537849, *3 (S.D.N.Y. Sept. 28, 2022) (finding plaintiffs pled facts sufficient to support personal jurisdiction where complaints alleged that defendant used New York branch, and New York banking system to process transactions for "ARB, a known financier of al-Qaeda, during the period of time that the attacks at issue took place, years after ARB's ties to terrorists became publicly known").

This assertion of jurisdiction is premised on New York's Long-Arm Statute, C.P.L.R. § 302(a)(1), which authorizes personal jurisdiction over a foreign defendant for causes of action that arise out of "transact[ing] any business within the state." For purposes of this analysis, courts recognize that "[t]ransacting business in this context means 'purposeful activity – some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Spetner*, 70 F.4th at 639 (citations omitted). In *Licci,* for example, the court held that the bank's "recurrent transfers" to a correspondent bank account in New York satisfied this standard, and exhibited a "desire to benefit from New York's 'dependable and transparent banking system.'" *Licci*, 732 F.3d at 168. The exercise of jurisdiction under these circumstances is appropriate where the Averment reflects "a

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

choice by the defendant bank to avail itself of the benefits of the New York financial system." *Id.* at 643. As further explained in *Licci*, the "arising from" prong of New York's long-arm statute "does not require a causal link between the defendant's New York business activity and a plaintiff's injury. Instead, it requires 'a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former, regardless of the ultimate merits of the claim.'" *Licci*, 732 F.3 at 168-69.

Here, the Averment provides facts establishing, from 1992 and continuing until at least 2015, ARB had a correspondent banking relationship with Chase Manhattan Bank in New York.[9] CA ¶ 429. This account was a "payable-through account", which is a specialized correspondent banking relationship where Chase Manhattan, the U.S.-based correspondent bank, provided checking writing privileges directly to ARB itself and to certain customers of ARB. CA ¶ 432. As set forth in the evidence of record, and as further discussed by Winer in his report, PTAs pose an increased hazard of money laundering through illicit criminal activity, because such accounts allow foreign banks to use their correspondent banking relationship with U.S. banks without adhering to U.S. money laundering controls. CA ¶¶ 433, 437.

From 1998 until at least 2005, ARB used its PTA with Chase Manhattan Bank to move billions of dollars via tens of thousands of transactions. CA ¶ 441. For the month of September 2011, $550,638,901.79 in debit transactions and $546,124,219.77 in credit transactions were made using ARB's PTA with Chase Manhattan Bank. CA ¶ 443. In the first six months of 2001, tens of million of dollars were transferred in and out of ARB's PTA with Chase Manhattan Bank. CA ¶ 444.

---

[9] With respect to this point, ARB's statement that it did not maintained any presence in the United States during the relevant period is not accurate, given ARB's maintenance of correspondent banking relationships, the PTA in New York, and the relationships that ARB maintained through Suleiman al Rajhi's establishment of the SAAR Foundation. *See* CA at ¶¶ 36, 45-52.

~~UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS~~

During the 1998 to 2001 time period, ARB authorized and provided Suleiman al Rajhi, his committee/foundation, and employees acting on his and its behalf, with check writing privileges. CA ¶¶ 450. Suleiman al Rajhi leveraged those check writing privileges to facilitate the terrorist financing activities of his SAAR Foundation enterprise, incorporating ARB as a core member of that operation, and used that PTA to transfer funds to al Qaeda fronts. CA ¶¶ 451, 464-470. ARB also authorized IIRO with check writing privileges for ARB's PTA, and evidence shows that the PTA was used to transfer funds to al Qaeda fronts dating as far back as 1992. CA ¶¶ 453, 457-464. Given the extent and nature of ARB's correspondent relationships, its deliberate integration into Suleiman al Rajhi's terrorist financing operation, and the substantial transfer of money by and between ARB's PTA in New York, and financiers and supporters of al Qaeda during the relevant time period, ARB is subject to jurisdiction pursuant to *Licci*. CA ¶¶ 449-488.

ARB's claim that jurisdiction is lacking because the correspondent account did not directly fund the September 11th attacks reflects a misunderstanding of the law. The Second Circuit rejected a similar claim in *Spetner,* and noted that the bank's argument that plaintiffs "omit a 'causal connection' between the funds transferred from HLF's Texas-based account to its account at PIB and plaintiffs' injuries from Hamas's terrorist operations" reflects a "fundamental misunderstanding of the 'arising from' requirement." *Spetner,* 70 F.4th at 643. There, the Second Circuit recognized that the use of the New York financial system to facilitate terrorism subjected the non-domiciliary bank to jurisdiction. *Spetner,* 70 F.4th at 643. Here, the Averment reflects that ARB and its Chairman themselves used the correspondent account to launder funds in support of al Qaeda; integrated that correspondent account as a key component of their U.S.-based terrorist financing operation, which included support for al Qaeda; and allowed charities they knew were operating as al Qaeda fronts, such as IIRO, to issue checks and send transfers via the PTA. This

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

conduct is closely related to the tortious conduct at issue in this case, and sufficient for purposes of the jurisdictional analysis.

### B.    ARB's Strawman Arguments Do Not Undermine the Jurisdictional Bases for Plaintiffs' Claims

As noted above, ARB's challenges to this Court's jurisdiction are primarily directed to the adequacy of Plaintiffs' showing under the purposeful direction test. In support of those challenges, ARB persists in suggesting that so-called "indirect support" is per se insufficient to establish intentional tortious conduct, contrary to the Second Circuit decision that reinstated the claims against ARB here. ARB also suggests that jurisdiction requires Plaintiffs to track specific transfers directly into al Qaeda's hands, and to show that those funds were used in furtherance of the September 11th attacks themselves. These arguments misconstrue the governing legal standards. Beyond that, ARB's motion largely takes aim at strawmen, and argues for dubious interpretations of the evidence and inferences to which it is not entitled, and that are belied by the record.

### 1.    ARB's Misapplication of the Legal Authority

Contrary to ARB's framing, under the Second Circuit's standards, ARB's witting support for al Qaeda over a period of years, coupled with its specific awareness of al Qaeda's mission to attack the United States and intent to advance that objective, establish that the exercise of personal jurisdiction comports with due process. *See Waldman*, 835 F.3d at 339-40; *see also Kaplan,* 999 F.3d at 866 (inferring, based on allegations that the bank knew of the terrorist ties based on public statements, that the bank understood money would be received by a terrorist organization, even absent direct transfer of funds to Hizbollah). That this support included so-called "indirect" assistance in the form of ARB's provision of financial services to al Qaeda's charity components and financial managers does not alter this conclusion, because such indirect support is adequate where, as here, Plaintiffs offer evidence of ARB's "specific intent." *Al Rajhi Bank*, 779 F. App'x

at 69. Indeed, as this Court has recognized, facts satisfying JASTA's aiding and abetting standard "give rise to an inference of the defendant bank's 'intent to further [the organization's] terrorist activities.'" ECF No. 8911 at 21 (quoting *Linde*, 882 F.3d at 330) (alterations in original); *see also Kaplan,* 999 F.3d at 864 ("If the defendant knowingly – and not innocently or inadvertently gave assistance, directly or indirectly, and if that assistance was substantial, then aiding and abetting is sufficiently established if the defendant was '*generally* aware' that it was playing a role in internationally terrorism.") (emphasis in original). Plaintiffs' evidence here goes well beyond the baseline aiding and abetting standard.

Further, the nexus necessary to establish jurisdiction focuses on ARB's conduct in support of al Qaeda, and does not require a showing of ARB's involvement in the September 11th attacks or another specific al Qaeda operation. Instead, this inquiry focuses on the four factors identified in the Second Circuit's decision reinstating ARB: "'(1) when the alleged support was given to al Qaeda, (2) what support was given, (3) whether the support was 'earmarked' for use in specific schemes or attacks not directed at the United States, or (4) specifically how these defendants were involved in the process of providing support to al Qaeda.'" *Al Rajhi Bank,* 779 F. App'x at 69 (*quoting Terrorist Attacks VII*, 714 F.3d at 678-79). Here, those factors show, *inter alia*, that ARB provided the essential financial services used to transfer the bulk of al Qaeda's funds, through partnerships with its most important fronts and financial managers, in the years before and through the date of the September 11th attacks. None of that support was "earmarked" for schemes unrelated to the United States.

None of the prior rulings ARB invokes involve support of such an extensive and critical scale. Instead, these other cases involved isolated donations to the charities, *see, e.g., In re Terrorist Attacks on Sept. 11, 2001,* 392 F.Supp.2d 539 (S.D.N.Y. 2005) (finding princes had

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

insufficient minimum contacts), conduct that the Court deemed to have principally occurred at times temporally remote from the September 11th attacks, ECF No. 8911 (involving Dubai Islamic Bank), or other distinguishing features. Stated simply, the present case involves far stronger showings of support for al Qaeda and intent to further its targeting of the United States than those at issue in cases where jurisdiction has been found lacking. In addition, none of those prior cases involved conduct undertaken from within the United States itself in furtherance of the defendant's support for al Qaeda.

### 2.    ARB's Misapplication of the Facts

Beyond these misunderstandings of the legal standards governing the purposeful direction test, ARB's motion broadly rests on sharply disputed factual claims attacking only selective aspects of the Averment, and pleas that the Court should draw various inferences in ARB's favor. For example, based on assertions that the implicated charities and financial managers were not formally designated prior to the September 11th attacks, and that the charities were licensed and engaged in certain legitimate activities, ARB asks the Court to infer that ARB could not have known of the terrorist associations of those individuals and entities before the September 11th attacks. ECF No. 9786 at 29. Similarly, based on newspaper articles reporting that Suleiman al Rajhi was a generous philanthropist, and Abdullah al Rajhi's self-serving claims that his father did not support terrorism, ARB asks the Court to disregard the import of the Averment and infer that ARB and its principals acted innocently. ECF No. 9786 at 10. ARB also asks the Court to attach significance to the fact that ARB did not facilitate transfers from Osama bin Laden's account after it was frozen by the Saudi government. ECF No. 9786 at 21, 32.

These arguments suffer from two overarching and fundamental defects. First, they ignore the governing standard of review, pursuant to which Plaintiffs are entitled to all inferences in their favor and prevail on the basis of an Averment that, if credited, would suffice to establish

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

jurisdiction over the defendant. *See Ball*, 901 F.2d at 198. Second, ARB's factual arguments attempt to argue individual and selective data points in isolation, contrary to *Kaplan's* requirement that the facts be assessed holistically. *Id.* at 854. For these reasons, ARB's extensive efforts to argue the facts cannot support its bid for dismissal or summary judgment. Beyond the fact that these arguments are legally incompetent, they are also largely irrelevant and contrary to the record.

**Designation is not a prerequisite for knowledge.** ARB spends considerable ink urging the Court to decline jurisdiction because the implicated charities and financial facilitators were not designated before the September 11th attacks. ECF No. 9786 at 2, 12, 21, 29, 31, 33, 36, 42. On this basis, and because the charities were allegedly licensed to operate before the attacks, ARB asks the Court to infer that ARB could not have known that those customers were associated with al Qaeda. This argument is both contrary to Second Circuit authority and the evidence presented in the Averment, and also ignores that the relevant program for designating terrorist supporters did not even exist prior to 9/11.

As the Second Circuit explicitly held in *Kaplan*, "it would defy common sense" to require a designation to serve as a prerequisite for knowledge that certain individuals or entities were associated with a terrorist organization, or to conclude that such knowledge "could be gained in no other way." *Kaplan,* 999 F.3d at 864; *see also Brown v. Nat'l Bank of Pakistan*, 19 Civ. 11876, 2022 WL 1155905, *3 (S.D.N.Y. Apr. 19, 2022) (finding bank was aware of customer's terrorist ties without regard to designation). Most obviously, one "other way" to demonstrate such knowledge is through evidence that a defendant bank's principals were themselves longstanding supporters of the terrorist organization, with deep ties to the very front charities and financiers who were being supported by their bank. That is the case here, and that showing is additionally bolstered by evidence that the charities' support for jihadist causes was well publicized within Saudi Arabia and the subject of public

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

reporting before the September 11th attacks. This evidence overwhelmingly supports ARB's knowledge and intent.

ARB's arguments suggesting that jurisdiction depends on a showing of support for a party designated at the time of the support is especially nonsensical in the context of the present litigation arising from the September 11th attacks. This is because it was not until *after* the September 11th attacks that President Bush issued Executive Order 13224, the principal program for designating funders and supporters of terrorism (and the program under which Al Haramain,[10] IIRO, Aqil, al Mujil, Jelaidan, al Buthe and others were designated). The limited designation programs in place prior to the attacks were relatively narrow and targeted specific regions in the Middle East and particular actions related to those regions. *See, e.g.* E.O. 12947, "Prohibiting Transactions With Terrorists Threatening to Disrupt the Middle East Peace Process." 60 Fed. Reg. 5,079, 5079-80 (Jan. 25, 1995).

. **Suleiman al Rajhi's alleged resignation from the IIRO board is immaterial.** ARB's assertions that Suleiman al Rajhi resigned from the IIRO board are contrary to the evidence and do nothing to undercut the showing of the close relationships among ARB, its principals, and the charities. CA ¶¶ 547-554. ARB's assertions, based on fragmentary and inadmissible communications, that Suleiman al Rajhi resigned from the board of the IIRO in 1992 are both disputed and inconsequential. ECF No. 9786 at 30. In fact, the record indicates that Suleiman al Rajhi was a principal funder and shareholder of IIRO's investment arm, Sanabel al Kheir, and that his appointment to IIRO's permanent committee was likely a function (and requirement) of his status as a co-founder and shareholder of Sanabel. CA ¶¶ 548-550. The partial communications

---

[10] ARB also asks the Court to draw inferences in its favor based on the fact that the U.S. did not designate the Saudi headquarters of Al Haramain until 2008. ECF No. 9786 at 29. However, the record establishes that U.S. officials targeted the entire Al Haramain organization for designation immediately after the September 11th attacks, but took the designations in stages for diplomatic and strategic reasons. CA ¶ 192.

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

confirm that he refused to relinquish those shares, and thus remained as a member of the IIRO's permanent committee. CA ¶¶ 548-549. In any case, the communications relating to Suleiman al Rajhi's alleged efforts to resign from IIRO's permanent committee do not undercut the broader showing of his extensive and intimate ties to the charities and their leadership.

**ARB's claims that it did not distribute its own funds to al Qaeda's charity fronts are irrelevant and inaccurate.** ARB also suggests that the Court should decline jurisdiction because ARB allegedly did not donate its own funds to al Qaeda's charity fronts. ECF No. 9786 at 2. As an initial matter, ARB's arguments on this point disregard that discovery was limited to only three of al Qaeda's front charities, and it remains to be seen whether ARB provided its own funds to charities that were excluded from discovery based on ARB's burden claims. But this argument is irrelevant in any case, because the extraordinary financial services ARB provided to Al Haramain, IIRO, WAMY, and other of al Qaeda's charity components are themselves a form of "substantial assistance" and material support. *See* CA ¶¶ 71, 76-106, 108, 114-128, 132, 160, 559, 561 ; *see* 18 U.S.C. 2339A(b)(1) (defining material support to include "financial services"). The scope of those relationships shows that ARB's support for al Qaeda's charity fronts and financial managers was far more extensive and critical than previously understood, and far more important than mere financial contributions.

ARB also overstates the record in suggesting that it does not show transfer of its own funds to the charities. Specifically, the limited information provided in discovery relating to transfers from Suleiman al Rajhi's charity committee account at ARB indicates that ARB often facilitated transfers when that account was in arrears, to the tune of millions of SR, indicating that ARB fulfilled those transfers with its own funds. CA ¶¶ 50-52.

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

**ARB was the subject of intensive counter-terrorism efforts undertaken by the United States.** ARB asks the Court to draw inferences in its favor based on the fact that ARB and its principals were not themselves designated by the United States. ECF No. 9786 at 2, 12, 21, 29, 31, 33, 36, 42. The record is clear, however, that the CIA and senior U.S. policymakers determined that ARB's support for terrorism presented a grave threat to U.S. interests, and elected to pursue remedial action through high-level engagements with senior Saudi counterparts. *See supra* § II.C.3; *see also* CA ¶¶ 181-187, 188-203. As Plaintiffs' experts explained, designation is only one of several policy tools available to the United States in countering a terrorist threat, and foreign policy, diplomatic, and other considerations often dictate that is not the best tool. CA ¶ 192. Such was the case with ARB. *Id.*

**ARB expert Dennis Lormel worked for Suleiman al Rajhi after leaving the FBI and the FBI has repudiated his claims about its alleged investigations of ARB.** ARB cites to the expert report of Dennis Lormel to support its claim that the FBI was unable to verify CIA reporting about ARB. ECF No. 9786 at 12, 45. However, Lormel's claims about the FBI's alleged investigations of ARB and the findings of that investigation have been disavowed by the FBI and the DOJ itself. Specifically, after Lormel offered his report and testified, the FBI undertook supplemental searches to determine whether any records existed, consistent with the investigations he described. *See* May 3, 2024 letter, attached as Ex. F to the accompanying Declaration of J. Scott Tarbutton. In fact, no investigation matching his description was ever undertaken. *Id.* Lormel's deposition also revealed that he left his role at the FBI before any such investigation could have been completed – to go work for Suleiman al Rajhi in an arrangement that was highly irregular, at best. *See* Lormel Tr. at 33:12-20; 53:22-60:7. ARB's experts cannot be credited for purposes of its

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

bid for dismissal in any case, but the record also provides compelling evidence that Mr. Lormel should not be heard from at all.

**The CIA reports are admissible and properly relied upon by Plaintiffs' experts.** This Court previously found that CIA finished intelligence reports, including several of the specific reports cited in Plaintiffs' Averment, are admissible under the public record exception. *See* ECF No. 8911. In so holding, the Court rejected Dubai Islamic Bank's argument that the reports were "based on unreliable, unfinished intelligence" and also was not swayed by the redaction of the authors' names, explaining that "the documents carry the imprimatur of the CIA, which largely cures any reliability concerns posed by the redactions." *Id.* at 13. That holding applies with full force here,[11] and is bolstered in this case by the expert report and testimony of Jonathan Winer, which explains the rigorous process undertaken to create these reports, offers evidence that they were prepared for senior U.S. policymakers, and presents facts corroborating the key assessments as to ARB and its principals. CA ¶ 138. Further, the record shows that the 9/11 Commission relied upon CIA finished intelligence reports of this precise nature, including several of the specific reports at issue, for purposes of its findings concerning al Qaeda's financial infrastructure, and ARB's own expert has emphatically endorsed the 9/11 Commission's methodology and reliability.

ARB's one-sentence challenge to the CIA reports ignores that they are properly relied upon by Plaintiffs' experts. As is well established, "[a]n expert may base an opinion on facts or data in

---

[11] On this point, ARB seeks to avoid the Court's prior holding, based on a single sentence in its brief claiming that the CIA Documents "are inadmissible under the record here for reasons not established in the *DIB* case." ECF No. 9786 at 33. That sentence is linked to a lengthy argument in the "Admissibility Objections" section of ARB's nearly 800 page "Response to Plaintiffs' Averment of Facts in Support of Jurisdiction." The lengthy legal argument presented in that document violates this Court's briefing order, ECF No. 9596, in multiple respects, and should be stricken. It represents an obvious attempt to evade the page limits the Court imposed on briefing, and directly contravenes the Court's directive that admissibility objections should be stated simply (i.e. "hearsay") and that "no legal argument should be included". *Id.* (adopting admissibility objection requirements set forth in ECF No. 9026). That order further provides that, if complex evidentiary issues arise, the parties will be afforded an opportunity to brief them. *Id.* Accordingly, Plaintiffs will not engage ARB's improper admissibility arguments in full here.

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." FRE 703; *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 438-40 (E.D.N.Y. 2013); *United States v. Damrah*, 412 F.3d 618, 625 (6th Cir. 2005).

**ARB has produced no evidence that ARB's accounts for al Qaeda's front charities and financial managers were subject to audits.** ARB asks the Court to infer a lack of wrongdoing based on its assertion that ARB was subject to routine audits, and that those audits allegedly did not identify any material noncompliance. ECF No. 9786 at 2, 12, 27. It predicates these claims not on the content of any actual audits, but rather on the opinions of experts who did not review any audits, general references to SAMA guidelines, and generic statements in its own Annual Reports.

ARB's arguments predicated upon the alleged audits are disingenuous, misleading, and besides the point. In point of fact, ARB successfully opposed discovery concerning audits unrelated to terrorist issues. CA ¶ 23. The Court did direct ARB to produce any specific audits referencing the key accountholders at issue, and concerning reviews of ARB's AML and CFT compliance, and the lack of any resulting production indicates they do not exist. *Id.* Further still, these arguments are insufficient to overcome Plaintiffs' expert's opinions documenting ARB's extensive violations of international AML and CFT standards, and showing that SAMA failed to exercise meaningful oversight before the September 11th attacks.

**Plaintiffs' Averment documents "direct" and "indirect" support to Al Qaeda.** ARB misconstrues the record in claiming that Plaintiffs' Averment does not indicate that it provided direct support to al Qaeda. ECF No. 9786 at 13-14. To the contrary, the CIA findings quoted in

55

~~UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS~~

the Averment confirm that "Al-Rajhi Bank has been a conduit for … the 11 September hijackers," CA ¶ 176, "Al-Rajhi Bank has maintained accounts for individuals linked to Usama bin Ladin," *id.*, "al-Qa'ida members have held accounts" at ARB, *id.* at ¶ 148, and ARB has been used "by some members of Usama Bin Ladin's Islamic Army to maintain accounts and transfer funds." *Id.* at ¶ 164. The CIA reporting also places this financial activity by al Qaeda members at ARB in critical context, by explaining that al Qaeda's choice of banks was predicated upon "personal contacts at the banks and security concerns." CA ¶ 155.

ARB's arguments about "direct" versus "indirect" support also overlook the degree to which its customer charities and financial facilitators were operating, with ARB's awareness, at the very center of al Qaeda's operations. There was no daylight between those beneficiaries of ARB's financial services and support and al Qaeda itself, and ARB knew as much. Because of this, ARB's support provided through those relationships was "more direct." *Al Rajhi Bank*, 779 F. App'x 69.

**ARB's account for Osama Bin Laden supports Plaintiffs' jurisdictional showing.**

ARB attempts to make much of the fact that it did not execute transfers through the account it held for Osama bin Laden, following the freezing of his assets by Saudi authorities in 1994, CA ¶ 32, but that argument misses the point. After the order freezing bin Laden's assets, it would have been impossible to transfer funds via an account in his name, which is precisely why bin Laden needed to use the accounts of charity fronts and financial facilitators to move money for al Qaeda. ARB provided those essential financial services. Further, the fact that bin Laden opened an account in his name in 1991, at a time when he was building al Qaeda and was already well known as a jihadist within Saudi Arabia, only strengthens the record concerning ARB's longstanding alignment with al Qaeda's founder. CA ¶¶ 57-61, 270

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

**The evidence relating to Towayan and Hussayen reflects disturbing connections to the September 11th hijackers and support network.** ARB fares no better in its efforts to discount the evidence concerning Towayan al Towayan and Saleh al Hussayen, reflecting their close interactions with the September 11th hijackers and support network. ECF No. 9786 at 34-37. ARB's claims that Towayen was not sent to the United States by ARB and was funding his own "studies" while here are belied by the record, which instead shows that his deployment was in furtherance of his job for ARB and that he received back-channel funding (to the tune of hundreds of thousands of SRs) from a senior official of ARB's shariah board. CA ¶¶ 490-501.

ARB's claim that Saleh al Hussayen had not been a member of ARB's shariah board is, meanwhile, misses the broader significance and relevance concerning his interactions with the hijackers. Specifically, the evidence establishes that, in addition to his role for ARB, Hussayen was also a senior advisory official of Suleiman al Rajhi's charity committee, and indicates that he was in the United States under the auspices of Suleiman al Rajhi's committee when he moved to the same hotel as the hijackers. CA ¶¶ 503-508. These circumstances provide additional evidence of Suleiman al Rajhi's deep associations with al Qaeda and its targeting of the United States, which inform the understanding of ARB's own terrorist activities.

C.    **The Evidence ARB Offers to Challenge Jurisdiction Should be Stricken**

1.    **ARB's Expert Testimony Should be Stricken**

ARB relies on the testimony of its rebuttal experts to support its claim that it lacked knowledge and intent to foster al Qaeda's terrorist objectives. Most obviously, ARB's expert reports disputing Plaintiffs' experts' opinions cannot be credited for purposes of the present motion. However, Plaintiffs also note that ARB's experts failed to comply with the basic requirements necessary to qualify and testify. Under Federal Rule 26(a)(2)(ii), expert witnesses

are obligated to disclose "the facts or data considered by the witness in forming [the opinions the witness will express.]."

ARB's experts' reports indicated that they had reviewed materials referenced and cited in Plaintiffs' experts' reports, but at their depositions, each acknowledged that was not correct. Each of the experts also testifies that he could not identify which documents were reviewed or considered. *See* Pasley Tr. at 25-27, Lormel Tr. at 22-23, Dean Tr. at 103-106, Hobayb Tr. at 17-18. This testimony confirms an overarching failure by ARB, its counsel, and their experts to comply with the requirements of Federal Rule 26 with respect to the expert disclosures. Plaintiffs intend to move to exclude ARB's experts on this and other grounds.[12] *See Allen v. Koenigsmann,* 2023 WL 11803060 (S.D.N.Y. Mar. 30, 2023) (excluding expert report and testimony where inability to identify documents as required by Rule 26 "prejudices the [plaintiff's] ability to cross examine [the defense expert] effectively").

### 2.      ARB's References to Mr. Galloway's Errata Should be Stricken

ARB's efforts to rely on the testimony of James Galloway, its 30(b)(6) representative, to support its claim that ARB was unaware of any link between its customers and terrorism, similarly fail. After the completion of Mr. Galloway's deposition, Plaintiffs received a sweeping thirty-page Errata Sheet, containing 521 alterations to his deposition record. Mr. Galloway's expansive Errata Sheet was a circuitous effort by ARB to submit testimony into the record that was never subjected to any challenge through customary cross-examination by counsel. By presenting supplemental uncontested statements from Mr. Galloway, ARB has, in essence, introduced a sham affidavit, in contravention of Second Circuit authority. *See Perma Research and Development Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969) ("[i]f a party who has been examined at length on deposition

---

[12] The Court's briefing order directed that the challenges to expert testimony would be deferred to a later stage. *See* ECF No. 9596 at 1.

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact"). Plaintiffs thus respectfully submit that any evidence relying on the Errata sheet should be disregarded for purposes of the present motion.[13]

## CONCLUSION

The Averment presents sufficient facts that establish a *prima facie* case in support of jurisdiction. Accordingly, Plaintiffs respectfully request that the Court deny Al Rajhi Bank's renewed motion to dismiss.

Dated: July 22, 2024                    Respectfully submitted,

                                        /s/  Sean P. Carter
                                        Sean P. Carter, Esq.
                                        William N. Clark, Jr., Esq.
                                        J. Scott Tarbutton, Esq.
                                        Abby J. Sher, Esq.
                                        COZEN O'CONNOR
                                        1650 Market Street, Suite 2800
                                        Philadelphia, PA 19103
                                        (215) 665-2000

                                        Attorneys for *Lloyd's Syndicate 2*
                                        and *Muenchener* Plaintiffs


                                        Robert C. Sheps, Esq.
                                        SHEPS LAW GROUP, P.C.
                                        25 High Street
                                        Huntington, NY 11743
                                        (631) 249-5600

                                        Attorneys for *Charter Oak* Plaintiffs

---

[13] The Second Circuit has adopted a permissive approach to errata changes, but that approach rests on the understanding that the witness will be subject to cross-examination about the changes at trial. *See In re Weatherford Intl. Sec. Litig.*, 11 Civ 1646, 2013 WL 4505259 (S.D.N.Y. Aug. 23, 2013) (citing *Podell v. Citicorp Diners Club*, 112 F.3d 98, 103 (2d Cir. 1997)). Here, Plaintiffs have not had an opportunity to cross-examine Mr. Galloway about the sweeping additions and changes introduced through his errata, and the errata testimony therefore cannot be credited at this time. Plaintiffs note that they afforded ARB an opportunity to re-produce Mr. Galloway for a deposition limited to the errata changes, but it refused to do so.

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

James L. Bernard, Esq.
Patrick N. Petrocelli, Esq.
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000

Attorneys for *Arrowood* Plaintiffs


Christopher R. LoPalo, Esq.
NAPOLI SHKOLNIK PLLC
400 Broadhollow Road, Suite 305
Melville, NY  11747
(212) 397-1000

Attorneys for *Augilar*, *Abarca*, *Abedhajajreh*,
*Addesso*, *Aiken*, *Hodges*, and *Abbate* Plaintiffs

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of Plaintiffs' Memorandum of Law in Opposition to Al Rajhi Bank's Renewed Motion to Dismiss and Motion for Summary Judgment for Lack of Personal Jurisdiction, was electronically filed under seal this 22nd day of July 2024. Notice of this filing will be served upon all parties in 03 MDL 1570 by operation of the Southern District of New York's Electronic Case Filing ("ECF") system.

_____

J. Scott Tarbutton, Esq.

LEGAL\71762411\1