IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re TERRORIST ATTACKS ON<br>SEPTEMBER 11, 2001 | Case No. 1:03-md-01570-GBD-SN |
| | ORAL ARGUMENT REQUESTED |
| *This document relates to:* | |
| *The Underwriting Members of Lloyd's<br>Syndicate 2, et al. v. Al Rajhi Bank, et al.*, No.<br>16-cv-7853; *Aguilar, et al. v. Kingdom of<br>Saudi Arabia, et al.*, No. 16-cv-09663;<br>*Addesso, et al. v. Kingdom of Saudi Arabia, et<br>al.*, No. 16-cv-09937; *Hodges, et al. v.<br>Kingdom of Saudi Arabia, et al.*, No. 17-cv-<br>0117; *Aiken, et al. v. Kingdom of Saudi<br>Arabia, et al.*, No. 17-cv-00450; *Charter Oak<br>Fire Insurance Co., et al. v. Al Rajhi Bank, et<br>al.*, No. 17-cv-02651; *Abarca, et al., v.<br>Kingdom of Saudi Arabia, et al.*, No. 17-cv-<br>03887; *Arrowood Indemnity Co., et al. v.<br>Kingdom of Saudi Arabia, et al.*, No. 17-cv-<br>03908; *Abedhajajreh v. Kingdom of Saudi<br>Arabia*, No. 17-cv-06123; *Muenchener<br>Rueckversicherungs-Gesellschaft<br>Aktiengesellschaft in Muenchen, et al. v.<br>Kingdom of Saudi Arabia, et al.*, No. 17-cv-<br>07914; and *Abbate, et al. v. Kingdom of Saudi<br>Arabia, et al.*, No. 17-cv-08617 | |

## REPLY MEMORANDUM OF LAW IN SUPPORT OF
## AL RAJHI BANK'S RENEWED MOTION TO DISMISS

**WHITE & CASE**
701 Thirteenth Street, NW
Washington, DC 20005

September 30, 2024                                                    *Counsel for Al Rajhi Bank*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT .................................................................................................. 1

I.   THE OPPOSITION CONCEDES MATERIAL FACTS ESTABLISHING THAT
     THE COURT LACKS PERSONAL JURISDICTION OVER AL RAJHI BANK ............ 1

     A.   The Opposition Does Not Dispute Material Facts That Establish This
          Court's Lack Of Personal Jurisdiction Over Al Rajhi Bank .................................... 1

     B.   The Opposition Cannot Avoid That Jurisdictional Discovery Disproved
          Plaintiffs' Representations To The Second Circuit .................................................. 2

     C.   The Opposition Fails To Show That The Bank Had The "Specific Intent"
          To Support Al Qaeda Terrorism Against The United States .................................... 3

          1.   The Opposition Identifies No Evidence That, If Credited, Would
               Establish That Al Rajhi Bank Knew About The Charities' Alleged
               Support For Al Qaeda .................................................................................. 3

          2.   The Opposition Identifies No Evidence That, If Credited, Would
               Establish That The Bank Supported Terrorism Via Sulaiman Bin
               Abdulaziz Al Rajhi's Charitable Entities..................................................... 5

          3.   The Opposition Identifies No Evidence That, If Credited, Would
               Corroborate The CIA Reports, Which In Any Event Do Not Show
               "Specific Intent" Or "Nexus"...................................................................... 7

          4.   The Opposition Identifies No Evidence That, If Credited, Would
               Establish That The Bank Provided "Knowing and Substantial"
               Assistance To Al Qaeda............................................................................. 10

          5.   The Opposition Identifies No Evidence That, If Credited, Would
               Establish That Any Purported Non-Compliance Was Specifically
               Intended To Support Al Qaeda Terrorism Against The United
               States ........................................................................................................ 12

          6.   The Opposition Identifies No Evidence That, If Credited, Would
               Establish Purported "Facilitation" By The Bank Of "Al Qaeda
               Financing" In The United States................................................................ 13

          7.   The Opposition Identifies No Evidence That, If Credited, Would
               Establish Any "Disturbing Connections" Between The Bank And
               The 9/11 Hijackers.................................................................................... 14

     D.   The Opposition Inaccurately Minimizes The Scope of Jurisdictional
          Discovery ............................................................................................................... 15

II.     THE OPPOSITION DOES NOT REFUTE THAT PLAINTIFFS BEAR THE
        BURDEN OF ESTABLISHING PERSONAL JURISDICTION ......................................16

III.    THE OPPOSITION FAILS TO ESTABLISH PERSONAL JURISDICTION................17

        A.      The Opposition Fails To Establish Personal Jurisdiction Under A
                "Purposeful Direction" Theory.............................................................................17

        B.      The Opposition Fails To Establish Personal Jurisdiction Under A
                Conspiracy Theory...............................................................................................22

        C.      The Opposition Fails To Establish Personal Jurisdiction Under A
                Correspondent-Banking Theory...........................................................................22

IV.     THE OPPOSITION'S EVIDENTIARY CHALLENGES ARE BASELESS..................24

        A.      The Opposition Identifies No Basis To Strike The Bank's Expert Reports ..........24

        B.      The Opposition Identifies No Basis To Exclude The Errata To The
                Deposition Of The Bank's Rule 30(b)(6) Representative......................................25

CONCLUSION..............................................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*All. for Env'tl. Renewal, Inc. v. Pyramid Crossgates Co.*,
    436 F.3d 82 (2d Cir. 2006)......................................................................................................16

*Allen v. Koenigsmann*,
    No. 19-cv-8173, 2023 WL 11803060 (S.D.N.Y. Mar. 30, 2023).............................................24

*Ampong v. Costco Wholesale Corp.*,
    No. 21-cv-02049, 2023 WL 4744185 (S.D.N.Y. July 25, 2023).............................................25

*Bank of N.Y. v. Meridien Biao Bank Tanz.*,
    171 F.R.D. 135 (S.D.N.Y. 1997).............................................................................................25

*Berk v. St. Vincent's Hosp. & Med. Ctr.*,
    380 F. Supp. 2d 334 (S.D.N.Y. 2005).............................................................................3, 5, 16

*Boit v. Gar-Tec Prods., Inc.*,
    967 F.2d 671 (1st Cir. 1992)..............................................................................................16, 17

*Calder v. Jones*,
    465 U.S. 783 (1984).........................................................................................................17, 19

*Cnty. of Suffolk v. Long Island Lighting Co.*,
    907 F.2d 1295 (2d Cir. 1990)....................................................................................................3

*Daou v. BLC Bank, S.A.L.*,
    42 F.4th 120 (2d Cir. 2022) .....................................................................................................23

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*,
    722 F.3d 81 (2d Cir. 2013).......................................................................................................16

*Fed. Ins. Co. v. Al Qaida (In re Terrorist Attacks on Sept. 11, 2001)*,
    No. 03-cv-06978, 2023 WL 2430381 (S.D.N.Y. Mar. 9, 2023)...................................... *passim*

*Freeman ex rel. Est. Freeman v. HSBC Holdings PLC*,
    57 F.4th 66 (2d Cir. 2023) .......................................................................................................22

*Honickman v. BLOM Bank SAL*,
    6 F.4th 487 (2d Cir. 2021) .........................................................................................................4

*Hussein v. Dahabshiil Transfer Servs.*,
    230 F. Supp. 3d 167 (S.D.N.Y. 2017).......................................................................................2

*ICD Cap., LLC v. CodeSmart Holdings, Inc.*,
   No. 14-cv-8355, 2020 WL 815733 (S.D.N.Y. Feb. 19, 2020) ...................................................9

*J. McIntyre Mach., Ltd. v. Nicastro*,
   564 U.S. 873 (2011)................................................................................................................18

*Kaplan v. Lebanese Canadian Bank, SAL*,
   999 F.3d 842 (2d Cir. 2021).....................................................................................................20

*King v. Habib Bank Ltd.*,
   No. 20-cv-4322, 2022 WL 4537849 (S.D.N.Y. Sept. 28, 2022) ............................................24

*Licci v. Lebanese Can. Bank, SAL*,
   984 N.E.2d 893 (N.Y. 2012)............................................................................................23, 24

*Licci v. Lebanese Canadian Bank*,
   732 F.3d 118 (2d Cir. 2013).....................................................................................................23

*Linde v. Arab Bank, PLC*,
   882 F.3d 314 (2d Cir. 2018).....................................................................................................20

*In re London Silver Fixing, Ltd.*,
   213 F. Supp. 3d 530 (S.D.N.Y. 2016).......................................................................................9

*O'Neill v. Asat Tr. Reg. ("Terrorist Attacks VII")*,
   714 F.3d 659 (2d Cir. 2013).................................................................................11, 17, 18, 19

*Olin Corp. v. Lamorak Ins. Co.*,
   332 F. Supp. 3d 818 (S.D.N.Y. 2018).....................................................................................24

*Perma Research & Dev. Co*,
   410 F.2d 572 (2d Cir. 1969).....................................................................................................25

*Rushaid v. Pictet & Cie*,
   68 N.E.3d 1 (N.Y. 2016)..........................................................................................................23

*Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*,
   22 F.4th 103 (2d Cir. 2021) .....................................................................................................22

*Spetner v. Palestine Inv. Bank*,
   70 F.4th 632 (2d Cir. 2023) .....................................................................................................23

*In re Terrorist Attacks on Sept. 11, 2001 ("Terrorist Attacks IV")*,
   718 F. Supp. 2d 456 (S.D.N.Y. 2010)..................................................................................2, 17

*In re Terrorist Attacks on September 11, 2001*,
   538 F.3d 71 (2d Cir. 2008)................................................................................................19, 21

*Twitter, Inc. v. Taamneh*,
    598 U.S. 471 (2023)............................................................................................................20, 22

*Walden v. Fiore*,
    571 U.S. 277 (2014)................................................................................................................18

*Waldman v. Palestine Liberation Org.*,
    835 F.3d 317 (2d Cir. 2016).........................................................................................17, 18, 19

*In re Weatherford Int'l Sec. Litig.*,
    No. 11-cv-1646, 2013 WL 4505259 (S.D.N.Y. Aug. 23, 2013)..............................................25

## STATUTES AND RULES

18 U.S.C. § 2333(d)(2) .................................................................................................................20

Fed. R. Civ. P. Rule 26(a)(2)(B)(ii).............................................................................................24

Plaintiffs' Opposition (ECF No. 10152) fails to show that their Averment establishes that Al Rajhi Bank "expressly aimed" any "intentional, and allegedly tortious" conduct at the United States, or that Plaintiffs' injuries "arose from" any such conduct. *Fed. Ins. Co.*, 2023 WL 2430381, at *10. The Opposition further fails to distinguish the factual averments here from those this Court found deficient against DIB. *See id.* at *10-15 (dismissing for lack of personal jurisdiction over DIB). In short, the Opposition identifies no evidence that, if credited, would establish personal jurisdiction over Al Rajhi Bank.

## I. THE OPPOSITION CONCEDES MATERIAL FACTS ESTABLISHING THAT THE COURT LACKS PERSONAL JURISDICTION OVER AL RAJHI BANK

### A. The Opposition Does Not Dispute Material Facts That Establish This Court's Lack Of Personal Jurisdiction Over Al Rajhi Bank

The Opposition fails to rebut material facts establishing that Al Rajhi Bank *never* knowingly provided direct or indirect support to Al Qaeda, *never* directed any tortious act against the United States, and *never* had knowledge before 9/11 that any of its customers had alleged connections to Al Qaeda. In particular, despite the tens of thousands of pages of documents produced in discovery by Al Rajhi Bank, its U.S. correspondent bank, the FBI, the CIA, and other MDL defendants, the Opposition fails to identify evidence disputing these material facts: (1) Al Rajhi Bank's senior leadership did not know or support Bin Laden; (2) the Bank froze Bin Laden's accounts by 1994; (3) the Bank never processed any transaction for any customer designated or even well-known in Saudi Arabia as being connected to Al Qaeda at the time of the transaction; (4) the Bank never donated its own funds to any of the alleged "front" Charities; (5) the Bank complied with KYC and AML policies that met international best practices and relevant SAMA regulations; (6) neither Al Rajhi Bank nor any Al Rajhi family member has ever been designated, charged, or found liable for any connection to terrorism; and (7) *no transaction* through the Bank has ever been traced to the planning, financing, or carrying out of the 9/11 Attacks. Mem. 2-3.

## B.    The Opposition Cannot Avoid That Jurisdictional Discovery Disproved Plaintiffs' Representations To The Second Circuit

Al Rajhi Bank is not "gaslighting" this Court. Opp. 6, 12. It is appropriate to remind the Court — by *quoting Plaintiffs' own appellate briefs* — of Plaintiffs' representations to the Second Circuit to obtain jurisdictional discovery and show how discovery disproved those representations. *See* Mem. 13-20. While contending that the Bank is "wrong" (Opp. 11) that Plaintiffs largely abandoned their representations to the Second Circuit, the Opposition identifies no evidence to support them. In particular, the Opposition cannot avoid (at 9-10) that discovery disproved, and Plaintiffs' Averment abandons, Plaintiffs' representations to the Second Circuit of "direct" support to "known" Al Qaeda operatives. *See* Mem. 13-15. The Opposition repeats conclusory statements (Opp. 11) that Al Rajhi Bank was "the bank of choice of al Qaeda," and was "used" by Al Qaeda's purported "financial facilitators and front charities." But being "used" for routine services cannot establish *knowing* support for terrorism. *See Dahabshiil Trans. Servs.*, 230 F. Supp. 3d at 176-77 (holding inference of "knowing" support is "implausible" based on "'routine' banking services" unless defendant "had reason to believe" customers were terrorists (citing *Terrorist Attacks IV*, 718 F. Supp. 2d at 489)). Evidence of knowledge is particularly lacking because Plaintiffs admit that none of the Bank's customers was designated pre-9/11 (Opp. 49), its Charity customers were government-licensed and "supervis[ed]" (*id.*at 17, 49), and the Charities were "fronts" (*id*. at 18). Plaintiffs fail to show that the Charity customers' alleged affiliations with terrorism were "well publicized within Saudi Arabia" pre-9/11 (Opp. 50). *See* ARB Ex. A ¶¶ 5, 51, 63. Plaintiffs also fail to support their false assertion on appeal (Pls. App. Br. 15, 48, 57 n.8), and again in their Opposition (at 11), that "ARB funds were transferred to Al Haramain." Discovery established that the Bank made no donations of its own funds to *any* of the Charities. ARB Aver. ¶ 6. And the representations that Plaintiffs made to the Second Circuit about the Bank's former Chairman,

–2–

Sulaiman bin Abdulaziz Al Rajhi, have either been abandoned *or disproved*. *See* Mem. 16-18; 42-46; *see, e.g.*, Opp. (making no reference to "Golden Chain").

### C.    The Opposition Fails To Show That The Bank Had The "Specific Intent" To Support Al Qaeda Terrorism Against The United States

The Opposition fails (at 15-34, 49-57) to identify any averment that shows that the Bank knowingly provided *any* support to Al Qaeda, much less the specific intent to support Al Qaeda in attacking the United States. *See* Summary Order 68-69. Nor does the Opposition identify any material fact in dispute that, if credited, would establish such "specific intent." The Opposition instead offers conclusory statements and asks the Court to draw impermissible inferences unsupported by evidence and often controverted by undisputed facts. *See Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (holding plaintiffs not entitled to "unreasonable inferences, or inferences at war with undisputed facts" (quoting *Cnty. of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990))).

#### 1.    The Opposition Identifies No Evidence That, If Credited, Would Establish That Al Rajhi Bank Knew About The Charities' Alleged Support For Al Qaeda

The Opposition focuses (at 16-18) on support that Al Haramain, IIRO, and WAMY allegedly provided Al Qaeda, but fails to demonstrate that Al Rajhi Bank knew of any such alleged support before the 9/11 Attacks, or that the Bank knowingly supported Al Qaeda, much less the 9/11 Attacks, through any of the Charities. And it is undisputed that *none* of the Charities' foreign branches ever held accounts at the Bank. *See* Mem. 12; ARB Ex. A ¶¶ 43, 55. The Opposition fails to identify a *single document* produced in extensive discovery from the Bank, IIRO, WAMY, the CIA, or the FBI showing that the Bank had knowledge of any Charity's alleged affiliation with terrorism before 9/11, let alone any alleged affiliation of any of the Bank's Charity customers.

The Opposition admits (at 49-51) that *none* of the Charities (Bank customer or not) was designated before the 9/11 Attacks, Al Haramain KSA was not designated until 2008, neither IIRO KSA nor WAMY was *ever* designated, and "the charities were licensed and engaged in certain legitimate activities." The Bank took steps before and after 9/11 to confirm the Charity customers were licensed and that doing business with them was permissible. *See* ARB Aver. ¶¶ 46, 58. The Opposition's reliance (at 50) on *Brown*, 2022 WL 1155905, at *3, is misplaced. There, the ATA's "general awareness" prong for aiding-and-abetting liability was satisfied based on one customer's terrorism *designation* and another customer's indictment for supporting *designated* terrorists; no such circumstances are at issue here. While the Opposition protests (at 51) that certain designation programs were not in place before the 9/11 Attacks, the evidence confirms that the United States had programs to designate or block individuals and entities and used those programs to target alleged Al Qaeda financiers before 9/11. *See* Pls. Ex. 44 (9/11 Commission Staff Rpt.) at 37.

In any event, the Opposition fails to show that the Bank learned of any alleged ties of its Charity customers to Al Qaeda in any "other way" (Opp. 50). The Opposition fails to support Plaintiffs' longstanding canard that the Bank's principals themselves supported Al Qaeda, through the Charities or otherwise (*id.*), or that (at 50-51) "the charities' support for jihadist causes was well publicized within Saudi Arabia," identifying only a few obscure articles, *none* of which connects any Charity customer to Al Qaeda. *See* ARB Ex. A ¶ 5, 51, 63. Further, the Opposition's refrain (*e.g.*, at 16, 18) that the Charities are "fronts" forecloses any plausible inference that the Bank knew of their hidden connections to Al Qaeda. *See Honickman*, 6 F.4th at 502. And while Plaintiffs argued to the Second Circuit that Sulaiman bin Abdulaziz Al Rajhi's alleged IIRO board service was "[e]specially important for establishing direct knowledge of al-Qaeda's anti-U.S. operations facilitated by organizations also served by ARB" (Pls. App. Br. 40), the record

–4–

establishes that Sulaiman bin Abdulaziz Al Rajhi resigned from the IIRO and Sanabel boards *in 1992*. *See* Resp. to Pls. Aver. ¶¶ 547-551; Pls. Ex. 4 (Winer Rpt.) at 71 n.191. Plaintiffs are not entitled to any inference "at war with" these undisputed facts based on mere speculation (Opp. 50-51) that Sulaiman bin Abdulaziz Al Rajhi "likely" was required to "remain[] as a member of the IIRO's permanent committee." *See Berk*, 380 F. Supp. 2d at 342. The Opposition cites (at 18) a CIA report that "'the Al Rajhis were routinely contacted' by officials at WAMY," but the uncorroborated report does not state that these unnamed "Al Rajhis" had any role at WAMY or the Bank, when these "contact[s]" occurred, or that the purported "contact[s]" with unnamed WAMY officials concerned Al Qaeda. *See* Pls. Ex. 9 at 744 (stating that "WAMY puts foreigners requesting aid in direct contact with Saudi donors who are looking for *worthwhile Islamic causes*" (emphasis added)). The Opposition offers (at 52) *no other evidence* of Sulaiman bin Abdulaziz Al Rajhi's purportedly "extensive and intimate ties" to the Charities.

Unable to point to a single Bank donation to any of the Charities, the Opposition (at 52) now declares "irrelevant" the absence of "mere financial contributions" — formerly a pillar of their claims (*see* Pls. App. Br. 15, 48, 57 n.8; Compl. ¶¶ 159-61, 173-75, 182-83). The Opposition's desperate suggestion (at 52) that a few (repaid) account overdrafts should count as a "transfer of [the Bank's] own funds to the charities" is immaterial and not credible.

## 2. The Opposition Identifies No Evidence That, If Credited, Would Establish That The Bank Supported Terrorism Via Sulaiman Bin Abdulaziz Al Rajhi's Charitable Entities

The Opposition fails (at 19-21) to identify any evidence that, if credited, (i) supports imputing to the Bank any purported conduct or "specific intent" of the Sulaiman bin Abdulaziz Al Rajhi Charitable Foundation ("Charitable Foundation") or the SAAR Foundation (*see* Mem. 17, 43-44); or (ii) shows that either entity had "specific intent" to support Al Qaeda terrorism against the United States, or that either entity's transactions were intended for or reached Al Qaeda.

–5–

The Opposition's assertion (at 19 (citing uncorroborated CIA statement)) that the Bank's Board and Executive Committee "were dominated" by "the Al Rajhi family" is controverted by the undisputed evidence that, at all relevant times, the Bank (1) maintained four to five independent board members, (2) was required to follow the rules of its regulators, not the whims of any one person or family, and (3) maintained specialized committees, on which Sulaiman bin Abdulaziz Al Rajhi did *not* serve. *See* Resp. to Pls. Aver. ¶ 33. Also undisputed: no Al Rajhi family member has ever been charged or designated for terrorism, and the private civil claims in this MDL against Sulaiman bin Abdulaziz Al Rajhi and his son Abdullah bin Sulaiman Al Rajhi, the Bank's current Chairman, were dismissed by this Court. *See* Mem. 5, 11; ARB Ex. A ¶¶ 118-20.

The undisputed evidence shows that Sulaiman bin Abdulaziz Al Rajhi donated billions of dollars to charities around the world, including through the Charitable Foundation and the SAAR Foundation, and that none of his donations, processed through the Bank or otherwise, has been traced to Al Qaeda, much less the 9/11 Attacks. ARB Ex. A ¶¶ 130, 136. The Opposition identifies no evidence to support its reckless assertion (at 20) that the SAAR Foundation was "established and operated to launder funds in support of terrorist causes." As the Opposition acknowledges (at 21-22), the SAAR Foundation was the subject of IRS and DOJ investigations, which concluded without any action against the SAAR Foundation or its officers or directors. *See* Resp. to Pls. Aver. § IV (heading). This Court dismissed all civil claims in this MDL against the SAAR Foundation and its officers and directors for failure to state a claim (except for one officer, against whom plaintiffs voluntarily dismissed all claims). Mem. 17. It is immaterial (Opp. 20) that in a few SAAR annual reports from the *early 1990s*, the names of Sulaiman bin Abdulaziz Al Rajhi and Abdullah bin Sulaiman Al Rajhi include their legal first names, middle initials, and second middle names, but not the name "Rajhi." *See* Resp. to Pls. Aver. ¶ 47. Plaintiffs concede (Pls.

Aver. ¶ 45) that the SAAR Foundation was *named after* Sulaiman bin Abdulaziz Al Rajhi, obliterating the Opposition's assertion (at 20) that he tried to "conceal" his involvement in it. The Opposition identifies no evidence that Sulaiman bin Abdulaziz Al Rajhi or any official of either foundation knew of any recipient's purported affiliation with terrorism, much less intended that charitable donations be diverted to support Al Qaeda attacks on the United States.

The Opposition has no support for the assertions (at 20-21) that the Bank was "incorporated into" an "operation" involving the SAAR Foundation or had an "intricate relationship" with it. The undisputed evidence shows that Al Rajhi Bank had no relationship with the SAAR Foundation other than processing transactions, none of which Plaintiffs trace to Al Qaeda, much less to Al Qaeda attacks against the United States. *See* Mem. 17, 43-44; ARB Ex. A ¶ 136.

### 3. The Opposition Identifies No Evidence That, If Credited, Would Corroborate The CIA Reports, Which In Any Event Do Not Show "Specific Intent" Or "Nexus"

The CIA reports relied on by the Opposition (at 21-24, 53-55) are not only inadmissible, but also immaterial, because they do not show that the Bank "specifically intended" to support Al Qaeda terrorism against the United States, or that any purported Bank conduct had a "reasonable . . . temporal, geographical or causal connection, or proximity to the 9/11 attacks." *See Fed. Ins. Co.*, 2023 WL 2430381, at *11; *see* also Mem. 33-34. For example, the Opposition ignores (at 22) that the November 1997 Report does *not* conclude that either Al Rajhi Bank or any Al Rajhi family member *knowingly supported* terrorism, but rather alleges unnamed Al Rajhi family members provided financial support for the "Afghan Mujahaddin in Pakistan via humanitarian organizations," at some unknown time, and notes that recipient NGOs "purportedly divert funds" to extremists. Pls. Ex. 9 at 743. The Opposition also ignores the report's conclusions that intelligence about "Al Rajhi financial ties to Islamists is *inconclusive*," and "[t]he use of [Al Rajhi Bank] by extremists in some of these cases probably denotes convenience rather than Al Rajhi

–7–

family involvement in financing radical groups." *Id.* at 744 (emphasis added). The Opposition omits that the February 2002 report makes no allegations about Al Rajhi *Bank*, discussing only allegations about unnamed Al Rajhi family members that "donate money to businesses tied to terrorists," with *no allegations* that the unnamed family members knew of any such terrorist "tie[s]" or intended any donation to support Al Qaeda. Pls. Ex. 46 at 198. The report also says *nothing* about when or to whom those donations were made. *Id.* The statement in a May 2003 CIA report (Pls. Ex. 10) (Opp. 23) that unnamed "al-Rajhi family" members (numbering over 700) "probably know that terrorists use their bank" does not establish Al Rajhi Bank's knowledge, much less "specific intent" to support Al Qaeda attacks against the United States. None of the reports identifies any transaction made in support of Al Qaeda at all.

Beyond being immaterial, the CIA reports (no matter how "finished," Resp. to Pls. Aver. § VI (heading)) are uncorroborated by evidence and could not be substantiated by the FBI. Mem. 12; *cf. Fed. Ins. Co.*, 2023 WL 2430381, at \*12 (finding plaintiffs "offer no other support" for CIA reports on DIB's alleged "witting involvement"). Unable to corroborate the CIA reports, the Opposition attempts (at 53) to smear Mr. Lormel, a 28-year veteran of the FBI and former Chief of the FBI Financial Crimes Section (ARB Ex. 4 (Lormel Rpt.) at 2-3). The Opposition, citing a snippet of Plaintiffs' correspondence with the FBI, falsely asserts (at 53) that the FBI and DOJ "repudiated" and "disavowed" Mr. Lormel's testimony about the FBI's investigations concerning Al Rajhi Bank; in fact, that correspondence confirms that, *as Mr. Lormel testified*, the FBI found *nothing* in its investigation concerning the Bank to cause the agency to name the Bank or an Al Rajhi family member as a "subject or a main" target of further investigation. *See* ARB Ex. 61 (Lormel Dep. Tr.) at 107-114 (testifying that "considerable investigation" by his team into CIA leads about the Bank never passed "preliminary stage" to "full field investigation" because

–8–

agents found no evidence of "any wrongdoing" by the Bank); *see also* ARB Ex. A ¶ 2. The FBI's letter affirms that "third parties who had accounts at the Bank" *were* the subjects or a "main" focus of formal FBI investigations. Pls. Ex. F. This only corroborates Mr. Lormel's testimony: "[T]he investigative team could not substantiate allegations involving Al Rajhi Bank. This included the investigations conducted through the U.S.-Saudi Joint Terrorist Financing Task Force . . . to examine certain customer accounts believed to be used for terrorism at Al Rajhi Bank." ARB Ex. 4 (Lormel Rpt.) at 19. Plaintiffs cannot dispute that, despite the CIA reports, the U.S. government took no action against the Bank or any Al Rajhi family member. ARB Ex. A ¶¶ 118-20. And the mere fact that the CIA and FBI agents conducted investigations involving Al Rajhi Bank cannot support an inference of culpability. *See, e.g.*, *In re London Silver Fixing, Ltd.*, 213 F. Supp. 3d 530, 560-61 (S.D.N.Y. 2016) (holding that DOJ investigation that closed "without charging" defendant was not a "plus factor" supporting conspiracy claim); *ICD Cap., LLC v. CodeSmart Holdings, Inc.*, No. 14-cv-8355, 2020 WL 815733, at *7 (S.D.N.Y. Feb. 19, 2020) (finding it "doubtful" that defendant aided and abetted fraud where government obtained criminal conviction against primary actor but did not indict defendant as co-conspirator).

Besides, statements in the CIA reports are disproved by the evidence. *See* Resp. to Pls. Aver. § VI (heading). For example, the CIA's statement (Pls. Ex. 10 at 4) that Bin Laden in the "late 1990s" "may" have used an account at the Bank is disproved by the undisputed evidence that the Bank froze his accounts by 1994. Mem. 32; ARB Ex. A ¶ 4. Likewise, the CIA's statement (Pls. Ex. 46) that "Sulaiman al-Rajhi" was a "permanent member[]" of IIRO is disproved by the undisputed evidence showing he resigned in 1992. *See* Mem. 16-17. Notably, post-9/11 CIA intelligence about Iraq was found to be "dead wrong" because of an "inability to collect good information," "serious errors in analyzing" information, and a "failure to make clear just how much

–9–

of its analysis was based on assumptions, rather than good evidence." Rpt. to U.S. Pres. 1 (Mar. 31, 2005), https://www.govinfo.gov/content/pkg/GPO-WMD/pdf/GPO-WMD.pdf.

**4.    The Opposition Identifies No Evidence That, If Credited, Would Establish That The Bank Provided "Knowing and Substantial" Assistance To Al Qaeda**

The Opposition's feeble attempts (at 24-26, 33-34) to show "knowing and substantial" support merely underscore Plaintiffs' dearth of evidence. Plaintiffs — who obtained in discovery thousands of pages of transactional records for individuals and entities that Plaintiffs contend were Al Qaeda's "most important financial facilitators" (*e.g.*, Opp. 23-26) — cannot trace a single transaction through Al Rajhi Bank to any act of terrorism, let alone the 9/11 Attacks. *See* Opp. 13-14; Pls. Ex. A. ¶ 2. This failure is particularly conspicuous given the 9/11 Staff Commission's finding that "Neither the hijackers nor their financial facilitators were experts in the use of the international financial system. They created a paper trail linking them to each other and their facilitators." Pls. Ex. 44 (9/11 Commission Staff Rpt.) at 3. The Opposition (at 24-26, 33) identifies no evidence or material fact in dispute showing that any funds transacted through the accounts of the Charity customers or their officials were used for anything besides charitable endeavors, much less that any transactions were "substantial" or "essential" (Opp. 24) to Al Qaeda's terrorism against the United States. The Opposition casts as "suspicious" (at 25) activity in the individual account of Aqil, head of Al Haramain, a major, government-licensed charity in a cash-based economy. But the Bank produced from Al Haramain's KYC file a communication from a Saudi government official expressly directing the public to make donations for Al Haramain's relief efforts *directly to Aqil*. *See* Mem. 40; Resp. to Pls. Aver. ¶ 234. The Opposition ignores this undisputed evidence showing that large cash transactions through Aqil's account were *not* inherently "suspicious." *Id*. And as with the Charities themselves, Plaintiffs do not connect a single Aqil transaction through Al Rajhi Bank to Al Qaeda terrorism against the United States.

–10–

The Opposition's absurd assertion (at 33) that "the bulk of al Qaeda's funding moved through ARB" is controverted by the evidence. *See* Pls. Ex. 44 (9/11 Commission Staff Rpt.) at 3 (finding hijackers "used U.S. and foreign financial institutions to hold, move, and retrieve their money"), 25 (finding Al Qaeda's supporters used numerous banks, particularly in Pakistan and the UAE). And Plaintiffs' counsel have sued in this MDL multiple other banks for allegedly funding Al Qaeda during this same period. *See Terrorist Attacks VII*, 714 F.3d at 672. Grasping, the Opposition adds (at 26) that some of the 9/11 hijackers held accounts at the Bank, but it is undisputed that none of the hijackers was a known terrorist before 9/11 and that the evidence shows negligible activity on those accounts. Mem. 13-15; ARB Ex. A ¶¶ 94-96. The Opposition mentions (at 26) Bin Laden's long-dormant account, but concedes (at 56) that his accounts were frozen by 1994. Mem. 2, 32.

Contrary to the Opposition (at 33), the U.S. government's "focus and prioritization" after the 9/11 Attacks plainly was *not* on Al Rajhi Bank. *See* Mem. 3, 34, 44-45 (detailing evidence that CIA's intelligence leads about Al Rajhi Bank were never corroborated, and no government agency ever took any action against the Bank or any Al Rajhi family member); *see also, e.g.*, Pls. Ex. F (U.S. Dept. of Just. Ltr. to Pls.) (stating that FBI's "targeted searches" "did not reveal information suggesting that the Bank or Sulaiman (as opposed to, as discussed previously, third parties who had accounts at the Bank) were the focus of an investigation or investigative steps by the FBI"); Pls. Ex. J (Zarate, *Treasury's War*) at 145-67 (detailing U.S. targeting of banks serving "terrorist networks," with *no mention* of Al Rajhi Bank). Plaintiffs speculate (at Pls. Aver. ¶ 196) that the U.S. government took no action against the Bank because of purported economic concerns, but this speculation is fanciful; the notion that successive administrations of the U.S. government would knowingly excuse anyone culpable in the 9/11 Attacks is ludicrous. *See, e.g.*, Pls. Ex. O

–11–

(FBI Decl.) ¶ 5 ("Protecting the United States from terrorist attacks is the FBI's number one priority."). The United States could have taken any number of actions against the Bank, or members of the Al Rajhi family, or Sulaiman bin Abdulaziz Al Rajhi's charitable foundations, but *never* did so. *See* Mem. 3-4, 11. Plaintiffs' own evidence shows that Al Rajhi Bank maintained its correspondent banking relationships in the United States long after 9/11. *See* Pls. Ex. H (listing Bank's U.S. correspondent accounts in 2009). And the United States submitted an amicus brief in *support* of Al Rajhi Bank when these same Plaintiffs' counsel sought Supreme Court review of the Second Circuit's decision affirming this Court's dismissal of nearly identical claims against the Bank. *See* Mem. 4. It strains credulity that the United States would file a brief in support of a bank that the U.S. government had concluded was responsible for the 9/11 Attacks.

### 5. The Opposition Identifies No Evidence That, If Credited, Would Establish That Any Purported Non-Compliance Was Specifically Intended To Support Al Qaeda Terrorism Against The United States

The Opposition (at 26-30) identifies no factual evidence to support Plaintiffs' unsupported legal conclusion that the Bank "violated AML, CFT, and KYC standards," much less that any purported non-compliance was specifically intended to, or did in fact, support Al Qaeda terrorism against the United States. The Opposition points to no evidence that Al Rajhi Bank was *ever* found to be non-compliant by its regulator, SAMA, for any of the banking activity identified by Plaintiffs as "suspicious." *See* Opp. 25, 55. And the Opposition fails (*id.*) to rebut evidence showing that, in fact, the Bank maintained internal-audit protocols, including an Audit Committee and comprehensive internal-audit plans; conducted regular internal audits; was subject to audits by its regulator, SAMA; and retained independent auditors that conducted periodic independent audits (the results of which are publicly available) that found no wrongdoing by the Bank. Mem. 12.

The Opposition (at 27-28) repeatedly mischaracterizes the evidence about the Charity customers' accounts at the Bank. The Opposition is flat wrong in asserting (at 27) that the Bank

–12–

operated accounts for Charity customers "without even asking for basic and required information," and without "due diligence, oversight, or regulation of these accounts." To the contrary, the evidence shows that the Bank collected extensive KYC and account-opening information for Al Haramain-KSA and IIRO-KSA, producing *3,767 pages* of such records that show the Bank knew its Charity customers to be reputable and government-licensed. *See* Mem. 2, 8, 29; ARB Aver. ¶¶ 46, 58. The Opposition's assertion (at 27) that the Bank opened accounts for WAMY without obtaining KYC information is outrageous; Plaintiffs did not seek *any* WAMY account records in discovery. *See* ECF No. 6996-3. The Opposition misleadingly asserts (at 27) that "[n]o rational purpose existed" for the Charities to have multiple accounts. The undisputed facts show that the Charity customer accounts were dedicated to distinct projects around the world (but not in the United States). *See* Mem. 39; ARB Ex. 2 (Hobayb Rpt.) 24-25. The Opposition emphasizes (at 27) that the Charities sent money to conflict areas where "jihadists were known to be active," but the evidence shows that the Charities sent relief to regions experiencing the toll and destruction of armed conflict, so this activity would not have raised "obvious terrorist financing risks," particularly pre-9/11. *See* Resp. to Pls. Aver. ¶ 211; ARB Ex. A ¶¶ 43, 55. Even if the Bank was "aware" (Opp. 28) that Charity officials used personal accounts to carry out Charity business, that fact would not reasonably support an inference that by processing transactions through such accounts the Bank specifically intended to support Al Qaeda terrorism aimed at the United States. *See* Mem. 31, 39-42.

### 6. The Opposition Identifies No Evidence That, If Credited, Would Establish Purported "Facilitation" By The Bank Of "Al Qaeda Financing" In The United States

Contrary to the Opposition's grossly misleading section heading (at 30), the Opposition *does not trace a single transaction* through the Bank to Al Qaeda within or through the United States (or otherwise). The Opposition contends (at 31) that the Bank's correspondent account in

the United States was used to process donations to purported "al Qaeda fronts," but identifies no evidence that any transfer through the Bank's correspondent account was diverted to Al Qaeda. And the Opposition (*id.*) does not show that any such "front" was known to be affiliated with Al Qaeda at the time, or that any such donations were wittingly made by Sulaiman bin Abdulaziz Al Rajhi to Al Qaeda, much less wittingly processed by the Bank for Al Qaeda. For instance, Plaintiffs provide no evidence (*id.*) showing that a transfer to the "Ministry of Islamic Affairs in the Saudi Embassy" should have raised red flags, or that (*id.*) a donation to the "Al Noor Mosque" in 1999 would have been suspect. *See* ARB Ex. A ¶ 130.

### 7. The Opposition Identifies No Evidence That, If Credited, Would Establish Any "Disturbing Connections" Between The Bank And The 9/11 Hijackers

The Opposition continues to repeat (at 32) the inflammatory and refuted allegations that a former Bank employee, Towayan, had "significant" contacts with three hijackers in San Diego. But the Opposition does not refute the evidence that Towayan did not cross paths with the hijackers. *See* Mem. 34-36. Plaintiffs themselves aver that the hijackers began their trip from Arizona to Virginia in March 2001, *before* Towayan's arrival in San Diego in April. *See* July 31, 2024 Tr. 118:8-10; Pls. Aver. Against KSA ¶¶ 1829-30 (ECF No. 9541); Mem. 35. Contrary to the Opposition's guilt-by-association framing (at 32), Bayoumi's purported listing of Towayan for mail-forwarding does not establish that Towayan — much less the Bank — knew of or supported any purported role of Bayoumi in the hijackers' plans. The Opposition does not dispute (at 57) that the Bank refused to cover Towayan's trip expenses, and that he repaid loans from a colleague (not the Bank) before *and after* his U.S. visit. *See* Mem. 35-36. The Opposition also points to no evidence (i) countering Towayan's employment records establishing that he took leave from the Bank while in the United States, or (ii) showing that the Bank even knew where Towayan went to study or about any personal loans he received. *Id.*; Resp. to Pls. Aver. ¶¶ 490-501.

–14–

Separately, the Opposition concedes (at 57) that Hussayen was not affiliated with Al Rajhi
Bank at any relevant time. And while immaterial as to the Bank, the Opposition misrepresents the
record (*id.*), which does *not* show that Hussayen was a "senior advisory official" of the Sulaiman
bin Abdulaziz Al Rajhi Charitable Foundation. *See* Resp. to Pls. Aver. ¶¶ 503-08, § XII (heading).
The Opposition also identifies *no evidence* that Hussayen was in the United States "under the
auspices of the SAAR Foundation's activities" (Opp. 32); Plaintiffs' own evidence shows that he
was in the United States for meetings with the Muslim World League. *See* Pls. Ex. 164 at 3. And
the FBI report cited by Plaintiffs (Opp. 32) does not establish that Hussayen "moved" to the same
hotel as the hijackers, or that he was ever in contact with them. *See* Mem. 36-37.

**D.      The Opposition Inaccurately Minimizes The Scope of Jurisdictional Discovery**

The Opposition tries (at 6, 31) to excuse Plaintiffs' lack of evidence by falsely asserting
that jurisdictional discovery was curtailed. Yet the magnitude of discovery that Plaintiffs obtained
is undeniable: tens of thousands of pages produced by the Bank; Rule 30(b)(6) and apex
depositions; extensive productions from the Bank's U.S. correspondent bank, the FBI, and the
CIA; and *millions* of documents that Plaintiffs have obtained from parties and nonparties in this
MDL. *See* Mem. 8-11. Moreover, Magistrate Judge Netburn held that the Bank's searches were
reasonable (ECF No. 9210 at 4-8), and Plaintiffs did not object to that Order. Given such ample
discovery, Plaintiffs' failure to establish personal jurisdiction cannot be attributed to any purported
limitation on the scope of discovery.

The Opposition (at 13) falsely blames the Bank for discovery being "substantially
concentrated" on Al Haramain and IIRO. In fact, *Plaintiffs chose* to limit their discovery requests
to Al Haramain, IIRO, and Muwafaq before the Bank made *any* objection on burden. *See* Pls.
Mot. 2 (ECF No. 6996) (stating Plaintiffs "seek records relating to" Al Haramain, IIRO, and
Muwafaq); *id.* ("Plaintiffs focused their requests on a narrower set of issues that they anticipate

–15–

will be sufficient."). The Opposition (at 13-14, 55) also misrepresents the discovery record. The Opposition (at 14) identifies *no evidence* that Al Haramain or IIRO conducted business through the individual account of any official of the Charitable Foundation. The Opposition incorrectly states (at 55) that no evidence of audits exists, when in fact, the Bank produced roughly 850 pages covering post-9/11 investigations and audits. *See* Resp. to Pls. Aver. ¶ 25; Order 7-8 (ECF No. 9210). And the Bank's public annual reports discuss audits and their findings. ARB Aver. ¶ 129.

## II.     THE OPPOSITION DOES NOT REFUTE THAT PLAINTIFFS BEAR THE BURDEN OF ESTABLISHING PERSONAL JURISDICTION

The Opposition does not refute that Plaintiffs bear the burden of establishing personal jurisdiction over the Bank. Mem. 22. But the Opposition erroneously suggests (at 40, 49-50) that considering only Plaintiffs' Averment "is sufficient . . . at this posture." Under Rule 56, the Court must consider whether *all* the "undisputed facts," including those set forth by the Bank, "demonstrat[e] the absence of" personal jurisdiction. *See Fed. Ins. Co.*, 2023 WL 2430381, at *6; *Dorchester*, 722 F.3d at 85. And Plaintiffs are *not* "entitled to all inferences in their favor" (Opp. 49), in particular, "unreasonable inferences, or inferences at war with undisputed facts." *See Berk*, 380 F. Supp. 2d at 342 (S.D.N.Y. 2005).

Because the Opposition fails to identify any material fact in dispute that must be resolved to decide personal jurisdiction, the Court need not hold an evidentiary hearing. *See Fed. Ins. Co.*, 2023 WL 2430381, at *15 (denying hearing as to DIB "as unnecessary and moot"). Regardless, *Alliance* (Opp. 35 n.7), which concerns subject-matter jurisdiction, would *not* preclude an evidentiary hearing if any material fact in dispute did exist. 436 F.3d at 88 (relying on *Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 677 (1st Cir. 1992)). *Boit* makes clear that, where material facts in dispute are "common" to the personal jurisdictional and merits questions, and deferring a jurisdictional determination "imposes on a defendant a significant expense and burden of trial on

–16–

the merits in the foreign forum" (as would be the case here), a court may "hold[] an evidentiary hearing and weigh[] evidence to make findings." 967 F.2d at 677. If a court determines that the plaintiff has not "shown a likelihood of the existence of each fact necessary to support personal jurisdiction," then "the court may grant the motion and dismiss forthwith." *Id.* at 677-78.

## III.   THE OPPOSITION FAILS TO ESTABLISH PERSONAL JURISDICTION

### A.   The Opposition Fails To Establish Personal Jurisdiction Under A "Purposeful Direction" Theory

The Opposition does not contest (at 37-38) that personal jurisdiction under the "purposeful direction," or "effects," test requires a showing of "specific[] inten[t]" and "nexus" (*Fed. Ins. Co.*, 2023 WL 2430381, at \*10-11), namely, that (i) the Bank "took intentional, and allegedly tortious actions" "'expressly aimed'" at the United States, and (ii) "the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Terrorist Attacks VII,* 714 F.3d at 674 (quoting *Calder*, 465 U.S. 789); *see* Mem. 24-25. But the Opposition (at 37-41, 47-49) misstates the legal standard, mischaracterizes or ignores controlling authority, and fails to identify facts establishing either prong of this theory.

**Al Qaeda's "specific intent" cannot be imputed to the Bank.** The Opposition does not contest that Plaintiffs must show that the Bank "specifically intended to aid al Qaeda in the commission of a terrorist attack against the United States and its citizens." *Fed. Ins. Co.*, 2023 WL 2430381, at \*10 (quoting *Terrorist Attacks IV*, 718 F. Supp. 2d at 487); *see* Mem. 25, 28. Yet the Opposition misrepresents *Waldman* (at 38-39, 47) as holding that indirect support to a terrorist group can establish specific intent if *the group* is "known to be targeting the United States." *Waldman*, issued post-JASTA, states the very opposite, explaining that in *Terrorist Attacks VII* even "support *directly* to al Qaeda when al Qaeda allegedly was *known to be targeting the United States*" did *not* establish specific intent. *Waldman*, 835 F.3d at 339-40 (quoting *Terrorist Attacks*

–17–

*VII*, 714 F.3d at 678 ("[F]actual issues persist with respect to whether this support was 'expressly aimed' at the United States.")). *Waldman* and *Terrorist Attacks VII* are unequivocal that Al Qaeda's specific intent to harm the United States is not imputable to even a direct Al Qaeda supporter, let alone an indirect supporter, as the Bank is alleged to be here: "The mere fact that harm in the [United States] was foreseeable is insufficient to establish jurisdiction." *Waldman*, 835 F.3d at 339 (quoting *Terrorist Attacks VII*, 714 F.3d at 674) (cleaned up); *Walden*, 571 U.S. at 286 (holding defendant's "relationship" with "third party" irrelevant for personal jurisdiction).

Neither *Linde* nor *Kaplan* addresses personal jurisdiction, much less silently overrules *Waldman* and *Terrorist Attacks VII* to establish, as the Opposition wrongly suggests (Opp. 39, 47-48), a personal-jurisdiction theory based on imputed specific intent. The Opposition is also wrong (at 47) that personal jurisdiction based on the attribution of Al Qaeda's specific intent to the Bank "comports with due process." Whether Al Rajhi Bank should have "reasonably anticipate[d]" facing claims in this Court (Opp. 35-36, 41) cannot be "based on general notions of fairness and foreseeability"; "[t]he question is whether a *defendant* has followed *a course of conduct directed at*" the "jurisdiction" of the United States. *Nicastro*, 564 U.S. at 884 (emphases added).

**The "nexus" between Al Qaeda and Plaintiffs' injuries cannot be imputed to the Bank.** The Opposition does not contest that the requisite "nexus" demands a showing that *the Bank's* conduct had a "reasonable . . . temporal, geographical or causal connection, or proximity to the 9/11 attacks." *Fed. Ins. Co.*, 2023 WL 2430381, at *11; *see* Mem. 25-26, 28, 46-47. Yet the Opposition (at 39, 47-48) again misrepresents *Waldman*, this time as purportedly holding that aiding and abetting a terrorist organization would establish the requisite "nexus to U.S. harm." Opp. 39 (citing *Waldman*, 835 F.3d at 339-40). In *Waldman*, however, the defendants' nexus to the attacks was not at issue; nor was aiding-and-abetting even claimed. And Plaintiffs' *Waldman*

–18–

quote comes from the specific-intent discussion in *Terrorist Attacks VII*. *See* 714 F.3d at 678. On nexus, *Terrorist Attacks VII* reiterates that, "assuming that the [defendants] were aware of Osama bin Laden's public announcements of jihad against the United States and al Qaeda's attacks on the African embassies and U.S.S. Cole, their contacts with the United States [i.e., funding Al Qaeda through charities] would remain far too attenuated to establish personal jurisdiction." 714 F.3d at 675 (quoting *Terrorist Attacks III*, 538 F.3d at 95 (dismissing Four Princes)); *see also Calder*, 465 U.S. at 790 ("Each defendant's contacts with the forum State must be assessed individually.").

Contrary to the Opposition's mischaracterization (at 40, 47-48), the Second Circuit's Summary Order confirms the rule that "providing indirect funding to an organization that was openly hostile to the United States *does not* constitute intentional conduct that is expressly aimed at residents of the United States." Summary Order 68 (emphasis added) (cleaned up). While the Opposition is wrong (at 40) that the Second Circuit could discern from Plaintiffs' indirect-support allegations a *prima facie* showing of personal jurisdiction, the panel remanded for jurisdictional discovery to explore Plaintiffs' since-disproved allegations of the Bank's purported support that was allegedly "'*more direct and one step closer* to al Qaeda.'" *Id.* at 69 (emphasis added).

**Personal jurisdiction cannot be based on aiding and abetting.** Contrary to the Opposition (at 48), by merely observing that allegations sufficient for aiding and abetting might also be sufficient for specific intent (*Fed. Ins. Co.*, 2023 WL 2430381, at *11), this Court did not endorse Plaintiffs' imputation theory that was foreclosed by *Terrorist Attacks VII* and *Waldman*. In any event, the Supreme Court in *Twitter* (*see* Mem. 38-39, 41) clarified the aiding-and-abetting formulation in *Linde* and *Kaplan*, on which the Opposition improperly relies (incredibly, without a peep about *Twitter*). To show "knowing and substantial assistance" (*see* 18 U.S.C. § 2333(d)(2)), *Twitter* requires Plaintiffs to show the Bank's "conscious, voluntary, and culpable participation"

–19–

in "the act of international terrorism that injured the plaintiffs." 598 U.S. at 493, 497. The

Opposition does not contest the immateriality of any purported Bank failure through "omissions,

inactions, or nonfeasance" to prevent transactions of the Charities and their officials — even if

they had been *known* terrorists (like ISIS in *Twitter*) — because any such failure cannot show

"affirmative and culpable misconduct" by the Bank. Mem. 39 (quoting *Twitter*, 598 U.S. at 489,

505). The Opposition also does not contest that the Bank cannot be "culpable" for purported

failures to block any accountholders from accessing "generally available" banking services. Mem.

38 (quoting *Twitter*, 598 U.S. at 498-99). Under *Linde* and *Kaplan*, too, the Opposition fails to

show that the Bank was even "generally aware" of its purported role in terrorism, let alone with

specific intent to support Al Qaeda terrorism against the United States, because Plaintiffs do not

aver that the Bank knowingly provided material support to any customer "closely intertwined with

[Al Qaeda's] violent terrorist activities." *Kaplan*, 999 F.3d at 860 ("[K]nowingly providing

material support to an FTO, without more, does not as a matter of law satisfy the general awareness

element." (citing *Linde*, 882 F.3d at 329-30)).

The Opposition founders in attempting (at 48-49) to distinguish from this case either the

Second Circuit's affirmance in *Terrorist Attacks III* of the dismissal of the "Four Princes," or this

Court's dismissal in *Federal Insurance* of DIB. In *Terrorist Attacks III*, the nexus between the

Four Princes and the 9/11 Attacks was much closer than the nexus Plaintiffs aver here. This was

not, as the Opposition asserts (at 48), a case of mere "isolated donations." The Four Princes

allegedly "supported Muslim charities knowing that their money would be diverted to al Qaeda

. . . which then *used the money to finance*" the 9/11 Attacks. 538 F.3d at 94 (emphasis added).

The Second Circuit affirmed dismissal, holding that such indirect but knowing support was "too

attenuated" to establish personal jurisdiction. *Terrorist Attacks III*, 538 F.3d at 95. Plaintiffs here

–20–

do not aver facts showing that the Bank donated its own funds to the Charities, or knew or intended that any financial services to the Charities would support Al Qaeda, much less that any funds or services to the Charities would be used for an Al Qaeda attack against the United States.

The Opposition's one-line treatment (at 49) of the dismissal of DIB fails to distinguish the post-discovery jurisdictional averments in that case that this Court found insufficient. *See* Mem. 26-27. The Opposition (at 49) mischaracterizes the Court's decision as based solely on finding that the alleged conduct was "temporally remote" from the 9/11 Attacks. In fact, this Court expressly acknowledged that DIB "provided al Qaeda-linked accounts with routine banking services *closer* in time to the 9/11 Attacks" than previously dismissed banks. 2023 WL 2430381, at *12 (emphasis added); *see, e.g.*, *id.* at *4 (reciting allegations that KSM's nephew opened account in August 2000 and withdrew "nearly all the money" on September 10, 2001). This Court, nevertheless, determined that the plaintiffs there lacked evidence to establish DIB's "specific intent" or "nexus." *Id.* at *11-12. DIB's conduct was "no more intentional or direct than that of the banks this Court dismissed from this litigation" where DIB (like those other banks, and like Al Rajhi Bank) allegedly "held accounts for individuals and entities involved in al Qaeda plots and provided 'routine banking services' for them." *Id.* That DIB's former Chairman and two directors "harbored extremist views or maintained links to extremist groups" — circumstances without analogy here — also could not establish DIB's "specific intent," nor could the CIA's uncorroborated "description of DIB management's 'apparently witting involvement' in financing al Qaeda." *Id.* The plaintiffs could not establish "nexus" because, as here, they lacked "specific evidence that any of the accounts held by individuals or entities with links to al Qaeda provided funding for the terrorist organization's operations, let alone for the 9/11 Attacks." *Id.*

–21–

**B.      The Opposition Fails To Establish Personal Jurisdiction Under A Conspiracy Theory**

The Opposition's "conspiracy theory of personal jurisdiction" fails at step one: showing that "a conspiracy existed." *See Schwab*, 22 F.4th at 122. Plaintiffs' Averment never offers direct *or* indirect evidence of any purported "agreement" between the Bank and Al Qaeda. *See Fed. Ins. Co.*, 2023 WL 2430381, at *13. The Opposition (at 43) cites no evidence of the Bank's "conscious commitment to" or "promotion of" *any* "scheme" with Al Qaeda (*Freeman v. HSBC Holdings PLC*, 57 F.4th 66, 79, 82 (2d Cir. 2023)), let alone a scheme to "target the United States through acts of violence." Nor is conspiracy shown by supposed evidence (unsupported in the record) of "irregular financial services" by the Bank for "Al Qaeda nodes and financial managers." Opp. 43; *see Fed. Ins. Co.*, 2023 WL 2430381, at *13-14 (finding no "agreement" even with evidence that DIB and its chairman "knowingly facilitated financial transactions for individuals linked to al Qaeda").

The Opposition also does not show the Bank's "conscious, voluntary, and culpable participation" in Al Qaeda terrorism against the United States. *Twitter*, 598 U.S. at 493 (clarifying ATA aiding-and-abetting standard). Personal jurisdiction thus cannot be based on an aiding-and-abetting theory, which Plaintiffs concede (at 43 n.8) is not viable here. *See Fed. Ins. Co.*, 2023 WL 2430381, at *15 (holding aiding-and-abetting jurisdiction "would violate due process").

**C.      The Opposition Fails To Establish Personal Jurisdiction Under A Correspondent-Banking Theory**

The Opposition ignores (at 43-47) the Second Circuit's synthesis in *Daou* of the correspondent-banking theory of personal jurisdiction under NY CPLR § 302. *See* Mem. 49-50. Even after multiple rounds of discovery from Al Rajhi Bank's correspondent bank, Plaintiffs have no evidence that the Bank used any "actual, specific" transaction through its U.S. correspondent account "in the course of bringing about [Plaintiffs'] injuries." *Daou*, 42 F.4th at 132; Mem. 50.

The Opposition does not identify any illicit funds processed by the Bank through its correspondent account (or otherwise), let alone any transaction linked to the 9/11 Attacks. Nor do Plaintiffs aver that then-Chase Manhattan ever blocked or even suspected any payments the Opposition erroneously identifies (at 45-46) as purportedly subjecting the Bank to jurisdiction under *Licci*.

The Opposition does not grapple with recent rulings in this Circuit that transfers through New York merely to alleged al Qaeda fronts (as alleged here, the Charities) and among "financiers and supporters of al Qaeda" (Opp. 46) are insufficient under *Licci* for personal jurisdiction. *See* Mem. 50 (citing cases); *see also Rushaid v. Pictet & Cie*, 68 N.E.3d 1, 11 (N.Y. 2016) (finding personal jurisdiction where bank's "New York account was *integral to the scheme*," observing that *Licci* allegations sufficed where "defendants actively *used a correspondent bank to further a scheme* that caused harm").

The "not completely unmoored" language in *Licci* that the Opposition relies on (at 45) does not allow for personal jurisdiction without *any* "articula[ted] nexus or substantial relationship between the transaction and the alleged breach." *Licci v. Lebanese Can. Bank, SAL*, 984 N.E.2d 893, 900 (N.Y. 2012). In *Licci*, the Second Circuit accepted plaintiffs' pre-discovery allegations that the defendant bank "used [its] correspondent account to wire millions of dollars on behalf of Hizballah, knowing that such wire transfers would enable Hizballah 'to plan, to prepare for and to carry out terrorist attacks,' including the rocket attacks in which the plaintiffs or their family members were injured." 732 F.3d at 166. In *Spetner* (*see* Opp. 46), plaintiffs alleged that the defendant bank knowingly processed through New York millions of dollars in "incentive payments" going "to families of terrorists" to "support and reward terrorist activities" in Israel. 70 F.4th at 644-45 (finding the New York transfers were "an instrument to achieve the very wrong

alleged"). The Opposition articulates no such "nexus or substantial relationship." *Licci*, 984 N.E.2d at 900.

*King* (Opp. 44) is irrelevant, as no Bank customer was "publicly known" at the time of any transaction to be a "financier of al-Qaeda." 2022 WL 4537849, at *3. And the pre-discovery allegations in *King* about Al Rajhi Bank (*id.*) were based on prior complaints *dismissed by this Court* for failure to state a claim and have never been substantiated, including in discovery here.

## IV.    THE OPPOSITION'S EVIDENTIARY CHALLENGES ARE BASELESS

### A.    The Opposition Identifies No Basis To Strike The Bank's Expert Reports

This Court has rejected the Opposition's suggestion (at 53-54) "that expert opinion is inadmissible evidence on a motion for summary judgment." *Olin Corp. v. Lamorak Ins.*, 332 F. Supp. 3d 818, 837-38 (S.D.N.Y. 2018). And the Bank's experts did not "fail[] to comply" (Opp. 57) with any disclosure requirement. An expert's report must contain "the facts or data considered by the witness in forming" their opinion. Fed. R. Civ. P. Rule 26(a)(2)(B)(ii). Each of the Bank's experts attached an appendix identifying the materials relied on and specifying that the list supplemented "the materials referenced in [his] report and in Plaintiffs' experts' reports." *See* ARB Exs. 1-4. Because the documents Plaintiffs point to are "referenced and cited in Plaintiffs' experts' reports" (Opp. 58), there is no mystery about "the exact set of documents" available for review by the Bank's experts, and thus no prejudice to Plaintiffs. *Allen*, 2023 WL 11803060, at *5-6. There is also nothing "irregular" (Opp. 53-54) about Mr. Lormel consulting, nearly twenty years ago, with other FBI-investigated MDL defendants like the SAAR Foundation, given his central role in the FBI's post-9/11 work (*see* ARB Ex. 4 (Lormel Rpt.) at 3). Mr. Lormel's credentials and credibility are beyond reproach. *See* ARB Ex. A ¶ 2.

## B. The Opposition Identifies No Basis To Exclude The Errata To The Deposition Of The Bank's Rule 30(b)(6) Representative

Rule 30(e) "allows deponents to make changes in form or substance to their testimony" with "no limitations on the type of changes." *Weatherford*, 2013 WL 4505259, at *4 (cited at Opp. 59 n.13). Plaintiffs' 30(b)(6) notice covered an extraordinary *128* distinct topics. *See* Mot. Ex. 2 (ECF No. 9037-2). Galloway submitted an errata proportional and necessary to provide the Bank's accurate testimony. *See Bank of N.Y. v. Meridien Biao Bank Tanz.*, 171 F.R.D. 135, 150 (S.D.N.Y. 1997) ("Rule 30(b)(6) is not designed to be a memory contest."). Galloway submitted his errata *six weeks* before the close of discovery and twelve months before Plaintiffs' request to strike, making Plaintiffs' "sham affidavit" attack "inapplicable." *Ampong v. Costco Wholesale Corp.*, No. 21-cv-02049, 2023 WL 4744185, at *4 (S.D.N.Y. July 25, 2023). Plaintiffs never sought reexamination of Galloway (Opp. 58), and, when deposing the Bank's Chairman two months *after* Galloway's errata submission, Plaintiffs declined to challenge or clarify Galloway's testimony. Plaintiffs' change of heart *long after* discovery closed (Opp. 59 n.13) is irrelevant. Regardless, the Opposition's failure to identify "which parts of the [Galloway errata] should be stricken and why" requires denial of Plaintiffs' request. *Perma Research & Dev. Co*, 410 F.2d at 579.

## CONCLUSION

For the foregoing reasons, and those set forth in the Bank's memorandum in support of its renewed motion to dismiss (ECF No. 9786), this Court should grant the Bank's motion and dismiss the Amended Complaint as against Al Rajhi Bank, with prejudice. Only if necessary to resolve any material fact in dispute, the Court should hold an evidentiary hearing. In the alternative, the Court should grant the Bank's pending Objections to the Magistrate Judge's opinion declining to consider the Bank's renewed motion to dismiss for failure to state a claim.

Dated: September 30, 2024
Washington, DC

Respectfully submitted,

## WHITE & CASE

/s/ *Christopher M. Curran*

Christopher M. Curran
Nicole Erb
Nicolle Kownacki (*pro hac vice*)
Reuben J. Sequeira
Michael Mahaffey (*pro hac vice*)
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
Telephone:   + 1 202 626 3600
Facsimile:   + 1 202 639 9355
ccurran@whitecase.com
nerb@whitecase.com
nkownacki@whitecase.com
rsequeira@whitecase.com
michael.mahaffey@whitecase.com

*Counsel for Al Rajhi Bank*