# Exhibit A

~~UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS~~

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br>ECF Case |
|---|---|

This document relates to:

*Underwriting Members of Lloyd's Syndicate 2, et al. v. Al Rajhi Bank, et al.*, No. 16-cv-07853
*Addesso, et al. v. Kingdom of Saudi Arabia, et al.*, No. 16-cv-09937
*Aguilar, et al. v. Kingdom of Saudi Arabia, et al.*, No. 16-cv-09663
*Hodges, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-00117
*Aiken, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-00450
*Charter Oak Fire Insurance Co., et al. v. Al Rajhi Bank, et al.*, No. 17-cv-02651
*Abarca, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-03887
*Arrowood Indemnity Co., et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-03908
*Abedhajajreh, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-06123
*Muenchener Rueckversicherungs-Gesellschaft Aktiengesellschaft in Muenchen, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-07914
*Abbate, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-08617

## PLAINTIFFS' COUNTERSTATEMENT TO AL RAJHI BANK'S AVERMENT OF JURISDICTIONAL FACTS AND EVIDENCE IN SUPPORT OF ITS RENEWED MOTION TO DISMISS

Plaintiffs respectfully submit this Counterstatement to Al Rajhi Bank's Averment of Jurisdictional Facts and Evidence in Support of its Renewed Motion to Dismiss at ECF No. 9787. Plaintiffs cannot here set forth all of the evidence in response to each assertion, many of which are quite wide-ranging. We therefore refer Al Rajhi Bank to Plaintiffs' Corrected Averment of Jurisdictional Facts and Evidence and/or Statement of Facts Pursuant to Rule 56.1 at ECF No. 9764 and accompanying exhibits for a complete statement of the facts.

| AL RAJHI BANK AVERMENT | PLAINTIFFS' COUNTERSTATEMENT |
|---|---|
| ***I. Al Rajhi Bank Did Not Support The 9/11 Terrorist Attacks*** | No response necessary. |
| 1. Al Rajhi Bank has never supported or intended to support Al Qaeda, Osama bin Laden, or terrorism in any form, including the terrorist attacks on September 11, 2001 ("9/11 Attacks") or any other plot of terrorism against the United States. Pls. Ex. 1 (Abdullah bin Sulaiman Al Rajhi Dep. Tr.) at 355:4-8, 356:4-10 (Al Rajhi Bank's Chairman testifying that neither he, nor his father, Sulaiman bin Abdulaziz Al Rajhi (the Bank's former Chairman), or "anyone else" at the Bank has ever supported "Bin Laden, Al Qaeda, or terrorism in any form"). Plaintiffs' Corrected Averment fails to identify a single transaction through Al Rajhi Bank, or a single donation by Al Rajhi Bank, showing knowing and intentional support by Al Rajhi Bank for Al Qaeda or any form of terrorism against the United States, including the 9/11 Attacks. *See generally* Plaintiffs' Corrected Averment (May 7, 2024), ECF No. 9764 ("Pls. Aver."), Pls. Ex. 4 (Winer Report) & Pls. Ex. 38 (Kohlmann Report) (all failing to identify a single transaction or donation showing knowing and intentional support by the Bank for Al Qaeda or any form of terrorism against the United States, including the 9/11 Attacks). | Disputed. ARB, Suleiman al Rajhi, and the al Rajhi family were key financial supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the September 11, 2001 attacks.<br><br>Initially, Suleiman al Rajhi and his family were financial supporters of Osama bin Laden and his organization ("Maktab al-Khidamat" or "MAK"), and the mujahideen during the Afghan-Soviet conflict. *See, e.g.*, Pls. Ex. 9[1] – *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, undated, CIA_00720-804 at 723 ("The religiously ultraconservative Al Rajhi family – owners of the Al Rajhi Banking & Investment Company, with $8.6 billion of total assets – appears to be a key financial backer of the Afghan Mujahideen, [REDACTED]."); *id.* at 743 ("[REDACTED] 1997, [REDACTED] a "Sheikh Rajhi" deposited [REDACTED] into [REDACTED] bank accounts held by the director of Maktab-ul Khedamat (MK) and another NGO [REDACTED]."); *id.* ("In addition, an unspecified member of the Al Rajhi family is charged with overseeing financial support to the Afghan Mujahideen along with the IIRO Director in Kabul, [REDACTED]. ARBIC apparently has been a conduit for funding the Mujahadin since the early 1990s."); Pls. Ex. 66, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact [REDACTED]*, January 11, 1999, CIA_000807-848 at 830 ("Members of the ultra-wealthy Al Rajhi family, which owns the Riyadh-based Al Rajhi Banking and Investment Company, probably are a source of financial support for Usama's al-Qa'ida organization. [REDACTED] a "shaykh Rajhi" – [REDACTED] deposited [REDACTED] into the [REDACTED] bank accounts of the Maktab al-Khidamat."); Pls. Ex. 91, *Usama Bin Ladin's Finances: Some Estimates of Wealth, Income, and Expenditures*, November 17, 1998, CIA_00317-338 at 338 ("[REDACTED] 'Sheikh Rajhi,' [REDACTED] deposited [REDACTED] into a [REDACTED] bank account controlled by Maktab al-Khidamat, an Islamic charity closely associated with Usama Bin Ladin since the early 1980s."). *See also* Averment ¶¶ 145, 154, 156-159, 294. Suleiman al Rajhi was thus specifically aware of bin Laden's longstanding use of ostensible charities to support his jihadist activities from the outset.<br><br>Following the Soviet-Afghan conflict and the subsequent formation of al Qaeda, Suleiman al Rajhi and his family |

---

[1] The term "Pls. Ex." refers to Plaintiffs' exhibits cited in their Corrected Averment at ECF No. 9764.

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

directed their financial support to Osama bin Laden in Sudan, at a time when al Qaeda was developing and transforming into a sophisticated, global terrorist organization with the ability to carry out large-scale attacks in countries around the world. *See* Pls. Ex. 89, *Al-Qa'ida in Sudan, 1992-1996: Old School Ties Lead Down Dangerous Paths*, March 10, 2003, CIA_00038-52 at 45 ("Al-Qa'ida benefited from an influx of Saudi investment in Sudan's new government in the early 1990s…. Other merchants in Saudi Arabia who built business ties to Bin Ladin's companies in Sudan, and who also finance extremists, include Ibrahim Said Badaoud, Adil Batargi, Yassin Qadi, and members of the Jamjun and al-Rajhi families."). *See also* Averment ¶ 177.

In addition to maintaining accounts for Osama bin Laden at ARB, the Bank maintained accounts for bin Laden's al Qaeda operatives and recruiters, al Qaeda charity fronts and their officials, Islamic extremists, and other radicals that used those accounts to launder and move money globally in support of terrorist activities, including but not limited to (1) E.O. 13224 Specially Designated Global Terrorists ("SDGTs") Wa'el Hamza Jelaidan, Abd al Hamid Sulaiman al Mujil, Yassin al Qadi, Aqil al Aqil, Soliman al Buthe, Adel Abdul Jalil Batterjee, Al Haramain Islamic Foundation, International Islamic Relief Organization ("IIRO"), Bank al Taqwa, Al Baraka Exchange, and Barakaat Bank of Somalia; (2) 9/11 hijackers Abdel Aziz Abdel Rahman Mohamed al Quba al Omari, Ahmed al Ghamdi, Saleh al Ghamdi, Majed Moqed, Saed al Ghamdi, Wael al Shehri, and Hani Hanjour; (3) al Qaeda charity fronts Al Haramain, IIRO, Muslim World League ("MWL"), World Assembly of Musli Youth ("WAMY"), Saudi Joint Relief Committee ("SJRC"), the Saudi High Commission ("SHC"), and Lajnat al Birr al Islamiyya; (4) Al Haramain officials Mansour al Qadi (Deputy Director of Al Haramain), Mohamed bin Marzuq al Harthi (Director of Al Haramain's Jeddah office), Hussein bin Abdullah al Yami (Executive Director of Al Haramain's Jeddah office), Faisal bin Fayez al Ahmadi (Deputy Director of Al Haramain's Jeddah office), Zayd Attia al Harithi (Office Director of Al Haramain's Taif branch office), and Abdullah bin Salim al Shahri; (5) al Qaeda members and Islamic extremists Mohammed Jamal Khalifa, Soliman Nassir Abdullah al Alwan (9/11 hijacker recruiter), Mohamed Mansour Hizbullah al Suwaidi al Zahrani, and Khaled Abdullah al Qafari; (6) individuals links to the Saudi support network assisting the 9/11 hijackers in the United States, including Fahad al Thumairy, Towayan al Towayan, and Mohamed Abdel Aziz al Habib; and (7) the Suleiman Abdul Aziz Al Rajhi Charitable Foundation and its officers Abdul Rahman al Rajhi (also referred to herein as the "charity committee/foundation"), Saleh al Habdan, and Abdullah al

~~UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS~~

Misfer. *See, e.g.*, Averment ¶¶ 6-11, 20, 22, 205-272. ARB was the "bank of choice" for al Qaeda and Islamic extremists. *See* Averment ¶¶ 179, 204-272.

CIA reporting has corroborated ARB's use by al Qaeda, terrorist financiers, and Islamic extremists. *See, e.g.*, Pls. Ex. 10, *Al-Rajhi Bank: Conduit for Extremist Finance*, May 28, 2003, CIA-SUB_0001-6 at 3 ("Several al-Qa'ida-linked individuals and organizations have held accounts at Al-Rajhi."); *id.* ("Muhammad Ghaleb Kalaje Zouyadi, [REDACTED] arrested in 2002 for his role as the financial planner for the Barakat Yarkas' al-Qa'ida cell, used his Al-Rajhi account [REDACTED] from 1993-1999."); *id.* at 4 ("Haji Wali Mohammed Trading Establishment maintained an Al-Rajhi account for business transactions as of August 2000. [REDACTED]. Afghan hawaladar Haji Wali Mohammed transferred money for Usama Bin Laden."); *id.* ("In 2002, Syrian supporters of Islamic extremists sent donations to Majid Abdallah al Turki's account at Al-Rajhi Bank."). *See also* Pls. Ex. 45, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149-150 ("Al-Rajhi Bank has maintained accounts for individuals linked to Usama Bin Ladin, [Redacted] and individuals with ties to the Egyptian Islamic Jihad. Islamic extremists in Yemen named Al Rajhi Bank as a preferred bank for transactions."); Pls. Ex. 66, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 809 ("[Redacted] al-Qa'ida members have held accounts at the Al Rajhi Banking and Investment Company."); *id.* at 831 ("[REDACTED] some Al Rajhi branches in Saudi Arabia have been used by members of the al Qa'ida organization."); Averment ¶¶ 148, 176, 540.

Moreover, CIA reports confirm that ARB was the "bank of choice" for al Qaeda, Islamic extremists, and other terror groups. As described in the following CIA reports, ARB was attractive to Islamic extremists/terrorists because they believed their financial activities and transactions would avoid government or law enforcement scrutiny, ARB had correspondent banking relationships abroad that could be utilized, and there were personal relationships in place to help facilitate these activities. Accordingly, al Qaeda and other Islamic militants and extremists were ordering their operatives to use ARB for their banking needs because they understood that ARB was a willing and knowing collaborator. *See* Pls. Ex. 9 – *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, undated, CIA_00720-804 at 736 (al Qaeda's choice of banks based on "personal contacts at the banks and security concerns."); *id.* at 746 ("Islamic militants similarly bank with financial institutions that provide assurance that their deposits and financial activities will not be

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

scrutinized by government or enforcement authorities."). *See* Pls. Ex. 10 – *Al-Rajhi Bank: Conduit for Extremist Finance*, May 28, 2003, CIA-SUB_0001-6 at 2 ("Islamic extremists have used Al-Rajhi Banking and Investment Corporation (ARABIC) since at least the mid-1990s as a conduit for terrorist transactions, probably because they find the bank's vast network and adherence to Islamic principles both convenient and ideologically sound."); *id.* at 3 ("Extremists' bank of choice. [REDACTED] since the mid-1990s [REDACTED] several extremists ordered operatives in Afghanistan, Indonesia, Pakistan, Saudi Arabia, Turkey, and Yemen to used ARABIC."); *id.* ("Extremists' accounts. Extremists use ARABIC because its Islamic banking principles appeal to them and because it is one of the few banks with branches in outlying areas of Saudi Arabia, as well as good correspondent connections to remote locations abroad."). *See* Pls. Ex. 45, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 150 ("Islamic extremists in Yemen named Al Rajhi Bank as a preferred bank for transactions."). *See* Pls. Ex. 4, Winer Report at 89 ("ARB was the preferred bank for Islamic extremists in Yemen"); *id.* at 212 (stating that ARB was the "bank of choice" for Islamic extremists by the mid-1990s); *id.* at 213 (explaining factors that caused al Qaeda and extremists to choose ARB). *See also* Averment ¶¶ 176, 178-180, 276, 524, 543.

Finally, al Qaeda operative Jamal al Fadl confirmed ARB's listing on the Golden Chain. In interviews with the FBI, Jamal al Fadl explained that the "'Golden Chain' consisted of wealthy individuals from the Gulf region who provided Bin Laden and Al Qaeda with money on a regular basis." *See* Pls. Ex. 42, August 29, 2002 Interview with Jamal al Fadl, PEC-KSA000329-352 at 351. *See id.* at 352 (Al Fadl "noted that the name Al Rajhi listed next to number 7 on this document is the name of a bank in which al Qaeda had funds on deposit."). *See* Averment ¶¶ 130, 221. Indeed, the 9/11 Commission validated the significance of the Golden Chain document. *See* Averment ¶ 65 (As the 9/11 Commission explained, bin Laden's organization "included a financial support network that came to be known as 'the Golden Chain,' put together mainly by financiers in Saudi Arabia and Persian Gulf states. Donations flowed through charities and other nongovernmental organizations (NGOs)."); Averment ¶ 66 (Following al Qaeda's move from Sudan to Afghanistan in 1996, "Bin Laden eventually enjoyed a strong financial position in Afghanistan, thanks to support from Saudi and other financiers associated with the Golden Chain." *See* Pls. Ex. 40, 9/11 Commission Report at 66.).

*See also* Plaintiffs' response to No. 2.

2. Not a single transaction through Al Rajhi Bank, including through its U.S. correspondent account, has ever been traced to planning, carrying out, or financing the 9/11 Attacks. *See, e.g.*, Pls. Aver. §§ X, XI (failing to trace a single transaction through Al Rajhi Bank to planning, carrying out, or financing the 9/11 Attacks); Pls. Ex. 4 (Winer Report) at § 11 (same); *see also* ARB Ex. 4 (Expert Report of Dennis Lormel) ("Lormel Report") at 7 (explaining that FBI investigated CIA intelligence leads concerning Al Rajhi Bank but could not verify or prove any allegation that the Bank provided support to Al Qaeda).

Disputed. ARB's claim that there is no evidence that any donation or transaction by Suleiman al Rajhi, members of the al Rajhi family, Suleiman al Rajhi's charity committee/foundation, or others conducted through the Bank has been traced or connected to the planning or carrying out of terrorism against the United States, including the 9/11 attacks themselves, is inaccurate and misleading.

ARB, Suleiman al Rajhi, members of the al Rajhi, and others were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and were specifically aware of al Qaeda's mission and intent to attack the United States. Intending to foster al Qaeda's terrorist agenda, they provided substantial financial assistance to al Qaeda charity and business fronts and other intermediaries through the Bank, knowing that the funds would be received by Osama bin Laden and al Qaeda. *See* Averment generally. Plaintiffs' Averment also shows how the support provided to al Qaeda by these parties allowed al Qaeda to acquire the strike capabilities needed to carry out the 9/11 attacks. *See* Averment ¶¶ 53-132. Plaintiffs need not prove that the donation or transaction at issue was traced to the terrorist plot or the attack itself.

By way of further response, ARB and Suleiman al Rajhi established a "Payable Through Account" at Chase Manhattan Bank in New York, a mechanism used by the Bank to obscure the origin and destination of funds transmitted to al Qaeda, al Qaeda proxies, and affiliated anti-American extremists and jihadists, including funds originating from ARB Chairman Suleiman al Rajhi himself. *See, e.g.*, Averment ¶¶ 11, 36-39, 52, 264, 392, 401, 404, 412, 414-419, 429-488.

The Payable Through Account was used to facilitate transfers by Suleiman al Rajhi, under the auspices of his alter-ego charity committee/foundation, to support terrorist causes inside and outside of the United States. By way of example, Abdul Rahman al Rajhi issued a check on behalf of Suleiman al Rajhi via the Payable Through Account to the American Open University. *See* Pls. Ex. 141, NL 10475. According to the FBI, American Open University "is connected to the Moslem Brotherhood and arranges for paramilitary training in Pakistan." 3563. *See* Pls. Ex. 51, FBI Report, *Connections to the Attacks of September 11, 2001*, July 23, 2021, EO14040-003478-3608-UPDATED at 3563. Jaafar Idris, who worked out of the Ministry of Islamic Affairs' office in the Saudi Embassy in Washington, D.C. and also served as American Open University's president, is described by the FBI as "a close associate of jihadi groups operating within the U.S." *See* also Averment ¶¶ 455, 480-481.

The Payable Through Account was also used to transmit money to at least two individuals associated with the Saudi support network in the United States assisting the 9/11 hijackers – Khalid al Sowailem, the head of the Ministry of Islamic Affairs' Da'wah Office in the Saudi Embassy in Washington, D.C.; and Omar al Bayoumi, a Saudi agent known to have provided substantial assistance to the 9/11 hijackers. *See* Averment ¶¶ 472-478; *see also* ¶¶ 475, 479 (indicating that Bayoumi and Fahad al Thumairy (an extremist Saudi government imam employed by the Ministry of Islamic Affairs, who, along with Bayoumi, provided substantial assistance to the 9/11 hijackers) were in telephone contact with two officials of Suleiman al Rajhi's charity committee/foundation, Abdul Rahman al Rajhi and Abdullah al Misfer).

In addition, the Payable Through Account was used to facilitate al Qaeda terrorist financing transfers by Executive Order 13224 Specially Designated Global Terrorist ("SDGT") Soliman al Buthe. Between January 22, 2001 and March 14, 2001, al Buthe executed six transactions totaling $45,000.00 via ARB's Payable Through Account. *See* Pls. Ex. 148, ARB 39154, 39156, 39158, 39160, 39162, 39164. Two of those payments specifically identified the Al Haramain branch office in Oregon as the beneficiary. Al Buthe further directed additional payments via the Payable Through Account to internet service provider networks established by al Buthe and another Al Haramain official to facilitate password protected communications and a website know as Islam Today, which was used by radical clerics in the Middle East, including Salman al-Awdah, a well-known cleric who issued fatwas advocating violence against the United States. *See* also Averment ¶¶ 456, 482-485.

Furthermore, the Payable Through Account was used to facilitate transfers by IIRO to its operations in Afghanistan, which were extensively intertwined with al Qaeda. ARB authorized the IIRO to issue a check via the Payable Through Account at Chase Manhattan, for the benefit of the Fatima al Zahraa Hospital in Jalalabad, Afghanistan. *See* Pls. Ex. 139, IIRO 109118-109119; Pls. Ex. 150, ARB 2477-2572 at 2543 (ARB account statement for Islamic Relief Organization-Health, identifying an August 19, 2001 transaction, 125,500.00 SR debit, "Issuance of bank checks."). The Fatima al Zahraa Hospital was an asset of the IIRO itself, and the IIRO's offices in Pakistan/Afghanistan were deeply tied to al Qaeda operations. Confirming this close connection, al Qaeda leader Ayman al Zawahiri conducted eye surgeries at Fatima al Zahraa Hospital, which was located in close proximity to an al Qaeda funded jihad camp, at some point after 1996. *See* Pls.

| | |
|---|---|
| | Ex. 159, Transcript, February 8, 2024 Deposition of Aimen Dean ("Dean Deposition"), at 308-309. *See* also Averment ¶¶ 475, 486-488.<br><br>Finally, Mr. Lormel's claims concerning the FBI's alleged investigation into ARB and Suleiman al Rajhi, and the findings of that investigation, have been flatly rejected by the FBI and DOJ. According to the FBI and DOJ, no investigation matching his expert report and deposition testimony was ever undertaken. *See* Ex. F, May 3, 2024 letter from Assistant U.S. Attorneys Sarah S. Normand and Jennifer Jude (stating that the FBI conducted supplemental searches for documents concerning "an investigation of the Bank or Sulaiman of the kind that Mr. Lormel describes in his report and deposition," and concluding that "[t]hose searches did not reveal information suggesting that the Bank or Sulaiman … were the focus of an investigation or investigative steps by the FBI during the time period Mr. Lormel described (September 11, 2001-December 31, 2003)."). Moreover, Mr. Lormel retired from the FBI in December 2003, before any such investigation into ARB and Suleiman al Rajhi could have been completed. Notably, soon after Mr. Lormel's departure from the FBI, he was hired by ███████ to provide consulting services in connection with a criminal investigation in the Eastern District of Virginia. That consulting engagement with ███ included the SAAR Foundation, Mar-Jac Poultry, and Jamal Barzinji, an arrangement that was highly irregular at best.[2] *See* ARB Ex. 61, Transcript, Deposition of Dennis Lormel, February 1, 2024 at 33:12-20; 53:22-60:7; 130:11-132:16. |
| 3. Al Rajhi Bank's senior leadership did not know Osama bin Laden and did not support Osama bin Laden, Al Qaeda, or terrorism in any form. Pls. Ex. 1 (Abdullah bin Sulaiman Al Rajhi Dep. Tr.) at 351:3-353:10, 354:17-355:8; 355:4-8; 356:4-10 (testifying that neither he nor his father, Sulaiman bin Abdulaziz Al Rajhi (the Bank's former Chairman), knew or supported Bin Laden, and that no one at the Bank supported Bin Laden, Al Qaeda, or terrorism in any form). | Disputed. *See* Plaintiffs' response to No. 1. |
| 4. Al Rajhi Bank prevented Osama bin Laden from accessing his accounts at the Bank or using any Bank services since at least 1994, when bin Laden was stripped of his Saudi citizenship and his accounts were frozen. Pls. Ex. 40 (9/11 Commission Rpt.) at 57 ("By 1994, the Saudi government would freeze [Bin Laden's] financial assets and revoke his citizenship."); *see also* ARB Ex. 8 (Nov. 16, 2002 Ltr. from Al | It is not disputed that the Saudi government revoked Osama bin Laden's Saudi citizenship and directed that his financial accounts be frozen in the early 1990s. *See* Pls. Ex. 171, Transcript, January 11, 2024 Deposition of Evan F. Kohlmann at 209. However, to the extent that ARB argues that bin Laden was prevented from taking advantage of ARB's banking services by virtue of those events, that is disputed. |

---

[2] The FBI has indicated that it will be providing Plaintiffs with a declaration attesting to the facts in the May 4, 2024 letter. However, due to the extensive work over the past several weeks relating to the sealing dispute, which was the subject of the July 17, 2024 hearing before Judge Daniels, the FBI has informed Plaintiffs that it will be a bit longer before they can provide us with the declaration. Plaintiffs will submit the declaration to the Court and counsel for ARB upon receipt.

Rajhi Bank to SAMA) at ARB-39559 (showing all Bin Laden accounts "blocked"). Plaintiffs' own experts concede that bin Laden did not use, and could not have used, his accounts at the Bank at all after his assets were frozen in 1994. *See* ARB Ex. 28 (Winer Dep. Tr.) at 53:5-55:2 (testifying "bin Laden's accounts had been frozen at some time earlier. The Saudi government had basically shut down his direct ability to move money in his own name is my understanding."); ARB Ex. 93 (Kohlmann Dep. Tr.) at 208:15-209:15 (explaining that bin Laden's "citizenship was revoked [by the Kingdom of Saudi Arabia] in [19]94, but . . . [the Kingdom of Saudi Arabia] basically stopped financial transactions sometime in [19]93"); ARB Ex. 1 (Dean Report) at 17 (explaining that Osama bin Laden departed Saudi Arabia in 1992 and was stripped of Saudi citizenship in 1994).

Bin Laden was officially designated by the U.S. government in 1998 in part for his role in the U.S. Embassy bombings in Africa. Once the designation was issued, the Society for Worldwide Interbank Financial Telecommunications ("SWIFT") system made it impossible for bin Laden to open another account under his name at any bank and conduct financial transactions. *See*, Pls. Ex. 171, Transcript, January 11, 2024 Deposition of Evan F. Kohlmann at 101, 130, 131, 135. Consequently, bin Laden and al Qaeda relied upon charity and business fronts, and other individuals to establish relationships with sympathetic banks that were willing to assist with laundering funds through their accounts in support of al Qaeda's global operations. Indeed, ARB became the "bank of choice" for al Qaeda and Islamic extremists. *See* Averment ¶¶ 179, 204-272.

As the "bank of choice" for al Qaeda, ARB and Suleiman al Rajhi knew that terrorists and extremists were using the Bank. *See* Pls. Ex. 10 – *Al-Rajhi Bank: Conduit for Extremist Finance*, May 28, 2003, CIA-SUB_0001-6 at 2, 4 ("Senior al-Rajhi family members have long supported Islamic extremists and probably know that terrorists use their bank."); *id.* at 4 (stating that Suleiman al Rajhi "is witting that his bank is attractive to extremists"). In addition to opening and servicing accounts for bin Laden (at a time when bin Laden was building al Qaeda, reflecting his trust in ARB and Suleiman al Rajhi), ARB maintained accounts for bin Laden's al Qaeda operatives and recruiters, al Qaeda charity fronts and their officials, Islamic extremists, and other radicals to launder and move money globally in support of terrorist activities, including but not limited to (1) E.O. 13224 Specially Designated Global Terrorists ("SDGTs") Wa'el Hamza Jelaidan, Abd al Hamid Sulaiman al Mujil, Yassin al Qadi, Aqil al Aqil, Soliman al Buthe, Adel Abdul Jalil Batterjee, Al Haramain Islamic Foundation, International Islamic Relief Organization ("IIRO"), Bank al Taqwa, Al Baraka Exchange, and Barakaat Bank of Somalia; (2) 9/11 hijackers Abdel Aziz Abdel Rahman Mohamed al Quba al Omari, Ahmed al Ghamdi, Saleh al Ghamdi, Majed Moqed, Saed al Ghamdi, Wael al Shehri, and Hani Hanjour; (3) al Qaeda charity fronts Al Haramain, IIRO, Muslim World League ("MWL"), World Assembly of Musli Youth ("WAMY"), Saudi Joint Relief Committee ("SJRC"), the Saudi High Commission ("SHC"), and Lajnat al Birr al Islamiyya; (4) Al Haramain officials Mansour al Qadi (Deputy Director of Al Haramain), Mohamed bin Marzuq al Harthi (Director of Al Haramain's Jeddah office), Hussein bin Abdullah al Yami (Executive Director of Al Haramain's Jeddah office), Faisal bin Fayez al Ahmadi (Deputy Director of Al Haramain's Jeddah office), Zayd Attia al Harithi (Office Director of Al Haramain's Taif branch

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

|  | office), and Abdullah bin Salim al Shahri; (5) al Qaeda members and Islamic extremists Mohammed Jamal Khalifa, Soliman Nassir Abdullah al Alwan (9/11 hijacker recruiter), Mohamed Mansour Hizbullah al Suwaidi al Zahrani, and Khaled Abdullah al Qafari; (6) individuals links to the Saudi support network assisting the 9/11 hijackers in the United States, including Fahad al Thumairy, Towayan al Towayan, and Mohamed Abdel Aziz al Habib; and (7) the Suleiman Abdul Aziz Al Rajhi Charitable Foundation and its officers Abdul Rahman al Rajhi, Saleh al Habdan, and Abdullah al Misfer. *See, e.g.*, Averment ¶¶ 6-11, 20, 22, 205-272. Although bin Laden's accounts had been neutralized, he was able to take advantage of the hundreds of al Qaeda associated accounts at ARB to move money in support of al Qaeda's global terrorist operations. |
|---|---|
| 5. Al Rajhi Bank never processed any transaction for any customer identified in Plaintiffs' Corrected Averment that was designated by the United States, the United Nations, or any other governmental body at the time of the transaction. *See* ARB Ex. 93 (Kohlmann Dep. Tr.) at 126:12-13, 130:21-131:2 (testifying that charity designations only began after 9/11 and that he had not identified any Al Rajhi Bank transactions violating sanctions or designations, because "once the designation has been issued," it becomes "impossible to open an account under that [designated] person's name"); *id.* at 132:23-133:5 ("[I]t's impossible to send money to an office that's been designated through a banking system once the designation has happened."); ARB Ex. 28 (Winer Dep. Tr.) at 57:8-12 ("To the best of my knowledge, there were no charities of any kind that I recollect that had been designated prior to 9/11 because terrorist designations were originally limited to terrorist organizations."); ARB Ex. 3 (Pasley Report) at 6 (noting that Plaintiffs' experts only identify "post-9/11 sanctions designations against NGOs and individuals for alleged ties to terrorism and Al Qaeda"). | Plaintiffs admit that ARB did not process any transaction for any customer identified in Plaintiffs' Corrected Averment that was designated by the United States, the United Nations, or any other governmental body at the time of the transaction, but that is immaterial. Plaintiffs' experts have been clear that the designation process for terrorist sanctioning was in its infancy during the Clinton Administration, and the Executive Order 13224 sanctions regime targeting charities for terrorism related offenses did not exist prior to the September 11, 2001 attacks. *See* Pls. Ex. 12, Transcript, January 12, 2024 Deposition of Jonathan M. Winer at 57:14-25 (testifying that the "designation process for sanctioning was in its infancy" during the Clinton administration, and that any charity designations happened after 9/11); 58:8-13 (testifying that that there were no designations of charities prior to 9/11 in part because the U.S. had undertaken other actions, which included direct discussions between the U.S. and Saudi Arabia).

Further, the evaluation of whether formal designation of a particular terror sponsor, or other possible action, would best serve U.S. national security interests following the 9/11 attacks involved a range of equities, including foreign policy, intelligence, diplomatic, law enforcement, and many other considerations. *See* Pls. Ex. 96, *Terrorism Financing: Origination, Organization, and Prevention*, Hearing Before the Committee on Governmental Affairs United States Senate (July 31, 2003), at 11 (R. Richard Newcomb, Director of the Office of Foreign Assets Control ("OFAC"), stating that all of the equities of the government come to the table, including law enforcement, intelligence, diplomatic, and military, among others). In addressing Saudi-based threats to U.S. national security in particular, U.S. policymakers broadly determined that pursuing cooperation and joint action with the Saudi government was critical to advancing the United States' overarching counterterrorism objectives, precisely because of |

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

the nature and scope of the problem emanating from Saudi Arabia. Accordingly, this policy approach often led U.S. officials to defer or delay formal designations or other actions against Saudi-based terror financiers and sponsors, as in the case of Al Haramain, and others. *See* Averment ¶¶ 192-194.

Plaintiffs' experts similarly testified that the U.S. government often deferred formal designations of Saudi charities and other entities, despite having extensive evidence of their support for terrorism, choosing instead to pursue cooperative action with the Saudi government. *See* Pls. Ex. 171, Transcript, January 11, 2024 Deposition of Evan F. Kohlmann at 106:19-23 (testifying that U.S. documents indicate "the United States government wanted to take further action, but was waiting for the Saudis to see what they would do internally first"); 107:17-22 (testifying that "the U.S. government had decided to encourage Saudi Arabia to take action on its own instead of embarrassing the government by designating an office in the kingdom").

To the extent that ARB argues that the absence of any designation is equivalent to a finding that the person or entity is innocent of terrorism charges, that is baseless and disputed. *See, e.g.*, Pls. Ex. 12, Transcript, January 12, 2024 Deposition of Jonathan M. Winer at 167:2-10 ("I've been involved in designation processes and I have pushed for the designation of people in certain cases who in my opinion should have been designated and where there was absolutely sufficient objective evidence well beyond including evidence that they participated in terrorist activity, who are not designated for policy reasons of various kinds, not one, but multiple different kinds of policy reasons.").

Further, to the extent that ARB asserts that the failure to designate demonstrates that ARB, Suleiman al Rajhi, and members of the al Rajhi family were not aware of any customer's connections to, and financial support for, al Qaeda and associated terrorist organizations, that is disputed.

By way of example, there was a wealth of public media reporting available to ARB prior to the 9/11 attacks concerning the involvement of Al Haramain and the IIRO in supporting Osama bin Laden, al Qaeda, and terrorism, including but not limited to the public reporting of those charities' links to the 1998 U.S. Embassy bombings in Africa. *See* Plaintiffs' responses to Nos. 51, 63. In addition, Plaintiffs' experts have testified that as early as 1995, Al Haramain was widely known within the Kingdom for supporting Islamic militant causes and armed conflict. *See* Plaintiffs' response to No. 47. Moreover, ARB, Suleiman al Rajhi, and the Bank's principals were expressly aware of the involvement of Al Haramain and IIRO

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

in supporting al Qaeda and terrorism by virtue of Suleiman al Rajhi's extensive contacts with those organizations and his close relationships with Al Haramain, IIRO, and MWL senior officials. *See* Plaintiffs' responses to Nos. 47, 59. Nevertheless, ARB continued to open and maintain hundreds of accounts for Al Haramain and IIRO. *See* Plaintiffs' response to No. 42 (94 accounts for Al Haramain), and Plaintiffs' response to No. 54 (308 accounts for the IIRO).

Moreover, ARB and Suleiman al Rajhi knew that terrorists were using ARB, and that the Bank had become the "bank of choice" for al Qaeda and Islamic extremists. *See* Averment ¶¶ 179, 204-272. *See* Pls. Ex. 10 – *Al-Rajhi Bank: Conduit for Extremist Finance*, May 28, 2003, CIA-SUB_0001-6 at 2, 4 ("Senior al-Rajhi family members have long supported Islamic extremists and probably know that terrorists use their bank."); *id.* at 4 (stating that Suleiman al Rajhi "is witting that his bank is attractive to extremists").

Importantly, banking records for Suleiman al Rajhi's "charity" committee/foundation indicate that ARB continued to facilitate the transfer of large sums of money to Al Haramain despite the public U.S.-Saudi joint designations of Al Haramain branch offices in Somalia and Bosnia-Herzegovina on March 11, 2002 for "supporting terrorist activities and terrorist organizations such as al-Qaida, AIAI (al-Itihaad al-Islamiya), and others." *See, e.g.*, Pls. Ex. 122, ARB 38079-38107 and ARB 39948-39959 at 38084 (June 3, 2002 payment of 100,000 SR to Al Haramain); *id.* at 38088 (June 23, 2002 payments of 200,000 SR to Al Haramain); *id.* at 38092 (August 18, 2002 payments of 175,250 SR to Al Haramain); *id.* at 38096 (August 27, 2002 payment of 100,000 SR to Al Haramain); Pls. Ex. 125, ARB 42183-42184 at 42183 (April 29, 2002 payment of 8,000 SR to Al Haramain); Pls. Ex. 126, ARB 42179-42180 at 42179 (April 3, 2002 payment of 38,000 SR to Al Haramain); Pls. Ex. 127, ARB 42181-42182 at 42181 (December 23, 2002 payment of 7,000 SR to Al Haramain). *See also* Averment ¶¶ 73, 88.

In addition, notwithstanding the public designations of the Al Haramain branch offices in Somalia and Bosnia-Herzegovina, ARB ignored those public allegations and continued to open new accounts for Al Haramain just a month later. *See* ARB 38600 (April 24, 2002 letter from Aqil al Aqil to ARB asking the Bank to open 10 new accounts for Al Haramain, with handwritten text from ARB stating "no objection."). Indeed, the March 2002 designation did not even elicit a pause from ARB to conduct an internal investigation concerning the allegations relating to Al Haramain, and it was business as usual for the Bank. Between April and December 2002, 16 new accounts were opened at ARB for Al Haramain. *See* Pls.

| | |
|---|---|
| | Ex. 98 (Abdullah al Rajhi Exhibit 31) (chart of 94 AHIF accounts at ARB).

Later designations of the Al Haramain branch offices in Indonesia, Kenya, Pakistan, and Tanzania on January 22, 2004 for providing "financial, material and logistical support to the al-Qaida network and other terrorist organizations" similarly failed to convince ARB that it should undertake an internal investigation into the accounts it held for Al Haramain to determine whether they reflected potential money laundering or counterterrorism financing risks. Although Abdullah al Rajhi agreed that ARB had an independent obligation to ensure its accounts weren't used for terrorism financing activities, when asked whether ARB did anything to investigate the accounts to determine whether they were opened properly, or whether there were any transactions that may have been problematic or raised red flags, Abdullah could not affirmatively say those internal inquiries occurred, despite being the General Manager of the Bank at that time (equivalent to the CEO). *See* Pls. Ex. 1, Transcript, September 17, 2023 Deposition of Abdullah bin Sulaiman al Rajhi at 93-101. Instead, ARB continued to work with Al Haramain and open new accounts for the al Qaeda charity front, notwithstanding the fact that the U.S. and Saudi governments were simultaneously designating Al Haramain branch offices for supporting al Qaeda at that time. *See* ARB Ex. 26 (ARB 39505). |
| 6.  Al Rajhi Bank never made charitable donations to any of the charities that Plaintiffs aver (*e.g.*, Pls. Aver. ¶¶ 5, 17) were "fronts" for Al Qaeda. *See* Pls. Ex. 3 (Galloway Dep. Tr.) at 271:6-15 and Errata 271:15 (testifying the Bank did not make any donations to International Islamic Relief Organization ("IIRO"), Al Haramain Islamic Foundation ("Al Haramain"), or Muwaffaq Foundation ("Muwaffaq")); *see also* ARB Ex. 93 (Kohlmann Dep. Tr.) at 205:5-10 (testifying that he was not aware of any donations from the Bank to the charities identified in Plaintiffs' Corrected Averment during the relevant period). | Disputed. Initially, due to ARB's burden claims, jurisdictional discovery did not encompass all of the al Qaeda charity fronts, and Plaintiffs do not yet know the extent to which ARB provided donations to those that were outside of the scope of discovery. Further, banking records produced by ARB indicate that the Suleiman al Rajhi "charity" committee/foundation used its account at ARB to transfer large sums of money to Al Haramain, including a transfer directly to Al Haramain director Aqil al Aqil. *See* Averment ¶¶ 249-250. As detailed in those account statements, the account was routinely operating in the red (often times by several million Saudi riyals), but ARB continued to cover the missing funds that were being paid to Al Haramain and Aqil al Aqil. *See e.g.*, Pls. Ex. 122 at ARB 38079 (account starting with a negative balance of -5,851,743.45 SR, but ensuring the payment of 100,000.00 SR to Al Haramain, resulting in a negative balance of -4,717,587.45 SR); ARB 38082 (account showing a negative balance of -4,028,430.66 SR, but ensuring the payment of 145,000.00 SR, resulting in a negative balance of -4,546,430.66 SR); ARB 38098 (account showing a balance of -868,868.00 SR but ensuring the payment of 150,000.00 SR to Al Haramain, resulting in a negative balance of -1,018,868.00 SR); ARB 38102 (account showing a negative balance of - |

13

40,554.00 SR, but ensuring the payment of 187,500.00 SR to Aqil al Aqil, resulting in a negative balance of -228,054.00 SR). *See also* checks to Al Haramain signed by Suleiman al Rajhi at Pls. Ex. 128, NL 10086 (150,000 SR), NL 10088 (300,000 SR), NL 10094 (12,500), NL 10245 (187,500 SR).

More fundamentally, this claim is immaterial, as the record confirms that ARB provided an extraordinary array of financial services to the charities. Those financial service are, like money, forms of material support.

CIA reporting also confirms that ARB, Suleiman al Rajhi, and the al Rajhi family financially supported and donated money to Al Haramain, IIRO, WAMY, and other charities suspected of supporting terrorism. *See, e.g.*, Pls. Ex. 9, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, undated, CIA_00720-804 at 723 ("The family and the bank purportedly also support NGOs who help finance the Bosnian Mujahideen, HAMAS, and other extremists."); *id.* at 743 ("REDACTED] Al Rajhi financial support for several other Saudi NGOs that purportedly divert funds to Islamic extremists."); *id.* ("The bank is a primary donor to Al-Nadwas al-Alamiyya Lil Shabab al Islami, a Saudi NGO that is suspected of financing Hamas"); Pls. Ex. 10, *Al-Rajhi Bank: Conduit for Extremist Finance*, May 28, 2003, CIA-SUB_0001-6 at 5 ("Senior al-Rajhi family members, including family patriarch Sulayman al-Rajhi, have donated money to NGOs suspected of supporting terrorism."); *id.* ("[REDACTED] March 2003, Sulayman al-Rajhi defended his donations to the al-Haramain Islamic Foundation, which has come under scrutiny for its support to extremists."); Pls. Ex. 55, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 221 ("Many prominent Saudi businessmen contribute generously to the IIRO through their *zakat* contributions, including the Al Rajhi family."); Pls. Ex. 66, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 826 ("WAMY has offices worldwide and is funded by donations from wealthy Saudi merchants and prominent businesses, such as the Al Rajhi Banking Corporation."); Pls. Ex. 91, *Usama Bin Ladin's Finances: Some Estimates of Wealth, Income, and Expenditures*, November 17, 1998, CIA_00317-338 at 338 ("'Sheikh Rajhi,' [REDACTED] deposited [REDACTED] into a [REDACTED] bank account controlled by Maktab al-Khidamat, an Islamic charity closely associated with Usama Bin Ladin since the early 1980s."). *See also* Averment ¶¶ 145, 154, 179.

ARB's assertion is also profoundly misleading, suggesting that jurisdictional discovery failed to develop evidence of ARB,

|  | Suleiman al Rajhi, or members of the al Rajhi family making donations to the other charities identified in Plaintiffs' Averment, including the World Assembly of Muslim Youth ("WAMY"), Muslim World League ("MWL"), and others. As ARB well knows, Plaintiffs agreed to limit their jurisdictional discovery to Al Haramain, IIRO, and the Muwafaq Foundation as a means to addressing ARB's burden claims, as reflected in the Court's November 22, 2021 Order (ECF No. 7378) at 22. *See* Averment ¶¶ 15, 16, 20. Notwithstanding, discovery obtained from another defendant, ███████, included a 1999 list of beneficiaries of Suleiman al Rajhi's financial support. *See* Pls. Ex. 29, NL 15578, 15043-15046. The 1999 distribution chart reflects contributions of 37,500 SR and 338,500 SR to "World Assembly of Muslim Youth," and a contribution of 2,215,000 SR to the "Muslim World League" (the parent organization of the IIRO). *See* Averment ¶¶ 419, 420. The ███████ discovery further revealed various check payments to WAMY, WAMY Secretary General Johani, and the MWL, all signed by Suleiman al Rajhi. *See* Pls. Ex. 185, NL 10068 ($120,000 check payable to Dr. Maneh al Johani); Pls. Ex. 185, NL 10384 (112,500 SR check payable to Dr. Maneh al Johani); Pls. Ex. 186, NL 10333 (check from Suleiman al Rajhi payable to WAMY for 75,000 riyals). |
| 7. After two decades of investigation into the 9/11 Attacks, no designation has ever been made or enforcement action taken — by the United States, United Nations, or any other governmental body — against Al Rajhi Bank or any Al Rajhi family member for any connection to terrorism. *See* ARB Ex. 4 (Lormel Report) at 9, 18 ("[T]he United States government never sanctioned Al Rajhi Bank or the Al Rajhi family for involvement in terrorist financing."); *see also* Pls. Ex. 4 (Winer Report) at 98 ("In the end, the [] U.S. government did not sanction [Al Rajhi Bank] for terrorist finance."); ARB Ex. 7 (May 27, 2021 FBI EC) at EO14040-000011 ("After nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged, which is consistent with the final conclusion of the 9/11 Commission Report which stated that 'no new information to date that would alter the original findings of the 9/11 Commission regarding the individuals responsible for the 9/11 attacks or for supporting those responsible for the attacks.'"); *see also* ARB Ex. 28 (Winer Dep. Tr.) at 160:10-15 (testifying that Al Rajhi Bank has never been designated by the U.S. government); 172:19-22 (testifying that no Al Rajhi family member has ever been designated by the United States or United Nations); ARB Ex. 93 (Kohlmann Dep. Tr.) at 36:20-22, 37:6-20, 38:3-39:5 (testifying that Al Rajhi Bank has never been designated by any government, and that he is unaware of any designation of any Al Rajhi Bank officer, director, or employee). | Disputed. ARB points to the fact that neither the U.S. government nor any foreign government or international body has ever designated the Bank, any member of the al Rajhi family, and or Bank official or employee as though that were somehow exculpatory, even though multiple government intelligence reports implicate ARB, Suleiman and Rajhi, and members of the al Rajhi family in supporting Osama bin Laden, al Qaeda, and Islamic militants and extremists for more than a decade leading up to the September 11, 2001 attacks.<br><br>Declassified CIA reports detailed in Plaintiffs' Averment confirm that (1) ARB was a conduit of funds for the 9/11 hijackers; (2) ARB, Suleiman al Rajhi, and al Rajhi family members funded al Qaeda, Islamic extremists, al Qaeda "charity" fronts, and other terrorist organizations; (3) ARB supported and maintained accounts for al Qaeda operatives, financiers, and individuals linked to other terror groups; (4) ARB was the "bank of choice" for al Qaeda and Islamic militants and extremists; and (5) ARB provided logistical support to terror groups. *See, e.g.*, Pls. Ex. 9 – *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, undated, CIA_00720-804; Pls. Ex. 10 – *Al-Rajhi Bank: Conduit for Extremist Finance*, May 28, 2003, CIA-SUB_0001-6; Pls. Ex. 11, *Islamic Banking: A Potential Economic Enabler in the Muslim World*, May 21, 2004, CIA-SUB_0020-30; Pls. Ex. 46, *Identifying Al-Qa'ida's Donors and Fundraisers: A Status Report*, February 27, 2002, |

CIA_00193-199; Pls. Ex. 66, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact [REDACTED]*, January 11, 1999, CIA_000807-848; Pls. Ex. 89, *Al-Qa'ida in Sudan, 1992-1996: Old School Ties Lead Down Dangerous Paths*, March 10, 2003, CIA_00038-52. *See also* Averment ¶¶ 136, 148, 154, 156-159, 176-180, 185, 265, 276, 294, 426, 524, 539, 540, 543.

The information detailed in these governmental investigations led senior U.S. government officials to debate several policy options for addressing the threat ARB's support for terrorism posed to U.S. national security, including listing, or threatening to list, ARB as a terrorist supporter pursuant to Executive Order 13224. *See* Pls. Ex. 10 – *Al-Rajhi Bank: Conduit for Extremist Finance*, May 28, 2003, CIA-SUB_0001-6 at 6. Within the context of these post-9/11 deliberations, the evaluation of whether formal designation of ARB, or other possible action, would best serve U.S. national security interests involved a range of equities, including foreign policy, intelligence, diplomatic, law enforcement, and many other considerations. U.S. officials reasoned that given the size of ARB and its structural importance to the Saudi banking system and economy, as well as the significance of the Al Rajhi family to the Saudi economy, sanctioning ARB and/or members of the al Rajhi family for their support of terrorism and al Qaeda would have had profound consequences on the Saudi Arabian economy and Saudi Arabians who used the bank for legitimate purposes, as well as profound consequences in the U.S.-Saudi Arabian security relationship. In the end, the U.S. government did not formally designate or sanction ARB, Suleiman al Rajhi, or members of the al Rajhi family, actions which would have "cripple[d] the bank," choosing instead to pursue reforms of the bank via high-level counterterrorism engagements with senior Saudi government officials, which included requiring Suleiman al Rajhi to relinquish his control over the bank. *See* Averment ¶¶ 181-184, 188-203; *see also* Pls. Ex. 10, *Al-Rajhi Bank: Conduit for Extremist Finance*, May 28, 2003, CIA-SUB_0001-6 at 6 ("Listing, or threatening to list, ARABIC as a terrorist supporter under Executive Order 13224 or United Nations resolution 1267 could cripple the bank.").

Plaintiffs' expert also emphasized the crippling effect a designation would have on the Bank and the collateral damage to consumers, depositors, individuals with loans, and correspondent relationships. *See* Pls. *Ex. 12,* Winer Deposition at 169 ("You close a bank like Al-Rajhi Bank down like that with sanctions, you're affecting its correspondent relations everywhere. You're creating pools of money at banks all over the world related to their correspondent accounts. You're affecting the commercial activities of Saudi Arabia. That's

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

| | |
|---|---|
| | going to be viewed by Saudi Arabia as an extremely hostile act."). *See also* Plaintiffs' Averment ¶¶ 181-187, 188-203. |
| | Plaintiffs' experts have also testified that the U.S. government often deferred formal designations of Saudi charities and other entities, like ARB, despite having extensive evidence of their support for terrorism, choosing instead to pursue cooperative action with the Saudi government. *See, e.g.*, Pls. Ex. 171, Transcript, January 11, 2024 Deposition of Evan F. Kohlmann at 106:19-23 (testifying that U.S. documents indicate "the United States government wanted to take further action, but was waiting for the Saudis to see what they would do internally first"); 107:17-22 (testifying that "the U.S. government had decided to encourage Saudi Arabia to take action on its own instead of embarrassing the government by designating an office in the kingdom"). |
| | Finally, to the extent that ARB argues that the absence of any designation is equivalent to a finding that the person or entity is innocent of terrorism charges, that is baseless and disputed. *See, e.g.*, Pls. Ex. 12, Transcript, January 12, 2024 Deposition of Jonathan M. Winer at 167:2-10 ("I've been involved in designation processes and I have pushed for the designation of people in certain cases who in my opinion should have been designated and where there was absolutely sufficient objective evidence well beyond including evidence that they participated in terrorist activity, who are not designated for policy reasons of various kinds, not one, but multiple different kinds of policy reasons."). |
| ***II.   Al Rajhi Bank Is A Large, Reputable Bank With A Robust Corporate Governance Structure*** | No response necessary. |
| ***A. Al Rajhi Bank Has Always Been Headquartered In Saudi Arabia With No Presence In The United States*** | No response necessary. |
| 8. Founded as a currency-exchange company in Saudi Arabia in 1957 and incorporated as a bank in Saudi Arabia in 1988, Al Rajhi Bank has always maintained its headquarters and principal place of business in Riyadh, Saudi Arabia. *See* Pls. Ex. 6 (1998 Al Rajhi Bank Ann. Report) at PDF p. 91; Pls. Ex. 7 (1999 Al Rajhi Bank Ann. Report) at PDF p. 78, 98; Pls. Ex. 8 (2000 Al Rajhi Bank Ann. Report) at PDF p. 23; ARB Ex. 16 (2001 Al Rajhi Bank Ann. Report) at PDF p. 98; *see also* Am. Compl. ¶ 67 (conceding Al Rajhi Bank "is a Saudi-based financial institution, with a principal place of business located at Olaya Street, Riyadh, Saudi Arabia"). | Undisputed as a general matter for purposes of this motion. |
| 9. Al Rajhi Bank was a publicly owned financial institution organized under the laws of Saudi Arabia, with its shares traded in Saudi Arabia. *See* Pls. Ex. 7 (1999 Al Rajhi Bank | Undisputed as a general matter for purposes of this motion. |

| | |
|---|---|
| Ann. Report) at PDF p. 98; *see also* ARB Ex. 14 ("Al Rajhi Bank" Profile, Company Profile Main Market). | |
| 10. The Bank did not have any branches, representative offices, or other presence in the United States. *See* Pls. Ex. 6 (1998 Al Rajhi Bank Ann. Report) at PDF pp. 58-70, 90; Pls. Ex. 7 (1999 Al Rajhi Bank Ann. Report) at PDF pp. 64-75, 97; Pls. Ex. 8 (2000 Al Rajhi Bank Ann. Report) at 13, 22, 46-57 (referencing its "Kingdom wide network of 366 branches"); ARB Ex. 16 (2001 Al Rajhi Bank Ann. Report) at PDF pp. 60-73 (listing Al Rajhi Bank's branches, all of which were located in Saudi Arabia); *id.* at 97 (listing Al Rajhi Bank's subsidiaries, none of which were located in the United States). | Disputed as stated. Plaintiffs acknowledge that ARB did not maintain a branch or similar base of operations in the United States. However, to the extent that ARB suggests that it did not conduct business activities in the United States, that is not correct. ARB and Suleiman al Rajhi established a "Payable Through Account" at Chase Manhattan Bank in New York, a mechanism used by the Bank to obscure the origin and destination of funds transmitted to al Qaeda, al Qaeda proxies, and affiliated anti-American extremists and jihadists, including funds originating from ARB Chairman Suleiman al Rajhi. *See, e.g.*, Averment ¶¶ 11, 36-39, 52, 264, 392, 401, 404, 412, 414-419, 429-488. Indeed, the Payable Through Account was used to transmit money to at least two individuals associated with the Saudi support network in the United States assisting the 9/11 hijackers – Khalid al Sowailem, the head of the Ministry of Islamic Affairs' Da'wah Office in the Saudi Embassy in Washington, D.C.; and Omar al Bayoumi, a Saudi agent known to have provided substantial assistance to the 9/11 hijackers. *See* Averment ¶¶ 472-478.<br><br>*See also* Plaintiffs' response to No. 2. |
| 11. Plaintiffs have no evidence that Al Rajhi Bank conducted any banking business in the United States apart from holding a U.S.-dollar correspondent banking account with then-Chase Manhattan Bank ("Chase Manhattan"). *See, e.g.*, Pls. Aver. ¶¶ 28, 35-36. | Disputed as stated. Plaintiffs acknowledge that ARB did not maintain a branch or similar base of operations in the United States. However, to the extent that ARB suggests that it did not conduct business activities in the United States, that is not correct. In addition to ARB's use of the "Payable Through Account" at Chase Manhattan Bank, ARB maintained correspondent accounts with several other U.S. banks. As of October 2009, ARB held correspondent accounts at JPMorgan Chase Bank, N.A., Wachovia Bank, N.A., Standard Chartered Bank, New York, and a correspondent accounts used by ARB's international brokerage, at Deutsche Bank. *See* Ex. G, *Al Rajhi Banking & Investment Corp. v. Eric H. Holder, Jr., et al.*, Case No. 1:10-nc-00055-ESH (D.D.C.), Memorandum of Points and Authorities in Support of Petitioner's Motion to Quash USA Patriot Act Subpoena, January 19, 2010, Dkt. No. 1-1, at 3, n.1. *See also* Ex. H, Declaration of Khalid A. Al-Thebity, October 21, 2009, at ¶ 4 ("The Bank is the holder of four correspondent accounts with United States banks. The Bank's correspondent accounts are held at with the following banks: (1) JP Morgan Chase Bank NA; (2) Wachovia Bank NA; (3) Standard Chartered Bank, New York; and (4) a correspondent account used by the Bank's international brokerage at Deutsche Bank."). Pursuant to the USA PATRIOT Act, 31 U.S.C. § 5318(k)(3)(b), a foreign bank that maintains a correspondent account in the United |

| | |
|---|---|
| | States must appoint an agent for service of process. *See* Ex. G at 3, n.2. ARB appointed a lawyer in the New York office of King & Spalding LLP to serve as its registered agent. *Id.*<br><br>Furthermore, ARB expanded its correspondent banking relationships in 2015-2017, simultaneous with the filing of Plaintiffs' complaints in this litigation, to include the New York branch of Habib Bank Limited ("Habib"). Notably, the New York State Department of Financial Services was deeply concerned with Habib's relationship with ARB and fined Habib over $225 million for "facilitating billions of dollars in transactions" through its New York branch to unidentified ARB customers "without adequate anti-money laundering and counter-terrorist financing controls." *See* Ex. I, New York State Dept. of Financial Services Press Release, *DFS Fines Habib Bank and its New York Branch $225 Million for Failure to Comply With Laws and Regulations Designed to Combat Money Laundering, Terrorist Financing, and Other Illicit Financial Transactions*, September 7, 2017. The Order noted that the ARB correspondent account presented Habib Bank with a significant risk of being used for terrorist financing, highlighting the fact that since 2014, Al Rajhi transactions represented an incredible 24 percent of the total number of transactions conducted through the New York branch. *Id.* For context of this volume, for the year ending in 2015, Habib processed correspondent banking transactions for all customers for a total of $287 billion. *Id.* |
| **B. Al Rajhi Bank Was During The Relevant Period, And Remains Today, One Of The World's Largest Shariah-Compliant Banks** | No response necessary. |
| 12. Al Rajhi Bank was, and is, one of the largest banks in Saudi Arabia and the Middle East. *See* Pls. Ex. 6 (1998 Annual Rep.) at PDF p. 107 (noting the "continue[d] to occupy the leading position [for net profits] for the fourth consecutive year among all financial institutions in the Kingdom"); ARB Ex. 13 ("Al Rajhi Bank 2023 Fact Sheet"); ARB Ex. 14 ("Al Rajhi Bank" Profile, Company Profile Main Market) ("Al Rajhi Bank is one of the largest banks in terms of market cap and the largest in Middle East and Saudi Arabia."). | Undisputed as a general matter for purposes of this motion. |
| 13. Al Rajhi Bank provided Shariah-compliant retail and corporate banking services. *See, e.g.*, Pls. Ex. 8 (2000 Al Rajhi Bank Ann. Report) at PDF p. 23 (discussing the Shariah Board's oversight over Al Rajhi Bank's investment and banking activities to ensure Shariah-compliance). Until 2004, Al Rajhi Bank was the only fully Shariah-compliant bank in Saudi Arabia. *See* ARB Ex. 15 ("Financial Services Report: | It is not disputed that ARB provided Shariah-compliant services as a general matter. However, to be clear, part of the Shariah-compliant protocols at ARB included identifying special commissions, which are prohibited income under Sharia law, and paying them to charities. *See* Pls. Ex. 6, 1998 ARB Annual Report at 24 (stating that "[s]pecial commission and related items, representing income prohibited by Sharia," "is paid out to charities"); Pls. Ex. 7, 1999 ARB Annual Report |

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

| | |
|---|---|
| Banks," *Economist Intelligence Unit*) at 7; *see also* ARB Ex. 1 (Expert Report of Aimen Dean) ("Dean Report") at 19. | at 25 (same). ARB has consistently taken the position in this litigation that the Bank never made any donations to any of the charities identified in Plaintiffs' Averment. *See, e.g.,* Memorandum of Law in Support of Al Rajhi Bank's Renewed Motion to Dismiss, ECF No. 9786, at 9, 15-16, 19, 28. ARB's annual reports indicate otherwise. |
| 14. Al Rajhi Bank had millions of customers. *See* Pls. Ex. 1 (Abdullah bin Sulaiman Al Rajhi Dep. Tr.) at 46:6-10 and Errata at 46:6, 46:10. | Undisputed as a general matter for purposes of this motion. |
| 15. Al Rajhi Bank had more than 350 branches, all in Saudi Arabia. *See* Pls. Ex. 3 (Galloway Dep. Tr.) at 111:22-23 and Errata at 111:22-23; *see also, e.g.,* Pls. Ex. 6 (1998 Al Rajhi Bank Ann. Report) at PDF p. 58-70 (listing Al Rajhi Bank's branches, all of which were located in Saudi Arabia); ARB Ex. 16 (2001 Al Rajhi Bank Ann. Report) at PDF pp. 60-73 (same). | It is not disputed that ARB had a significant banking presence within Saudi Arabia. To the extent that ARB asserts that it only conducted banking activities in the Kingdom, that is disputed. ARB and Suleiman al Rajhi established a "Payable Through Account" at Chase Manhattan Bank in New York, a mechanism that allowed them to obscure the origin and destination of funds transmitted to al Qaeda, al Qaeda proxies, and affiliated anti-American extremists and jihadists, including funds originating from ARB Chairman Suleiman al Rajhi. *See* Plaintiffs' responses to Nos. 2, 10. In addition, ARB maintained correspondent accounts with other U.S. banks, including Wachovia Bank, N.A., Standard Chartered Bank, New York, and a correspondent accounts used by ARB's international brokerage, at Deutsche Bank. *See* Plaintiffs' response to No. 11. |
| **C. Al Rajhi Bank Had A Corporate Governance Structure And Internal Controls Aimed At Ensuring Compliance With Applicable Law And The Bank's Own Policies** | No response necessary. |
| 16. Maintaining "a strong, robust, well-managed, and inspected risk framework" is a "core tenet" at Al Rajhi Bank. Pls. Ex. 3 (Galloway Dep. Tr.) at 105:9-105:12. To that end, the "controls Al Rajhi Bank had in place" during the relevant period "were already quite strong even by modern standards." Pls. Ex. 3 (Galloway Dep. Tr.) at 105:9-105:12; *see also* ARB Ex. 3 (Pasley Report) at 13-14 (explaining that "some SAMA regulations were much more stringent that U.S. banking regulations, pre-9.11, including "stronger 'Know-Your-Customer' (KYC) regulations than those in the United States"). | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 22, 23, 25-34. |
| 17. Al Rajhi Bank maintained a corporate governance structure and internal controls aimed at ensuring compliance with local law and adherence to the Bank's internal policies. *See* Pls. Ex. 3 (Galloway Dep. Tr.) at 104:20-106:3 and Errata at 104:24, 105:3-8, 105:15-16; *see also* Pls. Ex. 1 (Abdullah bin Sulaiman Al Rajhi Dep. Tr.) at 34:6-35:8 and Errata at 34:13-14, 34:18, 34:20, 34:22, 34:25; 35:1-4; ARB Ex. 2 (Expert Report of Fawzi Al-Hobayb) ("Hobayb Report") at | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 22, 23, 25-34. |

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

| | |
|---|---|
| 16-21 (discussing the components of Al Rajhi Bank's corporate governance structure during the relevant period). | |
| 18. The Bank's corporate governance structure included specialized committees and director-level positions that exemplified segregation of duties, checks and balances, and protocols for testing the Bank's internal controls and compliance through audits. *See generally* ARB Ex. 17 (Al Rajhi Bank Gen. Policies and Auths. Guide) (setting forth the Bank's comprehensive corporate governance controls); *see also* ARB Ex. 2 (Hobayb Report) at 17 (discussing the different specialized committees that were part of Al Rajhi Bank including the "High Management Committee, the International Credit Committee, Assets and Liabilities Committee, Procurement Committee, Information Systems Procurement Committee, and the Information Systems Steering Committee"); *id.* at 17-18 (discussing key corporate governance provisions outlined in Al Rajhi Bank's 1998 General Policies and Authorities Guide); *id.* at 18 (discussing Audit Committee, which was independent of the Bank's operations structure). | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 22, 23, 25-34. |
| 19. The Bank's Chairman was not a member of any of these specialized committees, including the Audit Committee. *See* ARB Ex. 17 (Al Rajhi Bank Gen. Policies and Auths. Guide) at 11 (stating that the "Board of Directors is the body that approves the Corporation's Organizational Structure"); *see also* ARB Ex. 2 (Hobayb Report) at 17 (explaining that, based on his review, the Bank's Chairman did not sit on any of the committees). | Disputed to the extent this statement suggests a lack of control over ARB's core operations by Suleiman al Rajhi. Suleiman al Rajhi founded ARB with his three brothers and served as the Chairman and Managing Director of ARB. *See* Averment ¶¶ 28, 29. As the Chairman of ARB, Suleiman al Rajhi dominated and exerted tight control over the Bank's operations throughout the period leading up to the 9/11 attacks. *See* Averment ¶¶ 34, 178, 179, 522, 537. Under Suleiman al Rajhi's leadership, ARB and the al Rajhi family became key financial supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the September 11, 2001 attacks, and became the "bank of choice" for al Qaeda, Islamic extremists, and other terror groups. *See, e.g.*, Plaintiffs' responses to Nos. 1, 2, 4, 5, 6. |
| ***D. Al Rajhi Bank's Policies And Procedures Implemented The Guidelines And Regulations Of Its Regulator, Which Were Consistent With International Standards*** | No response necessary. |
| 20. As a Saudi bank, Al Rajhi Bank operated within a regulatory and oversight regime led by the Saudi Central Bank, known during the relevant period as the Saudi Arabian Monetary Authority ("SAMA"). Pls. Ex. 3 (Galloway Dep. Tr.) at 344:21-345:3 and Errata at 344:24; ARB Ex. 2 (Hobayb Report) at 4-5 (explaining the Saudi banking regulatory regime and SAMA's regulatory role over Saudi banks, including Al Rajhi Bank). | It is undisputed that SAMA was the regulatory body responsible for overseeing Saudi banks during the relevant time period. However, However, SAMA failed to conduct rigorous oversight to ensure that AML and KYC protocols were implemented and followed by the Saudi banks in the years prior to the 9/11 attacks, as confirmed by the 9/11 Commission and the 9/11 Staff Monograph on Terrorist Financing. *See* Pls. Ex. 44 (Lormel Exhibit 12), *Monograph on Terrorist Financing*, Staff Report to the 9/11 Commission ("Monograph") at 116 ("Although the Saudis did institute |

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

| | |
|---|---|
| | "Guidelines for Preventing Money Laundering" in 1995 and "Regulations on Charitable Organizations and Institutions" in 1990, these were very loose rules whose enforcement was doubtful. Moreover, the regulations covered only domestic charities, through the Ministry of Labor and Social Affairs, and exempted all charities set up by royal decree."). *See also* Pls. Ex. 12, Transcript, January 12, 2024 Deposition of Jonathan M. Winer at 126:24-25 and 127:1-5 (testifying that in the late 1990s, "Saudi Arabia was not enforcing its anti-money laundering regulations which is one of the reasons we sent teams to Saudi Arabia to try to put pressure on them to shape up"). |
| 21. Since its creation, SAMA has regularly issued: (1) guidelines that provide guidance to Saudi banks about banking best practices (*see, e.g.*, Pls. Ex. 58 (1995 SAMA AML Guidelines)) and (2) regulations that are binding on Saudi banks, including Al Rajhi Bank. *See* Pls. Ex. 3 (Galloway Dep. Tr.) at 344:21-345:3 and Errata at 344:24. | It is undisputed that SAMA was the regulatory body responsible for overseeing Saudi banks during the relevant time period. However, However, SAMA failed to conduct rigorous oversight to ensure that AML and KYC protocols were implemented and followed by the Saudi banks in the years prior to the 9/11 attacks, as confirmed by the 9/11 Commission and the 9/11 Staff Monograph on Terrorist Financing. *See* Pls. Ex. 44 (Lormel Exhibit 12), *Monograph on Terrorist Financing*, Staff Report to the 9/11 Commission ("Monograph") at 116 ("Although the Saudis did institute "Guidelines for Preventing Money Laundering" in 1995 and "Regulations on Charitable Organizations and Institutions" in 1990, these were very loose rules whose enforcement was doubtful. Moreover, the regulations covered only domestic charities, through the Ministry of Labor and Social Affairs, and exempted all charities set up by royal decree."). *See also* Pls. Ex. 12, Transcript, January 12, 2024 Deposition of Jonathan M. Winer at 126:24-25 and 127:1-5 (testifying that in the late 1990s, "Saudi Arabia was not enforcing its anti-money laundering regulations which is one of the reasons we sent teams to Saudi Arabia to try to put pressure on them to shape up"). |
| 22. Al Rajhi Bank implemented policies and procedures according to SAMA's guidelines and regulations. *See* Pls. Ex. 3 (Galloway Dep. Tr.) at 105:13-21, 106:6-8 and Errata at 105:15-16, 106:6-8; *see also* ARB Ex. 2 (Hobayb Report) at 8-15 (discussing Al Rajhi Bank's implementation of policies and procedures consistent with SAMA's instructions). | Disputed. ARB consistently violated international Anti-Money Laundering ("AML"), Combatting the Financing of Terrorism ("CFT"), and Know-Your-Customer ("KYC") standards, as well as SAMA guidelines and ARB's own (nominal) protocols, in relation to its opening, maintenance, and operation of accounts of al Qaeda's charity fronts, financial facilitators, and Suleiman al Rajhi's own "charity" committee/foundation and its employees. By carrying out financial transactions for those al Qaeda partners, ARB consistently ignored obvious red flags indicative of money laundering, terrorist financing, and other serious crimes, again in violation of international standards and other obligations ARB was required to follow. Viewed collectively and in light of the other available evidence, ARB's treatment of these accounts and customers indicates that ARB knew that its |

| | |
|---|---|
| | accounts were being used to launder funds for al Qaeda and associated terrorists, and knowingly afforded al Qaeda's principal sponsors and financial facilitators unfettered license to use their accounts to engage in highly irregular transactions and activities, thus facilitating al Qaeda's access to the global financial system in ways that would not have been possible via accounts at other banks. *See* Averment ¶¶ 273-389; Pls. Ex. 4, Winer Report at 130-203. |
| 23. In 1995, SAMA issued anti-money laundering guidelines that provided Saudi banks, including Al Rajhi Bank, a framework and guidance for implementing anti-money laundering and know-your-customer protocols, and instructed Saudi banks to create internal policies addressing the prevention of money laundering. *See* Pls. Ex. 58 (1995 SAMA AML Guidelines) at PDF p. 9-10, 15; *see also* ARB Ex. 2 (Hobayb Report) at 6-7 (discussing key provisions of the 1995 SAMA AML Guidelines). | It is not disputed that international Anti-Money-Laundering ("AML") and Know-Your-Customer ("KYC") standards and best practices were adopted by SAMA and incorporated into its "Guidelines for Prevention and Control of Money Laundering Activities" in 1995 (the "1995 Guidelines"). The 1995 Guidelines were distributed to all banks in the Kingdom, including to ARB and Abdullah al Rajhi. *See* Averment ¶¶ 278-282, 296-301. However, SAMA failed to conduct rigorous oversight to ensure that AML and KYC protocols were implemented and followed by the Saudi banks in the years prior to the 9/11 attacks, as confirmed by the 9/11 Commission and the 9/11 Staff Monograph on Terrorist Financing. *See* Pls. Ex. 44 (Lormel Exhibit 12), *Monograph on Terrorist Financing*, Staff Report to the 9/11 Commission ("Monograph") at 116 ("Although the Saudis did institute "Guidelines for Preventing Money Laundering" in 1995 and "Regulations on Charitable Organizations and Institutions" in 1990, these were very loose rules whose enforcement was doubtful. Moreover, the regulations covered only domestic charities, through the Ministry of Labor and Social Affairs, and exempted all charities set up by royal decree."). *See also* Pls. Ex. 12, Transcript, January 12, 2024 Deposition of Jonathan M. Winer at 126:24-25 and 127:1-5 (testifying that in the late 1990s, "Saudi Arabia was not enforcing its anti-money laundering regulations which is one of the reasons we sent teams to Saudi Arabia to try to put pressure on them to shape up"). |
| 24. SAMA's guidelines and regulations were consistent with international standards aimed at preventing illegal activity. ARB Ex. 2 (Hobayb Report) at 8-13 (discussing "consistent similarities between the FATF Recommendations, the pre-9/11 SAMA 1995 AML Guidelines, and Al Rajhi Bank's Branch Manual and AML Unit Guide"); *see also* ARB Ex. 3 (Pasley Report) at 13 (noting that pre-9/11, "some SAMA regulations were much more stringent than U.S. banking regulations"). | Disputed. *See* Plaintiffs' response to No. 23. |
| 25. Al Rajhi Bank's 1997 Branch Instructions Manual, which guided the activities and procedures of the Bank's branches during the relevant period, followed SAMA guidelines on anti-money laundering. *See* Pls. Ex. 188 (Al Rajhi Bank Branch | It is not disputed that ARB implemented the 1995 Guidelines principally through sections of its Branch Instructions Manual issued in 1997, and an Anti-Money Laundering Procedure Guide issued in 1998. However, ARB consistently and |

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

| | |
|---|---|
| Manual) at ARB-0000164, ARB-0000259-ARB-0000263; ARB Ex. 2 (Hobayb Report) at 8-12 (highlighting provisions of the 1997 Al Rajhi Bank Branch Instructions Manual that reflect standards established in FATF Recommendations and the 1995 SAMA AML Guidelines); *see also* Pls. Ex. 4 (Winer Report) at 137 ("[Al Rajhi Bank]'s AML obligations set forth in the [Al Rajhi Bank] Manual and the [Al Rajhi Bank] AML Policies and Procedures largely track the SAMA Guidelines."). | extensively failed to comply with the basic AML and KYC requirements imposed by international standards and the 1995 Guidelines, as well as ARB's own (nominal) procedures, in relation to the opening and operation of its accounts for al Qaeda's financial facilitators, charity fronts, Suleiman al Rajhi's committee/foundation, and the individual officials of the charities and committee/foundation. *See* Averment ¶¶ 273-389; Pls. Ex. 4, Winer Report at 146-203. |
| 26. Following SAMA guidelines, Al Rajhi Bank had an AML Unit focused on developing AML procedures and monitoring compliance across the Bank. *See* Pls. Ex. 3 (Galloway Dep. Tr.) at 106:6-8 and Errata at 106:6-8; Pls. Ex. 189 (Al Rajhi Bank AML Guide) at ARB-00000736 (explaining that AML Unit "[u]pdate[d] anti-money laundering policies and procedures in accordance with developments in the methods, processes and activities that could be used in money laundering activity"); *see also* ARB Ex. 2 (Hobayb Report) at 20 (explaining AML Unit's role in preventing money laundering). | It is not disputed that ARB had an AML Unit. However, to the extent that ARB argues that the Bank and the AML Unit properly carried out the procedures and protocols with respect to accounts prior to the 9/11 attacks, that is disputed. According to ARB, the ARB AML Guide was designed to reduce illegal activities and practices, introduce automated monitoring programs, ensuring that the Bank does not become an illegal outlet for suspicious activities, and developing the necessary policies and procedures to address cases of suspicious activities. *See* Pls. Ex. 189, ARB 735-744 at 736. *See also* Averment ¶ 305 ("Among other processes and requirements, the AML Guide indicated that ARB had implemented an automated suspicious activity reporting software program, as required by the 1995 Guidelines, which reported suspicious transactions to the AML Unit. Reported transactions were subject to mandatory investigations, and recordkeeping requirements."). However, documents produced by ARB provide no evidence that the AML Unit successfully implemented and carried out the objectives set forth in the AML Guide, particularly with respect to accounts at issue prior to 9/11.

By way of example, Aqil al Aqil, the head of Al Haramain, made near daily cash deposits of huge sums of money into his ARB account (sixty-three separate cash deposits) over a two month period, including a single cash deposit of nearly 1.3 million SR, and numerous cash deposits in excess of 600,000 SR. These transactions presented myriad money laundering and illicit activity red flags, and under the 1995 Guidelines and ARB AML Guide, each of the Aqil transactions exceeding 100,000 SR should have been reported to ARB's AML Unit "through the unit's available automated programs," resulting in a required investigation. ARB was required to produce any suspicious activity reports or documents relating to money laundering investigations of the accountholders and accounts with the scope of discovery, but did not produce any, indicating they do not exist (whether for Aqil or any of the other accountholders in issue). *See* Averment ¶¶ 346-365. *See also* Pls. Ex. 4, Winer Report at 156 (concluding "that ARB's AML Unit head did not comply with the bank's own policies and procedures and that ARB itself did not adhere to its own |

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

|  |  |
|---|---|
|  | policies and procedures, which in turn were necessary to meet SAMA's requirements, which in turn were necessary for ARB to meet its international banking obligations"). |
| 27. Al Rajhi Bank trained its employees in protocols focused on anti-money laundering, combatting the financing of terrorism, and identifying suspicious transactions. *See* Pls. Ex. 189 (Al Rajhi Bank AML Guide) at ARB-00000736 (explaining AML Unit's responsibility to coordinate with other units "regarding the preparation and implementation of the necessary training and guidance programs to the company's employees and providing the necessary advice regarding all aspects related to money laundering"). | It is not disputed that ARB's AML Guide tasked the Bank and AML Unit with providing it employees with the necessary training concerning "all aspects related to money laundering with the various units and ensuring that the regulating procedures are followed." *See* Pls. Ex. 189, ARB 735-744 at 736. *See also* Pls. Ex. 4, Winer Report at 143 (indicating that the SAMA Guidelines required banks to train their employees about how to address money laundering risks at the account opening, during account maintenance, and in every financial transaction involving ARB). However, to the extent that ARB argues that the Bank and the AML Unit conducted the required training, that is disputed. ARB has failed to produce any evidence that ARB's AML Unit carried out the training required by SAMA under its November 1995 AML Guidelines. *See id.* at 155. *See also* Plaintiffs' response to No. 26.

By way of further response, documents obtained from JPMorgan Chase Bank indicate that SAMA imposed fines on ARB for violations of procedures and rules associated with opening new customer accounts, including failing to obtain sufficient supporting customer documentation. Violations reportedly occurred in 2002, 2007, 2008, and 2009, and led to the implementation of intensive know-your-customer training, enhanced account review checklists, enhanced supervision over the account opening process, and the use automated tools to assess customer risk. *See* Pls. Ex. 138, JPMC 0001-228 at 225. *See also* Averment ¶ 144. Clearly, ARB's training programs both prior to and after the 9/11 attacks were highly deficient. |
| 28. If suspicious transactions were identified, Al Rajhi Bank could not unilaterally close customer accounts without express instructions from SAMA. *See* Pls. Ex. 3 (Galloway Dep. Tr.) at 251:6-11 and Errata at 251:8; *see also* ARB Ex. 2 (Hobayb Report) at 15; ARB Ex. 18 (SAMA Circular 02419-BCL-142, July 4, 1996) (SAMA circular directing banks not to unilaterally close accounts); ARB Ex. 87 (Oct. 16, 2001 Banks' SSC meeting minutes) at ARB-39402 (providing instruction from SAMA that "listed names should be promptly communicated to SAMA" to receive instructions on "freez[ing] and appropriate action"). | Disputed. To clarify, Mr. Galloway testifies that *after the 9/11 attacks* SAMA issued a directive to Saudi banks not to close an account without SAMA's authorization. *See* Pls. Ex. 3 at 216, 250-251, 351 (testifying that SAMA directed banks not to close an account without SAMA's approval after the formation of the Self-Supervisory Committee following the 9/11 attacks). ARB has not produced or cited to any evidence of such a directive to Saudi banks *prior to the 9/11 attacks*.

The SAMA directive ARB has produced at ARB Ex. 18, restricts the Kingdom's banks closing accounts of low value customers, and has nothing to do with how banks should respond to terrorist financing or money laundering activities. Nothing in the record suggests that ARB lacked authority to close accounts or prohibit account activity based on evidence of terrorist financing activities. In any case, the record shows |

| | |
|---|---|
| | that ARB took no action to report suspicious activity or transactions, despite obvious red flags. *See, e.g.*, Averment ¶¶ 346-365. |
| 29. Al Rajhi Bank also had an internal audit control system and regularly conducted internal audits to ensure its policies and procedures were being implemented. *See* Pls. Ex. 3 (Galloway Dep. Tr.) at 104:20-105:12, 105:18-106:3 and Errata 104:24 (explaining that Al Rajhi Bank's internal control system included regular audits); *see also, e.g.*, ARB Ex. 19 (Al Rajhi Bank Internal Audit Plan for FY 1999) at PDF p. 7; ARB Ex. 20 (Al Rajhi Bank Internal Audit Plan for FY 2001) at PDF pp. 11-12 (including action items to examine and evaluate the Bank's internal control system; verify the Bank's compliance with its policies and procedures; evaluate the Bank's supervisory and operational controls; conduct audits of the Bank's branches; and evaluate corrective procedures taken); ARB Ex. 3 (Pasley Report) at 9 (explaining that the Bank's internal audit plans "show very comprehensive procedures for audits to protect the Bank from violations of laws, rules and regulations and to ensure the proper operation of its branches"); *id.* (concluding that the Bank's "comprehensive" internal audit plans "illustrate that the Bank had procedures for preventing and detecting noncompliance with internal banking policies"); ARB Ex. 2 (Hobayb Report) at 18-19 (discussing the "Internal Audit Committee" which "oversaw regular audits of the Bank" and "continuously monitored the Bank's compliance with relevant internal and governmental rules and procedures."). | Disputed. As authorized by the Court's November 22, 2021 Order at ECF No. 7378 ("Discovery Order No. 1"), Plaintiffs sought the production of ARB audits or similar reviews concerning the al Qaeda charity fronts and financial facilitators at issue in discovery, as well as audits addressing the sufficiency of ARB's Anti-Money Laundering ("AML") and Combatting the Financing of Terrorism ("CFT") protocols and compliance with same. *See* Averment ¶¶ 23-24. However, notwithstanding the fact that ARB has talked ad nauseum about ARB's Internal Auditing Department, Audit Committee, and the Bank's internal and external auditing policies and procedures throughout discovery, not a single audit was produced by the Bank. *See* Averment ¶ 25. *See also* Averment ¶ 26 (ARB's Rule 30(b)(6) designee identifying and describing annual branch audits, periodic thematic audits, short-notice audits, external auditing, and audits of all ARB branches conducted by the Bank's Internal Audit Department.). No audits pertaining to or referencing any of the accountholders were ever produced, whether for periods before or after the 9/11 attacks, indicating no such audits exist. *See* Averment ¶ 27. *See also* Pls. Ex. 4, Winer Report at 7 (stating that no such audits have been produced by ARB), 155 (indicating "that no such audits have been provided to the plaintiffs in discovery"). |
| 30. The Bank's Internal Audit Department, which functioned independently from the Bank's executive and operational functions, evaluated and enforced adherence to internal policies and procedures, and applicable law, across the Bank. *See* ARB Ex. 17 (Al Rajhi Bank Gen. Policies and Auths. Guide) at 3-4; *id.* at 8 ("The Internal Audit Department is not an executive or operations department. It must be disconnected from executing corporate operations."); *see also, e.g.*, ARB Ex. 19 (Al Rajhi Bank Internal Audit Plan for FY 1999); ARB Ex. 20 (Al Rajhi Bank Internal Audit Plan for FY 2001). | Disputed. As authorized by the Court's November 22, 2021 Order at ECF No. 7378 ("Discovery Order No. 1"), Plaintiffs sought the production of ARB audits or similar reviews concerning the al Qaeda charity fronts and financial facilitators at issue in discovery, as well as audits addressing the sufficiency of ARB's Anti-Money Laundering ("AML") and Combatting the Financing of Terrorism ("CFT") protocols and compliance with same. *See* Averment ¶¶ 23-24. However, notwithstanding the fact that ARB has talked ad nauseum about ARB's Internal Auditing Department, Audit Committee, and the Bank's internal and external auditing policies and procedures throughout discovery, not a single audit was produced by the Bank. *See* Averment ¶ 25. *See also* Averment ¶ 26 (ARB's Rule 30(b)(6) designee identifying and describing annual branch audits, periodic thematic audits, short-notice audits, external auditing, and audits of all ARB branches conducted by the Bank's Internal Audit Department.). No audits pertaining to or referencing any of the accountholders were ever produced, whether for periods before or after the 9/11 attacks, indicating no such audits exist. *See* Averment ¶ 27. *See also* Pls. Ex. 4, Winer Report at 7 (stating that no audits |

| | have been produced by ARB), 155 (indicating "that no such audits have been provided to the plaintiffs in discovery"). |
|---|---|
| 31. The Bank also had an Audit Committee, which evaluated and ensured the Bank's compliance, including by (1) "[m]onitor[ing] the performance of internal control systems and financial reports"; (2) "[v]erif[ing] implementation of the policies related to money laundering and other criminal activities"; and (3) "[e]nsur[ing] compliance with the banking control provisions, rules and regulations issued by the Saudi Arabian Monetary Authority." ARB Ex. 21 (Al Rajhi Bank Auths. of the Audit Comm. Manual) at ¶¶ 8, 15, 24; ARB Ex. 2 (Hobayb Report) at 18 ("[T]he audit committee continuously monitored the Bank's compliance with relevant internal and governmental rules and procedures. The audit committee also considered the reports of external auditors and discussed those reports with them."). | Disputed. As authorized by the Court's November 22, 2021 Order at ECF No. 7378 ("Discovery Order No. 1"), Plaintiffs sought the production of ARB audits or similar reviews concerning the al Qaeda charity fronts and financial facilitators at issue in discovery, as well as audits addressing the sufficiency of ARB's Anti-Money Laundering ("AML") and Combatting the Financing of Terrorism ("CFT") protocols and compliance with same. *See* Averment ¶¶ 23-24. However, notwithstanding the fact that ARB has talked ad nauseum about ARB's Internal Auditing Department, Audit Committee, and the Bank's internal and external auditing policies and procedures throughout discovery, not a single audit was produced by the Bank. *See* Averment ¶ 25. *See also* Averment ¶ 26 (ARB's Rule 30(b)(6) designee identifying and describing annual branch audits, periodic thematic audits, short-notice audits, external auditing, and audits of all ARB branches conducted by the Bank's Internal Audit Department.). No audits pertaining to or referencing any of the accountholders were ever produced, whether for periods before or after the 9/11 attacks, indicating no such audits exist. *See* Averment ¶ 27. *See also* Pls. Ex. 4, Winer Report at 7 (stating that no audits have been produced by ARB), 155 (indicating "that no such audits have been provided to the plaintiffs in discovery"). |
| 32. Further, as required by Saudi law, Al Rajhi Bank had two independent external auditors, whose responsibilities included "examin[ing] the bank's policies, procedures and internal control systems aimed at combating money laundering activities" and "test[ing] the enforcement of such policies, and procedures." *See* Pls. Ex. 58 (1995 SAMA AML Guidelines) at PDF p. 14 (outlining responsibilities of external auditors); ARB Ex. 22 (Banking Ctrl. Law (Royal Decree No. M/5 of June 11, 1966)) at 11-12 (requiring Saudi banks to have two external auditors); ARB Ex. 2 (Hobayb Report) at 19-20 (explaining that Saudi law required each bank to have two external auditors and that they would be required to test the Bank's internal control systems); *see also* Pls. Ex. 3 (Galloway Dep. Tr.) at 109:16-110:5, 345:19-23 and Errata at 109:18, 109:21-22, 110:4, 345:22; *see, e.g.*, Pls. Ex. 7 (1999 Al Rajhi Bank Ann. Report) at PDF p. 77 (external auditors' report signed by Al Rashed Certified Public Accounts and Al Juraid & Company (Member of PricewaterhouseCoopers)). | Disputed. As authorized by the Court's November 22, 2021 Order at ECF No. 7378 ("Discovery Order No. 1"), Plaintiffs sought the production of ARB audits or similar reviews concerning the al Qaeda charity fronts and financial facilitators at issue in discovery, as well as audits addressing the sufficiency of ARB's Anti-Money Laundering ("AML") and Combatting the Financing of Terrorism ("CFT") protocols and compliance with same. *See* Averment ¶¶ 23-24. However, notwithstanding the fact that ARB has talked ad nauseum about ARB's Internal Auditing Department, Audit Committee, and the Bank's internal and external auditing policies and procedures throughout discovery, not a single audit was produced by the Bank. *See* Averment ¶ 25. *See also* Averment ¶ 26 (ARB's Rule 30(b)(6) designee identifying and describing annual branch audits, periodic thematic audits, short-notice audits, external auditing, and audits of all ARB branches conducted by the Bank's Internal Audit Department.). No audits pertaining to or referencing any of the accountholders were ever produced, whether for periods before or after the 9/11 attacks, indicating no such audits exist. *See* Averment ¶ 27. *See also* Pls. Ex. 4, Winer Report at 7 (stating that no audits have been produced by ARB), 155 (indicating "that no such audits have been provided to the plaintiffs in discovery"). |

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

| | |
|---|---|
| 33. During the relevant period, SAMA routinely communicated with, examined, and inspected all Saudi banks, including Al Rajhi Bank, to ensure compliance with applicable guidelines and regulations. *See* Pls. Ex. 3 (Galloway Dep. Tr.) at 109:16-110:5, 112:2-5, 113:13-14; 113:20-114:4 and Errata at 109:18, 109:21-22, 112:5 (testifying that the Bank regularly audited its branches and that SAMA conducted "surprise and short-notice audits" as well as "thematic audits" for a "particular area of interest"); ARB Ex. 2 (Hobayb Report) at 5 (discussing variety of tools used by SAMA, "including self-reporting, document collection, special inspections into topics under SAMA's authorities, full-fledged inspections, as well as inspections of individuals or accounts the purpose of which were not disclosed to the bank"). | Disputed. As authorized by the Court's November 22, 2021 Order at ECF No. 7378 ("Discovery Order No. 1"), Plaintiffs sought the production of ARB audits or similar reviews concerning the al Qaeda charity fronts and financial facilitators at issue in discovery, as well as audits addressing the sufficiency of ARB's Anti-Money Laundering ("AML") and Combatting the Financing of Terrorism ("CFT") protocols and compliance with same. *See* Averment ¶¶ 23-24. However, notwithstanding the fact that ARB has talked ad nauseum about ARB's Internal Auditing Department, Audit Committee, and the Bank's internal and external auditing policies and procedures throughout discovery, not a single audit was produced by the Bank. *See* Averment ¶ 25. *See also* Averment ¶ 26 (ARB's Rule 30(b)(6) designee identifying and describing annual branch audits, periodic thematic audits, short-notice audits, external auditing, and audits of all ARB branches conducted by the Bank's Internal Audit Department.). No audits pertaining to or referencing any of the accountholders were ever produced, whether for periods before or after the 9/11 attacks, indicating no such audits exist. *See* Averment ¶ 27. *See also* Pls. Ex. 4, Winer Report at 7 (stating that no audits have been produced by ARB), 155 (indicating "that no such audits have been provided to the plaintiffs in discovery"). |
| 34. Al Rajhi Bank had "zero tolerance for any deviations" from the Bank's policies and applicable law. Pls. Ex. 3 (Galloway Dep. Tr.) at 105:18-106:3. If any audit or SAMA inspection uncovered any such "deviations," the deviating branches were required to take "corrective action" within a "time-bound window." *Id.*; *see also* ARB Ex. 21 (Al Rajhi Bank Auths. of the Audit Comm. Manual) at ¶ 27 (stating that the "Audit Committee discusses the external auditors' reports with them, whether their audit has revealed no violations of the Banking Control Law or the other laws and regulations, their certificates on the audit of the provision for doubtful debts, and their conclusions regarding the adequacy of this provision"). | Disputed. As authorized by the Court's November 22, 2021 Order at ECF No. 7378 ("Discovery Order No. 1"), Plaintiffs sought the production of ARB audits or similar reviews concerning the al Qaeda charity fronts and financial facilitators at issue in discovery, as well as audits addressing the sufficiency of ARB's Anti-Money Laundering ("AML") and Combatting the Financing of Terrorism ("CFT") protocols and compliance with same. *See* Averment ¶¶ 23-24. However, notwithstanding the fact that ARB has talked ad nauseum about ARB's Internal Auditing Department, Audit Committee, and the Bank's internal and external auditing policies and procedures throughout discovery, not a single audit was produced by the Bank. *See* Averment ¶ 25. *See also* Averment ¶ 26 (ARB's Rule 30(b)(6) designee identifying and describing annual branch audits, periodic thematic audits, short-notice audits, external auditing, and audits of all ARB branches conducted by the Bank's Internal Audit Department.). No audits pertaining to or referencing any of the accountholders were ever produced, whether for periods before or after the 9/11 attacks, indicating no such audits exist. *See* Averment ¶ 27. *See also* Pls. Ex. 4, Winer Report at 7 (stating that no audits have been produced by ARB), 155 (indicating "that no such audits have been provided to the plaintiffs in discovery").<br><br>Further, Plaintiffs' expert Jonathan Winer described how there were massive violations of international AML, CFT, and KYC |

<table>
<tr>
<td></td>
<td>standards, as well as SAMA guidelines and ARB's own (nominal) protocols, in in relation to ARB's opening, maintenance, and operation of accounts of al Qaeda's charity fronts, financial facilitators, and Suleiman al Rajhi's own "charity" committee/foundation and its employees, thereby undermining ARB's claims of a "zero tolerance" policy. *See* Averment ¶¶ 273, 306-389.</td>
</tr>
<tr>
<td>***III. Before The 9/11 Attacks, Al Rajhi Bank Did Not Know That Any Account User Was Connected to Terrorism***</td>
<td>No response necessary.</td>
</tr>
<tr>
<td>35. In jurisdictional discovery, Al Rajhi Bank produced 328 Customer Information Files, which include know-your-customer information and correspondence. *See* Erb Decl. ¶¶ 3-5. None of these files shows any connection between any active customer of the Bank and terrorism before the 9/11 Attacks. *See, e.g.*, Pls. Ex. 4 (Winer Report) at § 9 (stating he reviewed customer information files, but failing to identify any connections between any customer and terrorism before 9/11).</td>
<td>Disputed. ARB established, maintained, and operated hundreds of accounts for al Qaeda's principal sponsors ad financial facilitators. *See* Plaintiffs' response to No. 4. These accounts were opened and operated in ways that violated international money laundering standards and ARB's own (nominal) Anti-Money Laundering ("AML") and Know-Your-Customer ("KYC") requirements. *See* Averment ¶ 6. The nature of the account activity and transactions presented obvious red flags for terrorist financing.

Moreover, it is misleading for ARB to assert that Mr. Winer represented that he reviewed the customer information files and could not identify connections between any customer and terrorism prior to 9/11, citing Section 9 of his expert report. Section 9 says no such thing. Rather, Mr. Winer's report at Section 9 details and describes the countless instances in which ARB failed to adhere to Know-Your-Customer ("KYC"), Anti-Money-Laundering ("AML") and Counter-Terrorism best practices and international standards with respect to the opening and maintenance of accounts for al Qaeda charity fronts Al Haramain and IIRO, and Suleiman al Rajhi's own charity foundation. *See, e.g.*, Winer Report at 131 (stating that ARB permitted the charities and their principals "to engage in a broad range of financial activities that presented obvious red flags and terrorism financing concerns"); *id.* at 146 (stating that "ARB undertook only the most basic of all customer identification procedures," with account opening forms frequently omitting essential information); *id.* at 152-153 (detailing how ARB failed to undertake the proper due diligence steps required under its policies and procedures as set forth in ARB's Branch Manual, which would "have identified red flags that Al Haramain's accounts for many locations were at high risk of terrorist finance, especially those involved in providing funds to areas of active armed conflict"); *id.* at 152 (ARB failing to update the data of older account holders every three years prior to 9/11, as required by ARB's policies and procedures); *id.* (ARB failing to obtain the licensing documents of the charities prior to 9/11); *id.* (ARB failing to verify any data given by the charities when opening accounts); *id.* at 153 (ARB failing to</td>
</tr>
</table>

| | |
|---|---|
| | obtain information concerning the charities' financial structure and annual financial statements); *id.* (ARB failing to obtain information about the actual services provided by the charities and the actual uses of the funds they were moving through ARB); *id.* (ARB failing to obtain information on the actual foreign operations of the charities); *id.* at 154 (stating that there was "no evidence in any ARB document created prior to the 9/11 attacks that contains even a single reference to any media report, in any language, about any risks associated with international charities operating in conflict zones, or about the allegations in international media relating to the involvement of the Da'Wah Organizations in providing support to extremists and/or terrorists," thereby failing to adhere to its KYC obligations). |
| 36. No Al Rajhi Bank customer identified in Plaintiffs' Corrected Averment was designated under any sanctions regime for connections to terrorism when that customer opened an account at the Bank. *See* ARB Ex. 3 (Pasley Report) at 6 (noting that Plaintiffs' experts only identify "post-9/11 sanctions designations against NGOs and individuals for alleged ties to terrorism and Al Qaeda"). | It is undisputed that ARB's customers were not designated under any sanctions regime for connections to terrorism when those customers opened accounts at the Bank, but that fact is immaterial. *See* Plaintiffs' response to No. 5. |
| 37. Al Rajhi Bank never processed any transaction for any customer identified in Plaintiffs' Corrected Averment that was designated by the United States, the United Nations, or any other governmental body at the time of the transaction. *See* Pls. Ex. 171 (Kohlmann Dep. Tr.) at 126:12-13, 130:21-131:2; id. at 132:23-133:5; ARB Ex. 28 (Winer Dep. Tr.) at 57:8-12; ARB Ex. 3 (Pasley Report) at 6 (noting that Plaintiffs' experts only identify "post-9/11 sanctions designations against NGOs and individuals for alleged ties to terrorism and Al Qaeda"). | It is undisputed that ARB did not process transactions for any customer identified in Plaintiffs' Corrected Averment that was designated by the United States, the United Nations, or any other governmental body at the time of the transactions, but that fact is immaterial. *See* Plaintiffs' response to No. 5. |
| 38. Plaintiffs have no evidence that Al Rajhi Bank processed any transaction knowing that its customer or the transaction had any connection to Al Qaeda or any form of terrorism against the United States, including the 9/11 Attacks. *See* ARB Ex. 8 (Nov. 16, 2002 Ltr. from Al Rajhi Bank to SAMA) at ARB-39559 (showing all Bin Laden accounts "blocked"); ARB Ex. 3 (Expert Report of Robert Pasley) ("Pasley Report") at 16 ("Given my experience with banking practices and regulations pre-9/11, I find it is very plausible that a bank would not know if its NGO customer accounts were being used for terrorism financing."); *see also, e.g.*, Pls. Aver. § VIII (failing to put forward any evidence that the Bank processed any transaction knowing that its customer had any connection to Al Qaeda or terrorism, including terrorism against the United States); ARB Ex. 4 (Lormel Report) at 9 ("[I]f sufficient evidence linking Al Rajhi Bank or the Al Rajhi family to terrorism finance actually existed, the Bank, or | Disputed. *See* Plaintiffs' response to No. 5. |

| | |
|---|---|
| members of the Al Rajhi family, would have been sanctioned or designated."). | |
| 39.  Al Rajhi Bank never processed any transaction for any customer identified in Plaintiffs' Corrected Averment that was designated by the United States, the United Nations, or any other governmental body at the time of the transaction. *See* ARB Ex. 93 (Kohlmann Dep. Tr.) at 126:12-13, 130:21-131:2 (testifying that charity designations only began after 9/11 and that he had not identified any Al Rajhi Bank transactions violating sanctions or designations); ARB Ex. 28 (Winer Dep. Tr.) at 57:8-12 ("To the best of my knowledge, there were no charities of any kind that I recollect that had been designated prior to 9/11 . . . ."); ARB Ex. 3 (Pasley Report) at 6 (observing that Plaintiffs' experts only identify "post-9/11 sanctions designations against NGOs and individuals for alleged ties to terrorism and Al Qaeda"). Al Rajhi Bank did not provide services to any customer identified in Plaintiffs' Corrected Averment that was designated before the 9/11 Attacks under any sanctions regime for connections to terrorism. *See* ARB Ex. 8 (Nov. 16, 2002 Ltr. from Al Rajhi Bank to SAMA) at ARB-39559; ARB Ex. 28 (Winer Dep. Tr.) at 53:5-55:2. | It is undisputed that ARB did not process transactions for any customer identified in Plaintiffs' Corrected Averment that was designated by the United States, the United Nations, or any other governmental body at the time of the transactions, but that fact is immaterial. *See* Plaintiffs' response to No. 5. |
| **A. Charities** | No response necessary. |
| 40.  None of the charities identified in Plaintiffs' Corrected Averment, including Al Haramain Islamic Foundation, International Islamic Relief Organization, Muwaffaq Foundation, World Assembly of Muslim Youth ("WAMY"), Muslim World League ("MWL"), Saudi Joint Relief Committee for Kosovo and Chechnya ("SJRC"), and Saudi High Commission for Bosnia-Herzegovina ("SHC") (collectively, the "Charities"), was designated before the 9/11 Attacks under any sanctions regime for connections to terrorism. *See* ARB Ex. 28 (Winer Dep. Tr.) at 57:8-12 ("To the best of my knowledge, there were no charities of any kind that I recollect that had been designated prior to 9/11 because terrorist designations were originally limited to terrorist organizations."); ARB Ex. 93 (Kohlmann Dep. Tr.) at 126:12-13 (testifying that charity designations only began after 9/11). | It is not disputed that the charities were not designated prior to the 9/11 attacks for connections to terrorism. However, to the extent that ARB asserts that the failure to designate demonstrates that ARB, Suleiman al Rajhi, and members of the al Rajhi family were not aware of the charities' connections to, and financial support for, al Qaeda and associated terrorist organizations, prior to the 9/11 attacks, is disputed. *See e.g.*, Plaintiffs' responses to Nos. 1, 5, 42-90.<br><br>To the contrary, the evidence surveyed in the Corrected Averment shows that ARB, Suleiman al Rajhi, and the Bank's senior officials were quintessential insiders, operating at the very center of al Qaeda's financial and logistical support structure during the critical period leading up to the September 11, 2001 attacks. They maintained high-level contacts with the charities, and were well aware of the charities' terrorist nature at all relevant times. *See* Averment generally. |
| 41.  Plaintiffs have no evidence tracing a single transaction by the Charities through Al Rajhi Bank to Al Qaeda or in support of Al Qaeda or any form of terrorism against the United States, including the 9/11 attacks. *See, e.g.*, Pls. Aver. §§ X, XI (failing to trace any transaction through Al Rajhi Bank to planning, carrying out, or financing the 9/11 Attacks); *see also* ARB Ex. 4 (Expert Report of Dennis Lormel) ("Lormel Report") at 7 (explaining that FBI investigated CIA | Disputed. ARB's claim that there is no evidence that any donation or transaction by Suleiman al Rajhi, members of the al Rajhi family, Suleiman al Rajhi's charity committee/foundation, or others conducted through the Bank has been traced or connected to the planning or carrying out of terrorism against the United States, including the 9/11 attacks themselves, is inaccurate and misleading. |

~~UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS~~

| | |
|---|---|
| intelligence leads concerning Al Rajhi Bank but could not verify or prove any allegation that the Bank provided support to Al Qaeda; *id.* at 19-20 ("[N]o actions were taken or sanctions imposed against the Saudi charity headquarters in the aftermath of 9/11. . . . The fact that these headquarters were not sanctioned, despite strong pressure to do so, demonstrates that there was not enough evidence available against the charities' headquarters in Saudi Arabia."). | ARB, Suleiman al Rajhi, members of the al Rajhi, and others were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and were specifically aware of al Qaeda's mission and intent to attack the United States. Intending to foster al Qaeda's terrorist agenda, they provided substantial financial assistance to al Qaeda charity and business fronts and other intermediaries through the Bank, knowing that the funds would be received by Osama bin Laden and al Qaeda. *See* Averment generally. Plaintiffs' Averment also shows how the support provided to al Qaeda by these parties allowed al Qaeda to acquire the strike capabilities needed to carry out the 9/11 attacks. *See* Averment ¶¶ 53-132. Plaintiffs need not prove that the donation or transaction at issue was traced to the terrorist plot or the attack itself.<br><br>By way of further response, Plaintiffs have identified payments from ARB and Suleiman al Rajhi to the al Qaeda charity fronts. *See* Plaintiffs' response to No. 6.<br><br>Finally, Mr. Lormel's claims concerning the FBI's alleged investigation into ARB and Suleiman al Rajhi, and the findings of that investigation, have been flatly rejected by the FBI and DOJ. According to the FBI and DOJ, no investigation matching his expert report and deposition testimony was ever undertaken. *See* Ex. F, May 3, 2024 letter from Assistant U.S. Attorneys Sarah S. Normand and Jennifer Jude (stating that the FBI conducted supplemental searches for documents concerning "an investigation of the Bank or Sulaiman of the kind that Mr. Lormel describes in his report and deposition," and concluding that "[t]hose searches did not reveal information suggesting that the Bank or Sulaiman … were the focus of an investigation or investigative steps by the FBI during the time period Mr. Lormel described (September 11, 2001-December 31, 2003)."). Moreover, Mr. Lormel retired from the FBI in December 2003, before any such investigation into ARB and Suleiman al Rajhi could have been completed. Notably, soon after Mr. Lormel's departure from the FBI, he was hired by ▮▮▮▮▮ to provide consulting services in connection with a criminal investigation in the Eastern District of Virginia. That consulting engagement with ▮▮ ▮▮ included the SAAR Foundation, Mar-Jac Poultry, and Jamal Barzinji, an arrangement that was highly irregular at best. *See* ARB Ex. 61, Transcript, Deposition of Dennis Lormel, February 1, 2024 at 33:12-20; 53:22-60:7; 130:11-132:16. |
| ***1. Al Haramain*** | No response necessary. |
| 42. Al Haramain Islamic Foundation in Saudi Arabia ("Al Haramain KSA") held accounts at Al Rajhi Bank. *See* Pls. Ex. | It is not disputed that Al Haramain held accounts at ARB. However, to be clear, ARB maintained and operated at least |

| | |
|---|---|
| 3 (Galloway Dep. Tr.) at 77:13-17, 348:12-14, 350:13-16 and Errata at 77:17, 348:12-13. | 94 accounts for Al Haramain during the 1998-2002 jurisdictional discovery time period. *See* Averment ¶ 206. Between January 1, 1998 and December 31, 2002, ARB facilitated deposits into those Al Haramain accounts totaling 2,146,119,285.78 Saudi Riyals ("SR") (in excess of 2.1 billion SR), and withdrawals totaling 2,035,094,758.98 SR. *See* Averment ¶ 207. Two billion SR would convert to approximately $533 million, using the long term SR-USD exchange rate, and would represent nearly $950 million in today's dollars, based on a conservative inflation calculator. *See* Averment ¶ 207. |
| 43. Al Haramain Islamic Foundation branches outside of Saudi Arabia did not hold accounts at the Bank. *See* Pls. Ex. 3 (Galloway Dep. Tr.) at 77:13-17, 348:12-14, 350:13-16 and Errata at 77:17, 348:12-13. | It is not disputed that Mr. Galloway testified that ARB did not hold accounts for Al Haramain branch offices outside Saudi Arabia. However, notwithstanding the fact that Al Haramain's overseas branch offices may or may not have held accounts at ARB, the evidence demonstrates that Al Haramain accounts at ARB were used to send funds to Al Haramain's branch offices outside of Saudi Arabia, a fact that was well known to ARB. *See* Averment ¶¶ 210, 516; Pls. Ex. 4, Winer Report at 119-121, 150-152. Those included branch offices located in regions where al Qaeda was known to be operating, and conflict zones where al Qaeda and jihadists associated with al Qaeda were known to be fighting, including Chechnya, Bosnia, and Kosovo. *See* Averment ¶ 211; Pls. Ex. 4, Winer Report at 179-180.

For instance, in an undated document from an Al Haramain official to ARB, it is reported that Al Haramain held at least 15 accounts at ARB, affirming that a number of them were being used for funding activities outside of Saudi Arabia. *See* Averment ¶¶ 313-314; Pls. Ex. 99 (Lormel Exhibit 20), ARB 38816. These accounts included, for the Al Haramain Asia Committee, funding to Palestine and Chechnya. *See* Averment ¶ 315. For the Al Haramain Europe Committee account, funding occurred for activities in Albania, Bosnia and Kosovo, areas of active armed conflict where al Qaeda was active in the mid and late 1990s. *Id.* Additionally, the document identifies an Al Haramain Zakat Committee account dedicated to "Zakat outside of the Saudi Kingdom." *Id.* The information available to ARB confirmed that these accounts were to be used to send money to foreign jurisdictions, including jurisdictions that raised particular money laundering and terrorist financing concerns. These included jurisdictions with lax or ineffective AML regulations and oversight, areas where terrorists were known to be active, and conflict regions. *See* Averment ¶ 316; Pls. Ex. 4, Winer Report at 151-156.

In addition, ARB allowed Al Haramain officials to move staggering sums of money through their personal accounts, where ARB plainly knew the accounts were being used to |

carry out transactions unrelated to the individuals' personal affairs, and were instead being used to carry out financial transactions for Al Haramain branch offices which had been implicated in terrorist activities. For example, the Director of Al Haramain, Aqil al Aqil, and his deputy, Mansour al Kadi, used their personal accounts at ARB to conduct business on behalf of Al Haramain, moving millions of dollars through those accounts in support of the charity's global activities. Between 1998-2002, seven ARB accounts belonging to Aqil and Kadi took in a total of 89,677,415.00 SR in deposits (approximately $23.9 million at that time), and transferred in excess of 88,062,240.00 SR (approximately $23.5 million). *See* Averment ¶ 518. A closer examination of Aqil's ARB accounts reveals that Al Haramain made multiple cash deposits into Aqil's account, including a 5,000,000 SR deposit via a check designated as a "collection check." *See* Averment ¶¶ 335-336.

The CIA concluded that Aqeel was "providing funds to [Al Haramain] offices with terrorist ties in ways that will avoid foreign government scrutiny, such as using personal bank accounts." *See* Pls. Ex. 69, *Al-Haramain: Support for Extremists and Terrorists [REDACTED]*, August 28, 2002, CIA-SUB_0007-19 at 0008; *id.* at 0013 ("Al-Haramain increasingly sends money to individuals' personal accounts in addition to transferring funds to branch office accounts. We have also noted transfers originated from senior HIF officials' personal accounts in Saudi Arabia to personal accounts of known HIF affiliates."). *See also* Pls. Ex. 62, *Designation of Al-Haramain Foundation (AHF) branches in Afghanistan, Albania, Bangladesh, Ethiopia, and The Netherlands, and the AHF's leader Al-Aqil pursuant to the authorities of E.O. 13224*, TREASURY00017-29 at 0027 (stating that Aqeel was an "Al Qaida supporter that handled the collection of funds for 'freedom fighters' in areas including Afghanistan, Bosnia, Chechnya, Kosovo, and Somalia, [REDACTED]").

Moreover, in a series of communications between 1998 and 2001, other high-ranking Al Haramain officials also expressly notified ARB that they had been using certain personal or joint personal accounts at ARB, to conduct financial activities of Al Haramain. *See* Averment ¶¶ 328-332.

ARB was specifically aware that Al Haramain and its officials were improperly using personal accounts of the officials to carry out financial activities unrelated to their personal affairs, a practice that masked the true origin of funds transferred from those accounts and embodied a classic mechanism for carrying out money laundering and other financial crimes. *See* Averment ¶¶ 9, 110, 171, 172, 209, 327-340, 366, 371-384.

44. Al Haramain KSA was widely recognized as a reputable charitable organization that provided bona fide benevolent and humanitarian work in the form of the sponsorship of orphans and refugees, the provision of medicine, food, and clothing to those in need in conflict areas, and the development of educational programs. *See* Pls. Ex. 44 (Staff Monograph on Terrorism Financing) at 115 (stating that Al Haramain "provides meals and assistance to Muslims around the world, distributes books and pamphlets, pays for potable water projects, sets up and equips medical facilities, and operates more than 20 orphanages"); *see also* ARB Ex. 5 (May 21, 1998 and Dec. 13, 1996 Ltrs. from Al Haramain KSA's KYC files) at ARB-38774-ARB-38775 (letters describing Al Haramain KSA's humanitarian projects and good works); ARB Ex. 23 (June 7, 1999 Ltr. from Prince of Tabuk) at ARB-38699 (letter in Al Haramain KSA's KYC files describing Al Haramain KSA as a "humanitarian" organization engaged in "relief efforts"); ARB Ex. 1 (Dean Report) at 8 (describing the widespread recognition of Al Haramain for good works and humanitarian efforts); Pls. Ex. 56 ("Remarks by Treasury Secretary Paul O'Neill on New U.S.- Saudi Arabia Terrorist Financing Designations," Mar. 11, 2002) (referring to Al Haramain and stating that "the Saudi headquarters for this private charitable entity is dedicated to promoting Islamic teachings").

Disputed. Notwithstanding the fact that Al Haramain and its domestic and overseas branch offices may have undertaken genuine humanitarian relief work, "these relief activities also were used to recruit terrorists, to provide space for their training and operations, and to provide a cover so that al Qaeda operatives could undertake terrorist activities under the guise of being relief workers." *See* Pls. Ex. 4, Winer Report at 16. *See id.* at 4 (explaining that humanitarian and terrorist activities "were inextricably intermingled in the international operations of the principal Islamic NGOs who contributed to supporting Bin Ladin, al Qaeda, and similarly-minded terrorist organizations in the days, months, and years that preceded the 9/11 attacks"). *See also* Pls. Ex. 45, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149 (stating that a close associate of Osama bin Laden and a long-time al Qaeda donor and fundraiser directed NGOs where officers finance extremists or militants under the guise of rendering humanitarian aid and support).

The CIA assessed that Al Haramain's humanitarian activities in Africa and the Balkans were undertaken with the goal of recruiting young men for jihad. *See* Averment ¶¶ 98, 99; Pls. Ex. 67, *Al Haramain in Africa: Supporting Al-Ittihad Al-Islami and Other Terrorists*, March 22, 2002, CIA_000675-679 at 675; Pls. Ex. 68, *Al-Qa'ida Still Well Positioned to Recruit Terrorists REDACTED]*, July 1, 2002, CIA_000178-189 at 186. *See also* Pls. Ex. 67 at 676 ("In 2001, HIF provided humanitarian cover for unidentified Arabs traveling to Somalia to train AIAI military recruits.").

Plaintiffs' experts have also testified that as early as 1995, it was widely known throughout the Kingdom that Al Haramain supported armed conflict. *See* Ex. 171, Transcript, January 11, 2024 Deposition of Evan F. Kohlmann at 92:14-22 (testifying that by 1995, Al Haramain's reputation was widely known in Saudi Arabia); 92:23-25 and 93:1-2 ("But it would have been difficult to understand because al-Haramain advertised in English and Arabic, in multiple languages the fact that it was interested in armed conflict. It was interested in supporting individuals involved in armed conflict.); 93:7-15 (testifying that "individual branches of al-Haramain had been shut down already by 1998 in Kenya, in Macedonia. The Bosnian Muslim Army had warned people that al-Haramain was a fraud."); 122:13-17 ("And also al-Haramain had already gained a reputation in Saudi Arabia for having supported Islamic militant causes as well as armed conflicts as early as 1995. It hadn't been designated, but it was well-known in Saudi Arabia that was the case."); 124:4-25-125:1-3 ("However, it was widely reported in Saudi Arabia in the media prior to this that al-Haramain had already engaged in actions like this. The

| | committee for the defense of legitimate rights which is a very, very prominent Saudi dissident group reported as early as 1995 there was widespread knowledge in the Saudi kingdom that al-Haramain was under scrutiny because of its activities. That was already as of 1995. That was reported in the CDLR monitor in 1995.· It was something that was reported in international media. Obviously al-Haramain's branch in I believe Kenya had been shut down after the 1998 East African embassy bombings. The business card of Mansour al-Kadi who was the deputy general in charge of al-Haramain in Saudi Arabia was found in the possession of Wadih El-Hage who was Osama bin Laden's personal secretary and was prosecuted as a result of that investigation. So while there was not a formal designation, there was certainly plenty of information available in the open source that would indicate that al-Haramain itself, al-Haramain central operations were involved in things that were not necessarily legitimate based on what they were supposed to be doing."). |
|---|---|
| 45.   During the relevant period, Al Haramain KSA was a government-licensed, charitable organization in Saudi Arabia. *See* Pls. Ex. 3 (Galloway Dep. Tr.) at 251:12-252:20 and Errata at 230:4, 251:14, 251:23-24, 252:1, 252:4, 252:7-8, 252:13-14, 252:16, 252:18; *see also* Pls. Ex. 44 (9/11 Comm'n Staff Report) at 12 ("At least two Saudi government officials have supervisory roles (nominal or otherwise) over al Haramain."); ARB Ex. 42 (Jan. 29, 1997 Ltr. from Dep. Minister of Islamic Affairs) at ARB-38613 (authorizing the maintenance of an Al Haramain account at Al Rajhi Bank branch); ARB Ex. 41 (Oct. 17, 1997 Ltr. from Ministry of Islamic Affairs) at ARB-38586 (stating Al-Haramain operates under its supervision; ARB Ex. 43 (July 14, 1998 Ltr. from the Gen. Mngr. of the Eastern Province of the Ministry of Islamic Affairs) at ARB-38741 (stating Al-Haramain is under the supervision of the Ministry of Islamic Affairs); ARB Ex. 41 (Sept. 26, 1998 Ltr. from Dep. Minister of Islamic Affairs) at ARB-38585 (requesting transfer of certain accounts into the name of Al-Haramain Islamic Foundation, with signatory authority to be determined by Director General Aqeel Al-Aqeel); ARB Ex. 44 (April 14, 1999 Commercial Office License) at ARB-38837 (copy of Commercial Office License issued by the Department of Lands and Real Estate for an Al Haramain office in Jubail Municipality); ARB Ex. 56 (Ltr. from the Gov. of Yanbu, June 1, 1999) at ARB-38818 (discussing the newly opened Al-Haramain office in the region); ARB Ex. 24 (Jan. 4, 2004 (Hijri) Ltr. from Al Rajhi Bank Gen. Mngr. to Gov. of SAMA) at ARB-14545 (stating the Bank's understanding that Al Haramain KSA was "licensed according to His Highness the Minister of Interior's letter," dated February 7, 1996); ARB Ex. 26 (Mar. 13, 2004 Ltr. from Ministry of Islamic Affairs) at ARB-39505 (confirming that Al-Haramain KSA was | Disputed to the extent ARB intended to suggest that discovery shows that ARB verified Al Haramain's licensing status when opening and operating accounts. Records produced by ARB indicate that the Bank did not obtain required copies of original or authenticated licenses verifying Al Haramain's and the other charities' legal status and activities they were authorized to conduct, as required at the time of establishing customer relationships, opening any new account, and every three years thereafter. *See* Averment ¶ 318. ARB's Branch Instruction Manual ("ARB Manual"), issued January 1, 1997, at Section 1:3:6:3, specifically requires that any charity organization that collects donations and wants to open an account at ARB must provide a license from the Saudi government authorizing it to open the account and collect donations. *See* Pls. Ex. 188, ARB 16-734 at 172 ("A copy of the license issued by the authorities in the Kingdom of Saudi Arabia (the Ministry of Interior, the Emirate, or the Social Affairs Department for example) approving opening the account and collecting donations."). During the course of discovery, ARB produced numerous Know-Your-Customer ("KYC") and account opening documents for Al Haramain which did not contain copies of any "license issued by the authorities in the Kingdom of Saudi Arabia" as required by the ARB Manual. In light of this striking omission, it logically follows that each of the Al Haramain account openings violated ARB's own compliance materials and protocols. *See* Pls. Ex. 4, Winer Report at 147-148. Without question, ARB failed to obtain the licensing documents for Al Haramain prior to the 9/11 attacks. None have been produced. |

~~UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS~~

| | |
|---|---|
| permitted to engage in charitable work in the Kingdom); ARB Ex. 27 (Mar. 21, 2004 Ltrs. from Ministry of Justice to Al Rajhi Bank) at ARB-39410 (confirming that Al- Haramain KSA was "legally established in . . . Saudi Arabia and permitted to operate under its laws and regulations"). | To the extent Al Haramain was licensed, that fact is immaterial, given the evidence showing ARB's awareness of its role in supporting al Qaeda and connections to terrorism. |
| 46.  The Bank took steps before and after the 9/11 Attacks to confirm that Al Haramain-KSA was government-licensed. *See* Pls. Ex. 3 (Galloway Dep. Tr.) at 100:1-11, 115:23-25, 253:18-254:11 and Errata at 100:1-2, 100:5, 100:10, 115:24-25, 254:5; ARB Ex. 2 (Hobayb Report) at 26-27 (describing the Bank's collection and review of Al-Haramain KSA's licenses); Pls. Ex. 42 (Jan. 29, 1997 Ltr. from Dep. Minister of Islamic Affairs) at ARB-38613 (confirming "it is fine" to open an Al Haramain account at Al Rajhi Bank); ARB Ex. 24 (Jan. 4, 2004 (Hijri) Abdullah Sulaiman Al Rajhi Ltr. to Governor of SAMA) at ARB-14545 (asking if it was permissible for the Bank to continue doing business with Al Haramain KSA and IIRO KSA); Pls. Ex. 59 (Feb. 25, 2004 Abdullah Sulaiman Al Rajhi Ltr. to Minister of Islamic Affs.) at ARB-39945 (asking the Ministry to provide for Al Haramain KSA an additional permit that appeared to be required under post-9/11 regulation). | Disputed to the extent ARB intended to suggest that discovery shows that ARB verified Al Haramain's licensing status when opening and operating accounts. As indicated above, ARB failed to obtain Saudi government issued licenses for Al Haramain prior to 9/11, in direct violation of ARB's existing protocols. Moreover, ARB's internal records and communications with the Saudi government indicate that ARB finally sought to obtain those required licenses years after the 9/11 attacks in 2004, amidst the heightened scrutiny of the charities' and ARB's roles in financing terrorism. *See* Averment ¶ 319; Pls. Ex. 4, Winer Report at 159-162. Indeed, in a February 25, 2004 letter from the Director General of ARB, Abdullah al Rajhi, to the Minister of Islamic Affairs, Abdullah admits that "there is no permit from the competent agencies for the Al-Haramain Islamic Foundation to operate the charity work – according to the documents provided by the Al-Haramain Islamic Foundation to [ARB] when opening its account." *See* Pls. Ex. 59. *See also* Pls. Ex. 1, Transcript, September 17, 2023 Deposition of Abdullah bin Sulaiman al Rajhi at 138-139 (Abdullah al Rajhi affirming the letter and its representation that there was no permit or license for Al Haramain).<br><br>Moreover, ARB cites to the Expert Report of Fawzi al Hobayb at 26-27 in support of its position that the Bank collected and reviewed Al Haramain KSA's licenses. This is misleading and inaccurate. Not one of the documents cited by Mr. Al Hobayb mentions anything about a license from the Saudi government authorizing it to open an account at ARB and collect donations, as required by the ARB Manual at Section 1:3:6:3. As an example, Mr. Al Hobayb's report at 27 identifies "[a] letter indicating recognition from both Ministry of Interior and Ministry of Islamic Affairs that Al-Haramain was licensed," citing ARB 38253. But ARB 38253 is an October 17, 1997 letter from the Ministry of Islamic Affairs to the Director of the Passports Administration concerning the work of Al Haramain. There is not a single reference to a license in the letter, nor any discussion of opening a bank account. Mr. Al Hobayb and ARB are unable to cite to, or produce, a single license for Al Haramain because none existed.<br><br>To the extent Al Haramain was licensed, that fact is immaterial, given the evidence showing ARB's awareness of its role in supporting al Qaeda and connections to terrorism. |

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

47.  Before the 9/11 Attacks, neither Al Haramain KSA nor any Al Haramain Islamic Foundation branch was designated under any sanctions regime for connections to terrorism. *See* Pls. Ex. 60 (Treasury Department Press Release) (showing designation of Al Haramain branches outside Saudi Arabia started in 2002); *see also* ARB Ex. 28 (Winer Dep. Tr.) at 57:8-12 ("To the best of my knowledge, there were no charities of any kind that I recollect that had been designated prior to 9/11 because terrorist designations were originally limited to terrorist organizations."); ARB Ex. 93 (Kohlmann Dep. Tr.) at 126:12-13, 130:21-131:2 (testifying that charity designations only began after 9/11 and that he had not identified any Al Rajhi Bank transactions violating sanctions or designations, because "once the designation has been issued," it becomes "impossible to open an account under that [designated] person's name").

It is not disputed that neither Al Haramain KSA nor any Al Haramain branch was designated prior to the 9/11 attacks. Plaintiffs' experts have been clear that the designation process for terrorist sanctioning was in its infancy during the Clinton Administration, and the Executive Order 13224 sanctions regime targeting charities for terrorism related offenses did not exist prior to the September 11, 2001 attacks. *See* Pls. Ex. 12, Transcript, January 12, 2024 Deposition of Jonathan M. Winer at 57:14-25 (testifying that the "designation process for sanctioning was in its infancy" during the Clinton administration, and that any charity designations happened after 9/11); 58:8-13 (testifying that that there were no designations of charities prior to 9/11 in part because the U.S. had undertaken other actions, which included direct discussions between the U.S. and Saudi Arabia).

To the extent that ARB asserts that the failure to designate demonstrates that ARB, Suleiman al Rajhi, and members of the al Rajhi family were not aware of Al Haramain's connections to, and financial support for, al Qaeda and associated terrorist organizations, prior to the 9/11 attacks, that is disputed.

To the contrary, the evidence surveyed in the Corrected Averment shows that ARB, Suleiman al Rajhi, and the Bank's senior officials were quintessential insiders, operating at the very center of al Qaeda's financial and logistical support structure during the critical period leading up to the September 11, 2001 attacks. They maintained high-level contacts with Al Haramain, and were well aware of Al Haramain's terrorist nature at all relevant times. *See* Averment generally.

Further, ARB had a duty to know their customers and undertake the proper due diligence when opening accounts and providing financial services to Al Haramain and its officers. *See* Ex. 171, Transcript, January 11, 2024 Deposition of Evan F. Kohlmann at 92:14-22 (testifying that by 1995, Al Haramain's reputation was widely known in Saudi Arabia); 92:23-25 and 93:1-2 ("But it would have been difficult to understand because al-Haramain advertised in English and Arabic, in multiple languages the fact that it was interested in armed conflict. It was interested in supporting individuals involved in armed conflict.); 93:7-15 (testifying that "individual branches of al-Haramain had been shut down already by 1998 in Kenya, in Macedonia. The Bosnian Muslim Army had warned people that al-Haramain was a fraud."); 122:13-17 ("And also al-Haramain had already gained a reputation in Saudi Arabia for having supported Islamic militant causes as well as armed conflicts as early as 1995. It hadn't been designated, but it was well-known in Saudi Arabia

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

that was the case."); 124:4-25-125:1-3 ("However, it was widely reported in Saudi Arabia in the media prior to this that al-Haramain had already engaged in actions like this. The committee for the defense of legitimate rights which is a very, very prominent Saudi dissident group reported as early as 1995 there was widespread knowledge in the Saudi kingdom that al-Haramain was under scrutiny because of its activities. That was already as of 1995. That was reported in the CDLR monitor in 1995.· It was something that was reported in international media. Obviously al-Haramain's branch in I believe Kenya had been shut down after the 1998 East African embassy bombings. The business card of Mansour al-Kadi who was the deputy general in charge of al-Haramain in Saudi Arabia was found in the possession of Wadih El-Hage who was Osama bin Laden's personal secretary and was prosecuted as a result of that investigation. So while there was not a formal designation, there was certainly plenty of information available in the open source that would indicate that al-Haramain itself, al-Haramain central operations were involved in things that were not necessarily legitimate based on what they were supposed to be doing.").

*See also* Plaintiffs' response to No. 51, detailing public media reporting available to ARB prior to the 9/11 attacks concerning Al Haramain's involvement in supporting terrorism and Osama bin Laden, including Al Haramain's links to the 1998 U.S. Embassy bombings in Kenya and Tanzania.

Furthermore, ARB and its principals were expressly aware of Al Haramain's involvement in supporting al Qaeda and terrorism by virtue of Suleiman al Rajhi's extensive contacts with Al Haramain and his close relationship with Al Haramain director Aqil al Aqil. *See* Averment ¶ 323. For instance, in an April 6, 1999 letter from Abdul Rahman al Rajhi to Aqil enclosing a 187,500 SR check to Al Haramain signed by Suleiman al Rajhi, the al Rajhis coordinated with Aqil and Al Haramain concerning relief efforts in Kosovo, and further counseled Aqil on the opening of an Al Haramain office in the Republic of Macedonia. *See* Averment ¶ 546. S*ee also* Pls. Ex. 4, Winer Report at 114, 115, 129 (ARB senior officials participating in decisions on projects by Al Haramain), 210 (ARB officials directly coordinating with Al Haramain officials concerning the charity's activities relating to Kosovo); Pls. Ex. 128 (NL0010245). In addition, Suleiman al Rajhi hired Abdullah al Misfer to assist Abdul Rahman al Rajhi with the management and operations of his charity committee/foundation. *See* Averment ¶¶ 43, 44. In addition to his role as an official of Suleiman al Rajhi's charity committee/foundation, Misfer was also an official of Al Haramain, serving as the head of its Palestine Committee. *See* Averment ¶¶ 113, 236, 259, 546.

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

|  | Moreover, CIA reporting has assessed that Suleiman al Rajhi and senior al Rajhi family members long supported Islamic extremists and charities associated with terrorism and knew that terrorists were using the Bank. *See, e.g.*, Pls. Ex. 10, *Al-Rajhi Bank: Conduit for Extremist Finance*, May 28, 2003, CIA-SUB_0001-6 at 2 ("Senior al-Rajhi family members have long supported Islamic extremists and probably know that terrorists use their bank. [REDACTED] senior al-Rajhi family members control the banks' most important decisions and that ARABIC's principle managers answer directly to Sulayman. The al-Rajhis know they are under scrutiny and they have moved to conceal their activities from financial regulatory authorities."); *id.* at 3 ("Extremists' bank of choice. [REDACTED] since the mid-1990s [REDACTED] several extremists ordered operatives in Afghanistan, Indonesia, Pakistan, Saudi Arabia, Turkey, and Yemen to used ARABIC."); *id.* at 5 ("Senior al-Rajhi family members, including family patriarch Sulayman al-Rajhi, have donated money to NGOs suspected of supporting terrorism."); *id.* ("[REDACTED] March 2003, Sulayman al-Rajhi defended his donations to the al-Haramain Islamic Foundation, which has come under scrutiny for its support to extremists."). *See also* Averment ¶¶ 178, 179. |
| 48.   In 2002, the United States and Saudi Arabia jointly designated two Al Haramain branches outside of Saudi Arabia for connections to terrorism. Pls. Ex. 56 ("Remarks by Treasury Secretary Paul O'Neill on New U.S.-Saudi Arabia Terrorist Financing Designations," Mar. 11, 2002). In public remarks surrounding that joint designation, U.S. Treasury Secretary Paul O'Neill distinguished Al Haramain KSA from the newly designated Al Haramain branches, stating that "the Saudi headquarters for this private charitable entity is dedicated to promoting Islamic teachings." Secretary O'Neill emphasized the unwitting nature of Al Haramain's donors, stating, "Few deceits are more reprehensible than the act of collecting charity from well-intentioned donors, and then diverting those funds to support hatred and cruelty. As I said during my visit to the Gulf, misusing charity funds to support terrorism harms the people who gave the donation, harms the people who should have received it and is dangerous to us all." *Id.* | It is not disputed that the Somalia and Bosnia-Herzegovina branches of Al Haramain were designated on March 11, 2002 for "supporting terrorist activities and terrorist organizations such as al-Qaida, AIAI (al-Itihaad al-Islamiya), and others." *See* Pls. Ex. 56. *See also* Pls. Ex. 52, *Al-Haramayn Islamic Foundation–Bosnia-Herzegovina*, TREASURY 00009-11 at 11 ("HIF offices in Bosnia-Herzegovina have employed personnel with affiliations to or membership in an SDGT (Gama'at Al Islamiyya), indicating that the offices of HIF are widely infiltrated by terrorist elements."); Pls. Ex. 53, *Al-Haramain Islamic Foundation, Somalia*, TREASURY00030-36 at 30-31 ("The U.S. has assembled evidence that shows a history of ties between Al-Haramain Somalia and Usama bin Laden's al-Qaida network, Al-Itihaad al-Islamiya (AIAI), and other associated entities and individuals. For example, over the past few years, Al-Haramain Somalia has provided a means of funneling money to AIAI by disguising funds as intended to be used for orphanage projects or the construction of Islamic schools and mosques. The organization has also employed and provided salaries to AIAI members."). However, there is nothing in Mr. O'Neill's statement that remotely exonerates Al Haramain's Saudi headquarters for its connections to, and financial support for, al Qaeda and associated terrorist organizations. *See* Pls. Ex. 171, Transcript, January 11, 2024 Deposition of Evan F. Kohlmann at 122:24- |

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

| | |
|---|---|
| | 25 and 123:1-4 (testifying that "there was evidence that the Saudi headquarters was involved in promoting more than just Islamic teaching or more than just moderate Islamic teaching" and that "this was diplomatic language that was being used to assuage the government of Saudi Arabic for good reason"); *id.* at 123:9-12 (testifying that "the U.S. government at this point was trying to gently encourage the government of Saudi Arabia to take action on its own and was being very careful about the language it was using"); *id.* at 123:13-20 (testifying that at the time of the March 2002 designation of the Somalia and Bosnia-Herzegovina branches of Al Haramain, "there was already a huge amount of scrutiny being paid to the Saudi headquarters and that there was already evidence of money laundering that was being done on behalf of senior Saudi officials with al-Haramain including Soliman al Buthe and Aqil al Aqil by the time that this designation had already been issued."). <br><br> The Saudi government ultimately concluded that the entirety of Al Haramain, including the Saudi headquarters, was "one of the biggest terror-financing operations in the world and the funding organ and channel for the Nairobi, Kenya and Dar es Salaam bombings in 1998."). *See* Averment ¶ 107; Pls. Ex. 70 (Dean Exhibit 7), *The Kingdom of Saudi Arabia and Counterterrorism*, at 13, 86. |
| 49.  At no point did SAMA instruct Al Rajhi Bank to block Al Haramain KSA's accounts. *See* Pls. Ex. 3 (Galloway Dep. Tr.) at 348:12-16 and Errata at 348:12-13. | It is not disputed that Mr. Galloway testified that SAMA did not instruct ARB to block Al Haramain KSA's accounts at the Bank. However, to the extent that ARB asserts that this demonstrates that SAMA did not find any money-laundering, terrorist-financing, or other criminal activities with respect to the Al Haramain accounts at ARB, that is disputed. <br><br> First, Plaintiffs have not been afforded the opportunity to conduct discovery of SAMA concerning the Al Haramain accounts and related information in its possession, including any investigation that SAMA conducted of the Al Haramain accounts at ARB. Second, the evidence shows that Al Haramain KSA accounts at ARB were used to send funds overseas to Al Haramain's branch offices located in regions where al Qaeda was known to be operating, and conflict zones where al Qaeda and jihadists associated with al Qaeda were known to be fighting, including Chechnya, Bosnia, and Kosovo. *See* Averment ¶¶ 210-211; Pls. Ex. 4, Winer Report at 179-180. Third, the evidence is clear that Al Haramain officials were moving staggering sums of money through their personal accounts to carry out financial transactions for Al Haramain branch offices which had been implicated in terrorist activities. *See* Plaintiffs' response to No. 43, detailing the movement of millions of dollars through the accounts of Al Haramain officials Aqil al Aqil and Mansour al Kadi. The |

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

CIA assessed that Aqil was "providing funds to [Al Haramain] offices with terrorist ties in ways that will avoid foreign government scrutiny, such as using personal bank accounts." *See* Pls. Ex. 69, *Al-Haramain: Support for Extremists and Terrorists [REDACTED]*, August 28, 2002, CIA-SUB_0007-19 at 0008. *See also* Averment ¶¶ 227-235, 260-261, 333-336, 347-365, 386 (detailing Aqil's ARB accounts and banking transactions that presented myriad money laundering and illicit activity red flags, particularly at a time when Aqil served as one of al Qaeda's most important funders and financial facilitators).

To the extent that ARB asserts that SAMA's omission to instruct ARB to block Al Haramain's KSA accounts indicates that ARB, Suleiman al Rajhi, and the Bank's officials were not aware of any money-laundering, terrorist-financing, or other criminal activities associated with the Al Haramain accounts, that is disputed. *See, e.g.*, Averment ¶ 294 (Suleiman al Rajhi was a prominent donor to Makhtab al Khidamat, Osama bin Laden's organization during the jihad in Afghanistan, and was thus specifically aware of bin Laden's longstanding use of ostensible charities, like Al Haramain, to support his jihadist activities); Averment ¶ 295 (Suleiman al Rajhi and Abdullah al Rajhi were well aware of the risk of terrorist financing through purported Islamic charities prior to 9/11); Averment ¶ 323 (ARB's principals were expressly aware of the involvement of Al Haramain in supporting al Qaeda and terrorism by virtue of Suleiman al Rajhi's central role in supporting al Qaeda and militant Islamic causes, and his close ties to Al Haramain and its leadership); Averment ¶ 327 (ARB was specifically aware that Al Haramain's officers were improperly using personal accounts of the officials to carry out financial activities unrelated to their personal affairs, a practice that masked the true origin of funds transferred from those accounts and embodied a classic mechanism for carrying out financial crimes).

Furthermore, ARB and its principals were expressly aware of Al Haramain's involvement in supporting al Qaeda and terrorism by virtue of Suleiman al Rajhi's extensive contacts with Al Haramain and his close relationship with Al Haramain director Aqil al Aqil. *See* Averment ¶ 323. For instance, in an April 6, 1999 letter from Abdul Rahman al Rajhi to Aqil enclosing a 187,500 SR check to Al Haramain signed by Suleiman al Rajhi, the al Rajhis coordinated with Aqil and Al Haramain concerning relief efforts in Kosovo, and further counseled Aqil on the opening of an Al Haramain office in the Republic of Macedonia. *See* Averment ¶ 546. S*ee also* Pls. Ex. 4, Winer Report at 114, 115, 129 (ARB senior officials participating in decisions on projects by Al Haramain), 210 (ARB officials directly coordinating with Al Haramain

officials concerning the charity's activities relating to Kosovo); Pls. Ex. 128 (NL0010245). In addition, Suleiman al Rajhi hired Abdullah al Misfer to assist Abdul Rahman al Rajhi with the management and operations of his charity committee/foundation. *See* Averment ¶¶ 43, 44. In addition to his role as an official of Suleiman al Rajhi's charity committee/foundation, Misfer was also an official of Al Haramain, serving as the head of its Palestine Committee. *See* Averment ¶¶ 113, 236, 259, 546.

Moreover, notwithstanding the very public designations of Al Haramain branch offices in Somalia and Bosnia-Herzegovina on March 11, 2002 for "supporting terrorist activities and terrorist organizations such as al-Qaida, AIAI (al-Itihaad al-Islamiya), and others," ARB ignored those public allegations and continued to open new accounts for Al Haramain just a month later. *See* ARB 38600 (April 24, 2002 letter from Aqil al Aqil to ARB asking the Bank to open 10 new accounts for Al Haramain, with handwritten text from ARB stating "no objection."). Indeed, the March 2002 designation did not even elicit a pause from ARB to conduct an internal investigation concerning the allegations relating to Al Haramain, and it was business as usual for the Bank. Between April and December 2002, 16 new accounts were opened at ARB for Al Haramain. *See* Pls. Ex. 98 (Abdullah al Rajhi Exhibit 31) (chart of 94 AHIF accounts at ARB).

Later designations of the Al Haramain branch offices in Indonesia, Kenya, Pakistan, and Tanzania on January 22, 2004 for providing "financial, material and logistical support to the al-Qaida network and other terrorist organizations" similarly failed to convince ARB that it should undertake an internal investigation into the accounts it held for Al Haramain to determine whether they reflected potential money laundering or counterterrorism financing risks. Although Abdullah al Rajhi agreed that ARB had an independent obligation to ensure its accounts weren't used for terrorism financing activities, when asked whether ARB did anything to investigate the accounts to determine whether they were opened properly, or whether there were any transactions that may have been problematic or raised red flags, Abdullah could not affirmatively say those internal inquiries occurred, despite being the General Manager of the Bank at that time (equivalent to the CEO). *See* Pls. Ex. 1, Transcript, September 17, 2023 Deposition of Abdullah bin Sulaiman al Rajhi at 93-101. Instead, ARB continued to work with Al Haramain and open new accounts for the al Qaeda charity front, notwithstanding the fact that the U.S. and Saudi governments were simultaneously designating Al Haramain branch offices for supporting al Qaeda. *See* ARB Ex. 26 (ARB 39505).

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

| | |
|---|---|
| 50. Al Haramain KSA was not designated under any sanctions regime for connections to terrorism until the United States designated Al Haramain KSA in 2008. Pls. Ex. 60 ("Treasury Designates Al Haramain Islamic Foundation KSA" (June 19, 2008)). | It is not disputed that Al Haramain KSA was not designated until 2008. To the extent that ARB asserts that the 2008 designation of Al Haramain KSA demonstrates that ARB, Suleiman al Rajhi, and members of the al Rajhi family were not aware of Al Haramain KSA's connections to, and financial support for, al Qaeda and associated terrorist organizations, prior to or following 9/11, that is disputed. *See* Plaintiffs' responses to Nos. 47, 48, 49.<br><br>To the contrary, the evidence surveyed in the Corrected Averment shows that ARB, Suleiman al Rajhi, and the Bank's senior officials were quintessential insiders, operating at the very center of al Qaeda's financial and logistical support structure during the critical period leading up to the September 11, 2001 attacks. They maintained high-level contacts with Al Haramain, and were well aware off Al Haramain's terrorist nature at all relevant times. *See* Averment generally.<br><br>Further, the evaluation of whether formal designation of a particular terror sponsor, or other possible action, would best serve U.S. national security interests following the 9/11 attacks involved a range of equities, including foreign policy, intelligence, diplomatic, law enforcement, and many other considerations. *See* Pls. Ex. 96, *Terrorism Financing: Origination, Organization, and Prevention*, Hearing Before the Committee on Governmental Affairs United States Senate (July 31, 2003), at 11 (R. Richard Newcomb, Director of the Office of Foreign Assets Control ("OFAC"), stating that all of the equities of the government come to the table, including law enforcement, intelligence, diplomatic, and military, among others). In addressing Saudi-based threats to U.S. national security in particular, U.S. policymakers broadly determined that pursuing cooperation and joint action with the Saudi government was critical to advancing the United States' overarching counterterrorism objectives, precisely because of the nature and scope of the problem emanating from Saudi Arabia. Accordingly, this policy approach often led U.S. officials to defer or delay formal designations or other actions against Saudi-based terror financiers and sponsors, as in the case of Al Haramain, and others. *See* Averment ¶¶ 192-194.<br><br>Plaintiffs' experts similarly testified that the U.S. government often deferred formal designations of Saudi charities and other entities, despite having extensive evidence of their support for terrorism, choosing instead to pursue cooperative action with the Saudi government. *See, e.g.*, Pls. Ex. 171, Transcript, January 11, 2024 Deposition of Evan F. Kohlmann at 106:19-23 (testifying that U.S. documents indicate "the United States government wanted to take further action, but was waiting for the Saudis to see what they would do internally first"); 107:17- |

22 (testifying that "the U.S. government had decided to encourage Saudi Arabia to take action on its own instead of embarrassing the government by designating an office in the kingdom"); 118:11-22 (testifying that the U.S. government and its agencies were actively tracking transactions between the Al Haramain's Saudi headquarters and its branch offices and other institutions); 123:13-20 (testifying that at the time of the March 2002 designation of the Somalia and Bosnia-Herzegovina branches of Al Haramain, "there was already a huge amount of scrutiny being paid to the Saudi headquarters and that there was already evidence of money laundering that was being done on behalf of senior Saudi officials with al-Haramain including Soliman al Buthe and Aqil al Aqil by the time that this designation had already been issued"); 125:9-17 (testifying that "[a] designation is usually the result of many years of investigation and information gathering"); 125:18-25 and 126:1-3 (testifying that at the time of the March 11, 2002 designation of the Al Haramain branch offices in Somalia and Bosnia-Herzegovina, the U.S. government was already investigating senior officials at Al Haramain's headquarters, so the notion that "the U.S. government had no interest in … Al Haramain's central branch in Saudi Arabia at this point is not exactly a fair retelling of events").

Moreover, Juan Zarate, who served as both deputy national security advisor for combatting terrorism and the first ever assistant secretary of the Treasury Department for terrorist financing and financial crimes, explained that the U.S. government wanted to close down the entirety of Al Haramain following the 9/11 attacks, but knew that it would take time given various diplomatic, policy, and law enforcement considerations. *See* Ex. J. Juan C. Zarate, *Treasury's Wars: The Unleashing of a New Era of Financial Warfare* (2013), at 72-73 ("We wanted to close down all of al Haramain – its headquarters and all its branches (including in Oregon) but knew that we would need to take this one step at a time."); *id.* at 73 ("To get this done, we hoped to build a case against the entire Al Haramain organization. We would focus on the most problematic branches and work toward closing down the entire network. This would not happen overnight, but we needed to take a first step. It was imperative for us to get the Saudis on board with us to make a public announcement, and we hoped they would commit to shutting down all suspected conduits and donors for Al Qaeda."); *id.* at 75 ("We already knew that the Saudis were amenable to taking the step we were proposing, with the prospect that this could lead to tougher and tougher actions on their part over time. Still, the Saudis also wanted to modulate their actions, being careful about how aggressively and how quickly they confronted influential elements within Saudi society. We would not be shutting down the entire charity right away, but would take the first step in

| | |
|---|---|
| | this direction. Furthermore, it behooved both countries to demonstrate cooperation on this matter. We wanted to send a clear signal that the United States and Saudi Arabia were cooperating closely on countering terrorist financing."). |
| 51.  Plaintiffs have no evidence of public reporting or other media statements before September 11, 2001, connecting Al Haramain KSA to Al Qaeda. *See, e.g.*, Pls. Aver. § V (discussing Al Qaeda's "pre-9/11 funding," but presenting no evidence of any pre-9/11 public reporting connecting Al Haramain KSA to Al Qaeda); Pls. Ex. 4 (Winer Report) at § 4 (discussing "incidents involving charities and terrorist financing/crime pre-9/11," but presenting no evidence of any pre-9/11 public reporting connecting Al Haramain KSA to Al Qaeda); Pls. Ex. 38 (Kohlmann Report) at 11-15 (discussing Al Haramain but presenting no evidence of any pre-9/11 public reporting connecting Al Haramain KSA to Al Qaeda). | Disputed. *See* Averment ¶ 290. Jonathan Winer's Expert Report identifies public media reporting available to ARB prior to the 9/11 attacks detailing Al Haramain's involvement in supporting terrorism and Osama bin Laden. *See, e.g.*, Pls. Ex. 4, Winer Report at 180 n. 585. In addition, Mr. Winer's Appendix 1 – Listing of Reliance Materials and Materials Considered, cites to a number of public media reports issued prior to 9/11 reporting on Al Haramain's global support for terrorism, including its connections to the 1998 U.S. Embassy bombings in Kenya and Tanzania. *See, e.g.*, (1) IPS-Inter Press Service, *Kenya: Gov't Shuts Down Five Islamic Relief Agencies*, September 10, 1998 (reporting that the Kenyan government banned Al Haramain for supporting terrorism following the August 1998 U.S. Embassy bombings); (2) The U.N. Refugee Agency, *Human Rights Watch World Report 1999 – Kenya*, January 1, 1999 (stating that Kenyan government cancelled the registration of Al Haramain and other Islamic relief agencies for supporting terrorism); (3) Associated Press, *Kenya Bans Six Islamic Aid Agencies After U.S. Bombing*, September 9, 1998 (reporting that government of Kenya banned Al Haramain in connection with the August 7, 1998 terrorist bombing of the U.S. embassies in East Africa); (4) University of Pennsylvania-African Studies Center, *Horn of Africa: The Monthly Review, 19-10/98* (reporting that Al Haramain was one of five relief organizations banned by the Kenyan government following the August 1998 U.S. Embassy bombings); (5) New York Times, *Some Charities Suspected of Terrorist Role*, February 19, 2000 (reporting on the 1998 U.S. Embassy attacks and that the Kenyan government said the charities "'posed a serious threat' to Kenya's security"); (6) The Indian Ocean Newsletter, *Banned Islamic NGOs*, September 12, 1998 (reporting that Kenya banned Al Haramain and other NGOs following their investigation into the August 1998 attacks on U.S. embassies in Nairobi and Dar es Salaam). |
| 52. Plaintiffs have no evidence that, before the 9/11 Attacks, Al Rajhi Bank knew that Al Haramain KSA had any connection to Al Qaeda or any form of terrorism against the United States, including the 9/11 Attacks. *See, e.g.*, Pls. Aver. § VI (discussing pre-9/11 financial services provided by the Bank to the Charities, but presenting no evidence that the Bank had any knowledge before 9/11 of any alleged connection between Al Haramain KSA and Al Qaeda or terrorism against the United States); Pls. Ex. 4 (Winer Report) at § 7 (discussing purported "relationship" between Al Haramain KSA and the | Disputed. *See e.g.*, Plaintiffs' responses to Nos. 43, 47-49, 51. <br><br> By way of further response, the evidence surveyed in the Corrected Averment shows that ARB, Suleiman al Rajhi, and the Bank's senior officials were quintessential insiders, operating at the very center of al Qaeda's financial and logistical support structure during the critical period leading up to the September 11, 2001 attacks. They maintained high-level contacts with Al Haramain, and were well aware of Al |

| | |
|---|---|
| Bank, but presenting no evidence that the Bank had any knowledge before 9/11 of any alleged connection between Al Haramain KSA and Al Qaeda or terrorism against the United States); Pls. Ex. 38 (Kohlmann Report) at 11-15 (discussing Al Haramain but presenting no evidence that the Bank had any knowledge before 9/11 of any alleged connection between Al Haramain KSA and Al Qaeda or terrorism against the United States). | Haramain's terrorist nature at all relevant times. *See* Averment generally. |
| 53. Plaintiffs have no evidence tracing any transaction from Al Haramain KSA made through Al Rajhi Bank to the financing, planning, or carrying out of terrorism against the United States, including the 9/11 Attacks. *See, e.g.*, Pls. Aver. §§ X, XI (failing to trace any transaction through Al Rajhi Bank to planning, carrying out, or financing the 9/11 Attacks); Pls. Ex. 4 (Winer Report) at § 11 (same). | Disputed. ARB's claim that there is no evidence that any donation or transaction by Suleiman al Rajhi, members of the al Rajhi family, Suleiman al Rajhi's charity committee/foundation, Al Haramain, or others conducted through the Bank has been traced or connected to the planning or carrying out of terrorism against the United States, including the 9/11 attacks themselves, is inaccurate and misleading.<br><br>ARB, Suleiman al Rajhi, members of the al Rajhi, and others were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and were specifically aware of al Qaeda's mission and intent to attack the United States. Intending to foster al Qaeda's terrorist agenda, they provided substantial financial assistance to al Qaeda charity and business fronts and other intermediaries through the Bank, knowing that the funds would be received by Osama bin Laden and al Qaeda. *See* Averment generally. Plaintiffs' Averment also shows how the support provided to al Qaeda by these parties allowed al Qaeda to acquire the strike capabilities needed to carry out the 9/11 attacks. *See* Averment ¶¶ 53-132. Plaintiffs need not prove that the donation or transaction at issue was traced to the terrorist plot or the attack itself.<br><br>By way of further response, ARB and Suleiman al Rajhi transferred significant sums of money to al Qaeda charity front Al Haramain. Banking records produced by ARB indicate that the Suleiman al Rajhi "charity" committee/foundation used its account at ARB to transfer large sums of money to Al Haramain, including a transfer directly to Al Haramain director Aqil al Aqil. *See* Averment ¶¶ 249-250. As detailed in those account statements, the account was routinely operating in the red (often times by several million Saudi riyals), but ARB continued to cover the missing funds that were being paid to Al Haramain and Aqil al Aqil. *See e.g.*, Pls. Ex. 122 at ARB 38079 (account starting with a negative balance of -5,851,743.45 SR, but ensuring the payment of 100,000.00 SR to Al Haramain, resulting in a negative balance of -4,717,587.45 SR); ARB 38082 (account showing a negative balance of -4,028,430.66 SR, but ensuring the payment of 145,000.00 SR, resulting in a negative balance of - |

4,546,430.66 SR); ARB 38098 (account showing a balance of -868,868.00 SR but ensuring the payment of 150,000.00 SR to Al Haramain, resulting in a negative balance of -1,018,868.00 SR); ARB 38102 (account showing a negative balance of -40,554.00 SR, but ensuring the payment of 187,500.00 SR to Aqil al Aqil, resulting in a negative balance of -228,054.00 SR). *See also* checks to Al Haramain signed by Suleiman al Rajhi at Pls. Ex. 128, NL 10086 (150,000 SR), NL 10088 (300,000 SR), NL 10094 (12,500), NL 10245 (187,500 SR).

In addition, discovery obtained from another defendant, ▮▮▮▮▮▮, included a 1999 list of beneficiaries of Suleiman al Rajhi's financial support. *See* Pls. Ex. 29, NL 15578, 15043-15046. The 1999 distribution chart reflects contributions of 64,998 SR to Al Haramain Foundation-Indonesia, and 600,000 SR to Al Haramain Foundation. *See* Averment ¶ 418. The Indonesian branch of Al Haramain was designated on January 22, 2004 for providing "financial support to al-Qaida operatives in Indonesia and to Jemaah Islamiyah (JI)," and used donated money for "weapons procurement." *See* Pls. Ex. 57 (January 22, 2004 designation of Al Haramain's branches in Indonesia, Kenya, Tanzania, and Pakistan).

Moreover, in an April 6, 1999 letter from Abdul Rahman al Rajhi to Al Haramain director Aqil al Aqil, enclosing a 187,500 SR check to Al Haramain signed by Suleiman al Rajhi, the al Rajhis coordinated with Aqil and Al Haramain concerning relief efforts in Kosovo, and further counseled Aqil on the opening of an Al Haramain office in the Republic of Macedonia. *See* Averment ¶ 546. *See also* Pls. Ex. 4, Winer Report at 114, 115, 129 (ARB senior officials participating in decisions on projects by Al Haramain), 210 (ARB officials directly coordinating with Al Haramain officials concerning the charity's activities relating to Kosovo); Pls. Ex. 128 (NL0010245).

Finally, ARB's Payable Through Account at Chase Manhattan Bank was used to facilitate al Qaeda terrorist financing transfers by Executive Order 13224 Specially Designated Global Terrorist ("SDGT") Soliman al Buthe. Between January 22, 2001 and March 14, 2001, al Buthe executed six transactions totaling $45,000.00 via ARB's Payable Through Account. *See* Pls. Ex. 148, ARB 39154, 39156, 39158, 39160, 39162, 39164. Two of those payments specifically identified the Al Haramain branch office in Oregon as the beneficiary. Al Buthe further directed additional payments via the Payable Through Account to internet service provider networks established by al Buthe and another Al Haramain official to facilitate password protected communications and a website know as Islam Today, which was used by radical clerics in the Middle East, including Salman al-Awdah, a well-known cleric

| | who issued fatwas advocating violence against the United States. *See also* Averment ¶¶ 456, 482-485. |
|---|---|
| **2. IIRO** | No response necessary. |
| 54. The IIRO in Saudi Arabia ("IIRO KSA") held accounts at Al Rajhi Bank. *See* Pls. Ex. 3 (Galloway Dep. Tr.) at 77:13-17, 348:12-14, 350:13-16 and Errata at 77:17, 348:12-13. | It is not disputed that IIRO held accounts at ARB. However, to be clear, ARB maintained and operated 308 accounts for the IIRO during the 1998-2002 jurisdictional discovery time period. *See* Averment ¶ 212. An analysis of the account statements for 287 of those accounts shows that between January 1, 1998 and December 31, 2002, ARB facilitated deposits into those IIRO accounts totaling 2,974,279,291.71 SR (just under 3 billion SR), and withdrawals totaling 2,914,284,820.75 SR, or about 2.9 billion SR. *See* Averment ¶ 213. Three billion SR would convert to approximately $800 million, using the long term SRUSD exchange rate, and would represent nearly $1.4 billion in today's dollars, based on a conservative inflation calculator. *See* Averment ¶ 214. |
| 55. IIRO branches outside of Saudi Arabia did not hold accounts at the Bank. *See* Pls. Ex. 3 (Galloway Dep. Tr.) at 77:13-17, 348:12-14, 350:13-16 and Errata at 77:17, 348:12-13. | It is not disputed that Mr. Galloway testified that ARB did not hold accounts for IIRO branch offices outside Saudi Arabia. However, notwithstanding the fact that the IIRO's overseas branch offices may or may not have held accounts at ARB, the evidence demonstrates that IIRO accounts at ARB were used to send funds to IIRO's branch offices outside of Saudi Arabia, including ARB accounts for the IIRO-Eastern Province branch, a fact that was well known to ARB. *See* Averment ¶¶ 212-217; 516. Those included IIRO overseas branch offices in locations where al Qaeda was known to be operating, and conflict zones where al Qaeda and jihadists associated with al Qaeda were known to be fighting. *See* Averment ¶ 217. *See also* Pls. Ex. 78, Transcript, February 21, 2019 Deposition of Adnan Basha at 265-267 (testifying that the IIRO Eastern Province was sending money to IIRO branch offices overseas to implement their own projects without advising or seeking permission from the IIRO General Secretariat, which was the required IIRO protocol); *id.* at 268-269 (testifying that Prince Turki bin Fahd bin Jalawi, the head of the IIRO Eastern Province, was asked to stop this practice, but the Prince failed to comply with the request); *id.* at 269 (testifying that Pakistan was one of the areas where the Eastern Province was carrying out these projects without informing the IIRO General Secretariat); *id.* at 271-274 (testifying that Prince Turki resigned as the supervisor of the Eastern Province office following the auditor's findings that the Eastern Province was in violation of financial regulations, "[b]ecause he did not wish to implement the recommendations of the auditor"); *see also* Pls. Ex. 26 (Lormel Exhibit 9), *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States*, December 2004, EO14040-003414-3442 at 3419 (reporting that Khalid Sheikh Mohammed ("KSM") |

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

| | identified Prince Turki bin Jalawi, "a key leader of the Eastern Province office of the International Islamic Relief Organization (IIRO)," as "an important al-Qa'ida donor"); Averment ¶¶ 71, 119. |
|---|---|
| 56. IIRO KSA was widely recognized as a reputable charitable organization that provided bona fide benevolent work such as educational programs, healthcare, and cash and in-kind donations to Muslims in need, and supported social and economic development worldwide. *See* ARB Ex. 29 (Oct. 1978 Certificate from Ministry of Foreign Affairs) at ARB-13683 (certificate in IIRO KYC files certifying IIRO as a "humanitarian non governmental body" whose "main concern is to care for the Refugees, Children and the victims of wars and disasters"); ARB Ex. 29 (Oct. 1978 Ltr. from MWL) at ARB-13692 (letter in IIRO KYC files stating IIRO's purpose is to provide relief to the poor, orphans, widows, and to support hospitals and schools); *see also* ARB Ex. 93 (Kohlmann Dep. Tr.) at 146:3-147:7 (acknowledging that IIRO provided humanitarian relief to Muslims around the world); ARB Ex. 1 (Dean Report) at 8 (describing the widespread recognition of IIRO for good works and humanitarian efforts). | Disputed. Notwithstanding the fact that IIRO and its domestic and overseas branch offices may have undertaken genuine humanitarian relief work, "these relief activities also were used to recruit terrorists, to provide space for their training and operations, and to provide a cover so that al Qaeda operatives could undertake terrorist activities under the guise of being relief workers." *See* Pls. Ex. 4, Winer Report at 16. *See id.* at 4 (explaining that humanitarian and terrorist activities "were inextricably intermingled in the international operations of the principal Islamic NGOs who contributed to supporting Bin Ladin, al Qaeda, and similarly-minded terrorist organizations in the days, months, and years that preceded the 9/11 attacks"); *id.* at 39 n. 94 (explaining that "the IIRO was being used by Bin Laden and his brother in law, Mohammed Jamal Khalifa, to fund the purchase of arms and other logistical requirements of the terrorist group under the guise of providing humanitarian assistance"); *id.* at 49 (stating that the IIRO has been used to assist in financing al Qaeda although many of its activities relate to religious, educational, social and humanitarian programs). *See also* Pls. Ex. 45, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149 (stating that a close associate of Osama bin Laden and a long-time al Qaeda donor and fundraiser directed NGOs where officers finance extremists or militants under the guise of rendering humanitarian aid and support). *See also* Pls. Ex. 38, Kohlmann Report at 18 (stating that the U.S. Department of Defense has acknowledged that the IIRO has "provided financial assistance, funds transfers and legitimate cover for moving money under the pretense of humanitarian relief to Al-Qaida"). *See also* Pls. Ex. 171, Transcript, January 11, 2024 Deposition of Evan F. Kohlmann at 143:6-13 (testifying that IIRO was raising money under the pretense of humanitarian relief to buy weapons for combatants in Bosnia and Chechnya and elsewhere). |
| 57. IIRO KSA was a government-licensed, charitable organization in Saudi Arabia. *See* Pls. Ex. 3 (Galloway Dep. Tr.) and Errata at 232:19; ARB Ex. 29 (MWL documents relating to the founding of IIRO in 1978) at ARB-13679-ARB-13688, ARB-13691, ARB-13696 (recognizing the founding of IIRO KSA by the Deputy Prime Minister of Saudi Arabia and the Ministry of Foreign Affairs); ARB Ex. 24 (Jan. 4, 2004 (Hijri) Ltr. from Al Rajhi Bank Gen. Mngr. to Gov. of SAMA) at ARB-14545 (stating the Bank's understanding that IIRO KSA was "licensed according to the directive of His Majesty the King," and that "[t]he certificate issued by the Ministry of | Disputed to the extent ARB intended to suggest that discovery shows that ARB verified IIRO's licensing status when opening and operating accounts. Records produced by ARB indicate that the Bank did not obtain required copies of original or authenticated licenses verifying the IIRO's and the other charities' legal status and activities they were authorized to conduct, as required at the time of establishing customer relationships, opening any new account, and every three years thereafter. *See* Averment ¶ 318. ARB's Branch Instruction Manual ("ARB Manual"), issued January 1, 1997, at Section 1:3:6:3, specifically requires that any charity organization that |

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

| | |
|---|---|
| Foreign Affairs states that the Organization is recognized by the government of the Kingdom of Saudi Arabia"); ARB Ex. 40 (letters dated Nov. 18, 1989 to Dec. 16, 1989 from the Ministry of Interior in the Emirate of Asir) at ARB-37502-ARB-37511 (discussing the opening of IIRO office in the Emirate of Asir in 1989); ARB Ex. 39 (Sept. 20, 1989 Letter from the Governor of the Asir Emirate to the Chairman of the Imam Muhammad ibn Saud Islamic University) at ARB-37838-ARB-37839 (affirming the opening of an IIRO office in the region, dated September 20, 1989); ARB Ex. 38 (Jan. 26, 1994 business license in Jubail Municipality) at ARB-13527 (permitting IIRO KSA to collect donations) | collects donations and wants to open an account at ARB must provide a license from the Saudi government authorizing it to open an account and collect donations. *See* Pls. Ex. 188, ARB 16-734 at 172 ("A copy of the license issued by the authorities in the Kingdom of Saudi Arabia (the Ministry of Interior, the Emirate, or the Social Affairs Department for example) approving opening the account and collecting donations."). During the course of discovery, ARB produced numerous Know-Your-Customer ("KYC") and account opening documents for IIRO which did not contain copies of any "license issued by the authorities in the Kingdom of Saudi Arabia" as required by the ARB Manual. In light of this striking omission, it logically follows that each of the IIRO account openings violated ARB's own compliance materials and protocols. *See* Pls. Ex. 4, Winer Report at 147-148. Without question, ARB failed to obtain the licensing documents for the IIRO prior to the 9/11 attacks. None have been produced.<br><br>To the extent IIRO was licensed, that fact is immaterial, given the evidence showing ARB's awareness of its role in supporting al Qaeda and connections to terrorism. |
| 58.  The Bank also took steps before and after the 9/11 Attacks to confirm that IIRO-KSA was government-licensed. Pls. Ex. 3 (Galloway Dep. Tr.) at 100:1-11, 115:23-25, 253:18-254:11 and Errata at 100:1-2, 100:5, 100:10, 115:24-25, 254:5; ARB Ex. 2 (Hobayb Report) at 26-27 (describing the Bank's collection and review of IIRO KSA's licenses); ARB Ex. 24 (Jan. 4, 2004 (Hijri) Abdullah Sulaiman Al Rajhi Ltr. to Governor of SAMA) at ARB-14545 (asking if it was permissible for the Bank to continue doing business with Al Haramain KSA and IIRO KSA). | Disputed to the extent ARB intended to suggest that discovery shows that ARB verified IIRO's licensing status when opening and operating accounts. As indicated above, ARB failed to obtain Saudi government issued licenses for the IIRO prior to 9/11, in direct violation of ARB's existing protocols. Moreover, ARB's internal records and communications with the Saudi government indicate that ARB finally sought to obtain those required licenses after the 9/11 attacks in 2004, amidst the heightened scrutiny of the charities' and ARB's roles in financing terrorism. *See* Averment ¶ 319; Pls. Ex. 4, Winer Report at 159-162 (examination of ARB documents confirms that ARB did not have the required information concerning the legal identity and structure of the IIRO prior to 9/11, as required by the 1995 SAMA Guidelines and its own AML policies and procedures, and only sought to obtain that information after 9/11).<br><br>Moreover, ARB cites to the Expert Report of Fawzi al Hobayb at 26-27 in support of its position that the Bank collected and reviewed IIRO KSA's licenses. This is misleading and inaccurate. Not one of the documents cited by Mr. Al Hobayb mention anything about a license from the Saudi government authorizing it to open an account at ARB and collect donations, as required by the ARB Manual at Section 1:3:6:3. As an example, Mr. Al Hobayb's report at 26 identifies "[a] license from the Emirate for IIRO, clearly in accordance with the Branch Manual section 1:3:6:3," citing ARB 13674. But ARB 13674 is an August 9, 1989 letter from the Saudi Prince of the |

|  |  |
|---|---|
|  | Eastern Province to the heads of the MWL and IIRO discussing the opening of IIRO branch offices in the Eastern and Southern Provinces and a request to permit female students to participate in the Sanabel al Khair project overseen by the IIRO. There is not a single reference to a license in the letter, nor any discussion of opening a bank account. Mr. Al Hobayb and ARB are unable to cite to, or produce, a single license for the IIRO because none existed.<br><br>To the extent IIRO was licensed, that fact is immaterial, given the evidence showing ARB's awareness of its role in supporting al Qaeda and connections to terrorism. |
| 59.  Before the 9/11 Attacks, neither IIRO KSA nor any IIRO branch was designated under any sanctions regime for connections to terrorism. *See* Pls. Ex. 170 ("Treasury Designates Director, Branches of Charity Bankrolling Al Qaida Network," Aug. 3, 2006) (showing first sanctions designations of IIRO branches began in 2006); *see also* ARB Ex. 28 (Winer Dep. Tr.) at 57:8-12 ("To the best of my knowledge, there were no charities of any kind that I recollect that had been designated prior to 9/11 because terrorist designations were originally limited to terrorist organizations."); ARB Ex. 93 (Kohlmann Dep. Tr.) at 126:12-13, 130:21-131:2 (testifying that charity designations only began after 9/11 and that he had not identified any Al Rajhi Bank transactions violating sanctions or designations, because "once the designation has been issued," it becomes "impossible to open an account under that [designated] person's name"). | It is undisputed that neither IIRO KSA nor any IIRO branch was designated prior to the 9/11 attacks. Plaintiffs' experts have been clear that the designation process for terrorist sanctioning was in its infancy during the Clinton Administration, and the Executive Order 13224 sanctions regime targeting charities for terrorism related offenses did not exist prior to the September 11, 2001 attacks. *See* Pls. Ex. 12, Transcript, January 12, 2024 Deposition of Jonathan M. Winer at 57:14-25 (testifying that the "designation process for sanctioning was in its infancy" during the Clinton administration, and that any charity designations happened after 9/11); 58:8-13 (testifying that that there were no designations of charities prior to 9/11 in part because the U.S. had undertaken other actions, which included direct discussions between the U.S. and Saudi Arabia).<br><br>To the extent that ARB asserts that the failure to designate demonstrates that ARB, Suleiman al Rajhi, and members of the al Rajhi family were not aware of IIRO's connections to, and financial support for, al Qaeda and associated terrorist organizations, prior to the 9/11 attacks, that is disputed.<br><br>To the contrary, the evidence surveyed in the Corrected Averment shows that ARB, Suleiman al Rajhi, and the Bank's senior officials were quintessential insiders, operating at the very center of al Qaeda's financial and logistical support structure during the critical period leading up to the September 11, 2001 attacks. They maintained high-level contacts with the IIRO, and were well aware of IIRO's terrorist nature at all relevant times. *See* Averment generally.<br><br>Further, ARB had a duty to know their customers and undertake the proper due diligence when opening accounts and providing financial services to the IIRO and its officers. *See* Pls. Ex. 38, Kohlmann Report at 21 (identifying pre-9/11 raids and closures of IIRO overseas branch offices based on concerns of terrorism financing, including the IIRO's chapter in Nairobi following the 1998 U.S. Embassy bombings). *See* |

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

*also* Pls. Ex. 171, Transcript, January 11, 2024 Deposition of Evan F. Kohlmann at 142:21-25 ("IIRO also issued with its parent Muslim World League also issued propaganda and other documents suggesting that it was also supporting armed conflict and that it was interested in generating money to provide weapons for personnel.").

*See also* Plaintiffs' response to No. 63, detailing public media reporting available to ARB prior to the 9/11 attacks concerning IIRO's involvement in supporting terrorism and Osama bin Laden, including IIRO's links to the 1998 U.S. Embassy bombings in Kenya and Tanzania.

Furthermore, ARB and its principals were expressly aware of IIRO's involvement in supporting al Qaeda and terrorism by virtue of Suleiman al Rajhi's extensive contacts with the IIRO and his close relationships with MWL and IIRO officials. *See* Averment ¶¶ 44, 553 (Saleh al Hussayen, who served as an advisor to Suleiman al Rajhi and his charity committee/foundation and a member of ARB's Shariah Board, participated in the overseas da'wah activities of the IIRO); ¶¶ 44, 553 (officials of Suleiman al Rajhi's charity committee/foundation, Abdul Rahman al Rajhi, Saleh al Habdan, and Abdullah al Misfer participated in the overseas da'wah activities of the IIRO); ¶ 46 (Suleiman al Rajhi established Sana-Bell, Inc. in the United States and filled the Board of Trustees with MWL and IIRO officials.); ¶¶ 394-395 (Suleiman al Rajhi began establishing the U.S.-based SAAR Foundation enterprise and its associated entities in the 1980s in connections with senior officials of the MWL and IIRO.); ¶¶ 547-552 (Suleiman al Rajhi served as a member of IIRO's board or permanent committee, given his ongoing status as a shareholder of Sanabel al Kheir, the IIRO's investment arm.); ¶¶ 554-557 (Founding directors of Sana-Bell, Inc., included IIRO's then Secretary General, Dr. Farid Yasin Qurashi, and other MWL/IIRO officials, and then in 2000 IIRO Secretary General Adnan Basha served as President of Sana-Bell.). *See also* Pls. Ex. 46 – *Identifying Al-Qa'ida's Donors and Fundraisers: A Status Report*, February 27, 2002, CIA_00193-199 at 198 ("As of [REDACTED] 2000, Sulaiman al-Rajhi was also one of the 128 permanent members of International Islamic Relief Organization (IIRO), [REDACTED] al-Qa'ida has infiltrated some of IIRO's branches."). *See also* Averment ¶¶ 168, 547.

Moreover, CIA reporting has assessed that Suleiman al Rajhi and senior al Rajhi family members long supported Islamic extremists and charities associated with terrorism and knew that terrorists were using the Bank. *See, e.g.*, Pls. Ex. 10, *Al-Rajhi Bank: Conduit for Extremist Finance*, May 28, 2003, CIA-SUB_0001-6 at 2 ("Senior al-Rajhi family members have

| | |
|---|---|
| | long supported Islamic extremists and probably know that terrorists use their bank. [REDACTED] senior al-Rajhi family members control the banks' most important decisions and that ARABIC's principle managers answer directly to Sulayman. The al-Rajhis know they are under scrutiny and they have moved to conceal their activities from financial regulatory authorities."); *id.* at 3 ("Extremists' bank of choice. [REDACTED] since the mid-1990s [REDACTED] several extremists ordered operatives in Afghanistan, Indonesia, Pakistan, Saudi Arabia, Turkey, and Yemen to used ARABIC."); *id.* at 5 ("Senior al-Rajhi family members, including family patriarch Sulayman al-Rajhi, have donated money to NGOs suspected of supporting terrorism."); *id.* ("[REDACTED] March 2003, Sulayman al-Rajhi defended his donations to the al-Haramain Islamic Foundation, which has come under scrutiny for its support to extremists."). *See also* Pls. Ex. 9 – *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, undated, CIA_00720-804 at 743 ("In addition, an unspecified member of the Al Rajhi family is charged with overseeing financial support to the Afghan Mujahideen along with the IIRO Director in Kabul, [REDACTED]. ARBIC apparently has been a conduit for funding the Mujahadin since the early 1990s."); Pls. Ex. 55, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 221 ("Many prominent Saudi businessmen contribute generously to the IIRO through their *zakat* contributions, including the Al Rajhi family, which has an estimated wealth of $20 billion."). *See also* Averment ¶¶ 178, 179. |
| 60. No IIRO branch was designated under any sanctions regime for connections to terrorism until 2006. *See* Pls. Ex. 170 ("Treasury Designates Director, Branches of Charity Bankrolling Al Qaida Network") (showing first sanctions designations of IIRO branches in 2006). | It is not disputed that the IIRO's branch offices in the Philippines and Indonesia, including the Executive Director of the IIRO Eastern Province branch office, Abd al Hamid Sulaiman al Mujil, were not designated until August 3, 2006 "for facilitating fundraising for al Qaida and affiliated terrorist groups." *See* Pls. Ex. 170 (Abdullah al Rajhi Exhibit 28) (August 3, 2006 designation of IIRO's branches in the Philippines and Indonesia, including Abd al Hamid Sulaiman al Mujil); Pls. Ex. 75, *Additional Designations Pursuant to E.O. 13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches*, TREASURY00102-121. *See also* Averment ¶¶ 73, 115, 117, 118, 240-242, 245, 246. |
| | Importantly, however, the evaluation of whether formal designation of a particular terror sponsor, or other possible action, would best serve U.S. national security interests following the 9/11 attacks involved a range of equities, including foreign policy, intelligence, diplomatic, law enforcement, and many other considerations. *See* Pls. Ex. 96, *Terrorism Financing: Origination, Organization, and* |

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

*Prevention*, Hearing Before the Committee on Governmental Affairs United States Senate (July 31, 2003), at 11 (R. Richard Newcomb, Director of the Office of Foreign Assets Control ("OFAC"), stating that all of the equities of the government come to the table, including law enforcement, intelligence, diplomatic, and military, among others). In addressing Saudi-based threats to U.S. national security in particular, U.S. policymakers broadly determined that pursuing cooperation and joint action with the Saudi government was critical to advancing the United States' overarching counterterrorism objectives, precisely because of the nature and scope of the problem emanating from Saudi Arabia. Accordingly, this policy approach often led U.S. officials to defer or delay formal designations or other actions against Saudi-based terror financiers and sponsors, as in the case of IIRO, and others. *See* Averment ¶¶ 192-194. *See also* Pls. Ex. 171, Transcript, January 11, 2024 Deposition of Evan F. Kohlmann at 125:15-17 ("A designation is usually the result of many years of investigation and information gathering.").

To the extent that ARB asserts that the failure to designate demonstrates that ARB, Suleiman al Rajhi, and members of the al Rajhi family were not aware of IIRO's connections to, and financial support for, al Qaeda and associated terrorist organizations, prior to the 9/11 attacks, that is disputed.

To the contrary, the evidence surveyed in the Corrected Averment shows that ARB, Suleiman al Rajhi, and the Bank's senior officials were quintessential insiders, operating at the very center of al Qaeda's financial and logistical support structure during the critical period leading up to the September 11, 2001 attacks. They maintained high-level contacts with the IIRO, and were well aware of IIRO's terrorist nature at all relevant times. *See* Averment generally.

Further, ARB had a duty to know their customers and undertake the proper due diligence when opening accounts and providing financial services to the IIRO and its officers. *See* Pls. Ex. 38, Kohlmann Report at 21 (identifying pre-9/11 raids and closures of IIRO overseas branch offices based on concerns of terrorism financing, including the IIRO's chapter in Nairobi following the 1998 U.S. Embassy bombings). *See also* Pls. Ex. 171, Transcript, January 11, 2024 Deposition of Evan F. Kohlmann at 142:21-25 ("IIRO also issued with its parent Muslim World League also issued propaganda and other documents suggesting that it was also supporting armed conflict and that it was interested in generating money to provide weapons for personnel.").

*See also* Plaintiffs' response to No. 63, detailing public media reporting available to ARB prior to the 9/11 attacks concerning

IIRO's involvement in supporting terrorism and Osama bin Laden, including IIRO's links to the 1998 U.S. Embassy bombings in Kenya and Tanzania.

Furthermore, ARB and its principals were expressly aware of IIRO's involvement in supporting al Qaeda and terrorism by virtue of Suleiman al Rajhi's extensive contacts with the IIRO and his close relationships with MWL and IIRO officials. *See* Plaintiffs' response to No. 59.

In addition, Wa'el Jelaidan, a founding member of al Qaeda who played a key role in channeling support to al Qaeda from several ostensible charities, including the IIRO, was publicly and jointly designated by the United States and Saudi Arabian governments on September 6, 2002, and also publicly designated by the United Nations on November 9, 2002. *See* Averment ¶¶ 71, 112-127, 165-167, 224-226, 247. *See also* Pls. Ex. 79, *Additional Designation Pursuant to E.O. 13224*, TREASURY00001-8 at 4-5 (stating that "Julaidan is identified as one of the original founders of the al-Qa'ida organization and as bin Ladin's logistics chief," and also served on al Qaeda's shura council). Those public designations were available to ARB and its principals.

Moreover, CIA reporting has assessed that Suleiman al Rajhi and senior al Rajhi family members long supported Islamic extremists and charities associated with terrorism and knew that terrorists were using the Bank. *See, e.g.*, Pls. Ex. 10, *Al-Rajhi Bank: Conduit for Extremist Finance*, May 28, 2003, CIA-SUB_0001-6 at 2 ("Senior al-Rajhi family members have long supported Islamic extremists and probably know that terrorists use their bank. [REDACTED] senior al-Rajhi family members control the banks' most important decisions and that ARABIC's principle managers answer directly to Sulayman. The al-Rajhis know they are under scrutiny and they have moved to conceal their activities from financial regulatory authorities."); *id.* at 3 ("Extremists' bank of choice. [REDACTED] since the mid-1990s [REDACTED] several extremists ordered operatives in Afghanistan, Indonesia, Pakistan, Saudi Arabia, Turkey, and Yemen to used ARABIC."); *id.* at 5 ("Senior al-Rajhi family members, including family patriarch Sulayman al-Rajhi, have donated money to NGOs suspected of supporting terrorism."); *id.* ("[REDACTED] March 2003, Sulayman al-Rajhi defended his donations to the al-Haramain Islamic Foundation, which has come under scrutiny for its support to extremists."). *See also* Pls. Ex. 9 – *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, undated, CIA_00720-804 at 743 ("In addition, an unspecified member of the Al Rajhi family is charged with overseeing financial support to the Afghan Mujahideen along with the IIRO Director in Kabul,

| | |
|---|---|
| | [REDACTED]. ARBIC apparently has been a conduit for funding the Mujahadin since the early 1990s."); Pls. Ex. 55, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 221 ("Many prominent Saudi businessmen contribute generously to the IIRO through their *zakat* contributions, including the Al Rajhi family, which has an estimated wealth of $20 billion."). *See also* Averment ¶¶ 178, 179. |
| 61. IIRO KSA was never designated under any sanctions regime for connections to terrorism. *See* ARB Ex. 93 (Kohlmann Dep. Tr.) at 140:6-13 (acknowledging that IIRO KSA never received a sanctions designation); *see generally* ARB Ex. 59 (Office of Foreign Assets Control, Specially Designated Nationals and Blocked Persons List, U.S. Dept. of Treas. (May 3, 2024), https://www.treasury.gov/ofac/downloads/sdnlist.pdf). | It is not disputed that IIRO KSA was not designated. Importantly, however, the evaluation of whether formal designation of a particular terror sponsor, or other possible action, would best serve U.S. national security interests following the 9/11 attacks involved a range of equities, including foreign policy, intelligence, diplomatic, law enforcement, and many other considerations. *See* Pls. Ex. 96, *Terrorism Financing: Origination, Organization, and Prevention*, Hearing Before the Committee on Governmental Affairs United States Senate (July 31, 2003), at 11 (R. Richard Newcomb, Director of the Office of Foreign Assets Control ("OFAC"), stating that all of the equities of the government come to the table, including law enforcement, intelligence, diplomatic, and military, among others). In addressing Saudi-based threats to U.S. national security in particular, U.S. policymakers broadly determined that pursuing cooperation and joint action with the Saudi government was critical to advancing the United States' overarching counterterrorism objectives, precisely because of the nature and scope of the problem emanating from Saudi Arabia. Accordingly, this policy approach often led U.S. officials to defer or delay formal designations or other actions against Saudi-based terror financiers and sponsors, as in the case of IIRO, and others. *See* Averment ¶¶ 192-194. *See also* Pls. Ex. 171, Transcript, January 11, 2024 Deposition of Evan F. Kohlmann at 125:15-17 ("A designation is usually the result of many years of investigation and information gathering."). |
| | To the extent that ARB asserts that this demonstrates that ARB, Suleiman al Rajhi, and members of the al Rajhi family were not aware of IIRO KSA's connections to, and financial support for, al Qaeda and associated terrorist organizations, prior to or following 9/11, that is disputed. *See* Plaintiffs' responses to Nos. 59, 60, 63. |
| | To the contrary, the evidence surveyed in the Corrected Averment shows that ARB, Suleiman al Rajhi, and the Bank's senior officials were quintessential insiders, operating at the very center of al Qaeda's financial and logistical support structure during the critical period leading up to the September 11, 2001 attacks. They maintained high-level contacts with the |

| | |
|---|---|
| | IIRO, and were well aware of IIRO's terrorist nature at all relevant times. *See* Averment generally.<br><br>Finally, to the extent that ARB argues that the absence of any designation is equivalent to a finding that the person or entity is innocent of terrorism charges, that is baseless and disputed. *See, e.g.*, Pls. Ex. 12, Transcript, January 12, 2024 Deposition of Jonathan M. Winer at 167:2-10 ("I've been involved in designation processes and I have pushed for the designation of people in certain cases who in my opinion should have been designated and where there was absolutely sufficient objective evidence well beyond including evidence that they participated in terrorist activity, who are not designated for policy reasons of various kinds, not one, but multiple different kinds of policy reasons."). |
| 62.  At no point did SAMA instruct Al Rajhi Bank to block IIRO KSA's accounts. *See* Pls. Ex. 3 (Galloway Dep. Tr.) at 348:12-16 and Errata at 348:12-13. | It is not disputed that Mr. Galloway testified that SAMA did not instruct ARB to block IIRO KSA's accounts at the Bank. However, to the extent that ARB asserts that this demonstrates that SAMA did not find any money-laundering, terrorist-financing, or other criminal activities with respect to the IIRO accounts at ARB, that is disputed.<br><br>First, Plaintiffs have not been afforded the opportunity to conduct discovery of SAMA concerning the IIRO accounts and related information in its possession, including any investigation that SAMA conducted of the IIRO accounts at ARB. Second, the evidence shows that IIRO accounts at ARB were used to send funds to IIRO's branch offices outside of Saudi Arabia, a fact that was well known to ARB. *See* Averment ¶¶ 212-217; 516. Those included branch offices in locations where al Qaeda was known to be operating, and conflict zones where al Qaeda and jihadists associated with al Qaeda were known to be fighting. *See* Averment ¶ 217; *id.* at 118 (U.S. designation of IIRO and Abd al Hamid Sulaiman al Mujil indicates that the IIRO branch office in the Eastern Province sent funds to the IIRO overseas branches in the Philippines and Indonesia, which in turn financially supported the al Qaeda-affiliated terrorist groups Abu Sayyaf Group and Jemaah Islamiyah.). *See also* Pls. Ex. 78, Transcript, February 21, 2019 Deposition of Adnan Basha at 265-267 (testifying that the IIRO Eastern Province was sending money to IIRO branch offices overseas to implement their own projects without advising or seeking permission from the IIRO General Secretariat, which was the required IIRO protocol); *id.* at 268-269 (testifying that Prince Turki bin Fahd bin Jalawi, the head of the IIRO Eastern Province, was asked to stop this practice, but the Prince failed to comply with the request); *id.* at 269 (testifying that Pakistan was one of the areas where the Eastern Province was carrying out these projects without informing the IIRO General Secretariat); *id.* at 271-274 (testifying that |

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

|  | Prince Turki resigned as the supervisor of the Eastern Province office following the auditor's findings that the Eastern Province was in violation of financial regulations, "[b]ecause he did not wish to implement the recommendations of the auditor"); *see also* Pls. Ex. 26 (Lormel Exhibit 9), *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States*, December 2004, EO14040-003414-3442 at 3419 (reporting that Khalid Sheikh Mohammed ("KSM") identified Prince Turki bin Jalawi, "a key leader of the Eastern Province office of the International Islamic Relief Organization (IIRO)," as "an important al-Qa'ida donor"); Averment ¶¶ 71, 119.<br><br>To the extent that ARB asserts that SAMA's omission to instruct ARB to block IIRO KSA's accounts indicates that ARB, Suleiman al Rajhi, and the Bank's officials were not aware of any money-laundering, terrorist-financing, or other criminal activities associated with the IIRO accounts, that is disputed. *See, e.g.*, Averment ¶ 294 (Suleiman al Rajhi was a prominent donor to Makhtab al Khidamat, Osama bin Laden's organization during the jihad in Afghanistan, and was thus specifically aware of bin Laden's longstanding use of ostensible charities, like IIRO, to support his jihadist activities); Averment ¶ 295 (Suleiman al Rajhi and Abdullah al Rajhi were well aware of the risk of terrorist financing through purported Islamic charities prior to 9/11); Averment ¶ 323 (ARB's principals were expressly aware of the involvement of IIRO in supporting al Qaeda and terrorism by virtue of Suleiman al Rajhi's central role in supporting al Qaeda and militant Islamic causes, and his close ties to the MWL and IIRO and their leadership); Averment ¶ 327 (ARB was specifically aware that IIRO's officers were improperly using personal accounts of the officials to carry out financial activities unrelated to their personal affairs, a practice that masked the true origin of funds transferred from those accounts and embodied a classic mechanism for carrying out financial crimes). *See also* Plaintiffs' responses to Nos. 59, 60, 63. |
| 63.  Plaintiffs have no evidence of public reporting or other media statements before September 11, 2001, connecting IIRO KSA to Al Qaeda. *See, e.g.*, Pls. Aver. § V (discussing Al Qaeda's "pre-9/11 funding," but presenting no evidence of any pre-9/11 public reporting connecting IIRO KSA to Al Qaeda); Pls. Ex. 4 (Winer Report) at § 4 (discussing "incidents involving charities and terrorist financing/crime pre-9/11," but presenting no evidence of any pre-9/11 public reporting connecting IIRO KSA to Al Qaeda); Pls. Ex. 38 (Kohlmann Report) at 17-28 (discussing IIRO but presenting no evidence of any pre-9/11 public reporting connecting IIRO KSA to Al Qaeda). | Disputed. *See* Averment ¶ 290. Jonathan Winer's Expert Report identifies a handful of public reporting available to ARB prior to the 9/11 attacks regarding the IIRO's involvement in supporting terrorism and Osama bin Laden. *See, e.g.*, Pls. Ex. 4, Winer Report at 39 n. 92 and 94; 180 n. 585. In addition, Mr. Winer's Appendix 1 – Listing of Reliance Materials and Materials Considered, cites to a number of media reports issued prior to 9/11 reporting on the IIRO's global support for terrorism. *See, e.g.*, (1) Daily News, *It's More than Just Who Plants the Explosives*, July 31, 1996 (reporting that the IIRO is a major conduit of financial support to the Hamas terrorist group); (2) The Age, *Filipino Muslims* |

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

*Linked to Holy Warrior's Global Terror*, May 20, 1995 (reporting on the discovery of al Qaeda's terrorist plot in the Philippines ("Bojinka") and explaining that Mohammed Jamal Khalifa of the IIRO, a "key figure in the network of Islamic extremists," was funding Islamic militants in the Philippines); (3) Frontline, *A Terrorist Plot Unearthed*, March 12, 1999 (discussing the IIRO's connections to an terrorist operation to bomb U.S. Consulates in India, and describing the IIRO as being "closely associated with the billionaire terrorist Osama bin Laden"); (4) University of Pennsylvania-African Studies Center, *Horn of Africa: The Monthly Review, 19-10/98* (reporting that the IIRO was one of five relief organizations banned by the Kenyan government following the August 1998 U.S. Embassy bombings); (5) IPS-Inter Press Service, *Kenya: Gov't Shuts down Five Islamic Relief Agencies*, September 10, 1998 (reporting that the Kenyan government banned the IIRO for supporting terrorism following the August 1998 U.S. Embassy bombings); (6) ITAR-TASS, Russin Troops Find Arab, Bosnian Passports in Chechnya, February 21, 2000 (reporting that that IIRO, with its main office in Saudi Arabia, arranged for the transportation of Islamic fighters to participate in the conflict in Chechnya); (7) Japan Economic Newswire, *Bin Laden Providing Money, Military Aid to MILF: Report*, February 13, 1999 (reporting that the IIRO's Mohammed Jamal Khalifa "is instrumental in funneling funds to MILF and the extremist Abu Sayyaf Group," and further stating that the "IIRO is suspected by Western intelligence agencies to be bin Laden's conduit to various terrorist organizations in Islamic countries"); (8) Philippine Daily Inquirer, *Front Page: Bin Laden Funds Abu Sayyaf Through Muslim Relief Group*, August 9, 2000 (indicating that Mohammed Jamal Khalifa and the IIRO (working under the Muslim World League) is a conduit of funds for the Abu Sayyaf Group, a terrorist organization in the Philippines); (9) Philippine Daily Inquirer, *Front Page: Gemma Linked to Bin Laden Group Funding Sayyaf, MILF*, August 10, 2000 (reporting that the IIRO is a front to finance the operations of the Abu Sayyaf Group and Moro Islamic Liberation Front terrorist organizations); (10) The U.N. Refugee Agency, *Human Rights Watch World Report 1999 – Kenya*, January 1, 1999 (stating that Kenyan government cancelled the registration of the IIRO and other Islamic relief agencies for supporting terrorism); (11) New York Times, *Some Charities Suspected of Terrorist Role*, February 19, 2000 (reporting on the 1998 U.S. Embassy attacks and that the Kenyan government said the charities "'posed a serious threat' to Kenya's security"); (12) The Times, Terror by Degree, October 18, 1997 (reporting on the "Bojinka" terrorist plot and stating that Mohammed Jamal Khalifa was funding the Abu Sayyaf Group); (13) The Indian Ocean Newsletter, *Banned Islamic NGOs*, September 12, 1998 (reporting that Kenya banned the IIRO and other NGOs

| | |
|---|---|
| | following their investigation into the August 1998 attacks on U.S. embassies in Nairobi and Dar es Salaam); (14) U.S. News & World Report, *A Helping Hand From Saudi Arabia*, July 8, 1996 (reporting that the IIRO is a major clearinghouse for funds to aid Islamic extremism and terror in Gaza and the West Bank); (15) The Straits Times, *Osama Gave Funds to Abu Sayyaf: Manila*, August 10, 2000 (reporting that Mohammed Jamal Khalifa and the IIRO (working under the Muslim World League), "in the guise of giving charity to local Muslim communities, provided funds to Abu Sayyaf for acquiring arms"); (16) Overseas Immigration News, *Immigration Claims Teacher Linked to Terrorists Alleged Al-Jihad Member: Egyptian Denies Allegations, is Appealing Legal Proceedings*, May 21, 1999 (reporting that the IIRO "secretly funds terrorism"). |
| 64. Plaintiffs have no evidence that, before the 9/11 Attacks, Al Rajhi Bank knew that IIRO KSA had any connection to Al Qaeda or any form of terrorism against the United States, including the 9/11 Attacks. *See, e.g.*, Pls. Aver. § VI (discussing pre-9/11 financial services provided by the Bank to the Charities, but presenting no evidence that the Bank had any knowledge before 9/11 of any alleged connection between IIRO KSA and Al Qaeda or terrorism against the United States); Pls. Ex. 4 (Winer Report) at § 7 (discussing purported "relationship" between IIRO KSA and the Bank, but presenting no evidence that the Bank had any knowledge before 9/11 of any alleged connection between IIRO KSA and Al Qaeda or terrorism against the United States); Pls. Ex. 38 (Kohlmann Report) at 17-28 (discussing IIRO but presenting no evidence that the Bank had any knowledge before 9/11 of any alleged connection between IIRO KSA and Al Qaeda or terrorism against the United States). | Disputed. *See e.g.*, Plaintiffs' responses to Nos. 59, 60, 62, 63. By way of further response, the evidence surveyed in the Corrected Averment shows that ARB, Suleiman al Rajhi, and the Bank's senior officials were quintessential insiders, operating at the very center of al Qaeda's financial and logistical support structure during the critical period leading up to the September 11, 2001 attacks. They maintained high-level contacts with the IIRO, and were well aware of IIRO's terrorist nature at all relevant times. *See* Averment generally. |
| 65. Plaintiffs have no evidence tracing any transaction from IIRO KSA made through Al Rajhi Bank to the financing, planning, or carrying out of terrorism against the United States, including the 9/11 Attacks. *See, e.g.*, Pls. Aver. §§ X, XI (failing to trace any transaction through Al Rajhi Bank to planning, carrying out, or financing the 9/11 Attacks); Pls. Ex. 4 (Winer Report) at § 11 (same). | Disputed. ARB's claim that there is no evidence that any donation or transaction by Suleiman al Rajhi, members of the al Rajhi family, Suleiman al Rajhi's charity committee/foundation, or others conducted through the Bank has been traced or connected to the planning or carrying out of terrorism against the United States, including the 9/11 attacks themselves, is inaccurate and misleading. ARB, Suleiman al Rajhi, members of the al Rajhi, and others were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and were specifically aware of al Qaeda's mission and intent to attack the United States. Intending to foster al Qaeda's terrorist agenda, they provided substantial financial assistance to al Qaeda charity and business fronts and other intermediaries through the Bank, knowing that the funds would be received by Osama bin Laden and al Qaeda. *See* Averment generally. |

| | |
|---|---|
| | Plaintiffs' Averment also shows how the support provided to al Qaeda by these parties allowed al Qaeda to acquire the strike capabilities needed to carry out the 9/11 attacks. *See* Averment ¶¶ 53-132. Plaintiffs need not prove that the donation or transaction at issue was traced to the terrorist plot or the attack itself. |
| | By way of further response, ARB and Suleiman al Rajhi established a "Payable Through Account" at Chase Manhattan Bank in New York, a mechanism used by the Bank to obscure the origin and destination of funds transmitted to al Qaeda, al Qaeda proxies, and affiliated anti-American extremists and jihadists, including funds originating from ARB Chairman Suleiman al Rajhi himself. *See, e.g.*, Averment ¶¶ 11, 36-39, 52, 264, 392, 401, 404, 412, 414-419, 429-488. |
| | The Payable Through Account was used to facilitate transfers by IIRO to its operations in Afghanistan, which were extensively intertwined with al Qaeda. ARB authorized the IIRO to issue  check via the Payable Through Account at Chase Manhattan, for the benefit of the Fatima al Zahraa Hospital in Jalalabad, Afghanistan. *See* Pls. Ex. 139, IIRO 109118-109119; Pls. Ex. 150, ARB 2477-2572 at 2543 (ARB account statement for Islamic Relief Organization-Health, identifying an August 19, 2001 transaction, 125,500.00 SR debit, "Issuance of bank checks."). The Fatima al Zahraa Hospital was an asset of the IIRO itself, and the IIRO's offices in Pakistan/Afghanistan were deeply tied to al Qaeda operations. Confirming this close connection, al Qaeda leader Ayman al Zawahiri conducted eye surgeries at Fatima al Zahraa Hospital, which was located in close proximity to an al Qaeda funded jihad camp, at some point after 1996. *See* Pls. Ex. 159, Transcript, February 8, 2024 Deposition of Aimen Dean ("Dean Deposition"), at 308-309. *See also* Averment ¶¶ 475, 486-488. |
| **3. Muwaffaq Foundation** | No response necessary. |
| 66. During the relevant period, Muwaffaq Foundation never held any accounts at Al Rajhi Bank. *See* Pls. Ex. 3 (Galloway Dep. Tr.) at 77:13-17, 337:15-17 and Errata at 77:17, 337:15. | Undisputed as a general matter for purposes of this motion. |
| **4. World Assembly of Muslim Youth** | No response necessary. |
| 67.  Before the 9/11 Attacks, World Assembly of Muslim Youth was not designated under any sanctions regime for connections to terrorism. *See* ARB Ex. 93 (Kohlmann Dep. Tr.) at 164:19-21 (acknowledging that WAMY never received a sanctions designation); *see also* ARB Ex. 28 (Winer Dep. Tr.) at 57:8-12 ("To the best of my knowledge, there were no charities of any kind that I recollect that had been designated | As ARB is aware, jurisdictional discovery did not encompass WAMY. As set forth in Section III, Jurisdictional Discovery, *see* Averment ¶¶ 15, 16, and 20, Plaintiffs agreed to limit their jurisdictional discovery to Al Haramain, IIRO, and the Muwafaq Foundation. Recall that in 2021, ARB represented to the Court that its archived files were not properly indexed and that files originating before 2015 were not digitally searchable, |

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

prior to 9/11 because terrorist designations were originally limited to terrorist organizations."); ARB Ex. 93 (Kohlmann Dep. Tr.) at 126:12-13, 130:21-131:2 (testifying that charity designations only began after 9/11 and that he had not identified any Al Rajhi Bank transactions violating sanctions or designations, because "once the designation has been issued," it becomes "impossible to open an account under that [designated] person's name").

making any search of their physical files for responsive records unduly burdensome. ARB further argued that searches of the archived files for documents responsive to Plaintiffs' discovery would impose massive costs upon the defendant. The Court considered that argument and directed the parties to meet and confer on "an acceptable program of discovery" that accommodated ARB's burden claims. *See* November 22, 2021 Order (ECF No. 7378) at 22. Accordingly, Plaintiffs' jurisdictional discovery requests only encompassed Al Haramain, IIRO, and Muwaffaq Foundation as a means to addressing ARB's purported burden claims, as directed by the Court.

By way of further response, it is not disputed that WAMY was not designated prior to the 9/11 attacks for connections to terrorism. Plaintiffs' experts have been clear that the designation process for terrorist sanctioning was in its infancy during the Clinton Administration, and the Executive Order 13224 sanctions regime targeting charities for terrorism related offenses did not exist prior to the September 11, 2001 attacks. *See* Pls. Ex. 12, Transcript, January 12, 2024 Deposition of Jonathan M. Winer at 57:14-25 (testifying that the "designation process for sanctioning was in its infancy" during the Clinton administration, and that any charity designations happened after 9/11); 58:8-13 (testifying that that there were no designations of charities prior to 9/11 in part because the U.S. had undertaken other actions, which included direct discussions between the U.S. and Saudi Arabia).

To the extent that ARB asserts that the failure to designate demonstrates that ARB, Suleiman al Rajhi, and members of the al Rajhi family were not aware of WAMY's connections to, and financial support for, al Qaeda and associated terrorist organizations, prior to the 9/11 attacks, that is disputed.

To the contrary, the evidence surveyed in the Corrected Averment shows that ARB, Suleiman al Rajhi, and the Bank's senior officials were quintessential insiders, operating at the very center of al Qaeda's financial and logistical support structure during the critical period leading up to the September 11, 2001 attacks. They maintained high-level contacts with WAMY, and were well aware of WAMY's terrorist nature at all relevant times. *See* Averment generally.

Further, ARB had a duty to know their customers and undertake the proper due diligence when opening accounts and providing financial services to WAMY. *See* Pls. Ex. 38, Kohlmann Report at 33-37 (identifying pre-9/11 activities relating to WAMY, including but not limited to (i) presenting lectures on jihad to Muslim youth at WAMY summer camps; (ii) WAMY supporting Islamic jihadists participating in the

Bosnian war; (iii) WAMY Secretary General Maneh al Johani calling for jihad in Kashmir; (iv) WAMY Secretary General Johani calling on Muslims to donate money for the purchase of weapons for the conflict in Chechnya; and (v) significant donations from WAMY to the Third World Relief Agency ("TWRA"), a charity used by Osama bin Laden to "covertly provide financial and other support for terrorist activities"). *See also* Averment ¶ 71.

*See also* Plaintiffs' response to No. 70, detailing public media reporting available to ARB prior to the 9/11 attacks concerning WAMY's advocacy and encouragement to Muslims to financially support and/or participate in violent jihad.

Notwithstanding the public information available to ARB, Suleiman al Rajhi, and members of the al Rajhi family detailing WAMY's support for Islamic extremism and advocacy for violent jihad, Suleiman al Rajhi was simultaneously sending significant sums of money to WAMY, including direct payments to WAMY Secretary General Johani himself. *See, e.g.*, Pls. Ex. 29 (Galloway Exhibit 22), NL 15044-10546 (37,500 SR and 338,500 SR donations to WAMY in 1999); Pls. Ex. 185, NL 10068 (120,000 SR check payable to Dr. Maneh al Johani in 1999); Pls. Ex. 185, NL 10384 (112,500 SR check payable to Dr. Maneh al Johani in 1999); Pls. Ex. 186, NL 10333 (check from Suleiman al Rajhi payable to WAMY for 75,000 SR in 1999). *See also* Averment ¶¶ 419, 560-562.

Importantly, CIA reporting confirms the high-level relationships between ARB, the al Rajhi family and WAMY, stating that "the Al Rajhis were routinely contacted by officials" at WAMY, which it described as "a Saudi NGO where personnel often pursue an extremist agenda." *See* Pls. Ex. 9, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, CIA_00720-804 at 744. The report further states that "WAMY officials have couriered private Saudi donations to Islamic groups in Afghanistan and Bosnia" and put Saudi donors and foreigners in direct contact "for worthwhile Islamic causes" and would sometimes broker requests to donors when WAMY had "an ideological interest." *Id. See also* Pls. Ex. 66, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 826 ("WAMY has offices worldwide and is funded by donations from wealthy Saudi merchants and prominent businesses, such as the Al Rajhi Banking Corporation."). *See also* Averment ¶ 160.

Furthermore, ARB was servicing over 116 accounts for WAMY during the time when WAMY was operating as a key charity front for al Qaeda. *See* Averment ¶¶ 219-220, 517.

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

| | |
|---|---|
| | Indeed, the CIA has assessed that WAMY played an extensive role in supporting Islamic extremists, terrorist organizations, and paramilitary training camps. *See, e.g.*, Pls. Ex. 66, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 826 ("WAMY has long been alleged to be a financier of Islamic extremists" and "provided funding for the Palestinian Islamic Resistance Movement (HAMAS); Egypt's Islamic Jihad and Gama'at al_Islamiyya; and an Islamic movement in Kurdistan."); Pls. Ex. 68, *Al-Qa'ida Still Well Positioned to Recruit Terrorists [REDACTED]*, July 1, 2002, CIA_000178-189 at 185 (stating that Islamic NGOs with connections to al Qaeda, like WAMY, sponsor paramilitary training camps for Muslim students, which includes training in "weapons handling, firing, and explosives"). *See also* Averment ¶ 132. |
| 68. After the 9/11 Attacks, WAMY was never designated under any sanctions regime for connections to terrorism. *See* ARB Ex. 93 (Kohlmann Dep. Tr.) at 164:19-21 (acknowledging that WAMY never received a sanctions designation); *see generally* ARB Ex. 59 (Office of Foreign Assets Control, Specially Designated Nationals and Blocked Persons List, U.S. Dept. of Treas. (May 3, 2024)). | As ARB is aware, jurisdictional discovery did not encompass WAMY. As set forth in Section III, Jurisdictional Discovery, *see* Averment ¶¶ 15, 16, and 20, Plaintiffs agreed to limit their jurisdictional discovery to Al Haramain, IIRO, and the Muwafaq Foundation. Recall that in 2021, ARB represented to the Court that its archived files were not properly indexed and that files originating before 2015 were not digitally searchable, making any search of their physical files for responsive records unduly burdensome. ARB further argued that searches of the archived files for documents responsive to Plaintiffs' discovery would impose massive costs upon the defendant. The Court considered that argument and directed the parties to meet and confer on "an acceptable program of discovery" that accommodated ARB's burden claims. *See* November 22, 2021 Order (ECF No. 7378) at 22. Accordingly, Plaintiffs' jurisdictional discovery requests only encompassed Al Haramain, IIRO, and Muwaffaq Foundation as a means to addressing ARB's purported burden claims, as directed by the Court.<br><br>By way of further response, it is not disputed that WAMY was not designated after the 9/11 attacks for connections to terrorism. Importantly, however, the evaluation of whether formal designation of a particular terror sponsor, or other possible action, would best serve U.S. national security interests following the 9/11 attacks involved a range of equities, including foreign policy, intelligence, diplomatic, law enforcement, and many other considerations. *See* Pls. Ex. 96, *Terrorism Financing: Origination, Organization, and Prevention*, Hearing Before the Committee on Governmental Affairs United States Senate (July 31, 2003), at 11 (R. Richard Newcomb, Director of the Office of Foreign Assets Control ("OFAC"), stating that all of the equities of the government come to the table, including law enforcement, intelligence, diplomatic, and military, among others). In addressing Saudi- |

based threats to U.S. national security in particular, U.S. policymakers broadly determined that pursuing cooperation and joint action with the Saudi government was critical to advancing the United States' overarching counterterrorism objectives, precisely because of the nature and scope of the problem emanating from Saudi Arabia. Accordingly, this policy approach often led U.S. officials to defer or delay formal designations or other actions against Saudi-based terror financiers and sponsors, as in the case of WAMY, and others. *See* Averment ¶¶ 192-194. *See also* Pls. Ex. 171, Transcript, January 11, 2024 Deposition of Evan F. Kohlmann at 125:15-17 ("A designation is usually the result of many years of investigation and information gathering.").

To the extent that ARB asserts that the failure to designate demonstrates that ARB, Suleiman al Rajhi, and members of the al Rajhi family were not aware of WAMY's connections to, and financial support for, al Qaeda and associated terrorist organizations, prior to the 9/11 attacks, that is disputed.

To the contrary, the evidence surveyed in the Corrected Averment shows that ARB, Suleiman al Rajhi, and the Bank's senior officials were quintessential insiders, operating at the very center of al Qaeda's financial and logistical support structure during the critical period leading up to the September 11, 2001 attacks. They maintained high-level contacts with WAMY, and were well aware of WAMY's terrorist nature at all relevant times. *See* Averment generally.

Further, ARB had a duty to know their customers and undertake the proper due diligence when opening accounts and providing financial services to WAMY. *See* Pls. Ex. 38, Kohlmann Report at 31, 32, 37, 38. (identifying post-9/11 activities relating to WAMY, including but not limited to (i) WAMY Assistant Secretary General Saleh al Wohaibi requesting donations to support the Palestinian armed uprising against Israel, "the Palestinian Intifada;" (ii) the November 2001 closure of WAMY's branch offices by the Indian government for financing terrorist groups Lashkar-e-Taiba ("LET") and Jaish-e-Mohammed ("JEM"); (iii) the November 2002 raid of WAMY's Peshawar branch office by the FBI and Pakistani intelligence; (iv) the detainment of a WAMY employee for delivering a recorded message from Osama bin Laden to local media; and (v) the June 2004 raid of WAMY's branch office in Virginia by the FBI and others in connection with a terrorism-related investigation).

Notwithstanding the increased public scrutiny of the Saudi charities' connections to al Qaeda and terrorism following the 9/11 attacks, including WAMY, Suleiman al Rajhi continued to send funds to WAMY Secretary General Maneh al Johani

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

| | |
|---|---|
| | in support of WAMY's global activities. *See, e.g.*, Pls. Ex. 16, WAMYSA 102829 (October 14, 2001 donation of 131,250.00 Saudi Riyals ("SR") to WAMY Secretary General Maneh al Johani from Suleiman al Rajhi and his foundation); Pls. Ex. 17, WAMYSA 502115 (June 17, 2002 donation of 130,000.00 SR to WAMY Secretary General Maneh al Johani). *See also* Averment ¶ 43. |
| | To the extent that ARB argues that the absence of any designation is equivalent to a finding that the person or entity is innocent of terrorism charges, that is baseless and disputed. *See, e.g.*, Pls. Ex. 12, Transcript, January 12, 2024 Deposition of Jonathan M. Winer at 167:2-10 ("I've been involved in designation processes and I have pushed for the designation of people in certain cases who in my opinion should have been designated and where there was absolutely sufficient objective evidence well beyond including evidence that they participated in terrorist activity, who are not designated for policy reasons of various kinds, not one, but multiple different kinds of policy reasons."). |
| | Again, ARB was servicing over 116 accounts for WAMY during the time when WAMY was operating as a key charity front for al Qaeda. *See* Averment ¶¶ 218-219. |
| 69. WAMY was a government-licensed organization in Saudi Arabia. ARB Ex. 24 (Jan. 4, 2004 (Hijri) Ltr. from Al Rajhi Bank Gen. Mngr. to Gov. of SAMA) at ARB-14545 (stating the Bank's understanding that WAMY was "licensed according to the approval of His Majesty, the Prime Minister" dated February 18, 1979); *see also* ARB Ex. 1 (Dean Report) at 8 (describing the widespread recognition of WAMY for good works and humanitarian efforts). | Disputed to the extent ARB intended to suggest that discovery shows that ARB verified WAMY's licensing status when opening and operating accounts. As ARB is aware, jurisdictional discovery did not encompass WAMY. As set forth in Section III, Jurisdictional Discovery, *see* Averment ¶¶ 15, 16, and 20, Plaintiffs agreed to limit their jurisdictional discovery to Al Haramain, IIRO, and the Muwafaq Foundation. Recall that in 2021, ARB represented to the Court that its archived files were not properly indexed and that files originating before 2015 were not digitally searchable, making any search of their physical files for responsive records unduly burdensome. ARB further argued that searches of the archived files for documents responsive to Plaintiffs' discovery would impose massive costs upon the defendant. The Court considered that argument and directed the parties to meet and confer on "an acceptable program of discovery" that accommodated ARB's burden claims. *See* November 22, 2021 Order (ECF No. 7378) at 22. Accordingly, Plaintiffs' jurisdictional discovery requests only encompassed Al Haramain, IIRO, and Muwaffaq Foundation as a means to addressing ARB's purported burden claims, as directed by the Court. |
| | By way of further response, ARB's Branch Instruction Manual ("ARB Manual"), issued January 1, 1997, at Section 1:3:6:3, specifically requires that any charity organization that collects |

| | |
|---|---|
| | donations and wants to open an account at ARB must provide a license from the Saudi government authorizing it to open the account and collect donations. *See* Pls. Ex. 188, ARB 16-734 at 172 ("A copy of the license issued by the authorities in the Kingdom of Saudi Arabia (the Ministry of Interior, the Emirate, or the Social Affairs Department for example) approving opening the account and collecting donations."). ARB cites to a January 4, 2004 letter at ARB 14545 indicating that WAMY may have been "licensed" on February 18, 1979 (25 years earlier), but that alleged license has never been produced by ARB. In fact, not a single license that meets the requirements of ARB Manual Section 1:3:6:3 has been produced for WAMY for the time period between February 18, 1979 and the January 4, 2004 letter.<br><br>To the extent WAMY was licensed, that fact is immaterial, given the evidence showing ARB's awareness of its role in supporting al Qaeda and connections to terrorism. |
| 70. Plaintiffs have no evidence of public reporting or other media statements before September 11, 2001, connecting WAMY to Al Qaeda. *See, e.g.*, Pls. Aver. § V (discussing Al Qaeda's "pre-9/11 funding," but presenting no evidence of any pre-9/11 public reporting connecting WAMY to Al Qaeda); Pls. Ex. 4 (Winer Report) at § 4 (discussing "incidents involving charities and terrorist financing/crime pre-9/11," but presenting no evidence of any pre-9/11 public reporting connecting WAMY to Al Qaeda); Pls. Ex. 38 (Kohlmann Report) at 31-36 (discussing WAMY but presenting no evidence of any pre-9/11 public reporting connecting WAMY to Al Qaeda). | Disputed. As ARB is aware, jurisdictional discovery did not encompass WAMY. As set forth in Section III, Jurisdictional Discovery, *see* Averment ¶¶ 15, 16, and 20, Plaintiffs agreed to limit their jurisdictional discovery to Al Haramain, IIRO, and the Muwafaq Foundation. Recall that in 2021, ARB represented to the Court that its archived files were not properly indexed and that files originating before 2015 were not digitally searchable, making any search of their physical files for responsive records unduly burdensome. ARB further argued that searches of the archived files for documents responsive to Plaintiffs' discovery would impose massive costs upon the defendant. The Court considered that argument and directed the parties to meet and confer on "an acceptable program of discovery" that accommodated ARB's burden claims. *See* November 22, 2021 Order (ECF No. 7378) at 22. Accordingly, Plaintiffs' jurisdictional discovery requests only encompassed Al Haramain, IIRO, and Muwaffaq Foundation as a means to addressing ARB's purported burden claims, as directed by the Court.<br><br>By way of further response, various pre-9/11 publications cited by Plaintiffs' experts have reported on WAMY's years-long support for violent jihad and calling on Muslims to sacrifice their souls and money for Islamic extremists, mujahideen fighters, and violent jihadists. *See, e.g.*, Pls. Ex. 38, Kohlmann Report at 34 (citing a December 5, 1992 New York Times article, *Muslims From Afar Joining "Holy War" in Bosnia*, discussing support provided to jihadist fighters by WAMY); *id.* (citing a June 3, 1991 Musim World News article, *WAMY Calls for Jihad to Free Kashmir*, reporting on comments from WAMY Secretary General Maneh al Johani, advocating for Muslims to engage in jihad: "Muslims can go |

| | |
|---|---|
| | to the battlefield to wage a war against the enemies of Islam or they can give their moral, physical, and financial support [to] the cause of Jihad."); *id.* (citing a December 8, 1995 Riyadh Daily article, *Kashmiri Leader Thanks WAMY for Help*, discussing WAMY efforts to assist the mujahideen in their struggle for independence from India); *id.* at 34-35 (citing a January 15, 2000 Al Jazeera article, *The Chechen Tragedy*, authored by WAMY Secretary General Maneh al Johani, asking Muslims to donate "money to buy weapons and gear" for the jihadists). *See also* Pls. Ex. 4, Winer Report at 181 (citing December 5, 1992 New York Times article, *Muslims From Afar Joining "Holy War" in Bosnia*, discussing support provided to jihadist fighters by WAMY); *id.* at 183 (citing to several pre-9/11 editions of the MWL Journal reporting on MWL and WAMY officials calling for military support and sending "money, arms, and prayers" in support of jihad). *See also* Averment ¶ 71. |
| 71. Plaintiffs have no evidence that, before the 9/11 Attacks, Al Rajhi Bank knew that WAMY had any connection to Al Qaeda or any form of terrorism against the United States, including the 9/11 Attacks. *See, e.g.*, Pls. Aver. § VI (discussing pre-9/11 financial services provided by the Bank to the Charities, but presenting no evidence that the Bank had any knowledge before 9/11 of any alleged connection between WAMY and Al Qaeda or terrorism against the United States); Pls. Ex. 4 (Winer Report) at § 7 (discussing purported "relationship" between WAMY and the Bank, but presenting no evidence that the Bank had any knowledge before 9/11 of any alleged connection between WAMY and Al Qaeda or terrorism against the United States); Pls. Ex. 38 (Kohlmann Report) at 31-36 (discussing WAMY but presenting no evidence that the Bank had any knowledge before 9/11 of any alleged connection between WAMY and Al Qaeda or terrorism against the United States). | Disputed. As ARB is aware, jurisdictional discovery did not encompass WAMY. As set forth in Section III, Jurisdictional Discovery, *see* Averment ¶¶ 15, 16, and 20, Plaintiffs agreed to limit their jurisdictional discovery to Al Haramain, IIRO, and the Muwafaq Foundation. Recall that in 2021, ARB represented to the Court that its archived files were not properly indexed and that files originating before 2015 were not digitally searchable, making any search of their physical files for responsive records unduly burdensome. ARB further argued that searches of the archived files for documents responsive to Plaintiffs' discovery would impose massive costs upon the defendant. The Court considered that argument and directed the parties to meet and confer on "an acceptable program of discovery" that accommodated ARB's burden claims. *See* November 22, 2021 Order (ECF No. 7378) at 22. Accordingly, Plaintiffs' jurisdictional discovery requests only encompassed Al Haramain, IIRO, and Muwaffaq Foundation as a means to addressing ARB's purported burden claims, as directed by the Court.

By way of further response, *see* Plaintiffs' responses to Nos. 67, 68, and 70. In addition, ARB and its principals were expressly aware of WAMY's involvement in supporting al Qaeda and terrorism by virtue of Suleiman al Rajhi's extensive contacts with WAMY and his close relationships with WAMY Secretary General Maneh al Johani, WAMY Board of Trustee member Dr. Saleh Omar Badahdah, and other senior WAMY officials. *See, e.g.*, Plaintiffs' response to Nos. 67, 68 (Suleiman al Rajhi's payments to WAMY Secretary General Maneh al Johani); Pls. Ex. 38, Kohlmann Report at 32 (payments to Dr. Saleh Omar Badahdah). *See also* Averment ¶¶ 43, 132, 160, 419, 560-561. |

| | |
|---|---|
| | Further, the evidence surveyed in the Corrected Averment shows that ARB, Suleiman al Rajhi, and the Bank's senior officials were quintessential insiders, operating at the very center of al Qaeda's financial and logistical support structure during the critical period leading up to the September 11, 2001 attacks. They maintained high-level contacts with WAMY, and were well aware of WAMY's terrorist nature at all relevant times. *See* Averment generally.

Moreover, CIA reporting details WAMY's role in terrorism funding and recruiting, sponsoring military training camps, facilitating the movement of funds in support of Islamic extremism, and funding terrorist groups and Executive Order 12334 Specially Designated Global Terrorists ("SDGT"). *See, e.g.*, Pls. Ex. 45, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 151 ("WAMY's global reach and influence among Muslim youth has made it an excellent conduit of recruits for many extremist groups."); Pls. Ex. 66, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 820-821 (stating Osama bin Laden has funded offices of Lajant al Bir al Islamiya, which is closely affiliated with WAMY); *id.* at 826 (describing "WAMY Chairman Abdallah al Muhaidib as a supporter of Usama Bin Ladin"); Pls. Ex. 68, *Al-Qa'ida Still Well Positioned to Recruit Terrorists REDACTED]*, July 1, 2002, CIA_000178-189 at 186 ("In the Balkans, local offices of NGOs such as the World Assembly of Muslim Youth, al-Haramayn, Society for the Revival and Islamic Heritage, and al-Waqf al-Islamiya were actively involved in spotting and assessing suitable terrorist recruits from among young men who seek assistance from humanitarian organizations, [REDACTED]."); *id.* at 185 (stating that in addition to recruiting, WAMY has sponsored and funded military training camps for Muslim youth). *See also* Pls. Ex. 26 (Lormel Exhibit 9), *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States*, December 2004, EO14040-003414-3442 at 3438 ("WAMY offices in other countries are directly funding HAMAS-affiliated NGOs, including the UK-based charity Interpal and the Palestinian *zakat* (tithing) committees."). |
| 72. Plaintiffs have no evidence tracing any transaction from WAMY made through Al Rajhi Bank to the financing, planning, or carrying out of terrorism against the United States, including the 9/11 Attacks. *See, e.g.*, Pls. Aver. §§ X, XI (failing to trace any transaction through Al Rajhi Bank to planning, carrying out, or financing the 9/11 Attacks); Pls. Ex. 4 (Winer Report) at § 11 (same). | Disputed. ARB's claim that there is no evidence that any donation or transaction by Suleiman al Rajhi, members of the al Rajhi family, Suleiman al Rajhi's charity committee/foundation, or others conducted through the Bank has been traced or connected to the planning or carrying out of terrorism against the United States, including the 9/11 attacks themselves, is inaccurate and misleading. |

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

| | |
|---|---|
| | ARB, Suleiman al Rajhi, members of the al Rajhi, and others were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and were specifically aware of al Qaeda's mission and intent to attack the United States. Intending to foster al Qaeda's terrorist agenda, they provided substantial financial assistance to al Qaeda charity and business fronts and other intermediaries through the Bank, knowing that the funds would be received by Osama bin Laden and al Qaeda. *See* Averment generally. Plaintiffs' Averment also shows how the support provided to al Qaeda by these parties allowed al Qaeda to acquire the strike capabilities needed to carry out the 9/11 attacks. *See* Averment ¶¶ 53-132. Plaintiffs need not prove that the donation or transaction at issue was traced to the terrorist plot or the attack itself.<br><br>By way of further response, jurisdictional discovery did not encompass WAMY. As set forth in Section III, Jurisdictional Discovery, *see* Averment ¶¶ 15, 16, and 20, Plaintiffs agreed to limit their jurisdictional discovery to Al Haramain, IIRO, and the Muwafaq Foundation. Recall that in 2021, ARB represented to the Court that its archived files were not properly indexed and that files originating before 2015 were not digitally searchable, making any search of their physical files for responsive records unduly burdensome. ARB further argued that searches of the archived files for documents responsive to Plaintiffs' discovery would impose massive costs upon the defendant. The Court considered that argument and directed the parties to meet and confer on "an acceptable program of discovery" that accommodated ARB's burden claims. *See* November 22, 2021 Order (ECF No. 7378) at 22. Accordingly, Plaintiffs' jurisdictional discovery requests only encompassed Al Haramain, IIRO, and Muwaffaq Foundation as a means to addressing ARB's purported burden claims, as directed by the Court. |
| ***5. Muslim World League*** | No response necessary. |
| 73. Before the 9/11 Attacks, Muslim World League was not designated under any sanctions regime for connections to terrorism. *See* ARB Ex. 28 (Winer Dep. Tr.) at 57:8-12 ("To the best of my knowledge, there were no charities of any kind that I recollect that had been designated prior to 9/11 because terrorist designations were originally limited to terrorist organizations."); ARB Ex. 93 (Kohlmann Dep. Tr.) at 126:12-13, 130:21-131:2 (testifying that charity designations only began after 9/11 and that he had not identified any Al Rajhi Bank transactions violating sanctions or designations, because "once the designation has been issued," it becomes | As ARB is aware, jurisdictional discovery did not encompass the MWL. As set forth in Section III, Jurisdictional Discovery, *see* Averment ¶¶ 15, 16, and 20, Plaintiffs agreed to limit their jurisdictional discovery to Al Haramain, IIRO, and the Muwafaq Foundation. Recall that in 2021, ARB represented to the Court that its archived files were not properly indexed and that files originating before 2015 were not digitally searchable, making any search of their physical files for responsive records unduly burdensome. ARB further argued that searches of the archived files for documents responsive to Plaintiffs' discovery would impose massive costs upon the defendant. The Court considered that argument and directed |

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

| | |
|---|---|
| "impossible to open an account under that [designated] person's name"). | the parties to meet and confer on "an acceptable program of discovery" that accommodated ARB's burden claims. *See* November 22, 2021 Order (ECF No. 7378) at 22. Accordingly, Plaintiffs' jurisdictional discovery requests only encompassed Al Haramain, IIRO, and Muwaffaq Foundation as a means to addressing ARB's purported burden claims, as directed by the Court.<br><br>By way of further response, it is not disputed that the MWL was not designated prior to the 9/11 attacks for connections to terrorism. Plaintiffs' experts have been clear that the designation process for terrorist sanctioning was in its infancy during the Clinton Administration, and the Executive Order 13224 sanctions regime targeting charities for terrorism related offenses did not exist prior to the September 11, 2001 attacks. *See* Pls. Ex. 12, Transcript, January 12, 2024 Deposition of Jonathan M. Winer at 57:14-25 (testifying that the "designation process for sanctioning was in its infancy" during the Clinton administration, and that any charity designations happened after 9/11); 58:8-13 (testifying that there were no designations of charities prior to 9/11 in part because the U.S. had undertaken other actions, which included direct discussions between the U.S. and Saudi Arabia).<br><br>To the extent that ARB asserts that the failure to designate demonstrates that ARB, Suleiman al Rajhi, and members of the al Rajhi family were not aware of the MWL's connections to, and financial support for, al Qaeda and associated terrorist organizations, prior to the 9/11 attacks, that is disputed.<br><br>To the contrary, the evidence surveyed in the Corrected Averment shows that ARB, Suleiman al Rajhi, and the Bank's senior officials were quintessential insiders, operating at the very center of al Qaeda's financial and logistical support structure during the critical period leading up to the September 11, 2001 attacks. They maintained high-level contacts with the MWL, and were well aware of MWL's terrorist nature at all relevant times. *See* Averment generally.<br><br>Further, the MWL is the parent organization to the IIRO. The IIRO was founded in 1978 to serve as the operational arm of the MWL. *See* Averment ¶ 114; Pls. Ex. 38, Kohlmann Report at 17. By virtue of the MWL's relationship with the IIRO, Suleiman al Rajhi's extensive contacts with the MWL and IIRO and his close relationships with high-ranking officials of those organizations, public media reporting available to ARB prior to the 9/11 attacks concerning IIRO's involvement in supporting terrorism and Osama bin Laden, public media reporting available to ARB linking the IIRO to the 1998 U.S. Embassy bombings in Kenya and Tanzania, public designations of IIRO branch offices and officials (Wa'el |

| | |
|---|---|
| | Jelaidan and Abd al Hamid Sulaiman Mujil), and other evidence, ARB, Suleiman al Rajhi, and al Rajhi family members were aware of the MWL's connections to, and financial support for, al Qaeda and associated terrorist organizations, both prior to and after the 9/11 attacks. *See, e.g.*, Plaintiffs' responses to Nos. 59, 60, 62, 63. |
| | Notwithstanding the public information available to ARB, Suleiman al Rajhi, and members of the al Rajhi family detailing the MWL's and IIRO's support for Islamic extremism, Osama bin Laden, and al Qaeda, Suleiman al Rajhi was simultaneously sending significant sums of money to the MWL. *See, e.g.*, Pls. Ex. 29 (Galloway Exhibit 22), NL 15044-10546 at 15046 (2,215,000 SR payment to the "Muslim World League" in 1999). *See also* Averment ¶¶ 420, 552. |
| | Moreover, ARB maintained accounts for the MWL at a time when it was providing funding and logistical support to al Qaeda. *See* Averment ¶ 218. |
| 74.  After the 9/11 Attacks, Muslim World League was not designated under any sanctions regime for connections to terrorism. *See generally* ARB Ex. 59 (Office of Foreign Assets Control, Specially Designated Nationals and Blocked Persons List, U.S. Dept. of Treas. (May 3, 2024), https://www.treasury.gov/ofac/downloads/sdnlist.pdf). | As ARB is aware, jurisdictional discovery did not encompass the MWL. As set forth in Section III, Jurisdictional Discovery, *see* Averment ¶¶ 15, 16, and 20, Plaintiffs agreed to limit their jurisdictional discovery to Al Haramain, IIRO, and the Muwafaq Foundation. Recall that in 2021, ARB represented to the Court that its archived files were not properly indexed and that files originating before 2015 were not digitally searchable, making any search of their physical files for responsive records unduly burdensome. ARB further argued that searches of the archived files for documents responsive to Plaintiffs' discovery would impose massive costs upon the defendant. The Court considered that argument and directed the parties to meet and confer on "an acceptable program of discovery" that accommodated ARB's burden claims. *See* November 22, 2021 Order (ECF No. 7378) at 22. Accordingly, Plaintiffs' jurisdictional discovery requests only encompassed Al Haramain, IIRO, and Muwaffaq Foundation as a means to addressing ARB's purported burden claims, as directed by the Court. |
| | By way of further response, it is not disputed that the MWL was not designated after the 9/11 attacks for connections to terrorism. Importantly, however, the evaluation of whether formal designation of a particular terror sponsor, or other possible action, would best serve U.S. national security interests following the 9/11 attacks involved a range of equities, including foreign policy, intelligence, diplomatic, law enforcement, and many other considerations. *See* Pls. Ex. 96, *Terrorism Financing: Origination, Organization, and Prevention*, Hearing Before the Committee on Governmental Affairs United States Senate (July 31, 2003), at 11 (R. Richard |

| | |
|---|---|
| | Newcomb, Director of the Office of Foreign Assets Control ("OFAC"), stating that all of the equities of the government come to the table, including law enforcement, intelligence, diplomatic, and military, among others). In addressing Saudi-based threats to U.S. national security in particular, U.S. policymakers broadly determined that pursuing cooperation and joint action with the Saudi government was critical to advancing the United States' overarching counterterrorism objectives, precisely because of the nature and scope of the problem emanating from Saudi Arabia. Accordingly, this policy approach often led U.S. officials to defer or delay formal designations or other actions against Saudi-based terror financiers and sponsors, as in the case of the MWL, and others. *See* Averment ¶¶ 192-194. *See also* Pls. Ex. 171, Transcript, January 11, 2024 Deposition of Evan F. Kohlmann at 125:15-17 ("A designation is usually the result of many years of investigation and information gathering."). |
| | To the extent that ARB asserts that the failure to designate demonstrates that ARB, Suleiman al Rajhi, and members of the al Rajhi family were not aware of the MWL's connections to, and financial support for, al Qaeda and associated terrorist organizations, prior to the 9/11 attacks, that is disputed. *See, e.g.*, Plaintiffs' responses to Nos. 59, 60, 62, 63, 73. |
| | Finally, to the extent that ARB argues that the absence of any designation is equivalent to a finding that the person or entity is innocent of terrorism charges, that is baseless and disputed. *See, e.g.*, Pls. Ex. 12, Transcript, January 12, 2024 Deposition of Jonathan M. Winer at 167:2-10 ("I've been involved in designation processes and I have pushed for the designation of people in certain cases who in my opinion should have been designated and where there was absolutely sufficient objective evidence well beyond including evidence that they participated in terrorist activity, who are not designated for policy reasons of various kinds, not one, but multiple different kinds of policy reasons."). |
| 75. MWL was a government-licensed organization in Saudi Arabia. ARB Ex. 24 (Jan. 4, 2004 (Hijri) Ltr. from Al Rajhi Bank Gen. Mngr. to Gov. of SAMA) at ARB-14545 (stating the Bank's understanding that MWL was "licensed according to an implicit approval by His Royal Highness Deputy Prime Minister," dated January 28, 1979); *see also* ARB Ex. 1 (Dean Report) at 8 (describing the widespread recognition of MWL for good works and humanitarian efforts). | Disputed to the extent ARB intended to suggest that discovery shows that ARB verified the MWL's licensing status when opening and operating accounts. As ARB is aware, jurisdictional discovery did not encompass the MWL. As set forth in Section III, Jurisdictional Discovery, *see* Averment ¶¶ 15, 16, and 20, Plaintiffs agreed to limit their jurisdictional discovery to Al Haramain, IIRO, and the Muwafaq Foundation. Recall that in 2021, ARB represented to the Court that its archived files were not properly indexed and that files originating before 2015 were not digitally searchable, making any search of their physical files for responsive records unduly burdensome. ARB further argued that searches of the archived files for documents responsive to Plaintiffs' discovery would |

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

| | |
|---|---|
| | impose massive costs upon the defendant. The Court considered that argument and directed the parties to meet and confer on "an acceptable program of discovery" that accommodated ARB's burden claims. *See* November 22, 2021 Order (ECF No. 7378) at 22. Accordingly, Plaintiffs' jurisdictional discovery requests only encompassed Al Haramain, IIRO, and Muwaffaq Foundation as a means to addressing ARB's purported burden claims, as directed by the Court. |
| | By way of further response, ARB's Branch Instruction Manual ("ARB Manual"), issued January 1, 1997, at Section 1:3:6:3, specifically requires that any charity organization that collects donations and wants to open an account at ARB must provide a license from the Saudi government authorizing it to open the account and collect donations. *See* Pls. Ex. 188, ARB 16-734 at 172 ("A copy of the license issued by the authorities in the Kingdom of Saudi Arabia (the Ministry of Interior, the Emirate, or the Social Affairs Department for example) approving opening the account and collecting donations."). ARB cites to a January 4, 2004 letter at ARB 14545 indicating that the MWL may have been "licensed" on January 28, 1979 (25 years earlier), but that alleged license has never been produced by ARB. In fact, not a single license that meets the requirements of ARB Manual Section 1:3:6:3 has been produced for the MWL for the time period between January 28, 1979 and the January 4, 2004 letter. |
| | To the extent MWL was licensed, that fact is immaterial, given the evidence showing ARB's awareness of its role in supporting al Qaeda and connections to terrorism. |
| 76.  Plaintiffs have no evidence of public reporting or other media statements before September 11, 2001, connecting the Muslim World League to Al Qaeda. *See, e.g.*, Pls. Aver. § V (discussing Al Qaeda's "pre-9/11 funding," but presenting no evidence of any pre-9/11 public reporting connecting MWL to Al Qaeda); Pls. Ex. 4 (Winer Report) at § 4 (discussing "incidents involving charities and terrorist financing/crime pre-9/11," but presenting no evidence of any pre-9/11 public reporting connecting MWL to Al Qaeda); Pls. Ex. 38 (Kohlmann Report) at 17, 28 (discussing MWL but presenting no evidence of any pre-9/11 public reporting connecting MWL to Al Qaeda). | As ARB is aware, jurisdictional discovery did not encompass the MWL. As set forth in Section III, Jurisdictional Discovery, *see* Averment ¶¶ 15, 16, and 20, Plaintiffs agreed to limit their jurisdictional discovery to Al Haramain, IIRO, and the Muwafaq Foundation. Recall that in 2021, ARB represented to the Court that its archived files were not properly indexed and that files originating before 2015 were not digitally searchable, making any search of their physical files for responsive records unduly burdensome. ARB further argued that searches of the archived files for documents responsive to Plaintiffs' discovery would impose massive costs upon the defendant. The Court considered that argument and directed the parties to meet and confer on "an acceptable program of discovery" that accommodated ARB's burden claims. *See* November 22, 2021 Order (ECF No. 7378) at 22. Accordingly, Plaintiffs' jurisdictional discovery requests only encompassed Al Haramain, IIRO, and Muwaffaq Foundation as a means to addressing ARB's purported burden claims, as directed by the Court. |

By way of further response, Plaintiffs have identified a number of public media reports issued prior to 9/11 reporting on the IIRO's global support for terrorism, while operating as the MWL's operational arm. *See* Plaintiffs' response to No. 63, including the following: (1) Gulf News, *Orphanages in Southern Philippines Under Probe*, February 10, 2001 (reporting that the MWL's IIRO was financing Muslim orphanages in the southern Philippines associated with Osama bin Laden and are being investigated as possible conduits for terrorist funding); (2) The Straits Times, *Osama Gave Funds to Abu Sayyaf: Manila*, August 10, 2000 (reporting that that a member of Abu Sayyaf Group explained that the IIRO, which "worked under the Muslim World League," was set up to serve as a front for funding extremist groups); (3) Philippine Daily Inquirer, *Front Page: Gemma Linked to Bin Laden Group Funding Sayyaf, MILF*, August 10, 2000 (reporting that the IIRO, "which works under the Muslim World League, is a front to finance the operations of the Abu Sayyaf Group and Moro Islamic Liberation Front terrorist organizations); (4) Philippine Daily Inquirer, *Front Page: Bin Laden Funds Abu Sayyaf Through Muslim Relief Group*, August 9, 2000 (reporting that the MWL's IIRO is a conduit of funds for the Abu Sayyaf Group terrorist organization in the Philippines, Osama bin Laden, and Mohammed Jamal Khalifa); and (5) Japan Economic Newswire, *Bin Laden Providing Money, Military Aid to MILF: Report*, February 13, 1999 (reporting that the IIRO, "a local branch of the Jeddah-based social agency of the Muslim World League," and Mohammed Jamal Khalifa "is instrumental in funneling funds to MILF and the extremist Abu Sayyaf Group," and further stating that the "IIRO is suspected by Western intelligence agencies to be bin Laden's conduit to various terrorist organizations in Islamic countries").

Moreover, the MWL has for many years published and distributed numerous booklets, newsletters, and periodicals in multiple languages, including English and Arabic, that have focused on the proselytization of Saudi Arabia's (and al Qaeda's) Wahhabi Islamist ideology. In this respect, the MWL publications have promoted a hardline Wahhabi creed, including overt support for violent jihad and calling on Muslims to "commit to sacrificing their souls, money, family members, and children for the sake of Allah." *See* Plaintiffs' Corrected Averment of Facts and Evidence, ECF No. 9541-1, at ¶¶ 2022-2013 (citing several pre-9/11 editions of the MWL's publications – the Muslim World League Journal and Al Alam Al Isami – advocating for violent jihad and requesting donations for weapons and ammunition).

~~UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS~~

| | |
|---|---|
| 77. Plaintiffs have no evidence that, before the 9/11 Attacks, Al Rajhi Bank knew that Muslim World League had any connection to Al Qaeda or any form of terrorism against the United States, including the 9/11 Attacks. *See, e.g.*, Pls. Aver. § VI (discussing pre-9/11 financial services provided by the Bank to the Charities, but presenting no evidence that the Bank had any knowledge before 9/11 of any alleged connection between MWL and Al Qaeda or terrorism against the United States); Pls. Ex. 4 (Winer Report) at § 7 (discussing purported "relationship" between MWL and the Bank, but presenting no evidence that the Bank had any knowledge before 9/11 of any alleged connection between MWL and Al Qaeda or terrorism against the United States); Pls. Ex. 38 (Kohlmann Report) at 17, 28 (discussing MWL but presenting no evidence that the Bank had any knowledge before 9/11 of any alleged connection between MWL or terrorism against the United States). | Disputed. As ARB is aware, jurisdictional discovery did not encompass the MWL. As set forth in Section III, Jurisdictional Discovery, *see* Averment ¶¶ 15, 16, and 20, Plaintiffs agreed to limit their jurisdictional discovery to Al Haramain, IIRO, and the Muwafaq Foundation. Recall that in 2021, ARB represented to the Court that its archived files were not properly indexed and that files originating before 2015 were not digitally searchable, making any search of their physical files for responsive records unduly burdensome. ARB further argued that searches of the archived files for documents responsive to Plaintiffs' discovery would impose massive costs upon the defendant. The Court considered that argument and directed the parties to meet and confer on "an acceptable program of discovery" that accommodated ARB's burden claims. *See* November 22, 2021 Order (ECF No. 7378) at 22. Accordingly, Plaintiffs' jurisdictional discovery requests only encompassed Al Haramain, IIRO, and Muwaffaq Foundation as a means to addressing ARB's purported burden claims, as directed by the Court.

By way of further response, *see* Plaintiffs' responses to Nos. 59, 60, 62, 63, 73, 74. In addition, ARB and its principals were expressly aware of the MWL's involvement in supporting al Qaeda and terrorism by virtue of Suleiman al Rajhi's extensive contacts with the MWL and IIRO and his close relationships with MWL Secretary General Dr. Abdullah bin Saleh al Obaid, MWL Secretary General Dr. Ahmed Mohamed Ali, MWL Secretary General Abdullah Omar al Naseef, IIRO Secretary General Adnan Basha, IIRO Secretary General Dr. Farid Yasin Qurashi, and other MWL and IIRO officials. *See also* Averment ¶¶ 46, 395, 551, 555-557.

Further, By way of further response, the evidence surveyed in the Corrected Averment shows that ARB, Suleiman al Rajhi, and the Bank's senior officials were quintessential insiders, operating at the very center of al Qaeda's financial and logistical support structure during the critical period leading up to the September 11, 2001 attacks. They maintained high-level contacts with the MWL, and were well aware of MWL's terrorist nature at all relevant times. *See* Averment generally.

Moreover, CIA reporting describes the MWL's support for Osama bin Laden and al Qaeda, how al Qaeda members served in official roles with the MWL, and how they used those positions in the MWL and IIRO as cover to divert money to al Qaeda. *See, e.g.*, Ex. Ex. 45, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 150 ("Some reporting indicated the MWL is the parent organization of the International Islamic Relief Organization (IIRO) and the World Assembly of Muslim Youth (WAMY), |

| | |
|---|---|
| | is affiliated with more than a dozen other NGOs worldwide, and has its own offices in more than 30 countries. Several of Bin Ladin's associates, including Wa'il Julaydan and Muhammad Jamal Khalifah, were MWL representatives, according to [REDACTED] press reporting. [REDACTED] funds destined for al-Ittihad al-Islamiyya (AIAI) in Somalia were funneled through several Saudi NGOs, including MWL."); Pls. Ex. 55, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 210 ("The availability of funds, cover, and logistics networks makes NGOs an appealing resource for terrorist groups. NGOs typically are awash in money – the Muslim World League's budget is more than $26 million annually, and the annual budget of the International Islamic Relief Organization has never dipped below $50 million – and tapping into the funds offers terrorist some independence from traditional state sponsors, who often attempt to control such groups for their own purposes. The logistical support NGOs offer includes cover employment, false documentation, travel facilitation, training, and in some cases, weapons."); Pls. Ex. 66, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 823 (stating that the MWL was "used as a cover organization for several of Usama's associates: [REDACTED]."); Pls. Ex. 80, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 544 ("*Wa'el Hama A. Julaydan.* Longtime Bin Ladin associate and IFTSC senior official *Wa'el Hamza Julaydan* (alias Abu Hasan al-Madani), a veteran of the Islamic charity circuit, has held high-level positions at the International Islamic Relief Organization (IIRO), Muslim World League (MWL), the Saudi Joint Relief Committee (SJRC), the Saudi Red Crescent Society (SRCS), and lately at two Bin Ladin-affiliated charities, al-Waqf al-Islami, and as secretary general of Rabita Trust coordinating financial activities and overseeing the budget. Julaydan has provided support since the 1990s to Muslims in Bosnia and Chechnya – hotbeds of mujahidin activity – and may be using his position and influence at these organizations to divert funds and resources to al-Qa'ida."). *See also* Averment ¶¶ 72, 123, 125, 226. |
| 78. Plaintiffs have no evidence tracing any transaction from MWL made through Al Rajhi Bank to the financing, planning, or carrying out of terrorism against the United States, including the 9/11 Attacks. *See, e.g.*, Pls. Aver. §§ X, XI (failing to trace any transaction through Al Rajhi Bank to planning, carrying out, or financing the 9/11 Attacks); Pls. Ex. 4 (Winer Report) at § 11 (same). | Disputed. ARB's claim that there is no evidence that any donation or transaction by Suleiman al Rajhi, members of the al Rajhi family, Suleiman al Rajhi's charity committee/foundation, or others conducted through the Bank has been traced or connected to the planning or carrying out of terrorism against the United States, including the 9/11 attacks themselves, is inaccurate and misleading.

ARB, Suleiman al Rajhi, members of the al Rajhi, and others were witting supporters of Osama bin Laden and al Qaeda for |

| | more than a decade leading up to the 9/11 attacks, and were specifically aware of al Qaeda's mission and intent to attack the United States. Intending to foster al Qaeda's terrorist agenda, they provided substantial financial assistance to al Qaeda charity and business fronts and other intermediaries through the Bank, knowing that the funds would be received by Osama bin Laden and al Qaeda. *See* Averment generally. Plaintiffs' Averment also shows how the support provided to al Qaeda by these parties allowed al Qaeda to acquire the strike capabilities needed to carry out the 9/11 attacks. *See* Averment ¶¶ 53-132. Plaintiffs need not prove that the donation or transaction at issue was traced to the terrorist plot or the attack itself. |
|---|---|
| | By way of further response, jurisdictional discovery did not encompass the MWL. As set forth in Section III, Jurisdictional Discovery, *see* Averment ¶¶ 15, 16, and 20, Plaintiffs agreed to limit their jurisdictional discovery to Al Haramain, IIRO, and the Muwafaq Foundation. Recall that in 2021, ARB represented to the Court that its archived files were not properly indexed and that files originating before 2015 were not digitally searchable, making any search of their physical files for responsive records unduly burdensome. ARB further argued that searches of the archived files for documents responsive to Plaintiffs' discovery would impose massive costs upon the defendant. The Court considered that argument and directed the parties to meet and confer on "an acceptable program of discovery" that accommodated ARB's burden claims. *See* November 22, 2021 Order (ECF No. 7378) at 22. Accordingly, Plaintiffs' jurisdictional discovery requests only encompassed Al Haramain, IIRO, and Muwaffaq Foundation as a means to addressing ARB's purported burden claims, as directed by the Court. |
| ***6. Saudi Joint Relief Committee For Kosovo And Chechnya*** | No response necessary. |
| 79. Before the 9/11 Attacks, the Saudi Joint Relief Committee for Kosovo and Chechnya was not designated under any sanctions regime for connections to terrorism. *See* ARB Ex. 28 (Winer Dep. Tr.) at 57:8-12 ("To the best of my knowledge, there were no charities of any kind that I recollect that had been designated prior to 9/11 because terrorist designations were originally limited to terrorist organizations."); ARB Ex. 93 (Kohlmann Dep. Tr.) at 126:12-13, 130:21-131:2 and Errata at 131:1 (testifying that charity designations only began after 9/11 and that he had not identified any Al Rajhi Bank transactions violating sanctions or designations, because "once the designation has been issued," it becomes "impossible to open an account under that [designated] person's name"). | As ARB is aware, jurisdictional discovery did not encompass the SJRC. As set forth in Section III, Jurisdictional Discovery, *see* Averment ¶¶ 15, 16, and 20, Plaintiffs agreed to limit their jurisdictional discovery to Al Haramain, IIRO, and the Muwafaq Foundation. Recall that in 2021, ARB represented to the Court that its archived files were not properly indexed and that files originating before 2015 were not digitally searchable, making any search of their physical files for responsive records unduly burdensome. ARB further argued that searches of the archived files for documents responsive to Plaintiffs' discovery would impose massive costs upon the defendant. The Court considered that argument and directed the parties to meet and confer on "an acceptable program of discovery" that accommodated ARB's burden claims. *See* November 22, 2021 Order (ECF No. 7378) at 22. Accordingly, |

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

Plaintiffs' jurisdictional discovery requests only encompassed Al Haramain, IIRO, and Muwaffaq Foundation as a means to addressing ARB's purported burden claims, as directed by the Court.

By way of further response, it is not disputed that the SJRC was not designated prior to the 9/11 attacks for connections to terrorism. Plaintiffs' experts have been clear that the designation process for terrorist sanctioning was in its infancy during the Clinton Administration, and the Executive Order 13224 sanctions regime targeting charities for terrorism related offenses did not exist prior to the September 11, 2001 attacks. *See* Pls. Ex. 12, Transcript, January 12, 2024 Deposition of Jonathan M. Winer at 57:14-25 (testifying that the "designation process for sanctioning was in its infancy" during the Clinton administration, and that any charity designations happened after 9/11); 58:8-13 (testifying that there were no designations of charities prior to 9/11 in part because the U.S. had undertaken other actions, which included direct discussions between the U.S. and Saudi Arabia).

To the extent that ARB asserts that the failure to designate demonstrates that ARB, Suleiman al Rajhi, and members of the al Rajhi family were not aware of the SJRC's connections to, and financial support for, al Qaeda and associated terrorist organizations, prior to the 9/11 attacks, that is disputed.

To the contrary, the evidence surveyed in the Corrected Averment shows that ARB, Suleiman al Rajhi, and the Bank's senior officials were quintessential insiders, operating at the very center of al Qaeda's financial and logistical support structure during the critical period leading up to the September 11, 2001 attacks. They maintained high-level contacts with the charities, and were well aware of the charities' terrorist nature at all relevant times. *See* Averment generally.

The SJRC was established on May 19, 1999, pursuant to High Order 7/B/1863 (the "Albanian High Order"), issued by King Fahd bin Abdulaziz. *See* Declaration of Dr. Abdulrahman A. Al-Suwailem at ¶ 3 (ECF No. 631-3). In accordance with that Order, the SJRC was endowed with the responsibility for collecting and distributing aid to Albanian refugees from Kosovo. *See* Albanian High Order at ECF No 631-5. The SJRC included representatives from Al Haramain, IIRO, and WAMY. *Id.* As set forth in Plaintiffs' responses to Nos. 42-65 and 67-78, ARB, Suleiman al Rajhi, and members of the al Rajhi family were expressly aware of those charities' connections to, and financial support for, al Qaeda and associated terrorist organizations, prior to the 9/11 attacks. Accordingly, given their intimate involvement in the operations and activities of the SJRC, ARB and Suleiman al

| | |
|---|---|
| | Rajhi, and members of the al Rajhi family were also aware of the SJRC's support for al Qaeda.<br><br>Moreover, ARB maintained accounts for the SJRC at a time when it was providing funding and logistical support to al Qaeda. *See* Averment ¶ 218. |
| 80. After the 9/11 Attacks, the SJRC was not designated under any sanctions regime for connections to terrorism. *See generally* ARB Ex. 59 (Office of Foreign Assets Control, Specially Designated Nationals and Blocked Persons List, U.S. Dept. of Treas. (May 3, 2024), https://www.treasury.gov/ofac/downloads/sdnlist.pdf). | As ARB is aware, jurisdictional discovery did not encompass the SJRC. As set forth in Section III, Jurisdictional Discovery, *see* Averment ¶¶ 15, 16, and 20, Plaintiffs agreed to limit their jurisdictional discovery to Al Haramain, IIRO, and the Muwafaq Foundation. Recall that in 2021, ARB represented to the Court that its archived files were not properly indexed and that files originating before 2015 were not digitally searchable, making any search of their physical files for responsive records unduly burdensome. ARB further argued that searches of the archived files for documents responsive to Plaintiffs' discovery would impose massive costs upon the defendant. The Court considered that argument and directed the parties to meet and confer on "an acceptable program of discovery" that accommodated ARB's burden claims. *See* November 22, 2021 Order (ECF No. 7378) at 22. Accordingly, Plaintiffs' jurisdictional discovery requests only encompassed Al Haramain, IIRO, and Muwaffaq Foundation as a means to addressing ARB's purported burden claims, as directed by the Court.<br><br>By way of further response, it is not disputed that the SJRC was not designated after the 9/11 attacks for connections to terrorism. Importantly, however, the evaluation of whether formal designation of a particular terror sponsor, or other possible action, would best serve U.S. national security interests following the 9/11 attacks involved a range of equities, including foreign policy, intelligence, diplomatic, law enforcement, and many other considerations. *See* Pls. Ex. 96, *Terrorism Financing: Origination, Organization, and Prevention*, Hearing Before the Committee on Governmental Affairs United States Senate (July 31, 2003), at 11 (R. Richard Newcomb, Director of the Office of Foreign Assets Control ("OFAC"), stating that all of the equities of the government come to the table, including law enforcement, intelligence, diplomatic, and military, among others). In addressing Saudi-based threats to U.S. national security in particular, U.S. policymakers broadly determined that pursuing cooperation and joint action with the Saudi government was critical to advancing the United States' overarching counterterrorism objectives, precisely because of the nature and scope of the problem emanating from Saudi Arabia. Accordingly, this policy approach often led U.S. officials to defer or delay formal designations or other actions against Saudi-based terror financiers and sponsors, as in the case of the MWL, and others. |

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

| | |
|---|---|
| | *See* Averment ¶¶ 192-194. *See also* Pls. Ex. 171, Transcript, January 11, 2024 Deposition of Evan F. Kohlmann at 125:15-17 ("A designation is usually the result of many years of investigation and information gathering."). |
| | To the extent that ARB asserts that the failure to designate demonstrates that ARB, Suleiman al Rajhi, and members of the al Rajhi family were not aware of the SJRC's connections to, and financial support for, al Qaeda and associated terrorist organizations, prior to the 9/11 attacks, that is disputed. |
| | To the contrary, the evidence surveyed in the Corrected Averment shows that ARB, Suleiman al Rajhi, and the Bank's senior officials were quintessential insiders, operating at the very center of al Qaeda's financial and logistical support structure during the critical period leading up to the September 11, 2001 attacks. They maintained high-level contacts with the charities, and were well aware of the charities' terrorist nature at all relevant times. *See* Averment generally. |
| | As previously explained, Al Haramain, IIRO, and WAMY were tasked by the Saudi government to assist with the operations and activities of the SJRC. Following the 9/11 attacks, numerous branch offices of Al Haramain and IIRO, including certain high-ranking officials of both organizations were designated by the United States, Saudi Arabia, and the United Nations for their extensive support to Osama bin Laden and al Qaeda. *See, e.g.*, Averment ¶¶ 21, 71, 73, 75-90, 112, 115, 117, 118, 122, 124, 226, 235, 238, 240. Accordingly, given those charities' intimate involvement in the operations and activities of the SJRC, ARB and Suleiman al Rajhi, and members of the al Rajhi family were also aware of the SJRC's support for al Qaeda. |
| | Finally, to the extent that ARB argues that the absence of any designation is equivalent to a finding that the person or entity is innocent of terrorism charges, that is baseless and disputed. *See, e.g.*, Pls. Ex. 12, Transcript, January 12, 2024 Deposition of Jonathan M. Winer at 167:2-10 ("I've been involved in designation processes and I have pushed for the designation of people in certain cases who in my opinion should have been designated and where there was absolutely sufficient objective evidence well beyond including evidence that they participated in terrorist activity, who are not designated for policy reasons of various kinds, not one, but multiple different kinds of policy reasons."). |
| 81. SJRC was a government-licensed organization in Saudi Arabia. ARB Ex. 24 (Jan. 4, 2004 (Hijri) Ltr. from Al Rajhi Bank Gen. Mngr. to Gov. of SAMA) at ARB-14545 (stating | Disputed to the extent ARB intended to suggest that discovery shows that ARB verified the SJRC's licensing status when opening and operating accounts. As ARB is aware, jurisdictional discovery did not encompass the SJRC. As set |

| | |
|---|---|
| the Bank's understanding that SJRC was licensed to a royal decree and royal order, dated November 9, 1999). | forth in Section III, Jurisdictional Discovery, *see* Averment ¶¶ 15, 16, and 20, Plaintiffs agreed to limit their jurisdictional discovery to Al Haramain, IIRO, and the Muwafaq Foundation. Recall that in 2021, ARB represented to the Court that its archived files were not properly indexed and that files originating before 2015 were not digitally searchable, making any search of their physical files for responsive records unduly burdensome. ARB further argued that searches of the archived files for documents responsive to Plaintiffs' discovery would impose massive costs upon the defendant. The Court considered that argument and directed the parties to meet and confer on "an acceptable program of discovery" that accommodated ARB's burden claims. *See* November 22, 2021 Order (ECF No. 7378) at 22. Accordingly, Plaintiffs' jurisdictional discovery requests only encompassed Al Haramain, IIRO, and Muwaffaq Foundation as a means to addressing ARB's purported burden claims, as directed by the Court.<br><br>By way of further response, ARB's Branch Instruction Manual ("ARB Manual"), issued January 1, 1997, at Section 1:3:6:3, specifically requires that any charity organization that collects donations and wants to open an account at ARB must provide a license from the Saudi government authorizing it to open the account and collect donations. *See* Pls. Ex. 188, ARB 16-734 at 172 ("A copy of the license issued by the authorities in the Kingdom of Saudi Arabia (the Ministry of Interior, the Emirate, or the Social Affairs Department for example) approving opening the account and collecting donations."). ARB cites to a January 4, 2004 letter at ARB 14545 indicating that the SJRC for the Muslims of Bosnia-Herzegovina and Somalia may have been "licensed" on June 3, 1992 (12 years earlier), and the SJRC for the Muslims of Kosovo and Chechnya may have been "licensed" on November 9, 1999 (5 years earlier), but those alleged licenses have never been produced by ARB. In fact, not a single license that meets the requirements of ARB Manual Section 1:3:6:3 has been produced for the SJRC for the time period between June 3, 1992 and the January 4, 2004 letter.<br><br>To the extent the SJRC was licensed, that fact is immaterial, given the evidence showing ARB's awareness of its role in supporting al Qaeda and connections to terrorism. |
| 82. Plaintiffs have no evidence of public reporting or other media statements before September 11, 2001, connecting the SJRC to Al Qaeda. *See, e.g.*, Pls. Aver. § V (discussing Al Qaeda's "pre-9/11 funding," but presenting no evidence of any pre-9/11 public reporting connecting SJRC to Al Qaeda); Pls. Ex. 4 (Winer Report) at § 4 (discussing "incidents involving charities and terrorist financing/crime pre-9/11," but | As ARB is aware, jurisdictional discovery did not encompass the SJRC. As set forth in Section III, Jurisdictional Discovery, *see* Averment ¶¶ 15, 16, and 20, Plaintiffs agreed to limit their jurisdictional discovery to Al Haramain, IIRO, and the Muwafaq Foundation. Recall that in 2021, ARB represented to the Court that its archived files were not properly indexed and that files originating before 2015 were not digitally searchable, |

presenting no evidence of any pre-9/11 public reporting connecting SJRC to Al Qaeda); Pls. Ex. 38 (Kohlmann Report) at 21, 30 (discussing SJRC but presenting no evidence of any pre-9/11 public reporting connecting SJRC to Al Qaeda).

making any search of their physical files for responsive records unduly burdensome. ARB further argued that searches of the archived files for documents responsive to Plaintiffs' discovery would impose massive costs upon the defendant. The Court considered that argument and directed the parties to meet and confer on "an acceptable program of discovery" that accommodated ARB's burden claims. *See* November 22, 2021 Order (ECF No. 7378) at 22. Accordingly, Plaintiffs' jurisdictional discovery requests only encompassed Al Haramain, IIRO, and Muwaffaq Foundation as a means to addressing ARB's purported burden claims, as directed by the Court.

By way of further response, *see* Pls. Ex. 4, Winer Report at 38, citing BBC News, *U.S. Fears Terrorist Attacks in Kosovo*, April 3, 2002 (reporting on the April 2000 raid of the SJRC due to concerns of a possible terrorist attacks on the U.S. office in the province). *See also* Pls. Ex. 38, Kohlmann Report at 21 ("In early 2000, IIRO's shared office in Kosovo with the Saudi Joint Relief Committee (SJRC) was raided in an attempt to thwart potential attacks on U.S. interests."). Mr. Kohlmann's report cites to FED-PEC 97363-97365, produced to ARB in this litigation, which is the April 3, 2002 BBC News article, *U.S. Fears Terrorist Attacks in Kosovo. See* FED-PEC 98363 ("U.S. security officials say they believe members of the SJRC are linked with Osama bin Laden, the man suspected of being behind the attacks on the U.S. embassies in Kenya and Tanzania."); *id.* at FED-PEC 98364 ("In a document seen by the BBC in Pristina, U.S. officials called on the U.N. police force in the province to undertake open surveillance of the group."); *id.* ("It claims Adel Muhammad Sadiq Bin Kazem and Wa'el Hamza Jalaidan, the [SJRC's] former Director, are 'associates of Osama bin Laden' and that Mr. Jalaidan helped Mr. bin Laden 'move money and men to and from the Balkans.'").

83. Plaintiffs have no evidence that, before the 9/11 Attacks, Al Rajhi Bank knew that the SJRC had any connection to Al Qaeda or any form of terrorism against the United States, including the 9/11 Attacks. *See, e.g.*, Pls. Aver. § VI (discussing pre-9/11 financial services provided by the Bank to the Charities, but presenting no evidence that the Bank had any knowledge before 9/11 of any alleged connection between SJRC and Al Qaeda or terrorism against the United States); Pls. Ex. 4 (Winer Report) at § 9 (discussing alleged SJRC "activities," but presenting no evidence that the Bank had any knowledge before 9/11 of any alleged connection between SJRC and Al Qaeda or terrorism against the United States); Pls. Ex. 38 (Kohlmann Report) at 21, 30 (discussing SJRC but presenting no evidence that the Bank had any knowledge

As ARB is aware, jurisdictional discovery did not encompass the SJRC. As set forth in Section III, Jurisdictional Discovery, *see* Averment ¶¶ 15, 16, and 20, Plaintiffs agreed to limit their jurisdictional discovery to Al Haramain, IIRO, and the Muwafaq Foundation. Recall that in 2021, ARB represented to the Court that its archived files were not properly indexed and that files originating before 2015 were not digitally searchable, making any search of their physical files for responsive records unduly burdensome. ARB further argued that searches of the archived files for documents responsive to Plaintiffs' discovery would impose massive costs upon the defendant. The Court considered that argument and directed the parties to meet and confer on "an acceptable program of discovery" that accommodated ARB's burden claims. *See* November 22, 2021 Order (ECF No. 7378) at 22. Accordingly,

| | |
|---|---|
| before 9/11 of any alleged connection between SJRC and Al Qaeda or terrorism against the United States). | Plaintiffs' jurisdictional discovery requests only encompassed Al Haramain, IIRO, and Muwaffaq Foundation as a means to addressing ARB's purported burden claims, as directed by the Court.

By way of further response, the evidence surveyed in the Corrected Averment shows that ARB, Suleiman al Rajhi, and the Bank's senior officials were quintessential insiders, operating at the very center of al Qaeda's financial and logistical support structure during the critical period leading up to the September 11, 2001 attacks. They maintained high-level contacts with the charities, and were well aware of the charities' terrorist nature at all relevant times. *See* Averment generally. |
| 84.  Plaintiffs have no evidence tracing any transaction from SJRC made through Al Rajhi Bank to the financing, planning, or carrying out of terrorism against the United States, including the 9/11 Attacks. *See, e.g.*, Pls. Aver. §§ X, XI (failing to trace any transaction through Al Rajhi Bank to planning, carrying out, or financing the 9/11 Attacks); Pls. Ex. 4 (Winer Report) at § 11 (same). | Disputed. ARB's claim that there is no evidence that any donation or transaction by Suleiman al Rajhi, members of the al Rajhi family, Suleiman al Rajhi's charity committee/foundation, or others conducted through the Bank has been traced or connected to the planning or carrying out of terrorism against the United States, including the 9/11 attacks themselves, is inaccurate and misleading.

ARB, Suleiman al Rajhi, members of the al Rajhi, and others were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and were specifically aware of al Qaeda's mission and intent to attack the United States. Intending to foster al Qaeda's terrorist agenda, they provided substantial financial assistance to al Qaeda charity and business fronts and other intermediaries through the Bank, knowing that the funds would be received by Osama bin Laden and al Qaeda. *See* Averment generally. Plaintiffs' Averment also shows how the support provided to al Qaeda by these parties allowed al Qaeda to acquire the strike capabilities needed to carry out the 9/11 attacks. *See* Averment ¶¶ 53-132. Plaintiffs need not prove that the donation or transaction at issue was traced to the terrorist plot or the attack itself.

By way of further response, jurisdictional discovery did not encompass the SJRC. As set forth in Section III, Jurisdictional Discovery, *see* Averment ¶¶ 15, 16, and 20, Plaintiffs agreed to limit their jurisdictional discovery to Al Haramain, IIRO, and the Muwafaq Foundation. Recall that in 2021, ARB represented to the Court that its archived files were not properly indexed and that files originating before 2015 were not digitally searchable, making any search of their physical files for responsive records unduly burdensome. ARB further argued that searches of the archived files for documents responsive to Plaintiffs' discovery would impose massive costs upon the defendant. The Court considered that argument |

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

| | |
|---|---|
| | and directed the parties to meet and confer on "an acceptable program of discovery" that accommodated ARB's burden claims. *See* November 22, 2021 Order (ECF No. 7378) at 22. Accordingly, Plaintiffs' jurisdictional discovery requests only encompassed Al Haramain, IIRO, and Muwaffaq Foundation as a means to addressing ARB's purported burden claims, as directed by the Court. |
| **7. Saudi High Commission For Bosnia-Herzegovina** | No response necessary. |
| 85.  Before the 9/11 Attacks, the Saudi High Commission for Bosnia-Herzegovina was not designated under any sanctions regime for connections to terrorism. *See* ARB Ex. 28 (Winer Dep. Tr.) at 57:8-12 ("To the best of my knowledge, there were no charities of any kind that I recollect that had been designated prior to 9/11 because terrorist designations were originally limited to terrorist organizations."); ARB Ex. 93 (Kohlmann Dep. Tr.) at 126:12-13, 130:21-131:2 (testifying that charity designations only began after 9/11 and that he had not identified any Al Rajhi Bank transactions violating sanctions or designations, because "once the designation has been issued," it becomes "impossible to open an account under that [designated] person's name"). | As ARB is aware, jurisdictional discovery did not encompass the SHC. As set forth in Section III, Jurisdictional Discovery, *see* Averment ¶¶ 15, 16, and 20, Plaintiffs agreed to limit their jurisdictional discovery to Al Haramain, IIRO, and the Muwaffaq Foundation. Recall that in 2021, ARB represented to the Court that its archived files were not properly indexed and that files originating before 2015 were not digitally searchable, making any search of their physical files for responsive records unduly burdensome. ARB further argued that searches of the archived files for documents responsive to Plaintiffs' discovery would impose massive costs upon the defendant. The Court considered that argument and directed the parties to meet and confer on "an acceptable program of discovery" that accommodated ARB's burden claims. *See* November 22, 2021 Order (ECF No. 7378) at 22. Accordingly, Plaintiffs' jurisdictional discovery requests only encompassed Al Haramain, IIRO, and Muwaffaq Foundation as a means to addressing ARB's purported burden claims, as directed by the Court.<br><br>By way of further response, it is not disputed that the SHC was not designated prior to the 9/11 attacks for connections to terrorism. Plaintiffs' experts have been clear that the designation process for terrorist sanctioning was in its infancy during the Clinton Administration, and the Executive Order 13224 sanctions regime targeting charities for terrorism related offenses did not exist prior to the September 11, 2001 attacks. *See* Pls. Ex. 12, Transcript, January 12, 2024 Deposition of Jonathan M. Winer at 57:14-25 (testifying that the "designation process for sanctioning was in its infancy" during the Clinton administration, and that any charity designations happened after 9/11); 58:8-13 (testifying that that there were no designations of charities prior to 9/11 in part because the U.S. had undertaken other actions, which included direct discussions between the U.S. and Saudi Arabia).<br><br>To the extent that ARB asserts that the failure to designate demonstrates that ARB, Suleiman al Rajhi, and members of the al Rajhi family were not aware of the SHC's connections to, and financial support for, al Qaeda and associated terrorist organizations, prior to the 9/11 attacks, that is disputed. ARB |

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

| | maintained accounts for the SHC at a time when it was providing funding and logistical support to al Qaeda. *See* Averment ¶ 218. |
|---|---|
| 86. After the 9/11 Attacks, the SHC was not designated under any sanctions regime for connections to terrorism. *See generally* ARB Ex. 59 (Office of Foreign Assets Control, Specially Designated Nationals and Blocked Persons List, U.S. Dept. of Treas. (May 3, 2024), https://www.treasury.gov/ofac/downloads/sdnlist.pdf). | As ARB is aware, jurisdictional discovery did not encompass the SHC. As set forth in Section III, Jurisdictional Discovery, *see* Averment ¶¶ 15, 16, and 20, Plaintiffs agreed to limit their jurisdictional discovery to Al Haramain, IIRO, and the Muwafaq Foundation. Recall that in 2021, ARB represented to the Court that its archived files were not properly indexed and that files originating before 2015 were not digitally searchable, making any search of their physical files for responsive records unduly burdensome. ARB further argued that searches of the archived files for documents responsive to Plaintiffs' discovery would impose massive costs upon the defendant. The Court considered that argument and directed the parties to meet and confer on "an acceptable program of discovery" that accommodated ARB's burden claims. *See* November 22, 2021 Order (ECF No. 7378) at 22. Accordingly, Plaintiffs' jurisdictional discovery requests only encompassed Al Haramain, IIRO, and Muwaffaq Foundation as a means to addressing ARB's purported burden claims, as directed by the Court.<br><br>By way of further response, it is not disputed that the SHC was not designated after the 9/11 attacks for connections to terrorism. Importantly, however, the evaluation of whether formal designation of a particular terror sponsor, or other possible action, would best serve U.S. national security interests following the 9/11 attacks involved a range of equities, including foreign policy, intelligence, diplomatic, law enforcement, and many other considerations. *See* Pls. Ex. 96, *Terrorism Financing: Origination, Organization, and Prevention*, Hearing Before the Committee on Governmental Affairs United States Senate (July 31, 2003), at 11 (R. Richard Newcomb, Director of the Office of Foreign Assets Control ("OFAC"), stating that all of the equities of the government come to the table, including law enforcement, intelligence, diplomatic, and military, among others). In addressing Saudi-based threats to U.S. national security in particular, U.S. policymakers broadly determined that pursuing cooperation and joint action with the Saudi government was critical to advancing the United States' overarching counterterrorism objectives, precisely because of the nature and scope of the problem emanating from Saudi Arabia. Accordingly, this policy approach often led U.S. officials to defer or delay formal designations or other actions against Saudi-based terror financiers and sponsors, as in the case of the MWL, and others. *See* Averment ¶¶ 192-194. *See also* Pls. Ex. 171, Transcript, January 11, 2024 Deposition of Evan F. Kohlmann at 125:15- |

~~UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS~~

| | |
|---|---|
| | 17 ("A designation is usually the result of many years of investigation and information gathering."). |
| | To the extent that ARB asserts that the failure to designate demonstrates that ARB, Suleiman al Rajhi, and members of the al Rajhi family were not aware of the SHC's connections to, and financial support for, al Qaeda and associated terrorist organizations, prior to the 9/11 attacks, that is disputed. |
| | To the contrary, the evidence surveyed in the Corrected Averment shows that ARB, Suleiman al Rajhi, and the Bank's senior officials were quintessential insiders, operating at the very center of al Qaeda's financial and logistical support structure during the critical period leading up to the September 11, 2001 attacks. They maintained high-level contacts with the charities, and were well aware of the charities' terrorist nature at all relevant times. *See* Averment generally. |
| | Finally, to the extent that ARB argues that the absence of any designation is equivalent to a finding that the person or entity is innocent of terrorism charges, that is baseless and disputed. *See, e.g.*, Pls. Ex. 12, Transcript, January 12, 2024 Deposition of Jonathan M. Winer at 167:2-10 ("I've been involved in designation processes and I have pushed for the designation of people in certain cases who in my opinion should have been designated and where there was absolutely sufficient objective evidence well beyond including evidence that they participated in terrorist activity, who are not designated for policy reasons of various kinds, not one, but multiple different kinds of policy reasons."). |
| 87. SHC was a government-licensed, charitable organization in Saudi Arabia. ARB Ex. 24 (Jan. 4, 2004 (Hijri) Ltr. from Al Rajhi Bank Gen. Mngr. to Gov. of SAMA) at ARB-14545 (stating the Bank's understanding that SHC was licensed under a royal decree, dated June 3, 1992). | Disputed to the extent ARB intended to suggest that discovery shows that ARB verified the SHC's licensing status when opening and operating accounts. As ARB is aware, jurisdictional discovery did not encompass the SHC. As set forth in Section III, Jurisdictional Discovery, *see* Averment ¶¶ 15, 16, and 20, Plaintiffs agreed to limit their jurisdictional discovery to Al Haramain, IIRO, and the Muwafaq Foundation. Recall that in 2021, ARB represented to the Court that its archived files were not properly indexed and that files originating before 2015 were not digitally searchable, making any search of their physical files for responsive records unduly burdensome. ARB further argued that searches of the archived files for documents responsive to Plaintiffs' discovery would impose massive costs upon the defendant. The Court considered that argument and directed the parties to meet and confer on "an acceptable program of discovery" that accommodated ARB's burden claims. *See* November 22, 2021 Order (ECF No. 7378) at 22. Accordingly, Plaintiffs' jurisdictional discovery requests only encompassed Al Haramain, IIRO, and Muwaffaq Foundation as a means to |

| | |
|---|---|
| | addressing ARB's purported burden claims, as directed by the Court. |
| | By way of further response, ARB's Branch Instruction Manual ("ARB Manual"), issued January 1, 1997, at Section 1:3:6:3, specifically requires that any charity organization that collects donations and wants to open an account at ARB must provide a license from the Saudi government authorizing it to open the account and collect donations. *See* Pls. Ex. 188, ARB 16-734 at 172 ("A copy of the license issued by the authorities in the Kingdom of Saudi Arabia (the Ministry of Interior, the Emirate, or the Social Affairs Department for example) approving opening the account and collecting donations."). ARB cites to a January 4, 2004 letter at ARB 14545 in support of its assertion that the SHC was a licensed charitable organization, but the SHC is not identified in the English translation to the letter. Nevertheless, not a single license that meets the requirements of ARB Manual Section 1:3:6:3 has been produced for the SHC. |
| | To the extent the SHC was licensed, that fact is immaterial, given the evidence showing ARB's awareness of its role in supporting al Qaeda and connections to terrorism. |
| 88. Plaintiffs have no evidence of public reporting or other media statements before September 11, 2001, connecting the Saudi High Commission for Bosnia-Herzegovina to Al Qaeda before September 11, 2001. *See, e.g.,* Pls. Aver. § V (discussing Al Qaeda's "pre-9/11 funding," but presenting no evidence of any pre-9/11 public reporting connecting SHC to Al Qaeda); Pls. Ex. 4 (Winer Report) at § 4 (discussing "incidents involving charities and terrorist financing/crime pre-9/11," but presenting no evidence of any pre-9/11 public reporting connecting SHC to Al Qaeda); Pls. Ex. 38 (Kohlmann Report) at 23 (discussing "Saudi High Commission" (presumably SHC) but presenting no evidence of any pre-9/11 public reporting connecting SHC to Al Qaeda). | Disputed that this matter was within the scope of discovery. As ARB is aware, jurisdictional discovery did not encompass the SHC. As set forth in Section III, Jurisdictional Discovery, *see* Averment ¶¶ 15, 16, and 20, Plaintiffs agreed to limit their jurisdictional discovery to Al Haramain, IIRO, and the Muwafaq Foundation. Recall that in 2021, ARB represented to the Court that its archived files were not properly indexed and that files originating before 2015 were not digitally searchable, making any search of their physical files for responsive records unduly burdensome. ARB further argued that searches of the archived files for documents responsive to Plaintiffs' discovery would impose massive costs upon the defendant. The Court considered that argument and directed the parties to meet and confer on "an acceptable program of discovery" that accommodated ARB's burden claims. *See* November 22, 2021 Order (ECF No. 7378) at 22. Accordingly, Plaintiffs' jurisdictional discovery requests only encompassed Al Haramain, IIRO, and Muwaffaq Foundation as a means to addressing ARB's purported burden claims, as directed by the Court. |
| 89. Plaintiffs have no evidence that, before the 9/11 Attacks, Al Rajhi Bank knew that Saudi High Commission for Bosnia-Herzegovina had any connection to Al Qaeda or any form of terrorism against the United States, including the 9/11 Attacks. *See, e.g.,* Pls. Aver. § VI (discussing pre-9/11 financial services provided by the Bank to the Charities, but presenting | Disputed. As ARB is aware, jurisdictional discovery did not encompass the SHC. As set forth in Section III, Jurisdictional Discovery, *see* Averment ¶¶ 15, 16, and 20, Plaintiffs agreed to limit their jurisdictional discovery to Al Haramain, IIRO, and the Muwafaq Foundation. Recall that in 2021, ARB represented to the Court that its archived files were not |

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

| | |
|---|---|
| no evidence that the Bank had any knowledge before 9/11 of any alleged connection between SHC and Al Qaeda or terrorism against the United States); Pls. Ex. 4 (Winer Report) at 58-59 (quoting CIA report stating that SHC had "questionable, though less direct ties" to Bin Laden, but presenting no evidence that the Bank had any knowledge before 9/11 of any alleged connection between SHC and Al Qaeda or terrorism against the United States); Pls. Ex. 38 (Kohlmann Report) at 23 (discussing "Saudi High Commission" (presumably SHC) but presenting no evidence that the Bank had any knowledge before 9/11 of any alleged connection between SHC and Al Qaeda or terrorism against the United States). | properly indexed and that files originating before 2015 were not digitally searchable, making any search of their physical files for responsive records unduly burdensome. ARB further argued that searches of the archived files for documents responsive to Plaintiffs' discovery would impose massive costs upon the defendant. The Court considered that argument and directed the parties to meet and confer on "an acceptable program of discovery" that accommodated ARB's burden claims. *See* November 22, 2021 Order (ECF No. 7378) at 22. Accordingly, Plaintiffs' jurisdictional discovery requests only encompassed Al Haramain, IIRO, and Muwaffaq Foundation as a means to addressing ARB's purported burden claims, as directed by the Court. |
| | Moreover, the evidence surveyed in the Corrected Averment shows that ARB, Suleiman al Rajhi, and the Bank's senior officials were quintessential insiders, operating at the very center of al Qaeda's financial and logistical support structure during the critical period leading up to the September 11, 2001 attacks. They maintained high-level contacts with the charities, and were well aware of the charities' terrorist nature at all relevant times. *See* Averment generally. |
| 90. Plaintiffs have no evidence tracing any transaction from SHC made through Al Rajhi Bank to the financing, planning, or carrying out of terrorism against the United States, including the 9/11 Attacks. *See, e.g.*, Pls. Aver. §§ X, XI (failing to trace any transaction through Al Rajhi Bank to planning, carrying out, or financing the 9/11 Attacks); Pls. Ex. 4 (Winer Report) at § 11 (same). | Disputed. ARB's claim that there is no evidence that any donation or transaction by Suleiman al Rajhi, members of the al Rajhi family, Suleiman al Rajhi's charity committee/foundation, or others conducted through the Bank has been traced or connected to the planning or carrying out of terrorism against the United States, including the 9/11 attacks themselves, is inaccurate and misleading. |
| | ARB, Suleiman al Rajhi, members of the al Rajhi, and others were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and were specifically aware of al Qaeda's mission and intent to attack the United States. Intending to foster al Qaeda's terrorist agenda, they provided substantial financial assistance to al Qaeda charity and business fronts and other intermediaries through the Bank, knowing that the funds would be received by Osama bin Laden and al Qaeda. *See* Averment generally. Plaintiffs' Averment also shows how the support provided to al Qaeda by these parties allowed al Qaeda to acquire the strike capabilities needed to carry out the 9/11 attacks. *See* Averment ¶¶ 53-132. Plaintiffs need not prove that the donation or transaction at issue was traced to the terrorist plot or the attack itself. |
| | By way of further response, jurisdictional discovery did not encompass the SHC. As set forth in Section III, Jurisdictional Discovery, *see* Averment ¶¶ 15, 16, and 20, Plaintiffs agreed to limit their jurisdictional discovery to Al Haramain, IIRO, |

| | |
|---|---|
| | and the Muwafaq Foundation. Recall that in 2021, ARB represented to the Court that its archived files were not properly indexed and that files originating before 2015 were not digitally searchable, making any search of their physical files for responsive records unduly burdensome. ARB further argued that searches of the archived files for documents responsive to Plaintiffs' discovery would impose massive costs upon the defendant. The Court considered that argument and directed the parties to meet and confer on "an acceptable program of discovery" that accommodated ARB's burden claims. *See* November 22, 2021 Order (ECF No. 7378) at 22. Accordingly, Plaintiffs' jurisdictional discovery requests only encompassed Al Haramain, IIRO, and Muwaffaq Foundation as a means to addressing ARB's purported burden claims, as directed by the Court. |
| ***B. Osama Bin Laden*** | No response necessary. |
| 91.  In 1994, the Saudi government stripped Osama bin Laden of his citizenship and froze his accounts and assets in Saudi Arabia, including his accounts at Al Rajhi Bank. Pls. Ex. 40 (9/11 Commission Report) at 57; *see also* ARB Ex. 28 (Winer Dep. Tr.)at 53:5-55:2 (explaining "bin Laden's accounts had been frozen at some time earlier. The Saudi government had basically shut down his direct ability to move money in his own name is my understanding."); ARB Ex. 93 (Kohlmann Dep. Tr.) at 208:15-209:15 (explaining that bin Laden's "citizenship was revoked [by the Kingdom of Saudi Arabia] in [19]94, but . . . [the Kingdom of Saudi Arabia] basically stopped financial transactions sometime in [19]93"); ARB Ex. 1 (Dean Report) at 17 (explaining that Osama bin Laden departed Saudi Arabia in 1992 and was stripped of Saudi citizenship in 1994); Exec. Order No. 13,099, 63 Fed. Reg. 45,167 (Aug. 20, 1998) (designating bin Laden in 1998). | Admitted for purposes of the present motion, but immaterial. *See* Plaintiffs' response to No. 4. |
| 92.  At least since 1994, when Bin Laden's accounts were frozen by the Saudi government, Al Rajhi Bank blocked Bin Laden from accessing his accounts or using any Bank services. *See* ARB Ex. 8 (Nov. 16, 2002 Ltr. from Al Rajhi Bank to SAMA) at ARB-39559 (showing all Bin Laden accounts "blocked"); *see also* ARB Ex. 28 (Winer Dep. Tr.) at 53:5-55:2 (reviewing Bin Laden account statements and agreeing that there was no activity in Bin Laden's accounts at Al Rajhi Bank during the relevant period because his "accounts had been frozen at some time earlier"). | Admitted for purposes of the present motion, but immaterial. *See* Plaintiffs' response to No. 4. |
| 93.  During the relevant period, the Bank did not provide Osama bin Laden with any services: The Bank had frozen bin Laden's accounts and bin Laden was not permitted to process any transfers or receive any funds using his accounts at Al Rajhi Bank. *See* generally ARB Exs. 30-35 (Osama bin Laden | Disputed. *See* Plaintiffs' response to No. 4. |

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

| | |
|---|---|
| ~~Stmts. of~~ Acct.) at ARB-843-ARB-844; ARB-845; ARB-846-ARB-847; ARB-848-ARB-849; ARB-13775-ARB-13776; ARB-13777-ARB-13778 (showing no account activity during the relevant period); *see also* ARB Ex. 28 (Winer Dep. Tr.) at 53:5-55:2 (agreeing that there was no activity in bin Laden's accounts at Al Rajhi Bank during the relevant period); ARB Ex. 93 (Kohlmann Dep. Tr.) at 17:1-25 (confirming that, even apart from the absence of transactions in Osama bin Laden's account records, Kohlmann has not seen "any evidence or indication" of any transactions through bin Laden's accounts at Al Rajhi Bank). | |
| **C. 9/11 Hijackers** | No response necessary. |
| 94.  Before the 9/11 Attacks, Al Rajhi Bank had no reason to know of any involvement in Al Qaeda or terrorism by any of the hijackers who held accounts at the Bank. *See* Pls. Ex. 44 (Staff Monograph on Terrorism Financing) at 140-41 ("No one at SunTrust or any other financial institution thought, or had any reason to think, that the hijackers were criminals, let alone terrorists bent on mass murder . . . ."). | Disputed. A broad spectrum of evidence detailing and describing ARB's intimate ties with al Qaeda, coupled with the disturbing connections between the 9/11 hijackers and Towayan al Towayan (an ARB employee) and Saleh al Hussayen (the long-time advisor to Suleiman al Rajhi's charity committee/foundation, who previously also served on the Shariah Board of ARB), supports an inference that ARB did know of the hijackers and their intentions. *See* Averment ¶¶ 489-508.<br><br>Separately, the number of al Qaeda members who had accounts at ARB, including core al Qaeda foot soldiers involved in terrorist operations, as well as the hijackers, confirm and corroborate the CIA's findings that ARB was the "bank of choice" for al Qaeda, Islamic extremists and other terror groups. As described in the following CIA reports, ARB was attractive to Islamic extremists/terrorists because they believed their financial activities and transactions would avoid government or law enforcement scrutiny, ARB had correspondent banking relationships abroad that could be utilized, and there were personal relationships in place to help facilitate these activities. Accordingly, al Qaeda and other Islamic militants and extremists were ordering their operatives to use ARB for their banking needs because they understood that ARB was a willing and knowing collaborator. *See* Pls. Ex. 9 – *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, undated, CIA_00720-804 at 736 (al Qaeda's choice of banks based on "personal contacts at the banks and security concerns."); *id.* at 746 ("Islamic militants similarly bank with financial institutions that provide assurance that their deposits and financial activities will not be scrutinized by government or enforcement authorities."). *See* Pls. Ex. 10 – *Al-Rajhi Bank: Conduit for Extremist Finance*, May 28, 2003, CIA-SUB_0001-6 at 2 ("Islamic extremists have used Al-Rajhi Banking and Investment Corporation (ARABIC) since at least the mid-1990s as a conduit for terrorist transactions, probably because they find the bank's |

| | |
|---|---|
| | vast network and adherence to Islamic principles both convenient and ideologically sound."); *id.* at 3 ("Extremists' bank of choice. [REDACTED] since the mid-1990s [REDACTED] several extremists ordered operatives in Afghanistan, Indonesia, Pakistan, Saudi Arabia, Turkey, and Yemen to used ARABIC."); *id.* ("Extremists' accounts. Extremists use ARABIC because its Islamic banking principles appeal to them and because it is one of the few banks with branches in outlying areas of Saudi Arabia, as well as good correspondent connections to remote locations abroad."). *See* Pls. Ex. 45, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 150 ("Islamic extremists in Yemen named Al Rajhi Bank as a preferred bank for transactions."). *See* Pls. Ex. 4, Winer Report at 89 ("ARB was the preferred bank for Islamic extremists in Yemen"); *id.* at 212 (stating that ARB was the "bank of choice" for Islamic extremists by the mid-1990s); *id.* at 213 (explaining factors that caused al Qaeda and extremists to choose ARB). *See also* Averment ¶¶ 176, 178-180, 276, 524, 543. |
| 95. Before the 9/11 Attacks, none of the hijackers, including those who held accounts at the Bank, were designated for connections to terrorism. *See* Pls. Ex. 44 (Staff Monograph on Terrorism Financing) at 140-41; *see also* ARB Ex. 93 (Kohlmann Dep. Tr.) at 130:21-131:2 (testifying that he had not identified any Al Rajhi Bank transactions violating sanctions or designations, because "once the designation has been issued," it becomes "impossible to open an account under that [designated] person's name"). | It is not disputed that the hijackers were not designated prior to the 9/11 attacks for connections to terrorism. However, to the extent that ARB asserts that the failure to designate demonstrates that ARB, Suleiman al Rajhi, and members of the al Rajhi family were not aware of the hijackers and their intentions prior to the 9/11 attacks, that is disputed. *See* Plaintiffs' response to No. 94. |
| 96. Only one of the seven hijackers made any transactions through his Al Rajhi Bank account while in the United States, conducting just two transactions totaling SAR 875.59, or approximately U.S. $233.43. ARB Ex. 79 (Abdulaziz Al-Omari Statement of Account) at ARB-0004 (showing two transactions after Al-Omari's June 29, 2001 arrival in the United States: a credit of 706.86 SAR and a debit of 168.76 SAR); there were no transactions after November 2000 in any of the other hijackers' accounts. *See* ARB Ex. 80 (ARB-960 – ARB-973); ARB Ex. 81 (ARB-850 – ARB-855); ARB Ex. 82 (ARB-856 - ARB-857); ARB Ex. 83 (ARB-836 – ARB-840); ARB Ex. 84 (ARB-811 – ARB-814). | Disputed. Account statements for ARB customers and 9/11 hijackers Abdul Aziz al Omari, Wael al Shahri, Saeed al Ghamdi, Majed Mawqid, and Ahmed al Ghamdi identify extensive banking activity and financial transactions in their ARB accounts prior to their arrival in the United States. Indeed, the transactions occurred during a time when these muscle hijackers were selected for the 9/11 operation and were preparing for their mission. That preparation included traveling to Afghanistan to participate in firearms, heavy weapons, and explosives training at the al Faruq and Khaldan training camps run by al Qaeda. *See* Pls. Ex. 40, 9/11 Commission Report at 234-235. |
| 97. In the United States, the hijackers "made extensive use of U.S. banks," including U.S. branches of "major international banks," as well as "smaller regional banks." Pls. Ex. 44 (Staff Monograph on Terrorism Financing) at 140. The hijackers opened U.S. accounts in their own names. *Id.* | It is not disputed that the Staff Monograph on Terrorism Financing makes those statements. *See* Plaintiffs' response to No. 96. |

| | |
|---|---|
| 98.   The Bank had no reason to be suspicious of any of the hijackers' account activity. *See* ARB Ex. 4 (Lormel Report) at 31-32 ("The money-laundering controls in place at the time were largely focused on drug trafficking and large-scale financial fraud and could not have detected the hijackers' transactions. The controls were never intended to, and could not, detect or disrupt the routine transactions in which the hijackers engaged." (quoting Pls. Ex. 44 (9/11 Commission Staff Report) at 3)); *see also* Pls. Ex. 44 (9/11 Staff Report) at 141 (stating that the hijackers' transactions in their U.S. accounts were "not extraordinary or remarkable," and "[no] one monitoring their transactions alone would have had any basis for concern"); id. at 140-41 ("No one at SunTrust or any other financial institution thought, or had any reason to think, that the hijackers were criminals, let alone terrorists bent on mass murder . . . ."). | Disputed. *See* Plaintiffs' response to No. 94. |
| 99.   Plaintiffs have no evidence that, before the 9/11 Attacks, Al Rajhi Bank knew that any of the hijackers had any connection to Al Qaeda or any form of terrorism against the United States, including the 9/11 Attacks. *See, e.g.*, Pls. Aver. ¶¶ 136, 265, 540 (making passing reference to hijackers' accounts, but presenting no evidence that the Bank knew of the hijackers' connections to Al Qaeda or terrorism against the United States). | Disputed. *See* Plaintiffs' response to No. 94. |
| 100.   Plaintiffs have no evidence that during the relevant period Al Rajhi Bank provided non-routine banking services to any of the hijackers. *See, e.g.*, Pls. Aver. ¶¶ 136, 265, 540 (making passing reference to hijackers' accounts, but presenting no evidence that the Bank provided the hijackers with non-routine services); *see also* ARB Ex. 93 (Kohlmann Dep. Tr.) at 204:14-206:11 (testifying that Al Rajhi Bank provided services such as "accounts [and] wire transfers" as well as "issuing travelers checks, converting sums of money, [and] accepting donations"). | Disputed. *See* Plaintiffs' response to No. 94. |
| 101.   Plaintiffs do not trace any transaction in any account of a 9/11 hijacker at Al Rajhi Bank to planning, carrying out, or financing the 9/11 Attacks. *See, e.g.*, Pls. Aver. ¶¶ 136, 265, 540 (making passing reference to hijackers' accounts, but presenting no evidence tracing any transaction through any hijackers' account at Al Rajhi Bank to planning, carrying out, or financing the 9/11 Attacks). | Disputed. ARB's claim that there is no evidence that any transaction in the account of a 9/11 hijacker can be traced or connected to the planning, carrying, or financing of the 9/11 attacks is inaccurate and misleading. Plaintiffs need not prove that the transaction at issue was traced or connected to the terrorist plot or the attack itself. By way of further response, *see* Plaintiffs' responses to Nos. 94, 96. |
| ***IV.  Al Rajhi Bank Did Not Make Any Donation That Supported The 9/11 Attacks*** | No response necessary. |
| 102.   Al Rajhi Bank did not make any donations to the Charities. *See* Pls. Ex. 3 (Galloway Dep. Tr.) at 271:6-15 and | Disputed and immaterial. Initially, due to ARB's burden claims, jurisdictional discovery did not encompass all of the al |

| | |
|---|---|
| Errata 271:15 (testifying the Bank did not make any donations to IIRO, Al-Haramain, or Muwaffaq); ARB Ex. 93 (Kohlmann Dep. Tr.) at 205:5-10 (testifying that he was not aware of any donations from the Bank to the Charities during the relevant period). | Qaeda charity fronts, and Plaintiffs do not yet know the extent to which ARB provided donations to those that were outside of the scope of discovery. *See* Plaintiffs' responses to Nos. 6, 13, 67, 68, 130. In addition, part of the Shariah-compliant protocols at ARB included identifying special commissions, which are prohibited income under Sharia law, and paying them to charities. *See* Pls. Ex. 6, 1998 ARB Annual Report at 24 (stating that "[s]pecial commission and related items, representing income prohibited by Sharia," "is paid out to charities"); Pls. Ex. 7, 1999 ARB Annual Report at 25 (same). ARB has consistently taken the position in this litigation that the Bank never made any donations to any of the charities identified in Plaintiffs' Averment. *See, e.g.,* Memorandum of Law in Support of Al Rajhi Bank's Renewed Motion to Dismiss, ECF No. 9786, at 9, 15-16, 19, 28. ARB's annual reports indicate otherwise. |
| 103.  As requested by Plaintiffs, and directed by the Court, Al Rajhi Bank searched for documents showing any donations by the Bank to Al Haramain, IIRO, and the Muwaffaq Foundation. *See* Opp. to Pls. 2d Mot. to Compel 4-5 (ECF No. 8935) (describing the Bank's search process and findings). The Bank's searches confirmed that the Bank did not make donations to Al Haramain, IIRO, or the Muwaffaq Foundation. *Id.* | Disputed and immaterial. Initially, due to ARB's burden claims, jurisdictional discovery did not encompass all of the al Qaeda charity fronts, and Plaintiffs do not yet know the extent to which ARB provided donations to those that were outside of the scope of discovery. *See* Plaintiffs' responses to Nos. 6, 13, 67, 68, 130. In addition, part of the Shariah-compliant protocols at ARB included identifying special commissions, which are prohibited income under Sharia law, and paying them to charities. *See* Pls. Ex. 6, 1998 ARB Annual Report at 24 (stating that "[s]pecial commission and related items, representing income prohibited by Sharia," "is paid out to charities"); Pls. Ex. 7, 1999 ARB Annual Report at 25 (same). ARB has consistently taken the position in this litigation that the Bank never made any donations to any of the charities identified in Plaintiffs' Averment. *See, e.g.,* Memorandum of Law in Support of Al Rajhi Bank's Renewed Motion to Dismiss, ECF No. 9786, at 9, 15-16, 19, 28. ARB's annual reports indicate otherwise. |
| 104.  Magistrate Judge Netburn held that the Bank's search for records of donations was "reasonable." Order 4-5 (July 11, 2023), ECF No. 9210. | The Court's July 11, 2023 Order is not disputed.  However, to the extent that ARB argues that the Bank, Suleiman al Rajhi, members of the al Rajhi family, and Suleiman al Rajhi's charity committee/foundation did not make any donations to al Qaeda charity fronts Al Haramain and IIRO, that is disputed. Plaintiffs have presented the Court with a wealth of evidence and information – ARB banking records, other defendant discovery records, and Executive Order 14040 declassified records, including CIA, FBI, Treasury, and other intelligence reports – that support Plaintiffs' claims that ARB, Suleiman al Rajhi, Abdullah al Rajhi, and members of the al Rajhi family for years knowingly supported and funded al Qaeda charity fronts Al Haramain and IIRO, and others charities associated with terrorism. *See, e.g.,* Plaintiffs' responses to Nos. 6, 13, 67, 68, 130. |

| | |
|---|---|
| | In addition, part of the Shariah-compliant protocols at ARB included identifying special commissions, which are prohibited income under Sharia law, and paying them to charities. *See* Pls. Ex. 6, 1998 ARB Annual Report at 24 (stating that "[s]pecial commission and related items, representing income prohibited by Sharia," "is paid out to charities'); Pls. Ex. 7, 1999 ARB Annual Report at 25 (same). ARB has consistently taken the position in this litigation that the Bank never made any donations to any of the charities identified in Plaintiffs' Averment. *See, e.g.,* Memorandum of Law in Support of Al Rajhi Bank's Renewed Motion to Dismiss, ECF No. 9786, at 9, 15-16, 19, 28. ARB's annual reports indicate otherwise. |
| 105.  Al Rajhi Bank did not make any donations of any of its own funds to any of the other Charities or any entity designated under any sanctions regime for connections to terrorism, either before or after such designation. *See* ARB Ex. 93 (Kohlmann Dep. Tr.) at 206:12-207:6 (testifying that Plaintiffs have no evidence that Al Rajhi Bank made donations to designated charities or otherwise attempted to circumvent designations to help finance any charities). | Disputed and immaterial. Initially, due to ARB's burden claims, jurisdictional discovery did not encompass all of the al Qaeda charity fronts, and Plaintiffs do not yet know the extent to which ARB provided donations to those that were outside of the scope of discovery. *See* Plaintiffs' responses to Nos. 6, 13, 67, 68, 130. In addition, part of the Shariah-compliant protocols at ARB included identifying special commissions, which are prohibited income under Sharia law, and paying them to charities. *See* Pls. Ex. 6, 1998 ARB Annual Report at 24 (stating that "[s]pecial commission and related items, representing income prohibited by Sharia," "is paid out to charities'); Pls. Ex. 7, 1999 ARB Annual Report at 25 (same). ARB has consistently taken the position in this litigation that the Bank never made any donations to any of the charities identified in Plaintiffs' Averment. *See, e.g.,* Memorandum of Law in Support of Al Rajhi Bank's Renewed Motion to Dismiss, ECF No. 9786, at 9, 15-16, 19, 28. ARB's annual reports indicate otherwise.<br><br>By way of further response, banking records for Suleiman al Rajhi's "charity" committee/foundation indicate that ARB continued to facilitate the transfer of large sums of money to Al Haramain despite the public U.S.-Saudi joint designations of Al Haramain branch offices in Somalia and Bosnia-Herzegovina on March 11, 2002 for "supporting terrorist activities and terrorist organizations such as al-Qaida, AIAI (al-Itihaad al-Islamiya), and others." *See, e.g.,* Pls. Ex. 122, ARB 38079-38107 and ARB 39948-39959 at 38084 (June 3, 2002 payment of 100,000 SR to Al Haramain); *id.* at ARB 38088 (June 23, 2002 payments of 200,000 SR to Al Haramain); *id.* at ARB 38092 (August 18, 2002 payments of 175,250 SR to Al Haramain); *id.* at ARB 38096 (August 27, 2002 payment of 100,000 SR to Al Haramain); Pls. Ex. 125, ARB 42183-42184 at 42183 (April 29, 2002 payment of 8,000 SR to Al Haramain); Pls. Ex. 126, ARB 42179-42180 at 42179 (April 3, 2002 payment of 38,000 SR to Al Haramain); Pls. Ex. |

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

| | |
|---|---|
| | 127, ARB 42181-42182 at 42181 (December 23, 2002 payment of 7,000 SR to Al Haramain). *See also* Averment ¶¶ 73, 88. |
| 106.  Plaintiffs have no evidence that Al Rajhi Bank made any donations to any entity knowing or intending that the donation would be used to support Al Qaeda or any form of terrorism against the United States. *See* ARB Ex. 93 (Kohlmann Dep. Tr.) at 206:12-207:6 (testifying that Plaintiffs have no evidence that Al Rajhi Bank made donations to designated charities or otherwise attempted to circumvent designations to help finance any charities). | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 6, 13, 67, 68, 130, 143. |
| 107.  Plaintiffs do not trace any donation from Al Rajhi Bank to any entity for the funding of Al Qaeda or any form of terrorism against the United States, including the 9/11 Attacks. *See generally* Pls. Aver., Pls. Ex. 4 (Winer Report) & Pls. Ex. 38 (Kohlmann Report) (all failing to identify a single donation from the Bank in support of Al Qaeda or any form of terrorism against the United States, including the 9/11 Attacks). | Disputed. *See e.g.*, Plaintiffs' responses to Nos. 6, 13, 67, 68, 130, 144. By way of further response, Plaintiffs have identified payments from ARB and Suleiman al Rajhi to the al Qaeda charity fronts. *See* Plaintiffs' response to No. 6. |
| ***V. No Transaction Through The Bank, Including Through The Bank's U.S. Correspondent Accounts, Has Been Traced To The Financing Of The 9/11 Attacks*** | No response necessary. |
| 108.  Plaintiffs have no evidence tracing any transaction made through Al Rajhi Bank to Al Qaeda or to planning, carrying out, or financing any terrorism against the United States, including the 9/11 Attacks. *See, e.g.*, Pls. Aver. §§ X, XI; Pls. Ex. 4 (Winer Report) at § 11; *see also* ARB Ex. 4 (Lormel Report) at 7 (explaining that FBI investigated CIA intelligence leads concerning Al Rajhi Bank but could not verify or prove any allegation that the Bank provided support to Al Qaeda). | Disputed. ARB's claim that there is no evidence that any donation or transaction by Suleiman al Rajhi, members of the al Rajhi family, Suleiman al Rajhi's charity committee/foundation, or others conducted through the Bank has been traced or connected to the planning or carrying out of terrorism against the United States, including the 9/11 attacks themselves, is inaccurate and misleading.<br><br>ARB, Suleiman al Rajhi, members of the al Rajhi, and others were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and were specifically aware of al Qaeda's mission and intent to attack the United States. Intending to foster al Qaeda's terrorist agenda, they provided substantial financial assistance to al Qaeda charity and business fronts and other intermediaries through the Bank, knowing that the funds would be received by Osama bin Laden and al Qaeda. *See* Averment generally. Plaintiffs' Averment also shows how the support provided to al Qaeda by these parties allowed al Qaeda to acquire the strike capabilities needed to carry out the 9/11 attacks. *See* Averment ¶¶ 53-132. Plaintiffs need not prove that the donation or transaction at issue was traced to the terrorist plot or the attack itself. |

| | By way of further response, Plaintiffs have identified payments from ARB and Suleiman al Rajhi to the al Qaeda charity fronts. *See* Plaintiffs' response to No. 6. |
|---|---|
| | Finally, Mr. Lormel's claims concerning the FBI's alleged investigation into ARB and Suleiman al Rajhi, and the findings of that investigation, have been flatly rejected by the FBI and DOJ. According to the FBI and DOJ, no investigation matching his expert report and deposition testimony was ever undertaken. *See* Ex. F, May 3, 2024 letter from Assistant U.S. Attorneys Sarah S. Normand and Jennifer Jude (stating that the FBI conducted supplemental searches for documents concerning "an investigation of the Bank or Sulaiman of the kind that Mr. Lormel describes in his report and deposition," and concluding that "[t]hose searches did not reveal information suggesting that the Bank or Sulaiman … were the focus of an investigation or investigative steps by the FBI during the time period Mr. Lormel described (September 11, 2001-December 31, 2003)."). Moreover, Mr. Lormel retired from the FBI in December 2003, before any such investigation into ARB and Suleiman al Rajhi could have been completed. Notably, soon after Mr. Lormel's departure from the FBI, he was hired by ▮▮▮▮▮▮▮ to provide consulting services in connection with a criminal investigation in the Eastern District of Virginia. That consulting engagement with ▮▮ ▮▮ included the SAAR Foundation, Mar-Jac Poultry, and Jamal Barzinji, an arrangement that was highly irregular at best. *See* ARB Ex. 61, Transcript, Deposition of Dennis Lormel, February 1, 2024 at 33:12-20; 53:22-60:7; 130:11-132:16. |
| 109.   In jurisdictional discovery, the Bank produced 508 statements of accounts, including 440 charity customer accounts. *See* Erb Decl. ¶¶ 3-5. Plaintiffs have no evidence that any of these account statements shows any transaction that has been traced to Al Qaeda or to the financing, planning, or carrying out of any terrorism against the United States, including the 9/11 Attacks. *See, e.g.,* Pls. Aver. §§ X, XI; Pls. Ex. 4 (Winer Report) at § 11. | Disputed. ARB's claim that there is no evidence that any donation or transaction by Suleiman al Rajhi, members of the al Rajhi family, Suleiman al Rajhi's charity committee/foundation, or others conducted through the Bank has been traced or connected to the planning or carrying out of terrorism against the United States, including the 9/11 attacks themselves, is inaccurate and misleading.

ARB, Suleiman al Rajhi, members of the al Rajhi, and others were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and were specifically aware of al Qaeda's mission and intent to attack the United States. Intending to foster al Qaeda's terrorist agenda, they provided substantial financial assistance to al Qaeda charity and business fronts and other intermediaries through the Bank, knowing that the funds would be received by Osama bin Laden and al Qaeda. *See* Averment generally. Plaintiffs' Averment also shows how the support provided to al Qaeda by these parties allowed al Qaeda to acquire the strike capabilities needed to carry out the 9/11 attacks. *See* Averment |

| | |
|---|---|
| | ¶¶ 53-132. Plaintiffs need not prove that the donation or transaction at issue was traced to the terrorist plot or the attack itself.<br><br>By way of further response, ARB and Suleiman al Rajhi established a "Payable Through Account" at Chase Manhattan Bank in New York, a mechanism used by the Bank to obscure the origin and destination of funds transmitted to al Qaeda, al Qaeda proxies, and affiliated anti-American extremists and jihadists, including funds originating from ARB Chairman Suleiman al Rajhi himself. *See, e.g.*, Averment ¶¶ 11, 36-39, 52, 264, 392, 401, 404, 412, 414-419, 429-488.<br><br>To give one example, the Payable Through Account was used to facilitate transfers by IIRO to its operations in Afghanistan, which were extensively intertwined with al Qaeda. ARB authorized the IIRO to issue a check via the Payable Through Account at Chase Manhattan, for the benefit of the Fatima al Zahraa Hospital in Jalalabad, Afghanistan. *See* Pls. Ex. 139, IIRO 109118-109119; Pls. Ex. 150, ARB 2477-2572 at 2543 (ARB account statement for Islamic Relief Organization-Health, identifying an August 19, 2001 transaction, 125,500.00 SR debit, "Issuance of bank checks."). The Fatima al Zahraa Hospital was an asset of the IIRO itself, and the IIRO's offices in Pakistan/Afghanistan were deeply tied to al Qaeda operations. Confirming this close connection, al Qaeda leader Ayman al Zawahiri conducted eye surgeries at Fatima al Zahraa Hospital, which was located in close proximity to an al Qaeda funded jihad camp, at some point after 1996. *See* Pls. Ex. 159, Transcript, February 8, 2024 Deposition of Aimen Dean ("Dean Deposition"), at 308-309. *See also* Averment ¶¶ 475, 486-488. |
| 110.  The Bank did not process any transactions in violation of terrorism sanctions. Pls. ARB Ex. 93 (Kohlmann Dep. Tr.) at 132:23-133:5 (testifying it would be "impossible" for the Bank to process transactions to a designated person or entity). | Disputed. First, Plaintiffs' experts have been clear that the designation process for terrorist sanctioning was in its infancy during the Clinton Administration, and the Executive Order 13224 sanctions regime targeting charities for terrorism related offenses did not exist prior to the September 11, 2001 attacks. *See* Pls. Ex. 12, Transcript, January 12, 2024 Deposition of Jonathan M. Winer at 57:14-25 (testifying that the "designation process for sanctioning was in its infancy" during the Clinton administration, and that any charity designations happened after 9/11); 58:8-13 (testifying that there were no designations of charities prior to 9/11 in part because the U.S. had undertaken other actions, which included direct discussions between the U.S. and Saudi Arabia).<br><br>Second, to the extent that ARB asserts that the failure to designate demonstrates that ARB, Suleiman al Rajhi, and members of the al Rajhi family were not aware of any |

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

customer's connections to, and financial support for, al Qaeda and associated terrorist organizations, that is disputed.

By way of example, there was a wealth of public media reporting available to ARB prior to the 9/11 attacks concerning the involvement of Al Haramain and the IIRO in supporting Osama bin Laden, al Qaeda, and terrorism, including but not limited to the public reporting of those charities' links to the 1998 U.S. Embassy bombings in Africa. *See* Plaintiffs' responses to Nos. 51, 63. In addition, Plaintiffs' experts have testified that as early as 1995, Al Haramain was widely known within the Kingdom for supporting Islamic militant causes and armed conflict. *See* Plaintiffs' response to No. 47. Moreover, ARB, Suleiman al Rajhi, and the Bank's principals were expressly aware of the involvement of Al Haramain and IIRO in supporting al Qaeda and terrorism by virtue of Suleiman al Rajhi's extensive contacts with those organizations and his close relationships with Al Haramain, IIRO, and MWL senior officials. *See* Plaintiffs' responses to Nos. 47, 59. Nevertheless, ARB continued to open and maintain hundreds of accounts for Al Haramain and IIRO. *See* Plaintiffs' response to No. 42 (94 accounts for Al Haramain), and Plaintiffs' response to No. 54 (308 accounts for the IIRO).

Moreover, notwithstanding the very public designations of Al Haramain branch offices in Somalia and Bosnia-Herzegovina on March 11, 2002 for "supporting terrorist activities and terrorist organizations such as al-Qaida, AIAI (al-Itihaad al-Islamiya), and others," ARB ignored those public allegations and continued to open new accounts for Al Haramain just a month later. *See* ARB 38600 (April 24, 2002 letter from Aqil al Aqil to ARB asking the Bank to open 10 new accounts for Al Haramain, with handwritten text from ARB stating "no objection."). Indeed, the March 2002 designation did not even elicit a pause from ARB to conduct an internal investigation concerning the allegations relating to Al Haramain, and it was business as usual for the Bank. Between April and December 2002, 16 new accounts were opened at ARB for Al Haramain. *See* Pls. Ex. 98 (Abdullah al Rajhi Exhibit 31) (chart of 94 AHIF accounts at ARB).

Later designations of the Al Haramain branch offices in Indonesia, Kenya, Pakistan, and Tanzania on January 22, 2004 for providing "financial, material and logistical support to the al-Qaida network and other terrorist organizations" similarly failed to convince ARB that it should undertake an internal investigation into the accounts it held for Al Haramain to determine whether they reflected potential money laundering or counterterrorism financing risks. Although Abdullah al Rajhi agreed that ARB had an independent obligation to ensure its accounts weren't used for terrorism financing

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

| | |
|---|---|
| | ~~activities, when asked whether~~ ARB did anything to investigate the accounts to determine whether they were opened properly, or whether there were any transactions that may have been problematic or raised red flags, Abdullah could not affirmatively say those internal inquiries occurred, despite being the General Manager of the Bank at that time (equivalent to the CEO). *See* Pls. Ex. 1, Transcript, September 17, 2023 Deposition of Abdullah bin Sulaiman al Rajhi at 93-101. Instead, ARB continued to work with Al Haramain and open new accounts for the al Qaeda charity front, notwithstanding the fact that the U.S. and Saudi governments were simultaneously designating Al Haramain branch offices for supporting al Qaeda. *See* ARB Ex. 26 (ARB 39505). <br><br> Third, Plaintiffs expert Jonathan Winer has documented ARB's broad violations of international AML, CFT, and KYC standards, in relation to the operation of the accounts of the charities and other relevant actors. Those standards were themselves designed to prevent terrorist financing activities. *See* Averment ¶¶ 273, 306-389. |
| 111.  The Bank did not permit any transactions through Osama bin Laden's long-frozen accounts. *See* ARB Ex. 28 (Winer Dep. Tr.) at 53:5-55:2 (explaining "bin Laden's accounts had been frozen at some time earlier. The Saudi government had basically shut down his direct ability to move money in his own name is my understanding"); ARB Ex. 93 (Kohlmann Dep. Tr.) at 208:15-209:15 (explaining that bin Laden's "citizenship was revoked [by the Kingdom of Saudi Arabia] in [19]94, but . . . [the Kingdom of Saudi Arabia] basically stopped financial transactions sometime in [19]93"); ARB Ex. 1 (Dean Report) at 17 (explaining that Osama bin Laden departed Saudi Arabia in 1992 and was stripped of Saudi citizenship in 1994). | Admitted but immaterial. *See* Plaintiffs' response to No. 4. |
| 112. Al Rajhi Bank used its correspondent banking account with Chase Manhattan to conduct routine correspondent banking on behalf of Al Rajhi Bank customers. *See* Pls. Ex. 3 (Galloway Dep. Tr.) and Errata at 295:21. | Disputed. ARB and Suleiman al Rajhi established a "Payable Through Account" at Chase Manhattan Bank in New York, a mechanism used by the Bank to obscure the origin and destination of funds transmitted to al Qaeda, al Qaeda proxies, and affiliated anti-American extremists and jihadists, including funds originating from ARB Chairman Suleiman al Rajhi. *See, e.g.*, Averment ¶¶ 11, 36-39, 52, 264, 392, 401, 404, 412, 414-419, 429-488. *See also* Plaintiffs' responses to Nos. 2, 115. |
| 113.  Plaintiffs subpoenaed, and obtained documents from, the Bank's U.S. correspondent bank, JPMorgan Chase Bank (during the relevant period, Chase Manhattan Bank) ("JPM"). *See* ARB Ltr. Mot. to Quash at Ex. A (Mar. 2, 2023), ECF 8897. Plaintiffs' subpoena sought "all records" relating to "any accounts" held at JPM by Al Rajhi Bank, its former Chairman | Undisputed as a general matter for purposes of this motion. |

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

| | |
|---|---|
| Sulaiman bin Abdulaziz Al Rajhi, or the Saudi-based Sulaiman bin Abdulaziz Al Rajhi Charitable Foundation, including "'[a]ny and all records relating to any banking and/or financial transactions involving" any such accounts. Id. at 1, 3. Plaintiffs' subpoena also sought "[a]ny and all records relating to the establishment of a correspondent banking relationship between" the Bank and JPM, including any of JPM's parents, affiliates, subsidiaries, employees, officers, and so on. Id. at 4. | |
| 114. Plaintiffs' Corrected Averment shows that JPM produced hundreds of pages of documents, spanning from 1992 and continuing until at least 2020. See Pls. Aver. ¶¶ 438-39 (citing Pls. Ex. 138). | Undisputed as a general matter for purposes of this motion. |
| 115.  Plaintiffs do not trace a single transaction through Al Rajhi Bank's correspondent account at Chase Manhattan to Al Qaeda or to the financing, planning, or carrying out of any terrorism against the United States, including the 9/11 Attacks. See, e.g., Pls. Aver. §XI; Pls. Ex. 4 (Winer Report) § 10; see also ARB Ex. 2 (Hobayb Report) at 33 (noting that Plaintiffs' expert Winer did not identify "any transaction by the Bank that would constitute abuse of this practice [the correspondent banking relationship] for nefarious ends"). | Disputed. ARB's claim that there is no evidence that any donation or transaction by Suleiman al Rajhi, members of the al Rajhi family, Suleiman al Rajhi's charity committee/foundation, or others conducted through the Bank has been traced or connected to the planning or carrying out of terrorism against the United States, including the 9/11 attacks themselves, is inaccurate and misleading. |
| | ARB, Suleiman al Rajhi, members of the al Rajhi, and others were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and were specifically aware of al Qaeda's mission and intent to attack the United States. Intending to foster al Qaeda's terrorist agenda, they provided substantial financial assistance to al Qaeda charity and business fronts and other intermediaries through the Bank, knowing that the funds would be received by Osama bin Laden and al Qaeda. See Averment generally. Plaintiffs' Averment also shows how the support provided to al Qaeda by these parties allowed al Qaeda to acquire the strike capabilities needed to carry out the 9/11 attacks. See Averment ¶¶ 53-132. Plaintiffs need not prove that the donation or transaction at issue was traced to the terrorist plot or the attack itself. |
| | By way of further response, ARB and Suleiman al Rajhi established a "Payable Through Account" at Chase Manhattan Bank in New York, a mechanism used by the Bank to obscure the origin and destination of funds transmitted to al Qaeda, al Qaeda proxies, and affiliated anti-American extremists and jihadists, including funds originating from ARB Chairman Suleiman al Rajhi. See, e.g., Averment ¶¶ 11, 36-39, 52, 264, 392, 401, 404, 412, 414-419, 429-488. |
| | The Payable Through Account was used to facilitate transfers by Suleiman al Rajhi, under the auspices of his alter-ego charity committee/foundation, to support terrorist causes in and outside of the United States. By way of example, Abdul |

|  | Rahman al Rajhi issued a check on behalf of Suleiman al Rajhi via the Payable Through Account to the American Open University. *See* Pls. Ex. 141, NL 10475. According to the FBI, American Open University "is connected to the Moslem Brotherhood and arranges for paramilitary training in Pakistan." 3563. *See* Pls. Ex. 51, FBI Report, *Connections to the Attacks of September 11, 2001*, July 23, 2021, EO14040-003478-3608-UPDATED at 3563. Jaafar Idris, who worked out of the Ministry of Islamic Affairs' office in the Saudi Embassy in Washington, D.C. and also served as American Open University's president, is described by the FBI as "a close associate of jihadi groups operating within the U.S." *See* also Averment ¶¶ 455, 480-481.<br><br>The Payable Through Account was also used to transmit money to at least two individuals associated with the Saudi support network in the United States assisting the 9/11 hijackers – Khalid al Sowailem, the head of the Ministry of Islamic Affairs' Da'wah Office in the Saudi Embassy in Washington, D.C.; and Omar al Bayoumi, a Saudi agent known to have provided substantial assistance to the 9/11 hijackers. *See* Averment ¶¶ 472-478; *see also* ¶¶ 475, 479 (indicating that Bayoumi and Fahad al Thumairy (an extremist Saudi government imam employed by the Ministry of Islamic Affairs, who, along with Bayoumi, provided substantial assistance to the 9/11 hijackers) were in telephone contact with two officials of Suleiman al Rajhi's charity committee/foundation, Abdul Rahman al Rajhi and Abdullah al Misfer).<br><br>In addition, the Payable Through Account was used to facilitate al Qaeda terrorist financing transfers by Executive Order 13224 Specially Designated Global Terrorist ("SDGT") Soliman al Buthe. Between January 22, 2001 and March 14, 2001, al Buthe executed six transactions totaling $45,000.00 via ARB's Payable Through Account. *See* Pls. Ex. 148, ARB 39154, 39156, 39158, 39160, 39162, 39164. Two of those payments specifically identified the Al Haramain branch office in Oregon as the beneficiary. Al Buthe further directed additional payments via the Payable Through Account to internet service provider networks established by al Buthe and another Al Haramain official to facilitate password protected communications and a website know as Islam Today, which was used by radical clerics in the Middle East, including Salman al-Awdah, a well-known cleric who issued fatwas advocating violence against the United States. *See* also Averment ¶¶ 456, 482-485.<br><br>Finally, the Payable Through Account was used to facilitate transfers by IIRO to its operations in Afghanistan, which were extensively intertwined with al Qaeda. ARB authorized the |

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

| | |
|---|---|
| | IIRO to issue a check via the Payable Through Account at Chase Manhattan, for the benefit of the Fatima al Zahraa Hospital in Jalalabad, Afghanistan. *See* Pls. Ex. 139, IIRO 109118-109119; Pls. Ex. 150, ARB 2477-2572 at 2543 (ARB account statement for Islamic Relief Organization-Health, identifying an August 19, 2001 transaction, 125,500.00 SR debit, "Issuance of bank checks."). The Fatima al Zahraa Hospital was an asset of the IIRO itself, and the IIRO's offices in Pakistan/Afghanistan were deeply tied to al Qaeda operations. Confirming this close connection, al Qaeda leader Ayman al Zawahiri conducted eye surgeries at Fatima al Zahraa Hospital, which was located in close proximity to an al Qaeda funded jihad camp, at some point after 1996. *See* Pls. Ex. 159, Transcript, February 8, 2024 Deposition of Aimen Dean ("Dean Deposition"), at 308-309. *See also* Averment ¶¶ 475, 486-488. |
| 116. Plaintiffs have no evidence that any funds in Al Rajhi Bank's correspondent account at Chase Manhattan were used by Al Qaeda or in planning, carrying out, or financing any terrorism against the United States, including the 9/11 Attacks. *See, e.g.*, Pls. Aver. §XI; Pls. Ex. 4 (Winer Report) § 10; *see also* ARB Ex. 2 (Hobayb Report) at 33 (noting that Plaintiffs' expert Winer did not identify "any transaction by the Bank that would constitute abuse of this practice [the correspondent banking relationship] for nefarious ends"). | Disputed. *See* Plaintiffs' responses to Nos. 2, 115. |
| 117. Plaintiffs' Corrected Averment fails to trace a single transaction through Al Rajhi Bank, including through its US correspondent account, to Al Qaeda or in support of Al Qaeda or any form of terrorism against the United States, including the 9/11 Attacks. *See generally* Pls. Aver., Pls. Ex. 4 (Winer Report) & Pls. Ex. 38 (Kohlmann Report) (all failing to identify a single transaction through Al Rajhi Bank that supported Al Qaeda, terrorism against the United States, or the 9/11 Attacks). | Disputed. *See* Plaintiffs' responses to Nos. 2, 115. |
| ***VI. Neither The United States, The United Nations, Nor Any Other Governmental Body Has Ever Designated Or Taken Any Action Against Al Rajhi Bank Or Any Al Rajhi Family Member For Connections to Terrorism*** | No response necessary. |
| 118. The U.S. government never designated or otherwise sanctioned Al Rajhi Bank or any Al Rajhi family member for connections to terrorism. *See* ARB Ex. 4 (Expert Report of Dennis Lormel) ("Lormel Report") at 9, 18 ("[T]he United States government never sanctioned Al Rajhi Bank or the Al Rajhi family for involvement in terrorist financing."); *see also* Pls. Ex. 4 (Winer Report) at 98 ("In the end, [the] U.S. government did not sanction [Al Rajhi Bank] for terrorist finance."); *see also* ARB Ex. 28 (Winer Dep. Tr.) at 160:10- | Disputed to the extent ARB intended to suggest that U.S. authorities did not undertake serious actions to interdict ARB's terrorist activities. ARB points to the fact that neither the U.S. government nor any foreign government or international body has ever designated the Bank, any member of the al Rajhi family, and or Bank official or employee as though that were somehow exculpatory, even though multiple government intelligence reports implicate ARB, Suleiman and Rajhi, and members of the al Rajhi family in supporting Osama bin |

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

| | |
|---|---|
| 15; 172:19-22; ARB Ex. 93 (Kohlmann Dep. Tr.) at 36:20-22, 37:6-20, 38:3-39:5. | Laden, al Qaeda, and Islamic militants and extremists for more than a decade leading up to the September 11, 2001 attacks.<br><br>Declassified CIA reports detailed in Plaintiffs' Averment confirm that (1) ARB was a conduit of funds for the 9/11 hijackers; (2) ARB, Suleiman al Rajhi, and al Rajhi family members funded al Qaeda, Islamic extremists, al Qaeda "charity" fronts, and other terrorist organizations; (3) ARB supported and maintained accounts for al Qaeda operatives, financiers, and individuals linked to other terror groups; (4) ARB was the "bank of choice" for al Qaeda and Islamic militants and extremists; and (5) ARB provided logistical support to terror groups. *See, e.g.*, Pls. Ex. 9 – *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, undated, CIA_00720-804; Pls. Ex. 10 – *Al-Rajhi Bank: Conduit for Extremist Finance*, May 28, 2003, CIA-SUB_0001-6; Pls. Ex. 11, *Islamic Banking: A Potential Economic Enabler in the Muslim World*, May 21, 2004, CIA-SUB_0020-30; Pls. Ex. 46, *Identifying Al-Qa'ida's Donors and Fundraisers: A Status Report*, February 27, 2002, CIA_00193-199; Pls. Ex. 66, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact [REDACTED]*, January 11, 1999, CIA_000807-848; Pls. Ex. 89, *Al-Qa'ida in Sudan, 1992-1996: Old School Ties Lead Down Dangerous Paths*, March 10, 2003, CIA_00038-52. *See also* Averment ¶¶ 136, 148, 154, 156-159, 176-180, 185, 265, 276, 294, 426, 524, 539, 540, 543.<br><br>The information detailed in these governmental investigations led senior U.S. government officials to debate several policy options for addressing the threat ARB's support for terrorism posed to U.S. national security, including listing, or threatening to list, ARB as a terrorist supporter pursuant to Executive Order 13224. *See* Pls. Ex. 10 – *Al-Rajhi Bank: Conduit for Extremist Finance*, May 28, 2003, CIA-SUB_0001-6 at 6. Within the context of these post-9/11 deliberations, the evaluation of whether formal designation of ARB, or other possible action, would best serve U.S. national security interests involved a range of equities, including foreign policy, intelligence, diplomatic, law enforcement, and many other considerations. U.S. officials reasoned that given the size of ARB and its structural importance to the Saudi banking system and economy, as well as the significance of the Al Rajhi family to the Saudi economy, sanctioning ARB and/or members of the al Rajhi family for their support of terrorism and al Qaeda would have had profound consequences on the Saudi Arabian economy and Saudi Arabians who used the bank for legitimate purposes, as well as profound consequences in the U.S.-Saudi Arabian security relationship. In the end, the U.S. government did not formally designate or sanction ARB, Suleiman al Rajhi, or members of |

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

the al Rajhi family, actions which would have "cripple[d] the bank," choosing instead to pursue reforms of the bank via high-level counterterrorism engagements with senior Saudi government officials, which included requiring Suleiman al Rajhi to relinquish his control over the bank. *See* Averment ¶¶ 181-184, 188-203; *see also* Pls. Ex. 10, *Al-Rajhi Bank: Conduit for Extremist Finance*, May 28, 2003, CIA-SUB_0001-6 at 6 ("Listing, or threatening to list, ARABIC as a terrorist supporter under Executive Order 13224 or United Nations resolution 1267 could cripple the bank.").

Plaintiffs' expert also emphasized the crippling effect a designation would have on the Bank and the collateral damage to consumers, depositors, individuals with loans, and correspondent relationships. *See* Pls. Ex. 12, Winer Deposition at 169 ("You close a bank like Al-Rajhi Bank down like that with sanctions, you're affecting its correspondent relations everywhere. You're creating pools of money at banks all over the world related to their correspondent accounts. You're affecting the commercial activities of Saudi Arabia. That's going to be viewed by Saudi Arabia as an extremely hostile act."). *See also* Plaintiffs' Averment ¶¶ 181-187, 188-203.

Plaintiffs' experts have also testified that the U.S. government often deferred formal designations of Saudi charities and other entities, like ARB, despite having extensive evidence of their support for terrorism, choosing instead to pursue cooperative action with the Saudi government. *See, e.g.*, Pls. Ex. 171, Transcript, January 11, 2024 Deposition of Evan F. Kohlmann at 106:19-23 (testifying that U.S. documents indicate "the United States government wanted to take further action, but was waiting for the Saudis to see what they would do internally first"); 107:17-22 (testifying that "the U.S. government had decided to encourage Saudi Arabia to take action on its own instead of embarrassing the government by designating an office in the kingdom").

Finally, to the extent that ARB argues that the absence of any designation is equivalent to a finding that the person or entity is innocent of terrorism charges, that is baseless and disputed. *See, e.g.*, Pls. Ex. 12, Transcript, January 12, 2024 Deposition of Jonathan M. Winer at 167:2-10 ("I've been involved in designation processes and I have pushed for the designation of people in certain cases who in my opinion should have been designated and where there was absolutely sufficient objective evidence well beyond including evidence that they participated in terrorist activity, who are not designated for policy reasons of various kinds, not one, but multiple different kinds of policy reasons.").

| | |
|---|---|
| 119. The United States government never charged Al Rajhi Bank or Al Rajhi family members for connections to terrorism. *See* ARB Ex. 4 (Lormel Report) at 9 (explaining the FBI "did not find evidence sufficient to support criminal charges against the Bank [or] any members of the Al Rajhi family"); *see also* ARB Ex. 7 (May 27, 2021 FBI Report) at EO14040-000011 ("After nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged, which is consistent with the final conclusion of the 9/11 Commission Report which stated that [there was] 'no new information to date that would alter the original findings of the 9/11 Commission regarding the individuals responsible for the 9/11 attacks or for supporting those responsible for the attacks.'"). | Disputed to the extent ARB intended to suggest that U.S. authorities did not undertake serious actions to interdict ARB's terrorist activities. *See* Plaintiffs' response to No. 118.<br><br>Finally, Mr. Lormel's claims concerning the FBI's alleged investigation into ARB and Suleiman al Rajhi, and the findings of that investigation, have been flatly rejected by the FBI and DOJ. According to the FBI and DOJ, no investigation matching his expert report and deposition testimony was ever undertaken. *See* Ex. F, May 3, 2024 letter from Assistant U.S. Attorneys Sarah S. Normand and Jennifer Jude (stating that the FBI conducted supplemental searches for documents concerning "an investigation of the Bank or Sulaiman of the kind that Mr. Lormel describes in his report and deposition," and concluding that "[t]hose searches did not reveal information suggesting that the Bank or Sulaiman … were the focus of an investigation or investigative steps by the FBI during the time period Mr. Lormel described (September 11, 2001-December 31, 2003)."). Moreover, Mr. Lormel retired from the FBI in December 2003, before any such investigation into ARB and Suleiman al Rajhi could have been completed. Notably, soon after Mr. Lormel's departure from the FBI, he was hired by ▮▮▮▮▮ to provide consulting services in connection with a criminal investigation in the Eastern District of Virginia. That consulting engagement with ▮▮ ▮▮ included the SAAR Foundation, Mar-Jac Poultry, and Jamal Barzinji, an arrangement that was highly irregular at best. *See* ARB Ex. 61, Transcript, Deposition of Dennis Lormel, February 1, 2024 at 33:12-20; 53:22-60:7; 130:11-132:16. |
| 120. The U.S. government never took any other action against Al Rajhi Bank or Al Rajhi family members for connections to terrorism. *See* ARB Ex. 94 (Lormel Dep. Tr.) at 209:16-210:22 and Errata at 210:22 (testimony from Dennis Lormel, who led a comprehensive FBI investigation into Al Rajhi Bank's purported ties to Al Qaeda and found no support for those allegations, that if the U.S. government found clear evidence of anyone supporting 9/11, "actions would have been taken against them regardless of the political outcry" or the State Department's concerns about diplomatic ties); ARB Ex. 4 (Lormel Report) at 9 ("[N]either the United States nor the United Nations took action against Al Rajhi Bank or any member of the Al Rajhi family."); *id.* ("given the extensive and vigorous U.S. and U.N. response in the wake of 9/11, . . . if sufficient evidence linking Al Rajhi Bank or the Al Rajhi family to terrorism finance actually existed, the Bank, or members of the Al Rajhi family, would have been sanctioned or designated"). | Disputed to the extent ARB intended to suggest that U.S. authorities did not undertake serious actions to interdict ARB's terrorist activities. *See* Plaintiffs' response to No. 118.<br><br>By way of further response, Mr. Lormel's claims concerning the FBI's alleged investigation into ARB and Suleiman al Rajhi, and the findings of that investigation, have been flatly rejected by the FBI and DOJ. According to the FBI and DOJ, no investigation matching his expert report and deposition testimony was ever undertaken. *See* Ex. F, May 3, 2024 letter from Assistant U.S. Attorneys Sarah S. Normand and Jennifer Jude (stating that the FBI conducted supplemental searches for documents concerning "an investigation of the Bank or Sulaiman of the kind that Mr. Lormel describes in his report and deposition," and concluding that "[t]hose searches did not reveal information suggesting that the Bank or Sulaiman … were the focus of an investigation or investigative steps by the FBI during the time period Mr. Lormel described (September 11, 2001-December 31, 2003)."). Moreover, Mr. Lormel retired from the FBI in December 2003, before any such |

| | |
|---|---|
| | investigation into ARB and Suleiman al Rajhi could have been completed. Notably, soon after Mr. Lormel's departure from the FBI, he was hired by ███████ to provide consulting services in connection with a criminal investigation in the Eastern District of Virginia. That consulting engagement with ██ ██ included the SAAR Foundation, Mar-Jac Poultry, and Jamal Barzinji, an arrangement that was highly irregular at best. *See* ARB Ex. 61, Transcript, Deposition of Dennis Lormel, February 1, 2024 at 33:12-20; 53:22-60:7; 130:11-132:16. |
| 121. The United Nations never sanctioned or took any other action against Al Rajhi Bank or any Al Rajhi family members for connections to terrorism. *See* ARB Ex. 4 (Lormel Report) at 9 ("[N]either the United States nor the United Nations took action against Al Rajhi Bank or any member of the Al Rajhi family."); ARB Ex. 28 (Winer Dep. Tr.) at 160:16-18, 172:19-22 (agreeing that the United Nations never designated Al Rajhi Bank or any Al Rajhi family member). | Admitted but immaterial. *See* Plaintiffs' response to No. 118. |
| 122. SAMA never sanctioned or took any other action against Al Rajhi Bank for connections to terrorism. *See* ARB Ex. 2 (Hobayb Report) at 21-22. | Disputed to the extent ARB intended to suggest Plaintiffs were afforded fulsome discovery on this topic. Plaintiffs have not been afforded the opportunity to conduct discovery of SAMA concerning ARB's relationship and purported cooperation with SAMA following the 9/11 attacks, ARB's role in responding to U.S. government investigations and requests for information, ARB's compliance with SAMA's guidelines and regulations, including those related to anti-money laundering, and/or any sanction or other action taken against ARB by SAMA prior to or after the 9/11 attacks.

By way of further response, documents obtained from JPMorgan Chase Bank indicate that SAMA imposed fines on ARB for violations of procedures and rules associated with opening new customer accounts, including failing to obtain sufficient supporting customer documentation. Violations reportedly occurred in 2002, 2007, 2008, and 2009, and led to the implementation of intensive know-your-customer training, enhanced account review checklists, enhanced supervision over the account opening process, and the use automated tools to assess customer risk. *See* Pls. Ex. 138, JPMC 0001-228 at 225. *See also* Averment ¶ 144.

These are the same violations raised by Plaintiffs' expert following his review of the Al Haramain and IIRO Know-Your-Customer ("KYC") files and account opening records produced by ARB, which based on the JPMorgan Chase Bank records apparently persisted for years after the 9/11 attacks. *See, e.g.*, Pls. Ex. 4, Winer Report at 146 (stating that "ARB undertook only the most basic of all customer identification procedures," with account opening forms frequently omitting |

| | |
|---|---|
| | essential information); *id.* at 152-153 (detailing how ARB failed to undertake the proper due diligence steps required under its policies and procedures as set forth in ARB's Branch Manual, which would "have identified red flags that Al Haramain's accounts for many locations were at high risk of terrorist finance, especially those involved in providing funds to areas of active armed conflict"); *id.* at 152 (ARB failing to verify any data given by the charities when opening accounts); *id.* at 153 (ARB failing to obtain information concerning the charities' financial structure and annual financial statements). |
| 123. Plaintiffs' Corrected Averment identifies no evidence that any other governmental body anywhere has ever sanctioned or taken any other action against Al Rajhi Bank, any Al Rajhi Bank officer, director, or employee, or Al Rajhi family members for connections to terrorism. *See, e.g.*, Pls. Aver. ¶¶ 182-83; Pls. Ex. 4 (Winer Report) at 94-95. | Disputed. *See* Plaintiffs' response to No. 118. |
| ***VII. After The 9/11 Attacks, Al Rajhi Bank Cooperated With SAMA And U.S. Requests And Investigations*** | No response necessary. |
| 124.  After the 9/11 Attacks, Al Rajhi Bank cooperated with SAMA's requests and instructions to report, monitor, or block accounts. *See, e.g.*, Pls. Ex. 3 (Galloway Dep. Tr.) at 243:11-19, 346:7-347:13 and Errata at 243:15-16, 243:18, 346:8, 346:11, 346:25, 347:2, 347:7-8, 347:12; Pls. Ex. 1 (Abdullah Al Rajhi Dep. Tr.) at 66:13-24, 358:15-359:9 and Errata 66:24, 358:17, 358:22, 358:25 (explaining the Bank was "really proud of the work" it did after 9/11 to respond to requests and provide information "quickly"); ARB Ex. 8 (Nov. 16, 2002 Ltr. from Al Rajhi Bank to SAMA) at ARB-39559 (showing list of blocked accounts, including accounts of Osama bin Laden); ARB Ex. 62 (Oct. 24, 2001 faxes from Al Rajhi Bank) at ARB-14300-04 (reporting account data on individuals requested by SAMA). | It is not disputed that ARB responded to requests for information and instructions from SAMA, as testified by Abdullah al Rajhi. However, to the extent that ARB argues that it was simultaneously conducting its own internal investigations of potentially problematic accounts and transactions, that is disputed.

By way of example, notwithstanding the very public designations of Al Haramain branch offices in Somalia and Bosnia-Herzegovina on March 11, 2002 for "supporting terrorist activities and terrorist organizations such as al-Qaida, AIAI (al-Itihaad al-Islamiya), and others," ARB ignored those public allegations and continued to open new accounts for Al Haramain just a month later. *See* ARB 38600 (April 24, 2002 letter from Aqil al Aqil to ARB asking the Bank to open 10 new accounts for Al Haramain, with handwritten text from ARB stating "no objection."). Indeed, the March 2002 designation did not even elicit a pause from ARB to conduct an internal investigation concerning the allegations relating to Al Haramain, and it was business as usual for the Bank. Between April and December 2002, 16 new accounts were opened at ARB for Al Haramain. *See* Pls. Ex. 98 (Abdullah al Rajhi Exhibit 31) (chart of 94 AHIF accounts at ARB).

Later designations of the Al Haramain branch offices in Indonesia, Kenya, Pakistan, and Tanzania on January 22, 2004 for providing "financial, material and logistical support to the al-Qaida network and other terrorist organizations" similarly failed to convince ARB that it should undertake an internal investigation into the accounts it held for Al Haramain to |

|  | determine whether they reflected potential money laundering or counterterrorism financing risks. Although Abdullah al Rajhi agreed that ARB had an independent obligation to ensure its accounts weren't used for terrorism financing activities, when asked whether ARB did anything to investigate the accounts to determine whether they were opened properly, or whether there were any transactions that may have been problematic or raised red flags, Abdullah could not affirmatively say those internal inquiries occurred, despite being the General Manager of the Bank at that time (equivalent to the CEO). *See* Pls. Ex. 1, Transcript, September 17, 2023 Deposition of Abdullah bin Sulaiman al Rajhi at 93-101. Instead, ARB continued to work with Al Haramain and open new accounts for the al Qaeda charity front, notwithstanding the fact that the U.S. and Saudi governments were simultaneously designating Al Haramain branch offices for supporting al Qaeda. *See* ARB Ex. 26 (ARB 39505). |
|---|---|
| 125.  After the 9/11 Attacks, Al Rajhi Bank cooperated with investigations by the U.S. government, including by providing information through SAMA. Pls Ex. 1 (Abdullah bin Sulaiman Al Rajhi Dep. Tr.) at 358:15-359:9, 369:8-370:16 and Errata at 369:22, 370:15 (explaining the Bank was providing information to SAMA knowing it was being shared with the U.S. government, and was "really proud" of its efforts to respond and provide information quickly); *see also* ARB Ex. 4 (Lormel Report) at 19 ("I also have also not seen or been made aware of any evidence that Al Rajhi Bank failed to cooperate fully with any investigations conducted by either the Saudi government or the United States."). | Disputed. Plaintiffs have not been afforded the opportunity to conduct discovery of SAMA concerning ARB's relationship and purported cooperation with SAMA following the 9/11 attacks, ARB's role in responding to U.S. government investigations and requests for information, and ARB's compliance with SAMA's guidelines and regulations, including those related to anti-money laundering.<br><br>By way of further response, SAMA and ARB resisted a U.S. government proposal to conduct a joint examination of ARB given U.S. concerns that ARB was being used by al Qaeda and like-minded terrorist groups. For example, the U.S. sent senior Treasury official Juan Zarate to meet with the Saudis to formulate a plan for joint action between the two countries to deal with the continuing threat from the activities of ARB and the al Rajhi family three years after 9/11. *See* Averment ¶ 197. The U.S. "provided the Saudi government with information documenting specific instances of terrorists using the Al Rajhi Bank, including information about specific accounts and transactions of interest," and further presented a detailed proposal for a joint examination of ARB. *Id.* at ¶¶ 198-200. During those meetings, SAMA's Director of Banking Inspection Division, Ali bin Mohammed al Ghaith, represented to Mr. Zarate that ARB hired Ernst & Young in August 2003 to conduct a "full scope examination" of the Bank, and that the final report "did not indicate any wrong doings." *See id.* at ¶ 24; Pls. Ex. 2 (Pasley Exhibit 5), U.S. Diplomatic Cable, *Terrorist Financing: Al-Rajhi Bank*, September 27, 2004, at 1. When asked to produce documents concerning the proposed joint examination and the alleged Ernst & Young audit, ARB represented that it could not locate any responsive documents or information, indicating that Saudi authorities declined the U.S. government's proposal for |

| | a joint review of ARB's financial practices and suspect accounts, and that the "full scope examination" referenced by al Gaith does not exist. *See* Averment ¶¶ 201-203. |
|---|---|
| 126.  In jurisdictional discovery, Al Rajhi Bank produced 209 documents reflecting communications between the Bank and SAMA before and after the 9/11 Attacks. *See* Erb Decl. ¶¶ 3-5; *see also* Opp. to Pls. 2d Mot. to Compel 11 (ECF No. 8935) (describing Bank's search for documents relating to post-9/11 investigations and audits, and communications between the Bank and SAMA); Order 4 (July 11, 2023), ECF No. 9210 (finding Bank's search "reasonable"). | Disputed. First, to clarify, the Erb Declaration at ECF No. 9789 at ¶ 5 indicates 209 documents reflecting communications between the Bank and SAMA "after September 11, 2001," not before the 9/11 attacks. Second, Plaintiffs have not been afforded the opportunity to conduct discovery of SAMA concerning ARB's relationship and purported cooperation with SAMA following the 9/11 attacks, ARB's role in responding to U.S. government investigations and requests for information, and ARB's compliance with SAMA's guidelines and regulations, including those related to anti-money laundering. Third, to the extent that ARB argues that the communications are evidence of ARB's and SAMA's cooperation in post-9/11 investigations and audits, that is disputed. *See* Plaintiffs' responses to Nos. 124, 125. |
| 127.  These documents show the Bank was in compliance with SAMA's guidelines and regulations, and that the Bank was cooperating with SAMA's requests. ARB Ex. 2 (Hobayb Report) at 22 (noting "the Bank was not in violation of SAMA regulations for maintaining these accounts."); Pls. Ex. 1 (Abdullah Al Rajhi Dep. Tr.) at 358:15-359:9 and Errata 358:17, 358:22, 358:25 (describing pride in Bank's efforts to cooperate with SAMA's requests and quickly provide information after 9/11). | Disputed. Plaintiffs have not been afforded the opportunity to conduct discovery of SAMA concerning ARB's relationship and purported cooperation with SAMA following the 9/11 attacks, ARB's role in responding to U.S. government investigations and requests for information, and ARB's compliance with SAMA's guidelines and regulations, including those related to anti-money laundering.<br><br>By way of further response, ARB extensively violated international AML, CFT, and KYC standards, as well as SAMA guidelines and ARB's own (nominal) protocols, in relation to its opening, maintenance, and operation of accounts, including accounts for al Qaeda's charity fronts, financial facilitators, and Suleiman al Rajhi's own "charity" committee/foundation and its employees. *See* Averment ¶ 273. *See also* Pls. Ex. 4, Winer Report at 144 (stating that there is no evidence that ARB's AML Unit acted to ensure the Bank met the requirements imposed by SAMA); *id.* (stating that there is no evidence that ARB's AML Unit drafted reports concerning suspicious transactions that were reported to the AML Unit, or provided such reporting to SAMA); *id.* at 153 (indicating ARB's failure to adhere to SAMA's know-your-customer guidelines by not monitoring public media reports alleging the charities were supporting terrorists and extremists); *id.* at 155 (stating that there is no evidence that ARB's money-laundering and other compliance policies and procedures were audited, as required by the SAMA guidelines); *id.* (stating that there is no evidence ARB's AML Unit carried out the training required by SAMA); *id.* at 160-161 (indicating the documents do not show that ARB obtained information concerning the legal identity and structure of the IIRO prior to 9/11, as required by SAMA's 1995 Guidelines); |

| | |
|---|---|
| | *id.* at 168-169 (stating that ARB opened additional accounts for the Al Birr Islamic Committee without obtaining the required authorization from SAMA).<br><br>*See also* Plaintiffs' response to No. 122 (indicating that SAMA imposed fines on ARB for violations of procedures and rules associated with opening new customer accounts, including failing to obtain sufficient supporting customer documentation). |
| 128.  Plaintiffs have no evidence that SAMA's audits of Al Rajhi Bank during the relevant period ever found the Bank was not compliant with SAMA's guidelines and regulations, including those related to anti-money laundering. *See* ARB Ex. 3 (Pasley Report) at 11 ("As far as I have seen, SAMA never determined that the Bank was materially noncompliant with SAMA's requirements."); ARB Ex. 2 (Hobayb Report) at 4 (noting that SAMA was a "rigorous regulator" that subjected Saudi banks to "robust anti-money laundering controls on par with global standards."); Pls. Ex. 184 (Hobayb Dep. Tr.) at 36:12-13 (testifying that Saudi "banks are required to comply with [their] regulator [SAMA] and its regulations."). | Disputed. Plaintiffs have not been afforded the opportunity to conduct discovery of SAMA concerning ARB's relationship and purported cooperation with SAMA following the 9/11 attacks, ARB's role in responding to U.S. government investigations and requests for information, and ARB's compliance with SAMA's guidelines and regulations, including those related to anti-money laundering.<br><br>By way of further response, Plaintiffs sought the production of ARB audits or similar reviews concerning the al Qaeda charity fronts and financial facilitators at issue in discovery, as well as audits addressing the sufficiency of ARB's Anti-Money Laundering ("AML") and Combatting the Financing of Terrorism ("CFT") protocols and compliance with same, as authorized by the Court's November 22, 2021 Order at ECF No. 7378 ("Discovery Order No. 1"). *See* Averment ¶¶ 23-24. However, notwithstanding the fact that ARB has talked ad nauseum about ARB's Internal Auditing Department, Audit Committee, and the Bank's internal and external auditing policies and procedures throughout discovery, not a single audit was produced by the Bank. *See* Averment ¶ 25. *See also* Averment ¶ 26 (ARB's Rule 30(b)(6) designee identifying and describing annual branch audits, periodic thematic audits, short-notice audits, external auditing, and audits of all ARB branches conducted by the Bank's Internal Audit Department.). No audits pertaining to or referencing any of the accountholders were ever produced, whether for periods before or after the 9/11 attacks, indicating no such audits exist. *See* Averment ¶ 27. *See also* Pls. Ex. 4, Winer Report at 7 (stating that no audits have been produced by ARB), 155 (indicating "that no such audits have been provided to the plaintiffs in discovery"). Plaintiffs cannot be expected to evaluate whether SAMA's audits of ARB ever found the Bank was not compliant with SAMA's guidelines and regulations, including those related to anti-money laundering, if ARB is unwilling to produce audits as Plaintiffs requested. |
| 129.   Plaintiffs have no evidence that routine internal or external audits of Al Rajhi Bank during the relevant period ever found the Bank was materially noncompliant with SAMA's guidelines and regulations or the Bank's internal | Disputed. Plaintiffs have not been afforded the opportunity to conduct discovery of SAMA concerning ARB's relationship and purported cooperation with SAMA following the 9/11 attacks, ARB's role in responding to U.S. government |

policies. *See* ARB Ex. 2 (Hobayb Report) at 18 ("I have not seen anything to indicate that Al Rajhi Bank … was noncompliant with auditing and regulatory standards and procedures."); *id.* at 20 (noting "no evidence has been presented that these external auditors flagged noncompliance by Al Rajhi Bank"); ARB Ex. 3 (Pasley Report) at 9 ("The fact that these audits failed to reveal significant issues is evident from the Bank's Annual Reports, which are public, and which discuss the audits."); *id.* ("Presumably — given no evidence to the contrary — these audits did not uncover any significant noncompliance."); *see also, e.g.*, Pls. Ex. 6 (1998 Al Rajhi Bank Ann. Report) at PDF p. 72 and Pls. Ex. 7 (1999 Al Rajhi Bank Ann. Report) at PDF p. 77 and Pls. Ex. 8 (2000 Al Rajhi Bank Ann. Report) at PDF p. 42 and ARB Ex. 16 (2001 Al Rajhi Bank Ann. Report) at PDF p. 74 (external auditors' reports for 1998-2001 identifying no noncompliance by the Bank with its internal policies or local law).

investigations and requests for information, and ARB's compliance with SAMA's guidelines and regulations, including those related to anti-money laundering.

By way of further response, Plaintiffs sought the production of ARB audits or similar reviews concerning the al Qaeda charity fronts and financial facilitators at issue in discovery, as well as audits addressing the sufficiency of ARB's Anti-Money Laundering ("AML") and Combatting the Financing of Terrorism ("CFT") protocols and compliance with same, as authorized by the Court's November 22, 2021 Order at ECF No. 7378 ("Discovery Order No. 1"). *See* Averment ¶¶ 23-24. However, notwithstanding the fact that ARB has talked ad nauseum about ARB's Internal Auditing Department, Audit Committee, and the Bank's internal and external auditing policies and procedures throughout discovery, not a single audit was produced by the Bank. *See* Averment ¶ 25. *See also* Averment ¶ 26 (ARB's Rule 30(b)(6) designee identifying and describing annual branch audits, periodic thematic audits, short-notice audits, external auditing, and audits of all ARB branches conducted by the Bank's Internal Audit Department). No audits pertaining to or referencing any of the accountholders were ever produced, whether for periods before or after the 9/11 attacks, indicating no such audits exist. *See* Averment ¶ 27. *See also* Pls. Ex. 4, Winer Report at 7 (stating that no audits have been produced by ARB), 155 (indicating "that no such audits have been provided to the plaintiffs in discovery"). Plaintiffs cannot be expected to evaluate whether routine internal or external audits of ARB during the relevant period ever found the Bank was materially noncompliant with SAMA's guidelines and regulations or the Bank's internal policies, if ARB is unwilling to produce audits as Plaintiffs requested.

| | |
|---|---|
| ***VIII. Sulaiman Bin Abdulaziz Al Rajhi, One Of The Bank's Founders And Its Former Chairman, Is One Of The World's Leading Philanthropists And Strongly Condemned The 9/11 Attacks*** | No response necessary. |
| 130. Sulaiman bin Abdulaziz Al Rajhi, one of the Bank's Founders and its former Chairman, came from humble beginnings to become one of the world's leading philanthropists, donating billions of dollars to charities around the world. *See* ARB Ex. 36 (*Saudi Donates Billions to Charity*, Al Jazeera English (May 15, 2011), https://www.aljazeera.com/news/2011/5/15/saudidonates-billions-to-charity); Pls. Ex. 1 (Abdullah Al Rajhi Dep.) at 255:11-256:1 and Errata 255:16, 255:24, 255:25; ARB Ex. 37(Emmie Martin and Tanza Loudenback, 20 Most Generous People in the World, Business Insider (Oct 12, 2015) https://www.businessinsider.com/most-generous-people-in- | It is not disputed that Suleiman al Rajhi has been the subject of inadmissible media reporting concerning his purported philanthropy and charitable giving during his tenure at ARB. However, to the extent that ARB argues that Suleiman al Rajhi was a humble and benevolent individual that has consistently opposed Islamic radicalism, terrorism, and violence, that is disputed.

First, U.S. government intelligence has assessed that Suleiman al Rajhi has for years supported Islamic extremist policy and has known that Islamic extremists were using ARB for their banking needs. *See, e.g.*, Pls. Ex. 45, *Saudi-Based Financial* |

| | |
|---|---|
| the-world-2015-10); ARB Ex. 1 (Dean Report) at 17 (describing Sulaiman Al Rajhi as "famously humble and generous" and "one of the most generous people in the world"). | *Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149-150 (stating that "Sulaymen al-Rajhi, the family patriarch, has been widely reported to support Islamic extremist policy); Pls. Ex. 10 – *Al-Rajhi Bank: Conduit for Extremist Finance*, May 28, 2003, CIA-SUB_0001-6 at 2 ("Senior al-Rajhi family members have long supported Islamic extremists and probably know that terrorists use their bank."). *See also* Averment ¶¶ 176, 179.<br><br>Second, CIA reporting further determined that Suleiman al Rajhi, and the Bank and his family, knowingly supported and donated money to al Qaeda charity fronts Al Haramain, IIRO, and WAMY, and other charities suspected of supporting terrorism. *See, e.g.*, Pls. Ex. 9, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, undated, CIA_00720-804 at 723 ("The family and the bank purportedly also support NGOs who help finance the Bosnian Mujahideen, HAMAS, and other extremists."); *id.* at 743 ("REDACTED] Al Rajhi financial support for several other Saudi NGOs that purportedly divert funds to Islamic extremists."); *id.* ("The bank is a primary donor to Al-Nadwas al-Alamiyya Lil Shabab al Islami, a Saudi NGO that is suspected of financing Hamas"); Pls. Ex. 10, *Al-Rajhi Bank: Conduit for Extremist Finance*, May 28, 2003, CIA-SUB_0001-6 at 5 ("Senior al-Rajhi family members, including family patriarch Sulayman al-Rajhi, have donated money to NGOs suspected of supporting terrorism."); *id.* ("[REDACTED] March 2003, Sulayman al-Rajhi defended his donations to the al-Haramain Islamic Foundation, which has come under scrutiny for its support to extremists."); Pls. Ex. 55, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 221 ("Many prominent Saudi businessmen contribute generously to the IIRO through their *zakat* contributions, including the Al Rajhi family."); Pls. Ex. 66, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 826 ("WAMY has offices worldwide and is funded by donations from wealthy Saudi merchants and prominent businesses, such as the Al Rajhi Banking Corporation."); Pls. Ex. 91, *Usama Bin Ladin's Finances: Some Estimates of Wealth, Income, and Expenditures*, November 17, 1998, CIA_00317-338 at 338 ("'Sheikh Rajhi,' [REDACTED] deposited [REDACTED] into a [REDACTED] bank account controlled by Maktab al-Khidamat, an Islamic charity closely associated with Usama Bin Ladin since the early 1980s."). *See also* Averment ¶¶ 145, 154, 179.<br><br>Third, a list of Suleiman al Rajhi's "Foreign and Domestic Distributions for the Year 1419-1420," (encompassing one distribution in August 1998 and numerous donations between |

|  |  |
|---|---|
|  | January-September 1999), and a selection of distribution checks issued by ARB via its Payable Through Account at Chase Manhattan in New York, identify significant transfers of funds to *inter alia*: (1) al Qaeda charity fronts Al Haramain, Muslim World League ("MWL"), and World Assembly of Muslim Youth ("WAMY"); (2) the Dar al Hijra Association in the Philippines, a front for the Abu Sayyef Group, a key al Qaeda affiliate; (3) Taibah Aid Association, an entity with extensive ties to al Qaeda; and (4) the Al Noor Mosque, a mosque favored by the al Qaeda Hamburg cell that included 9/11 hijackers Mohammed Atta, Marwan al Shehhi, and Ziad Jarrah. *See* Pls. Ex. 29 (Galloway Exhibit 22), NL 15043-10546. *See also* Averment ¶¶ 415-428.

Suleiman al Rajhi was also a supporter of Sheikh Soliman Nassir Abdullah al Alwan, a radical cleric who recruited several of the 9/11 hijackers. As late as 2003, al Alwan was spewing violent anti-American rhetoric to an audience of hundreds *at the Al Rajhi Mosque*, funded and named for Suleiman al Rajhi, telling listeners "America and their allies, hell is their destination for the crimes they have committed," and calling them "invaders and colonists." Al Alwan held six accounts at ARB. *See* Averment ¶¶ 265-269.0

Finally, Suleiman al Rajhi and ARB maintained a close relationship with radical cleric Salman al Awdah, who endorsed ARB, after which "the Al Rajhi family [] became a major financial supporter of Awdah." *See* Pls. Ex. 9 – *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, undated, CIA_00720-804 at 748; Pls. Ex. 4, Winer Report at 67; Pls. Ex. 38, Kohlmann Report at 16 (discussing al Awdah's links to militant jihad and bin Laden/al Qaeda). *See also* Averment ¶ 161.

*See also* Plaintiffs' responses to Nos. 1, 3. |
| 131. Al Rajhi Bank and its officers and directors have consistently condemned the 9/11 Attacks. *See* Pls. Ex. 1 (Abdullah bin Sulaiman Al Rajhi Dep. Tr.) at 350:22-352:2 and Errata 351:4, 351:19 (Al Rajhi Bank's Chairman testifying that he and his father, the Bank's former Chairman Sulaiman bin Abdulaziz Al Rajhi, were shocked and saddened by the 9/11 Attacks). When Sulaiman bin Abdulaziz Al Rajhi heard about the 9/11 Attacks, he told his son, Abdullah bin Sulaiman Al Rajhi (then the Bank's General Manager, and currently its Chairman) that "this is murder. This is a crime." Pls. Ex. 1 (Abdullah bin Sulaiman Al Rajhi Dep. Tr.) at 350:22-351:4. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 1, 2, 4, 5, 6, 130, 136. |
| 132. Sulaiman bin Abdulaziz Al Rajhi abhorred terrorism, and told his son, Abdullah bin Sulaiman Al Rajhi "many, many times" that "if you as an individual kill one person, it's like | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 1, 2, 4, 5, 6, 130. |

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

| | |
|---|---|
| you are killing the whole humanity." Pls. Ex. 1 (Abdullah bin Sulaiman Al Rajhi Dep. Tr.) at 351:4-17 and Errata 351:5. | |
| 133. Sulaiman bin Abdulaziz Al Rajhi "is a religious person," but he opposes "radical or extremist belief[s]." Pls. Ex. 1 (Abdullah bin Sulaiman Al Rajhi Dep. Tr.) at 352:19-25; *see also* ARB Ex. 1 (Dean Report) at 17 ("[W]ithin al-Qaeda, Sulaiman Al Rajhi had a reputation as not being sympathetic to al-Qaeda's extreme views and instead as being an adherent of the nonviolent, 'Quietist' branch of Salafism."). | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 1, 2, 4, 5, 6, 130. |
| 134. Sulaiman bin Abdulaziz Al Rajhi said "many times" that "he doesn't agree that Osama bin Laden or al-Qaeda [] are representing Islam or acting on behalf of Islam." Pls. Ex. 1 (Abdullah bin Sulaiman Al Rajhi Dep. Tr.) at 351:23-352:2. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 1, 2, 4, 5, 6, 130. |
| 135. Sulaiman bin Abdulaziz Al Rajhi retired from his role as Chairman of the Board at Al Rajhi Bank in 2014, at the age of 86, due to his advanced age. Pls. Ex. 3 (Galloway Dep. Tr.) at 292:9-21. | Disputed. *See* Plaintiffs' responses to Nos. 7, 118. Plaintiffs contend that Suleiman al Rajhi was forced to relinquish his control over ARB as part of a number of reforms to the Bank, including leadership and managerial changes, following direct negotiations between the United States and Saudi government. |
| 136. Abdullah bin Sulaiman Al Rajhi was likewise shocked and saddened by the 9/11 Attacks. *See* Pls. Ex. 1 (Abdullah bin Sulaiman Al Rajhi Dep. Tr.) at 350:4-352:2 and Errata 350:19-21, 351:5, 351:19. | It is not disputed that Abdullah al Rajhi made those self-serving remarks during his deposition. However, to the extent that ARB argues that this shows that Abdullah al Rajhi has consistently opposed Islamic radicalism, terrorism, and violence, that is disputed. Abdullah al Rajhi played a significant role in helping his father establish and oversee the operations of various entities that financially supported extremist and terrorist causes, both in the United States and Saudi Arabia. |
| | Abdullah al Rajhi is Suleiman al Rajhi's son, and has served for many years as a senior official of ARB. During the 1998 through 2004 time period in particular, he was ARB's General Manager (equivalent to the Chief Executive Officer) and a member of its Board of Directors. In his capacity as General Manager, Abdullah al Rajhi oversaw the day-to-day operations of the bank, and reported to the Managing Director (his father) and the bank's Board of Directors. *See* Averment ¶¶ 30-33. |
| | Abdullah al Rajhi helped his father Suleiman establish and oversee a web of interrelated "charities" and institutions in the United States, including the SAAR Foundation, Inc. *See* Averment ¶¶ 30-33, 45 (detailing records identifying Abdullah al Rajhi as a SAAR Foundation Director and Board of Trustees member), 396, 397. Importantly, Abdullah al Rajhi testified that he and his father took deliberate steps to obscure and conceal their roles and involvement in the SAAR Foundation, including by intentionally and illegally using various false or misspelled names and fictitious addresses on official |

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

documents filed with the Commonwealth of Virginia. *See* Averment ¶ 45; Pls. Ex. 1, Al Rajhi Deposition at 311-315.

According to the December 2004 joint FBI-CIA assessment, the U.S.-based SAAR Foundation and its associated entities were "a complex web of overlapping companies with parallel ideologies, personal relationships, and financial associates that has exhibited numerous affiliations with entities known to support terrorism … the SAAR Foundation, in concert with its subsidiary companies, provided monetary support and other assistance to organizations linked to the Palestinian Islamic Jihad and HAMAS." *See* Averment ¶¶ 48-49, citing Pls. Ex. 26 (Lormel Exhibit 9), *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States*, December 2004, EO14040-003414-3442 at 3438. Moreover, in response to public reporting detailing evidence that one of the entities comprising Suleiman al Rajhi's SAAR Foundation was part of an "international ring to financing Islamic terrorists," Abdullah al Rajhi played a significant role in taking steps to move the SAAR Foundation operation overseas to the Isle of Man, a notorious bank secrecy haven. *See* Averment ¶¶ 291-293, 324, 399, 400.

In addition, Abdullah al Rajhi, while serving as an official of the Bank, provided extensive oversight of the operations and activities of Suleiman al Rajhi's charity committee/foundation, including financial contributions to al Qaeda charity fronts Al Haramain and IIRO. *See* Averment ¶¶ 51, 392; *see also* Pls. Ex. 29, NL 15578, 15043-15046 (letter and chart from Abdullah al Rajhi listing financial contributions from Suleiman al Rajhi's charity committee/foundation to Al Haramain, Muslim World League ("MWL"), World Assembly of Muslim Youth ("WAMY"), and others). Moreover, following concerns that funds distributed by Suleiman al Rajhi's charity committee/foundation were linked to terrorist activities, and while under investigation by the U.S. government and Internal Revenue Service ("IRS"), Abdullah al Rajhi orchestrated an arrangement that donations by his father's charity committee/foundation would be attributed, after the fact, to Humana Charitable Trust, as though Humana itself made the financial contributions. *See* Averment ¶¶ 50-51, 408-414, 468.

Moreover, Osama bin Laden's brother-in-law and IIRO official Mohamed Jamal Khalifa opened an account at ARB in 1987, granting power of attorney to Shaikha Mohammed bin Laden, a relative of Osama bin Laden. Khalifa's account was opened near the end of the Afghan jihad, during which Khalifa was known to have worked alongside bin Laden, and specifically approved by Abdullah al Rajhi. *See* Averment ¶¶ 243-244. *See also* Pls. Ex. 121, ARB 1098-1105 at 1104.

|  |  |
|---|---|
|  | Finally, during the many years that Abdullah al Rajhi served as a senior executive of ARB, the Bank was the "bank of choice" for al Qaeda, al Qaeda charity fronts, al Qaeda operatives, like-minded terrorists, and Islamic extremists. *See* Averment ¶¶ 204-272. |
| 137.  Like his father, Abdullah bin Sulaiman Al Rajhi is not an "extremist," and he opposes violence and terrorism. *See* Pls. Ex. 1 (Abdullah bin Sulaiman Al Rajhi Dep. Tr.) at 352:13-18. | Disputed. *See, e.g.*, Plaintiffs' responses to No. 1, 2, 4, 5, 6, 136. |
| 138.  Sulaiman bin Abdulaziz Al Rajhi and Abdullah bin Sulaiman Al Rajhi were dismissed as defendants in the 9/11 MDL litigation in 2010 for lack of personal jurisdiction. *In re Terrorist Attacks on Sept. 11, 2001* ("*Terrorist Attacks IV*"), 718 F. Supp. 2d 456, 485, 495 (S.D.N.Y. 2010) (dismissing claims against Sulaiman bin Abdulaziz Al Rajhi, a founder and former Chairman of the Bank, and Abdullah bin Sulaiman Al Rajhi, the Bank's Current Chairman), *aff'd sub nom. O'Neill v. Asat Tr. Reg.* ("*Terrorist Attacks VII*"), 714 F.3d 659, 675-76 (2d Cir. 2013), cert denied 134 S. Ct. 2870 (2014). | Immaterial. The Court's dismissal of Suleiman al Rajhi and Abdullah al Rajhi for lack of personal jurisdiction in 2013 is irrelevant to the current proceedings involving ARB. Although the Court found Plaintiffs' allegations were not enough for jurisdiction over the al Rajhis in 2013, Plaintiffs have presented the Court with a mountain of evidence and information – ARB banking records; Executive Order 14040 declassified records, including CIA, FBI, Treasury, and other intelligence reports; Executive Order 13224 designation materials; expert reports; deposition testimony; media reporting; and key pleadings from relevant criminal matters and other U.S. litigation – in support Plaintiffs' claims that (i) ARB, Suleiman al Rajhi, Abdullah al Rajhi, and members of the al Rajhi family for years supported and funded al Qaeda, al Qaeda charity fronts (Al Haramain, IIRO, and others), Islamic extremists, and other terrorist groups; (ii) ARB was the "bank of choice" for al Qaeda, Islamic militants and extremists, and others; and (iii) ARB supported and maintained accounts for Osama bin Laden, al Qaeda operatives and financiers, al Qaeda charity fronts, al Qaeda recruiters, Executive Order 13224 Specially Designated Global Terrorists ("SDGTs"), 9/11 hijackers, Islamic extremists, and other individuals linked to terrorism. All of this occurred under the leadership of Suleiman al Rajhi and Abdullah al Rajhi. *See, e.g.*, Plaintiffs' responses to Nos. 1, 3-6, 40-90, 130, 136. |
| *IX. None Of The Bank's Officers Or Directors Supported The 9/11 Attacks Or Other Terrorism* | No response necessary. |
| 139.  Abdullah bin Sulaiman Al Rajhi, the Bank's current Chairman, who served as the Bank's General Manager and Managing Director during the relevant period, has never met Osama bin Laden or supported Osama bin Laden, Al Qaeda or other terrorists, or terrorism at all. Pls. Ex. 1 (Abdullah bin Sulaiman Al Rajhi Dep. Tr.) at 353:7-10, 355:4-8, 356:4-10. | Disputed. *See, e.g.*, Plaintiffs' response to No. 1, 2, 4, 5, 6, 136. |
| 140.  Sulaiman bin Abdulaziz Al Rajhi, a founder of the Bank, and the Bank's Chairman during the relevant period, has never met Osama bin Laden or supported Osama bin Laden, Al | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 1, 2, 4, 5, 6, 130. |

| | |
|---|---|
| Qaeda or other terrorists, or terrorism at all. *See* Pls. Ex. 1 (Abdullah bin Sulaiman Al Rajhi Dep. Tr.) at 351:3-352:2, 352:18-353:5, 354:17-355:3 and Errata 351:5, 351:19 (stating that to the best of his knowledge Sulaiman bin Abdulaziz Al Rajhi has never supported Osama bin Laden, Al Qaeda or other terrorists, or terrorism in any form). | |
| 141. No Al Rajhi Bank officer or director has ever supported Osama bin Laden, Al Qaeda or other terrorists, or terrorism in any form. *See* Pls. Ex. 1 (Abdullah bin Sulaiman Al Rajhi Dep. Tr.) at 355:4-8. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 1, 2, 4, 5, 6, 130, 136. |
| 142. Plaintiffs have no evidence that Sulaiman bin Abdulaziz Al Rajhi or Abdullah bin Sulaiman Al Rajhi ever directed any Bank officer or employee to take any action to support Al Qaeda or any terrorism against the United States, including the 9/11 Attacks. *See generally* Pls. Aver. (and in particular § IV (discussing Al Rajhi Bank and its "principals," but presenting no evidence of any direction from Sulaiman bin Abdulaziz Al Rajhi or Abdullah bin Sulaiman Al Rajhi to any Bank officer or employee to take any action to support Al Qaeda or any terrorism against the United States, including the 9/11 Attacks)). | Disputed. ARB, Suleiman al Rajhi, and the al Rajhi family financially supported and donated money to al Qaeda charity fronts Al Haramain, IIRO, WAMY, and other charities suspected of supporting terrorism. *See, e.g.*, Pls. Ex. 9, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, undated, CIA_00720-804 at 723 ("The family and the bank purportedly also support NGOs who help finance the Bosnian Mujahideen, HAMAS, and other extremists."); *id.* at 743 ("REDACTED] Al Rajhi financial support for several other Saudi NGOs that purportedly divert funds to Islamic extremists."); *id.* ("The bank is a primary donor to Al-Nadwas al-Alamiyya Lil Shabab al Islami, a Saudi NGO that is suspected of financing Hamas"); Pls. Ex. 10, *Al-Rajhi Bank: Conduit for Extremist Finance*, May 28, 2003, CIA-SUB_0001-6 at 5 ("Senior al-Rajhi family members, including family patriarch Sulayman al-Rajhi, have donated money to NGOs suspected of supporting terrorism."); *id.* ("[REDACTED] March 2003, Sulayman al-Rajhi defended his donations to the al-Haramain Islamic Foundation, which has come under scrutiny for its support to extremists."); Pls. Ex. 55, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 221 ("Many prominent Saudi businessmen contribute generously to the IIRO through their *zakat* contributions, including the Al Rajhi family."); Pls. Ex. 66, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 826 ("WAMY has offices worldwide and is funded by donations from wealthy Saudi merchants and prominent businesses, such as the Al Rajhi Banking Corporation."); Pls. Ex. 91, *Usama Bin Ladin's Finances: Some Estimates of Wealth, Income, and Expenditures*, November 17, 1998, CIA_00317-338 at 338 ("'Sheikh Rajhi,' [REDACTED] deposited [REDACTED] into a [REDACTED] bank account controlled by Maktab al-Khidamat, an Islamic charity closely associated with Usama Bin Ladin since the early 1980s."). *See also* Averment ¶¶ 145, 154, 179. |

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

| | |
|---|---|
| | Following the 9/11 attacks, Suleiman al Rajhi, Abdullah al Rajhi, and the Bank were faced with intense government scrutiny and moved to conceal their activities from financial regulatory authorities. As part of that effort to conceal their disbursement of funds to the al Qaeda charity fronts, Suleiman al Rajhi directed members of the ARB Board of Directors "to explore financial instruments that would allow the bank's charitable contributions to avoid official Saudi scrutiny." *See* Pls. Ex. 10 – *Al-Rajhi Bank: Conduit for Extremist Finance*, May 28, 2003, CIA-SUB_0001-6 at 5. *See also* Averment ¶ 179. |
| 143. Plaintiffs have no evidence that any of Sulaiman bin Abdulaziz Al Rajhi, the Saudi-based Sulaiman bin Abdulaziz Al Rajhi Charitable Foundation, the U.S.-based SAAR Foundation, Abdullah bin Sulaiman Al Rajhi, or any Al Rajhi Bank officer, director, or employee made any donation knowing or intending that the donation would be used or diverted to support Al Qaeda or any terrorism against the United States, including the 9/11 Attacks, or that any such purported knowledge or intent was shared with the Bank. *See generally* Pls. Aver. (and in particular § IV), Pls. Ex. 4 (Winer Report) (and in particular at § 11) & Pls. Ex. 38 (Kohlmann Report) (all failing to identify a single donation from the Bank in support of Al Qaeda or any terrorism against the United States, including the 9/11 Attacks); see also ARB Ex. 4 (Lormel Report) at 32-34 (explaining that the FBI's investigations into the U.S.-based SAAR Foundation, Al Rajhi Bank, and members of the Al Rajhi family found no credible evidence of links to terrorism, and that Plaintiffs' experts' allegations as to the Saudi-based Sulaiman bin Abdulaziz Al Rajhi Charitable Foundation are likewise insufficient to show terrorist finance); *see also* ARB Ex. 3 (Pasley Report) at 17 ("Given this fact, based on my experiences and expertise, I do not see how the Bank or, for that matter, individual donors, could have determined how and when and to what extent this large and prominent NGO was using a small portion of funds — wittingly or unwittingly — for illicit purposes."). | Disputed. Suleiman al Rajhi, ARB, and the al Rajhi family were key financial supporters of Osama bin Laden and al Qaeda for years leading up to the September 11, 2001 attacks. *See, e.g.*, Plaintiffs' responses to Nos. 1, 2, 5, 6.

In addition, CIA reporting has assessed that ARB, Suleiman al Rajhi, and members of the al Rajhi family knowingly supported and funded al Qaeda, al Qaeda charity fronts, Islamic extremists, other terror organizations for years. *See, e.g.*, Pls. Ex. 9 – *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, undated, CIA_00720-804 at 723 ("The religiously ultraconservative Al Rajhi family – owners of the Al Rajhi Banking & Investment Company, with $8.6 billion of total assets – appears to be a key financial backer of the Afghan Mujahideen, [REDACTED]. The family and the bank purportedly also support NGOs who help finance the Bosnian Mujahideen, HAMAS, and other extremists."); Ex. 10 – *Al-Rajhi Bank: Conduit for Extremist Finance*, May 28, 2003, CIA-SUB_0001-6 at 2 ("Senior al-Rajhi family members have long supported Islamic extremists"); Pls. Ex. 46, *Identifying Al-Qa'ida's Donors and Fundraisers: A Status Report*, February 27, 2002, CIA_00193-199 at 198 ("Illicit Activity: [REDACTED] several Al Rajhi family members donate money to businesses tied to terrorists and personally oversee transactions destined for terrorists."). *See also* Averment ¶¶ 154, 178, 179, 539.

CIA reporting also confirms that ARB, Suleiman al Rajhi and his family knew that ARB was the "bank of choice" for al Qaeda, Islamic extremists, and other terror groups. *See* Pls. Ex. 10 – *Al-Rajhi Bank: Conduit for Extremist Finance*, May 28, 2003, CIA-SUB_0001-6 at 2 ("Senior al-Rajhi family members have long supported Islamic extremists and probably know that terrorists use their bank."); *id.* at 4 ("Sulayman's tight control of ARABIC activities suggests he is witting of his bank is attractive to extremists."). *See* Averment ¶¶ 34, 178, 179, 204-272. *See also* Plaintiffs' responses to Nos. 1, 4 |

| | |
|---|---|
| | (ARB was the "bank of choice" for al Qaeda and Islamic extremists.). |
| | Finally, Mr. Lormel's claims concerning the FBI's alleged investigation into ARB and Suleiman al Rajhi, and the findings of that investigation, have been flatly rejected by the FBI and DOJ. According to the FBI and DOJ, no investigation matching his expert report and deposition testimony was ever undertaken. *See* Ex. F, May 3, 2024 letter from Assistant U.S. Attorneys Sarah S. Normand and Jennifer Jude (stating that the FBI conducted supplemental searches for documents concerning "an investigation of the Bank or Sulaiman of the kind that Mr. Lormel describes in his report and deposition," and concluding that "[t]hose searches did not reveal information suggesting that the Bank or Sulaiman … were the focus of an investigation or investigative steps by the FBI during the time period Mr. Lormel described (September 11, 2001-December 31, 2003)."). Moreover, Mr. Lormel retired from the FBI in December 2003, before any such investigation into ARB and Suleiman al Rajhi could have been completed. Notably, soon after Mr. Lormel's departure from the FBI, he was hired by ▓▓▓▓▓▓▓ to provide consulting services in connection with a criminal investigation in the Eastern District of Virginia. That consulting engagement with ▓▓ ▓▓▓▓ included the SAAR Foundation, Mar-Jac Poultry, and Jamal Barzinji, an arrangement that was highly irregular at best. *See* ARB Ex. 61, Transcript, Deposition of Dennis Lormel, February 1, 2024 at 33:12-20; 53:22-60:7; 130:11-132:16. |
| 144.  Plaintiffs have no evidence tracing any donation from any of Sulaiman bin Abdulaziz Al Rajhi, the Saudi-based Sulaiman bin Abdulaziz Al Rajhi Charitable Foundation, the U.S.-based SAAR Foundation, Abdullah bin Sulaiman Al Rajhi, or any Al Rajhi Bank director, officer, or employee to Al Qaeda, or for the financing, planning, or carrying out of the 9/11 Attacks. *See generally* Pls. Aver. (and in particular § IV), Pls. Ex. 4 (Winer Report) (and in particular at § 11) & Pls. Ex. 38 (Kohlmann Report) (all failing to identify a single donation from these individuals in support of Al Qaeda or any terrorism against the United States, including the 9/11 Attacks); *see also* ARB Ex. 4 (Lormel Report) at 32-34 (explaining that the FBI's investigations into the U.S.-based SAAR Foundation, Al Rajhi Bank, and members of the Al Rajhi family found no credible evidence of links to terrorism, and that Plaintiffs' experts allegations as to the Saudi-based Sulaiman bin Abdulaziz Al Rajhi Charitable Foundation are likewise insufficient to show terrorist finance). | Disputed. ARB's claim that there is no evidence that any donation or transaction by Suleiman al Rajhi, members of the al Rajhi family, Suleiman al Rajhi's charity committee/foundation, or others conducted through the Bank has been traced or connected to the planning or carrying out of terrorism against the United States, including the 9/11 attacks themselves, is inaccurate and misleading.<br><br>ARB, Suleiman al Rajhi, members of the al Rajhi, and others were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and were specifically aware of al Qaeda's mission and intent to attack the United States. Intending to foster al Qaeda's terrorist agenda, they provided substantial financial assistance to al Qaeda charity and business fronts and other intermediaries through the Bank, knowing that the funds would be received by Osama bin Laden and al Qaeda. *See* Averment generally. Plaintiffs' Averment also shows how the support provided to al Qaeda by these parties allowed al Qaeda to acquire the strike capabilities needed to carry out the 9/11 attacks. *See* Averment ¶¶ 53-132. Plaintiffs need not prove that the donation or |

| | |
|---|---|
| | transaction at issue was traced to the terrorist plot or the attack itself.<br><br>By way of further response, Plaintiffs have identified payments from ARB and Suleiman al Rajhi to the al Qaeda charity fronts. *See* Plaintiffs' response to No. 6.<br><br>Finally, Mr. Lormel's claims concerning the FBI's alleged investigation into ARB and Suleiman al Rajhi, and the findings of that investigation, have been flatly rejected by the FBI and DOJ. According to the FBI and DOJ, no investigation matching his expert report and deposition testimony was ever undertaken. *See* Ex. F, May 3, 2024 letter from Assistant U.S. Attorneys Sarah S. Normand and Jennifer Jude (stating that the FBI conducted supplemental searches for documents concerning "an investigation of the Bank or Sulaiman of the kind that Mr. Lormel describes in his report and deposition," and concluding that "[t]hose searches did not reveal information suggesting that the Bank or Sulaiman … were the focus of an investigation or investigative steps by the FBI during the time period Mr. Lormel described (September 11, 2001-December 31, 2003).").  Moreover, Mr. Lormel retired from the FBI in December 2003, before any such investigation into ARB and Suleiman al Rajhi could have been completed. Notably, soon after Mr. Lormel's departure from the FBI, he was hired by ██████████ to provide consulting services in connection with a criminal investigation in the Eastern District of Virginia. That consulting engagement with ██ ████ included the SAAR Foundation, Mar-Jac Poultry, and Jamal Barzinji, an arrangement that was highly irregular at best. *See* ARB Ex. 61, Transcript, Deposition of Dennis Lormel, February 1, 2024 at 33:12-20; 53:22-60:7; 130:11-132:16. |
| 145.  Plaintiffs' Corrected Averment fails to identify any evidence that any of Sulaiman bin Abdulaziz Al Rajhi, the Saudi-based Sulaiman bin Abdulaziz Al Rajhi Charitable Foundation, the U.S.-based SAAR Foundation, Abdullah bin Sulaiman Al Rajhi, or any Al Rajhi Bank director, officer or employee ever withdrew or transferred funds from accounts at Al Rajhi Bank to support the 9/11 Attacks. *See generally* Pls. Aver. (and in particular § IV), Pls. Ex. 4 (Winer Report) (and in particular at § 11) & Pls. Ex. 38 (Kohlmann Report) (all failing to identify a single transaction through Al Rajhi Bank that supported Al Qaeda or any terrorism against the United States, including the 9/11 Attacks); *see also* ARB Ex. 4 (Lormel Report) at 32-34 (explaining that the FBI's investigations into the SAAR Foundation, Al Rajhi Bank, and members of the Al Rajhi family found no credible evidence of links to terrorism, and that Plaintiffs' experts allegations as to the Sulaiman bin Abdulaziz Al Rajhi Charitable Foundation are likewise insufficient to show terrorist finance). | Disputed. ARB and Suleiman al Rajhi established a "Payable Through Account" at Chase Manhattan Bank in New York, a mechanism used by the Bank to obscure the origin and destination of funds transmitted to al Qaeda, al Qaeda proxies, and affiliated anti-American extremists and jihadists, including funds originating from ARB Chairman Suleiman al Rajhi. *See, e.g.*, Averment ¶¶ 11, 36-39, 52, 264, 392, 401, 404, 412, 414-419, 429-488.<br><br>The Payable Through Account was used to transmit money to at least two individuals associated with the Saudi support network in the United States assisting the 9/11 hijackers – Khalid al Sowailem, the head of the Ministry of Islamic Affairs' Da'wah Office in the Saudi Embassy in Washington, D.C.; and Omar al Bayoumi, a Saudi agent known to have provided substantial assistance to the 9/11 hijackers. *See* Averment ¶¶ 472-478; *see also* ¶¶ 475, 479 (indicating that Bayoumi and Fahad al Thumairy (an extremist Saudi |

| | |
|---|---|
| | government imam employed by the Ministry of Islamic Affairs, who, along with Bayoumi, provided substantial assistance to the 9/11 hijackers) were in telephone contact with two officials of Suleiman al Rajhi's charity committee/foundation, Abdul Rahman al Rajhi and Abdullah al Misfer). |
| | In addition, ARB employee named Towayan al Towayan "had significant direct and indirect contacts with several subjects and active participants in the World Trade Center (WTC) attacks," including Omar al Bayoumi and 9/11 hijacker Hani Hanjour. *See* Averment ¶¶ 489-508. Towayan arrived in San Diego in approximately early 2001, moving into the same apartment complex where Omar al Bayoumi lived and where hijackers Nawaf al Hazmi and Khalid al Mihdhar had resided the prior year. *See* Averment ¶ 498; Pls. Ex. 209, FBI Report, September 27, 2001, EO14040-002857-2863-MDL at 2858. Both prior to and after Towayan's arrival in San Diego, significant sums of money were being deposited into his ARB account and then withdrawn. *See* Averment ¶¶ 494-499. |
| | Finally, Mr. Lormel's claims concerning the FBI's alleged investigation into ARB and Suleiman al Rajhi, and the findings of that investigation, have been flatly rejected by the FBI and DOJ. According to the FBI and DOJ, no investigation matching his expert report and deposition testimony was ever undertaken. *See* Ex. F, May 3, 2024 letter from Assistant U.S. Attorneys Sarah S. Normand and Jennifer Jude (stating that the FBI conducted supplemental searches for documents concerning "an investigation of the Bank or Sulaiman of the kind that Mr. Lormel describes in his report and deposition," and concluding that "[t]hose searches did not reveal information suggesting that the Bank or Sulaiman … were the focus of an investigation or investigative steps by the FBI during the time period Mr. Lormel described (September 11, 2001-December 31, 2003)."). Moreover, Mr. Lormel retired from the FBI in December 2003, before any such investigation into ARB and Suleiman al Rajhi could have been completed. Notably, soon after Mr. Lormel's departure from the FBI, he was hired by ███████ to provide consulting services in connection with a criminal investigation in the Eastern District of Virginia. That consulting engagement with ██. ███ included the SAAR Foundation, Mar-Jac Poultry, and Jamal Barzinji, an arrangement that was highly irregular at best. *See* ARB Ex. 61, Transcript, Deposition of Dennis Lormel, February 1, 2024 at 33:12-20; 53:22-60:7; 130:11-132:16. |
| 146. Plaintiffs have no evidence that any of Sulaiman bin Abdulaziz Al Rajhi, the Saudi-based Sulaiman bin Abdulaziz Al Rajhi Charitable Foundation, the U.S.-based SAAR Foundation, Abdullah bin Sulaiman Al Rajhi, or any Al Rajhi | Disputed. there was a wealth of public media reporting available to ARB prior to the 9/11 attacks concerning the involvement of Al Haramain and the IIRO in supporting Osama bin Laden, al Qaeda, and terrorism, including but not |

UNDER SEAL – SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

Bank director, officer, or employee knew or had reason to know, before the 9/11 Attacks, of any charity's connection to Al Qaeda or any terrorism or plot of terrorism against the United States, including the 9/11 Attacks, or that any such purported knowledge or intent was shared with the Bank. *See generally* Pls. Aver. (and in particular § IV), Pls. Ex. 4 (Winer Report) (and in particular at § 11) & Pls. Ex. 38 (Kohlmann Report) (all failing to identify any evidence that these individuals or entities knew of any charity's support for Al Qaeda or any terrorism against the United States, including the 9/11 Attacks, or that any such purported knowledge was shared with the Bank); *see also* ARB Ex. 4 (Lormel Report) at 32-34 (explaining that the FBI's investigations into the US-based SAAR Foundation, Al Rajhi Bank, and members of the Al Rajhi family found no credible evidence of links to terrorism, and that Plaintiffs' experts allegations as to the Saudi-based Sulaiman bin Abdulaziz Al Rajhi Charitable Foundation are likewise insufficient to show terrorist finance); ARB Ex. 3 (Pasley Report) at 17 ("Given this fact, based on my experiences and expertise, I do not see how the Bank or, for that matter, individual donors, could have determined how and when and to what extent this large and prominent NGO was using a small portion of funds — wittingly or unwittingly — for illicit purposes.").

limited to the public reporting of those charities' links to the 1998 U.S. Embassy bombings in Africa. *See* Plaintiffs' responses to Nos. 51, 63. In addition, Plaintiffs' experts have testified that as early as 1995, Al Haramain was widely known within the Kingdom for supporting Islamic militant causes and armed conflict. *See* Plaintiffs' response to No. 47. Moreover, ARB, Suleiman al Rajhi, and the Bank's principals were expressly aware of the involvement of Al Haramain and IIRO in supporting al Qaeda and terrorism by virtue of Suleiman al Rajhi's extensive contacts with those organizations and his close relationships with Al Haramain, IIRO, and MWL senior officials. *See* Plaintiffs' responses to Nos. 47, 59. Nevertheless, ARB continued to open and maintain hundreds of accounts for Al Haramain and IIRO. *See* Plaintiffs' response to No. 42 (94 accounts for Al Haramain), and Plaintiffs' response to No. 54 (308 accounts for the IIRO).

Moreover, the evidence surveyed in the Corrected Averment shows that ARB, Suleiman al Rajhi, and the Bank's senior officials were quintessential insiders, operating at the very center of al Qaeda's financial and logistical support structure during the critical period leading up to the September 11, 2001 attacks. They maintained high-level contacts with the charities, and were well aware of the charities' terrorist nature at all relevant times. *See* Averment generally.

Furthermore, Mr. Lormel's claims concerning the FBI's alleged investigation into ARB and Suleiman al Rajhi, and the findings of that investigation, have been flatly rejected by the FBI and DOJ. According to the FBI and DOJ, no investigation matching his expert report and deposition testimony was ever undertaken. *See* Ex. F, May 3, 2024 letter from Assistant U.S. Attorneys Sarah S. Normand and Jennifer Jude (stating that the FBI conducted supplemental searches for documents concerning "an investigation of the Bank or Sulaiman of the kind that Mr. Lormel describes in his report and deposition," and concluding that "[t]hose searches did not reveal information suggesting that the Bank or Sulaiman … were the focus of an investigation or investigative steps by the FBI during the time period Mr. Lormel described (September 11, 2001-December 31, 2003)."). Moreover, Mr. Lormel retired from the FBI in December 2003, before any such investigation into ARB and Suleiman al Rajhi could have been completed. Notably, soon after Mr. Lormel's departure from the FBI, he was hired by ▮▮▮▮▮ to provide consulting services in connection with a criminal investigation in the Eastern District of Virginia. That consulting engagement with ▮▮ ▮▮ included the SAAR Foundation, Mar-Jac Poultry, and Jamal Barziniji, an arrangement that was highly irregular at best. *See* ARB Ex. 61, Transcript, Deposition of Dennis Lormel, February 1, 2024 at 33:12-20; 53:22-60:7; 130:11-132:16.

| | |
|---|---|
| 147. Plaintiffs have no evidence that any money that was transferred through accounts at Al Rajhi Bank, including its U.S. correspondent account, reached Al Qaeda or supported the financing, planning, or carrying out of the 9/11 Attacks or any other terrorism against the United States. Nor do Plaintiffs have any evidence that any donations made by Al Rajhi Bank or its officers and directors supported the financing, planning, or carrying out of the 9/11 Attacks or any other terrorism against the United States. And Plaintiffs have no evidence that the Bank acted with any knowledge or intent to support Al Qaeda or the financing, planning, or carrying out of the 9/11 Attacks or any other terrorism against the United States. *See generally* Pls. Aver.; Pls. Ex. 4 (Winer Report); Pls. Ex. 38 (Kohlmann Report) (all failing to identify a single transaction through Al Rajhi Bank, or any donation by Al Rajhi Bank, showing knowing and intentional support by Al Rajhi Bank for Al Qaeda or any form of terrorism against the United States, including the 9/11 Attacks). | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 1, 2, 47, 59, 60, 130, 143, 145. <br><br> By way of further response, the evidence surveyed in the Corrected Averment shows that ARB, Suleiman al Rajhi, and the Bank's senior officials were quintessential insiders, operating at the very center of al Qaeda's financial and logistical support structure during the critical period leading up to the September 11, 2001 attacks. They maintained high-level contacts with the charities, and were well aware of the charities' terrorist nature at all relevant times. *See* Averment generally. |

LEGAL\71744537\1