# Exhibit E

# 18-1201-cv(L),

**18-1264-cv(CON), 18-1266-cv(CON), 18-2162-cv(CON), 18-2171-cv(CON)**

# United States Court of Appeals

## for the

## Second Circuit

IN RE: TERRORIST ATTACKS ON SEPTEMBER 11, 2001

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFFS-APPELLANTS

James L. Bernard
Patrick N. Petrocelli
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, New York 10038
(212) 806-5400

Paul J. Napoli
Christopher R. LoPalo
NAPOLI SHKOLNIK PLLC
400 Broadhollow Road, Suite 305
Melville, New York 11747
(212) 397-1000

Robert C. Sheps
SHEPS LAW GROUP, P.C.
25 High Street
Huntington, New York 11743
(631) 249-5600

Stephen A. Cozen
Sean P. Carter
COZEN O'CONNOR
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
(215) 665-2000

– and –

Carter G. Phillips
Richard D. Klingler
SIDLEY AUSTIN LLP
1501 K Street N.W.
Washington, DC 20005
(202) 736-8000

_Attorneys for Plaintiffs-Appellants_

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1, Appellants certify as follows:

*Docket No. 18-1201 (Lloyd's Syndicate 2, et al. v. Al Rajhi Bank):*

Appellants Underwriting Members of Lloyd's Syndicates 2, 271, 376, and 535 are members of RiverStone Insurance (UK) Limited. RiverStone Insurance (UK) Limited is a wholly-owned subsidiary of RiverStone Holdings Limited, a publicly traded company; the ultimate parent, Fairfax Financial Holdings Limited, is also a publicly traded company.

Appellants Underwriting Members of Lloyd's Syndicates 510, 557, and 807 are members of Tokio Marine Kiln Insurance Services Limited. Tokio Marine Kiln Insurance Services Limited is a wholly-owned subsidiary of Tokio Marine Kiln Group Limited; the ultimate parent, Tokio Marine Holdings, Inc., is a publicly traded company.

Appellant Marlon Insurance Company n/k/a River Thames Insurance Company Limited is managed by Enstar (EU) Limited, which is a wholly-owned subsidiary of Enstar Group Limited, a publicly traded company.

Appellants Underwriting Members of Lloyd's Syndicates 53, 55, 205, 228, 529, 991, 1121, 1236, 1243, and 1308 are managed by StarStone Underwriting

Limited, which is a wholly-owned subsidiary of Enstar Group Limited, a publicly traded company.

Appellants Underwriting Members of Lloyd's Syndicates 588 and 861 comprise various companies and individuals who have transferred their financial interests to Lloyd's Syndicate 2008, which is managed by StarStone Underwriting Limited. StarStone Underwriting Limited is a wholly-owned subsidiary of Enstar Group Limited, a publicly traded company.

Appellant The Copenhagen Reinsurance Company (U.K.) Limited operates as a subsidiary of Nordic Run-Off Limited; the ultimate parent is Enstar Group Limited, a publicly traded company.

Appellants Underwriting Members of Lloyd's Syndicates 672, 1003, and 2020 comprise various companies and individuals who have transferred their financial interests to Lloyd's Syndicate 2003, which is managed by Catlin Underwriting Agencies, Limited. Appellant Underwriting Members of Lloyd's Syndicate 1209 is managed by Catlin Underwriting Agencies, Limited; the ultimate parent of Catlin Underwriting Agencies, Limited, XL Group Ltd., is a publicly traded company.

No publicly-traded company owns 10% or more of the stock of Appellant UnionAmerica Insurance Company Limited.

Appellants SCOR Global P&C SE, SCOR UK Company Limited, SCOR Reinsurance Asia-Pacific Pte Limited, SCOR Reinsurance Company (Asia) Limited, SCOR Reinsurance Company, General Security National Insurance Company, General Security Indemnity Company of Arizona, and SCOR Canada Reinsurance Company are entities with an ultimate parent of SCOR SE, a publicly traded company.

Appellants American Fire & Casualty Company, Liberty Mutual Insurance Company, American Economy Insurance Company, Employers Insurance Company of Wausau, Excelsior Insurance Company, The First Liberty Insurance Corporation, General Insurance Company of America, Indiana Insurance Company, Liberty Insurance Corporation, Liberty Insurance Underwriters, Inc., Liberty Lloyds of Texas Insurance Company, Liberty Management Agency Limited for and on behalf of the Lloyd's Underwriting Members from time to time of Lloyd's Syndicates 4472, 190, and 282, Liberty Mutual Fire Insurance Company, LM Insurance Company, LM Property and Casualty Insurance Company, Liberty Mutual Insurance Europe Limited, The Midwestern Indemnity Company, The Netherlands Insurance Company, The Ohio Casualty Insurance Company, Peerless Insurance Company, Safeco Insurance Company of America, Wausau Business Insurance Company, Wausau Underwriters Insurance Company, and West American Insurance Company

are entities with an ultimate parent of Liberty Mutual Holding Company, Inc.  No publicly-traded company owns 10% or more of those entities' stock.

Appellant Liberty Life Assurance Company of Boston is a wholly-owned subsidiary of The Lincoln National Life Insurance Company, which is a wholly-owned subsidiary of Lincoln National Corporation, a publicly traded company that operates under the marketing name of Lincoln Financial Group.

Appellants American Safety Indemnity Company and American Safety Casualty Insurance Company merged with and into TIG Insurance Company; the ultimate parent, Fairfax Financial Holdings Limited, is a publicly traded company.

Appellant Odyssey Reinsurance Company is a wholly owned subsidiary of Odyssey US Holdings, Inc.; the ultimate parent, Fairfax Financial Holdings Limited, is a publicly traded company.

Appellant QBE Insurance (International) Ltd. is a wholly-owned subsidiary of QBE Holdings (AAP) Pty Limited; the ultimate parent, QBE Insurance Group Ltd., is a publicly traded company.

*Docket No. 18-1264 (Muenchener Rueckversicherungs-Gessellschaft Aktiengesellscheft in Muenchen, et al. v. Al Rajhi Bank):*

Appellant New Reinsurance Company, Ltd., is a wholly-owned subsidiary of its parent company, Appellant Muenchener Rueckversicherungs-Gesellschaft Aktiengesellschaft in Muenchen, which is a publicly traded company.

Appellants AIG Specialty Insurance Company, Chartis Excess Limited, AIU Insurance Company, American Home Assurance Company, AIG Insurance Company – Puerto Rico, AIG Insurance Company of Canada, AIG Assurance Company, AIG Property Casualty Company, Commerce and Industry Insurance Company, Granite State Insurance Company, Illinois National Insurance Co., The Insurance Company of the State of Pennsylvania, Lexington Insurance Company, National Union Fire Insurance Company of Pittsburgh, Pa., and New Hampshire Insurance Company are wholly-owned subsidiaries of American International Group, Inc., a publicly traded company.

*Docket No. 18-1266 (Arrowood Indem. Co. et al. v. Al Rajhi Bank):*

Appellant Arrowood Indemnity Company is the 100% parent company of Appellant Arrowood Surplus Lines Insurance Company, and no publicly traded company owns 10% or more of the stock of said parties.

Arrowpoint Capital Corp. is the ultimate parent company of Appellant Arrowood Indemnity Company, and no publicly traded company owns 10% or more of the stock of said parties.

*Docket No. 18-2162 (Aguilar, et al. v. Al Rajhi Bank):*

Appellants are natural persons.

*Docket No. 18-2171 (Charter Oak, et al. v. Al Rajhi Bank):*

Appellants The Charter Oak Fire Insurance Company, First Floridian Auto

and Home Insurance Company, The Premier Insurance Company of Massachusetts, TravCo Insurance Company, and The Phoenix Insurance Company are 100% owned by the Travelers Indemnity Company, which is 100% owned by Travelers Insurance Group Holdings, Inc., which is 100% owned by The Travelers Companies, Inc. The Travelers Companies, Inc. is the only publicly held company in the corporate family. No individual or corporation owns 10% or more of the stock of The Travelers Companies, Inc.

Appellant The Travelers Indemnity Company is 100% owned by Travelers Insurance Group Holdings, Inc., which is 100% owned by Travelers Property Casualty Corp., which is 100% owned by The Travelers Companies, Inc. The Travelers Companies, Inc. is the only publicly held company in the corporate family. No individual or corporation owns 10% or more of the stock of The Travelers Companies, Inc.

Appellants Travelers Personal Security Insurance Company, Travelers Personal Insurance Company, Travelers Property Casualty Insurance Company, and The Automobile Insurance Company of Hartford, Connecticut are 100% owned by The Standard Fire Insurance Company, which is 100% owned by Travelers Insurance Group Holdings, Inc., which is 100% owned by Travelers Property Casualty Corp., which is 100% owned by The Travelers Companies, Inc. The Travelers Companies, Inc. is the only publicly held company in the corporate

family.  No individual or corporation owns 10% or more of the stock of The Travelers Companies, Inc.

Appellant The Standard Fire Insurance Company is 100% owned by Travelers Insurance Group Holdings, Inc., which is 100% owned by Travelers Property Casualty Corp., which is 100% owned by The Travelers Companies, Inc. The Travelers Companies, Inc. is the only publicly held company in the corporate family.  No individual or corporation owns 10% or more of the stock of The Travelers Companies, Inc.

Appellants Travelers Casualty Company of Connecticut, Travelers Casualty and Surety Company of America, Travelers Lloyds of Texas Insurance Company, and Farmington Casualty Company are 100% owned by Travelers Casualty and Surety Company, which is 100% owned by Travelers Insurance Group Holdings Inc., which is 100% owned by Travelers Property Casualty Corp., which is 100% owned by The Travelers Companies, Inc.  The Travelers Companies, Inc. is the only publicly held company in the corporate family.  No individual or corporation owns 10% or more of the stock of The Travelers Companies, Inc.

Appellant Travelers Casualty and Surety Company is 100% owned by Travelers Insurance Group Holdings, Inc. which is 100% owned by Travelers Property Casualty Corp., which is 100% owned by The Travelers Companies, Inc. The Travelers Companies, Inc. is the only publicly held company in the corporate

family.  No individual or corporation owns 10% or more of the stock of The Travelers Companies, Inc.

Appellants The Travelers Indemnity Company of America, The Travelers Indemnity Company of Connecticut, Travelers Property Casualty Company of American, and Constitution State Services LLC are 100% owned by The Phoenix Insurance Company, which is 100% owned by Travelers Indemnity Company, which is 100% owned by Travelers Insurance Group Holdings, Inc., which is 100% owned by Travelers Property Casualty Corp., which is 100% owned by The Travelers Companies, Inc.  The Travelers Companies, Inc. is the only publicly held company in the corporate family.  No individual or corporation owns 10% or more of the stock of The Travelers Companies, Inc.

Appellant St. Paul Protective Insurance Company is 100% owned by Northbrook Holdings, Inc., which is 100% owned by St. Paul Fire and Marine Insurance Company, which is 100% owned by The Travelers Companies, Inc.  The Travelers Companies, Inc. is the only publicly held company in the corporate family.  No individual or corporation owns 10% or more of the stock of The Travelers Companies, Inc.

Appellants St. Paul Mercury Insurance Company and St. Paul Guardian Insurance Company are 100% owned by St. Paul Fire and Marine Insurance Company, which is 100% owned by The Travelers Companies, Inc.  The Travelers

Companies, Inc. is the only publicly held company in the corporate family. No individual or corporation owns 10% or more of the stock of The Travelers Companies, Inc.

Appellants Fidelity and Guaranty Insurance Underwriters, Inc. and Fidelity and Guaranty Insurance Company are 100% owned by United States Fidelity and Guaranty Company, which is 100% owned by St. Paul Fire and Marine Insurance Company, which is 100% owned by The Travelers Companies, Inc. The Travelers Companies, Inc. is the only publicly held company in the corporate family. No individual or corporation owns 10% or more of the stock of The Travelers Companies, Inc.

Appellant United States Fidelity and Guaranty Company is 100% owned by St. Paul Fire and Marine Insurance Company, which is 100% owned by The Travelers Companies, Inc. The Travelers Companies, Inc. is the only publicly held company in the corporate family. No individual or corporation owns 10% or more of the stock of The Travelers Companies, Inc.

Appellant St. Paul Fire and Marine Insurance Company is 100% owned by The Travelers Companies, Inc. The Travelers Companies, Inc. is the only publicly held company in the corporate family. No individual or corporation owns 10% or more of the stock of The Travelers Companies, Inc.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... xii

PRELIMINARY STATEMENT ...........................................................1

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION.....3

STATEMENT OF ISSUES PRESENTED FOR REVIEW ......................................4

STATEMENT OF THE CASE..................................................................4

STATEMENT OF FACTS .................................................................7

SUMMARY OF ARGUMENT ..................................................................17

STANDARD OF REVIEW .................................................................20

ARGUMENT ...........................................................................21

I.  PLAINTIFFS' SHOWING OF FACTS REGARDING ARB'S TORTIOUS
    ACTIVITIES DESIGNED TO ADVANCE AL-QAEDA'S ANTI-U.S.
    OBJECTIVES AND ACTIVITIES SUFFICIENTLY ESTABLISHED
    PERSONAL JURISDICTION AT THIS STAGE OF THE PROCEEDINGS
    ...........................................................................21

    A.  The Applicable Legal Framework.....................................................21

        1.  The Due Process Standard ......................................................21

        2.  The Pleading Standard ..........................................................24

    B.  ARB Had Ample and Fair Notice That It Could Be Held to
        Account for Its Actions in U.S. Courts .................................................25

    C.  Plaintiffs' Allegations Readily Establish That ARB Undertook
        Tortious Acts Expressly Directed at the United States ......................29

        1.  ARB's Support to al-Qaeda Meets the Proper Test for
            Showing Acts as Part of a Common Scheme to Target the
            United States .........................................................................30

        2.  Sufficiency of Plaintiffs' Showing ...........................................37

3.     The District Court Incorrectly Concluded That This
       Court's Rulings Require a Finding that Plaintiffs'
       Allegations are Insufficient .......................................................53

4.     The Relevance of Recent Legal Changes and Expert
       Factual Conclusions ..................................................................63

D.    Al-Qaeda's Tortious Actions Directed Against the United
      States Establish the Basis for Personal Jurisdiction Over ARB
      Due to the Joint Nature of ARB and al-Qaeda's Actions ...................69

II.    THE DISTRICT COURT ERRED IN DENYING APPELLANTS
       THE OPPORTUNITY TO CONDUCT JURISDICTIONAL
       DISCOVERY OF ARB ................................................................74

CONCLUSION ..................................................................................79

CERTIFICATE OF COMPLIANCE ....................................................82

CERTIFICATE OF SERVICE ............................................................83

ADDENDUM:  The Justice Against Sponsors of Terrorism Act ("JASTA")

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Alliance of American Insurers v. Cuomo*,
854 F.2d 591 (2d Cir. 1988) ...............................................................75

*Amidax Trading Group v. S.W.I.F.T. SCRL*,
671 F.3d 140 (2d Cir. 2011) .............................................................74

*Asahi Metal Indus. v. Cal. Super. Ct.*,
480 U.S. 102 (1987)...........................................................................21

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*,
902 F.2d 194 (2d Cir. 1990) ........................................................24, 25

*Bank Markazi v. Peterson*,
136 S.Ct. 1310 (2016)........................................................................69

*Banks v. Consumer Home Mortg., Inc.*,
No. 01-8508, 2003 WL 21251584 (E.D.N.Y. Mar. 28, 2003) ..........52

*Boim v. Holy Land Found. for Relief & Dev.*,
549 F.3d 685 (7th Cir. 2008) (en banc) ...........................31, 33, 36, 46

*Calder v. Jones*,
465 U.S. 783 (1984).....................................................22, 24, 65, 66

*Cantanzaro v. Weiden*,
140 F.3d 91 (2d Cir. 1998) ................................................................52

*Charles Schwab Corp. v. Bank of America Corp.*,
883 F.3d 68 (2d Cir. 2018) ........................................................*passim*

*Dorchester Financial Securities, Inc. v. Banco BRJ, S.A.*,
722 F.3d 81 (2d Cir. 2013) ................................................................25

*Filus v. LOT Polish Airlines*,
907 F.2d 1328 (2d Cir. 1990) ...........................................................74

*First City, N.A. v. Rafidain Bank*,
150 F.3d 172 (2d Cir. 1998) .............................................................74

*Freeman v. HSBC Holdings PLC*,
No. 14-6601, 2018 WL 3616845 (E.D.N.Y. July 27, 2018) ..............................67

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000) .......................................................................38, 51

*Gelboim v. Bank of America*,
823 F.3d 759 (2d Cir. 2016) .................................................................................72

*Gualandi v. Adams*,
385 F.3d 236 (2d Cir. 2004) .................................................................................77

*Haber v. United States*,
823 F.3d 746 (2d Cir. 2016) .........................................................................20, 74

*Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983) ...................................................................*passim*

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010)...............................................................24, 48, 56, 67, 68

*Int'l Shoe Co. v. Washington*,
326 U.S. 310 (1945)...................................................................................21

*J. McIntyre Machinery, Ltd. v. Nicastro*,
564 U.S. 873 (2011).............................................................................35, 66

*Kamen v. AT&T Co.*,
791 F.2d 1006 (2d Cir. 1986) ..........................................................................76

*Leh v. Gen. Petroleum Corp.*,
382 U.S. 54 (1966)...............................................................................................72

*Linde v. Arab Bank, PLC*,
882 F.3d 314 (2d Cir. 2018) ...................................................................*passim*

*In re Magnetic Audiotape Antitrust Litig.*,
334 F.3d 204 (2d Cir. 2003) .......................................................22, 25, 31, 65

*Rosemond v. United States*,
572 U.S. 65 (2014)......................................................................................31, 34

*Rostker v. Goldberg*,
453 U.S. 57 (1981)...................................................................68

*Rothstein v. UBS AG*,
708 F.3d 82 (2d Cir. 2013) .....................................................64

*Staples v. United States*,
511 U.S. 600 (1994)..........................................................38, 51

*In re Terrorist Attacks on September 11, 2001*,
349 F. Supp. 2d 765 (S.D.N.Y. 2005) ...................................5

*In re Terrorist Attacks on September 11, 2001*,
538 F.3d 71 (2d Cir. 2008) ..............................................*passim*

*In re Terrorist Attacks on September 11, 2001*,
714 F.3d 118 (2d Cir. 2013) ...............................................5, 64

*In re Terrorist Attacks on September 11, 2001*,
714 F.3d 659 (2d Cir. 2013) ...........................................*passim*

*United States v. Brunner*,
726 F.3d 299 (2d Cir. 2013) ..................................................67

*United States v. Morrison*,
529 U.S. 598 (2000)................................................................67

*Walden v. Fiore*,
571 U.S. 277 (2014).....................................................33, 56, 66

*Waldman v. Palestine Liberation Org.*,
835 F.3d 317 (2d Cir. 2016) ..............................................23, 36

*Wight v. BankAmerica Corp.*,
219 F.3d 79 (2d Cir. 2000) ....................................................51

*World-Wide Volkswagen Corp. v. Woodson*,
444 U.S. 286 (1980)................................................................21

**Statutes**

Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No.
114-222, 130 Stat. 852 (2016) (codified at 28 U.S.C. § 1605B)................*passim*

Case 15-1261, Document 127, 03/09/2015, 23?4817, Page46 of 19?

18 U.S.C. § 2 ............................................................................................31

18 U.S.C. § 2331 *et seq.* ..........................................................................3

18 U.S.C. § 2332 ......................................................................................27

18 U.S.C. § 2333 ....................................................................6, 27, 28, 64

18 U.S.C. § 2339 ........................................................................27, 55, 67

28 U.S.C. § 1291 ........................................................................................3

28 U.S.C. § 1331 ........................................................................................3

## Other Authorities

Fed. R. Civ. P. 4 .....................................................................................23

Fed. R. Civ. P. 9 .....................................................................................51

# PRELIMINARY STATEMENT

On September 11, 2001, members of al-Qaeda hijacked four commercial airliners and used those planes as weapons in coordinated attacks on the United States (the "September 11th attacks").  Those attacks were the culmination of a campaign to wage *jihad* against the United States, set in motion with the formation of al-Qaeda in 1988 and made possible by massive financial, logistical, and material support provided to al-Qaeda by its collaborators and supporters over many years.

Plaintiffs include individual victims of the September 11th attacks, as well as insurers that compensated nationals of the United States for substantial property and business losses resulting from the attacks.  Plaintiffs seek to hold Al Rajhi Bank ("ARB") accountable under the Anti-Terrorism Act ("ATA") for its pervasive support and aiding and abetting of, and conspiracy with, al-Qaeda to foster that organization's express objective of attacking the United States and its citizens.

This appeal arises from the district court's dismissal of plaintiffs' ATA claims against ARB for lack of personal jurisdiction and denial of jurisdictional discovery.[1] The district court's core conclusion was that plaintiffs' allegations related to funding of and banking services provided to al-Qaeda established no more than that ARB was able to foresee that its assistance to al-Qaeda and its affiliates could be used to

---

[1] This appeal excludes two defendants also addressed in the decision under appeal, Saudi Binladin Group and National Commercial Bank.

Case 15-1261, Document 127, 03/09/2015, 23, Page 18 of 19

mount a terrorist attack, which this Court had found insufficient to satisfy due process requirements. The district court also found that plaintiffs' allegations did not warrant permitting them to undertake jurisdictional discovery.

The district court's ruling produced a result at odds with the guiding due process principle that personal jurisdiction should exist where a defendant should reasonably anticipate that its actions could result in being held to account in U.S. courts. In particular, it incorrectly treated any "indirect contributions" or provision of "financial services" to a terrorist organization as showing only "mere" foreseeability of harm, no matter what additional nexus existed, here, between ARB and al-Qaeda's anti-U.S. scheme and activities. In doing so, the district court discounted the importance of recent Congressional fact-finding and expansion of the scope of tortious activity and discounted the significance of the factual allegations set forth in plaintiffs' First Amended Complaint ("FAC"). Those allegations show much more than "mere" foreseeability, and instead show an operational partnership between ARB and al-Qaeda to foster the objective of undertaking terrorist activities targeted against the United States. They readily establish that ARB provided extensive financial and operational support to al-Qaeda, including support to the al-Qaeda operatives who executed the September 11th attacks, and did so with full knowledge of its role in advancing terrorist objectives. These additional elements—substantial assistance toward and knowledge of the role in advancing the tortfeasors'

objective—are what support the inference that ARB's actions were tightly bound with and designed to advance al-Qaeda's anti-U.S. objectives and scheme, and thus were also tortious activities directed against U.S. interests. That is, the alleged facts establishing those elements provided the basis for personal jurisdiction over ARB (and, at the very least, warranted jurisdictional discovery).

In addition, personal jurisdiction over ARB was separately supported by the joint action theory applicable to co-conspirators and, by extension, to abettors, recognized in *Charles Schwab Corp. v. Bank of America Corp.*, 883 F.3d 68 (2d Cir. 2018), which issued after briefing below.

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

The district court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Plaintiffs' claims arise under the Anti-Terrorism Act, 18 U.S.C. § 2331 *et seq.*, as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852 (2016) (codified at 28 U.S.C. § 1605B).

This Court has jurisdiction pursuant to 28 U.S.C. § 1291. The appeals consolidated before this Court arise from five notices of appeal filed in eleven lawsuits consolidated for pre-trial proceedings under multi-district litigation Docket No. 03-MDL-1570 (S.D.N.Y). On March 28, 2018, the district court entered its Memorandum Decision and Order (SPA1-23) dismissing ARB from those underlying actions and, on June 28, 2018, entered final judgment in favor of ARB

pursuant to Fed. R. Civ. P. 58(d) and 54(b). Plaintiffs in the *Lloyd's Syndicate 2, Muenchener,* and *Arrowood* cases timely filed Notices of Appeal on April 24, 2018 and April 27, 2018, and timely filed Amended Notices of Appeal on June 29, 2018 and July 18, 2018. Plaintiffs in this appeal's other cases timely filed Notices of Appeal on July 17, 2018 and July 18, 2018.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.     Whether the district court erred in finding, prior to jurisdictional discovery, that plaintiffs had not alleged the existence of a nexus between ARB's actions and al-Qaeda's anti-U.S. scheme and acts that was sufficiently close to defeat a motion to dismiss for lack of personal jurisdiction.

2.     Whether the district court erred in denying jurisdictional discovery.

## STATEMENT OF THE CASE

### Nature of the Case and Course of Proceedings

This case involves ATA claims against ARB premised on its extensive support of al-Qaeda to advance that organization's scheme and activities to attack the United States and its citizens.

In 2002, other claimants injured as a result of the September 11th attacks filed ATA claims against ARB in *Thomas E. Burnett, et al. v. Al Baraka Investment & Dev. Corp., et al.*, 1:02-cv-1616 (D.D.C.), which was subsequently transferred to the Southern District of New York. On January 18, 2005, Judge Richard Casey

dismissed the claims against ARB under Fed. R. Civ. P. 12(b)(6).  *In re Terrorist Attacks*, 349 F. Supp. 2d 765, 831-33 (S.D.N.Y. 2005) ("*Terrorist Attacks I*").  Judge Casey's 12(b)(6) ruling was based on the allegations of the *Burnett* plaintiffs' More Definite Statement as to ARB, which focused on the banking services ARB provided to charities affiliated with al-Qaeda.

On April 16, 2013, this Court affirmed the district court's dismissal of ARB for failure to state a claim.  *In re Terrorist Attacks on September 11, 2001*, *O'Neill v. Al Rajhi Bank, et al.*, 714 F.3d 118 (2d Cir. 2013).  The Court held, under the pre-2005 record and then-existing law, that plaintiffs' claims that ARB aided and abetted al-Qaeda and the September 11th attacks were properly dismissed because the ATA does not permit recovery based on theories of secondary liability.  *Id.* at 123.  In a separate opinion, this Court also affirmed the dismissal of three defendants affiliated with ARB for lack of personal jurisdiction and ordered jurisdictional discovery with respect to another.  *O'Neill v. Asat Trust Reg. et al.*, 714 F.3d 659, 675-76, 678-79 (2d Cir. 2013) ("*Terrorist Attacks VII*"); *infra* pp. 54-55.

On September 28, 2016, Congress enacted the Justice Against Sponsors of Terrorism Act ("JASTA"), as part of an ongoing effort to combat international terrorism.  *See generally infra* Addendum (text of Act).  JASTA amended the ATA's civil liability provision expressly to "recognize the substantive causes of action for aiding and abetting and conspiracy liability."  JASTA § 2(a)(4); *id*. § 4(a); 130 Stat.

at 854 (enacting 18 U.S.C. § 2333(d)).  JASTA directs courts to apply the expansive standards for aiding and abetting and conspiracy liability set forth in *Halberstam v. Welch,* 705 F.2d 472 (D.C. Cir. 1983).  *See* JASTA § 2(a)(5), 130 Stat. at 852. JASTA's central purpose, and the touchstone for construing its provisions, is "to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, *wherever acting or wherever they may be found,* that have provided material support, *directly or indirectly*, to foreign organizations or persons that engage in terrorist activity."  JASTA § 2(b); 130 Stat. at 853 (emphasis added). JASTA thus eliminated the principal basis for ARB's dismissal from the earlier action for failure to state a claim under the ATA.

In January 2016, plaintiffs in *Lloyd's Syndicate 2* filed new claims against ARB, among others, in a case transferred to the multidistrict proceedings before the district court.  Plaintiffs in the other above-referenced appeals thereafter adopted the factual allegations set forth in the *Lloyd's* FAC.

On March 28, 2018, Judge George Daniels, who currently presides over the proceedings in the district court, dismissed plaintiffs' claims.  The district court construed plaintiffs' allegations and claims as establishing only that defendants knowingly maintained bank accounts for al-Qaeda affiliates that were used for al-Qaeda operations and provided "indirect" support for al-Qaeda through

contributions to al-Qaeda-affiliated organizations. SPA12-15. As a result, the court found that plaintiffs' allegations established only the "mere foreseeability" of harm arising from the defendant's actions, and did not amount to the "tortious activity expressly directed" toward the United States that is required to establish personal jurisdiction. SPA17 (citing *In re Terrorist Attacks on September 11, 2001*, 538 F.3d 71 (2d Cir. 2008) ("*Terrorist Attacks III*") and *Terrorist Attacks VII*). It stated that this Court "has repeatedly held similar, if not identical, allegations concerning both the banks' and their principals' alleged funding of front organizations for al-Qaeda insufficient to establish specific jurisdiction for claims arising out of the 9/11 Attacks." SPA12 (citing *Terrorist Attacks VII*).

The district court also held that Congress's passage of JASTA was irrelevant because "constitutional due process analysis cannot be altered by legislative enactment." SPA16. Finally, the district court denied jurisdictional discovery of ARB on the ground that "the underlying legal theories upon which Plaintiffs seek to premise jurisdiction over ARB are untenable." SPA22.

## STATEMENT OF FACTS

At issue are allegations regarding the ongoing and close operational relationship between ARB and al-Qaeda (along with its affiliated entities). As further elaborated below, *see infra* pp. 11-17, 36-50, the FAC presents detailed factual allegations concerning the origins of al-Qaeda and its express aim to direct

violence against the United States and its interests, the funding and infrastructure that facilitated its growth and development and ultimately enabled it to realize its goal to attack the United States, and ARB's role as an intimate partner providing that funding and financial infrastructure as well as working with al-Qaeda affiliated organizations focused on the same objectives and extensively supporting the attacks of al-Qaeda operatives.

### The Origins of al-Qaeda and its Stated Aim to Attack the United States

Al-Qaeda was a foreign terrorist organization widely known to be conducting a terrorist campaign targeting U.S. interests.  Osama bin Laden formed al-Qaeda in or around 1988, in order to "destroy[]" the United States "at all costs" because he and his followers believed it to be "the source of all problems confronting the Muslim world."  JA136 (FAC ¶96) ("the United States has been, since al-Qaeda's inception, the primary target of bin Laden's organization").  The "centerpiece" of bin Laden's strategy to destroy the United States "involved staging high profile terrorist attacks against America and its citizens."  JA136-37 (FAC ¶97).

In the ensuing years, al-Qaeda openly announced to the entire world what was known to its material sponsors and collaborators from the outset—that al-Qaeda's primary mission was to attack America and kill American citizens.  For example, in 1988 bin Laden "expressly affirmed what he believed to be the personal obligation of all Muslims to wage jihad against the enemies of Islam," and in a 1990 speech he

"singled out the United States as the primary target of this global jihad, asserting that '[t]he Americans won't stop their support of Jews in Palestine until we give them a lot of blows.  They won't stop until we do jihad against them.'"  JA152-53 (FAC ¶¶143-44).  In the following years, he continued to deliver diatribes against the United States and "gave frequent lectures in which he declared the need to cut off 'the head of the snake,' referring to the United States."  JA153 (FAC ¶¶146-47).  He also issued fatwas calling for jihad against the United States in 1992, 1996, and 1998. JA153-54 (FAC ¶¶146, 148-49).  Moreover, al-Qaeda confirmed its objective to harm the United States by its actions, through its role in various attacks and plots against Americans during the decades leading up to the September 11th attacks. JA154 (FAC ¶150) (listing 1992 attacks on U.S. soldiers in the Battle of Mogadishu, 1993 World Trade Center bombings, 1995 Bojinka plot, 1996 Khobar bombing attacks, 1998 bombing of U.S. embassies in Africa, and 2000 attack on the USS Cole).

Osama bin Laden built the infrastructure that was capable of carrying out sophisticated international terrorist attacks by relying on contributions from wealthy supporters who knowingly directed donations to al-Qaeda through Saudi-based Islamic *da'awa* organizations or "charities" closely affiliated with al-Qaeda.  JA144-45 (FAC ¶118).  The financial support network underlying this effort, referred to as the Golden Chain, directed funds to al-Qaeda operatives from ostensible charities

and relief organizations that operated with the assistance of other collaborators in the financial sphere, including ARB. JA135 (FAC ¶¶90-91). In many cases, the "wealthy donors also held positions of authority or influence with one or more of al-Qaeda's charity fronts, and used businesses under their control to provide essential support and assistance to bin Laden and al-Qaeda." JA144-45 (FAC ¶118). This essential support framework has been confirmed by extensive U.S. intelligence and government reports. JA145-46 (FAC ¶¶120-22).

The ostensible charities were not merely fronts for supporting al-Qaeda, but instead were "fully integrated components of al-Qaeda's financial and logistical support infrastructure," and "were repeatedly implicated in the sponsorship of al-Qaeda and other terrorist organizations during the years preceding the September 11th attacks." JA146-47 (FAC ¶124). These "charities" could operate publicly, but performed numerous functions to facilitate al-Qaeda's operations. As explained by one former counter-terrorism finance official:

> Distinguishing between some of the international Wahhabi organizations and terrorist support networks was nearly impossible, especially when support for Al-Qaeda and support for spreading Wahhabi beliefs seemed to blend together so seamlessly. This was true in the work of some of the branches of Saudi-based institutions, such as the (IIRO).

JA148 (FAC ¶125).

As plaintiffs documented, the United States has investigated many of these ostensible charities and detailed their connections to al-Qaeda and terrorism in

Case 1:03-md-01570-GBD-SN Document 1221, 03/09/2015, 2394817, Page27 of 107

intelligence reports, memoranda, diplomatic cables, and other documents. *See generally* JA209-70 (FAC Exhibit A). The United States also expressly designated several of them closely identified with ARB as supporters of terrorism. For example, it formally identified IIRO as a terrorist support entity, JA228 (FAC Exhibit A ¶83), and, after a raid by the U.S. Treasury Department in 2002, concluded that the SAAR network "had sent more than $26 million in untraceable money overseas and that the leaders of the organization 'have committed and conspired to ... provide material support to foreign terrorist organizations.'" JA164 (FAC ¶186). Moreover, the United States designated various branches of Al Haramain Islamic Foundation (AHIF), including its U.S. branch, as providers of financial, material, and logistical support to al-Qaeda. *See, e.g.*, JA244-53 (FAC Exhibit A ¶¶133-39, 142-51, 153, 158).

### ARB Served as an Essential Part of the al-Qaeda Network

ARB is a Saudi-based, international financial institution that, for a period of many years, was family-owned and served as an essential part of the al-Qaeda network by providing critical financial and logistical support to al-Qaeda in furtherance of that terrorist organization's anti-U.S. scheme. JA155-66 (FAC ¶¶153-92). Through the direct and active sponsorship of ARB and its senior management, al-Qaeda gained the capabilities and infrastructure that enabled the

Case 19-1261, Document 127, 03/09/2015, 2301017, Page28 of 197

organization to conceive, plan, coordinate, and carry out the September 11th attacks against the United States.

Although ARB was nominally a bank, it functioned as an operational partner of al-Qaeda in carrying out al-Qaeda's terrorist objectives against the United States. Osama bin Laden acknowledged this role by describing ARB as acting like a "'good brother'" to al-Qaeda. JA158-59 (FAC ¶167) (quoting 2014 testimony of Zacarias Moussaoui, an al-Qaeda affiliate convicted for his role in the September 11th attacks). Moussaoui further testified that ARB was responsible for "'moving money around'" for al-Qaeda and confirmed that ARB was one of the main supporters of al-Qaeda through its ostensible charity fronts. JA159 (FAC ¶167).

ARB's operational partnership with al-Qaeda included direct support of the September 11th attacks. In particular, "money was funneled to the Hamburg, Germany al-Qaeda cell through the Al Rajhi Bank to businessmen Mahmoud Darkazanli and Abdul Fattah Zammar, who in turn provided the al-Qaeda cell of September 11th hijackers with financial and logistical support." JA157-58 (FAC ¶163). In addition, Abdulaziz al Omari, one of the September 11th hijackers, received a wire transfer from ARB days before the attacks and utilized a credit card drawn on ARB in planning the attacks. JA158 (FAC ¶163). Saleh Al-Hussayen, a member of ARB's Sharia board that channeled contributions to the ostensible charities, traveled to the United States shortly before the September 11th attacks and

stayed in the same hotel as at least three of the hijackers, leading this Court to authorize jurisdictional discovery with respect to him. *Terrorist Attacks VII*, 714 F.3d at 679 & n.17.

ARB also provided other direct support to al-Qaeda, such as funneling money and logistical assistance, in connection with other terrorist activities. *E.g.*, JA158 (FAC ¶165) (ARB couriers delivered money to al-Qaeda affiliates to fund weapons purchases and bomb-making activities); JA158 (FAC ¶166) (a money courier for Ayman al Zawahiri, bin Laden's second-in-command, traveled on a visa that ARB obtained for his use). Recognizing ARB's commitment to this terrorist agenda, extremists ordered operatives to utilize the services provided by ARB. JA157 (FAC ¶162). As a result, ARB maintained accounts and provided financial services to virtually all of the charity fronts that were staffed with al-Qaeda officials and operatives and that funded and provided logistical support for al-Qaeda's attacks, including AHIF, the Muslim World League, IIRO, World Assembly of Muslim Youth, Benevolence International Foundation, and Saudi High Commission for Relief of Bosnia & Herzegovina. JA156, 160 (FAC ¶¶158, 173). ARB also advertised the existence and account information it maintained for the ostensible charities to assist them in fundraising, including campaigns publicly identified with supporting suicide bombers. JA160-61 (FAC ¶174). In addition, ARB assisted the

SAAR network, established by the bank's founder, in laundering money for terrorist activities.  JA163-64 (FAC ¶¶185-86).

In addition, the most senior ARB officials had significant roles in al-Qaeda affiliated entities or otherwise had close relationships with U.S.-designated terrorist entities.  For example, Suleiman al Rajhi served as the Chairman, Managing Director, and largest shareholder of ARB in the years leading up to the September 11th attacks.  JA155 (FAC ¶154).  He simultaneously was one of al-Qaeda's principal financiers and an essential player in the Golden Chain.  JA150 (FAC ¶¶131-32).  The factual allegations in the FAC link Suleiman al Rajhi to numerous entities designated as Specially Designated Global Terrorist entities pursuant to Executive Order 13324, and also to individuals with known ties to al-Qaeda.  JA164 (FAC ¶¶187-88).  In addition, he served on the Executive Council of the IIRO, JA162 (FAC ¶180), and founded, financed, and was the namesake of the SAAR network, a group of "charities" and companies allegedly established specifically to channel resources to al-Qaeda covertly.  JA163-64 (FAC ¶185).  Several other senior ARB officials also served as senior officers of the IIRO and Sanabel al Kheer, the IIRO's financial and investment arm.  JA162 (FAC ¶¶179-80).

The interlocking leadership of ARB and ostensible charities provided ARB with detailed knowledge of how those entities used ARB's services and funds to benefit al-Qaeda, and enabled those ARB officials positioned within those

organizations to direct ARB funds, especially those provided to IIRO, to al-Qaeda itself. *See infra* pp. 39-42, 48-49, 56. The FAC further identifies specific donations that ARB made to the charity fronts and alleges that ARB contributed *zakat* and *haram* funds to these organizations with knowledge that they were operating as charity fronts for al-Qaeda. JA160-61, 163 (FAC ¶¶174, 183). The FAC similarly alleges that al Rajhi family members provided significant donations to charities suspected of funding terrorism, with the design and knowledge that those charities were operating as al-Qaeda fronts, and that ARB was being used as a vehicle to launder funds to the terrorist organization. JA155-57 (FAC ¶¶156, 159).

Even though U.S. officials warned ARB before the attacks to stop its support of al-Qaeda, *see infra* pp. 42-43, ARB took efforts to conceal its support for terrorism from U.S. and other counter-terrorism officials. For example, U.S. investigations found that senior ARB officials took actions in the wake of the attacks to circumvent counter-terrorism financing measures, directing ARB's board "to explore financial instruments that would allow the bank's charitable contributions to avoid official Saudi scrutiny." JA157 (FAC ¶160). Other examples of concealment include ARB's efforts to "conceal and disguise unusual transfers through purported charities" by means of "'a unique computer code,'" which suggested to U.S. officials "'that the money may have been intended for illegitimate ends.'" JA157 (FAC ¶161).

ARB's longstanding collaboration with al-Qaeda and its affiliates is further shown by allegations based on information in CIA reports. The FAC describes investigations undertaken by the CIA after the September 11th attacks, during which time U.S. intelligence and law enforcement agencies were engaged in concerted efforts to disrupt the financial and logistical support network that made the attacks possible. JA149 (FAC ¶127). During these investigations, the nature and scope of the collaboration between ARB and al-Qaeda prompted the United States to focus its attention on ARB. A 2003 CIA Report reached the following conclusions:

> Al Rajhi Bank: Conduit for Extremist Finance (S/NF)
>
> Islamic extremists have used Al-Rajhi Banking & Investment Corporation (ARABIC) since at least the mid-1990s as a conduit for terrorist transactions, probably because they find the bank's vast network and adherence to Islamic principles both convenient and ideologically sound. Senior al-Rajhi family members have long supported Islamic extremists and probably know that terrorists use their bank.

JA155 (FAC ¶156). Further, an April 25, 2002 CIA report concerning sources of al-Qaeda's vast financing and ARB's extensive sponsorship of al-Qaeda highlights the criticality of financial institutions such as ARB in the al-Qaeda network. The report documents how wealthy financiers within al-Qaeda's inner circle used purported charities and businesses as middlemen in an effort to conceal their roles in channeling resources to al-Qaeda and confirms that channeling money through

businesses "'hides the donors' role and allows them to deny knowing the funds went to terrorists.'"  JA146 (FAC ¶122).

The information uncovered in these governmental investigations led U.S. officials to debate whether to covertly interfere with the bank's internal operations and to designate the bank as a sponsor of terrorism pursuant to Executive Order 13224.  JA159 (FAC ¶168).  U.S. officials ultimately chose instead to seek reforms of the bank via direct negotiations with the Saudi government, which included requiring Suleiman al Rajhi to relinquish his control over the bank.  JA159-60 (FAC ¶¶169-72).

These allegations and other facts outlined in plaintiffs' complaint as described below sufficiently allege that ARB committed tortious acts that were expressly directed at advancing al-Qaeda's scheme and activities to attack the United States, and thus at the United States itself.

## SUMMARY OF ARGUMENT

This appeal calls again upon this Court to address when a defendant's provision of support for al-Qaeda and its anti-U.S. terrorist objectives, undertaken abroad, establishes personal jurisdiction over a defendant who faces claims arising from the September 11, 2001 attacks.  Three aspects of this case make it particularly distinct.  First, the legal and policy landscape has recently changed dramatically.  Just this year, this Court has newly recognized how conspiracy claims provide a

basis for personal jurisdiction (in *Charles Schwab Corp. v. Bank of America Corp.*, 883 F.3d 68 (2d Cir. 2018)), establishing a second, independent basis for jurisdiction over ARB, and has applied JASTA to address when a bank's provision of services to terrorists shares a common objective, directed toward the same target (*Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018)).  And in passing JASTA, Congress expanded what this Court had viewed as the relevant "tortious activity" implicated by support of terrorism and made expert factual determinations regarding how that activity is directed against and harms U.S. interests.

Second, the allegations in this case portray an unusually close, substantial nexus between ARB and al-Qaeda.  Over many years, ARB provided extensive financial support and services to al-Qaeda, its operatives, and the affiliated organizations that were populated by those operatives and organized by bin Laden to help facilitate their attacks.  That support culminated when ARB provided various forms of support to al-Qaeda operatives just before they carried out the September 11th attacks.  The allegations also establish that ARB fully knew of its role in supporting al-Qaeda's anti-U.S. agenda.  For example, al-Qaeda officials, including Osama bin Laden, acknowledged that ARB acted on its behalf to assist its activities and directed operatives to use ARB; U.S. officials informed ARB that its services were supporting al-Qaeda; and ARB's principal controlling official was highly motivated to assist al-Qaeda as a major financial backer of the organization and

18

intimately knew of the financial and terrorist operational activities of al-Qaeda affiliated organizations.  The bank's scope of services to al-Qaeda and its close working relationship with al-Qaeda's affiliates point to the same conclusion.

ARB's knowledge of its role in fostering al-Qaeda's anti-U.S. objective and the substantial degree of its support mean that plaintiffs' allegations establish far more than just "merely foreseeable" harm, and instead support the inference that attacking the United States became the shared objective and design of ARB and al-Qaeda—and thus that ARB's tortious activity was directed at the United States.  This alignment of objective between the abettor and the tortfeasor who receives aid is just what the elements of aiding and abetting establish, and the two key elements of aiding and abetting—substantiality of support and knowledge of the role in providing it—are precisely the ones that the allegations support.  Indeed, the common aim and coordinated actions of ARB and al-Qaeda also amount to aiding and abetting, and conspiracy, that separately supports personal jurisdiction under the new framework set out in *Schwab*, through the attribution of al-Qaeda's undisputed contacts with the United States to those of its co-conspirators or joint tortfeasors, including ARB.

And third, plaintiffs' allegations supporting these bases for personal jurisdiction are especially sufficient because they were challenged at an early stage of the litigation.  A lower pleading burden applies where, as here, plaintiffs have

been afforded no jurisdictional discovery.   In addition, for the key issues of knowledge and intent, a plaintiff's burden is generally satisfied by any inference a jury could plausibly draw from circumstantial evidence—and at this stage, plaintiffs are entitled to have all reasonable inferences drawn in their favor.   At a minimum, plaintiffs' allegations suffice to entitle them to jurisdictional discovery to explore further the existing indicia that ARB knew of its role in supporting al-Qaeda's anti-U.S. objective and activities, and thus that a plausible basis exists to conclude that ARB acted to further them.

## STANDARD OF REVIEW

This Court "review[s] a district court's dismissal of an action for want of personal jurisdiction *de novo*, construing all pleadings and affidavits in the light most favorable to the plaintiff and resolving all doubts in the plaintiff's favor." *Terrorist Attacks VII*, 714 F.3d at 673 (internal quotation omitted).   The Court reviews the district court's denial of jurisdictional discovery for abuse of discretion.   *Haber v. United States*, 823 F.3d 746, 754 (2d Cir. 2016).

# ARGUMENT

## I. PLAINTIFFS' SHOWING OF FACTS REGARDING ARB'S TORTIOUS ACTIVITIES DESIGNED TO ADVANCE AL-QAEDA'S ANTI-U.S. OBJECTIVES AND ACTIVITIES SUFFICIENTLY ESTABLISHED PERSONAL JURISDICTION AT THIS STAGE OF THE PROCEEDINGS.

### A. The Applicable Legal Framework.

1. <u>The Due Process Standard</u>.

For purposes of establishing personal jurisdiction, due process requires "certain minimum contacts with [the United States] such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Terrorist Attacks VII*, 714 F.3d at 673 (brackets in original; internal quotes omitted). For these purposes, the touchstone due process inquiry is whether "the defendant's conduct and connection with the forum … are such that he should reasonably anticipate being haled into court there.'" *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980); *see Terrorist Attacks VII*, 714 F.3d at 673 (quoting passage). This evaluation of fair play and notice is based in part on the strength of the forum's interests at issue. *See Int'l Shoe Co. v. Washington*, 326 U.S. 30, 317-320 (1945); *Asahi Metal Indus. v. Cal. Super. Ct.*, 480 U.S. 102, 113 (1987).

Two ways of satisfying the fair warning requirement apply in this case. First, the "fair warning requirement is satisfied if the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries

that arise out of or relate to those activities." *Terrorist Attacks VII*, 714 F.3d at 674 (internal quotations omitted). In this context, a defendant has "purposefully directed his activities at residents of [this] forum,'" if he "took 'intentional, and allegedly tortious actions … expressly aimed' at the forum" or its residents, *id.* at 674 (quoting *Calder v. Jones*, 465 U.S. 783, 789 (1984)), or was a "primary participant in intentional wrongdoing—albeit extraterritorially—expressly directed at [the] forum." *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 208 (2d Cir. 2003) (characterizing *Calder*'s requirement); *see infra* Part. I.C. "The fact that harm in the forum is foreseeable, however, is insufficient for the purpose of establishing specific personal jurisdiction over a defendant." *Terrorist Attacks VII*, 714 F.3d at 674; *see Terrorist Attacks III*, 538 F.3d at 95.

Second, the fair warning requirement can also be satisfied if the defendant was a participant in joint action and a co-participant's acts in furtherance of the joint objective created sufficient contacts with the forum. *Schwab*, 883 F.3d at 87 (2d Cir. 2018) (conspiracy). In that event, the co-participants' minimum contacts with the forum are attributed to others participating in the joint action. *Id. Schwab* applied that principle to establish personal jurisdiction over a co-conspirator, and it applies by extension to one who aids and abets another's actions causing harm in the forum. *See infra* Part I.D. Both conspiracy and aiding and abetting are alleged here.

Case 1:15-cv-12061-DScdocument 127, 03/07/2018, 2397017, Page39 of 107

Several factors shape what actions in this case give rise to fair warning and satisfy these more particular tests.  First, in this case the relevant targeted "forum" is the United States and its interests, not any particular state and its interests.  *See, e.g., Terrorist Attacks VII*, 714 F.3d at 674; Fed. R. Civ. P. 4(k)(2).  Second, the relevant interests include U.S. interests and residents abroad, as well as those within the territorial United States.  *See, e.g., Waldman*, 835 F.3d at 339-41 (2d Cir. 2016).  Thus, a tortious action that inherently threatens U.S. interests abroad suffices for purposes of the test.  *Id.*  Third, because the jurisdictional issue is whether U.S. courts can exercise jurisdiction over the defendant at all, rather than whether jurisdiction can be asserted by one state or another, the "fair notice" determination is somewhat different.  It is whether the defendant has "fair notice" of being subjected to any redress from U.S. litigation, not whether fairness indicates that the suit should be litigated in one state rather than another.  While it may be that the jurisdictional analyses under the Fifth and Fourteenth Amendments are "basically the same," *Waldman*, 835 F.3d at 330,[2] the national scope of the forum and the "all-or-nothing" nature of whether a suit may be maintained inherently affect whether an exercise of jurisdiction is fundamentally fair.  Fourth, and finally, the nature of the tort at issue

---

[2] Plaintiffs acknowledge that the Court has adopted this principle, but respectfully disagree and reserve the right to argue in further proceedings that the Fifth Amendment provides the basis for a considerably more robust assertion of personal jurisdiction.

shapes the required legal conclusions regarding what amounts to intentional tortious activities and whether undertaking them targets U.S. interests. *Cf. Schwab*, 883 F.3d at 88 (manipulation of U.S. Dollar LIBOR may be directed against the United States as a whole); *Calder,* 465 U.S. at 788-90 (nature, and focal point of injury resulting from, allegedly defamatory statement determines whether a court has jurisdiction over nonresident defendant). In the context of counter-terrorism, Congressional and Executive Branch determinations have unusual importance in defining the nature of what constitutes tortious activities in the counter-terrorism context and how those activities and entities undertaking them target and harm U.S. interests. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-36 (2010); *infra* pp. 67-69.

2.   The Pleading Standard.

With respect to what constitutes sufficiently pled allegations, "the nature of the plaintiff's obligation varies depending on the procedural posture of the litigation." *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 196-97 (2d Cir. 1990). Consistent with the low threshold for securing jurisdictional discovery, *see infra* p. 74, a much lower pleading standard applies where, as with ARB, a plaintiff has had no opportunity to conduct jurisdictional discovery. Although plaintiffs had undertaken some jurisdictional discovery with respect to the other two defendants at issue in the proceedings below, the district court plainly erred in applying the higher standard to ARB as well. *See* SPA9 (determining for all

Case 15-1261, Document 127, 03/09/2015, 2350117, Page41 of 107

defendants that, "[w]here jurisdictional discovery has taken place, as here, the plaintiff must allege facts that, if credited by the ultimate trier of fact, would be sufficient to establish jurisdiction over the defendant."); SPA22 (elsewhere acknowledging no discovery had been undertaken with respect to ARB.)

Prior to discovery, a plaintiff must make only general, legally sufficient allegations of jurisdiction to defeat a motion to dismiss. *Magnetic Audiotape*, 334 F.3d at 206. "At that preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations." *Ball, S.A.*, 902 F.2d at 197; *cf. Magnetic Audiotape*, 334 F.3d at 207-08 (pre-discovery, general allegations of participation in agreement and control over entity, even "insufficiently developed" factual claims, sufficed and warranted discovery). Only *after* discovery has been taken must the *prima facie* case for jurisdiction be based upon an averment of facts that, if credited by the trier of facts, would suffice to establish jurisdiction over the defendant. *Ball,* 902 F.2d at 197. And, a court at both stages must "construe the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor." *Dorchester Financial Securities, Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013) (quoting the tri-partite framework in *Ball* extensively).

### B.    ARB Had Ample and Fair Notice That It Could Be Held to Account for Its Actions in U.S. Courts.

As noted, the particular due process tests regarding tortious activity expressly directed at the forum and contacts with the forum in furtherance of joint activity,

addressed below in Parts I.C and I.D, are designed to implement the general principle

that jurisdiction exists if and only if a defendant has the necessary "fair warning"

that it may be held accountable in U.S. courts for harm produced by those activities.

*See Terrorist Attacks III,* 538 F.3d at 93; *supra* pp. 21-22. In this case, the nature of

al-Qaeda's actions directed against the United States, and ARB's extensive support

of al-Qaeda and knowledge of its role in advancing al-Qaeda's objective, leave no

doubt that ARB had fair notice that its earlier actions could lead to claims against it

in U.S. courts following an al-Qaeda attack against Americans.

During the many years of ARB's support for al-Qaeda and its operatives, al-

Qaeda was a notorious and notoriously anti-U.S. terrorist organization whose leaders

had issued fatwas declaring war against the United States. As described above, al-

Qaeda had beginning in the 1990s undertaken and taken public credit for a series of

attacks against U.S. facilities and persons. *See supra* pp. 8-9. Its leader, Osama bin

Laden, openly touted his organization's objectives of harming the United States and

its Western allies. *See supra* pp. 8-9. In turn, the United States was prominently

acting against any party that knowingly or inadvertently acted to support al-Qaeda

and its activities. It had in 1999 formally designated al-Qaeda as an anti-U.S.

terrorist organization, and did the same for all or parts of several of the front

organizations acting in concert with al-Qaeda. *See supra* pp. 10-11. The United

States had also developed extensive processes for sanctioning individuals and

organizations that provided financial and other support to al-Qaeda and its affiliates, whether or not that support consisted of "banking" services (and debated sanctioning ARB itself, *see supra* pp. 11, 16-17). Treasury Department and other Executive Branch officials were pressuring private banks, money transfer services, and foreign governments (including specifically ARB and the Saudi Kingdom) to prevent al-Qaeda from continuing to take advantage of banking facilities to advance their objectives. *See, e.g.,* JA159-60, 164 (FAC ¶¶ 170-71, 186); *infra* pp. 28, 42-43.

Long before the September 11th attacks, Congress also had enacted criminal and civil laws to be enforced in U.S. courts as an integral part of U.S. counter-terrorism policy. The criminal laws prohibited various types of material support for anti-U.S. terrorist organizations, *see, e.g.*, 18 U.S.C. §§ 2332 & 2339A-C, and Congress enacted the ATA's civil remedy provision, 18 U.S.C. § 2333, to redress and deter international terrorism in all its forms. Congress discerned that banks and financiers of terrorism were especially influenced by civil litigation and targeted them by "'impos[ing] liability at any point along the causal chain of terrorism,'" including by 'interrupt[ing] or at least imperil[ing] the flow of money' to terrorist groups." *Linde*, 882 F.3d at 326 (quoting legislative history). The Executive Branch also has recognized as much. Brief for the U.S. as *Amicus Curiae,* at 2, *Boim*, No. 01-1969 (7th Cir. Nov. 14, 2001) (Section 2333 is "an effective weapon in the battle

against international terrorism" because it "discourage[s] those who would provide financing for this activity.")

In these circumstances, it is inconceivable that ARB could be surprised by the United States taking action against it for any of its or its officers' activities that supported and advanced the objectives of al-Qaeda and its affiliates. The nature of the al-Qaeda threat to the United States and the pervasive scope of the U.S. response all but guaranteed that the United States would seek retribution against any parties providing support to al-Qaeda generally or that facilitated particular attacks against U.S. persons in any manner. Because U.S. counter-terrorism efforts were especially focused on stopping financial support to al-Qaeda and barring it from using the global financial system, banking officials in particular were on notice that any action that supported al-Qaeda could well place their bank in the crosshairs of U.S. counter-terrorism responses, especially criminal and civil process in U.S. courts. Indeed, before the September 11th attacks, senior U.S. Treasury and counter-terrorism officials told ARB that it should stop continuing to provide support to al-Qaeda operatives. *See infra* pp. 42-43.

As further described *infra* pp. 37-50, ARB's actions in support of al-Qaeda, including support for the September 11th attackers themselves, far exceeded any conceivable threshold for placing ARB on notice that it might be subject to U.S. court proceedings as a criminal or civil defendant arising from any al-Qaeda attacks

that harmed U.S. citizens.  That ARB knew of its ongoing role in advancing al-Qaeda's anti-U.S. agenda, and still continued to provide support, underscores this point.

### C.     Plaintiffs' Allegations Readily Establish That ARB Undertook Tortious Acts Expressly Directed at the United States.

In granting ARB's motion to dismiss, the district court applied incorrect legal standards and disregarded the principal elements of plaintiffs' factual allegations and arguments for why that factual showing is legally sufficient.  The district court dismissed the relevance of any allegations related to the provision of banking services or involving dealings with al-Qaeda in conjunction with its affiliated charitable organizations (as well as evidence of ARB's direct support of al-Qaeda).  SPA12-13; *infra* pp. 57-60.  However, that approach ignores the governing legal standards.  Part I.C.1 shows that such support *can* provide the basis for establishing personal jurisdiction under the applicable standards, when a plaintiff's allegations also establish a sufficiently close nexus between the terrorist organization and its defendant supporter.  That nexus is sufficiently close when the allegations support an inference that ARB had general knowledge of its role in advancing al-Qaeda's anti-U.S. scheme and activities and when it provides a sufficient degree of support for that scheme.  If those two elements are established, then the supporters' actions are themselves tortious activities directed at the object of the terrorist scheme and activities—here, U.S. interests—even if they involve banking services or third

parties.  Part I.C.2 outlines the extensive facts alleged by plaintiffs that establish both of these elements and closely tie ARB's actions to the fostering of al-Qaeda's scheme and activities.  Part I.C.3 describes how the district court erred in construing and applying this Court's decisions, and erred in failing to address or properly credit plaintiffs' allegations of fact.  Part I.C.4 describes how the district court compounded its errors by dismissing the relevance of JASTA.  In passing JASTA, Congress defined the nature and expanded the scope of the "tortious activity" relevant to this case.  It also made a series of expert factual findings about how acts supporting terrorism, like ARB's, are intertwined with the recipient terrorists' activities and objectives, as well as the resulting harm, and therefore are directed against U.S. interests.

1.     <u>ARB's Support to al-Qaeda Meets the Proper Test for Showing Acts as Part of a Common Scheme to Target the United States.</u>

Consistent with how ARB's close and ongoing support for al-Qaeda's anti-U.S. agenda gave ARB fair notice that it could be held accountable in U.S. courts, those acts also were "tortious actions" "expressly aimed at the United States." *Terrorist Attacks VII*, 714 F.3d at 676 (internal quotes omitted).  Contrary to the district court's conclusions, the nature and scope of ARB's support for al-Qaeda, including support provided in the form of banking services or in coordination with third parties, did provide the basis for personal jurisdiction.  This is so because ARB's support was provided as part of a sufficiently close and substantial

relationship between ARB and al-Qaeda whereby ARB's actions advanced the common scheme and objective of attacking U.S. interests. ARB was generally aware of its role in facilitating al-Qaeda's terrorist activities directed against the United States and provided substantial assistance, and its conduct was sufficient in both respects to amount to aiding and abetting. As the Supreme Court recently stated, "for purposes of aiding and abetting law, a person who actively participates in a criminal scheme knowing its extent and character *intends* that scheme's commission." *Rosemond v. United States*, 572 U.S. 65, 77 (2014) (emphasis added). This standard is somewhat higher than that required in the civil context, *see Boim III*, 549 F.3d at 692, but in either event one who aids and abets another tortfeasor has itself undertaken acts directed at achieving the common scheme. *See also* Brief for the U.S. as *Amicus Curiae*, at 16, *Boim III*, No. 05-1815 (7th Cir. Aug. 21, 2008). As a result, ARB's knowledge of its role in fostering al-Qaeda's anti-U.S. objectives and its provision of substantial support to al-Qaeda indicated ARB's design or intent to foster al-Qaeda's expressly anti-U.S. objectives, and amounted to tortious activity "expressly aimed… at the United States." *Terrorist Attacks VII*, 714 F.3d at 666.[3]

---

[3] Indeed, for these reasons, ARB also made itself a "primary participant" in the wrongdoing, *Magnetic Audiotape,* 334 F.3d at 208, and thus subject to U.S. courts' jurisdiction. *Cf.* 18 U.S.C. § 2 ("Whoever commits an offense against the United States or aids, abets, counsels, induces, or procures its commission, is punishable as a principal").

There must, however, be a sufficiently close nexus between the abettor and the recipient tortfeasor—extending beyond mere foreseeability of harm—to infer that the abettor expressly directed his actions towards realizing the common scheme. A well-established standard, set out in *Halberstam*, 705 F.2d 472, and other decisions, establishes when the provision of aid creates that nexus and becomes joint action such that the object of the recipient's tort is also the object of the aider's provision of assistance. *See, e.g.*, *Linde*, 882 F.3d at 329-31 (recognizing and applying the *Halberstam* standard in the ATA context, based on JASTA's direction). Specifically, one who aids the tort of another must (i) generally be aware of his role in facilitating the recipient's tortious activity, and (ii) must provide "substantial" aid, creating a degree of proximity that reflects action to sufficiently advance the recipient's tortious activities. *Halberstam v. Welch*, 705 F.2d 472, 477 D.C. Cir. 1983). A multi-factor test addresses when the provision of aid creates that nexus and proximity. Those factors include: "the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other tortfeasor and his state of mind," and duration of the assistance provided. *Id.* at 478, 484-85 (quoting the *Restatement (Second) of Torts* § 876). Where this nexus exists, the tortious activities giving rise to personal jurisdiction are those of the defendant itself, jointly targeted as part of the common scheme advanced by both tortfeasors, and thus jurisdiction is not based on "random"

Case 1:03-md-01570-GBD-SN   Document 127   03/09/2015   2364417   Page 49 of 107

or "fortuitous" contacts or "on the unilateral activity of a plaintiff."  *Walden v. Fiore*, 571 U.S. 277, 291 (2014).

In the terrorism context, these principles establish that when one provides aid to a designated, anti-U.S. terrorist organization, the provision of aid is itself a tortious action aimed at the same parties targeted by the terrorist.  The provision of support to a known terrorist organization, if occurring through an indirect contribution, can be but is not always associated with foreseeability alone, *Terrorist Attacks III*, 538 F.3d at 95, even though a direct contribution generally amounts to a tortious act expressly aimed at the target.  *See Terrorist Attacks VII*, 714 F.3d at 678-79; *Boim v. Holy Land Found. for Relief & Dev.* ("*Boim III*"), 549 F.3d 685, 693-94, 695 (7th Cir. 2008) (en banc).  *Linde* shows that actions satisfying the *Halberstam* test also suffice, even for indirect contributions or banking services, to establish that a terrorist's abettor acted to foster the terrorist operator's scheme, making both parties' actions aimed or directed toward the terrorists' target.  Once the abettor's action meet the standards established by *Halberstam*, the defendant's support of terrorists reflects the defendant's own "intent to further its terrorist activities or awareness that one is playing a role in those activities."  *Linde*, 882 F.3d at 330.  Apart from substantial support, the additional element required to establish this intent to advance the common scheme is, for a bank's provision of financial services, evidence permitting a finding that "in providing such services, the bank

was 'generally aware' that it was thereby playing a 'role' in Hamas's violent or life-endangering activities." *Id.* That is, the abettor in these circumstances itself plays a role in the common scheme and thus directs its acts at the common target—here, U.S. interests.[4]

Congress, in affirming that aiding and abetting provides the basis for civil recovery under the Anti-Terrorism Act (and rejecting this Court's construction of the ATA to the contrary), endorsed precisely these principles. It indicated that *Halberstam v. Welch* "provides the proper legal framework for how such [civil aiding and abetting and conspiracy] liability should function" with respect to the ATA. JASTA § 2(a)(5). It found as a matter of fact that because anti-U.S. international terrorism so significantly harms U.S. interests, and the provision of financial and other support to such terrorists is tortious activity integral to their anti-U.S. actions, those who conspire with or aid and abet such terrorism "necessarily direct their conduct at the United States, and should reasonably anticipate being brought to court in the United States to answer for such activities." *Id.* § 2(a)(6).

Under this framework, it is enough for the supporter to advance the recipient's scheme directed against U.S. interests, and that no showing is required that the

---

[4] Indeed, the allegations here would support a reasonable inference of an even higher standard of intent that *Linde* indicates is *not* required to establish aiding and abetting: the "defendant's intent to participate in a criminal scheme as 'something that he wishes to bring about and seek by this action to make it succeed.'" *Linde*, 882 F.3d at 329 (quoting *Rosemond v. United States*, 572 U.S. 65, 76 (2014)).

abettor sought to advance particular incidents of violence against the United States. In addition, this Court recently confirmed that the "express direction" test for personal jurisdiction is satisfied by a course of conduct directed at and harming U.S. society generally. *See Schwab*, 883 F.3d at 87-88. There, plaintiffs sought to establish California-based jurisdiction through allegations that defendants had acted abroad to manipulate U.S. Dollar LIBOR [in London markets]." *Id.* at 71. The Court cited and endorsed the point set out in *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873, 884 (2011), that personal jurisdiction can be asserted when "'a defendant has followed a course of conduct directed at [a specific] society or economy,'" and that action directed at the United States as a whole may "'subject [a defendant] to the jurisdiction of the courts of the United States … .'" *Schwab*, 883 F.3d at 88. Here, al-Qaeda's general campaign of attacking U.S. interests is such a "course of conduct," and support provided to al-Qaeda such as ARB's is expressly directed against U.S. interests—just as, in World War II, buying a U.S. war bond or supplying food to U.S. armed forces was directed against enemies of the United States, Germany and Japan. Congress, through JASTA, in particular defined the relevant tortious activity directed against the United States in just this way. *See infra* pp. 63-66. The Court further suggested that "actions to manipulate U.S. Dollar LIBOR [could be] aimed at the U.S. as a whole" in this sense. *Schwab*, 883 F.3d at 88. Here, even more clearly, al-Qaeda's inherently anti-U.S. objective and activities,

advanced by ARB's acts, reflects a "course of conduct directed at [U.S.] society." *Id*. That is, allegations of advancing al-Qaeda's inherently violent, anti-U.S. scheme and its course of activities—reflected in various attacks on U.S. interests—should suffice to establish personal jurisdiction, without having to show as well a specific intent to further particular attacks on the United States. *Id*.; *see also Terrorist Attacks VII*, 714 F.3d at 678 (reaching same conclusion in finding that personal jurisdiction would be established where charity officials "directly provided financial and other resources to al-Qaeda, knowing that al-Qaeda was engaged in a global campaign of terror directed at the United States"); *Boim III,* 549 F.3d at 690 (knowingly giving financial support to Hamas permits inference that donor intended to support Hamas' violent terrorist activities and intended to coerce or intimidate the targeted citizens); *cf. Waldman*, 835 F.3d at 340 (declining to exercise personal jurisdiction over one who supported Hamas, because Hamas's objective was not to direct terrorist activities against Americans, but rather to target Israel).[5]

---

[5] The United States has expressed the view that "[t]o the extent [this Court's] language suggests that a defendant must specifically intend to cause injury to residents in the forum before a court may exercise jurisdiction over him, that is incorrect" because other, lesser showings can meet the "tortious activities expressly aimed" standard. Brief for the United States as *Amicus Curiae*, at 18-19, *Federal Ins. Co. v. Kingdom of Saudi Arabia*, No. 08-640 (U.S. S. Ct., filed June 1, 2009); *see also* Brief for the United States as *Amicus Curiae*, at 19-20, *O'Neill v. Al Rajhi Bank* (U.S. S. Ct. filed May 27, 2014). As just discussed above, one such showing for even indirect support is that the defendant has acted as an aider and abettor of al-Qaeda's scheme or objective of attacking the United States, with a sufficient nexus to al-Qaeda's actions, making that objective the defendant's as well.

2.    <u>Sufficiency of Plaintiffs' Showing</u>.

In this case, plaintiffs' allegations of fact readily meet these standards and support a reasonable inference that ARB undertook tortious actions expressly directed against the United States, and do so with a degree of specificity at least sufficient to defeat a motion to dismiss for lack of personal jurisdiction at this stage of the proceedings.

In considering whether the allegations establish a sufficiently close nexus between ARB and al-Qaeda's anti-U.S. scheme and activities, such that ARB's support of al-Qaeda can be said to seek or act to advance those activities itself, two largely uncontested points frame whether ARB's acts were directed against the United States in this sense.  First, al-Qaeda was indisputably a notorious terrorist organization, publicly committed to directing its actions against U.S. interests.  By the early 1990s, this was widely known generally and specifically known to officials of ARB.  *See supra* pp. 8-9; *infra* pp. 42-43; *see also* JA152-54 (FAC ¶¶141-52). Second, from the mid-1990s, ARB in fact did provide extensive, ongoing support to al-Qaeda, through financial contributions directed to it and services provided to al-Qaeda operatives, including the operatives who carried out the September 11th attacks.  *See infra* pp. 38-50.  The remaining issue is the one principally contested by ARB in the court below:  whether there is a basis to infer that ARB had general knowledge of its role in supporting al-Qaeda's anti-U.S. scheme, *see Halberstam*,

705 F.2d at 477; *Linde*, 882 F.3d at 329-30, or only to infer no more than that ARB was the unwitting provider of financial services to thousands of customers (who happened to include al-Qaeda operatives) and of financial contributions to ostensible charities (that just happened to be working hand-in-glove with al-Qaeda to advance its attacks).

      a.   <u>Knowledge of supporting role</u>.  The complaint provides at least five clusters of facts that readily support, and indeed compel, a reasonable inference that ARB acted with full knowledge of its role in advancing al-Qaeda's anti-U.S. agenda and activities.  *See, e.g.*, *Staples v. United States*, 511 U.S. 600, 615 n.11 (1994) ("knowledge can be inferred from circumstantial evidence"); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168-69 (2d Cir. 2000) (same).

      <u>First</u>, the most senior and knowledgeable al-Qaeda officials and operatives have indicated that ARB acted with this design and intent in coordination with al-Qaeda itself.  One of the most prominent al-Qaeda insiders and convicted September 11th plotter, Zacarias Moussaoui, reported that Osama bin Laden himself characterized the bank as acting "like a good brother," JA158-59 (FAC ¶167), which connotes active and sympathetic support for al-Qaeda and its objectives.  Moussaoui claimed that ARB performed the critical role of "moving money around" for Al-Qaeda.  JA159 (FAC ¶167).  That is, Osama bin Laden directly vouched for ARB's intent to act in concert with al-Qaeda, and Moussaoui confirms that ARB

affirmatively and consciously acted to assist al-Qaeda. Extremist leaders generally
acted consistently with this understanding by, according to the U.S. government,
"order[ing] operatives in Afghanistan, Pakistan, Saudi Arabia, Turkey, and Yemen'
to use Al Rajhi Bank," JA157 (FAC ¶162), further supporting the conclusion that al-
Qaeda and other operatives understood that ARB was a willing and knowing
collaborator. It is difficult to imagine more authoritative sources for determining
whether al-Qaeda and ARB acted in concert toward the same end, and whether ARB
was, in fact, al-Qaeda's partner, or "good brother."

Second, ARB acted with knowledge of its role in supporting al-Qaeda's
activities because it was founded and controlled by an individual who had intimate
knowledge of al-Qaeda's reliance on ARB and sought himself to advance al-Qaeda's
objectives. Suleiman al Rajhi founded and, along with his family, owned a
controlling ownership position in ARB, and he had operational control of ARB as
Chairman, Managing Director, CEO, and largest shareholder, which included
control over the bank's key operational policies. JA155, 270 (FAC ¶¶154; FAC
Exhibit A ¶219). He was intimately familiar with the web of organizations that most
directly supported al-Qaeda and particularly its terrorist operations and which of
them extensively relied on ARB to that end. For example, he established the SAAR
Foundation and Network, a network of Muslim organizations and charities based in
Herndon, Virginia, created to provide funding, money laundering, and other material

support to al-Qaeda and other terrorist groups and which was the target of U.S. counter-terrorism efforts.  JA162-64 (FAC ¶¶180, 185-86).  (SAAR is an acronym for Suleiman Abdul Aziz al-Rajhi.)  According to the Department of Defense, "the Al Rajhi family utilized SAAR to fund Islamic extremist organizations and has ties to al-Qaida."  JA163-64 (FAC ¶185).  Suleiman al Rajhi was a board member of one bank that the U.S. government had deemed a Specially Designated Global Terrorist (Akida Bank), and had close relationships with Ahmed Iris Nasreddin, yet another SDGT who founded a separate bank that directly supported al-Qaeda.  JA164 (FAC ¶¶187-88).

Especially important for establishing direct knowledge of al-Qaeda's anti-U.S. operations facilitated by organizations also served by ARB, Suleiman al Rajhi served on the Executive Council of the IIRO when ARB provided extensive financial services to IIRO and directed its own "charitable" contributions to the IIRO.  JA161-63 (FAC ¶¶178-81).  (He also served on the Board of Trustees of Sanabel, Inc., the U.S.-based arm of Sanabel al Kheer, which functioned as IIRO's financial arm. JA162 (FAC ¶¶179-80)).  Components of IIRO, in turn, were designated by the U.S. government as terrorist groups assisting al-Qaeda, and the U.S. government cited affiliation with the IIRO as a "primary factor" in detaining IIRO officials as "enemy combatants."  JA228 (FAC Exhibit A ¶82); *see* JA161 (FAC ¶176) (State Department cable concluding:  "Usama bin Ladin used the *entire* IIRO network for

his terrorist activities.") (emphasis added).  The IIRO was intimately involved in funding and supporting the operations of al-Qaeda's prominent attacks, including those against the United States:  Through its offices in Kenya, the IIRO provided direct financial and logistical support to al-Qaeda terrorists in the 1998 bombings of the U.S. embassies in Kenya and Tanzania and the 1999 al-Qaeda plot to attack U.S. consulates in Madras and Calcutta.  JA227 (FAC Exhibit A ¶¶75, 77).  Also, according to the 1996 CIA report, the "'IIRO help[ed] fund six militant training camps in Afghanistan,'" including camps from which al-Qaeda planned, approved, and coordinated the September 11th attacks, and at which some or all of the September 11 hijackers received indoctrination and training."  JA217-18 (FAC Exhibit A ¶38).  Abu Haman al Saudi, Osama bin Laden's cousin and manager of the IIRO's branch office in Pakistan, transferred IIRO funds to Madani al Tayyib, who then distributed the amounts to individuals in charge of salary, travel, and health benefits for al-Qaeda.  JA216-17 (FAC Exhibit A ¶34).  According to a 1996 CIA report, the Director of the IIRO's Philippines branch, in 1995 devised the Bojinka Plot to blow up 11 airliners from Asia to the United States.  JA217-18 (FAC Exhibit A ¶¶37-38, 41).  According to Sayed Abu Nesir, a Bangladeshi national who was ordered by the Director of IIRO operations in Asia to attack the U.S. consulates, 40 to 50% of IIRO's charitable funds were being diverted to finance terrorist training camps in Afghanistan and Kashmir.  JA227 (FAC Exhibit A ¶78).  In these

circumstances, it is inconceivable that Suleiman al Rajhi was not intimately familiar with IIRO's operational integration with and work to support al-Qaeda's anti-U.S. activities, and with its reliance in that respect on ARB's services and financial contributions.

Further, Suleiman al Rajhi himself was a major financial contributor to al-Qaeda, further supporting the inference that he directed his bank to act toward the same objective. In 2002, authorities seized al-Qaeda documents that, according to U.S. officials, "included a handwritten list of al-Qaeda's most important wealthy donors—'the people referred to within al-Qaeda as the 'Golden Chain.'" JA150 (FAC ¶¶130-31). According to a former senior Treasury official, "[p]rominent and wealthy names long familiar to law enforcement appeared on the list. Not surprisingly, many of these men were prominent Saudis—such as Suleiman al Rajhi … ." JA150 (FAC ¶132.) He also is alleged to have used his position at IIRO to ensure that ARB's contributions to IIRO were directed to al-Qaeda. *See supra* pp. 14, 40-42.

<u>Third</u>, ARB clearly knew of its role as a supporter of al-Qaeda because the U.S. government *told* it so. As plaintiffs allege, "[i]n 1999, William Weschler of the National Security Council and Richard Newcomb of the Office of Foreign Assets Control (OFAC) traveled to Saudi Arabia to specifically warn SAMA and Al Rajhi that their financial systems were being manipulated or utilized to fund terrorist

organizations such as Al-Qaeda."  JA323-24.  In addition, in 2003, a CIA report concluded that "Islamic extremists have used [ARB] since at least the mid-1990s as a conduit for terrorist transactions," and [s]enior al-Rajhi family members have long supported Islamic extremists and probably know that terrorist use their bank." JA155 (FAC ¶156).  While the report bases this conclusion on "extensive circumstantial evidence that some executives are aware the bank is used by extremists," knowledge is generally established by such circumstantial evidence. Various other U.S. government investigations followed, focusing on ARB's extensive support for terrorist activities, *see* JA156-60 (FAC ¶157, 161-66, 170), leading, in 2013, to the U.S. Senate Permanent Subcommittee on Investigations report canvassing the U.S. government actions, which it summarized as:  "Taken together, the information—the Al-Qaeda Golden Chain document, the 2002 search of Al Rajhi-related entities in Virginia, the 2003 CIA report, the 2005 al Haramain Foundation indictment and trial, the 2007 media reports, the 2010 refusal to provide bank documents in a terrorist-financing trial, and the multiple links to suspect banks and accountholders—present an unusual array of troubling allegations about a particular financial institution."  JA165 (FAC ¶191).

Fourth, the scope and nature of the support the bank provided to al-Qaeda supports the conclusion that it knew of its supporting role.  The extensive and essential support provided directly to the September 11th hijackers and their

immediate operational directors, *see infra* pp. 12-13, suggests something far beyond a coincidence and gives further credence to the claims by Osama bin Laden and Moussaoui that ARB acted in close operational partnership with al-Qaeda to foster its objectives.  The unusual nature of the support that ARB provided also buttresses that inference.  Examples include transferring money via couriers to remote locales, accepting unusual forms of payment for funds later destined for terrorist operations, and the bank's use of unusual and complicated computer codes to assure anonymity for funds transfers to al-Qaeda operations (as well as Al-Hussayen's apparent on-the-ground support for the attackers).  JA157-58 (FAC ¶¶161, 166); *Terrorist Attacks VII*, 714 F.3d at 679 & n.17.  The bank's efforts to evade counter-terrorism enforcement efforts, after the attacks, also indicate knowledge of wrongdoing and even an effort to ensure that it could continue to support al-Qaeda.  JA157 (FAC ¶160).

Fifth, and finally, ARB undertook fundraising efforts with al-Qaeda-supporting organizations targeting the U.S. and using ARB accounts, including in circumstances where ARB clearly knew the funds would be used for terrorist activities.  For example, it advertised in IIRO journals for contributions to ARB accounts for IIRO to be used in various countries "for the action most loved by Allah"—suicide bombings and other sacrifice in the course of terrorist activities.  JA161-62 (FAC ¶178).  This Court has noted that an equivalent communication,

Case 1:15-cv-12-cv, Document 127, 03/07/2018, 23-8217, Page 61 of 107

"alerting the bank that the transfers being requested therein were payments for suicide bombings" could support a jury finding "that the bank was aware that by processing future transfers it was playing a role in violent or life endangering acts … ." *Linde*, 882 F.3d at 330.

Here, the various factual allegations described above provide far greater support for the conclusion that ARB knew exactly what role it was playing in fostering al-Qaeda's anti-U.S. agenda and advancing its terrorist activities undertaken as part of that scheme. That provides one of the two elements, along with the substantiality of ARB's support provided to al-Qaeda, that establishes a more than adequate basis to conclude that ARB's tortious activities were expressly directed, as much as al-Qaeda's, against U.S. interests.

b. <u>Substantiality of ARB's support provided to al-Qaeda</u>. Allegations of fact bearing on the various factors related to the substantiality of the abettor's support for the co-tortfeasor's wrongful scheme, *see supra* pp. 32-33, provide the other key element establishing the nexus between ARB and al-Qaeda that supports an inference that both ARB's and al-Qaeda's acts were directed toward the common scheme of harming U.S. interests. Here, the duration, scope, proximity of the acts to the harm, the nature of the scheme and support, and related factors are all amply alleged with considerable detail. *Cf. Halberstam*, 705 F.2d at 478, 484; *Linde*, 882 F.3d at 329.

Providing financial support and services related to money transfers and management are clearly essential to the success of modern terrorism and specifically to al-Qaeda's activities, including those leading to the September 11th attacks. *See, e.g.*, *Boim III*, 549 F.3d at 690-91 ("financial angels" that support terrorist organizations serve as "the terrorists' lifeline"); JASTA § 2(a)(3)&(5), 130 Stat. at 854; JA133-34 (FAC ¶¶82, 86). Plaintiffs' allegations also establish that ARB's support for al-Qaeda in these ways extended for years prior to the attacks and took many forms that reflected the close operational partnership described above. *See supra* pp. 11-17. ARB's support for the al-Qaeda operators undertaking the September 11th attacks is most relevant for inferences regarding facilitation and design, and confirms the intimate proximity of support to the resulting harm (even if linkages to specific violent activities directed against the United States were needed). As described above, *see id.*, that support was extensive. ARB transferred the funds to al-Qaeda's Hamburg cell that launched the September 11th attackers on their U.S. mission, and September 11th hijacker al Omari maintained an account with ARB, was issued a Visa debit credit card through the bank, and received a wire transfer on September 7, 2001 from ARB. Mohammed Atta himself made a transfer to this account held by Omari. JA316; *see also Terrorist Attacks VII*, 714 F.3d at 679 (discussing relevance of ARB Sharia Board official Al-Hussayen's actions in

apparent support of the September 11th hijackers, in Virginia, and how that put a "different light" on ARB's direct and indirect support of al-Qaeda).

ARB provided support to many other al-Qaeda operatives and activities as well. As noted, senior al-Qaeda officials noted the broad range of money transfer and other services provided to al-Qaeda operatives by ARB, and various terrorist leaders directed their operatives to use ARB's services. *See supra* pp. 13-15. And, in fact, the bank functioned as a principal mechanism to support al-Qaeda's need to acquire funds and to move them to its operatives. JA155-56 (FAC ¶¶155, 156, 158). For example, ARB provided a visa to the money courier for Ayman al Zawahiri, Osama bin Laden's second-in-command, to enable him to travel and fund al-Qaeda operatives. JA158 (FAC ¶166). It provided fund transfer and account capabilities to al-Qaeda operatives who would not be able to secure them from ordinary banks. JA157-58 (FAC ¶163). And the U.S. government repeatedly recognized that ARB provided banking services over a lengthy period for al-Qaeda's operatives and otherwise in support of al-Qaeda's activities. *See, e.g.*, JA155-58 (FAC ¶¶155-166).

ARB is also alleged to have supported al-Qaeda in three important respects through its activities in conjunction with the al-Qaeda-affiliated and coordinated charities. First, ARB undertook joint fundraising activities with the organizations, with funds directed to ARB accounts, which suggests a high degree of coordination regarding how the accounts were to be used—including in support of al-Qaeda's

activities. *See* JA161-62 (FAC ¶¶178, 179); *see also supra* pp. 44-45; *infra* p. 55 (martyrdom funds for ARB accounts). Second, ARB provided accounts and other financial services generally to the charities, with considerable knowledge of those organizations' close working relationship with al-Qaeda. *See* JA160-63 (FAC ¶¶173,182).

And third, plaintiffs allege that ARB contributed its own funds to the charities in circumstances that ensured that they would support al-Qaeda's activities. JA163 (FAC ¶183); JA305-06, 311-13. Even without a close relationship of operational coordination with the charities, such extensive support for organizations that funnel large portions of their funding to al-Qaeda and its activities inevitably functions as support for al-Qaeda, harming U.S. interests. *See, e.g., Holder*, 561 U.S. at 33-36; *id*. at 33 ("In the Executive's view: 'Given the purposes, organizational structure, and clandestine nature of foreign terrorist organizations, it is highly likely that any material support to these organizations will ultimately inure to the benefit of their criminal, terrorist functions'") (internal citation omitted). However, plaintiffs also allege such close coordinating relationships, including but extending beyond the joint fundraising and intimate relationships between ARB's leaders and those of the charitable organizations. ARB's founder and controlling officials also served in roles in those "charitable" affiliates that enabled them to control those organizations' activities, when those organizations were alleged to be components of al-Qaeda

itself, dedicated to facilitating al-Qaeda's anti-U.S. objectives, populated by al-Qaeda operatives, and directly advancing al-Qaeda operations. *See supra* pp. 14-15; JA162-65 (FAC ¶¶180-190). As a result, the ARB officials ensured that those organizations would and could use ARB's finance capabilities to assist al-Qaeda and that those organizations' receipt of funds directly from ARB would be directed to al-Qaeda. JA156-57, 160-63 (FAC ¶¶159, 173, 174, 175-83). This is so for Suleiman al Rajhi's role with respect to IIRO, *see supra* pp. 14, 40-42, and his membership in the "Golden Chain" signified that his task was to divert funds to al-Qaeda from organizations such as the IIRO. *See* JA151, 156-57 (FAC ¶¶136, 159)). It is also true for Abdul Aziz Al-Khereiji, an executive on the Board of Al Rajhi between April 3, 1999 and autumn 2000, who was also a principal owner of Muwaffaq and from late 1999 also served in its board, replacing Yasin al Qadi as one of Muwaffaq's two directors. JA321-22. This gave him control like that held by al Qadi, which this Court found sufficiently indicated a course of direct contributions to al-Qaeda sufficient to justify jurisdictional discovery. *See Terrorist Attacks VII*, 714 F.3d at 678. And, this Court has already considered the actions of one of the officials controlling ARB's own "charitable" contributions, Saleh Al-Hussayen, who served as a member of ARB's Sharia Board for five years. *Id*. at 679. In the weeks before the September 11th attacks, Al-Hussayen traveled to the U.S. visiting locations in New York City and elsewhere, including the vicinity of the

World Trade Center, and then in the days before the attacks, switched hotels in Northern Virginia to one where three of the September 11th attackers were staying. *Id.* As this Court noted in concluding that other plaintiffs had met the threshold for jurisdictional discovery with respect to Al-Hussayen, the "additional allegations" regarding his actions "cast his activities at Al Rajhi Bank … in a different light," with respect to both its direct support of al-Qaeda and its support provided via affiliated entities. *Id*.

c. Sufficiency in light of pleading considerations. The sufficiency of plaintiffs' allegations is especially clear at this stage of the proceedings, for two reasons. First, plaintiffs have not had discovery against ARB, and can make a prima facie case of jurisdiction based upon legally sufficient allegations without averring particular facts that would, if accepted, suffice to support an ultimate determination of jurisdiction. *See supra* pp. 24-25. For example, although plaintiffs allege much more, it would suffice under this standard to allege that ARB employees providing services to the September 11th attackers knew who or what they were supporting, or operated pursuant to policies designed to facilitate al-Qaeda's access to those services, and provide further details following discovery.

Second, and applicable even under a higher standard of pleading, plaintiffs' allegations are sufficient because the key issues of "aiming" or "expressly directing" their actions at the United States are ones of knowledge and intent that inherently

Case 1:15-12-01, Document 127, 03/09/2015, 23, Filed 17, Page 47 of 107

rest on inferences drawn from circumstantial evidence and for which direct factual support is not required.  The standard for alleging general awareness, intent, and state of mind is a low one.  *Wight v. BankAmerica Corp.*, 219 F.3d 79, 91 (2d Cir. 2000) ("We apply the more general standard to scienter for the simple reason that a plaintiff realistically cannot be expected to plead a defendant's actual state of mind.").   The general circumstances of the wrongdoing generally supply the evidence of intent.  *Halberstam*, 705 F.2d at 486; *see also, e.g., Staples v. U.S.*, 511 U.S. 600, 615 n.11 (1994).  In the context of joint criminal action, it is rare, in the absence of a confession, to find direct evidence of the required state of mind, and consequently, courts must typically infer intent from indirect, circumstantial evidence.  *Halberstam*, 705 F.2d at 481 (recognizing that "in most cases the court will have to infer a conspiracy from indirect evidence.").[6]  Some indicia of general awareness that courts credit in this context are whether the tortfeasors: 1) have the same goal, although symbiotically perform different functions, 2) are in contact with one another, 3) have worked together for a lengthy period of time, and 4) carry out seemingly routine services in unusual ways.  *Id.* at 481, 487 ("Mutually supportive

---

[6] Even in the context of fraud, which carries a special, higher pleading standard, "malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  "Such intent can be established … by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 168-69 (2d Cir. 2000); *Wight*, 219 F.3d at 91 ("the requisite intent of the alleged [perpetrator of the fraud] need not be alleged with great specificity").

activity by parties in contact with one another over a long period suggests a common plan"). Those are readily established here. And in pleading those factual circumstances that may permit an inference of intent in conspiracy cases, "great leeway should be allowed the pleader, since by the nature of the conspiracy, the details may not be readily known at the time of pleading." *Banks v. Consumer Home Mortg., Inc.*, No. 01-8508, 2003 WL 21251584, at *5 (E.D.N.Y. Mar. 28, 2003)).

Even after discovery, circumstantial evidence can readily support an inference of intent to foster a particular scheme or course of action. For example, in the counter-terrorism context, evidence of knowledge of an associate's wrongdoing gives rise directly to a permissible inference of the relevant intent associated with aiding and abetting a terrorist act. *See, e.g., Linde*, 882 F.3d at 330 (aiding and abetting liability could be established by "certain communications … [that] alerted the bank that the transfers being requested therein were payments for suicide bombings"); *cf. Halberstam*, 705 F.2d at 486 ("it defies credulity" that the wife of a man who committed burglaries for five years and regularly brought home stolen coins for her to help smelt into gold bars and then sell "did not know that something illegal was afoot.") Wide latitude is given to what facts and circumstances support an inference regarding intent, because "'traditionally a jury resolves questions about a tortfeasor's state of mind.'" *Linde,* 882 F.3d at 330 (quoting *Cantanzaro v. Weiden*, 140 F.3d 91, 95 (2d Cir. 1998)). Here, the allegations of fact related to

ARB's knowledge of its role in supporting al-Qaeda and its anti-U.S. agenda, and the broad and varied types of support in close proximity to al-Qaeda's operations, readily support an inference that ARB shared al-Qaeda's objective and undertook tortious acts expressly directed or aimed at the United States.

>   3.    The District Court Incorrectly Concluded That This Court's Rulings Require a Finding that Plaintiffs' Allegations are Insufficient.

Contrary to the claims of ARB before the district court and that court's conclusions, none of the limitations set out in this Court's prior cases supports a conclusion that plaintiffs' pleadings were insufficient to withstand a motion to dismiss for lack of jurisdiction.

>   a.    Indirect support as indicating only "mere foreseeability of harm."

Plaintiffs' allegations portray a close operational relationship between ARB and al-Qaeda, a degree of support, and an awareness on ARB's part of its role in supporting al-Qaeda that go well beyond the allegations of "mere foreseeability" of harm that this Court has previously found to be insufficient. *Cf. Terrorist Attacks VII*, 714 F.3d at 675; *Terrorist Attacks III*, 538 F.3d at 95. In particular, this Court has previously indicated that allegations insufficiently rest on "mere foreseeability" of harm when they are only claims that the defendant (1) indirectly provided material support to al-Qaeda via a separate organization, and (2) did so with knowledge of al-Qaeda's character as a terrorist organization. *Terrorist Attacks VII*, 714 F.3d at 675; *Terrorist Attacks III*, 538 F.3d, at 95. Here, the allegations go further, alleging

that ARB acted with sufficient proximity and nexus to al-Qaeda, such that it was acting with knowledge of its role in fostering al-Qaeda's agenda to direct violence against the United States and itself significantly advancing that common scheme. *See supra* pp. 38-50.  For the reasons canvassed at length above, allegations of fact establishing these two elements indicate a relationship between ARB and al-Qaeda that makes ARB's actions directed against al-Qaeda's target, the United States.  *See supra* pp. 29-38.  Harm was indeed foreseeable, but establishing these additional elements shows aim and direction, not just "mere" foreseeability.  That is, the harm was not just foreseeable, it was a consequence of ARB's tortious actions that were designed to, and did, advance al-Qaeda's scheme to target U.S. interests, and thus ARB's acts were themselves directed against the United States.

Nowhere did this Court indicate that any contributions to al-Qaeda made via a third party, without regard to other elements of the relationship between terrorist supporter and terrorist, necessarily amounted to "mere foreseeability" of harm, and the District Court erred in treating the rule as such.  *See* SPA11-12; 16-17.  This Court has instead indicated that additional facts regarding the relationship may make even "indirect" contributions serve as the basis for jurisdiction, and indeed did so in the context of directing jurisdictional discovery regarding an ARB official responsible for many of the very "indirect" contributions now at issue.  *See Terrorist Attacks VII,* 714 F.3d at 679 ("These additional allegations not only suggest the

possibility that he may have provided direct aid to members of al-Qaeda, but they also raise a plausible inference that he may have intended his alleged indirect support of al-Qaeda to cause injury in the United States."); *id.* (his relationship to September 11 hijackers "cast his activities at Al Rajhi Bank and his alleged indirect funding of al-Qaeda in a different light").  In light of this conclusion, the district court had it exactly backwards in reasoning that this Court's prior decisions required that ARB's motion be granted.

In addition, ARB is alleged to have provided support directly to al-Qaeda in various ways.  This support includes ARB's provision of a visa to the money courier for Osama bin Laden's second-in-command and facilitating the transfer of funds and lines of credit to al-Qaeda for the financial support of the Hamburg Cell and the support of the September 11th hijackers upon their arrival in the United States.  JA157-58 (FAC ¶¶163, 166); *see supra* pp. 12-13, 46-47; *cf.* 18 U.S.C. § 2339A (including the provision of "financial services" within the definition of "material support or resources").  In addition, ARB is alleged to have worked jointly with certain of those organizations to solicit funds to be deposited in ARB accounts for the benefit of rewarding terrorist activities and the families of "martyrs."  JA161-62 (FAC ¶178).  Nor was the district court correct in reasoning that jurisdiction would otherwise be founded on "unilateral activity" unrelated to the defendant's own acts.  SPA17.  As noted *supra* pp. 30-31, support for terrorism of the nature alleged here

is the abettor's own tortious activity directed toward the common objective of attacking U.S. interests, and the nexus between ARB and al-Qaeda is coordinated, knowing, and intended – not "unilateral" or "random" or "fortuitous." *Walden*, 571 U.S. at 286.

Further, ARB's highest-ranking officers held key leadership roles in some of the most prominent "charities" that provided direct aid to al-Qaeda, and to which ARB contributed funds. *See supra* pp. 14-15, 49. This joint role enabled ARB officials to ensure that ARB's contributions to the "charities" were, in fact, directly provided to al-Qaeda. *See Terrorist Attacks VII,* 714 F.3d at 678 (personal jurisdiction supported by circumstances showing that "instead of [just] knowingly sending money to purported charitable organizations that allegedly supported al-Qaeda… the [defendants] allegedly controlled and managed some of those 'charitable organizations' and, through their positions of control, they allegedly sent financial and other material support *directly* to al-Qaeda when al-Qaeda allegedly was known to be targeting the United States.") (emphasis in original). That joint role also facilitated the use, for al-Qaeda's purposes, of the ARB accounts and other banking services provided to the charities.[7]

---

[7] As a separate basis for establishing "direct" funding, the "charitable organizations" receiving ARB funding and services are alleged to be operational components of al-Qaeda, undertaking ostensibly legitimate "front" activities as a cover for soliciting, receiving, and moving money, services, and other material support to al-Qaeda terrorists for use in their operations. *See supra* pp. 9-11. That is, even such

b.    "Financial services."  Nor can the decision below be upheld on the ground that important elements of ARB's provision of support to al-Qaeda took the form of credit extension, fund transfer, and account maintenance and were thus "financial services" that did not reflect tortious activity directed against U.S. interests.  *See* SPA13*; cf. Terrorist Attacks III*, 538 F.3d at 95-96 (indirect control of finance subsidiaries which in turn provided banking services to terrorists deemed insufficient); *Terrorist Attacks VII,* 714 F.3d at 676 (applying same).

To the extent that plaintiffs' allegations involve the provision of financial services,[8] the district court erred in its application of *Terrorist Attacks III* and *Terrorist Attacks VII*.  This Court's decisions do not suggest that a terrorist group's use of banking services cannot amount to the bank's tortious activity directed against the target of the terrorists' efforts.  Instead, they held that the financial services of *bank subsidiaries* could not be imputed to a senior *manager* of the parent company,

_____

"indirect" support was, under the facts alleged, provided directly to al-Qaeda and assisted its overall operations even if not always used in full for al-Qaeda's terrorist activities.  *See Holder*, 561 U.S. at 30-31 (provision of funds to designated terrorist organization used for "legitimate" activities in fact fosters the organization's terrorist objectives and is appropriately punished as the criminal offense of material support to terrorist under the ATA).

[8] Much of the support provided by ARB—including provision of ARB's own funds, securing the visa for senior al-Qaeda operatives, joint fundraising, and collection of funds to compensate the families of deceased "martyrs" in terrorist attacks from controlled front groups—extended well beyond banking services in any event.  *See supra* pp. 13-14, 47, 55.

because "in the circumstances presented here" the nexus between the bank official

and the provision of services to terrorists did not establish that the official directed

tortious activities toward the United States. *Terrorist Attacks III,* 538 F.3d at 95-96.

There, the defendant Prince Mohamed served as the CEO of DMI, a bank in

Switzerland that maintained several bank subsidiaries like the Faisal Islamic Bank

of Bahrain. Because DMI itself never held terrorists' deposits or provided direct

services to Bin Laden or al-Qaeda, and the defendant "was never a director, officer,

shareholder or employee of the banks that purportedly held terrorists' deposits," the

allegations did not establish that the defendant purposefully directed actions against

the United States. *Id.* In *Terrorist Attacks VII*, the Court quoted the test of *Terrorist*

*Attacks III*, including points that distinguished between the parent company and

subsidiaries and between managers and the bank, and concluded that the rule applied

to allegations against a bank and various bank officials, including Suleiman al Rajhi

and certain relatives. *See Terrorist Attacks VII*, 714 F.3d at 676. The Court did not

address the particular allegations and arguments presented in that case other than to

quote the conclusion of *Terrorist Attacks III,* declining to find that "'the provision

of financial services to an entity that carries out a terrorist attack on United States

citizens could make [a defendant], in the circumstances presented here, subject to

the jurisdiction of American courts.'" *Id.* (quoting *Terrorist Attacks III*, 538 F.3d at

96).

Case 19-1261, Document 127, 03/09/2019, 2501817, Page75 of 107

The reasoning of *Terrorist Attacks III* does not support a finding of no personal jurisdiction here. At issue is the bank's own liability, based on the services it directly provided to al-Qaeda operatives and those working in close coordination with al-Qaeda to fund and support its anti-U.S. objectives. Here, the particular allegations are more extensive than those presented in either prior case, and establish a close nexus between the bank's provision of services and al-Qaeda's anti-U.S. scheme. They establish the elements of aiding and abetting discussed above, *see supra* pp. 31-32, 34-36, and thus support an inference that the bank has sought to share and foster al-Qaeda's objectives and thus has undertaken tortious activities expressly directed against the United States. The fact that the support for terrorists took the form of the provision of financial services cannot serve as a general exemption from personal jurisdiction. *Cf. Linde v. Arab Bank*, 882 F.3d at 325-27 (banking services provided with knowledge of general role in supporting terrorism can violate ATA, and whether a defendant bank's "financial services to [a terrorist organization] are to be "viewed as routine … raises questions of fact for a jury to decide."). That is especially so where knowledge of the bank's role in supporting al-Qaeda arises from such a web of intimate dealings with al-Qaeda operatives and with the al-Qaeda affiliates that were staffed with al-Qaeda operatives and coordinated to foster those operatives' activities, and where the bank has as a result become the institution of choice for those organizations and for al-Qaeda itself to

support its activities, including those of the various participants in the September

11th attacks.  That would be akin to saying that a mob-affiliated bank, supporting

the mob's money laundering and movement activities and providing financial

services to particular mob operatives as they undertook unlawful activities, could

not be thought to be laundering money or otherwise fostering the common enterprise

and particular unlawful acts simply because it was providing "financial services."

And *Terrorist Attacks VII* itself indicates that this Court has adopted no such rule:  it

found that jurisdictional discovery was warranted for one ARB official based on his

dealings with al-Qaeda, "which cast his activities at al Rajhi and his alleged indirect

funding of al-Qaeda in a different light," and even "raise a plausible inference that

he may have intended his alleged indirect support of al-Qaeda to cause injury in the

United States."  *Terrorist Attacks VII*, 714 F.3d at 679.  Indeed, the District Court

had its application of this decision exactly backwards:  because that defendant was

an ARB official and his "indirect support" took the form of his distribution of ARB

funds, application of the decision would, if anything, compel at least jurisdictional

discovery for ARB as well.

      c.    <u>Treatment of the factual allegations</u>.  The district court also erred in its

treatment of the factual allegations before it.  For nearly all the factual allegations

outlined above, the district court simply failed to acknowledge the allegations or

address the reasonable inferences they might support.  The court suggested that the

allegations' similarity to those before this Court in *Terrorist Attacks VII* with respect to *other* plaintiffs' claims against *other* defendants relieved it of any obligation to analyze the allegations, SPA14, but that is plainly not so. For example, to the extent the prior case addressed allegations related to a handful of ARB's senior bank officials, including Suleiman al Rajhi, this Court's conclusion that personal jurisdiction cannot be asserted over them has little bearing on whether the *bank* itself is subject to jurisdiction. Even if those allegations were too remote for jurisdictional purposes from the duties of particular senior officials, they may be directly relevant for the assertion of jurisdiction over the bank itself.[9]

This conclusion applies, for example, to evidence of the bank's services provided directly to the September 11th attackers and their colleagues, the U.S. officials' warning to the bank not to continue to support al-Qaeda operatives, the joint fundraising initiatives and other services provided to IIRO and other al-Qaeda-affiliated entities (including for martyrdom operations), the bank's own "charitable" contributions to al-Qaeda, the totality of the evidence of the bank's support to al-Qaeda, and the evidence that senior al-Qaeda officials viewed ARB as working in

---

[9] The allegations previously before this Court with respect to ARB's liability were addressed in the decision that upheld dismissal of ARB for failure to state a claim, based on the unavailability of theories of secondary liability under then-existing law and the lack of showing the type of causation deemed required by the ATA. *See O'Neill v. Al Rajhi Bank*, 718 F.3d at 123-25. That issue has nothing to do with personal jurisdiction, and the allegations at issue in that case were in any event limited to those before Judge Casey when he ruled in 2005. *See supra* pp. 4-5.

Case 1:03-md-01570-GBD-SN   Document 1227-5   Filed 07/09/2015, 23   Page 48 of 49

close partnership with al-Qaeda.  The distinction between jurisdiction over ARB and jurisdiction over individual managers is particularly clear in light of the key factors for personal jurisdiction outlined above:  some of ARB's actions may well have had no bearing on the knowledge of the particular senior officials previously at issue, but can and should be attributed to the bank with regard to its overall knowledge, and the substantiality of the bank's support may be quite sufficient for asserting jurisdiction over the bank but not for jurisdiction over particular managers.  And while one of the dismissed defendants in *Terrorist Attacks VII* was a bank (National Commercial Bank), the allegations related to it were quite distinct from the most relevant allegations related to ARB.

Moreover, any reliance on which allegations were or were not before this Court in *Terrorist Attacks VII* would be mistaken because that decision did not describe or discuss any of the particular allegations at issue or their implications, and instead simply set forth a brief, overall conclusion with respect to all the allegations for all the defendants the Court determined should be dismissed from the case, "in the circumstances presented here."  *Terrorist Attacks VII*, 714 F.3d at 675 (internal quotation omitted).  Indeed, as noted above, the most apt discussion of particular evidence and defendants in *Terrorist Attacks VII* supports personal jurisdiction here, and arises when the Court indicates that jurisdictional discovery is warranted with

respect to one ARB officials, Al-Hussayen, whose actions "cast his activities at Al Rajhi Bank … in a different light."  *Id*. at 679.

The only particular allegation that the district court did address further compounded its errors in addressing the other allegations.  The district court dismissed the relevance of the testimony of Zacarias Moussaoui on the grounds that "it at most supports an inference that ARB provided funds and financial services to individuals and organizations that were affiliated with al Qaeda"—even as he acknowledged that the allegation was that "Osama bin Ladin had described ARB as a 'good brother' who 'move[ed] money around *for al Qaeda*.'"  SPA14-15 (emphasis added).  This conclusion failed to treat the particular allegation as true and failed to draw reasonable inferences from it (and related evidence) in plaintiffs' favor, both of which were required at this stage of the proceedings.  It also ignored the relationship between this allegation and others concerning ARB's moving money for al-Qaeda itself, *see supra* pp. 12, 38-39, 45-50, as well as the broader implications of the "good brother" characterization.

### 4. The Relevance of Recent Legal Changes and Expert Factual Conclusions.

Since this Court's prior decisions, Congress has changed both the legal and factual predicates relevant to determining whether particular support to al-Qaeda amounts to tortious actions expressly directed against the United States.  Those

changes, reflected in JASTA, confirm that ARB's motion to dismiss should have been denied.  *See* Addendum (JASTA's text).

First, Congress determined that the relevant "tortious activity" was, as a matter of law, different from the narrower view set forth by this Court when it made its prior personal jurisdiction determinations.  When this Court in *Terrorist Attacks III* and *Terrorist Attacks VII* considered what actions amounted to the relevant tortious actions, and thus the relevant conduct directed at the United States, its analysis proceeded based on an underlying legal framework that did not treat aiding and abetting terrorism as a tortious act under the ATA.  In the ATA decision issued contemporaneously with the *Terrorist Attacks VII* decision addressing the "express direction" test, this Court upheld the grant of ARB's Rule 12(b)(6) motion on the grounds that alleging aiding and abetting did not make out a Section 2333 claim for recovering damages arising from material support of terrorism.  *O'Neill v. Al Rajhi Bank, et al.*, 714 F.3d at 121; *see also Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013) (holding that a defendant cannot be liable under the ATA on an aiding-and-abetting theory of liability).  In JASTA, Congress consciously and directly changed that legal framework.  It confirmed that aiding and abetting a designated terrorist group such as al-Qaeda amounts to a tortious action, and that such action gives rise directly to liability for harm caused by the joint action.  That is, an abettor is a "primary actor in the wrongdoing," satisfying the test for personal jurisdiction as

expressed in *Magnetic Audiotape*: a "court may exercise personal jurisdiction over defendant consistent with due process when defendant is a primary participant in intentional wrongdoing—albeit extraterritorially—expressed directly at forum." *Magnetic Audiotape*, 334 F.3d at 208 (characterizing *Calder* test); *see also Terrorist Attacks III*, 538 F.3d at 96 (quoting *Magnetic Audiotape* expression of test).

In addition, Congress made relevant factual determinations regarding the relation between undertaking such tortious activity and seeking to harm United States interests. *See* JASTA § 2(a)(1-7). Congress directly adopted the analysis required by *Halberstam*, which calls for factual determinations regarding the scope of harm associated with the tortious activity, the nexus or proximity between the abettor and the recipient of aid who most directly causes harm, whether the provision of aid encourages or facilitates the recipient's ability to effect harm, and the intent associated with the provision of such aid. *Id.* § 2(a)(5) ("The decision of the United States Court of Appeals for the District Court of Columbia in *Halberstam v. Welch*… provides the proper legal framework for how such liability should function in the context of chapter 113B of title 18, United States code."). In turn, Congress concluded that the provision of aid to designated anti-U.S. terrorists inevitably harmed various U.S. interests, directly facilitates and is essential to the terrorists' capabilities to accomplish those harmful actions, and is usually undertaken with the intent or objective of accomplishing that harm. *Id.* § 2(a)(6). That is, support for

terrorism is itself a tortious activity that, when sufficiently connected to the terrorist organization and its objective, is directed at the tortfeasors' common target.  As a result, Congress found that persons or entities who contribute support, "directly or indirectly," to designated terrorists "necessarily direct their conduct at the United States."  *Id*.  Those determinations reflected Congress's extensive experience with and expertise regarding the nature of the threat posed by designated anti-U.S. terrorists and the entities and persons who support them.

Congress's definition of support for terrorism as the relevant tort and its related finding that such support, with a sufficient nexus to the terrorist organization, itself harms U.S. interests is especially important for the personal jurisdiction determination.  As explained in *Walden*, the "crux of *Calder*" was the libel that connected the defendant with the forum, and "the strength of the connection was largely a function of the nature of the libel tort."  *Walden*, 571 U.S. at 287.  Here, Congress has defined a tort that, by its nature, harms and is directed against U.S. interests.  It has also defined the relevant "course of conduct directed at [a specific] society or economy" that establishes personal jurisdiction for purposes of the *Calder* test.  *Schwab*, 883 F.3d at 88 (quoting *McIntyre*, 564 U.S. at 884).

The district court misunderstood the relevance of Congress's legal and factual determinations.  SPA15-16  The point is not, contrary to the district court's view, that Congress through JASTA purported to direct or can direct the federal courts'

constitutional determinations.[10]    Rather, Congress made legal and factual determinations that are clearly within its power and relevant to federal courts' assessment of whether aiding and abetting an organization like al-Qaeda is sufficiently harmful to and usually directed at U.S. interests, such that the defendant has an adequate nexus to the U.S. and fair notice of being held to account here.

In this respect, Congress was acting much as it and the Executive Branch had done in defining the scope of and indicating the nature of the national interest in enforcing 18 U.S.C. § 2339A, the criminal prohibition against providing material support to a designated sponsor of terror.  In *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), the U.S. Supreme Court was called upon to assess the relevance of these findings to its constitutional determination of whether the First Amendment limited the scope of criminal liability for entities that claimed that their support of an anti-U.S. terrorist group was not intended to foster the recipient's terrorist

---

[10] However, the Constitutional determinations of a coordinate branch are entitled to careful, respectful consideration, *United States v. Morrison*, 529 U.S. 598, 607 (2000) ("Due respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds"); *U.S. v. Brunner*, 726 F.3d 299, 303 (2d Cir. 2013), and Congress addressed the Due Process Clause in the course of indicating that courts should assert jurisdiction over ATA aiding and abetting claims.  *See* JASTA § 2(a)(6); *see also, e.g.*, *Freeman v. HSBC Holdings PLC*, No. 14-6601, 2018 WL 3616845, *63 (E.D. NY 2018) (recommending the denial of ten banks' motion to dismiss in ATA case arising from terrorist acts in Iraq in part because "recent congressional action in passing JASTA, coupled with the Second Circuit's case law interpreting this recent congressional action, *see Linde v. Arab Bank, PLC*, urges judicial restraint at this preliminary stage in the litigation.").

objectives.  The Supreme Court noted that the judicial branch does not defer to coordinate branches' interpretations of the Constitution, but found that courts should defer to factual and policy assessments that inform a constitutional determination (there, the nexus between the prohibition and the implicated U.S. interests).  *Id.* at 33-36.  Addressing the national security and counter-terrorism policies underlying the ATA's prohibition on the provision of material support to designated terrorists in particular, the Court held that "when it comes to collecting evidence and drawing factual inferences in this area, 'the lack of competence on the part of the courts is marked,' . . . and respect for the Government's conclusions is appropriate."  *Id.* at 34 (citing *Rostker v. Goldberg*, 453 U.S. 57, 68 (1981)); *see also id.* at 35 ("the considered judgment of Congress" that "providing material support to a designated foreign terrorist organization—even seemingly benign support—bolsters the terrorist activities of that organization" is "entitled to significant weight").

Here, federal courts should likewise carefully attend to the expert political branches' view of the close nexus between an intent to harm U.S. interests and support for designated, anti-U.S. terrorist groups, and of how advancing the objectives of such groups—and their general "course of conduct"—amounts to harm to and acts directed against U.S. interests.  That Congress made those determinations in the course of considering the weight of the factors that should bear on assertions of jurisdiction over parties *in this particular MDL* gives special force to Congress's

conclusions for purposes of this appeal. *Cf. Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1317 (2016) ("Congress, our decisions make clear, may amend the law and make the change applicable to pending cases, even when the amendment is outcome determinative").

Indeed, any determination that jurisdiction cannot appropriately be exercised over defendants who aid or conspire with designated anti-U.S. terrorists, whether directly or indirectly, would create a severe separation of powers issue. Congress has clearly indicated that such actions in support of anti-U.S. terrorist groups designated as such by the Executive Branch are tortious acts and, in its view, are inherently directed against the United States. To the extent such supporters of terrorism (including ARB) were deemed not subject to the jurisdiction of U.S. courts, that determination would, for that class of defendants, effectively rule the ATA and its intended operation unconstitutional.

### D. Al-Qaeda's Tortious Actions Directed Against the United States Establish the Basis for Personal Jurisdiction Over ARB Due to the Joint Nature of ARB and al-Qaeda's Actions.

This Court recently recognized an additional basis for personal jurisdiction over an out-of-forum party that acts to advance the forum-directed activities of others who cause harm in the forum. *See Schwab,* 883 F.3d at 86-87. The case applies directly to support jurisdiction based on allegations that ARB conspired with al-Qaeda to advance its anti-U.S. objective, and by extension establishes jurisdiction

based on plaintiffs' allegations that ARB aided and abetted al-Qaeda's achievement of that objective.

In the context of considering the exercise of jurisdiction over co-conspirators, the *Schwab* court determined that "the forum contacts of [one conspirator]" may be "imputed to the co-conspirators" who otherwise lack the minimum contacts with the forum required by the Due Process Clause.  That is so when "the in-forum acts … have been in furtherance of the conspiracy." *Id.* at 86 (internal quotation omitted).  Thus, whether or not the out-of-forum co-conspirator expressly directs its actions toward the forum, a court may assert personal jurisdiction over the entity where "the plaintiff … allege[s] that (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." *Schwab*, 883 F.3d at 87; *id*. at 86-87 (sufficient contacts may exist "if a co-conspirator has a presence within the forum and the conspiracy is directed towards the forum, or substantial steps in furtherance of the conspiracy are taken in the forum … .").

This rationale applies to this case in two separate respects.  First, the logic of attributing one co-conspirator's contacts with the forum to another also applies to attributing the contacts of one tortfeasor (here, al-Qaeda operators) to another (here, ARB) whose own tortious activity aids and abets the tortious activity directed at, and

causing harm in, the forum.  Both conspiracy and aiding and abetting are types of

common or joint activity where all the participants advance a common objective,

*Halberstam*, 705 F.2d at, 476-78, and the minimum contacts with the forum of the

actor causing harm should equally be attributed to the other participants where the

common objective is directed against a particular target.  In this case, the plaintiffs'

allegations readily establish that ARB substantially advanced al-Qaeda's objective

of harming U.S. interests, and did so with knowledge of its role in fostering al-

Qaeda's capabilities.  *See* JA198-202 (FAC ¶¶312-32); *supra* pp. 11-17, 37-50.  That

is enough to allege aiding and abetting, and the rationale of how joint action

establishes personal jurisdiction over all the joint actors should apply here to ARB,

as an aider and abettor, as well.

Second, and more directly, *Schwab* confirms the sufficiency, for jurisdictional

purposes, of plaintiffs' allegations that ARB's actions reflected its participation with

al-Qaeda and with al-Qaeda-affiliated entities in a conspiracy to advance al-Qaeda's

anti-U.S. objectives.  In this case, the conspiracy element absent in *Schwab* is clearly

present: the al-Qaeda operatives who planned and executed the attack on the United

States plainly were acting in furtherance of the conspiracy's anti-U.S. objective and

had the requisite contacts with the U.S. forum.  JA155-66, 200, 202, 207 (FAC

¶¶153-92, 324, 330-31, 356).  In addition, plaintiffs adequately alleged the other two

elements needed for jurisdiction as identified in *Schwab*: a conspiracy and ARB's

71

participation in it.  *See* JA198-99, 201-02 (FAC ¶¶312-19, 328-32); *Schwab*, 883 F.3d at 87.  To state a claim for conspiracy, a plaintiff must allege "an agreement between two or more persons" to "participate in an unlawful act, or a lawful act in an unlawful manner." *Halberstam*, 705 F.2d at 477.  The agreement need relate only to the broad object of the conspiracy (here, advancing the organization's attacks on U.S. interests), not the particular attack resulting in harm.  *Schwab*, 883 F.3d at 87; *see also Leh v. Gen. Petroleum Corp.*, 382 U.S. 54, 59 (1966).  Here, the allegations support the claim that ARB at least tacitly agreed to advance the anti-U.S. agenda and operations of al-Qaeda and its affiliated charitable entities.

To establish such an agreement, it is sufficient to allege indirect or circumstantial evidence.  *Halberstam,* 705 F.2d at 480.  "[C]onspiracies are rarely evidenced by explicit agreements" and "nearly always must be proven through 'inferences that may fairly be drawn from the behavior of the alleged conspirators.'" *Gelboim v. Bank of America*, 823 F.3d 759, 781 (2d Cir. 2016).  Courts look to several types of such behavior.  One is evidence of assistance itself.  *Halberstam,* 705 F. 2d at 478.  Another is the length of time the two parties worked together.  "Mutually supportive activity by parties in contact with one another over a long period suggests a common plan," and can be established, for example, by tacit aid over five years.  *Id.* at 481.  A third is the frequency of communication and extent of relationships between the parties.  *Gelboim,* 823 F.3d at 781.

The facts alleged in the complaint clearly provide these indicia of an agreement. *See generally supra* pp. 11-17, 37-50. The relationship and support are longstanding: the complaint details support knowingly provided by ARB to al-Qaeda (and its affiliates) from the early 1990s through the attacks itself, as well as efforts to avoid detection and disruption of the relationship thereafter. The relationship was intimate and extensive: the complaint describes al-Qaeda's view of ARB, as functioning as a "good brother" for al-Qaeda and moving money on its behalf, and directing its operatives to take advantage of that cooperative relationship. JA155, 157-59, 160-63 (FAC ¶¶156, 162, 165, 167, 174-82). ARB's founder and controlling officers provided support to al-Qaeda, and directed ARB's own provision of support to al-Qaeda. JA149-50, 155-57 (FAC ¶¶127, 132, 154, 159-61). Those officials also served in organizations that were operationally intertwined and completely familiar with al-Qaeda, and which had been directly organized by Osama bin Laden to act in a coordinated fashion to assist al-Qaeda and advance their common anti-U.S. objective. JA157, 161-66, 211 (FAC ¶¶162, 175-81, 184-92; FAC Exhibit A ¶¶8, 9). And the proof of assistance is varied and ongoing, spanning unusual support for carriage of funds to direct and indirect financial aid to very direct support for the al-Qaeda operatives launching the September 11th attacks. JA155-163 (FAC ¶¶156, 158-65, 167, 174, 183).

The facts alleged regarding ARB's support for al-Qaeda also readily satisfy the requirement that a plaintiff prove an overt act in furtherance of the agreed objective. A conspirator can be liable even if he did not actively participate in or benefit from the wrongful action. *Halberstam*, 705 F.2d at 481. A conspirator need not even plan or know about the particular overt act that caused the injury, so long as the purpose of the act was to advance the overall objective of the conspiracy. *Id.* at 481, 487. Here, ARB's various acts that supported al-Qaeda, directly and indirectly, advanced al-Qaeda's anti-U.S. campaign, the object of the conspiracy. Allegations of facts related to ARB's further acts in support of the September 11th attacks themselves underscore the point but are unnecessary to allege conspiracy.

## II.   THE DISTRICT COURT ERRED IN DENYING APPELLANTS THE OPPORTUNITY TO CONDUCT JURISDICTIONAL DISCOVERY OF ARB.

At a minimum, plaintiffs' allegations were sufficient to entitle them to undertake jurisdictional discovery. "In general, the plaintiff may obtain discovery in connection with issues related to the court's jurisdiction." *Haber v. United States*, 823 F.3d 746, 753 (2d Cir. 2016); *see also, e.g., Filus v. LOT Polish Airlines,* 907 F.2d 1328, 1332 (2d Cir. 1990); *First City, N.A. v. Rafidain Bank,* 150 F.3d 172, 176-77 (2d Cir. 1998). "[A] court should take care to give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction." *Amidax Trading Group v. S.W.I.F.T. SCRL*, 671 F.3d 140, 149 (2d Cir. 2011);

*Alliance of American Insurers v. Cuomo,* 854 F.2d 591, 597 (2d Cir. 1988) ("before dismissing a case for want of jurisdiction, a court should permit the party seeking the court's intervention to engage in discovery of facts supporting jurisdiction").

In this case, plaintiffs requested jurisdictional discovery to develop and explore the context of the various factual allegations that support an inference that ARB acted with a sufficient nexus to al-Qaeda and its anti-U.S. terrorist activities, such that it undertook tortious activities directed against the United States. SPA21. Plaintiffs specifically requested discovery related "to ARB's activities in support of al-Qaeda, including those described in the CIA documents relating to U.S. Investigations and the testimony of Zacarias Moussaoui." SPA21; Consolidated Memorandum of Law In Opposition to Motions To Dismiss, at 32-33 (Dec. 5, 2017) (ECF 3835). The particular facts alleged in the FAC themselves call out for additional discovery regarding closely related information bearing on intent, knowledge, and related acts. This is true for each of the five clusters of facts identified above as supporting inferences regarding ARB's knowledge of assisting al-Qaeda and intent to do so. *See supra* pp. 38-45. It is especially true for the facts and bank policies related to ARB's provision of various services directly to the September 11th attackers and their immediate organizing operatives, and for the facts and context related to the public solicitation of funds via ARB accounts expressly earmarked for terrorist operations, as well as other instances of ARB's

joint fundraising activities with al-Qaeda-affiliated organizations. *See supra* pp. 12-14, 44, 47-48, 55; JA158, 161-62, 165, 179 (FAC ¶¶165-66, 178, 191, 240).

In addition, the various general and specific allegations related to ARB's extensive funding of many "charitable" organizations coordinating with al-Qaeda operatives, especially where senior ARB officials also held controlling positions in those organizations, justify discovery related to ARB's policies and ARB officials' knowledge and related actions with regard to the charities and ARB's funding of them. *See supra* pp. 14-15, 39-42. In addition, Osama bin Laden's view of al-Qaeda's partnership with ARB and other terrorist leaders' direction to operatives to use ARB's services (as well as the alleged facts related to those operatives' use of those services), *see supra* pp. 13, 18, 39, 47, warrant discovery related to ARB officials' knowledge, policies, and intent related to the bank's provision of services related to al-Qaeda operatives. This conclusion is buttressed, conclusively, by this Court's previous determination that jurisdictional discovery was appropriate based on the close proximity of one ARB official (Al-Hussayen) to the September 11th attackers, and how that proximity "cast[s] his activities at Al Rajhi Bank and his alleged indirect funding of al-Qaeda [via ARB] in a different light." *Terrorist Attacks VII*, 714 F.3d at 659. Jurisdictional discovery is especially appropriate "where the facts are peculiarly within the knowledge of the opposing party," *Kamen v. AT&T Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986), which applies here because the

factual context already alleged and the ultimate jurisdictional issue concerns the knowledge and intent of ARB officials. *See also, e.g., Gualandi v. Adams,* 385 F.3d 236, 244 (2d Cir. 2004) ("courts generally require that plaintiffs be given an opportunity to conduct discovery on [] jurisdictional facts, at least where the facts, for which discovery is sought, are peculiarly within the knowledge of the opposing party").

All of these particular facts alleged, and their direct relevance for the inferences that may appropriately be drawn related to disputes surrounding ARB's intent and the overall nexus of its actions to al-Qaeda's anti-U.S. scheme, refute the district court's statement that plaintiffs had failed to "point to a single genuine issue of jurisdictional fact justifying additional discovery" with respect to all three defendants before it (including ARB). SPA22. The district court's reasoning fell short in other ways. For example, the court dismissed the claim that ARB and the other two defendants have "unique knowledge and control of information necessary to establish jurisdictional facts" on the ground of "the extensive nature of Plaintiffs' own allegations" and "the years of jurisdictional discovery that have been undertaken on these very issues." SPA22. However, plaintiffs' own, extensive allegations *support*, not undermine, their entitlement to discovery because those allegations point to specific issues and facts where additional context and evidence of knowledge are relevant. Moreover, the particular plaintiffs in this case are both

new to this litigation and, like all other plaintiffs in the MDL, have had *no* opportunity to secure discovery against ARB.  Discovery undertaken by other plaintiffs against other defendants on such "issues" does not bear on the need for discovery against ARB for claims bearing on *ARB*'s acts and *its* officials' knowledge and objectives.  The district court, in addressing the need for discovery against all three defendants in one discussion, conflated rationales for denying discovery against the other two defendants (undertaken by other plaintiffs) with the denial of discovery against ARB—for which, as the court elsewhere acknowledged, "[p]laintiffs have not yet had jurisdictional discovery."  SPA22.

The district court also erred in stating that jurisdictional discovery was unwarranted because "the underlying legal theories upon which Plaintiffs seek to premise jurisdiction over ARB are untenable."  SPA22.  This could be so only if this Court had established a bright-line rule that any financial contributions to al-Qaeda in conjunction with an al-Qaeda-affiliated charity could never amount to a tortious act expressly directed against the United States, regardless of the contributor's state of mind or close working or controlling relationship with the affiliate and al-Qaeda, and only if this Court had likewise ruled that the provision of banking services to al-Qaeda operatives and affiliates could never support a conclusion that a defendant bank committed such a tortious act.  But of course this Court has not created either of those bright-line exceptions, *see Terrorist Attacks III,* 538 F.3d at 95-96; *Terrorist*

*Attacks VII*, 714 F.3d at 675-76, 678-79, and instead has indicated that evidence of a closer nexus between a defendant and al-Qaeda—even for the provision of funds in coordination with a "charity" or for the provision of banking services—may establish personal jurisdiction. *See Terrorist Attacks III,* 538 F.3d at 94-96; *Terrorist Attacks VII*, 714 F.3d at 676, 678-79; *see also Linde*, 882 F.3d at 330-31 (2d Cir. 2018) (banking services with knowledge of use for terrorist activities amounts to aiding and abetting). Plaintiffs' legal theory posits just those additional elements, and jurisdictional discovery would be focused on the acts and evidence of knowledge and intent that could further support the existing, extensive allegations that support these elements. (Moreover, *Schwab* and plaintiffs' allegations related to conspiracy separately provide the basis for plaintiffs to undertake jurisdictional discovery, as well, if necessary, to replead the jurisdictional issue.)

## CONCLUSION

For the foregoing reasons, the decision of the district court should be reversed.

Dated: September 7, 2018                     Respectfully submitted,

                                                              /s/  Stephen A. Cozen
                                                              Stephen A. Cozen
                                                              Sean P. Carter
                                                              COZEN O'CONNOR
                                                              1650 Market Street, Suite 2800
                                                              Philadelphia, PA  19103
                                                              (215) 665-2000

-and –

Carter G. Phillips
Richard D. Klingler
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000

Attorneys for *Lloyd's Syndicate 2*
and *Muenchener* Plaintiffs-Appellants
(18-1201-cv(L)) and 18-1264-cv(CON))

James L. Bernard
Patrick N. Petrocelli
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY 10038
(212) 806-5400

Attorneys for *Arrowood* Plaintiffs-
Appellants (18-1266-cv(CON))

Paul J. Napoli
Christopher R. LoPalo
NAPOLI SHKOLNIK PLLC
400 Broadhollow Road, Suite 305
Melville, NY  11747
(212) 397-1000

Attorneys for *Augilar*, *Abarca*,
*Abedhajajreh*, *Addesso*, *Aiken*, and *Hodges*
Plaintiffs-Appellants (18-2162-cv(CON))

Robert C. Sheps
SHEPS LAW GROUP, P.C.
25 High Street
Huntington, NY 11743
(631) 249-5600

Attorneys for *Charter Oak* Plaintiffs-
Appellants (18-2171-cv(CON))

# CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B), Second Circuit Rule 32.1(a)(4)(A), and this Court's September 4, 2018 Order because it contains 19,092 words, excluding the portions of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point font.

Dated: September 7, 2018

/s/     J. Scott Tarbutton
J. Scott Tarbutton, Esq.

# CERTIFICATE OF SERVICE

I hereby certify that I caused to be filed the foregoing with the Clerk of the

Court for the United States Court of Appeals for the Second Circuit by using the

appellate CM/ECF system on September 7, 2018.  I further certify that the foregoing

was served on all counsel of record in this appeal by CM/ECF pursuant to Second

Circuit Rule 25.1(b)(1)-(2).


/s/    J. Scott Tarbutton
J. Scott Tarbutton, Esq.

LEGAL\38209572\1

Case 19-1261, Document 117, 09/09/2019, 2356817, Page100 of 107

**ADDENDUM**

Case 18-1261, Document 127, 05/07/2018, 2305817, Page101 of 107

# Table of Contents for Addendum

**Page**

Public Law 114–222 — Justice Against Sponsors of
    Terrorism Act (September 28, 2016) ...............................   Add-1

PUBLIC LAW 114–222—SEPT. 28, 2016

JUSTICE AGAINST SPONSORS OF TERRORISM
ACT

130 STAT. 852          PUBLIC LAW 114–222—SEPT. 28, 2016

Public Law 114–222
114th Congress

## An Act

Sept. 28, 2016
[S. 2040]

To deter terrorism, provide justice for victims, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

Justice Against
Sponsors of
Terrorism Act.
18 USC 1 note.

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Justice Against Sponsors of Terrorism Act".

18 USC 2333
note.

**SEC. 2. FINDINGS AND PURPOSE.**

(a) FINDINGS.—Congress finds the following:

(1) International terrorism is a serious and deadly problem that threatens the vital interests of the United States.

(2) International terrorism affects the interstate and foreign commerce of the United States by harming international trade and market stability, and limiting international travel by United States citizens as well as foreign visitors to the United States.

(3) Some foreign terrorist organizations, acting through affiliated groups or individuals, raise significant funds outside of the United States for conduct directed and targeted at the United States.

(4) It is necessary to recognize the substantive causes of action for aiding and abetting and conspiracy liability under chapter 113B of title 18, United States Code.

(5) The decision of the United States Court of Appeals for the District of Columbia in Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983), which has been widely recognized as the leading case regarding Federal civil aiding and abetting and conspiracy liability, including by the Supreme Court of the United States, provides the proper legal framework for how such liability should function in the context of chapter 113B of title 18, United States Code.

(6) Persons, entities, or countries that knowingly or recklessly contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism that threaten the security of nationals of the United States or the national security, foreign policy, or economy of the United States, necessarily direct their conduct at the United States, and should reasonably anticipate being brought to court in the United States to answer for such activities.

(7) The United States has a vital interest in providing persons and entities injured as a result of terrorist attacks committed within the United States with full access to the

Case 15-1201, Document 227, 09/07/2015, 2376811, Page104 of 107

PUBLIC LAW 114–222—SEPT. 28, 2016          130 STAT. 853

court system in order to pursue civil claims against persons, entities, or countries that have knowingly or recklessly provided material support or resources, directly or indirectly, to the persons or organizations responsible for their injuries.

(b) Purpose.—The purpose of this Act is to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States.

### SEC. 3. RESPONSIBILITY OF FOREIGN STATES FOR INTERNATIONAL TERRORISM AGAINST THE UNITED STATES.

(a) In General.—Chapter 97 of title 28, United States Code, is amended by inserting after section 1605A the following:

**"§ 1605B. Responsibility of foreign states for international terrorism against the United States**          28 USC 1605B.

"(a) Definition.—In this section, the term 'international terrorism'—

    "(1) has the meaning given the term in section 2331 of title 18, United States Code; and

    "(2) does not include any act of war (as defined in that section).

"(b) Responsibility of Foreign States.—A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which money damages are sought against a foreign state for physical injury to person or property or death occurring in the United States and caused by—

    "(1) an act of international terrorism in the United States; and

    "(2) a tortious act or acts of the foreign state, or of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, regardless where the tortious act or acts of the foreign state occurred.

"(c) Claims by Nationals of the United States.—Notwithstanding section 2337(2) of title 18, a national of the United States may bring a claim against a foreign state in accordance with section 2333 of that title if the foreign state would not be immune under subsection (b).

"(d) Rule of Construction.—A foreign state shall not be subject to the jurisdiction of the courts of the United States under subsection (b) on the basis of an omission or a tortious act or acts that constitute mere negligence.".

(b) Technical and Conforming Amendments.—

    (1) The table of sections for chapter 97 of title 28, United States Code, is amended by inserting after the item relating to section 1605A the following:          28 USC 1602 prec.

"1605B. Responsibility of foreign states for international terrorism against the United States.".

    (2) Subsection 1605(g)(1)(A) of title 28, United States Code, is amended by inserting "or section 1605B" after "but for section 1605A".

130 STAT. 854          PUBLIC LAW 114–222—SEPT. 28, 2016

**SEC. 4. AIDING AND ABETTING LIABILITY FOR CIVIL ACTIONS REGARDING TERRORIST ACTS.**

(a) IN GENERAL.—Section 2333 of title 18, United States Code, is amended by adding at the end the following:

"(d) LIABILITY.—

"(1) DEFINITION.—In this subsection, the term 'person' has the meaning given the term in section 1 of title 1.

"(2) LIABILITY.—In an action under subsection (a) for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism.".

<span style="float:left">18 USC 2333 note.</span>

(b) EFFECT ON FOREIGN SOVEREIGN IMMUNITIES ACT.—Nothing in the amendment made by this section affects immunity of a foreign state, as that term is defined in section 1603 of title 28, United States Code, from jurisdiction under other law.

<span style="float:left">Claims.<br>Courts.<br>18 USC 1605B note.</span>

**SEC. 5. STAY OF ACTIONS PENDING STATE NEGOTIATIONS.**

(a) EXCLUSIVE JURISDICTION.—The courts of the United States shall have exclusive jurisdiction in any action in which a foreign state is subject to the jurisdiction of a court of the United States under section 1605B of title 28, United States Code, as added by section 3(a) of this Act.

(b) INTERVENTION.—The Attorney General may intervene in any action in which a foreign state is subject to the jurisdiction of a court of the United States under section 1605B of title 28, United States Code, as added by section 3(a) of this Act, for the purpose of seeking a stay of the civil action, in whole or in part.

(c) STAY.—

<span style="float:left">Certification.</span>

(1) IN GENERAL.—A court of the United States may stay a proceeding against a foreign state if the Secretary of State certifies that the United States is engaged in good faith discussions with the foreign state defendant concerning the resolution of the claims against the foreign state, or any other parties as to whom a stay of claims is sought.

(2) DURATION.—

(A) IN GENERAL.—A stay under this section may be granted for not more than 180 days.

(B) EXTENSION.—

(i) IN GENERAL.—The Attorney General may petition the court for an extension of the stay for additional 180-day periods.

(ii) RECERTIFICATION.—A court shall grant an extension under clause (i) if the Secretary of State recertifies that the United States remains engaged in good faith discussions with the foreign state defendant concerning the resolution of the claims against the foreign state, or any other parties as to whom a stay of claims is sought.

Add-4

PUBLIC LAW 114–222—SEPT. 28, 2016          130 STAT. 855

**SEC. 6. SEVERABILITY.**

If any provision of this Act or any amendment made by this Act, or the application of a provision or amendment to any person or circumstance, is held to be invalid, the remainder of this Act and the amendments made by this Act, and the application of the provisions and amendments to any other person not similarly situated or to other circumstances, shall not be affected by the holding.

18 USC 2333 note.

**SEC. 7. EFFECTIVE DATE.**

The amendments made by this Act shall apply to any civil action—

(1) pending on, or commenced on or after, the date of enactment of this Act; and

(2) arising out of an injury to a person, property, or business on or after September 11, 2001.

Applicability.
18 USC 2333 note.

Mac Thornberry
*Speaker of the House of Representatives pro tempore.*

John Cornyn
*Acting President of the Senate pro tempore.*

IN THE SENATE OF THE UNITED STATES,

*September 28, 2016.*

The Senate having proceeded to reconsider the bill (S. 2040) entitled "An Act to deter terrorism, provide justice for victims, and for other purposes.", returned by the President of the United States with his objections, to the Senate, in which it originated, it was

*Resolved,* That the said bill pass, two-thirds of the Senators present having voted in the affirmative.

Julie E. Adams
*Secretary.*

I certify that this Act originated in Senate.

Julie E. Adams
*Secretary.*

130 STAT. 856        PUBLIC LAW 114–222—SEPT. 28, 2016

IN THE HOUSE OF REPRESENTATIVES, U.S.

*September 28, 2016.*

The House of Representatives having proceeded to reconsider the bill (S. 2040) entitled "An Act to deter terrorism, provide justice for victims, and for other purposes.", returned by the President of the United States with his objections, to the Senate, in which it originated, and passed by the Senate on reconsideration of the same, it was

*Resolved,* That the said bill do pass, two-thirds of the House of Representatives agreeing to pass the same.

Karen L. Haas
*Clerk.*

---

LEGISLATIVE HISTORY—S. 2040:

CONGRESSIONAL RECORD, Vol. 162 (2016):
        May 17, considered and passed Senate.
        Sept. 9, considered and passed House.
DAILY COMPILATION OF PRESIDENTIAL DOCUMENTS (2016):
        Sept. 23, Presidential veto message.
CONGRESSIONAL RECORD, Vol. 162 (2016):
        Sept. 28, Senate and House override veto.

○

Add-6