# Exhibit 4

Plaintiffs' Corrected Averment of Jurisdictional Facts and Evidence and/or Statement of Facts as to Defendant Al Rajhi Bank Pursuant to Rule 56.1

EXHIBIT
PASLEY 3 01/31/2024 dv
exhibitsticker.com

**SUBJECT TO MDL AND FBI PROTECTIVE ORDERS**

**UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **IN RE: TERRORIST ATTACKS** | **)** | **03-MDL-1570 (GBD) (SN)** |
| **ON SEPTEMBER 11, 2001** | **)** | **ECF Case** |
| | **)** | |

Relating to: *Underwriting Members of Lloyd's Syndicate 2, et al., v. ARB, et al,* No 16-cv-07853

---

# EXPERT REPORT OF JONATHAN M. WINER

---

**FBI PROTECTED MATERIAL REDACTED**

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

## CONTENTS

| Section Number | Section Contents | Page Number |
|---|---|---|
| 1 | Introduction | 3 |
| 2 | Framework: Al Qaeda and Its Support from Religious Charities | 14 |
| 3 | Q1: Was terrorist financing involving charities of concern to banks pre-9/11? | 23 |
| 4 | Q2: Were there incidents involving charities and terrorist financing/crime pre-9/11? | 28 |
| 5 | Q3: Were banks obligated to adopt and implement effective AML/CFT measures pre-9/11? | 42 |
| 6 | Q4: Is there evidence al Qaeda relied on sympathetic financiers and financial institutions pre-9/11? | 48 |
| 7 | Q5: Is there evidence that ARB and its principals had unique relationships with jihadists/al Qaeda pre-9/11? | 85 |
| 8 | Q6: Is there evidence that ARB had unique relationships with Al-Haramain, MWL, IIRO, and WAMY pre-9/11? | 104 |
| 9 | Q7: Did ARB adhere to KYC, AML and CFT best practices & international standards with respect to its relationships with Al-Haramain, MWL, IIRO, and WAMY pre-9/11? | 130 |
| 10 | Q8: Did ARB ignore AML/CFT red flags on accounts of Al-Haramain, MWL, IIRO, WAMY, SAAR Foundation pre-9/11? | 170 |
| 11 | Q9: Is there evidence al Qaeda received support/benefited from accounts at ARB maintained for Al-Haramain, MWL, IIRO, WAMY, and SAAR Foundation pre-911? | 203 |
| 12 | Q10: Has ARB produced evidence showing that transactions it carried out for Al-Haramain, MWL, IIRO, WAMY, and SAAR Foundation were earmarked for "use in specific schemes or attacks *not directed at the United States*." | 214 |

**Attachments**

Appendix 1: Reliance Materials
Appendix 2: Qualifications and Experience, CV, Publications and Expert Witness Testimony 2017-present

FBI PROTECTED MATERIAL REDACTED

## 1. Introduction

1.1.    I have been asked by the law firm of Cozen O'Connor to render my expert opinion on questions relating to Al Rajhi Bank ("ARB") and related persons and entities in connection with international terrorist finance in the period leading up to the 9/11 attacks. The narrative below is submitted to assist the Court as it considers the issues raised in this case. I have separated each section by topic, to make my Expert Report more easily followed. I am being compensated at an hourly rate of $950 for my study and testimony in this case.

1.2.    The ten questions I have been asked to provide my opinions on are set forth below:

1.2.1.    *Question 1*: Was terrorist financing, and more specifically terrorist financing through purported charitable organizations, an area of concern in the international banking industry before September 11, 2001?

1.2.2.    *Question 2:* Were there incidents in which purported charities were implicated in money laundering for criminal activities, including the financing of terrorism and/or specific attacks, before September 11, 2001?

1.2.3.    *Question 3:* Was it an obligation of international banking institutions to adopt and implement effective anti-money laundering and counter-terrorism financing protocols to prevent the financing of terrorism and other illicit financial activity through purported charities prior to September 11, 2001?

1.2.4.    *Question 4:* Is there evidence that al Qaeda relied on sympathetic financiers and financial institutions to raise and move money prior to September 11, 2001?

1.2.5.    *Question 5:* Is there evidence that ARB and its principals had unique relationships with jihadists and al Qaeda affiliated persons and entities before September 11, 2001?

1.2.6.    *Question 6:* Is there evidence that ARB and its principals had unique relationships with Al-Haramain Islamic Foundation ("Al-Haramain"), the Muslim World League ("MWL"), the International Islamic Relief Organization ("IIRO,") and the World Assembly of Muslim Youth ("WAMY") before September 11, 2001?

1.2.7.    *Question 7:* Did ARB adhere to Know Your Customer, Anti-Money Laundering, and Counter-Terrorism Financing best practices and international standards with respect to the opening and maintenance of accounts for Al-Haramain, MWL, IIRO, WAMY, and the Saudi-based Suleiman Abdel Aziz Al Rajhi Charitable Foundation ("SAAR Foundation") before September 11, 2001?

1.2.8.    *Question 8:* Did ARB ignore money laundering and terrorist financing red flags with respect to the accounts it maintained for Al-Haramain, MWL, IIRO, WAMY, and the Saudi-based SAAR Foundation before September 11, 2001?

**FBI PROTECTED MATERIAL REDACTED**

1.2.9.  *Question 9:* Is there evidence that al Qaeda received support and benefited from the accounts ARB maintained for Al-Haramain, MWL, IIRO, WAMY, and the SAAR Foundation before September 11, 2001? If so, what was the nature of that support and when was it provided and how was ARB involved in providing it?

1.2.10.  *Question 10:* Has ARB produced evidence showing that individual transactions it carried out for Al-Haramain, MWL, IIRO, WAMY, and the SAAR Foundation before September 11, 2001 were earmarked for "use in specific schemes or attacks not directed at the United States?"

1.3.  *Material Reviewed for This Expert Report.* To prepare this Expert Report, I have reviewed:

1.3.1.  The First Amended Complaint in this case.

1.3.2.  Pleadings in this case, including the Memorandum of Law in Support of Plaintiffs' Second Motion to Compel the Production of Documents from ARB and Exhibits thereto.

1.3.3.  Documents produced by ARB in response to discovery requests from the Plaintiffs, relating to its relationships to charities that allegedly engaged in the financing of terrorism through transactions undertaken through ARB, including:

- Correspondence between ARB and the Saudi Arabian Ministry of Islamic Affairs and between ARB and its regulator, the Saudi Arabian Monetary Authority ("SAMA");

- Documents pertaining to ARB's accounts of Al-Haramain, a Saudi-based charity which ceased operating internationally after becoming the subject of global sanctions due to its systemic involvement in terrorist finance;

- ARB accounts of the IIRO, some of whose components were sanctioned globally due to their involvement in terrorist finance;

- Accounts of the Afghanistan Taliban at ARB;

- Payments from the cofounder and head of ARB, Suleiman Abdul Aziz Al Rajhi[1] ("SAAR"), and by his personally-funded Foundation, the SAAR Foundation, to Al-Haramain and its principals through accounts at ARB and to WAMY through accounts at ARB;

- Payments by SAAR and the SAAR Foundation to third-parties, including payments through ARB's correspondent banking relationship with Chase

---

[1] The name of the family is sometimes provided with a capitalized "Al" and sometimes without the capital, as "al." I have generally retained the spelling used in original source documents and otherwise refer to the last name of family members as "Al Rajhi," with capitalization, reflecting the use of the capitalized letter in the name of the bank in English.

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

> Manhattan Bank in New York through the use of a "Payable Through Account" that ARB maintained there;

- ARB's Branch Instruction Manual of January 1, 1997 and its Anti-Money Laundering Unit Procedure Guide of November 1998;

- Other documents produced by ARB and persons and entities engaged in transactions with ARB produced in discovery in this and related matters, including documents produced by IIRO and other Saudi-based charities and documents by U.S. persons and entities related to the SAAR Foundation.

1.3.4.  A transcript of the ARB Rule 30(b)(6) Witness Deposition of James Galloway ("Galloway") of May 11, 2023 ("Galloway Deposition") and exhibits to that deposition; a transcript of the Witness Deposition of Saudi Arabia's Minister of Islamic Affairs, Saleh Bin Abdulaziz Al Ash Sheikh of March 23-24, 2021 ("Ash Sheikh Deposition"), and exhibits to that deposition; and a transcript of the Witness Deposition of Abdullah bin Sulaiman Al Rajhi ("Abdullah Al Rajhi") of September 27, 2023, and exhibits to that deposition.

1.3.5.  Analytic reports prepared by the CIA based on information available to the CIA prior to the 9/11 attacks, which I understand to have been declassified and released under Presidential Executive Order 14040 ("EO 14040") issued by President Biden on September 3, 2021[2] or in response to Plaintiffs' subpoena relating to ARB, as modified, and other documents created by the U.S. government and released under EO 14040.

1.3.6.  Material I have previously written regarding terrorist finance, including my Congressional testimony on terrorist finance.

1.3.7.  Government reports, and testimony and reports relating to Congressional hearings, including the Report of the 9/11 Commission ("9/11 Commission") and

---

[2]In issuing EO 14040 on September 3, 2001, President Biden stated the purpose of the declassifications to be as follows: "Many Americans continue to seek full accountability for the horrific attacks of September 11, 2001 (9/11), including 9/11 survivors and victims' family members. As the 20th anniversary of 9/11 approaches, the American people deserve to have a fuller picture of what their Government knows about those attacks. Although the indiscriminate release of classified information could jeopardize the national security—including the United States Government's efforts to protect against future acts of terrorism—information should not remain classified when the public interest in disclosure outweighs any damage to the national security that might reasonably be expected from disclosure. The significant events in question occurred two decades ago or longer, and they concern a tragic moment that continues to resonate in American history and in the lives of so many Americans. It is therefore critical to ensure that the United States Government maximizes transparency, relying on classification only when narrowly tailored and necessary. Thus, information collected and generated in the United States Government's investigation of the 9/11 terrorist attacks should now be disclosed, except when the strongest possible reasons counsel otherwise." Declassification Reviews of Certain Documents Concerning the Terrorist Attacks of September 11, 2001, September 3, 2021, https://www.federalregister.gov/documents/2021/09/09/2021-19578/declassification-reviews-of-certain-documents-concerning-the-terrorist-attacks-of-september-11-2001  Although declassified, these reports still include areas that are blacked-out, or "redacted." I assume that the blacked-out material has been redacted due to the CIA's determination that despite the public interest in disclosure, that material should remain classified to protect other national security interests, such as keeping sources and methods secret.

**FBI PROTECTED MATERIAL REDACTED**

the Monograph on Terrorist Financing produced by 9/11 Commission staff ("Monograph") and the Congressional hearings, Congressional research, appendices and staff reports cited in this Expert Report.

1.3.8.  Documents issued by governments and official or intergovernmental bodies, such as the U.S. Department of State ("State" or "State Department"), the U.S. Department of the Treasury ("Treasury" or "Treasury Department"), the Federal Bureau of Investigation ("FBI"), the U.S. Department of Justice ("Justice" or "Justice Department"),  the White House, the U.S. Congress, the United Nations ("UN"), the Financial Action Task Force ("FATF"), the Basel Committee on Banking Supervision ("Basel Committee"), NATO and other governmental entities.

1.3.9.  Publicly available information issued by other governments and governmental bodies prior to 9/11 and after 9/11, including the Government of Saudi Arabia, that I found to be material to the questions posed.

1.3.10. Court records from cases involving allegations of terrorist finance relating to persons or entities material to answering the questions posed.

1.3.11. Coverage by public media material to terrorist finance risk, in particular by charities, both prior to 9/11 and after 9/11.

1.3.12. Public testimony and publications from other experts in terrorist finance, money laundering policy and enforcement issues.

1.3.13. A more complete list of materials used in this Expert Report is attached at Appendix 1 to this Expert Report.

1.4.    *Methodology.* To respond to those questions, I have applied an all-source source analysis methodology as I employed during my years of work for the U.S. government and as a consultant to the U.S. government, as well as in my previous work as an expert. All-source analysis is terminology used in the U.S. Intelligence Community for the methodology for collection and analysis of information from multiple sources and disciplines but is essentially interchangeable with the term comparative analysis used in other contexts outside of the Intelligence Community. Starting with the questions to be addressed, I collect information available to me regarding the subject area of the inquiry. Using my experience and education, I then consider, analyze, compare, and weigh the whole body of the sources to systematically build out a response to the inquiries based on the available record. In the process, I consider a mixture of primary source information; information that can be a combination of primary and secondary sources; academic and analytic research, government reports; scholarly literature; and other available information, together with my own experience and education, and human reason.

1.4.1.  For this opinion, the all-source information includes documents produced by ARB and by others in discovery in this case. The documents produced by ARB provide important information that I relied on in forming my opinions in this Expert Report. However, they are clearly incomplete. For example, they include no

FBI PROTECTED MATERIAL REDACTED

audits for the relevant period (that is prior to the September 11 attacks); no internal (or external) reports on anti-money laundering assessments or evaluations by ARB or persons acting on behalf of ARB concerning ARB's compliance with its AML processes and procedures, as required by ARB's own applicable policies and procedures; no statistical compilations of ARB's reporting of any suspicious activities or any other AML metric for ARB's AML compliance department; and no documentation produced by ARB's AML compliance department of any kind regarding Al-Haramain, IIRO, the SAAR Foundation, IIRO, MWL, WAMY, or any other entity material to this litigation, during the pre-9/11 period (or after).[3]

1.4.2.    Based on these gaps, and other gaps I discuss over the course of this Expert Report, I cannot conclude that all documents maintained by ARB relevant to helping me answer the questions posed in this Expert Report have been provided by ARB to the plaintiffs. For example, in the Galloway Deposition, Galloway testified that there were audits by ARB, internal and external, of its implementation of its AML policies and procedures systemically and at the branch levels. No such audits have been provided to me, and based on my review of pleadings filed in this case, it appears none have been produced by ARB to the plaintiffs despite having been requested by the plaintiffs under the discovery process. Having those documents produced would have been helpful to me to ensure that the evidentiary record on which I am basing my opinions contains all materially important evidence. The absence of the audits from the record raises the question of the extent to which the audits referred to by Galloway in the Galloway Deposition took place, and if they did, the extent to which I can rely on his characterization of the contents of documents that are not available to the plaintiffs or to me in my capacity as an Expert.[4] I discuss this issue in my response to Question 7, regarding whether ARB adhered to Know Your Customer, Anti-Money Laundering and Counter Terrorist Financing best practices and international standards with respect to the opening and maintenance of accounts for Al-Haramain, MWL, IIRO, WAMY, and the SAAR Foundation prior to the 9/11 attacks.

1.4.3.    Despite the material gaps in the documentation provided by ARB in response to the discovery requested by the plaintiffs, all of my opinions offered herein are expressed to a reasonable degree of certainty based on the record to which I have had access to date. In particular, the additional information provided by the U.S. government under EO 14040 and the documents produced by ARB, which were

---

[3] I understand that to reduce the burden on ARB from the discovery process, as directed by the judge overseeing the discovery in this case, the plaintiffs have confined discovery requests for account opening and maintenance documents to cover the two Da'Wah Organizations whose branches or operations became subject to international sanctions, Al-Haramain and IIRO. Accordingly, I have not had access to such information for WAMY and MWL accounts at ARB.

[4] In the Galloway Deposition, Galloway testified that he had not seen specific documents relating to audits of any of the Al-Haramain or IIRO accounts. pp. 106-109. Even if there were no audit material relating to the accounts of those specific entities, a review of any of the audits undertaken by ARB of its branch operations, or of any aspect of its compliance with Saudi banking regulations and its own policies and procedures during the relevant period could be material to understanding the extent to which ARB complied with its AML obligations more generally.

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

not available to me at the time I prepared my first Expert Report in a related case before this court, have provided further detail that is consistent with and further strengthens the evidentiary basis for opinions I have previously rendered regarding the actions of charities discussed in this Expert Report.

1.4.4.   I reserve my right to reconsider and/or revise my opinions based on any additional information that may later be made available to me in connection with this case by any person or entity.[5]

1.4.5.   In writing this Expert Report, I incorporate and reaffirm as may be relevant the substance of my findings and analysis from the previous Expert Reports I have written relating to and filed with this court in "In Re Terrorist Attacks on September 11, 2001," 03-MDL-1570 (GBD) (SN), subject to the caveat that I now also rely on additional information that was not available to me at the time I wrote those reports. This additional information includes in particular, the government documents from the CIA and FBI declassified and released under EO 14040 and in response to plaintiffs' ARB subpoena to the CIA, which contain extensive information on terrorist finance issues material to the 9/11 attacks, and which were not available to me until the spring of 2022. As stated, this additional information also includes documents produced to the plaintiffs' lawyers by ARB and by others as a result of discovery in this case, and depositions taken by plaintiffs' lawyers in this case.

1.5.   *My Background in Terrorist Finance.*

1.5.1.   *Initial Work on Cross-Border Financial Crime and Terrorist Issues, U.S. Senate, 1985-1994.* As set forth in my CV, I worked as counsel for Senator John F. Kerry in the U.S. Senate from 1985 until 1994, when I became Deputy Assistant Secretary of State for International Law Enforcement. During the years I worked with Senator Kerry, we focused on cross-border threats to U.S. security in a series of investigations, beginning in 1985 with information we received that turned out to relate to what later became known as the Iran-Contra affair. During this period, Senator Kerry became the chairman of the Senate Subcommittee on Terrorism, Narcotics, and International Operations, in which I assisted him in investigations (and exposure of) the Middle Eastern Bank, BCCI, the Bank of Credit and Commerce International, which was involved in serious corruption, fraud, narcotics money laundering, and the handling of terrorist funds.[6]

---

[5] In particular, I note that the documents produced by ARB and others within the discovery process undertaken in this matter include account records that are not maintained chronologically, dating errors, and documents which appear incomplete on their face. These characteristics of the document production, as well as redactions made in the versions provided to me with English translations, have made it difficult for me trace particular account openings and transactions. In such cases, my assessments could change based on additional information.

[6] "The BCCI Affair, A Report to the Committee on Foreign Relations United States Senate by Senator John Kerry and Senator Hank Brown," December 1992 102nd Congress 2d Session Senate Print 102-140. https://www.hsdl.org/?view&did=449738

**FBI PROTECTED MATERIAL REDACTED**

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

1.5.1..1.  Over the course of these investigations, we found that as of the mid-1980's, there was no international system to protect against money laundering, terrorist finance, fraud or any other form of cross-border crime. Accordingly, we sought to build one. We developed ideas and principles that beginning in 1989 became incorporated into the FATF created by the G-7 that year, and its money laundering and counter-terrorist finance standards, which are now global norms.

1.5.1..2. In the same period, as we investigated BCCI, we found that the bank was being used in the Middle East (and elsewhere) to carry out terrorist finance, and that the bank had close ties to several of Saudi Arabia's most prominent intelligence officials. As summarized in a section of the Senate's report on BCCI, "The BCCI Affair," of which I was the principal author, "BCCI's support of terrorism and arms trafficking developed out of several factors. First, as a principal financial institution for a number of Gulf sheikhdoms, with branches all over the world, it was a logical choice for terrorist organizations, who received payment at BCCI-London and other branches directly from Gulf-state patrons, and then transferred those funds wherever they wished without apparent scrutiny. Secondly, BCCI's flexibility regarding the falsification of documentation was helpful for such activities. Finally, to the extent that pragmatic considerations were not sufficient of themselves to recommend BCCI, the bank's pan-third world and pro-Islam ideology would have recommended it to Arab terrorist groups."[7]

1.5.1..3. Our report did not cover the specifics of support for terrorism by particular governments, government officials, government agencies, or state-sponsored religious entities, as these topics were not the primary focus of our investigation of BCCI's criminal conduct, including its involvement in terrorist finance. That said, government support for political Islam, and its potential consequences for terrorist activity, was already an area of concern for me and for others working on terrorism issues in the Senate at the time. These concerns initially arose in connection with Saudi support to Palestinian terrorists during the First Intifada (1987-1993) as well as the arming of the Afghan Mujahidin against the Soviets. In particular, we were concerned that the 1979 attack on the Grand Mosque, which attacked the religious legitimacy of the Saudi ruling family, had led the Saudi Arabian government to defend itself through exporting an extreme interpretation of Islam called Wahabism globally, allying itself with Islamic extremism and thereby avoiding becoming a further target of it. Because the religious/political concept of holy war, or jihad, could be applied to a range of potential targets and contemporary political conflicts, not just the Soviets in Afghanistan, we were concerned that Gulf State support for "pan-third world and pro-Islam ideology" was creating a potential ideological,

---

[7] The BCCI Affair, id., p. 66.

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

religious, and in practice, economic, foundation for supporting terrorism.

1.5.2.    *Service as Deputy Assistant Secretary of State for International Law Enforcement, 1994-1999.* During this period, I was the senior U.S. diplomat focused on cross-border financial crime within the State Department. My primary work was to build international capabilities to combat financial crime threats, including terrorist finance. I came to work most closely during this period with the White House's counter-terrorism and transborder threats official, Richard A. Clarke ("Clarke"). During this period, Clarke headed what was known as the "Transnational Threats" ("TNT") office at the National Security Council in the White House ("NSC"), which coordinated and directed U.S. intelligence, law enforcement, military, diplomatic and financial regulatory efforts to build an integrated U.S. (and global) response to transnational threats, including terrorism. Towards the end of this period, Clarke became increasingly focused on the threat posed to the United States by Osama Bin Ladin ("bin Ladin"),[8] who the U.S. indicted for the first time in 1998 for terrorist activity aimed at killing Americans. By necessity, my work in this role required extensive analysis and understanding of terrorist financing modalities and the ideologies that support them.

1.5.2..1.    During this period, a central goal of my work was to build an international consensus sufficient to require all countries to put into place effective measures to criminalize money laundering and other forms of cross-border crime, including terrorist finance, and to impose regulatory controls requiring financial institutions, wherever located, to take effective measures that ensured they would not facilitate such crimes. At this time, there were many countries that had still failed to build out these capabilities, including essentially all of the countries of the Middle East.[9]

1.5.2..2.    By 1996, I became concerned about the risk of a major terrorist event threatening the United States, and the United States homeland in particular. While I was in my position at the State Department, I was consulted about the threat by then-Senator John Kerry, as he was writing a book about international crime published in 1997. After we talked about the growing terrorist threat to the U.S. homeland, he wrote, five years period to the 9/11 attacks: "It will take only one mega-terrorist event in any of the great cities of the world to change the world in a single day."[10] This reference in Senator Kerry's book did not specify an

---

[8] I refer to Osama Bin Ladin as "bin Ladin" or "Bin Ladin" throughout this Expert Report, except when an original document has a different spelling of his name in which case I use the spelling set forth in that document throughout the discussion of that document, such as "Usama" for "Osama" for his first name, or "Bin Laden" for his last name.
[9] In this period, Middle Eastern countries generally lagged behind much of the world in putting measures in place to counter the risk of serious financial crimes being facilitated by banks. Some countries had no controls; those that did, generally had no visible enforcement of the controls. During the Clinton Administration, we came to see this as a significant national security risk, for our country and for the world.
[10] John F. Kerry, The New War, Simon & Schuster (1997), p. 111.

FBI PROTECTED MATERIAL REDACTED

attack from Islamic extremists. We knew then that there was also other extremists who might undertake such an action, including domestic ones, as reflected in the Oklahoma City bombing carried out on April 19, 1995 by domestic terrorist Timothy McVeigh. But Islamic extremism of the kind represented by al Qaeda as a mutation of Saudi state-sponsored fundamentalism and political Islam, was very much on our minds, given the first World Trade Center attack of February 26, 1993, and a range of intelligence indicators in the Middle East and North Africa ("MENA") region, as well as sub-Saharan Africa, and portions of South East Asia.

1.5.2..3. During 1998 and 1999, as part of a process directed by the NSC, President Clinton asked interagency teams to travel overseas to warn countries that they would face the risk of no longer having open access to the United States if they failed to take steps to criminalize money laundering and related activities like terrorist finance. As the head of multi-agency team of U.S. officials acting at the direction of the White House, I visited countries in the Mediterranean and Middle East, including Cyprus, Israel, Lebanon, and Syria, to communicate the warnings, and to require them to take action to combat the use of their financial systems by criminals and terrorists. Other U.S. officials with whom I worked closely in developing and implementing U.S. policies addressing these threats travelled to Saudi Arabia and other Gulf states who were members of a regional body, the Gulf Cooperation Council, to issue similar warnings.

1.5.2..4. By the time I left the U.S. government in late 1999, we had made substantial progress in securing commitments and action from some countries, including Cyprus, Israel, and Lebanon, while others, such as Syria and the Gulf States, had taken no action in response to our warnings that they needed to put effective measures in place to combat the threat of money laundering and terrorist finance.[11] I was not personally involved in the visits to the Gulf States; however, I knew people who were. I learned from them that they remained deeply concerned that no progress was being made in those countries to address the risks, and that they were increasingly frustrated by the failure of the Gulf States to take any action against a terrorist finance threat that they knew was serious and that was imperiling U.S. national security.

1.5.3. *Post-9/11 Work Pertaining to Terrorist Finance and Financial Crime.* After I left the U.S. government, I continued to provide advice and expertise to governments and to international institutions. This included providing assistance regarding money laundering, illicit finance, and terrorist finance and sponsorship to the U.S. intelligence community, the Treasury Department, the Justice

---

[11] As of 1995, Saudi Arabia was one of the few Gulf States whose financial regulator had imposed know-your-customer obligations on its banks, but we did not see enforcement of the regulations in practice.

**FBI PROTECTED MATERIAL REDACTED**

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

Department, the NSC, the U.S. House of Representatives, the U.S. Senate, the IMF, World Bank, and the UN, as well as to the governments of Russia and Indonesia in connection with the development of their domestic money laundering laws and regulations. Shortly after the September 11, 2001 terrorist attacks ("September 11 attacks" or "9/11 attacks" or "9/11"), the Senate Committee on Banking, Housing and Urban Affairs asked me to testify in connection with Congressional consideration of a legislative response to the September 11 attacks to address money laundering and terrorist finance. My testimony on terrorist finance was given to the Senate on September 26, 2001, and became part of the record relied upon by the Congress in connection with its consideration of the USA-PATRIOT Act ("Patriot Act").[12] Title III of the Patriot Act incorporated a broad panoply of provisions to combat financial crime and terrorist finance and support whose adoption I had advocated during my time in the Clinton Administration. Over the years following the September 11 attacks, I was then asked by both the U.S. Senate and the U.S. House of Representatives to testify on terrorist finance and support issues, as well as asked by numerous organizations and publications, including prominent U.S. and foreign academic journals, to provide my expertise on terrorist finance and support and transnational criminal issues. I list my Congressional testimony, publications and lectures, together with my CV, as Appendix 2 to this Expert Report.

1.5.4.    *Other Work that Provides Background for My Expertise.* From late 1999 through mid-2008, I practiced law at Alston & Bird L.L.P. During that period, I provided both domestic and non-US clients legal and advisory services on money laundering and terrorist finance enforcement and regulation in the United States and globally. I rendered advice to financial institutions regarding their obligations to counter money laundering and terrorist finance, both statutory and regulatory, as well as to assist clients in developing and implementing their own internal policies and procedures to ensure they were adopting global best practices and complying with them. I was also asked to handle matters pertaining to the application of UN and U.S. sanctions regarding terrorist funds, administered in the U.S. by the Office of Foreign Assets Control ("OFAC") of the Treasury. I also provided informal assistance to the UK liquidator of BCCI in connection with the liquidator's ongoing efforts to secure compensation for BCCI's depositors. From time to time, I provided informal advice to the UN, IMF, OECD, and World Bank on terrorist finance, money laundering and other topics involving transnational financial crime.

1.5.4..1.    From mid-2008 until mid-2013, I provided consulting services at the international consulting and strategic communications firm of APCO Worldwide. During this period, I continued to work on legal and regulatory issues pertaining to money laundering and terrorist finance, and to related topics such as combatting the laundering of the proceeds of corruption, for foreign and domestic clients of that firm, including for

---

[12] Public Law 107–56—Oct. 26, 2001

**FBI PROTECTED MATERIAL REDACTED**

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

international bodies such as the IMF, the OECD, the UN and World Bank.

1.5.4..2.  From September 2013-January 2017, I served in front-office of the U.S. Department of State's Bureau for Near Eastern Affairs, which is responsible for managing and implementing the foreign policy of the United States in relation to the Middle East, specifically, the countries of Algeria, Bahrain, Egypt, Iran, Iraq, Israel, Jordan, Kuwait, Lebanon, Libya, Morocco, Oman, Qatar, Saudi Arabia, Syria, Tunisia, the United Arab Emirates, and Yemen. During that time I served as the Senior Coordinator for the Resettlement of the anti-Iranian government, the Mujahedin-e Khalq, formerly designated by the U.S. government as a terrorist group, and as the Special Envoy for Libya. In these capacities, I participated in daily discussions at the Bureau about counter-terrorism issues concerning the Middle East. I also participated in senior interagency meetings on counter-terrorism issues chaired by the National Security Council and provided advice to the Secretary of State and the White House as relevant on terrorism issues pertaining to Iran, Iraq, and North Africa. As part of my work, from time to time, I was required to sign-off on specific U.S. government operations to counter terrorists.

1.5.4..3.  Since my departure from the U.S. government I have returned to private legal practice and consulting, while also undertaking academic and public policy work at the Middle East Institute, as reflected in my profile there.[13] My current legal and consulting practices continue to include work on law enforcement and financial regulatory issues, sanctions, money laundering, and on matters pertaining to the Middle East, including compliance for Middle Eastern banks.

1.5.4..4.  I qualified as an Expert Witness regarding ARB and its relationship to terrorist finance in the case of Al Rajhi Banking and Investment Corporation and The Wall Street Journal Europe SPRL, HQ02X00924 for the High Court of Justice, Queen's Bench Division in 2004.

1.5.4..5.  Further information on my background and experience is provided as Appendix 2 to this Expert Report.

---

[13] My public profiles are available on the Middle East Institute website at https://wwww.mei.edu/experts/jonathan-m-winer and on my law firm websites, https://www.winerlegal.com and https://mosaiqlaw.com/about-us/ and on my consulting firm website, https://apcoworldwide.com/people/jonathan-winer/

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

## 2.  Framework: Al Qaeda[14] and Its Support from Religious Charities

2.1.    To provide context to the opinions I am expressing in this Expert report, I begin with the following information to provide the framework for my assessments of the relationships involving al Qaeda, particular Saudi-based international charities that have been found to be involved in terrorist finance, and sanctioned or closed as a result, and the financial institutions, such as ARB, which handled their accounts.

       2.1.1.    The information in this Section 2 of this Expert Report is not limited to the information that was publicly known prior to 9/11, but includes findings arising from information developed following the attacks.

       2.1.2.    By contrast, my answers to each of the ten questions discussed in Sections 3-12 of this Expert Report are based on contemporaneous information regarding terrorist financing and charities relating to events prior to the September 11 attacks; incidents involving charities and terrorist finance that occurred prior to the September 11 attacks; the obligations of financial institutions such as ARB prior to 9/11 to undertake sufficient due diligence to avoid implicating themselves in handling funds used in support of terrorism; and the actual role of ARB prior to 9/11 in relationship to charities and other customers of ARB who provided support to al Qaeda and/or other terrorist groups.

       2.1.3.    As appropriate, I have also relied on documents or information created after 9/11 and incidents which took place after 9/11 which are material to events that took place prior to 9/11. For example, the CIA prepared a number of analyses after 9/11 which describe events that led up to the September 11 attacks, and which include its assessments of ARB's role in terrorist finance, based in large part on information about events that took place prior to 9/11. This type of process, in which information regarding pre-9/11 events was considered and analyzed, was also the basis for various findings by the 9/11 Commission, whose work I have also relied upon. I have also taken note of actions and decisions undertaken by the U.S. government, the Saudi government, other governments, and the United Nations after 9/11, that I found material to the actions which led to 9/11, as well as information cited by those governments after 9/11 material to events which took place before 9/11.

2.2.    Al Qaeda, founded by a Saudi, bin Ladin, in 1988, spent about $30 million a year in direct expenditures to run its operations. In addition to these funds, it relied on spending by Islamic charities many times that amount per year to indoctrinate, recruit, train, house, transport, equip, and arm Islamic fighters and terrorists, and to operate al Qaeda and

---

[14] There are multiple spellings in English of bin Ladin's terrorist organization. I use "al Qaeda" or "Al Qaeda" except when the text of a document I am discussing uses a different spelling, such as the CIA's adoption of the spelling as "Al Qa'ida" or "al Qa'ida."

FBI PROTECTED MATERIAL REDACTED

affiliated and associated terrorist groups. This support enabled al Qaeda to develop the ability to carry out terrorism on a global basis by the time it carried out the 9/11 attacks.[15]

2.3. Saudi Arabia was the most significant souce of funding for al Qaeda in the years leading up to 9/11, and the epicenter for terrorist finance globally.[16]

2.4. Islamic charities, most of which were founded by Saudi Arabians and/or headquartered in Saudi Arabia, played the most important role in providing the resources al Qaeda needed.[17] Those charities included the International Islamic Relief Organization ("IIRO"),[18] the Muslim World League ("MWL"),[19] the World Assembly of Muslim Youth ("WAMY"),[20] and Al-Haramain,[21] whose foreign offices were forced to be closed in 2004 by Saudi Arabia, with those refusing to close then subjected to sanctions by the UN 1267 Committee.[22] Soon thereafter, Saudi Arabia closed Al-Haramain in its entirety.[23]

2.5. The funds and support from the charities assisted al Qaeda and its affiliates in essentially every aspect of their terrorist activities.[24] The charities that helped al Qaeda were engaged

---

[15] Final Report, National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Report") (2004), p. 55, 170-172, 371-372, 382-383. Notably, several of these references directly address as a prime example of the use of charities to fund terrorism Al-Haramain's involvement in terrorist financing on behalf of al Qaeda.

[16] 9/11 Commission Report, p 171; David D. Aufhauser, General Counsel, Department of Treasury, Testimony to Senate Judiciary Committee, June 26, 2003. Notably, the 9/11 Commission said "Saudi Arabia has long been considered the primary source of al Qaeda funding, but we have found no evidence that the Saudi government as an institution or senior Saudi officials individually funded the organization. (This conclusion does not exclude the likelihood that charities with significant Saudi government sponsorship diverted funds to al Qaeda.)" "Saudi-Based Financial Support for Terrorist Organizations," ("Saudi Financial Support") Central Intelligence Agency, November 14, 2002, CIA_000143-158.

[17] 9/11 Commission Report, p. 55. The CIA has estimated that half of more of al-Qaida's pre-9/11 budget was raised in Saudi Arabia, CIA_000147, see also CIA_000150 and CIA_000148-155; see also "Saudi Financial Support," id, CIA_000150; "Islamic Terrorists: Using Nongovernmental Organizations Extensively ("Islamic Terrorists"), April 9, 1999, CIA_000210-000236

[18] 9/11 Commission Report, id.; CIA_000149; CIA 000220-221

[19] "Saudi Financial Support," CIA_000150, id, "Islamic Terrorists," April 9, 1999, CIA_000210; CIA_000213; CIA_000221; CIA_000223

[20] "Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions," ("Funding Islamic Extremists") Central Intelligence Agency Office of Transnational Issues, based on information available as of November 20, 1997, CIA_00721-000804 at CIA_000744.

[21] CIA_000150-151

[22] Security Council ISIL (Da'esh) and Al-Qaida Sanctions Committee Amends 29 Entries to Its Sanctions List," Press Release, UN Security Council, SC/15190, https://press.un.org/en/2023/sc15190.doc.htm. The Al-Haramain offices cited for providing financing, material, technological, and other support to Al-Qaida included its offices in Afghanistan, Albania, Bangladesh, Bosnia and Herzegovina, Ethiopia, Kenya, The Netherlands, Pakistan, Tanzania, the Union of the Comoros. Saudi Arabia ultimately ordered that all of Al-Haramain's offices be closed, including its headquarters in Saudi Arabia, and Al-Haramain to be dissolved as an entity. See "Saudis Are Shutting Down A Charity Tied to Terrorists," New York Times, June 3, 2004, https://www.nytimes.com/2004/06/03/world/saudis-are-shutting-down-a-charity-tied-to-terrorists.html

[23] "Country Report on Terrorism - Saudi Arabia," Released by the Office of the Coordinator for Counterterrorism, U.S. Department of State, April 27, 2005, https://2001-2009.state.gov/p/nea/ci/sa/80177.htm

[24] UN Security Council Letter dated 1 December 2003 from the Chairman of the Security Council Committee established pursuant to resolution 1267 (1999) concerning Al-Qaida and the Taliban and associated individuals and entities addressed to the President of the Security Council, enclosing Second report of the Monitoring Group

FBI PROTECTED MATERIAL REDACTED

in two principal types of activities which made them especially suitable for partnering with al Qaeda. The first of these was religious propagation activities of a form of Islam, Wahhabism, which in the period prior to the 9/11 attacks included the dissemination and teaching of texts justifying armed conflict, violent jihad, and the killing of non-believers.[25] The second type of activities were relief efforts aimed at Muslims in need, especially in conflict zones. While these included genuine humanitarian activities, these relief activities also were used to recruit terrorists, to provide space for their training and operations, and to provide a cover so that al Qaeda operatives could undertake terrorist activities under the guise of being relief workers. Funds from the relief agencies were also used to help al Qaeda and other terrorist groups by purchasing weapons and other things the terrorists needed, or were given to al Qaeda and affiliated groups for their own direct spending. The funds and support included indoctrinating potential fighters and terrorists, by providing materials in mosques and madrassas that taught Muslims it was proper to kill non-believers (that is, Christians, Jews, those not believing in God, as was the case for the Soviet state during the period of the USSR, and Muslims viewed as apostates for having different views of Islam). This propagation process helped to recruit jihadists and terrorists. The charities then facilitated the transport to and support for jihadists and terrorists in combat zones; bought weapons for jihadists and terrorists;[26] provided storage facilities for weapons for jihadists and terrorists; provided training camps for jihadists and terrorists where they were taught how to use weapons and make bombs; disseminated terrorist training manuals to jihadists and terrorists; provided food, housing and medical care to jihadists and terrorists; provided cover to people engaged in terrorism, such as by providing fake work papers to jihadists and terrorists; provided office space for al Qaeda and its agents to do business as they engaged in such activities as weapons purchases; and raised funds for and transmitting funds to al Qaeda and to

---

established pursuant to resolution 1363 (2001) and extended by resolutions 1390 (2002) and 1455 (2003), on sanctions against Al-Qaida, the Taliban, and individuals and entities associated with them ("Second Report"), S/2003/1070, ¶¶ 34-35, https://documents-dds-ny.un.org/doc/UNDOC/GEN/N03/600/46/PDF/N0360046.pdf?OpenElement

[25] MWL played an important part in the publication of materials used to indoctrinate Muslims to carry out acts of violence and to become participants in armed conflict against governments they viewed to be persecuting Muslims and in terrorist acts against governments and civilians alike in pursuit of their political and religious objectives. The calls to arms were explicit. See e.g. "Every Muslim should be committed to liberate the land of Islam totally from any *Shirk* (polytheism) or *Kufr* (disbelief) or any system other than the system of Allah. The Fuqaha said, 'When the enemy occupies the land of Islam, Jihad becomes obligatory (*wajib*) on every Muslim." MWL Journal (September 1998); "A child should be made aware that participating in Jihad is worship in itself and running away from the battle field is a great sin. Taking part in the battle fought in Allah's Cause can be done by sacrificing one's life and wealth." MWL Journal (February 1994). "Jihad . . . becomes mandatory for the Muslims when an enemy threatens, when he violated the frontiers of Dar-ul-Islam. It becomes the duty of every able-bodied Muslim male to rise to the defense of the frontiers of Dur-ul-Islam, and of the honor of Muslim women, and the lives of Muslim men, women, and children." MWL Journal (December 1980); "Jihad [takes] many forms [including] making real sacrifice even of their own life," referencing threats to Muslims in Afghanistan, Burma, Cambodia, Cyprus, Palestine, the Philippines, and Vietnam from "Zionism, Communism, Free Masonry, Qadianism, Bahaism, and Christian missionaries," MWL Journal (April 1980); "[E]very Muslim must make a sacrifice with money or with life for Allah and his religion," Al Alam Al Islami (June 29, 1992; "Jihad is an obligation anytime and anywhere . . . whatever you are able of the mental and physical strength . . .This incudes weapons, machines, artillery, machine guns, rifles, airplanes, ground and sea craft, castles, trenches, defense tools, opinion, and politics. By these the Muslims advance and defend themselves against the evil of their enemies," Al Alam Al Islami (April 20, 1992).

[26] 9/11 Commission Report, p. 55, "Islamic Terrorists" id, CIA_000210-211.

FBI PROTECTED MATERIAL REDACTED

those working with it.[27]

2.6.    Al Qaeda used the infrastructure it was able to develop with the support of the charities that I have summarized above to train Muslims to become terrrorists and to succeed in carrying out terrorist attacks. The terrorist training manuals and activities supported by such charities included weapons training, training in land mines, bomb making, how to carry out guerilla warfare, how to kill unarmed people and how to carry out chemical weapons attacks.[28] The terrorist activities engaged in by both al Qaeda and its affiliated terrorist groups included terrorist activities in conflict zones and elsewhere, such as Europe and the United States, as well as violent resistance to non-Muslim forces in areas of civil conflict. The charities' support to al Qaeda affiliates included, for example, providing training camps and guesthouses in areas in which the charities and al Qaeda were active, including Afghanistan, Chechnya, Pakistan, the Sudan, Somalia and Kenya, for the use of al Qaeda and for these affiliates.[29] The infrastructure provided by or made possible by the charities also enabled al Qaeda to recruit and select candidates for major terrorist operations against Western targets such as the United States and to provide them the specific training they needed to carry out such attacks. These skills and others developed and taught at the training camps provided the foundation for the planning and operational activities necessary for al Qaeda to succeed in striking the United States.

2.7.    The records created by charities that are involved in supporting armed conflict, extremism, and terrorism, generally do not document such expenditures and activities. Lawful, public, authorized uses of charities do not include providing support for violence. Record-keeping by any charity involved in support for such acts of violence or for any form of serious crime necessarily omits and seeks to hide evidence of such support that might be used by outsiders to the detriment of the charity engaged in supporting extremism and terrorism. Documenting terrorist activities in the books of a charity is counter to the interests of both the charities supporting terrorist groups and to the interests of the terrorist groups themselves. Any such documentation increases the risk that the donor as well as the recipient could be exposed to indictment, arrest, civil liability, sanctions, or having their commercial activities closed down. While terrorists, like others

---

[27] "Central Intelligence Agency Report on NGOs With Terror Links," 1996, "1996 CIA Report," handwritten notation, Jan '98, no further date specified, Exhibit 95, Index of Evidence Supporting Plaintiffs' Averment of Facts in Support of Their Claims Against the Kingdom of Saudi Arabia and the Saudi High Commission for Relief of Bosnia & Herzegovina available, text available online as Exhibit J  Case 1:03-md-01570-GBD-SN   Document 3826-6  Filed 12/01/17  Page 37 of 99, https://www.docketbird.com/court-documents/In-Re-Terrorist-Attacks-On-September-11-2001/Exhibit-EX1JT4B1/nysd-1:2003-md-01570-03826-006  and except for first paragraph at https://en.wikisource.org/w/index.php?title=CIA_Report_on_NGOs_With_Terror_Links&action=edit.  The report is also referenced in the UNSC Second Report, id, at p. 15, as a "recently published report by the United States Central Intelligence Agency." See also "Islamic Terrorists," id, CIA_00210-236, and "Funding Islamic Extremists," id, CIA_000744..

[28] "Various documents also established that Arnaout worked with others -- including members of al Qaida -- to purchase rockets, mortars, rifles, and offensive and defensive bombs, and to distribute them to various mujahideen camps, including camps operated by al Qaida," "Treasury Designates Benevolence International Foundation and Related Entities as Financiers of Terrorism," U.S. Department of the Treasury Press Release, 11/19/2002. https://home.treasury.gov/news/press-releases/po3632

[29] These conclusions reflect the analytic reporting of the CIA as of April 9, 1999, reflected in its finished analysis on "Islamic Terrorists," id., produced by the CIA's counterterrorist center ("CTC"), CIA_000210-236..

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

engaged in illegal activity, generally do their best to avoid documenting their "sources and methods," charities facilitating criminal conduct and seeking to cover it up can leave behind a crumbs of evidence which provide clues to what they are actually doing:

2.7.1.  For example, a charity may send faxes for military equipment in which other documents govering the same transactions describe the goods as "wheat," or "satellite telephones," as was documented with one charity, Third World Relief Agency ("TWRA"), operating in Bosnia in the mid-1990s, in connection with proceedings of the International Court for Criminal Justice.[30]

2.7.2.  In another example, which is especially material to this case, information contained in records maintained by charities and/or banks which indicates deception is relevant to assessing whether that institution has been manipulating its record keeping or omitting information to conceal activities related to terrorist finance. Such information may also provide corroboration for findings made by government agencies tasked with understanding terrorist finance, such as the CIA.

2.8.  Information available on charities that provided material support to al Qaeda and other terrorist groups prior to 9/11 shows a recurrent pattern of deficient controls, missing funds, false invoicing, and other schemes to make accurately reconstructing how they actually spent their funds impossible. I have found that few audits of such charities for the period prior to 9/11 have been available in connection with this and related cases. The few limited audits that have emerged show recurrent patterns of gross abuse, as one would expect of charities whose personnel intentionally were expending charitable funds for prohibited purposes, such as buying weapons and providing direct support to terrorist groups. Based on audits I have reviewed from some of the charities, and comparing them with other information available to me, such as CIA reports, reports of other governmental bodies such as NATO, and reports from individuals who were inside al Qaeda, charities that provided support to al Qaeda hid what they were doing through false or misleading their documentation of expenditures, such as by listing military and terrorist support activities as expenses for legitimate activities. Notably, based on the documents produced by ARB that I have reviewed, SAAR himself and other members of the Al Rajhi family and those associated with them, undertook actions to create false or

---

[30] Expert Report Concerning the Area – Financial Investigations – relating to the judicial assistance request, ref. no. INV/10289/T09-PH (245), dated 8/27/2002 of the "Office of the Prosecutor (OTP) of the International Court of Criminal Justice for the former Yugoslavia relating to the "Third World Relief Agency" TWRA), Vienna/Austria, MR/GER049960, Exhibit 231 Affirmation of Sean Carter Transmitting Evidence in Support of Plaintiff's Memorandum of Law in Opposition to the Motion to Dismiss of the Kingdom of Saudi Arabia and Saudi High Commission for Relief of Bosnia & Herzegovina, hereafter "ICCJ Expert Report." I take note that the ICCJ Expert Report also found several transactions from SAAR and other persons with the family name "Al Rajhi" making contributions to TWRA during the period of the Bosnian conflict during which TWRA was found to have been providing military support to Islamic fighters there. The contributions, totaling just over $200,000, are characterized in the report as having been made through Austrian banks in 1993 and 1994 by "Suleiman Al-Rajhi" and by "Saleh Alaabdulaziz [sic] Al Rajhi and Brothers," also spelled "Saleh Alabdulaziz Al Rajhi and Brothers," at MR/GER049979 and MR/GER049980. According to an online profile maintained about him at Alrahhibmb.com, which according to the website stands for "Al Rajhi Business Management Board," the late Saleh Abdul Aziz Al Rajhi was the eldest of the brothers who founded Al Rajhi bank, and the co-founder of the bank together with his brother Suleiman. "About Saleh Abdul Aziz Al-Rajhi," https://www.alrajhibmb.com/about_us.htm

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

misleading documentation of their charitable activities for the purpose of concealing them from persons concerned about terrorism, as I will discuss later in this Expert Report. These documents also corroborate some of the information relied on by the CIA in its findings on terrorist finance relating to the charities and to its bankers, including the defendant, ARB.

2.9.    The records provided to me from ARB show that it provided accounts to or had relationships with a number of charities which each provided significant material support to al Qaeda without which it would not have achieved its global capabilities.[31] Prior to the 9/11 attacks, such support included:

    2.9.1.    *IIRO* supported terrorist finance activities through its field offices in many countries. IIRO provided funding for terrorist infrastacture, provided jobs and safe haven to al Qaeda and al Qaeda operatives, and funded and built local support for affiliated terrorist groups. Two of IIRO's branches and a senior official of one of its major Saudi Arabian offices were specifically designated for terrorist sanctions by the U.S. and the UN. That other offices of IIRO were not designated should not be interpreted to mean that no other IIRO office was similarly implicated. To the contrary: U.S. government assessments indicate the bin Laden used other offices of the IIRO to support al Qaeda's activities, and that they too were suspectible to abuse.[32]

    2.9.2.    *MWL* provided funding to al Qaeda and bin Ladin and incubated others who provided such funding.[33] As stated by a former member of al Qaeda who knew bin Ladin well, MWL incubated and housed other charities and their key personnel as they supported terrorism, by providing funding to them that they

---

[31] One of the most extensive discussions of the relationship of the support of terrorism by a number of charities, including those discussed in this Expert Report, is set forth in "Second report of the Monitoring Group established pursuant to resolution 1363 (2001) and extended by resolutions 1390 (2002) and 1455 (2003), on sanctions against Al-Qaida, the Taliban and individuals and entities associated with them," UN Security Council, November 3, 2003, distributed December 2, 2003, S/2003/1070,  https://documents-dds-ny.un.org/doc/UNDOC/GEN/N02/225/80/PDF/N0222580.pdf?OpenElement

[32] 9/11 Commission Report, id.; "Saudi Financial Support," id., CIA_000149; "Islamic Terrorists," id, CIA_000210, CIA 000220-221; "Usama Bin Ladin s [sic] Finances: Some Estimates of Wealth, Income, and Expenditures," Central Intelligence Agency, November 17, 1998, CIA_000325; CIA_000330; "Usama Bin Ladin: Some Saudi Financial Ties Probably Intact," ("UBL Saudi Financial Ties") Central Intelligence Agency, Office of Transnational Issues," January 11, 1999, CIA_000807-84, see CIA_000808, CIA_000811, CIA_000817-818.  See also FBI-CIA Joint "Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States," December 2004, referring to "Turki Bin Fahd Jiluwi, an important al-Qa'ida donor who hails from a minor line in the Saudi royal family." According to the assessment, Bin Jiluwi was a "key leader of the Eastern Province office" of IIRO," and was also suspected of embezzling more than $3 million from the organization, indicative of its poor controls. FBI/CIA "Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States," December 2004, p.5, EO14040-003419. The head of that branch of IIRO, Abd Al Hamid Sulaiman Al-Mujil, was designated for sanctions for using his position "to bankroll the al Qaida network in Southeast Asia." In sanctioning him, the U.S. Treasury stated that "Al-Mujil has a long record of supporting Islamic militant groups, and he has maintained a cell of regular financial donors in the Middle East who support extremist causes," "Treasury Designates Director, Branches of Charity Bankrolling Al Qaida Network," August 3, 2006, https://home.treasury.gov/news/press-releases/hp45

[33] "UBL Saudi Financial Ties," id, CIA_000822-823

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

were able to use to build the capacity of al Qaeda and associated organizations to carry out jihad locally and globally, including against the United States. As described by the al Qaeda insider, MWL was the "mother" of the other charities helping al Qaeda.[34]

2.9.3.    *WAMY,* through its network of subsidiaries and affiliates, provided funds to al Qaeda and to associated Islamic terrorist organizations and separatist movements. It channeled donated funds to al Qaeda and these organizations and movements; provided them financial and logistical support; helped recruit and facilitate the movement of Islamic fighters and terrorists into conflict zones; provided weapons to al Qaeda, as well as Islamic soldiers and terrorists involved in affiliated or associated activities and causes; recruited young Muslims to join terrorist and separatist organizations and causes, including to become martyrs for Islam; served as a distribution channel for transmitting information and documents to and from al Qaeda and within and among Islamic terrorist organizations and associated separatist movements; disseminated hate speech against Christians and Jews designed to advance al Qaida's radical Islamist ideology throughout the Muslim world and legitimize violent jihad against "infidels;" and urged young Muslims to take up arms against secular, non-Islamist societies.[35]

2.9.4.    *Al-Haramain,* through various offices on three continents (Africa, Asia, and Europe), participated in "the financing, planning, facilitating, preparing or perpetrating of acts or activities by, in conjunction with, under the name of, on behalf or in support of Al-Qaida," as described by the UN when it imposed sanctions on various offices of Al-Haramain that continued to operate after Saudi Arabia in 2004 ordered Al-Haramain to cease all of its foreign operations and close all of its foreign branches.

2.9.4..1.  In August 2002, the CIA found that people working for Al-Haramain in at least twenty countries in Africa, Asia and Europe had supported Islamic terrorist and militant groups, and that its "officials had provided financial and logistical support to Bin Ladin and other Islamic radicals by diverting funds and supplies from legitimate activities."[36]

2.9.4..2.  In November 2003, the conclusions reached by the UN Experts in the 2nd UN Monitoring Report about Al-Haramain were similarly devastating, linking the charity to acts of terrorism in Bosnia and Herzegovina,

---

[34] Interview of al-Fadl, Exhibit 141, PEC-KSA002135-2143, 01-1535-cr(L)

[35] "Terrorism Finance: Custodial Interviews Providing Leads into Al-Qa'ida Financial Network," ("Terrorism Finance,") August 7, 2002, CIA_000313; UBL Saudi Financial Ties," id, CIA_000826-827

[36] "Security Council ISIL (Da'esh) and Al-Qaida Sanctions Committee Amends 29 Entries to Its Sanctions List," Press Release, UN Security Council, SC/15190, February 2, 2023, https://press.un.org/en/2023/sc15190.doc.htm. The Al-Haramain offices cited for providing financing, material, technological, and other support to Al-Qaida included its offices in Afghanistan, Albania, Bangladesh, Bosnia and Herzegovina, Ethiopia, Kenya, The Netherlands, Pakistan, Tanzania, the Union of the Comoros. See also "Al-Haramain: Support for Extremists and Terrorists," Central Intelligence Agency," August 28, 2002, CIA-SUB_0007-00019.

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

Indonesia, and Kenya, the last of which was an apparent reference to al Qaeda's bombing of the U.S. Embassy in Nairobi.[37]

2.9.4..3.  The following January, the Saudi government joined the U.S. government in sanctioning four branches of Al-Haramain.[38] Later, the Saudi government issued a 104-page white paper which characterized Al-Haramain as "one of the biggest terror-financing operations in the world and the funding organ and channel for the Nairobi, Kenya and Dar es Salaam bombings in 1998." In the white paper, the Saudi government referred to Al-Haramain as "the charity front Al-Haramain Islamic Foundation, notoriously tied to Osama bin Laden, the Taliban and Al Qaeda's terror campaigns."[39] In this assessment, the Saudi view reflected that of the Treasury Department in its June 2, 2004 designation of Al-Haramain. In a statement issued that day, the Treasury Department stated "[w]hen viewed as a single entity, AHF is one of the principal Islamic NGOs providing support for the al Qaida network and promoting militant Islamic doctrine worldwide. . . numerous AHF field offices and representatives operating throughout Africa, Asia, Europe and North America appeared to be providing financial and material support to the al Qaida network. Terrorist organizations designated by the U.S. including Jemmah Islammiya, Al-Ittihad Al-Islamiya, Egyptian Islamic Jihad, HAMAS and Lashkar E-Taibah received funding from AHF and used AHF as a front for fundraising and operational activities."[40]

2.9.4..4.  The United Nations concluded that Al-Haramain, when viewed as a single entity, was one of the "principal NGOs acting throughout the world providing support for the Al-Qaida network."

2.10.  It is not possible to determine an exact dollar amount of the material support given by these charities for terrorism.[41] The charities did not accurately report support they

---

[37] 2nd UN Monitoring Report, id., ¶¶45-51.

[38] "Treasury Announces Joint Action with Saudi Arabia Against Four Branches of Al-Haramain In The Fight Against Terrorist Financing," January 22, 2004, https://home.treasury.gov/news/press-releases/js1108

[39] "White Paper on Saudi Arabia and Counterterrorism," Government of Saudi Arabia, in English, undated, p. 13 and p. 86. Apart from its reference to Al-Haramain's support for terrorism in the period prior to the 9/11 attacks, the Saudi White Paper generally references events from the date of the terrorist bombings in Riyadh May 12, 2003 to April 5, 2016, with internal references suggesting it was issued by Saudi Arabia's Embassy in Washington, with the support of its Ministry of Foreign Affairs, sometime after that date, likely mid-2016. The White Paper includes as appendices opinion pieces published in U.S. media by its then Foreign Minister and Ambassador to the United States. The White Paper describes in some detail Saudi Arabian actions to counter extremism, terrorism, and terrorist finance from roughly September 2003 onward.

[40] "Additional Al-Haramain Branches, Former Leader Designated by Treasury as Al Qaida Supporters Treasury Marks Latest Action in Joint Designation with Saudi Arabia," Treasury Department, June 2, 2004, https://home.treasury.gov/news/press-releases/js1703

[41] Terrorist finance is by its nature covert, and this makes the development of global metrics regarding the total funds raised and used to support al Qaeda more difficult. As stated in Congressional testimony by then Under Secretary of the Treasury Stuart Levey, "Scientific metrics are simply not available in our line of work. Al Qaida does not release financial statements, and we will never know precisely how much money intended for terrorists never reached their hands due to our efforts. We therefore find ourselves discussing proxies for the ultimate

21

**FBI PROTECTED MATERIAL REDACTED**

provided for terrorism. The limited information provided about the bookkeeping maintained by various Islamic charities, including these charities and other Islamic charities, provides evidence of incomplete and dishonest records, as I have discussed in expert reports previously submitted to this court in a related case.[42]

2.11.    In practice, the offices, activities, and funds of the charities could be, and were actually used simultaneously for, both humanitarian and terrorist purposes. While some of the humanitarian assistance provided by these charities was unrelated to providing support for jihad and terrorism, overall, the two types of activities - humanitarian and terrorist - were inextricably intermingled in the international operations of the principal Islamic NGOs who contributed to supporting Bin Ladin, al Qaeda, and similarly-minded terrorist organizations in the days, months, and years that preceded the 9/11 attacks.

2.12.    In addition to using charities to support his terrorist activities, Bin Ladin used financial institutions to assist him in his work to build al Qaeda. ARB was one of the financial institutions that was extensively implicated in facilitating terrorist transactions for al Qaeda and other extremist groups.[43]

2.13.    The summary above provides the framework for helping to understand the the answers I provide over the remainder of this Expert Report, given the focus of the ten questions on

---

questions: how many donors and facilitators have been captured; how many channels for moving terrorist funds have been designated and blocked; or how many countries are equipped to monitor and interdict illicit financing channels. Each of these benchmarks points to only one aspect of the problem, though, and imperfectly at that. Most revealing, to my mind, is intelligence reporting that although anecdotal speaks to the difficulty with which terrorists are raising, moving, and storing money. The information available to us is encouraging. We are seeing terrorist groups avoiding formal financing channels and instead resorting to riskier and more cumbersome conduits like bulk cash smuggling. And, most importantly, we have indications that terrorist groups like al Qaida and HAMAS are feeling the pressure and are hurting for money." Testimony of Stuart Levey, Under Secretary Office of Terrorism and Financial Intelligence U.S. Department of the Treasury Before the House Financial Services Subcommittee on Oversight and Investigations, May 4, 2005, https://home.treasury.gov/news/press-releases/js2427 One important implication of Levey's testimony is that terrorists find it more difficult to obtain the funds they need to carry out terrorist attacks when traditional banking channels are closed to them. When a bank becomes a conduit for terrorist funding, the result is to promote the terrorist activity that follows from the use of the funds. Similarly, when a bank maintains sufficient controls to prevent such funding, terrorists are forced to adopt alternatives that are "riskier," less efficient, and therefore, less likely be help the terrorists achieve their goals.

[42] Expert Report of Jonathan M. Winer, March 10. 2020, and Rebuttal Report of Jonathan M. Winer, February 2, 2021, *In re Terrorist Attacks on September 11, 2001*, 03-MDL-1570 (GBD) (SN). In these reports, I addressed auditing deficiencies pertaining to IIRO, WAMY, and the support of MWL for multiple charities that were engaged in supporting terrorism. I also addressed the involvement of Al-Haramain in terrorist finance and other support for terrorism, but not its record-keeping practices. I address issues relating to Al-Haramain's financial record-keeping and support for terrorism later in this Expert Report. At the time, I did not have the benefit of the additional information on the involvement of these charities in supporting terrorism, bin Ladin, his associates, and al Qaeda, contained in the material declassified and released by President Biden under EO 14040 and in response to Plaintiffs' ARB subpoena, and also had not reviewed documents produced by ARB in this case.

[43] See e.g. ARB-00013809-815, for bin Laden account in foreign (non-Saudi) currency as of October 20, 1991, and for its overall role in funding terrorism and al Qaeda, CIA_000723; CIA_000743-744; CIA_000783; CIA_000809; CIA_000811; CIA_000826; CIA_000830-831; CIA-SUB_0002-006; CIA-SUB_0024; CIA-SUB_0027; CIA-SUB_0032; CIA-SUB_0001-0006. The phrase "conduit for terrorist transactions" was applied by the CIA to Al Rajhi bank at CIA-SUB_0002.

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

facts and circumstances as they were known or took place prior to the September 11 attacks. Having a grasp of this framework is especially important for answering these ten questions given the close, unique, relationship between ARB; its cofounder and chief executive, SAAR; the charity he established, the SAAR Foundation, which undertook banking transactions through ARB; and charities that were deeply involved in providing funds and other support for terrorism, including Al-Haramain and IIRO, which each maintained many bank accounts at ARB, as discussed in detail in later sections of this Expert Report.

3. **Question 1:** *Was terrorist financing, and more specifically terrorist financing through purported charitable organizations, an area of concern in the international banking industry before September 11, 2001?*

3.1.     Yes, terrorist financing through purported charitable organizations was an area of concern to the international banking industry before September 11, 2001. Prior to the 9/11 attacks, the UN and its member states, which include every country in the world other than Palestine and the Vatican, undertook a series of actions focusing on terrorist finance. When taking these steps, the UN's member states expressly specified the threat posed by charities being used for that purpose. UN member states made commitments to apply anti-money laundering standards to cover terrorist finance and to put those standards into place as part of their regulation of banks and other financial institutions.

3.2.     On January 16, 1997, the UN, acting as a body, took formal notice of the problem of the financing of terrorism through charities. On that date, the UN General Assembly, which had previously adopted a Declaration on Measures to Eliminate International Terrorism on December 9, 1994, and issued a Resolution on that topic on December 11, 1995, issued a new Resolution on "Measures to eliminate international terrorism," stating that the General Assembly, which includes every member state of the UN, was "[d]eeply disturbed by the persistence of terrorist acts, which have taken place worldwide." The Resolution "strongly" condemned "all acts, methods and practices of terrorism as criminal and unjustifiable, wherever and by whomsover comittted," and called upon all States to take further measures to prevent terrorism. The measures the UN and its member states agreed should be taken to combat terrorism included the commitment to "take steps to prevent and counteract, through appropriate domestic measures, the financing of terrorists and terrorist organizations, whether such financing is direct or indirect through organizations which also have or claim to have charitable, social or cultural goals…"[44]

3.2.1.     The inclusion of this language in a statement by the UN reflects the international recognition as of January 16, 1997 that terrorist financing through "charitable, social or cultural" entities was already a significant problem.

3.2.2.     In subsequent UN resolutions, the General Assembly reiterated the call to States to take effective actions to combat terrorist finance, citing the January 16, 1997

---

[44] UN Resolution Adopted by the General Assembly [on the report of the Sixth Committee (A/51/631)], Fifty-first session, Agenda Item 151, January 16, 1997.

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

Resolution that expressly referred to it taking place through "charitable" organizations, and the need to combat that. These resolutions included a further iteration of 52/165 "Measures to eliminate international terrorism," on January 19, 1998. [45]

3.2.3.    The UN General Assembly acted again on January 26, 1999 to cite its prior statements about the need to combat terrorism by referring to the previous resolutions, and moved the ball forward further by authorizing the prompt development of a comprehensive international convention to provide a common set of requirements for its member states to stop terrorist financing, as a necessary addition to the existing international instruments dealing with international terrorism. [46]

3.2.4.    This new international legal instrument to combat terrorist financing was negotiated quickly, and adopted by the UN General Assembly on December 9, 1999 in resolution 54/109, and given the formal title of "International Convention for the Suppression of the Financing of Terrorism" ("Terrorist Finance Convention"). [47]

3.2.5.    The Terrorist Finance Convention was promptly signed by a number of countries, including countries with major financial centers, such as the United States, the United Kingdom, France,  and Germany, with a few months of its adoption by the UN General Assembly, which includes all of the UN's member states. Other countries which had experienced serious terrorist incidents at home, such as Algeria, Egypt, Russia, and Sri Lanka also signed the Terrorist Finance Convention in 2000.[48]

3.2.6.    The Terrorist Finance Convention consisted of 28 articles. The most detailed and lengthy article, Article 18, specified a number of specific measures governments signing the instrument were required to take, including in their regulation of banks and other financial institutions, to counter terrorist finance risk. These included in pertinent part:

    3.2.6..1.  (1) (b) Measures requiring financial institutions and other professions involved in financial transactions to utilize the most efficient measures available for the identification of their usual or occasional customers. . . and to pay special attention to unusual or suspicious transactions and report transactions suspected of stemming from a criminal activity.

---

[45] UN Resolution Adopted by the General Assembly [on the report of the Sixth Committee (A/51/631)], Fifty-second session, Agenda Item 152, January 19, 1998.
[46] UN Resolution Adopted by the General Assembly [on the report of the Sixth Committee (A/51/631)], Fifty-third session, Agenda Item 152, January 26, 1999.
[47] Terrorist Finance Convention, Adopted by the General Assembly of the United Nations in resolution 54/109 of December 9, 1999, https://www.un.org/law/cod/finterr.htm
[48] Dates of signing and ratification of the convention are maintained by the UN and accessible at its treaties website at https://treaties.un.org/Pages/ViewDetails.aspx?src=IND&mtdsg_no=XVIII-11&chapter=18

FBI PROTECTED MATERIAL REDACTED

3.2.6..2.  (i) Adopting regulations prohibiting the opening of accounts the holders or beneficiaries of which are unidentified or unidentifiable, and measures to ensure that such institutions verify the identity of the real owners of such transactions;

3.2.6..3.  (ii) With respect to the identification of legal entities, requiring financial institutions, when necessary, to take measures to verify the legal existence and the structure of the customer by obtaining, either from a public register or from the customer or both, proof of incorporation, including information concerning the customer's name, legal form, address, directors and provisions regarding the power to bind the entity;

3.2.6..4.  (iii) Adopting regulations imposing on financial institutions the obligation to report promptly to the competent authorities all complex, unusual large transactions and unusual patterns of transactions, which have no apparent economic of obviously lawful purpose . . .

3.2.6..5.  2(b) Feasible measures to detect or monitor the physical cross-border transportation of cash and bearer negotiable instruments. . .[49]

3.3.    Forty-five UN member states signed the Terrorist Finance Convention during the first eighteen months after it was opened for signature, prior to the 9/11 attacks. These included a number of EU countries, such as Denmark, France, Germany, Italy, the Netherlands and Spain, whose financial institutions were in the Eurozone; the United Kingdom, and the United States, representing the three most commonly used currencies in the world for international banking, and they included Switzerland, whose currency, the Swiss Franc, depends on universal acceptance by international financial institutions. They also included countries that had significant terrorist incidents prior to 9/11, such as Chile, Comoros, Costa Rica, Greece, Egypt, India, Israel, Russia, and Sri Lanka.[50]

3.4.    The UN was not the only international body to address the need for banks to be alert to, and prevent, their use for terrorist finance. In 1996, the world's premier standard setting body for bank regulators, the Basel Committee, expressly addressed this issue, stating that banking regulators throughout the world, and the governments of the member states in which they were headquartered, needed to have in place effective measures to prevent the use of banks to facilitate terrorism and to report cases involving serious crimes (expressly including terrorism), to law enforcement agencies.[51]

---

[49] Terrorist Finance Convention, id
[50] "International Convention for the Suppression of the Financing of Terrorism," December 9, 1999 https://treaties.un.org/Pages/ViewDetails.aspx?src=IND&mtdsg_no=XVIII-11&chapter=18
[51] "The Supervision of Cross-Border Banking." Report by a working group comprised of members of the Basle [sic] Committee on Banking Supervision and the Offshore Group of Banking Supervisors," Basel Committee, Basle [sic], October 1996, p. 14, https://www.bis.org/publ/bcbs27.pdf. The Basel Committee referred to terrorism as an example of serious crime, and unlike the UN did not expressly address the risks of charities as a subset of the need to combat terrorist finance.

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

3.5.    Major international media attention described the magnitude of the problem of charities being used to finance terrorism prior to the 9/11 attacks, highlighting the factual basis for why banks shoud be concerned about the phenomenon as an area of risk. For example, some eighteen months prior to the 9/11 attacks, the New York Times published an article stating that the United States had developed a list of more than 30 charities and relief groups that U.S. government agencies were examining for links to terrorism, including at least two headquartered in the United States. The article specified that charities and relief groups had been linked to a recent plot to bomb historic and tourist sites in Jordan, the 1993 bombing of the World Trade Center, terrorist attacks in Egypt against tourists and government officials, as well as to lethal attacks on U.S. embassies in Kenya and Tanzania in 1998. The article named the two U.S. charities as the Holy Land Foundation and the Global Relief Foundation.[52] Both of these charities later were subject to U.S. sanctions for having financed terrorism after the 9/11 attacks.[53]

3.6.    The status of the express adoption to apply global countering terrorist finance standards to domestic banks was noted by the State Department in its annual International Narcotics Control Strategy Report issued on March 1, 2001, discussing the obligations countries had under the Terrorist Finance Convention. This State Department report also described the implications of the commingling of funds for terrorism and for humanitarian purposes as making terrorist finance more difficut for governments to investigate, stating: "Hizballah, HAMAS, Bin Ladin's al-Qa'ida, and others also need funds for media campaigns, to buy political influence, and even to undertake social projects--largely with the aim of maintaining membership and attracting sympathetic supporters. Indeed, for many terrorist groups, the planning and execution of violent attacks probably comprise a small part of their total budget. It is much more difficult to investigate the financial dealings of a terrorist organization if most of its funds are earmarked for legitimate political, social, and humanitarian activities."[54]

3.7.    Given the terrorist finance concerns expressed in the UN resolutions and reflected in the UN Terrorist Finance Convention, as well as the work of the Basel Committee, and the kind of press coverage described above prior to the 9/11 attacks, any bank operating internationally, that is, having correspondent banking accounts with money center banks to enable transactions in major international currencies such as the U.S. dollar, the Euro, and the British pound, needed to be aware of the risks of terrorist finance through charities.[55] Any bank found to have facilitated terrorist finance faced significant

---

[52] "Some Charities Suspected of Terrorist Role," New York Times, February 19, 2000, https://www.nytimes.com/2000/02/19/world/some-charities-suspected-of-terrorist-role.html
[53] "Shutting Down the Terrorist Financial Network December 4, 2001," designating the Holy Land Foundation as a terrorist financier and subjecting it to sanctions, U.S. Department of the Treasury, December 4, 2001, https://home.treasury.gov/news/press-releases/po841 and "Treasury Department Statement Regarding the Designation of the Global Relief Foundation," October 18, 2002, https://home.treasury.gov/news/press-releases/po3553
[54] INCSR 2000, U.S. Department of State, overview, describing terrorist finance under national laws in Azerbaijan, Cyprus, Egypt, Gibraltar, Guernsey, Ireland, Isle of Man, Hersey, Paraguay, Peru, Spain, St. Kitts, Turkey, and the United States https://2009-2017.state.gov/j/inl/rls/nrcrpt/2000/959.htm
[55] I further address press coverage of the phenomenon in my response to Question 2, about instances in which purported charities were implicated in money laundering and/or terrorist finance prior to 9/11.

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

reputational, legal and regulatory risks for failing to meet the requirements of its own domestic laws, the risk of potential civil liability, and the potential of having their ability to do business curtailed in major currencies, should major financial center banks providing them correspondent banking services find them to be associated with terrorist finance, and to have inadequate controls in place.

3.7.1.    By way of example, the defendant in this case, ARB, faced the threat of being sanctioned by the United States for financing terrorist groups, including al Qaeda, as reflected in a CIA report produced to facilitate U.S. decision making on that issue.[56] While the U.S. government ultimately did not choose to take this action, the CIA report and other documents that I discuss later in this Expert Report make clear that the U.S. was considering doing this as an option to respond to the threat perceived from ARB's acting as a "Conduit for Terrorist Finance."

3.7.2.    ARB eventually lost one or more correspondent banking relationships with major international western banks which were terminated due to concerns about its lack of controls, first by HSBC and then, according to media reports, by JPMorgan Chase. In the case of HSBC, the terminations explicitly were related to concerns about Al Rajhi Bank's involvement with charities alleged to have engaged in terrorist finance.[57]

3.7.3.    While these terminations took place years after the 9/11 attacks, they provide examples of the risks for any international bank pre-9/11 which failed to meet its anti-money laundering and terrorist finance obligations, including those relating to charities.

3.8.    Paying attention to the risk of terrorist finance through charities was not merely a topic of concern for banks and other financial institutions prior to 9/11. As discussed in greater detail in my response to Question 2, international banks, that is, banks engaging in activities in more than one country, were obligated not to handle funds relating to all serious crimes, including terrorism, as of 1996. This pre-9/11 obligation was reflected in

---

[56] CIA_SUB_0001-0005.

[57] The chronology relating to HSBC's terminations in 2005 and 2010 of its relationship with Al Rajhi bank is set forth in detail in "U.S. Vulnerabilities to Money Laundering, Drugs, and Terrorist Financing: HSBC Case History," Majority and Minority Staff Report, Permanent Subcommittee on Investigations, U.S. Senate, July 17, 2912, https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/PSI%20REPORT-HSBC%20CASE%20HISTORY%20(9.6).pdf  The Senate Committee's detailing of links between Al Rajhi bank to terrorist-linked charities and charitable contributions are set forth at pp. 194-202. Bloomberg, reported the apparent closure of JP Morgan Chase bank's relationship with Al Rajhi bank after the U.S. bank found Al Rajhi could not provide essential information on the sources of funds it was transmitting through JP Morgan's dollar clearing operations as of 2013, "JPMorgan Said Cut Tie to Saudi Bank Amid Focus on Control," February 19, 2014, https://www.bloomberg.com/news/articles/2014-02-19/jpmorgan-said-cut-tie-to-saudi-bank-amid-focus-on-control#xj4y7vzkg. Evidence in this matter shows that Chase Manhattan, a bank that was merged into JP Morgan Chase in 2000, maintained a Payable Through Account in New York prior to the 9/11 attacks, whose use was linked to a person who had previously provided support for two of the 9/11 terrorist hijackers. I discuss this evidence in my response to Question 8. See "History of JPMorgan Chase & Co," p. 19, available at https://web.archive.org/web/20110927133631/http://www.jpmorganchase.com/corporate/About-JPMC/document/shorthistory.pdf

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

both international standards, and in domestic laws and regulations governing banks, including banks based in Saudi Arabia.

4. **Question 2:** *Were there incidents in which purported charities were implicated in money laundering for criminal activities, including the financing of terrorism and/or specific attacks, before September 11, 2001?*

4.1.    Yes. There were incidents in which purported charities were implicated in criminal activity and/or terrorist finance years before the 9/11 attacks, and taking place in many different countries. These included, for example, the attacks on the United States, at its Embassies in Nariboi, Kenya and Dar es Salaam, Tanzania, on August 8, 1998, which killed more than 200 people,[58] discussed further below. There were also pre-9/11 allegations of charities being linked to the first attack on the World Trade Center in New York on February 26, 1993.[59] These incidents also included purported charities providing support to terrorist activity in such countries as Afghanistan, Albania, Bosnia, Chechnya, Ireland, India, Israel, Kenya, Kosovo, the Philippines, Tanzania, and Uganda, as I detail later in this section of this Expert Report.

4.2.    The use of charities to fund terrorism was studied extensively by the Central Intelligence Agency during the 1990's. The CIA's Counterterrorist Center issued a 16-page finished Intelligence Report on April 9, 1999, which provided considerable detail on the phenomenon, especially as it related to countries in which: 1) Muslims were in conflict

---

[58] For the Embassy attack, see contemporaneous media accounts such as the reporting of the Voice of America "Nairobi Bomb Investigation," VOA, August 22, 1998, at https://irp.fas.org/news/1998/08/980822-bomb.htm and "Assault on a U.S. Embassy, a Plot Both Wide and Deep," Washington Post, November 23, 1998, https://www.washingtonpost.com/archive/politics/1998/11/23/assault-on-a-us-embassy-a-plot-both-wide-and-deep/ddf5cb00-15e9-4dfa-9cd7-41fb2b592cb5/. See also the pre-9/11 indictment, and conviction of Wadih al Hage, who at the time of the Embassy attack was a director of a local charity, "Help Africa People," which was used by Hage and others involved in the attacks on the Embassies who worked for bin Ladin. *U.S. v. Bin Ladin*, May 8, 2000, https://www.nonproliferation.org/wp-content/uploads/2016/05/us_indictment_against_bin_laden.pdf. For a profile highlighting El Hage's activities in Kenya, including his involvement with charities, see Frontline's A Portrait of Wadih El Hage, Accused Terrorist, published January 31, 2001, and last updated September 12, 2001, https://www.pbs.org/wgbh/pages/frontline/shows/binladen/upclose/elhage.html

[59] "Some Charities Suspected of Terrorist Role; U.S. Officials See Muslim Groups Linked to bin Laden and Others," Judy Miller, New York Times (February 19, 2000), https://archive.nytimes.com/www.nytimes.com/library/world/global/021900terror-charity.html The article's lead was clear on the involvement of charities in providing funds for bin Laden's terrorist activities directed at the United States: "Government officials investigating a decade of international terrorist attacks say they have found a common thread, Islamic charities and relief organizations that they suspect are being used to move men, money and weapons across borders. American officials said Osama bin Laden, the Saudi exile charged with masterminding the 1998 bombings of American Embassies in East Africa, relied on at least nine of the groups in his recent operations. Other charities and relief groups, the Americans said, have been linked to a recent plot to bomb historic and tourist sites in Jordan, the 1993 bombing of the World Trade Center and terrorist attacks in Egypt against tourists and Government officials." Apart from any foreign funds, a Brooklyn-based Islamic charity also provided support for the 1993 bombing through money coming from the Alkifah Refugee Center in Brooklyn. (For a copy of one of the checks involved see https://www.investigativeproject.org/documents/14-al-kifah-check-to-islamic-association-for.gif and "The New Face of Terrorism," New York Times, January 4, 2000, https://www.nytimes.com/2000/01/04/opinion/the-new-face-of-terrorism.html As stated in the article, "[f]or instance, the World Trade Center bombing was financed through money coming from the Alkifah Refugee Center in Brooklyn. And the system of funneling money through charities has improved greatly since then."

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

with or opposed to non-Muslim governments, such as in Afghanistan, Azerbaijan, Bosnia, Chechnya, Israel; (2) sought to change local governments which they viewed to be insufficiently fundamentalist, such as in Algeria, Egypt, Indonesia, the Philippines; or (3) sought to attack U.S. and other western interests, such as in Kenya, Somalia, Sudan, Tanzania, and the United States. The April 9, 1999 CIA report contained many important insights into how the NGOS were implicated in terrorism, which accord with key assessments I have reached over the course of my career working in terrorist financing, and accordingly I will quote pertinent excerpts from the report at some length:

4.2.1.  "Many Islamic terrorist and extremist groups – including all of the nine Islamic groups that the US State Department officially has designated as terrorist organizations—rely on nongovernmental organizations (NGOs) for funding, and their exploitation of these organizations is likely to grow."

- "NGOs also provide an easily exploitable international network for logistics support, which for many terrorists is more valuable than the funds they may receive through NGOs."

4.2.2.  "Although there are more than 6,000 Islamic NGOs and charities, only a few dozen support terrorists. Those that do generally fall into three basic categories:"

- "Large, internationally active organizations headquartered in the Persian Gulf countries, which provide official support to the NGOs. These organizations are most often exploited by individual employees sympathetic to terrorist causes without the knowledge of the organization's leaderships. The illict activity tends to take place at local branch offices rather than at headquarters locations."

- "Private NGOs, some of which are headquartered outside the traditional Muslim world. Several offices of these NGOs exist solely to support a militant cause, such as the Afgan or Bosnian murjahedin, making them somewhat more susceptible to extremist penetration."

- "NGOs closely affiliated with a state sponsor of terrorism and operating as a foreign policy or intelligence tool of the state. State ties to NGOs are often well known, leading some state sponsors to penetrate smaller, locally run NGOs to avoid detection."

4.2.3.  "The availability of funds, cover, and logistics networks makes NGOs an appealing resource for terrorist groups. NGOs typically are awash in money – the Muslim World League's budget is more than $26 million annually, and the annual budget of the International Relief Organization [comment: from the context, I understand this to mean the IIRO] has never dipped below $50 million – and tapping into the funds offers terrorists some independence from traditional state sponsors, who often attempt to control such groups for their own purposes. The logistical support NGOs offer includes cover employment, false documentation,

29

**FBI PROTECTED MATERIAL REDACTED**

travel facilitation, training, and in some cases, weapons. Most Islamic terrorist groups maintain relationships with several NGOs, which protects them from the closure of any one organization. Terrorists typically penetrate NGOs by finding individual sympathizers who divert resources in support of the group, but in a few instances, entire NGO offices including senior management positions, are staffed by extremists. The use of legitimate NGOs has proven so successful that some terrorist groups and the state sponsors of terrorism have created their own NGOs to hide their terrorist activities."

4.2.4. "Most efforts by Persian Gulf states to curb terrorist use of NGOs by restricting the collection of funds within their borders have been ineffective, largely because the steps taken do not address the diverse of resources at the branch offices. . ." [60]

4.3. The April 9, 1999 report stated that the NGOs principally had a "double agenda" of providing humanitarian relief to need Muslims, but also to "spread the Islamic faith as they interpret it." Of importance to answering this question, the CIA report further stated "Islamic NGOs also consider the defense of Muslims involve in armed conflicts part of their 'humanitarian' duties – explaining why many Islamic NGOs provided support, including weapons, to the Afghan and Bosnian mujahedin forces in the 1980s and 1990s, respectively."[61]

4.4. The April 9, 1999 report discussed how the IIRO and other MWL affiliates had "provided terrorists with funding and cover employment, documentation, and training, according to [redacted] press reporting.[62] It also differentiated Saudi state-sponsored charities implicated in the support of terrorism from "private organizations—some also are headquartered in the Persian Gulf countries—that either have opened offices in areas of military conflict involving Muslims or have grown out of such conflicts." It specifically listed the Pakistan-based Maktab al-Khidamat ("MAK"), co-founded by bin Laden, as the premier example of this type of NGO, and noted other charities of this type operating in Bosnia and other Balkan countries, as well as in Pakistan.[63]

4.5. The CIA Intelligence Report described the Islamic NGOs as providing "a dependable, and seemingly endless, resource base" for terrorist groups such as al Qaeda.[64] It described

---

[60] "Islamic Terrorists: Using Nongovernmental Organizations Extensively, Intelligence Report, DCI Counterterrorist Center, April 9, 1999, CIA_000210-211

[61] Id, CIA_000213

[62] Id

[63] Id, CIA_000214. I note that later CIA assessments, including its joint Assessment of Saudi Arabian support to Terrorism and the Counterintelligence Threat to the United States, issued December 2004, EO 14040 003414-003442, revised these earlier judgments to determine that there was "evidence that official Saudi entities, chiefly the Ministry of Islamic Affairs and associated nongovernmental organizations (NGOs), provide financial and logistical support to individuals in the United States and around the world, some of whom are associated with terrorism-related activity." EO 14040-003416, The joint assessment further found that "the Saudi Government and many of its agencies have been infiltrated and exploited by individuals associated with or sympathetic to al Qa-ida," Id. Finally, it revealed that there was an active FBI investigation of the IIRO's U.S. affiliate, the Success Foundation, which "appear to be connected to a number of individuals and organizations associated with subjects of al-Qa'ida investigations." EO 14040-003438

[64] Id, CIA_000215

links between the Egyptian terrorist group al-Gama'at al-Islamiyya and Islamic NGOs providing support, but redactions in the document limit any further information regarding the details of that support. The CIA report described incidents in which MAK provided safehaven to World Trade Center bomber Ramzi Yousef, in addition to bin Laden's brother-in-law, Muhammad Jamal Khalifah, providing Yousef and his co-conspirators funding and logistics support as they were plotting to blow up the 12 US airlines in East Asia.[65] Other incidents described in the CIA report, and familiar to me as a result of my career working in counterterrorism and terrorism financing, include:

4.5.1. Bin Laden using relationships with employees in several Al-Haramain offices to divert resources to support his terrorist agenda.

4.5.2. The exploitation by terrorists of the UN High Commission for Refugees (UNHCR) accrediting Islamic charitable NGOs to travel more freely across borders.

4.5.3. The use of MAK to provide financial and logistics support for the Egyptian terrorist group Al-Gama'at al-Islamiyya, for Hamas in Israel, and for Algerian extremists.

4.5.4. The use of the NGO Africa Help in Nairobi, Kenya "as a front for al-Qa'ida activities," and its likely use to provide identity documents to al Qaeda members as a cover for their travel between Afghanistan, Sudan, and Somalia in the mid-1990s. Separately the CIA report notes the de-registration of four NGOs following the US Embassy bombings in August 1998 in Nariboi and Dar es Salaam.

4.5.5. The use of the Yemen-based office of Mercy International by its director, described as a "member" of al Qaeda, to provide documents and identity cards to support terrorist operations in Somalia in 1994.

4.5.6. The use of the Azerbaijan office of the Kuwaiti Revival of Islamic Heritage Society to employ associates of bin Laden and provide false documentation to extremists.

4.5.7. The use of Qatari NGOS in the West Bank to funnel money to Hamas.[66]

4.6. Other CIA reporting, set forth in a January 11, 1999 report on bin Ladin and his financial ties, listed the use of the Al-Haramain office in Nariboi as a front for the Al-Ittihad Al-Islami, described by the CIA as a bin Ladin-backed Islamic insurgent group engaged in politically motivated violence in Somalia and Ethiopia.[67]

---

[65] Id, CIA_000216
[66] Id, CIA_000216-224
[67] CIA_000819

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

4.7.    The April 9, 1999 CIA Intelligence Report, like the January 11, 1999 report, generally redacted its sources, except for a references to "press reporting." It cited "press reporting" as part of its sourcing for statements that several MWL affiliate organizations, including the IIRO specifically, provided terrorists with funding and cover employment, documentation, and training.[68] It cited press reporting regarding the use of the MAK to facilitate the travel and training of Arab volunteers to fight with the muhahidin in Afghanisan, and that it providing World Trade Center bomber Yusef with safe haven, and that its US-based office was "a focal point for Yousef and his co-conspirators."[69] It also cited press reporting for the use of MAK to support Al-Gama'at al-Islamiyya, Hamas, and Algerian terrorists.[70] I note this because where there was press reporting, the information was publicly available, and available to any bank undertaking due diligence for a bank in the same way that it was available to the CIA for use as an open source. Open source information of this kind was indeed the principal category of source that was not redacted from the declassified version of this CIA report, and declassified CIA reports generally.

4.8.    There was meaningful public coverage of charities being implicated in terrorism before 9/11, both generically, as reflected in the decisions of the UN to specifically reference it in UN resolutions and actions, and in particular incidents. When I testified before Congress on September 26, 2001, two weeks after the 9/11 attacks, I stated the following about what was publicly known prior to the 9/11 attacks:

4.8.1.    "Before you is a chart displaying a portion of Osama bin Laden's financial network. Every one of the more than 100 boxes on this chart reflects a publicly reported financial link of bin Laden, residing in more than 20 separate countries, in the Americas, Asia, Africa, Europe and the Middle East. Public information demonstrates terrorist funds moving through Islamic charities, travel agents, construction businesses, fisheries, import-export businesses, stock markets, chemical companies, and a number of banks. All of this is public record, and far from complete. There simply isn't room on a single chart to include everything connected to bin Laden and related terrorist groups."

4.8.2.    "[T]he U.S. needs to secure domestic and international action against those entities that have wittingly or unwittingly provided support to terrorism, as the President committed himself to doing in his announcement Monday. These include a number of Islamic charities, some of which are prominent and otherwise do many good works. We will need to work with other governments, including many in the Middle East, to cleanse charities that have supported terrorism unwittingly and to protect them from abuses by terrorists. Other charities, who have systematically supported terrorism, should be closed down, with their assets

---

[68] Id, CIA_000213, CIA_000216
[69] Id, CIA_000214
[70] Id, CIA_000219

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

seized and made available to assist terrorism's victims."[71]

4.9.    The information I relied on when I testified before the U.S. Senate in the immediate aftermath of the 9/11 attacks was not classified information from the CIA. It was information that was publicly available to anyone (such as me), who was paying attention to widely disseminated public information. And as reflected in the CIA reports I have quoted from above, the information that was publicly known and what the CIA had from its intelligence sources were well-aligned.

4.10.    Publicly-reported incidents in which purported charities were implicated in criminal activity or terrorist finance before the 9/11 attacks included:

4.10.1. *Afghanistan.* During the 1990's, Maktab al-Khidamat ("MAK"), a Pakistani-based non-profit, organized charitable activities directed at the Afghan resistance to the Soviet invasion of Afaghanistan. In so doing, it also organized other charities undertaking this work, which included training and arming fighters. The MAK was ostensibly a charity, but in practice, was providing support to a pan-Islamic war effort against the Soviets which bin LadIn then turned into an agenda of terrorism targeting the United States, and sometimes other countries, under al Qaeda.[72] Prior to the 9/11 attacks, reporting by a prominent human rights organization also referred generally to the problem of charities being used to provide arms to fighters in Afghanistan, who in turn would abuse human rights.[73] In its annual report, Patterns of Global Terrorism, the State Department referred in April 2000 to bin Ladin's and al Qaeda's siphoning off of funds from unspecified

---

[71] Testimony of Jonathan M. Winer, Hearing on the Administration's National Money Laundering Strategy for 2001, Senate Banking Committee, September 26, 2001, available at:
https://irp.fas.org/congress/2001_hr/092601_winer.html
[72] "Newsmaker Bio : Osama bin Laden," August 22, 1998, ABC News,
https://abcnews.go.com/International/story?id=82412&page=1. Immediately after 9/11, MAK was designated for global sanctions by the UN. The organization was listed on October 6, 2001 for "participating in the financing, planning, facilitating, preparing or perpetrating of acts or activities by, in conjunction with, under the name of, on behalf or in support of", "supplying, selling or transferring arms and related materiel to" or "otherwise supporting acts or activities of" Al-Qaida  and Usama bin Laden. The UN described its role as follows: "Makhtab al-Khidamat, also known as the Afghan Service Bureau, is the pre-cursor organization to Al-Qaida (QDe.004) and provided the basis for its infrastructure. It was created in the 1980s by Abdullah Azzam (deceased) and Usama bin Laden (deceased) to establish guest houses near the Afghan border and paramilitary camps to prepare militants for the Afghan conflict. Makhtab al-Khidamat helped channel fighters and money to Afghanistan, and established offices worldwide under the alias Al Kifah. Disagreements between Azzam and Bin Laden in the late 1980s resulted in the creation of Al-Qaida by Bin Laden. After Azzam was killed in 1989, Bin Laden continued to utilize Makhtab al-Khidamat and the Al Kifah branches before absorbing them into Al-Qaida." Notably, the UN also lists other sanctioned Islamic charities as linked to it, including "The Rabita Trust," listed on October 17, 2001; The Global Relief Foundation, listed on October 12 2002, the Al-Haramain Foundation (Pakistan), listed on January 26, 2004, and the Al-Haramain: Afghanistan Branch, listed July 6, 2004.
https://www.un.org/securitycouncil/sanctions/1267/aq_sanctions_list/summaries/entity/makhtab-al-khidamat
[73] "Following the reported cut-off of official Saudi assistance in 1998, significant funds continued to flow to the Taliban from private Saudi sources. Some of this money has been raised by Saudi individuals dedicated to the Taliban cause; much of the rest comes in the form of charitable activity, some of which may be allocated to military purposes. "Crisis of Impunity: The Role of Pakistan, Russia, and Iran in Fueling the Civil War in Afghanistan," Human Rights Watch, July 1, 2001, https://www.hrw.org/report/2001/07/01/crisis-impunity-role-pakistan-russia-and-iran-fueling-civil-war-afghanistan#P482_139627

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

charities to support its terrorist activities in Afghanistan and elsewhere.[74]

4.10.2. *Albania.* In mid-August 1998 it was publicly reported the U.S. had temporarily closed its Embassy in Tirana, Albania, due to a concerns raised by anti-U.S. declarations by Islamic extremists and by press reports of a CIA role in the arrest and extradition to Egypt of four suspected radicals. The U.S. reporting on the closure stated that Albania's largest newspaper, Koha Jone, said the country, Europe's poorest nation, had become a fertile ground for Islamic extremists taking advantage of easy access and lax law enforcement, to carry out criminal activity, including arms trafficking and money laundering "[u]nder the guise of religion, or as charitable humanitarian associations [to] engage in criminal economic activities to make money to finance their organizations operating in other states." The reporting quoted Albanian authorities as stating Egyptians it had deported were connected with a charitable organization, the Islamic Revival Foundation, whose apartment contained stamps to produce fake documents and a loaded Kalashnikov.[75] Other reporting, in the Washington Post in late August 1998, described a broader pattern in Albania involving Islamic charities being tied to terrorism. According to the Post, Albanian officials found "terrorists used Islamic charitable foundations in Albania 'to cover their secret activities . . . [and]relations and links with other Islamic organizations outside Albania," and that members of these organizations 'facilitated people coming from the Middle East' who went on to plan or commit terrorist acts elsewhere."[76]

4.10.3. *Bosnia.* As of 1996, contemporaneous reports found that hundreds of millions in dollars in weapons had been funnelled into Bosnia by Islamic charities. One such charitable organization, the Third World Relief Agency, publicly supported a chicken farm, a women's sewing factory, and a news agency, while covertly smuggling in massive shipments of arms for fighters, as found by European police and German investigators, in violation of the UN arms embargo. Notably, according to the public reporting, the funds were tied to the activities of bin Ladin in Bosnia, and those involved were also in contact with one of the central figures in the 1st World Trade Center bombing in 1993.[77]

---

[74] "Patterns of Global Terrorism, 1999, " issued April 2000, U.S. Department of State, p. 113,  https://1997-2001.state.gov/global/terrorism/1999report/patterns.pdf

[75] "U.S. Closes Embassy In Albania," Chicago Tribune, August 15, 1998, https://www.chicagotribune.com/news/ct-xpm-1998-08-15-9808150097-story.html

[76] "Albania Expands Crackdown On Arabs," Washington Post, Augustu 29, 1998, https://www.washingtonpost.com/archive/politics/1998/08/29/albania-expands-crackdown-on-arabs/da907bf6-a693-4f63-b379-3b375ef88a90/ Separately, there was press reporting in November 1998 that bin Ladin ran a terrorist network in Albania which carried out operations in Kosovo. According to the reporting, the then-head of the Albanian secret service stated then that the network was run by bin Ladin as a staging area to send fighters to Kosovo. The reporting stated that bin Ladin personally visited Albania between 1996 and 1997. See "Written Question to the Commission," E-3308/01, by Konstantinos Hatzidakis (PPE-DE), November 28, 2001, citing specific pubic reporting in the 1998 period regarding al Qaeda activities in Albania at that time.  https://eur-lex.europa.eu/legal-content/EN/TXT/HTML/?uri=CELEX%3A92001E003308

[77] "How Bosnia's Muslims Dodged Arms Embargo," Washington Post, September 22, 1996, https://www.washingtonpost.com/archive/politics/1996/09/22/how-bosnias-muslims-dodged-arms-

**FBI PROTECTED MATERIAL REDACTED**

4.10.4. *Chechnya.* By the late 1990s, there was recurrent reporting that bin Ladin was providing financial support to Chechen terrorists, in connection with the Chechen resistance movement against Russia, in both media reports and by the U.S. Department of State in its annual reports on global terrorism.[78] It was later found that a principal mechanism for funding the Chechens with arms was the Saudi charity, Al-Haramain, which the Russians stated wired $1 million to Chechen rebels in 1999 and arranged to help them buy 500 heavy weapons from the Taliban.[79] The CIA found that Bin Ladin used the IIRO office in Baku, Azerbaijan to obtain travel documents for Islamic fighters ("mujahedin") to fight in Chechnya.[80]

4.10.5. *Ireland/UK.* During the 1990's, an Irish charity, Noraid, was recurrently implicated in providing financial support to the Irish Republican Army, which was then engaged in a series of terrorist bombings and other military activity directed at the British government, including attacks on civilians.[81] While

---

embargo/b2d78043-3e34-46d9-babc-c4c335236aeb/ "European police backed by anti-terrorist squads raided the office here of a seemingly obscure organization, the Third World Relief Agency, headed by a one-time Sudanese diplomat named Elfatih Hassanein. Since then, poring over several van loads of documents, they have pieced together one of the untold stories of the Bosnian war: how Bosnia's Muslim-led government evaded a United Nations arms embargo and purchased hundreds of millions of dollars worth of black-market weapons. In the documents and in the bank accounts of the Third World Relief Agency, Austrian investigators have tracked $350 million they say flowed from Muslim governments and radical Islamic movements to Bosnia. At least half was used to purchase weapons illegally and smuggle them to the Bosnian government army, according to Western intelligence estimates. . . . militants in the terrorist underworld are also believed to have used the relief agency to get money to the Bosnian government, including the wealthy Saudi Arabian emigre Osama Binladen, a suspected sponsor of militant Islamic groups around the Middle East. Binladen, a resident of Sudan until last year, is reportedly now in Afghanistan, where he has issued statements calling for attacks on U.S. forces in the Persian Gulf. Investigators say the agency also had ties to Sheik Omar Abdel Rahman, a radical Egyptian cleric who was convicted of planning several terrorist bombings in New York and is linked to the group that carried out the World Trade Center bombing in February 1993." As previously mentioned, the audit undertaken by German investigators who reviewed TWRA records found contributions from SAAR and his brothers to TWRA, as well as evidence that the charity was actively involved in procuring weapons to be used by the Muslim side in the Bosnian conflict. This example captures how unrestricted "charitable" giving from Gulf State donors could be rapidly transformed into military support for armed conflict.
[78] Patterns of Global Terrorism, U.S. Department of State, January 15, 1998; https://1997-2001.state.gov/global/terrorism/1998Report/sponsor.html; "Chaos in the Caucasus," October 7, 1999, https://www.economist.com/special/1999/10/07/chaos-in-the-caucasus; "Export of holy terror to Chechnya from Pakistan and Afghanistan," Vinod Anand, Strategic Analysis, 24:3, 539-551, June 2000, https://www.tandfonline.com/doi/abs/10.1080/09700160008455231, noting the presence of al Qaeda in Chechnya and the funding of Chechen extremism coming from "public collections and donations and contributions from Arab countries.
[79] "How Jihad Made Its Way to Chechnya," Washington Post, April 25, 2003, https://www.washingtonpost.com/archive/politics/2003/04/26/how-jihad-made-its-way-to-chechnya/5b941796-ed50-4f65-9a2b-18a90155e571/. The article cited a memo quoting reported messages exchanged between Arab commanders in Chechnya and Al-Haramain's director in Saudi Arabia. "Today, Al-Haramain has $50 million for the needs of the mujaheddin," one message from the charity read." As discussed later in this Expert Report, the U.S. branch of Al-Haramain was also alleged to have raised funds for and provided them to Chechen militants.
[80] CIA_00818
[81] "IRA Thrives On Income From Rackets, Investigators Say," New York Times, February 12, 1994, https://www.washingtonpost.com/archive/politics/1994/02/12/ira-thrives-on-income-from-rackets-investigators-say/01900ed9-f6b5-4463-aba9-b720cd25c976/; "Irish Nationalism Effort Hurt by Split Into Factions in American Camp : Northern Ireland: The hijacking of the NORAID office last July reduced the flow of dollars to Ireland and

FBI PROTECTED MATERIAL REDACTED

terrorism by groups seeking to end UK sovereignty over Northern Ireland is an entirely separate political cause from the other examples set forth in this section, the Northern Island case provides a good example of a purported charity financing terrorism outside the context of Islamic extremism.

4.10.6. *India.* There was an attempted attack on two U.S. diplomatic missions in India on January 7, 1999 by a man carrying four pounds of explosives who was reported to have told Indian police that he intended to blow up the U.S. consulates in Calcutta and Madras and was working for the IIRO.[82] Separately, prior to 9/11, the intelligence service of Pakistan, ISI, was reported to be using charitable "fronts," largely funded with donations from Saudi Arabia, to finance armed insurgency in Kashmir, according to a RAND study.[83]

4.10.7. *Israel.* Prior to 9/11, there was regular reporting of charities funding terrorist bombings and other military activities by Hamas against Israeli civilians by governments and the media. These included specific references in Patterns of Global Terrorism published annually by the U.S. Department of State to a pattern of support by charities for terrorism, and recurring articles in the major media as of the mid-1990's.[84]

4.10.8. *Kenya*. After the August 8, 1998 attack organized by al Qaeda against the U.S. Embassy in Kenya, which killed 213 people, local authorities in Kenya, as well as U.S authorities, recognized apparent involvement of local charities in supporting this terrorist attack, and this information became public prior to the 9/11 attacks, as reflected in a lengthy New York Times account published on January 9, 1999.[85] As described online on a website maintained by the Public Broadcasting

---

raised doubts that the cause could ever win much support in the United States," Associated Press, February 11, 1990. https://www.latimes.com/archives/la-xpm-1990-02-11-mn-895-story.html, "FBI Claims Odd Trio of Brink's Suspects Stole Millions to Aid IRA," November 14, 1993, https://www.latimes.com/archives/la-xpm-1993-11-14-mn-56960-story.html;  "For Irish, a Mix of Pride and Discomfort Over the I.R.A.," New York Times, March 13, 1996, https://www.nytimes.com/1996/03/13/nyregion/for-irish-a-mix-of-pride-and-discomfort-over-the-ira.html
[82] "Attacks on U.S. Mission Foiled, Indian Police Say," Los Angeles Times, January 21, 1999, Page A4, https://www.latimes.com/archives/la-xpm-1999-jan-21-mn-178-story.html
[83] "Pakistan's Role in the Kashmir Insurgency," RAND, published by Jane's, September 1, 2001. https://www.rand.org/blog/2001/09/pakistans-role-in-the-kashmir-insurgency.html
[84] "Patterns of Global Terrorism, 1997," U.S. Department of State, which noted that in a year featuring multiple horrific terrorist suicide bombings in public places in Tel Aviv and Jerusalem, the Palestinian Authority closed down 17 Hamas social and charitable institutions that were alleged to have channeled money to the group's terrorist wing. https://1997-2001.state.gov/global/terrorism/1997Report/mideast.html  See *e.g.* "U.S. Probing Chicago Connection To Hamas," Chicago Tribune, November 16, 1994  https://www.chicagotribune.com/news/ct-xpm-1994-11-16-9411170294-story.html and "Bread or Bullets: Money for Hamas - A special report.; U.S. Muslims Say Their Aid Pays for Charity, Not Terror," New York Times, August 16, 1995, https://www.nytimes.com/1995/08/16/us/bread-bullets-money-for-hamas-special-report-us-muslims-say-their-aid-pays-for.html;
[85]"Before Bombings, Omens and Fears," New York Times,. January 9, 1999, https://archive.nytimes.com/www.nytimes.com/library/world/africa/010999africa-bomb.html  Notably, the article describes in some detail how the CIA sent a counter-terrorism team to Kenya to meet with persons working for Al-Haramain who had been arrested by the Government of Kenya due to their alleged ties to terrorism before the bombing, and described the CIA's mistakes in not following up adequately on the allegations of involvement by the Al-Haramain personnel.

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

System news magazine, Frontline, the FBI described the involvement of charities in supporting the attack as follows: "Sometime in 1993 to early 1994, individuals associated with al-Qaeda, a terrorist organization founded by Usama Bin Ladin and Muhammed Atef, began to locate to Kenya, primarily to the Nairobi and Mombasa areas. Some were "mujahedin" or "holy warriors" who, like Usama Bin Ladin himself, had fought against the former Soviet Union after the Soviet invasion of Afghanistan in 1979... One commonality amongst the above individuals is the fact that at one time or another, all were associated with Kenya based non-governmental organizations (NGO's), organizations ostensibly created for the purposes of humanitarian relief and aid work. A chapter of one NGO, Help Africa People, allegedly founded in Germany, was established in Nairobi by El-Hage. At one time, Help Africa employed [bin Ladin associate] Harun. Odeh [another bin Ladin associate] was given an identity card for Help Africa People to show his wife and her family as an indication of his employment. Aside from their NGO work, many of these individuals, who the FBI believes may be part of the original core group of the Usama Bin Ladin cell in East Africa, also set up other businesses; commercial fishing and clothing companies were common to many of them. To the casual observer, these individuals would have appeared to live ordinary lives."[86] Eventually, it was established that Al-Harimain had deep involvement in the bombings of the U.S. Embassies, with the result multiple branches of the charity became subject to sanctions by the UN.[87] One of the participants in the al Qaeda Kenya bombing terrorist attack, Ali Mohammed, pled guilty on October 20, 2000, and explained explicitly how Al Qaeda also used a local charity to provide al Qaeda members with identity documents.[88]

---

[86] Declassified Summary, "U.S. Department of Justice Federal Bureau of Investigation," Washington, D.C. 20535 November 18,1998, made available on Frontline website, that includes material created in January 2001, and updated to September 12, 2001, https://www.pbs.org/wgbh/pages/frontline/shows/binladen/bombings/summary.html

[87] The following quotation from the UN Security Council website describes the extensive history of Al-Haramain's Kenyan branch in relation to the Kenyan and Tanzania Embassy attacks. "As early as 1997, the Kenyan branch of AHF [Al-Haramain] was involved in plotting terrorist attacks against Americans. As a result, a number of individuals connected to AHF in Kenya were arrested and later deported by Kenyan authorities.  In August 1997, an AHF employee indicated that the planned attack against the United States Embassy in Nairobi would be a suicide bombing carried out by crashing a vehicle into the gate of the Embassy. A wealthy AHF official outside East Africa had agreed to provide the necessary funds. Also in 1997, AHF senior activists in Nairobi decided to alter their (then) previous plans to bomb the United States Embassy in Nairobi and instead sought to attempt to assassinate United States citizens. During this period, an AHF official indicated that he had obtained five hand grenades and seven "bazookas" from a source in Somalia. These weapons were to be used in a possible assassination attempt against a United States official. Wadih el-Hage, a leader of the Al-Qaida cell in East Africa and personal secretary to Usama bin Laden, visited the Kenya offices of AHF before the 1998 attacks on the United States Embassies in Nairobi and Dar Es Salaam. El-Hage possessed contact information for a senior AHF official who was head of AHF's Africa Committee, the overseeing authority for AHF's offices in Kenya and Tanzania. AHF (Kenya) was deregistered in 1998, following its alleged links with Al-Qaida and the United States embassy bombings in Kenya and Tanzania, which killed over 200 people. However, in 1999, AHF (Kenya) successfully contested deregistration in the courts and resumed operations the following year, in 2000." Al-Haramayn Foundation (Kenya), narrative to explain designation, al Qaeda sanctions, UN Security Council website, https://www.un.org/securitycouncil/sanctions/1267/aq_sanctions_list/summaries/entity/al-haramayn-foundation-%28kenya%29

[88] Court transcript of Guilty Plea, Ali Mohammed, *U.S. v. Ali Mohammed*, S(7) 98 Cr. 1023 (LBS), SDNY, October 20, 2000, available at https://cryptome.org/usa-v-mohamed.htm  According to contemporary press accounts, five charities were closed by Kenyan authorities in the aftermath of the Nairobi terrorist bombing of the U.S. Embassy

**FBI PROTECTED MATERIAL REDACTED**

4.10.9. *Kosovo*. As contemporaneously reported, U.S. forces raided a house in April 2000 rented by a Saudi charity, the Saudi Joint Relief Committee ("SJRC") due to fears of a possible terrorist attack on the US office in the province. At the time, it was reported that U.S. officials believed the charity was linked to bin Ladin, described as "the man suspected of being behind the attacks on the US embassies in Kenya and Tanzania." Those named in the report included Jelaidan, one of Bin Ladin and Al Qaeda's principal terrorist financiers.[89] The reported links of the SJRC to bin Ladin and his associates is notable. The SJRC was formed out of the MWL. MWL accounts held at ARB were used to establish its financing at the outset of the SJRC's activities in Kosovo.[90] Moreover, Jelaidan himself had accounts at ARB.[91]

4.10.10. *The Philippines*. Bin Ladin's brother-in-law, Mohammed Jamal Khalifah, provided support for terrorist groups and activity, including that of World Trade Center bomber Ramzi Yousef. Yousef, a serial terrorist bomber who planned terrorist bombings (and carried several out) targetting Iran, Pakistan, and the Philippines, as well as the United States, was also one of the two masterminds of what became known as Bojinka plot, an effort to blow up as many as ten airplanes simultaneously in a precursor of the 9/11 attacks that was uncovered in early January 1995 by Philippine law enforcement. In the same

due to their suspected involvement in providing support for those involved in the attack: "Five non-governmental organisations (NGOs) considered security risks by the Kenyan Government have been shutdown. The NGO coordinating chief warned that other NGOs were under investigation and would be shut down if compelling evidence to do so surfaced. The five relief organizations were: Help Africa's People, the Al-Haramain Foundation, the International Islamic Relief Organization, the Ibrahim Bin Abdul Aziz al Ibrahim Foundation, and Mercy Relief International. Another sixteen Muslim NGOs have also been asked to stop all activities. (The Monitor, September 10; IRIN Weekly Round Up, September 18), cited by Horn of Africa: The Monthly Review, 09-10/98, University of Pennsylvania, https://www.africa.upenn.edu/Hornet/hoa0998.html

[89] "US fears terrorist attack in Kosovo," April 3, 2000, BBC News, http://news.bbc.co.uk/2/hi/europe/700435.stm. The German report on TWRA describes Julaidan as under UN terrorist sanctions, and identifies his involvement in terrorism as follows: "As part of the analysis six transactions were found in connection with one Wael JELAIDAN. Among them were two transfers to the account of the TWRA with amounts of 3,999,998.55 USD and 1,999,987.75 USD. Also listed were four transfers from the aforementioned account to account number [REDACTED] 1587 of Bank Austria in Vienna to the amount of 7,058,973.20 USD. Mentioned in all four transfers from the account of the TWRA are among other things "Debt repayment Hasan Cengic". In this regard it was established that the person Wa'el Hamza JULAIDAN date of birth 1/22/1958 Al-Madinah/Saudi Arabia Saudi Arabian passport no. A- 992535 can be found under different spellings on international sanction lists issued by the United Nations, the European Union and the United States. . . Wael Hamza JULAIDAN is also on the so-called "Golden Chain List" as a recipient of contributions to Al-Qaeda. This list was found according to the US authorities when actions were taken against the Benevolence International Foundation in Sarajevo in March 2002. According to information from the US, Wael Hamza JELAIDAN is the former general secretary of the organizations "Muslim World League" and the "Rabita Trust" in Pakistan and is supposedly a partner and aid to Bin Laden. In the meantime the assets of JULAIDAN and/or "Rabita Trust" have been frozen according to US information. This is confirmed also by the 9/11/2001 report of the U.S. Congress." "Expert Report Concerning the Area – Financial Investigations - relating to the judicial assistance request, ref. no. INV/10289/T09-PH (245), dated 8/27/2002 of the "Office of the Prosecutor" (OTP) of the International Court of Criminal Justice for the former Yugoslavia relating to the "Third World Relief Agency" (TWRA), Vienna/Austria, MR/GER049972-049973

[90] ARB-00000169

[91] ARB-0001183-1216; ARB-0001191-1192

period, Yousef was also plotting to assassinate the Pope, who was due to visit the Phillipines later that month. He also successfully planted a bomb on a Philippine Airline airplane, which denonated and killed the occupant of the seat where the bomb was planted. At the time of the Philippine bombing plots, Khalifa led the IIRO's offices in the Philippines, where he was reported to be financing another terrorist group specializing in armed attacks, Abu Sayyaf.[92] An April 9, 1999 CIA Intelligence Report, recently declassified under EO 14040, shows that as of that date, the CIA had concluded that Khalifiah "directed the IIRO in the Philippines [and] provided funding and some logistics support to Yousef and his associates in 1995 as they plotted to bomb at least 12 US airlines in East Asia."[93]

4.10.10..1. There was additional public reporting of the use of the IIRO to carry out terrorism in the Philippines by a major, and highly-regarded, Philippines newspaper, the Philippine Daily Inquirer, based on police and military intelligence reports which were cited as stating that the IIRO had been set up in the Philippines for the purpose of being a "front organization for funding terrorist activities . . . working with the Muslim World League, an organization wholly financed by the Saudi Arabia government."[94]

4.10.11. *Tanzania.* A former Tanzanian Al-Haramain director associated with bin Ladin facilitated the August 7 1998 bombings of the United States Embassies in Dar Es Salaam, Tanzania, and Nairobi, Kenya. As stated in the UN's terrorist

---

[92] "Retracing The Steps Of A Terror Suspect," Washington Post, June 5, 1995 https://www.washingtonpost.com/archive/politics/1995/06/05/retracing-the-steps-of-a-terror-suspect/8d0c4e23-19e4-4dc5-80f0-f002029d2d9f/ For more on what was known in the mid-1990's about the relationship between bin Laden, Mohammed Khalifa, Ramzi Yousef and IIRO, see "Blowback," The Atlantic, May 1996, which states: "Muhammad Jamal Khalifa, Bin Laden's brother-in-law and a Saudi financier, was a prime conduit for funding militant Islamic groups in the Philippines, Filipino officials assert; and, according to U.S. investigators, there is evidence that during the mid-1990s, when Khalifa was the head of the Islamic Relief Agency -- a quasi-government Saudi charity -- in the Philippines, he had contact with Ramzi Ahmed Yousef, alleged to be the mastermind of the World Trade Center bombing in New York. https://www.theatlantic.com/magazine/archive/1996/05/blowback/376583/ See also "Bin Laden's Finances Are Moving Target," Washington Post, August 28, 1998, describing Khalifah as running an Islamic charity in the Philippines that was also supported by bin Laden, and implicated in Yousef's efforts to blow up "a dozen jumbo jets." https://www.washingtonpost.com/wp-srv/inatl/longterm/eafricabombing/stories/binladen082898.htm

[93] "Islamic Terrorists: Using Nongovernmental Organizations Extensively," Intelligence Report, DCI Counterterrorist Center, April 9, 1999, CIA_000216.

[94] "Bin Laden Funds Abu Sayyaf Through Muslim Relief Group," Philippine Daily Inquirer," August 9, 2000. The Philippine newspaper cited a military intelligence report as finding that the IIRO was being "utilized by foreign extremists as a pipeline through which funding for the local extremists is being coursed." It quoted a former member of the Abu Sayyaf terrorist group at some length, who stated that the IIRO was being used by Bin Laden and his brother in law, Muhammad Khalifa, to fund the purchases of arms and other logistical requirements of the terrorist group under the guise of providing humanitarian assistance, with the latter received only "10 to 30 percent" of the foreign funding for legitimate relief projects." The former terrorist group member quoted in the article stated that Bin Laden and Khalifa funded a three-month commando training course of recruited Abu Sayyaf members and said that the public filings of IIRO about its humanitarian objectives were, in essence, a coverup for the actual extremists goals of IIRO and Bin Laden in the Philippines, financed by "bank-to-bank" transactions to fund Abu Sayyah through IIRO.

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

designation of Al-Haramain's Tanzania office, "[s]hortly before the attacks in Kenya and Tanzania, a former [Al-Haramain] official in Tanzania met another conspirator and cautioned the individual against disclosing knowledge of preparations for the attacks. Around the same time, four individuals led by an [Al-Haramain] official were arrested in Europe. They admitted maintaining close ties with the Egyptian Islamic Jihad." The UN also noted that the Saudi charity to bin Ladin's "personal secretary," Waid el-Hage, visited the charity's Kenya office prior to the attacks on the U.S. Embassy in Tanzania.[95]

4.10.12.    *Uganda.* On September 25, 1998, the Washington Post reported that U.S. intelligence officers had helped to stop an attempt the previous week by Islamic extremists associated with bin Ladin to bomb the U.S. Embassy in Uganda, allegedly aided by the Tawheed Islamic Association, a Kampala charity, which a source interviewed for the article described as a kind of "holding pen" for would-be terrorists.[96]

4.10.13.    *The United States*. Both the 1993 first World Trade Center Bombing in New York City, and the 1998 bombings of the U.S. Embassies in Nairobi, Kenya and Dar es Salaam, Tanzania, were publicly linked to support from charities. Public reporting also described the alleged involvement of charities in aborted attacks on U.S. facilities and people in Albania, India, and Uganda.[97]

4.11.    *State Department Cables*. The scope of the involvement of charities in supporting Bin Ladin and al Qaeda before 9/11 was broader than the incidents covered by the contemporaneous public reporting on it I have described above. To provide further context on this issue, I reference the contents of a post 9/11 January 28, 2003 State Department cable which largely tracks the information contained in the CIA's August 28, 2002 report "Al-Haramain: Support for Extremists and Terrorists," but which contains additional material on the use of Al-Haramain before 9/11 to help Al Qaeda which is not contained in the declassified report.[98] This material, which based on the style and information contained in the cable I assess to be authentic, includes the following statements which align with my own understandings based on my work and experience on these issues, described as information to be shared with the Government of Saudi

---

[95] Al-Haramayn Foundation Designation, UN Security Council, Sanctions Committee website, https://www.un.org/securitycouncil/sanctions/1267/aq_sanctions_list/summaries/entity/al-haramayn-foundation-%28tanzania%29

[96] "CIA Halted Plot To Bomb U.S. Embassy In Uganda," Washington Post, September 25, 1998, https://www.washingtonpost.com/archive/politics/1998/09/25/cia-halted-plot-to-bomb-us-embassy-in-uganda/8c8fd38b-1c6f-4570-ba14-126601660bf6/

[97] "Nairobi Bomb Investigation," VOA, August 22, 1998, id; "Assault on a U.S. Embassy, a Plot Both Wide and Deep," Washington Post, November 23, 1998, id;  *U.S. v. Bin Ladin*, May 8, 2000, id; "A Portrait of Wadih El Hage, Accused Terrorist, published January 31, 2001, and last updated September 12, 2001, id; "Some Charities Suspected of Terrorist Role; U.S. Officials See Muslim Groups Linked to bin Laden and Others," Judy Miller, New York Times (February 19, 2000),  id; "The New Face of Terrorism," New York Times, January 4, 2000, id.

[98] Cable 03 STATE 23994, "Terrorist Financing – Updated Non Paper on Al-Haramain," January 28, 2003, Secretary of State to Embassy Riyadh, https://wikileaks.wikimee.org/cable/2003/01/03STATE23994.html  see also link at https://wikileaks.org/plusd/cables/03STATE23994_a.html  The original is in all capitals, and the material has been reformatted here for clarity.

**FBI PROTECTED MATERIAL REDACTED**

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

Arabia in total as a Non-Paper[99] for the purpose of securing its help to address the threat posed by Al-Haramain's support for terrorism, and referencing earlier briefings of Saudi officials which took place before 9/11, as follows:

4.11.1. "On several occasions, from August 1998-November 2002, we have provided reports to and/or asked for assistance from the Mubahith related to the activities of Al-Haramain. Several of our reports and inquiries related to the possible involvement of Al-Haramain officials in Al-Qa'ida's bombings of US embassies in East Africa."[100]

4.11.2. "We also have provided leads on several other Al-Haramain officials who have been reported to have ties to Al-Qa'ida, including for example: Information in late 1999 and late 2001 noting how al-Haramain employees in general helped Al-Qa'ida with financial and logistic support and the possibility that some funds were flowing from Al-Haramain through the remittance firm Al-Barakat to Al-Qa'ida's ally, Al-Ittihad Al-Islami (AIAI)."[101]

4.11.3. "*Al-Haramain ties to UBL, EIJ, and Al-Gama'at al-Islamiyyah:* an unspecified branch office of Al-Haramain provided logistical support to the EIJ and UBL associates by diverting both funding and supplies from legitimate NGO activities. Al-Haramain was used as cover for the Bosnia-Herzegovina-based Egyptian terrorist group, Al-Gama'at al-Islamiyyah."[102]

4.11.4. "Al-Haramain may also have been funded directly by Usama bin Ladin. Elements of Al-Haramain were involved in trafficking arms in support of Islamic extremists in Bosnia-Herzegovina."[103]

4.11.5. "*Al-Haramain ties to Somalia's Al-Ittihad al-Iislami (AIAI)*: As of April 1999, an unspecified branch of Al-Haramain had financial links to Kenya-based Al-Ittihad al-Islami (AIAI), a major terrorist group with links to Al-Qa'ida. AIAI has trained an armed militia which has been waging a ruthless campaign for control of the Gedo region in Somalia. An unspecified branch of Al-Haramain supported AIAI in Al Waq, Somalia by sending relief food to AIAI members in AIAI camps."[104]

4.11.6. "*Al-Haramain staffed by UBS Associates and Others with Terrorist Ties*: UBL associates have occupied key positions in Al-Haramain offices overseas. In 1997, Al-Haramain Kenya-branch employees were arrested and expelled for planning a terrorist attack against the United States. Some of this planning occurred within the Al-Haramain Office. Al-Haramain official, Salah A.Q. al-Thibani, ran the Al-

---

[99] In governments, a "non-paper" is an informal document, usually provided without explicit attribution, put forward for discussion in a closed, that is, non-public, negotiation for the purposes of seeking agreement on a contentious issue.
[100] Id
[101] Id
[102] Id
[103] Id
[104] Id

FBI PROTECTED MATERIAL REDACTED

Haramain-Albania office. Al-Thibani is a close associate of UBS operative Fahid al-Shahri. Thibani was also founder of the IIRO."[105]

4.11.7. "*Al-Haramain Funding of Islamic Jihad Movements in Yemen*: As of March 1999, an unspecified branch office of Al-Haramain supported the Islamic Jihad movement and its associated facilities in Yemen."[106]

4.12.   In summary, the many examples cited in this section of the use of charities to fund terrorism in many different countries involving different parts of the world provide the factual backdrop for the UN repeatedly citing the need to curtail the abuse of charities for supporting terrorism in its annual resolutions in 1997, 1998, and 1999, and its decision to adopt the UN Terrorist Finance Convention in 2000, to address this problem through the enhanced due diligence measures set forth in that instrument.

5.   **Question 3:** *Was it an obligation of international banking institutions to adopt and implement effective anti-money laundering and counter-terrorism financing protocols to prevent the financing of terrorism and other illicit financial activity through purported charities prior to September 11, 2001?*

5.1.   Yes. From 1996 onward, international banking institutions had the obligation to adopt and implement effective anti-money laundering and counter-terrorism financing protocols to prevent the financing of terrorism and other illicit financial activity through purported charities. They were obligated to do this as a result of the international application of the international standards developed by the FATF, the universally recognized body for establishing minimum standards for anti-money laundering and countering-terrorist finance measures for governments, financial institutions, and others relevant to protecting against the ability of criminals and terrorists to move through funds through the international financial infrastructure.

5.2.   In 1990, the FATF carried out its initial work by developing and issuing a list of 40 recommendations (the "Forty Recommendations") that established a comprehensive plan for combating drug money laundering. At the time, there was discussion, but not yet agreement, on expanding the applicability of the Recommendations to other crimes, including terrorism. In 1996, under the U.S. presidency of the FATF, the organization amended the Forty Recommendations explicitly to cover all serious crimes, including terrorism. This action in turn obligated countries participating in FATF, and other countries whose banking systems linked to FATF countries, to implement these changes in their own domestic banking laws and regulations.

5.3.   Since its beginning, the mission of the FATF has been to harmonize anti-money laundering laws, regulations, practices, and enforcement globally to protect the banking system, and the world, from the threat posed by the use of financial institutions to launder criminal funds, including funds of, by, or for the benefit of terrorists. The FATF carries out this function through meetings of senior regulatory and enforcement officials from its

---

[105] Id
[106] Id

FBI PROTECTED MATERIAL REDACTED

member states to develop standards, embodied in its Recommendations. The FATF then monitors member states' progress in adopting the Forty Recommendations and the Eight Special Recommendations. Member countries complete self-assessments on an annual basis. Each member country is examined by the FATF in a mutual evaluation process. Other countries are evaluated through a similar process either at the regional or subregional level through organizations affiliated with the FATF, or by the FATF itself if they are not a member of the organization but are perceived to pose an especially high risk of vulnerability to the world financial system due to their vulnerability to or use by money launderers or terrorist financiers.

5.4.    *The Forty Recommendations.*  Initially developed in 1990 and revised in 1996, the Forty Recommendations cover all areas of anti-money laundering, including the criminal justice system and law enforcement, the financial system and its regulation, and international cooperation. Both the 1990 version of the 40 Recommendations[107] and the 1996 update of the 40 Recommendations[108] contained principles that imposed duties on member states to regulate their financial institutions so that the financial institutions would take appropriate actions to protect themselves against being used to launder money, including as of 1996, for all serious crimes, including funds relating to terrorism.[109] Materially, these provisions included the following elements that were promulgated prior to the September 11 attacks, with numbering and wording taken from the 1996 revision in place prior to 9/11 and which also includes guidance in Recommendations 28, 29, 37, and 38 to member states regarding actions they should take relating to financial institutions:

5.4.1.   <u>Recommendation 10.</u> Financial institutions should not keep anonymous accounts or accounts in obviously fictitious names: they should be required (by law, by regulations, by agreements between supervisory authorities and financial institutions or by self-regulatory agreements among financial institutions) to identify, on the basis of an official or other reliable identifying document, and record the identity of their clients, either occasional or usual, when establishing business relations or conducting transactions (in particular opening of accounts or passbooks, entering into fiduciary transactions, renting of safe deposit boxes, performing large cash transactions).

---

[107] Original FATF 40 Recommendations (1990), financial institution provisions are set forth as Recommendations 12-22. https://www.fatf-gafi.org/content/dam/fatf-gafi/recommendations/FATF%20Recommendations%201990.pdf
[108] Updated FATF 40 Recommendations (1996), financial institution provisions are set forth as Recommendations 10-21. https://www.fatf-gafi.org/content/dam/fatf-gafi/recommendations/FATF%20Recommendations%201996.pdf
[109] The 1996 update of the 40 Recommendations specifies in Recommendations 4, 5, and 6, that each country should criminalize money laundering to include offenses set forth in the Vienna Convention, pertaining to illicit drugs, and one based on serious offenses, with the specifics of that determined on the basis of national law. These recommendations also state that "the offence of money laundering should apply "at least to knowing money laundering activity, including the concept that knowledge may be inferred from objective factual circumstances." Recommendation 6 further states that "[w]here possible, corporations themselves – not only their employes – should be subject to criminal liability." Updated FATF 40 Recommendations, id. Since the 9/11 attacks, the FATF 40 Recommendations have been repeatedly updated, but those updates are outside the scope of this Expert Report.

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

5.4.1..1. In order to fulfill identification requirements concerning legal entities, financial institutions should, when necessary, take measures:

- To verify the legal existence and structure of the customer by obtaining either from a public register or from the customer or both, proof of incorporation, including information concerning the customer's name, legal form, address, directors and provisions regulating the power to bind the entity.

- To verify that any person purporting to act on behalf of the customer is so authorised and identify that person.

5.4.2. <u>Recommendation 11</u>. Financial institutions should take reasonable measures to obtain information about the true identity of the persons on whose behalf an account is opened or a transaction conducted if there are any doubts as to whether these clients or customers are acting on their own behalf, for example, in the case of domiciliary companies (i.e., institutions, corporations, foundations, trusts, etc. that do not conduct any commercial or manufacturing business or any other form of commercial operation in the country where their registered office is located.)

5.4.3. <u>Recommendation 12</u>. Financial institutions should maintain, for at least five years, all necessary records on transactions, both domestic or international, to enable them to comply swiftly with information requests from the competent authorities. Such records must be sufficient to permit reconstruction of individual transactions (including the amounts and types of currency involved if any) so as to provide, if necessary, evidence for prosecution of criminal behavior.

5.4.3..1. Financial institutions should keep records on customer identification (e.g., copies or records of official identification documents like passports, identity cards, driving licenses or similar documents), account files and business correspondence for at least five years after the account is closed.

5.4.3..2. These documents should be available to domestic competent authorities in the context of relevant criminal prosecutions and investigations.

5.4.4. <u>Recommendation 14.</u> Financial institutions should pay special attention to all complex, unusual large transactions, and all unusual patterns of transactions, which have no apparent economic or visible lawful purpose. The background and purpose of such transactions should, as far as possible, be examined, the findings established in writing, and be available to help supervisors, auditors and law enforcement agencies.

5.4.5. <u>Recommendation 15.</u> If financial institutions suspect that funds stem from a criminal activity, they should be required to report promptly their suspicions to the competent authorities.

5.4.6. <u>Recommendation 17.</u> Financial institutions, their directors, officers and employees, should not, or where appropriate, should not be allowed to, warn their

**FBI PROTECTED MATERIAL REDACTED**

customers when information relating to them is being reported to competent authorities.

5.4.7.   Recommendation 18.  Financial institutions reporting their suspicions should comply with instructions from the competent authorities.

5.4.8.   Recommendation 19. Financial institutions should develop programs against money laundering. These programs should include, as a minimum:

   5.4.8..1. The development of internal policies, procedures and controls, including the designation of compliance officers at management level, and adequate screening procedures to ensure high standards when hiring employees;

   5.4.8..2. An ongoing employee training program;

   5.4.8..3. An audit function to test the system.

5.4.9.   Recommendation 21. Financial institutions should give special attention to business relations and transactions with persons, including companies and financial institutions, from countries which do not or insufficiently apply these Recommendations. Whenever these transactions have no apparent economic or visible lawful purpose, their background and purpose should, as far as possible, be examined, the findings established in writing, and be available to help supervisors, auditors, and law enforcement agencies.

5.4.10.  Recommendation 22. Countries should consider implementing feasible measures to detect or monitor the physical cross border transportation of cash and bearer negotiable instruments, subject to strict safeguards to ensure proper use of information and without impeding in any way the freedom of capital movements.

5.4.11.  Recommendation 28.  The competent authorities should establish guidelines which will assist financial institutions in detecting suspicious patterns of behavior by their customers. It is understood that such guidelines must develop over time, and will never be exhaustive. It is further understood that such guidelines will primarily serve as an educational tool for financial institutions' personnel.

5.4.12.  Recommendation 37. There should be procedures for mutual assistance in criminal matters regarding the use of compulsory measures including the production of records by financial institutions and other persons, the search of persons and premises, seizure and obtaining of evidence for use in money laundering investigations and prosecutions and in related actions in foreign jurisdictions.

5.5.   In addition to these recommendations, the FATF issued interpretative notes to be relied on by those applying the recommendations, expressly including financial institutions such as banks. Included in the Interpretative note to Recommendations 11, and 15-18,

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

directed at financial institutions, are the following standards for applying them properly:[110]

5.5.1.   Interpretative Notes to the Forty Recommendations

> 5.5.1..1.Recommendations 11, 15 through 18. Whenever it is necessary in order to know the true identity of the customer and to ensure that legal entities cannot be used by natural persons as a method of operating in reality anonymous accounts, financial institutions should, if the information is not otherwise available through public registers or other reliable sources, request information – and update that information – from the customer concerning principle owners and beneficiaries. If the customer does not have such information, the financial institution should request information from the customer on whoever has actual control.

> 5.5.1..2.If adequate information is not obtainable, financial institutions should give special attention to business relations and transactions with the customer.

> 5.5.1..3.If, based on information supplied from the customer or from other sources, the financial institution has reason to believe that the customer's account is being utilised in money laundering transactions, the financial institution must comply with the relevant legislation, regulations, directives, or agreements concerning reporting of suspicious transactions or termination of business with such customers.

> 5.5.1..4.Recommendation 11. A bank or other financial institution should know the identity of its own customers, even if these are represented by lawyers, in order to detect and prevent suspicious transactions as well as to enable it to comply swiftly to information or seizure requests by the competent authorities. Accordingly Recommendation 11 also applies to the situation where an attorney is acting as an intermediary for financial services.

> 5.5.1..5.Recommendation 14. (a) In the interpretation of this requirement, special attention is required not only to transactions between financial institutions and their clients, but also to transactions and/or shipments especially of currency and equivalent instruments between financial institutions themselves or even to transactions within financial groups. As the wording of Recommendation 14 suggests indeed "all" transactions are covered, it must be read to incorporate these interbank transactions.

> 5.5.1..6.Recommendation 22. (a) To facilitate detection and monitoring of cash transactions, without impeding in any way the freedom of capital movements, members could consider the feasibility of subjecting all

---

[110] They are provided in pertinent part verbatim from the FATF website.

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

cross-border transfers, above a given threshold, to verification, administrative monitoring, declaration or record keep requirements.

5.5.1..7. Recommendation 29. Recommendation 29 should not be read to require the introduction of a system of regular review of licensing of controlling interests in financial institutions merely for anti-money laundering purposes, but to stress the desirability of suitability review for controlling shareholders in financial institutions (banks and non-banks in particular) from a FATF point of view. Hence, where shareholder suitability (or "fit and proper") tests exist, the attention of supervisors should be drawn to their relevance for anti-money laundering purposes.

5.6.    Prior to 9/11, these recommendations from the FATF were required to be adopted in national laws and regulations and oversean and enforced by domestic regulators of banks and other financial institutions, with a process of monitoring then put into place both domestically and through international mutual assessments to ensure that the measures were being effectively implemented.

5.7.    A core question is whether it was expected that terrorist finance would be among the "serious crimes" covered by the FATF's recommendations from 1996 on. The substantive answer is that members of FATF assessed that it was covered either by domestic laws already in place or as a money laundering offense. As stated in its 2000-2001 Annual Report, June 22, 2001:

5.7.1..1. The FATF attempted to examine the ways that terrorist groups move or conceal funds in order to support their operations. One purpose of this examination was to see whether there were significant differences between the methods used by terrorists and those used by organised crime groups. Material discussed by the experts appeared to indicate that there is little difference, first, in the source of funding for both types of groups. Terrorists generate proceeds to support their activities through criminal activity (and sometimes from contributions or donations) in virtually the same way that organised crime does. The methods used for laundering funds in both cases are also virtually the same. Moreover, many countries consider that terrorist acts or even affiliations with such groups constitute a serious crime. There is not agreement on whether anti-money laundering laws could (or should) play a direct role in the fight against terrorism. Some countries, for example, are not able to use anti-money laundering legislation for tracking or restraining suspected terrorist money if the source of the funds was a voluntary contribution and not a criminal act. There are also differences between jurisdictions as to which groups are classified as terrorist organisations. Certain of the FATF experts were of the opinion that terrorist related money laundering is a distinct sub-category of money laundering. Others held the opposite view

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

and believed that terrorism can be adequately targeted under existing laws.[111]

5.7.1..2. This question is therefore somewhat technical: the distinction is whether it was necessary to specifically recommend to countries to make terrorist finance a specific criminal offense on its own to ensure its incorporation as a predicate offense for money laundering, or to consider it covered as a money laundering offense regardless of being specified as an independent crime as falling within the crime of terrorism generally.

5.7.1..3. The discussion within the FATF on these issues highlights the focus on terrorist finance as a problem that every country had to address one way or another, in the wake of the 1999 UN Terrorist Finance Convention, and the need for financial institutions to meet the international standards for taking the necessary measures to combat terrorist financing, given their participation in cross-border financial transactions involving major currencies such as the U.S. Dollar, the Euro, the British Pound, and the Swiss Franc, authorized by countries that were signatories of the Convention.

5.7.2. In summary, in this pre-9/11 period, as the major international instrument to combat terrorist financing was being adopted, and the FATF was actively engaged in efforts to further define it, there was a general understanding internationally that one way or another, terrorist finance was an activity that should not be facilitated by banks, and that banks needed to take appropriate action to counter the risk of being used by terrorists and/or implicated in terrorist finance, through application of the relevant recommendations of the FATF to their policies and procedures.

# 6. Question 4: *Is there evidence that al Qaeda relied on sympathetic financiers and financial institutions to raise and move money prior to September 11, 2001?*

6.1. Yes, there is evidence that al Qaeda relied on sympathetic financiers and financial institutions to raise and move money prior to September 11, 2001. This evidence includes the findings made by an international group of experts established by the UN which on November 3, 2003 issued its 2nd Monitoring report on the status of efforts to combat terrorist finance in the wake of the 9/11 attacks, which provided the first detailed findings made by the UN about the extent of the terrorist financing problem. In pertinent part, the UN Experts Monitoring Report on Sanctions against Al-Qaida, the Taliban and Individuals and Entities Associated with Them ("2nd UN Monitoring Report") found the following:

6.1.1. "From its inception Al-Qaida has relied heavily on charities and donations from its sympathizers to finance its activities. Charities provide Al-Qaida with

---

[111] Financial Action Task Force, Annual Report, 2000-2021, June 22, 2001, https://www.fatf-gafi.org/content/dam/fatf-gafi/annual-reports/2000%202001%20ENG.pdf

FBI PROTECTED MATERIAL REDACTED

a very useful international channel for soliciting, collecting, transferring and distributing the funds it needs for indoctrination, recruitment, training, and logistical and operational support. These funds are often merged with and hidden among funds used for other legitimate humanitarian or social programmes. Al-Qaida supporters and financiers have also established front charity networks whose main purpose is to raise and deliver funds to Al-Qaida. The roots of these charity networks stem from the anti-Soviet jihad in Afghanistan during the late 1980s. During that time Al-Qaida could draw on the support of a number of State-assisted charities and other deep-pocket donors that supported the anti-Soviet cause."[112]

6.1.2.   "Today, Al-Qaida continues to rely heavily on those charities to facilitate and mask the collection and movement of its funds. Activities range from collection boxes at mosques and Islamic centres to direct fund-raising and solicitations, the merging of funds for both legitimate relief purposes and terrorism, the misuse or embezzlement of legitimate charitable funds, and the creation of front charities to channel funds from community collections or deep-pocket supporters. Al-Qaida has also benefited from, and relies heavily on, the activities of legitimate charities that support the propagation and teaching of more radical forms of Muslim fundamentalism."[113]

6.2.   These and many related findings over the course of the eighty-three pages of the 2nd UN Monitoring Report summarize the material information available to the UN experts as of that date, based on reports from 83 countries received by the UN experts, supplemented by miscellaneous press reports, Parliamentary debates, statements by experts on terrorism, and other materials cited in the Report. Examples of the evidence relied on by the UN experts in the 2nd UN Monitoring Report are provided in their consideration of two Saudi charities, the IIRO and Al-Haramain, whose use, and their funding by sympathetic donors, are addressed at some length in the UN Monitoring Report. In pertinent part these include the following statements by the UN Experts:

6.2.1.   "One important example of the use by Al-Qaida of charities and the difficulties in dealing with this issue touches directly on the activities of one of the largest Islamic umbrella charities, the International Islamic Relief Organization (IIRO) headquartered in Jeddah, Saudi Arabia. Most of that organization's activities, and the activities of its associated charities, relate to religious, educational, social and humanitarian programmes. But IIRO, and some of its constituent organizations, has also been used, knowingly or unknowingly, to assist in financing Al-Qaida."[114]

6.2.2.   "The International Islamic Relief Organization has branch offices throughout the world, including 36 in Africa, 24 in Asia, 10 in Europe and 10 in Latin America,

---

[112] 2nd UN Monitoring Report, id, ¶34, UN Security Council, November 3, 2003, distributed December 2, 2003, S/2003/1070,  https://documents-dds-ny.un.org/doc/UNDOC/GEN/N02/225/80/PDF/N0222580.pdf?OpenElement
[113] Id, ¶35
[114] Id, ¶40

FBI PROTECTED MATERIAL REDACTED

the Caribbean and North America. The bulk of its financial contributions come from private donations in Saudi Arabia. An endowment fund (Sanabil al-Khair) has been established to generate a stable income to finance its various activities. The charity also works in close association with the Muslim World League. Many prominent Middle East figures and financiers have associated themselves with this mainstream Islamic charity."[115]

6.2.3. "Evidence produced recently in a Canadian court linked IIRO funding directly to Al-Jihad, a designated entity tied closely to Al-Qaida, and responsible for the bombing in 1998 of the American Embassies in Dar es Salaam and Nairobi. A recently published report by the United States Central Intelligence Agency also indicated that IIRO funds directly supported six Al-Qaida training camps in Afghanistan prior to 11 September 2001. After that date, Pakistan also identified and expelled some two dozen Al-Qaida supporters who had been working for the IIRO-sponsored organizations in Pakistan."[116]

6.2.4. "Allegations have surfaced in India and the Philippines that local IIRO officers and employees were directly implicated in Al-Qaida-related terrorist activities, including planned attacks against the American Consulates in Madras and Calcutta. The IIRO office in Zamboanga City, the Philippines, reportedly served during the early 1990s as the coordinating centre for secessionist Islamic activities, and as late as 1996 channeled money to the Abu Sayyaf group, another designated entity. That office was established and run by Mohammed Jamal Khalifa, the brother-in-law of Osama bin Laden. More recently, IIRO, which operates in the United States as the Islamic Relief Organization, was tied to Soliman S. Biheiri and the Safa group of charities now under investigation in the United States for funding Al-Qaida-related activities."[117]

6.2.5. "The Safa investigation has also highlighted the problematic issue of the use and mingling of charitable funds with investment and business funds. In that investigation, information was uncovered indicating that funds were provided by IIRO to Sana-Bell, Inc., a United States corporation for investment and business purposes. Those funds were subsequently transferred through various channels to Al-Qaida operatives, and to an Al-Qaida financier, Yassin al-Qadi, a designated individual. A number of the charities that have been implicated in Al-Qaida funding, and that have been designated by the Committee, have also been engaged

[115] Id, ¶41

[116] Id, ¶42

[117] Id, ¶43. This allegation in turn was closely linked to U.S. federal investigations of the U.S.-based component or components of the SAAR Foundation, and those connected to it, including the IIRO. For a post-9/11 media account which describes the backdrop to this investigation regarding the alleged involvement of these entities in terrorist finance for al Qaeda, see "Trails Lead to Saudis," National Review, May 21, 2003, https://www.nationalreview.com/2003/05/trails-lead-saudis-matthew-epstein/ as well as the Affidavit of David Kane, *In The Matter Of Searches Involving 555 Grove Street, Herndon, Virginia, And Related Locations,* (EDVA) October 2003, ("Kane Affidavit"), FED-PEC 0001243-1369

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

in business ventures to supplement their revenues."[118]

6.2.6.    "Attention has also centred on the Al-Haramain Islamic Foundation. On 11 March 2002 the United States and Saudi Arabia jointly designated the Bosnia and Herzegovina and Somalia offices of Al-Haramain. A Saudi Arabia-based charity, Al-Haramain raises almost $30 million a year in donations. According to its web site, it has active branches in about 49 countries. It draws its support and funding from across the Middle East, and other Muslim centres. The Somalia and Bosnia branches had been directly implicated in Al-Qaida funding activities. Al-Haramain Somalia had funneled money to Al-Ittihad al-Islami, a designated terrorist group, by disguising the funds as contributions for an orphanage project and for Islamic school and mosque construction. The Bosnia office was linked to Al-Jemaah al-Islamiyah al-Masriyah and to Osama bin Laden."[119]

6.2.7.    "Al-Haramain's offices in Indonesia have also been implicated in the funding of the Bali bombing. Omar al-Farouq, the Al-Qaida senior representative in South-East Asia, who was arrested in June 2002, told interrogators that Al-Haramain was the "principal source" of funding for the Indonesian Islamic group suspected of carrying out that attack. Al-Haramain has also continued as a conduit for funding to the Jemaah Islamiyah, another designated entity. Many of the leaders of the Jemaah Islamiyah also reportedly continue as branch officers and members of Al-Haramain. The Government of the Russian Federation has also complained to Saudi Arabia about funding provided by Al-Haramain to Chechen rebels."[120]

6.2.8.    "In May 2003, Saudi Arabia asked the Al-Haramain Islamic Foundation and all Saudi charities to suspend activities outside Saudi Arabia until a security clearance mechanism, to screen all personnel, could be implemented. This order applied to branches in Albania, Bosnia and Herzegovina, Croatia, Ethiopia, Kenya, Kosovo, Indonesia, Pakistan, Somalia and the United Republic of Tanzania."[121]

6.2.9.    "Al-Haramain's General Manager, Sheikh Aqeel al-Aqeel, is now under investigation in Saudi Arabia, regarding indications that other branches of Al-Haramain may also have been engaged in such activities. Al-Haramain has also been closed by authorities in Kenya after having been linked to those responsible for the bombing in 1998 of the United States Embassy there. It has also been asked to close its doors in Albania, Croatia and Ethiopia. In response to enquiries from the Group the Permanent Mission of Albania to the United Nations wrote on 1 October 2003 that the Albanian Ministry of Finance had acted to freeze the bank accounts of the Al-Haramain Islamic Foundation. The Group has addressed similar enquiries to Croatia, Ethiopia, Indonesia, Kenya, Pakistan and the United

---

[118] Id, ¶44
[119] Id, ¶47
[120] Id, ¶46
[121] Id, ¶46

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

Republic of Tanzania.[122]

6.2.10. "The Government of the Philippines indicated in its report submitted pursuant to resolution 1455 (2003) that Mohammed Jamal Khalifa, the brother-in-law of Osama bin Laden, had established numerous organizations, corporations and charitable institutions which served as conduits for funds to the Abu Sayyaf group as well as other extremist organizations."[123]

6.2.11. "The problem of charities also involves the problem of donors who use such charities to funnel money that supports Al-Qaida indoctrination, recruitment and logistical activities. It has proved particularly difficult to pierce the charity veil and uncover the deep-pocket donors, including the business entities that provide such funding. One important lead was provided by the so-called "golden chain" memorandum, found during raids on the offices of the Benevolence International Foundation in Sarajevo in March 2002. This subject continues to be under review by the Group. While a number of individuals are under suspicion or investigation, it has proved particularly difficult to establish that they were directly involved or knew that the funds they provided were being used for terrorism-related purposes."[124]

6.3.    In conclusion, the 2nd UN Monitoring Report summarized the evidence available to it as of November 2003 about al Qaeda's reliance on "sympathizers" and "deep-pocket donors" to charities that were deeply involved in supporting terrorist activities for al Qaeda and affiliated groups throughout the world, covering evidence that existed before the 9/11 attacks on the United States, and evidence which was found in its immediate aftermath of the 9/11 attacks on the United States relating to pre-9/11 events. The UN Monitoring Report's conclusions on these points capture my own understandings on these key points, derived from my direct work on these issues in and out of government.

6.4.    Other evidence includes extensive contemporaneous (that is, pre-9/11) reporting and analysis from the CIA and more general statements by others in the U.S. government on al Qaeda's reliance on donors, actions undertaken by the U.S. government prior to 9/11 to response to the problem posed by the "sympathizers" and the "donors," as well as post-9/11 work which found additional evidence on what the sympathizers and donors were doing prior to the 9/11 attacks. The evidence which existed prior to the 9/11 attacks prompted visits by U.S. officials to Saudi Arabia before those attacks seeking Saudi Arabian action to address bin Ladin obtaining support from Saudi charities and through Saudi financial institutions, efforts which intensified after the attacks and finally met success in late 2003 and early 2004, when Saudi Arabia instituted greater controls on terrorist finance and charities operating within Saudi Arabia.[125]

---

[122] Id, ¶47
[123] Id, ¶55
[124] Id, ¶58
[125]"White Paper on Saudi Arabia and Counterterrorism," Government of Saudi Arabia, in English, id, pp 2-3, pp. 18-25

**FBI PROTECTED MATERIAL REDACTED**

6.5. Most of the evidence on which these governments relied on in making their assessments on this issue was classified. Some of this evidence has now been declassified in CIA and other U.S. government documents as a result of the release and declassification of this material under EO 14040. However, even these documents generally excise ("redact") the underlying documentary, testamentary, or physical evidence on which they have based their assessments, to protect the government's sources and methods.

6.6. There is now additional corroborating evidence for the governmental assessments that Al Qaeda relied on sympathetic financiers and financial institutions to raise and move funds from discovery in this case. The documents produced over the course of the discovery process from ARB and others includes evidence of ARB handling accounts of charities found to have engaged in terrorist finance, in high-risk countries. The documents produced in discovery also provide evidence of ARB engaging in the kinds of practices consistent with those described by the CIA in its reports on terrorist finance, and its specific reporting in a number of those reports on ARB's role as a conduit for terrorist funds for al Qaeda and others. This evidence comes in the form of ARB bank records, and documents provided by others connected to ARB, obtained through the discovery process, and discussed in this Expert Report in response to Questions 7, 8, and 9. These documents provide information regarding ARB's adherence (or failure to adhere) to AML/CFT best practices and international standards prior to 9/11, ARB's response (or failure to respond) to money launder and terrorist finance red flags prior to 9/11, and the support and benefits al Qaeda received from accounts ARB maintained for Al-Haramain, MWL, IIRO, WAMY, the SAAR Foundation, and others prior to 9/11.

6.7. *Assessments by the CIA*

6.8. Prior to the 9/11 attacks, Clarke, the White House's senior coordinator on terrorism, tasked the CIA to produce finished intelligence on bin Ladin and his sources of support. While there may have been others also issuing these taskings, I was working with him at the time and knew of his focus on this topic. In response to the taskings, the CIA produced reports on this topic prior to 9/11. In addition, after 9/11, the CIA went back to the raw intelligence it had prior to 9/11, and produced additional finished analytic reports based on information that was available prior to 9/11. In considering each report as part of the basis on which I am answering this question, I will specify the date or period of when the information was generated, and the date when the report was issued, unless that information is unavailable.

6.8.1. These reports were maintained as classified by the CIA for two decades after the 9/11 attacks, but were then in large part declassified, with redactions, which I assess were largely to protect their sources and their methods, consistent with the requirements of EO 14040. Based on what I know about how the CIA builds its analytic reports, I understand that the sources included a mix of human intelligence, that is information provided by people; signals intelligence, that is, information generated from telephone calls or other electronic signals; financial intelligence, that is, information from financial or business records; and open source intelligence, such as press reporting, the last of which is the only type of

intelligence source that is generally not redacted from the reports.

6.8.2. The reports were all "finished intelligence," meaning, that they were the end-products of a highly-developed process that has the goal of producing reports which can be relied on by senior U.S. policy makers, including the President. The intelligence process by which these reports were created ordinarily involves a series of steps. First is a tasking, or definition of the intelligence requirements or needs to protect U.S. national security. As mentioned, the White House prior to 9/11 was heavily focused on bin Ladin, and issued taskings to better understand his activities and sources of support, including sources of funding for terrorism. Next is implementing the tasking through defining the collection requirements for various forms of raw intelligence that will be used to produce finished intelligence, and then allocating resources to meet them. U.S. intelligence agencies then work together, and sometimes with intelligence and other components of other U.S. governmental agencies such as the State Department, Treasury Department and Justice Department, to collect the raw information based on the requirements through gathering information from individuals (human intelligence), carrying out technical (and sometimes physical) surveillance (signals intelligence), gathering information from other governments, gaining access to business records, such as financial records, and adding open source information from public reporting to those non-public sources. The CIA then integrates this data so that its analysts have access to it, undertaking any needed processing to decrypt encrypted data and translate information from other languages. This work in turn leads to the creation and build out of databases, so that the databases contain all relevant source material. The CIA analysts then integrate, evaluate, and analyze the data to prepare the final intelligence products, weighing and evaluating the information they have, to produce finished intelligence, connect the dots, and draw conclusions about what it all means. This finished intelligence is then distributed to the government consumers, who may ask questions about it, seek further information or analysis, raise queries about the particular sourcing that went into the document, and/or use the finished intelligence as the foundation for policy decisions.

6.8.3. As a result of this systematic process, over the decades, I have found CIA finished intelligence to be generally reliable, and evidence-based, relying on the evidence available to the CIA on a given topic at the time the finished analysis was produced.[126] In cases where the CIA does not have enough evidence to be certain

[126] I am aware of the risks of the politicization of intelligence, and the CIA has internal mechanisms that have long guarded against it. See e.g. "A message to analysts, Guarding Against Politicization," Robert M. Gates, remarks delivered by the Director of Central Intelligence made March 16, 1992 in the CIA auditorium. https://www.cia.gov/static/Guarding-Against-Politicization.pdf The views expressed in 1992 by then-CIA Director Gates reflected the approach taken by the CIA through my tenure in the State Department during the 1994-1999 period, as well as during my post-9/11 tenure from 2013-2017. Having carefully read the CIA's now declassified reporting on al Qaeda, Bin Ladin, and terrorist finance issues for the period prior to 9/11, I see no evidence of politicization. Rather, I see great and recurrent caution to avoid the possibility of over-interpreting data points, which I assume was enhanced by the difficult policy implications of any findings of Saudi state-sponsorship or other forms of Saudi support for terrorism.

about a topic, it typically provides caveats about its conclusions consistent with the limitations of the evidence, use terms such as "possible," "apparently," or "probably," to limit or qualify a statement to ensure that it does not overstate the evidence available to the CIA on the topic. In some cases, such caveats or limitations may change over time, as new information confirms initial assessments, or disproves them. Such changes are based on the acquisition of additional information, from both public and classified sources, which are added to the original information, for updated assessments, either because the CIA itself believes an update is required due to the additional information, changes in circumstances, or the passage of time, or as requested by policymakers.

6.8.4.   To organize my consideration of this material, I first discuss CIA reports on this topic that were completed and disseminated prior to 9/11. I then discuss reports which bear dates that are post-9/11, but which expressly state that they are solely based on information the CIA had prior to 9/11, and which provide the time periods the information arose. Then I discuss CIA reports that are undated, but which specify that the time period for information used in the CIA reports is prior to 9/11. Finally, I discuss CIA reports that are dated after 9/11, but which contain facts or information pertaining to pre-9/11 activities and incidents. I then review the contents of these government reports and compare the CIA's conclusions with information provided by discovery in this case, including documents provided by ARB.

6.8.5.   The CIA reports released under EO 14040 and in response to plaintiffs' ARB subpoena include extensive information on al Qaeda's reliance on sympathetic financiers and financial institutions. Accordingly, the information I am highlighting here necessarily constitutes a selective summary of the information, rather than the entirety of the information provided in hundreds of pages of finished intelligence and analysis relevant to this topic.

6.9.   *Pre-9/11 Assessments by the CIA*

6.9.1.   On November 17, 1998, the CIA's Office of Transnational Issues ("OTI"), prepared a report entitled: "Usama Bin Ladin s [sic] Finances: Some Estimates of Wealth, Income, and Expenditures," at the request of a "Richard" who worked at "Global Is [sic] and Multilateral Affairs at the NSC," which I understand to be a reference to the NSC's counter-terrorism coordinator, Richard Clarke, and the title of his office before he secured a name change regarding his scope of work to "Transnational Threats."[127]

6.9.2.   While most of the CIA report described bin Ladin's own wealth, it also contained references to the use of financial institutions by bin Ladin. These references included in pertinent part the following statements, each of which provided one or more data-points relevant to answering this question:

---

[127] CIA_000317

**FBI PROTECTED MATERIAL REDACTED**

6.9.2..1. "Bin Ladin and Al-Qa'ida members control numerous bank accounts worldwide. [redacted] the choice of financial institutions has been based on personal contact with the bank, security concerns, and the bank's adherence to Islamic law."[128]

6.9.2..2. "The major sources of outside financial support probably are wealthy family members, several of whom maintain contact with Usama or have similar militant views; wealthy Gulf sponsors, and Islamic NGOs."[129]

6.9.2..3. "Gaining insight into Bin Ladin's financial activities has been made more difficult since May 1996 when he departed Sudan, a place where his associates carried out financial decisions at offices of identified commercial ventures, often via established financial institutions."[130]

6.9.2..4. Bin Ladin "has also been able to rely on major sources of funding during his 15-year career as a mujahaddin, especially from wealthy Gulf families; and he may continue to have access to his family's wealth."[131]

6.9.2..5. *"Bank Accounts*. Bin Ladin and Al-Qa'ida members control numerous bank accounts worldwide. [redacted] the choice of financial institutions has been based on personal contact within the bank, security concerns, and the bank's adherence to Islamic law. For example, Bin Ladin's companies and Al-Qa'ida members made extensive use of the Islamic banks in Sudan and probably still maintain some accounts there, [redacted] NIF cadre – who probably remain sympathetic to Bin Laden's cause – dominate bank board and the top management positions. [redacted] Bin Ladin, financial officer Madani Al-Tayyib, and other Al-Qa'ida members held numerous accounts at Dubai Islamic Bank because of Bin Ladin's reported personal friendship with DIB Chairman, Saeed Ahmed Lootah. Islamic financial institutions probably are key repositories for Al-Qa'ida's liquid funds because they conform to the principals [sic] of Islamic law, which forbids the payment of interest; they therefore operate in line with Bin Ladin's aim of establishing Islamic regimes throughout the Middle East [redacted] Because Islamic banks are limited in number and have little presence in many developed countries, a fatwa (religious opinion) was issued in Sudan that allowed Bin Ladin to keep funds with non-Islamic institutions, [redacted][132]"

6.9.2..6. *"Conventional Banks.* Undoubtably, banks continue to be used by Bin Ladin and his associates to facilitate fund movements. In some cases, they use contacts inside the institutions to facilitate fund movements. In some cases, they use contacts inside the institutions to facilitate

[128] CIA_000318
[129] Id.
[130] CIA_000320
[131] CIA_000321
[132] CIA_00322-323

transactions—especially in the case of Islamic banks. [redacted] DIB Chairman Saeed Ahmed Lootah authorizes--stamps and signs--some of Bin Ladin's letters of credit. In addition, Bin [L]adin may have sympathetic bank personnel willing to conduct transactions at Al-Shamal Islamic Bank, the Animal Resources Bank, and the Farmers' Bank for Investment and Rural Development, all of which are in Sudan and allegedly were capitali[z]ed partly by Bin Ladin."[133]

6.9.2..7. *"Gulf Sponsors.* Bin Ladin probably maintains support from Gulf sympathizers, including some prominent merchants and government officials who reportedly contributed millions of dollars to his efforts during the Afghan war, [redacted]"[134]

6.9.2..8. *"Financial Support to Islamic NGOs.* While Bin Ladin receives NGO financial support diverted from Gulf sponsors, Bin Ladin also provides funding to sp[e]cific offi[c]es of these organizations."[135]

6.9.2..9. "Appendix. **Islamic Banks Possibly Harboring Bin Ladin's Wealth. [redacted]** . . . Islamic financial institutions, nevertheless may be key repositories for Al-Qa'ida's liquid funds. Of some 180 Islamic banks operating worldwide, [redacted] a handful may house Bin Ladin-linked accounts:"[136]

6.9.2..10. *"[bullet] Dubai Islamic Bank (DIB)* has served as a key financial conduit for Al-Qa'ida and for Bin Ladin's companies in Sudan, [redacted] Bin Ladin and his companies maintained [redacted] accounts at DIB. [redacted] DIB Chairman Saeed Ahmed Lootah is a close friend of Bi Ladin's. . ."[137]

6.9.2..11. "'Sheikh Rajhi' [redacted] deposited [redacted] into a [redacted] bank account controlled by Maktab al-Khidamat, an Islamic charity closely associated with Usama Bin Ladin since the early 1980's."[138]

6.9.3. On January 11, 1999, the CIA's Office of Transnational Issues issued a 41-page report entitled "Usama Bin Ladin: Some Saudi Financial Ties Probably Intact." This CIA Report covered a range of sources of financial support for Bin Ladin, reviewing his own funds, support from family members and "merchants, officially sponsored nongovernmental organizations (NGOs) and clerics based in Saudi Arabia." This CIA Report contained numerous data points and information on the CIA's understanding, prior to 9/11, based on the evidence and reporting it had obtained, of his reliance on sympathetic financiers and financial institutions to

[133] CIA_000326
[134] CIA_000329
[135] CIA_000336
[136] CIA_000337
[137] Id.
[138] CIA_000338

raise and move money prior to September 11, 2001.[139]

6.9.4. As suggested by the above quotation from the first page of the CIA report, these sympathetic financiers included Saudi-based charities, such as the IIRO, Al-Haramain, MWL, WAMY and several other Saudi-backed Islamic charities.[140]

6.9.5. Given the length of the CIA report, I will only provide examples of some of the data points it cites that are material to answering this question.

6.9.5..1. "[redacted] foreign offices of several Saudi-based NGOs have been infiltrated by al-Qa'ida operatives. [redacted] As a result, funds from several Saudi NGOs continued to be diverted to al-Qa'ida and other Islamic extremists. Saudi NGOs with the strongest links to Usama include:"

6.9.5..2. " [bullet point] The International Islamic Relief Organization (IIRO) funds a military camp associated with Usama [redacted]"

6.9.5..3. "[bullet point] offices of Al Haramayn in Albania, Azerbaijan, Bosnia, Kenya, and Tanzania, have been used by al-Qa'ida."[141]

6.9.5..4. "Several other Saudi-backed NGOs have questionable, though less direct, ties to Usama Bin Ladin – including the Muslim World League, the Iqra Foundation, the Saudi High Commission – Bosnia Herzegovina, World Assembly of Muslim Youth, Stalk of Goodness, and Al-Waqf al-Islami."[142]

6.9.5..5. "Usama may obtain financial support or be involved in commercial ventures with some members of the Jeddah business community—many of which have links to financial institutions:"[143]

6.9.5..6. "[bullet point] [redacted] "al-Qa'ida members have held accounts at the Al Rajhi Banking and Investment Company. [redacted two and a third lines]"[144]

6.9.5..7. "During [the 1980s and early 1990s], Usama also forged ties to Saudi-based nongovernmental organizations (NGOs), wealthy Jeddah-based businessmen, clerics, and government officials who were interested in aiding Afghan and other Islamic causes."[145]

[139] CIA_000807
[140] CIA_000808-809
[141] CIA_00808
[142] CIA_000809
[143] Id
[144] Id
[145] CIA_000810

FBI PROTECTED MATERIAL REDACTED

6.9.5..8. The CIA report contains a chart entitled "Usama Bin Ladin: Possible Saudi Contacts and Financial Links." The chart shows four types of relationships: family, Saudi-backed charities, Saudi business community, and clerics.

6.9.5..8..1. The Saudi-backed charities were divided into two categories, those of "primary concern," and those with "possible connections." Those listed as of "primary concern" were IIRO, Al-Haramain (spelled "Al Haramyn"), Lajnat al-Bir al Islamiya ("Lajnat"), and Muwafaq Foundation ("Muwafaq"). Those listed as "possible connections" included the Muslim World League, Iqra Foundation, the Islamic Relief Agency office in Jeddah, the Saudi High Commission of Bosnia/Herzegovina, and Al-Waqfal al-Islami.

6.9.5..8..2. Five Saudi businessmen and one Saudi business family are listed. The businessmen are Salah al din Ahmad Idris, Khalid bin Mahfouz, Muhammad Abdul Yamani, Saleh Abduallah Jamel, and Ahmed Saleh Jamjoom. The family listed is the Al Rajhi family.

6.9.5..9. In a section of the January 11, 1999 CIA report entitled "Bin Ladin Ties to Saudi NGOs," the CIA report stated, in essence, that the problematic Saudi charities were continuing to fund terrorism worldwide, had "poor" internal oversight, controls and audits, and "are directed by and derive a substantial portion of their budgets from Saudi princes and wealthy merchant families, at least some of whom maintain a deeply conservative outlook toward Islam, Israel and the West [redacted]."[146]

6.9.5..10. In the section of the January 11, 1999 CIA report entitled "Saudi-Operated NGOs of Primary Concern," the CIA described al Qaeda's penetration of Saudi NGOs in Afghanistan and Pakistan and how funding for Arabs in Afghanistan (presumably, foreign fighters) was being provided to al Qaeda by charities that included IIRO, Lajnat al-Birr, and others, using accounts at local banks in Peshawar that were reportedly branches at Mashreq Bank, Emirates Bank International, and Habib Bank, the same banks handling bin Ladin's funds. The CIA report stated that "All-source intelligence suggests that several Saudi NGOs are funding conduits for al-Qa'ida or have been penetrated by Usama's network," and reports those of greatest concern were IIRO, Al-Haramain, Lajnat, and Mawafaq. This section then provided a number of data points on each of these organizations. Examples include its statement that bin Ladin was using the IIRO to provide travel documents for mujahedin to fight in Chechnya; that employees at Al-Haramain's offices in Albania, Azerbaijan, Kenya and possibly Tanzania had been

[146] CIA_000816

FBI PROTECTED MATERIAL REDACTED

funded by or acted on behalf of bin Ladin; that Al-Haramain's offices had supported other terrorist groups, including providing financial and logistical support to the Bosnian mujahedin and help to Egyptian terrorists; and that the Iqra Foundation, established by Sheikh Saleh Abdallah Kamel, the owner of a $4.5 billion Saudi banking and construction conglomerate, was among a handful of organizations that provided funding for a terrorist group carrying out a military insurgency in Somalia backed by bin Ladin.[147]

6.9.5..11. In a section of the January 11, 1999 CIA report entitled, "Usama's Possible Links to the Saudi Business Community," the CIA listed the activities of three of the businessmen included on the chart, plus the Al Rajhi family, in a section of the CIA report that contains seven to eight inches of redactions in various bulleted subsections. Most of the section on the Al Rajhi family is redacted, leaving only the following data points:

6.9.5..11..1. "Members of the ultra-wealthy Al Rajhi family, which owns the Riyadh-based Al Rajhi Banking and Investment Company, probably are a source of financial support for Usama's al-Qa'ida organization."

6.9.5..11..2. "[A] "Shaykh Rajhi—[redacted]—deposited [redacted] into the [redacted] bank accounts of the Maktab al-Khidamat."

6.9.5..11..3. [redacted] some Al-Rajhi branches in Saudi Arabia have been used by members of the al-Qa'ida organization." There is a footnote to this sentence, but the footnote is also redacted. I infer it contained information on the source or sources for the statement.

6.9.6. On April 9, 1999, the CIA's Counterterrorist Center issued a sixteen page report that it called an "update and elaboration of a July 26, 1995 Intelligence Report, "International Islamic Charitable Organizations: Pursuing Multiple Agendas."[148] The Intelligence Report is entitled "Islamic Terrorists: Using Nongovernmental Organizations Extensively."[149] The Scope Note on the report stated: "This assessment examines specific foreign-based nongovernmental organizations (NGOs) that provide terrorists with infrastructure support independent of the NGO's legitimate, humanitarian, or charitable work."[150]

6.9.7. While most of this CIA report detailed the role of Islamic NGOs such as MWL, IIRO, MAK, and Al-Haramain in providing financial, logistical, and administrative support for Al Qaeda and other terrorist groups, it also addressed

[147] CIA_0008717-824
[148] To the best of my knowledge, I have not had access to the July 25, 1995 CIA Intelligence Report.
[149] CIA_000210
[150] CIA_000212

the role of sympathetic financiers in supporting terrorism. These references included the following statements:

6.9.7..1. "Many prominent Saudi businessmen contribute generously to the IIRO through their *zakat* contributions, including the Al Rajhi family, which has an estimated wealth of $20 billion."[151]

6.9.7..2. "Manilla has barred Muhammad Jamal Khalifa, the former head of the IIRO's branch office in the Philippines and brother-in-law to Usama Bin Ladin, from reentry for his support to the terrorist Abu Sayyah Group. Khalifah currently is attempting to continue his support to the ASG and extremists elsewhere through his private companies, but his ties to the IIRO appear to be severed, and the IIRO is continuing its own efforts to rebuild its damaged reputation as a legitimate humanitarian organization."[152]

6.10. *Other Assessments by the CIA Based on Information Available Prior to 9/11*

6.10.1. The CIA's Office of Transnational Issues issued an Intelligence Report entitled "Funding Islamic Extremists: The Role of Islamic Financial Institutions," a 28-page report with four additional pages of Key Findings and a 49-page appendix, at a date that is not specified in the version released under EO 14040.[153] There are no references in the document to the 9/11 attacks. The CIA report stated: "Information available as of 20 November 1997 was used in this report." Accordingly, while I cannot provide the date of issuance of this CIA report, it appears to provide information solely describing facts, events, activities, data, and assessments relating to the pre-9/11 period as of November 20, 1997. I will therefore refer to it as the "November 20, 1997 CIA Report," although the report may have been written at an unstated later date.

6.10.2. The November 20, 1997 CIA report provided three pages of "Key Findings," plus a fourth page that is redacted but which based on format appears to be part of the Key Findings of the CIA report. The unclassified information stated the following in pertinent part (with information less material to this section of this Expert Report omitted):

6.10.2..1."Several Islamic financial institutions—those that ascribe to the Koran's principles against the payment of interest—regularly serve as

[151] CIA_000221

[152] CIA_000223. Later CIA and US government action reflect determinations that the IIRO's support for al Qaeda encompassed senior leadership of the IIRO in Saudi Arabia. See FBI/CIA "Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States," in its entirety, EO 14040-003414 through 003442, and its references to the activities of Prince Turki bin Jalawi at 003419, and the Treasury Department designation of the head of IIRO's Eastern Province in Saudi Arabia, "Treasury Designates Director, Branches of Charity Bankrolling Al Qaida Network," August 3, 2006, https://home.treasury.gov/news/press-releases/hp45 August 3, 2006.

[153] CIA_000721-804

FBI PROTECTED MATERIAL REDACTED

financial conduits and sources of financial support for a range of Islamic extremist groups, organizations, and political parties. Some of the extremists have been involved in terrorist activities. Our study of [redacted] on some 130 Islamic financial entities has revealed that Bank Al Taqwa and Dubai Islamic Bank demonstrated especially close ties to Algeria's Islamic Salvation Front (FIS), Egypt's Gama-at al Islamiyya (IG), the Palestinian Islamic Resistance Movement (HAMAS), Saudi exile Usama Bin Ladin's terrorist Islamic Army and other Muslim Brotherhood-backed groups [redacted] extremist ties to the Saudi-owned Dar Al Maal Al Islami and Dallah Al Baraka groups and Al Rajhi Banking & Investment Company, [redacted]"[154]

6.10.2..2."[bullet point] Bank Al Taqwa, based in Nassau, is one of the most important financial conduits for the International Muslim Brotherhood (MB) [redacted] Along with its affiliate in Geneva, the bank has been a source of financial support for the Afghan and Bosnian Mujahaddin, the IG, FIS, and Tunisia's banned An Nahda movement. The bank's president has been a top MB financial officer in Europe since at least the mid-1980s, [redacted]. Its board of directors also includes a notable financial supporter of the IG and a prominent radical cleric based in Qatar."[155]

6.10.2..3."[bullet point] Dubai Islamic Bank (DIB) is a key financial conduit for Usama Bin Ladin's Islamic Army, HAMAS, and Oman's Muslim Brotherhood, [redacted]. The bank's chairman, Saeed Ahmed Lootah, is a member of the MB and a close friend of Bin Ladin's, [redacted] Bin Ladin and his Sudan-based companies maintain several accounts at DIB. The bank also is used by such nongovernment humanitarian organizations (NGOs) as Human Appeal International—an alleged financial conduit for HAMAS—and the Dar al-Birr Society, which has financed the Bosnian Mujahaddin.[156]

6.10.2..4."[bullet point] The religiously ultraconservative Al Rajhi family---owners of the Al Rajhi Banking & Investment Company, with $8.6 billion of total assets—appears to be a key financial backer of the Afghan Mujahaddin, [redacted] The family and the bank purportedly also support NGOs who help finance the Bosnian Mujaheddin, HAMAS, and other extremists."[157]

6.10.2..5."Arab Albanian Islamic Bank, Bahrain Islamic Bank, the Islamic Bank of Yemen for Finance & Investment, and Qatar International

[154] CIA000_722. This language quoted as is from the unredacted portions of this first paragraph of the Key Findings in this CIA report. Due to the CIA's redactions, it is only partially intelligible, but clearly contains a reference to "extremist ties" involving ARB and the other banks named in this portion of this first paragraph.
[155] Id.
[156] Id.
[157] CIA_000723

Islamic Bank maintain financial ties to radical extremist groups and suspect Islamic NGOs."[158]

6.10.2..6."In addition to providing the ability to bank in accordance with their religious beliefs, Islamic activists—and militants—are attracted to Islamic banks for two other reasons:"

6.10.2..6..1. "[bullet point] Top management affiliations with the MB, HAMAS, and NIF make Islamic banks a safe haven for extremist funds. [redacted] In addition, low-level bank employees at Islamic institutions—who are often hired on the basis of commitment to Islam—may turn a blind eye to money movements by extremist groups. Finally, a general lack of local regulatory scrutiny—as compared with regulation at conventional institutions—may offer additional confidence to extremists that their financial activities will not be closely examined."[159]

6.10.2..6..2. "Because of a significant amount of cross-ownership among Islamic financial institutions, Islamic bank board of directors and management teams share common personnel that may result in influence over bank policy with regard to dealings with extremists."[160]

6.10.2..7.This section of the November 20, 1997 CIA report was followed by a description of 60 Islamic institutions being capitalized by the Dallah Al Baraka Group and the Dar Al Maal Al Islami Trust; a statement that DIB Chairman Lootah was a director of four other Islamic banks in Bahrain and Bangladesh; and that Bank Al Taqwa adviser Sheikh Youssef Al Qaradawi was director or religious supervisor of Islamic financial institutions in Egypt, Kuwait, Malaysia and Qatar. The remainder of the Key Findings section of the report is redacted.

6.10.3. I found the entire November 20, 1997 CIA report, not just the "Key Findings" I have excerpted above, to be material to answering the question of whether there is evidence that al Qaeda relied on sympathetic financiers and financial institutions to raise and move money prior to September 11, 2001. Indeed, its Scope Note stated that the very purpose of the report was "to document reporting on this particular avenue for the financing of radical Islam and Islamic extremists and to assess its vulnerabilities."[161]

[158] Id.
[159] CIA_000723-724
[160] CIA_000724
[161] CIA_000727

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

6.10.3..1.    Notably, this CIA report expressly says that it is based on "reporting," that is, the process by which the CIA collects intelligence, which I have described earlier in this Expert Report.

6.10.3..2.    Given this CIA report's length, I will limit direct quotations from it to the information I found of greatest significance, and summarize the remaining information that I found also material to answering this question.

6.10.3..3.    The Scope Note to the report further stated that the report analyzed the financial and personal ties of Islamic radical movements to Islamic financial institutions, and found that a "handful" of them "appear to be actively engaged in financial militant groups," and that in some cases, the banks' executives had personal ties to Islamic extremists and activists.[162]

6.10.3..4.    In the opening section of the report, entitled "Islamic Financial Institutions Ties to Extremists Groups," the CIA stated that it had examined approximately 130 Islamic financial entities, and then singled out five as having "radical Islamic financial links." These were Al Taqwa, Dubai Islamic Bank, the Saudi owned Dar Al Maal Al Islami and Dallah Al Baraka banking groups, and the Al Rajhi Banking & Investment Company. It describes Al Taqwa and Dubai Islamic Bank as standing out from other Islamic banks, based on the evidence available at the time of the report, due to their apparently witting involvement in the financial activities of terrorist groups. [163]

6.10.3..5.    With respect to bin Ladin's terrorist activities in particular, the report described Dubai Islamic Bank's founder and chairman, Saeed Ahmed Lootah, as Bin Ladin's "friend and banker," and the bank itself as a "financial conduit" for both al Qaeda, referred to at the time by the CIA as "Usama Bin Ladin's Islamic Army," and to Hamas. The report explicitly links DIB's support of bin Ladin, Hamas, and "militant Afghani and Bosnian extremist groups," to Lootah's "conspiracy theories regarding the intentions of the United States and other Western countries to control the Islamic world."[164]

6.10.3..6.    Large portions of the section of the November 20, 1997 CIA report which focused on DIB and Lootah, entitled "Dubai Islamic Bank,"

---

[162] Id

[163] CIA_000728. As of 1997, the CIA had yet to conclude that ARB's support of terrorist groups and al Qaeda was witting, and this report states only that some of the support was "possibly" unwitting. By May 28 2003, in its report on the Al Rajhi Bank entitled, "Al-Rajhi Bank: Conduit for Extremist Finance,: the CIA had accumulated additional evidence, and as a result of its reporting and analysis, concluded that ARB's support for terrorist finance was likely witting and probable, consistent with the long-time support of Islamic extremists by senior members of the Al Rajhi family, including its then chairman and cofounder, SAAR. I discuss the evolution of the CIA's understanding of ARB's role further below in my detailed review of the substance of that 2003 report.

[164] CIA_000734

FBI PROTECTED MATERIAL REDACTED

remain redacted, amounting to roughly 56% of the text. Most of the text in the section captioned "Financial Links [of DIB/Lootah] to Usama Bin Ladin and the Islamic Army" is redacted, leaving only five sentences visible. In addition to stating that Lootah is a "close friend and business associate of Usama bin Ladin," it specified that the Islamic Army's goal was to bring about the return of the Caliphate. It then listed alleged ties of Lootah and DIB to other Dubai-based individuals and firms that maintain financial links to bin Ladin. Only one was named in the unredacted portions of this section of the report, as a DIB customer who regularly did business and financial dealings with Bin Ladin, one of his companies, and Islamic army members.[165]

6.10.3..7.   The report profiled Bin Ladin's relationships with financial institutions in the section "Terrorist Financier Usama Bin Ladin: Background and Islamic Financial Ties." It stated that his choice of financial institutions was based on personal contacts at the banks and security concerns, and that his use of DIB was probably based on his purported friendship with its chairman, Lootah.[166]

6.10.3..8.   A later section of the November 20, 1997 CIA report stated that Lootah "personally authorized, stamped, and signed" letters of credit on behalf of bin Ladin companies in Khartoum, Sudan through DIB, and stated that it was possible that Lootah did this routinely for larger transactions. The report then added that "Lootah's personal friendship with Bin Ladin suggests greater personal service for this customer," a sentence followed by an inch and a half of redacted text, which based on the formatting appears to be relate to the Lootah-bin Ladin relationship.[167]

6.10.3..9.   Two pages of the November 20, 1997 CIA report are devoted to the links between ARB and financial support for Islamic extremism, including the Afghan Mujahaddin in Pakistan, the MAK, and Islamic groups in Bosnia during the Bosnian conflict. Assessing elements of this portion of the CIA report is made more difficult by extensive redactions within the section covering ARB, entitled "Al Rajhi Banking & Investment Company." However, the unredacted elements still covered some basics of the ARB-Al Qaeda relationship. At the outset of the section, after describing the Al Rajhi family as "secretive and religiously ultraconservative," the CIA stated that "[t]he most compelling [redacted] information on Islamic extremist links to the Al Rajhi family and ARABIC [ARB] documents their financial support for the Afghan Mujahaddin in

---

[165] CIA_000734-735
[166] CIA_735
[167] CIA_000747

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

Pakistan via humanitarian organizations," including through the MAK.[168] The MAK has been described by the UN as co-founded by Bin Ladin and as a "pre-cursor" to al Qaeda that provided the essentials for military camps to train jihadists for battle in Afghanistan.[169] The early support of ARB and the Al Rajhi family for the Afghan Mujahaddin was similarly a pre-cursor to their continuing support for the major Gulf State charities providing terrorist finance to extremist groups throughout the period covered by this Expert Report.

6.10.3..10.  The ARB section of the November 20, 1997 CIA report further stated that ARB "apparently has been a conduit for funding the Mujahaddin since the early 1990s," but then redacted any further information concerning ARB's support for the Mujahaddin, before referring to "Al Rajhi financial support for several other Saudi NGOs that purportedly divert funds to Islamic extremists:" followed by a redaction of more than three inches of text which I understand, based on my experience of reading classified CIA reports, likely provided data points, analysis, and source information about that sentence.

6.10.3..11. The ARB section of the November 20, 1997 CIA report included a few additional unclassified facts about ARB and the Al Rajhi family that survived the extensive redactions. It stated that "the Al Rajhis were routinely contacted" by officials at WAMY, which it described as "a Saudi NGO where personnel often pursue an extremist agenda." It stated that "WAMY officials have couriered private Saudi donations to Islamic groups in Afghanistan and Bosnia" and put Saudi donors and foreigners in direct contact "for worthwhile Islamic causes" and would sometimes broker requests to donors when WAMY had "an ideological interest." Unfortunately, this part of the ARB section of the report is heavily redacted: there is no explanation in the unclassified section regarding this activity by ARB other than a single sentence preceded by a two-and-half inch redactions, which stated "Al Rajhi financial ties to Islamists is inconclusive."[170] Following another three inch redaction, the CIA report stated that the use of ARB by extremists in some cases "probably denotes convenience rather than Al Rajhi family involvement in financial radical groups,"

---

[168] CIA_000743

[169] "Makhtab al-Khidamat," UN Sanctions Committee, providing summary of background on entities and persons sanctioned by UN.
https://www.un.org/securitycouncil/sanctions/1267/aq_sanctions_list/summaries/entity/makhtab-al-khidamat

[170] The information in this particular CIA report only includes data up to November 20, 1997, and its carefully caveated assessments reflect both the date and caution about going beyond the data available to it at that time. Later, as described further in this Expert Report, the CIA concluded that "Senior al-Rajhi family members have long supported Islamic extremists and probably know that terrorists use their bank," and that "Bank chairman Sulayman and several other al-Rajhis have given money to suspicious individuals and organizations worldwide. Moreover. Sulayman's tight control of ARABIC activities suggests be is witting that his bank is attractive to extremists." CIA-SUB_0001 and _0004

**FBI PROTECTED MATERIAL REDACTED**

as the bank "probably" was the only choice for transferring funds to some regions, such as Jordan and the West Bank to Palestinians.[171]

6.10.3..12. The final unredacted reference to the Al Rajhi's in the ARB section of this CIA report stated, "[t]he Saudi Government undoubtably is aware of Al Rajhi's role in providing support to Muslim groups and probably even sanctions some of the support." The footnote to this statement further explained that Saudi Arabia and some other Gulf states had long been a source of financial support for Islamic causes, with "at least some of these funds [then] diverted to militants and terrorists." The last unredacted sentence in this footnote stated "[t]he difficulty of supervising overseas operations offers Riyadh a plausible defense when NGO links to radical groups are brought to light."[172]

6.10.3..13. The November 20, 1997 CIA report in the section "Ability to Bank in Accordance with Religious Beliefs," focused on ARB as being the subject of sermons by a radical Saudi cleric, Salman al Awdah, who preached that it was the only bank worthy of Muslim deposits due to it following Islamic guidelines. The CIA report further stated that "the Al Rajhi family subsequently became a major financial supporter of Awdah."[173]

6.10.3..14. After covering the use of other (non-ARB) Islamic banks for "Suspect Financial Activities," in places like Bosnia and Yemen, the November 11, 1997 CIA report turned to the "Motivations for Using Islamic Banks," and characterized the core reason as providing them safe havens including assurance that their funds and activities will not be scrutinized by officials, with the secondary purpose being ideological affinity, and a third being "sometimes, significant financial support for local Islamic movements."[174]

6.10.3..15. The concluding unredacted sections of this CIA report are almost entirely redacted, but contain a few intelligible references to the phenomenon of Islamic financial institutions support for terrorism generally. For example, page 26 of the CIA report stated "Although Gulf states acknowledge the problem of financial support to extremist

---

[171] CIA_000744. Regarding this assessment, I reiterate the points I make in the previous footnote. Documents provided in discovery by ARB and others provide further information material to ARB's involvement in Jordan and the West Bank in providing funds to Palestinians, as described later in this Expert Report.

[172] CIA_000744

[173] CIA_000748. Al Awdah, sometimes spelled al-Ouda in English, has been described as an associate of Bin Ladin and al Qaeda before 9/11, who supported their mission before his public rejection of both in 2007. See e.g. "Al Qaeda and Affiliates: Historical, Perspective, Global Presence, and Implications for U.S. Policy, Congressional Research Service, February 5, 2010, p. 2. https://digital.library.unt.edu/ark:/67531/metadc505435/m1/1/high_res_d/R41070_2010Feb05.pdf and "Salman Al-Odah: The chameleon cleric," Arab News, February 22, 2021, https://www.arabnews.com/node/1479231/saudi-arabia

[174] CIA_000746

FBI PROTECTED MATERIAL REDACTED

groups via Islamic banks, they probably will do little to tackle the problem in the near term:" The colon was followed by redacted material, and then a bullet point: "Gulf states are not likely to scrutinize the financial activities of powerful and wealthy merchants and royal family members owning shares in Islamic banks and holding director positions on their boards."[175]

6.10.4. The Appendix to the November 20, 1997 CIA Report was formatted as a chart covering the entire range of Islamic banks reviewed in the CIA research. I read the chart to have been based on a mix of open source material such as public lists of banks and their ownership, corporate records, to which the CIA Report sometimes makes reference, and intelligence sources. Only some of these Islamic banks are shown to have links to "Islamic Fundamentalists, the Muslim Brotherhood, and Islamic Extremists," and in some cases, the information about these links was redacted, and thus cannot be assessed. Leaving aside banks supporting other terrorist or extremist military activity for other terrorist groups, some of which may have been aligned with or supporting al Qaeda, ten of these institutions were directly linked in the declassified portions of the Appendix to Bin Laden and/or al Qaeda (and/or its precursors, MAK and the Islamic Army), as of November 20, 1997. I summarize the information in the chart about each of them:

6.10.4..1. *Al Ameen Securities Company, Manama, Bahrain*. "The African Muslim Agency (AMA) – a Kuwait based NGO which employed a suspect in the attempted assassination of President Mubarak— maintains an account at the Karachi branch. The AMA has ties to Usama Bin Ladin, according to an Algerian service."[176]

6.10.4..2. *Seh-In Islamic Bank, Bosnia-Herzegovina*. Listed as owned by She-in Bin Baz Kompanija, described as a Saudi cleric who owned as much as 90% of the shares, and presiding over Saudi Arabia's Ulama Council, and close to then-Saudi King Fahd. "[F]unds Makhtab al-Khidamat (MK), an NGO based in Peshawar, Pakistan closely linked with the Afghan mujahaddin and purportedly funded by Usama Bin Ladin [redacted] it funds a range of radicals [a]nd sends training militants to Bosnia, Chechnya, Palestine, and elsewhere."[177]

6.10.4..3. *Qatar International Islamic Bank, Doha, Qatar*. "Accounts at the bank are used by a top financial officer of Usama Bin Laden's Islamic Army to transfer funds."[178]

6.10.4..4. *ARB in Riyadh, Saudi Arabia.* "Used by some members of Usama Bin Ladin's Islamic Army to maintain accounts and transfer funds.

175 CIA_000753
176 CIA_000758
177 CIA_000765
178 CIA_000781

FBI PROTECTED MATERIAL REDACTED

[redacted] . . . the al Rajhis have financed radical Afghani and Kashmiri organizations in Pakistan and elsewhere. Some of the aid was provided under the guise of orphan relief and delivered to radical causes – possibly unwiting [sic] to the Al Rajhis."[179]

6.10.4..5. *Al Barakat Bank, Mogadishu, Somalia.* "Principal bank and fundraiser for Al Jihad Islamiya, the leading Islamic group in Somalia allegedly financed by Usama Bin Ladin. Al Jihad seeks to establish an Islamic agenda in Somalia and regain control over the Ogaden territory from Ethiopia."[180]

6.10.4..6. *Al Baraka Bank, Sudan,* with branches in Saudi Arabia. "Has maintained accounts for extremist financier Usama bin Laden, his firms, and his Islamic Army associates; the branch in the Al-Borg district in Khartoum houses an office Bin Ladin's Al Ikhlas International Company [redacted] which allegedly is a front for Bin Ladin's money."[181]

6.10.4..7. *Al-Shamal Islamic Bank, Khartoum, Sudan.* "NIF-controlled bank and key financial conduit for Usama Bin Ladin, his businesses, and Islamic Army members."[182]

6.10.4..8. *Islamic Bank of Western Sudan, Khartoum, Sudan.* "Usama Bin Ladin an Islamic Army member maintained several company accounts in the bank."[183]

6.10.4..9. *Tadamon Islamic Bank, Khartoum, Sudan*. "Used by several of Usama Bin Ladin's companies and Islamic Army members to transfer funds. Sudanese office of UAE-based Human Appeal International, which allegedly moves funds for HAMAS."[184]

6.10.4..10. *Dubai Islamic Bank, Dubai, UAE*. "Lootah is a close friend and business associate of extremist Usama Bin Ladin, whose companies are active customers of DIB. The bank maintains accounts for several NGOs which are suspected of financing radical Islamic groups; it appears for example, to be one of the principal banks for Human Appeal International an NGO that funds HAMAS."[185]

6.11. *Post-9/11 Assessments by the CIA*

[179] CIA_000783
[180] CIA_000786
[181] Al Baraka is an entirely different bank, and part of a different bank group, from Al Barakat, and was owned by Sheikh Saleh Abdullah Kamel and his family, from Saudi Arabia. CIA_000786
[182] CIA_000787
[183] CIA_000790
[184] CIA_000791
[185] CIA_000797

6.11.1. After the 9/11 attacks, the CIA undertook further work to determine the role of financial supporters of bin Ladin in enabling his ability to carry out terrorist attacks against the United States and others bin Ladin viewed to be aligned with the United States.

6.11.2. Some of this work was reflected in a number of finished analytic reports that were declassified under EO 14040 and in response to Plaintiffs' ARB subpoena to the CIA, each of which provided one or more data points material to the question of whether there is evidence that Al Qaeda relied on sympathetic financiers and financial institutions to raise and move money prior to September 11, 2001.

6.11.3. These data points were included within a February 27 2002 report entitled "Identifying Al-Qa'ida's Donors and Fundraisers: a Status Report," an August 28, 2002 report on Al-Haramain, entitled, "Al-Haramain: Support for Extremists and Terrorists," a November 14, 2002 report entitled "Saudi-Based Financial Support for Terrorist Organizations; a December 12, 2002 report on an Islamic charity, the Talibah International Aid Association, entitled, "Talibah: Linking Extremists in the Balkans and the United States; a March 10, 2003 report entitled "Al-Qa'ida in Sudan, 1992-96: Old School Ties Lead Down Dangerous Paths;' a May 28 2003 report on the Al Rajhi Bank entitled, "Al-Rajhi Bank: Conduit for Extremist Finance," and a May 21, 2004 Report on Islamic Banking, entitled, "Islamic Banking: A Potential Economic Enabling in the Muslim World." Below I will summarize a number of the data points from each of these CIA reports, which succinctly capture my own understandings and assessments on the issues discussed here, addressing the reports in chronological order.

6.11.4. The February 27, 2002 CIA report, "Identifying Al-Qa'ida's Donors and Fundraisers: a Status Report, prepared by the CIA's CTC Office of Terrorism analysis, contained three pages of text and a two page appendix, plus one "Key Finding," stated at the outset. The Key Finding stated in pertinent part: "An array of fragmentary intelligence reporting indicates that wealthy individuals in the Arabian Penisula and grassroots supporters from around the world are critical funding sources for al-Qa'ida." It stated its reporting is mostly anecdotal and old, and that further work is needed from the CIA, Defense, FBI and Treasury to disrupt future al-Qa'ida operations.[186]

6.11.4..1.Despite the "fragmentary nature of the fundings," the CIA found that it had "identified several wealthy Saudi individuals and families we suspect of supporting al-Qa'ida – including Shaykh Adil Batarji, the al-Rajhi family, the Julaydan family, and Ahmad Salah Jamjoon." It then identified the Jamjoon information as "typical of the fragmentary and dated nature of our information."[187]

[186] CIA_000194
[187] CIA_000195

FBI PROTECTED MATERIAL REDACTED

6.11.4..2.The report's appendix provided what it terms "Three Al-Qa'ida Donor Case Studies."[188]

6.11.4..3.One of the three Case Studies concerned a Saudi relative of "a well-known al-Qa'ida associate Wa'el Hamza Julaydan" named Ibrahim Julaydan. In the unredacted text, the Case Study merely stated that Julaydan "may donate large amounts of funds through his family to terrorists, including Bin Ladin." All the other material in that section of the report is redacted, so there is no detail provided beyond that bald statement.[189] (As discussed later in this Expert Report, Wa'el Julaidan maintained accounts at ARB and was issued a credit card by the bank. He was designated by the Treasury Department as a SDGT on September 6, 2002, about six months after the date of this CIA report.)[190]

6.11.4..4.The other two "Case Studies" also contained redactions, but provided greater unredacted detail. These Case Studies were on the Al-Rajhi Family and on Adil Abd Al-Jalil Adil Batarji.

6.11.4..5.The Al-Rajhi Family profile was captioned with the words "Illicit Activity," followed by a redaction, and then the statement that "several Al-Rajhi family members donate money to businesses tied to terrorists and personally oversee transactions destined for terrorists." These assertions were followed by about 13 lines of redacted material. The case study then stated that "[a]s of [redacted] 2000, Sulaiman al-Rajhi was also one of 128 permanent members of International Islamic Relief Organization (IIRO),"[191] followed by a redacted line, and then the phrase "al Qa'ida has infiltrated some of IIRO's branches."[192]

6.11.4..6.The third case study on Batarji also had a caption "Illicit Activity," followed by the statement: "Adil Batarji is a long-time Bin Ladin and al-Qa'ida donor, fundraiser, and businessman. Batarji also is closely associated with several NGOs and Sudanese businesses that have supported al-Qa'ida and other Islamic groups." It then stated that "Batarji is a close associate of Bin Ladin and raises funds on his behalf, and financially supported 1993 World Trade Center Bomber Ramzi

---

[188] CIA_000198-199

[189] CIA_000199

[190] "Treasury Department Statement on the Designation of Wa'el Hamza Julidan," September 6, 2002, https://home.treasury.gov/news/press-releases/po3397

[191] I am aware of documents produced by ARB documenting efforts by SAAR to resign from this position due to his having insufficient time to devote to it, and accordingly, do not rely on this data point from the CIA profile of the Al Rajhi family's involvement with IIRO, but include this statement within the report for the sake of completeness. See ARB-00039593-09594. These documents provide evidence that the IIRO had failed to remove SAAR's name from the list of its permanent members in response to his letters of resignation, a fact apparently not known to the CIA given the IIRO's continued treatment of him as a permanent member of its governance through at least October 4, 1998, and based on the CIA's statement, as late as some date in 2000.

[192] CIA-000198

Yousef," a statement then is followed by a redaction. This case study stated that Batarji was providing religious advice to Bin Ladin, and that Yemeni extremists had sought his advice "possibly relating to minimizing Muslim loss of life in attacks against US interests." The profile stated that Batarji had headed or been a senior number of several NGOs that the CIA suspected supported terrorists, most significantly the Saudi charity Lajnat al-Birr al-Islamia, which it characterized as reportedly affiliated with al-Qa'ida, among other NGOs, which included the International Charity Committee in Bosnia, a charity that had been publicly criticized in Croatian newspapers for supporting terrorism and not conducting relief work.[193]

6.11.5. The August 28, 2002 report on Al-Haramain stated, in essence, that Al-Haramain had supported Islamic terrorist and militant groups, including bin Ladin and his associates, prior to 9/11 and continued to do so after 9/11, including cover and logistic support for Al Qaeda cells attacking the U.S. These included the 1998 attacks on the US Embassies in Kenya and in Tanzania. It found that "at least 20 al-Haramain field offices and representatives operating in 50 countries in Africa, Asia, Europe and North America, as well as is headquarters in Saudi Arabia, appear to be providing financial and logistic support to al-Qaida," including providing "financial support or collusion in terrorist plots," some of which were "ongoing plots."[194]

6.11.5..1. The first footnote in the report stated that Al-Haramain "is a Saudi based NGO funded by the Saudi Government and wealthy individuals sympathetic to the Salafiyya movement.[redacted]"[195]

6.11.5..2. The report then cited documents seized in a raid by NATO forces in the Balkans as suggesting that employees at Al-Haramain offices in Albania, Bosnia, Croatia, and Kosovo continued to support Al Qaeda and affiliated groups, and that people in each of these offices were also funded by, or worked with, bin Ladin. It also provided data points on other connections between Al-Haramain and Al Qaeda, in Tanzania, relating to the 1988 U.S. Embassy bombing there, and an employee in its Somalia office having possible ties to the terrorists who attacked the USS Cole, another terrorist attack mounted by Al Qaeda which took place prior to 9/11.[196]

---

[193] CIA_000198-199

[194] CIA-SUB_007-0019, quoted material is from CIA-SUB_0010

[195] CIA-SUB_00100

[196] CIA-SUB_0011. The U.S.S. Cole attack took place while the U.S. naval vessel was in harbor in Yemen on October 10, 2000. This terrorist attack killed 17 American sailors and injured 40 others, and was found to have been organized and carried out by al Qaeda. See FBI case history, USS Cole Combing, https://www.fbi.gov/history/famous-cases/uss-cole-bombing and Remarks of Attorney General John Ashcroft, Indictment for the Bombing of the U.S.S. Cole, May 15, 2003, https://www.justice.gov/archive/ag/speeches/2003/051503agremarksusscole.htm

6.11.5..3. The CIA report contained data points relating to ongoing use by Al-Haramain of bank accounts, contained in a series of bullet points in the section of the CIA report, "Adapting Under Scrutiny." These included:

- "HIF [Al-Haramain] employees' accounts in Albania previously received money from an HIF official account at al-Rajhi bank."
- "HIF headquarters sent [redacted[ cash to the Tanzania office via courier. The transfer is particularly suspicious given [redacted] that the chief of the office is wanted in Algeria for inciting Islamic demonstrations against the government. [redacted]"
- "[redacted] funds from an HIF account in Saudi Arabia at al Rajhi bank were transferred to an al-Ansar Welfare Trust in Kashmir. Al-Ansar Welfare Trust is a front for Lashkar-i-Tayyiba (LT) and Tehrik ul-Mujahidin, which have been listed by the United States as terrorist groups."[197]

6.11.6. On November 14, 2002, the CIA's CTC Office of Terrorism Analysis issued a ten page report entitled "Saudi-Based Financial Support for Terrorist Organizations," with two additional pages of "Key Findings." The Key Findings directly addressed the question of whether al Qaeda benefitted from sympathetic financiers and banks before the 9/11 attacks, and provided an answer in the affirmative:

6.11.6..1. "Saudi Arabia is a key base of financial support for al-Qa'ida and several other terrorist organizations. We estimate that since the mid-1990's several tens of millions of dollars a year has flowed to terrorists from a variety of sources in the Kingdom. Most of the money originates from wealthy individuals, fundraisers who solicit smaller donations, and diversions from non-governmental organizations (NGOs); a portion of the funding is derived from legitimate religious contributions."[198]

6.11.6..2. "Al-Qa'ida has relied on its node in Saudi Arabia for bulk fundraising for several years [readacted][.] Money that originates in the Kingdom is dispersed to al-Qa'ida members operating in Pakistan and Afghanistan, as well as Yemen, Iran, and other countries whose operatives have relocated following the loss of Afghanistan as a safe haven."[199]

6.11.6..3. "[bullet] Donors who are members of prominent merchant families often have business dealings or frequent interactions with the Saudi royal family, suggesting that Riyadh may be hesitant [to] move against their businesses and bank accounts. [redacted]"

---

[197] CIA-SUB_0013
[198] CIA_000144
[199] Id

6.11.7. The remainder of this CIA report provided detail on its Key Findings. Pertinent excerpts follow:

6.11.7..1. "A Major [S]ource of Terrorist Funds. [redacted] al-Qa'ida and several other terrorist and militant groups consider Saudi Arabia a key base of financial support. [redacted] we estimate that since the mid-1990s terrorist groups have received several tens of millions of dollars a year from Saudi sources. Most of the money originates from wealthy individuals, fundraisers who solicit smaller donations, and non-governmental organizations (NGOs)."[200]

6.11.7..2. "[bullet] Most of the larger financiers, however, knowingly donate funds to al-Qa'ida and are witting the money finances terrorist activity [redacted] Several of these [apparent redaction] nships [sic, perhaps meaning 'relationships'] with Bin Ladin or other key al-Qa'ida operates since at least the 1990's."[201]

6.11.7..3. "We estimate that half or more of al-Qa'ida's estimated pre-9/11 "budget" was raised in Saudi Arabia."[202]

6.11.7..4. "**Key Financial Base for Al-Qa'ida** Bin Ladin's network has relied on its node in Saudi Arabia for the bulk of its fundraising for several years [one inch, about six lines redacted]. Money that originates in the Kingdom is dispersed to al-Qa'ida members in Pakistan and Afghanistan, as well as Yemen, Iran, and other countries where key al-Qa'ida operatives have relocated over the past year following the loss of Afghanistan as a safehaven."[203]

6.11.7..5. "[bullet point] Al Qa'ida members in Yemen – the key platform for operational planning in the Gulf – get the majority of their financial support from Saudi Arabia. [redaction of about 10 lines][204]

6.11.7..6. "[bullet point] Some funding is also going from Saudi Arabia to finance al Qaeda operatives and al-Qa'ida linked terrorist groups in South East Asia.[205]

6.11.7..7. "**Major Donors** We have identified several wealthy Saudi individuals and families we suspect of support the al-Qa'ida network. Many of the donors come from prominent merchant families in Jeddah, and they probably account for the largest share of al-Qa'ida's income. These families usually have large, diversified business holdings or control

[200] CIA_000147
[201] Id
[202] Id
[203] CIA_000148
[204] Id
[205] Id

non-governmental organizations within the Kingdom and the Middle East that provide vehicles for transferring funds to terrorists." [approximately five lines redacted][206]

6.11.8. The "Major Donors" section of the CIA report then listed examples of these key sympathetic "major donors" to al Qaeda.[207] They included:

6.11.8..1. Yasin al-Qadi, a Saudi business executive who the CIA states donated funds to al-Qa'ida and other Islamic extremist groups, according to media reports, and then make additional statements about the specifics of his support to an NGO he founded, the Muwafaq Islamic charity, for this use.[208]

6.11.8..2. Muhammad Jamal Khalifa, bin Ladin's brother-in-law, who as previously stated was implicated in supporting terrorist Ramzi Yousef in the Philippines where Yousef was undertaking steps to blow up ten to twelve jets in 1995, after Yousef had already bombed the World Trade Center in 1993.[209]

6.11.8..3. Sheikh Adil Batterjee, a close business associate of bin Ladin and longtime al-Qaida donor and fundraiser, who the CIA stated used Islamic charities to fund extremists and militants "under the guise of rendering humanitarian aid and support."[210]

6.11.8..4. The Bin Mahfouz family, which owned a Saudi bank among other businesses.[211]

6.11.8..5. The Al Rajhi family, owner of ARB, the latter of which the report described as a "conduit for funds for Islamic extremists and for the 11 September hijackers." The report also stated that "Al-Rajhi Bank has maintained accounts for individuals linked to Usama bin Ladin" and an associated terrorist group based in Egypt, which it referred to here as "Egyptian Islamic Jihad."[212]

6.11.9. The three-page December 12, 2002 CIA report entitled "Taibah: Linking Extremists in the Balkans and the United States," prepared by the CIA's CTC Office of Terrorism Analysis, characterizes the "Taibah International Aid Association," as an Islamic charitable organization with "extensive ties to al-

[206] Id
[207] CIA_000148
[208] CIA_001149
[209] Id
[210] Id. There are many spellings of Batterjee's name used in this report. I have sought in each case to preserve the one used in the document I am referencing. The UN terrorist finance sanctions designating Batterjee, and later delisting him from sanctions, listed his name as Adel Abdul Jalil Ibrahim Batterjee. https://press.un.org/en/2013/sc10884.doc.htm
[211] Id
[212] Id

Qa'ida and other extremists in the Balkans and the United States." It contains a few data points providing evidence that al Qaeda relied on sympathetic financiers and financial institutions to raise and move money prior to the 9/11 attacks, including ARB.

6.11.9..1. The context for the report was the CIA's finding that Taibah's office in Sarajevo, Bosnia was "an active part of the local extremist facilitator network composed of other nefarious NGOs and al-Qa'ida facilitators," who had operated with mujahidin forces in Bosnia in December 1995, donated to a local radical group that was possibly surveilling U.S. military installations, and associated with the Global Relief Foundation, a U.S.-based NGO sanctioned by the U.S. in December 2001, and had an employee who had been arrested by Bosnian authorities under suspicion of being part of a terrorist cell that threatened the U.S. Embassy in Sarajevo.[213]

6.11.9..2. This CIA report found that the Sarajevo office of Taibah had "received regular funding from banks and individuals with ties to al-Qaida." The report then listed an institution named "Depozitna Bank," with a redaction following the bank's name and the statement that one of that bank's investors was "Wa'il Julayden," who it described as "a logistic and financial facilitator for al Qaeda."

6.11.9..2..1. "Wa'el Hamza Julaidan" was formally designated as a terrorist financier by both Saudi Arabia and the United States on December 6, 2002. The U.S. statement accompanying the designation stated "Julaidan, a Saudi citizen, is an associate of Usama bin Ladin. Julaidan fought with bin Laden in Afghanistan in the 1980s. Julaidan is also associated with several individuals and entities linked to al-Qa'ida, including bin Ladin lieutenants, Ayman al-Zawahri, Abu Zubaida, and Mohammed Atef; and the organizations: Makhtab al Khedmat, the Rabita Trust, and al-Gam'a al-Islamiya. These individuals and entities have been previously designated under President Bush's Executive Order and by the United Nations.  Bin Laden himself acknowledged his close ties to Julaidan during a 1999 interview with al-Jazeera TV. When referring to the assassination of al-Qa'ida co-founder Abdullah Azzam, bin Ladin stated that We were all in one boat, as is known to you, including our brother, Wa'il Julaidan. Julaidan has established contacts with several known Arab Islamic extremists, including bin Ladin's principal lieutenant, Ayman al-Zawahri. Another bin Ladin lieutenant, Abu Zubaida, claimed that he accompanied Julaidan from

---

[213] CIA-SUB_0031

FBI PROTECTED MATERIAL REDACTED

Pakistan to Kandahar, Afghanistan during the summer of 2000. Zubaida said that Julaidan met with bin Ladin and senior bin Ladin lieutenant Mohammed Atef soon after arriving in Kandahar. In February 2000, Julaidan was appointed to the Board of Trustees of the Rabita Trust and served as its Director General. The Rabita Trust is an NGO designated under President Bush's Executive Order as an organization that provided logistical and financial support to al-Qa'ida."[214]

6.11.9..2..2. The CIA report found that Taibah's Sarajevo office received approximately $140,000 from WAMY-Jeddah in May 2001, and that more than $48,000 was transferred through ARB in Saudi Arabia, which the CIA stated "has handled numerous transactions of NGOs with known ties to al-Qa'ida such as GRF [Global Relief Fund] and al-Haramain."[215]

6.11.9..2..3. The CIA report found that "Taibah's financial practices mirror those of other nefarious NGOs—they often receive large sums of money from known extremists that seem to exceed what they would need for legitimate purposes."[216]

6.11.9..2..4. In summary, the report found (a) that this Bosnian-based charity was owned in part by a major bin Ladin financier, (b) receiving funds from the Saudi charity, WAMY, linked to support from terrorists, and (c) used ARB to handle more than $48,000 after it had handled many transactions for NGOs tied to al Qaeda.[217]

6.11.10. The ten-page March 10, 2003 CIA report entitled "Al-Qa'ida in Sudan, 1992-96: Old School Ties Lead Down Dangerous Paths," exclusively focused on events and activities relating to the period when bin Ladin was based in Sudan, and thus all pre-9/11.[218] It contained only three paragraphs on bin Ladin's financial infrastructure during that time. Each of these paragraphs is material to the question of whether al Qaeda relied on sympathetic financiers and financial

---

[214] Treasury Department Statement on the Designation of Wa'el Hamza Julidan, September 6, 2002, https://home.treasury.gov/news/press-releases/js700  Although it is not specified by the Treasury Department, Julaidan was also the director of the MWL's field office in Peshawar, Pakistan, working on behalf of Afghans then, in the period that bin Ladin was still in Pakistan and about to move to Sudan. See "Directory of Humanitarian Agencies Working for Afghans," September 1992, Agency Coordination Body for Afghan Relief, Peshawar, Pakistan, p. 231.
[215] CIA-SUB_0032
[216] Id
[217] Id
[218] CIA_000038-52

institutions prior to 9/11. I provide the pertinent parts of this section of the report:

6.11.10..1. "[M]erchants in Saudi Arabia who built business ties to Bin Ladin's companies in Sudan, and who also finance extremists, include Ibrahim Said Badoaoud, Adil Batarga, Yasin Qadi, and members of the Jamjun and al-Rajhi families."[219]

6.11.10..1..1. I note that Badaoud had three accounts at ARB that SAMA later required ARB to seize.[220] Al Qadi had eight accounts at ARB, which SAMA later required ARB to seize.[221] ARB also provided banking services to Al-Birr a/k/a Benevolence, the NGO controlled by Batterjee (spelled in this CIA report as Batarga), which became subject to US and UN sanctions after the 9/11 attacks due to its support for al Qaeda.[222]

6.11.10..2. "[bullet point] A letter found in Afghanistan in 2002 suggests that Adil Batargi and Yasin Qadi each served as Bin Ladin's financial manager in Sudan at some point before 1996."[223]

6.11.10..3. "Bin Ladin also made financial and commercial connections in Dubai. For example, Bin Ladin's Sudan-based companies and his financial officers opened bank accounts and letters of credit at Dubai Islamic Bank (DIB) with the active help of DIB Chairman Sa'id Ahmed Lootah."[224]

6.11.11. The May 28, 2003 CIA report entitled "Al-Rajhi Bank: Conduit for Extremist Finance," prepared by the CIA's Counter-terrorist Center's Office of Terrorism Analysis, consisted of a cover page, a one paragraph summary on its second pages, and four pages of text, of which about 40 lines or six inches of text are redacted. It contained data points and analysis throughout that is material to answering the question of whether there is evidence that al Qaeda relied on sympathetic financiers and financial institutions to raise and move money prior

[219] CIA_000045
[220] ARB-0014466
[221] ARB-0014465-4466
[222] ARB-0039583; see also UN sanctions summary on Al-Birr: "The Benevolence International Foundation was listed on 21 November 2002 pursuant to paragraphs 1 and 2 of resolution 1390 (2002) as being associated with Al-Qaida, Usama bin Laden or the Taliban for "participating in the financing, planning, facilitating, preparing or perpetrating of acts or activities by, in conjunction with, under the name of, on behalf or in support of", "supplying, selling or transferring arms and related materiel to" or "otherwise supporting acts or activities of" Usama bin Laden and Al-Qaida." UN Security Council Summary, 1267 Sanctions Committee, Benevolence Foundation, https://www.un.org/securitycouncil/sanctions/1267/aq_sanctions_list/summaries/entity/benevolence-international-foundation
[223] Id
[224] CIA_00045

to September 11, 2001. Its one-paragraph Executive Summary, entitled "Summary" addressed this point head-on with regard to Al Rajhi bank, as follows:

6.11.11..1. "Islamic extremists have used Al-Rajhi Banking and Investment Corporation (ARABIC) [ARB] since at least the mid-1990s as a conduit for terrorist transactions, probably because they find the bank's vast network and adherence to Islamic principles both convenient and ideologically sound. Senior al-Rajhi family members have long supported Islamic extremists and probably know that terrorists use their bank. [redacted] senior al-Rajhi family members control the banks' most important decisions and that ARABIC's principle managers answer directly to Sulayman. The al-Rajhis know they are under scrutiny and they have moved to conceal their activities from financial regulatory authorities. The 12 May bombings in Riyadh probably will make the Saudi Government more amenable to investigating the al-Rajhi family, as they have already begun to target other alleged al-Qa'ida donors. [redacted]"[225]

6.11.11..2. The entire text of this report is relevant to Question 5, "is there evidence that Al Rajhi Bank and its principals had unique relationships with Al-Haramain Islamic Foundation, MWL, IIRO, and WAMY before September 11, 2001?." Accordingly, I make additional reference to it in the section of this Expert Report addressing that specific question, while stating here that additional portions of this CIA report provided further evidence that al Qaeda relied on sympathetic financials and financial institutions to raise and move money prior to September 11, 2001.

6.11.12. The final CIA report that I am relying on to answer this question is the report entitled "Islamic Banking: A Potential Economic Enabler in the Muslim World," dated May 21, 2004, which referenced the use of Islamic banking institutions prior to the 9/11 attacks, describing their pre-9/11 use for terrorist financing, and distinguishing banks who changed their practices after 9/11 from those who did not. The report's observations and findings on this topic included in pertinent part:

6.11.12..1. "Although publicity about Islamic banks being havens for terrorist assets was widespread after 9/11, once tighter regulations and heightened scrutiny on financial institutions worldwide were put into place to guard against terrorist financial activities, high-profile

[225] CIA-SUB_0002

Sunni Islamic extremist groups largely abandoned Islamic and conventional banks."[226]

6.11.12..2. "[bullet] Islamic banks were prominent vehicles for terrorist groups like al-Qa'ida, HAMAS, Egypt's al-Gama'at al-Islamiyya, and the Egyptian Islamic Group throughout the 1990s, when most countries did not have laws and regulations in place to deter terrorist from using financial institutions."[227]

6.11.12..3. "[bullet] Management of Islamic institutions now employ better internal control procedures to ensure terrorists are not using their banks. [redaction]"[228]

6.11.12..4. "Nevertheless, a few banks that operate under Islamic principles, such as the Al-Rajhi Banking and Investment Company in Saudi Arabia, are still of concern because of longtime use by al-Qa'ida operatives and other terrorists. The Saudi-based Bank al-Jazira and Saba Islamic Bank in Sanaa, Yemen, are also of concern because of their use by extremists."[229]

6.11.12..5. "[bullet] Some of the owners of these institution—such as Shayk Suleiman al-Rajhi in Saudi Arabia and Salih al-Kamel and Abdual Majid Zinani in Yemen—reportedly have provided widespread funding to al-Qa'ida, HAMAS, and various mujahadin groups." [redaction][230]

6.11.12..6. **Al-Rajhi Family Complicity and Control.** ***"Senior al-Rajhi family members have long supported Islamic extremists and probably know that terrorists use their bank.*** Bank chairman Sulayman and several other al-Rajhis have given money to suspicious individuals and organizations worldwide. Moreover, Sulayman's tight control of ARABIC [ARB] activities suggests he is witting that his bank is attractive to extremists."[231]

6.11.12..7. [bullet point] "ARABIC [ARB] Chairman Salyman al-Rajhi and his brother Saleh al-Raji transferred $5 million to Germany and Pakistan in December 1998. [redacted] The brothers used a unique computer

[226] CIA-SUB_0024
[227] Id
[228] Id
[229] Id
[230] Id
[231] Id. Thus, by May 24, 2004, the time the CIA disseminated this report within the U.S. government, the CIA's view of the head of ARB, and its cofounder, SAAR, had shifted from his possibly not being witting of the use of the bank for supporting terrorism, to an assessment which finds that the evidence "suggests he is witting" that he has made his bank "attractive to extremists."

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

code to send funds at regular intervals to unspecified recipients." [Two lines and a portion of a third line that follow are redacted].[232]

6.12.   *Assessments by the 9/11 Commission and its Terrorist Financing Staff Report*

6.13.   In its final report, the 9/11 Commission stated bin Ladin and al Qaeda were able to succeed in Afghanistan due to Bin Ladin understanding that he needed "an increasingly complex, almost worldwide organization" to meet al Qaeda's objectives and needs. It identified his support from sympathetic financiers as central to that undertaking, as follows: "The organization included a financial support network that came to be known as the "Golden Chain," put together mainly by financiers in Saudi Arabia and the Person Gulf states. Donations flowed through charities or other nongovernmental organizations (NGOS). Bin Ladin and the "Afghan Arabs" drew largely on funds raised by the network, whose agents roamed world markets to buy arms and supplies for the mujahideen, or "holy warriors."[233]

6.14.   The 9/11 Commission's final report ("9/11 Report") provided some of the history of how the funding of the Arab fighters in Afghanistan was undertaken, tracing it back to bin Ladin's creation, with another Islamic extremist, Abdullah Azzam, of the MAK or "Bureau of Services" to meet (and fund) the logistical requirements for the mujahideen in Afghanistan.[234] The 9/11 Report also provided further information on the centrality of the financiers associated with the Golden Chain to provide funding to the Taliban which solidified the Taliban's ability to help bin Ladin circumvent any restrictions on his freedom of movement or activities.[235] It then reached the following conclusion:

6.14.1.   "Al Qaeda appears to have relied on a core group of financial facilitators who raised money from a variety of donors and other fund-raisers, primarily in the Gulf countries and particularly in Saudi Arabia. Some individual donors knew, and others did not, the ultimate destination of their donations."[236]

6.15.   Although the 9/11 Commission found that the chief of the CIA unit responsible for organizing and producing intelligence on bin Ladin was not very interested in "following the money," it stated that despite the CIA's limited emphasis on the issue, the CIA had obtained "a general understanding of how al Qaeda raised money."[237] As set forth in the 9/11 Report:

6.15.1.   "[The CIA] knew relativity early, for example, about the loose affiliation of financial institutions, businesses, and wealthy individuals who supported extremist Islamic activities. Much of the earlier reporting on al Qaeda's financial situation and its structure came from Jama Ahmed al Fadl . . . After the 1998 embassy bombings, the U.S. government tried to develop a clearer picture of Bin

---

[232] Id
[233] 9/11 Commission, p. 55
[234] Id, p. 56
[235] Id, p. 66
[236] Id, p. 170
[237] Id, p. 185

FBI PROTECTED MATERIAL REDACTED

Ladin's finances. A U.S. interagency group traveled to Saudi Arabia twice, in 1999 and 2000, to get information from the Saudis about their understanding of those finances. The group eventually concluded that the oft-repeated assertion that Bin Ladin was funding al Qaeda from his personal fortune was in fact not true."[238]

6.15.2. "The officials developed a new theory: al Qaeda was getting its money elsewhere, and the United States needed to focus on other sources of funding, such as charities, wealthy donors, and financial facilitators."[239]

6.15.3. Three staff members of the 9/11 Commission wrote the "Monograph" as a Staff Report to the Commission providing some additional analysis of some of the terrorist finance issues raised by 9/11. The Monograph was published by the Commission and is available from its website. That said, its director, Philip Zelikow, stated when it was issued that the Commissioners had been briefed on it and reviewed earlier drafts, but had not formally approved the text. Despite this limitation, the Monograph amplified several terrorist financing findings beyond those covered in the 9/11 Report itself. A number of its observations and findings are material to the question of whether al Qaeda relied on sympathetic financiers and financial institutions to raise and move money prior to 9/11. [240]

6.15.4. Among the key findings from the Executive Summary of the Monograph is that bin Ladin relied on raising some $30 million a year "by diversions of money from Islamic charities and the use of well-placed financial facilitators who gathered money from both witting and unwitting donors, primarily in the Gulf region."[241]

6.15.5. The Executive Summary further found that while al Qaeda used formal banking channels less after his relocation to Afghanistan in 1996, his "[s]upporters and other operatives continued to use banks, particularly in the Gulf region, to move money on behalf of al Qaeda." The primary use was stated to be paying off the Taliban, with lesser amounts spent to train operatives at terrorist camps in Afghanistan, build out terrorist networks and alliances with other terrorist groups, support "jihadists and their families," with "a relatively small amount of money, estimated at $400,000-$500,000, used directly on the September 11 attack themselves.[242]

6.15.6. Most of the Monograph is taken up by a review of how the U.S. government approached terrorist finance prior to 9/11, bureaucratic differences and constraints, and what it did afterward, with a heavy emphasis on the difficulties in getting the Saudi government to take action before 9/11, and even afterwards

[238] Id, p. 185-186
[239] Id, p. 186
[240] "Monograph on Terrorist Financing," Staff Report, 9/11 Commission, https://govinfo.library.unt.edu/911/staff_statements/911_TerrFin_Monograph.pdf
[241] Id, Executive Summary, p. 4
[242] Id, p. 4

FBI PROTECTED MATERIAL REDACTED

until the Riyadh bombings of May 12, 2003. The statements from the Monograph set forth above are repeated several times in the body of the Monograph, with little further detail, and appear in essence to be the staff's summary of what the CIA had learned about bin Ladin's and al Qaeda's funding over the years prior to 9/11. The statements are material principally in providing an independent assessment that al Qaeda did, in fact, rely on sympathetic financiers and financial institutions to raise and move money prior to 9/11. The Monograph also addresses the pre-9/11 information the U.S. government had developed on the Saudi charity Al-Haramain, and the history of U. S./Saudi engagement on terrorist support by that charity, but does not discuss the specifics of Al-Haramain's banking relationships.

6.16. *State Department Assessments pre-9/11*

6.17. Each year during the 1990's, the State Department issued a product called "Patterns of Global Terrorism," prepared by its Counterterrorism office. They did not generally include a "terrorist finance" component, as the Bureau of International Narcotics and Law Enforcement ("INL") at the State Department, where I served, covered international financial crime issues. However, in regards to bin Ladin, the State Department did state that funding for bin Laden and al Qaeda relied in part on donations from like-minded supporters, and covertly siphoned funds from donations to Muslim charitable organizations, referencing this in Patterns of Global Terrorism 1998 (published April 1999), Patterns of Global Terrorism 1999 (published April 2000), thereby facilitating attacks on the U.S. such as the August 1998 Embassy bombings and the October 2000 attack on the USS Cole.[243]

6.18. *NSC and Treasury Department Assessments pre-9/11*

6.19. Over the course of the Clinton Administration (1993-2001), and especially after the August 1998 Embassy bombings, the NSC came to recognize that al Qaeda and bin Ladin had developed the capacity to threaten the United States, helped by, in the words of then White House counter-terrorism czar Clarke, "a lot of the money being raised…coming from people in Saudi Arabia." As Clarke stated in his book on his tenure in the White House during the years in which his work was dominated by his efforts to combat terrorism, "[m]any Saudi charities being used by al-Qaeda were quasi-governmental entities that the regime used to spread its version of Islam abroad." [244] Clarke further concluded that Bosnia had proven to be a "guidebook to the bin Laden network," where beginning in 1992, former Afghan mujahadeen showed up, accompanied by "the arrangements, the money men, logisticians and "charities," who arranged "front companies and banking networks."[245]

[243] Patterns of Global Terrorism, U.S. Department of States, for 1998 and 1999, published in April 1999 and April 2000 respectively. Profiles of bin Ladin. Archived at https://1997-2001.state.gov/global/terrorism/1998Report/sponsor.html and https://1997-2001.state.gov/global/terrorism/1999report/patterns.pdf

[244] *Against all Enemies*, Richard A. Clark, Free Press/Simon & Schuster (2004), p. 193

[245] Id, p. 137

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

6.20.    Clarke's assessment is corroborated by the assessments made by two of his senior staffers at the NSC on terrorism, Daniel Benjamin and Steven Simon, who described the work of the Treasury Department during the Clinton years to understand al Qaeda's funding network. Their summary of that work during their time at the Clinton NSC prior to 9/11, as set forth in their 2002 Book, "The Age of Sacred Terror," is as follows:

> 6.20.1.    "It took months, but as information was gathered and evaluated, a picture emerged that was far more intricate than anyone had imagined. Bin Laden's years as a "trusted third party," gathering contributions from wealthy Gulf families and establishing ties with Islamic charities, had paid off for him. Streams of money were circulating out of the Gulf states by way of regional banking centers, especially Dubai, and then being transferred electronically or carried by hand to Pakistan or Afghanistan. [citation to two articles in major U.S. media, listed in the footnote below] From there, funds would be wired or carried to terrorist cells around the world. Some Islamic NGOs were acting as conduits to channel money to al-Qaeda operatives. Rich Arab contributors, it became clear, were providing an important chunk of the al-Qaeda budget. Banks both conventional and Islamic . . . were laundering funds for the terrorists…[246]

6.21.    *U.S. Government Actions pre-9/11*

6.22.    As reflected in the CIA reporting and the State Department's Patterns of Global Terrorism, as well as the United States' prompt signing of the UN Terrorist Finance Convention as soon as it was opened for signature, elements of the U.S. government, starting with the National Security Council, had come to recognize that terrorist financing was a serious threat to the national security of the United States, and that bin Ladin was relying on sympathetic donors, not just his own money, to build al Qaeda's capability to strike the United States. As I learned in 1999 while I was Deputy Assistant Secretary of State, at Clarke's direction the NSC led interagency trips to Saudi Arabia that year (and as I learned later, also in 2000), and then "succeeded in dispelling the myth that Bin Ladin was funding al Qaeda from his personal fortune. The group also focused on trying

---

[246] *The Age of Sacred Terror,* Daniel Benjamin and Steven Simon, Random House, 2002, pp. 269-270. This paragraph cites to a pre-9/11 front-page article in the New York Times, "U.S. Officials Say Aid for Terrorists Came Through Two Persian Gulf Nations," New York Times, July 8, 1999, https://www.nytimes.com/1999/07/08/world/us-officials-say-aid-for-terrorists-came-through-two-persian-gulf-nations.html  The article stated that "[t]he Central Intelligence Agency has obtained evidence that Mr. bin Laden has been allowed to funnel money through the Dubai Islamic Bank in Dubai, which the United Arab Emirates Government effectively controls." In addition to the UAE, the article refers to financial flows through Qatar. Benjamin and Simon and then cite a Los Angeles Times story, published after 9/11, describing the use of UAE banks to provide funds to al Qaeda prior to 9/11, as highlighted in its opening paragraph: "Until Sept. 11, Osama bin Laden's terrorists in Afghanistan used the Persian Gulf crossroads of the United Arab Emirates as their lifeline to the outside world. Poor oversight in the loose federation of seven tiny sheikdoms allowed Bin Laden's Al Qaeda network and Taliban agents to set up clandestine arms-trading and money-laundering operations, according to accounts from American, United Nations, Afghan and U.A.E. sources." I was among the American sources quoted on the article. I note that it is a common practice for U.S. officials such as Benjamin and Simon who held high-level security clearances to quote media sources when they write about a topic that are consistent with what they know from classified sources to which they cannot refer. Their statements are also, of course, consistent with the findings of the CIA documents quoted earlier in this Expert Report.

**FBI PROTECTED MATERIAL REDACTED**

to figure out how to stop the flow of funds to Bin Laden and was concerned about Bin Ladin's apparent ability to raise funds from charities."[247]

6.23.   As the Monograph acknowledges, once the State Department formally designated al Qaeda in October 1999 as a "foreign terrorist organization," the U.S. could prosecute anyone who provide material support to al Qaeda.[248] But such laws were not in place internationally, with the effect even after bin Laden was sanctioned by the UN under UNSCR 1333 on December 19, 2000, "the Middle East [was] vulnerable to the exploitation of its financial systems because of generally weak or nonexistent financial controls."[249]

6.24.   These trips took place in the very period that the Clinton Administration was pushing to get the Terrorist Finance Convention adopted by the UN, which was concluded successfully on December 9, 2000, with Article 18 expressly addressing the requirement not to have financial institutions handle terrorist funds.[250]

6.25.   These actions reflected the reporting I have previously referenced from the CIA, and its findings, namely that sympathetic financiers were a problem prior to 9/11, as was the use of banks and the financial system, both of which helped to enable al Qaeda to build the capacity to attack U.S. targets.

## 7.   Question 5: *Is there evidence that Al Rajhi Bank and its principals had unique relationships with jihadists and al Qaeda affiliated persons and entities before September 11, 2001?*

7.1.   Yes, there is evidence that Al Rajhi Bank and its principals had unique relationships with jihadists and al Qaeda affiliated persons and entities before September 11, 2001. Evidence on these relationships is contained in documents produced by the CIA which were declassified in response to Executive Order 14040 and in response to Plaintiffs' ARB subpoena to the CIA. Important elements of the information contained in these reports is also corroborated by documents produced in this litigation in discovery by ARB.

7.2.   The evidence documents that ARB was:

7.2.1.   The bank at which bin Laden had personally chosen to open his own account in 1991, and at which he appears to have held at least four accounts in total,

---

[247] Monograph, id, pp. 39-41

[248] Prior to identifying al Qaeda as a terrorist organization, the U.S. government had recognized Bin Ladin as a terrorist financier. The U.S. statute criminalizing material support of terrorism, 18 U.S.C. § 2339A, came into force on September 13, 1994. https://uscode.house.gov/view.xhtml?req=(title:18%20section:2339B%20edition:prelim) Accordingly, from that date onward, anyone who had engaged in supporting Bin Ladin could have been indicted in the U.S. for material support of terrorism years before the formal designation of al Qaeda as a terrorist group. See e.g. "Patterns of Global Terrorism: 1997," Department of State Publication 10535, April 1998, Afghanistan section, https://1997-2001.state.gov/global/terrorism/1997Report/asia.html

[249] Monograph, id, p. 39

[250] International Convention for the Suppression of the Financing of Terrorism, Adopted by the General Assembly of the United Nations in resolution 54/109 of 9 December 1999 https://www.un.org/law/cod/finterr.htm

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

including one to hold U.S. dollars[251]

7.2.2.    The bank found by the CIA to be a "Conduit for Extremist Finance" since "at least the mid-1990s;"[252]

7.2.3.    The bank controlled by senior members of the Al Rajhi family who the CIA found  "have long supported Islamic extremists and probably know that terrorists use their bank;"[253]

7.2.4.    A bank which ARB documents suggest provided services to a central bin Ladin associate and Al Qaida financier, Wael Hamzah Jelaidan, sanctioned by the United States in 2002, and then sanctioned by the UN for supporting terrorism.[254]

7.2.5.    A bank which ARB documents show provided services to another central Bin Ladin associate and Al Qaida financier through the abuse of charities to support

---

[251] ARB-00013809/ARB-00013807 through ARB-00013815/ARB-00013813 and ARB-0001111
[252] CIA-SUB_0002
[253] Id
[254] ARB-00001218-1219. Julaidan was one of the most important figures in the history of al-Qaeda and clearly had an unusually long relationship with ARB, opening there in 1986 and another in 1988, and continuing to bank at ARB until after the 9/11 attacks. Both of these accounts were later seized at the orders of SAMA. ARB-00014465 and ARB-00014466. They also exhibited indicators of money laundering: Julaidan's account records are characterized by large cash deposits of 100,000 and 200,000 SR at a time, ARB-00000974, ARB-00000978, and also by large checks to unknown payees of 130,000 SR and 150,000 SR. ARB-000001010, ARB-00000989, ARB-000001010, ARB-00000989ARB-000001010, ARB-00000989. The account appears to have functioned at times as an unofficial account for the sanctioned Saudi Joint Relief Committee, as evidenced by the deposit of a 30,611 SR collection check on July 19, 2000 with the notation "Saudi Joint Committee." ARB-00000999.  A useful summary of Julaidan's central role in al Qaeda's financing of terror was provided in the U.S. Department of Treasury Statement on Designation of Julaidan as a SDGT on September 6, 2002: "Wa'el Hamza Julaidan, a Saudi citizen, is an associate of Usama bin Ladin. Julaidan fought with bin Laden in Afghanistan in the 1980s. Julaidan is also associated with several individuals and entities linked to al-Qa'ida, including bin Ladin lieutenants, Ayman al-Zawahri, Abu Zubaida, and Mohammed Atef; and the organizations: Makhtab al Khedmat, the Rabita Trust, and al-Gam'a al-Islamiya. These individuals and entities have been previously designated under President Bush's Executive Order and by the United Nations. Bin Laden himself acknowledged his close ties to Julaidan during a 1999 interview with al-Jazeera TV. When referring to the assassination of al-Qa'ida co-founder Abdullah Azzam, bin Ladin stated that 'We were all in one boat, as is known to you, including our brother, Wa'el Julaidan.' Julaidan has established contacts with several known Arab Islamic extremists, including bin Ladin's principal lieutenant, Ayman al-Zawahri. Another bin Ladin lieutenant, Abu Zubaida, claimed that he accompanied Julaidan from Pakistan to Kandahar, Afghanistan during the summer of 2000. Zubaida said that Julaidan met with bin Ladin and senior bin Ladin lieutenant Mohammed Atef soon after arriving in Kandahar. In February 2000, Julaidan was appointed to the Board of Trustees of the Rabita Trust and served as its Director General. The Rabita Trust is an NGO designated under President Bush's Executive Order as an organization that provided logistical and financial support to al-Qa'ida. The United States has credible information that Wa'el Hamza Julaidan is an associate of Usama bin Laden and several of bin Laden's top lieutenants. Julaidan has directed organizations that have provided financial and logistical support to al-Qa'ida. Accordingly, the United States is designating Julaidan under Executive Order 13224 as a person who supports terror." https://home.treasury.gov/news/press-releases/po3397#:~:text=The%20United%20States%20has%20credible,to%20al%2DQa'ida. Julaidan was sanctioned by the UN on the first anniversary of the 9/11 attacks, September 11, 2002. https://unis.unvienna.org/unis/en/pressrels/2002/sc7502.html  He was removed from the list in 2014. https://press.un.org/en/2014/sc11534.doc.htm

FBI PROTECTED MATERIAL REDACTED

terrorism, Yassin al Qadi, designated as a SDGT on October 12, 2001.[255]

7.2.6. A bank which ARB documents show provided accounts and services to another provider of financial support to Al Qaida, Abdul Hamid bin Sulaiman bin Muhammed al Mujil, designated as a SDGT on August 3, 2006, for having used his position as "a high-ranking IIRO official in Saudi Arabia. . . to bankroll the al Qaida network in Southeast Asia.." At the time of his designation, a senior Treasury official stated that "Al-Mujil has a long record of supporting Islamic militant groups."[256]

7.2.7. A bank that provided accounts to Mohammad Ghaleb Zouyadi, who was arrested in 2002 for his role as the financial planner for Baraka Yarkas' al Qaeda cell from 1993-1999.[257] Yarkas was the alleged leader of al Qaeda's operations in Spain, and convicted in Spain of helping some of the 9/11 suicide hijackers prior to the 9/11 attacks.[258] In addition to holding multiple accounts for people associated with the Yarkas' al Qaeda cell in Spain, the FBI found that ARB handled a number of transactions linked to the al Qaeda Spanish cell.[259]

7.2.8. A bank that provided six bank accounts to the Afghanistan Taliban government through its embassy in Riyadh, prior to the 9/11 attacks during the period it was

---

[255] ARB-0001339-1341. In making the terrorist designation of Al Qadi, OFAC found that Al Kadi had been acting for or on behalf of al Qaida, Osama Bin Laden, and Makhtab al-Khidamat; assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, among others, al Qaida, Osama Bin Laden, Makhtab al-Khidamat, Hamas, the Revival of Islamic Heritage Society, Al–Haramayn (Bosnia), Chafiq Ayadi, and Wa'el Julaidanl and was associated with, among others, al Qaida, Osama Bin Laden, Makhtab al-Khidamat, Hamas, the Revival of Islamic Heritage Society, Al–Haramayn (Bosnia), Chafiq Ayadi, and Wa'el Julaidan." Al Qadi sued, and OFACs decision was upheld by the District Court in *Kadi v. Geithner*, 42 F. Supp. 3d 1 (D.D.C. 2012). See also Yassin Al Qadi Designation Memo, Treasury 00017-00121.pdf and Department of Treasury Memo to R. Richard Newcomb, Director of Office of Foreign Assets Control, from Foreign Terrorist Officer, FAC No.SDG-196367, DOJAR-000003-000022, which also describes the terrorist finance activities of ARB client and close Bin Ladin associate, and SDGT, Wa'el Julaidan.

[256] ARB-00001051-1067. Al Mujil had two ARB accounts. One appears to have functioned as an unofficial IIRO, as reflected in it making a 28,201.55 SR transfer in 1998 to the Philippines, when Mujil (and IIRO in that country) were active in supporting al Qaeda. ARB 000750. The other account was used for primarily small transactions in the hundreds or low thousands of riyals. However, on October 17, 2001, Mujil received a highly unusual deposit of 173,357.72 SR from an auto parts company called Al Hazem, causing his account balance to skyrocket 14 times its prior size. Mujil then made a 100,000 SR transfer to a Hamid al Ghamdi just four days later, on October 21. ARB 000799. This type of rapid in/out activity involving funds is a red flag for possible money laundering. For the U.S. government's view of Al Mujil's activities in support of al Qaeda, see "Treasury Designates Director, Branches of Charity Bankrolling Al Qaida Network," August 3, 2006, https://home.treasury.gov/news/press-releases/hp45 The Indonesian and Philippines branches of IIRO were designated for sanctions by the Treasury Department simultaneously with the designation of Al Mujil. Al Mujil was removed from the UN sanctions list in July 2013, but remains sanctioned by the U.S. as of August 17, 2023. https://www.treasury.gov/ofac/downloads/sdnlist.pdf

[257] CIA-SUB_0003

[258] "Spain sentences alleged Qaeda chief for 9/11 role," New York Times, September 26, 2005, https://www.nytimes.com/2005/09/26/world/europe/spain-sentences-alleged-qaeda-chief-for-911-role.html

[259] "Imad Eddin Barakat Yarkas International Terrorism – Spanish Cell," report of FBI, January 8, 2003, declassified April 27, 2006, 000000134-143. The FBI report shows eight entries for the use of ARB by the Spanish al Qaeda cell including two (redacted) account numbers, and six groupings of one or more wire transfers involving members of the cell and ARB, taking place over the period from 1993 to 2000.

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

harboring Bin Ladin.[260]

7.2.9.   A bank that provided banking services to Bin Laden's brother-in-law, Mohamed Jalal Khalifa beginning in 1987, in an account granting power of attorney to Mohammed bin Laden, an apparent relative of Osama bin Laden.[261] The branch manager aproving the account is listed as "Abdullah A. al Rajhi."[262] Khalifa led the two IIRO branches in Southeast Asia which were later sanctioned by the United States. The Treasury Department described his role in al Qaeda and terrorism as follows: "The Philippine branches of the IIRO were founded sometime in the late 1980s or early 1990s by Muhammad Jamal Khalifah, who is Usama bin Laden's brother-in-law and has been identified as a senior al Qaida member. . . While working as the director of IIRO-PHL, Khalifah maintained close connections with al Qaida through his relations with senior al Qaida supporters, including Specially Designated Global Terrorist (SDGT) Wa'el Hamza Julaidan."[263]

7.2.10.  A bank that provided payments, ranging from small transactions (20 SRs) to large ones (404,473 SRs) in explicit support of the Palestinian intifada, amounting to some 1,738,457 SRs in total during the 2001-2002 period (or approximately $652,000).[264]

7.2.11.  A bank that provided services to Omar Ahmed Mostafa al Bayoumi ("al-Bayoumi"), a Saudi intelligence asset in the United States who in turn provided support prior to the 9/11 attack to two of the al Qaeda suicide hijackers, as I discuss later in this section.[265]

7.2.12.  A bank that handled hundreds of bank accounts in total for Da'Wah Organizations that had extensive links to the support of terrorism generally and to al Qaeda specifically.[266]

7.2.13.  A bank whose owners were found by the CIA to have known they were under scrutiny and "moved to conceal their activities from financial regulatory authorities."[267]

---

[260] ARB-00039692-39694; ARB-00039748-39752; ARB-00039759

[261] Bin Laden's father, Mohammed Bin Laden, was deceased at that time; he had at least one brother named Mohammed.

[262] ARB-0001100-1104.

[263] "Protecting Charitable Organizations," Treasury Department, IIRO Philippines profile, http://www.treasury.gov/resource-center/terrorist-illicit-finance/Pages/protecting-charities_execorder_13224-i.aspx,

[264] IIRO accounts at ARB branches in al-Jawf, Jizan, and Nazran transferred 1,738,457 SR ($652,000) in 2001-2002 that were explicitly designated for the "Quds Intifada" or the "Aqsa Intifada." See ARB-0002700, 2701, 5085, 5087, 5105, 10061, 10064, 10068, 10071, 10074, 10079, 10101, 10105, 10109, 10113, 10116.

[265] EO14040-00238-0239.

[266] See generally CIA_000143-158; CIA_000193-199; CIA_SUB0001-0006; CIA_000210-236; CIA_000720-000804; CIA_000807-848; CIA_0007-0019

[267] CIA-SUB_0002

**FBI PROTECTED MATERIAL REDACTED**

7.2.14.  The bank whose owners were found to have established a charity, the SAAR Foundation, that the FBI and CIA concluded, in a December 2004 Joint "Assessment of Saudi Arabian Support to Terrorism," was not a single charity but "a complex web of overlapping companies with parallel ideologies, personal relatonships, and financial associates that has exhibited numerous affiliations with entities known to support terrorism."[268]

7.2.15.  A bank whose activities were of such concern to the United States that the U.S. sent delegations after 9/11 to Saudi Arabia to expressly ask that the Saudi government take action to address the continuing terrorist finance threat posed by the bank, including seeking a joint examination of the bank through the two countries' Joint Terrorist Financing Task Force.[269]

7.3.  Additionally, as set forth in my answers to Question 4, data points cited by the CIA in reaching the conclusion that ARB was a "Conduit for Extremist Finance" prior to the 9/11 attacks included:

7.3.1.  The Al Rajhi family was financing extremists, benefitting al Qaeda.[270]

7.3.2.  ARB was a conduit for funds for Islamic extremists generally, and for the 9/11 hijackers specifically; [271]

7.3.3.  ARB was "used by some members of Usama bin Ladin's Islamic Army to maintain accounts and transfer funds."[272]

7.3.4.  ARB maintained accounts for individuals linked to bin Ladin;[273]

7.3.5.  ARB maintained accounts for individuals tied to the Egyptian Islamic Jihad (a group that had merged with al Qaeda prior to 9/11);[274]

7.3.6.  ARB was the preferred bank for Islamic extremists in Yemen;[275]

---

[268] "FBI/CIA Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States," December 2004, p. 24, EO14040-003438.

[269] For the assessments in this subsection of this Expert Report, I rely on all of the information that I have reviewed in connection with the preparation of this Expert Report, but cite in particular the CIA Report, "Al-Rajhi Bank: Conduit for Extremist Finance," May 29, 2003, CIA-SUB_0001-0006, which makes the assessments I have summarized in this subsection, and "Joint Examination Of Al Rajhi Bank Through The Joint Terrorist Financing Task Force," State Department Cable 04STATE251768, November 25, 2004, https://wikileaks.org/plusd/cables/04STATE251768.html and "Terrorist Financing: Al-Rajhi Bank," State Department Cable Riyadh 005103, September 26, 2004, http://wikileaks.org/cable/2004/09/04RIYADH51303.html

[270] CIA_000045

[271] CIA_000149

[272] CIA_000783

[273] CIA_000149

[274] CIA_000149-150

[275] CIA_000150

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

7.3.7.  ARB and Al Rajhi family members provided financial support to the Afghan mujahaddin through the IIRO in Kabul;[276]

7.3.8.  "Sheikh Rajhi" deposited funds into a bank account controlled by MAK, the Afghan agency co-created by bin Laden;[277]

7.3.9.  The Al Rajhi family contributed "generously" to the IIRO, while it was engaging in supporting terrorism;[278]

7.3.10. ARB was a conduit for funding the mujahaddin generally since the early 1990's;[279]

7.3.11. ARB provided support to several other Saudi NGOs that "purportedly diverted funds to Islamic extremists;[280]

7.3.12. ARB worked with WAMY in a context suggesting the Al Rajhis helped WAMY courier private Saudi donations to Islamic groups in Afghanistan and Bosnia;[281]

7.3.13. Al Rajhi family members donated money to businesses tied to terrorists and personally oversaw transactions destined for terrorists;[282]

7.3.14. SAAR personally was one of the 128 pemanent members of IIRO prior to 9/11;[283]

7.3.15. ARB and the Al Rajhi family were not only key backers of the Afghan mujahaddin. They were also "purportedly" supporting NGOs who helped to finance the mujahaddin in Bosnia, Hamas in Israel; and other extremists;[284]

7.3.16. The Al Rajhis financed radical Afghans and Kashmiri organizations in Pakistan and elsewhere, some of which was provided under the guise of orphan relief and diverted to radical causes;[285]

---

[276] CIA_000743. A January 11, 1999 CIA report stated only that the Al Rajhi family "probably" was a source of financial support for al Qaeda, but also noted that al Qaeda was using some of its branches in Saudi Arabia to meet its banking needs. CIA_000830-831

[277] CIA_000338

[278] CIA_000221

[279] Id

[280] Id

[281] CIA_000744; due to redactions, the exact role of Al Rajhi in the courier activity is implied rather than expressly stated. Most of the material pertaining to the Al Rajhis and ARB in this particular report is redacted.

[282] CIA_000198

[283] Id

[284] CIA_000723

[285] CIA_000783. Here, the CIA includes the caveat, based on pre-November 20, 1997 information, that the diversions to radical causes was "possibly unwitting to the al Rajhis." By contrast, after 9/11, the CIA characterized the activity of the Al Rajhis in relation to al Qaeda and terrorism as "misdeeds." CIA-SUB_0006 A later CIA report on Al-Haramain stated that Al-Haramain was using funds from its account at ARB to transfer it to terrorist groups in Kashmir. CIA-SUB_0013

FBI PROTECTED MATERIAL REDACTED

7.3.17. ARB had handled "numerous transactions of NGOs with known ties" to al Qaeda such as Global Relief Foundation and Al-Haramain.[286]

7.4. Consistent with these data points, the principal finished intelligence reports produced by the CIA before and after the 9/11 attacks which analyzed evidence of pre-9/11 support by ARB for Bin Ladin, al Qaeda and associates of theirs who were also involved in terrorism, recurrently highlighted two major banking relationships as central to providing bin Laden help in raising and moving money. The CIA found that the two key banking relationships for al Qaeda and Bin Ladin were ARB and Dubai Islamic Bank ("DIB").

7.5. The CIA assessments of al Qaeda's relationship to the two banks differed in some respects. The CIA found that DIB provided banking services and support to bin Laden, al Qaeda and associated terrorists due to both the ideological affinity between bin Laden and its head, Sheikh Lootah for extremist Islam, and to the personal friendship between Lootah and bin Laden. The CIA found that ARB provided banking services and support to bin Ladin and persons associated with al Qaeda and its predecessor organization, the MAK, for similar ideological reasoons, but also amplified that support through providing services to the charities that were most engaged in providing support for terrorism, and thus became what the CIA referred to as the "Extremists Bank of Choice," as detailed below.

7.6. These charities included in particular Al-Harmain and IIRO, both of which maintained many bank accounts at ARB. ARB's services also included providing a range of services to the charity founded, owned, and directed by the head of ARB, who the CIA refers to in its reporting as "Sulayman Abdul Aziz Al Rajhi," (previously defined as "SAAR" in this Expert Report), as well as by other senior members of the Al Rajhi family. The May 28, 2003 CIA report, the most recent of the CIA reports concerning the Al Rajhi and ARB role in terrorist finance released under EO 14040, "Al-Rajhi Bank: Conduit for Extremist Finance," ("CIA Al Rajhi Report") provided a number of examples in concrete detail on the use of ARB by bin Ladin, al Qaeda, and aligned terrorists and terrorist groups in a number of countries. Material data points from the May 28, 2003 report include, but are not limited to, the following. All **boldface** type was boldfaced in the report itself; when *italics* are used, or ***boldfaced italics,*** they similarly reflect the font used by the CIA for emphasis:

7.6.1. "[Redaction] the al-Rajhis have a history of funding a broad array of Islamic causes, some of which have been associated with terrorists."[287]

7.6.2. "**Extremists' bank of choice**. [redaction] since the mid-1990s [redaction] several extremists ordered operatives in Afghanistan, Indonesia, Pakistan, Saudi Arabia, Turkey and Yemen to use ARABIC [meaning, ARB] [redaction]."[288]

7.6.3. **"Extremists' accounts.** Extremists use ARABIC [ARB] because its Islamic banking principles appeal to them and because it is one of the few banks with

[286] CIA-SUB-0032
[287] CIA-SUB_0003
[288] Id

branches in outlying areas of Saudi Arabia, as well as good correspondent connections to remote locations abroad. Several al-Qa'ida linked individuals and organizations have held bank accounts at Al'Rajhi."[289]

7.6.4. "[bullet point] [redaction] late 1990's, Bank al-Taqwa held a correspondent account at the Riyadh branch of Al-Rajhi Bank. The Department of Treasury listed Bank al-Taqwa's parent organization Al-Taqwa Management a.k.a. Nada Management) as a foreign terrorist organization in November 2001."[290]

7.6.5. "Muhammed Ghaleb Kalaje Zouyadi [redacted] arrested in 2002 for his role as the financial planner for the Barakat Yarkas' al-Qa'ida cell, used his Al-Rajhi account [readacted] from 1993-1999.[291]

7.6.6. "Haji Wali Mohammed Trading Establishment maintained an Al-Rajhi account for business transactions as of August 2000. [redacted] Afghan hawaladar Haji Wali Mohammed transferred money for Usama bin Ladin."[292]

7.6.7. "[redacted] late 1990s Usama Bin Ladin may have used an account or accounts at Al-Rajhi Bank to pay al-Qa'ida operatives."[293]

7.6.8. **Couriers**. Al-Rajhi has extensive money exchange operations, as well as representation in remote locations. In addition to traditional bank transactions, ARB has used couriers to move funds."[294]

7.6.9. "[bullet point] In 2000, ARABIC [ARB] couriers delivered money to the Indonesian insurgent group Kompak to fund weapons purchases and bomb-making activities."[295]

7.6.10. "[bullet point] ARABIC [ARB] in 1999 helped obtain a visa for a courier who collected money in Saudi Arabia for the Egyptian Islamic Jihad Organization. [redacted] Reporting does not indicate whether bank management was witting of

---

[289] Id

[290] Id

[291] Id. Barakat Yarkas was ultimately convicted in Spain of direct involvement in the 9/11 attacks in the United States, for organizing a meeting in Spain which was attended by Mohammed Atta, the lead hijacker on Sept. 11, and Ramzi bin al-Shibh, a high-ranking member of al Qaeda, which was used to plan the attacks. "Spain finds Qaeda cell chief guilty in 9/11 plot," New York Times, September 27, 2005, https://www.nytimes.com/2005/09/27/world/europe/spain-finds-qaeda-cell-chief-guilty-in-911-plot.html

[292] CIA-SUB_003-004

[293] CIA-SUB_004

[294] Id

[295] Id. Kompak was an Indonesian organization that grew out of terrorist group Jemaah Islamiyah ("JI"), an al-Qaida linked terrorist group with cells operating in several countries in Southeast Asia., as set forth in the terrorist designation of JI announced by then U.S. Secretary of the Treasury John Snow on September 5, 2003, which referenced Kompak and described JI's training by al Qaeda, its plans to attack Americans in Southeast Asia, and its involvement in the Bali bombing, which killed 202 people in October 2003. "Snow Announces Designation of 10 Jemaah Islamiyah (JI) Terrorists," Treasury Press Release, September 5, 2003 https://home.treasury.gov/news/press-releases/js700

the courier's EIJ affiliation.[296]

7.6.11. "**Nongovernment organizations (NGOS).** [redacted] Gulf-based Islamic NGOs use ARABIC [ARB] to transfer funds to their offices abroad some of which may be used to support terrorists." [five lines redacted][297]

- "Saudi-based al-Haramain, which has come under close scrutiny by US and Saudi authorities for alleged terrorist ties, uses [ARB] and National Commercial Bank to fund its programs abroad."[298]

- "The International Islamic Relief Organization, a nongovernment organization with ties to al-Qa'ida, as of the late 1990s used Al-Rajhi to pay its employees."[299]

**7.6.12. "Al-Rajhi Family Complicity and Control [redacted]** ***Senior al-Rajhi family members have long supported Islamic extremists and probably know that terrorists use their bank.*** Bank chairman Sulayman and several other al-Rajhis have given money to suspicious individuals and organizations worldwide. Moreover, Sulayman's tight control of ARABIC [ARB] activities suggest he is witting that his bank is attractive to extremists."[300]

- "ARABIC [ARB] Chairman Sulayman al-Rajhi and his brother Saleh al-Rajhi transferred $4 million to Germany and Pakistan in December 1998. [redacted] The brothers used a unique computer code to send funds at regular intervals to unspecified recipients."[301] [about three lines of redactions follow)
- [Approximately 10 lines of redactions follows a second bullet]

7.6.13. "Senior al-Rajhi family members, including family patriarch Sulayman al-Rajhi, have donated money to NGOs suspected of supporting terrorism."[302]

- "In the 1980's, the al-Rajhis established the SAAR Foundation –SAAR is an acronym for Salayman Abdul Aziz al-Rajhi—to manage the family's charitable contributions. US law enforcement has long suspected the SAAR

[296]CIA-SUB_004. Egyptian Islamic Jihad was listed for sanctions by the UN on October 6, 2001 "as being associated with Al-Qaida, Usama bin Laden or the Taliban for 'participating in the financing, planning, facilitating, preparing or perpetrating of acts or activities by, in conjunction with, under the name of, on behalf or in support of', 'supplying, selling or transferring arms and related materiel to' or 'otherwise supporting acts or activities of Al-Qaida and Usama bin Laden." UN Sanctions Committee summary regarding its sanctions on Egyptian Islamic Jihad, https://www.un.org/securitycouncil/sanctions/1267/aq_sanctions_list/summaries/entity/egyptian-islamic-jihad

[297]CIA-SUB_0004

[298] Id

[299] Id

[300] Id

[301] Id

[302] CIA-SUB_0005

Foundation of funding HAMAS."[303]

- [redacted] "March 2003, Sulayman al-Rajhi defended his donations to the al-Haramain Islamic Foundation, which has come under scrutiny for its support to extremists."[304]

- "[redacted] ***senior al-Rajhi family members control the bank's most important decisions and that ARB's principle managers answer directly to Sulayman.*** [sic] ARABIC [ARB] historically granted branch managers substnatial autonomy in consolidating statements, transferring funds, and detecting fraud, but [redacted] the bank is looking to remedy its poor internal reporting systems by centralizing control in the main office in Riyadh."[305]

- "Because the bank's headqarters has only minimal control over some of its branches, ARBIC [ARB] is developing a new platform for improved supervision. [redacted]"[306]

7.6.14. **"Fighting Transparency and Oversight.** ***The al-Rajhis know they are under scrutiny and have moved to conceal their activities from financial regulatory authorities."*** [307]

- "[redacted] Sulayman al-Rajhi in December 2002 directed ARB board members to explore financial instruments that would allow the bank's charitable contributions to avoid official Saudi scrutiny."[308]

7.6.15. "**US Links and Next Steps.** The al-Rajhi family's wealth and power have influenced Islamic communities around the world, including in the United States. The al-Rajhi's worldwide presence, paired with the Saudi royal family's willingness to investigate the al-Rajhi misdeeds, presents several options for disrupting the family's aid to extremists both witin and outside of Saudi Arabia.[309]

- "Listing, or threatening to list, ARABIC [ARB] as a terrorist supporter under Executive Order 13224 or United Nations resolution 1267 could cripple the bank."[310]

- "The al-Rajhi's wide-ranging US connections – financial, charitable, and diplomatic—expose the family to domestic oversight, scrutiny, civil

---

303 Id
304 Id
305 Id
306 Id
307 Id
308 Id
309 CIA-SUB_0006
310 Id

litigation, and criminal prosecution."[311]

- "Identifying and putting pressure on banks holding the family's offshore accounts could further disrupt the al-Rajhi's ability to send money to extremists. [redaction]"[312]

7.6.16. "A successful effort against the al-Rajhis would encourage efforts against other donors, or at a minimum, would discourage private funding of al-Qa'ida."[313]

7.6.17. Additional information contained in a July 26, 2007 report by the Wall Street Journal referencing "a 2003 CIA report" with the title "Al Rajhi Bank: Conduit for Extremist Finance," contains information that based on the context of the report seems likely to be from portions of the CIA Al Rajhi Report that remain redacted in the version declassified in response to Plaintiffs' ARB subpoena to the CIA. Citing the 2003 CIA report, the Wall Street Journal report states the following:

7.6.18. "[A] year after Sept. 11, with a spotlight on Islamic charities, Mr. Al Ralji ordered Al Rajhi Bank's board to explore financial instruments that would allow the bank's charitable contributions to avoid Saudi scrutiny.' A few weeks earlier, the report says, Mr. Al Rajhi 'transferred $1.1 billion to offshore accounts –using commodity sways and two Lebanese banks—citing a concern that U.S. and Saudi authorities might freeze his assets.'"[314]

7.6.19. The information published by the Wall Street Journal fits structurally into the roughly eleven lines of material redacted from the section of the CIA Al Rajhi Report entitled in boldface, "**Al-Rajhi Family: Complicity and Control [redacted].**" Based on the specificity of the Wall Street Journal's reporting, and its accurate information on the parts of the report that are now unclassified, I find that its references to other material in the CIA report are also likely accurate, absent contrary evidence.

7.6.20. While explicitly including ARB's denial of having any role in financing extremists, and their denunciations of terrorist acts as "un-Islamic," the Wall Street Journal stated that ARB "declined to address specific allegations made in American and law enforcement records, citing client confidentiality," and had previously sued Wall Street Journal Europe after that publication had reported that "Saudi authorities were monitoring some Al Rajhi Bank accounts at U.S. request, in a bid to prevent them from being used, wittingly or unwittingly, for funneling money to terrorist groups." The article stated that the bank dropped the

[311] Id
[312] Id
[313] Id
[314] "**U.S. Tracks Saudi Bank Favored by Extremists** Officials Debated What to Do About Al Rajhi, Intelligence Files Show," Wall Street Journal, July 26, 2007, Page A1, https://www.wsj.com/articles/SB118530038250476405

suit in 2005 and the Journal published a statement "saying its article hadn't reported any allegation that the bank supported or financed terrorism."[315]

7.6.21. In the article, the Wall Street Journal also summarized a number of data points regarding the relationship between ARB and its principals and jihadists and al-Qaeda related persons and entities before the 9/11 attacks. Those that related to pre-9/11 activity[316] included:

- "The Al Rajhi name appeared on a list of regular financial contributors to al Qaeda that was discovered in Sarajevo, Bosnia, in 2002. The list was authenticated for the Federal Bureau of Investigation that year by America's top judicial witness against al Qaeda, a onetime al Qaeda business manager named Jamal Al Fadl, who is in the federal witness-protection program. He called the contributor list the "golden chain."[317]

- "A 2003 German police report said Sulaiman Al Rajhi and other family members had contributed more than $200,000 in 1993 to a charity that financed weapons for Islamic militants in Bosnia, in addition to providing humanitarian aid."[318]

- "The report says extremists 'ordered operatives in Afghanistan, Indonesia, Pakistan, Saudi Arabia, Turkey and Yemen,' to use Al Rajhi Bank.[319]

- "Mamduh Mahmud Salim, convicted mastermind of the 1998 embassy bombings in Kenya and Tanzania, was carrying records of an Al Rajhi account (number [redacted] 424/4) when arrested in Germany in 1998, German police found."[320]

- "In 2000, the CIA report says, Al Rajhi Bank couriers 'delivered money to the Indonesian group Kompak to fund weapons purchases and bomb-making activities."[321]

- "According to a federal indictment in Oregon, a top Al-Haramain official in 2000 carried $130,000 in $1,000 traveler's checks from Portland to Riyadh and deposited them with Al Rajhi – funds the indictment says were for the ultimate benefot of al Qaeda fightres in Chechnya. The indicted official,

[315] Id. Shortly before ARB reached the settlement that ended the suit, I was certified as an Expert Witness by the British court presiding over the case.

[316] I have omitted additional data points contained in the article relating to post-9/11 relationships between ARB, its principals, and jihadists and al Qaeda affiliated persons and entities.

[317] Id. The Golden Chain document is generally dated to the late 1980s, and as referring to the list of early financiers for al Qaeda.

[318] Id. From the context, this information in the Wall Street Journal appears to reference material in the CIA Al Rajhi Report that is redacted from the version released in response to Plaintiffs' ARB subpoena to the CIA.

[319] Id. This tracks the information contained in the CIA Al Rajhi Report at CIA-SUB_0003.

[320] Id

[321] Id. This tracks the information contained in the CIA Al Rajhi Report at CIA-SUB_0004

Soliman Al-Buthe, now works for the city of Riyadh. In an interview, he confirmed carrying the checks and depositing them with Al Rajhi Bank and said they weren't for al Qaeda and he did nothing wrong."[322]

- "A Jiddah based charity called the International Islamic Relief Organization, or IIRO, arranges for donors to send their donations directly to the Al Rajhi Bank. . . .the U.N. has labelled two of the IIRO's branches and some of its officials as al Qaeda supporters."[323]

7.7. The CIA Al Rajhi Report obtained by the Wall Street Journal was literally front-page news. Not only did it highlight ARB and the Al Rajhis as having multiple connections with jihadists and al Qaeda affiliated persons prior to the 9/1 attacks. The CIA Al Rajhi Report did something that is very rare for the CIA, and which in my experience is never done by the CIA except when it was directed to do so by senior U.S. policymakers: the CIA Al Rajhi Report provided policy options to senior U.S. officials. The options set forth in the CIA Al Rajhi Report appear designed to implement a specific goal that must have been set by senior officials in the Bush Administration: "disrupting the family's aid to extremists both within and outside of Saudi Arabia." These options included listing ARB as a supporter of terrorism or threatening to do so. The report states that implementation of either option "could cripple the bank." Additional options listed in the CIA Al Rajhi report stated that the "al-Rajhi's wide-ranging US connections—financial, charitable, and diplmatic—expose the family to "domestic oversight, scrutiny, civil litigation, and criminal prosecution," without being precise about how those connections might be leveraged. The report further stated that other governments might be willing to help investigate "and stem al-Rajhi funding for extremists, even if the Saudis balk." Finally, it suggested "[i]dentifying and putting pressure on banks holding the family's offshore accounts could further disrupt the al-Rajhi's ability to send money to extremists. [redacted]"[324]

7.8. The CIA Al Rajhi Report acknowledged the massive scope of ARB's presence in Saudi Arabia, and the size of the Al Rajhi family. The CIA Al Rajhi report stated that the bank

---

[322] Id. Al Buthe was named a Specially Designated Global Terrorist on September 9, 2004, in connection with his provision of military support to Chechen militants from a branch of Al-Haramain in the United States and remains on OFAC's sanctions list. https://sanctionssearch.ofac.treas.gov/Details.aspx?id=8591 He was also indicted, along with the head of the Al-Haramain U.S. branch, in the case of *U.S. v. Al-Haramain Islamic Foundation, Inc., Piroux Sedaghaty, and Soliman Hamd al-Buthe*, which ran into complex legal issues due to OFAC sanctions raising due process issues for U.S. persons when coupled with an asset seizure, and findings that due to the OFAC process, *Brady* material was improperly withheld from the defendants, resulting in a settlement in which the charity pled guilty to a tax offense, the previously convicted head of the charity was released from "pending criminal charges," and Buthe, who had left the U.S. for Saudi Arabia, remained under indictment. See "Specially Designated Global Terrorist Al-Haramain Islamic Foundation, Inc. Pleads Guilty to Tax Fraud," July 29, 2014, https://www.justice.gov/usao-or/pr/specially-designated-global-terrorist-al-haramain-islamic-foundation-inc-pleads-guilty. For a summary of the government's case against the U.S. branch of Al-Haramain see the original indictment, available at https://www.investigativeproject.org/documents/case_docs/480.pdf and the more detailed statement of facts by the prosecutors in "Government's Memorandum In Support Of Pretrial Detention, August 21, 2007, available at https://www.investigativeproject.org/case_docs/us-v-al-haramain-islamic-foundation-et-al/482/governments-memorandum-in-support-of-pretrial-detention.pdf

[323] Id

[324] Id

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

had 400 branches in Saudi Arabia that made it the largest "banking network" in Saudi Arabia, with correspondent banking relationships with JP Morgan Chase in New York and other banks in 18 other countries. It stated that the Al Rajhi family included 700 male members with an estimated net worth of $20 billion, including a business empire that ecnompassed development, agriculture, shipping, cement, biotech, and tourism among other businesses.[325]

7.9.     According to the Wall Street Journal, a committee of "Deputies," typically meaning the #2 persons at a U.S. government agency such as the Deputy Secretary of State, Deputy Secretary of the Treasury and the Deputy Attorney General, debated a proposal for "legal and political action against Al Rajhi Bank, including covert operations such as interfereing with the bank's internal operations, according to Bush administration documents and former U.S. officials."[326] Given the size of ARB and its role in Saudi Arabia, and the significance of the Al Rajhi family to the Saudi economy, sanctioning ARB and/or members of the Al Rajhi family for their support of terrorism and al Qaeda would have had profound consequences on the Saudi Arabian economy and the many Saudi Arabians using the bank for legitimate purposes, as well as profound consequences in the U.S.-Saudi Arabian security relationship. U.S. policy makers typically consider such consequences in making decisions on when to apply sanctions or undertake covert action of the type reported by the Wall Street Journal.

7.10.    In the end, the the U.S. government did not sanction ARB for terrorist finance. But it did take other steps in 2004 in an effort to address the terrorist finance problem created by ARB and the Al Rajhi's long-time relationship with al Qaeda and bin Laden, as detailed in both the pre-9/11 and post-9/11 CIA reporting.

7.11.    Instead of applying sanctions to ARB and taking the option set forth by the CIA, the U.S. sent a senior Treasury Department official, Juan Zarate, to meet with the Saudis and to formulate a plan for joint action between the United States and Saudi Arabia to deal with the continuing threat the U.S. government perceived from the activities of ARB and the Al Rajhis three years after 9/11, as reflected in the leaked State Department cables about the initiative.[327]

7.12.    Notably, on November 25, 2004, the U.S. Embassy in Riyadh was directed to hand deliver a paper to the Saudi government asking for a cooperative effort to conduct a joint examination of "certain accounts at Al Rajhi Bank," with the "mutual goal of ensuring that Al Rajhi Bank is doing everything possible to keep the taint of terrorists and their supporters out of the bank," including being able to "monitor and note suspicious patterns and trends in account activity" to prevent the bank from continuing to be used for

---

[325] CIA-SUB_0003

[326] "U.S. Tracks Saudi Bank Favored by Extremists," id

[327] "Joint Examination Of Al Rajhi Bank Through The Joint Terrorist Financing Task Force," State Department Cable 04STATE251768,  November 25, 2004,  https://wikileaks.org/plusd/cables/04STATE251768.html  and "Terrorist Financing: Al-Rajhi Bank," State Department Cable Riyadh 005103, September 26, 2004, http://wikileaks.org/cable/2004/09/04RIYADH51303.html, which describe the frosty response of the Saudi's to Treasury's request to address ARB's links to terrorist finance.

**FBI PROTECTED MATERIAL REDACTED**

terrorist finance." The cable describing this initiative noted that the U.S. had already told the Saudis that ARB had been used by al Qaeda "and like-minded terrorist groups."[328]

7.13. The Saudi response, based on the limited public information available, was negative, rejecting Zarate's proposal as not needed. I have no further information from government reports on further steps the U.S. government may have undertaken regarding ARB and the Al Rajhi family after Zarate undertook his initiative in 2004. The Wall Street Journal reporting does not address the timing of any U.S. actions concerning ARB and the Al Rajhis after 2004, other than to suggest that proposals to take "strong action" against ARB and the Al Rajhis due to their terorrist ties was "repeatedly debated" by the Bush Administration, but in the end limited to quietly lobbying Saudi officials to address the risks posed by the bank and the family arising from its "alleged role in extremist finance," incuding al Qaeda.[329] As discussed earlier in this Expert Report, Saudi Arabia undertook comprehensive changes to its regulation of both banks and charities within Saudi Arabia in 2004, following the terrorist bombings the previous year which killed Saudis.[330]

7.14. I do not know the sourcing underlying the redacted portions of the CIA Al Rajhi report that were declassifed under Executive Order 14040. However, the Summary statement that ARB was used at least since the mid-1990s as a conduit for terrorist transactions is consistent with statements made by Jamal al Fadl, a business and money manager for al Qaeda who joined al Qaeda in 1988, knew its top leadership, including bin Ladin, and then defected to the United States in the mid-1990's after being caught stealing some $110,000 from the group in response to his reported perception of being underpaid, and being asked by bin Ladin to give it back.[331]

7.15. I have read declassified government documents which I understand to be summaries of interviews between al Fadl and the FBI, which include the following information material to my answer to this question:

7.15.1. While reviewing the document, Source indicated that some of the names appearing on the document appeared to be members of a group who Source referred to as the "Golden Chain." According to Source, the "Golden Chain" consisted of wealthy individuals from the Gulf region who provided BIN LADEN and Al QAEDA with money on a regular basis. Source explained that all Muslims are required to make zakat, which according to Source means donating 2.5% of their total yearly earnings to one of six different tenants of Islam. According to Source, one of the tenants to which the money can be donated is jihad. Source had a specific conversation with MADANI AL TAYYIB during which MADANI AL TAYYIB informed Source that-both YOUSIF JAMEEL EH KAMEL donated their zakat funds, via the "Golden Chain," to BIN LADIN's Al QAEDA group. . . .

[328] "Joint Examination," id
[329] "U.S. Tracks Saudi Bank Favored by Extremists," id
[330] "White Paper on Saudi Arabia and Counterterrorism," Government of Saudi Arabia, in English, id, pp 2-3, pp. 18-25
[331] 9/11 Commission Report, pp 62, 109, and 185

FBI PROTECTED MATERIAL REDACTED

Source noted that the name AL RAJHI listed next to number 7 on this document is the name of a bank in which Al QAIDA had funds on deposit."[332]

7.16.   In addition, documents provided in discovery in this case show a direct link of the use of ARB's Payable Through Account at the Chase Manhattan Bank in New York to two of the terrorist hijackers who participated in the 9/11 attacks.[333] These were Khalid Muhammad Abdallah al-Mihdhar ("al-Mihadhar"), one of the five hijackers of American Airlines Flight 77, which was flown into the Pentagon as part of the 9/11 attacks and Nawaf Muhammed Salin al-Hazmi ("al-Hazmi"), who were recruited by bin Ladin for the 9/11 coordinated suicide hijacking mission, as set forth in the 9/11 Commission Report [334] and in a later investigation by the FBI Inspector General.[335]

7.17.   As detailed at length in the 9/11 Commission Report and the FBI Inspector General investigation, the individual who assisted these two terrorist hijackers in the United States ahead of their participation in the 9/11 attacks was a Saudi, Omar Ahmed Mostafa al Bayoumi ("al-Bayoumi"). Both the 9/11 Commission Report and the FBI Inspector General have extended discussions of al-Bayoumi and his role in relationship to the 9/11 attacks.[336] (There are 70 references to him in the 9/11 Commission Report and 87 references to al-Bayoumi in the report issued by the FBI IG.) Al-Bayoumi hosted the two terrorist hijackers when they first arrived in the United States, and paid for their first month of housing in San Diego, starting in February 2000, before they switched apartments and continued a series of movements prior to undertaking the 9/11 attacks. The FBI had previously investigated al-Bayoumi after a source told them that al-Bayoumi reportedly delivered $400,000 to the Islamic Kurdish community in El Cajon, California in order to build a mosque and opined al-Bayoumi "must be an agent of a foreign power or an agent of Saudi Arabia."[337]

---

[332] Interview with unnamed FBI source who I understand to have been subsequently identified as Jamal al-Fadl, dated August 29, 2002, PEC-USA_351-352. Before the 9/11 attacks, al-Fadl had told the FBI that Al Tayyib, later identified in the 9/11 Report, id, at p. 68, as the then-head of al Qaeda's "Finance Committee," was working with the head of the IIRO in Peshawar in late 1989. SDY 0101-0093. In the 2002 interview with the FBI, al-Fadl further described the specific involvement of Al Tayyib in establishing a relationship between al Qaeda and the "relief organizations that were based in Bosnia and Croatia," for the purpose of building out capacity that then could be used against the United States. PEC-KSA000349. He also described the "Golden Chain" document as referring to "wealthy individuals from the Gulf region who provided Bin Laden and al Qaeda with money on a regular basis." PEC-KSA000351

[333] I address the well-known serious money laundering and financial crime risks of Payable Through Accounts of the type used by ARB with Chase Manhattan Bank later in this report.

[334] 9/11 Commission Report, pp. 144-166, 217-222

[335] "Chapter Five: Two September 11 Hijackers: Khalid Al-Mihdhar and Nawaf Al-Hazmi," in "A Review of the FBI's Handling of Intelligence Information Prior to the September 11 Attacks," FBI OIG Report, November 2004, https://oig.justice.gov/sites/default/files/archive/special/0506/chapter5.htm.

[336] A comprehensive review of the involvement of al-Bayoumi and others in providing support for the hijackers is beyond the scope of this Expert Report, but I understand that issue has been addressed by other experts in the related litigation against the Kingdom of Saudi Arabia. This Expert Report addresses evidence related to al-Bayoumi and related actors that is relevant to understanding ARB's connections to and support for terrorism.

[337] "A Review of the FBI's Handling of Intelligence Information Prior to the September 11 Attacks Special Report November 2004 (Released Publicly June 2005), FBI OIG id

FBI PROTECTED MATERIAL REDACTED

7.18.  A staff memo written by staff of the 9/11 Commission in 2003, released in 2014, describes al-Bayoumi's possible involvement in the 9/11 attacks as follows:

    7.18.1.  "Al-Bayoumi, a Saudi national provided September 11 hiajckers Nawaf al-Hazmi and Khalid al-Mihdhar with considerable assistance after the hijackers arrived in San Diego in February 2000. He helped them locate an apartment, co-signed their lease, and ordered Mohdhar Abdullah . . . to provide them with whatever assistance they needed in acclimating to the United States. The FBI now believes that in January 2000 al-Bayoumi met with Fahad al-Thumairy, a Saudi diplomat and cleric, at the Saudi Consulated in Los Angeles before going to the restaurant where he met the hijackers and engaged them in conversation. . . Al-Bayoumi has extensive ties to the Saudi Government and many in the local Muslim community in San Diego believed that he was a Saudi intelligence officer. The FBI believes it possible that he was an agent of the Saudi Government and that he may have been reporting on the local community to Saudi Government officials. In addition, during its investigation, the FBI discovered that al-Bayoumi has ties to terrorist elements as well."[338]

7.19.  While the 9/11 Commission did not find evidence proving al-Bayoumi to be a Saudi intelligence asset as the time he was providing assistance to two of the 9/11 hijackers, eventually, the FBI did find such evidence. Specifically, in a report dated June 14, 2017, the FBI found that from "the late 1990's and up to September 11, 2001, Omar Albayoumi was paid a monthly stipend as a cooptee of the Saudi General Intelligence Presidency (GIP) via then Ambassador Prince Bandar bin Sultan Alsaud." The FBI further stated that al-Bayoumi "was a source of investigative interest following the 9/11 attacks for his support of the 9/11 hijackers while living in California." The FBI also explained that al-Bayoumi's employment by Saudi intelligence had not been confirmed by the U.S. government as of the time the 9/11 Commission issued its report. The June 14, 2017 FBI report on al-Bayoumi described al-Thumairy as "[a]nother individual identified within the support network of the 9/11 hijackers."[339]

7.20.  An earlier FBI report, dated October 5, 2012, written in a tone that I would characterize as deeply skeptical of Bayoumi's status as a student who accidently assisted the 9/11 hijackers, described Bayoumi in the following terms: "Omar al-Bayoumi was living in San Diego on a student visa despite not attending classes, and receiving a salary from the Kingdom of Saudi Arabia for job duties he never performed. Shortly after arriving in Los Angeles, the two hijackers had an allegedly accidently meeting with al-Bayoumi, who claims to have been in Los Angeles on personal business. At this meeting, al-Bayoumi advised the hijackers to relocate to San Diego, which they did. Once in San Diego, al-Bayoumi assisted the hijackers with a place to live, opening a bank account, and also

[338] June 6, 2003 Updated Work Plan for Commissioners and for FBI, 9/11 Commisssion Staff Memo, released by National Archives on May 17, 2016, labeled page 1, but 7th page of document, available at https://www.nytimes.com/interactive/2016/05/17/us/document-saudi-memos-9-11.html  As stated earlier in this report, in 2017, the FBI definitively concluded that Baymoui was a Saudi intelligence asset at the time he provided support to two of the 9/11 al Qaeda terrorist hijackers, "Albayoumi/GOP Cooptee," FBI, EO14040-002638 and 002539
[339] Alayoumi/GIP Cooptee, FBI, EO 14040-0024643

FBI PROTECTED MATERIAL REDACTED

assigned two individuals to care for them. . . There is evidence that [Musaed] al-Jarrah [redacted] and tasked al-Thumairy and al-Bayoumi with assisting the hiajckers."[340]

7.21. Musaed al-Jarrah ("al-Jarrah") worked as the deputy chief of the Islamic Affairs section of the Saudi Embassy in Washington. According to press accounts quoting former FBI officials, al-Jarrah he left the United States in 2005, after coming under FBI scrutiny because of his suspected ties to other Saudis linked to al-Qaida. The press reporting described al-Jarrah as being suspected by the FBI, based on evidence, as having arranged for Al Thumairy and al-Bayoumi to help the first two Qaida hijackers after they arrived in California in early 2000.[341] The FBI-CIA Assessment from December 2004 describes him as "the Assistant Director for Islamic Affairs at the Embassy responsible for disbursing stipends to individuals in the United States" some of whom had "ties to terrorism." [342]

7.21.1. At the time al-Jarrah was working as the deputy at the Islamic Affairs section of the Saudi Embassy, a principal colleague of his was Khalid al Sowailem ("Sowailem"), who served as the head of the Saudi government's Da'wah Office in the United States, operating out of the Ministry of Islamic Affairs' office in the Saudi Embassy.[343]

7.21.2. While in that position, Sowailem received payments from SAAR and from the SAAR Foundation in 1999. His Da'Wah office at the Embassy also received a payment from ARB of $25,000 to the Saudi Embassy's account at Riggs National Bank in Washington, D.C. In addition, Sowailem received ARB checks through ARB's Payable Through Account at Chase Manhattan Bank in New York.[344]

7.21.3. These payments show a close relatonship between ARB and the Saudi Embassy in Washington DC's Islamic Affairs officials, in the period in which one of those officials, al-Jarrah, was "disbursing stipends" to people with "ties to terrorism," and who the FBI found evidence had directed Bayoumi and al-Thumairy to help two of the 9/11 hijackers.

7.22. Al-Bayoumi himself had two types of relationships with ARB and persons associated with ARB, including two people working for its head and cofounder, SAAR, at the SAAR Foundation. First, ARB forwarded funds to him from another one of its clients. Second, al-Bayoumi had relationships, of some kind, with SAAR Foundation officials. These relationships are summarized below:

---

[340] "FBI Updates and Initiatives as of 5 October 2012," p. 4, Document 6292-1 filed June 25, 2020 in Case 1:03-md-01570-GBD-SN; a more heavily redacted version is posted at https://www.floridabulldog.org/wp-content/uploads/2016/12/2012-FBI-Summary-Report.pdf

[341] "The Justice Department Accidentally Released the Name of Saudi Official Suspected of Helping the 9/11 Hijackers - William Barr's DOJ inadvertently named Saudi official Musaed al-Jarrah in a court filing after trying for two years to conceal his identity," Pro Publica, May 13, 2020, https://www.propublica.org/article/the-justice-department-accidentally-released-the-name-of-saudi-official-suspected-of-helping-the-9-11-hijackers. See also "FBI Updates and Initiatives as of 5 October 2012," id.

[342] EO14040-003431

[343] DOJ-0000009 and 0010

[344] NL 15578, NL 15043-15046, NL 15572, NL 10468, NL 10485, KSA 1685, KSA 1687

7.22.1. *Transfers of funds from ARB to Al-Baymoui.* Prior to the 9/11 attacks, funds went through the ARB Payable Through Account at the Chase Manhattan Bank on three occasions to Al-Bayoumi. The first remittance was for $5000 on February 8, 2000; the second remittance was for $13,000 on April 8, 2021, and the third remittance was for $6,333 on April 15, 2001.[345] The information was provided by ARB to its Saudi regulator, SAMA, on August 3, 2003, following an "inquiry on remittances added to the account of Omar Ahmed Mostafa al Bayoumi in the USA," by another Saudi client of ARB, identified only as "Mohamed Abedel Aziz al Habib," "one of the distinguished clients," and someone with 12 bank accounts at ARB as well as two "golden VISA cards."[346] These transactions took place in the very period that al-Baymoui provided assistance to two of the 9/11 terrorist hijackers and allegedly had other terrorist associations.

7.22.2. *Contacts in 2001 with Officials of the SAAR Foundation.* While Bayoumi was living in San Diego, al-Bayoumi made telephone calls to Saudi Arabia on January 20, 2001 to telephone numbers belonging to two officials at the SAAR Foundation in Saudi Arabia: Abdul Rahman bin Abdullah Al Rajhi, and al-Misfer.[347] I have no way of determining the subject matter of this middle-of-the-night calls from al-Bayoumi to the two SAAR officials (one of whom, al-Misfer, was also a senior office of Al-Haramain). However, the fact that al-Bayoumi had the telephone numbers of two SAAR officials, and that he made calls to these officials, provides further evidence of the unique relationship ARB and its principals had with with jihadists and al Qaeda affiliated persons and entities before September 11, 2001: Al-Bayoumi directly assisted two of the hijackers with housing prior to the attacks.

7.23. Al-Bayoumi's relationships to ARB do not appear to be unique to those involved in providing assistance to the 9/11 hijackers. Notably, al-Thumairy had an account at ARB,[348] [redacted]

[345] ARB-00013750/ARB-00013748; ARB-00013763/ARB-00013761; ARB-00013764/ARB-00013762; ARB-00013769/ARB-00013767. Another ARB document, from November 11, 2002, provided to SAMA after the 9/11 attacks, ARB-00013754, shows these transactions from ARB to Bayoumi with slightly different amounts and dates: February 9, 1999 for $4,985; April 17, 2001 for $5,313, and April 17, 2001, for $12,985. Another document, ARB-0039329, also sent to SAMA, on August 3, 2022, shows the transactions as $5,000 for February 8, 2000, $13,000 for April 8, 2001, and $5,333 for April 15, 2001. This document also shows that the transactions were undertaken at the request of Mohamed Abdel Aziz al Habib, and from his funds at ARB, to Bayoumi. Other ARB documents show other variations on the payment numbers and dates. See e.g. ARB-00039330. I cannot account for the discrepancies on the dates and numbers, but the numbers and dates are reasonably similar, and may be accounted for by banking fees applied by ARB to international transfers, together with minor errors in the record keeping and reporting.

[346] ARB-00013750/ARB-00013748

[347] AT&T Response to Subpoena in Case Number MDL 03-1570, produced February 3, 2020. The subpoenaed number was a telephone number associated with Bayoumi's office at a Kurdish Mosque in San Diego. The response shows a call to the number associated with Abdul Rahman bin Abdullah al Rajhi, 96614920033 and a second call to the number associated with al-Misfer, 96655487313. The first call lasted 25 seconds. The second call lasted twelve and a half minutes. The two calls were made in the middle of the night, Pacific time, at 3:33am and 3:35am, respectively, which would be in the early afternoon in Riyadh. For evidence on phone number identifications see NL 18775, which lists the numbers and who they belong to. The document also included phone numbers for SAAR personally, who was chairman of ARB at the time, and for his son Abdullah, the current chairman of ARB.

[348] ARB-0001038-1050, account statement, Fahad al Thumairy, January 8, 1998-March 18, 2002.

[redacted]

7.24. In addition, one of ARB's employees, Towayan al Towayan, was linked to al-Bayoumi in the United States. Immediately after the 9/11 attacks, the FBI sought to interview al-Towayan after finding that he had "significant direct and indirect contacts with several subjects and active participants in the World Trade Center (WTC) attacks." An FBI document entititled "PENTTBOMB MAJOR CASE," dated September 27, 2001, describes al-Towayan as being designated to receive al-Bayoumi's mail after al-Bayoumi left his apartment on June 23, 2001, and that al-Towayan also had contact with a Saudi named Hani Hanjour, who was one of the 9/11 hijackers of American Airlines Flight 77 which crashed into the Pentagon. It further stated that al-Towayan was employed by "Al-Rajhi, an investment firm located in Riyadh, Saudi Arabia," working in its compliance section, and that ARB was paying his costs while he was in the United States to study English at at the request of the Al Rajhi finance company.[350]

7.24.1. Betweeen January 1, 1998 and December 31, 2002, al-Towayan had deposits of 2,676,939.55 SR in three accounts he maintained at ARB, and withdrawals of 2,732,558.78 SR, based on documents available regarding those accounts.[351]

7.25. In sum, based on the evidence I have reviewed, ARB and its principals had unique, ongoing relationships with jihadists and al Qaeda affiliated persons and entities before the 9/11 attacks, and had them for many years.

## 8. Question 6: Is there evidence that Al Rajhi Bank and its principals had unique relationships with Al-Haramain Islamic Foundation, MWL, IIRO, and WAMY before September 11, 2001?

8.1. Yes, there is evidence that Al Rajhi Bank and its principals had unique relationships with Al-Haramain Islamic Foundation, MWL, IIRO, and WAMY ("Da'Wah Organizations") before September 11, 2001. As documented by the evidence I have already described in this Expert Report, ARB simultaneously was:

8.1.1. cofounded, owned, and controlled by SAAR;

8.1.2. the bank of choice for Al-Haramain and IIRO (as well as other Islamic charities) at the time these charities were involved in providing funds and other support for terrorism;

8.1.3. the bank of choice for personal accounts of charity officials who were key al Qaeda financiers, and who used their "personal" accounts at ARB to conduct large and irregular transactions that plainly did not relate to their personal affairs,

[redacted]

[350] E014040-002857 through 002863, FBI Document, September 27, 2001

[351] ARB Accounts [redacted]2 450; SA[redacted]3758; SA[redacted]6599. The amounts are equivalent to about $713,736 in deposits and $728,565 in withdrawals for the period covered.

in contravention of applicable AML and CTF protocols and ARB's own (nominal) rules.

8.1.4. the bank used by SAAR personally to provide funds to Al-Haramain, IIRO and other Islamic charities linked to supporting terrorism at the time SAAR and other Al Rajhi family members controlled both ARB and the SAAR Foundation;

8.1.5. a bank that was used to courier funds on behalf of Al-Haramain and likely on behalf of WAMY;[352]

8.1.6. the bank used to pay the employees of Al-Haramain and IIRO overseas – in places and times when Al-Haramain and IIRO employees were found by the CIA and others to be providing support to terrorists including al Qaeda;

8.1.7. the bank used by Al-Haramain to transfer funds to terrorists and terrorist financiers in multiple countries;

8.1.8. the principal bank for the foundation SAAR and other members of the Al Rajhi family established, funded, and controlled, the SAAR Foundation, which in turn provided funds to Al Halamain, IIRO, and other Islamic charities linked to supporting terrorism prior to 9/11.

8.2. The CIA's reporting on SAAR, the Al Rajhi family, and the SAAR Foundation provides further data points on these relationships prior to the 9/11 attacks, as follows:

8.2.1. "Many prominent Saudi businessmen contribute generously to the IIRO through their zakat contributions, including the Al Rajhi fmaily, which has an estimated wealth of $20 billion."[353]

8.2.2. "Suleimein al Rajhi is the Kingdom's largest payer of *zakat* (chraitable donations); he reported maintains a staff of 20 to manage his unpublicized charitable endeavors."[354]

8.2.3. "[T]he al Rajhis were routinely contacted by officials of the World Assembly of Muslim Youth (WAMY) – a Saudi NGO whose personnel often pursue an extremist agenda, [redacted] WAMY officials have couriered private Saudi donations to Islamic groups in Afghanistan and Bosnia."[355]

8.2.4. In the May 28, 2003, report exclusively devoted to ARB and the Al Rajhis, "Al Rajhi Bank: Conduit for Extremist Finance," "**Nongovernment organizations (NGOs)**. Gulf-based NGOs use [ARB] to transfer funds to their offices abroad some of which may be used to support terrorists: [about five lines redacted]

[352] CIA_000744
[353] CIA_000221
[354] CIA_000743
[355] CIA_000745

[bullet point] "Saudi-based al-Harmaain, which has come under close scrutiny by US and Saudi authorities for alleged terrorist ties, uses [ARB] and National Commercial Bank to fund its programs abroad. [bullet point] "The International Islamic Relief Organization, a nongovernment organization with ties to al-Qa'ida, as of the late 1990s used Al-Rajhi to pay its employees."[356]

8.2.5. "HIF [Al-Haramain] employees' accounts in Albania prevously received money from an HIF official account at al-Rajhi bank."[357]

8.2.6. "[Redacted] funds from an HIF [Al-Haramain] account in Saudi Arabia at al-Rajhi bank were transferred to an al-Ansar Welfare Trust in Kashmir. Al-Ansra Welfare Trust is a front for Lashkar-i-Tayyibya (LT) and Tekrik al-Mujahidin, which have been listed by the United States as terrorist groups. [redacted]"[358]

*Documentary and Testimonial Material Produced in This Case*

8.3. Discovery in this case has provided important direct documentary evidence about these unique relationships. I understand from the pleadings that the material produced from ARB amounts to some 39,959 documents. From that broader discovery, plaintiffs' counsel have provided me approximately 1,200 sets of documents relating to ARB's provision of services to the Da'Wah Organizations. Occasionally, these sets reflect only one document, but generally, the sets include a number of documents, so the total number of pages I have reviewed is far greater, but I have not calculated the number. My ability to fully assess this material has been somewhat inhibited by redactions throughout the material produced by ARB in discovery. I understan that these redactions were initially made by ARB counsel before producing the documents, and that these redactions were later ordered by the court to be removed and the underlying information restored. Unfortunately, due to the timing of that order, some documents shared with me retain many such redactions, as they had been translated into English prior to that order. Accordingly, I expressly reserve my right to reassess and reformulate any portion of this Expert Report and my responses to the questions posed to me, as they relate to documents produced by ARB that were originally in a redacted form, should I receive additional information material to the redacted documents at some future time.

---

[356] CIA_000746. I assess the information from this May 28, 2003 Report to refer to activity that was pre-9/11, which may have been supplemented by additional information from after the 9/11 attacks. The section on the IIRO expressly states that the IIRO-ARB relationship existed prior to 9/11 and documentary evidence produced in this case, discussed later in this section, and the deposition of an ARB official in this case, confirm the Al-Haramain/ARB banking relationship existed prior to 9/11. There are other data points in this CIA Report that refer to the relationship between ARB and these NGOs after 9/11, which I have disregarded for the purpose of answering the questions posed with regard to the pre-9/11 relationship.

[357]CIA-SUB_0012. This data point is from an August 28, 2002 CIA Report, "Al-Haramain: Support for Extremists and Terrorists," but given the term "previously" as it is used in the context of that report, I assess that this reference refers to pre-9/11 activity, as it is contrasted in this section of the CIA report with how Al-Haramain changed its manner of sending funds to foreign offices after the 9/11 attacks.

[358] CIA-SUB_0013

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

8.4.     Consistent with the CIA's reporting, the discovery process confirmed that ARB
         maintained a large number of separate Al-Haramain and IIRO bank accounts during the
         period before the 9/11 attacks, and in the immediate period after the attacks (1998-2002),
         as confirmed by Galloway testifying on behalf of defendant ARB on May 11, 2023.

8.5.     The documents provided by ARB regarding ARB's handling of the Al-Haramain
         accounts show 94 accounts maintained for Al-Haramain at ARB over the five year period
         of January 1, 1998 through December 31, 2002.[359] Total deposits in these accounts in
         Saudi riyals amounted to 2,146,119,285.78, more than 2.1 billion SRs. Total withdrawals
         from the accounts amounted to 2,035,094,758.98.[360]

8.6.     The documents provided by ARB regarding ARB's handling of the IIRO accounts show
         287 accounts maintained for IIRO at ARB over the five year period of January 1, 1998
         through December 31, 2002.[361] Total deposits in these accounts in Saudi riyals amounted
         to 2,974,279,291.71, or just under 3 billion SRs. Total withdrawals from the accounts
         amounted to 2,914,284,8208.75, or about 2.9 billion SRs. [362]

8.7.     At the long-term SR-USD exchange rate of about 3.7505 Saudi Riyals to one U.S. dollar,
         the total amount from these two Da'Wah Organizations amounts to about $1.33 billion
         deposited and nearly that amount withdrawn from accounts maintained by ARB over a
         five year period. Based on the value of the dollar at the midpoint of the 1998-2002 period
         covered by the information provided by ARB, this would amount to roughly $2.37 billion
         in today's (2023) dollars.[363]

8.8.     During his initial examination by plaintiffs' counsel in his deposition, Galloway was not
         able to provide any information about the purposes for which the $1.33 billion that went
         through the accounts were used, including whether or not the accounts sent funds outside
         of Saudi Arabia. Then, on cross-examination by ARB's counsel, Galloway acknowledged
         that Al-Haramain funds may have been sent outside of Saudi Arabia. Portions of his
         testimony that I found material to the question of whether there is evidence that Al Rajhi
         and its principals had unique relationships with Al-Haramain, MWL, IIRO, and WAMY
         prior to 9/11 were as follows:

    8.8.1.    According to Galloway, there were 95 Al-Haramain accounts maintained at ARB
              during the 1998 through 2002 time period. Galloway testified that the reason for
              the large number of accounts was that each account was "created for different
              charitable accounts by Al-Haramain, in other words, different projects or different
              activities would have a different name on the account in order to keep the funds

---

[359] Some of these accounts were open only for a portion of this period.
[360] Exhibit 31, September 27, 2023 Deposition of Abdullah al Rajhi, Plaintiffs' Summary Spreadsheet of Al-Haramain Islamic Foundation Accounts at ARB.
[361] Some of these accounts were open only for a portion of this period.
[362] Exhibit 32 (ARB 32), September 27, 2023 Deposition of Abdullah al Rajhi, Plaintiff's Summary Spreadsheet of International Islamic Relief Organization Accounts at ARB.
[363] Online calculators of U.S. inflation convert $1 in 2000 dollars to about $1.78 as of 2023. "CPI Inflation Calculator," https://www.officialdata.org/us/inflation/1800?amount=2000; also see "US Inflation Calculator," which provides an identical calculation. https://www.usinflationcalculator.com/

FBI PROTECTED MATERIAL REDACTED

and the activities separate by project."[364]

8.8.2. Galloway testified that he could not provide specifics on what the "multiple projects" in the "multiple accounts" related to.[365] Galloway confirmed that there were 308 distinct bank accounts at ARB for IIRO during the same period, and that the reason for this (implicitly large) number of accounts was the same as the one for Al Harmain, namely, that "new acounts were opened every time there was a new project over that period."[366]

8.8.3. Regarding audits, Galloway testified that ARB conducted or commissioned audits for compliance purposes by ARB between 1998 and 2002, but he did not know whether or not these audits encompassed reviews of any Al-Haramain accounts.[367]

8.8.3..1. In an errata sheet correcting his deposition, the corrected testimony added "During the relevant period, the branch audit team normally audited each branch annually. The auditors checked the account-opening documentation for a sample of accounts every year, and required all identified deficiencies to be rectified by the branch. This requirement applied to sampled acounts opened before 1997."[368]

8.8.3..2. A later portion of the errata sheet for the Galloway Deposition adds that "SAMA's periodic thematic audits included surprise and short-notice audits that also checked for compliance with onboarding requirements. And the Bank's external auditor further checked for compliance with SAMA regulations."[369]

8.8.3..3. The Errata sheet for the Galloway Deposition further adds "The Internal Audit department undertook to audit all branches, which would include branches where accounts for Al-Haramain or IIRO accounts were audited, however, the Bank would have to collect all of the audit reports to find the audits of those particular branches, and those audits would have to be reviewed to determine which accounts were covered."[370]

[364] Rough Draft Testimony of 30(b)(6) Al Rajhi Bank, James Galloway, Taken on 05/11/2023, p. 76, lines 20-25, and p. 77, lines 1-2 ("Galloway Deposition").
[365] Galloway Deposition, p. 77, lines 18-23
[366] Galloway Deposition, pp. 83-84. The documents provided by ARB do not back up Galloway's statements on this point. The records I have reviewed indicate that accounts were opened by ARB without any verification of the purpose and without evidence that ARB inquired about the purpose of accounts at account opening or later. Instead, the records suggest, based on what I have reviewed, that accounts were often opened with generic designations as belonging to an organization, such as Al-Haramain, without a further specification of purpose. Furthermore, in some instances, multiple accounts were opened simultaneously without an explanation of the different purposes of the accounts being provided.
[367] Galloway Deposition, pp. 106-108
[368] Galloway Deposition, Errata, p. 108, line 16.
[369] Gallow Deposition, Errata, p. 112, line 5.
[370] Gallow Deposition, Errata, p. 113, lines 1-9

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

8.8.4.   Galloway testified that based on his preparation he did not know whether any of the Al-Harmain accounts at ARB were established to support Al-Haramain activities outside of Saudi Arabia, before affirming that to his best understanding, ARB did not open accounts for charitable work overseas. He then explained that any donations made to Al-Haramain were made to accounts inside Saudi Arabia, regardless of whether they might reference donations or other transactions to such counties as "Albania," "Bosnia," "Kosovo," or regions such as Asia, Europe, or Africa.[371]

8.8.4..1.   In his Errata additions, Galloway stated: "To clarify, the accounts that Al Rajhi Bank opened for Al-Haramain were solely for the Al-Haramain entity in Saudi Arabia, and not for any foreign entities. The requirement that charity accounts at banks in Saudi Arabia be used to support charitable activities was not in effect before May 23, 2003."[372]

8.8.4..2.   As discussed further in this Section of this Expert Report, and in subsequent sections, I have found a number of ARB documents which provide evidence that ARB officials knew that Al-Haramain accounts were being used for activities outside Saudi Arabia prior to the 9/11 attacks.

8.8.5.   Galloway testified that he did not undertake any inquiry to determine whether the Al-Haramain and the IIRO accounts at ARB during 1988 through 2002 were being used to send funds outside of Saudi Arabia.[373]

8.8.6.   Galloway testified that ARB had no knowledge of the roles of various persons whose names appeared on the ARB documents produced in discovery, including: Abdul Rahman al Rajhi, Saleh bin Sulaiman al Habdan, and Abdullah bin Ibrahim al Misfer ("al Misfer"), or any personnel relating to the SAAR Foundation, stating affirmatively the ARB "has no knowledge of the roles and responsibilities of these people, and the foundation has never been a parent, subsidiary or affiliate of the bank."[374]

8.8.7.   Galloway further testified that he did not know who founded the SAAR Foundation, and that ARB's current head, Abdullah Al Rajhi, "had no involvement" in the foundation's activities, and that those activities were "separate to anything he was involved in."[375]

8.8.8.   Galloway affirmed that "the person [plaintiff's attorney] referred to as Abdul Rahman al Rajhi has never had any role with the bank."[376]

---

[371] Galloway Deposition, pp 137-143
[372] Galloway Deposition, Errata, p. 144, line 23, and p. 145, lines 5-7.
[373] Galloway Deposition, pp 149-151
[374] Galloway Deposition, pp. 278-279
[375] Galloway Deposition, pp. 280
[376] Galloway Deposition, p. 301, lines 6-9

FBI PROTECTED MATERIAL REDACTED

8.8.9.   On further questioning conducted by counsel for ARB, Galloway testified that bank records showed that SAAR and the SAAR Foundation had contributed to Al Harmain in Saudi Arabia, but had not contributed to IIRO.[377]

8.8.10.   On questioning by ARB's counsel, Galloway also testified that ARB was aware that SAAR had resigned from the IIRO Board by a letter on June 20, 1993, and that SAAR had asked a total of ten times to be removed from the IIRO Board, including as of October 4, 1998.[378]

8.8.11.   On questioning by ARB's counsel, Galloway clarified that that there were ARB documents showing charitable projects involving Al-Haramain in Saudi Arabia that were "conducted apparently outside the Kingdom of Saudi Arabia," and stated that if so, any such transactions were at the time not prohibited by the Saudi Arabian bank regulator, SAMA.[379]

8.8.12.   On questioning by ARB's counsel, Galloway testified that SAAR and the SAAR Foundation contributed to Al-Haramain's Saudi Arabian office.[380]

8.9.   The documents I refer to in this section, each labeled with an ARB Bates number, are documents I understand to have been produced by ARB through the discovery process in this case from various document repositories it has maintained, characterized as "Operations Systems," "FileNet," and "Physical Archives," from custodians characterized as "Operations," "Legal," "Board Secretariat," "Internal Audit," and "Compliance." I understand them to be documents produced in response to a request for all documents "identifying all monetary donations provided to the Da'Wah Organizations by ARB, Suleiman al Rajhi, Saleh al Rajhi, Abdual Rahman al Rajhi, the SAAR Foundation and members of the Al Rajhi family." Consistent with my use of the term "Da'Wah Organizations" as a defined term, I understand the "Da'Wah Organizations" to include within the term Al-Haramain, MWL, IIRO, WAMY, and the SAAR Foundation. However, I understand that the discovery requests to ARB for contributions to the Da'Wah Organizations were limited to Al-Haramain and IIRO, given the burden considerations mentioned previously. I understand the documents to have generally been in Arabic in the original, and that for the Arabic documents, I have been provided English transactions that have been certified as accurate, and on which I can therefore rely.

8.10.   The documents produced by ARB in response to the request for documents identifying monetary donations involving the SAAR Foundation to other "Da'Wah Organizations," include a number of donations, referenced by date, that I describe below, contextualized to the best of my ability given the reality that many of the documents appear not to include all of the information that I would like to have about each donation. In general, redactions imposed by the defendant's attorneys, and largely remaining at the time of my review due to the timing of the translations, limit the information to the last four digits or

---

[377] Galloway Deposition, p. 343, lines 2-6
[378] Galloway Deposition, pp. 343-345
[379] Galloway Deposition, pp 357-358
[380] Galloway Deposition, p. 343

**FBI PROTECTED MATERIAL REDACTED**

two digits of an account number, the name of the donor, the date, and the amount of the donation. In some cases, this information is provided without identifying an ultimate beneficiary. Due to the redactions, I cannot assess if a beneficiary or other information to identify more about the transaction could be ascertainable if the full document had been provided without the redactions. In other cases, a beneficiary is identified, but other information is redacted.

8.11.    The documents have not been provided to me in chronological order, nor are they entirely in sequence according to the Bates numbers. (That is, sequential Bates numbers do not necessarily correspond to the sequences of pages in underlying documents, in cases in which I am able to ascertain the pagination of an underlying document.) Accordingly, the following represents my effort to work with the ARB documents as they have been provided, by organizing the transactions chronologically when possible and as I find helpful to understanding the relationships of ARB, SAAR, and the SAAR Foundation to Al-Haramain, IIRO, WAMY, and MWL, each of which are shown in the documents as having a relationships with ARB.[381]

8.12.    Donations to Da'Wah organizations from the SAAR Foundation through ARB included the following transactions. In cases when the documents provide further identifying information, such as the name of the beneficiary, I note than.

*ARB, SAAR Foundation, Al-Haramain and the Role of Aqil bin Abdul Aziz al Aqil*

8.13.    The donations through ARB by the SAAR Foundation to "Da'Wah Organizations" provided in ARB documents made available to me included a number of transactions involving apparent donations by SAAR and the SAAR Foundation to Al-Haramain.

8.14.    As this Expert Report has described, Al-Haramain supported terrorists and terrorism in many countries prior to 9/11, and after 9/11 was designated by the Treasury Department as a Specially Designated Global Terrorist. The international branches (and operations) of this Da'Wah Organization were closed by the order of the Saudi Arabian government in 2004, following the joint designation of a number of its branches by the United States and Saudi Arabia, and eventually the entire organization was designated, including its

---

[381] As reflected in pleadings and decisions relating to the discovery permitted in this matter, and the limitations on that discovery as it has been interpreted by the defendants, the information produced by the defendant has been for accounts of Al-Haramain and IIRO at ARB during the period from January 1, 1998 through December 31, 2002, and does not cover accounts held by ARB for WAMY and MWL. Other documents provided to me suggest that accounts were also maintained at ARB for WAMY and MWL, although the information provided to me regarding those accounts is sparse. For example, I have reviewed the Declaration of Omar T. Mohammedi Pursuant to Opinion and Order in related cases to this matter dated April 1, 2019, which includes an Exhibit that lists 116 accounts held on behalf of WAMY by ARB. There is evidence that ARB only received formal proof that these four NGOs were legally established in Saudi Arabia and permitted to operate under its laws and regulations as of March 21, 2004, see ARB-00039947. I discuss the implications of this belated confirmation of license in my response to Question 7, whether ARB adhered to AML/CFT best practices and international standards with regards to the opening and maintenance of accounts for these entities, and for the SAAR Foundation.

FBI PROTECTED MATERIAL REDACTED

branches in Saudi Arabia, and the organization has shut down by Saudi Arabia.[382] Many of its branches were also specifically designated as supporters of terrorism generally and al Qaeda specifically by the UN, which chracterized Al-Haramain as follows: "When viewed as a single entity, Al-Haramain was one of the principal NGOs active throughout the world providing support for the Al-Qaida network. Funding generally came from individual benefactors and special campaigns which targeted selected business entities around the world."[383] In the end, every part of Al-Haramain was shut down due to its pervasive contamination from providing support to terrorist groups and activities.

8.15. Al-Haramain was founded and headed by Aqil bin Abdul Aziz al Aqil ("al-Aqil"). As I discuss further in this section of this Expert Report, al-Aqil was simultaneously a global force in funding terrorism and an active, multi-account customer of ARB. In designating al-Aqil for sanctions, the Treasury Department described him as "the founder and long-time leader of AHF and a suspected al Qaida supporter." According to Treasury, "Al-Aqil has been identified as AHF's Chairman, Director General and President in a variety of sources and reports. As AHF's founder and leader, Al-Aqil controlled AHF and was responsible for all AHF activities, including its support for terrorism."[384] Treasury further made explicit, that Al-Haramain was "one of the principal Islamic NGOs providing support for the al Qaida network and promoting militant Islamic doctrine worldwide. Under Al Aqil's leadership of AHF, numerous AHF field offices and representatives operating throughout Africa, Asia, Europe and North America appeared to be providing financial and material support to the al Qaida network. Terrorist organizations designated by the U.S. including Jemmah Islammiya, Al-Ittihad Al-Islamiya, Egyptian Islamic Jihad, HAMAS and Lashkar E-Taibah received funding from AHF and used AHF as a front for fundraising and operational activities."[385]

8.16. There are many indicators in the documents I have reviewed from ARB showing the close relationship between al-Aqil, Al-Haramain, and ARB. To start with, ARB held two principal accounts in al-Aqil's name, Account No. SA [REDACTED] 3412 ("3412 Account") and Account No. SA [REDACTED] 5920 ("5920 Account").

8.17. During the five year period covered by the discovery, the 3412 Account at ARB for al-Aqil as an individual, took in deposits of just over 19,848,169 SR, or roughly $5.29 million; and paid out nearly all of it in withdrawals (leaving about 57,668 SRs or $15,375 not withdrawn). The 5920 Account for al-Aqil at ARB took in 21,640,672 SR in total deposits, and al-Aqil withdrew 21,809,050 SR from them. These amounted to roughly

---

[382] "Additional Al-Haramain Branches, Former Leader Designated by Treasury as Al Qaida Supporters Treasury Marks Latest Action in Joint Designation with Saudi Arabia," U.S. Department of the Treasury, June 2, 2004 https://home.treasury.gov/news/press-releases/js1703

[383] UN Summary of Sanctioning of Al-Haramain, from its web page on Al-Haramain Kenya maintained by the UN 1267 Sanctions Committee, which references the sanctioning of a number of other Al-Haramain entities, last updated June 2, 2023, https://www.un.org/securitycouncil/sanctions/1267/aq_sanctions_list/summaries/entity/al-haramayn-foundation-%28kenya%29

[384] The Treasury Department used the acronym "AHF" to refer to Al-Haramain, and for the purposes of this Exert Report, the terms are identical.

[385] "Additional Al-Haramain Branches, Former Leader Designated by Treasury as Al Qaida Supporters Treasury Marks Latest Action in Joint Designation with Saudi Arabia," U.S. Department of the Treasury, June 2, 2004, id.

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

$5.77 million in additional transactions, for a total in the two accounts put together of roughly $11 million over the five year period, an amount equivalent to about $19.5 million today.[386] Some of these deposits – amounting to 938,681 SR (slightly over $250,000) were listed as being provided to al-Aqil by Al-Haramain itself. Another 29,458 SR were listed as withdrawals from the 3412 Account at ARB for al-Aqil to the order of Al-Haramain.[387]

8.18.   These transactions involved numerous transactions in cash. In the 3412 Account for al-Aqil at ARB, there were 10,228,494 SR cash deposits (more than $2.8 million in 1999 dollars) made to the account by al-Aqil in May 1999 alone.[388] In the following month of June 1999, al-Aqil deposited an additional 2,163,299 SR, about $577,000.[389]

8.19.   During the same period, the 5920 Account at ARB for al-Aqil received a total of 1,188,000 SR from Abdul Rahman Al Rajhi, who is either the Abdul Al Raham bin Abudllah Al Rajhi who was working for SAAR and the SAAR Foundation, or another family member with a similar name, equivalent to about $317,000 then and just under $564,000 today.[390] The 5920 Account at ARB for al-Aqil also withdrew sums distributed from the 4920 Account to Abdul Rahman Al Rajhi in an even greater amound, totalling 2,495,917 SR, equivalent to more than $665,000 then, and approximately $1.18 million today.

8.19.1.   As I detail in Section 10 in my response to Question 8, rapid deposits of cash into an account, and then withdrawals from the same account to the same persons is a red flag of possible money laundering. These are not just cash deposits and withdrawals by al-Aqil: they are cash deposits and withdrawals from an al-Aqil account on behalf of another person who was a family member of SAAR, the bank's own founder.

8.20.   Below I provide a sampling of transactions involving al-Aqil, Al-Haramain, ARB, and SAAR:

8.20.1.   April 8, 1999. Withdrawal by ARB check, Al-Haramain, 187,500. Currency S.R., which I understand to mean Saudi Riyals.[391] This transaction appears to be related to correspondence on April 6, 1999 from Abdul Rahman Bin Abdallah Al Rajhi of the SAAR Foundation to "His Eminence Shiekh Aqil bin Abdul Aziz al Aqil", as Director General of Al-Haramain. While al-Aqil was not sanctioned by the Treasury Department as a Specially Designated Global Terrorist until June 2, 2004,[392] the documentation regarding his involvement in terrorism pre-dates the

---

[386] ARB-00041454-41463. I use a figure of 1.78 as an inflation calculator for US dollar equivalents. See https://www.usinflationcalculator.com/

[387] ARB-00041454

[388] ARB-00041455-41457

[389] ARB-41457-41459

[390] ARB-00041464-41501

[391] ARB-00039956-9957

[392] "Additional Al-Haramain Branches, Former Leader Designated by Treasury as Al Qaida Supporters Treasury Marks Latest Action in Joint Designation with Saudi Arabia," U.S. Treasury Department Press Release,  June 2,

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

9/11 attacks. CIA reporting states that as of April 1999, Al-Haramain used a centralized system that prohibited individuals from allocating funds without the personal approval of the foundation's director – al- Aqil), implicitly suggesting that Al-Haramain's involvement in terrorist finance as of that time would have been under the direction or control of al-Aqil.[393] Here, Abdul Rahman Bin Abdullah Al Rajhi wrote al-Aqil to advise him that following al-Aqil's phone call, al-Rajhi was enclosing Check No. 1538 for 187,500 S.R., thus tracking the amount shown in the April 8, 1999 check.

8.20.2. The English language version of the check does not show the number of the check, so I cannot verify that it is Check No 1538, but based on the context, I assume the 187,500 paid in Check No 1538 and the actual payment of that amount by ARB to Al-Haramain are the same funds and represent the same transaction.

8.20.3. In the correspondence, Al Rajhi also wrote al-Aqil to advise him that the purpose of the payment (not shown on the actual check) is "to sponsor the Relief Program for the Muslims of Kosovo." Al Rajhi further provides a specific recommendation to al-Aqil as to what to do with the payment: "We suggest that you may open an office in the Republic of Macedonia." He also asked to be provided "with a copy of the reports that you receive, so we may be updated on the situations of the refugees of Kosovo in a timely manner."[394]

8.20.4. Thus, in this instance, where we have documents which specify the use of the funds, Abdul Rahman Al Rajhi was instructing, apparently on behalf of SAAR, the particular use to which the funds should be put: creating a new Al-Haramain office in Macedonia, nominally to help refugees of Kosovo.

8.20.5. These communications and the support from SAAR through Al-Haramain for the "Muslims of Kosovo" came at the height of the civil conflict in Kosovo, which pitted Serbs against Kosovars, and in the midst of the mobilization by the Saudi government of support for the Muslims of Kosovo.[395]

---

2004, https://home.treasury.gov/news/press-releases/js1703  The press release provides pertinent information on the scope of Aqil's and Al-Haramain's support for bin Ladin, al Qaeda, and terrorist activity, including the following: "When viewed as a single entity, [Al-Haramain] is one of the principal Islamic NGOs providing support for the al Qaida network and promoting militant Islamic doctrine worldwide. Under Al Aqil's leadership of [Al-Haramain], numerous [Al-Haramain] field offices and representatives operating throughout Africa, Asia, Europe and North America appeared to be providing financial and material support to the al Qaida network. Terrorist organizations designated by the U.S. including Jemmah Islammiya, Al-Ittihad Al-Islamiya, Egyptian Islamic Jihad, HAMAS and Lashkar E-Taibah received funding from [Al-Haramain] and used [Al-Haramain] as a front for fundraising and operational activities. Under Al-Aqil's leadership, [Al-Haramain] implemented its tasks through its offices and representatives, which span more than 50 countries around the world." See also Treasury link specifying Aqil al Aqil's designation at https://ofac.treasury.gov/recent-actions/20040602

[393] CIA-SUB_0014
[394] NL0010245
[395] A detailed history, extensively footnoted, of the Saudi support for "Wahhabi-style missionary groups with loose ties to the Saudi government, including the Al Haramain Islamic Foundation, al-Haramain al-Masjid al-Aqsa Charity Foundation, the International Islamic Relief Organization (IIRO), the Muslim World League (MWL), al-

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

8.20.6.  Notably, Al-Haramain did create an office in Macedonia, and Al-Haramain's activities in Kosovo became linked to al Qaeda and to the armed conflict there, and was eventually closed.[396]

8.20.7.  April 28, 1998. Withdrawal by ARB check, 11,636. Account 6006. Currency S.R. Payor: SAAR Foundation. Recipient, not identified; I note redactions.[397]

8.20.8.  June 29, 1998. Withdrawal by ARB check, Al-Haramain, 50,000, Account 6006. Currency: S.R. Payor: SAAR Foundation.[398]

8.20.9.  December 30, 1998. Withdrawal by ARB check, Al-Haramain, 100,000, Account 6006. Currency: S.R. Payor: SAAR Foundation.[399]

8.20.10. January 11, 1999. Withdrawal by ARB check, Al-Haramain, 200,000, Account 6006. Currency: S.R. Payor: SAAR Foundation.[400]

8.20.11. April 19, 1999. Withdrawal by ARB check, Al-Haramain, 300,000, Account 6006. Currency S.R. Payor: SAAR Foundation[401]

8.20.12. May 5, 1999. Withdrawal by ARB check Al-Haramain, 12,500, Account 6006. Currency: S.R. Payor: SAAR Foundation.[402]

8.20.13. May 11, 1999. Withdrawal by ARB check Al-Haramain, 150,000, Account 6006. Currency: S.R. Payor: SAAR Foundation.[403]

8.20.14. December 15, 1999. Withdrawal by ARB check Al-Haramain, 53,400. Currency: S.R. Payor: SAAR Foundation.[404]

---

Waqf al Islami, and the World Assembly of Muslim Youth (WAMY)," is set forth in Testimony of Evan F. Kohlmann Before the Senate Committee on the Judiciary, Subcommittee on Crime and Drugs "Evaluating The Justice Against Sponsors of Terrorism Act, S. 2930," The Role of Saudi Arabian State-Sponsored Charitable Fronts in Providing Material Support to Foreign Paramilitary and Terrorist Organizations," July 14, 2010, https://www.judiciary.senate.gov/imo/media/doc/07-14-10%20Kohlmann%20Testimony.pdf  In it, Kohlmann notes that the Saudis put an associate of bin Ladin's, Wa'el Julaidan, as the director of  the Saudi Joint Committee for the Relief of Kosovo and Chechnya, the organization responsible for coordinating Saudi-originated assistance in Kosovo.
[396] See ARB-00038116 for Al-Haramain sponsorship of activities in Kosovo. See "How Kosovo Was Turned Into Fertile Ground for ISIS, Extremist clerics and secretive associations funded by Saudis and others have transformed a once-tolerant Muslim society into a font of extremism," New York Times, May 21, 2016. https://www.nytimes.com/2016/05/22/world/europe/how-the-saudis-turned-kosovo-into-fertile-ground-for-isis.html
[397] ARB-00039948-9949
[398] ARB-00039950-3951
[399] ARB-00038079-8081
[400] ARB-00039954-3955
[401] ARB-00039958-9959
[402] ARB-00038090-8091
[403] ARB-00038098-8099
[404] ARB-00381003-8101

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

8.20.15. May 8, 2000. Withdrawal by ARB check Aqil al Aqil, 187,500. Currency S.R. Payor: SAAR Foundation.[405]

8.20.15..1. Based on the context of this transaction, I understand the "Aqil al Aqil" referenced here to be the then-Chairman, Director General, or President of Al-Haramain, later identified by the U.S. Treasury Department as "a suspected al Qaida supporter "who was responsible for all [Al-Haramain] activities, including its support for terrorism," and sanctioned by OFAC as a Specially Designated Global Terrorist on June 2, 2004.[406]

8.20.16. May 18, 2000. Withdrawal by ARB check Al-Haramain Islamic Foundation, 150,000, Account 6006, Currency: S.R. Payor: SAAR Foundation. Recipient, not identified; I note redactions.[407]

8.20.17. June 10, 2001. Withdrawal by ARB check, 145,000, Account 6006. Currency: S.R. Payor: SAAR Foundation. Recipient: Not identified; I note redactions.[408]

8.20.18. November 13, 2001. Withdrawal by ARB check, 187,5000, Account 6006. Currency: S.R., Payor: SAAR Foundation. Recipient: Not identified; I note redactions.[409]

8.20.19. June 3, 2002. Withdrawal by ARB check, 100,000, Account 6006. Currency: S.R. Payor: SAAR Foundation. Recipient: Not identified; I note redactions.[410]

8.20.20. June 23, 2002. Two withdrawals by ARB check, for 100,000 and for 100,000, Account 6006. Currency S.R. Payor: SAAR Fo undation. Recipient: Not identified; I note redactions.[411]

8.20.21. August 18, 2002. Two withdrawals by ARB check, for 55,000 and for 120,250, Account 6006. Currency S.R. Payor: SAAR Foundation. Recipient: Not identified; I note redactions.[412]

8.20.22. August 27, 2002. Withdrawal by ARB check, 100,000, Account 6006. Currency: S.R. Payor: SAAR Foundation. Recipient: Not identified; I note redactions.[413]

[405] ARB-00038102-8103
[406] "Additional Al-Haramain Branches, Former Leader Designated by Treasury as Al Qaida Supporters Treasury Marks Latest Action in Joint Designation with Saudi Arabia," U.S. Treasury Department Press Release, June 2, 2004, https://home.treasury.gov/news/press-releases/js1703 See also Treasury link specifying Aqil al Aqil's designation as a Specially Designated Global Terrorist at https://ofac.treasury.gov/recent-actions/20040602
[407] ARB-00038104-8105
[408] ARB-00038082-8083
[409] ARB-00038106-8107
[410] ARB-00038084-8086
[411] ARB-00038088-8089
[412] ARB-00038092-8094
[413] ARB-00038096-8097

FBI PROTECTED MATERIAL REDACTED

8.20.23. The total of the donations set forth in this group of documents on Account 6006 is approximately 2.2 million S.R., which I calculate to amount to about $586,572, as the exchange rate was essentially fixed throughout the period. In today's dollars, this figure would be somewhat more than $1 million. About half of these donations were made prior to the 9/11 attacks.

8.21. While the information directly provided in these documents is parsimonious, it does contain some useful indicators about the likely uses of these donations by inference when these documents are cross-referenced with the findings made by the CIA regarding ARB, the Al Rajhi family, and Al-Haramain.

8.21.1. As the Treasury Department found, al-Aqil led Al-Haramain's global activities in this period.

8.21.2. Al-Aqil is explicitly listed in one of the ARB documents as the recipient of one of the payments, on May 8, 2000, in the amount of 187,500 S.R. Transaction on two other dates are also for this exact amount of 187,500 – April 8, 1999 and November 13, 2001, making this look like some form of recurring payment.

8.21.3. The April 8, 1999 documents list the recipient as Al-Haramain.

8.21.4. Given the explicit listing of al-Aqil on one of these three checks, al-Aqil's role as head of Al-Haramain, many ARB documents referencing al-Aqil's direction of Al-Haramain's accounts,[414] and the U.S. government's finding that "Al-Aqil controlled AHF [Al-Haramain] and was responsible for all AHF activities, including its support for terrorism,"[415] I conclude that it is likely that al-Aqil controlled the uses of all of the funds provided from the 6006 account of the SAAR Foundation set forth in these documents.

8.21.5. Taken as a whole, and read with the knowledge I have from the other documents I have cited in this section of this Expert Report, these documents are consistent with and provide documentary evidence consistent with the CIA's findings regarding the use of Al-Haramain to "Support Extremists and Terrorists,"[416] and the use of ARB as a "Conduit for Extremist Finance"[417] through ARB's provision of banking services to Al-Haramain.[418]

8.21.6. They also document the support of SAAR, and the SAAR Foundation for Al-Haramain in at least one war zone (Kosovo) where al Qaeda was active. Other ARB documents, discussed later in this section, show similar support to several

[414] See as examples ARB-0038988, ARB-00039000, ARB-00038279; ARB-00038284, ARB-00039484, ARB-00038461, ARB-00038456, ARB-00038428, ARB-00038426, ARB-00038372, ARB-00038361, ARB-0038335, ARB-00038347, ARB-0038335, ARB-00038295, ARB-00038302, ARB-00038441.

[415] "Additional Al-Haramain Branches, Former Leader Designated by Treasury as Al Qaida Supporters Treasury Marks Latest Action in Joint Designation with Saudi Arabia," U.S. Department of the Treasury, id

[416] CIA-SUB_0007-0019

[417] CIA-SUB_0001-0006

[418] CIA-SUB_0004

FBI PROTECTED MATERIAL REDACTED

other areas of conflict between Muslims and non-Muslims – Bosnia, Chechnya, and Palestine.

8.22. Other documents provided in discovery by ARB are evidence of the broader account relationship of Al-Haramain to ARB, and confirm al-Aqil's status as the co-signatory on most of the accounts held by Al-Haramain at ARB.

8.22.1. A document on Al-Haramain's letterhead with its logo and emblem dated September 26, 1994, from al-Aqil, to the Director of the Al Olaya Street General Bramch of ARB, lists what it describes as "the numbers of the Al-Haramain Islamic Foundation's accounts," with "you." In the letter, Al Aqil asks the ARB Director, identified only as "Brother Mohamed al Ahmadi," to "not cash out or transfer any amount from these accounts – either between these accounts or to different accounts – without formal checks issued by the Al-Haramain Islamic Foundation and coded by SAMA," the Saudi banking regulator for ARB, warning that "[i]f any amount is withdrawn in a manner contrary to the instructions above, we shall have no liability in the future."[419]

8.22.2. The following (and second) page of the document lists Al-Haramain as maintaining just eleven accounts at ARB, rather than the 95 referred to by Galloway as being opened maintained in the period 1998-2002. As the time periods are different, I cannot determine whether the al-Aqil accounts cover all or only some of the accounts maintained in 1994 by ARB on behalf of Al-Haramain. It is possible they cover only the accounts maintained at the Al Olaya Street branch of ARB

8.22.3. The second page describes the accounts as covering distinct purposes and regions, but does so only in general terms, which are not fully consistent with Galloway's testimony, which described each account as being project based. Instead, the second page shows the accounts being labeled in very broad terms, as follows:

8.22.3..1. Account No 41 General Account

8.22.3..2. Account No 90 Europe Committee

8.22.3..3. Account No 09 Africa Committee

8.22.3..4. Account No 98 Zakat

8.22.3..5. Account Number 92 Continuous Alms (Inside Saudi Arabia)

8.22.3..6. Account Number 89 Indian Subcontinent Committee

8.22.3..7. Account Number 33 Mosques Committee

---

[419] ARB-00038534

FBI PROTECTED MATERIAL REDACTED

8.22.3..8. Account Number 50 Middle East Committee

8.22.3..9. Account Number 47 Iftar of Fasting People Committee

8.22.3..10. Account Number 88 Sponsorships Committee

8.22.3..11. Account Number 80 Islamic Book Publishing Committee[420]

8.22.4. Al-Aqil is listed as a co-signatory on eight of the eleven accounts, and all of the geographically specific accounts, except Europe, which lists a different al-Aqil, Abdel Rahman al Aqil, as a cosignatory.

8.22.5. None of the account numbers, provided by ARB in a partially redacted form leaving only the two numbers per account I have specified, correspond to the number "06," the last two digits of the "6006" account reflecting the donations made by the SAAR Foundation to Al-Haramain I have reviewed in this section of this Expert Report.

8.22.6. A second, undated document from Al-Haramain's head office, provided by ARB in discovery, which may be from a later time, does reflect an account with the last two digits "0/6," for one of 15 accounts the document states Al-Haramain holds at ARB as of that unspecified date. This account is described as the "Tawhid Endowment," which is further described as "a charity endowment whose revenue is spent for all types of charity."[421]

8.22.7. Redactions on this document as provided by the attorneys for ARB obscure the identity of the branch to which account corresponds. Eight of the 15 accounts corresponded to the account names listed in the earlier document, but not a single one of these accounts has the same last two digits as those reflected in the 1994 document. My ability to understand and analyze this apparent discrepancy or change of numbering is impaired by the redactions in the document, accordingly, I do no more than note that it was not possible for me to track the accounts and their purposes given the limitations on and the redactions contained within the documents as provided.

8.22.8. The undated document does, however, provide some additional significant information regarding the geographic scope of the ARB-Al-Haramain relationship, in that it specifies separate accounts for "Asia," "Africa," and "Europe." Oddly, the project descriptions or "Statements" about the uses of these funds in the document do not always fully align with the geographic labels. For example, the "Asia Committee" handles donations for both "Palestine" and "Chechnya." Chechnya, which is part of Russia, is located in Europe, in the Caucusus. The "Europe" programs that are geographically identified in the document are "Albania," "Bosnia," and Kosovo." Like Palestine and Chechnya,

[420] ARB-00038535
[421] ARB-00038116

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

Bosnia and Kosovo had active military conflicts in the 1990's, and became incubators of terrorism. As discussed elsewhere in this Expert Report, all of these countries, including Albania, were locations which had been targeted by bin Ladin and al Qaeda or its predecessors for support in the 1990's, and Al-Haramain's activities in these countries were all shut down due to their pervasive links to terrorism, eventually with the agreement of the Saudi government, in the coordinated closures and sanctioning of Al-Haramain previously descibed in this Expert Report.

8.22.9.    The undated document also provides evidence of the close coordination of Al-Haramain and ARB on deposits for particular projects in particular countries, such as the countries specified in the document that had active military conflicts in this period. It states: "Note, please deposit the donations allocated to a specific country to the account of the concerned committees (Asia Committee, Europe Committee, Africa Committee). . . The deposit notice – together with the purpose of donation – shall be sent to Fax No. 4623306."[422]

8.22.10.   Given the process expressly outlined above, there should have been documents maintained by ARB with fax headings of a phone number including the numbers "4623006," showing the purpose of every donation made to Al-Haramain, including any donations made by SAAR and/or the SAAR Foundation to Al-Haramain. I have not had access to any such documents, and upon inquiry, understand that none have been produced by ARB through the discovery process. Such documents, specifying the purpose of each donation, would very likely be material to answering questions about the extent of the relationship between ARB and Al-Haramain with regards to the handling of particular donations; whether such donations were being made to areas of terrorist finance risk; and whether ARB met its banking compliance obligations to ensure that it was not facilitating the support to such improper areas of funding by charities as support for military activity. I do not have information as to whether such documents still exist and if so, why they have not been provided. If they existed, they should have been preserved under applicable document retention schedules at ARB, and if they were archived, warehoused, or destroyed, there should be records of documenting what happened to them.

8.22.11.  The ARB documents are generally consistent with the statements made by the Treasury Department in designating al-Aqil for sanctions that "[u]nder Al-Aqil's leadership, AHF implemented its tasks through its offices and representatives, which span more than 50 countries around the world. AHF maintained nine general committees and several other active committees that included the Continuous Charity Committee, African Committee, Asian Committee, Da'wah and Sponsorship Committee, Masjid Committee, Seasonal Projects Committee, Doctor's Committee, European Committee, Internet and the American Committee, the Domestic Committee, Zakaat Committee and the Worldwide

---

[422] ARB-00038116

FBI PROTECTED MATERIAL REDACTED

Revenue Promotion Committee."[423]

8.22.12. Given the close correspondence of these committees of Al-Haramain shown on the ARB documents, I assess that ARB was providing the banking services to Al-Haramain and to al-Aqil by which he provided the funding for the terrorist activities described by the Treasury Department, and which became the basis for the sanctions of Al-Aqil and Al-Haramain by the United States, and for the sanctions on Al-Haramain by Saudi Arabia and the UN.

8.23. The documents provided in discovery also show a set of payments made in 1999 by SAAR and/or the SAAR Foundation to a number of Islamic charities and causes, which were then allocated to be paid, as if actually paid, by the Humana Charity Trust, a SAAR Foundation related charity that was originally in the United States and then ostensibly moved to the Isle of Man. Based on the documentation provided, I conclude that the payments, in Saudi Riyals, were likely paid in Riyadh through ARB, and did not actually involve the U.S. (or Isle of Man) component of SAAR, all as directed by SAAR. These payments included one to Al-Haramain, in the amount of 600,000 S.R. The columns for the Check No. and the column for the "Check Date and Cashing" are both left blank.[424]

*The Al-Misfer Activity: Simultaneously Representing SAAR and Al-Haramain, Al Misfer Received Many Payments Through ARB*

8.24. The documents provided in discovery also show a set of payments made by the cofounder and then-head of ARB, Suleiman Al Rajhi (previously defined as "SAAR"), and the SAAR Foundation to al Misfer, Director of Al-Haramain's Palestine Division, prior to the 9/11 attacks, at the 6006 Account at ARB. In addition to serving as an officer of Al-Haramain, Al Misfer was also an official of the SAAR Foundation, and receiving payments from an account held at ARB.[425]

8.25. These payments included:

8.25.1. January 12, 1999 payment by ARB check to Abdullah bin Ibrahim al Misfer, 20,000, Account 6006, Currency S.R. Payor: SAAR (listed on document as "Shiekh Suleiman al Abdel Aziz al Rajhi.")[426]

---

[423] "Additional Al-Haramain Branches, Former Leader Designated by Treasury as Al Qaida Supporters Treasury Marks Latest Action in Joint Designation with Saudi Arabia," U.S. Department of the Treasury, id,

[424] The payment to Al-Haramain is contained at NL 0015046. The documents I rely on for this part of this Expert Report include NL 0015572, NL 0015578, NL 0015043-5046,

[425] See NL 9625, draft letter by [REDACTED] stating: "Currently the Charity office is managed by Abdul Rahman Bin Abdullah Al Rajhi, Saleh Bin Sulaiman Al-Habdan and Abdullah I. Al-Misfer," December 28, 2000; NL 9623, letter from al-Misfer to Executive Director of "Islamic Call at Universities," in Garden Grove, California, stating that he works for the "Al-Rajhi Charity Office," August 24, 1999. See also "The Al-Haramain Islamic Foundation Launches a Donation Campaign for the Palestinians," Al-Jazirah, April 8, 2002, referring to al-Misri as head of the Palestine Division of Al-Haramain, https://www.al-jizirah.com/2002/200020408/In29.htm; and the online article, "Achievements of Al-Haramain Charitable Foundation in Palestine," available in Arabic, with a Google translation to English, p. 3, www.alminbar.net/haramain.htm.

[426] NL 0010327

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

8.25.2. February 6, 1999 payment by ARB check to Abdullah bin Ibrahim al Misfer, 5000, with purpose indicated in handwriting, "to be handed to propagator Qassim Mohamed from Mali." Account 6006, Currency S.R. Payor: SAAR.[427]

8.25.3. February 6, 1999 payment by ARB check to Abdullah bin Ibrahim al Misfer, 9375, with purpose indicated in handwriting, "received for the benefit of propagators in Sierra Leone." Account 6006 Currency S.R. Payor: SAAR.[428]

8.25.4. February 6, 1999 payment by ARB check to Abdullah bin Ibrahim al Misfer, 72,000, with handwritten note, "I received the check – Abdullah Ibrahim al Misfer," Account 6006 Currency S.R. Payor: SAAR.[429]

8.25.5. April 5, 1999 payment by ARB check to Abdullah bin Ibrahim al Misfer, 23,375, with handwritten note, "The check was received – to be handed to Brother Abdullah al Misfer." Account 6006, Currency S.R. Payor: SAAR[430]

8.25.6. May 22, 1999 payment by ARB check to Abdullah bin Ibrahim al Misfer, 235,000, with handwritten note, "Accounts Division – I handed a copy to Omar – hand the check to Brother al Misfer." Account 6006, Currency S.R. Payor: SAAR[431]

8.25.7. [Date Truncated Number] 1999, payment by ARB check to Abdullah bin Ibrahim al Misfer, 104000, with handwritten note, "the check was received – to be handed to Brother Abdullah 8-11/13." Account 6006, Currency S.R. Payor: SAAR.[432]

8.26. Separately, a year earlier, on August 24, 1999, Al-Misfer himself wrote the Executive Director of an Islamic NGO, the Islamic Call at Universities based in Garden Grove, California, to inform him that the "Al-Rajhi Charity Office I am working for, has already allocated an amount of US$5000 and sent to to you by cheque No 00092033 dated 12/04/1999," which I assume to mean April 12, 1999 to make sense of the chronology.[433]

8.27. Al Misfer's relationships with ARB, SAAR, and the SAAR Foundation are also significant because in addition to having a role at Al-Haramain, Al Misfer was involved with the IIRO. Years earlier, on May 30, 1995, the IIRO had written the Chief of Protocol of the Tanzania Ministry of Foreign Affairs to request use of the "V.I.P. Facilities" on arrival at Dar es Salaam for a six person official delegation of the IIRO to Tanzania, which included SAAR, "Saleh Al-Habdan," and "Abdullah al-Misfer" and three others, suggesting that the SAAR's "Charity office team had already been working for or with

---

[427] NL 0010348
[428] NL 0010349
[429] NL 0010350
[430] NL 0010145
[431] NL 0010423
[432] NL 0010194
[433] NL 0009623

**FBI PROTECTED MATERIAL REDACTED**

both SAAR and the IIRO since at least 1995.[434]

8.27.1. The location of the visit itself reflects the close links between the non-SAAR Da'Wah Organizations and their support by SAAR, the SAAR Foundation and its senior personnel, and ARB. A former director of Al-Haramain's offices in Dar es Salaam was later found linked to the bombing of the U.S. Embassy there on August 7, 1998.[435] The IIRO was also linked to the Dar es Salaam terrorist attack, as well as the one in Nairobi.[436]

8.28. The evidence shows that Al-Misfer was not only the head of Al Harimain's Palestinian relief efforts, but was part of an official mission of the IIRO to another country, Tanzania, where these charities were then linked to terrorist attacks on U.S. Embassies. He was simultaneously acting as a senior officer of the SAAR Foundation, and receiving checks that were personally donated by the cofounder of ARB, the then-head of ARB, and the then-head of the SAAR Foundation, SAAR, all at a time that the CIA found Al-Haramain was being used systematically to "Support Extremists and Terrorists," and ARB was being used as a "Conduit for Extremist Finance" through ARB's provision of banking services to Al-Haramain.[437]

8.29. Another example of the IIRO-ARB relationship from documents provided in discovery in this case is a "Circular" sent by IIRO, in its capacity as a component of the MWL, which is also identified on the circular, asking preachers and imans at mosques in Saudi Arabia to collect donations in collection boxes to be used to support "the Blessed Al-Aqsa Intifada in the Mecca Region" by making donations to "our brethen in the Intifada," dated February 24, 2001, which were then to be deposited in a fund for "Al-Aqsa Martyrs and Orphans" at the ARB Heraa Branch in the city of Jeddah.[438]

8.29.1. The Al-Aqsa Intifada is a term that has been used in Arab countries, and particularly by Palestinians, for the Palestinian-Israeli conflict otherwise known as the Second Intifada from 2000 to about 2005, in which about 4000 people died.[439]

---

[434] IIRO 314040

[435] Al-Haramayn Foundation Designation, UN Security Council, Sanctions Committee website, https://www.un.org/securitycouncil/sanctions/1267/aq_sanctions_list/summaries/entity/al-haramayn-foundation-%28tanzania%29

[436] "Two Muslim Charities Under Scrutiny," Washington Post, September 30, 2001, https://www.washingtonpost.com/archive/politics/2001/09/29/muslim-charities-under-scrutiny/a72826c9-5789-4d31-844a-c0452c89e43f/

[437] CIA-SUB_0007-0019 and CIA-SUB_0001-0006. For SAAR's personal history, and his cofounding of ARB with his brother, see e.g. "Sulaiman Al-Rajhi's life a rags to riches story," May 30, 2012, https://www.arabnews.com/economy/sulaiman-al-rajhi%E2%80%99s-life-rags-riches-story, which includes an extended interview with SAAR, and which describes him as the founder of ARB. Other references to ARB describe him as its cofounder, with his brother Saleh. See e.g. Profile of SAAR, Arabian Business, https://www.arabianbusiness.com/lists/power-100-290344-htmlitemid290400. Yet other references list additional Al Rajhi brothers as among the cofounders of ARB. For the purpose of this Expert Report, I refer to SAAR as the "founder" or "cofounder" of ARB.

[438] IIRO 285616

[439] "The Al-Aqsa Intifada," 2000, Institute for Palestine Studies, https://www.palestine-studies.org/en/node/1651665

FBI PROTECTED MATERIAL REDACTED

8.29.2. The document by its own terms reflects ARB being used by IIRO to hold funds collected for the purpose of providing charitable support relating to an armed conflict. Superfically, this would be characterized as humanitarian assistance distributed to "orphans." But by its terms, it also included support to "martyrs," which in that period was a category of people that included intifada participants of all categories – including those who died not only in armed conflict against Israeli soldiers, but terrorists who caused their own deaths in suicide bombing attacks, died shooting Jews attending religious events, or died in the course of blowing up teenagers at discos.[440]

8.29.3. An account held at IIRO captioned "Donations for Al Aqsa Martyrs and Orphans," had deposits of 25,751,459.49 SRs in the time period October 10, 2000 through December 31, 2002, with withdrawals during that period of 12,364,332.45 SRs (equivalent to roughly $3.3 million in 2000, or about $5.8 million as of 2023).[441] During that twenty-six month period, terrorist attacks on Americans in Israel took place roughly once a month, killing and injuring dozens of Americans by means of suicide bombings, bombings of buses and bus stations, shootings, stabbings, attacks on private cars and on taxicabs, and the use of explosive devices.[442]

8.30. Evidence in the ARB documents also shows ARB was taking instructions in 1992 from one of the IIRO's leaders, Abdel Hamid al Mujil (spelled "Mujal: in the translated ARB document),[443] who was deeply implicated in terrorist finance relating to al Qaeda activities in Southeast Asia, and sanctioned by the U.S. as a SDGT on August 3, 2006. The U.S. Treasury found that Al-Mujil, who they described as "a high-ranking IIRO official in Saudi Arabia. . . used his position to bankroll the al Qaida network in Southeast Asia," had "a long record of supporting Islamic militant groups, and . . . maintained a cell of regular financial donors in the Middle East who support extremist

[440] There is extensive information available on this phenomenon in this period online, which at the time reflected Saudi state policy. One useful source is material published by the U.S. Director of National Intelligence at https://www.dni.gov/nctc/ftos.html, which contains chronologies of terrorist events, including Palestinian suicide bombings. See also the 2002 report of Human Rights Watch on the subject, "Financial and Logistical Support," which includes annotations on the sources for their information on the phenomenon of payments to martyrs being part of the support for maintaining the armed conflict. https://www.hrw.org/reports/2002/isrl-pa/ISRAELPA1002-06.htm. See also Palestinian Foreign Aid: Saudi Financial Aid, by Steven Stalinsky (July 2003), https://www.jewishvirtuallibrary.org/saudi-financial-aid-to-the-palestinian-authority For a contemporaneous account of the disco bombing, which occurred shortly after the date of the circular, see "Suicide bombing at Israeli disco kills 17," CNN.com, June 1, 2001 http://www.cnn.com/2001/WORLD/meast/06/01/israel.explosion.03/ Americans were among those killed in Israel in the course of the 2nd Intifada, both before and after the 9/11 attacks. Those killed before the 9/11 attacks in the course of the 2nd Intifada included a number of Americans. See "American Victims of Terrorist Attacks (1970 – Present)," compiled by the Jewish Virtual Library, which specifies them by name, age, and the date and circumstances of each of the terrorist attacks. https://www.jewishvirtuallibrary.org/american-victims-of-terrorist-attacks

[441] Account SA[REDACTED] 0156, ARB-00040444-ARB-00040543.

[442] Chart, "American Victims of Terrorist Attacks," https://www.jewishvirtuallibrary.org/american-victims-of-terrorist-attacks

[443] ARB-00013503-3506

causes."[444] He was also designated the next day by the UN for supporting terrorism, and delisted there about five years later as part of the UN's normal delisting process when a person is no longer considered to be a terrorist finance threat.[445]

8.31. The evidence shows that al Mujil, as head of the IIRO Eastern Province Office in Saudi Arabia, was the person directing ARB to recognize signatories as authorized on IIRO accounts when they were opened for that office. The ARB records show al Mujil as continuing to provide such instructions to ARB on these accounts as late as September 2, 2001.[446]

*Additional Indicators of ARB, SAAR, SAAR Foundation, and WAMY Relationship*

8.32. Additional checks that appear to be written by SAAR himself directly from one or more accounts he appears to have personally maintained at ARB, and funneled in some cases through WAMY, add further to the evidence. These include:

8.32.1. A January 1999 payment [information regarding specific day in January truncated] from SAAR personally, by ARB bank check to the order of WAMY, 75,000, no purpose specified.[447]

8.32.2. February 8, 1999, payment by ARB check to the order of WAMY, 37500, "which is a donation from Sheikh Suleiman bin Abdullah Alrajhi for the benefit of the Institute of Information and Islamic Culture in Chicago, USA," drawn on ARB Head Office, Riyadh, undertaken by Abdul Rahman Bin Abdullah Alrajhi, "To be cashed out at all of our branches in the Saudi Kingdom."[448]

8.32.3. Payments by ARB check to the order of various persons "to sponsor charity," with donations from SAAR for the benefit of various local Islamic NGOs, including the Dar Al Hijrah Association in the Philippines (60,000 S.R.), February 4, 1999; the Da'Wah and Islamic Culture Organization in Ethiopia (100,000 S.R.), February 4, 1999; the Ibn al Qasim Islamic Center, Pakistan (10,000 S.R.), Febrary 4, 1999; the Islamic Da'Wah Organization in Khartoum (50,000 S.R.), February 4, 1999; and the Saudi Charity School in Islamabad, Pakistan (334,000 S.R.), February 8, 1999.[449]

8.32.4. The February 8, 1999 donation and payment from SAAR to WAMY, to pay to an Institute for Islamic Culture in Chicago, in the United States, drawn on what

[444] "Treasury Designates Director, Branches of Charity Bankrolling Al Qaida Network," August 3, 2006 https://home.treasury.gov/news/press-releases/hp45

[445] "Security Council Committee Adds One Individual, One Entity To Al-Qaida Sections Of Consolidated List, 4 August 2006, Security Council SC/8801 https://press.un.org/en/2006/sc8801.doc.htm "Security Council Al-Qaida Sanctions Committee Deletes Abd al Hamid Sulaiman Muhammed al-Mujil from Its Sanctions List," 1 July 2013, Security Council SC/11053 https://press.un.org/en/2013/sc11053.doc.htm

[446] ARB-0013503-3506; ARB-00013669

[447] NL0010333

[448] NL0010465

[449] NL0010500, NL0010501, NL0010504, NL0010505, NL0010508, NL0010509

FBI PROTECTED MATERIAL REDACTED

appears to be a ARB bank check, rather than a personal account, and which is listed as "For Al Rajhi Banking & Investment Account" on the original check itself: (the translated text does not include this reference) speaks directly to the "unique relationship" between ARB, SAAR, and WAMY. Here, the head of ARB and of the SAAR Foundation is directing another member of his family, Abdul Rahman Bin Abdullah al Rajhi, who is a senior official at the SAAR Foundation (Director General), established by the head of ARB, to make a payment to another Saudi charity in Saudi Arabia that has been linked to terrorism, which in turn is supposed to pay it to a U.S.-based Islamic Institute for purposes described simply as "charity."

8.32.5. The other donations and payments involving ARB and SAAR did not go through WAMY, but were in other respects substantively similar to the payment allocated to go to Chicago. Each was made through an account at ARB, at SAAR's request. Based on the documents provided, the records suggest the funds were drawn directly from the Al Rabwah Branch of ARB (not, apparently, from anyone's particular account), to a designated person on behalf of a separate designated Islamic charity in another (non-Saudi) country, that is, Ethiopia, Indonesia, Pakistan, the Philippines, and Sudan – each one of which is a country that had, at the time, a notable presence of Islamic extremism linked to al Qaeda, and a notable presence of Al-Haramain and IIRO during periods that various components of these NGOs were linked to supporting terrorism.[450]

8.32.6. Separately, the head of the SAAR Foundation, and other entities that were part of the SAAR network of charities and companies in the United States, including Humana, [REDACTED], communicated to Abdullah al Rajhi, SAAR's son and then a high ranking official of ARB, and now ARB's Chairman, on October 31, 2000, regarding a payment to WAMY that [REDACTED] was directed by Abdullah al Rajhi to make (ostensibly on behalf of the charity committee created by SAAR and the SAAR Foundation which selected the receipients of the donations), in the amount of 338,500 S.R. (about $84800).[451] The payment was one among many ostensibly "made" by Humana in the United States, but actually made by SAAR and/or the SAAR Foundation or those associated with them in Riyadh, at the direction of SAAR.[452]

8.32.6..1. In the letter, [REDACTED] advised that the U.S. Internal Revenue Service was asking about the addresses and contact names for the organizations

---

[450] For Ethiopia presence of al Qaeda prior to the 9/11 attacks see e.g. "Al Ittihad Al Islamiya," profile, Stanford University, last updated June 18, 2016, tracing its origins there to the early 1990s with a detailed chronology of events, primarily in the mid-1990s. The Stanford compendia also provides a bibliography of citations on al Qaeda in Ethiopia. http://stanford.edu/group/mappingmilitants/cgi-bin/groups/print_view/99 Elsewhere in this Expert Report I have specified examples of the al Qaeda presence pre-9/11 in Indonesia, Pakistan, the Philippines and Sudan. For Al-Haramain presence and involvement in terrorism, see UN sanctions reports on Al-Haramain at https://www.un.org/securitycouncil/sanctions/1267/aq_sanctions_list/summaries/entity/al-haramain-%26-al-masjed-al-aqsa-charity-foundation

[451] NL 0015572

[452] NL 0015044-5047, NL 0009625

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

who had received the money, and ▮▮▮ needed them to respond to the IRS. Thus, the head of the entity that had purportedly made the payments did not have information concerning the recipients.

8.32.6..2. The ▮▮▮ communication and related documentation highlighted again the unique nature of the relationship between ARB, its principals, such as SAAR himself, the SAAR Foundation, and WAMY. Here, a U.S. officer of the SAAR Foundation has been directed to make a donation to WAMY that appears to have actually not involved the U.S. officer of the company, or indeed, anyone in the U.S. at all, raising the question of why a Saudi Arabian charity (SAAR Foundation) controlled by the head of a Saudi Arabian bank (ARB), would choose to structure a payment to a Saudi charity, WAMY, through creating a paper trail that the donation was made through an entity in the United States. I have reviewed evidence that provides an explanation for the reason. In subsequent sections of this Expert Report, addressing bank compliance issues, I address this issue further.

8.33.    The relationship between SAAR and the SAAR Foundation with WAMY is illustrated by direct payments by SAAR and the SAAR Foundation to WAMY. Those provided in the discovery by WAMY document the following:

8.33.1. A donation by SAAR and the SAAR Foundation on October 14, 2001, in the amount of 131,250 S.R, to an Islamic Research Foundation in India, but enclosed to the Secretary General of WAMY, Dr. Manei bin Hammad al Juhani, for WAMY to forward funds from the SAAR Foundation through WAMY to the designated charitble recipient in Mumbai India. This transaction was handled by the Director General of the SAAR Foundation Abduel Rahman bin Abdullah Al Rajhi.[453]

8.33.2. A donation by SAAR and the SAAR Foundation on June 17, 2002, in the amount of 130,000 S.R., to various projects in Brazil, Canada, The Czech Republic, Poland, Malawi – Ivory Coast for courses in "Sharia" and youth camps, including Da'Wah Camps, again through WAMY through correspondence from Abdul Rahman Bin Abdullah al Rajhi to the Secretary General of WAMY, al Juhani.[454]

8.34.    These two payments took place after the 9/11 attacks. However, they provide further evidence of the close ongoing relationship between WAMY, SAAR, and the SAAR Foundation reflected in the pre-9/11 documents I have already cited in this section of my report.

---

[453]WAMYSA 102829
[454] WAMYSA 502115

FBI PROTECTED MATERIAL REDACTED

*Additional Indicators of ARB, SAAR, SAAR Foundation and MWL Relationship*

8.35. The ARB documents I have reviewed include evidence that shows that MWL used IIRO as the mechanism to carry out activities in foreign countries, rather than engaging in direct financial activity itself through ARB. While there are perhaps a handful of transactions involving transfers to or from MWL in the documents provided to me, the core of the relationship with ARB relating to MWL is MWL providing its imprimature of approval or authorization to ARB to carry out activities for IIRO. Thus, many of the IIRO documents I have reviewed relating to financial transactions it carried out at ARB also carry the logo, letterhead, and/or insignia of MWL alongside those of IIRO. In some cases, documents state in effect that IIRO's financial activities are all being carried out under an authorization or mandate from MWL.[455]

8.36. The Circular regarding IIRO's support to the Palestinian Second Intifada, instructing IIRO ofices to coordinate with preachers and imams to collect funds for deposit in an IIRO account at ARB for "Al-Aqsa Martyrs and Ophans" carries with it the Muslim World League imprimature, in both English and Arabic, although the rest of the original document is in Arabic only.[456]

8.37. One document shows a donation from ARB's cofounder and head, SAAR, and the SAAR Foundation to the MWL, but as with the similar payment to WAMY referred to in the WAMY portion of this section, the donation is structured in a fashion that makes little rational sense. Like the WAMY donation from SAAR characterized as coming through Humana in the U.S. but actually apparently made in Riyadh, the MWL donation is set forth in the list of "Foreign and Domestic Aid for the Year 1419," or 1999 by the Gregorian Calendar, sent to U.S. SAAR Foundation head [REDACTED] that he ws directed to pay by representatives of SAAR or the SAAR Foundation. The payment is in the amount

[455] See e.g. ARB-00013505, ARB-00040258, IIRO 285616, ARB-00014455, the last of which is explicit on the principle that the IIRO is carrying out work under the authority of the MWL: "Since His Eminence Dr. Abdullah Omar Nassif – the former Secretary General of the Muslim World League – was appointed as Vice President of the Shura Council, and since Dr. Ahmed Mohamed Ali was chosen as Secretary General of the Muslim World League, he became the President of the International Islamic Relief Organization's Constituent Assembly. Please note that the Saudi Arabian Monetary Authority SAMA [Currently: Saudi Central Bank] received the letter of His Eminence Dr. Ahmed Mohamed Ali – Secretary General of the Muslim World League and President of the International Islamic Relief Organization's Constituent Assembly – No. 1S./27/M, dated 09/02/1415 AH (July 17, 1994 AD), about informing all banks operating in the Saudi Kingdom to open the accounts of the International Islamic Relief Organization upon an authorization by the Secretary General of the Muslim World League & Chief of the International Islamic Relief Organization's Board of Directors – Dr. Ahmed Mohamed Ali – or by Vice President of the International Islamic Relief Organization's Constituent Assembly and General Supervisor – Dr. Farid Mohamed Yassin Qurashi. A 1992 document also states this relationship clearly: "The Saudi Arabian Monetary Authority SAMA [Currently: Saudi Central Bank] received the letter of the Secretary General of the Muslim World League & Chief of the International Islamic Relief Organization's Borad of Directors No. 298, dated 30/04/1412 AH (November 06, 1991 AD), about authorizing all banks operating in the Saudi Kingdom to open accounts for the International Islamic Relief Organization upon an authorization by [Handwriting: 1] the Secretary General of the Muslim World League & Chief of the International Islamic Relief Organization's Board of Directors – Dr. Abdullah Omar Nassif – or by Vice President of the International Islamic Relief Organization's Constituent Assembly and General Supervisor – Dr. Farid Mohamed Yassin Qurashi. No one other than the two mentioned persons may do this action." ARB-00014347

[456] See English translation and Arabic original, IIRO 285616

of 2,215,000 S.R., and is specified as being designated for the "Mecca Association," with the columns for "Check No" and "Check Date and Cashing" left blank.[457]

*Summary Regarding Indicators of ARB Relationship with the Da'Wah Organizations*

8.38. The approximately twenty-five pages of this Expert Report that I have taken to answer this question covers two major types of evidence. I first reviewed the evidence set forth in the "outside" assessment of these relationships formed over years of analysis by the CIA which led to it concluding that ARB was a conduit for terrorist finance, including for the particular charities whose branches were ultimately sanctioned by the United States and by the UN for terrorist finance (Al-Haramain, IIRO). I then reviewed ARB's own "inside" documentation in the context of the information and analysis undertaken by the CIA. The evidence in the ARB documents is consistent with the CIA's findings and reflects a broad, ongoing set of relationships that went well beyond mere banker and client and beyond mere facilitation of the financial needs of the Da'Wah Organizations for funds transfers. The relationships included donations to the Da'Wah Organizations by the principal and cofounder of ARB, using ARB's infrastructure, through use of ARB's own checks, as well as by the charity founded by SAAR, the SAAR Foundation. The relationship included representatives of ARB's senior officials participating in decision on projects by the charities, as in Kosovo/Macedonia. It included helping the charities collect and disburse funds as payments to the families of "martyrs" in connection with the very violent, ongoing Second Intifada, during a period of intense terrorist activity in Israel in which Americans were killed.

8.39. While I am aware of the CIA's findings about Dubai Islamic Bank also being a "key financial conduit for al-Qa'ida,"[458] I do not know of any financial institution that had as extensive a range of activities, arrangements, and connections with these particular charities that ARB possessed. I therefore conclude that there is evidence that ARB and its principals had unique relationships with Al-Haramain, MWL, IIRO, and WAMY before the 9/11 attacks.

---

[457]NL 0015044-5046. I address the "red flags" implications of the Humana/[REDACTED] documents in my response to Question 8 below.

[458] CIA_000337, CIA_000722, CIA_000734-735.

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

## 9. Question 7: Did Al Rajhi Bank adhere to Know Your Customer, Anti-Money Laundering and Counter-Terrorism Financing best practices and international standards with respect to the opening and maintenance of accounts for Al-Haramain Islamic Foundation, MWL, IIRO, WAMY, and the Saudi-based Suleiman Abdulaziz Al Rajhi Foundation Before September 11, 2001?

9.1. No, ARB did not adhere to Know Your Customer, Anti-Money Laundering and Counter-Terrorism best practices and international standards with respect to the opening and maintenance of accounts for Al-Haramain, MWL, IIRO, WAMY, and the SAAR Foundation ("Da'Wah Organizations"). In my review of the accounts maintained by ARB for the Da'Wah Organizations, I found that most of its own policies and procedures relating to these areas arose from the requirements imposed on Saudi banks by its regulator, SAMA, for the purpose of meeting best practices and international standards. But while these policies and procedures were formally in place, with regards to the accounts I have reviewed, they were broadly disregarded by both the bank and by its Da'Wah customers. One flagrant example took place in a set of incidents, where senior ARB bank officials approved ARB transferring funds from personal accounts into Al-Haramain after being accurately told by the head of its legal office that to do so would expressly violate the bank's own compliance requirements.

9.1.1. The only due diligence exhibited in the account opening documents for the charities (in particular, Al-Haramain), was ARB determining in some instances that particular accounts were authorized by one or another Saudi official, most often, the Deputy Minister or Minister of Islamic Affairs, who prior to the 9/11 attacks was also a senior official at Al-Haramain, and ensuring that it had the ID documents for the signatories on Al-Haramain accounts.

9.1.2. I have seen no evidence that ARB undertook any due diligence regarding the actual uses by the Da'Wah Organizations of their accounts with ARB prior to the 9/11 attacks.

9.1.3. I review the evidence regarding these findings, and the implications of them, in greater detail in this section of this Expert Report.

9.2. In Section Five of this Expert Report, I concluded that international banking institutions had the obligation to adopt and implement effective anti-money laundering and counter-terrorism financing protocols to prevent the financing of terrorism and other illicit financial activity through purported charities prior to September 11, 2001.

9.3. In this Section of this Expert Report, I conclude on the basis of reviewing the applicable legal standards and guidance, and the documents available to me, which includes the materials produced by ARB in discovery that I have reviewed, that ARB did not adhere to best practices and international standards with respect to the opening and maintenance of accounts for the entities, accounts, and transactions covered by the documents. Indeed, for these entities, accounts, and transactions, the record shows that ARB did not adhere to its own required protocols for implementing the requirements mandated by its Saudi

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

regulator prior to 9/11.

    9.3.1.   Instead of adhering to its regulatory obligations and its own policies and procedures, ARB permitted Da'wah organizations and principals of those entities to engage in a broad range of financial activities that presented obvious red flags and terrorism financing concerns, with essentially no limitations or meaningful protections.

9.4.    The international standards applied to ARB's conduct with respect to the opening and maintenance of accounts for Al-Haramain, MWL, IIRO, WAMY, and the SAAR Foundation, including, as expressly stated under Saudi Arabian regulations in effect prior to 9/11, with respect to their handling of funds relating to terrorism. These standards were implemented by ARB in policies and procedures, set forth in its January 1, 1997 "Branch Instruction Manual,"[459] and ARB's November 1998 "Anti-Money Laundering Unit Procedure Guide," and related materials[460] as discussed below.[461]

9.5.    These standards were imposed on ARB to maintain its status as an international bank, operating with correspondent banks in other countries, including ARB's correspondent banking relationship with the Chase Manhattan Bank, which I examine, discuss, and consider in this section of this Expert Report, and its relationship with HSBC, the latter of which was heavily criticized in a U.S. Senate investigation due to the latter continuing its relationship with ARB despite public information about its involvement in terrorist finance, as a result of pressure from its Middle Eastern affiliates.[462]

---

[459] ARB-00000016-733, and with particular materiality, ARB-000000256-261.

[460] ARB-000000735-744.

[461] The Branch Instruction Manual purports to cover only branches of ARB. I do not have information about the structure of ARB prior to 9/11, and what accounts, if any, were maintained outside of the branches of the bank, and therefore would not be directly covered by the Branch Instruction Manual. As the Saudi Arabian regulations issued by SAMA required the coverage of all transactions touching Saudi banks, to comply with the SAMA Guidelines, ARB would have needed to ensure that the requirements imposed on its branches were imposed on all of its operations. I have seen no evidence to show that ARB undertook steps to do this. Information regarding the extent of ARB's compliance  material to my response to this question should have been contained in audits of ARB on its AML implementation by ARB's own auditors, as referenced in the Galloway Deposition, and shared with SAMA, at least regarding the "full-scope examination done by Ernst & Young" in August 2003, which a SAMA regulator referenced in a State Department cable 005103, September 26, 2004, entitled, "Terrorist Financing: Al-Rajhi Bank," https://wikileaks.jcvignoli.com/cable_04RIYADH5103. According to the State Department cable, the Saudi regulator told the Treasury Department official, Juan Zarate, that the Ernst & Young audit found no "wrong doings." As I have seen in a related case, audits of some of the charities that are the subject of this Expert Report violate accounting principles, contain substantial limits to their scope or their opinions. Consistent with this experience, I cannot meaningfully assess any such audits and their implications without reviewing their actual text, and as needed, any relevant back-up material on which they were based. While this State Department cable does not appear to have been released by the U.S. government, but instead, leaked, based on its format, structure, substance, and context, as well as writings of the Treasury Assistant Secretary Zarate, I assume it to be authentic. See **Treasury's War**, Juan Zarate, Public Affairs/Perseus Books (2013), pp. 68-83, describing U.S. efforts against the Saudi charities, and the tendency of Saudi Arabian officials to "push back" against U.S. efforts to curtail their support for terrorism, and referencing both the name Al Rajhi in the Golden Chain document, and Al-Haramain.

[462] "U.S. Vulnerabilities to Money Laundering, Drugs, and Terrorist Financing: HSBC Case History, Staff Report, Permanent Subcommittee on Investigations, United States Senate, July 17, 2012, pp. 6-7 and pp. 189-224,

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

9.6.     These standards were imposed on ARB by its Saudi regulator. They were also incorporated into ARB's own bank policy and procedures, to which ARB was required to adhere, as expressly acknowledged by ARB's representative in the Galloway Deposition.[463]

  9.6.1.   At the global level, these obligations were set by the FATF, as described in Section Five of this Expert Report, which established global standards for banks operating internationally as well as for countries participating in the FATF, which included ARB's home country of Saudi Arabia through the Gulf Cooperation Council ("GCC"), which represented Gulf countries in the FATF before the 9/11 attacks.[464] International banks needed to meet these standards in order to maintain their correspondent banking relationships, such as ARB's one with the Chase Manhattan Bank, to avoid the risk that their correspondent banks would be facilitating money laundering or terrorist finance if ARB failed to meet its obligations in this field.

  9.6.2.   At the national level, these obligations were set by SAMA, which changed its name in 2020 from the "Saudi Arabian Monetary Authority" to become the "Central Bank of Saudi Arabia." SAMA, established in 1952 as the country's central bank, has long functioned as the principal financial regulator in the country. Prior to the 9/11 attacks, SAMA had full authority over all credit institutions and currency exchanges in the country, including ARB.[465]

9.7.     *SAMA Regulations, Issued as Guidelines*

9.8.     Although Saudi Arabia had no formal law criminalizing money laundering prior to the 9/11 attacks, Saudi Arabia's banks were required to implement anti-money laundering controls as a condition of licensing by the country's sole bank regulator, SAMA. In 1995, SAMA issued Guidelines for Prevention and Control of Money Laundering Activities. At the time, it described its purpose in issuing these regulations under Article 16 of the Banking Control Law, "with a view to strengthen the ability of Banks to counter illegal transactions and to maintain and enhance the credibility and reputation of the Saudi Banking System." SAMA further stated that "[b]anks are required to make these [measures in the guidelines] an integral part of their own systems and procedures and to fully implement these as soon as possible."  The English language text of the SAMA

---

https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/PSI%20REPORT-HSBC%20CASE%20HISTORY%20(9.6).pdf
[463] Galloway Deposition, pp. 96-112
[464] Bahrain, Kuwait, Oman, Qatar, Saudi Arabia, and the United Arab Emirates were at the time the members of the Gulf Cooperation Council, which had an associated membership in the FATF. See description of Gulf Co-operation Council for the Arab States of the Gulf (GCC) on FATF's website, https://www.fatf-gafi.org/content/fatf-gafi/en/countries/detail/Gulf-Co-operation-Council.html  and its membership status there at: https://www.fatf-gafi.org/en/countries.html
[465] "SAMA is an executive agency that supervises banks and other financial institutions in the country in accordance with the SAMA Statute promulgated by Royal Decree No. 23 of 23 Jumada U A.H. 1377 and the Bank Supervision Statute promulgated by Royal Decree No. 5 of 22 Jumada II A.H. 1386, which together constitute the law in force. SAMA frames the regulations governing banking activities in accordance with the provisions of the two statutes indicated." UN Report, *id*.

FBI PROTECTED MATERIAL REDACTED

regulation materially included the following provisions:

9.8.1.   "By all accounts, world-wide money laundering activities, particularly those related to drugs, now constitute a multi-billion dollar business annually. However, money laundering could also encompass funds derived from theft, blackmail, extortion, ***terrorism*** [emphasis added], and other criminal activities. It is inconceivable and unlikely that such large amounts of money can be stored or moved without the cooperation or unwitting participation of many international banks and banking systems." Notably, the language about the risk of terrorist finance is contained in the first paragraph of the entire SAMA document, specifying from the outset that the scope of the anti-money laundering obligations included measures to combat abuse of banks by terrorists.

9.8.2.   "In recognition of international legal and supervisory efforts to combat the spread of money-laundering, the Agency has prepared these Money Laundering Control Guidelines which provide basic information on the subject, along with information on measures to be taken for prevention, control, and detection of money laundering activities. Banks are required to make these Guidelines an integral part of their own systems and procedures aimed at detecting and controlling such illegal activities. The objectives of the Agency in issuing these Guidelines are as follows:"

- "To help Saudi Banks to comply with the Banking Control Law and SAMA regulations."

- "To prevent Saudi Banks from being exploited as channels for passing illegal transactions arising from money-laundering and other criminal activity."

- "To maintain and enhance the credibility of the Saudi Banking System."

9.8.3.   "Money laundering is normally a three stage operation. These stages are:

- "Placement. The criminal or drug dealer places the funds obtained through illegal activities in the banking system."

- "Layering. The criminal or drug dealer aims to cover up the source of the funds obtained and disguises the relation between those funds and its illegal source through a series of normal commercial transactions."

- "Integration. The laundered funds become part of other legal funds in the economy so that it is difficult to differentiate between the laundered funds and those from legal sources."

9.8.4.   "Legal Responsibility of Banks. The Saudi Arabian Monetary Agency has the authority under Article 16(3) of the Banking Control Law, to issue general rules with the approval of the Minister of Finance and National Economy regarding

FBI PROTECTED MATERIAL REDACTED

various matters, including the fixing of terms and conditions which banks should take into consideration when carrying out certain types of transactions for their customers. Over the years, the Agency has issued a number of circulars that were aimed at encouraging banks to immediately report any suspicious or unusual transactions to the authorities and the nearest police station."

9.8.5.  "Under the provisions of the Banking Control Law and these regulations a Bank shall be held responsible for the action or inaction of its employees, including their failure to notify the concerned authorities of any suspected money laundering transactions. If it is proven that a Bank or its employees failed to comply with these Circulars, they shall be subjected to penalties prescribed under Article 23 paragraph 5 of the Banking Control law."

9.8.6.  "General Policy Requirements."

9.8.7.  "Detection and Prevention: Saudi Banks should train and educate their employees to enhance their understanding of money-laundering and its relationship with criminal activities. As employees become familiar with such activity, they can play an effective role in combating money laundering through prevention and detection measures."

9.8.8.  "Deposit of Fund Taking[:] Saudi Banks should take care when accepting deposits or other funds. If it is suspected that a deposit is, or forms part of funds obtained through illegal activities, then these funds should be accepted in the normal manner, following correct procedures. Under no circumstances should the customer be alerted to any suspicion. The suspicious deposit should be reporting to the Police and SAMA and no transfers or withdrawals should be allowed from account until authorized by the Police or SAMA."

9.8.9.  "Cooperation: Saudi Banks should cooperate locally and internationally to combat money-laundering through exchange of information with banking supervisors and appropriate law enforcement agencies, when they discover or suspect money laundering transactions. However, at the same time they must follow the legal and regulatory procedures that are aimed to protect customer confidentiality and banking secrecy."

9.8.10. "Internal Control Systems."

9.8.11. "A Bank should design and develop internal control systems to combat money laundering transactions.  Such system should include detailed written policies and procedures for preventing the use of the Bank's branches and operations by money launderers and for detecting such transactions."

9.8.12. "These policies and procedures should include special instructions on money [l]aundering and in particular emphasize the "know your customer" principle."

9.8.13. "Know Your Customer."

FBI PROTECTED MATERIAL REDACTED

9.8.14. "In general, this principle is aimed at ensuring that Banks are fully knowledgeable about their customers and are aware of their bank dealings. The application of this principle should not affect the relationship of a Bank with its reputable customers. Banks should apply the following procedure for implementing this principle."

9.8.15. "No account should be opened or banking services provided for customers without proper identification or under fictitious names."

9.8.16. "Identify any client who opens a new account or has a business relationship with the Bank."

9.8.17. "Identification should be made by reference to proper official documents in accordance with previous SAMA Circulars regarding customer identification."

9.8.18. "Identification is not limited to customers that have accounts with the banks; it should also include those who benefit from other bank services such as renting of safety deposit boxes and large cash transfers and foreign exchange transactions. . . ."

9.8.19. "The follow procedures should be followed as a minimum where opening a Personal Account for an individual (emphasis in original):

9.8.20. "The Bank should obtain proper identification of the customer as stipulated by SAMA Directives."

9.8.21. "The Bank should seek information on the customer's business, or job title and ascertain the accuracy of such information."

9.8.22. "The Banks [sic] should seek information on a customer's dealings with other banks with which he deals and seek information from such banks about their dealing with the customer. . . ."

9.8.23. "Procedures to be followed when opening a Current Account or a Joins [sic] account for a Business Entity:"

9.8.24. "The Bank should obtain original documents or authenticated copies which identify the legal identity of the customer, details about its activities etc. as prescribed in the customer agreement."

9.8.25. "The Bank should collect direct or indirect information about the business enterprise from other banks and sources . . . "

9.8.26. "The Bank should know the sources of deposits, specially large cash deposits when an account is being opened."

9.8.27. "Referral of Business."

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

9.8.28. "It is a recognized business objective that the Bank will cross-refer and cross-sell business, but this must be done in such a way as to comply with any local rules regarding "know your customer". These rules ordinarily require each office to[:]"

9.8.29. 'Take all reasonable steps to identify fully customers bonafides, including beneficial customers."

9.8.30. "Take all reasonable steps to enable suspicious transactions to be recognized."

9.8.31. "Reasonable steps to enable suspicious transactions to be recognized will include:"

9.8.32. "Obtaining a reasonable understanding of the normal character of the customer's business; and"

9.8.33. "Having a reasonable understanding of the commercial basis of the transaction to be undertaken or the service to be provided. What is a reasonable understanding will depend upon the complexity of the business and transactions concerned. For example high value or high volume transactions, especially if the transactions or the customer type is one regarded as high risk from a laundering viewpoint will require customer and transaction information in considerable detail."

9.8.34. "Alerting the Authorities of Suspicious Transactions:"

9.8.35. "A Bank is not responsible for carrying out formal investigations of all customer transactions to search for possible money laundering activities."

9.8.36. "However, a Bank should identify for use and reference of its employees, distinct patterns of customer behavior or unusual patterns of transactions that could indicate money laundering activities. . . "

9.8.37. "Retention of Records and Documents."

9.8.38. "Banks should retain all documents and records relating to their operations in accordance with normal banking practices, for ease of reference in their own use, and for use by supervisory authorities, other regulators and auditors."

9.8.39. "Banks should retain in original form the following documents;"

9.8.40. "—"Account opening documents"

9.8.41. "[bullet] Customer identification documents"

9.8.42. "[bullet] Documents relating to operation of customer accounts including all correspondence with the customer".

9.8.43. "Banks should also retain the following documents and records;"

9.8.44. "Records of a customer transaction."

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

9.8.45. "Details of customer accounts and balances:"

9.8.46. "Documents relating to a local or a foreign transaction."

9.8.47. "* Accounting entry documents."

9.8.48. "* Subsidiary ledgers related to customers, debit and credit notes, deposit slips and cashed cheques."

9.8.49. "External Audit:"

9.8.50. "The external auditor of a bank is responsible, among other things, to examine the bank's policies, procedures and internal control systems aimed at combating money laundering activities. He should also test the enforcement of such policies, and procedures. The result of his tests and any observations arising therefrom must be reported as part of his letter to management and if significant to SAMA. The external auditor should notify the Bank's management of any suspicious transactions that he identifies during the performance of his duties. The management, can then decide on the appropriate action, with or without further collaboration from the external auditors, and reporting to authorities. The external auditor should keep fully aware of the action taken by management, and where in his opinion this was not satisfactory, consider direct contact with the authorities."

9.8.51. "Effective Date"

9.8.52. "These guidelines are effective from the date of the accompanying circular."[466]

*ARB's Response to the Issuance of the SAMA Guidlines*

9.9.    The sections of the ARB Branch Instruction Manual ("ARB Manual") relating to AML carry a date of issue of January 1, 1997, and the bank's Anti-Money Laundering Procedure Guide ("ARB AML Guide") carries a date of November 1998.[467] I assess the ARB Manual and the ARB AML Guides to represent ARB's formal institutional implementation of the SAMA standards, which in turn represented Saudi Arabia's implementation prior to the 9/11 attacks of the FATF Recommendations as they applied to financial institutions, such as ARB, subject to SAMA's supervision.

9.10.   ARB's AML obligations set forth in the ARB Manual and the ARB AML Policies and Procedures largely track the SAMA Guidelines. I provide material language in pertinent part from each of these two ARB documents sequentially.

9.11.   *The ARB Manual*

---

[466] All citations in this subsection are to "Guidelines For Prevention Of Money Laundering" Saudi Arabian Monetary Authority ("SAMA"), November 1995, in English, included in Facsimile Message sent from the Governor of the Saudi Arabian Monetary Agency in Riyadh.
[467] ARB-00000259-265 and ARB 000000735-744.

**FBI PROTECTED MATERIAL REDACTED**

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

9.12.  The ARB Manual contains two major Parts addressing its "Anti-Money Laundering Guidelines," Part 20, consisting of three pages covering ARB's overall guidelines to prevent and detect money laundering, and Part 21, consisting of four pages covering indicators of suspicious activity (sometimes known as "red flags"), which ARB personnel should investigate and if appropriate report to authorities as set forth in Part 20.

9.13.  Part 20 explicitly addresses the obligation to "Know the Customer" and the customer's business, including both individual customers and institutional or business customers, establishing a standard that the bank's employees need to be "fully familiar" with their clients and what their clients are actually doing in using the bank. As set forth in the ARB Manual Section "20:2 – Getting to Know the Client": "The principle of getting to know the client in general aims to ensure that the branches are fully familiar with their clients and their banking transactions."[468]

> 9.13.1.  Part 20:2 states that as part of meeting its commitments to know the client, ARB's branches are prohibited from opening any anonymous or pseudonymous accounts or providing any services to such clients, are required to identify any client opening a new account or having a business relationship with the client, and base their client identification on "official identification documents."[469]

> 9.13.2.  Part 20:2 requires that ARB obtain "[a] copy of the clients' ID" whenever a client is "opening a new account, making use of banking services, or carrying out a major transaction for the client."[470]

> 9.13.3.  Part 20:2 requires that ARB personnel pay "full attention to any unusual transaction carried out by the client to conceal or obscure his true identity" when opening a new account or in any other dealing with the bank.[471]

9.14.  Part 20:2 also has a lengthy list of requirements for account opening, and account maintenance, all of which are material to answering the question posed.[472] I provide them verbatim, with their original paragraph numbering and formatting, italicized to distinguish them from the numbering generally used throughout this Expert Report:

> 7.  *"Updating the data of old account holders periodically and continuously (at least every three years)."*

> 8.  *"In the event that the data given to the branch by the client is suspected, the branch should try to verify its authenticity as deemed appropriate, such as by calling home or the workplace by phone."*

---

[468] ARB-00000265
[469] Id, 20:2, subparagraph 1 and 2
[470] Id, subparagraph 3 and 5
[471] Id, subparagraph 6
[472] ARB-00000266

FBI PROTECTED MATERIAL REDACTED

**SUBJECT TO MDL AND FBI PROTECTIVE ORDERS**

9. *"The following procedures must be retaken as a minimum when opening a personal account or providing any service to such clients:"*

- *"Recognizing the true identity of the client"*

- *"Knowing the type of the client's business or career, following up on this, and verifying it"*

- *"Knowing the source of the deposited funds when opening the account, particularly large cash deposits"*

- *"Determining the identity of the client through his relationship with other banks he deals with, and obtaining information from these banks regarding their dealings with the client"*

- *"Completing identification procedures if the client is known by a branch clerk"*

- *"Knowing the reason for opening the account if the client's address is far from that branch"*

10. *"The following procedures should be followed when opening a current account or a joint account for institutions or companies:*

- *"Ensuring obtaining the real documents determining the type of establishment or company and the scope of its formation and establishment, as mentioned in the account opening application"*

- *"Indirectly inquiring about the company or facility with other banks or any other sources"*

- *"Verifying the data given by the company or establishment when opening the account, such as verifying the address by calling the headquarters"*

- *"Visiting the headquarters of the company or facility, if possible, since this is important in identifying the scope of its operations and business*

- *"It is necessary to know the source of the funds deposited by the client at the time of opening the account, particularly large cash deposits"*

- *"Obtaining the following information for accounts of large companies:"*

**FBI PROTECTED MATERIAL REDACTED**

- *"The company's financial structure and annual financial statements"*

- *"A description of the services and businesses the company provides"*

- *"A list of the most important suppliers, dealers, and business locations"*

- *"A description of the area where the company operates"*

- *"Any dealings with related parties."*

- *"A description of the business operations of the company."*

11. *"The branch where the client's account is opened is responsible for complying with the mentioned requirements and directions even when the client chooses another branch of the company to carry out his transactions. The last branch contacts the branch in which the client's account is located before commencing with the execution of the said client's transactions"*

12. *"The branch must obtain all the necessary information about the person opening the account and the person holding the account when the client opens the account on behalf of another person or opens a joint account."[473]*

9.15.   Part 20:3 of the ARB Manual, entitled "Reporting Suspicious Transactions," states that ["w]hen a money laundering process or any activity related thereto is suspected, the branch director must notify the Internal Audit Division – the Anti-Money Laundering Unit – of the General Administration as soon as possible." This Part states explicitly that ["r]eporting suspicious transactions to the competent authorities does not conflict with bank and client confidentiality stipulated under the Saudi banks' laws and regulations."[474]

9.16.   Part 21 of the ARB Manual provides a list of general indicators, and the various types of specific indicators, of potential illicit activity that could involve money laundering and which would require reporting to ARB's AML unit. The first, and most important example is "(1) Transactions whose general form suggests that they may have an illegal – or unknown – purpose." [numbering in original] Other material indicators include "[c]ontinuous cash deposits to the accounts of companies and commercial accounts," "[w]ithdrawal of cash shortly after depositing, " [t]he client opens more than one account in his name at the same branch without a clear reason with many internal transfers between these accounts," "[m]any people transfer payments to one single account, whether in cash or through internal remittances," and "[e]xistence of bank accounts in the

---

[473] Id

[474] ARB-0000263. Due to pages being out of sequence in the Bates stamping of this portion of the Branch Instruction Manual, Bates numbers of these provisions do not accurately follow the ordering of the material in the underlying documents. I provide their substance and text sequentially based on the documents' internal pagination and numbering.

FBI PROTECTED MATERIAL REDACTED

branch for clients whose addresses are outside the branch's region."[475]

9.17. Part 21:5, "Remittance Indicators" of the ARB Manual provides a list of "red flags" that I consider especially material to the question posed, and I accordingly provide it verbatim.[476] As with Part 20:2 above, I retain the original numeration and formatting used by ARB, again italicized to distinguish this material from the numbering generally used throughout this Expert Report.

1. *"Repeated transfer of amounts to another bank without clarifying the name of the beneficiary."*

2. *"Repeated transfer of amounts abroad with instructions to pay the beneficiary in cash."*

3. *"The remittance amount is not appropriate with the appearance of the remitter or the type of his business."*

4. *"Significant and frequent transfers to and from countries known as drug sources."*

5. *"Client's deliberate deception by providing incorrect information to the branch."*

6. *"Splitting the large remittance amount when transferring into smaller amounts."*

7. *"Repeated transfers to banks known for absolute confidentiality."*

8. *"Large and repeated transfers against checks that have not yet been collected or are not collected."*

9. *"Cash remittances in large amounts."*

10. *"Depositing amounts in different accounts, transferring them to a main account, and then transferring them outside the Saudi Kingdom."*

11. *"The client requests the branch to transfer amounts from his account abroad, while transfers are received to the same account in amounts equal to the transferred amount."*

12. *"Using transfers, once they are received, to purchase monetary instruments (bank checks, certified checks, etc.) for the benefit of other parties."*

13. *"The client frequently deposits bank checks issued by foreign banks."*

475 ARB-00000262.

476 ARB-00000262, ARB-00000259. The material numbered 1-9 is from 262, 10-13 is from 259.

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

9.18.   Part 21:6, "Indicators of the Client," of the ARB Manual lists some red flags relating to the clients themselves. Materially, they include whenever a client tries to prevent a bank official from reporting a suspicious transaction.[477]

9.19.   Part 21:8, "Indicators of Changes in Bank Transaction Methods," lists as a red-flag "[v]iolating or failing to implement the company's internal control instructions or deliberately evading the applicable banking policies."[478]

9.20.   In addition, at Section 1:3:6:3, the ARB Manual requires specific procedures for opening up accounts of charities, and apply to both domestic and foreign "social or charity organizations that collect donations or the like. The procedures are as follows:

   9.20.1.  "They are required to submit the following documents:"

   9.20.2.  "A copy of the license issued by the authorities in the Kingdom of Saudi Arabia (the Ministry of Interior, the Emirate, or the Social Affairs Department for example) approving opening the account and collecting donations;"

   9.20.3.  "A statement with the names of members of the Board of Directors and a copy of the agency's decision to open the account, showing the names of those authorized to sign and deal in the account for associations whose headquarters are outside the Kingdom of Saudi Arabia. The documents should be approved by the Saudi Consulate and the Ministry of Foreign Affairs in the concerned country."

   9.20.4.  "A copy of the ID documents of those authorized to sign and deal in the account."[479]

9.21.   The section of the ARB Manual relating to charities also contains a further requirement: "After fulfilling all the required conditions and documents, the approval of deputy general director of the banking group or his representative should be obtained in all cases, as well as in the case the agency wants to circulate the opening of the account in more than one branch."[480]

9.22.   In order to adhere to Know Your Customer, Anti-Money Laundering, and Counter-Terrorism Financing best practices and international standards with respect to the opening and maintenance of accounts for the Da'Wah Organizations, ARB would have to have complied with each of the sections of the ARB Manual I have cited. As discussed further in this section of this Expert Report, ARB did not do this.

9.23.   *The ARB AML Guide.*

---

[477] ARB-00000259
[478] ARB-00000260
[479] ARB AML Guide, 1:3:6:3, "Local And Foreign Social Or Charity Organizations That Collect Donations Or The Like," ARB-00000172-173
[480] ARB-00000173

**FBI PROTECTED MATERIAL REDACTED**

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

9.24.    The first four pages ARB AML Guide list a number of objectives for the AML Unit at ARB, and then lists tasks the Unit is supposed to carry out. The remaining five pages of the Guide provide sample forms for the Unit to use.[481]

9.25.    The objectives in the ARB AML Guide accurately lay out why it matters that a bank's AML Unit does its job properly. They include, materially, "Reducing illegal activities and practices," "Introducing automated monitoring programs; "Protecting the company from being subject to illegal practices so that it does not become an illegal outlet for suspicious activities and thus preserving the company's reputation," "[Undertaking a] technical and analytical study of the reports received from branches, exchange and transfer centers, and any other party, in addition to the cases discovered through the unit," "Developing the necessary policies and procedures to help the branches follow modern methods to address any case of suspicion," "Securing the requirements of the Monetary Authority with regard to money laundering operations," cooperating with relevant Saudi authorities, and informing them whenever the Unit verifies any suspicious case.[482]

9.25.1.    To comply with basic international standards to combat the risk of money laundering and countering terrorist finance, banks were also required prior to the 9/11 attacks to train the bank's staff about how to address these risks at account opening, during account maintenance, and in every transaction involving the bank, and to carry out reviews to determine the effectiveness of both the controls put into place, and the training, through regular audits. These requirements were incorporated in the SAMA Guidelines

9.25.2.    The documents made available to me from discovery in this case do not show that the two-person ARB AML Unit successfully carried out these objectives with respect to the accounts at issue prior to the 9/11 attacks, or indeed, took any action of any kind to undertake most of them.

9.25.2..1.    In my experience, when banks fail to undertake required due diligence and compliance measures, their negligence creates an open door for misconduct by their customers: the lack of attention to due diligence provides a safe zone for such customers to act with impunity, knowing that the bank has no desire to prevent them from carrying out problematic activity, and that the lack of records will protect them from exposure by others.

9.25.2..2.    Weak links in the financial system are exceptionally dangerous because of this phenomenon. Their lack of concern for compliance sends a message of comfort and safety to those who pose the greatest risks of using banks for financial crimes. Such weak links become what I have long referred to as 'nodes' for facilitating crimes, or, to

---

[481] ARB-000000735-744
[482] ARB-000000736

**FBI PROTECTED MATERIAL REDACTED**

use the CIA's word, makes them susceptible to becoming, as ARB did, "conduits" for criminal conduct, including terrorist finance.

9.25.2..3.  Consistent with this phenomenon, the CIA's reporting found ARB acted in fact as a "conduit" for terrorist financing for al Qaeda and many other extremist and/or terrorist groups, over many years, covering the period before 9/11 and continuing for some years after 9/11.

9.25.3. ARB's internal documents concerning the subject accounts show no evidence of the implementation of actions prior to 9/11 to address most of the objectives set forth in the ARB AML Guide. No documents have been provided to me from the discovery (or from other sources) to show that the AML Unit:

9.25.3..1.  Undertook any action to reduce illegal activities and practices at the bank;

9.25.3..2.  Introduced automated monitoring programs;

9.25.3..3.  Protected the company from being subject to illegal practices (thereby preserving the company's reputation);

9.25.3..4.  Undertook the technical and analytical study mandated in the objectives;

9.25.3..5.  Developed policies and procedures to help the branches follow modern methods to address any case of suspicion, to implement any element of the ARB Manual, a document which pre-dated the Guide by some 22 months;

9.25.3..6.  Acted to ensure the bank met the requirements imposed by SAMA in practice, as opposed to merely on paper; or

9.25.3..7.  Identified any suspicious transactions, anywhere;

9.25.3..8.  Drafted any reports regarding suspicious transactions reported to the Unit by others at ARB, or provided any such reporting to SAMA or other Saudi authorities.

9.25.4. The internal documents show that ARB's AML Unit created the shells of some rudimentary templates the Unit could use to carry out its responsibilities, without showing that they were actually ever actually used.

9.25.5. The documents I have reviewed also show that the unit communicated occasionally (but not in every case) with Saudi officials regarding whether it would be permissible to open particular accounts on behalf of Al-Haramain in particular locations subject to the authority of particular local officials and/or to the Saudi Ministry of Islamic Affairs, and were told that the openings were

FBI PROTECTED MATERIAL REDACTED

permissible, but did not obtain documents required under applicable Saudi AML regulations or ARB's own policies and procedures for the charities that are the subject of this question. I discuss this evidence later in this section.

9.26. The ARB AML Guide expressly list tasks for the "Head of the Unit" to include: "undertaking analytic technical study of suspicious cases;" "designing work models for the unit;" "[r]eplying to all correspondence received by the Unit;" "updating anti-money laundering policies and procedures according to developing in the methods, processes, and activities that may be used in money laundering activity;" and coordinating "the preparation and implementation of the necessary training and guidance programs to the company's employees and providing the necessary advice regarding all aspects related to money laundering with the various units and ensuring that the regulating procedures are followed."[483]

9.27. The ARB AML Guide lists further obligations for the Head of the Unit to analyze suspicious incidents, using certain forms included in the Guide. These are rudimentary. The first is a one-page Money Laundering Process Notifications, containing information about the client, their ID type, account number, and other personal information; the list of indictors; the reason/rationale for viewing them as potentially suspicious and attachments; the second is a letter to the Internal Audit Department, from the branch, containing a template for what documents should be requested from the branch. These consist of client account opening documents; documents regarding the transactions of the client over a relevant period; "aspects of the client's activity supported by the documents," and the branch employee's views on the client's transactions. The third page merely lists basics about the accounts and deposits/withdrawals relevant to the suspected case. The fourth page is a perfunctory cover note for auditors and supervisors review of the underlying material. The fifth page, entitled "Initial Statement of Suspected Cases Extracted from the System, has two columns – one for client name, one for transfer amount, and up to 40 rows to provide that information.[484]

9.28. The ARB templates for use by the Unit are also rudimentary. By their terms, they were to be used to record the fact that a suspected case had been discovered that needed investigating, and would provide basic information about the identity of the client, account, and transactions involved to alert higher-ups at the bank that further investigation was needed.

9.28.1. I have seen no evidence that they were actually used by the bank prior to the 9/11 attacks, as would be contained in proper bank audits regarding the effectiveness of the bank's AML systems.

9.29. The final page of the ARB AML Guide describes the Unit as responsible for a monitoring system for external remittances and bank checks that is to take place on an ongoing basis to assist in research and analysis, which is to be completed five months after the issuance

[483] ARB-000000736
[484] ARB-000000740-745

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

of the Guide (that is, March 1999).

9.29.1. No information has been provided to me to provide evidence that this system was actually put into place, or used.

9.30. The last section of the Guide states that the Unit will secure documents from SAMA, send and follow up on reports and keep them on schedule, and consolidate the "Know Your Customer" principle at the bank's "branches and centers" to ensure that the ARB meets its obligations at all of its locations "to be aware of their customers' activities and the sources of their funds."[485]

9.30.1. No documents have been provided to me that show the Head of the Unit, or anyone at ARB, undertaking the obligations set forth in ARB's AML Manual and Guide, prior to the 9/11 attacks, with a few exceptions. I will address ARB's handling of compliance for Al-Haramain, then its handling of this set of obligations for IIRO, and then more generally.

*General Observations*

9.31. I have reviewed all of the documents provided to me relating to 70 Al-Haramain account openings[486] and sampled account opening documents from the group of documents representing 165 IIRO account openings.[487] Most of this material was for the period before 9/11, but some of it included account activity after 9/11, in some cases, as late as 2004.

9.32. I found that generally, at account opening, ARB undertook only the most basic of all customer identification procedures: requiring identity documents for the signatories of new accounts, or whenever signatories changed. Beyond that, the forms typically included only the minimal elements of providing contact information, such as an address to send mail, and a telephone number, frequently omitting such fields required on the account opening form as "occupation," and "legal status." The level of care given the data entry for such fields was minimal.

9.32.1. For example, on a May 27, 1995 account opening for an Al-Haramain, the customer is correctly identified as a "charity," but the customer data lists the word "retired," as the customer's occupation, which is then crossed out, and the only data provided regarding the signatories is that someone provided a handwritten signature for the account, but the identity of that person is not specified. Whoever it was was given a four-digit personal identification number to use in connection with the account. I can provide no further information about this account, other than that it as the "Al Olaya Street General Branch" of ARB: all other identifying information on the document was redacted by ARB. Regardless of the redactions,

---

[485] ARB-000000737
[486] The account opening/KYC documents for Al-Haramain are pages ARB-00038108 through ARB-00039005.
[487] The sampled account opening/KYC documents for IIRO are from groups of documents within the ranges of ARB-00013442-ARB-00013711, ARB-00014068-ARB-000114149, ARB-00037174-ARB-00037677, and ARB-39031-38075

FBI PROTECTED MATERIAL REDACTED

the material produced suggest that not even basic due diligence was documented before providing the customer the account.[488]

9.33. Many accounts included no further information beyond the – redacted – addresses and phone numbers, and the photographed IDs of the signatories. Some accounts specified a very general purpose of the account to be "charity." Other accounts specified a geographic region in which charitable fundraising would take place to gather donations, and in such cases, the accounts sometimes included an assurance from a Saudi official with authority over a region that this activity would be permitted in that region.

9.34. Many Al-Haramain accounts had no identifier to differentiate the use of any particular account as being for any specific project, or activity. I note that the documents provided by ARB do not back up the statements in the Galloway Deposition that each account was opened as needed whenever there was a new project or activity.[489] The ARB documents are generally silent about the purposes of any new accounts opened by Al-Haramain, and the uses to which funds flowing through them would be put.

9.35. I found numerous account opening documents that did not provide, as required by the ARB Manual, "copies of the license issued by the authorities in the Kingdom of Saudi Arabia (the Ministry of Interior, the Emirate, or the Social Affairs Department for example) approving opening the account and collecting donations."[490] I found cases of this both in the Al-Haramain account opening documents and in account openings for IIRO. In such cases, the only permission sought from the Da'Wah Organization was from the director of a particular branch of ARB.[491] Unless other documents existed for these accounts which were not available to me, providing copies of such licenses, these account openings violated ARB's own compliance requirements.

---

[488]ARB-00038567-8568

[489] Galloway Deposition, pp. 83-84.

[490] ARB-00000172

[491] See e.g. Account Opening for IIRO "Account No [redacted] 57," September 2, 2001, ARB-00013667-3671; IIRO Account, "Blind Child in Egypt," Account No 4327, May 15, 1993, ARB-00013692-3699; Account Opening for Al-Haramain, Account No 2/7, May 19, 2001, ARB-0038211-223; Account Opening for Al-Haramain Tawhid Endowment Project, December 9, 2000, ARB-00038224-241; Account Opening for Al-Haramain June 10, 2000, ARB-00038256-8260; Account Opening for Al-Haramain, November 6, 1994, ARB-00039069-9071; Account Opening for Al-Haramain, August 7, 2001, ARB-00039006-9113; Account Opening for Al-Haramain, August 26, 2000, ARB-00038120-121; Account Opening for Al-Haramain August 26, 2000, ARB-00038132=8133; Account Opening for Mohamed Fahd al Tuwaiji/Al-Haramain Foundation, May 3, 1994, ARB-00038932-8943; Account Opening for "Iftar of Fasting People," to be included within the IIRO's name, January 19, 1993, ARB-0013658-3663, Account Opening, Al-Haramain, July 24, 2000, for Ahmed Ibrahim al Buraidah and Abdullah al Ghammas on behalf of Al-Haramain as representatives of the company – a document in which literally no information is provided other than Buraidah's personal data and ID. ARB-00038680-8683; Accounting opening for Account No [redacted] 6/2, Al-Haramain, April 24, 2000. For these and many other accounts, I do not know whether I have been provided the full account information or only partial information. I remain open to revising or updating my conclusions based on these documents and the other information currently available to me should additional documents provide information that addresses the deficiencies I have found comparing the information in the documents available with that required by ARB's policies and procedures, SAMA requirements, and the applicable international standards.

9.36. In some cases, ARB did obtain an approval from a Saudi official as required by the ARB Manual, 1:3:6:3.[492] These were typically an approval from a local official, such as the Prince of Tabuk for the opening of the Da'Wah Organization branch in that city.[493]

9.37. From time to time, ARB officials had contacts with Saudi Arabia's Ministry of Islamic Affairs, to seek or receive assurances that opening an account for Al-Haramain or for IIRO, or changing the signatories on the accounts, was an authorized activity. This took place, for example, on an Al-Haramain account (redacted as 9/5 in some of the documents) at the same Al Olaya Office which the evidence in a sequence of documents shows to have been controlled by al-Aqil in his capacity as Director General of Al-Haramain. The dates in the Bates-stamped sequence describe account openings and related activity such as issuing checkbooks over a range of dates that include April 30, 1995, May 27, 1995, January 1, 1997, February 3, 1997, September 25, 1997. This set of documents does not contain IDs, but merely states the procedure for the client to obtain his PIN at the local branch in order to access the accounts.[494] These documents refer to al-Aqil – not Al-Haramain - as the "client." They describe al-Aqil as coordinating with the then-Deputy Minister of Islamic Affairs. The name of this official is not specified.[495]

9.38. Other ARB records provide evidence that this Saudi official was Saleh bin Abdel Aziz bin Mohamed Al ash-Sheikh. For example, a document from the Ministry of Islamic Affairs, that appears to include its logo, dated October 17, 1997, in which "Saleh bin Abdel Aziz bin Mohamed Al ash-Sheikh," states that "Al-Haramain Islamic Foundation is working under our supervision."[496] This statement is consistent with an article in Al-Jazirah dated March 5, 1997, which quotes the Deputy Ministry of Islamic Affairs as being "Sheikh Saleh bin Abdel Aziz Al ash-Sheikh," who is described as having been assigned "to manage Al-Haramain Foundation's work and activities in Riyadh," and to be preparing to hold a meeting and select board members shortly.[497] The October 17, 1997 letter from ash-Sheikh to an official in Riyadh Passports Administration, states not only that "Al-Haramain Islamic Foundation" is working under our supervision," but lists ash-Sheikh's titles at the time as "Deputy Minister of Islamic Affairs, Endowments, Da'wah, and Guidance and Supervisor of Al-Haramain Islamic Foundation."[498]

9.38.1. The evidence produced by ARB documented ash-Sheikh as having the position of "Supervisor" of Al-Haramain, and his stating on Ministry of Islamic Affairs stationery, with the Ministry logo, that Al-Haramain is working "under his

---

[492] ARB-00000172
[493] ARB-00038693-8706
[494] ARB-00038567-8577. Even after 9/11, the treatment of the accounts at this branch was, at best, sloppy. An account opening document for al-Aqil dated April 30, 2002, that leaves him as the sole signatory of an Al-Haramain account, identified as 696/2 with a redaction of the other numbers, also does not include al-Aqil's signature card, and wrongly identifies his birthdate as "[REDACTED] 2002." ARB-00038670
[495] ARB-00038572
[496] ARB-00038201
[497] "After being assigned to supervision the Foundation, Al ash-Sheikh to Al-Jazirah: 'Al-Haramain Islamic Foundation is distinguished by its associated with scholars, clear methodology, and this will be a helping factor in my work with it." Al Jazirah, Issue No 8924, March 5, 1997, ARB-00038722
[498] ARB-00-38201.

supervision." Yet in the ash-Sheikh Deposition, ash-Sheikh stated definitively that he had no relationship with Al-Haramain of any kind.[499]

9.38.2. In the deposition, ash-Sheikh said that Al-Haramain had been created prior to ash-Sheikh's arrival at the Ministry of Islamic Affairs, and from the beginning worked without a permit.[500] According to ash-Sheikh, at no time prior to the 9/11 attacks did Al-Haramain actually have a license, a permit, or the authority to operate a charity in Saudi Arabia.[501] Ash-Sheikh testified that lacking these things, and a board of directors, and any governance, its "financial and administrative procedures . . . were not proper – were inappropriate."[502] Accordingly, as set forth in the ash-Sheikh deposition, after the 9/11 attacks, the Ministry of Islamic Affairs recommended that Al-Haramain be "shut down."[503]

9.38.3. Ash-Sheikh further testified that he did "not recall ever having any relationship with Al Haramain Foundation."[504] He stated that he did not found it.[505] He stated that as it was without without a license, he could not "trust any information they write on their website."[506]

9.38.4. I note the existence of another document, dated February 25, 2004, in which ash-Sheikh as Minister of Islamic Affairs, again advises ARB that Al-Haramain was at that time "authorized to practice charity work," and accordingly "[i]t is fine to open an account for it with the company according to the regulations and instructions of the Saudi Arabian Monetary Authority."[507]

9.38.4..1. I take note of the date of this February 2004 authorization, which took place two and a half years after the 9/11 attacks, and well after the U.S. had raised concerns with the Saudi government. By 2004, the U.S. had already taken action to designate numerous branches of Al-Haramain, and a month before this authorization, Saudi authorities had agreed with the United States to designate some of its branches for sanctions and as of 2004, Saudi Arabia had agreed to close all of Al-Haramain's overseas branches.[508] Saudi Arabia was also preparing to shut down Al-Haramain in its entirety, which took place in early October 2004.[509]

---

[499] Ash Sheikh Deposition, p. 14-, lines 2-6
[500] Id, p. 137, lines 3-13; p. 145, lines 1-6
[501] Ash Sheikh Deposition, p. 146, lines 5-14, and 22-24; p 147 lines 4-23; p. 148, lines 1-19; p. 153, lines 12-20
[502] Id, p. 153, lines 12-19
[503] Id, p. 54, lines 9-16 and p. 154, lines 5-16
[504] Id, p 140, lines 3-6
[505] Id, p. 142, lime 6
[506] Id, p. 191
[507] ARB-00039505
[508] 'Treasury Announces Joint Action with Saudi Arabia Against Four Branches of Al-Haramain In The Fight Against Terrorist Financing," U.S. Department of the Treasury, January 22, 2004, https://home.treasury.gov/news/press-releases/js1108
[509] "Saudis shut down charity," Al Jazeera, October 5, 2004, https://www.aljazeera.com/news/2004/10/5/saudis-shut-down-charity

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

9.38.4..2.  Moreover, the assurance that ARB sought and received from ash-Sheikh came from an individual who was also serving as an official of Al-Haramain.

9.38.4..3.  The records provided do not show that ARB took any other due diligence regarding Al-Haramain, other than, according to a State Department cable citing a SAMA official, undertake a full scale audit of itself, conducted by Ernst & Young, which was ostensibly provided to SAMA, but which has never been publicly disclosed.

9.38.5.  The evidence in the ARB documents and the contemporaneous Al Jazeera article, on the one hand, and the testimony of ash-Sheikh, on the other, are in direct conflict with one another. I assess them to be factually irreconcilable.

9.38.6.  While I am aware of ash-Sheikh's statements that Al-Haramain was not licensed and was not operating lawfully, and that he had had nothing to do with this Da'Wah Organization, the contemporaneous documents provide evidence that ARB did receive some confirmation in connection with its handling of accounts for Al-Haramain suggesting that its activities had been authorized by the Ministry of Islamic Affairs generally and by ash-Sheikh personally. That said, any such authorizations, provided for the few account opening files that contained them (if they were in fact obtained by ARB as reflected in its records and contrary to ash-Sheikh's express testimony) failed to comply with ARB's explicit policies and procedures requiring ARB to obtain a copy of Al-Haramain's permit to operate.

9.39.  Occasionally, ARB officials would request or obtain information on the specific activities of a proposed new account. As all of these new accounts were within Saudi Arabia, when a geographic region is referenced, the requests for information were ordinarily made about the scope of domestic, rather than foreign activities. A handful of documents showed that some of the accounts related to broad areas of foreign activity, such as "Africa," or "Asia," or "Europe," and these sometimes listed non-inclusive examples of countries within that region, without defining the precise activities that would be undertaken in these specific countries. For example, a document dated September 26, 1994, from al-Aqil as Director General of Al-Haramain advises the director of the ARB branch at Al Olaya Street that there are eleven accounts at his branch, which include the accounts for Al-Haramain's "General Account," "Europe Committee," "Africa Committee," "Zakat," "Continuous Alms (Inside the Saudi Kingdom)," "Indian Subcontinent Committee," "Mosques Committee," "Middle East Committee," "Iftar of Fasting People Committee," "Sponsorships Committee," and "Islamic Book Publishing Committee."[510]

9.40.  These Committees correspond well to the areas of the world in which Al-Haramain provided support to al Qaeda and other terrorist groups, as described by the U.S. Treasury Department on June 2, 2004 when it sanctioned al-Aqil as a Specially Designated Global

---

[510] ARB-00038534

FBI PROTECTED MATERIAL REDACTED

Terrorist for his support through Al-Haramain to al Qaeda and other terrorist groups. In announcing al-Aqil's designation and that of Al-Haramain, the Treasury Department stated the following: "When viewed as a single entity, [Al-Haramain] is one of the principal Islamic NGOs providing support for the al Qaida network and promoting militant Islamic doctrine worldwide. Under Al Aqil's leadership of [Al-Haramain], numerous [Al-Haramain] field offices and representatives operating throughout Africa, Asia, Europe and North America appeared to be providing financial and material support to the al Qaida network. Terrorist organizations designated by the U.S. including Jemmah Islammiya, Al-Ittihad Al-Islamiya, Egyptian Islamic Jihad, HAMAS and Lashkar E-Taibah received funding from [Al-Haramain] and used [Al-Haramain] as a front for fundraising and operational activities. Under Al-Aqil's leadership, [Al-Haramain] implemented its tasks through its offices and representatives, which span more than 50 countries around the world."[511]

9.40.1.  In the correspondence, al-Aqil tells ARB's branch director not to cash out or transfer any funds except with "formal checks" issued by Al-Haramain and "coded by SAMA," and lists himself as the authorized signatory of seven of the accounts.[512] (I assume the term "coded by SAMA," refers to funds being sent to the correct account as determined by SAMA's coding system, rather than direct oversight of the transfers by Al-Haramain of anyone at Saudi Arabia's main bank regulator.)

9.40.2.  Notably, this information on the accounts was about as detailed as any in ARB's files, but one, which I discuss below. Yet it does not list where in "Europe," "Africa," "the Indian Subcontinent," or the "Middle East" any funds might be going, or what specifically would be done with them. I have seen no evidence that at any time, anyone at ARB asked this question before the 9/11 attacks, as mandated by its own AML policies and procedures. Had it done so, the inquiry likely would have brought to ARB's explicit attention evidence indicating the very conclusions the U.S. government would reach – the accounts were being used for supporting extremism and terrorism in many countries.[513]

9.40.3.  The most detailed document that I reviewed from the ARB account opening files is undated. It shows that at some unspecified date, someone at Al-Harimain advised someone at ARB that Al-Haramain maintained 15 accounts at ARB and specified a number of accounts in which funds were being used for activities

---

[511] "Additional Al-Haramain Branches, Former Leader Designated by Treasury as Al Qaida Supporters Treasury Marks Latest Action in Joint Designation with Saudi Arabia," U.S. Treasury Department Press Release,  June 2, 2004, id

[512] ARB-00038535

[513] There may be additional information contained in documents that have been redacted by ARB and provided only in heavily blacked-out form. For example, another ARB document appears to also provide information on other accounts maintained by Al-Haramain, but all identifying information other than two digit account numbers such as 5/9, 9/5, 9/6, 0/3, and so on, have been redacted, including the branches where the accounts were held. The document is provided in a form with eight blank pages prior to the redacted information regarding an account listed only as 7/0, and without any date contained in the remaining material. These account numbers are consistent with account numbers set forth in another document – ARB-00038116 that is *also* undated. I have no way of knowing whether information material to my opinion might be contained beneath the redactions. ARB-00038288-8295

**FBI PROTECTED MATERIAL REDACTED**

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

outside of Saudi Arabia. These included for the Asia Committee, funding to Palestine and Chechna, two conflict zones, and miscellaneous activities that included animal sacrifice and vows, book printing Da'Wah, Institute sponsorship, Quran memorization; heath clinics; propagators, and orphans' sponsorship. For the Africa Committee, there were similar categories of projects, plus chastity belts, but no country was mentioned. For Europe, similar categories of activities were listed, and three countries: Albania, Bosnia and Kosovo – again areas of active armed conflict in the mid and late 1990s. For the Zakat Committee, the entry merely listed "Zakat outside of the Saudi Kingdom."[514]

9.40.4.  I have seen no evidence that ARB responded to this information by asking questions about any of of the information in the document, let alone verifying any of it, as required by its own policies and procedures. To the contrary, based on the ARB documents provided, I found that ARB enabled al-Aqil and Al-Haramain to open accounts at will, sometimes multiple accounts at the same time, without requiring al-Aqil or anyone at Al-Hariman to explain in concrete terms what the funds entering and exiting the accounts would be used for.

9.41.  To summarize:

9.41.1.  I found no evidence that ARB updated the data of old account holders periodically and continuously, or at least every three years prior to the 9/11 attacks, as required by ARB's policies and procedures.

9.41.1..1.  I did find evidence that ARB updated such data to respond to particular requests from the account holders or their representatives to change a signatory or transfer an account.

9.41.2.  I found no evidence that ARB obtained the licensing documents of the Da'Wah Organizations prior to the 9/11 attacks.

9.41.3.  I found no evidence that ARB indirectly inquired about the Da'Wah Organizations with other banks or any other sources.

9.41.3..1.  I did find evidence ARB did occasionally receive authorization from Saudi government ministries, including the Ministry of Islamic Affairs, regarding Al-Haramain being approved to open a particular new account, as reflected in the examples which I have described above, which I found to be inconsistent with the testimony of Ash Sheikh in the Ash Sheikh Deposition.

9.41.4.  I found no evidence that ARB verified any data given by the Da'Wah organizations when opening accounts, such as verifying the address or visiting the headquarters of the organizations.

---

[514] ARB-00038116

FBI PROTECTED MATERIAL REDACTED

9.41.5. I found no evidence that ARB undertook any verification to know the sources of the funds deposited by the Da'Wah Organizations at the time of opening accounts for them, or later, including when there were cash deposits.

9.41.6. I found no evidence that ARB obtained information on the Da'Wah organizations' financial structure and annual financial statements.

9.41.7. I found no evidence that ARB obtained concrete information about the actual services the Da'Wah Organizations were providing and the actual uses of the funds that they were moving through ARB.

9.41.8. I found no evidence that ARB obtained a list of the Da'Wah Organizations' most important suppliers, dealers, contractors, or business locations.

9.41.9. I found no evidence that ARB obtained information about the Da'Wah Organizaion's dealings with related parties.

9.41.10. I did find evidence ARB obtained information that the Da'Wah Organizations were operating in particular continents, in accounts labeled with such names as "Africa" "Asia" and "Europe," and occasionally, specifying countries and purported activities,[515] but not that it verified whether the funds in these accounts were being used for the described purposes.

9.41.11. I found no evidence that ARB obtained information on the actual foreign operations of the Da'Wah organizations.

9.42. If ARB had undertaken the due diligence steps required under its policies and procedures as set forth in the ARB Branch Manual, or monitored the public allegations that Al-Haramain was involved in terrorist finance, such due diligence should have identified red flags that Al-Haramain's accounts for many locations were at high risk of terrorist finance, especially those involved in providing funds to areas of active armed conflict.

9.43. The absence of ARB putting into place any form of monitoring of public reports alleging that the Da'Wah Organizations were involved in providing support to terrorists and extremists is especially striking and inconsistent with its obligations to adhere to international banking standards, SAMA's know-your-customer Guidelines, and ARB's commitment to putting in place a system in which it would know its customers. [516]

---

[515] ARB-00038116, for example. This undated Al-Haramain document maintained by ARB specifies 15 Committees associated with Al-Haramain maintained at ARB, and their general purposes, which are as specific as providing chastity kits to unknown persons in unknown countries in Africa, Account Number [redacted] 9/0, and as general as "Charity endowment whose revenue is spent for all types of charity," Account No [redacted] 2/2

[516] By way of reference, I note that I have been using online data-base searches of major media since the late 1970s, through Lexis/Nexis, which I first had 24/7 access to when I was in law school and working as a journalist. I also used it as a Congressional investigator in the late-1980s in connection with the work I did investigating money laundering and terrorist finance relating to the Emirati-owned bank, BCCI. The type of public information I have cited in Section 4 of this Expert Report regarding the use of charities such as the Da'Wah Organizations was available to any bank in the 1990's which choose to buy access to it through services such as Lexis/Nexis, or which

9.44.    I have seen no evidence in any ARB document created prior to the 9/11 attacks that contains even a single reference to any media report, in any language, about any risks associated with international charities operating in conflict zones, or about the allegations in international media relating to the involvement of the Da'Wah Organizations in providing support to extremists and/or terrorists. I therefore assume, given the scope of discovery in this case regarding ARB's due diligence on the Da'Wah Organizations, no such public reports were accessed by ARB as part of adhering to its know-your-customer obligations.

9.44.1. As cited in my response to Question 3 in this Expert Report, the FATF Recommendations that formed the basis of the 1995 SAMA Guidelines expressly state that reviewing media is a necessary part of due diligence. In interpreting FATF Recommendations 11 and 15 through 18, the FATF's interpretive notes in place prior to 9/11 state that ["w]henever it is necessary in order to know the true identity of the customer and to ensure that legal entities cannot be used by natural persons *as a method of operating in reality anonymous accounts* [emphasis added]*,* financial institutions should, if the information is not otherwise available through public registers or other reliable sources, request information – and update that information – from the customer concerning principle owners and beneficiaries. If the customer does not have such information, the financial institution should request information from the customer on whoever has actual control. If adequate information is not obtainable, financial institutions should give special attention to business relations and transactions with the customer. If, based on information supplied from the customer or from other sources, the financial institution has reason to believe that the customer's account is being utilised in money laundering transactions, the financial institution must comply with the relevant legislation, regulations, directives, or agreements concerning reporting of suspicious transactions or termination of business with such customers."[517]

9.44.2. In this case, the ocean of anonymous, minimally documented transactions, including the apparent use of cash and couriers by the Da'Wah Organizations to transfer funds, meant that in reality, the accounts that ARB were providing to the Da'Wah Organizations functioned as anonymous accounts, in being able to provide funds throughout the world to people and for purposes that were not documented by ARB. ARB's failure to respond to this risk by taking the measures described by FATF is a further example of it not adhering to Know Your

---

looked for it on the Internet: "By 1995, the internet and the World Wide Web were established phenomena: Netscape Navigator, which was the most popular browser at the time, had around 10 million global users." See e.g. "A Short History of the Internet," National Science and Media Museum, December 3, 2020, https://www.scienceandmediamuseum.org.uk/objects-and-stories/short-history-internet. I do not know whether banks in Saudi Arabia were able to use the Internet for monitoring customers and undertaking due diligence prior to 1999, when Saudi authorities first authorized the Internet for general public use, long after it was available in most other countries. But Saudi-based banks had the obligation to carry out due diligence regardless, like other international banks. The international news database of Lexis/Nexis, for example, was available to uses who had IBM-compatible computer terminals by 1983, https://www.lexisnexis.com/anniversary/30th_timeline_fulltxt.pdf
[517] FATF Interpretative Guidance, id.

FBI PROTECTED MATERIAL REDACTED

Customer Anti-Money Laundering, and Counter Terrorism best practdices and international standards prior to the 9/11 attacks.

9.45.    I also have seen no documentary evidence that ARB's anti-money laundering and the other relevant compliance policies and procedures promulgated by the bank were contemporaneously audited, as required by the SAMA regulations, and therefore, that any such audits found ARB to be in compliance with its own policies and procedures, SAMA regulations, and international standards with regards to the Da'Wah Organizations.

9.45.1. I am mindful of, and have carefully reviewed, the statements made in the Galloway deposition that ARB's AML work was audited internally and externally by the bank, at the branch level, and sometimes account-by-account on the basis of sampling, and that these audits included contemporaneous audits. I have also reviewed his additional statements on these points as contained in the extensive Errata he filed following his deposition, which stated that audits of ARB's branches were undertaken contemporaneously and reviewed contemporaneously by ARB's regulator, SAMA. But I have not been provided any such audits regarding ARB generally, or its handling of accounts of the Da'Wah Organizations. My understanding from reviewing the pleadings is that no such audits have been provided to the plaintiffs in discovery. Any audits, especially if they were made contemporaneously, could provide important information that might provide further evidence affecting my assessment of this issue.[518]

9.46.    I also have seen no evidence that ARB's Anti-Money Laundering Unit carried out the training required by SAMA under its November 1995 AML Guidelines.

9.47.    I also cannot determine from the documents provided to me that ARB met its obligations to maintain and retain bank records pertaining to the Da'Wah Organizations, as required by SAMA under its AML Guidelines. Documents I would expect to see regarding decisions taken about the opening and transfer of particular accounts are missing in particular cases. The redactions that have been made in the documents provided, and the additional documents which have been withheld from production by ARB, prevent me from reaching a definitive assessment on that point.

9.48.    From reviewing pleadings filed in this case, I understand that the lawyers for the plaintiffs have requested all KYC and AML compliance documents from the relevant period at ARB be provided to them as part of the discovery process, and that any documents that are material to this issue have been provided to me.

9.48.1. In the absence of other evidence, such as the missing audits, the documents I have reviewed show that the Head of the Unit did not undertake the required tasks mandated by ARB, and that no one at ARB took meaningful actions to ensure that these tasks – including the "active monitoring" of the accounts of the Da'Wah

---

[518] Galloway Deposition, pp. 96-112, including the errata from pp. 108-116 concerning the audit activities at ARB. Even audits conducted years after the proper period for an audit (six months following the end of the year for the entity), and in anticipation of potential litigation as would have been the case for Al-Haramain in 2003, can still contain valuable information, even if they are based on incomplete information, or are caveated by the auditors.

FBI PROTECTED MATERIAL REDACTED

Organizations -- were actually carried out.

9.48.2. Accordingly, on the basis of the evidence provided, I conclude that ARB's AML Unit head did not comply with the bank's own policies and procedures and that ARB itself did not adhere to its own policies and procedures, which in turn were necessary to meet SAMA's requirements, which in turn were necessary for ARB to meet its international banking obligations generally, including meeting FATF Recommendation 10, requiring financial institutions to obtain and maintain adequate identification documentation for accounts and verify the legal existence of customers such as the Da'Wah Organizations; FATF Recommendation 11, requiring financial institutions to obtain information about the true identity of the person on whose behalf an account is opened or a transaction is conducted; Recommendation 12, requiring financial institutions to maintain sufficient records to permit reconstruction of individuals transactions to provide, if necessary, evidence for prosecution of criminal behavior; Recommendation 14, requiring financial institutions to pay special attention to complex, unusual transactions and patterns of transactions; Recommendation 15, requiring financial institutions to report suspicious transactions to authorities; Recommendation 19, requiring financial institutions to develop programs against money laundering that include adequate internal controls, an ongoing employee training program; and an audit function to test the system; and Recommendation 21, requiring financial institutions to give special attention to business relations and transactions with persons from countries which do not or insufficiently apply the FATF Recommendations.[519]

9.48.3. Further evidence that I considered in reaching these judgments is provided through the duration of this section of this Expert Report, and in the section of my report that addresses Question 8, whether ARB ignored money laundering and terrorist finance red flags.

*The Da'Wah Organizations Treated by ARB as Saudi Official Bodies*

9.49. One feature of the lack of due diligence regarding these accounts, and ARB's failure to adhere to its own AML requirements regarding them, was the treatment in some cases by ARB of accounts oof the Da'Wah Organizations as if they were accounts of government agencies, rather than as NGO accounts, prior to the 9/11 attacks. Several documents reference this inappropriate treatment explicitly.

9.49.1. For example, on June 1, 1999, the Governor of Yanbu Province in Saudi Arabia, whose capital is the coastal city of Yanbu northwest of Jeddah, issued a "Circular to all Government Administrations, Centres, Companies and Banks," which ARB received and retained, and produced in discovery in this case. The Circular states that Al-Haramain had opened an office in the province and was supervised by the Deputy Minister of Islamic Affairs, Saleh bin Abdel Aziz bin Mohamed Al ash-

---

[519] Should documents that showed that such tasks had been carried out be provided to me in the future, I would re-evaluate this inference.

FBI PROTECTED MATERIAL REDACTED

Sheikh ("ash-Sheikh"). As set forth in the circular, Al-Haramain's missions were to teach and promulgate "the correct doctrine in the hearts of the Muslims, as sourced from the Quran," teach the correct "Sunna" or traditions and practices of Mohammed, and undertake "Rushing to aid the Muslims at times of disasters and catastrophes."[520] The issuance of this Circular implies Al-Haramain was functioning as an agency authorized and controlled by the Saudi Islamic Ministry.

9.49.2. On some occasions, as I have discussed in this section of this Expert Report, ARB confirmed with ash-Sheikh that particular accounts should be opened or maintained for Al-Haramain. For example, ash-Sheikh made such a confirmation on January 29, 1997 with regard to one account (Account No [redacted by defendant] 55), at branch [redacted by defendant].[521] In another example, Ash-Sheikh confirmed that ARB could open an account for Al-Haramain on March 13, 2004, when he had become the Minister of Islamic Affairs.[522]

9.49.3. Notably, at the time ash-Sheikh made these confirmations, he was also listed in his own correspondence with ARB as serving as Al-Haramain's "General Supervisor."[523] The dual, simultaneous roles of ash-Sheikh as serving as a senior official at the Islamic Ministry and in a senior role at Al-Haramain reflected in the ARB documents is consistent with Al-Haramain, and MWL, WAMY, and IIRO, as the subsidiary of MWL, being treated functionally by ARB, as entities sponsored by, or even part of, the Islamic Ministry of the Saudi government.

9.49.4. In another example, on August 18, 1999, SAMA expressly approved the opening of an account on behalf of the Saudi Joint Committee for the Relief of the People of Kosovo (this is the same entity as the SJRC, discussed earlier in this Expert Report) to be created from two existing accounts of the MWL for assistance to Kosovo, with conditions imposed on that action: "instructions governing opening government accounts [must be] observed, while approve the signatures of those authorized to withdraw, certified by the person holding authority." The applicable rules from the ARB Manual states that this is to be done as follows: "An official letter should be obtained from the government institution as a request to open the account, indicating the names of the persons authorized to sign. The signature and position of the clerk signing the request should be endorsed by the competent agency, provided that the clerk's position is not lower than a general director."[524] The documents show that the Secretary General of the Muslim World League, on IIRO stationary, then provided the instructions, suggesting that the MWL, the IIRO, and the SJRC were *all* acting as government agencies.[525]

---

[520] ARB-00038818
[521] ARB-0038573
[522] ARB-0039505
[523] ARB-0038201
[524] ARB Manual, ARB-00000169
[525] As previously noted, the SJRC was linked to both al Qaeda and bin Ladin. The CIA found it to be a state-sponsored entity which was coordinating support from Islamic charities in Kosovo and Chechnya, "some of which have been tied to terrorist and mujahidin activity including al-Haramain, al-Waqfal-Islami, IIRO, and WAMY. Bin

FBI PROTECTED MATERIAL REDACTED

9.49.5. Separately, on April 25, 2000, the director of the branches division at ARB, responded to a request from a branch director at Al-Haramain made on February 14, 2000, that ARB approved the opening of the account "provided that the instructions governing the opening of government accounts are observed," which he explained meant that the signature cards for those authorized to withdraw funds from the Al-Haramain account needed to be a certified by a government official.[526] This suggests that Al-Haramain, too, was seen by ARB at the time as a Saudi government agency, holding Saudi government accounts.

9.49.6. After the 9/11 attacks, in a document dated April 06, 2003, an ARB official, noting that several Al-Haramain accounts at a particular branch were not complying with ARB's legal requirements because they were linked to "unrelated identification codes" and needed to be expressly linked to Al-Haramain's code. In asking them to be linked to the Al-Haramain code, the official wrote that it was "Very important" to "Create a letter . . . to transfer the subcategory from government current account to corporate current account."[527]

9.49.7. I cannot determine whether ARB's comprehensive failure to undertake the due diligence required by its regulator and its own policies and procedures was related to its officials viewing the Da'Wah accounts as government accounts and therefore not subject to due diligence (despite the express requirements of its policies and procedures), or alternatively, whether officials at ARB viewed the Da'Wah organizations' linkages to government entities as providing a convenient cover enabling those organizations to use their accounts without limitations. Regardless, the due diligence failure was comprehensive, and created an environment for easy abuse. In practice, there was not merely an absence of due diligence, but one of basic record-keeping. On a number of accounts of the Da'Wah organizations I found that many of the fields required by ARB on ARB's account opening forms were not even filled in.

9.49.8. Whether or not ARB was treating the accounts of the Da'Wah organizations as government accounts, neither SAMA's regulations nor ARB's own policies and procedures contain exemptions for accounts that have some connection to government, nor does that category exempt a bank from applying compliance policies as a matter of applicable international standards. To the contrary: accounts controlled by "politically exposed persons," such as government officials, are an entire category of potential risk that banks need to assess as part of their compliance obligations. When such accounts are held in the personal names of officials, the risks of self-dealing, corruption, and improper conduct in the handling of those accounts particularly have to be taken into account. I have seen no evidence that any such diligence was applied to any of the accounts of the Da'Wah organizations in which Saudi officials, such as ash-Sheikh, were

---

Ladin-associated Wa'el Julaydan was the Saudi-government appointed head [of[ the SJRC's Kosovo office during the mid-1990's [redacted]." CIA_000151

[526] ARB000038842-8844

[527] ARB-00038810

FBI PROTECTED MATERIAL REDACTED

involved, as shown in documents produced by ARB.

9.50.    With these general observations and analysis, I turn to further specifics of ARB's handling of the opening and maintenance of accounts for Al-Haramain, MWL, WAMY, and the SAAR Foundation, based on the limited set of ARB documents that have been made available to me, supplemented by external information, such as that provided in the CIA reports and other government documents I have considered for this Expert Report.

*The Opening and Maintenance of Accounts for the Charities as Verified Legal Entities*

9.51.    Saudi regulations and ARB's own policies and procedures required ARB prior to the 9/11 attacks to "obtain ***original documents or authenticated copies*** [emphasis added] which identify the legal identity of the customer, details about its activities etc. as prescribed in the customer agreement," as specified in the 1995 SAMA Guidelines. ARB's Manual similarly requires "official identification documents" for each customer, and each new account, and having them updated every three years.

9.52.    The materials I have been provided do not show ARB obtaining any such documentary confirmation Al-Haramain, MWL, IIRO, and WAMY prior to the 9/11 attacks. ARB did obtain such information after the 9/11 attacks for Al-Haramain, MWL, IIRO and WAMY. The required identification documents for these charities were contained in a March 21, 2004 document from the Saudi Minister of Justice, certifying these entities were lawfully established in Saudi Arabia and permitted to operate under its laws and regulations.[528]

9.53.    This belated effort to obtain documentation was consistent with ARB issuing a bilingual text on an unspecified date to its clients generally, with the word "IMPORTANT!" as its caption, stating that SAMA had "recently issued rules requiring banks to request identification documents from clients to retain copies of such documentation in their account portfolios at the banks," effective April 2003, warning that funds would be frozen from "3 years from the date of the regulation issued in April 2003," if the personal data was not updated immediately.[529]

9.54.    Section 5.2 of the SAMA Guidelines issued in November 1995 had already required ARB to obtain such information for the previous seven and a half years at the time ARB issued this notice. The "IMPORTANT!" notice implicitly suggests that ARB did not enforce these documentation requirements in practice prior to sending out the "IMPORTANT!" bilingual text to its clients, and is consistent with what I have previously noted which is that I have seen no evidence ARB had ever undertaken the three-year client updates required by its AML policies and procedures regarding its Da'Wah clients.

9.55.    I have found documents produced by ARB showing that it possessed, on a date not specified in the document, proofs of IIRO being authorized by the Saudi government to

---

[528] ARB-00039947
[529] ARB-00038870

**FBI PROTECTED MATERIAL REDACTED**

act as a Da'Wah organization which were approved by the government of Saudi Arabia on May 29, 2002, stating as follows:

9.55.1. "World Muslim League – headquartered in Mecca, Kingdom of Saudi Arabia – hereby certifies that International Islamic Relief Organization was founded in accordance with a decision by Muslim World League's Constituent Assembly in its in its 20th Session held from 11/15/1398 AH (October 17, 1978 AD) to 11/27/1398 AH (October 29, 1978 AD). It is an agency with legal personality and has its own structural, administrative, and financial systems. It provides relief to peoples and societies in cases of disasters across all continents, and comprehensive health care to the poor widows, children, and orphans. It establishes, supports, and manages general institutes, schools, educational and training organizations, as well as training and social programs. It provides scholarships and establishes and manages hospitals and clinics in the needy countries and societies. It establishes, manages, and assists orphanages and takes care of health, education, and training. Therefore, World Muslim League hopes for cooperation with International Islamic Relief Organization and assistance with its mission."[530] This language was accompanied by an undated certificate from the Saudi Ministry of Foreign Affairs confirming IIRO's status "To Whom It May Concern," as a government-sponsored NGO with the mission of caring for "Refugees, children, and victims of wars and disasters worldwide."[531]

9.55.2. The context of these documents suggest that in May 2002, the Muslim World League and IIRO, in consultation with the Saudi Foreign Ministry, were seeking to regularize the status of the IIRO in the wake of the 9/11 attacks. The documents state that following amendments to the IIRO's status in April 01-11, 2002, the IIRO was defined as "an Islamic charity organization [that] is part of Muslim World League. It works worldwide and cooperates with the donors to give their donations to their needy and afflicted brethren in the world. It keeps them on the path of Islam, provides them with relief, ends their suffering, and develops their communities. It was founded in accordance with the decision of Muslim World League's Constituent Assembly in its 20th Session in 1398 AH (1978 AD) with Royal Approval No. 4734, dated 02/30/1399 AH (January 29, 1979 AD). It has its own independent legal personality and its own structural, administrative, and financial systems in the framework of the provisions of its Statute and bylaws thereof." The documents further state that "The International Islamic Relief Organization's headquarters is Mecca, Kingdom of Saudi Arabia. It may manage its whole work from its center in Jeddah and may found offices and branches inside the headquarters' country and abroad."[532]

9.55.3. While I was unable to find a date on the documents showing when ARB received them, by their own terms, they pertain to the spring of 2002, or well after the 9/11 attacks. Thus, they do not show that ARB obtained the required information on

[530] ARB-00013681
[531] ARB-00013683
[532] ARB-00013684-686

the legal identity and structure of IIRO prior to the 9/11 attacks, as required by the 1995 SAMA Guidelines and by its own AML policies and procedures. Indeed, as I read them, dating of these documents to May 2002 implies that ARB did not have this information prior to the 9/11 attacks.

9.56. I also found references to the granting of certain permissions for IIRO to open an office in Mecca (Makkah Province) by senior Saudi officials in an ARB IIRO account file whose contents pre-date the attacks. But the correspondence and account appears to refer to an account in Saudi Arabia's Eastern Province, not Makkah Province, and there is no information in the set of documents as to whether the documents containing the permissions are part of the file on that account, and if so, when they were placed in the file.

9.56.1. The file pertains to IIRO Account No [redacted] 57, in which the most recent document is dated September 2, 2001, and asks for the updating of signatory authorities on that account, an act that was initially sought according to the documents on April 19, 2001. This is set forth in ARB-000137670-137673.[533]

9.56.2. The following two pages in the Bates stamping, ARB-00013674 and ARB-00013675, which are not otherwise referenced in the documents expressly characterized as being part of the IIRO Account No [redacted] 57, contain much older information relating to the IIRO's authorization from senior officials Saudi Arabia on August 9, 1989 and October 26, 1984 to open up an office in Mecca to carry out educational activities for girls and to collection donations for them (in the case of the 1989 document) , and "to contact concerned agencies in the Islamic countries to promote Islamic Relief Organization's activity and provide it with possible staff and financial and in-kind assistance."[534]

9.56.3. I do not have enough information about the documents to determine whether they were actually in the account file for IIRO Account "[redacted] 57," and if they were, whether they were placed there prior to the 9/11 attacks, or afterwards. I note that even if they were in the IIRO account, the documents were more than three years old as of the dates of the other transactions in the account, being respectively, created nearly 12 years and 17 years earlier, and not in any way updated or reaffirmed. Also, as mentioned one of the two documents refers to establishing and IIRO office in Mecca, which is located in a completely different part of Saudi Arabia from the Eastern Province, and neither of the older documents refers to the Eastern Province. Accordingly, I do not assess them to conform to the requirement of ARB having the requisite licensing documents for IIRO relating to the account, even if they were included within its files. The subsequent actions of ARB to obtain documentary evidence of the IIRO's licensing after the 9/11 attacks, as described earlier in this subsection, is consistent with the view that these documents, in this file, did not comply with

[533] ARB-00013667-3673
[534] ARB-00013674 and 3675

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

ARB's rules governing customer identification, or those issued by SAMA.

9.57.    I have seen no documentary confirmation that any corporate identification documents were ever obtained by ARB regarding its banking customer, the SAAR Foundation in Saudi Arabia. I have seen no evidence from ARB that ARB ever confirmed that the SAAR Foundation had a legal existence prior to 9/11. There is evidence that it could not have done so for many years while it was processing transactions on behalf of the SAAR Foundation, as the SAAR Foundation did not obtain a license to operate as a charity until June 19, 2000.

9.57.1.    A statement by entities associated with and under the apparent control of the Al Rajhi family not produced in discovery, but available online, shows that the SAAR Foundation did not come into legal existence until mid-2000. The online statement is set forth in a website maintained by the "Sulaiman al Rajhi Holding Company," regarding the "Sulaiman al Rajhi Charitable Foundation," and states the following regarding the SAAR Foundation: "It was founded through a Joint Committee between the brothers, Saleh, Abdullah and Sulaiman and Mohammed Abdul Aziz Al Rajhi in the year 1403/1983, and it has attracted a range of qualified expertise in philanthropy field. Under a license from Ministry of Social Affairs No. (10) of the date 2000/06/19 the philanthropic institution turned to Sulaiman Abdul Aziz Al Rajhi Charitable Foundation."[535]

9.57.2.    The "Sulaiman al Rajhi Holding Company" describes its investments on the same website, and provides a short biography of the SAAR Foundation's founder, SAAR, and extensive material regarding the activities of the Al Rajhi family and its corporate vehicles. Accordingly, I rely on its description on the website of the corporate history of the SAAR Foundation as to its legal status in Saudi Arabia.

9.57.3.    Based on the statement on the website, I conclude that the SAAR Foundation in Saudi Arabia did not have a legal existence in Saudi Arabia until June 19, 2000, and therefore, donations purporting to come from it prior to that date either came from SAAR personally through ARB, from other family members, from unknown sources, or from ARB itself.

9.57.4.    The ARB documents provide evidence that ARB treated the SAAR Foundation as a licensed charity and provided a charity that had no legal status in Saudi Arabia an account, whose last four digits were "6006," which engaged in financial transactions and made donations for some years prior to its actual existence. These included, for example, the following payments by the "Sulaiman Bin Abdulaziz Al Rajhi Charitable Foundation," through the 6006 account made prior to June 19, 2000, the date of the foundation's creation:

---

[535] "Sulaiman Al-Rajhi Charitable Foundation," website of Sulaiman al Rajhi Holding Company, undated, accessed August 28, 2023, https://www.asrhc.com/sulaiman-al-rajhi-charitable-foundation/?lang=en

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

9.57.4..1.   Payment of 100,000 SR through withdrawal by check to Al-Haramain, December 30, 1998;[536]

9.57.4..2.   Payment of 12,500 SR through withdrawal by check to Al-Haramain, May 5, 1999;[537]

9.57.4..3.   Payment of 150,000 SR through withdrawal by check to Al-Haramain, May 11, 1999;[538]

9.57.4..4.   Payment of 53,400 SR through withdrawal by check to Al-Haramain, December 15, 1999;[539]

9.57.4..5.   Payment of 187,500 SR through withdrawal by check to Aqil al Aqil (who was the head of Al-Haramain), May 8, 2000;[540]

9.57.4..6.   Payment of 150,000 SR through withdrawal by check to Al-Haramain, May 18, 2000.[541]

9.57.5. In each of the transactions listed above, the payor listed on the account was the "Sulaiman Bin Abdulaziz Al Rajhi Charitable Foundation," although that payor had no legal existence. Notably, once the entity came to exist, as of June 19, 2000, it used the same account, the name on the account did not change to reflect the fact that the charity now had a legal existence, and it continued making payments to Al-Haramain and to others in which the recipients of the funds were not identified at all in the ARB documents.[542]

9.57.6. The evidence I have reviewed also shows that numerous donations made through ARB to Al-Haramain and other Da'Wah Organizations said to be from the SAAR Foundation used checks issued by ARB itself, rather than under its own name.

9.57.7. The documentation provided does not enable me to provide a definitive answer regarding the source or sources of funds for the 6006 account; nor to determine how or if ARB itself documented the sources of the funds paid for through the ARB account. However, I take note of the testimony of SAAR's son, Abdullah al Rajhi, ARB's chair, which I find material to questions about this account and these donations. In his September 27, 2023 deposition, Abdullah al Rajhi testified that:

---

[536] ARB-00038079
[537] ARB-00038090
[538] ARB-00038098
[539] ARB-00038100
[540] ARB-00038102
[541] ARB-00038104
[542] ARB-00038082; ARBH-00038084; ARB-00038088; ARB-00038092; ARB-0038096; ARB-00038106

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

9.57.7..1.    His father Sulaiman (SAAR) created the SAAR Foundation in the US to carry out charitable activities;[543]

9.57.7..2.    SAAR was the "major, major" contributor to the Foundation;[544]

9.57.7..3.    SAAR maintained a charity office in Saudi Arabia which made charitable contributions around the world from an account with ARB.[545]

9.57.8.    I assess from Abdullah al Rajhi's testimony, and from the documents I have reviewed, that the probable source of the funds for the SAAR Foundation's payments to Al-Haramain and others in the period prior to its legal existence in Saudi Arabia was SAAR himself, drawing on his own funds.

9.57.9.    Regardless of whether or not the SAAR Foundation was obtaining its funds from the founder and chairman of ARB, or from him and other, unspecified, sources, ARB's provision of an account to a charity that had no legal existence in Saudi Arabia violated its own policies and procedures. ARB failed to apply its compliance obligations to transactions involving the SAAR Foundation at a time that the evidence shows the SAAR Foundation was operating at the direction of SAAR himself, in some instances, facilitated by other members of his family, enabling SAAR to make any contributions according to his own decisions from any funds he maintained or had access to at ARB. The evidence documents no instance in which ARB's compliance rules were applied to SAAR or the SAAR Foundation by ARB personnel, and thus to transactions involving them relating to the Da'Wah Organizations.

*Other Evidence Which is Material to ARB's Adherence to KYC, AML, and CFT Best Practices and International Standards with Regard to the Da'Wah Accounts – Willful Disregard of its Own Compliance Requirements*

9.58.    In reviewing the ARB account opening and maintenance documents, I found a set of cases in which ARB knowingly violated its own compliance policies after considering the issue, after recognizing that the actions were improper under its compliance policies, and proceeding despite the request being improper. The set of cases involved requests made by al-Aqil, whose involvement in terrorist finance I have addressed elsewhere in this Expert Report.

9.58.1.    The situation took place over a period of more than two years, from the first request made by al-Aqil to change the names of the accounts from accounts by multiple individuals who were connected to Al-Haramain, to accounts that would be directly held in the name of Al-Haramain, to the final request made by al-Aqil to do this on one of his own accounts, and ARB expressly agreeing to do it

---

[543] September 27, 2023 Deposition of Abdullah bin Sulaiman al-Rajhi, p. 294
[544] Id, p. 295
[545] Id, pp. 320-321

**FBI PROTECTED MATERIAL REDACTED**

despite the requests violating ARB's compliance obligations.

9.58.2. During this period, the head of the legal department concluded that such requests would not comply with specific requirements of ARB's policies and procedures. ARB's legal department provided the specifics of why the request should not be honored, and provided alternative solutions to carrying out al-Aqil's request to avoid ARB being out of compliance with its policies and procedures.

9.58.3. The legal assessment was then overruled by ARB's management, and al-Aqil's requests were implemented by the bank, despite violating the bank's compliance rules, which it adopted to meet SAMA's requirements, which in turn SAMA put into place at a national level for Saudi Arabia as of November 1995 to meet the best practices and international standards applicable to its banks prior to 9/11.

9.59. The documentation on this sequence of events begins on September 26, 1998, when al Aqil, under the logo of Al-Haramain and on Al-Haramain letterhead, wrote the "Director General" of ARB asking him to transfer nine accounts that he described as "Al-Haramain" accounts to Al-Haramain held at two branches of ARB – Al Olaya Street General Branch and Al Dabab Street Branch.[546] The purpose and the substance of this request – to transfer accounts from an entity to itself – as described in the document, would be difficult to understand, as it did not include a request to change anything in particular, including the signatories. A second communication from al-Aqil followed 12 days later. This second communication explained that al-Aqil was actually requesting that nine accounts held in two branches of ARB by unspecified individuals be transferred to being held under the name of Al-Haramain instead, with the signatories remaining unchanged. Al Aqil would remain one of these four signatories.[547]

9.60. The documents I have reviewed do not show whether ARB did or did not carry out these requests from al-Aqil. So far as I know, no document showing any response from ARB to al-Aqil has been provided. Therefore, I do not know for certain whether ARB failed to respond, or carried out al-Aqil's requests concerning these nine accounts, which occurred about six weeks after the bombings of the U.S. Embassies in Nairobi and Dar es Salaam, and a time of U.S. government focus on Al-Haramain due to allegations of the support of some Al-Haramain personnel in Kenya for the bombings.[548] However, based on the lack of follow-up information to show the accounts as having been closed at that time, I assume the requests by al-Aqil to ARB were carried out by the bank.[549]

---

[546] ARB-00038214

[547] ARB-0038920, the other signatories were listed as Mansour bin Abdel Rahman al Qadi, Abdel Malik bin Mohamed al Qassim, and Mohamed bin Fahd al Tuwaijri.

[548] "Before Bombings, Omens and Fears," New York Times, January 9, 1999, id. No reason was provided by al-Aqil to ARB as the purpose to carry out the transfers at this time, and the documents provided do not show that ARB asked any questions to seek to understand the requested transfer, as required by its Manual (Part 20:2) and Guide's requirements for the bank to know its customers.

[549] My ability to track account information has been impeded by the redactions of account numbers from the documents produced by ARB. It is possible that one could determine whether the accounts were transferred by

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

9.61.    A year later, in a document dated September 1, 1999, the Director of the Legal Affairs
Administration unit at ARB communicated to ARB's Director of Branches
Administration regarding another request made by Al-Haramain, to change the name on
an account at the Taif Branch of ARB from the name of an individual, Zayd Attia al-
Harithi, to Al-Haramain. The branch and number of the account are different from those
show on the earlier request by al-Aqil.[550]

9.61.1.    The internal text of the September 1, 1999 document referenced a later date,
September 6, 1999, as the date the request to change the account was made. One
of these dates must be incorrect.

9.61.2.    The Director of Legal Affairs stated that the question of whether it was possible to
change the name on the account from an individual to Al-Haramain with the
individual continuing to be the authorized signatory had been referred to his office
at ARB, which was responsible for providing legal advice at the bank regarding
compliance issues. As a response, he stated that "[w]hen changing the name of the
account, the basic rule is closing the old account and opening a new account with
a new number and a new name, so that the accounts are not mixed up while using
the two accounts, and this specifies the company's responsibility." He further
stated that as the account number already involved persons who were using it for
transactions, if all the parties to the transaction agreed, and Al-Haramain
specifically authorized the change, and they all agreed to hold ARB harmless for
anything that went wrong as a result of the change, he would approve it. He then
referred it to the Director of Branches Administration with a handwritten note,
"for your review and to do what is required," with a date of September 14,
1999.[551]

9.61.3.    Meanwhile, al-Aqil wrote the Director General of ARB at the ARB's head office
in Riyadh on Al-Haramain stationery on September 9, 1999, stating that Al-
Haramain sought to transfers its account in Taif (account number redacted, except
for the numbers "00" ) from the individual, al-Harithi, to the Da'Wah
Organization, Al-Haramain, with no change to the signatory. This document,
based on its markings, was in turn faxed to or from someone at Al Rajhi on
September 14, 1999.[552]

9.61.4.    As with the September 26, 1998 request, I have seen no documentation to enable
me to determine with certainty whether ARB did or did not carry out this request
from al-Aqil. Because no document showing any response from ARB to al-Aqil is
provided, I do not know whether ARB failed to respond, or did carry out al-Aqil's

---

tracing the account numbers, but I have not been able to carry this out on the basis of the information available to
me.
[550] ARB-0003885. The previous al-Aqil requests were shown at ARB-00038214 and 8215, and covered different
branches and had different numbers. Because of redactions by ARB, I cannot state with certainty whether the earlier
accounts are entirely separate from this second request, but given the differences in the facts set forth in the
documents, I assume they refer to different accounts.
[551] ARB-00038885
[552] ARB-00038878

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

request concerning this account. As I have seen no documentation showing that the request was denied and the account closed, I assume the request was carried out.

9.61.5. On November 13, 1999, the Director of yet another branch of ARB, at Al Arbaeen Street, wrote ARB's Head of Legal Affairs Section seeking a legal opinion regarding whether it was proper to carry out a request made by Al-Haramain to transfer a joint account held under the name of three individuals characterized as "clients" of ARB (Mohamed Marzouk al Harithi, Faisal Fayex al Ahmedi, and Hussain Abdullah al-Yami) to Al-Haramain. In the letter, the ARB Al Arbaeen Street Branch Director noted that the three men were the Director, Deputy Director and Executive Director of Al-Haramain's office in Jeddah. The letter stated that they wanted to keep the account in the old account number because donors were accustomed to it. But they did not explain why the funds had been held in their names, or why they were now seeking to transfer it to the name of the Da'Wah organization.[553]

9.61.6. The Head of ARB's Legal Affairs Section provided a prompt response to the inquiry on November 18, 1999, and in this response, the answer was definitive. Carrying out the requests would violate Section II 1/1 of the Branches Instruction Manual. The head of the Legal Affairs Section accurately quoted the language, which specifies: "In the event that the client wants to change the name of his current account from a personal account to a legal account or vice versa, the old account should be closed, and a new account opened (with a new account number) in the name of the new person. Thus, there is complete separation between the transactions of the old account and those of the new account."[554] He then asked the branch manager to explain this to the clients and "try to convince them to open a new account under the name of Al-Haramain, but if that failed, and they insisted, the branch manager should contact the Deputy Director General of ARB's Banking Group to obtain approval for the change.[555]

9.61.7. In response, on November 23, 1999, the Al Arbaeen Street Branch manager wrote ARB's Deputy Director General of the Banking Group, stated that the clients and Al-Haramain insist on using the same number because the donors were used to it, and asking him to approve the change of the account from the individuals to Al-Haramain, "since it is a distinguished client."[556]

9.61.8. On January 19, 2000, an unspecified person at Al-Haramain wrote the head of the ARB Al Arbaeen Street Branch, on Al-Haramain letterhead, to advise him that Al-Haramain had obtained the approval from the Deputy Supervisor directly, and that they accepted any liability that might result from the change. They therefore asked the name of the account be changed with new checkbooks for the account

---

[553] ARB-00039001
[554] Note regarding Account Opening Rules, ARB Branch Instruction Manual, p. 2-11, ARB-00000165
[555] ARB-00000165
[556] ARB-00038978

FBI PROTECTED MATERIAL REDACTED

and promised to return the old checkbooks on the account.[557]

9.61.9. I have not found other documents that would provide further information regarding ARB's ultimate response to this request, but based on the totality of the correspondence provided, I assume absent receiving additional information to the contrary that ARB did in fact open up the accounts under the name Al-Haramain in violation of its own compliance rules.

9.61.10. On August 8, 2001, Al-Aqil made another request to the branch manager at the Al Olaya Street Branch of ARB to change another account under his own name to the name of Al-Haramain, asking for ten new checkbooks to be issued once the name was changed from his to that of the Da'Wah organization. In this case, the director of the branch again referred the issue up to a higher level at the bank, to ARB's Director of Companies Branches in the Central Region of Saudi Arabia.[558]

9.61.11. I have not been provided additional documents concerning this incident, and thus do not have further evidence regarding ARB's ultimate response to this request, but based on the totality of the correspondence provided, I assume absent receiving additional information to the contrary that ARB did in fact open up the al-Aqil account under the name Al-Haramain in violation of its own compliance rules.

9.61.12. I note that in a separate case, in which the MWL requested the transfer of its account for Kosovo humanitarian activities to the SJRC on August 24, 1999, ARB received express authorization from its regulator, SAMA, to make the transfer of funds. The formal approval by ARB's national regulator, made at the request of a major Saudi Da'Wah Organization as a new Da'Wah Organization was being established, is contrast to the transfers of funds requested repeatedly by al-Aqil without notification and permission from its banking regular, SAMA, and which appear to have been approved by ARB, as reflected in the documents I have cited.[559]

9.62. On a separate issue, evidence documents that from time to time ARB contacted SAMA regarding the opening of a particular charitable account, and received permission from SAMA to open such an account. However, it then used this permission to open additional accounts for the charity later, without obtaining SAMA's permission, and exceeding whatever authority was granted it by SAMA.

9.62.1. ARB documents provide evidence that after the 9/11 attacks, SAMA contacted ARB regarding the formation of a "Banks Committee," after which representatives of ARB, and possibly other banks, met with Saudi regulators, apparently at the Al Faisaliah Hotel in Riyadh, according to "Meeting Notes" taken of such a meeting on March 17, 2002. The notes describe new reporting

---

[557] ARB-00038979
[558] ARB-00038486
[559] ARB-000 37997-38016

FBI PROTECTED MATERIAL REDACTED

requirements by the banks to SAMA, as well as an explicit criticism of ARB for exceeding the authority granted it by SAMA. The note states: "Al Birr Islamic Committee." On the next line is the sentence. "We authorized Al Rajhi to open one account; they opened many accounts." I read this sentence as a criticism of ARB's conduct by its regulator.[560]

9.62.2. "Al Birr Islamic Committee" is part of the name of an Islamic charity, Lajnat al-Birr al-Islamiah, Arabic for "Islamic Benevolence Committee," founded around 1987, in part to raise funds for fighters in Afghanistan. The organization also provided cover and immigration assistance to fighters traveling in and out of Pakistan, and after 9/11. The CIA describe the organization's involvement with terrorist finance as follows: "Batterjee raised funds on behalf of Bin Ladin using LBI as a cut-out."[561] The UN found it to be a precursor of another charity, Benevolence International Foundation, that was sanctioned by the United States and the UN for terrorist finance in support of bin Ladin and al Qaeda.[562] The CIA also found that Lajnat was "a close affiliate" of WAMY.[563]

9.62.3. The same ARB documents appear to document SAMA directing ARB and other Saudi banks to "Monitor the charity accounts and notify SAMA about remittances in large amounts." This statement, from March 17, 2002, appears in context to be a direction to ARB (and possibly banks) from SAMA. It implies that thus monitoring had not been undertaken previously, which would constitute a further failure to adhere to international standards applicable to ARB's handling of a accounts for the Da'Wah Organizations and other charities. I have seen no evidence that ARB undertook such monitoring of the accounts it maintained on behalf of the Da'Wah Organizations prior to the 9/11 attacks.

9.63. To conclude, the documents produced by ARB regarding its handling and maintenance of accounts of the Da'Wah Organizations show that ARB did not carry out a number of the policies and procedures that were set forth in its Branch Instruction Manual relating to countering the risk of money laundering, countering terrorist finance, and knowing its customers and their activities at a level sufficient to protect the bank from being at risk of being used for improper conduct.

9.63.1. From the documents provided, I found no evidence that its *AML Unit* undertook *any* of the activities it was required to undertake as set forth in the AML Guide, at any time, following the issuance of the Guide prior to the 9/11 attacks.

---

[560] ARB-00039581-39585

[561] CIA-000149. The same page of this CIA report, from November 14, 2002, "Saudi-Based Financial Support for Terrorist Organizations," states that "Al-Rajhi Bank has maintained accounts for individuals linked to Usama Bin Ladin, [redacted] and individuals with ties to the Egyptian Islamic Jihad."

[562] Benevolence International Foundation, UN 1267 Committee, https://www.un.org/securitycouncil/sanctions/1267/aq_sanctions_list/summaries/entity/benevolence-international-foundation

[563] CIA_0000820. The same report also found that Bin Ladin had at one point funded Lajnat's offices in Afghanistan and probably in Pakistan. CIA_000821

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

9.63.2. From the documents provided, I found no evidence that ARB met such compliance requirements as documenting the corporate existence of the Da'Wah Organizations prior to the 9/11 attacks. With regard to one of them, the SAAR Foundation, the entity appears to have had no corporate existence while it was conducting transactions through ARB at the direction of ARB's chairman until June 2000, although ARB provided it an account listing it as if it were an actual charitable foundation in Saudi Arabia, and enabled it to make charitable donations through that account prior to the charitable foundation existing.

9.64.   In short, based on the documents I have reviewed, I found extensive evidence that ARB did not adhere to best practices and international standards with respect to opening and maintaining the accounts of Al-Haramain, MWL, IIRO, WAMY, and the SAAR Foundation.

## 10. Question 8: Did Al Rajhi Bank ignore money laundering and terrorist financing red flags with respect to the accounts it maintained for Al-Haramain Islamic Foundation, MWL, IIRO, WAMY and the Saudi-based Suleiman Abdul Al Rajhi Foundation before September 11, 2001?

10.1.   Yes, ARB ignored numerous money laundering and terrorist red flags with respect to the accounts it maintained for the Da'Wah Organizations.

10.2.   Money laundering compliance is a risk-based concept. To meet their anti-money laundering and countering terrorist flag obligations, banks and other financial institutions have to be aware of the types of risks that arise from the particular type of business that a client is engaged in, so that they can identify red flags of potential risk of misconduct and investigate the red flags.

10.3.   A red flag will be different for a bank client that is a personal savings account from a bank client which is a small grocery store, a medium-sized professional services firm, a large construction firm, or an NGO that is moving hundreds of millions of dollars for projects throughout the world annually. Those who do business locally differ in their profiles, and their risks, from clients who are involved in international or cross border activity. Similarly, clients that undertake only transactions involving small amounts of cash, such as that used for household needs, differ from clients who use large amounts of cash every day. Assessing money laundering and terrorist finance risk requires a bank to know its customer sufficiently to be able to assess the particular types of red flags that would arise given the nature of the customer's business.

10.4.   In its 1995 Guidelines, SAMA included an appendix of "Money Laundering Indicators" which did not specifically address the risks facing religious charities. It did provide "General Indicators" for such indicators or red flags, as well as "Indicators for Bank Accounts," "Indicators for Drafts," and "Changes in Branch Transactions Indicators." Materially, these included:

10.4.1.   "Continuous cash deposits in companies and establishment's accounts."

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

10.4.2. "Abnormal purchase of cashier's cheques and payment orders against cash."

10.4.3. "Withdrawal of cash amounts after a short time of its deposit."

10.4.4. "Transactions for unknown objectives which do not adhere to activity of the company or its branches."

10.4.5. "Existence of a large number of deposits of small amounts whether in cash, cheques or incoming drafts and whose total amounts or the approximate total amounts, are transferred to another city or country in one transactions."

10.4.6. "Opening of more than one account by a customer in his name in the same bank without a clear reason, and existence of inter-account transfer among those accounts."

10.4.7. "Payments or transfers by many persons to a single account whether in cash or through internal drafts."

10.4.8. "Frequent transfer or amounts to another bank without mentioning the name of the beneficiary."

10.4.9. "Frequent transfer of amounts to foreign banks with instructions to pay in cash to the beneficiary."

10.4.10. "Cash transfers in large amounts."

10.4.11. "Deposits in different accounts and transfer of these amounts to a main account and then transferring it outside the Kingdom."

10.4.12. "Overriding or not implementing the bank's internal control directives or intentional non-compliance with bank's policies by employees."[564]

10.5. Consistent with my findings in my response to Question 7 in this Expert Report, ARB did not adhere to its AML policies and procedures in its handling of accounts for the Da'Wah organizations. ARB's due diligence over the Da'Wah accounts was minimal in many respects.

10.5.1. Analyzing all of its deficiencies has been made even more difficult, and in some cases, impossible, by ARB's decisions not to produce some documents relating to its handling of the accounts of Da'Wah organizations and ARB's initial decision to redact material relating to its handling of the accounts in material it did produce. In reviewing the documents, I have reflected on the comments made two decades ago to a Washington Post reporter by a U.S. official, which raised questions about the bookkeeping practices of the SAAR Foundation back in 2002. At the time, the Washington Post article stated: "In 1998, for example, SAAR moved $9 million to the Humana Charitable Trust, which a SAAR tax form said

---

[564] Appendix 2, 2005 SAMA Guidelines, id.

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

was based in the tax haven of the Isle of Man. U.S. investigators said they found no evidence the trust existed. Panama, another tax haven, was also the destination of millions of dollars. 'Looking at their finances,' one U.S. official involved in the probe said, 'is like looking into a black hole.'"[565]

10.6.   As I have looked into the "black hole" of the documents produced by ARB, including transactions through ARB undertaken by the head of the SAAR Foundation Abdul Rahman bin Abdullah al Rajhi on behalf of its founder, SAAR, some light has emerged. I have found evidence of transactions involving elements of each of the twelve red flags for potential money laundering risk specified 28 years ago by SAMA that I have listed. In some cases, the Da'Wah organizations' activities literally fit the descriptors, in others, they fit only part of the descriptors because some essential information needed to determine whether they actually constituted a red flag in all respects is not available from the documents provided. To review the SAMA-defined red flags:

10.6.1.   There were continous cash deposits into the limited number of Al-Haramain and IIRO accounts available to me which provided ledger information. These were potential red flags that ARB should have investigated (or at least reviewed to assess risk mitigation measures) further, but ignored.

10.6.2.   There may have been "Abnormal purchase of cashier's cheques and payment orders against cash." There were many checks and payment orders made against cash deposits. These were potential red flags that ARB should have investigated (or at least reviewed to assess risk mitigation measures), but ignored.

10.6.3.   There was frequent "Withdrawal of cash amounts." I cannot determine how quickly the withdrawals were made due to ARB not providing specific dates with regard to most of the withdrawals in the documents made available to me. These were potential red flags that ARB should have investigated (or at least reviewed to assess risk mitigation measures), but ignored.

10.6.4.   There were many "transactions for unknown objectives," but there was not enough information provided to know whether or not they "adhere[d] to activity of the company or its branches." These were potential red flags that ARB should have investigated (or at least reviewed to assess risk mitigation measures), but ignored.

10.6.5.   There were many deposits of cash from many sources into the accounts of the Da'Wah Organizations maintained by ARB. Where they were transferred to is often not visible given the state of the document production and the paucity of information about the purpose of withdrawals. These were red flags that were ignored by ARB, which should have, at minimum, put controls in place to prevent abuse.

---

[565] "U.S. Trails Va. Muslim Money, Ties," Washington Post, October 7, 2002, https://www.washingtonpost.com/archive/politics/2002/10/07/us-trails-va-muslim-money-ties/11fed21c-9928-40a4-845e-78b60c37f645/

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

10.6.6.  There were many instances of multiple accounts being controlled by a single person. The best examples are at Al-Haramain, where al-Aqil controlled multiple accounts. Some of these were in his name, some of them were in Al-Haramain's name, and the name on the accounts changed over time from his to that of the charity. Thus with al-Aqil, there were clear red flags for ARB regarding the "Opening of more than one account by a customer in his name in the same bank without a clear reason, and existence of inter-account transfer among those accounts." ARB ignored these red flags, although they were noticed by the head of their legal department, as discussed in the previous section of this Expert Report, and then approved for handling despite being red flags.

10.6.7.  There were "Payments or transfers by many persons to a single account whether in cash or through internal drafts." I assess these to be red flags that ARB ignored.

10.6.8.  Based on the general information available to me from the accounts maintained at ARB for the Da'wah Organizations, it would seem logical that there were "Frequent transfer or amounts to another bank without mentioning the name of the beneficiary," as beneficiary information was often absent from the records provided to me on withdrawals by cash or check made by the Da'Wah Organizations from accounts at ARB. But information on transfers made to other banks on behalf of the Da'Wah Organizations was not provided by ARB in discovery. Given the purposes of the Al-Haramain and IIRO accounts to provide "relief" in other countries, there had to have been transfers either by cash to other countries or to banks in other countries, but the documents provided do not show definitively how this took place, except in cases involving cash couriers (another category of red flag for terrorist finance, discussed). Accordingly, I cannot make a definitive assessment as to whether this red flag was triggered with regard to foreign banks. I assess this to be a probable red flag that ARB failed to investigate and therefore ignored.

10.6.9.  The same observation applies regarding directions to foreign banks to pay in cash to beneficiaries. I do not have documents reflecting directions to any foreign bank by ARB, outside of a single bank in the United States, involving the ARB account at Chase Manhattan Bank, and accordingly, cannot assess whether or not this red flag was triggered. Based on the locations of Al-Haramain and IIRO offices in many countries in conflict zones, some of which did not have modern banking regulation prior to the 9/11 attacks, there would have been a risk that such payments were made in cash, but again, documentation to answer the question has not been available to me.[566] I assess this to be a likely red flag that ARB failed to investigate and therefore ignored.

---

[566] I have reviewed about 30 checks that were produced in this litigation involving ARB's account at Chase Manhattan Bank in New York, made by Abdul Rahman Bin Abduallah Al Rajhi on behalf of SAAR. These had other issues for Chase Manhattan Bank's AML compliance which I will address below, and were structured in what is known as a "payable through" account by ARB, which is a known money laundering risk and no longer lawful. But the checks specified the beneficiaries and they did not involve cash.) See generally NL0010462-0010491.

**FBI PROTECTED MATERIAL REDACTED**

10.6.10. There were many transactions involving cash payments in large amounts involving the Da'Wah Organizations, making this a red flag that ARB ignored.

10.6.11. There were "Deposits in different accounts and transfer of these amounts to a main account," with every indicator that they would then be transferred outside of Saudi Arabia, but the transfers outside of Saudi Arabia were not shown in the ARB documents, making this a probable red flag that ARB failed to investigate and therefore ignored.

10.6.12.  There were specific instances in which ARB engaged in "[o]verriding or not implementing the bank's internal control directives or intentional non-compliance with bank's policies by employees." These were red flags that in some cases the legal department became aware of and recognized as compliance issues, and in other cases did not come to their attention. With or without the involvement of ARB's legal department, these red flags, involving a person who was later found deeply involved in terrorist finance and sanctioned globally, along with his "charity" Al Harmain, were ultimately ignored.

10.7.    As suggested in my summary above, some of these red flags as identified by SAMA's Guidelines could have been seen as inherent for public charities raising funds from cash donations made by many members of the public. Risks for abuses involving the cash deposits or cash withdrawals could have been mitigated through appropriate measures, such as reviewing the books of the charities periodically, obtaining their audits, visiting their offices, or obtaining documentation on their actual operations, domestic and foreign through spot checks of sample activities. Others would require deeper investigation to assess properly whether the red flags were in fact signs of deeper problems with the Da'Wah Organizations, of the kind suggested by multiple media accounts. In reality, the abuses involving the Da'Wah Organizations in providing support to al Qaeda and to other extremist organizatoins both in-and outside of the al Qaeda network eventually led to the international closure of Al-Haramain on a global basis and its termination by Saudi authorities, as well as to the closure of individual IIRO branches. I found no evidence that ARB considered any of these red flags, or did anything to respond to them. The evidence is that ARB ignored all of them.

*The Al Buthe Transactions*

10.8.    The Al Buthe transactions undertaken on behalf of Al-Haramain's U.S. affiliate provides one further example of ARB's failure to notice red flags of money laundering and terrorist finance. Soliman al-Buthe was an officer of Al-Haramain in Saudi Arabia who worked closely with al-Aqil, and then helped to found (and to fund) the opening of Al-Haramain's only U.S. affiliate, in Ashland, Oregon. Al-Buthe was indicted in the U.S. on allegations that he transported funds deposited in an Al-Haramain bank account in Oregon, where the U.S. chapter of Al-Haramain was based, and then converted into travellers and cashier's checks and hand carried them back to Saudi Arabia, where they were cashed in for Saudi riyals at ARB and alleged to be smuggled to support mujahedin

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

fighters in Chechnya.[567] Over the course of the proceedings in the U.S. against him, Al-Buthe fled and became a fugitive. Al-Buthe remains sanctioned by the U.S. and the subject of an outstanding arrest warrant.[568]

10.8.1. In the course of funding Al-Haramain's offices in Oregon, while acting as its Treasurer, al-Buthe engaged in three transactions with ARB that I assess to be red flags for (or indicators) of possible money laundering.

10.8.2. In the first instance, on June 20, 1999, al-Buthe made what ARB characterized as a "cash deposit" of 187,750 SR in an account he had at ARB, and simultaneously deposited a "collection check" in the amount of 60,000 SR, suddenly increasing his funds on deposit from 21,779.37 SR to 269,529.37 SR – an incdrease of more than ten fold or 1000%. He then immediately converted those funds into traveller's checks on the same date of June 20 1999, leading to a debit to his ARB account of 300,000 SR – or more than the total funds he had in total on deposit.[569]

10.8.2..1. I can provide no explanation for why ARB would authorize a transaction that would have left a negative balance in al-Buthe's account. ARB-00000882 shows a positive balance of 14,529.37 SRs in the account after the withdrawals, rather than a negative balance.

10.8.2..2. The large deposit of cash, amounting to just under $80,000, and its immediate conversion into traveller's checks, should have raised questions at the bank, as al-Buthe had never had previously held that much in his account, with balances typically in the thousands or tens or thousands of Saudi riyals, not in the hundreds of thousands.

10.8.2..3. Then, ten days later, al-Buthe redeposited traveler's checks (presumably the same ones) of nearly the full amount he had withdrawn,that is 292,500 SR, on June 30, 1999, and then immediately withdrew most of these funds, totalling 247,630 SRs, through a "telex entry debit note," or a bank-to-bank wire transfer, once again on the same day.

---

[567] ARB-000735-000744; ARB-000859-0000959; ARB 00039626-00039652. See also "Defendant Convicted of Lying About Funds Bound for Religious Extremist Militants Federal Jury Convicts Leader of Al-Haramain Islamic Foundation of Two Felonies," U.S. Attorney's Office, September 12, 2010, https://archives.fbi.gov/archives/portland/press-releases/2010/pd091010.htm and "U.S.-Based Branch of Al Haramain Foundation Linked to Terror Treasury Designates U.S. Branch, Director," Treasury Press Release September 9, 2004, https://home.treasury.gov/news/press-releases/js1895  Al-Buthe was designated for sanctions by the UN on September 28, 2004, and his name was removed from the UN sanctions list on February 10, 2013. "Security Council Committee Adds One Individual and Two Entities To Al-Qaida Section Of Its Consolidated List," 28/09/2004, Press Release, SC/8200 https://press.un.org/en/2004/sc8200.doc.htm and UN Ombudsman, Status of Cases, Case 23, https://www.un.org/securitycouncil/sc/ombudsperson/status-of-cases

[568] OFAC Specially Designated Nationals and Blocked Persons List September 6, 2023, https://www.treasury.gov/ofac/downloads/sdnlist.pdf

[569] ARB 882.

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

10.8.2..4.   These transactions were unusual, and weird. Taken together, they do not make sense as normal banking transactions. At ARB, no questions were asked.

10.8.3.   The second instance took place the following year, in March and April. In this case, ARB records report al-Buthe making a 'cash deposit" of 184,795.00 SRs on March 22, 2000, and a second "cash deposit" on March 27, 2000, of 70,000 SRs, together rapidly increasing his balance from 311.39 SR (or less than $100) on March 21 to 236,358.39 on March 27, equivalent to a bit more than $63,000, and thus more than sixty-three times as much money. A week later, on April 3, 2000, al-Buthe transferred nearly half of those funds, 101,315 S.R., via a "telex transfer" to an unspecified recipient – and then had slightly more than that amount – 101,385 SRs, deposited in his acccount the following day, thereby replenishing it. Five days after that, al-Buthe received another "cash deposit" in the amount of 78,729 SR, characterized as coming from "external collections."[570]

10.8.3..1.   I note that these transactions coincide with the period when al-Buthe was alleged by the U.S. government to have returned to Saudi Arabia from the United States, illegally carrying $130,000 in American Express traveler's checks and a $20,000 bank check provided to him by the Al-Harmain branch in Oregon. According to the Justice Department indictment of al-Buthe and Al-Haramain, the checks were deposited in ARB in mid-to-late March 2000.[571] According to the indictment, the funds originated from a person in Egypt, who wanted to donate $150,000 as "zakat" or charity to support Muslims in Chechnya, and were accepted by Al-Haramain's head, al-Aqil, in a letter to the Egyptian donor, stating that those involved wanted to assure the donor "our commitment to continue every possible effort to help ending the Chechen crisis."[572] The U.S. indictment then states that a fellow officer of Al-Haramain in Oregon, Pirouz Sedaghaty, then provided a false financial summary to the Al-Haramain accountant regarding the use of the funds.[573] Thus, the transactions were not only suspicious – they were actual evidence of possible terrorist finance for Chechnya, undertaken through an account at ARB.

10.8.4.   A third set of transactions completes the picture of ARB ignoring red flags of potential laundering. In May, 2000, according to the Al-Haramain Oregon search warrant affidavit, al-Buthe hand carried $275,000 in American Express traveler's checks issuesd to him by ARB in Saudi Arabia to the United States. The money was deposited into Al-Haramain's Bank of America account in Ashland and put

---

[570] ARB-00000900-0901
[571] Indictment, U.S. v. Al-Haramain Islamic Foundation, Inc., Pirouz Sedaghaty, and Soliman Hamd al-Buthe," No CR 05-600008-HO, February 17, 2005, pp 13-14.
[572] Id, p. 9.
[573] Id, p. 11

**FBI PROTECTED MATERIAL REDACTED**

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

toward the purchase of a building for Al-Haramain in Springield, Missouri.[574]

10.8.4..1.   On May 9, 200,0 al-Buthe made two unusually large "cash deposits" in his account at ARB. The first was for 40,000 SR. The second was for 1,032,900 SR. This second deposit was by far the largest cash deposit made by al-Buthe over the five year period covered by the document production.[575]

10.8.4..2.   Four days later, on May 13, 2000, ARB's account for al-Buthe statement shows a "Debit Entry Note" with a "Traveler's Check Discount." The amount deducted was 1,125,000 SR, which converts using 2000 exchange rates to about $275,000 – a match between ARB's production and the amount specified in the federal search warrant.

10.8.4..3.   The sequence contains several red flags for possible money laundering. First, al-Buthe made an exceptionally large cash deposit, given the ordinary size of funds he maintained at ARB. Second, he created a balance that was a substantial multiple of the average balance he had maintained over months and years. Third, most of the funds remained in al-Buthe's account at ARB for a period of just five days. Fourth, the funds – a great deal of money for an individual whose average account balances were far lower - were converted into traveler's checks. Who and what were the source of funds? What would they be used for, and where? Once again, there is no evidence that ARB asked any questions.

10.9.    As reflected in the al-Buthe case, there can be indicators of potential financial crime based on reviewing internal bank records alone – which ARB failed to do in response to multiple indicators that al-Buthe's transactions at ARB were not normal banking transactions for a person with his previous patterns of banking. But a bank cannot meet its AML obligations by only looking at internal banking records for accounts that merely provide transaction information without reference to the reasons for the transactions and the broader context in which they take place. To adhere to international best practices and standards, a bank has to tailor its compliance assessments to the type of risks posed by a particular client. To do this, it has to look at the external environment, as well as the information it maintains on transactions, and the information a client puts down on paper about its activities.

10.10.   For international charities such as the Da'Wah Organizations for whom ARB had accounts, there would be five major risks that banks would need to consider, and mitigate as appropriate:

---

[574] *In the Matter of the Search of One story residential building located at 3800 S Highway 99 in Ashland, Oregon,* Case Number 04-4009, filed in Case 6:05-crd-60008-AA, Document 183-3 Filed June 19, 2009, ¶16.
[575] ARB-00000903

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

10.10.1. *(1) the risk of diversion of funds by officials or employees at the charities, especially overseas,* taking into account the conditions in the locations where the funds would be used, the methods of moving the funds, the identies of the institutions handling and receiving the funds, and the evidence regarding the ultimate uses of the funds*;*

10.10.2. *(2) the possible affiliation of the charities with persons or groups alleged to supporting or engaging in terrorism,* such as bin Ladin and al Qaeda and other extremist groups*;*

10.10.3. *(3) abuses of humanitarian funds to support jihadists engaged in military activity,* such as the use of humanitarian funds to support fighters, to transport fighters, or to purchase military equipment or weapons;

10.10.4. *(4) support for recruitment of jihadists for military activity; and*

10.10.5. *(5) providing cover to jihadists for military activity,* through lending them the name of the charity as a cover for their military activities, providing identity documents to the jihadists, or characterizing them as employees of the charity when they were not engaged in the provision of humanitarian services*.*

10.10.6. During the 1990's, as I describe in detail in Section 3 of this Expert Report, there were articles in major international media referencing the use of charities for each one of these five improper purposes, including expressly describing the use of the Da'Wah Organizations for such purposes.

10.11. A large bank such as ARB handling accounts for international charities would need to be aware of these risks, and to structure its due diligence over their accounts in order to prevent their abuse, as described in Section 3 of tis Expert Report.

10.11.1. MWL was itself aware of the risk of diversion of its funds at field offices for improper purposes. The CIA reported that its "officials admit. . . that the lack of strict auditing procedures [at the Da'Wah Organization] has made diversions of funds a problem."[576]

10.11.2. As reflected in these statements by its customer, MWL, IIRO's parent organizatoin, ARB had no basis to assume that the Da'Wah Organizations were themselves auditing there activities in the field to address the risk of terrorist diversion. The documents do not provide evidence that ARB relied on any such audits, obtained such audits, or asked for them prior to the 9/11 attacks.

10.12. To meaningfully meet its regulatory obligations not to be used to support terrrorism, and thereby notice the red flags which were actually present, ARB would have had to take into account two principal types of information that would be red flags of potential abuse. The first would be information available to the bank *from outside sources,* such as international media referring to the activities of its international charity clients, as well as

---

[576] CIA_000823

FBI PROTECTED MATERIAL REDACTED

any reporting to the bank from its own government or other governments. The second would be information available to the bank *from inside the bank*, from its own records, including the information it received from its clients, from any additional information it demanded from its clients, and from any analysis it gave to all of the information available to it, as suggested by SAMA in the compliance Guidelines that ARB ignored.

10.13.    The documents I have reviewed show that ARB did secure assurances from Saudi officials, especially Saudi officials in the Ministry of Islamic Affairs, for it opening and/or maintaining domestic accounts for domestic offices and activities of the Da'Wah Organizations. ARB also occasionally received such assurances for its foreign activities, for example, in connection with its provision of support to Da'Wah Organizations involved in Kosovo during the Kosovo conflict and to the Palestinian intifada. However, even if ARB received assurances from Saudi officials that the Da'Wah Organizations could provide services for charities working in specific foreign countries, this would not relieve it from the obligation to assess the activities of its clients in situations where there were risks of it facilitating improper conduct, including not just handling the proceeds of drugs, but facilitating the support of terrorism.

10.14.    The documents I have reviewed do not show that ARB ever considered, or maintained documents regarding even a single one of the international reports raising serious allegations of the involvement of the Da'Wah Organizations in supporting terrorism, over a period of many years, including from governmental bodies such as the UN, discussed in my response to Question 1 in this Expert Report. The reporting by international media and the discussion of the issue by governments were indicators of risk that needed to be taken into account by ARB, and they included red flags about the alleged specific involvement in terrorist finance and support for bin Ladin's terrorist activities on the part of components of the Da'Wah Organizations. These risk indicators were systematically ignored by ARB as an institution, including during the period before the 9/11 attacks when ARB like other banks operating international had access to the internet.

10.15.    The documents I have reviewed also show numerous red flags of money laundering and terrorist finance risk apparent within ARB's records for the Da'Wah Organizations, which ARB ignored. These red flags included:

10.15.1.    *The transfer of funds by the Da'Wah Organizations to areas where extremist and terrorist entities were known to have a substantial presence*, and where there were active Islamic groups engaged in armed conflict. While there would be legitimate humanitarian activities taking place in some areas to be undertaken by charities for such purposes as caring for injured people or helping orphans, charities operating in areas in which there is also active, armed conflict have heightened risks for abuse.

10.15.1..1.    ARB knew that the Da'Wah Organizations were operating in areas of armed conflict. in some cases, the donations reported were not only reporting as going to an area of conflict, but for "jihadists" or to families of "martyrs." Examples of transfers to and from areas of conflict through ARB by Da'Wah Organizations in the midst of armed

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

conflicts include Bosnia,[577] Chechnya,[578] Kosovo,[579] and Israel/Palestine.[580] ARB records also show that these Da'Wah Organizations were making transfers to and from ARB where there was not only armed conflict but terrorist incidents allegedly involving charities – including the Da'Wah Organizations themselves in such countries as Kenya,[581] Tanzania,[582] Indonesia,[583] and the Philippines.[584] The pre-9/11 public reporting of the Da'Wah Organizations alleged involvement in these areas in relation to terrorist activity prior to 9/11 was extensive.[585]

---

[577] ARB-00014549 and 14551 and ARB-00038116

[578] ARB-00014557 and ARB-00038116

[579] ARB-00014556 and ARB-00038116

[580] Examples of donations made to the IIRO account at ARB for supporting Palestinians during the period of the Second Intifada include ARB-0009781, 9782, 9784, 9785, 9787, 9839, 9840, 9841, 9849. All were reported as coming in in cash. The donation listed at ARB-0009787 was expressly stated to be "for jihadists." Another donation at ARB-0000814 similarly lists a payment as being for the benefit of "Palestinian jihadists." Other examples are at another IIRO account at ARB, ARB-00001767, 17774, 1777, and 1786. The donation listed at ARB-00001786 refers to payments to families of "martyrs." Another example of a donation through IIRO's account at ARB expressly earmarked for families of martyrs is provided at ARB-00001786. As previously explained, "martyrs" was a term often used for people who died in armed combat, including suicide bombings and other terrorist activity directed at civilians. See also ARB-00038116 for Al-Haramain listing of Palestine among its areas of activity.

[581] ARB-00006606, ARB-00005147, ARB00005151, ARB-00005176, ARB-00005183, ARB-00005185, ARB-00005202, ARB-00005221, ARB-00010726, ARB-00002496, ARB-00006676.

[582] ARB-00005183, ARB-00005192, ARB-00005203, ARB-00002502, ARB-00002504, ARB-00006670

[583] ARB-00007267-7280

[584] ARB-00006179, ARB-00010729, ARB-00010731, ARB-00010732,  ARB-00002497 ARB-00005157 ARB-00005158, ARB-00005180, ARB-00005182, ARB-00005191, ARB-00005195,  ARB-00002497, ARB-00002502, ARB-00002497. See also NL 0015044-5055 regarding the SAAR Foundation's activities in the Philippines and Indonesia, which based on the documents I have reviewed, would very likely have been carried out through ARB, as based on the documents, it appears that ARB was acting across-the-board as the SAAR Foundation's bank for transactions in Riyals.

[585] I discuss this information in detail in my response to Question 2 in this Expert Report. For the purposes of "red flags," I wish to note some of the public information available to ARB prior to the 9/11 attacks regarding the alleged involvement of the Da'Wah Organizations and/or related groups with support for terrorism generally and bin Ladin and his associates specifically. These examples of public reporting include but are not limited to: "Kenya bans six Islamic aid agencies after U.S. Embassy bombing," Associated Press, September 09, 1998," referencing Kenya government action to ban Al-Haramain and IIRO from Kenya due to their relationship to U.S. Embassy terrorist attacks; "US fears terrorist attack in Kosovo," BBC News, April 3, 2000, id, referencing Saudi Joint Relief Committee involvement, and their links to bin Ladin and U.S. Embassy bombings; "It's more than just who plants the explosives," New York Daily News, July 31, 1996, referencing involvement of IIRO as a "major funnel" for Saudi support for terrorism; "A terrorist plot unearthed," Frontline (India), Feb 27-Mar 12, 1999, Vol 16 No 05, regarding IIRO involvement in Bosnia and elsewhere, and its ties to bin Ladin; "Russian Troops Find Arab, Bosnian Passports in Chechnya," ITAR-TASS, February 21 2000, referring to use of IIRO passports to transport mercenary fighters to Chechnya; "Bin Laden Providing money, military aid to MILF: report," Kyodo News Service, linking bin Ladin and his brother-in-law Mohammad Khalifa to IIRO and MWL-sponsored activities in Philippines; "Gemma Linked to Bin Laden Group Funding Sayyaf, MILF," Philippine Daily Inquirer, August 10, 2000, regarding alleged IIRO links to Bin Ladin and terrorism in Philippines and "Bin Laden Funds Abu Sayyaf Through Muslim Relief Group," Philippine Daily Inquirer, August 9, 2000, id, regarding IIRO support for Bin Ladin and terrorism in the Philippines, under MWL sponsorship; "Some Charities Suspected of Terrorist Role," New York Times, February 19, 2000, id.; "A helping hand from Saudi Arabia," U.S. News & World Report, July 8, 1996, referencing IIRO coordination of $20 million a year from Saudi Arabian sources to Islamic extremists in Gaza and West Bank; "Nairobi Bomb Investigation," VOA, August 22, 1998, id; "Assault on a U.S. Embassy, a Plot Both Wide and

**FBI PROTECTED MATERIAL REDACTED**

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

10.15.1..2. As an example: on December 5, 1992, the New York Times wrote a front-page article entitled, "Muslims from Afar Joining Holy War in Bosnia," which reported that there were some 400 Saudi volunteers, many of them veterans of Afghanistan, fighting in Bosnia along with Arabs from Egypt, Pakistan, the Sudan and Algeria. The article described, with some specifics, the involvement of two of the Da'Wah Organizations in area of conflict – the IIRO and WAMY, and that Saudi officials said that relief work volunteers often wound up as soldiers.[586]

10.15.1..3. In some case, ARB did not have to guess that funds flowing through the bank were being used to finance jihad. Some transactions actually expressly stated that payments were being made to Afghani or Palestinian jihadists.[587]

10.15.1..4. ARB had relationships with IIRO and WAMY. It handled many bank accounts for IIRO. It had "know your customer" duties for its account holders. It was supposed to identify red flags and respond to them. The New York Times story provides a clear example of red flags for the possible involvement of account holders of ARB in supporting terrorism.

10.15.2. *The existence of reliable information indicating that the Da'Wah Organizations and/or their representatives such as al-Aqil, were linked to third parties that were supporting or engaged in terrorist activity.*

10.15.2..1. This type of information is considered to be a red flag of terrorist finance risk. As previously stated, and as set forth at length in my answers to Qeustions 1 and 2 in this Expert Report, this was the principal known risk for the abuse of charities. It was a subject of concern by international bodies such as the United Nations. It was a subject of concern for governments.

10.15.2..2. This type of information, which was available, was a red flag for each of the five types of risks for international charities operating in conflict zones. As stated above, they were: the risk of diversion of funds by officials or employees at the charities; affiliations with extremists and terrorists; support for people engaging in military activity in conflict zones; support for recruitment of people for such activities, and providing cover to jihadists for military activity,

---

Deep," Washington Post, November 23, 1998, id; Frontline's A Portrait of Wadih El Hage, Accused Terrorist, published January 31, 2001, and last updated September 12, 2001, id.

[586] "Muslims From Afar Joining 'Holy War' in Bosnia," New York Times, December 5, 1992, https://www.nytimes.com/1992/12/05/world/muslims-from-afar-joining-holy-war-in-bosnia.html

[587] For example, an Al-Haramain account received a 2000 SR donation on November 3, 2001 "from [a] donor to Afghani jihadists." ARB-00012293. An ARB account held for the IIRO received 3000 SR on June 19, 2001 "to Palestinian Jihadists." ARB-00008414

FBI PROTECTED MATERIAL REDACTED

through lending them the name of the charity. This is exactly the type of information available before 9/11 to ARB about its Da'Wah Organization clients and those working with them which it ignored.

10.15.3. *A lead from a public source alleging that a charity is engaged in activities related to terrorism.* Throughout this Expert Report, I have documented the extensive number of leads regarding the involvement of the Da'Wah Organizations in activities related to terrorism prior to the 9/11 attacks. These were public sources providing red flags of terrorist finance risk.

10.15.4. *Use of cash couriers to transfer funds from the Da'Wah Organizations into areas with known conflict and/or terrorist activity,* by SAAR directing cash donations in checks written on an account at ARB written to agents and officers of the Da'Wah Organizations that they were then supposed to transfer to third parties in areas of conflict and/or terrorist activity.[588] The use of cash couriers generally is an area for terrorist finance and money laundering risk, for the obvious reason that it is easier to divert cash than electronic funds without leaving a trail, absent effective controls to document the recipients and the uses of the cash.

10.15.5. *Actual direct evidence that customer funds were being used for improper purposes, such as providing support for armed jihadists.* ARB records document that ARB had information Al-Haramain and IIRO accounts at ARB received funds from such sources as a "donor to Afghani jihadists" and "to Palestinian Jihadists."[589]

10.15.6. *Large amounts of funds withdrawn by the Da'Wah Organizations in cash, minimizing the evidentiary trail of the uses of the cash.* A single account for the IIRO maintained by ARB (SA [redacted] 5718), with the label "Zakat," as set down by auditors, Ernst & Young in Riyadh, shows totals deposits for the five year period from January 1, 1998 through December 31, 2002 as 1,156,476.50 S.R., of which more than 92% was then withdrawn in the untraceable form of

[588] See e.g. NL0010348, contribution from SAAR through ARB to al Misfer "to be handed to propagator Qassim Mohamed from Mali," February 06, 1999. This was the period of the second Tuareg rebellion, which had gradually evolved into a small-scale civil war involving the Arab community in Mali. See "The Challenges of Retaking Northern Mali," CTC Sentinel, Combatting Terrorism Center, West Point, November 2012, Vol 5, Issue 11-12 https://ctc.westpoint.edu/wp-content/uploads/2012/11/CTCSentinel-Vol5Iss11-121.pdf; NL0010349, contribution from SAAR through ARB to al Misfir "for the benefit of propagators in Sierra Leone," February 6, 1999. This was a period of ongoing terrorism and conflict in Sierra Leone. See "Patterns of Global Terrorism," U.S. Department of State, April 2000, for its summary of the ongoing civil war, conflict, kidnappings, and terrorist incidents there at the period of the donation. https://1997-2001.state.gov/global/terrorism/1999report/patterns.pdf; NL0010500, contribution from SAAR through ARB on February 4, 1999 by check to Sheikh Saud bin Mohamed al Awshan, to be sent to the Islamic Endowment Association in the Philippines, with the means not specified. For a description of the Philippines massive terrorism problem in this period, see Patterns of Global Terrorism, id; NL001501, contribution from SAAR through ARB on February 4, 1999 by check to Abdullah Abdel Rahman al Saqir, to be sent to the Dar Al Hijrah Association in the Philippines, with the means not specified; see similar payments and mechanisms for contributions from SAAR through ARB earmarked for Ethiopia, Pakistan, Sudan, at NL0010504, 0506, 0508, 0509 and at NL0010471, NL0010472 and NL0014074.

[589] ARB-00012293, Al-Haramain, 2000 SR, November 3, 2001; ARB-00008414, IIRO, 3000 SR, June 19, 2001.

cash.[590] The auditor's listing of transactions for the account does not provide dates on specific transactions, and mainly refers to "cash deposits," for the sources of funds, and "check withdrawal" to *the* IIRO itself for the uses of the funds.[591]

10.15.7. *Commingling of funds from the Da'Wah Organizations with personal funds, or private business funds.* Failure to keep funds separate, so that they can be properly accounted for and audited, is another red flag for the risk of money laundering and terrorist finance. In my response to Question 7 in this Expert Report, I detailed how the head of Al-Haramain, al-Aqil (later sanctioned by the U.S. and the UN for his sysetmatic abuse of Al-Haramain for supporting terrorism), repeatedly moved funds, even entire accounts, held at ARB, from individual persons to Al-Haramain, and was allowed to do this by ARB. Many documents I have reviewed refer to transactions involving al-Aqil and the Da'Wah Organizations. The documentation is generally so minimal that it would be impossible based on those documents alone to determine what funds sent to and from accounts at ARB by the Da'Wah Organizations or their officers, including to and from the personal accoumts of Da'Wah Organiation officers, were actually used for, and whether diversions, either personal, or to terrorist support, took place. But the commingling of funds that was visible constituted red flags that ARB ignored.

10.15.8. *Publications or speakers of the Da'Wah Organizations expressly supporting military action, raising the question of whether the organizations are providing support for armed confict or terrorism.* The Da'Wah organizations repeatedly took part in statements or activities relating to such support.

10.15.8..1. For example, the MWL Journal, a publication of the MWL, repeatedly called on Muslim states to "rush to the support of the Bosnia people" against the "Serb aggressors," including citing the calls of senior religious officials and and officials at MWL and WAMY for sending "money, arms and prayers."[592]

10.15.8..2. The MWL journal repeatedly featured statements calling for military support for Muslims around the world relating to the need for jihad in Kashmir, citing officials at WAMY as well as the MWL.[593]

10.15.8..3. The MWL and IIRO joined in issuing a Circular calling on their organizations to take action to contact preachers and imams in Saudi Arabia to highlight the efforts of Palestinians participating in the

---

[590] ARB-00001469

[591] ARB-00001148-ARB-00001468. My ability to analyze more fully the information maintained by ARB in its accounts for the Da'Wah Organizations would be enhanced were the defendant to provide all ledgers or summaries produced by Ernst & Young of all the accounts ARB maintained for the Da'Wah Organizations.

[592] See MWL Journal of August-September 1993, pp. 8-18, p. 16, p. 75; MWL Journal, January 1994, pp. 17-20; MWL Journal, September 1995, pp. 26-31

[593] MWL Journal of February-March 1990, pp. 22-24, and September-October 1990, p. 5, also January-February 1991, p 60 and September 1998, pp. 17-21

FBI PROTECTED MATERIAL REDACTED

Second Intifada, and asking them to father donations to go through the IIRO to be used in su[pport of 2nd Intifada participants. As previously mentioned, the 2nd Intifada constituted a period of intensive armed activity by Palestinians directed against Israeli civilians through suicide bombings and other forms of terrorism.[594]

10.15.8..4. The MWL called for Muslims to sacrifice their own lives in Jihad, which is "obligatory on every Muslim," when "the enemy occupues the land of Islam."[595]

10.15.8..5. These and similar statements made by publications and officials of the Da'Wah organizations were red flags which ARB ignored.

10.15.9. *Requests to violate the bank's own compliance procedures designed to provide accountability for funds and to maintain the integrity of the bank's own operations.* I have discussed the repeated transfer of accounts from individuals who were officiers of Al-Haramain to Al-Haramain itself in my response to Question 7, in violation of ARB's own compliance policies. Asking a bank to violate its own policies and procedures in connection with the transfer of funds from one persons name to another's is a classic hallmark of a red flag.

*The Humana Transactions: An Entire Set of Red Flags*

10.16. There was an additional area of a serious set of red flags for ARB, involving the activities of its own founder and chairman, SAAR, and his involvement in structuring transactions involving SAAR's U.S.-components to hide their activities due to concerns about being seen as their facilitation of terrorism. The red flag is serious, because intentionally hiding of transactions due to their being potentially seen as related to terrorism suggests that the transactions could raise suspicions or concerns by third parties, including other banks with whom ARB had correspondent relationships, if information on the transactions was provided in a transparent fashion.

10.17. I characterize this red flag as: "*Activity to hide or disguise transactions or accounts to make them harder to trace, in violation of the intent as well as the substance of banking best practices and international standards.*"

10.18. The 1995 SAMA Guidelines identify this as an additional red flag, not discussed earlier, as follows: "*The employee [of the bank] tries to facilitate rendering of banking services to a customer (individual, company) without applying normal banking procedures*.[596]

10.19. In this case, as I discuss in some detail below, those involved in the transactions were the cofounder and chairman of ARB, SAAR, and the person he personally designated to manage his charitable giving, Abdul Rahman Bin Abdullah al Rajhi, as well as the then-head of his charitable activities in the United States, [REDACTED]. The

[594] IIRO 285616
[595] MWL Journal, September 1998, pp. 5-8, referencing Palestine.
[596] Appendix 2, Section 8(1), SAMA Guidelines, November 1995, id.

FBI PROTECTED MATERIAL REDACTED

activities set forth in the documents raise questions about the integrity of each person and each institution involved in the activity, and constitute serious red flags for money laundering and fraud, as well as possible terrorist finance.

10.20. For context, [redacted] current [redacted][597] [redacted] previously was the head of what the Washington Post characterized in 2002 as "a cluster of companies and charities based in Herndon that was launched in the 1970s by one of Saudi Arabia's leading banking families, the al-Rajhis," in connection with a federal investigation of allegations of terrorist financing involving the use by the al-Rajhis of a number of companies located in Herndon. The article also described him, more simply, as the man who "[took] the helm of the SAAR Foundation in Herndon, whose money he invested to start or gain positions in dozens of firms around the globe."[598]

10.21. The Washington Post article was written following a federal raid on addresses and property associated with [redacted] and a group of companies that had ties to the SAAR Foundation. The background to the raid was described by a federal judge in a subsequent civil case in pertinent part as follows: (internal citations omitted): "Saar Foundation was established as a charity in 1983 and was initially funded by members of the wealthy al-Rajhi family of Saudi Arabia. In 1995, a member of the al-Rajhi family requested the resignation of three Saar board members, who he allegedly believed shared a different vision of Islamic thinking, and promoted [redacted] to become Saar's president. In 1996, Saar came under some scrutiny in the United States about potential ties with radical Islamic groups. Thereafter, Saar began a process of transferring funds to the Humana Charitable Trust, an offshore trust in the Channel Islands, managed by a corporate trustee which was controlled by [redacted] and an attorney who represented the al-Rajhi family. Saar ultimately dissolved in 2000. At all times relevant to this litigation, [redacted] was an officer, director, or managing agent of Mar-Jac or its holding company, Saar, and the Safa Trust. The Safa Trust is a non-profit organization, funded in part by the al-Rajhi family, and was established as an endowment for the International Institute of Islamic Thought. The International Institute of Islamic Thought is an Islamic think tank funded in large part by Safa. Mena Corp was a wholly owned subsidiary of Safa Trust. Id. Roughly from 1984 to 1997 — by way of loans, donations, or other arrangements — millions of dollars flowed between Mar-Jac (and/or its holding companies) and Saar, Safa, Heritage Education Trust, Mena Corp., and/or International Institute of Islamic Thought."[599]

10.22. Prior to the raid, a U.S. Customs official, David Kane, had filed an affidavit with the Eastern District of Virginia to obtain permission for search warrants of the various entities controlled by [redacted] While no criminal cases were ultimately brought against

---

[597] LinkedIn Profile of [redacted]

[598] "Finances Prompted Raids on Muslims," Washington Post, March 24, 2002, https://www.washingtonpost.com/archive/politics/2002/03/24/finances-prompted-raids-on-muslims/d56e1d1f-0854-4af4-9d1d-1ffc94679e19/ [redacted] was not charged with any crime in connection with the investigation of the "cluster of charities," and businesses related to the charities, which included the MWL and the SAAR Foundation Inc. among others. See Kane Affidavit, id.

[599] *Mar-Jac Poultry, Inc. v. Katz*, 773 F. Supp. 2d 103 (D.D.C. 2011)

█████ and the companies he headed or was affiliated with, including the SAAR Foundation U.S., the affidavit describes in concrete specifics many indicia of money laundering and possible terrorist finance, including in pertinent part the following statements by Kane – each one of which describes significant indicators of money laundering:

10.22.1. "I have seen evidence of the transfer of large amounts of funds from the *Safa Group* organizations directly to terrorist-front organizations since the early 1990's. Some of this information was developed by the FBI, the USCS, and the INS, in previous investigations conducted of terrorist financing that focused on *Sami Al-Arian*, who fronted for the *Palestinian Islamic Jihad-Shikaki Faction* ("*PIJ"*), an organization that has been formally designated by the President of the United States as a terrorist organization since 1995. This previous investigation, which resulted in search warrants being executed in Tampa, Florida, in 1995, showed that money was being provided directly to *PIJ* front organizations by individuals controlling the *Safa Group*."[600]

10.22.2. "In 1998, the FBI opened an investigation of the Safa Group's terrorist financing connections as a result of the seizures made in the Al-Arian search warrants in Tampa in 1995. Investigators then noticed that the pattern of direct funding to the PIJ front organizations had hanged since the mid-1990s. By the late 1990's, the finances of the Safa Group, including charities required by law to open their books to the public, exhibited a convoluted web of multiple transactions between related corporations and charities that made it virtually impossible for federal investigators to ascertain where the money that finally left the web of the Safa Group ultimately went. Indeed, the current investigation has traced millions of dollars through layers of related companies and to charities in the Isle of Man – from which point the trail cannot practically be followed."[601]

10.22.3. "The FBI, USCS, and IRS agents involved in this investigation at various times since 1998 suspect that, as a result of the 1995 searches in Tampa, the *Safa Group* engaged in the money laundering tactic of "layering" to hide from law enforcement authorities the trail of its support for terrorists. There appears to be no innocent explanation for the use of layers and layers of transactions between *Safa Group* companies and charities other than to throw law enforcement authorities off the trail; this inference is strengthened by the *Safa Group's* repeated failure to disclose on tax forms as required the connections between various members of the *Safa Group*. Accordingly, I and the other agents involved in this investigation believe that some of the moneys that move overseas are destined to the PIJ and other terrorist organizations; at the least, the

[600] Affidavit of David Kane, *In The Matter Of Searches Involving 555 Grove Street, Herndon, Virginia, And Related Locations,* (EDVA) October 2003, ("Kane Affidavit"), FED-PEC 0001243-1369 p. 7, FED-PEC0001249
[601] Kane Affidavit, id

money is being used for other than tax-exempt purposes in violation of the tax laws.[602]

10.22.4. "Of the contributions to the *Safa Charities* for 1996-2000, the vast majority, over 71.8%, comes from other members of the *Safa Group* of from their principals. Of that support which does not emanate from the *Safa Group* or its principals other 12.2% is reportedly drived from the unindentified contributors labeled "overseas general public."[603]

10.22.5. "Similarly, the pattern of grants and allocatons made does not demonstrate the *Safa Charities* are operating for an exempt purpose. The grants and allocatons made by the *Safa Group* generally go to other members of the *Safa Charities*, or in some instances, other charities within the *Safa Group*. For the years in question 84.4% went to these entities."[604]

10.22.6. In addition, of the $54 million in grants and allocations reported for 1996-2000, $26 million or 49% were transferred to entities in the Isle of Man, $20 million (or 37%) remained within the *Safa Charities*. Of the balance approximately $7.7 [million] went to unidentified donees. Accordingly, I believe the *Safa Charities* are used to shuttle monues between them, blur the trail, and hinder the ability of investigators to ascertain the ultimate disposition of those monies."[605]

10.22.7. [REDACTED] has signatory authority over 27 different bank accounts associated with 15 different organizations of the *Safa Group* [demonstrating their common control] . . .A further example is found in a letter obtained by IRS auditors in 2000 in connection with an audit of *SAAR Foundation*. The letter, dated December 3, 1997, from Humana Charitable Trust, P.O. Box 1297, Herndon, Virginia, was addressed to [REDACTED] of the SAAR Foundatoin. The letter explained that *Humana* was an Isle of Man trust, stated *Humana*'s purchase, and requested [REDACTED] on behalf of SAAR to become a "major sponsor" of *Humana*. The letter was signed "*Amana Limited* Trustee" and bore what appears to be the signature of [REDACTED]. In other words, [REDACTED], on behalf of Amana Limtied, the trustee for Humana, sent a letter to [REDACTED], Director of SAAR, soliciting major donations from *SAAR* to *Humana* in the Isle of Man.[606]

10.22.8. "The vast majority of the funds leaving the circle of the *Safa Charities* is distributed to two Isle of Man entities [Humana Charitable Trusta and York International]. Between 1996 and 2000, approximately $26 million was moved from the *Safa Charities* to *Humana* and *York*. The disposition of funds from these entities is unknown."[607]

---

[602] Kane Affidavit, id, p. 8, FED-PEC0001250
[603] Kane Affidavit, id. pp 44-45, FED-PEC0001286-87
[604] Kane Affidavit, id. p. 45, id
[605] Kane Affidavit, id
[606] Kane Affidavit, pp 46-47, FED-PEC0001288-1289
[607] Kane Affidavit, p. 47, FED-PEC0001289

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

10.22.9. "The movement of funds into entities in the Isle of Man, a known tax haven, makes it difficult to verify whether these funds were used for terrorist finance or some other non-exempt purpose. . . When the IRS attempted through an audit to verify the ultimate disposition of the funds sent to the Isle of Man entities, their efforts were stymied by ▮▮▮▮ . . The auditors never learned of the $5.3 million moved to York International because relatoinships *between SAAR, African Muslim Agency, Safa Trust* and *York Foundation*, were concealed from them.[608]

10.22.10. "I believe that one source of funds flowing through the Safa Group is from the wealthy Al-Rajhi family in Saudi Arabia. The *SAAR Foundation*, a *Safa Charity*, was named after Sulaiman Abdul Aziz *Al-Rajhi (SAAR)*, head of a wealthy Saudi family. Abdullah Sulaiman *Al-Rajhi*, a relative of Sulaiman Abdual Aziz, is one of the directors of the Safa Group corporaton, Aradi, Inc., located at 5555 Grove Street, Herndon, Virginia."

10.22.11. "All of these financial activities listed above are indicator of money laundering. The layering and pass through activities that occur are designed to disguise the origin and ultimate destination of the money. I suspect that moneys ultimately are transferred directly to terrorist organizatoins from the *Safa Group* entities on the Islae of Man, or that funds are otherwise expended for purposes which do not further the *Safa Charities'* exempt purposes(s)."[609]

10.22.12. "▮▮▮▮ told the examining agents that he had founded *Humana Charitable Trust* in the Isle of Man ("*Humana*") and was transferring *SAAR*'s assets to it as a result of negative newspaper publicity that associated *SAAR* and *Safa Trust* with terrorist groups."

10.22.13. "In order to verify that *SAAR*'s grants/allocations were being used for an exempt purpose, the examiners requested a list of donee-beneficiaries that had received grants from *SAAR* and/or *Humana* for the years 1997 and 1998. They contacted those donees located in the United States, who denied having any knowledge of Humana or *SAAR*. ▮▮▮▮ advised the examiners that *Humana*'s funds were distributed to *Al Rajhi* Charities in Saudi Arabia and then to the beneficiaries through *Al-Rajhi*."[610]

10.22.14. Over the duration of the Kane Affidavit, the affidavit specifies alleged false statements made by the various entities on their U.S. tax returns, including by the SAAR Foundation, describes additional red flags for money laundering, and references checks drawn through the Payable Through Account maintained by ARB at Chase Manhattan bank in the name of ARB, with checks being paid not be Al-Rajhi Charity, but from "Abdul Rahman Al-Rajhi," identified as "Vice Chairman & Executive Manager of Al-Rajhi Commercial Foreign Exchange," which I understand to be a predecessor institution that was eventually merged

---

[608] Kane Affidavit, p. 48, FED-PEC0001290
[609] Kane Affidavit, p. 52, FED-PEC0001293
[610] Kane Affidavit, p. 69, FED-PEC-0001305

FBI PROTECTED MATERIAL REDACTED

into ARB.[611] Notably, Kane concludes his discussion of the false statements encountered by the U.S. investigators, the indicators of money laundering in the transactions, the involvement of ARB and related persons, with this statement: "There is no innocent reason which accounts for these additional financial transactions connected with these disbursements."[612]

10.23. As indicated by these excerpts from the Kane Affidavit, U.S. investigative agencies found numerous indicators or red flags of possible money laundering and terrorist finance associated with the SAAR Foundation activities in the United States, which required further investigation at a level that to them justified obtaining a search warrant from a federal judge to enable them to review records maintained at the SAAR Foundation's Herndon offices, and the offices of the related charities headed by [REDACTED] The statements in the Kane Affidavit appear to be based on facts found over the course of investigations undertaken by four federal law enforcement agencies. They are also consistent with the similar findings by the CIA in this period about ARB's terrorist finance activities. And they provide further evidence demonstrating that information available to ARB and its officials regarding the same set of companies and their activities prior to the 9/11 attacks constituted a set of red flags.

10.24. Documents produced in discovery involving SAAR personally and other ARB officials shed further lights on the issues raised in the Kane Affidavit, based on the contemporaneous communications of those involved, and provide some corroboration for the statements made by Kane.These documents bear the prefix "NL," which I understand reflect the initials of a U.S. attorney who represented [REDACTED] and related entities in connection with this case, and other civil cases involving [REDACTED], his associates, and his constellation of businesses and charities, including the SAAR Foundation's U.S. offices in Herndon.[613]

10.25. My analysis on this issue begins with a set of documents from the NL material obtained from [REDACTED] and his related entities that relate to communications between [REDACTED] in connection with a charity he headed, the "Humana Charitable Trust" ("Humana"), and the two senior officials at ARB: SAAR himself and his son, Abdullah Sulaiman Al Rajhi, who later succeeded SAAR as head of ARB and remains its current chairman. Materially, these documents state the following:

10.25.1. A November 29, 1999 email which states it is "From: Abdullah Sulaiman Al Rajhi" – now the head of ARB -- to [REDACTED]" The email states: "Dear [REDACTED], Asslamu Alaykum, On your fax machine you are going to receive a letter dated October 18, 99 duly signed by Sh. Sulaiman along with a-three-page list of the grants (in Arabic.) Regards, Busha Ahmed."[614]

10.25.2. A single-page document with a fax marking of 29 Nov 1999 9:49, No. 578, dated October 18, 1999, addressed to "[REDACTED], Humana Charitable

[611] Kane Affidavit, pp 72-73, FED-PEC0001308-1309
[612] Kane Affidavit, p. 74, FED-PEC0001310
[613] Kane Affidavit, id.
[614] NL 0015578

FBI PROTECTED MATERIAL REDACTED

Trust, 555 Grove Street, Suite 110, Herdon VA 20170 (U.S.A.)." The document states "Assalamu Alaikum, During my visit in July 1998 I had explained to you and Dr. M. Jaghlit that a committee has been set up to receive requests from various charities located throughout the world and then to review, investigate and decide if a charitable contribution will be made. As we discussed and agreed during your visit in December 198 that Humana Charitable Trust will join in and pay part of these contributions. Attached is the list of grants made and paid by me to various entities sent for reimbursement for your part of the contribution. Should you need additional information on any of the recipientes, let me know. Yours, Sulaiman A. Al-Saleh [signature below]."[615] The full name of SAAR is Sulaiman Bin Abdul Aziz Bin Saleh Al Rajhi. From the context, I assume this email was sent by or authorized to be sent under his name, by him.[616]

10.25.3. A three page document with a fax marking of 29 Nov 1999 9:49, No. 578, in Arabic (with English language translations provided to me), with the caption "Foreign and Domestic Aid for the Year 1419-1420 (1998-9199 AD). The documents list 100 transactions, predominantly by check, with some undertaken by "transfer by telex," and others by am unspecified form of "transfer," to beneficiaries all over the world on dates prior to October 18, 1999, with all but one taking place in 1999 and the other on August 13, 1999. The transactions are all listed as being in Saudi riyals, and amount to many millions in total.[617]

10.25.4. The donations specify the beneficiaries, and the names listed for the beneficiaries appear to be Islamic charities, schools, associations, and cultural centers, located in some 20 countries, including Bahrain, Cambodia, Colombia, Ethiopia, Eritrea, Germany, India, Indonesia, Kenya, Kosovo, Kuwait, Morocco, Pakistan, the Philippines, Sudan, Tanzania, Thailand, the United Kingdom, the United States, and Zambia. They also include donations to three of other Da'Wah Organizations discussed in this Expert Report: Al-Haramain, MWL, and WAMY. Seventeen of the transaction specified on the list contain amounts of the donations and beneficiaries, but do not specify a check number or other method by which the funds were transferred, do not specify the date of the listed donation. The beneficiaries of the undated donations that contained no method of payment included Al-Haramain, MWL, and WAMY.[618]

10.25.5. I have been provided one "NL" document, from the documents produced by [redacted] and related entities, which is unsigned, and dated December 28, 2000, with fax markings as showing the date of 12/27/20000, 2158, to a phone number of 184547247, with the name "Mazoor Qureshi," and an identifier as part of the

[615] NL 0015043

[616] This full name is set forth in the English language profile of SAAR provided on the SAAR Foundation's current website as follows: "The pioneer of the foundation, Sulaiman Bin Abdul Aziz Bin Saleh Al Rajhi, was born in 1929 A.D. He was raised in a poor family and in difficult living conditions," "About Founder," https://rf.org.sa/en/main-page/541

[617] NL 0015044-15046

[618] Id

FBI PROTECTED MATERIAL REDACTED

fax markings at the top of the document showing it as Page 04. The bottom of the page shows it to be "2", or what I assume is page two, of this particular document.[619]

10.25.6. This document contains typed information, with handwritten edits and additions to the document, and lists it as having been "Prepared by" [REDACTED], [REDACTED], with a signature line for him, which is not signed, above the December 28, 2000 date.[620]

10.25.7. The typed portions of the document stated the following, which given the importance of the information to the question of whether ARB ignored red flags, I provide verbatim. I then describe the handwritten changes to the document, and then analyze the implication of both the typed information and the handwritten edits and additions:

*The Typewritten Document Without Edits*

10.25.7..1. "The donors became very concerned about linked to terrorist activities, of course with which they had nothing to do. A question was asked, "why do we want to continue to be in U.S.A.?" The trustees then decided to "re-locate" its operations. After seeking appropriate legal advice, steps were taken to create Human Chairtable Trust on 12th day of November 1997 as an Isle of Man trust. Saar Foundation then made a charitable contribution of assets to Human to be used solely for charitable purposes. Dr. Cherif Sedky, which lives in Saudi Arabia and [REDACTED] who lives in U.S.A. became the trustees of Humana."[621]

10.25.7..2. "Shaikh Sulaiman during his visit to U.S.A. in July 1998 made the suggestion to the trustees that to optimize the grant makng process we should consider working with the Charity office already in existence rather than setting up a new office. The offer was welcome because banks in Europe were not very cooperative in writing a lot of checks, and also because the committee overseeing the Charity office in Riyadh has the set up to receive requests from various charities located throughout the world and then to review, investigate, and decide if a charitable contribution will be made."[622]

10.25.7..3. "Currently the Charity office is managed by Abdul Rahman Bin Abdullah Al Rajhi, Saleh Bin Sulaiman Al-Hadbad and Abudalla I. Al-Misfer. In accordance with the established practice of the Charity office, as explained in the third paragraph of this statement, the checks are processed without showing the contributor's name.

[619] NL 0009625
[620] Id
[621] Id
[622] Id

These are processed by Al Rajhi Banking and Investment Corporation, having its account with Chase Manhattan and other correspondent banks."[623]

*The Edits to the Document and Additional Language*

10.25.7..4. The edits to the document are to the last sentence of paragraph 1 of the page, the first sentence of paragraph 2 of the page, and the last sentence of paragraph 3 of the page.

10.25.7..5. The change to paragraph 1 is to add that Sedky and [REDACTED] became "the directors of Amana Ltd which serve as the trustees of Humana," therefore noting the existence of a corporate body acting as the "trustees" rather than the individuals.[624]

10.25.7..6. The change to paragraph 2 would change it to read as follows: "During his visit to USA July 1998, a suggestion was made to the trustees that to optimize the grant making process we should consider working with the Charity office already in existence rather than setting up a new office."[625]

10.25.7..7. The change to paragraph 3 specifies that the donations processed by Al Rajhi Banking and Investment Corporation (that is, ARB), are processed by ARB "Riyadh Saudi Arabia, having its account with Chase Manhattan and other correspondent banks."[626]

10.25.7..8. The additional handwritten language on the page states the following: "The list of charitable contributions made by the charity office which have been provided to you shows a distributent [sic] of US $10,886,412 whereas Humana contributed US $7,572,700.[627]

10.26. While at least three pages of the document faxed on December 27, 2000 to a fax machine under [REDACTED] control and relating to his businesss are missing, and no signed copy of the document has been produced, the outlines of what is taking place, and the reasons for it, are evident from the four pages of documents produced in the NL discovery from [REDACTED] and his related charities and businesses. In essence, the first three documents show SAAR and his son and future successor as head of ARB instructing [REDACTED] to take responsibity

[623] Id

[624] Id. I have seen minimal documentation on "Amana Ltd," and in the absence of further information, assume it was a shell holding company, without any actual business operations of its own. Placing responsibility in the name of a shell is one technique that financial criminals use to protect themselves from legal risk. I have found references to "Amana Limited" in the Kane Affidavit, which shows the company to have been an Isle of Man company controlled by [REDACTED] FED-PEC0001337

[625] Id

[626] Id

[627] Id

for and authorize payments that had already been made by SAAR and the SAAR Foundation in Saudi Arabia to various charities around the world.

10.27. The fourth document provides the reason for this unusual and irregular mechanism to retroactively characterize the payments as coming from Humana when they had at the time already been made by SAAR and the SAAR Foundation through one or more accounts of ARB, including ARB correspondent accounts at international banks such as "Chase Manhattan." The reason is stated directly: the "donors," which prominently included SAAR himself and the SAAR Foundation, had become "very concerned being linked to terrorist activities." To avoid detection, the "trustees then decided to 'relocate'" the operations of the charity or charities they were trustees for, and therefore created "Humana Charitable Trust" in the Isle of Man to make it harder for anyone to tie the donations to the underlying donor.

10.28. The Isle of Man was known as a bank secrecy location in the late 1990's. When I was serving as the Deputy Assistant Secretary of State for International Law Enforcement, I personally discussed with senior British officials, including a Home Minister in the Blair government, about the need to change Isle of Man laws so that it was no longer a place that enabled wrongdoers to hide their money from foreign authorities. The memo acknowledges this point: The Isle of Man was not a true "re-location" of the business of the charities associated with SAAR which were using ARB to move their funds. Humana Charitable Trust in the Isle of Man and Amana Ltd, its supposed parent, were fronts, designed to use the Isle of Man's bank secrecy laws to enable the donors (SAAR) and the charitable officials (█████ and associates) to conceal what they were doing.

10.29. The documents also lay out a scheme in which the donations would be characterized fraudulently as coming from Humana, when Humana had nothing whatsoever to do with them, was not aware of them until months after they had been made, and indeed, had no information on some of the beneficiaries even after reporting information on the donations to U.S. federal tax authorities.

10.30. Important context for this correspondence is the fact that during this very period, U.S. officials from multiple law enforcement agencies had begun prior to the 9/11 attacks to investigate █████, the Herndon offices of the SAAR Foundation, and related entities controlled by █████, for a range of possible federal offenses. The Kane affidavit describes how the FBI, U.S. Customs Service ("Customs"), and the Immigration and Naturalization Service ("INS"), and ultimately the Internal Revenue Service ("IRS"), were all investigating █████, the SAAR Foundation and related entities, because there were a host of red flags present in their activities, including for terrorist finance, prior to the 9/11 attacks. The Kane Affidavit provides the details of the multiple red flags present in these transactions. The quoted material is from the Kane Affidavit. The material outside the quotes is present as a "Comment," which are my explanations of why the conduct described is a particular "red flag" for possible money laundering or terrorist finance:

10.30.1. "I am investigating a criminal conspiracy to provide material support to terrorist organizations by a group of Middle Eastern nationals living in Northern Virginia. These individuals operate or have operated over 100 different

organizations, on which they commonly serve as corporate officers. These organizations include charitable organizations, educational and cultural organizations, for-profit businesses and investment firms. For the purpose of this affidavit, this group of individuals and the organizations that they operate will be referred to as the "*Safa Group*."[628]

> 10.30.1..1.  *Comment:* The SAMA Guidelines state that "Opening of more than one account by a customer in his name in the same bank without a clear reason, and existence of inter account transfer among these accounts," is an indicator of money laundering risk for bank accounts. In my experience, the creation of multiple organizations under the control of a small group of people, is a risk factor for money laundering, if it also involves movements of funds from account to account, as is described in the Kane Affidavit.[629]

10.30.2.  "Many organizations in the *Safa Group* dissolve and are replaced by other organizations under the control of the same individuals. Most of these *Safa Group* organizations, which present themselves as Islamic educational and charitable organizations, are "paper" organizations that are registered at common addresses, but have no apparent physical presence on the premises. The majority of these organizations is or was located at 555 Grove Street, Herndon, Virginia." [630]

> 10.30.2..1.  *Comment:* This material provides two red flags. It provides further evidence of an indicator under SAMA Guidelines Appendix 2, (3)1, and the existence of shell companies without a physical presence is a classic mechanism for laundering money, and was known as a risk factor prior to the 9/11 attacks.

10.30.3.  "I have seen evidence of the transfer of large amounts of funds from the *Safa Group* organizations directly to terrorist-front organizations since the early 1990's. Some of this information was developed by the FBI, the USCS, and the INS, in previous investigations conducted of terrorist financing that focused on Sami Al-Arian, who fronted for the Palestinian Islamic Jihad-Shikaki Faction ("PIJ"), an organization that has been formally designated by the President of the United States as a terrorist organization since 1995. This previous investigation, which resulted in search warrants being executed in Tampa, Florida, in 1995, showed that money was being provided directly to PIJ front organizations by individuals controlling the *Safa Group*."[631]

> 10.30.3..1.  *Comment:* Movements of funds connected to terrorist groups is an obvious indicator of terrorist finance risk.

---

[628] Kane Affidavit, id, p. 6, FED-PEC0001248
[629] SAMA Guidelines, id, Appendix 2, Section 3(1), "Indicators for Bank Accounts."
[630] Kane Affidavit, id, p. 7, FED-PEC0001249
[631] Kane Affidavit, id

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

10.30.4. "In 1998, the FBI opened an investigation of the *Safa Group's* terrorist financing connections as a result of the seizures made in the Al-Arian search warrants in Tampa in 1995. Investigators then noticed that the pattern of direct funding to the PIJ front organizations had changed since the mid-1990s. By the late 1990's, the finances of the Safa Group, including charities required by law to open their books to the public, exhibited a convoluted web of multiple transactions between related corporations and charities that made it virtually impossible for federal investigators to ascertain where the money that finally left the web of the Safa Group ultimately went. Indeed, the current investigation has traced millions of dollars through layers of related companies and to charities in the Isle of Man – from which point the trail cannot practically be followed." [632]

    10.30.4..1. *Comment:* As previously stated, these are classic money laundering indicators, regardless of whether they are involved with terrorist finance. Appendix 1 of the SAMA Guidance expressly warns of the risk of money laundering through the use of countries with "strict and complete banking secrecy in respect of its banking system, thus hindering other concerned authorities from discovering money laundering transactions."[633]

    10.30.4..2. *Comment:* Having the same officers engaged in common control of a number of companies, some of which are commercial entities, such of which are non-profits, and some of which are non-profit charities, provides the opportunity for non-arms length transactions to disguise possible improper conduct; it is another risk factor for money laundering and terrorist finance.

10.30.5. "The FBI, USCS, and IRS agents involved in this investigation at various times since 1998 suspect that, as a result of the 1995 searches in Tampa, the Safa Group engaged in the money laundering tactic of "layering" to hide from law enforcement authorities the trail of its support for terrorists. There appears to be no innocent explanation for the use of layers and layers of transactions between Safa Group companies and charities other than to throw law enforcement authorities off the trail; this inference is strengthened by the Safa Group's repeated failure to disclose on tax forms as required the connections between various members of the Safa Group. Accordingly, I and the other agents involved in this investigation believe that some of the moneys that move overseas are destined to the PIJ and other terrorist organizations; at the least, the money is being used for other than tax-exempt purposes in violation of the tax laws."[634]

---

[632] Kane Affidavit, id. pp 7-8, FED-PEC0001249-1250
[633] SAMA Guidelines, Appendix 1, Examples of Weaknesses in Procedures in a Banking System that Encourage Money Laundering
[634] Kane Affidavit, id, p. 8, FED-PEC0001250

**FBI PROTECTED MATERIAL REDACTED**

10.30.5..1. *Comment:* Layering is one of the three classic elements of money laundering, as set forth in Section 2.2 of the SAMA Guidelines, which describe it as a method by which a criminal " aims to cover up the source of the funds obtained and disguises the relation between these funds and its illegal source through a series of normal commercial .transactions. I note that in the Kane Affidavit, there are also descriptions of the process of "Integration," when laundered funds become part of other legal funds in the economy so that it is difficult to differentiate between the laundered funds and those from legal sources." The SAMA Guidelines in Section 2.3 note that another important element of money laundering involves "internal collusion of bank employees," as appears present here, as set forth in the ███ documents I have cited.[635]

10.31. The entire constellation of conduct described in the NL documents I have cited, with its emphasis on keeping the names of the donors hidden, the use of a bank secrecy haven, the Isle of Man, to counter the risk of detection given concerns about "terrorist finance," and the structure of the SAAR Foundation-related businesses, NGOs, and charities in the United States all constitute indicators or red flags for money laundering and terrorist finance risk.

10.32. These risk factors were highlighted are excerbated by the reference to the "donors" being concerned about being linked to terrorist finance as of July 1998, as set forth in the fax from SAAR to ███ of October 18, 1999, and the account set forth in the draft ███ explanation of ther structuring of the charitable account of Humana "re-located" to the Isle of Man, is consistent with the SAAR Foundation having been notified about the federal investigations which involved federal searches in Florida. The timing suggests that concern about these ongoing federal investigation was the factor that initiated the move of the transactions off-shore to a bank secrecy haven to protect them from official scrutiny by United States authorities.

10.32.1. One document from the NL group, dated October 31, 2000, and captioned "IRS Request," showed that Abdullah S. Al Rajhi, the son of the founder and the current head of ARB, was aware of at least the IRS investigation prior to the ███ document expressing the "donors" concerns about being linked to terrorist finance. In this document, ███ emailed Al Rajhi at his ARB email address – asalrajhi@alrajhibank.com.sa, regarding an IRS request for certain basic evidence to help prove Humana made the charitable donations it evidently told the IRS it had made. In the letter, ███ stated that "[t]he IRS has come back asking the address and contact information for the following organizations whom Human has given contributions. We went through the material sent to us from Riyadh but these are not there."[636]

---

[635] SAMA Guidance, id, Sections 2.2 and 2.3 and NL 0015578NL0015043, NL 001544, NL0015045, NL 0015046, NL009625
[636] NL 0015572

10.32.2. Seven of the nine organizations listed as the "organizations to which Human has given contributions" were U.S.-based, except for one: WAMY, in the amount of 338,500 SRs (about $85,000). One other donation was listed by [REDACTED] as made to unspecified "Universities and Science Institutes," on an unspecified date or dates and in an unspecified amount or amounts.[637]

10.32.3. Even though the donations supposedly made by Humana were mostly to U.S.-based entities, the email from [REDACTED] suggested [REDACTED] knew nothing about the substance of the donations, or the identities of the individuals who received them on behalf of the organizations. On the last category of beneficiaries, [REDACTED] did not know even the names of the organizations. Accordingly, he asked Abduallah Al Rajhi to "list the universities and science institutions to whom donations have been made" – supposedly by Humana, but of which, as reflected in the [REDACTED] email, Humana had no actual knowledge.[638]

10.32.4. [REDACTED] also stated to Abdullah al Rajhi, "Kindly treat this as an urgent request. We only have a few days to respond," meaning, to the IRS, which as evidenced in the Kane Affidavit, was actively investigating [REDACTED] charities at the time in connection with the federal terrorist finance investigation. [639]

10.32.5. The document provided further evidence that the charitable "donations" being made by Humana out of the United States, and thus within the purview of the IRS, were not actually made by Humana, but directed by the Al Rajhi family operating out of ARB in Riyadh. Consistent with the scheme laid out in the December 27/28, 2000 [REDACTED] document,[640] the donations were actually donations that had been made by in Riyadh by the al Rajhis, and [REDACTED] now required the assistance of Abdullah al Rajhi at ARB to provide the IRS information regarding the beneficiaries of donations that [REDACTED] had represented were made by Humana.

10.32.6. In showing the awareness of the Abdullah al Rajhi of the IRS investigation, the document provided evidence that SAAR, his son Abdullah, and those working with them, knowingly decided to enter into the scheme to hide the actual source of the donations, SAAR and/or the SAAR Foundation or ARB in Saudi Arabia purportedly made by Humana, from U.S. authorities.

10.33. Based on all the information I have reviewed regarding SAAR, the SAAR Foundation, Humana, and the related entities controlled by [REDACTED], I conclude that the reference to "donors" by [REDACTED] in his December 27/28, 2000 document," was a reference to SAAR himself. SAAR was the principal donor, not only to the specified Da'Wah Organizations, but to the charities he asked Humana and [REDACTED] to "contribute to."

[637] Id
[638] Id
[639] NL 0015572 and Kane Affidavit, id
[640] NL 0009625

10.34. At the time, federal law enforcement authorities were already aware that SAAR and/or the SAAR Foundation had been funding some of the businesses and activities of the [REDACTED]-headed charities. The SAAR Foundation's U.S. associates were within the scope of a multi-agency federal investigation into their financial activities. Moreover, SAAR was himself the head of the bank that was being used in connection with at least some (and based on the record available to me, probably all) of the international transactions involving Humana and of the donations of the SAAR Foundation in Saudi Arabia.[641]

10.35. Thus, the "red flag" in this situation was one involving apparent "internal collusion" from the top – one of the most serious of all red flags, a red flag that raises fundamental questions about the integrity of the entire institution when it comes to the problematic banking activity. This red flag is also consistent with the later findings of the CIA, namely that ARB was a "Conduit for Extremist Finance" in a report which expressly noted that SAAR had directed members of the board of ARB "to explore financial instrument that would allow the bank's charitable contributions to avoid official Saudi scrutiny."[642]

10.36. Further evidence that is consistent with, and supports, the assessments I have made above was provided in the September 27, 2023 testimony of Abdullah al-Rajhi, who verified the following facts:

10.36.1. SAAR started the SAAR Foundation in the United States to carry out charitable activities.[643]

10.36.2. SAAR was the major contributor to the SAAR Foundation.[644]

10.36.3. There was "negative news" about the SAAR Foundation prior to the 9/11 attacks, which SAAR's decision to close the SAAR Foundation in the United States.[645]

10.36.4. The "negative news" was "about the money being disbursed maybe went to wrong entities, which is – could be suspicious of terrorists or something like this."[646]

10.36.5. SAAR became concerned about his reputation and "didn't want to expose his reputation and his charity, you know, for any potential – and then he decide – and then he decided to focus on the charity here. . . and so the decision – the final decision of [SAAR] did not accept the suggestion of going to Isle of Man and instead it gets back to Saudi."[647]

10.37. This testimony from Abdullah al-Rajhi, with the exception of this statement about the Isle of Man, is consistent with the documentary evidence, which shows that those

[641] Kane Affidavit, id, p. 50, Paragraph 117, FED-PEC0001292
[642] CIA-SUB_0005, CIA-SUB001-0006 overall
[643] September 27, 2023 Deposition of Abdullah al Rajhi, p. 294
[644] Id, p. 295
[645] Id, p. 296-298
[646] Id.
[647] Id, p. 299-300

FBI PROTECTED MATERIAL REDACTED

participating in the decision to move the "Humana Charitable Trust" to the Isle of Man did so for the purpose expressed in the ████ document of avoiding "being linked to terrorist activities." It also helped to make their transactions difficult to trace. Those participating in this structuring of the donations also acted to document their decision making, while changing the text to have it avoid stating, as it did in the original, that the entire structure was dictated by the principal donor to the SAAR Foundation, the head of ARB, "Sheikh Sulaiman," with the support of his son Abdullah, ARB's current head, as reflected in NL 0015578. That structure included requiring ████ and his charities to state after-the-fact that they had authorized charitable donations which in reality they had not made, and had nothing to do with. Adopting this non-transparent structure made it easier for ARB to use its correspondent banking relationships for charitable donations on behalf of its donors. It also was designed to be in accord with the SAAR Foundation's "established practice," of ensuring that "the checks are processed without showing the contributor's name."[648]

10.38. I assess Abdullah al-Rajhi's testimony that his father SAAR did not accept the suggestion of going to the Isle of Man to be inconsistent with the documentary record.

10.39. Abdullah al-Rajhi also acknowledged in his deposition that from the beginning of the SAAR Foundation's existence in the United States, "there was this concern about – privacy and security," and for that reason, on the annual reports for SAAR, beginning in 1991, al-Rajhi family members who were listed as its principal officers and directors, including Abdullah al-Rajhi himself, were listed on public reports without their last names, made as a conscious decision by the family to maintain their "privacy and security."[649] He further acknowledged that the address listed for SAAR and for himself in Herndon, Virginia reflected an address that neither of them had ever lived in, or used as an office.[650]

10.40. Abdullah al-Rajhi further testified that there was an agreement that Humana would reimburse SAAR's charity office (that is, the SAAR Foundation in Saudi Arabia), for portions of the charitable donations SAAR made in 1998 and 1999, as reflected in the three-page list of contributions in that period to charities in the Phillipines, Kuwait, Indonesia, the United States, and Colombia on a document shown to Abdullah al-Rajhi. In his deposition, Abdullah al-Rajhi acknowledged that normally the SAAR Foundation in Saudi Arabia, which he referred to as "the charity office" made such payments through ARB.[651]

10.40.1. I assess Abdullah al-Rajhi's testimony on these points to be consistent with the documentary evidence, which showed that for donations made by SAAR in 2008-2009, SAAR was using his U.S. operations to create documentation showing payments that were not actually made by the purported U.S. (or Isle of Man) donors, but which were actually being made in Saudi Arabia through

[648] NL 0009625
[649] Id, pp. 311-313
[650] Id, pp. 314-315
[651] Id, pp. 320-321, September 27, 2023 Abdullah al-Rajhi Deposition, Exhibit ARB 22. Exhibit ARB 22 includes NL 0015578 and NL0015043-5056.

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

ARB, under an account listed as the SAAR Foundation, at a time when no such entity existed under Saudi law.

10.41.  In practice, the approach of structuring transactions to avoid scrutiny by the U.S.entities working with SAAR and the SAAR Foundation was effective, successfully impeding investigations by U.S. officials into whether Humana, the SAAR Foundation and related entities located in Herndon Virginia known as the "Safa Group" were involved in terrorist finance. As stated in 2003 in the Kane Affidavit, "By the late 1990's, the finances of the Safa Group, including charities required by law to open their books to the public, exhibited a convoluted web of multiple transactions between related corporations and charities that made it virtually impossible for federal investigators to ascertain where the money that finally left the web of the Safa Group ultimately went. Indeed, the current investigation has traced millions of dollars through layers of related companies and to charities in the Isle of Man – from which point the trail cannot practically be followed."[652]

*A Further Red Flag – ARB's Use of Its Chase Manhattan Account to Make Anonymous Donations and as a Payable Through Account*

10.42.  Accounts in which a foreign bank uses a domestic bank as a checking account for the customers of the foreign bank have long been known as "Payable Through Accounts." For decades, Payable Through Accounts have been of serious concern for money laundering and terrorist finance due to the ability of those using them to circumvent the KYC obligations that domestic banks would otherwise have to apply to those customers.

10.43.  U.S. bank regulators have a specific definition of the term: "The term payable-through account means a correspondent account maintained by a U.S. financial institution for a foreign financial institution by means of which the foreign financial institution permits its customers to engage, either directly or through a subaccount, in banking activities usual in connection with the business of banking in the United States."[653]

10.44.  The principal source of regulatory guidance for U.S. financial institutions, the Federal Financial Institution Examination Council ("FFIEC") current guidance explains the risks of Payable Through Accounts ("PTAs") in the context of money laundering and terrorist finance as follows: "PTAs may be prone to higher risk because U.S. banks do not typically implement the same due diligence requirements for PTAs that they require of domestic customers who want to open checking and other accounts. For example, some U.S. banks merely request a copy of signature cards completed by the payable through customers (the customer of the foreign financial institution). These U.S. banks then process thousands of sub-accountholder checks and other transactions, including currency deposits, through the foreign financial institution's PTA. In most cases, little or no independent effort is expended to obtain or confirm information about the individual and business subaccountholders that use the PTAs. Foreign financial institutions' use of PTAs, coupled with inadequate oversight by U.S. banks, may facilitate unsound banking

---

[652] Kane Affidavit, id,  Executive Summary, Paragraph 4, p. 8
[653] 31 CFR § 561.307 - Payable-through account

**FBI PROTECTED MATERIAL REDACTED**

practices, including money laundering and related criminal activities. The potential for facilitating money laundering or terrorist financing, OFAC violations, and other serious crimes increases when a U.S. bank is unable to identify and adequately understand the transactions of the ultimate users (all or most of whom are outside of the United States) of its account with a foreign correspondent. PTAs used for illegal purposes can cause banks serious financial losses in criminal and civil fines and penalties, seizure or forfeiture of collateral, and reputation damage."[654]

10.45.   A second source of guidance, the Federal Deposit Insurance Corporation ("FDIC"), which examines FDIC-insured banks, goes into further depth about the risks of Payable Through Accounts. "Unless a U.S. banking entity is able to identify adequately, and understand the transactions of the ultimate users of the foreign bank's account maintained at the U.S. banking entity, there is a potential for serious illegal conduct. Because of the possibility of illicit activities being conducted through PTAs at U.S. banking entities, financial institution regulators believe it is inconsistent with the principles of safe and sound banking for U.S. banking entities to offer PTA services without developing and maintaining policies and procedures designed to guard against the possible improper or illegal use of PTA facilities."[655]

10.46.   The use of Payable Through Accounts as a way of avoiding regulatory oversight was a well-known strategy for money laundering when I was working in the U.S. government in the 1990's because it enabled foreign banks to use their correspondent banking relationships with U.S. banks to provide services to their customers without having to those customers subject to U.S. money laundering controls.

10.47.   Prior to the 9/11 attacks, ARB maintained a Payable Through Account at the Chase Manhattan Bank in New York, which it used to make donations, as if on its own behalf, fulfilling the statement made in the December 27-28 ████ document: "In accordance with the established practice of the Charity office, as explained in the third paragraph of this statement, the checks are processed without showing the contributor's name. These are processed by Al Rajhi Banking and Investment Corporation, having its account with Chase Manhattan and other correspondent banks."[656]

10.48.   The NL documents available to me document a number of payments on an ARB account at the Chase Manhattan bank which identify the payor as ARB, not any customer of ARB such as Humana, the SAAR Foundation, or SAAR himself. These payments are to a range of institutions and persons, and the instructions on at lest some of the payments state that they actually represent donations from SAAR personally, although consistent

[654] "Risks Associated With Money Laundering And Terrorist Financing, Payable Through Accounts—Overview," Guidance, Federal Financial Institution Examination Council,"
https://bsaaml.ffiec.gov/manual/RisksAssociatedWithMoneyLaunderingAndTerroristFinancing/04
[655] "Bank Secrecy Act, Anti-Money Laundering, And Office Of Foreign Assets Control, FDIC Manual of Examination Policies,  https://www.fdic.gov/regulations/safety/manual/section8-1.pdf
[656]NR 0009625

with "the established practice of the Charity office," he is never identified as the donor on the checks.[657]

10.49. The NL documents available to me also document payments apparently made by others on the same account, in the classic manner of a Payable Through Account. These persons included the manager of the SAAR Foundation, Abdul Rahman Al Rajhi, who is listed on some of the checks, although other information on the documents show that the payments were made by SAAR personally. [658] Notably, some of these payments went to beneficiaries in other countries, such as Kenya, Pakistan, and the Philippines, which as I have previously identified, were areas of terrorist finance risk in the 1990's, and areas in which al Qaeda and bin Ladin had been active.

10.49.1. These payments reflected classic red flags of risk – from their structuring through a Payable Through Account relationship by ARB, to the concealment of the donors, through to the locations of the recipients in high-risk areas.

*Use of ARB Payable Through Account at Chase Manhattan Bank to Transmit Funds to a Person Who Provided Support to Two 9/11 Terrorist Hijackers – A Further Serious Red Flag*

10.50. The risks of terrorist finance abuse for these red flag transactions undertaken through the ARB Payable Through Account at Chase Manhattan in New York were not merely generic, but reflected actual risk. As I have detailed in my answer to Question 5, regarding ARB's unique relationships with jihadists and al Qaeda affiliated persons and entities before September 11, 2001, there proved to be a direct link of the use of ARB's Payable Through Account to two of the terrorist hijackers who participated in the 9/11 attacks through al-Baymoui. In 2001, al-Bayoumi was acting as an intelligence agent of the Saudi government. Whether or not he was witting of the 9/11 terrorist plot, the evidence shows that al-Bayoumi provided assistance to two of the 9/11 terrorist hijackers and had other possible terrorist associations. Without any due diligence being carried out by anyone regarding whether financial services to al-Bayoumi might carry terrorist finance risks, or other questions, al-Baymoumi was able to be the beneficiary of the use of ARB's Payable Through Account at Chase Manhattan Bank in New York, providing a textbook example of why the use of Payable Through Accounts is a red flag for terrorist finance and criminal risk.

10.50.1. In this case, the risk was not just theoretical; the Payable Through Account was used to benefit a person who assisted the 9/11 terrorist hijackers in a structure blessed, arranged, and personally used for other transactions (that is, not related to Bayoumi) by the founder and head of ARB.

10.51. Based on the documents I have reviewed, and all of the information known to me, prior to the 9/11 attacks, all of the indicators of risk and red flags for money laundering and

[657] NL0010447, NL0010455, NL0010456, NL001057, NL-0010458, NL0010462, NL10464, NL10466, NL10467, NL0010470, NL0010471, NL0010472, NL0010473, NL0010474, NL0010475, NL0010483, NL0010485, NL0010491

[658] NL0010447, NL0010455, NL0010457, NL0010462

FBI PROTECTED MATERIAL REDACTED

terrorist finance, and the risks associated with them, which I have detailed, were ignored by ARB.

**11. Question 9: Is there evidence that al Qaeda received support and benefited from the accounts ARB maintained for Al-Haramain, MWL, IIRO, WAMY, and the SAAR Foundation before September 11, 2001?  If so, what was the nature of that support and when was it provided and how was ARB involved in providing it?**

*Is there Evidence al Qaeda Benefitted from Accounts at ARB Maintained for the Da'Wah Organizations?*

11.1.   Yes, there is evidence that al Qaeda received support and benefited from the accounts ARB maintained for the Da'Wah Organizations before the 9/11 attacks. I have highlighted many examples of that evidence in my responses to Questions 4, 5, 6, 7, and 8 of this Expert Report (Section 6, Section 7, Section 8, Section 9 and Section 10 of this Expert Report), and accordingly, will not recapitulate all of the specific data points and the citations covering those data points in my response here. Instead, I will do my best to summarize the evidence I have detailed, at length, over the course of this Expert Report, and hereby incorporate all of it by reference to the statements I am making in response to Question 9, with limited additional citations for my conclusions here to avoid repetition.

11.2.   The evidence documents that ARB maintained 94 accounts for Al-Haramain and 287 accounts for IIRO in the five year period of January 1, 1998-December 31, 2002 for which documentation has been provided. More than five billion Saudi riyals moved into and out of these accounts– some $660 million annually, amounting to more than $130 million per year in 2000 dollars, equivalent to about $230 million per year in 2023 dollars.[659] Beginning in the late 1980's, al Qaeda received support and benefited from branches of IIRO that based on the evidence, were likely receiving funds from accounts maintained by IIRO at ARB.[660] Al Qaeda's support from Al-Haramain was systemic. The CIA found that at least twenty of Al-Haramain's field offices were used to provide logistical, organizational, and financial support to al Qeda amd other extremist groups.[661] Examples of such support before the 9/11 attacks including Al-Haramain offices in Albania, Azerbaijan, and Kenya hiring as employees persons who were simultaneously receiving funds from and/or acting on behalf of Bin Ladin.[662]

---

[659] Exhibits 31, September 27, 2023 Deposition of Abdullah bin Sulaiman al Rajhi, Plaintiff's Summary Spreadsheet of Al-Haramain Islamic Foundation Accounts at ARB; Exhibit 32 (ARB 32), September 2,7 2023 Deposition of Abduallah bin Sulaiman al rajhi, Plaintiff's Summary Spreadsheet of International Islamic Relief Organization Accounts at ARB.

[660] See e.g. CIA_000220-0221, CIA__000149, ARB-00006179, ARB-00010726. The period for discovery of ARB documents does not include the period when Bin Ladin's brother-in-law, Muhammad Jalal Khalifa, was reported to be recruiting Muslims for training in Pakistan as mujahidin fighters and using the IIRO's offices in Manila to support World Trade Center Ramzi Yousef's efforts to blow up international civilian aircraft. The ARB documents cited merely show, without any internal dates, evidence of the IIRO sending funds to the Philippines at times not specified in the documents.

[661] CIA_000150

[662] CIA_000819

FBI PROTECTED MATERIAL REDACTED

11.3. The evidence documents that ARB also maintained 116 accounts for WAMY from 1992-2002, holding amounts for WAMY that I cannot estimate, due to documents not being provided to me showing the deposits and withdrawals on the WAMY accounts.[663]

11.3.1. In its January 11, 1999 report on Bin Ladin's Saudi financial ties, the CIA found that WAMY had offices worldwide and was "funded by donations from wealthy Saudi merchants and prominent businesses, such as the Al Rajhi Banking Corporation."[664] I find this statement significant. Typically, the CIA reports referencing ARB or the Al Rajhi family refer only to support for al Qaeda or other terrorist groups as coming from members of the Al Rajhi family, rather stating explicitly that ARB itself as a business and a corporation is funding an activity.

11.3.2. The same report states that WAMY's then chairman, Abdalla Al-Muhaidib, was a supporter of Bin Ladin; that WAMY had "long been alleged to be a financier of Islamic extremists."[665]

11.4. The evidence also documents that ARB handled some twenty individual and joint accounts belonging to SAAR Foundation officials Abdul Rahman Al Rajhi, Saleh al Habdan, and Abdullal al Miser, which had 187,181,580.14 SR in deposits and 174,974,641.36 SR in withdrawals over the five year period of January 1, 1998-December 31, 2002, for which documentation has been provided, as well as another 5 million SR in deposits and more than 7 million SR in withdrawals during the period through an account maintained in the name of the SAAR Foundation itself.[666]

11.5. In addition, the evidence documents that ARB provided accounts to senior Al Harmain officials, including al-Aqil, who was sanctioned by the UN and the United States for his role in providing various kinds of support to al Qaeda, and his colleague, Mansour al Kadi, which enabled them to move an additional 89 million SR in deposits and 88 milllion SR in withdrawals from ARB accounts during the five year period – amounting

---

[663] Declaration of Omar T. Mohammedi Pursuant to Opinion and Order, (MDL ECF No. 4465); Exhibit 19 (MDL ECF No. 4465-19)

[664] CIA_000826

[665] CIA_000827

[666] Plaintiffs' Summary Spreadsheet of Al Rajhi Bank Customer Account Transactions (ARB Tranche 21), including eight accounts of Abdel Rahman Abdullah Abdel Rahman al Rajhi, numbered SA[redacted]6727; SA[redacted]6031; SA[redacted]5527; SA[redacted]3776; SA[redacted]7104; SA[redacted]9704; SA[redacted]0642; SA[redacted]9704 (with different Bates numbers and withdrawal figures from the other account with that number, also with a different, narrower time period); three accounts for Saleh al Habdan (jointly held with Abdel Rahman Abdullah al Rajhi), SA[redacted]6507; SA[redacted]6705; SA[redacted]9704; one account held by "Abdel Rahman Abdullah al Rajhi Saleh Soliman," SA[redacted]6014; one account held by Abdel Rahman Mohamed al Aqil and Abdullah al Misfer, SA[redacted]7554; and seven accounts held by al Misfir alone: SA[redacted]8331; SA[redacted]8015; SA[redacted]8937; SA[redacted]8937; SA[redacted]9126; SA[redacted]0167; SA[redacted]6221,

to approximately another $23.5 million, or about $4.9 million per year, while Al-Haramain was providing support to al Qaeda.[667]

11.6. The evidence documents that ARB did not adhere to its own policies and procedures in handling these accounts, and did not inquire about the actual uses of the accounts. Its records, in the form provided through the discovery process, do not disclose the actual uses of the funds it maintained for the Da'Wah Organizations.

11.7. I am mindful of the evidence set forth in the Galloway Deposition by Galloway's testimony that ARB has been audited and that ARB has found no evidence that it was used to support terrorist activity. I am also mindful of this statement by the CIA in its assessment of al Qaeda's donors and fundraiswers: "Donors generally channel money intended for terrorist-related activities through middlemen – including nongovernmental organizations (NGOs), mosques, fundraisers, and businessmen – rather than giving the funds directly to Bin Ladin or other senior al-Qa'ida members. This practice hides the donors' role and allows them to deny knowing funds went to terrorists."[668]

11.7.1. Based on all of the evidence I have reviewed in connection with this case, including the material I have cited in this Expert Report and in my previous Expert Reports in related cases arising out of the 9/11 attacks, I find the CIA's assessment to accurately portray the reason that one does not see direct references to support for al Qaeda or terrorism in bank statements and correspondence, even when such support is taking place on an ongoing basis.

11.7.2. I refer here, again, to the express statements made in the Mirza documents, confirming that to address concerns about terrorist funding on the part of banks, it would be the practice of a U.S.-based entity, Humana, receiving funds from the SAAR Foundation to move its activities to a bank-secrecy offshore haven, the Isle of Man, and additionally, the SAAR Foundation would continue its practice of *not disclosing its donors,* by ensuring that *"checks are processed without showing the contributor's name.*" I further note that this intent on the part of those party to the structuring of the donations was accompanied by stating that ***hiding the donor's name was "[i]n accordance with the established practice of the Charity office*** " [emphasis added] for transactions being handled by ARB. [669]

11.7.3. Thus, the Da'Wah Organizations were providing extensive support to al Qaeda while deposting, maintaining, and receiving very large sums in accounts at ARB, amounting to at more than $130 million a year during the period for

[667] Plaintiffs' Summary Spreadsheet of Al Rajhi Bank Customer Account Transactions (ARB Tranche 21), six accounts held by Aqil al Aqil, SA[redacted]3412; SA[redacted]5920; Sa[redacted]5997; SA[redacted]1001; SA[redacted]2588; SA[redacted]3412; six accounts held by Mansour al Qadi, SA[redacted]0917; SA[redacted]8359; SA[redacted]9102; SA[redacted]0209; SA[redacted]8507, and SA[redacted]0159.
[668] CIA_000195
[669] NL 0009625

FBI PROTECTED MATERIAL REDACTED

which documents have been produced by ARB, including for transactions in the countries in which the Da'Wah Organizations were carrying out that support. Under such circumstances, and taking into consideration the explanation provided in the [redacted] document which expressly states that it was ARB's practice not to show the donor's name. I find there is corroboration within materials produced for the CIA's assessment: those involved with financing al Qaeda and terrorism, including the members of the Al Rajhi family, did their best to hide the paper trail to make it possible to connect all of the dots.

11.7.4. The minimalist nature of ARB's documentation of the uses of its $530 million in deposits and withdrawals for two of the Da'Wah Organizations reflects these realities. One important requirement of being able to provide financial support to al Qaeda was to maintain secrecy and to go about it through mechanisms that foreign governments would find difficult to detect, to penetrate, and to shut-down with sanctions, criminal cases, and/or political pressure forcing countries to change their regimes to shut-it down. Despite the efforts undertaken by those involved in terrorist finance to maintain secrecy, ultimately the CIA and other U.S. government agencies, as well as multinational forces such as SFOR, and other governments such as those in the Philippines, were able to penetrate and obtain evidence of some of ARB's support for al Qaeda. The data points in ARB documents which remain provide evidence of the extensive support the Da'Wah Organizations provided to al Qaeda, and of the essential services that ARB provided to the Da'Wah Organizations as they helped al Qaeda. These acts collectively helped to enable al Qaeda to build its global capacity over many years and to attack the United States and U.S. interests, from the 1st World Trade Center bombing in 1993, to the Embassy Bombings in Kenya and Tanzania in 1998, and in the many other terrorist activities I have reviewed and discussed in this Expert Report.

*What was the Nature of That Support and When Was it Provided and How was ARB Providing it?*

11.8. The evidence documents that ARB provided support to the Da'Wah Organizations prior to the 9/11 attacks beginning with its support of the Mujahedin in Afghanistan and Pakistan by the late 1980's, funding al Qaeda's precursor organization, the MAK, working with people who were working at the time for MWL and IIRO. Based on the evidence, it continued such support to Da'Wah Organizations working not only in the Afghanistan/Pakistan region, but during the 1990's in other regions with al Qaeda and al Qaeda affiliates, including but not limited to Albania, Bangladesh, Bosnia, Chechnya, Egypt, Ethiopia, Indonesia, Kenya, Kosovo, Pakistan, the Philippines, Sudan, Tanzania, while al Qaeda and persons associated with it were planning and in some instances, successfully executing, terrorist attacks directed against the United States, prior to the 9/11 attacks. The support included:

11.8.1. *Enabling their ability to collect funds from donors to the Da'Wah Organizations to send from Saudi Arabia to other countries, without undertaking any due diligence on the uses of those funds.*

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

11.8.2.    *Maintaining accounts for the Da'Wah Organizations to enable them to accumulate hundreds of millions of dollars over the five year period covered by discovery, and likely amounting to billions of dollars over the course of the banking relationships, which were then available for use by the Da'Wah Organizations as they provided support to al Qaeda to recruit, transport, and train fighters, to provide them cover for their involvement in armed conflict and terrorism through receiving identity documents from the Da'Wah Organization; and to fund military and terrorist operations, in incidents I have detailed throughout this Expert Report, which included attacks on the United States prior to the 9/11 attacks.*

11.8.3.    *Approving the control and direction of accounts for Da'Wah Organizations held at ARB by persons who were actively involved in providing support to al Qaeda.* These persons included:

11.8.3..1.    **Al-Aqil at Al-Haramain**, who controlled and directed some 94 accounts at ARB for Al-Haramain, serving, according to the Treasury Department, as its Chairman, Director General and President. In sanctioning al-Aqil as a SDGT, the Treasury Department found that he controlled and directed Al-Haramain and was responsible for all of its activities, "including its support for terrorism. In the words of the Treasury Department, Al-Haramain was "one of the principal Islamic NGOs providing support for the al Qaida network and promoting militant Islamic doctrine worldwide. Under Al Aqil's leadership of AHF [Al-Haramain], numerous AHF field offices and representatives operating throughout Africa, Asia, Europe and North America appeared to be providing financial and material support to the al Qaida network."[670] While never inquiring into the ultimate beneficiaries of the funds or how they would actually be used, ARB knew generally the regions and sometimes countries where these funds were going. Al Aqil provided this baseline information.[671] Beyond that, there is not evidence that ARB sought further information, even as al-Aqil was "providing funds to offies with terrorist ties in ways that will avoid foreign government scrutiny, such as using personal bank accounts."[672] The amounts that flowed through al-Aqil's personal accounts at ARB involved many millions a year. Over the five year period covered by the discovery in this case, five ARB accounts maintained under al-Aqil's name had more than 41 million SRs in deposits and withdrawals, or more than $11 million in total and thus more than $2 million per year just for his

---

[670] "Additional Al-Haramain Branches, Former Leader Designated by Treasury as Al Qaida Supporters Treasury Marks Latest Action in Joint Designation with Saudi Arabia," Treasury Department, id
[671] ARB-00038534-8535
[672] CIA-SUB_0008

**FBI PROTECTED MATERIAL REDACTED**

own account, leaving aside that of official officials at Al-Haramain, such as Mansour al Kadi, who had personal accounts at ARB.[673]

11.8.3..2. *Abdul Hamid bin Sulaiman bin Muhammed al Mujil at IIRO*. As stated by the Treasury Department when designating him as a SDGT for his support of al Qaeda and his use of IIRO funds to do so: "Abd Al Hamid Sulaiman Al-Mujil (Al-Mujil) is the Executive Director of the IIRO Eastern Province (IIRO-EP) branch office in the Kingdom of Saudi Arabia. Al-Mujil has been called the "million dollar man" for supporting Islamic militant groups. Al-Mujil provided donor funds directly to al Qaida and is identified as a major fundraiser for the Abu Sayyaf Group (ASG) and Jemaah Islamiyah (JI). Both ASG and JI are al Qaida-associated terrorist groups in Southeast Asia designated pursuant to the authorities of E.O. 13224. These terrorist groups are also on the United Nations 1267 Committee's consolidated list of individuals and entities associated with the Taliban, al Qaida and/or Usama Bin Ladin. In 2004, Al-Mujil invited a Philippines-based JI supporter to Saudi Arabia under the cover of traveling for the hajj (the Muslim pilgrimage), and planned to provide him with cash to carry back to the Philippines to support organizations including JI. Al-Mujil was also present in Afghanistan in the late 1990s and personally knew Usama Bin Ladin and deceased al Qaida co-founder Abdallah Azzam. Al-Mujil traveled continuously to meet with members of Bin Ladin's organization in Arab countries. In the 1990s, Al-Mujil established a relationship with senior al Qaida operational planner Khalid Shaykh Muhammad. Al-Mujil has a long history of providing support to terrorist organizations.[674]

11.8.4. *Supporting the Da'Wah Organizations when they were helping "finance the Bosnian Mujahhdin, HAMAS, and other extremists,"[675] who in turn worked with and helped to build al Qaeda.* For example, as the CIA concluded in a report based on information available as of November 20, 1997, ARB "apparently has been a conduit for funding the Mujahaddin since the early 1990s," while "a Sheikh Rajhi" deposited [amount redacted] into [redacted] bank accounts held by the director of Maktab-ul Khedamat (MK) and another NGO."[676]

11.8.5. *Transferring funds from the SAAR Foundation to the other Da'Wah Organizations while they were engaged in providing support to al Qaeda.*

[673] ARB Account No SA[redacted] 3412, ARB-00031454-ARB-00041463; ARB Account No SA[redacted] 5920, AR-00041464-ARB-00041501; SA[redacted] 5997, ARB-00041502-ARB-00041503; SA[redacted] 10001, ARB-00041504-ARB-00041505; SA[redacted] 2588, ARB 00041506-ARB-00041507

[674] "Treasury Designates Director, Branches of Charity Bankrolling Al Qaida Network," August 3, 2006, id

[675] CIA_000723

[676] CIA_00743

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

11.8.6. *Providing services by providing bank accounts and credit cards to individuals associated with the Da'Wah Organizations as they engaged in supporting al Qaeda, such as Wa'el Hamza Julaidan, al-Buthe, and al-Bayoumi.*

11.8.6..1.    Julaidan headed another NGO, the Rabita Trust, that was designated for sanctions by the United States and the UN. He was among the founders of MAK in Afghanistan. In designating Julaidan, the Treasury Department described him as "an associate of Usama bin Ladin, stating that "Julaidan fought with bin Laden in Afghanistan in the 1980s. Julaidan is also associated with several individuals and entities linked to al-Qa'ida, including bin Ladin lieutenants, Ayman al-Zawahri, Abu Zubaida, and Mohammed Atef; and the organizations: Makhtab al Khedmat, the Rabita Trust, and al-Gam'a al-Islamiya. These individuals and entities have been previously designated under President Bush's Executive Order and by the United Nations. Bin Laden himself acknowledged his close ties to Julaidan during a 1999 interview with al-Jazeera TV. When referring to the assassination of al-Qa'ida co-founder Abdullah Azzam, bin Ladin stated that 'We were all in one boat, as is known to you, including our brother, Wa'el Julaidan.' Julaidan has established contacts with several known Arab Islamic extremists, including bin Ladin's principal lieutenant, Ayman al-Zawahri. Another bin Ladin lieutenant, Abu Zubaida, claimed that he accompanied Julaidan from Pakistan to Kandahar, Afghanistan during the summer of 2000. Zubaida said that Julaidan met with bin Ladin and senior bin Ladin lieutenant Mohammed Atef soon after arriving in Kandahar. In February 2000, Julaidan was appointed to the Board of Trustees of the Rabita Trust and served as its Director General. The Rabita Trust is an NGO designated under President Bush's Executive Order as an organization that provided logistical and financial support to al-Qa'ida."[677] ARB records document that it provided Julaidan with accounts going back to 1988, in Pakistan with Bin Laden and other founders of al Qaeda, the very period in which he was working with MAK, and continued through at least 2000.[678] ARB also provided Julaidan with a credit card.[679] The Rabita Trust was jointly established by the MWL, which provided much of the funding for it from the outset.[680] Thus, ARB provide services to Julaidan while Julaidan was helping to build al Qaeda for an organization founded by the MWL, the Rabita Trust, that was itself

---

[677] "Treasury Department Statement on the Designation of Wa'el Hamza Julidan," September 6, 2002, id
[678] ARB-0001183-1216
[679] ARB-0001191-1192
[680] The founding document for the Rabita Trust, and MWL's role in establishing "financial responsibility" for its early activities, is set forth in "Background information about the Rabita Trust," at http://www.statelesspeopleinbangladesh.net/rabita_trust_deed.php

**FBI PROTECTED MATERIAL REDACTED**

directly engaged in providing financial support and services to what became al Qaeda.

11.8.7. *Helping donors to al Qaeda hide their support of al Qaeda, through laundering it through the Da'Wah Organizations with minimal documentation regarding the uses of the funds, so that it would be very hard for anyone to prove that the donors had used ARB to fund al Qaeda, terrorism, and extremism.* This included ARB enabling the use of cash couriers in particular cases and countries, making the actual uses of the cash in the field impossible to trace.[681]

11.8.8. *Providing accounts to MWL sponsored organizations, such as IIRO and SJRC, enabling these Da'Wah Organizations to collect, maintain, and transfer funds in support of terrorism, even as the MWL itself was being "apparently" used as a cover organization for bin Ladin associates.*[682]

11.8.9. *Providing accounts to Al-Haramain for its operations in Europe and Africa, which the Stabilization Force in the former Yugoslavia concluded, based on documents found in raids on the Al-Haramain offices in Croatia, had employees in Albania, Bosnia, Croatia, and Kosovo supporting al Qaeda.* The CIA also found that Al-Haramain had former personnel who helped coordinate involvement in the 1998 U.S. Embassy bombing in Tanzania, and which took steps in its Kosovo offices immediately after the 9/11 attacks to destroy all documents that could link Al-Haramain to extremist or terrorist activities.[683] ARB maintained accounts for Da'Wah Organizations designated for funds for Kosovo.[684] Here, I find it material that ARB officials directly coordinated with Al-Haramain officials to establish Al-Haramain's activities relating to Kosovo in 1999, recommending that it be undertaken throughestablishing an office in Macedonia.[685]

11.9. Prior to the 9/11 attacks, the CIA determined that Bin Laden and al Qaeda made "extensive use" of the Da'Wah Organizations. Those it listed as the organizations used by al Qaeda included Al-Haramain, IIRO, the SJRC, each demonstrated by the documents to be ARB customers, and the MAK, which the CIA found to be supported by ARB's founder and head, SAAR. The CIA, in noting SAAR's support for the MAK, a Da'Wah Organization it described as "closely associated with Usama Bin Ladin since the 1980s,"[686] and which the U.S. Treasury has characterized as a precursor of al Qaeda, [687] and which the UN stated was absorbed by Bin Ladin into al Qaeda[688] after the car

[681] CIA-SUB_0001 and _0004; CIA_000744
[682] CIA_000823
[683] CIA-SUB_0007-0019
[684] ARB-00037997-37816
[685] NL0010244-0245
[686] CIA_000325, CIA_000338
[687] "Treasury Designates Global Network, Senior Officials of IARA for Supporting bin Laden, Others," October 13, 2004, https://home.treasury.gov/news/press-releases/js2025
[688] UN 1287 Sanctions Listing of Makhtab Al-Khidamat, https://www.un.org/securitycouncil/sanctions/1267/aq_sanctions_list/summaries/entity/makhtab-al-khidamat

bombing of its cofounder, Abdullah Azzam, in November 1989 following disagreements between Azzam and Bin Ladin.[689]

11.10. The CIA was also able to determine that funds were flowing from Saudi Arabia through the Da'Wah Organizations to that were then used to benefit terrorists, implicitly including al Qaeda:

11.10.1. "We estimate since the mid-1990s several tens of millions of dollars a year has flowed to terrorists from a variety of sources in the Kingdom. Most of the money originates from welthy individuals, fundraisers who solicit smaller donations, and diversions from non-governmental organizations (NGOs); a portion of the funding is derived from legitimate religious contributions."[690]

11.10.2. *Comment:* This finding by the CIA identifies the period as of the mid-1990's when "several million a year" flowed to terrorists from wealthy individuals and NGOs. The identities are specified in the section of the CIA report with the caption "**Major Donors**." The "Major Donors" include the Al Rajhi family, customers of ARB, the Da'Wah Organizations, and those controlling the Da'Wah Organizations including several individuals and two Da'Wah Organizations whose offices were later placed on U.S. and UN sanctions lists.

11.10.3. "Money that originates in the Kingdom is disersed to al-Qa'ida members operating in Pakistan and Afghanistan, as well as Yemen, Iran, and other countires where operatives have relocated following the loss of Afghanistan as a safehaven."[691]

11.10.4. "**Major Donors**. We have identified several wealthy Saudi individuals and families we suspect of supporting the al-Qa'ida network." The CIA then listed as the major ones Yasin al-Qadi, Wa'il Hamza Julaydan, Muhammed Jamal Khalifa, Sheikh Adel Batterjee, the Bin Mahfouz Family, and the Al Rajhi family.[692] It then listed NGOs "on which Bin Ladin has exerted influence, and which were implicated in providing support to terrorism to include Al-Haramain, MWL, IIRO and WAMY, as well as the entity spawned from the MWL, the SJRC in Kosovo and Chechnya, which it identified as run by Wa'il Julaydan, as well as Lajnar al-Birr al-Islami, or the Islamic Charity Committee,[693] which the UN found raised funds for fighters in Afghanistan and provided cover and immigration assistance to fighters traveling in and out of Pakistan.[694]

---

[689] *Ghost Wars*, Steve Coll, Penguin Books, 2004, p. 204
[690] CIA_000144
[691] Id
[692] CIA_000148-149
[693] CIA_000150-151
[694] "Benevolence International Foundation," UN 1267 Al Qaeda Sanctions Committee: "The Benevolence International Foundation was listed on 21 November 2002 pursuant to paragraphs 1 and 2 of resolution 1390 (2002) as being associated with Al-Qaida, Usama bin Laden or the Taliban for "participating in the financing, planning, facilitating, preparing or perpetrating of acts or activities by, in conjunction with, under the name of, on behalf or in

FBI PROTECTED MATERIAL REDACTED

11.11. The evidence documents that many of these "major donors," including both the individuals and the NGOs, banked at ARB and carried out transactions at ARB. The available documentation suggests that this was undertaken through mechanisms consistent with the findings of the CIA: taking out funds in cash or in poorly documented fashion, in some cases stating that it would be going overseas. ARB records provide evidence that those described as major donors by the CIA who relied on ARB as their bank included Yasin al-Qadi, Wa'il Hamza Julaydan, Adel Batterjee (for the charity he used to help bin Ladin and al Qaeda, Al Birr Islamic Committee), and the Al Rajhi family – who also controlled ARB since its inception and were its major shareholders, and all of the Da'Wah Organizations, each of which also had ongoing relationships and connections to the Al Rajhi's, as I have described over the course of this Expert Report.[695]

11.12. The evidence documents that the support these ARB customers and al Qaeda donors provided included support by Batterjee for the first World Trade Center attack mastermind, Ramzi Yousef.[696] Notably, ARB itself moved money to a person, Al-Bayoumi, who provided support to two of the suicide bombers in the 9/11 attacks.[697]

11.13. The evidence documents that the support provided to al Qaeda by the Da'Wah Organizations who were ARB's customers and account holders, involving the substantial sums deposited, held, and withdrawn from ARB accounts which I have described, included such services as "providing terrorists with funding and cover employment, documentation, and training," as the CIA described the work of the IIRO in the field,[698] as well as "funding and logistical support to [Ramzi] Yousef and his associates in 1995 as they plotted to bomb at least 12 US airlines in East Asia."[699]

11.14. To sum up, ARB was the "Extremists Bank of Choice," the description of the bank's brand chosen by the CIA to describe its support for al Qaeda and other terrorist groups, because ARB provided them with essentially everything they could hope for in a bank.[700] It began this role early, when SAAR funded Bin Ladin's initial NGO, MAK, in the late 1980s. By the mid-1990s, extremists had concluded that it was the bank of choice, and directed their operatives to use it in Afghanistan, Indonesia, Pakistan, Saudi Arabia, Turkey, and Yemen,[701] among other locations.

---

support of", "supplying, selling or transferring arms and related materiel to" or "otherwise supporting acts or activities of" Usama bin Laden and Al-Qaida (QDe.004)." https://www.un.org/securitycouncil/sanctions/1267/aq_sanctions_list/summaries/entity/benevolence-international-foundation

[695] I note the concern expressed by SAMA about ARB's handling of the accounts for the charity created by and controlled by Batterjee - the Al Birr Islamic Committee, otherwise known as Lajnat al Birr al-Islamyi. As notes of a meeting with SAMA and banks, including ARB, provided in the ARB discovery state: "We authorized Al Rajhi to open one account; they opened many accounts." ARB-00039583

[696] CIA_000198

[697] ARB-00013750/ARB-00013748, ARB-00013763/ARB-00013761, ARB-00013764/ARB-00013762, ARB-00013769/ARB-00013767

[698] CIA_000213

[699] CIA_000216

[700] CIA-SUB_0003

[701] Id

FBI PROTECTED MATERIAL REDACTED

11.14.1. According to the CIA, two factors that caused extremists to choose ARB were that ARB's Islamic banking principles appealed to them and it was one of the few Saudi banks that had branches in outlying areas of the country, as well as correspondent connections to bank accounts in remote locations abroad.[702] The CIA also assessed that security concerns and personal relationships were key factors in al Qaeda's selection of banks. Additional reasons why al Qaeda and other extremists selected ARB as their bank identified by the CIA was that unlike most banks, ARB used couriers to move funds, in cash.[703] Such payments appear to have been in some cases by giving checks to people such as Abdullah bin Ibrahim al Misfer, who was working for Al-Haramain, earmarked for people in countries in which ARB had no license to operate, or to officials at WAMY checks "to be cashed out at all our branches in Saudi Arabia," earmarked for such donations outside of Saudi Arabia.[704] This is an effective way to launder money and hide terrorist finance, which is why it is an important red flag of potential terrorist finance, as I have discussed earlier in this Expert Report. Thus, for terrorists, it is a preferable mechanism to transfer funds from a bank to activities that otherwise would risk drawing attention due to their possible connection to supporting terrorists.

11.14.2. Also, as of the late 1980's, members of the Al Rajhi family had funded jihadists and al Qaeda affiliated persons and entities.[705]

11.14.3. Also, as reflected in the materials produced in discovery, despite the 1995 SAMA Guidelines, which its formal policies incorporated, ARB did not carry out due diligence on the activities of the Da'Wah Orgnaizations, and facilitated transactions, including account openings, with minimal documentation, that at most consisted of asking Saudi authorities whether it was permissible to open an account, and then undertaking no further checks. (In some instances, ARB did not even carry out that step, based on the documents provided.) In at least one case, relating to a purported charity found to have engaged in support al Qaeda, Lajnat, the evidence suggests that ARB's regulator, SAMA, complained that ARB had permission to open one account and then inappropriately used that permission to open "many."[706] This problem may have extended to Al-Haramain and IIRO as well.

11.14.4. Also, ARB was handing hundreds of accounts for Da'Wah Organizations, and its staff did not ask questions about what they were doing around the world, or if they did, document that any questions were asked. Instead, ARB's approach was to be helpful to a number of al Qaeda's most important financiers, such as al-Aqil, and Yasin al-Qadi, as well as to their NGOs.

---

[702] Id

[703] CIA-SUB_0004 and 0009

[704] NL0010348, NL0010349, NL0010465

[705] CIA-SUB_0001-0006 and CIA000743-000744, CIA_000783, CIA_000830-831

[706] ARB-00039583

FBI PROTECTED MATERIAL REDACTED

11.14.5. Also, ARB facilitated donations by the Al Rajhi family to the Da'Wah organizations and organizations allied with them or created from them, such as the SJRC.[707]

11.14.6. Also, ARB recognized the principle that it was important to the donors that their names not be shown on transactions, and it built that principle into its own donations, as reflected in the evidence provided in the [REDACTED] documents.[708]

11.14.7. Ideological alignment – convenience – services in cash – global reach – generous with donations from its own senior officials – no questions asked – willingness to hide transactions from prying foreign eyes. These are the elements that would constitute a useful shopping list for a terrorist seeking a bank. ARB and ARB's senior management provided them all. And as demonstrated in the evidence considered and detailed in this report, and reflected in the CIA's entitled its report on ARB "Conduit for Terrorist Finance," ARB welcomed providing an array of banking services to those who were helping al Qaeda. And al Qaeda's financial helpers were essential to making it possible for the organization constructed by bin Ladin to undertake the 9/11 attacks.

**12. Has ARB produced evidence showing that individual transactions it carried out for Al-Haramain, MWL, IIRO, WAMY, and the SAAR Foundation before September 11, 2001 were earmarked for "use in specific schemes or attacks not directed at the United States?"**

12.1. After the 9/11 attacks, the CIA concluded that ARB "has been a conduit for funds for Islamic extremists and for the September 11 hijackers," and thus was used in specific schemes or attacks *directed* at the United States.[709]

12.2. The CIA reports I have cited extensively within this Expert Report, and the other evidence I have reviewed, provide extensive evidence that ARB's accounts for the Da'Wah Organizations were used to support terrorism, including terrorism carried out by Aal Qaeda against the United States and U.S. interests, as documented by the materials I have cited in footnotes throughout this Expert Report.

12.3. However, I have not see evidence in the material produced by ARB showing that individual transactions it carried out for the Da'Wah Organizations before the 9/11 attacks were earmarked for use in specific schemes or attacks *not directed at the United States.*

12.4. I have seen evidence in the material that ARB knowingly conducted transactions intended for the support of those involved in the Palestinian 2nd Intifada in Israel, which involved ongoing attacks, including suicide bombings, targetting Israelis and foreigners in Israel,

[707] ARB00037998-38015
[708] NL 0015044-5047, NL 0009625
[709] CIA_000149

FBI PROTECTED MATERIAL REDACTED

SUBJECT TO MDL AND FBI PROTECTIVE ORDERS

including Americans.[710] As discussed earlier in this Expert Report, these transactions totalled 12,364,332.45 SRs in withdrawals made for "Martyrs and Orphans" by the IIRO in its ARB account labeled as being for that purpose, over a two-year period at the time of the 2nd Intifada.

12.4.1. For the purpose of answering this question, and in the absence of being provided any audit relating to this ARB account or other evidence on this point, I will assume that those funds actually went to Palestinian families of those engaged in the 2nd Intifada. Based on that assumption, the transactions would have supported families of some people, characterized as "martyrs" who participated in the violence and terrorism of the 2nd Intifada, which led to the murder of U.S. citizens as well as of Israelis and other non-U.S. persons.

12.4.2. However, this evidence does not show that the funds in any individual transactions that ARB carried out to assist those engaged in the 2nd Intifada were *earmarked for use in specific schemes or attacks* such as those carried out by terrorists in Israel which killed Israelis and other non-U.S. persons in addition to the U.S. persons killed in some of the attacks which took place in the 2nd Intifada.

12.4.3. Consistent with this view of the documents and testimony I have reviewed, I know of no evidence that *individual transactions* ARB carried out for the Da'Wah Organizations were *earmarked for specific schemes or attacks* not directed at the United States. To the contrary, individual transactions at ARB carried out for the Da'Wah Organizations were, as I have discussed, minimally documented with regards to their specific uses for any particular purpose other than generic ones such as "charity." The evidence shows that when such transactions were in any way "earmarked" they were ordinarily earmarked in more general terms, such as being for "martyrs" in Palestine, or for "orphans"in Kosovo, or in a few cases, for projects detailed for such purposes as "Quran memorization" and "health clinics," for funds to be spent in Asia; "book printing," "animal sacrifices and vows," "orphans' sponsorship" for funds to be spent in Africa; and "book printing," "Sharia Hijab; ""Albania," "Bosnia," "Kosovo" and "orphans' sponsorship to be spent in Europe," with no further information provided in the materials avaiable to me about the actual use of particular funds.[711] The exceptions, which I have discussed elsewhere in this Expert Report, involved the identification of a particular beneficiary for the funds from the Da'Wah Organizations, such as a specific charity or religious propagator, with the purpose designated as being for

---

[710] A few ARB documents reference payments for "jihad" or "jihadists" in another location (Afghanistan) or refer to the term "jihad" in a payment with no specifics, such as where the funds would be used.

[711] I have not seen audits of any transaction of ARB, which might provide information on what level of detail is contained in ARB documents involving the Da'Wah Organizations beyond those produced under the discovery process that have been made available to me. The most specific of the ARB documents that I have been seen have been documents which reference payments from ARB to agents of Al-Haramain such as al-Misfer, with payments made to him that are characterized as being on behalf of "Brother Ahmed Taha," NL0010327; or "propagator Qassim Mohamed from Mali, NL0010348, or unidentified "propagators in Sierra Leone," NL0010349. In the absence of further evidence regarding such transactions, in practice the payments could have gone to anyone, for anything, as documentation on their actual uses is absent, although the documentation does show that such payments were issued in 1999 by the Al Rabwah Branch of ARB.

FBI PROTECTED MATERIAL REDACTED

"propagators," in Africa, for example, or to take care of orphans, as in Kosovo, for example.[712]

12.4.4. I have taken into account the CIA's findings about the Al Rajhi family having "moved to conceal their activities from financial regulatory authorities."[713] Consistent with that finding by the CIA, which was based on the evidence that it had from all of its sources, I would not expect ARB to produce evidence that accounts it maintained for the Da'Wah Organizations were used in "specific schemes or attacks" by terrorists, either for attacks directed at the United States, or for attacks not directed at the United States. On the basis of the information available to me to date and that I have reviewed, I have seen no evidence produced by ARB documenting that ARB funds were earmarked for "particular schemes or attacks."

***

[712] ARB-00038116, NL 0010347-0348
[713] CIA-SUB_0002

FBI PROTECTED MATERIAL REDACTED

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

I also certify under penalty of perjury that the contents of the material I provide in Appendix 1 (reliance materials) and Appendix II, which provides my experience and qualifications, CV, publications, and lists my expert witness service from 2019 to the present, to be true and correct.

Dated: October 4, 2023

Jonathan M. Winer

FBI PROTECTED MATERIAL REDACTED

***In Re Terrorist Attacks on September 11, 2001*** **(03 MDL 1570) (GBD) (SN)**

**APPENDIX 1 - EXPERT REPORT OF JONATHAN M. WINER (OCTOBER 4, 2023)**

| LISTING OF RELIANCE MATERIALS AND MATERIALS CONSIDERED | |
|---|---|
| **No.** | **Description** |
| 1. | First Amended Complaint, *The Underwriting Members of Lloyd's Syndicates 2, et al. v. Al Rajhi Bank, et al.*, Case No. 1:16-cv-07853-GBD-SN (S.D.N.Y.) (May 22, 2017). |
| 2. | CIA_000038-000052 – *Al-Qa'ida in Sudan, 1992-96: Old School Ties Lead Down Dangerous Paths [REDACTED]* (March 10, 2003). |
| 3. | CIA_000143-000158 – *Saudi-Based Financial Support for Terrorist Organizations [REDACTED]* (November 14, 2002). |
| 4. | CIA_000193-000199 – *Identifying Al-Qa'ida's Donors and Fundraisers: A Status Report [REDACTED]* (February 27, 2002 ). |
| 5. | CIA_000210-000236 – Intelligence Report, DCI Counterterrorist Center: *Islamic Terrorists: Using Nongovernmental Organizations Extensively* (April 9, 1999). |
| 6. | CIA_000306-000315 – *Terrorism Finance: Custodial Interviews Providing Leads into Al-Qa'ida Financial Network* (August 7, 2002). |
| 7. | CIA_000317-000338 – *Usama Bin Ladin's Finances: Some Estimates of Wealth, Income and Expenditures [REDACTED]* (November 17, 1998). |
| 8. | CIA_000720-000804 – Intelligence Report, Office of Transnational Issues: *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions [REDACTED]*. |
| 9. | CIA_000807-000848 – Intelligence Report, Office of Transnational Issues: *Usama Bin Laden: Some Saudi Financial Ties Probably Intact [REDACTED]* (January 11, 1999). |
| 10. | CIA-SUB_0001-0006 – *Al-Rajhi Bank: Conduit for Extremist Finance [REDACTED]* (May 28, 2003). |
| 11. | CIA-SUB_0007-0019 – *Al-Haramain: Support for Extremists and Terrorists [REDACTED]* (August 28, 2002). |
| 12. | CIA-SUB_0020-0030 – *Islamic Banking: A Potential Economic Enabler in the Muslim World [REDACTED]* (May 21, 2004). |
| 13. | CIA-SUB_0031-0033 – *Taibah: Linking Extremists in the Balkans and the United States [REDACTED]* (December 12, 2003). |

| | |
|---|---|
| 14. | Press Room, U.S. Department of the Treasury – *Remarks by Treasury Secretary Paul O'Neill on New U.S.-Saudi Arabia Terrorist Financing Designations* (March 11, 2002). |
| 15. | Press Room, U.S. Department of the Treasury – *Treasury Announces Joint Action with Saudi Arabia Against Four Branches of Al-Haramain in the Fight Against Terrorist Financing* (January 22, 2004). |
| 16. | Press Room, U.S. Department of the Treasury – *Additional Al Haramain Branches, Former Leader Designated by Treasury as Al Qaida Supporters, Treasury Marks Latest Action in Joint Designation with Saudi Arabia* (June 2, 2004). |
| 17. | Press Room, U.S. Department of the Treasury – *U.S.-Based Branch of Al Haramain Foundation Linked to Terror, Treasury Designates U.S. Branch, Director* (September 9, 2004). |
| 18. | Press Room, U.S. Department of the Treasury – *Treasury Designates Al Haramain Islamic Foundation* (June 19, 2008). |
| 19. | TREASURY00009-00011 – Al Haramayn Islamic Foundation – Bosnia-Herzegovina. |
| 20. | TREASURY00012-00016 – Memorandum for R. Newcomb, Director, Office of Foreign Assets Control re: Designation of Al-Haramain Foundation-Pakistan. |
| 21. | TREASURY00017-00029 – Memorandum for R. Newcomb, Director, Office of Foreign Assets Control re: Designation of Al Haramain Foundation (AHF) branches in Afghanistan, Albania, Bangladesh, Ethiopia and the Netherlands and AHF's leader Al-Aqil pursuant to the authorities of E.O. 13224. |
| 22. | TREASURY00030-00036 – Al Haramain Islamic Foundation, Somalia (February 11, 2002). |
| 23. | TREASURY00037-00054 – Memorandum for R. Newcomb, Director, Office of Foreign Assets Control re: Designation of Al-Haramain Foundation (AHF) locations in the United States, the Comoros Islands, and AHF official Soliman Al-Buthe pursuant to the authorities of E.O. 13224. |
| 24. | TREASURY00087-00093 – Memorandum for R. Newcomb, Director, Office of Foreign Assets Control re: Additional Designations Pursuant to E.O. 13224: Al Haramain, Indonesia. |
| 25. | TREASURY00094-00101 – Memorandum for R. Newcomb, Director, Office of Foreign Assets Control re: Additional Designations Pursuant to E.O. 13224: Al-Haramayn Kenya and Tanzania. |
| 26. | Memorandum of Law in Support of Plaintiffs' Second Motion to Compel the Production of Documents From Defendant Al Rajhi Bank (MDL ECF No. 8903) (March 3, 2023). |
| 27. | Declaration of J. Scott Tarbutton Transmitting Documents in Support of Plaintiffs' Second Motion to Compel the Production of Documents From Defendant Al Rajhi Bank (MDL ECF No. 8904) (March 3, 2023), including Exhibits 1-22. |

FBI PROTECTED MATERIAL REDACTED

| | |
|---|---|
| 28. | Plaintiffs' Letter Motion to Compel ARB to Produce Relevant Documents Responsive to Plaintiffs' Second Set of Jurisdictional Requests for Production of Documents (MDL ECF No. 9039) (April 19, 2023). |
| 29. | Declaration of J. Scott Tarbutton Transmitting Documents in Support of Plaintiffs' April 19, 2023 Motion to Compel the Production of Documents From Defendant Al Rajhi Bank (MDL ECF No. 9040) (April 19, 2023), including Exhibits 1-7. |
| 30. | United States District Court, Northern District of Georgia, Exhibit/Attachment 36. |
| 31. | Federal Bureau of Investigation FD-302, Jamal al Fadl, SNY101-0119 – SNY101-0128 (April 2, 9, 1998). |
| 32. | Federal Bureau of Investigation FD-302, Jamal al Fadl, SNY101-0113 – SNY101-0118 (March 31, 1998). |
| 33. | Federal Bureau of Investigation FD-302, Jamal al Fadl (August 29, 2002) (PEC-KSA 329-352). |
| 34. | Federal Bureau of Investigation FD-302, Jamal al Fadl SNY101-0092 – SNY101-0105 (January 8, 1998, January 14, 1998, January 23, 1998, February 20, 1998). |
| 35. | Federal Bureau of Investigation FD-302, Jamal al Fadl SNY101-0117 – SNY101-0118 (March 31, 1998). |
| 36. | Federal Bureau of Investigation FD-302, Abdul Hakim Murad (April 13, 1995). |
| 37. | Federal Bureau of Investigation FD-302, Jamal al Fadl SNY101-0024 – SNY101-0041 (November 4-5, 1996). |
| 38. | Transcript, Deposition of Abdullah bin Sulaiman al Rajhi (September 27, 2023), and Exhibits 26-63, *In re: Terrorist Attacks on September 11, 2001*, 03-MD-01570 (GBD)(SN). |
| 39. | Exhibit 31 (ARB 31), September 27, 2023 Deposition of Abdullah bin Sulaiman al Rajhi, Plaintiffs' Summary Spreadsheet of Al Haramain Islamic Foundation Accounts at Al Rajhi Bank. |
| 40. | Exhibit 32 (ARB 32), September 27, 2023 Deposition of Abdullah bin Sulaiman al Rajhi, Plaintiffs' Summary Spreadsheet of International Islamic Relief Organization Accounts at Al Rajhi Bank. |
| 41. | Exhibit 57 (ARB 57), September 27, 2023 Deposition of Abdullah bin Sulaiman al Rajhi, Plaintiffs' Summary Spreadsheet of International Islamic Relief Organization Accounts at Al Rajhi Bank. |
| 42. | Plaintiffs' Summary Spreadsheet of Al Rajhi Bank Customer Account Transactions (ARB Tranche 21). |
| 43. | Transcript, Deposition of 30(b)(6) Al Rajhi Bank Designee James Galloway (May 11, 2023), and Exhibits 1-25, *In re: Terrorist Attacks on September 11, 2001*, 03-MD-01570 (GBD)(SN). |

FBI PROTECTED MATERIAL REDACTED

| | |
|---|---|
| 44. | Errata, Deposition of 30(b)(6) Al Rajhi Bank Designee James Galloway (May 11, 2023), *In re: Terrorist Attacks on September 11, 2001*, 03-MD-01570 (GBD)(SN), dated July 17, 2023. |
| 45. | Transcripts, Deposition of Saleh bin Abdulaziz al Ash-Sheikh (March 23-24, 2021), *In re: Terrorist Attacks on September 11, 2001*, 03-MD-01570 (GBD)(SN). |
| 46. | KSA 1234, 1685, 1687. |
| 47. | NL 9623, 9625, 10068, 10086, 10088, 10091, 10094, 10097, 10108, 10139, 10145, 10161, 10166, 10182, 10186, 10194, 10240, 10244, 10245, 10314, 10327, 10333, 10334, 10335, 10336, 10338, 10348, 10349, 10350, 10384, 10423, 10447, 10455, 10456, 10457, 10458, 10460, 10462, 10463, 10464, 10466, 10467, 10468, 10470, 10471, 10472, 10473, 10474, 10475, 10483, 10485, 10491, 15043, 15044, 15045, 15046, 15048, 15572, 15578, 18775, 20452, 20453, 20454, 20470. |
| 48. | White Paper – The Kingdom of Saudi Arabia and Counterterrorism (1996). |
| 49. | Federal Office of Criminal Investigation, Expert Report Concerning the Area – Financial Investigations – Relating to the Third World Relief Agency (TWRA) (August 28, 2003). |
| 50. | International Convention for the Suppression of the Financing of Terrorism, adopted by the General Assembly of the United Nations in resolution 54/109 of 9 December 1999. |
| 51. | U.N. General Assembly, Resolution 51-210, Measures to Eliminate International Terrorism (January 16, 1997). |
| 52. | U.N. General Assembly, Resolution 52-165, Measures to Eliminate International Terrorism (January 19, 1998). |
| 53. | U.N. General Assembly, Resolution 53-108, Measures to Eliminate International Terrorism (January 26, 1999). |
| 54. | Glenn Simpson, *Terror Finance, U.S. Tracks Saudi Banks Favored by Extremists*, The Wall Street Journal (July 26, 2007), and Excerpt from 2003 CIA Report. |
| 55. | Declaration of Omar T. Mohammedi Pursuant to Opinion and Order (MDL ECF No. 4465). |
| 56. | Exhibit 19 (MDL ECF No. 4465-19). |
| 57. | Department of the Treasury Memorandum to R. Richard Newcomb regarding the Yassin al Kadi Designation Pursuant to E.O. 13224 (Treasury 00055-00086). |
| 58. | Department of the Treasury Memorandum to R. Richard Newcomb regarding the Yassin al Kadi Designation Pursuant to E.O. 13224 (DOJ AR – 000003-000022). |
| 59. | Associated Press, *Kenya bans six Islamic aid agencies after U.S. bombing* (September 9, 1998). |
| 60. | BBC News, *U.S. Fears Terrorist Attack in Kosovo* (April 3, 2000). |

**FBI PROTECTED MATERIAL REDACTED**

| | |
|---|---|
| 61. | Washington Post, *Bin Laden's Finances Are Moving Target* (August 28, 1998). |
| 62. | Daily News, *It's More than Just Who Plants the Explosives* (July 31, 1996). |
| 63. | The Age (Melbourne, Australia), *Filipino Muslims linked to holy warrior's global terror* (May 20, 1995). |
| 64. | Frontline, *A Terrorist Plot Unearthed* (Feb.-March 1999). |
| 65. | University of Pennsylvania – African Studies Center, Horn of Africa: The Monthly Review, 09-10-98. |
| 66. | Inter Press Service, Global Information Network, *Kenya: Gov't Shuts Down Five Islamic Relief Agencies* (September 10, 1998). |
| 67. | ITAR-TASS, Russian Troops Find Arab, Bosnian Passports in Chechnya (February 21, 2000). |
| 68. | Japan Economic Newswire, *Bin Laden Providing Money, Military Aid to MILF: Report* (Feb. 13, 1999). |
| 69. | Legislation Against Terrorism – A Consultation Paper, Presented to Parliament by the Secretary of State for the Home Department and the Secretary of State for Northern Ireland by Command of Her Majesty, December 1998. |
| 70. | The Advertiser, *Pact of Blood* (June 3, 1995). |
| 71. | Philippine Daily Inquirer, *Bin Laden Funds Abu Sayyaf Through Muslim Relief Group* (August 9, 2000). |
| 72. | Philippine Daily Inquirer, *Gemma Linked to Bin Laden Group Funding Sayyaf, MILF* (August 10, 2000). |
| 73. | UNHCR, The U.N. Refugee Agency, *Human Rights Watch World Report 1999 – Kenya* (January 1, 1999). |
| 74. | Judith Miller, *Some Charities Suspected of Terrorist Role*, The New York Times (February 19, 2000). |
| 75. | The Times, *Terror By Degree* (October 18, 1997). |
| 76. | The Indian Ocean Newsletter, *Banned Islamic NGOs* (Sept. 12, 1998). |
| 77. | Oriana Zill, *A Portrait of Wadih El Hage, Accused Terrorist*, Frontline (September 12, 2001). |
| 78. | U.S. News & World Report, *A Helping Hand from Saudi Arabia* (July 8, 1996). |

FBI PROTECTED MATERIAL REDACTED

| | |
|---|---|
| 79. | The World Bank Group, 1997 Annual Meetings of the Boards of Governors, Summary Proceedings (September 23-25, 1997). |
| 80. | The Straits Times, *Osama Gave Funds to Abu Sayyaf: Manila* (August 10, 2000). |
| 81. | Gulf News (online edition), *Orphanages in Southern Philippines Under Probe* (February 10, 2001). |
| 82. | Overseas Immigration News, *Immigration Claims Teacher Linked to Terrorists Alleged Al-Jihad Member: Egyptian Denies Allegations, is Appealing Legal Proceedings* (May 21, 1999). |
| 83. | Al Jazirah, *The Al-Haramain Islamic Foundation Launches a Donation Campaign for the Palestinians*, Issue No. 10784 (April 8, 2002). |
| 84. | Al Minbar, *Achievements of the Al-Haramain Islamic Foundation in Palestine*. |
| 85. | Susan Schmidt, *Spreading Saudi Fundamentalism in U.S., Network of Wahhabi Mosques, Schools, Web Sites Probed by FBI*, Washington Post (October 2, 2003). |
| 86. | David Rennie, *Hijackers in Same Hotel as Saudi Minister*, The Telegraph (October 2, 2003). |
| 87. | 38th Annual ISNA Convention Program, Chicago, Illinois (September 1, 2001). |
| 88. | Al Rajhi Bank Custodian and Repository Information (February 15, 2023). |
| 89. | IIRO 285616 |
| 90. | IIRO 212-330. |
| 91. | IIRO 331-441. |
| 92. | IIRO 315040 |
| 93. | WAMY INTL E001481 |
| 94. | WAMYSA 502115 |
| 95. | WAMY SA 15516 |
| 96. | JPMC 0001-0221 – Documents produced in response to Plaintiffs' June 13, 2022 Subpoena to JP Morgan Chase Bank. |
| 97. | Al Rajhi Bank Tranche 1 (ARB-00000001-00000005), English translations. |
| 98. | Al Rajhi Bank Tranche 2 (ARB-00000006-00000015), English translations. |
| 99. | Al Rajhi Bank Tranche 3 (ARB-00000016-00001050), English translations. |

FBI PROTECTED MATERIAL REDACTED

| | |
|---|---|
| 100. | Al Rajhi Bank Tranche 4 (ARB-00001051-00001361), English translations. |
| 101. | Al Rajhi Bank Tranche 5 (ARB-00001362-00001593), English translations. |
| 102. | Al Rajhi Bank Tranche 6 (ARB-00001594-00002930), English translations. |
| 103. | Al Rajhi Bank Tranche 7 (ARB-00002931-00006268), English translations. |
| 104. | Al Rajhi Bank Tranche 8 (ARB-00006269-00013367), English translations. |
| 105. | Al Rajhi Bank Tranche 9 (ARB-00013368-00013813), English translations. |
| 106. | Al Rajhi Bank Tranche 10 (ARB-00013814-00014581), English translations. |
| 107. | Al Rajhi Bank Tranche 12 (ARB-00017318-00017580), English translations. |
| 108. | Al Rajhi Bank Tranche 14 (ARB-00023305-00039552), English translations. |
| 109. | Al Rajhi Bank Tranche 15 (ARB-00039553-00039947), English translations. |
| 110. | Al Rajhi Bank Tranche 16 (ARB-00039948-00039959), English translations. |
| 111. | Al Rajhi Bank Tranche 17 (ARB-00039960), English translation. |
| 112. | Al Rajhi Bank Tranche 18 (ARB-00039961). |
| 113. | Al Rajhi Bank Tranche 19 (ARB-00039962-40281), English translations. |
| 114. | Al Rajhi Bank Tranche 20 (ARB-00040282-00040443), English translations. |
| 115. | ARB 42119-42126, English translations. |
| 116. | ARB 42189-42216, English translations. |
| 117. | ARB 42217-42218, English translations. |
| 118. | ARB 42219-42245, English translations. |
| 119. | ARB 42246-42249, English translations. |
| 120. | Muslim World League Journal (September 1995). |
| 121. | Muslim World League Journal (January 1994). |
| 122. | Muslim World League Journal (August-September 1993). |
| 123. | Muslim World League Journal (September 1998). |

FBI PROTECTED MATERIAL REDACTED

| | |
|---|---|
| 124. | Muslim World League Journal (January/February 1991). |
| 125. | Muslim World League Journal (September/October 1990). |
| 126. | Muslim World League Journal (February/March 1990). |
| 127. | Muslim World League Journal (January 2001). |
| 128. | Muslim World League Journal (February 1994). |
| 129. | Muslim World League Journal (July/August 1991). |
| 130. | Muslim World League Journal (January/February 1989). |
| 131. | Muslim World League Journal (September 1981). |
| 132. | Muslim World League Journal (March 1981). |
| 133. | Muslim World League Journal (December 1980). |
| 134. | Muslim World League Journal (October 1980). |
| 135. | Muslim World League Journal (April 1980). |
| 136. | Muslim World League Journal (November 1979). |
| 137. | Muslim World League Journal (May 1979). |
| 138. | Al Alam Al Islami (August 30, 1993). |
| 139. | Al Alam Al Islami (April 19, 1993). |
| 140. | Al Alam Al Islami (November 2, 1992). |
| 141. | Al Alam Al Islami (August 31, 1992). |
| 142. | Al Alam Al Islami (June 29, 1992). |
| 143. | Al Alam Al Islami (April 27, 1992). |
| 144. | Al Alam Al Islami (April 20, 1992). |
| 145. | Al Alam Al Islami (March 23, 1992). |
| 146. | Al Alam Al Islami (English Version) ("WAMY Calls for Jihad to Free Kashmir"). |
| 147. | *The Chechen Tragedy, The Reality and the Required Role*, Dr. Manei bin Hammad al Juhani. |

FBI PROTECTED MATERIAL REDACTED

| | |
|---|---|
| 148. | 2012 FBI Summary Report (MDL ECF No. 6292-1). |
| 149. | EO14040 2638-2643. |
| 150. | EO14040 2797-2815. |
| 151. | EO14040 3414-3442. |
| 152. | EO14040 3465-3472. |
| 153. | EO14040 3478-3608. |
| 154. | EO14040 2857-2863-MDL. |
| 155. | FBI 573-580. |
| 156. | FBI 2002 Suspect List, available at https://legislatie.just.ro/Public/DetaliiDocument/36423. |
| 157. | Plaintiffs' Averment of Facts and Evidence in Support of Their Claims Against the Kingdom of Saudi Arabia and the Saudi High Commission (February 3, 2015) (ECF No. 2927-1). |
| 158. | Documents produced in response to Plaintiffs' January 7, 2020 Subpoena to AT&T Global Legal Demand Center (February 3, 2020). |
| 159. | JPMC 0001-0221 – Documents produced in response to Plaintiffs' June 13, 2022 Subpoena to JP Morgan Chase Bank. |
| 160. | DOJ 009-010. |
| 161. | KFM 098. |
| 162. | Transcript, Deposition of Ibrahim Abdullah (October 21, 2019) (excerpted pages 1, 207-209), *In re: Terrorist Attacks on September 11, 2001*, 03-MD-01570 (GBD)(SN). |
| 163. | Transcript, Deposition of Adnan Basha (February 21, 2019), *In re: Terrorist Attacks on September 11, 2001*, 03-MD-01570 (GBD)(SN). |
| 164. | FED-PEC0001243-0001369 – (Proposed Redacted) Affidavit of David Kane, Senior Special Agent with the United States Customs Service ("USCS"), in Support of Application for Search Warrant (October 2003). |
| 165. | Affidavit of David Kane, *In The Matter Of Searches Involving 555 Grove Street, Herndon, Virginia, And Related Locations,* (EDVA) October 2003, ("Kane Affidavit"), available online at https://www.investigativeproject.org/documents/case_docs/891.pdf. |

FBI PROTECTED MATERIAL REDACTED

| | |
|---|---|
| 166. | Application and Affidavit – *In the Matter of the Search of One Story Residence Building Located at 3800 S. Highway 99 in Ashland, Oregon*, Case No. 6:05-cr-60008-AA, United States District Court, District of Oregon (June 19, 2009). |
| 167. | Indictment – *United States v. Al Haramain Islamic Foundation, Inc., Pirouz Sedaghaty, and Soliman Hamd Al-Buthe*, Case No. 6:05-cr-60008-AA, United States District Court, District of Oregon (February 17, 2005). |
| 168. | Reporter's Transcript of Proceedings, *United States v. Pirouz Sedaghaty*, Case No. 6:05-cr-60008-AA, United States District Court, District of Oregon (August 22, 2007). |
| 169. | Government's Memorandum in Support of Pretrial Detention, *United States v. Perouz Sedaghaty*, Case No. 6:05-cr-60008-AA, United States District Court, District of Oregon (August 21, 2007). |
| 170. | Government's Trial Memorandum, *United States v. Pirouz Sedaghaty*, Case No. 6:05-cr-60008-AA, United States District Court, District of Oregon (August 19, 2010). |
| 171. | The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attack Upon the United States (July 22, 2004). |
| 172. | All additional documents and materials expressly cited in the body and footnotes of my expert report, which are incorporated herein by reference. |

FBI PROTECTED MATERIAL REDACTED

**Appendix II – Jonathan M. Winer**

1. **Experience and Qualifications**
2. **CV**
3. **Publications**
4. **Expert Witness 2019-2023**

***

## 1 Experience and Qualifications

Currently I practice law in Washington, D.C. where I specialize in financial regulation, including the regulation of financial institutions in the United States and around the world to combat money laundering and terrorist finance, as well as in other areas of national security law. I am also a non-resident scholar at the Middle East Institute. I also provide international consulting services on matters within my expertise, which include areas of international law, sanctions, trade, transborder criminal activity, counterterrorism, corruption, information security and data protection, and related issues.

*Service at State Department*

I was Deputy U.S. Assistant Secretary of State for International Law Enforcement from 1994 through 1999. In that position, I served as the principal policy-maker focused on a daily basis on international organized crime and financial crime for State, including money laundering and the systems used for terrorist finance. I handled oversight of U.S. law enforcement relations with many nations. At the request of the National Security Council ("NSC") of the White House or the Vice President's office, I chaired numerous interagency working groups on trans-border law enforcement and crime issues, as well as bilateral and multilateral groups working on these issues with foreign counterparts. My work included developing responses by the government of the United States to criminal conspiracies directed at our government or our people from overseas; tracking such criminal activity; obtaining evidence regarding it; obtaining cooperation from other countries on trans-border criminal activity; and initiating and overseeing overt and covert operations to control and combat trans-border criminal activity emanating from overseas. In this position, I represented our government in negotiations taking place in more than 40 countries on six continents, carried out direct bilateral negotiations and discussions with representatives of some 80 countries in the U.S. and overseas and multilateral negotiations with representatives of more than 100 countries. That work included development and oversight of U.S. anti-money laundering policy internationally, including U.S. policy regarding the FATF, based in Paris, the world's premiere anti-money laundering body, which at the time was undertaking ongoing assessments of the money laundering regulation of its member countries. These included the Gulf Cooperation Council ("GCC"), whose members include Saudi Arabia.

I returned to the State Department in September 2013, and served in the Bureau of Near Eastern Affairs as the Special Advisor for the Resettlement of the Mujahedin-e Khalq ("MEK") and Special Envoy for Libya until January 2017. In those roles, I served as the White House and Secretary of State's senior official to resettle an Iranian political group that had previously been designated by the United States for terrorist sanctions, and which had since been delisted for no longer posing a terrorist threat, out of Iraq and into Albania, thereby ending an ongoing source of

FBI PROTECTED MATERIAL REDACTED

instability and risk between Iraq and Iran. I also was the lead U.S. diplomat for efforts to end a civil war in Libya through a negotiated settlement which was achieved in December 2015, and continued in that role seeking to maintain that peace until my departure from the State Department at the beginning of the Trump Administration. In these two roles, I worked directly with senior officials of many countries, including Albania, Algeria, Canada, China, Egypt, the EU, France, Germany, Italy, Jordan, Libya, Morocco, Qatar, Romania, Russia, Saudi Arabia, Sudan, Tunisia, the United Arab Emirates, among others. During that time, I worked directly with senior officials at the U.S. Department of Defense and AFRICOM, as well as with the CIA and other U.S. intelligence agencies, to address terrorism issues involving the Islamic State and U.S. sanctions programs and designations. I also participated in White House meetings of the Deputies Committee (involving the Deputy Secretaries of cabinet agencies), at the Principals Committee (involving the Secretaries of cabinet agencies), and at the National Security Council, in meetings chaired by the National Security Advisor or the President. These meetings included discussions of how to respond to terrorist threats in the Middle East, including how we would address the terrorist threat through a mixture of diplomatic, military, and sanctions options.

*Experience in U.S. Foreign Policy Sanctions, and Terrorist Finance Process*

During my six-year service as Deputy Assistant Secretary of State, I met daily with other senior policy makers at State to discuss foreign policy issues involving the response of the U.S. government to foreign governments, officials, businesses, and persons involved in planning or carrying out criminal activity directed at the United States and/or its people, including issues relating to terrorism. I also worked on a daily basis with counterparts at the NSC, the U.S. Department of Justice ("Justice"), Treasury, the U.S. Department of Commerce ("Commerce"), Department of Defense ("Defense"), the Central Intelligence Agency ("CIA") and other components of the U.S. intelligence community. The work included daily contact with senior officials from the major U.S. federal law enforcement agencies, which at the time included the Federal Bureau of Investigation ("FBI"), DEA, Customs, Secret Service, the Bureau of Alcohol, Tobacco and Firearms ("ATF"), the Coast Guard, and the Immigration and Naturalization Service ("INS"). During this period, I was an active participant in many interagency agencies involving these and other U.S. agencies, and led numerous interagency missions at home and overseas dealing with responding to international criminal activity, including financial elements of transborder terrorist activity (terrorist finance). This work included leading or participating in delegations involving the United States and the UN, EU, Council of Europe, FATF, Organization of American States ("OAS"), Group of Seven ("G-7") and Group of Eight ("G-8") and many other modalities. I had ongoing contact with the Office of Foreign Assets Control ("OFAC"), responsible for administering sanctions, and with the White House as well as the agencies specified above, over questions about when and how to use targeted sanctions against individuals and entities, including discussions over designating particular targets.

During my three-and-a-half year service in the State Department's Bureau of Near Eastern Affairs, I met daily with other senior policy makers at State to discuss foreign policy issues involving the Middle East and terrorism, as both of my portfolios involved having to develop appropriate policies and diplomatic activities to address issues involving terrorists or former terrorists.

FBI PROTECTED MATERIAL REDACTED

In the case of the MEK, I had to address the problem of resettling people the U.S. had previously found to have engaged in terrorism, once they renounced terrorism, in order to protect them from the immediate and ongoing risk of being subject to terrorist attacks themselves by agents of the government of Iran. To do this, I had to work closely with senior officials from such other U.S. government agencies as Justice, Defense, CIA, FBI, and the Department of Homeland Security ("DHS"), as well as with the State Department and the White House.

During this period, Libya faced many terrorist threats. These included the occupation of the central coastal region of Libya by the Islamic State, which the U.S. responded to with airstrikes against the Islamic State in Libya, undertaken with the permission of Libyan authorities that I brokered. They also included attacks on civilian airports by militia leaders seeking to gain military advantage over other militias or security forces. In the course of considering the appropriate U.S. response to these threats, I met frequently with other senior policy makers at the State Department and throughout the U.S. government to discuss the use of sanctions to combat the risk of terrorism and civil war in Libya. I again participated in sanctions designation processes, which were typically managed by senior officials at the National Security Council of the White House.

*Earlier Experience*

I first became involved in international money laundering matters in 1980, while I was working as an associate while still in law school for the U.S. Attorney in Denver, Colorado on a bank fraud case involving the use of offshore banks in the Caribbean to launder funds and defraud U.S. banks and investors. At that time, I received training from senior investigators from the FBI and the Office of the Comptroller of the Currency ("OCC"), responsible for regulating U.S. banks. In 1980 and 1981, while working as a journalist writing about legal affairs, I first developed expertise in the application of U.S. sanctions laws arising out of the Iranian hostage crisis and the use by the United States of the International Emergency Economic Powers Act ("IEEPA") to freeze Iranian assets prior to the resolution of the crisis in 1981 with the Algiers Accords. From 1985 through 1994, I worked in the U.S. Senate as counsel to Senator John F. Kerry. During that time, I handled financial regulatory, criminal justice and foreign policy issues in connection with hearings and legislative matters before the Senate Committees on Foreign Relations, Judiciary, and Banking. I drafted legislation to strengthen U.S. law against international money laundering and financial crime. I also directed and/or staffed a series of investigations into international money laundering and serious transnational criminal activity affecting the United States and Americans. These international investigations included matters pertaining to the Iran/Contra Affair, the drug trafficking of Panamanian dictator Manuel Noriega, and the corrupt activities of the Bank of Credit and Commerce International ("BCCI") in Asia, Africa, Latin America, North America, Europe and the Middle East. This work substantially focused on the intersection of foreign policy and law enforcement. For example, I drafted a substantial portion of a report on this topic, published in 1988 by the Senate Committee on Foreign Relations, with the title "Drugs, Law Enforcement and Foreign Policy." The Senate report analyzed cases in which U.S. foreign policy interests were preventing the U.S. government from protecting U.S. citizens from injury by foreign drug traffickers, arms traffickers, criminals, and terrorists. Later, I drafted the preponderance of the U.S. Senate report on BCCI, "The BCCI Affair," issued by Senators Kerry and Brown, which reported on how BCCI was used, among other purposes, to facilitate terrorist finance.

FBI PROTECTED MATERIAL REDACTED

*Non-Government Experience*

Over more than two decades (from 1999 to the present, in reference to my work since I left the State Department in November 1999), I have been involved in sanctions and terrorist finance issues from a number of perspectives and roles.

One role has been as a lawyer. I have provided counselling to financial institutions; persons and entities seeking to assess and address their risk of being designated for sanctions; persons and entities who have been sanctioned and are seeking to be delisted and international organizations dealing with sanctions issues, such as the IMF, World Bank, and UN, among others.

A second role has been as a policy analyst. I have written on sanctions and on money laundering and on terrorist finance issues for many publications, as set forth in my CV. I was also retained as an expert on financial crime by a U.S. government agency from 2000-2008 to assess the vulnerabilities of countries throughout the world to money laundering, terrorist finance, and corruption. During this time, I studied and provided assessments on financial crime and terrorist finance risk on most of the countries in the world, including to the best of my recollection, every country in the Middle East.

A third role has been as a teacher. For many years, I taught analysts at the CIA's Kent School, covering a number of topics, especially those relating to corruption and financial crime, as well as lectured on those topics, terrorist finance, sanctions and many other foreign policy and regulatory issues at many academic institutions, in the United States and internationally, again as set forth in my CV.

A fourth role has been as a public commentator. After the 9/11 attacks, I was a consultant for ABC News on terrorist finance issues. From the date of the 9/11 attacks to the present, I have been frequently quoted on terrorism and sanctions issues by U.S. and international media.

A fifth role has been as a consultant on sanctions, anti-money laundering, and counter-terrorist finance issues to domestic and foreign clients, as well as with government agencies, domestic and foreign, and international organizations such as the United Nations and World Bank.

A sixth role has been as an expert witness on terrorist finance, financial crime and sanctions issues.

## 2. CV – Jonathan M Winer

### Positions

*Partner, Mosaiq Law Group, Sep 2021 - Present*

We leverage multi-dimensional legal and policy expertise and high-level professional networks around the world to offer a range of legal advisory services such as:

FBI PROTECTED MATERIAL REDACTED

- Quarterbacking complex cross-border matters, including investigative cases and investment-related projects.

- Targeted counsel related to specific law & policy issues such as sanctions, compliance, CFIUS, due diligence, FCPA, asset recovery, expropriation, and M&A.

- Strategic advice at the complex intersection of geopolitical, financial, legal, policy and political factors.

*Principal, Law Offices of Jonathan M. Winer, January 2017-present*

Represent and counsel domestic and multinational clients on cross-border compliance and enforcement issues relating to national security law, international financial regulatory issues, trade and e-commerce, foreign corrupt practices, public policy and legislative matters, including matters relating to extradition, mutual legal assistance, money laundering and counterterrorism (AML-CFT), sanctions (OFAC), inward investment (CFIUS), cybersecurity, cross-border taxation, and data protection compliance.

Private practice of law and international consulting, focusing on the Middle East, former Soviet Republics, and cross border issues relating to the U.S. and the European Union.

*Non-Resident Scholar, Middle East Institute, May 1, 2017-present*

Research, writing, and speaking on political, economic and security issues relating to Libya, North Africa, and the Middle East at the Middle East Institute in Washington, D.C.

*Senior Counsellor, APCO Worldwide, August 1, 2017-present*

Provide strategic advice to international clients of global communications firm on matters relating to national security law, financial regulatory issues, foreign corrupt practices, sanctions, foreign investment/trade, and public policy.

*Strategic Advisory Board Member, International Fraud Group (IFG) September 2020 – present*

The International Fraud Group is a global network of highly skilled international lawyers who specialize in tracing, freezing, seizing and recovering stolen assets. The IFG is based in London and has developed a network of practitioners with expertise in identifying and recovering stolen assets and investigating and developing enforcement action to respond to complex frauds. I provide strategic advice to the organization, and participate in seminars on current topics relating to financial crime.

*Advisory Council Member, Keep Our Republic, June 2020- present*

Keep Our Republic is a U.S. non-partisan civic action organization dedicated to protecting a republic of laws and strengthening the checks and balances of our democratic electoral system. I provide strategic advice to the organization, participate in civil events and seminars on current

FBI PROTECTED MATERIAL REDACTED

topics relating to U.S. elections, and work with others in the group to publish articles of relevance to these issues.

*Special Envoy for Libya, Senior Coordinator for Libya, Senior Advisor for MEK Resettlement, Bureau of Near Eastern Affairs, US Department of State, September 2013-January 2017*

Served as Secretary of State Kerry's and the State Department's Special Envoy for Libya. Played a central role in shaping and implementing US policies regarding Libya, working with U.S. officials, other governments, Libyan officials, representatives of the private sector, NGOs, and others interested in Libya and its future. Served as the Senior Advisor for MEK Resettlement, responsible for securing the resettlement of more than 3000 members of an Iranian dissident group of Iraq, which concluded with the successful resettlement of all of them out of Iraq as of September 12, 2016.

Awarded the Secretary's Distinguished Service Award, the highest award issuable by the Secretary of State, "*for extraordinary service to the U.S. government in solving one of the most intractable issues in U.S. foreign policy, thereby avoiding the massacre of over 3,000 members of the Mujahedin-e Khalq and averting a crisis between Iran and Iraq,"* and for "*leading U.S. policy in Libya, tenaciously and brilliantly moving Libya from a major foreign policy embarrassment to a fragile but democratic, internationally recognized government.*" November 2016.

*Senior Vice President./Senior Director/Head of Government Affairs Group, APCO Worldwide, June 2008-September 2013*

Strategic advice to corporate, non-governmental and governmental clients and international organizations in U.S., Pacific Rim, Central Europe, Israel and Eurasia regarding cross-border regulatory, legal and policy issues, primarily involving financial services regulation, foreign investment and trade, corruption and corrupt practices, information security and data protection, money laundering, asset recovery, sanctions, and cross-border law enforcement assistance. Expert witness services on money laundering and terrorist finance. Public sector work included assisting World Bank Stolen Assets Recovery Initiative, UN (ODC) Anti-Corruption Initiatives (Vienna), Global Forum on Corruption (Doha), OECD Working Group on Mining Transportation (Paris).

*Partner 2004-2008; Counsel 1999-2003, Alston & Bird, LLP, November 1999-May 2008*

Represented domestic and multinational clients on compliance and enforcement issues relating to international financial regulatory issues, privacy, data protection and information security, foreign corrupt practices, cross-border trade, foreign investment (CFIUS), public policy and legislative matters. Provided counseling regarding AML-CFT compliance, terrorist finance, international criminal enforcement, and sanctions issues. Written and lectured extensively on cross-border financial regulation, national security law and intelligence issues, cross-border legal issues relating to data protection and cyber-security, corruption. Provided expert witness services on cross-border financial crime, narcotics, and corruption issues. Investigations and compliance work relating to complex matters involving corruption, money laundering, and sanctions in

FBI PROTECTED MATERIAL REDACTED

multiple jurisdictions. Undertook initiatives for World Bank and UN International Peace Institute on corruption and money laundering. Provided open source analysis of money laundering, corruption, and sanctions vulnerabilities and capacities of 80+ countries over an eight-year period as contractor for US government.

*Deputy Assistant U.S. Secretary of State for International Law Enforcement, 1994-1999*

Senior person at the U.S. Department of State responsible on a day-to-day basis for formulating and overseeing U.S. policy and programs to deal with money laundering, high-tech crime, intellectual property theft, corruption, small arms trafficking, trafficking in women, alien smuggling and other cross-border crime. Led interagency U.S. negotiations with P-8, EU, OAS, and managed bilateral modalities on law enforcement and financial regulatory issues with China, Russia, Thailand, Mexico, Hungary, Nigeria, Ukraine, and various countries in Central America, the Caribbean, and Southern Africa. Developed President Clinton's Transnational Organized Crime strategy, 1998. Conceptualized and negotiated Inter American Treaty on Illicit Arms (1997) and scope and framework of UN Transnational Organized Crime Convention (2000). Created and negotiated frameworks for international law enforcement academies for Southeast Asia (ILEA-Bangkok) and Southern Africa (ILEA-Gaborone). Created and served as Executive Secretary for 1st Global Forum Against Corruption (1999).

Awarded Distinguished Honor Award, U.S. Department of State, November 1999, which stated that "*he created the capacity of the Department and the U.S. government to deal with international crime and criminal justice as important foreign policy functions*," and that *"the scope and significance of his achievements are virtually unprecedented for any single official*."

*Counsel and Senior Legislative Assistant, U.S. Senator John F. Kerry (D-Mass.), 1985- 1994*

Responsible for policy development and legislation for U.S. Senator in the areas of banking and financial services, foreign relations, law enforcement. Conducted numerous Congressional investigations of international money laundering, drug trafficking, corruption, and fraud, including investigations of Iran/Contra affairs (1986-1988); drug trafficking and money laundering in the Caribbean and Central America, including the Bahamas, Haiti, and Panama (1988-1989); undertook key elements Senate investigation into the global activities of the Bank of Credit and Commerce International (BCCI), 1990-1992; primary authorship of the Senate's final report on BCCI. Investigations included extensive inquiries into activities of U.S. intelligence and law enforcement agencies in the period 1986-1994.

*Counsel, Lieutenant Governor of Massachusetts, 1983-1984*

Provided legal advice, policy development, and speech-writing for Massachusetts Lieutenant Governor on law enforcement and federal-state relations issues. Staffed Governor's Anti-Crime Council; redrafted portions of Massachusetts general criminal laws; developed Massachusetts high-tech crime legislation and draft state Racketeering Influenced and Corrupt Organizations (RICO) law.

FBI PROTECTED MATERIAL REDACTED

*Associate, Hale and Dorr L.L.P., Boston, Mass, 1981-1983*

Handled civil and criminal litigation in state and federal courts.

*Reporter, National Law Journal, New York, NY 1978-1981*

Staff reporter, covering national and international legal affairs, including sanctions issues (IEEPA) pertaining to Iranian assets litigation.

*Education and Citizenship*

J.D. New York University School of Law, 1981

B.A. Yale University, 1976 cum laude

United States. Born Boston, Massachusetts, [REDACTED] 1954

**3. Publications and Testimony**

**2023**

"As Libyan strongman explores deepened relationship with Russia, US has multiple sanctions options," Middle East Institute, October 2, 2023

"Despite pause in Tripoli violence, Libya's future remains at an impasse," Middle East Institute, August 21, 2023

"Not the Donald, But the Don – Indicting a Career Racketeer," Washington Spectator, August 15, 2023

"Rift with UN growing amid opposition to implementation of Libyan 6+6 election deal," Middle East Institute, June 26, 2023

"How Biden Ends the Phony Debt Crisis: The Law is Clear – Here's The Speech," Washington Spectator, May 9, 2023

"Artificial Intelligence Poses a Huge Threat. It's Time to Put a Seatbelt on It," Newsweek, April 17, 2023, with Senator Tim Wirth, Congressman Richard Gephardt, and Lt Gov Kerry Healey

"US on potential collision course with UAE and Turkey over sanctions busting," Middle East Institute, April 17, 2023

"Acute economic pressures and geopolitical posturing in North Africa," Middle East Institute, January 20, 2023

FBI PROTECTED MATERIAL REDACTED

**2022**

“Supreme Court case on state legislatures could have ‘devastating consequences,’” City & State Pennsylvania, Government & Media Executive, December 5, 2022

“Lawyers Should Be Key Reporters in Anti-Money Laundering Efforts,” Bloomberg Law, December 1, 2022

“Time to Go Local in Libya,” Middle East Institute, September 9, 2022

“Departure of UN Special Advisor Stephanie Williams leaves Libya facing intensified instability,” Middle East Institute, August 1, 2022

“Out of power, out of patience, Libya faces risky summer of unrest,” Middle East Institute, July 5, 2022

“Divided Libya stands, with a long process ahead before elections,” May 23, 2022

“Amid shutdowns of oil production, Tripoli faces risk of post-Ramadan confrontation,” Middle East Institute, April 25, 2022

“Struggle over legitimacy in Libya begins third period of dueling governments,“ Middle East Institute, February 14, 2022

“Which Libyan-led process will lead to elections in 2022?,” Middle East Institute, January 18, 2022

“Prosecuting Trump and His Accomplices,” Washington Spectator, January 4, 2022

**2021**

“Libyan election processes under threat with resignation of UN special envoy,” Middle East Institute, November 29, 2021

“Post Paris conference, realpolitik likely to govern next steps on Libya,” Middle East Institute, November 15, 2021

“December elections advance, but many risks remain for Libya,” Middle East Institute, October 25, 2021

“Reopen the Obstruction of Justice Case Against Trump,”, Just Security, October 14, 2021, with Mark Medish

“Road Map for a Constitutional Coup,” Washington Spectator · Oct 4, 2021

FBI PROTECTED MATERIAL REDACTED

"Political infighting goes into overdrive as Libya prepares for Dec. 24 elections," Middle East Institute, September 27, 2021

"Testing who's serious in Libya," Middle East Institute, August 23, 2021

"To succeed, Berlin II Libya Ministerial must build support not only for elections, but for the departure of foreign military forces," Middle East Institute, June 21, 2021

"To consolidate early Libyan successes, the Biden administration will need continued engagement," Middle East Institute, April 28, 2021

"The Biden Administration and the Middle East: Policy Recommendations for a Sustainable Way Forward," Chapter on Libya, Middle East Institute, March 10, 2021

"Amid bribery claims, eyes focus on upcoming Sirte meetings of Libya's Parliament," Middle East Institute, March 1, 2021

"Libya's challenge to prevent history from repeating itself," February 22, 2021

"Planning for the day 10 years after the fall of Gadhafi," Middle East Institute, February 17. 2021

"New year, new administration, new chance for Libya," Middle East Institute, January 4, 2021

**2020**

"Libyans pulled back from conflict but still seek deals on leadership," Middle East Institute, December 14, 2020

"Direct Libyan-to-Libyan talks are giving Libyan peace a new chance," Middle East Institute, November 24, 2020

"Will nationwide cease-fire in Libya enable new political agreements?," Middle East Institute, October 26, 2020

"Election 2020: Challenges and Opportunities for US Policy in the Middle East," Libya section, Middle East Institute, September 8, 2020

"As Hifter rejects Libyan cease-fire, renewed diplomacy is essential," Middle East Institute, August 24, 2020

"Are the foreign patrons of the Libyan war ready to end it?," Middle East Institute, May 27, 2020

"Keeping the UN political track in Libya alive," Middle East Institute, March 16, 2020

FBI PROTECTED MATERIAL REDACTED

"Libya: Will Berlin peace plan take on the immovable object and his irresistible force?," Middle East Institute, January 21, 2020

"Big questions for Libya in 2020," Middle East Institute, January 6, 2000

**2019**

"Libya's descent into civil war," Middle East Institute, December 23, 2019

"Seized Russian-printed dinars highlight an opportunity to reform Libya's civil war economy," November 7, 2019

"Origins of the Libyan Conflict and Options for Its Resolution," Libya chapter of book "Escaping the Conflict Trap: Toward Ending Civil Wars in the Middle East," published by Middle East Institute, August 2, 2019, earlier version published by the Middle East Institute May 21, 2019

"Looking for Libyan ceasefires, but on what terms?," Middle East Institute, May 13, 2019

"Foreign support a wildcard in Libya," Middle East Institute, April 14, 2019

"Libya: Reawakening the spirit of change," Middle East Institute, January 7, 2019

**2018**

"Libya: Maintaining a stable instability in 2018," Middle East Institute, December 17, 2018

"Palermo talks need to spur Libyan actions," Middle East Institute, November 5, 2018

"The UN's "Plan B" for Libya needs a security solution, too," Middle East Institute, October 29, 2018

"A turbulent trial for Tripoli," Middle East Institute, September 17, 2018

"Putin's Proposed Deal With Trump: An Offer America Can Only Refuse," The Daily Beast, July 19. 2018

"Libya's future is bigger than any one leader," Middle East Institute, April 25, 2018

"Egypt continues efforts to unite Libyan military," Middle East Institute, March 19. 2018

"Devin Nunes is investigating me. Here's the truth," Washington Post, February 8, 2018.

"Libya to receive UN aid," Middle East Institute, January 22, 2018

"Libya: Reawakening the spirit of change," Middle East Institute, January 7, 2018

FBI PROTECTED MATERIAL REDACTED

**2017**

“Libya Talks Continue,” Middle East Institute, October 10, 2017

“French FM in Libya to Push for Peace,” Middle East Institute, September 5, 2017

“Outsiders’ Bets on Libya Torpedo Peace,” Cipher Brief, August 31, 2017

“Libya Weighing Choices between Rescues and Standoffs,” August 14, 2017

“Libya Still Seeking Grand Bargains, But Facing Range of Spoilers,” Middle East Institute, August 4, 2017

“Foreign Powers Should Push for Peace in Libya,” Middle East Institute, May 23, 2017

“Russia to Hold Navy Drill off Libyan Coast,” Middle East Institute, May 22, 2017

“Libya Talks Progress,” Middle East Institute, May 8, 2017

**2016**

Congressional Testimony, "US Policy in Libya," *Senate Foreign Relations Committee*, June 15, 2016

Congressional Testimony, “US Policy in Libya,” *House Foreign Affairs Committee,* November 30, 2016

**2015**

Op-Ed, “Time for Libyans to Seize the Moment,” *Libya Herald*, August 6, 2015

**2012**

Congressional Testimony, “The Case of George Wright and Beyond*,” U.S. Commission on Security and Cooperation in Europe (Helsinki Commission)* July 11, 2012

**2011**

“Youth Unemployment in North Africa and Middle East Driving Political Change,” *SitRep*, February 28, 2011

“Two Scenarios for Change in Egypt,” February 3, 2011; “Ozymandias in Egypt,” both in *Counterterrorism Blog*, January 31, 2011

**2010**

FBI PROTECTED MATERIAL REDACTED

"Mexican Money Laundering: A Study in Cross-Border Currency Flows, a Permeable Financial Services Sector," Center for Strategic and International Studies, October 2010

"Illicit Finance in China," a study for Centra Technology, September 2010

"Testing a Dangerous Yemen," Counterterrorism Blog, January 1, 2010

**2009**

"An Initial International Cooperation Agenda on High Consequence Events for the Obama Administration," *PACER National Center of Excellence on Homeland Security,* Johns Hopkins SAIS.

"Jakarta bombings highlight importance of splinter group analysis," Counterterrorism Blog, July 17, 2009

"Bipartisan Experts Tell Congress to Let Guantanamo Detainees Come to US," Counterterrorism Blog, July 13, 2009

"U.S. Public Health System Needs To Accelerate Attention to Bioterror Threat," *Counterterrorism Blog,* February 1, 2009

**2008**

"Countering Terrorist Finance: A Work, Mostly in Progress," article in *The Annals of the American Academy of Political and Social Science*, July 2008, in volume "Terrorism: What the Next President Will Face."

"Diplomatic Expulsions Highlight Need for US to Re-Engage with Latin America," September 14, 2008, "EU High Court Invalidates Sanctions Against Al Qaeda," "The Urgent Need for a Broader Counterinsurgency Approach in the FATA," September 2, 2008, "Islamic D-8 Summit Agenda in Malaysia Promotes Trade, Energy Revenue Sharing," July 7, 2008, "Details on Colombia Hostage Operation Right Out of Spy Thriller," July 2, 2008; "Colombia Rescues Ingrid Betancourt and Three US Hostages," July 2, 2008, "Boumediene v. Bush, Another View -- Judicial Oversight of Terrorist Detainment Essential to Freedom," June 16, 2008; "EU Agrees to Join US Iran Sanctions, Iran Gets Funds Out of Town," June 10, 2008; "In Southeast Asia, a Counterterrorism Strategy That's Working," June 9, 2008; "FARC's terrorist diplomacy reaches Germany," May 24, 2008; "INTERPOL Finds FARC Computers Material Authentic and Extensive," May 15, 2008; "Docs Suggest Chavez, FARC Agreed to Blame Paramilitaries for FARC's Murders," May 12, 2008; "More on the FARC-Chavez Connection," May 12, 2008; "Colombian Newspaper Reports INTERPOL Found No Tampering with FARC Computers," May 7, 2008; "UK Court Invalidates Terrorist Asset Freezing Regime as Unconstitutional," April 24, 2008; "FARC's Efforts to Assassinate Uribe Described in Seized Computers," April 23, 2008; "Indonesia Bans Jemaah Islamiyah After Malaysia Arrests Leaders On Way to Syria," April 21, 2008; "Ecuador Publishes FARC Commander's "Brotherly Greetings," April 11, 2008;

FBI PROTECTED MATERIAL REDACTED

"New information on FARC Support For Ecuador Presidential Campaign," April 10, 2008; "FARC Uranium May Be Depleted, But It's Still Nuclear Material," March 28, 2008; "Colombia Announces Find of 66 Pounds of Uranium It Says Linked to FARC," March 26, 2008, "The FARC's Terrorist Diplomacy," March 18, 2008, "FARC allegations multiply, require vetting," March 10, 2008; "Provocative material in FARC computers needs broad disclosure and analysis," March 7, 2008, "U.S. reportedly skeptical about the dirty bomb allegation," March 5, 2008, "Growing International Free-For-All, As Charges Mount On Chavez Laundering and Terrorist Ties," March 4, 2008, "Al-Qadi Ruling Threatens EU and Ultimately UN Terrorist Sanctions Process," January 16, 2008 (all in *Counter-Terrorism Blog*).

**2007**

"Proposed Internet Gambling Regulation Would Require New Policies and Procedures for the U.S. Payments System," with Kathryn Marks, *Electronic Banking and Commerce Report*, Vol 12, Issue 9.

"Bhutto Murder Fits Pattern of Lashkar I Jhangvi Terrorism, With Nasty Implications," December 28, 2007; "Benazir Bhutto's Assassination -- a Lethal Assault on Democracy," December 27, 2007; "In Stunning Move, UN and US Delist Nasreddin and His Companies from Sanctions," November 16, 2007, "Canada's FinTrac Public Info Limited by Canadian Law," November 4, 2007, "Did Syria Have Visible WMD Program Prior to US Invasion of Iraq?," October 28, 2007, "Treasury Sanctions On Iran Will Have Commercial Impact For Foreign Banks," October 25, 2007, "Economic Sanctions and Iranian Containment," August 29, 2007 "Paradoxical Policies For Pakistan and Iran," August 6, 2007, "The Threat of "Homegrowns," June 3, 2007; "Battle of the Brands," May 20, 2007; "An Unusual Apparent Win-Win on North Korea," March 19, 2007, "Is U.S. Supporting Brotherhood Activities in Syria?," March 11, 2007, "Treasury's Message About Iran: "Be Afraid,"" March 9, 2007, "Bangladesh Stalled on Enacting Terrorist Finance Law," February 25, 2007, "Treasury Hits Iran With Another Proliferation Freeze," February 16, 2007, "The Pakistan Taliban," February 14, 2007; "Writing Now on Wall for Handling of Iranian Assets," February 13, 2007, "EU Undertakes Major Assault on PKK, Backed By US," February 11, 2007; "Regulators Provide Current Stats on Results of BSA Reporting," February 9, 2007, "Treasury Seeks $ to Hire New Specialists on Rogue States," February 6, 2007, "EU Privacy Czar Claims Right to Prohibit US Access to EU Financial Records," February 1, 2007, "Is Treasury Bank Freeze Real or Phony Issue Stalling NK Talks?," January 29, 2007; "Treasury To Take Away Kim Jong Il's iPods and Cognac," January 26, 2007; "CIA, Military Reveal Acquisition of Domestic Bank Records," January 14, 2007, "The "Material Support" Test for Terrorism," January 11, 2007; "$14 billion Iranian Bank Sepah Hit by US Sanctions," January 9, 2007; "Treasury Uses Sanctions Authority to Name More Syrian Proliferators," January 8, 2007, "Beach Bank Case Highlights Laundering Risk of Phone Cards," January 3, 2007 (all in *Counter-Terrorism Blog*).

**2006**

Testimony, House Committee on International Relations, Subcommittee on Oversight, "Offshore Banking, Corruption and the War on Terrorism," March 29, 2006.

FBI PROTECTED MATERIAL REDACTED

Advisory, "FinCEN Issues Clarification of Securities and Futures Industries Due Diligence Obligations Under § 312 of the USA PATRIOT Act," Alston & Bird, June 20, 2006. "Federal Financial Institutions Examination Council Releases 2006 Releases to the Bank Secrecy Act," *Electronic Banking Law and Commerce Report* (West Legalworks), September 2006 (Kathryn Marks, coauthor).

"EU Strikes Down Terrorist Finance Designation of Iranian Opposition," December 12, 2006; "UK Banks Bowing to Risk of Action from US on Iran," December 4, 2006; "European Privacy Czars Seek to Stop Terror Finance Monitoring," November 29, 2006; "Australia Finds US Pressure on Iran Having an Impact," November 26, 2006; "Clarifying the Status of Arab Bank in the U.S.," November 17, 2006; "Isolating Iranian Banking Activities," November 14, 2006; "Counter Insurgency and Counter Terrorism in Europe," October 15, 2006 (all in *Counter-Terrorism Blog*).

**2005**

"Cops Across Borders: The Evolution of Trans-Atlantic Law Enforcement and Judicial Cooperation," in *Transatlantic Homeland Security* (Routledge Publishing)

"Tracking Conflict Commodities and Financing," in *Profiting From Peace – Managing the Resource Dimensions of Civil War,"* (Rienner Publishing)

"Cleaning Up the UN," Washington Times (March 4, 2005)

"The President's Faith-Based Policy Towards Russia," (Stuart B. Eizenstat, co-author)," published in *NY Times online* (Khodorkovsky on Trial)

"Confronting International Terrorism -- Networking Individual Governments to Combat a Global Threat," *The Atlantic Council* (March 2005)

"New FinCEN Regulations Require Insurance Companies to Implement Anti-Money Laundering Programs and File Suspicious Activity Reports," with Kathryn Marks, *Electronic Banking Law and Commerce Report*, December 2005

**2004**

Testimony, *Senate Committee on Finance*, "U.S. Govt Efforts on Terrorist Finance," May 19, 2004

Articles, "Towards a Unified Tracking System for Conflict Commodities and Financing," Economic Agendas in Civil Wars (*UN International Peace Academy*, article version of 2005 book chapter)

"Yemen's Enduring Challenges," *Jamestown Monitor*, April 8, 2004

FBI PROTECTED MATERIAL REDACTED

**2003**

Testimony, "Terrorist Finance," *U.S. Senate Committee on Government Operations* (July 31, 2003

"The Finance of Illicit Resource Extraction," in *Natural Resources and Violent Conflic*t (World Bank Publishing)

"Old Rules, New Threats: Building Global Jurisdiction, Systems*," Council on Foreign Relations/American Society of International Law* (March 2003)

"Illicit Transactions and Nigerian Oil," CSIS Nigeria Working Group (May 2003)

"The Growing Role of International Institutions in Counterterrorism and Law Enforcement," *Council on Foreign Relations*, November 5, 2003

**2002**

Testimony, "Terrorist Finance," *Senate Judiciary Committee* (November 20, 2002)

"Finance of Illicit Conflict," *World Bank (online)* (December 2002)

"Globalization, Terrorist Finance, and Global Conflict," in the *Financing of Terrorism, Special Issue on Criminal and Regulatory Law Reform of the European Journal of Law Reform*, Geneva (Volume 4, Issue 2)

"International and Domestic Efforts to Combat Terrorist Finance Since 9/11," S*urvival, International Institute for Strategic Studies,* (Vol. 44 Number 3 Autumn 2002), coauthored with Dr. Trifin J. Roule).

"Review of International Money Laundering," *Strategic Survey*, London, (Spring 2002) (coauthored with Dr. Trifin J. Roule)

"Illicit Finance and Global Conflict*," Programme for International Co*-*operation and Conflict Resolution, Fafo Institute for Applied Social Science,* Oslo, Norway, Report 380, (March 25, 2002)

"How to clean up dirty money," *Financial Times* (March 22, 2002)

"Canadian Privacy Law," chapter in "GigaLaw Guide to Internet Law," Random House, September 2002

"EU Privacy Czars Consider Enforcement Test Cases," *E-Commerce Law Report*, Vol 4, No. 8, pg. 2, (June, 2002).

FBI PROTECTED MATERIAL REDACTED

**2001**

Testimony, "International Terrorist Finance," *Senate Committee on Banking, Housing and Urban Affairs*, (September 26, 2001) in connection with hearings on USA-Patriot Act following September 11 terrorist attacks.

"The Role of Economic Sanctions in Combating International Terrorism (And Its Place in The Trans-Atlantic Alliance),"*American Institute for Contemporary German Studies,* Johns Hopkins University (November, 2001).

"Characteristics and Features of Russian Organized Crime," commissioned by the *National Intelligence Center of the Central Intelligence Agency* (March, 2001).

"Russian Crime and Corruption In an Era of Globalization: Implications for the U.S." (May 2001), commissioned by *the Congressional Research Service*, in "Russia's Uncertain Economic Future," published by *Congress' Joint Economic Committee* (December 2001), written with Dr. Phil Williams.

"The EU Data Protection Directive: Implications for the U.S. Privacy Debate," March 8, 2001, *House Subcommittee on Commerce, Trade, and Consumer Protection*

"U.S. Approach to the Regulation of E-Commerce - Consensus or Collision with the EU," with JL Douglas, *Business Law International*, 2001 – HeinOnline.

**2000**

Testimony, Russian money laundering and financial crime issues, including Bank of New York/Benex case, House Committee on Banking and Financial Services, (March 9, 2000)

"The Coming Wave of Transparency Reform: A Tidal Shift," originally prepared as an address to Jesus College, Cambridge University on September 13, 1999, and published as an article in the *Journal of Financial Crime*, Institute of Advanced Legal Studies, Henry Stewart Publications (Spring 2000).

"Regulating the Free Flow of Information: a Privacy Czar as the Ultimate Big Brother," *John Marshall Journal of Computer and Information Law,* VOL. XIX • Fall 2000.

**1998**

Testimony, Money Laundering, *House Committee on Banking and Financial Services,* (June 11, 1998).

"Replacing Safe Havens with a Safe System," 12 *Amicus Curiae* 2.

FBI PROTECTED MATERIAL REDACTED

**1997**

Testimony, Migrant Trafficking, *House Judiciary Subcommittee on Immigration and Claims*, (April 21, 1997). Testimony, "Mexico: Measures to Combat Money Laundering, *House Banking and Financial Services Committee* (May 15, 1997).

"Alien Smuggling: Elements of the Problem," *Transnational Organized Crime,* 3.1, Frank Cass Publishers. McDonald, W-F. (Ed.) (1997).

"International Crime in the New Geopolitics: A Core Threat to Democracy," *in Crime and Law Enforcement in the Global Village*. Highland Heights, KY, and Cincinnati, OH: Academy of Criminal Justice Sciences and Anderson Publishing. ISBN 0-87084-196-3;

"Crime and Cooperation," *in European Integration and American Interests*, J Gedmin, edit, AEI Press

"Problems and Strategies to Attack Narcotics, Crime and Corruption in the Caribbean," Paper, *Georgetown University Conference on the Caribbean*.

**1996**

Testimony, Nigerian Crime, *House International Relations Committee, (*September 11, 1996).

Testimony, Money Laundering and Mexico, *House Banking and Financial Services Committee,* (September 5, 1996).

Testimony, "The Threat to U.S. Trade and Finance From Drug Trafficking and International Organized Crime," *Senate Caucus on International Narcotics Control of the Subcommittee on Trade of the Senate Finance Committee* (July 30, 1996).

**1992**

*The BCCI Affair*, Report to the Senate from Senator John Kerry and Senator Hank Brown, principal investigator and drafter (December, 1992).

"How Banking Reform Ended in 1991," *Durrell Journal of Money and Banking* (March 1992).

**1991**

"Will U.S. Regulators Rethink Role of Foreign Banks in Wake of BCCI Scandal?" *Durrell Journal of Money and Banking* (November 1991).

FBI PROTECTED MATERIAL REDACTED

**Lectures and Presentations**

Lecturer on foreign policy and national security issues *at Kent Center for Intelligence Analysis, Central Intelligence Agenc*y 2002-2013.

Lectured on foreign relations, national security, and national security law issues and on international financial regulation and enforcement, sanctions, money laundering, financial crime, information and computer security, data protection and privacy, payments systems and the regulation of payments systems, inward investment and trade, sanctions, corruption, terrorism, terrorist finance, transnational organized crime, extradition and mutual legal assistance, and intelligence issues: U.S.-China, US-Mexico, and U.S.-EU transborder investment and trade, and related topics at American Academy of Arts and Science (MA); American Banker (DC); American Bar Association International Section (New York); American Bar Association Committee on Law and National Security US-UK (London); American Conference Institute (New York); American Institute for Contemporary German Studies (DC); Asian Institute of International Studies (Asia-ISIS) (Singapore); Atlantic Council (Washington DC and Vienna, Austria); Argentine National School of Intelligence (Buenos Aires); Banking Institute (Charlotte, North Carolina); Bilateral US-Arab Chamber of Commerce (DC); Boston University (MA); Brookings Institute (DC); Bureau for National Affairs (BNA) (DC); Cambridge University, Jesus College (Cambridge UK); Canadian Institute of International Affairs (Toronto); Canadian Center for International Peace and Security (Ottawa); Carnegie Endowment (DC); Center for American Progress (DC); Central Intelligence Agency Kent School (Virginia); Center for Peace and Security Studies (CPSS); Center for Strategic and International Studies (CSIS)(DC); Cosmos Club (DC); Council on Foreign Relations (NY) and (DC); Cybersecurity Industry Alliance (DC); Dickinson College (Carlisle, PA) Duquesne University School of Law (Pittsburgh, PA) European Council on Foreign Relations (Berlin); Georgetown University (DC); George Washington University Homeland Security Institute (Washington DC); Harvard University Kennedy School of Government (Cambridge, MA); Global Forum Against Corruption (Doha); International Islamic Finance Forum (Geneva); International Monetary Fund (IMF) (DC); Jane's Defense Seminars (DC); Johns Hopkins University (DC); Middle East Institute (DC); NACHA (Washington DC); Nanjing Business Forum (Nanjing); National Defense University (DC); NATO (DC); New York University (NY); Offshore Alert Forum (Miami); Organization for Cooperation and Development (Paris); PACER National Center of Excellence on Homeland Security (DC); Princeton University (Princeton, NJ); Ripon Society (Rome, Italy); School of Advanced International Studies (SAIS) (DC); Strategic Research Institute (SRI) (DC); The Tahrir Institute for Middle East Policy (DC); Task Force on Financial Integrity & Economy Development (Washington DC); Thomson Financial (NY); Tufts University (MA); University Center for International Studies (University of Pittsburgh); University of London, School of Advanced International Legal Studies (London); (DC); United Nations (IPA) (NY) (Oslo, Norway and Bellagio, Italy); United Nations UNODC (Vienna Austria); University of Pennsylvania Law School (Philadelphia, PA); US Institute of Peace (DC); Washington College of Law (American University); US Special Forces Training Academy (Virginia Beach); Villanova University (Villanova, PA); Wilton Park, UK (UK Foreign Office); World Bank (DC).

FBI PROTECTED MATERIAL REDACTED

**Other**

Outside Director, Global Witness Foundation (US), 2003-2013
Member, Council on Foreign Relations Task Force on Terrorist Finance, 2002-2004
Steering Committee, CSIS Transnational Threats Initiative, 2002-2013 and 2017-2021
Member, Atlantic Council Experts Group on Terrorism, 2005-2006
Contributing Expert, Counter-Terrorism Blog, 2006-2011
Commissioner, Council on Foreign Relations Andes 2020 Commission, 2003-2004
On-air Expert, Terrorist Finance, ABC World News, September-December 2001
Senior Advisor, Kerry-Edwards Presidential Campaign and Kerry Presidential Debate Team (2004)
Obama for President Foreign Policy Task Force Member (Latin America) (2007-2008)
Biden for President Foreign Policy Task Force Member (Middle East) (2020)
US Institute of Peace Financial Sanctions Study Group on North Korea (2009)
OSI Burma Sanctions Study Group (2009)
Financial Services Volunteer Corps (2004-2008)

## IV. Expert Witness – 2019-2023

1. Served as Expert Witness since 2021 for the plaintiffs In Re: Terrorist Attacks on September 11, 2001, 03-MDL-1570 (GBD) (SN), regarding terrorist finance and related issues concerning certain charities and banks.

2. Served as Expert Witness from 2018-2021 in Marcus Wide of Grant Thornton (British Virgin Islands) Limited, and Hugh Dickson, of Grant Thornton Specialist Services (Cayman) Ltd, acting together herein in their capacities as joint liquidators of Stanford International Bank Limited and the Toronto-Dominion Bank, Ontario Superior Court of Justice Commercial List, Court File No: CV-12-9780-00CL

FBI PROTECTED MATERIAL REDACTED