Exhibit 71

Plaintiffs' Corrected Averment of Jurisdictional Facts and
Evidence and/or Statement of Facts as to Defendant Al Rajhi Bank
<u>Pursuant to Rule 56.1</u>

# EXHIBIT 2
# Part 1 of 3

# United States District Court

DISTRICT OF OREGON

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

**One story residential building located at 3800 S. Highway 99 in Ashland, Oregon.**

APPLICATION AND AFFIDAVIT

CASE NUMBER: 04-4009-M

I, Colleen Anderson, being duly sworn depose and say:

I am a Special Agent, Internal Revenue Service, Criminal Investigation, and have reason to believe
*Official Title*
that ____ on the person of or __XX__ on the property or premises known as (description):

3800 S. Highway 99 in Ashland, Oregon, further described in Attachment A,

in the District of Oregon, there is now concealed a certain person or property, namely:

fruits, evidence and instrumentalities of crimes against the United States, further described in Attachment B,

concerning a violation of Title 26, United States Code, Section(s) 7206(1) and Title 31, U.S.C. § 5324.

The facts to support a finding of Probable Cause are as follows:

See Attached Affidavit of Special Agent Colleen Anderson incorporated by reference as if fully reset forth herein.

Continued on the attached sheet and made a part hereof. ☒ Yes ☐ No

_Colleen Anderson_
Signature of Affiant

Sworn to before me, and subscribed in my presence

_2/13/04_  _____  at  __Medford, Oregon__
Date  Signature of Judicial Officer  City and State

John P. Cooney, U.S. Magistrate Judge

Name and Title of Judicial Officer

000137

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

In re:  3800 S. Highway 99                    ) Affidavit in Support of an
        Ashland, OR 97520                     ) Application for Search Warrant

I, Colleen Anderson, being duly sworn, depose and say:

1.      I am a Special Agent with the Internal Revenue Service - Criminal
Investigation, assigned to the Medford, Oregon Post-of-Duty.  As a Special Agent, I
investigate possible violations of the Internal Revenue Code (Title 26, United States
Code), the Money Laundering Control Act (Title 18, United States Code), and the Bank
Secrecy Act (Title 31, United States Code).

2.      This affidavit is in support of a search warrant application for 3800 S.
Highway 99 in Ashland, Oregon.  A detailed description of these premises is attached
hereto and incorporated herein as Attachment A.  The affidavit will show there is probable
cause to believe criminal violations of Currency and Monetary Instrument reporting
requirements and Internal Revenue Laws have been committed by two officers of the Al
Haramain Islamic Foundation, Inc. in Ashland, Oregon and evidence of these violations, as
detailed in Attachment B, attached hereto and incorporated herein, is presently located at
3800 S. Highway 99 in Ashland, Oregon.

3.      I make this affidavit based on my participation in this joint investigation, as
well as information I have received from other members of the joint investigation, including
the Federal Bureau of Investigation (FBI), the U.S. Immigration and Customs Enforcement

Affidavit in Support of Search Warrant - Page 1

(ICE), and other Internal Revenue Service personnel.

4.      I have been a Special Agent with IRS-CI since December 1995 and have conducted and assisted in numerous criminal investigations involving violations of federal tax laws, money laundering laws, and other related offenses where I have gained experience in locating, tracing, and corroborating financial information pertaining to the receipt and disposition of funds.  I also have a B.S. degree in Accounting.

## INTRODUCTION

5.      This affidavit will first establish that there is probable cause to believe Soliman ALBUTHE, a citizen of Saudi Arabia, traveled to Oregon in March of 2000 and obtained approximately $130,000 in traveler's checks.  Soon after obtaining the traveler's checks, ALBUTHE departed the United States (U.S.) with those traveler's checks, without declaring them on a Currency Monetary Instrument Report, as required by U.S. law, in violation of Title 31, United States Code, §5324..

6.      This affidavit will then establish that there is probable cause to believe that Pirouz SEDAGHATY (a.k.a Pete SEDA), a U.S. citizen, established a tax exempt charitable organization in the U.S. known as the Al Haramain Islamic Foundation, Inc., and that he knowingly filed a materially false informational tax return on behalf of the organization, in violation of Title 26, United States Code, §7206(1).

7.      To prove this tax violation, this affidavit will show that the Al Haramain Islamic Foundation, Inc.'s 2000 tax return was false in that some funds received by the organization in 2000 were omitted from the return and that the utilization of certain funds received by the organization were mischaracterized.  It will be shown that these omissions and mischaracterizations were material, in that if the transactions were properly reported,

Affidavit in Support of Search Warrant - Page 2

the organization would more likely be scrutinized by the IRS or law enforcement and the organization's tax exempt status would be in jeopardy, meaning that it could be subject to taxation.

      8.     Finally, I believe that evidence of these violations will likely be found at 3800 S. Highway 99 in Ashland, Oregon.

EVIDENCE

## BACKGROUND OF THE AL-HARAMAIN ISLAMIC FOUNDATION

      9.     The investigation has established that the Al Haramain Islamic Foundation (sometimes referred to herein as "AHIF" or "AHIF, Inc.") is one of Saudi Arabia's largest Non Governmental Organizations (NGOs) with offices throughout the world. AHIF's headquarters are in Riyadh, Saudi Arabia and its stated mission is to provide charitable services and Islamic education to people around the world. AHIF, Inc. appears to have first established its presence in the U.S. when Pete SEDA and Soliman ALBUTHE registered it with the Oregon Secretary of State as an assumed business name in October 1997. Oregon Secretary of State records show SEDA as the authorized representative of the organization with a principal place of business of 1257 Siskiyou Blvd. #224 in Ashland, Oregon.[1]

      10.    A document obtained during the investigation shows that in October 1997, the Al Haramain Islamic Foundation in Saudi Arabia appointed Soliman ALBUTHE true and lawful attorney in Al Haramain Foundation's name, place and stead. The document

---

[1] 1257 Siskiyou Blvd. in Ashland, Oregon is a private mail service known as the Mail Stop. A representative of the Mail Stop stated in an interview that SEDA and the Al Haramain Foundation lease private mail boxes from the Mail Stop.

Affidavit in Support of Search Warrant - Page 3

appears to give ALBUTHE broad legal authority to act on the organization's behalf within the U.S. The document is signed by Aqueel Bin Abdel-Aziz Al-Aqueel, who I know was, until recently, the general manager of AHIF.

11.    Jackson County Oregon Title company records show that, in December 1997, ALBUTHE purchased the property subject to this search warrant application at 3800 S. Highway 99 in Ashland, Oregon on behalf of the Al Haramain Islamic Foundation for approximately $190,162.50. ALBUTHE'S bank records, Immigration Forms 94 (I-94's), and Currency Monetary Instrument Reports (CMIR's) show that between October and December of 1997, ALBUTHE brought into the U.S. from Saudi Arabia over $206,000 in Visa Traveler's checks issued by the Al Rajhi Bank in Saudi Arabia, which he used to purchase 3800 S. Highway 99 in Ashland, Oregon.

12.    I have observed the building located at 3800 S. Highway 99 in Ashland, Oregon and reviewed Jackson County Assessors records pertaining to the location. Based on Jackson County Assessors records, I know that 3800 S. Highway 99 is a one story residence built in 1973 with a basement and garage on the bottom level and a total of 4,157 livable square feet.

13.    Documents provided by AHIF, Inc. to the IRS, as well as interviews conducted, indicate that 3800 S. Highway 99 was used by AHIF, Inc. to host prayer meetings and for the publication and distribution of Islamic books that deal with spiritual issues, including the distribution of Islamic books to prisoners. Information provided by AHIF, Inc.'s accountant shows 3800 S. Highway 99 appears to be the main facility in the U.S. in which AHIF, Inc. conducts its business activities. Information obtained from individuals familiar with the location indicates that SEDA also used 3800 S. Highway 99 as

Affidavit in Support of Search Warrant - Page 4

a personal residence for himself and his family until approximately February of 2003, when he departed the U.S. for Saudi Arabia. Individuals familiar with the location believe the use of 3800 S. Highway 99 as a prayer house ceased around the Spring of 2003.

14.    In February 1999, the Al Haramain Islamic Foundation incorporated through the Oregon Secretary of State and listed its corporate address as 1257 Siskiyou Blvd #224 in Ashland, Oregon which, as stated above, is a private mail facility. Along with AHIF, Inc.'s application, the organization submitted its Articles of Incorporation. In its Articles of Incorporation, AHIF claims that the organization's purposes are:

The corporation is organized as a public benefit corporation exclusively for religious, humanitarian, educational, and charitable purposes as defined in Section 501 ( C ) (3) of the Internal Revenue Code, and ORS 65.036 of the Oregon Revised Code. The corporation shall not carry on any activities which are not permitted by the Internal Revenue Code for such corporations which are exempt from federal income tax and to which contributions are deductible for federal income tax purposes. Al Haramain Islamic Foundation, Inc. stands against terrorism, injustice, or subversive activities in any form and shall not support any statement or acts of terrorism. Al Haramain Islamic Foundation, Inc. believes such conduct is contrary to Islamic principles.

15.    AHIF, Inc.'s Articles of Incorporation in Oregon listed SEDA as the organization's registered agent and the following individuals as the organization's board of directors:

(a)    Ageel Al-Ageel (Aqueel)

Affidavit in Support of Search Warrant - Page 5

(b)   Mansour Al-Kadi

(c)   Soliman H.S. Al-Buthe (ALBUTHE)

(d)   Perouz Seda Ghaty (SEDA)

16.   In June of 2000, AHIF, Inc. purchased property located at 2151 E. Division in Springfield, Missouri for $378,291.74. Title company and bank records show that a large portion of the funds used for the purchase of 2151 E. Division came from an AHIF, Inc. bank account in Ashland, Oregon, which only SEDA and ALBUTHE control. Similar to the purchase of 3800 S. Highway 99 in Ashland, Oregon in 1997, bank records, Immigration Forms 94 (I-94's), and Currency Monetary Instrument Reports (CMIR's) show ALBUTHE brought most of the funds used to purchase 2151 E. Division, Springfield, Missouri into the U.S. with him from Saudi Arabia. These records show that in May of 2000, just before AHIF, Inc.'s purchase of the Springfield, Missouri property, ALBUTHE brought $275,000 into the U.S. from Saudi Arabia. The $275,000 brought into the U.S. by ALBUTHE consisted of American Express Traveler's checks issued by Al Rajhi Bank in Riyadh, Saudi Arabia. Bank records show these funds were deposited into a Bank of America account in Ashland, Oregon, in the name of AHIF, Inc., and then ultimately used for the purchase of 2151 E. Division in Springfield, Missouri. I know that Pete SEDA purchased a cashier's check in the amount of $318,291.74 from Bank of America in Ashland, Oregon, made payable to First Escrow, Inc. This cashier's check was used to help purchase the property in Springfield, Missouri, and was bought with the traveler's checks brought into the U.S. by ALBUTHE.

17.   Based on AHIF, Inc.'s claim that it was a public benefit corporation organized

Affidavit in Support of Search Warrant - Page 6

exclusively for religious, humanitarian, educational, and charitable purposes, the IRS

granted AHIF, Inc. tax-exempt status in December of 2000. IRS records show that on a

Form 1023 *Application for Recognition of Exemption*, AHIF, Inc. listed their web site

address as www.alharamain.org and provided the following information about the

organization's governing body:

| Name | Address | Title of officer |
|------|---------|------------------|
| Ageel Al-Ageel | 1257 Siskiyou Blvd. #212 Ashland, OR | President |
| Mansuor Al-Kadi | 1257 Siskiyou Blvd. #212 Ashland, OR | Vice President |
| Soliman H.S. Al-Buthe | 1257 Siskiyou Blvd. #212 Ashland, OR | Treasurer |
| Perouz Seda Ghaty | 1257 Siskiyou Blvd. #224 Ashland, OR | Secretary |

18.     In June 2003, a grand jury subpoena was served on AHIF, Inc. in Oregon for

books and records, based on an investigation concerning AHIF, Inc.'s tax returns.

Documents received pursuant to the subpoena served on AHIF, Inc. and

other information obtained during the investigation, show that in addition to being the

President of AHIF, Inc. in Ashland, Oregon, Ageel Al-Ageel (aka Aqeel Abdul-Aziz Al-

Aqeel or Aqueel Bin Abdel-Aziz Al-Aqueel) is the General Manager of Al Haramain

Foundation, headquartered in the Kingdom of Saudi Arabia, Riyadh. The investigation

concerning AHIF, Inc.'s tax returns and the results of the investigation to date is more fully

described below.

RESULTS OF INVESTIGATION

Affidavit in Support of Search Warrant - Page 7

19.    I have examined bank records relating to AHIF, Inc. Bank records show that on February 24, 2000, Mahmoud T El Feki wired $149,985 to AHIF, Inc.'s Bank of America account number 2880311561 in Ashland, Oregon, from an account with the National Bank of Kuwait in London, England.

20.    I have examined copies of e-mails received pursuant to a grand jury subpoena served on Al-Haramain in Oregon. In one e-mail, someone with an e-mail address of "s-elfeki" wrote in part "I have the pleasure [of] informing you that I have already asked my bank in London to make a transaction to your USA account, using the details provided in an earlier e-mail, as Zakat[2] in order to participate in your nobel support to our muslim brothers in Chychnia..." The author of this e-mail went on to state that the donation was made by "Dr. Mahmoud Talaat El-Fiki," and that he had a mailing address in Giza - Cairo, Egypt. The author of this e-mail also asked that a letter and e-mail be sent to him confirming the $150,000 transaction.

21.    Another document provided by AHIF, Inc., in Ashland, Oregon pursuant to the grand jury subpoena shows Al-Haramain's general manager, 'Aqeel Abdul-Aziz Al-'Aqeel, sent a letter dated February 21, 2000 stating in part:

"Dear Brother Dr. Mahmoud T. Al-Fiki, ... On behalf of Al-Haramain Foundation management and staff, I would like to thank you for your generous donation of $150,000 (One hundred-fifty thousand dollars) as zakaat. We appreciate your trust in Al-Haramain Islamic Foundation and assure you of our

---

[2]The term "Zakat" is defined in an Islamic glossary as the fourth of the five pillars of Islam, and is the obligatory alms or charity tax imposed on all practicing Muslims.

Affidavit in Support of Search Warrant - Page 8

commitment to continue every possible effort to help ending the Chechnyan crisis". This letter appears to bear the signature of Aqeel Abdul-Aziz Al-'Aqeel, the General Manager of Al-Haramain in Riyadh, Saudi Arabia.

22.     I have learned from a non-governmental international terrorism consultant that Chechnya is a tiny North Caucasus province ethnically comprised of Turkic-Muslim people that has had a long history of Muslim-led guerilla resistance to European occupation, including a long struggle against Russian occupation. By the Spring of 1995, the Russo-Chechen conflict over the independence of Chechnya from Russia drew the attention of several well known Arab mujahideen[3] commanders. These Arab mujahideen commanders came to Chechnya because they believed there was a jihad occurring there and they saw an opportunity to defend the Muslim world against infidel aggression. By the end of 1996, it is estimated that the total number of foreign mujahideen in Chechnya reached as high as 700. According to some Russian officials, the Chechnyan mujahideen have received substantial funding from Islamic charities and Non Governmental Organizations.

23.     The Washington Post published an article on the history behind the Chechen conflict in April of 2003, titled *How Jihad Made Its Way to Chechnya.* The article says that the goal of the Arabs who came to the Chechen region went beyond preserving Chechnya's freedom; they wanted to merge Chechnya and nearby Dagestan to create an

---

[3]I was informed by an international terrorism consultant that the word mujahideen is used by some to describe themselves as "holy warriors" who engage in a physical struggle and/or armed conflict known as a jihad to confront "infidels", who are individuals who do not practice the religion of Islam.

Affidavit in Support of Search Warrant - Page 9

Islamic state. The article goes on to say Russian intelligence officials estimate that over the past 3½ years, hundreds of Arab radicals fueled fighting in the Chechen conflict with their fervor and funds, which cost the lives of more than 4,500 Russian soldiers, thousands of rebels, and many civilians.

24.     According to a December 2003 U.S. News and World Report article titled "The Saudi Connection," some Saudi charities are well integrated into the jihadist movement. The article states that U.S. officials have concluded that one of Saudi Arabia's largest charities, the Al-Haramain Foundation (Riyadh), was providing arms or cash to terrorists, including those in Indonesia, Pakistan, and Somalia. The article states that Russian officials suspect that in Chechnya, the AlHaramain Foundation moved $1 million to the rebels and arranged the purchase of 500 heavy weapons from the Taliban.

25.     Through the investigation, I know that at least six offices of the AlHaramain Foundation have been investigated for funding and providing other material and logistical support to Islamic mujahideen throughout the world, including Usama bin Laden's Al Qaida network. In March of 2002, the U.S. Department of Treasury, through the Office of Foreign Asset Control (OFAC), designated the Bosnia and Somalia offices of the AlHaramain Foundation as supporters of terrorism. In January of 2004, the Indonesia, Kenya, Tanzania, and Pakistan offices of the AlHaramain Foundation were jointly designated by the Kingdom of Saudi Arabia and the U.S. Department of Treasury, through the Office of Foreign Asset Control (OFAC), as supporters of terrorism. As a result of these designations, United States persons and/or property or interests within the United States are prohibited from engaging in transactions or dealings with these offices. In addition, in

Affidavit in Support of Search Warrant - Page 10

# EXHIBIT  2
# Part 2 of 3

January 2004, the United Nations imposed sanctions on the Al-Haramain offices in

Indonesia, Pakistan, Kenya and Tanzania, requiring member nations to impose a travel

ban, arms embargo and asset freeze on those entities.  The Al-Haramain offices in Bosnia-

Herzegovina and Somalia were placed on this same list by the U.N. in March 2002.

26.    I have learned 'Aqeel Abdul-Aziz Al-'Aqeel, the general manager

of the Al-Haramain Foundation in Saudi Arabia and the President of AHIF, Inc. here in

Oregon, was recently fired from his position in Saudi Arabia.  The Wall Street Journal

reported on Friday, January 9, 2004, that the Saudi Government removed Al-'Aqeel from

his position and the Al-Haramain Foundation had been the subject of intense investigation

by the U.S. for possible terrorist links, with several of its regional branches being shut

down by U.S. and Saudi officials.

27.    The Washington Post reported in April of 2003 that in a Russian Federal

Security Service internal memo, Al-Haramain's director (Aqeel) was accused of

exchanging a message with Arab commanders in Chechnya in which he reportedly stated,

"Today, AlHaramain has $50 million for the needs of the mujaheddin".  However, Aqeel

denied allegations that AlHaramain offices used charitable donations to finance terrorist

activities and stated, "We do not have any relationship with any terrorist activities.  We

work under the supervision of the Saudi government."

28.    During the investigation, information was found on an Al-Haramain website,

www.alharamain.org , which showed The Al-Haramain Islamic Foundation in Saudi Arabia

strongly supported the cause of the mujahideen fighters in Chechnya in 1999 and 2000.

Information on their website included reports and articles about the mujahideen in

Affidavit in Support of Search Warrant - Page 11

Chechnya.  One report titled "The Latest News About The Jihaad in Chechnya" appeared to give specific information to its readers about the battles between the Russian forces and the mujahideen in Chechnya.  An article written by the editor of Al-Haramain, Riyadh's website, dated January 2000, appears to include prayers for the Mujahideen and reads, in part, as follows:

> "My Muslim Brother: Help from you towards us, would be that you raise your hands towards the heavens on a regular basis and make Du'aa to Allah for us and beseech Him, with the following Du'aa:
>
> O Allah! Who sent down The Book...Who makes the clouds drift; Who defeats the armies....Defeat Russia! O All Mighty! O All Powerful! O Allah Indeed we ask that You Scatter their firing, and Shake the earth beneath their feet, and Strike fear in their hearts. O Allah! Cripple their limbs and Blind their sight, and send upon them an epidemic and calamities. O Allah! Separate their gatherings and Scatter their unity, and make their condition severe amongst themselves, and make their plots go against them, and show us in them the amazements of your Power, and make them a lesson for those who do not learn lessons. O Allah! Hurry their destruction, and make their wealth as booty for the Muslims.
>
> O Allah! Aid our Mujaahideen brothers in Chechnya. O Allah! Unify their rows, and gather them on the word of truth. O Allah! Aim their firing and strengthen their determination, and make their feet firm, and

Affidavit in Support of Search Warrant - Page 12

descend upon them tranquility, and satisfy their hearts and guide them
to that which is all good. O Allah! Make for them from Yourself an
authority, and aid them with the army from Yourself, for to You belong
the armies of the heavens and the earth, O Lord of the Worlds. May
Salaah and Salaam be upon the Messenger of Allah and upon all his
followers and companions. And thusly we pray for all those fighting to
protect the honor of Allah's Deen and the protection of the Muslimeen,
Aameen, Aameen, Aameen."

### VIOLATION OF TITLE 31 USC §5324

29.    After Mahmoud T El Feki wired approximately $150,000 from
London, England to an AHIF, Inc. bank account in Ashland, Oregon on February 24, 2000,
U.S. Immigration and Customs Enforcement records show ALBUTHE entered the U.S.
from the Kingdom of Saudi Arabia. As documented on immigration form I-94 number
35584030208, ALBUTHE flew into John F. Kennedy (JFK) International Airport in New
York on March 7, 2000 and was admitted under admissions code B1, visitor for business.
ALBUTHE identified himself on the form as a Saudi Arabian citizen with passport number
B049614, a date of birth of December 8, 1961, and claimed a visiting United States
address of 1257 Siskiyou Blvd., 212 in Ashland, Oregon.[4]

30.    Bank records show on March 10, 2000 ALBUTHE obtained a portion of the
funds El-Feki wired to AHIF, Inc. by purchasing one hundred thirty (130) $1,000 American
Express Travelers checks. Al-Haramain had to pay a total of $1,300 to the Bank of

_____

[4] As stated above, this is a private mailbox facility utilized by SEDA and AHIF, Inc.

Affidavit in Support of Search Warrant - Page 13

000150

America for the purchase of the travelers' checks. The funds used to purchase these traveler's checks and the bank fees were both withdrawn from AHIF, Inc. account number 2880311561 in Ashland, Oregon. Bank records show that the only two signers on AHIF, Inc. account number 2880311561 are Pete SEDA and Soliman ALBUTHE. Information provided by a Bank of America employee indicates that ALBUTHE came into the Ashland branch on March 10, 2000 with SEDA and SEDA'S son, Jonah, to purchase the traveler's checks.

31.     The bank employee was told by SEDA that they would like to negotiate a check out of the foundation's account for $130,000 worth of traveler's checks in certain denominations. The bank employee told SEDA the bank did not have enough of those denominations and the bank employee tried to convince SEDA to take a cashier's check instead. SEDA said he could not take a cashier's check because the money was to help people and a lot of times these people may not be able to negotiate a cashier's check. Ultimately, the bank employee issued one hundred thirty (130) $1,000 American Express Traveler's checks to ALBUTHE.

32.     Bank records also show that on March 11, 2000 the remaining funds El-Feki wired to AHIF, Inc. were obtained by SEDA through the purchase of a $21,000 Bank of America cashier's check, check number 1001040568. Information provided by a bank employee with Bank of America in Ashland shows SEDA came into the bank's Ashland branch on March 11th to purchase the cashier's check and authorized the check to be issued to ALBUTHE.

33.     Additional records provided pursuant to grand jury subpoena indicate that the $21,000 withdrawn from the AHIF, Inc. account by ALBUTHE and SEDA were intended to

Affidavit in Support of Search Warrant - Page 14

be distributed to persons in Chechnya. These records include a copy of the $21,000

cashier's check payable to ALBUTHE, with the notation, "Donations for Chichania

Refugees" handwritten on the front of the check.

34.    I have examined copies of two agreements provided under subpoena by Al-

Haramain in Oregon. The agreements are between "Soliman" (who I believe to be Soliman

Al-Buthe), and "Abu Yunus" (which I know through this investigation is an alias or Muslim

name used by Pete SEDA). Both of the agreements appear to have been signed by

ALBUTHE and SEDA, dated 4th of Thul Hijjah, 1420.[5] Both agreements state in part that

SEDA was turning all monies over to ALBUTHE for the "Brothers and Sisters in Chechnya"

and that Abu Yunus was relieved of all responsibilities for the money.

35.    The two agreements are slightly different. One states ALBUTHE received

$188,465 and contains, in addition to the signatures of SEDA and ALBUTHE, the

signatures of two unidentified witnesses. The second agreement, however, states

ALBUTHE received $186,644.70, lists a second handwritten date of March 11, 2000, and

contains the notation "I deposit the amanet [6] in Alharamain head office for Chechenya

Refugees", and appears to have been signed a second time by ALBUTHE.

36.    U.S. Immigration and Customs Enforcement records show that on March 12,

2000 ALBUTHE left the United States from JFK International Airport in New York on Saudi

Arabian flight 38, as documented on immigration form I-94 number 35584030208. An

inspector for Customs and Border Protection determined that on March 12, 2000, Saudi

---

[5] The 4th of Thul Hijah, 1420 is from the Islamic Calendar, which translated means
approximately the 11th of March, 2000.
[6] I have learned from an FBI translator that the word "amanet" in Arabic translates to the
phrase "something entrusted with".

Affidavit in Support of Search Warrant - Page 15

Arabian flight 38 flew from New York, New York to Riyadh, Saudi Arabia, connecting to Dhahran.

## CMIR REQUIREMENTS:

37.    From my training and experience, I know that Currency and Monetary Instrument Reports (CMIR's) are used by government agencies, including the IRS, to track currency and other monetary instruments coming into and leaving the U.S. Based on the training and experience of ICE Special Agent Robert Priddy and his conversations with other experienced ICE Special Agents, I also understand the following regarding the laws relating to CMIRs:

38.    CMIR reporting requirements are imposed by U.S. Treasury regulations promulgated at Title 31 C.F.R. §103.23, pursuant to Title 31 U.S. C. §5316. In summary, the requirements mandate that any person physically transporting currency or certain monetary instruments, including traveler's checks in any form, in an aggregate amount exceeding $10,000 at any one time, into or out of the United States, must file a CMIR with United States Customs and Border Protection. A review of a CMIR shows that it requires the person filling out the report to provide, in part, information pertaining to the person's identity, information about the exportation or importation of funds, information about the person's business on whose behalf importation or exportation was conducted, information about the type and amount of currency and/or monetary instruments, and the signature of the person completing the report.

39.    Title 31 U.S.C. §5324 provides in most pertinent part:

(c )    International monetary instrument transactions. No person

Affidavit in Support of Search Warrant - Page 16

shall, for the purpose of evading the reporting requirements of

section 5316— (1) fail to file a report required by section 5316,

or cause or attempt to cause a person to fail to file such

report;...

    (d)    Criminal penalty.— (1) In general.--- Whoever violates this section

shall be fined in accordance with title 18, United States Code,

imprisoned for not more than 5 years, or both.  (2) Enhanced penalty

for aggravated cases.—  Whoever violates this section while violating

another law of the United States or as part of a pattern of illegal

activity involving more than $100,000 in a 12 month period shall be

fined twice the amount provided in subsection (b) (3) or (c ) (3) (as the

case may be) of section 3571 of title 18, United States Code,

imprisoned for not more than 10 years, or both.

40.    The elements of a CMIR violation charged under Title 31 U.S.C. § 5324 most

pertinent to this case are:

    (a)    The violator transported, shipped, or mailed-or

attempted to transport, ship, or mail-currency or other

reportable monetary instruments into or out of the United

States, or the violator received in the United States

currency or other reportable monetary instruments

transported, shipped, or mailed from abroad;

    (b)    The value of the currency or other reportable monetary instruments

Affidavit in Support of Search Warrant - Page 17

involved in the violation exceeded $10,000 U.S. in an aggregate amount at any one time; and

(c)     The violator acted for the purpose of evading the requirements by failing to file a report, or causing another to fail to file a report, when required to do so.

41.    As stated above, U.S. Immigration and Customs Enforcement records show ALBUTHE left the United States from JFK International Airport in New York on Saudi Arabian flight 38 on March 12, 2000.  Officials at ICE informed me that no CMIRs were found related to this departure, nor did ALBUTHE ever file a CMIR reporting that he took the $130,000 in traveler's checks out of the country.

42.    Immigration Forms 94 obtained by U.S. Immigration and Customs Enforcement show between October 1997 and April 2001, ALBUTHE crossed the United States border at least thirteen times.  During this time period, ALBUTHE filed nine (9) CMIRs, showing he transported a total of $777,845 into the United States.  From the nine CMIRs filed by ALBUTHE, seven of them were filed based on ALBUTHE'S transportation of traveler's checks.  The filing of nine CMIRs by ALBUTHE, unrelated to the financial transactions detailed earlier in this affidavit, shows that he knew he was required to file the CMIR form while transporting currency or monetary instruments, including traveler's checks, into the United States.

43.    A CMIR clearly states on its face that it is required to be filled out by anyone departing or entering the United States, or a person shipping, mailing, or receiving currency or monetary instruments.  In addition, the general instructions to the form state

Affidavit in Support of Search Warrant - Page 18

that persons who must file the form are each person who physically transports, mails, or ships, or causes to be physically transported, mailed, or shipped currency or other monetary instruments in an aggregate amount exceeding $10,000 at one time from the United States to any place outside the United States or into the United States from any place outside the United States.

44.     I have reason to believe that ALBUTHE speaks, reads, and/or writes English and therefore was aware of the requirement to report funds exceeding $10,000 while departing the U.S. In addition to filling out CMIRs on nine prior occasions, the investigation has shown that ALBUTHE appears to have written, "I deposit the amanet in Alharamain head office for Chechenya Refugees", on an agreement between him and SEDA and then signed the agreement. A document containing e-mails that was provided by AHIF, Inc., pursuant to a grand jury subpoena also indicates that ALBUTHE reads English. The e-mails were conducted between SEDA and other individuals in English and ALBUTHE appears to have received a carbon copy (Cc:) of these e-mails.

45.     I have attempted to learn the disposition of the $130,000 in traveler's checks and the $21,000 cashier's check obtained by ALBUTHE from AHIF, Inc. funds. An analysis of the American Express Travelers checks indicates ALBUTHE cashed the traveler's checks on approximately March 25, 2000 at Al Rajhi Banking and Investment in the Kingdom of Saudi Arabia.

46.     An analysis of the $21,000 cashier's check ALBUTHE received from SEDA shows the check was deposited into an Al Rajhi Banking and Investment account in the Kingdom of Saudi Arabia. A date for the deposit could not be established due to illegible

Affidavit in Support of Search Warrant - Page 19

bank stamps found on the back of the check, however Arabic markings on the check indicate that the cashier's check was deposited in what appears to be a personal account for ALBUTHE at Al Rajhi Banking and Investment.

47.   In summary, I believe there is probable cause to believe that ALBUTHE knowingly failed to file a CMIR when he departed the U.S. on March 12, 2000 with the one hundred thirty (130) $1,000 American Express Traveler's checks.  I believe that because SEDA assisted ALBUTHE with the purchase of the traveler's checks, and that the agreements pertaining to the turning over of these funds to ALBUTHE appear to have emanated from AHIF, Inc. in Ashland, Oregon, it is likely additional evidence of the CMIR violation may be located at 3800 S. Highway 99, where I believe AHIF, Inc. has conducted most of its business affairs.   Further, since it appears that SEDA and ALBUTHE have attempted to conceal the movement of funds to Chechnya, as more fully described below, there may other similar transactions conducted which we have not yet detected. Therefore, I request authorization to search for evidence of all financial transactions conducted between October 1997 and February 2003 which involved cash, traveler's checks, cashier's checks or money orders, and the individuals or entities set forth in attachment B, for indications of additional CMIR violations.

**VIOLATION OF TITLE 26 U.S.C 7206(1)**

48.   The second violation to be established in this affidavit is the willful filing of a false tax return by SEDA with the IRS for the year 2000.  Support for this violation is as follows.

49.   IRS records show that SEDA filed a 2000 Form 990, *Return of Organization*

Affidavit in Support of Search Warrant - Page 20

000157

*Exempt From Income Tax,* in October of 2001 on behalf of AHIF, Inc.  AHIF, Inc.'s

accountant, Thomas J. Wilcox, Certified Public Accountant (CPA), stated that he prepared

AHIF, Inc.'s 2000 Form 990 in his office in Medford, Oregon.  Accountant Wilcox also told

me that the return bared his signature and the signature of SEDA and that SEDA signed

the form in his accounting office before the returns were filed with the IRS via certified mail.

**FILING REQUIREMENTS:**

50.     From my experience and from consulting with experienced exempt

organization specialists within the IRS, I know that, under the Internal Revenue Code, tax-

exempt public charities are required to file annual information returns with the IRS on Form

990, *Return of Organization Exempt From Income Tax,* if their gross receipts during the

year exceed $100,000.

51.     Similar to for-profit entities, tax exempt entities are subject to audit by the

IRS.  If upon review of the organization's Form 990 and backup documentation, the IRS

determines the organization is not operating consistently with its tax-exempt purpose, then

the IRS may revoke the tax exemption, or impose excise taxes based on the nature and

severity of the violation.  Once an organization loses tax-exempt status, its total revenues

are subject to federal income taxation, based upon its business form (i.e. corporation,

partnership, or sole proprietorship).

52.     From my experience, I know that under Title 26 U.S.C. § 7206(1), any person

who willfully makes and subscribes any return, statement, or other document, which

contains or is verified by a written declaration that it is made under the penalties of perjury,

and which he does not believe to be true and correct as to every material matter shall be

guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000

Affidavit in Support of Search Warrant - Page 21

($500,000 in the case of a corporation), or imprisoned not more than 3 years, or both, together with the costs of prosecution.

53.     The elements of Title 26 U.S.C. § 7206(1) are:

(a)     The taxpayer made and subscribed a return, statement, or other document;

(b)     The return, statement, or other document contained a written declaration that it was made under the penalties of perjury;

(c)     The taxpayer did not believe the return, statement or other document to be true and correct as to every material matter; and

(d)     Willfulness.

54.     In AHIF, Inc.'s 2000 Form 990, I believe SEDA attempted to disguise the true disposition of the $150,000 that AHIF, Inc. received from Mahmoud El-Fiki in February of 2000, as described above, in order to prevent law enforcement and/or the IRS from scrutinizing the transaction. SEDA disguised the true disposition of the funds received from El-Fiki by causing the omission of AHIF, Inc.'s receipt of some of the funds and mischaracterizing the utilization of the remaining funds, as explained in detail below.

55.     Accountant Wilcox said he first met SEDA in December of 1999 and from his first meeting with SEDA, SEDA told him that he thought the AHIF, Inc. and/or himself would be scrutinized by the U.S. government. Accountant Wilcox said SEDA believed his phones had been tapped for over ten years because the U.S. government thinks all Muslims are Bin Laden followers, but SEDA said this is far from the truth. Therefore,

Affidavit in Support of Search Warrant - Page 22

SEDA told Accountant Wilcox that the books had to be right and clean, because if they are not, AHIF, Inc. will be audited.

56.    Accountant Wilcox said the original records and backup documentation for AHIF, Inc. are maintained at the organization's facility at 3800 S. Highway 99 in Ashland. Accountant Wilcox estimated that he has been to AHIF, Inc.'s Ashland facility about four times and the last time he was there was on January 13, 2003, prior to SEDA's departure from the U.S.  Accountant Wilcox recalled the Ashland facility contained a downstairs office with two computers, filing cabinets, and banker boxes full of records.  Accountant Wilcox told me that AHIF, Inc. used a software accounting program called Quickbooks for the organization's financial transactions and this program was contained in a computer located against the far wall in the downstairs office at 3800 S. Highway 99 in Ashland. Accountant Wilcox said he trained two women named "Laleh" and "Sumer" at 3800 S. Highway 99 in Ashland on how to use the Quickbooks software program.

57.    Accountant Wilcox said these two women categorized and input the income and expense items into the AHIF Inc.'s Quickbooks program, while SEDA oversaw them, and they called Wilcox if they had any questions.  Accountant Wilcox stated that SEDA told him several times to make sure these women knew the program and to ensure the records were clean.  I have attempted to interview Laleh and Sumer by asking them on June 23, 2003 to telephone me to arrange an appointment.  Neither of the two women ever contacted me, and I have reason to believe they no longer reside or work at 3800 S. Highway 99, Ashland, Oregon.  I have been unable to contact them since June 2003.

58.    Accountant Wilcox said he prepared AHIF, Inc.'s returns using information provided by SEDA, which included AHIF, Inc.'s bank statements, bank reconciliation

Affidavit in Support of Search Warrant - Page 23

statements, and summaries from their Quickbooks accounting program. Accountant Wilcox said that with a Quickbook's disk, it is possible for him to get a full detailed income and expense printout for each year. However, he said the transaction details for 1999 and 2000 are no longer available for review because SEDA told him that AHIF, Inc.'s computer crashed in October of 2001.

59.     In an interview with Accountant Wilcox, I showed him several documents pertaining to the apparent disposition of the $150,000 AHIF, Inc. received from El-Fiki in February of 2000, as described in this affidavit. These records included bank documents pertaining to the purchase of the $130,000 in traveler's checks by ALBUTHE, bank documents pertaining to the purchase of the $21,000 cashier's check by SEDA, copies of the two agreements provided by AHIF, Inc. between ALBUTHE and SEDA stating monies were being turned over to ALBUTHE for the Brothers and Sisters in Chechnya, and a copy of the check provided by AHIF, Inc. with the notation, "Donations for Chichania Refugees". After reviewing this documentation, Accountant Wilcox said SEDA did not provide him any records indicating these funds were being sent to Chechnya. He said if he had known about the disposition of the funds in Chechnya, he would have prepared the 2000 Form 990 differently.

60.     Accountant Wilcox stated the information he received from SEDA pertaining to the disposition by AHIF, Inc. of the $131,300 showed the funds were used to purchase the Springfield, Missouri prayer house, described earlier in this affidavit. I have reviewed AHIF, Inc.'s Quickbooks Springfield, Missouri building schedule, which was provided to Accountant Wilcox for preparation of the organization's 2000 Form 990. The schedule shows SEDA, or one of his associates, improperly listed the $131,300 disbursement to

Affidavit in Support of Search Warrant - Page 24

# EXHIBIT  2
# Part 3 of 3

ALBUTHE as funds used to purchase the Springfield prayer house, showing a total purchase price of $461,541,74.

61.     I have obtained the closing records from the purchase of the Springfield, Missouri prayer house and I reviewed those records with Accountant Wilcox.  The closing documents show that AHIF, Inc. purchased the property for $378,291.74, not for the $461,541.74 SEDA reported to AHIF, Inc.'s accountant.  Thus, SEDA or his associates appear to have deceived AHIF, Inc.'s accountant by providing the accountant with information which overstated the purchase price of the Springfield, Missouri property by over $80,000.  In addition, Accountant Wilcox stated that based on conversations he had with SEDA, it was his understanding that the $21,000 issued to ALBUTHE were funds going back to the original contributor.  I have reviewed AHIF, Inc. Quickbook's detail schedule for reimbursed expenses provided to Accountant Wilcox for the preparation of the organization's 2000 Form 990.  The detail schedule for reimbursed expenses shows SEDA, or someone assisting him and AHIF, incorrectly listed the $21,000 as a reimbursed expense, rather than as funds being distributed to Chechnya.

62.     After reviewing the aforementioned documents with Accountant Wilcox, he stated the contribution income on AHIF, Inc.'s 2000 Form 990 appears to be understated due to the $21,000 that was disbursed to ALBUTHE and backed out of contribution income.  In addition, Accountant Wilcox stated that grants and allocations on AHIF, Inc.'s 2000 Form 990 appears to be understated by over $150,000, due to the disbursement of the funds to ALBUTHE for apparent distribution in Chechnya.  Lastly, Accountant Wilcox stated that the cost basis in the Springfield, Missouri prayer house may be overstated due to the fact that the $131,300 disbursed to ALBUTHE for distribution in Chechnya should

Affidavit in Support of Search Warrant - Page 25

not have been added to the cost basis of the asset.

63.   In summary, I believe there is probable cause to believe that the 2000 Form 990 filed by SEDA on behalf of AHIF, Inc. is materially false. Based on various documents described above and information provided by AHIF, Inc.'s accountant, I believe that the following line items on AHIF, Inc.'s 2000 Form 990 are materially false:

   a)   Line 1a is false, in that AHIF, Inc.'s contribution income is understated by at least $21,000;

   b)   Line 22 is false, in that grants and allocations are understated by at least $150,000;

   c)   Line 57a is false, in that the organizations basis in land, buildings, and equipment is overstated by the incorrect addition of the $131,300, which appears to have been disbursed to ALBUTHE for distribution in Chechnya.

64.   Based on the evidence described above, I believe SEDA deliberately attempted to mislead the IRS about the true disposition of the funds received from El-Fiki and given to ALBUTHE. SEDA attempted to disguise the disposition of these funds by causing AHIF, Inc.'s accountant to omit $21,000 from the organization's contribution income, thus allowing the distribution of these funds to ALBUTHE without having to account for the funds on the Form 990. In addition, SEDA mischaracterized the disposition of the $131,300 to ALBUTHE by falsely claiming that the funds were used to purchase the Springfield, Missouri prayer house.

65.   I have consulted with IRS tax exempt experts regarding the false reporting of

Affidavit in Support of Search Warrant - Page 26

000163

the disposition of funds by a tax exempt charitable organization, in the manner shown above. A tax exempt expert has informed me that if a tax exempt charitable organization's Form 990 was false in this regard, then AHIF, Inc.'s tax exempt status may be questioned and/or revoked. If AHIF, Inc.'s status was revoked, AHIF, Inc. would be responsible for paying U.S. taxes and would more likely be scrutinized by the IRS, including IRS Criminal Investigation and other law enforcement agencies.

## LIKELIHOOD OF RECORDS BEING FOUND AT LOCATION

66.     The investigation has established SEDA left the U.S. for Saudi Arabia in February of 2003. SEDA told an FBI special agent that he planned on returning to the U.S. on March 11, 2003 or March 12, 2003. Flight records retrieved and analyzed by agents involved in the investigation show SEDA has not returned to the U.S. Currently, there does not appear to be any business or religious activities at 3800 S. Highway 99. The front gate has often been padlocked since SEDA's departure. I know that Pete SEDA's son, Jonah Seda, left the United States in December 2003, but has recently returned and appears to be residing at 3800 S. Highway 99, Ashland, Oregon. Property records reflect that AHIF, Inc. still owns the property. Information received from Pacific Power indicates that the utilities at 3800 S. Highway 99, Ashland, Oregon are still in the name of Al-Haramain and that the last payment was received on January 21, 2004.

67.     Although SEDA presently remains abroad, I have reviewed evidence that shows AHIF, Inc. is still operating in Oregon. First, according to a representative of The Mail Stop, a private mail service in Ashland, Oregon, AHIF, Inc. is still actively using its private mail box and the organization's mail is being retrieved regularly by, among others,

Affidavit in Support of Search Warrant - Page 27

Jonah Seda. This representative also stated that Pete SEDA, by way of e-mail, renewed AHIF's private mail box at the Mail Stop for another six months on Februuary 6, 2004. Secondly, AHIF, Inc.'s bank records show that, even though SEDA left the U.S. in February of 2003, the organization is still conducting limited, but continuous bank activity. Bank records show deposits and disbursements from AHIF, Inc.'s main account in Ashland, Oregon continued until June 2003, which indicates AHIF, Inc. was active after SEDA left the U.S. Third, according to Unicom, an internet service provider, Unicom provided internet service to 3800 S. Highway 99, Ashland, Oregon until February 10, 2004, at which time service was canceled. Fourth, according to a representative of Qwest, as of February 10, 2004, there were four active telephone numbers associated with Pete SEDA at 3800 S. Highway 99, Ashland, Oregon.

68.     An attorney representing AHIF, Inc. in Oregon has provided me with a great deal of records in response to a Grand Jury subpoena issued to the organization, and has invited the IRS to review additional records. However, I believe there may be additional items at 3800 S. Highway 99, Ashland, Oregon which neither SEDA nor anyone else at AHIF, Inc. in Ashland, Oregon have disclosed to investigators or to AHIF, Inc.'s attorney.

69.     Specifically, AHIF, Inc.'s accountant could not provide investigators with transaction details from the organization's Quickbooks program for the 1999 and 2000 tax years. The accountant stated that he did not have these transaction details because SEDA told him they were no longer available for review because AHIF, Inc.'s computer crashed in October of 2001. If SEDA has attempted to disguise financial transactions in a manner described in this affidavit, then I believe there may not have been a computer

Affidavit in Support of Search Warrant - Page 28

crash and there may still be computer and paper records relevant to this investigation at the location. In addition, based on the e-mails described earlier in this affidavit, there appears to be e-mails referred to involving Mahmoud El-Fiki, Pete SEDA and Soliman ALBUTHE which I have not been provided.

70.     FBI Special Agent Dave Carroll advised me that during the course of an interview of Pete SEDA on September 15, 2001, he was provided a tour of the upper floor of 3800 S. Highway 99, Ashland, Oregon. He advised me that during this tour, SEDA brought him to a room located above the garage which contained a computer and numerous pamphlets and boxes, as well as a back storage area containing religious reading materials.

71.     Therefore, I believe there may still be records relating to the false Form 990 and the CMIR violation still at 3800 S. Highway 99 in Ashland, Oregon. These records may consist of the following financial records and computer data.

**FINANCIAL RECORDS:**

72.     From my experience and from consulting with other experienced IRS-CI special agents, I know that individuals normally maintain records of their financial activity, such as receipts for expenditures made with cash and checks, bank records, and other financial documents, in their personal residences and in their businesses. Persons engaged in tax and/or money laundering violations frequently retain records of their transactions for long periods of time within their residence, place of business, rented storage units, vehicles, or other places under their control. These records may be in the form of written notes and correspondence, receipts, negotiated instruments, contracts,

Affidavit in Support of Search Warrant - Page 29

bank statements, and other records. Records of this kind are also often stored on computer media.

73.    As a criminal investigator with the IRS, I know that to adequately investigate the accuracy of a tax return, especially a business tax return, it is necessary to examine most of the business' records for that year, including all financial documentation concerning income, expenses, asset purchases, communications with tax preparers and other officers.

74.    Persons engaged in tax and/or money laundering violations often maintain such records for long periods of time, particularly when they are involved in ongoing criminal conduct over a long period of time. There are many reasons why criminal offenders maintain evidence for long periods of time. The evidence may be innocuous at first glance (e.g. financial, credit card, and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes, packaging materials, computer hardware and software), but have significance and relevance when considered in light of other evidence.

75.    The criminal offender may no longer realize he/she still possesses the evidence or may believe law enforcement could not obtain a search warrant to seize the evidence. The criminal offender may also be under the mistaken belief that he/she has deleted, hidden, or further destroyed any computer-related evidence, but which may be retrievable by a trained forensic computer expert.

Affidavit in Support of Search Warrant - Page 30

**COMPUTER DATA:**

76.     Based upon information related to me by IRS-CI Special Agent Richard Smith, and others involved in the forensic examination of computers, I know computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips.  I also know during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

77.     Searching computer systems is a highly technical process which requires specific expertise and specialized equipment.  There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

78.     Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden", erased, compressed, encrypted, or password-protected data.  Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be

Affidavit in Support of Search Warrant - Page 31

extracted.

79.     The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing fifteen gigabytes of data are now commonplace in desktop computers.  Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 7.5 million pages of data, which, if printed out, would completely fill a 10'x12'x10' room to the ceiling.

80.     Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.

81.     In addition, computer users can conceal data within another seemingly unrelated innocuous file in a process called "steganography."  For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened.  Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is

Affidavit in Support of Search Warrant - Page 32

evidence, contraband, or instrumentalities of a crime.

## CONCLUSION

Based on the foregoing, I have probable cause to believe that Soliman ALBUTHE,

with the assistance of Pete SEDA has evaded reporting requirements, in violation of Title

31 U.S.C. §5324 and that Pete SEDA has committed the crime of subscribing to a false

return in violation of Title 26 U.S.C. §7206(1). I believe ALBUTHE and SEDA committed

these crimes while attempting to disguise the true disposition of funds, that if reported

correctly, would have caused the IRS and law enforcement to scrutinize their activities and

may have jeopardized the organizations tax exempt status.

Therefore, I request that the court authorize a warrant to search 3800 S. Highway

99 in Ashland, Oregon, detailed in Attachment A, for the evidence listed in Attachment B

and to seize the same. I request authority to seize all records set forth in Attachment B

and to physically seize all computers and related equipment for analysis.

xxxxxxxx

xxxxxxxx

xxxxxxxx

xxxxxxxx

xxxxxxxx

xxxxxxxx

xxxxxxxx

xxxxxxxx

Affidavit in Support of Search Warrant - Page 33

The evidence set forth in this affidavit is true, complete, and accurate to the best of my knowledge and belief.

This affidavit and attachments have been reviewed and approved by Assistant United States Attorney Christopher L. Cardani.


Colleen Anderson
Special Agent, IRS-CI


Subscribed and sworn to me this _13_ day of February, 2004.


John P. Cooney
United States Magistrate Judge


Affidavit in Support of Search Warrant - Page 34

000171