# Exhibit 78

Plaintiffs' Corrected Averment of Jurisdictional Facts and
Evidence and/or Statement of Facts as to Defendant Al Rajhi Bank
<u>Pursuant to Rule 56.1</u>

This Transcript Contains Confidential Material

1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF NEW YORK

3                      -   -   -

4

5   IN RE: TERRORIST    :

6   ATTACKS ON          :    03-MDL-1570

7   SEPTEMBER 11, 2001  :    (GBD)(SN)

8   -------------------------------------------

9                      -   -   -

10          Thursday, February 21, 2019

11                     -   -   -

12      THIS TRANSCRIPT CONTAINS CONFIDENTIAL

13                   MATERIAL

14                     -   -   -

15      Day 2 of the videotaped deposition of

16  ADNAN BASHA, taken pursuant to notice, was held

17  at the Park Hyatt Jeddah, Al Hamra District,

18  Southern Corniche, Jeddah, Saudi Arabia, 21432,

19  beginning at 3:03 p.m., on the above date,

20  before Lisa V. Feissner, RDR, CRR, Notary

21  Public.

22                     -   -   -

23          GOLKOW LITIGATION SERVICES

            877.370.3377 ph | 917.591.5672 fax

24               deps@golkow.com

This Transcript Contains Confidential Material

```
 1   APPEARANCES:
 2      COZEN O'CONNOR P.C.
        BY: SEAN P. CARTER, ESQUIRE
 3      BY: J. SCOTT TARBUTTON, ESQUIRE
        (via video/phone conference)
 4      One Liberty Place
        1650 Market Street
 5      Suite 2800
        Philadelphia, Pennsylvania 19103
 6      (215) 665-2000
        scarter1@cozen.com
 7      starbutton@cozen.com
        -- Representing the Plaintiffs'
 8         Executive Committee and Plaintiffs
 9      MOTLEY RICE LLC
        BY: ROBERT T. HAEFELE, ESQUIRE
10      (via video/phone conference)
        28 Bridgeside Boulevard
11      Mount Pleasant, South Carolina 29464
        (843) 216-9000
12      rhaefele@motleyrice.com
        -- Representing the Plaintiffs'
13         Executive Committee and Plaintiffs
14      KREINDLER & KREINDLER LLP
        BY: ANDREW J. MALONEY, III, ESQUIRE
15      (via video/phone conference)
        750 Third Avenue
16      New York, New York 10017
        (212) 687-8181
17      amaloney@kreindler.com
        -- Representing the Plaintiffs'
18         Executive Committee and Plaintiffs
19      ANDERSON KILL
        BY: ARTHUR ARMSTRONG, ESQUIRE
20      (via video/phone conference)
        1760 Market Street, Suite 600
21      Philadelphia, Pennsylvania 19103
        267-216-2711
22      armstrong@andersonkill.com
        -- Representing the Plaintiffs'
23         Executive Committee and Plaintiffs
24
```

This Transcript Contains Confidential Material

```
 1   APPEARANCES:  (Continued)
 2      JONES DAY
        BY: GABRIELLE PRITSKER, ESQUIRE
 3      BY: STEPHEN DEGENARO, ESQUIRE
        (via video/phone conference)
 4      51 Louisiana Avenue, N.W.
        Washington, D.C. 20001
 5      (202) 879-3939
        gpritsker@jonesday.com
 6      sdegenaro@jonesday.com
        -- Representing Dubai Islamic Bank
 7
 8      ALFAHAD & PARTNERS
        BY: FAHAD N. ALARFAJ
 9      Prestige Center, Building No. 4
        Takhasusi Street
10      Riyadh, Saudi Arabia 11454
        farfaj@fahadlaw.com
11      (+966 11) 464 8081
        -- Representing the Kingdom of Saudi Arabia
12
13      LEWIS BAACH KAUFMANN MIDDLEMISS PLLC
        BY: ERIC L. LEWIS, ESQUIRE
14      BY: WALEED NASSAR, ESQUIRE
        BY: SUMAYYA KHATIB, ESQUIRE
15      1101 New York Avenue, NW
        Suite 1000
16      Washington, D.C. 20005
        (202) 833-8900
17      eric.lewis@lbkmlaw.com
        waleed.nassar@lbkmlaw.com
18      sumayya.khatib@lbkmlaw.com
        -- Representing the Muslim World League,
19         International Islamic Relief
           Organization, and the Witness
20
        MOLOLAMKEN, LLP
21      BY: ERIC R. NITZ, ESQUIRE
        (via video/phone conference)
22      600 New Hampshire Avenue, N.W.
        Washington, D.C. 20037
23      (202) 556-2021
        enitz@mololamken.com
24      -- Representing Dallah Avco
```

This Transcript Contains Confidential Material

```
 1    APPEARANCES:  (Continued)
 2       THE LAW FIRM OF OMAR T. MOHAMMEDI, LLC
         BY: OMAR T. MOHAMMEDI, ESQUIRE
 3       (via video/ phone conference)
         Woolworth Building
 4       233 Broadway, Suite 820
         New York, New York 10279
 5       (212) 725-3846
         omohammedi@otmlaw.com
 6       -- Representing the World Assembly
            of Muslim Youth
 7
         KELLOGG, HANSEN, TODD, FIGEL &
 8       FREDERICK, PLLC
         BY: MATTHEW R. HUPPERT, ESQUIRE
 9       (via video/phone conference)
         Sumner Square
10       1615 M Street, N.W., Suite 400
         Washington, D.C. 20036
11       (202) 326-7900
         mhuppert@kellogghansen.com
12       -- Representing the Kingdom of
            Saudi Arabia
13
14
      ALSO PRESENT:
15
         THOMAS K. FEISSNER, CLVS, Videographer
16
         BASSIM SALEH, Interpreter
17
         KATHERINE CIENKUS, Legal Assistant
18       MoloLamken, LLP
         (via video/phone conference)
19
20
21
22
23
24
```

This Transcript Contains Confidential Material

```
 1                    -  -  -

 2                 I N D E X

 3                    -  -  -

 4    Testimony of:  ADNAN BASHA

 5       By Mr. Carter            154

 6                    -  -  -

 7                 E X H I B I T S

 8                    -  -  -
```

BASHA

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| 138 | IIRO letter, No. 100/1446/207 dated 06/12/1421 AH IIRO 285019 | 154 |
| 139 | Administrative Decision No. 185 dated 11/3/1422 AH IIRO 287198 | 162 |
| 140 | Decision Number 93 dated 7/7/1421 AH IIRO 129743 - IIRO 129744 | 179 |
| 141 | IIRO letter, No. 100/1478/103 dated 7/1/1422 AH IIRO 284663 | 181 |
| 142 | Djibouti Office Visit Report From 12/11/1422 AH to 15/11/1422 AH IIRO 46225 - IIRO 46234 | 184 |
| 143 | Minutes of the Twenty-First Meeting of the Saudi Coordination Council MWL 063317 - MWL 063322 | 186 |
| 144 | Minutes of the second Meeting of the Editorial Committee on the Issue of the Saudi Coordinating Council Newsletter | 189 |

This Transcript Contains Confidential Material

```
 1                        -  -  -
 2              E X H I B I T S (Continued)
 3                        -  -  -
     BASHA
 4   EXHIBIT NO.      DESCRIPTION                  PAGE
 5   145    Administrative decision No. 245        195
            dated 27/09/1419 AH
 6          IIRO 287341
 7   146    IIRO letter, No. 100/665/M/K           195
            dated 03/10/1420 AH
 8          IIRO 287342
 9   147    IIRO letter, No. 100/987/103           201
            dated 16/4/1421 Hijri
10          IIRO 285013
11   148    IIRO letter, No. 532/1                 205
            dated 27/8/1419 H
12          IIRO 111814 - IIRO 111815
13   149    IIRO letter, no Ref. or Date,          211
            Addressed to Dr. Mohammed
14          Fedaa Al Din Bahgat
            IIRO 031022 - IIRO 031023
15
     150    Ford Rhodes Sidat Hyder & Co.          225
16          Verification Report
            IIRO026468 - IIRO026490
17
     151    Letter, Subject: Case of State         241
18          V/S Amir Jasim
            IIRO 168291
19
     152    IIRO letter, Ref: 1478/21              244
20          dated 12/01/1421 AH
            IIRO 111029
21
     153    IIRO letter, Ref: 320/4052/1           247
22          dated 11/09/1424 AH
            IIRO 127895
23
24
```

This Transcript Contains Confidential Material

```
 1                    -   -   -
 2              E X H I B I T S (Continued)
 3                    -   -   -
```

BASHA

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| 154 | IIRO letter, Ref. 135/12 dated 08/15/1424 AH IIRO 117362 | 248 |
| 155 | Letter, no Ref. or Date, to Basha from Jamal Ahmed Khalifa IIRO-003010 - IIRO-003011 | 252 |
| 156 | Minutes of the Third Meeting of the Organization's Executive Committee IIRO 287007 - IIRO 287013 | 257 |
| 157 | IIRO letter, No. 100/1223/1424 dated 05/10/1424 AH IIRO 49708 - IIRO 49710 | 269 |
| 158 | Administrative Decision Number (58) of 28/4/1424 AH IIRO 287391 | 272 |
| 159 | Press release dated August 3, 2006 "Treasury Designates Director, Branches of Charity Bankrolling Al Qaida Network" FED-PEC0202110 - FED-PEC0202112 | 276 |

This Transcript Contains Confidential Material

```
 1                      -  -  -

 2              DEPOSITION SUPPORT INDEX

 3                      -  -  -

 4    Direction to Witness Not to Answer
      Page Line      Page Line      Page Line
 5
      (None.)
 6

      Request for Production of Documents
 7    Page Line      Page Line      Page Line
 8    (None.)
 9    Stipulations
      Page Line      Page Line      Page Line
10
      (None.)
11

      Question Marked
12    Page Line      Page Line      Page Line
13    (None.)
14
15
16
17
18
19
20
21
22
23
24
```

This Transcript Contains Confidential Material

1            VIDEO OPERATOR:  This is Day 2 of

2       the videotaped deposition of Adnan Basha

3       taken in the matter of In Re: Terrorist

4       Attacks on September 11, 2001, In the

5       United States District Court for the

6       Southern District of New York, Civil

7       Action Number 03-MDL-1570(GBD)(SN).

8            Today's date is Thursday, February

9       21st, 2019.  The time on the video

10      monitor is 3:03.  My name is Thomas K.

11      Feissner, CLVS, and I am the

12      videographer.  The court reporter is

13      Lisa V. Feissner, RDR, CRR.  We are here

14      today on behalf of Golkow Litigation

15      Technologies, Philadelphia,

16      Pennsylvania.

17           This video deposition is taking

18      place at the Park Hyatt Hotel, Jeddah,

19      Saudi Arabia.

20           The interpreter and the deponent

21      having been previously sworn, you may

22      proceed.

23           (By stipulation of the parties, the

24      Interpreter was previously duly sworn by

This Transcript Contains Confidential Material

1          the court reporter to translate the

2          proceedings herein from English into

3          Arabic and from Arabic into English to

4          the best of his ability.)

5              (Unless indicated otherwise, all

6          questions and answers are through the

7          Interpreter.)

8                    ADNAN BASHA,

9      having been previously duly sworn by the court

10     reporter by stipulation of the parties, was

11     examined and testified through the Interpreter

12     as follows:

13                    EXAMINATION

14     BY MR. CARTER:

15         Q.   Good afternoon, Dr. Basha.  Can you

16     hear me okay?

17         A.   Good morning to all the gentlemen

18     in your room.

19         Q.   Thank you.  Dr. Basha, although we

20     took a break, I assume you're aware that you

21     remain under oath?

22         A.   Yes.

23         Q.   During our discussion yesterday, we

24     briefly talked about the Kingdom's Ministry of

This Transcript Contains Confidential Material

1    Islamic Affairs.  Do you recall that exchange?

2         A.    Yes.

3         Q.    And I believe you told me that you

4    were familiar with the Ministry of Islamic

5    Affairs; is that correct?

6         A.    Not familiar in terms I work for

7    it.

8         Q.    No, but you know what the entity

9    is?

10        A.    Yes.

11        Q.    And during the time you were

12   serving as Secretary General between 1997 and

13   2001, did you have interactions with the

14   Ministry of Islamic Affairs?

15        A.    No.

16        Q.    Did you, in your capacity as the

17   Secretary General of the IIRO between 1997 and

18   2001, have communications with the Ministry of

19   Islamic Affairs?

20        A.    I had communication with the Deputy

21   Minister.

22        Q.    Do you recall ever having

23   communications with the Minister of Islamic

24   Affairs?

This Transcript Contains Confidential Material

1          A.    I do not recall.

2          Q.    You mentioned a moment ago that you

3    had communications with the Deputy Minister of

4    Islamic Affairs.  Who was that during the time

5    you had those communications?

6          A.    His name is Abdulaziz Al-Omar.

7          Q.    And do you recall what the purpose

8    of your communications with him was?

9          A.    He was a member -- before I joined

10   the IIRO, he was a member in a committee called

11   the committee for local and external offices,

12   in his personal capacity.

13         Q.    Was that a committee of the IIRO?

14         A.    Yes.

15         Q.    And was he serving as the Deputy

16   Minister of Islamic Affairs while he was

17   serving on that IIRO committee?

18         A.    He was promoted to become a Deputy

19   Minister later on.  While he was serving in

20   that committee, he held a position in the

21   Ministry, but I do not remember exactly what

22   that position was.

23         Q.    What was the purpose of that

24   committee in the IIRO?

1          A.    That committee was responsible for

2     the coordination of the work between the local

3     and the external offices of the IIRO.

4          Q.    How many members did that committee

5     have?

6          A.    I do not exactly recall, but I

7     think it's between eight to ten people or more.

8          Q.    And do you recall who was the chair

9     of that committee during the period we've been

10    discussing?

11          MR. LEWIS:  Objection, period you

12          were discussing?  Can you -- you've

13          discussed a number of periods.  Do you

14          want to clarify a time frame?

15          Q.    During the period 1997 to 2001, do

16    you recall who was the chair of the committee?

17          A.    The Secretary General of the IIRO.

18          Q.    And in your capacity as the

19    Secretary General of the IIRO, did you serve as

20    the chair of that committee?

21          A.    Yes, in my capacity as the

22    Secretary General, yes.

23          Q.    And for purposes of this work, did

24    that committee receive reports from the

1  internal offices in Saudi Arabia and external

2  offices of the IIRO?

3          MR. LEWIS:  Objection to form.

4          He can answer.

5      A.    The committee was responsible for

6  the general blueprint of the policies and

7  procedures in the local and the external

8  offices and how to develop them.

9      Q.    During the period between 1997 and

10  2001, do you recall how often the committee

11  met?

12      A.    I recall that it had annual

13  meetings, but I do not remember exactly how

14  many meetings the committee held during that

15  period.

16      Q.    And do you know whether minutes of

17  the committee's meetings were prepared in each

18  instance?

19      A.    Supposedly, yes.

20      Q.    Returning for the moment to the

21  Ministry of Islamic Affairs, did you, during

22  the period between 1997 and 2001, have an

23  understanding of what the Ministry of Islamic

24  Affairs' role was?

1          A.   It is a ministry responsible for

2    the mosques and endowments inside Saudi Arabia.

3          Q.   Do you know whether the Ministry of

4    Islamic Affairs had any responsibility for

5    conducting or directing da'wah activities

6    outside of Saudi Arabia?

7          A.   I do not know about that.

8          Q.   Do you know whether the Ministry of

9    Islamic Affairs had any role in da'wah

10   generally?

11         A.   For the da'wah inside Saudi Arabia,

12   yes, this is their scope.

13         Q.   Did the IIRO conduct any da'wah

14   activities inside Saudi Arabia?

15         A.   Before I answer, I want to

16   understand what is meant by the expression

17   "da'wah."

18         Q.   Well, it's an Arabic expression

19   that I've seen most commonly interpreted as

20   "propagation," but when I used the English

21   term, you told me you didn't understand what it

22   was.  So I'm trying to use the term in the

23   IIRO's own documents.

24         A.   Da'wah inside Saudi Arabia is not

This Transcript Contains Confidential Material

1  the -- something that is of interest for the

2  IIRO, inside Saudi Arabia.

3      Q.    So the IIRO's efforts with regard

4  to da'wah were external-focused?

5      A.    Yes.  And I said yesterday that by

6  "da'wah," we mean the psychological

7  rehabilitation of the victims of disasters and

8  wars.

9      Q.    Would da'wah include educating

10  people about Islam?

11          MR. LEWIS:  Objection to form.

12      A.    "Da'wah" means -- "da'wah" means

13  establishing the Islam with Muslims and

14  teaching them the principles and the guidelines

15  of Islam.

16          MR. NASSAR:  We have an objection

17          to the translation.  I think what the

18          witness stated was, "Da'wah means

19          maintaining the faith," as opposed to

20          "establishing Islam for the Muslims."

21          INTERPRETER:  Yes.  It is, "Da'wah

22          means the maintaining of faith with the

23          Muslims and teaching them the principles

24          and the guidelines of Islam."

This Transcript Contains Confidential Material

1          MR. NASSAR:  Okay, thank you.

2     Q.    Did the IIRO sponsor propagators?

3          MR. LEWIS:  Objection to form.

4     A.    There are some propagators

5  affiliated with the IIRO in the areas of

6  disasters and calamities.

7     Q.    And what was their job?

8     A.    They work alongside the relief

9  actors and amongst Muslims, and they try to

10  monitor any psychological effects that has

11  occurred to the Muslims because of the

12  disasters.

13     Q.    During the time that you were

14  Secretary General, did the IIRO ever seek to

15  coordinate its work with the Ministry of

16  Islamic Affairs?

17     A.    No.

18          MR. CARTER:  I'm sorry, what was

19     the answer?

20          INTERPRETER:  The answer was "no."

21          MR. CARTER:  I'd like to ask the

22     court reporter to mark as Basha-138 a

23     document that was produced at IIRO

24     285019.

This Transcript Contains Confidential Material

1              (Exhibit Basha-138 marked for

2         identification and attached to the

3         transcript.)

4    BY MR. CARTER:

5         Q.   Dr. Basha, you should have an

6    English translation as well as the original

7    Arabic document produced by the IIRO.  Please

8    take a moment to review the document.

9         A.   Yes.

10        Q.   Dr. Basha, do you recognize that

11   document?

12        A.   Yes.

13        Q.   Did you author that document?

14        A.   I have signed it.

15        Q.   So it issued under your signature?

16        A.   Yes.

17        Q.   And is this a letter to the

18   Minister of Islamic Affairs?

19        A.   Yes.

20        Q.   So at least in this instance, it

21   appears that you had a communication with the

22   Minister of Islamic Affairs, correct?

23        A.   This was a letter addressed from

24   the IIRO to the Minister in which the IIRO

This Transcript Contains Confidential Material

1   expresses its interest in coordinating the

2   steps for sponsoring the propagators outside

3   Saudi Arabia, and to estimate their

4   compensations and the performance appraisal

5   reports and the reports of the field visits and

6   training, and to take advantage of every

7   training course that is conducted to train the

8   propagators.

9          So this was like a proposal from

10  our brothers within the IIRO, and this letter

11  went to the Minister, but we did not receive

12  any reply.

13         Q.   My question was much more simple.

14  Is this a letter that issued from you to the

15  Minister of Islamic Affairs?

16         A.   It is issued from the IIRO under

17  the signature of the Secretary General of the

18  IIRO.

19         Q.   And you were the Secretary General

20  of the IIRO who signed the letter, correct?

21         A.   Yes.

22         Q.   And as I understand it, this letter

23  issued on September 12th, 2000; is that

24  correct?

This Transcript Contains Confidential Material

1          A.    I do not know the corresponding

2    date because the date within here in the Arabic

3    document is in the Hijri calendar.

4          Q.    And what is the Hijri date?

5          A.    21st of the 6th month of the year

6    1421 Hijri.

7          Q.    The first full paragraph of the

8    text of the letter indicates that, the

9    International Islamic Relief Organization in

10   the Kingdom of Saudi Arabia has placed at the

11   top of its priorities since its establishment

12   to make the Islamic propagation a central

13   foundation of its activities and a targeted

14   goal of its programs.

15          Do you see that text?

16          A.    Yes.

17          Q.    Do you agree with that statement?

18          A.    I agree with this statement when it

19   is coupled with the statements that follow.

20          Q.    Well, let's turn to the statements

21   that follow.  The next statement indicates

22   that, Therefore, all the activities of the

23   Organization, such as supporting of the

24   orphans, relief of the affected, sheltering of

This Transcript Contains Confidential Material

1    the refugees, as well as providing health and

2    educational care and seasonal programs, et

3    cetera, were connected with the propagation

4    mission.

5              Do you agree with that statement?

6        A.   Yes, I agree with it when it is

7    said "the da'wah goal," not "propagation."

8        Q.   Are you disagreeing with the term

9    "propagation," or are you just saying you don't

10   know what it means?

11       A.   I understand that the da'wah

12   carried out by the IIRO for the refugees and

13   the orphans was to maintain the Islam that they

14   had within.

15       Q.   The letter goes on to indicate that

16   the IIRO was supporting 1,000 propagators in

17   more than 20 countries.

18             Was that statement correct when

19   this letter was written?

20       A.   The figure 1,000 propagators was

21   estimated.  I do not recall the exact number

22   now.

23       Q.   But the IIRO did have a significant

24   number of propagators working outside of Saudi

This Transcript Contains Confidential Material

1    Arabia?

2              MR. LEWIS:  Objection to the term

3         "propagators," which is -- is not a

4         precise translation.

5         A.   I do not think that 1,000 is a big

6    number -- is a significant number.

7              INTERPRETER:  Sorry.  Just to make

8         the answer clear, he said, "I do not

9         think that the figure 1,000 is a

10        significant number."

11             MR. NASSAR:  Sorry, we have an --

12             (Cross-talk.)

13        Q.   (Inaudible) know whether the

14   propagators supported by the IIRO were required

15   to provide any sort of reporting regarding

16   their activities?

17             MR. NASSAR:  Sorry, we have an

18        objection to the previous translation.

19        I think what the witness said was that,

20        "I don't think we reached that

21        significant number," not that "1,000 is

22        not a significant number."

23             (The witness and interpreter

24        conferred in Arabic.)

This Transcript Contains Confidential Material

1          INTERPRETER:  The witness is saying

2      now that, "We did not reach that figure.

3      And for this reason, it was

4      insignificant."

5          Q.   Are you saying the IIRO did not

6  reach a level of support of 1,000 propagators?

7          A.   The text says that.  It says "about

8  1,000."  So it means it is less than that in

9  Arabic.

10          Q.   Does it mean that it's nearly

11  1,000?

12          A.   "About" means "around."

13          Q.   So were the around 1,000

14  propagators required to submit any reports to

15  the IIRO relating to their activities?

16          A.   Reports should be enlightened if

17  there is a permanent work for them.  But the

18  vast majority of them were either voluntary

19  propagators of da'wah or people who receive

20  some symbolic bonuses.  So they are not full

21  time.

22          MR. CARTER:  Can you read back the

23      answer?

24          INTERPRETER:  The answer was as

This Transcript Contains Confidential Material

1           follows -- this is --

2                (The witness and interpreter

3           conferred in Arabic.)

4                MR. NASSAR:  It probably was

5           "reports should be submitted" instead of

6           "enlightened"?

7                INTERPRETER:  "Reports should be

8           submitted if there is a permanent work

9           for them.  But the vast majority of them

10          were either voluntary propagators of

11          da'wah or people who would receive some

12          symbolic bonuses.  So they were not

13          full-time employed."

14               MR. NASSAR:  We have an objection

15          to the translation.  I think instead of

16          "bonuses" the more proper translation

17          would be "stipends."

18               Do you agree?

19               (The witness and interpreter

20          conferred in Arabic.)

21               THE WITNESS:  (In English.)

22          "Rewards," maybe.

23               INTERPRETER:  The witness stated

24          "bonuses."

This Transcript Contains Confidential Material

1        Q.   The letter mentions that part of

2    the work being carried out by this group

3    included the distribution of Islamic

4    publications and tapes.

5             Do you see that?

6             MR. LEWIS:  Objection to the

7        characterization of the sentence,

8        mischaracterization.

9        A.   Yes, I see it.

10        Q.   As part of its work, did the IIRO

11    distribute Islamic publications and tapes?

12        A.   Here in the letter it says that it

13    is the function of the committee to oversee the

14    propagators, then conduct the courses.  But

15    the -- it does not say that the propagators

16    were distributing the publications and the

17    tapes then.

18        Q.   Again, my question was a bit

19    different.  During the time that you served as

20    the Secretary General of the IIRO, did the IIRO

21    distribute Islamic publications and tapes?

22        A.   When Islamic publications and tapes

23    are gifted to the IIRO, and there are no

24    comments or observations about these materials,

This Transcript Contains Confidential Material

1  yes, they are given to the propagators for

2  distributing them.

3         Q.   And what about audiotapes, during

4  the period before 2002, did the IIRO distribute

5  audiotapes?

6         A.   This is what I said actually.  If

7  there are publications or tapes that are gifted

8  to the IIRO from reliable entities, and the

9  text or the contents of these materials is

10  approved by the committee of da'wah in the

11  IIRO, yes, they are distributed.

12         Q.   And were publications or audiotapes

13  ever donated to the IIRO by agencies of the

14  Saudi government?

15         A.   No.  We'd receive publications and

16  tapes from charities, local charities in Saudi

17  Arabia.

18         Q.   Would the IIRO retain copies of

19  donated publications and audiotapes that it

20  distributed?

21         A.   I do not think so because these are

22  sent directly to the propagators outside.

23         Q.   Returning to Basha-138, was the

24  IIRO proposing in this letter to coordinate

This Transcript Contains Confidential Material

1   with the Ministry of Islamic Affairs the work

2   of the propagators?

3          A.    This is what is in the letter.  It

4   is about the coordination between the committee

5   of da'wah in the IIRO and the committee of

6   da'wah in -- and the department, sorry, and the

7   department of da'wah under the Ministry, and in

8   the five items mentioned in the letter.

9          Q.    And was part of the logic for

10  proposing this coordination that it would help

11  to avoid wasting resources and capacities?

12         A.    Yes.

13         Q.    And was it the view of the IIRO

14  that there was a possible duplication of the

15  work of its propagators and those working for

16  the Ministry?

17         A.    The duplication if there are

18  propagators from the IIRO and the Ministry in

19  the same area, this is number one.  Especially

20  in needy areas.  And to have somehow

21  consolidated reports about the field visits and

22  the performance appraisal, and not to duplicate

23  conducting training or courses in order to

24  avoid wasting the resources, and to build the

This Transcript Contains Confidential Material

1  capacities of propagators from one single

2  entity.

3       Q.   So was it the view of the IIRO that

4  its propagators were essentially doing the same

5  work as the propagators of the Ministry?

6            MR. LEWIS:  Objection to form.

7       A.   I do not know the job descriptions

8  of the propagators under the Ministry, and

9  therefore I cannot assert that their mission is

10  the same.

11       Q.   In the letter, the IIRO cites as

12  one of the reasons for coordinating efforts of

13  the IIRO and Ministry, that all of our efforts

14  are attributed to our beloved Kingdom which

15  raised the banner of the Islamic propagation

16  and undertook the propagation duties.

17            Do you see that?

18       A.   Yes, I see it.

19       Q.   So in this letter, the IIRO was

20  representing that its propagation activities

21  were properly attributed to the Kingdom,

22  correct?

23            MR. LEWIS:  Objection to form.

24       A.   The sentences in the Arabic

This Transcript Contains Confidential Material

1  language do not carry the same meaning as in

2  the English.

3      Q.   What does the Arabic mean?

4      A.   The meaning is that the da'wah is a

5  field for contribution in order to consolidate

6  the efforts, and not to waste the efforts and

7  the capacities.

8      Q.   Is that the translation, in your

9  view, of the sentence we were talking about?

10     A.   In my opinion, this is what is

11  meant by the IIRO.

12     Q.   Does the Arabic document, in your

13  view, state that the Kingdom raised the banner

14  of the Islamic propagation and undertook the

15  propagation duties?

16     A.   This is a question to be directed

17  to the Ministry.  I have no idea about that.

18     Q.   You have no idea whether the

19  Kingdom of Saudi Arabia raised the banner of

20  the Islamic propagation?

21     A.   Well, this is the problem of the

22  terminology.  In Arabic, here, it does not mean

23  that there is a banner for Islamic propagation

24  and that Saudi Arabia is carrying this banner.

This Transcript Contains Confidential Material

1    But it means that Saudi Arabia has efforts in

2    the field of Islamic propagation, and it is

3    well-known for that.  That's it.

4         Q.   And the letter is citing its

5    well-known role in that as part of the basis

6    for coordinating the efforts of the IIRO and

7    the Ministry, correct?

8              MR. LEWIS:  Objection to form.

9         A.   The coordination is about

10   cooperation between the committee of da'wah

11   under the IIRO and the department of da'wah in

12   the Ministry.  And the text does not carry any

13   other meanings.

14             MR. NASSAR:  And Sean, we're going

15             to object to that characterization of

16             the document.  I think the witness has

17             already stated that the letter went out

18             to the Ministry, but it wasn't responded

19             to or accepted.

20             MR. CARTER:  Okay.  So the court

21             reporter -- or the translator asked to

22             take a break every hour and a half, so

23             why don't we do that now.

24             MR. LEWIS:  Every hour and a half?

This Transcript Contains Confidential Material

1        We've only gone 50 minutes.

2            Do you want a -- I mean, do you

3        want a break?

4            INTERPRETER:  It's okay.  You said

5        you never turn down a break.

6            THE WITNESS:  (In English.)  Let's

7        stick to one and a half hours.

8            INTERPRETER:  It's okay.

9            MR. CARTER:  Oh, I'm sorry.  I'm

10       sorry, I misread my clock.  I'm sorry, I

11       misread my clock.  I apologize.

12           MR. LEWIS:  Yeah, it will be easier

13       to coordinate with prayer time here and

14       do it that way because the next prayer's

15       at --

16           MR. CARTER:  We can continue.

17           MR. LEWIS:  Thank you.

18           MR. CARTER:  I'd like to ask the

19       court reporter to mark as an exhibit a

20       document produced at IIRO 287198.

21           (Exhibit Basha-139 marked for

22       identification and attached to the

23       transcript.)

24           MR. CARTER:  And that will be

This Transcript Contains Confidential Material

1        Basha-139.

2    BY MR. CARTER:

3        Q.   Dr. Basha, have you had a chance to

4    review Basha-139?

5        A.   Yes.

6        Q.   Is that a communication that issued

7    under your signature when you were Secretary

8    General?

9        A.   Yes.

10       Q.   What was the subject matter of this

11   communication?

12       A.    In order to improve the work of the

13   IIRO office in Chad, and to establish a

14   committee to oversee the work of the office, so

15   a three-member committee was established for

16   this purpose.

17       Q.   Do you recall what prompted the

18   decision to establish a committee for the

19   office in Chad?

20       A.   Yes.  This decision was issued

21   after the position of the office manager became

22   vacant.  And there was no person with the

23   leadership skills, and the people working in

24   the office were locals, and therefore this

This Transcript Contains Confidential Material

1    committee was established until a qualified

2    person is appointed to fill in this position.

3         Q.    And the letter indicates that you

4    appointed as the chairman of this committee

5    Mr. Jalwi Abdul Karim Al-Ashqar, and it

6    identifies him as the Supervisor of the Islamic

7    File at the Embassy.

8              Do you see that?

9         A.    Yes.

10        Q.    Do I understand from that that

11   Mr. Al-Ashqar was an employee of the Saudi

12   Embassy in Chad?

13        A.    Yes.

14        Q.    And was he in charge of the Islamic

15   Affairs department at the Embassy?

16        A.    This is what the decision says,

17   yes.

18        Q.    In that capacity, do you know

19   whether he was an employee of the Ministry of

20   Islamic Affairs?

21             MR. LEWIS:   Objection to form.

22        A.    I do not know.

23        Q.    And later in the letter, am I

24   correct that you designated Mr. Al-Ashqar to be

This Transcript Contains Confidential Material

1   the primary signatory on the IIRO's accounts at

2   the banks?

3        A.    Yes, primary signatory with two

4   other signatories.

5        Q.    So the committee you established to

6   oversee the IIRO's office in Chad was headed by

7   an employee of the Saudi Embassy who held

8   primary signatory authority over the IIRO's

9   bank accounts?

10            MR. LEWIS:   Objection to form.

11       A.    This authority is not activated

12  unless there is a direct approval from the

13  Secretary General.

14       Q.    But that's not what I asked.   I

15  asked whether or not the committee you

16  established was headed by an employee of the

17  Saudi Embassy who held primary signatory

18  authority over the bank accounts.

19            MR. LEWIS:   Same objection.

20       A.    Yes.   And this is what I answered.

21  I said that he is primary signatory, but he

22  does not act alone unless he receives written

23  approvals from the Secretary General.

24            MR. CARTER:   I'd like the court

This Transcript Contains Confidential Material

1          reporter to mark as Basha-140 a document

2          produced by the IIRO at IIRO 129743

3          through 129744.  And you should have

4          both the original Arabic and an English

5          translation.

6                  (Exhibit Basha-140 marked for

7          identification and attached to the

8          transcript.)

9    BY MR. CARTER:

10         Q.   Dr. Basha, have you had a chance to

11   review Basha-140?

12               MR. LEWIS:  He just got it a second

13         ago, so he hasn't.

14               MR. CARTER:  Okay.  Sorry.

15         A.   Yes.

16         Q.   Dr. Basha, is this a communication

17   that issued under your signature?

18         A.   Yes.

19         Q.   And did you issue this in your

20   capacity as Secretary General of the IIRO?

21         A.   Yes.

22         Q.   Am I correct that this letter

23   concerns the formation of a committee to manage

24   the IIRO's office in Mauritania?

This Transcript Contains Confidential Material

1    A.    Yes.

2    Q.    Do you recall what prompted your

3  decision to establish a committee to manage the

4  office in Mauritania?

5    A.    It is the same reason that applied

6  to the office in Chad.  The position of the

7  office manager became vacant, and the assistant

8  manager was requested to act as the manager,

9  and therefore there was an administration

10  vacuum, and in order to address that in a

11  temporary manner, this committee was

12  established until further appointments are

13  made.

14    Q.    Do you recall why the head office

15  position became vacant?

16    A.    It seems that a Saudi person was

17  managing the office, and then he did not wish

18  to continue, and he returned back to Saudi

19  Arabia.  And this is before I joined the IIRO.

20    Q.    Was there a period of time where --

21  strike that.

22        The committee that you established

23  through this letter included three members,

24  correct?

This Transcript Contains Confidential Material

1          A.    Yes.

2          Q.    And one of the individuals you

3    appointed to serve on this committee was

4    Mr. Ahmed bin Gharamullah Al-Zahrani, correct?

5          A.    Yes.

6          Q.    And the letter identifies him as an

7    employee of the Saudi Embassy responsible for

8    Islamic affairs, correct?

9          A.    Yes.

10         Q.    And did you speak to Mr. Al-Zahrani

11   about his appointment to this committee?

12         A.    The person who spoke to him was the

13   person in charge of this work at that time,

14   Mr. bin Omar Li, who chaired the committee.

15         Q.    And through this letter, did you

16   also designate Mr. Al-Zahrani as one of the

17   signatories on the IIRO's bank accounts?

18         A.    Yes, but not the primary signatory.

19              MR. CARTER:  I'd like the court

20         reporter to mark as Basha-141 a document

21         produced by the IIRO at IIRO 284663.

22              (Exhibit Basha-141 marked for

23         identification and attached to the

24         transcript.)

This Transcript Contains Confidential Material

```
 1              THE WITNESS:  Yes.
 2   BY MR. CARTER:
 3        Q.   And is this communication you
 4   issued under your signature as Secretary
 5   General of the IIRO?
 6        A.   Yes.
 7        Q.   And did this communication issue in
 8   September of 2001?
 9        A.   The date stated here is in the
10   Hijri calendar, and I cannot assert that it
11   coincides with that particular date in the
12   Gregorian calendar.
13        Q.   And I'm not sure, but are there
14   Gregorian dates referenced in the text of the
15   Arabic letter?
16        A.   Yes, there are.
17        Q.   And does it reference letters
18   dating to August and September 2001 in the
19   text?
20        A.   Yes.
21        Q.   And this letter is addressed to
22   Mr. Ibrahim bin Mohammed Al-Hibr, correct?
23        A.   Yes.
24        Q.   And the letter refers to him as the
```

This Transcript Contains Confidential Material

1    religious attach? at the Saudi Embassy in Addis

2    Ababa and chairman of the committee supervising

3    the organization's office in Ethiopia, correct?

4         A.   Yes.

5         Q.   So am I correct that in this time

6    period, there was also a committee established

7    to supervise the IIRO's office in Ethiopia?

8         A.   Yes.

9         Q.   Do you recall when that committee

10   was established?

11        A.   I think around these dates.

12        Q.   And was the chairman of that

13   committee the religious attach? at the Saudi

14   Embassy in Addis Ababa?

15             MR. LEWIS:  Objection to form.

16        A.   He is the head of the committee in

17   his capacity -- in his personal capacity as a

18   Saudi citizen.

19        Q.   That's not what I asked.  I asked

20   whether Mr. Al-Hibr was both the chairman of

21   the committee supervising the office and the

22   religious attach? of the Saudi Embassy in Addis

23   Ababa.

24        A.   And I have answered as such because

This Transcript Contains Confidential Material

1    it is not a necessity for the religious attach?

2    in any Saudi Embassy anywhere to be the head of

3    the committee supervising any IIRO office

4    unless he has a personal interest as a

5    volunteer for the pleasure of Allah to do this

6    hard work.  And the person does not receive a

7    single cent in remuneration.

8         Q.   Just to step back, at this time,

9    when you wrote the letter, Mr. Al-Hibr was the

10   religious attach? of the Saudi Embassy,

11   correct?

12        A.   Yes.

13        Q.   And he was the chair of the

14   committee supervising the IIRO's office in

15   Ethiopia, correct?

16        A.   Yes, in a temporary fashion.

17             MR. CARTER:  I'd like the court

18        reporter to mark as Basha-142 a document

19        produced by the IIRO at IIRO 46225

20        through 46234.

21             (Exhibit Basha-142 marked for

22        identification and attached to the

23        transcript.)

24   BY MR. CARTER:

This Transcript Contains Confidential Material

1          Q.   Dr. Basha, I know this is a long

2    document, and I only have a few questions.   Am

3    I correct that this is a report from 2002

4    relating to the IIRO's Djibouti office?

5          A.   Yes.

6          Q.   And there is a section under the

7    heading, Historical Background about the

8    Office.

9               Do you see that?

10         A.   Yes.

11         Q.   And it states that, The

12   organization opened its office in Djibouti in

13   1989 under the umbrella of the Saudi Religious

14   Attach? in Djibouti.

15              Is that correct?

16         A.   Yes.

17         Q.   Are you aware of any other

18   incidents where an IIRO office was opened under

19   the umbrella of a Saudi religious attach??

20              MR. LEWIS:  Objection to form.

21         A.   I do not know any.

22              MR. CARTER:  I'd like the court

23         reporter to mark as Basha-143 a document

24         produced by the IIRO -- I'm sorry, a

1          document produced by the Muslim World

2          League at MWL 063317 through 063322.

3               (Exhibit Basha-143 marked for

4          identification and attached to the

5          transcript.)

6               THE WITNESS:  Yes.

7     BY MR. CARTER:

8          Q.   Dr. Basha, based on my reading of

9     this document, I understand it relates to a

10    meeting that was held in 1996, and that would

11    have been before you assumed your role as

12    Secretary General of the IIRO, correct?

13         A.   Yes.

14         Q.   The document references a meeting

15    of the Saudi Coordination Council in Nairobi,

16    Kenya.  Although this document predates your

17    term as Secretary General, are you familiar

18    with that Coordination Council?

19         A.   I'm not familiar with it.

20         Q.   You don't recall, during your term

21    as Secretary General, the existence of a

22    Coordination Council located in Kenya?

23         A.   I do not recall.

24         Q.   This letter indicates that the

This Transcript Contains Confidential Material

1  meeting of this council was held at the offices

2  of the International Islamic Relief

3  Organization.  Did the IIRO have an office in

4  Nairobi during this time period?

5       A.   I was not in the IIRO at that time,

6  and therefore I do not know if it had an office

7  in that region then.

8       Q.   Turning your attention to the

9  section of the report under First, which at

10  least on the English appears at MWL 63318, it

11  discusses challenges facing Saudi relief

12  organizations, particularly in Somalia.

13       A.   Yes.

14       Q.   And there is a statement that, It

15  seems that the relief aids, which must be

16  provided to every person in need or in

17  distress, take other directions and are resold

18  in markets so that later the price is used for

19  purchasing weapons that are offered to other

20  entities.

21            Do you see that?

22            MR. LEWIS:  Objection.  You're

23       asking -- you're just asking if he sees

24       the sentence there?

This Transcript Contains Confidential Material

1          MR. CARTER:  Yes.  That's exactly

2     what I asked him.

3          MR. LEWIS:  Okay.

4     A.    The answer is, yes, I see this

5     sentence.

6     Q.    At any point during your term as

7     Secretary General of the IIRO, did anyone raise

8     to you concerns that relief aids being

9     distributed by the IIRO in Somalia were being

10    resold to purchase weapons?

11    A.    I do not recall any of that.

12    Q.    Do you recall, during your term as

13    Secretary General, whether any protocols were

14    in place to guard against the resale of IIRO

15    relief aids in Somalia for weapons?

16    A.    Yes.  I want to connect the answer

17    to this question to an earlier answer that I

18    provided yesterday about the five million Saudi

19    riyals provided by Prince Sultan bin Abdul Aziz

20    to relieve those affected by the floods in

21    Somalia.  And when this aid is approved, a

22    delegation from the General Secretariat and the

23    local office goes to the field to oversee the

24    implementation.

This Transcript Contains Confidential Material

1          And I remember that we have

2    rejected a number of requests presented to us

3    for help from countries that suffered

4    disasters.  We refused to hand over the money

5    to the government or any government entities in

6    those countries, and our condition was that the

7    distribution of the aid should be joint by

8    people from Saudi Arabia, from the IIRO and the

9    country.  And this is to prevent any misuse or

10   suspicion of misuse or resale.

11          MR. CARTER:  I'd like the court

12       reporter to mark as Basha-144 a document

13       produced by the Muslim World League at

14       MWL 62668 through 62669.

15          (Exhibit Basha-144 marked for

16       identification and attached to the

17       transcript.)

18          THE WITNESS:  Before the new

19       exhibit is distributed, I want to go

20       back to the previous document.  It says

21       here that the manager of the IIRO spoke,

22       and he stated that the information or

23       the complaint delivered to the

24       Ambassador should be verified because

This Transcript Contains Confidential Material

1           every charity or party do have political

2           directions, and he highlighted that the

3           distribution of aid is conducted by the

4           workers in the IIRO themselves.

5           Thank you.

6    BY MR. CARTER:

7           Q.   Before we go off, in light of that

8    last comment, do you agree that this document

9    indicates that the Coordination Council

10   described in the document included the

11   Ambassador -- the Saudi Ambassador in Kenya,

12   correct?

13          MR. LEWIS:  Hang on.

14          We don't have the document in front

15          of us anymore, but we're -- I'm just

16          putting it back in front of the witness

17          so that he can review it and respond to

18          your question.

19          A.   Yes, it may indicate that.  But as

20   a clarification, this -- in the letter, there

21   is a reference that this Coordination Council

22   is for all Islamic relief organizations of

23   Saudi identity or located -- their headquarters

24   located in Saudi Arabia.  And they have been

This Transcript Contains Confidential Material

1    mentioned by name.

2         Q.   And in addition to the Ambassador,

3    it mentions that the religious attach? of the

4    Saudi Embassy was also a member of the council,

5    correct?

6         A.   This is what the document says, in

7    addition to the manager of the Saudi airlines

8    office.

9         Q.   And in addition, it says that the

10   meeting was attended by the head of Islamic

11   Affairs at the Saudi Embassy, correct?

12             MR. LEWIS:  Objection -- objection

13        to form.  You're asking him what the

14        document says?

15             MR. CARTER:  Yes.

16             MR. LEWIS:  Okay.

17        A.   Yes, this is what the document

18   says.

19             MR. CARTER:  Okay.  We can take our

20        break.

21             MR. LEWIS:  Okay, what time --

22        Do people want to pray?

23             MR. CARTER:  I think it depends

24        more on you.

This Transcript Contains Confidential Material

1          THE WITNESS:  20 minutes, yeah, 20

2     minutes --

3          MR. LEWIS:  About 20 minutes, plus

4     or minus?

5          It's now 4:33, so maybe about --

6     between 4:50 and 4:55, or minus 8 for

7     you?

8          MR. CARTER:  Okay.

9          VIDEO OPERATOR:  We are now going

10    off the video record.  The time is 4:33.

11         (Recess from 4:33 p.m. until

12    5:00 p.m.)

13         VIDEO OPERATOR:  We are now going

14    back on the video record.  The time is

15    5:00.

16    BY MR. CARTER:

17         Q.   Dr. Basha, we have marked as

18    Basha-144 a document produced by the Muslim

19    World League.  And based on the text, I

20    understand this to be minutes of a meeting of

21    the Editorial Committee of the Saudi

22    Coordinating Council in Kenya.

23         A.   Yes.

24         Q.   And before we took a break, we were

This Transcript Contains Confidential Material

1  discussing a 1996 meeting of the same

2  Coordinating Council, and you noted that that

3  preceded your tenure as Secretary General of

4  the IIRO, right?

5      A.  Yes.

6      Q.  The date of this letter, as I

7  understand it, is July 29, 1997, correct?

8      A.  Yes.

9      Q.  And were you at that time in your

10 post as Secretary General of the IIRO?

11     A.  Yes.

12     Q.  And this document indicates that

13 the meeting of the Coordinating Council was

14 attended by Mahmoud Khleif, and it identifies

15 him as the representative of the International

16 Islamic Relief Organization office.  Do you see

17 that?

18     A.  Yes.

19     Q.  And did you know Mr. Khleif during

20 this time?

21     A.  I do not remember him exactly, but

22 it is written here that he is the

23 representative of the IIRO office.

24     Q.  Do you have any recollection how

This Transcript Contains Confidential Material

1    long he served in that capacity?

2              MR. LEWIS:  Objection to form.

3         A.    No.  The answer is no.

4         Q.    About a year after this document

5    was prepared, there were bombings at U.S.

6    Embassies in Kenya and Tanzania.  Are you

7    familiar with that terrorist attack?

8         A.    I have heard about them, yes.

9         Q.    Do you know who the head of the

10   IIRO office in Kenya was at the time of those

11   attacks in 1998?

12        A.    I do not recall now.

13        Q.    Although this meeting of the

14   Coordinating Council occurred during your

15   tenure as Secretary General and was attended by

16   a representative of the IIRO, you don't recall

17   ever having heard anything about this

18   Coordinating Council?

19             MR. LEWIS:  Objection to form.

20        A.    Yes.  The answer is yes.

21        Q.    I'm sorry, the answer is, you don't

22   recall, correct?

23        A.    Yes, I do not recall.

24        Q.    And the letter indicates that the

This Transcript Contains Confidential Material

1    meeting of this council was chaired by the head

2    of Islamic Affairs at the Saudi Embassy,

3    Mr. Fahad bin Mohammed Al-Sabbagh.  Do you know

4    who that person is?

5         A.   No.

6         Q.   And you don't recall receiving any

7    information in this time period that there was

8    a Coordinating Council that included the IIRO

9    and was being headed by the representative of

10   the Embassy in Kenya?

11              MR. LEWIS:  Objection to form.

12        A.   I do not recall because it has been

13   22 years since then.

14              MR. CARTER:  I'd like the court

15              reporter to mark as Basha-145 -- hang on

16              one second.  We have an issue with the

17              exhibits that we need to resolve.

18              Okay, got it.  Sorry about that.

19              I'm hoping the court reporter can

20              mark as Basha-145 a document produced at

21              IIRO 287341, and 287342.

22              (Exhibits Basha-145 and Basha-146

23              marked for identification and attached

24              to the transcript.)

This Transcript Contains Confidential Material

 1                THE WITNESS:  Yes.

 2     BY MR. CARTER:

 3          Q.   Looking first at the document we've

 4     marked as 145 --

 5                MR. LEWIS:  And he's only look at

 6           the first --

 7          Q.   -- is this a communication --

 8                MR. LEWIS:  He's only looked at the

 9           first document, so if you want to

10           question him on both documents, let's

11           take another minute.

12          A.   Yes.

13          Q.   Dr. Basha, I'm looking first at the

14     document marked as Basha-145.  Is this a

15     communication that issued under your name as

16     Secretary General of the IIRO?

17          A.   This document has my name, but the

18     signature does not exist.

19          Q.   Is this document some sort of

20     administrative decision issued by the IIRO?

21          A.   Yes, it looks like that.

22          Q.   And this type of administrative

23     decision, would those normally be issued by the

24     General Secretary of the IIRO?

This Transcript Contains Confidential Material

1          A.   Yes, for some job grades it is

2     issued in the name of the Secretary General.

3          Q.   And this document pertains to the

4     appointment of a new manager for the IIRO's

5     office in Albania, correct?

6          A.   Yes.

7          Q.   And the individual being appointed

8     is Mr. Abdel-Samad bin Mohammed Al-Baradi

9     Al-Ansari, correct?

10         A.   Yes.

11         Q.   And it indicates he's being

12    appointed manager based on the approval of His

13    Highness, the Minister of Islamic Affairs,

14    correct?

15         A.   Yes.

16         Q.   Why did the Minister of Islamic

17    Affairs have to approve Mr. Al-Ansari's

18    appointment to serve as manager of an IIRO

19    office?

20              MR. LEWIS:  Objection to form.

21         A.   Well, it -- the decision says that

22    this is a secondment of an employee who works

23    for the Ministry of Islamic Affairs, and in

24    order to transfer the services of this person

This Transcript Contains Confidential Material

1    from his ministry to a new entity, this

2    requires the approval of his direct supervisor.

3         Q.   Do you recall whether you were

4    personally involved in the appointment of

5    Mr. Al-Ansari to this position?

6         A.   What I recall is that the office of

7    the IIRO in Makkah knows this person, and

8    therefore they proposed to him to move to work

9    as the manager of the IIRO office in Albania.

10   And he agreed to that, and he requested that

11   the Ministry is addressed in this relation.

12   But I do not have personal knowledge of him at

13   all.

14             MR. NASSAR:   Sean, we have an

15        objection to the written translation of

16        the document.   In the second bullet

17        point, it states, including a request to

18        appoint Mr. Abdel-Samad bin Mohammad

19        Al-Baradi Al-Ansari, and the Arabic

20        states, a request to second Mr.

21        Abdel-Samad bin Mohammad Al-Baradi

22        Al-Ansari.

23             MR. CARTER:   Okay.   Thanks, Waleed.

24        Q.   Dr. Basha, do you recall whether

This Transcript Contains Confidential Material

1    you had any direct communications with the

2    Ministry of Islamic Affairs regarding the

3    secondment of Mr. Al-Ansari?

4         A.   No.

5         Q.   Based on this document, am I

6    correct that the Ministry agreed to the

7    arrangement and to pay Mr. Al-Ansari's salary

8    and allowances during the secondment?

9              MR. LEWIS:  Objection to form.

10        A.   Yes, because this was the request

11   of the chairman of the board of directors of

12   the IIRO in his letter to the Minister.

13        Q.   So this arrangement was initiated

14   by a request from the Secretary General of the

15   Muslim World League to the Minister of Islamic

16   Affairs?

17        A.   Yes, because the level of

18   communication with Saudi ministers should be at

19   the level of the chairman of the board of

20   directors.

21        Q.   Turning your attention to

22   Basha-146, is this a letter that issued under

23   your signature in June of 1999?

24        A.   Yes.

This Transcript Contains Confidential Material

1      Q.    And this is a communication that

2   you sent to a representative of the Ministry of

3   Islamic Affairs, correct?

4      A.    Yes, in his capacity as in charge

5   of the administrative and financial affairs.

6      Q.    And this letter also concerns

7   Mr. Al-Ansari?

8      A.    Yes.

9      Q.    And this letter indicates that

10  Mr. Al-Ansari is being transferred from the

11  Albania office to the Secretariat General in

12  Jeddah.  Is that correct?

13     A.    Yes.

14     Q.    Do you know why he was transferred?

15     A.    Based on his personal wish.  He did

16  not like living in Albania.  It was the first

17  time for him to travel outside Saudi Arabia.

18     Q.    And when he was transferred back,

19  did he continue to work for the IIRO?

20     A.    He completed the year of

21  secondment, because he spent five months only

22  in the Albania office.

23              MR. CARTER:  I'd like the court

24              reporter to mark as Basha-147 a document

This Transcript Contains Confidential Material

1          produced by IIRO at IIRO 285013.

2                (Exhibit Basha-147 marked for

3          identification and attached to the

4          transcript.)

5                THE WITNESS:  Yes.

6     BY MR. CARTER:

7          Q.   Dr. Basha, is this a communication

8     you sent as Secretary General of the IIRO to

9     the Deputy Minister of Foreign Affairs of Saudi

10    Arabia in July of 2000?

11         A.   Yes.

12         Q.   And does this concern the IIRO's

13    office in India?

14         A.   Yes.

15         Q.   And in this letter, you request

16    that the Saudi Consulate in Bombay cooperate

17    with the head of the IIRO's office at your

18    request, the possibility of issuing diplomatic

19    plates for the IIRO's vehicles, correct?

20         A.   Yes.

21         Q.   And you indicate that the Ministry

22    had provided such diplomatic plates for the

23    World Assembly of Muslim Youth's office in

24    India, correct?

This Transcript Contains Confidential Material

1        A.   Yes.

2        Q.   Do you know whether or not the IIRO

3   was, in fact, issued diplomatic plates for its

4   vehicles in India?

5        A.   No, nothing has been issued.

6        Q.   Do you recall whether any of the

7   IIRO's offices outside of Saudi Arabia held

8   diplomatic status?

9             MR. LEWIS:  Object to the -- I

10        object to the form of the question.

11        A.   Yes.

12        Q.   What was the basis for imbuing

13   offices of the IIRO with diplomatic status?

14        A.   It is only when the host government

15   has the willingness to honor the IIRO by

16   providing it with this status.

17        Q.   In circumstances where such status

18   was granted, was it requested by the Saudi

19   government?

20        A.   No.

21        Q.   So the IIRO would make the request

22   directly to the host government?

23        A.   Yes --

24        Q.   And to your --

This Transcript Contains Confidential Material

1          A.   -- after we brought [sic] with the

2    concerned authorities to make sure that the

3    request will be accepted.

4          Q.   So you would have to consult with

5    the Saudi government before making a request?

6               MR. LEWIS:  Objection to form.

7          A.   No.  We consult with concerned

8    authorities in the host country.

9          Q.   And to your recollection, the Saudi

10   Ministry of Foreign Affairs was not involved in

11   making any of those requests on behalf of the

12   IIRO?

13         A.   No, it did not -- it was not

14   involved.

15         Q.   Why then in this instance are you

16   asking for the assistance of the Saudi

17   Consulate in securing diplomatic plates for the

18   IIRO's vehicles instead of simply making the

19   request to the Indian government?

20         A.   In the Indian government at the

21   executive levels, there are no officials who

22   can be communicated with in order to obtain

23   this status.  And because there is a precedence

24   for the office of the World Assembly of Muslim

This Transcript Contains Confidential Material

1    Youth in India as they obtained this status,

2    here the manager of the office requested us to

3    communicate with the Ministry of Foreign

4    Affairs for this matter.

5         Q.   So in this case, the Ministry of

6    Foreign Affairs was involved in trying to

7    secure diplomatic credentials for the IIRO?

8              MR. LEWIS:  Object -- excuse me.

9         Objection to form.  Objection to form.

10        Sorry.

11        A.   But it did not happen.  The plates

12   were not issued.

13        Q.   But that's not my question.  I had

14   asked you earlier whether the IIRO ever

15   requested the assistance of the Saudi

16   government to obtain diplomatic credentials,

17   and you said no.

18             My question is, in this case, did

19   the IIRO request that the Saudi foreign

20   ministry assist it to obtain diplomatic

21   credentials?

22             MR. LEWIS:  Same objection.  Your

23        terminology is jumping around.

24        A.   This is not diplomatic credentials.

This Transcript Contains Confidential Material

1    It is about diplomatic plates for vehicles.

2           Q.   So would a vehicle holding

3    diplomatic plates be treated as having

4    diplomatic status?

5              MR. LEWIS:  Objection to form.

6           A.   I'm not a diplomat, and I do not

7    know the answer to this question therefore.

8           Q.   Why were you requesting diplomatic

9    plates?

10          A.   It is written in the communication

11   that there are Saudi individuals from the IIRO

12   headquarters who visit India to supervise, and

13   it requires that they are received in the

14   airport.  And they face difficulties in the car

15   parking in the airport.

16          Q.   And so having diplomatic plates

17   would hold some benefits?

18          A.   I expect in the airport at least to

19   have access to the airport car parking.

20             MR. CARTER:  I'd like the court

21             reporter to mark as Basha-148 documents

22             produced at IIRO 111814 and 111815.

23             (Exhibit Basha-148 marked for

24             identification and attached to the

This Transcript Contains Confidential Material

1          transcript.)

2              THE WITNESS:  Yes.

3    BY MR. CARTER:

4          Q.   Dr. Basha, this is a letter sent to

5    you by an IIRO office manager in Pakistan named

6    Al-Butairi, right?

7          A.   Yes.

8          Q.   And at the time of this letter,

9    where was the IIRO's office in Pakistan?

10         A.   In Islamabad.

11         Q.   Did the IIRO, during this time

12   period, also have an office in Peshawar?

13         A.   No, it did not have an office in

14   Peshawar at that period of time.

15         Q.   Did it conduct operations in

16   Peshawar on an informal basis?

17         A.   What do you mean by "informal

18   basis"?

19         Q.   Do you know where Mr. Butairi was

20   himself located?

21         A.   In Islamabad.

22         Q.   Do you know whether there were any

23   employees or volunteers of the IIRO during this

24   time period who were resident in Peshawar?

This Transcript Contains Confidential Material

1          A.    I do not know.

2          Q.    This letter concerns a visit by an

3     individual identified as the Chancellor at the

4     Embassy, Mr. Ismail Abbas Ayaz.  Do you see

5     that?

6          A.    Yes.

7          Q.    Do you know who Mr. Ayaz is?

8          A.    The letter says that he is in

9     charge of the religious affairs.

10         Q.    And is he in charge of the

11    religious affairs at the Embassy?

12         A.    This is what the memo says, yes.

13         Q.    But does it also identify him as

14    the director of the office of the International

15    Islamic Relief Organization?

16              MR. NASSAR:  And Sean, we're going

17         to -- we have an objection to the

18         translation.  Either there should be a

19         comma or/and the director.  They're two

20         separate people in the -- as written in

21         the Arabic.  The English blurs it as

22         though it's the same person.

23              MR. CARTER:  That's what I was

24         asking the witness.  Thanks, Waleed.

This Transcript Contains Confidential Material

1     A.   The memo here means that there are

2  two individuals and the manager of the IIRO

3  office, who is Moayad Al-Butairi.  And Moayad

4  Al-Butairi accompanied Ismail Ayaz in the

5  visit.

6     Q.   And looking at the other page, IIRO

7  111815.

8     A.   Yes.

9     Q.   And is it your understanding that

10  that also indicates that Mr. Ayaz is separate

11  from the person identified as the director of

12  the office of the IIRO?

13     A.   Yes.  This is what the document

14  says.

15     Q.   Do you recall what the purpose of

16  the visit by Mr. Ayaz was?

17     A.   The visit, as the letter states, is

18  for the purpose of distributing the gift of the

19  Custodian of the Two Holy Mosques in Free

20  Kashmir.

21     Q.   So the Saudi King provided a gift

22  to the people of Free Kashmir, and the IIRO was

23  the instrument for distributing that gift?

24          MR. LEWIS:  Objection to form.

This Transcript Contains Confidential Material

1           Lack of foundation.

2           A.   I want to explain something here.

3   The IIRO at a certain point of time was

4   receiving 800 tons of dates purchased by the

5   Saudi government from the local Saudi farmers,

6   as a form of subsidy to these farmers, and was

7   giving these tons, this quantity, to the IIRO

8   to distribute it to whoever it decides, in

9   different places where offices of the IIRO are

10  located or at Saudi Embassies, without giving

11  any directives or instructions where this aid

12  should go, to which country.  And therefore

13  when this quantity is received, the urgent

14  relief department of the IIRO, with the

15  external offices, decides to which country the

16  aid goes, and the quantity to each country.

17          And when the distribution of

18  quantities is approved, the coordination -- it

19  is distributed then in coordination with the

20  Saudi Embassy because the donation itself came

21  from the Saudi government.  And this is what

22  happened in Kashmir, probably the Embassy

23  designated the religious attach? for this

24  purpose.

This Transcript Contains Confidential Material

1          Q.   So the gift was provided by the

2     King, correct?

3          A.   Yes.

4          Q.   And it was distributed by the IIRO

5     in coordination with the Embassy?

6               MR. LEWIS:  Objection to form.

7          A.   Yes.

8          Q.   Dr. Basha, do you know when

9     Mr. Butairi was appointed to serve as manager

10    of the IIRO's office in Pakistan?

11         A.   I don't know, but when I joined the

12    IIRO, he was already in the office.

13         Q.   Do you know how long he had been

14    there when you joined?

15         A.   I do not recall.

16         Q.   Do you have any idea what he was

17    doing before he came to work for the IIRO?

18         A.   I have no idea.

19         Q.   Do you know whether Mr. Al-Butairi

20    was a Saudi citizen?

21         A.   For sure, he was Saudi.

22              MR. CARTER:  I'd like the court

23         reporter to mark as Basha-149 a

24         communication produced by the IIRO at

This Transcript Contains Confidential Material

1          IIRO 031022 to 031023.

2              (Exhibit Basha-149 marked for

3          identification and attached to the

4          transcript.)

5              THE WITNESS:  Yes.

6    BY MR. CARTER:

7          Q.   Dr. Basha, is this a letter sent by

8    you to Dr. Mohammed Fedaa Al Din Bahgat?

9          A.   This is a draft letter because I

10   wrote comments on it, and then it went for

11   revision again.

12             MR. CARTER:  I'm sorry, the

13         translator's -- got cut off at the end.

14         I didn't hear the last part of your

15         translation.

16             INTERPRETER:  He said that "This is

17         a draft letter because I wrote comments

18         on it, and it went for revision again."

19         Q.   Do you know whether some version of

20   this letter was ultimately sent to Mr. Bahgat?

21         A.   I do not recall this now.

22         Q.   What was the subject matter of this

23   draft letter?

24         A.   It says here that during the

This Transcript Contains Confidential Material

1  handover and taking between the managers of the

2  IIRO offices, the organization had difficulties

3  in applying the mechanism -- the mechanism for

4  the handover and taking of the managers.  And

5  this led to an issue in the office.

6           And the rest of the letter explains

7  the developments in this matter.  And therefore

8  we have requested the office of Osama El

9  Khereiji, who is a chartered auditor, to audit

10  the documents of the Pakistan office.  And he

11  presented a quotation for the fees, and

12  therefore we have requested the opinion of

13  Dr. Mohammed Fedaa al Din Bahgat in this matter

14  because the financial comptroller and the

15  follow-up manager, they disagreed about the

16  rate.

17      Q.   Do I understand from this letter

18  that around the time this letter issued,

19  Mr. Butairi was being replaced as the manager

20  of the IIRO's Pakistan office?

21      A.   Yes.

22      Q.   And when a manager is replaced,

23  there is some sort of process in place to turn

24  over control of the office, correct?

This Transcript Contains Confidential Material

1          A.    Yes.   There is a mechanism.

2          Q.    And in the context of the

3    replacement of Mr. Butairi, there was a

4    problem, correct?

5          A.    Yes.

6          Q.    And as a result of the problem,

7    this letter indicates that the IIRO established

8    a delegation to look into the office, correct?

9          A.    Yes.

10         Q.    And the inquiry performed by that

11   delegation, according to this letter, found

12   evidence indicating the existence of cheating,

13   forgery, and misuse of the IIRO's funds,

14   correct?

15         A.    Yes.

16         Q.    And as a result of those

17   discoveries, the letter indicates that the

18   financial officer of the Pakistan office was

19   arrested and was under investigation, correct?

20         A.    Yes.

21         Q.    And do you recall the name of that

22   person?

23         A.    Yes.

24         Q.    Who was that?

This Transcript Contains Confidential Material

1        A.    Amir Jasim.

2        Q.    According to the English

3   translation I have of this draft letter, it

4   indicates that Mr. Jasim was arrested and is

5   under investigation with the reservation of the

6   office's director, who is of a Saudi origin.

7              What does that language indicating

8   that he was arrested under the reservation of

9   the office's director mean?

10       A.    The financial officer was arrested

11  by the Pakistani police based on a complaint

12  from the IIRO.  The complaint was prepared by a

13  lawyer who was appointed for this purpose, and

14  the -- but for the office manager, he was

15  called to Jeddah to answer to the legal

16  department and its requirements.

17       Q.    So as I understand this, the

18  Pakistani financial officer was arrested in

19  Pakistan, correct?

20             MR. LEWIS:  Objection, lack of

21             foundation.  He's not Pakistani.

22       Q.    Do you know Mr. Jasim's

23  nationality?

24       A.    Iraqi.

This Transcript Contains Confidential Material

1          Q.   Okay.  So Mr. Jasim, who is an

2     Iraqi, was arrested in Pakistan, correct?

3          A.   Yes.

4          Q.   And when the IIRO discovered the

5     cheating, forgery, and misuse of funds, it

6     called Mr. Butairi back to Saudi Arabia?

7          A.   Because he was claiming that the

8     only person responsible for this cheating is

9     Amir Jasim in his capacity as the financial

10    officer.

11         Q.   And it was the preference of the

12    IIRO that the inquiry concerning Mr. Butairi

13    and his possible involvement be conducted in

14    Saudi Arabia, correct?

15         A.   For two reasons.  The first reason

16    is Moayad Al-Butairi, he held Amir Jasim

17    accountable for that, and he declined any form

18    of responsibility -- sorry, he denied any form

19    of responsibility.  And the second reason is

20    that he remained in Pakistan for one week

21    during the stay of the delegation from the

22    IIRO, and he was not arrested by the Pakistani

23    police.  And therefore, we preferred to bring

24    him to Saudi Arabia in order not to lose our

This Transcript Contains Confidential Material

1   cards.  And therefore, at that time, the

2   conclusive evidences were incomplete.

3        Q.   Did you later receive evidence

4   indicating that Mr. Butairi was himself

5   involved in the cheating, forgery, and misuse

6   of IIRO funds?

7        A.   Yes.

8        Q.   Did the IIRO request that he be

9   prosecuted?

10       A.   In order to have the conclusive

11  evidences, this took some time from us.  And it

12  required a lot of patience.  And therefore when

13  Moayad Al-Butairi found that he has -- in front

14  of him he has the chance of being arrested,

15  just that, he wrote a waiver -- he wrote a

16  waiver or an assignment of the three clinics he

17  had [unclear words], which he operated from the

18  embezzled funds from the IIRO.

19            And therefore, in comparison to the

20  long period of time that was consumed with Amir

21  Jasim, in this case the IIRO, in a very short

22  period of time, was able to retrieve its funds,

23  to know -- or to discover how the theft

24  happened, and who stole the money, and to which

This Transcript Contains Confidential Material

1    bank the money was deposited.

2         Q.    Are you saying that the IIRO

3    recovered all of the money that was stolen from

4    its Pakistan branch?

5         A.    After the IIRO examined all the

6    documents -- financial documents and the money

7    transfers, and given the absence of documents

8    that were incinerated by Amir Jasim, the IIRO

9    found that what has been stolen equals to the

10   value of the three clinics that were owned by

11   Amir Jasim and Moayad Butairi from the money

12   they embezzled.

13        Q.    So evidence was destroyed, correct?

14        A.    Yes, incinerated.

15        Q.    And the --

16              MR. LEWIS:  Hang on, he hasn't

17        finished his answer.

18        A.    And Amir Jasim admitted in writing

19   that he was the primary responsible person for

20   all the forgery of documents and cheating.

21   Regardless of that, we did not relieve even

22   Moayad Al-Butairi from the responsibility, and

23   when he knew that we will bring him to justice

24   in Saudi Arabia, he had no option other than

This Transcript Contains Confidential Material

1    that only option.  So he confessed that he owns

2    the three clinics, and he expressed in writing

3    that he's ready to hand them over, and this is

4    what happened.

5         Q.   I take it this was a relatively

6    significant controversy for the IIRO?

7              MR. LEWIS:  Objection to form.

8         A.   For the IIRO, it was a financial

9    problem, but we have managed to contain it and

10   to precisely identify it, and to prevent its

11   recurrence by adopting some mechanisms, and to

12   set an example for other employees that whoever

13   dares to conduct such act will meet the fate of

14   dismissal.  And this is what happened to Amir

15   Jasim and Moayad Al-Butairi.

16        Q.   Did the IIRO document all of its

17   analysis of the losses incurred as a result of

18   this activity and valuation of the three

19   clinics that were transferred to it?

20             MR. LEWIS:  Objection to form.

21             (Witness answers.)

22             MR. LEWIS:  Let the translator --

23        A.   Yes.  And this leads me to say

24   something that I did not mention.  As soon as

This Transcript Contains Confidential Material

1    that delegation came back from Islamabad, a

2    committee was established in the General

3    Secretariat.  And the committee composed of

4    four departments, and it was presided over by a

5    senior official in the IIRO.  And the

6    responsibility of the committee was to review

7    all the documents that were obtained.

8              And sadly, the committee tried to

9    do its best, given the lack of many of the

10   documents, but with the patience and the

11   perseverance of the committee, the committee

12   managed, with all the adverse circumstances it

13   faced, be they in Pakistan, it managed at the

14   end of the day to reach an estimation of the

15   embezzled money.

16             And it consulted with the lawyer in

17   Pakistan who authorized that, and therefore the

18   settlement was conducted in such a way.

19             Noting that even the original

20   documents that were in the possession of the

21   finance department in Jeddah, which the

22   Pakistani court requested to obtain so it can

23   issue a judgment in the case of Amir Jasim,

24   these documents were lost in the court after

This Transcript Contains Confidential Material

1    delivering the documents to the court under

2    signature.

3              So all these adverse circumstances

4    did not deter the IIRO from obtaining its

5    legitimate rights.

6         Q.   So as I understand it, the IIRO

7    decided to have its own internal committee

8    analyze the extent of the losses and their

9    disposition, correct?

10        A.   Yes.  And the committee was given

11   all the powers to take the wide decision.

12        Q.   And in the end, Mr. Butairi was not

13   prosecuted, correct?

14        A.   We found it sufficient, based on

15   the advice of the lawyers, to retrieve our

16   funds -- to recover, sorry, to recover our

17   funds, and we considered it closed.

18        Q.   How much did you recover?

19        A.   I do not recall now, but it was

20   based on the estimations of the value of the

21   three clinics.

22        Q.   So you recovered the three clinics,

23   correct?

24        A.   Yes.  One in Peshawar, one in

This Transcript Contains Confidential Material

1  Islamabad, and another one in Karachi.

2       Q.   And based on the transfer of those

3  three committees [sic], you resolved your

4  issues with Mr. Butairi?

5            MR. LEWIS:  Objection to form.

6       A.   It's not that we settled, but we

7  have recovered our funds.  And actually, this

8  allowed us to conduct a thorough review of the

9  rules and regulations that we had because they

10  contained some gaps that allowed Amir Jasim to

11  do what he did.

12            Amir Jasim was one of the most

13  efficient accountants and one of the oldest

14  employees in the IIRO, and Moayad Al-Butairi

15  also was receiving the title of the ideal

16  manager.  And with all that, they have managed

17  to take advantage of the gaps, but with a

18  review, we have closed them.

19       Q.   So as I understand it, there should

20  be documents reflecting the IIRO's valuation of

21  the three clinics, correct?

22            MR. LEWIS:  Objection to form.

23       A.   This is for sure.  These were

24  procedures for the committee, and the committee

This Transcript Contains Confidential Material

1   was authorized with all powers.  And the

2   members of the committee come from departments

3   that were considered as inspectors of the

4   finance department.  So there is no bias to any

5   entity.

6          Q.   Well, if you wanted to avoid bias

7   to any entity, wouldn't you have hired an

8   independent actor to do this process?

9               MR. LEWIS:  Objection to form.

10         A.   I mean that there was no bias.  The

11  committee composed of people from the financial

12  follow-up department, which is like a

13  controller, over the performance of the finance

14  department and the offices.  And it is the

15  financial -- and the second member was the

16  financial controller before any disbursement,

17  and the third member was from the legal

18  department, and all of these departments are

19  reporting to the Secretary General directly.

20         Q.   During what period did the

21  committee conduct its work?

22         A.   In fact, the committee took long

23  time in this matter because of the lack of

24  evidences.  But the waiver -- or the assignment

This Transcript Contains Confidential Material

1    was done three and a half months after the

2    discovery of the theft.

3         Q.   So the committee began its work

4    within three and a half months of the initial

5    discovery of the problem, correct?

6         A.   No.   After three and a half months

7    of the incident, the waiver was obtained from

8    Moayad Al-Butairi, when he knew that he will be

9    prosecuted or brought to justice.

10        Q.   The problem with the office was

11   discovered sometime around late 1999 or early

12   2000, correct?

13        A.   Late 2000.

14        Q.   And did the committee begin its

15   work shortly thereafter?

16        A.   Yes.   After the return of the

17   delegation from Pakistan to Jeddah, and

18   presenting its report, the committee was

19   directly established.

20        Q.   And do you know whether the

21   committee completed its work by 2004?

22        A.   It was around -- I do not remember

23   exactly when the work was completed.   It was

24   around that date, and it took long time because

This Transcript Contains Confidential Material

1  some of the evidences were incinerated, some of

2  them were lost, and Amir Jasim started to

3  manipulate with the Pakistani judiciary.  And

4  we have acted based on an advice from the chief

5  judge in Pakistan.  He told us that if you

6  continue this course and you request a full

7  imprisonment of the person, the process may

8  take between 15 to 20 years.

9          Q.   So from that do I understand you

10  decided not to pursue the full prosecution of

11  Mr. Jasim?

12          A.   Yes.  Based on the advice from the

13  chief judge.

14          Q.   And as a result, Mr. Jasim was

15  released?

16          A.   Amir Jasim had family problems.

17  His wife was divorced, and he was expelled from

18  Pakistan.

19          Q.   But he was released from jail in

20  Pakistan, correct?

21          A.   On the condition that he is

22  expelled from Pakistan, yes.

23              MR. CARTER:  I'd like the reporter

24              to mark as Basha-149 [sic] a document

This Transcript Contains Confidential Material

1        produced at IIRO 026468 through 026490.

2            (Exhibit Basha-150 marked for

3        identification and attached to the

4        transcript.)

5            MR. NASSAR:  And Sean, on this

6        document, because there's no Arabic

7        version and the witness reads English

8        very -- kind of slowly, you know, if we

9        could just take our time and point him

10       to which parts of the document that you

11       are asking questions on.

12           MR. CARTER:  That's fine, Waleed.

13       And I know that the translator has asked

14       that we take breaks every 90 minutes.

15       I'm not sure if we're butting up on

16       that.

17           MR. NASSAR:  I think we are.

18           MR. CARTER:  I think we are.  So if

19       he wants to break, that's fine.

20           MR. LEWIS:  It's five minutes until

21       prayer time.  We can go another five

22       minutes or we can just break.  It just

23       may take a little bit longer because

24       it's prayer time in five minutes.

This Transcript Contains Confidential Material

```
 1              MR. NASSAR:  It came in.  We can

 2        take the break now.

 3              MR. CARTER:  Okay.  Why don't we

 4        take a break now.

 5              VIDEO OPERATOR:  We are now going

 6        off the video record.  The time is 6:23.

 7              (Recess from 6:23 p.m. until

 8        6:51 p.m.)

 9              VIDEO OPERATOR:  We are now going

10        back on the video record.  The time is

11        6:51.

12    BY MR. CARTER:

13        Q.   Dr. Basha, before we took a break,

14    I asked the court reporter to mark an exhibit,

15    and I misspoke.  I said it would be Basha-149.

16    In fact, it's Basha-150.  And it's -- bears

17    Bates stamp IIRO 26468 through 26490.

18              Do you have that document in front

19    of you?

20        A.   Yes.

21        Q.   Do you recall whether you've ever

22    seen this document before?

23        A.   No.

24              MR. LEWIS:  Excluding -- I assume
```

This Transcript Contains Confidential Material

 1          you intend to exclude having been shown

 2          it recently by his lawyers.

 3               MR. CARTER:  Correct.

 4          Q.   Dr. Basha, I understand this to be

 5     a report of an audit conducted of the IIRO's

 6     Pakistan branch by Ford Rhodes Sidat Hyder &

 7     Company.  Do you recall whether such an audit

 8     was conducted?

 9               MR. LEWIS:  Object to the form of

10          the question.

11          A.   What I recall is that I have

12     ordered the delegation that travelled to

13     Pakistan to consult with Judge Cheema to

14     appoint an independent auditor to audit the

15     records and the books of the IIRO office in

16     Pakistan.  And this office, the auditor was

17     selected for this assignment.

18          Q.   And turning to the page bearing

19     Bates 26472, there is a section labeled Scope

20     of Work.  Do you see that?

21               MR. LEWIS:  Sean, the Bates number

22          is blocked by the logo.  So it might be

23          easier to refer to the page number,

24          assuming it's consecutively marked.

This Transcript Contains Confidential Material

1          Q.    Yeah, it's page 3.

2          A.    Yes.

3          Q.    And it indicates that the

4     accountants or the auditors were being retained

5     to conduct an audit of the Pakistan branch for

6     the period January 1996 through January 2001.

7                Is that the scope of the audit you

8     directed to be undertaken?

9                MR. LEWIS:  Object to the form of

10          the question.

11         A.    This is the scope of the audit

12    requested by the IIRO.

13         Q.    And under Roman numeral II, it says

14    that the original scope of work contemplated

15    that the auditors would verify all payments and

16    ensure that all underlying documents are

17    attached to it, and also ensure that attached

18    underlying documents are authentic.

19                Do you see that?

20         A.    Yes.

21         Q.    And further down on the same page,

22    this report indicates that on July 16, 2000, a

23    letter -- I'm sorry, that through a letter

24    dated July 16, 2001, the auditor's scope of

1  work was restricted to verification of certain

2  areas for the last three years only.

3          Do you see that?

4      A.   Yes.

5      Q.   Do you know who sent that July 16,

6  2001 letter changing the scope of the auditor's

7  work?

8      A.   No.

9      Q.   Do you know if --

10         MR. LEWIS:  He's not finished.

11     A.   It is supposed to mention the

12  number of this letter and the name of the

13  person and the department that approved that.

14     Q.   Based on that, is it your

15  understanding that the directive would have

16  come from the IIRO?

17         MR. LEWIS:  Objection to form.

18     A.   It is supposed to be issued from

19  the IIRO and have a number and a date.  And not

20  verbal.

21     Q.   Do you know whether or not the IIRO

22  established a special file related to the

23  investigation of the Pakistan office?

24     A.   What I know is that the IIRO, under

This Transcript Contains Confidential Material

1    my signature, established a committee, and it

2    was authorized by all the powers to examine the

3    issue of Pakistan.

4          Q.   So based on this document, it

5    appears that in the end, the independent audit

6    of the Pakistan branch was limited to a

7    three-year period and only to the areas

8    mentioned on page 3 of this report, correct?

9               MR. LEWIS:  Object to the form of

10         the question.

11         A.   I cannot assert the correctness of

12    this because I have not seen it.

13         Q.   Turning to page 6 of the report,

14    the auditors indicate that for the period

15    covered by their inquiry, no internal or

16    external audit was ever carried out for the

17    Pakistan branch, and HO, home office,

18    management never asked local management to

19    provide them audit report on some fixed

20    interval/periodic basis.

21               Do you see that?

22               MR. LEWIS:  I'm sorry, we have a

23         different section that's up on the

24         screen.  You're asking about the first

This Transcript Contains Confidential Material

1         paragraph?

2              MR. CARTER:  Yeah, sorry.  I think

3         we should have the right one now,

4         Findings.

5              MR. LEWIS:  Okay, let's take a look

6         at that, and maybe we can translate

7         that.

8         A.   Well, when this text is mentioned

9    in auditor's report, and based on my humble

10   experience about the financial reports in the

11   General Secretariat of the IIRO, I find that

12   the auditor's office would start by writing a

13   draft auditor's report highlighting the

14   conclusions it reached and would request the

15   relevant department that was subject of the

16   audit to respond to the questions.  And then in

17   the final report, these are either accepted or

18   rejected.

19              I do not find this in this

20   paragraph.  This paragraph seems to be making

21   final conclusions without asking the relevant

22   department whether it is documenting these

23   procedures or not.  This is one thing.

24              On the other hand, there are

This Transcript Contains Confidential Material

1   mechanisms at the level of the General

2   Secretariat.  The first manual is the

3   accounting manual of the local offices.  Second

4   manual is the accounting manual for the

5   external offices.  This is in addition to the

6   financial regulations of the General

7   Secretariat, approved by the general assembly

8   and the board of directors.  And the IIRO does

9   not have one external office that is the

10  Pakistan one.

11          And in the General Secretariat,

12  there is an auditor who reviews or audits the

13  final accounts and presents to the board of

14  directors a report about the final accounts.

15  And this auditor, the IIRO is very keen to

16  choose the auditor from the top three auditors

17  globally.

18          And I can say that the final

19  accounts of the IIRO were audited by Arthur

20  Andersen, and then KPMG, and now Ernst & Young.

21  And these auditing firms, they take -- they

22  randomly audit the local offices, some local

23  offices, and some external offices, focusing on

24  the important ones.  On top of them is the

This Transcript Contains Confidential Material

1  Pakistan office.

2            And if any auditing firm discovers

3  this case as referenced to in this report, it

4  would have written that and proved that in the

5  report presented to the board of directors and

6  the general assembly.

7            And we in the IIRO, we do not

8  consider sufficient this control procedure.

9  There are two control entities within the

10 IIRO --

11       Q.   Dr. Basha, the only question I

12 asked was whether you saw the text I was

13 referring to, and you've given a very long

14 speech that was not responsive to that request.

15 And we have limited amount of time.  So if you

16 would do us the favor of simply responding to

17 the questions that are posed.

18            My simple question was, do you see

19 the text?

20            MR. LEWIS:  I think the witness was

21       responding to the substance of the text.

22       A.   Yes, I see it.

23            MR. CARTER:  I didn't ask him to

24       respond to the substance; I asked him if

This Transcript Contains Confidential Material

1          he saw it, Eric, and we have limited

2          time.

3          Q.   Dr. Basha, you told me before that

4     aside from the possibility your counsel may

5     recently have shown you this report, you don't

6     recall ever having seen it before, correct?

7          A.   Yes.

8          Q.   And did you have any personal

9     involvement in the audit performed by this

10    member company of Ernst & Young?

11               MR. LEWIS:  Objection to form.

12         A.   No.

13         Q.   And do you have any personal

14    knowledge concerning the inquiries and analysis

15    the auditors conducted in carrying out this

16    audit?

17               MR. LEWIS:  Objection to form.

18         A.   I'm afraid to say something and

19    then you say I'm not answering to your

20    question.

21         Q.   I'm just asking if you know what

22    these auditors did in the performance of their

23    audit.

24               MR. LEWIS:  Objection to form.

This Transcript Contains Confidential Material

1          A.    They were commissioned under my
2     name and my order, my signature.  And then
3     they're assigned to do the job and to discuss
4     the matter with the committee that has been
5     established for this purpose.
6          Q.    Did the auditors report to you?
7          A.    This report in front of me now is
8     supposed to have been presented to the
9     committee established for this purpose.
10         Q.    Now, the text I was referring to
11    indicates a finding by the auditors that no
12    internal or external audit was ever carried out
13    for the Pakistan branch.
14              Have you ever personally seen an
15    audit for the Pakistan branch for the three
16    years 1998 through 2001?
17         A.    This is not my personal function.
18         Q.    Turning to page 13 of the report,
19    there's a section on Construction.
20         A.    Yes.
21         Q.    And the auditors found that
22    invoices and supporting documents for
23    construction projects were self-made and that
24    certain of the construction companies did not

1    even seem to exist.

2              Do you see that?

3              MR. LEWIS:  Once again, that's not

4        what's up on the screen.

5              MR. CARTER:  Now it is.

6    A.    Yes, I have seen it.

7    Q.    Based on your familiarity with the

8    investigation that was conducted of the

9    Pakistan office, is it your understanding that

10   invoices and receipts for construction projects

11   allegedly conducted by that office had been

12   fabricated?

13   A.    These invoices, when they are sent

14   by any external office to the General

15   Secretariat, they do not go to the Secretary

16   General; they go to the relevant department.

17   Q.    Again, my question was different,

18   Dr. Basha.  You indicated that you had some

19   involvement in the investigation of the

20   Pakistan office, correct?

21   A.    My responsibility regarding

22   Pakistan was about sending the delegation and

23   appointing the external auditor and forming the

24   committee responsible for examining the

1  documents and obtaining the results.  That's

2  it.  But I do not get involved in invoices and

3  stuff like that.

4        Q.   And in your role receiving the

5  results of the investigation, did anyone convey

6  to you that the Pakistan office had fabricated

7  receipts for construction projects?

8        A.   The assignment given to the office

9  was related to the imprisonment that took place

10 in the Pakistan office within the time period

11 mentioned in the report, and then when the

12 committee concluded that the stolen funds can

13 be recovered by seizing the three clinics, the

14 assignment was over then.  But nothing has been

15 mentioned to me in relation to mosques.

16       Q.   It's your understanding that funds

17 were misappropriated by people at the IIRO

18 Pakistan branch, correct?

19       A.   It is a proven fact for me, based

20 on the documents, that the embezzled funds were

21 stolen by Amir Jasim, with the knowledge of

22 Moayad Al-Butairi.

23       Q.   And as part of its investigation,

24 did the IIRO discover that those individuals

This Transcript Contains Confidential Material

1    had fabricated receipts as part of their

2    misappropriation?

3         A.   I have said before that Amir Jasim

4    had made written admissions in this respect,

5    yes.  And it was explicit that there was

6    fabrication in invoices, fabrication of

7    documents.

8         Q.   Did Mr. Jasim provide a document to

9    the IIRO making those acknowledgments?

10        A.   Yes, a written document signed by

11   him.

12        Q.   Turning to page 9 of this audit

13   report, under the heading, Conclusion.

14        A.   Yes.

15        Q.   The first sentence indicates that

16   the auditors found, The net unreported amount

17   of US $3,071,659 is unaccounted for and

18   represents the expenditure which was either not

19   recorded and for which no vouchers and

20   supporting documentation is available and/or

21   the amounts which have been misused or

22   misappropriated locally.

23             Do you see that?

24        A.   Yes, I see this text.

This Transcript Contains Confidential Material

1      Q.   Did anyone ever communicate to you

that as much as $3 million transferred to the

Pakistan branch between 1998 and 2001 had gone

missing?

5      A.   I was not notified by this number.

6      Q.   And you don't remember what

valuation the IIRO assigned to the three

clinics that Butairi turned over, do you?

9      A.   I do not remember this value, but I

want to highlight something important.  And I

don't know whether this report mentions that or

not.  Number one, the fire that destroyed the

documents, which was premeditated, was done by

Amir Jasim.

15          In addition to 15 financial

transfers, about them there were discussions

and lengthy communications between the IIRO and

Al-Rajhi Bank.  Because in the records of the

General Secretariat, it shows that these

transfers were made to Pakistan, but they do

not appear in the accounts or the records of

the Pakistan office.  And therefore, as an

assumption, maybe this figure mentioned here

represents a substantial part of these

This Transcript Contains Confidential Material

1   transfers.

2       Q.   Do you know when the clinics that

3   Butairi transferred to IIRO were established?

4       A.   I do not know exactly, but it seems

5   that it happened after Amir Jasim and Butairi

6   gained a kind of experience after we have

7   established Al-Khalij [ph] clinic to examine

8   the expatriate workers.  After the success of

9   that clinic, they have established three

10  prototypes of it in different parts.

11          The initial clinic that was

12  established was conducting the medical

13  examination of expatriate workers who are

14  supposed to be coming to the Gulf area, and the

15  money of the tests was paid in cash was

16  received by Amir Jasim, and he was not

17  depositing these funds into the IIRO accounts.

18      Q.   Do you know how much money Butairi

19  and Jasim invested to establish each of the

20  clinics?

21      A.   Of course, we were unable to obtain

22  this information, not from Butairi, nor from

23  Jasim.

24          And this reminds me of another

This Transcript Contains Confidential Material

1  problem that I want to raise.  Even when the

2  IIRO requested from banks the personal accounts

3  of Amir Jasim and Butairi, the banks refused.

4      Q.   But the valuation the IIRO assigned

5  to the clinics at the time of the transfer was

6  based on the value at the time of the transfer,

7  not what Butairi and Jasim invested to

8  establish them, correct?

9           MR. LEWIS:  Objection to form.

10     A.   I think, and this is my personal

11  assumption, that the valuation of these clinics

12  was done based on the value at the time of the

13  equipment and furniture that was found in these

14  clinics.

15          MR. CARTER:  I would ask the

16          reporter to mark as Basha-151 the

17          document produced at IIRO 168291, which

18          should be in the same Redwell.

19          (Exhibit Basha-151 marked for

20          identification and attached to the

21          transcript.)

22  BY MR. CARTER:

23     Q.   Dr. Basha, do you recognize that

24  document?

This Transcript Contains Confidential Material

1          A.    I have just received it now.

2          Q.    You don't recall having seen it

3    previously?

4          A.    Please give me time to read it.

5          Q.    Sure.

6                INTERPRETER:  Yes, the document has

7          been read to the witness.

8          Q.    And the sender of this document is

9    identified as Shoukat Hayat.  Do you know who

10   that is?

11         A.    I do not know him.

12         Q.    And the letter conveys information

13   that Amir Jasim burnt records of the IIRO.  And

14   am I correct that you received information

15   indicating that Mr. Jasim had, in fact, burned

16   IIRO records?

17         A.    Yes.  I was notified about that by

18   Mr. Salama Al-Quraani, who was the then-manager

19   of the legal department at the IIRO.  And Amir

20   Jasim has admitted that to him in prison.

21         Q.    And the letter says that he burned

22   the records on the orders of Moayad Al-Butairi.

23   Were you ever told that Mr. Butairi directed

24   Mr. Jasim to burn the records of the IIRO?

This Transcript Contains Confidential Material

1      A.   This was denied by Moayad.

2      Q.   But the accusation was presented to

3  you?

4      A.   Yes.  It was presented orally by

5  Salama Al-Quraani.

6      Q.   Mr. Quraani was the legal

7  consultant working on the case?

8      A.   He was the manager of the legal

9  department at the IIRO and the member of the

10  committee of inquiry that was responsible for

11  examining the documents.

12          MR. NASSAR:  Sean, I'm sorry, at

13          the top of the page, there's some Arabic

14          scribbled in that has a date on the

15          document.  It didn't make it on -- I

16          think it's marked as illegible on the

17          English version on the first page.  It

18          may be helpful in terms of timeline,

19          just to get it straight, to read out the

20          date.  And then what's on ours is --

21          it's, I think -- October 17th, 2003 is

22          the date that's scrawled in Arabic.  I'm

23          sorry, October 16th, 2003.

24      Q.   Dr. Basha, your counsel has just

This Transcript Contains Confidential Material

1  indicated that there is Arabic writing --

2  handwriting on the original version of the

3  document and that there is a date referenced.

4  Are you able to read the date?

5      A.   I hardly can read it.  It is -- the

6  day is the 16th, the month is not clear, and

7  the year is 2003.

8          MR. CARTER:  I ask the court

9          reporter to mark as Basha-152

10         IIRO 111029.

11         (Exhibit Basha-152 marked for

12         identification and attached to the

13         transcript.)

14         THE WITNESS:  Yes.

15  BY MR. CARTER:

16      Q.   Dr. Basha, earlier you mentioned

17  that there was an issue with the loss of

18  original documents relating to the Jasim case.

19  Do you recall that?

20      A.   Yes.

21      Q.   Okay.  And is Basha-152 a letter

22  that was sent to you regarding the documents

23  required by the Pakistani police in the Jasim

24  case?

This Transcript Contains Confidential Material

1     A.    Yes.

2     Q.    And does it indicate that the

3  Pakistani police could not accept photocopies

4  of the documents for purposes of Mr. Jasim's

5  case?

6     A.    Yes.

7     Q.    And do I understand from this

8  document that whatever original documents were

9  available were sent to you to be handed over

10  for purposes of the case?

11     A.    The original documents will be

12  contained in big cartons, and they cannot -- it

13  is illogical that they are all sent to the

14  Office of the Secretary General.  But the

15  purpose of this letter is to seek a permission

16  from the Office of the Secretary General to

17  send the original documents that can only be

18  accepted in Pakistan.

19     Q.    Okay.  So as I understand it, the

20  Pakistani police said that they needed the

21  original documents in order to continue with

22  the Jasim case, correct?

23     A.    Yes.

24     Q.    And those original documents were

This Transcript Contains Confidential Material

1    in the possession of the IIRO, correct?

2         A.    Yes.

3         Q.    And do I understand you to have

4    testified previously that the IIRO sent those

5    original documents to the Pakistani police but

6    said that the Pakistani police lost them?

7         A.    Yes, by the acts of someone.

8         Q.    Well, did the Pakistani police ever

9    confirm initial receipt of the documents?

10        A.    The committee informed me that the

11   documents were sent by courier.  They were not

12   sent with the office manager.  And they were

13   hand-delivered to the person in the police who

14   requested them.

15             We were happy then because we

16   thought that having the original documents with

17   the police will reveal the truth.  But what

18   happened is the documents disappeared.

19        Q.    Did the fact that the documents

20   disappeared impair the efforts to prosecute

21   Mr. Jasim?

22        A.    This was what has been requested by

23   the Pakistani police in order to prepare a

24   criminal prosecution.

This Transcript Contains Confidential Material

1        Q.   So I take it the answer is, yes,

2   the loss of the documents made it impossible

3   for the Pakistani police to move forward?

4        A.   Yes.  And there is another surprise

5   that came to our knowledge later on.  We knew

6   that Amir Jasim has been released.

7              (The witness and interpreter

8              conferred in Arabic.)

9        A.   He was released on bail on the

10  condition that he could be summoned any time.

11             MR. CARTER:  I would ask that the

12             reporter mark as Basha-153 the document

13             produced at IIRO 127895.

14             (Exhibit Basha-153 marked for

15             identification and attached to the

16             transcript.)

17             THE WITNESS:  Yes.

18  BY MR. CARTER:

19       Q.   Dr. Basha, this appears to be a

20  2004 letter addressed to your attention.

21       A.   Yes.

22       Q.   And it references a letter to be

23  filed by Mr. Jasim with the IIRO office

24  petitioning the settlement of his case.

This Transcript Contains Confidential Material

1             Do you know whether Mr. Jasim

2    submitted such a letter?

3        A.    Yes.  I have mentioned that there

4    was a written admission from him admitting the

5    cheating, and that he was responsible for that

6    cheating, and he did it on purpose, and

7    requesting amnesty to conclude the case after

8    he knew that Moayad Al-Butairi was in Saudi

9    Arabia, has given up the clinics.

10       Q.    And the letter describes an

11   internal IIRO process that would need to be

12   followed in consideration of Mr. Jasim's

13   request, correct?

14       A.    Yes.

15       Q.    And do you know whether or not the

16   process described in this letter actually took

17   place?

18       A.    Yes, they took place.

19            MR. CARTER:  I ask the court

20            reporter to mark as Basha-154 a document

21            produced at IIRO 117362.

22            (Exhibit Basha-154 marked for

23            identification and attached to the

24            transcript.)

This Transcript Contains Confidential Material

1            THE WITNESS:  Yes.

2    BY MR. CARTER:

3            Q.   Dr. Basha, is this a letter sent to

4    you in 2003 by the then-director of the IIRO's

5    Pakistan branch?

6            A.   Yes.

7            Q.   And the letter indicates that,

8    Given the lack of banks until now in

9    Afghanistan and the fact that we previously

10   used to transfer the funds in cash, and due to

11   the risks we could be exposed to.

12           Do you see that language?

13           A.   Yes.

14           Q.   Am I correct in understanding from

15   this letter that prior to the 2003 date of this

16   letter, the IIRO Pakistan branch transferred

17   funds to Afghanistan in cash?

18           A.   What I understood the process that

19   was followed is that the manager of the IIRO

20   office in Afghanistan -- sorry, the

21   representative of the IIRO in Afghanistan will

22   be called to come to Pakistan to receive the

23   monthly salaries of the workers and to receive

24   the rental payments of the buildings and the

This Transcript Contains Confidential Material

1    operational expenses.  That's it.  And then he

2    goes to Afghanistan to make these disbursements

3    and comes back with the documents, because

4    there weren't official banks operating in

5    Afghanistan at that time.  And therefore, I see

6    that the expression to stop all projects is not

7    an accurate expression, and the office found

8    that it is -- this step is risky.

9         Q.   Dr. Basha, during the period that

10   Mr. Butairi was the director of the IIRO's

11   Pakistan branch, was the Pakistan branch

12   responsible for the IIRO's activities in

13   Afghanistan?

14        A.   Yes.

15        Q.   Dr. Basha, do you recognize a

16   person named Mohammed Jamal Khalifa?

17        A.   Yes.

18        Q.   Have you ever met him personally?

19             (Reporter interruption.)

20        Q.   Have you ever met him in person?

21        A.   One time.

22        Q.   When was that?

23        A.   I do not recall the year exactly,

24   but this was based on a request from the

This Transcript Contains Confidential Material

1  previous lawyer of the IIRO, Mr. Martin

2  McMahon.

3      Q.   So you met him while this lawsuit

4  was ongoing?

5      A.   By request from the lawyer.

6      Q.   But was Mohammed Jamal Khalifa the

7  head of the Philippine office of the IIRO when

8  you became Secretary General of the IIRO?

9      A.   No.  He left the IIRO three or four

10  years before I joined it.

11      Q.   When you became Secretary General

12  of the IIRO, did you receive information that

13  Mr. Khalifa had at one point been arrested by

14  U.S. authorities?

15      A.   I knew that only when he came to

16  our office for the discussion with the lawyer

17  of the IIRO.

18      Q.   Did you ever receive information

19  that Mr. Khalifa had fought in Afghanistan with

20  Osama bin Laden?

21      A.   The accusations against Mohammed

22  Jamal Khalifa were written in an official

23  letter that was sent to him by the IIRO, and he

24  responded to them through a letter that he

This Transcript Contains Confidential Material

1    wrote.

2              MR. CARTER:  I'd like to ask the

3         reporter to mark as Basha-155 the

4         document produced at IIRO 3010 through

5         3011, along with the English

6         translation.

7              (Exhibit Basha-155 marked for

8         identification and attached to the

9         transcript.)

10   BY MR. CARTER:

11        Q.   Dr. Basha, is the document we've

12   marked as Basha-155 the letter Mr. Khalifa sent

13   responding to the accusations against him?

14        A.   This is the letter I mentioned a

15   while ago.

16        Q.   And on the page bearing the stamp

17   3011, under a heading, Summary, Mr. Khalifa

18   says that, The organization's office and my

19   work in the Philippines were entirely legal and

20   they were under the oversight of the Saudi

21   Embassy.

22              Do you see that?

23              MR. LEWIS:  Seems like it would be

24         fair to let him read the whole sentence

This Transcript Contains Confidential Material

1          rather than cut it off in the middle of

2          the sentence.

3          Q.   Dr. Basha, did you conduct any

4     inquiry to determine whether the IIRO's office

5     in the Philippines operated under the oversight

6     of the Saudi Embassy during the time that

7     Mr. Khalifa headed that office?

8          A.   As I said, that Jamal Khalifa has

9     worked in the IIRO office for three or four

10    years, and he left before I joined the IIRO,

11    three or four years before that.

12         Q.   So you don't know whether the

13    statement in his letter that his work was

14    conducted under the oversight of the Saudi

15    Embassy is correct or not?

16         A.   I don't know.

17         Q.   Dr. Basha, did you ever have any

18    interactions with a Saudi ambassador to the

19    Philippines named Mohammed Amin Waly?

20         A.   Yes.

21         Q.   In what context did you have

22    interactions with him?

23         A.   The context of any communication

24    with any Saudi ambassador outside, requesting

This Transcript Contains Confidential Material

1   some kind of facilitation or assistance.

2         Q.   Do you know whether Ambassador Waly

3   ever intervened to get members of IIRO who had

4   been arrested in the Philippines out of prison?

5         A.   This is the first time I hear that

6   members of the IIRO were arrested in

7   Philippines.

8         Q.   So just to clarify, you don't know

9   whether Ambassador Waly ever intervened to help

10  IIRO employees in the Philippines get out of

11  prison?

12        A.   I do not know that at all.

13        Q.   Dr. Basha, earlier we talked a

14  little bit about the bombings of the U.S.

15  Embassies in Kenya and Tanzania, and you

16  were -- you indicated you were familiar with

17  those attacks, correct?

18        A.   Yes, because sadly, as soon as I

19  joined the IIRO, we had these sad incidents,

20  this sad terrorist attack.

21        Q.   Do you know whether Kenyan

22  authorities closed the IIRO office in Kenya in

23  connection with the investigation of those

24  attacks?

```
 1        A.   Yes, they have closed the office
 2   and confiscated all the computers.  But a week
 3   or so after that, everything was reinstated
 4   with a polite apology.
 5        Q.   Did the IIRO conduct any internal
 6   investigation to determine if its branch in
 7   Kenya was involved in the attacks?
 8        A.   For any problem that arises
 9   regarding any of the offices of the IIRO, a
10   thorough inquiry is conducted, administrative,
11   financial, and for the workers in it, and if
12   necessary, the manager of the office will be
13   called for investigation.
14        Q.   So did that process occur with
15   regard to the IIRO office in Kenya or Tanzania
16   after the bombings?
17        A.   Yes.
18        Q.   Do you know whether any documents
19   were created relating to that internal
20   investigation?
21        A.   The investigation is conducted by
22   the relevant departments.  In this case it is
23   the legal department.  And the conclusions are
24   presented to me only.
```

This Transcript Contains Confidential Material

1          Q.   Do you recall receiving a report

2     from the legal department relating to an

3     inquiry of the Kenya or Tanzania offices?

4                MR. LEWIS:  Objection.  You used

5          the term "report."  Do you mean to

6          suggest a written report or any sort of

7          report?

8                MR. CARTER:  Any kind of report.

9          He said that the findings would be

10         reported to him.

11         A.   In most of the cases, the findings

12    are discussed in a brief meeting in the office

13    of the Secretary General in the presence of the

14    manager of the concerned office and the manager

15    of the legal department.

16               (Cross-talk.)

17               MR. NASSAR:  I think he also said,

18         "as well as the financial department."

19               (The witness and interpreter

20         conferred in Arabic.)

21               INTERPRETER:  Sorry.  "And the

22         financial department."

23         Q.   Do you know whether or not the

24    legal department typically creates documents as

This Transcript Contains Confidential Material

1    part of such an inquiry?

2         A.    If it is required, yes.

3              MR. CARTER:  I'd like the reporter

4         to mark as Basha-156 a document produced

5         at IIRO 287007 through 287013.

6              (Exhibit Basha-156 marked for

7         identification and attached to the

8         transcript.)

9              MR. LEWIS:  Yeah, we've gone about

10        another hour and a half, so if this is a

11        quick document, we can do that, or we

12        can break now.  It's really a

13        function -- I think our witness feels

14        fine; it's our translator and our court

15        reporter.

16             THE WITNESS:  (In English.)  Let's

17        do this one.  It's okay.

18             MR. CARTER:  I'll defer to you

19        guys.

20             MR. LEWIS:  Is this a quick

21        document, Sean?

22             MR. CARTER:  That's not entirely

23        under my control.

24             MR. LEWIS:  Well, I understand

This Transcript Contains Confidential Material

1        that, but some are quicker than others.

2              MR. CARTER:  Why don't we take a

3        few minutes.

4              MR. LEWIS:  Why don't we just take

5        a break now.  I have 8:18.  Shall we

6        start again at 8:30?

7              MR. CARTER:  Okay.  Thank you.

8              VIDEO OPERATOR:  We are now going

9        off the video record.  The time is 8:18.

10             (Recess from 8:18 p.m. until

11       8:35 p.m.)

12             VIDEO OPERATOR:  We are now going

13       back on the video record.  The time is

14       8:35.

15   BY MR. CARTER:

16       Q.   Dr. Basha, before we took a break,

17   the court reporter marked as Basha-156 a

18   document that I understand to be minutes of a

19   1999 meeting of the IIRO's executive committee.

20   Is that correct?

21       A.   Yes.

22       Q.   And from the document, I understand

23   that you attended that meeting?

24       A.   Yes.

This Transcript Contains Confidential Material

1      Q.   I just have a few questions about

2   it.  Under the heading, Fourth Term, it

3   indicates an agenda item involving, reviewed

4   the issue of the fund of Mr. Wa'el Jelaidan.

5           Do you see that?

6      A.   Yes.

7           INTERPRETER:  The answer was "Yes."

8      Q.   Did you know who -- at the time of

9   this meeting, did you know Mr. Jelaidan?

10          MR. NASSAR:  Sorry, Sean, we have

11          an objection to the translation in the

12          written document.  I think the term

13          "fund" should be properly translated as

14          "advance."

15          MR. CARTER:  Okay, noted.  Thanks,

16          Waleed.

17      Q.   Mr. Basha, my question was, at the

18   time of this meeting in 1999, did you know

19   Mr. Jelaidan?

20      A.   There was another meeting, I do not

21   remember the exact date of that meeting, it was

22   a meeting for the executive committee, and

23   members of the committee were asked to approve

24   the nomination of Mr. Wa'el Jelaidan as a

1  member in the urgent relief committee.  I do

2  not know which meeting was before the other

3  one.

4       Q.   Do you recall when you first met

5  Mr. Jelaidan?

6       A.   The first time I met him was in the

7  meeting of the executive committee in which he

8  was nominated to be a member in the urgent

9  relief committee.

10       Q.   And turning your attention to the

11  ninth agenda item, which appears on the page

12  marked 287012.

13       A.   Yes.

14       Q.   There is a reference to a

15  discussion about adding Mr. Jelaidan to the

16  urgent aid committee.  Is that the issue you

17  were just mentioning?

18       A.   Yes.

19       Q.   So based on that, was this the

20  first time you met Mr. Jelaidan?

21       A.   Yes.

22       Q.   Had you communicated with him at

23  any point prior to this meeting?

24       A.   No.

This Transcript Contains Confidential Material

1        Q.    Did you know him by reputation

2   prior to this meeting?

3        A.    As a justification for his

4   nomination to be a member of the urgent relief

5   committee, it was said to us in this meeting

6   that he has an experience in the relief

7   operations.

8        Q.    But prior to receiving his

9   credentials for the urgent relief committee,

10  had you ever received information about

11  Mr. Jelaidan previously?

12       A.    I do not recall.

13       Q.    At the time this meeting occurred,

14  had you ever heard that Mr. Jelaidan had a

15  relationship with Osama bin Laden dating to the

16  fighting in Afghanistan against the Soviet

17  Union?

18       A.    For me personally, had I knew that,

19  I would have made reservations against this

20  decision or I would have rejected it.

21       Q.    So based on that, do I understand

22  that your testimony is that you had not

23  received such information as of the time of

24  this meeting?

This Transcript Contains Confidential Material

1          A.    Yes.

2          Q.    But if you had known that, you

3    would have deemed appointing him to serve on

4    the urgent relief committee inappropriate.  Is

5    that correct?

6          A.    Yes.

7          Q.    Turning back to the fourth issue

8    briefly, do you recall what the --

9                MR. LEWIS:  The fourth term?

10         Q.    Fourth term.  And do you recall

11   what the discussion about the fund or advance

12   of Mr. Jelaidan was about?

13         A.    What I remember is that he had an

14   advance before he joins the IIRO, but I do not

15   know the background and the details of it.

16               MR. NASSAR:  Sorry, I think the

17         answer -- I think the witness said,

18         "before I joined the IIRO," not before

19         Jelaidan joined.

20               (The witness and interpreter

21         conferred in Arabic.)

22               INTERPRETER:  "Before I joined the

23         IIRO."

24         Q.    Do you recall what the amount of

This Transcript Contains Confidential Material

1    the advance was?

2         A.    No, I do not recall.

3         Q.    Do you know why the IIRO provided

4    the advance to Mr. Jelaidan?

5         A.    I don't know, but I guess he was

6    working in Pakistan with the Saudi Red

7    Crescent, and maybe an advance was given to him

8    at that time.  Maybe.  I don't know.

9         Q.    Turning to Term Nine that we were

10   discussing before, you referenced there was a

11   discussion to add Mr. Jelaidan as a member to

12   the urgent aid committee.  Do you recall that

13   discussion?

14        A.    Yes.

15        Q.    And was that the urgent aid

16   committee of the IIRO?

17        A.    In the IIRO, we do not have urgent

18   relief committee.  We have a department for

19   urgent relief.

20        Q.    So based on your involvement in

21   this, what was Mr. Jelaidan being proposed to

22   join as a member?

23        A.    According to the text I see, it is

24   because of the importance to support the

1    efforts of the IIRO in the field of urgent

2    relief, and the nomination of people who are

3    interested in this field; not only him, another

4    name in the same session was also proposed,

5    Dr. Abdulaziz Jifry.

6         Q.   So Mr. Jelaidan was being proposed

7    to join the urgent aid department of the IIRO,

8    correct?

9         A.   The urgent relief committee.

10        Q.   The urgent relief committee of

11   what?

12        A.   Of the relief for the people of

13   Kosovo.

14        Q.   Was that the Saudi Joint Relief

15   Committee of Kosovo and Chechnya?

16        A.   No.   There is an urgent relief

17   committee for Kosovo that is different than the

18   Saudi Joint Committee for the Relief of Bosnia

19   and Herzegovina.

20        Q.   Was the urgent relief --

21        A.   And that committee later on became

22   the Joint Saudi Committee for the Relief of the

23   People of Kosovo.

24        Q.   And do I understand from this

This Transcript Contains Confidential Material

1  document that the IIRO approved the nomination

2  of Jelaidan to serve as the head of that

3  committee?

4          A.    As a secretary for the committee.

5          Q.    As the Secretary General, correct?

6          A.    As a secretary only.

7          Q.    And do you recall who proposed

8  Mr. Jelaidan for that nomination?

9          A.    I do not recall now, but it should

10  be one member of the executive committee.

11          Q.    But you do not recall who that was?

12          A.    I do not recall now.

13          Q.    Turning to the sixth term, it

14  identifies an issue that was discussed

15  regarding the approval of an additional budget

16  for projects of the Eastern district office.

17                Do you see that?

18          A.    Yes.

19          Q.    And do you recall the discussion?

20          A.    To some extent, yes.

21          Q.    It indicates that there were

22  projects being financed directly by the Eastern

23  district office without the Care entity and the

24  Secretariat General knowing about it.

This Transcript Contains Confidential Material

```
1            Do I understand from that that the

2    Eastern district was independently financing

3    activities outside of Saudi Arabia?

4        A.    Well, in fact, the relationship

5    between the Eastern district office and the

6    General Secretariat is a relationship that is

7    marked by different opinions.  The Eastern

8    district office view was that having the

9    project implementation and affiliation to the

10   General Secretariat is something that is

11   bureaucratic.  And they justify that by saying

12   the donor wants a quick implementation of the

13   project.

14            And therefore, their opinion is

15   that having the project go through the General

16   Secretariat and the validation process would

17   take long time.  And therefore they implemented

18   the project, but they implemented in the

19   regions where the external IIRO offices are

20   operating.

21            And therefore, the external offices

22   of the IIRO are the other eye for the General

23   Secretariat.  So even if the project is

24   implemented directly by the Eastern district
```

This Transcript Contains Confidential Material

1    office, the external office would include the

2    project in its reports presented to the General

3    Secretariat.

4              So this was the point of difference

5    between us and them.

6         Q.   So as I understand it, the office

7    in the Eastern district was sending money

8    overseas on its own to implement projects.

9              MR. LEWIS:   Objection to form.

10        A.   As I said, projects are implemented

11   by the external offices of the IIRO.  And

12   therefore, the representative to that project,

13   rather than being sent by the General

14   Secretariat, he or she is sent by the Eastern

15   district office.

16        Q.   Dr. Basha, it's a simple question.

17   Was the Eastern district office sending money

18   overseas on its own for projects?

19        A.   It would send the funds from the

20   accounts of the Eastern district office to the

21   accounts of the external office.

22        Q.   So the Eastern district office was

23   initiating funds transfers from its accounts to

24   offices outside Saudi Arabia, correct?

This Transcript Contains Confidential Material

1      A.   Yes, to the external offices of the

2  IIRO outside Saudi Arabia.

3      Q.   And further down in this document,

4  it indicates that the projects of the Eastern

5  district office were being carried out in

6  Thailand, Indonesia, Jordan, Pakistan,

7  Baltistan, Palestine, Lebanon, India, Sudan,

8  Egypt, Philippines, and Ethiopia, correct?

9      A.   Yes.

10     Q.   And who was the head of the Eastern

11  district office at that time?

12     A.   A person named Turki bin Fahad bin

13  Jiluwi.

14     Q.   Was he a member of the Saudi Royal

15  Family?

16     A.   Yes.

17     Q.   Did you ask him to cut it out?

18          MR. NASSAR:  By "cut it out," I

19      think he means "stop."

20          MR. LEWIS:  Objection to form.

21     A.   Yes.

22     Q.   Did he comply with your request?

23     A.   No.

24     Q.   And during the period that this

This Transcript Contains Confidential Material

1    discussion occurred, Mr. Butairi was the head

2    of the Pakistan branch, correct?

3         A.   Yes.

4         Q.   And during that same period,

5    Mr. Jasim was the financial officer of the

6    Pakistan office, correct?

7         A.   Yes.

8         Q.   And Pakistan was one of the areas

9    where the Eastern district office was carrying

10   out these projects, correct?

11        A.   Yes.

12             MR. CARTER:  I'd like the court

13             reporter to mark as Basha-157 a document

14             produced at IIRO 49708.  It's actually

15             three related documents, I'm sorry, that

16             were produced at 49708, 49709, and

17             49710.

18             (Exhibit Basha-157 marked for

19             identification and attached to the

20             transcript.)

21   BY MR. CARTER:

22        Q.   Dr. Basha, I want to look first at

23   the top document, 49708.

24        A.   Yes.

This Transcript Contains Confidential Material

1    Q.   And is this a letter that you sent

2    from -- or you sent to the Secretary General of

3    the Muslim World League concerning a meeting

4    about the Eastern district office?

5    A.   Yes.

6    Q.   Do you know what precipitated this

7    meeting?

8    A.   A report of the auditor contained

9    some remarks about the office.  And therefore,

10   the executive manager and the follow-up manager

11   were summoned to the General Secretariat to

12   discuss these issues.  These are payments that

13   were made without the supporting documents.

14   Q.   So does this document indicate that

15   an audit discovered that Mr. Khalil Ibrahim of

16   the Eastern district office had made payments

17   without supporting vouchers?

18   A.   Yes.

19   Q.   And do you recall the amount of the

20   payments that were made by Mr. Ibrahim without

21   supporting documentation?

22   A.   No, I do not remember.

23   Q.   Are you able to provide any

24   estimate whatsoever?

This Transcript Contains Confidential Material

1       A.   It will be an improvised

2  estimation.

3       Q.   Are you able to provide any fair

4  estimation?

5       A.   I apologize doing that because it

6  has been 19 years.

7       Q.   What was Mr. Ibrahim's position in

8  the Eastern district office?

9       A.   The office manager for the previous

10 regional supervisor.

11      Q.   Do you know who he reported to in

12 that role?

13      A.   The regional supervisor.

14      Q.   And who was that?

15      A.   Prince Turki.

16      Q.   And that's Prince Turki bin Fahad

17 bin Jiluwi, correct?

18      A.   Yes.

19      Q.   And further down in the document,

20 it references that the committee that was

21 studying this issue met with Prince Turki bin

22 Fahad bin Jiluwi before his resignation and

23 discussed the auditor's report.

24           Do you recall what prompted Prince

This Transcript Contains Confidential Material

 1    Turki bin Fahad bin Jiluwi to resign as the

 2    supervisor of the regional office?

 3          A.    Because the report of the auditors

 4    refused the behavior -- the individual behavior

 5    of the Eastern district office, and their

 6    actions without the knowledge of the General

 7    Secretariat, and the financial regulations.

 8    And it's a violation of the regulations.

 9          Q.    So he resigned in response to the

10    auditor's findings?

11          A.    Because he did not wish to

12    implement the recommendations of the auditor.

13               MR. CARTER:  I'd ask the court

14               reporter to mark as Basha-158 the

15               document produced at IIRO 287391.

16               (Exhibit Basha-158 marked for

17               identification and attached to the

18               transcript.)

19               THE WITNESS:  Yes.

20    BY MR. CARTER:

21          Q.    And is this an administrative

22    decision issued under your signature confirming

23    this -- Prince Turki bin Fahad bin Jiluwi's

24    resignation?

This Transcript Contains Confidential Material

1    A.    Yes.

2    Q.    And through this same

3  administrative decision, was an individual

4  named Dr. Abdul-Hamid bin Sulaiman Al-Mujil

5  appointed the new executive director of the

6  Eastern district office?

7    A.    He was already the executive

8  director.  When Prince Turki was the general

9  supervisor, this person was the executive

10 director.  And therefore, he was assigned to be

11 the acting manager or in charge of the office

12 sine die.

13          (Reporter interruption.)

14          (Cross-talk.)

15   Q.    Before deciding that Mr. Al-Mujil

16 should be designated to be in charge of

17 managing the Eastern district office going

18 forward, did the IIRO conduct an inquiry to

19 determine whether he was also involved in the

20 problems reflected in the auditor's report?

21   A.    I rely now on my memory.  I recall

22 that the auditor's report connected all the

23 violations to requests from the Prince.  And

24 therefore Abdul-Hamid Al-Mujil did not have any

This Transcript Contains Confidential Material

1  role in these violations.

2       Q.   Was there a written auditor's

3  report that you're referring to?

4       A.   Yes.

5            MR. CARTER:  I'll ask the reporter

6            to mark as Basha-159 a document produced

7            at FED-PEC0202110 through 0202112.

8       A.   But before that I want to mention

9  something important now, that the auditor's

10 report was handed over to the chairman of the

11 board of directors.

12      Q.   And that would have been the

13 Secretary General of the Muslim World League?

14      A.   Yes.

15      Q.   And the IIRO didn't keep a copy of

16 its own auditing department's report?

17      A.   I do not remember receiving a copy

18 of it.

19      Q.   But the report would have been

20 delivered to the Secretary General of the

21 Muslim World League in 2003?

22      A.   Yes, it was delivered to him, but I

23 do not recall the year exactly.  It was after

24 the conclusion of the inquiry.

This Transcript Contains Confidential Material

1    Q.   And the Secretary General of the
2    Muslim World League at that time was Abdullah
3    bin Abdul Mohsin Al-Turki, correct?
4         A.   I remember that his name was
5    Abdullah Obaid.
6         Q.   Okay.  Just turning back to
7    Basha-157, that document is a letter from you
8    concerning the audit addressed to His Highness
9    Dr. Abdullah bin Abdul Mohsin Al-Turki,
10   Secretary General of the Muslim World League.
11   So based on that --
12        A.   Yes.
13        Q.   Okay.  So based on that, can you
14   tell me whether, in fact, Dr. Al-Turki was the
15   Secretary General at the time of the audit?
16        A.   I think the report was issued
17   during the tenure of Dr. Abdullah bin Obaid.
18   And he was then replaced by Dr. Abdullah
19   Al-Turki.  I'm here relying on my memory.
20        Q.   Okay.  But based on the document we
21   marked as Basha-157, you obviously communicated
22   with Dr. Al-Turki about this precise issue,
23   correct?
24        A.   Yes.

This Transcript Contains Confidential Material

1        Q.    Dr. Basha, before we pivoted, I had

2   marked a document as Basha-159.  And it's in

3   English.

4              (Reporter interruption.)

5              (Exhibit Basha-159 marked for

6         identification and attached to the

7         transcript.)

8   BY MR. CARTER:

9        Q.    Dr. Basha, this is an August 3,

10   2006 press release from the United States

11   Department of the Treasury relating to the

12   United States' designation of the Philippine

13   and Indonesian branches of the IIRO, and

14   Abdul-Hamid Sulaiman Al-Majil, for facilitating

15   fundraising for Al Qaida.

16             Were you aware that the U.S.

17   government took those actions against the

18   branches of the IIRO and Mr. Mujil?

19        A.    This is what I was told by the

20   lawyer.

21        Q.    Did the IIRO conduct an

22   investigation, following these designations,

23   into the U.S. claim that the offices referenced

24   and Mr. Mujil were involved in supporting Al

This Transcript Contains Confidential Material

1    Qaida?

2            A.    Yes.

3            Q.    And did the IIRO prepare any

4    written reports as a result of that

5    investigation?

6            A.    The actions taken by the IIRO are

7    that the papers of all these offices were

8    reviewed, the administrative and financial

9    papers, and the files of the staff members who

10   were working in these offices.  And the

11   conclusion was that all the procedures were

12   sound for us, but it was not in writing.

13           The most important thing here is

14   that our office in Indonesia was operating

15   during this designation, and furthermore, it

16   was receiving letters of appreciation in

17   relation to its operations.

18           As far as the Philippines office is

19   concerned, we had only a mission there --

20           (In English.)  A representative.

21           INTERPRETER:  "A representative,"

22       sorry.

23           A.    (Through interpreter.)

24           -- a representative there who was

This Transcript Contains Confidential Material

1  responsible for supervising projects, and these

2  projects did not stop.

3          And this indicates that the

4  responsible governments in these two countries

5  did not have comments on the operations of

6  these offices.

7      Q.   Okay.  Well, let's stick to what

8  I'm asking you for the moment.  Did -- the

9  document indicates that the U.S. government had

10 concluded that Al-Mujil provided donor funds

11 directly to Al Qaida.

12     A.   We have confronted him by this

13 claim, and he absolutely denied this.

14     Q.   Okay.  But you did determine that

15 there were financial improprieties occurring in

16 the Eastern district office, correct?

17          MR. LEWIS:  Objection to the form.

18     A.   Yes.  The financial improprieties

19 were there in the office.

20     Q.   Dr. Basha, we obtained information

21 in our investigation indicating that the Saudi

22 Ministry of Interior conducted an investigation

23 of the IIRO Eastern Province branch.  Were you

24 aware of that?

This Transcript Contains Confidential Material

1           MR. LEWIS:  Objection to form.

2      A.   No.

3      Q.   Do you recall whether the Saudi

4  government ever requested that the IIRO provide

5  information to it so that it could conduct an

6  investigation of the Eastern Province branch

7  and Mr. Mujil?

8      A.   I do not recall that.

9      Q.   Dr. Basha, there's a document I'd

10 like to show you that we're just going to have

11 to post on the screen.  It is Defendant IIRO's

12 Amended Answer to Claimant's First Amended

13 Complaint.  It is a filing the IIRO submitted

14 to the Court in our case on December 13, 2005.

15           Dr. Basha, do you know whether or

16 not you ever reviewed this document before it

17 was filed?

18      A.   This is the first time I see it.

19      Q.   If possible, can we turn your

20 attention to the last page of the document,

21 which hopefully is on the screen right now.

22 And it indicates that the document was

23 submitted by a lawyer named Martin McMahon.  Do

24 you see that at the bottom?

This Transcript Contains Confidential Material

1        A.    Yes, I see it.

2        Q.    And was Mr. McMahon the IIRO's

3    attorney in 2005?

4        A.    I do not recall the date, but he

5    was the lawyer of the IIRO, yes.

6        Q.    And did you have direct contact

7    with Mr. McMahon relating to his representation

8    of the IIRO?

9            MR. LEWIS:  Objection to form.

10       A.    Yes.

11       Q.    Looking up the page, it says, under

12    the title, 13th Affirmative Defense, Immunity,

13    IIRO is an instrumentality of the government of

14    the Kingdom of Saudi Arabia.  Accordingly, IIRO

15    is immune from suit.

16            Do you see that?

17       A.    Yes.

18       Q.    Did you discuss with Mr. McMahon

19    the IIRO's status as an instrumentality of the

20    government of the Kingdom of Saudi Arabia?

21            MR. LEWIS:  I'm going to object to

22            that as privileged.  What he discussed

23            with his lawyer at the time is

24            privileged information.

This Transcript Contains Confidential Material

```
 1              You can ask him what his

 2         understanding is as to whether it's an

 3         instrumentality.

 4              And he also said he's seeing this

 5         for the very first time today.

 6              But I don't think you can ask him

 7         what he discussed with his lawyer.

 8              MR. CARTER:  That's fine.

 9         Q.   Dr. Basha, this document was filed

10    by the IIRO stating its position with regard to

11    matters relevant to the lawsuit.  And in this

12    document, the IIRO represented to the Court

13    that it was entitled to claim status as

14    instrumentality of the government of the

15    Kingdom of Saudi Arabia and that it was

16    therefore immune.

17              Do you understand what basis the

18    IIRO had for making that claim?

19         A.   The IIRO never claims that it is an

20    instrument of the government of Saudi Arabia.

21    And its constitution declares that very simply,

22    and in all its publications.  And all these

23    documents were given to the lawyer.  And when

24    any lawyer wants to change the facts, he should
```

This Transcript Contains Confidential Material

1  have consulted with the concerned people before

2  doing that.

3           MR. LEWIS:  Dr. Basha was not

4       referring to us.

5       A.   And this did not happen in our

6  case.  I'm talking about Martin McMahon.

7  Therefore, I am surprised to see this.

8           MR. CARTER:  Why don't we just take

9       five minutes.  We're basically done, but

10      we just want to collect our thoughts and

11      we'll come back.

12          MR. LEWIS:  Okay.  Very good.

13          VIDEO OPERATOR:  We are now going

14      off the video record.  The time is 9:30.

15          (Recess from 9:30 p.m. until

16      9:42 p.m.)

17          VIDEO OPERATOR:  We are now going

18      back on the video record.  The time is

19      9:42.

20          MR. CARTER:  Dr. Basha, when we

21      were off the record, I just spoke to

22      counsel for the IIRO and Muslim World

23      League and let him know that we don't

24      have any further questions, and I

This Transcript Contains Confidential Material

1          understand that counsel on your side

2          doesn't have any further questions, so

3          with that, we are concluded with your

4          deposition.  We appreciate and thank you

5          for your time.

6               THE WITNESS:  May you allow me to

7          say something?

8               MR. CARTER:  Certainly.

9               THE WITNESS:  First of all, I'd

10         like to thank the gentlemen in the

11         United States for their patience because

12         of our -- because of the lack of

13         understanding from our side about these

14         deliberations.  Because for me, it is

15         the first time to be in such position.

16         And especially today, I spoke sometimes

17         at length, and I apologize for that.

18              But in conclusion, I would like to

19         confirm to you all that terrorism, as

20         the IIRO believes, and my own belief, is

21         a cold tool or way to cause damage to

22         all the innocent people worldwide.  And

23         it is a tool that is forbidden in all

24         the divine religions, and never approved

This Transcript Contains Confidential Material

1          in any international laws or treaties.

2          And it is inconsistent with the peaceful

3          nature of mankind.  And therefore, we in

4          the IIRO, when I was in it, terrorism

5          caused us another heavy burden, to treat

6          the victims of terrorism.

7               And thank you in all cases.

8               MR. LEWIS:  Thank you and good

9          night.

10              MR. CARTER:  Thank you.  Not

11         everyone agrees with the sentiments you

12         just expressed, unfortunately.

13              THE WITNESS:  Thank you.

14              VIDEO OPERATOR:  We are now going

15         off the video record.  The time is 9:46.

16              (Off the record at 9:46 p.m.)

17

18

19

20

21

22

23

24

This Transcript Contains Confidential Material

```
1              C E R T I F I C A T E

2

3          I, Lisa V. Feissner, RDR, CRR, CLR,

4    Notary Public, certify that the foregoing is a

5    true and accurate transcript of the deposition

6    of said witness, who was first duly sworn by me

7    pursuant to the stipulation of counsel on the

8    date and place hereinbefore set forth.

9          I further certify that I am neither

10   attorney nor counsel for, nor related to or

11   employed by, any of the parties to the action

12   in which this deposition was taken, and

13   further, that I am not a relative or employee

14   of any attorney or counsel employed in this

15   action, nor am I financially interested in this

16   case.

17

18

19          Lisa V. Feissner, RDR, CRR, CLR
            Notary Public
20          Dated: February 26, 2019

21

22          (The foregoing certification of this
     transcript does not apply to any reproduction
23   of the same by any means, unless under the
     direct control and/or supervision of the
24   certifying reporter.)
```

This Transcript Contains Confidential Material

1              INSTRUCTIONS TO WITNESS

2

3         Please read your deposition over

4    carefully and make any necessary corrections.

5    You should state the reason in the appropriate

6    column on the errata sheet for any change made.

7         After doing so, please sign the errata

8    sheet and date it.

9         You are signing it subject to the

10   changes you have noted on the errata sheet,

11   which will be attached to your deposition.  You

12   must sign in the space provided.  The witness

13   need not be a notary public.  Any competent

14   adult may witness your signature.

15        It is imperative that you return the

16   original errata sheet to the deposing attorney

17   within thirty (30) days of receipt of the

18   deposition transcript by you.  If you fail to

19   do so, the deposition may be deemed to be

20   accurate and may be used in court.

21

22

23

24

This Transcript Contains Confidential Material

1   WITNESS NAME:        ADNAN BASHA

    DEPOSITION DATE:     FEBRUARY 21, 2019

2

3                        ERRATA

4   PAGE LINE   CHANGE                    REASON

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

This Transcript Contains Confidential Material

1                  ACKNOWLEDGMENT OF DEPONENT

2

3           I hereby acknowledge that I have read

4    the foregoing deposition dated FEBRUARY 21,

5    2019, and that the same is a true and correct

6    transcription of the answers given by me to the

7    questions propounded, except for the changes,

8    if any, noted on the attached Errata.

9

10

11   SIGNATURE:

                    ADNAN BASHA

12

13   DATE:

14

15

16

17   WITNESSED BY:

18

19   DATE:

20

21

22

23

24

This Transcript Contains Confidential Material

1                          LAWYER'S NOTES

2      PAGE   LINE

3      _____  _____   _____

4      _____  _____   _____

5      _____  _____   _____

6      _____  _____   _____

7      _____  _____   _____

8      _____  _____   _____

9      _____  _____   _____

10     _____  _____   _____

11     _____  _____   _____

12     _____  _____   _____

13     _____  _____   _____

14     _____  _____   _____

15     _____  _____   _____

16     _____  _____   _____

17     _____  _____   _____

18     _____  _____   _____

19     _____  _____   _____

20     _____  _____   _____

21     _____  _____   _____

22     _____  _____   _____

23     _____  _____   _____

24     _____  _____   _____

**In re Terrorist Attacks on September 11, 2001, MDL No. 03-1570 (GBD)**

ERRATA SHEET FOR THE TRANSCRIPT OF:

Deponent:  Dr. Adnan Basha
Dep. Date: February 20 & 21, 2019

| PAGE/LINE | CHANGE TRANSCRIPT FROM: | CHANGE TRANSCRIPT TO: | REASON FOR CHANGE/OTHER ISSUE |
|---|---|---|---|
| 12:9-10 | in federal court in Philadelphia in Manhattan. | in federal court in Manhattan. | Interpreter Commentary Added |
| 21:15-18 | In comparison to my Arabic language, I face difficulty because of the  differences of -- in the level of my fluency, both | In comparison to Arabic, there is difficulty because of the differences  between the two languages | Interpreter Mistranslation |
| 25:2-3 | He chairs the administration and the finance of the Muslim World League. | He chairs the MWL, chairs its administrative and financial body. | Interpreter Omission |
| 26:2-5 | To receive all the incoming papers and transactions that are addressed to the Secretary General from the different departments of the League. | To receive all of the incoming documents and communications addressed to the Secretary General from the various departments at the League. | Interpreter Mistranslation |
| 28:6-8 | Yes, either as escorting the Secretary General or accompanying him in some meetings. | Yes, either accompanying the Secretary General or as his representative in some meetings. | Interpreter Mistranslation |
| 29:6-7 | As an organizational chart, you mean? | As an organizational structure? | Interpreter Mistranslation |
| 29:11-15 | The General Secretariat has business and projects outside Saudi Arabia. It has different departments. And the general manager is responsible for supervising these departments. | The MWL's Secretariat General has activities, projects and programs found outside of the Kingdom of Saudi Arabia and there are departments specialized in various fields at the MWL. And the general manager is the administrative person-in-charge or the administrative supervisor over this work. | Interpreter Omission |
| 31:7-9 | The mandate of the Muslim World League is to introduce Islam within the Muslims. | Educate on Islam, the MWL's mission is to educate Muslims about Islam. | Interpreter Mistranslation |

1

| PAGE/LINE | CHANGE TRANSCRIPT FROM: | CHANGE TRANSCRIPT TO: | REASON FOR CHANGE/OTHER ISSUE |
|---|---|---|---|
| 32:3-8 | When we say educating Muslims about Islam, I mean here that Muslims for centuries have been subject to ignorance, and they are away from Islam, and the Muslim World League is introducing to them the principles of Islam and lighting the pathway for them. | What's meant by educating on Islam, when we talk about Muslims, the Muslims have suffered for a long period of time from periods of ignorance and illiteracy during which they deviated from the basic principles and main outlines of Islam. The MWL came to light up this path for them. | Interpreter Mistranslation |
| 39:3 | This is not my function. | This is not part of my duties. | Interpreter Mistranslation |
| 42:23-43:1 | And when the student receives the admission from a particular university and we have the financial resources, we approve it. | When he receives the acceptance and we see that this acceptance is certified and we have the financial resources to fund it, it is accepted. | Interpreter Omission |
| 46:8-10 | I remember once that I was a companion Sheikh Mohammed al-Harkan when he traveled to Pakistan en route to Japan. | I remember that I also once visited Pakistan as a companion as part of a delegation headed by Sheikh Mohammed al-Harkan to visit Pakistan on his way to Japan | Interpreter Omission |
| 49:1 | This was news in all newspapers. | This was being circulated in all of the newspapers. | Interpreter Mistranslation |
| 56:5-7 | The IIRO was established by a resolution from the founding council of the Muslim -- World Muslim League. | The IIRO was established by a resolution from the Constituent Council of the Muslim World League. | Interpreter Mistranslation |
| 57:10-13 | The IIRO, as stipulated in its articles of association or constitution, it is an organization that has its independent administrative and financial structure. | The IIRO, as stipulated in its articles of association and its constitution, that it is an international organization that has its own independent administrative and financial entity. | Interpreter Omission |
| 58:12-13 | When I talk about the time period, I talk about the time period I served in the IIRO, and before that, we had this organizational structure. | When I talk about the time period, I talk about the time period during which I served at the IIRO. Prior to that, this is possibly what was present at that time. | Interpreter Mistranslation |
| 69:14-15 | The IIRO has local offices in Saudi Arabia and different regions of Saudi Arabia. | IIRO-KSA has domestic offices distributed in some regions in the Kingdom. | Interpreter Mistranslation |

2

| PAGE/LINE | CHANGE TRANSCRIPT FROM: | CHANGE TRANSCRIPT TO: | REASON FOR CHANGE/OTHER ISSUE |
|---|---|---|---|
| 69:24-70:3 | If the relevant department responsible for donations and the General Secretariat wishes to obtain this information, it can obtain it from the local office. | If the department concerned with the donation at the secretariat general wishes to obtain this information it obtains it from the domestic office. | Interpreter Mistranslation |
| 70:17-18 | We were using the system of DataFlex for all the computers in the IIRO. | We were using the DataFlex system for all of the departments at IIRO. | Interpreter Mistranslation |
| 75:8 | The foreword is not signed. | It is not issued with a signature. | Interpreter Mistranslation |
| 78:4-5 | Yes, it is correct, and this is a sort of respect. | Yes, that is correct and this is a matter of respect. Only a matter of respect. | Interpreter omission |
| 80:7-18 | The emergency relief has a specific department in the headquarters, and this department is responsible for the emergency relief operations. But this does not prevent some members of the external offices -- (In English.) Domestic. The domestic. (Through interpreter.) But this does not prevent some members of the domestic offices of the IIRO from engaging if they want to volunteer -- if they want to volunteer in the relief campaigns. | Emergency relief has an independent department at the secretariat general, and this department carries out the emergency relief campaign. This does not preclude the presence of a number of volunteering members of the domestic offices who wish to contribute to this campaign. To the relief campaigns. | Interpreter misinterpretation |
| 90:22-91:1 | The internal office is like a second eye for the General Secretariat for that particular region, and it monitors the project being implemented. | The domestic office to which this mission is assigned serves as the other eye for the Secretariat General for that region and it monitors the progress of the implemented project. | Interpreter Omission |
| 92:1-7 | But all the accounts of the external offices are sent to the General Secretariat, and the General Secretariat has an external auditor who conducts the auditing of the IIRO. And it takes -- the external auditor would take samples of the offices that require further auditing. | However, all the accounts of the office abroad reach the General Secretariat, and the chartered accountant at the secretariat general, when he audits IIRO's annual final accounts, he takes random samples at these offices for auditing and accounting. | Interpreter Mistranslation; |

3

| PAGE/LINE | CHANGE TRANSCRIPT FROM: | CHANGE TRANSCRIPT TO: | REASON FOR CHANGE/OTHER ISSUE |
|---|---|---|---|
| 97:5-8 | And the Secretary General of the League, who is a member of the board of directors, he's also a member of this council. | And the Secretary General of the MWL, the chairman of the board of directors, is a member of this council. | Interpreter Omission |
| 102:14-15 | Social welfare houses and caring for the orphans. | The social welfare orphanages and orphan sponsorships. | Interpreter Mistranslation |
| 116:13,14 | If someone from the universities, I do not remember. | If it wasn't someone from the universities then I don't remember, I don't remember. | Interpreter Mistranslation |
| 117:19-20 | Mostly it would be the relief department. | Most probably the relief department. | Interpreter Mistranslation |
| 120:9 | It presents only the headings. | It only presents the general outlines. | Interpreter Mistranslation |
| 124:14-16 | In accordance with the constitution, the board of directors would meet twice a year. | In accordance with the constitution and regulations, the board of directors meets twice a year. | Interpreter Omission |
| 132:15-16 | And he endowed a full house for the benefit of the IIRO. | And he endowed an entire orphanage for the benefit of the IIRO. | Interpreter Mistranslation |
| 136:7-12 | Not a coincidence, but to say that for purposes to serve the IIRO -- for example,  in saying that Hassan bin Ali Marfak donated a whole building for the IIRO. | It is not a coincidence, but for purposes that serve the IIRO, for example, saying that Hussain Ali Marfak donated a whole building to the IIRO as an endowment. | Interpreter Mistranslation |
| 137:12-16 | If it is so, there are four members of the board of directors of the IIRO who are affiliated with the Muslim World League -- who are members of the Constituent Council of the Muslim World League, four members. | If as such, there are four members of IIRO's Board of Directors who are members of the Constituent Council... as members of the MWL's Constituent Council…four. | Interpreter Mistranslation |

| PAGE/LINE | CHANGE TRANSCRIPT FROM: | CHANGE TRANSCRIPT TO: | REASON FOR CHANGE/OTHER ISSUE |
|---|---|---|---|
| 155:6-7 | Not familiar in terms I work for it. | Not familiar as I don't work for it. | Interpreter Mistranslation |
| 156:6 | His name is Abdulaziz Al-Omar. | His name is Abdulaziz Al-Ammar | Transcription Correction |
| 157:6-7 | I do not exactly recall, but I think it's between eight to ten people or more. | I do not remember the exact number but more than 8 to 10 people. | Interpreter Mistranslation |
| 160:12-15 | "Da'wah" means -- "da'wah" means establishing the Islam with Muslims and teaching them the principles and the guidelines of Islam. | Da'wah" means maintaining the faith of the Muslims and their understanding of the principles and the guidelines of Islam. | Interpreter mistranslation |
| 161:4 | propagators | preachers calamities. | Interpreter mistranslation |
| 165:20-22 | The figure 1,000 propagators was estimated. I do not recall the exact number now. | This "approximately 1000 preachers" was an estimated number but I don't remember now the exact number. | Interpreter Mistranslation; Omission |
| 167:7-9 | The text says that. It says "about 1,000." So it means it is less than that in Arabic. | That's what the text says.  It says "approximately." "Approximately" in the Arabic language means a number less than 1000. | Interpreter Mistranslation |
| 167:12 | "About" means "around." | "Approximately" means "around." | Interpreter Mistranslation |
| 167:16 | Enlightened | In writing | Transcription correction |
| 169:12-17 | Here in the letter it says that it is the function of the committee to oversee the propagators, then conduct the courses. But the -- it does not say that the propagators were distributing the publications and the tapes then. | In the text here it says, it is the committee's mission to supervise the missionaries, hold courses and distribute publications. However, this doesn't mean that the missionaries are carrying this out at that time. | Interpreter Mistranslation; |
| 170:1 | propagators | preachers | Interpreter Mistranslation |
| 170:22 | propagators | preachers | Interpreter Mistranslation |

| PAGE/LINE | CHANGE TRANSCRIPT FROM: | CHANGE TRANSCRIPT TO: | REASON FOR CHANGE/OTHER ISSUE |
|---|---|---|---|
| 172:8 | propagators | preachers | Interpreter Mistranslation |
| 173:4-7 | The meaning is that the da'wah is a field for contribution in order to consolidate the efforts, and not to waste the efforts and the capacities. | The meaning in Arabic is that da'wah is a field for the contribution of maintaining the faith of Muslims and to avoid wasting efforts and energies which occur due to the existence of duplication of work. | Interpreter omission |
| 46:1-2 | every charity or party do have political directions, | every association or party has political orientations, | Interpreter Mistranslation; |
| 197:20-198:2 | Well, it -- the decision says that this is a secondment of an employee who works for the Ministry of Islamic Affairs, and in order to transfer the services of this person from his ministry to a new entity, this requires the approval of his direct supervisor. | In the same decision it says that this is a secondment. He is an employee at the Ministry of Islamic Affairs, and therefore the request for the transfer of his the services to the work at IIRO requires the approval of a direct supervisor. And the direct supervisor in this case is must be his minister. | Interpreter Omission |
| 200:4-5 | Yes, in his capacity as in charge of the administrative and financial affairs. | Yes, in his capacity as the person in charge of the financial and administrative affairs. | Interpreter omission |
| 203:1-3 | --after we brought [sic] with the concerned authorities to make sure that the request will be accepted. | After we bring up the possibility of the request being accepted to the concerned authorities. | Interpreter Mistranslation |
| 215:15-216:2 | For two reasons. The first reason is Moayad Al-Butairi, he held Amir Jasim accountable for that, and he declined any form of responsibility -- sorry, he denied any form of responsibility. And the second reason is that he remained in Pakistan for one week during the stay of the delegation from the IIRO, and he was not arrested by the Pakistani police. And therefore, we preferred to bring him to Saudi Arabia in order not to lose our cards. And therefore, at that time, the | For two reason. The first, is that Moayad Al-Butairi, as I previously mentioned, held Amir Jasim accountable and denied any responsibility and denied that he had any involvement in this matter. The second reason is that he remained in Pakistan for a period of one week after the incident, during the presence of the IIRO delegation, and the Pakistani police did not arrest him. Therefore, we preferred to bring him to Saudi Arabia to avoid losing our cards. Therefore, the conclusive evidences at that time were | Interpreter Mistranslation |

| PAGE/LINE | CHANGE TRANSCRIPT FROM: | CHANGE TRANSCRIPT TO: | REASON FOR CHANGE/OTHER ISSUE |
|---|---|---|---|
| | conclusive evidences were incomplete. | incomplete. | |
| 216:10-217:1 | In order to have the conclusive evidences, this took some time from us. And it required a lot of patience. And therefore when Moayad Al-Butairi found that he has -- in front of him he has the chance of being arrested, just that, he wrote a waiver -- he wrote a waiver or an assignment of the three clinics he had [unclear words], which he operated from the embezzled funds from the IIRO. And therefore, in comparison to the long period of time that was consumed with Amir Jasim, in this case the IIRO, in a very short period of time, was able to retrieve its funds, to know -- or to discover how the theft happened, and who stole the money, and to which bank the money was deposited. | To reach the conclusive evidences, this took us some time and a lot of patience. And therefore, when Moayad Al-Butairi found there was no chance in front of him but to be arrested, he wrote a waiver conceding the three clinics affiliated with him and Amir which he operated using the funds embezzled from the IIRO. And therefore, the IIRO was able, in a very short time relative to what took place with Amir Jasim, the matter of which took a long time from us, IIRO was able to retrieve its funds and to find out how the theft was carried out, who stole and at which bank it took place and it regained it. | Interpreter Mistranslation |
| 218:8-15 | For the IIRO, it was a financial problem, but we have managed to contain it and to precisely identify it, and to prevent its recurrence by adopting some mechanisms, and to set an example for other employees that whoever dares to conduct such act will meet the fate of dismissal. And this is what happened to Amir Jasim and Moayad Al-Butairi. | For the IIRO, it was a financial problem that took place, but we were able to overcome, contain, and avoid it in the future by changing some mechanisms and setting an example to all of the other employees that anyone who dares to carry out such an action will be fired and this is what happened to Amir Jasim and Moayad Al-Butairi. | Interpreter Mistranslation |
| 220:10-11 | Yes. And the committee was given all the powers to take the wide decision. | Yes. And it was delegated all the powers to take the suitable decision. | Interpreter Mistranslation |

| PAGE/LINE | CHANGE TRANSCRIPT FROM: | CHANGE TRANSCRIPT TO: | REASON FOR CHANGE/OTHER ISSUE |
|---|---|---|---|
| 220:14-17 | We found it sufficient, based on the advice of the lawyers, to retrieve our funds -- to recover, sorry, to recover our funds, and we considered it closed. | Based on the lawyers' advice, we found it sufficient to obtain our money and the man was terminated. | Interpreter Mistranslation and Omission |
| 221:6-18 | It's not that we settled, but we have recovered our funds. And actually, this allowed us to conduct a thorough review of the rules and regulations that we had because they contained some gaps that allowed Amir Jasim to do what he did. Amir Jasim was one of the most efficient accountants and one of the oldest employees in the IIRO, and Moayad Al-Butairi also was receiving the title of the ideal manager. And with all that, they have managed to take advantage of the gaps, but with a review, we have closed them. | Not that we resolved the matter, we obtained our funds and we don't want more than that. It was also an opportunity to review the rules and regulations through which Amir Jasim was able to…from some of the gaps in them… and who was considered to be one of the first accountants at the IIRO and one of the most competent accountants, and well as Moayad al-Butairi who consistently received the title of model director…but despite this they were able to find gaps and therefore, we were able to fix even the mechanisms that included some gaps. | Interpreter Mistranslation |
| 222:10-19 | I mean that there was no bias. The committee composed of people from the financial follow-up department, which is like a controller, over the performance of the finance department and the offices. And it is the financial -- and the second member was the financial controller before any disbursement, and the third member was from the legal department, and all of these departments are reporting to the Secretary General directly. | What I mean by unbiased entities, is that the committee was made up of members from the Department of Financial Oversight which serves as the financial controller over the performance of the Financial Department and the offices and the pre-disbursement financial controller, the second member, the financial controller. The third member is the legal department and they are all departments affiliated directly with the Secretariat General. | Interpreter Mistranslation |
| 229:11-13 | It is supposed to mention the number of this letter and the name of the person and the department that approved that. | It is supposed to mention the number of the letter, its date, and the name of the man, or the name of the department or director who | Interpreter omission |

| PAGE/LINE | CHANGE TRANSCRIPT FROM: | CHANGE TRANSCRIPT TO: | REASON FOR CHANGE/OTHER ISSUE |
|---|---|---|---|
| | | assigned them with this. | |
| 230:3 | issue of Pakistan. | issue of Pakistan and take the necessary action. | Interpreter omission |
| 231:8-11 | Well, when this text is mentioned in auditor's report, and based on my humble experience about the financial reports in the General Secretariat of the IIRO, | Ok, when this stuff comes from a report from the office of a chartered accountant at this level, from my humble experience in the field of financial reports with regards to the Secretariat General, | Interpreter omission |
| 232:11-14 | And in the General Secretariat, there is an auditor who reviews or audits the final accounts and presents to the board of directors a report about the final accounts. | And at the Secretariat General there is a chartered accountant who annually audits the final accounts and presents a report to the board of directors and general assembly about the final accounts. | Interpreter omission |
| 232:21-233:6 | And these auditing firms, they take -- they randomly audit the local offices, some local offices, and some external offices, focusing on the important ones. On top of them is the Pakistan office. And if any auditing firm discovers this case as referenced to in this report, it would have written that and proved that in the report presented to the board of directors and the general assembly. | And all of these offices randomly audit a number of the domestic offices and some of the offices abroad, and at the top of these are some of the big offices such as the Pakistan office. And if any chartered accountant's office had discovered a mess such as the one mentioned in the report, it would have written and documented this in the report presented to the board of directors and the general assembly. | Interpreter mistranslation |
| 237:9 | imprisonment | embezzlement | Transcription Correction |
| 240:4-17 | I do not know exactly, but it seems that it happened after Amir Jasim and Butairi gained a kind of experience after we have established Al-Khalij [ph] clinic to examine the expatriate workers. After the success of that clinic, they have established three prototypes of it in different parts. The initial clinic that was | I don't remember the date but I link it with [the fact] that after he gained experience, him and Amir Jasim, with the clinic, which we called the Khaleej Clinic for the examination of expatriate workers, and this clinic succeeded, he made prototypes of it in three other regions using the IIRO funds that came from the medical examination, this medical examination | Interpreter Omission |

| PAGE/LINE | CHANGE TRANSCRIPT FROM: | CHANGE TRANSCRIPT TO: | REASON FOR CHANGE/OTHER ISSUE |
|---|---|---|---|
| | established was conducting the medical examination of expatriate workers who are supposed to be coming to the Gulf area, and the money of the tests was paid in cash was received by Amir Jasim, and he was not depositing these funds into the IIRO accounts. | of expatriate workers which was directed at the Gulf and Saudi Arabia. It was in cash and therefore, it was delivered to Amir Jasim and he did not enter it into the IIRO accounts and he took advantage of it. | |
| 250:5-8 | And therefore, I see that the expression to stop all projects is not an accurate expression, and the office found that it is -- this step is risky. | Therefore, it seems that the sentence "cessation of all programs" is an incorrect expression. What he means is that there should be…that even in this step, the office found there to be some risks in it. | Interpreter Omission |
| 253:9 | IIRO Office | Philippines Office | Interpreter mistranslation |
| 254:19-20 | we had these sad incidents, this sad terrorist attack. | very unfortunately, this unfortunate terrorist incident happened, yes. | Interpreter Mistranslation |
| 264:2-5 | and the nomination of people who are interested in this field; not only him, another name in the same session was also proposed, Dr. Abdulaziz Jifry | and the nomination of people who have experience in this field; it was not only him, another name was proposed in the same meeting, in the same session, Dr. Abdulaziz Jifry. | Interpreter Mistranslation |
| 120:12-13 | Of the relief for the people of Kosovo. | What I believe now, the one affiliated with relief for the people of Kosovo. | Interpreter Omission |
| 272:3-8 | Because the report of the auditors refused the behavior -- the individual behavior of the Eastern district office, and their actions without the knowledge of the General Secretariat, and the financial regulations. And it's a violation of the regulations. | Because the auditor's report refused the Office's independent action without the Secretariat General's knowledge and its violation of the IIRO's administrative and financial regulations. | Interpreter mistranslation; |
| 277:15-17 | and furthermore, it was receiving letters of appreciation in relation to its operations. | Furthermore, it received letters of praise and appreciation from the concerned authorities in Indonesia. | Interpreter Omission |

10

| PAGE/LINE | CHANGE TRANSCRIPT FROM: | CHANGE TRANSCRIPT TO: | REASON FOR CHANGE/OTHER ISSUE |
|---|---|---|---|
| 281:21-282:2 | And its constitution declares that very simply, and in all its publications. And all these documents were given to the lawyer. And when any lawyer wants to change the facts, he should have consulted with the concerned people before doing that. | The IIRO does not claim to be an instrument of the government of Saudi Arabia. And its constitution declares this very simply, in Arabic and in English, and these official publications were provided to the lawyer since the first day he was assigned. And when the lawyer, any lawyer, wants to change the facts, he must consult with the concerned people in this matter. | Interpreter Omission |
| 283:21 | cold | cowardly | Transcription Correction |

I, Waleed Nassar, declare under penalty of perjury that the following statement is true as a matter of my personal knowledge:

I am a partner in the law firm Lewis Baach Kaufmann Middlemiss PLLC and co-counsel for Defendant Dr. Adnan Basha in this action. This firm has taken the lead on preparing the foregoing errata sheet, which was done under my direct supervision. With the assistance of an Arabic-speaking Associate and an Arabic-speaking Analyst, we reviewed the video and listened to the audio and compared the testimony to the transcript of Dr. Adnan Basha's deposition. All of the foregoing corrections are based on the review process described herein.

Executed on May 6, 2019

_____
Waleed Nassar