# Exhibit 149

## Plaintiffs' Corrected Averment of Jurisdictional Facts and Evidence and/or Statement of Facts as to Defendant Al Rajhi Bank <u>Pursuant to Rule 56.1</u>

Please note that the SDNY's ECF system is unable to accept this Exhibit given its file size. A complete set of Plaintiffs' Exhibits is being filed with the SDNY's Records Management Office on DVD. If you wish to obtain a copy of this Exhibit, or others, you may contact the following Plaintiffs' representatives.

- Coleen Williams - <u>CWilliams@cozen.com</u>
- Marc Adler – <u>MAdler@cozen.com</u>
- Scott Tarbutton – <u>STarbutton@cozen.com</u>

1

FILED '07 SEP 19 15:21 USDC-ORE

1          UNITED STATES DISTRICT COURT

2             DISTRICT OF OREGON

3

4     THE HON. THOMAS M. COFFIN, JUDGE PRESIDING

5

6

7   UNITED STATES OF AMERICA,          )
                                        )
8                 Government,           )
                                        )
9          v.                          )  No. 05-60008-02-HO
                                        )
10  PIROUZ SEDAGHTAY, also known as    )
    Pete Seda, also known as Perouz     )
11  Seda Ghaty, also known as Abu       )
    Yunus,                              )
12                                      )
                  Defendant.            )
13  _____)

14

15

16        REPORTER'S TRANSCRIPT OF PROCEEDINGS

17              EUGENE, OREGON

18

19         WEDNESDAY, AUGUST 22, 2007

20              PAGES 1 - 172

21

22              Kristi L. Anderson
                Official Federal Reporter
23              United States Courthouse
                405 East Eighth Avenue
24              Eugene, Oregon 97401
                (541) 431-4112
25              Kristi_Anderson@ord.uscourts.gov

```
 1   APPEARANCES OF COUNSEL:

 2

 3   FOR THE GOVERNMENT:   UNITED STATES ATTORNEY
                          BY:  CHRISTOPHER CARDANI, ESQ.
 4                        405 East Eighth Avenue
                          Eugene, Oregon 97401
 5                        (541)465-6771
                          chris.cardani@usdoj.gov
 6

 7   FOR THE GOVERNMENT:   UNITED STATES ATTORNEY
                          BY:  CHARLES F. GORDER, JR., ESQ.
 8                        1000 SW Third Avenue, Suite 600
                          Portland, Oregon 97204-2902
 9                        (503)727-1044
                          charles.gorder@usdoj.gov
10

11   FOR THE DEFENDANT:    LAWRENCE MATASAR, ESQ.
                          621 SW Morrison, Suite 1025
12                        Portland, Oregon 97205
                          (503)222-9830
13                        larry@pdxlaw.com

14

15                           I N D E X

16              CHRONOLOGICAL INDEX OF WITNESSES
```

|                    |        |       |          |         | VOIR  |     |
| WITNESS            | DIRECT | CROSS | REDIRECT | RECROSS | DIRE  | VOL |
|--------------------|--------|-------|----------|---------|-------|-----|
| D. GARTENSTEIN-ROSS| 11     | 42    |          |         |       | 1   |
| COLLEEN ANDERSON   | 60     | 71    |          |         |       | 1   |
| EVAN KOHLMANN      | 77     | 93    |          |         |       | 1   |
| AS'AD ABUKHALIL    | 107    | 129   | 138      |         |       | 1   |
| KAREN CALDWELL     | 140    | 143   |          |         |       | 1   |
| JEFFREY GOLDEN     | 145    | 147   | 148      |         |       | 1   |

PROCEEDINGS

WEDNESDAY, AUGUST 22, 2007

1

2

3      THE CLERK:  Now is the time set for the matter of

4  Pirouz Sedaghaty, detention hearing, Case No. 05-60008.

5      MR. CARDANI:  Good morning, Judge.

6      THE COURT:  All right.  Do you have a witness you

7  wish to call?

8      MR. CARDANI:  Yes.  Before I do, Your Honor, Chris

9  Cardani for the government.  To my left is Colleen Anderson,

10  special agent with IRS.  To her left is Charles Gorder with

11  our Portland office, U.S. Attorney's Office, and behind him

12  is Dave Carroll with the FBI.

13      Yes, I have three witnesses to promote before the

14  court today in this detention hearing.  Judge, before I do,

15  if I could just spend five minutes putting this in context.

16      THE COURT:  All right.

17      MR. CARDANI:  I know the court has spent some time

18  reading the government's filing and its exhibits.  I know

19  the court is aware that we strongly believe that

20  Mr. Sedaghaty should be detained as a flight risk and as a

21  danger to the community.

22      We will show, through the witnesses and through

23  the filing, that Mr. Sedaghaty was the U.S. head, the head

24  Al-Haramain official for a period of time from 1997 to 19 --

25  I'm sorry -- 2003, when he departed the country in the

1  middle of an investigation, a criminal investigation in

2  which he knew he was a subject.  He stayed out of the

3  country for a period of time, four and a half years, and

4  knew he was a fugitive for at least two years.

5       The Al-Haramain Foundation has been identified as

6  a promoter of terrorism throughout the world.  The court

7  knows from the filings that not only the United States but

8  the United Nations has designated about 13 or 14 offices of

9  Al-Haramain as sponsors of terrorism or supporters of

10 terrorism.

11      I'd just like to quote from -- from two quips

12 before moving on to the witnesses.  But in Exhibit D to my

13 memorandum, the government -- our government, in terms of

14 identifying Al-Haramain, the Bangladesh office, as a

15 specially designated global terrorist states that:

16           "Information available to the U.S. shows that

17       a senior AHIF, Al-Haramain, official deployed a

18       Bangladeshi national to conduct surveillance on

19       U.S. consulates in India for potential terrorist

20       attacks.  The Bangladeshi national was arrested in

21       early 1999 in India, reportedly carrying four

22       pounds of explosives and five detonators.  The

23       terror suspect told police that he intended to

24       attack U.S. diplomatic missions in India.  The

25       suspect reportedly confessed to training in

1    al-Qaeda terrorist camps in Afghanistan where he
2    met personally with Osama bin Laden in 1994.  The
3    suspect first heard of plans for these attacks at
4    the Al-Haramain office in Bangladesh."
5         Moving on to Kenya and Tanzania from the same
6    exhibit:
7         "In August of 1997, an Al-Haramain employee
8    indicated that the planned attack against the U.S.
9    embassy in Nairobi would be a suicide bombing
10    carried out by crashing a vehicle into the gate at
11    the U.S. Embassy.  A wealthy Al-Haramain official
12    outside East Africa agreed to provide the
13    necessary funds."
14         "Also in 1997, Al-Haramain senior activities
15    in Nairobi decided to alter their then previous
16    plans to bomb the U.S. Embassy in Nairobi; instead
17    sought to attempt to assassinate U.S. citizens.
18    During this time, an Al-Haramain official
19    indicated he had five hand grenades, seven
20    bazookas from a source in Somalia.  According to
21    information available to the U.S., these weapons
22    were to be used in a possible assassination
23    attempt against a U.S. official."
24         "A former Tanzanian Al-Haramain director was
25    believed to be associated with Osama bin Laden and

```
 1        was responsible for making preparations for the

 2        advance party that planned the August 7th, '98

 3        bombings of the U.S. embassies in das Es Salaam,

 4        Tanzania, and Nairobi, Kenya.  As a result of

 5        these attacks, 224 people were killed."

 6            "Wadih el-Hage, a leader of the East African

 7        al-Qaeda cell, personal secretary to Osama bin

 8        Laden, visited the Kenya offices of Al-Haramain

 9        before the 1998 dual embassy attacks.

10        Searches conducted by authorities revealed that

11        el-Hage possessed contact" --

12                    (Reporter interrupted.)

13            MR. CARDANI:  "Searches" -- excuse me.

14        "Searches conducted by authorities revealed that

15        el-Hage possessed contact information for a senior

16        Al-Haramain official who was head of Al-Haramain's

17        Africa Committee, the overseeing authority for

18        Al-Haramain's offices in Kenya and Tanzania."

19            And just a final one that I'd like to comment is

20    about the Al-Haramain office in Indonesia.

21            Designated as a specially designated global

22        terrorist organization based on, in part, "In

23        2002, money purportedly donated by Al-Haramain for

24        humanitarian purposes to nonprofit organizations

25        in Indonesia, possibly diverted for weapons
```

1    procurement with the full knowledge of Al-Haramain

2    in Indonesia."

3        "Using a variety of means, Al-Haramain has

4    provided financial support to al-Qaeda operatives

5    in Indonesia and to Jemaah Islamiyah (JI).

6    According to a senior al-Qaeda official

7    apprehended in Southeast Asia, Omar al-Faruq,

8    Al-Haramain was one of the primary sources of

9    funding for al-Qaeda network activities in the

10    region.  The U.S. has designated JI, and the

11    United Nations, under 1267, has included it on a

12    list because of ties to al-Qaeda.  JI has

13    committed a series of terrorist attacks, including

14    the bombing of a nightclub in Bali on

15    October 12th, 2002, killing 202 people, wounding

16    over 300."

17        Judge, you know from the filing that this goes on

18    and on and on.  It's not limited to places like Chechnya.

19    It involves direct attacks and planned attacks on U.S.

20    people, citizens, and U.S. interests in areas of the world.

21        We will show the court, again, that Mr. Sedaghaty

22    headed the U.S. chapter from 1997 to 2003.  We will show the

23    court through testimony that his primary interest in

24    sponsoring the objectives of Al-Haramain Saudi Arabia seems

25    to be in four areas.  The prison program.  We'll call Daveed

1   Gartenstein-Ross shortly.  He will testify that he was an

2   employee for about a year of defendant Sedaghaty's and was

3   tasked with promoting a prison program spreading strident

4   radical Wahhabi Islam information into U.S. prisons.

5   Exceeding 1,000 quotes from that are in the government

6   brief.  This witness will talk about that and other

7   publications sent into U.S. prisons in an attempt to spread

8   the virulent form of radical Islam sponsored by Al-Haramain.

9        We'll show also that defendant Sedaghaty was

10   tasked with obtaining and Internet service provider in

11   Ashland, Oregon, which he did, that was used as a primary

12   vehicle to launch a Web site called *Islam Today* by a

13   sheikh -- a radical sheikh in Saudi Arabia who a witness by

14   telephone, an international terrorism expert, will identify

15   as one of the more radical sheikhs in the world at the time.

16        We'll show that Mr. Sedaghaty obtained buildings

17   in Ashland, Oregon and Springfield, Missouri, attempting to

18   grow Al-Haramain's presence in the United States during his

19   time as the head of Al-Haramain here in the country.

20        And the final area, briefed, again, but there will

21   be testimony, is that defendant Sedaghaty funded Islamist

22   fighters known as mujahideen, or jihâdists, in Chechnya and

23   in Kosovo and evinced a pro-mujahideen attitude while here

24   in the country.

25        We'll show the court that he departed in the

1    middle of a criminal investigation.  That he stayed outside

2    the United States intentionally for four and a half years in

3    countries we have little, if any, diplomatic presence.

4           After the testimony is completed, I'd like to talk

5    to the court about the passport issue and the family ties

6    issue, the weapons that were at the mosque or the AHIF, the

7    Al-Haramain headquarters, during the search warrant in 2004.

8           As a final matter, Judge, the discussion of

9    religion is a rare event in courtrooms like this in the

10   United States, and I want to apologize in advance.  I find

11   it difficult to talk about things like this and elicit

12   things like this from my witnesses, but unfortunately, this

13   is a case about radical forms of religion and the effects it

14   has on people, so there will be a fair amount of that.

15          May I call my first witness?

16          THE COURT:  You may.

17          MR. CARDANI:  Daveed Gartenstein-Ross.

18          MR. MATASAR:  Your Honor, may I briefly respond?

19          THE COURT:  All right.  Why don't you hold off on

20   your witness.

21          MR. MATASAR:  From our perspective, Your Honor,

22   it's -- we have no dispute with the fact that there is

23   terrorism in the world.  However, we believe the government

24   has wildly overreached in its presentation.  We don't think

25   that the defendant is any more responsible for the misdeeds

1  of Al-Haramain than Mr. Cardani would be responsible for the

2  misdeeds of the United States government.  It's simply

3  trying to tar him with things that other people have done,

4  not in his name.

5        Mr. Cardani neglects to indicate that while some

6  of the Al-Haramain chapters have been designated as

7  terrorist organizations, and many people have, even under

8  the abbreviated, barely, if at all, due process rules of

9  OFAC, Mr. Seda has not been designated, and that's an

10  important factor to consider.

11        We'll simply ask the court to listen to the

12  government's testimony carefully, look at the records.  For

13  example, they are using a -- they are trying to link a

14  defendant in a criminal case to Osama bin Laden by producing

15  a document in which they -- for example, the address of this

16  document, Osama bin Laden's address on the e-mail is

17  osamabinladen@hotmail.com.

18        In our view, the government is vastly

19  overreaching.  They have not looked into the facts or the

20  evidence, and Mr. Seda is somebody with great community

21  ties, interfaith community ties over a period of 15 years.

22  We have presented material from a rabbi.  We'll have a

23  minister here today, and others.  He's been a force for

24  peace in Ashland.  And the idea that because he was involved

25  with an organization makes him somehow a flight risk and a

```
 1   danger to the community we are confident the court will not

 2   find is accurate after the government's presentation.

 3            THE COURT:  All right.  Thank you.

 4            All right.  Now you may call your witness.

 5            MR. CARDANI:  Daveed Gartenstein-Ross.

 6            THE CLERK:  Sir, could you please step over to the

 7   center of the courtroom.

 8            Thank you.

 9            And -- that's great.  If you'd please raise your

10   right hand.

11                  (The witness was sworn.)

12            THE CLERK:  Thank you.  If you'd please take the

13   witness stand.

14            Sir, would you please state your full name for the

15   record, spelling your first and last name.

16            THE WITNESS:  Daveed Gartenstein-Ross.  First

17   name, D-A-V-E-E-D; last name, G-A-R-T-E-N-S-T-E-I-N, hyphen,

18   R-O-S-S.

19            THE CLERK:  Thank you.

20                    DIRECT EXAMINATION

21   BY MR. CARDANI:

22   Q.   Good morning, Mr. Gartenstein-Ross.

23            Where were you raised?

24   A.   I was raised in Ashland, Oregon.

25   Q.   Do you still live there now?
```

```
 1   A.   No, I do not.

 2   Q.   Did you go through high school in Ashland?

 3   A.   I did.

 4   Q.   After attending Ashland High School, did you attend a

 5   university?

 6   A.   I did.

 7   Q.   Where?

 8   A.   Wake Forest University in Winston-Salem, North

 9   Carolina.

10   Q.   While at Wake Forest, did you convert to the religion

11   of Islam?

12   A.   I did.

13   Q.   From what faith?

14   A.   Well, my parents were Jewish.  They had more of a New

15   Age type practice of religion.  So I would have before

16   classified myself as spiritual but not particularly

17   religious.

18   Q.   After graduating from Wake Forest, did you eventually

19   attend law school?

20   A.   I did.

21   Q.   Was there a time in between, though, that you worked

22   for Mr. Sedaghaty in the Al-Haramain Islamic Foundation?

23   A.   Yes, I did.

24   Q.   We'll get back to that in a minute.

25        Where did you attend law school?
```

```
 1   A.    I went to New York University School of Law.

 2   Q.    Did you graduate?

 3   A.    I did.

 4   Q.    What was your job after that?

 5   A.    My first job after that was clerking on the United

 6   States Court of Appeals for the District of Columbia

 7   Circuit.

 8   Q.    Did you then go into private practice for a number of

 9   years?

10   A.    Yes, I did.

11   Q.    And did you eventually leave that and form a terrorism

12   consulting business?

13   A.    Yes, I did.

14   Q.    Who do you presently work for?

15   A.    I presently work for the Foundation For Defense of

16   Democracies where I'm the vice president of research.

17   Q.    Have you testified before the United States Senate?

18   A.    Yes, I have.

19   Q.    Is that on prison radicalization?

20   A.    Yes, it was.

21   Q.    We will get to that as well.

22         Do you frequently write and appear on TV about

23   these sort of matters?

24   A.    Yes, I do.

25   Q.    And did you also write a book about your conversion
```

1   and -- did you write a book?

2   A.   Yes, I did.

3   Q.   What's the name of the book?

4   A.   It's called *My Year Inside Radical Islam*.

5   Q.   Is it about your conversion to radical Islam?

6   A.   It is.

7   Q.   Are you still a practicing Muslim?

8   A.   I am not.

9   Q.   Now, getting back to the Al-Haramain Foundation, do you

10  know the defendant Pete, Pirouz Sedaghaty?

11  A.   Yes, I do.

12  Q.   Does he also go by Pete Seda?

13  A.   Yes, he does.

14  Q.   When was the first time you met him?

15  A.   The first time I met him was in December of 1997.

16  Q.   How so?

17  A.   This was back before -- before we had a prayer house on

18  the south end of town.  I was going to attend the Friday

19  prayers.  They were held in the back room of his house.

20  That was the first time that I met him.

21  Q.   And did you have some contact with him a couple of

22  times before coming to work with him?

23  A.   Yes, I did.  The first time was in December of 1997.

24  The other time I had contact with him was in the summer of

25  1998, when it moved from having prayers in the back of

1   Pete's house to having prayers in a large building in the

2   south end of town.  At that point in time, when I attended

3   Friday afternoon prayers there, Pete explained to me that

4   they had come into a relationship with a Saudi Arabian

5   charity, which was how they were able to afford this

6   building.  And he said that with, you know, their

7   partnership with this charity, they had very big plans for

8   the future, and he encouraged me to apply for a job, which I

9   did.

10  Q.   All right.  And were you hired?

11  A.   Yes, I was.

12  Q.   Who hired you?

13  A.   Pete was the one who informed me that I was given the

14  position.

15  Q.   What was the name of the foundation?

16  A.   The Al-Haramain Islamic Foundation.

17  Q.   Are you familiar with a group called the Qur'ân

18  Foundation?  Q-U-R-A-N?

19  A.   Q-U-R, apostrophe, A-N, yes.

20  Q.   What is the Qur'ân Foundation?

21  A.   The Qur'ân Foundation was a charity that Pete had

22  formed prior to his relationship with the Al-Haramain

23  Islamic Foundation.  Through the Qur'ân Foundation, he would

24  engage in community religious outreach, distribute Islamic

25  literature, and engage in educational projects.

```
1   Q.   So you went to work for Al-Haramain Islamic Foundation?

2   A.   Yes, I did.

3   Q.   Where did you physically report to, to do your job?

4   A.   I went to the prayer building which we had on the south

5   end of town.  I believe that the address is 3800 South

6   Highway 99.

7   Q.   And did you see Mr. Seda there over -- how long did you

8   work there?

9   A.   I worked there from December of 1998 through August of

10  1999.

11  Q.   And did you leave to attend law school?

12  A.   Yes, I did.

13  Q.   During your almost three quarters of a year there, who

14  would you describe as your boss?

15  A.   Pete.

16  Q.   And how many other people worked at the foundation when

17  you were there?

18  A.   The number varied.  There were three of us who would

19  work in the same office.  There was one other employee who

20  was there for part of the time but ended up leaving for

21  Saudi Arabia, and there were a few Al-Haramain employees who

22  came and stayed with us for a couple of months during that

23  summer.

24  Q.   Now, have you -- you have done quite a bit of readings

25  and studying on the religion of Islam?
```

1  A.    Yes, I have.

2  Q.    And are you familiar with a strain of the religion

3  called Wahhabism?

4  A.    Yes, I am.

5  Q.    And can you tell the court what Wahhabism is and focus

6  on different degrees of Wahhabism and then talk to the court

7  about the form of Wahhabism practiced at Al-Haramain and

8  Pete Seda.

9        MR. MATASAR:  I'm going to object, Your Honor.  I

10  don't think this person is an expert on Wahhabism and cannot

11  give such an opinion.

12        THE COURT:  Overruled.

13        THE WITNESS:  Wahhabism is a version of Islam that

14  is named for Muhammad ibn 'Abd-al-Wahhab, an eighteenth

15  century theologian who was born in 1703.  The distinctive

16  feature of Wahhabism is that it's meant to answer the

17  question of, you know, what went wrong with Islam.  And his

18  argument is that Islam fell from its glory when it deviated

19  from the practice of the faith as it was practiced during

20  the time of Prophet Muhammad.  He insisted that the faith

21  had to return to that period.

22        The distinctive thing about the way he viewed the

23  religion is that he thought that any sort of ruling that had

24  been introduced by jurists over time was bid'ah, or

25  innovation.  Basically that it was adding something to the

1    faith that was impermissible to add.  He thought that all of

2    this innovation needed to be stripped out and believed that

3    individuals whose practice of the faith differed from his

4    could be cast out of the faith for their deviations.  To

5    that extent, the -- what would occur could sometimes be

6    quite severe when he had ruled that people had been cast

7    outside of the faith.

8           Wahhabism formed -- he formed a relationship with

9    Muhammad ibn Saud, who was the founder of the first Saudi

10   state.  Over time, there were several Saudi states that

11   emerged, but ultimately, we currently have the Saudi state

12   that exists, Saudi Arabia, where Wahhabism is very much

13   wedded to the practice of Islam.  It's prevalent within the

14   state.

15          There are different gradations of Wahhabism.

16   There are different variants of what people believe within

17   this faith, just as there are within any strain of a faith.

18   But at its most extreme, Wahhabism can be quite militant and

19   counsel, basically, conflict with both unbelievers and also

20   those who do not subscribe to the Wahhabi vision of Islam.

21          Within the literature that Al-Haramain had and

22   also with the scholars who would sometimes visit and teach

23   us, it was very much consonant with that more extreme

24   version of Wahhabi Islam.

25   Q.   Give us an example.

A.   Well, examples would be -- probably the most prominent

example would be the call to jihâd appendix, which appeared

at the back of *The Noble Qur'ân*, which we distributed and

used internally.  That appendix was written by Sheikh

Muhammad bin Humaid, and bin Humaid argued that there were

three stages of jihâd.  That -- or rather, there were three

stages of fighting within Islam.  At first, when Muhammad

was living in Mecca and being persecuted by some of the

Meccan tribes, Muslims were prohibited from fighting.

In the second phase, jihâd, or fighting, became

permissible.  Finally, in the third phase, he argues that it

became obligatory upon all Muslims until the rest of the

world submits to Islam and until non-Muslims paid the

jizyah, which is a tax that you paid to live under Islamic

rule.

He argued that the third phase is the phase that

we are in right now.  That essentially it's our obligation

to spread the faith by force.  That would be one example of

the militant version of the faith that was propagated within

our literature.

Q.   Now, did you come to ascribe to that radical form of

Wahhabi Islam?

A.   Yes, over time.

Q.   And did you do that before and while you were at

Al-Haramain in Oregon?

1    A.    Yes, I did.  Well, actually, let me -- you said before

2    and while I was at.  No.  It would be while I was at and

3    after.  Not before.

4    Q.    And so you mentioned -- who brought you into this

5    radical strain of Islam?

6    A.    Well, there were a number of scholars who went through

7    there.  There was literature that we had internally.  So it

8    would be both the community and also my study of the faith

9    through the literature that we had.

10   Q.    What about the defendant?

11   A.    Pete was a part of that in that he definitely

12   subscribed to the view that I was -- that people who lacked

13   Islamic knowledge on a certain subject were unqualified to

14   make judgments, basically moral judgments.  One example of

15   that was early in my time there when there was a non-Muslim

16   who wrote an e-mail asking a question about female genital

17   mutation.  I responded with an e-mail stating that --

18           MR. MATASAR:  Objection, Your Honor.

19   Nonresponsive.

20           THE COURT:  Yeah.  Why don't you rephrase the

21   question.

22           MR. CARDANI:  Sure.  I will rephrase the question.

23   BY MR. CARDANI:

24   Q.    Was there anything in your interaction with Mr. Seda

25   that led you to believe that he believed in this radical

1    form of Islam?

2    A.   Yes.   In my interactions with Pete, I certainly came to

3    see that he believed that the ones who were qualified to

4    make decisions about moral issues or theological issues were

5    the sheikhs in Saudi Arabia, were those who were affiliated

6    were the Al-Haramain Foundation, and who, you know, were

7    more learned in this particular strand of the faith.

8    Q.   All right.   Now, the one question -- you fielded a

9    question from somebody wanting some advice on Islam.   Did

10   you then have some interaction with Mr. Sedaghaty and then

11   change your answer or alter the answer?

12   A.   Well, yes.   With response to the e-mail that I was

13   talking about, I sent a response to the individual talking

14   about how -- initially, after I received the e-mail asking

15   about female genital mutilation, I responded, after some

16   research on the Internet, with an answer that female genital

17   mutilation was not a part of the faith and was in fact

18   un-Islamic.

19            I was reprimanded by the defendant for sending

20   that e-mail on the basis of being unqualified to make a

21   judgment that something like female genital mutilation was

22   bad.   Pete told me that there scholars in Saudi Arabia who

23   would, you know, love to answer questions like this, and

24   that I shouldn't be making a judgment based on a complex

25   area of Islamic law.

1   Q.   That leads me to my next question, and that is what was

2   the relationship, from your observations, between

3   Al-Haramain in the United States, in Oregon, where you were

4   working, and the parent organization, Saudi Arabia?

5   A.   The parent organization provided us with funding.  It

6   provided -- we filed monthly reports with them letting them

7   know about our activities.  And the parent organization

8   would occasionally give us instructions as to projects that

9   we should undertake, or else, you know, they would -- or

10  else they would tell us projects that we shouldn't

11  undertake.

12  Q.   And was there anybody in particular that you dealt with

13  or that you saw the defendant deal with in Saudi Arabia on

14  behalf of Al-Haramain Saudi Arabia?

15  A.   Yes.  The major contact was Soliman al-Buthe.

16  Q.   That's the codefendant in this case?

17  A.   That's correct.

18  Q.   Is he, to your knowledge, physically located in Riyadh,

19  Saudi Arabia?

20  A.   To the best of my knowledge, yes.

21  Q.   Now, you've mentioned a little bit about the atmosphere

22  of Al-Haramain and some people coming through.  You

23  mentioned this radical form of Islam.

24       Did anybody there openly support, for example, the

25  Taliban government in Afghanistan?

1   A.   Yes, they did.

2   Q.   Okay.  How so?

3   A.   Well, when I first came to Al-Haramain, I had a very

4   liberal practice of the faith, and I had a coworker with

5   whom I would frequently engage in debates. He was very --

6   very much radicalized. And one of the debates that we would

7   engage in was about the rule of the Taliban. His argument

8   was that the Taliban was practicing true Islam. That

9   objections to the Taliban were basically the result of

10   Western media hype.

11   Q.   Okay.  Were there other people there that were

12   similarly radicalized, in your opinion?

13   A.   Yes, there were.

14   Q.   Okay.  Was that sort of the atmosphere of Al-Haramain

15   while you were there for your time?

16   A.   Yes, that was the internal atmosphere.

17   Q.   Okay.  Including that of the defendant Sedaghaty?

18   A.   Yes.  I engaged in less conversations about this with

19   the defendant, but within Al-Haramain, the atmosphere was

20   one in which deviant views, views that didn't subscribe to

21   these Wahhabi norms, were very much looked down upon.

22   Q.   Now, did that include your physical appearance, growing

23   a beard, and your dress and things like that?

24   A.   Yes, that is correct.

25   Q.   And did you alter your dress and appearance to conform

1    with the beliefs of Wahhabism?

2    A.    Yes, I did.

3    Q.    You mentioned some dialogue, I believe, about *The Noble*

4    *Qur'ân*.  Are you familiar with a project at Al-Haramain

5    known as the Prisoner Project?

6    A.    Yes, I am.

7    Q.    And did you participate in the Prisoner Project while

8    an employee of the defendant?

9    A.    Yes, I did.

10    Q.    Did that project -- was that an ongoing project when

11    you got there, or is this something you came up with, or

12    tell --

13    A.    No.  It preexisted my time there.

14    Q.    All right.  And what were you tasked with doing?

15    A.    Well, there was a system of sending Islamic literature

16    to prisoners.  Initially, prisoners who requested literature

17    from us would be given a questionnaire, which would allow us

18    to grade their Islamic knowledge.  After we would grade the

19    questionnaires, there was a standard set of literature that

20    we would send to them.  If they scored a three on a scale

21    from zero to ten, that was the basic score which made

22    someone a Muslim.  If so, we would send them a copy of *The*

23    *Noble Qur'ân*, as well as usually another small pamphlet

24    called *Towards Understanding Islam*.  If they got higher

25    scores, they would be sent more literature.

```
 1    Q.   Okay.  Now, Exhibit B to the government's memo is an

 2    excerpt from The Noble Qur'ân.  With --

 3             MR. CARDANI:  May I approach the witness, Your

 4    Honor?

 5             THE COURT:  Yes.

 6    BY MR. CARDANI:

 7    Q.   Sir, I have placed in front of you two pieces of

 8    literature.  One is The Noble Qur'ân.  Do you see that?

 9    A.   Yes, I do.

10    Q.   And is that the type of -- is that The Noble Qur'ân

11    that you helped distribute on behalf of the Prisoner

12    Project?

13    A.   Yes.

14    Q.   All right.  And could you open up the front cover.  Do

15    you see an identification of the business that's associated

16    with this document?

17    A.   Yes, I do.

18    Q.   All right.  Is that the Al-Haramain Islamic Foundation?

19    A.   Yes, it is.

20    Q.   In Ashland?

21    A.   Yes, it is.

22    Q.   And the other cover, the front cover, I believe.

23    A.   Yes.

24    Q.   The Qur'ân Foundation?

25    A.   Um-hmm.
```

```
 1   Q.   And was that your understanding that that was the
 2   defendant's organization?
 3   A.   Yes.
 4   Q.   Were copies of the -- this is The Noble Qur'ân.  Let me
 5   restate the question.
 6        Is this The Qur'ân that is the word of Muhammad?
 7   A.   To answer the question that I think you are asking,
 8   this was not the -- within Islam, it's believed that Qur'ân
 9   is the word Allah as -- as revealed to Muhammad.  And the
10   Arabic text inside is the Arabic text of The Qur'ân.  What
11   makes this translation, The Noble Qur'ân translation
12   distinctive is that it contains intertextual interpolations,
13   basically bracketed material and footnotes that are meant to
14   serve an explanatory purpose and that guide the reader's
15   understanding of the text.
16   Q.   By who?
17   A.   Well, the brackets and the footnotes were inserted by
18   the two translators.  The two translators are Muhammad
19   Al-Hilali and Muhammad Khan, and they guide the reader's
20   interpretation of the text in -- towards the version of
21   Wahhabism that the translators of the organization subscribe
22   to.
23   Q.   Did you send copies of The Noble Qur'ân into U.S.
24   prisons?
25   A.   Yes, I did.
```

1   Q.   Approximately how many times?

2   A.   During my time there, maybe, approximately 750 to 800

3   times.  We had a data base which contained the list of where

4   *The Qur'ân* had been sent.  At the time that I had left the

5   organization, there were 15,000 to 16,000 names in the data

6   base.

7   Q.   Now, before we get too far into this, we have provided

8   an excerpt of *The Noble Qur'ân* in the government's brief in

9   Exhibit B, but verse -- there's a footnote about Jihâd holy

10   fighting.  Are you aware of that?

11   A.   Yes, I am.

12   Q.   And it talks about holy fighting in Allâh's cause is

13   given the utmost importance in Islam and one of its pillars,

14   and it talks about, by abandoning jihâd, Islam is destroyed,

15   Muslims fall into an inferior position, their honor is lost,

16   land stolen.  Jihâd is an obligatory duty in Islam on every

17   Muslim, and he who tries to escape from this duty or does

18   not, in his innermost heart, wish fulfill this duty, dies

19   with one of the qualities of a hypocrite.  Are you aware of

20   that footnote?

21   A.   Yes, I am.

22   Q.   And this is contained in *The Noble Qur'ân*?

23   A.   Yes, it is.

24   Q.   Was defendant Sedaghaty aware that you were

25   distributing *The Noble Qur'ân* into U.S. prisons?

1   A.   Yes, he was.

2   Q.   And did he -- who supervised you in this program?

3   A.   Well, ultimate oversight lay with Pete in that this is

4   a program that he had set up that had preexisted my time

5   there, and at times he would look at the data base and see

6   where the material had been sent.  At times also we would

7   discuss the Prisoner Project with him in that it was

8   something that he certainly cared about.

9   Q.   Where did *The Noble Qur'âns* come from?

10  A.   They were sent to us from Saudi Arabia.

11  Q.   Al-Haramain?

12  A.   From Al-Haramain, yes.

13  Q.   Now, did you send other types of literature into the

14  prisons as well?

15  A.   Yes, we did.

16  Q.   Now, the government's memo talks about --

17          MR. CARDANI:  And Judge, I might add that Exhibit

18  C to the government's brief is a copy of Appendix 4, the

19  call to -- call to jihâd.

20

21  BY MR. CARDANI:

22  Q.   And Mr. Gartenstein-Ross, you are aware of not only the

23  footnote, but an appendix to *The Noble Qur'ân*?

24  A.   Yes, I am.

25  Q.   All right.  And the call to jihâd, holy fighting in

 1   Allâh's cause, in *The Qur'ân*?

 2   A.    Yes.

 3   Q.    Was that part of *The Noble Qur'ân* that was sent into

 4   the U.S. prisons?

 5   A.    Yes, it is.

 6   Q.    And what is the call to jihâd?

 7   A.    That's the appendix that I explained earlier by Sheikh

 8   Muhammad bin Humaid which argues that Islam must be locked

 9   in a state of mortal combat with non-Muslims.

10   Q.    So if I get this right, prisoners would ask for

11   information from Al-Haramain, and you would respond by

12   having a questionnaire filled out and, based on their

13   responses, decide what literature to send out?

14   A.    That's correct.

15   Q.    And did you send *The Noble Qur'ân* out?  How would you

16   determine when to send *The Noble Qur'ân* out?

17   A.    If a prisoner got a score of three, which was the

18   basic -- we would grade their respond of knowledge on a

19   scale from zero to ten.  If they scored a three, that was

20   the basic score that would allow us to consider them a

21   Muslim.  If they got that score, then they would be sent a

22   copy of *The Noble Qur'ân*, and if they got above that score,

23   they would also be sent a copy of *The Noble Qur'ân*.

24   Q.    Now, on -- you have a copy of the government's brief

25   in -- memo in front of you?

1   A.   I do.

2   Q.   Could you turn to Page 6.  And I will refer you to

3   Footnote 3 where there are excerpts.

4        "Allah made the fighting obligatory."

5        "Fighting, even though by its nature, is

6   disliked by the human soul because of the

7   liability, of being killed, or being taken as a

8   captive, or being injured, Allah had made ready an

9   immensely good reward that cannot be imagined by a

10  human soul."

11       "To get ready for jihâd involves various

12  kinds of preparations and weapons.  Tanks,

13  missiles, artillery, airplanes, ships, and the

14  training of soldiers in these weapons are all

15  included under the meaning of the word force, land

16  force, navy, and Air Force."

17       "Jihâd is obligatory on every Muslim."

18       I'm sorry.  Those first three quotes, are those

19  quotes from Appendix 4 to *The Noble Qur'ân*?

20  A.   Yes, they are.

21  Q.   Is that consistent with the type of material that

22  permeates a call to jihâd in Appendix 4?

23  A.   Yes, it is.

24  Q.   Now, was there other literature that was sent,

25  depending on a prisoner's score, into U.S. prisons?

1   A.   Yes, there was.

2   Q.   By you at Al-Haramain?

3   A.   Yes.

4   Q.   Literature that you obtained from Al-Haramain Saudi

5   Arabia?

6   A.   Yes.

7   Q.   Exhibit E to the government's brief is a cover page

8   from a book called *Islamic Guidelines for Individual and*

9   *Social Reform*.  Are you aware of that book?

10  A.   Yes, I am.

11  Q.   Is a hard-covered copy in front of you?

12  A.   Yes, it is.

13  Q.   Okay.  What is that?

14  A.   *Islamic Guidelines for Individual and Social Reform* is

15  a book written by a Saudi Arabian scholar named Muhammad bin

16  Jamil Zino.  The book is basically guidelines for how

17  Muslims are supposed to conduct themselves in a variety of

18  affairs.

19  Q.   Did you send this -- how many copies of this, roughly,

20  are you aware were sent into U.S. prisons on behalf of the

21  Prisoner Project at Al-Haramain?

22  A.   Based on -- based on my recollection of the data base,

23  I would say that approximately a 1,000 copies had been sent

24  by the time I left Al-Haramain, most of those previous to

25  when I came there, although we continued to send them while

1   I was there.

2   Q.   Now, the material in this book, does it contain some

3   radical beliefs?

4   A.   Yes, it does.

5   Q.   And do those include that, "Jihâd against the

6   disbelievers, communists, and aggressors from

7   Jewish-Christian Nations can either be by spending on jihâd

8   or by participating in it in person"?

9   A.   Yes.

10  Q.   And what is an ahadith?

11  A.   Ahadith are the sayings and also traditions of the

12  prophet Muhammad.

13  Q.   And in this -- this document, *Islamic Guidelines*, sent

14  to the prisons, did there also include statements under the

15  heading of Act Upon These Ahadith, "The last hour will not

16  appear unless the Muslims fight the Jews and kill them"?

17  A.   Yes.

18  Q.   Page 167.

19       Under Jihâd and Bravery, "Teach your children the

20  love of justice and revenge from the unjust like the Jews

21  and the tyrants"?

22  A.   Yes.

23  Q.   Page 108.  And similar type of material talking about

24  funding jihâd or otherwise participating in it directly?

25  A.   Yes.

1  Q.   Did occasionally prisoners respond to literature such

2  as this?

3  A.   Yes, they would frequently write us letters.

4  Q.   And were you aware of those letters?

5  A.   Yes, I was.

6  Q.   Was the defendant aware of those letters?

7  A.   Yes, he was.

8  Q.   How so?

9  A.   Well, we had boxes that contained the various letters

10  that had been sent to us.  The boxes would be kept at the

11  office.

12  Q.   And were there lots and lots of these letters?

13  A.   Yeah, there were hundreds of them.

14  Q.   And were some of them or a lot of them just mundane

15  questions and answers that, really, no cause for alarm?

16  A.   Yes, a lot of them were.

17  Q.   But were some of them involving more strident

18  information?

19  A.   Yes.

20  Q.   There's a quote in Page 9 of the government's brief

21  from a prisoner -- I'm sorry -- Page 7 of the government's

22  brief.

23           "My name is Umar Khalid Al-Mujahid.  I am

24       sending this $10.  I would like it to be used

25       towards helping the mujahideen in Chechnya that

1    are being persecuted by the coalition of kuffar,

2    whether it be providing some food, medical help to

3    the family of the martyrs, or weapons.  I would

4    have sent more but am currently in prison and my

5    finances are very short.  I hope that this will be

6    able to help at least one mujahid or a family of

7    one."

8         Is this a type of letter that you got from U.S.

9    prisoners in response to some of the literature you sent?

10   A.   It's a type of letter.  As you said, these letters

11   would be more rare, but occasionally we would get letters

12   that were very strident like this.  More often we would get

13   letters that were asking, you know, a number of theological

14   questions, including questions that were quite strident as

15   well.

16   Q.   Now, before I move on to a different subject, you

17   mentioned testifying before the United States Senate.  When

18   was that?

19   A.   That was in September of 2006.

20   Q.   What was the subject of your testimony?

21   A.   It was prison radicalization.

22   Q.   And what was -- could you tie that testimony -- or is

23   there a connection between your testimony there and here in

24   terms of the ties between radical literature like this and

25   U.S. prisoners?

1  A.   Yes.  In the testimony -- what they were concerned

2  about in the testimony -- I was testifying on a panel with

3  two individuals, one who teaches at George Washington

4  University at their Homeland Security Institute, the other

5  one teaches at the University of Virginia.  They had

6  released a report entitled *Out of the Shadows* about the

7  threat of radical Islam in prisons.

8       And one of the big concerns of the report is that

9  prisons are a potential tinderbox for radical Islam because

10  prisoners are disaffected coming in.  Many of them are

11  looking for answers or looking for some -- something that

12  will vindicate their existence, and there have been several

13  instances in which prisoners have either become involved in

14  terrorist plots or, in California, a terrorist plot was

15  hatched from a prison cell.

16       Ultimately there are a number of factors that go

17  into prisoner radicalization, including imams or chaplains

18  who may be in the prisons, other prisoners, but literature

19  was a part of that.  In my testimony, I discussed our

20  literature program as well as discussing this from a more

21  broad perspective.

22  Q.   How about the connection between Al-Haramain literature

23  and radicalization of prisoners?

24  A.   Well, judging from the letters that we received from

25  prisoners, the material certainly had an effect in bringing

1  them to more extremist beliefs.  Also, you know, there are

2  prisons who wouldn't trust other versions of *The Qur'ân*

3  other than *The Noble Qur'ân* because they believed *The Noble*

4  *Qur'ân* to be the most accurate.

5  Q.   All right.  I'd like to move on to a different subject

6  now, and that is the Kosovo mujahideen.  And what is a

7  mujahid?

8  A.   A mujahid is a holy warrior, and the plural of

9  mujahid -- the plural is mujahideen.

10  Q.   And what is the hajj?

11  A.   The hajj is the pilgrimage to Mecca that -- it's one of

12  the five pillars of Islam.  Muslims who are capable of this

13  should undertake it at least once during their lives.

14  Q.   Are you aware of whether the defendant attended the

15  hajj in 1999?

16  A.   Yes, he did.

17  Q.   Was that early 1999?

18  A.   Yes, it was.

19  Q.   Did you have an opportunity to listen to some of his

20  speeches upon his return from hajj?

21  A.   Yes, I did.

22  Q.   And I'd like to focus directly on a time period,

23  roughly April of 1999, and a discussion by the defendant

24  about the mujahideen's efforts in Kosovo.

25  A.   Yes.  This was at a time when -- it was on the verge of

1  when the U.S. went to war in Kosovo.  The Serbs under

2  Slobidan Milosevic were -- you know, there was a conflict

3  there, and the Serbs, as far as the U.S. government is

4  concerned and as far as I'm concerned, were engaging in acts

5  of aggression.  They were slaughtering people.  Pete was

6  very upset by this, as many of us were, and he discussed

7  this one day after the Friday prayers.  At the Friday

8  prayers, there's a sermon.  After the sermon, Pete stood up

9  and talked about what was occurring in Kosovo and said that

10 he would be -- he knew of a couple of individuals who were

11 going to go over to this area to fight against the Serbs.

12 He encouraged us to give money for this.

13 Q.   All right.  And were there other people present when

14 this was done?

15 A.   Yes, there were.

16 Q.   Was there money collected by the defendant?

17 A.   There was.

18 Q.   And did you see this?

19 A.   I did.

20 Q.   Did you yourself donate money at the time?

21 A.   I did.

22       MR. CARDANI:  Judge, Exhibit K to the government's

23 brief is a wire transfer of $2,000 from Ashland, Oregon,

24 Al-Haramain Foundation bank account, and also The Arborist,

25 which is defendant Sedaghaty's tree business at the time.

1  $2,000 was sent to Banco Italo-Albanese, which is the

2  Tirane, Albanian office of Al-Haramain.  That office was

3  later designated by the United States and as well by the

4  United Nations as a terrorist supporting organization.

5  BY MR. CARDANI:

6  Q.   Mr. Gartenstein-Ross, I'd like to now move on to

7  another subject, and that is, sometime after this -- well,

8  let me start with this:  You are aware that our embassies in

9  Kenya and Tanzania were attacked by al-Qaeda in 1998?

10  A.   Yes.

11  Q.   Are you aware of a discussion that the defendant had

12  with Soliman al-Buthe, the codefendant, over the phone about

13  the subject of who was responsible for these terrorist

14  attacks?

15  A.   Yes.

16  Q.   Could you please tell the court what you know about

17  that subject.

18  A.   This was in the Summer of 1999.  There was a show on

19  PBS called *Frontline* which had just come out about the 1998

20  East African embassy bombings.  And as part of the show,

21  there was a discussion on how the embassy bombers had made

22  use of the offices of an Islamic charity in Africa as a

23  launching point for the attacks.  Both times this was

24  mentioned, Al-Haramain's logo was flashed on the screen.

25       After this happened, Pete was upset by this and

1  called the Saudi Arabian office.  This discussion with

2  Soliman al-Buthe took place shortly after the special was

3  aired over speakerphone, and I was in the office for it.

4  Pete said to them, this is totally false, right?

5  Al-Haramain was not connected with the 1998 East African

6  embassy bombings.  Soliman al-Buthe's response was, no.  We

7  have a lot of volunteers, brother.  We don't know what our

8  volunteers have done.  And Pete said, so you are telling me

9  that we can't -- that you cannot say that Al-Haramain was

10  not involved in the 1998 embassy bombings.  And Soliman

11  said, yes, that's correct.

12  Q.  All right.  After that conversation, did you -- how did

13  he react?

14  A.  He was very upset by that.  We hired a public relations

15  person kind of as a response to that.  And, you know, he --

16  his trust of the Saudi Arabian office dropped noticeably

17  during my time there.  At one point, he talked about how as

18  far as he was concerned, we, in Oregon, were the head

19  office, meaning that we -- he wanted to wash his hands of

20  whatever the Saudi Arabian office was doing.

21  Q.  Do you know when that conversation occurred?

22  A.  Yes.  This was in the summer of 1999.

23  Q.  Summer of '99?

24  A.  Yes.  It was -- these occurred in the June, July, and

25  August of 1999 period.

1  Q.   Now, did you become aware of defendant Sedaghaty's

2  support for the mujahideen in the area of Chechnya,

3  Caucasus, and Russia?

4  A.   Yes.

5  Q.   Tell us a little bit about that.

6  A.   Well, the conflict in Chechnya broke out just as I was

7  leaving Al-Haramain.  This was -- I left in August of 1999.

8        Just shortly before I left, the -- there were

9  mujahideen in Chechnya who invaded the neighboring Dagistan

10 in the attempt to set up an Islamic state there.  After

11 that, the Russians intervened after a series of apartment

12 bombings, and a war raged through the next several years.

13 Pete and I had several -- had several discussions about the

14 mujahideen in Chechnya.

15 Q.   And did he support the Chechnyan mujahideen?

16 A.   In the conversations, he was, you know, upset by what

17 the Russians were doing.  He defended the mujahideen against

18 accusations, such as their use of chemical weapons on the

19 battlefield.

20 Q.   And are you aware, from an examination of the

21 indictment in this case, Mr. Gartenstein-Ross, that some of

22 the allegations surrounding the indictment concern the

23 receipt of $150,000 from an Egyptian donor sent to

24 Al-Haramain in February of 2000?

25 A.   Yes.

1    Q.    So this is after the conversation you had with him

2    about the East Africa bombings and who was associated with

3    that?

4    A.    Yes.

5    Q.    And you are aware that it's alleged, at least, that

6    Al-Haramain received $150,000, and it was sent to a bank

7    account in Ashland, Oregon?

8    A.    Yes.

9    Q.    And that Soliman al-Buthe, the individual you talked

10   about earlier, actually flew to the United States and

11   retrieved that money?

12   A.    Yes.

13   Q.    Converting it to traveler's checks and taking it back

14   to Saudi Arabia?

15           MR. MATASAR:  I'm going to object, Your Honor.

16           Do you have personal knowledge of this, or is this

17   just what you read in the indictment?

18           THE WITNESS:  No.  He's asking me about what I

19   read in the indictment.

20           THE COURT:  What's the point?  I can read the

21   indictment.

22           MR. CARDANI:  Okay.  If I may have a moment, Your

23   Honor.

24           THE COURT:  Fine.

25           MR. CARDANI:  Thank you.  That's all I have,

1   Judge.

2          THE COURT:  Okay.

3                  **CROSS-EXAMINATION**

4   BY MR. MATASAR:

5   Q.   Mr. Gartenstein-Ross, you have indicated that Pete Seda

6   was against the slaughtering by the Serbs?

7   A.   Yes.

8   Q.   And he was against Al-Haramain -- or was concerned that

9   Al-Haramain was shown as -- on *Frontline* as being involved

10  in terrorist activities?

11  A.   Yes.

12  Q.   Isn't it true that there were -- there was a legal

13  effort made to get a retraction from *Frontline*?

14  A.   Yes, there was.  I'm not aware of how -- I don't think

15  it went very far, but I'm aware that they put a law firm on

16  retainer in Washington, D.C.

17  Q.   So you are not aware that they successfully got a

18  retraction from *Frontline*, and that Al-Haramain was taken

19  off all further broadcasts?

20  A.   I have never heard that, no.

21  Q.   What is your doctorate in?

22  A.   I don't have a doctorate, sir.

23  Q.   What languages are you fluent in?

24  A.   I am fluent in English.  I am proficient in Italian.

25  Q.   You don't know Arabic at all?

1  A.   I do know some Arabic, yes.  I can read in Arabic.  I

2  have a basic understanding of the language.

3  Q.   Are you fluent?

4  A.   No, I'm not.

5  Q.   Isn't it true that *The Noble Qur'ân is* in libraries

6  throughout the United States?

7  A.   Yes.

8  Q.   It's in Library of Congress?

9  A.   I have no knowledge of that.

10  Q.   I want to ask a little bit about your employment.

11  Right after law school, you worked at -- in a law firm; is

12  that right?

13  A.   No, it's not.

14  Q.   What did you do after law school?

15  A.   I clerked on the United States Court of Appeals for the

16  D.C. Circuit.

17  Q.   Oh, I'm sorry.  Yes.  And after that?

18  A.   I worked for the law firm of Boies, Schiller & Flexner.

19  Q.   Okay.  For how long?

20  A.   For a year, and then I worked there for another six

21  months after a six-month hiatus.

22  Q.   So you worked there for a year, and then you worked

23  doing something else.  Was that when you worked at the

24  Investigative Project?

25  A.   Yes, it is.

1  Q.   Okay.  Then you went back to the law firm?

2  A.   Yes.

3  Q.   And then you describe yourself as a counterterrorism

4  consultant?

5  A.   Yes.

6  Q.   What does that mean?

7  A.   It means that I would do consulting projects related to

8  issues involving terrorism and Islamic extremism.

9  Q.   Have you been in the military service?

10  A.   I have not.

11  Q.   Then when you say you were a counterterrorism

12  consultant, was that freelance?

13  A.   Yes, that's what consultants do.

14  Q.   And then after a while, you worked for the Gerard

15  Group?

16  A.   I was consulting for the Gerard Group.  That was part

17  of what I did while I was a consultant.

18  Q.   And you post Web logs and various articles on the

19  Internet; is that right?

20  A.   On the counterterrorism blog, yes, as well as writing

21  for other publications.

22  Q.   *The National Review*?

23  A.   Yes.

24  Q.   *Weekly Standard*?

25  A.   Yes.

1  Q.    *Daily Standard*?

2  A.    Yes.

3  Q.    You are a consultant, I think, for *Christian*

4  *Broadcasting*?

5  A.    *The Christian Broadcasting Network*, yes.

6  Q.    And you post for a blog called *Pajamas Media*?

7  A.    No.  That's actually a news Web site.

8  Q.    Okay.

9  A.    It's not a blog.  I have written for them, though, yes.

10 Q.    Were you paid for your testimony today?

11 A.    No.

12 Q.    Were you subpoenaed?

13 A.    Yes, I was.

14 Q.    And you have provided information to the government --

15 A.    Yes, I have.

16 Q.    -- as part of this case; is that right?

17 A.    Yes.

18 Q.    Now, that's not as an undercover informant; is that

19 correct?

20 A.    Not as an undercover informant, no.  I worked for them

21 as a confidential informant, but that's --

22 Q.    But not undercover.  You just gave them information?

23 A.    No, not undercover.  That's correct.

24 Q.    You spoke about Pete Seda and female genital

25 mutilation.  Isn't it true that he's personally strongly

1   against that practice?

2   A.   I don't know.  We didn't discuss it.  My impression

3   from that conversation was not that he was saying I

4   shouldn't have written that because female genital

5   mutilation was right, but, rather, he was saying I shouldn't

6   have written it because it was a complex area of Islamic law

7   that you should consult sheikhs on prior to issuing any sort

8   of opinion.

9   Q.   Hasn't he written a pamphlet on Islam?

10  A.   You are talking about *Islam Is*?

11  Q.   Yes.

12  A.   Yes, he has.

13  Q.   And isn't that strongly against female mutilation?

14  A.   I do not know.  I have actually not read the pamphlet.

15  Q.   You have not read the pamphlet?

16  A.   I have not.  He published it in 2002, after I left

17  there.

18  Q.   It's widely available on the Internet, is it not?

19  A.   I own a copy of it.  I haven't read the entirety of the

20  pamphlet.

21  Q.   Some Muslims refer to non-Muslims as infidels; is that

22  right?

23  A.   Well, the Arabic word is kafir, or kuffar is the

24  plural.

25  Q.   And Wahhabi Islam does that as well; is that right?

1    A.    Yes, that's correct.

2    Q.    And some Wahhabis believe that Muslims should take

3    action against infidels?

4    A.    Yes.

5    Q.    And some believe that they should kill infidels?

6    A.    Some believe that, yes.

7    Q.    Pete Seda does not, does he?

8    A.    That you should kill infidels?

9    Q.    Correct?

10   A.    I have not heard him say that you should kill infidels,

11   no.

12   Q.    Isn't it true that you know that his overall approach

13   is not that Muslims need to even take action against

14   infidels?

15   A.    No, I wouldn't say that I know that that's his overall

16   approach in that the organization as a whole was

17   distributing literature which, quite, you know, frankly,

18   said that you should be engaged in conflict.  I have talked

19   to Pete about this on many occasions, and he was both -- you

20   know, personally would very much indicate that he was

21   against terrorism in our conversations.

22          At the same time, the organization, you know, is

23   one that was distributing very strident literature.  And I

24   don't know, as between the two, certain of these

25   conversations and the fact that we had an organization that

1  was distributing literature such as this or that we had

2  scholars who had fairly strident views on things like jihâd

3  and the proper relations between Islam and the west, I don't

4  know where Pete lay in his heart of hearts.  But overall as

5  an organization, we were putting forward a message which

6  counseled this sort of conflict.

7  Q.    I understand about the organizational -- organizational

8  message.

9  A.    Yes.

10  Q.    I'm asking you about Pete Seda.  Wasn't his overall

11  theme not -- was that Muslims should not take action against

12  infidels?

13  A.    I don't know that that was his overall theme.  I mean,

14  he has said that to me on multiple occasions, that's

15  correct.  But I don't know if that's his overall theme, as

16  you put it.

17  Q.    Weren't you interviewed on Jefferson Public Radio?

18  A.    Yes, I was.

19  Q.    That was part of a big book tour, right?

20  A.    It was part of a book tour, yes.

21  Q.    A book tour.  Maybe not a big book tour.

22  A.    I don't know.

23  Q.    And don't you recall being asked by Jeff Golden about

24  Pete Seda during that interview?

25  A.    Yes.

1  Q.   And didn't you say that his overall theme was not that

2  Muslims needed to take action against infidels?

3  A.   Well, that's different than what you just asked me.

4  That says his overall theme was not that Muslims should take

5  action against infidels.  That's saying that that was not

6  his overall theme.  Whereas, it would be different if I had

7  said his overall theme was that Muslims should not take

8  action against infidels, right?  There's a grammatical

9  difference between the two of those.

10         I was saying that Pete's overall theme was not --

11  he wasn't a guy who, day after day, was putting forward

12  radical things.  That what I was saying on Jeff Goldbloom --

13  Jeff Golden's, sorry, station.

14  Q.   He was upset after September 11th, wasn't he?

15  A.   Yes, he was.

16  Q.   You know that, and you believed him.  You saw him right

17  after September 11th, and he was very upset?

18  A.   Well, I spoke to him on the phone, and he was very

19  upset, yes.

20  Q.   And you genuinely believe he was upset?

21  A.   Yes.

22  Q.   You are not worried about Pete Seda being in the

23  community as a threat to you, are you?

24  A.   I really can't assess that.  I mean, I -- I would hope

25  not.  It certainly is something that would be, you know, a

```
 1   bit of a concern, but, you know, I would like to think that
 2   that's not the case.
 3   Q.   Weren't you asked about that by Jeff Golden as well?
 4   If you were concerned about people in the community?
 5   A.   I do not recall.  I mean, if you -- if you have a
 6   transcript of this and read it to me, then -- but I did a
 7   number of interviews related to the book and don't recall
 8   the specific line that you are talking about.
 9   Q.   Let me see if I can refresh your recollection.
10   A.   Sure.
11   Q.   I can play it for you if you want.  Didn't you say that
12   you were not concerned about anybody that you actually knew
13   being in the community?
14   A.   Well, if it's -- if the way you are putting it forward
15   is what I think it is, then I was talking about what the
16   Muslim community was in Ashland now.  And now, you know,
17   with Al-Haramain gone, the community is being run by people
18   who are quite moderate in their beliefs.
19   Q.   All right.  So anybody that you knew you wouldn't --
20   didn't you say anybody that you knew you wouldn't be
21   concerned about?
22   A.   Well, again, this is based on one of several -- of many
23   interviews that I gave at the time.  I do not recall this
24   specific line.
25   Q.   The question is, then, not so much what you said then.
```

1   A.   Okay.

2   Q.   But are you now saying that you would be concerned

3   about people that you know in the community?

4   A.   Um --

5   Q.   Whether it be Pete Seda or whether it be other people

6   in the Ashland community?

7            THE COURT:  Well, rather than broaden it, why

8   don't you just focus on your client.

9   BY MR. MATASAR:

10  Q.   Sure.  Are you saying you would be -- now are you

11  saying you would be concerned about him?

12  A.   Well, I'm certainly concerned that at the time that I

13  was working for Pete, we served as a conduit for this

14  radical strain of Islam.  That we both, you know, propagated

15  the message, but also did quite a bit of work for the

16  Al-Haramain organization as a whole, which is a -- which is

17  an extremist organization.  There are multiple ways that

18  somebody who is related to the organization, sympathetic

19  with the organization, could help further its agenda, and I

20  think that that's a concern.

21  Q.   Are you putting Pete Seda and other people that you

22  know --

23           THE COURT:  I'm not interested in other people.

24  BY MR. MATASAR:

25  Q.   Are you putting Pete Seda in that category?

1   A.   Of people who -- yes.  At every turn, we furthered

2   Al-Haramain's agenda.  It was an agenda that we -- that both

3   has not -- it was an agenda that -- when they told him to do

4   something and they gave him instructions, we would follow

5   the instructions that Al-Haramain gave us.  I think that's a

6   concern.  And Pete has been gone for the past three, three

7   and a half years, you know the exact figure better than I

8   do, and, you know, he has not repudiated Al-Haramain.

9          I mean, what you are doing here at this hearing is

10  talking about Al-Haramain wasn't bad, was not extremist,

11  which makes me think that Pete is not -- I would love it if

12  Pete had learned the lesson from being involved with this

13  radical organization.  I don't dislike Pete.  I don't hate

14  Pete.  I actually have some liking for him.

15         But at the same time, you know, this organization

16  was doing terrible things and teaching terrible things.  And

17  it's your contention that none of that, you know, matters,

18  which makes me think that no lesson has been learned.  And

19  that, you know, from -- from an Al-Haramain lawyer traveling

20  back with him to e-mail conversations that I have had with

21  Soliman al-Buthe, I believe that he is still in touch with

22  and sympathetic with this organization.

23  Q.   I will ask you some questions about the e-mails later

24  on.

25         Let me ask you about the Prison Project.

1   A.   Um-hmm.

2   Q.   You had some of your own initiative in that, did you

3   not?

4   A.   The only initiative that I had was for something that

5   was called the Prisoner Pen Pal Project, which was very

6   short-lived.

7   Q.   And your goal, was it not, was to improve the lives of

8   prisoners in the United States?  That was part of the call?

9   A.   Yes, absolutely.

10  Q.   And you decided to work on a funding letter?  Was that

11  your approach?  Your idea?

12  A.   Um, yes, that was my idea, and it was in conjunction

13  with Pete.  We sent out a total of about nine funding

14  letters.  That didn't go very far either.

15  Q.   And the idea was to help prisoners stay within the fold

16  of Islam when they were released; is that right?

17  A.   No, it had nothing to do with their release.  It was,

18  rather, to educate them while they were in prison.

19  Q.   Didn't -- didn't you say you wanted to produce, or

20  wasn't part of the program to produce a number of educated

21  brothers who would be very devoted to their faith upon

22  release?

23  A.   Um, I do not recall the letter that you are reading.

24  If it's something that's in front of you, then I will take

25  your word for it.

1  Q.   I don't want you to take my word for it.  I just want

2  you to try to remember what happened.  Wasn't there part of

3  this that would deal with them upon their release?

4  A.   Sir, you are talking about a funding letter which we

5  sent out a total of about nine for.  Pete was very skeptical

6  of sending this out because he said, look, you can send this

7  out, but people won't send you money.  And we sent out, you

8  know, a very limited amount of them.  This was a -- you

9  know, something that didn't -- basically went nowhere.

10  Q.   The questionnaire -- the whole project went nowhere?

11  A.   No.  The funding letter went nowhere.  The whole

12  project distributed a large amount of Islamic material.

13  Q.   There was a questionnaire you talked about, right?

14  A.   Yes, there was.

15  Q.   The questionnaire was not used for radical purposes,

16  was it?

17  A.   The questionnaire was used to assess the knowledge of

18  prisoners.

19  Q.   It was not used for terrorist recruitment, was it?

20  A.   No, it was not.

21  Q.   That's what you testified to, to the senate; is that

22  not correct?

23  A.   Yes, that is correct.

24  Q.   In fact, the focus of recruitment by Al-Haramain in

25  Saudi Arabia was not for prisoners at all?

1    A.   Yes, that's correct.

2    Q.   Okay.  They didn't care about prisoners?

3    A.   Yeah.  They did not.

4    Q.   They were trying to convert affluent white people?

5    A.   Yes.  Incidentally, just to clarify that, that's --

6    that was our internal characterization of what they wanted

7    to do.  That wasn't -- as far as I know, they didn't

8    actually say, we want to convert affluent white people.

9    Q.   Correct.

10   A.   But rather, that was the way we understood them to --

11   that's the way we understood their approach to be.

12   Q.   Correct.  And that's what you told the senate?

13   A.   Yes.  Yeah.

14   Q.   You worked for Al-Haramain from December '98 through

15   August '99?

16   A.   That's correct.

17   Q.   The Saudis running Al-Haramain were not in favor of

18   terror attacks against the United States; isn't that fair to

19   say?

20   A.   I really cannot say that.  In fact, I think Aqil

21   al-Aqil, who headed the international charity, who is a

22   specially designated global terrorist, may well have been in

23   favor of them.  So I think that that's something which I

24   certainly could not agree with.

25   Q.   Didn't you tell the United States Senate that the

1  Saudis at Al-Haramain sought it strategically wise to avoid

2  terror attacks against the United States?

3  A.   This is -- the part that you are quoting from in my

4  senate testimony was talking about the pre-9/11 world, and

5  the point that I made thereafter, if you keep reading, is

6  that things may well have changed post-9/11.

7  Q.   I understand.  But you were at Al-Haramain from

8  December '98 through August of '99?

9  A.   Oh, so you are limiting it to during that time period?

10  Is that your question?

11  Q.   Well, that's when you had direct familiarity with

12  Al-Haramain; is that not correct?

13  A.   Yes, that is correct.

14  Q.   And isn't it the case that you told the senate that

15  Al-Haramain Saudi Arabia saw it as strategically wise to

16  avoid terror attacks against the United States?

17  A.   During that period, yes, pre-9/11.

18  Q.   Now, you have seen the indictment in this case, have

19  you not?

20  A.   Yes, I have.

21  Q.   Haven't you said that there really isn't anything to

22  the indictment?

23  A.   No.

24  Q.   Haven't you said that you laughed when you read it?

25  A.   Not that I can recall.

1  Q.   You have indicated you have had e-mail with Soliman

2  al-Buthe; is that correct?

3  A.   That is correct.

4  Q.   Okay.  Do you see something on the screen?

5  A.   Oh, yeah.

6  Q.   Okay.  I will show you the first page first here.  It

7  says -- it's from you, dated November 17th, 2005.

8  A.   Yes.  It was December 1st, 2005.

9  Q.   I'm sorry.

10  A.   Oh, no.  You are right.  November 17th.  I'm sorry.

11  Q.   Okay.  And don't you thank Soliman for sending an

12  article to you?

13  A.   Yes.

14  Q.   And don't you say, "I read over the government's

15  indictment in the Al-Haramain case the other day and almost

16  laughed when I read it," exclamation point?

17  A.   Yes.

18  Q.   And don't you say, "You were right in our last

19  conversation.  They don't even say one word about

20  terrorism," exclamation point.  And don't you also say,

21  "After all that noise, it looks like there really isn't

22  anything to the indictment"?

23  A.   Yes.  But sir, this was the point at which we were

24  trying to get information in which Soliman al-Buthe had

25  contacted me after I wrote an article about Al-Haramain's

1  Islamic literature.  And you know, I got in touch -- I was

2  concerned about Soliman's e-mail.  He was, at this point, a

3  specially designated global terrorist.  I got in touch with

4  the FBI at this point.  Dave wanted me to reach out to

5  Soliman al-Buthe because he was a fugitive.  So I sent this

6  e-mail to him in order to facilitate communication with

7  Soliman.

8  Q.   Didn't, at the very beginning of your testimony, you

9  tell us that you did not work undercover for the United

10 States government?

11 A.   I don't consider this to have been undercover work,

12 sir.  Generally when you are undercover, you are posing as

13 something else.

14 Q.   Well, what were you posing as when you wrote this?

15 A.   Well, I was writing it as myself.

16 Q.   Did you get direction from the FBI on exactly what to

17 say?

18 A.   No, I did not.

19 Q.   How often have you talked to the FBI around this

20 period?

21 A.   Around that period?

22 Q.   Yeah.

23       THE COURT:  How does this help me resolve the

24 issues that I'm concerned with at this detention hearing?

25       MR. MATASAR:  I think it goes to bias, Your Honor.

```
 1              THE COURT:  Well --

 2              MR. MATASAR:  To the extent he's tied to the

 3    government, it goes to bias.  Also credibility, if he's

 4    saying he thinks the indictment is worthless.

 5              THE COURT:  Okay.  I think I have heard enough on

 6    that subject.

 7              MR. MATASAR:  Nothing further, Your Honor.

 8              THE COURT:  Okay.

 9              MR. CARDANI:  No further questions.

10              THE COURT:  You can step down.  You are excused.

11              Call your next witness.

12              MR. CARDANI:  Special Agent Colleen Anderson.

13              Judge, could we take a brief recess for the

14    witness?

15              THE COURT:  Sure.  We'll take a -- we'll be in

16    recess for ten minutes.

17              THE CLERK:  This court's in recess.

18                           (Recess.)

19              THE CLERK:  If you'd please raise your right hand.

20                    (The witness was sworn.)

21              THE CLERK:  Thank you.  Please be seated.

22              Would you please state your full name for the

23    record, spelling your last name.

24              THE WITNESS:  Sure.  My name is Colleen Anderson.

25    Last name is A-N-D-E-R-S-O-N.
```

1    THE CLERK:  Thank you.

2                **DIRECT EXAMINATION**

3    Q.    You are a criminal -- I'm sorry.  You are a criminal

4    investigator with the Internal Revenue Service?

5    A.    Yes, I am.

6    Q.    How long have you been doing that?

7    A.    A little over eleven years.

8    Q.    Are you one of the case agents in this investigation?

9    A.    Yes, I am.

10   Q.    You are aware of a lot of the evidence giving rise to

11   the charges?

12   A.    Yes, I am.

13   Q.    There's a discussion in the government's memorandum

14   before the court today about defendant's acquisition of an

15   Internet service provider used to facilitate communications

16   involving some radical people.  Are you aware of that?

17   A.    Yes, I am.

18   Q.    Before we call the next witness, we'll talk a little

19   bit about that.  Would you please tell the court, did you

20   interview anybody about this acquisition, and how is it that

21   you learned that Mr. Sedaghaty had gotten involved in this

22   ISP?

23   A.    Sure.  I interviewed an individual by the name of

24   Ferhad Erdogan, who is a -- the owner of an Internet service

25   provider or was an owner of an Internet service provider

1    around the 1998 time period.  And during this interview,

2    Mr. Erdogan told me that Mr. Sedaghaty had approached him to

3    host some servers for Al-Haramain.

4    Q.    For what reason?

5    A.    They had a Web site named *Islam Today* that they wanted

6    to get up and running, that and some e-mail servers.

7    Sedaghaty had expressed an interest in getting involved in

8    Mr. Erdogan's business and becoming partners.

9    Q.    Did Mr. Erdogan actually get this ISP underway and this

10   *Islam Today* site up at Mr. Sedaghaty's request?

11   A.    Yes, he did.  He got the main site, islamtoday.com and

12   net, up and running at the request of Mr. Sedaghaty, who

13   Mr. Erdogan believed was taking direction from Soliman

14   al-Buthe.

15   Q.    And Al-Haramain?

16   A.    And Al-Haramain.

17   Q.    Did Mr. Sedaghaty have physical access to the servers

18   of *Islam Today*?

19   A.    Yes, he did.  Mr. Erdogan told me that Sedaghaty had

20   physical access, and basically his role was as a general

21   manager for the business.

22   Q.    And what about the site content?  Did Mr. Erdogan

23   indicate how the site content was added or modified?

24   A.    Yes.  He said the -- the site was programmed out of

25   Dubai.  Modifications were made out of Saudi Arabia --

```
 1                    (Reporter interrupted.)
 2              THE WITNESS:  Out of Dubai.
 3   BY MR. CARDANI:
 4   Q.    Is that D-U-B-A-I?
 5   A.    D-U-B-A-I.
 6   Q.    In Saudi Arabia?
 7   A.    And modifications were made out of Saudi Arabia.
 8   Q.    Okay.  Did Mr. Erdogan indicate for what reason this
 9   site was created on this server?
10   A.    Yes.  He said that the site was intended to broadcast
11   live audio of sheikhs from Saudi Arabia, and that the e-mail
12   server was very important to the organization because they
13   wanted communications.
14   Q.    Did he say anything about the nature of this particular
15   sheikh or sheikhs in Saudi Arabia?
16   A.    He specifically said that the sheikh that they were
17   supporting couldn't freely speak about what he believed.
18   Mr. Erdogan believed that the sheikh had a harder edge to
19   him and to his understanding of Islam and that the Web site
20   was basically a vehicle for the sheikh.
21   Q.    Did he say where the sheikh was located?
22   A.    He believed the sheikh was in Saudi Arabia.
23   Q.    And that he had a hard time getting his message out
24   from Saudi Arabia?
25   A.    That's correct.
```

1  Q.    And so this would be a vehicle to allow him to do so?

2  A.    Yes.

3  Q.    And Mr. Erdogan said that he e-mailed -- the e-mail

4  capabilities of this server were important as well?

5  A.    Yes.

6  Q.    Were there eGroups attached to *Islam Today* that you are

7  aware of?

8  A.    Yes, there were.

9  Q.    And are eGroups a way to distribute messages amongst a

10  certain group of people?

11  A.    Yes, they are.

12  Q.    Are you familiar with whether defendant Sedaghaty and

13  Soliman al-Buthe are recipients in the ListServe accounts

14  for *Islam Today*, or were at one time?

15  A.    Yes.  Both Mr. Sedaghaty and Soliman al-Buthe are

16  listed under the subscribers' list for the *Islam Today*

17  network.

18  Q.    All right.  And you know Exhibit O to the government's

19  memorandum contains an e-mail; is that correct?

20  A.    Yes, yes, it does.

21  Q.    All right.  And that e-mail will be discussed by the

22  next witness.  But where was that e-mail discovered?

23  A.    This e-mail was discovered on the *Islam Today* Web

24  server in which the government obtained images of those

25  servers and reviewed them, and this e-mail came from that.

1    Q.   And this e-mail was written in Arabic?

2    A.   Yes, it is.

3    Q.   And Exhibit O has that e-mail.  It references an

4    Aloadah, subscribers@islamtoday, list@islamtoday?

5    A.   Yes, it does.

6    Q.   And that list is what you are talking about, saying

7    that Mr. Sedaghaty and al-Buthe were recipients of *Islam*

8    *Today* messages?

9    A.   Yes, they are both listed as subscribers to this

10   network.

11   Q.   Page 3 to Government's Exhibit O is an English version

12   of this e-mail, is it not?

13   A.   Yes, it is.  It's a translation.

14   Q.   Okay.  Did you translate this?

15   A.   No.  I asked for an FBI translator to translate the

16   message.

17   Q.   Now, do you have evidence that this e-mail was actually

18   sent out to defendant Sedaghaty?

19   A.   No.

20   Q.   But that it was physically located on the server, the

21   e-mail server that was in Ashland, Oregon at the time?

22   A.   Yes.  That's how I obtained the e-mail.

23   Q.   E-mail, "Subject:  Prayer is the weapon.

24             "In the name of Allah, the All Merciful, the

25        All Compassionate, God's peace, mercy, and

1    blessings be upon you.  My dearest, this is" -- my

2    dear brothers, this is the office of Sheikh

3    Ussamah Bin Laden in Qandahar.  He sends you a

4    message of gratitude and appreciation and asks you

5    not to forget to pray during this blessed night

6    and on Friday.  God is near.  The infidel (kafers)

7    and the hypocrites have collaborated against us.

8    It's a sad situation when an Islamic nation faces

9    death and the world stands by and watches.  We are

10   profoundly committed to jihâd.  I ask you to

11   continue in prayer.  God is the benefactor of his

12   servants.  Your brothers, the mujahideens (Ussamah

13   Bin Laden Brigade)."

14        And then there's a reference to a Web site, is

15   there not, in the actual e-mail?

16   A.   Yes, there is.

17   Q.   And the e-mail reference is www.laden, L-A-D-E-N,

18   .s5.com?

19   A.   Correct.

20   Q.   Moving on to another subject, did you attempt to

21   interview some witnesses concerning the defendant's

22   philosophy and possible support for the mujahideen in

23   Chechnya?

24   A.   Yes, I did.

25   Q.   Did you interview an individual with the last name of

1    Cabral, C-A-B-R-A-L.

2    A.    Yes.  I interviewed an individual by the name of

3    Richard Cabral who had attended the Ashland prayer house for

4    many years.

5    Q.    All right.  And what did he say about this subject?

6    A.    Mr. Cabral said that he had visited Mr. Sedaghaty on

7    one particular occasion at his house on Valley View Road in

8    which Mr. Cabral said that Mr. Sedaghaty had trailers on the

9    property, and in one of these trailers was a TV and a VCR

10   set up.  And when he visited Mr. Sedaghaty, Mr. Sedaghaty

11   was sitting there watching the television with a tape in it,

12   and in that was a video about Chechnyan mujahideen.  That

13   Mr. Sedaghaty was showing the video to an unknown Caucasian

14   male and Sedaghaty's youngest son, Joseph.

15   Q.    And what was in this video?

16   A.    The video contained fighting scenes.  Let's see, the

17   way Mr. Cabral described it was that Russians were standing

18   around laughing and smoking, and then they were lying on the

19   ground, and somebody else was holding a camera.  And then

20   there were pictures of armored carriers being attacked by

21   mujahideen.

22   Q.    And when you -- you participated in the execution of

23   search warrants -- a search warrant, rather, issued by Judge

24   Cooney at the premises of this -- at this premises?

25   A.    Yes, I did.

1    Q.   And did you find videos of Chechnyan fighting --

2    footage of Chechnyans fighting?

3    A.   Yes.  During the search warrant, we found tapes that

4    had what appeared to be Chechnyan mujahideen fighting with

5    Russians.

6    Q.   And did you also find a bunch of literature and e-mails

7    and E-Serve e-mails concerning Chechnyan mujahideen on

8    defendant's computers?

9    A.   Yes.  During the search warrant, we obtained several

10   computers, and after imaging them and reviewing the

11   contents, we found multiple pictures on the defendant's

12   computer regarding -- I would describe it -- pictures of

13   battle scenes, persons that are dead or dying that appear to

14   be mujahideen and/or Russian soldiers, military-type

15   pictures, even a picture that depicted, like, a battle

16   scene.

17   Q.   All right.  And some of that is excerpted in

18   attachments to the government's motion before the court

19   today?

20   A.   Yes.

21   Q.   Did Mr. Cabral, before we leave him, indicate whether

22   Mr. Seda allied himself with the cause of mujahideen in

23   Chechnya?

24   A.   Yes.  He said that this video was not the only occasion

25   in which he had had discussions with Mr. Sedaghaty regarding

1   the Chechnyan mujahideen.  He described three or four other

2   instances where he had spoken with Mr. Sedaghaty regarding

3   the Chechnyan mujahideen and that Mr. Sedaghaty basically

4   said that he would like to go and fight the Russians in

5   Chechnya on behalf of the mujahideen.

6   Q.   And how did Mr. Cabral react to that?

7   A.   Mr. Cabral stated that he felt that Mr. Sedaghaty may

8   have been shooting off his mouth regarding that, actually

9   wanting to personally go and fight in Russia, due to the

10  fact that Mr. Sedaghaty had a comfortable lifestyle with his

11  wives in the U.S.

12  Q.   Okay.  Now, you mentioned trailers and that Mr. Cabral

13  observed these in trailers.  You are aware that several

14  weapons were found on the premises of the defendant's

15  residence, or the Al-Haramain offices, rather, during the

16  search warrant?

17  A.   Yes, I am.

18  Q.   And were they found in these trailers?

19  A.   Um, I -- I can't say whether or not they were the same

20  trailers that Mr. Cabral was describing, but there were

21  two -- I believe two trailers at the location during the

22  search warrant, and in one of the trailers was a gun safe

23  that contained multiple weapons in which one of the law

24  enforcement officers at the site created a firearms

25  inventory of the weapons and the ammunition that were in

1   that box.

2   Q.   And is that inventory of weapons -- those were not

3   taken; is that right?

4   A.   No, they were not taken.  It was determined at the site

5   by the law enforcement officer that had taken down the

6   information that they were legally registered to

7   Mr. Sedaghaty and that Mr. Sedaghaty had a concealed weapons

8   permit.

9   Q.   And to the best of your knowledge, he had departed the

10  country by the time of the warrant?

11  A.   Yes, that's correct.

12  Q.   He was not present.  And so are those weapons

13  chronicled in the government's memo at Page 16, four Glock

14  pistols, a Magnum, a Ruger shotgun, rifles, a Beretta,

15  ammunition clips, and ammunition?

16  A.   Yes.

17  Q.   At the time Mr. Sedaghaty left the country, are you

18  aware whether he was married?

19  A.   From speaking with two witnesses, both Mr. Cabral and

20  also Ferhad Erdogan, their understanding was that

21  Mr. Seda --

22          MR. MATASAR:  Your Honor, objection.  It's not

23  sufficient of a foundation to answer that question.

24          MR. CARDANI:  I believe it is.  I'm sorry.

25          MR. MATASAR:  That's all.

1          THE COURT:  What's the relevance?

2          MR. CARDANI:  Family ties and whether there may be

3     people overseas that he has connection with that are not

4     back in the United States.

5          THE COURT:  Well, okay.  Go ahead.  You can answer

6     it.

7          THE WITNESS:  Okay.  Yes, with discussions with

8     these witnesses, it is their understanding that

9     Mr. Sedaghaty had two wives prior to leaving the United

10    States, a Laleh Zahedi and a Summer Rife.

11    BY MR. CARDANI:

12    Q.   Okay.  Now, is it your understanding that they too have

13    left the United States?

14    A.   Yes.  At the time of the search warrant, neither were

15    at the search warrant location, and we have been unable to

16    locate them, so we believe they have left the United States.

17    Q.   And have you done record checks recently to attempt to

18    determine whether they have reentered the United States?

19    A.   Yes.  We asked immigration and customs enforcement to

20    look and determine whether or not these two women have come

21    into the country recently.

22    Q.   And --

23    A.   And we were unable to locate any records showing that

24    they have returned.

25         MR. CARDANI:  That's all I have.  Thank you.

**CROSS-EXAMINATION**

1

2  BY MR. MATASAR:

3  Q.   Ms. Anderson, you talked about this ISP, but wasn't it

4  true that Ferhad Erdogan's main contact was Soliman

5  al-Buthe?

6  A.   Mr. Erdogan told me that Pete was the general manager,

7  and that Soliman al-Buthe was the money behind the -- behind

8  the ISP.

9  Q.   Didn't your investigation show you that at some point

10  Soliman al-Buthe and Ferhad Erdogan were actually partners

11  in this Internet business?

12  A.   My investigation, through looking through documents,

13  not only at the search warrant location, showed that

14  Mr. Sedaghaty facilitated the arrangement between Data Pact

15  and Midway Networks in which at one point in time, I do

16  believe that Soliman al-Buthe would have been the primary

17  owner.

18  Q.   Okay.  So he facilitated some aspects of it, but

19  Soliman al-Buthe was the primary owner and was indeed

20  partners -- or do you know, was he partners with Erdogan?

21  A.   Data Pact was the partner for Midway Networks, which

22  Mr. Erdogan owned Midway Networks, so thereby becoming 50%

23  owner.  And then at a later time, approximately October

24  of '01, then Mr. Erdogan sold out the remaining shares to

25  Data Pact, which at that point in time I believe was owned

1    by Mr. al-Buthe.

2    Q.    You have talked about Exhibit O and the translation

3    that was obtained.  Did you get a report on the translation

4    by the FBI translator?

5    A.    I believe we got an e-mail.

6    Q.    Okay.  An e-mail simply with the translation, or did it

7    contain some sort of evaluation of the Arabic?

8    A.    I believe the e-mail just contained a translation.

9    Q.    So you have no indication of the authenticity of the

10   Arabic text?

11   A.    Well, prior to sending this in for official

12   translation, I noted the -- the site listed at the bottom,

13   ladens5.com, and I did some Internet research on that

14   particular Web site, which appeared to be basically a

15   biography for Osama bin Laden and praising Osama bin Laden.

16   So based on that, yes, I officially asked for a translation

17   but did not ask for an opinion from the translator as to the

18   authenticity.

19   Q.    Aren't there agents in the government that routinely

20   study every single thing that Osama bin Laden writes to

21   determine its authenticity?

22   A.    I can't answer that.  I have no knowledge.

23   Q.    You indicated that you interviewed this Richard Cabral

24   in -- on this case, right?

25   A.    Yes, I did.

1  Q.   And he talked to you about a meeting he had with Pete

2  Seda at a house on Valley View Road; is that right?

3  A.   Yes.  He described it as a brick house on what he

4  believed to be Valley View Road in Ashland.

5  Q.   And you are aware, are you not, that Mr. Seda sold that

6  house before September 11th, 2001, indeed, in August of

7  2001, are you not?

8  A.   I am aware that he did sell that residence.  I'm not

9  aware of the actual date of the sale.

10 Q.   You were aware, are you not, that there were many

11 Americans before September 11th who were in favor of the

12 mujahideen in Chechnya?

13 A.   Yes, I'm aware of that.

14 Q.   Okay.  And that was -- there are congressmen, all sorts

15 of legitimate republicans and democrats alike who supported

16 the mujahideen in Chechnya before September 11th?

17 A.   Yes.

18 Q.   You seized, as a part of this case, numerous copies of

19 a pamphlet called *Islam Is*; is that right?

20 A.   Um, I'm not sure how many copies we had.  I believe

21 that via consents that we obtained numerous copies of the

22 different literature that was at the search warrant

23 location.

24 Q.   Well, one of the documents is called *Islam is*.  Does

25 that not ring a bell?

1    A.    That rings a bell to me --

2    Q.    Okay.

3    A.    -- basically while reviewing the computers from the

4    search warrant.  I could see the -- Mr. Sedaghaty writing

5    that book, yes.

6    Q.    Okay.  And you are aware that in that book he says that

7    in his view of Islam, committing suicide and killing

8    civilians are both forbidden in Islam?

9    A.    I am not familiar enough with that book to state what's

10   in it.

11   Q.    Well, I assume you have looked to determine his

12   position on terrorism, have you not?

13   A.    I have interviewed witnesses regarding his position on

14   the mujahideen, and I have looked at materials, some

15   materials from the Al-Haramain site.  I don't know that I'm

16   qualified to determine his position on terrorism.

17   Q.    Well, you have read the government's memo in this case,

18   the detention memo?  You haven't read that, or have you read

19   it?

20   A.    Yes.

21   Q.    Okay.  It's fair to say that that's pretty much about

22   terrorism all over the world; is it not?

23   A.    Yes.

24   Q.    You were here and you sat through Mr. Cardani's opening

25   statement?

1   A.   Yes.

2   Q.   He talked about terrorism everywhere, right?

3   A.   Yes.

4   Q.   Okay.  Pete Seda has written a book, and are you saying

5   that you are not aware that he says, for example, also in

6   this book, terrorism is against Islamic principles?

7   A.   What I'm saying is I'm not familiar enough with the

8   book to know if that is an actual quote from the book.

9   Q.   You -- well, it's fair to say that whether it's an

10  actual quote or not, it's a clear theme throughout the book

11  that he is against terrorism, or you haven't read it that

12  carefully?

13  A.   I believe that the theme throughout the book was

14  very -- yeah.

15  Q.   Okay.

16  A.   Was pretty moderate, let's put it that way.

17  Q.   Okay.  Pretty moderate, but also pretty immoderate in

18  the sense that it was strongly against terrorism.

19            Don't know?

20  A.   I don't.

21  Q.   You seized, when you did the search warrant, many

22  copies of what's known as *The Noble Qur'ân*; is that correct?

23  A.   Again, I'm not sure how many copies that we seized.  We

24  have probably at least two to three that I know of.

25  Q.   And don't some of them lack the essay on jihâd in the

1    back?

2    A.    The three that I have reviewed I believe had the jihâd

3    essay.

4    Q.    Have you looked at the dates for when the books were

5    published of the ones that you have?

6    A.    No, I have not.

7    Q.    You released -- you returned a lot of them, did you

8    not?

9    A.    I have not returned anything from the warrant site.

10   Q.    Haven't there been numerous documents returned that

11   were seized?

12   A.    I believe you are referring to the office of foreign

13   asset control who returned documents, it is my

14   understanding, to Al-Haramain.

15   Q.    Have you or other members of the government spoken to

16   the press about this case as anonymous sources?

17   A.    I have not spoken to the press as an anonymous source,

18   no.

19   Q.    Are you aware if anybody else has?

20   A.    No.

21            MR. MATASAR:   That's all I have.   Thank you.

22            MR. CARDANI:   Nothing else.

23            THE COURT:   You can step down.

24            You can call your last witness.

25            MR. CARDANI:   Judge, my last witness is a

1    telephonic witness, Mr. Evan Kohlmann, and I have provided

2    the number to be called.

3         THE CLERK:  Mr. Kohlmann, are you able to hear me

4    okay?

5         THE WITNESS:  Yeah, I can hear you.

6         THE CLERK:  Thank you.  If you'd please raise your

7    right hand.

8                    *(The witness was sworn.)*

9         THE CLERK:  Thank you.  Sir, could you please

10   state your full name for the record, spelling your last

11   name.

12        THE WITNESS:  Sure.  My full name is Evan,

13   E-V-A-N, F. Kohlmann, K-O-H-L-M-A-N-N.

14        THE CLERK:  Thank you.

15        MR. CARDANI:  Judge, before I question him, could

16   we get the volume for him turned up just a tad bit.  I'm

17   having a hard time picking him up.

18                   **DIRECT EXAMINATION**

19   BY MR. CARDANI:

20   Q.   Mr. Kohlmann, can you hear me?

21   A.   Yeah, I can hear.

22   Q.   This is Chris Cardani from the U.S. Attorney's Office.

23   Can you tell us what you do for a living?

24   A.   Yeah.  I'm an international terrorism consultant, and I

25   work as the consultant on behalf of media, educational

1   organizations, nonprofit organizations, and also government

2   agencies in terms of tracking international terrorist

3   organizations, their propaganda, their recruitment, and

4   their financing.

5   Q.   How long have you been doing this work?

6   A.   I have been doing it for approximately 11 years.

7   Q.   Do you have a law degree?

8   A.   Yes, I do.

9   Q.   And have you testified as an expert witness in federal

10  court on matters relating to international terrorism and

11  financing?

12  A.   Yes, I have testified seven times in U.S. Federal Court

13  as an approved expert witness.  In addition, in *United*

14  *States v. Uzair Paracha*, U-Z-A-I-R, P-A-R-A-C-H-A, I was

15  subject to a *Daubert* hearing in the Southern District of

16  New York, and at which point the judge in that case found me

17  to be qualified under the *Daubert* rule.

18  Q.   Okay.  Now, at our request, a number of images and

19  photographs were sent to you, and do you have them in front

20  of you, Mr. Kohlmann?

21  A.   Yes, I do.

22  Q.   Do you have a document starting with Exhibit K?

23  A.   Exhibit K.  Yes, I do.  Hold on one second.  Exhibit

24  J -- K.  Okay.  I have got K right in front of me now.

25  Q.   All right.  Now, these were exhibits appended to the

1  government's motion for detention in this case, and I'd like

2  to start with K.  There's been testimony that Mr. Sedaghaty,

3  or someone on his behalf, Al-Haramain, sent $2,000 from the

4  United States to Tirane, Albania.

5          Now, based on your experience, are you familiar

6  with whether Al-Haramain had an office in Tirane, Albania,

7  at the time of this transfer?

8  A.   Yeah.  In approximately April of 1999, when this

9  transfer was sent out, Al-Haramain humanitarian organization

10  did have an office in Tirane, Albania.

11  Q.   And was there fighting somewhere in that area between

12  mujahideen -- involving mujahideen?

13  A.   Yeah.  At that particular point in 1999, foreign

14  fighters were gathering in Albania with the intent of

15  crossing the border into nearby Kosovo, linking up with

16  fighters from the Kosovo Liberation Army, the KLA, and

17  joining them as part of a new foreign mujahideen brigade in

18  the same style as the fighters who had joined local Muslim

19  fighters in Bosnia or Herzegovina and also in the Caucasus.

20  Q.   Now, this -- geographically, Mr. Kohlmann, you are

21  aware of the number of Al-Haramain offices throughout the

22  world at this time.  If one were attempting to fund the

23  mujahideen, consistent with your testimony, where would be

24  the logical office to wire money at this time?

25  A.   I'm aware that Al-Haramain's offices throughout the

1    Balkans were a primary means of supporting the mujahideen.

2    One of the ways in which I know that is, is that I have

3    served as an expert witness on behalf of international

4    prosecutors in war crimes cases for the Bosnian Supreme

5    Court in Sarajevo, Bosnia and, as a result of my work, I

6    have been presented original documents from the Military

7    Intelligence Service, the Bosnian Muslim Arm, which

8    indicated that Al-Haramain humanitarian organization was one

9    of the primary sponsors of foreign mujahideen fighters in

10   the Balkans during this period.

11   Q.   And you are aware that the Albanian office of

12   Al-Haramain has been designated by the United States and

13   United Nations as a supporter of international terrorism?

14   A.   Yes, I am.

15   Q.   Now, I'd like to move on to another exhibit, Exhibit H,

16   as in Harry.  Do you have some photographs --

17        THE COURT:  Before you do that, can I ask when

18   that designation took place?

19        MR. CARDANI:  Yes, Your Honor.

20        Stand by, Mr. Kohlmann.

21        Judge, in Exhibit D, Page 1, the United States

22   designated that office on June 2nd, 2004.  I don't have, off

23   the top of my head, when the United Nations did so, but

24   there's a reference in my brief --

25        THE COURT:  So five years after this transaction.

```
 1              MR. CARDANI:  Yes, Your Honor.
 2              THE COURT:  Okay.
 3              MR. CARDANI:  May I move on?
 4              THE COURT:  Yes.
 5    BY MR. CARDANI:
 6    Q.    Mr. Kohlmann, do you have Exhibit H in front of you?
 7    A.    Yes, I do.
 8    Q.    It's a series of photographs, two photographs.  The
 9    first one depicts three individuals.  Do you have that in
10    front of you?
11    A.    Yes, I do.
12    Q.    And then the second one is -- is just one individual.
13    A.    That's correct.
14    Q.    Based on your expertise in international terrorism, can
15    you identify who these three people are?
16    A.    Yes, I can.  The first photo, going from left to right,
17    the individual holding on to the radio is an individual that
18    went by the pseudonym Ibn al-Khattab, K-H-A-T-T-A-B.  Ibn
19    al-Khattab is a former Saudi national from Saudi Arabia who,
20    at the age of 17, left his home and traveled to Afghanistan
21    where he joined Arab mujahideen fighters under the lead of
22    Osama bin Laden.  Ibn al-Khattab fought in Afghanistan
23    alongside bin Laden at the Lyon's Den camp, which was bin
24    Laden's original headquarters inside of Afghanistan, and
25    distinguished himself in battle.
```

1    Shortly thereafter, when the Afghan war came to a

2    close, Ibn al-Khattab left Afghanistan and traveled to other

3    jihâd conflict zones, first Tajikistan, and then later to

4    the Caucasus region of Chechnya, C-H-E-C-H-N-Y-A.

5    In Chechnya, Ibn al-Khattab became the leader of

6    the foreign mujahideen brigade, otherwise known as the

7    Islamic Army of the Caucasus.  Ibn al-Khattab, in 2002, was

8    poisoned by Russian security services who accused him of

9    involvement in the bombing of two apartment buildings in

10   Moscow in 1999.

11   Q.    Okay.  The individual in the middle.

12   A.    Sure.  The individual in the middle goes by the name

13   Shamil Basayev, S-H-A-M-I-L, B-A-S-A-Y-E-V.

14   Shamil Basayev, I should say the late Shamil

15   Basayev, was a fighter with Chechen mujahideen waging a war

16   against the Soviet -- or excuse me -- the Russian army in

17   the Caucasuss.  Shamil Basayev was an Islamic extremist who

18   was involved in numerous incidents of violence.  In

19   approximately 1996, he crossed into Russian territory from

20   Chechnya and took hundreds of hostages prisoner at a

21   hospital inside Russian territory.  Numerous individuals

22   lost their lives as a result of this attack, and Basayev was

23   able to escape back into Chechen territory.  Basayev has

24   also acknowledged his responsibility in the Beslan school

25   hostage taking massacre that happened in neighboring

1    Ingushetia back in 2005.

2    Q.    And the third individual.

3    A.    The third individual at the right, also currently

4    deceased, is Abu al-Walid al-Ghamdi.  That's, A-L, dash,

5    W-A-L-I-D, al-Ghamdi, A-L, dash, G-H-A-M-D-I.  Like Ibn

6    al-Khattab, Abu al-Walid al-Ghamdi is from Saudi Arabia.  He

7    was Ibn al-Khattab's deputy commander, first in Tajikistan

8    and then later in the Caucasus.  When Ibn al-Khattab was

9    assassinated by the Russian security services in 2002, Abu

10   al-Walid al-Ghamdi succeeded him as top commander of the

11   foreign mujahideen brigade in the Caucasus.  There are

12   numerous videos of Abu al-Walid fighting in the Caucasus,

13   including a particularly notable video of him using a

14   shoulder-fired, surface-to-air missile launcher to shoot

15   down a Russian helicopter.

16   Q.    All right.  Now, do you have Exhibit G in front of you?

17   A.    I believe so.  Yeah, I do.  One second.

18         MR. CARDANI:  And while he's doing that, Judge,

19   Exhibit --

20         THE WITNESS:  Yeah.  I have G in front of me right

21   now.

22   Q.    All right.  Stand by.

23         MR. CARDANI:  Exhibit H and Exhibit G are items

24   that came off of defendant Sedaghaty's computer.

25   BY MR. CARDANI:

1   Q.   What does Exhibit G depict?

2   A.   Exhibit G is a banner that was taken from a -- a

3   jihâddist Web site that advocates and supports the jihâd in

4   Chechnya.  The specific Web site that this banner came from

5   was a Web site known as qoqaz.net, Q-O-Q-A-Z, .net, which is

6   currently defunct.  When that Web site was in existence from

7   approximately the years 1999 to 2003, that Web site was run

8   by an organization called Azzam Publications, which was the

9   work of an individual known as Babar Ahmed.  Azzam

10  Publications is spelled A-Z-Z-A-M, Publications.  Babar

11  Ahmed is B-A-B-A-R, A-H-M-E-D.  Mr. Ahmed is currently

12  awaiting extradition to the Federal District of

13  California -- excuse me -- of Connecticut to await charges

14  on providing material support to terrorism.  His Web site,

15  qoqaz.net, was used as a primary means to fund-raise,

16  recruit, and spread propaganda on behalf of the Islamic Army

17  of the Caucasus, Ibn al-Khattab, and Shamil Basayev.

18  Q.   And the banner on Exhibit G you are saying is related

19  to that Web site?

20  A.   Excuse me, yes.  That banner was taken directly from

21  that Web site.  And that Web site, I should add, also

22  contains such items as a guide in English titled, *How Can I*

23  *Train Myself for Jihâd*.  It also contains interviews with

24  Ibn al-Khattab, Shamil Basayev, Abu al-Walid al-Ghamdi, and

25  other leaders of the Army of the Islamic Caucasus.

1   Q.   Do you have Exhibit O in front of you?

2   A.   One second.  I believe I do.  I do.

3   Q.   Exhibit O is a three-page document, is it not, with an

4   Arabic e-mail and the English translation that follows?

5   A.   That's correct.

6   Q.   All right.  Did we ask you to take a look at this and

7   provide some expert reflection on the nature of this e-mail?

8   A.   Yes, you did.

9   Q.   All right.  And when did the United States begin its

10  bombing of Afghanistan in retaliation --

11           MR. MATASAR:  Can I have a question in aid of

12  objection, Your Honor?

13           THE COURT:  Yes.

14           MR. MATASAR:  Do you know Arabic?

15           THE WITNESS:  I'm not entirely fluent, but I know

16  some Arabic, yes.

17           MR. MATASAR:  Did you translate the Arabic on this

18  document, yourself?

19           THE WITNESS:  No, no, I did not.  I relied upon

20  the government translation.

21           MR. MATASAR:  Okay.

22  BY MR. CARDANI:

23  Q.   Now, the -- the question was when the United States

24  began bombing Afghanistan in retaliation for the events of

25  9/11.

1    A.    In October -- excuse me.  October -- October 7th, 2001.

2    Excuse me.

3    Q.    And this e-mail, the first page of it, purports to have

4    been sent on October 10th of 2001?

5    A.    That's correct.

6    Q.    And there are references in the "from" section to an

7    Osama bin Laden Hotmail account?

8    A.    That's correct.  The e-mail appears to originate from

9    an e-mail address osama, underscore, bin, underscore, laden,

10   underscore, moslem at hotmail.com.

11        MR. CARDANI:  All right.  Now, Judge, we are not

12   purporting this and offering this as an e-mail from Osama

13   bin Laden.  Rather, we are offering this as content

14   consistent with the ideology sponsored by him and that it

15   was found in the --

16        MR. MATASAR:  Objection, Your Honor.  It's been

17   offered.  The government is not allowed to make some sort of

18   argument in the middle of questioning a witness.

19        THE COURT:  Well, he's telling me what purpose

20   he's offering the exhibit for, if I understand correctly.

21        MR. CARDANI:  Yes, Your Honor.  I'm not attempting

22   to overstate the significance of this e-mail.  I'm not

23   saying this is an e-mail sent by Osama bin Laden.

24        THE COURT:  Okay.

25        MR. CARDANI:  But it was found in the *Islam Today*

1    e-mail server in Ashland, Oregon, is the significance of

2    this that it's being offered for.

3              THE COURT:  Okay.

4              MR. MATASAR:  I have another question or two in

5    aid of objection, Your Honor, to the witness.

6              THE COURT:  Go ahead.

7              MR. MATASAR:  Do you know where this was found on

8    the computer?

9              Mr. Kohlmann?

10             THE WITNESS:  Oh, I'm sorry.  No, I was not given

11   that information.  I was presented with the translation,

12   with the e-mail itself, and with the header information

13   indicating what -- who had -- who had this message been sent

14   from, where it had been sent to, and exactly what Internet

15   protocol or IP addresses, that it had been sent from and to.

16             MR. MATASAR:  So you don't know if it was

17   specifically saved into a certain folder or if it was --

18             THE WITNESS:  No, no, I'm not privy to that

19   information.

20             MR. CARDANI:  And again, we are not offering it as

21   evidence that the defendant Sedaghaty was sent this e-mail.

22   Just that it was physically located in this e-mail server,

23   Your Honor.

24             MR. MATASAR:  Objection.  Relevance, then.

25             THE COURT:  It will be received.

1    BY MR. CARDANI:

2    Q.   Mr. Kohlmann, have you examined the -- some of the

3    recipients of this, specifically salman@aloadah.com?

4    A.   Yes, I have.

5    Q.   Are you familiar Salman al-Awdah?

6    A.   Yes, I am.

7    Q.   Who is he?

8    A.   Sheikh Salman al-Awdah is one of the most well known, I

9    guess you'd say, Islamic clerics in Saudi Arabia.  He

10   happens to be one of the more extreme as well.  He is known

11   to be an ally, at least ideologically speaking, of Osama bin

12   Laden, and in approximately 1996, Osama bin Laden declared

13   that one of the reasons he decided to wage war --

14                  (Reporter interrupted.)

15   BY MR. CARDANI:

16   Q.   Mr. Kohlmann, hold on.

17          Mr. Kohlmann, the court reporter has her hands

18   full with trying to get down what you are saying.  So could

19   you speak a lot slower and a little louder.

20   A.   Yeah.  No problem.

21   Q.   And start your answer again.

22   A.   Sure.  Sheikh Salman al-Awdah, it's S-A-L-M-A-N, A-L,

23   dash, A-W-D-A-H, Salman al-Awdah, is one of the most famous

24   and perhaps one of the most extreme clerics in Saudi Arabia,

25   in the Kingdom of Saudi Arabia.  Al-Awdah has openly

1    declared in al-Qaeda publications that he is, quote, proud

2    to be a soldier of Abu Abdullah, Osama bin Laden, and when

3    Osama bin Laden initially declared his war against the

4    government of Saudi Arabia and the United States, he

5    indicated that one of the primary reasons he had decided to

6    take up arms was the imprisonment of Salman al'Awdah by the

7    government of Saudi Arabia for encouraging violence against

8    the United States.

9    Q.   Now, has Sheikh al-Awdah written very strident

10   anti-Western material through a Web site that you are aware

11   of?

12   A.   Yes.   Through numerous Web sites, but *Islam Today* is

13   one of those.   Salman al-Awdah has issued several fatwas, or

14   Islamic edicts, which has either indirectly or directly

15   encouraged violence against the United States, its

16   nationals, and its material.

17   Q.   And the *Islam Today* Web site was one of those methods

18   of getting these messages out?

19   A.   Yeah.   The *Islam Today* Web site is known to me as the

20   primary mechanism by which Salman al-Awdah releases his

21   publications, his commentary, his fatwas to his followers.

22   It is primarily released over the Internet, and this is his

23   primary Web site.

24   Q.   Is there another sheikh that distributes material like

25   this through *Islam Today*'s Web site named al-Hawali?

1   A.    Yes.  Sheikh Safar, S-A-F-A-R, al-Hawali, A-L, dash,

2   H-A-W-A-L-I.  Sheikh Safar al-Hawali has, in many ways, been

3   a close colleague of Salman al-Awdah.  Al-Hawali has also

4   issued numerous statements endorsing al-Qaeda, endorsing

5   Osama bin Laden, and endorsing operations against the United

6   States.  As well, al-Hawali has been involved in charitable

7   organizations that have come under scrutiny for providing

8   support and material resources to al-Qaeda and other

9   mujahideen organizations around the world.

10  Q.    Mr. Kohlmann, on Page 2 of that document, the Arabic

11  e-mail, there's a reference to a Web site.  Do you see that?

12  A.    Yes, I do.

13  Q.    Are you familiar with that Web site?

14  A.    Yes, I am.

15  Q.    How so?

16  A.    I have viewed the Web site.

17  Q.    And how would you describe it?

18  A.    Sure.  The Web site itself is www.laden, L-A-D-E-N,

19  .s5, S as in Sam, the number 5, .com.  This Web site was set

20  up as an Arabic language Web site in order to provide

21  information on the biography of Osama bin Laden.  It is a

22  biography that you would typically consider to be fairly

23  complimentary to bin Laden and portrays bin Laden as the

24  hero of Islam.

25  Q.    Now, the English translation on Page 3, if you could

1   turn to that, after this, it's indicated there's a signature

2   line or a reference line, "Your brothers, the mujahideens,

3   the Ussamah Bin Laden Brigade."  Are you familiar with an

4   outfit known as the Osama bin Laden Brigade?

5   A.   I'm familiar that there is a unit within al-Qaeda that

6   uses the name Osama bin Laden Brigade, however, they are not

7   typically located in Kandahar.

8   Q.   Where are you familiar with them being located?

9   A.   I'm familiar with them being located in the Kingdom of

10  Saudi Arabia.

11  Q.   And did you know that this -- excuse me.

12        (Counsel conferred with the agent.)

13  BY MR. CARDANI:

14  Q.   Mr. Kohlmann, did you know that this e-mail was sent by

15  someone from Saudi Arabia to the United States in the *Islam*

16  *Today* e-mail server?

17  A.   Yeah.  Upon doing my own analysis of the IP, Internet

18  protocol, numbers listed in the headers of this e-mail, I

19  was able to determine, I believe this is something that was

20  determined by others as well, that this e-mail originated

21  from a university in the Kingdom of Saudi Arabia.

22  Q.   Mr. Kohlmann, based on your expertise and studies, is

23  there a value for terrorist organizations to have access to

24  an Internet service provider in the United States?

25  A.   Yes, there is.

1   Q.   How so?

2   A.   There are a number of reasons why it is beneficial to

3   have a Web site that supports terrorism inside the United

4   States, the first of which is, is that Internet hosting

5   companies are the cheapest in the United States.  Second of

6   all, these Internet hosting companies tend to also be the

7   most reliable in terms of not going off-line, in terms of

8   providing a fast rate of data transfer.

9         And finally, another important reason why

10  terrorist organizations have sought to host Web sites inside

11  the United States is because of the fact that there are very

12  few restrictions on the content of those Web sites being

13  hosted in the United States; whereas, many of the Web sites

14  that support al-Qaeda, that support other mujahideen

15  organizations, they would not necessarily be allowed in a

16  place like the Kingdom of Saudi Arabia, even if they did not

17  directly endorse violence; whereas, in the United States,

18  these Web sites can exist and can say some extremely radical

19  things and yet remain online.

20  Q.   And this Sheikh al-Awdah that you spoke about before,

21  are you aware that he was imprisoned by the Saudi government

22  for a bit of time?

23  A.   Yes.  He was imprisoned in 1994 by the Kingdom of Saudi

24  Arabia, and, again, this is one of the reasons that Osama

25  bin Laden has directly cited for why he took up arms against

1  the Saudi government and the United States.  He has blamed

2  the arrest of Sheikh Salman al-Awdah by the Saudi government

3  directly on pressure from the United States.

4  Q.   Mr. Kohlmann, that's all I have.  If you could stand by

5  for some more questions from Mr. Seda's lawyer.

6         THE WITNESS:  Of course.  Of course.

7                  **CROSS-EXAMINATION**

8  BY MR. MATASAR:

9  Q.   Mr. Kohlmann, you have indicated that Web sites can say

10  radical things in the United States and still stay online,

11  right?

12  A.   That's correct, yes.

13  Q.   Why is that, do you think?

14  A.   Number one, there is not as much of an effort to police

15  these Web sites as there is in many other countries.  In

16  countries such as China, you have entire branches of law

17  enforcement whose job it is merely to police the content of

18  Web sites; whereas, in general, because of the freedom of

19  speech laws here in the United States and because also it's

20  so difficult to monitor the vast number of Web sites that

21  there are, there's not nearly as much of an effort to

22  monitor content.

23  Q.   What's your doctorate in?

24  A.   I don't have a doctorate.  I have a BSFS, a bachelor in

25  the School of -- Science of Foreign Service from Georgetown

1    University.  I also have a certificate in Islam and

2    Muslim-Christian Understanding from the -- from the --

3    excuse me -- the Prince Alwaleed Bin Talal Center for

4    Muslim-Christian Understanding at Georgetown University.  In

5    addition, I have a JD, a juris doctorate, from the

6    University of Pennsylvania Law School.

7    Q.    When you say certificate, what does that mean?  How

8    many hours do you need to spend to get a certificate?

9    A.    Sure.  It's -- what it is, it's the equivalent of a

10   minor program, however, what they do is, in order to achieve

11   this, you have to study under a mentor at the Center for

12   Muslim-Christian Understanding.  My mentor was Dr. John

13   Voll.  And you have to complete two years of coursework, at

14   the end of which you have to -- you have to write what's

15   called a capstone thesis paper.  My -- which is, of course,

16   on a topic of your own choosing, and it is a topic,

17   obviously, that's supposed to be academic and rather in

18   depth.  My topic was King Amanullah Khan, A-H -- excuse

19   me -- A-M-A-N-U-L-L-A-H, K-H-A-N, and his drive to provide

20   religious, I guess you'd call it modernization in

21   Afghanistan in the 1920s, and analyzing why those moves had

22   failed and what that had to do with modern Afghanistan, with

23   modern Afghan politics.

24   Q.    So my question was how many hours, and are you saying

25   two years of coursework?

1  A.   Two -- yeah.  Two years -- I had to do a full year of

2  basic Islamic history.  At that point, I took, also, courses

3  in Islamic modernism --

4  Q.   Were you a student full time?

5  A.   -- and I also took courses -- I mean, it was -- again,

6  it's a full two years of coursework.

7  Q.   When you were doing this full two years of coursework,

8  was this your full-time work?  Were you working at all at

9  the time, or were you essentially a full-time student?

10  A.   I was -- I was -- this is part -- I earned this

11  certificate as part of my bachelor in the Science of Foreign

12  Service.  At the time when I was studying at Georgetown

13  University, I was also employed by a think tank in

14  Washington, D.C., where I was studying the Arab-Afghan

15  movement, mujahideen movement across the world, and also

16  their financial instruments, their recruitment, their

17  propaganda.  It fit into what I was doing at Georgetown,

18  because, in addition to my certificate in Islam and

19  Muslim-Christian Understanding, I also wrote an honors

20  thesis for my major, which was international security

21  studies, international politics.  And my honors thesis

22  was -- the title of the honors thesis was *The Legacy of the*

23  *Arab-Afghans, A Case Study*, which was an in-depth analysis

24  of the history of al-Qaeda --

25  Q.   Mr. Kohlmann, I'm going to ask the --

1              (Reporter interrupted.)

2    Q.   Mr. Kohlmann, I'm going to ask the court to strike your

3    answer as nonresponsive.  My question was were you a

4    full-time student at that time.

5              THE COURT:  I'm not going to strike it.

6              THE WITNESS:  Yes, I was -- yeah, I was full time.

7    I was also working at the time.  I was a full-time student.

8    I was also working.

9              THE COURT:  I'm struggling to understand the

10   relevance of all this.  Are we going somewhere?

11             MR. MATASAR:  No.  I'm done with that, Your Honor.

12   BY MR. MATASAR:

13   Q.   Let me ask, you indicate that some of the photos were

14   people who fought with the mujahideen in Afghanistan?

15   A.   That's correct, yes.

16   Q.   And Osama bin Laden fought the mujahideen in

17   Afghanistan as well, did he not?

18   A.   Well, actually, when I identified those individuals who

19   were fighting with the mujahideen in Afghanistan, I should

20   be very specific.  I wasn't referring to, necessarily, the

21   Afghan mujahideen.  I was referring to the Arab mujahideen.

22   And these individuals specifically fought with the

23   mujahideen fighters that were fighting on behalf of an

24   organization known as the Mujahideen Services Office, which

25   later became al-Qaeda.

1    Q.    Where did the fighters against the Russians in

2    Afghanistan get their money?

3    A.    They primarily got their money from the Kingdom of

4    Saudi Arabia, other governments in the Arabian Gulf region,

5    charities, and between approximately 1986 and 1988, they

6    also received some money from the United States.

7    Q.    Okay.  And there were a lot of refugees as a result of

8    this war, were there not?

9    A.    I believe two million.

10   Q.    And also in Chechnya; is that not correct?

11   A.    Yes, that's correct.

12   Q.    And isn't it correct that large sums were spent by

13   Saudi charities on behalf of the refugees?

14   A.    I believe that's correct, yes.

15              MR. MATASAR:  That's all.  Nothing further.

16              MR. CARDANI:  Nothing further, Judge.

17              THE COURT:  Okay.  Thank you.  You can hang up

18   now.

19              THE WITNESS:  Thank you very much.

20              THE COURT:  You bet.

21              MR. CARDANI:  Judge, to the extent I need to, I

22   offer all of the exhibits appended to the government's

23   memorandum as exhibits for purposes of this detention

24   hearing.

25              THE COURT:  All right.  They will be received.

1    MR. CARDANI:  And other than a discussion we can

2    do now or later, I'd like to talk about passport issues and

3    flight concerns.  I don't know if you want to do that now or

4    after Mr. Matasar's case.

5    THE COURT:  Well, we have five more minutes before

6    the noon recess, so do you want to do it now?

7    MR. CARDANI:  Sure.

8    MR. MATASAR:  Your Honor, if I might talk to

9    Mr. Cardani before this.

10    THE COURT:  Sure.

11    (Counsel conferred.)

12    MR. CARDANI:  What Mr. Matasar just said is that

13    he has another passport of Mr. Sedaghaty's that he's willing

14    to turn over.  It's an Iranian passport.  That answers one

15    of the questions that we have had.

16    Judge, when Mr. Sedaghaty flew back into the

17    country, it was with very little notice.  I knew that he was

18    coming back.  I didn't know precisely when until Mr. Matasar

19    and I had some conversations, and he did tell me the route

20    and the flight.

21    Mr. Sedaghaty came into the United States in the

22    presence of a lawyer named Tom Nelson who represents

23    defendant Soliman al-Buthe and, in other litigation,

24    Al-Haramain Islamic Foundation.

25    When Mr. Sedaghaty was arrested, he had in his

1   possession the passport that's in my hand right now.   There

2   were some oddities about the passport that I don't have

3   answers for.   According to government records, Mr. Sedaghaty

4   was issued a passport in 2002, September 12th of 2002.   It

5   was a ten-year passport, expiring in 2012.

6            THE COURT:   A United States passport?

7            MR. CARDANI:   Yes, sir.   Yes, Your Honor.   A

8   United States passport.

9            That passport we don't have.   The passport in my

10   hand is a new passport issued January 21st of 2004, also a

11   ten-year passport, a U.S. passport.   That is this one.

12            This one depicts travel in Saudi Arabia, the

13   United Arab Emirates, Oman, Netherlands, and Germany.   It

14   does not depict travel to Iran or Syria.

15            It's my understanding, through Mr. Matasar, that

16   he has told pretrial that Mr. Sedaghaty has lived in Iran

17   and Syria recently.   This passport shows no travel to those

18   countries.

19            We -- my understanding from the government records

20   is that when Mr. Sedaghaty turned -- got the replacement

21   passport, he did not surrender the old passport.   It's

22   unknown why he needed to get a new passport in 2004 when his

23   previous passport was good for another eight years is the

24   point.

25            So we are missing the original passport, which was

1  good.  It was replaced in Dubai, UAE, by the United States

2  consulate while Mr. Sedaghaty was out of the country but

3  before he had been indicted.  So there are some real

4  unanswered questions there.

5        Our belief, it has been confirmed by Mr. Matasar,

6  is that there are other passports, at least one other

7  passport, and that's an Iranian passport, and that obviously

8  is of great concern, because while the defendant turned

9  himself in voluntarily, if things should change in any way,

10  shape, or form in the mind of Mr. Seda, we have great

11  concerns that he will flee the country and use passports

12  that may be unknown to us.  And, of course, based on my

13  recent experience, one can go to Canada and, if you are an

14  Iranian citizen, easily get a passport replacement and flee

15  if one should so desire.  Mr. Sedaghaty has dual citizenship

16  in the United States and Iran, his birthplace.

17        I have also some concern about family contacts.

18  There was brief testimony on it.  But our information is

19  that Mr. Sedaghaty has told not only witnesses, but pretrial

20  services that he has been married on multiple occasions, and

21  he described -- he identified some of those people to

22  pretrial services but not others.  If I may have a moment to

23  find that report.

24        "Defendant disclosed he's been married to a Marie

25  for the past four years.  Did not disclose her whereabouts.

1    Defendant reported three additional marriages lasting nine

2    years, a couple of years, and a couple of months.  He also

3    indicated there were additional marriages, however did not

4    provide any additional information."

5         The reason I think that's pertinent to this

6    hearing, Your Honor, is he's indicated that there are people

7    in his world that he's close to, has been close to, that

8    don't appear to be in the United States, and we have

9    concerns that he may attempt to reach out to them.

10        Other information in the pretrial services report

11   is of concern to the government.  His failure to cooperate

12   with pretrial services, to give information to this court to

13   make an informed decision.  He chose not to answer questions

14   regarding his location for the past five years.  We have

15   grave concerns over that because it involved known travel to

16   the countries of Iran and Syria.  We have no ability to

17   determine what he's been up to there while he's been

18   traveling there or even in some of the more U.S. friendly

19   countries, if I might, like Saudi Arabia, the UAE, the

20   Netherlands, and so forth.

21        He did indicate that he has traveled and, as I

22   said, lived in Iran for 18 months and Damascus, Syria, and I

23   think those were his most recent countries of residence.

24   The court is aware that those are not countries we are

25   presently on tremendously friendly relationships with.

```
 1            Also, we are very concerned about what he has
 2   done, as I said, and pretrial indicated that Mr. Matasar
 3   told them that when asked about what Mr. Sedaghaty has been
 4   doing for the last four and a half years since his departure
 5   from the United States, stated he was -- he could not find
 6   good work while away, lived off the proceeds from the sale
 7   of a house prior to going overseas in the amount of
 8   $450,000, as well as off his credit card.
 9            Judge, we have information that seems to conflict
10   with that.  It's new information, and we need to run it down
11   a little better, but our information is the sale of that
12   house generated far less gains in the amount of, I think,
13   $80,000?
14            (Counsel conferred with the agent.)
15            MR. CARDANI:  70 to $80,000 back in -- at the sale
16   of this house, which was many years ago.  So my point is, is
17   he made -- it's the same house, we are talking about the
18   same proceeds, it was far less than $450,000, it was a
19   number of years ago, and so I don't think that he had that
20   kind of money to fund his -- well, at some point, fugitive
21   existence.
22            The point, if you are away from the United States
23   for four and a half years traveling all over those
24   countries, this indicates that he did not work at all.  We
25   wonder what he has been doing.  If it hasn't been working
```

1 and he's been traveling to countries like this, what has he

2 been doing?  The court has heard testimony and seen the

3 material that he has connections with very dangerous

4 individuals throughout the world.

5       And I understand the court's point.  I appreciate

6 the court's point that the designations that occurred

7 largely occurred, perhaps all occurred sometime after the

8 events that he was in touch with them.  But if the court

9 looks at those designations, the activities giving rise to

10 those designations occurred while he was here, while he was

11 the U.S. head of Al-Haramain, and that was from at least

12 1997, when he first established it in the United States,

13 through his departure from the United States in the midst of

14 this criminal investigation in 2003.  We have -- we have

15 very strong concerns about his contacts, what he might have

16 been doing, and, honestly, why he's come back.

17       I understand he has a right to fight the charges.

18 We'll give him a fair trial.  But we have concerns about his

19 release, because we don't know what he's been doing and what

20 he might want to do if he's released.

21       I don't think that the evidence is that we are

22 trying to depict him as a terrorist in the sense that he's

23 going to go explode something or acquire explosives or

24 things of the like.  Our concern is one of ideology and

25 facilitating that ideology, that hateful, extreme propaganda

1   that he, under his leadership, distributed into U.S.

2   prisons.  And our concerns -- and the Web site, by giving a

3   vehicle in the United States to a sheikh that is directly

4   connected with Osama bin Laden who has condemned the Western

5   world, giving him a platform from which to espouse these

6   hateful views.

7         And while he's been gone for four and a half years

8   and hasn't, certainly, been doing that here, he certainly

9   could be engaging in those type of activities or something

10  like those.  I mean, it could take on a different form of

11  talking to others, recruiting others, helping to raise money

12  for others.

13        And that is the nature of our argument.  That

14  there are no set of circumstances that this court can

15  fashion that will guarantee the safety of citizens in the

16  United States.  I don't think that's an overstatement.

17        We also have concerns, as I said, about his risk

18  of flight.  I understand he came back on his own, but I

19  think there's plenty of evidence that there is so much

20  unknown about his travels.  We are talking now about an

21  Iranian passport.  That's new information.  Why wasn't that

22  turned over to pretrial services.  Why weren't they more

23  forthcoming with pretrial services when they were

24  interviewed about important subjects that this court

25  routinely takes into consideration in determining whether

1    someone is a flight risk or a danger to the community?

2    Based on all this, Your Honor, I wholeheartedly

3    concur with pretrial services that there is no condition or

4    combination of conditions which will reasonably assure the

5    defendant's future court appearance and the safety of the

6    community; therefore, pretrial detention is recommended.

7    I think that's solid and consistent with our

8    evidence, and we ask the court to accept those

9    recommendations.

10    THE COURT:  All right.  Mr. Matasar, we'll hear

11    from you at 1:30.

12    MR. MATASAR:  Yes, Your Honor.  Could I have one

13    minute of response before the court leaves?  And I really

14    mean one minute.

15    First of all, I'd suggest the court, while there

16    were no cites in the materials, I'd just suggest the court

17    might want to read Judge Shirley Hufstedler's dissent in a

18    case called *State v.* -- I'm sorry -- *United States v. Frank*

19    *Giese*.  In that case, I think the court will see the

20    relevance.

21    Second of all, I want to use the rest of my minute

22    by saying the government is really having to try -- having

23    it both ways here.  They, as the court knows from other

24    filings in this court, they told Mr. Seda, if he came back

25    and did not plead guilty on these charges, he was looking at

1  30, 40, 50 years in prison.  The only way that they would

2  accept him coming back would be to plead guilty, and you

3  can't really -- that's just something that should be

4  understood in assessing all of this.

5              MR. CARDANI:  Excuse me.  I object to that.

6  What's the basis for the statement that he was told that he

7  was facing 30, 40, or 50 years in prison?

8              THE COURT:  Okay.  I'm hearing from Mr. Matasar

9  now.  You will have your chance at 1:30, if we ever get to

10  our recess.

11             MR. MATASAR:  That's my minute, Your Honor.

12             THE COURT:  All right.  We'll see you at 1:30.

13             THE CLERK:  This court's in recess.

14                       *(Recess.)*

15             THE COURT:  All right.  Do you have a witness you

16  wish to call?

17             MR. MATASAR:  Yes.  We'll call As'ad AbuKhalil.

18             THE CLERK:  Thank you.

19                 *(The witness was sworn.)*

20             THE CLERK:  Thank you.  If you'd please take the

21  witness stand.

22             Sir, would you please state your full name for the

23  record, spelling your first and last names.

24             THE WITNESS:  As'ad AbuKhalil.  First name, As'ad,

25  A-S-A-D; last name, one word, A-B-U-K-H-A-L-I-L.

## DIRECT EXAMINATION

BY MR. MATASAR:

Q.   How are you employed?

A.   Currently I am a full professor at California State University, Stanislaus.  I am also a permanent visiting professor and scholar at the Center for Middle Eastern Studies at UC Berkeley.  I also do consulting, and I'm also an international speaker and author.

Q.   What's your educational background?

A.   In my formative years, I got my BA and my master's in political science with Middle East specialty at the American University of Beirut.

     I came to the United States in 1983, where I subsequently, in five years, received my Ph.D in comparative politics from Georgetown University, with a specialty in Middle Eastern studies.

Q.   How many languages do you speak?

A.   Well, certainly, for the record, not equally, but in my -- since infancy, we were studying simultaneously in my school French, English, and Arabic.  Arabic is my mother tongue.  In my college years, both graduate, undergraduate, I subsequently studied German, Persian, and then studied Hebrew at the synagogue in Livermore a few years ago.

Q.   Arabic, would you say, is still your first language or your mother tongue, as you put it?

1    A.    Correct.  Correct.  Mother tongue.

2    Q.    Have you published articles and books?

3    A.    Correct.  I have to my name four books, and the number

4    of articles I haven't counted.  I can include that in my CV.

5    But I would say hundreds of entries in more than 115

6    encyclopedias and probably, I'm sure, more than a 100

7    articles between English, Arabic, German, Spanish, and other

8    languages.

9    Q.    Can you give us the title of your books?

10   A.    The first one is *Historical Dictionary of Lebanon*.  The

11   second one is *Bin Laden, Islam, and America's New "War on*

12   *Terrorism."*  And then I wrote another book about the war on

13   terrorism published in Arabic.  And then my most recent one

14   is Saudi Arabia.  It's called *The Battle for Saudi Arabia,*

15   *Fundamentalism -- Fundamentalism and Global Power*.

16                    (Reporter interrupted.)

17            THE WITNESS:   *The Battle for Saudi Arabia,*

18   *Fundamentalism* -- I'm missing in the subtitle something now.

19   It's not hitting me now, but -- the full title is *The Battle*

20   *for Saudi Arabia* --

21   Q.    Are you --

22   A.    -- *Royalty, Fundamentalism, and Global Power*.

23   Q.    Have you been a consultant for television?

24   A.    Yes.

25   Q.    Which -- go ahead.

1   A.   I have been a consultant over the years for NBC News

2   and ABC News on Middle East and terrorism issues.

3   Q.   Have you testified as an expert in Middle Eastern

4   affairs?

5   A.   Correct, I have, in various forums.

6   Q.   What qualifications do you believe are necessary to be

7   an expert in the Middle East?

8   A.   Well, I do believe what my professors have taught me,

9   American professors, both at the American University of

10  Beirut and here, which is years of study, learning of

11  languages, careful examination of documents, writing,

12  attending conferences, interactions with colleagues, and

13  things of that nature.

14  Q.   What's the importance, do you think, of knowing the

15  Arabic language in your expertise?

16  A.   Extremely important.  Not only Arabic.  It seems to me

17  if you want to study a region, you are not qualified to

18  speak about it unless you really know the language.  I mean,

19  just think about it this way:  I mean, would somebody who

20  lives in America, not knowing any English, be qualified to

21  go to China or France and speak authoritatively about the

22  United States of America?  I would say that person would not

23  be qualified.

24  Q.   How -- how is what you consider yourself to be a Middle

25  Eastern expert different from a terrorism expert?

1   A.   Well, to be honest, there is a difference between

2   academics and terrorism experts, because we always wonder,

3   what does one study to become a terrorism expert.  And we

4   academics who study the Middle East, we have an association

5   called Middle East Studies Association, and we meet once a

6   year.  And you would notice, you don't find any terrorism

7   experts among us because we believe it's not an academic

8   field of study.  Don't get me wrong.  There is a whole

9   industry that is related to terrorism and so on.  And, of

10  course, I have been in certain events, conferences, private

11  and some of them sponsored in Canada or in Washington, D.C.,

12  so I have known some of them, and some of them are

13  responsible.

14          But it seems to me, if you want to study

15  international terrorism, and there's terrorism,

16  unfortunately, worldwide, are you saying that somebody can

17  still call it --

18                  (Reporter interrupted.)

19  A.   Yeah.  I will try my best.

20          What I'm saying is that since terrorism is an

21  international phenomenon and since terrorism expert are

22  delving into issues from Latin America to Central Asia and

23  to the Arab world, how can one be really expert of the

24  world.  And to be a terrorism expert, you have to be an

25  expert on the world.  And we academics, we believe you can't

1  be that.  We believe in regional expertise.

2  Q.    What is Wahhabi Islam?

3  A.    That's an interesting question, especially having read

4  all the material.  There's a lot of controversy about that

5  word.  Wahhabism is a word that stems, named after the

6  founder, Muhammad Abd-al-Wahhab, who started this very

7  particular, very extremist, and I wouldn't mind saying from

8  a secular point of view, a very fanatical sect in Islam.

9  But what is also important to know, that this small sect,

10  representing no more than one percent of world Muslims,

11  wouldn't have been heard of, wouldn't have been known to an

12  audience here in Oregon if it wasn't for the fact that it

13  has been sponsored for two reasons.  One, it has been

14  sponsored by a very wealthy government that has used its

15  financial wherewithal to spread its message around the

16  world, and that's the Kingdom of Saudi Arabia.  And the

17  second reason is we hear about it because, unfortunately,

18  some fanatical terrorists, bin Laden and his cohorts, have

19  been influenced by Wahhabiyyah and use it in their own

20  pursuit of violence.

21        So in a sense, we can say Wahhabiyyah is a

22  fanatical, particularly conservative, particularly

23  misogynistic, particularly intolerant, particularly violent,

24  antisemitic, anti-other version within Islam.  But the

25  effort by the Saudi government to win convert to Wahhabiyyah

```
 1   has been largely unsuccessful, which explains why they use

 2   so much money to spread their literature, to give it to

 3   mosques, to prisons, around the world for free.

 4   Q.   Who is the leader of the Wahhabi sect?

 5   A.   It is fair to say that the chief spokesperson,

 6   propagandizer of Wahhabiyyah in the world today is a close

 7   friend of the United States, I'm afraid, and that would be

 8   the king of Saudi Arabia.

 9   Q.   Are there variants of Wahhabism?

10   A.   I have seen references in the government documents to

11   the effect that there are variants in Wahhabiyyah.  As

12   somebody who has studied it, written about it, read the

13   primary sources in Arabic, every shred by the founder he

14   wrote I read, I do not believe there are variants in

15   Wahhabiyyah.

16        Personally, and this is my opinion, Your Honor, I

17   believe the suggestion that there are variants in

18   Wahhabiyyah is merely employed to absolve the chief

19   Wahhabiyyah propagandizers in the world, the royal family of

20   Saudi Arabia, from responsibility.  Because I will tell you

21   this:  Yes, there is a conflict right now between bin Laden

22   and the House of Saud in the Kingdom of Saudi Arabia.  They

23   differ on foreign policy.  But you know what?  They don't

24   disagree in their adherence to this fanatical sect within

25   Islam.
```

1   Q.   How is Wahhabi -- you talked a little bit about it, but

2   how is it propagated around the world?

3   A.   I have studied, in my book, in a chapter, in Saudi

4   Arabia.  I wanted to see what the Saudi government has been

5   doing over the years to spread that message, and I found

6   there is certainly evidence.  They have used millions of

7   dollars, particularly in Asia.  For some reason, they really

8   targeted Asia.  But they also targeted Africa, they targeted

9   the United States, and they spend so much money in basically

10  funding their propaganda, their religious and political

11  propaganda.  Just yesterday in the British newspaper the

12  *Guardian*, there was an article about Saudi Arabia funding

13  yet another fanatical school in Pakistan.  So they have used

14  that money for that.

15       And the Saudis are known, they don't give anything

16  for free without attaching their religious literature to it.

17  If they give a poor person a potato, they accompany the

18  religious literature with that aid.  They once sent garbage

19  trucks to Lebanon, and they sent with them religious

20  propaganda.

21       And unfortunately, because there is no other

22  moderate secular force within Islam with money, if you are

23  setting up a mosque, if you are setting up an Islamic

24  institution, the only place that will come forward for --

25  not for -- in my opinion, not for pure motives, but for

1   purposes of spreading their own propaganda, is the fact that

2   Saudi Arabia is the place that will give you free copies of

3   *The Qur'ân*, their particular annotated, distorted version

4   that we have seen in some of these exhibits, for their own

5   purposes.  So they are notorious for doing that.

6         They do that for mosques particularly, and, of

7   course, for charitable organization that have an Islamic

8   name in them.  They try to control them.  They know that

9   Wahhabiyyah, and I would say here, I daresay fortunately

10  Wahhabiyyah is not popular as a version in Islam.  To

11  compensate for its lack of popularity, to compensate for the

12  minuscule number of followers in Wahhabiyyah, they try to

13  win people by buying them off, giving them free literature.

14  And that costs millions of dollars to do.

15  Q.   Could we have the machine on?

16         What is *The Noble Qur'ân*?

17  A.   You see, what was rather interesting for me, looking at

18  these exhibits, is that people seem to be talking about *The*

19  *Noble Qur'ân* as if there is a nefarious, sinister version of

20  *The Qur'ân*, while, in reality, for Muslims, people who

21  believe in Islam, there is only one version of *The Qur'ân*,

22  and that is *The Qur'ân*.  This is basically a translation of

23  *The Qur'ân*, itself, and, I would say, having looked at it,

24  one of the worst translation of *The Qur'ân* into English that

25  I have laid my eyes on.

1      But what is most damaging and what is more harmful

2   is that accompanying this copy of *The Qur'ân* is

3   interpretation that deviate from what every mainstream

4   Muslim believe, including my own believing Muslim mother,

5   for example, 78 woman.  The stuff that is in there is so

6   contrary to what she believes in to be Islam, and they put

7   that inside and they put these violent, repugnant elements

8   as appendices, which is un-Islamic, by the way.  Usually,

9   when people have copies of *The Qur'ân*, they do not add

10  things to it.  It is considered to be un-Islamic.  But in

11  Saudi Arabia, one time they sent free copies to Central

12  Asia.  There was even an uproar because they insisted on

13  putting a picture of King Fahd inside *The Qur'ân*, itself,

14  and they have to recall that because there was an uproar.

15      But if you look at the copy of *The Noble Qur'ân*,

16  what got my attention, and this is not available in many of

17  the copies you have seen, is that why do these two people

18  provide this interpretation and annotation that is

19  particularly repugnant, fanatic, in my opinion, of *The*

20  *Qur'ân*.

21      You find there is an official seal that needs not

22  to escape our attention.  It has the seal of approval of the

23  chief cleric of Saudi Arabia, the most important cleric in

24  the country for years until his death in the 1990s.  And

25  that is Ibn Baz.  And he, who has no knowledge of English or

1   any other foreign language, said that these two people are

2   qualified to translate *The Qur'ân*.  So this is a state

3   effort.  We cannot say that Al-Haramain or these two dudes

4   are doing something freelancing.  This is part of the work

5   of the Saudi government.

6   Q.   And have you also studied -- well, before we go on to

7   that, *The Noble Qur'ân*, as far as you know, has been

8   distributed throughout the world by those in Saudi Arabia.

9   Do you see on the screen there a letter from the Library of

10  Congress?

11  A.   I do.

12  Q.   Right.  And they deeply appreciate their copy of *The*

13  *Noble Qur'ân*.  Is that what it says?

14  A.   I see that, to my surprise.

15  Q.   How about this one?  Where is this from?

16  A.   That's Department of Air Force.

17  Q.   And what are they doing with this letter?

18  A.   They are thanking them for copies.

19  Q.   What is the -- you studied the relationship between

20  Saudi Arabia and the United States of America?

21  A.   Correct.

22  Q.   Can you address that, please.

23  A.   Well, I mean, I think that there's no question that

24  since FDR's administration, the United States and

25  Saudi Arabia have been rather very close allies over the

1  years.  And in fact, the Taliban, when it was founded, it

2  was fashioned after Saudi Arabia where exemplary model for

3  construction of government was, in fact, Saudi Arabia.  And

4  we remember that the Taliban was recognized only by three

5  countries of the world, and these were Pakistan,

6  Saudi Arabia, and the United Arab Emirates.

7          The relationship between Saudi Arabia and the

8  United States have been very intimate over the years, to the

9  point that President Bush said in 2004 in a phone

10  conversation, according to the Saudi press agency, and I

11  have the footnote in my book if you want to look for it, and

12  he said, the relationship between our two countries, this is

13  in response to some rumor that there was some conflict, is

14  one of permanent friendship.  That's how close the United

15  States relationship is with Saudi Arabia.  And this has been

16  true -- I should say, by the way, it is not a partisan

17  issue.  It has been true in Jimmy Carter's administration,

18  it has been true in Bill Clinton, George W. Bush's father,

19  and the current president.  It has remained constant.

20  Q.    What -- are you familiar with Al-Haramain, the

21  religious organization -- the charity organization?

22  A.    Certainly more familiar since I was hired for this

23  case, but yes, I have been hired -- I have been aware of it.

24  Q.    What do you know about it?  Could you briefly describe

25  it.

1   A.   Well, I was surprised in some of the documents that

2   there's a Chapter 7, I believe, in the commission on --

3                 (Reporter interrupted.)

4       THE WITNESS:  When I was looking over the

5   documents, and one of the exhibits I think is a Chapter 7 of

6   the September commission report, and it deals with

7   Al-Haramain, and I was surprised that here was a very

8   expensive government investigation and they said that

9   Al-Haramain was founded sometime in the early 1990s.  And I

10   was surprised that couldn't they find somebody to pin down

11   the date of birth more specifically?  Because it seems to

12   me, if you look at the Arabic literature, it's quite known.

13   It was founded in 1988 by Mr. al-Aqil in Karachi, in

14   Pakistan, and it was founded at the time when the United

15   States and Saudi Arabia and Pakistan and other governments,

16   to be fair, were all involved in the largest-scale effort to

17   recruit, finance, arm some of the most fanatical Muslim

18   groups worldwide, all in the name of fighting communism.

19   From the ranks of these came al-Qaeda and these kind of

20   terrorists.

21   Q.   What is jihâd?

22   A.   That is another word that I also see to be

23   misinterpreted in some of these exhibits that I have seen

24   and of some these testimonies.  Jihâd is a largely

25   misunderstood word.  If you look at the root of the word,

1   like the historical dictionary in 20 volumes, I have the

2   Volume 3 of it, which talks about that word.  The root of it

3   simply means to make an effort.  That's simply the word.  It

4   has a religious connotation.

5        But the suggestion by some of this literature,

6   especially in the annotation that these two Saudi clerics

7   wrote that jihâd is in some way a pillar of Islam is totally

8   inaccurate.  The five pillars of Islam are known, and they

9   certainly do not include jihâd.  And the meaning of jihâd is

10  often translated as -- like in some of these documents, I

11  think the government has said -- one of the documents, I

12  should say, I think in one of the documents, the word was

13  explained to mean holy war or something like that.  That is

14  not accurate.

15       I agree with my colleague and friend,

16  John Esposito, the chair of the Center for Christian-Muslim

17  Understanding at Georgetown, when he said, we should

18  translate more as holy struggle, because when you say

19  struggle, that connotes a variety of actions, from giving

20  charity, being good.  And, in fact, there's a very well

21  known hadith by Muhammad, hadith is utterance of the

22  prophet, in which he once was told by one of his fighters,

23  he said, you know, I just performed a fight against the

24  infidels, and I feel good because I performed jihâd.  And

25  according to this hadith, the prophet told him, you have

1    performed the smaller jihâd.  And the guy asked, what is the

2    greater jihâd?  He said, the struggle to be a better person.

3          So in the mind of Muslims, in the minds of the

4    Muslims that I grew up in Lebanon with, they understand that

5    to be the struggle that average Christians, Muslims, and

6    Jews, and Hindus engage in to try to live up to the ethical

7    teaching of the world.

8          Having said that, there is no question that

9    Wahhabiyyah and some fanatics in Islam have deliberately

10   distorted the meaning of the word to make it purely a

11   violent requirement of action and also to insist on making

12   it a requirement of the faith where it is not.

13   Q.   You say that jihâd is not a pillar of Islam.  What

14   about charity?

15   A.   Certainly.  Zakat is one of the five pillars of Islam.

16   Q.   Could you spell that?  Zakat.

17   A.   Z-A-K-A-T.

18   Q.   Go ahead.

19   A.   Zakat is certainly one of the pillars of Islam.  A

20   Muslim, he or she, is expected to donate a portion of their

21   income for charitable, philanthropic purposes, which

22   explains the phenomenon of Islamic philanthropies.

23          Having said that, as we have seen, the Saudis have

24   been seen, proven in some cases, to have used -- misused

25   some of these charitable organization for their own

1   nefarious purposes.

2   Q.   What are mujahideen?

3   A.   Mujahideen is a word that comes from the same root of

4   the word jihâd.  It can be translated as holy strugglers.

5   In America, the word came into the English language, so now

6   we can find it in the dictionary.  It came, then, to denote

7   those Muslim, and I daresay fanatical, fighters who are

8   sponsored and funded and armed by the United States and by

9   the Pakistanis and the Saudis and others to fight against

10  the communists in Pakistan.  Back then, the word

11  mujahideen --

12  Q.   Did you misspeak?  You said Pakistan?

13  A.   Yeah.

14  Q.   Okay.

15  A.   Pakistan was one of them, yes.

16  Q.   Okay.

17  A.   They all sponsored these groups to fight against the

18  communists.  And back then, it was not uncommon for the

19  president of the United States, Ronald Reagan, among others,

20  to praise and to shower praise on these groups.

21  Q.   And what has been their role in Afghanistan and

22  Chechnya?

23  A.   Well, I mean, as we have seen, there was so much money

24  spent on these groups.  There was very little scrutiny about

25  why these people are fighting.  Back then, the United

1    States, unfortunately, did not care.  As long as they were

2    fighting the communists, the United States did not care why

3    they are fighting the communists.  What do they want?

4    What's their alternative?  There were very few questions

5    asked.  It is estimated billions of dollars were given.

6    Saudis spent 16 billion.  I don't have the exact amount of

7    how much the United States spent, but it's in the billion,

8    Brzezinski, in his memoir, speak about that effort, how it

9    was started.

10          And these groups, after the fight in an

11   Afghanistan was over, were restless.  So they started

12   wanting to open new fronts or join already existing fronts,

13   from Chechnya to Kosovo to Algeria, and, of course, in

14   Afghanistan later with the construction of Taliban and

15   whatever al-Qaeda branches existed.  That's their roots.

16   That's where they all originated.

17   Q.   And the -- I think you indicated that the mujahideen in

18   Afghanistan and, to some degree in Chechnya, were popular in

19   the United States, including in political circles?

20   A.   Oh, I mean, I think I would say this:  That in the

21   1980s, and as I said to the court, I have come to this

22   country in 1983, back then in the 1980s, it was not uncommon

23   in the republican and democratic fund-raisers to show

24   footage of these people.  And if one is to go back and look

25   at some of this footage, you would be pained to know that

1    some of these people who were lionized later joined the

2    ranks of al-Qaeda.

3    Q.    Is -- have you studied Osama bin Laden?

4    A.    Yes.

5    Q.    In detail?

6    A.    I would definitely say so, yes.

7    Q.    You have written a book?

8    A.    Correct.

9    Q.    Are you familiar with his use of the Internet?

10   A.    Not at the personal level, no.  But I mean, I have read

11   about it.

12   Q.    His groups -- not at a personal level for himself --

13   A.    Yes.

14   Q.    -- but are you familiar with groups that he has been

15   involved with and how they use the Internet?

16   A.    Correct.  Correct.  I can say this:  That I have

17   observed -- I mean, I'm asked to speak on these things in a

18   variety of places, mostly in the United States, and so as a

19   result, I have to follow these things, and I would say

20   that we can -- I mean, one of the things about what makes

21   him even more dangerous is that they have a very good skill

22   in the use of international communications for their own

23   purposes.  The Internet.  Look at, for example, al-Qaeda had

24   its own propaganda wing.  It's called the Sahab Foundation.

25   They put out highly glitzy, sophisticated footage, videos to

1    be disseminated around the Internet for their own purposes

2    and so on.  And if you -- I mean, there's a book in Arabic

3    by one of the first -- one of their publishers who has the

4    dubious honor of spending the most time with bin Laden over

5    the years, and he met him back in the late 19 -- 1996, '97,

6    and he observed back then how much they cared about

7    international communication, technology, and things of that

8    nature.

9          Having said that, based on their skill in

10   international technology, they are also very adept at using

11   it with very little fingerprints left behind, so to speak.

12   Q.   In your opinion, would Osama bin Laden or one of his --

13   one of the people who he worked with, issue a letter with

14   the e-mail address osamabinladen@hotmail.com?

15   A.   There's nothing funny about bin Laden, given the horror

16   he's inflicted on the world, but this, for me, was almost

17   comical.  I think it is absolutely, for me as an expert,

18   unthinkable that there would be, by Osama bin Laden or his

19   offices, it says here, an e-mail saying

20   "osamabinladenmoslem@hotmail.com."  I mean, this is 2001.

21   The United States -- I mean, we have, presumably, a

22   government that can speak.  We know that he has not used a

23   phone since the late nineties, ever.  Not a satellite phone,

24   not a cell phone, not a land phone.  And to imagine that he

25   would use an e-mail with his full name is actually quite

1  unthinkable based on what I know, or to have a Web site

2  sponsored by al-Qaeda with the name laden 5, something like

3  that, is also, for me, quite unthinkable.

4  Q.    Let me go --

5  A.    Yes.

6  Q.    -- before I continue with Exhibit O, I forgot some

7  things I wanted to ask you about.

8           Is it -- you were talking about how *The Noble*

9  *Qur'ân* and the Wahhabi version of Islam is widely propagated

10 by the Kingdom of Saudi Arabia, one of the United States's

11 closest allies?

12 A.    Correct.

13 Q.    Is it easy for groups to get other versions of *The*

14 *Qur'ân* to distribute?  Are there other sources whereby you

15 could get many free copies of *The Qur'ân* to distribute?

16 A.    If you are willing to shell out the dollars, you can,

17 from your local bookstores.  They cost.  If you want the

18 free ones, unfortunately, the available source is always

19 from Saudi Arabia, their embassy.  I have known schools who

20 contact the Saudi embassy in Washington.  This is the

21 headquarter of Wahhabi propagation in America, by the way.

22 They will send you material for free.  And as a result, they

23 have no competitors, unfortunately.

24           And I should say, this remains to be a problem.

25 That they have no competitors.  They provide free

1  literature, and their particular brand of literature is,

2  from my own perspective, particularly exclusivist,

3  intolerant, and fanatic.

4  Q.   One side question, is Wahhabi Islam that you have

5  indicated is popular in Saudi Arabia, is it practiced in

6  Iran?

7  A.   I shouldn't say "popular."  It's enforced.  It's

8  enforced.  It's a state ideology and religion.  The Saudi

9  government teaches that from infancy at all levels.  They

10 have more Wahhabi propaganda in the school than math,

11 chemistry, science combined.  They do it at all level.  You

12 see it in all level of their media, nonstop.

13 Q.   Is Wahhabi Islam practiced in Iran or Syria?

14 A.   Well, by the standard for Wahhabiyyah, Shiite Muslims

15 are infidels, and in fact, the founder of Wahhabiyyah in the

16 eighteenth century, when he started, he wanted to take the

17 cause to destroy all Shiite Islam and all their religious

18 monuments in Southern Iraq.  And he reached that far.  So by

19 that standard, there is a strong theological difference and

20 conflict between Wahhabiyyah and Shiite Islam of Iran.

21 Q.   Have you reviewed the Arabic in Exhibit O?

22 A.   I have.

23 Q.   And this is the exhibit that the government has used to

24 show -- to essentially try to link the defendant in this

25 case, Pete Seda, with Osama bin Laden; is that correct?  You

1  have been here in the morning?

2  A.    I have.

3  Q.    And what do you make of the Arabic in this document?

4  A.    Well, as I have looked at the material carefully, I

5  first was struck by the Osama bin Laden e-mail.

6  Q.    E-mail address?

7  A.    By the e-mail address of Osama bin Laden with his name.

8  Q.    Right.

9  A.    So that raised my antenna, so to speak.  And then when

10  I got to the Arabic text, by the first line, more antennas

11  were raised in my head because the text did not read like

12  Arabic sequence.  These are jumbled words.  No

13  Arabic-speaking person would write them.  And Osama bin

14  Laden personally takes great pride in his own Arabic.  And

15  he is so vain about his Arabic, he often, especially in the

16  beginning, he used to tape his speeches, because he does not

17  want to be quote making Arabic grammatical mistake.

18        So based on that, I started reading this, and I

19  felt there's something wrong with that.

20  Q.    Could you translate it as -- as best you can.

21  A.    Well, I would say that the thing that also -- the third

22  thing that surprised me, when I read the English, I felt the

23  English translation is not true to the Arabic original.  You

24  can see the Arabic original before you, those who have

25  exhibit.  I will read you my translation of how it should

1  be.

2  "The compassionate, the Merciful Allâh, in

3  his name."

4  And then the second line, "His blessing, God,

5  mercy on you, salutation."

6  Third line, "Qandahar, in laden bin Osama

7  sheikh office this dear people, dear brothers."

8  Q.  So in your view --

9  A.  Following line -- so on.

10  Q.  So in your --

11  A.  Basically every sentence here is like, instead of

12  saying, "student went to school," it's like, "school student

13  went."

14  Q.  So in your view, the Arabic in this document was not

15  written by an Arabic speaker, a native -- or an Arabic

16  speaker?

17  A.  I would say this, to be very careful:  This does not

18  read as a proper Arabic text.  This read like jumbled words.

19  The only thing I would say, without offering any speculation

20  on my part, you can -- like this, when I first saw it, I

21  thought, this very much look -- if you -- you know, we don't

22  have good Internet tools to translate from English into

23  Arabic or Arabic into English.  But if you use Internet

24  sources, you come up with something jumbled like that.  So

25  this look, to me, like some people, if they take English and

1   do an Internet tool for translation, you come up with

2   something jumbled like that.  And that's what I thought of

3   that personally.

4          MR. MATASAR:  That's all I have.  Thank you.

5                    **CROSS-EXAMINATION**

6   Q.   Is it Dr. Khalil?

7   A.   AbuKhalil.

8   Q.   AbuKhalil?

9   A.   AbuKhalil.

10  Q.   AbuKhalil.  Excuse me.  Thank you for your testimony,

11  sir.  I just have a few questions.

12  A.   Please.

13  Q.   You have apparently been shown some of the material

14  added as exhibits to the government's memorandum?

15  A.   I believe I have, yes.

16  Q.   And that was -- when you say the government says this,

17  the government says that, what you mean is, is that the

18  exhibits that are attached to the government's memorandum

19  reflect some very Wahhabi extreme fanatical teachings; is

20  that correct?

21  A.   You see, as I was trying to say, based on my study of

22  Wahhabiyyah, I was taking issue with the notion that there

23  are variants of Wahhabiyyah.  Some are moderate and some are

24  not.  I am saying, unfortunately, Wahhabiyyah, by its very

25  nature, consider Jews to be infidels who should be fought.

1  Christians, Shiites, the same, and so on.

2  Q.  Okay.  Thank you.  So when a quote goes in -- I'm

3  sorry.  If a document is distributed --

4  A.  Right.

5  Q.  -- that says, "Teach your children the love of justice

6  and revenge from the unjust, like the Jews and the tyrants,"

7  that is representative of this type of Wahhabism thought

8  that you are talking about; is that correct?

9  A.  The fanatical intolerant.

10  Q.  Yes.

11  A.  Right.

12  Q.  Yes.  And you are saying that it does not represent

13  true Islam?

14  A.  Well, I mean, first of all, I leave to Muslims to

15  define their own religion, and I don't think anybody can say

16  who represent Christianity.  I speak from outside any faith.

17  So I do not want to be an authority of what is true Islam,

18  and that's why I invoke my mother, because she is an example

19  of a believing Muslim who find all of this to be very

20  repugnant.

21  Q.  But Dr. AbuKhalil --

22  A.  Yes.

23  Q.  -- these are not the tenets of the Islam that you

24  believe in, and the majority of Muslims --

25  A.  I'm an atheist, so I cannot decide on that.

1  Q.  I'm sorry.  What I'm getting at --

2  A.  Yes.

3  Q.  -- is these are reflections, and I will give you some

4  more quotes in a minute.

5  A.  Please.

6  Q.  These are the reflections of the type of radical

7  Islamist thought that you have testified, if I heard you

8  correctly --

9  A.  Right.

10  Q.  -- in your direct.  "Jihâd is obligatory in every

11  Muslim in two ways.  By spending one's wealth or offering

12  oneself for fighting in the cause of Allah."

13  A.  Right.

14  Q.  Let me just give you a few more and then ask you to

15  respond.

16  A.  Please.

17  Q.  "Act upon these Ahadith.  The last hour will not appear

18  unless the Muslims fight the Jews and kill them."

19      And then you are familiar that from the --

20  A.  The essay.

21  Q.  -- from *The Noble Qur'ân* --

22  A.  Right.

23  Q.  -- there is a footnote talking about jihâd being a

24  violent jihâd?

25  A.  Right.

1   Q.   Fighting in Allah's cause is an obligatory aspect of

2   Islam.

3   A.   Right.

4   Q.   Now, you will agree with me that those are all the type

5   of radical statements that are represented in -- as far as

6   your direct is concerned, in Wahhabi doctrine?

7   A.   Yeah.  And my answer was, like from an Islamic

8   perspective, I mean, I teach Islam in colleges.  I have for

9   more than 19 years, and we treat, those of us who study

10  Islam, those statements as being representative of

11  Wahhabiyyah, even though they deviate from mainstream Muslim

12  teaching that most Muslims believe in.

13          But these are the kind of teaching that are

14  familiar to anybody who reads, as I do, the kind of

15  political, religious propaganda that come out of

16  Saudi Arabia and has come for the last 60 years.

17  Q.   Very good.  And the quotes that I have been reading you

18  from are from Al-Haramain Islamic Foundation documents.

19  A.   Right.

20  Q.   *The Noble Qur'ân* with the appendix, *Islamic Guidelines*

21  *for Individual and Social Reform* that the Al-Haramain office

22  here in the United States sent into U.S. prisons exceeding a

23  1,000 times?

24  A.   Right.

25  Q.   You are an expert in this area, sir.

1    A.    Yes.

2    Q.    My thought -- my question is this --

3    A.    Yes.

4    Q.    -- do you not consider this an incredibly dangerous,

5    inciteful act to be sending this type of literature to

6    people serving sentences for felony convictions in U.S.

7    prisons?

8    A.    I do believe -- this is my own perspective, somebody

9    who cares about human justice, equality, liberty, feeling

10   for all, gender equality, things of that, I do believe that

11   this kind -- these kind of messages, this intolerance and

12   the violence advocacy in them is certainly dangerous for

13   anybody who cares about peace and justice around the world.

14         And I do believe that, yes, it is quite dangerous

15   to have a big center for this kind of propaganda in

16   Washington, D.C. in the name of the Saudi embassy, and if

17   there are other centers related to Al-Haramain and others,

18   then, yes, they are, knowingly or unknowingly, spreading

19   harmful ideas and messages.

20         And what's important to underline to the court,

21   the notion in the Kingdom of Saudi Arabia, one of the most

22   oppressive states on earth, that anything can be private,

23   the doing of somebody who came up with an idea for

24   Al-Haramain, is totally folly.  Nothing goes on without the

25   approval and the authority of the Saudi government.  And

1   this is why this version of this particularly extremist

2   interpretation of *The Qur'ân* has the seal, there's an

3   official seal of the chief cleric of Saudi Arabia on it.

4   Q.   Okay.  I understand that.

5   A.   Yes.

6   Q.   And thank you for that.

7   A.   Yes.

8   Q.   And isn't it true that we know, an expert like yourself

9   knows --

10  A.   Yes, yes.

11  Q.   -- especially since 9/11 and all of the initiatives by

12  the United States government to study this subject --

13  A.   Right.

14  Q.   -- that it is material like this spread to the

15  disaffected, like prisoners, which can turn someone into

16  someone who is willing to explode themselves in the name of

17  Islam?

18  A.   I would say I hope that the human being, Muslim and

19  otherwise, when confronted by this kind of messages, the

20  person would be immediately alert to see the harm that they

21  contain.

22          Unfortunately, I mean, I am not going to, you

23  know, make aspersions about the Library of Congress or the

24  Department of the Air Force accusing them of being a

25  recipient and disseminators of Wahhabi propaganda, having

```
 1    sent letters of gratitude because they received them.  If my
 2    mother got a copy of this, she would have sent letters of
 3    outrage.  And it shows you that some people were not very
 4    careful.
 5              Now, I would not in any way say that the person
 6    who wrote that letter --
 7                        (Reporter interrupted.)
 8              THE WITNESS:  -- based on that to say those who
 9    wrote the letters are guilty of terrorism themselves.
10    BY MR. CARDANI:
11    Q.    But Dr. AbuKhalil --
12    A.    Yes.
13    Q.    -- just the point I'm trying to make --
14    A.    Yes.
15    Q.    -- is that you are familiar that prisoners have become
16    radicalized by writings like this?  Fair statement?
17    A.    I would say this kind of religious propaganda is
18    fanatical and harmful.  I do agree with that, yes.
19    Q.    And incites acts of violence?
20    A.    It may.  It may incite because it presents this
21    fanatical twist that it puts on Islam as if it is Islam
22    when, in reality, it speaks for a very small, minuscule,
23    unrepresentative version.
24    Q.    Another subject, sir.  You are familiar with, through
25    your studies, expertise in Osama bin Laden, are you familiar
```

1   with a sheikh out of Saudi Arabia named al-Awdah, and I'm

2   pronouncing that wrong.  Al-Awdah?

3   A.    Salman al-Awdah.  Salman al-Awdah, yes.

4   Q.    And were you here for the testimony this morning about

5   him?

6   A.    I was.  I was.

7   Q.    All right.  Do you agree with the characterization from

8   the government's witness as to who he is?

9   A.    Well, again, it's like bin Laden.  At one point, he was

10  on first-name basis with the king and the crown prince and

11  other princes and so on.  On other names he had -- on other

12  occasions, bin Laden had a fallout, or so we were told, with

13  the royal family.

14         The two clerics, al-Hawali and al-Awdah, seems to

15  have up and downs with the government.  And now, as recently

16  we have read, that al-Awdah has become in good favor with

17  the government.

18  Q.    But back in the time of roughly the 2001 time period --

19  A.    Right.

20  Q.    -- 2000, 2001 --

21  A.    Right.

22  Q.    -- is it not true that this Sheikh al-Awdah and

23  al-Hawali represented --

24  A.    Hawali.

25  Q.    I'm sorry?

1   A.    Hawali.

2   Q.    Yes.

3   A.    Right.  H-A-W-W-A-L-I.

4   Q.    Were very closely associated with not only with Osama

5   bin Laden, but the anti-Western doctrine that bin Laden

6   represents?

7   A.    Every cleric in Saudi Arabia up in that point was

8   espousing and declaring, proclaiming most fanatical,

9   intolerant, anti-American, anti-Jewish, anti-Shiite in the

10  kingdom, so in no way is this an exception.  So in that

11  sense, they don't stand out in that regard.

12         But maybe I would take issue with the suggestions

13  earlier that he was kind of the chief cleric for bin Laden.

14  I think bin Laden is too arrogant to consider any of those

15  two to be his own clerics.  He sees himself as being the top

16  person.  And this is why I don't believe that he, at any

17  point, considered the -- either of them as chief.  Even

18  though he have offered words of praise for one of them, I

19  know you are going to get to that, as he has offered words

20  of praise for the guy whose seal appear on the first page of

21  this book, Sheikh Ibn Baz.

22         MR. CARDANI:  If I may have a moment, Your Honor.

23         THE COURT:  Yes.

24  BY MR. CARDANI:

25  Q.    Dr. AbuKhalil, that's all I have.  Thank you for your

1  testimony.

2  A.    Thank you very much.

3  **REDIRECT EXAMINATION**

4  BY MR. MATASAR:

5  Q.    Wait.  I just have two questions.

6  A.    Please.

7  Q.    Have you read Pete Seda's book, *Islam Is*?

8  A.    I have to admit that I read it in the day here.

9  Q.    Briefly.

10  A.    Yes.

11  Q.    Right.  As far as you can tell, does he agree with the

12  extremes of Wahhabi Islam?

13  A.    Now, that's an interesting question.  Does he believe

14  in the extremes of Wahhabism.

15  Q.    Let me call your attention --

16  A.    I would say that -- yes, yes.  I know.  I have read it.

17  Q.    Let me call your attention, for example, to --

18  A.    Please.

19  Q.    -- Section 20 --

20  A.    Uh-huh.

21  Q.    -- and Section -- the end of Section 18.  I'm sorry.

22  Yeah.  The end of Section 18.

23  A.    Yeah.  I would say this:  By and large, this piece

24  represents more mainstream interpretation of Islam.  But

25  there is one section where I felt as if there was an effort

Case 1:03-md-01570-GBD-SN    Document 10597    Filed 09/14/07    Page 139 of 173
Case 1:03-cr-00559-MBS    Document 1659    Filed 09/10/12    Page 140 of 173

As'ad AbuKhalil - 8/22/07
Redirect Examination by Lawrence Matasar
139

1   to make it consistent with Wahhabism, which is Section 9,

2   "The Danger of Innovations in Islam," because that section

3   is purely Wahhabi and doesn't usually belong to mainstream

4   Islam.

5           The rest of it, on Jesus, on jihâd in particular,

6   on what are the pillars of Islam, he does not freelance and

7   argue that, as these two clerics here argue, that it is --

8   jihâd is a pillar of Islam.  The rest of it is more

9   mainstream, with the exception of Number 9, I felt.

10  Q.   And what about terrorism?  He is -- is it fair to say

11  he's clearly against terrorism as a part of Islam?

12  A.   In this document it is.  And also I found in this

13  document, there was an acknowledgment of the sexism in

14  Muslim societies that you would not find in Wahhabi

15  propaganda in Saudi Arabia, because over there, despite the

16  fact that women are severely oppressed, there's the claim

17  that it is a gender utopia.  So here he's not defensive

18  about that, even though, of course, he still absolves

19  religion, which is his right, as any believing Muslims

20  would, absolves Islam of responsibility of the reality of

21  gender discrimination and oppression and argues it's more

22  culture than religion, which is a point view that some

23  academics argue, like Elizabeth Fernea in her book *Middle*

24  *Eastern Muslim Women Speak*, published by the University of

25  Texas Press.

1          MR. MATASAR:  Thank you.  No further questions.

2          THE COURT:  Okay.  You may step down and you are

3    excused.

4          MR. MATASAR:  We have two brief character

5    witnesses.

6          THE COURT:  All right.

7          MR. MATASAR:  First, Karen.

8          THE CLERK:  Would you please raise your right

9    hand.

10              *(The witness was sworn.)*

11          THE CLERK:  Thank you.  Will you please take the

12   witness stand.

13          Will you please state your full name for the

14   record, spelling your last name.

15          THE WITNESS:  Karen Caldwell, C-A-L-D-W-E-L-L.

16          THE CLERK:  Thank you.

17                   **DIRECT EXAMINATION**

18   BY MR. MATASAR:

19   Q.   How are you employed?

20   A.   I'm an associate minister at the Medford, Oregon,

21   United Methodist Church.

22   Q.   What's your educational background?

23   A.   I have a master of divinity from Pacific School of

24   Religion.

25   Q.   How long have you lived in Southern Oregon, the

1   Medford-Ashland area?

2   A.    I have lived in Ashland since 1985, 22 years.

3   Q.    Do you know my client?

4   A.    I do.

5   Q.    You know him as Pete Seda?

6   A.    And as Pirouz Sedaghaty.

7   Q.    Okay.  How long have you known him?

8   A.    I've known him for at least 20 years that I recall.  I

9   don't remember the year that we met the first time.

10  Q.    In what context do you know him?

11  A.    I know him in several ways.  I think we first became

12  acquainted when Pete was still a college student.  He came

13  to the church that I was then pastoring, which is the

14  Ashland United Church of Christ.  And he asked to be able to

15  rent space in the building for Friday evening prayers for

16  his community.  And then as we got acquainted, he came to

17  the church on two or three occasions over the years to share

18  information with the congregation and classes about world

19  religions.  So he was sharing about Islam.

20          We were on panels together, seminars, and

21  representing Christianity and representing Islam, peace

22  rallies and worship services in the community.

23  Q.    Do you see him as a danger to the community in Ashland?

24  A.    No, absolutely not.

25  Q.    Do you feel he's a force for peace and tolerance?

1   A.   He has consistently spoken out publicly and privately

2   for peace, for tolerance, for understanding between

3   religious groups.

4   Q.   When you say "consistently," you have talked about the

5   panels and that sort of thing that you have known him on.

6   That's what you are talking about?

7   A.   Exactly.

8   Q.   Both in public and in private?

9   A.   Yes, in private conversations, as well as in these

10   public venues.

11   Q.   Has he expressed your -- a view to you about whether

12   Islam is pro-violence, anti-violence, or one way or the

13   other?

14   A.   It's like he made it his mission to explain to people

15   who were not familiar with Islam that Islam is not the way

16   it's portrayed in Hollywood, on television, and in a lot of

17   our news media.  It is not about violence.  It is opposed to

18   violence.  It is a religion of compassion and integrity.

19   And I always appreciated the point of view that he was

20   expressing.  It made sense to me.

21   Q.   Did you see him shortly after September 11th, 2001?

22   A.   I did.  Within the week, he came to the church to give

23   me an estimate on tree care.

24   Q.   When you say "tree care," what --

25   A.   Well, he came as a professional.  He had a company

1  where, you know, he took care of trees called The Arborist.

2  So he came out at that time.  It was within a week of 9/11.

3  And -- and he was, I mean, clearly upset.  We were all very

4  upset by, you know, the tragedy, the travesty that had

5  happened.  He also expressed to me at that time how many

6  calls he had received from people in Ashland who were not

7  Muslim who had called to -- to let him know after 9/11 how

8  upset -- how they knew how upset he must be and how they

9  understood that this had nothing to do with the Islam that

10 he professed, and that they were offering him their support.

11 And he was very touched by that.  He said he was quite

12 embarrassed by this outpouring of concern for him.

13          MR. MATASAR:  Okay.  That's all I have.

14                   **CROSS-EXAMINATION**

15 BY MR. CARDANI:

16 Q.   Ms. Caldwell, do you know what Mr. Seda has been doing

17 for the last four and a half years?

18 A.   I don't.

19 Q.   Have you been in contact with him during those last

20 four and a half years?

21 A.   No, I have not.

22 Q.   Do you know where he's been living?

23 A.   No.

24 Q.   Have you been here for a lot of the testimony today?

25 A.   Yes, I have.

1  Q.   And I'm not going to repeat them.  You have heard them

2  already.  You have heard some of those hateful, antisemitic

3  comments that were published in books of Al-Haramain and

4  sent to U.S. prisons?

5  A.   I have heard the quotes that you have offered.

6  Q.   Okay.  All right.  Were you aware, during the time that

7  you knew him, that the group that he was the branch

8  president of was sending this type of literature into U.S.

9  prisons?

10  A.   I was not.  I have always known that he was making it a

11  ministry of his to share information about Islam, and I have

12  characterized the kind of messages that I heard him giving.

13  He has given me a *Qur'ân* as a gift, which I appreciated, and

14  he has given me a copy of the pamphlet that he wrote about

15  Islam, which did not contain those kinds of things.

16  Q.   Okay.

17  A.   And he has spoken personally about Islam.

18  Q.   Very well.  So the copy of *The Qur'ân* that you got, Ms.

19  Caldwell, was not *The Noble Qur'ân* with the violent appendix

20  attached to it?

21  A.   No, absolutely not.

22  Q.   That's all I have.  Thank you.

23       THE COURT:  You can step down.  Thank you.

24       Call your next witness.

25       MR. MATASAR:  Jeff Golden.

| | |
|---|---|
| 1 | THE CLERK: Sir, could you please step forward to |
| 2 | the center of the courtroom. And if you'd please raise your |
| 3 | right hand. |
| 4 | *(The witness was sworn.)* |
| 5 | THE CLERK: Thank you. If you'd please take the |
| 6 | witness stand. |
| 7 | Sir, would you please state your full name for the |
| 8 | record, spelling your first and last name. |
| 9 | THE WITNESS: My name is Jeffrey Simon Golden, |
| 10 | J-E-F-F-R-E-Y, Simon, G-O-L-D-E-N. |
| 11 | THE CLERK: Thank you. |
| 12 | **DIRECT EXAMINATION** |
| 13 | BY MR. MATASAR: |
| 14 | Q. How are you employed, sir? |
| 15 | A. I am a writer, a columnist, a speaker, and I work in |
| 16 | public radio. |
| 17 | Q. Okay. Formerly you were pretty much more focused on |
| 18 | public radio? |
| 19 | A. Yes. Until recently, I was a host of a daily talk show |
| 20 | on Jefferson Public Radio. |
| 21 | Q. Okay. And what is Jefferson Public Radio? |
| 22 | A. Jefferson Public Radio is a network of approximately 30 |
| 23 | NPR stations serving Southern Oregon and Northern |
| 24 | California. |
| 25 | Q. Do you -- oh, pardon me. Were you going to say |

```
1    something else?

2    A.   Hmm-um.

3    Q.   Do you know my client, Pete Seda?

4    A.   Yes, I do.

5    Q.   How long have you known him?

6    A.   I think I met Pete Seda in 1990, give or take a year,

7    when I asked him professionally to come look at some trees

8    at my property when he ran the business The Arborist.

9    Q.   And you have known him since then?

10   A.   Yes.

11   Q.   Okay.  How often have you talked to him or heard him

12   speak?

13   A.   I would say that I have either been on a panel with him

14   or heard him speak in some sort of formal setting about

15   seven or eight times.  I believe he's been a guest on my

16   program twice.  I know once.  I believe twice.  And just

17   casually running into each other in town, we have had a

18   dozen conversations or so.

19   Q.   And you know -- you are active in community affairs

20   also?

21   A.   Yes, I am.

22   Q.   And so you know others who know him?

23   A.   Yes, I do.

24   Q.   And you know of his reputation in the community?

25   A.   Yes, I do.
```

1    Q.    Okay.  Will you tell the court about whether you think

2    he's a danger to the community or a positive force in the

3    community.

4    A.    I feel very strongly he's a positive force in the

5    community, and I believe there's a very wide consensus in

6    Ashland that would say the same thing.

7    Q.    Why is that?  Can you give some detail?

8    A.    I would say that it has to do with the steadiness and

9    tenacity of his effort to reach out, to represent Islam as a

10   legitimate and peaceful religion in a time of -- when that's

11   been brought into question.  His efforts to not just speak

12   about Islam, but to interface with other faith traditions

13   and try to understand and build common ground with them, and

14   a sense of philanthropic work he has done around the world

15   over time, preceding 9/11 by quite a few years.  And people

16   just really find him a -- an easy listener and a good

17   person.

18            MR. MATASAR:  Okay.  That's all I have.

19                         **CROSS-EXAMINATION**

20   BY MR. CARDANI:

21   Q.    Just a couple of questions, Mr. Golden.

22   A.    Yes.

23   Q.    Do you know what Mr. Pete Seda has been doing for the

24   last four and a half years?

25   A.    No, I don't.

1    Q.    Has he been in contact with you?

2    A.    I have had a couple of brief e-mail contacts with him

3    over the years in that time.

4    Q.    That's all I have.  Thank you, sir.

5                      **REDIRECT EXAMINATION**

6    BY MR. MATASAR:

7    Q.    Oh, that reminds me of something.  Wasn't Pete Seda

8    about to -- going to win an award?

9    A.    Yes.

10   Q.    And that might have been what the contacts were about?

11   A.    That's correct.

12   Q.    And what was that award?

13   A.    I am a member of a nonprofit organization called

14   Mediation Works based in Medford.  Mediation Works has an

15   annual award called the Imagine Awards given to people who

16   have done extraordinary work on behalf of peace.  For five

17   years, we have given that award to five individuals each

18   year.  And Pete was initially selected to be a recipient of

19   that award, and I, on behalf of the board, tried to have

20   contact to find out his whereabouts and whether he would be

21   present to receive the award at a ceremony.

22            MR. MATASAR:  Okay.  Thank you.  That's all.

23            THE COURT:  All right.  You can step down.

24            MR. MATASAR:  Let me have one moment, Your Honor.

25            That's all, Your Honor.  No further witnesses.

```
 1              THE COURT:  All right.  Thank you.

 2              MR. CARDANI:  Judge, I don't know procedurally how

 3   we should do this, but I do have a little bit more

 4   information for the court to consider.  I can do it by way

 5   of argument.  I don't want to disrupt Mr. Matasar, but I

 6   want to make sure I have an opportunity to be heard

 7   before --

 8              THE COURT:  Well, did you get the other passport

 9   after the lunch recess?  Have you had an opportunity to

10   examine that?

11              MR. CARDANI:  Somewhat.

12              THE COURT:  That's an Iranian passport?

13              MR. CARDANI:  Yes, Your Honor.

14              THE COURT:  All right.  Does that fill in any

15   information that you were missing?

16              MR. CARDANI:  Somewhat.

17              THE COURT:  Okay.

18              MR. CARDANI:  Can I proceed?

19              THE COURT:  Sure.

20              MR. CARDANI:  First, I'd like to have it tendered

21   to the court.  I don't know how -- when he came into

22   possession of this.  It was not in Mr. Sedaghaty's

23   possession when he came back to the United States.  I got it

24   from Mr. Matasar.  It may be that the Al-Haramain lawyer

25   that accompanied Mr. Seda back on the airplane from
```

1  Frankfurt had it and gave it to Mr. Matasar, but I don't

2  know the answer to that.  What I do know is that it just

3  came into our possession today.

4        This photo, I'm no expert whatsoever, but I would

5  tender it to the court, if I may ask through the benefit of

6  Ms. Weller.  The picture here really doesn't look like

7  Mr. Seda.  It may well be, but it really does not look like

8  him.  I don't know what to make of that.  We just got it.

9  And I don't know why he needed an Iranian passport to travel

10 within these countries.  There is some unanswered questions.

11 We have had it photographed -- photocopied, and we are

12 having it looked at, but that's what we know so far.

13        I'd also like to be heard on the information that

14 Mr. Seda apparently told the court, through pretrial, about

15 having access to $450,000 from the sale of a house.

16        THE COURT:  Yes.

17        MR. CARDANI:  In the employment income source of

18 the pretrial services report via an e-mail from defendant's

19 attorney, defendant could not find good work while away and

20 lived off the proceeds from the sale of a house prior to

21 going overseas in the amount of $450,000, as well as off his

22 credit cards.

23        It's come to my attention that the sale of the

24 house was in 2001, August of 2001, about two years before

25 Mr. Seda departed the country.  The sale of the house was

roughly $577,000.  However, there were a number of

individuals paid at escrow by -- through this sale,

diminishing the net value of that money to Mr. Seda.

    One of the recipients of money was Soliman

al-Buthe from this 2001 property sale, and my records

indicate that Mr. al-Buthe received $138,333 of the proceeds

of this house sale.  A number of credit cards were paid off.

10,000, 20,000, 25,000, on and on.  Other individuals were

paid.  But Mr. Seda, according to these records, netted

$78,000 from this 2001 sale, a far lower figure than the

amount that may have been indicated in the presentence

report.

    My point is, is $78,000, and he lived off of some

of that money for the two years, roughly, before he left,

diminishing the value of that money even further is nowhere

near enough to be moving overseas, traveling all over the

Arab world, expensive airfares, and we are to believe that

he did not work.  I think questions still beg to be answered

that have not been -- not been answered.

    That's the only extra information I have.

    THE COURT:  Is your issue about what he did during

the years he was out of the country one that's focused on

the issue of a flight risk?

    MR. CARDANI:  As well as a danger.

    THE COURT:  Could you elaborate on the danger

1    issue?

2         MR. CARDANI:  The flight risk, I do feel that this

3    is definitely reflective of a flight risk.  And withholding

4    information from pretrial about the nature of the travels

5    and the employment are a main concern.  But Judge, it gets

6    back into the whole question of who is Pete Seda.  And I

7    think that what the court has seen is that there may well be

8    two faces to Pete Seda.  I think that there are.

9         One is the one represented in the community

10   witnesses, who I believe are being sincere, showing Mr. Seda

11   has done a lot of good in their community.  But I think we

12   have shown that this very different and far more dangerous

13   side to Pete Seda, and that is a knowing proponent of

14   Wahhabi beliefs, that he took money from Al-Haramain, used

15   it for its nefarious purposes, while putting on the face to

16   the community that he wished to.

17        It's for those reasons that his

18   four-and-a-half-year absence make him also a potential

19   danger.  We just don't know who he has been meeting with.

20   Has he continued these associations.  And -- and why hasn't

21   there been more information forthcoming to pretrial

22   services, and so on and so forth.  We just don't know.

23        He's indicated that he did not work for four and a

24   half years.  We have to know what he's been doing, I suggest

25   to you, before we even consider the notion of releasing a

1    man like this, considering his past associations and his

2    past activities in this area.

3              THE COURT:  All right.  Thank you.

4              Mr. Matasar.

5              MR. MATASAR:  Your Honor, it -- as far as some of

6    the pretrial services matters, some of that may be my fault

7    in the sense that some of the material that -- the interview

8    that we did was a very difficult, part computer phone, part

9    regular phone interview, when Mr. Seda was out of the

10   country.  We had asked, Ms. Brown simply did not have time,

11   to meet with him personally while he was here.

12             I provided the information about where he was,

13   thought that's what she wanted.  If what they are saying now

14   is they want to know the exact addresses, that is not my

15   understanding of what I thought they wanted.  So there could

16   be some way that we could provide some of the information if

17   pretrial services wants it.  That we can still do.

18             The government's argument here, Your Honor,

19   essentially is that Pete Seda, while distributing -- what he

20   did that was wrong was he distributed books that are

21   promoted by one of America's closest allies, and that

22   because other people who believe what they believe are bad

23   people, that because he sent those books, he should be

24   detained and he's a danger to the community.  We know he

25   doesn't believe that.  And we know that the only way to

1   promulgate his faith is essentially to use these books,

2   which have some bad things in them.  There's a lot of good

3   things in them.  It's a thousand-page book, or close to it.

4   It's not cause for detention.

5           Mr. Cardani says, well, we don't know what he's

6   doing.  He's this man who is so tied to this Wahhabism that

7   he's a danger, and he's in Syria and Iran.  Well, obviously,

8   he was not promoting that brand of violent faith in those

9   places.  That would be crazy, as our expert said.  We think

10  we have given Your Honor a more than enough explanation for

11  what a positive person he is in the community.  He's the

12  opposite of a danger to the community.  You can create

13  conditions that would assure that he will come to court.

14  He's neither a flight risk nor a danger.  He came here.  And

15  so we'd simply ask the court to release him on appropriate

16  conditions.

17          THE COURT:  All right.  Thank you.

18          Well, to say the least, this has been a most

19  unusual detention hearing.  I can't recall another detention

20  hearing I have had where evidence was offered regarding a

21  person's religious views and a particular sect of a religion

22  and what their belief system is.  And to say the least, one

23  certainly must be delicate when one makes such inquiries and

24  determines what inferences to draw from them.  Not to say

25  that one's religious views can never be relevant.  I can

1    think of analogies where it would clearly be relevant.

2    Suppose, for example, you have an ardent Christian whose

3    faith and value system is such that he believes that

4    abortion is immoral, and let us say further that his belief

5    system is such that he believes that it's his duty as a

6    Christian to use whatever means are necessary to prevent

7    abortions, including violence, and that person is charged

8    with illegal possession of explosive devices.  It would

9    certainly be relevant, indeed, highly relevant for the

10   government to offer evidence of that person's belief systems

11   to -- in support of his argument that he was a danger to the

12   community and that no conditions of release could be

13   fashioned to safeguard the community under these

14   circumstances.

15        At the same time, it would be a stretch for the

16   government to argue that any person who was a Christian and

17   who believed that abortion was immoral was a poor candidate

18   for release.  I would think that the relevant inquiry, under

19   those circumstances, would be did that person's belief

20   system include a belief that he was entitled to use violent

21   means to effect his purpose of preventing the activity that

22   he disagreed with.

23        So here we have this inquiry into the Wahhabi

24   theology and its views about jihâd and waging war on those

25   of other faiths and religious practices, and we have the

1    Islamic literature that the government offered that was

2    distributed at various prisons.

3         But counterbalancing that, we have the defendant's

4    own views that he published in an article that he authored,

5    and we have the testimony of the character witnesses, as

6    well as the testimony of the defense expert that would

7    strongly suggest that he does not share in those extremist

8    views as expressed in the literature, and that he, indeed,

9    has spoken out against using violence against those of other

10   faiths, such as the Jewish faith, the Christian faith,

11   et cetera.  So that would counterbalance the more strident

12   literature that the government references that was

13   distributed.

14        I'm curious.  I hadn't heard any testimony at all

15   on this issue.  Is this literature such that it's forbidden

16   to be distributed in our penal systems, or is it something

17   that those who publish such literature are free to

18   distribute?

19        MR. MATASAR:  Your Honor, I think in Daveed

20   Gartenstein's book, he says it was rejected at very, very

21   few prisons, if I'm not mistaken.  I think almost all the

22   prisons accept them.

23        MR. CARDANI:  I don't have strong information for

24   the court.  I do know that since 9/11, there have been

25   various efforts, like the United States Senate has

1    undertaken, to look into this.  But I think the larger point

2    is that the First Amendment is so alive and strong that we

3    are allowed to disseminate all types of materials.  So it's

4    been kind of a struggle.  I don't know what the current

5    status is in that regard.

6          THE COURT:  Well, and the defense expert's point

7    was that if the Wahhabi theology, as expressed in the

8    literature that was distributed, is a cause of concern that

9    a person's a danger to society, that the royal family of

10   Saudi Arabia would be precluded from coming here as dangers

11   to the community.

12         So I'm not sure that the issue about the

13   literature is such that I'm convinced that the defendant is

14   not a release candidate.

15         Similarly, I'm not quite sure what to make of the

16   government's references to the Chechnya mujahideen and

17   Kosovo, what inferences the government wants me to draw from

18   that.

19         You might want to address that directly, because

20   it's my understanding that the government of the United

21   States at times has supported the resistance in Chechnya and

22   in Kosovo.

23         MR. CARDANI:  If I might, Your Honor, I'm not here

24   to debate the wisdom of foreign policy.  I'm here as a

25   prosecutor trying to enforce U.S. law.  Under Title 18

1    U.S.C. 956, it is illegal to conspire to move forms of

2    support into areas of the world where -- to commit acts of

3    violence upon -- and to try to attempt to affect government

4    policy in countries that we are at peace with.  What may

5    have gone on in Afghanistan in the eighties and the Cold

6    War, I'm not an historian.  I don't have a real good grasp

7    of that.  But as a prosecutor, I do know that it is illegal

8    to do those types of acts in Chechnya.  And I believe that

9    Jose Padilla, speaking a little bit off the cuff here, but I

10   believe Jose Padilla was recently convicted in Miami for

11   doing something just like that, and that is in areas of the

12   world where there's some fighting going on involving

13   governments, and Chechnya, I think, is one of the places

14   that was mentioned in the *Padilla* indictment.

15            THE COURT:  Well, that's the background or context

16   of some of the charges in the indictment, correct?

17            MR. CARDANI:  In the present indictment?

18            THE COURT:  Yes.

19            MR. CARDANI:  Yes, Your Honor.  But you are asking

20   about Kosovo as well?

21            THE COURT:  Yes.  Are you asking the court to draw

22   an inference from that that this defendant is a danger to

23   the community here because of that activity?

24            MR. CARDANI:  Yes.

25            THE COURT:  And if so, could you elaborate on the

1    that?

2           MR. CARDANI:  Yes, Your Honor.  I may have

3    misheard your question.  I'm sorry.  When we talk about

4    danger to the community, and you have to evaluate what is

5    the community that you are trying to protect in releasing

6    pretrial -- whether or not to release pretrial a defendant,

7    I don't think it's just the community of Southern Oregon.

8    In fact, if that were it, I don't think that Mr. Seda is a

9    direct danger to the residents of Southern Oregon and

10   Ashland.  I think that gets back to the two faces of Pete

11   Seda.  The community that we are worried about is the more

12   general U.S. population one, and that is, in this day and

13   age, this inflammatory term, jihâd, mujahideen, and things

14   of the like, connote, and I believe the evidence that you

15   have heard today, someone that is so radicalized that they

16   are willing to fight in behalf of their beliefs, not just

17   what they believe in, but what they are willing to do in

18   support of their belief system.

19          And Your Honor, in this day and age, if someone

20   makes a statement, someone of this thought, of this school,

21   this thought, proclaims U.S. interests as antithetical to

22   their form, their perception of their religions, then it

23   opens the door to acts of violence against Western

24   interests.  And we have seen that.  We have seen that

25   overseas in the bombings.  We have seen some of the

1    designation material.  But also, it raises the question of,

2    in this day and age, with events in Iraq and all over the

3    Middle East, these people that are radicalized through

4    literature like the defendant promoted, and I'm trying to --

5    to separate the belief system versus the actions, but it was

6    the actions of spreading this and radicalizing people like

7    this, they become lit fuses.

8            And our concern is if he is still willing to

9    engage in the type of activity that he did, sponsoring Web

10   sites for some of the most radical people on earth right

11   now, and if he's done that, we have shown you he's done that

12   when he was here, then the individual that fled an

13   investigation and has been a fugitive, a known fugitive for

14   two and a half years in Iran, in Syria, I think that it is a

15   very fair statement to say that there is a genuine fear that

16   he may continue on those type of actions.

17           THE COURT:  Well, you said something right before

18   the lunch break that rather intrigued me.  You said the

19   government was not concerned that this defendant would

20   engage in physical acts of violence, but that the government

21   was concerned regarding his ideology.

22           MR. CARDANI:  If I said it that way --

23           THE COURT:  Did I get that right?

24           MR. CARDANI:  I'm sorry.  If I said it that way, I

25   misspoke.  It's not his ideology that I'm asking you to

1    detain him.  It's acts taken off of that ideology like the

2    ones we have proven to the court that he engaged in before

3    he fled.

4            THE COURT:  The distribution of this Islamic

5    material.

6            MR. CARDANI:  In part.

7            THE COURT:  What else?

8            MR. CARDANI:  The sponsoring of the Web site

9    allowing individuals from outside the United States seeking

10   to spread these bad things through an Internet service

11   provider that he helped operate and maintain in the United

12   States.

13           THE COURT:  Are you saying that there's no

14   conditions that can be fashioned to prevent that sort of

15   activity from taking place?  In other words, a condition

16   that he not set up a Web site without permission of the

17   court?  That he not distribute any -- well, this would be

18   somewhat delicate to fashion as a condition, but that he not

19   distribute certain classes of literature without the

20   permission of the court.  Although I don't want to get in

21   the business of being a sensor.  But if there's some

22   particular literature that you feel is particularly

23   problematical, it may even be that the defense will agree

24   with you that he won't distribute it.

25           But are you saying no conditions can be fashioned?

1          MR. CARDANI:  Well, if I might just continue,

2    before I answer that, I also wanted the court to focus on

3    what you asked about, and that's sending money to places

4    like Kosovo.  Again, these are actions in support of an

5    ideology.  It's not the ideology that I'm asking you to

6    detain him.  It's those acts.

7          So another reason for concern is funding, and

8    terrorist funding is a real problem.  And when I said

9    earlier that I don't think he's a physical danger, what I

10   meant was it's the support of those type of people that I am

11   particularly concerned that he might engage in.

12         THE COURT:  Well, we can have a condition that he

13   not engage in any financial transactions without permission

14   of the court.

15         MR. CARDANI:  I understand that, Your Honor, and I

16   have done that for several years with the court.

17         THE COURT:  Sure.

18         MR. CARDANI:  And that's worked just fine in most

19   cases.  This is an exceptional case.

20         I have never had a contested detention hearing

21   like this, never called civilian witnesses like this.  But I

22   think, when you put the whole package together, the fact,

23   and I keep coming back to this, that we do not -- the court

24   does not know what this defendant has been doing for the

25   last four and a half years when he fled an active criminal

1   investigation.  While there, he became a fugitive because he
2   knew he was indicted and he knew there was an arrest
3   warrant.  He met with his lawyer overseas and chose to stay
4   away for another two plus years.
5            THE COURT:  But now he's back.
6            MR. CARDANI:  So now he's back, and he's asked
7   what he's been doing.
8            THE COURT:  He came back voluntarily.
9            MR. CARDANI:  Yes, Your Honor.
10           THE COURT:  And why -- why -- why do you suppose
11  he came back, if I may ask?
12           MR. CARDANI:  Well, to fight the charges would
13  have to be part of that.  But the fear is that it may be
14  something a little bit more than that.
15           THE COURT:  Are you telling me that you think he's
16  a Trojan horse?
17           MR. CARDANI:  That he is acting on somebody else's
18  behalf?
19           THE COURT:  Yes.
20           MR. CARDANI:  Perhaps.
21           THE COURT:  Do you have anything specific to base
22  that on?
23           MR. CARDANI:  An absence from the country for four
24  and a half years and living in the countries of Iran and
25  Syria, and when asked by pretrial about his location for the

1    last five years, he chose not to answer questions.

2         THE COURT:  Well, that's a valid concern that I

3    have as well.

4         Let me ask Mr. Matasar, according to the pretrial

5    service, at the advice of counsel, the defendant chose not

6    to answer questions regarding his location for the past five

7    years.

8         MR. MATASAR:  Your Honor --

9         THE COURT:  Do you have any objection --

10         MR. MATASAR:  I wrote an e-mail that is -- that --

11    I don't recall the exact --

12         THE COURT:  I don't care about your e-mails right

13    now.

14         MR. MATASAR:  Okay.

15         THE COURT:  I want to know, do you have an

16    objection to pretrial services debriefing your client about

17    where he has been and how he has supported himself during

18    the time period he's been outside of the country.

19         MR. MATASAR:  No, Your Honor.  No.  No objection.

20    That's -- I want to make clear, I'm not saying we won't do

21    it.  I'm saying we have no objection to talking to pretrial

22    services about all of that.

23         THE COURT:  All right.  And we have one passport

24    in addition to the first one that's been supplied.  There is

25    apparently another passport out there.

1          Ms. Weller -- I'm going to give this back to the

2     government.  Does the government want to examine this, or do

3     you have a copy of that?

4          MR. CARDANI:  We have made a copy.  Is that the

5     Iranian passport?

6          THE COURT:  Yeah.

7          MR. CARDANI:  We have made a copy.

8          THE COURT:  All right.  Then we will keep this as

9     an exhibit with the court, as well as -- how about the U.S.

10    passport?

11         MR. CARDANI:  Could I tender that to the court so

12    I don't risk losing it?  We have made a copy of this one as

13    well.

14         THE COURT:  How about the original U.S. passport?

15    Do you know where that is?

16         THE DEFENDANT:  It's in Dubai.

17         MR. MATASAR:  Your Honor, it's my understanding

18    that when somebody is in Dubai, there is a requirement that

19    they leave and come back every two months, causing there to

20    be numerous stamps on the passport.  I believe a duplicate

21    passport was obtained for that purpose.  I don't think we

22    have the original -- the previous one, but I believe if you

23    look, and we'll have to get all this information, that a

24    duplicate passport was requested for that purpose.

25         THE COURT:  But that begs the question of where

1    the other passport is.

2                    (Counsel conferred with the defendant.)

3            MR. MATASAR:  We think we can try to find -- find

4    it in Dubai, Your Honor, yes.

5            THE DEFENDANT:  I think so.

6            THE COURT:  All right.  I want that done.  In the

7    meantime, I will take this under submission.  And when the

8    interview is completed -- do you have any objection to the

9    results of that interview being shared with the government?

10   The government has resources to investigate his activity

11   while he was overseas that the court doesn't have.

12           MR. MATASAR:  Fine, Your Honor.  Just as in the

13   same manner as the pretrial services report, we have no

14   trouble with that being also shared.

15           THE COURT:  How long does everyone estimate this

16   will take to do?

17           MR. CARDANI:  Well, excuse me.  We are not allowed

18   to disclose the contents of these pretrial services report

19   directly to agents.  For it to be of any use, we have to be

20   able to use the information.

21           THE COURT:  Why don't you visit with Mr. Matasar

22   and see if you can work out conditions that would govern

23   your use of this information.

24           MR. MATASAR:  Sorry, Your Honor.  I forgot about

25   that aspect of the report, as Mr. Cardani was reciting it in

1    open court today.  I had not remembered that part of it.

2    But I'm sure we can work it out.

3         THE COURT:  I'm sure we can work it out too.

4         MR. MATASAR:  I'm sure we can work it out.

5         So as far as your asking for the time, the

6    interview is at Ms. Brown's leisure.  I can be here any

7    time, whenever she wants, right after the hearing today or

8    tomorrow or the next day.

9         THE COURT:  What I'm telling you is that from what

10   I have heard today, it seems to me that it is possible to

11   fashion conditions that would allow your client to be

12   released, but before I undertake to do that, I want to

13   address Mr. Cardani's legitimate concerns that the

14   government doesn't know what he's been up to the last four

15   to five years, and that is information that can and should

16   be provided, and I think that needs to be run down.  I think

17   it needs to be fleshed out.  And once that's done, we can

18   come back and we can talk about whether it's possible to

19   fashion conditions of release.

20        MR. MATASAR:  Great.  Thank you.

21        THE COURT:  And also find the other missing

22   passport.  So how long do you think it will take?  Because I

23   will put this on for another hearing.  Two weeks down the

24   road?  A week down the road?

25        MR. MATASAR:  Give me a second.

1          MR. CARDANI:  Judge, we are going to need some

2     time.  If we are allowed to run with this information, if

3     that's our agreement, I'm going to need some time to do

4     that.  It involves overseas offices and sending leads and

5     things like that.

6          THE COURT:  I'm going to give you time to address

7     those concerns that you have that I view as legitimate

8     concerns, that for most of which is where has he been the

9     last four years.

10          MR. CARDANI:  I'd ask that we set a status

11     conference in two weeks, and we'll update the court with the

12     information.

13          THE COURT:  All right.  What date do we have

14     available?

15          MR. MATASAR:  Your Honor, I'm away the 5th through

16     the 9th, so if we can have it sometime either right before

17     that or right after that.  Maybe the Tuesday the -- is the

18     4th.  Two weeks from yesterday.

19          THE COURT:  All right.  We'll put it on for the

20     4th.

21          MR. CARDANI:  I'm sorry, Your Honor.  I'm away --

22     I think I'm away.  Is that the day after Labor Day?

23          THE CLERK:  Yes.

24          MR. MATASAR:  How about, then, Friday, the 31st?

25          THE COURT:  Of August?

1         MR. MATASAR:  That's a week and a half from today.

2         THE COURT:  Do you think that will be enough time?

3         MR. MATASAR:  Well, I don't know about the

4    government's time.  Ms. Brown and I and my client, we can do

5    our part immediately.  I don't know how much time they need.

6         THE COURT:  Well, then that brings to my mind

7    another thing.  You have a request that you have previously

8    made to have counsel appointed from the federal defenders

9    office as well.

10        MR. MATASAR:  Yes, Your Honor.

11        THE COURT:  To assist in the defense of this case.

12        MR. MATASAR:  Yes, Your Honor.  You had asked me

13   to prepare an affidavit on financial issues.

14        THE COURT:  Yes.

15        MR. MATASAR:  But as you can well imagine, I have

16   been busy every minute trying to deal with this part of the

17   hearing.  I will definitely get that to you.

18        THE COURT:  Well, we can certainly appoint Mr. Wax

19   at this time for the purpose of having him make this

20   appearance in your absence, if necessary.  Can you bring him

21   up to speed, do you think, to stand in for you if you are

22   gone?

23        MR. MATASAR:  It's only three days I'm gone, Your

24   Honor.  I would much prefer to be here.

25        THE COURT:  It's only three days you are gone?

1          MR. MATASAR:  Three days I'm gone, yes.  The 5th,

2     6th, and 7th of September.  Those are the only days I'm

3     gone.

4          THE COURT:  Well, then, can we put it on the 8th?

5          MR. MATASAR:  That would be Saturday.

6          THE COURT:  Okay.  Then the 10th.

7          MR. CARDANI:  10th.

8          THE COURT:  September 10th at 1:30.  Actually,

9     let's do it in the morning.

10          MR. MATASAR:  That's fine.  Is that 9:30 or 9

11     o'clock?

12          THE COURT:  What am I doing September 10th?

13          THE CLERK:  I have a settlement conference set for

14     you.

15          THE COURT:  At what time?

16          THE CLERK:  10:00.

17          THE COURT:  September 10th at 9:00.

18          THE CLERK:  Would you like to discuss the trial

19     date?

20          THE COURT:  Yes.  That's the other thing I was

21     going to discuss is the trial date.  Are you prepared to

22     address that at this time, or do you want to wait until --

23          MR. MATASAR:  Yes, Your Honor.  We -- I guess I

24     would like to wait on the trial date.  I expect we'll be

25     asking that it be designated a complex case so that the

1   timing not be so short.  But I think I'd like to formally

2   wait until the next hearing.

3           THE COURT:  Until the 10th?

4           MR. MATASAR:  Yes.

5           THE COURT:  All right.  We'll set it over for

6   trial setting on the 10th as well, as well as status.

7           MR. MATASAR:  Thank you.

8           THE COURT:  All right.  Thank you.  We'll take it

9   under submission.

10          MR. CARDANI:  Thank you.

11          THE CLERK:  This court's in recess.

12          Judge Coffin, are these going to be sealed or are

13  they available?

14          THE COURT:  For the record, if we could go back on

15  the record, we are going to turn over these passports to

16  pretrial services for them to hold on to.  All right?

17          *(The proceedings were concluded this*

18          *22nd day of August, 2007.)*

1     I hereby certify that the foregoing is a true and

2   correct transcript of the oral proceedings had in the

3   above-entitled matter, to the best of my skill and ability,

4   dated this 19th day of September, 2007.

5

6

7   _____

Kristi L. Anderson, Certified Realtime Reporter

8

9



10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25