# Al Rajhi Bank Ex. 1



**Rebuttal Expert Report of Aimen Dean**

*In re Terrorist Attacks on September 11, 2001*, No. 03-md-1570 (S.D.N.Y.)

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD) (SN),
United States District Court for the Southern District of New York

## Table of Contents

Introduction .................................................................................................................................... 3

Background, Expertise, Methodology, and Compensation ............................................................ 3

Summary Of Opinions................................................................................................................... 7

Opinions ....................................................................................................................................... 8

    a.  Winer and Kohlmann misrepresent the Subject Charities' supposed relationship
with al-Qaeda, and are incorrect that these charities knowingly funded al-Qaeda's
terrorist operations. ................................................................................................... 8

    b.  Winer and Kohlmann misunderstand al-Qaeda's financing and operations, and
incorrectly assume that al-Qaeda benefited from the use of accounts at Al Rajhi
Bank.  12

    c.  Winer and Kohlmann misunderstand the tenets of Islam and mischaracterize
supposed links between Sulaiman Al Rajhi or Al Rajhi Bank and "extremists." ............. 14

        (i)     Winer and Kohlmann mistakenly assume that supporters of Jihad against
foreign powers in Bosnia, Chechnya and Afghanistan also supported al-
Qaeda's terrorism........................................................................................... 14

        (ii)    Winer and Kohlmann mistakenly suggest that Sulaiman Al Rajhi's
conservative religious beliefs make him an al-Qaeda supporter............................ 16

        (iii)   Winer and Kohlmann misunderstand the importance in Islamic culture of
Sharia compliance, and mistakenly suggest that extremists were attracted to
Al Rajhi Bank because of Al Rajhi Bank's supposed support for terrorism.......... 18

    d.  Winer and Kohlmann ignore the tenets of Islam and mischaracterize the Al Rajhi
family's philanthropy as showing a connection to al-Qaeda. ............................................. 19

    e.  Based on my knowledge and experience, Winer's and Kohlmann's conclusions are
unreliable.................................................................................................................... 21

Conclusion.................................................................................................................................. 22

Subject to the MDL Protective Order

## Introduction

I have been engaged by the law firm White & Case LLP to provide this rebuttal report in the litigation against Al Rajhi Bank related to the attacks in the United States on September 11, 2001. In particular, I have been asked to respond to certain aspects of a report submitted in the litigation by Jonathan M. Winer dated October 4, 2023, and a report submitted by Evan F. Kohlmann also dated October 4, 2023.

Based on my two-year experience as a jihadist and member of al-Qaeda; my subsequent eight years still embedded in al-Qaeda but working as an undercover agent for British intelligence services; then nine years working as a counter-terrorism expert and advisor to HSBC; and the last eight years as a consultant, researcher, and commentator on counter-terrorist finance and counterterrorism, I respond below to statements in the reports suggesting that Al Rajhi family members and Al Rajhi Bank provided support to al-Qaeda through certain charities and individuals that held accounts at Al Rajhi Bank. I also address al-Qaeda's financing strategies, including their methods of raising and distributing funds, as well as their practice of disguising transactions. In this context, I further discuss a number of misconceptions and mischaracterizations evident in the Winer and Kohlmann reports.

## Background, Expertise, Methodology, and Compensation

**Background and Expertise.** I was born in 1978 in Saudi Arabia, where I lived until the age of 16. I grew up in a conservative Sunni Arab household observing the five daily prayers, adhering to the holy month of Ramadan, and attending Islamic Study Circles. I memorized the Quran by the age of twelve. From the age of 9, I trained for 7 years to become an imam. I was educated in Islamic creeds, history, jurisprudence, and matters pertaining to worship and the religious doctrines regarding finance and commercial transactions.

When the Bosnian Civil War broke out in 1992, I was a teenager with a burgeoning social consciousness of the persecution of Muslims and of *fard al-ayn*, or the 'mandatory obligation' of every able-bodied man to participate in the defense of persecuted Muslim minorities. I felt a moral and religious duty to take up arms and fight alongside the Muslims in Bosnia, so I left Saudi Arabia in 1994 to assist the Bosnian armed forces.

After 14 months in Bosnia, I attempted to reach Chechnya in 1996, where I believed Muslims were suffering at the hands of an indiscriminate Russian military campaign. The quickest way to the Caucasus was through Azerbaijan. However, I was unable to traverse to Chechnya during the winter months, and ended up working with the Al Haramain Foundation branch in the Azeri capital of Baku. I worked there for five months, surreptitiously funneling charitable support away from the charity and towards the Chechen resistance.

3

I arrived in Afghanistan in 1996. Motivated to defend Muslims wherever they may be under persecution, I swore an oath of allegiance, in person, to Osama Bin Laden in 1997. My extensive training in Islamic theology was considered an asset, and Bin Laden initially charged me with educating the al-Qaeda recruits on the holy texts and Islamic religious history. I also began training as an al-Qaeda fighter. Over time, I worked my way through various training camps and steadily rose up the ranks for two years.

I was forced to question my allegiance to al-Qaeda as a result of the 1998 bombing of the U.S. embassy in Kenya, in which 224 people were killed in two suicide bombings. Most of those who were killed were ordinary Kenyans going about their business in one of Nairobi's busiest neighborhoods. I could not overlook that this operation had no regard for the lives of innocent civilians. I was also troubled by the use of suicide bombers in both embassy attacks. I could see no religious justification for the use of suicide bombers, as I believed that the Quran explicitly forbade suicide. Ultimately, I understood that al-Qaeda's vision of Jihad had become a perversion of Islam, no longer motivated by defense of Muslims and marked by callous indifference to civilian casualties that was too much for me to stomach. I was 20 years old at the time.

When I had made up my mind to leave al-Qaeda in 1998, I traveled to Qatar. When I arrived in Doha, the authorities held me for questioning. I no longer felt the need to protect a group that was veering towards some warped interpretation of the faith that meant everything to me, so I agreed to cooperate with the authorities. It was then, in 1998, that I began to work as an undercover agent for British intelligence.

While I worked undercover, al-Qaeda tasked me with recruiting, fundraising, serving as an imam, and operating a honey-export company. As I became more involved with the financial operations of al-Qaeda, I gained audiences with decision-makers and significant figures in the organization. This access enabled me to help British intelligence to save thousands of lives, according to the UK's now-Minister of State for Security Tom Tugendhat, by thwarting several terrorist plots, such as:  a plot against British missionaries in Yemen; al-Qaeda's poison-gas plots against the New York City subway; a planned attack against U.S. sailors of the Fifth Fleet in Bahrain; and the 'nicotine poison' plot against British civilians.[1] I also assisted British intelligence in mapping out al-Qaeda's money-laundering and money-transfer operation out of London and other European cities and capitals. I acted as an undercover agent for eight years, continuing to gain responsibility in al-Qaeda until my cover was compromised in 2006.

After being fortunate enough to survive while undercover in al-Qaeda, I transitioned to the financial sector, where I continued to investigate cases of terror

---

[1] In 2022, the current UK Minister of State for Security Tom Tugendhat (then MP and a former British military intelligence officer), publicly came to my defense in an unfortunate public dispute over complaints related to my prior membership in al-Qaeda. Mr. Tugendhat stated that "thousands of lives" had been saved by my service with British intelligence. Severin Carrell, "MPs call for investigation into ex-spy's claim of discrimination against daughter," The Guardian, 22 August 2022, https://www.theguardian.com/uk-news/2022/aug/22/mps-call-for-investigation-into-ex-spy-allegations-of-discrimination-against-daughter-scotland-aimen-dean.

Subject to the MDL Protective Order

financing and monitor the adapting methods of and motivations behind this phenomenon. In 2006, upon the recommendation and reference of MI6, I began working for the multinational bank HSBC, where for 9 years I provided analysis and training, and conducted investigations pertaining to counter-terrorist financing. I carried out dozens of investigations of charities, institutions, high-net worth individuals, and financial institutions. I developed a team to carry out counter-terrorism financing due diligence, and trained senior bank management on financial crimes related to violent extremism.

In 2015, I accepted an invitation to serve as a fellow in the Program on Extremism at George Washington University in Washington, D.C. In that role, which I still hold today, I regularly advise faculty on Islamic theology and the ideology of extremist organizations, and assist with curriculum development, research, and thesis evaluation. Although I have had to limit my public appearances due to attempts on my life, I have lectured at various other institutions, including Oxford University, King's College, and Duquesne University. In 2018, 2019, and 2023, I delivered lectures at the UK Houses of Parliament, educating MPs, members of the House of Lords, and other distinguished guests on counter-terrorist financing and strategies to address radicalization.

I continue to advise on the theological underpinnings of violent extremist groups. Training seminars I currently offer include workshops on Modern Islamic Fundamentalism and Violent Extremism, in which I educate governments, NGOs, corporate security practitioners, and academics on the five modern strands of Islamic Fundamentalism (Wahhabism, Deobandism, Muslim Brotherhood, Willayat-e-Faqih, and Hezbul Tahrir) and the impact that the emergence of Jihad movements has had on global security. I also help train banking and financial professionals and regulators on the complex web of connections between religious charitable institutions, commerce, non-conventional money transfer businesses (Hawala), war zone economies, commodities markets, and supply chains. I recently provided training for the British counter-terrorism police (SO 15) on counter-terrorist financing, delving into the theological, ideological, and motivational underpinnings of terrorist financing. And I assisted the UK Ministry of Justice in formulating counter-radicalization policies for prison populations, relying heavily on the teaching of Islamic theology. I have provided similar training to the Belgium police forces and the New York Police Department.

I continue to conduct research in this field. For example, from 1999 to 2005 I contributed to a six-year ongoing study conducted by MI5, the British domestic counter-intelligence and security agency, into the theological, philosophical, ideological, and psychological motivations of individual jihadists. I was a contributing researcher and lecturer for the Inter-Disciplinary Center in Herzliya, Israel. I also conducted research into the eschatology of al-Qaeda and other jihadist groups, and how these beliefs were utilized by such groups to recruit and fundraise.

I currently lead a counter-terrorist financing consultancy and continue to advise and train a number of governments and global corporations on counter-terrorism, combatting terrorism financing, and strategic security in the Middle East. In this role, I

identify, investigate, and track terrorist financing and other forms of illicit finance in order to provide tailored and intelligence-led training to law enforcement agencies and corporations across sectors such as banking and financial services, energy, and pharmaceuticals. I regularly deploy field teams throughout the Middle East, Africa, Turkey, Pakistan, and Afghanistan to carry out on-the-ground information-gathering for clients. To support this work, I continue to be in frequent contact with members of the intelligence community and my on-the-ground sources. Our consultancy is recognized as one of the leading firms carrying out such work in the Middle East region.

In addition, I continuously conduct research into the history, politics, and social dynamics of the Middle East for my podcast "Conflicted," which has been critically acclaimed and attracts millions of listeners around the world.[2] In preparation for the podcast, I have extensively studied and discussed issues including the trajectory of the War on Terror, the philosophy and motivations of violent jihadists, the manifestations and ramifications of the Cold-War on the Middle East, and current cases of terrorism, warfare, and statecraft in the Middle East.

**Methodology.** My opinions below are based upon my research and study of al-Qaeda, Islamic charities, and terrorist financing that I have conducted for the last twenty-five years, including through my years of experience working undercover directly with al-Qaeda, the risk analysis work I did at HSBC to assess financial transactions and counterparties, and the continuing research, study, and analysis that I do as part of my consultancy work investigating international terrorist and criminal financing flows and developing countermeasures.

Kohlmann states that he uses a social-science methodology to formulate his expert opinion that, he acknowledges, relies "heavily on secondary sources" and also on numerous "tertiary sources."[3] Winer's "all-source analysis" methodology also appears heavily weighted towards secondary sources.[4] My opinions, in contrast with both Winer and Kohlmann's, are based largely on my analysis of what Kohlmann calls "primary sources," though I am also well read in the applicable secondary and tertiary sources, and I cite many as further support for my opinions and analysis below.

My primary sources include my direct observations and interactions with, among others, numerous members and leaders of al-Qaeda, other jihadists, and representatives of Islamic charities. Notably, many of these interactions I had were also contemporaneous with or shortly following the events relevant to this case. In addition, as part of my continued work in the field of counter-terrorist financing, I meet routinely with primary sources, including current and former government officials who work on counter-

---

[2] See, for example, John Phipps review of Conflicted: "Like so much good radio broadcasting, **Conflicted** shows us just how interesting it can be to listen to two intelligence people discussing the subject they know best." John Phipps, "Podcasts: Conflicted/You're Booked," THE SPECTATOR, February 29, 2020, https://www.spectator.co.uk/article/an-al-qaeda-double-agent-explains-what-s-really-going-on-in-middle-east/.

[3] Kohlmann, pg. 5.

[4] Winer, para. 1.4.

terrorist financing in the Middle East. My observations and analysis based on my interactions with these various primary sources are reflected in my opinions below.

As Kohlmann recognizes, whether a source is primary, secondary, or tertiary bears on its credibility and the weight it should be afforded, with primary sources afforded the greatest weight and credibility "to create the most accurate historical narrative."[5] I find it questionable that one's opinions on al-Qaeda, Islamic charities, and terrorism financing could be reliable without including significant analysis of contemporaneous primary sources. And it is my further conviction that without at least very strong proficiency in Arabic—the liturgical language of Islam—and a theological background in Islamic religious tenets as they pertain to taxation, finance, and charity, one cannot fully understand the complete picture of the Islamic charitable sector, al-Qaeda, or the charity sector's supposed role in the financing of al-Qaeda's terrorism. The interpretation of tenets of Islam, the role of charitable giving, and the upheaval in the Middle East and the Caucusus in the late 20th century cannot be accurately understood by looking merely through the lens of al-Qaeda. Winer and Kohlmann do not appreciate the nuance and complexity inherent to these issues, and, it appears to me, they lack the expertise to do so. Depending instead on unreliable sources and insufficient methods, they make disrespectfully broad generalizations and reach erroneous conclusions.

**Compensation.** I am being paid $1,000 per hour for the preparation of this report and service as a witness in this litigation. My compensation is not contingent on any opinion that I provide in this matter or on the outcome of the litigation.

## Summary Of Opinions

a. Winer and Kohlmann misrepresent the relationship that Islamic charities—particularly those allegedly linked to Al Rajhi Bank—actually had with al-Qaeda before 9/11. To the extent that any of the charities' foreign branches siphoned charitable support to jihadist organizations, this was done covertly, without the knowledge of the charity headquarters in Saudi Arabia, and in a manner that Al Rajhi Bank would not have been able to detect.

b. Winer and Kohlmann fundamentally misunderstand the operational norms of al-Qaeda. Because al-Qaeda's fundraising and its movement of funds for operations did not depend on formal banking channels, al-Qaeda did not rely on any use of accounts at Al Rajhi Bank.

c. Winer and Kohlmann misunderstand the movements supporting Jihad, and improperly conflate al-Qaeda's corrupted concept of Jihad with the resistance movements in Afghanistan, the Balkans, and Caucasus. In doing so, Winer and Kohlmann mischaracterize alleged links between the Al Rajhi family and al-Qaeda, and extremists' alleged use of Al Rajhi Bank.

---

[5] Kohlmann, pg. 5.

Subject to the MDL Protective Order

d.  Winer and Kohlmann misinterpret Islamic tenets on charitable giving and incorrectly attribute the Al Rajhi family's fulfillment of these tenets to extremism and support for al-Qaeda's terrorist agenda.

e.  Winer's and Kohlmann's conclusions about al-Qaeda's financing and supposed links to charities and Al Rajhi Bank are based on unreliable desktop analysis. In particular, the analysis in the CIA reports that Winer and Kohlmann depend on is not reliable.

## Opinions

**a.  Winer and Kohlmann misrepresent the Subject Charities' supposed relationship with al-Qaeda, and are incorrect that these charities knowingly funded al-Qaeda's terrorist operations.**

Winer and Kohlmann specifically discuss four organizations that they state held accounts at Al Rajhi Bank: IIRO (International Islamic Relief Organization), WAMY (World Assembly of Muslim Youth), Al Haramain Islamic Foundation ("AHIF"), and MWL (Muslim World League), which I will refer to collectively as the "Subject Charities" (although MWL is not itself a charity but an international body that oversees various charities including IIRO).[6] Winer and Kohlmann both characterize the Subject Charities as "systemic[ally]" involved in terrorist activity.[7] Winer and Kohlmann misrepresent the role that the Subject Charities played in the region pre-9/11, and in particular the relationship that these charities had with al-Qaeda during the years leading up to 9/11. Any funneling of support to armed jihadists was not approved, and most likely not even known, by the charity headquarters in Saudi Arabia, but was an abuse of the headquarters' difficulty in maintaining oversight.

Specifically, Winer and Kohlmann display a fundamental misunderstanding of how these charities functioned and how any charitable donations or other support may have ended up in al-Qaeda's hands. As I describe below, the Subject Charities in fact were widely known and recognized for their *good* works and efforts to facilitate relief in far flung places in need. Where charitable funds or supplies were siphoned to jihadi activities, that was done in such a way as to deceive the charity headquarters about the destination and use of that support.

To begin with, the Saudi Subject Charities were well known for their good works. The religious context of these activities is important. Islamic charities tend to be prevalent in warzones, and this can be traced to the special merit in Islam for providing assistance to displaced refugees. The vast majority of the activities of the Subject Charities—even by the branches that may have been infiltrated by pro-jihadists—were directed at and benefited vulnerable communities desperate for help, for example, in Afghanistan,

---

[6] For example, Winer, para. 2.9; Kohlmann, pg. 41.

[7] For example, Winer, para. 11.2 (regarding Al Haramain and IIRO), and para. 2.11; Kohlmann, pg. 17 (regarding IIRO) and pg. 31 (regarding WAMY).

Subject to the MDL Protective Order

Pakistan, Bosnia and Chechnya. I saw firsthand that the charitable works provided by these organizations were instrumental in maintaining the dignity and health of the refugees created by conflicts.

Winer's and Kohlmann's descriptions of the charities, however, could lead a reader unfamiliar with the terrain to believe that, besides doing good deeds, the Subject Charities had the express intent and organizational directive to fundraise for terrorist activity.[8] This is not accurate.

The Subject Charities in Saudi Arabia were not operated as fronts for al-Qaeda, and al-Qaeda had no involvement in the charities' operations. However, at least in some instances, the charity branches suffered from a severe lack of oversight. Winer acknowledges this as well, noting that: "Information available on charities that provided material support to al-Qaeda and other terrorist groups prior to 9/11 shows a recurrent pattern of deficient controls, missing funds, false invoicing, and other schemes to make accurately reconstruing how they actually spent their funds impossible."[9] It was this lack of oversight that allowed some resources intended for charitable purposes to end up in the hands of militants.

I saw first-hand at an Al Haramain branch in Azerbaijan how field managers and low-level actors deceived the headquarters in Saudi Arabia. When I first arrived at the Al Haramain branch in Baku, we engaged in 'cooking the books.' There were plenty of book-keeping and other tricks that worked well. For example, we would invent the names of volunteers to justify more funding. When Al Haramain head-office officials came to check on the operations, we moved thousands of bewildered refugees from one camp to another to more than double the number of supposed beneficiaries. Sometimes we would pull down tents and make children cry, videotape the fabricated calamity, and send it to Al Haramain's headquarters in Riyadh with a plea for more money and shelters. In another scheme, a pliable local doctor provided falsified certifications, with invoices attached, for various fictional procedures. With schemes like these, the Al Haramain branch raked in enough money to pay off its Azeri patrons and buy supplies for the Chechen resistance. I personally saw the same type of deception happening at other charity offices in Baku, and in Tbilisi, Georgia.

The fact that some charities' branches may have had deficient controls cannot be considered intentional support from the headquarters for terrorism as Winer suggests.[10] What is important to understand about this region during this time is the utter lack of communication infrastructure that existed. As I saw the situation on the ground, the

---

[8] See, for example, Winer para. 2.11 (asserting that the charities' "two types of activities - humanitarian and terrorist - were inextricably intermingled in the international operations of the principal Islamic NGOs who contributed to supporting Bin Ladin, al Qaeda, and similarly-minded terrorist organizations in the days, months, and years that preceded the 9/11 attacks"); Kohlmann, pg. 25 (FN. 159, referring to charitable organizations, including IIRO, and front companies that provided funds for extremist groups).

[9] Winer, para. 2.8.

[10] Winer, para. 2.8.

Subject to the MDL Protective Order

charities' headquarters in Saudi Arabia had little practical ability to reliably confirm how the branch offices were utilizing resources. Cell phones or email were not readily available to alert headquarters to potential abuses. The Subject Charities generally were unable to independently verify stories, effectively audit regional accounts, or confirm localized natural disasters. All global organizations—not only the Subject Charities—attempting to provide humanitarian aid in these conflict zones faced similar challenges to the oversight of branch offices. It was due to the inability to effectively monitor regional offices, and not a directive from the organization to support terrorists, that some charity branches later became designated for ties to terrorism.

To the extent that the Subject Charities were implicated in supporting jihadist efforts, it was individual branches of the charities that were exploiting weak controls, embezzling funds from the charity headquarters, and deceiving the headquarters about how the funds were used. The CIA acknowledged this phenomenon: Winer reports that the CIA in 1999 recognized that in instances where large, internationally active Islamic NGOs and charities headquartered in the Persian Gulf countries had been linked to terrorist groups, the NGOs were "most often exploited by individual employees sympathetic to terrorist causes without the knowledge of the organization's leadership. The illicit activity tends to take place at local branch offices rather than at headquarters location."[11] The U.S. State Department thought that this was how IIRO resources supposedly ended up going to support "violent operations": Kohlmann states that a 2004 U.S. State Department diplomatic cable alleges that "'some elements of the International Islamic Relief Organization (IIRO) have been *exploited* by terrorists and their financiers as a means of transferring assets, providing organizational cover, or otherwise supporting extremist, violent operations.'"[12] The acknowledgement by the United States that only "some" foreign elements of the Saudi charities were exploited while the headquarters were unwitting matches my research and experience.

This reality contradicts Winer's and Kohlmann's assumption that, because the Subject Charities supposedly engaged in terrorist financing and also held accounts at Al Rajhi Bank, the Bank must have knowingly supported terrorism.[13] If the Subject Charities in Saudi Arabia lacked visibility into the mis-use of funds by some foreign branches, then the Bank could hardly have had reason to know through its banking relationship with the Subject Charities in Saudi Arabia of such wrongdoing by the charity branches that were not the Bank's customers.

Another major and pervasive flaw in Winer's and Kohlmann's understanding is that they characterize any alleged support for armed resistance against Russian and Russian-backed forces in Afghanistan (from 1979-1992) and Chechnya (from 1994-1996), and against Serbian forces in Bosnia and Kosovo (from 1992-1995), as support for al-

---

[11] Winer, para. 4.2.2 (quoting April 9, 1999 CIA Report).

[12] Kohlmann, pg. 18 (my emphasis).

[13] Winer, para. 6.6; Kohlmann, pg. 11.

Qaeda—by which they imply al-Qaeda's terrorism against civilians in the United States.[14] This conflation is extremely misleading.

As discussed in section (c) below, the ideological motivations behind al-Qaeda's terrorism were very different from the resistance movements in the Balkans and Caucasus. And in practice, support for the jihadist campaigns against the Serbs and Russians was not allocated for the benefit al-Qaeda or its operations in other theaters. On the ground, al-Qaeda had practically no role in Chechnya or Bosnia. In Chechnya, most of the fighters were Chechens who had never heard of al-Qaeda. The number of foreign fighters was actually quite small. I personally observed that the leadership of this foreign contingent had no interest in coordinating with al-Qaeda in its global terrorism campaign. The focus of the jihadists in Chechnya was resistance to Russian domination.

In Bosnia, the foreign resistance fighters (I was one) operated under the auspices of the Bosnian government. Because al-Qaeda was dedicated to the idea of an Islamic state, al-Qaeda wanted nothing to do with resistance alongside Bosnian forces, and strongly criticized other jihadist groups for subordinating their forces to the "secular" Bosnian government.

Due to these rifts, one cannot consider that any charity resources diverted to the mujahideen in Bosnia, Kosovo, Chechnya, and against Russia and Russia-backed forces in Afghanistan, were meant as support for al-Qaeda, much less al-Qaeda's terrorism against the United States. Winer himself acknowledges a distinction between the "pan-Islamic war effort against the Soviets which Bin Laden *then* turned into an agenda of terrorism targeting the United States, and sometimes other countries, under al-Qaeda."[15]

Funds diverted from the charity branches in the 1980s and the 1990s were channeled to resistance fighters against the Russians and Serbs in Chechnya and Bosnia and Kosovo—not to al-Qaeda. While working with al-Qaeda, I never encountered any representatives from any Subject Charity who met with al-Qaeda to discuss providing support—whether financial or in-kind support—for al-Qaeda's operations. Al-Qaeda's Afghanistan camps did indirectly receive a very small amount of in-kind support misappropriated from local charities. But, contrary to Winer's assertions,[16] all of this was purely humanitarian-type support irrelevant to foreign terrorism operations.

---

[14] See, for example, Winer para. 11.8.9 (answering the question *"What was the Nature of That Support [for Al Qaeda] and When Was it Provided and How was ARB Providing it?"* with the response that Al Rajhi Bank was "Providing accounts to Al-Haramain for its operations in Europe and Africa, which the Stabilization Force in the former Yugoslavia concluded, based on documents found in raids on the Al-Haramain offices in Croatia, had employees in Albania, Bosnia, Croatia, and Kosovo supporting al Qaeda."); Winer, paras. 2.6, 2.7.1, 2.9.4..2, 4.1, 4.2, 4.10.3, 4.10.4, 4.11.3, 4.11.4, 6.2.6, 6.9.5..10, 6.10.2..4, 6.10.3..9, 6.10.3..11, 6.11.5..2, 6.19, 7.3.12, 7.3.15, 7.6.21, 8.2.3. 8.21.6, 8.22.8, 8.38, 10.8.3..1, 10.15.1..1, 10.15.1..2, 10.15.8..1, 11.8, 11.8.4, 11.8.9, 11.10.4, and 12.4.3; Kohlmann, pg. 7, 12-13, 21-23.

[15] Winer, para. 4.10.1 (my emphasis added).

[16] Winer, para. 2.9 ("The records provided to me from ARB show that it provided accounts to or had relationships with a number of charities which each provided significant material support to al Qaeda without which it would not have achieved its global capabilities.").

Subject to the MDL Protective Order

One must recognize that at least some of the charitable support and aid provided to populations in war-torn areas, regardless of the donor, will be diverted for use by unintended beneficiaries.[17] For example, while I was involved with al-Qaeda, I saw in Afghanistan that far more prevalent than assistance from any charities was humanitarian-type in-kind aid misappropriated from the UN World Food Program and U.S. AID. Examples like this, however, do not indicate an intent by the organizations providing the resources to support terrorism operations and aims.

I note that Winer in particular has employed the term "Da'Wah Organizations" to refer to the Subject Charities. Winer provides no basis for this characterization, but seems to associate *da-wah* with extremism.[18] *Da-wah* means "invitation," and in the religious context means an invitation to Islam. Islam—like many other faiths—is a proselytizing religion. Equating *da-wah* with extremism is terribly misinformed and offensive.

> **b.  Winer and Kohlmann misunderstand al-Qaeda's financing and operations, and incorrectly assume that al-Qaeda benefited from the use of accounts at Al Rajhi Bank.**

Winer's and Kohlmann's opinions about Al Rajhi Bank's supposed role in financing al-Qaeda assume that al-Qaeda was running an operation heavily reliant on having close relationships with banks, Al Rajhi Bank in particular,[19] and that the maintenance of accounts at Al Rajhi Bank was evidence of that close relationship.[20] I know that this understanding is not correct.

Contrary to Winer's and Kohlmann's statements,[21] al-Qaeda primarily operated through cash and in-person hand-offs rather than bank transactions. The funds needed for the day-to-day operations of al-Qaeda were not funneled through deposits and

---

[17] See Oliver May and Paul Curwell, TERRORIST DIVERSION: A GUIDE TO PREVENTION AND DETECTION FOR NGOs, xix ("It is an open secret in the humanitarian and global development sector that diversion to terrorists and other sanctioned entities is more common than many might think. It is under-detected, under-reported, and under-managed – but not well understood."). For example, an internal UN Security Council report estimated that as much as half of the food aid sent to Somalia by the World Food Program was diverted to corrupt contractors, militants, and local staff. Jeffrey Gettleman and Neil MacFarquhar, "Somalia Food Aid Bypasses Needy, U.N. Study Says," New York Times (March 9, 2010) https://www.nytimes.com/2010/03/10/world/africa/10somalia.html. To combat this prevalent issue, the OECD has developed recommendations for best practices by development agencies. OECD Recommendation of the Council for Development Cooperation Actors on Managing Risks of Corruption, https://www.oecd.org/corruption/oecd-recommendation-for-development-cooperation-actors-on-managing-risks-of-corruption.htm.

[18] See, for example, Winer, para. 7.2.12 (asserting that Al Rajhi Bank "handled hundreds of bank accounts in total for Da'Wah Organizations that had extensive links to the support of terrorism generally and to al Qaeda specifically").

[19] Winer, para. 2.12 ("In addition to using charities to support his terrorist activities, Bin Ladin used financial institutions to assist him in his work to build al Qaeda. ARB was one of the financial institutions that was extensively implicated in facilitating terrorist transactions for al Qaeda and other extremist groups.").

[20] See, for example, Kohlmann pg. 7-8; Winer, paras. 7.2.1, 7.2.4, 7.2.5, 7.2.6, 7.2.7, 7.2.8, 7.2.9, 7.2.11, and 7.2.12 (arguing that Al Rajhi bank had a 'unique' relationship with jihadist and al-Qaeda pre-9/11 because of the existence of accounts).

[21] Winer, para. 6.1 ("There is evidence that al Qaeda relied on sympathetic financiers and financial institutions to raise and move money prior to September 111, 2011."); Kohlmann, pg. 41 ("It is also clear that Al-Rajhi Bank provided key, high value financial services to the 9/11 hijackers, their associates, and the most important Al-Qaida charities . . . .").

Subject to the MDL Protective Order

checking accounts in banking institutions. Instead, cash was the primary mode of financing, and this cash was not kept in banks.

Al-Qaeda primarily utilized the *hawala* system. The *hawala* system was introduced by Arab traders over a thousand years ago to transfer money along the Silk Road. The system thrives in countries with poorly functioning financial systems, typical in war-torn regions. The *hawala* system was well established in Afghanistan at least since the 1980s because it supported Afghanistan's largest industry, the export of heroin around the globe. *Hawala* networks facilitate cash transfer outside the banking system and without the physical movement of money. *Hawala* is based on the honour system, so there is no paper trail lodged with third parties. While the formal banking system is fairly transparent, the *hawala* system is almost completely opaque. Al-Qaeda utilized *hawala* in every country of the Middle East and in Europe as well. Al-Qaeda had no reason to abandon this secret, secure, reliable, and nearly instantaneous system to create a paper trail under the scrutiny of the formal banking system. In any case, before 9/11 Afghanistan did not have a well-functioning banking system.

As an undercover agent during my time in London, I personally handled the movement of money from Europe to al-Qaeda. We used the *hawala* system or simply sent cash for hand delivery. Either way, this often involved one person handing another person a bag with large amounts of currency and a mere slip of paper with the name of the recipient. By using cash and relying on the goodwill and the secrecy of thousands of participants, al-Qaeda could evade the scrutiny of authorities.

Winer is wrong to suggest that al-Qaeda depended on donations from the Subject Charities.[22] Instead, the funds for al-Qaeda's operations largely came from the business ventures of al-Qaeda members. The encouragement of independent entrepreneurship within al-Qaeda's ranks was not an alien idea, given that Bin Laden himself came from a business family. By encouraging members to start import and export businesses to fund themselves, al-Qaeda was able to divert funds from its welfare system to the expansion of military training camps.

The region offered several profitable export opportunities. There was honey from the Kashmiri mountains, Himalayan pink salt, and Afghan carpets—all of which were coveted by consumers in the region and commanded high margins. Importing was also a significant source of income for al-Qaeda. Members got into the business of importing cars, fertilizers, and other agri-nutrients. I myself used an export business as a cover while operating as an agent for MI6, because al-Qaeda favored financially independent members—particularly those who could contribute to the cause. In my case, my business partners and I sourced honey from Kashmiri suppliers and sold our products at a mark-

---

[22] See, for example, Winer, para. 2.5 ("The funds and support from the charities assisted al Qaeda and its affiliates in essentially every aspect of their terrorist activities."); Winer 2.9 ("The records provided to me from ARB show that it provided accounts to or had relationships with a number of charities which each provided significant material support to al Qaeda without which it would not have achieved its global capabilities.").

Subject to the MDL Protective Order

up of roughly 1,000 percent. On top of this, protection of the opium trade was one of the largest sources of funding for al-Qaeda operations. I observed first hand that drug cartels in Afghanistan paid al-Qaeda millions of dollars to protect the heroin caravans passing from Afghanistan into Iran.

It was through businesses like these that al-Qaeda was able to become a self-sustaining entity and finance its operations. While undercover for MI6, based on my interactions with the al-Qaeda leadership handling finances and my participation in meetings where revenue was reported, I estimated that the al-Qaeda enterprises (legitimate and illicit) were generating upwards of at least $20-30 million per year before 9/11 to support operations. Winer and Kohlmann do not identify any funding transactions from the Subject Charities to al-Qaeda, and I am aware of none, let alone funding that would have meaningfully contributed to al-Qaeda's budget—and certainly not through the formal banking system.

     c.   **Winer and Kohlmann misunderstand the tenets of Islam and mischaracterize supposed links between Sulaiman Al Rajhi or Al Rajhi Bank and "extremists."**

          (i)  <u>Winer and Kohlmann mistakenly assume that supporters of Jihad against foreign powers in Bosnia, Chechnya and Afghanistan also supported al-Qaeda's terrorism.</u>

Winer and Kohlmann misinterpret Islamic tenets and mischaracterize alleged links between the Al Rajhi family and Islamic extremists. Specifically, Winer and Kohlmann interchangeably refer to "extremism"; "Wahabbism"; jihadist causes in the defensive theaters of Afghanistan, Bosnia, and Chechnya; and "al-Qaeda."[23] This is misleading and ignorant. Winer, Kohlmann, and the CIA reports they cite are incorrect in suggesting that anyone who supported the resistance movements in Bosnia or Chechnya or the Afghan mujahideen must also have supported al-Qaeda's terrorist agenda.[24]

---

[23] For example, in discussing his background, Winer states: "[W]e were concerned that the 1979 attack on the Grand Mosque, which attacked the religious legitimacy of the Saudi ruling family, had led the Saudi Arabian government to defend itself through exporting an extreme interpretation of Islam called Wahabism globally, allying itself with Islamic extremism and thereby avoiding becoming a further target of it. Because the religious/political concept of holy war, or jihad, could be applied to a range of potential targets and contemporary political conflicts, not just the Soviets in Afghanistan, we were concerned that Gulf State support for 'pan-third world and pro-Islam ideology' was creating a potential ideological, religious, and in practice, economic, foundation for supporting terrorism." Winer, para. 1.5.1..3. See also the references in footnote 14, above.

[24] Winer and Kohlmann consistently refer to support for jihadi forces in defensive theaters such as Afghanistan and Bosnia in the early 1990s without clarifying that these are distinct from Al Qaeda. See, for example, Winer, para. 6.10.3..9, ("Two pages of the November 20, 1997 CIA report are devoted to the links between ARB and financial support for Islamic extremism, including the Afghan Mujahadeen in Pakistan, the MAK, and Islamic groups in Bosnia during the Bosnian conflict…At the outset of the section, after describing the Al Rajhi family as 'secretive and religiously ultraconservative,' the CIA stated 'the most compelling [redacted] information on Islamic extremist links to the Al Rajhi family and ARABIC [ARB] documents their financial support for the Afghan Mujahadeen in Pakistan via humanitarian organizations, including through the MAK.'"); Kohlmann, pg. 7. See additional references in footnote 14, above.

Subject to the MDL Protective Order

It is important to clarify that Jihad is not synonymous with terrorism. Jihad is a term often used very loosely, but it has specific meanings in Islam. The term stems from the root *j-h-d* meaning "effort" or "struggle." In a religious context, Jihad covers two crucial aspects of Islam. One concerns the inner struggle against worldly temptations such as alcohol, theft, extra-marital affairs and so on—the struggle to be a better Muslim. The second aspect covers military struggle. Whenever Jihad is mentioned in the Quran outside the spiritual context it usually means participation in military conflict.

It is also critical to recognize that Jihad is exclusively the prerogative of the political state. Intrinsic to a correct understanding of Jihad is that it is not a religious tool to be appropriated by rogue, non-state actors. Yet the most common misconception is that Jihad means the right of any Muslim to wage a "holy war."[25] There is nothing holy about a war, and there is no such concept in Islam. Jihad is not a call to indiscriminate violence.[26] To wage Jihad, as interpreted in a theologically faithful manner, means to fight injustice under the auspices of a state actor. The overwhelmingly predominant perspective of Jihad supporters accepts the interpretation of Jihad as a state-sanctioned effort normally to defend Muslims from violent aggression. This perspective distinguishes between the Jihad movements in Afghanistan, the Balkans and Caucusus, and the beliefs ultimately behind al-Qaeda's agenda of terrorism.

In the 1980s and the early 1990s, the Afghan mujahideen resistance to the Soviet invasion of Afghanistan was supported by multiple governments across the world—including the United States, many European governments, and U.S.-allied countries in the Middle East. All these countries contributed to and positively supported the Afghan mujahideen's efforts to repel the Soviet invasion. Many understood the invasion of Afghanistan as one step toward the Soviet Union's larger, more menacing objective: to gain strategic control over oil shipping out of the Persian Gulf.[27] It was a perceived geopolitical threat—not expansionist "Wahabbism"[28]—that motivated Saudi Arabia's

---

[25] Winer, para. 1.5.1..3 ("[T]he religious/political concept of holy war, or jihad, could be applied to a range of potential targets and contemporary political conflicts . . . .").

[26] The Quran teaches: "That is why We ordained for the Children of Israel that whoever takes a life—unless as a punishment for murder or mischief in the land—it will be as if they killed all of humanity; and whoever saves a life, it will be as if they saved all of humanity." The Quran, Al Ma'idah, 5:32.

[27] See, for example, Selig S. Harrison, "Baluch Nationalism and Superpower Rivalry," International Security, Winter 1980/81 (Vol. 5, No. 3) (explaining that: "Together with continued Soviet access to military facilities in South Yemen, the Soviet development of naval and air bases at Gwadar, Pasni and other Baluch ports would make it difficult, if not impossible, for the United States to defend the Straits of Hormuz in a conventional war . . . ."); William Branigin, "Baluchi Harbor a Lure to Soviets," Washington Post (February 9, 1980), https://www.washingtonpost.com/archive/politics/1980/02/09/baluchi-harbor-a-lure-to-soviets/03454a5a-706d-40b8-b4e2-e2608088e75a/ (referring to the "natural deep warm-water harbor" at Gwadar: "The Soviet Union, having moved to Baluchistan's doorstep through its invasion of Afghanistan, is closer than ever to reaching that long-sought goal, one that has eluded the Russian czars and their Soviet successors. If that prize were ever attained, a Soviet naval base here would enable Moscow to control the mouth of the West's oil lifeline, the Persian Gulf, and the strategic Strait of Hormuz 400 miles to the west.").

[28] See, for example, Winer 1.5.1..3. (explaining his concern that the Saudi government, by "the arming of the Afghan Mujahadin against the Soviets," was engaged in a policy of "exporting an extreme interpretation of Islam called

15

support for the cause of the Afghan mujahideen. Accordingly, the jihadi fighters who participated in armed resistance in Afghanistan at this time were not considered terrorists; any charities supporting these efforts were not deemed supporters of terrorism; and the world governments—including the United States—that supported this resistance were not deemed terrorist sponsors. Similarly, those jihadis who served with the Bosnian armed forces or the Chechen rebels were acting under the auspices of state actors or on behalf of a state.

Osama Bin Laden's view of Jihad was not tied to defending Muslims on behalf any state, but instead called for global conquest by offensive terrorism, including by means (like suicide operations against civilians) anathema to traditional Islam. However much al-Qaeda might dress up their terrorism as a defense of Islam, this manipulative use of the word "Jihad" is not comparable to the defense of Muslims in Afghanistan, the Balkans or Caucasus.

Winer and Kohlmann, however, ignore the historical context and the philosophical motivations behind these movements, and fail to acknowledge the distinction.[29] Any allegations of Al Rajhi family links to "extremism" or that Al Rajhi Bank was "used" by or "preferred" by so-called "extremists" in Bosnia, Chechnya, or the Afghan mujahideen resistance cannot be understood as an allegation that the Al Rajhi family or Al Rajhi Bank supported al-Qaeda's terrorism.

(ii) <u>Winer and Kohlmann mistakenly suggest that Sulaiman Al Rajhi's conservative religious beliefs make him an al-Qaeda supporter.</u>

The Winer and Kohlmann reports and the CIA documents they rely on also exemplify a view of Islamic sects that is regrettable and misleading. For example, Kohlmann relates a CIA report that Sulaiman al Rajhi "'wear[s] a full-length beard and traditional Wahhabi garments,' and 'has been widely reported to support Islamic extremist policy.'"[30] This amounts to a thinly-veiled xenophobic suggestion that because someone dresses in a religiously adherent manner, they must support violent extremism.[31] These insinuations betray a deep misunderstanding of the Islamic

---

Wahabism globally, allying itself with Islamic extremism" to defend "the religious legitimacy of the Saudi ruling family").

[29] See, for example, Winer para. 6.10.2.4 (quoting a November 20, 1997 CIA report, "The religiously ultraconservative Al Rajhi family—owners of the Al Rajhi Banking & Investment Company, with $8.6 billion of total assets—appears to be a key financial backer of the Afghan Mujahaddin. [redacted] The family and the bank purportedly also support NGOs who help finance the Bosnian Mujaheddin, HAMAS, and other extremists."); 11.14.2 ("[A]s of the late 1980's, members of the Al Rajhi family had funded jihadists and al Qaeda affiliated persons and entities.").

[30] Kohlmann, pg. 7.

[31] See Winer, para. 6.10.2.4 (quoting a November 20, 1997 CIA report as referring to the Al Rajhi family as "ultraconservative" when alleging that the family supports extremists).

Subject to the MDL Protective Order

movements, particularly the strains of Salafism, within which so-called "Wahhabism" is found.[32]

As context, the Al Rajhi family is one of the most prominent and recognizable families in the Arab world. Suleiman Al Rajhi in particular is an icon of the business community, while also famously humble and generous. He is reported to be one of the most generous people in the world.[33] And he is known to be a very pious Muslim. Yet, within al-Qaeda, Sulaiman Al Rajhi had a reputation as not being sympathetic to al-Qaeda's extreme views and instead as being an adherent of the non-violent, "Quietist" branch of Salafism.

While the Salafi movement attracted attention after 9/11 as ideological inspiration for violent terrorist organizations, including al-Qaeda and the Islamic State, it is more accurate to understand Salafism as a "complex and multifaced conservative global Islamic movement," with multiple strains.[34] The Salafi movement, which encompasses so-called Wahhabi institutions, can generally be understood as a conservative movement to reassert "Islamic authenticity."[35] The vast majority of Salafists adhere to a branch of the movement known as "Quietists." Tenets of the Quietist strand of the Salafi movement include overt rejection of political activism and preservation of the community from strife and disorder.[36] Quietist Salafism teaches obedience to the local government and total abhorrence of violence as a means for change or to challenge the authority. Respect for authority, law, and order is at the core of the Quietist sect. I am certain that there were no Quietists among al-Qaeda's ranks.

Osama Bin Laden, at least since he departed Saudi Arabia in 1992 and then was stripped of Saudi citizenship in 1994, was focused on the destruction of the House of Saud and the re-establishment of an Islamic caliphate in Saudi Arabia.[37] The Quietists considered al-Qaeda's antagonism to the Saudi royal government to be seditious and unlawful rebellion. It is inconceivable that the Al Rajhi family, as known Quietists, would support al-Qaeda's core agenda. And from the point of view of al-Qaeda, Sulaiman Al

---

[32] Kohlmann and Winer's ignorance of the well-known strains of Salafism, which are generally described even on Wikipedia, is telling. See Wikipedia, "Salafi Movement," https://en.wikipedia.org/wiki/Salafi_movement (explaining that two of three strands of the Salafi movement—the majority of Salafi adherents—eschew violence).

[33] See Emma Martin and Tanza Loudenback, *The 20 Most Generous People in the World*, BUSINESS INSIDER (October 12, 2015), https://www.businessinsider.com/most-generous-people-in-the-world-2015-10. Sulaiman Al Rajhi was recognized for his service to Islam, including by having given away half of his fortune to charity. Saudi Gazette, "Al-Rajhi gets King Faisal Prize for serving Islam," (March 7, 2012) https://archive.ph/dgbY9#selection-281.1-281.210.

[34] Alexander Meleagrou-Hitchens, Salafism in America History, Evolution, Radicalization, PROGRAM ON EXTREMISM, The George Washington University (October 2018), 1.

[35] Laurent Bonnefoy, Saudi Arabia and the Expansion of Salafism, NORWEGIAN PEACEBUILDING RESOURCE CENTER, Policy Brief, September 2013, 1.

[36] Laurent Bonnefoy, Saudi Arabia and the Expansion of Salafism, NORWEGIAN PEACEBUILDING RESOURCE CENTER, Policy Brief, September 2013, 2.

[37] See the 1995 edict from Osama Bin Laden criticizing Saudi Arabia's royal regime, a translation of which is publicly available here: https://ctc.westpoint.edu/wp-content/uploads/2013/10/Open-Letter-to-King-Fahd-from-bin-Laden-Translation.pdf.

Subject to the MDL Protective Order

Rajhi was another member of the Saudi "establishment," a supporter of the hated Saudi monarchy, and even an apostate.

The Al Rajhi family's own antagonism to violence and extremism is widely known, even a matter of public discourse, and apparent from my own research. By way of example, the Sulaiman bin Abdulaziz Al-Rajhi Charitable Foundation in Saudi Arabia has been honored for supporting projects like the "Our Security in the Safety of Our Thought" initiative, which "aims to protect intellectual security in society and confront extremism and fanaticism."[38] And publicly available statements that appear to be endorsed by Suleiman Al Rajhi himself oppose extremism and support the security of the state.[39]

> (iii)    <u>Winer and Kohlmann misunderstand the importance in Islamic culture of Sharia compliance, and mistakenly suggest that extremists were attracted to Al Rajhi Bank because of Al Rajhi Bank's supposed support for terrorism.</u>

Winer and Kohlmann obviously attempt to imply that, because certain individuals and institutions held accounts at Al Rajhi Bank, the Al Rajhi family and Al Rajhi Bank must have condoned the beliefs of those individuals.[40] This is nonsensical. One simply cannot attribute to any business the beliefs of certain customers. On top of that, Winer and Kohlmann fundamentally misunderstand the role of Al Rajhi Bank and its indispensability to all devout Muslims in Saudi Arabia before 9/11.

The importance to devout Muslims of banking in compliance with Sharia law cannot be overstated. Interest-based lending (including earning interest on deposit

---

[38] See Suleiman bin Abdulaziz Al Rajhi Charitable Foundation press release, 'Saweer Cooperative in Al-Jouf' Honors Al-Rajhi Charity for Supporting the Project 'Our Security in the Safety of Our Thought' Project (July 5, 2017), https://rf.org.sa/ar/news/5068.

[39] See, for example, press release by Advanced Manara Company, an organization founded and funded by Suleiman Al Rajhi to serve the needs of mosques, regarding a sermon at a mosque maintained by the organization; the press release focuses on the speaker's urging that a "Muslim should perform his mission in defending his religion and the security of his homeland and stand with the brave security men to combat terrorism and extremism." *Speech of His Excellency the General President of the Grand Mosque and the Prophet's Mosque Affairs at the Company's Branch in Makkah*, ADVANCED MANARA COMPANY (May 2, 2019), https://rm.org.sa/ar/news/234.

[40] See, for example, Winer, para. 6.11.11..1. ("Islamic extremists have used AL-Rajhi Banking and Investment corporation (ARABIC) [ARB] since at least the mid-1990s as a conduit for terrorist transactions, probably because they find the bank's vast network and adherence to Islamic principles both convenient and ideologically sound. Senior al-Rajhi family members have long supported Islamic extremists and probably know that terrorists used their bank."); Kohlmann, pg. 8 ("Among the contemporary Saudi clerics who have most aggressively promoted violent jihad, one name stands out in particular – Sulayman bin Nasir bin Abdullah al-Alwaan (a.k.a. "Abu Abdullah")"), and pg. 16 ("Before his initial arrest in Saudi Arabia in 1994, al-Awdah allegedly told his followers that Al-Rajhi Bank was 'the only financial institution in Saudi Arabia that followed Islamic guidelines and, therefore, the only bank worthy of Muslim deposits.' According to an undated CIA report, 'the Al Rajhi family subsequently became a major financial supporter of al-Awdah.'").

Subject to the MDL Protective Order

accounts) is forbidden and considered to be a mortal sin,[41] subjecting the sinner to dire consequences in this life and the next.[42] A strictly adherent Muslim is compelled by the tenets of Islam to bank with a Sharia-compliant bank where possible.

Winer overlooks this religious significance in suggesting that Al Rajhi Bank catered to extremists: "To sum up, ARB was the 'Extremist Bank of Choice,'…because ARB provided them with essentially everything they could hope for in a bank."[43] Winer and Kohlmann and the CIA reports they cite ignore that in the 1990s and prior to 9/11 Al Rajhi Bank was the *only* bank in Saudi Arabia able to offer *any* devout Muslim what they hoped for in a bank, that is, full compliance with Sharia law. It was not until 2004 that the next Sharia-compliant bank, Bank Bilad, became an option in Saudi Arabia.[44]

      **d. Winer and Kohlmann ignore the tenets of Islam and mischaracterize the Al Rajhi family's philanthropy as showing a connection to al-Qaeda.**

Winer and Kohlmann attempt to paint the vastness of the Al Rajhi family's philanthropy, including through leading charities in Saudi Arabia, as showing a "unique relationship" with those charities, and that this "unique relationship" somehow demonstrates the Al Rajhi family's support for terrorism.[45] Winer specifically points to the fact that "Suleiman al Rajhi is the Kingdom's largest payer of *zakat* (charitable donations); he reportedly maintains a staff of 20 to manage his unpublicized charitable endeavors."[46] In the context of Islamic teachings and Saudi culture, there is nothing nefarious at all about charitable giving to prominent Saudi charities by the Al Rajhi family, even anonymously, in devout fulfillment of Islamic law.

Zakat is not a donation; it is a mandatory religious tax levied on certain assets and agrarian income. Islam encourages voluntary charitable contributions in addition to Zakat. In Islamic theology, the importance of Zakat compliance ranks close to completing the daily prayers. To qualify as fulfilling the obligation of Zakat, a payment must satisfy specific criteria listed in the Quran. Zakat payments by organizations are collected in

---

[41] See, for example, Saḥīḥ *al-Bukhārī* 6857, Saḥīḥ *Muslim* 89, "Abu Huraira reported: The Prophet, peace and blessings be upon him, said, 'Stay away from seven mortal sins.' They said, 'O Messenger of Allah, what are they?' The Prophet said, 'Idolatry with Allah, occult magic, killing a soul that Allah has sanctified except for a just cause, consuming usury, usurping the property of an orphan, fleeing the battlefield, and accusing chaste but unwary believing women.'"

[42] See, for example, The Quran, al-Baqarah, 2:275-281, "Those who benefit from interest shall be raised like those who have been driven to madness by the touch of the Devil; this is because they say: 'Trade is like interest' while God has permitted trade and forbidden interest. Hence those who have received the admonition from their Lord and desist, may keep their previous gains, their case being entrusted to God; but those who revert shall be the inhabitants of the fire and abide therein for ever."

[43] Winer, para. 11.14; also 11.14.7 (inferring from CIA's report that "ARB welcomed providing an array of banking services to those who were helping al Qaeda.")

[44] See Economist Intelligence Unit (EIU) Financial Services Report: Banks, August 23, 2010.

[45] See Kohlmann, pg. 41 ("Given the long, close relationship between Sulaiman al-Rajhi and his family with the leaders of the charities, the Saudi conservative clergy, and others within the Saudi power hierarchy, it strains credulity that the Al-Rajhi family and Al-Rajhi Bank could have unintentionally provided so much support over a period of a decade or more to a long list of Al-Qaida sympathizers without having any clue as to their real goals,"); Winer paras. 7.1; 8.1.

[46] Winer, para. 8.2.2.

Subject to the MDL Protective Order

Saudi Arabia by a state body. Zakat payments and charity paid by individuals are traditionally given through authorized recipients who ensure compliance with the strict beneficiary requirements for paying Zakat. The Saudi government closely regulates any charity that receives payment of Zakat.

Winer asserts that Al Rajhi Bank and Al Rajhi family members had "unique" relationships with the Subject Charities.[47] But Winer ignores that at that time there were actually only a few large regulated charities in Saudi Arabia capable of receiving significant Zakat payments, and it was well known that many other major companies and prominent families throughout the country were donating to these charities. Al Haramain, IIRO, and WAMY were known as among the most prestigious charities. These organizations were regulated by the government, and regarded as ideal recipients of charitable giving by Saudi Muslims in fulfilment of religious duty.

Winer and Kohlmann further demonstrate their misunderstanding of charitable giving in Islam by assuming that the Al Rajhi family, in making donations anonymously, was attempting to "hide the paper trail" of supposed funding for terrorism.[48] Kohlmann, for example, points to a single, apparent donation from Sulaiman Al Rajhi that came with the instruction: "do not post in the media."[49] Winer and Kohlmann evidently are not aware, or else ignore, that it was the religious practice to give not only generously but also discreetly.

The Quran emphasizes the virtue of concealing one's charity: "If you disclose your charity, it is well, but if you conceal it, and give it to the poor, that is better for you."[50] The Quran's preference for anonymous giving was to safeguard donors from seeking other people's praise rather than God's pleasure. Payment through authorized Zakat recipients, i.e., the regulated charities, not only ensures compliance with the Quran's strict guidelines for paying Zakat, but also promotes social cohesion by facilitating anonymous giving and equitable distribution of charity.

If in fact Sulaiman Al Rajhi or the Al Rajhi family intended not to disclose their identity to recipients of their charitable donations, or if they sought to avoid media attention to their donations, I consider this entirely explainable by the tenets of Islam regarding charitable giving.

---

[47] Winer, para. 8.1.

[48] Winer, para. 11.7.3; also para. 7.6.14 (quoting CIA report, "[redacted] Sulayman al-Rajhi in December 2002 directed ARB board members to explore financial instruments that would allow the bank's charitable contributions to avoid official Saudi scrutiny."); Winer para. 8.2.2 (referring to Sulaiman Al Rajhi's "unpublicized charitable endeavors").

[49] Kohlmann, pg. 29; also Kohlmann pg. 41 ("Nor does it help their case that it appears the Al-Rajhi family has attempted on occasion to actively hide its financial donations to controversial causes from the public view.").

[50] Quran – 2:271.

Subject to the MDL Protective Order

e. **Based on my knowledge and experience, Winer's and Kohlmann's conclusions are unreliable.**

The "open-source" materials typically relied on by Winer and Kohlmann[51] are unreliable in isolation and present an incomplete and inaccurate picture of al-Qaeda's financial operations and its supposed ties to charities and Al Rajhi Bank. In a number of instances, as discussed above, Winer's and Kohlmann's desktop analyses do not square with my expertise derived from research and investigation of primary sources, or my first-hand observations.

I note that the CIA reports that Winer and Kohlmann primarily rely on contain mostly inconclusive statements of probability and sanitized intelligence analysis—few hard intelligence facts. While I was involved with al-Qaeda and operating with British intelligence, I obtained facts as an eye-witness in the field. British intelligence generally was in a very unique position during the years before 9/11. London was sometimes referred to as "Londonistan," because many Islamic extremist groups had their European headquarters in London, and many extremist websites were operated out of the UK. London was a hotbed of recruitment for jihadist groups including al-Qaeda, it was a fundraising factory, and it was a hub for financial coordination. For this reason, during my time as an undercover agent I regularly moved between the Middle East and London. In the particular area of intelligence on extremist organizations and terror financing, MI6 had a distinct advantage over their American counterparts, which almost certainly did not have close to the same visibility on the inside workings of these groups. I do not consider the CIA reports to be very reliable, particularly where they contradict my understanding of British intelligence.

Winer's and Kohlmann's analyses are also unsound. I cannot possibly address in this format the numerous unsupported conclusions in some 250 pages of statements. But by way of example, Winer works backwards from a simplistic and uniformed understanding of the word translated "martyr" to suggest that IIRO was intentionally supporting "terrorists who caused their own deaths in suicide bombing attacks, died shooting Jews attending religious events, or died in the course of blowing up teenagers at discos."[52] Neither Winer nor Kohlmann discuss the Arabic word translated martyr, *shahid*. The word actually means "witness," and is a generic term used to refer to any Muslim believer who dies in the service of God, nation, or community. Colloquially, this is an honorific term that is bestowed on any innocent person who dies tragically, not only victims of war or violent conflict. For example, a firefighter who dies in the line of duty, a child who drowns, a woman dying in childbirth, or a cancer victim may be referred to as *shahid*. Given the very expansive use of this term in Islamic culture, it is simply a logical fallacy that because some terrorists may have been referred to by some as "martyrs," all

---

[51] Winer, para. 4.7 ("Open source information of this kind was indeed the principal category of source that was not redacted from the declassified version of this CIA report, and declassified CIA reports generally."); Kohlmann, pg. 4-5.

[52] Winer, paras. 8.29 – 8.29.3.

Subject to the MDL Protective Order

references to "martyrs" in connection with humanitarian aid to Palestine includes terrorists. Thousands of civilians were displaced, injured, or orphaned during the conflict popularly known as the Al Quds [Jerusalem] Intifada or the Al Aqsa [Temple Mount] Intifada. The fact that the bank account Winer refers to was designated for "*Orphans* and Martyrs [*shuhada*],"[53] indicates that the aim of this fund was benevolence, not violence. Winer's analysis does not show that IIRO was providing funds to terrorists through this account—or that Al Rajhi Bank should have drawn such a faulty conclusion.

Due to Winer's and Kohlmann's reliance on the unsubstantiated interpretation of largely undisclosed intelligence, their flawed analysis, and erroneous characterization of Arabic and Islamic concepts, I consider the conclusions in Winer's and Kohlmann's reports to be inherently unreliable.

## Conclusion

Based on my study, expertise, and experience, I conclude that, contrary to the statements and suggestions in the Winer and Kohlmann reports, al-Qaeda did not receive support for its terrorist agenda from the Al Rajhi family or Al Rajhi Bank via the Subject Charities or otherwise.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:    22-12-2023            Signed:    _____

                                          Aimen Dean

---

[53] Winer, para. 8.29.3.

Subject to the MDL Protective Order

# APPENDIX I

# Materials Considered

In addition to the materials referenced in my report and in Plaintiffs' experts' reports and appendices, I considered the following materials:

| No. | Document |
|---|---|
| 1 | Will McCants, "A New Salafi Politics," Foreign Policy, October 12, 2012 |
| 2 | Jacob Olidort, "The Politics of 'Quietist' Salafism, The Bookings Project on U.S. Relations with the Islamic World, February 2015 |
| 3 | Patrick French, "What do Islamic Extremists Believe? Salafi-Jihadism by Shiraz Maher and Crusade and Jihad by Malcolm Lambert – Review, The Guardian, March 14, 2016 |
| 4 | El Moghni, by Ibn Qudama al-Maqdisi, 1970 publication, volume 3 |
| 5 | El Moghni, by Ibn Qudama al-Maqdisi, 1970 publication, volume 4 |
| 6 | El Moghni, by Ibn Qudama al-Maqdisi, 1970 publication, volume 9 |
| 7 | El Moghni, by Ibn Qudama al-Maqdisi, 1970 publication, volume 10 |

# APPENDIX II



**Aimen Dean**

Aimen Dean is the Co-Founder and Director of Operations of Cruickshank & Dean Global Intelligence. Dean is a renowned international security, geopolitical risk, and business intelligence consultant. He is one of the world's leading Counter-Terrorist Financing (CFT) experts. He previously played a key role in the global campaign against terrorism for the British Secret Intelligence Service (Ml6). Dean has consulted on issues of violent extremism, radicalization, and counter-terrorist finance for major public and private entities, ranging from intelligence and law enforcement organizations to high net-worth individuals.

Experience

1- **2021–Present: Co-Founder and Director of Operations of Cruickshank & Dean Global Intelligence**

Cruickshank & Dean Global Intelligence is a global intelligence consultancy that offers clients in the private and public sectors vital insights and information based on its extensive network of human sources in the Middle East and around the world.

Using the highest analytic standards, and emphasizing rigor and integrity, Cruickshank & Dean Global Intelligence provides rapid answers to highly specific and pressing questions to strengthen clients' strategic and tactical decision-making. It focuses particularly on high-risk high-reward markets in the Middle East, including Saudi Arabia and other GCC countries.

Services include:

- Geopolitical Risk Consulting
- Corporate Intelligence
- Business and Reputational Risk Analysis
- Due Diligence
- Anti-Counterfeit and Anti-Illicit Trade Investigations
- Stakeholder Mapping
- Market Entry Consulting
- Energy Sector Consulting
- Defense Sector Consulting
- Security Threat Consulting

- Counter-Terrorist Financing (CFT) Investigations & Training
- Counter-Terrorism & Counter Violent Extremism Consulting

**2- 2015-Present: Fellow, George Washington University, Program on Extremism**

Lecture on terrorism financing, Islamic theology and the ideology of extremist organizations, and radicalization. Advise on developing curriculum; mentoring; and evaluating research in areas of study pertaining to extremism. Serve as graduate advisor to PhD students, assisting with conducting research and providing resources.

**3- 2018-Present:  Guest Lecturer, Reichman University, International Institute for Counter-Terrorism (ICT)**

Visiting lecturer providing seminars on terrorism financing, new trends in recruitment tactics, evolving ideologies, and the role of eschatology in radicalization.

**4- 2018-Present: Co-host of the podcast "Conflicted"**

Conflicted is a leading history, politics, and religion podcast with over 5 million listeners worldwide, and has ranked in the top 25 of all podcasts on the UK Apple Podcasts charts. Focused on issues of strategic security geopolitics, the podcast explores the intricacies of the Muslim world's history and religions, with a particular emphasis on Middle Eastern conflicts. The podcast provides in-depth insights into theology, history, radicalization, and jihadism, drawing on decades of experience and elucidating the scholarly works in the field.

**5- 2020-2023: Taught seminars for the British counter-terrorism police (SO 15) on counter-terrorism finance**

Taught focused seminars to public police force specializing in counter-terrorism finance, addressing the theological, ideological, and motivational underpinnings of the phenomenon of counter-terrorism finance. Presented real-life case studies, shedding light on terrorism finance by state and non-state actors.

**6- 2018-2023: Delivered lectures to UK Houses of Parliament**

Periodically lectured on radicalization, counter-radicalization strategies, and counter-terrorism finance. Addressed MPs, members of the House of Lords, and other distinguished guests.

7- **2018-2019: Guest Lecturer at the European Institute of Peace**

Invited to present at multiple peace-building conferences on subjects related to politics of jihad, aspects of sharia and how to incorporate former jihadists into the political society; provided specific policy recommendations.

8- **2017-2020: Consultant for the Ministry of Justice in the UK**

Contributed expertise to UK Ministry of Justice's efforts to combat religious extremism, violent extremism, and Islamist radicalization within UK prisons. This effort involved explaining ideological and theological grounds to counter radicalization. Recommendations led to successful initiatives mitigating the impact of English-speaking extremist preachers and other external influences on individuals turning to violent extremism while incarcerated.

9- **2015–2021: CEO, Amal Global Risk Management Limited (formerly Five Dimensions Consultants)**

Amal Global Risk Management Limited provided analysis and intelligence investigations into terror financing in the Middle East, South/South East Asia, and Africa. The firm also contributed to terrorism and political risk reporting and provided counter-terrorism finance and CVE training and solutions.

10- **2015-2018: Advisor to Belgian counter-terrorism police in Brussels and Antwerp**

Advised public police force in counter-terrorism finance. Provided expertise on tools and methods to identify, track, and disrupt channels of finance and gave instruction on mitigating the risks of kidnappings and ransom financing. Offered insight on the links between European jurisdictions and the financing of terrorism in conflict zones across the world.

11- **2015-2016: Provided seminars to the World Diamond Center in Antwerp**

Lectured on terrorism finance, addressing the role of diamonds and supposed connections between the diamond trade in Africa and terror-group activities.

12- **2014-2021: Chief geopolitical and socioeconomic advisor for the Japan Bank of International Cooperation (JBIC)**

Advised on political stability, security situations, and issues related to corruption, money laundering, and terrorism finance across 13 Middle Eastern countries, facilitating annual lending of over $19 billion.

**13- 2006 – 2015: Senior Consultant for HSBC Bank Global HQ, London, UK**

Lead consultant on geopolitical and terrorism risks, counter-terrorism financing, and Middle East political developments. Responsibilities included:

- Preparing daily and weekly high-level updates for the management and the board of directors on major political, strategic and security developments within the Middle East and the wider Muslim world.

- Providing seminars and presentations to senior bank management on financial crimes related to violent extremism, Middle Eastern politics, and geopolitical/religious/cultural trends.

- Assisting the FIU (Financial Intelligence Unit) to investigate terror financing and money laundering cases in the MENA region. Investigations covered Islamic banks, charities, prominent business families, evolving terror-financing methodologies, terror-related business networks and ransom payments in exchange for hostages.

- Training and preparing senior bank executives for deployments to high-risk countries and hostile environments. The training contained cultural, security and psychological components.

- Led numerous investigations, leading to  closure of multiple accounts, including for over a dozen charities, NGOs, and think tanks linked to terrorism, and the exit of certain correspondent banking relationships in the Middle East.

**14- 1998 – 2006: Field operative/undercover Agent, UK Intelligence/Security Services (MI6/MI5)**

Responsibilities included:

- Deployments to Afghanistan, Pakistan, Lebanon, GCC Countries, Australia and other countries for undercover counter-terrorism, intelligence and information gathering missions.

- Analyzing information/intelligence and assessing veracity of sources.

- Formulating recommendations based on predictions of terrorism trajectory and forecasting future events, utilizing a variety of factors and methods.

- Assisting HMG during negotiations with terror groups over the fate of British hostages held by terror groups in Iraq and the Gaza region.

- Identifying, tracking and disrupting terrorism financing sources, with an emphasis on tracking charities, NGOs, fundraising and business networks, and the use of the non-conventional money transfer systems (Hawala, online shops, high value items) to transfer funds from one point to another.

- Identifying, tracking, and disrupting criminal financing, with an emphasis on smuggling, hostage taking, counterfeiting, and banking fraud.

**INVESTIGATIONS**

Conducting over 200 investigations into terrorism finance, money laundering, and illicit trade; successfully identifying and disrupting smuggling channels and trade connections with terrorist actors in the Middle East, South Asia, and North Africa.

Representative investigations include:

1- **2016-Present: Investigate the production and smuggling of the highly toxic and addictive narcotic Captagon**

   Investigation, spanning 16 Middle East jurisdictions, has uncovered joint ventures between the Assad regime and Hezbollah in Lebanon. Investigation covers power families involved in the trade across Lebanon, Syria, Iraq, and the Kurdish Regional Government (KRG).

2- **2021-2023: Conducted five investigations into the activities of the Wagner Group**

   Investigated the Russian mercenary presence in various African countries. Explored the role of gold mining and smuggling in laundering money for the Wagner Group, with a focus on their financial, commercial, and banking networks.

3- **2012: Investigated links between Mauritius banking sector and terror organizations**

   Uncovered significant links between banking sector and terror organizations in the Middle East, the EU, and South East Asian countries.

4- **2012: Investigated money laundering in Foz do Iguaçu region (border area of Brazil, Argentina, and Paraguay)**

   On-the-ground investigation into money laundering practices by various illegal organization and state sponsors of terrorism that led to significant shift in Brazilian banking practices.

**5- 2011-2013: Investigation of Hezbollah money laundering in Lebanon**

Investigated and uncovered Hezbollah's abuse of the healthcare sector in Lebanon to launder funds.

TRAINING SEMINARS AND WORKSHOPS CURRENTLY OFFERED

**Insider Threat:** to help corporate security managers, HR and legal departments identify signs of violent extremism tendencies and vulnerabilities within staff members and external contractors, and deploy delicate and responsible countermeasures.

**Modern Islamic Fundamentalism and Violent Extremism:** to educate government, corporate, and academic security practitioners on the modern strands of Islamic Fundamentalism and the impact emergent Jihad movements have had on global security. This seminar also focuses on the sectarian nature of conflicts that exist between the two eschatological visions of militant fundamentalist—Shia Islam and militant fundamentalist Sunni Islam—in South Asia, Africa, and the Middle East.

**Evolution of Terror Finance:** to help compliance, FIU, and banking and financial professionals and regulators understand the complex web of connections between religious charitable institutions, commerce, non-conventional money transfer businesses (Hawala), war zone economies, commodities trade, and supply chains. This seminar also focuses on the motivations behind engagement in terror finance and the ever-evolving methodologies of trans-national fundraising.