# Al Rajhi Bank
# Ex. 2

**Expert Report of Fawzi Al-Hobayb**

**Case No. 1:03-md-01570 (S.D.N.Y.)**

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD) (SN), United States District Court for the Southern District of New York

## TABLE OF CONTENTS

1. **Introduction** ........................................................................................................................1

2. **Background and Compensation** ...................................................................................1

3. **Summary of Opinions** ....................................................................................................2

4. **Opinions** ..............................................................................................................................3

    4.1 Kohlmann and Winer make incorrect assumptions about the Saudi banking regulatory landscape pre-9/11. ................................................................................................................3

        (a)    Prior to 9/11, Saudi Arabia implemented strong banking regulatory controls. ............4

        (b)    Prior to 9/11, SAMA implemented anti-money laundering guidelines that reflected the priorities of international banking regulators (FATF) at that time...........6

        (c)    The pre-9/11 Saudi banking regulatory regime reflected international best practices, which were incorporated by the Bank. ....................................................8

        (d)    Pre-9/11, SAMA issued regulations with respect to the opening and maintenance of accounts. .........................................................................................................13

        (e)    Post-9/11, Saudi banking oversight procedures shifted along with international banking procedures to focus more on combating terrorism financing.......................15

    4.2 Pre-9/11, Al Rajhi Bank had an appropriate corporate governance structure — which included checks and balances, a segregation of duties, audits, and transparency with its shareholders — that would prevent systemic noncompliance with its policies. ...................16

        (a)    Pre-9/11, Al Rajhi Bank had a General Policies and Guidelines Guide, which laid the foundation for good controls. ..................................................................17

        (b)    Pre-9/11, Al Rajhi Bank had a standing Internal Audit Committee, which oversaw regular audits of the Bank. .................................................................18

        (c)    Al Rajhi Bank had two External Auditors for their annual reviews, which was in compliance with SAMA Guidelines and exceeded U.S. standards. ..........................19

        (d)    Al Rajhi Bank had an AML Unit solely focused on developing AML procedures and monitoring compliance across the Bank. ...............................................20

        (e)    As required by law, Al Rajhi Bank held regular General Assembly meetings with its shareholders, where it would discuss the opinions of its auditors..........................21

    4.3 Based on my experience as a Saudi auditor, I cannot conclude that the Bank's pre-9/11 activity, as outlined by Kohlmann and Winer in their reports, signals complicity in money laundering or terrorist financing. ...............................................................................21

        (a)    Providing routine banking services, such as maintaining accounts, does not support an inference of material noncompliance. ..............................................22

        (b)    The examples Winer and Kohlmann provide about how the Bank handled charity accounts pre-9/11 fail to convince me, as an auditor, of any material noncompliance by the Bank. ..........................................................................24

        (c)    The Aqil transactions outlined by Plaintiffs' experts do not indicate to me that the Bank failed to monitor suspicious activity ................................................30

(d)     Suleiman Al Rajhi's donations are neither reflective of the Bank's conduct nor indicative of a support for terrorism. ............................................................... 31

(e)     The use of "Payable Through Accounts," a banking practice of the time, does not suggest material noncompliance. ....................................................................... 32

**5.   Conclusion** .................................................................................................................. **33**

Subject to the MDL Protective Order

## 1. Introduction

I have been retained by defendant Al Rajhi Bank, in the matter 03-MDL-1570 (S.D.N.Y.), to serve as an expert witness to provide a rebuttal to the reports of Evan Kohlmann and Jonathan Winer. Specifically, my rebuttal report addresses issues regarding Saudi banking regulations and Al Rajhi Bank policies and procedures regarding anti-money laundering and counter-terrorism financing. Against that context, I also evaluate Winer and Kohlmann's conclusions regarding Al Rajhi Bank's compliance with applicable regulations and procedures.

By virtue of my specialized knowledge, skill, experience, and training, I am an expert in the areas of the Saudi banking audits as well as banking regulations issued between 1998 and 2002, and reviewing for compliance with those regulations. I have extensive experience with auditing banks' internal control systems in Saudi Arabia. I worked as an external auditor with Ernst & Young (known at the time as Whinney Murray & Co.), as well as Chief of Internal Audit at Arab National Bank, a Saudi bank located in Riyadh, Saudi Arabia. After the terrorist attacks on September 11, 2001, I served as Chairman of the Self-Supervisory Committee organized and supervised by the Saudi Arabian Monetary Agency (SAMA), Saudi Arabia's banking regulator. The Self-Supervisory Committee was composed of representatives from all Saudi banks at the time, and its purpose was to coordinate SAMA searches and requests among Saudi banks to flag suspicious customers, accounts, and implement actions to combat terrorism financing. In these roles, I developed expertise in how the Saudi banking regulatory regime operated pre-9/11 and immediately following the 9/11 attacks. My experience qualifies me to comment on the Bank's level of implementation of and adherence to Saudi banking regulations, policies, and procedures.

In my report, I generally will discuss Saudi banking regulations and the Saudi banking oversight procedures in place "pre-9/11," meaning 1998 to September 11, 2001. Where I discuss circumstances following September 11, 2001, I will indicate that I am referring to the post-9/11 period.

## 2. Background and Compensation

I graduated from King Abdulaziz University, located in Jeddah, KSA, in 1989 with a bachelor's degree in accounting. I passed the Certified Public Account (CPA) exam in California in 1993. I completed the Advanced Management Program for Overseas Bankers at Wharton School in 1997, one of many professional trainings I have completed throughout my career. I currently live and reside in Riyadh, KSA.

I have years of experience interpreting, implementing, and reviewing Saudi financial regulations, and auditing Saudi banks based on those regulations. I joined EY (then Whinney Murray and Co.) in 1989. After passing the CPA exam in 1993, I joined Arab National Bank in Riyadh as Chief of Internal Audit until 2002. As Chief Internal Auditor at Arab National Bank, my responsibilities were overseeing auditing plans and their execution, fraud investigations, and evaluating internal control systems. Amongst my accomplishments as a chief internal auditor, I supervised the first internal audit in the Middle East to be in full compliance with Basel Guidance on Internal Audit. In 2004, I joined the Capital Market Authority (CMA), which is the Saudi equivalent to the United States Securities and Exchange Commission. I worked for the CMA for twelve years, where I assisted in creating the Enforcement Division of the CMA, which

I led for nine years. At the CMA's Enforcement Division, I oversaw the Investigation Department and the Prosecution Department. The Prosecution Department included actions involving various violations of Capital Market Law (CML), including market manipulation and insider trading. Subsequently, I became Head of the Internal Audit Department, where I oversaw auditing plans and their execution within the CMA.

As discussed above, immediately after the 9/11 attacks, SAMA created the Self-Supervisory Committee to provide a coordinated response among Saudi banks for combatting terrorism financing. As Chairman of the Self-Supervisory Committee, I would coordinate submissions to SAMA, supervise the progress on processes, and discuss obstacles faced by banks.

Through my extensive and varied experiences as a Saudi banking auditor and investigator, I developed considerable knowledge about the Saudi banking regulatory landscape, including in the years preceding the 9/11 attacks and as Chairman of the Self-Supervisory Committee post-9/11.

I am being compensated $1,333 (SAR5000) per hour for my work on this report. My fees are not contingent upon the outcome of this matter or the opinions provided herein.

## 3. Summary of Opinions

*1. The Regulatory Landscape.* Seemingly lacking expertise on the Saudi banking industry, Kohlmann and Winer make incorrect assumptions about the Saudi banking regulatory landscape pre-9/11. For instance, contrary to Winer's incorrect assumptions, it is evident that Saudi Arabia, even pre-9/11, had strong banking regulatory controls and a regulatory regime that reflected international best practices and priorities. Indeed, SAMA had a regulatory landscape pre-9/11 that was in line with FATF's 1996 40 Recommendations and covered AML procedures that included, among other things, KYC, monitoring suspicious transactions, reporting suspicious transactions, and internal controls systems. This is highlighted by SAMA's 1966 Banking Control Law, which set up the regulatory framework for banks within the Kingdom and provided guidelines for banks' reporting to SAMA. Although Saudi banking procedures evolved post-9/11, along with international standards, those post-9/11 procedures are not an appropriate basis to which Al Rajhi Bank's pre-9/11 activities should be compared.

*2. Al Rajhi Bank's Corporate Governance Structures and Tools.* Contrary to any suggestion otherwise, Al Rajhi Bank's corporate governance structures and procedures were in line with normal pre-9/11 banking practices. I did not see any material deficiencies in the Bank's internal control system and structures. I found the Bank's structure for its internal control systems to be functioning as designed. Among other features, Al Rajhi Bank had an internal control system in place that complied with its regulatory obligations. Among other features, the Bank had internal audit policies and procedures, appropriate checks-and-balances, and appropriate segregation of duties, which would prevent the Bank from being dominated by any one individual. Pre-9/11, Al Rajhi Bank had an AML guide in effect (which, in line with contemporary AML approaches, focused on proceeds from drug-trafficking and not terrorism). The Bank also had an extensive branch manual covering different aspects of its operations, including account opening conditions for different types of customers, including charities. Furthermore, there was an Audit Committee with a wide range of responsibilities including reviewing annual internal audit plans, reviewing the results of the audits, and meeting at regular intervals. The Internal Audit Department was

Subject to the MDL Protective Order

totally independent from Operations, which illustrated its ability to function freely. Finally, the AML Unit and its processes and reviews were also part of the Bank's internal control system. I did not see any material deficiencies in the Bank's internal control system and structures.

***3. Unwarranted Conclusions in Plaintiffs' Experts' Reports.*** Given my discussions of (i) the pre-9/11 regulations and guidelines applicable to the Bank and (ii) the Bank's corporate governance structure, the isolated instances of supposed noncompliance that Winer points to do not justify a conclusion that Al Rajhi Bank was supporting Al Qaeda or terrorist financing. Kohlmann's report and Winer's lengthy report, together, are snapshots and conjecture—devoid of context that is relevant to this litigation. Many of the examples of supposed noncompliance that Winer cites are in fact not examples of any material noncompliance or suspicious activity (e.g., the Bank was not supposed to be closing accounts on its own accord or thoroughly scrutinizing all big cash transactions at the time). And, some negligible amount of noncompliance alleged by Winer and Kohlmann are nonmaterial errors that are a regular occurrence at every bank—not a sign of a bank's ill intent.

Based on my experience as an auditor in Saudi Arabia in the pre-9/11 period, I find that Winer and Kohlmann have failed to point to examples of the kind of serious misconduct that would warrant a finding that a large, professional organization like Al Rajhi Bank, was intending to support acts of terrorism targeted at the U.S.

## 4. Opinions

### 4.1 Kohlmann and Winer make incorrect assumptions about the Saudi banking regulatory landscape pre-9/11.

Plaintiffs' experts draw negative inferences about Al Rajhi Bank's compliance based on mistaken assumptions about banking standards applicable to Al Rajhi Bank and other banks in Saudi Arabia prior to the 9/11 attacks. Kohlmann's methodology of "comparative analysis" misses key context about the regulatory landscape of Saudi banking as he offers opinions based on irrelevant snapshots of events, without providing important context regarding the Saudi regulatory landscape. Similarly, Winer makes assumptions and inferences about the Saudi regulatory landscape as to Saudi banking standards pre-9/11 and Al Rajhi Bank's purported non-compliance within that context, but these assumptions and inferences lack evidence and are inappropriate in view of the realities of the time.

In general, any assessment of the Bank's compliance with the pre-9/11 regulatory regime first requires a proper understanding of the financial controls and regulations that were in place in Saudi Arabia pre-9/11. Neither Winer nor Kohlmann appear to have sufficient expertise in Saudi banking regulations to opine in these respects.

As discussed below, based on my knowledge and review of the history of SAMA and SAMA guidelines, as well as my extensive experience operating within the Saudi banking framework, I conclude that, prior to 9/11, Saudi banks did *not* operate within a weak or non-existent regulatory system, and they were routinely audited for compliance with that system.[1] I therefore disagree with Winer and Kohlmann to the extent that their conclusions rely on a suggestion that Saudi

---

[1] *See, e.g., Guidelines for Prevention and Control of Money Laundering Activities*, SAMA, Nov. 1995, Cover Letter of SAMA Governor.

Subject to the MDL Protective Order

banks operated pre-9/11 in a weak or non-existent regulatory system. Winer and Kohlmann are mistaken about Saudi banks' regulatory obligations in several respects.

     (a)    <u>Prior to 9/11, Saudi Arabia implemented strong banking regulatory controls.</u>

Contrary to Winer's assertion, Saudi Arabia did not have "weak or nonexistent financial controls" pre-9/11.[2] Years before the 9/11 attacks, Saudi banks operated within a robust regulatory and oversight regime, led by the Saudi Arabian Monetary Authority (SAMA), the sole regulator of Saudi banks pre- (and post-) 9/11.[3] SAMA was a rigorous regulator, subjecting Saudi banks even pre-9/11 to robust anti-money laundering controls on par with global standards.[4] To my knowledge, Saudi banks could not opt out of following these standards.

***Role of SAMA.*** As background on SAMA, SAMA was formed in 1952 by Royal Decree No. 23, to (1) "issue and strengthen the Saudi currency and to stabilize its internal and external value;" (2) "deal with the banking affairs of the Government;" and (3) "regulate commercial banks and exchange dealers."[5] Since its inception, SAMA's oversight responsibilities were broad and numerous, and included, among other things, protecting customer deposits, strengthening bank financials, and examining banks' books and accounts.[6]

Since its creation, one of SAMA's primary purposes has been to prevent the use of Saudi banks for illegal purposes, such as, but not limited to, money laundering, financial fraud, and currency forgery. In the mid-1960s, Saudi Arabia implemented a "Banking Control Law" that established a framework for the regulation of Saudi banks by SAMA.[7] For example, the Banking Control law established reporting mechanisms for banks to SAMA, the required number of external auditors and disclosure of their reports to shareholders, and the ability of SAMA to request information from banks "at any time."[8]

Since then, SAMA has regularly issued guidelines for the oversight of Saudi banks. For example, Winer mentions SAMA's 1995 AML Guidelines.[9] As acknowledged by Winer, the 1995 SAMA Guidelines provided Saudi banks a framework and guidance for implementing anti-money laundering and Know-Your-Customer protocols prior to the 9/11 attacks, and reflected SAMA's striving to establish a compliance regime consistent with international standards.[10]

---

[2]    *See* Winer ¶ 6.23 (quoting *Terrorist Financing Staff Monograph*, 9/11 Commission, Aug. 21, 2004, at 39, "the Middle East was vulnerable to the exploitation of its financial systems because of generally weak or nonexistent financial controls.").

[3]    Saudi Arabian Monetary Agency (SAMA), in its current form as the Saudi Central Bank, continues to be the only regulator of Saudi banks.

[4]    For example, Saudi Arabia implemented AML KYC protocols in 1995, before the updated 1996 FATF AML Recommendations.

[5]    Royal Decree No. 30/4/1/1046 of Apr. 20, 1952, and Royal Decree No. 30/4/1/1047 of July 15, 1952; *see* SAMA, Historical Preview, https://sama.gov.sa/en-us/about/pages/samahistory.aspx.

[6]    Banking Control Law (Royal Decree No. M/5 of June 11, 1966), Articles 6-7, 16-18.

[7]    Banking Control Law (Royal Decree No. M/5 of June 11, 1966).

[8]    Banking Control Law (Royal Decree No. M/5 of June 11, 1966), Articles 14, 17.

[9]    *See* Winer ¶ 9.8 ("In 1995, SAMA issued *Guidelines for Prevention and Control of Money Laundering Activities*.")

[10]    *See* Winer ¶¶ 9.8.1 to 9.8.52 (quoting provisions of *Guidelines for Prevention and Control of Money Laundering Activities*, SAMA, Nov. 1995); *see also Guidelines for Prevention and Control of Money Laundering Activities*, SAMA, Nov. 1995, Cover Letter of SAMA Governor.

Subject to the MDL Protective Order

Pre-9/11, SAMA routinely communicated with, examined, and inspected Saudi banks to ensure compliance with applicable guidelines and regulations. SAMA relied on a variety of tools, including self-reporting, document collection, special inspections into topics under SAMA's authorities, full-fledged inspections, as well as inspections of individuals or accounts the purpose of which were not disclosed to the bank. Some of SAMA's inspections were surprise inspections. SAMA also conducted full-fledged examinations at its discretion. To my knowledge and based on my experience, all Saudi banks have been subject to all the aforementioned tools, including a full-fledged examination by SAMA, at some point.

Saudi banks were expected to regularly communicate with SAMA, though the frequency of those communications depended on the particular context of each bank. Pre-9/11, Saudi banks also would relay their financial positions to SAMA on a monthly basis.[11]

***Other Banking Auditors and Regulatory Authorities.*** As required by SAMA, Saudi banks also had audit committee and two external independent auditors.[12] External auditors would annually evaluate the internal control systems of a bank, through among other things, examinations of a sampling of various bank processes and services. The processes and services examined could include, for example, account openings, transfers, or sales of traveler's checks. In my experience at Whinney Murray, we would review a sample, but not every single account at the bank would be reviewed. In fact, with respect to money laundering, Saudi banks were explicitly "not responsible for carrying out formal investigations of all customer transactions to search for possible money laundering activities."[13]

While SAMA was the sole regulator of Saudi banks pre-9/11, other Saudi agencies also undertook investigative and enforcement tasks on issues specific to money-laundering. Generally, in this period, banks reported suspected money laundering activity to SAMA and the police authorities,[14] as well as to the General Directorate of Narcotics Control.[15] While these other authorities may have investigated different financial crimes, any authority in the Kingdom of Saudi Arabia that would want to interact with banks, such as the Saudi Arabia Financial Investigation Unit (FIU), or the General Directorate of Narcotics Control, would have to go through SAMA.[16] This was regardless of the purpose of the investigation – such as inheritance disputes or a criminal investigation.

---

[11]    SAMA Charter (Royal Decree No. 23 of Dec. 15, 1957), Article 3.d.

[12]    *See* 13/50 - Circulars: Rules for Banks in Saudi Arabia for Organizing Audit Committee, July 1996; Banking Control Law (Royal Decree No. M/5 of June 11, 1966), Articles 14, 18.

[13]    *Guidelines for Prevention and Control of Money Laundering Activities*, SAMA, Nov. 1995, p. 13.

[14]    *Guidelines for Prevention and Control of Money Laundering Activities*, SAMA, Nov. 1995, p. 14; *see also* SAMA Circular 8301-BC-340, Dec. 8, 1994.

[15]    *See* SAMA Circular 159-Mat-016780 dated January 16, 2001; *see also Guide to Anti-Money Laundering Procedures*, ARB Internal Audit Dept., Nov.1998 (ARB-00000737).

[16]    SAMA Circular 16323-BC-319, Sept. 7, 1985.

Subject to the MDL Protective Order

### (b)    Prior to 9/11, SAMA implemented anti-money laundering guidelines that reflected the priorities of international banking regulators (FATF) at that time.

Pointing primarily to the standards established by the Financial Action Task Force (FATF) of OECD countries, Winer suggests that pre-9/11 Saudi banking regulatory guidelines were out of step with international standards.[17] I disagree.

First, Winer describes FATF as "the universally recognized body for establishing minimum standards for anti-money laundering and countering-terrorist finance measures for governments, financial institutions, and others relevant to protecting against the ability of criminals and terrorists to move through funds through the international financial infrastructure."[18] However, Winer incorrectly represents FATF's focus on terrorism financing pre-9/11. FATF, by its own admission, did not address terrorism pre-9/11; the organization notes that "[i]n [October] 2001, the FATF expanded its mandate to [...] combat terrorist financing."[19] Based on my review, neither the words "terrorism" nor "charities" nor "non-profits" appear even once in the 1996 FATF Recommendations which were prevailing during the responsive period.[20] The fact that, pre-9/11, international banking regulations were not primarily concerned with counter-terrorism financing is not surprising.

Consistent with the *actual* priorities of the international banking regulators at the time,[21] Saudi authorities issued a set of Anti-Money Laundering guidelines in 1995 ("the Guidelines" or "the 1995 Guidelines") "to strengthen the ability of Banks to counter illegal transactions."[22] The 1995 Guidelines were focused on money laundering mainly associated with drug trafficking, rather than terrorism.[23] In his cover letter to the 1995 Guidelines, the SAMA Governor referred to the importance of international initiatives, such as the 1988 Convention Against the Illicit Traffic in Narcotics Drugs, the 1990 FATF Report and the 1991 Basel Committee Guidelines for International Banks.[24] This showed that, despite lacking a focus on counter-terrorism, international initiatives were a top concern in establishing the 1995 Guidelines.

---

[17]    *See* Winer ¶ 1,5,2,,4, n.11 (stating "we did not see enforcement of the regulations in practice [by SAMA]") and ¶ 6.23 (asserting that financial controls in the Middle East were "generally weak or nonexistent.").

[18]    *See* ¶ Winer 5.1.

[19]    History of the Financial Action Task Force (FATF), https://www.fatf-gafi.org/en/the-fatf/history-of-the-fatf.html.

[20]    *See generally, Financial Action Task Force on Money Laundering, The Forty Recommendations*, FATF, 1996, https://www.fatf-gafi.org/content/dam/fatf-gafi/recommendations/FATF%20Recommendations%201996.pdf.

[21]    The 1996 FATF Guidelines themselves, *never* mention terrorism, and Recommendation 1 instead focuses on ratifying the "1988 United Nations Convention against Illicit Traffic in Narcotic Drugs and Psychotropic Substances (the Vienna Convention)." *See generally, Financial Action Task Force on Money Laundering, The Forty Recommendations*, FATF, 1996, https://www.fatf-gafi.org/content/dam/fatf-gafi/recommendations/FATF%20Recommendations%201996.pdf.

[22]    *Guidelines for Prevention and Control of Money Laundering Activities*, SAMA, Nov. 1995, Cover Letter of SAMA Governor.

[23]    *See Guidelines for Prevention and Control of Money Laundering Activities*, SAMA, Nov. 1995 [Arabic], Introduction. I have relied on the Arabic original, which does not mention "terrorism" once.

[24]    *Guidelines for Prevention and Control of Money Laundering Activities*, SAMA, Nov. 1995, Cover Letter of SAMA Governor.

As part of the Guidelines, SAMA issued ten specific policies and guidelines to the Banks, namely:

1. "Internal Control Systems"

2. "Know Your Customer"

3. "Referral of Business"

4. "Retention of Records and Documents"

5. "Money Laundering Control Unit"

6. "External Auditors"

7. "Use of Electronic Funds Transfer Systems"

8. "Employee Training [Requirements]"

9. "Alerting the Authorities [of Suspicious Transactions]"

10. "Delivery of Documents to Authorities"[25]

In addition to the specific guidance from SAMA, SAMA regulations also encouraged banks to create their own internal policies to address money laundering. The 1995 SAMA Guidelines noted that Banks should:

> "formulate internal policies and procedures to be followed by employees when they have reasons to suspect that a money-laundering transaction is taking place. These policies and procedures should be part of an internal operational manual and should clearly prescribe the actions to be followed by an employee in informing branch and H.O. [Head Office] management. It should also prescribe actions to be taken to immediately inform the authorities i.e., Police and SAMA."[26]

The Guidelines also noted that "a Bank should identify for use and reference of its employees[] distinct patterns of customer behaviour of unusual patterns of transactions that could indicate money laundering activities."[27] However, contrary to Winer's assertions,[28] banks' KYC responsibilities under these Guidelines were not so broad; the SAMA Guidelines categorically stated that a "bank is not responsible for carrying out formal investigations of all customer transactions to search for possible money laundering activities."[29]

Notably, in conformity with SAMA guidelines, the 1997 Al Rajhi Bank's Branch Instructions Manual had sections on anti-money laundering and the Bank also had a separate AML Guide,

---

[25] *Guidelines for Prevention and Control of Money Laundering Activities*, SAMA, Nov. 1995, p. 1.

[26] *Guidelines for Prevention and Control of Money Laundering Activities*, SAMA, Nov. 1995, p. 13.

[27] *Guidelines for Prevention and Control of Money Laundering Activities*, SAMA, Nov. 1995, pp. 13-14.

[28] *See, e.g.*, Winer ¶ 9.42 (asserting that Al Rajhi Bank should have "monitored the public allegations that Al-Haramain was involved in terrorist finance") and ¶ 5.6 (noting that "recommendations from the FATF were required to be adopted in national laws and regulations and overseen and enforced by domestic regulators of banks and other financial institutions, with a process of monitoring then put into place both domestically and through international mutual assessments to ensure that the measures were being effectively implemented.").

[29] *Guidelines for Prevention and Control of Money Laundering Activities*, SAMA, Nov. 1995, p. 13.

Subject to the MDL Protective Order

issued in November 1998, that outlined guidelines for a specific AML unit then in place at the Bank.[30]

      (c)   <u>The pre-9/11 Saudi banking regulatory regime reflected international best practices, which were incorporated by the Bank.</u>

Winer suggests that the 1996 FATF Recommendations reflected international banking standards and "best practices" at the time.[31] To note, both the Saudi banking regulatory regime and Al Rajhi Bank incorporated the FATF Recommendations into their procedures, even pre-9/11. Winer identified a handful of recommendations that he deemed as supposedly relevant from the 1996 FATF Recommendations. Here, I explain how pre-9/11 Saudi banking regulations reflected these key recommendations, as well as the similar policies of Al Rajhi Bank from the time period:

- FATF Recommendation 10, which recommended that financial institutions "not keep anonymous accounts or accounts in obviously fictitious names."[32] SAMA had included this instruction in its 1995 AML Guidelines, stating that "No account should be opened or banking services provided for customers without proper identification or under fictitious names."[33] The 1997 ARB Branch Instructions Manual likewise required that Customer Service Officers verify the customer's original identifying documents and for the Assistant Operations Managers review the information on the customer's identity document.[34]

- FATF Recommendation 11, which recommended that financial institutions "take reasonable measures to obtain information about the true identity of the persons on whose behalf an account is opened."[35] The 1995 SAMA AML Guidelines instructed banks to "[i]dentify any client who opens a new account or has a business relationship with the Bank" and stated that "[i]dentification should be made by reference to proper, official documents in accordance with previous SAMA Circulars regarding customer identification."[36] The ARB Manual likewise required Assistant Operations Managers to verify the validity and legitimacy of bank customer's identity document.[37]

- FATF Recommendation 12, which recommended that "financial institutions should maintain, for at least five years, all necessary records on transactions" to enable

---

[30]   *See generally, Guide to Anti-Money Laundering Procedures,* ARB Internal Audit Department, Nov. 1998 (ARB-00000735).

[31]   *See, e.g.,* Winer ¶¶ 5.1, 9.6.

[32]   *See Financial Action Task Force on Money Laundering, The Forty Recommendations,* 1996, Recommendation 10. p. 3, https://www.fatf-gafi.org/content/dam/fatf-gafi/recommendations/FATF%20Recommendations%201996.pdf; *see also* Winer ¶ 5.4.1.

[33]   *Guidelines for Prevention and Control of Money Laundering Activities,* SAMA, Nov. 1995, p. 7.

[34]   *Branch Instructions Manual,* (ARB-0000164).

[35]   *See Financial Action Task Force on Money Laundering, The Forty Recommendations,* 1996, Recommendation 11. p. 3, https://www.fatf-gafi.org/content/dam/fatf-gafi/recommendations/FATF%20Recommendations%201996.pdf; *see also* Winer ¶ 5.4.2.

[36]   *Guidelines for Prevention and Control of Money Laundering Activities,* SAMA, Nov. 1995, p. 8.

[37]   *Branch Instructions Manual,* part 1 (ARB-0000164).

Subject to the MDL Protective Order

compliance with requests from authorities.[38]  The SAMA AML Guidelines noted that "[b]anks should retain all documents and records relating to their operations in accordance with normal banking practices, for ease of reference in their own use, and for use by supervisory authorities, other regulators and auditors" for "no less than ten years."[39] The Guidelines went on to note that banks "should also retain [...] [r]ecords of a customer transaction."[40] In line with those guidelines, as I understand it, Al Rajhi Bank had a retention policy to hold all documents indefinitely.[41]

- FATF Recommendation 14, which noted that "financial institutions should pay special attention to all complex, unusual large transactions, and all unusual patterns of transactions, which have no apparent economic or visible lawful purpose."[42] The 1995 SAMA AML guidelines also addressed this point of FATF, noting that "[a] Bank should develop a system for internal reporting of transactions and account movements that could facilitate detection of such transactions. A Bank should use specialized software that is available in the market to detect unusual patterns of transactions and trends to indicate criminal activities."[43]  The Al Rajhi Bank Branch Manual likewise required the Bank employees to  "pay special attention to some transactions that are characterized by a pattern that differs from usual transaction patterns, such as transactions involving large sums or those executed in small sums at regular intervals without having an acceptable purpose or clear economic reason, or transactions that are executed with other parties in countries that do not apply adequate anti-money laundering controls."[44]

- FATF Recommendation 15, which noted that if "financial institutions suspect that funds *stem from* a criminal activity, they should be required to report promptly their suspicions to the competent authorities."[45]  The SAMA AML Guidelines follow this recommendation by stating, "[w]hen a Branch management suspects that a money laundering transaction is taking place, it must immediately report it to the local police authorities and notify SAMA through its head office Money Laundering Control Unit. There should be no time wasted in informing the authorities and SAMA."[46] The Al Rajhi Bank Branch Manual followed SAMA's requirement by mandating employees to report any suspicious transactions to the branch manager; subsequently the branch manager

---

[38] *See Financial Action Task Force on Money Laundering, The Forty Recommendations*, 1996, Recommendation 12, p. 3, https://www.fatf-gafi.org/content/dam/fatf-gafi/recommendations/FATF%20Recommendations%201996.pdf;  *see also* Winer ¶ 5.4.3.

[39] *Guidelines for Prevention and Control of Money Laundering Activities*, SAMA, Nov. 1995, p. 11. (I am quoting to the Arabic version of this clause, while noting the fact the English translation mistakenly omits the phrase "no less than ten years.").

[40] *Guidelines for Prevention and Control of Money Laundering Activities*, SAMA, Nov. 1995, p. 11.

[41] Galloway Deposition, Tr. 112:10-12.

[42] *See Financial Action Task Force on Money Laundering, The Forty Recommendations*, 1996, Recommendation 14, p. 4, https://www.fatf-gafi.org/content/dam/fatf-gafi/recommendations/FATF%20Recommendations%201996.pdf; *see also* Winer ¶ 5.4.4.

[43] *Guidelines for Prevention and Control of Money Laundering Activities*, SAMA, Nov. 1995, p. 6.

[44] *Branch Instructions Manual*, part 20:3, section 2 (ARB-00000263).

[45] *See Financial Action Task Force on Money Laundering, The Forty Recommendations*, 1996, Recommendation 15, p. 4, https://www.fatf-gafi.org/content/dam/fatf-gafi/recommendations/FATF%20Recommendations%201996.pdf. (Note the language "stem from" focuses on the sources of money, rather than their destination.) *See also*, Winer ¶ 5.4.5.

[46] *Guidelines for Prevention and Control of Money Laundering Activities*, SAMA, Nov. 1995, p. 7.

Subject to the MDL Protective Order

must promptly notify the Anti-Money Laundering Unit at the Internal Audit Department within the Head Office for subsequent processing, further verification, and reporting.[47]

- FATF Recommendation 17, which stated that financial institutions, "should not, or where appropriate, should not be allowed to, warn their customers when information relating to them is being reported to competent authorities."[48] The SAMA Guidelines were consistent, noting that a "[b]ank should not inform the suspected client of its notification to the authorities but should exercise more caution in its dealings with him."[49] The Al Rajhi Bank Branch Manual Instructions likewise prohibited the branch from warning its customers that the Bank is suspicious of the customer's account if the competent authorities have been notified and the authorities were provided by the Bank with the relevant information. Moreover, the Al Rajhi Bank Manual prohibited the Bank from ceasing business with the reported customer, but rather required that the branch conduct more investigation and exercise more caution regarding the reported customer's transactions.[50]

- FATF Recommendation 18, which stated that "financial institutions reporting their suspicions should comply with instructions from the competent authority."[51] The SAMA Guidelines corollary was: "Saudi Banks should cooperate, locally and internationally to combat money-laundering through exchange of information with banking supervisors and appropriate law enforcement agencies, when they discover or suspect money laundering transactions."[52] The Guidelines then listed relevant policies and procedures banks should follow, which included a process for reporting suspicions and how documents and information would be provided to authorities.[53] The Al Rajhi Bank Branch Manual likewise required that the branch must provide everything related to the reported suspicious transaction (e.g., adequate documents and information about the transaction and relevant parties), "cooperate with competent authorities[] and work in accordance with the authorities' directives."[54]

- FATF Recommendation 19, which recommended that financial institutions "should develop programs against money laundering. These programs should include, as a minimum:

---

[47] *Branch Instructions Manual*, part 20:3, sections 3-7 (ARB-00000263); *see generally Guide to Anti-Money Laundering Procedures, ARB Internal Audit Department, Nov. 1998 (ARB-00000735).*

[48] *See Financial Action Task Force on Money Laundering, The Forty Recommendations*, 1996, Recommendation 17, p. 4, https://www.fatf-gafi.org/content/dam/fatf-gafi/recommendations/FATF%20Recommendations%201996.pdf; *see also,* Winer ¶ 5.4.6.

[49] *Guidelines for Prevention and Control of Money Laundering Activities*, SAMA, Nov. 1995, p. 14.

[50] *Branch Instructions Manual*, part 20:3, section 6 (ARB-00000263).

[51] *See Financial Action Task Force on Money Laundering, The Forty Recommendations*, 1996, Recommendation 18, p. 4, https://www.fatf-gafi.org/content/dam/fatf-gafi/recommendations/FATF%20Recommendations%201996.pdf; *see also* Winer ¶ 5.4.7.

[52] *Guidelines for Prevention and Control of Money Laundering Activities*, SAMA, Nov. 1995, p. 6.

[53] *Guidelines for Prevention and Control of Money Laundering Activities*, SAMA, Nov. 1995, pp. 14-15.

[54] *Branch Instructions Manual*, p.3, part 20:3, section 4 (ARB-00000263).

Subject to the MDL Protective Order

- (i) The development of internal policies, procedures and controls, including the designation of compliance officers at management level, and adequate screening procedures to ensure high standards when hiring employees;

- (ii) An ongoing employee training program;

- (iii) An audit function to test the system."[55]

Similar SAMA Guidelines included sections 5.1, 5.5, and 5.8, which focus on "Internal Control Systems," "Money Laundering Control Unit," and "Employee Training."[56] The SAMA Guidelines also devoted a whole section to "Employee Training," informing banks they "must develop a regular training program" for anti-money laundering.[57] ARB's AML Unit Guide designated a specific AML unit head to "update anti-money laundering policies and procedures in accordance with developments in the methods, processes and activities that could be used in money laundering activity."[58] Meanwhile, according to the "ARB Audit Committee Authorities," part of the scope of the Audit Committee at the Bank was to "[v]erify implementation of the policies related to money laundering" indicating an audit function to test the system.[59]

The Al Rajhi Bank AML Unit Guide also addressed training, noting that the unit should "[c]oordinate with the various units on preparation and implementation of the necessary training and guidance programs for Corporation employees and on provision of the necessary advice regarding all aspects related to money laundering."[60]

Separately, the Al Rajhi Bank Branch Manual included a section on monitoring and screening employees to make sure that they were not violating any AML laws.[61]

- FATF Recommendation 21, which noted that financial institutions "should give special attention to business relations with persons, including companies and financial institutions, from countries which do not or insufficiently apply these Recommendations."[62] Appendix 1 of the SAMA AML Guidelines warned banks to be aware of "weaknesses in procedures" in a country's banking system that could "encourage money laundering," and to be wary of countries "where money laundering is not a crime."[63] Likewise, the Al Rajhi Bank Branch Manual requested that employees

---

[55]  *See Financial Action Task Force on Money Laundering, The Forty Recommendations*, 1996, Recommendation 19, p. 4, https://www.fatf-gafi.org/content/dam/fatf-gafi/recommendations/FATF%20Recommendations%201996.pdf; *see also* Winer ¶ 5.4.8.

[56]  *Guidelines for Prevention and Control of Money Laundering Activities*, SAMA, Nov. 1995, pp. 6-7, 12-13.

[57]  *Guidelines for Prevention and Control of Money Laundering Activities*, SAMA, Nov. 1995, p. 13.

[58]  *Guide to Anti-Money Laundering Procedures*, ARB Internal Audit Department (ARB00000736).

[59]  *Authorities of the Audit Committee*, Al Rajhi Bank, June 10, 1997, ¶ 15

[60]  *Guide to Anti-Money Laundering Procedures*, ARB Internal Audit Department (ARB-00000736).

[61]  *Branch Instructions Manual*, part 21 (ARB-00000259).

[62]  *See Financial Action Task Force on Money Laundering, The Forty Recommendations*, 1996, Recommendation 21, p. 5, https://www.fatf-gafi.org/content/dam/fatf-gafi/recommendations/FATF%20Recommendations%201996.pdf; *see also* Winer ¶ 5.4.9.

[63]  *Guidelines for Prevention and Control of Money Laundering Activities*, SAMA, Nov. 1995, p. 17.

Subject to the MDL Protective Order

monitor for "[l]arge and frequent transfers from and to countries known to be exporters of narcotics."[64]

- FATF Recommendation 22, which noted that "[c]ountries should consider implementing feasible measures to detect or monitor the physical cross border transportation of cash [...] without impeding in any way the freedom of capital movements."[65] This would not necessarily apply to financial institutions, but governmental entities such as customs and border control. Further, to the extent this recommendation did extend to financial institutions, the SAMA Guidelines themselves reflect this. Moreover, as an example of such measure, the Branch Manual instructed employees to detect if a customer frequently deposits bank checks issued by a foreign bank.[66]

- FATF Recommendation 28, which noted the countries' "competent authorities should establish guidelines which will assist financial institutions in detecting suspicious patterns of behaviors by their customers. It is understood that such guidelines must develop over time, and will never be exhaustive." Appendix 2 of the SAMA AML Guidelines involved a full section on "Money Laundering Indicators."[67] And in addition to the Al Rajhi Bank Branch Manual's indicators of money laundering for employees,[68] the Manual provided "Anti-Money Laundering Guidelines" that required branch employees be especially attentive to unusual transactions "such as transactions involving large sums or those executed in small sums at regular intervals without having an acceptable purpose or clear economic reason, or transactions that are executed with other parties in countries that do not apply adequate anti-money laundering controls."[69]

- FATF Recommendation 37, which stated "[t]here should be procedures for mutual assistance in criminal matters [...] in money laundering investigations and prosecutions and in related actions in foreign jurisdictions."[70] The SAMA AML Guidelines noted that a "Bank should have written policies and procedures that must be followed by responsible employees for making information and documentation available to local and foreign authorities" and that "[w]here information and documentation is sought by or is to be provided to a foreign law enforcement authority, the bank must seek permission of SAMA and local authorities before passing any documents, records or information."[71] The ARB AML Unit Guide noted that the AML unit head was to "cooperate and coordinate with the related authorities."[72]

---

[64]  *Branch Instructions Manual*, part 21:5 (ARB-00000262).

[65]  *See Financial Action Task Force on Money Laundering, The Forty Recommendations*, 1996, Recommendation 22, p. 5, https://www.fatf-gafi.org/content/dam/fatf-gafi/recommendations/FATF%20Recommendations%201996.pdf; *see also* Winer ¶ 5.4.10.

[66]  *Branch Instructions Manual*, part 21, section 13 (ARB-00000259).

[67]  *Guidelines for Prevention and Control of Money Laundering Activities*, SAMA, Nov. 1995, p. 19.

[68]  *Branch Instructions Manual*, part 21 (ARB-00000259).

[69]  *Branch Instructions Manual*, part 20 (ARB-00000263).

[70]  *See Financial Action Task Force on Money Laundering, The Forty Recommendations*, 1996, Recommendation 37, pp. 6-7, https://www.fatf-gafi.org/content/dam/fatf-gafi/recommendations/FATF%20Recommendations%201996.pdf; *see also* Winer ¶ 5.4.12.

[71]  *Guidelines for Prevention and Control of Money Laundering Activities*, SAMA, Nov. 1995, pp. 14-15.

[72]  *Guide to Anti-Money Laundering Procedures*, ARB Internal Audit Department (ARB-00000736).

Subject to the MDL Protective Order

Winer also claims that FATF reflects the international standard for combating the financing of terrorism ("CFT") at the time.[73] However, combating terrorism financing was not an international priority until after the 9/11 attacks, which is reflected in the FATF Recommendations' main focus on combatting drug trafficking pre-9/11.[74] In my opinion, the 1996 FATF recommendations do not prioritize nor provide sufficient guidance on CFT as Winer alleges.[75] Fundamentally, money-laundering is about taking "dirty" money and making it "clean." Meanwhile, terrorism financing is about taking money and making it "dirty." As clearly observed from the FATF Recommendations, the focus was on the sources of money. While Winer asserts that as a principle, FATF Recommendations were from the "beginning, the[ir] mission [...] has been to harmonize anti-money laundering laws, regulations, practices, and enforcement globally to protect the banking system, and the world, from the threat posed by the use of financial institutions to launder criminal funds, including funds of, by, or for the benefit of terrorists," the content and context of the recommendations prove his opinion incorrect.[76]

Consequently, given these consistent similarities between the FATF Recommendations, the pre-9/11 SAMA 1995 AML Guidelines, and Al Rajhi Bank's Branch Manual and AML Unit Guide, I disagree with Winer's conclusion that pre-9/11 Saudi regulatory standards were out of step with international standards.[77]

> (d)   Pre-9/11, SAMA issued regulations with respect to the opening and maintenance of accounts.

Looking even more specifically to some of Saudi Arabia's pre-9/11 regulations, Winer states that Al Rajhi Bank did not "adhere to Know Your Customer, Anti-Money Laundering and Counter-Terrorism Financing best practices and international standards with respect to the opening and maintenance of accounts" for charities pre-9/11.[78] As I have already discussed, the Saudi regulations of the time and Al Rajhi Bank's own policies were on par with international standards and best practices in many respects. Even so, I disagree with the emphasis Winer puts on international standards in this context, because the real indicator of Al Rajhi Bank's compliance record was its compliance with the rules of its regulator, SAMA. Pre-9/11, SAMA did provide guidance on the opening and maintenance of accounts, and KYC practices were a banking norm.

While Winer suggests that some of the applicable regulations were not fully satisfied by Al Rajhi Bank,[79] as I will note later, those small examples do not indicate any material noncompliance by the Bank. The regulations discussed below are important because, for a regulator, it is presumed that a Saudi bank would be complying with the rules of its regulator and that its regulator,

---

[73]   *See, e.g.,* Winer ¶ 5.1

[74]   *See* History of the Financial Action Task Force (FATF), *https://www.fatf-gafi.org/en/the-fatf/history-of-the-fatf.html* (stating "[i]n 2001, the FATF expanded its mandate to also combat terrorist financing.").

[75]   *See, e.g., Financial Action Task Force on Money Laundering, The Forty Recommendations,* 1996, FATF Recommendation 15 notes that financial institutions should promptly report funds that "stem from a *criminal activity*" (italics added); *see also* Winer ¶ 5.1.

[76]   *See* Winer ¶ 5.3.

[77]   *See, e.g.,* Winer ¶¶ 9.1, 9.3, 9.22, 9.44.2, 9.64.

[78]   *See* Winer ¶ 9.1.

[79]   *See, e.g.,* Winer ¶ 1.5.2..4, n.11; ¶¶ 9.1, 9.51-9.64.

SAMA, is enforcing relevant regulations. A Saudi bank with significant failures in compliance would have been identified and the failures addressed.

Under SAMA's pre-9/11 regulations, anybody who provided proper identification documents was able to open an account at a Saudi bank of that individual's choosing.[80] There was no minimum deposit for who could open an account.[81] The SAMA 1995 AML Guidelines noted that a bank should "[i]dentify any client who opens a new account" and that "[i]dentification should be made by reference to proper, official documents in accordance with previous SAMA Circulars regarding customer identification."[82] These previous SAMA circulars included instructions to verify the signatures of clients and to accept original identification documents at the time of account opening,[83] and limiting the number of powers of attorney and authorized individuals on account to ten.[84]

The 1995 AML Guidelines from SAMA contained a full section on KYC guidelines.[85] The guidelines forbade the opening of accounts under "fictitious names" and mandated that a client should be identified through "official documents in accordance with previous SAMA Circulars regarding customer identification."[86] I discussed these SAMA circulars in the paragraph directly above. Banks were required to "obtain" "a copy of customer's identification documents [...] when a new account is opened [...]."[87] Banks were also required to "[p]eriodically (at a minimum every five years) updat[e] [] the documentation and information of old account[s]."[88]

In cases where an individual was opening a personal account, the bank was also required to "seek information on the customer's business, or job title and ascertain the accuracy of such information."[89] Furthermore, "[t]he bank should be aware of the sources of customer's deposits, particularly those of significant cash amounts" and "should seek information on a customer's dealings with other banks with which he deals and seek information from such banks about their dealing with the customer."[90]

SAMA had the authority to collect any documents from Saudi banks for its own review. According to the SAMA Banking Control Law, "[t]he Agency, may any time, request any bank to supply it, with a time limit it will specify and a manner it will prescribe, with any information it deems necessary for ensuring the realization of this Law."[91] Article 18 of the Banking Control Law further notes:

> "The Agency [SAMA] may, with the approval of the Minister of Finance and National Economy, conduct an inspection of the books and accounts of any bank,

---

[80] *See* SAMA Circular 02419/BCL/142, July 4, 1996.

[81] SAMA Circular 02419/BCL/142, July 4, 1996.

[82] *Guidelines for Prevention and Control of Money Laundering Activities*, SAMA, Nov. 1995, pp. 7-8.

[83] SAMA Circular - 11989-BC-121, Oct. 26, 1993.

[84] SAMA Circular – 86-BC-55, Sept. 20, 1991.

[85] *Guidelines for Prevention and Control of Money Laundering Activities*, SAMA, Nov. 1995, pp. 7-8.

[86] *Guidelines for Prevention and Control of Money Laundering Activities*, SAMA, Nov. 1995, pp. 7-8.

[87] *Guidelines for Prevention and Control of Money Laundering Activities*, SAMA, Nov. 1995, p. 8.

[88] *Guidelines for Prevention and Control of Money Laundering Activities*, SAMA, Nov. 1995, p. 8.

[89] *Guidelines for Prevention and Control of Money Laundering Activities*, SAMA, Nov. 1995, p. 8.

[90] *Guidelines for Prevention and Control of Money Laundering Activities*, SAMA, Nov. 1995, p. 8.

[91] Banking Control Law (Royal Decree No. M/5 of June 11, 1966), Article 17.

Subject to the MDL Protective Order

either by the Agency's own staff or by outside auditors assigned by it. The examination of the bank's books and accounts should take place in the bank's premises. In such a case the bank staff must produce all the required books and records of accounts and other documents in their custody or within their authority and must furnish any information they have relating to the bank."[92]

Pre-9/11, Saudi banks had limited discretion to refrain from opening an account, provided that above-stated standards were satisfied (i.e., that ID, etc. was provided).[93] A SAMA circular dated 18/2/1417 H (July 4, 1996 G) indicates that banks were required to open an account for any customer regardless of amount as long as certain documentation requirements were met.[94] From my experience and my review of the then-applicable regulations, I can confirm that a bank was only permitted to close an account following requests from authorities, following a client request, or else by following the procedures related to dormancy based on this circular. The circular stipulated that an account may only be closed at a customer's request and that even non-active accounts required the bank to follow separate instructions rather than effect immediate closure.[95]

Even in cases where illegal AML activity was suspected, a bank was not allowed to close an account, but rather was required to inform the relevant authorities of the suspected activity.[96] To be clear, a Saudi bank did *not* have discretion to close an account based upon its own suspicions about the customer's account. SAMA's 1995 AML Guidelines explicitly stated that a bank "should not stop dealing with the customer, but [should] exercise more caution when dealing with them" after notifying the authorities of their suspicions about the client.[97] Such instructions indicate that a bank was not to close an account without relevant guidance from the authorities.

>    (e)    <u>Post-9/11, Saudi banking oversight procedures shifted along with international banking procedures to focus more on combating terrorism financing</u>.

It is true that post-9/11, Saudi banking oversight procedures shifted to focus more on combatting terrorism. However, many of Winer's conclusions about the Bank's pre-9/11 compliance with applicable policies rely on inferences based on post-9/11 FATF standards. Many of the standards Winer appears to be considering actually really only took hold with post-9/11 reforms.[98]

Post-9/11, SAMA took a more centralized role in its oversight procedures and authority. In particular, SAMA formed the Banks' Self-Supervisory Committee (SSC) as a response which was intended to streamline the collection of account information by Saudi Arabian banks for individuals of interest and report that information to SAMA. I chaired that committee in my capacity as representative of Arab National Bank in Riyadh until around September 2002. The September 26, 2001 letter creating the Bank SSC referred to the "Executive Order of the Office of Foreign Assets Control of the US Treasury," which in context was Executive Order 13224

---

[92]    Banking Control Law (Royal Decree No. M/5 of June 11, 1966), Article 18.

[93]    *See, e.g.*, SAMA Circular 02419/BCL/142, July 4, 1996; SAMA Circular - 11989-BC-121, Oct. 26, 1993.

[94]    SAMA Circular 02419-BCL-142, July 4, 1996.

[95]    SAMA Circular 02419-BCL-142, July 4, 1996.

[96]    *Guidelines for Prevention and Control of Money Laundering Activities*, SAMA, Nov. 1995, p 14.

[97]    *Guidelines for Prevention and Control of Money Laundering Activities*, SAMA, Nov. 1995, p. 12.

[98]    *See, e.g.*, Winer ¶ 10.4.12 n.564 (citing to "2005 SAMA Guidelines").

Subject to the MDL Protective Order

signed by George W. Bush on September 23, 2001, and was "issued in response to the grave acts of terrorism and threats of terrorism committed by foreign terrorists, including the terrorist acts committed on September 11, 2001."[99] SAMA was to attend all the meetings of the Banks' SSC.[100] Furthermore, SAMA was to become the communication point between banks and foreign governments as "[a]ll inquiries which may be received by Saudi banks directly from foreign government agencies must be communicated to and responses routed through SAMA."[101]

The Banks' SSC, at its first meeting, also made reference to compliance with a UN resolution on terrorism that was circulated by SAMA.[102] Thereon, the Bank SSC focused on addressing requests from the United Nations and the United States at the direction of SAMA. Furthermore, at the creation of the Bank SSC in the aftermath of 9/11, SAMA stated that "[i]n general, banks need to review their money laundering procedures as per SAMA guidelines," indicating its central role in providing banks directions on money-laundering issues.[103]

Overall, post-9/11 Saudi bank procedures became more coordinated to take into account international sanctions regimes and sanctions imposed on individuals and organizations. Furthermore, at the direction of SAMA, the banks were to review their money laundering guidelines in view of the post-9/11 shifts.[104]

## 4.2 Pre-9/11, Al Rajhi Bank had an appropriate corporate governance structure — which included checks and balances, a segregation of duties, audits, and transparency with its shareholders — that would prevent systemic noncompliance with its policies.

Winer and Kohlmann repeatedly suggest that Al Rajhi Bank corporate governance structures were lacking and susceptible to exploitation by senior leadership, such as the former Chairman, Suleiman Abdelaziz Al Rajhi.[105] The materials I have reviewed indicates the opposite. I have reviewed Al-Rajhi Bank's corporate governance processes and structures which reflect appropriate practices at the time. The components of the Bank's pre-9/11 corporate governance structure and internal processes include: 1) the Bank's General Policies and Guidelines Guide; 2) the Internal Audit Committee; 3) multiple external auditors; 4) an AML unit; and 5) the annual General Assembly Meetings with shareholders which included shareholders questions to management and discussions of external audit reports.

---

[99]  *See* Letter from Managing Director of Arab National Bank to SAMA Director, Banking Inspection, Financial Leasing and Insurance, Sept. 26, 2001 (creating self-supervisory committee in response to the "Executive Order of the Office of Foreign Assets Control of the US Treasury") (ARB-00039373); *see also* Terrorist Assets Report, OFAC, U.S. Dept. of the Treasury, 2012, p. 4, https://ofac.treasury.gov/media/8491/download?inline.

[100]  Letter from Managing Director of Arab National Bank to SAMA Director, Banking Inspection, Financial Leasing and Insurance, Sept. 26, 2001 (ARB-00039373).

[101]  Letter from Managing Director of Arab National Bank to SAMA Director, Banking Inspection, Financial Leasing and Insurance, Sept. 26, 2001 (ARB-00039373).

[102]  *See* Minutes – Banks' Self-Supervisory Committee Meeting, Oct. 7, 2001 (ARB-00039586); *see also* SAMA Circular 12872-MAT-120, Sept. 29, 2001 (ARB-00014391).

[103]  Letter from Managing Director of Arab National Bank to SAMA Director, Banking Inspection, Financial Leasing and Insurance, Sept. 26, 2001 (ARB-00039374).

[104]  Letter from Managing Director of Arab National Bank to SAMA Director, Banking Inspection, Financial Leasing and Insurance, Sept. 26, 2001 (ARB-00039374).

[105]  *See* Winer ¶¶ 2.13, 6.11.12..6 n.231, 7.2.13, 7.2.14, 7.3.1, 7.3.8, 7.6.13-7.6.15, 7.22, 9.57.7-9.57.9, 10.34-10.36; Kohlmann p.41.

Subject to the MDL Protective Order

(a)      <u>Pre-9/11, Al Rajhi Bank had a General Policies and Guidelines Guide, which laid the foundation for good controls.</u>

Contrary to Plaintiffs' experts' suggestions that the Bank could be dominated by one person, my review of the 1998 "General Policies and Authorizations Guide" ("the guide") indicates that this was not only incorrect, but also not probable. The guide explicitly states that the "Board of Directors is the body that approves the Corporation's Organizational Structure," rather than any one individual.[106] The guide describes specialized committees focused on addressing specific issues, such as the High Management Committee, the International Credit Committee, Assets and Liabilities Committee, Procurement Committee, Information Systems Procurement Committee, and the Information Systems Steering Committee.[107] Based on my review, the Bank's Chairman was not a member of any of these committees. Based on the guide, I conclude that the Bank's corporate governance structure included levels of authority, segregation of duties, checks and balances, the independence of Internal Audit from the Operations side of the Bank, and Internal Audit's authority to conduct audits.

The guide outlines various director-level positions that illustrate an appropriate corporate governance structure. For example, an "Operations Engineer" was responsible for "evaluating all proposed amendments to the approved work [operational] procedures and for making decisions surrounding proposed amendments [by department directors] as supported by the necessary evaluation."[108] This set up appropriate checks and balances by allowing the "Operations Engineer" to be a central point in monitoring a department's procedures. The guide also gives "[t]he deputy directors general and the department directors, regional directors, area directors, and branch directors [full responsibility] for monitoring adherence to the approved work [operational] procedures at their places of work [respective departments]."[109]

In a separate role, the Information Systems Steering Committee was responsible for the information systems strategy of the bank, while the Information Systems Procurement Committee would make purchases based on the recommendations of the Information Systems Steering Committee, in accordance with the financial authority matrix outlined in the document.[110] In my opinion as an auditor, these separate roles reflected a sound segregation of duties and checks and balances.

The guide also laid out the duties of the Internal Audit Department. The Audit Department's role was to ensure adherence with policies, authorizations, and work procedures across the bank.[111] The Internal Audit Department functioned separately from the executive/operational functions.[112] In a distinct role, the Internal Audit Director was responsible for developing and maintaining the Internal Audit Guide.[113]

---

[106]   *1998 General Policies and Authorizations Guide*, Nov. 29, 1999, p. 11.

[107]   *See generally 1988 General Policies and Authorizations Guide*, Nov. 29, 1999.

[108]   *1998 General Policies and Authorizations Guide*, Nov. 29, 1999, p. 12.

[109]   *1998 General Policies and Authorizations Guide*, Nov. 29, 1999, p. 12.

[110]   *1998 General Policies and Authorizations Guide*, Nov. 29, 1999, pp. 16, 55, 57.

[111]   *1998 General Policies and Authorizations Guide*, Nov. 29, 1999, pp. 3, 8.

[112]   *1998 General Policies and Authorizations Guide*, Nov. 29, 1999, p. 4.

[113]   *1998 General Policies and Authorizations Guide*, Nov. 29, 1999, pp. 3, 8.

Subject to the MDL Protective Order

The distribution of various roles among the different committees, departments, and directors indicates that there was a segregation of duties and check-and-balances in place. This weakens Plaintiffs' suggestions that individuals at the Bank had unilateral power to violate the Bank's own procedures. I also recall from that time that SAMA would informally welcome "whistleblowing" which would be another protective layer against the domination of the Bank by one individual.

> (b)    Pre-9/11, Al Rajhi Bank had a standing Internal Audit Committee, which oversaw regular audits of the Bank.

I have reviewed an Al Rajhi Bank document, titled "Authorities of the Audit Committee," dated June 10, 1997.[114] Based on that document and the lack of evidence to the contrary in Winer and Kohlmann's reports, I have not seen anything to indicate that Al Rajhi Bank lacked an internal audit control system or was noncompliant with auditing and regulatory standards and procedures. The document reveals that the audit committee had the authority to:

> "Monitor the performance of internal control systems and financial reports, review management reports and information requested by supervisory authorities, monitor the work of external and internal auditors as well as the level of coordination among them, and ensure compliance with the rules on commercial financial transactions resulting from insider information and the Bank's professional conduct."[115]

The document suggests that the audit committee continuously monitored the Bank's compliance with relevant internal and governmental rules and procedures. The audit committee also considered the reports of external auditors and discussed those reports with them.[116]

The Audit Committee also had responsibilities related to anti-money laundering. The "Authorities of the Audit Committee" document states that the Audit Committee should "[v]erify implementation of the policies related to money laundering and other criminal activities."[117] Additionally, the audit committee had the responsibility to "[e]nsure compliance with the banking control provisions, rules and regulations issued by the Saudi Arabian Monetary Authority,"[118] and could create a reporting system regarding internal compliance and potential violations of internal and SAMA policies.[119] These clauses show that the Bank was monitoring the implementation of its AML policies, as well as regulations imposed by SAMA. This internal Bank document indicates that the audit committee functioned in a sound and effective manner. Tellingly, Plaintiffs' experts point to no evidence that the Bank's internal audit controls were inadequate.

---

[114]  *Authorities of the Audit Committee*, Al Rajhi Bank, June 10, 1997.

[115]  *Authorities of the Audit Committee*, Al Rajhi Bank, ¶ 8, June 19, 1997.

[116]  *Authorities of the Audit Committee*, Al Rajhi Bank, June 10, 1997, ¶ 27 (stating that the "Audit Committee discusses the external auditors' reports with them, whether their audit has revealed no violations of the Banking Control Law or the other laws and regulations, their certificates on the audit of the provision for doubtful debts, and their conclusions regarding the adequacy of this provision.")

[117]  *Authorities of the Audit Committee*, Al Rajhi Bank, June 10, 1997, ¶ 15.

[118]  *Authorities of the Audit Committee*, Al Rajhi Bank, June 10, 1997, ¶ 24.

[119]  *Authorities of the Audit Committee*, Al Rajhi Bank, June 10, 1997, ¶ 26.

Subject to the MDL Protective Order

The Bank's internal audit plans further indicate action by the Bank to ensure its policies and procedures were being implemented. In my experience as an auditor, an audit plan is a description of how a bank *will* conduct its audits, rather than a statement of goals. I have reviewed the internal audit annual plans for 1999 and 2001, which indicate that Al Rajhi Bank continuously monitored its compliance with internal policies and SAMA regulations.

The focus of the 1999 plan was to "examine and evaluate the internal control system in order to determine the adequacy of the accounting and operational controls."[120] As part of its 1999 plan, Al Rajhi Bank planned to audit all branches and a number of head office units, including "a comprehensive field audit of 217 bank branches."[121] The Bank also planned to conduct a follow-up audit of 50% of these branches in the same year,[122] an initiative which, in my experience, exceeded the norms of the time. The plan, which also envisioned audits of general management, refers to an AML unit, which would "research cases of money laundering and the like referred by the various work units or suspicious cases through our periodic audits of the various work units."[123] Considering these objectives, Winer's statement that the Bank "broadly disregarded" the policies and procedures in place is unsupported.[124]

I also reviewed Al Rajhi Bank's audit plan for fiscal year 2001.[125] Specifically, the plan outlined risk-based audits, which reflected conformity with auditing practices internationally. The plan also intended to cover the performance of the "Fraud, Embezzlement, and Money Laundering Unit."[126] These facts do not indicate a lack of due diligence by Al-Rajhi Bank — on the contrary they indicate the Bank was taking proactive steps to ensure that its systems and processes were working. Al Rajhi Bank's audit plans show that their internal audit functions were in accordance with normal, best practices. Furthermore, I do not see any evidence from Plaintiffs indicating that the Bank was not evaluating and implementing its policies and procedures on a systemic basis.

      (c)      <u>Al Rajhi Bank had two External Auditors for their annual reviews, which was in compliance with SAMA Guidelines and exceeded U.S. standards.</u>

Saudi law pre-9/11 required each bank to have two external auditors.[127] For context, to my understanding and knowledge, the practice in the United States is to have one external auditor. Requiring two external auditors increases the likelihood that any material noncompliance would have been discovered.

To ensure the independence of the external auditors, after being nominated by the Board, the external auditors would be voted upon by the shareholders of a bank at the General Assembly

---

[120]   *Internal Audit Plan for the Fiscal Year 1999*, Al Rajhi Bank, Jan.06, 1999, p. 1.

[121]   *Internal Audit Plan for the Fiscal Year 1999*, Al Rajhi Bank, Jan.06, 1999, p. 1.

[122]   *Internal Audit Plan for the Fiscal Year 1999*, Al Rajhi Bank, Jan.06, 1999, p. 2.

[123]   *Internal Audit Plan for the Fiscal Year 1999*, Al Rajhi Bank, Jan.06, 1999, p. 3.

[124]   Winer ¶ 9.1.

[125]   *Internal Audit Plan for the Fiscal Year 2001*, Al Rajhi Bank, Dec. 2000.

[126]   *Internal Audit Plan for the Fiscal Year 2001*, Al Rajhi Bank, Dec. 2000, p. 2.

[127]   Banking Control Law (Royal Decree No. M/5 of June 11, 1966), Article 14.

Subject to the MDL Protective Order

Meeting of the bank.[128] Additionally, the results of their audit reports would be sent to SAMA and read out at the General Assembly Meeting.[129]

As a rule, the scope of the external auditors' audit included testing the internal control systems. As stipulated in the AML Guidelines issued by SAMA, "[t]he external auditor of a bank is responsible, among other things, to examine the bank's policies, procedures and internal control systems aimed at combating money laundering activities."[130]  The auditor "should also test the enforcement of such policies, and procedures."[131]  Considering that the Bank's internal systems and procedures, including their AML processes, would have been scrutinized by independent external auditors, and no evidence has been presented that these external auditors flagged noncompliance by Al Rajhi Bank, I can assume that the Bank implemented appropriate controls and systems.

> (d)    Al Rajhi Bank had an AML Unit solely focused on developing AML procedures and monitoring compliance across the Bank.

As previously discussed, Al Rajhi Bank had a functioning AML Unit pre-9/11.  I have reviewed the 1998 AML Unit Guide, which indicates proactiveness by the Bank in combatting money laundering.  The Bank's AML Unit Guide included instructions to "continuous[ly] monitor[] external transfers and bank checks," and "monitor[] and follow up on the transactions performed at the branches and at the exchange and transfer centers through the software available to the Unit, detects suspicious cases, and submit them to the Unit Head."[132]  Furthermore, the AML Unit was obligated to "[u]pdate anti-money laundering policies and procedures in accordance with developments in the methods, processes and activities that could be used in money laundering activity."[133]  In addition, the AML unit would create frequent reports so that it would have centralized oversight,[134] and further investigate cross-branch patterns.[135]  If the AML Unit identified a red flag, it would have checked in with the local branch to assess whether more information about the customer or transaction was needed.[136]  Winer asserts that he has seen no evidence that this unit undertook its activities.[137]  However, I have seen no evidence that the Unit did *not* fulfill its responsibilities.  I have no reasonable basis from which to conclude that the Bank created an AML unit, incorporated that unit into its manuals and systems, and kept employees on the payroll, but allowed the AML Unit to be a ghost unit, while avoiding the scrutiny and oversight of the Bank's Audit Committee and the Bank's auditors, both internal and external.

---

[128]  Companies' Law (Royal Decree No. M/6 of 22/3/1385 H (July 21, 1965 G)), Article 130.

[129]  Banking Control Law (Royal Decree No. M/5 of (June 11, 1966)), Article 14.

[130]  *Guidelines for Prevention and Control of Money Laundering Activities*, SAMA, Nov. 1995, ¶ 5.6, p. 12.

[131]  *Guidelines for Prevention and Control of Money Laundering Activities*, SAMA, Nov. 1995, ¶ 5.6, p. 12.

[132]  *Guide to Anti-Money Laundering Procedures*, ARB Internal Audit Department, Nov. 1998 (ARB-00000737-ARB-00000738).

[133]  *Guide to Anti-Money Laundering Procedures*, ARB Internal Audit Department, Nov. 1998 (ARB-00000736).

[134]  *Guide to Anti-Money Laundering Procedures*, ARB Internal Audit Department, Nov. 1998 (ARB-00000738).

[135]  *Guide to Anti-Money Laundering Procedures*, ARB Internal Audit Department, Nov. 1998 (ARB-00000738).

[136]  *Guide to Anti-Money Laundering Procedures*, ARB Internal Audit Department, Nov. 1998 (ARB-00000738).

[137]  Winer ¶ 9.63.

Subject to the MDL Protective Order

Furthermore, I have reviewed the Al Rajhi Bank Branch Instructions Manual, which contains instructions on AML that reflected the SAMA AML Guidelines and FATF Recommendations. As already noted in section 4.1(c), these instructions were already in place pre-9/11 to counter money-laundering at the branch level. The Branch Manual included instructions for the Bank to: (1) identify the customer (which prevents the creation of anonymous accounts);[138] (2) pay attention to unusual transactions;[139] and (3) report suspicious activities to the Branch Manager who would then notify the AML Unit.[140] The Branch Manual also included a prohibition against warning a customer of the Bank's suspicions or of being reported.[141]

Taking the above into account, the Bank's AML and Branch manuals set up procedures to monitor and investigate money-laundering, undermining the Plaintiffs' unsupported arguments that the AML Unit was inactive.

    (e)    <u>As required by law, Al Rajhi Bank held regular General Assembly meetings with its shareholders, where it would discuss the opinions of its auditors.</u>

Under Saudi law, at the time, Al Rajhi Bank was required to hold a General Assembly Meeting with its shareholders.[142] The meeting, which was held annually and, to my knowledge, involved the shareholders, audit committee, external auditors, and management, included discussions of the annual report and corporate affairs. An external auditor also would present their report, independence, any scope limitations, and opinion.[143] Shareholders were given the opportunity to ask questions.[144] To my knowledge, the meeting would also be attended by members of the Ministry of Commerce to ensure the meeting complied with relevant governmental regulations (such as allowing questions from shareholders and ensuring a proper quorum). Such requirements ensured that the Bank had to be transparent with its shareholders. Taken together, these various and distinct procedures and controls that the Bank had in place indicate appropriate corporate governance policies. Winer and Kohlmann point to no evidence showing that these protocols systematically failed.

**4.3 Based on my experience as a Saudi auditor, I cannot conclude that the Bank's pre-9/11 activity, as outlined by Kohlmann and Winer in their reports, signals complicity in money laundering or terrorist financing.**

Given the regulatory landscape outlined above — and evidence of Al Rajhi Bank policies and procedures aligned with that framework — I, as an auditor, would generally assume a bank's compliance with those regulations, policies and procedures. In order to draw an inference of noncompliance, I would expect to see evidence of sanctions or failed audits, and more than a few selected instances of supposed noncompliance. I do not see this type of evidence in the Winer

---

[138] *See Financial Action Task Force on Money Laundering, The Forty Recommendations*, 1996, Recommendation 10; Branch Instructions Manual, part 20:2 section 1 (ARB-0000164).

[139] *See* Branch Instructions Manual, part 20:2, section 6 (ARB-00000265).

[140] *Branch Instructions Manual*, part 20:3, sections 3-7 (ARB-00000263).

[141] *Branch Instructions Manual*, part 20:3, section 6 (ARB-00000263).

[142] Banking Control Law (Royal Decree No. M/5 of June 11, 1966), Article 14.

[143] Banking Control Law, (Royal Decree No. M/5 of June 11, 1966), Article 14. *See also*, Companies' Law (Royal Decree No. M/6 of 22/3/1385 H (July 21, 1965 G), Articles 131-132.

[144] *See* Companies' Law (Royal Decree No. M/6 of 22/3/1385 H (July 21, 1965 G)), Article 94.

Subject to the MDL Protective Order

and Kohlmann reports, which rely on assumptions made from hand-selected pre-9/11 activities. Below, I explain why the activities highlighted by Winer and Kohlmann fail to show material noncompliance, in my opinion as an auditor.

(a)    Providing routine banking services, such as maintaining accounts, does not support an inference of material noncompliance.

Winer[145] and Kohlmann[146] refer to the existence of several charity and individual accounts at Al-Rajhi Bank pre-9/11 as if that, in and of itself, is evidence of misconduct by the Bank. However, I have reviewed specific accounts that Winer and Kohlmann seemed to find problematic and have found no indication of deliberate misconduct by the Bank.

Most critical to my assessment as an auditor is the fact that, pre-9/11, the Bank was not in violation of SAMA regulations for maintaining these accounts. The Plaintiffs' experts do not identify any actual violations by the Bank of specific SAMA regulations that would indicate material noncompliance by the Bank. Instead, they infer the Bank's noncompliance based on post-9/11 conclusions or revelations from U.S. intelligence agencies about the alleged suspicious connections of certain account holders,[147] without pointing to any regulatory action by SAMA against the Bank for maintaining those accounts.

As an initial matter, the Bank complied with SAMA and FATF guidelines by not maintaining anonymous accounts. I see no evidence that the Bank kept anonymous accounts.[148] I have reviewed the charities account lists compiled by Plaintiffs and did not see any accounts opened without a name. I understand the remaining accounts in the record are individual accounts, and by definition not anonymous accounts. Neither Winer nor Kohlmann identify anonymous accounts.[149]

Winer asserts that SAMA criticized the Bank for opening accounts for the "Al-Birr Foundation."[150] I see nothing corroborating that that statement actually came from SAMA. Further, in my view, the statement, even if true and from SAMA, can only be read as a statement of fact. Most importantly, Winer points to no regulatory action by SAMA against the Bank for

---

[145]    *See e.g.*, Winer ¶ 6.11.10.1..1 (stating "I note that Badaoud had three accounts at ARB that SAMA later required ARB to seize. Al Qadi had eight accounts at ARB, which SAMA later required ARB to seize. ARB also provided banking services to Al-Birr a/k/a Benevolence, the NGO controlled by Batterjee (spelled in this CIA report as Batarga), which became subject to US and UN sanctions after the 9/11 attacks due to its support for al Qaeda") and ¶¶ 8:30-8:31 (noting that Al Rajhi Bank took instructions "in 1992 from one of IIRO's leaders, Abdel Hamid al Mujil . . . to recognize signatories as authorized on IIRO accounts when they were opened for [IIRO Eastern Province Office in Saudi Arabia].").

[146]    *See, e.g.*, Kohlmann p. 8 (noting "Usama Bin Laden himself had at least 4 accounts at the institution, as well as at least 7 9/11 hijackers--Abdelaziz al-Omari, Ahmed al-Ghamdi, Saleh al-Ghamdi, Majed Moqed, Saeed al-Ghamdi, Wael al-Shehri, and Hani Hanjour").

[147]    *See, e.g.*, Winer ¶¶ 6.21-6.23, 7.1-7.3; Kohlmann p. 15.

[148]    *See* Winer ¶ 5.4.1.

[149]    The Bank's Branch Manual outlines requirements to identify clients and obtain a government-backed ID from them. *See Branch Instructions Manual*, part 1 (ARB-000164). Also, the AML section of the Branch Manual also does not permit opening an account under a pseudonym (such as a formal title like "Father of [name]"), highlighting that there were no loopholes allowing for anonymous accounts. *Branch Instructions Manual*, part 20 (ARB-000265).

[150]    Winer ¶ 9.62.1 (asserting that "The [handwritten] note [produced by Al Rajhi Bank] states: 'Al Birr Islamic Committee.' On the next line is the sentence. 'We authorized Al Rajhi to open one account; they opened many accounts.' I read this sentence as a criticism of ARB's conduct by its regulator.").

opening these accounts. As I noted, the Bank was required to open accounts and had no discretion as long as it was provided with the correct identification information.[151]

Kohlmann discusses alleged misdeeds of various charities and individuals to suggest that the Bank was on notice of suspicious activity in these accounts and should have closed the accounts of Al Haramain and IIRO.[152] However, without an instruction from SAMA or a request from the customer,[153] a Saudi bank could not unilaterally close accounts.[154] Kohlmann cites to no pre-9/11 orders from SAMA telling the Bank to close the accounts.

Similarly, Plaintiffs' experts emphasize that the Bank must have committed wrongdoing because, pre-9/11, it maintained accounts for Bin Laden and some of the hijackers.[155] But they do not point to any sanctions against the Bank for maintaining those accounts. Nor do they point to any suspicious activity within these accounts. For example, Kohlmann states that "Usama Bin Laden himself had at least four accounts at the institution, as well as at least seven 9/11 hijackers--Abdelaziz al-Omari, Ahmed al-Ghamdi, Saleh al-Ghamdi, Majed Moqed, Saeed al-Ghamdi, Wael al-Shehri, and Hani Hanjour."[156] However, the bin Laden accounts apparently had been dormant since before the mid-1990s.[157] For the account of Hani Hanjour, it also appears that the account had been zeroed out prior to 1998.[158] Furthermore, there is no evidence in the record to indicate "Saleh al-Ghamdi" held an account with Al Rajhi Bank, or that there was a 9/11 hijacker with that first and last name.[159] I must also again note that the Bank could not refuse to open these accounts, or close them, in the absence of instructions from SAMA.

Additionally, Winer states that Al Rajhi Bank "in 1992 took instructions" on signatories for IIRO accounts from Abdel Hamid al Mujil, a person "deeply implicated in terrorist finance relating to al Qaeda activities in Southeast Asia and sanctioned by the U.S. as a SDGT on August 3, 2006."[160] I first note that Mujil's alleged connections with Al Qaeda and his designation were revealed post-9/11, something the Bank could not have known in 1992, fourteen years before Mujil's designation. Further, I cannot conclude, based on the situation outlined by Winer and my review of documents cited by him, that the Bank engaged in wrongdoing. An individual who was a principal or officer of a charity, and was not recognized to be on any sanctions list, would have the authority to authorize signatures on their charities' accounts. I do not see any violation by the Bank here. I only see routine banking services.

---

[151] *See supra*, Section 4.1 (d).

[152] *See, e.g.*, Kohlmann pp. 12-14, 21, 41.

[153] SAMA Circular 02419-BCL-142, July 4, 1996.

[154] *See supra*, Section 4.1 (d).

[155] *See, e.g.*, Kohlmann p. 8.

[156] *See* Kohlmann p. 8.

[157] *See* Statements of Accounts for Osama Bin Laden, 1998-2002 (ARB-00000843-00000848; ARB-00013775-00013778) (showing no transactions during 1998-2002).

[158] *See* First Tasks Completed by Authority, Oct. 21, 2001 (ARB-00014302).

[159] *See The FBI Releases 19 Photographs of Individuals Believed to be the Hijackers of the Four Airliners that Crashed on September 11, 2001*, FBI, Sept. 28, 2001, *https://archives.fbi.gov/archives/news/pressrel/press-releases/fbi-announces-list-of-19-hijackers.*

[160] Winer ¶ 6.11.10.1..1.

Kohlmann's description of the Buthe transactions do not make sense chronologically.[161] Kohlmann states that Buthe arrived in the United States in *May* 2000 with traveler's checks issued by Al-Rajhi Bank and then deposited $275,000 of them at Bank of America. Kohlmann then states that Buthe withdrew $151,000 of the deposited amount in May 2000 and deposited them in *March* 2000 at Al-Rajhi Bank. What Kohlmann describes here is chronologically impossible. Even if the transactions were chronologically sound and what Kohlmann alleges is true, it does not suggest noncompliance by Al-Rajhi Bank, or by Bank of America for that matter. Use and deposits of traveler's checks at that time were common and perfectly normal banking transactions.

I am further unconvinced that simply maintaining accounts or providing other, routine financial services implies material noncompliance. Al-Rajhi Bank was known to be the only Bank in Saudi Arabia complying with Islamic banking principles at the time. Winer alleged, based on a CIA report, that "extremists" chose "ARB [because their] Islamic banking principles appealed to them [...]."[162] But, the use of the Bank by certain individuals would not have implied any ill intent by Al Rajhi Bank. Al Rajhi Bank was, and still is, a large commercial retail bank with millions of customers.[163] The fact that certain individuals or organizations representing a tiny fraction of the Bank's customers held accounts with the Bank is not itself suspicious. Pre-9/11, these individuals and organizations almost certainly held accounts at other banks too. One need not look any further than the alleged Bank of America accounts held by supposedly suspicious individuals highlighted by Winer and Kohlmann.[164]

Finally, the Bank was not obligated, nor has it ever been an expectation in the banking regulatory industry, to check the personal connections and ideology of every account holder at the time of an account opening. The Bank had no obligation, nor capability, to be an intelligence agency searching for suspicious affiliations of customers.

    (b)    <u>The examples Winer and Kohlmann provide about how the Bank handled charity accounts pre-9/11 fail to convince me, as an auditor, of any material noncompliance by the Bank.</u>

*Number of Accounts.* Without pointing to any applicable Saudi regulations that restricted the number of accounts that charities or any individual could have at Saudi banks pre-9/11, both Winer and Kohlmann suggest that the number of accounts held by IIRO and Al Haramain at Al Rajhi Bank, pre-9/11, indicate that the Bank ignored suspicious actions by these charities.[165] However, I am not aware of any such prohibition, pre-9/11, on the number of accounts a single charity could have with one bank. In fact, a post-9/11 instruction from SAMA indicates that, prior to 9/11, the regulator had indeed not restricted the number of accounts a single charity could have at one bank.

---

[161] Kohlmann p. 15.

[162] Winer ¶ 11.14.1.

[163] *See, e.g., Al Rajhi Bank 4Q2022 Financials Fact Sheet, Al Rajhi Bank,* 2022, https://www.alrajhibank.com.sa/-/media/Project/AlrajhiPWS/Shared/Home/about-alrajhi-bank/Investor_Relation/Financial-Materials/2022/Q4/Fact-Sheet/Fact-Sheet.pdf.

[164] *See e.g.,* Winer ¶ 10.8.4 (referring to Al-Haramain's American bank accounts at Bank of America); Kohlmann pp. 9, 15 (referring to Omar Al-Bayoumi's account at Bank of America).

[165] *See, e.g.,* ¶ Winer 9.40.4, Kohlmann p. 17.

Subject to the MDL Protective Order

Specifically, in a May 2003 circular related to charity accounts, SAMA stated "[i]n the event there are branches of these institutions and associations or there are multiple purposes for their activities, it will be permitted for secondary accounts to be opened under the main account for these branches and purposes."[166]  In other words, the post-9/11 instruction did not restrict the number of "secondary accounts" a charity could have.  Instead, such an instruction would make it easier for regulators and a charity's external auditors, among others, to see affiliated accounts in one place (i.e., under a main account) which apparently was not the policy pre-9/11.  Thus, even post-9/11, SAMA regulations reflected the specific needs of legitimate charities to collect and track donations for specific projects.  Given I have seen no pre-9/11 SAMA instructions to the contrary, I have no reason to conclude that the Bank was materially noncompliant by maintaining multiple accounts for charities.

Further, as an auditor, I am also not alarmed that a charity might hold multiple accounts at one bank without practical reasons.  To maximize donations, a charity must be accessible to donors.  Multiple accounts, across banks and within banks, is a method of financial management that would not have been atypical for large, Islamic charities, soliciting and receiving donations for different charitable causes.  For example, without raising alarms, a charity could have separate accounts for each of the following projects or initiatives: "Sponsoring Orphans," "Immigrants, Refugees and Victims of Disasters", or "Winter Supplies."[167]  Pre-9/11, the charities banked widely in Saudi Arabia and around the world.  Al Haramain also held accounts at U.S. banks pre-9/11, such as Bank of America.[168]  IIRO's board minutes from 1998 indicate that it held accounts at nine major Saudi Arabian banks.[169]  The fact that the charities — like some commercial entities — held multiple accounts at multiple banks was normal, especially considering the specific needs of charities.

***KYC and Account Opening.***  Without evidence, Winer further opines that "ARB undertook only the most basic of all customer identification procedures"[170] or failed to conduct due-diligence or KYC with respect to the IIRO and AHIF accounts.[171]  Perhaps due to his lack of experience in the banking regulatory industry, particularly with Saudi regulations, Winer fails to note that the Bank's account opening and customer identification process complied with SAMA requirements and normal bank practices of the time.   As discussed previously, SAMA's identification requirements mandated that the Bank acquire identification documents of customers.[172]  Winer cites no provision indicating more was required.

As an example of supposed insufficient KYC protocols, Winer discusses a situation where an individual filled out his occupation as "retired" for an Al-Haramain account.[173]  Winer takes this snapshot as an indication of a lack of "basic due diligence" by the Bank.  This situation, by itself, does not indicate to me as an auditor, a lack of proper systems or processes in place.  The

---

[166]  *See* SAMA Circular 6465-MAT/110, May 24, 2003 (ARB-00017579).

[167]  *See* Chart of IIRO Accounts (Exhibit ARB_003).

[168]  *See* Kohlmann, p. 15.

[169]  *See* IIRO 1998 Board Minutes (MWLIIRO-000161285).

[170]  Winer ¶ 9.32.

[171]  Winer ¶ 9.35.

[172]  *See, e.g.*, Letter from Regional Office, Banking Operations referring to opening of account for Al-Haramain, Apr. 30, 1995 (ARB-00038567).

[173]  *See* Winer ¶ 9.32.1.

information was filled out on the whole, there is a license in the record, and there are IDs for signatories on the account.[174] The substance of the account is unaffected. I cannot conclude that there was a lack of "basic due diligence" across possibly hundreds of thousands of accounts opened at Al Rajhi Bank based on an example of one innocuous error discussed by Winer.

***Charity Licenses.*** Winer also claims to have seen numerous IIRO and AHIF accounts opened without a license.[175] Winer states that the "the only permission sought from the Da'Wah Organization was from the director of a particular branch of ARB" and that this somehow "violated ARB's own compliance requirements."[176] Winer's statement here makes no sense to me. The Branch Manual states that a charity account should have "a copy of the license granted by the authorities in the Kingdom of Saudi Arabia (Ministry of Interior or the Emirate or the Social Affairs) approving the opening of the account and the collection of donations,"[177] which appears to be exactly what the Bank had done, i.e., ask the charity for its authorization.

I have reviewed the documents cited by Winer regarding an alleged lack of charity licenses and have not seen any material noncompliance with applicable policies, regulations, and procedures. Based on my experience, I find it plausible that, considering that some branches had many accounts for Al-Haramain or IIRO, a branch manager could have issued a waiver for acquiring licenses every time an account was opened. The documents indicate a widespread recognition of these charities as legitimate entities, and they were almost certainly well-known charities among the branch managers. In fact, among the documents that Winer cites, I have also seen indicators that AHIF and IIRO were recognized/licensed within the Kingdom.[178] For example, I have seen the following:

- A license from the Emirate for IIRO, clearly in accordance with the Branch Manual section 1:3:6:3.[179]

- A letter from the Crown Prince, in his capacity as Deputy President of the Counsel of Ministers, recognizing the activities of IIRO.[180]

- Another letter from the Crown Prince, in his capacity as Deputy President of the Counsel of Ministers, approving the decisions of the Muslim World League at their meeting, which presumably included the formation of IIRO.[181]

---

[174] *See* Letter from Regional Office, Banking Operations referring to opening of account for Al-Haramain, Apr. 30, 1995 (ARB-00038567); Letter from KSA Vice Minister of Islamic Affairs, Endowments, Preaching and Guidance referring to validity of Al-Haramain's ongoing operations, (ARB-00038568).

[175] Winer ¶ 9.35.

[176] Winer ¶ 9.35.

[177] *Branch Instructions Manual*, 1:3:6:3, ¶ 1 (ARB-00000172).

[178] Letter from Prince of Eastern Province recognizing IIRO opening an office in the region, Aug. 9, 1989 (ARB-00013674); Letter from Deputy Prime Minister recognizing activities of the IIRO, Mar. 18, 1985 (ARB-00013675); Letter from Deputy Prime Minister Approving Decisions and Recommendations relating to formation of IIRO (ARB-00013679-13680); Letter from Muslim World League Certifying the Founding of IIRO (ARB-00013681).; Certificates issued by Ministry of Foreign Affairs recognizing the work of IIRO (ARB-00013682-13683, ARB-00013693-13694); Letter to ARB from Al-Haramain operating under approval of Vice Minister of Islamic Affairs, Nov. 19, 1998(ARB-00038214).

[179] Letter from Prince of Eastern Province recognizing IIRO opening an office in the region, Aug. 9, 1989 (ARB-00013674); *Branch Instructions Manual*, 1:3:6:3, ¶ 1 (ARB-00000172).

[180] Letter from Deputy Prime Minister Approving Decisions and Recommendations relating to formation of IIRO, Jan. 28, 1979 (ARB-13675).

Subject to the MDL Protective Order

- A letter from the Ministry of Foreign Affairs, indicating that IIRO was recognized by the national government for its work.[181]

- Documents confirming that Al-Haramain was operating under the permission of Ministry of Islamic Affairs.[183]

- A letter indicating recognition from both Ministry of Interior and Ministry of Islamic Affairs that Al-Haramain was licensed.[184]

In sum, I have seen documents indicating that both Al-Haramain and IIRO were licensed, or at least officially recognized and authorized charitable organizations in Saudi Arabia. Overall, the situation with respect to charity licenses as presented by Winer does not lead me to conclude there was a lack of due diligence or material noncompliance by the Bank.

In fact, contrary to Winer's assertion, the Bank did conduct other due diligence to seek confirmation about Al-Haramain's status in 2004.[185] Winer claims that after Al Rajhi Bank received confirmation from the Minister of Islamic Affairs that Al-Haramain was authorized to continue its charity work, the Bank did not conduct any other due diligence with respect to Al-Haramain "other than a full-scale audit."[186] I assume that Winer is referring to the Wikileaks cable noting, "Al-Rajhi had a full scope examination done by Ernst & Young. The report did not indicate any wrong doings."[187] Winer clearly attempts to minimize the actions and initiative of a "full scope" examination. In my experience as an auditor, a "full scope examination" of a bank is a large and resource-intensive project, that is wide in scope, and includes among other measures, testing the effectiveness of a bank's internal control systems. Winer states the Bank itself initiated the audit, which, if true, shows excellent initiative. SAMA's alleged possession of the report suggests to me that the audit was reported to SAMA.[188]

Even outside the audit, Winer's conclusion that Al Rajhi Bank did not take any other due diligence to seek confirmation about the status of Al-Haramain in 2004 is incorrect. In fact, Winer ignores that the General Manager of the Bank, Abdullah Al Rajhi, reached out to SAMA on at least two distinct occasions to confirm whether the Bank could continue doing business

---

[181] Letter from Deputy Prime Minister Approving Decisions and Recommendations relating to formation of IIRO (ARB-00013679-13680); Letter from Muslim World League Certifying the Founding of IIRO (ARB-00013681).

[182] *See* Certificates issued by Ministry of Foreign Affairs recognizing the work of IIRO (ARB-00013682-13683, ARB-00013693-13694).

[183] Letter to ARB from Al-Haramain operating under approval of Vice Minister of Islamic Affairs, Nov. 19, 1998 (ARB-00038214).

[184] Letter from Ministry of Islamic Affairs to Ministry of Interior, Passport Office, Oct. 17, 1997 (ARB-00038253).

[185] Winer ¶ 9.38.4.3.

[186] Winer ¶ 9.38.4.3.

[187] Diplomatic Cable from U.S. Embassy Riyadh to U.S. Secretary of State "Terrorist Financing: Al-Rajhi Bank," Wikileaks; https://wikileaks.jcvignoli.com/cable_04RIYADH5103.

[188] *See* Diplomatic Cable from U.S. Embassy Riyadh to U.S. Secretary of State "Terrorist Financing: Al-Rajhi Bank," Wikileaks; https://wikileaks.jcvignoli.com/cable_04RIYADH5103.

Subject to the MDL Protective Order

with Al-Haramain.[189]  The Bank also asked for verification from the Ministry of Justice, which confirmed that Al-Haramain was permitted to operate within the Kingdom.[190]

***Charity Account Names.***  Winer also incorrectly asserts that "ARB knowingly violated its own compliance policies" in situations where al-Aqil "change[d] the names of the accounts from accounts by multiple individuals who were connected to Al-Haramain, to accounts that would be directly held in the name of Al-Haramain."[191]  Winer admits that he "assume[s] the requests by al-Aqil to ARB were carried out by the bank" and makes negative inferences based on his assumptions.[192]  Winer admits, for all the accounts he has reviewed, that he has no evidence to prove that the account name change was undertaken.[193]  The requests to change the names of accounts or to transfer accounts, if anything, reflect mismanagement by Al Haramain, not the Bank.  Further, when an individual switches the name of their account to Al-Haramain, it indicates to me, as an auditor, that a bank would gain *more* information about Al-Haramain's full operations.  I see no material noncompliance here even if the request was carried out by the Bank.

Winer also asserts that in one of these instances Al Rajhi Bank "open[ed] up the accounts under the name Al-Haramain in violation of its own compliance rules," despite having no evidence to show they were definitively opened.[194]  However, even if the Bank opened these accounts, the Bank seemingly followed the required procedures.  A Bank employee asked the Legal Affairs division if the Bank could change the account names.  The employee was informed that he should close the old account and then open a new account, but if the client refused, the employee should seek approval from the Deputy Director General of Al Rajhi Bank's Banking Group.[195]  This advice from the legal division followed Branch Manual guidelines that state that the Deputy Director General of the Banking Group or his representative should seek instructions "for more details and requirements applicable to […] [opening accounts for] charitable organizations."[196]  The alternate route for compliance advised by the legal division, and allowed by the Branch Manual, accounted for good reasons why a charity that has been receiving donations to certain account would not want to confuse donors by closing that account.  With this context, I cannot conclude that this situation demonstrates the Bank violating its own policies or that this provides any support to Winer's allegations.

***Treatment of Charity Accounts.***  Further, contrary to Winer's assertion, I see no evidence that the Bank treated the accounts of "the Da'Wah Organizations as if they were accounts of

---

[189]  Letter from ARB General Manager to SAMA Jan. 4, 2004 (ARB-00014545); Letter from ARB General Manager to SAMA, Jan. 24, 2004 (ARB-00014546).

[190]  Letters from Ministry of Justice confirming that Al-Haramain permitted to operate within the Kingdom, Mar. 21, 2004 ARB-00039410; ARB-00039947.

[191]  Winer ¶ 9.58 (stating "In reviewing the ARB account opening and maintenance documents, I found a set of cases in which ARB knowingly violated its own compliance policies after considering the issue, after recognizing that the actions were improper under its compliance policies, and proceeding despite the request being improper.")

[192]  *See, e.g.,* Winer ¶¶ 9.60, 9.61.4, 9.61.9, 9.61.11.

[193]  *See* Winer ¶¶ 9.58, 9.60, 9.61.4, 9.61.9, 9.61.11.

[194]  *See* Winer ¶¶ 9.61.8, 9.61.9.

[195]  Winer ¶ 9.61.6.

[196]  *Banking Instructions Manual*, part 1 (ARB-00000173).

government agencies, rather than as NGO accounts, prior to the 9/11 attacks."[197]  The documents cited by Winer do not support his conclusion.

Winer contends that because Al Rajhi Bank retained a circular, stating that Al-Haramain is allowed to open an office in the region (Yanbu), and would be supervised by the Deputy Minister of Islamic affairs, that Al Haramain "was functioning as an agency authorized and controlled" by the Saudi authorities.[198]  However, nothing about this scenario supports an inference that the Bank treated the charity as a government body.  Winer's reasoning here is illogical.  Winer also tries to have it both ways by criticizing the supposed lack of licenses or permits for charities, while also criticizing the Bank's treatment of certain charities that had received government recognition from proper authorities of Al Haramain's permission to operate as evidence that the charity was treated as a government body.

In a different supposed example of the Bank treating charity accounts as government accounts, Winer asserts that "[t]he documents show that the Secretary General of the Muslim World League, on IIRO stationary, then provided the instructions, suggesting that the MWL, the IIRO, and the SJRC were *all* acting as government agencies."[199]  However, Winer provides no citations to these alleged documents.  Even if true, a statement made by an MWL official is not attributable to the Bank, and does not prove that the Bank treated charities as government entities.

Winer's remaining examples also fail to support Winer's conclusion on this point.  Winer asserts that, in February 2000, "ARB approved the opening of the [Al-Haramain] account 'provided that the instructions governing the opening of government accounts are observed.'"[200]  In my opinion, the author of note simply made a clerical error.  Absent evidence otherwise, I presume that the author of this note intended to follow those procedures.  Regardless, to me, this example does not indicate risky conduct by the Bank.

In addition, Winer states that, in April 2003, an Al Rajhi Bank official notes that Al-Haramain accounts at a certain branch were mistakenly linked to government account identification codes instead of Al-Haramain's corporate account code.[201]  Based on my review, only four accounts had been miscoded, and as described by Winer,[202] the Bank took steps to rectify the issue.  In my opinion, Winer's example illustrates that the Bank was not treating the accounts as government accounts, but correcting mistakes and clerical errors probably made by the relevant employee.  Based on these examples, I see no "comprehensive failure[s]", especially considering that Winer has cited only three examples out of hundreds of charity accounts.

Finally, Winer states that an "undated document," which lists various Al-Haramain accounts donors could contribute to, shows "evidence of close coordination" between the Bank and Al-Haramain since the text on the document requests that each deposit slip and purpose should be faxed to a certain number.[203]  However, the document does not show that the Bank faxed deposit

---

[197]  Winer ¶ 9.49.
[198]  *See* Winer ¶ 9.49.1.
[199]  *See* Winer ¶ 9.49.4.
[200]  *See* Winer ¶ 9.49.5.
[201]  Winer ¶ 9.49.6.
[202]  Winer ¶ 9.49.6.
[203]  Winer ¶ 8.22.9.

slips for Haramain. After reviewing the document, I see it is clearly a general form from Al-Haramain, and the language at the bottom is clearly directed at donors rather than the Bank. A practice where the Bank, which is not a subsidiary or affiliate of Al-Haramain, is consistently informing the Al-Haramain of transactions is unheard of. This is illogical thinking by Winer. If the document was directed to Al-Rajhi Bank, it almost certainly would have come in the form of a signed letter by charity management requesting the Bank to take specific actions.

(c)    The Aqil transactions outlined by Plaintiffs' experts do not indicate to me that the Bank failed to monitor suspicious activity.

In my opinion, contrary to Winer's conclusions,[204] the transactions made by Aqil al-Aqil, "in cash," were not a "red flag of *possible* money laundering."[205] Winer quotes a pre-9/11 FATF recommendation advising financial institutions to "pay special attention to all complex, unusual large transactions, and all unusual patterns of transactions, which have no apparent economic or visible lawful purpose."[206] Based on this recommendation, Winer seems to draw the incorrect conclusion that *every* large cash transaction was suspicious. Winer fails to appreciate that large cash transactions are not always suspicious or that there was a prevalence of cash-based transactions in Saudi Arabia, especially during the 1990s. In the context of Aqil, considering that I would expect that the branch personnel would know Aqil was associated with charities and probably had his own business affairs, a large cash transaction from him would not have raised a red flag.[207]

As reflected in the SAMA AML Guidelines, FATF Recommendations, and my own experiences as a Saudi auditor, the suspiciousness of large cash transactions is based on relevant context, such as the normal activity of a particular account and what the bank knows about the owner of the account.[208] If an account owner is known to make cash-based transactions, the transactions would not necessarily be suspicious. For example, a supermarket would have had a high amount of cash transactions deposited every day at a bank, and that would not raise any suspicions. Similarly, large cash transactions in a charity account or a charity official's account would have been normal. I would presume that charities, particularly during the 1990s, collected, deposited, and disbursed many cash transactions from donors. For Saudi banking auditors such as myself, and other individuals familiar with Saudi society, large cash transactions in accounts associated with charities would not have raised alarms before 9/11.

With this context in mind, I have reviewed the transactions highlighted by Winer and find no support for the conclusion that the Aqil transactions were suspicious. The transactions described generally occurred intermittently over five years, and the distribution of transactions over this time period does not make the amounts unusual. Additionally, Aqil's affiliation with the charity would have been well-known. It would have been normal for Al-Haramain to provide Aqil with

---

[204]  *See* Winer ¶¶ 8.13-8.21

[205]  Winer ¶ 18.19.1 (italics added).

[206]  Winer ¶ 5.4.4.

[207]  Considering, as discussed in Sections 4.1(b) and (c), *supra*, that the focus of AML was on illegal activity such as money from drug proceeds, Aqil's KYC and activities would not have raised the relevant red flags.

[208]  This is why FATF and SAMA Guidelines emphasize the KYC procedures – to understand the source of the funds. *See Financial Action Task Force on Money Laundering, The Forty Recommendations*, 1996, Recommendations 10 and 11, p. 3; *See also, Guidelines for Prevention and Control of Money Laundering Activities*, SAMA, Nov. 1995, p. 8 (noting "The Bank should be aware of the sources of customer's deposits, particularly those of significant cash amounts.").

Subject to the MDL Protective Order

charity funds if it needed Aqil to pay out some donations on behalf of the charity, or needed to reimburse him for administrative expenses. Furthermore, considering that post-9/11, in 2002, Treasury Secretary O'Neill considered Al-Haramain to be a "private, charitable, and educational organization dedicated to promoting Islamic teaching throughout the world,"[209] it defies belief that a bank aware of the charitable reputation of Al-Haramain and its leaders would be inclined to suspect that those accounts were associated with wrongdoing, particularly prior to 9/11. Winer does not point to any evidence or context that would lead me to believe that the transactions in Aqil's accounts were used for any illegal purposes, let alone terrorist financing.

> (d)    Suleiman Al Rajhi's donations are neither reflective of the Bank's conduct nor indicative of a support for terrorism.

Plaintiffs' experts' overemphasis on Suleiman Al Rajhi's donations pre-9/11, while he served as Chairman of the Bank, suggest that Winer and Kohlmann assume, without evidence, that Al Rajhi Bank did not have proper corporate governance structures. Kohlmann cites to donations from Suleiman Al Rajhi as examples "of connections linking Al-Haramain with the Al-Rajhi family and Al-Rajhi Bank."[210] Similarly, Winer discusses Suleiman Al Rajhi's donations to Al Haramain and other charities, as "evidence that Al Rajhi Bank and its principals had unique relationships with Al-Haramain Islamic Foundation, MWL, IIRO, and WAMY."[211] In doing so, Plaintiffs' experts wrongly conflate the actions of Suleiman Al Rajhi and the Bank. However, I have seen no evidence showing that, pre-9/11, the corporate governance structure of Al Rajhi Bank discussed in section 4.2 allowed for its use by Suleiman Al Rajhi as an alter ego for his own activities. Moreover, I have seen no evidence showing that the referenced donations by Suleiman Al Rajhi were intended to support terrorism, especially because the charities in question were widely recognized as legitimate and were not designated at the time the donations were made. Considering Suleiman Al Rajhi had a well-known reputation for charity in Saudi Arabia, these allegations seem more unlikely.

Further, Winer mischaracterizes transactions from the "SAAR Foundation" to Aqil al-Aqil and Al-Haramain between April 28, 1998 and August 27, 2002.[212] Based on the documents I reviewed, the donations to Al Haramain did not come from the "SAAR Foundation," which I understand to be a charitable organization based in the United States, but rather the Suleiman Abdelaziz Al Rajhi Charitable Foundation based in Riyadh, Saudi Arabia. The donations were made to one charity organization by another charity organization, not from or by the Bank. I also note that Suleiman Al-Rajhi was making donations to Al-Haramain's headquarters in Saudi Arabia, which as noted by the U.S. Treasury Secretary Louis O'Neill in 2002, was "dedicated to promoting Islamic teachings."[213] I do not see any evidence from Winer indicating that the donations were illegal or improper.

In a further attempt to draw nefarious connections between Aqil and the Bank, or between Aqil and Al Rajhi family members, Winer speculates on the identity of an "Abdul Rahman Al-Rajhi"

---

[209]    Fact Sheet Designations of Somalia and Bosnia-Herzegovina Branches of Al-Haramain Islamic Foundation, March 11, 2002, https://irp.fas.org/news/2002/03/dot031102fact.html.

[210]    Kohlmann pp. 11-12.

[211]    Winer ¶¶ 8.1, 8.8, 8.23, 8.32.4, 8.39.

[212]    *See* Winer ¶ 8.20.

[213]    U.S. Department of the Treasury Press Release, Mar. 11, 2002, https://home.treasury.gov/news/press-releases/po1086.

Subject to the MDL Protective Order

whose name appears on the account of Aqil al-Aqil.[214]  Without proof, Winer theorizes that the transfer to Aqil could be from a family member of Suleiman Al-Rajhi.[215]  Again, Winer fails to note important context, such as the fact that the Al-Rajhi family has thousands of family members, with the same family name, or the possibility that there may be individuals with the last name "Al-Rajhi" unrelated to Suleiman Al-Rajhi.[216]  Of note, the transaction that Winer cites refers to an "Abdul Rahman *Abdulaziz* Al-Rajhi,"[217] while his report discusses an "Abdul Rahman *Abdullah* Al Rajhi," who are likely two different individuals.

However, even if "Abdul Rahman Al-Rajhi" was a family member of Suleiman Al-Rajhi or was connected to the Bank, the transactions did not appear to violate any SAMA instructions.  Winer notes the "5920 Account at ARB for al-Aqil received a total of 1,188,000 SR from Abdul Rahman Al Rajhi" alleging that they were "rapid deposits."[218]  However, these "rapid" transactions occurred over a total of four years.  Moreover, Aqil appeared to have *paid* Abdel Rahman Al Rajhi 2,495,917 SAR.[219]  This indicates some sort of business relationship where Aqil possibly paid Abdel Rahman al-Rajhi a net of 1,307,917 SR over five years.  Transactions over a number of years in these amounts do not appear to be rapid or unusual.

(e)    The use of "Payable Through Accounts," a banking practice of the time, does not suggest material noncompliance.

Winer describes the Bank's use of its Chase Manhattan correspondent account "as a payable through account" and characterizes it as a "further red flag."[220]  Upon review, I am not sure if it is a "draft check" or "payable through account." Assuming it even is a payable through account, according to Winer, "Payable Through Accounts have been of serious concern for money laundering and terrorist finance due to the ability of those using them to circumvent the KYC obligations that domestic banks would otherwise have to apply to those customers."[221]  However, by Winer's own admission, Payable Through Accounts have been in use within the US for decades, indicating they were a normal banking practice.[222]  To my understanding, drawing checks upon such types of accounts was a convenient method to transfer money because these account types may have less fees and are paid out more quickly than other types of money transfers.

Winer also states that payable through accounts were significant because "U.S. banks do not typically implement the same due diligence requirements for PTAs that they require of domestic customers who want to open checking and other accounts."[223]  The recipient would still be subject to due diligence and KYC protocols by its own bank, which usually was an American

---

[214]  *See* Winer ¶ 8.20.1.

[215]  *See* Winer ¶ 8.19.1.

[216]  *See e.g.,* Minutes – Banks' Self-Supervisory Committee Meeting, Oct. 7, 2001 (ARB-00039586) (where Bank SSC meeting minutes note "the search criteria was based mainly on names and there was no information on identification numbers. It is difficult to search by names as there are names with the same spelling.").

[217]  *See* Winer ¶ 8.19 n.390 (citing (ARB-00041467)).

[218]  *See* Winer ¶ 8.19.1.

[219]  *See* Winer ¶ 8.19.

[220]  Winer ¶ 10.42.

[221]  Winer ¶ 10.42.

[222]  Winer ¶ 10.42 (noting "For decades, Payable Through Accounts have been of serious concern for money laundering […]").

[223]  Winer ¶ 10.44.

Subject to the MDL Protective Order

bank, and the payor was subject to KYC from the Bank which had a correspondent relationship with the American bank providing such accounts. If Winer is concerned about a loophole, his grievance should be with U.S. banking regulators for allowing this practice; not to mention American banks could have voluntarily conducted their own KYC. Furthermore, Winer has not identified any transaction by the Bank that would constitute abuse of this practice for nefarious ends.

## 5. Conclusion

Based on the foregoing, I find the conclusions Kohlmann and Winer draw regarding Al Rajhi Bank's purported noncompliance with banking regulations and alleged support for terrorism to be unsupported and speculative. Pre-9/11, the Saudi banking-regulatory regime, which consisted of strong regulations and controls, reflected applicable international banking standards of the time, such as FATF Recommendations. These standards were incorporated into Al Rajhi Bank's own policies and procedures. Pre-9/11, Al Rajhi Bank also had an appropriate corporate governance structure aimed at ensuring adherence to Saudi banking regulations and its own policies. Al Rajhi Bank's corporate governance system appropriately consisted of check-and-balances, segregated duties, and internal and external oversight.

Based on my experience, this system, which reflected proper practices of the time, likely would have uncovered any material noncompliance by the Bank. Yet neither Kohlmann nor Winer point to any instances where the Bank was found to be materially noncompliant. Plaintiffs' experts' allegations of noncompliance lack convincing evidence and are devoid of context. I have seen nothing in Kohlmann's or Winer's reports to support a conclusion of material noncompliance by the Bank, let alone an intent to engage in terrorism targeted at the United States.

The opinions expressed herein are correct based on my knowledge, experience, and belief.

I hereby confirm that I am submitting this report for the benefit of the Court adjudicating this case and hope the Court finds this report helpful. No other person may rely on this report for any other purpose, and I disclaim any legal liability to any such person.

Executed on: _NOVEMBER 21, 2023_

      (Date)                                     (Signature)

33

# APPENDIX I

# Materials Considered

In addition to the materials referenced in my report and in Plaintiffs' experts' reports and appendices, I considered the following materials:

| No. | Document |
|-----|----------|
| 1 | Charter of Collecting Donations for Charitable Purposes, March 30, 1976 |
| 2 | ARB AML Manual, November 1998 |
| 3 | Future Monitoring Plan for SAMA, November 28, 2001 (ARB-00039356) |
| 4 | ARB AML Manual, January 2003 |
| 5 | ARB Circular – SAMA 1995 AML Guide, December 4, 1996 |
| 6 | ARB Circular – AML Process, April 26, 2000 |
| 7 | ARB Circular – AML Unit, January 9, 2001 |
| 8 | ARB Circular – Charities' Accounts, February 16, 2003 |
| 9 | SAMA Circular 1812-mat-3992, April 20, 2003 (ARB-00014540) |
| 10 | SAMA Circular 227-mat-18721, October 25, 2003 |
| 11 | AML Regulation History |

# APPENDIX II

# FAWZI I. AL-HOBAYB

## Residence: Riyadh, Saudi Arabia

## Education & Professional Qualifications

**King Abdul Aziz University – Jeddah**
Bachelor of Science Degree in Accounting (February 1989)

- Passed Certified Public Accountant Exam – American Institute of Certified Public Accountants, USA (1993)
- Advanced Management Program for Overseas Banks – Wharton School, University of Pennsylvania (1997)
- Chairman (former) – American Institute of Internal Auditors, Riyadh Chapter
- Former Member – Saudi Accounting Association, Saudi Arabia

## Present Committee Memberships

- Chairman of the Audit Committee at FIPCO (Publicly listed company)
- Member of Audit Committee at Bank AlJazira (Publicly listed company)
- Member of Audit Committee at Qassim Cement (Publicly listed company)

## Work History

**Capital Market Authority, Riyadh                    (2013 to 2015)**
Director, Internal Audit Department  (Reporting to H.E., the Chairman administratively and to the BOD functionally)

*Scope:*
Responsibilities includes developing risk-based internal audit plans consistent with CMA's goals and risk tolerance, managing the timely deployments of the approved audit plans, ensuring high quality, professional day-to-day execution of internal audit engagements and projects in line with CMA's strategic objectives, contributing to the improvement of governance and risk management process by continuously assessing the promotion of ethics and values, accountability, and proper communication of risk and control information within CMA through internal audit activities, keeping senior management, the audit committee and the board informed of engagements status, key issues and work plans, and actively leading the update of the Internal Audit department Policies and Procedure to ensure proper alignment with the Institute of Internal Auditors (IIA) standards and requirements.

**Capital Market Authority, Riyadh                    (2004 to 2013)**
Director, Enforcement Division (Reporting to H.E., the Chairman)

*Scope:*
Responsible for articulating the strategy and directions for the Enforcement Division, managing effectively five departments: Investigation, Prosecution, Investors' Complaints, Internet Enforcement and Follow-up. Specific responsibilities included the following: defining the overall strategy for the Division, overseeing investigations, court sessions and prosecution activities, negotiating settlements on behalf of CMA, providing reports and recommendations to the Board of Commissioners on Enforcement's issues, overseeing the implementation of decisions of the Board of Commissioners and the court, monitoring investors' protection strategy and initiatives, coordinating with other government agencies and departments on Enforcement's matters, managing manpower and establishing annual performance goals for each department, reviewing and approving the development of risk-based policies, procedures, standards and methodology and recommending updates and enhancements on rules and regulations.

**Arab National Bank, Riyadh**                                    **(1993 to 2002)**
Deputy General Manager
Head of Internal Audit Division (Reporting directly to the Board of Directors)

*Scope:*
Scope of responsibility included providing the management with an independent appraisal tool for evaluating and examining bank's activities, promoting effective controls at bank wide level at reasonable costs, developing internal audit programs to cover all significant activities over an appropriate cycle, making recommendation to the bank's management on internal controls, accounting system and regulatory compliance, independent participation in the major acquisition of information systems, evaluation and assessment of alternative solutions prior to finalization, conducting periodic audits of MIS and post-installation evaluation to determine if the systems meet the intended purpose, conducting special examinations such as fraud investigation and money laundering, performance efficiency evaluation study, review of new procedures and maintaining close cooperation with the external auditors on matters of mutual interest.


**Whinney Murray & Co. (Ernst & Young, Saudi Arabia)**                    **(1989 to 1992)**

*Scope:*
Scope of responsibility included planning, conducting and supervising a variety of small to large size engagements with reporting responsibility mostly to the audit manager or engagement partner. As part of this scope, a number of clients were added to my audit portfolio some of which included banks, brokerage and financial institutions, manufacturing companies, contracting entities, trading organizations, airlines companies, hospitals and Government banks.

*Key Achievements:*
- Swiftly moved up in the organizational ladder to conduct and supervise a number of large assignments with direct reporting to the partner.
- Developed excellent inter-personal relations with clients and team members.

2