# Al Rajhi Bank Ex. 3

## <u>EXPERT REPORT OF ROBERT S. PASLEY</u>

*In re Terrorist Attacks on September 11, 2001*, No. 03-md-1570 (S.D.N.Y.)

Relating to: *The Underwriting Members of Lloyd's Syndicate 2, et al. v. Al Rajhi Bank, et al.*, No. 16-cv-7853

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD) (SN), United States District Court for the Southern District of New York

## TABLE OF CONTENTS

I.    Introduction ............................................................................................................. 1

II.   Background and Compensation .............................................................................. 1

III.  Summary of Opinions ............................................................................................. 3

IV.   Discussion of Opinions ........................................................................................... 5

   A.    CIA reports and post-9/11 sanctions designations cannot be relied upon
   to indicate a failure to flag potentially suspicious customers .............................. 5

     1.   CIA and other U.S. Government reports cannot be relied upon to
     conclude that the Bank supported terrorism ................................................... 5

     2.   A bank has no means of knowing about information shared between
     governments ..................................................................................................... 6

     3.   Post-9/11 sanctions designations against various NGOs and individuals
     cited in the Plaintiffs' expert reports are not indicative of the Bank's conduct ............ 6

     4.   The Post-9/11 Senate Subcommittee Report on HSBC does not provide
     evidence of Al Rajhi Bank's wrongdoing ....................................................... 7

   B.    A few instances of purported noncompliance with SAMA regulations —
   which, in any event, have not been proven — would not support an inference
   that the Bank was not materially compliant with SAMA rules and regulations ......... 8

     1.   The Bank was regularly audited ..................................................................... 8

     2.   Transactions characterized by Plaintiffs' experts as suspicious do not
     suggest the Bank was materially noncompliant with SAMA's rules and
     regulations ..................................................................................................... 10

     3.   Pre-9/11 tools used by banks and regulators to monitor and identify
     suspicious activity were not as effective and sophisticated as they are today ........ 11

   C.    I cannot infer from purported noncompliance with U.S. and international
   banking-regulatory standards and "best practices" that the Bank intended to
   support terrorism .................................................................................................... 12

     1.   In the banking-regulatory industry, a bank's compliance is measured
     against the rules and regulations of its regulator, not against international
     standards ........................................................................................................ 12

     2.   Pre-9/11, Saudi Arabia had stronger "Know Your Customer" (KYC)
     regulations than those in the United States ................................................... 13

     3.   Best practices did not require banks to monitor all international media
     and reports daily, especially not pre-9/11 ..................................................... 14

     4.   Purported discussions between the United States and Saudi Arabia about
     sanctions against the Bank are not indicative of the Bank's noncompliance ......... 15

i

5. Plaintiffs' experts failed to identify any examples of the Bank
disregarding proper governance, yet continuously and inappropriately
conflate Suleiman Abdul Aziz Al Rajhi and his family with the Bank ............................... 15

D.    Given my experience with banking practices and regulations pre-9/11, I
find it is very plausible that a bank would not know if its NGO customer
accounts were being used for terrorism financing............................................................... 16

E.    The Bank's position as a large Islamic bank does not indicate, let alone
prove, that the Bank did anything wrong.............................................................................. 18

V.    Conclusion .................................................................................................................................. 19

Subject to the MDL Protective Order

## I.      Introduction

I have been retained by White & Case, LLP, in the matter 03-MDL-1570 (S.D.N.Y.) against Defendant Al Rajhi Bank (the Bank), to serve as a rebuttal expert witness on a number of topics raised in the expert reports submitted by the Plaintiffs' experts, Jonathan Winer and Evan Kohlmann. The rebuttal topics I address include: (1) whether CIA reports and post-9/11 sanctions designations are reliable sources for evaluating the Bank's conduct; (2) whether there is evidence to conclude that the Bank failed to materially comply with its regulator, the Saudi Arabian Monetary Agency (SAMA); (3) the extent to which pre-9/11 U.S. and international banking standards are relevant to evaluating the Bank's conduct; (4) whether banks could provide banking services to NGOs without knowing which NGO customer accounts might be used for terrorism; and (5) whether a bank's position as a large Islamic bank suggests a support for terrorism. The materials I relied upon for this opinion are listed in Appendix I to this report.

By virtue of my specialized knowledge, experience and training, I have expertise in the areas of U.S. and international banking standards. Between 1975-2005, I worked for the Office of the Comptroller of the Currency (OCC), the U.S. regulator of national banks. From 2005-2007, I handled Bank Secrecy Act issues for the Financial Crimes Enforcement Network (FinCEN) and Bank of America. Since 2007, I have served as a banking-regulatory consultant focused on anti-money laundering (AML), the Bank Secrecy Act (BSA) and combatting the financing of terrorist (CFT) issues, as well as supervisory, regulatory and enforcement matters with regard to financial institutions. My curriculum vitae is included in Appendix II to this report.

In my report, I generally will discuss U.S. and international banking standards in place "pre-9/11," meaning 1998 to September 2001. When I discuss circumstances following September, 2001, I will try to be clear that I am referring to the post-9/11 period.

## II.     Background and Compensation

I graduated from Hamilton College in Clinton, New York, in 1971, with Departmental Honors in English. I graduated from Cornell Law School in Ithaca, New York, in 1975. I passed the bar examination in New York in 1975, and waived into the bar in Washington, D.C. that same year. I successfully took the lawyers' bar examination in Pennsylvania in 1983 and in Maryland in 1984.

After law school, I worked at the OCC for thirty years, from 1975 to 2005. Until 1983, I was an attorney and then a senior attorney in the Enforcement and Compliance Division of the Law Department of the OCC.

The Enforcement and Compliance Division is the division within the OCC that investigates and litigates potential violations of law and regulation — including those pertaining to BSA — and unsafe and unsound banking practices engaged in by national banks and officers and directors of national banks, as well as "institution-affiliated parties" (IAPs).

In 1983, I became an Assistant Director of the Enforcement and Compliance Division and supervised all the enforcement cases handled by the Division until a second Assistant Director was

1

Subject to the MDL Protective Order

appointed a number of years later due to the growing size of the Division. From that point until I retired in 2005, I supervised half of all the enforcement cases handled by the Division. I presented, or oversaw the presentation of, enforcement cases to the senior management of the OCC. I also presented countless administrative actions of all forms based on those cases to the banks or the affected individuals, negotiated the administrative actions and, when necessary, litigated the cases. I personally handled some of the biggest investigations and litigated cases within the Division.

In 1989, while at the OCC, I received a Diploma of Graduation from the three-year banking program at the American Bankers Association's Stonier Graduate School of Banking, writing an honors thesis on the "Consolidation of the Federal Banking Agencies."

In my last ten years at the OCC, I developed an expertise in BSA, AML and CFT. As a result, I worked on a number of BSA-related cases for the OCC, as well as on BSA- and CFT-related interagency efforts. I became the resident expert on BSA and AML matters in the Enforcement and Compliance Division. After the passage of the USA PATRIOT Act in 2001, I was detailed to the Department of the Treasury for five months to assist in drafting regulations to implement the Act. While I was detailed to the Treasury Department, I studied the provisions of § 311 of the USA PATRIOT Act, dealing with sanctions against countries, banks, transactions and accounts, and wrote an outline as to how to use the section (an outline being necessary due to the complexity of the section). In addition, I worked on the first two cases in which the Department of the Treasury sanctioned countries under § 311. Further, I worked as an expert witness for and testified on behalf of a Middle Eastern bank that was — unfairly in my opinion — the subject of a § 311 sanction.

Upon retirement from the OCC in 2005, I worked at FinCEN for one year as a consultant. FinCEN is the bureau within Treasury tasked with implementing and enforcing BSA and issuing AML guidance. During that year, I assisted in resolving FinCEN's case backlog; handled various policy issues; and drafted regulations implementing some sections of the USA PATRIOT Act, including § 312 of the Act dealing with foreign correspondent banking accounts and private banking accounts (a regulation that had not been issued since the passage of the Act in 2001 due to its complexity).

Upon leaving FinCEN in 2006, I went to work for Bank of America in its BSA area as a Senior Vice President, helping the bank, among other things, revise its overarching AML policy. I left Bank of America and became an independent consultant in the area of AML/BSA, CFT and bank regulatory matters.

As an independent consultant, my clients have included: the Association of Certified Anti-Money Laundering Specialists (ACAMS); the World Bank; the Export-Import Bank; American Express; Western Union; Wells Fargo; U.S. Bank; JP Morgan Chase Bank; Sovereign Bank; Bank of the West; and Bryan Cave.

I was part of the 2011 World Bank team doing an in-depth Financial Action Task Force (FATF) evaluation of the AML and CFT laws, rules and procedures of Kuwait.

I was part of the 2011 Financial Services Volunteer Corps (FSVC) team doing an evaluation of the AML and CFT laws, rules and procedures of Kenya.

Subject to the MDL Protective Order

I have given AML and CFT presentations in Moscow, Russia and Muscat, Oman.

As reflected by my background and experience, I have developed substantial expertise in BSA/AML and CFT. In addition, I have been retained as an expert in 18 cases, 13 of which were BSA/AML-related; have written nine expert opinion reports; have testified in one court proceeding where I was recognized by the presiding judge as an expert in BSA/AML; have testified in two arbitration tribunals; and have been deposed four times.

I am a member of ACAMS and am a Certified Anti-Money Laundering Specialist (CAMS). I am also a member of the Board of the Washington, D.C. Chapter of ACAMS. In order to become "CAMS certified," one must study a comprehensive ACAMS Study Guide and pass a written 100-question test. A passing grade for the test varies, but it is around 65 to 70. I received a 97 on the test.

Since becoming an AML/BSA consultant, I researched and wrote a legislative history of the BSA — covering all of the hearings, legislation and regulations from 1968 up to 2008 — and analyzed, researched and wrote a series of BSA-related recommendations for the American Bankers Association to submit to the then-incoming Obama administration in 2008.

I also was the Editor-in-Chief for the 400-page ACAMS Study Guide, 5th Edition, which was used by candidates sitting for the CAMS certification test. (I assisted in revising the Study Guide to produce the 6th Edition.) I have also worked in developing and revising the questions for the CAMS examination. In addition, I have made numerous presentations on AML/BSA and CFT issues and have conducted many AML/BSA and CFT trainings, including the one-day and three-day CAMS preparatory course.

This report summarizes my current opinions given the information made available to me to date.

I am being compensated at a rate of $400 per hour for the time that I work on this matter. My fees are not contingent on the outcome of this matter or on the opinions provided herein.

### III.    Summary of Opinions

Below is a summary of my opinions offered in rebuttal to the conclusions of Plaintiffs' experts, Jonathan Winer and Evan Kohlmann, based on my review of their reports, their cited documents, and other, relevant materials cited within my report.

A. CIA reports and post-9/11 sanctions designations cannot be relied upon to indicate a failure to flag potentially suspicious customers. Contrary to Winer's and Kohlmann's contentions, government intelligence reports and purported information shared between governments are not good indicators of information available to a bank, nor are they an appropriate tool for evaluating a bank's conduct. Banks, which do not operate as intelligence agencies, would not reasonably be expected to have access to this type of information. For similar reasons, post-9/11 sanction designations of individuals and entities cited by Winer and Kohlmann are not indicative of the Bank's conduct because they are backwards looking and are often based on intelligence, rather than on established fact. As a banking regulator,

3

I would not evaluate a bank's pre-9/11 conduct using the government reports or post-9/11 sanction designations selected by Plaintiffs' experts.

B.  Winer is wrong in his apparent assumption that a bank must be perfectly compliant in order to be materially compliant with its regulator.  A few instances of purported noncompliance with Saudi regulations, which, in any event, have not been proven, do not support an inference that the Bank was not compliant with those regulations.  Moreover, given the evidence that the Bank was routinely audited, as even Winer acknowledges, I, as a banking regulator, would expect to see evidence that these audits flagged material noncompliance before I concluded that there was misconduct by the Bank.  Further, a <u>bank's ability to identify red flags pre-9/11 should not be evaluated based on today's detection capabilities. The tools used by banks and regulators to monitor and identify suspicious activity have greatly improved since 2001.</u>

C.  I cannot infer from purported noncompliance with U.S. and international banking-regulatory standards and "best practices" that the Bank intended to support terrorism. Contrary to Winer's assertion, the Bank's compliance should not be measured against international standards or best practices, but by the rules and regulations of its regulator. FATF recommendations represent the gold standard for banking regulation, but not even the United States follows the recommendations completely.  In any event, pre-9/11, Saudi Arabia had stronger "Know Your Customer" regulations than those in the United States. In addition, neither Winer nor Kohlmann show that the Bank failed to materially comply with its regulator.

D.  Given my experience with U.S. and international banking practices and regulations pre-9/11, I find it is entirely plausible that a bank would not know if its NGO customer accounts were being misused for terrorism financing.  Even Winer and Kohlmann acknowledge that charities do good work and sometimes have to operate in conflict zones, making misuse of funds difficult to detect.  Winer further acknowledges that charitable donations sometimes *unwittingly* go to noncharitable purposes and even governments struggled pre-9/11 to identify misuse of funds by charities.  Plaintiffs' experts' position — that providing financial services to charities indicates a support for terrorism financing — is untenable.

E.  The Bank's position as a large Islamic bank does not indicate, let alone prove, that the Bank did anything wrong.  Contrary to assumptions made by Winer and Kohlmann, the fact that the Bank was attractive to a lot of customers because it was Shariah complaint does not suggest the Bank supported terrorism.  Further, I find it implausible that the United States would fail to sanction Al Rajhi Bank if the Bank was truly known to support Al Qaeda and terrorist activity targeted against the United States.

Subject to the MDL Protective Order

## IV.    Discussion of Opinions

### A.    CIA reports and post-9/11 sanctions designations cannot be relied upon to indicate a failure to flag potentially suspicious customers

#### 1.    CIA and other U.S. Government reports cannot be relied upon to conclude that the Bank supported terrorism

Time and time again throughout their reports, the Plaintiffs' experts rely on reports and cables generated by the CIA, the FBI, the State Department, and other Government or quasi-Government agencies to support their opinions that the Bank failed to flag allegedly suspicious customers and transactions pre-9/11.[1]  However, I see no evidence showing that the confidential information contained in these reports, many of which post-date 9/11, was shared at the time with the Bank. Information obtained by U.S. intelligence agencies could not have been duplicated by the Bank, given the resources and sources available to the CIA and the other agencies compared to those available to the Bank.  The information underlying the CIA and other reports was generated, acquired, and compiled by unnamed and unknown sources that cannot be cross-examined; and represent uncontested, unilateral findings and conjectures.  As a banking regulator, I would not reasonably expect a bank to have access to the types of intelligence and information relied upon in the CIA reports, FBI reports, or State Department cables.

As noted by the Plaintiffs' expert, Jonathan Winer, the CIA reports are based on "a mix of human intelligence, that is, information provided by people; signals intelligence, that is, information generated from telephone calls or other electronic signals; [and] financial intelligence [presumably from more than one bank in more than one country]."[2]  Winer further explains that "U.S. intelligence agencies" work together to obtain information by "gathering information from individuals (human intelligence), carrying out technical (and sometimes physical) surveillance (signals intelligence), [and] gathering information from other governments . . . [as well as] encrypted data and translate[d] information from other languages."[3]

No bank, no matter how large, had access to any of this information before 9/11.  Even today, no bank, following reasonable due diligence, would be able to access this kind of information.[4]  In fact, the CIA and related reports were not released until twenty years after 9/11 (and even then, with extensive redactions) by President Biden, pursuant to Executive Order 14040.[5]  This underscores the fact that the information cited was not reasonably available to the Bank pre-9/11. Based on my more than forty-five years of experience in banking regulatory matters, I conclude

---

[1] *See, e.g.*, Winer ¶¶ 6.7-6.10 and Kohlmann p. 15 n. 76 and p. 20 n.125.

[2] Winer ¶ 6.8.1.

[3] Winer ¶ 6.8.2.

[4] Reasonable due diligence, pre-9/11, would not have required a bank to obtain information about the purpose of an account or the source of funds for the account or the beneficial owners of the account and would not have required a bank to conduct on-going monitoring of the account.  *See*, 81 F.R. 29398, May 11, 2016, 31 C.F.R. § 1020.210. Reasonable due diligence would have been minimal, involving mostly setting forth the name for the account and handling the transactions run through the account.

[5] Winer ¶¶ 1.3.5, 1.4.5 and 2.10 n. 42.

Subject to the MDL Protective Order

that it is totally inappropriate for Winer and Kohlmann to rely on this information to evaluate the Bank's conduct.

### 2. A bank has no means of knowing about information shared between governments

A bank's conduct cannot be evaluated based on confidential information shared between governments. According to Winer, in 1999 and 2000, the U.S. National Security Council shared information with the Saudi government about funding for bin Laden and Al Qaeda.[6]  In other parts of his report, Winer refers to alleged incidents where allegations about the Bank and Al Rajhi family members were shared between the United States, Saudi Arabia and the United Nations.[7] This information, like U.S. intelligence reports, would not have been reasonably available to Al Rajhi Bank.  Intelligence information shared between the U.S. and Saudi governments is not the type of information that would have been available to banks.  Al Rajhi Bank had an obligation to materially comply with the requirements of its regulator, not to operate as an intelligence agency. Therefore, I cannot rely on information that may have been shared between governments to conclude that the Bank failed to identify suspicious accounts.

### 3. Post-9/11 sanctions designations against various NGOs and individuals cited in the Plaintiffs' expert reports are not indicative of the Bank's conduct

As a former banking regulator with experience dealing with sanctions under § 311 the USA PATRIOT Act, I disagree with Kohlmann's and Winer's opinions that post 9/11 sanctions designations of some Bank customers indicate that the Bank failed to monitor and respond to suspicious account activity prior to 9/11.[8]  Throughout their reports, the Plaintiffs' experts cite to various post-9/11 sanctions designations against NGOs and individuals for alleged ties to terrorism and Al Qaeda to opine that the Bank should not have dealt with the NGOs or individuals before they were designated.[9]  However, no experienced banking regulator or auditor would take this approach to assess a bank's conduct.

The underlying information supporting the sanctions designations would not have been available to the Bank beforehand.  Sanctions designations, many of which come from the Office of Foreign Assets Control (which is part of the U.S. Department of the Treasury), are backwards looking, *i.e.*, based on information only available in hindsight.  Winer cites to a series of CIA reports[10] for opinions that the Bank "provided accounts to or had relationships with a number of charities which each provided significant material support to al Qaeda" and were later sanctioned by the U.S. and UN post-9/11.[11]  Though Winer essentially implies that Al Rajhi Bank should have been on notice of much of the information later revealed in CIA reports, the nature of the information that was being assessed was unavailable to banks, especially pre-9/11.

---

[6] Winer ¶ 6.22.
[7] Winer ¶¶ 3.7.1 and 7.9-7.13.
[8] *See, e.g.*, Kohlmann p. 12 nn. 50, 51, 52; pp. 15, 17, 26, 29, 31, 35, and 38; and Winer ¶¶ 7.2.4- 7.2.6; 7.2.9; 7.6.4; 8.14-8.15; 8.22; 8.30; 9.40; 10.8; 11.5; 11.8.3..1; and 11.8.6.1.
[9] *See id.*
[10] *See, e.g.*, Winer ¶¶ 2.9.1 n. 32; 2.9.2 n. 33-34; 2.9.3 n. 35; and 2.9.4.1 n. 36.
[11] *See* Winer ¶ 2.9.

Subject to the MDL Protective Order

Further, none of the designations raised by Kohlmann and Winer as evidence of the Bank's alleged support for terrorism mentions any connection between the designated individuals or organizations and the Bank. For example, I have reviewed the U.S. Department of the Treasury's June 2, 2004 Press Release announcing the designation of Aqil Al-Aqil,[12] whose accounts at the Bank are mentioned extensively by Winer and Kohlmann.[13] The announcement makes no mention of alleged support for Al-Aqil by Al Rajhi Bank or any Al Rajhi family members. Because Al-Aqil was not designated pre-9/11, and the Bank's regulator had not ordered the Bank to close Al-Aqil's accounts pre-9/11, the Bank was not required to take any adverse action pre-9/11 — and there is no evidence provided by Winer or Kohlmann that the Bank had sufficient information to take such adverse action pre-9/11. It must be repeated here for emphasis that sanctions designations against NGOs, or other entities and individuals, are — by definition — backwards looking. That is, no bank can know or predict the existence of a sanctions designation before it is issued. So, the knowledge of a sanctions designation issued after the events of 9/11 cannot be attributed to the Bank pre-9/11. And the mere fact of a post-9/11 designation is not itself sufficient to warrant an inference that the Bank knew pre-9/11 about the alleged conduct that led to the designation.

Moreover, the standard for imposition of a sanctions designation is not *established fact* (of criminal activity, supporting terrorism, etc.), but rather unilateral, unchallenged determinations based on undisclosed, confidential information. In fact, cancellations of designations have happened by regulators and courts. Thus, even if an NGO or individual is designated, this is not dispositive proof that the entity or individual was engaged in terrorist activity, and designation targets can challenge their designations and get themselves removed from sanctions lists.

In addition, there is no specific standard for closing an account in the United States. And, I understand that, under Saudi law, a bank must open accounts for Saudi citizen with a valid ID and it may not close an account unilaterally unless its regulator (the Saudi Central Bank, or "SAMA") says it may do so. I thus cannot infer anything about the Bank's conduct based merely upon its failure to close accounts of entities designated post-9/11.

4. The Post-9/11 Senate Subcommittee Report on HSBC does not provide evidence of Al Rajhi Bank's wrongdoing

Contrary to Winer's opinion, the Senate Subcommittee Report on HSBC does not support an inference of wrongdoing by Al Rajhi Bank. In his report, Winer discusses what he calls Al Rajhi Bank's "relationship with HSBC, the latter of which was heavily criticized in a U.S. Senate investigation due to the latter continuing its relationship with ARB despite public information about its involvement in terrorist finance, as a result of pressure from its Middle Eastern affiliates."[14] However, the HSBC report, which came out in 2012, well after the events of 9/11, primarily focused on HSBC, not Al Rajhi Bank. Further, the report is not based on supported facts, but on speculation derived from post-9/11 U.S. intelligence reports, unsubstantiated media

---

[12] *See* Press Release, *Additional Al-Haramain Branches, Former Leader Designated by Treasury as Al Qaida Supporters Treasury Marks Latest Action in Joint Designation with Saudi Arabia*, U.S. Department of the Treasury, June 2, 2004, https://home.treasury.gov/news/press-releases/js1703.
[13] Kohlmann p. 12 and n. 50.
[14] Winer ¶ 9.5.

Subject to the MDL Protective Order

reports, including a discredited *Wall Street Journal* article,[15] and the allegations of U.S. plaintiffs.[16] Like Kohlmann's and Winer's reports, the HSBC report fails to provide specific, non-speculative evidence of the Bank's purported ties to Al Qaeda, and gives undue weight to the post-9/11 sanctions designations of some of the Bank's customers.[17] Also, like Plaintiffs' experts reports, the HSBC report unjustifiably conflates Suleiman Al Rajhi with Al Rajhi Bank.[18] Finally, it should be noted that HSBC — as horribly as it was portrayed in this report — is still a strong, well-respected bank in the industry. Based on my many years of experience in the banking regulation industry, I would not use this report as evidence of the Bank's wrongdoing.

**B.  A few instances of purported noncompliance with SAMA regulations — which, in any event, have not been proven — would not support an inference that the Bank was not materially compliant with SAMA rules and regulations**

### 1.  The Bank was regularly audited

Pursuant to industry standards, the Bank is answerable only to its regulatory body, SAMA. SAMA is the only entity in a position to determine whether the Bank's transactions rise to the level of a failure to identify and investigate any individual or specific "red flags" of suspicious activity, in the context of the Bank's overall compliance.

As a general matter, it can be expected that the Bank was routinely audited and that any significant issues would have been flagged as areas of correction and reported to SAMA. Winer claims to have seen no evidence of audits of the Bank, but evidence is in the record from the deposition testimony of the Bank's designated representative, James Galloway, during Plaintiffs' deposition of the Bank.[19]

Winer's claim of seeing no evidence of audits is contradicted by his repeated acknowledgements that Galloway testified that "there were audits by the Bank, internal and external, of its

---

[15] *See U.S. Vulnerabilities to Money Laundering, Drugs, and Terrorist Financing: HSBC Case History*, Staff Report, Permanent Subcommittee on Investigations, United States Senate, July 17, 2012, pp. 197-198, https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/PSI%20REPORT-HSBC%20CASE%20HISTORY%20(9.6).pdf.; *see also* Corrections & Amplifications, Wall Street Journal, Oct. 19, 2004, (correction issued by Wall Street Journal following a lawsuit by Al Rajhi Bank), https://www.wsj.com/articles/SB109813567093248511.

[16] *See U.S. Vulnerabilities to Money Laundering, Drugs, and Terrorist Financing: HSBC Case History*, Staff Report, Permanent Subcommittee on Investigations, United States Senate, July 17, 2012, p. 194 ("In the ten years after the 9/11 attack in 2001, U.S. Government reports, criminal and civil legal proceedings, and media reports have alleged links between Al Rajhi family members and the Al Rajhi Bank to terrorist financing."), https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/PSI%20REPORT-HSBC%20CASE%20HISTORY%20(9.6).pdf.

[17] *See, e.g., U.S. Vulnerabilities to Money Laundering, Drugs, and Terrorist Financing: HSBC Case History*, Staff Report, Permanent Subcommittee on Investigations, United States Senate, July 17, 2012, p. 201, https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/PSI%20REPORT-HSBC%20CASE%20HISTORY%20(9.6).pdf.

[18] *See U.S. Vulnerabilities to Money Laundering, Drugs, and Terrorist Financing: HSBC Case History*, Staff Report, Permanent Subcommittee on Investigations, United States Senate, July 17, 2012, pp. 194-196, https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/PSI%20REPORT-HSBC%20CASE%20HISTORY%20(9.6).pdf; *see also infra* IV.C.5.

[19] Winer ¶ 1.4.2.

8

implementation of its AML policies and procedures systemically and at the branch levels."[20] Moreover, I have reviewed the Bank's audit plans for 1999[21] and 2001,[22] which show very comprehensive procedures for audits to protect the Bank from violations of laws, rules and regulations and to ensure the proper operation of its branches. For example, the internal audit plans I reviewed include protocols for: conducting annual audits; examining and evaluating the Bank's internal control system; verifying the Bank's compliance with its policies and procedures; evaluating the Bank's supervisory and operational controls; conducting field audits of 217 branches of the Bank, in addition to audits of the rest of the Bank's branches; and evaluating corrective procedures taken. In my opinion as a banking regulator, these plans illustrate that the Bank had procedures for preventing and detecting noncompliance with internal banking policies.

Further, Galloway testified that SAMA itself conducted audits (or examinations) of the Bank.[23] Winer and Kohlmann offer no evidence that SAMA ever sanctioned the Bank for noncompliance. Presumably — given no evidence to the contrary — these audits did not uncover any significant noncompliance. Plus, pre-9/11, the Bank also was regularly audited by independent auditors. The fact that these audits failed to reveal significant issues is evident from the Bank's Annual Reports, which are public, and which discuss the audits. Winer also refers to an Ernst & Young audit of the Bank that supposedly took place in 2003,[24] which SAMA represented to Juan Zarate, then a high-ranking U.S. Treasury official, as finding "no 'wrong doings.'"[25] Further, common auditing practices and methodology, then and now, do not support the inference that selected instances of purported noncompliance, even if proven, necessarily mean overall noncompliance.

Based on my 45 plus years of experience in banking regulatory matters, no bank is expected (a) to identify all suspicious activity involving accounts maintained in or transactions conducted through the bank; or (b) to be entirely free of some deficiencies in complying with all applicable rules and regulations. A basic tenet of banking regulation is that no bank can identify and interdict all instances of fraud, money laundering or terrorist financing. I base this conclusion on having read and studied literally tens of hundreds of Reports of Examination over the course of 30-plus years at the OCC and FinCEN. As noted above, I was responsible for reviewing and proposing administrative enforcement actions against banks for violations of law, rule or regulation or unsafe and unsound banking practices and, of the thousands of banks that existed at the time, the OCC did not take administrative actions against a large proportion of such banks. Again, no bank is expected to be in perfect compliance with all rules, regulations and laws in order to be materially compliant.

---

[20] *See* Winer ¶ 1.4.2 (summarizing Galloway's testimony); *see also* ¶¶ 8.8.3 and 11.7.

[21] *Internal Audit Plan for the Fiscal Year 1999*, Al Rajhi Bank, Jan.06, 1999.

[22] *Internal Audit Plan for the Fiscal Year 2001*, Al Rajhi Bank, Dec. 2000.

[23] Galloway deposition, May 11, 2023, Tr. 109:20-110:05; 111:08-13 and 113:13-14; and Winer report ¶ 8.8.3..2.

[24] Winer ¶ 9.4 n. 461.

[25] Winer ¶ 9.4 n. 461.

Subject to the MDL Protective Order

2. <u>Transactions characterized by Plaintiffs' experts as suspicious do not suggest the Bank was materially noncompliant with SAMA's rules and regulations</u>

Transactions through Al Rajhi Bank accounts that were highlighted in Winer's report do not seem suspicious to me. For example, Winer focuses heavily on transactions involving Aqil Al-Aqil. However, as noted above, Al-Aqil was not sanctioned by the U.S. until 2004.[26] Additionally, while some large deposits and withdrawals occurred over a five-year period,[27] there is nothing to indicate that these intermittent transactions were in fact problematic or used for wrongdoing. Further, a request to change the name on an account, to me, is not significant, and it appears that Winer does not even know if this request was granted.[28]

For similar reasons, I am not concerned by the Al Buthe transactions.[29] According to Winer, Al Buthe was not indicted in the U.S. until 2010,[30] and Winer presents no evidence as to why the Bank should have suspected Al Buthe pre-9/11. Winer also discusses cash deposits into Al-Buthe's account and the use of traveler checks, but does not provide enough information to indicate wrongdoing by the Bank, only detailing routine banking services.[31] Without more information, I cannot say that these transactions are suspicious.

Nor do I find cash transactions identified by Winer concerning.[32] According to Winer, some of these transactions seem to be Zakat contributions.[33] Further, as acknowledged by Winer, E&Y apparently reviewed these transactions and, evidently, did not find any issues.[34] Based on my experience, while cash transactions can sometimes be problematic, they are not *per se* indicative of terrorism financing or money laundering, especially in a country that uses much more cash than the U.S., which I understand is the case here. However, *even if* these transactions had not perfectly complied with SAMA regulations at the time or were in fact used for improper purposes — which has not been shown by Winer or Kohlmann — I still could not conclude that the Bank was materially noncompliant absent more information.

Material compliance does not mean perfection. Suspicious or criminal activity can always slip through the cracks. The goal of compliance is to minimize those instances. In support of his conclusion that the Bank gave special treatment to alleged Al Qaeda-affiliated charities, Winer claims to "have found evidence of transactions involving elements of each of the twelve red flags for potential money laundering risk specified [in 1995] by SAMA."[35] I see nothing in Winer's report to support a conclusion that Al Rajhi Bank failed to properly investigate these transactions if required to do so by SAMA. In fact, even Winer acknowledges that the Bank's pre-9/11 policies

---

[26] *See* Press Release, *Additional Al-Haramain Branches, Former Leader Designated by Treasury as Al Qaida Supporters Treasury Marks Latest Action in Joint Designation with Saudi Arabia*, U.S. Department of the Treasury, June 2, 2004, https://home.treasury.gov/news/press-releases/js1703.
[27] *See, e.g.*, Winer ¶¶ 8.16-8.19.1, 10.15.6.
[28] *See* Winer ¶¶ 9.58.1, 9.61.8-9.61.9.
[29] *See* Winer ¶ 10.8.2.
[30] *See* Winer ¶ 10.8 n. 567.
[31] *See* Winer ¶ 10.8.2.
[32] *See* Winer ¶ 10.15.6.
[33] *See* Winer ¶ 10.15.6.
[34] Winer ¶ 9.4 n. 461.
[35] *See* Winer ¶¶ 10.6-10.6.12.

Subject to the MDL Protective Order

and procedures were good, largely tracking SAMA Guidelines and addressing AML issues.[36] Even if it were shown that the Bank had ignored the transactions highlighted by Winer, cherry-picked instances of possible noncompliance with SAMA regulations are not indicative of an intent to not comply with regulations, much less an intent to do so with the purpose of aiding Al Qaeda.

### 3. Pre-9/11 tools used by banks and regulators to monitor and identify suspicious activity were not as effective and sophisticated as they are today

Winer contends again and again that the Bank ignored or failed to identify obvious red flags.[37] However, as noted above, only SAMA is in a position to assess whether the Bank's supposed failure to identify, analyze, and act on a particular red flag would rise to the level of noncompliance. As far as I have seen, SAMA never determined that the Bank was materially noncompliant with SAMA's requirements. In addition, in the United States, reporting suspicious activity is a confidential matter that cannot be disclosed to anyone, especially not the target of the report.[38] I have not seen anything to suggest that the Bank in fact failed to identify any particular, unspecified red flag. Pursuant to industry standards, even if a bank filed a Suspicious Activity Report with its regulator, it was under no obligation or expectation to close a specific account, unless instructed by its regulator to do so.[39]

In addition, the capability of banks to identify and investigate red flags or suspicious activity has greatly improved since 2001. In 2002, it was noted by U.S. Government agencies that "detecting suspicious wire transfers is nearly impossible. A large bank can process between 10 and 125,000 wire transfers in a typical day."[40] As noted by the U.S. General Accounting Office: "One of the most frequently identified reasons for the increases [in SAR filings from 2000 through 2007] was the implementation of automated monitoring systems at depository institutions."[41]

---

[36] *See* Winer ¶¶ 9.10; 9.12-9.17; and 9.20.

[37] *See, e.g.,* Winer ¶¶ 6.6; 9.3.1; and 10.1.

[38] 31 C.F.R. § 1020.320(e); 12 C.F.R. § 21.11(k). It should be noted that FATF's Recommendations – the international standard that Plaintiffs keep referring to – specifically recommends that Suspicious Activity Reports should be confidential. *See* Financial Action Task Force on Money Laundering, The Forty Recommendations, 1996 (FATF Recommendations), Recommendation 32.

[39] In this regard, *see, e.g.,* FinCEN Guidance issued Jan. 19, 2021:

> Answers to Frequently Asked Questions Regarding Suspicious Activity Reporting and Other Anti-Money Laundering Considerations
>
> Question 3: Maintaining a Customer Relationship Following the Filing of a SAR or Multiple SARs
>
> Is a financial institution required to terminate a customer relationship following the filing of a SAR or multiple SARs?
>
> [Answer:] No. There is no BSA regulatory requirement to terminate a customer relationship after the filing of a SAR or any number of SARs. The decision to maintain or close a customer relationship as a result of the identification of suspicious activity is a determination for a financial institution to make based on the information available to it, its assessment of money laundering or other illicit financial activity risks, and established policies, procedures, and processes.

[40] Office of Inspector General, Dept. of the Treasury, Annual Plan Fiscal Year 2002, Appendix A, p. 8.

[41] U.S. Government Accountability Office, Report to Congressional Requesters, GAO-09-226, Feb. 27, 2009, p. 17, https://www.gao.gov/products/gao-09-226.

Subject to the MDL Protective Order

Further, Winer himself quotes a key provision of the 1995 SAMA Guidelines for Prevention and Control of Money Laundering Activities, which stated "A bank is not responsible for carrying out formal investigations of all customer transactions to search for possible money laundering activities."[42]   Yet, Winer suggests the opposite notion when he assesses the Bank's overall compliance with SAMA based on a few cherry-picked transactions which he claims the Bank "ignored."[43]   In my 30 years of taking administrative actions against noncompliant banks — including cease and desist orders and civil monetary penalties — I never saw, nor would I have approved, an administrative action that was based on a few vague allegations.  Without clear underlying facts, I would never have been able to convince a bank to consent to the administrative action at issue.  With all due respect to the Plaintiffs' experts, they clearly are not familiar with the process of bringing actions against financial institutions for noncompliance.

### C. I cannot infer from purported noncompliance with U.S. and international banking-regulatory standards and "best practices" that the Bank intended to support terrorism

####    1. In the banking-regulatory industry, a bank's compliance is measured against the rules and regulations of its regulator, not against international standards

Contrary to Winer's opinion, Al Rajhi Bank had no obligation to "adhere to . . . best practices and international standards."[44]  Throughout his report, Winer measures the Bank's conduct against the 1996 FATF recommendations.  It is well known that FATF recommendations, which are issued as guidance to countries and banks, serve as a "gold standard" for AML and CFT.  However, as set forth in the CAMS Study Guide that I was the editor for, FATF did not issue recommendations focused on counter-terrorist financing until October 31, 2001.[45]  The first 40 Recommendations were first issued in 1990 and then revised in 1996 and 2003.  The initial 40 Recommendations dealt primarily with anti-money laundering.  Subsequently, the Special Recommendations that focused on counter-terrorist financing were merged into 40 Recommendations, dealing with both anti-money laundering and counter-terrorist financing.

I gained extensive knowledge of FATF while working on a World Bank team conducting an in-depth FATF evaluation of the AML and CFT laws, rules and procedures of Kuwait in 2011 and a subsequent review of Kenya's laws, rules and regulations.   Based on this experience and my general knowledge of banking regulations, I know that FATF recommendations are not the appropriate standard by which to evaluate the Bank; Saudi banking law is.

FATF issues recommendations, which are distinct from regulations.  Granted, as noted by Winer, the Bank's regulator, SAMA, did incorporate some of the 1996 FATF recommendations into its regulations "prior to 9/11."[46]  However, the Bank's compliance should be assessed against those SAMA regulations, not against FATF recommendations.   And, as Winer acknowledges, the

---

[42] Winer ¶ 9.8.35.
[43] *See* Winer ¶ 10.1.
[44] *See* Winer ¶ 9.22.
[45] ACAMS, *Study Guide for the CAMS Certification Examination* (5th ed. 2012), p. 15 ("In October 2001, FATF expanded its mandate to cover the financing of terrorism.").
[46] Winer ¶¶ 9.4 and 9.6.

Subject to the MDL Protective Order

Bank's policies and procedures implemented SAMA regulations,[47] which in my opinion as a banking regulator, signals the Bank's commitment to compliance. Neither Winer nor Kohlmann point to any indication that SAMA has ever taken any enforcement action or issued any fines against the Bank for material noncompliance of Saudi law or regulations. Instead, according to Winer, a SAMA representative on behalf of the Saudi government informed the U.S. that there was an audit of the Bank in 2003 that "found no 'wrong doings.'"[48] In addition, in the same document cited by Winer, that SAMA representative purportedly said that "he had seen no hard evidence linking Al-Rajhi or individuals who have accounts or work at the bank with Al-Qaida or terrorism."[49]

Though FATF recommendations represent the gold standard in the banking regulation industry, no country or bank follows the recommendations completely. Not even the United States adheres to all the recommendations.[50] Further, many of FATF's recommendations address countries, not banks.[51] In the 1996 FATF recommendations, approximately 27 of the 40 recommendations apply to countries;[52] seven apply to financial institutions;[53] and six apply to both.[54] Nevertheless, as stated above, no bank is required to comply with these recommendations, even the ones addressing banks. Rather, banks are required to comply with the laws, rules and regulations of the country where they are located.

### 2. Pre-9/11, Saudi Arabia had stronger "Know Your Customer" (KYC) regulations than those in the United States

It should be noted here that some SAMA regulations were much more stringent than U.S. banking regulations, pre-9/11. For instance, as Winer himself acknowledges, SAMA implemented a KYC requirement as early as 1995.[55] At the time, Saudi Arabia was one of the few Gulf States to impose KYC obligations,[56] which, in my view, were quite strict. Specifically, they required banks to obtain information about beneficial owners of accounts[57] and required banks to obtain information about a customer's source of funds.[58] In contrast, I was part of an interagency effort to impose a KYC rule on U.S. banks in the 1990s, but we were met with over 330,000 adverse comment letters

---

[47] Winer ¶ 9.4.

[48] Winer ¶ 9.4 n. 461.

[49] "Terrorist Financing: Al-Rajhi Bank," Wikileaks cable – 04RIYADH5103, September 26, 2004, https://wikileaks.jcvignoli.com/cable_04RIYADH5103

[50] For example, a 2020 mutual evaluation by FATF and the U.S. found: "The United States is compliant on 9 of the 40 Recommendations and largely compliant on 22 of them. It remains partially compliant on 5 of Recommendations and not compliant on 4 of them. The United States remains in enhanced follow-up and will report back to the FATF on progress to strengthen its implementation of measures to *combat money laundering and the financing of terrorism* and the proliferation of weapons of mass destruction." *United States' progress in strengthening measures to tackle money laundering and terrorist financing*, FATF, Mar. 31, 2020, https://www.fatf-gafi.org/en/countries/detail/United-States.html (emphasis added).

[51] *See, e.g.*, Winer ¶ 5.4.10 (citing Recommendation 22 of the FATF Recommendations).

[52] FATF Recommendations 1-9; 13; 22-25; 27; and 29-40.

[53] FATF Recommendations 10-12; 14; and 19-21.

[54] FATF Recommendations 15-18; 26; and 28.

[55] Winer ¶ 1.5.2..4 n. 11.

[56] Winer ¶ 1.5.2..4 n. 11. As noted above, the U.S. did not require any KYC until after 9/11.

[57] Winer ¶¶ 9.8.18 and 9.8.29.

[58] Winer ¶ 9.8.26.

Subject to the MDL Protective Order

and were forced to withdraw the Notice of Proposed Rulemaking.[59]  A KYC obligation was not imposed in the U.S. until after the 9/11 attacks when Congress passed the USA PATRIOT Act.[60] However, the implementing regulation was weak even for a post-9/11 landscape, requiring a bank to obtain only four pieces of information: the name of the account holder; his or her date of birth (if it was an account for an individual); an address; and a Government identification number, plus requiring the bank to verify this information through documentary or non-documentary means.[61]

These were minimal requirements and did not address obtaining information about the beneficial ownership of accounts or obtaining information about the source of funds for accounts.[62] Obtaining information about the beneficial owners of an account, conducting ongoing due diligence and understanding the nature and purpose of an account were not required in the U.S. until May 11, 2018,[63] long after the events of 9/11.  Obtaining the source of funds for an account is *still* not something required of U.S. banks.  Neither is obtaining information about a customer's dealing with other banks.  The only law close to this is Section 314(b) of the USA PATRIOT Act which permits banks — on a voluntary basis — to share certain information pertaining to money laundering and terrorist financing with each other, but both banks have to register with FinCEN before being able to share such information.[64]

Pre-9/11 (as now), the Bank was obligated to comply with the rules of its regulator, SAMA, and not international standards or guidelines.  SAMA regulations incorporated some international standards, and, in terms of KYC obligations, outpaced banking regulations in other countries, including the United States.  The Bank need not have perfectly carried out every SAMA regulation for every transaction to have materially complied with the laws, rules and regulations of its regulator.  Winer and Kohlmann point to no evidence that convinces me, as a banking regulator, that Al Rajhi Bank failed to materially comply with SAMA regulations, let alone that it flouted those regulations for the purposes of aiding terrorists.

### 3.  Best practices did not require banks to monitor all international media and reports daily, especially not pre-9/11

The Plaintiffs' experts contend that, as part of KYC and AML efforts, the Bank should have been reviewing and studying media sources, as well as court records, across the globe.[65]  These media sources and court records, according to the Winer, include the New York Times; ABC News; NBC

---

[59] It should be noted here that the proposed KYC rule put forth by the banking agencies would have required banks to obtain information about a customer's source of funds and the customer's normal and expected transactions, and would have required banks to monitor a customer's account for any inconsistencies with the expected transactions. However, again, this proposed rule was withdrawn after receipt of "overwhelming" negative comments. 62 FR 67524, 67529 (12/7/89); 64 FR 14845 (3/29/99).

[60] *See* Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001, Pub. L. No. 107-56 (2001), § 326.

[61] 31 C.F.R § 1020.220.

[62] As noted, U.S. regulations did not require financial institutions to obtain beneficial ownership information until 2018 and has still not required them to obtain information about the source of funds for an account.

[63] 81 F.R. 29398, May 11, 2016; 31 C.F.R. § 1020.210.

[64] USA PATRIOT Act, § 314(b).

[65] Winer ¶¶ 3.5; 4.7; 4.10.1 n. 72; 4.10.8 n. 88; 4.11 n. 98; 6.2.3; 10.5.1; and 10.15.1..1 n. 585; and Kohlmann p. 18 n. 111.

Subject to the MDL Protective Order

News; Frontline; New York court transcripts; WikiLeaks; the Washington Post; the Philippine Daily Inquirer; and information from a 2003 Canadian court decision.[66] Scouring worldwide media sources — including those of questionable reliability, like WikiLeaks, and including regularly watching U.S. TV shows like Frontline — is not required by any country's banking regulator, nor is it practical.

### 4. Purported discussions between the United States and Saudi Arabia about sanctions against the Bank are not indicative of the Bank's noncompliance

According to Winer, the Bank was threatened with sanctions.[67] Even if such a threat was in fact made, the simple fact is that no such sanctions were ever imposed.[68] Winer speculates that no action was taken for political reasons, after discussions with Saudi Arabia.[69] However, this does not change the fact that no sanctions were imposed. Further, this conclusion runs contrary to the notion that the United States viewed the Bank as inimical to the U.S.'s national security. If the United States truly viewed the Bank as such a threat, the U.S. would have — at a minimum — issued sanctions against the Bank under § 311 or the Office of Foreign Assets Control.

### 5. Plaintiffs' experts failed to identify any examples of the Bank disregarding proper governance, yet continuously and inappropriately conflate Suleiman Abdul Aziz Al Rajhi and his family with the Bank

Throughout their reports, Winer and Kohlmann improperly conflate Suleiman Al Rajhi and his family (and various unnamed "wealthy individuals") with the Bank[70] seemingly to imply that the Bank was the alter ego of Suleiman al Rajhi. Just because Suleiman Al Rajhi and his family were majority shareholders the Bank does not mean their actions, religious beliefs, or charitable donations can be attributed to the Bank. Further, the Bank's corporate governance procedures, as enforced by the Bank's internal audits and protocols, would have prevented and detected such

---

[66] *See id.*

[67] Winer ¶¶ 3.7.1; 7.6.15; and 7.9-7.13.

[68] Winer ¶¶ 3.7.1 and 7.10.

[69] Winer ¶¶ 7.9-7.13.

[70] *See* Winer ¶¶ 2.8 ("[Suleiman Al Rajhi and his family] undertook actions to create false or misleading documentation of their charitable activities . . ."); 6.9.2..2; 6.9.2..4; 6.9.5..8..2; 6.9.5..11; 6.10.2..4 ("'The religiously ultraconservative Al Rajhi family . . . appears to be a key financial backer of the Afghan Mujahaddin . . . .'" (emphasis added indicating conjecture)); 6.10.3..3; 6.10.3..4 n. 163; 6.10.3..9 ("describing the Al Rajhi family as 'secretive and religiously ultraconservative' . . . ."); 6.10.3..11 n. 170 ("CIA concluded that 'Senior al-Rajhi family members have long supported Islamic extremists and probably know that terrorists use their bank'. . . ." (emphasis added indicating conjecture)); 6.11.4..4; 6.11.4..5 ("'several Al-Rajhi family members donate money to businesses tied to terrorists.'"); 6.11.7..7; 6.11.8..5; 6.11.10..1; 6.11.11..1; 6.11.12..5 ("'[Suleiman Al Rajhi] . . . reportedly [has] provided widespread funding to al-Qaeda'" (emphasis added indicating conjecture)); 6.11.12..6; 6.11.12..7; 7.1; 7.2.3; 7.6.1; 7.6.12; 7.6.13 ("'Senior al-Rajhi family members, including family patriarch [Suleiman Al Rajhi], have donated money to NGOs suspected of supporting terrorism.'" (emphasis added indicating conjecture)); 7.21.2; 8.1.4; 8.1.8; 8.2; 8.2.1; 8.2.2; 8.8.9; 8.24; 8.32.6..2; 8.33.1; 8.34; 10.32.5; 10.32.6; 11.10.2; and 11.14.2. *See also* Kohlmann pp. 6 ("there is evidence that [Suleiman Al Rajhi] encouraged and/or fostered the spread of Al Qaeda's ideology. . . ."); 7 ("[Suleiman Al Rajhi] 'devoutly practices Wahhabism, wearing a full-length beard and traditional Wahhabi garments. . . .'"); n.7 ("'Members of the ultra-wealthy Al Rajhi family . . . probably are a source of financial support for . . . [al Qaeda]. . . .'" (emphasis added indicating conjecture)); 10; 11; 29; 32; 35; 37; 39 ("Aside from the financial support provided by the [Suleiman Al Rajhi] family to Islamic extremists, there is evidence of other forms of support as well." (emphasis added – no evidence is provided)); and 41.

15

misuse.[71] Similarly, in my experience, external auditors would have identified and reported any such activity. Neither report points to anything showing that the Bank failed to comply with proper corporate governance structures as required by SAMA/international banking standards.

### D. Given my experience with banking practices and regulations pre-9/11, I find it is very plausible that a bank would not know if its NGO customer accounts were being used for terrorism financing

Undoubtedly, some charities have been exploited by terrorists, but detecting this activity is difficult for governments and even more so for financial institutions. For example, Holy Land Foundation was not uncovered as a supporter of terrorism and shut down until after 9/11.[72] Further, as acknowledged by Winer, there are more than 6,000 Islamic NGOs, but only "a few dozen support terrorists."[73] With this in mind, it is difficult to understand how a bank with millions of accounts can unfailingly identify which NGOs and which individual transactions are suspect, especially before 9/11.

Winer also acknowledges that some NGOs are unwittingly used by terrorists.[74] With regard to Suleiman Al Rajhi, his family and the Bank, various statements in Winer's report itself indicates that some donations may have *unwittingly* gone for non-charitable purposes.[75]

Further, even Winer acknowledges that NGOs sometimes have to operate near areas where there is armed conflict, but that they nonetheless provide "legitimate humanitarian activities . . . such . . . as caring for injured people or helping orphans . . . ."[76] As set forth by the Consortium for Financial Access, in a report issued June 2019:

> "NPOs [non-profit organizations], by their nature, provide assistance to those in need, sometimes in or near conflict zones. Rather than considering these activities as creating insurmountable risks to banking relationships, [financial institutions] should recognize that NPOs undertake considerable efforts to protect their organization, donors, programs, partners and recipients and to prevent abuse by terrorists and criminals."[77]

The report also noted that:

> [T[he U.S. government does not view the charitable sector as a whole as a presenting a uniform or unacceptably high risk of being used or exploited for money laundering, terrorist financing, or sanctions violations.[78]

---

[71] *See Internal Audit Plan for the Fiscal Year 1999*, Al Rajhi Bank, Jan.06, 1999; *Internal Audit Plan for the Fiscal Year 2001*, Al Rajhi Bank, Dec. 2000.

[72] Winer ¶ 3.5 n.53.

[73] Winer ¶ 4.2.2.

[74] Winer ¶ 4.8.2.

[75] Winer ¶ 6.10.3..4 n. 163.

[76] Winer ¶ 10.15.1.

[77] Consortium for Financial Access, *Banking Nonprofit Organizations - The Way Forward*, ACAMS, June 2019, p. 1. This report was sponsored by ACAMS and the Charity Security Network. I was part of the team that researched and drafted this report.

[78] Consortium for Financial Access, *Banking Nonprofit Organizations - The Way Forward*, ACAMS, June 2019, p. 1.

16

Subject to the MDL Protective Order

One of the conclusions that the report drew was as follows:

> It is well known that the nonprofit sector provides essential services to assist those in need often in high-risk areas, conflict zones and inaccessible regions . . . Many NPOs play a crucial role in fighting conditions conducive to terrorism, reducing the appeal of violence by building social structures and by increasing intercommunity dialogue and understanding.[79]

Even Winer had to admit that charities do good work, although some funds are "inextricably intermingled" with other funds.[80] As Winer explains, citing a State Department report referring to al Qaeda and other terrorist organizations:

> "[T]he planning and execution of violent attacks probably comprise a small part of their total budget. It is much more difficult to investigate the financial dealings of a terrorist organization if most of its funds are earmarked for legitimate political, social, and humanitarian activities."[81]

If this is the case — as there is no doubt it is — I would consider that it is much more difficult for a bank to investigate and separate the bad NGOs from the 6,000 other Islamic NGOs, not to mention the "small part" of their "bad" transactions from their overwhelming other legitimate transactions.

With regard to IIRO, an NGO that is a focus of this case, Winer, citing a UN report, states that:

> "[It is] one of the largest Islamic umbrella charities . . . Most of [IIRO's] activities, and the activities of its associated charities, relate to religious, educational, social and humanitarian programmes. But IIRO, and some of its constituent organizations, has also been used, knowingly or unknowingly, to assist in financing al-Qaida"[82]

Given this fact, based on my experiences and expertise, I do not see how the Bank or, for that matter, individual donors, could have determined how and when and to what extent this large and prominent NGO was using a small portion of funds — wittingly or unwittingly — for illicit purposes.

So, contrary to the approach seemingly espoused by the Plaintiffs' experts that there should be an inherent concern or adverse inferences drawn from the fact that the Bank provided accounts and financial services to NGOs — prior to any of them being sanctioned — in my opinion, it was

---

[79] Consortium for Financial Access, *Banking Nonprofit Organizations - The Way Forward*, ACAMS, June 2019, p. 2.
[80] Winer ¶ 2.11. *See also*, Winer ¶ 2.5.
[81] Winer ¶ 3.6 (emphasis added).
[82] Winer ¶ 6.2.1 (emphasis added).

Subject to the MDL Protective Order

appropriate and sound for the Bank to provide banking services, especially to large, international, and, in the words of the U.N., "mainstream"[83] organizations like IIRO.[84]

### E. The Bank's position as a large Islamic bank does not indicate, let alone prove, that the Bank did anything wrong

The Bank is one of the largest banks in Saudi Arabia and has a large network of branches.[85] As set forth in the Complaint, the Bank is "Shariah compliant."[86] Winer opines, quoting a 2003 CIA report (which was not available to the Bank pre-9/11), that is why terrorists are attracted to the Bank, although this allegation is preceded by the tentative word "probably,"[87] underscoring the lack of proof for this supposition. Notably, I understand that the few bin Laden accounts at the Bank had been dormant since the mid-1990s.[88]

Just because the Bank is a large Islamic bank does not mean — absent any proof — that it conspired with al Qaeda or other terrorists to attack the United States.[89] In addition, it should be pointed out that neither SAMA nor the United States has ever brought any action or sanctions against the Bank for this so-called conspiracy or for any other offense. This is particularly significant in light of the fact that Complaint alleges that:

> [The Bank] was one of al Qaeda's most essential and critical partners in the years preceding 9/11, [and that] U.S. national security and counter-terrorism officials made the disruption of [the Bank's] support for al Qaeda a central focus of their effort to dismantle al Qaeda's financial and logistical support infrastructure.[90]

---

[83] Winer ¶ 6.2.2 (citing Second UN Monitoring Report, ¶ 41, UN Security Council, November 3, 2003, distributed December 2, 2003, S/2003/1070 (stating of IIRO, "[m]any prominent Middle East figures and financiers have associated themselves with this mainstream Islamic charity.").

[84] The same is true as to Al Haramain, which was recognized by the U.S. Treasury Secretary post-9/11 for its charitable activities. *See* Press Release, *Fact Sheet Designations of Somalia and Bosnia-Herzegovina Branches of Al-Haramain Islamic Foundation*, U.S. Department of the Treasury, Mar. 11, 2002, https://irp.fas.org/news/2002/03/dot031102fact.html. (In 2002, U.S. Treasury Secretary O'Neill described Al Haramain as a "private, charitable, and educational organization dedicated to promoting Islamic teaching throughout the world.").

[85] *See, e.g., Al Rajhi Bank 4Q2022 Financials Fact Sheet*, Al Rajhi Bank, 2022, https://www.alrajhibank.com.sa/-/media/Project/AlrajhiPWS/Shared/Home/about-alrajhi-bank/Investor_Relation/Financial-Materials/2022/Q4/Fact-Sheet/Fact-Sheet.pdf.

[86] Complaint ¶ 67; Winer ¶¶ 6.11.11..1; 6.11.12..4; and 7.6.3. *See also*, Kohlmann, p. 16.

[87] Winer ¶ 6.11.11..1

[88] *See* Statements of Accounts for Osama Bin Laden, 1998-2002 (ARB-00000843-00000848; ARB-00013775-00013778) (showing no transactions during 1998-2002).

[89] Similarly, in ¶ 11.14.7 of Winer's report, he argues that the Bank's "Ideological alignment – convenience – services in cash – global reach – generous with donations from its own senior officials – no questions asked – willingness to hide transactions . . . . These are the elements that would constitute a useful shopping list for a terrorist seeking a bank." Not only is this purely speculative in nature, it should be stressed that the first five items are irrelevant to imposing any liability on the Bank (its alleged conservatism; its size, its ability to conduct transactions in cash (not citing to any particular amount); and individuals' (not the Bank's) generosity. None of these supposed factors can, in my view, be a basis for imposing unspecified treble and punitive damages against the Bank. The last two items – no questions asked and a willingness to hide transactions – are vague and are not alleged with any specifics as to what was hidden, when, how, where, by whom, etc. Consequently, they cannot, in my view, be relied on as proof of anything.

[90] Complaint ¶ 155.

Subject to the MDL Protective Order

Assuming that this were the case, it is impossible for me to believe the notion that the United States would stand by and do nothing to restrict or sanction the activity of the Bank under § 311 of the USA PATRIOT Act or by other means (such as OFAC designations), much less refrain from doing so for political reasons. As stated above, under my background section, I am familiar with how and when § 311 of the USA PATRIOT Act is used.

The conclusion that the U.S. would have taken action under this scenario if warranted is bolstered by Plaintiffs' own expert who quotes the U.S. State Department as saying that "the U.S. could prosecute anyone who provide[s] material support to al Qaeda."[91] And yet the United States never prosecuted the Bank[92] or anyone connected with the Bank, in spite of the U.S.'s purported "central focus" on the Bank in a matter concerning national security.

## V.    Conclusion

In closing, I note Kohlmann's concluding remarks in his report where he says:

> [I]t strains credulity that the Al-Rajhi family and Al-Rajhi Bank could have unintentionally provided so much support over a period of a decade or more to a long list of Al-Qaida sympathizers without having any clue as to their real goals — or that they would be utterly clueless as to their intent to provide support to international terrorism.[93]

While this unproven scenario may strain Mr. Kohlmann's credulity, his statement is pure, wild conjecture, unsupported by any facts, dates, specificity or evidence that the Bank committed any wrongdoing whatsoever. Based on my decades of experience handling banking-regulatory matters, I know that such conjecture would not provide a sustainable basis under U.S. rules for an administrative action against a bank, let alone a conclusion about a bank's purported intent to engage in terrorist financing. In fact, as noted above, even Winer acknowledges that the Bank's pre-9/11 policies and procedures were good, largely tracking SAMA Guidelines and addressing AML; suspicious activity; red flags; know your customer (KYC); account opening; account maintenance; and beneficial ownership of accounts; obtaining a customer's source of funding; having a list of red flags; and having procedures for opening accounts for charities.[94]

Based on the information presented by Plaintiffs' experts, I cannot conclude that the Bank failed to materially comply with SAMA regulations. Therefore, given that SAMA pre-9/11 standards incorporated some international standards, and were at times *stricter* than U.S. standards, I also cannot conclude — and in my view Kohlmann and Winer have no basis to conclude — that Al Rajhi Bank would have failed to satisfy U.S. and international banking standards. Much less do I find any basis to conclude that Al Rajhi Bank intended to not comply with these standards in order to support Al Qaeda or terrorism. In my opinion, Kohlmann and Winer have demonstrated only

---

[91] Winer ¶ 6.23.
[92] Winer ¶ 7.10, which also refers to unspecified actions in 2004 (three years after 9/11), as allegedly detailed in unspecified CIA reports.
[93] Kohlmann, p. 41.
[94] Winer ¶¶ 9.10; 9.12-9.15; 9.17; and 9.20.

Subject to the MDL Protective Order

that Al Rajhi Bank provided routine banking services to certain NGOs and individuals, which does not indicate to me, as a banking regulator, a concerted effort to support terrorism.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

I also certify under penalty of perjury that the contents of the material I provide in Appendix I (reliance materials) and Appendix II, which provides my experience and qualifications, curriculum vitae, publications, and lists my expert witness service from 2019 to the present, to be true and correct.

12/18/23
_____
Date

_Robert S Pasley_
_____
Robert S. Pasley

20

# APPENDIX I

# Materials Considered

In addition to the materials referenced in my report and in Plaintiffs' experts' reports and appendices, I considered the following materials:

| No. | Document |
|-----|----------|
| 1 | 1998 Al Rajhi Bank Annual Report |
| 2 | 1999 Al Rajhi Bank Annual Report |
| 3 | 2000 Al Rajhi Bank Annual Report |
| 4 | 2001 Al Rajhi Bank Annual Report |
| 5 | "Answers to Frequently Asked Questions Regarding Suspicious Activity Reporting and Other Anti-Money Laundering Considerations," Financial Crimes Enforcement Network, January 19, 2021 |
| 6 | "Prepared Remarks of FinCEN Director James H. Freis, Jr. delivered at the West Coast Anti-Money Laundering Form," U.S. Dept. of Treasury, Financial Crimes Enforcement Network, May 2, 2012 |
| 7 | SAMA Circular 86/BC/55 |
| 8 | SAMA Circular 11989/BC/121 |
| 9 | SAMA Circular 2419/BCL/142 |

# APPENDIX II

# ROBERT S. PASLEY
## *pasleyconsulting.net*

## EDUCATION

### Stonier Graduate School of Banking
- Graduated June, 1989.
- Senior thesis was one of 12 accepted as an honors thesis and published in the American Bankers Association and the Harvard Business School libraries.

### Cornell Law School
- Graduated June, 1975 – J.D.
- Co-founded the Elmira Prison Project designed to instruct and to personally counsel inmates on the law.

### Hamilton College
- Graduated June, 1971 – B.A.
- Was one of three out of a group of 43 English majors to graduate with departmental honors in English.
- Awarded the Kirkland Essay Prize for Biblical Studies.

## LEGAL EMPLOYMENT

### Independent Consultant
- 3/07 – Present – Focus has been on anti-money laundering and Bank Secrecy Act issues as well as supervisory, regulatory and enforcement matters dealing with financial institutions.
- Clients have included:
  - Association of Certified Anti-Money Laundering (ACAMS);
  - International Monetary Fund;
  - Export-Import Bank;
  - American Express;
  - American Bankers Association;
  - Western Union;
  - U.S. Bank, N.A.;
  - JP Morgan Chase;
  - Sovereign Bank;
  - Bank of the West; and
  - Bryan Cave.

## Bank of America
- 9/06 – 3/07 – Senior Vice President, handling BSA policy issues.

## Financial Crimes Enforcement Network (FinCEN)
- 6/05 – 6/06 – Worked as a contractor within the Regulatory Policy and Programs Division, handling BSA issues, cases and regulation drafting.

## Office of the Comptroller of the Currency (OCC)
- 12/83 – 5/05 – Assistant Director of the Enforcement and Compliance Division.
- 7/86 – 12/86 – Legislative Counsel.
- 6/80 – 12/83 – Senior Attorney.
- 9/75 – 6/80 – Attorney.

## Additional Legal Positions
- 7/02 – 11/02 – Rotational assignment to Main Treasury to assist in writing regulations implementing the USA Patriot Act.
- 7/87 – 2/88 – Acting General Counsel for the District of Columbia's Office of Banking and Financial Institutions.
- 9/80 – 9/81 – Special Assistant United States Attorney assigned to the Fraud Section of the U.S. Attorney's Office in Washington, D.C.

# <u>AREAS OF EXPERIENCE</u>

## Designations as an Expert Witness

I have been designated as an expert witness in approximately 18 cases. In 13 of the cases, I was designated as a Bank Secrecy Act/anti-money laundering (BSA/AML) expert; in the other cases, I was designated as an expert in the area of bank regulatory matters.

In connection with these cases, I have written nine expert opinion reports and have been deposed four times, twice in the last four years. Once on April 19, 2023, in the case of *Peter S. Davis v. JP Morgan Chase Bank, N.A.*, No. CV-2019-011499 (Superior Court of Arizona, County of Maricopa), and once in the case of *GSR Markets Limited v. Diana McDonald and Wells Fargo Bank, N.A.*, No. 1:19-cv-01005-MHL (N.D. Ga.) on May 28, 2021. On both occasions, I testified on behalf of the bank.

I have testified at a court hearing in one case – where I was recognized by the presiding judge as an expert in BSA/AML – and have testified before arbitration tribunals in two other cases.

## Writings

Authored a book on the failure of a national bank in West Virginia in 1999. The bank was engaged in the securitization of subprime mortgages and a series of fraudulent transactions to cover up the losses emanating from the securitizations. The bank was touted as the most profitable large community bank for a number of years before its failure led to one of the biggest losses in FDIC history. The book was published by Transaction Publishers in May, 2016. The book is entitled *Anatomy of a Banking Scandal – Harbinger of the 2008 Financial Crisis*.

Was the primary author of a legal textbook on the confluence of money laundering, terrorist financing and corruption.

In 2008, researched and drafted report for the American Bankers Association recommending five major reforms to the country's Bank Secrecy Act/Anti-Money Laundering regime and providing a legislative history of the then 38 years of the BSA's existence.

Have written and edited numerous position papers, research memoranda, motions, hearing briefs, appellate briefs and administrative notices and orders.

Authored a 250-page thesis for the Stonier Graduate School of Banking on the "Consolidation of the Federal Financial Regulatory Agencies." The thesis was based on extensive research, as well as interviews of prominent individuals in Congress, the Executive Branch and the banking industry. Subsequently published a condensed version of the thesis as a law review article for the "Annual Review of Banking Law" put out by the Boston University School of Law, Morin Center for Banking Law Studies. 9 Annual Review of Banking Law 255 (1990).

Authored a law review article entitled "Double Jeopardy and Civil Money Penalties," published in The Banking Law Journal. 114 Banking Law Journal 4 (1997).

Authored a chapter on the "History and Coordination of the Agencies' Enforcement Powers" for a book entitled Banks and Thrifts: Government Enforcement and Receivership published by Matthew Bender (1991).

Authored a law review article entitled "Privacy Rights vs. Anti-Money Laundering Enforcement," which was published in April, 2002, in the University of North Carolina School of Law Banking Institute. 6 N.C. Banking Inst. 147 (2002).

Authored a law review article entitled "Recent Developments in Bank Secrecy Act Enforcement," which was published in April, 2005, in the University of North Carolina School of Law Banking Institute. 9 N.C. Banking Inst. 61 (2005).

# AWARDS

- Received the co-volunteer of the year award from ACAMS on 9/20/11.

- Received the OCC's 2004 Bank Supervision Award on 4/20/05 "in recognition of . . . exceptional contributions to [the] fulfillment of OCC's bank supervision responsibilities." Award was given for my review and guidance with regard to all Bank Secrecy Act issues set forth in the Reports of Examination of the large national banks.

- Received the Secretary of the Treasury Albert Gallatin Award for having over 20 years of service with the Department of the Treasury.

- Received the Secretary of the Treasury's Award in 1999 for work on a case involving a major fraud in a national bank.

- Received the OCC's Chief Counsel's Award "for extraordinary legal contributions to the achievements of the Office of the Comptroller of the Currency during 1986" for my work on the T. Bertram Lance case, mentioned below.

- Received at least 15 Special Achievement Awards from the OCC.