# Al Rajhi Bank Ex. 4



**_Rebuttal Expert Report of Dennis M. Lormel_**

December 22, 2023

For use in _In re: Terrorist Attacks on September 11, 2001_, No. 1:03-01570 (S.D.N.Y.)

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD) (SN), United States District Court for the Southern District of New York

# TABLE OF CONTENTS

Introduction .......................................................................................................... 1

Background and Compensation ............................................................................ 1

Summary of Opinions .......................................................................................... 5

Opinions ............................................................................................................... 6

    A.    Overview ................................................................................................. 6

    B.    The CIA reports relied upon by plaintiffs' experts are not "evidence," making them improper sources upon which to rely for factual conclusions regarding terrorism financing and Al Rajhi Bank. ................................... 10

        1.    The methodology of creating CIA reports undermines their utility in legal proceedings. ........................................................................ 10

        2.    Contrasting two CIA reports shows how intelligence reports are incomplete and unreliable. ................................................................. 15

        3.    Intelligence in the CIA reports did not result in criminal cases or sanctions against Al Rajhi Bank or the Al Rajhi family. ..................... 18

    C.    Relying on unreliable sources and incomplete information, plaintiffs' experts repeatedly draw unsupportable inferences and reach unsupportable conclusions throughout their reports. ........................ 20

        1.    Winer and Kohlmann do not present sufficient evidence to conclude that Al Rajhi Bank and its principals had "unique relationships with jihadists and al Qaeda affiliated persons and entities before September 11, 2001." ........... 20

        2.    Winer and Kohlmann do not present sufficient evidence to conclude that Al Rajhi Bank and its principals had "unique relationships" with charities or that Al Qaeda benefitted from or received support from charity accounts held at Al Rajhi Bank. ............................................. 26

        3.    Winer and Kohlmann's discussions of "SAAR" are misleading and do not support their conclusions. ................................................ 32

## Introduction

I have been retained by White & Case LLP to provide services as a rebuttal expert on U.S. intelligence before and after 9/11, in support of the defense of Al Rajhi Bank (ARB or the Bank) in the matter *In re: Terrorist Attacks on September 11, 2001*, No 1:03-md-01570-GBD-SN (S.D.N.Y.).

In forming my opinion, I reviewed the expert reports submitted by the plaintiffs in this case and prepared by the experts Jonathan Winer and Evan Kohlmann, as well as the sources the experts relied on to prepare their reports. I also reviewed certain court filings and documents provided to me by Defense Counsel in the above captioned case; and I conducted independent research and relied on publications and reports relevant to this matter. I have attached as **Annex 1** a list of materials, which, in addition to the materials referenced in this report or the reports of plaintiffs' experts, I considered or relied on in forming the opinions expressed in this report. In addition to the listed and cited materials, I drew from my nearly thirty years of experience in law enforcement, during which time I investigated financial crimes and terrorist financing. Most notably, I have firsthand experience in terrorist financing investigations, including investigations into the 9/11 attacks and the potential financiers of the attacks. I also relied on my extensive personal experience as a subject-matter expert providing consultant services in the financial sector regarding anti-money laundering (AML) and financial crimes compliance, fraud, terrorist financing, training, customer due diligence, enhanced due diligence, investigations, suspicious activity, and related matters.

## Background and Compensation

For over fifty years, I have fought fraud, money laundering and other financial crime in a variety of capacities. My experience includes conducting criminal investigations, managing criminal investigative programs, performing forensic accounting reviews and auditing, and providing consulting services and training regarding the full gamut of fraud, money laundering, terrorist financing, customer due diligence, enhanced due diligence, suspicious activity, and related topics. Throughout my career, I have worked extensively with the financial services industry. My curriculum vitae (C.V.), which is attached as **Annex 2**, reflects the following experience:

Of my fifty years of professional experience, I spent approximately thirty-one years in federal government service, three years with the Internal Revenue Service (IRS) and twenty-eight with the Federal Bureau of Investigation (FBI). For the last nineteen years, I have been in the private sector. Of this time, I spent approximately one year developing and implementing an anti-fraud program for a Fortune 200 energy company and the last eighteen years consulting, primarily with the financial services industry, on the detection and prevention of fraud, terrorist financing and money laundering.

1

Between 1973 and 1976, I was an IRS Revenue Agent. In my first two years, I conducted numerous field audits of business income tax returns. This required me to regularly review and reconcile business books and records with federal income tax returns. I spent my last year with the IRS assigned to the Organized Crime Strike Force in Newark, New Jersey. I traced illicit funds from organized crime syndicates to shell companies by reviewing and assessing financial records.

From 1976 to 2003, I served as a Special Agent in the FBI, where I conducted and led white collar and financial crime investigations. These investigations required the review of a myriad of documentary records and required meticulous investigative planning and innovation. A sampling of my FBI career includes:

- Serving as Chief of the Financial Crimes Section, where I managed the FBI's white collar crimes program, approximately 3,000 special agents, as well as financial analysts and other support employees assigned to the program. I established program investigative priorities and implemented proactive national investigative initiatives. I also had policy and liaison responsibilities with federal regulators, the Inspectors General, law enforcement and the financial services industry.

- Representing the FBI in my senior executive service (SES) capacity, I served as the FBI's senior representative to the Bank Secrecy Act Advisory Group (BSAAG), the federal government interagency policy coordinating committee for terrorist financing, the 2003 Anti-Money Laundering Threat Assessment, and the U.S. Justice Department's Bank Fraud Working Group.

- Liaising with the Financial Crimes Enforcement Network (FinCEN), federal, state, and local law enforcement, and federal and state regulatory agencies regarding financial crimes, money laundering, and terrorist financing.

- Establishing and setting the scope and financial investigative methodology of an undercover operation (UCO) that focused on the fencing of stolen bearer bonds and the laundering of money for street level criminals. This operation became the longest running continuous UCO in FBI history at the time it ceased operations.

- Creating a first of its kind financial crimes task force with the New York Police Department (NYPD) and the United States Secret Service (USSS) that operated in the financial district of Manhattan. I developed an investigative methodology known as the "network targeting concept," which allowed the task force to link networks of conspirators together from the point of theft, through middlemen, and eventually to the criminal masterminds for prosecution.

2

- Serving as one of the original case agents for the investigation involving the Bank of Credit and Commerce International (BCCI). At the time, BCCI was the largest international bank failure in history. I developed evidence that demonstrated that BCCI made illicit payments to select and prominent individuals.

In my capacity as Chief of the Financial Crimes Section, following the 9/11 terrorist attacks, I recommended conducting a comprehensive financial investigation of the attacks to identify the responsible terrorists and prevent a potential second wave of attacks. I then formed an interagency working group and established the investigative methodology (both proactive and reactive) to accomplish these goals. The group I formed evolved into a formal section within the Counterterrorism Division, known as the Terrorist Financing Operations Section (TFOS).

As a result of forming TFOS and establishing proactive and progressive investigative methodologies, I was awarded the Department of Justice's Award for Investigative Initiative in 2003. Upon my retirement from the Bureau, in December 2003, I was awarded the George H.W. Bush Award for Excellence in Counterterrorism from the Central Intelligence Agency (CIA). At that time, I was only the second non-CIA award recipient.

Following my retirement from the FBI, I entered the private sector as a consultant and advised clients primarily on AML, terrorist financing, and financial fraud issues. In this role, I have provided the following services:

- In 2004, I developed an anti-fraud program for AES, a fortune 200 energy company. This anti-fraud program strengthened internal accounting controls as a fraud deterrent.

- Between 2004 and 2008, I served as a Senior Vice President at Corporate Risk International, where I oversaw enhanced due diligence for major financial institutions regarding a wide range of fraud and AML considerations.

- Between 2008 and 2010, I served as a Managing Director for the Northeast Region of IPSA International, where I oversaw a series of special investigations focused on fraud or AML compliance.

- In 2010, I established my own consulting business, DML Associates, LLC. I provide a full range of consulting services, primarily focused on financial institutions, consulting companies, and law firms, regarding a wide range of fraud and AML issues. I have conducted Bank Secrecy Act (BSA) AML independent reviews, which are essential elements of AML programs; conducted fraud and money laundering risk assessments; developed anti-fraud programs, policies and procedures; developed foreign corrupt practices programs, policies and procedures; and have

Subject to the MDL Protective Order

provided subject matter expertise to clients as well as other consulting services. For example, I advised a significant financial services institution in revising its investigative policies and procedures, updating its fraud and money laundering training, and implementing its court-ordered recommendations.

Between 2004 and 2011, I served as a contributing expert to the Counterterrorism Blog, the first multi-expert blog dedicated solely to counterterrorism issues. I have also written numerous articles and white papers for industry trade publications. I have attached a list of articles and white papers I have written for publication since 2004 as **Annex 3**.

I am a frequent speaker and instructor on money laundering and financial crimes, including terrorist financing. I served as a Distinguished Lecturer in the Master of Arts Program for Financial Integrity at Case Western Reserve University. In that capacity, I developed most of the content for two elective classes I taught on terrorist financing and financial investigations. I have served as a guest lecturer on terrorist financing for undergraduate and graduate programs at universities and colleges, including at Yale, George Washington, George Mason, Pace, John Jay, Maryland, Notre Dame College (Ohio), Northern Virginia Community College and Johns Hopkins. I also participated in developing the content for advanced certificate education programs for the Association of Anti-Money Laundering Specialists (ACAMS) regarding terrorist financing and for conducting financial crimes investigations. Further, I participated in the development of an advanced certification designation in financial crimes investigations for ACAMS. I am a primary instructor for both ACAMS advanced certificate education programs and advanced certificate designation in financial crimes investigations. I have also taught one-day workshops for conducting financial crimes and money laundering investigations for law enforcement throughout the Washington, D.C. and Baltimore High Intensity Drug Trafficking Area (HIDTA). In 2022, I authored a financial investigations training course for ManchesterCF with a dual focus on law enforcement and financial institution investigations. In 2023, I rewrote a terrorist financing course for ManchesterCF.

Additionally, I have been featured at the annual American Bankers Association (ABA) Conferences on AML and Regulatory Compliance, where I also led ABA workshops on suspicious activity reporting and fraud. I am a Certified Anti-Money Laundering Specialist (CAMS) and have been a regular speaker and instructor at conferences and training events sponsored by ACAMS. I am also a member of the cadre of instructors who teach the CAMS certification preparation class. For my contributions to the AML community, I was presented with the ACAMS volunteer of the year award in 2010 and the West Coast Anti-Money Laundering Forum 2023 Patricia Wise Award for excellence in AML education and advancing the fight against money laundering and financial crimes.

Subject to the MDL Protective Order

Beginning in September 2015, I became a member of the ACAMS Advisory Board, which provides advice and counsel to ACAMS on strategies to enhance global AML/Financial Crime prevention practices. In addition, from September 2013 until May 2019, I served as a member of the Board of Directors for the West Coast Anti-Money Laundering Forum, which fosters cooperation and the exchange of ideas between public and private sector stakeholders.

In 2016 and 2017, I served as a volunteer providing subject matter expertise to the Polaris Project regarding financial aspects of human trafficking as they were preparing to publish the 2017 Polaris Project Typologies of Modern Slavery: Defining Sex and Labor Trafficking in the United States. In addition, in 2019 and 2020, I served as the Co-Chair for the Financial Crimes Task Force for the Antiquities Coalition, which published a report titled, "Reframing U.S. Policy on the Art Market: Recommendations for Combating Financial Crimes."

I have testified before Congress on several occasions since 2001, as both a senior executive in the FBI and a private sector consultant on financial crimes, terrorist financing, BSA, and AML program and reporting requirements. In addition, I have briefed Congressional members and staff on terrorist financing and financial crimes. Between 2004 and 2007, I served as an Advisor to the Congressional Task Force on Terrorist Financing. In that capacity, I provided subject matter expertise and training to Congressional members and staff regarding terrorist financing and money laundering.

My compensation in this matter is $500 per hour. No part of my compensation depends upon the conclusions I reach or the outcome of this litigation.

## Summary of Opinions

Plaintiffs' experts Jonathan M. Winer and Evan F. Kohlmann heavily rely on CIA reports that are inherently unreliable for the purpose the experts use them. I consequently do not agree that they are appropriate to rely on as "evidence" as the experts do.

In particular, Winer and Kohlmann rely on these CIA reports without providing sufficient context for the evolving nature of intelligence and without affording careful consideration to the unidentified sources and methods that underly the reports. CIA reports are intended to provide national security intelligence to U.S. policy makers and are not intended to be used as evidence in a legal case, whether civil or criminal. The intelligence contained in these reports – in particular the sources and methods of gathering such information -- is usually classified and unidentified. Accordingly, they cannot be verified or tested and their reliability cannot be ascertained.

Moreover, individual reports cherry-picked from the thousands of reports created in the intelligence community cannot adequately capture how the intelligence community's understanding of a situation evolved over many years. The insufficiency of relying on CIA reports as evidence is exemplified by the reports themselves — the reports are inconclusive and inconsistent, and many contain support for arguments antithetical to the very points Winer and Kohlmann attempt to make.

In attempting to show that Al Rajhi bank had "unique relationships" with so called "jihadists," "al Qaeda affiliated persons and entities," and certain Islamic charities – and that accounts maintained at Al Rajhi Bank were used to benefit Al Qaeda – Winer and Kohlmann rely on the CIA reports and the mere fact that certain individuals and entities held accounts at the Bank. Given the general unreliability of many of Winer and Kohlmann's sources, the dominance of Al Rajhi Bank as a sharia-compliant bank and the pre-eminence of the charities in the region, and the experts' failure to identify a pattern of significant suspicious transactions, I disagree with a number of plaintiffs' experts' opinions related to Al Rajhi Bank.

I conclude that Winer and Kohlmann have *not* shown that Al Rajhi Bank had "unique relationships" with "jihadists," "al Qaeda affiliated persons and entities" or the Islamic charities, and Winer and Kohlmann *do not* identify sufficient evidence to conclude that Al Qaeda benefitted from the charities' use of Al Rajhi Bank.

Finally, Winer repeatedly conflates the terminology associated with Sulaiman Bin Abdulaziz Al Rajhi, the U.S.-based SAAR Foundation, and the Saudi-based Sulaiman Bin Abdulaziz Al Rajhi Charitable Foundation (the SAAR Charitable Foundation) – deploying the same "SAAR" acronym for each and rendering the portions of his report dealing with "SAAR" incomprehensible and unreliable. Both Winer and Kohlmann's discussions of "SAAR" lack important information and context.

## Opinions

### A. Overview

The opinions of plaintiffs' experts in this matter, Jonathan M. Winer and Evan F. Kohlmann, are materially flawed for several reasons. In particular, their opinions and conclusions about Al Rajhi Bank and/or the Al Rajhi family are unsupported by reliable or sufficient proof.

Neither Winer nor Kohlmann possesses law enforcement or specific intelligence community analytical experience. This shortcoming is significant in this matter due to the experts' extensive reliance on CIA reporting and, to a lesser degree, reporting from the FBI and other U.S. government agencies. The primary flaw in their reports is the failure to

differentiate between evidence and intelligence, especially when describing CIA reporting. The experts do not appear to understand, or they lose sight of the fact that, the purpose of CIA intelligence reporting is to provide national security intelligence to U.S. policy makers to assist them in making policy decisions. Such reporting is usually classified, and the sources and methods of information collected and turned into intelligence are consequently protected and not identified. Intelligence reporting is not intended to be used as evidence in criminal or civil legal proceedings. What Winer and Kohlmann do not reconcile is that law enforcement consumers of CIA intelligence reporting use the information for *lead value* to *develop* the evidence necessary to support legal process. Winer and Kohlmann, in contrast, accept intelligence at face value without consideration of the source of information or the reliability of the information.

The FBI thus was a consumer of CIA intelligence reporting. As a Senior Executive in the FBI, serving as the Chief of TFOS, I was a consumer of CIA intelligence reporting beginning in approximately October 2001 through December 2003, when I retired from the FBI. During my tenure as Chief of TFOS, I worked closely with my counterpart at the CIA Counterterrorism Center, Financial Operations Group. My consumption was not for policy making purposes, but rather for investigative operational support. We could only use the intelligence for lead purposes to develop evidence.

In the months following the 9/11 attacks, my CIA counterpart, who then served as Chief of the CIA Counterterrorism Financial Operations Section, advised me that CIA intelligence reporting had identified Al Rajhi Bank as the supposed "bank of choice" for Al Qaeda. This information was shared as part of broader discussions regarding possible sources of funds for Al Qaeda and how Al Qaeda moved money.

As a result of this intelligence from the CIA, in 2002, I assigned a team of FBI Agents and Intelligence Analysts to investigate potential links between Al Rajhi Bank and terrorism. In large part, the team relied on CIA intelligence reporting to develop investigative leads. In the 2002 to 2003 timeframe, during my tenure overseeing these investigations as Chief of TFOS, TFOS could not verify or prove the CIA intelligence reporting or other investigative leads developed by the FBI and CIA regarding allegations that Al Rajhi Bank provided support for Al Qaeda or that Al Rajhi Bank was the so-called "bank of choice" for Al Qaeda or terrorism.

Winer and Kohlmann, meanwhile, do not exhibit this same level of care when considering the intelligence before them. In his expert report, Winer uses the word "evidence" 214 times. In most instances, what he describes as "evidence" is not actually evidence, but rather, intelligence. Such intelligence must be corroborated and sourced before being deemed evidence. Where Winer cites CIA reporting, the sources of information are unknown, and Winer makes no attempt to corroborate or validate the information.

Subject to the MDL Protective Order

Similarly, Kohlmann uses the word "evidence" eighteen times in his report (including footnotes). In at least eight of these instances, "evidence" is mischaracterized: like Winer, Kohlmann refers not to "evidence," but rather to *intelligence*. Of Kohlmann's remaining uses of "evidence," six appear in citations, where he discusses it in passing reference. Notably, in his "Summary of Professional Opinions and Conclusions" Kohlmann uses the word "evidence" twice. And in the closing paragraph of his expert report, he refers to "a multitude of evidence." In each of these three instances, the use of the word "evidence" is a mischaracterization of its true meaning, and changes depending on the context for which Kohlmann uses it. As I discuss in more detail later in this report, I find that Winer and Kohlmann's recurring misconstruction of the word "evidence" severely undermines the credibility of their reports as a whole. Intelligence documents, such as CIA reports, cannot be considered "evidence" before a court of law.

In relying so heavily on unsubstantiated and unreliable intelligence documents, Winer and Kohlmann fail to identify any actual evidence linking Al Rajhi Bank and/or the Al Rajhi family's own activities with the terrorist activities of al-Qaeda or Osama Bin Laden. In particular, Winer and Kohlmann fail to factually demonstrate how Al Rajhi Bank and the Al Rajhi family supposedly facilitated the flow of funds from accounts at Al Rajhi Bank through charities and other non-government organizations (NGOs) to Bin Laden, al-Qaeda, or other terrorist organizations.

Winer opines that Al Rajhi Bank and its principals had "unique relationships" with "jihadists" and/or "al-Qaeda affiliated persons and entities,"[1] and also had "unique relationships" with al-Haramain Islamic Foundation, Muslim World League (MWL), International Islamic Relief Organization (IIRO), and World Assembly of Muslim Youth (WAMY) before 9/11.[2] But Winer does not establish or articulate what made these alleged relationships supposedly "unique," particularly in the context of banking relationships.[3] Similarly, Kohlmann focuses on supposed connections to what he inflammatorily refers to as "fraudulent charities."[4] But the alleged corruption of individual branches of the charities does not transform the charitable organizations as a whole into "fraudulent charities" as Kohlmann attempts to imply.

Overall, to sufficiently support the allegations and conclusions that Winer and Kohlmann assert, there are several critical types of evidence that I would expect to see, but are lacking here.

---

[1] *See* Winer 7.

[2] *See* Winer 8.

[3] *See* Winer 7-8.

[4] *See, e.g.,* Kohlmann, p. 6.

Subject to the MDL Protective Order

First, from an AML procedures and controls standpoint, I would expect to see evidence that Al Rajhi Bank circumvented the controls it had in place to detect money laundering or suspicious activity that would link the Bank to terrorist financing. I have not seen any evidence of this. Second, given the extensive and vigorous U.S. and U.N. response in the wake of 9/11, I would have expected that, if sufficient evidence linking Al Rajhi Bank or the Al Rajhi family to terrorism finance actually existed, the Bank, or members of the Al Rajhi family, would have been sanctioned or designated. In the end, however, neither the United States nor the United Nations took action against Al Rajhi Bank or any member of the Al Rajhi family. The FBI did not find sufficient evidence to support the allegations made in Winer and Kohlmann's reports, and certainly did not find evidence sufficient to support criminal charges against the Bank, any members of the Al Rajhi family, or the SAAR Foundation (US). And the United States did not designate Al Rajhi Bank, the SAAR Foundation, the SAAR Charitable Foundation, or any member of the Al Rajhi family—which would have required less evidence than bringing criminal charges.

Finally, given that Al Rajhi Bank is (and was at the time) one of the largest banks in Saudi Arabia and that the Al Rajhi family consists of experienced and successful businesspeople, I would expect to see evidence that they attempted to hide or cover up any supposed association with terrorist groups. In other words, if Al Rajhi Bank had been involved in supporting Al Qaeda, I would expect that the Bank or the Al Rajhi family members would insulate themselves from identification through the use of nominees, or front people, to conduct the transactions on their behalf. By contrast, the allegations that Al Rajhi Bank held accounts for charities such as Al Haramain, IIRO—and that Sulaiman Al Rajhi and the SAAR Charitable Foundation in Saudi Arabia donated to at least some of those charities[5]— would show me that they did *not* view such activities as a risk. The fact that the Bank and the family are alleged to have openly donated to or provided services for these charities shows that they believed they were contributing to the charitable purposes of the organizations, contrary to the suggestions made by Winer and Kohlmann.

Below, I discuss these issues and other major flaws with the experts' sources and methods for reaching their conclusions.

---

[5] *See* Winer 6.6, 8.1.8.

Subject to the MDL Protective Order

**B. The CIA reports relied upon by plaintiffs' experts are not "evidence," making them improper sources upon which to rely for factual conclusions regarding terrorism financing and Al Rajhi Bank.**

### 1. The methodology of creating CIA reports undermines their utility in legal proceedings.

As noted above, CIA intelligence reporting is intended to provide national security intelligence to U.S. policy makers to assist them in making policy decisions. Such reporting is usually classified, and the sources and methods of information collected and turned into intelligence are protected and not identified. Intelligence reporting is not intended to be used as evidence in legal proceedings.

Winer describes taking raw intelligence (which is raw information), analyzing it, and turning it into finished intelligence.[6] What he is describing is the intelligence cycle. Winer states that he finds finished CIA intelligence to be "generally reliable and evidence based."[7] I strongly disagree with this premise. While I agree that the CIA intelligence is generally reliable for the purposes *intended*, intelligence is not intended to be used as evidence, nor are the conclusions in intelligence reports evidence-based. Instead, intelligence is *information*-based. From a law enforcement and legal perspective, in most instances, information and intelligence should be further corroborated and enhanced, including through known and testable sources, before becoming evidence.

Intelligence is unreliable for evidentiary purposes for a number of reasons, most critically that the sources are unverifiable and the intelligence is often circular and inconclusive—that is, intelligence can be used to supply "leads," but not establish any particular fact. I describe this further below.

***Unidentified sources.*** As a starting point, it is again important to make a distinction between intelligence and evidence. Both start with collecting information. For intelligence purposes, the information is collected, analyzed, and disseminated to consumers for their end use, usually for policy-making purposes or lead value, or sometimes even for political purposes. The sources of intelligence and methods of intelligence gathering are usually protected from identification, such as through redaction and classification. FBI operational consumers use the intelligence for strategic and investigative purposes. The FBI thus is a consumer of CIA intelligence reporting.

Notably, intelligence reporting is *not* intended for use as evidence in litigation. Evidence, on the one hand, can be developed from information and intelligence. But the information

---

[6] Winer 6.8.2.
[7] Winer 6.8.3.

Subject to the MDL Protective Order

and/or intelligence must be corroborated and enhanced—for example, with sources that are identified and whose reliability is testable—to threshold levels of proof such as "probable cause," "preponderance of the evidence," or "beyond a reasonable doubt." Developing intelligence, on the other hand, relies on some level of verification, but is not concerned with providing the level of proof necessary to serve as evidence in a legal proceeding. While in certain instances, some intelligence may rise to the level of evidence, in the case of CIA intelligence, the CIA would normally not allow agencies such as the FBI or Department of Justice to use their intelligence as evidence. For example, internal regulations at the FBI require agents to locate and develop data independent of intelligence information in order to use that information as evidence.[8] This was required when I was with the FBI through the early 2000s as well.

From an evidentiary standpoint, I question the use of the CIA reporting in this case without further verification of the information provided in the reporting. The fact that the cited reports do not identify their sources and evaluate the sources' reliability or discuss the context in which the underlying information was obtained is highly problematic. For example, in Section 6.8.3, Winer speaks about the general reliability of CIA reports.[9] But Winer should have taken additional steps to verify the reliability of the information he references from the CIA reports.

The prevalence of redacted information similarly presents issues of unverifiable sourcing. CIA reports are most often redacted in order to protect sources and methods. This effort, however, makes the information not only entirely unverifiable, but also makes it more difficult to draw complete and accurate conclusions. Indeed, in the CIA reports Winer cites, heavy redactions, especially concerning Al Rajhi Bank and/or the Al Rajhi family indicate that the available information may be incomplete. Winer nevertheless relies on heavily redacted CIA reports while making no qualification as to his ability to produce conclusive assessments based on them.[10] A similar issue regarding sourcing is implicated by Winer and Kohlmann's reliance on reports that were apparently based, in part, on information

---

[8] *See* U.S. Dept. of Justice, The Attorney General's Guidelines for Domestic FBI Operations, September 29, 2008, p. 9 ("The FBI conducts investigations of federal crimes and threats to the national security based on priorities and strategic objectives set by the Department of Justice and the FBI, independent of DNI-established foreign intelligence collection requirements."); *id.* at p. 18 ("Preliminary investigations may be initiated on the basis of any allegation or information indicative of possible criminal or national security-threatening activity, but more substantial factual predication is required for full investigations."), justice.gov/archive/opa/docs/guidelines.pdf. *See also* Fred F. Magnet, *Intelligence, and the Criminal Law System*, (Stanford Law and Policy Review, May 19, 2006) p. 415 ("Law enforcement agencies routinely receive a significant amount of information in intelligence reports that is for lead purposes only and remains classified. Law enforcement agencies may use it to develop their own independent cases, but not as evidence to be introduced in a public court proceeding."), https://law.stanford.edu/wp-content/uploads/2018/03/manget.pdf.

[9] Winer 6.8.3.

[10] *See, e.g.,* Winer 6.10.2..1 FN 154; 6.10.3..9; 7.3.12 FN 281.

Subject to the MDL Protective Order

obtained by detainees of Guantanamo Bay.[11]  Winer and Kohlmann fail to mention, however, that information of this manner elicited from these detainees during this time period have been rejected by courts as not credible.[12]

***Circular reporting.***  What I found during 2002 and 2003 regarding CIA intelligence reporting, especially with respect to Al Rajhi Bank, was that the intelligence appeared to be circular—meaning that the same base information reported about Al Rajhi Bank (and, more broadly, the Al Rajhi family) appeared to be recycled, repeated, and repackaged in various reports addressing different topics but containing information about the bank.  From a criminal investigative perspective, this made me question the reliability of the intelligence being reported, specifically in terms of the ability to develop the levels of evidence necessary to predicate criminal investigations or to sustain criminal prosecutions.

Intelligence reporting is especially unreliable where press sources underly the report.  Winer discusses the sources for CIA reporting in general terms to include human intelligence, signals intelligence, financial intelligence, and open-source intelligence, such as press reporting.[13]  In my experience at the FBI's TFOS, I was surprised and troubled by the CIA's reliance on media reporting.  My concern was what I considered to be an over reliance on media reporting and the circular nature of reporting that appeared in the media and then in intelligence reports, or vice versa. For example, a 2002 CIA Report,[14] cited by Winer,[15] references "press reports" and "press reporting" as support for its statements.[16]  Similarly, a 2007 Wall Street Journal article cited by Winer references a "2003 CIA Report" purported to be about Al Rajhi Bank.[17]

At times during my tenure as Chief of TFOS, between September 2001 and December 2003, there was information from media reporting that I believe appeared in subsequent intelligence reporting, including in CIA reports.  During that timeframe, as a senior FBI executive I was a regular consumer of intelligence reporting, including CIA reports.  On a daily basis, I also reviewed a compilation of media reports regarding terrorism that was provided to me from within the FBI.  My concern about media information appearing in intelligence reports and intelligence reporting appearing in media reports arose from these

---

[11] *See, e.g.*, Kohlmann 17-18; 20; 32; 36; Winer 2.9.3 (relying on a 2002 CIA report, "Terrorism Finance: Custodial Interviews Providing leads into Al-Qa'ida Financial Network," August 7, 2002,which includes appendices that are based on interviews of detainees and information elicited using interrogation techniques, and which proffers that "detainees have provided information on al-Qa'ida linked donors, fundraisers, and facilitators, although the information is incomplete and almost certainly false" (CIA_000308).).

[12] See, e.g., *Al Rabiah v. U.S.*, 658 F.Supp.2d 11, 34 (D.D.C. 2009) ("The Court agrees with the assessment of Al Rabiah's interrogators, as well as Al Rabiah's counsel in this case, that Al Rabiah's confessions are not credible.").

[13] Winer 6.8.1.

[14] "Al-Haramain: Support for Extremists and Terrorists," August 8, 2002, (CIA-SUB_0007).

[15] *See, e.g.*, Winer 2.9.4..1, 4.11, 6.11.3, 8.2.5. 8.21.5, 8.28, 11.8.3..1, 11.8.9.

[16] CIA-SUB_0011-0013.

[17] Winer, 7.6.17.

reviews I was conducting daily. I recall reviewing articles on a regular basis written by a variety of reporters to include Glenn Simpson, Wall Street Journal; Doug Farrah, Washington Post; Jim Risen, Los Angeles Times; Josh Meyer, Los Angeles Times; Eric Lichtblau, New York Times; and other reporters. Although I cannot specifically recall which CIA reports reflected this media reporting, I recall it was a sufficiently prevalent occurrence to become concerning to me in the period I was reviewing reports between September 2001 and December 2003.

Notably, this type of intelligence reporting, where media information was used in intelligence reports and where intelligence was reported in the media, was not only a concern of mine during my tenure in TFOS, but is known to have led to great failures on the part of both the media and the intelligence community.[18]

**Inconclusiveness.** In addition to the issues of circular reporting and unverifiable sourcing, there is also the issue of inconclusiveness. Winer himself stated that, in cases where the CIA does not have enough evidence to be certain about a topic, they use caveats such as "possible," "apparently," or "probably" to ensure evidence is not overstated.[19] In my review of the CIA reports, I saw several such caveats in multiple reports cited by both experts.[20] Where Winer relied on CIA reports with these caveats, he should have consistently qualified his reliance on such reports. By using the CIA reports to reach the conclusions he did, however, Winer plainly and improperly discounted those caveats.

*     *     *

In contrast to the CIA reports, I consider the 9/11 Commission Report to be the most authoritative, comprehensive, objective, and reliable report addressing 9/11. The 9/11 Commission was appointed by the U.S. Congress and composed of five prominent Republicans and five prominent Democrats who oversaw the investigation conducted by a large professional Commission staff. The Commission came together with a unity of purpose and sought to be independent, impartial, thorough, and nonpartisan.[21] In reaching

---

[18] For example, consider the widely noted failures of the intelligence community and the media concerning the U.S. War in Iraq. Editorial, "Lessons of War," Wash. Post. March 18, 2007,(Lessons of War (washingtonpost.com), ("Clearly we were insufficiently skeptical of intelligence reports. It would almost be comforting if Mr. Bush had 'lied the nation into war,' as is frequently charged. The best postwar journalism instead suggests that the president and his administration exaggerated, cherry-picked and simplified but fundamentally believed — as did the CIA — the catastrophically wrong case that then-Secretary of State Colin L. Powell presented to the United Nations."); Editorial, "From the Editors; The Times and Iraq," N.Y. Times, May 25, 2004, (FROM THE EDITORS; The Times and Iraq - The New York Times (nytimes.com) ("We have examined the failings of American and allied intelligence, especially on the issue of Iraq's weapons and possible Iraqi connections to international terrorists…The problematic articles…shared a common feature. They depended at least in part on information from a circle of Iraqi informants. Defectors and exiles bent on "regime change" in Iraq, people whose credibility has come under increasing public debate in recent weeks.").

[19] Winer 6.8.3.

[20] See, e.g., CIA_000318,000331-000332,000337; CIA_000817,00826,000830; CIA-SUB_002SUB_0004.

[21] 9/11 Commission Report, xv.

Subject to the MDL Protective Order

their findings, the Commission reviewed more than 2.5 million pages of documents and interviewed more than 1,200 individuals in ten countries.[22]  Further, the investigations conducted by the 9/11 Commission were transparent, as the Commission held public hearings to obtain testimony, all statements were publicly sourced, and all sources were identified, thereby making the content in the 9/11 Commission Report potentially verifiable. By contrast, the CIA reports were opaque: they were not intended for a public audience and did not identify their sources. The reliability of the statements contained in the CIA reports cannot be tested, as their sources are unknown.

Like the 9/11 Commission Report, I also consider the Monograph on Terrorist Financing ("the Monograph") to be a highly reliable source of information.[23]  The Monograph on Terrorist Financing was meticulously prepared with great rigor and objectivity by the Commission Staff responsible for the terrorist financing review.  I was interviewed on multiple occasions, for an extensive number of hours, for the Monograph, and therefore have firsthand experience in its content and reliability.  The Monograph, which includes only limited reliance on CIA reports, appropriately did not simply adopt those reports.  The Monograph was created by investigating, verifying, and corroborating the information it analyzed, by reviewing information from other government agencies including the Departments of Treasury, Justice, and State.[24]  When Winer, by contrast, adopts statements from the CIA reports, often verbatim, he does not conduct the same level of verification.

Winer is disingenuous in his characterization of the Monograph on Terrorist Financing.[25] For example, Winer states that the Monograph placed "a heavy emphasis on the difficulties in getting the Saudi government to take action before 9/11."[26]  However, this statement misconstrues the purpose of the Monograph, which was predominantly to evaluate the U.S. government's response to terrorist financing prior to and after 9/11.[27]  Indeed, the

---

[22] 9/11 Commission Report, xv.

[23] See generally "Monograph on Terrorist Financing," Staff Report to the 9/11 Commission, August 21, 2004, ("Monograph").

[24] See Monograph, pp. 2-3 ("We have had significant access to highly classified raw and finished intelligence from the intelligence community, have reviewed law enforcement, State Department, and Treasury Department files, and have interviewed at length government officials, from street-level agents to cabinet secretaries, as well as non-government experts, representatives from the financial services industry, and representatives of individuals and entities directly affected by U.S. government action to combat al Qaeda financing.").

[25] See Winer 6.15.3 ("Three staff members of the 9/11 Commission wrote the 'Monograph' as a Staff Report to the Commission providing some additional analysis of some of the terrorist finance issues raised by 9/11. The Monograph was published by the Commission and is available from its website. That said, its director, Philip Zelikow, stated when it was issued that the Commissioners had been briefed on it and reviewed earlier drafts, but had not formally approved the text.").

[26] Winer 6.15.6.

[27] Monograph, pp. 2-3 ("This monograph, together with the relevant parts of the Commission's final report, reflects the staff's investigation into al Qaeda financing and the U.S. government's efforts to combat it. . . . We have sought to understand how al Qaeda raised, moved, and stored money before and after the September 11 attacks, and how the

Subject to the MDL Protective Order

Monograph explains that, "[b]efore the September 11 attacks, the Saudi government resisted cooperating with the United States on the al Qaeda financing problem, although the U.S. government did not make this issue a priority or provide the Saudis with actionable intelligence about al Qaeda fund-raising in the Kingdom."[28]

Winer also minimizes the importance of the Monograph when paraphrasing the Preface written by Philip Zelikow, Executive Director of the 9/11 Commission Staff.[29]  Winer noted that the Commission had not formally approved the text of the Monograph and referred to this as a limitation.  From my personal experience, however, I know that the Monograph was recognized as a significant aid to the 9/11 Commission in assessing the U.S. government's performance in response to 9/11.

Two further points I discuss below demonstrate why the cited CIA reports cannot be relied upon as evidence in this context. First, as shown by a close examination of two such reports, CIA reports are prone to providing incomplete and unreliable narratives.  Second, the CIA reports cited by Winer and Kohlmann here ultimately did not provide actionable intelligence against Al Rajhi Bank or the Al Rajhi family.  Rather, they describe just snippets or impressions of evolving situations, such that one cannot rely on these reports to suggest that what is contained in an individual report is the final determination on an issue.

**2.  Contrasting two CIA reports shows how intelligence reports are incomplete and unreliable.**

Winer extensively relies on two CIA reports without considering the contexts in which they were written or how these two reports relate to each other. A contemporaneous consideration of both, however, shows the potential unreliability of information contained in such reports.  Specifically, I will refer to (i) a CIA intelligence report titled *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, dated November 20, 1997,[30] and (ii) A CIA intelligence report titled, *Al Rajhi Bank: Conduit for Extremist Finance*, dated May 28, 2003.[31]

The 1997 Report focuses on numerous financial institutions and other entities including charities.  It mentions that "the Al Rajhis were routinely contacted by officials of the World

---

U.S. government confronted the problem of al Qaeda financing before and after 9/11. . . . This monograph does not attempt a comprehensive survey of all known data on al Qaeda financing and every government action to combat it. Rather, we have sought to understand the issues that make a difference, what the 9/11 disaster should have taught us about these issues, and the extent to which the current U.S. strategy reflects these lessons.").

[28] Monograph, p. 15.

[29] Winer 6.15.3.

[30] "Funding Islamic Extremist Movements:  The Role of Islamic Financial Institutions," 20 November 1997 (CIA_000720-000804).  This is discussed in the Winer Report, sections 6.10.1.-6.10.4.10.

[31] "Al Rajhi Bank: Conduit for Extremist Finance," 28 May 2003, (CIA-SUB_0001-0006).

Subject to the MDL Protective Order

Assembly of Muslim Youth (WAMY)."[32]  It further mentions that "Al Rajhi Bank ties to Islamists is inconclusive."[33]  Following redactions, the report states:

> The use of [Al Rajhi Banking & Investment Company ("ARBIC")] by extremists in some of these cases probably denotes convenience rather than Al Rajhi family involvement in financing radical groups.  The bank's dominance of the foreign remittance business, coupled with strong financial links to Africa and the Asian subcontinent, probably make ARBIC the only choice for transferring funds to some regions.[34]

Following a redaction, the narrative continues: "for example, that ARBIC was the only bank in the Kingdom authorized to remit funds to banks in Jordan and the West Bank and, therefore, was a primary conduit for funds transfers to Palestinians."[35]  After a short redaction the report comments:  "The Saudi Government undoubtedly is aware of Al Rajhi's role in providing support to Muslim groups and probably even sanctions some of the support."[36]

This excerpt from the 1997 Report is noteworthy for a few reasons.  It underscores a *banking* purpose for extremists to use Al Rajhi Bank, that is, specifically, convenience and cross border access which other banks in Saudi Arabia did not offer at the time.  The excerpt uses the caveats that extremists *probably* use the bank for "convenience" rather than due to the Al Rajhi family's supposed involvement in financing radical groups.  In my opinion, this business purpose is where the idea of Al Rajhi Bank being the preferred bank of choice for Al Qaeda emanates from.

Another section of the 1997 Report includes similar analysis.  Specifically, under a heading "Ability to Bank in Accordance With Religious Beliefs" the 1997 Report states: "Islamic extremist groups are certainly attracted to Islamic banks because the institutions offer the ability to bank in accordance with religious beliefs."[37]  After a redaction, the Report continues,

> [S]ince the mid-1980s Muslim clerics and MB officials throughout the Middle East increasingly have called on Muslims to use Islamic banks at the expense of interest-based financial institutions.  Several years before his imprisonment in late 1994, for example, radical Saudi cleric Salman al Awdah preached that

---

[32] CIA_000744.

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] CIA_000748.

Subject to the MDL Protective Order

the Al Rajhi Banking & Investment Company was the only financial institution in Saudi Arabia that followed Islamic guidelines and therefore, the only bank worthy of Muslim deposits.[38]

The Report then continues, stating that "the sermon was distributed throughout the country on tape," and that "the Al Rajhi family subsequently became a major financial supporter of Awdah."[39]

Again, these comments from the 1997 CIA Report describe that there was a *banking* purpose for extremists to use Al Rajhi Bank, which was that Al Rajhi Bank was the only Shariah-compliant bank in Saudi Arabia. This fact then contributed to the skewed narrative that Al Rajhi Bank was the bank of choice for extremists.

However, when portions of that same reporting are repeated later, in the 2003 CIA report, the important analysis and context is not included. The 2003 Report summary states:

> Islamic extremists have used Al-Rajhi Banking and Investment Corporation (ARABIC) since at least the mid-1990s as a conduit for terrorist transactions, probably because they find the bank's vast network and adherence to Islamic principles both convenient and ideologically sound. Senior Al Rajhi family members have long supported Islamic extremists and probably know that terrorists use the bank.[40]

After a short redaction, the summary continues to state:

> [S]enior al-Rajhi family members control the bank's most important decisions and that ARABIC's principle [*sic*] managers answer directly to Sulayman. The al- Rajhis know they are under scrutiny and have moved to conceal their activities from financial regulatory authorities. The 12 May bombing in Riyadh probably will make the Saudi Government more amenable to investigating the al-Rajhi family, as they have already begun to target other alleged al-Qa'ida donors.[41]

In my opinion, the 2003 CIA Report is important and telling in several respects. First, a good portion of the Report focuses on Al Rajhi Bank's banking operations. The Report reinforces what was detailed in the CIA 1997 Report discussed above: namely, the vast

---

[38] *Id.*

[39] *Id.*

[40] CIA-SUB_0002.

[41] *Id.*

Subject to the MDL Protective Order

size and reach of the bank as an international bank and that Al Rajhi Bank was the bank of choice for extremists.

But while the 2003 Report describes the Bank's convenience, accessibility, and cross border reach, what is lacking in the description as the "bank of choice" in this report is sufficient emphasis on convenience and Islamic banking principles as was articulated in the 1997 Report. This might incorrectly lead some to infer that ARBIC was the bank of choice because the Al Rajhis supported terrorism. In reality, though, the Bank was popular throughout the Muslim world because it implemented unique shariah-compliant banking features.

Notably, neither Report analyzes the implications of the Bank's business and reputational concerns on the Reports' assessment of whether Al Rajhi Bank was supporting Al Qaeda. A complete analysis would have taken into account that Al Rajhi Bank's business and reputational concerns should have served as a deterrent against any Al Rajhi Bank support of terrorism. But the CIA did not address this potential deterrent effect in its reporting, and therefore the Reports fail to provide a complete picture to determine whether Al Rajhi Bank was wittingly aiding Al Qaeda.

### 3. Intelligence in the CIA reports did not result in criminal cases or sanctions against Al Rajhi Bank or the Al Rajhi family.

Despite Winer and Kohlmann's reliance on CIA reports as "evidence" of Al Rajhi Bank conduct, Winer and Kohlmann downplay one key point: the United States government *never* sanctioned Al Rajhi Bank or the Al Rajhi family for involvement in terrorist financing. Winer even concedes that, "[i]n the end, [the] U.S. government did not sanction ARB for terrorist finance."[42] In contrast to Winer and Kohlmann's claims of "evidence" against Al Rajhi Bank, the lack of any sanctions against it suggests that the U.S. government did *not* find sufficient evidence that Al Rajhi Bank or its principals knew or should have known of any alleged connections to Al Qaeda and/or 9/11.

Winer attempts to overcome this fact by explaining that the U.S. government took "other steps in 2004 in an effort to address the terrorist finance problem created by ARB and the Al Rajhi's long-time relationship with al Qaeda and bin Laden, as detailed in both pre-9/11 and post-9/11 CIA reporting."[43] Winer's only follow-up to this allegation, however, is that the U.S. Embassy in Riyadh "was directed to hand deliver a paper to the Saudi government asking for a cooperative effort to conduct a joint examination of 'certain accounts at Al Rajhi Bank,'" of Al Rajhi Bank customers "with the 'mutual goal of ensuring that Al Rajhi Bank is doing everything possible to keep the taint of terrorists and their supporters out of the

---

[42] Winer 7.10.

[43] *Id.*

Subject to the MDL Protective Order

bank.'"[44]  Winer can only conclude that he "ha[s] no further information from government reports on further steps the U.S. government may have undertaken regarding ARB and the Al Rajhi family after [2004]."[45]  Indeed, despite Winer's allegation that the U.S. government "repeatedly debated" taking "strong action" against Al Rajhi Bank, he concedes that any action was "in the end limited to quietly lobbying Saudi officials to address the risks posed by the bank and the family arising from its 'alleged role in extremist finance.'"[46]

Winer does not acknowledge that the United States had good reason to take action against Al Rajhi Bank if it had the evidence. But as the CIA report acknowledged, "[a] successful effort against the al Rajhis would encourage efforts against other donors, or at a minimum, would discourage private funding of al Qa'ida."[47]

In my opinion, there was *never* a level of evidence anywhere near the level of sufficiency needed to impose sanctions or take regulatory action against Al Rajhi Bank or the Al Rajhi family.  I also have not seen or been made aware of any evidence that Al Rajhi Bank failed to cooperate fully with any investigations conducted by either the Saudi government or the United States. My opinion is supported by my TFOS experience where I assigned a team of FBI agents and analysts to investigate Al Rajhi Bank.  As stated earlier, the investigative team could not substantiate allegations involving Al Rajhi Bank.  This included the investigations conducted through the U.S.-Saudi Joint Terrorist Financing Task Force – a Task Force which I helped establish to examine certain customer accounts believed to be used for terrorism at Al Rajhi Bank.[48]  This Task Force initiated "more than 100 investigations on individuals and entities suspected of criminal, intelligence related, and terrorism related activity."[49]  And, again, the result was not a sanction or prosecution against Al Rajhi Bank or its principals.

This lack of actionable intelligence in the CIA reports (and generally) applies not only to Al Rajhi Bank and the Al Rajhi family, but also to the charities. Despite some CIA intelligence on conduct by the Saudi charities, which Winer also relies on,[50] no actions were taken or

---

[44] Winer 7.12.

[45] Winer 7.13.

[46] Winer 7.13.

[47] CIA-SUB_0006.

[48] U.S. State Department Cable, Joint Examination of Al Rajhi Bank through the Joint Terrorist Financing Task Force, dated November 25, 2004, ¶ 1 ("This is an urgent action cable. Please pass the proposed terms of reference for the joint examination of the Al Rajhi Bank through the Joint Terrorist Financing Task Force to appropriate Saudi officials at the Saudi Arabian Monetary Agency, the Ministry of Finance, the Ministry of the Interior, and the Joint Terrorism Finance Task Force."). *See generally* Collaborative Intelligence Assessment: "Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States" (FBI/CIA December 2004), (EO14040-003414-003442).

[49] Collaborative Intelligence Assessment: "Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States" (FBI/CIA December 2004), (EO14040-003434).

[50] *See, e.g.*, Winer 11.2 (citing CIA_000150, CIA_000819); 11.3.1 – 11.3.2 (citing CIA_000826-27), 11.8.8 (citing CIA_000823); 11.9 (citing CIA_000325, CIA_000338), 11.10.4 (citing CIA_000150-151).

Subject to the MDL Protective Order

sanctions imposed against the Saudi charity headquarters in the aftermath of 9/11.  Al Haramain was eventually sanctioned by the United States, but not until much later in 2008,[51] further illuminating the point that any factual basis for this designation did not come to light even for the U.S. government until many years after 9/11, and certainly would not have been known to the Bank in 2001 or before.  The other charities' Saudi headquarters were never sanctioned, suggesting that no evidence was produced to link the Saudi charities Winer and Kohlmann discuss to wittingly funding terrorism.  While some of the branches may have been infiltrated, neither law enforcement nor the sanctioning authorities were ever able to establish that the charities' headquarters were involved in such actions. The fact that these headquarters were not sanctioned, despite strong pressure to do so, demonstrates that there was not enough evidence available against the charities' headquarters in Saudi Arabia.

### C. Relying on unreliable sources and incomplete information, plaintiffs' experts repeatedly draw unsupportable inferences and reach unsupportable conclusions throughout their reports.

#### 1. Winer and Kohlmann do not present sufficient evidence to conclude that Al Rajhi Bank and its principals had "unique relationships with jihadists and al Qaeda affiliated persons and entities before September 11, 2001."[52]

In Section 7 of his report, Winer concludes that "there is evidence that Al Rajhi Bank and its principals had unique relationships with jihadists and al Qaeda affiliated persons and entities before September 11, 2001."[53]  Winer suggests that merely providing non-designated individuals and entities with simple banking services before September 11 somehow constitutes a "unique relationship."[54]  I disagree. What would be unique is if the bank had provided banking services to customers and entities that were publicly affiliated with terrorism *before* they opened accounts at the Bank, which I did not find.  Moreover, when Winer is not citing the mere existence of accounts serviced before 9/11, Winer is once again parroting intelligence without reliable corroboration,[55] which as discussed above, is not sufficient evidence upon which one can draw conclusions.[56]

---

[51] Press Release, U.S. Department of the Treasury, "Treasury Designates Al Haramain Islamic Foundation" (June 19, 2008), https://home.treasury.gov/news/press-releases/hp1043.

[52] Winer 7.

[53] Winer 7.1.

[54] Winer 7.2.1; 7.2.4; 7.2.5; 7.2.6; 7.2.7; 7.2.8; 7.2.9; 7.2.11; 7.2.12

[55] Winer 7.2.2; 7.2.3; 7.2.13; 7.2.14

[56] *See* above, Section B.

Subject to the MDL Protective Order

Considered as a whole, Winer's primary sources (account information) are insignificant, and Winer's "human intelligence" (the CIA reports) are unsubstantiated, making Winer's ultimate conclusion unsupportable. I discuss a few examples below.

As support for the conclusion that the Bank had "unique relationships" with "jihadists" and/or "Al Qaeda affiliates," Winer discusses the fact that Osama Bin Laden and certain other individuals held accounts at the Bank.[57] Kohlmann discusses this as well.[58] Considering that Al Rajhi Bank was a market leader in the region and the only Sharia compliant bank in Saudi Arabia at the time, the fact that this bank was used by Bin Laden cannot justify a conclusion that there were "unique relationships" between the Bank and Al Qaeda affiliates. Meanwhile, evidentiary indicators of what could be considered a "unique relationship" – namely, enabling the use of the relevant bank accounts for suspicious purposes – are not present.

Through my personal experience investigating financial crimes and terrorism finance for the FBI, I know that there are several characteristics of bank accounts I would assess when considering whether the account was "suspicious" for purposes of terrorist financing. First, we would look at the account opening. When was the account opened and by whom? Who was the beneficial owner of the account? Could we identify false statements or fraudulent documentation in the account opening process. We would also look at the level of risk presented by the customer at account opening. Would it be normal for the bank to onboard and maintain a relationship with such a customer? Second, we would review the account history. The longer the account was open, the better an account profile can be established and the more likely we could identify anomalous account activity. Third, we would analyze transactional activity to identify patterns of suspicious account activity. Naturally, the less active an account, the less likely it was that it was being used for terrorism finance, particularly considering the relevant time period. Fourth, we would assess the nature and purpose of the account, especially the business purpose. Was account activity reasonable for the given nature and purpose of the account? Fifth, we would assess the level of transparency throughout our review. The more transparent the account relationship, the less likely illicit activity would occur. The less transparent, the more likely there would be illicit activity. In the event we established a nexus to terrorism, especially in personal bank accounts, we would prepare a timeline of activity from the time the bank account was opened through the last transaction or account activity. Winer's report does not do this type of assessment, or anything close.

---

[57] Winer 7.2.1 (citing ARB-00013809/ARB-00013807 through ARB-00013815/ARB-00013813 and ARB-0001111).
[58] Kohlmann, p. 8.

Subject to the MDL Protective Order

As to the accounts Winer references as allegedly "held" by Bin Laden, I understand these were opened in 1980, 1984, and 1991 – years before the time period relevant to this litigation, and years before the publication of the CIA reports the experts so heavily rely upon for this conclusion.[59]  In addition, all of these accounts were inactive in the pre-9/11 period: there was not a single transaction from these accounts in the documents I reviewed – which date back to at least January 1998.[60]  The fact that Bin Laden's accounts were completely dormant in the years leading up to 9/11 belies Winer's statement that such accounts serve as "evidence" that "Al Rajhi Bank and its principals had unique relationships with jihadists and al Qaeda affiliated persons and entities before September 11, 2001."[61]  There was nothing at all "unique" between Bin Laden and the Bank when *no* transactions occurred during these critical pre-9/11 years.

During the years in which Bin Laden allegedly opened bank accounts at Al Rajhi Bank (1980, 1984 and 1991), the Bank would have had no reason to deny him access.  In the 1980s and early 1990s, Bin Laden was not recognized as a terrorist, even in the intelligence community.  From the Bank's perspective, the public perception of Bin Laden at that time would not have been sufficient reason to find him suspicious and deny him accounts.

Although Winer states that Al Rajhi Bank was "[t]he bank at which bin Laden had personally chosen to open his own account in 1991,"[62] this characterization overstates the facts.[63]  The fact that Bin Laden opened an account at Al Rajhi Bank is easily explained by the fact that Al Rajhi Bank was the *only* sharia law-compliant bank in Saudi Arabia during these years, and one of the only banks in the region with a large global presence.  This fact made Al Rajhi Bank attractive to *all* Muslims who wished to bank in compliance with sharia law, not just "extremists," as Winer and Kohlmann attempt to establish.[64]  I do not agree with Winer's implication that these accounts suggest any unique relationship between Bin Laden and Al Rajhi Bank.

As further support for his argument, Winer, unsurprisingly, cites to a CIA report.[65]  As an initial matter, and as I discussed above, the unreliability of the information in this CIA report means it should not be afforded any probative value here.  Moreover, elements of the report

---

[59] Winer 7.2.1; I understand that the accounts referenced were opened in 1980, 1984, and 1991.

[60] *See* Statements of Accounts for Osama Bin Laden, 1998-2002 (ARB-00000843-00000848; ARB-00013775-00013778) (showing no transactions during 1998-2002).

[61] Winer 7.1

[62] Winer, 7.2.1.

[63] *See* above, Section B.1.

[64] Winer 7.5; Kohlmann, p.7.

[65] *See* Winer 7.6.1 – 7.6.16 (citing "Al Rajhi Bank: Conduit for Extremist Finance," 28 May 2003, (CIA-SUB_0001–0006).

Subject to the MDL Protective Order

further reveal why Winer's reliance upon it is flawed and exaggerative.  The report equivocates that, "Usama Bin Ladin *may* have used an account or accounts at Al-Rajhi Bank to pay al-Qa'ida operatives."[66]  Such uncertain language in a CIA report Winer relies so heavily upon demonstrates the lack of concrete knowledge at the time, even within the CIA.  And the *actual* documents which pertain to Bin Laden's accounts at the Bank show that Bin Laden did not, in fact, use the accounts to "pay al-Qa'ida operatives"; instead, the accounts were actually stagnant and unused.[67]

As support for the conclusion that Al Rajhi Bank had "unique relationships" with "jihadists" and Al Qaeda operatives, the experts also discuss alleged banking services to Omar Al-Bayoumi and/or Fahad al-Thumairy, as well as alleged communications between purported officials of the Riyadh-based SAAR Charitable Foundation and Al-Bayoumi and al-Thumairy.[68]  I disagree with the experts' statements that any alleged links to these individuals suggests a "unique relationship" between Al Rajhi Bank and "jihadists" or Al Qaeda.

As to Al-Bayoumi, Kohlmann states that, telephone records show multiple calls in January 2001 from Al-Bayoumi's office in San Diego to "two officials from the Suleiman Abdul Aziz Al Rajhi Charitable Foundation in Saudi Arabia."[69]  He also states that records from Al-Rajhi Bank show at least three transfers in July and August of 2001 from Al-Rajhi Bank accounts held by Sheikh Mohamed Abdel Aziz al-Habib to al-Bayoumi's Bank of America account in California."[70]  Likewise, Winer alleges that Al-Bayoumi had "two types of relationships with ARB and persons associated with ARB."[71]  The first, Winer explains, was that "ARB forwarded funds to him from another one of its client."[72]  The second was that "al-Bayoumi had relationships, of some kind, with SAAR Foundation officials."[73]  The experts also make similar statements as to al-Thumairy, who they further note had an account at Al Rajhi Bank.[74]

Underscoring their unreliability, however, the experts fail to mention the eventual conclusions of the FBI: that there was insufficient evidence to support the allegation that Al-

---

[66] CIA-SUB_0004 (emphasis added).

[67] *See* Statements of Accounts for Osama Bin Laden, 1998-2002 (ARB-00000843-00000848; ARB-00013775-00013778) (showing no transactions during 1998-2002).

[68] Winer 7.17-7.24, 10.50; *see also* Kohlmann, pp. 9-11.

[69] Kohlmann, p. 9.

[70] Kohlmann, p. 9.

[71] Winer 7.22.

[72] *Id.*

[73] *Id.*

[74] Kohlmann, p. 10; Winer 7.23.

Bayoumi or Al-Thumairy were involved in the September 11 attacks.[75]  The FBI administratively closed the investigations into Al-Bayoumi and Al-Thumairy in 2021, explaining that, "Based on the totality of these investigative efforts and in coordination with the Assistant United States Attorneys of the Southern District of New York, it was jointly determined, that insufficient evidence existed to prosecute Thumairy, Bayoumi, and Al-Jarrah for wittingly conspiring to assist the AQ hijackers in furtherance of the 9/11 attack."[76]

Instead of acknowledging this fact, the experts misleadingly cite only to *earlier* FBI reports and government documents, published years before the FBI made its eventual conclusion in 2021.[77]  Kohlmann cites to a 2012 FBI report, while Winer cites to a 2003 9/11 Commission Staff Memo and FBI reports from 2012 and 2017.[78]  Accordingly, none of the experts' conclusions on supposed "unique relationships" to "jihadists" or Al Qaeda affiliates is credible against the reality that Al-Bayoumi and Al-Thumairy were *never* prosecuted by the United States government due to "insufficient evidence" to even initiate a prosecution (let alone, prove guilt).  And if the U.S. government, using all of the highly advanced and specialized tools at its disposal, could not find sufficient evidence to prosecute or designate these individuals after nearly two decades of investigation, the Bank certainly could not have been expected to know of any alleged (and eventually rejected) terrorist links, particularly in the years before 2001.[79]

Kohlmann also discusses Saleh al Hussayen, who, he states, "served as a member of Al-Rajhi Bank's Sharia Board from 1998-1999, and further served as an officer of Sulaiman al-Rajhi's SAAR Foundation, Inc. in the United States."[80]  In what is a clear accusation of mere guilt by association, Kohlmann alleges that Al Hussayen met with members of charities in the United States the week of the 9/11 attacks.  But notably, Kohlmann himself does not even assert that Hussayen was an employee of Al Rajhi Bank, only that he was a private individual serving on the Sharia Board.  I simply do not see how this is evidence of a "unique relationship" between *Al Rajhi Bank* and Al Qaeda.

Winer similarly discusses that one of the Bank's alleged former employees, Towayan al Towayan, "was linked to al-Bayoumi in the United States" and "had contact with a Saudi

---

[75] EO14040-00010.

[76] EO14040-00010.

[77] *See* Kohlmann, p. 9 (citing 2012 FBI Summary Report); Winer 7.18-7.20 (citing 2003 Commission Staff Memo; 2017 FBI Report; 2012 FBI Updates).

[78] *See* Kohlmann, p. 9 (citing 2012 FBI Summary Report); Winer 7.18-7.20 (citing 2003 Commission Staff Memo; 2017 FBI Report; 2012 FBI Updates).

[79] *See* EO14040-00010 (explaining that the FBI was unable to find sufficient evidence to prosecute Al-Bayoumi).

[80] Kohlmann, p. 10.

Subject to the MDL Protective Order

named Hani Hanjour, who was one of the 9/11 hijackers."[81]  First, as explained, the United States never found sufficient evidence to bring charges against Al Bayoumi.[82]  And second, Winer's description of al Towayan does not comport with the information actually contained within the cited FBI report and the 9/11 Commission Report.  Rather, those reports make clear that al Towayan *never* physically overlapped with Hanjour in San Diego,[83] rebutting Winer's reference to alleged "significant direct and indirect contacts"[84] between the two men.

The experts also reference the so-called "Golden Chain" document in support of the conclusion that Al Rajhi Bank allegedly had "unique relationships" with jihadists and Al Qaeda affiliates.[85]  This document does not and cannot support such a conclusion.  Citing nothing more than a Wall Street Journal article that purports to describe the document, Kohlmann states that, "The Al-Rajhi family name appeared on the 'Golden Chain' document, which the United States has described as a secret list of the twenty most prominent donors to the Al-Qaida network in the Arabian Gulf region dating from the late 1980s."[86]  Winer similarly asserts that, "the 'Golden Chain' consisted of wealthy individuals from the Gulf region who provided BIN LADEN and Al QAEDA with money on a regular basis. . . . the name AL RAJHI listed next to number 7 on this document is the name of a bank which Al QAIDA had funds on deposit."[87]

The critical fact that both experts neglect to mention, however, is that the Golden Chain document has been repeatedly rejected as evidence of Al Qaeda financing.[88]  In my tenure at TFOS at the FBI, I dealt with the Golden Chain document extensively.  I concluded that the list pre-dated the formation of Al Qaeda, and that it instead related to support for Afghan rebels fighting Russians in Afghanistan (who were also supported by the United States). Even if the document *were* to serve the purpose for which the experts cite it (which it

---

[81] Winer 7.24.

[82] EO104040-00010.

[83] *See, e.g.*, EO 14040-002857-2863 at 2858-59 (describing rental records which show that Towayan Al-Towayan lived in an apartment complex in San Diego from April 5, 2001 to August 5, 2001); *but see* 9/11 Commission Report at 223-27 (explaining that Hanjour arrived in San Diego in December 2000 but left "a few days" later, and arrived in Falls Church, Virginia on April 4, 2001 after driving from Arizona, the day before Towayan arrived in San Diego).

[84] Winer 7.24.

[85] *See, e.g.*, Winer 6.2.11, 6.3-6.4, 7.6.21, 7.15.1; Kohlmann, p. 7.

[86] Kohlmann, p.7.

[87] Winer 7.15.1 (citing an "Interview with unnamed FBI source who [Winer] understand[s] to have been subsequently identified as Jamal al-Fadl, dated August 29, 2002, PEC-USA_351-352").

[88] *See, e.g.*, *In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 817-18 (S.D.N.Y. 2005) (finding document had "serious foundational flaws," concluding that "with no indication of who wrote the list, when it was written, or for what purpose, the Court cannot make the logical leap that the document is a list of early al Qaeda supporters"); *United States v. Arnaout*, No. 02 Cr. 892, 2003 WL 255226, at *1-2 (N.D. Ill. Feb. 4, 2003) (rejecting the proffered list as inadmissible hearsay).

Subject to the MDL Protective Order

conclusively does not), the document was never proven to be a list of *actual* donors, but rather more likely a wish list of *potential* donors or financial targets because of their prior support for the Afghan Mujahadeen.[89]  For these reasons, Kohlmann and Winer are irresponsible and wrong to cite the Golden Chain document as support for both the allegation that Al Qaeda "had funds on deposit" at Al Rajhi Bank,[90] and the conclusion that Al Rajhi Bank had "unique relationships" with jihadists and Al Qaeda affiliates.[91]

> **2.  Winer and Kohlmann do not present sufficient evidence to conclude that Al Rajhi Bank and its principals had "unique relationships" with charities or that Al Qaeda benefitted from or received support from charity accounts held at Al Rajhi Bank.**

Winer and Kohlmann also suggest that Al Rajhi Bank and its principals had "unique relationships"[92] with charities by virtue of the fact that charities[93] and charity officials[94] used the bank for typical banking services such as paying employees[95] and transferring funds.[96] Winer concludes that on the basis of the existence of these accounts, Al Qaeda received support and benefited from the charity accounts maintained at Al Rajhi Bank.[97]  Based on my own counter-terrorism expertise and a review of the purported "evidence" Winer and Kohlmann cite, I conclude that the information Winer and Kohlmann cite is entirely insufficient to support such inferences.

First, as also discussed above, the use of a bank for typical banking services does not constitute a "unique relationship" when the services are provided to and for charities that were widely considered to be legitimate and the transfers are ordinary transactions that would not raise any suspicion.  Additionally, in providing these ordinary services to legitimate charities, Winer and Kohlmann do not identify any reason that the Bank

---

[89] It is widely acknowledged that the Golden Chain document indicates those who donated to support the Afghan mujahideen during the Soviet invasion, not to support Al Qaeda. *See, e.g.*, Monograph, p.94 (describing the "golden chain" as a group of wealthy donors which "provided support to mujahideen, including mujahadeen under the leadership of Usama Bin Laden); Monograph, p. 103 (describing the golden chain as a "list of wealthy donors to the Afghan mujahideen").

[90] Winer 7.15.1.

[91] *See generally* Winer 7.

[92] Winer 8.1; *See also* Kohlmann, p. 41 (discussing these charities in detail as support for his conclusion that Al Rajhi Bank and its principals "have provided charitable donations and substantial support to designated Al-Qaida financial front groups.").

[93] Winer 8.1.2; 11.2; 11.3.

[94] Winer 8.1.3; 11.4; 11.5.

[95] Winer 8.1.6.

[96] Winer 8.1.8.

[97] *See generally* Winer 11.

Subject to the MDL Protective Order

necessarily would have known if and how the funds contained in the account ultimately were used by Al Qaeda.

Second, although the CIA reports are not reliable as evidence in this context, it is worth noting that they (along with other sources cited by Winer and Kohlmann) include information that would undermine the experts' own conclusions. Namely, the reports describe the legitimacy of the charities' operations, the fact that charity headquarters were unwitting to the way support was being diverted from its original charitable intent, the difficulty charity headquarters had in exercising oversight over charity branch operations, and the fact that there was no way to know the extent to which charitable support was diverted to terrorists.

***Routine banking services and charity accounts.*** Even if the Saudi charities held accounts at Al Rajhi Bank, and even if members of the Al Rajhi family donated to these charities, when concluding that this constitutes a unique relationship, Winer seemingly fails to account for the fact that, according to his own sources, these charities were well known in Saudi Arabia for their charitable work and positive impact in the Muslim world.[98] Although certain of the charities' branches may have been engaged in providing support for terrorism or other illicit activities, Winer and Kohlmann fail to identify any reason that Al Rajhi Bank would have known of the illicit activity of distant branches of legitimate and well-known charities when the Bank did not hold accounts for, or otherwise deal with, those distant charity branches.[99] Instead, Winer and Kohlmann merely point to the existence of certain accounts and transactions, which when conducted before 9/11 and before any charity branches or principals were designated, should not be considered evidence of knowing or witting involvement in terrorism.

For example, the experts' discussion of the Bank's relationship with Aqil Al-Aqil is exaggerated and unsupportive of their conclusion that the Bank and its principals had "unique relationships" with Saudi charities.[100] Kohlmann states that "Aqil al Aqil held five accounts at ARB,"[101] and that "[d]iscovery in the litigation has produced accounts statements and other materials for the Sulaiman Abdel Aziz Al-Rajhi Charitable Foundation's account at ARB, which identify at least twenty-five payments to Al-Haramain,

---

[98] For example, the Staff Monograph to the 9/11 Commission reported that several U.S. government officials described al Haramain as the "United Way" of Saudi Arabia, and at its peak, al Haramain had a presence in at least 50 countries. Monograph, p. 114.

[99] The phenomenon of diversion by employees in branch offices was noted by the 9/11 Commission. "Al Qaeda also collected money from employees of corrupt charities. It took two approaches to using charities for fund-raising. One was to rely on al Qaeda sympathizers in specific foreign branch offices of large, international charities—particularly those with lax external oversight and ineffective internal controls, such as the Saudi-based al Haramain Islamic Foundation." 9/11 Commission, P. 170.

[100] *See* Winer 8.16; Kohlmann, pp.12, 15 n.74.

[101] Kohlmann, p. 15 n.74.

Subject to the MDL Protective Order

and one payment to Aqil al Aqil, the former head of Al-Haramain and an E.O. 13224 Specially Designated Global Terrorist ('SDGT')."[102] Kohlmann's statement, however, neglects to mention that Al-Aqil was not designated until 2004.[103] From my own personal experience, I know that the U.S. government did not have sufficient information or evidence to designate Al-Aqil before this date, and certainly not before September 11, 2001. Compared to the investigative tools and intelligence available to the U.S. government, it is unlikely Al Rajhi Bank would have been able to know of Al-Aqil's alleged associations.

Likewise, Winer attempts to show that there was a "close relationship" between the Bank and Al-Aqil by stating that, "ARB held two principal accounts in al-Aqil's name."[104] First, merely holding two accounts is insufficient to establish any type of "close relationship."[105] Winer does not establish any reason why the Bank would have been able to reject opening an account for Al-Aqil at the time the accounts were opened, and thus this statement demonstrates nothing more than what it plainly says: Al-Aqil held two accounts at the Bank. Winer's conclusion is even less appropriate considering that a source Winer cites later in the same section explains that Al Rajhi Bank was "the largest Islamic bank in the world, and one of the largest companies in Saudi Arabia."[106] Two accounts—or even a dozen or two dozen—out of the millions of accounts at the Bank does not itself suggest a unique relationship between Al Rajhi Bank and a customer.

Attempting to tie Al Rajhi Bank to support for Al Qaeda, Winer refers to his same purported "evidence" pertaining to the existence of charity accounts.[107] Winer does not allege that Al Rajhi Bank held accounts for distant branches of the subject charities. But he nevertheless conflates those distant branches with the Saudi branches for which the Bank *did* hold accounts — none of which were sanctioned prior to 9/11. For example, Winer states that Al Qaeda's support from Al-Haramain was "systemic."[108] As support, he quotes from a CIA report stating that "at least twenty of Al-Haramain's field offices" were used to provide support to Al Qaeda.[109] Winer then lists examples as including offices in Albania,

---

[102] Kohlmann, p. 12.

[103] *See* "Additional Al-Haramain Branches, Former Leader Designated by Treasury as Al Qaida Supporters Treasury Marks Latest Action in Joint Designation with Saudi Arabia," U.S. Department of the Treasury, June 2, 2004, https://home.treasury.gov/news/press-releases/js1703.

[104] Winer, 8.16.

[105] *Id.*

[106] *See* Winer 8.28 n.437 (citing Muhammad Al-Harbi, "Sulaiman Al-Rajhi's life a rags to riches story," Arab News (May 30, 2012).

[107] When asserting that there is evidence that al Qaeda received support and benefited from the accounts Al Rajhi Bank maintained for the Saudi charities before the 9/11 attacks, Winer claims that he has "highlighted many examples of that evidence…Section 6, Section 7, Section 8, Section 9 and Section 10 of this Expert Report" Winer 11.1.

[108] *Id.*

[109] *Id.* (citing CIA_000150).

Subject to the MDL Protective Order

Azerbaijan, and Kenya.[110]  Winer does not allege that Al Rajhi Bank held accounts for any Al Haramain field offices, let alone the field offices in these locations, but yet he perplexingly suggests that Al Rajhi Bank should be held accountable for the alleged activities of Al Haramain branches with which it did not even interact or have any relationship.

Further, in attempting to make these claims of unique relationships and support for Al Qaeda, Winer implies that, pre-9/11, the Bank should have been aware of information that only became known *after* the 9/11 attacks.  For example, Winer discusses bank accounts held for Wa'el Hamza Julaidan, leader of the NGO Rabita Trust.[111]  However, as explained by the source Winer cites here, neither Rabita Trust nor Julaidan was designated until after 9/11.[112]  Thus, Winer provides no basis on which Al Rajhi Bank would have known to be suspicious of any Julaidan accounts pre-9/11.  Moreover, Winer does not even allege that Al Rajhi Bank provided these individuals associated with Saudi charities with anything beyond routine banking services, such as providing bank accounts and credit cards.  Nevertheless, inferences and assertions such as these are the foundation for Winer's conclusion that Al Qaeda benefitted from the charities' accounts at Al Rajhi Bank.  For this reason, I cannot agree with that conclusion.

***Conflicting sources.***  Although Winer and Kohlmann cite extensively to CIA reports and other secondary sources, these documents in fact undermine a number of their conclusions.  For example, the very CIA reports on which Winer relies describe the humanitarian causes the charities engaged in, and Winer does not attempt to refute these points. One report notes, "IIRO operations include running or supporting schools, orphanages, medical clinics and hospitals in more than 90 countries, [redacted].  Accredited by the UNHCR, the IIRO also runs programs in UN-sponsored camps for war refugees in Afghanistan, Pakistan, and in locations in Africa."[113]  Similarly, another CIA report cited by Winer[114] explains that "Al-Haramayn is a nonprofit, private organization accredited by the United Nations High Commission for Refugees. . .. Al-Haramayn's branches worldwide officially provide aid to refugees – including apartments, houses and other lodging, refugee camps, medical assistance, food and clothing."[115]

---

[110] *Id.*

[111] Winer 11.8.6.1.

[112] *Id.* (citing "Treasury Department Statement on the Designation of Wa'el Hamza Julidan," September 6, 2002).

[113] CIA_000221.

[114] *See, e.g.,* Winer 2.9.1, 2.12, 6.9.4-6.9.5, 7.3.7, 10.11.1, 11.2, 11.8.8.

[115] "Usama Bin Laden: Some Saudi Financial Ties Probably Intact," January 11, 1999 (CIA_000806-000848), at CIA_000818.

These reports also suggest that any illicit activity conducted by the charity branches was intentionally so covert that both the charities' headquarters and their donors were unwitting to any alleged terrorist operations at distant branches. For example, Winer cites a 1999 CIA report entitled, "Islamic Terrorists: Using Nongovernmental Organizations Extensively."[116] Despite Winer using this report as support for his conclusion that, in maintaining a banking relationship with and donating to certain charities, the Bank and members of the Al Rajhi family were somehow involved in terrorist finance,[117] the CIA report actually explains the opposite. The report details how the charities themselves were often "exploited by individual employees sympathetic to terrorist causes without the knowledge of the organization's leadership."[118] The report continues:

> The illicit activity tends to take place at local branch offices rather than at headquarters locations. . .. Terrorist groups typically exploit NGOs by establishing a close relationship with an NGO employee who sympathizes with their cause. The sympathizer then diverts NGO funds or logistics support to the terrorist group, usually in small amounts to avoid detection by NGO management.[119]

The report also emphasizes, "Senior NGO leaders usually are *unwitting of the activity* and willing to take corrective action when apprised of the abuse."[120] Winer relies on this report but omits the full picture. If senior NGO leaders were unaware of the activity at distant branches, often conducted by a sole actor operating covertly, Al Rajhi Bank, a step even further removed, *certainly* would not have been expected to be aware of such activity.

CIA reports cited by Winer also note that the problem was lack of oversight to thwart exploitation by terrorists, not top-down intent by the organizations. A CIA report explained that, "[c]ontrol measures adopted in the past few years . . . focus on the collection of funds within their countries only, offering no oversight of the finances once the money reaches branch offices or recipients abroad."[121] This statement illustrates the regulatory environment in place at the time as I also understood it from my investigations with the FBI: donations to the NGOs were widely assumed to have been going toward the stated

---

[116] "Islamic Terrorists: Using Nongovernmental Organizations Extensively," April 9, 1999 (CIA_000210-CIA_000236).

[117] *See* Winer 4.3-4.5, 4.7, 6.9.6-6.9.7.2, 8.2.1.

[118] CIA_000210.

[119] CIA_000210, 000218.

[120] CIA_000213 (emphasis added).

[121] CIA_000220.

Subject to the MDL Protective Order

objectives of the charities. Individual donors would have had no way of knowing how their donations were actually spent.

Additionally, although Winer points to accounts at Al Rajhi Bank as evidence that "Al Qaeda received support and benefited from branches of IIRO" that "were likely receiving funds from accounts maintained by IIRO at ARB,"[122] Winer fails to account for a key fact emphasized by reports Winer himself cited. As one such report states, "[s]eparating funding used for illicit versus legitimate activities is difficult. No method currently exists to ensure that funds collected in the Gulf states by NGOs are not diverted to terrorists or their supporters in the branch offices."[123]

In addition to CIA reports, Winer also cites a Second U.N. Monitoring Report as support for his conclusions regarding the "unique relationship" between Al Qaeda, the charities, and the charities' donors.[124] But Winer selectively cites from this report as well, and does not reference this telling excerpt, which states:

> Controlling charities that are used, or abused, for purposes of supporting terrorism is proving extremely difficult. The close association of such charities with both religious and humanitarian relief purposes has made government regulation and oversight a very sensitive issue. Many of the charities that have been involved with Al-Qaida have also funded important humanitarian programmes in Afghanistan, Bosnia and Herzegovina, Chechnya (Russian Federation), Kosovo (Serbia and Montenegro), Pakistan, Somalia and the Sudan and in rural areas in South-East Asia. In many countries, particularly in South-East Asia and the Middle East, there is a strong tradition that supports the independent operation of charities and the anonymity of their donors.[125]

This statement explains that it would have been nearly impossible for a financial institution such as the Bank to have been able to determine that Al Qaeda was infiltrating certain charity branches, especially those with which the Bank had no connection. Further, the Monograph directly contradicts Winer's statements about what Al Rajhi Bank should have known prior to 9/11.[126] For example, the Monograph states that, "The money-laundering controls in place at the time were largely focused on drug trafficking and large-scale

---

[122] Winer 11.2.
[123] CIA_000223.
[124] *See* Winer 6.1-6.3.
[125] 2nd UN Monitoring Report (S/2003/1070), ¶ 36.
[126] *See, e.g.,* Winer 6.11.12..6, 10.15, 12.4.

Subject to the MDL Protective Order

financial fraud and could not have detected the hijackers' transactions. The controls were never intended to, and could not, detect or disrupt the routine transactions in which the hijackers engaged."[127]  Taking this into a broader context, there was no reason why, pre-9/11, banks would have flagged transactions to charitable entities as suspicious for terrorist financing.

Finally, as I have previously explained, I disagree with Winer's characterization of Al Rajhi Bank as the so-called "bank of choice" for charities.[128]  As discussed above, Al Rajhi Bank was the *only* sharia-law compliant Saudi bank with a global footprint during this time period. It was therefore not the "bank of choice," but rather the only bank that devout Muslims in Saudi Arabia (and by extension, Saudi Muslim charities) could choose to ensure their financial institution was properly compliant with Islamic law.  And as I have explained,[129] the phrase "bank of choice" as used in CIA reports was taken out of context and consequently given a misconstrued meaning.

###     3.    Winer and Kohlmann's discussions of "SAAR" are misleading and do not support their conclusions.

Another pervasive flaw in Winer's report is his imprecise and even misleading use of the term "SAAR Foundation" to refer interchangeably to the "SAAR Foundation" based in Northern Virginia, and the "SAAR Charitable Foundation" — properly referred to as the Sulaiman Bin Abdulaziz Al Rajhi Charitable Foundation[130] — based in Riyadh, Saudi Arabia.[131]  Contrary to Kohlmann's misunderstanding,[132] I understand that the "SAAR Foundation" in Northern Virginia is a separate and distinct legal entity from, and not a "branch" of, the Sulaiman Bin Abdulaziz Al Rajhi Charitable Foundation based in Riyadh.[133] By repeatedly referring to Sulaiman Al Rajhi as "SAAR"[134] Winer's report seems intended to conflate allegations about the SAAR Foundation in Northern Virginia with Sulaiman Al Rajhi.

---

[127] Monograph, p. 3.

[128] *See* Winer 8.1.2-8.1.3.

[129] *See* above, Section B.

[130] *See* Sulaiman Bin Abdulaziz Al Rajhi Charitable Foundation website, "Sulaiman Bin Abdulaziz Al-Rajhi Charitable Foundation," at https://www.rf.org.sa/en (showing full name of charity as "Sulaiman Bin Abdulaziz Al Rajhi Charitable Foundation").

[131] *See, e.g.*, Winer 1.3.3; 1.4.2; 2.13.

[132] Kohlmann, p. 6.

[133] *See* Winer 7.6.13 (reporting that SAAR Foundation in Northern Virginia was founded in the "1980s"); Winer 10.20-10.21 (reporting that SAAR Foundation in Northern Virginia "ultimately dissolved in 2000"); Sulaiman Bin Abdulaziz Al Rajhi Holding Company website, "Sulaiman Al-Rajhi Charitable Foundation," at https://www.asrhc.com/sulaiman-al-rajhi-charitable-foundation/ (showing Sulaiman Al Rajhi Charitable Foundation established in 2000).

[134] *See, e.g.*, Winer 1.3.3; 2.8; 2.13; 7.3.14; 7.6; 8.1.1; 8.2; 8.24; 8.27.

Subject to the MDL Protective Order

In any event, Winer discusses the so-called "SAAR Foundation" of Northern Virginia to allege various links between Sulaiman Al Rajhi and "'entities known to support terrorism.'"[135] Winer's discussions of the SAAR Foundation, however, omit important context.

Prior to 9/11, the Washington Field Office of the FBI opened a terrorism investigation into the SAAR Foundation and related charities in Northern Virginia. I became aware of this investigation after 9/11 as part of my responsibility as the Chief of TFOS at the FBI. In 2002, the FBI's investigation of the SAAR Foundation in Northern Virginia and related charities was declined for prosecution by the U.S. Attorney's Office in the Eastern District of Virginia.

In October 2001, following the FBI's formation of TFOS, the U.S. Customs Service established Operation Green Quest within their investigative jurisdiction as a means to investigate terrorist financing.[136] Operation Green Quest used an alleged income tax violation as a predicate offense to reopen the previously-closed investigation into the Northern Virginia charities. Based on the affidavit of a Customs agent, search warrants were issued against the charities in Northern Virginia, including the SAAR Foundation. Despite heavy media attention, however, neither Operation Green Quest nor any other investigation ever found sufficient evidence of the affidavit's allegations to pursue criminal charges against the SAAR Foundation for providing material support to terrorists or terrorist organizations in the form of financing.[137]

As mentioned above, in my role at TFOS, I directed a specific review from 2001 to 2003 of potential evidence and specific leads that may have linked Al Rajhi Bank or the Al Rajhi family to terrorism. TFOS and the FBI found no credible evidence of such links. Accordingly, to the extent Winer suggests anything to the contrary based upon investigations of the "SAAR Foundation" – none of which led to criminal charges – his statements would not be consistent with the TFOS / FBI's thorough investigation.

Finally, Winer's discussion of the Sulaiman Al Rajhi Charitable Foundation in Riyadh also does not support a conclusion of Al Rajhi Bank links to Al Qaeda or terrorism. The alleged practice of the Sulaiman Al Rajhi Charitable Foundation in Riyadh to not disclose a *donor's*

---

[135] Winer 7.2.14 (citing Collaborative Intelligence Assessment: "Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States," at 24 (FBI/CIA December 2004), (EO14040-003438)); *see also* Winer 10.21-22.

[136] *See* Press Release, "Undersecretary Gurulé's Remarks at the Launch of Operation Green Quest," U.S. Dep't of Treasury (Oct. 25, 2001), https://home.treasury.gov/news/press-releases/po728.

[137] *See* Winer 10.22.

Subject to the MDL Protective Order

identity can hardly show intent to fund terrorists when the *recipients* are clearly identified.[138] Anonymous giving is a common practice. Winer glosses over that the reported policy of anonymous giving would cover all donations, not only those with a supposedly nefarious purpose.[139] And Winer ignores a reasonable explanation that anonymous giving is considered more virtuous.[140] In addition, one cannot infer from the mere fact that donations to terrorists often go "through middlemen" that any particular donations to or through a charity will be channeled to terrorists.[141] I therefore conclude that the supposed circumstantial evidence[142] Winer relies on is insufficient to "corroborat[e]" his conclusion that members of the Al Rajhi family supposedly "did their best to hide the paper trail" to connections with alleged terrorist beneficiaries.[143]

The alleged donations from Sulaiman Al Rajhi or the Sulaiman Al Rajhi Charitable Foundation in Riyadh to various Islamic charities around the world also fail to show that these donations were intended to or were in fact used to fund terrorism, let alone the 9/11 attacks.[144] Winer and Kohlmann's extensive treatment of donations by Sulaiman Al Rajhi and/or the Sulaiman Al Rajhi Charitable Foundation in Riyadh confirms that Sulaiman Al Rajhi donated liberally to charities, but nothing more. And this is a well-reported fact.[145] Consistent with the FBI's findings, neither Winer nor Kohlmann point to any specific donation from Sulaiman Al Rajhi or the Sulaiman Al Rajhi Charitable Foundation in Riyadh –or, for that matter, the SAAR Foundation in Northern Virginia – that was used to fund terrorism.

\*       \*       \*

Winer's and Kohlmann's conclusions about Al Rajhi Bank are fundamentally flawed because they are based on a retrospective, post-9/11 assessment of certain individuals' and entities' supposed links to terrorism.[146] After 9/11, with the benefit of hindsight, hundreds and hundreds of individuals and entities were investigated or designated for

---

[138] *See* Winer 11.7 – 11.7.4. I note that the document relied on by Winer is incomplete and lacks reliable indicia of attribution. *See* Winer 11.7.2 (citing NL 0009625, which appears to be a faxed copy of an unsigned draft letter).

[139] Winer 11.7.2.

[140] *See, e.g.,* Tr. Depo. of Abdullah Sulaiman Al Rajhi, 308:14-309:8.

[141] Winer 11.7.

[142] *See, e.g.,* Winer 11.7 (stating that the "Da'Wah Organizations were providing extensive support to al Qaeda while depositing, maintaining, and receiving very large sums in accounts at ARB," despite the fact that "one does not see direct references to support for al Qaeda or terrorism in bank statements and correspondence").

[143] Winer 11.7.3.

[144] *See, e.g.,* Winer 8.13-8.22, Winer 8.27-8.29, Winer 8.32-8.34, Winer 8.35-8.37.

[145] *See, e.g.,* Muhammad Al-Harbi, "Sulaiman Al-Rajhi's life a rags to riches story," Arab News (May 30, 2012) (explaining that Sulaiman Al Rajhi's charitable endowments "are regarded as the largest endowment in the history of the Islamic world") (cited by Winer at 8.28, FN 437).

[146] 9/11 Commission Report, p. 285 ("As we turn to the events of September 11, we are mindful of the unfair perspective afforded by hindsight.").

Subject to the MDL Protective Order

suspected terrorist links. But it is nonsensical to suggest that Al Rajhi Bank is responsible for the attacks of 9/11 because the Bank, without the benefit of hindsight, did not prevent financial transactions.

With the amount of attention both Al Rajhi Bank and the Al Rajhi family received, I have no doubt that, if sufficient evidence to link them to the 9/11 attacks existed, they would have been prosecuted or sanctioned. The fact that they were not convinces me that such evidence is lacking.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

I also certify under penalty of perjury that the contents of the material I provide in Annex 1 (reliance materials), Annex 2 (which provides my experience, qualifications, and curriculum vitae), and Annex 3 (which lists my publications since December 2013 and expert witness services from 2019 to the present), to be true and correct.

I reserve the right to modify this report upon further review or should any new or different information come to my attention.

12-22-2023

Date

Dennis M. Lormel

# Annex 1: Materials Considered

In addition to the materials referenced in my report and in Plaintiffs' experts' reports and appendices, I considered the following materials:

| No. | Document |
|-----|----------|
| 1 | James M. Dorsey, "Saudis Monitor Key Bank Accounts for Terror Funding at U.S. Request," Wall Street Journal, February 6, 2002 |
| 2 | FBI Electronic Communication: (Redacted) Albayoumi/GIP Cooptee, dated June 14, 2017 |
| 3 | FBI Electronic Communication: Operation Encore, dated May 27, 2021 |
| 4 | Testimony of Dennis M. Lormel before the House Committee on Financial Services, October 3, 2001 |
| 5 | Testimony of Dennis M. Lormel Before the House Committee on Financial Services, Subcommittee on Oversight and Investigations, February 12, 2002 |
| 6 | Glenn R. Simpson, "Report Links Charity To an al Qaeda Front," Wall Street Journal, September 20, 2002 |
| 7 | Judith Miller, "Raids Seek Evidence of Money Laundering," New York Times, March 21, 2002 |
| 8 | Josh White, "Va. Terror Suspect Sentenced to 1 Year," Washington Post, January 13, 2004 |
| 9 | Leef Smith, "Man Pleads Guilty in Passport Case," Washington Post, October 7, 2004 |
| 10 | FATF Press Release, "FATF Cracks down on Terrorist Financing," October 31, 2001 |
| 11 | Department of Justice Testimony, Terrorism/Homeland Security Related Hearings, 107th Congress (Post September 11, 2001), 2001-2002 |
| 12 | FATF IX Special Recommendations, October 2001 |
| 13 | FATF 40 Recommendations, June 20, 2003 |
| 14 | FATF 40 Recommendations, February 2012 |
| 15 | U.S. Department of Treasury, "G7 Combating the Financing of Terrorism: First Year Report," September 27, 2002 |

| No. | Document |
|---|---|
| 16 | International Monetary Fund, Anti-Money Laundering/Combating the Financing of Terrorism – Topics |
| 17 | Bruce Berkowitz, "The Big Difference Between Intelligence and Evidence," Commentary, The Washington Post, February 2, 2003 |
| 18 | United Nations Office of Drugs and Crime, Criminal Intelligence Manual for Analysts, 2011 |
| 19 | Office of Director of National Intelligence, "What is Intelligence?" |
| 20 | Office of Director of National Intelligence, "Members of the Intelligence Community" |
| 21 | FindLaw, "What Are the Rules of Evidence?" |
| 22 | Intel.gov, "How the IC Works" |

# Annex 2
# Dennis M. Lormel

## Career Summary

Currently provides wide-ranging consulting services and training related to terrorist financing, money laundering, fraud, financial crimes and risk management. Amassed extensive major case experience in the FBI, as a street agent, supervisor and senior executive particularly in complex document and labor intensive financial-related crime matters. In response to the terrorist attacks of September 11, 2001, assumed responsibility for establishing, coordinating and directing the FBI's comprehensive terrorist financing initiative. Throughout career, developed new and innovative techniques to achieve success in solving criminal cases for law enforcement and identifying systemic weaknesses and risk factors for private sector clients. Accomplished instructor and speaker; frequently interviewed as subject matter expert by the media. Both in and out of government service, has testified before and briefed Congressional committees, members and staff on a recurring basis. While in the FBI, recipient of numerous citations and awards for investigative excellence.

## Experience

**2010 – present          DML Associates, LLC**

- Founded business to provide consulting services and training related to terrorist financing, money laundering, fraud, financial crimes and due diligence
- Served three years as Deputy to court appointed Monitor working with the Southwest Border Alliance and Western Union regarding money laundering
- Clients include law firms, banks, money services businesses, broker dealers and precious metals dealers; provide clients with vast array of training
- 
- Recipient of 2010 Association of Anti-Money Laundering Specialists (ACAMS) Volunteer of the Year Award; member of ACAMS Advisory Board
- Distinguished Lecturer, Master of Arts Program, for Financial Integrity, Case Western Reserve University
- President, Society of Former Special Agents of the FBI

**2008 – 2010          IPSA International**

**Managing Director, Northeast Region**

- Responsible for oversight of regional operations and directing, fraud, anti-money laundering and terrorist financing consulting services, to include training
- Collateral professional responsibilities included serving as contributing expert to the Counterterrorism Blog and providing volunteer training/mentoring

**2004 – 2008          Corporate Risk International**

**Senior Vice President, Anti Money Laundering**

- Responsible for establishing and directing anti-money laundering and terrorist financing consulting service; provided broad based training to clients
- Primary client was one of the most prominent Broker Dealer's on Wall Street. Conducted due diligence, enhanced due diligence and special projects for Senior Vice President of Business Intelligence Group.
- Participated as contributing subject matter expert to the Counterterrorism Blog and served as advisor to Congressional Terrorist Financing Task Force

**2003 – 2004          AES Corporation**

**Director of Forensic Audits**

- Directed sensitive fraud audits and investigations

**Dennis M. Lormel**

| 1976 - 2003 | Federal Bureau of Investigation |
|---|---|

**Senior Executive Service**

**Chief, Terrorist Financing Operations Section, Counterterrorism Division**

- Established elite multi-agency, multi-disciplined task force to address all aspects of terrorist financing
- Developed successful, time sensitive and innovative investigative methodologies to identify, disrupt and dismantle terrorist funding mechanisms
- Developed a comprehensive outreach program to maximize visibility and to create a reliable network of liaison contacts
- Recipient of the CIA George H. W. Bush Award for Excellence in Counterterrorism and the DOJ, Criminal Division, Assistant Attorney General Award for Investigative Initiative

**Chief, Financial Crimes Section, Criminal Investigative Division**

- Provided leadership and oversight in directing the financial crimes program of the FBI. Implemented a series of noteworthy national investigative initiatives
- Served as an advisor to a number of industry associations such as the American Bankers Association, the National Insurance Crime Bureau and the National White Collar Crime Center
- Improved and encouraged communication and redefined operational procedures to increase productivity and employee satisfaction and dedication

**Inspector in Place, Inspection Division**

- Conducted three Inspections as a Lead Inspector in the field office inspection process. Directed teams of Assistant Inspectors in the execution of their duties
- Served as Inspector in Charge supervising a team of Assistant Inspectors in a sensitive deadly force investigation

**Assistant Special Agent in Charge, Pittsburgh Division**

- Responsible for directing the day-to-day operations of the field office to include crisis management response, routine investigative oversight, administrative oversight and management of the field office budget
- Served as On-Scene Commander in SWAT deployments and in emergency response situations
- Directed numerous high profile investigations to include six child molestation/kidnapping/murder investigations, two investigations involving death threats to agents, the arrest of two fugitives wanted for the ambush murders of two police officers, two sensitive public corruption undercover operations and a significant bank failure
- Implemented squad and program reporting requirements and crime surveys to identify priority crime problems and emerging crime trends

**Assistant Inspector, Inspection Division**

- Participated in 16 field office inspections as a Team Leader, using organizational skills to evaluate extensive data in a compressed time frame in assessing the effectiveness, efficiency and productivity of field office operations
- Provided leadership to team members and addressed assignments with objectivity, sensitivity, and professionalism
- Recognized as white collar crime program expert during tenure with the Inspection Division

**Supervisory Special Agent**

FBIHQ

**Dennis M. Lormel**

- Served two tours of duty as a headquarters supervisor in the Criminal Investigative Division including assignments in public corruption, financial institution fraud and criminal operational intelligence
- Assigned in multiple capacities as lead agent responsible for investigation of Bank of Credit and Commerce International, the largest international bank failure in history
- Program manager for numerous complex and high profile investigative matters
- Coordinated and presented numerous corruption awareness and financial crimes seminars
- Participated in National Bank Fraud Working Group and served as a liaison to American Bankers Association

New York Division

- Supervised a squad responsible for financial crimes involving institutions in the financial district, primarily Broker Dealers. Developed new investigative methodology to link separate stolen securities cases to common subjects
- Established the first financial crimes task force in the FBI which included the New York City Police and the U.S. Secret Service. This task force achieved noteworthy accomplishments and was held as a model for the development of future task forces
- Established a financial crimes undercover operation that became the longest running and one of the most successful undercover operations ever undertaken
- Regularly provided fraud awareness and systemic vulnerabilities training to brokerage firms and financial institutions

**Special Agent**

- As street agent, amassed extensive major case experience in complex and challenging high profile white collar crime matters
- Obtained the first public corruption conviction in the New York Division
- Routinely participated in long term undercover operations in cameo appearances as the accountant or financial consultant of the undercover business entity

**1973 - 1976            Internal Revenue Service**

- Revenue Agent conducting income tax audits for personal, partnership and corporate income tax returns
- One year assignment to Organized Crime Strike Force focusing on investigations of shell companies

## Education/Personal

**St. Peters College      Jersey City, NJ**

- Graduated with a BS in Accounting in 1973
- Co-Captain of football team

**Volunteer / Mentor**

- Over forty years of experience as a volunteer/mentor for youth and adult programs/activities

## Security Clearance

- Previously held Top Secret SCI–TK security clearance with polygraph
- Currently hold Top Secret Clearance



www.dmlassociatesllc.com

Getting to the root of the matter.

# Annex 3

- Papers and articles published in trade magazines and posted to industry websites include:

  - Terrorist Financing:  The Mumbai Bombing, a Case Study in the Possible and Probable – ACAMS Today – July 31, 2014
  - Assessing the Islamic State and Like Minded Terrorist Groups from an AML Perspective – Chartwell Compass and ACAMS Today - September 2014
  - Confronting the Evolving Threat of Terrorism – ACAMS Today - January 2015
  - Business Model for a Terrorist Organization – ACAMS Today – January 2015
  - Testify…Who Me? – ACAMS Today – April 2015
  - The Rings of Defense Needed to Address the Threats of Terrorism to the Homeland – ACAMS Today – April 2015
  - World Cup of Fraud – ACAMS Today - September 2015
  - Observations about the Paris Terrorist Attacks and Implications for Financial Institutions – ACAMS Today (online) - November 2015
  - Three Thoughts about the San Bernardino Shooting – ACAMS Today (online) - December 2015
  - Banking Law Enforcement Undercover Operations – ACAMS Today – March 2016
  - How Terrorist Trends Evolve and How Financial Institutions Should Respond – ACAMS Today – March 2016
  - A Tribute to the Law Enforcement Community – ACAMS Today – May 2016
  - Orlando Shooting – ACAMS Today – June 2016
  - Terrorist Financing Typologies for AML Programs – ACAMS Today  - February 2017
  - From Law Enforcement to AML –ACAMS Today – May 2017
  - Manchester Bombing Assessment – ACAMS Today – May 2017
  - Islamist Terrorism from a Risk Perspective – ACAMS Today – May 2017
  - Deconstructing a Fraudster – ACAMS Today – August 2017
  - Catalonia Terrorist Attack Assessment – ACAMS Today – September 2017
  - Terrorist Financing Through the Lens of the Terrorist Attack Cycle – ACAMS Today – January 2018
  - Terrorist Financing:  Visualizing Funding Flows – ACAMS Today – September 2018
  - Flash to Bang:  Left of Boom, Right of Boom – ACAMS Today – March 2019
  - Terrorist Threats within Domestic Boundaries – ACAMS Today – July 2020
  - Terrorist Financing in 2021 – ACAMS Today – September 2021
  - September 11:  The 20 Year Journey – ACAMS Today – September 2021
  - 9/11:  A 20 Year Retrospective of the Central Backstory – Manchester Analytics – September 2021

- o Financial Investigations – FIU Connect, ManchesterCF, Financial Intelligence – May 2022
- o Terrorist Financing – FIU Connect, ManchesterCF, Financial Intelligence – October 2023

- Since 2019, I served as an expert and was deposed in the following litigation:

    - o *Government of the United States Virgin Islands v. JPMorgan Chase Bank, N.A.; Jane Doe 1 v. JPMorgan Chase Bank, N.A.; JPMorgan Chase Bank, v. James Edward Staley*, Nos. 22-cv10019-JSR; 1:22-cv-10904-JSR (S.D.N.Y.). Deposed on Sept. 6, 2023.