# Al Rajhi Bank
# Ex. 50

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
 2

 3    -----------------------------)
                                   ) 03 MDL 1570 (GBD)(SN)
 4    In re Terrorist Attacks on   )
      September 11, 2001           ) ECF Case
 5                                 )
      -----------------------------)
 6                                 )
      This document relates to:    )
 7                                 )
      Underwriting Members of      )
 8    Lloyd's Syndicate 2, et al. v.)
      Al Rajhi Bank, et al.,       )
 9    No. 16-cv-07853              )
                                   )
10    Addesso, et al. v. Kingdom of )
      Saudi Arabia, et al.,        )
11    No. 16-cv-09937              )
                                   )
12    Aguilar, et al. v. Kingdom of )
      Saudi Arabia, et al.,        )
13    No. 16-cv-09663              )
                                   )
14    Hodges, et al. v. Kingdom of )
      Saudi Arabia, et al.,        )
15    No. 17-cv-00117              )
                                   )
16    Aiken, et al. v. Kingdom of  )
      Saudi Arabia, et al.,        )
17    No. 17-cv-0450               )
                                   )
18    Charter Oak Fire Insurance   )
      Co., et al. v. Al Rajhi Bank, )
19    et al., No. 17-cv-02651      )
                                   )
20    Abarca, et al. v. Kingdom of )
      Saudi Arabia, et al.,        )
21    No. 17-cv-03887              )
                                   )
22    Arrowood Indemnity Co.,      )
      et al. v. Kingdom of Saudi   )
23    Arabia, et al.,              )
      No. 17-cv-03908              )
24                                 )
```

This Transcript Contains Confidential Material

```
 1   Abedhajajreh, et al. v.        )
     Kingdom of Saudi Arabia,       )
 2   et al., No. 17-cv-06123        )
                                    )
 3   Muenchener Rueckversicherungs-)
     Gesellschaft                   )
 4   Aktiengesellschaft in          )
     Muenchen, et al. v. Kingdom    )
 5   of Saudi Arabia, et al.,       )
     No. 17-cv-07914                )
 6                                  )
     Abbate, et al. v. Kingdom of   )
 7   Saudi Arabia, et al.,          )
     No. 17-cv-08617                )
 8                                  )
     -----------------------------)
 9
10                     - - -
11               FRIDAY, FEBRUARY 9, 2024
12
13      THIS TRANSCRIPT CONTAINS CONFIDENTIAL MATERIAL
14                     - - -
15
16            Remote videotaped deposition of FAWZI
17   AL-HOBAYB, held at the location of the witness in
18   Saudi Arabia, commencing at 2:32 p.m., Arabia Standard
19   Time, on the above date, before Juliana F. Zajicek,
20   Registered Professional Reporter, Certified Shorthand
21   Reporter and Certified Realtime Reporter.
22                     - - -
23            GOLKOW LITIGATION SERVICES
          877.370.3377 ph | 917.591.5672 fax
24                Deps@golkow.com
```

This Transcript Contains Confidential Material

```
 1                    A P P E A R A N C E S :

 2


 3   ON BEHALF OF LLOYD'S SYNDICATE 2 AND MUENCHENER
     PLAINTIFFS:
 4
          COZEN O'CONNOR P.C.
 5        1650 Market Street, Suite 2800
          Philadelphia, Pennsylvania 19103
 6        215-665-2000
          BY:  SEAN P. CARTER, ESQ. (Via Zoom)
 7             scarter1@cozen.com

 8        COZEN O'CONNOR P.C.
          1200 19th Street, NW, 3rd Floor
 9        Washington, D.C. 20036
          202-912-4800
10        BY:  J. SCOTT TARBUTTON, ESQ. (Via Zoom)
               starbutton@cozen.com
11

12   ON BEHALF OF CHARTER OAK PLAINTIFF:

13        SHEPS LAW GROUP
          25 High Street
14        Huntington, New York 11743
          631-249-5600
15        BY:  ROBERT C. SHEPS, ESQ. (Via Zoom)
               rsheps@shepslaw.com
16

17   ON BEHALF OF AL RAJHI BANK:

18        WHITE & CASE LLP
          701 Thirteenth Street, NW
19        Washington, D.C. 20005-3807
          202-626-3600
20        BY:  CHRISTOPHER M. CURRAN, ESQ.
               ccurran@whitecase.com;
21             NICOLLE KOWNACKI, ESQ.
               nkownacki@whitecase.com;
22             REUBEN SEQUEIRA, ESQ.
               rsequeira@whitecase.com;
23             MICHAEL MAHAFFEY, ESQ. (Via Zoom)
               michael.mahaffey@whitecase.com
24
```

```
1                    A P P E A R A N C E S :

2

    ON BEHALF OF AL RAJHI BANK:
3
        WHITE & CASE LLP
4       1221 Avenue of the Americas
        New York, New York 10020-1095
5       212-819-8200
        BY:  ANWAR AKROUK, ESQ.
6            anwar.akrouk@whitecase.com

7

    ON BEHALF OF DUBAI ISLAMIC BANK:
8
        JONES DAY
9       51 Louisiana Avenue, NW
        Washington, D.C. 20001-2113
10      202-879-3939
        BY:  LESLEY E. ROE, ESQ. (Via Zoom)
11           lroe@jonesday.com

12

    ON BEHALF OF THE MUSLIM WORLD LEAGUE, THE
13  INTERNATIONAL ISLAMIC RELIEF ORGANIZATION:

14      LEWIS BAACH KAUFMANN MIDDLEMISS PLLC
        1101 New York Avenue, NW, Suite 1000
15      Washington, D.C. 20005
        202-833-8900
16      BY:  E. JON A. GRYSKIEWICZ, ESQ. (Via Zoom)
             jon.gryskiewicz@lbkmlaw.com;
17           SUMAYYA KHATIB, ESQ. (Via Zoom)
             sumayya.khatib@lbkmlaw.com
18

19  ON BEHALF OF WORLD ASSEMBLY OF MUSLIM YOUTH:

20      THE LAW FIRM OF OMAR T. MOHAMMEDI, LLC
        233 Broadway Site 801
21      New York, New York 10279
        212-725-3846
22      BY:  OMAR T. MOHAMMEDI, ESQ. (Via Zoom)
             omohammedi@otmlaw.com;
23           FATEMA ZOHNY, ESQ.
             fzohny@otmlaw.com (Via Zoom)
24           MUSTAPHA NDANUSA, ESQ.


                    mndanusa@otmlaw.com
```

This Transcript Contains Confidential Material

```
 1
                    A P P E A R A N C E S :
 2

 3    ALSO PRESENT:

 4         RAYMOND RIVERA (Via Zoom);
           ABDULRHMAN ALMUSSAED, Al Rajhi Bank
 5         EVAN WOLFE, Trial Tech (Via Zoom)

 6

 7

 8    THE VIDEOGRAPHER:

 9         DAVID LANE, Golkow Litigation Services

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

This Transcript Contains Confidential Material

```
 1                          I N D E X

 2    WITNESS:                                    PAGE:

 3      FAWZI AL-HOBAYB

 4          EXAM BY MR. CARTER..................   10

 5

 6                          * * * * *

 7

 8                      E X H I B I T S

 9    FAWZI AL-HOBAYB EXHIBIT              MARKED FOR ID

10      No. 1    Notice of Oral Deposition of Fawzi   13

11               Al-Hobayb

12      No. 2    Expert Report of Fawzi Al-Hobayb,    16

13               Case No. 1:03-md-01570 (S.D.N.Y.)

14      No. 3    Document titled "Powers of the       20

15               Audit Committee at the Al Rajhi

16               Banking & Investment Corp."

17      No. 4    Correspondence titled "Circular to   23

18               All Banks Operating in The

19               Kingdom," Date: 18/2/1417 H

20      No. 5    Correspondence from Abdullah         24

21               Al-Sulaiman Al-Rajhi, dated

22               1211/1419 AH]

23

24
```

This Transcript Contains Confidential Material

```
 1                    E X H I B I T S

 2   FAWZI AL-HOBAYB EXHIBIT                MARKED FOR ID

 3     No. 6     Al Rajhi Banking & Investment          27

 4                Corp. Audit Plan for the Fiscal

 5                Year 2001 AD

 6     No. 7     National Commission on Terrorist       46

 7                Attacks Upon the United States

 8                Monograph on Terrorist Financing

 9     No. 8     Saudi Arabian Monetary Agency          93

10                Banking Control Guidelines for

11                Prevention of Money Laundering

12     No. 9     Expert Report of Jonathan M. Winer    106

13                relating to Underwriting Members

14                of Lloyd's Syndicate 2, et al., v.

15                ARB, et al., No. 16-cv-07853

16     No. 10    Aqil al-Aqil Account Statement        175

17     No. 11    Al Rajhi Banking & Investment         199

18                Corporation, Internal Audit

19                Department, Anti-Money Laundering

20                Procedure Guide, Edition: November

21                1998

22

23

24
```

```
 1          THE VIDEOGRAPHER:  We are now on the record.  My

 2    name is David Lane, videographer for Golkow Litigation

 3    Services.

 4              Today's date is February 9th, 2024.  Our

 5    time on the record is 2:32 p.m. Saudi Arabia time.

 6              This remote video deposition is being held

 7    in the matter of the Terrorist Attacks on

 8    September 11, 2001, MDL Number 1570.

 9              Our deponent today is Fawzi Al-Hobayb.

10              All parties to this deposition are

11    appearing remotely and have agreed to the witness

12    being sworn in remotely.

13              Due to the nature of remote reporting,

14    please pause briefly before speaking to ensure all

15    parties are heard completely.

16              All counsel will be noted on the

17    stenographic record.

18              The court reporter today is Juliana

19    Zajicek, and will now swear in the witness.

20                  (WHEREUPON, the witness was duly

21                   sworn.)

22        THE VIDEOGRAPHER:  Please begin.

23        MR. CURRAN:  Mr. Carter, I think you know,

24    right, but we would like strict compliance with
```

This Transcript Contains Confidential Material

1    Rule 30 and the identification of all people who are

2    present.

3              So I can begin that process here.  So this

4    is Christopher Curran representing Al Rajhi Bank and

5    the witness today.  I'm joined in the room here by my

6    colleagues Nicole Kownacki, Reuben Sequeira, and Anwar

7    Akrouk.

8              I have another colleague of mine, Michael

9    Mahaffey, may be on virtually.  And also in the room

10   here, we have a representative from the Al Rajhi Bank

11   legal department, Abdulrhman Almussaed.

12             That's it for here.

13        MR. CARTER:  Good morning, Mr. Al-Hobayb.  I'm

14   an attorney with Cozen O'Connor.  I'm here on behalf

15   of plaintiffs.  I am the only person in my room today.

16             And I'll turn it over to other plaintiffs.

17        MR. SHEPS:  Robert Sheps from the Sheps Law

18   Group, and I represent a series of plaintiffs as well.

19             Good morning.

20        MR. CURRAN:  If there is no one else

21   representing plaintiffs, how about representing other

22   defendants?

23        MR. GRYSKIWICZ:  This is Jon Gryskiwicz.  Also

24   on the call is Sumayya Khatib with me.  We're from

This Transcript Contains Confidential Material

1    Lewis Baach Kaufmann Middlemiss representing MWL,

2    IIRO, and certain charity officials.

3         MR. CURRAN:  Okay.  Is there anyone else on the

4    call?  Okay.

5             I will remind all participants that this

6    deposition in the case is -- is covered by a

7    protective order governing confidentiality.

8             With that, Mr. Carter, the witness is

9    available.  He does have a clean copy of his expert

10   report in front of him.

11        MR. CARTER:  Excellent.  Thank you.

12                   FAWZI AL-HOBAYB,

13   called as a witness herein, having been first duly

14   sworn, was examined and testified as follows:

15                   EXAMINATION

16   BY MR. CARTER:

17        Q.   Good morning, Mr. Al-Hobayb.  How are you?

18        A.   Very good.  Thank you very much, sir.

19        Q.   As I said in the introduction, I'm an

20   attorney representing plaintiffs in this case.

21             Are you aware that this litigation arises

22   from the September 11th attacks?

23        A.   Yes, sir.

24        Q.   Are you aware that the plaintiffs in this

```
 1    litigation include both commercial parties injured as

 2    a result of the attacks as well as family members

 3    making claims for wrongful deaths and personal

 4    injuries from those attacks?

 5         A.    Yes, sir.

 6         Q.    I take it that you're also aware that

 7    Al Rajhi Bank is a defendant in the litigation?

 8         A.    Yes, sir.

 9         Q.    Mr. Hobayb, I believe you have previously

10    served as an expert for Al Rajhi Bank in litigation

11    that was brought in the UK against the Wall Street

12    Journal, is that correct?

13         A.    Yes, sir.

14         Q.    Did that concern reporting relating to

15    Al Rajhi Bank in connection with terrorism financing

16    issues?

17         MR. CURRAN:   Objection; vague.

18              You may answer.

19    BY THE WITNESS:

20         A.    I did not understand -- understand the

21    question.  Can you please repeat it in -- I served in

22    that -- in that case, the UK case, as an expert

23    witness, and they did a test -- like a -- I think they

24    call it testimony before the judge or something like
```

This Transcript Contains Confidential Material

 1    that.

 2    BY MR. CARTER:

 3         Q.    Have you served as an expert witness in

 4    any other court proceeding?

 5         A.    No, I don't recall.

 6         Q.    Just so we have a clear set of ground

 7    rules for today's proceeding, the court reporter is

 8    going to be taking down both my questions and your

 9    answers.  And so it's important for you to wait until

10    I finish asking my question before you begin to answer

11    and for me to wait until you finish your answer before

12    starting another question.

13               Is that understood?

14         A.    Sure, sir.

15         Q.    The court reporter also cannot take down

16    gestures or nods of the head, so you have to try to

17    remember to verbalize all of your answers, okay?

18         A.    Sure, sir.

19         Q.    If you need to take a break at any time,

20    let us know, and I'll discuss it with your counsel and

21    we'll find an appropriate time to do that.  Okay?

22         A.    Sure, sir.

23         MR. CARTER:  If we can just mark as Exhibit 1

24    the deposition notice at Tab 1.

This Transcript Contains Confidential Material

```
 1                    (WHEREUPON, a certain document was

 2                     marked Fawzi Al-Hobayb Deposition

 3                     Exhibit No. 1, for identification, as

 4                     of 02/09/2024.)

 5    BY MR. CARTER:

 6        Q.    Mr. Hobayb, just let me know when that is

 7    up on your screen and visible.

 8        A.    It is visible.

 9        Q.    Mr. Hobayb, this is a legal notice we

10    served scheduling your deposition today.

11              Have you seen this at any point prior to

12    just now?

13        A.    Can I have a minute to read it?

14        Q.    Sure.

15        A.    I don't remember seeing it.

16        MR. CURRAN:  Yeah, and just so you're aware,

17    Mr. Al-Hobayb, you can see the first page here.  If

18    you need to look at other pages, you have that

19    computer available.

20        THE WITNESS:  Okay.

21        MR. CURRAN:  Just so you know.  I'm not -- I'm

22    not saying you need to look at additional pages for

23    this document, but just so you know the process here.

24    BY THE WITNESS:
```

This Transcript Contains Confidential Material

```
 1        A.      No, I don't recall seeing it.

 2   BY MR. CARTER:

 3        Q.      Mr. Al-Hobayb, I'm drawing your attention

 4   to this simply because in No. 5 in this list, we had

 5   requested that counsel for Al Rajhi Bank provide us

 6   copies of any invoices you submitted in connection

 7   with your work as an expert.

 8            We have reached a conditional stipulation

 9   with counsel for Al Rajhi that they would provide us

10   with a statement of the number of hours and total

11   amount paid, pending possible further requests by us

12   to the court for additional information.

13            I just want to ask whether or not you

14   have, in fact, generated and submitted invoices for

15   the work --

16        A.      Yes.

17        Q.      -- that you performed?

18        MR. CURRAN:  Objection; vague.

19            You may answer.

20   BY THE WITNESS:

21        A.      Yes, sir, I did.  I did submitted

22   invoices.

23   BY MR. CARTER:

24        Q.      Do -- do those invoices include narrative
```

This Transcript Contains Confidential Material

1    descriptions of the work that you performed?

2         A.    No.   Just the hours spent.

3         Q.    Do they identify the dates on which those

4    hours were performed by you?

5         A.    Yes.   I submitted for each -- for each

6    day, for each date, I submitted how many hours spent

7    in that particular day.

8         Q.    Mr. Hobayb, when did you begin your work

9    for Al Rajhi Bank in this matter?

10        MR. CURRAN:   Objection as to form.

11             You may answer.

12   BY THE WITNESS:

13        A.    I issued my report on 21st November, 2003.

14   Sometimes either -- when did they start working on the

15   report?   This was the question, sir?

16   BY MR. CARTER:

17        Q.    Yes.   When did you start performing work

18   in relation to the report?

19        A.    Early October or sometime in September,

20   September, October, on what that -- during that day --

21   I don't really recall exact date when did they start.

22        Q.    And I believe counsel has indicated to us

23   that from the date you began your work until the date

24   that you signed and submitted your report, you -- you

This Transcript Contains Confidential Material

```
 1    billed for 176 hours of work and a total invoice of

 2    $234,608, is that correct?

 3         A.    Yes, sir.  Yes, sir, correct.

 4         Q.    So that 176 hours would cover all of the

 5    work you did in reviewing documents as well as the

 6    time you spent writing your report in this matter,

 7    correct?

 8         A.    Yes, everything.

 9         MR. CARTER:  And if we can, why don't we just go

10    ahead and mark as exhibit Al-Hobayb 2 the expert

11    report at Tab 2.

12                    (WHEREUPON, a certain document was

13                     marked Fawzi Al-Hobayb Deposition

14                     Exhibit No. 2, for identification, as

15                     of 02/09/2024.)

16    BY MR. CARTER:

17         Q.    Mr. Hobayb, I've marked the expert report

18    you submitted in this matter.  I understand that there

19    have been some relatively minor corrections to your

20    report that were submitted by counsel to me at some

21    point yesterday.

22                Are you familiar with that?

23         A.    Yes, sir.

24         Q.    Those are not reflected on this document,
```

This Transcript Contains Confidential Material

 1    but to the extent that we have a discussion related

 2    to the -- the particular references or text that has

 3    been revised, we can flag that issue.

 4              Is that okay?

 5        A.    Okay, sir.

 6        Q.    Turning to Appendix I of your expert

 7    report, which would be probably Page 35 in the PDF --

 8    oh, you're there.

 9        MR. CARTER:  Thanks, Evan.

10    BY MR. CARTER:

11        Q.    And on the next page, you've indicated the

12    materials you considered in your report.

13              Do you see that?

14        A.    Yes, I can see them, yes.

15        Q.    And you've included a statement there

16    that:

17              "In addition to the materials referenced

18    in my report and in Plaintiffs' experts' reports and

19    appendices, I considered the following materials:"

20              And then there's 11 specific documents

21    listed, correct?

22        A.    Correct, sir.

23        Q.    Did you review each and every document

24    referenced in plaintiffs' expert reports and the

This Transcript Contains Confidential Material

```
 1    appendices to those reports?

 2         A.    No, sir.

 3         Q.    Is there any identification in your report

 4    which of those documents you did review and which you

 5    did not?

 6         MR. CURRAN:  Objection as to form.

 7              You may answer.

 8    BY THE WITNESS:

 9         A.    Yeah.  In general, whatever I saw I deemed

10    it necessary, I -- I -- I mention it.  I mean -- I

11    mean, mention whatever.  I don't recall exactly, but,

12    for example, when the -- in Winer's report, when he

13    was talking about certain account openings or

14    something, when he pointed that problematic things, I

15    referred to what he says.  I referred to the document,

16    so this is how.

17    BY MR. CARTER:

18         Q.    But to be clear, as I understand your

19    testimony, you did not review all of the documents

20    listed in the appendix of Mr. Winer's report, correct?

21         A.    I reviewed what I -- what I thought was

22    necessary, but not all of them.  I did not review all

23    of them, but I reviewed whatever I thought were

24    related to my expertise.
```

This Transcript Contains Confidential Material

1    Q.    And turning to the list of additional

2  documents that you list here, and just as an example,

3  in No. 2 you list the ARB AML Manual of November 1998.

4         Do you see that?

5    A.    Yes, sir.

6    Q.    Do you know whether that document was

7  produced in discovery?

8    MR. CURRAN:  Objection; lack of foundation.

9         You may answer.

10  BY THE WITNESS:

11   A.    Was it produced at the discovery?

12  BY MR. CARTER:

13   Q.    Yeah.  Do you know whether that's a

14  document that Al Rajhi Bank produced to the plaintiffs

15  as part of the discovery in this case?

16   A.    I don't recall.  I don't -- I don't know.

17  I cannot answer that.

18   Q.    Let's just -- let's go through a few

19  specific documents cited in your -- in your expert

20  report.

21   MR. CARTER:  And first let's -- let's bring up

22  and mark as the next exhibit the document at Tab 14R.

23         (WHEREUPON, a certain document was

24          marked Fawzi Al-Hobayb Deposition

This Transcript Contains Confidential Material

```
 1                    Exhibit No. 3, for identification, as

 2                    of 02/09/2024.)

 3   BY MR. CARTER:

 4        Q.    Mr. Hobayb, do you recall citing this

 5   document in your expert report?

 6        MR. CURRAN:  I'll note for the witness that this

 7   appears to be a multipage document, that you -- you

 8   can only see the first page on that computer screen.

 9   BY THE WITNESS:

10        A.    It looks to me this is -- is this act- --

11   is this document a translation?

12   BY MR. CARTER:

13        Q.    Yeah, and if you page through, there's the

14   Arabic version behind it.

15        A.    Is it possible to see the Arabic version,

16   please?

17        Q.    There is.

18        MR. CURRAN:  You can look on that computer if

19   that's helpful, too.

20        THE WITNESS:  Is there time?

21   BY THE WITNESS:

22        A.    Yes, yes, I saw this document, yes.  I

23   reviewed it, yes.

24   BY MR. CARTER:
```

```
 1      Q.      And in reviewing documents for your expert

 2   report, did you note that some of the documents

 3   included a legend at the bottom indicating ARB with a

 4   numerical sequence after them?

 5      A.      Ah, I notice sometimes those, yeah, those

 6   things, yes.

 7      Q.      And I'm going to represent to you that the

 8   ones that included the ARB with a numerical sequence

 9   were documents that Al Rajhi Bank provided to us as

10   part of discovery.

11              This document does not have any such

12   legend, does it?

13      A.      At the bottom should be?  Yeah, no, no, I

14   don't see.

15      Q.      Where did you get this document?

16      A.      Through the documents that were provided

17   to me.

18      Q.      Did you ask for this document?

19      A.      Many documents -- some documents I asked

20   for, some documents were provided.

21              I don't recall exactly this document,

22   whether I have asked for it or it was provided to me.

23   I do not recall, but --

24      Q.      So there were documents that you were
```

This Transcript Contains Confidential Material

```
 1    interested in that you asked for and that Al Rajhi

 2    Bank provided to you?

 3         A.    They were provided to me, but no contact

 4    with Al Rajhi at all.

 5         Q.    But this particular document, as you

 6    understand it, is an internal Al Rajhi Banking

 7    document, correct?

 8         A.    Yes, sir, correct.

 9         Q.    And you don't recall whether you asked for

10    this or it was given to you, is that my understanding?

11         A.    Yes, sir.

12         Q.    But in either event, this document was

13    something that you had available to you for purposes

14    of your report, correct?

15         A.    I reviewed it, yeah.

16         Q.    And I think you actually cite it in your

17    report as well, right?

18         A.    Yes, sir.

19         MR. CARTER:  And if we can pull up the -- the

20    document at Tab 16R.

21         MR. CURRAN:  When Mr. Carter says that, I think

22    he's asking the court reporter or a technician to

23    bring up the document, not you.

24         MR. CARTER:  I am.
```

This Transcript Contains Confidential Material

```
 1                   And we'll mark this as the next exhibit.

 2                   (WHEREUPON, a certain document was

 3                   marked Fawzi Al-Hobayb Deposition

 4                   Exhibit No. 4, for identification, as

 5                   of 02/09/2024.)

 6   BY MR. CARTER:

 7        Q.    This is another document that is cited in

 8   your expert report.  And do you agree, this also does

 9   not include any ARB with a numerical designation

10   legend at the bottom?

11        A.    I don't see it on the screen.

12        Q.    Do you recall whether you requested this

13   document, or how did this -- how did this document

14   come to you for purposes of your expert report?

15        A.    Well, I have access to many SAMA

16   circulars.  I ident- -- I identified this as related.

17        Q.    Is this something that you sought out and

18   found on your own or is it something you got that you

19   received from Al Rajhi Bank even, including through

20   counsel?

21        MR. CURRAN:  Objection as to form.

22             You may answer.

23   BY THE WITNESS:

24        A.    Really, I'm not really certain, but --
```

This Transcript Contains Confidential Material

 1    well, more probable that I -- I have cited this, more

 2    probable.

 3    BY MR. CARTER:

 4         Q.    More probable that you had this in your

 5    own collection?

 6         A.    No, no, that I picked this out of many

 7    circulars, that this is related.  I mean -- I mean,

 8    when we're talking about account opening, you want to

 9    see what the regulations are talking about.  So I

10    don't really recall exactly whether it was just

11    provided or I picked it.  I don't recall.

12         MR. CARTER:  Let's move on to the document at

13    Tab 24R.

14                   (WHEREUPON, a certain document was

15                    marked Fawzi Al-Hobayb Deposition

16                    Exhibit No. 5, for identification, as

17                    of 02/09/2024.)

18    BY MR. CARTER:

19         Q.    Mr. Hobayb, this is another document cited

20    in your report.  And, again, there's no ARB numerical

21    designation on this.

22              Was this an --

23         A.    I --

24         Q.    Is this an --

This Transcript Contains Confidential Material

```
 1        A.      If I understand --

 2        Q.      If you'll look at the Arabic, the Arabic

 3   is a few pages in.

 4        A.      Yeah.

 5        Q.      This is an internal Al Rajhi Bank

 6   document, correct?

 7        A.      Yes, sir.

 8        Q.      And so this was provided to you for

 9   purposes of your expert report?

10        A.      I reviewed this.  I reviewed this, yeah.

11   I reviewed this.  It was provided, yes.

12        Q.      Do you recall whether you -- whether you

13   asked for this?

14        A.      I don't -- don't really recall.  I don't

15   really recall.

16        Q.      But this document was in some way made

17   available to you for purposes of your expert report?

18        A.      Whether I have asked for it or whether it

19   was provided, I don't really recall, but it's very

20   important document for me to base my opinion on.

21        Q.      So to the extent that there were really

22   important documents relevant to your opinions, there

23   was a -- a means for you to obtain those from Al Rajhi

24   Bank, correct?
```

This Transcript Contains Confidential Material

```
1        A.      Not from Al Rajhi.  Al Rajhi was not in

2    the picture.  So you -- when you talk about Al Rajhi,

3    you mean Al Rajhi and his counsels or...?

4        Q.      I do.

5        A.      Or Al Rajhi by him -- by themselves, bank?

6        Q.      No.  I mean Al Rajhi includes their

7    counsel for purposes of my question.

8        MR. CURRAN:  Well, objection as to form.

9             You may answer.

10   BY THE WITNESS:

11       A.      Yeah.  Yeah, it was provided.  Whether it

12   was provided or I asked for it, because that was

13   committee.  When you go to the internal audits, when

14   you talk about internal audits, also you are --

15   you're -- it's very important for me to form an -- an

16   opinion and the allegations by either Kohlmann or

17   Winer, I forgot, that the internal audit was not

18   functioning, or it was like an eagle or like a ghost

19   or something.  I need to see whether, to certain

20   extent, for me to either confirm or confirm otherwise.

21   So having an annual audit plan is -- is an essential

22   part in -- of the internal auditor system.

23       MR. CARTER:  And if we can just pull up and mark

24   as the next exhibit the document at 25R.
```

```
 1                    (WHEREUPON, a certain document was

 2                    marked Fawzi Al-Hobayb Deposition

 3                    Exhibit No. 6, for identification, as

 4                    of 02/09/2024.)

 5    BY MR. CARTER:

 6         Q.    Mr. Hobayb, this is another audit plan

 7    that also does not have any ARB numerical designation

 8    legend at the bottom.

 9                    Do you recall that you cited this document

10    in your report as well?

11         A.    Can I see the Arabic, please?

12         Q.    Sure.

13         A.    Yeah, I think I saw this, yes.

14         Q.    Okay.

15         A.    And I think I refer to it in my report

16    also.

17         Q.    And, again, do you recall whether this is

18    a document you requested for purposes of your report?

19         A.    If it was not provided -- I mean, if it

20    was not provided, I would have asked for it.  So I

21    don't really recall, I mean.  The result is the same.

22    If it was not provided, I would have asked for it at

23    that time before forming my opinion.

24         Q.    Mr. Hobayb, were there any documents that
```

This Transcript Contains Confidential Material

 1    you asked for that were not provided?

 2        MR. CURRAN:  Objection as to form.

 3            You may answer.

 4    BY THE WITNESS:

 5        A.    I don't -- I don't -- I don't recall.  I

 6    mean, I don't recall any document that I asked for and

 7    it was not provided, no.

 8    BY MR. CARTER:

 9        Q.    Turning for a moment to -- back to your

10    report and in particular your curriculum vitae under

11    Appendix II.

12        A.    Yes, sir.

13        Q.    And given that it's only been a short time

14    since you produced your report, I assume that this

15    curriculum vitae is essentially up-to-date?

16        MR. CURRAN:  Objection as to form.

17            You may answer.

18    BY THE WITNESS:

19        A.    Yes.  Yes, up-to-date, yes.  I think so, I

20    mean, up-to-date.  Nothing major after the -- after

21    the -- submitting the CV that -- of material to be

22    changed.

23    BY MR. CARTER:

24        Q.    Mr. Hobayb, I understand from your CV that

This Transcript Contains Confidential Material

```
 1   you spent about almost a decade at Arab National Bank

 2   as the head of the internal audit division, is that

 3   correct?

 4         A.     Yes, nine -- nine years, nine and

 5   something years, yes.

 6         Q.     And you have a degree in accounting from

 7   King Abdul Aziz University?

 8         A.     Yes, sir.

 9         Q.     You passed the certified public accountant

10   exam in the US in 1993?

11         A.     Yes, sir.

12         Q.     You thereafter participated in an advanced

13   management program for overseas banks at Wharton in

14   the University of Pennsylvania in 1997?

15         A.     Yes, sir.

16         Q.     What -- what type of degree did you

17   receive from Wharton?

18         A.     It was like a training.  Maybe they

19   gave -- you know, at the end of the training -- I

20   don't really recall, but, you know, at the end of the

21   training, some -- some provide like a certificate that

22   you attended or something like this, but in this in

23   particular, I don't really recall.  Maybe I need to go

24   back to my papers or something.  I don't really
```

This Transcript Contains Confidential Material

1    recall.

2        Q.    And how long was the program at the

3    University of Pennsylvania?

4        A.    A number of weeks.  It was very condensed.

5    A number -- it's like -- I don't really recall

6    exactly, but, like, four to six weeks, four to five

7    weeks, some -- I don't recall, but in that range.

8        Q.    After leaving Arab National Bank, your

9    curriculum vitae indicates you went to work at the

10   Capital Market Authority in Riyadh, correct?

11       A.    Yes, I -- I joined the Capital Market

12   Authority in 2004.

13       Q.    Is the Capital Market Authority a

14   component of the -- of the Saudi government?

15       A.    It is what?  It is what?  Sorry.

16       Q.    Is it part of the government?

17       A.    Yes, sir.

18       Q.    And you were there in -- in some -- in

19   different capacities from 2004 to 2015?

20       A.    I was -- as -- as -- I don't really get

21   your question.  I mean, I spent it from 2004 to 2013

22   as director of the enforcement division, and during

23   that year I moved to the -- to head the internal audit

24   division within the CMA.  So in total, it's from 2004

This Transcript Contains Confidential Material

1    until end of 2015.

2        Q.    Your CV indicates that you currently serve

3    on a number of committees, correct?

4        A.    Yes, sir.

5        Q.    Aside from your committee membership, are

6    you employed currently in any other capacity?

7        A.    No, sir.  Except for the -- I mean, my

8    assignment in this report as an expert.

9        Q.    Do you do any other consulting work

10   currently?

11       A.    No, sir.

12       Q.    During the time that you were the head of

13   the internal audit division at Arab National Bank, do

14   you know whether Arab National Bank held accounts for

15   the Saudi committee for support of the Intifada al

16   Quds?

17       MR. CURRAN:  Objection as to form.

18            You may answer.

19   BY THE WITNESS:

20       A.    I don't re -- it -- what's -- what's --

21   the name of that account?

22   BY MR. CARTER:

23       Q.    The English would be Saudi Committee for

24   Support of the Intifada al Quds, and I'm going to do a

This Transcript Contains Confidential Material

```
 1    poor job with the Arabic, but I think it would be

 2    Allajnat Alsueudiat Lidaem Intifada al Quds?

 3         MR. CURRAN:  Objection as to form.

 4              You may answer.

 5    BY THE WITNESS:

 6         A.    I don't recall.

 7    BY MR. CARTER:

 8         Q.    You don't recall there being any inquiry

 9    concerning payments originating at Arab National Bank

10    from an account for the Saudi Committee Support -- for

11    Support of the Intifada al Quds --

12         A.    No, I don't.

13         Q.    -- and Martyrs?

14         MR. CURRAN:  Are you done with that question?

15         MR. CARTER:  Yeah.

16         MR. CURRAN:  Objection as to form.

17              You may answer.

18    BY THE WITNESS:

19         A.    No, I don't recall something like that.

20    BY MR. CARTER:

21         Q.    You don't recall any inquiry by the Office

22    of the Comptroller of the Currency in the

23    United States of banks under its jurisdiction that

24    addressed payments originating from Arab National Bank
```

This Transcript Contains Confidential Material

```
 1   from that account?

 2        A.    Can you specific -- or can you indicate in

 3   what date that request may came?

 4        Q.    The Office of the Comptroller of the

 5   Currency inquiry would have been sometime shortly

 6   after April -- well, it would have included the period

 7   through April of 2001.

 8        MR. CURRAN:  Objection as to form.

 9             That's the period of inquiry or that's the

10   period of the request, Mr. Carter?

11        MR. CARTER:  The inquiry was shortly thereafter.

12        MR. CURRAN:  Objection as to form.

13             You may answer.

14   BY THE WITNESS:

15        A.    No, I don't recall.  I tried to help,

16   because if it -- if it's -- if it's post 9/11, it

17   could be part of the names in the list or something,

18   which I don't recall now, but, no, at that time I

19   don't recall, no.

20   BY MR. CARTER:

21        Q.    Turning to -- turning to Page 2 of your

22   report, you included a summary of your opinions, and

23   the first topic addressed under that section is "The

24   Regulatory Landscape."
```

This Transcript Contains Confidential Material

```
 1              Do you see that?

 2      A.     Yes, sir.

 3      Q.     And in -- in that summary section, you

 4   indicate that:

 5              "...Saudi Arabia, even pre-9/11, had

 6   strong regulatory controls and a regulatory regime

 7   that reflected international best practices and

 8   priorities."

 9              Do you see that?

10      A.     Yes, sir.

11      Q.     Do you agree that Al Rajhi Bank was

12   subject to the regulatory controls and regime that

13   you're referring to in that section of your report?

14      A.     Yeah, Al Rajhi Bank is a bank and, like

15   any other bank, is being -- being regulated at the

16   same time from -- from the Central Bank at that time.

17      Q.     Do you believe that Al Rajhi Bank was,

18   therefore, subject to adhering to international best

19   practices?

20   MR. CURRAN:   Objection as to form.

21              You may answer.

22   BY THE WITNESS:

23      A.     We know that all banks in Saudi Arabia are

24   obliged to abide by the regulations issued by the
```

1    Central Bank of Saudi Arabia, which is SAMA, and as

2    discussed -- being discussed in my report, that SAMA

3    is striving to be in line with international best

4    practices and things.  And all banks are, I mean,

5    they're cooperating with SAMA.  SAMA is aggressive,

6    rigorous regulators.

7         MR. CURRAN:  Can you say that word again, what

8    regulator?

9         THE WITNESS:  Like assertive, like strong.  Can

10   you help me with it?  Is it --

11        MR. CURRAN:  Were you saying aggressive?

12        THE WITNESS:  Aggressive.

13        MR. CURRAN:  All right.  Thank you.

14   BY MR. CARTER:

15        Q.    Mr. Hobayb, do I correctly understand your

16   opinion to be that SAMA's regulatory controls and

17   regime incorporated international best practices?

18        MR. CURRAN:  Objection as to form.

19             You may answer.

20   BY THE WITNESS:

21        A.    Yeah, because it -- when I discuss --

22   whenever what -- whatever I discuss, I -- I formed

23   that opinion in a -- in a certain context.  For

24   example, when you talk -- talk about money --

This Transcript Contains Confidential Material

 1    anti-money laundering measures, I talk in that

 2    context.

 3    BY MR. CARTER:

 4        Q.    The -- the regulatory regime established

 5    by SAMA would reflect the minimum that banks in

 6    Saudi Arabia were required to do, correct?

 7        MR. CURRAN:  Objection as to form.

 8            You may answer.

 9    BY THE WITNESS:

10        A.    I cannot -- I mean, if you can't give me

11    examples, I cannot assist, I mean, not general like

12    this.  But banks are required to comply with the

13    regulator and its regulations.  This is...

14    BY MR. CARTER:

15        Q.    Would you agree that Al Rajhi Bank was

16    permitted to do more than the regulations required if

17    it chose to?

18        MR. CURRAN:  Objection as to form, overbroad.

19            You may answer.

20    BY THE WITNESS:

21        A.    I understand your question that, was

22    anybody, which you mean the regulator, has asked

23    Al Rajhi itself in particular as an exception to do

24    more than other banks?

This Transcript Contains Confidential Material

1    BY MR. CARTER:

2        Q.    No.   I'm saying wasn't Al Rajhi free to

3    implement anti-money laundering controls that went

4    beyond the -- the mere requirements of the SAMA

5    regulations?

6        MR. CURRAN:   Same objection.

7            You may answer.

8    BY THE WITNESS:

9        A.    Any bank -- any bank -- I mean, SAMA --

10   even SAMA encourages that if you find new tools to

11   combat anti-money laundering, do it like this, so.

12   And not only Al Rajhi, I mean, any bank.   But the

13   minimum things, they require -- the regu- -- the

14   regulations are -- these are the minimum, but if they

15   want to do extra, fine.

16   BY MR. CARTER:

17       Q.    During this period, were you familiar with

18   Al Rajhi Bank's scope of operations?

19       MR. CURRAN:   Object as to form.

20           You may answer.

21   BY THE WITNESS:

22       A.    It's a bank.

23   BY MR. CARTER:

24       Q.    Were you familiar with how large of a bank

This Transcript Contains Confidential Material

```
 1   it was?

 2        A.    Well, it was a large bank.  It was -- it

 3   was the main -- the large -- the largest retail bank

 4   in The Kingdom and they just may be in the Middle East

 5   maybe.

 6        Q.    Do you know whether during this period Al

 7   Rajhi Bank maintained correspondent relationships with

 8   banks outside of the kingdom?

 9        A.    Which period -- which --

10        MR. CURRAN:  Objection; vague.

11             You may answer.

12   BY THE WITNESS:

13        A.    Which period do you mean?

14   BY MR. CARTER:

15        Q.    Sorry.

16             The period between the beginning of 1998

17   through September 11, 2001.

18        A.    Yeah, same thing.  I saw that he has a

19   correspondent bank with Chase Manhattan, which

20   indicate to me that he has correspondent banking all

21   over the world, not only...

22        Q.    During the time that you were working at

23   Arab National Bank in the same period, 19 --

24        A.    Sorry, could you repeat?
```

This Transcript Contains Confidential Material

```
 1        Q.      When you were working for Arab National

 2   Bank in this same time period, 1998 through

 3   September 11th, 2001, did Arab National Bank have

 4   correspondent banking relationships?

 5        A.      Yes, all banks have correspondent banking

 6   relationships.

 7        Q.      And so you're familiar with the

 8   correspondent banking system?

 9        A.      Yes, adequately.

10        Q.      In -- in a very basic way, can you explain

11   to me what a correspondent bank does?

12        A.      A correspondent bank is a -- okay.  Let me

13   put it this way.  I mean, when you have transactions

14   that is being done -- or to be done abroad, which

15   means money.  For example, for LLCs, when you import

16   goods, when you do like this, so they have -- the

17   seller, let's say, in Germany, and the buyer in

18   Saudi Arabia, okay, so the merchandise comes and the

19   money has to be paid.

20             So who is paying the money?  For example,

21   the bank opens an account at -- at another bank in

22   Germany or in the US to maintain an account with the

23   balance or with the current facility, and that --

24   instruct that bank to -- to pay to the -- to the
```

This Transcript Contains Confidential Material

1    seller.

2          This is the same thing for any other

3    transactions, including transfer and things like this.

4    And -- and they're -- and they're being -- being

5    called -- if -- if in Arab National Bank, our -- our

6    account at, for example, Chase Manhattan, we call

7    Nostro account.  Chase Manhattan account at Arab

8    National Bank, we call it Vostro account, just to

9    distinguish between the two.

10          So if the Nost -- the correspondent

11    bankings -- banks and accounts, they're being used for

12    banking needs -- for banking needs and transactions

13    since -- since long time, I mean, and the SWIFT is --

14    is a very fast mean for the instructions that you say,

15    pay this, pay that.

16      Q.    Given the way that that system works,

17    if -- if a bank in one jurisdiction is allowing its

18    customers to launder money at its bank, the

19    correspondent banking system can then allow illicit

20    funds to travel across border, is that true?

21      MR. CURRAN:  Objection as to form.

22          You may answer.

23    BY THE WITNESS:

24      A.    I don't know.  Can you give me an example,

This Transcript Contains Confidential Material

1    please?  I don't understand.

2    BY MR. CARTER:

3        Q.    Well, if a bank in one jurisdiction is

4    allowing a drug --

5        A.    Let's say a bank in Riyadh, Arab National

6    Bank, okay.

7        Q.    Let's just say they're allowing a customer

8    to launder drug proceeds through their bank.

9        A.    I mean, all banks, they have to have

10   anti-money laundering measures to combat the drugs

11   and -- and things like this.

12       Q.    And so the correspondent bank is relying

13   upon the bank with the customer relationship to carry

14   out those money laundering protocols correctly, right?

15       MR. CURRAN:  Objection as to form.

16            You may answer.

17   BY THE WITNESS:

18       A.    What transaction you are talking?  Are you

19   talking transfers or you are talking, what?

20   BY MR. CARTER:

21       Q.    I'm talking about -- a transfer is a -- is

22   a fine example.  The correspondent bank that is

23   carrying out the transfer for the originating bank is

24   relying upon that originating bank to conduct the due

 1    diligence and anti-money laundering with regard to its

 2    customer's account.

 3         MR. CURRAN:  Objection as to form, overbroad.

 4              You may answer.

 5    BY THE WITNESS:

 6         A.    I don't know about other jurisdictions,

 7    but should I assume that the transfer is from a Saudi

 8    bank to international bank?  Is this what you're

 9    referring?

10    BY MR. CARTER:

11         Q.    Sure.

12         A.    Well, I guess -- I guess both -- both

13    banks have to do their due diligence.

14         Q.    Well, does the correspondent bank have

15    access to the information to do all of the Know Your

16    Customer inquiry with regard to the customer at the

17    Saudi bank where the transaction is originating?

18         MR. CURRAN:  Objection; overbroad.

19              You may answer.

20    BY THE WITNESS:

21         A.    I cannot speculate, cannot speculate, but

22    I hear at that time that -- I don't know if it was the

23    regulator, or was it, like, the Federal Reserve or

24    something, or a long time ago that when -- when a

This Transcript Contains Confidential Material

```
 1    transfer done with certain threshold, they have to

 2    have -- they don't pass it until they have minimum

 3    information about things.

 4              So this what made me feel -- or, I mean,

 5    my opinion that whenever it is the circumstances,

 6    both -- both parties, they -- they must do their --

 7    their job.  I mean, they have to do the -- the best

 8    that they can.

 9    BY MR. CARTER:

10        Q.    In -- in -- in your experience during the

11    '98 through 2001 time period at Arab National Bank,

12    when Arab National Bank was establishing a

13    correspondent relationship, did that correspondent

14    bank seek assurances that Arab National Bank had

15    effective anti-money laundering protocols in place?

16        MR. CURRAN:  Object as to form.

17              You may answer.

18    BY THE WITNESS:

19        A.    I don't really recall because this was not

20    my department.  I don't recall whatever we have done

21    in the department, but they -- I cannot speculate.

22    BY MR. CARTER:

23        Q.    On Page 3 of your report, you include a

24    statement that Saudi banks cannot operate within a
```

This Transcript Contains Confidential Material

 1    weak or nonexistent regulatory system and that they

 2    were routinely audited.

 3           Do you see that?

 4       MR. CURRAN:  Where is that, Mr. Carter, on the

 5    document?

 6       MR. CARTER:  It's on Page 3.  Give me one

 7    second.

 8       MR. CURRAN:  Okay.  It looks like it might be on

 9    the screen now.

10       MR. CARTER:  Yeah, sorry.

11    BY THE WITNESS:

12       A.    Yes, sir, I can see it.

13    BY MR. CARTER:

14       Q.    Okay.  And during the -- the period you're

15    discussing in this section of the report, you were

16    working within that Saudi banking system yourself,

17    right?

18       A.    During that period?  Yes, I was.  I was at

19    Arab National Bank.

20       Q.    And subsequent to your period at -- in

21    Arab National Bank, you went to work within a

22    component of the government within the Saudi banking

23    regulatory structure, correct?

24       A.    What's that?

This Transcript Contains Confidential Material

```
1        Q.    You went to work for the -- the Capital

2   Market Authority, which was part of the government,

3   right?

4        A.    SAMA is part of the government and Capital

5   Market Authority is also part of the government, and

6   many other authorities are part of the government.

7              What's the question about?

8        Q.    So -- so you -- you were part of this

9   system essentially from 1993 through 2015, right?

10   MR. CURRAN:  Objection as to form.

11             You may answer.

12   BY THE WITNESS:

13       A.    Yeah, in -- in the enforcement division in

14   the Capital Market Authority, yes.  It's the same

15   because the regulations and the capital market law and

16   it's associated -- the regulations associated --

17   derived from the law, so my work, my scope of work was

18   mainly focusing on the capital market law, and...

19   BY MR. CARTER:

20       Q.    And on Page 4, you cite as evidence of the

21   adequacy of the regulatory system at the time the 1995

22   guidelines issued by SAMA for the Prevention and

23   Control of Money Laundering Activities, correct?

24       A.    Yes, one of them, yes.
```

This Transcript Contains Confidential Material

```
 1        Q.      Would you agree with me that guidelines of

 2    that nature suffice only if they are properly

 3    implemented?

 4        MR. CURRAN:  Sorry, what was your last word,

 5    Mr. Carter?

 6        MR. CARTER:  "Implemented."

 7    BY THE WITNESS:

 8        A.      Can you repeat the question?

 9    BY MR. CARTER:

10        Q.      The guidelines, like the 1995 guidelines

11    issued by SAMA, are effective only if people follow

12    them and they're enforced, right?

13        MR. CURRAN:  Objection as to form.

14              You may answer.

15    BY THE WITNESS:

16        A.      Well, it depends on circumstances.  I

17    mean, if it's something major, I would agree, but if

18    it's something minor, it doesn't change the -- the

19    substance.

20        MR. CARTER:  If we can, just look briefly at the

21    document at Tab 24.

22                        (WHEREUPON, a certain document was

23                        marked Fawzi Al-Hobayb Deposition

24                        Exhibit No. 7, for identification, as
```

This Transcript Contains Confidential Material

```
 1                    of 02/09/2024.)

 2          MR. CURRAN:  The witness has the first page in

 3    front of him.

 4          MR. CARTER:  And, unfortunately, if you'll just

 5    give me a second, it seems to be a -- actually

 6    misfiled by me.

 7                If we can just go to Page 116 of that

 8    document.

 9    BY MR. CARTER:

10          Q.    Let me ask first, Mr. Hobayb, are you

11    familiar with the document we've marked, it's the -- a

12    Staff Monograph on Terrorist Financing that was

13    prepared by 9/11 Commission staff members?

14          A.    Yeah, I think I came across some part of

15    this document during my review, and -- and I think --

16    I think I have indicated somewhere in my report, if

17    you can help me with, to -- to some -- to the

18    Monograph of Terrorist Financing, something like that,

19    yeah.

20          Q.    I understand from your report that in the

21    period after the September 11th attacks, you were part

22    of a self-supervisory committee established among

23    Saudi banks in response to the terrorist attacks?

24          A.    Yes, sir.
```

This Transcript Contains Confidential Material

1    Q.    In connection with that role, did you have

2    any direct dealings with US officials relating to

3    terrorist financing issues in the wake of the

4    September 11th attacks?

5    A.    No, sir.

6    Q.    Did you have any dealings with US

7    officials concerning terrorist financing issues in

8    your work for the Saudi government after you left Arab

9    National Bank?

10    A.    For which government?

11    Q.    The Saudi government.

12    A.    I do not work for the Saudi government

13    except for the Capital Market Authority.

14    Q.    I'm sorry.  I thought you had said that

15    the Capital Market Authority was part of the Saudi

16    government?

17    A.    Yes, it is -- it was.  Yes, it is.  It was

18    and it is.

19    Q.    So in your role at the Capital Market

20    Authority, did you have any dealings with US officials

21    on counterterrorism financing issues?

22    A.    No, for that, no.

23    Q.    Turning back to the document, and first

24    we'll go to Page 115, and just to highlight this, this

This Transcript Contains Confidential Material

```
 1    is a section of the report addressing circumstances

 2    before 9/11.

 3              Do you see that?

 4    A.      Yes, I can see that.

 5    Q.      And then turning to Page 116, there is a

 6    statement at the top of the page indicating that:

 7              "The Saudis took little initiative with

 8    respect to their charities.  They did not make tough

 9    decisions or undertake difficult investigations of

10    Saudi institutions to ensure that they were not being

11    used by terrorists and their supporters.  Although the

12    Saudis did institute 'Guidelines for Preventing Money

13    Laundering' in 1995 and 'Regulations on Charitable

14    Organizations and Institutions' in 1990, these were

15    very loose rules whose enforcement was doubtful."

16              Do you see that?

17    A.      I can see that.

18    Q.      Were you aware that 9/11 Commission staff

19    had reached an assessment that the Guidelines for

20    Preventing Money Laundering were very loose rules

21    whose enforcement was doubtful?

22    MR. CURRAN:  Objection as to form.

23              You may answer.

24    BY THE WITNESS:
```

This Transcript Contains Confidential Material

```
1      A.    I -- I really cannot -- I cannot comment

2   on it.  I mean, I don't know what -- you know, what --

3   what basis they -- what -- what work they did for --

4   for -- to reach that conclusion and on what basis.  I

5   really cannot comment.  I comment on my -- on my

6   opinions own.

7   BY MR. CARTER:

8      Q.    But were you aware that the US Government

9   was engaged in significant dialogue with the Saudi

10  government after 9/11 about terrorism financing

11  issues?

12     A.    Yes, I am.  Yes, everybody knows that.

13     Q.    And do you know whether that dialogue

14  included discussions about the sufficiency of

15  Saudi Arabia's regulatory oversight of money

16  laundering practices at Saudi banks?

17     A.    I don't recall.  It's been a long time

18  now.  It's been 20 years.  I mean, I don't remember

19  details on things.  I remember that there was

20  dialogue, and we -- we create the -- the SSC, the

21  Self-Supervisory Committee, was created surely because

22  of the dialogue -- the dialogue between the Saudi and

23  the American and US government to combat terrorists

24  and to identify persons, suspected persons.
```

This Transcript Contains Confidential Material

1    So there was that, but to what extent the

2    dialogue was, I didn't really know.

3        Q.    Do you recall whether in the -- in the

4    period after 9/11, say, through 2004 SAMA implemented

5    additional training programs for Saudi banks on money

6    laundering issues?

7        A.    Well, I left -- I left banking in

8    September of 2002, so I -- and during that period, I

9    don't recall what -- what happened, but after 2002 I

10   don't really -- I'm not part of the system.  I cannot

11   confirm either/or.

12       Q.    Do you disagree with this assessment that

13   the Guidelines for Preventing Money Laundering that

14   issued in 1995 were very loose rules whose enforcement

15   was doubtful?

16       A.    Money laundering, if -- what do they mean

17   by "money laundering"?  If they mean the -- the -- for

18   combating terrorist act -- terrorist activities, then

19   I -- that money laundering before, pre-9/11, was --

20   was meant for the source of funds, which mainly the --

21   the drugs.

22       So if they mean that -- I don't know if

23   they mean, what's the meaning of the yellow

24   highlighted portion here of the -- if they mean it was

This Transcript Contains Confidential Material

```
 1    not for terrorist -- for terrorist attack, I mean,

 2    every -- I mean, no -- even FATF itself did not cover

 3    the terrorism financing pre-9/11.

 4         Q.    Mr. Hobayb, I believe we -- we just

 5    discussed that your report cites the 1995 guidelines

 6    issued by SAMA as evidence of the adequacy of the

 7    Saudi anti-money laundering regime in the period

 8    before 9 -- September 11, 2001, correct?

 9         A.    Come again, please, because I wasn't

10    looking at the paragraph.

11         Q.    I think -- I think we just discussed, and

12    that you agreed, that your report on Page 4 cites the

13    SAMA Guidelines for Preventing Money Laundering that

14    issued in 1995 as evidence of the sufficiency of the

15    Saudi anti-money laundering regime in the period

16    before the September 11 attacks, correct?

17         A.    Yes, sir.

18         Q.    This document is referring -- this

19    assessment of the 9/11 Commission Staff Monograph is

20    referring specifically to the Guidelines for

21    Preventing Money Laundering that issued in 1995.

22    That's the same document that you reference in your

23    report, is it not?

24         A.    I -- I can assume that.
```

This Transcript Contains Confidential Material

```
 1          Q.     Okay.  And do you disagree with the 9/11

 2    Commission staff's assessment that the 1995 Guidelines

 3    for Preventing Money Laundering that you cite in your

 4    report were very loose rules whose enforcement was

 5    doubtful?

 6          MR. CURRAN:  Objection as to form.

 7               You may answer.

 8    BY THE WITNESS:

 9          A.     I really cannot comment.  I really can't,

10    because I don't know in what basis, what's the context

11    that they mean.  It is only five lines here.  I mean,

12    I -- I cannot comment.

13    BY MR. CARTER:

14          Q.     On Page 5 of your report, you discuss a

15    range of tools that were available to SAMA prior to

16    9/11 to exercise its regulatory authority, correct?

17          A.     Yes, sir.

18          Q.     And you indicate that those included

19    "self-reporting."  Do I understand that to mean

20    self-reporting by the banks to SAMA?

21          A.     Yes, included self-reporting, yeah, yes.

22          Q.     Then you refer to "document collection."

23    Do you mean collection of documents by SAMA from banks

24    in The Kingdom?
```

This Transcript Contains Confidential Material

```
 1        A.    By SAMA from the banks, yes.

 2        Q.    "Special inspections into topics under

 3  SAMA's authorities," are you referring to SAMA's

 4  authority to conduct special inspections of banks in

 5  The Kingdom into topics within SAMA's scope of

 6  authority?

 7        A.    Yes, sir.

 8        Q.    You refer next to "full-fledged

 9  inspections."  I understand that to mean full-fledged

10  inspections by SAMA of Saudi banks?

11        A.    Yes, sir.

12        Q.    And then you refer to inspections of

13  individual -- "individuals or accounts, the purpose of

14  which were not disclosed to the bank."

15              Do I understand that SAMA had the ability

16  to demand an inspection of an individual customer or

17  account at a bank without telling the bank why it was

18  doing that?

19        A.    Yes, sir.

20        Q.    And then you referred to the fact that

21  SAMA had the ability to conduct surprise inspections,

22  right?

23        A.    Yes, sir.

24        Q.    And then it also had discretion, you say,
```

This Transcript Contains Confidential Material

```
 1    to conduct full-fledged examinations, correct?

 2         A.    Yes, sir.

 3         Q.    And you say:

 4               "To my knowledge and based on my

 5    experience, all Saudi banks have been subject to all

 6    the aforementioned tools, including a full-fledged

 7    examination by SAMA, at some point."

 8               Correct?

 9         A.    Correct, sir.

10         Q.    Did you review any documents reflecting

11    that those things actually happened with regard to

12    Al Rajhi Bank in the period before 9/11?

13         MR. CURRAN:  Objection as to form.

14               You may answer.

15    BY THE WITNESS:

16         A.    I did not -- I did not even thought that I

17    would ask for them, because they are -- they are

18    facts.  They are facts.  All banks -- I was in the

19    bank for more than nine years, and all banks were

20    subject to -- somehow or another to one or more or all

21    of these -- of these measures.

22    BY MR. CARTER:

23         Q.    It is -- it is your opinion, as I

24    understand it, that these -- the implementation of
```

This Transcript Contains Confidential Material

 1    these measures is evidence that Al Rajhi Bank was

 2    complying with its money laundering obligations,

 3    correct?

 4         A.    Many --

 5         MR. CURRAN:  Objection as to form.

 6              You may answer.

 7    BY THE WITNESS:

 8         A.    Many, many tools -- many tools, even

 9    internal system of the bank also is one of the tools

10    to make sure that Al Rajhi was complying, up to the

11    shareholders and the general assembly.  So all -- many

12    tools, external and internal tools.

13    BY MR. CARTER:

14         Q.    But did you ask -- did you ask your

15    client, Al Rajhi Bank, to provide you with copies of

16    documents showing that any of these things actually

17    happened so that you would have an assurance and

18    additional basis for your opinions?

19         MR. CURRAN:  Objection as to form.

20              You may answer.

21    BY THE WITNESS:

22         A.    I did not -- I did not think that was

23    necessary because my experience in the field for many

24    years is a -- no, I didn't see them necessary because

This Transcript Contains Confidential Material

1    I'm sure that it was.

2    BY MR. CARTER:

3        Q.    Well, the purpose of the inspections,

4    among other things, would be to identify problems at a

5    Saudi bank, correct?

6        A.    To make sure that they're complying or

7    whatever the objective of the exercise.  It depends.

8        Q.    And so the -- the process implemented by

9    SAMA would potentially identify failures in compliance

10   and problems at the bank, right?

11       A.    It depends on the circumstances.  It

12   depends on the object -- the goal of the -- of the

13   visits or the action by SAMA.  Maybe just -- they just

14   want conformation, so it's not about -- confirmation

15   about some -- some bank accounts.  I don't know.  I

16   mean, it depends on the objective of the visit or of

17   the action.  If it's compliance, then it's a

18   compliance.  If it's for other purposes, then it's for

19   other purposes.

20             So they do -- do many, many -- like, for

21   the collection of the -- the self-reporting, I mean,

22   the banks are -- are required to submit their

23   financial statements, something like that, on a

24   monthly basis to SAMA, to the Central Bank,

This Transcript Contains Confidential Material

```
 1      Q.    Well --

 2      A.    That -- that's not -- yeah, that's not --

 3      Q.    -- the -- the submitting of financial

 4   statements to SAMA would not yield any information

 5   about whether or not the bank is complying with Know

 6   Your Customer or money laundering obligations, would

 7   it?

 8      MR. CURRAN:  Objection as to form.

 9           You may answer.

10   BY THE WITNESS:

11      A.    I gave you an example of -- of other

12   things because you are -- as you are say -- as you

13   under -- you understand that all of these actions,

14   only for one purpose which is compliance.  Many of

15   them for compliance, of course.

16           But I just want to explain to you -- to

17   you that -- and even the self -- even the financial

18   statements for -- for a compliance and somehow, like

19   their liquidity, like their concentrations,

20   like what -- I mean, SAMA is the Central Bank.

21   Central Bank is -- have wide oversight, scope on

22   financial system.

23   BY MR. CARTER:

24      Q.    You would agree that the Winer report that
```

This Transcript Contains Confidential Material

```
 1    you are responding to is focused significantly on the

 2    adequacy of Al Rajhi Bank's Know Your Customer and

 3    anti-money laundering practices with regard to

 4    particular accounts and customers that are at issue in

 5    this litigation, correct?

 6         A.    Well, Winer -- Winer's report is very

 7    lengthy and talking about many things.  I just -- I

 8    tried to identify the things that -- of my specialty

 9    of my expertise, including what you have just

10    mentioned, and they -- and this is my report.  I

11    included whatever in my report, and this is my report.

12         Q.    But Mr. -- Mr. Winer's report doesn't

13    address the adequacy of Al Rajhi Bank's liquidity in

14    the period of -- before September 11, does it?

15         MR. CURRAN:  Objection as to form.

16              You may answer.

17    BY THE WITNESS:

18         A.    Through the -- the -- my reading, I didn't

19    come across that, no.

20    BY MR. CARTER:

21         Q.    So focusing specifically on anti-money

22    laundering and Know Your Customer practices at

23    Al Rajhi Bank, did you require --

24         A.    Sorry?
```

This Transcript Contains Confidential Material

```
 1        Q.     Focusing specifically on anti-money

 2   laundering and Know Your Customer protocols at

 3   Al Rajhi Bank during the period from 1998 through

 4   2001, did you request information from the bank

 5   concerning any exercise of the tools you've identified

 6   that -- that concerned money laundering and Know Your

 7   Customer specifically?

 8        MR. CURRAN:  Objection as to form, asked and

 9   answered.

10             You may answer.

11   BY THE WITNESS:

12        A.     See, this report -- my scope in this

13   report was -- is to report what Kohlmann and Winer --

14   and Winer's report, okay.  So this is the starting

15   point, okay.

16             I did not ask for that because I did not

17   see them necessary, knowing from my experience that

18   the anti-money laundering pre-9/11 was focusing only

19   on source of funds and mainly activities associated

20   with drugs.  I'm here to assess through my

21   experience -- and also, again, my scope is not a

22   forensic job to just go endless in digging all -- all

23   day, but I see the fundamentals, whether they exist

24   and functioning as -- as designed.
```

This Transcript Contains Confidential Material

```
 1              So this is my -- there has to be a --
 2    there has to -- you have to reach a conclusion at a
 3    certain point of time.  That's why my -- in my
 4    experience, I found what they have mentioned in some
 5    parts of my report about the corporate governance of
 6    the -- of Al Rajhi, through what I saw from the
 7    documents that are -- that is appropriate.
 8    BY MR. CARTER:
 9         Q.    Mr. Hobayb, the full-fledged examination
10    by SAMA that you referenced in this section of your
11    report, is that a -- a significant undertaking?
12         A.    Yes.  It's a -- it's a huge -- huge scope.
13         Q.    And is -- does it typically result in the
14    production of some report?
15         A.    Yes.
16         Q.    Is that -- is that report shared with the
17    bank that's the subject of the full-fledged
18    examination?
19         MR. CURRAN:  Objection as to form.
20              You may answer.
21    BY THE WITNESS:
22         A.    I would -- I would presume, though this is
23    right now 20 years ago, more than 20 years ago --
24    BY MR. CARTER:
```

This Transcript Contains Confidential Material

```
 1       Q.     I believe --

 2       A.     But originally, yes, to --

 3       Q.     I believe -- well, 20 years ago you were

 4   at Arab National Bank, right?

 5       A.     In 19 -- 2002 -- what, what are we now?

 6       Q.     More than 20 -- I'm sorry.

 7              In 1998 to 2001, you were at Arab National

 8   Bank, right?

 9       A.     Yeah, 1997 to 2002, at Arab National Bank.

10       Q.     Did SAMA conduct a full-fledged

11   examination of Arab National Bank between --

12       A.     Yes, in 1997.

13       Q.     -- between 1997 and September 11, 2001?

14       A.     Yes, in 1997, I remember.

15       Q.     And did --

16       A.     Sorry, I was with the bank from '93 to

17   2002.

18       Q.     Was -- was there any additional

19   full-fledged examination between 1997 and 2001?

20       MR. CURRAN:   Objection as to form.

21              You may answer.

22   BY THE WITNESS:

23       A.     I don't recall, but I think -- I remember

24   that was a very major one.
```

This Transcript Contains Confidential Material

1    BY MR. CARTER:

2        Q.    Did Arab --

3        A.    At all banks, all banks were subject to

4    the same thing.  This is what I -- from my experience.

5        Q.    Did Arab National Bank receive a copy of

6    the results of SAMA's full-fledged investigation that

7    was conducted in 1997?

8        A.    I don't really recall exactly, but I would

9    presume something.  I mean, things like this, I mean,

10   and other things need to be communicated somehow.

11       Q.    I believe you indicate in your report that

12   Al Rajhi Bank's document retention policy reflects the

13   retention of documents indefinitely, correct?

14       A.    Yeah, I'm quoting the deposition of -- of

15   Galloway and also -- and also seeing the documents

16   now, that they were, like, what, more than -- more

17   than 20 years old, support also this assumption.

18       Q.    And, Mr. Hobayb, doesn't it follow from

19   that, that to the extent there was a full-fledged

20   examination of Al Rajhi Bank between 1998 and 2004,

21   the report of that examination should still be in

22   Al Rajhi Bank's possession?

23       A.    I don't really know if that audit -- that

24   full-fledged audit or examination has ever happened or

This Transcript Contains Confidential Material

 1    not.  I really can't speculate.  I don't know.  I

 2    cannot answer.

 3          Q.    On Page 5 of your report, you reference

 4    the fact that Saudi banks had an audit committee and

 5    two external independent auditors, correct?

 6          A.    Yes, sir.

 7          Q.    And you discussed the involvement of

 8    external auditors in annually evaluating the internal

 9    control systems of the bank, correct?

10          A.    Yeah, it's part of the scope.  When you --

11    when you audit, the external auditors usually when

12    they -- to arrive at an opinion, they have to have a

13    scope.  One of -- part of their scope is to examine

14    the internal control system of a company.

15          Q.    Based on your experience as the head of

16    internal auditing at Arab National Bank, would you

17    agree with me that there are many different types of

18    audits?

19          A.    By the internal auditor, you mean?

20          Q.    Yeah.

21          A.    Yeah, we have different type of audits,

22    yes.

23          Q.    Different -- they can concern different

24    subject matter, correct?

This Transcript Contains Confidential Material

```
 1        A.     I mean, we cover -- in auditing we

 2   cover -- we cover the whole bank in -- with a tenor of

 3   time.  It depends on the risks and things like this,

 4   yeah.

 5        Q.     During -- during your time at Arab

 6   National Bank leading up to September 11th, 2001, was

 7   there a process in place at Arab National Bank to

 8   conduct specific audits concerning anti-money

 9   laundering practices?

10        A.     I cannot discuss -- I mean, you're asking

11   me about -- about my ex-em -- ex-employer, I mean.

12   I'm not -- I'm not -- I'm not confirming nor -- nor

13   denying, but you are asking me about my ex-employer.

14   I cannot -- I don't know whether my ethics allow me to

15   do, to discuss that.

16        Q.     But you didn't -- you didn't work at

17   Al Rajhi Bank during that time period, correct?

18        A.     No, I never worked for Al Rajhi.

19        Q.     And your familiarity with what was

20   happening within the Saudi banking sector during that

21   period is based on your experience at Arab National

22   Bank, right?

23        A.     Yes, sir, and also as an external auditor

24   before.
```

This Transcript Contains Confidential Material

```
 1        Q.    And the reason I'm asking you about Arab

 2   National Bank is because I understand that to be the

 3   foundation of your knowledge about what the practices

 4   were during this time period.

 5        A.    Okay.  You can ask my general question,

 6   but you do not ask me about my bank.  You can just

 7   give an example and I can answer it, but I do not know

 8   my ethical obligations can allow me to -- to answer

 9   either/or.  It doesn't mean that it existed or

10   happened --

11        Q.    Between --

12        A.    -- but I don't know.

13        Q.    Between 1998 and 2003, do you know what

14   specific audits were carried out by the internal

15   auditor at Al Rajhi Bank?

16        A.    Between '98?

17        Q.    1998 and 2003.

18        A.    No, I saw -- I saw the annual plan of, was

19   it 1999 and 2001, two annual audit plans, and it was

20   compre- -- comprehensive, risk-based, and I -- I

21   didn't see any problem in them.

22        Q.    But --

23        A.    Which are the plan to do the -- the -- the

24   internal audit for the subsequent year.  I mean, they
```

This Transcript Contains Confidential Material

1  planned the audit for whatever year that they're going

2  to -- it's not an ad hoc.  I mean, you just wrote --

3  woke in the morning and you say, oh, I will go to that

4  branch.  No, it doesn't happen this way.

5      Q.   So, so the first step in this is -- is to

6  have an actual plan that defines what you're going to

7  do through your internal auditing process, right?

8      MR. CURRAN:  Objection as to form.

9           You may answer.

10 BY THE WITNESS:

11     A.   The plan is to -- is to decide to what you

12 are going to do as internal audit tasks for a year.

13 BY MR. CARTER:

14     Q.   And then someone actually has to take the

15 steps to carry out the plan, correct?

16     A.   Yes, sir.

17     Q.   And in carrying out the steps required by

18 the plan, the internal auditor would have to produce

19 documents reflecting its work, right?

20     A.   Presumably, yes.

21     Q.   Those documents would reflect the scope of

22 the audit, right?

23     A.   I didn't -- I cannot speculate.  It

24 depends from audit report to the -- to the other, I

1    mean, but -- but definitely they contain the findings

2    or the result of the audit.

3        Q.    And they would also contain any

4    limitations that were imposed on the audit?

5        MR. CURRAN:  Objection as to form.

6            You may answer.

7    BY THE WITNESS:

8        A.    Yes, of course.  I mean, if you -- the

9    limitations, they need to be escalated even before or

10   during the audit itself.  Or maybe, I mean, the

11   limitations -- see, the internal and external audit

12   are different in -- in something like this, but, yes,

13   the internal auditor, sure.  I mean, if there is any

14   scope limitation or -- or documents refused to provide

15   it to them, they should escalate it and say, this is

16   scope limitation.

17   BY MR. CARTER:

18       Q.    And to the extent that the internal audit

19   reveals any problems that need to be addressed or

20   should be addressed, that would be reflected in the

21   report, right?

22       A.    Yes.  For example, let's say material

23   weaknesses in the internal control system, material

24   noncompliance, yeah, things like this.  Yeah, it

This Transcript Contains Confidential Material

1  contains lots of things.

2      Q.   So the internal audit reports would

3  contain lots of information that would be relevant in

4  assessing the adequacy of the internal controls and

5  any problems, right?

6      MR. CURRAN:   Objection as to form, overbroad.

7           You may answer.

8  BY THE WITNESS:

9      A.   The -- the internal audit report, minimum

10 contains the results, the results, the findings, what

11 they have -- what -- what did they find, not to be

12 necessarily having many things.  May -- maybe the --

13 the department you want to audit is clean, then you

14 come up with a clean report.

15 BY MR. CARTER:

16     Q.   And maybe it's not?

17     A.   And maybe it's not.  It depends.  I mean,

18 not all -- well, what I mean is, not all internal

19 audit reports have many, many, many findings.  It

20 depends on the results.

21     Q.   Given that the results are reflected in

22 the actual audit documents and not in the plan, did

23 you ask for copies of any internal audits that were

24 conducted at Al Rajhi Bank from 1998 through 2003?

This Transcript Contains Confidential Material

```
 1        MR. CURRAN:  Objection as to form.

 2  BY THE WITNESS:

 3        A.    I did not see them necessary because I --

 4  my job here, my scope is to -- is to assess the -- the

 5  internal control system.  And even though, even if I

 6  ask for -- for the -- for the internal audit reports

 7  of an X branch or an X area, whatever, like this, what

 8  should I find?

 9             If I were to find that this is here

10  noncompliance, please comply, whatever like this, but

11  may be material, may be immaterial, may be lawyers,

12  maybe I ask.  This is the -- the -- what I expect

13  to -- to see, and I did not see that very important.

14             What was important to me are the

15  fundamentals of good, appropriate internal control

16  system, like you have audit committee that this is

17  one; do you have the internal audit is independent

18  from the operations or not, this is important to me;

19  the audit committee, the external audit, the general

20  assembly, these are the fundamentals, more -- much

21  more important than seeing an audit report.  I did

22  not -- I did not even thought that I -- that I need

23  it.  And even if I ask for it, it won't change

24  anything in my report.
```

This Transcript Contains Confidential Material

```
 1        Q.    Okay.  So to the extent there -- there is

 2   an audit report that -- an internal audit report that

 3   reflected material noncompliance at Al Rajhi Bank with

 4   the 1995 SAMA Anti-Money Laundering Guidelines, you

 5   would not review -- view that report as relevant to

 6   your work in this case?

 7        MR. CURRAN:  Objection as to form.

 8             You may answer.

 9   BY THE WITNESS:

10        A.    Which report you are referring to?

11   BY MR. CARTER:

12        Q.    I'm saying, you're saying even -- your

13   testimony a moment ago was that the -- the content of

14   the report, no matter what it found, wouldn't matter

15   to your opinions in this case.  That's my

16   understanding.  Right?

17        A.    Yeah, the audit report.  I mean, they --

18   they conduct their -- they plan the audit, they plan

19   the annual plan, then they execute their plan, and

20   then they audit and then they issue their report.

21   This is the cycle.

22        Q.    And to the extent they're -- they're --

23   one of the internal audits that was -- that was

24   conducted, if, in fact, it was conducted, had found
```

This Transcript Contains Confidential Material

 1    material noncompliance at Al Rajhi Bank with the 1995

 2    SAMA anti-money laundering guidelines, you would not

 3    view such a finding as relevant to your work here?

 4         MR. CURRAN:  Objection as to form.

 5              You may answer.

 6    BY THE WITNESS:

 7         A.    I told you before, I told you before.  I

 8    mean, if you want me to dig for all those reports to

 9    ask, to see whether there was a -- I saw nothing --

10    nothing suspect me that the internal audit is not

11    functioning, the anti-money laundering unit is not

12    functioning.  I want to assess the internal control

13    system.  And my job is to rebut the Winer's and

14    Kohlmann report.

15    BY MR. CARTER:

16         Q.    Did you ask whether --

17         A.    It's not a forensic -- it's not a forensic

18    job.

19         Q.    Did you ask whether there were any

20    internal reports that had identified material

21    noncompliance with anti-money laundering practices?

22         MR. CURRAN:  Objection as to form.

23              You may answer.

24    BY THE WITNESS:

This Transcript Contains Confidential Material

```
 1        A.      I reviewed -- I reviewed many documents

 2   about Al Rajhi, which I referred to in my report, make

 3   me comfortable to judge, to assess the internal

 4   control systems surrounding the anti-money laundering

 5   side, let me call it.  They have their guidelines,

 6   anti-money laundering guidelines.  It's included in

 7   the annual audit plan.  So nothing suspect me.

 8              And they are document -- I mean,

 9   nothing -- nothing suspect me that things are not

10   being done or -- and there was no evidence in the

11   contrary.

12   BY MR. CARTER:

13        Q.      In your experience, are there

14   circumstances in which bank employees fail to follow

15   the bank's anti-money laundering requirements?

16        MR. CURRAN:  Objection as to form, overbroad.

17              You may answer.

18   BY THE WITNESS:

19        A.      Any -- any -- any required policies or

20   procedures, if anybody no -- not -- non-complied with,

21   I mean, but that would be refer -- if it's part of the

22   sample or it's part of his examination, if it's

23   noncompliance, he would raise it, yes, in general, in

24   any bank, in any internal audit, not only...
```

This Transcript Contains Confidential Material

1    BY MR. CARTER:

2        Q.    Did you ask Al Rajhi Bank whether there

3    were any audits conducted in the -- internal audits

4    conducted in the 1998 through 2003 time period

5    concerning anti-money laundering and

6    Know-Your-Customer practices specifically?

7        A.    I assume it was done.  I mean, no need

8    for -- from my experience, I know what to ask, what

9    not to ask.  I mean, I'm not -- really don't know

10   about the subject.  No.  I don't -- I didn't need

11   that.  I don't need -- I cannot assume it was not

12   done.  I mean, that -- meaning that if I didn't see

13   the internal audit reports, it means the audit -- the

14   audit department is -- doesn't exist or is not

15   working.

16            I cannot assume that.  I mean, I assume

17   the norm.  The norm are that everything is

18   functioning.  And all the tools to make sure that

19   everything is functioning, I have seen.  I have seen

20   the external audit, I have seen the audit committee,

21   everything, I mean.

22            And I was in the banking -- I was in the

23   banking sector.  I mean, even from my personal

24   perspective, we meet in conferences, banks, I mean,

This Transcript Contains Confidential Material

1    bank -- banking-related -- related subjects at

2    conferences.  And I've seen bank colleagues from

3    different banks and internal audits, including

4    Al Rajhi.

5        Q.    And in that experience, you've reviewed

6    internal audit reports of banks, right?

7        A.    Did I what?

8        Q.    In that experience that you just

9    described, you've had occasion to review internal

10   audit reports of banks, right?

11       A.    I didn't say that.  Did I see -- I see in

12   my -- during my work at Arab National Bank?

13       Q.    Yeah.

14       A.    That's confidential.  You cannot see other

15   banks' documents.

16       Q.    No, I'm not saying Al Rajhi Bank.  I'm

17   saying that in your experience, have you had occasion

18   to review internal audits that were conducted of a

19   bank?

20       A.    I don't understand your question.  Your

21   question is very broad.  "Of a bank," what do you mean

22   by "a bank"?

23       Q.    When -- when you were at Arab National

24   Bank, did you have occasion to review internal audits

1    that were conducted at the bank?

2         A.    I was head of the internal -- I was the

3    one who was issuing the internal audit reports.

4         Q.    And --

5         A.    I was the one who -- who signed the

6    internal audit reports.

7         Q.    And did you ever review reports that

8    reflected a finding of material noncompliance with

9    regard to a matter within the scope of the audit?

10        MR. CURRAN:   Objection as to the form.

11   BY THE WITNESS:

12        A.    Yeah, okay.   There is -- when you say

13   "material noncompliance," you have to say it in a

14   context, okay.   When we go to an area, and let's say

15   we find many findings of noncompliance, we have to

16   classify them, either low -- in materiality, either

17   low, medium, high, or significant, okay.

18             To that context of that exact department

19   processes and scope, we can classify within that one,

20   based on implications and whatever.   But, if I take

21   this, let's say, material noncompliance for that

22   particular area, I cannot take this out of context,

23   and I will say, well, see, there -- there is a

24   material -- material noncompliance as bank -- in the

This Transcript Contains Confidential Material

```
 1    bank as a whole.

 2              So they're two different -- two different

 3    things here.  Did you get my point?

 4              But, yes, during audits, we issue

 5    material, but material not in that -- in bank-wide

 6    context, no.  Material to that specific process or...

 7        Q.    And the reason you reviewed the -- the

 8    internal audit documents when you were at Arab

 9    National Bank is because the findings actually

10    mattered, right?

11        MR. CURRAN:  Objection as to form, lack of

12    foundation.

13              You may answer.

14    BY THE WITNESS:

15        A.    It's the supervision of the department.  I

16    have staff.  It is not only just for the -- this is

17    one -- or part of them, part of them.  But I assure

18    that the scope is complete, supervision of the whole

19    unit, of everything, including what -- what you said.

20    BY MR. CARTER:

21        Q.    Am I correct that you did not review any

22    audit report concerning Al Rajhi Bank for purposes of

23    your expert report?

24        MR. CURRAN:  Objection as to form.
```

This Transcript Contains Confidential Material

```
 1                    You may answer.

 2    BY THE WITNESS:

 3         A.    I did not see -- I did not see it

 4    necessary to form my opinion.  The documents I -- I

 5    reviewed -- I reviewed were -- were adequate for me to

 6    be confident to issue the opinions I have included in

 7    my report.

 8         MR. CURRAN:  All right.  Mr. Carter, I need a

 9    break.

10         MR. CARTER:  Okay.  How long do you need, Chris?

11         MR. CURRAN:  Just ten.

12         MR. CARTER:  Okay.  Sure.

13         THE VIDEOGRAPHER:  All right.  We are going to

14    go off the record at 4:02 p.m.

15                    (WHEREUPON, a recess was had

16                     from 4:02 to 4:14 p.m.)

17         THE VIDEOGRAPHER:  We are back on the record at

18    4:14 p.m.

19    BY MR. CARTER:

20         Q.    Mr. Hobayb, before we took our break, we

21    had discussed briefly the types of findings that might

22    be included in an audit report, and you had explained

23    to me that there can be varying degrees of

24    noncompliance identified from very low level
```

This Transcript Contains Confidential Material

1    noncompliance to significant, correct?

2         A.    Yes, generally, yes.

3         Q.    And so the only way to know what type of

4    noncompliance may have been discovered in an audit

5    would be through the audit report itself, right?

6         A.    Yes.

7         Q.    And, again, in connection with your work

8    for Al Rajhi Bank in this matter, you did not request

9    that the bank provide you with copies of any audit

10   reports, right?

11        A.    I did not see them necessary because my --

12   my scope is to rebut findings about when they claim

13   that the bank did not have something like that that

14   did not have -- or lose control, whatever the --

15   whatever they have named it.

16              But this, my -- so what's important to me

17   is to see the fundamentals and the -- and the system

18   and the tools in the system that's -- that makes it

19   running.

20        Q.    The -- the Winer report includes

21   discussion of a number of particular account holders

22   and their accounts, including accounts Al Rajhi Bank

23   held for Al-Haramain Islamic Foundation and IIRO,

24   correct?

This Transcript Contains Confidential Material

```
 1        A.    Yes.

 2        Q.    It also includes a discussion of accounts

 3   Al Rajhi Bank held for a charity official, Aqil

 4   al-Aqil, who after 9/11 was designated by the United

 5   States as a terrorist supporter, correct?

 6        MR. CURRAN:  Objection as to form.

 7             You may answer.

 8   BY THE WITNESS:

 9        A.    Yes, Winer discusses Aqil al-Aqil accounts

10   with Al Rajhi.

11   BY MR. CARTER:

12        Q.    He also discussion -- discusses accounts

13   for an individual named Soliman Al-Buthe, correct?

14        A.    I don't really recall exact name -- all of

15   the names out of my head.  If you can refer me to

16   whatever I can.

17        Q.    Did -- did you asked Al Rajhi Bank whether

18   there were any audits that reviewed accounts

19   associated with those particular clients?

20        MR. CURRAN:  Objection as to form.

21             You may answer.

22   BY THE WITNESS:

23        A.    Again, let me just give you an example, I

24   mean, about audit, about, for example, al -- Aqil
```

This Transcript Contains Confidential Material

1   al-Aqil that in the context of related -- relating him

2   to anti-money laundering, if that is where you -- what

3   do you mean by your question, I did not -- I did not

4   see any necessary.

5          Because all of the focus at that time was

6   for the source of money, and the source of money for a

7   person like Aqil al-Aqil -- Aqil al-Aqil who was head

8   of -- executive of -- of Al-Haramain charity, he -- at

9   that time he was highly regarded in the society.

10         So, relate -- relating him to, like,

11  drugs, because it was the concept at that time

12  pre-9/11, globally, I guess, even FATF mentioned it

13  expressly that it's about drugs and things like that.

14  And so I wouldn't expect that any -- that you suspect

15  that the source of the money for coming -- because,

16  again, the anti-money laundering at that time,

17  pre-9/11, was focusing on the source of the money.

18  BY MR. CARTER:

19     Q.    Putting -- putting all of that aside,

20  Mr. Hobayb, I think you testified earlier that SAMA

21  had the capacity to conduct investigations of

22  particular accounts or account holders, right?

23     A.    Yes, sir.

24     Q.    And that can happen for any number of

This Transcript Contains Confidential Material

1    reasons, right?

2        A.    Yeah.

3        Q.    And the bank itself could decide to

4    conduct an inquiry as to one of its account holders or

5    accounts, correct?

6        A.    Maybe.  The bank can do -- they have

7    their -- their -- they have their records.  I mean,

8    they can do anything.

9        Q.    Did you ask whether or not there was any

10   audit or inquiry conducted between 1998 and

11   September 11, 2001, of any accounts associated with

12   Al-Haramain?

13       A.    I did not see it.  I did not see it

14   necessary to -- to ask for it because there is no

15   evidence that the bank knew that al-Aqil, or any other

16   person, many of the persons it mentioned in the -- the

17   subject here that were associated with drugs for them

18   to suspect that they would go and -- and undertake

19   inquiries or a study of any certain bank account.

20             But, again, any bank, any bank, they have

21   their records, and they can just review whatever they

22   want for whatever reason, even business reason.

23       Q.    And so you also did not ask whether or not

24   there had been any audit or inquiry conducted as to

This Transcript Contains Confidential Material

1    the IIRO or any of its accounts between 1998 and

2    September 11, 2001, correct?

3        A.    I wouldn't assume that there was -- I

4    mean, I cannot -- I mean, how the bank -- a bank,

5    even, for example, when you ask about any other bank,

6    I mean, it was not in the radar that charities at that

7    time -- by the way, charities at that time, pre-9/11,

8    the classification, in my opinion, in my strong

9    opinion, it was low risk because it's taking money

10   from donors and giving it to the poor people.

11       Q.    Mr. Hobayb, you've given me a number of

12   long answers.  I'm just trying to establish whether or

13   not you asked your client, Al Rajhi Bank --

14       A.    I give you --

15       Q.    -- whether -- whether there was any audit

16   or inquiry conducted as to the -- the charities that

17   were the subject of discovery, Al-Haramain and IIRO,

18   between 1998 and 2000 -- September 11, 2001.

19            Did you -- did you ask whether that

20   happened?

21       A.    I --

22   MR. CURRAN:  No.  Hold on, hold on.

23            Objection.

24            Mr. Carter, you definitely interrupted the

This Transcript Contains Confidential Material

```
 1   witness in his prior answer.  He didn't get to

 2   complete it, notwithstanding his oath earlier that

 3   he'd tell the whole truth, and your frequent

 4   admonitions to witnesses to -- as to their obligation

 5   to tell the full accounting of facts, so I object to

 6   that interruption.

 7            You can answer.

 8       MR. CARTER:  Okay.  Let me give a new

 9   instruction, Mr. Curran.

10   BY MR. CARTER:

11       Q.    Mr. Hobayb, when I -- when I ask you a

12   question, I would like you to answer that question in

13   the first instance, and if you feel that there's

14   elaboration, go ahead and give that elaboration after

15   you've answered my question.

16       MR. CURRAN:  Okay.  I object to that purported

17   instruction.

18            Come on, Mr. Carter, you know you're not

19   in a position to give instructions to the witness.  If

20   you've a got a question, ask it.

21       MR. CARTER:  I have asked it, Chris, and he --

22   BY MR. CARTER:

23       Q.    The question is:  Did you in connection

24   with your work for Al Rajhi Bank in this matter ask
```

This Transcript Contains Confidential Material

 1    whether or not any inquiry or audit was conducted as

 2    to the IIRO or its accounts between 1998 and

 3    September 11, 2001?

 4         A.    My answer is, I did not see it necessary

 5    for me to ask for that thing, especially that it was

 6    not claimed that any instructions came to the bank.

 7    If it was alleged and there was evidence, enough

 8    evidence that the bank was asked to, whatever you call

 9    it, examine or scrutinize or whatever, any account and

10    they did not comply, then that's -- that's a different

11    scope.

12              My scope is to rebut the reports.  I'm not

13    a forensic -- it is not a forensics job, again.

14    BY MR. CARTER:

15         Q.    So that answer -- the answer you just gave

16    would apply to the other account holders that were

17    subject of discovery as well, right, Al-Haramain --

18         A.    You -- you just give me whatever -- not in

19    general, just give me names and I can -- I can answer

20    you.  Not in general can I answer.

21         Q.    Did -- did you ask whether or not there

22    was any audit or inquiry conducted with regard to

23    Al-Haramain or any of its accounts?

24         A.    I did not see it necessary for me to take

This Transcript Contains Confidential Material

 1   into consideration my scope, my assignment to rebut

 2   the Winer's and Kohlmann report based on my

 3   experience.  I did my best in my report.  I did not

 4   only just -- I proved in my report that the regulatory

 5   landscape, I -- I went the extra mile to see that the

 6   bank's internal control system, main elements,

 7   corporate governors and the audit committee, internal

 8   audit, anti-money laundering, the guidelines, to help

 9   the reader of the report.

10          What you are asking me is just like a

11   forensic, part of a forensic job, which is not mine.

12      Q.    Mr. Hobayb, I'm just trying to understand

13   what you did and did not do.

14          Now, did you inquire as to whether or not

15   any transactions carried out through Al-Haramain

16   accounts at Al Rajhi Bank had been flagged as

17   suspicious?

18      A.    I saw some of Al-Haramain bank accounts

19   and transactions.  I saw also bank accounts of Aqil

20   al-Aqil and some transactions also, and take into

21   consideration that the AML, pre-9/11, was mainly

22   focusing on the source of funds and mainly on drug

23   trafficking or drug -- drugs, illegal activities in

24   general.

This Transcript Contains Confidential Material

1         And you -- you want to presume a bank

2    would scrutinize this because of drugs?  I mean, who

3    can appear as -- assume that thing.  So I did not ask

4    for it because I did not see it necessary.

5         Q.   You're aware that during this time period,

6    there was -- there were mechanisms or protocols in

7    place for reporting suspicious activity, correct?

8         A.   When you say that time period, I

9    appreciate if you just repeat whatever time period you

10   mean.

11        Q.   Yeah.  You agree that under the 1995 SAMA

12   Guidelines, there were protocols in place between 1998

13   and September 11, 2001, for reporting suspicious

14   activity at banks, correct?

15        A.   I mean, all banks since -- they have to

16   report suspected anti -- anti-money -- money

17   laundering transactions.  If they suspect any

18   customer, they should report it to the -- to the

19   authorities and they should investigate it and report

20   it.

21        Q.   Am I correct -- am I correct that one way

22   a suspicious activity report could have been generated

23   during this time period, and I'm talking about 1998

24   through September 11th, 2001, would be as a result of

This Transcript Contains Confidential Material

1    an employee at the bank identifying a transaction as

2    suspicious?

3         A.    Yeah, an employee at the bank may identify

4    a transaction as a -- as a suspicion.  You report it

5    to the related anti-money laundering unit, and they

6    investigate and they take action.

7         Q.    And during this time period, did the SAMA

8    Guidelines also require banks to use specialized

9    software to detect suspicious transactions?

10        A.    Yeah, they encouraged -- they encouraged

11   the banks to do so.  Of course, you appreciate that

12   the technology at that time is not like the technology

13   now.  So, yes, but --

14        Q.    Do you know -- do you know whether or not

15   Al Rajhi Bank had such software in place during the

16   period 1998 through September 11, 2001?

17        A.    I saw a document about the anti-money

18   laundering mentioning software like that, but even

19   without the software, I mean, you can identify, for

20   example, in the system itself the amount, big amounts,

21   and there are different means.

22              But I read -- yes, I read -- I read in one

23   of the documents that they are going to use that

24   software that was available to them at that time,

This Transcript Contains Confidential Material

1    something like that.

2        Q.    With regard to the account holders at

3    issue in this case, and in particular Al-Haramain,

4    IIRO, Aqil al-Aqil, Soliman Al-Buthe, did you ask the

5    bank whether there were any suspicious activity

6    reports issued with respect to their accounts?

7        A.    I did not see -- I did not see any,

8    because who -- who can assume that those -- those

9    people are associated with drugs.  The whole -- the

10   whole concept at that time was always about drugs.  I

11   cannot imagine a scenario that you can -- at -- in

12   1995 -- '8 or 1999 that you can suspect, you can say

13   that, oh, charity, yeah, this is associated with

14   drugs.

15            I mean, you have to have evidence.  I

16   mean, the bank is not an intelligence agency.  I mean,

17   it's a -- the bank.

18   BY MR. CARTER:

19       Q.    Is it your testimony that the anti-money

20   laundering regime that was in place -- strike that.

21   Let me start over.

22            Is it your testimony that the anti-money

23   laundering international best practices in place

24   during the period 1998 through 2001 was limited solely

This Transcript Contains Confidential Material

```
 1    to drug trafficking?

 2         MR. CURRAN:  Objection as to form.

 3             You may answer.

 4    BY THE WITNESS:

 5         A.    No, but the AML talk about illegal

 6    activities.  I'm sure it was talking about the source

 7    of funds.  It did not say about the disbursement of

 8    funds.  Sure, this is one thing.

 9             Second, it talks about illegal activities,

10    but the concentration, the concept and the

11    understanding, the understanding globally, even the

12    FATF itself, I remember reading, like, the -- after

13    talking about the -- the drug smuggling and sometimes

14    and the cover that they used.

15    BY MR. CARTER:

16         Q.    Is it -- is it your testimony that

17    Al Rajhi Bank had no obligation during the period 1998

18    to September 11, 2001, to prevent its accounts from

19    being used to finance terrorism?

20         MR. CURRAN:  Objection as to form.

21             You may answer.

22    BY THE WITNESS:

23         A.    No.  No bank -- no bank wants to accept or

24    wants to pass any illegal activity whatsoever.  What
```

This Transcript Contains Confidential Material

 1    I'm saying is that terrorism financing was not on the

 2    radar, was not in the concept of the risk at that

 3    time.

 4            That's why post-9/11, even the FATF

 5    itself, they have refined their recommendations and

 6    they are concentrated so more specific to -- and,

 7    again, in my report I -- I did an exercise of

 8    reviewing the facts, recommendations at specific

 9    period, and I search in the -- for the words like

10    "terrorism," like "charities," like "non-governmental

11    organization."  And I haven't seen them even once

12    mentioned in that -- explicitly in that.  And it's all

13    talking about source of funds and things -- things

14    like this.  So I don't know.

15    BY MR. CARTER:

16        Q.    Did the -- did the FATF regulations you

17    are referring to specifically refer to extortion?

18        A.    To...?

19        Q.    Extortion.

20        A.    Can you rephrase?  I mean, what's the

21    meaning -- what's the meaning?  I'm forgot the meaning

22    of it.  I know that word, but I forgot the meaning of

23    it.

24        Q.    Extortion is essentially when you use

This Transcript Contains Confidential Material

```
 1    damaging information about someone to force them to

 2    pay you money.

 3         A.    I don't understand.

 4         Q.    Do -- do the FATF regulations during this

 5    period make any specific reference to the crime of

 6    bribery?

 7         A.    I remember it was talking about illegal

 8    activities in general.  I don't really recall exactly

 9    what it was now.

10         Q.    And terrorism is an illegal activity,

11    correct?

12         A.    Very, yes, agree.

13         Q.    And you cite in your reports -- and let's

14    pull out the 1995 SAMA Guidelines that are at Tab 1,

15    and these were previously marked as an exhibit.

16         MR. CURRAN:  Which exhibit number was that?

17         MR. CARTER:  Well, I think it will show up,

18    Chris.

19         MR. CURRAN:  Oh, Okay.  Previously designated at

20    a prior deposition, is that what you mean?

21         MR. CARTER:  Yes.

22         MR. CURRAN:  Okay.

23         MR. CARTER:  Yeah, introduced at the Pasley

24    deposition and it's at Tab 1.
```

This Transcript Contains Confidential Material

```
 1          THE EXHIBIT TECH:  I'm sorry.  This is Evan, the

 2    tech.  Do you have the Pasley exhibit number?

 3          MR. CARTER:  I'm sorry, Evan, it's at 1R.  My

 4    apologies.

 5          THE EXHIBIT TECH:  Thank you, sir.  Coming up

 6    now.

 7                    (WHEREUPON, a certain document was

 8                     marked Fawzi Al-Hobayb Deposition

 9                     Exhibit No. 8, for identification, as

10                     of 02/09/2024.)

11    BY MR. CARTER:

12          Q.    Mr. Hobayb, take a moment and let me know

13    if you recognize these as the 1995 SAMA Guidelines for

14    preventing -- for prevention of money laundering

15    referenced in your report?

16          A.    Yes, I can recognize it.  I see now the

17    cover letter, the covering page, the covering page,

18    yeah.

19          Q.    And -- sorry.

20                Turning to the introduction section on the

21    134 in the handwritten page numbers.  Okay.

22          A.    Yeah.

23          Q.    Now, we have in this document side-by-side

24    English and Arabic versions, correct?
```

This Transcript Contains Confidential Material

```
 1        A.    No, not always.

 2        Q.    Well --

 3        A.    I didn't -- I did not vouch that -- in

 4  English, so I cannot -- I cannot really assure of

 5  any -- for anything.

 6        Q.    Mr. Hobayb, you agree that there is

 7  English text on the left and Arabic text on the right,

 8  correct?

 9        A.    Yes, sir.

10        Q.    And based on your familiarity with SAMA's

11  practices during this time period, did it commonly

12  issue directives and circulars in both English and

13  Arabic?

14        A.    Well, they are always, because the main

15  language, the official language is Arabic, but because

16  there are some ex-patriots working for the -- for --

17  in the banking sector, so sometimes they put also --

18  but not always everything is in Arabic or English.

19  You may find only Arabic, but, I mean, mainly Arabic.

20  The Arabic language is the main one.

21        Q.    And so SAMA issued English language text

22  at times because there were non-Saudi and non-Arabic

23  individuals working in Saudi banks during the time

24  period?
```

This Transcript Contains Confidential Material

```
 1        A.      Just my presumption, but I -- I don't

 2   speak on behalf of SAMA.

 3        Q.      Do you happen to know whether or not there

 4   were any English -- native English speakers working at

 5   Al Rajhi Bank in the auditing or anti-money laundering

 6   functions between 1998 and 2001?

 7        A.      I don't -- I don't -- I don't recall.  I

 8   don't know.  But all banks, they have Americans,

 9   Europeans, non-English -- non-Arabic speaking

10   employees, and I would presume that Al Rajhi just like

11   any other bank, you could.

12        Q.      And -- and in the introduction section in

13   the English, it says:

14               "By all accounts, world-wide money

15   laundering activities, particularly those related to

16   drugs, now constitutes a multi-billion dollar business

17   annually.  However, money laundering could also

18   encompass funds derived from theft, blackmail,

19   extorsion, terrorism, and other criminal activities."

20               You see that text, correct?

21        A.      I see it.

22        Q.      Now, the English here refers specifically

23   to the -- to the word "terrorism," right?

24        MR. CURRAN:  Objection as to form, out of
```

This Transcript Contains Confidential Material

```
 1    context.

 2              You may answer.

 3    BY THE WITNESS:

 4        A.    Well, can you allow me to read the Arabic

 5    one, please?

 6    BY MR. CARTER:

 7        Q.    No, I -- you -- you read English, correct?

 8        A.    Yes, but the official language --

 9        Q.    We're going to get -- Mr. Hobayb, we're

10    going to get to the Arabic.  I understand the point

11    you're making in your report, and I'm just trying to

12    establish whether you agree with me that the word

13    "terrorism" appears in the English language

14    introduction section?

15        MR. CURRAN:  I'm going to instruct the witness

16    he may look at the original Arabic.

17              So feel free to do so.

18    BY THE WITNESS:

19        A.    I just look at the Arabic version.  The

20    Arabic version did not say "terrorism."

21    BY MR. CARTER:

22        Q.    So you're saying that the Arabic version

23    is different from the English, right?

24        A.    I don't know about the English.  All my
```

This Transcript Contains Confidential Material

 1    concentration is on the Arabic.

 2        Q.    Well, you read English, don't you,

 3    Mr. Hobayb?

 4        A.    I read English, but the official -- I

 5    repeat it to you, the official document in my country

 6    is Arabic.

 7        Q.    The official document we have here issued

 8    by SAMA was issued by SAMA with English text and

 9    Arabic text, right?

10        A.    But the Arabic text is the official and

11    dominating version, the Arabic.

12        Q.    You just told me, though, that there may

13    be bank personnel who don't read Arabic at Saudi banks

14    during this time period.

15        A.    I just suspect.  I just presume.  But

16    I'm -- I'm not on behalf of SAMA.  I said it before.

17              You asked -- asked me why it was in

18    English.  I don't know.  It's just a -- just a guess.

19    I don't know.

20        Q.    So -- so reading the English, the word

21    "terrorism" appears there, doesn't it?

22        A.    It didn't appear in the Arabic one.

23        Q.    Okay.  So my question is:  Does it appear

24    in the English?  We're all looking at it.  It's

This Transcript Contains Confidential Material

1  highlighted.  You can read.

2      A.    If it appears in the English, but it

3  doesn't appear in the Arabic.

4      Q.    Now, this document, if we go back to

5  Page 132.

6      A.    Can I comment on something, please, before

7  we go to that, to the next one?

8      Q.    Sure.

9      A.    Can you go back to the document?

10     Q.    Yeah, sure.

11     A.    Same highlight.  I mean, see, even -- even

12  this one is -- even -- even what -- when you mentioned

13  about that, the English one, see, it's -- in the one,

14  two, three, four, five -- in the fifth line

15  "could...encompass funds" -- "encompass funds

16  derived..."

17          "Derived from," not "applied to."  So the

18  whole context even doesn't apply.

19     Q.    So to the extent that a terrorist receives

20  contributions because that terrorist is engaged in

21  acts of terrorism, you don't view those to be derived

22  from terrorism?

23     MR. CURRAN:  I'm sorry.  I need to hear that

24  question again, Mr. Carter.

```
 1    BY THE WITNESS:

 2        A.    I did not hear it.  I did not understand

 3    it.

 4    BY MR. CARTER:

 5        Q.    So let's take the example of Osama bin

 6    Laden, the -- do you agree that people who were

 7    knowingly giving him money before September 11 were

 8    giving him money precisely because he was engaging in

 9    acts of terrorism?

10        MR. CURRAN:  Objection as to form, lack of

11    foundation, overbroad.

12              You may answer.

13    BY THE WITNESS:

14        A.    It depends on the context, I mean.  Prior

15    to 9/11, I don't know what was -- when he -- when

16    did -- he was designated.  I -- I really -- I need to

17    have -- to have more information to -- so, to answer.

18    I mean, but...

19    BY MR. CARTER:

20        Q.    So you don't view funds that are

21    contributed in order to facilitate acts of terrorism

22    as being derived from terrorism?

23        A.    I mean, any -- any money, any funds that

24    derive from any illegal action is something you -- you
```

This Transcript Contains Confidential Material

1   want to stop, you want to discover, you want to

2   report.

3            I'm not sure that I understood your...

4        Q.   Now, the words -- just focusing again on

5   the English, am I correct that the words "theft,

6   blackmail, extortion" that appear in the English

7   version are also missing from the Arabic?

8        A.   Do you want me to check now?

9        Q.   Yeah, sure.

10       A.   Yeah, the Arabic one talks about -- about

11  money laundering that are related to drugs.  And my

12  test --

13       Q.   And it does not -- it does not -- sorry.

14       MR. CURRAN:  Were you done with your answer?

15  BY THE WITNESS:

16       A.   As far as the first paragraph, it mentions

17  only -- I see it only mentions drugs.

18  BY MR. CARTER:

19       Q.   So it does not -- the Arabic does not

20  mention the words "blackmail," "theft" or "extortion,"

21  correct?

22       A.   I didn't say the Arabic -- in the first

23  paragraph, the Arabic just mentioned drugs only.

24       Q.   And turning back to where we were going to

This Transcript Contains Confidential Material

```
1    go before, to Page 132, and the Arabic is at 131,

2    the -- the -- this -- these guidelines were sent to

3    the attention of the managing directors and general

4    managers of Saudi banks, correct?

5         A.    Yes, sir.

6         Q.    And these were still the guidelines in

7    place between 1998 and 2001?

8         A.    I guess so.  I would presume that.  I

9    don't recall exactly, but yes, this is --

10        Q.    Do you know --

11        A.    This is part --

12        Q.    Do you know who the -- sorry.

13              Do you know who the general manager was at

14   Al Rajhi Bank between '98 and September 11, 2001?

15        A.    I don't recall really.  If -- if something

16   happened -- if something in the papers that I saw,

17   maybe, but relating to the period now, I'm not in the

18   position to really good -- have definite answer.

19        Q.    Do you know who Abdullah Al Rajhi is?

20        A.    Yes.  He's a general manager, but I really

21   forgot from what year he was.

22        Q.    Do you know if he speaks and reads

23   English?

24        A.    I don't know him personally.
```

This Transcript Contains Confidential Material

```
 1        Q.    And going down in this document, in
 2   addition to the work of FATF, the document also refers
 3   to the Basel Committee.
 4              Do you see that?
 5        A.    Can you highlight it for me?
 6        Q.    Sure.  It's the last sentence -- or last
 7   line of the first paragraph.
 8        A.    Yeah, yeah.  The 1991 Basel Committee
 9   guidelines for international banks, the OECD.
10        Q.    Yeah.  What -- what was the Basel
11   Committee?
12        A.    Oh, Basel -- Basel Committee is part of
13   the OECD.  OECD I guess stands for Organization for
14   Economic and Cooperation -- Economic Cooperation and
15   Development, something like that, which they have -- I
16   don't know their activities, but they have some -- a
17   committee or this, the Basel Committee, that they
18   issue -- or oversight of international banks.  And
19   they give them, like, standards, recommendations,
20   whatever like that, many things like this.
21        Q.    Was Saudi Arabia a part of the OECD
22   between 1998 and 2001?
23        A.    I don't really recall.  I don't know.  I
24   forgot.
```

This Transcript Contains Confidential Material

1    Q.    Do you know --

2    A.    I forgot.  I mean, I don't know.  Now I

3    cannot, I'm sorry, because it is not on the top of my

4    head either yes or no.

5    Q.    Okay.  During the time that you were at

6    Arab National Bank, were the recommendations of the

7    Basel Committee relevant, seen as relevant to

8    maintaining compliance with standards?

9    A.    No, but directly, no.  SAMA, as Central

10   Bank, is taking the international, whatever, standards

11   and instruct the banks to -- by -- by the way, Basel

12   Committee, they have many things, I mean, even could

13   be for liquidity, for concentration, and banks, not

14   only just controls, but the banks are not obliged to

15   comply with Basel Committee directly.

16         All of the regulations and the mandate,

17   they take it from the Central Bank, SAMA.

18   Q.    Well, do you know whether Al Rajhi Bank

19   paid attention to recommendations of the Basel

20   Committee during the 1998 to 2001 time period?

21   MR. CURRAN:  Objection as to form, lack of

22   foundation.

23         You may answer.

24   BY THE WITNESS:

1    A.    Which -- which standards or committee or

2    what?  Your question is very generic.

3    BY MR. CARTER:

4    Q.    Yeah, well, I mean, the Basel Committee

5    issues reports and guidelines, correct?

6    A.    Can you pinpoint to any one of them,

7    which -- whatever you mean, but I cannot presume that.

8    I -- I don't -- I don't know.  I mean, banks are not

9    obliged directly to, unless the Central Bank asks

10   them, specifically anything.  I mean, the whole

11   regulator is SAMA.

12   Q.    Do you recall during this -- the time

13   period 1998 to 2001 whether Arab National Bank where

14   you worked reviewed recommendations of the Basel

15   Committee to ensure that it was adhering to best

16   practices?

17   A.    I remember that I voluntarily, myself, as

18   an internal audit because they have, like, standards

19   for internal audits also, I voluntarily asked the

20   management that I want to compare the -- the

21   internal -- the system of the internal audit of the

22   bank, which I was heading, to the Basel standards at

23   that time and just to -- to compare us.

24         It was -- I mean, I remember it was issued

This Transcript Contains Confidential Material

 1    not very long time before my request was, as an extra

 2    mile by me, as an initiative.  And, yeah, I was

 3    100 percent compliance.

 4        Q.    Yeah, do -- do you know whether anyone at

 5    Al Rajhi Bank took a similar initiative to -- to make

 6    sure that they were complying with the Basel

 7    guidelines?

 8        A.    I don't know.  It could be, it could be

 9    not.  I don't know.

10              Even though -- even this document, the one

11    in front of me, say that -- it says against illicit

12    traffic in narcotics, drugs.  This is cover letter by

13    the governor of -- of SAMA.

14        Q.    Do -- do you recall that in Mr. Winer's

15    report, he referenced a UN international convention on

16    the prevention of terrorism financing that was issued

17    in 1999?

18        A.    That?

19        Q.    I'm trying to find the page.  I apologize.

20        MR. CARTER:  Okay.  On -- if we can, let's pull

21    up Mr. Winer's report, which is at Tab 4 in the

22    binder.

23        MR. CURRAN:  Mr. Carter, I'm going to hand a

24    clean copy of that to the witness.

This Transcript Contains Confidential Material

```
 1        MR. CARTER:  Sure.

 2                  (WHEREUPON, a certain document was

 3                  marked Fawzi Al-Hobayb Deposition

 4                  Exhibit No. 9, for identification, as

 5                  of 02/09/2024.)

 6   BY MR. CARTER:

 7        Q.    And if we can, let's look at Page 25 of

 8   Mr. Winer's report.

 9             Okay.  And in this section of the

10   report -- actually, if we can go back to the prior

11   page -- he references the issuance by the UN General

12   Assembly of a resolution on December 9, 1999, which

13   was titled International Convention on the Suppression

14   of Financing of Terrorism.

15             Do you see that?

16        MR. CURRAN:  3.2.4.

17   BY THE WITNESS:

18        A.    3.2.4.  Can I -- can you give me a minute

19   reading the --

20   BY MR. CARTER:

21        Q.    Yeah, sure.

22        A.    I can see that.

23        Q.    Okay.  Are you familiar with that

24   convention from your work during the 1999 to 2001 time
```

This Transcript Contains Confidential Material

1    period at Arab National Bank?

2        A.    I don't really recall.  I don't really

3    recall.  But what -- we -- we get instructions and the

4    regulations, we are -- banks are being regulated by --

5    by SAMA.  We are not obliged to any international

6    by -- legally by -- by auditing.  I mean, they're all

7    through the Central Bank.

8        Q.    But do you agree with me -- have you

9    reviewed this document as part of the preparation for

10   your report?

11       A.    I really forgot.  I don't recall.  If I

12   referred to it, to some part of it.  I really -- I

13   don't really recall all documents that I have read.

14   Many documents, but I don't recall.

15       Q.    And this document addressed the importance

16   of member states of the UN implementing action to make

17   sure financial institutions subject to their oversight

18   implemented processes to counterterrorism financing

19   risk.

20             Do you know whether that's correct or not?

21       A.    I don't really recall.  I mean, did FATF

22   after that in that same year issue something about the

23   combatant terrorist financing?

24       Q.    Well, do you --

This Transcript Contains Confidential Material

```
 1        A.     I don't recall.  I don't recall FATF

 2   having issued something like that.

 3        Q.     Well, do you agree that the issuance by

 4   the United Nations General Assembly of a specific

 5   convention addressing concerns about terrorism

 6   financing shows that terrorism financing through

 7   financial institutions was an issue of concern at

 8   least as of the date of this document on December 9,

 9   1999?

10        A.     I cannot comment on that.  I cannot

11   comment on that.  I really don't know.  I mean,

12   what's -- I don't know.  I cannot comment.

13        Q.     Turning to the footnote in Page 25, 51,

14   Mr. Winer refers to a report by the Basel Committee.

15        A.     Page 24?

16        MR. CURRAN:  Give him a second.

17   BY MR. CARTER:

18        Q.     It is Footnote 51 --

19        MR. CURRAN:  Okay.  Footnote 51.

20   BY MR. CARTER:

21        Q.     -- on Page 25, which referred to terrorism

22   as an example of a serious crime.

23               Were you aware of this report of the Basel

24   Committee during the 1998 to 2001 time period?
```

This Transcript Contains Confidential Material

```
 1        A.    I don't -- I don't recall.

 2        Q.    Do you -- do you know whether anyone at Al

 3   Rajhi Bank was aware of this report at the time?

 4        A.    I don't know.

 5        Q.    Given Mr. Winer's citations to the UN

 6   convention in this Basel Committee report as evidence

 7   that terrorism financing was a concern in the

 8   international arena before 9/11, did you ask anyone at

 9   Al Rajhi Bank whether they were aware of those

10   documents during the pre-9/11 time period?

11        MR. CURRAN:  Objection as to form, lack of

12   foundation.

13             You may answer.

14   BY THE WITNESS:

15        A.    Well, the Al Rajhi, Al Rajhi obligation at

16   that time is to comply with the -- with the -- with

17   its regulator.  The regulator at that time issued the

18   AML 1995.  This is the -- this is the Al Rajhi's

19   obligation -- or any other bank, I mean, any other

20   bank under the supervision of -- of SAMA are obliged

21   for the regulations and for the oversight of SAMA.

22   BY MR. CARTER:

23        Q.    But do you know whether Al Rajhi Bank

24   viewed the financing of terrorism through the accounts
```

This Transcript Contains Confidential Material

```
 1    it maintained as a serious crime before 2001 -- or

 2    before 9/11?

 3         MR. CURRAN:  Objection as to form, lack of

 4    foundation.

 5              You may answer.

 6    BY THE WITNESS:

 7         A.    Can you repeat the question, please?  Did

 8    they what?

 9    BY MR. CARTER:

10         Q.    Do you know whether Al Rajhi Bank viewed

11    the financing of terrorism through accounts it

12    maintained?

13         A.    Hear?  Did you say hear?  Did you say

14    hear?

15         Q.    No.

16              Do you know whether Al Rajhi Bank viewed,

17    in other words, considered, the financing of terrorism

18    through accounts it maintained to be a serious crime

19    that it was obligated to prevent between 1998 and

20    September 11, 2001?

21         A.    I mean, terrorism is -- is a huge crime.

22    I mean, anybody, any person in the globe, I mean, it's

23    serious.  It is not specific to Al Rajhi, not

24    Al Rajhi.  But at that time, you have -- the whole
```

This Transcript Contains Confidential Material

1    concentration and the whole focus was on illegal money

2    coming -- coming from, as the source, from drugs.

3    This is the -- if we have other customers that they

4    suspected for drugs, yes, of course.  This is the --

5    the main concentration, I mean, but terrorism, I mean,

6    is a huge crime and we are all...

7         Q.   You mention in your report that Al Rajhi

8    Bank also had a branch manual concerning, among other

9    things, anti-money laundering procedures.

10             Do you recall that?

11        A.   Yes, I recall something like that, yes.

12        Q.   And is it your recollection that the

13   branch manual largely implemented the -- at least as

14   to the money laundering issues, largely implemented

15   the 1995 guidelines?

16        A.   Branch manual?

17        Q.   Yeah.  Did the anti-money laundering

18   suspicious transaction processes in the branch manual

19   largely implement the 1995 SAMA Guidelines?

20        A.   I reviewed documents.  Money laundering

21   was in that manual you mentioned, also in the -- in

22   some other documents, which I don't memorize now.

23   Even the internal auditor annual plan, they have some,

24   like, processes or, like, a plan of what they are

This Transcript Contains Confidential Material

1    going to do.

2            So in general, I saw documents that are

3    fulfilling -- appropriately fulfilling their duties.

4        Q.    Well, do you -- do you recall whether you

5    identified any significant discrepancies between the

6    anti-money laundering guidelines in the branch manual

7    and the requirements of the 1995 SAMA Guidelines?

8        A.    I mean, not specific.  I don't recall -- I

9    saw different -- different documents.  I mean, there

10   can be collectively meet -- but my opinion that

11   collectively all -- based on the documents that I saw

12   at -- for the Al Rajhi documents, my opinion, I did --

13   I did not see any significant deviation from the

14   AML -- the SAMA AML guidelines, 1995 guidelines.

15       Q.    The -- I believe you indicate in your

16   report that the SAMA Guidelines required Al Rajhi Bank

17   to carry out anti-money laundering and suspicious

18   activity reporting training of its personnel, is that

19   correct?

20       A.    Yeah, I recall something like this, yes,

21   sir.

22       Q.    Did you review any materials concerning Al

23   Rajhi Bank's training of its personnel as to

24   anti-money laundering and suspicious activity

This Transcript Contains Confidential Material

```
 1   reporting protocols?

 2        A.    Yes, I recall.  I recall one of the

 3   documents, which I forgot which was, that they are

 4   going to do, like, training, something like -- yeah, I

 5   came across training for anti-money laundering, yes,

 6   in --

 7        Q.    And there --

 8        A.    -- one of the documents of Al Rajhi, yes.

 9        Q.    Okay.  The document -- there's a document

10   that refers to the fact that Al Rajhi was going to

11   conduct training, correct?

12        A.    I forgot exact phrase.

13        Q.    Yeah.  Did you -- did you review any

14   documents concerning the actual training that was

15   conducted?

16        A.    Well, again, this is similar to the

17   anti-money laundering reports.  I mean, since there

18   is -- the initiative is there, I mean, I cannot assume

19   that it was done -- it was not done without evidence.

20   I mean, this is the norm.  The norm is banks, the norm

21   is whatever plans they have, they execute their plans.

22   Why -- for what reason they -- they make plans if they

23   don't want to -- or if they don't intend to do them?

24              And, again, these trainings -- these
```

This Transcript Contains Confidential Material

1    trainings can be done by even the -- the HR can be

2    engaged.  It's not a -- yeah, so there's no reason for

3    me to suspect that, like, regular internal auditor

4    reports, that it was not done or it was not issued or

5    not -- or whatever.  Even the training, there is no

6    reason for me to suspect that it was not done.

7         Q.    But -- and I'm just trying to -- to

8    clarify.  Did --

9         A.    I -- I can -- I can add something, if you

10   may -- may allow me, please, Mr. Carter.

11        Q.    Yeah, go ahead.

12        A.    At one point of time it was, again,

13   from -- because we want to improve and develop our --

14   the internal audit proficient, me and my -- a number

15   of colleagues and I, we communicated with the American

16   Institute for Internal -- for Internal Auditors in the

17   US and asked them to allow us to create a chapter,

18   which is like a branch or something.  They call a

19   chapter.  And we created a chapter.  And I was

20   nominated as a chairman for that chapter.

21             And I do recall that we had -- we

22   create -- we made a conference for the internal audit

23   practitioners amongst the banks and other companies if

24   they want.  And many of the -- many of the -- many of

This Transcript Contains Confidential Material

 1    the banks' person -- the related banks' personnel,

 2    including Al Rajhi, were attending that conference.

 3    And guess what, that -- the main subject, the main

 4    speech was anti-money laundering.

 5            And I remember we invited a reputable

 6    speaker at that time from Canada to also give a speech

 7    on -- on this.  And the main subject was for that --

 8    that conference was anti-money laundering.  This is

 9    also training.  So the initiative that -- everything

10    was there.  I mean, nothing will just assume that it

11    was not -- it was not -- it was not done.

12        Q.    When was that conference that you just

13    referred to held?

14        A.    Before 9/11, for sure.

15        Q.    And, again, I'm just trying to make sure I

16    understand what you did do as part of your work here

17    and -- and things that were beyond the scope of your

18    work.

19            And so with -- within that context, am I

20    correct that you didn't undertake to evaluate what

21    Al Rajhi Bank actually did for purposes of training

22    its employees on anti-money laundering or suspicious

23    activity reporting?

24        A.    Again, I saw -- I saw in one of the

This Transcript Contains Confidential Material

1    documents.  Like, I don't recall the exact phrase, was

2    it a plan, was it an immediate plan to do, talks about

3    training about anti-money laundering for bank's

4    employees.

5         Q.    And, again, but I'm just trying to

6    clarify.

7               You didn't evaluate what was actually done

8    as part of the training program, correct?

9         A.    I didn't see the need for that.

10        Q.    Do you --

11        A.    I didn't see any bad -- I did not see any

12   bad intent by Al Rajhi.  They took the initiative for

13   the training.  They made their -- their guidelines.  I

14   didn't see any -- anything that can indicate to me any

15   misconduct or any bad intent or...

16        Q.    Did Al Rajhi Bank have, to your knowledge,

17   a dedicated anti-money laundering department prior to

18   September 11, 2001?

19        A.    Yeah.  I saw it in parts of -- in one of

20   the documents, that they have the anti-money

21   laundering unit.

22        Q.    Do you know how many employees were in

23   that unit?

24        A.    I don't really -- I didn't really know.  I

This Transcript Contains Confidential Material

1    mean, it's a....

2         Q.    And do you know who was working in that

3    unit during the period before September 11, 2001?

4         A.    I don't recall that.  I don't recall.

5    Maybe I saw the names or I didn't see the names.  I

6    didn't really recall.

7         Q.    And in connection with the

8    self-supervisory committee, were there particular

9    people at Al Rajhi Bank that you interacted with?

10        A.    The -- yeah, a member of Al Rajhi Bank

11   was, like any other bank, members of that committee.

12        Q.    Do you recall who at Al Rajhi Bank you

13   interacted with in connection with the

14   self-supervisory committee?

15        A.    Yeah.  I remember seeing Sal Al-Jarboua's

16   (phonetic) name, something like that, yeah.

17        Q.    Do you -- do you recall whether any of the

18   people you've interacted with were part of the

19   anti-money laundering unit at Al Rajhi Bank?

20        A.    I really don't recall.  I mean, that's

21   been a long, long time now.

22        Q.    Turning to Page 13 of your report, you

23   express your opinion that:

24              "While Winer suggests that some of the

```
 1   applicable regulations were not fully satisfied by Al

 2   Rajhi Bank, as I will note later, those small examples

 3   do not indicate any material noncompliance by the

 4   Bank."

 5            Do you see that?

 6        MR. CURRAN:  All right.  Hold up.  The document

 7   is not up yet and...

 8        MR. CARTER:  Sorry, I apologize.  It's down in

 9   the bottom paragraph on Page 13.  It's the first

10   sentence of the last paragraph.

11   BY THE WITNESS:

12        A.    It's in section (d)?

13        MR. CURRAN:  Page 13 at the bottom, I'm going to

14   point it out.  I think he is -- it's the paragraph

15   beginning with "While," correct?

16        THE WITNESS:  Ah.

17        MR. CARTER:  Yes.

18        MR. CURRAN:  It's not on the screen -- it's not

19   on the screen yet.  It will be there shortly.

20   BY THE WITNESS:

21        A.    So he's talking about this -- you are

22   talking about (d) paragraph, Mr. Carter?

23   BY MR. CARTER:

24        Q.    Yeah, the first sentence there.
```

This Transcript Contains Confidential Material

```
 1      A.      Yeah, can I -- can I -- allow me --

 2      Q.      Sure.

 3      A.      -- some time to read the paragraph,

 4   please.

 5      Q.      Mr. Hobayb, are we on the same page yet?

 6      A.      Yeah, I'm reading (d).  Is this in (d),

 7   SAMA is enforcing or because --

 8      Q.      No, we should be -- we should be on the

 9   paragraph -- second paragraph in that section:

10           "While Winer suggests that some of the

11   applicable regulations were not fully satisfied by Al

12   Rajhi Bank, as I will note later, those small examples

13   do not indicate any material noncompliance by the

14   Bank."

15           Correct?

16      MR. CURRAN:  Yeah, yeah, he's there, it's just

17   that --

18   BY THE WITNESS:

19      A.      Correct.

20      MR. CURRAN:  -- this is the next page, right?

21      THE WITNESS:  So, yeah.

22   BY THE WITNESS:

23      A.      Yes, sir.

24   BY MR. CARTER:
```

This Transcript Contains Confidential Material

```
 1        Q.    Okay.  The phrase "material noncompliance"
 2   that you use there, is that a term of art that you are
 3   familiar with from your work in banking?
 4        A.    It's very -- it's familiar in auditing.
 5   It's one of the auditing terms.
 6        Q.    And -- and within auditing, what does
 7   "material noncompliance" indicate?
 8        A.    Well, good question.  Material -- material
 9   noncompliance is all -- is always related to the
10   context and the implications and the risk.  What is
11   the risk behind our -- if this happens?  Is there a
12   fraud risk, financial risk, legal risk?
13              Yeah, this is the -- the context.  So
14   you -- you decide on the -- or you assess it and you
15   arrive at the magnitude of the implement --
16   implications, and you can, at your professional
17   judgment, say this is a material noncompliance or
18   significant noncompliance or medium noncompliance --
19   medium risk noncompliance or low noncompliance.  So
20   this is done.
21        Q.    And --
22        A.    So it's about impact, risk.
23        Q.    And in relation to how you're using the
24   term there, what subject matter are you referring to
```

This Transcript Contains Confidential Material

```
 1    when you say that there is not material noncompliance?

 2    Are you referring with -- are you referring to AML

 3    practices?  Are you referring to Know-Your-Customer

 4    practices?

 5              What issue are you addressing?

 6        A.    No.  I'm referring to -- to Winer,

 7    which -- that's why I say, "While Winer suggests that

 8    some of the applicable regulations are not fully

 9    satisfied by the bank, as I will note later..."

10              So in 4.3, I have detailed all -- in

11    details what I mean by this.  This is just in the

12    opinion.  This is just...

13        Q.    Okay.  So you're talking specifically in

14    this section about whether or not there was material

15    noncompliance reflected in the particular subject

16    issues that you address in Section 4.3 of your report,

17    correct?

18        A.    And just give me a second.

19              Yeah, we are in (d), and (d) falls under

20    4.1, which I'm -- I was talking about regulatory

21    landscape, okay.  And as in Winer, some -- he -- in

22    some of his examples, or whatever he said, that he is

23    saying that they are not complying with the

24    regulations.  That's why I put this -- this sentence.
```

This Transcript Contains Confidential Material

```
 1        Q.    Okay.  You're -- you're talking

 2   specifically about the examples Mr. Winer offered of

 3   problems in his report.  You're not -- just to be

 4   clear, Mr. Hobayb, I want to make sure, you're not

 5   offering an opinion as to whether or not there was

 6   material noncompliance with Al Rajhi Bank on an

 7   institutional level across a broader spectrum of

 8   accounts that are addressed in Mr. Winer's report,

 9   right?

10        MR. CURRAN:  Objection as to form.

11   BY THE WITNESS:

12        A.    I don't really -- what's the context you

13   are talking about?  But I'll volunteer an answer.  My

14   report is covering three things that I understood from

15   Winer and Kohlmann, that they are saying that there's

16   no re -- it's a lose or there is non-existence of

17   regulations, and that's why a -- the whole country is

18   not operated under regulations.

19             The second thing that they say, the bank

20   is lose, they don't have good internal controls.

21             And then they mentioned a number of -- of

22   instances that, for example, like account openings,

23   whatever, like this, and this is -- I categorize my

24   report to this effect just to make it read.
```

This Transcript Contains Confidential Material

```
 1            So as far as they are talking about that
 2   the -- the regulations are not enough or whatever, or
 3   the bank is not complying, I have proven in my report
 4   that they are complying with -- the regulations are
 5   met and the internal control system of the bank is
 6   good.
 7            So I did not see any material
 8   non-compliance.  That's -- that's all I mean.
 9        Q.    And, Mr. Hobayb, if -- based on your
10   experience as the head of internal auditing at ANB for
11   a number of years, if you were undertaking an
12   evaluation of the adequacy of Al Rajhi Bank's
13   anti-money laundering practices throughout the bank
14   during the period from 1998 to 2001, generally how
15   would you go about doing that?
16        A.    It Depends on the scope.  Is it a forensic
17   or...?
18        Q.    Sure.
19        A.    If it's a -- forensic for what?  What is
20   our objectives?  What is the scope?
21        Q.    It is to ascertain --
22        A.    I cannot -- I cannot put this in a
23   hypothetical context, I mean.  If I was asked now to
24   audit Al Rajhi as a forensic, no, I need to think
```

This Transcript Contains Confidential Material

1    about it.  I mean, I -- most likely I will go beyond,

2    beyond this, but, no, this is enough for me.  This is

3    enough to see the fundamentals.

4            If you want -- in the -- the forensic, you

5    just go for transactions.  It's not going for

6    fundamentals.  Fundamentals, they have already covered

7    and satisfied --

8        Q.    I see.

9        A.    -- I mean.  There is no material evidence,

10   I mean.

11           And -- and Winer and Kohlmann did not

12   present any -- any evidence of such.  They give --

13   they give their best as examples, which I have already

14   covered in my report.

15       Q.    Mr. Winer's review was limited to a

16   particular subset of customers and bank records

17   relating to those customers, right?

18       A.    I don't know.  I don't recall either.

19       Q.    But do you --

20       A.    I don't know.

21       Q.    Mr. Winer wasn't engaged in any sort of

22   full scope review of Al Rajhi Bank's practices, right?

23       A.    I cannot comment on this.  Ask him.

24       Q.    And -- and you agree that he could only

This Transcript Contains Confidential Material

```
 1    comment as to the scope of the customers and documents

 2    that he had access to, right?

 3         MR. CURRAN:  Objection as to form.

 4              You may answer.

 5    BY THE WITNESS:

 6         A.    Whatever.

 7    BY MR. CARTER:

 8         Q.    Well, do you agree with that?

 9         A.    I mean, I don't know what documents he --

10    what's the magnitude of documents that he saw.  I

11    don't know the -- his scope.  I mean, the scope, I

12    know that he's -- he is for the case, but I really --

13    you are -- you are really -- I cannot -- not relate to

14    your previous question about forensic with this, I

15    mean.  I hope I'm helping, but this is my

16    understanding of what you...

17         Q.    Are you unaware of the scope of documents

18    that Mr. Winer had access to?

19         A.    I read it, but I don't remember exactly

20    what I -- what I read now.

21         Q.    Turning to Page 15 of your report, you

22    indicate that:

23              "A SAMA circular dated July 4, 1996,

24    indicates that banks were required to open an account
```

This Transcript Contains Confidential Material

```
 1    for any customer regardless of amount as long as

 2    certain documentation requires" -- "requirements were

 3    met.  From my experience and my review of the

 4    then-applicable regulations, I can confirm that a bank

 5    was only permitted to close an account following

 6    requests from authorities, following a client request,

 7    or else by following the procedures related to

 8    dormancy based on this circular."

 9              You're familiar with that section of your

10    report?

11         A.    Yeah, I'm -- I'm talking about certain

12    section -- about the closing of the account

13    requirements, yeah.

14         MR. CARTER:  Yeah, and if we can just pull up

15    that circular which is, I believe, at -- the one at

16    Tab 16, which I think -- or Tab 16R, which I think we

17    marked earlier.

18    BY MR. CARTER:

19         Q.    When you've had a chance, Mr. Hobayb, let

20    me know if this is the circular that you're citing in

21    the section of your report that we just read?

22         MR. CURRAN:  Objection as to form.

23              You may answer.

24    BY THE WITNESS:
```

This Transcript Contains Confidential Material

```
 1      A.    Yes, familiar.

 2   BY MR. CARTER:

 3      Q.    And looking at this, are there any

 4   material discrepancies that you're aware of between

 5   the Arabic and the English in this document?

 6      A.    I don't know.  I haven't looked at the

 7   English at all.

 8      Q.    So the English, first paragraph, begins:

 9            "SAMA has noticed from inspection visits

10   and client complaints that some banks refuse to open

11   current accounts for less than a specific minimum and

12   that they close current accounts that fall below a

13   certain minimum."

14      A.    Yeah, the same in the general context, but

15   can you go to the Arabic one, please.

16      Q.    Yes, it is right next to it, so.

17      MR. CURRAN:  You can look at the copy.  Well, it

18   was -- it was obscured by the highlighting.

19            You can look at the full document over

20   there, too, if you wish.

21   BY THE WITNESS:

22      A.    You want me to compare Arabic to English,

23   Mr. Carter?

24   BY MR. CARTER:
```

This Transcript Contains Confidential Material

```
 1        Q.     Well, I just want to know whether or not

 2   what I just read is consistent with what your

 3   understanding of what -- how the document begins, that

 4   SAMA has noticed from inspection visits and client

 5   complaints that some banks refuse to open current

 6   accounts for less than specific --

 7        A.     Yeah.  No -- similar, similar, yes.

 8        Q.     Yeah.  So based on that introductory

 9   language, the focus of this circular was on a problem

10   involving refusal of certain banks to open accounts

11   for small amounts, right?

12        A.     Yeah, this is all -- this refers -- let me

13   talk about this.  This also proves that the -- that

14   SAMA conducts inspection visits.

15             So I'm -- so this is one of the tools that

16   SAMA did -- they do.  Yes, I think through their

17   visits, maybe some banks, they -- they don't want

18   small customers, maybe, and they -- because it's

19   costly for them.

20             And some say, no, you have to open for

21   everyone and as long as -- and without making any

22   condition of minimum amount, and they -- they must

23   be -- they continue to -- to be -- to be active, to

24   be -- to be open, not to close it unless it was
```

This Transcript Contains Confidential Material

 1   certain condition, like was asked by the account owner

 2   or something like this, yeah.

 3       Q.   So the focus of this circular is on

 4   ensuring the availability of banking services to small

 5   customers and preventing discrimination against small

 6   customers, right?

 7       MR. CURRAN:  Objection as to form.

 8           You may answer.

 9   BY THE WITNESS:

10       A.   Yeah, it's general, yeah.  Do you want me

11   to read you the whole paragraph?  Yes, in general,

12   yes, because the main -- want the banking services to

13   be available to all the -- all customers.

14   BY MR. CARTER:

15       Q.   This document has nothing to do with the

16   circumstances in which a bank closed an account based

17   on a determination that it was being used for criminal

18   activity, does it?

19       A.   No, that --

20       MR. CURRAN:  Objection as to form.

21           You may answer.

22   BY THE WITNESS:

23       A.   -- bank cannot -- to my understanding, the

24   bank cannot close an account unless it is requested by

This Transcript Contains Confidential Material

```
 1    the account owner or by authorities.  Not --

 2        Q.    Yeah, but this --

 3        A.    The bank cannot have that -- the banks --

 4    banks don't have the discretion by their own just

 5    to -- just to close it.

 6        Q.    I understand that that's your testimony,

 7    Mr. Hobayb, but the circular you cited in this section

 8    of your report has nothing to do with the

 9    circumstances under which a bank can proceed to close

10    an account based on a determination that it's being

11    used for criminal activity, does it?

12        MR. CURRAN:  Objection as to form.

13            You may answer.

14    BY THE WITNESS:

15        A.    I think this -- this circular applies to

16    everything.

17    BY MR. CARTER:

18        Q.    But this circular that addresses the

19    protection of small customers in your view is a

20    significant directive on how to handle accounts that

21    are being used for criminal activity?

22        A.    This circular is general.  You cannot

23    close the account.  It's very specific, very explicit.

24        Q.    Well, it's talking about the inability to
```

This Transcript Contains Confidential Material

```
 1    close an account -- it's stipulating that banks aren't

 2    permitted to close the account based on it falling

 3    below a minimum amount threshold or on the grounds

 4    that it is allegedly dormant, right?

 5         A.    Which paragraph?

 6         MR. CURRAN:  Yeah, Mr. Carter, could you put up

 7    the whole circular?

 8         MR. CARTER:  The third paragraph.

 9         MR. CURRAN:  Yeah, that's not on his screen,

10    okay.

11    BY THE WITNESS:

12         A.    The one that starts with "SAMA, there --

13    therefore"?

14    BY MR. CARTER:

15         Q.    Yeah.

16         A.    "To maintain such accounts as long as they

17    are active and not closed at the request of the

18    client."

19               I prefer to -- okay.  They look similar,

20    maybe, here, but the Arabic one, they say, "and these

21    accounts should remain open."

22         Q.    And "these accounts" that they are talking

23    about are accounts --

24         A.    All accounts.
```

```
 1        Q.      -- are small value accounts?

 2        A.      No, not to my understanding.  It's all

 3   bank accounts.

 4        Q.      You -- you --

 5        A.      They did not say -- they did not say

 6   it's -- they did not say that -- well, the trigger for

 7   the -- for SAMA at that -- those inspection visits

 8   maybe was for the small customers, but the -- the

 9   whole context -- context here is about all bank

10   accounts.

11            They did not say here that close it.  It

12   says explicit here that without asking, "and these

13   accounts should remain, must remain open," as long as

14   it is an active or it's -- the bank -- the account

15   owner did not ask to close it.

16        Q.      Does this document say anything about the

17   procedures that would apply to closing the account

18   that has been determined to be associated with

19   criminal activity?

20        MR. CURRAN:  Objection as to form.

21            You may answer.

22   BY THE WITNESS:

23        A.      I didn't see such a thing here.  Did you?

24   If there is anything, please pinpoint it to me.
```

This Transcript Contains Confidential Material

```
 1    BY MR. CARTER:

 2        Q.    To -- no, I don't -- I don't see anything

 3    either.

 4              To -- to the extent that a bank in

 5    Saudi Arabia during the 1998 to 2001 time period

 6    determined that one of its accounts was being used for

 7    criminal activity, was the procedure for it to report

 8    that account to SAMA?

 9        A.    Yeah, I remember that requirement is to

10    the police and to the authorities and -- and SAMA.

11    Yeah, I remember, but I really -- not on top of my

12    head now.  And SAMA, yeah.

13        Q.    Well --

14        A.    And those under SAMA, yes, I remember

15    that.

16        Q.    And --

17        A.    I recall something like that.

18        Q.    And such a report, do you know whether it

19    might be accompanied with a request from the bank for

20    authorization to close the account?

21        A.    I wouldn't presume that, because simply

22    the bank didn't have the ability to make an assertion

23    or to be sure 100 percent that it is derived from,

24    like, let's say, drugs.
```

This Transcript Contains Confidential Material

```
 1              So the bank just do some sort of
 2    investigation.  If you have a suspicious -- suspicion,
 3    they report it to the -- to the authorities.  The
 4    authorities, they have the -- more -- more tools to
 5    investigate and to see that person, suspected person,
 6    is associated with drugs or -- or not.
 7              Do you understand me?
 8              And this -- the investigation takes also
 9    time.
10         Q.   Okay.
11         A.   So how can you ask -- you -- you close an
12    account without -- and maybe he is innocent.  Maybe
13    the account holder is innocent.  Although some --
14    maybe the -- whatever triggered that, suspicious, but
15    it's not, no.
16              Even after 9/11, I mean, the banks don't
17    have -- are not -- don't have the luxury of just close
18    the accounts by themselves.
19         Q.   To the extent a customer refused to
20    provide the information, the Know Your Customer
21    information required by the 1995 SAMA Guidelines,
22    could a bank refuse to open an account for that
23    customer during this time period?
24         A.   I mean, I have to see examples, life
```

This Transcript Contains Confidential Material

1    examples.  I cannot just KYC in general, you have to

2    specify, I mean, that KYC also asks for

3    identification, asks for not to be fictitious names,

4    so.

5        Q.    Right.  So let's assume, for example, an

6    individual customer comes in and says, I want to open

7    a small value account and I refuse to give you a copy

8    of my ID.

9            Would the bank in that -- in that

10   circumstance have been permitted to refuse to open the

11   account?

12       A.    I mean, naturally -- how -- how can you

13   know his name if his name is -- he just put any name?

14   How do you establish that it is his name?

15       Q.    So the account would not open, right?

16       A.    My name is Fawzi and you are a banker, I

17   come to you, I want to open an account, but I'm

18   refusing to give you the ID.  What is your name?  I

19   will say just XYZ, not Fawzi.  How come?

20       Q.    Right.  So in that --

21       A.    That's a fictitious name.  And this is

22   like --

23       Q.    So in that --

24       A.    -- that to the -- to the AML.

This Transcript Contains Confidential Material

```
 1        Q.    So in that circumstance, the bank would be
 2   entirely within its authority to refuse to open the
 3   account, right?
 4        A.    I mean, if it's something material, yeah.
 5   I mean, if it's a fictitious name, the bank is
 6   forbidden from not only -- he doesn't just have the
 7   luxury.  He is forbidden from opening an account.
 8        Q.    And --
 9        A.    A fictitious name, I mean, just fictitious
10   name, no.
11        Q.    And banks were entirely free and, in fact,
12   required to report to SAMA to the extent that they
13   believed a customer was using their account for
14   criminal activity, right?
15        MR. CURRAN:  Objection as to form, lack of
16   foundation.
17              You may answer.
18   BY THE WITNESS:
19        A.    No, I don't understand.  A customer who
20   refused to --
21   BY MR. CARTER:
22        Q.    No, no.  I'm asking a different question.
23        A.    A different -- a different question
24   completely or what?
```

This Transcript Contains Confidential Material

```
 1        Q.    Yeah.  To the extent that the bank had
 2   determined that a customer was using an account to
 3   launder money, it would have been required to report
 4   that to SAMA, right?
 5        MR. CURRAN:  Objection.  Objection as to form.
 6             You may answer.
 7   BY THE WITNESS:
 8        A.    If they discover it.  I mean, the bank
 9   had -- doesn't have the capability to uncover all
10   money laundering transactions, and it happened all
11   over the world, I mean.  I mean, banks have limited --
12   okay.  They do their due diligence, but they cannot
13   guarantee that, in any bank in the world, that they
14   can just discover all money laundering transactions.
15             Not suspicious.  I'm talking about money
16   laundering here that is 100 percent.  Really, I
17   suspect that they can't, any bank.
18   BY MR. CARTER:
19        Q.    Mr. Hobayb, you've offered an opinion that
20   banks in Saudi Arabia were not required to close
21   customer -- were not permitted to close or deny
22   customer relationships without authorization from the
23   regulator, right?
24        A.    Can you cite me to whatever -- can you
```

 1    direct me to whatever words they say that, in what

 2    context?

 3         Q.    "SAMA circular dated July 4, 1996,

 4    indicates that banks were required to open an account

 5    for any customer regardless of amount as long as

 6    certain documentation requirements were met.  From my

 7    experience and my review of the then-applicable

 8    regulations, I can confirm that a bank was only

 9    permitted to close an account following requests from

10    authorities, following a client request, or else by

11    following the procedures related to dormancy based on

12    this circular."

13            Do you see that?

14       MR. CURRAN:  Yeah, Mr. Carter, I just pointed to

15    that paragraph, that's Page 15, first full paragraph.

16       MR. CARTER:  In his report.

17    BY THE WITNESS:

18       A.    Yeah, because it's not on the screen.

19       THE WITNESS:  This paragraph?

20       MR. CURRAN:  First full paragraph.  Yeah, I'm

21    going to point.  Pre-9/11 --

22       THE WITNESS:  Pre-9/11.

23       MR. CURRAN:  -- he quoted some language from

24    that paragraph.

This Transcript Contains Confidential Material

```
 1        THE WITNESS:  Okay.

 2   BY THE WITNESS:

 3        A.    Can I have -- can I have a minute reading

 4   it, Mr. Carter, please?

 5   BY MR. CARTER:

 6        Q.    Sure.

 7        MR. CARTER:  And then if we can add up on the

 8   screen, the first two sentences of the next paragraph

 9   too.

10        MR. CURRAN:  If you want to read what's beyond

11   this, you can look at the hard copy you have or this.

12        THE WITNESS:  Yeah, okay.

13        MR. CURRAN:  I am not rushing you, but when

14   you're done reading, you can say you're ready for the

15   question or --

16   BY THE WITNESS:

17        A.    Yes, and even Mr. Carter, this is

18   confirmed in the AML, not to close the account even

19   for suspected -- suspected transactions, not allowed

20   to close the account.

21   BY MR. CARTER:

22        Q.    And, Mr. Hobayb, the way the system

23   worked, as you described it, is that where illegal

24   anti-money laundering activity was suspect --
```

This Transcript Contains Confidential Material

```
 1    suspected, the bank was required to report that to

 2    SAMA, right?

 3         MR. CURRAN:  Objection as to form, overbroad.

 4              You may answer.

 5    BY THE WITNESS:

 6         A.    Yeah, I need to refer to that, whatever

 7    document, but, yeah, from the top of my head, yes, to

 8    report --

 9    BY MR. CARTER:

10         Q.    Well, I'm reading from your report.

11              "In the cases where illegal AML activity

12    was suspected" --

13         A.    Yes.

14         Q.    -- "the bank was required to inform the

15    relevant authorities of the suspected activity."

16              That's what you say in your report, right?

17         A.    Yes, but you are putting SAMA here, which

18    I need to refer back to the AML guidelines.

19         Q.    Okay.  The --

20         A.    I remember -- I remember SAMA was in -- to

21    be -- being reported, but really, I need to see the

22    documents that I saw before.

23         Q.    And in the event that a suspected illegal

24    AML activity was reported by a bank, the relevant
```

This Transcript Contains Confidential Material

```
 1    authority would then conduct an investigation, right?

 2         MR. CURRAN:  Objection as to form.

 3              You may answer.

 4    BY THE WITNESS:

 5         A.    Yes.

 6    BY MR. CARTER:

 7         Q.    And that investigation could very well

 8    lead to the closure of the account, correct?

 9         A.    Correct, yes.

10         Q.    Now, do you know whether there was any

11    report of possible suspicious activity sent to the

12    relevant authorities concerning any account for

13    Al-Haramain at Al Rajhi Bank?

14         MR. CURRAN:  Objection as to form.

15              You may answer.

16    BY THE WITNESS:

17         A.    I don't know.  I didn't -- I don't know.

18    BY MR. CARTER:

19         Q.    Do you know whether Al Rajhi Bank made any

20    report of suspicious activity with respect to any IIRO

21    account it maintained?

22         MR. CURRAN:  Objection as to form.

23              You may answer.

24    BY THE WITNESS:
```

This Transcript Contains Confidential Material

```
 1      A.    I cannot.  It's not for Al-Haramain at --

 2   at that time, I mean.  I mean, it's not even

 3   conceivable to me that sending to the authority that

 4   IIRO or Haramain is suspected for drugs.  I mean, it

 5   is not conceivable to me at that time.

 6   BY MR. CARTER:

 7      Q.    What about Aqil al-Aqil, do you know

 8   whether any report of suspicious activity was

 9   transmitted to the relevant authorities with respect

10   to any account he held at Al Rajhi Bank?

11      MR. CURRAN:  Objection as to form.

12           You may answer.

13   BY THE WITNESS:

14      A.    I say again, same -- same answer.  I

15   wouldn't -- I wouldn't suspect that Aqil al-Aqil,

16   being highly regarded in the society for helping the

17   poor people and having a charity, Al-Haramain charity,

18   he would be, I mean, suspected for drugs or something.

19   It's all so unconceivable at that time.

20   BY MR. CARTER:

21      Q.    Well, you -- you talk a bit in your report

22   on Page 30 about the Aqil transactions, correct?

23      A.    Can you direct me, please, to that?

24      MR. CURRAN:  Yeah, Mr. Carter, if you're
```

This Transcript Contains Confidential Material

```
 1   shifting topics, I don't know if you are, but if you

 2   are shifting topics, I would like to take a break

 3   soon.

 4        MR. CARTER:  Sure.  How long?

 5        MR. CURRAN:  Ten minutes.

 6        MR. CARTER:  Okay.

 7        MR. CURRAN:  Well, Unless -- yeah, I think --

 8   yeah, ten minutes, ten minutes is okay.

 9        MR. CARTER:  That's great.

10        THE VIDEOGRAPHER:  All right.  We are going to

11   go off the record at 5:44 p.m.

12                  (WHEREUPON, a recess was had

13                   from 5:44 to 5:58 p.m.)

14        THE VIDEOGRAPHER:  Back on the record at

15   5:58 p.m.

16   BY MR. CARTER:

17        Q.    Mr. Hobayb, before we took a break, I was

18   directing your attention to the section of your report

19   beginning on Page 30, subheading (c), where you say:

20             "The Aqil transactions outlined by

21   Plaintiffs' experts do not indicate to me that the

22   Bank failed to monitor suspicious activity."

23             Do you recall that section of your report?

24        A.    Yes, sir.  Can you display it, please?
```

This Transcript Contains Confidential Material

```
 1        Q.    Sure.

 2        THE EXHIBIT TECH:  Sorry, this is the tech.

 3   Could you possibly give me the section again, please?

 4        MR. CARTER:  Oh, sorry, Evan.  It's on Page 30.

 5        MR. CURRAN:  You should say when you're ready to

 6   have a question.

 7   BY THE WITNESS:

 8        A.    Oh, I don't know which part of it.  Is it

 9   all (c) so I should read it all, or just part of it?

10   BY MR. CARTER:

11        Q.    I just asked, Mr. Hobayb, whether you

12   actually recall the section of your report that

13   addressed the Aqil transactions, correct?

14        A.    Yes, in general, yes.  Yeah.

15        Q.    Okay.  And the section of the Winer report

16   here that you cite covers 8.13 through 8.21, right?

17   That's section -- Footnote 204.

18        A.    Yes.

19        Q.    Okay.  And you say that:

20             "The transactions described generally

21   occurred intermittently over five years, and the

22   distribution of transactions over this time period

23   does not make the amounts unusual."

24             Do you see that?
```

This Transcript Contains Confidential Material

```
 1       A.    Okay.  Yes, the amounts that were

 2  described by -- in Winer's report, it was over five

 3  years.  And if you can see that -- if you can see in

 4  the opening paragraph that larger transactions,

 5  unusual patterns, things like this.

 6            Go on, what is the question, please, so I

 7  can --

 8       Q.    You are addressing here Mr. Winer's

 9  assessments of cash transactions involving accounts

10  held in Aqil's name, correct?

11       A.    Yes.  Yes, sir.

12       Q.    And with regard to those, you opine in the

13  second paragraph of this section of your report that

14  "the suspiciousness of large cash transactions is

15  based on relevant context"?

16       A.    Can you highlight that?

17       Q.    Sorry.  They are going to highlight it,

18  yeah.

19            "...suspiciousness of large cash

20  transactions is based on relevant context, such as the

21  normal activity of a particular account and what the

22  bank knows about the owner of the account."

23            Do you see that?

24       A.    Yes, sir.
```

This Transcript Contains Confidential Material

```
 1      Q.    And when you refer to the normal activity

 2   of a particular account, are you referring to its

 3   historical and traditional uses?

 4      A.    Everything, I mean, and the nature of the

 5   customer.  Everything.

 6      Q.    Okay.  But you talk here both about the

 7   nature of the customer, what the bank knows about the

 8   owner of the account, and the normal activity of a

 9   particular account.

10           When you're referring to the normal

11   activity of the particular account, are you referring

12   to its traditional and historical usage?

13      MR. CURRAN:  Objection as to form.

14           You may answer.

15   BY THE WITNESS:

16      A.    Part of it, yes, of course, of course.

17   But historical usage is part of knowing the customer

18   and knowing the nature of the activity, yes.

19   BY MR. CARTER:

20      Q.    And part of what the bank knows about the

21   owner of the account would include the information the

22   bank is required to compile as part of its Know Your

23   Customer obligations under the 1995 SAMA Guidelines,

24   right?
```

This Transcript Contains Confidential Material

```
 1      A.      Well, in that -- in that era -- in that

 2   era, the branch manager, branch personnel also

 3   exercised continuous Know Your Customer through the

 4   activities, through the routine activities.

 5      Q.      Right.  But I'm asking, there were certain

 6   requirements that Al Rajhi Bank was subject to under

 7   the SAMA Guidelines to collect information about

 8   individual customers, right?

 9      A.      Yeah, the AML -- you mean the AML 1995?

10      Q.      Yeah, the 1995.

11      A.      It has requirements, yes, many

12   requirements, many requirements.

13      Q.      And I'm just looking at it, and I think --

14   hopefully we don't need to turn to it, but the '95

15   guidelines say:

16              "The bank should seek information on the

17   customer's business or job title and that the bank

18   should be aware of the sources of the customer's

19   deposits, particularly those of significant cash

20   amounts."

21              Do you agree with -- that those were the

22   requirements in place during the 1998 to 2001 time

23   period?

24      A.      In general, yes.  That's what it says,
```

This Transcript Contains Confidential Material

```
 1   like this, yes.

 2        Q.    And going on, in that same paragraph, the

 3   final two sentences of your report say:

 4             "I would presume that charities,

 5   particularly during the 1990s, collected, deposited,

 6   and disbursed many cash transactions from donors.

 7   Saudi banking auditors such as myself, and other

 8   individuals familiar with Saudi society, large cash

 9   transactions in accounts associated with charities

10   would not have raised alarms before 9/11."

11             Do you see that section of your report?

12        A.    I can see it.

13        Q.    Okay.  When you are talking here about

14   money collected from donors, what -- what kind of

15   donations are you referring to?

16        MR. CURRAN:  Objection as to form.

17             You may answer.

18   BY THE WITNESS:

19        A.    All donations.  I mean, you -- you can see

20   that, for example, Haramain has -- has many -- many

21   accounts for different purposes that are specified in

22   their -- and I saw a list that shows different, like,

23   projects, objectives that Haramain has -- has put for

24   that.
```

1    BY MR. CARTER:

2         Q.    Okay.  Well, I understand you to be

3    indicating in your report here the possibility that

4    the money deposited into Aqil's account may have been

5    comprised of cash donations to Al-Haramain, is that

6    correct?

7         A.    Could you repeat the question again?

8         Q.    I understand you to be indicating in this

9    section of your report the possibility that the cash

10   deposited into Aqil's account may have been comprised

11   of cash donations to Al-Haramain.

12            Is that correct?

13        A.    May -- yes, yes, because, as you can see,

14   in other examples in the -- in the report that --

15   of -- for Winer that when they -- when they change --

16   when that -- when that Haramain asked to change the

17   account name from an actual person to a Haramain name,

18   that means that the -- the people associated with --

19   with the charities may also receive donations, be it

20   an Al-Qatiroh (phonetic) or any other person.

21        Q.    And -- and, again, you're -- you're

22   indicating here a familiarity with how society --

23   Saudi society worked at the time.

24            Are you talking here about individual cash

This Transcript Contains Confidential Material

 1    donations from, you know, individual Saudi citizens?

 2          MR. CURRAN:  Objection as to form, overbroad.

 3          You may answer.

 4    BY THE WITNESS:

 5          A.    I -- I mean, I did not specify either --

 6    either individuals or -- or something.  I did not

 7    really thought of -- of this question to be asked,

 8    otherwise I would have looked at it like this.

 9          But, I mean, donations from any donor,

10    from any donor, even from -- even from other, I mean,

11    entities, from -- from companies.  Maybe a company

12    wants to donate to Al-Haramain, maybe.  I don't know.

13    BY MR. CARTER:

14          Q.    Do you think during this time period that

15    a company that wanted to donate to Al-Haramain would

16    hand the money over in cash?

17          A.    See, give me an example.  I mean, I cannot

18    really assess anything.

19          Q.    Okay.  Well, you are the one -- you're --

20          A.    You're relating -- you're relating the

21    cash -- you are relating the cash to whether it's

22    being individual or non-individual, right?  Is this

23    what you mean?

24          Q.    No, no.  What I'm asking is that, you have

This Transcript Contains Confidential Material

1    raised the possibility in your report that based on

2    how Saudi society worked at the time, the money

3    deposited into Aqil's account may have consisted of

4    cash donations to Al-Haramain, that's what you have

5    said, right?

6         A.    Yeah.  Haramain --

7         Q.    Okay.  So from what I understand, what you

8    know about Al-Haramain's collection processes that

9    supports that theory, were you familiar with how

10   Al-Haramain collected money?

11        A.    I -- I have a general idea about -- I'm

12   not special -- specialized in charities by themselves,

13   about the operations of the charities, but I am an

14   auditor.  I am an expert auditor, not -- not -- I

15   imagine all -- all -- at that time being a -- very,

16   very much more than now, cash-based society, all

17   charities, they -- they open the mean for -- for

18   donors to -- to donate, even if they go to the office

19   of the -- of the charity and give them in cash.  So

20   it's all means that are there.

21        Q.    What were -- do you know what the most

22   common denominations of Saudi currency were in terms

23   of actual usage in the '90 to 2001 time period?

24        MR. CURRAN:  Objection as to form.

This Transcript Contains Confidential Material

```
 1              You may answer.

 2   BY THE WITNESS:

 3       A.    Do you mean what's the cash transaction?

 4   BY MR. CARTER:

 5       Q.    Yeah.  No, yeah.  What -- so, for

 6   instance, in the United States we have a hundred

 7   dollar bill, but it's not all that common for people

 8   to use them.

 9              What were the denominations in

10   Saudi Arabia during this time period that were most

11   commonly used?

12       MR. CURRAN:  Objection as to form.

13              You may answer.

14   BY THE WITNESS:

15       A.    Five -- the 500 riyal, I know that the

16   biggest note is 500 riyal.  One note, 500 riyal, which

17   is equivalent to a little bit maybe less than 200

18   dollar.  This is the biggest note now we have.

19   BY MR. CARTER:

20       Q.    Yeah.  How common was that in usage during

21   the 1998 to 2001 time period?

22       A.    I really forgot when was the 500 riyal was

23   introduced to the -- to the market by the government,

24   but it's being used too many times.  I mean, if it's
```

This Transcript Contains Confidential Material

 1    there, if it's bad cash -- big cash, I would imagine

 2    it's -- it's better to be in the 500 riyal notes.  So

 3    the size will be -- so the size will be smaller.

 4         Q.    So if -- if the -- if the deposit consists

 5    of money given by individual donors, are you

 6    suggesting that the individual donor contributing to

 7    Al-Haramain would have been using a denomination on

 8    the order of $200 to make a donation?

 9         A.    I really can't speculate.  I don't know.

10    I don't know what transaction took place.  I don't

11    know at the time the transaction, how well the

12    contribution -- the donation was -- was done.  Was it

13    in 500, was it in 100, I really don't know.

14         Q.    What were the -- what were the smaller

15    denominations in use at the time?

16         A.    Paper notes or --

17         Q.    Yeah, paper notes.

18         A.    One riyal.

19         Q.    Okay.  What were the other denominations?

20         A.    We have, like, a half riyal, quarter

21    riyal.

22         Q.    What about a one riyal?

23         A.    Ah, five -- five riyals, two riyals, 50

24    riyals, 100.  And there is the 200, but I'm sure that

This Transcript Contains Confidential Material

 1    200 was introduced post-9/11.  And the 500, the 500,

 2    I'm sure it was since long time, but I really don't

 3    know when did it start.

 4        Q.    And so to the extent that these deposits

 5    were comprised of money given to Al-Haramain by

 6    individual donors, wouldn't it be natural to expect

 7    that there would be a whole variety of denominations

 8    within the -- the total deposit?

 9        A.    I cannot speculate, Mr. Carter.  I cannot

10    speculate.  I really don't know that.  I can't -- I

11    can't imagine how the donor came with the cash and...

12        Q.    Okay.  So to the -- to the -- to the

13    extent you are offering an opinion that these were

14    comprised of donations to Al-Haramain, you don't have

15    any familiarity with how Al-Haramain went about

16    collecting donations, do you?

17        A.    I know --

18        MR. CURRAN:  Objection as to form.

19             You may answer.

20    BY THE WITNESS:

21        A.    I know all -- all charities, they -- they

22    are -- they publish their account, bank account

23    numbers in the newspapers.  They have offices to also

24    receive donations in -- in the form of checks or in

This Transcript Contains Confidential Material

```
 1   the form of cash.  This is the -- the thing I know.

 2   BY MR. CARTER:

 3       Q.    Now, you indicate later in this section

 4   that:

 5             "The transactions described generally

 6   occurred intermittently over five years, and the

 7   distribution of transactions over this time period

 8   does not make the amounts unusual."

 9             Do you see that?

10       A.    Yes, I see that, taking into

11   consideration -- are we talking now here about Aqil or

12   Haramain itself?

13       Q.    Well, you're -- you're talking here about

14   the transactions in the Aqil accounts.  It's your

15   report.

16       A.    Yeah, yeah.  I mean, five years, I

17   don't -- it doesn't really trigger any -- any alarm.

18   And being Aqil is highly regarded in the society for

19   being associated with a charity that is helping

20   people, no, I haven't.  Aqil -- I'm sure Aqil has a

21   banking with the bank or -- and maybe at other --

22   other banks also for a period prior to these

23   transactions so that they know.  I mean, Aqil, I would

24   presume, he is known by many branch managers and
```

1    personnel in Al Rajhi or -- or any other bank that he

2    deals with.

3            So I wouldn't -- I wouldn't see that this

4    snapshot of transactions would trigger suspicions that

5    Aqil is dealing in drugs.

6        Q.    Okay.  Well, let's -- let's talk about a

7    couple of things here, Mr. Hobayb, because you're

8    jumping away from the section I'm talking about.

9            You talk in this sentence about the

10   fact -- the fact that:  "The transactions...occurred

11   intermittently over five years, and the distribution

12   of transactions over this time period does not make

13   the amounts unusual."

14           When you're talking about the distribution

15   of transactions, are you referring to the timing and

16   concentration of the transactions?

17       A.    Yeah, because I'm -- I'm rebutting here to

18   some -- I guess I'm rebutting to some rationale that

19   saying, see how those amounts were occurred.  I --

20   I -- I remember that some of the amounts were occurred

21   almost on a daily basis.  But, again, still, they

22   don't -- they don't trigger, taking into consideration

23   that Aqil is associated with charity, highly regarded

24   and not conceivable to associate him with drugs.

This Transcript Contains Confidential Material

```
 1    And -- and -- and also we have to be reminded that

 2    everything was -- is about the sources of funds and

 3    being it's from --

 4         Q.    Okay.  I'm --

 5         A.    -- from drugs or illegal act --

 6    activities.  So all -- all of this collectively

 7    doesn't -- and I appreciate that some of the

 8    transactions that in al-Aqil occurred, some of them

 9    maybe on a daily basis or something, as I recall, I

10    don't remember.  But, still, I mean, his banking

11    relation -- banking relationship with the bank.

12              And so it's not just you take the -- those

13    consider -- repeated transactions on a daily basis for

14    a series of -- some period -- a period of time and you

15    isolate it from all other content and information.

16         Q.    Mr. Hobayb, I'm asking you about things --

17         A.    So to me --

18         Q.    -- that you say in your report.  So let

19    me -- let me -- let me ask you about your report and

20    this statement.

21              The particular statement here cites, and

22    is support for your opinion, the -- the claim that:

23              "The transactions generally occurred

24    intermittently over five years, and the distribution
```

This Transcript Contains Confidential Material

 1   of transactions over this time period does not make

 2   the amounts unusual."

 3            Focusing on that statement in your report,

 4   is it correct that the transactions cited in

 5   Mr. Winer's report generally occurred intermittently

 6   over five years?

 7      MR. CURRAN:  Objection as to form.  I object in

 8   particular to the commentary that preceded the

 9   question.  I object to the characterization of the

10   prior answer.

11            Mr. Carter, the paragraph you are

12   referring the witness to begins with "With this

13   context in mind," and then you are accusing Mr.

14   Al-Hobayb --

15      MR. CARTER:  Mr. Curran, please stop testifying.

16   He specifically offered an opinion based on the timing

17   and distribution of the transactions.  I am entitled

18   to ask him about that statement --

19      MR. CURRAN:  He is entitled to provide the

20   context.

21      MR. CARTER:  -- and his understanding of that

22   statement.

23      MR. CURRAN:  He is -- he is entitled to provide

24   the context, which is part of the paragraph you are

This Transcript Contains Confidential Material

```
 1   referring him to.  But the witness may answer.

 2   BY THE WITNESS:

 3        A.    Well, take -- take my -- take my paragraph

 4   in totality, in addition to the previous comment here,

 5   you can just continue reading the paragraph.

 6   "Additionally" -- what does it say?  You can read it

 7   yourself:

 8             "Additionally, Aqil's affiliation with the

 9   charity would have been well-known."

10             So --

11        Q.    And, Mr. Hobayb, you say that --

12        A.    I cannot --

13        Q.    -- the transaction --

14        A.    Excuse me.  Let me interrupt you, please,

15   sir.  My apologies for this interruption, but

16   just don't take one line and just omit the other

17   lines.

18        Q.    Okay.  Well, Mr. Hobayb, you say that the

19   trend --

20        A.    Read -- read the whole paragraph, please.

21        Q.    Mr. Hobayb, I am entitled to ask you about

22   assertions you make in your report.  You say in your

23   report that the transactions addressed by Mr. Winer

24   generally occurred intermittently over five years.
```

This Transcript Contains Confidential Material

```
 1                Is that correct?

 2        A.    Yes, sir.  This is what I saw in the

 3   account statements, yes.

 4        Q.    Didn't you just acknowledge in earlier

 5   testimony that there was a significant concentration

 6   of cash deposits on an almost daily basis during a

 7   certain period of time?

 8        A.    Yes, I remember saying something like

 9   that.

10        Q.    Okay.  And you acknowledge in your report

11   that the timing and distribution of transactions is

12   relevant in assessing whether or not they're

13   suspicious, right?

14        A.    One of the relevant elements.  Also,

15   knowing the customer is.

16        Q.    And in terms of knowing the customer,

17   you've gone to this a few times now, you say that Aqil

18   was well known during this time period.

19                Is that my understanding?

20        A.    This is my understanding because he was

21   associated with the -- because all cash transaction

22   were associated with knowing the customer itself, and

23   Aqil was known for charity.  And being a cash-based

24   society and knowing that charities use a lot of cash
```

This Transcript Contains Confidential Material

```
1    for -- either for -- for -- from don- -- from donors

2    or as disbursements to -- to the poor people and the

3    needy people, then just take them to the -- it's not

4    out of context.  I mean, you have to relate it to the

5    context.

6         Q.    Okay.  And -- and did you know Aqil

7    al-Aqil during this time period?

8         A.    Personally, no.

9         Q.    Did you know who he was?

10        A.    I remember -- I remember Aqil was a

11   Haramain charity, something, yeah, at that time, at

12   that time period.

13        Q.    So Al-Haramain was a prominently known

14   organization?

15        A.    Generally, yes, I think so.

16        Q.    Was there a lot of information available

17   about it in the public domain?

18        A.    I didn't recall, but -- I didn't recall.

19        Q.    Okay.  And you say that "Aqil's

20   affiliation with the charity would have been

21   well-known," right?

22        A.    What is that?

23        Q.    You say in your report:  "Aqil's

24   affiliation with the charity would have been
```

This Transcript Contains Confidential Material

```
 1   well-known," right?

 2        A.    Yes, yes, for sure.  Bank personnel, I'm

 3   sure they do.

 4        Q.    Okay.  And the bank personnel would have

 5   then known that Aqil was an employee of the charity,

 6   right?

 7        A.    He was head of the charity, yes.

 8        Q.    Well, they would have known he was an

 9   employee of the charity, right?

10        MR. CURRAN:  Objection as to form.

11   BY THE WITNESS:

12        A.    I don't -- I don't remember, I mean, what

13   was -- I mean, he was head of the charity.  He was

14   managing the charity, I think so.  From the papers,

15   the documents, they show that he was authorizing

16   the -- instructing the bank for -- when opening an

17   account, authorizing signatories, things like this.

18   So he's...

19   BY MR. CARTER:

20        Q.    And -- and the bank would, therefore, know

21   that Aqil's sources of personal income would be his

22   salary from the charity, right?

23        MR. CURRAN:  Objection as to form.

24             You may answer.
```

This Transcript Contains Confidential Material

1    BY THE WITNESS:

2        A.    Well, I mean, there are employees who

3    receive salaries and they have some -- some people

4    they have business activities, at the same time

5    different sources.  I mean, it's not all just a

6    salary, no.  Maybe business -- businesses.

7    BY MR. CARTER:

8        Q.    The SAMA Guidelines require that Al Rajhi

9    Bank to have an understanding of his job and the

10   sources of his deposits, particularly those in

11   significant cash amounts, right?

12       A.    Which part of SAMA Guidelines?

13       Q.    It's the SAMA Guidelines, the 1995 SAMA

14   Guidelines on 139, concerning "personal account for an

15   individual."

16       A.    Can you display it, please?

17       Q.    Sure.

18       THE EXHIBIT TECH:  This is the tech.  Was that

19   exhibit -- or Tab 24 that we were looking at?

20       MR. CARTER:  Oh, yeah, it's Tab 1R, and if we go

21   to the page handwritten 139, Evan.

22       THE EXHIBIT TECH:  Great.  Thank you, sir.

23   BY MR. CARTER:

24       Q.    Okay.  And do you see where it says

This Transcript Contains Confidential Material

```
 1    "Personal Account for an individual"?

 2        A.    Show me.

 3        Q.    It's about two-thirds of the way down.

 4              These are the SAMA Guidelines you cite

 5    quite a number of times in your report, right,

 6    Mr. Hobayb?

 7        A.    Yeah, I'm just trying to just read to

 8    refresh, please.

 9              Yeah, which -- which bullet point?

10        Q.    Okay.  And so under these Know Your

11    Customer requirements, Al Rajhi Bank was required to

12    seek information on Aqil's business or job title,

13    right?

14        A.    Yes.

15        Q.    Okay.  And his job title during the time,

16    as I understand it, was director of Al-Haramain

17    Foundation, right?

18        A.    I don't know at the opening of his account

19    when was that and...

20        Q.    You didn't evaluate what information Al

21    Rajhi Bank had in its possession concerning Aqil

22    al-Aqil's job?

23        MR. CURRAN:  Objection as to form.

24              You may answer.
```

This Transcript Contains Confidential Material

1    BY THE WITNESS:

2        A.    No.  He is the head of that at the time of

3    the -- do you have the date of what time he opened the

4    account?

5    BY MR. CARTER:

6        Q.    Well, you've -- you've conducted an

7    assessment here about whether or not the transactions

8    were suspicious.  As I understand your testimony, part

9    of assessing whether or not they're suspicious --

10       A.    Yes.

11       Q.    -- would be determined by what the bank

12   knows about the customer --

13       A.    Yes.

14       Q.    -- his job and his sources of income,

15   right?

16       A.    Banks should seek information about

17   (indiscernible, reading to self).

18             Are you referring to the second bullet

19   point?

20       Q.    I am.

21       A.    Okay.

22             Yeah, that's -- yeah, okay.  They are more

23   or less the same.

24       Q.    Okay.  And they should also have an

This Transcript Contains Confidential Material

```
 1    understanding of the sources of the customers'

 2    deposits, particularly those of significant cash

 3    amounts, right?

 4         A.    The third bullet point?

 5         Q.    Yes.

 6         A.    No.  The Arabic one is -- is different.

 7    It says that --

 8         Q.    What does the Arabic one say?

 9         A.    It says that the sources at the account

10    opening time -- at the account opening.

11         Q.    Okay.

12         A.    Especially large deposit, I mean, you open

13    an account with very large deposit, because you don't

14    know the customer, from where he got the money, and he

15    wants to open an account.  And it is logical, very

16    logical.

17         Q.    Okay.  If we turn then to 150 of the

18    document, the Al Rajhi was also required to pay

19    attention to indicators of possible money laundering

20    and illegal activity, right?

21         A.    Yeah, the general indicators is the AML

22    1995, yes, the general indicator.

23         Q.    And one of those is large withdrawals or

24    deposits inconsistent with customer's activities,
```

This Transcript Contains Confidential Material

1    right?

2         A.    Large deposits of checks?

3         Q.    The last one, large withdrawals or

4    deposits inconsistent with customer's activities.

5         A.    Yes, and this is -- see, this is also

6    another proof that knowing the customer -- the nature

7    of the customer is you just -- you don't just take the

8    amount as isolated thing.  You always have to relate

9    it to a context, to --

10        Q.    And the context here for Al Rajhi Bank

11   would include the historical usage of the account,

12   right?

13        A.    All information, all information.

14        Q.    It would also include the nature of Aqil's

15   job, right?

16        A.    Yes.

17        Q.    And the sources of his personal income,

18   right?

19        A.    Yes.

20        Q.    Okay.  Did Aqil al --

21        A.    And you are assuming -- let me complete,

22   please.

23        Q.    Sure.

24        A.    I believe there is -- here you are

 1    assuming that Aqil has only -- is only the salary.

 2    Maybe the -- the branch employees know that Aqil is

 3    doing some real estate business, for example, or

 4    whatever.

 5         Q.    You're just speculating?

 6         A.    If you have evidence of otherwise, please

 7    do.

 8         Q.    Well, do you -- do you have any

 9    evidence --

10         A.    I didn't see -- I didn't see evidence.

11    This is the norm.  This is the norm.  I mean, that,

12    you know, you always interact with your customers.

13    Customers, you -- not like now.  Now -- now everything

14    is in the application.  In the apps, you can just do

15    banking and things like this.

16              In that era, you have to go and visit the

17    bank to do things.

18         Q.    So --

19         A.    So there was much more opportunity that

20    you know the customers.  I mean, mostly, I -- I think,

21    a customer like al-Aqil, he goes to the branch manager

22    who is the routine branch manager.  And, for example,

23    if he deposits or withdrawal or whatever like this, he

24    checks with him so they get to know him.  So that they

This Transcript Contains Confidential Material

1  get to know him.

2      Q.    Okay.  So you think that there would have

3  been direct interaction between the branch manager and

4  Aqil with regard to the transactions of this nature?

5      A.    No.  I mean -- I mean, when he -- when he

6  wants to bank, some -- some people, they just go and

7  visit the branch and bank with the branch.  They do

8  transaction at the -- at the branch, especially

9  that -- the electronic means at that time were not

10  like -- look like now.  It was -- a lot of things

11  were -- were manual.

12      Q.    Mr. Hobayb --

13      A.    So it's -- it's very conceivable that --

14  that -- that the branch personnel know -- know Aqil

15  and his nature of business better than you and I.

16      Q.    Yeah.  Mr. Hobayb, isn't it true that the

17  money laundering protocols focused not only on the

18  identity of the -- of the customer but also the nature

19  of the transaction?

20      A.    Yeah, in general, in context it talks

21  about many things, I mean, yeah.  What do you mean by

22  the amount of transaction?  I mean, even everything, I

23  mean.  I need an example to understand what you mean.

24      Q.    Well, isn't part of the reason that the

This Transcript Contains Confidential Material

```
 1   system is set up that way is to avoid people relying

 2   upon their prejudices and assumptions about customers

 3   and ensuring that they're actually conducting some

 4   objective evaluation of best possible involvement of

 5   money laundering?

 6        MR. CURRAN:  Objection as to form, lack of

 7   foundation.

 8            You may answer.

 9   BY THE WITNESS:

10        A.   I didn't understand what this -- the AML

11   1995 is clear, if I -- if I heard what you say.  I

12   mean, the bank has to comply with it.  The bank did

13   what it has to be done based on what I saw to draw

14   my -- my opinion.  And I have put my -- the basis how

15   I derive my opinion and that -- and this is...

16   BY MR. CARTER:

17        Q.   Mr. Hobayb, Aqil al-Aqil was a person,

18   right?  He is not himself a charity?

19        A.   He is not what?

20        Q.   He is not himself a charity.  Aqil al-Aqil

21   is a person, right?

22        A.   I know, yes, he is a person, yes.

23        Q.   Okay.  And Aqil al-Aqil is not himself a

24   charity, right?
```

This Transcript Contains Confidential Material

```
 1        MR. CURRAN:  Objection as to form.

 2   BY THE WITNESS:

 3        A.    I don't -- I don't know.

 4   BY MR. CARTER:

 5        Q.    And in order for banks to maintain

 6   accounts for charities during this time period, they

 7   need to verify that the charity was licensed, right?

 8        A.    Yes, yeah.

 9        Q.    Okay.  Was Aqil al-Aqil licensed as a

10   charity?

11        MR. CURRAN:  Objection as to form.

12             You may answer.

13   BY THE WITNESS:

14        A.    He is a -- he is a person.  But I can tell

15   you something about the society at that time, and even

16   now, that you give your do -- your donation to a

17   person who can just distribute it to -- to the poor

18   people.

19   BY MR. CARTER:

20        Q.    Okay.

21        A.    You -- you understand my -- my question?

22             And -- and this is a -- and those are

23   examples that Winer has -- has put that -- about the

24   Al-Haramain requests -- requested to change the
```

This Transcript Contains Confidential Material

1    account name from the individuals associated with them

2    to the -- to the charity.  This to me indicates that

3    there are charity -- charities or donations come by

4    people maybe know those people because they are highly

5    regarded persons maybe in their areas or their cities

6    or whatever, like this, and deposited in his account.

7              This is what I presume.  This is what I

8    read.  This is my assumption on this.

9    BY MR. CARTER:

10        Q.    But these are -- these are cash deposits,

11   right?

12        A.    Which deposits you are talking about?

13        Q.    Well, the section of your report that we

14   are discussing addresses cash deposits, largely cash

15   deposits into Aqil's account, right?

16        A.    In Aqil accounts?

17        Q.    Yes.

18        A.    What about -- what about --

19        Q.    Well, the section of your report we've

20   been discussing concerns your assessment of cash

21   deposits into Aqil's account, right?

22        A.    Yes.

23        Q.    And you're speculating that the money

24   deposited may have been comprised of donations to

This Transcript Contains Confidential Material

```
 1  Al-Haramain, right?

 2       A.    Maybe.

 3       MR. CURRAN:  Objection as to form.

 4             You may answer.

 5  BY THE WITNESS:

 6       A.    Maybe.  Maybe business.  I cannot

 7  speculate.

 8  BY MR. CARTER:

 9       Q.    How many -- how many accounts did

10  Al-Haramain have in its own name at Al Rajhi Bank in

11  1999?

12       A.    I don't recall.  I don't recall now how

13  many, but there -- there are many.

14       Q.    So Al-Haramain had its own accounts for

15  carrying out any charitable work it was licensed to

16  do, right?

17       A.    Yes.

18       Q.    Why would Al-Haramain's banking activities

19  be carried out through a personal account in the name

20  of Aqil?

21       A.    I can't speculate.  Maybe that -- that

22  person before being associated with the -- with

23  Al-Haramain, maybe he was getting donations and

24  disbursing it to more people, and then they decide
```

```
 1    to -- that funds to be in a Haramain, the cash or the

 2    transactions, donations contributed in his name at

 3    certain point of time, and Haramain management decided

 4    that to fix things and to change the name from the

 5    person to the -- I mean, I cannot speculate, but this

 6    is just one of the assumptions.

 7         Q.    Okay.  You -- but you can't -- you don't

 8    know?

 9         A.    No, I don't know.

10         Q.    And based on all of your experience as an

11    auditor, isn't it a concern where there's evidence

12    that a person's account is being used to carry out

13    affairs on behalf of someone other than the account

14    holder?

15         MR. CURRAN:  Objection as to form.

16              You may answer.

17    BY THE WITNESS:

18         A.    Do you mean somebody else is managing

19    somebody else's account or what?  I don't know what it

20    is.

21    BY MR. CARTER:

22         Q.    I'm saying that there's an account in the

23    name of one person, and in reality the money flowing

24    through that account is actually money of some other
```

This Transcript Contains Confidential Material

```
 1   party?

 2        A.    It depends on the scenario.  I don't know.

 3        Q.    It's a possible -- it's a possible red

 4   flag, right?

 5        MR. CURRAN:  Object as to form.

 6             You may answer.

 7   BY THE WITNESS:

 8        A.    I have to get real -- real example so I

 9   can assess.  It is not just -- I cannot re --

10   BY MR. CARTER:

11        Q.    Let me go back.

12             Looking at the -- one of the Aqil's

13   accounts in issue, and we're talking about Tab 14

14   here, the document previously marked as ARB 49.

15                  (WHEREUPON, a certain document was

16                   marked Fawzi Al-Hobayb Deposition

17                   Exhibit No. 10, for identification,

18                   as of 02/09/2024.)

19   BY MR. CARTER:

20        Q.    Mr. Hobayb, tell me when you have that in

21   front of you.

22        A.    I have the English one, but I am waiting.

23   Is there another one or no?  But anyway, please, go

24   ahead, Mr. Carter.
```

This Transcript Contains Confidential Material

```
 1       Q.     There is the Arabic behind it.

 2              Is this one of the Aqil's account

 3    statements that you reviewed in connection with your

 4    opinions about whether transactions associated him --

 5    with him were suspicious?

 6       A.     By the way, is it the same version, the

 7    Arabic and the English?  They're not, Mr. Carter.

 8    Should I look at --

 9       Q.     Well, that's the second page of the Arabic

10    and the -- now you're on the same page with the two

11    documents.

12       A.     Oh, okay.

13              Okay.  Go on.  I think I have it.  I saw

14    this.  I think I saw it, yes.

15       Q.     And this is -- this is one of the -- or

16    this is -- this document reflects a set of the

17    transactions that Mr. Winer addressed in his report

18    and that you address in your report, right?

19       A.     This is I think the one that's over five

20    years.  Is this that account, right?

21       Q.     Well, there's two accounts that Mr. Winer

22    addressed, and -- and between them they span a period

23    of five years.  This particular account, I believe,

24    spans a little more than two years.
```

This Transcript Contains Confidential Material

```
 1        A.      I remember I saw an acc- -- an account

 2   that from the beginning, the start was, like, five

 3   years and a total --

 4        Q.      Okay.  Well, there were a couple of

 5   accounts.  This is one of the ones that Mr. Winer

 6   commented upon and that you were responding to.

 7        A.      Okay.

 8        Q.      And it's my understanding is that the

 9   information we have on this account is that we have

10   a -- our information about it begins on January 10th,

11   1998, and that the last transaction reflected -- well,

12   it is March 2nd, 2002.

13        A.      You talk about transactions.  Now you talk

14   about the statement attached or the statement provided

15   here?

16        Q.      Yeah, it's -- it's -- that's the period of

17   activity.

18        A.      Okay, sir.

19        Q.      Okay.  And did you review this?

20        A.      I remember, yes.

21        Q.      And beginning with the -- the transaction

22   activity that we see and account activity that we see

23   between January of 1998 through March 15th of 1999, do

24   you agree with me --
```

This Transcript Contains Confidential Material

```
 1       A.      What period is it?

 2       Q.      It's from the first transaction on the

 3  first page, which is dated to January 10, 1998, as I

 4  understand it, and continuing through the first

 5  transaction on the second page which is dated to March

 6  15th, 1999.

 7               Do you follow the period I'm referring to?

 8       A.      Yes, although the Arabic one is in Hijri,

 9  we call it Hijri calendar, not in Gregorian, but I

10  would assume that the -- that that conversion is -- is

11  correct.

12       Q.      Okay.  So --

13       A.      The behavior of the -- of the statement in

14  the English, the English one, and even in the Arabic

15  one, says this statement is from January 1st, 1998,

16  until December 31st, 2002.

17       Q.      Yeah, that's the --

18       A.      So this is over five years.

19       Q.      Right.  That's the total span of the

20  transaction history reflected in the document, right?

21       A.      Or the history of the -- I mean, the

22  transactions of -- of Aqil depends on how many years

23  he was banking with the -- before this statement.  I

24  mean, you have transactions before this statement,
```

This Transcript Contains Confidential Material

1    many transactions after this statement, yeah, but I

2    forgot, yeah.

3         Q.    For purposes of assessing whether or not

4    activity in this account was suspicious, did you

5    assess the historical usage of the account?

6         A.    I was rebutting to a report.  I mean, why

7    it is suggested based on this statement that he had

8    comment on it, so I have to go back to that.

9         Q.    Okay.  But -- but one of the factors that

10   you've acknowledged to me is relevant in assessing

11   whether or not a transaction or set of transactions is

12   suspicious is how the account was historically used,

13   right?

14        A.    Part of knowing the customer.  I mean,

15   part -- for example, when you -- the two accounts,

16   this is only from my memory, the two accounts, one

17   reached, like, 15 million or 17 million.  The other

18   one also reached balances like -- like this.

19              So it's a -- there are activities in

20   his -- in his account.  I mean, even those act -- even

21   these numbers.  I mean, when you say this is a large

22   amount or not a large amount, this is -- you have

23   to -- it is not -- you have to relate it to something

24   else.

This Transcript Contains Confidential Material

```
 1      Q.    Okay.

 2      A.    Not every cash -- not every cash deposit

 3  into the account --

 4      Q.    And part of the something -- part of the

 5  something else you would relate it to is the

 6  historical activity in the account, right?

 7      A.    Yeah, part of the -- part of the

 8  customer's relationship with the bank.  I mean,

 9  when -- when you -- when you -- maybe I should explain

10  it in this way.

11            When you see these -- if you want just to

12  see a snapshot or to assist a snapshot of these

13  amounts with isolation of all, omitting everything

14  else, knowing the customer, knowing the relationship

15  with the customer, knowing the business -- that the

16  branch person -- personnel know their -- some of his

17  businesses, connection with that, with the charity.

18            But if you want to just to isolate only

19  these, yes.  Is -- the question is, maybe he has same

20  like these amounts in different time periods.  So just

21  having these amounts, and we assess it that every --

22  let's say -- let's say over certain period of time

23  that there are cash deposits every day.  Wow, this is

24  suspicious.  No, it's not.  It may not be suspicious.
```

This Transcript Contains Confidential Material

 1    Take into consideration all other things.

 2            Let me tell you a story.  A jewelry shop,

 3    jewelry shop sells, especially at that time, a lot in

 4    cash.  So it's very conceivable that on a daily basis

 5    the jewelry shop deposits in his -- their bank account

 6    at the bank 2 million riyal every day.  It's

 7    conceivable.

 8       Q.    Yeah, but he is not a jewelry shop, is he,

 9    Mr. Hobayb?

10       A.    Yeah.  I'm just giving you a flavor of how

11    you relate the amounts to the -- to the person.

12       Q.    Right.  And part of that -- part of that

13    is assessing how the account was historically used

14    leading up to the set of transactions at issue, right?

15       A.    Maybe, yes.

16       MR. CURRAN:  I object to the repeated

17    interruptions, but continue.

18    BY THE WITNESS:

19       A.    I mean, part -- part of it.  For me, I

20    mean, I'm not the bank personnel at that time, but,

21    yes, maybe.  It may be helpful.

22    BY MR. CARTER:

23       Q.    We -- the information we have available to

24    us begins in this case from January of 1998.

This Transcript Contains Confidential Material

```
 1              Did you ask for information concerning the
 2   usage of the account prior to that date?
 3        A.    I did not even think to ask about it
 4   because al-Aqil is just a -- at that time and every --
 5   and pre-9/11 all the focus, as I said, Mr. Carter, was
 6   on drugs and -- and sort of like this.
 7              Having -- and even the charities were not
 8   in the -- in the radar at that time globally.  Even
 9   Al-Haramain -- even Al-Haramain -- let me complete,
10   please, my sentence.
11              Even Al-Haramain itself, they have one or
12   two offices and operations in the US.  They were --
13   they were closed in 2004.
14              You understand -- you understand that how
15   the cash -- how -- how -- how people or how that
16   society visioning this, even banks.  If you -- if you
17   don't have suspicions that -- that Aqil himself is
18   associated with drugs, and at the same time what's
19   available to you is -- this is -- you all -- you
20   need -- you only need to focus on sources of funds and
21   knowing what the customer is.
22        Q.    Yeah, and let's try and do that,
23   Mr. Hobayb.
24        A.    Yeah, this is what I'm trying to do.
```

This Transcript Contains Confidential Material

1    Q.    Let's look at -- let's look at the

2    information we have about this account, which is what

3    I'm trying to do.  And during the period from January

4    of 1998 through March of 1999, do you agree with me

5    that the total balance in the account was at its

6    highest point 30,194 riyals and 72 cents -- I'm sorry,

7    that's not -- I'm looking at the wrong thing.

8          That the total balance in the account

9    during this January of 1998 through March of 1999

10   period never exceeded 29,458 riyals and 94 cents, and

11   hit a low point in March of 1999 of minus 1,207.11

12   riyals?

13      MR. CURRAN:  Objection as to form.  Also, I

14   don't think the witness can see that from this slide

15   that's on the scree.

16   BY THE WITNESS:

17      A.    Yeah, I don't see it.  I didn't see any.

18   It was talking something that I couldn't see.

19          What is the question?

20   BY MR. CARTER:

21      Q.    I'm asking the point -- the question about

22   whether you agree that between January of 1998 and

23   March of 1999, the -- the value in Aqil's account

24   never went above 29,458 riyals, a little bit of

This Transcript Contains Confidential Material

```
 1    change, and hit a low point on March 15th of 1999 of a

 2    little over negative 1,207 riyals?

 3         MR. CURRAN:  To answer that question, you'd have

 4    to scroll through the full document.

 5    BY THE WITNESS:

 6         A.    Yeah, I'm sorry, Mr. Carter, I got

 7    confused.  This is the start of the -- okay.  I will

 8    go, Mr. Carter, from January 1st.

 9               Let me just explain it to you.  You just

10    stop me at the portion that you -- you want me to stop

11    at.

12               How do I scroll down, like this?  Ah,

13    okay.

14               Okay.  So this is January 1st, 1998.

15    Okay.  The balance was a million, 2 million, 3

16    million, 4 million, 4 million.  Okay.  Then continue.

17    The balance is like --

18         Q.    Mr. Hobayb, I'm trying really hard to

19    focus you on a period of time here that's reflected in

20    the accounts from the date at the top of the English,

21    which is January 10th, 1998, on the first page,

22    through the date March 15th of 1999, which is the

23    first page of ARB 1455.

24         A.    Let me go back here.
```

This Transcript Contains Confidential Material

```
 1              Of course, they have here the Hijri

 2    calendar and here the Gregorian, so I get really

 3    confused.  But here it is starting --

 4              Do you -- do you mean from the opening

 5    date to March 1999?

 6        Q.    We don't -- I think to be fully accurate

 7    here, I don't think we have the opening date of the

 8    account, because under the discovery process, we only

 9    have access to what happened between January 1st of

10    1998 and December 31st of 2002.

11              So what we have here is extracted account

12    information for this account covering that period, and

13    I'm asking if you can look at the set of transactions

14    that occurred and the activity in the account from

15    March 10th of 1998, which is the first entry we have,

16    through --

17        A.    Okay.

18        Q.    -- I'm sorry --

19        A.    Okay.  This date, this date corres- --

20    corresponding, okay.  I think this is the one:

21    10,000, then 1,000, then 900, then -- then 260, then

22    2,200 transactions, then 29,000, then 1,000.  Okay.

23        Q.    Okay.  So during this period from

24    January 10th of 1998 through March 15th of 1999, which
```

This Transcript Contains Confidential Material

```
 1    is a little over a year --

 2         A.    And the last transaction was what, 100, so

 3    I can just scan between the two documents, please --

 4         Q.    The --

 5         A.    -- if I have time, maybe, but because --

 6         Q.    It's 1500 -- it's a withdrawal of 1,590

 7    riyals, is the last transaction in the period, the

 8    deduction of -- deduction of credit card dues.

 9         A.    Yes, okay.  Now I got it.

10         Q.    Okay.

11         A.    I'm thankful you for that.

12         Q.    So -- so during this span of about

13    14 months, do you agree with me that the highest

14    account balance that is reached in this Aqil account

15    is 29,458 riyals and a little change?

16         A.    Yes.

17         Q.    Okay.  And during this period, the account

18    reaches a low point on March 15th of 1999 of a little

19    over negative 1,207 riyals?

20         A.    Yeah, whatever.

21         Q.    And so that is the -- the snapshot of the

22    activity we have in the account for a little over a

23    year, right?

24         A.    For a certain period of time for one
```

This Transcript Contains Confidential Material

```
 1   account.

 2        Q.    And then as we've discussed, beginning on

 3   May 5th, 1999, and continuing --

 4        A.    Which -- which transaction starts with,

 5   because this is --

 6        Q.    The -- the transaction that starts is the

 7   deposit on May 5th of 1999 in cash of 440,792 riyals.

 8        A.    Okay.  Yeah, I got it.  I can see it, yes.

 9        Q.    And -- and that happens on May 5th, right?

10        A.    I would presume the conversion is correct.

11        Q.    Okay.  Well, assuming the conversions are

12   correct, we have that deposit on May 5th, then on

13   May 6th we have another cash deposit of 676,708

14   riyals, correct?

15        A.    Yes, sir.

16        Q.    And then on the 8th, two days later, we

17   have deposit of 1,259,430 riyals, right?

18        A.    Yes, sir.

19        Q.    And then we have another cash deposit the

20   very next day of 684,044 riyals, right?

21        A.    Okay.

22        Q.    And then the day after that, we have

23   another cash deposit by Aqil of 690,340 riyals,

24   correct?
```

This Transcript Contains Confidential Material

```
 1        A.    Okay.

 2        Q.    Do you agree?

 3        A.    This is what I see in the document in

 4   front of me.

 5        Q.    And based --

 6        A.    I reviewed the -- I reviewed the Arabic,

 7   but I -- I would presume this is correct, the

 8   translation is correct.  I don't know.

 9        Q.    Yeah, and this -- Mr. Hobayb, your report

10   was written in English, right?

11        A.    Yes.

12        Q.    Okay.  And so you -- you are proficient in

13   reading and writing English, right?

14        A.    Yes, to a certain extent.  But because

15   there are -- there are -- you are talking here about

16   account statements, bank account statements.  You are

17   talking about transactions, numbers.  So I'm just

18   trying to tally between the two.  Because the one I

19   show was the Arabic one.  So it's not fair for me just

20   to assess a document that I saw it, maybe, but my

21   review was the Arabic one.

22        Q.    Okay.  I am just making sure.

23        A.    It has nothing to do with my -- with my

24   English.
```

```
 1         Q.     I'm just making sure.

 2                And you agree with me that this pattern of

 3    large cash deposits continues through July 14th of

 4    1999 when there's a cash deposit of 23,631 riyals,

 5    correct?

 6         A.     Where is that?

 7         Q.     That is on 41460.

 8         A.     Yeah, okay.

 9         Q.     And that -- in that span of -- and in that

10    span of time, there is an additional -- a -- a large

11    check deposit as well in the amount of 5 million

12    riyals on May 25th, 1999, correct?

13         A.     Where is that?

14         Q.     It says 5 million there.

15         A.     Where is the check, 5 million...

16         Q.     It is on 41456.

17         A.     Yeah, just one second.

18                Yeah, yes, a check, yes.

19         Q.     And -- and during this time, the deposit

20    amount in the account climbs from the minus 1,207

21    riyals that we referenced earlier up to 19,777,552

22    riyals and change, right?

23         A.     Yes.

24         Q.     And during that time, there is only a
```

This Transcript Contains Confidential Material

 1    single -- I'm sorry.

 2             During that same time period, there's no

 3    withdrawal from the account, right?

 4        A.    Yeah, for a certain period of time there

 5    was no withdrawals, yes.

 6        Q.    And so during that time, there is only

 7    deposits coming in which drive the value of the

 8    account up over 19 million riyals, right?

 9        A.    Yes, sir.

10        Q.    Okay.  And then beginning on July 27 of

11    1999, there are a series of withdrawals, correct?

12        A.    Just a second, please, sir.  Can you

13    display it?

14        Q.    There's a withdrawal of --

15        A.    The one that starts with 2.7?

16        Q.    Yeah, 2.76 million riyal withdrawal --

17        A.    Yeah, yeah.

18        Q.    -- and there are some other withdrawals.

19             And then we lead up to August 20th when

20    16,900,000 riyals is withdrawn from the account in

21    a -- in a single transaction, right?

22        A.    In a check, by a check.

23        Q.    Yep.  Correct?

24        A.    Yes.

This Transcript Contains Confidential Material

1    Q.    Okay.  Now, am I correct that you don't

2    regard these near -- nearly -- near daily cash

3    deposits as large as 1.259 million riyals, which

4    inflated the account from minus 1207 riyals to over

5    19 million riyals in the span of just a little over a

6    two-month period, that doesn't concern you as

7    potentially suspicious?

8        MR. CURRAN:  Objection as to form.

9            You may answer.

10   BY THE WITNESS:

11       A.    No, taking all other considerations about

12   knowing the customer and the nature of the customer

13   and being a charity, not at all.  And that in fact --

14   in fact, maybe he has other accounts.  Maybe he

15   has prior -- and even the same account in prior

16   periods, maybe you have much more amounts than this.

17   I don't know.

18           Branch personnel, they know.  They know

19   about the customer.  They know.  But I don't -- I take

20   into consideration all what I -- circumstances around

21   this.  I don't see -- it's not -- again, it's not only

22   by the amount, the inflation, no.  It doesn't go like

23   this.

24   BY MR. CARTER:

This Transcript Contains Confidential Material

```
 1        Q.      You -- you don't know what the -- you

 2   don't know what the branch managers knew about Aqil,

 3   do you?

 4        A.      This is presumed.  I mean, all that --

 5   again, people used to -- to bank, they go to the bank

 6   to deposit checks, to withdrawal cash, to deposit

 7   cash, to do whatever, like -- not like now.  It's more

 8   electronic and applications, and that's fine, you

 9   know, everything.  So it's -- so it's by going to the

10   bank, they -- they know you.

11        Q.      Okay.  With -- in your report you indicate

12   the potential that Al-Haramain provided Aqil with

13   "funds if it needed Aqil to pay out some donations on

14   behalf of the charity, or needed to reimburse him for

15   administrative expenses."

16               That's on Page 30 to 31 of your report.

17        A.      Okay.

18        Q.      Okay.  Do you believe that the cash

19   deposits that went into Mr. Aqil's account during the

20   May of 1999 to July of 1999 period are potentially

21   explained away as reimbursement for administrative

22   expenses?

23        MR. CURRAN:  Objection as to form.

24               You may answer.
```

This Transcript Contains Confidential Material

```
 1   BY THE WITNESS:

 2       A.    I'm saying what -- what could be the

 3   reasons here.  I'm trying to help in reasoning, but

 4   in -- whatever reasons or whatever legitimate reasons

 5   at that time, known at that time by the -- by the

 6   branch personnel, I -- it's not conceivable to relate

 7   Aqil or Haramain to drugs.  This is what I'm trying to

 8   convey here.

 9   BY MR. CARTER:

10       Q.    Are you aware that in the wake of the

11   African embassy bombings in 1998, Al-Haramain was

12   implicated as potentially having been involved?

13       MR. CURRAN:  Objection as to form, lack of

14   foundation.

15           You may answer.

16   BY THE WITNESS:

17       A.    Haramain Kenya or Haramain Saudi Arabia?

18   BY MR. CARTER:

19       Q.    Well, do you know?

20       A.    I don't know -- from my -- out of my

21   memory, the Kenya one was condemned or something, the

22   Kenyan Haramain, yeah.

23       Q.    Doesn't the use by Aqil of his account to

24   carry out transactions for Al-Haramain raise the
```

This Transcript Contains Confidential Material

```
 1   possibility that he was trying to obscure

 2   Al-Haramain's involvement in the financial activities

 3   being carried out through the account?

 4       A.   Can --

 5       MR. CURRAN:  Objection as to form, ambiguous.

 6            You may answer.

 7   BY THE WITNESS:

 8       A.   Can you repeat your previous question

 9   about Kenya?  Because I missed one word that I want to

10   elaborate on.

11   BY MR. CARTER:

12       Q.   Well --

13       A.   Do I know that, what?  Al-Haramain Kenya

14   did what?

15       Q.   I'm wondering if you know whether or not

16   there was information -- well, do you know whether a

17   branch of Al-Haramain was implicated in potential

18   involvement in the August 1998 embassy attacks after

19   they occurred?

20       A.   I think, like, it was accused or

21   something.

22       Q.   And how do you know that?

23       A.   I really didn't -- I think from Winer,

24   maybe.  I don't recall exactly, the Winer report or
```

This Transcript Contains Confidential Material

```
 1    Kohlmann.  I don't remember which report even.

 2         Q.    Does the -- the potential usage by Aqil of

 3    an account in its personal name to carry out financial

 4    activities on behalf of Al-Haramain raise a concern

 5    that he may have been using his personal account to

 6    try and obscure Al-Haramain's association with those

 7    transactions?

 8         A.    I cannot --

 9    MR. CURRAN:  Objection.  Objection as to form.

10         You may answer.

11    BY THE WITNESS:

12         A.    I cannot -- I cannot comment on this.

13    There has to be evidences to accuse people.

14    BY MR. CARTER:

15         Q.    In terms of just, you know, whether -- you

16    know, you've talked a lot about the evidence to accuse

17    people.

18         If we can go back to the SAMA Guidelines,

19    which, again, are Tab 1 in the -- or Tab 1R, sorry.

20    And on 137, we've discussed this briefly before:

21         "The SAMA Guidelines indicated that among

22    the systems banks should implement to combat money

23    laundering, they should include specialized software

24    that is available in the market to detect unusual
```

This Transcript Contains Confidential Material

```
1    patterns of transactions and trends to indicate

2    criminal activities.  These normally include the

3    following..."

4              You're aware of that requirement?

5        A.    Can you display it, because I -- can you

6    highlight it?  Or just tell me which number is it.

7    Can you minimize the -- the page so I can see?

8        Q.    It's No. 3.

9        A.    Yeah, okay.  Now I can see it.  It's -- so

10   it's No. 3, the highlighted ones, specifically,

11   policies and guidelines...

12             Yeah, the Arabic version says "system," it

13   doesn't say "software," but that's okay.

14             What's the question?

15       Q.    Okay.  And then it goes on to say that

16   the -- that the unusual patterns and types of

17   transactions that the system should identify includes

18   in number -- Roman Numeral iv, small Roman Numeral iv

19   on 138:

20             "Significant transactions" which "include

21   all transactions which exceed SR 100,000.  Significant

22   transactions report should identify accounts to which

23   these transactions are related and the sources of

24   these large amounts."
```

This Transcript Contains Confidential Material

```
 1            Do you see that?

 2      A.    Yes, but I want -- just give me just

 3 one -- a second.

 4      THE WITNESS:  Give me the mouse.

 5            Yeah, yeah, I want to --

 6      MR. CURRAN:  Don't --

 7      THE WITNESS:  I know, I know, I know.  I just

 8 wanted to go to...

 9 BY THE WITNESS:

10      A.    Yes, sir.  Yes, sir.

11 BY MR. CARTER:

12      Q.    Do you know whether Al Rajhi Bank had in

13 place an automated system to generate a significant

14 transactions report including all transactions which

15 exceed SR 100,000?

16      A.    I mean, the system of the bank can

17 generate itself.  But I also saw in -- in the

18 anti-money laundering, like, system or mechanism that

19 they're going to use a software available, something

20 like this.

21      Q.    Okay.  So to the extent the software was,

22 in fact, being used, under the SAMA Guidelines, it

23 should have generated reports that included that --

24 all transactions exceeding 100,000 riyals, right?
```

This Transcript Contains Confidential Material

```
 1      A.    My apologies for coughing.  Just a second,
 2  please.  I want to stop.
 3            Yes.  Yes, sir.
 4      Q.    Okay.  And so -- and when that report was
 5  generated, it should have also specified and
 6  identified the sources of these large amounts, right?
 7      A.    Yes, sir.
 8      Q.    Okay.  So a number of the transactions
 9  that we discussed in Mr. Aqil's account exceeded
10  100,000 riyals, correct?
11      A.    Correct, sir, yes.
12      Q.    Do you know whether the automated software
13  system flagged any of those consistent with the
14  requirements of the SAMA Guidelines?
15      A.    I would presume that the -- see, that --
16  not every -- just to explain about how the systems,
17  about -- like, like, in the money laundering, for
18  example, not every -- not every time you generate all
19  amounts above 100,000 riyals bank-wide.
20            I mean, globally the cash movements are
21  huge cash movements, are huge number.  The first time
22  maybe of -- okay.  Let me say that, for example, the
23  first time the anti-money laundering issue -- unit
24  generated that -- generated that report, which
```

This Transcript Contains Confidential Material

 1    included the jewelry shop and al-Aqil.  Let's assume

 2    that, okay.  And this is -- it could have happened.  I

 3    mean, most likely that could have happened.

 4              Then what they will do, they will say,

 5    what -- for example, let me say that the anti-money

 6    laundering unit doesn't know Aqil.  He will contact

 7    the branch manager.  He will go to his trans -- maybe

 8    transactions, whatever he can -- he can see.

 9              Next time he will de-flag him.  He will

10    not continue to be flagged, not every transaction in

11    the future.  As long as you know the customer and you

12    know the sources of the customer, not every time you

13    flag the 100,000.  It's a huge number of transactions.

14        Q.    And, Mr. Hobayb, you've mentioned the --

15    the documents you've seen referring to the Al Rajhi

16    automated system.

17        MR. CARTER:  If we can go to the document that's

18    at Tab 8R.

19                    (WHEREUPON, a certain document was

20                    marked Fawzi Al-Hobayb Deposition

21                    Exhibit No. 11, for identification,

22                    as of 02/09/2024.)

23    BY MR. CARTER:

24        Q.    And this is, as I understand it, Al Rajhi

This Transcript Contains Confidential Material

 1    Bank's Anti-Money Laundering Procedure Guide that you

 2    reference in your report, which was issued in November

 3    of 1998, right?

 4         MR. CURRAN:  Objection as to form.

 5              You may answer.

 6    BY THE WITNESS:

 7         A.    Let me see it.  They did not open it yet.

 8              Yeah, what's in front of me now, the

 9    Arabic version, the internal audit department,

10    guidelines for -- guidelines and processes to combat

11    anti-money laundering transactions, yeah.

12              Do you want me to search for that whatever

13    or --

14    BY MR. CARTER:

15         Q.    No, no, no.  I'm asking you if this is

16    the -- the Al Rajhi Anti-Money Laundering Procedure

17    Guide from November of 1998 that you -- you cite in

18    your report?

19         A.    Yes, it was, yes.

20         Q.    Okay.  And just turning to the first text

21    page of that document, and, again, I'm in the English,

22    the objectives of the unit include -- the first one is

23    to "Reduce illegal activities and practices," right?

24         A.    Yes.

This Transcript Contains Confidential Material

```
 1        Q.     And it goes on to say that another goal of

 2   the unit is to "Protect the company from being

 3   subjected to illegal practices, that it does not

 4   become an illegal outlet for suspicious activities and

 5   thus preserving the company's reputation," right?

 6        A.     Yes, sir.

 7        Q.     And that doesn't -- that's not limited

 8   solely to drugs, right?

 9        A.     Yeah, legal practices.  I mean, again, I

10   mean, the money laundering is talking about the

11   sources of funds.  In that context, yes, I mean

12   legally, but yeah.

13        Q.     Okay.  Now, going to page ARB 738 of this

14   document --

15        A.     See, the third bullet point says "A

16   technical" -- yeah, okay.  Go ahead.

17        Q.     In the section under "Nature of work:

18   Research and investigation phase," it indicates that:

19               "Money laundering operations are

20   discovered through the unit's available automated

21   programs, where suspicious operations are extracted by

22   those programs.  The concerned branch is then

23   contacted and provided with information about the

24   volume of the client's transactions, such as the
```

This Transcript Contains Confidential Material

1   amount of external transfers (the issued bank

2   checks-foreign transfers), the transfer destination,

3   the total amount of deposits, the bought travelers'

4   checks, et cetera.  After that, a statement is sent to

5   the branch director asking him to complete and fill

6   out the data of a suspected money laundering case

7   form..."

8            Do you see that?

9       A.   Yes.  Can you give me a minute to read it

10  again, please?

11      Q.   Sure.

12      A.   Yes, sir.

13      Q.   Okay.  So this indicates that there was an

14  automated system for extracting suspicious

15  transactions at Al Rajhi Bank, right?

16      A.   Flagging, not suspicious.

17      Q.   Okay.  For flagging transactions, right?

18      A.   Yes.

19      Q.   And I think based on our discussion

20  previously about SAMA Guidelines, significant

21  transactions over 100,000 riyals should have been

22  flagged by this system, right?

23      A.   Yes, by --

24      Q.   And --

This Transcript Contains Confidential Material

```
 1        A.    By the bank.  By any means.

 2        Q.    By the bank.

 3        A.    By any -- either automated system or

 4   manual or whatever means.

 5        Q.    Okay.  And a number of the Aqil

 6   transactions exceeded that 100,000 riyal threshold,

 7   right?

 8        A.    Yes, sir.

 9        Q.    So there should have been some flag by the

10   automated system in relation to at least the first of

11   those transactions, right?

12        A.    Could be, yes.  I would -- I would

13   presume, yes.

14        Q.    And in the event that that occurred as it

15   was supposed to, the process described in this section

16   of the manual should have taken place, correct?

17        A.    They should what?  Yes, yes.

18        Q.    Well, this section describes what you do

19   in -- in the event, right?

20        A.    Yes, yes, contacting the branch manager,

21   okay, yeah.

22        Q.    And part of it is to figure out the source

23   of the funds, right?

24        A.    Yeah, one of the things that was laid out
```

This Transcript Contains Confidential Material

 1   here is also the source of the funds.  I mean, source

 2   of the funds knowing about knowing the customer.

 3        Q.    Okay.  And so to the extent that the

 4   answer to the -- to the source of the funds inquiry

 5   was that these are Al-Haramain donations, shouldn't

 6   someone at the bank have instructed Aqil to use the

 7   Al-Haramain accounts for those instead of his own

 8   account?

 9        MR. CURRAN:  Objection as to form.

10             You may answer.

11   BY THE WITNESS:

12        A.    I cannot -- I mean, there has to be

13   specific examples to imagine a scenario.  There could

14   be any scenario happened that day, but -- but I'm

15   telling you, at the first time, most likely that,

16   like, Aqil transaction exceeded 100, maybe it was --

17   it was a flagged by the system, there was some inquiry

18   happened with the branch manager and they told him,

19   well, he was associated with the -- with the charity.

20   So the drugs aspect, the drugs possibility is

21   eliminated.

22   BY MR. CARTER:

23        Q.    Well, but that just eliminates the drug

24   possibility.  There is also this issue of whether or

This Transcript Contains Confidential Material

```
 1    not Aqil's account is being used to carry out

 2    financial transactions for some other party, right?

 3         MR. CURRAN:  Objection as to form.

 4              You may answer.

 5    BY THE WITNESS:

 6         A.    You can -- you can bank for your brother

 7    or -- I mean, I don't understand what's the context.

 8    BY MR. CARTER:

 9         Q.    It is your expert opinion that it was

10    perfectly fine for Al-Haramain to carry out financial

11    transactions through an account that was not in its

12    name.  Is that your opinion?

13         A.    Well, no.  No, no, no, I'm not saying

14    this.  I'm not saying this.  I'm saying that there are

15    some persons, this is the society, this is the

16    society, that people give their donations -- some

17    people prefer to give their donations to an actual

18    person that they know them, in their area or they are

19    being highly regarded or whatever like this.  I'm just

20    suspect -- I'm just assuming.  But your --

21         Q.    Yeah, but the --

22         A.    Yes, I have the right to assume also.

23         MR. CURRAN:  Mr. Carter, too many interruptions,

24    way too many.
```

This Transcript Contains Confidential Material

```
 1    BY MR. CARTER:

 2         Q.    Mr. Hobayb, Mr. Aqil to the extent that he

 3    was receiving donations from people who were looking

 4    to support Al-Haramain had signatory authority over

 5    Al-Haramain's actual accounts, didn't he?

 6         A.    Aqil has -- he is -- he is managing

 7    Al-Haramain.  This is what we understand from the

 8    records.  There are some people associated with

 9    Al-Haramain for whatever reason happened at that time,

10    and Haramain asked the bank or maybe others also at

11    the banks to change that name holder, owner, from that

12    person to Al-Haramain.

13               This was the --

14         Q.    And did --

15         A.    -- those were the -- you want to relate

16    something that's between two things, I couldn't really

17    understand what -- what you want to relate what to

18    what.

19         Q.    I just want to make clear and be clear,

20    you -- you raised the possibility that people looking

21    to support Al-Haramain might have been giving their

22    donations to Aqil because they feel more comfortable

23    giving it to an actual person.

24               Is that what you said?
```

This Transcript Contains Confidential Material

```
 1      A.    I cannot -- I don't know what's the intent

 2  of those donors.  Every donor has a different --

 3  different intent.

 4      Q.    Okay.

 5      A.    I mean, I want to -- I want to give --

 6  this is the scenario I'm reporting, that I want to

 7  give money to Al-Haramain so I deposit it in XYZ

 8  person's account.  I didn't say that.  I didn't say

 9  that, no.

10          I said I'm just assuming, or just one of

11  the possibilities, that those people, actual people,

12  before being associated with knowing the society, of

13  course, for me knowing the society, that before, may

14  be associated with Al-Haramain, they -- people used to

15  give donations to those people.

16          Maybe later on, maybe later on, those

17  people get associated with Al-Haramain.  Maybe they

18  get a lot of cash, a lot of money to -- for -- from

19  donations that they are -- the poor people they know

20  are limited and they want to go to much more databased

21  organization, like Al-Haramain.  They have -- they

22  have lists of hundreds, thousands, or millions of poor

23  or whatever, and use on different projects.

24          Then after certain point of -- period of
```

This Transcript Contains Confidential Material

```
 1    time, Al-Haramain decided, said, no, we want

 2    everything under our name.  Okay.  This was in the

 3    past before you got associated with me, or during or

 4    whatever, for whatever reason, I'm just giving.  I'll

 5    say, if -- if there was a bad intent and Haramain

 6    would continue to -- I'm not defending Al-Haramain.

 7    I'm defending -- I'm defending what's the facts and my

 8    opinion here, that the bank -- I mean -- sorry, I mean

 9    Al-Haramain could have just continued.

10             I see that they just want to fix their

11    management things.  This is what -- not beyond

12    anything else.

13        Q.    Okay.  Mr. Hobayb, did Al-Haramain have

14    accounts in its own name during the period that Aqil

15    made the transactions we've been discussing from May

16    of 1999 to July of 1999?

17        A.    Yes, I think so.

18        Q.    Okay.  And did Aqil al-Aqil have signatory

19    authority over those accounts?

20        MR. CURRAN:  Objection as to form.

21             You may answer.

22    BY THE WITNESS:

23        A.    Accounts of Haramain?

24    BY MR. CARTER:
```

This Transcript Contains Confidential Material

```
 1        Q.     Yes.

 2        A.     Well, I have to go back because when

 3   they -- I remember from the documents I saw, I

 4   studied, that when they say -- when they send -- when

 5   they request a bank to open an account, they, Aqil or

 6   whoever was the signatory, assigned the -- the

 7   signatories -- the authorized signatories for that

 8   particular account, if the name of Aqil was one of the

 9   signatories being it.  If not, I don't --

10        Q.     To the extent -- to the extent that people

11   gave Aqil cash donations for Al-Haramain, he had the

12   ability to deposit those in Al-Haramain's account,

13   right?

14        A.     Now you are giving to us assumptions here,

15   that you are -- you are giving that the intent of the

16   people is to Al-Haramain.  Maybe the intent of the

17   people that, "Please, Aqil, just give it to the poor

18   people that you know."  I cannot --

19        Q.     Well, are you raising that possibility

20   that Aqil was depositing money into this account for

21   charity purposes to be undertaken outside of the

22   context of Al-Haramain?

23        A.     I -- I cannot speculate.  I can't

24   speculate.  I cannot speculate anything, Mr. Carter.
```

This Transcript Contains Confidential Material

```
 1   There is no information for me to -- to indicate

 2   other -- otherwise.  I mean, there is nothing to me to

 3   indicate that it has to do with illegal activity or

 4   from sources of, like, drugs or something.  So I -- I

 5   just go by the norm.

 6        Q.    With regard, in your report, to your

 7   discussion about corporate governance structure at Al

 8   Rajhi Bank on Page 17.

 9        MR. CURRAN:  If you're changing subjects,

10   Mr. Carter, I'd like a break.  If not, we can continue

11   a little longer.

12        THE WITNESS:  Yeah.

13        MR. CARTER:  We are, but this isn't very long.

14        MR. CURRAN:  Are you okay?

15        THE WITNESS:  If it's less than 15 minutes.

16        MR. CURRAN:  If it's 10 or 15 minutes, okay, or

17   less.

18        MR. CARTER:  Yeah, I think that's it.

19             Actually, you know what, we can take a

20   break.  That's fine.

21        MR. CURRAN:  All right.  Let's make this 15,

22   because I understand we have got some dinner in the

23   next room.

24        MR. CARTER:  Okay.
```

This Transcript Contains Confidential Material

```
 1        THE VIDEOGRAPHER:  All right.  We are going off

 2   the record at 7:31 p.m.

 3                  (WHEREUPON, a recess was had

 4                   from 7:31 to 7:51 p.m.)

 5        THE VIDEOGRAPHER:  Back on the record at

 6   7:51 p.m.

 7   BY MR. CARTER:

 8        Q.    Mr. Hobayb, before we took a break, I was

 9   about to refer you to a section of your report

10   discussing Al Rajhi's corporate structure, but before

11   we get into that, with regard to the transactions that

12   we discussed into the Aqil account, the cash

13   transactions from May of 1999 through July of 1999,

14   did you undertake any inquiry to assess whether or not

15   the size of those deposits was in line with the

16   fundraising activities of Al-Haramain?

17        A.    I cannot speculate.  I cannot speculate.

18   Maybe, maybe not.  I cannot speculate what -- the

19   picture is not complete.  I mean, it's just a

20   snapshot, this one.  It's not full.

21        Q.    To the extent that the explanation was

22   that these were donations for Al-Haramain, would it

23   have been appropriate to then look at Al-Haramain's

24   account activity to see whether or not these types of
```

This Transcript Contains Confidential Material

```
 1    transactions matched up with the usual activity in its
 2    accounts?
 3         A.    Is it usual for Al-Haramain?
 4         Q.    Yeah.
 5         MR. CURRAN:  Objection as to form.
 6               You may answer.
 7    BY THE WITNESS:
 8         A.    Yeah, I mean, the bank account for
 9    Al-Haramain, for any charity, would presume that a lot
10    of deposits, either cash or in any other form.
11    BY MR. CARTER:
12         Q.    It's -- I think we're talking about --
13    about 19 million riyals, right?
14         A.    This is in -- this is the check, you mean?
15         Q.    No.  I'm saying the total of the deposits
16    into Aqil's account that we discussed from May of '99
17    to July of 1999 was a bit over 19 million riyals,
18    right?
19         A.    Yes, sir.
20         Q.    And -- and would that be in the general
21    parameter of $6 million?
22         A.    No.  Much less than that.  I mean, less
23    than -- less than $5 million.
24         Q.    And do you know -- do you happen to know
```

This Transcript Contains Confidential Material

```
 1   whether it was typical for Al-Haramain to collect

 2   $5 million in donations in a two-month period?

 3        MR. CURRAN:  Objection as to form, lack of

 4   foundation.

 5             You may answer.

 6   BY THE WITNESS:

 7        A.    It could be.  It's a big -- a big charity

 8   organization.  I mean, it's a -- it's big.

 9             And by the way, Al-Haramain was not

10   designated either by Saudi government and US

11   government until years post-9/11.  And also take into

12   consideration that in 2002, which is post-9/11,

13   treasury secretary of the United States, what is his

14   name, his name is Lewis O'Neill, the treasury

15   secretary, made the statement which I saw in one of

16   the documents that were available, that he regards

17   Haramain as something -- it is not maybe the same

18   wording, but legitimate charity organization operating

19   in Saudi Arabia, or something like that, and for

20   Islamic teaching and whatever like this.

21             So how can you expect in 1999 or 1998 a

22   bank with limited cape -- capabilities, not

23   intelligence, of course, not intelligence agency, the

24   banks are not being regarded whatsoever anywhere, even
```

This Transcript Contains Confidential Material

 1   in the only -- in the banking world, the US banks,

 2   they are not like this.

 3            So, to -- to suspect that those

 4   transactions -- transactions are derived from drugs, I

 5   mean, this is out of logic, I mean.

 6   BY MR. CARTER:

 7       Q.    Mr. Hobayb, you said a lot right there,

 8   including a statement by the treasury secretary.

 9            Are you familiar with the content of any

10   diplomatic discussions that were ongoing between the

11   United States and Saudi Arabia concerning how to

12   approach Al-Haramain in the aftermath of

13   September 11th?

14       MR. CURRAN:  Objection as to form.

15            You may answer.

16   BY THE WITNESS:

17       A.    I'm -- through the documents that were --

18   I reviewed, there was -- I remember there was like

19   from a WikiLeaks, something, or something like that.

20   BY MR. CARTER:

21       Q.    Do you -- do you know whether the treasury

22   department indicated as early at 2002 to the Saudis

23   that it wanted the entire Al-Haramain organization

24   shut down?

This Transcript Contains Confidential Material

```
 1        MR. CURRAN:  Objection to form.

 2             You may answer.

 3   BY THE WITNESS:

 4        A.    Which -- which Al-Haramain was shut down?

 5   BY MR. CARTER:

 6        Q.    The organization.

 7        A.    In Saudi?

 8        Q.    Yes.

 9        A.    What date was that?

10        Q.    Do you know whether US officials

11   communicated to Saudi officials as early as 2002 that

12   they believed the entire Al-Haramain organization,

13   including the Saudi headquarters, needed to be shut

14   down?

15        A.    Well, all -- all -- I don't recall.  I

16   really don't recall, don't remember anything.  I mean,

17   maybe it came to my -- my knowledge at certain point

18   of time, but I know that Al-Haramain was shut down in

19   Saudi Arabia years post-9/11.  Was it 2003 or 2004,

20   something like -- I didn't really recall exactly.

21        Q.    Do you --

22        A.    But anyway -- anyway -- but anyway, it was

23   post-9/11.  It is not pre-9/11, so, I mean -- see,

24   those actions took place post-9/11, and we are
```

```
 1    assuming a bank with limited capabilities to take

 2    actions and to -- where -- and be of the mind that the

 3    anti-money laundering and -- obligations that it is

 4    called, if you will, to combat anti-money laundering,

 5    is always in the focus of the sources of funds and --

 6    being it's from illegal activities -- and was the main

 7    concentration, amongst others, of course, the drugs.

 8         Q.    Mr. Hobayb, you've mentioned --

 9         A.    So this is the con -- this is the context

10    that we -- we should view things pre-9/11.

11         Q.    Mr. Hobayb, you've mentioned a few times

12    "a bank with limited resources."

13              Are you referring to Al Rajhi Bank?

14         A.    I didn't say -- intelligence, they don't

15    have intelligence capabilities, not the resources.

16         Q.    You used the phrase "limited resources."

17         A.    Maybe by mistake because I'm not -- my

18    English is not the first language, but, I mean -- I

19    mean, to the context that I was talking about, I mean

20    resources of intelligence resources.

21              But for whatever they have available --

22    available to them.  I don't mean staff when I talk

23    about resources, no.  I mean to the context that --

24    that they know something that became to be known
```

This Transcript Contains Confidential Material

1    post-9/11 and we are assuming that they should have

2    known them pre-9/11.

3        Q.    Mr. --

4        A.    This is what I care about.

5        Q.    Mr. Hobayb, do you have any understanding

6    of what Al Rajhi Bank's annual revenue was between

7    1998 and 2001?

8        A.    Yeah, they're making good money.  I mean,

9    they're making good profits.  It's a big bank.  It's a

10   big bank, yeah.  It's a big -- one of the biggest

11   banks in Saudi Arabia.

12       Q.    You are aware that Aqil al-Aqil was

13   designated by the United States after 9/11 on the

14   basis of a determination that he was providing support

15   to Al-Qaeda, are you not?

16       A.    I am not aware of what was the reason, but

17   I heard that he was designated in -- when was it?  Was

18   it 2005 or --

19       Q.    '4.

20       A.    2004?

21       Q.    It was 2004.

22       A.    Yeah.

23       Q.    And are you aware -- and do you accept

24   that Aqil al-Aqil was, in fact, involved prior to 9/11

This Transcript Contains Confidential Material

```
1    in channeling resources to Al-Qaeda?

2         MR. CURRAN:  Objection as to form.

3              You may answer.

4    BY THE WITNESS:

5         A.    I don't really know.  I didn't see -- I

6    didn't see things.  So I -- I didn't -- I just didn't

7    know.

8    BY MR. CARTER:

9         Q.    On Page 17 of your report, you talk about

10   Al Rajhi's corporate structure.

11        A.    Yes, sir.

12        Q.    Do you recall that aspect of your report?

13        A.    Yes, sir.

14        Q.    Are you a lawyer?

15        A.    What do you mean by -- by "lawyer"?  This

16   is -- my career, I have put it in my CV.

17        Q.    Yeah, you are not a -- you're not trained

18   as a lawyer, correct?

19        A.    My -- yeah, my undergraduate study was in

20   accounting.

21        Q.    Are you an expert on corporate governance

22   structures?

23        MR. CURRAN:  Objection as to form.

24              You may answer.
```

This Transcript Contains Confidential Material

```
 1   BY THE WITNESS:

 2       A.    It's part of our -- of our -- of the scope

 3   of the tailor of the audit, internal and external.

 4   BY MR. CARTER:

 5       Q.    And --

 6       A.    Internal and external, part of the scope

 7   to assess --

 8       Q.    And --

 9       A.    -- corporate governance.

10       Q.    During the time period that we've been

11   discussing, 1998 to 2001, who was the chairman of

12   Al Rajhi Bank?

13       A.    I don't know.  Maybe Sulaiman Al Rajhi.  I

14   don't -- I do not exactly -- maybe Sulaiman Al Rajhi,

15   because you are specifying a period which I haven't --

16   I don't know when was -- there were some changes or

17   something.

18       Q.    Do you know who the general manager of

19   Al Rajhi Bank was during the 1998 to 2001 time period?

20       A.    Through the documents, they show

21   Abdullah -- Abdullah Al Rajhi was, like, the general

22   manager or something, but I don't know from which --

23   when did it start, I really don't know.  But from the

24   documents I saw, pre-9/11 Abdullah Al Rajhi at certain
```

This Transcript Contains Confidential Material

```
 1    point of time was the general manager of -- of

 2    Al Rajhi.

 3         Q.    And do you know whether Abdullah Al Rajhi

 4    was related to Sulaiman Al Rajhi?

 5         A.    I think he --

 6         MR. CURRAN:  Objection as to the tense.

 7              You may answer.

 8    BY THE WITNESS:

 9         A.    I think -- I think he is the son.

10    BY MR. CARTER:

11         Q.    Do you know whether any other members of

12    Sulaiman Al Rajhi's family served within the

13    management structure of Al Rajhi Bank during this

14    period?

15         A.    I do not.  I cannot answer it.  I really

16    don't know.

17         Q.    Do you know who the members of the board

18    were during this time period?

19         A.    I don't remember the names.  I mean, I

20    remember there were many, like, ten or maybe more,

21    maybe more than ten.  I -- I don't really exactly

22    recall names or numbers.

23         Q.    Do you know what percentage of Al Rajhi

24    Bank Sulaiman Al Rajhi owned during the 1998 to 2001
```

This Transcript Contains Confidential Material

```
 1   time period?

 2       A.    I don't know exactly.

 3       Q.    There is a discussion in your report about

 4   the relationship -- well, Mr. Winer's discussion of

 5   the SAAR Foundation.  This is on Page 31 of your

 6   report.

 7       A.    Yes, sir.

 8       Q.    Okay.  And you indicate that:

 9             "...donations to Al-Haramain did not come

10   from the 'SAAR Foundation,' which I understand to be a

11   charitable organization based in the United States,

12   but rather the Sulaiman Abdul Aziz Al Rajhi Charitable

13   Foundation based in Riyadh, Saudi Arabia."

14             Do you see that?

15       A.    Yes, sir.

16       Q.    Okay.  In connection with your report, did

17   you undertake a review to determine who was

18   responsible for creating the SAAR Foundation in the

19   United States?

20       A.    No.

21       Q.    Did you undertake a review to determine

22   who had operational control over that?

23       A.    No.  It's outside the Saudi Arabia, no.

24       Q.    Did -- in connection with your report, did
```

This Transcript Contains Confidential Material

1    you undertake any review to determine whether or not

2    the funds provided by the Sulaiman Abdul Aziz Al Rajhi

3    Charitable Foundation were attributable to the SAAR

4    Foundation USA?

5        A.    I don't recall exactly.  It's -- do you

6    mean are there funds transferred from Sulaiman Abdul

7    Aziz Al Rajhi Charitable Foundation to SAAR Foundation

8    in the US?

9        Q.    Well, no.  I'm asking you whether or not

10   any money that was distributed the Sulaiman Abdul Aziz

11   Charity Foundation in Saudi Arabia was then attributed

12   to SAAR Foundation in the USA?

13       A.    What do you mean "attributed"?  I mean,

14   transferred from the fund, from the Sulaiman Abdul

15   Aziz Al Rajhi Charitable Foundation to the US one?

16       Q.    I mean --

17       A.    Is this what you mean by that?

18       Q.    I mean designated -- designated as a

19   disbursement made by the SAAR Foundation in the US?

20       MR. CURRAN:  Objection as to form.

21           You may answer.

22   BY THE WITNESS:

23       A.    I don't remember seeing transactions.

24   Maybe there was transactions, maybe there were not.  I

This Transcript Contains Confidential Material

1    mean, I forgot what transactions they show.  If you

2    can pinpoint to any transaction that -- during my

3    review, please.  I didn't really -- I don't remember

4    was -- whether it was or was not during my review that

5    I saw a transfer from Sulaiman Abdul Aziz Al Rajhi

6    charitable organization in Saudi Arabia to SAAR

7    Foundation in the US.

8            I saw, as stated in my report, that I just

9    wanted to clarify that Winer was miss -- I mean,

10   missing between -- or mischaracterizing between SAAR

11   Foundation in the US, and he considered as -- as it is

12   the Saudi one.  The Saudi one name is not SAAR

13   Foundation.  The name is Sulaiman Abdul Aziz Al Rajhi

14   Charitable Foundation.

15   BY MR. CARTER:

16       Q.    But did you undertake --

17       A.    So the transcript that he -- it was

18   mentioned by the -- the donation was mentioned by --

19   by Winer, in reality it was from Sulaiman Abdul Aziz

20   Al Rajhi charitable organization to Al-Haramain.

21   And -- and by the way, Sulaiman Al Rajhi is very well

22   known, maybe globally, that one of the highest paid

23   people on donations to the poor people and the needy

24   people.

This Transcript Contains Confidential Material

```
 1            And the amount there that was donated from

 2   Sulaiman Abdul Aziz Al Rajhi charitable organization

 3   to Al-Haramain in relation to, I presume, to the total

 4   donations, the total is just adding much.

 5        Q.    Did -- did you undertake any evaluation to

 6   determine whether or not the -- the Sulaiman Abdul

 7   Aziz Charitable Foundation in Saudi Arabia and SAAR

 8   Foundation in the United States functioned as a single

 9   entity?

10        A.    I didn't see any evidence of such.

11        Q.    Did -- did you -- did you under -- was

12   that part of your evaluation to try and determine

13   whether that was the case?

14        A.    I had found it irrelevant, to be honest

15   with you.  I found it irrelevant, because I'm -- I'm

16   rebutting to -- I'm rebutting to -- to Winer.  When he

17   highlighted this transaction and he miscategorized it

18   as it was the -- a donation from SAAR -- SAAR

19   Foundation in the US to Al-Haramain, I just wanted to

20   clarify.

21            That may be misunderstanding by Winer that

22   the donation was made by SAAR Foundation in the US to

23   Al-Haramain in Saudi Arabia, which was not that

24   transaction.  It didn't -- it doesn't say that at all.
```

This Transcript Contains Confidential Material

```
 1    It says it is not from the SAAR Foundation in the US.

 2    It says from Sulaiman Aziz Al Rajhi Central Reserve

 3    organization to Al-Haramain organization -- charity.

 4         Q.    Well, do you happen to know whether any of

 5    the distributions from Sulaiman Abdul Aziz's

 6    charitable foundation in Saudi Arabia to Al-Haramain

 7    were then listed as distributions from SAAR Foundation

 8    USA to Al-Haramain?

 9         A.    I didn't see any evidence of such.

10         MR. CARTER:  Okay.  That's all I have,

11    Mr. Hobayb.

12         THE VIDEOGRAPHER:  Go off the record?

13         MR. CURRAN:  No, no need to go off the record.

14    I don't have any questions for the witness.  I'd like

15    to thank the court reporter, the videographer, and the

16    technician for their time and efforts, and thanks

17    everyone else.  I appreciate it very much.

18         MR. CARTER:  Yeah, I'm going to join in that and

19    especially Evan who joined from the West Coast at

20    3:30 in the morning.  So, thanks, everybody.

21              Thank you, Mr. Hobayb.  And safe travels

22    to all of you who are returning from Saudi Arabia.

23         THE WITNESS:  Thank you very much, sir.

24         THE VIDEOGRAPHER:  All right.  This ends today's
```

This Transcript Contains Confidential Material

```
 1    deposition.  We are going to go off the record at

 2    8:11 p.m.

 3                         ---

 4              Thereupon, at 8:11 p.m., on Friday,

 5    February 9, 2024, the deposition was concluded.

 6                         ---

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

This Transcript Contains Confidential Material

```
 1                  REPORTER'S CERTIFICATE

 2

 3          I, JULIANA F. ZAJICEK, a Registered

 4   Professional Reporter and Certified Shorthand

 5   Reporter, do hereby certify that prior to the

 6   commencement of the examination of the witness herein,

 7   the witness was duly remotely sworn by me to testify

 8   to the truth, the whole truth and nothing but the

 9   truth.

10          I DO FURTHER CERTIFY that the foregoing is

11   a verbatim transcript of the testimony as taken

12   stenographically by me at the time, place and on the

13   date hereinbefore set forth, to the best of my

14   availability.

15          I DO FURTHER CERTIFY that I am neither a

16   relative nor employee nor attorney nor counsel of any

17   of the parties to this action, and that I am neither a

18   relative nor employee of such attorney or counsel, and

19   that I am not interested directly or indirectly in the

20   outcome of this action.

21          IN WITNESS WHEREOF, I do hereunto set my

22   hand on this 27th day of February, 2024.

23          Juliana F. Zajicek

24          JULIANA F. ZAJICEK, Certified Reporter
```

This Transcript Contains Confidential Material

```
 1                  DEPOSITION ERRATA SHEET

 2

 3   Assignment No.  350182

 4   Case Caption:  In Re Terrorist Attacks on

 5                  September 11, 2001

 6

 7        DECLARATION UNDER PENALTY OF PERJURY

 8

 9        I declare under penalty of perjury that I

10   have read the entire transcript of my Deposition taken

11   in the captioned matter or the same has been read to

12   me, and the same is true and accurate, save and except

13   for changes and/or corrections, if any, as indicated

14   by me on the DEPOSITION ERRATA SHEET hereof, with the

15   understanding that I offer these changes as if still

16   under oath.

17

18                          FAWZI AL-HOBAYB

19

20   SUBSCRIBED AND SWORN TO

21   before me this      day

22   of                , A.D. 20__.

23

24          Notary Public
```

This Transcript Contains Confidential Material

```
  1                 DEPOSITION ERRATA SHEET

  2     Page No._____Line No._____Change to:_____

  3     _____

  4     Reason for change:_____

  5     Page No._____Line No._____Change to:_____

  6     _____

  7     Reason for change:_____

  8     Page No._____Line No._____Change to:_____

  9     _____

 10     Reason for change:_____

 11     Page No._____Line No._____Change to:_____

 12     _____

 13     Reason for change:_____

 14     Page No._____Line No._____Change to:_____

 15     _____

 16     Reason for change:_____

 17     Page No._____Line No._____Change to:_____

 18     _____

 19     Reason for change:_____

 20     Page No._____Line No._____Change to:_____

 21     _____

 22     Reason for change:_____

 23     SIGNATURE:_____DATE:_____

 24                   FAWZI AL-HOBAYB
```

This Transcript Contains Confidential Material

```
 1                DEPOSITION ERRATA SHEET

 2    Page No._____Line No._____Change to:_____

 3    _____

 4    Reason for change:_____

 5    Page No._____Line No._____Change to:_____

 6    _____

 7    Reason for change:_____

 8    Page No._____Line No._____Change to:_____

 9    _____

10    Reason for change:_____

11    Page No._____Line No._____Change to:_____

12    _____

13    Reason for change:_____

14    Page No._____Line No._____Change to:_____

15    _____

16    Reason for change:_____

17    Page No._____Line No._____Change to:_____

18    _____

19    Reason for change:_____

20    Page No._____Line No._____Change to:_____

21    _____

22    Reason for change:_____

23    SIGNATURE:_____DATE:_____

24                  FAWZI AL-HOBAYB
```

THIS TRANSCRIPT CONTAINS CONFIDENTIAL MATERIAL

**ERRATA**

GOLKOW LITIGATION SERVICES
ONE LIBERTY PLACE
1650 MARKET STREET, SUITE 5150
PHILADELPHIA, PA 19103
877-370-3377

NAME OF CASE:  *In Re: Terrorist Attacks On September 11, 2001*, No. 03-md-1570 (S.D.N.Y.)
DATE OF DEPOSITION:  February 9, 2024
NAME OF DEPONENT: Fawzi Al-Hobayb

| Page | Line(s) | Change | Reason |
|------|---------|--------|--------|
| 9 | 13-14 | Add "My name is Sean Carter" before "I'm an attorney" | Transcription error. |
| 14 | 21 | Change "submitted" to "submit" | Grammar. |
| 15 | 13 | Change "2003" to "2023" | Clarification. |
| 15 | 14 | Change "they" to "I" | Clarification. |
| 15 | 20 | Replace "on what that" with "on what date" | Clarification. |
| 15 | 21 | Change "I don't really recall exact date when did they start." To "I don't really recall the exact date when I started." | Clarification. |
| 18 | 11 | Change "I mean, mention whatever" to "mean, it depends on whatever." | Transcription error. |
| 20 | 10 | Delete "is this act" | Clarification. |
| 26 | 12 | Replace "that was" with "the audit" | Transcription error. |
| 26 | 13 | Replace ". W" with ", w". | Transcription error. |
| 26 | 18 | Replace "eagle" with "alter-ego" | Transcription error. |
| 26 | 22 | Replace "auditor" with "auditing" | Transcription error. |
| 33 | 2 | Change "specific" to "specify" | Clarification. |
| 33 | 2-3 | Change "in what date that request may came" to "on what date that request may have come" | Grammar. |
| 34 | 6 | Add "banking" between strong and regulatory | Transcription error. |
| 36 | 10 | Replace "can't" with "can" | Transcription error. |
| 36 | 11 | Replace "cannot" with "can" | Transcription error. |
| 38 | 4 | Replace "they just" with "I guess" | Transcription error. |
| 38 | 4 | Replace "may be" with "maybe" | Transcription error. |

**CONFIDENTIAL**: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD) (SN), United States District Court for the Southern District of New York.

THIS TRANSCRIPT CONTAINS CONFIDENTIAL MATERIAL

| Page | Line(s) | Change | Reason |
|---|---|---|---|
| 38 | 18-20 | Change "I saw that he has a correspondent bank with Chase Manhattan, which indicate to me that he has correspondent banking" to "I saw that it has a correspondent bank with Chase Manhattan, which indicated to me that it has correspondent banking" | Grammar. |
| 39 | 15 | Replace "LLCs" with "LCs" | Transcription error. |
| 39 | 23 | Replace "current facility" with "current or facility" | Clarification. |
| 40 | 10 | Replace "Nost" with "Nostro" | Clarification. |
| 42 | 22 | Change "hear" to "heard" | Grammar. |
| 43 | 1 | Change "transfer done with a certain threshold" to "transfer was done above a certain threshold" | Grammar and clarification. |
| 43 | 4 | Add "is" after "so this" | Grammar. |
| 43 | 5 | Add "—depends on" before "the circumstances" | Transcription error. |
| 48 | 12 | Change "do" to "did" | Grammar. |
| 50 | 6 | Change "own" to "only" | Transcription error. |
| 50 | 20 | Change "create" to "created" | Grammar. |
| 52 | 9 | Replace "wasn't" with "was" | Transcription error. |
| 55 | 16-17 | Change "I did not -- I did not even thought that I would ask for them" to "I did not -- I did not even think to ask for them" | Grammar. |
| 55 | 20 | Change "some or another" to "somehow or other" | Grammar. |
| 58 | 20 | Change "what" to "that" | Clarification. |
| 58 | 21-22 | Change "Central Bank is -- have wide oversight, scope on financial system." to "The Central Bank has a wide oversight scope over the financial system." | Grammar. |
| 59 | 12 | Add "Hobayb" after "But Mr." | Transcription error. |
| 60 | 13 | Change "report what" to "rebut" | Transcription error and clarification. |
| 60 | 24 | Add "were" after "and" | Clarification. |
| 65 | 2 | Replace "with a tenor" with "within a term" | Transcription error. |
| 66 | 5 | Change "my" to "me" | Transcription error. |
| 66 | 6 | Change "do" to "can" | Clarification. |
| 66 | 9 | Change "it existed" to "it didn't exist" | Clarification. |
| 66 | 10 | Change "happened" to "it didn't happen" | Clarification. |
| 70 | 16 | Add "an" before audit committee and "--" before "this is" | Grammar and punctuation. |
| 70 | 11 | Replace "lawyers" with "low-risk" | Transcription error. |
| 70 | 12 | Replace "I ask" with "high risk" | Transcription error. |
| 70 | 17 | Remove "is" before "independent" | Grammar. |
| 70 | 22 | Change "thought" to "think" | Grammar. |
| 72 | 13 | Change "Winer's" to "Winer" | Grammar. |

**CONFIDENTIAL**: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD) (SN), United States District Court for the Southern District of New York.

THIS TRANSCRIPT CONTAINS CONFIDENTIAL MATERIAL

| Page | Line(s) | Change | Reason |
|---|---|---|---|
| 72 | 14 | Change "report" to "reports" | Grammar. |
| 73 | 2 | Add "that" before "make" | Grammar. |
| 73 | 7 | Change "suspect me" to "was suspect to me" | Grammar. |
| 73 | 9 | Change "suspect me" to "suggested to me" | Clarification. |
| 73 | 11 | Change "in the contrary" to "to the contrary" | Grammar. |
| 74 | 17 | Change "are" to "is" | Grammar. |
| 80 | 17 | Change "asked" to "ask" | Transcription error. |
| 81 | 3 | Remove "do" before "you mean" | Transcription error. |
| 81 | 4 | Change "any" to "it" | Grammar. |
| 82 | 13 | Replace "- -" with "." | Clarification. |
| 86 | 2 | Change "Winer's" to Winer" and "report" to "reports" | Grammar. |
| 89 | 17 | Change "the bank" to "a bank" | Grammar. |
| 90 | 5 | Add "policy" after "AML" and change "talk to "talks" | Clarification. |
| 91 | 8 | Change "facts," to "FATF recommendations" | Transcription error. |
| 91 | 9 | Change "search" to "searched" | Transcription error. |
| 94 | 16 | Replace "ex patriots" with "expatriates" | Transcription error. |
| 95 | 9 | Delete "non-English" | Clarification. |
| 96 | 19 | Change "look" to "looked" | Transcription error. |
| 100 | 22 | Change "I didn't say the Arabic" to "It didn't say. The Arabic --" | Transcription error. |
| 103 | 9 | Delete "but" | Transcription error. |
| 103 | 11 | Change "and instruct the banks to -- by -- by the way, Basel Committee" to and "instructing the banks to -- by -- by the way, the Basel Committee" | Clarification. |
| 103 | 12 | Add "it" before "even" | Grammar. |
| 103 | 15 | Add "the" before "Basel Committee" | Grammar. |
| 104 | 18 | Replace "audit" with "auditor" | Transcription error. |
| 105 | 1 | Remove "was" | Grammar. |
| 105 | 12 | Add "a" before "cover letter" | Grammar. |
| 107 | 6 | Replace "by -- legally by -- by auditing" with "body, legally" | Clarification. |
| 107 | 22-23 | Change "about the combatant" to "combating" | Clarification. |
| 109 | 18 | Remove "the" before "Al Rajhi" | Grammar. |
| 109 | 20-21 | Change "are obliged for the regulations and for the oversight of SAMA" to "is obliged to comply with the regulations and be subject to the oversight of SAMA." | Clarification. |
| 110 | 22 | Add "for" before "anybody" | Clarification. |
| 111 | 23 | Replace "auditor" with "audit" | Transcription error. |
| 112 | 10 | Delete "meet" | Clarification. |
| 113 | 17 | Replace "anti-money laundering" with "internal audit" | Transcription error. |
| 113 | 17 | Replace "reports" with "plans" | Clarification. |
| 113 | 19 | Replace "that it was done" with "that is was not" | Transcription error. |
| 114 | 2 | Replace "engaged" with "arranged" | Transcription error. |
| 114 | 12 | Change "it" to "I" | Transcription error. |

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD) (SN), United States District Court for the Southern District of New York.

THIS TRANSCRIPT CONTAINS CONFIDENTIAL MATERIAL

| Page | Line(s) | Change | Reason |
|------|---------|--------|--------|
| 114 | 14 | Change "proficient" to "profession" | Transcription error. |
| 115 | 10 | Change "will" to "to make one" | Clarification. |
| 117 | 15 | Replace "Sal Al-Jarboua's" with "Saleh Al-Jarbou's" | Transcription error. |
| 122 | 16 | "it's a lose" to "it's loose" | Transcription error. |
| 122 | 20 | Change "lose" to "loose" | Transcription error. |
| 125 | 12 | Add "Plaintiffs'" after "for the" | Clarification. |
| 128 | 20 | Change "And some say" to "And SAMA says" | Transcription error. |
| 129 | 1 | Change "certain condition, like was asked by the account owner" to "a certain condition, like it was asked for by the account owner" | Grammar. |
| 133 | 9 | Add "report to" after "is to" | Clarification. |
| 134 | 1 | Change "do" to "does" | Grammar. |
| 134 | 2 | Change "you" to "they" | Clarification. |
| 134 | 14 | Add "appears" before "suspicious" | Clarification. |
| 134 | 17 | Change "close" to "closing" | Grammar. |
| 135 | 1 | Add "answer regarding" before KYC | Clarification. |
| 135 | 3 | Add "there" between "asks for" and "not to be" | Clarification. |
| 135 | 24 | Add "goes" before "to the" | Clarification. |
| 136 | 6-7 | Change "he" to "it" | Grammar. |
| 137 | 11 | Add "capabilities" after "limited" | Clarification |
| 139 | 19 | Add "bank is" before "not allowed" | Clarification. |
| 140 | 20-21 | Change "I remember SAMA was in – to be -- being " to "I remember SAMA is where it " | Clarification. |
| 140 | 21 | Add "would be" before "reported." | Clarification. |
| 149 | 15 | Remove "for" before "Winer" | Clarification. |
| 149 | 16 | Remove "that" before "Haramain" | Clarification. |
| 149 | 19-20 | Change "be it an Al-Qatiroh (phonetic)" to "be it Al-Aqil" | Transcription error. |
| 150 | 6 | Change "did" to "had" | Grammar. |
| 151 | 14 | Replace "not" with "but" | Transcription error. |
| 151 | 16 | Add "," after "very" | Transcription error. |
| 151 | 20 | Delete "it's" | Clarification. |
| 151 | 20 | Delete "that" | Clarification. |
| 151 | 23 | Change "'90" to "1998" | Transcription error. |
| 152 | 16 | Change "riyal" to "riyals" | Transcription error. |
| 152 | 18 | Change "dollar" to "dollars" | Transcription error. |
| 152 | 22 | Remove "was" before "the 500 riyal note was" and add "note" before "was" | Clarification. |
| 152 | 24 | Remove "too" before "many" | Clarification. |
| 153 | 1 | Remove "bad" | Clarification. |
| 153 | 11 | Remove "well" | Transcription error. |
| 153 | 23 | Replace "two" with "ten" | Transcription error. |
| 154 | 2-3 | Change "I'm sure it was since a long time, but I really don't know when did it start" to "I'm sure it was a long time ago, but I really don't know when it started" | Grammar. |

**CONFIDENTIAL**: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD) (SN), United States District Court for the Southern District of New York.

THIS TRANSCRIPT CONTAINS CONFIDENTIAL MATERIAL

| Page | Line(s) | Change | Reason |
|------|---------|--------|--------|
| 155 | 18 | Add "that" before "Aqil" | Grammar. |
| 155 | 20 | Remove "no, I haven't" | Clarification. |
| 155 | 21 | Add "relationship" after "banking" and before "with the bank" | Clarification. |
| 155 | 23 | Add "him" after "know" | Clarification. |
| 156 | 10 | Add "BY MR. CURRAN: Objection as to form." | Transcription error. |
| 156 | 19-20 | Change "occurred" to "occurring" | Grammar. |
| 160 | 15 | Add "who" before "customer is" | Transcription error. |
| 161 | 18 | Change "I didn't recall, but – I didn't recall" to " I really don't recall, but -- I really don't recall." | Transcription error and clarification. |
| 170 | 10 | Replace "what this" with ", but the" | Transcription error. |
| 170 | 11 | Replace "is" with "guidelines are" | Grammar. |
| 171 | 22 | Change "and those are" to "and the other" | Transcription error. |
| 173 | 24 | Change "more people" to "poor people" | Transcription error. |
| 174 | 1 | Change "a Haramain" to "al-Haramain" | Transcription error. |
| 178 | 21 | Change "Or" to "Well" | Transcription error. |
| 179 | 2 | Remove "Forgot, yeah" | Transcription error. |
| 179 | 6 | Remove "to" before "a report" and remove "why" | Clarification. |
| 179 | 8 | Change "comment" to "commented" | Grammar. |
| 180 | 12 | Replace "assist" with "assess" | Transcription error. |
| 181 | 6 | Change "riyal" to "riyals" | Grammar. |
| 182 | 16 | Replace "visioning" with "envisioning" | Clarification. |
| 182 | 17 | Change "Aqil" to "al-Aqil" | Transcription error. |
| 183 | 15 | Change "scree" to "screen" | Transcription error. |
| 186 | 11 | Change "I'm thankful" to "My apologies to you" | Transcription error. |
| 186 | 20 | Delete "whatever" | Clarification. |
| 188 | 19 | Change "show" to "saw" | Transcription error. |
| 190 | 5 | Change "was" to "were" | Grammar. |
| 192 | 6 | Change "withdrawal" to "withdraw" | Grammar. |
| 192 | 8 | Change "that's fine" to "at home" | Transcription error. |
| 192 | 9 | Replace "So it's – so it's" with "So, back then, it's" | Clarification. |
| 197 | 18 | Add "guide" after "anti-money laundering" and add "a" before "system" | Clarification. |
| 197 | 23 | Remove "that – " | Transcription error. |
| 198 | 21 | Add "a" before "huge number" | Grammar. |
| 198 | 23 | Change "anti-money laundering issue -– unit " – to anti-money laundering unit issue -- " | Transcription error. |
| 201 | 9 | Change "legal practices" to "illegal practices" | Transcription error. |
| 201 | 10 | Change "money laundering" to "anti-money laundering guide" | Clarification. |
| 201 | 12 | Change "legally to "any illegal" | Transcription error. |
| 205 | 17 | Change "actual" to "natural" | Transcription error. |
| 207 | 6 | Change "reporting" to "putting" | Transcription error. |
| 207 | 12 | Add "-" before "knowing the society" | Clarification. |
| 207 | 13 | Replace "society," with "society –" | Clarification |
| 207 | 24 | Add "a" between "after" and "certain point of" | Grammar. |

**CONFIDENTIAL**: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD) (SN), United States District Court for the Southern District of New York.

THIS TRANSCRIPT CONTAINS CONFIDENTIAL MATERIAL

| Page | Line(s) | Change | Reason |
|------|---------|--------|--------|
| 208 | 3 | Replace "me" with "us" | Clarification. |
| 208 | 5 | Replace "and Haramain" with "Al-Haramain" | Transcription error. |
| 209 | 8-9 | Change comma to a period after "particular account." The following text should read "If the name of Aqil was one of the signatories on it..." | Punctuation. |
| 209 | 16 | Change text after "people" to "was to give to Al-Haramain." | Clarification. |
| 213 | 10 | Add "the" before "Saudi government" and change "and" to "or" before "US government" | Grammar. |
| 213 | 13 | Add "the" before Treasury Secretary | Grammar. |
| 213 | 14 | Replace "Lewis" with "Paul" | Clarification. |
| 216 | 2 | Change "and be of the mind" to "and bear in mind" | Transcription error. |
| 216 | 14 | Add "that" after "say" | Clarification. |
| 216 | 20 | Add "But in fact, I did not use the word 'resources.' I said 'limited capabilities' and I meant they had limited intelligence capabilities'" after "intelligence resources." | Clarification |
| 219 | 3 | Delete "tailor of the" | Transcription error and clarification. |
| 222 | 3 | Change "attributable" to "attributed" | Transcription error. |
| 222 | 10 | Add "by" after "distributed" | Transcription error. |
| 223 | 1 | Replace "they show" with "I saw" | Transcription error. |
| 223 | 4 | Replace "was -- whether it was or was not" with "whether or not" | Clarification. |
| 223 | 17 | Replace "transcript" with "transfer" | Transcription error. |
| 223 | 17 | Delete "it" | Clarification. |
| 223 | 22-23 | Change "that one of the highest paid people on donations to the poor people and the needy" to "as one of the people making the highest amount of donations to the poor people and the needy" | Clarification. |
| 224 | 4 | Replace "just" with "not" | Clarification. |
| 224 | 18 | Add "if" after "as" | Clarification. |
| 225 | 2 | Replace "Central Reserve" with "Charitable" | Transcription error. |

**CONFIDENTIAL**: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD) (SN), United States District Court for the Southern District of New York.

THIS TRANSCRIPT CONTAINS CONFIDENTIAL MATERIAL

ACKNOWLEDGEMENT OF DEPONENT

I, Fawzi Al Hobayb, do hereby certify that I have read the pages in the transcript of my deposition on February 9, 2024, in the matter *In Re: Terrorist Attacks On September 11, 2001*, No. 03-md-1570 (S.D.N.Y.), and that the transcript is a correct transcription of the answers given by me to the questions therein propounded, subject to the corrections and changes in form or substance noted in this Errata.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed_____  April 12, 2024

_____
Fawzi Al-Hobayb

**CONFIDENTIAL**: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD) (SN), United States District Court for the Southern District of New York.