# Al Rajhi Bank Ex. 61

This Transcript Contains Confidential Material

```
 1                    UNITED STATES DISTRICT COURT.

 2                    SOUTHERN DISTRICT OF NEW YORK

 3

 4    IN RE: TERRORIST ATTACKS ON
      SEPTEMBER 11, 2001
 5    _____
      Underwriting Members of Lloyd's
 6    Syndicate 2, et al., v.
      Al Rajhi Bank, et al.,          03 MDL 1570
 7    No. 16-cv-07853                 (GBD) (SN)

 8    Addesso, et al. V. Kingdom of   ECF Case
      7 Saudi Arabia, et al.,
 9    No. 16-cv-09937

10    Aguilar, et al. V. Kingdom of
      Saudi Arabia, et al.,
11    No. 16-cv-09663

12    Hodges, et al. V. Kingdom of
      Saudi Arabia, et al.,
13    No. 17-cv-00117

14    Aiken, et al. V. Kingdom of
      Saudi Arabia, et al.,
15    No. 17-cv-00450

16    Charter Oak Fire Insurance Co.,
      et al. V. Al Rajhi Bank, et
17    al., No. 17-cv-02651

18    Abarca, et al. V. Kingdom of
      Saudi Arabia, et al.,
19    No. 17-cv-03887

20    Arrowood Indemnity Co., et al.
      v. Kingdom of Saudi Arabia, et
21    al., No. 17-cv-03908

22    Abedhajajreh, et al. V. Kingdom
      of Saudi Arabia, et al.,
23    No. 17-cv-06123

24
```

This Transcript Contains Confidential Material

1    Muenchener
     Rueckversicherungs-Gesellschaft
2    Aktiengesellschaft in Muenchen,
     et al. V. Kingdom of Saudi
3    Arabia, et al.,
     Case No. 17-cv-07914
4
     Abbate, et al. V. Kingdom of
5    Saudi Arabia, et al.,
     No. 17-cv-08617
6    _____

7

8        THIS TRANSCRIPT CONTAINS CONFIDENTIAL MATERIAL

9

10                          – – –

11            VIDEOTAPED EXPERT DEPOSITION OF

12                  DENNIS M. LORMEL

13

14            Thursday, February 1, 2024

15              9:02 a.m. Eastern Time

16

17

18

19   Reported by:  Denise Dobner Vickery, CRR, RMR

20   JOB NO.: 350187

21

22            GOLKOW LITIGATION SERVICES

23                877.370.DEPS

24              deps@golkow.com

This Transcript Contains Confidential Material

1

2

3

4

5

6

7

8                              Thursday, February 1, 2024

9                              9:02 a.m. Eastern Time

10

11              Videotaped Expert Deposition of

12    DENNIS M. LORMEL, held at the offices of:

13

14              WHITE & CASE LLP

15              701 Thirteenth Street NW

16              Washington, DC 20005

17

18

19              Pursuant to notice, before Denise

20    Dobner Vickery, Certified Realtime Reporter,

21    Registered Merit Reporter, and Notary Public in

22    and for the District of Columbia.

23

24    APPEARANCES:

```
 1   Representing Lloyd's Syndicate 2 and Muechener
     Plaintiffs:
 2
          COZEN O'CONNOR P.C.
 3        BY:  SEAN P. CARTER, ESQ.
               scarter1@cozen.com
 4        BY:  SCOTT TARBUTTON, ESQ.
               starbutton@cozen.com
 5        1650 Market Street, Suite 2800
          Philadelphia, PA 19103
 6        215.665.2000

 7
     Representing Charter Oak Plaintiff:
 8
          SHEPS LAW GROUP
 9        BY:  ROBERT C. SHEPS, ESQ.
               rsheps@shepslaw.com
10        25 High Street
          Huntington, NY 11743
11        631.249.5600

12
     Representing Al Rajhi Bank:
13
          WHITE & CASE LLP
14        BY:  NICOLLE KOWNACKI, ESQ.
               Nicolle.kownacki@whitecase.com
15        BY:  MICHAEL MAHAFFEY, ESQ.
               michael.mahaffey@whitecase.com
16        BY:  REUBEN J. SEQUEIRA, ESQ.
               rsequeira@whitecase.com
17        BY:  SORAYA TODD, ESQ.
               soraya.todd@whitecase.com
18             (Via Zoom)
          BY:  COURTNEY DAVIS, ESQ.
19             courtney.davis@whitecase.com
               (Via Zoom)
20        BY:  ANWAR AKROUK, ESQ.
               anwar.akrouk@whitecase.com
21             (Via Zoom)
          701 Thirteenth Street NW
22        Washington, DC 20005-3807
          202.626.3600
23

24
```

This Transcript Contains Confidential Material

```
1    Representing Dubai Islamic Bank:

2            JONES DAY
             BY:  GABRIELLE E. PRITSKER, ESQ.
3                 gpritsker@jonesday.com
             51 Louisiana Avenue NW
4            Washington, DC 20001-2113
             202.879.3939
5


6
     Representing The Muslim World League, the
7    International Islamic Relief Organization:

8            LEWIS BAACH KAUFMANN MIDDLEMISS PLLC
             BY:  E. JON A. GRYSKIEWICZ, ESQ.
9                 jon.gryskiewicz@lbkmlaw.com
                  (Via Zoom)
10           BY:  SUMAYYA KHATIB, ESQ.
                  sumayya.khatib@lbkmlaw.com
11                (Via Zoom)
             1101 New York Avenue NW, Suite 1000
12           Washington, DC 20005
             202.833.8900
13


14


15   Representing World Assembly of Muslim Youth:

16           THE LAW FIRM OF OMAR T. MOHAMMEDI, LLC
             BY:  FREDERICK J. GOETZ, ESQ.
17                fgoetz@otmlaw.com
                  (Via Zoom)
18           BY:  FATEMA ZOHNY, ESQ.
                  fzohny@otmlaw.com
19                (Via Zoom)
             BY:  OMAR T. MOHAMMEDI, ESQ.
20                omohammedi@otmlaw.com
                  (Via Zoom)
21           BY:  MUSTAPHA NDANUSA, ESQ.
                  mndanusa@otmlaw.com
22                (Via Zoom)
             233 Broadway, Suite 801
23           New York, NY 10279
             212.725.3846
24
```

This Transcript Contains Confidential Material

```
 1    Representing Yassin al-Qadi:

 2            SALERNO & ROTHSTEIN
              BY:  PETER C. SALERNO, ESQ.
 3                 peter.salerno.law@gmail.com
                   (Via Zoom)
 4            BY:  AMY ROTHSTEIN, ESQ.
                   amyrothsteinlaw@gmail.com
 5                 (Via Zoom)
              221 Schultz Hill Road
 6            Pine Plains, NY 12567
              518.771.3050
 7


 8
      ALSO PRESENT:
 9


10            ABDULRAHMAN AL MUSSAED, foreign
              litigation department, Al Rajhi Bank
11            (Via Zoom)

12


13    TRIAL TECHNICIAN:

14
              GINA VELDMAN, Precision Trial Services
15            (Via Zoom)

16
      VIDEOGRAPHER:
17


18            VINCE ROSICA, Golkow Litigation Services

19

20
                           - - -
21

22

23

24
```

This Transcript Contains Confidential Material

```
 1                          INDEX
 2  EXAMINATION OF DENNIS M. LORMEL            PAGE
 3  BY MR. CARTER                               12
 4  AFTERNOON SESSION                          190
 5
 6              LORMEL DEPOSITION EXHIBITS
 7  NUMBER        DESCRIPTION                   PAGE
 8  EXHIBIT 1    Notice of Oral Deposition of    16
 9               Dennis M. Lormel
10  EXHIBIT 2    Rebuttal Expert Report of       49
11               Dennis M. Lormel December 22, 2023
12  EXHIBIT 3    Steven Barentzen Letter of      54
13               December 13, 2010 re Dr. Barzinji
14  EXHIBIT 4    Deposition Transcript of Dennis 56
15               Lormel dated December 16, 2014
16               Life For Relief & Development v.
17               Bank of America
18  EXHIBIT 5    Memorandum for the Record 1/16/04  61
19               Formal Interview of Dennis M. Lormel
20  EXHIBIT 6    Pg 201-216 Zarate's Treasury's War 74
21  EXHIBIT 7    The Washington Post Article by    78
22               Michelle Boorstein August 21, 2011
23               "A founding father of American Islam
24               struggles to put raids behind him"
```

This Transcript Contains Confidential Material

| 1 | EXHIBIT 8 | (Proposed Redacted) Affidavit in | 84 |
| 2 | | Support of Application for Search | |
| 3 | | Warrant (October 2003) by Kane | |
| 4 | | March 2002 | |
| 5 | EXHIBIT 9 | Assessment of Saudi Arabian | 97 |
| 6 | | Support to Terrorism and the | |
| 7 | | Counterintelligence Threat to the | |
| 8 | | United States, December 2004 | |
| 9 | | EO14040-003414 - 442 | |
| 10 | EXHIBIT 10 | Diplomatic Cable 04RIYADH5103 | 120 |
| 11 | | Terrorist Financing: Al-Rajhi Bank | |
| 12 | | Created 2004-09-27 | |
| 13 | EXHIBIT 11 | Diplomatic Cable 04STATE251768 | 125 |
| 14 | | Joint Examination of Al Rajhi Bank | |
| 15 | | The Joint Terrorist Financing Task | |
| 16 | | Force, Created 2004-11-25 | |
| 17 | EXHIBIT 12 | National Commission on Terrorist | 141 |
| 18 | | Attacks Upon the United States | |
| 19 | | Monograph on Terrorist Financing | |
| 20 | | Staff Report to the Commission | |
| 21 | EXHIBIT 13 | Rebuttal Expert Report of | 144 |
| 22 | | Aimen Dean 22-12-2023 | |
| 23 | EXHIBIT 14 | October 4, 2023 Expert Report of | 158 |
| 24 | | Jonathan M. Winer | |

This Transcript Contains Confidential Material

```
 1   EXHIBIT 15   The 9/11 Commission Report       163

 2   EXHIBIT 16   The 9/11 Commission Report Notes  165

 3   EXHIBIT 17   Assessing an Evolving Al-Qaeda    212

 4                and State Sponsors of Terrorism;

 5                Hearing before the Subcommittee on

 6                Counterterrorism and Intelligences

 7                of the Committee on Homeland Security

 8                House of Representatives May 18, 2012

 9   EXHIBIT 18   June 2, 2004, Al-Haramain         222

10                Branches, Former Leader Designated by

11                Treasury as Al Qaida Supporters

12                Treasury Marks Latest Action in Joint

13                Designation with Saudi Arabia

14   EXHIBIT 19   August 3, 2006, Treasury          225

15                Designates Director, Branches of

16                Charity Bankrolling Al Qaida Network

17   EXHIBIT 20   The Al-Haramain Islamic           231

18                Foundation's Account Numbers with the

19                Al Rajhi Banking & Investment Corp.

20                ARB-00038116 (Arabic/English)

21   EXHIBIT 21   Aqil bin Abdel Aziz al Aqil       233

22                Letter dated September 26, 1994

23                ARB-00038534 - 38535 (Arabic/English)

24           (Exhibits attached to transcript.)
```

This Transcript Contains Confidential Material

```
 1              P R O C E E D I N G S

 2                   -  -  -

 3              THE VIDEOGRAPHER:  We are now

 4         on the record.

 5              My name is a Vince Rosica.

 6         I'm a videographer for Golkow Litigation

 7         Services.  Today's date is February 1,

 8         2024 and the time is 9:02 a.m.

 9              This video deposition is being

10         held in Washington, DC in the matter of

11         Terrorist Attacks on September 11, 2001,

12         MDL No. 1570.  The deponent is Dennis

13         Lormel.

14              Counsel in the room please

15         identify yourselves for the video record.

16              MR. CARTER:  Sean Carter from

17         Cozen O'Connor on behalf of plaintiffs

18         and my colleague, Scott Tarbutton, is

19         here in the room with me.

20              MS. KOWNACKI:  Good morning.

21         This is Nicolle Kownacki of White & Case

22         on behalf of Al Rajhi Bank and the

23         witness, and I'm joined in the room today

24         by my colleagues, Michael Mahaffey,
```

This Transcript Contains Confidential Material

```
 1        Reuben Sequeira, and Soraya Todd.

 2               We also have a representative

 3        from the Al Rajhi Bank legal department,

 4        Abdulrahman Al Mussaed, appearing

 5        virtually.

 6               MR. SHEPS:  Robert Sheps,

 7        Sheps Law Group, representing the

 8        plaintiffs.

 9               MS. PRITSKER:  Good morning.

10        Gabrielle Pritsker on behalf of defendant

11        Dubai Islamic Bank.

12               THE VIDEOGRAPHER:  For those

13        on Zoom, can you please state your

14        appearances.

15               MR. GOETZ:  Frederick Goetz

16        for World Assembly of Muslim Youths.

17               MR. GRYSKIEWICZ:  Jon

18        Gryskiewicz from Lewis Baach Kaufmann

19        Middlemiss for MWL, IIRO, and certain

20        charity officials.

21               MR. SALERNO:  Peter Salerno,

22        Salerno & Rothstein for Yassin al-Qadi.

23               MS. ROTHSTEIN:  Amy Rothstein,

24        Salerno & Rothstein for Yassin al-Qadi.
```

This Transcript Contains Confidential Material

```
 1                    MS. ZOHNY:  Good morning.

 2         Fatema Zohny on behalf of OTM Law for

 3         WAMY.

 4                    THE VIDEOGRAPHER:  The court

 5         reporter is Denise Vickery will now swear

 6         the witness.

 7                         - - -

 8                    DENNIS M. LORMEL

 9    called for examination, and, after having been

10    duly sworn, was examined and testified as

11    follows:

12                         - - -

13                    EXAMINATION

14                         - - -

15    BY MR. CARTER:

16         Q.       Good morning, Mr. Lormel.

17         A.       Good morning.

18         Q.       As you heard during the

19    introductions, my name is Sean Carter.  I'm an

20    attorney for plaintiffs in the litigation, and

21    we're here today to take your deposition.

22                    I trust you're aware that this is

23    litigation arising from the September 11th

24    attacks, correct?
```

This Transcript Contains Confidential Material

1        A.        Yes.

2        Q.        And are you aware that the

3    plaintiffs in the litigation include individuals

4    making claims for deaths and injuries resulting

5    from the attacks?

6        A.        Yes.

7        Q.        And are you aware that the

8    plaintiffs in litigation also include commercial

9    parties claiming financial damages as a result of

10   the attacks?

11       A.        Yes.

12       Q.        I take it from your responses that

13   you're cognizant of the importance of the subject

14   matter of this litigation?

15                 MS. KOWNACKI:  Objection.

16                 THE WITNESS:  Yes.

17   BY MR. CARTER:

18       Q.        Mr. Lormel, have you been deposed

19   before?

20       A.        Yes, I have.

21       Q.        About how many times?

22       A.        This would be about the 11th.

23       Q.        And did all those occur in the

24   context of some civil litigation proceeding?

This Transcript Contains Confidential Material

1     A.      Yes.

2     Q.      And have you given testimony under

3   oath in any other capacities?

4     A.      Yes.

5     Q.      What other capacities?

6     A.      I've testified in one of my expert

7   cases in a trial, and during my law enforcement

8   career I've testified numerous times, and I've

9   testified before Congress a number of times.

10    Q.      And with regard to the testimony in

11  your law enforcement career, did that include in

12  connection with criminal matters?

13    A.      Yes.

14    Q.      And that was at trial?

15    A.      I only believe I testified at trial

16  maybe once.  I testified in a number of hearings

17  and in grand jury proceedings.

18    Q.      And with regard to the testimony

19  before Congress, about how many times did you do

20  that?

21    A.      While I was in the FBI, at least

22  five, and five since my retirement from the FBI.

23  I also wrote testimony for at least another five

24  Congressional hearings for executives in the FBI.

1      Q.      So fair to say you have some

2  experience providing testimony?

3      A.      Yes, sir.

4      Q.      Just to make sure that we understand

5  the ground rules for today, the court reporter to

6  your left and my right is going to be taking down

7  my questions and your answers.  So it's important

8  that you wait until I finish my questions before

9  answering, and that I wait for you to finish your

10  answer before starting another question.

11              Does that seem fair?

12      A.      Yes.

13      Q.      If at any point today you need to

14  take a break, just let us know, and we'll find an

15  appropriate time to do that.

16      A.      Thank you.

17      Q.      In connection with my questioning

18  today, it's important that you be as forthcoming

19  as possible.  So if you have information

20  responsive, I'm going to expect that you share

21  that, even if it's only partial information.

22              Is that okay?

23      A.      Yes.

24              MR. CARTER:  I'm going to mark

This Transcript Contains Confidential Material

```
 1          as Exhibit 1 the notice of oral

 2          deposition for your deposition today,

 3          which should be at Tab 1 in the binder.

 4          And we'll designate this as Lormel 1 per

 5          the protocol we've been using.

 6                    (Document marked for

 7          identification as Lormel Exhibit 1.)

 8  BY MR. CARTER:

 9      Q.      Mr. Lormel, have you seen this

10  document yet?

11      A.      I don't believe I have.

12      Q.      In number 4 in this request that we

13  sent to counsel for Al Rajhi Bank, we asked to be

14  provided copies of billing statements and invoices

15  in connection with your work in this litigation.

16                    Do you have those with you today?

17      A.      No, I don't.

18      Q.      Have you submitted invoices or

19  billing statements to Al Rajhi Bank for your work

20  in this matter?

21      A.      Yes.

22      Q.      When was the last time you submitted

23  one?

24      A.      In December.
```

This Transcript Contains Confidential Material

```
1          Q.      And was that at the conclusion of

2     the writing of your report?

3          A.      No.

4          Q.      Was it before you finished writing

5     your report?

6          A.      Yes.

7          Q.      And so you have not yet submitted a

8     bill that encompasses all the work through the

9     date of the completion of your report?

10         A.      Correct.

11                 MR. CARTER:  We had an

12            agreement with counsel for Al Rajhi Bank

13            that we would share copies of the billing

14            statements, subject to some redactions.

15            Do we have them?

16                 MS. KOWNACKI:  We agreed to

17            give -- we stipulated to giving you the

18            hours and total compensation, and we will

19            give you those.

20                 MR. CARTER:  Okay.  Can I have

21            them now so that they can be of benefit

22            for purposes of talking with the witness?

23                 MS. KOWNACKI:  Yes.  So Dennis

24            Lormel has billed up to his final invoice
```

This Transcript Contains Confidential Material

```
 1          165 hours, 165.5 hours, and a total
 2          compensation of $82,750.
 3   BY MR. CARTER:
 4       Q.      So, Mr. Lormel, if I understand, as
 5   of the date of your invoice in December, you had
 6   billed about 165 hours?
 7       A.      Yes.
 8       Q.      Do you recall approximately how many
 9   additional hours you billed through the date you
10   signed your report?
11       A.      Through the date I signed the
12   report, probably 20.
13       Q.      And another 20?
14       A.      20.  Yeah.  Altogether in between
15   the report and in preparation today, 42 hours.
16       Q.      So I want to just carve out the work
17   you did from the beginning of the engagement in
18   this matter through the date you submitted your
19   report.
20          Would that be about 185 hours?
21       A.      Yes.
22       Q.      And when did you begin your work?
23       A.      Back in September.
24       Q.      Do you recall exactly when?
```

This Transcript Contains Confidential Material

```
 1        A.        It would have been after

 2   September 7th, but probably toward the end of the

 3   month.

 4        Q.        So the 185 hours that you estimated

 5   from the commencement of your work through the

 6   date of your report would have covered a period

 7   from about late September through December 22nd,

 8   the date your report was signed?

 9        A.        About 165 hours would have been

10   that -- that window, I think.

11        Q.        Okay.  Well, I think you said that

12   there was about another 20 hours up to the

13   completion --

14        A.        Well --

15        Q.        -- of your report?

16        A.        -- no, I think that was -- I'm

17   sorry.  If my -- if I've concluded the report in

18   December, then it was in that 165.

19        Q.        So let's clarify the record here.

20                  From the time you commenced your

21   work sometime in late September through the date

22   you completed your report and signed it on

23   December 22, 2023 --

24        A.        Right.
```

This Transcript Contains Confidential Material

```
 1          Q.        -- you --

 2          A.        A total of about 165.  I think it's

 3   actually 167.5 hours.

 4          Q.        Okay.  And in the statements that

 5   you submitted to counsel for that work, without

 6   telling me any specifics, did you include

 7   descriptions of the nature of the work that you

 8   performed?

 9          A.        General descriptions, yes.

10          Q.        Did you include descriptions of the

11   materials that you reviewed?

12          A.        No.

13          Q.        Okay.  Your report refers to court

14   filings and documents provided by counsel that you

15   reviewed, in addition to other materials, but it

16   doesn't identify those materials.

17                    What were those?

18                    MS. KOWNACKI:  Objection.

19                    You can answer.

20                    THE WITNESS:  Can you repeat

21        that, please?

22   BY MR. CARTER:

23          Q.        Sure.

24                    The report refers to court filings
```

This Transcript Contains Confidential Material

1    and documents provided by counsel that you

2    reviewed, in addition to other materials, but it

3    doesn't identify those documents.

4                    What were those?

5         A.        Court filings and -- well, the

6    initial court filing they provided me with and

7    documents that -- that -- that I felt were

8    relevant.

9         Q.        Well, can you identify them for me

10   today with any particularity so that I know what

11   they were?

12        A.        They're listed in the -- in the

13   appendix and -- and in the other documents I

14   reviewed.  And in my -- in my report, the

15   citations.

16        Q.        So were there any court documents or

17   other materials provided by counsel to you that

18   you reviewed that are not listed in the annex or

19   cited in your report?

20                    MS. KOWNACKI:  Objection.

21                    You can answer.

22                    THE WITNESS:  I don't believe

23        so.

24   BY MR. CARTER:

This Transcript Contains Confidential Material

1    Q.    Well, you -- you indicated a minute

2    ago that counsel had provided you with a copy of

3    the initial filing in the case.

4         Is that the complaint?

5    A.    Yes.

6    Q.    Okay.  The complaint, as I

7    understand it, is not referenced anywhere in your

8    report.

9         So that's a document you considered

10   that I don't see listed anywhere in your report.

11   A.    I looked at --

12        MS. KOWNACKI:  Objection.  The

13        appendix says that it includes materials

14        cited in his report and those cited in

15        the experts' reports.

16   BY MR. CARTER:

17   Q.    Okay.  Did you review each and every

18   document listed in appendix of Mr. Winer's report?

19   A.    No.

20   Q.    Did you identify each -- did you

21   review each and every document referenced in

22   Mr. Kohlmann's report?

23   A.    No.

24   Q.    How is it possible for me to know

This Transcript Contains Confidential Material

1    looking at your report which documents you did

2    review and which you didn't?

3        A.      Well, certain, the documents I have

4    cited here.

5        Q.      So I can understand that you

6    reviewed documents you specifically cited.

7                Are those the only documents you

8    reviewed?

9        A.      Well, I reviewed some of the

10   documents that are cited in Kohlmann and in

11   Winer's reports.

12       Q.      But can you tell me which ones you

13   did review and which ones you didn't, sitting here

14   today?

15       A.      Specifically, no.

16       Q.      Okay.  You've been a financial crime

17   investigator for many years?

18       A.      Yes, sir.

19       Q.      And in financial crime

20   investigations, would you agree that review of the

21   actual records of the bank are relevant to

22   conducting a thorough investigation?

23       A.      In most instances, I'd agree with

24   that.

This Transcript Contains Confidential Material

1    Q.      Did you conduct a review of the

2    banking records produced by Al Rajhi Bank

3    concerning the customers that were within the

4    scope of discovery?

5    A.      I reviewed a couple but not -- not

6    -- not a lot of the records.

7            My -- my engagement was to review

8    and -- and report on, provide my opinion on

9    Kohlmann and Winer's reports, which I did.

10   Q.      And Mr. Winer's report addresses

11   issues related to possible anti-money laundering

12   and counterterrorism financing inadequacies on the

13   part of Al Rajhi Bank, correct?

14   A.      Correct.

15   Q.      Okay.  And for purposes of

16   responding to his opinions on that issue, did you

17   conduct a comprehensive review of the account

18   information for the customers that he addressed in

19   his report?

20   A.      Not all the customers, no.

21   Q.      Did you conduct a comprehensive

22   review of the documents provided to determine

23   whether there were any transactions that would be

24   suspicious within traditional banking standards?

This Transcript Contains Confidential Material

1          MS. KOWNACKI:  Objection as to

2      form of the question.

3          You can answer.

4          THE WITNESS:  Can you repeat

5      that, please?

6  BY MR. CARTER:

7      Q.      You're familiar with the term

8  "suspicious transaction" as used in the anti-money

9  laundering context?

10     A.      Yes.

11     Q.      Did you conduct a comprehensive

12 review of the Al Rajhi Bank financial documents to

13 determine whether or not there were transactions

14 that fit the definition of a suspicious

15 transaction, as you understand the term?

16     A.      No.  No, I did not.

17             Again, my -- my engagement was to

18 respond to their reports, Kohlmann and Winer.

19     Q.      Is the curriculum vitae you attached

20 to your report essentially up to date?

21     A.      Yes.  Excuse me.

22     Q.      And have you given any testimony as

23 an expert since that time?

24     A.      Since which time?

This Transcript Contains Confidential Material

```
 1          Q.      Since the time you finished your

 2   report just a --

 3          A.      Oh, no.

 4          Q.      -- month ago?

 5          A.      No.  No.

 6          Q.      And in describing your experience in

 7   your report, did you try to provide the court with

 8   the work that you deemed the most relevant to

 9   evaluating your role as a proposed expert in the

10   case?

11                  MS. KOWNACKI:  Objection.

12                  You can answer.

13                  THE WITNESS:  Yes.

14   BY MR. CARTER:

15          Q.      I believe you said you've testified

16   as an expert in a number of civil matters,

17   correct?

18          A.      In depositions.

19          Q.      I meant in depositions, yes.

20          A.      Yeah.  Yeah.

21          Q.      And have you been engaged as an

22   expert in civil matters where you didn't testify

23   at a deposition or trial?

24          A.      Yes.
```

This Transcript Contains Confidential Material

1    Q.      With regard to the civil matters

2    where you've been engaged to serve as a consultant

3    or expert, did any of them involve claims of

4    terrorist financing activity?

5    A.      Yes.

6    Q.      Okay.  Which were those?

7    A.      I was retained years ago, I think it

8    was like 2012-2014 -- excuse me -- involving

9    litigation against, I believe it was, the Bank of

10   China.  Similar 9/11 type of things.

11           And then 2018 through 2021, I was

12   involved in litigation involving the Dubai Islamic

13   Bank.

14   Q.      And that was on behalf of Dubai

15   Islamic Bank in this litigation?

16   A.      Yes.

17   Q.      And you've submitted an expert

18   report in the 9/11 multidistrict litigation case

19   on behalf of Dubai Islamic Bank, correct?

20   A.      Yes.

21   Q.      And some of the CIA reports that you

22   discuss in your expert report for Al Rajhi Bank

23   also contain information concerning Dubai Islamic

24   Bank, correct?

This Transcript Contains Confidential Material

```
 1          A.      Correct.

 2          Q.      And do you agree with me that some

 3    of the information in those CIA reports concerning

 4    Dubai Islamic Bank is derogatory in nature?

 5                  MR. PRITSKER:  Objection.

 6            This is outside the scope of his expert

 7            report.  So is the rebuttal report

 8            concerning Dubai Islamic bank.

 9    BY MR. CARTER:

10          Q.      You can answer?

11          A.      Can you repeat that, please?

12          Q.      Yeah.  Would you agree with me that

13    some of the expert or CIA reports addressed in

14    your report on behalf of Al Rajhi Bank include

15    information that is derogatory about Dubai Islamic

16    Bank, your other client?

17          A.      Yes.

18          Q.      And so those -- the content of those

19    CIA documents has been cited by plaintiffs in the

20    9/11 multidistrict litigation in support of their

21    claims against Dubai Islamic Bank, correct?

22                  MS. PRITSKER:  Objection.

23                  THE WITNESS:  Yes.

24    BY MR. CARTER:
```

This Transcript Contains Confidential Material

```
 1          Q.      So you mentioned the litigation
 2   against the Bank of China.
 3                  What was the basic allegation in
 4   that case?
 5          A.      It was a lawsuit that monies flowed
 6   through the Bank of China that resulted in the
 7   deaths of Americans in -- I think in a Hamas
 8   attack.
 9          Q.      And what party did you work for in
10   that case?
11          A.      The -- the bank.
12                  I'm sorry.  No, no, no.  Yes, it was
13   the bank.
14          Q.      And by virtue of the name Bank of
15   China, am I correct in understanding that that is
16   a China-based bank?
17          A.      Yes.
18          Q.      Any other work of that nature?
19          A.      I worked, again, for a bank as an
20   expert for the bank in a case involving a charity
21   that was an Islamic charity that the bank exited a
22   relationship with.
23          Q.      Was that a civil claim by victims of
24   terrorism against the bank?
```

This Transcript Contains Confidential Material

```
 1        A.        No.

 2        Q.        Okay.  What was the nature of that

 3   case?

 4        A.        It was the NGO itself.  The banking

 5   relationship was exited by the bank as a high-risk

 6   customer, and they -- they determined they wanted

 7   to exit the relationship.

 8        Q.        And do I infer from that that the

 9   NGO then sued the bank?

10        A.        Yes.

11        Q.        And what was the nature of the claim

12   the NGO was making against the bank?

13        A.        Discrimination.

14        Q.        What was the name of the NGO?

15        A.        I think it was Life For -- I don't

16   specifically recall.  Life For something.

17        Q.        What was the name of the bank?

18        A.        Bank of America.

19        Q.        Any others?

20        A.        From a terrorist financing

21   standpoint, court-wise, no.

22        Q.        What about not court-wise?

23        A.        Yes.  I worked for litigation

24   against ██████████.
```

This Transcript Contains Confidential Material

1    Q.    ███████████    who was associated with

2  a group of nonprofit organizations in the Herndon,

3  Virginia area?

4    A.    Yes.

5    Q.    And ███████████ who was associated

6  with the SAAR Foundation?

7    A.    Yes.

8    Q.    Okay.  And did you work for anyone

9  other than ███████████ in connection with that?

10   A.    Well, it was basically ███████████ --

11  ███████████ case that I was engaged in and with the

12  umbrella would have been the SAAR Foundation or

13  Safa.

14   Q.    Okay.  Who paid you?

15   A.    ███████████

16   Q.    Do you know where he got the money

17  from to pay you?

18   A.    I assumed it was from -- from --

19  from -- from his own funds.

20   Q.    Do you know that for a fact?

21   A.    No.

22   Q.    You were working on behalf of the

23  SAAR Foundation as well?

24   A.    This is for with ███████████ -- it was

This Transcript Contains Confidential Material

```
1    the SAAR Foundation defense team was involved, but
2    I was specifically working with ████ and ██████
3    attorney.
4         Q.       Well, who were the targets of the
5    inquiry that the defense team were defending?
6         A.       Primarily ████.
7         Q.       What about any of the entities ████
8    was associated with?
9         A.       It dealt with the charges against
10   ████.
11        Q.       Well, did it -- did the charges
12   against ████ have anything to do with his role
13   and relationships with a group of nonprofits --
14        A.       Yes.
15        Q.       -- in Herndon, Virginia?
16        A.       Yes.
17        Q.       And one of those was the SAAR
18   Foundation?
19        A.       Yes.
20        Q.       And there were others as well?
21        A.       Yes.
22        Q.       So the nature of work you were doing
23   concerned the allegations relating to that group
24   of entities, correct?
```

This Transcript Contains Confidential Material

```
 1          A.      Correct.

 2          Q.      And you were serving in a capacity

 3   helping the defense team?

 4          A.      Yes.

 5          Q.      And what attorney were you working

 6   for?

 7          A.      Buddy Parker.

 8          Q.      And anyone besides Buddy Parker?

 9          A.      Primarily I worked with Buddy.

10   Nancy Luque was involved.

11          Q.      And in addition to Buddy Parker and

12   Nancy Luque, was Steve Barentzen involved?

13          A.      I believe Steve worked with, in some

14   capacity, Nancy.

15          Q.      And what was the time period of that

16   engagement?

17          A.      It would have been between 2005 and

18   2011.  It was kind of recurring on and off.

19          Q.      A six-year engagement in total?

20          A.      Over a six-year period.  It was -- I

21   would call it more of a limited engagement.

22          Q.      Are you aware that the SAAR

23   Foundation and ███████ were named defendants

24   in the civil litigation that's part of this 9/11
```

```
 1    proceeding?

 2         A.      Yes.

 3         Q.      And did you work for Mirza in

 4    connection with this litigation?

 5         A.      No.

 6         Q.      What about SAAR?

 7         A.      No.

 8         Q.      Any of the other entities that are

 9    identified as having been associated with ███    in

10    Herndon, Virginia?

11         A.      No.

12         Q.      What was the nature of the inquiry

13    as to ███    that you were involved in?

14         A.      It was the criminal charges against

15    him that were still pending in the Eastern

16    District of Virginia.  And based on my experience

17    in the FBI, I was familiar with that case, I was

18    familiar with the execution of the search warrant,

19    and -- and so I knew the circumstances behind the

20    case.

21                 I honestly believe ███    should not

22    have been charged.

23         Q.      And the criminal investigation that

24    you were working on remained active in some
```

This Transcript Contains Confidential Material

```
 1   capacity throughout that period up to 2011 or so?

 2        A.      At least that time period, when it

 3   was declined for prosecution.

 4        Q.      And were there any indictments?

 5        A.      In that case, no.

 6        Q.      And when you specify "in that case,"

 7   why are you using that language?

 8        A.      Nothing specific.  There were

 9   indictments during the course of that case that

10   became associated with the case but were not

11   related.  They were not directly involved in that

12   case.

13              The Eastern District charged an

14   individual.  I don't recall his specific name.  He

15   was charged with -- with being involved in an

16   assassination attempt or paying for an

17   assassination of an official in another country,

18   and that case got linked to the SAAR case and to

19   ███████ case through in the Eastern District and

20   it shouldn't have been.

21        Q.      Was that individual Abdurahman

22   Alamoudi?

23        A.      Yes.

24        Q.      And if I recall correctly, he was
```

This Transcript Contains Confidential Material

 1    found to have been carrying a large sum of money

 2    when reentering the United States from Libya?

 3         A.        Yes.

 4         Q.        And did Alamoudi have some

 5    association with one of the nonprofit entities

 6    associated with the Herndon group?

 7         A.        I believe so, yes.

 8         Q.        Do you recall what that was?

 9         A.        No.

10         Q.        Was there also a prosecution of --

11    initiated against an entity called Mar-Jac

12    Poultry?

13         A.        I believe Mar-Jac was one of the

14    companies, and ████ was involved in Mar-Jac.

15         Q.        And do you recall whether or not

16    there was an indictment in Georgia?

17         A.        I don't recall.

18         Q.        Do you recall the approximate total

19    amount of compensation you received for working on

20    the ████ and SAAR Foundation-related criminal

21    investigation over that six-year period?

22         A.        No, but it -- I would estimate no

23    more than 20,000, if that much.

24         Q.        What were you billing by the hour?

This Transcript Contains Confidential Material

```
 1        A.        Because ████ was paying, I was

 2   billing a lower rate.  I don't recall the specific

 3   rate.

 4        Q.        And was your role in that capacity

 5   to serve as a financial crime investigator for

 6   ████

 7        A.        No.  It was a consultant to

 8   provide -- provide Mr. Parker and -- and the legal

 9   team with my perspective and my experience on the

10   case and help them in reviewing the charges and

11   things.

12        Q.        When you say your perspective on the

13   case, are you talking about your perspective on

14   the case from the work you did at the FBI?

15        A.        Based on my -- yes.

16        Q.        And you left the FBI at the end of

17   2003?

18        A.        Yes.

19        Q.        And you then took an engagement

20   sometime thereafter to work for ████ and on

21   behalf of the associated entities?

22        A.        Yes.

23        Q.        And did you have exposure to aspects

24   of the investigation at the FBI?
```

This Transcript Contains Confidential Material

1    A.        During the time period I worked in

2    the FBI, yes.  From the time I retired, absolutely

3    not.

4    Q.        Okay.  But part of your role working

5    for █████ and in relation to the SAAR Foundation

6    was to share with them perspectives you had based

7    on things you learned at the FBI?

8              MS. KOWNACKI:  Objection.

9              THE WITNESS:  Based on my

10        experience.

11   BY MR. CARTER:

12   Q.        At the FBI?

13   A.        Yes.

14   Q.        And at the FBI you had exposure to

15   investigative details relating to the FBI's

16   investigation of █████?

17   A.        Yes.

18   Q.        And did you have an employment

19   agreement with the FBI?

20   A.        When I worked at the FBI, I

21   certainly did, yes.

22   Q.        And do you know whether or not that

23   employment agreement placed any constraints on

24   your use of information you obtained during the

This Transcript Contains Confidential Material

1    course of your career at the FBI?

2         A.      I didn't provide any information

3    from my investigative time at the FBI to ███.

4    When I retired from the FBI, all information that

5    I contained, especially anything that might have

6    been classified or confidential, remained at the

7    FBI.

8         Q.      Well, you've said things about

9    information you obtained at the FBI in your report

10   in this matter, haven't you?

11        A.      In terms of -- of information that

12   I'm aware of based on my experience, yes.

13        Q.      I don't know what that means.

14                You've made representations in your

15   expert report about --

16        A.      Show me where.

17        Q.      Okay.  We will.  We will.

18                Did you have any contact with ███

19   ███ when you were at the FBI?

20        A.      No.

21        Q.      Do you know whether any agents of

22   the FBI had contact with ███████ unrelated to

23   the criminal investigation?

24        A.      During what time period?

This Transcript Contains Confidential Material

```
1          Q.       At any point before 2003.

2          A.       No, I don't know of any contacts.  I

3    knew that he was being investigated as part of the

4    SAAR Foundation.

5          Q.       Do you know whether ████████ ever

6    provided information to the FBI on other

7    investigations?

8          A.       Not to my knowledge.

9          Q.       Do you know whether he was ever a

10   source of any kind for the FBI?

11         A.       No.

12         Q.       What about anyone else associated

13   with the Herndon, Virginia charities?

14         A.       No, I don't have any knowledge of

15   that.

16         Q.       And I'm just trying to understand

17   what you were -- what you were doing for

18   ████████.

19                  You were just providing your

20   perspective from your experience at the FBI on the

21   case that was brought against him?

22                  MS. KOWNACKI:  Objection.

23             Form of the question.

24                  You can answer.
```

This Transcript Contains Confidential Material

```
 1                    THE WITNESS:   Yes.
 2   BY MR. CARTER:
 3        Q.      Did you review any documents?
 4        A.        My background in that case was
 5   during the run-up to -- when I started the
 6   Terrorist Financing Operations Section in the FBI,
 7   one of the things that we did was, I had agents
 8   assigned to looking at as one of the areas we were
 9   going after when we were looking at the scope of
10   terrorist financing because terrorist financing
11   hadn't been investigated consistently before.
12            So one of -- one of the things that
13   we were doing was assigning teams to look at as
14   many -- identify as many cases as we could where
15   terrorist financing was -- was involved and bring
16   that together to see what we needed to do going
17   forward in terms of investigations.  So that was
18   one of the things.
19            So in there, I became aware of that
20   case.  And then going forward, I was aware that
21   the case was declined for prosecution in the
22   Eastern District of New York -- I mean, in New
23   York -- in the Eastern District of Virginia.
24            Then when legacy Customs who became
```

This Transcript Contains Confidential Material

```
 1    Homeland Security started Operation Green Quest,
 2    Operation Green Quest had the SAAR Foundation case
 3    reopened, and it became their pivotal case and
 4    they -- they -- predication for reopening it was
 5    the income tax charges.
 6              So the charges against -- the
 7    traditional charge -- traditional is a bad word --
 8    but the charges that were preexisting about the
 9    SAAR Foundation, about the SAAR Foundation's
10    potential or the money that -- that they were
11    alleged to have provided to terrorist
12    organizations, that case was declined for
13    prosecution.
14              Customs had it reopened with the
15    predicate of income tax charges, and they reopened
16    it and brought the income tax into that case.  And
17    they began to investigate it again, which led to
18    the search warrant that was executed in -- in --
19    in Herndon against a number of those entities and
20    individuals.
21              At the time, we were working in
22    cooperation with Operation Green Quest.  They
23    started their task force after we had started the
24    Terrorist Financing Operations Section, and -- and
```

This Transcript Contains Confidential Material

```
1    we had an agent working as a liaison agent in

2    their task force.  They had an agent assigned to

3    our task force.  We agreed that we would assist in

4    the execution of the search warrant.  So I had

5    agents assigned to that.

6              In the run-up to that, I looked at a

7    lot of things.  I looked at the facts.  I looked

8    at the -- the affidavit for the search warrant.  I

9    looked at the planning that was in place and I

10   decided -- I made the decision -- and rightfully

11   so -- that -- that -- that there wasn't -- the

12   case wasn't there.

13        Q.     So --

14        A.     That I didn't agree with the -- or

15   there were inconsistencies.  I pulled the FBI

16   resources and -- and made a point that we weren't

17   going to be involved in that investigation.

18        Q.     So we'll try to work through all of

19   that in a relatively clean way in a minute.

20              What I had asked was:  What specific

21   service and benefit were you providing to

22   ▮▮▮▮▮ when you served as a consultant to his

23   criminal defense team?

24              And I understand from your prior
```

This Transcript Contains Confidential Material

1    answer that you weren't principally involved in

2    reviewing the actual documents that concerned the

3    investigation; is that correct?

4                    MS. KOWNACKI:  Objection.

5         Form of the question.

6                    You can answer.

7                    THE WITNESS:  Yes.

8    BY MR. CARTER:

9         Q.      So you just mentioned that the

10   investigation as opened was a tax-related

11   investigation, correct?

12        A.      Yes.

13        Q.      So it involved allegations of

14   improprieties in financial dealings related to

15   possible tax evasion?

16        A.      Yes.

17        Q.      You were not involved in reviewing

18   the actual financial records to address the tax

19   evasion issues, were you?

20                    MS. KOWNACKI:  Objection.

21                    You can answer.

22                    THE WITNESS:  Yes, I wasn't.

23   BY MR. CARTER:

24        Q.      You was not?  You were not?

This Transcript Contains Confidential Material

```
 1         A.      Right.  Right.

 2         Q.      Okay.  So, again, what was ██████████

 3  paying you to do?

 4         A.      Just to provide consulting with

 5  and -- and consulting.

 6         Q.      To provide consulting with --

 7         A.      Yeah.

 8         Q.      -- regard to a criminal

 9  investigation --

10         A.      Right.

11         Q.      -- in which you were directly

12  involved when you were at the FBI?

13                 MS. KOWNACKI:  Objection.

14                 THE WITNESS:   I wasn't

15         directly involved.

16                 I was involved to the extent

17         that I had resources assigned to the

18         case.  I reviewed the -- the search

19         warrants, and I interacted with Marcy

20         Forman, who was the head of Operation

21         Green Quest, in trying to establish the

22         plans and what -- what they were trying

23         to accomplish in their investigation.

24                 And I saw it as a potential
```

This Transcript Contains Confidential Material

```
 1              liability for our agents.  I saw it as a

 2              danger for our agents and, therefore, I

 3              had the FBI pulled out of that.

 4    BY MR. CARTER:

 5         Q.      Well, you must have been

 6    sufficiently involved, based on your answer --

 7         A.      Yeah.

 8         Q.      -- to have assessed what the

 9    evidence was, correct?

10         A.      Right.

11                 MS. KOWNACKI:  Objection.

12    BY MR. CARTER:

13         Q.      So you were involved at the FBI in

14    the sense --

15         A.      Right.

16         Q.      -- that you had direct access to the

17    evidence that had been collected in support of the

18    investigation, right?

19                 MS. KOWNACKI:  Objection.

20                 You can answer.

21                 THE WITNESS:   I had access to

22              the -- the legal documents.  I didn't

23              have hands-on access to any documents or

24              any evidence.
```

This Transcript Contains Confidential Material

```
 1    BY MR. CARTER:

 2         Q.      What -- what -- what materials did

 3    you have access to?

 4         A.      The only material I had access to

 5    that I saw directly was the search warrant.

 6         Q.      And am I correct that you directed

 7    your agents to cease participating in the

 8    investigation based on the review solely of that

 9    search warrant?

10         A.      No.  It was based on the prior

11    declination.  The fact that the investigation was

12    predicated, reopened on the tax -- tax charges,

13    briefings I was getting from my people that were

14    assigned over there, and there were -- there were

15    just a number of things that were -- were wrong

16    with that situation.  And I deemed it appropriate

17    to pull our folks out.

18         Q.      But as I understand your testimony,

19    you did not personally review the evidence that

20    had been collected in support of the

21    investigation; is that correct?

22         A.      Correct.  I was aware that based on

23    prior evidence that had been collected the case

24    was declined for prosecution.
```

This Transcript Contains Confidential Material

1          Q.       Well, the Eastern District of

2   Virginia U.S. Attorney's Office continued to be

3   involved in the investigation thereafter, correct?

4          A.       Correct.

5          Q.       So at some point, the United States

6   Attorney's Office for the Eastern District of

7   Virginia agreed to continue the investigation

8   after the 2002 period, right?

9                   MS. KOWNACKI:  Objection.

10                  You can answer.

11                  THE WITNESS:  Correct.

12  BY MR. CARTER:

13         Q.       And the criminal investigation

14  continued, right?

15         A.       Correct.

16                  There was never a prosecution.  The

17  case was declined for prosecution again.

18         Q.       And that was a criminal prosecution,

19  right?

20         A.       Yes.

21                  MR. CARTER:  I'm just trying

22          to find the right page of your report.

23                  The section of your report

24          that primarily addresses this is on

This Transcript Contains Confidential Material

```
1              page 33.

2                     And if we can, let's mark

3              Mr. Lormel's report as Lormel 2.

4                     And that is at Tab 2, I think,

5              Gina.

6                     (Document marked for

7              identification as Lormel Exhibit 2.)

8                     MS. KOWNACKI:  And, Sean,

9              before we go forward, he had some small

10             corrections to his report if you want to

11             introduce the report.

12                    MR. CARTER:  It's been

13             introduced.

14                    MS. KOWNACKI:  Yeah.  So do

15             you want to talk about -- can he talk

16             about those now?

17                    MR. CARTER:  Well, do they

18             concern this specific section?

19                    MS. KOWNACKI:  It's a small

20             edit on that page.

21       BY MR. CARTER:

22             Q.     Okay.  Sure.  You can tell me what

23       the edit is on that page.

24                    MS. KOWNACKI:  I may have a
```

1          copy of the pages with corrections we can

2          give you.

3                    MR. CARTER:  Okay.

4                    MS. KOWNACKI:  We will issue a

5          formal errata later, but for purposes of

6          precision in explaining the corrections.

7                    (Hands document).

8     BY MR. CARTER:

9          Q.        Mr. Lormel, is the discussion on

10    page 33 the principal section of your report

11    addressing the investigation of the SAAR

12    Foundation in Northern Virginia?

13         A.        Yes.  Excuse me.

14         Q.        And --

15         A.        May I just?

16                   The -- you're looking at the

17    corrected page where, and then there's a minor

18    correction there where I said in the report that

19    you are working from 2002, and it was either in

20    2001 or early 2002 that case was declined.

21         Q.        And so in your report, you

22    specifically reference the initial declination to

23    prosecute by the U.S. Attorney's Office in the

24    Eastern District of Virginia in 2001 or early

This Transcript Contains Confidential Material

1    2002, right?

2         A.       Yes.

3         Q.       Do you anywhere note that the U.S.

4    Attorney's Office in the Eastern District of

5    Virginia continued the investigation thereafter?

6         A.       Yes.  I believe below that in

7    October 2001 I have the Green Quest here, but let

8    me look.

9                  They reopened -- "Operation Green

10   Quest used an alleged income tax violation as a

11   predicate offense to reopen the previously-closed

12   investigation into the Northern charities into the

13   Northern Virginia charities."

14        Q.       You don't anywhere indicate how long

15   that investigation continued to remain open, do

16   you?

17        A.       Not in this report, no.

18        Q.       And you don't anywhere in this

19   report acknowledge the involvement of the U.S.

20   Attorney's Office in the Eastern District of

21   Virginia in that ongoing investigation, do you?

22        A.       No, I don't.

23        Q.       And do you mention anywhere in this

24   report your role as a consultant for ▮▮▮▮ and the

This Transcript Contains Confidential Material

```
1    SAAR Foundation?
2         A.        No.
3         Q.        Don't you agree that it is highly
4    relevant to the court's assessment of your role
5    now serving as an expert in relation to Al Rajhi
6    Bank?
7                        MS. KOWNACKI:  Objection.
8                        You can answer.
9                        THE WITNESS:  No, it had
10        nothing to do with the Al Rajhi Bank.
11   BY MR. CARTER:
12        Q.        Well, you're aware and specifically
13   address in your report opinions Mr. Winer offers
14   concerning the significance of the SAAR Foundation
15   to the claims against Al Rajhi Bank, right?
16                        MS. KOWNACKI:  Objection to
17        the form of the question.
18                        THE WITNESS:  Could you
19        repeat that?
20   BY MR. CARTER:
21        Q.        You're aware that Mr. Winer's
22   report, to which you're responding, includes
23   opinions concerning the significance of the SAAR
24   Foundation in the USA to the claims against Al
```

This Transcript Contains Confidential Material

```
 1   Rajhi Bank, aren't you?

 2                    MS. KOWNACKI:  Object.

 3                    THE WITNESS:  Yes.

 4                    MS. KOWNACKI:  You can answer.

 5                    THE WITNESS:  Yes.

 6   BY MR. CARTER:

 7        Q.      So you're aware that the SAAR

 8   Foundation has been cited as relevant to the

 9   claims against the bank, correct?

10                    MS. KOWNACKI:  Objection.

11                    You can answer.

12                    THE WITNESS:  Yes.

13   BY MR. CARTER:

14        Q.      And your report doesn't say anything

15   at all about your role having worked for a number

16   of years for the SAAR Foundation and ████?

17                    MS. KOWNACKI:  Objection.

18                    You can answer.

19                    THE WITNESS:   Please repeat

20        that.

21   BY MR. CARTER:

22        Q.      You agree that your report doesn't

23   say anything about your work -- your role working

24   for approximately six years as a consultant to
```

1    ████████ and the SAAR Foundation?

2         A.       You frame that as if I had worked a

3    considerable amount of time on that case, and it

4    wasn't.

5         Q.       I'm not saying how much time you

6    worked or not.

7                  I'm saying that you had a consulting

8    relationship --

9         A.       Yes.

10        Q.       -- with ████████ and the SAAR

11   Foundation?

12        A.       Right.

13                 MS. KOWNACKI:  Objection.  I

14          don't believe he said that he worked for

15          the SAAR Foundation.

16                 THE WITNESS:  Right.

17   BY MR. CARTER:

18        Q.       Well --

19        A.       I was engaged by ████████ in that case.

20                 MR. CARTER:  Let's take a look

21          at the letter at Tab 28 and mark that as

22          the next exhibit.

23                 (Document marked for

24          identification as Lormel Exhibit 3.)

This Transcript Contains Confidential Material

```
1    BY MR. CARTER:

2         Q.      This is a letter that was submitted

3    to the court in the 9/11 multidistrict litigation

4    by attorney Steven Barentzen on behalf of an

5    individual named Jamal Barzinji.

6              Do you know who Dr. Jamal Barzinji

7    is?

8         A.      Yes.

9         Q.      And were you working on his behalf

10   in relation to your engagement with ███████████?

11              MS. KOWNACKI:  Objection.

12              You can answer.

13              THE WITNESS:   I remember his

14        involvement.  I don't recall.

15              Again, I was working for

16        ████████████  and Barzinji was part of that

17        case.

18   BY MR. CARTER:

19        Q.      If you look at Footnote 8 on page 11

20   of this filing, it says:

21              "In March 2010, the government

22   returned another 300 plus boxes of documents taken

23   during the searches.  Those boxes are in the

24   possession and custody of Dennis Lormel, a
```

This Transcript Contains Confidential Material

```
1    consultant for Mar-Jac Poultry supervised by

2    Mr. Parker."

3                   Do you see that?

4         A.        Yes.

5         Q.        And were you a consultant for

6    Mar-Jac Poultry?

7         A.        With ████.  ████ -- Mar-Jac was

8    ████ company.

9         Q.        So --

10        A.        And I acted as the custodian in that

11   particular case at the office.  I maintained, I

12   accepted the -- the return of the documents and

13   made sure that they were in locked storage.

14        Q.        So the representation here that, in

15   addition to being a consultant to ████, you

16   were also a consultant to Mar-Jac Poultry,

17   correct?

18        A.        Yes.

19                  MR. CARTER:  And if we can

20           mark as the next exhibit the deposition

21           transcript at Tab 27.

22                  (Document marked for

23           identification as Lormel Exhibit 4.)

24   BY MR. CARTER:
```

This Transcript Contains Confidential Material

```
 1            Q.        Mr. Lormel, this is a deposition

 2   transcript that was filed in the Life For Relief &

 3   Development v. Bank of America case.

 4                      Is that a case that you testified

 5   earlier you were involved in?

 6            A.        Yes.

 7            Q.        And were you deposed in that matter?

 8            A.        Yes.

 9            Q.        And turning to pages 12 and 13, it

10   includes questioning concerning your role for the

11   Herndon, Virginia entities.

12                      And you were asked:

13                      "Have you ever been asked to provide

14   an expert opinion regarding nonprofit

15   organizations as a consultant?"

16                      And you responded:

17                      "I've had another case where I've

18   been retained that involved a nonprofit -- or a

19   group of nonprofits and some Islamic principals."

20                      Do you see that?

21            A.        Yes.

22            Q.        And that was you were testifying

23   truthfully there?

24            A.        Yes.
```

This Transcript Contains Confidential Material

```
1        Q.      And you were asked when you were
2   retained, and it says that that would have been in
3   2004.
4                Does that sound correct?
5        A.      It sounds correct.
6        Q.      And you actually --
7        A.      It's actually 2005, though.
8        Q.      You believe it was actually 2005?
9        A.      I believe so, yeah.
10       Q.      What time frame in 2005?
11       A.      It would have been early.  Late
12  2004/early 2005.
13       Q.      And you left the FBI in late 2003?
14       A.      Yes.
15       Q.      So it would have been close --
16       A.      2005.
17       Q.      -- to a year after you left?
18       A.      Yes.
19       Q.      And you were asked who you were
20  retained by, and it says:
21                "By the two principals and SAAR
22  Foundation."
23                Do you see that?
24       A.      Okay.  Yeah.
```

This Transcript Contains Confidential Material

```
 1        Q.        So is it correct that you were

 2   retained by the two principals and the SAAR

 3   Foundation?

 4        A.        Yeah, I guess.

 5                  My -- my interactions were with

 6   ████████████  They certainly all.

 7        Q.        This testimony --

 8        A.        Yeah.

 9        Q.        -- occurred about nine years ago,

10   right?

11        A.        Can I see the date on it?

12        Q.        Yeah, it's right at the top?

13        A.        You have the date on the front?

14                  I don't see it here.

15        Q.        Sorry.  There you go.

16        A.        Okay.  Yeah.

17        Q.        About nine years ago?

18        A.        Yeah.

19        Q.        Fair to say that your recollection

20   of this consulting role would have been a bit

21   fresher at that time?

22        A.        Yes.

23        Q.        And again at that time, you

24   testified that you were retained by the two
```

This Transcript Contains Confidential Material

1    principals and the SAAR Foundation, right?

2        A.      Correct.

3        Q.      And you identified the two

4    principals as ███████████ and another person,

5    Dr. Barzinji?

6        A.      Right.  Again, my interactions are

7    with ███████████.

8        Q.      When you were at the FBI, were you

9    opposed to the involvement of Customs in taking

10   the lead in terrorism investigations?

11       A.      Was I opposed to it?  No.

12       Q.      Did you believe that such

13   investigation should be conducted only under the

14   leadership of the FBI?

15       A.      What I believed was that terrorist

16   financing was a component of terrorism and needed

17   to be coordinated very closely.  The FBI had

18   primary jurisdiction in counterterrorism.  So I

19   believed that whoever was working terrorist

20   financing needed to coordinate it very closely

21   with the FBI.

22       Q.      Do you recall giving an interview

23   with the 9/11 Commission?

24       A.      I gave numerous interviews to the

This Transcript Contains Confidential Material

1    9/11 Commission.

2         Q.      Do you recall giving a briefing on

3    or about January 16, 2004?

4         A.      Not specifically.

5              MR. CARTER:  We're going to

6         mark as the next exhibit the document at

7         number 29, which is a Memorandum for the

8         Record of a formal interview of Dennis M

9         Lormel.

10              (Document marked for

11         identification as Lormel Exhibit 5.)

12   BY MR. CARTER:

13        Q.      Do you know whether you've ever read

14   this Memorandum for the Record of your interview?

15        A.      No.

16        Q.      But you do recall giving interviews

17   with the 9/11 Commission?

18        A.      Absolutely.  I gave many -- I spent

19   many hours with them.

20        Q.      Turning to page 9 of the document.

21        A.      Let me just -- if you would go back

22   to the --

23        Q.      Sure.

24        A.      -- Page 1 for a second?

This Transcript Contains Confidential Material

1     Q.      Yes.

2     A.      Okay.  So Greenburg and Roth were

3  the people I dealt with quite extensively.  They

4  were responsible for the terrorist financing,

5  Monograph for Terrorist Financing.  Okay.

6     Q.      So you're referring to Doug

7  Greenburg and John Roth?

8     A.      Yes.

9     Q.      And as I understand, you're saying

10  that they were staff members of the 9/11

11  Commission?

12     A.      Yes.

13     Q.      And they had a principal role in the

14  Staff Monograph on Terrorist Financing?

15     A.      Yes.

16     Q.      And on -- if we can on page 9, the

17  paragraph -- there's some redactions, but the

18  second paragraph that we can see indicates:

19          "Lormel flatly rejected any

20  suggestion that the FBI should not take the lead

21  on CTF" -- which I understand to be

22  counterterrorism financing -- "because other

23  agencies, such as Customs, Secret Service, and IRS

24  CID, have more financial investigative expertise.

This Transcript Contains Confidential Material

1    First, he said that the FBI has vastly superior

2    financial investigative expertise than Customs or

3    Secret Service."

4                 It goes on to explain, and you end

5    with saying:

6                 "There needs to be a multi-agency

7    coordinated approach, but it has to be under FBI

8    leadership because the FBI has the overall

9    counterterrorism responsibility."

10                Is that correct?

11   A.       Yes.  Yes.

12   Q.       And you agree with all of that?

13   A.       Yes.

14   Q.       And that was your position at the

15   time you were at the FBI?

16   A.       Yes.

17   Q.       And the Operation Green Quest

18   investigation you're referring to, was that an

19   investigation that was being headed by the FBI?

20   A.       No.  The Operation Green Quest was

21   started by the Customs Service and involved

22   Customs and the IRS.

23   Q.       And in your view, Customs and IRS

24   were intruding on the territory of the FBI?

This Transcript Contains Confidential Material

```
 1                    MS. KOWNACKI:  Objection.

 2                    THE WITNESS:  No.

 3                    Customs started Green Quest

 4          after the FBI had established the

 5          Terrorist Financing Operations Section.

 6          Customs was disingenuous in how they

 7          started that.  They wanted control of

 8          terrorist financing.

 9                    My position was that that

10          should have been part of the same task

11          force what they were doing.

12                    So my objection to Green Quest

13          was different, not that they were running

14          it.  If we had coordinated things -- and

15          at this point, when Green Quest was being

16          formed, Michael Chertoff was the

17          Assistant Attorney General in charge of

18          the criminal division.

19                    And when we understood that

20          they were going to form Green Quest and

21          model it after what we were doing, our

22          position was, we should be joint and that

23          they should put their resources with our

24          resources and we have one task force and
```

This Transcript Contains Confidential Material

```
1            it fall under the FBI supervision and --

2            and under the FBI leadership in the sense

3            that FBI had the counterterrorism lead.

4            And it was very important that terrorist

5            financing is a component of terrorism.

6                      Operation Green Quest, they

7            set their model up to be unilateral, and

8            we'll work one case, you work another

9            case.  That's wrong.  That's absolutely

10           wrong, and it's counterproductive.

11                     And they opened up that

12           particular case as the centerpiece for

13           Operation Green Quest.

14                     So they were disingenuous in

15           the way they opened it up.  They opened

16           it up with that motivation, and that was

17           my -- my experience in that whole thing.

18                     I honestly believe that we

19           needed to have a multi-agency coordinated

20           approach, which we did.  I opened up --

21           when we opened up the Terrorist Financing

22           Operations Section, we brought in every

23           agency.  We opened ourselves up to the

24           international community and brought in
```

This Transcript Contains Confidential Material

```
 1          other countries to model their work after
 2          what we were doing.
 3                  There's absolutely no question
 4          that what we did was -- was the best
 5          approach to doing that, and I make no
 6          apology for that.
 7                  And at the end of the day,
 8          Operation Green Quest -- because of the
 9          conflicts that they caused -- was folded
10          back into or was supposed to be folded
11          into the Terrorist Financing Operations
12          Section through an agreement between the
13          Attorney General and the -- and the
14          director of Homeland Security, Tom Ridge
15          at the time, and that came right through
16          the White House and the National Security
17          Counsel.
18                  So what we did was the right
19          thing and the right way to approach it.
20     BY MR. CARTER:
21          Q.      You did not like what Operation
22     Green Quest was doing at the time structurally?
23                  MS. KOWNACKI:  Objection.
24                  You can answer.
```

This Transcript Contains Confidential Material

```
 1                    THE WITNESS:   Not
 2         necessarily.  When we were able to
 3         coordinate and when they worked in a
 4         genuine fashion to do things the right
 5         way, then I had no problem with that.
 6   BY MR. CARTER:
 7         Q.      During that time period, did you
 8   work at all with Stuart Levey?
 9         A.      Yes, I did.
10         Q.      What was Stuart Levey's role?
11         A.      At that time, Stuart -- a number of
12   people came into the Treasury Department -- I'm
13   sorry, Treasury.  That was later on, he was
14   Treasury.
15               No, but at that time, Stuart was a
16   special advisor to either the Attorney General or
17   to -- to Michael Chertoff and he had a
18   responsibility on the terrorist financing side.
19                    MS. KOWNACKI:  John, can we
20         get a break?
21                    MR. CARTER:  Yeah.  Sure.
22                    MS. KOWNACKI:  Thank you.
23                    THE VIDEOGRAPHER:  The time is
24         10:06 a.m.  We're off the record.
```

This Transcript Contains Confidential Material

```
 1                    (Recess.)

 2                    THE VIDEOGRAPHER:  The time is

 3          10:18 a.m.  We are back on the record.

 4  BY MR. CARTER:

 5          Q.      Mr. Lormel, before we took a break,

 6  we were briefly discussing an individual named

 7  Stuart Levey, who, I believe, had a role at the

 8  Department of Justice during the time period --

 9          A.      Yes.

10          Q.      -- that you were at the FBI dealing

11  with terrorism financing issues, correct?

12          A.      Yes.

13          Q.      And I believe you had interactions

14  with Mr. Levey?

15          A.      Yes.

16          Q.      How commonly?

17          A.      Very -- we had frequent

18  interactions.  He was -- Stuart was in the

19  position where he was responsible at the

20  department for terrorist financing, and I'm not

21  sure if he was under the Attorney General or

22  Deputy Attorney General or the criminal division,

23  or where else he sat, but what we had frequent

24  interactions when he came onboard.
```

This Transcript Contains Confidential Material

1       Q.      Did you have any interactions with

2   him concerning Operation Green Quest?

3       A.      Yes.

4       Q.      And did you have any interactions

5   with him at the time concerning the involvement of

6   Customs and Treasury in pursuing criminal

7   investigations?

8                   MS. KOWNACKI:  Objection.

9                   You can answer.

10                  THE WITNESS:   Repeat that.

11          I'm sorry.

12  BY MR. CARTER:

13      Q.      Well, did you have any interactions

14  with him concerning the propriety of Customs

15  operating through Green Quest in pursuing criminal

16  investigations?

17      A.      Yes, but Stuart came in, and I'm not

18  sure if he joined the department after Green Quest

19  had been formed or at what point he got involved,

20  but it was after that.  Because my initial

21  involvement was with Assistant Attorney General

22  Michael Chertoff about that.

23                  I was at the meeting.  When we heard

24  that Green Quest was going to be formed, Chertoff

1   was against it.  He wasn't going to allow it.

2   Commissioner Bonner from Customs and Jimmy Gurulé,

3   the Under Secretary from Treasury, had a meeting.

4   We met at FBI headquarters.  Myself, those two

5   gentlemen, and -- and Chertoff.

6              And Chertoff allowed them -- he

7   acquiesced and told them he would allow them to

8   form Green Quest.  And Green Quest was set up very

9   similar to what we had, and Bonner's position was

10  that we would deconflict cases.

11             And I was totally opposed to that.

12  We should have been working together, not you work

13  one, I work one.  That -- that's -- that's not a

14  good -- that's not a good mix.

15             And the other thing that I was

16  concerned about was, they wanted to work all their

17  cases unilaterally with no coordination, and if

18  they're going to work terrorist financing,

19  terrorist financing is a component of terrorism.

20  You have to work with the counterterrorism

21  division of the FBI.  They had -- they had the

22  lead role in that.  You know, from what I did in

23  terrorist financing, we coordinated everything

24  through the counterterrorism division.

This Transcript Contains Confidential Material

```
 1                      So it was clear, and ultimately
 2    Green Quest was done away with because of that
 3    type of conflict and -- and -- and the lack of
 4    coordination the way we should have had it.
 5          Q.        So you were at the meeting where
 6    Attorney General Chertoff had the discussion with
 7    the head of Customs --
 8          A.        Yes.
 9          Q.        -- concerning the establishment of
10    Green Quest?
11          A.        Yes.
12          Q.        And going into that meeting,
13    Chertoff was opposed to the creation of Green
14    Quest?
15          A.        Yes.
16          Q.        Did you share his view?
17          A.        Very much so, yes.
18          Q.        So it's fair to say from the outset,
19    you were opposed to the creation of Green Quest as
20    Customs envisioned it?
21          A.        Yes.
22          Q.        And the investigation Green Quest
23    conducted of the Herndon-related charities,
24    including SAAR Foundation, was the signature
```

This Transcript Contains Confidential Material

1    undertaking by Green Quest?

2                         MS. KOWNACKI:  Objection.

3                         THE WITNESS:   I viewed it

4         that way, yes.

5    BY MR. CARTER:

6         Q.       And during the time that you were in

7    government, did you have interactions with an

8    individual named Juan Zarate?

9         A.       Yes.

10        Q.       And what was Juan Zarate's role

11   during the time that you were in government?

12        A.       Juan worked for Jimmy Gurulé, who

13   was the Under Secretary for Enforcement in

14   Treasury, and Juan had some capacity under Jimmy

15   and he did a lot of Jimmy's bidding.

16        Q.       Okay.  Juan had a role on behalf of

17   Treasury with regard to terrorism financing?

18                         MS. KOWNACKI:  Objection.

19                         THE WITNESS:  Yes.

20   BY MR. CARTER:

21        Q.       And am I correct that Juan Zarate

22   later went to work at the National Security

23   Council in the White House?

24        A.       Yes.

This Transcript Contains Confidential Material

1          Q.          And in that capacity, was he the

2     first terrorism czar in the White House?

3          A.          I don't believe he was the first,

4     but he -- he worked -- he worked in that capacity,

5     yes.

6          Q.          Are you aware that Mr. Zarate wrote

7     a book concerning his experience at Treasury

8     called "Treasury's Wars"?

9          A.          Yes.

10         Q.          Okay.  Have you read the book?

11         A.          No.

12         Q.          So you don't have an opinion on it?

13         A.          No.

14         Q.          Well, you're smirking, and we agreed

15    at the beginning of the deposition that if you had

16    information --

17         A.          Yeah.

18         Q.          -- responsive --

19         A.          I --

20         Q.          -- you would share with me.  So.

21         A.          I -- I -- I don't know necessarily

22    share Zarate's perspective on things.  You know,

23    Zarate, he wrote on it based on his experience,

24    and -- and I don't necessarily agree with that.

1    That's -- that's all.

2        Q.     Well, without having read the book,

3    what's the basis for disagreeing with what's in

4    the book?

5        A.     I had heard from other sources, you

6    know, about -- about Juan's book and asked about

7    it, and I just didn't want to read it.

8        Q.     Have you commented on the book

9    anywhere publicly?

10       A.     Yes.  I -- now, you just -- at one

11   point, I was asked, if I'm not mistaken now, which

12   I didn't recall, to -- to write -- to write a

13   review or -- or to write an opinion on -- on -- on

14   that, but I don't recall the circumstances.

15                   MR. CARTER:  If we can, I'd

16          like to just mark as the next exhibit the

17          section of the Zarate book at Tab 30.

18                   (Document marked for

19          identification as Lormel Exhibit 6.)

20   BY MR. CARTER:

21       Q.     And if we can just go to the page

22   208.  And if we can go about a little beyond

23   halfway down the page, there's a paragraph that

24   begins "In particular."

This Transcript Contains Confidential Material

```
 1              And it says:

 2              "In particular, Levey" -- referring

 3    to Stuart Levey, who was then at the DOJ -- "had

 4    never liked the Treasury's perceived intrusion

 5    into the FBI's role as the lead on terrorism

 6    investigations in the United States.  The

 7    existence of the Treasury law-enforcement

 8    initiative Operation Green Quest, led by Customs

 9    and assisted by the IRS-CID and the Secret

10    Service, had been a thorn in the side of the FBI.

11    The FBI did not like the competition and confusion

12    that a separate law-enforcement effort seemed to

13    create.  With Green Quest moving aggressively on

14    cases against illegal money-service businesses,

15    charities of concern, and tax avoidance by suspect

16    individuals like Abdurahman Muhammad Alamoudi,

17    there was real competition in town.  Levey heard

18    the complaints, and he didn't like the apparent

19    interference with the FBI or the potential crossed

20    wires on intelligence operations."

21              Did you have personal knowledge at

22    the time you were at the FBI of these issues?

23        A.    Yes.

24        Q.    And --
```

This Transcript Contains Confidential Material

1    A.    So this -- you asked me before about

2   Zarate and the book.  Zarate is providing his

3   perspective here.  He describes it a certain way.

4   Maybe it's not that way.

5    Q.    Well, do you disagree with the

6   description of what was going on at the time?

7    A.    "The FBI did not like the

8   competition and confusion" with separate law

9   enforcement agencies.

10         It's not about the competition.

11  There shouldn't be any competition.  The confusion

12  is the lack of coordination, which was their

13  fault.  That's what I have a problem with.

14   Q.    If we can --

15   A.    And to another point here, if I may.

16         Where they talk about the success

17  he's having, the aggressive on cases of illegal

18  money-service businesses, what he fails to say in

19  here is how they stepped over and interfered in

20  counterterrorism investigations by doing some of

21  these things and -- and they -- they jeopardized

22  some classified information and operations.

23         And that's one of the things that

24  Stuart Levey was very concerned about because

This Transcript Contains Confidential Material

```
 1    Stuart and I collaborated very closely about that.
 2              That context is not in his book.
 3    Q.       And then to be clear, when you left
 4    the FBI in December 2003, within just a little
 5    over a year you were working for the targets of
 6    the investigation?
 7    A.       Over a year, yes.
 8    Q.       And if we can mark --
 9    A.       Well, you know, you say I was
10    working for them, as if I'm undermining the
11    government.  That's not the case.
12    Q.       Well, the role of the defense
13    attorneys you were working with was to try and
14    prevent the United States government from
15    successfully prosecuting them, right?
16                    MS. KOWNACKI:  Objection.
17                    THE WITNESS:   They were never
18         prosecuted because the evidence wasn't
19         there.  The allegations against them were
20         never proven, and I went to work with
21         them because I felt and I believed
22         sincerely -- and I always believe in
23         doing the right thing -- that they should
24         have never been charged.
```

This Transcript Contains Confidential Material

```
 1    BY MR. CARTER:
 2         Q.        And were there transfers from the
 3    entities associated with the Herndon, Virginia
 4    nonprofits that went overseas?
 5         A.        I'm sorry.  Can you repeat that,
 6    please?
 7         Q.        Was -- was there money transferred
 8    overseas by the Herndon, Virginia nonprofit
 9    organizations?
10         A.        I'm not --
11                   MS. KOWNACKI:  Objection.
12                   THE WITNESS:   I'm not
13            familiar with that.
14                   MR. CARTER:  Okay.  If we can
15            mark as the next exhibit the document at
16            Tab 31.
17                   (Document marked for
18            identification as Lormel Exhibit 7.)
19    BY MR. CARTER:
20         Q.        This is a Washington Post article
21    from 2011 written by Michelle Boorstein.
22                   Do you recall speaking to
23    Ms. Boorstein about the subject matter of this
24    article?
```

```
 1          A.       I don't recall.

 2          Q.       This concerns the investigation of

 3    the Northern Virginia nonprofit organizations?

 4          A.       Okay.

 5          Q.       If we turn to I think what will be

 6    page 4 of the PDF.

 7                   Referring to the raids that were

 8    conducted, most of the way down it says:

 9                   "But even within the government, the

10    raids were controversial.  Dennis Lormel, who

11    headed the FBI's terrorist financing operations

12    section at the time and is now a private

13    consultant, said he refused to let his agents

14    participate alongside those from U.S. Customs and

15    other agencies because he didn't believe the

16    evidence was strong enough."

17                   You see that?

18          A.       Yes.

19          Q.       And then it goes on to quote you as

20    saying:

21                   "'Unfortunately... the targets were

22    maligned by that investigation, and quite frankly

23    I think that investigation should never have

24    happened.'"
```

This Transcript Contains Confidential Material

```
 1                    Do you see that?
 2      A.       Yes.
 3      Q.       And would you agree that -- that
 4  those remarks were offered in relation to your
 5  former role of the FBI's Terrorist Financing
 6  Operations Section?
 7      A.       Yes.
 8      Q.       And did you disclose to the reporter
 9  who interviewed you that you had been working for
10  targets of the investigation for a number of prior
11  years?
12      A.       I don't recall.
13      Q.       There's no indication in the media
14  report that you alerted the reporter addressing
15  these issues that you had a role working for them
16  as a consultant, is there?
17                    MS. KOWNACKI:  Objection.  He
18        hasn't even read the whole.
19                    MR. CARTER:  He can read it.
20                    THE WITNESS:   With respect to
21        an interview like this, I wouldn't have
22        contacted the reporter.  The reporter
23        would have contacted me and asked me if I
24        would speak about the topic.
```

This Transcript Contains Confidential Material

```
 1                      You know, I wasn't pushing any

 2          agenda.  I was interviewed and I was -- I

 3          was candid.

 4  BY MR. CARTER:

 5      Q.      Well, in being candid, you don't

 6  think it would have been appropriate to alert the

 7  writer of the article about your involvement as a

 8  consultant for the targets of the investigation

 9  you were discussing?

10      A.      It had nothing to do.

11                  MS. KOWNACKI:  Objection.

12          His --

13                  THE WITNESS:   We were talking

14          about my experience.  My experience was

15          my experience regardless of what I was

16          doing with ███████.

17  BY MR. CARTER:

18      Q.      If we can just go back.

19              I believe you said and mentioned in

20  your report on page 33 that there was an affidavit

21  of a Customs official that was the predicate for

22  the investigation; is that right?

23      A.      Where are you referring?

24      Q.      Well, on page 33 you say:
```

This Transcript Contains Confidential Material

```
 1                    "Based on the affidavit of a Customs
 2  agent, search warrants were issued."
 3                    And then you go on to say that:
 4                    The investigation never found
 5  sufficient evidence of the affidavit's allegations
 6  to pursue criminal charges against SAAR
 7  Foundation.
 8                    Correct?
 9        A.        Correct.
10        Q.        Okay.  And do you happen -- is that
11  the affidavit that you reviewed at the FBI when
12  you told your agents to stand down?
13        A.        Yes.
14        Q.        And was that an affidavit of David
15  Kane?
16        A.        Yes.
17        Q.        And was that essentially the
18  foundational predicate for the Operation Green
19  Quest investigation?
20                    MS. KOWNACKI:  Objection.
21                    THE WITNESS:   I don't believe
22        so.  I don't recall.
23  BY MR. CARTER:
24        Q.        Well, did it --
```

This Transcript Contains Confidential Material

1      A.      I don't recall.

2      Q.      Sorry.

3              Did it essentially lay out the

4  theory of the case?

5                  MS. KOWNACKI:  Objection.

6                  THE WITNESS:   It laid out --

7          the affidavit laid out the statement of

8          facts to support a search warrant.

9  BY MR. CARTER:

10     Q.      And were the statement of facts

11 reflected in that search warrant the -- the basis

12 for the ongoing investigation that continued after

13 you left the FBI?

14     A.      I don't know.  I'm not sure.

15     Q.      In connection with your role for

16 ███████████ and the SAAR Foundation as a consultant,

17 was the affidavit a relevant document?

18                 MS. KOWNACKI:  Objection.

19         Form.

20                 THE WITNESS:   I don't recall.

21         Honestly, I don't recall at this point.

22                 MR. CARTER:  If we can just

23         mark as the next exhibit the Kane

24         affidavit.

This Transcript Contains Confidential Material

```
 1                    (Document marked for

 2            identification as Lormel Exhibit 8.)

 3   BY MR. CARTER:

 4        Q.      Do you recognize this as the

 5   affidavit that was the predicate for the search

 6   warrant?

 7        A.      Yes.

 8        Q.      And if we can look at paragraph 111.

 9        A.      Do I need to?

10                    MS. KOWNACKI:  The tech should

11            be.

12                    MR. CARTER:  I'm not sure,

13            Gina, we --

14                    MS. KOWNACKI:  They're finding

15            the page.

16   BY MR. CARTER:

17        Q.      Here you go.

18                    And in paragraph 111, the author of

19   the affidavit, Mr. Kane, says:

20                    "Based on my examination of

21   financial documents, correspondence, and

22   interviews with confidential witnesses, I believe

23   that the first members of Safa Group were

24   established in the early 1980's.  I believe that
```

This Transcript Contains Confidential Material

1    one source of funds flowing through the Safa Group

2    is from the wealthy Al-Rajhi family in Saudi

3    Arabia.  The SAAR Foundation, a Safa charity, was

4    named after Sulaiman Abdul Aziz Al-Rajhi."

5                    Do you see that?

6         A.     Yes.

7                    MS. KOWNACKI:  Objection.

8    BY MR. CARTER:

9         Q.     And were you aware of this

10    information at the time you were working at the

11    FBI?  And in particular I mean that the SAAR

12    acronym referred to Sulaiman Abdul Aziz Al Rajhi?

13        A.     Yes.

14        Q.     And that's something you were aware

15    of in connection with your work for ███████

16        A.     Yes.

17        Q.     If we --

18        A.     So if I may add a little context

19    around this.

20                    You've asked me about my feeling and

21    things about the case, and I've described that.

22                    One of the contributing factors here

23    as to why I was concerned about that case was that

24    we were investigating, independent of this,

This Transcript Contains Confidential Material

1  allegations about the Al Rajhi Bank, and we didn't

2  find any evidence that Al Rajhi through this

3  period had supported terrorism.

4            So this is inconsistent -- I was

5  concerned about the information that they were

6  using because we -- we couldn't substantiate

7  allegations that the Al Rajhi Bank funded

8  terrorism.

9       Q.       So one of your particular concerns

10  with Green Quest was the connection to Al Rajhis?

11       A.       No, that --

12       Q.       Well --

13       A.       No, no.  Green Quest is totally

14  different.  I'm talking about this search warrant.

15  I'm talking about their investigation and

16  allegations that ultimately include Al Rajhi Bank.

17            That was one of the things that when

18  you asked me and you framed here about my

19  resistance against this case, my resistance

20  against Green Quest, one of the factors to include

21  here is that we aside from that, independent of

22  that, had conducted very comprehensive

23  investigations, and we didn't find allegations

24  that supported Al-Rajhi being involved in

This Transcript Contains Confidential Material

1   terrorist financing.

2        Q.      And so just to be clear, you were

3   aware of the connection between SAAR and Sulaiman

4   Abdul Aziz Al Rajhi?

5                    MS. KOWNACKI:  Objection.

6                    THE WITNESS:  Yes.

7   BY MR. CARTER:

8        Q.      And you were aware of the connection

9   between Sulaiman Abdul Aziz Al Rajhi and Al Rajhi

10  Bank?

11                   MS. KOWNACKI:  Objection.

12                   THE WITNESS:  Yes.

13  BY MR. CARTER:

14       Q.      And if we can just go back to the

15  deposition testimony that we marked earlier from

16  the case against Bank of America.

17                   And on page 13 you were talking

18  about the investigation, and you said that "there

19  were related charities under the umbrella of the

20  SAAR Foundation, S-A-A-R."

21                   And the attorney questioning you

22  asked:

23                   "What does that stand for?"

24                   And you said:

This Transcript Contains Confidential Material

```
 1                    "I'm not sure what the acronym

 2    stands for."

 3         A.         And at that point in time, I wasn't.

 4         Q.         So after the direct involvement at

 5    the FBI where you were specifically concerned

 6    about the intersection between the Herndon,

 7    Virginia investigation and the FBI's investigation

 8    of Al Rajhi Bank, and after working as a

 9    consultant for ████ for years in relation to the

10    investigation, you had forgotten that SAAR stood

11    for Sulaiman --

12         A.         During the questioning --

13         Q.         -- Abdul Aziz --

14         A.         During that --

15         Q.         -- Al Rajhi?

16                    MS. KOWNACKI:  Objection.

17                    THE WITNESS:  I'm sorry.  Go

18         ahead finish.

19    BY MR. CARTER:

20         Q.         That's the end of my question.

21         A.         At that particular point in time

22    when I was asked that specific question, I didn't

23    recall.

24         Q.         Are you aware that Abdullah Al Rajhi
```

This Transcript Contains Confidential Material

1    has testified in this case?

2        A.      I don't recall.

3        Q.      Okay.  And do you know whether any

4    of the incorporation documents associated with

5    entities under the SAAR Foundation umbrella had

6    manipulated the names of Al Rajhi family members?

7                MS. KOWNACKI:  Objection.

8                THE WITNESS:  No.

9    BY MR. CARTER:

10       Q.      Do you know whether any efforts were

11   taken by the Al Rajhi family members themselves to

12   obscure their involvement in the Herndon, Virginia

13   entities?

14               MS. KOWNACKI:  Objection.

15               THE WITNESS:  No.

16   BY MR. CARTER:

17       Q.      You have referenced the fact that,

18   in your view, the FBI investigation of Al Rajhi

19   Bank had not established sufficient proof of its

20   involvement in terrorist financing, correct?

21               MS. KOWNACKI:  Objection.

22               THE WITNESS:  Yes.

23   BY MR. CARTER:

24       Q.      Just before I go on to that, your

1    report includes the detail that the prosecutor in

2    the Eastern District of Virginia declined

3    prosecution in 2002, correct?

4         A.     Yes, but I'm not sure if it was 2002

5    or earlier.  Around 2002.

6         Q.     And that would have been based on an

7    interaction between the FBI and the U.S.

8    Attorney's Office in the Eastern District of

9    Virginia?

10        A.     Yes.

11        Q.     And that would have been a

12   conversation where the FBI presented evidence to

13   the U.S. Attorney's Office to decide whether to

14   prosecute?

15             MS. KOWNACKI:  Objection.

16             THE WITNESS:   I believe there

17        was an ongoing investigation.  I don't

18        know at what point.  I don't know if it

19        was presented at that point.  I believe

20        they were working on an investigation

21        that was ongoing, and at some point it

22        was declined for prosecution.

23   BY MR. CARTER:

24        Q.     And are discussions between the FBI

This Transcript Contains Confidential Material

1    and a U.S. Attorney's Office about whether to

2    prosecute a party typically matters of public

3    release?

4         A.      No.

5                 MS. KOWNACKI:  Objection.

6    BY MR. CARTER:

7         Q.      Those are private matters?

8         A.      I'm sorry?

9         Q.      Those are private matters?

10                MS. KOWNACKI:  Objection.

11                THE WITNESS:   That's the

12         policy of the U.S. Attorney's Office.

13         They don't -- they generally do not make

14         an announcement about declination.  It

15         would be they decline prosecution, and

16         the FBI would follow up to corroborate

17         that with a declination letter to -- to

18         the attorney so that we could document in

19         our file that they had declined

20         prosecution.  That was our way of -- of

21         documenting the declination.

22    BY MR. CARTER:

23         Q.      And prior to the issuance of your

24    report in this matter, are you aware of any

This Transcript Contains Confidential Material

1    setting in which the Eastern District of Virginia

2    U.S. Attorney's Office's decisions in 2002 have

3    been disclosed publicly?

4              MS. KOWNACKI:  Objection.

5              THE WITNESS:   That case,

6         there may have been public disclosures,

7         not by the U.S. Attorney's Office, but in

8         media reports of Congressional testimony.

9    BY MR. CARTER:

10        Q.      Do you know?

11        A.      No, I don't specifically know.

12        Q.      And your report discusses the views

13   of the sufficiency of the evidence to support a

14   prosecution, correct?

15             MS. KOWNACKI:  Objection.

16             THE WITNESS:   Where?  Point

17        that out for me, please.

18   BY MR. CARTER:

19        Q.      Apologies.  It may be somewhere else

20   in your report.

21             Your report doesn't say why the U.S.

22   Attorney's Office in the Eastern District of

23   Virginia declined prosecution?

24        A.      No, it does not.

This Transcript Contains Confidential Material

```
 1          Q.        Okay.  And any of the written

 2   details about that decision would be housed in

 3   either the files of the U.S. Attorney's Office or

 4   the FBI?

 5                    MS. KOWNACKI:  Objection.

 6                    THE WITNESS:  Yes.

 7   BY MR. CARTER:

 8          Q.        And do you know if those documents

 9   exist?

10          A.        No.  I wouldn't know.  I never saw

11   them.

12          Q.        So do you know what the basis for

13   the U.S. Attorney's Office's decision to decline

14   prosecution in late 2001 or 2002 was?

15          A.        They didn't have evidence to support

16   a prosecution.

17          Q.        Okay.  So you're testifying that --

18   that the decision was based on an assessed lack of

19   evidence.

20                    Do you know whether or not the

21   government's views on the sufficiency of the

22   evidence has ever been the subject of a public

23   disclosure?

24                    MS. KOWNACKI:  Objection.
```

This Transcript Contains Confidential Material

1                    THE WITNESS:   I'm not aware.

2   BY MR. CARTER:

3       Q.      What steps did you take before

4   authoring this expert report on behalf of Al Rajhi

5   Bank to determine whether the FBI viewed it as

6   appropriate to be discussing these matters in a --

7   in a public report?

8                    MS. KOWNACKI:  Objection.

9                    THE WITNESS:   I didn't

10              consult with the FBI, if you're asking me

11              that, no.

12                   I didn't -- I didn't disclose

13              anything there in terms of sensitive

14              information or anything that was

15              confidential or classified.

16   BY MR. CARTER:

17       Q.      Is this predicated on information

18   that came into your possession while you were in

19   the employ of the FBI?

20       A.      That particular declination?  Yes.

21       Q.      Was the FBI aware during the late

22   2004 or early 2005 time period through 2011 or so

23   that you were engaged as a consultant on behalf of

24   the -- ███████  and the SAAR Foundation?

This Transcript Contains Confidential Material

```
1           A.        I wouldn't know.

2           Q.        Did you ever advise the FBI that you

3   were taking on a role as a consultant to those

4   parties?

5           A.        Clarify that for me, when you say

6   did I advise the FBI.

7           Q.        Did you tell anyone at the FBI that

8   you were taking on a role as a consultant to ███

9   or the SAAR Foundation in relation to ongoing

10  criminal investigations?

11                    MS. KOWNACKI:  Objection.

12                    THE WITNESS:   At the FBI and

13       at the Department of Justice, yes.

14  BY MR. CARTER:

15          Q.        You did tell them?

16          A.        Yes.

17          Q.        Okay.  You mentioned that your view

18  that there was never any evidence -- I don't want

19  to paraphrase.

20          A.        Uh-huh.

21          Q.        Is it your view that there was never

22  evidence that the SAAR U.S. entities were involved

23  in terrorist financing activities?

24                    MS. KOWNACKI:  Objection.
```

This Transcript Contains Confidential Material

```
 1                THE WITNESS:   Could you

 2       clarify that?  Because I believe money

 3       from the SAAR Foundation would have gone

 4       to Sami Al-Arian's charity or his --

 5       whatever his NGO was, and ultimately I

 6       believe money from that went to Hamas.

 7       That likely came from SAAR.

 8                But the issue then is, was

 9       SAAR witting.  Did they provide money to

10       what they believed was a charity, or did

11       they provide money wittingly to support

12       terrorism.  So you have a fine line

13       there.

14                We never could conclude --

15       well, at least on the Al Rajhi side --

16       that that was the case.

17   BY MR. CARTER:

18       Q.    And when you say "we never could

19   conclude," you're talking about your experience at

20   the FBI up until you left in December of 2003?

21       A.    Yes.

22       Q.    Okay.  And is it -- am I

23   understanding your testimony that there was money

24   from the SAAR Foundation that went to a charity
```

This Transcript Contains Confidential Material

 1   associated with an individual named Sami Al-Arian?

 2        A.        I believe so.  I don't know

 3   directly, but I believe so, yes.

 4        Q.        And do you recall the name of the

 5   charity associated with Sami Al-Arian?

 6        A.        No, I don't.

 7        Q.        Am I understanding your testimony to

 8   be that the charity associated with Sami Al-Arian

 9   was giving resources to Hamas?

10        A.        I believe that's the case.  I

11   believe Al-Arian was convicted.

12                  MR. CARTER:  If we can mark as

13        the next exhibit the document at Tab 17.

14                  (Document marked for

15        identification as Lormel Exhibit 9.)

16   BY MR. CARTER:

17        Q.        Mr. Lormel, this is a joint

18   assessment of the FBI and CIA of Saudi Arabian

19   Support to Terrorism and the Counterterrorism

20   Threat to the United States dated December 2004.

21                  Are you familiar with this document?

22        A.        Yes.

23        Q.        And, in fact, I think you cite it in

24   one place in your report, correct?

This Transcript Contains Confidential Material

```
 1            A.      Correct.  Yes.

 2            Q.      And are you aware that this document

 3    was signed off on by the heads of the CIA and the

 4    FBI?

 5                    MS. KOWNACKI:  Objection.

 6                    THE WITNESS:   I'm sure it was

 7            approved.  I don't know that it was

 8            approved specifically by the heads.  It

 9            would have been somebody below that, that

10            level, that would have approved it.

11    BY MR. CARTER:

12            Q.      I believe there was an actual

13    transmittal letter --

14            A.      Okay.

15            Q.      -- signed by both of them but --

16            A.      Okay.

17            Q.      -- we'll look for that in a minute.

18                    But this is an official product of

19    the CIA and FBI?

20            A.      Yes.

21            Q.      And if we can, just turn to page 24.

22                    And, actually, before we get to that

23    the section, this section of the report, if we go

24    back to 21, is an appendix discussing Saudi
```

This Transcript Contains Confidential Material

1    nongovernmental organizations with operations in

2    the United States.

3                   Do you see that?

4         A.       Yes.

5                   MR. CARTER:  And if we turn to

6              24, there's a reference here to the

7              Sulaiman Abdul-Aziz al-Rajhi Foundation.

8                   Gina, we're a little further

9              down.  In the heading, it's the "Sulaiman

10             Abdul-Aziz al-Rajhi Foundation."  There

11             you go.  Thank you.

12   BY MR. CARTER:

13        Q.       You see this section of the report?

14        A.       Yes.

15        Q.       And it says:

16                  "The Saudi Arabian-based al-Rajhi

17   family established the Sulaiman Abdul-Aziz

18   al-Rajhi Foundation in the 1980s to manage the

19   family's charitable contributions.  SAAR is a

20   complex web of overlapping companies with parallel

21   ideologies, personal relationships, and financial

22   associations that has exhibited numerous

23   affiliations with entities known to support

24   terrorism.  The SAAR Foundation, in concert with

This Transcript Contains Confidential Material

1    its subsidiary companies, provided monetary

2    support and other assistance to organizations

3    linked to the Palestinian Islamic Jihad and

4    HAMAS."

5              Do you see that?

6              MS. KOWNACKI:  Objection.

7         Sean, you skipped over the redaction.

8              MR. CARTER:  I'm sorry.  There

9         was a redaction.

10              THE WITNESS:  Yes, I see it.

11   BY MR. CARTER:

12        Q.    Okay.  And this assessment of the

13   FBI and CIA issued a year after you left the FBI,

14   correct?

15        A.    Correct.

16        Q.    In your report -- and I think we've

17   discussed -- you talked about the investigations

18   that were conducted during the time that you were

19   at the FBI concerning Al Rajhi Bank.

20              Do you recall that?

21        A.    Yes.

22        Q.    And, again, those would have been

23   investigations that occurred prior to your

24   departure in December of 2003?

This Transcript Contains Confidential Material

```
 1          A.      Yes.

 2          Q.      And were you personally involved in

 3   those investigations?

 4                  MS. KOWNACKI:  Objection.

 5          Vague.

 6                  THE WITNESS:   I was a senior

 7          executive.  I was responsible in having

 8          those -- some of those initiated.  I

 9          wasn't the person who did the hands-on

10          work, but I was a hands-on leader and I

11          would have been very involved.

12                  But if you're asking did I do

13          the specific groundwork?  No.

14   BY MR. CARTER:

15          Q.      Was there a specific FBI

16   investigation opened as to Al Rajhi Bank?

17                  MS. KOWNACKI:  Objection.

18          Vague.

19                  THE WITNESS:   So if I may

20          provide a little backdrop on that.

21                  Immediately after 9/11 when we

22          started this, there was -- before 9/11,

23          there was no consistent terrorist

24          financing investigative entity in the
```

This Transcript Contains Confidential Material

```
 1        FBI.

 2                  Based on a position I had as

 3        the head of the Financial Crimes Section,

 4        I was in a position where I was able to

 5        start that, and we put together then a

 6        more consistent investigative approach.

 7                  But 9/11, the response to 9/11

 8        was a number of things.  It was the

 9        largest investigation ever conducted.  It

10        involved an incredible number of

11        resources, and early on, 56 field offices

12        in the FBI -- we have 56 field offices

13        and overseas legats -- were all

14        instructed to conduct investigations, and

15        then they were going to be brought in to

16        be a centralized investigation.

17                  I -- when I had the ability to

18        start the terrorist financing part of

19        that, I was doing the same thing.

20                  So I'm sorry I'm being

21        long-winded, but I want to give you the

22        background here is that we set out as

23        many as leads as possible.

24                  So there's not as if there's
```

This Transcript Contains Confidential Material

```
 1              one agent investigating or one analyst.
 2              The entire Bureau is out there working
 3              every allegation, and what I did is, I
 4              assigned a few agents and analysts to
 5              track that.  And over time over that
 6              first few months or year, we brought that
 7              all in together, and -- and from that,
 8              tried to consolidate in whatever was out
 9              there.
10                   So in terms of specific
11              investigations, I can't tell you
12              emphatically what was opened or what
13              wasn't opened.
14                   I can tell you that
15              considerable resources went in there and
16              all of the known allegations involving Al
17              Rajhi and others would have at some point
18              been consolidated.
19  BY MR. CARTER:
20      Q.     After 9/11, the FBI faced a massive
21  scope of investigation; is that correct?
22      A.     Correct.
23      Q.     And that included investigations
24  associated with trying to stop any potential
```

This Transcript Contains Confidential Material

1  future attacks?

2      A.      Absolutely.  That was one of the top

3  priorities.

4      Q.      That included investigations

5  directly related to the financial trail of the

6  hijackers?

7      A.      Yes.

8      Q.      And I believe you were personally

9  involved in that?

10     A.      Yes.

11     Q.      And did you have a role in figuring

12 out how the tracking of the hijackers' bank

13 accounts and credit cards should be undertaken?

14     A.      I had direct involvement in that,

15 yes.

16     Q.      And then there were a whole host of

17 allegations about involvement in providing support

18 to al-Qaeda as well?

19             MS. KOWNACKI:  Objection.

20             THE WITNESS:  Yes.

21 BY MR. CARTER:

22     Q.      And so the scope of the potential

23 areas of inquiry, would you agree, was massive?

24     A.      Extremely massive, yes.

This Transcript Contains Confidential Material

1    Q.    And a lot of that work remained

2  ongoing after you left the FBI, right?

3    A.    Yes.  The funding of 9/11, the

4  actual funding for the 9/11 portion, that was --

5  we completed that early.  Within months we had

6  identified the sources and everything.

7            That, I mean, the expansion

8  continued on for sure, but the funding piece for

9  9/11, that was pretty well known by the time I

10 left the FBI.

11   Q.    But the investigation of the broader

12 sources of support to al-Qaeda continued for quite

13 sometime --

14   A.    Oh, yes.

15   Q.    -- after you left?

16   A.    Yes.

17   Q.    And the FBI investigation you're

18 referring to of Al Rajhi Bank, when do you recall

19 that becoming a focus of the FBI?

20            MS. KOWNACKI:  Objection.

21            THE WITNESS:   So immediately

22        after 9/11, when I got -- I think on

23        about 9/12, 9/13, I had the opportunity

24        to talk to the director and the deputy

This Transcript Contains Confidential Material

1      director and told them we needed to have

2      a comprehensive financial investigation.

3      They agreed, and I took all of the

4      financial resources, and we started that

5      from -- from square one and -- and moved

6      forward.

7              And so the first weekend, the

8      Saturday of 9 -- after 9/11 -- and I

9      don't recall the date -- I had a meeting

10     at FBI headquarters with executives from

11     every government agency -- well, every

12     law enforcement agency and -- and

13     different other agencies with any nexus

14     to financial investigations -- and told

15     them we had to have a task force and we

16     needed to put all of our resources

17     together to work on that stuff.

18             Immediately the person who was

19     my counterpart or who became my

20     counterpart at the CIA, he and I agreed

21     that we needed to work together.  And I

22     sent agents over there and he sent some

23     folks over to me.

24             And in our early -- somewhere

This Transcript Contains Confidential Material

```
 1        in that nascent relationship, he said to

 2        me at one point that Al Rajhi Bank was

 3        the bank of choice for al-Qaeda, and that

 4        resonated with me.

 5                As we got a little more

 6        organized -- as you can imagine, it was

 7        very chaotic.  And as we got our arms

 8        around things and started to get

 9        organized, David Aufhauser from the

10        Treasury Department, who was -- excuse me

11        -- general counsel, we started a working

12        group.

13                There was a preexisting

14        working group, but it evolved into the

15        Policy Coordinating Committee For

16        Terrorist Financing.

17                Within that group, we had a

18        separate group which included myself,

19        Aufhauser, National Security Advisor, my

20        counterpart from the CIA.  And, again, I

21        remember very early in those first few

22        days him saying Al Rajhi Bank was a bank

23        we had to look at.

24                I remember we decided we
```

This Transcript Contains Confidential Material

```
1        needed to have a matrix of financial

2        targets, and he proffered Al Rajhi as a

3        bank of choice.  So I immediately put

4        emphasis on that and had agents assigned

5        and told them, "I want you to find every

6        allegation we have against that bank and

7        let's -- let's run with that."

8                Because, as you pointed out,

9        one of the things we were very concerned

10       about was a second wave of attacks, and

11       what Director Mueller allowed me to start

12       and pull all the financial resources away

13       from the main investigation was, I

14       assured him that if there was a second

15       wave of attacks, it would be related to

16       the first wave and there would be a

17       financial connection and if we could get

18       that.

19               And he said, "How fast can you

20       finish that?"  I said, "We can do that

21       within a few weeks," which we did.

22               So collateral to that, we were

23       looking at all these other pieces.  So

24       that piece, the -- the Al Rajhi piece and
```

This Transcript Contains Confidential Material

```
 1          everything, was certainly secondary to
 2          the immediate -- immediacy of the threat
 3          environment of 9/11 and the continued
 4          threats.
 5                    And so we were working all of
 6          those, and in conjunction, we were trying
 7          to compile a matrix.  I believe there was
 8          a TV program that came out around that
 9          time about the Matrix, and they were
10          running around and that was really what
11          was going on.
12                    Because the counterterrorism
13          side and the CIA's investigators -- I
14          would refer to them as the bullet and
15          bomb chasers -- were out literally
16          chasing bullets and bombs, and we were
17          just following the money, and so we were
18          able to do that.
19                    And as, again, we continued
20          and as -- as we got some structure around
21          that whole terrorist financing apparatus
22          beyond TFOS, and I had heard those
23          continuing allegations, I prioritized the
24          investigation of Al Rajhi and I made sure
```

This Transcript Contains Confidential Material

```
1              that we had that one consistent team.
2              But there was a lot of moving parts
3              around there, and we were consistently
4              trying to pull in whatever information.
5                       And through that and
6              especially with the CIA reporting, I was
7              a consumer of that reporting, and -- and
8              those allegations that I would read.  I
9              would make sure we were looking at all of
10             that and trying to prove or disprove
11             whatever we could.
12    BY MR. CARTER:
13        Q.      Okay.  You indicate in your report
14    that you "assigned a team of FBI Agents and
15    Intelligence Analysts to investigate potential
16    links between Al Rajhi Bank and terrorism."
17                       How many people?
18        A.      The initial?  I would have initially
19    had probably one agent, one analyst.  As time
20    progressed, that would have been at least two
21    agents and two analysts.  But, again, every field
22    office, other components of the FBI were all
23    investigating leads, which would have included
24    leads involving Al Rajhi Bank.  So there were
```

This Transcript Contains Confidential Material

```
 1   other agents out there.
 2              So as I believe in the report, we
 3   just -- you just showed the joint report, the CIA
 4   joint report with the FBI.  I think an FBI
 5   contribution to that report they were talking
 6   about Terrorist Financing Operations Section.
 7   They talked about the task force we set up in
 8   Saudi Arabia.  They talked about the Washington
 9   field office investigation.
10              And so you had -- so I'm -- it's
11   difficult to answer that question in terms of, I
12   assigned -- at some point, there were at least two
13   agents and two analysts, sometimes probably more.
14   But around that, there were other agents who were
15   conducting investigations, which would have
16   crossed over and overlapped with that, and we
17   would have been pulling or attempting to pull --
18   and I hope we did -- all that information into
19   what we were doing.
20        Q.     And the two agents and analysts that
21   you assigned to Al Rajhi Bank, were they working
22   on other things?
23        A.     Yes.
24        Q.     And did the two agents or analysts
```

This Transcript Contains Confidential Material

1    produce any written product that you reviewed?

2         A.     I don't recall.  We would have had

3    records and -- and -- but as we sit here, I can't

4    specifically recall what was -- what was produced.

5         Q.     Do you know whether Al Rajhi Bank

6    was ever designated as a subject of an FBI

7    investigation?

8         A.     Specifically?  I -- I don't recall

9    because what I would consider what we were doing

10   as more as a preliminary investigation, and I

11   don't know that we ever got past that preliminary

12   stage to say that -- that there was predication

13   for -- for a full field investigation.

14              But, again, it was so chaotic back

15   in those days, and we were going.  Al Rajhi was

16   one piece of an incredible portfolio.

17        Q.     So as I understand your testimony,

18   during the time that you were at the FBI, the

19   investigation of Al Rajhi Bank was still in its

20   preliminary stages?

21        A.     We conducted considerable

22   investigation.  Preliminary in the sense that we

23   never were able to -- to get a lot of evidence or

24   predication of -- of any wrongdoing.

This Transcript Contains Confidential Material

```
 1                  Again, we would look at those

 2      allegations, and we couldn't prove or disprove.  A

 3      lot of that was very circular, and it would keep

 4      coming back and, you know, once a lot of these

 5      allegations are out there, in some instances you

 6      can disprove them.  In a lot of instances, you

 7      can't prove or disprove.  You know, you just can't

 8      prove it.  And in some instances, it doesn't make

 9      sense.

10          Q.      Just to understand --

11          A.      Or it's not reasonable.  Yeah.

12          Q.      Mr. Lormel --

13          A.      Yeah.

14          Q.      -- with respect, this is an expert

15      report.  You've authored --

16          A.      Yes.

17          Q.      -- the report.

18          A.      Yes.

19          Q.      And you've told the court that there

20      was this investigation that you tasked people to

21      work on --

22          A.      Right.

23          Q.      -- about Al Rajhi Bank.

24          A.      Right.
```

This Transcript Contains Confidential Material

```
 1          Q.      And you've told the court that it
 2   was unable to develop evidence to establish the
 3   wrongdoing --
 4          A.      Right.
 5          Q.      -- correct?
 6          A.      That's correct.
 7          Q.      That's your testimony.
 8                  Don't you think it's fair for the
 9   court to understand what the scope of the
10   investigation was and what was and was not done?
11                  MS. KOWNACKI:  Objection.
12                  THE WITNESS:   We -- as I
13          said, we identified allegations and, you
14          know, we would investigate those
15          allegations.  That's -- that's what we
16          had done.
17   BY MR. CARTER:
18          Q.      And then --
19          A.      It's difficult because a lot of that
20   is recurring.  So, you know, you just continue to
21   run with them.  Investigations like that are very
22   reactive, you know, and we work in a situation
23   when you're dealing with financial crimes,
24   terrorist financial money laundering, we're
```

This Transcript Contains Confidential Material

1    inherently reactive.  So it's very difficult, very

2    difficult challenge.

3         Q.       During the time that you were there,

4    the FBI did not disprove allegations that Al Rajhi

5    Bank was involved in financing terrorism, did it?

6                    MS. KOWNACKI:  Objection.

7                    THE WITNESS:   I think there

8         were some that were disapproved, but

9         overall we couldn't prove or disprove.

10   BY MR. CARTER:

11        Q.       Okay.  And the investigations of Al

12   Rajhi Bank continued after you left the FBI?

13        A.       I would -- I would think so, yes.

14        Q.       And during the time that you were at

15   the FBI, did the FBI have access to internal Al

16   Rajhi Bank account documents relating to suspect

17   charities?

18        A.       We may have.  We -- we would have

19   interacted -- well, we would have -- we did

20   interact with SAMA and other central banks around

21   the world, and so the agents, we would have had

22   agents who had gone to Saudi Arabia.

23                    When we started that Terrorist

24   Financing Task Force with the Saudis, I believe

This Transcript Contains Confidential Material

```
1    there was an FBI and an IRS agent that were

2    assigned there.  So we did have agents going.  I

3    can't specifically say what was or wasn't

4    reviewed, but it's likely that we did have some

5    access.

6         Q.     Some access to what?

7         A.     To records of Al Rajhi through SAMA.

8         Q.     Are you sure of that?

9         A.     No.

10        Q.     The joint task force that you're

11   referencing, that was a joint task force formed

12   between the United States and Saudi Arabia?

13        A.     Yes.

14        Q.     And when did that get up and

15   running?

16        A.     2002 I believe.

17        Q.     I'm going to represent to you that

18   the Staff Monograph on Terrorist Financing says it

19   began to do its work in the fall of 2003.

20        A.     Okay.

21        Q.     Okay.  And so --

22        A.     When we say we formed that, the

23   formation began.  Believe me, that was a very long

24   and arduous process.
```

This Transcript Contains Confidential Material

```
 1          Q.      Well, you cite the work --

 2          A.      Yeah.

 3          Q.      -- of the joint task force in your

 4   report --

 5          A.      Okay.

 6          Q.      -- as a predicate for some of your

 7   opinions, don't you?

 8          A.      Show me.  I don't know that I said

 9   that.

10          Q.      "As stated earlier, the

11   investigative team could not substantiate

12   allegations involving Al Rajhi Bank.  This

13   included the investigations conducted through the

14   U.S.-Saudi Joint Terrorist Financing Task Force --

15   a Task Force which I helped establish to examine

16   certain customer accounts believed to be used for

17   terrorism at Al Rajhi Bank.  This Task Force

18   initiated 'more than 100 investigations on

19   individuals and entities suspected of criminal,

20   intelligence related, and terrorism related

21   activity."

22                  Do you see that?

23          A.      That was one of the corrections we

24   made in there.
```

This Transcript Contains Confidential Material

1    Q.      And you say in addition to the task

2   force, the Washington field office of the FBI

3   initiated more than 100 investigations?

4    A.      Yes.  Yes.

5    Q.      Okay.  So with regard to the

6   citation you make here to invoking the work of the

7   Joint Terrorist Financing Task Force with the U.S.

8   and Saudi Arabia, your knowledge of that would be

9   limited to the period in the fall of 2003 when it

10   began its work and when you left in December?

11    A.      Yes.

12    Q.      So a couple months?

13    A.      Correct.

14    Q.      Okay.  And you don't identify that

15   limitation on the scope of your familiarity with

16   the work in your report, do you?

17              MS. KOWNACKI:  Objection.

18              THE WITNESS:  No, I don't

19       believe I do.

20   BY MR. CARTER:

21    Q.      Okay.  And if we can -- well, before

22   I get to this.

23              You're an experienced anti-money

24   laundering and terrorism financing investigator,

This Transcript Contains Confidential Material

```
1   right?

2        A.      Yes.

3        Q.      And would you agree with me that an

4   assessment of a bank's role in terrorist financing

5   would be significantly advantaged by having access

6   to the actual bank records concerning suspect

7   accounts?

8                    MS. KOWNACKI:  Objection.

9                    THE WITNESS:   Depending on

10       the situation, yes.

11  BY MR. CARTER:

12       Q.      You'd want to look at the bank's

13  records?

14                   MS. KOWNACKI:  Objection.

15                   THE WITNESS:   Again, it

16       depends on the -- on the situation, the

17       circumstances.

18  BY MR. CARTER:

19       Q.      Well, with -- with Al Rajhi Bank,

20  when you were at the FBI, would have liked to have

21  access -- have had access to the bank records?

22       A.      If I knew of bank records in

23  particular that warranted review, then, yes.

24                   MR. CARTER:  If we can mark as
```

This Transcript Contains Confidential Material

```
 1              the next exhibit the document at Tab 33.

 2                   (Document marked for

 3              identification as Lormel Exhibit 10.)

 4   BY MR. CARTER:

 5        Q.        Mr. Lormel, we've previously marked

 6   this as an exhibit at Bob Pasley's deposition.

 7                   Do you know him?

 8        A.        Yes.

 9        Q.        And have you worked together?

10        A.        Yes.

11        Q.        In government or out of government?

12        A.        Out of government.  Bob and I were

13   independent -- were -- are independent

14   consultants, and there are times that we've

15   collaborated with each other on projects.

16        Q.        Have you collaborated together on

17   this project?

18        A.        No, we haven't spoken about this at

19   all.

20        Q.        This diplomatic cable is from

21   September of 2004.

22                   Do you see that?

23        A.        Yes.

24        Q.        Okay.  And it reflects conversations
```

1    between Treasury Assistant Secretary Zarate and a

2    Saudi official named Ali Al-Gaith concerning Al

3    Rajhi Bank.

4              Do you see that?

5    A.      Yes.

6    Q.      And during the meeting, in

7    paragraph 5 it says:

8              "Zarate noted that the United States

9    Government has real concerns about the financial

10   activities facilitated by Al-Rajhi and that these

11   concerns were not an indictment against the Saudi

12   Arabian government."

13             And it goes on to say:

14             "Particular accounts of concern need

15   to be investigated and the compliance and the

16   bank's compliance structure needs to be reviewed."

17             And "Al-Gaith said that information

18   on suspect accounts would be shared."

19             Do you see that?

20   A.      Yes.

21   Q.      Now, this is nine months or so after

22   you left the FBI?

23   A.      Yes.

24   Q.      And this reflects that the U.S.

This Transcript Contains Confidential Material

```
 1   government is still trying to obtain information

 2   about suspect accounts at Al Rajhi Bank?

 3        A.      Yes.

 4        Q.      Okay.  So fair to say that the Al

 5   Rajhi -- that the U.S. government had not yet

 6   received all of the information it thought

 7   necessary to evaluate the Al Rajhi Bank

 8   allegations?

 9                MS. KOWNACKI:  Objection.

10                THE WITNESS:   Excuse me.  I'm

11        getting a leg cramp.  Sorry.

12                Please repeat that.

13   BY MR. CARTER:

14        Q.      Well, the fact that the U.S.

15   government was --

16                MS. KOWNACKI:  Sean, can we

17        take a break if the witness has a cramp?

18                THE WITNESS:   I'm okay now.

19                MS. KOWNACKI:  Are you sure?

20                THE WITNESS:  Yeah, I'm good.

21        I'm good.

22                MR. CARTER:  Sure.

23   BY MR. CARTER:

24        Q.      Yeah.  I can't remember what it was
```

This Transcript Contains Confidential Material

 1    and this thing has gone off.  Oh.

 2                   Last question was:  So fair to say

 3    that the -- that the U.S. government had not yet

 4    received all of the information it thought was

 5    necessary to evaluate the Al Rajhi Bank

 6    allegations?

 7                        MS. KOWNACKI:  Objection.

 8                        THE WITNESS:   That's what it

 9       says.

10    BY MR. CARTER:

11       Q.      Okay.  And then --

12       A.      And if I may.

13                   Based on my experience and in

14    special having dealt with Zarate and some others

15    that worked at Treasury, they would make a lot of

16    demands for things and -- and not provide any

17    documentation.  I believe that's said in here also

18    where Al-Gaith complains that we don't -- "we

19    haven't gotten any information from you."

20                   They were great at making these

21    statements.  Oftentimes there was no substance

22    behind them in terms of, what are you talking

23    about that you're not getting?

24                   Zarate would complain to me or to

This Transcript Contains Confidential Material

```
1   people in the government that we weren't providing

2   him with information when we were.

3           So I take this -- I take Zarate's

4   statement here with a grain of salt.  It's in that

5   cable.  It's very, very possible that there were

6   records that weren't being provided.

7           I don't know.  Obviously, as you

8   pointed out, I'm gone from the government at that

9   point in time.

10          So I only, having dealt with

11  Mr. Zarate quite, quite frequently, oftentimes

12  they didn't have the information or couldn't

13  provide information because they didn't -- they

14  were more -- they were reaching more than what

15  they had.  If that makes sense.

16      Q.      Well, Mr. Lormel, it's a different

17  issue, though.

18      A.      Okay.

19      Q.      Whether or not the U.S. government

20  provided sufficient predicate to the Saudi

21  government to justify its request --

22      A.      Okay.

23      Q.      -- is different from whether or not

24  the U.S. government already had the records.
```

This Transcript Contains Confidential Material

```
1        A.      Okay.

2        Q.      So do you agree with me that the

3   fact that the U.S. government was asking for

4   records likely indicates that it didn't have them?

5               MS. KOWNACKI:  Objection.

6               THE WITNESS:  Well, it

7          indicates that they didn't have a set of

8          records.  Doesn't -- but, yes.  Yeah.

9               MR. CARTER:  And if we can

10         mark as the next exhibit the diplomatic

11         cable at Tab 34.

12              (Document marked for

13         identification as Lormel Exhibit 11.)

14  BY MR. CARTER:

15       Q.      This can turn -- this concerns a

16  proposed joint examination of Al Rajhi Bank

17  through the Joint Terrorist Financing Task Force.

18              Do you see that?

19       A.      Yes, uh-huh.

20       Q.      And this is dated to November of

21  2004, correct?

22       A.      Yes.

23       Q.      And the proposal, if you go down

24  near the bottom -- well, I'm sorry -- go up to the
```

This Transcript Contains Confidential Material

```
1    top where we were, reflects that it's an urgent

2    action cable and the request is:

3                "Please pass the proposed terms of

4    reference for the joint examination of the Al

5    Rajhi Bank through the Joint Terrorist Financing

6    Task Force to appropriate Saudi officials at the

7    SAMA" and others.

8                Do you see that?

9         A.    Yes.

10        Q.    Okay.  And it goes on lower down to

11   say:

12                "The U.S. Department of the

13   Treasury, together with an inter-agency bank

14   examination, team will work with SAMA through the

15   existing JTFTF" -- that's the joint task force,

16   right?

17        A.    Yes, uh-huh.

18        Q.    -- "on terms of reference for

19   conducting a joint examination of certain accounts

20   at Al Rajhi Bank."

21                Do you see that?

22        A.    Yes.

23        Q.    So as of November 2004, there had

24   not been a joint task force examination of Al
```

This Transcript Contains Confidential Material

1     Rajhi Bank, correct?

2                    MS. KOWNACKI:  Objection.

3                    THE WITNESS:  No, I wouldn't

4          make that assumption.  There could have

5          been.  This is a request at this point in

6          time.  Doesn't cover anything prior to

7          that.

8     BY MR. CARTER:

9          Q.     So you think the U.S. government is

10    making a proposal for a joint examination of Al

11    Rajhi Bank even though one has already been

12    conducted?

13         A.     Oh, I'm sorry.

14                    In terms of that type of

15    examination, no, I doubt anything had been done

16    before that like that.

17         Q.     Okay.  And this is a year after you

18    left government?

19         A.     Yes.

20                    MR. CARTER:  And -- and it

21          goes on to include a specific terms of

22          reference to govern the joint examination

23          on the second paragraph through the third

24          -- sorry -- the second page through the

This Transcript Contains Confidential Material

```
1              third page.

2                         It's at the bottom, Gina,

3              beginning with the paragraph 3C, Exhibit

4              A to the proposed terms of reference.

5                         MS. KOWNACKI:  Sorry.  I don't

6              think we have the right things on the

7              screen.

8                         TRIAL TECH:  So you want page

9              2 and 3?

10                        MR. CARTER:  Yeah, it's the

11             bottom of page 2 at that 3C.

12                        TRIAL TECH:  Got it.  Sorry.

13   BY MR. CARTER:

14        Q.      And this indicates that the United

15   States was seeking particular documents and

16   information regarding specified accounts and

17   account holders.

18                  Do you agree with that?

19        A.      Yes.

20        Q.      So as of this November 2004 time

21   period, the United States was still seeking Al

22   Rajhi Bank records for purposes of conducting its

23   investigation, right?

24        A.      Yes.
```

This Transcript Contains Confidential Material

1    Q.    Okay.  With regard to the details

2    recounted in your report about the investigation

3    of Al Rajhi Bank while you were at the FBI, given

4    the nature of the tasking that you issued, is it

5    reasonable to expect that the people you tasked to

6    work on this would have produced some kind of

7    documentation about their work?

8              MS. KOWNACKI:  Objection.

9              THE WITNESS:  Yes.

10   BY MR. CARTER:

11   Q.    What would you -- what kind of

12   documents would you expect to see?  And feel free

13   to use the internal FBI terminology.

14   A.    To the extent any interviews were

15   conducted, FD-302s.  More likely electronic

16   communications, referred to as ECs, summarizing

17   the activity that was being conducted would have

18   been -- would have been appropriate.

19   Q.    And those documents would reflect

20   what your investigators and analysts found

21   pursuant to the tasking that you issued?

22   A.    Yes.

23             MR. CARTER:  Okay.  Do we want

24      to take another quick break, I think?

This Transcript Contains Confidential Material

```
 1                    MS. KOWNACKI:  Sure.

 2                    MR. CARTER:  Based on just

 3        number duration.

 4                    MS. KOWNACKI:  Yes.

 5                    THE VIDEOGRAPHER:  The time is

 6        11:29 a.m.  We're off the record.

 7                    (Recess.)

 8                    THE VIDEOGRAPHER:  The time is

 9        11:43 a.m.  We're back on the record.

10   BY MR. CARTER:

11        Q.     Mr. Lormel, we're going to move on

12   to some other subjects, but I had one follow-up

13   question related to an issue we discussed.

14               You mentioned that you communicated

15   your consulting role with ██████ and the SAAR

16   Foundation to people at the FBI, correct?

17        A.     And I believe I said DOJ as well.

18   Department of Justice.

19        Q.     And to whom did you convey that you

20   were taking on that role?

21        A.     To people who I had worked with and

22   just a few people, and it would have been

23   informal.

24        Q.     So there was no formal communication
```

This Transcript Contains Confidential Material

1   to anyone at the Department of Justice to make

2   sure that there was nothing problematic with going

3   to work in the consulting capacity?

4                    MS. KOWNACKI:  Objection.

5                    THE WITNESS:   There was no

6            reason to.  There was absolutely no

7            reason to -- to report anything.

8                    It was what I did, there

9            was -- if you infer that -- that there

10           should have been because of the short

11           period of time I was retired, by the time

12           I started working with them, that was

13           over a year after I left.  So any type of

14           potential conflict in that regard

15           wouldn't exist.

16                   But in what I was doing, I'm

17           not aware of any requirement or any need

18           to have -- to have advised DOJ or -- or

19           the FBI.

20   BY MR. CARTER:

21      Q.       You said that a year had passed.

22               Is there some sort of one year?

23      A.       There's a conflict rule, and it had

24   absolutely no bearing on this case.  It was just a

This Transcript Contains Confidential Material

1    matter of timing.  But generally for government

2    employees, FBI, for us, if I had investigated

3    somebody or had worked on something, there was a

4    cooling-off period of a year so as there's no

5    conflict of interest.

6         Q.     And how -- how long after the

7    expiration of the cooling-off period did you go to

8    work for ████████ and the SAAR Foundation?

9         A.     I don't recall.

10        Q.     I think you said that you started

11   working for them in either late 2004/early 2005.

12               So that would have been very --

13        A.     2005.  It would have been after a

14   year and it would have been coincidental because I

15   never thought of that.  There was -- there was no

16   -- no conflict.

17        Q.     Shifting gears, you discuss in your

18   report the treatment by Mr. Winer and Mr. Kohlmann

19   of certain CIA reports in their -- in their expert

20   opinions, correct?

21        A.     Yes.

22        Q.     And just to paraphrase, you opine in

23   your report that the CIA reports cited by Winer

24   and Kohlmann in their reports are not evidence, in

This Transcript Contains Confidential Material

1  your view, and that both experts commit errors by

2  citing and relying upon them.

3             Is that fair?

4                  MS. KOWNACKI:  Objection.

5                  THE WITNESS:   Rely on them in

6       terms of evidence, yes.

7  BY MR. CARTER:

8       Q.     Okay.  And in terms of the word

9  "evidence," which is used in your report and in

10  their reports, are you referring to the term

11  "evidence" in the legal sense?

12       A.     Yes.

13       Q.     And so you're referring to materials

14  or information that would be admissible in a court

15  of law to prove something?

16                  MS. KOWNACKI:  Objection.

17                  THE WITNESS:   Yes.

18  BY MR. CARTER:

19       Q.     And are you familiar with the

20  colloquial definition of the term "evidence,"

21  which as I understand it is the available body of

22  facts or information indicating whether a belief

23  or proposition is true or valid?

24       A.     Right.  In terms of court cases and

This Transcript Contains Confidential Material

1   things, I'm -- I'm looking at my perspective of

2   evidence is related to criminal and civil

3   proceedings, and this obviously is a civil

4   proceeding.

5              And their use of evidence in that

6   regard I find troubling because the bottom line is

7   it's -- the CIA reports are not transparent and

8   the sources of information, the reliability of the

9   information, the -- the corroboration of the

10  information is not known.

11             So that's not something I would be

12  able to use in a proceeding, and the CIA reports

13  are intended for a different purpose.

14       Q.      And I'm just trying to avoid any

15  sort of semantic issues that --

16       A.      Sure.

17       Q.      -- are in our conversation here.

18       A.      Sure.

19       Q.      I think you state in your report

20  that intelligence reports include information,

21  correct?

22       A.      Correct.

23       Q.      And do you agree that intelligence

24  reports commonly include factual matter?

This Transcript Contains Confidential Material

1                    MS. KOWNACKI:  Objection.

2                    THE WITNESS:   They can.

3     BY MR. CARTER:

4          Q.     So just for example, some of the

5     intelligence reports I've seen here indicate that

6     Sulaiman Abdul Aziz Al Rajhi is an officer of Al

7     Rajhi Bank.

8                    That's a factual matter, right?

9                    MS. KOWNACKI:  Objection.

10                   THE WITNESS:  Correct.  Yeah.

11    BY MR. CARTER:

12         Q.     And to the extent that Winer and

13    Kohlmann are using the word "evidence" to refer to

14    information and facts, do you have a problem with

15    that usage of the term?

16                   MS. KOWNACKI:  Objection.

17                   THE WITNESS:   Repeat the

18        question, please.

19    BY MR. CARTER:

20         Q.     Well, to the extent that Winer and

21    Kohlmann are using the term "evidence" in

22    reference to the CIA reports to talk about

23    information and factual matter, do you have a

24    problem with it?

This Transcript Contains Confidential Material

```
 1                    MS. KOWNACKI:  Objection.
 2                    THE WITNESS:   In certain
 3          respects, I do.  Some -- some respects,
 4          no.
 5   BY MR. CARTER:
 6          Q.      And in terms of just the -- the
 7   legal use of the term "evidence," you're not a
 8   lawyer, correct?
 9          A.      Correct.
10          Q.      And throughout the course of your
11   career with the FBI, your focus was exclusively on
12   criminal proceedings?
13          A.      Until 9/11.  After 9/11, it was
14   counterterrorism, but I would try to work within
15   the criminal framework and stay away from the
16   classified side.
17          Q.      But your work at the FBI didn't
18   involve any civil litigation?
19          A.      Early in my career, there were some
20   civil cases that I was involved in.  As a new
21   agent, you kind of cut your teeth type things and
22   cases that were not attractive, but they were
23   civil.
24          Q.      You're not purporting to offer
```

This Transcript Contains Confidential Material

1    expert opinions about the admissibility standards

2    in federal court, are you?

3         A.    No.

4         Q.    And you're not purporting to offer

5    opinions about what the judge is permitted to let

6    into evidence, right?

7         A.    Right.  Correct.  But what I am --

8    what concerns me on those reports is the use of

9    the term "evidence" and the inference that --

10   that, to the point you made before, what's fact

11   and what's not necessarily fact that turns that.

12             And, also, I'm not a lawyer.  That's

13   certain, but I have 28 years in the FBI of which I

14   worked extensively with U.S. Attorney's Office,

15   with prosecutors, with developing what we referred

16   to as evidence to support a prosecution and --

17   and, obviously, those standards are pretty high.

18             I don't think you need to be a

19   lawyer to understand that.

20        Q.    You mentioned that while you were at

21   the FBI, there was a prohibition against using CIA

22   intelligence as evidence, right?

23             MS. KOWNACKI:  Objection.

24             THE WITNESS:  I'm sorry.

This Transcript Contains Confidential Material

1          Please repeat that.

2    BY MR. CARTER:

3          Q.      I believe you indicate in your

4    report that when you were at the FBI that you were

5    not permitted to use CIA intelligence materials as

6    evidence?

7          A.      Where did I say that?  How did I say

8    that?

9          Q.      Page 11.

10               "While in certain instances, some

11   intelligence may rise to the level of evidence, in

12   the case of CIA intelligence, the CIA would

13   normally not allow agencies such as the FBI or

14   Department of Justice to use their intelligent as

15   evidence."

16               Do you see that?

17         A.      Yes.

18         Q.      And a significant reason for that is

19   because the use of CIA intelligence as evidence in

20   a criminal matter would expose the CIA to

21   discovery, right?

22               MS. KOWNACKI:  Objection.

23               THE WITNESS:   One of the

24         them.  One of the reasons, yes.

This Transcript Contains Confidential Material

1    BY MR. CARTER:

2         Q.      And doing that could potentially

3    imperil ongoing intelligence operations?

4         A.      Yes, and sources.

5         Q.      You --

6         A.      Well, you know, if I may to complete

7    that answer a little bit more.

8                 The CIA reports would have been

9    problematic because they usually withhold the

10   source of the information.  So we would have to

11   develop that information independent and

12   corroborate the sources of information and -- and

13   the reliability of that information.

14        Q.      Well, in a lot of -- would you agree

15   that in many cases, CIA reports include materials

16   that would be usable in court as evidence if not

17   for the CIA's intelligence equities?

18                     MS. KOWNACKI:  Objection.

19                     THE WITNESS:  Yes, but I would

20          question how much.  There's also

21          information that you wouldn't be able to

22          use.  Single source information or

23          information that is -- how would I

24          describe? -- information that would be

This Transcript Contains Confidential Material

```
 1          more opinion than fact.

 2    BY MR. CARTER:

 3          Q.      You, as I understand it, contrast

 4    the CIA reports with the 9/11 Commission Report?

 5          A.      Yes.

 6          Q.      Okay.  And you say:

 7                  "I consider the 9/11 Commission

 8    Report to be the most authoritative,

 9    comprehensive, objective, and reliable report

10    addressing 9/11."

11                  Right?

12          A.      Yes.

13          Q.      And you note that the 9/11

14    Commission reviewed more than two and a half

15    million pages of documents and interviewed more

16    than 1200 individuals in 10 countries, right?

17          A.      Yes.

18          Q.      And you go on to also say that you

19    consider the Monograph on Terrorist Financing to

20    be a highly reliable source of information and

21    that it was meticulously prepared with great rigor

22    and objectivity by the Commission Staff

23    responsible for the terrorist financing review; is

24    that correct?
```

This Transcript Contains Confidential Material

1      A.      Yes, that -- that's correct.  I

2   spent a lot of time with them.  I was impressed by

3   their integrity.  I was impressed by their

4   objectivity and -- and their meticulousness.

5      Q.      And in that answer, you're referring

6   to the staff who prepared the Monograph?

7      A.      Yes.

8              MR. CARTER:  If -- if we can,

9         can we mark as the next exhibit the

10        Monograph, which is at Tab 5 I think.

11             (Document marked for

12        identification as Lormel Exhibit 12.)

13  BY MR. CARTER:

14     Q.      Mr. Lormel, I trust from the

15  statements in your report that you're familiar

16  with the Monograph that we've marked as an

17  exhibit?

18     A.      Yes.

19     Q.      I gather from your testimony that

20  you were engaged with the staff members who wrote

21  this, the Monograph?

22     A.      Yes.

23     Q.      What was the nature of that

24  interaction?

This Transcript Contains Confidential Material

1    A.    They were -- they were fact-finding.

2    They -- they were looking at the government's

3    response from -- to 9/11.  They were looking at

4    the shortcomings before that.  They -- so, in

5    part, we were providing them with a lot of

6    information for their consideration, their

7    background.  They balanced that, I'm sure, with

8    the other agencies they spoke to and other sources

9    they went to.

10              And as you pointed out, in an

11   earlier memorandum, you know, on certain

12   occasions, I was interviewed, and they put it in

13   the form of that type of memo that -- that you --

14   you produced earlier.

15   Q.    And do I understand then that your

16   interactions with the staff who prepared the

17   Monograph included interactions while you were at

18   the FBI?

19   A.    Yes.

20   Q.    And the FBI was providing

21   information to the staff in relation to their work

22   on the Monograph?

23   A.    Yes.

24   Q.    And other agencies were as well?

This Transcript Contains Confidential Material

```
 1        A.       Yes.

 2        Q.       And in addition to any documents,

 3   you also were engaged in interviews and

 4   conversations with them?

 5        A.       Yes.

 6        Q.       If we can look at page 4 of the

 7   Staff Monograph, and the paragraph that begins:

 8                 "Al Qaeda and Usama Bin Ladin

 9   obtained money from a variety of sources.

10   Contrary to common belief, Bin Ladin did not have

11   access to any significant amounts of personal

12   wealth (particularly after his move from Sudan to

13   Afghanistan) and did not personally fund al Qaeda,

14   either through an inheritance or businesses he was

15   said to have owned in Sudan.  Rather, al Qaeda was

16   funded, to the tune of approximately $30 million

17   per year, by diversions of money from Islamic

18   charities and the use of well-placed financial

19   facilitators who gathered money from both witting

20   and unwitting donors primarily, in the Gulf

21   region.  No persuasive evidence exists that al

22   Qaeda relied on the drug trade as an important

23   source of revenue, had any substantial involvement

24   with conflict diamonds, or was financially
```

This Transcript Contains Confidential Material

1    sponsored by a foreign government."

2             Do you agree with those assessments

3    and findings of the Staff Monograph?

4        A.      Yes.

5        Q.      And that includes the statement

6    about the manner in which the al-Qaeda

7    organization was funded to the tune of

8    approximately $30 million per year?

9        A.      Yes.  Excuse me.  Yes.

10       Q.      If we can -- are you aware,

11   Mr. Lormel, that Al Rajhi Bank has produced an

12   expert report from an individual named Aimen Dean?

13       A.      No, I'm not aware of that.  I know

14   that they had other experts, but I'm not familiar

15   with him.

16                 MR. CARTER:  If we can mark

17        Mr. Dean's report as the next exhibit.

18                 (Document marked for

19        identification as Lormel Exhibit 13.)

20   BY MR. CARTER:

21       Q.      And apologies.  I just have it in a

22   different binder here.  So give me a moment.

23       A.      Yeah.

24       Q.      And if we can turn to page 13 and

1  continuing on to 14.  Beginning with "Winer is

2  wrong."

3              The section I want to address is the

4  paragraph beginning there and the two that follow

5  it, and just to include them for the record.

6              "Winer is wrong to suggest that

7  al-Qaeda depended on donations from the Subject

8  Charities.  Instead, the funds for al-Qaeda's

9  operations largely came from the business ventures

10  of al-Qaeda members.  The encouragement of

11  independent entrepreneurship within al-Qaeda's

12  ranks was not an alien idea, given that Bin Laden

13  himself came from a business family.  By

14  encouraging members to start import and export

15  businesses to fund themselves, al-Qaeda was able

16  to divert funds from the welfare system to the

17  expansion of military training camps.

18              "The region offered several

19  profitable export opportunities.  There was honey

20  from the Kashmiri mountains, Himalayan pink salt,

21  and Afghan carpets -- all of which were coveted by

22  consumers in the region and commanded high

23  margins.  Importing was also a significant source

24  of income for al-Qaeda.  Members got into the

This Transcript Contains Confidential Material

1  business of importing cars, fertilizers, and other

2  agri-nutrients.  I myself used an export business

3  as a cover while operating as an agent for MI6,

4  because al-Qaeda favored financially independent

5  members -- particularly those who could contribute

6  to the cause.  In my case, my business partners

7  and I sourced honey from Kashmiri suppliers and

8  sold our products at a mark-up of roughly 1,000

9  percent.  On top of this, protection of the opium

10  trade was one of the largest sources of funding

11  for al-Qaeda operations.  I observed first hand

12  that drug cartels in Afghanistan paid al-Qaeda

13  millions of dollars to protect the heroin caravans

14  passing from Afghanistan into Iran.

15           "It was through businesses like

16  these that al-Qaeda has able to become a

17  self-sustaining entity and finance its operations.

18  While undercover for MI6, based on my interactions

19  with the al-Qaeda leadership handling finances and

20  my participation in meetings where revenue was

21  reported, I estimated that the al-Qaeda

22  enterprises (legitimate and illicit) were

23  generating upwards of at least $20-30 million per

24  year before 9/11 to support operations.  Winer and

This Transcript Contains Confidential Material

```
 1    Kohlmann do not identify any funding transactions
 2    from the Subject Charities to al-Qaeda, and I am
 3    aware of none, let alone funding that would have
 4    meaningfully contributed to al-Qaeda's budget --
 5    and certainly not through the formal banking
 6    system."
 7              Having -- having read that opinion
 8    from Mr. Dean concerning the sources of al-Qaeda's
 9    funding before 9/11, do you agree with his
10    statements?
11         A.     I agree with those statements, yes.
12    They -- I don't see why you couldn't agree with
13    both.  And al-Qaeda, Bin Laden was -- they were
14    looking for any source they could --
15         Q.     Well --
16         A.     -- to fund him.
17         Q.     -- Mr. Lormel, let's be clear.
18         A.     Uh-huh.
19         Q.     The Monograph which you agree with
20    says that the primary source of al-Qaeda's revenue
21    was diversions of monies from charities and
22    well-placed financial facilitators and that
23    generated the $30 million.
24              Mr. Dean says that charities were
```

This Transcript Contains Confidential Material

```
 1   not a significant source of revenue for al-Qaeda.
 2                   Do you disagree with his statement
 3   that -- that charities were not a significant
 4   source of money for al-Qaeda?
 5        A.       Oh, I think charities were a source,
 6   and I also believe in the 9/11 Commission Report
 7   that they had a caveat in there about hindsight
 8   and foresight about other information that they
 9   weren't aware of.
10                   This individual clearly has
11   firsthand experience.
12                   We encountered the honey trade for
13   sure.  So I believe there were funds that did come
14   from -- from other sources.
15                   I do believe that the charities were
16   a source, and we were very concerned because of
17   the amount -- the amounts of cash that went
18   through the charities.
19        Q.       Okay.  The Staff Monograph says that
20   charities were a significant source of funding for
21   al-Qaeda.
22                   You agree with that, right?
23        A.       Yes.
24        Q.       Mr. Dean says that they were not.
```

This Transcript Contains Confidential Material

```
 1                    Do you agree with that?

 2                    MS. KOWNACKI:  Objection.

 3            Mr. Dean is referring to the Subject

 4            Charities.  That says it clearly.

 5   BY MR. CARTER:

 6        Q.      Okay.  Well, let's ask the question.

 7                    MS. KOWNACKI:  Is that right?

 8   BY MR. CARTER:

 9        Q.      You're aware that the U.S.

10   government designated the entirety of the

11   Al-Haramain organization over a number of years,

12   right?

13                    MS. KOWNACKI:  Objection.

14   BY MR. CARTER:

15        Q.      Are you aware of that?

16        A.      Yes.

17        Q.      Okay.  And some of those

18   designations occurred while you were still with

19   the FBI, right?

20        A.      The -- the Al-Haramain branches,

21   yes.

22        Q.      Okay.  And based on the work you did

23   at the FBI, do you believe that Al-Haramain was a

24   source of funding for al-Qaeda?
```

This Transcript Contains Confidential Material

```
1          A.        Yes.

2                    MS. KOWNACKI:  Objection.

3    BY MR. CARTER:

4          Q.        And that's one of the Subject

5    Charities in Mr. Dean's report?

6          A.        I haven't read Mr. Dean's report.

7    So I don't know, you know, who.  I don't know who

8    he's referring to.

9          Q.        Well, the Staff Monograph says that

10   the opium trade was not a significant source of

11   income for al-Qaeda before 9/11.  Mr. Dean says

12   that it was.

13                    Which should we believe?

14                    MS. KOWNACKI:  Objection.

15                    THE WITNESS:  Well --

16                    MS. KOWNACKI:  That

17            mischaracterizes Dean's statement which

18            says the protection of opium trade.

19   BY MR. CARTER:

20         Q.        Which shall we believe?

21         A.        Well, I think both are believable.

22   I think certainly the charities, and he -- I don't

23   know him.  Just looking from his background, you

24   know, he has some very -- would seem to me has a
```

This Transcript Contains Confidential Material

1    very good firsthand experience that we lacked and,

2    you know, I would -- I would take a serious look

3    at that.  I wouldn't discount it at all.

4         Q.      Well, you don't believe there to be

5    tension between what he's saying here and what's

6    reported as the official findings of the 9/11

7    staff concerning the primary sources of al-Qaeda's

8    financing?

9              MS. KOWNACKI:  Objection.  He

10        says he hasn't read the full report.

11              THE WITNESS:   I honestly see

12        that both could be sources.

13   BY MR. CARTER:

14        Q.      It's not sources.

15        A.      Yeah.

16        Q.      It's not sources.

17              The report he's offered indicates

18   that the funding for al-Qaeda came from business

19   enterprises operated by al-Qaeda members,

20   protection from the opium trade, and the like, and

21   not from charities.

22              Do you agree with that?

23        A.      From his perspective.

24              MS. KOWNACKI:  Objection.

This Transcript Contains Confidential Material

```
 1                    THE WITNESS:  Yes, his

 2          perspective.  He's basing that on his

 3          experience.  I have no reason to -- to

 4          doubt his perspective on that.

 5   BY MR. CARTER:

 6          Q.      And from your perspective, were

 7   charities the primary source of funding for

 8   al-Qaeda before 9/11, as is said in the Staff

 9   Monograph?

10                    MS. KOWNACKI:  Object.

11                    THE WITNESS:  I think

12          charities were a big -- a certain -- a

13          major source.  I also believe there were

14          other sources.

15   BY MR. CARTER:

16          Q.      So who is the court supposed to

17   believe as to whether or not charities were a

18   major source of funding: You or Mr. Dean?

19                    MS. KOWNACKI:  Objection.

20          It's not clear what charities you're even

21          talking about here.  Charities to mean...

22                    THE WITNESS:  I don't have

23          his perspective.  I don't have that

24          experience, but I do recall, you know,
```

This Transcript Contains Confidential Material

```
 1        that we did look at monies coming from
 2        other sources.
 3                 I think we do ourselves a
 4        serious disservice by -- by saying this
 5        versus that.  Al-Qaeda wasn't
 6        discriminating.  They were going to get
 7        money from any source they could.
 8                 At the time of the 9/11
 9        Commission Report, that's what the
10        Commission believed and that's -- that's
11        reasonable.
12                 What he's saying here is
13        reasonable, and you're looking at it now
14        many years later and these -- these two
15        opinions collide.  I think there's room
16        for both of them.
17   BY MR. CARTER:
18        Q.     Okay.  And based on the information
19   you saw at the time, do you believe that business
20   ventures generated or run by al-Qaeda members were
21   generating $20 to 30 million a year revenue for
22   al-Qaeda?
23                 MS. KOWNACKI:  Objection.
24                 THE WITNESS:   In my
```

This Transcript Contains Confidential Material

```
 1             experience from what we were looking at,

 2             I couldn't say that.  I wouldn't.

 3                     I believe -- excuse me.

 4                     I believe revenue was

 5             generated from sources like this.  I

 6             can't quantify how much and how close it

 7             was to the charitable things.

 8                     When we first got involved,

 9             one of the first things we were looking

10             at was the charities.  That was one of

11             the first things.  We saw that as a -- as

12             a significant -- as a significant source

13             in it, and we were concerned about it and

14             we focused on that.

15                     And if that's what the 9/11

16             Commission bases their findings on, it's

17             from what we initially went after.

18   BY MR. CARTER:

19        Q.      Okay.  You would agree with --

20        A.      That's not to say that there weren't

21   other sources.  That's what I'm trying to say

22   here.  There's a lot of sources.

23        Q.      I understand what you're trying to

24   say.
```

This Transcript Contains Confidential Material

```
 1                   And what I'm trying to get clarity
 2    about is that Mr. Dean says that it was through
 3    businesses like these that al-Qaeda was able to
 4    become a self-sustaining entity and finance its
 5    operations.
 6          A.      And I'm saying --
 7          Q.      Based on the experience you had in
 8    government, do you agree with that assessment?
 9                   MS. KOWNACKI:  Objection.
10          Again, he doesn't have the context of the
11          whole report.
12                   THE WITNESS:  I don't doubt
13          his sincerity in what he's saying there.
14                   What we were looking at, at
15          the time, was more focused on the
16          charities, but we were also were aware of
17          some of these other sources.
18    BY MR. CARTER:
19          Q.      Okay.  The 9/11 Commission Staff
20    Monograph did not conclude that businesses run by
21    al-Qaeda members enabled al-Qaeda to become a
22    self-sustaining entity and finance its
23    operations --
24          A.      Right.
```

This Transcript Contains Confidential Material

1        Q.       -- did it?

2        A.       I think they were more focused not

3    only on the charities, aside from the charities,

4    the wealthy donors.

5        Q.       Okay.  But neither of those are

6    businesses run by al-Qaeda members, are they?

7        A.       Some could be, but not -- not

8    entirely.

9        Q.       Okay.  And do you believe that the

10   9/11 Commission had access to quality information

11   pointing to the involvement of the charities -- of

12   charities in financing al-Qaeda?

13                   MS. KOWNACKI:  Objection.

14          Vague.

15                   THE WITNESS:   I'm sorry.  Can

16          you repeat that?

17   BY MR. CARTER:

18        Q.       Do you believe that the 9/11

19   Commission and, in particular, the staff had

20   access to quality information in relation to the

21   funding of al-Qaeda by charities?

22                   MS. KOWNACKI:  Objection.

23                   THE WITNESS:  Yes.

24   BY MR. CARTER:

This Transcript Contains Confidential Material

1    Q.    Okay.  Just turning back to your

2  commentary about the Staff Monograph in your

3  report and, in particular, the bottom of page 14

4  and the top of page 15.

5              I'm sorry.  Page -- page 15.

6              You say:

7              "Winer also minimizes the importance

8  of the Monograph when paraphrasing the Preface

9  written by Philip Zelikow, Executive Director of

10  the 9/11 Commission staff.  Winer noted that the

11  Commission had not formerly approved the text of

12  the Monograph and referred to this as a

13  limitation.  From my personal experience, however,

14  I know that the Monograph was recognized as a

15  significant aid to the 9/11 Commission in

16  assessing the U.S. government's performance in

17  response to 9/11."

18              Do you see that?

19    A.    Yes.

20    Q.    Mr. Winer cites and relies upon the

21  Monograph, doesn't he?

22    A.    Yes.

23    Q.    Okay.  So he agrees with you that

24  it's an authoritative source, doesn't he?

This Transcript Contains Confidential Material

```
 1                    MS. KOWNACKI:  Objection.

 2                    THE WITNESS:   That's -- he

 3        also offhandedly minimizes it here.

 4                    So I'm pointing out that --

 5        that it is a significant source.

 6   BY MR. CARTER:

 7        Q.     Well, he cites it and relies upon it

 8   and says it offers some significant and important

 9   findings, doesn't he?

10                    MS. KOWNACKI:  Objection.  Are

11        you quoting Winer?

12                    MR. CARTER:  I'm asking his

13        understanding of the treatment of the

14        Monograph in Mr. Winer's report.

15                    THE WITNESS:  I'd like to see

16        more of --

17   BY MR. CARTER:

18        Q.     Okay.

19        A.     -- the references you're -- or the

20   comments you're referring to.

21                    MR. CARTER:  Let's go to the

22        Winer report at Section 6.15.3, which is

23        number 50.

24                    (Document marked for
```

This Transcript Contains Confidential Material

1          identification as Lormel Exhibit 14.)

2    BY MR. CARTER:

3          Q.       And I believe the paragraph where

4    you say he minimizes the Staff Monograph is

5    paragraph 6.15.3.

6          A.       (Reviews document.)

7          Q.       Have you had a chance to read the

8    paragraph, Mr. Lormel?

9          A.       I'm reading it now.

10                  (Reviews document.)

11                  Yes.

12         Q.       Okay.  And so just to read the

13   section:

14                  "Three staff members of the 9/11

15   Commission wrote the 'Monograph' as a Staff Report

16   to the Commission providing some additional

17   analysis of the terrorist finance issues raised by

18   9/11."

19                  Do you agree with that?

20         A.       Yes.

21         Q.       "The Monograph was published by the

22   Commission and is available from its website."

23                  Do you agree with that?

24         A.       Yes.

This Transcript Contains Confidential Material

1      Q.      "That said, its director, Philip

2  Zelikow, stated when it was issued that the

3  Commissioners had been briefed on it and reviewed

4  earlier drafts, but had not formally approved the

5  text."

6              Do you agree with that?

7      A.      Yes.

8      Q.      Okay.  And do you agree with

9  Mr. Winer that "the Monograph amplified several

10  terrorist financing findings beyond those covered

11  in the 9/11 Report itself"?

12      A.      Yes, but I disagree with the

13  limitation.

14      Q.      So your quarrel with Mr. Winer here

15  that you elevated to your report is that he

16  identified Philip Zelikow's statement

17  acknowledging that it was not a formal document of

18  the Commissioners as a limitation.

19              That's it?

20      A.      No.  He also -- God, I just lost my

21  thought.  There was another point in there that --

22  that I have a problem with that -- oh, I'm sorry.

23  I recall.

24              His characterization in -- in the --

This Transcript Contains Confidential Material

```
 1    oh, God, I lost it again.  My apology.  What was

 2    that?

 3         Q.      Well, Mr. Lormel, if I may, do you

 4    believe it was appropriate for Mr. Winer to

 5    acknowledge the caveat that Mr. Zelikow had

 6    included in the Preface so as to avoid being

 7    potentially accused of misrepresenting it as a

 8    product of the Commissioners?

 9         A.      No, I consider it a slight that it

10    wasn't approved.

11         Q.      It's a fact that it wasn't approved.

12         A.      I don't dispute that, but the manner

13    in which he then puts that down there is to my

14    point.  I looked at that as minimizing the value.

15              And the other thing --

16         Q.      Well, no.

17         A.      If I may.  If I may.

18              The other point I was -- I was

19    looking at was, he makes the statement also that

20    the primary focus was on -- oh, God what was it?

21              The -- where he made a big focus

22    about the CIA report when the purpose of the 9/11

23    Monograph was to determine what the government's

24    response was.  So he had that out of context.
```

This Transcript Contains Confidential Material

```
1          Q.      Okay.  But with regard to the issue

2    that we're talking about, isn't it really pretty

3    clear here that what he's saying is that the

4    caveat that Zelikow included in the Preface

5    doesn't take away from the fact that "the

6    Monograph amplified several terrorist financing

7    findings beyond those covered in the 9/11 Report

8    itself"?

9          A.      Well --

10                 MS. KOWNACKI:  Objection.

11                 THE WITNESS:  -- that's how

12           you interpret it, that's fine.  That's

13           not how I interpret it.

14   BY MR. CARTER:

15         Q.      Okay.

16         A.      I look at it as a slight.  Mr. --

17         Q.      And -- and let's -- he goes on to

18   say:

19                 "A number of his observations and

20   findings are material to the question of whether

21   al Qaeda relied on sympathetic financiers and

22   financial institutions to raise and move money

23   prior to 9/11."

24                 Do you agree with that?
```

This Transcript Contains Confidential Material

```
 1        A.       Yes.

 2        Q.       Then he goes on to cite as one of

 3   the key findings from the Monograph its statement

 4   that "bin Ladin relied on raising some $30 million

 5   a year 'by diversions of money from Islamic

 6   charities and the use of well-placed financial

 7   facilitators who gathered money from both witting

 8   and unwitting donors, primarily in the Gulf

 9   region."

10                 Do you agree with that?

11        A.       Yes.

12                 MR. CARTER:  Turning back to

13            the 9/11 Report itself, and if we can

14            mark the report as an exhibit, and it is

15            at Tab 36.

16                 (Document marked for

17            identification as Lormel Exhibit 15.)

18   BY MR. CARTER:

19        Q.       And it's a big document, as you

20   know --

21        A.       Yes.

22        Q.       -- Mr. Lormel.

23        A.       Yes.

24        Q.       We're not going to review the
```

This Transcript Contains Confidential Material

1  entirety of it.

2      A.      (Laugh).  Thank you.

3      Q.      I would, however, like to go to the

4  Table of Contents and just talk about a few of the

5  chapters.

6              Chapter 2 of the Commission's report

7  was titled "The Foundation of the New Terrorism."

8              And are you familiar with that

9  chapter?

10     A.      Yes.

11     Q.      And you're familiar with the report

12 generally?

13     A.      Yes.

14     Q.      Okay.  And am I correct that this

15 chapter includes the 9/11 Commission's findings

16 concerning the establishment of al Qaeda, the Rise

17 of Bin Ladin and al Qaeda, the way in which Bin

18 Ladin built the organization, the steps he took to

19 declare war against the United States, and al

20 Qaeda's Renewal in Afghanistan in 1996 to 1998?

21     A.      Yes.

22     Q.      Okay.  And then with regard to

23 paragraph 5, "Al Qaeda Aims At the American

24 Homeland," I assume that's also a part of the

This Transcript Contains Confidential Material

```
1    report you're familiar with?

2         A.      Yes.

3         Q.      And this section of the report

4    reflects the Commission's findings concerning the

5    development of the 9/11 operation and Khalid

6    Sheikh Mohammed's role in bringing it to Bin

7    Ladin, correct?

8         A.      Yes.

9         Q.      Okay.  And then paragraph or

10   Chapter 6 reflects findings the 9/11 Commission

11   reached concerning the effort to move from threat

12   to threat related to different al Qaeda attacks

13   preceding 9/11, correct?

14                     MS. KOWNACKI:  Objection.

15                     THE WITNESS:  Yes.

16                     MR. CARTER:  Okay.  If we can

17          mark as the next exhibit the notes to

18          Chapter 2.

19                     (Document marked for

20          identification as Lormel Exhibit 16.)

21                     MR. CARTER:  Number 8.  Yeah,

22          Gina, it's number 8.

23   BY MR. CARTER:

24         Q.      Mr. Lormel, are you familiar with
```

This Transcript Contains Confidential Material

 1    the Notes that were included with the 9/11

 2    Commission Report?

 3        A.      Yes.  Mine didn't come up on the

 4    screen.

 5        Q.      I think we're still getting there.

 6        A.      Yeah.  Okay.

 7        Q.      But the Notes is where the

 8    Commission directed people to source information?

 9        A.      Yes.

10        Q.      And we're now at Chapter 2, and I

11    just want to flag for a couple.

12                In Footnote 18, you see that the

13    9/11 Commission cited as sources for information

14    an intelligence report concerning the

15    interrogation of Zubaydah, and a CIA analytical

16    report "Bin Ladin's Terrorist Operations

17    Meticulous and Adaptable."

18                Correct?

19        A.      Yes.

20        Q.      And in support of number 21, the

21    government -- the 9/11 Commission cited the

22    "Government's Evidentiary Proffer Supporting the

23    Admissibility of Co-Conspirator Statements,"

24    correct?

This Transcript Contains Confidential Material

```
1          A.      Yes.

2          Q.      And the next footnote cites -- 22

3    cites an intelligence report as well.

4    "Intelligence report, Terrorism:  Usama Bin

5    Ladin's Historical Links to 'Abdallah Azzam'"?

6          A.      Yes.

7                  MS. KOWNACKI:  Objection.

8          You're not referring to what any of these

9          footnotes refer to.

10                 MR. CARTER:  I'm just asking

11         if he agrees that these are the citation

12         sources that were included with the 9/11

13         Commission Report.

14   BY MR. CARTER:

15         Q.      And then in paragraph 25, the

16   Commission said:

17                 "A wealth of information on al

18   Qaeda's evolution and history has been obtained

19   from materials seized in recent years, including

20   files labeled 'Tareekh Usama' (Usama's history)

21   and 'Tareekh al Musadat' (History of the Services

22   Bureau).  For descriptions of and substantial

23   excerpts from these files, see Government's

24   Evidentiary Proffer Supporting the Admissibility
```

This Transcript Contains Confidential Material

```
 1    of Co-Conspirator Statements, United States v.

 2    Arnaout.  See also Intelligence report, Terrorism:

 3    Historical Background of the Islamic Army and bin

 4    Ladin's Move from Afghanistan to Sudan."

 5                 Do you see this -- those?

 6         A.      Yes.

 7         Q.      Are you familiar with the

 8    evidentiary proffer in the Arnaout case?

 9         A.      Yes.

10         Q.      And that was a document filed by the

11    Department of Justice in a terrorism prosecution?

12         A.      Yes.

13         Q.      And if we go down -- I'm not going

14    to review all of these.

15                 Paragraph 30 there's a reference to

16    CIA report "Al-Qa'ida in Sudan, 1992 to 1996: Old

17    School Ties Lead Down Dangerous Paths."

18                 In paragraph 35, there's another

19    reference to a cite to the "Old School Ties"

20    report.

21                 Also 36, also 37.  Again in 44.

22                 In 52, there's an Intelligence

23    report cited "Establishment of a Tripartite

24    Agreement Among Usama Bin Ladin, Iran, and the
```

This Transcript Contains Confidential Material

1   NIF."  An Intelligence report, "Cooperation Among

2   Usama Bin Ladin's Islamic Army and the NIF."

3                    There's quite a number of other

4   intelligence reports cited in the notes.

5                    You agree with me that the 9/11

6   Commission, in offering source information for

7   findings it included in its report, cited

8   frequently to intelligence reports including CIA

9   analytic reports?

10                   MS. KOWNACKI:  Objection.

11                   THE WITNESS:  I'm not sure

12       about frequently but, yes.  Yeah.

13  BY MR. CARTER:

14       Q.      Okay.  Do you happen to know how

15  many of the CIA reports cited in Mr. Winer's and

16  Kohlmann's reports are cited in Notes to the 9/11

17  Commission Report?

18       A.      No.

19       Q.      I'm going to represent to you that

20  at least eight of the CIA reports that they cite

21  in their reports are also cited in the 9/11

22  Commission Report.

23                   Were you aware of that when you

24  wrote your report?

This Transcript Contains Confidential Material

```
1        A.       That specific fact, no.

2                 Doesn't change my opinion.

3        Q.       Okay.  You did in your report,

4   though, credit the 9/11 Commission for the

5   thoroughness of its investigation, didn't you?

6        A.       Yes, I did.

7        Q.       Okay.  And you credited the 9/11

8   Commission for the way in which it sourced its

9   findings, correct?

10       A.       Yes.

11       Q.       In your report, I recall that you

12  also criticize Mr. Winer and Mr. Kohlmann for

13  their reliance on the Golden Chain document.

14                Do you recall that?

15       A.       Yes.

16       Q.       Okay.  And that appears on pages 25

17  and 26 of your report, correct?

18       A.       Yes.

19       Q.       You have your report in front of

20  you, right?

21       A.       Yes.

22       Q.       Okay.  And in particular, you -- as

23  part of this criticism, you cite in Footnote 85

24  the references by Winer in paragraph 6.2.11 and
```

This Transcript Contains Confidential Material

1    6.3-6.4, correct?

2         A.      Yes.  Yes.

3         Q.      Okay.  And to a reference in the

4    Kohlmann report at page 7?

5         A.      Yes.

6         Q.      And you indicate in your report that

7    the experts are referencing "the so-called 'Golden

8    Chain' document."

9                 What is that?

10        A.      Golden Chain was a list of wealthy

11   individuals who were purported to provide support

12   to Bin Laden and to al-Qaeda.

13        Q.      And I believe you indicate in your

14   report that you concluded that the list predated

15   the formation of al-Qaeda and instead related to

16   support for the Afghan rebels fighting Russians in

17   Afghanistan?

18        A.      The origination of the list and the

19   donor source, yes.

20        Q.      And just to clarify here, in the

21   conflict in Afghanistan against Russia, there were

22   Afghan fighters?

23        A.      Yes.

24        Q.      And there were also foreign

This Transcript Contains Confidential Material

```
 1    fighters?

 2         A.       Right.

 3         Q.       And Bin Laden was one of the foreign

 4    fighters?

 5         A.       Right.

 6         Q.       Correct?

 7                  And Bin Laden wouldn't be considered

 8    one of the Afghan rebels?

 9         A.       He was fighting with the Afghan

10    rebels.

11         Q.       But there was a distinction between

12    the Afghan rebels and the foreign fighters,

13    correct?

14         A.       I don't know that I'd make a

15    distinction, but certainly he's a foreign fighter.

16    He's not Afghan.

17         Q.       Well, there you say here "who are

18    also supported by the United States."

19                  Isn't it correct that the United

20    States provided support during this time to the

21    Afghans but not to the foreign mujahideen?

22         A.       Correct.

23         Q.       And Bin Laden would have been part

24    of the foreign mujahideen?
```

```
 1        A.        I thought he was very active with

 2   the -- the Afghan rebels, and I don't know that I

 3   make the distinction between the two.

 4        Q.        Well, doesn't the U.S. make a

 5   distinction between who it supported during that

 6   time?

 7        A.        It supported the Afghan rebels.  Bin

 8   Laden was fighting with the Afghan rebels, and he

 9   was -- he was certainly a visible force and leader

10   in that capacity.

11        Q.        So is it your view that the United

12   States during that time was supporting Bin Laden?

13        A.        No.

14        Q.        Okay.  So there is a distinction?

15        A.        Okay.

16        Q.        And the list was a list of people

17   associated with the funding of the Maktab

18   al-Khidamat, which was Bin Laden's organization,

19   right?

20        A.        Right.

21        Q.        Together with Abdullah Azzam?

22        A.        Right.

23        Q.        Looking back to the paragraphs in

24   Mr. Winer's report that you're criticizing him for
```

1    here, beginning with 6.2.11, this is a quote from

2    a report, isn't it?

3            A.      I haven't seen it yet.

4            Q.      I think if you look at this entire

5    section beginning with of 6.2, it might help you

6    have some context.

7            A.      (Reviews document.)

8            Q.      Mr. Lormel, have you had a chance to

9    look at that section?

10           A.      There's a lot here.  So I'm...

11           Q.      Well, I understand the section of

12    Mr. Winer's report from 6.2.1 through 6.2.11 to

13    include excerpted quotes from a report of the UN

14    monitoring group on al-Qaeda and the Taliban; is

15    that correct?

16           A.      Yes.

17           Q.      So what Mr. Winer is doing here is

18    quoting a UN report, right?

19           A.      Yes.

20           Q.      And the UN report is the document

21    that included a reference to the Golden Chain,

22    right?

23           A.      I don't see it here.

24           Q.      It's in 6.2.11.

This Transcript Contains Confidential Material

1      A.      Yes.

2      Q.      Are you familiar with the second UN

3  monitoring report on al-Qaeda and the Taliban?

4      A.      I was familiar that the report was

5  produced.  Yes.

6      Q.      Were you familiar with the work of

7  the monitoring group?

8      A.      Not particularly.

9      Q.      Okay.  So do you know one way or

10  another whether it was doing good work?

11      A.      I can't opine about that.

12      Q.      Okay.  So you don't have an

13  opinion --

14      A.      Yeah.

15      Q.      -- about whether or not it was

16  appropriate for Mr. Winer to cite the UN

17  monitoring group report?

18      A.      No.

19      Q.      And you also make reference to

20  Mr. Winer's Golden Chain reference in paragraph

21  7.5 of his report.  Paragraph 7. -- I'm sorry.

22  This might be 7.15.1.  Sorry.

23      A.      (Reviews document.)

24      Q.      Mr. Lormel, have you had a chance to

This Transcript Contains Confidential Material

1    look at this?

2         A.      I'm looking at it now.

3                 (Reviews document.)

4                 Okay.

5         Q.      Okay.  What is -- what source

6    information is Mr. Winer discussing here?

7         A.      It doesn't say.

8         Q.      In 7.15, it says:

9                 "I have read declassified government

10   documents which I understand to be summaries of

11   interviews between al Fadl and the FBI, which

12   include the following information material to my

13   answer to this question."

14                From that, do you understand that

15   Mr. Winer was reviewing the content of FBI

16   documents concerning an interview of Jamal al

17   Fadl?

18        A.      It's what it says here.

19        Q.      And are you familiar with the FBI's

20   interviews of Jamal al Fadl?

21                     MS. KOWNACKI:  Objection.

22                     THE WITNESS:   I don't recall.

23   BY MR. CARTER:

24        Q.      Do you know who Jamal al Fadl is?

This Transcript Contains Confidential Material

```
 1        A.      I did.

 2        Q.      Do you recall whether Jamal al Fadl

 3   was a one-time al-Qaeda member who became a

 4   cooperating witness for the United States

 5   government?

 6        A.      I don't recall.

 7        Q.      And you can't --

 8        A.      I remember the name.  I don't

 9   recall.

10        Q.      And you don't recall whether or not

11   the Department of Justice offered him as a witness

12   in the prosecutions relating to the 1998 Embassy

13   bombings?

14        A.      I'm not familiar with that.  I don't

15   recall.

16        Q.      And you don't know what role Mr. al

17   Fadl held in al-Qaeda?

18        A.      As we sit here, I don't recall.

19        Q.      And you don't have any basis to

20   assess the credibility of Mr. Fadl's statements

21   reflected in this interview summary?

22        A.      No.

23        Q.      With regard to the Golden Chain

24   criticisms in your report, I notice that you
```

This Transcript Contains Confidential Material

1    didn't reference paragraphs 6.13 and 6.14 of

2    Mr. Winer's report where he also refers to the

3    Golden Chain.

4                    Are you familiar with those

5    references?

6         A.        I certainly read those, the report,

7    put it in my report.  You know, he has a lot of

8    context here.  So.

9         Q.        Okay.  Well, let's look at those.

10        A.        Uh-huh.

11        Q.        6.13 is in a section of the report

12   dealing with the 9/11 Commission Report and the

13   Terrorist Financing Staff Report, and 6.13 itself

14   says:

15                   "In its final report, the 9/11

16   Commission stated bin Ladin and al Qaeda were able

17   to succeed in Afghanistan due to Bin Ladin

18   understanding that he needed 'an increasingly

19   complex, almost worldwide organization' to meet al

20   Qaeda's objectives and needs.  It identified his

21   supports -- his support from sympathetic

22   financiers as central to that undertaking, as

23   follows:  'The organization included a financial

24   support network that came to be known as the

This Transcript Contains Confidential Material

1    'Golden Chain,' put together mainly by financiers

2    in Saudi Arabia and the Person Gulf states.

3    Donations flowed through charities or other

4    nongovernmental organizations (NGOS).  Bin Ladin

5    and the 'Afghan Arabs' drew largely on funds

6    raised by the network, whose agents roamed world

7    markets to buy arms and supplies for the

8    mujahideen, or 'holy warriors.'"

9              Do you see that?

10   A.     Yes.

11   Q.     And do you recall that language from

12   the 9/11 Commission Report?

13   A.     Specifically, I don't recall.

14   Q.     Okay.  And in that section, the 9/11

15   Commission made a specific reference to a Golden

16   Chain?

17   A.     Right.

18   Q.     And you view the 9/11 Commission

19   Report to be credible?

20   A.     Right.

21   Q.     And in criticizing Mr. Winer about

22   his use of the "Golden Chain" terminology, you

23   omitted any reference to his citation in this

24   section of his report to the 9/11 Commission

This Transcript Contains Confidential Material

```
1    Report using that same term, right?

2                   MS. KOWNACKI:  Objection.

3                   THE WITNESS:   I wouldn't

4         characterize it that way.  I didn't use

5         it, no.

6                   My criticisms of the Golden

7         Chain go from my experience.  I was

8         tasked with proving the funding.  We

9         could not prove that.

10                  You could make all these

11        statements.  They can be everywhere, but

12        show me anybody who -- who can

13        specifically state that Citizen A who was

14        on this list provided funds directly to.

15                  We would have taken it to

16        court had we had that information.  We

17        would have made a case.  That's one.

18                  And then what's the time frame

19        here?  Are you talking to monies that are

20        going to Bin Laden in Afghanistan?  Or

21        are you talking of monies going to

22        al-Qaeda?  Please differentiate because

23        we could never differentiate that.

24    BY MR. CARTER:
```

This Transcript Contains Confidential Material

 1          Q.      So -- so let's -- let's address that

 2    as well.

 3          A.      So it's easy to make a lot of

 4    statements.  It's very difficult to prove it.

 5          Q.      Well -- well, the 9/11 Commission is

 6    cited in your report as an authoritative --

 7          A.      Right.  That doesn't mean --

 8          Q.      -- source?

 9          A.      -- I agree with every single word.

10    It doesn't mean I agree with the context.  I'm

11    talking in total.  So you can nitpick that all you

12    want.

13          Q.      Okay.  Well, let's look at the 9/11

14    Commission Report that we've already cited on page

15    66.

16                  Okay.  And this discusses the period

17    subsequent to Bin Laden and al-Qaeda's relocation

18    to Afghanistan from Sudan.  So after 1996.

19          A.      Where are you?

20          Q.      Well, if we go -- let's go back just

21    so we have the context of what period we're

22    talking about.

23          A.      Okay.

24                  MR. CARTER:  Gina, can you

This Transcript Contains Confidential Material

```
 1          page back?  Keep going.  Keep going.

 2          Okay.

 3   BY MR. CARTER:

 4          Q.      We're in Section 2.5 dealing with

 5   al-Qaeda's Renewal in Afghanistan in '96 to 1998.

 6                  Do you agree with me?

 7          A.      Yes.

 8          Q.      Okay.  And if we then go to page 66,

 9   and that period of 1996 to 1998 was after the

10   Afghan Jihad, right?

11          A.      Yes.

12          Q.      And this is a time period when

13   al-Qaeda was fully formed and operating, right?

14          A.      Yes.

15          Q.      And about a little more than halfway

16   down the page, the third -- fourth full paragraph.

17                  "Bin Ladin eventually enjoyed a

18   strong financial position in Afghanistan, thanks

19   to Saudi and other financiers associated with the

20   Golden Chain.  Through his relationship with

21   Mullah Omar -- and the monetary and other benefits

22   that it brought the Taliban -- Bin Ladin was able

23   to circumvent restrictions; Mullah Omar would

24   stand by him even when other Taliban leaders
```

This Transcript Contains Confidential Material

1    raised objection.  Bin Ladin appeared to have in

2    Afghanistan a freedom of movement that he had

3    lacked in Sudan.  Al Qaeda members could travel

4    freely within the country, enter and exit it

5    without visas or any immigration procedures,

6    purchase and import vehicles and weapons, and

7    enjoy the use of official Afghan Ministry of

8    Defense license plates.  Al Qaeda also used the

9    Afghan state-owned Ariana Airlines to courier

10   money into the country."

11            So this issue with support from the

12   Golden Chain is clearly during the period of

13   al-Qaeda, right?

14        A.      Yes.

15        Q.      Okay.  And if we can, can we go back

16   to the Chapter Notes to Chapter 2.  The associated

17   citation for that statement is -- is in Note 77 to

18   the chapter.  It's page 470 of the report.  There

19   you go.

20                And the 9/11 Commission says:

21                "On Gulf-based donors to Bin Ladin,

22   see Frank G. and Mary S. briefing (July 15, 2003);

23   CIA analytic report, 'Saudi-Based Financial

24   Support for Terrorist Organizations,' CTC

This Transcript Contains Confidential Material

1    2002-40117CH, November 14, 2002."

2                    Do you see that?

3        A.        Yes.

4        Q.        And the CIA analytic report that the

5    Commission directed readers to concerning

6    "Gulf-based donors to Bin Ladin" is one of the CIA

7    reports that Mr. Winer relies on in his report,

8    correct?

9        A.        Yes.

10       Q.        And that report includes information

11   about Al Rajhi, doesn't it?

12                    MS. KOWNACKI:  Objection.

13                    THE WITNESS:   I'd have to

14          look at it.  I don't recall off the top

15          of my head.

16   BY MR. CARTER:

17       Q.        Okay.  In connection with the

18   opinions you were offering about Mr. Winer's

19   references to the Golden Chain, did you take steps

20   to review the 9/11 Commission statements and the

21   sources that it was relying upon?

22       A.        No.  I relied on my experience.  I

23   relied on the fact that we could not establish

24   money -- a money flow from wealthy donors to Bin

This Transcript Contains Confidential Material

1    Laden.

2         Q.        When you say you couldn't establish

3    that, what do you mean?

4         A.        Prove it.

5         Q.        Prove it to the level of

6    satisfaction for a criminal prosecution?

7         A.        Prove it anywhere.

8                   Well, a number of these people were

9    designated and over time a number of those people

10   who were designated for their support, the

11   designations were lifted.

12        Q.        Well --

13        A.        I haven't seen any proof.

14        Q.        So in terms of designations being

15   lifted, are you referring to someone specific?

16        A.        People like Nada Nazradeen.  We went

17   and sanctioned a lot of people in part on

18   allegations about contributions.  These people

19   were on the Golden Chain.  I still haven't seen

20   any of them prosecuted.

21        Q.        Okay.  The ability to prosecute

22   someone includes the need to --

23        A.        Need to have evidence, which isn't

24   there.

This Transcript Contains Confidential Material

1      Q.      Well, you say that, but you would

2  also need to be able to exercise jurisdiction over

3  them, correct?

4      A.      Yes.

5      Q.      And you may need to obtain

6  extradition from a foreign country?

7      A.      And there are times when foreign

8  countries asked us for our support, and we

9  couldn't provide the information to them like the

10  Swiss.

11      Q.      Well, there could be all kinds of

12  reasons that we couldn't provide --

13      A.      Right.

14      Q.      -- information to them including --

15      A.      Right.  Because we didn't have it.

16  That's why.

17      Q.      No.  There could be ongoing

18  intelligence.

19      A.      No, because we didn't have it.

20      Q.      At times there are ongoing

21  intelligence equities, aren't there?

22      A.      Yes, but at the same time, some of

23  these countries came to us hat in hand looking for

24  information, thinking we had information based on

This Transcript Contains Confidential Material

```
 1    some of this reporting, and the information wasn't

 2    there.  The evidence wasn't there.

 3                  You can make these allegations all

 4    day-long, and I will agree with you all day-long

 5    about the Golden Chain and everything in these

 6    reports.  That's great.  But when push comes to

 7    shove, show me the exact evidence.  Show me a

 8    contribution one of those individuals made.  Show

 9    it to me.

10         Q.     Well, don't you know that it's not

11    --

12         A.     No, no, no, no.  Show me --

13         Q.     Mr. --

14         A.     -- the contribution that was made.

15         Q.     Mr. Lormel, you've been at this a

16    long time.

17         A.     Uh-huh.

18         Q.     People actively work to hide

19    contribution to terrorism, don't they?

20         A.     Absolutely.

21         Q.     And if they --

22         A.     And at some point when you accuse

23    people of something, you have to have evidence.

24    You have to have proof.  That proof is lacking.
```

This Transcript Contains Confidential Material

1       Q.      Mr. Lormel.

2       A.      Believe me, I worked that for over a

3    year.  And believe me --

4       Q.      Mr. Lormel.

5       A.      -- we weren't trying not to find

6    evidence.  We were trying to find evidence because

7    if the evidence was there, those people deserve to

8    be prosecuted.

9       Q.      And, Mr. Lormel, would the testimony

10   of the al-Qaeda member who served as its financial

11   chief during a period of time be evidence?

12      A.      Not necessarily.

13      Q.      Could it be?

14      A.      I need to see.

15              It could be, yes.

16      Q.      And to the extent that the

17   Department of Justice put that person forward in a

18   prosecution it was pursuing, stands to reason they

19   viewed his testimony as evidence, doesn't it?

20      A.      I'd have to see the circumstances.

21   I'd have to see what the case was.

22      Q.      Okay.

23              MS. KOWNACKI:  Can we break

24       for lunch?

This Transcript Contains Confidential Material

```
 1                    MR. CARTER:  Sure.

 2                    THE VIDEOGRAPHER:  The time is

 3        12:55 p.m.  We're off the record.

 4                    (Whereupon, at 12:55 p.m., a

 5        luncheon recess was taken.)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

This Transcript Contains Confidential Material

```
 1                    AFTERNOON SESSION

 2                              (1:35 p.m.)

 3                    DENNIS M. LORMEL

 4   called for continued examination and, having been

 5   previously duly sworn, was examined and testified

 6   further as follows:

 7                    EXAMINATION (CONTINUED)

 8                    THE VIDEOGRAPHER:  The time is

 9      1:35 p.m.  We're back on the record.

10   BY MR. CARTER:

11      Q.      Mr. Lormel, in your report,

12   principally on pages 19 and 20, you reference the

13   absence of designations of Al Rajhi Bank and Al

14   Rajhi family members.

15              Do you recall that?

16      A.      Give me a second, please.

17      Q.      Sure.

18      A.      19 and 20?

19      Q.      Yes.

20      A.      Yes, I recall.

21      Q.      And you use at times the term

22   "sanctions"?

23      A.      Yes.

24      Q.      Okay.  What type of sanctions were
```

This Transcript Contains Confidential Material

1    you referring to?

2         A.      I mean, just where specifically is

3    that?  If you don't mind.

4         Q.      Well, if you go to the heading of

5    the section, I think, on page 18.

6         A.      Okay.

7         Q.      I'm sorry.  Yeah.

8                 "Intelligence in the CIA reports did

9    not result in criminal cases or sanctions against

10   the Al Rajhi Bank or the Al Rajhi family."

11                Do you see that?

12        A.      Oh, yes, yes.  I'm sorry.

13        Q.      Okay.  And criminal cases I

14   understand.

15                When you refer to "sanctions," what

16   are you using that term to refer to?

17        A.      To OFAC sanctions or -- I think

18   because we worked with OFAC, you know, kind of an

19   OFAC sanctioning.

20        Q.      And OFAC refers to the --

21        A.      I'm sorry.

22        Q.      -- Office of Foreign Assets Control?

23        A.      Yes.

24        Q.      And that is a component of the

This Transcript Contains Confidential Material

1    Treasury Department?

2         A.      Yes.

3         Q.      And is that component of the

4    Treasury Department responsible for implementing

5    certain terrorist sanctions and designation

6    programs?

7         A.      Yes.

8         Q.      And what designation program, if you

9    know, would be relevant to any potential action

10   against Al Rajhi Bank or the Al Rajhi family?

11                    MS. KOWNACKI:  Objection.

12                    You can answer if you know.

13                    THE WITNESS:   Any type of

14          designation, whether it be State

15          Department or Treasury.  If -- especially

16          OFAC, if they were going to sanction Al

17          Rajhi, that would preclude Al Rajhi from

18          doing any business in the United States,

19          and it would effectively put them out of

20          business.

21   BY MR. CARTER:

22        Q.      And in terms of the sanctions you're

23   referring to, you reference, I believe, State

24   Department sanctions and Treasury Department

This Transcript Contains Confidential Material

```
 1   sanctions --

 2        A.      Yes.

 3        Q.      -- right?

 4        A.      Yes.

 5        Q.      Okay.  What -- what State Department

 6   sanctions programs would potentially have been

 7   available as to Al Rajhi Bank or the Al Rajhi

 8   family?

 9        A.      Designating them -- designating them

10   as a terrorist or terrorist organization.  I'm

11   sorry.  Terrorist, or support of, whatever the

12   term is.  D -- I don't recall the exact term.

13        Q.      Is there a State Department run

14   program for designating supporters of terrorism?

15        A.      I believe so, yeah.

16        Q.      Do you know what that program is?

17        A.      Off the top of my head, I don't.  I

18   don't recall by names, no.

19        Q.      And when you refer to "supporters of

20   terrorism," are you distinguishing supporters from

21   the terrorist organizations themselves?

22        A.      Yes.

23        Q.      So it's your understanding --

24        A.      So certainly you designate a
```

This Transcript Contains Confidential Material

1  terrorist organization.  People, you know, for

2  instance, most recently designations against

3  individuals that were Hezbollah or Hamas members.

4      Q.      It's your understanding that during

5  the post 9/11 time period, there was a State

6  Department run designation program that would be

7  applicable to persons who supported terrorism?

8      A.      Yes.  I wasn't involved, you know,

9  with the sanctioning.  We -- with the State

10  Department.  We worked closely with -- with OFAC.

11      Q.      And, again, OFAC is the Office of

12  Foreign Assets Control?

13      A.      Yeah, and I think if I may go back

14  here in talking about imposing sanctions.

15          Never mind.  I just looked at

16  something.  I was going to include regulatory

17  actions there, but I mention that separate from

18  the sanctions.

19      Q.      And I'm just trying to get a sense

20  what is encompassed when you use the term

21  "sanctions."

22      A.      Well, in the terms I'm using them,

23  it's as a mechanism of seizing or freezing assets

24  mostly.

This Transcript Contains Confidential Material

1     Q.      And there are programs run by the

2  United States government pursuant to which

3  entities can be designated?

4     A.      Yes.

5     Q.      And I think we've already

6  established, it's your understanding that there

7  was a program run by the State Department for

8  designating individuals or entities as supporters

9  of terrorism?

10    A.      Yes.

11    Q.      Was there a program run by the

12  Treasury Department for imposing designations?

13    A.      Yes, the sanctions program.

14    Q.      Do you recall what sanctions program

15  was run under the auspices of the Treasury

16  Department that could potentially have been

17  available as to Al Rajhi Bank or Al Rajhi family

18  members?

19    A.      Specifically, I couldn't tell you

20  the name.

21    Q.      Did the Treasury Department have

22  primary responsibility for overseeing the

23  designation program it ran?

24    A.      Yes.

This Transcript Contains Confidential Material

```
1          Q.      Is designation the only potential

2   tool available to the United States to address a

3   party's perceived involvement in supporting

4   terrorism?

5                    MS. KOWNACKI:  Objection.

6                    THE WITNESS:  No.  Excuse me.

7          Certainly, if -- if we could take a law

8          enforcement action, there would be a law

9          enforcement action.  We would certainly

10          do it with, if it's, like, in Saudi

11          Arabia in concert with the Saudis.

12   BY MR. CARTER:

13          Q.      You reference in your report

14   involvement with something called a policy

15   coordinating committee?

16          A.      Yes.

17          Q.      What was that?

18          A.      The government had a number of

19   different committees that came under the deputy

20   director.  So the principals committee.  So there

21   was hearings, and the policy coordinating

22   committee was a subcommittee of -- of that group.

23   We called it the policy coordinating committee for

24   terrorist financing.
```

This Transcript Contains Confidential Material

```
 1                  So it was the U.S. government
 2     agencies that had responsibility for -- for
 3     different aspects of terrorist financing, and it
 4     was -- it was -- it was very good because it
 5     involved law enforcement, your intelligence
 6     community, your regulators, OFAC from a
 7     sanctioning standpoint, State Department, and the
 8     military, DOD.
 9          Q.      And did that eventually evolve into
10     a process that was overseen by the National
11     Security Council and the White House?
12          A.      Yes.
13          Q.      Was the NSC role in overseeing the
14     policy coordinating committee something that
15     happened while you were at the FBI or after?
16          A.      No.  While I was at the FBI, as I
17     said, before I formed the Terrorist Financing
18     Operations Section.  Whatever -- whatever the
19     committee was prior to that, a representative from
20     the counterterrorism division represented the FBI
21     and different agencies had different
22     representatives.
23                  Following 9/11, David Aufhauser, who
24     was the general counsel to the Treasury
```

This Transcript Contains Confidential Material

 1    Department, took an extremely active role, and he

 2    basically became the -- nobody had -- I mean, it

 3    was to your point under the NSC.

 4                 Aufhauser took a leadership role and

 5    he was the driving force that brought us together

 6    and focused specifically on terrorist financing,

 7    9/11, terrorist financing threats going forward,

 8    and the idea was to identify the most significant

 9    financial targets we had in the United States.

10                 So identify them collectively and

11    then to determine the best strategies to go after

12    them.  Was it a law enforcement strategy?  Was it

13    an intelligence strategy?  Was it sanctions or

14    some other type of regulatory action?  Way beyond

15    my -- my -- my scope or interest was the military,

16    their involvement.

17                 And they became a very big asset to

18    us when we invaded Iraq by virtue of having given

19    us resources to different types of information.

20                 But getting back to the specific

21    point, we collectively had a kind of a matrix of

22    financial targets that we were looking at.

23         Q.     Is it fair to say that the policy

24    coordinating committee brought together different

This Transcript Contains Confidential Material

1    agencies that had equities with regard to

2    terrorist financing issues for purposes of

3    coordinating the best possible tool to use with

4    regard to a terrorist financing target?

5        A.      Yes.

6                MS. KOWNACKI:  Objection.

7    BY MR. CARTER:

8        Q.      And the State Department had a seat

9    at that table?

10       A.      Yes.

11       Q.      Is that because at times these

12   issues implicated foreign policy and diplomatic

13   equities?

14       A.      Yes.

15       Q.      How many policy coordinating

16   committee meetings did you attend?

17       A.      I believe the major, I mean, the

18   overall body, the policy coordinating committee,

19   we met early on when we started that a weekly

20   basis.  Later on possibly further out.

21               I was also part of a group, a

22   subgroup within the policy coordinating committee,

23   which was Aufhauser, the NSC, my counterpart at

24   the CIA, myself, and the State Department, and we

This Transcript Contains Confidential Material

1    would meet every Wednesday.

2         Q.      Were there discussions at those

3    policy coordinating committee meetings that you

4    attended concerning recommendations for possible

5    designations under Treasury Department run

6    sanctions programs?

7         A.      Yes.

8         Q.      And were there discussions at those

9    meetings that you recall concerning possible

10   recommendations of designations of Saudi-based

11   entities?

12        A.      Saudi-based entities and

13   individuals, yes.

14        Q.      And within the context of those

15   discussions, was there a dialogue about whether or

16   not designation was the appropriate tool?

17                    MS. KOWNACKI:  Objection.

18        Form.

19                    THE WITNESS:  Yes.

20   BY MR. CARTER:

21        Q.      Do you recall whether you

22   participated in discussions about the designation

23   of Al-Haramain or any of its branches?

24        A.      I was involved, yes.

This Transcript Contains Confidential Material

1      Q.      Did you participate in discussions

2  about designation of Aqil Al-Aqil, the director of

3  Al-Haramain?

4      A.      I don't recall Aqil.  I recall us

5  discussing Al-Haramain.  I recall discussions on

6  other prominent individuals.  We may have

7  discussed Aqil.  I just -- I -- as we're sitting

8  here, I can't recall.

9      Q.      Do you recall participating in

10  discussions concerning the International Islamic

11  Relief Organization?

12      A.      I don't specifically recall, but I

13  believe we did.

14      Q.      What about the World Assembly of

15  Muslim Youth?

16      A.      I don't recall.

17      Q.      With regard to the Al-Haramain

18  discussions you recall, when did those take place?

19      A.      That would have --

20              MS. KOWNACKI:  Objection.  Can

21        you clarify Al-Haramain more

22        specifically?

23              MR. CARTER:  I'm going to ask

24        him.

This Transcript Contains Confidential Material

```
 1                    MS. KOWNACKI:  Okay.

 2                    MR. CARTER:  I can't clarify

 3          specifically until he tells me who they

 4          discussed.

 5                    MS. KOWNACKI:  Okay.

 6                    THE WITNESS:  Please ask me

 7          again the question.

 8   BY MR. CARTER:

 9        Q.      With regard to the discussions about

10   Al-Haramain --

11        A.      Yeah.

12        Q.      -- when do you recall those taking

13   place?

14        A.      I don't recall specific dates, but

15   early in the process when we got together,

16   Al-Haramain was clearly of interest and beyond my

17   responsibility there.  I know that worked into

18   that group and I'm sure outside of that group were

19   efforts by the State Department, Treasury -- State

20   and Treasury for the most part and different

21   components of State and Treasury -- working on the

22   Al-Haramain issue and then working with the Saudis

23   on that.

24        Q.      What was the nature of their work
```

This Transcript Contains Confidential Material

```
1    with the Saudis that you were aware of?

2         A.      Well, there were a couple of issues

3    and it went beyond Al-Haramain.

4                 One issue was the level of cash

5    contributions and -- and the lack of

6    accountability for the cash contributions being

7    made and, more concerningly, the cash

8    contributions being siphoned from wherever they

9    were supposed to go.

10                I mean, when you look at it,

11   charities like Al-Haramain, IIRO, all of those

12   charities all had a humanitarian need, and they

13   did provide needed -- needed relief and needed

14   services.

15                Unfortunately, we were concerned

16   about where monies were going to al-Qaeda or to

17   other terrorist organizations.

18        Q.      Did you directly participate in any

19   discussions with Saudi officials about how to

20   address those problems?

21        A.      With the Saudis?  I don't believe I

22   was involved in any.  Certainly, there were a

23   couple of trips that were taken by representatives

24   from NSC.  Townsend when she came onboard.  And
```

This Transcript Contains Confidential Material

1    I'm sorry.  I'm missing her first name.  I should

2    know that.  I worked with her closely.

3                But when she came in as the National

4    Security Advisor, or whatever the role was in NSC,

5    Aufhauser had been the face of that working group.

6    When Townsend came in, she took that over and she

7    -- Aufhauser dealt directly with the Saudis.

8    Townsend worked and dealt directly with the

9    Saudis.

10               I may have had some input when

11   Aufhauser was doing it.  I know when Townsend came

12   in, there was a major push for her to go to Saudi

13   Arabia, and we met with her up to the run-up to

14   her trip on that.  And she wanted me to go, and I

15   didn't go.  I may have sent somebody to go with

16   her, but that was really the purpose.

17               That trip was more the Treasury side

18   of it, not us.

19        Q.      You're referring to Fran Townsend?

20        A.      Yes, thank you.

21        Q.      And do you recall whether Richard

22   Newcomb from the Treasury Department was also

23   involved with engagements with the Saudis during

24   the time period?

This Transcript Contains Confidential Material

1    A.    I recall Newcomb was the head of

2    OFAC.  He was certainly at the broad meetings we

3    had.  He wasn't part of the smaller working group

4    that we did.  He would have certainly been engaged

5    in -- in the conversations regarding those trips.

6    I don't specifically recall if he went, but he

7    could have.

8    Q.    What about Zarate?

9    A.    Yes, Zarate was.  He -- he worked at

10   the time I was there.  Zarate worked for Jimmy

11   Gurulé, and Jimmy Gurulé was going all over the

12   place and Zarate would go with him either with,

13   you know, in tandem as a group, as we were

14   supposed to be, or Gurulé liked to go rogue, so to

15   speak, and go out on his own.

16   Q.    In this period following 9/11, based

17   on your experience, was the U.S. government

18   placing considerable emphasis on securing Saudi

19   cooperation in addressing terrorism financing

20   issues?

21   A.    Yes.

22   Q.    Why?

23   A.    Well, a number of the 19 hijackers

24   were Saudi citizens.  The Saudi funding, the

This Transcript Contains Confidential Material

 1   funding sources, the wealthy donors in particular,

 2   the charities we were concerned about.  There was

 3   a lot of emphasis on cooperation, and we knew that

 4   we needed -- we needed to be able to work through

 5   Saudi Arabia and in Saudi Arabia.

 6              And so, you know, the Saudis by

 7   nature are nontransparent and that's a cultural

 8   thing, but they were very protective of the royal

 9   family.  So any negotiations with the Saudis was

10   very tenuous.

11              Anytime they thought that there was

12   focus or potential embarrassment to the royal

13   family, it became more difficult, and our focus

14   was not on that.  Our focus or my focus

15   particularly was to follow the money right from

16   day one.

17              I met with the Saudis.  In fact, I

18   briefed Bandar, and the other gentleman at the

19   time, Al-Jubeir.

20              Do you know who I'm referring to?

21   Q.       I do.  Adel Al-Jubeir?

22   A.       Al-Jubeir.  Yes.  Yes.

23              In the aftermath of 9/11, Dale

24   Watson, who was the assistant director in charge

This Transcript Contains Confidential Material

1   of counterterrorism, and Louis Freeh at the time

2   when Louis was the director -- obviously, Mueller

3   came in just before 9/11 -- they had a very good

4   working relationship with Bandar and the Saudis.

5   So they had a direct line with -- with them.

6           And I remember in the days after

7   9/11, especially when a lot of the allegations

8   were flying about the Saudis, Bandar came to FBI

9   headquarters with Jubeir.  And he had a

10  contingent, and I specifically sat and briefed

11  them for quite a while at what we were doing in

12  terrorist financing and the cooperation we needed.

13          At least on our side from the law

14  enforcement standpoint.  That was totally away

15  from what the policy coordinating committee did

16  and the other agencies in -- in the work that they

17  were doing.

18          And then as I got engaged with the

19  terrorist financing with the policy coordinating

20  committee, Aufhauser was out in front, and so we

21  didn't do anything around that and allowed

22  Aufhauser to go in his direction.

23      Q.      Do you know from the work that you

24  were doing whether or not the Treasury Department

This Transcript Contains Confidential Material

1    was placing emphasis on trying to get the Saudis

2    to engage in joint action with the United States

3    on terrorism financing issues?

4         A.       They certainly wanted cooperation.

5    To the extent that we saw in the Zarate cable, I'm

6    not sure to that extent.  But, yes, they -- we

7    definitely wanted.  The Treasury wanted

8    cooperation with the Saudis.  They wanted the

9    Saudis to openly take action and -- and certainly

10   in the area of the charities and our concern about

11   the cash contributions.

12        Q.       Given those goals, is it fair to say

13   that how the Saudis would react to U.S. actions

14   was a relevant consideration in what the U.S.

15   decided to do?

16                 MS. KOWNACKI:  Objection.

17                 THE WITNESS:  Certainly with

18        the State Department involved.  The State

19        Department, my own personal view, were

20        very good defense lawyers for everybody

21        outside the U.S.

22                 So, yes, in that standpoint,

23        they had that, and that's why this policy

24        coordinating committee worked.

This Transcript Contains Confidential Material

```
 1              Because you had them
 2        representing their perspective, and
 3        everybody else at the table had a
 4        perspective, and those were all brought
 5        to bear.
 6              Now, if you're asking would
 7        they have caved to Saudi pressure about
 8        any particular individuals or entities
 9        that we wanted to investigate, especially
10        in the aftermath of 9/11 early on, no.
11              We would have -- we would have
12        gone forward as that relationship
13        progressed.  I'm sure relationships
14        progressed and especially after I left,
15        and I can't answer what happened.
16              At the time period I was
17        there, if we had a smoking gun, so to
18        speak, that anyone was involved in
19        especially in supporting 9/11, I firmly
20        believe actions would have been taken
21        against them regardless of the political
22        outcry.
23              If you recall in September,
24        September 28th or something thereabout,
```

This Transcript Contains Confidential Material

```
 1          Bush had the press conference in the Rose
 2          Garden and he said, "You're either with
 3          us or against us."
 4                  I had extensive experience
 5          working international cases, and even
 6          with our best friends, cooperation could
 7          be tenuous.  There was always an
 8          impediment.
 9                  And when Bush made that
10          announcement and he said, "You're with us
11          or against us," those impediments went
12          away in at least for a short period of
13          time.
14                  And I can't give you a
15          definition of, okay, on this date, State
16          Department was going to be stronger and
17          push back on what we were doing versus
18          this date.
19                  But I can say while I was
20          involved at that point, I think we would
21          have gone forward regardless of the
22          Stata's concerns on some of these issues.
23  BY MR. CARTER:
24      Q.    Well, when you say "we would have
```

This Transcript Contains Confidential Material

```
 1   gone forward" --

 2        A.      The government.

 3        Q.      -- you're talking about

 4   investigations?

 5        A.      No, no, no.  The U.S. government.

 6   If you --

 7        Q.      Well, let's talk about specifically

 8   a designation.

 9                A designation is just one tool to

10   address --

11        A.      Yes.

12        Q.      -- the terrorist financing problem,

13   correct?

14        A.      Correct.

15        Q.      And a designation may from the

16   perspective of the State Department very well

17   raise diplomatic considerations, correct?

18        A.      Yes.

19        Q.      And those could include diplomatic

20   considerations concerning adverse effects on the

21   cooperation from the affected government, right?

22        A.      Yes.

23        Q.      And those were, in fact, significant

24   considerations after 9/11 vis-a-vis the Saudis,
```

This Transcript Contains Confidential Material

```
 1   weren't they?

 2                    MS. KOWNACKI:  Objection.

 3                    THE WITNESS:   In general,

 4        yes.  I don't know specifics on that.

 5   BY MR. CARTER:

 6        Q.     You don't know specifics because you

 7   weren't directly involved?

 8        A.     Yes, I wasn't involved.  Certainly,

 9   on that -- on that level.

10                    MR. CARTER:  If we can mark as

11             the next exhibit 13, Tab 13.  It's

12             transcript of May 18, 2012 Congressional

13             hearing.

14                    (Document marked for

15             identification as Lormel Exhibit 17.)

16   BY MR. CARTER:

17        Q.     And the title of the hearing was

18   "Terrorist Financing Since 9/11: Assessing An

19   Evolving Al-Qaeda and State Sponsors of

20   Terrorism."

21                    Mr. Lormel, do you recall

22   participating in this Congressional hearing?

23        A.     I participated in a number of

24   hearings.  If I saw this a little further, I could
```

This Transcript Contains Confidential Material

 1   tell you.

 2        Q.      Well, if we go to page -- bottom of

 3   page 2 and the top of page 3, there's a list of

 4   witnesses.  I think I see your name at the top of

 5   page 3.

 6                    MR. CARTER:  The next page,

 7        Gina.

 8                    THE WITNESS:  Okay.  Yes,

 9        there it is.

10   BY MR. CARTER:

11        Q.      Okay.  So based on that, it appears

12   you participated in this one?

13        A.      Yes.

14        Q.      And just turning -- unfortunately,

15   these aren't -- aren't designated by page numbers

16   on the version we have.

17                    Do you recall responding to written

18   questions after this hearing?

19        A.      I don't specifically recall, but I

20   probably did.  Because in most hearings I

21   testified in, I got written questions after the

22   fact.

23        Q.      And in this case, I believe that we

24   have questions from Chairman Patrick Meehan for

This Transcript Contains Confidential Material

```
1    Dennis M. Lormel.  See if we can find that.
2         A.      Okay.
3                    MR. CARTER:  Gina, do you have
4         a way to search the document?
5                    TRIAL TECH:  Yes, I just need
6         to do at the top.
7                    So the document is OCR.  So I
8         don't OCR.
9                    MR. CARTER:  Okay.  We're
10        going to go, Gina, to the page 35 of the
11        PDF.
12                   No, that's not it.
13   BY MR. CARTER:
14        Q.      40.  Sorry.  Apologize for this
15   delay, Mr. Lormel.
16        A.      Oh, please.
17                   MR. CARTER:  And, Gina, if we
18        can just go back from there one, two
19        pages.
20                   Sorry.  Forward one.  And
21        forward one more.  Oops.  Sorry.  Stay
22        there.
23   BY MR. CARTER:
24        Q.      So, Mr. Lormel, this is the section
```

This Transcript Contains Confidential Material

```
1     giving your answers to Mr. Meehan's questions.

2               And question 2 he posed to you was:

3               "President Obama recently signed an

4     Executive Order allowing the Treasury Department

5     to freeze U.S.-based assets of persons who the

6     White House has identified as a 'threat to the

7     peace, security, and stability' of Yemen.

8               "Do you think this is an effective

9     use of the designation authority?  Especially when

10    a group such as Boko Haram -- who have killed

11    thousands of civilians that are in constant

12    contact with AQIM -- remain undesignated?"

13              And the response you say:

14              "I believe sanctions and

15    designations are one tool of many that should be

16    employed to combat terrorists."

17              Sorry.  This is -- this is the wrong

18    one.  Sorry.  This is not his response.  Scratch

19    that.

20         A.     No, I think that --

21         Q.     No, it's the same question --

22         A.     Oh.

23         Q.     -- but it's someone else's response

24    to the question.
```

This Transcript Contains Confidential Material

```
 1                 It's the same question, Mr. Lormel.
 2   I'm just going to read to you, and we'll figure
 3   out exactly where it is.
 4                 MS. KOWNACKI:  I think he
 5           should have his full answer in front of
 6           him for context.  Can we find the right
 7           one?
 8                 MR. CARTER:  Okay.  Scott, can
 9           we find the place where it says this?
10                 MS. PRITSKER:  Let me see.
11                 MR. CARTER:  Okay.  It's page
12           50 of the PDF.
13   BY MR. CARTER:
14       Q.      It's the same question.
15               "Do you think this is an effective
16   use of the designation authority?"
17               And your answer is:
18               "If evidence exists to support
19   designations, I am an ardent supporter for the
20   designation process.  Such actions disrupt funding
21   flows and serve as a deterrent.  Boko Haram is a
22   violent and dangerous group.  They have been very
23   active and pose a formidable threat in Nigeria.
24   With respect to designating other groups, I would
```

This Transcript Contains Confidential Material

```
 1    not make designation decisions by comparing one

 2    group, such as Boko Haram, to other groups.  A

 3    number of factors must be taken in consideration

 4    in the decision process to include the level of

 5    overall terrorist threat, threat to the United

 6    States, diplomatic considerations, and the need to

 7    continue the classification and protection of

 8    intelligence information."

 9              Do you see that?

10    A.      Yes.

11    Q.      And do you agree with everything you

12    said there?

13    A.      Yes.

14    Q.      Your report expresses the view that

15    if evidence had existed, you believe that the U.S.

16    government would have imposed sanctions on Al

17    Rajhi Bank, correct?

18    A.      Yes.

19    Q.      And by that do you mean that the

20    U.S. government would have designated the bank?

21    A.      Possibly.  I think I meant beyond

22    that.  Also some type of deferred prosecution or

23    some sort of action, whether it's sanctions or

24    regulatory.
```

This Transcript Contains Confidential Material

```
1          Q.        Is it possible that the United

2    States government decided that the better approach

3    was to work with the Saudi government to try and

4    reform the bank?

5          A.        It's possible.  I'm not going to

6    speculate on that, but that's possible.

7          Q.        Do you know whether Al Rajhi Bank at

8    the time was one of Saudi Arabia's largest banks?

9          A.        I believe it was, yes.

10         Q.        And I think you said previously that

11   designating the bank could potentially put it out

12   of business?

13         A.        Yes.

14         Q.        And doing something like that could

15   have significant impact on the Saudi economy and

16   banking sector, couldn't it?

17                        MS. KOWNACKI:  Objection.

18                        THE WITNESS:  Yes.

19   BY MR. CARTER:

20         Q.        It could have impacts on depositors,

21   couldn't it?

22                        MS. KOWNACKI:  Objection.

23                        THE WITNESS:  Yes.

24   BY MR. CARTER:
```

This Transcript Contains Confidential Material

1       Q.      So it's a relatively significant and

2    complicated question, isn't it?

3       A.      Yeah.  Very complicated and the

4    people that died in the World Trade Center, that

5    was very complicated as well.  And I believe that

6    if there was evidence, especially if there was

7    some sort of smoking gun, that wouldn't matter.

8       Q.      Well, we actually do have evidence

9    that the State Department or that the U.S.

10   government through Treasury was trying to

11   encourage the Saudis to pursue a joint review of

12   the bank's activities, weren't they?

13      A.      In that -- in that document that you

14   showed, the Zarate document, yes.

15      Q.      You weren't directly involved in any

16   of the discussions between the United States and

17   Saudi Arabia about how to handle the issues

18   concerning Al Rajhi Bank, were you?

19      A.      No.

20      Q.      On page 20 of your report, you

21   express a similar opinion that the absence of

22   designations of -- sorry, 19 to 20 -- that the

23   absence of evidence -- alleged absence of evidence

24   is also the reason that designations weren't

This Transcript Contains Confidential Material

1    imposed against the Saudi charity headquarters in

2    the aftermath of 9/11.

3                    Do you see that?

4        A.       Yes.

5        Q.       Did you participate in discussions

6    with the Saudis about those issues?

7        A.       Directly, no.

8        Q.       Do you happen to know whether or not

9    any of the charities that Treasury was concerned

10   about had connections to the Saudi royal family?

11       A.       No.

12                    MS. KOWNACKI:  Objection.

13   BY MR. CARTER:

14       Q.       You said earlier that actions that

15   potentially implicated the interests of the Saudi

16   royal family were particularly sensitive; is that

17   correct?

18       A.       Yes.

19       Q.       And you go on to say that:

20                    "Al Haramain was eventually

21   sanctioned by the United States, but not until

22   much later in 2008, further illuminating the point

23   that any factual basis for this designation did

24   not come to light even for the U.S. government

This Transcript Contains Confidential Material

```
 1    until many years after 9/11."

 2                Do you see that?

 3        A.      Yes.

 4        Q.      Is it your understanding that the

 5    U.S. government did not have factual information

 6    to support the designation of Al-Haramain

 7    headquarters until 2008?

 8        A.      No, before.  My recollection is that

 9    it was, oh, earlier than that, and the Saudis took

10    action against Al-Haramain.

11        Q.      The Saudis in cooperation with the

12    United States --

13        A.      Yes.

14        Q.      -- functionally shut down

15    Al-Haramain in 2004, right?

16        A.      Yes.

17        Q.      And so it wasn't really necessary to

18    designate the headquarters at that point because

19    it had been neutralized, right?

20                MS. KOWNACKI:  Objection.

21                THE WITNESS:   I'm sorry.

22         Repeat that.

23    BY MR. CARTER:

24        Q.      Once it was shut down, a designation
```

This Transcript Contains Confidential Material

1    of the headquarters wasn't really necessary as a

2    matter of dealing with a counter-terrorist

3    financing threat because they had been

4    neutralized?

5         A.      Yes.

6         Q.      Okay.  So the delay in designating

7    the headquarters in 2008 had nothing to do with a

8    lack of evidence?

9                 MS. KOWNACKI:  Objection.

10                THE WITNESS:   I'm not going

11           to say that.  I don't know, but I know by

12           2008 Al-Haramain was a problem again and

13           caused the designation.

14   BY MR. CARTER:

15        Q.      And do you recall when the United

16   States designated Aqil Al-Aqil, the director of

17   Al-Haramain?

18        A.      It might have been 2004 time frame.

19   I don't recall specifically.

20                MR. CARTER:  And if we can,

21           can we pull up the Aqil designation memo

22           from the Treasury Department that's at

23           Tab 6.

24                (Document marked for

This Transcript Contains Confidential Material

```
 1          identification as Lormel Exhibit 18.)

 2   BY MR. CARTER:

 3        Q.       And this is the Treasury Department

 4   press release concerning --

 5        A.       Okay.

 6        Q.       -- the designation of Aqil Al-Aqil.

 7                 Do you see that?

 8        A.       Yes.

 9        Q.       And it's dated June 2, 2004,

10   correct?

11        A.       Yes.

12        Q.       And on the third page under the

13   summary relating to Aqeel Abdulaziz Al-Aqil, it

14   said:

15                 "These activities within the

16   Al-Haramain branches took place under the control

17   of Aqeel Abdulaziz Al-Aqil, the founder and

18   long-time leader of AHF and a suspected Al Qaida

19   supporter.  Al-Aqil has been identified as AHF's

20   Chairman, Director General and President in a

21   variety of sources and reports.  As AHF's founder

22   and leader, Al-Aqil controlled AHF and was

23   responsible for all AHF activities, including its

24   support for terrorism.  Having been under
```

This Transcript Contains Confidential Material

1    investigation in late 2003, by March 2004 Al-Aqil

2    was reportedly no longer leading AHF activities;

3    however, some reports indicate Al-Aqil may still

4    be in a position to exercise control or influence

5    over AHF.

6              "When viewed as a single entity, AHF

7    is one of the principal Islamic NGOs providing

8    support for the al Qaida network and promoting

9    militant Islamic doctrine worldwide.  Under Al

10   Aqil's leadership of AHF, numerous AHF field

11   offices and representatives operating throughout

12   Africa, Asia, Europe and North America appeared to

13   be providing financial and material support to the

14   al Qaida network."

15             You see all that?

16   A.        Yes.

17   Q.        So by this date, the U.S.

18   government, obviously, had a basis to take down

19   the head of the entire organization, right?

20   A.        Correct.

21   Q.        And is it your understanding Aqil

22   also controlled the headquarters?

23   A.        Yes.

24   Q.        In terms of the charities at issue

This Transcript Contains Confidential Material

1  here, we had mentioned the International Islamic

2  Relief Organization as well.

3              Do you recall that?

4      A.      Yes.

5      Q.      Do you know whether the United

6  States government ever took action to designate

7  any components of the IIRO?

8      A.      Offhand, no.

9      Q.      Your -- your report addresses an

10  absence of designations of the charities

11  headquarters, doesn't it?

12     A.      Yes.

13     Q.      Okay.  Do you happen to know whether

14  or not the U.S. government ever took action to

15  sanction a senior official of one of the IIRO's

16  branches in Saudi Arabia?

17     A.      I don't recall.

18             MR. CARTER:  If we can mark as

19         the next exhibit the designation memo at

20         Tab 16.

21             (Document marked for

22         identification as Lormel Exhibit 19.)

23  BY MR. CARTER:

24     Q.      This is from August of 2006.

This Transcript Contains Confidential Material

```
 1                    "Treasury additionally designated

 2      Abd Al Hamid Sulaiman Al-Mujil, the Executive

 3      Director of the Eastern Province Branch of IIRO in

 4      the Kingdom of Saudi Arabia.

 5                    "'Abd Al Hamid Sulaiman Al-Mujil, a

 6      high-ranking IIRO official in Saudi Arabia, has

 7      used his position to bankroll the al Qaida network

 8      in Southeast Asia.  Al-Mujil has a long record of

 9      supporting Islamic militant groups, and he has

10      maintained a cell of regular financial donors in

11      the Middle East who support extremist causes,'

12      said Stuart Levey, Treasury's Under Secretary for

13      Terrorism and Financial Intelligence."

14                    You see that?

15      A.      Yes.

16      Q.      And you knew Mr. Levey?

17      A.      Yes.  When he was in DOJ, Department

18      of Justice, and when he first got appointed to his

19      Treasury position, he -- he asked me for some help

20      in -- in how he was going to approach that

21      organization in terms of setting it up.

22      Q.      And moving down further, under the

23      heading "Identifier Information: Abd Al Hamid

24      Sulaiman Al-Mujil."
```

This Transcript Contains Confidential Material

```
 1              It says that:
 2              Abd Al Hamid Sulaiman Al-Mujil is
 3   the Executive Director of the IIRO Eastern
 4   Province, branch office in the Kingdom of Saudi
 5   Arabia.  Al-Mujil has been called the 'million
 6   dollar man' for supporting Islamic militant
 7   groups.
 8              "Al-Mujil provided donor funds
 9   directly to al Qaida and is identified as a major
10   fundraiser for the Abu Sayyaf Group and Jemaah
11   Islamiyah."
12              You see that?
13   A.      Yes.
14   Q.      So on the basis of this, the U.S.
15   government did take action against a senior
16   official of the IIRO in Saudi Arabia, correct?
17   A.      Correct.
18              MR. GRYSKIEWICZ:  Objection as
19       to form.
20   BY MR. CARTER:
21   Q.      Earlier you mentioned -- we
22   discussed the joint FBI/CIA assessment of Saudi
23   support for terrorism?
24   A.      Yes.
```

This Transcript Contains Confidential Material

```
 1                    MR. CARTER:  And I think we
 2          marked that as an exhibit, and we can
 3          pull that up and that was from December
 4          2004.
 5                    Gina, it's number 17.  Sorry
 6          about that.
 7                    TRIAL TECH:  Exhibit 17 or
 8          Tab 17?
 9                    MR. CARTER:  Sorry.  It's
10          Tab 17.  It was Lormel 9, I think.
11  BY MR. CARTER:
12     Q.      And turning to what's listed as
13  page 5 of this document and the second bullet
14  point.
15              "In early 2003, KSM" -- which refers
16  to Khalid Sheikh Mohammed -- "identified an
17  individual named Bin Jiluwi, who may be
18  identifiable with Turki Bin Fahd Jiluwi, an
19  important al-Qa'ida donor who hails from a minor
20  line in the Saudi royal family.  Separate
21  sensitive reporting indicates that Bin Jiluwi is a
22  key leader of the Eastern Province office of the
23  International Islamic Relief Organization (IIRO),
24  an NGO.  According to foreign government service
```

This Transcript Contains Confidential Material

1    sensitive reporting, Riyadh suspects Bin Jiluwi

2    has embezzled more than $3 million from IIRO.  The

3    Mabahith has been investigating his activities."

4              Do you see that?

5    A.    Yes.

6    Q.    And this information concerning the

7    potential involvement in this Bin Jiluwi person

8    associated with the IIRO and supporting al-Qaeda

9    was not known to you when you wrote your report?

10             MS. KOWNACKI:  Objection.

11             THE WITNESS:   I don't recall

12        this.  I mean, I reviewed this document.

13        I don't recall this.

14   BY MR. CARTER:

15   Q.    Okay.  It appears based on the

16   content of the document that the U.S. government

17   was working with the Saudi government to

18   neutralize Jiluwi.

19             Do you agree?

20             MS. KOWNACKI:  Objection.

21             MR. GRYSKIEWICZ:  Objection to

22        form.

23             THE WITNESS:  Yes.

24   BY MR. CARTER:

This Transcript Contains Confidential Material

```
 1          Q.        And that would be one way to deal

 2   with the problem of Jiluwi that would be different

 3   from designating him, right?

 4                    MS. KOWNACKI:  Objection.

 5                    THE WITNESS:  Yes.

 6   BY MR. CARTER:

 7          Q.        Mr. Lormel, in your report -- I

 8   don't have the specific cite in front of me -- I

 9   believe there's indication that Al Rajhi Bank only

10   had accounts for the Saudi offices of the

11   charities at issue.

12                    Do you recall that?

13          A.        Yes.

14                    But do you have that where I can see

15   it in full context?

16          Q.        I do and, unfortunately, I lost my

17   place.

18                    Okay.  On page 28, you say:

19                    "Winer does not allege that Al Rajhi

20   Bank held accounts for distant branches of the

21   subject charities.  But he nevertheless conflates

22   those distant branches with the Saudi branches for

23   which the bank did hold accounts."

24                    Do you see that statement?
```

This Transcript Contains Confidential Material

```
 1        A.        Where are you?  I'm sorry.

 2        Q.        I'm sorry.  On page 28.

 3        A.        Yeah.  Where about?

 4        Q.        Oh.  The last paragraph on that page

 5   beginning with the second sentence.

 6        A.        Right.  Got it.

 7        Q.        In connection with stating that

 8   opinion, did you review Know Your Customer

 9   information from Al Rajhi Bank for the charities'

10   accounts to ascertain what they were opened for?

11        A.        No, I did not.

12        Q.        Are you aware that some of that

13   information has been provided by the bank?

14        A.        Yes.

15                  MR. CARTER:  And if we can

16             mark as the next exhibit the document at

17             Tab 24, which is an Al Rajhi Bank

18             document that was produced at ARB 38116.

19                  (Document marked for

20             identification as Lormel Exhibit 20.)

21   BY MR. CARTER:

22        Q.        This is a list of certain

23   Al-Haramain accounts at Al Rajhi Bank.

24                  Have you seen this document before?
```

This Transcript Contains Confidential Material

```
 1          A.       No.

 2                   MS. KOWNACKI:  Objection.

 3          This is, at a minimum, a translation of

 4          that document.

 5                   MR. CARTER:  I'm sorry.  What?

 6                   MS. KOWNACKI:  At a minimum,

 7          it's a translation of the document you're

 8          describing.

 9  BY MR. CARTER:

10          Q.       Okay.  This is a translation of an

11  Al-Haramain Foundation account related document

12  produced by Al Rajhi Bank.

13                   And you haven't seen this document

14  before?

15          A.       I don't believe so.

16          Q.       And just to draw your attention,

17  number 2 references an account for Asia Committee,

18  and the associated statement refers to Palestine

19  and Chechnya.

20                   Number 5 refers to the Europe

21  Committee and refers to Albania, Bosnia, Kosovo.

22                   Skipped number 4 which is Africa

23  Committee.

24                   Number 7 is "Zakat outside of the
```

This Transcript Contains Confidential Material

1    Saudi Kingdom."

2              Do you see those?

3    A.      Yes.

4    Q.      Based on those, does it appear that

5    the accounts in Saudi Arabia were being used to

6    support Al-Haramain activities outside of the

7    Kingdom?

8              MS. KOWNACKI:  Objection.

9              THE WITNESS:   I'd want to see

10        more documentation.

11   BY MR. CARTER:

12   Q.      But you didn't look for that

13   documentation for purposes of your report?

14   A.      No.

15             MR. CARTER:  If we can mark

16        the next exhibit the discovery document

17        at Tab 25.

18             (Document marked for

19        identification as Lormel Exhibit 21.)

20   BY MR. CARTER:

21   Q.      This is a translation of two pages

22   that the bank produced us in discovery.  The first

23   is a letter from Aqil Al-Aqil which begins:

24             "Please find enclosed herewith a

This Transcript Contains Confidential Material

1    statement of the numbers of the Al-Haramain

2    Islamic Foundation's accounts with you."

3              This is dated to 1994.

4              Do you see that?

5    A.      Yes.

6    Q.      And then if we go to the next page,

7    there's a reference to the Europe Committee, the

8    Africa Committee, the Indian Subcontinent

9    Committee, and the Middle East Committee.

10             Does that information raise a

11   question in your mind as to whether or not the

12   Al-Haramain accounts at Al Rajhi Bank in Saudi

13   Arabia were being used to support Al-Haramain

14   operations outside of Saudi Arabia?

15             MS. KOWNACKI:  Objection.

16             THE WITNESS:   Excuse me.

17             I'd want to see more

18        documentation.

19   BY MR. CARTER:

20   Q.      So you're not certain?

21   A.      No.

22             MR. CARTER:  I think I would

23        like just to confer with my colleagues,

24        but we may be wrapped up.

This Transcript Contains Confidential Material

```
 1                    MS. KOWNACKI:  Okay.  We can
 2         take --
 3                    THE VIDEOGRAPHER:  Ready to go
 4         off the record?
 5                    MR. CARTER:  Yeah.  We can go
 6         off the record.
 7                    THE VIDEOGRAPHER:  The time is
 8         2:31 p.m.  We're off the record.
 9                    (Recess.)
10                    THE VIDEOGRAPHER:  The time is
11         2:39 p.m.  We're back on record.
12    BY MR. CARTER:
13         Q.    Mr. Lormel, thank you for your time.
14    We don't have anything further, subject to any
15    questioning your counsel may have.
16                    MS. KOWNACKI:  Thank you.
17                    THE WITNESS:   Thank you.
18                    MS. KOWNACKI:  I don't have
19         any further questions.  Just, you know,
20         thank you to the technicians, and I want
21         to designate today's deposition under the
22         protective order for the initial period
23         and thereafter.
24                    So that's it from us.
```

This Transcript Contains Confidential Material

```
 1                    MR. CARTER:  Okay.  And we'll
 2          just reserve rights with regard to the
 3          designation.
 4                    MS. KOWNACKI:  Thank you.
 5                    THE WITNESS:   Okay.
 6                    THE VIDEOGRAPHER:  The time is
 7          2:39 p.m.  We are off the record.
 8
 9                    (Signature not waived, the
10          deposition concluded at 2:39 p.m.)
11
12                         *       *
13
14
15
16
17
18
19
20
21
22
23
24
```

This Transcript Contains Confidential Material

```
 1                      ERRATA SHEET

 2

 3      Page No._____Line No._____Change to:_____

 4      _____

 5      Page No._____Line No._____Change to:_____

 6      _____

 7      Page No._____Line No._____Change to:_____

 8      _____

 9      Page No._____Line No._____Change to:_____

10      _____

11      Page No._____Line No._____Change to:_____

12      _____

13      Page No._____Line No._____Change to:_____

14      _____

15      Page No._____Line No._____Change to:_____

16      _____

17      Page No._____Line No._____Change to:_____

18      _____

19      Page No._____Line No._____Change to:_____

20      _____

21      Page No._____Line No._____Change to:_____

22      _____

23      Page No._____Line No._____Change to:_____

24      _____
```

This Transcript Contains Confidential Material

```
 1              DECLARATION UNDER PENALTY OF PERJURY

 2

 3

 4                   I declare under penalty of

 5      perjury that I have read the entire transcript of

 6      my Deposition taken in the captioned matter

 7      or the same has been read to me, and

 8      the same is true and accurate, save and

 9      except for changes and/or corrections, if

10      any, as indicated by me on the DEPOSITION

11      ERRATA SHEET hereof, with the understanding

12      that I offer these changes as if still under

13      oath.

14

15                   Signed on the _____ day of

16      _____, 2024.

17

18      _____

19                   DENNIS M. LORMEL

20

21

22

23

24
```

This Transcript Contains Confidential Material

```
 1                    CERTIFICATE OF REPORTER

 2   DISTRICT OF COLUMBIA       )

 3              I, Denise Dobner Vickery, a

 4   Registered Court Reporter and Notary Public of

 5   the District of Columbia, do hereby certify that

 6   the witness was first duly sworn by me.

 7              I do further certify that the

 8   foregoing is a verbatim transcript of the

 9   testimony as taken stenographically by me at the

10   time, place and on the date herein set forth, to

11   the best of my ability.

12              I do further certify that I am

13   neither a relative nor employee nor counsel of

14   any of the parties to this action, and that I am

15   neither a relative nor employee of such counsel,

16   and that I am not financially interested in the

17   outcome of this action.

18

19

20                    _____

21                    DENISE DOBNER VICKERY, CRR,RMR
                       Notary Public in and for the
22                     District of Columbia

23

24   My Commission expires:  March 14, 2028
```

THIS TRANSCRIPT CONTAINS CONFIDENTIAL MATERIAL

**ERRATA**
GOLKOW LITIGATION SERVICES
ONE LIBERTY PLACE
1650 MARKET STREET, SUITE 5150
PHILADELPHIA, PA 19103
877-370-3377

NAME OF CASE: *In Re: Terrorist Attacks On September 11, 2001*, No. 03-md-1570 (S.D.N.Y.)
DATE OF DEPOSITION: February 1, 2024
NAME OF DEPONENT:  Dennis M. Lormel

| Page | Line(s) | Change | Reason |
|------|---------|--------|--------|
| 4 | 14 | Change "Nicolle.Kownacki@whitecase.com" to "nkownacki@whitecase.com" | Transcription error |
| 4 | 18 | Delete "(Via Zoom)" | Transcription error |
| 20 | 3 | Change "167.5" to "165.5" | Clarification |
| 30 | 15-16 | Change " – I don't specifically recall.  Life for something" to "Relief." | Clarification |
| 33 | 18 | Change "2011" to "roughly 2012" | Clarification |
| 39 | 5 | Change "contained" to "had" | Clarification |
| 41 | 22-23 | Delete "Eastern District of New York – I mean, in New York – in the" | Clarification |
| 42 | 4 | Change "they – they" to "the" | Clarification |
| 43 | 9 | Change "I" to "we" | Clarification |
| 43 | 10 | Add "initial" after "I made the" | Clarification |
| 43 | 10 | Add ", and briefed Directed Robert Mueller, who concurred" after "I made the initial decision" | Clarification |
| 46 | 2 | Change "danger" to "safety risk" | Clarification |
| 46 | 3 | Add ", and Mueller concurred" after "had the FBI pulled out of that" | Clarification |
| 48 | 20 | Change "yes" to "It was a criminal investigation.  Criminal prosecution was declined." | |
| 51 | 7 | Change "the" to "Operation" | Clarification |
| 51 | 9 | Delete "They reopened –" | Clarification |
| 60 | 6 | Change "are" to "were" | Transcription error |
| 64 | 9-11 | Change "My position was that that should have been part of the same task force what they were doing." to "My position was that what they were doing should have been part of the same task force." | Clarification |
| 64 | 24 | Change "and" to ", so that" | Clarification |
| 65 | 1 | Add "and have" before "it" | Clarification |
| 65 | 20 | Delete "I opened up –" | Clarification |
| 65 | 21 | Capitalize "When" | Capitalization |
| 68 | 23 | Delete "what" | Clarification |
| 69 | 18 | Capitalize "Department" | Capitalization |
| 73 | 21 | Insert "that I" after "know" | Clarification |

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD) (SN), United States District Court for the Southern District of New York.

THIS TRANSCRIPT CONTAINS CONFIDENTIAL MATERIAL

| Page | Line(s) | Change | Reason |
|---|---|---|---|
| 74 | 10 | Delete "I -- now, you just --" and capitalize "At" | Clarification |
| 74 | 12 | Change "didn't" to "don't" | Clarification |
| 75 | 15 | Change "suspect" to "suspected" | Transcription error |
| 76 | 17 | Change "aggressive" to "aggression" | Clarification |
| 80 | 18 | Add "article" after "whole" | Clarification |
| 81 | 10 | Change "had nothing to do" to "was unrelated to our discussion for this article." | Clarification |
| 82 | 4-7 | Add quotation marks before "found" and after "Foundation." | Clarification |
| 82 | 6 | Add "the" before "SAAR Foundation." | Clarification |
| 86 | 24 | Change "Al-Rajhi" to "Al Rajhi Bank or the Al Rajhi family" | Clarification |
| 96 | 7 | Add "the" before "SAAR" and "Foundation" after "SAAR" | Clarification |
| 96 | 9 | Add "the" before "SAAR" and "Foundation" after "SAAR" | Clarification |
| 97 | 19 | Change "Counterterrorism" to "Counterintelligence" | Transcription error |
| 99 | 18 | Add "(SAAR)" between "al-Rajhi" and "Foundation" | Transcription error |
| 102 | 2 | Change "a" to "the" | Clarification |
| 102 | 22 | Add ", which" after "here" | Clarification |
| 108 | 2 | Add "Bank" after "Al Rajhi" | Clarification |
| 108 | 17 | Remove "if" | Clarification |
| 114 | 24 | Change "financial" to "financing," | Clarification |
| 117 | 18 | Remove """ symbol before "more" | Transcription error |
| 123 | 13-14 | Change "in special" to "especially" | Clarification |
| 126 | 14 | Remove comma after "examination" | Transcription error |
| 138 | 14 | Change "intelligent" to "intelligence" | Transcription error |
| 139 | 11 | Change "independent" to "independently" | Clarification |
| 160 | 23 | Add "don't" before "recall" | Clarification |
| 161 | 22 | Change "report" to "reporting" | Transcription error |
| 174 | 5 | Remove "of" before "6.2" | Transcription error |
| 179 | 2 | Remove "Person" before "Gulf" | Transcription error |
| 180 | 14 | Add "Al Qaeda." after "to" | Clarification |
| 181 | 9 | Add "that doesn't mean" before "I agree with" | Clarification |
| 183 | 1 | Change "objection" to "objections" | Transcription error |
| 183 | 11 | Remove "issue with" and replace with "reference by the 9/11 Commission to" | Transcription error |
| 185 | 16 | Change "Nazradeen" to "Nasserdeen" | Clarification |
| 192 | 18 | Change "doing any business in the United States" to "really doing business with anybody in the West, certainly in the United States it wouldn't be able to" | Transcription error |
| 196 | 20 | Change "director" to "directors" | Clarification |
| 196 | 21 | Change "was hearings" to "were meetings" | Clarification |
| 198 | 10 | Change "So" to "To" | Transcription error |
| 210 | 22 | Change "Stata's" to "State" | Transcription error / Clarification |
| 210 | 22 | Add "Department's" after "State" | Clarification |

**CONFIDENTIAL**: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD) (SN), United States District Court for the Southern District of New York.

THIS TRANSCRIPT CONTAINS CONFIDENTIAL MATERIAL

| Page | Line(s) | Change | Reason |
|------|---------|--------|--------|
| 216 | 10 | Change "MS. PRITSKER" to "MR. TARBUTTON" | Transcription error |
| 217 | 3 | Change "in" to "into" | Transcription error |
| 219 | 7 | Add "the size of the bank" after "smoking gun," | Clarification |
| 219 | 7 | Change "wouldn't matter" to "wouldn't have mattered" | Transcription error |

ACKNOWLEDGEMENT OF DEPONENT

I, Dennis M. Lormel, as Al Rajhi Bank's designated deponent, do hereby certify that I have read the pages in the transcript of my deposition on February 1, 2024, in the matter *In Re: Terrorist Attacks On September 11, 2001*, No. 03-md-1570 (S.D.N.Y.), and that the transcript is a correct transcription of the answers given by me to the questions therein propounded, subject to the corrections and changes in form or substance noted in this Errata.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed ___3/22/2024___

_Dennis M Lormel_

**CONFIDENTIAL**: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD) (SN), United States District Court for the Southern District of New York.