# Al Rajhi Bank
# Ex. 68

**WHITE & CASE**

January 19, 2023

White & Case LLP
701 Thirteenth Street, NW
Washington, DC 20005-3807
T +1 202 626 3600

whitecase.com

VIA EMAIL

Sean Carter
Cozen O'Connor
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA 19103

*In re Terrorist Attacks on September 11, 2001*, Case No. 1:03-md-1570-GBD-SN (S.D.N.Y.)

Dear Sean:

We write to respond to issues you raised in our meet-and-confer calls on January 6 and January 10, 2023, and in your January 17, 2023 letter, and on which Plaintiffs contend the parties are at an impasse.

1. **Search Methodology for Possible Donations to the "Da'wah Organizations"**

    (a) **Possible Donations by Certain ARB Principals and the Suleiman Abdul Aziz Al Rajhi Charity Foundation**

During our January 6 call, Plaintiffs questioned for the first time the Bank's methodology for searching for alleged payments to the charities that Plaintiffs define as "Da'wah organizations." As we explained on our January 10 call, the Bank's core banking system contains the master record of each customer, dating back to 1996.

The Bank searched for accounts belonging to all three entities Plaintiffs define as "Da'wah organizations." The Bank identified accounts belonging IIRO and Al Haramain Islamic Foundation ("the two Charities") in the core banking system. The Bank did not find any accounts belonging to Muwafaq Foundation (a/k/a Blessed Relief Foundation). The Bank also identified the accounts at the Bank belonging to former Chairman Saleh Al Rajhi, former Chairman and Managing Director Suleiman Al Rajhi, former Managing Director (current Chairman) Abdullah Al Rajhi, and the Suleiman Abdul Aziz Al Rajhi Charity Foundation (the "Al Rajhi Charity Foundation") (collectively, the "Potential Donors").

To identify possible donation from Potential Donors to the two Charities, the Bank ran a keyword search for "Rajhi" (in English and Arabic) in the two Charities' accounts, and identified any credits to the two Charities' accounts that matched debit amounts from the Potential Donors' accounts on the same transaction date.

WHITE & CASE

Sean Carter
January 19, 2023

The Bank also searched for transactions to any of the "Da'wah organizations'" accounts outside the Bank. For funds transfers outside the Bank, the Bank sets up a "Beneficiary" record, linked to the customer's record, identifying the beneficiary's name and account at any other domestic or international bank. The Bank searched all Beneficiaries set up for the Potential Donors, and confirmed that the "Da'wah organizations" were not set up as Beneficiaries to receive funds transfers. To identify any checks that might have been written from the Potential Donors' accounts to the "Da'wah organizations" and cashed or deposited at another bank, the Bank reviewed available information in the "Notes" field for checks written from the Potential Donors' accounts.

      (b)      **Possible Donations by the Bank**

On the January 6 call, Plaintiffs asked for the first time for information on the Bank's methodology for searching for what Plaintiffs call "zakat" payments to the "Da'wah organizations." As we explained on our January 10 call, the Bank's zakat obligation is not discharged through charitable donations. Rather, zakat in Saudi Arabia is administered as a tax, which the Saudi government collects from the Bank. During the relevant period, the Bank paid zakat to the General Authority for Zakat and Tax. The Bank paid the entire amount directly to the General Authority; the Bank did not have any discretion over how the zakat paid by the Bank to the General Authority was used; specifically, the Bank could not designate any of its zakat payment to be passed on to any specific charitable organizations. Nor did the Bank deduct from its zakat payment to the government any donations that the Bank might have made to charitable organizations, including the "Da'wah organizations." The Bank, nevertheless, reviewed its zakat filings from the relevant period, and confirmed that those filings did not reference any donations to the named "Da'wah organizations."

As we explained during the January 10 call, the Bank searched for any transactions from the Bank itself to the "Da'wah organizations" using a similar process to that described above in Section 1(a). The Bank searched for any credits to the two Charities' accounts at the Bank that matched the transaction date and amount of debits from General Ledger accounts of the Bank. The Bank found no matches. To search for transactions made outside the Bank, the Bank also searched, as described above, for Beneficiaries set up for funds transfers, and information available in the Notes field for checks. The Bank found no matches.

To supplement its search, the Bank reviewed the minutes of Board meetings from the relevant period. The Bank's current policy requires Board approval for charitable donations. Although the Bank has not confirmed that this same policy was in place during the relevant period, the Bank has confirmed that none of the Board minutes during the relevant period references donations to any of the "Da'wah organizations."

Separately, the Bank also located a contemporaneous letter from the Bank to SAMA listing all charitable donations by the Bank itself from 2002. That list did not include any donations to the "Da'wah organizations." As a test of its search methodology, the Bank confirmed that the search methodology described above identified the 2002 donations listed in the document that the Bank provided to SAMA.

WHITE & CASE

Sean Carter
January 19, 2023

During our January 10 call, Plaintiffs stated that they had information indicating that there are transactions missing from the Bank's production. We asked that Plaintiffs provide us the basis for that statement, so that the Bank could use this information to supplement and focus its search. To date Plaintiffs have declined to provide the Bank with any additional information in this regard.

2. **Possible Donations by the Al Rajhi Charitable Foundation to the Da'wah Organizations**

In the process of confirming the completeness of its production of transactions involving the Al Rajhi Charity Foundation, the Bank identified five additional transactions that were captured by the Bank's search process but inadvertently left out of the Bank's production. The Bank produced those transactions to Plaintiffs on January 19, 2023. The Bank confirms that it has produced the records for all possible donations from the Al Rajhi Charity Foundation to the "Da'wah organizations" during the relevant period (1998–2002) that were identified using the search methodology described above.

3. **Redactions**

As explained in our November 8, 2022 letter, the Bank redacted basic Personally Identifiable Information ("PII") in keeping with relevant Saudi laws and regulations, including the Banking Control Law, the Code of Conduct and Work Ethics in Financial Institutions (issued by SAMA in 2019), the Rules for Bank Accounts (updated in September 2021), and the Saudi Personal Data Protection Law (issued in 2021). Under these rules, PII includes, among other things, account numbers, bank-customer identification numbers, personal national identification numbers, individuals' addresses and contact information, and passport information.

During our January 6 and 10 calls, Plaintiffs stated for the first time that there were specific documents where the Bank's partial redactions of account numbers made it difficult to draw conclusions across documents. Plaintiffs also raised for the first time that there are documents where Plaintiffs believe that branch locations, rather than customer addresses, have been redacted. Plaintiffs' January 17 letter (at 2) for the first time adds additional categories of redactions that are "of principal concern to Plaintiffs": "customer information (mailing address and telephone number), lists of recipients of financial aid and their banks and account numbers, . . . Saudi identification cards, and other examples." Plaintiffs have identified only categories of information, not specific redactions identified on specific pages of the Bank's production.

As we stated during our January 6 and January 10 calls, the Bank's redaction of PII reflects its obligations under Saudi law, particularly the banking regulations applicable to the Bank. If Plaintiffs identify specific documents for which Plaintiffs justify a need for more information, or where the redaction exceeds the categories of information that the Bank intended to redact, the Bank will review and consider those requests.

4. **Post-9/11 Investigation Requests**

During our January 6 call, Plaintiffs for the first time raised specific questions about the Bank's search for and production of documents relating to post-9/11 investigations and audits. The earlier communications cited in Plaintiffs' January 17 letter merely confirm that, before this month,

3

WHITE & CASE

Sean Carter
January 19, 2023

Plaintiffs had only raised these requests in the most general of terms, and have never questioned the sufficiency of the Bank's searches or completeness of its productions. As we stated on our January 10 call, the Bank conducted a thorough search and produced all responsive, non-privileged documents, including the specific documents we cited on the call.

On our January 10 call, Plaintiffs agreed to provide us with information to support your contention that there are missing communications between the Bank and the Saudi government regarding audits or investigations. Yet Plaintiffs' January 17 letter refers only to supposed communications between *U.S. and Saudi government* officials, based only on Plaintiffs' allegations of purported State Department Cables (which Plaintiffs have not produced) that describe supposed "joint" investigations and audits carried out by *those* government officials and agencies. None of the allegations Plaintiffs repeat in their letter suggests that *the Bank* was a party to any of those purported communications or involved any such joint investigations or audits.

The Bank searched for documents from the relevant period responsive to Plaintiffs' requests, including searching for any responsive communications with Saudi or U.S. government officials, and the Bank produced what it found. The Bank's production includes numerous communications with SAMA in the weeks and months following 9/11, complying with SAMA's directions to major Saudi banks to provide banking information and take certain actions with respect to the accounts of specific individuals and entities, including those of interest to the United States. To Plaintiffs' specific question (Pls.' Jan. 17 Ltr. 4) of whether the Bank "has characterized investigations or reviews of accounts at ARB (concerning Al Haramain or other accountholders) as relating to something other than 'terrorism,' and excluded them that basis," the Bank has not done so.

5.   **Possible Donations By Unnamed Al Rajhi Family Members and Individuals with No Position at the Bank**

As we explained in our December 17, 2021 letter, and reiterated in our January 10, 2023 call, Abdulrahman Al Rajhi never had a position with Al Rajhi Bank, and instead appears to have headed a completely separate financial company with a similar name to Al Rajhi Bank. The Bank therefore will not search for documents concerning him. Nor, as we also explained in our December 17, 2021 letter, will the Bank conduct a fishing expedition to search for records of unnamed individuals. Plaintiffs did not respond to those portions of our December 2021 letter, and did not raise these issues again until January 6, 2023.

6.   **Communications with "Da'Wah Organizations"**

During our January 6 call, Plaintiffs contended for the first time that the Bank's search for and production of communications with the "Da'wah organizations" was not sufficient, and questioned whether the Bank maintained records other than Know Your Customer ("KYC") files that might house such communications. We explained on the January 10 call that the Bank produced the account operating documents for each of the named charities for which the Bank held accounts, and that such documents include not only KYC but also correspondence. We have since confirmed that these account operating documents are kept in files called "Customer Information Files" and are maintained at the branch level.

Sean Carter
January 19, 2023

Moreover, as we explained in our January 14, 2022 letter, the Court rejected Plaintiffs' specific request for all communications with the "Da'wah organizations," holding that Request No. 6, which seeks "all communications" between "ARB Principals" and the "Da'wah organizations" is "overbroad," "disproportionate to the needs of this dispute," and "likely to reveal vast amounts of superfluous information." Order 9, ECF No. 7378.

### 7. Suleiman Al Rajhi Departure

As we have previously explained, including in our November 8, 2022 letter, and in our January 6, 2023 call, the Court ruled that the relevant period for Request No. 55 (for "all documents discussing the reasons for Suleiman al Rajhi's departure from, and relinquishment of control over, ARB") is January 1, 1998 to December 31, 2002. *See* Order 8, ECF No. 7378 (holding that the end date for "Requests 8, 44, 47-54, and 58" is December 31, 2004, and "[f]or all other requests, the end date is December 31, 2002"). Plaintiffs have insisted that the end date for this request is some other unspecified date, but that position finds no support in the Court's Order. Suleiman Al Rajhi stepped down as managing director of the Bank in 2008, and stepped down as Chairman of the Board of the Bank in 2014. There is no basis in the Court's Order to search for documents dated as late as 2008, much less 2014. The Bank is not required to expand its search beyond the relevant period ordered by the Court.

### 8. Email

On our September 26, 2022 call, and again in our November 8, 2022 letter, we informed you that, while email was not in use throughout the Bank during the relevant period, the Bank determined that some individuals did have email accounts during the relevant period. We also informed you then that the Bank was continuing its search for any relevant documents, including email, and would produce any additional responsive, non-privileged emails. Plaintiffs did not respond to our November 8, 2022 letter or otherwise raise this issue until January 6, 2023.

During our January 10, 2023 call, we described that email was first used in approximately 1997 — primarily on a group basis, meaning that a group or team within the Bank could share an email address — and that some individuals may also have had email. The Bank began rolling out email to individuals across the company in approximately 2001.

As we described on our January 10 call, the Bank experienced an inadvertent data loss that may have impacted the Bank's ability to search email from the relevant period. Specifically, in 2009 the Bank's email archive system crashed and some email could not be recovered. The Bank has collected archived email and attachments from the period of 1998 to 2004. The Bank has searched this collection for potentially relevant email and attachments, and produced any responsive documents. We also indicated to you that we understand that email was not the primary mode of communication at the Bank during this period (1998 to 2004); written communication was typically conducted by letter and fax.

### 9. 2009 Administrative Subpoena

As we have previously explained, including in our November 8, 2022 letter to which Plaintiffs did not respond, the Bank has collected and produced to Plaintiffs the documents produced to U.S.

5

WHITE & CASE

Sean Carter
January 19, 2023

authorities in response to the July 17, 2009 Administrative Subpoena served on the Bank. The Bank searched for documents and fully complied with the subpoena in 2010.

During our January 6, 2023 call, Plaintiffs asked whether the Bank or its counsel had any communications about any compromise to "narrow" of the scope of the subpoena. As we explained, White & Case did not represent the Bank in this subpoena response. And Dewey & LeBoeuf, LLP, the law firm that represented the Bank in connection with this subpoena, ceased operations in mid-2012.

A review of the district court and Ninth Circuit dockets indicates that the district court narrowed the scope of the subpoena in response to the U.S. Government's motion to compel. *See* Order 14-15, *United States v. Sedaghaty*, Cr. No. 05-60008-HO (D. Or. Feb. 26, 2010), ECF No. 277. The briefing also indicates that the U.S. Government moved to dismiss the dispute as moot after reviewing the Bank's production in response to the subpoena "as narrowed by the district court" and confirming "the completeness and authenticity of the newly produced documents." *See* Joint Mot. to Dismiss Appeal as Moot 1-2, *United States v. Sedaghaty*, No. 10-36007 (9th Cir. July 8, 2010).

\*   \*   \*

We remain available for a meet-and-confer call to discuss the issues above and whether Plaintiffs will be seeking Court intervention regarding any of these issues. During our January 6, 2023 call, you also raised a subset of additional issues as warranting additional conversation, but as not being ripe for the Court's intervention. We have focused our attention on the above issues, but we have begun researching the questions you raised, and remain willing to meet and confer on this other subset of issues.

Finally, in light of the Court's December 22, 2022 Order and its firm end date for jurisdictional fact discovery, we would like to return to an issue we raised in our November 22, 2021 meet-and-confer call. The Bank requests that, following the close of jurisdictional discovery, the Plaintiffs file a proposed statement of jurisdictional facts with supporting documents that the Bank can review and rely upon in making its renewed motion to dismiss for lack of personal jurisdiction. The Bank believes that this is the most orderly and efficient way to proceed, and it is consistent with the process adopted for other defendants that have raised jurisdictional issues.

Sincerely,

*[signature]*

Nicole Erb
Matthew S. Leddicotte
Reuben J. Sequeira

*Counsel for Al Rajhi Bank*

cc:   Sean Carter

6

WHITE & CASE

Sean Carter
January 19, 2023

  J. Scott Tarbutton
  Abby J. Sher
  Robert Sheps
  James L. Bernard
  Patrick N. Petrocelli
  Christopher R. LoPalo