# Al Rajhi Bank
# Ex. 69

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Southern District of New York

| | |
|---|---|
| In Re Terrorist Attacks on September 11, 2001 ) | |
| *Plaintiff* ) | |
| v. ) | Civil Action No. 1:03-md-01570-GBD-SN |
| ) | |
| ) | |
| *Defendant* ) | |

**SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION**

To: Central Intelligence Agency
Langley, Virginia

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Attachment A

| Place: Cozen O'Connor, 1200 19th Street, N.W., Washington, D.C. 20036 | Date and Time: 11/19/2021 10:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 10/19/2021

CLERK OF COURT                                OR   *[signature]*

_____                         _____
*Signature of Clerk or Deputy Clerk*                *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Plaintiffs' Executive Committees _____, who issues or requests this subpoena, are:
Sean P. Carter, Cozen O'Connor, 1650 Market St., 28th Fl., Phila., PA 19103; scarter1@cozen.com; 215-665-2105

**Notice to the person who issues or requests this subpoena**
A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 1:03-md-01570-GBD-SN

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____
on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____
_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____
_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____    _____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

Case 1:03-md-01570-GBD-SN   Document 10598-69   Filed 12/09/24   Page 4 of 17

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

### Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
      (i) is a party or a party's officer; or
      (ii) is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
   (A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   (B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
   (A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   (B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
   (A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      (i) fails to allow a reasonable time to comply;
      (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
      (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      (iv) subjects a person to undue burden.
   (B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      (i) disclosing a trade secret or other confidential research, development, or commercial information; or
      (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   (C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   (A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   (B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   (C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   (D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
   (A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      (i) expressly make the claim; and
      (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   (B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## **ATTACHMENT A**

I. **Instructions and Definitions:**

1. This subpoena is issued pursuant to Rule 45 of the Federal Rules of Civil Procedure, and not pursuant to a request for records under the Freedom of Information Act ("FOIA"), and all documents specified below are required to be produced as required by Rule 45.

2. Each document responsive to this subpoena shall be produced in its entirety, with all non-identical copies and drafts, and without abbreviation or redaction, subject only to credible assertions of privileges recognized under the common law.

3. If You assert a privilege or other authorized protection with respect to any document requested herein, You must produce all non-privileged/protected portions of the document with those portions as to which a privilege/protection is claimed redacted, and You must provide a privilege log that conforms with the requirements set out by United States Magistrate Judge Frank Maas in the case captioned *In re Terrorist Attacks on September 11, 2001*, No. 03-md-1570 (S.D.N.Y.), by Order dated November 19, 2012 (ECF No. 2644), including providing the following information concerning each individual document withheld or redacted:

    a. The type of document or information (e.g., letter, notebook, telephone conversation, etc.);

    b. The general subject matter of the document;

    c. The date of the document;

    d. The authors of the document, the addressees of the document and any other recipients, and where not apparent, the relationship of the authors, addressees, and recipients to one another;

    e. If the document is an electronic document, its file size; and

    f. Each and every basis for the privilege or protection claimed; and if a privilege or protection asserted is based upon or governed by a law, statute, regulation, or rule, the specific law, statute, regulation, or rule being invoked.

4. No document responsive to this subpoena shall be withheld or redacted pursuant to FOIA exemptions.

5. As used herein, the following terms are defined as follows:

    a) "Document" or "Documents" are defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" and "any designated tangible things" as used in Fed. R. Civ. P. 34(a)(1)(A) and (B). A draft or non-identical copy is a separate document within the meaning of this term.

b)  The terms "You," "Your," and/or "CIA" shall mean the Central Intelligence Agency, including without limitation any directorate or center of the Central Intelligence Agency, or any official, employee, and representative of the Central Intelligence Agency.

c)  The term "Al Rajhi Bank" shall mean Al Rajhi Bank and any branch office, board member, executive, official, employee, consultant, agent, alter ego, volunteer, or representative acting on Al Rajhi Bank's behalf.

d)  The term "concerning" shall mean relating to, referring to, describing, evidencing, or constituting.

e)  The term "person" shall mean any natural person or any legal entity, including, without limitation, any business or governmental entity or association.

f)  The terms "all," "any," and "each" shall each be construed as encompassing any and all.

g)  The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

## II. **Documents to be Produced:**

1.  All documents, that were provided to or reviewed by any reporter for the Wall Street Journal, in whole or in part, in relation to the article *"Terrorist Finance – U.S. Tracks Saudi Banks Favored By Extremists"* (July 26, 2007), attached hereto as Exhibit A, including without limitation any and all documents referenced in that article, in whole or in part. Responsive documents shall include but are not limited to the following:

    a)  The 2003 CIA report titled *"Al Rajhi Bank: Conduit for Extremist Finance,"* which reportedly states *inter alia* that: (i) "Islamic extremists have used Al-Rajhi Banking & Investment Corporation (ARABIC) since at least the mid-1990s as a conduit for terrorist transactions;" (ii) "[s]enior al-Rajhi family members have long supported Islamic extremists and probably know that terrorists use their bank;" (iii) "[t]he al-Rajhi's know they are under scrutiny and have moved to conceal their activities from financial regulatory authorities;" (iv) Suleiman al Rajhi ordered Al Rajhi Bank's Board "to explore financial instruments that would allow the bank's charitable contributions to avoid official scrutiny;" (v) Suleiman al Rajhi "transferred $1.1 billion to offshore accounts – using commodity swaps and two Lebanese banks – citing a concern that U.S. and Saudi authorities might freeze his assets;" (vi) Suleiman al Rajhi and Saleh al Rajhi transferred $4 million to parties in Germany and Pakistan in December 1998 using "a unique computer code to send funds at regular intervals to unspecified recipients, suggesting they were trying to conceal the transactions and that the money may have been intended for illegitimate ends;" (vii) extremists "ordered operatives in Afghanistan, Indonesia, Pakistan, Saudi Arabia, Turkey, and Yemen" to use Al Rajhi Bank; (viii) Al Rajhi Bank couriers "delivered money to the Indonesian insurgent group Kompak to fund weapons purchases and bomb-making activities;" and (ix) Mamduh Mahmud Salim, convicted mastermind of the 1998 U.S. Embassy bombings, had an account at Al Rajhi Bank (Account No. 001424/4).

    b)  The November 2002 CIA document reportedly indicating *inter alia* that: (i) the Saudi government "has made little independent effort to uncover terrorist financiers, investigate individual donors, and tighten the regulation of Islamic charities;" (ii) officials from the CIA, National Security Council, Treasury and State Departments debated possible legal and political actions against Al Rajhi Bank, including covert operations to interfere with the bank's internal operations; and (iii) "a successful effort against the Al Rajhis would encourage efforts against other donors, or at a minimum, would discourage private funding of Al Qaeda."

    c)  The November 16, 2001 U.S. intelligence memorandum reportedly indicating that a money courier for Osama bin Laden's second-in-command, Ayman al Zawahiri, traveled on a visa obtained by Al Rajhi Bank.

    d)  U.S. intelligence reports describing how Al Rajhi Bank has maintained accounts and accepted donations for Saudi charities that the U.S. and other nations have formally designated as fronts for al Qaeda, including the International Islamic Relief Organization ("IIRO").

3

e) Intelligence and law-enforcement reports indicating that Al Rajhi Bank maintained at least 24 accounts and handled transactions for the Al Haramain Islamic Foundation, an Executive Order 13224 Specially Designated Global Terrorist ("SDGT") entity.

f) U.S. intelligence reports indicating that members of the Al Rajhi family maintain close ties to Saudi Arabia's conservative clerics.

g) The 2003 German police report indicating that Suleiman al Rajhi and other al Rajhi family members contributed money to a charitable organization that financed weapons for Islamic militants in Bosnia.

2. All documents providing the factual, evidentiary, or other basis for the specific facts and allegations set forth in the documents identified in Demand No. 1, including any documents referenced in or relied upon in preparing the documents identified in Demand No. 1.

3. All documents concerning Suleiman al Rajhi,[1] Saleh al Rajhi,[2] Abdullah al Rajhi,[3] Abdul Rahman al Rajhi,[4] Abdul Aziz al Khereiji,[5] Abdullah Misfer,[6] and Saleh al Hussayen,[7]

---

[1] Suleiman al Rajhi served as the Chairman and largest shareholder of Al Rajhi Bank, one of al Qaeda's most essential partners in the years leading up to the September 11, 2001 terrorist attacks. As described by the Wall Street Journal, Suleiman al Rajhi and Al Rajhi Bank played a critical role in facilitating the terrorist activities of al Qaeda's integrated charity fronts, including Executive Order 13224 Specially Designated Global Terrorist ("SDGT") entities International Islamic Relief Organization ("IIRO") and Al Haramain Islamic Foundation. Suleiman al Rajhi has been identified as a member of the "Golden Chain," al Qaeda's most important wealthy donors from the Gulf region.

[2] Saleh al Rajhi, Suleiman al Rajhi's brother, co-founded and served as a high-ranking official at Al Rajhi Bank. As described by the Wall Street Journal, Saleh used Al Rajhi Bank to donate significant funds to al Qaeda's charity fronts, including the Third World Relief Agency ("TWRA"). The 9/11 Commission concluded that Osama bin Laden "made use of the already-established Third World Relief Agency" to provide financial and other support for al Qaeda's terrorist activities. *See* 9/11 Commission Report at p. 58.

[3] Abdullah al Rajhi served as a member of Al Rajhi Bank's executive committee, and further held leadership positions with the SAAR network of "charities" organized in Northern Virginia. According to the Department of Defense, "the SAAR network includes more than 100 Muslim think tanks, charities and companies. The al-Rajhi family utilized SAAR to fund Islamic extremist organizations and has ties to al Qaida."

[4] Abdulrahman al Rajhi served as an official at Al Rajhi Bank and held various leadership positions, including Vice Chairman and Executive Manager of Al Rajhi Commercial Foreign Exchange and head of the Sulaiman Abdul Aziz al Rajhi Foundation. Abdulrahman al Rajhi is alleged to have had contacts with certain members of the Saudi government support network aiding the 9/11 hijackers upon their arrival in the United States.

[5] Abdul Aziz al Khereiji served as an executive on Al Rajhi Bank's Board of Directors while simultaneously serving as one of four shareholders of the Muwafaq Foundation (a/k/a Blessed Relief Foundation), along with Executive Order 13224 Specially Designated Global Terrorist ("SDGT") Yassin Kadi. According to the U.S. government, Muwafaq served as "an al Qaeda front that receives funding from wealthy Saudi businessmen," and there exists "substantial and credible evidence that both Muwafaq as an entity, and many of the individuals charged with operating it and distributing its funds, were engaged in a long-standing pattern of supporting terrorist and extremist causes." *See Yassin Abdullah Kadi v. Timothy Geithner, et al.*, Civil Action No. 09-0108 (JDB) (May 22, 2009).

[6] Abdullah Misfer served as an official at Al Rajhi Bank while simultaneously holding the position as head of the Palestine Division of the Al Haramain Islamic Foundation, an Executive Order 13224 Specially Designated Global Terrorist ("SDGT") entity. Misfer is alleged to have had contacts with certain members of the Saudi government support network aiding the 9/11 hijackers upon their arrival in the United States.

[7] Saleh al Hussayen served as a member of Al Rajhi Bank's Sharia Board, which was responsible for *inter alia* approving Al Rajhi Bank's zakat contributions, including those contributions sent to the IIRO, Al Haramain Islamic Foundation, and other al Qaeda charity fronts. The night before the 9/11 attacks, Hussayen stayed in the same hotel in Virginia (Marriott Residence Inn) as 9/11 hijackers Nawaf al Hazmi, Khalid al Mihdhar, and Hani Hanjour.

       including without limitation, all documents detailing the possible involvement of these individuals in terrorism or terrorism financing or sponsorship activities.

4. All documents concerning any terrorism financing, support, sponsorship, or money laundering investigation, inquiry, or audit conducted by the U.S. government or any foreign government or international body which references or addresses Al Rajhi Bank, any member of the Al Rajhi family, and/or the individuals identified in Demand No. 3.

5. All documents concerning allegations that an Al Rajhi Bank account linked to Soliman al Buthe, an official of the Al Haramain Islamic Foundation, was used to transfer funds to al Qaeda fighters in Chechnya.

6. All documents concerning allegations that Al Rajhi Bank was used to transfer funds to the Hamburg, Germany al Qaeda terror cell,[8] with the possible involvement of Mahmoud Darkazanli and Abdul Fattah Zammar.

7. All documents concerning allegations that an Al Rajhi Bank account linked to 9/11 hijacker Abdulaziz al Omari was used to transfer funds in support of the September 11, 2001 terrorist attacks.

LEGAL\54414450\1

---

[8] Members of the Hamburg terror cell included Ramzi bin al Shibh and 9/11 hijackers Mohammed Atta, Marwan al Shehhi, and Ziad Jarrah.

5

# Exhibit A



**July 26, 2007**

### PAGE ONE

*TERROR FINANCE*

# U.S. Tracks Saudi Bank Favored by Extremists

**Officials Debated What To Do About Al Rajhi, Intelligence Files Show**

By GLENN R. SIMPSON
*July 26, 2007; Page A1*

**DOW JONES REPRINTS**

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit:
www.djreprints.com.

• See a sample reprint in PDF format.
• Order a reprint of this article now.

JIDDA, Saudi Arabia -- In the 1940s, two Bedouin farm boys from the desert began changing money for the trickle of traders and religious pilgrims in this then-remote and barren kingdom. It was a business built on faith and trust, Sulaiman Al Rajhi once told an interviewer, and for many years he would hand gold bars to strangers boarding flights in Jidda and ask them to give the gold to his brother on their arrival in Riyadh.

> **EXTREMISTS' ACCOUNTS**
>
> **The News:** U.S. intelligence reports say Islamic extremists often use Saudi Arabia's Al Rajhi Bank to move money. The bank has denounced terrorism and denies any role in financing extremists.
>
> **The Issue:** A confrontation with Al Rajhi would be politically difficult for Saudi monarchy, and U.S. isn't satisfied with its efforts to curb the financial infrastructure essential to terrorism.
>
> **Result:** U.S. has periodically debated taking action on its own against the bank, but chosen instead to lobby the Saudis quietly about its concerns.

Today, Mr. Al Rajhi is a reclusive octogenarian whose fortune is estimated at $12 billion. And Al Rajhi Bank grew into the kingdom's largest Islamic bank, with 500 branches in Saudi Arabia and more spread across the Muslim world.

Following the Sept. 11, 2001, attacks, the bank also set off an intense debate within the U.S. government over whether to take strong action against its alleged role in extremist finance. Confidential reports by the Central Intelligence Agency and other U.S. agencies, reviewed by The Wall Street Journal, detail for the first time how much the U.S. learned about the use of Al Rajhi Bank by alleged extremists, and how U.S. officials agonized over what to do about it.

After 9/11, the Saudi monarchy pledged its full support in the fight against global terrorism. And following violent attacks inside the kingdom in the next two years, the Saudis did launch major strikes against militants operating on their soil. But the Saudi government has been far been less willing to tackle the financial infrastructure essential to terrorism. U.S. intelligence reports state that Islamic banks, while mostly doing ordinary commerce, also are institutions that extremism relies upon in its global spread.

As a result, the Bush administration repeatedly debated proposals for taking strong action itself against Al Rajhi Bank, in particular, according to former U.S. officials and previously undisclosed government documents. Ultimately, the U.S. always chose instead to lobby Saudi officialdom quietly about its concerns.

The U.S. intelligence reports, heretofore secret, describe how Al Rajhi Bank has maintained accounts and accepted donations for Saudi charities that the U.S. and other nations have formally designated as fronts for al

Qaeda or other terrorist groups.

In addition, Mr. Al Rajhi and family members have been major donors to Islamic charities that are suspected by Western intelligence agencies of funding terrorism, according to CIA reports and federal-court filings by the Justice Department.

A 2003 CIA report claims that a year after Sept. 11, with a spotlight on Islamic charities, Mr. Al Rajhi ordered Al Rajhi Bank's board "to explore financial instruments that would allow the bank's charitable contributions to avoid official Saudi scrutiny."

A few weeks earlier, the report says, Mr. Al Rajhi "transferred $1.1 billion to offshore accounts -- using commodity swaps and two Lebanese banks -- citing a concern that U.S. and Saudi authorities might freeze his assets." The report was titled "Al Rajhi Bank: Conduit for Extremist Finance."

Al Rajhi Bank and the Al Rajhi family deny any role in financing extremists. They have denounced terrorist acts as un-Islamic. The bank declined to address specific allegations made in American intelligence and law-enforcement records, citing client confidentiality.

**RELATED DOCUMENTS**

Al-Rajhi bank became a target for U.S. terrorism sanctions less than two months after Sept. 11, 2001.

No action was taken, but in mid-2003, the Central Intelligence Agency concluded that the Al-Rajhi family and their bank were financing terrorists, probably knowingly. This is the **summary page**[1] from the agency's report.

The bank sued The Wall Street Journal Europe for libel in 2002 over a report that it was under scrutiny in connection with terrorism funding, but dropped the case in 2004 and The Wall Street Journal published **the bank's statement**[2].

The CIA's report and other U.S. intelligence on Al-Rajhi remained secret, and in 2005 a federal judge threw out a lawsuit against the bank by victims of Al Qaeda, saying there was no evidence Al-Rajhi provided anything but routine banking services to terrorists. **Read the order**.[3]

The Al-Rajhi family and the ruling Al-Saud family of Saudi Arabia have been at odds for decades, in part because of the accidental death of an infant Al-Rajhi family member in a botched police rescue attempt during a kidnapping. Saudi dissidents in London issued a **communiqué recounting the incident**[4] that was highly critical of Saudi authorities. The document was made available by the Investigative Project on Terrorism, a Washington-based nonprofit group.

This 1992 **State Department cable**[5] from the U.S. ambassador in Riyadh discusses the Saudi press coverage of the Al Rajhi bank's purported role in the BCCI scandal.

One of the Al Rajhi bank's major longtime clients is the International Islamic Relief Organization of Jeddah, Saudi Arabia, a powerful charity backed by some of the country's wealthiest businessmen. This **fundraising solicitation**[6] is from the IIRO's March 2007 newsletter. The group strongly denounces terrorism on its **Web site**[7].

U.S. intelligence has alleged connections between

In 2002, the bank sued The Wall Street Journal Europe after an article said Saudi authorities were monitoring some Al Rajhi Bank accounts at U.S. request, in a bid to prevent them from being used, wittingly or unwittingly, for funneling money to terrorist groups. The bank dropped the suit in 2005 and the Journal published a statement saying its article hadn't reported any allegation that the bank supported or financed terrorism.

Also in 2005, a U.S. judge dismissed Al Rajhi Bank from a lawsuit filed by relatives of Sept. 11 victims. The ruling said banks couldn't be held liable for providing routine services to people who turned out to be terrorists. In a statement in response to questions about suspected terrorists among its clients, the bank noted that "Al Rajhi Bank has a very large branch network, and a very large retail customer base."

U.S. law-enforcement and intelligence agencies acknowledge it is possible that extremists use the bank's far-flung branches and money-transfer services without bank officials' knowledge. The U.S. has never obtained proof that the bank or its owners knowingly facilitate terrorism, according to documents and former officials, despite what they describe as extensive circumstantial evidence that some executives are aware the bank is used by extremists. The 2003 CIA report concluded: "Senior Al Rajhi family members have long supported Islamic extremists and probably know that terrorists use their bank."

Most major banks around the world are bound by a patchwork of treaties and agreements that, in effect, require them to know their customers and report any suspicious activities to regulators. The rules are designed to fight terrorism, money laundering and narcotics trafficking. It's generally acknowledged that Saudi banks are bound by these rules, although experts differ on when compliance became

al Qaeda and the IIRO since 1996, and the Treasury Department now **alleges**[8] the IIRO has been deeply penetrated by al Qaeda. The group denies supporting terrorism in this **statement**[9] from its most recent newsletter. The group also claims it no longer sends money overseas, and that its accounts are frozen by Saudi banks. Yet its most recent **fundraising letter**[10] solicits donations to Al Rajhi bank and touts a variety of ongoing projects in overseas conflict zones.

In 2004, IIRO funded a medical facility in Fallujah while that central Iraqi town was under the control of Iraqi insurgents. The U.S. Marine Corps blew up the clinic, and says all three of the city's hospitals were being used by insurgents as fighting positions. See the **PowerPoint slides**[11].

mandatory.

The top counterterrorism official at the U.S. Treasury Department, while declining to comment on Al Rajhi Bank specifically, says Saudi officials haven't met a promise to create a commission to oversee Saudi charities, many of which bank with Al Rajhi. "They are also not holding people responsible for sending money abroad for jihad," says the Treasury official, Stuart Levey. "It just doesn't happen."

The Saudi government maintains it has been working diligently with the U.S. and others to counter terrorism. It cites its arrests of several alleged terrorist fund-raisers in recent years. The Saudis didn't respond to specific questions about their efforts to counter terrorist finance or oversee banks.

A White House statement said that "the Saudis continue to be a strong partner in the War on Terror....We have made significant progress on numerous fronts -- including the freezing of assets and the shutdown of known conduits of [terrorist] funding." A CIA spokesman said "publishing details of how our government seeks to track extremist financing" could undermine those efforts.

For the ruling Saud family, any confrontation with the Al Rajhis could be politically treacherous. To stay in power, the Sauds rely on the tolerance of clerical and business elites, many of whom view the royal family as corrupt. The wealthy Al Rajhis are a clan long at odds with the royal family. And U.S. intelligence files show the Al Rajhis also have close ties to another group critical of the royals: Saudi Arabia's conservative clerics.

The Al Rajhi empire includes hotels, housing developments, commodities trading, shipping, aviation leasing and poultry. Its core is the bank, with more than 500 branches in Saudi Arabia and other offices abroad, from Pakistan to Malaysia. For 2006, the publicly held institution reported $1.9 billion in profit and $28 billion in assets.

Sulaiman Al Rajhi grew up in the Nejd desert, the birthplace of a severe form of Islam, called Wahhabism, that forbids birthday parties, musical instruments and photographing people. In the 1940s, he and a brother, Saleh, went to the Saudi capital city. "From literally nothing -- making change on what were then the dirt streets of Riyadh -- Sulaiman and Saleh al Rajhi built the Al Rajhi Bank," Sulaiman's lawyers told a U.S. court in New York in 2005.

Sulaiman described the business in a rare interview with Euromoney magazine in 1983. With two other brothers, he and Saleh began changing money for pilgrims taking camel caravans across the desert to the holy cities of Mecca and Medina. When throngs of migrant workers came to Saudi Arabia during the 1970s oil boom, the Al Rajhis helped them send their earnings home to places like Indonesia and Pakistan.

In 1983, the brothers won permission to open Saudi Arabia's first Islamic bank, one that would observe religious tenets such as a ban on interest.

But relations with the ruling family frayed. The government-controlled press in 1992 publicized Al Rajhi Bank's tangential role in an international scandal of that era, that of the bank called BCCI, U.S. diplomats reported. Then in 1994, an infant relative of the Al Rajhis died in a kidnapping. Official press accounts said the kidnappers slit the child's throat, but Saudi dissidents claimed police shot the child. Mr. Al Rajhi blamed the royal family, the CIA report says.

Although Al Rajhi Bank continued to make a show of support for the Sauds -- annual reports had flowery tributes

to the royal family -- the bank began refusing to make loans to the Sauds or to finance their projects, U.S. diplomats said at the time.

With its Islamic procedures, the bank was a magnet for the clerical establishment, which grew rich from alms amid the oil boom. As the clerics' charities spread, they became entwined with Al Rajhi Bank and the conservative Al Rajhi family's own extensive financial support for Islamic causes.

There is no reliable estimate of how much the Al Rajhis have given to promote Islam over the years, but an endowment holding much of Saleh Al Rajhi's wealth gives an indication of the scale. Its Web site details nearly $50 million in direct donations within the kingdom to Islamic causes and at least $12 million in donations abroad. The overseas money went to aid embattled Muslims in Kosovo, Chechnya and the Palestinian territories and to finance Islamic instruction.

There are indications not all the giving was for such purposes. The Al Rajhi name appeared on a list of regular financial contributors to al Qaeda that was discovered in Sarajevo, Bosnia, in 2002. The list was authenticated for the Federal Bureau of Investigation that year by America's top judicial witness against al Qaeda, a onetime al Qaeda business manager named Jamal Al Fadl, who is in the federal witness-protection program. He called the contributor list the "golden chain."

A 2003 German police report said Sulaiman Al Rajhi and other family members had contributed more than $200,000 in 1993 to a charity that financed weapons for Islamic militants in Bosnia, in addition to providing humanitarian aid.

The 2003 CIA report tells of efforts by two Al Rajhi brothers to keep some giving secret. It says that Sulaiman and Saleh transferred $4 million to parties in Germany and Pakistan in December 1998 using "a unique computer code to send funds at regular intervals to unspecified recipients, suggesting they were trying to conceal the transactions and that the money may have been intended for illegitimate ends."

The report says extremists "ordered operatives in Afghanistan, Indonesia, Pakistan, Saudi Arabia, Turkey, and Yemen" to use Al Rajhi Bank. Mamduh Mahmud Salim, convicted mastermind of the 1998 embassy bombings in Kenya and Tanzania, was carrying records of an Al Rajhi account (number 001424/4) when arrested in Germany in 1998, German police found.

In 2000, the CIA report says, Al Rajhi Bank couriers "delivered money to the Indonesian insurgent group Kompak to fund weapons purchases and bomb-making activities."

A U.S. intelligence memo dated Nov. 16, 2001, says a money courier for Osama bin Laden's second-in-command, Ayman al-Zawahri, traveled on a visa that the bank had obtained for him. The memo adds, however: "Reporting does not indicate whether bank management was witting" of the courier's terrorist connections.

Al Rajhi Bank maintained at least 24 accounts and handled unusual transactions for Al-Haramain foundation -- a charity that Treasury officials say has acted as a front for al Qaeda in 13 countries -- until the Saudi government ordered the charity shut down in late 2004, according to intelligence and law-enforcement reports. The United Nations has designated top officials of Al-Haramain foundation as terrorists, and most of its offices now are closed.

According to a federal indictment in Oregon, a top Al-Haramain official in 2000 carried $130,000 in $1,000 traveler's checks from Portland to Riyadh and deposited them with Al Rajhi -- funds the indictment says were for the ultimate benefit of al Qaeda fighters in Chechnya. The indicted official, Soliman Al-Buthe, now works for the city of Riyadh. In an interview, he confirmed carrying the checks and depositing them with Al Rajhi Bank but

said that they weren't for al Qaeda and that he did nothing wrong.

A Jidda-based charity called the International Islamic Relief Organization, or IIRO, arranges for donors to send their donations directly to the Al Rajhi Bank. The IIRO's chairman, Adnan Khalil Basha, says the charity is "absolutely apolitical" and has elaborate spending controls to prevent illicit diversions. The charity says it works with Al Rajhi Bank simply because its fees are low and its service is best.


Adnan Khalil Basha

However, the U.N. has labeled two of the IIRO's branches and some of its officials as al Qaeda supporters. In 2004, the IIRO solicited donations through Al Rajhi Bank for the Iraqi city of Fallujah, then largely under the control of insurgents and the base of the late Abu Musab al Zarqawi, who led al Qaeda in Mesopotamia. The IIRO's workers oversaw construction of a trauma clinic in an insurgent-controlled area of Fallujah. The U.S. saw the clinic as a haven for insurgent fighters, and Marines destroyed it in November 2004. That was "a big tragedy for us," says the IIRO's chairman, Mr. Basha.

He denies the charity had any involvement with the Iraqi insurgency. Charity officials complain that the U.S. has produced no evidence of their alleged ties to terrorism.

Two years earlier, federal agents raided the Virginia offices of a network of charities funded by Sulaiman Al Rajhi that worked closely with the IIRO and that -- according to Justice Department court filings -- provided funds to Palestinian terrorists. No charges have been filed.

A year after the 9/11 attacks, U.S. authorities began to lament the lack of Saudi action in taking down terrorists' financial infrastructure. A November 2002 CIA report said the Saudi government "has made little independent effort to uncover terrorist financiers, investigate individual donors, and tighten the regulation of Islamic charities," largely because of "domestic political considerations."

The report advised against a noisy confrontation: "A key factor for continued successful counterterrorism initiatives with the Saudis, whose society is by tradition private, closed, and conservative, will be to ensure that their cooperation with the United States is handled discreetly and kept as much as possible out of the public eye."

The U.S. began to rethink that approach after an al Qaeda attack in Riyadh in May 2003 that killed 26 people, including nine Americans. Deputies from the National Security Council, CIA, Treasury and State departments debated a proposal for legal and political action against Al Rajhi Bank, including the possibility of covert operations such as interfering with the bank's internal operations, according to Bush administration documents and former U.S. officials.

One idea kicked around was "listing or threatening to list" Al Rajhi Bank as a supporter of terrorism. Such a listing can be done if recommended by a committee representing the Treasury, State and Defense departments and the CIA and NSC, and signed by the president. The designation bars U.S. companies from doing business with the named entity. A U.S. designation also normally is forwarded to the U.N., and if that body puts the name on its own terrorist-supporter list, all member states are obliged to freeze the entity's assets.

Other ideas U.S. officials discussed included enlisting friendly countries to step up scrutiny and regulatory action against the Al Rajhis. The CIA report said that "a successful effort against the Al Rajhis would encourage efforts against other donors, or at a minimum, would discourage private funding of Al Qaeda."

Ultimately, the Bush administration again chose merely to continue privately exerting pressure on the Saudis to stiffen their oversight.

**Write to** Glenn R. Simpson at glenn.simpson@wsj.com[12]

**URL for this article:**
http://online.wsj.com/article/SB118530038250476405.html

**Hyperlinks in this Article:**
(1) OpenWin(' http://online.wsj.com/public/resources/documents/info-enlargePic07.html?project=imageShell07&bigImage=Rajhi_070725.gif&h=405&w=635&title=WSJ.COM=20070724','imageShell07','635','461','off','true',40,10);return false;
(2) http://online.wsj.com/article/SB109813521879148492.html
(3) http://wsj.com/public/resources/documents/4caseyorderjan182005.pdf
(4) http://wsj.com/public/resources/documents/5Communique1994No23.pdf
(5) http://wsj.com/public/resources/documents/CablestatedocC167.pdf
(6) http://wsj.com/public/resources/documents/iirodonationform2007.pdf
(7) http://www.iirosa.org/en/
(8) http://wsj.com/public/resources/documents/6IIRODesignation2006.pdf
(9) http://wsj.com/public/resources/documents/7iirodefensemarch2007color.pdf
(10) http://wsj.com/public/resources/documents/8Pagesfromiirosamarch2007color2.pdf
(11) http://wsj.com/public/resources/documents/9OperationAlFahr2004.ppt
(12) mailto:glenn.simpson@wsj.com

Copyright 2007 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our **Subscriber Agreement** and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit **www.djreprints.com**.

**RELATED ARTICLES AND BLOGS**

Related Articles from the Online Journal
- Al Qaeda May Use Iraqi Network To Attack Homeland, Report Says
- Big German Banks to Sever Most Iran Ties
- Terror Estimate
- Daniel Pearl's Widow Sues Pakistan's Largest Bank

Blog Posts About This Topic
- U.S. Tracks Saudi Bank Favored by Extremists - WSJ.com  minstrelboy.blogspot.com
- Saudi finance of terror in the Balkans  serbianna.com

More related content       *Powered by Sphere*

## Excerpt from 2003 CIA Report

**Al-Rajhi Bank: Conduit for Extremist Finance (S//NF)**

Islamic extremists have used Al-Rajhi Banking & Investment Corporation (ARABIC) since at least the mid-1990s as a conduit for terrorist transactions, probably because they find the bank's vast network and adherence to Islamic principles both convenient and ideologically sound. Senior al-Rajhi family members have long supported Islamic extremists and probably know that terrorists use their bank. Reporting indicates that senior al-Rajhi family members control the bank's most important decisions and that ARABIC's principle managers answer directly to Sulayman. The al-Rajhis know they are under scrutiny and have moved to conceal their activities from financial regulatory authorities.