# Exhibit 166

Plaintiffs' Corrected Averment of Jurisdictional Facts and
Evidence and/or Statement of Facts as to Defendant Al Rajhi Bank
<u>Pursuant to Rule 56.1</u>

# EXHIBIT 12A

DAC-00411-03

# Congress of the United States
Washington, D.C.

January 29, 2003

The Honorable George J. Tenet
Director of Central Intelligence
Washington, DC 20505

Dear Director Tenet:

As you know, the final report of the Joint Inquiry into the events of September 11 has been submitted to the Intelligence Community for declassification review. We look forward to early release of the public report so that efforts at reforms can be accelerated.

Having been privileged to lead this bipartisan, bicameral investigation last year, we are committed to working in the current Congress to help secure implementation of its recommendations. In furtherance of that goal, we are writing to the President and heads of departments and agencies about portions of the Joint Inquiry's recommendations that may be of particular concern to them.

Our first recommendation calls for establishment of a Director of National Intelligence, or DNI, who in addition to being the President's principal intelligence adviser "shall have the full range of management, budgetary and personnel responsibilities needed to make the U.S. Intelligence Community operate as a coherent whole." To help promote both strong leadership of the entire Intelligence Community leadership and an effective CIA, the Joint Inquiry also recommended that Congress provide that the DNI not simultaneously serve as director of the CIA or any other agency. In considering this recommendation, the Congress will certainly, we believe, benefit from learning of your views about the strengthening of the role of head of the Intelligence Community.

A number of the recommendations that follow address proposed tasks of the Director of National Intelligence, but as that reform will require study and deliberation, for the immediate future those further recommendations are directed to the Director of Central Intelligence as the present statutory head of the Intelligence Community.

The Joint Inquiry found that prior to September 11 neither the U.S. Government as a whole nor the Intelligence Community had a comprehensive counterterrorist strategy. One of our recommendations calls on the National Security Council, in conjunction with key agency and department heads, to prepare such a strategy for the President's approval. The recommendation states that the strategy should be

The Honorable George J. Tenet
January 29, 2003
Page 2

"government wide," apply both "home and abroad," and include "the growing terrorism
threat posed by the proliferation of weapons of mass destruction and associated
technologies." The recommendation asks that this strategy identify and fully engage the
intelligence as well as foreign policy, economic, military and law enforcement elements
that are "critical to a comprehensive blueprint for success in the war against terrorism."
The Director of Central Intelligence's full participation in this overall process will be
essential, as will the DCI's development of the Intelligence Community component of
the full strategy. The Joint Inquiry recommended that the Intelligence Community's
component of the overall strategy include a number of important items, among them
development of human sources to penetrate terrorist organizations and networks.

To provide to the Congress and Executive Branch policymakers intelligence
estimates on terrorism, the Joint Inquiry has recommended establishment on the
National Intelligence Council of the position of National Intelligence Officer for
Terrorism. The recommendation suggests that the person holding this position also
assist the Intelligence Community in developing a program for strategic analysis.

Another recommendation addresses the need for Congress and the
Administration to ensure development within the Department of Homeland Security of
an effective all-source terrorism information fusion center, as mandated by the
Homeland Security Act of 2002. The success of that fusion center will depend, as the
recommendation states, on the center's "full and timely access to all counterterrorism-
related intelligence information, including 'raw' supporting data as needed." Your action
to ensure full cooperation between the entire Intelligence Community (including, of
course, the CIA) and the Department of Homeland Security will be fundamental to the
success of this vital reform. We applaud the President's announcement of the
establishment of a new Terrorist Threat Integration Center, which we understand will be
located under the Director of Central Intelligence. The important challenge, we believe,
is to assure the full and harmonious implementation of both the information fusion
requirement of the Homeland Security Act and the center that the President announced.

The recommendations include a list of significant reforms that the Intelligence
Committees believe are essential for strengthening the FBI's domestic intelligence
capability. In regard to these critically needed reforms, the Joint Inquiry has
recommended that Congress should direct that the head of the Intelligence Community,
together with the Attorney General and the Secretary of Homeland Security, should
report to Congress on the FBI's progress. The report should include "the specific
manner in which a new domestic intelligence service could be established in the United

The Honorable George J. Tenet
January 29, 2003
Page 3

States, recognizing the need to enhance national security while fully protecting civil liberties."

The Committees expressed their strong conviction that "the Intelligence Community's employees remain its greatest resource." They recommend that the head of the Intelligence Community "should require that measures be implemented to greatly enhance the recruitment and development of a workforce with the intelligence skills and expertise needed for success in counterterrorist efforts." Several particular actions are set forth in the recommendation. One is that Intelligence Community agencies should expand and improve counterterrorism training, including about information sharing among law enforcement and intelligence personnel, the use of the Foreign Intelligence Surveillance Act, and watchlisting. The recommendation includes steps to improve Intelligence Community language capabilities and the utilization of the skills and experience of retired personnel. It calls on the Intelligence Community to "enhance recruitment of a more ethnically and culturally diverse workforce."

A further personnel recommendation proposes, in part, that Congress enact legislation, modeled on the landmark Goldwater-Nichols Department of Defense Reorganization Act of 1986, to help instill the concept of "jointness" throughout the Intelligence Community and ensure that its components will work more closely together than has been the case. The mechanisms identified in the recommendation include such things as joint tours for intelligence and law enforcement personnel as well as incentives for joint service throughout the Intelligence Community. In developing these ideas, Congress would benefit from the Administration's detailed proposals.

The Joint Inquiry identified several important objectives concerning classified information, including expanding access by federal agencies outside the Intelligence Community, by state and local authorities, and by the American public. To this end, we recommended that the Director of Central Intelligence, in consultation with the heads of key components of the Intelligence Community, including the Attorney General, should report to the Intelligence Committees on "proposals for a new and more realistic approach to the processes and structures that have governed the designation of sensitive and classified information." The report should also address "proposals to protect against the use of the classification process as a shield to protect agency self-interest."

The Congress and the Nation as a whole will be grateful for your attention and response to these and other matters identified in the course of the Joint Inquiry. Further, we are confident that the Congress will benefit from other recommendations

The Honorable George J. Tenet
January 29, 2003
Page 4

that you might have for legislative or administrative action to improve the Nation's
counterterrorist capabilities.

Sincerely,

Bob Graham
Chairman, Senate Intelligence
Committee, 107th Congress

Porter Goss
Chairman, House Intelligence
Committee, 107th and 108th
Congresses

Richard Shelby
Vice Chairman, Senate Intelligence
Committee, 107th Congress

Nancy Pelosi
Ranking Minority Member, House
Intelligence Committee, 107th Congress
and Member ex officio (as Minority
Leader), 108th Congress

Enclosure:  As stated

S. REPT. No. 107-   107TH CONGRESS, 2D SESSION   H. REPT. No. 107-

JOINT INQUIRY INTO
INTELLIGENCE COMMUNITY ACTIVITIES
BEFORE AND AFTER THE TERRORIST ATTACKS OF
SEPTEMBER 11, 2001

REPORT

OF THE

U.S. SENATE SELECT COMMITTEE ON INTELLIGENCE

AND

U.S. HOUSE PERMANENT SELECT COMMITTEE ON
INTELLIGENCE

TOGETHER WITH ADDITIONAL VIEWS

DECEMBER 2002

TOP SECRET ████████████ /NCS/NF

# PART FOUR—FINDING, DISCUSSION AND NARRATIVE REGARDING CERTAIN SENSITIVE NATIONAL SECURITY MATTERS

20. <u>Finding</u>: While in the United States, some of the September 11 hijackers were in contact with, and received support or assistance from, individuals who may be connected to the Saudi Government. There is information, primarily from FBI sources, that at least two of those individuals were alleged by some to be Saudi intelligence officers. The Joint Inquiry's review confirmed that the Intelligence Community also has information, much of which has yet to be independently verified, indicating that individuals associated with the Saudi Government in the United States may have other ties to al-Qa'ida and other terrorist groups. The FBI and CIA have informed the Joint Inquiry that, since the September 11 attacks, they are treating the Saudi issue seriously, but both still have only a limited understanding of the Saudi Government's ties to terrorist elements. In their testimony, neither CIA nor FBI witnesses were able to identify definitively the extent of Saudi support for terrorist activity globally or within the United States and the extent to which such support, if it exists, is knowing or inadvertent in nature. The FBI's Washington Field Office created a squad devoted to ████████████████████

████████████ ████████████

████████████████████████████████████. Only recently, and at least in part due to the Joint Inquiry's focus on this issue, did the FBI and CIA establish a working group to address the Saudi issue. In the view of the Joint Inquiry, this gap in U.S. intelligence coverage is unacceptable, given the magnitude and immediacy of the potential risk to U.S. national security. The Intelligence Community needs to address this area of concern as aggressively and as quickly as possible.

<u>Discussion</u>: One reason for the limited understanding is that it was only after September 11 that the U.S. Government began to aggressively investigate this issue. Prior to September 11th, the FBI apparently did not focus investigative resources on ████████████ ████████████ Saudi nationals in the United States due to Saudi Arabia's status as an American "ally." A representative of the FBI ████████████████ testified that, prior to ...

TOP SECRET ████████████ /NCS/NF

Case 1:03-md-01570-GBD-SN Document 9789-16 Filed 11/09/24 Page 9 of 37

TOP SECRET ▆▆▆▆▆▆▆ HCS/NF

September 11, 2001, the FBI received "no reporting from any member of the Intelligence Community" that there was a ▆▆▆▆▆▆ presence in the United States.

According to various FBI documents and at least one CIA memorandum, some of the September 11 hijackers, while in the United States, apparently had contacts with individuals who may be connected to the Saudi Government. While the Joint Inquiry uncovered this material during the course of its review of FBI and CIA documents, it did not attempt to investigate and assess the accuracy and significance of this information independently, recognizing that such a task would be beyond the scope of this Joint Inquiry. Instead, the Joint Inquiry referred a detailed compilation of information uncovered by the Inquiry in documents and interviews to the FBI and CIA for further investigation by the Intelligence Community and, if appropriate, law enforcement agencies. A brief summary of the available information regarding some of these individuals is illustrative for purposes of this report:

- Omar al-Bayoumi. The FBI has received numerous reports from individuals in the Muslim community, dating back to 1999, alleging that al-Bayoumi may be a Saudi intelligence officer. FBI files suggest that al-Bayoumi provided substantial assistance to hijackers Khalid al-Mihdhar and Nawaf al-Hazmi after they arrived in San Diego in February 2000. Al-Bayoumi met the hijackers at a public place shortly after his meeting with an individual at the Saudi consulate and there are indications in the files that his encounter with the hijackers may not have been accidental. During this same timeframe, al-Bayoumi had extensive contact with Saudi Government establishments in the United States and received financial support from a Saudi company affiliated with the Saudi Ministry of Defense. According to FBI files, ▆▆▆▆▆ at the company said that al-Bayoumi received a monthly salary even though he had been there on only one occasion. This support increased substantially in April 2000, two months after the hijackers arrived in San Diego, decreased slightly in December 2000, and stayed at that same level until August 2001. That company reportedly had ties to Usama Bin Ladin and al-Qa'ida. In addition, the FBI determined that al-Bayoumi was in contact with several individuals under FBI investigation and with the Holy Land Foundation, which has been under investigation as a fundraising front for Hamas;

TOP SECRET ▆▆▆▆▆▆ HCS/NF 416

- Osama Bassnan. Bassnan may have been in contact with al-Mihdhar and al-Hazmi during their time in San Diego. Bassnan was a close associate of al-Bayoumi and Omar Bakarbashat, another one of the hijackers' close associates. He also lived across the street from the hijackers, and made a comment to an FBI asset that he did more than al-Bayoumi did for the hijackers. According to an FBI document, Basnan told another individual that he met al-Hazmi through al-Bayoumi and later that he met two of the hijackers through al-Bayoumi. He also told the asset that al-Bayoumi was arrested because he knew al-Hazmi and al-Mihdhar very well. The document goes on to state that Bassnan and al-Bayoumi have been "close to each other for a long time." Bassnan has many ties to the Saudi Government, including past employment by the Saudi Arabian Education Mission, referred to in FBI documents as ████████████████. The FBI also received reports from individuals in the Muslim community alleging that Bassnan might be a Saudi intelligence officer. According to a CIA memo, Bassnan reportedly received funding and possibly a fake passport from Saudi Government officials. He and his wife have received financial support from the Saudi Ambassador to the United States and his wife. A CIA report also indicates that Bassnan traveled to Houston in 2002 and met with an individual who was ████████████████████████████████████████. The report states that during that trip a member of the Saudi Royal Family provided Bassnan with a significant amount of cash. FBI information indicates that Bassnan is an extremist and supporter of Usama Bin Ladin, and has been connected to the Eritrean Islamic Jihad and the Blind Shaykh;

- Shaykh al-Thumairy. According to FBI documents and a CIA memorandum, al-Hazmi and al-Mihdhar may have been in contact with Shaykh al-Thumairy, an accredited diplomat at the Saudi Consulate in Los Angeles and one of the "imams" at the King Fahad mosque in Culver City, California. Also according to FBI documents, the mosque was built in 1998 from funding provided by Saudi Arabia's Crown Prince Abdulaziz. The mosque is reportedly attended by members of the Saudi Consulate in Los Angeles and is widely recognized for its anti-Western views;

TOP SECRET                    HCS/XI

- Saleh al-Hussayen. In September 2001, Saleh al-Hussayen, reportedly a Saudi Interior Ministry official, stayed at the same hotel in Herndon, Virginia where al-Hazmi was staying. While al-Hussayen claimed after September 11 not to know the hijackers, FBI agents believed he was being deceptive. He was able to depart the United States despite FBI efforts to locate and re-interview him; and

- Abdullah Bin Ladin. Abdullah Bin Ladin claims to work for the Saudi Embassy in Washington, D.C. as an administrative officer. He is identified by the FBI as Usama Bin Ladin's half brother. He is a close friend of Mohammed Quadir-Harunani, a possible associate of Mohammed Atta and Marwan al-Shehhi prior to September 11, 2001.

The Joint Inquiry also found other indications that individuals connected to the Saudi Government have ties to terrorist networks, including:

- The CIA and FBI have identified the Ibn Tamiyah Mosque in Culver City as a site of extremist-related activity. Several subjects of FBI investigations prior to September 11 had close connections to the mosque and are believed to have laundered money through this mosque to non-profit organizations overseas affiliated with Usama Bin Ladin. In an interview, an FBI agent said he believed that Saudi Government money was being laundered through the mosque;

- Another Saudi national with close ties to the Saudi Royal Family, [redacted], is the subject of FBI counterterrorism investigations and reportedly was checking security at the United States' southwest border in 1999 and discussing the possibility of infiltrating individuals into the United States;

- According to FBI documents, several of the phone numbers found in the phone book of Abu Zubaida, a senior al-Qa'ida operative captured in Pakistan in March 2002, could be linked, at least indirectly, to telephone numbers in the United States. One of those U.S. numbers is subscribed to by the ASPCOL Corporation, which is located in Aspen,

TOP SECRET                    HCS/XI                    418

Case 1:03-cv-01570-GBD-SN   Document 10599-12   Filed 12/09/24   Page 13 of 37

TOP SECRET ▮▮▮▮▮▮▮▮ NOCON

Colorado, and manages the affairs of the Colorado residence of the Saudi Ambassador Bandar. The FBI noted that ASPCOL has an unlisted telephone number. A November 18, 2002 FBI response to the Joint Inquiry states that "CIA traces have revealed no direct links between numbers found in Zubaida's phone book and numbers in the United States."

- According to an FBI document, the telephone number of a bodyguard at the Saudi Embassy in Washington, DC, who some have alleged may be a ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ — was also found in Abu Zubaida's possessions; and

- According to an FBI agent in Phoenix, the FBI suspects Mohammed al-Qudhaeein of being ▮▮▮▮▮▮▮▮▮▮▮▮ Al-Qudhaeein was involved in a 1999 incident aboard an America West flight, which the FBI's Phoenix office now suspects may have been a "dry run" to test airline security. During the flight, al-Qudhaeein and his associate asked the flight attendants a variety of suspicious questions; al-Qudhaeein then attempted to enter the cockpit on two occasions. Al-Qudhaeein and his associate were flying to Washington, D.C. to attend a party at the Saudi Embassy, and both claimed that their tickets were paid for by the Saudi Embassy. During the course of its investigations, the FBI has discovered that both al-Qudhaeein and the other individual involved in this incident had connections to terrorism.

Finally, the Committees are particularly concerned about the serious nature of allegations contained in a CIA memorandum found by the Joint Inquiry Staff in the files of the FBI's San Diego Field Office. That memorandum, which discusses alleged financial connections between the September 11 hijackers, Saudi Government officials, and members of the Saudi Royal Family, was drafted by a CIA officer ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, relying primarily on information from FBI files. The CIA officer sent it to the CTC to determine whether CIA had additional information. He also provided a copy to the FBI agent responsible for the investigation of one of the individuals discussed in the memorandum. Despite the clear national implications of the CIA memorandum, the FBI agent included the memorandum in an individual case file and did not forward it to FBI Headquarters. FBI Headquarters, therefore, was unaware

TOP SECRET ████████ ██████ HCS/NF

of statements in the memorandum until the Joint Inquiry brought the memorandum's implications to the Bureau's attention. ████████████████████████

████████████████████████████████████████████

### Possible Saudi Government Connections to Terrorists and Terrorist Groups

While in the United States, some of the September 11 hijackers were in contact with, and received support or assistance from, individuals who may be connected to the Saudi Government. There is information, from FBI sources, that at least two of those individuals were alleged to be Saudi intelligence officers. The Joint Inquiry's review confirmed that the Intelligence Community also has information, much of which remains speculative and yet to be independently verified, indicating that Saudi Government officials in the United States may have other ties to al-Qa'ida and other terrorist groups.

The Committees are particularly concerned about the serious nature of allegations contained in a CIA memorandum found within the files of the FBI's San Diego Field Office That memorandum, which discusses alleged financial connections between the September 11 hijackers, Saudi Government officials, and members of the Saudi Royal Family, was drafted by a CIA officer ████████████████████, relying primarily on information from FBI files.

In their testimony before the Joint Inquiry, neither the CIA nor the FBI was able to definitively identify for these Committees the extent of Saudi support for terrorist activity globally or within the United States and the extent to which such support, if it exists, is intentional or innocent in nature. Both the FBI and CIA have indicated to the Committees that they are now aggressively pursuing Saudi-related terrorism issues.

Prior to September 11th, the FBI apparently did not focus investigative ████████
████████████████████████████████████████ Saudi nationals in the United States due to Saudi Arabia's status as an American "ally". ████████████
████████████████████████████████████████████
████████████. A representative of the FBI's ████████████████ testified in closed

TOP SECRET ████████ ██████ HCS/NF          420

TOP SECRET //NOFORN

hearings that, prior to September 11th, the FBI received "no reporting from any member of the Intelligence Community" that there is a ████████████ presence in the United States.

It should be clear that this Joint Inquiry has made no final determinations as to the reliability or sufficiency of the information regarding these issues that we found contained in FBI and CIA documents. It was not the task of this Joint Inquiry to conduct the kind of extensive investigation that would be required to determined the true significance of any such alleged connections to the Saudi Government. On the one hand, it is possible that these kinds of connections could suggest, as indicated in a ████████████ dated July 2, 2002, "incontrovertible evidence that there is support for these terrorists within the Saudi Government." On the other hand, it is also possible that further investigation of these allegations could reveal legitimate, and innocent, explanations for these associations.

Given the serious national security implications of this information, however, the leadership of the Joint Inquiry is referring the staff's compilation of relevant information to both the FBI and the CIA for investigative review and appropriate investigative and intelligence action.

Possible Connections Between the September 11 Hijackers and Saudi Government Officials in the United States

In reviewing FBI documents and the CIA memorandum, the Joint Inquiry Staff has examined information suggesting that:

- One individual who provided assistance to Nawaf al-Hazmi and Khalid al-Mihdhar may be connected to the Saudi Government. A second individual who may have been in contact with al-Hazmi and Al-Mihdhar also has ties to the Saudi Government, including connections to the Saudi Ambassador to the United States. There is reporting in FBI files that persons have alleged that both of these individuals may be Saudi intelligence officers;


TOP SECRET //NOFORN                421

TOP SECRET ████████ //CS/NF

- The September 11 hijackers may have been in contact with other Saudi Government officials in the United States prior to the September 11 attacks; and

- Saudi Government officials in the United States may have ties to Usama Bin Ladin's terrorist network.

**Omar al-Bayoumi and Osama Bassnan**

Two individuals known to the FBI prior to September 11, 2001 – Omar al-Bayoumi and Osama Bassnan – may have provided assistance or support to al-Hazmi and al-Mihdhar while the two hijackers-to-be were living in San Diego. While the documentary evidence that al-Bayoumi provided assistance to al-Hazmi and al-Mihdhar is solid, the files contain only limited evidence that Osama Bassnan had contacts with the two individuals.

When al-Hazmi and al-Mihdhar moved to San Diego, al-Bayoumi provided them with considerable assistance. Before the hijackers moved in with the long-time FBI informant, they stayed at al-Bayoumi's apartment for several days until al-Bayoumi was able to find them an apartment. Al-Bayoumi then co-signed their lease and may have paid their first month's rent and security deposit.[1] After al-Hazmi and al-Mihdhar moved into their own apartment, al-Bayoumi threw a party to welcome them to the San Diego community. He also tasked Modhar Abdullah, another individual from the Islamic Center of San Diego (ICSD), to help them get acclimated to the United States. Abdullah served as their translator, helped them get drivers' licenses, and assisted them in locating flight schools. ████████

---

[1] The FBI notes, in its November 18, 2002 response that "financial records indicate a cash deposit of the same amount as the cashier's check into al-Bayoumi's bank account on the same day, which suggests that the hijackers reimbursed him." FBI November 18 Response, 3. However, another FBI document, dated October 14, 2002, appears to reach a slightly different conclusion. This document states that "a review of Khalid Al-Mihdhar and Nawaf Al-Hazmi's bank records indicate there is no bank documentation that supports the reimbursement of [the rent money], or any monies to Omar Al-Bayoumi from al-Hazmi or Al-Midhar."

TOP SECRET// ~~████████~~ //HCS/NF

During the post-September 11 investigation, the FBI discovered that al-Bayoumi had far more extensive ties to the Saudi Government than previously realized. In fact, according to an October 14, 2002 FBI document, al-Bayoumi has "extensive ties to the Saudi Government." The connections identified by the FBI are:

- Al-Bayoumi had been an accountant at the Saudi Civil Aviation Administration from 1976 to 1993, when he relocated to the United States;

- According to the FBI, al-Bayoumi was in frequent contact with the Emir at the Saudi Ministry of Defense, responsible for air traffic control;

- The FBI has also located records, indicating that al-Bayoumi received $20,000 from the Saudi Ministry of Finance at one point;

- When al-Bayoumi applied to schools in the United States in 1998, he had a letter from the Saudi Embassy, which stated that he was getting a full scholarship from the Government of Saudi Arabia; and

- While in San Diego, al-Bayoumi was receiving money from the Saudi Ministry of Defense through a Saudi company called "Ercan." ████████ of that company informed the FBI after September 11, 2001 that, although al-Bayoumi only showed up at the company on one occasion, he received a monthly salary and allowances. ████████ stated that, at first, he attempted to refuse to pay al-Bayoumi a monthly salary, but he was told that his company would lose their contract if he did not pay him. ████████ informed the FBI that at the time, he attributed this to Saudi corruption.

Al-Bayoumi also had frequent contact with Saudi establishments in the United States. In a review of telephone toll records, the FBI learned that al-Bayoumi called Saudi Government establishments in the United States almost 100 times between January and May of 2000. According to the FBI, al-Bayoumi was in contact with at least three individuals at the Saudi

TOP SECRET// ~~████████~~ //HCS/NF          423

TOP SECRET　　　　　　　　　//ORCON//

Embassy in Washington, DC; two individuals at the Saudi Arabian Cultural Mission in Washington, DC; and three individuals at the Saudi Consulate in Los Angeles. In a search of Bayoumi's ▮▮▮▮▮ ▮▮▮▮▮, they also discovered that he had the phone number for an individual at the Saudi Consulate in London.

Two former San Diego agents addressed the issue of whether al-Bayoumi was an intelligence officer at the October 9, 2002 closed hearing. The former case agent who handled Muppet testified:

> [Al-Bayoumi] acted like a Saudi intelligence officer, in my opinion. And if he was involved with the hijackers, which it looks like he was, if he signed leases, if he provided some sort of financing or payment of some sort, then I would say that there's a clear possibility that there might be a connection between Saudi intelligence and UBL.

A former Assistant Special Agent in Charge in San Diego testified that the FBI received "numerous, I would say half a dozen" reports from individuals who believed that al-Bayoumi was a Saudi intelligence officer. The FBI's November 18th response is inconsistent as to whether the FBI currently is designating al-Bayoumi as a suspected Saudi intelligence officer. In its response, the FBI notes that al-Bayoumi ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ until after September 11th, but the response also states that "there is no evidence" to conclude that al-Bayoumi is a Saudi intelligence officer.

The FBI had received reporting from a reliable source well prior to September 11, 2001 indicating that al-Bayoumi might be a Saudi intelligence officer. Al-Bayoumi was known to have access to large amounts of money from Saudi Arabia, despite the fact that he did not appear to hold a job. On one occasion prior to September 11, the FBI received information that al-Bayoumi had received $400,000 from Saudi Arabia to help fund a new mosque in San Diego. The FBI conducted a counterterrorism investigation on al-Bayoumi in 1998 and 1999, but closed the investigation at that point.

TOP SECRET　　　　　　　　　//ORCON//

424

TOP SECRET ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ HCSM

Since September 11, 2001 FBI investigation revealed that al-Bayoumi has some ties to terrorist elements. Pasquale J. D'Amuro, the Executive Assistant Director for Counterterrorism and Counterintelligence testified in the October 9, 2002 hearing that

> [w]e've been talking with the �reducted▓ Government about collection on an individual named ▓▓▓▓▓ who has ties to al-Qa'ida, who has ties to Bayoumi.

In addition, the FBI reported the results of their search of al-Bayoumi's ▓▓▓▓▓ that, "after an exhaustive translations of Bayoumi's documents, it is clear that in Bayoumi's correspondence he is providing guidance to young Muslims and some of his writings can be interpreted as jihadist."

According to information acquired by the FBI after September 11, 2001, al-Bayoumi also noted on one of his school applications that he worked for a company called "Dallah/Avco." According to the FBI, Ercan is a San Diego subcontractor of Dallah/Avco. According to a separate ▓▓ document, Dallah and Avco are under the same umbrella company, Avco Dallah Trans Arab, which is a subsidiary of Al Barakaat Investment and Development Company. Avco Dallah reportedly holds the contracts for cleaning and maintenance at the three major airports in Saudi Arabia. The ▓▓ document states that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ the company has links to Usama Bin Ladin. FBI Headquarters was informed of the affiliation between Dallah/Avco and Al Barakaat in February 2001, but the San Diego Field Office apparently never got this information.

According to FBI documents, al-Bayoumi's pay increased during the time that al-Hazmi and al-Mihdhar were in the United States. According to a recent ▓▓▓ analysis of ties between the terrorist attacks and elements of the Saudi Government, before al-Hazmi and al-Mihdhar arrived in the U.S., al-Bayoumi generally received approximately $465 per month in "allowances." According to the ▓▓ document, in March 2000, a month after al-Hazmi and al-Mihdhar arrived in San Diego, his "allowances" jumped to over $3700 a month and stayed constant until December 2000, when al-Hazmi left San Diego. Al-Bayoumi's allowances were then decreased to approximately $3,200 a month and stayed at that rate until al-Bayoumi left the United States in August 2001, approximately one month before the September 11th attacks.

TOP SECRET ███████ ██████

The ███ memorandum dated July 2, 2002, incorrectly noted that al-Bayoumi's wife, while living in San Diego, was receiving $1200 a month from Princess Haifa Bint Sultan, the wife of Prince Bandar, the Saudi Ambassador to the United States. The FBI has now confirmed that only Osama Bassnan's wife received money directly from Prince Bandar's wife, but that al-Bayoumi's wife attempted to deposit three of the checks from Prince Bandar's wife, which were payable to Bassnan's wife, into her own accounts.

The Joint Inquiry also found, in FBI files, information suggesting that Osama Bassnan may have also been in contact with al-Mihdhar and al-Hazmi, including:

- Bassnan was a very close associate of Omar al-Bayoumi's and was in telephone contact with al-Bayoumi several times a day while they were both in San Diego. Bassnan also has close ties to a number of other individuals connected to the hijackers, including Omar Bakarbashat, discussed below, who is referred to in FBI documents as Bassnan's brother-in-law;

- According to an October 16, 2001 FBI document, Bassnan informed an asset that he had met Nawaf al-Hazmi through al-Bayoumi. He went on to say that he met two of the nineteen hijackers through Omar al-Bayoumi. According to the FBI document, he also told the asset that al-Bayoumi was arrested because he knew al-Hazmi and al-Mihdhar very well. The document goes on to state that Bassnan and al-Bayoumi have been "close to each other for a long time."

- Bassnan lived in the apartment complex in San Diego across the street from al-Hazmi and al-Mihdhar;

- Bassnan made a comment to an FBI source after the September 11 attacks suggesting that he did more for the hijackers than al-Bayoumi did;

TOP SECRET ███████ ██████            426

Case 1:03-md-01570-GBD-SN Document 5785-18 Filed 12/09/21 Page 1 of 18

# EXHIBIT 12B

~~TOP SECRET~~ ███████ ~~JICSAP~~

- The FBI is aware of contact between the hijackers and a close friend of Bassnan's, Khaled al-Kayed, a commercial airline pilot and certified flight instructor living in San Diego. Al-Kayed admitted to the FBI that in May 2000, al-Mihdhar and al-Hazmi contacted him about learning to fly Boeing jet aircraft;

FBI documents speculate that Osama Bassnan ████████████████████████
█████████████ ██████ The FBI's November 18, 2002 response contends that this was an early investigative theory based on asset reporting which the FBI has not been able to corroborate. However, there is also additional information possibly tying Bassnan to██████
████████ In 1992, while he was living in Washington, DC, Bassnan listed his employment as the Saudi Arabian Education Mission. FBI documents state that███████████████████
████████████████████████████████████████████████████████████████
███████████████████

Bassnan also has other ties to the Saudi Government. Bassnan's wife received a monthly stipend from Princess Haifa. In a recent search of Bassnan's residence, the FBI located copies of 31 cashiers checks totaling $74,000, during the period February 22, 1999 to May 30, 2002. These checks were payable to Bassnan's wife and were drawn on the Riggs Bank account of Prince Bandar's wife. The FBI has determined that there has been a standing order on Princess Haifa's account since January 1999 to send $2000 a month to Bassnan's wife. Bassnan's wife was allegedly receiving the funding for "nursing services," but, according to the ████ document, there is no evidence that Bassnan's wife provided nursing services. ██████████████
████ █ ██████████████████████████████████████████████
████████████████████████████████████

On at least one occasion, Bassnan received a check directly from Prince Bandar's account. According to the FBI, on May 14, 1998, Bassnan cashed a check from Bandar in the amount of $15,000. Bassnan's wife also received at least one check directly from Bandar. She also received one additional check from Bandar's wife, which she cashed on January 8, 1998, for $10,000.

~~TOP SECRET~~ ███████ ~~JICSAP~~ 427

TOP SECRET ████████████ ███NF

In the October 9, 2002 hearing FBI Executive Assistant Director D'Amuro commented on this funding:

> I believe that we do have money going from Bandar's wife, $2,000 a month up to about $64,000. What the money was for is what we don't know."

████████████████████████████ testified:

████████████████████████. She gives money to a lot of different groups and people from around the world. We've been able to uncover a number of these…but maybe if we can discover that she gives to 20 different radical groups, well, gee, maybe there's a pattern here.

The FBI has also developed additional information clearly indicating that Bassnan is an extremist and supporter of Usama Bin Ladin. In 1993, the FBI became aware that Bassnan had hosted a party for the Blind Shaykh at his house in Washington, DC in October 1992. Bassnan has made many laudatory remarks to FBI assets about Bin Ladin, referring to Bin Ladin as the official Khalifate and the ruler of the Islamic world. According to an FBI asset, Bassnan spoke of Bin Ladin "as if he were a god." Bassnan also stated to an FBI asset that he heard that the U.S. Government had stopped approving visas for foreign students. He considered such measures to be insufficient as there are already enough Muslims in the United States to destroy the United States and make it an Islamic state within ten to fifteen years. According to FBI documents, Bassnan also knew Bin Ladin's family in Saudi Arabia and speaks on his mobile telephone with members of the family who are living in the United States.

## Phone Numbers Linking Abu Zubaida to a Company in the United States and a Saudi Diplomat in Washington

On March 28, 2002 U.S. and coalition forces retrieved the telephone book of Abu Zubaida, whom the U.S. Government has identified as a senior al-Qa'ida operational coordinator. According to an FBI document, "a review of toll records has linked several of the numbers found in Zubaida's phonebook with U.S. phone numbers." One of the numbers is unlisted and subscribed to by the ASPCOL Corporation in Aspen, Colorado. On July 15, 2002,

TOP SECRET ████████████ ███NF 428

TOP SECRET▓▓▓▓▓▓▓▓▓▓▓HCS/NF

FBI Headquarters sent a lead to the Denver Field Office requesting that it investigate this connection. On September 19, 2002 agents of the Denver Field Office responded, stating that they had completed their initial investigation.

According to the FBI's Denver Office, ASPCOL is the umbrella corporation that manages the affairs of the Colorado residence of Prince Bandar, the Saudi ambassador to the United States. The facility is protected by Scimitar Security. Agents of the Denver Field Office noted that neither ASPCOL nor Scimitar Security is listed in the phone book or is easily locatable. In addition, the Colorado Secretary of State's office has no record of ASPCOL. The Denver office did not attempt to make any local inquiries about ASPCOL, as they believed that any inquiries regarding ASPCOL would be quickly known by Prince Bandar's employees. Due to the sensitivity of this matter, they decided to hold their investigation of ASPCOL in abeyance until they received additional guidance from FBI Headquarters.

According to the FBI, the phone number of an individual named ▓▓▓▓▓▓▓▓ of McLean, Virginia was found within the effects of Abu Zubaida. ▓▓▓▓▓▓ is reportedly a bodyguard at the Saudi Embassy in Washington, DC. The FBI now suspects that he may be a ▓▓▓▓▓▓▓▓▓▓. In a September 17, 2002 document, the FBI notes that the Bureau is opening an investigation on ▓▓▓▓ due to the size and value of his residence and his suspicious activity in approaching U.S. Intelligence Community personnel. It also appears that ▓▓▓▓▓ has been in contact with ▓▓▓▓▓▓▓▓▓▓, which is located at ▓▓ ▓▓▓▓▓▓▓▓▓▓, in McLean, Virginia. The FBI has identified this address as the address of Prince Bandar. According to the FBI, ▓▓▓▓ is officially a driver for the Saudi Embassy. ▓▓▓▓▓▓ number was also linked to ASPCOL, Prince Bandar's umbrella company located in Colorado.

It should be noted that the FBI's November 18, 2002 response states that "CIA traces have revealed no *direct* (emphasis added) links between numbers found in Zubaida's phone book and numbers in the United States."

TOP SECRET▓▓▓▓▓▓▓▓▓▓HCS/NF          429

TOP SECRET / HCS/NF

The U.S. Government also located another Virginia number at an Usama Bin Ladin safehouse in Pakistan. The number is subscribed to by an individual named ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ was interviewed by the FBI in June 2002. He could not explain why his number ended up at a safehouse in Pakistan, but stated that he regularly provides services to a couple who are personal assistants to Prince Bandar. This couple's driver is an individual named ▮▮▮▮▮▮▮▮▮▮▮, who is assigned to the Saudi Embassy in Washington, DC. According to ▮▮▮▮▮▮▮ regularly called ▮▮▮▮▮▮▮ business and frequently travels back and forth to Pakistan.

**Other Saudi Government Officials in the United States Who May Have Been in Contact with the September 11 Hijackers**

Among the individuals who may have been associates of the al-Hazmi and al-Mihdhar was Shaykh al-Thumairy. According to the ▮▮▮ memorandum reviewed by the Joint Inquiry Staff, "initial indications are that al-Thumairy may have had a physical or financial connection to al-Hazmi and al-Mihdhar, but we are still looking at this possibility." Al-Thumairy is an accredited diplomat at the Saudi Consulate in Los Angeles and is also considered one of the "imams" at the King Fahad Mosque in Culver City, California. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

According to FBI documents, the King Fahad mosque was built in 1998 from funding from the Saudi Arabian Crown Prince Abdulaziz. The mosque is attended by members of the Saudi Consulate in Los Angeles and is widely known for its anti-Western views. FBI documents indicate that Mohdhar Abdullah drove al-Hazmi and al-Mihdhar to the King Fahad Mosque, before al-Mihdhar returned to Saudi Arabia.

Several individuals on the East Coast whom the hijackers may have met may also had connections to the Saudi Government. After the terrorist attacks, the FBI discovered that, during September 2001, an individual named Saleh al-Hussayen stayed at the same hotel in Herndon, Virginia where al-Hazmi was staying at the time. According to FBI documents al-Hussayen is apparently a "Saudi Interior Ministry employee/official." He claimed not to know the hijackers,

TOP SECRET                    NOFORN

but agents in the FBI's Washington Field Office believed he was being deceptive. The interview was terminated when al-Hussayen either passed out or feigned a seizure requiring medical treatment. He was released from the hospital several days later and managed to depart the United States despite law enforcement efforts to locate and re-interview him.

Saleh al-Hussayen is the uncle of Sami Omar al-Hussayen. Sami al-Hussayen is connected to the Islamic Assembly of North America (IANA) and is the subject of an FBI counterterrorism investigation. The FBI has also discovered that Saleh al-Hussayen is a major contributor to the IANA, a non-profit organization based in Michigan that is dedicated to the spread of Islam worldwide. According to the FBI, the IANA's mission is actually to spread Islamic fundamentalism and Salafist doctrine throughout the United States and the world at large. The IANA solicits funds from wealthy Saudi benefactors, extremist Islamic Shaykhs, and suspect non-governmental organizations. According to FBI documents, IANA has solicited money from Prince Bandar, but the documents are unclear as to whether Bandar actually contributed money to this organization.

FBI documents also indicate that several Saudi Naval officers were in contact with the September 11 hijackers. FBI documents state that the San Diego Field Office opened a counterterrorism investigation on an individual named Osama Nooh, a Saudi Naval officer, due to his association with Nawaf al-Hazmi and Khalid al-Mihdhar. In addition, Lafi al-Harbi, another Saudi Naval officer, was in telephonic contact with flight 77 hijackers Khalid al-Mihdhar and Nawaf al-Hazmi on nine occasions from March 11, 2000 to March 27, 2000.

The Jacksonville FBI Field Office is conducting an investigation to determine whether Saleh Ahmed Bedaiwi, a Saudi Naval officer within its territory was in contact with any of the hijackers.



TOP SECRET ████████████ ████/NF

The FBI has also discovered some more tenuous connections between Saudi Government personnel and the hijackers during the course of the PENTTBOM investigation. For example, according to the FBI, an individual named Fahad Abdullah Saleh Bakala was close friends with September 11 hijackers Ahmed al-Ghamdi and Hamza al-Ghamdi. Bakala previously "worked as a pilot for the Saudi Royal family, flying Usama Bin Ladin between Afghanistan and Saudi Arabia during UBL's exile." In addition, an FBI source stated after September 11 that he/she was 50% sure that al-Mihdhar was a visitor at an apartment in McLean, Virginia that was occupied in July and August 2001 by Hamad Alotaibi of the Saudi Embassy Military Division. FBI documents also note that September 11 hijacker Saeed Alghamdi may have also visited the address.

**Connections Between Saudi Government Officials in the United States and Other Possible Terrorist Operatives**

The Joint Inquiry also reviewed information in FBI files, suggesting other possible connections between Saudi Government officials and terrorist operatives.

For example, according to FBI documents, there is evidence that hijackers Marwan al-Shehhi and Mohammed Atta were in contact with Mohammed Rafique Quadir Harunani, the subject of an FBI counterterrorism investigation since 1999 and a close associate of Abdullah Bin Ladin, who is referred to in FBI documents as Usama Bin Ladin's half brother. Abdullah Bin Ladin, who is the subject of several FBI investigations, is currently in the United States ███ ████████████████████████████████ He claims to work for the Saudi Arabian Embassy in Washington, DC as an administrative officer. Abdullah Bin Ladin has financed Quadir's company and is listed by Quadir as the emergency contact for Quadir's children. They are in frequent email and phone contact as well.

Case 1:03-md-01570-GBD-SN Document 5793-18 Filed 12/09/24 Page 27 of 18

TOP SECRET/ /HCS/NF

According to the FBI, Abdullah Bin Ladin has a number of connections to terrorist organizations. He is the President and Director of the World Arab Muslim Youth Association (WAMY) and the Institute of Islamic and Arabic Sciences in America. Both organizations are local branches of non-governmental organizations (NGOs) based in Riyadh, Saudi Arabia. According to the FBI, there is reason to believe that WAMY is "closely associated with the funding and financing of international terrorist activities and in the past has provided logistical support to individuals wishing to fight in the Afghan War." In 1998, the CIA published a paper characterizing WAMY as a NGO that provides funding, logistical support and training with possible connections to the Arab Afghans network, Hamas, Algerian extremists, and Philippine militants. [2]

Also of potential interest, at least in retrospect, is the 1999 incident involving Mohammed al-Qudhaeein and Hamdan al-Shalawi. Al-Qudhaeein and al-Shalawi were flying from Phoenix to Washington, DC to attend a party at the Saudi Embassy. After they boarded the plane in Phoenix, they began asking the flight attendants technical questions about the flight that the flight attendants found suspicious. When the plane was in flight, al-Qudhaeein asked where the bathroom was; one of the flight attendants pointed him to the back of the plane. Nevertheless, al-Qudhaeein went to the front of the plane and attempted on two occasions to enter the cockpit. The plane made an emergency landing and the FBI investigated the incident, but decided not to pursue a prosecution. At the time, al-Qudhaeein and al-Shalawi claimed that the Saudi Embassy paid for their airplane tickets.

After the FBI discovered that an individual in Phoenix who was the subject of a counterterrorism investigation was driving al-Shalawi's car, the Bureau opened a counterterrorism investigation on al-Shalawi. In November 2000, the FBI received reporting from ▆▆▆▆ that al-Shalawi had trained at the terrorist camps in Afghanistan and had received explosives training to perform "Khobar Towers"-type attacks. After the September 11, 2001 attacks, the Phoenix Field Office attached even potentially greater significance to that 1999 incident. A Phoenix FBI communication explained the theory behind this: "Phoenix FBI now

---

[2] According to the FBI's November 18, 2002 response, although several officials in WAMY support al-Qa'ida and other terrorist groups, the intelligence is insufficient to show whether the organization as a whole and its senior leadership support terrorism.

Case 1:03-md-01570-GBD-SN Document 5793-18 Filed 12/09/24 Page 9 of 18

TOP SECRET//~~~~~~~~~~//NOFORN

believes both men were specifically attempting to test the security procedures of America West Airlines in preparation for and in furtherance of UBL/Al Qaeda operations."

In testimony before the Joint Inquiry, the agent who drafted the "Phoenix EC" stated:

In a post 9/11 world, I went back and looked at that as possibly being some sort of dry run. It is currently under investigation.

After September 11, 2001, al-Qudhaeein ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

████████████

In interviews, a Phoenix FBI agent stated that Phoenix ████████████████████████ believed that al-Qudhaeein might be ████████████████. His profile is similar to that of al-Bayoumi and Bassnan. He is in the United States as a student and does not have a visible means of income. He is in frequent contact with Saudi Government establishments in the United States and appears to be very involved in the affairs of the local Saudi community. He runs a "Saudi Club" in Phoenix, and assists Saudi students in the area. The FBI has also developed information that al-Qudhaeein was receiving money from the Saudi Government but, as of August 2002, had not obtained the relevant bank records for review. The FBI's Phoenix Field Office has speculated that al-Qudhaeein and others may be ████████████████████ █████████.

There are other indications in FBI files that elements of the Saudi Government may have provided support to terrorist networks. For example, the FBI had identified the Ibn Tamiyah Mosque in Culver City as a site of extremist-related activity both before and after September 11. Several subjects of San Diego investigation prior to September 11 had close connections to the mosque. Based on interviews and review of FBI files, San Diego FBI agents believed at the time that these subjects were laundering money through this mosque first to Somali non-profit organizations and then to other entities affiliated with Usama Bin Ladin.

TOP SECRET//~~~~~~~~~~//NOFORN



In approximately 1998, the FBI became aware of millions of dollars in wire transfers from the Somali community in San Diego to Al Barakaat Trading Company and other businesses affiliated with Usama Bin Ladin. At the time, the funding appeared to be originating from the local Somali community in the form of donations to various Somali non-profits. However, the FBI now believes that the some of the funding actually originated from Saudi Arabia and that both the Ibn Tamiyah Mosque in Los Angeles and the Islamic Center of San Diego were involved in laundering the money.

According to the former FBI agent in San Diego who was involved in this investigation, this scheme may allow the Saudi Government to provide al-Qa'ida with funding through covert or indirect means. In his October 9, 2002 testimony the former agent commented on the possible money laundering:

> My guess Saudi–it's connected somehow with the Saudis. And knowing that probably 70-80 percent of the population of Saudi Arabia support Usama Bin Ladin, it might be an indication.

There are also indications of Saudi governmental support for terrorist activity through charitable organizations. The Saudi-based Umm al-Qura Islamic Charitable Foundation (UQ) is an Islamic non-governmental organization linked to terrorist support activities. According to a May 2002 Defense Intelligence Terrorism Summary, the UQ's activities in support of terrorism include: suspicious money transfers, document forgery, providing jobs to wanted terrorist suspects, and financing travel for youths to attend jihad training. The Defense communication notes that since September 2001, UQ couriers have transported over $330,000 in cash, most of which they received from Saudi Embassies in the Far East. In January 2002, UQ administrator Yassir El-Sayid Mohammed traveled to Thailand to pick up approximately $200,000 from the Saudi Embassy in Bangkok. In early November 2001, the personal assistant to the UQ administrator traveled to Kuala Lumpur for a meeting at the Saudi Arabian Embassy. He returned with tens of thousands of dollars, according to the Department of Defense.

CIA, Treasury, and FBI officials have all expressed their concern about the al-Haramain Foundation's ties to both the Saudi Government and terrorist activity. According to the FBI's



TOP SECRET /////////////////////// NOFORN

November 18, 2002 response, the al-Haramain Islamic Foundation (HIF) has clear ties to the Saudi Government, and intelligence reporting suggests it is providing financial and logistical support to al-Qa'ida. In 1993, HIF established its U.S.-based office in Ashland, Oregon, and that office has since received approximately $700,000 from the parent offices in Saudi Arabia. The FBI has a pending investigation of HIF and the activities of the Portland HIF Office. As discussed above, the FBI has located correspondence between al-Bayoumi and the HIF. From the documents, it is clear that HIF was interested in appointing the imam of the mosque in Cajon, California, that al-Bayoumi managed.

The Treasury General Counsel testified about his agency's concern about the foundation:

MR. AUFHAUSER: Second, and this is important point, it also rises out of Rick's testimony, on al-Haramain, the two branch offices that we took a public and joint action against, al-Haramain really does represent a significant issue for the PCC and for terrorist financing and for the United States policy. It is, of course, the largest, I think the largest Islamic charity in the world. Its name is synonymous with charity in the Islamic world. Its direct overseers are members of the Royal Family; significant contributors are members of the Royal Family. We don't have a great deal of intelligence on the headquarters, about whether they are knowingly assisting people in al-Qa'ida and others; but in significant branch offices yet to be designated and under current investigation, we have ample evidence that large cash amounts are being couriered to those branch offices, that large wire transfers of money are being sent to those offices, that a great deal of the money is being dissipated through misspending, unaccounted for, and finally, that those offices have significant contacts with extremists, Islamic extremists.

CIA officials recently testified that they are making progress on their investigations of al-Haramain:

A year ago we had a lot of reporting suggesting branch offices were tied to al-Qa'ida....Over the last year we developed a lot of intelligence and law enforcement information and we prepared a paper about a month, six weeks ago which assembled all of that...That paper gave us the first clear indication that the head of the central office is complicit in supporting terrorism, and it also raised questions about Prince Nayef.

Finally, ████████████, the subject of Phoenix and Portland FBI counterterrorism investigations, also has close ties to a member of the Saudi royal family. ████████ no longer resides in the United States, but is still the subject of an FBI investigation. The FBI opened an

TOP SECRET                    HCS/NF

investigation of ████ an employee of Saudi Arabian Airlines, in 1999 after receiving information ███████████████ that Bin Ladin lieutenant Abu Zubaida had been in contact with a telephone number associated with ████ in Portland. In May 2001, two individuals were arrested in Bahrain and later admitted they were on their way to blow up U.S. facilities in Saudi Arabia. One of them had a passport that had been issued to one of ████ ████ The FBI's Phoenix Field Office also received source reporting in 1999 that ████ was checking security at the Southwest border and discussing the possibility of infiltrating individuals into the United States.

The FBI has developed information that ████ has close ties with one of the Saudi princes and accompanies him on many trips, including travel to the United States. According to the FBI, ████████████ was recently interrogated at the detention facility at Guantanamo Bay. He informed the FBI that ████ got the job at Saudi Arabian Airlines through his contacts. He said that ████ did not earn much money in this job, but that he "had another source of income through a Saudi prince" named Khalid al-Bandar. According to ████ ████ performed miscellaneous tasks for the Prince, such as handling real estate matters and assisting the Prince's grandmother. ████ traveled many places with the Prince, including Europe, and often to the United Arab Emirates. ████████ made the cryptic comment that nobody "knew everything about ████" Although his name was on the State Department's watchlist, ████████ was apparently able to circumvent the Customs Service and the Immigration and Naturalization Service because he was traveling with the Saudi prince. The FBI only learned of the trip after the fact. Agents in the FBI's Portland Field Office expressed their concern that ████ and others were using their status as Saudi Arabian Airlines employees as a cover to enable them to transport weapons in and out of the United States.

Lack of Saudi Cooperation in Counterterrorism Investigations

In testimony and interviews, a number of FBI agents and CIA officers complained to the Joint Inquiry about a lack of Saudi cooperation in terrorism investigations both before and after the September 11 attacks. For example, a veteran New York FBI agent stated that, from his

point of view, the Saudis have been useless and obstructionist for years. In this agent's opinion, the Saudis will only act when it is in their self-interest.

When a high-level ▮ officer was asked how the September 11 attacks might have been prevented, he cited greater Saudi cooperation, pointing to an example from the summer of 2001, when the U.S. Government requested Saudi assistance, with no success. In May 2001, the U.S. Government became aware that an individual in Saudi Arabia was in contact with Abu Zubaida and was most likely aware of an upcoming al-Qa'ida operation. The U.S. Government pressured the Saudi Government to locate him. The Saudis informed the U.S. Government that they required additional information to do so. The U.S. Government agency that had originally learned of this individual's knowledge refused to provide the Saudis with additional information because it would reveal sources and methods. The National Security Council also tried to pressure the Saudis, but the Saudis would not cooperate without the additional information.

According to some FBI personnel, this type of response is typical from the Saudis. For example, one FBI agent described one investigation after September 11 in which he provided the Saudi Government with copies of the subjects' Saudi passports. The Saudi Government maintained that they had no record of the subjects.

According to the former Chief of Alec Station, the unit in the DCI's Counterterrorist Center established in 1996 to focus specifically on Usama Bin Ladin, it was clear from about 1996 that the Saudi Government would not cooperate with the United States on matters relating to Usama Bin Ladin. There is a May 1996 memo from the DCI's Counterterrorist Center ▮ ▮ stating that the Saudis had stopped providing background information or other assistance on Bin Ladin because Bin Ladin had "too much information about official Saudi dealings with Islamic extremists in the 1980s for Riyadh to deliver him into U.S. hands." In a June 1997 memo to the DCI, Alec Station reemphasized the lack of Saudi cooperation and stated that there was little prospect of future cooperation regarding Bin Ladin. The former Chief of Alec Station thought that the U.S. Government's hope of eventually obtaining Saudi cooperation was unrealistic because Saudi assistance to the U.S. Government on this matter was contrary to Saudi national interests.

438

████████████

██████████████████████ testified on this issue on October 9,
2002:

> On the issue of al-Qa'ida and Saudi intelligence, that goes back to our efforts to interact
> with the Saudi to get them to help us on investigating al-Qa'ida...for the most part it was
> a very troubled relationship where the Saudis were not providing us quickly or very
> vigorously with response to it. Sometimes they did, many times they didn't. It was just
> very slow in coming.

Both FBI and CIA personnel cited an individual named Madani al-Tayyib as a specific
case in which the Saudis were uncooperative. The CIA and the FBI had been pressuring the
Saudis for years for permission to talk to al-Tayyib. According to the former head of ALEC
Station, al-Tayyib managed all of Bin Ladin's finances when Bin Ladin was in Sudan, and any
expense over $1,000 had to be approved by al-Tayyib. Al-Tayyib moved to London in 1996 to
work with Khalid al-Fawwaz, another important al-Qa'ida figure who has since been arrested. In
the summer of 1996, al-Tayyab returned to Saudi Arabia. The Saudis continuously refused the
FBI's and the CIA's requests to talk to al-Tayyib, stating, in the words of an FBI agent, that al-
Tayyib was "just a poor man who lost his leg. He doesn't know anything."

The former chief of Alec Station also cited the example of Mohammed Jamal Khalifa.
Khalifa is Bin Ladin's brother-in-law and an important figure in al-Qa'ida. The U.S.
Government arrested Khalifa in the United States in 1994. Khalifa had been sentenced to death
*in absentia* by the Jordanian Government for his role in a bombing in Jordan. As a result, the
U.S. agreed to extradite him to Jordan. The Jordanians then returned him to Saudi Arabia. In the
opinion of the CIA officer, the Saudis "bought off" the Jordanians for the return of Khalifa.
According to the CIA officer, when Khalifa subsequently arrived in Saudi Arabia, he was met by
at least one important government official. Khalifa now works for a Riyadh-based NGO and
travels and operates freely.

The General Counsel of the U.S. Treasury Department testified at the July 23, 2002
hearing about the lack of Saudi cooperation with the U.S.:

Case 1:03-md-01570-GBD-SN Document 9589-18 Filed 11/09/24 Page 35 of 28



There is an almost intuitive sense, however, that things are not being volunteered. So I want to fully inform you about it, that we have to ask and we have to seek and we have to strive. I will give you one-and-a-half examples. The first is, after some period, the Saudis have agreed to the designation of a man named Julaydin, who is notoriously involved in all of this; and his designation will be public within the next 10 days. They came forward to us 2 weeks ago and said, okay, we think we should go forward with the designation and a freeze order against Mr. Julaydin. We asked, what do you have on him? Because they certainly know what we have on him, because we shared it as we tried to convince them that they ought to join us. The answer back was, nothing new.

MR. BEREUTER: Do you believe that?

MR. AUFHAUSER: No, I think that taxes credulity, or there is another motive we are not being told.

### Status of the U.S. Intelligence Community's Investigations into Connections Between Terrorism and Saudi Government Officials

Both the FBI and the CIA have informed the Committees that they are treating the Saudi issue seriously. According to the November 18, 2002 FBI response, the FBI and CIA have established a working group to look into the Saudi issue. The FBI formed a squad at the Washington Field Office ████████████ to investigate this issue and ██████████

Case 1:03-md-01570-GBD-SN Document 9789-13 Filed 11/09/24 Page 36 of 37

TOP SECRET/ ██████████ /HCS/NF

However, both the FBI and the CIA still have only a limited understanding of the Saudi Government's ties to terrorist elements. In the October 9, 2002 closed hearing, Director Mueller stated:

> If I have one preliminary note of caution, it is that at this point there are more questions than answers, and I would caution against jumping to conclusions before we know a lot more.

A document located by the Joint Inquiry Staff confirms that the FBI's Washington Field Office is still in the early stages of focusing on these investigations. In an August 15, 2002, communication, a field office agent stated that ' ████████████████████

████████████████████████████████████████████████████████████ In

that same document, the Washington Field Office asked ████████████████████

████████████████████████████

████████ ████████████████████████████████ acknowledged in his

testimony that the ████████ understanding of this issue is limited as well:

> With regard to the specific question of have we seen the Saudi intelligence services supporting terror groups, I think the record is not clear at all on that.

Both the FBI and CIA recognized the possibility that individuals connected to the Saudi Government may be providing support to terrorists.

████████████████ testified:

> So there is certainly a good, good chance that there are sympathizers or extremists, sympathizers possibly for al-Qa'ida within the security services.

████████████ also noted that:

> Abu Zubaydah said he's confident that al-Qa'ida must have contact certainly with Saudis in the United States and that al-Qa'ida and Usama Bin Ladin are particularly—they

TOP SECRET/ ██████████ /HCS/NF                                    441

TOP SECRET ▓▓▓▓▓ /HCS/NF

invest significant energy in cultivating what Abu Zubaydah called good relationships with Saudis of all standing…He said bin Ladin is very pleased when Saudis in the military, those successful in business and those close to the royal family to lend active support to his cause. He said bin Ladin actively seeks out such relationships.

Other CIA and FBI officials echoed these remarks in recent Congressional testimony.

▓▓▓▓ ▓▓▓▓▓▓▓▓▓ , stated:

What we find troubling about the cases that we learned about from FBI, both the Los Angeles cases and some of the cases that the Washington Field Office has looked at, in which you're seeing Saudi money going to people, is that it fits sort of a pattern that we've seen in terms of direct payments from the Saudis, the Saudi Government's longstanding support for very fundamentalist Wahabi and Salafi charities and movements around the world, which in a sense you see the money is going to fundamentalists and you would be very surprised if some of it doesn't bleed over into terrorist support…We've had a lot of suspicions before September 11 which we documented in a number of different papers, and again it's a lot of smoke and the issues that come up are who knows about the payments, on whose behalf are the payments being made, are they being made on behalf of the central government or are they being made by a local official or a person. Do the people who are making the payments know what's happening to the money? If they do know what's happening, why are they making the payments? Is it a form of blackmail? Do they recognize the terrorist support? There's the issue of are they regulating themselves as well as are they doing the due diligence that they ought to.

FBI Executive Assistant Director Pasquale D'Amuro testified at that same hearing:

To date I can't sit here and tell you that those ties go back, that we can prove that the Saudi royal family is sponsoring terrorism. But there's enough smoke that we are conducting several investigations to try to determine what other information is out there.

What is clear is that the FBI did not treat the Saudis as a counterterrorism ▓
▓▓▓▓▓▓▓ threat prior to September 11, 2001.

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓

TOP SECRET ▓▓▓▓▓ /HCS/NF                    442

TOP SECRET                    HCS/AT

Michael Rolince, the former head of the International Terrorism Operations Section at FBI testified:

> The answer to your question is pre-9/11 there were not any significant preliminary inquiry or full investigations, with relatively few exceptions, conducted by the FBI looking at Saudi [redacted] or support to terrorism…I'm not going to stand here, Ms. Hill, and tell you in any way, shape or form [redacted]

The former Assistant Special Agent in Charge in San Diego confirmed this in his testimony:

> Basically [redacted], They were not a country identified by the State Department as a state sponsor of terrorism. And the theme or the common modus operandi that we saw in San Diego was that if there were [redacted] there, their primary objective was to monitor dissidents in the interest of protecting the royal family. So they were not viewed as an inimical threat to national security.

In the October 9, 2002 closed hearing, Director Mueller acknowledged that he became aware of some of the facts regarding the Saudi issue only as a result of the investigative work of the Joint Inquiry Staff:

> I'm saying the sequence of events here, I think the staff probed and, as a result of the probing, some facts came to light here and to me, frankly, that had not come to light before, and perhaps would not have come to light had the staff not probed. That's what I'm telling you. So I'm agreeing with you that the staff probing brought out facts that may not have come to this Committee."

Senator Dewine: But what you're also saying, though, is that that probing then brought facts to your attention.

Director Mueller: Yes.

TOP SECRET                    HCS/AT