# Al Rajhi Bank
# Ex. 96

This Transcript contains Confidential Material

```
1                   UNITED STATES DISTRICT COURT

2                 SOUTHERN DISTRICT OF NEW YORK

3

4    IN RE: TERRORIST ATTACKS ON
     SEPTEMBER 11, 2001
5    _____
     Underwriting Members of Lloyd's
6    Syndicate 2, et al., v.
     Al Rajhi Bank, et al.,                03 MDL 1570
7    No. 16-cv-07853                       (GBD) (SN)

8    Addesso, et al. V. Kingdom of         ECF Case
7    Saudi Arabia, et al.,
9    No. 16-cv-09937

10   Aguilar, et al. V. Kingdom of
     Saudi Arabia, et al.,
11   No. 16-cv-09663

12   Hodges, et al. V. Kingdom of
     Saudi Arabia, et al.,
13   No. 17-cv-00117

14   Aiken, et al. V. Kingdom of
     Saudi Arabia, et al.,
15   No. 17-cv-00450

16   Charter Oak Fire Insurance Co.,
     et al. V. Al Rajhi Bank, et
17   al., No. 17-cv-02651

18   Abarca, et al. V. Kingdom of
     Saudi Arabia, et al.,
19   No. 17-cv-03887

20   Arrowood Indemnity Co., et al.
     v. Kingdom of Saudi Arabia, et
21   al., No. 17-cv-03908

22   Abedhajajreh, et al. V. Kingdom
     of Saudi Arabia, et al.,
23   No. 17-cv-06123

24
```

```
 1   Muenchener
     Rueckversicherungs-Gesellschaft
 2   Aktiengesellschaft in Muenchen,
     et al. V. Kingdom of Saudi
 3   Arabia, et al.,
     Case No. 17-cv-07914
 4
     Abbate, et al. V. Kingdom of
 5   Saudi Arabia, et al.,
     No. 17-cv-08617
 6   _____

 7

 8      THSI TRANSCRIPT CONTAINS CONFIDENTIAL MATERIAL

 9

10                      - - -

11           VIDEOTAPED EXPERT DEPOSITION OF

12                 ROBERT S. PASLEY

13

14            Wednesday, January 31, 2024

15               9:11 a.m. Eastern Time

16

17

18

19   Reported by:  Denise Dobner Vickery, CRR, RMR

20   JOB NO.: 350185

21

22              GOLKOW LITIGATION SERVICES

23                  877.370.DEPS

24                 deps@golkow.com
```

This Transcript Contains Confidential Material

```
 1
 2
 3
 4
 5
 6
 7
 8                          Wednesday, January 31, 2024
 9                          9:11 a.m. Eastern Time
10
11             Videotaped Expert Deposition of
12    ROBERT S. PASLEY, held at the offices of:
13
14                  WHITE & CASE LLP
15                  701 Thirteenth Street NW
16                  Washington, DC 20005
17
18
19
20             Pursuant to notice, before Denise
21    Dobner Vickery, Certified Realtime Reporter,
22    Registered Merit Reporter, and Notary Public in
23    and for the District of Columbia.
24
```

```
 1    APPEARANCES:

 2    Representing Lloyd's Syndicate 2 and Muechener
      Plaintiffs:
 3
             COZEN O'CONNOR P.C.
 4           BY:   SEAN P. CARTER, ESQ.
                   scarter1@cozen.com
 5           BY:   SCOTT TARBUTTON, ESQ.
                   starbutton@cozen.com
 6           BY:   WILLIAM CLARK, ESQ.
                   wclark@cozen.com
 7                 (Via Zoom)
             1650 Market Street, Suite 2800
 8           Philadelphia, PA 19103
             215.665.2000
 9

10    Representing Charter Oak Plaintiff:

11           SHEPS LAW GROUP
             BY:   ROBERT C. SHEPS, ESQ.
12                 rsheps@shepslaw.com
                   (Via Zoom)
13           25 High Street
             Huntington, NY 11743
14           631.249.5600

15
      Representing Al Rajhi Bank:
16
             WHITE & CASE LLP
17           BY:   MICHAEL MAHAFFEY, ESQ.
                   michael.mahaffey@whitecase.com
18           BY:   NICOLLE KOWNACKI, ESQ.
                   Nicolle.kownacki@whitecase.com
19           BY:   COURTNEY DAVIS, ESQ.
                   courtney.davis@whitecase.com
20           BY:   REUBEN J. SEQUEIRA, ESQ.
                   rsequeira@whitecase.com
21                 (Via Zoom)
             BY:   ANWAR AKROUK, ESQ.
22                 anwar.akrouk@whitecase.com
                   (Via Zoom)
23           701 Thirteenth Street NW
             Washington, DC 20005-3807
24           202.626.3600
```

This Transcript Contains Confidential Material

```
 1    Representing Dubai Islamic Bank:

 2           JONES DAY
             BY:  GABRIELLE E. PRITSKER, ESQ.
 3                gpritsker@jonesday.com
                  (Via Zoom)
 4           51 Louisiana Avenue NW
             Washington, DC 20001-2113
 5           202.879.3939

 6

 7    Representing The Muslim World League, the
      International Islamic Relief Organization:
 8
             LEWIS BAACH KAUFMANN MIDDLEMISS PLLC
 9           BY:  E. JON A. GRYSKIEWICZ, ESQ.
                  jon.gryskiewicz@lbkmlaw.com
10                (Via Zoom)
             BY:  SUMAYYA KHATIB, ESQ.
11                sumayya.khatib@lbkmlaw.com
                  (Via Zoom)
12           1101 New York Avenue NW, Suite 1000
             Washington, DC 20005
13           202.833.8900

14

15
      Representing World Assembly of Muslim Youth:
16
             THE LAW FIRM OF OMAR T. MOHAMMEDI, LLC
17           BY:  OMAR T. MOHAMMEDI, ESQ.
                  omohammedi@otmlaw.com
18                (Via Zoom)
             BY:  MUSTAPHA NDANUSA, ESQ.
19                mndanusa@otmlaw.com
                  (Via Zoom)
20           BY:  FATEMA ZOHNY, ESQ.
                  fzohny@otmlaw.com
21                (Via Zoom)
             233 Broadway, Suite 801
22           New York, NY 10279
             212.725.3846
23

24
```

This Transcript Contains Confidential Material

1    ALSO PRESENT:

2

3           ABDULRAHMAN AL MUSSAED, foreign
            litigation department, Al Rajhi Bank
            (Via Zoom)

4

5    TRIAL TECHNICIAN:

6

7           GINA VELDMAN, Precision Trial Services
            (Via Zoom)

8

9    VIDEOGRAPHER:

10

            VINCE ROSICA, Golkow Litigation Services

11

12

13                          -  -  -

14

15

16

17

18

19

20

21

22

23

24

```
 1                        INDEX

 2   EXAMINATION OF ROBERT S. PASLEY          PAGE

 3   BY MR. CARTER                              11

 4

 5                PASLEY DEPOSITION EXHIBITS

 6   NUMBER       DESCRIPTION                  PAGE

 7   EXHIBIT 1    Notice of Oral Deposition of  14

 8                Robert S. Pasley

 9   EXHIBIT 2    12/18/23 Expert Report of     24

10                Robert S. Pasley

11   EXHIBIT 3    October 4, 2023 Expert Report of  50

12                Jonathan M. Winer

13   EXHIBIT 4    October 4, 2023 Expert Report of  60

14                Evan F. Kohlmann

15   EXHIBIT 5    Diplomatic Cable 04RIYADH5103   75

16                Terrorist Financing: Al-Rajhi Bank

17                Created 2004-09-27

18   EXHIBIT 6    Diplomatic Cable 04STATE251768  84

19                Joint Examination of Al Rajhi Bank

20                The Joint Terrorist Financing Task

21                Force, Created 2004-11-25

22

23

24
```

This Transcript Contains Confidential Material

```
 1   EXHIBIT 7   January 01, 1998 -                   114
 2               December 31, 2002
 3               Aqil Abdel Aziz al Aqil
 4               Bank Statements
 5               ARB-00041454 - ARB-00041463
 6   EXHIBIT 8   Saudi Arabian Monetary Agency,      130
 7               Banking Control, Guidelines For
 8               Prevention Of Money Laundering
 9               (Arabic and English)
10               Pages 130 - 157
11
12
13
14
15
16
17
18
19
20         (Exhibits attached to transcript.)
21
22
23
24
```

This Transcript Contains Confidential Material

```
 1                P R O C E E D I N G S

 2                       -  -  -

 3                THE VIDEOGRAPHER:  We are now

 4        on the record.

 5                My name is a Vince Rosica.

 6        I'm a videographer for Golkow Litigation

 7        Services.  Today's date is January 31,

 8        2024 and the time is 9:11 a.m.

 9                This video deposition is being

10        held in Washington, DC in the matter of

11        Terrorist Attacks on September 11, 2001

12        MDL No. 1570.  The deponent is Robert S.

13        Pasley.

14                Counsel, please identify

15        yourselves for the record video record.

16                MR. CARTER:  Sean Carter from

17        Cozen O'Connor on behalf of plaintiffs,

18        and I have with me in the room today my

19        colleague, Scott Tarbutton, and

20        participating via the Zoom, my colleague,

21        William Clark.

22                MR. MAHAFFEY:  Michael

23        Mahaffey of White & Case on behalf of Al

24        Rajhi Bank and the witness.  I'm joined
```

This Transcript Contains Confidential Material

```
 1          in the room by my firm colleagues,

 2          Nicolle Kowacki and Courtney Davis.  My

 3          firm colleague, Reuben Sequeira, will be

 4          joining virtually.  We also have a

 5          representative from Al Rajhi Bank's legal

 6          department, Abdulrahman Al Mussaed is

 7          appearing virtually as well.

 8                    THE VIDEOGRAPHER:  The court

 9          reporter is Denise Vickery.

10                    Is that all the appearances?

11                    MR. CARTER:  No, I believe we

12          have some other folks appearing by Zoom,

13          and if those folks could simply identify

14          themselves now, that would be helpful.

15                    MR. MOHAMMEDI:  This is Omar

16          Mohammedi on behalf of World Assembly of

17          Muslim Youth.  I have with me Fatema

18          Zohny as well as Mustapha Ndanusa.

19                    M,R. GRYSKIEWICZ:  And you've

20          got Jon Gryskiewicz from Lewis Baach

21          Kaufmann Middlemiss representing MWL,

22          IIRO, and certain charity officials.

23                    MS. PRITSKER:  And Gabrielle

24          Pritsker from Jones Day on behalf of the
```

This Transcript Contains Confidential Material

1          defendant Dubai Islamic Bank.

2                    THE VIDEOGRAPHER:  The court

3          reporter is Denise Vickery and will now

4          swear in the witness.

5                         - - -

6                    ROBERT S. PASLEY

7   called for examination, and, after having been

8   duly sworn, was examined and testified as

9   follows:

10                        - - -

11                    EXAMINATION

12                        - - -

13  BY MR. CARTER:

14      Q.      Good morning, Mr. Pasley.  How are

15  you?

16      A.      I'm fine.  Thank you.

17      Q.      We're here today to take your

18  deposition in the In re Terrorist Attacks matter.

19              Have you been deposed before?

20      A.      Yes, I have.

21      Q.      Although you might be familiar with

22  the process, let me just go through a couple of

23  the ground rules so that we're clear.

24      A.      That would be fine.

```
 1         Q.      Okay.  The court reporter to your
 2    left is going to be taking down both my questions
 3    and your answers in a transcript.  So it's
 4    important that you allow me to finish my questions
 5    before answering, and that I allow you to finish
 6    your answer before asking another question.
 7                 Does that sound fair?
 8         A.      That would be fine.
 9         Q.      At any point during the deposition
10    if you need a break, simply let us know, and we'll
11    find an appropriate time to -- to let you take a
12    break.
13                 Is that also fair?
14         A.      That's fine.
15         Q.      And over the course of today, the
16    expectation is that you'll provide full and
17    complete answers to my questions, and that if you
18    have information that is fully or partially
19    responsible -- responsive to the questions, you'll
20    share that with me.
21                 Is that fair?
22         A.      Yes, that is.
23         Q.      I understand that you're being
24    offered as an expert on behalf of Al Rajhi Bank in
```

1  the litigation?

2       A.      That is correct.

3       Q.      And are you aware that this

4  litigation arises from injuries suffered as a

5  result of the September 11th attacks on the United

6  States?

7       A.      Yes, I do.

8       Q.      And are you aware that the

9  plaintiffs in the litigation include individuals

10 who are claiming wrongful death and personal

11 injuries as a result of the attacks?

12      A.      Yes, I'm aware of that.

13      Q.      And are you also aware that the

14 plaintiffs include commercial parties that

15 suffered damages as well?

16      A.      Yes, I'm aware of that.

17      Q.      Okay.  And I trust that you agree

18 with me that this involves relatively important

19 matters?

20      A.      Yes, I agree with you.

21      Q.      And you're aware that you are under

22 oath and will be under oath throughout the course

23 of the deposition?

24      A.      Yes, I understand that.

This Transcript Contains Confidential Material

```
1                    MR. CARTER:  If we can mark as
2          Exhibit 1 the notice of Mr. Pasley's
3          deposition.
4                    (Document marked for
5          identification as Pasley Exhibit 1.)
6                    MR. CARTER:  And we're going
7          to use the designation for today of
8          Pasley 1 and continuing with that
9          formatting.
10   BY MR. CARTER:
11        Q.     Mr. Pasley, I've marked as Exhibit 1
12   to your deposition the Notice of Oral Deposition
13   that we sent to counsel for Al Rajhi Bank
14   scheduling today's deposition.
15               Have you seen this before?
16        A.     No, I have not.
17        Q.     Okay.  Under number 4 in the notice
18   of deposition, we asked that you provide any
19   billing statements, invoices, or the like, for the
20   work that you did in connection with your review
21   of materials in the case and preparation of your
22   expert report.
23               Do you see that?
24        A.     Yes, I see that.
```

This Transcript Contains Confidential Material

```
 1          Q.      Do you have any of those materials

 2   with you today?

 3          A.      No, I do not.

 4          Q.      Have you generated invoices for your

 5   work?

 6          A.      Yes, I have.

 7          Q.      And have you generated any

 8   itemization of the work that you conducted?

 9          A.      In the invoices, there's a general

10   description of the work I've -- I've had.

11          Q.      And did you send those invoices to

12   counsel at White & Case?

13                    MR. MAHAFFEY:  Objection.

14                    You can answer to the extent

15          your response does not reveal

16          communications with counsel.

17                    THE WITNESS:  Yes, I did.

18   BY MR. CARTER:

19          Q.      And did you send those by e-mail?

20          A.      Yes, I did.

21          Q.      Okay.  And so it follows that

22   counsel at White & Case would be in possession of

23   your invoices, correct?

24                    MR. MAHAFFEY:  Objection.
```

This Transcript Contains Confidential Material

```
1                      THE WITNESS:  Yes, they would
2         be.
3                      MR. CARTER:  Counsel, could we
4         request that you provide copies of
5         Mr. Pasley's invoices?
6                      MR. MAHAFFEY:  Mr. Pasley's
7         invoices, as he -- as he said, include
8         descriptions of the work that he's done,
9         and we consider that to be work product.
10                     MR. CARTER:  Well, they may or
11        may not depending on the nature of the
12        description.  I think probably not.  But
13        even if that were the case, then that
14        would simply be a matter of redaction,
15        and we could address whether or not those
16        redactions are appropriate.
17                     Can you provide copies of the
18        invoices with any redactions you seem
19        appropriate?
20                     MR. MAHAFFEY:  Well, like I
21        said, we believe these to be work
22        product.  We don't believe you're
23        entitled to these under Federal Rule 26.
24                     MR. CARTER:  Okay.  The
```

1          provision of invoices issued by experts,

2          including the content of the descriptions

3          subject to appropriate privilege

4          redactions, has been a standard feature

5          of the MDL litigation, and every party in

6          the litigation on the defendants' and

7          plaintiffs' side has provided those

8          materials upon request in connection with

9          expert depositions.

10                    Are you aware that that's the

11         practice in the MDL?

12                    MR. MAHAFFEY:  We're aware of

13         certain practices by other parties

14         besides Al Rajhi Bank, but our position

15         is that these are work product and they

16         you are not entitled to them under the

17         federal rules.

18                    MR. CARTER:  Okay.  So you're

19         refusing to provide them?

20                    MR. MAHAFFEY:  Well, counsel,

21         I'm not being deposed here.  You have our

22         position.  I think we can move on.

23                    MR. CARTER:  No.  No.  We may

24         actually have to stop the deposition to

 1          call the magistrate judge.  So I'm trying

 2          to assess whether or not that's necessary

 3          five minutes in.

 4                    MR. MAHAFFEY:  I don't think

 5          it's necessary five minutes in to call

 6          the magistrate judge, but we're not going

 7          to give you right here the itemized

 8          invoices.

 9                    MR. CARTER:  All right.  Well,

10          let me -- let me try and address part of

11          this, and then we'll figure out how to

12          proceed.

13     BY MR. CARTER:

14          Q.     Mr. Pasley, when did you begin work

15     in connection with your expert report in this

16     matter?

17          A.     My invoices cover October to the

18     current date.

19          Q.     So they cover October of 2023?

20          A.     Correct.

21          Q.     Through the date of today where

22     we're sitting here?

23          A.     Yes.  The last invoice I submitted

24     was in the middle of December.

1      Q.      Okay.  And the invoice that you

2    submitted in the middle of December, did that

3    cover work through the preparation of your expert

4    report?

5      A.      No, I have not submitted an invoice

6    for January yet.

7      Q.      Well, your expert report in this

8    matter, as I see it, was signed on December 18th

9    of 2023, correct?

10     A.      That is correct.

11     Q.      Okay.  And --

12     A.      And I submitted an invoice after

13   that date.

14     Q.      And so the invoice you submitted

15   after that date covered all the work that you had

16   done up to the point of the issuance of your

17   expert report, correct?

18     A.      That is correct.

19     Q.      And the period of time that that

20   invoice covered was a date in October through

21   December 18th or so --

22     A.      It was --

23     Q.      -- of 2023?

24     A.      -- December 18th.  Yes, that is

```
 1    correct.

 2         Q.      And do you remember the date, the

 3    first date for work covered by your invoice in

 4    October?

 5         A.      No, I do not.  It was, I believe,

 6    early October, but I did not go back and look.

 7         Q.      And do you recall the total number

 8    of hours that were included in that invoice?

 9         A.      It's -- October's invoice or all the

10    invoices?

11         Q.      October through the one covering

12    December 18th.

13         A.      It was approximately --

14    approximately 500 hours, if my math is correct.

15         Q.      500 hours total from the time of

16    your engagement in October through the completion

17    of your report on December 18th?

18         A.      I apologize.  My math is not very

19    good.  It's 50 hours.

20         Q.      50 hours?

21         A.      Yes.

22         Q.      Okay.  So over the course of the

23    time from when you were retained in this matter

24    until the date on which you issued your expert
```

This Transcript Contains Confidential Material

1   report, you engaged in a total of 50 hours of

2   work, correct?

3          A.        Approximately, yes.

4          Q.        Okay.  And that included the

5   drafting of your report itself?

6          A.        Correct.

7          Q.        And how many hours were encompassed

8   in the billing for the drafting of your report?

9          A.        I really don't know.  I did not

10  break it down as such.  I did not -- I did not

11  look up that particular fact.

12         Q.        Are you able to estimate how many

13  hours you spent drafting your 20-page report?

14         A.        No, I do not know.

15         Q.        You have no estimate about how much

16  time you spent writing the report?

17         A.        Maybe 20, 25 hours, but it's a

18  guess.  I'm sorry.

19         Q.        Okay.  But would you say that that

20  guess is a fair estimate?

21         A.        It's as good of a guess as I can

22  come up with.

23         Q.        Okay.  And so then the remainder of

24  the 50 hours would have been the time that you

1    spent reviewing materials in the case?

2          A.      Yes, that is correct.

3          Q.      Okay.

4          A.      Which is, in effect, all part and

5    parcel of the same endeavor.

6          Q.      And did you bill for all of your

7    time?

8          A.      Yes, I did.

9          Q.      Okay.  And did you prepare the draft

10   of your report yourself?

11         A.      Yes, I did.

12         Q.      And would your invoices itemize the

13   amount of time you dedicated to certain tasks

14   associated with your work?

15         A.      It would identify what I had read,

16   for instance, a particular deposition.  It would

17   indicate that I was working on my report over a

18   particular period of time, but it did not break

19   material down by five or 10 or 15 minutes.  It was

20   for the -- for the day.

21                So I could have been reading a

22   deposition, working on the report, looking up

23   material, and I would put down a total number of

24   hours for that particular day.

```
1          Q.      And within the description of the

2     hours for that day, your invoices describe the

3     things that you reviewed and the things that you

4     researched?

5          A.      Yes.

6          Q.      And does it identify the things that

7     you reviewed with particularity?

8                       MR. MAHAFFEY:  Objection.

9                       You can answer yes or no.

10                       THE WITNESS:   I believe it

11          did, yes.

12     BY MR. CARTER:

13          Q.      Okay.  So those invoices reflect the

14     things that you reviewed in connection with your

15     report, correct?

16          A.      For the most part, yes.

17                       MR. CARTER:  Okay.  Counsel,

18          we're going to reiterate our demand for

19          production of the invoices, subject to

20          any appropriate redactions for truly

21          privileged materials, and we may elect to

22          take the matter up with the magistrate at

23          a break.

24                       MR. MAHAFFEY:  Take that under
```

1          advisement.

2  BY MR. CARTER:

3          Q.       Mr. Pasley, we've just discussed

4  that you did, in fact, issue an expert report in

5  this matter, right?

6          A.       Yes, I did.

7          Q.       And that report was issued on

8  December -- or at least signed on December 18th of

9  2023?

10          A.       Yes, that is correct.

11          Q.       And I'd like to mark as Exhibit 2,

12  Pasley 2, a copy of your expert report, and for

13  your convenience I have --

14          A.       (Indicates).

15          Q.       I see you have a physical copy

16  already in front of you?

17          A.       I have a copy.  Thank you.

18          Q.       Great.

19                  (Document marked for

20          identification as Pasley Exhibit 2.)

21  BY MR. CARTER:

22          Q.       Mr. Pasley, you're aware that under

23  the federal rules your report must include a

24  complete statement of all the opinions you intend

1    to express in the case?

2         A.      Yes, I understand that.

3         Q.      And does your report include all of

4    the opinions you intend to express in this

5    litigation?

6         A.      There may be additional opinions

7    going forward, but as of this point in time, it

8    does contain all of my opinions.

9         Q.      Okay.  And in terms of additional

10   opinions going forward, is there something that

11   you expect to do, or are you just allowing for the

12   possibility that that could happen?

13        A.      Just allowing for the possibility of

14   that happening.

15        Q.      You have no current expectation of

16   issuing a supplemental report, correct?

17        A.      That is correct.

18        Q.      And under the federal rules, are you

19   aware that you're also required to identify all

20   the bases and reasons for the opinions you're

21   expressing?

22        A.      Yes, I understand that.

23        Q.      Does your report do so?

24        A.      I believe so.

This Transcript Contains Confidential Material

```
 1          Q.      And your report is required to
 2   identify all of the facts and data you considered
 3   in forming your opinions.
 4                  Does the expert report marked as
 5   Exhibit 2 do that?
 6          A.      Yes, I believe so.
 7          Q.      Turning to Appendix I of your expert
 8   report, which includes the Materials Considered?
 9          A.      Yes.
10          Q.      You've itemized nine items with
11   specificity, correct?
12          A.      That is correct.
13          Q.      And then in front of that, you
14   indicate that you also reviewed materials
15   referenced in your report and in plaintiffs'
16   expert reports and appendices, correct?
17          A.      That is correct.
18          Q.      Did you review all of the materials
19   referenced in plaintiffs' expert reports and
20   appendices?
21          A.      No, I did not.
22          Q.      So you reviewed some of the
23   materials referenced in plaintiffs' expert reports
24   and appendices but not all of them?
```

 1      A.      The reports were extremely lengthy

 2   and replete with footnotes and documents to

 3   reference material.  I read through the report.  I

 4   did not look at the -- at all the underlying

 5   reference material.

 6      Q.      Okay.  So looking at your report and

 7   the description of the Materials Considered,

 8   there's no way for me to tell which materials you

 9   did, in fact, look at and those that you did not?

10      A.      I tried to cite to the plaintiffs'

11   experts' reports as best I could.  I did not

12   necessarily reference the particular documents

13   that they footnoted in their reports.

14      Q.      But your description here says that

15   your review included a review of materials

16   referenced in plaintiffs' expert reports and

17   appendices, but it doesn't tell me which -- which

18   of those you reviewed, correct?

19      A.      That is correct.

20      Q.      Your expert report includes a

21   relatively extensive discussion of your

22   background?

23      A.      It's a couple of pages, yes.

24      Q.      I'm not going to go through all of

1   your background, but I do want to ask you a few

2   questions.

3              You indicate in your report that

4   following your extensive period of working for the

5   government, you were with Bank of America in its

6   Bank Secrecy Act section; is that correct?

7      A.      That is correct.

8      Q.      Okay.  And looking at your

9   curriculum vitae that's attached to your report,

10  it appears that that engagement lasted for only a

11  few months; is that correct?

12     A.      It was approximately six months.

13  Yes, that is correct.

14     Q.      Was there a particular reason why

15  your employment with Bank of America spanned only

16  a six-month period?

17     A.      They indicated to me at the time

18  that there was a reduction in force that the bank

19  was undertaking.  There is some background

20  material that is involved as well, if you want me

21  to go into it.

22     Q.      Sure.

23     A.      Okay.  After I left the OCC, I was a

24  whistleblower in connection with what I viewed as

1    improper activity on the part of one of my

2    supervisors.  That did not sit well with the then

3    chief counsel of the OCC, and she contacted the

4    bank after I went with the bank and informed them

5    that she did not want to have any dealings with me

6    at the OCC.  And I believe that was one of the

7    reasons why I was let go.

8                I brought a suit under the Merit

9    Systems Protection Board against the OCC and

10   settled the case on a very favorable basis from my

11   perspective.

12        Q.      And what was the nature of the

13   conduct raised in your whistleblower notification?

14        A.      My supervisor was engaged in what

15   appeared to be an improper relationship with a

16   female attorney of another division to whom he was

17   assigning cases and for whom he was recommending

18   awards.  And people in the division, not at my

19   behest or with my knowledge, followed the two

20   people, my supervisor and the woman, to local

21   hotels a couple of times.

22                And so I put that into my

23   whistleblower complaint.

24        Q.      So the whistleblower complaint

This Transcript contains Confidential Material

```
 1    didn't have anything to do with the relationship
 2    between the Office of the Comptroller of Currency
 3    and any financial institution?
 4         A.       That is correct.
 5         Q.       Did you pursue any claim against
 6    Bank of America?
 7         A.       No, I did not.
 8         Q.       You mentioned earlier the OCC, and
 9    just for the benefit of folks who may review your
10    testimony at some point who aren't familiar with
11    some of these terminology, I understand that to
12    refer to the Office of the Comptroller of the
13    Currency, correct?
14         A.       That is correct.
15         Q.       You worked at the OCC for a number
16    of years?
17         A.       For 30 years, yes.
18         Q.       And can you describe in sort of
19    broad brush strokes what you did with the OCC?
20         A.       I was primarily assigned to the
21    enforcement and compliance division as an
22    attorney, a senior attorney, and then assistant
23    director, and that's a division within the law
24    department of the OCC that takes administrative
```

1   actions against banks and individuals and

2   litigates those actions when necessary.

3        Q.      Did that work review or did that

4   work involve assessments of whether individual

5   financial institutions had violated their

6   anti-money laundering or counter-terror financing

7   obligations?

8        A.      Yes, it did, primarily violations of

9   law, rules and regulations in general, and unsafe

10  and unsound banking practices.

11       Q.      Were any of the reviews you

12  conducted while at OCC focused on possible

13  terrorist activities specifically?

14       A.      Well, AML, anti-money laundering and

15  counterterrorism financing really, you know, are

16  viewed in a combined fashion, but the work that I

17  engaged in was primarily banking practices and

18  banking conditions and, to an extent, towards the

19  end of my tenure anti-money laundering.

20       Q.      Were you involved in conducting any

21  reviews of failures by financial institutions to

22  fulfill their anti-money laundering obligations?

23       A.      Yes, I believe I was.

24       Q.      And how many such investigations

1    were you involved in?

2         A.       At this point in time, I really

3    can't remember.

4         Q.       Can you tell me just in general

5    terms what that kind of review would entail?

6         A.       It would be based primarily on

7    reports of examination that were conducted and

8    produced by national bank examiners, and they

9    would detail their conclusions as to violations of

10   law, rule, or regulation, or unsafe and unsound

11   banking practices.  I would review those reports

12   and recommend administrative action as appropriate

13   to the higher-ups within the OCC.

14        Q.       And the -- I'm sorry.  Was the

15   national banking?

16        A.       National bank examiners.

17        Q.       And the national bank examiners,

18   what types of materials would they typically

19   review for purposes of providing the report to you

20   on particular banks' AML practices?

21        A.       They would look at the books and

22   records of the national bank and policies and

23   procedures that the bank engaged in and whether

24   they complied with the policies and procedures and

1    with anti-money laundering and counterterrorism

2    financing regulations.

3        Q.       And would the bank examiners as part

4    of that process generally review any existing

5    external or internal audits in the possession of

6    the bank?

7        A.       Yes, they would.

8        Q.       And why would they do that?

9        A.       That would be part of the bank's

10   recordkeeping process.  It would be a record

11   within the national bank that the examiners would

12   look at.  They look at -- they can look at

13   anything and everything within the bank.

14       Q.       The audits would be relevant to the

15   assessment of whether or not the bank complied

16   with its AML requirements, correct?

17       A.       Potentially, that might be one

18   factor that the national bank examiners would look

19   at, not necessarily the only one or not

20   necessarily one they would look at each and every

21   time.

22       Q.       But as a general matter in your

23   experience, did the national bank examiners

24   typically review audits in the possession of the

 1   bank they were examining as part of their process?

 2        A.      I really can't say it was a typical

 3   practice.  I would say from time to time they

 4   would look at the audit reports internal and

 5   external as they were deemed to be relevant.

 6        Q.      If the reports specifically

 7   concerned an audit of anti-money laundering, would

 8   you expect them to have reviewed the audit in

 9   conjunction with an anti-money laundering scope

10   review?

11        A.      If the bank examiners were

12   conducting an anti-money laundering or

13   counterterrorism financing examination, yes.

14        Q.      Turning back to your experience, you

15   mentioned that you were involved in three cases

16   involving Section 311 sanctions, correct?

17        A.      Two or three, yes.  I was assigned

18   to the Department of Treasury to help implement

19   regulations pursuant to the USA PATRIOT Act.

20        Q.      And at a very high level, what is

21   Section 311 of the PATRIOT Act?

22        A.      It provides for the ability of the

23   U.S. government to impose sanctions on financial

24   institutions or individuals for various untoward

This Transcript Contains Confidential Material

```
 1   activity in the area of anti-money laundering or

 2   counterterrorism financing.

 3        Q.      And the cases that you were involved

 4   in while you were detailed to the Department of

 5   the Treasury, which banks did they involve?

 6        A.      They involved countries, not banks.

 7        Q.      Which countries did they involve?

 8        A.      I believe the primary case that I

 9   worked on involved the country of Naru, and I

10   believe I also worked on a matter involving the

11   Seychelles.

12        Q.      And then -- I'm sorry.

13               Did either of those cases involve

14   issues related to terrorism financing?

15        A.      It was -- addressed both anti-money

16   laundering and counterterrorism financing.

17        Q.      Was there -- were there specific

18   suspected terrorism financing transactions that

19   were identified as a result of the -- or that

20   prompted the sanction?

21        A.      I don't remember that there were.

22   They were focused primarily on the conduct of the

23   -- of the countries in general with regard to

24   counterterrorism financing and anti-money
```

1    laundering, that they had very poor procedures and

2    were not conducting themselves properly.

3         Q.        You mention in your report an

4    additional engagement as an expert witness in

5    which you testified on behalf of a Middle Eastern

6    bank that was unfairly, in your opinion, the

7    subject of a Section 311 sanction, correct?

8         A.        That is correct.

9         Q.        And what bank was that?

10        A.        FBME.  It was a bank located in

11   Cypress.  Its headquarters were in Lebanon.

12        Q.        And what was the nature of the

13   allegation against FBME?

14        A.        The allegation was that they were

15   engaged in money laundering activity, were not

16   conducting themselves properly, and as a result of

17   the 311 order, the country of Cypress canceled

18   their -- their license to conduct banking.

19        Q.        Had the regulator in Cypress taken

20   action against FBME prior to the section --

21   Section 311?

22        A.        No, they had not.  The sanction was

23   issued, I think, on a Friday.  Cypress without any

24   review or investigation engaged in their activity

1    on Saturday or Sunday.

2         Q.    Given that sequence of events, is it

3    fair to say that the regulatory activity of

4    Cypress had failed to identify a problem that then

5    arose to the level of the need for the U.S. to

6    impose a sanction?

7                   MR. MAHAFFEY:  Objection as to

8         the form.

9                   THE WITNESS:   It was really

10        the other way around.

11                  The U.S. government imposed a

12        311 sanction and then Cypress, the

13        government of Cypress took its action

14        within 24-48 hours without any review or

15        analysis.

16   BY MR. CARTER:

17        Q.    The bank at issue, FBME, was subject

18   to regulatory oversight by the applicable

19   regulator in Cypress prior to that time, correct?

20        A.    That is correct.

21        Q.    And as part of that regulatory

22   oversight preceding the Section 311 sanction, did

23   the regulatory authority in Cypress identify a

24   problem with the bank?

```
1          A.      I don't think so, no.

2          Q.      And was there any particular

3   allegation that FBME had been used to finance

4   terrorism?

5          A.      No, not that I recall.

6          Q.      You identify in Appendix II of your

7   report, which is your CV, your experience as an

8   expert witness; is that correct?

9          A.      I believe it does, yes, in general.

10         Q.      It's on page 2, I think, of your --

11         A.      Yes.

12         Q.      -- CV?

13                 Do you have that in front of you?

14         A.      Yes, I do.

15         Q.      And it says that you've been

16  designated as an expert witness in approximately

17  18 cases, correct?

18         A.      Yes, and this would be the 19th

19  case.

20         Q.      And aside from the present matter,

21  how many of those 18 cases involved allegations of

22  terror financing activities?

23         A.      A number of them involved

24  allegations of anti-money laundering and in
```

1    general counterterrorism financing, not

2    necessarily with any particularity.

3         Q.     Did any of them involve particular

4    allegations that the bank's accounts were used to

5    fund terrorism?

6         A.     I don't think so, no.

7         Q.     Okay.  And did any of them arise

8    from civil claims brought by terrorism victims?

9         A.     No, I don't believe so.  No.

10        Q.     You mention two cases in which

11   you've testified within the last few years.  The

12   first is Davis v. JP Morgan Chase Bank.

13               Do you see that?

14        A.     Yes, I do.

15        Q.     What was that case about?

16        A.     I'm having a hard time recalling the

17   details.  I believe it may well have been a

18   lawsuit brought by victims of a Ponzi scheme

19   against the bank that maintained accounts for the

20   con artist engaged in the Ponzi scheme.

21        Q.     And I take it that you represent --

22   that you were an expert for the bank in that case?

23        A.     That is correct.

24        Q.     And you offered opinions that the

This Transcript Contains Confidential Material

```
 1   bank committed no wrongdoing?
 2        A.       Yes, that is correct, and among
 3   other opinions.
 4        Q.       And do you recall what the
 5   resolution of the case?
 6        A.       I believe it was settled.
 7        Q.       Do you recall the amount of the
 8   settlement?
 9        A.       No, I was not informed of that.
10                 If I'm not mistaken, if I could
11   correct myself.  I believe the case was dismissed.
12        Q.       So it was either dismissed or
13   settled?
14        A.       I believe it was dismissed.
15        Q.       And do you recall the -- the reason
16   for the dismissal?
17        A.       That there was not -- it was a
18   failure to state a claim of action.
19        Q.       And the case of GSR -- GSR Markets
20   V. Diana McDonald and Wells Fargo, what was that
21   about?
22        A.       It involved an entity in Spain that
23   purchased $4 million worth of Bitcoins.  It sent
24   $4 million by wire to an attorney, Diana McDonald,
```

```
 1    who's located in Florida as a sole practitioner.

 2    She absconded with half the money, did not send it

 3    on to the seller of the Bitcoins and only provided

 4    $2 million back to the purchaser of the Bitcoins.

 5    So they were out $2 million.

 6              Diana and -- and GSR, who was a

 7    purchaser of the Bitcoins, brought suit against

 8    the bank because they maintained an account for

 9    Diana McDonald.

10         Q.    And you represented the bank in that

11    matter?

12         A.    I did.

13         Q.    And it had nothing to do with

14    terrorism?

15         A.    No, just the sale of Bitcoins.

16         Q.    Your summary of your experience in

17    curriculum vitae indicate that you've also engaged

18    in consulting work subsequent to your term with

19    the government, correct?

20         A.    Yes, after I left Bank of America.

21         Q.    Okay.  And at a very general level,

22    what types of consulting work do you do aside from

23    serving as an expert witness?

24         A.    That's primarily it.  Serving as an
```

This Transcript Contains Confidential Material

1    expert witness primarily on behalf of financial

2    institutions involving allegations of anti-money

3    laundering -- of -- of violations of anti-money

4    laundering and CFT regulations.

5         Q.      And in the 18 cases you reference in

6    your curriculum vitae where you've served as an

7    expert witness, have you worked for the financial

8    institution in all of those cases?

9         A.      Not in all of those cases, no.  One

10   case involved assisting an NFL linebacker in a

11   suit against Bank of America.

12        Q.      What was the nature of that suit?

13        A.      The nature of the suit was the NFL

14   player had deposited millions of dollars with the

15   bank for investment because he didn't want to go

16   to a small institution that might not be able to

17   handle that kind of money.

18             The account representatives handling

19   his funds left the bank, took the account with

20   them, and then absconded with the money.

21        Q.      And the suit was against Bank of

22   America?

23        A.      Yes, that is correct.

24        Q.      And that suit occurred after Bank of

1    America terminated your employment?

2         A.    It was long after, yes.

3         Q.    And that case in which you

4    represented the plaintiff in a lawsuit against

5    Bank of America is the only case in which you've

6    served as an expert where you represented the

7    plaintiff suing the bank?

8         A.    There may have been one or two other

9    cases.

10        Q.    You can't remember right now?

11        A.    I can't remember the details.  I'm

12   sorry.

13        Q.    Okay.  Have you ever done any

14   consulting work for banks in the Middle East?

15        A.    Other than the bank that we just --

16        Q.    Correct.

17        A.    -- discussed?

18        Q.    Other than FBME.

19        A.    Correct.  That is correct.

20        Q.    That's the only one?

21        A.    That is correct.

22        Q.    Okay.  Just I think the way that our

23   exchange went, there may be some confusion in the

24   transcript.  So let me just try to clarify this.

1          A.       Please.

2          Q.       Aside from your engagement on behalf

3    of FBME, have you ever been engaged to serve as a

4    consultant for any financial institution in the

5    Middle East?

6          A.       Not any particular financial

7    institution.  I did work on a FATF review of the

8    laws, rules, and regulations of Kuwait.

9          Q.       On behalf of what client?

10         A.       It would be on behalf of Royal Bank.

11         Q.       Have you ever been engaged by any

12   government in the Middle East?

13         A.       No.

14         Q.       Have you ever done any prior work on

15   behalf of Al Rajhi Bank?

16         A.       No, I have not.

17         Q.       Have you ever worked with a firm

18   called Smith Regulatory Strategies?

19         A.       I have consulted with Brian Smith,

20   who operates that company.  He's a former chief

21   counsel of the OCC.  I have worked with him on a

22   couple of assignments, but it's been quite a

23   while.

24         Q.       Are those assignments reflected

1    within the summary you provided in your CV?

2         A.     I don't think so because I wasn't

3    working as an expert witness in those cases, more

4    as an advisor, a consultant.

5         Q.     I had asked prior whether or not

6    your consulting work spanned any areas other than

7    serving as an expert witness, and I understand you

8    to have told me that it did not.

9               Am I now understanding that you have

10   done consulting work since leaving the government

11   outside of the expert witness arena?

12              MR. MAHAFFEY:  Objection as to

13        form.  Misstates testimony.

14              THE WITNESS:  Yes, you are

15        correct.  I apologize for the

16        misstatements or confusion.

17   BY MR. CARTER:

18        Q.     And the consulting work you've done

19   with Smith Regulatory Strategies, has that

20   involved any clients in the Middle East?

21        A.     No, it did not.

22        Q.     And just so again I'm clear, am I

23   correct that you have not done any consulting work

24   unrelated to services and expert testimony for any

```
 1   bank or client in the Middle East prior to this
 2   engagement?
 3        A.      That is correct.
 4        Q.      And I take it that you haven't done
 5   any work for the Saudi Arabian Monetary Authority
 6   at any time?
 7        A.      That is correct.
 8        Q.      Did you have any dealings with the
 9   Saudi Arabian Monetary Authority during your term
10   at OCC?
11        A.      No, I did not.
12        Q.      Did you have any involvement in the
13   U.S. government's engagements with Saudi Arabia
14   concerning terrorist financing issues after
15   September 11, 2001?
16        A.      No, I did not.
17        Q.      Have you ever had any role during
18   your time with the government relating to the
19   Executive Order 13224 designation program?
20        A.      I'm not directly familiar with that.
21   So the answer would be no.
22        Q.      What about the other designation
23   programs established by the United States for
24   foreign terrorist organizations or individuals who
```

 1    have disrupted the Middle East peace process?

 2    Were you ever involved with those?

 3                      MR. MAHAFFEY:  Objection as to

 4          the form.

 5                      THE WITNESS:  No, I was not.

 6    BY MR. CARTER:

 7          Q.      And in your post-government service,

 8    have you ever done any work relating to Executive

 9    Order 13224 designations?

10          A.      No, other than my only involvement

11    was in connection with designations under Section

12    311 of the USA PATRIOT Act that we discussed

13    earlier.

14          Q.      So with regard to Executive Order

15    13224 designations, you have never done any work

16    in that space?

17          A.      That is correct.

18          Q.      And what about with respect to any

19    of the other designation -- terrorism designation

20    programs aside from Section 311?

21                      MR. MAHAFFEY:  Objection as to

22          the form.

23                      THE WITNESS:  No, I have not.

24    BY MR. CARTER:

1     Q.     Turning to your -- the body of your

2  report, which again we've marked as Exhibit 2.

3            There is a summary of your opinions

4  on page 3 which includes subheadings A through E,

5  correct?

6     A.     Yes, I see that.

7     Q.     And those summarize your principal

8  opinions in the case?

9     A.     Yes, they do.

10    Q.     And the first one concerns the

11 treatment of CIA reports and post-9/11 sanctions

12 designations in the reports of Jonathan Winer and

13 Evan Kohlmann, who are plaintiffs' experts,

14 correct?

15    A.     That is correct.

16    Q.     And your discussion of the CIA

17 reports commences on page 5 of your report,

18 correct?

19    A.     Yes, I believe it does.

20    Q.     If you can turn to that section, I'd

21 like to ask you some questions about this section

22 of your report.

23    A.     Okay.

24    Q.     On page 5, you introduce this

1    section of your report by stating:

2                    "Time and time again throughout

3    their reports, the plaintiffs' experts rely on

4    reports and cables generated by the CIA, the FBI,

5    the State Department, and other government or

6    quasi-government agencies to support their

7    opinions that the bank failed to flag allegedly

8    suspicion customers and transactions pre-9/11."

9                    Do you see that?

10       A.       Yes, I do.

11       Q.       And in connection with that

12   criticism that you direct at plaintiffs' experts,

13   you include a footnote citing to sections of the

14   Winer and Kohlmann reports, correct?

15       A.       Yes.  That sentence itself is not a

16   criticism.  It's a statement.

17       Q.       And --

18       A.       Just to be clear.

19       Q.       But your report does criticize them

20   for the methodology that you characterize in the

21   sentence --

22       A.       Yes, definite --

23       Q.       -- is that fair?

24       A.       Yes, it is fair.

This Transcript Contains Confidential Material

```
 1        Q.      Okay.  And so Footnote 1 is where
 2   you provide examples of the conduct that you're
 3   addressing, correct?
 4        A.      That is correct.
 5                MR. CARTER:  Okay.  I'd like
 6        to take a look at the relevant sanctions
 7        that you cite from Mr. Winer's report,
 8        which we will mark as Exhibit 3 and it is
 9        at Tab 4.
10                (Document marked for
11        identification as Pasley Exhibit 3.)
12   BY MR. CARTER:
13        Q.      And if it would be convenient for
14   you, Mr. Pasley, I do have an extra hard copy --
15        A.      Okay.
16        Q.      -- which might make it easier.
17        A.      Okay.
18        Q.      There you go.
19        A.      Thank you.
20        Q.      With regard to this statement that
21   we just summarized in your report, you agree with
22   me that you cite to Sections 6.7 through 6.10 in
23   Mr. Winer's report?
24        A.      Yes, I see that.
```

```
 1        Q.      And turning to the beginning of that

 2   section on page 48, what is the subject heading of

 3   that section of Mr. Winer's report?

 4        A.      Okay.  I'm sorry.  I'm a little

 5   lost.  6.7 I believe starts on page 53.

 6        Q.      I'm sorry.  6.7 is a part of

 7   Section 6 of the report?

 8        A.      Yes.  Yes, I understand that.  Yes.

 9   Okay.

10        Q.      And so if you go to the beginning of

11   Section 6 on page 48?

12        A.      Right.  I'm there.

13        Q.      What is the subject matter of

14   Section 6 of Mr. Winer's report?

15        A.      The heading is "Question 4:  Is

16   there evidence that al-Qaeda relied on sympathetic

17   financiers and financial institutions to raise and

18   move money prior to September 11, 2001?"

19        Q.      Would you agree with me that

20   Mr. Winer's description of this section of his

21   report indicates that it addresses how al-Qaeda

22   raised and moved money, correct?

23                  MR. MAHAFFEY:  Objection as to

24          the form.
```

1                    THE WITNESS:   In general, I

2          believe that's right.  I can't point to

3          specifics without going through it in

4          more detail.

5  BY MR. CARTER:

6          Q.      Okay.  Well, does this section of

7  Mr. Winer's report say anything at all about Al

8  Rajhi Bank's AML practices or failure to flag

9  suspicious transactions?

10                   MR. MAHAFFEY:   Objection as to

11         the form.

12                   THE WITNESS:   I'm not sure

13         just looking at this, you know, right now

14         without -- without being directed to

15         particular parts of Section 6.

16  BY MR. CARTER:

17         Q.      Well, let's look at the sections

18  that you cited in relation to the statement of

19  your report that Mr. Winer time and again cites

20  reports generated by the CIA to support opinions

21  that the bank failed to flag allegedly suspicious

22  customers and transactions, and you cited to

23  Sections 6.7 through 6.10.

24                   Where in Sections 6.7 to 6.10 does

1    Mr. Winer say anything at all about Al Rajhi

2    Bank's failure to flag suspicious customers or

3    transactions?

4                    MR. MAHAFFEY:  Objection as to

5         the form.

6                    THE WITNESS:  (Reviews

7         document.)

8                    Well, 6.8.5 refers to the

9         bank, and it's a general understanding

10        that Mr. Winer is addressing the

11        deficiencies at the bank throughout his

12        entire 200-page report.

13   BY MR. CARTER:

14        Q.    6.8.5 you say refers to the bank?

15        A.    Yes.

16                    MR. MAHAFFEY:  Objection as to

17        form.

18   BY MR. CARTER:

19        Q.    What does it say about the bank?

20        A.    It discusses the bank's subpoena and

21   the CIA report released under Executive Order

22   14040.

23        Q.    Where does it say anything about the

24   conduct of the bank in that section that you just

```
 1    read to me?

 2         A.        It doesn't in particular.

 3         Q.        And the reference to ARB there

 4    refers to plaintiffs' Al Rajhi Bank's subpoena,

 5    meaning the subpoena plaintiffs issued in this

 6    litigation?

 7         A.        That is correct.

 8                        MR. MAHAFFEY:  Objection as to

 9              the form.

10    BY MR. CARTER:

11         Q.        And it doesn't say anything about

12    suspicious activity or red flags, does it?

13         A.        No, not there.

14                        MR. MAHAFFEY:  Objection as to

15              the form.

16    BY MR. CARTER:

17         Q.        And if we go to the Table of

18    Contents of Mr. Winer's report on page 2?

19                        MR. MAHAFFEY:  Counsel, if I

20              could just object.  You've asked him to

21              identify certain provisions in a 20-page

22              section of the report, and now you're

23              asking him to flip back to the Table of

24              Contents while he's still reviewing that
```

```
 1          section.  Can he have an opportunity to
 2          finish reviewing 6.7 to 6.10?
 3                    MR. CARTER:  He can.
 4                    MR. MAHAFFEY:  Okay.
 5                    MR. CARTER:  If it's
 6          reasonable.  These are the sections cited
 7          in his report in support of his opinion.
 8                    MR. MAHAFFEY:  Okay.
 9                    MR. CARTER:  So one would
10          expect him to be able to answer the
11          questions.
12                    MR. MAHAFFEY:  Well, again,
13          counsel, you're asking him to identify
14          specific provisions in a 20-page section.
15                    THE WITNESS:  (Reviews
16          document.)
17                    Well, 6.9.5.11 refers to the
18          Al Rajhi family.  I mean, there are
19          references to the bank throughout the
20          200-page report.  The report speaks for
21          itself.
22   BY MR. CARTER:
23        Q.    Well, I agree the report speaks for
24   itself.
```

1               And what I'm asking you is:  Where
2    in this Section 6 in the provisions that you cite,
3    6.7 through 6.10, does it say anything about the
4    issue you raise in your report concerning the
5    bank's failure to flag suspicious customers or
6    transactions?
7         A.      I'd have to read through it a little
8    more carefully, and I don't think you want me to
9    spend the time to do that.
10               The report speaks for itself.
11        Q.      Okay.  So sitting here, you're
12   unable to identify for me any provision of the
13   section of the report that you cited in your
14   report that actually refers to the bank's failure
15   to flag suspicious customers or to red flag
16   transactions?
17               MR. MAHAFFEY:  Objection as to
18         the form.
19               THE WITNESS:  Well, 6.10.3.10
20         and 11 refers to the bank in the CIA
21         reports, and it also says in 6.10.3.11
22         that -- that ARB, other than a single
23         sentence preceded by a
24         two-and-a-half-inch redaction, it states

This Transcript Contains Confidential Material

```
 1            "Al Rajhi financial ties to Islamists is

 2            inconclusive."

 3    BY MR. CARTER:

 4        Q.        Right.

 5                  And those talk about the bank's

 6    relationship to Islamists, but not about its AML

 7    or its suspicious transaction reporting

 8    compliance, do they?

 9        A.        It may not.  I would have to, with

10    all due respect, study this section a little more.

11        Q.        Well, let's turn to the Table of

12    Contents of the report on Section 2, and there

13    Mr. Winer provides a Table of Contents and

14    describes what the different sections of his

15    report address.

16                  Do you agree?

17        A.        Yes, I see that.  There are 12

18    section numbers, yes.

19        Q.        And Section 9 of the report

20    specifically addresses Al Rajhi Bank's adherence

21    to Know Your Customer, AML, and Count-Terror

22    Financing best practices, correct?

23        A.        Yes, I see that.

24        Q.        And Section 10 addresses whether or
```

```
 1   not Al Rajhi Bank ignored anti-money laundering or

 2   counterterrorism financing red flags on accounts

 3   of specific customers, correct?

 4        A.      Yes, that's correct.

 5        Q.      And that's distinct from the section

 6   you cited in your report?

 7                    MR. MAHAFFEY:  Objection as to

 8           form.

 9                    THE WITNESS:   They are

10           distinct, yes.

11   BY MR. CARTER:

12        Q.      Doesn't Section 6 of the Winer

13   report address an entirely subject matter --

14   different subject matter than the failure to flag

15   suspicious customers and transactions that you

16   describe in your report?

17                    MR. MAHAFFEY:  Objection as to

18           the form.

19                    THE WITNESS:  Well, the

20           description of Section 6 here in the

21           Table of Contents -- not to argue with

22           you does -- talk about financial

23           institutions and al-Qaeda relying on

24           those financial institutions.
```

This Transcript Contains Confidential Material

```
 1   BY MR. CARTER:
 2        Q.       But it doesn't say anything about
 3   those financial institutions' money laundering
 4   practices or counterterrorism financing practices
 5   does it?
 6                    MR. MAHAFFEY:  Objection as to
 7        form.
 8                    THE WITNESS:  Again, I would
 9        have to go through the 40-page -- 40
10        pages of this section in order to be able
11        to respond properly.
12   BY MR. CARTER:
13        Q.       So we've taken a few minutes to look
14   at this.
15                    I take it that you haven't found any
16   specific references in Section 6 as of yet to --
17                    MR. MAHAFFEY:  Objection.
18   BY MR. CARTER:
19        Q.       -- money laundering or red flags?
20                    MR. MAHAFFEY:  Objection as to
21        form.
22                    THE WITNESS:  As I indicate,
23        this section is almost 40 pages in
24        length, and I've only had a few minutes
```

This Transcript Contains Confidential Material

```
1            to read through it.  I would have to
2            spend a lot more time looking through it.
3    BY MR. CARTER:
4         Q.      Well, the sections that you cite in
5    your report aren't 40 pages in length?
6         A.      No.
7         Q.      And you cited them in your report.
8                 Have you had a chance to look at
9    those?
10                    MR. MAHAFFEY:  Objection as to
11            form.
12                    THE WITNESS:  Okay.  I've
13            answered as best I could.
14                    MR. CARTER:  Let's take a look
15            at Mr. Kohlmann's report and the sections
16            of his report that you cite.
17                    And Mr. Kohlmann's report is
18            at Tab 3 and, if I'm remembering, this
19            will be Exhibit 4.
20                    (Document marked for
21            identification as Pasley Exhibit 4.)
22                    THE WITNESS:  Thank you.
23    BY MR. CARTER:
24         Q.      Okay.  Again, focusing on the same
```

1    introductory statement in this section of your

2    report:

3              "Time and time again throughout

4    their reports, the plaintiffs' experts rely on

5    reports and cables generated by the CIA, the FBI,

6    the State Department, and other government or

7    quasi-government agencies to support their

8    opinions that the bank failed to flag allegedly

9    suspicious customers and transactions pre-9/11."

10             And with regard to that, you cite to

11   Mr. Kohlmann's report page 15 note 76 and page 20

12   note 125, correct?

13        A.        Yes, that is correct.

14        Q.        And looking first at Mr. Kohlmann's

15   report on page 15 note 76, the relevant text of

16   the report indicates that:

17             "CIA documents indicate that

18   Al-Haramain employee accounts in Albania

19   specifically received money from Al-Haramain's

20   official account at Al Rajhi Bank."

21             Do you see that?

22        A.        Yes, I see that.

23        Q.        Okay.  Does Mr. Kohlmann there issue

24   any opinion about whether or not Al Rajhi Bank

This Transcript Contains Confidential Material

```
 1    failed in relation to those payments to flag a
 2    suspicious transaction?
 3                   MR. MAHAFFEY:  Objection as to
 4         form.
 5                   THE WITNESS:   I believe
 6         that's implicit in this statement of the
 7         report.
 8    BY MR. CARTER:
 9         Q.     Do you know whether Mr. Kohlmann was
10    offered to testify as to anti-money laundering or
11    counterterrorism financing protocols governing
12    banks?
13         A.     I would have to go back and look at
14    what his particular assignment was, but I believe
15    it encompassed that, yes.
16         Q.     And turning to the next section of
17    the report that you cite in this section
18    criticizing the reliance on the CIA reports, on
19    page 20, Mr. Kohlmann states:
20                   "IIRO's operations in Pakistan were
21    allegedly responsible for sponsoring 7 al-Qaeda
22    training camps in the region."
23                   And that's the statement and
24    footnote you cite, correct?
```

This Transcript Contains Confidential Material

```
1        A.       Yes, that is correct.

2        Q.       Okay.  What does that have to do

3   with the argument you make about Al Rajhi Bank's

4   failure to flag suspicious customers or

5   transactions?

6        A.       It may not directly, no.

7        Q.       Are you an expert on al-Qaeda's

8   sources of funding prior to September 11, 2001?

9        A.       No, I am not.

10       Q.       Are you an expert on al-Qaeda's

11  relationships with charity organizations prior to

12  9/11?

13       A.       No, I'm not.

14       Q.       And are you -- do you -- are you an

15  expert on whether or not the International Islamic

16  Relief Organization provided support to al-Qaeda

17  prior to 9/11?

18       A.       No, I'm not.

19       Q.       Are you an expert on whether or not

20  the Al-Haramain Islamic Foundation provided

21  support to al-Qaeda prior to 9/11?

22       A.       No, I'm not.

23       Q.       And you're not offering opinions on

24  those issues?
```

1        A.       No.   I've been retained to be a

2   rebuttal witness with regard to Mr. Winer's and

3   Mr. Kohlmann's expert opinion reports.

4        Q.       Well, Mr. Kohlmann's report

5   specifically addresses al-Qaeda's pre-9/11 support

6   network and relationships with certain charities.

7                 You're not offering rebuttal

8   testimony concerning that subject matter, are you?

9        A.       Maybe not specifically.  My

10   assignment was to rebut in the context of my

11   expertise the expert opinion reports of Jonathan

12   Winer and Evan Kohlmann.

13        Q.       Turning back to your report and in

14   particular your criticisms of Mr. Winer, does

15   Mr. Winer anywhere in his report argue that Al

16   Rajhi Bank should have been aware of the existence

17   of the cited CIA reports or the texts included in

18   them at the time they were created?

19                 MR. MAHAFFEY:   Objection as to

20        form.

21                 THE WITNESS:   He refers a

22        number of times specifically to the 2003

23        CIA report, which was not released until

24        20 years after that, that date.  So the

```
 1            bank could not have known about that CIA

 2            report until the disclosure of it 20

 3            years later in a heavily redacted form.

 4  BY MR. CARTER:

 5       Q.      But -- but does he anywhere argue

 6  that the bank should have had access to these CIA

 7  reports at the time they were created?

 8                 MR. MAHAFFEY:  Objection as to

 9            form.

10                 THE WITNESS:  Well, by

11            definition, the bank could not have had

12            access to the reports, and Mr. Winer does

13            not dispute that.

14  BY MR. CARTER:

15       Q.      So you agree that Mr. Winer does not

16  in his report claim that the bank should have had

17  access to the CIA reports at the time that they

18  were created, correct?

19       A.      Correct.

20                 MR. MAHAFFEY:  Objection as to

21            form.

22                 THE WITNESS:  Correct.

23  BY MR. CARTER:

24       Q.      Have you ever been a consumer of CIA
```

```
 1  intelligence reporting?

 2        A.       When I was at the OCC, I had a very

 3  high-level clearance and was provided from time to

 4  time infrequently with classified material to

 5  review and determine whether there was any

 6  necessary follow-up.  Some of those reports may

 7  well have contained CIA reports or information

 8  from CIA reports.

 9        Q.       Do you recall how frequently you may

10  have come into contact during your government

11  career with CIA intelligence reporting?

12        A.       It was only in the last couple of

13  years of my tenure at the OCC and it was

14  relatively infrequent.

15        Q.       Have you read the CIA reports in

16  this case?

17        A.       I have read excerpts, I believe, if

18  not the entire report from 2003.  It was contained

19  in the material provided to me.

20        Q.       There are a number of CIA reports

21  that have been cited by Mr. Winer and

22  Mr. Kohlmann.

23               Has your review been limited to the

24  2003 report?
```

1        A.        I believe it has, yes.

2        Q.        And your report criticizes both

3    Mr. Winer and Mr. Kohlmann for their treatment of

4    CIA reports, including reports that you did not

5    review, correct?

6        A.        Correct.

7        Q.        You discuss in your report

8    designations, correct?

9        A.        Yes, I do.

10       Q.        And you offer an opinion that an

11   after-the-fact designation doesn't provide a basis

12   for asserting that the bank should have known

13   during a prior period, correct?

14       A.        That is correct.

15       Q.        Would you agree that designations

16   may be relevant in evaluating whether the

17   designated party was associated with terrorism at

18   a point in time prior to the designation?

19       A.        That's not the point I was trying to

20   make but, yes, it is possible that that is

21   related.

22       Q.        Okay.  And do you happen to know

23   whether Mr. Winer and Mr. Kohlmann cite the

24   designations in support of their opinions that the

This Transcript Contains Confidential Material

```
 1   designated entities were, in fact, involved in

 2   terrorism?

 3                    MR. MAHAFFEY:  Objection as to

 4        form.

 5                    THE WITNESS:   I really can't

 6        point exactly where in the 300 pages of

 7        reports that they -- whether or not they

 8        do so, but the implication is that --

 9        implication is that the CIA reports do

10        cast aspersions on the particular NGOs.

11   BY MR. CARTER:

12        Q.      And are you aware that the claims

13   against Al Rajhi Bank include allegations relating

14   to its relationship with the Al-Haramain Islamic

15   Foundation?

16        A.      There are a number of references to

17   Al-Haramain, yes, that is correct.

18        Q.      And was Al-Haramain Islamic

19   Foundation a customer of the bank?

20        A.      I believe it held numerous accounts,

21   approximately 95 different accounts, at the bank.

22        Q.      Do you know whether Al-Haramain was

23   designated subsequent to the September 11th

24   attacks?
```

This Transcript Contains Confidential Material

```
 1          A.      It was -- well, not the headquarters

 2   in Saudi Arabia, but various branches in other

 3   countries I believe were designated.

 4          Q.      What's the basis for your statement

 5   that the headquarters in Saudi Arabia was not

 6   designated?

 7          A.      Okay.  Upon reflection, it may well

 8   have been, but it was way after 9/11.

 9          Q.      Do you have any understanding as to

10   what factors may have resulted in the designation

11   of that headquarters being deferred?

12                  MR. MAHAFFEY:  Objection as to

13          form.

14                  THE WITNESS:  No.  I know that

15          there were branches of Al-Haramain

16          initially designated but not the

17          headquarters in Saudi Arabia, but then

18          the entire entity was designated, if I'm

19          not mistaken and the best of my

20          recollection.

21                  Does that answer your

22          question?

23   BY MR. CARTER:

24          Q.      To a degree.
```

This Transcript Contains Confidential Material

```
 1                   Have you been made aware in
 2    connection with your assignment that the director
 3    of Al-Haramain in Saudi Arabia Aqil Al-Aqil was
 4    also an Al Rajhi Bank customer?
 5         A.       I believe he was, yes.
 6         Q.       When was he designated?
 7         A.       It was post-9/11.
 8         Q.       Okay.  But it was years before the
 9    2008 designation of the headquarters, wasn't it?
10         A.       Actually, I can't remember the
11    dates.  I'm sorry.
12         Q.       Again, you don't have any opinion as
13    to whether or not Al-Haramain was, in fact,
14    involved in supporting al-Qaeda before 9/11?
15         A.       I have no knowledge one way or the
16    other.
17         Q.       And do you have any opinion as to
18    whether or not Aqil Al-Aqil was involved in
19    supporting al-Qaeda before 9/11?
20         A.       No, I do not.
21         Q.       You reference a number of times in
22    your report protocols at the bank for the conduct
23    of audits.
24                   Do you recall that?
```

1        A.        Yes, I do have a discussion of the

2    audits.

3        Q.        On page 8 of your report, you

4    discuss your views on whether or not the bank was

5    not materially compliant with Saudi Arabian

6    Monetary Authority rules and regulations, correct?

7        A.        I'm sorry.  Where are on page 8 are

8    we?

9        Q.        On page 8 of your report, you have a

10   section that is introduced as indicating that

11   you're discussing instances of purported

12   noncompliance with SAMA regulations.

13       A.        Yes, I see that.  Yes, I see the

14   heading.  I'm sorry.

15       Q.        So that's the discussion in this

16   section of your report?

17       A.        Yes, that is correct.

18       Q.        And in the second paragraph, the

19   introductory section says:

20                 "As a general matter, it can be

21   expected that the bank was routinely audited and

22   that any significant issues would have been

23   flagged as areas of correction and reported to

24   SAMA."

1           Do you see that?

2       A.      Yes, I do.

3       Q.      Now, why do you say "it can be

4    expected that the bank was routinely audited"?

5       A.      Well, throughout the record and in

6    particular in Mr. Galloway's deposition, there's

7    evidence of the fact that the bank was routinely

8    audited on an internal and external basis, and

9    that SAMA conducted reviews or examinations of the

10   bank as well.

11      Q.      Aside from Mr. Galloway's testimony,

12   do you have any other support for that

13   proposition?

14      A.      Well, in the documents that I was

15   provided, there were extensive detailed audit

16   plans for the bank during the period of time,

17   during a two-year period.

18              And in addition, in the bank's

19   annual reports, there are contained in that the

20   cover page of four external audits between 1998

21   and 2001 conducted by Ernst & Young and

22   PriceWaterhouse.

23      Q.      And there are different types of

24   audits, correct?

This Transcript Contains Confidential Material

```
 1          A.       Yes, there are.
 2          Q.       There's many different types of
 3     audits, right?
 4          A.       There can be, yes.
 5          Q.       And it's either a fact that the bank
 6     was audited or it wasn't?
 7          A.       I guess you could say that, yes.
 8          Q.       And the way that you could verify
 9     that would be to ask for the audits and to review
10     them, right?
11                       MR. MAHAFFEY:  Objection as to
12          form.
13                       THE WITNESS:  I believe so.
14          I believe that's correct, yes.
15     BY MR. CARTER:
16          Q.       And did you ask Al Rajhi Bank in
17     connection with your work on this case to provide
18     copies of any audits?
19                       MR. MAHAFFEY:  Objection.
20                       You can answer to the extent
21          your response does not reveal
22          communications with counsel.
23                       THE WITNESS:  Based on the
24          objection, I really can't answer that
```

1          question.

2     BY MR. CARTER:

3          Q.     Well, can you tell me whether your

4     work in this case would have benefited from an

5     opportunity to have reviewed any existing audits

6     at Al Rajhi Bank covering the period 1998 through

7     2001?

8          A.     I'm not sure I can answer that

9     correctly.

10                I believe that, as I indicated in

11    the annual reports, it indicated that there were

12    audits during this period of time and that no

13    problems were found.

14                In addition, SAMA disclosed to Juan

15    Zarate, a high official within the Department of

16    Treasury of the U.S., that Ernst & Young had done

17    a review of the bank and found no wrongdoings.

18         Q.     Well, let's talk about the statement

19    in that diplomatic community -- communication

20    concerning the conversation between the Saudi

21    official and Mr. Zarate.

22         A.     Yes.

23         Q.     Have you read that diplomatic cable?

24         A.     Yes, I have.

This Transcript Contains Confidential Material

1        Q.      And you say, it refers to a 2003

2   audit that the Saudi official represented had been

3   conducted of Al Rajhi Bank, right?

4        A.      That is correct.

5                MR. CARTER:  Why don't we mark

6        that document as the next exhibit.

7                MR. MAHAFFEY:  Counsel, if I

8        can just interject.  I don't want to

9        interrupt your line of questioning, but

10       next time you get to a good stopping

11       point, can we have a break?

12               MR. CARTER:  Sure.

13               MR. MAHAFFEY:  Thanks.

14               MR. CARTER:  Scott, what tab

15       is that?  It's September 27.

16               It's Tab 22.

17               (Document marked for

18       identification as Pasley Exhibit 5.)

19   BY MR. CARTER:

20       Q.      And the reference in this diplomatic

21   cable to the Saudi official's assertion about a

22   review by Ernst & Young of Al Rajhi Bank is about

23   midway through.

24               Do you see it?

1    A.    Yes.

2          Is there a way I can make this

3    document larger?

4    Q.    Yeah, he's going to.

5    A.    Okay.  Thank you.

6    Q.    Okay.  So it says:

7          "In August, 2003, Al-Rajhi had a

8    full scope examination done by Ernst & Young.  The

9    report did not indicate any wrong doings.

10   Assistant Secretary Zarate requested a copy of the

11   report.  Al-Gaith said he would share the findings

12   of the examination."

13         That's what you were referring to

14   earlier?

15   A.    Yes, I was.  Yes, that's correct.

16   Q.    Have you seen that report?

17   A.    No, I have not.

18   Q.    Okay.  Would you have found that

19   helpful to see that report in connection with your

20   work in this matter?

21         MR. MAHAFFEY:  Objection as to

22    form.

23         THE WITNESS:  Again, I'm not

24    sure because I did have the additional

This Transcript Contains Confidential Material

```
 1              documentation, the audit plans, the

 2              annual reports, and the statement from

 3              SAMA, SAMA to the U.S. Treasury.

 4    BY MR. CARTER:

 5         Q.      So you regard this generic statement

 6    of no wrongdoings from a Saudi official to be a

 7    sufficient replacement for an actual review of the

 8    audit?

 9                   MR. MAHAFFEY:  Objection as to

10              form.

11                   THE WITNESS:  It's really

12              hard to say.  I would rely on the

13              representation of SAMA and of the cover

14              pages contained in the bank's annual

15              reports.

16    BY MR. CARTER:

17         Q.      To the extent --

18         A.      I did rely on that.  I'm sorry.

19         Q.      To the extent that the audit

20    actually exists and shows no wrongdoings, wouldn't

21    it be helpful to you in your work to try to defend

22    the bank in this case?

23         A.      Well, I'm not sure.  I've been

24    retained as a rebuttal witness, and I saw no
```

1    evidence to the contrary.  No evidence that there

2    was an audit that criticized the bank in any way

3    with regard to AML or CFT.

4         Q.       The audit referenced -- the alleged

5    audit referenced in this, are you aware that

6    plaintiffs requested a copy of this in discovery

7    with Al Rajhi Bank?

8         A.       I'm not familiar with discovery

9    requests or discovery production, no.

10        Q.       Are you --

11        A.       That's not within the gambit of my

12   review.

13        Q.       Well, are you aware that Al Rajhi

14   Bank has told plaintiffs that it is unable to

15   locate any audit corresponding to this

16   description?

17                 MR. MAHAFFEY:  Objection as to

18        form.

19                 THE WITNESS:  Again, the

20        discussions between Al Rajhi Bank and

21        you-all as counsel for the plaintiffs is

22        not within my purview.  I'm not familiar

23        with it.

24   BY MR. CARTER:

1        Q.      Well, you've cited to this report in

2   support of opinions you've offered in the case,

3   correct?

4        A.      I cited to the annual report, yes.

5        Q.      No.  You cited to this statement

6   concerning this alleged audit, right?

7        A.      Yes, I did.  Yes.

8        Q.      Okay.  Don't you think the fact that

9   the audit might not exist would be relevant to

10  your opinions in this case?

11       A.      It would be hard for me to believe

12  that the audit did not take place.  I don't know

13  what the recordkeeping requirements are imposed on

14  Al Rajhi Bank in Saudi Arabia.  I'm not an expert

15  in Saudi law.

16       Q.      Okay.  When you say it would be hard

17  for you to believe that it didn't take place, is

18  that because there is a reference to it by a Saudi

19  official in a meeting with a U.S. official?

20              MR. MAHAFFEY:  Objection as to

21         form.

22              THE WITNESS:  Yes, and there's

23         sworn testimony by bank representative, a

24         30(b) representative to that effect.

1              In addition, there are

2         reference or there's a cover page of the

3         audits between 1998 and 2001 in the

4         bank's annual reports.

5    BY MR. CARTER:

6         Q.     Mr. Pasley, those are different

7    things.

8         A.     Okay.

9         Q.     Mr. Galloway in his deposition does

10   not at any point testify that this audit

11   referenced in the diplomatic cable actually

12   exists, does he?

13             MR. MAHAFFEY:  Objection as to

14        form.

15             THE WITNESS:  I can't

16        remember specifically what he testified

17        to.  I just -- I don't know.

18   BY MR. CARTER:

19        Q.     And do the annual reports say

20   anything about the existence of this particular

21   audit?

22        A.     In 2003, no.

23        Q.     Okay.  And it doesn't concern you

24   that the audit may not exist?

```
 1          A.        Well --

 2                         MR. MAHAFFEY:  Objection as to

 3          form.

 4                         THE WITNESS:  -- the audits

 5          that are referenced and are addressed in

 6          the four annual reports are during the

 7          relevant period of time for this lawsuit

 8          '98 to 2001.  This is outside the scope

 9          of that period.

10   BY MR. CARTER:

11          Q.        And you don't know what those audits

12   covered, do you?

13          A.        Not with any degree of

14   particularity, no.

15          Q.        And as we said, there's all kinds of

16   different audits?

17          A.        Potentially, yes.

18          Q.        In fact, there are audits simply to

19   reconcile debits and credits in an account, aren't

20   there?

21          A.        That is true.

22          Q.        And those types of audits don't do

23   anything to assess anti-money laundering or

24   counter-terror financing deviations, do they?
```

This Transcript Contains Confidential Material

```
 1        A.        Well, let me answer it this way.

 2               With regard to the annual reports,

 3   my recollection in reading the cover pages is that

 4   it addresses in general rules and regulations of

 5   SAMA and find that the bank is in compliance with

 6   those rules and regulations.  It does not say it

 7   was looking at debits and credits only.

 8        Q.        Okay.  You don't know whether or not

 9   there were any anti-money laundering audits

10   conducted of Al Rajhi Bank, do you?

11        A.        That were focused just on that area?

12   No, I don't know.

13        Q.        Okay.  And with regard to your

14   invocation of the reported statements by

15   Mr. Al-Gaith, the Saudi official at this meeting

16   with Mr. Zarate, did you note the comment in the

17   diplomatic cable that:

18               "Al-Gaith did not appear to support

19   a close relationship with the United States

20   government throughout the meeting.  At the

21   beginning of the conversation, Al-Gaith said that

22   he was 'fed up' with the U.S. government's

23   allegations"?

24               MR. MAHAFFEY:  Objection as to
```

This Transcript Contains Confidential Material

1           form.

2                    THE WITNESS:    I can't

3           remember the particular statement.    I

4           would have to look at it.

5    BY MR. CARTER:

6           Q.      Well, in deciding to cite

7    Mr. Gaith's statement to Mr. Zarate reported in

8    this cable, did it give you any pause that the

9    U.S. government assessed that Mr. Gaith did not

10   appear to support a close relationship with the

11   United States government?

12                   MR. MAHAFFEY:    Objection as to

13          form.    Misstates the report.

14                   THE WITNESS:    To the extent

15          that Mr. Gaith said that that is a very

16          general statement and doesn't impact, in

17          my view, on the particularity of what he

18          says with regard to the Ernst & Young

19          audit in 2003.

20   BY MR. CARTER:

21          Q.      Do you know whether the Ernst &

22   Young audit was ever provided to the United States

23   government?

24                   MR. MAHAFFEY:    Objection.

This Transcript contains Confidential Material

```
1                     THE WITNESS:   I do not know
2         that.
3                     MR. CARTER:  Okay.  If we can
4         mark as the next exhibit the diplomatic
5         cable dated November 25, 2004, which is
6         at Tab 21.
7                     (Document marked for
8         identification as Pasley Exhibit 6.)
9                     MR. CARTER:  You know what?
10        Let's take this down.  We can take that
11        break.  Sorry.
12                    MR. MAHAFFEY:  Thanks.
13                    THE VIDEOGRAPHER:  The time is
14        10:30 a.m.  We're off the record.
15                    (Recess.)
16                    THE VIDEOGRAPHER:  The time is
17        10:45 a.m.  We are back on the record.
18   BY MR. CARTER:
19        Q.     Mr. Pasley, before we took a break,
20   we were discussing a few diplomatic cables that
21   are referenced in the expert reports in the case.
22             Before turning to the second of
23   those, do you know what customer relationships
24   were within the scope of discovery in this case?
```

```
 1                    MR. MAHAFFEY:  Objection as to
 2        form.
 3                    THE WITNESS:  No, I do not
 4        know about the scope of discovery.
 5   BY MR. CARTER:
 6        Q.      Okay.
 7        A.      If I could go back?  If you'd permit
 8   me to amplify my answer with regard to the audits.
 9                    I was looking at my report, and
10   Footnote 20 cites to Jonathan Winer's report 1.4.2
11   which talks about the audits and Mr. Galloway
12   saying that they were audits pertaining to the
13   implementation of AML policies and procedures
14   systematically and at branch levels.
15                    So I just wanted to clarify that,
16   that the audits, according to Mr. Galloway's sworn
17   testimony, did address AML issues.
18        Q.      You testified earlier that, to the
19   extent there were audits addressing AML issues,
20   those would have been relevant to the work that
21   you were doing here, didn't you?
22                    MR. MAHAFFEY:  Objection as to
23        form.
24                    THE WITNESS:  Well, I believe
```

```
 1          my answer with that regard still stands.
 2                  I had the references, the
 3          explanations in Mr. Winer's report that I
 4          was reviewing, and the annual reports,
 5          which indicate that with regard to these
 6          audits that covered AML and BSA that
 7          there were no problems found.
 8   BY MR. CARTER:
 9          Q.    Well, where -- where -- where do you
10   have information saying that there were audits
11   covering AML and BSA that showed no problems
12   found?
13          A.    It's a combination of different
14   things.  One, Mr. Winer's report that I just
15   referenced and --
16          Q.    Mr. Winer's report doesn't say that.
17          A.    -- and the annual reports which
18   contain the cover page of those audits.
19          Q.    You don't know what the audits were
20   about, do you?
21                  MR. MAHAFFEY:  Objection as to
22          form.
23                  THE WITNESS:  Well, as I
24          attempted to just say, according to
```

1          Mr. Winer's report, they addressed AML

2          and BSA.

3    BY MR. CARTER:

4          Q.     So as an AML and BSA expert, you

5    find it sufficient to rely entirely on

6    representations of a witness concerning the

7    existence of audits that you haven't seen?

8                    MR. MAHAFFEY:  Objection as to

9          form.

10                   THE WITNESS:   I'm relying on

11         that, plus the audit plans, plus the

12         annual reports, plus the fact that

13         Mr. Winer does not dispute that there --

14         there were no findings of wrongdoings.

15   BY MR. CARTER:

16         Q.     That's -- that's a misrepresentation

17   of Mr. Winer's report.

18                   MR. MAHAFFEY:  Objection as to

19         form.

20   BY MR. CARTER:

21         Q.     Where does Mr. Winer say that?

22         A.     Again, his report speaks for itself.

23                I was referencing --

24         Q.     No.  You just -- you just

```
 1    represented what his report said.

 2                    Where does he say that the audits

 3    reflected no wrongdoing?

 4                    MR. MAHAFFEY:  Objection as to

 5         form.

 6                    THE WITNESS:   I believe he

 7         cites to the State Department cable.  I

 8         couldn't -- can't find it right off the

 9         hand -- my hand.

10    BY MR. CARTER:

11         Q.     He doesn't credit the statement in

12    the State Department cable, does it?

13                    MR. MAHAFFEY:  Objection as to

14         form.

15                    THE WITNESS:   I don't believe

16         he disputes it either.

17    BY MR. CARTER:

18         Q.     Mr. Pasley, you acknowledge that you

19    haven't seen a single audit relating to Al Rajhi

20    Bank, have you?

21         A.     Not --

22                    MR. MAHAFFEY:  Objection.

23                    THE WITNESS:   Not the full

24         audit, no, that is correct.
```

1    BY MR. CARTER:

2         Q.      And there -- you acknowledge that

3    there are all kinds of different types of audits,

4    right?

5                     MR. MAHAFFEY:   Objection as to

6         form.   Asked and answered.

7                     THE WITNESS:   Correct.   But as

8         I indicated in Mr. Winer's report, he

9         references the audit as covering AML and

10        BSA.

11   BY MR. CARTER:

12        Q.      Well, Mr. Winer doesn't represent

13   that.  He acknowledges testimony of Mr. Galloway,

14   doesn't he?

15        A.      Correct, but he doesn't refute

16   Mr. Galloway's statement in his sworn testimony.

17        Q.      Okay.  We'll get to that in a

18   second.

19                Have you seen any AML- or

20   BSA-related audits for Al Rajhi Bank?

21        A.      Not the underlying audits, no.

22        Q.      And the purpose of audits is to

23   identify compliance deficiencies, problems, or

24   even criminal wrongdoing, aren't they?

This Transcript Contains Confidential Material

```
 1                      MR. MAHAFFEY:  Objection as to
 2        form.
 3                      THE WITNESS:   Not necessarily
 4        -- not necessarily criminal wrongdoing
 5        but, yes, you're right.
 6   BY MR. CARTER:
 7        Q.     Okay.
 8        A.     You're correct in general.
 9        Q.     And audits also often include
10   statements from the auditors about any material
11   limitations that were placed on their work, don't
12   they?
13        A.     Generally, yes.
14        Q.     Okay.  And did Mr. Galloway indicate
15   that he had seen any of the audits?
16                      MR. MAHAFFEY:  Objection as to
17        form.
18                      THE WITNESS:   I believe he
19        testified that the audits did occur,
20        internal and external audits, and that
21        there were SAMA reviews of the bank.
22   BY MR. CARTER:
23        Q.     Did Mr. Galloway see any of the
24   audits?
```

```
 1        A.      I don't know what he had available
 2   to him.  I would have to assume that -- well, I
 3   don't know.  I don't know what he had available to
 4   him.
 5        Q.      Do you agree that reviewing the
 6   audits would be helpful in ascertaining whether or
 7   not Al Rajhi Bank complied with its AML
 8   obligations before 9/11?
 9               MR. MAHAFFEY:  Objection as to
10          form.
11               THE WITNESS:  Again, I think
12          I've answered that question a couple of
13          times.
14               I don't think it was essential
15          for my review as a rebuttal witness
16          reviewing what Mr. Galloway testified to
17          and what Mr. Winer said in his report.
18   BY MR. CARTER:
19        Q.      Okay.  You invoke the existence of
20   the audits as a basis for your criticisms of
21   Mr. Winer's opinions about deficiencies in the
22   bank's practices, don't you?
23        A.      I don't really understand your
24   question.
```

```
 1                      I don't think so.  I don't think I
 2   do.
 3        Q.       In criticizing Mr. Winer's reports,
 4   you invoke the audits, don't you?
 5                      MR. MAHAFFEY:  Objection as to
 6        form.
 7                      THE WITNESS:   The audits are
 8        referenced in the record, and I refer to
 9        them a couple of times saying that the
10        audits did occur based on the annual
11        reports, Mr. Galloway's testimony, the
12        detailed audit plan.  All of which
13        reference AML and BSA.  And SAMA's
14        explanation to Juan Zarate that there
15        were no problems found.
16   BY MR. CARTER:
17        Q.       Okay.  That wasn't an answer to my
18   question.
19                  My question is:  Does your expert
20   report cite the alleged audits as a basis for your
21   criticisms of Mr. Winer's conclusions?
22                      MR. MAHAFFEY:  Objection as to
23        form.
24                      THE WITNESS:   I think the
```

This Transcript Contains Confidential Material

```
 1              report speaks for itself.  I'm not sure I
 2              understand your question.  I apologize.
 3    BY MR. CARTER:
 4         Q.      You --
 5         A.      I just don't understand it.
 6         Q.      You haven't seen the audits, just to
 7    be clear, right?
 8                      MR. MAHAFFEY:  Objection as to
 9              form.  Asked and answered.
10                      THE WITNESS:   Again, we've
11              gone over this material, with all due
12              respect.
13                      I have not seen the underlying
14              audits, no.
15    BY MR. CARTER:
16         Q.      So you don't know what they say?
17         A.      I do not have access to the
18    underlying audits.
19         Q.      And the claims in this case concern
20    Al Rajhi Bank's relationships with specific
21    customers and the handling of those specific
22    accounts.
23                      Are you aware of that?
24                      MR. MAHAFFEY:  Objection as to
```

```
1              form.

2                        THE WITNESS:  Yes, I am.

3    BY MR. CARTER:

4         Q.        Okay.  Do you know whether any audit

5    during this period touched upon or referred to any

6    of the involved customers or their accounts?

7                        MR. MAHAFFEY:  Objection as to

8              form.

9                        THE WITNESS:    With

10             specificity, no, I do not.

11   BY MR. CARTER:

12        Q.        Okay.  Are you aware that plaintiffs

13   asked for any audits that referenced any of these

14   customers and were told that none exist?

15                       MR. MAHAFFEY:  Objection as to

16             form.

17                       THE WITNESS:    Again, the

18             maintenance of the bank's records,

19             discussions between counsel, none of that

20             is within my purview.

21   BY MR. CARTER:

22        Q.        Going back to where we left off, we

23   had marked the November 2004 diplomatic cable as

24   the next exhibit.
```

```
1         A.      Yes.

2         Q.      Did you review this diplomatic cable

3    as part of your work?

4         A.      I believe I did.

5                 I can't really read it here on the

6    screen.

7         Q.      We can make it bigger.

8                 It concerns a proposed joint

9    examination the United States government was

10   asking for of Al Rajhi Bank.

11                Do you recall that?

12        A.      Yes, I do.

13        Q.      And do you know whether or not that

14   joint examination ever occurred?

15        A.      I'm not positive, but I believe I

16   understand that it never did occur.

17        Q.      Okay.  Do you know why it didn't

18   occur?

19        A.      No, I have no idea.

20                    MR. MAHAFFEY:  Objection as to

21        form.

22   BY MR. CARTER:

23        Q.      And what is the basis for your

24   understanding that it did not occur?
```

```
 1        A.       I think there's a reference to that
 2   effect in the documentation or in Mr. Winer's
 3   report.  I'm not positive as to where I came upon
 4   that information.
 5        Q.       The proposed joint examination was
 6   prompted by concerns related to terrorist
 7   financing issues, correct?
 8                 MR. MAHAFFEY:  Objection as to
 9        form.
10                 THE WITNESS:   I am not sure.
11        I think that may be reflected in this
12        State Department diplomatic memo.
13   BY MR. CARTER:
14        Q.       The U.S. was proposing that it be
15   conducted pursuant to something called the Joint
16   Terrorist Financing Task Force; is that correct?
17        A.       Yes, I see that.
18        Q.       Do you know what the Joint Terrorist
19   Financing Task Force was?
20        A.       No, I'm not familiar with it.
21        Q.       And if we can scroll down a bit, it
22   indicates that:
23                 "The U.S. government has provided
24   the Saudi government with information documenting
```

```
 1   specific instances of terrorists using Al Rajhi

 2   Bank."

 3              Do you see that section?

 4       A.    Yes, I do see that.

 5       Q.    And do you understand that the

 6   proposal from the U.S. was prompted, in part, by

 7   that use of the bank?

 8       A.    What is the date of this memo again?

 9       Q.    It's 2004.

10       A.    Okay.  So this is 2004.  So this

11   would be after 9/11.

12       Q.    My question stands.

13       A.    Could you repeat your question?  I'm

14   sorry.

15       Q.    Okay.  Do you understand that the

16   joint examination being proposed by the United

17   States was prompted, at least in part, by the

18   information documenting specific instances of

19   terrorists using Al Rajhi Bank?

20              MR. MAHAFFEY:  Objection as to

21         form.

22              THE WITNESS:  I believe

23         that's what it says here, yes.

24   BY MR. CARTER:
```

This Transcript Contains Confidential Material

```
 1          Q.        And do you recall whether or not the

 2  diplomatic cable reflects that the U.S. government

 3  made a specific proposal to the Saudis concerning

 4  the protocol for the joint examination?

 5                    MR. MAHAFFEY:  Objection as to

 6       form.

 7                    THE WITNESS:  No, I don't

 8       know.

 9  BY MR. CARTER:

10          Q.        If we scroll down to the next page

11  -- well, beginning of the bottom of that page, it

12  describes what the joint examination will include.

13                    "The joint examination will include

14  a review of both customer information relevant to

15  the specified accounts and transactions (wire

16  transfer, check payment, cash management)

17  processed through those accounts.  Additionally,

18  the examination team will review anti-money

19  laundering compliance files related to all of the

20  accounts."

21                    Do you see that?

22          A.        Yes, I see that.

23          Q.        Okay.  And reviewing further down

24  near the bottom, under Section 1B through 1C, it
```

1    talks about the specific information that would be

2    provided for the accounts subject to the joint

3    review.

4              Do you see that section?

5         A.      The document speaks for itself.  I

6    really can't -- cannot interpret the document with

7    any other -- with any further degree of

8    specificity.

9         Q.      I'm just asking whether or not you

10   follow where I am in the document.

11        A.      I follow where you are, yes.

12        Q.      And then if we go down to the next

13   page, the last item that the U.S. government

14   proposed including in the joint examination was:

15              "Any internal audit reports,

16   including any work papers and supporting

17   documentation, rendered during the preceding three

18   years, including audits of Compliance and

19   AML/KYC."

20              Do you see that?

21        A.      Yes, I see that.

22        Q.      Do you agree with me that for

23   purposes of the review that the United States was

24   proposing to the Saudi government, the United

1    States had proposed that the review should

2    encompass external audit reports?

3        A.      To the extent that this was the

4    U.S.'s proposal, yes, I agree.

5        Q.      Okay.  So the experts of the United

6    States government conducting this proposed terror

7    financing review thought it was relevant to

8    actually review the audit reports and not just

9    take the representation from Al-Gaith a year

10   earlier -- or three months earlier that there had

11   been an audit showing no wrongdoing?

12               MR. MAHAFFEY:  Objection as to

13        form.

14               THE WITNESS:  I really don't

15        know what was in the heads of the U.S.

16        government in making this request.  It

17        really speaks for itself.

18               And my understanding is that

19        not only does it postdate 9/11, it was a

20        joint examination that never occurred.

21   BY MR. CARTER:

22        Q.      Mr. Pasley, your report includes a

23   discussion of certain sets of transactions that

24   Mr. Winer identified as suspicious.

This Transcript Contains Confidential Material

```
 1                    Do you recall that discussion?
 2          A.        In general, yes.  You'd have to
 3   direct me to specific parts of my report.
 4          Q.        Well, I'm just asking whether or not
 5   you remember addressing that subject matter in
 6   your report.
 7          A.        I believe I did.  Again, you'd have
 8   to direct me to the particular page and sentence.
 9          Q.        On page 10 of the report.
10          A.        Yes.
11          Q.        There is a heading "Transactions
12   characterized by Plaintiffs' experts as suspicious
13   do not suggest the Bank was materially
14   noncompliant with SAMA's rules and regulations."
15                    Do you see that?
16          A.        Yes, I do.
17          Q.        And do you recall addressing those
18   issues?
19          A.        Yes, I do recall.
20          Q.        And do you recall the account
21   holders that were involved with regard to the
22   alleged suspicious transactions?
23          A.        Again, in general, there were four
24   or five NGOs that Mr. Winer addresses in his
```

1    report that I was addressing.

2         Q.    Okay.  Do you recall whether or not

3    you addressed any individual accounts?

4         A.    Well, there was the account of

5    Al-Buthe, who is an individual.  So, yes.

6         Q.    Any others that you recall?

7         A.    Well, in the first paragraph, Aqil

8    Al-Aqil.

9         Q.    Okay.  Is the term "suspicious

10   transaction" familiar to you?

11        A.    Yes, it is.

12        Q.    Is it a term of art in the

13   anti-money laundering field?

14        A.    Well, yes, it is.  Banks are

15   required in the United States to file reports with

16   regard to suspicious activity.

17        Q.    Okay.  And are there criteria used

18   to determine whether a particular transaction is

19   suspicious?

20        A.    No.  The term is "suspicious" or

21   "unusual."  So it's in the eyes of the beholder.

22   There's no specific direction as to what is

23   suspicious, what isn't.  It would depend on the

24   circumstances, the analysis of the bank, their

This transcript contains Confidential Material

1   conclusion as to whether it's unusual or

2   suspicious with regard to a particular client or

3   particular account.

4        Q.      And there are no descriptions of

5   types of transactions that on their face are red

6   flags for a suspicious activity?

7                    MR. MAHAFFEY:  Objection as to

8         form.

9                    THE WITNESS:    In various

10        guidelines and issuances, there are lists

11        of potential red flags that a bank should

12        be mindful of.

13                    So to the extent that that

14        answers your question, yes.

15   BY MR. CARTER:

16        Q.      And were there any red flags of that

17   nature in existence in the 1998 to 2001 time

18   period?

19                    MR. MAHAFFEY:  Objection as to

20        form.

21                    THE WITNESS:    With regard to?

22        To what?

23   BY MR. CARTER:

24        Q.      Suspicious transactions.

```
1        A.       With regard to Al Rajhi Bank?

2        Q.       No, no, no.

3                 I'm asking whether or not there were

4    any factors or types of transactions that were

5    designated as red flags for potential suspicious

6    activity reporting.

7                         MR. MAHAFFEY:  Objection as to

8           form.

9                         THE WITNESS:   Again, there

10          are lists of red flags that are available

11          to banks, but there are hundreds of

12          thousands of suspicious activity reports

13          that are filed every year by banks.  So

14          they -- they run the gambit.

15   BY MR. CARTER:

16       Q.       Were there lists of red flags

17   available to banks in the years before

18   September 11th attacks?

19       A.       Yes, there were.

20       Q.       And do you recall any of the types

21   of transactions or behavior described in the lists

22   that were available during that time?

23                        MR. MAHAFFEY:  Objection as to

24          form.
```

This Transcript Contains Confidential Material

```
 1                      THE WITNESS:  Well, the list
 2         goes on for pages and pages.
 3   BY MR. CARTER:
 4         Q.      You say on page 10 that the
 5   transactions involving Aqil Al-Aqil discussed in
 6   Winer's report do not seem suspicious to you.
 7                  Do you see that?
 8         A.      Yes, I do.
 9         Q.      Okay.  What were the transactions at
10   issue in Aqil's report --
11                      MR. MAHAFFEY:  Objection as to
12         form.
13   BY MR. CARTER:
14         Q.      -- or in Aqil's account?
15         A.      Well, it indicates that there were
16   some large deposits and withdrawals over a
17   five-year period, but nothing to indicate that
18   these intermittent transactions were, in fact,
19   problematic or used for wrongdoing.
20         Q.      Okay.  Well, do you recall how much
21   money was deposited into and out of Aqil Al-Aqil's
22   personal account?
23                      MR. MAHAFFEY:  Objection as to
24         form.
```

```
 1                    THE WITNESS:   I do not have
 2         that in front of me, and I don't recall,
 3         no.  I'm sorry.
 4    BY MR. CARTER:
 5         Q.      And with regard to Mr. Al-Buthe, do
 6    you recall any of the details of the transactions
 7    carried out via his accounts that you address in
 8    your expert report?
 9                    MR. MAHAFFEY:  Objection as to
10         form.
11                    THE WITNESS:   Well, it
12         indicates in my report that Mr. Winer
13         discussed cash deposits into Al-Buthe's
14         account and use of travelers checks, but,
15         in my view, does not provide information
16         to indicate wrongdoing by the bank, only
17         detailing routine banking services.
18    BY MR. CARTER:
19         Q.      And do you recall the size of any of
20    the cash deposits involved with the Al-Buthe
21    account?
22                    MR. MAHAFFEY:  Objection as to
23         form.
24                    THE WITNESS:   No, I don't know
```

```
1          the amounts.
2     BY MR. CARTER:
3          Q.     And do you --
4          A.     I don't have it in front of me.
5          Q.     And do you recall approximately the
6     value of the travelers checks that were involved?
7                      MR. MAHAFFEY:  Objection as to
8          form.
9                      THE WITNESS:    I believe it
10         was a large volume, but I do not know
11         specifically what -- what they were.
12    BY MR. CARTER:
13         Q.     Your report doesn't specifically
14    address the value of any individual transactions
15    carried out by Aqil, does it?
16         A.     No, I don't think it does.
17         Q.     And it doesn't discuss the value of
18    any individual transaction carried out by
19    Mr. Al-Buthe, does it?
20         A.     Not with any degree of specificity,
21    no, I don't think so.
22         Q.     Okay.  Your report references the
23    fact that Aqil was not designated as a terrorist
24    until 2004.
```

```
 1                    Do you see that?
 2          A.       I believe that's correct.  I don't
 3     have it in front of me.
 4                    Yes, I see that.  Yes, in the first
 5     paragraph.
 6          Q.       Okay.  And it says that Al-Buthe was
 7     not indicted until 2010.
 8                    Do you see that?
 9          A.       Yes, I see that.
10          Q.       And you cite the fact that Aqil was
11     not designated until 2004 as a data point in
12     support of your opinion, right?
13          A.       I believe that's correct, yes.
14          Q.       And you cite --
15          A.       Again, with regard to rebutting what
16     Mr. Winer has concluded.
17          Q.       And you cite the fact that
18     Mr. Al-Buthe was not indicted until 2010 in
19     support of your rebuttal of Mr. Winer's opinion
20     that the Al-Buthe transactions were suspicious,
21     correct?
22          A.       Well, let me answer it in the
23     negative and quote from my report, that Mr. Winer
24     presents no evidence as to why the bank should
```

This Transcript Contains Confidential Material

```
 1   have suspected Al-Buthe before 9/11.

 2        Q.     Okay.  Are suspicious transaction

 3   protocols limited to people who have been publicly

 4   implicated in criminal wrongdoing?

 5        A.     No, they are not.

 6        Q.     And, in fact, people who have never

 7   been implicated can carry out transactions that

 8   carry -- that qualify as suspicious, can't they?

 9        A.     Yes, and we don't know whether Al

10   Rajhi Bank reported these suspicious or unusual

11   transactions, to the extent that's what they

12   concluded, or whether they did not report them to

13   SAMA.  We just don't know.  Those -- in the United

14   States, those type of reports are confidential and

15   can't be disclosed.

16        Q.     Okay.  Do you know whether under

17   SAMA's guidelines the bank would be required to

18   stop activity in the account upon issuing a

19   suspicious activity report?

20                    MR. MAHAFFEY:  Objection as to

21        form.

22                    THE WITNESS:  No, I don't

23        know.  I do know in United States it's

24        not a requirement for a bank to close an
```

THIS TRANSCRIPT CONTAINS CONFIDENTIAL MATERIAL

```
1              account.  That is the basis for a filing
2         of a SAR.
3    BY MR. CARTER:
4         Q.      I didn't ask if it was a SAMA
5    requirement to close the account.
6                   I asked whether or not you know if
7    SAMA's guidelines dictated that activity in the
8    account needed to be stopped once a suspicious
9    activity report was filed.
10        A.      No --
11                   MR. MAHAFFEY:  Objection.
12                   THE WITNESS:  -- I do not
13        know.
14   BY MR. CARTER:
15        Q.      Okay.  Do you agree that the
16   protocols governing assessment of whether or not a
17   transaction is suspicious do not focus solely on
18   the identity of the client?
19                   MR. MAHAFFEY:  Objection as to
20        form.
21                   THE WITNESS:  Well, I think
22        it's part and parcel of the identity of
23        the client, the nature of his or her or
24        its transactions, its accounts, its
```

1           business, its normal practices, the level

2           and degree of its transactions over the

3           years.  All that is part and parcel of

4           the bank's review and analysis of a

5           transaction or an account.

6      BY MR. CARTER:

7           Q.      So the nature of the customer's

8      business or employment would matter?

9           A.      Yes, it would.

10          Q.      Okay.  The historical level of

11     activity in the account might matter?

12          A.      Yes.  I will give you an example.

13     If I engaged in a lot of cash transactions, that

14     would be one thing.  If there were an account held

15     by Starbucks that dealt with a lot of cash, that

16     would be another thing.

17          Q.      Okay.  And speaking of that, are

18     large cash transactions a potential red flag?

19          A.      Potentially, yes.

20          Q.      Okay.  And are a large number of

21     deposits without any withdrawals a possible red

22     flag?

23          A.      Typically the red flag is a large

24     volume of cash deposits followed quickly by large

1   withdrawals, but, again, it's a potential red flag

2   for the bank to potentially review and analyze,

3   and it would depend.  The level of investigation

4   or review would depend on the nature of the

5   account and the history of the bank, the bank has

6   with that account.

7       Q.     Okay.

8       A.     I would also note that there is a

9   guideline, too, by SAMA indicating that banks do

10  not necessarily have to review and analyze and

11  investigate all transactions.

12      Q.     Okay.  Well, we've -- you've

13  identified a few things that would potentially

14  indicate red flags.  Let's continue on that

15  subject.

16             Are transactions for unknown

17  objectives which do not adhere to the customer's

18  job or activity pose a potential red flag?

19      A.     It's possible to the extent that the

20  bank is aware of the activity, goals, and -- and

21  nature of the account.

22      Q.     What about transactions through an

23  account that are being conducted for some other

24  person?

This Transcript Contains Confidential Material

1    A.    That's possibly something that the

2    bank would look like at, to the extent it's aware

3    of such transactions that are not for the account

4    holder.

5    Q.    With regard to your analysis of the

6    Aqil transactions, does your report include an

7    assessment of any of the potential red flags we

8    just discussed?

9    A.    Not the specific transactions in

10   Aqil's account, no.  I was discussing them in

11   general --

12   Q.    Okay.

13   A.    -- in an effort to rebut Mr. Winer's

14   report.

15   Q.    And in connection with your rebuttal

16   of Mr. Winer's report concerning the Aqil

17   accounts, did you assess the historical use of

18   that account reflected in the records produced in

19   discovery?

20   A.    I primarily relied on my review and

21   analysis of Mr. Winer's report and description of

22   the Al-Aqil account and transactions.

23   Q.    Did you review the Aqil account

24   transactions?

This Transcript Contains Confidential Material

1          A.       Not specifically, no.  They were

2      made available to me in general.  I did page

3      through them.

4          Q.       Okay.  But you did not analyze the

5      Aqil transactions?

6          A.       I did not do a forensic accounting

7      review, no.

8          Q.       What about the Al-Buthe

9      transactions?  Did you review the actual

10     transaction information or just base your opinion

11     on the reading of what was in Mr. Winer's report?

12         A.       I believe both.  I reviewed the

13     Al-Buthe's transactions in general as an overview,

14     but primarily addressed Mr. Winer's description of

15     the transactions and his conclusions.

16                  MR. CARTER:  Let's mark the

17              Aqil transactions, which were previously

18              marked as an exhibit at Abdullah Al

19              Rajhi's deposition.  It's Exhibit 49 and

20              it's at Tab 14.

21                  (Document marked for

22              identification as Pasley Exhibit 7.)

23     BY MR. CARTER:

24         Q.       Mr. Pasley, this is transaction

```
 1   information from one of Mr. Aqil's accounts.  As I
 2   recall, he had two.
 3             Does that comport with your
 4   recollection?
 5        A.    I can't remember it specifically.
 6        Q.    Okay.  Looking at the one in front
 7   of you which covers period from January 1, 1998 to
 8   December 31, 2002 and -- well, I'm not going to
 9   read the entire account number, but the opening
10   balance on this is 15,117 riyals, approximately.
11             Are we on the same document?
12        A.    Yes, I see that.  Yes.
13        Q.    Okay.  Do you recall reviewing this
14   set of transaction information?
15        A.    Just in general.
16        Q.    When you say "just in general," what
17   do you mean?
18        A.    I did not do any kind of forensic
19   review of the transactions.
20        Q.    Did you review the transactions
21   reflected in this document based on your
22   understanding of the red flag factors?
23        A.    I can't say that I did.  In order to
24   do a proper review of the transactions, you would
```

```
 1    have to know the background of the account, the

 2    account holder, and the nature of the transactions

 3    and do an analysis and probably contact the

 4    customer.  None of which I did.

 5         Q.    Okay.  So you didn't do a formal red

 6    flag analysis of these transactions?

 7         A.    Correct.  I did not.

 8         Q.    Okay.  Did you review the Know Your

 9    Customer file for Mr. Aqil?

10         A.    No, I did not.  It was not available

11    to me.

12         Q.    Just a few things with regard to

13    this.

14               The scope of the transactions that

15    we have available begins with a balance on January

16    10, 1998.

17               Do you see that?  It's the second

18    column in.

19         A.    Well, there's an opening balance

20    indicated --

21         Q.    Yeah.

22         A.    -- and there's date at the top.  So

23    I have to assume that those correlate one to the

24    other, but I don't know.
```

This Transcript Contains Confidential Material

```
 1        Q.      Well, I understand the box that's
 2   highlighted in the version in front of you to
 3   reflect the date of the transaction and that the
 4   98 refers to the year, the 01 refers to the month,
 5   and the 10 --
 6        A.      I see that now.
 7        Q.      -- refers to the day.
 8        A.      Yes.
 9        Q.      Do you know whether or not that's
10   correct?
11        A.      Well, I have no way of knowing if
12   it's correct, but I understand what you're saying.
13        Q.      Well, for purposes of understanding
14   whether or not transactions are suspicious, would
15   the dates on which they occur potentially be
16   relevant?
17        A.      Yes, it would be potentially
18   relevant.  Yes.
19        Q.      Okay.  And you're not sure looking
20   at this document what the dates are?
21        A.      Well, I'll take it on faith as you
22   represent that the date in this box is January 10,
23   1998.
24        Q.      Okay.  But that's not available --
```

1    that's not information that you were aware of

2    before I made the representation to you?

3                   MR. MAHAFFEY:   Objection as to

4          form.

5                   THE WITNESS:   I did not focus

6          on the dates, no.

7    BY MR. CARTER:

8          Q.      Okay.   Looking at this, you'll see

9    that the period from January through 1998 through

10   March of 1999 which is -- covers the first entry

11   on the second page?

12         A.      Yes.

13         Q.      There's a relatively modest level of

14   activity in the account, correct?

15         A.      There seems to be a transaction once

16   a month or so, yes.

17         Q.      And during that period, if I'm

18   understanding the document correctly, there was an

19   opening balance of a little more than 15,000

20   riyals and it appears never to go above 29,000 --

21   29,458 riyals during this period?

22         A.      I see that, yes.

23         Q.      And as of the March '99 -- March 15,

24   '99, the balance is a negative 1200 or so riyals,

```
1    correct?

2         A.      Yes, I see that.

3         Q.      Okay.  So during the year from the

4    beginning of 1998 through March of 1999, would you

5    agree with me that the total value of funds in the

6    account spanned about negative 1200 riyals and up

7    to an apex of about 29,458 riyals?

8         A.      That appears to be what the document

9    says, yes.

10        Q.      Okay.  And now let's look at the

11   period beginning on May 5, 1999, which is the next

12   entry below the March entry.

13        A.      Yes, I see that.

14        Q.      Okay.  Now, on March --

15               On May 5th, there is a cash deposit

16   into the account of over 440,000 riyals.

17               Do you see that?

18        A.      Yes, I see that.

19        Q.      Okay.  Does that cash -- cash

20   deposit seem to be out of line with the historical

21   usage of the account?

22        A.      It is large compared to the previous

23   year, yes.

24        Q.      And that would be a factor in
```

1    assessing of whether there's a red flag?

2         A.        Potentially, and I don't know

3    whether or not the bank actually reviewed the

4    transaction.

5         Q.        Okay.  But you do know --

6         A.        And whether --

7                   MR. MAHAFFEY:  Objection.

8    BY MR. CARTER:

9         Q.        -- whether or not Mr. Winer

10   suggested that this trans -- this -- this -- these

11   deposits were suspicious, and that's what we're

12   talking about, not whether the bank flagged them.

13        A.        Well, I don't think you can separate

14   one from the other.

15        Q.        Well --

16        A.        I don't know whether the bank

17   analyzed these transactions and/or made a report

18   to SAMA with regard to them.

19        Q.        Based on the historical usage during

20   the 14 months or, actually, 16 months preceding

21   the May 5, '99, does the 440,000-plus riyal cash

22   deposit into Mr. Aqil's account strike you as

23   suspicious?

24        A.        It's larger than the previous year.

This Transcript Contains Confidential Material

```
 1    I would agree with you.  I don't know whether it's
 2    per se suspicious.  I don't know anything about
 3    the account or the purpose of the transaction, or
 4    whether the bank inquired as to the nature and
 5    purpose of the -- of the transaction.
 6         Q.    And then the very next day, Mr. Aqil
 7    deposits over 676,000 riyals.
 8              Do you agree?
 9         A.    Yes, I see that.
10         Q.    Okay.  And that's, again, a cash
11    deposit?
12         A.    Correct.
13         Q.    And then two days later 1.259
14    million riyals, correct?
15         A.    Correct.
16         Q.    And then the day after that 684,000
17    riyals, correct?
18         A.    Yes.  Correct.
19         Q.    And then the day after that 690,000
20    riyals again in cash, correct?
21         A.    Yes.  Correct.
22         Q.    And you'd agree this pattern of cash
23    deposits goes on almost daily for most of the
24    month of May 1999 and into July of 1999, doesn't
```

1    it?

2         A.      I'm trying to look at it, but I'll

3    take your word for it.

4         Q.      Okay.  And during that period from

5    May of 1999 until July 14th of 1999, the account

6    balance goes from negative 1207 riyals to

7    19,777,000 riyals, correct?

8         A.      I'll take your word for it.  I'm

9    having trouble finding July.

10        Q.      It is on the page that's

11   Bates-stamped ARB 41460.

12        A.      Okay.

13        Q.      And the last cash deposit during the

14   period I'm discussing is in the amount of 23,631

15   riyals.

16        A.      Yes, I see that.

17        Q.      Okay.  And do you agree then that

18   the period I just described from the beginning of

19   these deposits in May of '99 until this July 14,

20   '99 date, the value of the funds in this personal

21   account of Mr. Aqil goes from about negative 1200

22   riyals to almost 20 million riyals?

23        A.      I see that, yes.

24        Q.      Okay.  And during that same time

```
1    period, there are no withdrawals from the account,

2    correct?

3         A.      There does not appear to be.

4         Q.      And if you look -- well, do you

5    understand this to be Mr. Aqil's personal account?

6         A.      It's in his name.  I don't know

7    whether it's a personal account or a business

8    account, or an account that he held on behalf of

9    Al-Haramain.

10        Q.      Shouldn't an account for Al-Haramain

11   be in the name of Al-Haramain?

12                    MR. MAHAFFEY:  Objection as to

13        form.

14                    THE WITNESS:   I don't know

15        the practices of account holders in Saudi

16        Arabia or Al-Haramain, but generally I

17        would agree with you.

18   BY MR. CARTER:

19        Q.      Okay.  Do you happen to know whether

20   SAMA's guidelines require that accounts not be

21   held in fictitious names?

22                    MR. MAHAFFEY:  Objection as to

23        form.

24                    THE WITNESS:   I don't think
```

1          Mr. Al-Aqil is a fictitious person.

2                    But in response to your

3          question, I'm not a SAMA regulatory

4          expert.  So I don't know what its

5          guidelines and regulations are.

6     BY MR. CARTER:

7          Q.     Okay.  Now, most of these

8     transactions are in cash, correct?

9          A.     Yes, and in further response to your

10    question, Al-Haramain is listed in these cash

11    transactions.

12         Q.     Okay.  And I was going to ask you

13    about that.

14                  So there are entries reflecting, for

15    example, on 41459 a deposit in the account

16    associated with Al-Haramain Islamic Foundation.

17                  Do you see that?

18         A.     Beginning on 1459, yes.

19         Q.     There's one there and --

20         A.     And going to 1460.

21         Q.     And as a -- as an anti-money

22    laundering expert, does that raise concerns with

23    you that Mr. Aqil's account in his personal name

24    was being used to conduct Al-Haramain business?

```
 1        A.      I'm really not sure how to interpret
 2   the account transactions and what Mr. Al-Aqil was
 3   doing.
 4               I do understand that later in --
 5   later in time Mr. Aqil asked for the account to be
 6   transferred completely to Al-Haramain.
 7        Q.      And do you happen to know whether or
 8   not Al-Haramain had been publicly implicated in
 9   terrorist activity prior to this 1999 period?
10                  MR. MAHAFFEY:  Objection as to
11        form.
12                  THE WITNESS:  No, I don't
13        know.  I don't know when it was
14        designated or parts of it were
15        designated.  My understanding it was
16        after 9/11.
17   BY MR. CARTER:
18        Q.      Well, I'm raising a question
19   separate from designation.
20        A.      Okay.
21        Q.      Do you happen to know whether there
22   was any action to close any Al-Haramain offices
23   based on suspected involvement in terrorism prior
24   to this 1999 period?
```

```
 1                        MR. MAHAFFEY:  Objection as to
 2          form.
 3                        THE WITNESS:    I'm not aware
 4          of that.
 5   BY MR. CARTER:
 6          Q.      Now, once we get to July of --
 7   July 27, 1999, there is a significant reversal of
 8   the flow of the funds into this account.
 9                   Do you see that in the ensuing --
10          A.      Well, there was a withdrawal of
11   2.7 million riyals, yes.
12          Q.      Yeah.  And then on the next page
13   41461, there's actually a withdrawal of 16,900,000
14   riyals.
15                   Do you see that?
16          A.      Yes, I see that on --
17          Q.      Does the --
18          A.      -- August 20th.
19          Q.      Does this sudden reversal in the
20   flow of funds into and out of the account concern
21   you from a suspicious transaction perspective?
22          A.      Again, I don't know whether it's
23   suspicious or not.  I did not analyze the
24   underlying transactions or account, nor speak to
```

 1  anybody at Al-Haramain or at the bank with regard

 2  to the account.

 3      Q.      Okay.  You agree that the withdrawal

 4  in a single check transaction of nearly 17 million

 5  riyals is a large transaction?

 6      A.      It appears to be a large

 7  transaction, yes.

 8      Q.      Okay.  What -- if you were to

 9  conduct a full suspicious transaction review of

10  this set of transactions that we just discussed,

11  what -- what factors would you consider?

12      A.      The nature of the account, the

13  purpose of the account, Mr. Aqil's explanation of

14  the transactions, that type of information.

15      Q.      Would you -- would a transaction or

16  series of transactions such as those reflected in

17  May of 1999 involving cash deposits, ranging from

18  400,000 riyals to 1.259 million riyals warrant an

19  inquiry to determine the purpose?

20      A.      It would be potentially something

21  the bank should do, yes.

22      Q.      Okay.

23      A.      But I don't know what information

24  was available to the bank, what underlying

This Transcript Contains Confidential Material

```
 1   information the bank had with regard to the

 2   account or the account holder, the purpose of the

 3   account, why it was receiving cash transactions.

 4   I do understand it was a very large NGO at the

 5   time.

 6        Q.     Well, Mr. Aqil is not a large NGO,

 7   is he?

 8        A.     He individually, no, but Al-Haramain

 9   was.

10        Q.     Yeah.  Well, again, from an

11   anti-money laundering perspective, wouldn't

12   Mr. Aqil's personal use or use of his personal

13   account to carry out transactions for a charity

14   that had over 90 accounts of its own with the bank

15   itself be a red flag?

16              MR. MAHAFFEY:  Objection as to

17         form.

18              THE WITNESS:  Not

19         necessarily.  I think it would be

20         preferable to have the account in

21         Al-Haramain's name, but not necessarily

22         essential.

23              Again, it would depend on the

24         circumstances, and Al-Aqil's purpose and
```

1          explanation for the account being in his

2          name, not Al-Haramain's.

3                    And I do note that, as we

4          discussed, Al-Haramain is referenced a

5          number of times with regard to these

6          transactions.

7    BY MR. CARTER:

8          Q.     Right.

9                    And so that would have provided the

10   bank with notice of the potential involvement of

11   Al-Haramain in using the account, wouldn't it?

12         A.     Yes, it would.

13                   MR. MAHAFFEY:  Objection as to

14         form.

15   BY MR. CARTER:

16         Q.     Okay.  And if anything, that would

17   be a red flag?

18         A.     I can't say that it would.  Again,

19   it would depend on the bank's knowledge of the

20   account, why the account was in Al-Aqil's name

21   instead of Al-Haramain.

22                   MR. CARTER:  Let's go ahead

23         and mark as the next exhibit here the

24         1995 SAMA guidelines which are at Tab 17.

```
 1                    (Document marked for

 2          identification as Pasley Exhibit 8.)

 3                    THE WITNESS:  Yes, I see that.

 4          I've got a copy of it.

 5   BY MR. CARTER:

 6          Q.     Okay.  And, Mr. Pasley, did you

 7   review this document in connection with the

 8   preparation of your expert report?

 9          A.     I believe I did, yes.

10          Q.     Okay.  And my understanding that

11   these are guidelines on money laundering that the

12   Saudi Arabian Monetary Authority issued in 1995;

13   is that correct?

14          A.     I don't know the date in front of

15   me, but I'll take your word for it.

16          Q.     Okay.  Well, if we go to the third

17   page of the document?

18          A.     Yes, I have the page open, and it

19   says 1995.

20          Q.     Okay.  And is it your understanding

21   that these guidelines applied to Al Rajhi Bank

22   during the 1998 to 2001 time period?

23                    MR. MAHAFFEY:  Objection as to

24          form.
```

```
 1                    THE WITNESS:   It would seem
 2        that they would.
 3   BY MR. CARTER:
 4        Q.      And just to touch on a few of these
 5   guidelines and focusing initially on the issues
 6   we've been discussing about suspicious
 7   transactions, in Section 5.9 on the page that is
 8   the handwritten notation 144 and continuing to
 9   145.
10                    MR. MAHAFFEY:  Counsel, sorry
11        to interrupt.  There seems to be a bit of
12        an issue with this document loading in
13        the exhibit.  So you need to make sure
14        it's on the screen or give a second to --
15                    MR. CARTER:  Sure.
16                    THE WITNESS:  Yeah, I think
17        I'm on page 144.
18   BY MR. CARTER:
19        Q.      Okay.  If we're -- if we're all
20   receiving the same feed, we should have the pages
21   with the handwritten notations 144 and 145 in
22   front of us.
23                    Do you have that, Mr. Pasley?
24        A.      Well, I see 144.
```

```
 1        Q.      Okay.

 2        A.      Scrolling down I see 145.

 3        Q.      Great.

 4        A.      So I see the two pages.

 5        Q.      Okay.  And there's a Section 5.9

 6   covering "Alerting the Authorities of Suspicious

 7   Transactions."

 8        A.      Yes, I see that.

 9        Q.      And it says under Section 3 that:

10                "A Bank should identify for use and

11   reference of its employees distinct patterns of

12   customer behaviour or unusual patterns of

13   transactions that could indicate money laundering

14   activities.  These could be regular or periodic

15   transactions of either very large or small

16   amounts.  These can be without an apparent

17   economic or acceptable purpose and often with

18   parties operating from countries or jurisdictions

19   that are known to have weak regulations for

20   combating money laundering activities."

21                Do you see that?

22        A.      Yes, I do.  That's a very common

23   guideline.

24        Q.      Okay.  And the very common
```

This Transcript Contains Confidential Material

```
 1   guideline, as you call it, on money laundering

 2   indicates that very large -- transactions of very

 3   large amounts can be an indicator of money

 4   laundering, doesn't it?

 5        A.     And where are you?  I'm sorry.

 6        Q.     Okay.  In the top of the page

 7   written 145.

 8               "These could be regular or periodic

 9   transactions of either very large or small

10   amounts."

11        A.     Yes, I see that.

12        Q.     Okay.  So transactions of very large

13   amounts are a potential flag for money laundering?

14        A.     Potentially, yes.

15        Q.     Okay.

16        A.     But I also see item number 2 on page

17   144 saying that "A Bank is not responsible for

18   carrying out formal investigations of all customer

19   transactions."

20        Q.     Right.

21               It's risk-based, right?

22        A.     Yes, it is.

23        Q.     Okay.  And so the duty is to do

24   what's necessary based on the risk that's
```

This Transcript Contains Confidential Material

1  indicated?

2       A.      And it's up to the discretion of the

3  bank to determine what is appropriate to review

4  and necessary to review.

5       Q.      And SAMA, though, in trying to

6  inform the bank about what's appropriate to review

7  identifies large transactions as an area of

8  concern?

9       A.      Yes.

10      Q.      Okay.  And then it also identifies

11 transactions without an apparent economic or

12 acceptable purpose.

13              Do you see that?

14      A.      Yes, I do.

15      Q.      Okay.  We've looked at the Aqil

16 Al-Aqil transactions.

17              Do you have any idea what the

18 apparent economic or acceptable purpose of them

19 was?

20      A.      No, I do not because I have not

21 contacted the account holders.

22      Q.      Now, in your report, you indicate

23 that there's no evidence that the transactions

24 were used for wrongdoing, and that's a statement

 1    you make on page 10 of your report.

 2         A.      That is correct.

 3         Q.      Okay.  Is that the protocol for

 4    assessing whether or not the transactions are

 5    suspicious?

 6                   MR. MAHAFFEY:  Objection as to

 7         form.

 8                   THE WITNESS:    This is a

 9         statement in my report rebutting

10         Mr. Winer's report.

11    BY MR. CARTER:

12         Q.      Okay.

13         A.      So I'm pointing out the fact that

14    it's not been established in the record by

15    Mr. Winer or elsewhere that there's any evidence

16    that this is problematic or wrong and/or that the

17    bank did not report it.

18         Q.      But the factor that SAMA instructed

19    Al Rajhi Bank and other banks to consider was

20    whether or not the transactions on their face

21    lacked an apparent economic or acceptable purpose,

22    not whether or not they were overtly associated

23    with wrongdoing, correct?

24         A.      Well, I guess I would disagree with

1    you.  It would be incumbent upon the bank, to the

2    extent it's not aware of the economic purpose, to

3    inquire as to what the possible economic purpose

4    was.

5         Q.     And would you expect those types of

6    inquiries to be reflected in the Know Your

7    Customer file?

8         A.     Not in the Know Your Customer file,

9    which would pertain to the opening of the account,

10   but it would pertain to any written conclusions as

11   to the analysis of the bank of the transactions or

12   the account.

13        Q.     What about the customer information

14   file?

15        A.     Well, that would be part and parcel

16   of Know Your Customer.

17        Q.     Well --

18        A.     And that is -- I'm sorry.

19               That is prepared at the account

20   opening time.  Now, that might be reviewed and

21   referenced in order to determine the nature of the

22   account and the transactions, but it's not

23   necessarily part -- it wouldn't be the only thing

24   the bank would look at in analyzing the potential

 1  economic purpose of the transactions.

 2      Q.      Are you familiar with Al Rajhi

 3  Bank's protocols for maintaining customer records

 4  during this time?

 5      A.      No, I am not.

 6      Q.      And do you know whether or not any

 7  suspicious activity reports that issued in

 8  relation to the Aqil transactions should have been

 9  reflected in materials turned over in discovery?

10              MR. MAHAFFEY:  Objection as to

11         form.

12              THE WITNESS:  Well, in the

13         United States, those reports are strictly

14         confidential and wouldn't be disclosed to

15         anybody, other than law enforcement and

16         FinCEN and banking regulators.

17  BY MR. CARTER:

18      Q.      Okay.  Moving on, and we'll get back

19  to that.

20              In Appendix - 2 of the SAMA

21  guidelines, there's a list of Money Laundering

22  Indicators?

23      A.      I believe it's loading.  It's very

24  slow.

1      Q.      Sorry.

2      A.      Not your fault.

3              I have Appendix - 1 but not 2.

4      Q.      Yeah, it's at page 150.  They have

5  it up on mine.  So I think it will be loading in a

6  second.

7      A.      I have page 151, but not 150.  So

8  it's not cooperative.

9              But I have it up on your screen.

10     Q.      Okay.  So you're able to see page

11  150?

12     A.      Yes, I am.

13     Q.      And do you see where there's a

14  section "General Indicators" referring to money

15  laundering general indicators?

16     A.      Yes, I do.

17     Q.      And SAMA describes there:

18              "The transaction whose general form

19  is indicative of illegitimate or unknown purpose.

20  Existence of movements in the customer's account

21  not related to his activities such as" and then it

22  describes "Continuous cash deposits"?

23     A.      I see that.

24     Q.      Okay.  "Large deposits of cheques,

1    incoming drafts and payment orders that are

2    inappropriate to the nature of customer's

3    activities"?

4         A.        Yes, I see that.

5         Q.        "Large withdrawals or deposits

6    inconsistent with the customer's activities,"

7    right?

8         A.        I see -- I see that.

9         Q.        And do you believe that the cash

10   transactions involving Mr. Aqil's account fit

11   within that indicator?

12        A.        Not necessarily because this says

13   it's activity that's not related to his

14   activities.  I don't know what his activities are.

15   He seems to be operating on behalf of Al-Haramain,

16   which as I understand at the time was a very, very

17   large NGO, one of the largest, to which many

18   people were contributing cash donations and other

19   donations.

20        Q.        But in the first year plus two

21   months of the account statements we have available

22   for Mr. Aqil's account, you'll recall that the

23   total value of the funds never went above 29,000

24   riyals and -- and actually went down to negative

This Transcript Contains Confidential Material

```
 1   1,000 riyals, correct?

 2        A.      I remember that, yes.

 3        Q.      And that is an indicator of the

 4   historical usage of the account, isn't it?

 5        A.      Well, I don't know why it changed.

 6        Q.      Okay.  Someone should have asked?

 7        A.      Potentially, if the bank didn't

 8   already know.  Potentially, the bank should have

 9   inquired, but I did not have that information

10   available to me and I did not contact Mr. Al-Aqil.

11        Q.      Now, you mentioned that Al-Haramain

12   was taking in cash deposits during the time?

13        A.      Yes, I believe it was.

14        Q.      Okay.  Where were those coming from,

15   as you understood it?

16        A.      Individual donations, as I

17   understand.

18        Q.      And do you know the riyal

19   denominations that were common in Saudi Arabia

20   during the time period?

21        A.      No, I do not.

22        Q.      Okay.  And so is -- are you

23   suggesting in your testimony that the nearly 19

24   million riyals that were deposited into Mr. Aqil's
```

1  account, the one held in his own name, would have

2  potentially been from cash donations from

3  individual donors to Al-Haramain?

4            MR. MAHAFFEY:  Objection as to

5       form.

6            THE WITNESS:  I do not know

7       the source or purpose of the -- of the

8       transactions.  I do note that they were

9       in cash.

10 BY MR. CARTER:

11     Q.      And, again, if we're just looking at

12 this period of time, it would mean that there

13 would have had to be cash donations totaling in

14 excess of 19 million riyals just in a two-month

15 period?

16     A.      I don't know what made up the cash

17 transactions.

18     Q.      Okay.  And do you have a sense of

19 what 1.259 million riyals would look like

20 physically?

21            MR. MAHAFFEY:  Objection as to

22       form.

23            THE WITNESS:  No, I do not

24       know.

```
 1    BY MR. CARTER:

 2         Q.      If -- if -- if someone walked into a

 3    bank with a massive stack on a pallet, would that

 4    be a concern?

 5         A.      Potentially, yes, that would

 6    potentially be unusual.

 7         Q.      And if someone did that almost on a

 8    daily basis over the period of two months, would

 9    that be a concern?

10         A.      Potentially, yes.

11         Q.      Going back to the SAMA guidelines.

12                 There are requirements reflected on

13    where there's a section of this manual called

14    "Internal Control Systems" at 5.1.

15                 It's on 137 --

16         A.      130 --

17         Q.      -- and continues on 138.

18         A.      We were at 150.  So I have to go

19    back up.

20                 I'm on page 137.

21         Q.      Okay.  And do you see the section

22    titled "Internal Control Systems"?

23         A.      Yes, I do.

24         Q.      And under Section 3, the section --
```

1    the second sentence says:

2              "A bank should use specialized

3    software that is available in the market to detect

4    unusual patterns of transactions and trends to

5    indicate criminal activities."

6         A.    I see that, yes.

7         Q.    Do you know whether or not Al Rajhi

8    Bank had in place any specialized software to

9    detect unusual patterns of transactions and

10   trends?

11        A.    I do not know specifically, but I do

12   note that Mr. Winer in his report indicates, if

13   I'm not mistaken, that the bank was following the

14   guidelines of SAMA.

15        Q.    Well, he said that the bank was --

16   bank was subject to the guidelines of SAMA, and

17   his report says that they failed to adhere to

18   those guidelines.  He doesn't say that they

19   fulfilled the requirements of SAMA.

20              MR. MAHAFFEY:  Objection as to

21        form.

22              THE WITNESS:  I'm not going

23        to quarrel with you.

24              My recollection is that he was

1           indicating that the bank was generally

2           following the guidelines that were put

3           out by SAMA.

4    BY MR. CARTER:

5           Q.    Okay.  I'm just for the record going

6    to disagree with that characterization of his

7    report.

8           A.    That's fine.

9           Q.    Okay.  So you don't know if there

10   was any software in place?

11                Among other things, it says that

12   this type of software detecting unusual patterns

13   would normally include a mechanism, and then on

14   the next page, there are two sections about

15   significant transactions report.

16                Do you see that?

17         A.    Yes, I do.

18         Q.    Okay.  And the first says that this

19   report "should include all telegraphic transfers

20   affected via telex, Swift and other means."

21         A.    Yes, I see that.

22         Q.    Okay.  And then the second says:

23                "These should include all

24   transactions which exceed Saudi riyal 100,000.

 1    Significant transactions report should identify

 2    accounts to which these transactions are related

 3    and the sources of these large amounts."

 4              Do you see that?

 5         A.    Yes, I see that.

 6         Q.    Okay.  Do you agree that the

 7    transactions that we discussed in Mr. Aqil's

 8    accounts involving deposits of well over 200,000

 9    and up to 1.2 million riyals would meet the

10    definition in subsection 4 here for the

11    significant transactions report?

12         A.    Yes.  The transactions are over

13    100,000 Saudi riyals.

14         Q.    And what is the point of this kind

15    of significant transactions report?

16         A.    To serve as a basis or indicator for

17    the banks to review the transactions.

18         Q.    Okay.  So this is an automated

19    mechanism to bring to the attention of the bank

20    transactions that warrant particular review,

21    correct?

22         A.    If the bank has software that would

23    indicate alerts, spit out alerts with regard to

24    all transactions over 100,000 SR, then -- then,

1    yes, I would say so.

2          Q.    And --

3          A.    I don't know what the bank's

4    parameters were or what its software was.

5          Q.    But SAMA says that it should have

6    software and says that it should include a

7    mechanism to generate these significant

8    transactions reports, doesn't it?

9                MR. MAHAFFEY:  Objection as to

10         form.

11               THE WITNESS:  Yes, and I

12         didn't see anything from SAMA indicating

13         that the bank had failed to adhere to

14         this guideline.

15   BY MR. CARTER:

16         Q.    Okay.  Did you see anything

17   indicating the existence of any significant

18   transactions report?

19         A.    I did not have that available to me,

20   no.

21         Q.    Okay.  And you don't know sitting

22   here today whether the bank actually had any

23   software in place at all, do you?

24               MR. MAHAFFEY:  Objection as to

1          form.

2                    THE WITNESS:   I don't know

3          the internal recordkeeping or reports

4          that were conducted by the bank, no.

5     BY MR. CARTER:

6          Q.      Now, you talked earlier about the

7     fact that the issuance of a SAR does not provide a

8     predicate for closing the account, correct?

9                    MR. MAHAFFEY:  Objection as to

10         form.

11                   THE WITNESS:   There's a

12         FinCEN guideline saying that it's up to

13         the discretion of the bank as to whether

14         or not to close the account.  Even if the

15         law enforcement authorities ask for the

16         account to be closed, that it's up to the

17         bank.

18    BY MR. CARTER:

19         Q.      Okay.  And --

20         A.      One way or the other.  Let me

21    rephrase that.

22                   If law enforcement asks for the

23    account to be kept open for monitoring purposes,

24    the bank does not necessarily have to agree to

```
 1    that.
 2         Q.      Okay.  And the FinCEN requirements
 3    you're talking about are current requirements
 4    governing U.S. banks?
 5         A.      That is correct.
 6         Q.      Okay.  Now, with regard to the SAMA
 7    guidelines on page 136, there's a section titled
 8    "General Policy Requirements."
 9         A.      Yes, I see that.
10         Q.      Okay.  And number 2 discusses
11    depositor fund taking, and it says:
12                 "Saudi banks should take care when
13    accepting deposits or other funds.  If it is
14    suspected that a deposit is, or forms part of
15    funds obtained through illegal activities, then
16    these funds should be accepted in the normal
17    manner, following correct procedures.  Under no
18    circumstances should the customer be alerted to
19    any suspicion.  The suspicious deposit should be
20    reported to the Police and SAMA."
21                 That's the suspicious activity
22    reporting protocol?
23         A.      Whatever they -- whatever their
24    terminology is, yes.
```

```
 1        Q.      Okay.

 2        A.      I would agree.

 3        Q.      And then it goes on to say that in

 4   the event that that happens, "no transfers or

 5   withdrawals should be allowed from" a SAMA -- from

 6   -- sorry.

 7                "No transfers or withdrawals should

 8   be allowed from account until authorized by the

 9   Police or SAMA."

10                Do you see that?

11        A.      I see where it says that, yes.

12        Q.      Okay.  So when we reviewed the Aqil

13   transfers, I think we agreed that there were

14   deposits on an almost nearly daily basis during

15   that May of '99 to July of '99 period, correct?

16        A.      Yes, I believe that's the case.

17        Q.      Okay.  And there didn't appear to be

18   interruption -- any interruption of services in

19   the account during that period?

20        A.      Not that were apparent.

21        Q.      Okay.  And doesn't that suggest that

22   there was no suspicious activity report filed?

23                MR. MAHAFFEY:  Objection as to

24        form.
```

```
 1                    THE WITNESS:   I don't know
 2         whether a suspicious activity report was
 3         filed or not.  I just have no way of
 4         knowing.
 5   BY MR. CARTER:
 6         Q.    But --
 7         A.    And if the -- I mean, I don't
 8   understand this guideline.  Because if a report is
 9   filed and the account is closed or frozen, the
10   account holder would know that a report has been
11   filed.
12         Q.    Well, it is SAMA's guideline?
13         A.    Right, and, again, I didn't draft
14   this.  I don't have an ability to interpret it.
15         Q.    And now you've talked a bit about
16   this -- this process being risk-based and
17   dependent on who the customer is and what the
18   nature of their job is, correct?
19         A.    Yes.
20         Q.    Okay.  And the SAMA guidelines also
21   talk about the information that Al Rajhi Bank
22   should have collected in order to have a baseline
23   understanding to assess those risks, right?
24         A.    To the extent it's contained in the
```

```
 1   guideline, I would agree with you.  I don't know

 2   where exactly it is as you state in the guideline.

 3        Q.      Okay.  Well, on 139?

 4        A.      Yes.

 5        Q.      Okay.  It says "Personal Account for

 6   an individual"?

 7        A.      Yes.

 8        Q.      Okay.  And for purposes of an

 9   individual, among other things, it requires that

10   the bank "seek information on the customer's

11   business, or job title and ascertain the accuracy

12   of such information," right?

13        A.      Yes, I see that.

14        Q.      Okay.  And it also says that:

15               "The Bank should be aware of the

16   sources of customer's deposits, particularly those

17   of significant cash amounts."

18        A.      I see that, yes.

19        Q.      Okay.  And so under these

20   guidelines, Al Rajhi Bank should have been aware

21   of Aqil Al-Aqil's job title?

22                    MR. MAHAFFEY:  Objection as to

23        form.

24                    THE WITNESS:  That's set
```

1          forth in the guideline, and I don't know

2          what the bank knew or did not know.

3     BY MR. CARTER:

4          Q.     Okay.  And the bank should have been

5     taking steps to be aware of the sources of the

6     customer's deposits, particularly those of

7     significant cash amounts, right?

8                    MR. MAHAFFEY:  Objection as to

9          form.

10                   THE WITNESS:   That seems to

11         be what the guideline is saying.

12                   Again, I did not draft the

13         guideline and am not in a position to

14         really interpret it.

15    BY MR. CARTER:

16         Q.     And do you know what, if anything,

17    Al Rajhi Bank did during that May of 1999 through

18    July of 1999 period to ascertain the sources of

19    the 19 million or so riyals in funds that were

20    being deposited into Aqil Al-Aqil's account --

21         A.     No.

22         Q.     -- on almost daily?

23         A.     I'm sorry.  It's not in the record

24    as to what the bank did or did not do.

1       Q.      Then turning on the next page, it

2    talks about business entities.  It's a little bit

3    hard to find.  It's --

4       A.      I'm having difficulty.

5       Q.      It's right there under the words

6    "Procedures to be followed when opening."  Yeah.

7       A.      Oh, okay.

8       Q.      Business entities.

9       A.      Is this?  What page is it?

10      Q.      It's 140.  Sorry.

11      A.      No, no problem.  I just -- okay.

12              Oh, here's the next.

13              Okay.  Yes, I see it.

14      Q.      Okay.  And these are the guidelines

15   governing the information that the bank should

16   ascertain for purposes of a business account?

17      A.      When it opens the account, yes.

18      Q.      Okay.  And would the accounts of the

19   charities fall under the business account protocol

20   or the personal account for individual protocol?

21      A.      Generally, the business protocol.

22      Q.      Okay.  And the protocols for

23   businesses are different than the ones for

24   individuals?

```
 1        A.       Yes, generally.

 2        Q.       Okay.

 3        A.       Because an individual operates

 4   differently from a business.

 5        Q.       Right.

 6                 And so if a business is using an

 7   individual's account to carry out its affairs, the

 8   bank doesn't have the baseline information for

 9   that business it's supposed to have?

10        A.       Not necessarily.  It may well have

11   asked for that baseline information with regard to

12   the business, even though the account is in the

13   name of an individual.

14                 Again, I don't know the CIP

15   information that the bank had with regard to this

16   account.

17        Q.       Okay.  Well, it's supposed to obtain

18   that information at the time the account is being

19   opened for the entity or person, right?

20        A.       That is correct.

21        Q.       Okay.  And among other things, this

22   indicates that:

23                 "The Bank should collect direct or

24   indirect information about the business
```

```
 1   enterprise.

 2                   "Bank employees should visit the

 3   enterprise's location, if possible.

 4                   "The Bank should know the sources of

 5   deposits, specially large cash deposits when an

 6   account is being opened.

 7                   "The Bank should obtain the

 8   following information when an enterprise is

 9   opening a significant account.

10                   "The financial structure of the

11   enterprise and its annual financial statements.

12                   "Description of the services and

13   business.

14                   "List of significant suppliers,

15   customers and their locations.

16                   "Description of the geographical

17   coverage where the enterprise carries out its

18   activities."

19                   Do you see all of that?

20        A.        Yes, and, again, remind me when this

21   was issued.

22        Q.        1995.

23        A.        Okay.  Keep in mind that it wasn't

24   until after 9/11 that the United States had any
```

```
 1   CIP requirements imposed on banks for individual

 2   accounts or business accounts.

 3        Q.      Well, this is the document that

 4   governed what Al Rajhi Bank was supposed to do,

 5   right?

 6        A.      Right.

 7                    MR. MAHAFFEY:  Objection as to

 8        form.

 9   BY MR. CARTER:

10        Q.      And do you know whether or not all

11   of those steps were undertaken with respect to the

12   opening of accounts for Al-Haramain?

13                    MR. MAHAFFEY:  Objection as to

14        form.

15                    THE WITNESS:  I do not know.

16   BY MR. CARTER:

17        Q.      Do you know whether those steps were

18   undertaken with regard to the opening of any

19   accounts for IIRO?

20                    MR. MAHAFFEY:  Objection as to

21        form.

22                    THE WITNESS:  No, I do not

23        know.

24   BY MR. CARTER:
```

```
 1        Q.       Okay.  And in terms of the scope of
 2   the issues that SAMA intended to address via these
 3   guidelines, just direct your attention to the
 4   Introduction.
 5        A.       I'm sorry.  Where are you directing
 6   me to?
 7        Q.       I'm sorry.  Page 134.
 8        A.       Oh, it's way up.
 9                 Yes, I'm on page 134.  Introduction.
10   I see that.
11        Q.       And it says:
12                 "By all accounts, world-wide money
13   laundering activities, particularly those related
14   to drugs, now constitutes a multi-billion dollar
15   business annually."
16                 Do you see that?
17        A.       Yes, I do.
18        Q.       And it goes on to say:
19                 "However, money laundering could
20   also encompass funds derived from theft,
21   blackmail, extortion, terrorism and other criminal
22   activities."
23                 Do you see that?
24        A.       Yes, I do.
```

```
 1          Q.      So the SAMA guidelines you would
 2   agree issued in 1995 referred to terrorism
 3   explicitly?
 4          A.      Yes, it appears that it did.
 5          Q.      Okay.  And it goes on to say that:
 6                  "It is inconceivable and unlikely
 7   that such large amounts of money can be stored or
 8   moved without the cooperation or unwitting
 9   participation of many international banks and
10   banking systems."
11                  Right?
12          A.      Yes.
13          Q.      And that it goes on to acknowledge
14   that "money-laundering is considered as a serious
15   threat to the integrity of many international
16   banks and even some banking systems"?
17          A.      Yes, and as it indicates, banks may
18   be involved with cooperation or unwittingly.
19          Q.      Yep.
20                  With regard to the accounts of the
21   charities --
22          A.      Yes.
23          Q.      -- does the principle that the level
24   of diligence that was required depends on the risk
```

```
 1   also apply?

 2        A.      Yes, it would depend on the risk.

 3   It's a risk-based operation, yes.

 4        Q.      And as I recall, the SAMA guidelines

 5   indicated that banks were required to ascertain

 6   geographical regions where its customers were

 7   carrying out activities?

 8        A.      I can't remember that specifically,

 9   but I wouldn't be surprised.

10        Q.      On 140 in the business entity

11   section we just reviewed, it says:

12                "Description of the geographical

13   coverage where the enterprise carries out its

14   activities."

15        A.      Okay.  I would agree with your

16   reading of the document.

17        Q.      And do regions where active armed

18   conflicts are ongoing pose more significant risk

19   than stable geographical regions?

20        A.      Yes, and NGOs are more apt to be

21   operating in high-risk areas.  So, yes, I would

22   agree with you.

23        Q.      And some of those high-risk areas

24   are high risk because some of the activities may
```

This Transcript Contains Confidential Material

1    include arms tracking -- trafficking, right?

2         A.    That is correct.

3         Q.    You discuss in your report that SAMA

4    was the regulatory authority overseeing Al Rajhi

5    Bank during this period, right?

6         A.    That is correct.

7         Q.    And do you happen to know whether in

8    the period after the September 11th attacks the

9    U.S. government expressed concern -- excuse me --

10   about the rigor of SAMA's oversight of banks in

11   Saudi Arabia?

12              MR. MAHAFFEY:  Objection as to

13         form.  Scope.

14              THE WITNESS:  I think in the

15         documentation, especially the State

16         Department cable, there was reflection of

17         that issue, yes.

18   BY MR. CARTER:

19         Q.    And is your recollection that the

20   U.S. expressed some dissatisfaction with the rigor

21   of SAMA's AML oversight?

22              MR. MAHAFFEY:  Objection as to

23         form.  Scope.

24              THE WITNESS:  Again, as I

```
 1              indicated, I think that's reflected in
 2              the documentation.  I would let the
 3              cables speak for themselves as to what
 4              concerns the United States had and what
 5              concerns they expressed to the Saudi
 6              government.
 7    BY MR. CARTER:
 8         Q.      Okay.  You indicate in your report
 9    that you find it implausible -- sorry, I want to
10    get the language right -- "implausible that the
11    United States would fail to sanction Al Rajhi Bank
12    if the bank was truly known to support al-Qaeda
13    and terrorist activities targeted against the
14    United States."
15              Do you see that?
16         A.      I remember saying that, yes.  I
17    don't see it in my report, but I remember saying
18    it.
19         Q.      And the principal designation tool
20    in the wake of the September 11th attacks was the
21    Executive Order 13224 designation program,
22    correct?
23              MR. MAHAFFEY:  Objection as to
24         form.
```

This Transcript Contains Confidential Material

```
 1                    THE WITNESS:    I'm not
 2          familiar with the Executive Order number,
 3          but, yes, the bank -- the United States
 4          had the ability to designate entities and
 5          individuals.
 6   BY MR. CARTER:
 7          Q.       And do you know whether or not the
 8   United States viewed designation as simply one of
 9   a number of possible tools that could be used to
10   deal with terrorist financing issues?
11                    MR. MAHAFFEY:    Objection as to
12          form.   Scope.
13                    THE WITNESS:    I believe it
14          was one of a number of tools, yes.
15   BY MR. CARTER:
16          Q.       Okay.   And do you know what
17   considerations came into play in deciding whether
18   or not it was the appropriate tool?
19                    MR. MAHAFFEY:    Objection as to
20          form.
21                    THE WITNESS:    They would be
22          based on internal discussions and
23          analysis on the part of State Department
24          and Treasury --
```

1    BY MR. CARTER:

2         Q.      And --

3         A.      -- and CIA.

4         Q.      And the State Department would be

5    involved because of diplomatic equities?

6         A.      I believe so, yes.

7                      MR. MAHAFFEY:  Objection as to

8         form.

9    BY MR. CARTER:

10        Q.      And CIA would be involved because of

11   intelligence equities?

12                     MR. MAHAFFEY:  Objection as to

13        form.

14                     THE WITNESS:  Yes, I believe

15        so.

16   BY MR. CARTER:

17        Q.      And do you have any familiarity with

18   how those factors may have come into play with

19   regard to the dealings with Saudi Arabia on Al

20   Rajhi Bank?

21                     MR. MAHAFFEY:  Objection as to

22        form.

23                     THE WITNESS:  No, not with any

24        particularity.  No, I was not involved in

```
 1          that process.
 2   BY MR. CARTER:
 3          Q.      On page 4 of your report --
 4          A.      Yes.
 5          Q.      -- it says -- sorry.  I'm trying to
 6   find the right paragraph.
 7                  Oh.  On page 4 of your report in
 8   Section D, you say:
 9                  "I find it is entirely plausible
10   that a bank would not know if its NGO customer
11   accounts were being misused for terrorism
12   financing."
13                  You see that?
14          A.      Yes, I see that.
15          Q.      And whether or not a bank knows or
16   not if its NGO customer accounts are being misused
17   is a question concerning the bank's state of mind,
18   right?
19                  MR. MAHAFFEY:  Objection as to
20          form.
21                  THE WITNESS:   I don't know
22          what the bank's state of mind is.
23                  It would be -- it would depend
24          on the bank's analysis and its knowledge
```

```
 1            of the transactions and of the account.

 2                    I do note that in Mr. Winer's

 3            report in particular, he notes that it's

 4            very difficult to uncover terrorism

 5            financing and it's usually only a small

 6            part of even an illicit NGO.

 7    BY MR. CARTER:

 8        Q.      Okay.  But the statement you're

 9    indicating here reflects your views on what Al

10    Rajhi Bank may or may not have known, right?

11                    MR. MAHAFFEY:  Objection as to

12            form.

13                    THE WITNESS:  I'm not sure I

14            can agree with you.  I don't know really

15            what -- what the question is.

16    BY MR. CARTER:

17        Q.      Okay.  Well --

18        A.      It says statement in rebuttal to

19    Mr. Winer's and Mr. Kohlmann's reports.

20        Q.      It addresses the bank's knowledge,

21    right?

22                    MR. MAHAFFEY:  Objection as to

23            form.

24                    THE WITNESS:  It refers to
```

This Transcript Contains Confidential Material

```
 1              charitable donations sometimes

 2              unwittingly going for noncharitable

 3              purposes and that it is not easy to

 4              discover.

 5    BY MR. CARTER:

 6         Q.        The opinion I was referring to is

 7    the opinion that you find it plausible that the

 8    bank would not know.

 9         A.        Correct.

10         Q.        And that concerns the bank's

11    knowledge, right?

12                   MR. MAHAFFEY:  Objection as to

13         form.  Misstates the report.

14                   THE WITNESS:  Yes, the bank

15         would not necessarily know, and SAMA

16         indicates it's not necessary for the bank

17         to investigate all transactions.

18                   MR. CARTER:  Why don't we take

19         a quick break, and we'll see if we need

20         to come back.

21                   THE VIDEOGRAPHER:  The time is

22         12:12 p.m.  We are off the record.

23              (Recess.)

24                   THE VIDEOGRAPHER:  The time is
```

THIS TRANSCRIPT CONTAINS CONFIDENTIAL MATERIAL

```
 1              12:23 p.m.  We are back on the record.
 2                        THE WITNESS:    Thank you.   I
 3         just wanted to correct two things.
 4    BY MR. CARTER:
 5         Q.      Sure.
 6         A.      One with regard to the number of
 7    hours I worked on the case, up to the submission
 8    of my report on December 18th of last year, I
 9    worked 115 hours.
10         Q.      Okay.   Thank you.
11         A.      And secondly with regard to the
12    number of cases that I handled against a bank,
13    there are three of them and two of them actually
14    were against Bank of America.
15         Q.      And what was the name of the other
16    bank that you appeared in adverse capacity?
17         A.      It was a small bank in Florida
18    involving a conflict of interest in firing a
19    director and his widow, I think, brought the case
20    against the bank, and the case was settled very
21    quickly.
22         Q.      Okay.
23         A.      So I really had no -- no active role
24    in the case.  I was retained, but there was
```

This Transcript Contains Confidential Material

```
 1   nothing came of the case.

 2                  MR. CARTER:  Thank you.

 3                  And just to try to summarize

 4           the arrangement that we reached with

 5           regard to Mr. Pasley's invoices -- and I

 6           assume this extends as well to

 7           Mr. Lormel's invoices -- you've agreed to

 8           provide the statement of the total hours

 9           and the amount billed?

10                  MR. MAHAFFEY:  Correct.

11                  MR. CARTER:  But none of the

12           content of the -- other content of the

13           invoices?

14                  MR. MAHAFFEY:  That's correct.

15                  MR. CARTER:  And we've agreed

16           to accept those as a basis to go forward

17           with the depositions, subject to a

18           reservation of our rights to ask the

19           judge for more information.

20                  MR. MAHAFFEY:  That's fine.

21                  MR. CARTER:  With that,

22           Mr. Pasley, we're done for the day.

23           Thanks so much.

24                  THE WITNESS:   Thank you.
```

```
 1                      MR. CARTER:  Okay.

 2                      THE WITNESS:   Thank you both.

 3                      THE VIDEOGRAPHER:  The time is

 4         12:25 p.m.  We're off the record.

 5

 6                      (Signature not waived, the

 7         deposition concluded at 12:25 p.m.)

 8

 9                          *       *       *

10

11

12

13

14

15

16

17

18

19

20

21

22

23                      ERRATA SHEET

24
```

This Transcript Contains Confidential Material

```
 1      Page No._____Line No._____Change to:_____

 2      _____

 3      Page No._____Line No._____Change to:_____

 4      _____

 5      Page No._____Line No._____Change to:_____

 6      _____

 7      Page No._____Line No._____Change to:_____

 8      _____

 9      Page No._____Line No._____Change to:_____

10      _____

11      Page No._____Line No._____Change to:_____

12      _____

13      Page No._____Line No._____Change to:_____

14      _____

15      Page No._____Line No._____Change to:_____

16      _____

17      Page No._____Line No._____Change to:_____

18      _____

19      Page No._____Line No._____Change to:_____

20      _____

21      Page No._____Line No._____Change to:_____

22      _____

23              DECLARATION UNDER PENALTY OF PERJURY

24
```

1

2                   I declare under penalty of

3     perjury that I have read the entire transcript of

4     my Deposition taken in the captioned matter

5     or the same has been read to me, and

6     the same is true and accurate, save and

7     except for changes and/or corrections, if

8     any, as indicated by me on the DEPOSITION

9     ERRATA SHEET hereof, with the understanding

10    that I offer these changes as if still under

11    oath.

12

13                   Signed on the _____ day of

14    _____, 2024.

15

16    _____

17              ROBERT S. PASLEY

18

19

20

21

22

23              CERTIFICATE OF REPORTER

24    DISTRICT OF COLUMBIA       )

```
 1                 I, Denise Dobner Vickery, a

 2    Registered Court Reporter and Notary Public of

 3    the District of Columbia, do hereby certify that

 4    the witness was first duly sworn by me.

 5                 I do further certify that the

 6    foregoing is a verbatim transcript of the

 7    testimony as taken stenographically by me at the

 8    time, place and on the date herein set forth, to

 9    the best of my ability.

10                 I do further certify that I am

11    neither a relative nor employee nor counsel of

12    any of the parties to this action, and that I am

13    neither a relative nor employee of such counsel,

14    and that I am not financially interested in the

15    outcome of this action.

16

17

18                      Denise D. Vickery

19                 DENISE DOBNER VICKERY, CRR,RMR
                   Notary Public in and for the
20                 District of Columbia

21

22    My Commission expires:  March 14, 2028

23

24
```

THIS TRANSCRIPT CONTAINS CONFIDENTIAL MATERIAL

**ERRATA**
GOLKOW LITIGATION SERVICES
ONE LIBERTY PLACE
1650 MARKET STREET, SUITE 5150
PHILADELPHIA, PA 19103
877-370-3377

NAME OF CASE: *In Re: Terrorist Attacks On September 11, 2001*, No. 03-md-1570 (S.D.N.Y.)
DATE OF DEPOSITION: January 31, 2024
NAME OF DEPONENT: Robert S. Pasley

| Page | Line(s) | Change | Reason |
|------|---------|--------|--------|
| 9 | 15 | Remove duplicate word "record" before "video record" | Transcription error |
| 9 | 22 | Add "This is" before Michael | Transcription error |
| 10 | 2 | Replace "Kowacki" with "Kownacki" | Transcription error |
| 13 | 7 | Change "Yes, I do." To "Yes, I am." | Clarification |
| 15 | 10 | Change "had" to "done in relation to this matter" | Clarification |
| 18 | 1 | Add "," after "So" | Transcription error |
| 20 | 5-6 | Replace "No, I do not.  It was, I believe, early October, but I did not go back and look." with "My first billing date was October 19, 2023." | Clarification |
| 20 | 14 | Replace "500 hours, if my math is correct." with "117 hours." | Clarification |
| 20 | 18-19 | Replace "I apologize.  My math is not very good. It's 50 hours." with "It's 117 hours." | Clarification |
| 20 | 21 | Change "Yes." to "117 hours." | Clarification |
| 21 | 3 | "Approximately, yes." to "117 hours." | Clarification |
| 21 | 14 | "No, I do not know." to "Approximately 75 hours." | Clarification |
| 21 | 17-18 | Replace "Maybe 20, 25 hours, but it's a guess. I'm sorry." with "Approximately 75 hours." | Clarification |
| 21 | 22-22 | Replace "It's as good of a guess as I can come up with." with "Yes." | Clarification |
| 21 | 24 | Change "50" to "40" | Clarification |
| 22 | 23 | Change " a total number of" to "the total number of" | Transcription error |
| 24 | 17 | Insert "already" between "I" and "have a copy." | Transcription error |
| 29 | 2 | Add "at the OCC" after supervisors | Clarification |
| 29 | 4 | Change "went with the bank" to "started working for Bank of America" | Clarification |
| 29 | 14 | Add "at the OCC" after supervisor | Clarification |
| 32 | 7 | Delete "conducted and" | Clarification |
| 34 | 4-5 | Insert "," after "reports" and after "external" | Punctuation |
| 35 | 9 | Change "Naru" to "Nauru" | Transcription error |
| 35 | 15 | Change "It was –" to "Those cases" | Clarification |

**CONFIDENTIAL**: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD) (SN), United States District Court for the Southern District of New York.

THIS TRANSCRIPT CONTAINS CONFIDENTIAL MATERIAL

| Page | Line(s) | Change | Reason |
|------|---------|--------|--------|
| 36 | 11, 17, 19, 23 | Change "Cypress" to "Cyprus" | Transcription error |
| 36 | 23-24 | Change "without review or investigation engaged in their activity." to "without review or investigation, revoked the bank's license" | Clarification |
| 36 | 14 | Change "they were" to "it was" | Clarification |
| 36 | 15 | Change "were" to "was" | Clarification |
| 36 | 16 | Change "themselves" to "itself" | Clarification |
| 36 | 18 | Change "their – their" to "its" | Clarification |
| 36 | 22 | Add "311" before "sanction" | Clarification |
| 37 | 4, 12, 13, 19, 23 | Change "Cypress" to "Cyprus" | Transcription error |
| 37 | 22 | Add "," after oversight | Punctuation |
| 39 | 16-17 | Replace "I'm having a hard time recalling the details. I believe it may well have been a" with "It was a" | Clarification |
| 39 | 18 | Change "by victims of a Ponzi scheme" to "by a victim of a con artist's scheme" | Clarification |
| 39 | 20 | Delete "engaged in the Ponzi scheme" | Clarification |
| 40 | 5 | Add "was" after "of the case" | Transcription error |
| 40 | 9-10 | Replace "No, I was not informed of that. If I'm not mistaken, if" with "If" | Clarification |
| 40 | 11 | Change "I believe the" to "The" | Clarification |
| 40 | 14 | Change "I believe it" to "It" | Clarification |
| 41 | 1 | Change "who's" to "who was" | Clarification |
| 41 | 6 | Delete "Diana and – and" before GSR | Clarification |
| 41 | 8 | Change "they" to "it" | Clarification |
| 42 | 9 | Add "There were three cases in which I was an expert witness against a bank." after "no." and before "One" | Clarification |
| 43 | 8-9 | Replace "There may have been one or two other cases." with "There were three cases in which I was an expert witness against a bank." | Clarification |
| 44 | 10 | Change "Royal" to World" | Clarification |
| 45 | 14-16 | Replace "Yes, you are correct. I apologize for the misstatements or confusion." with "I apologize for the confusion. As I stated previously, I testified that I have worked primarily as an expert witness. The work with Brian Smith involved consulting and constituted a very short assignment." | Clarification |
| 49 | 8 | Change "suspicion" to "suspicious" | Transcription error |
| 50 | 6 | Change "sanctions" to "sections" | Transcription error |
| 58 | 22 | Change "does –" to "– does" | Transcription error |
| 66 | 4 | Change "infrequently" to ", infrequently," | Punctuation |
| 69 | 19 | Add "to" after "and" | Clarification |
| 74 | 9 | Remove "correctly" | Clarification |

**CONFIDENTIAL**: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD) (SN), United States District Court for the Southern District of New York.

THIS TRANSCRIPT CONTAINS CONFIDENTIAL MATERIAL

| Page | Line(s) | Change | Reason |
|---|---|---|---|
| 74 | 10-11 | Replace "indicated in the annual reports, it" with "said in my report, the annual reports" | Clarification |
| 74 | 17 | Add quotation marks around "no wrong doings." | Clarification |
| 75 | 1 | Insert "as" between "And" and "you say" | Transcription error |
| 75 | 15 | Insert "the" between "It's" and "September 27" | Transcription error |
| 80 | 1 | Change "are" to "is a" | Clarification |
| 80 | 15-17 | Change "I can't remember specifically what he testified to.  I just – I don't know." to "Galloway testified in general that audits did occur, including by internal and external auditors and by SAMA of compliance with account opening documentation, on-boarding requirements and SAMA regulations. | Clarification |
| 85 | 12 | Change "they" to "there" | Clarification |
| 88 | 7-9 | Change "I couldn't – can't find it right off the hand – my hand." to "I can't find it immediately." | Clarification |
| 102 | 4 | Change "the account of" to "an account held by" | Transcription error |
| 102 | 20-21 | Change "The term is 'suspicious' or 'unusual.'" to "The term is 'suspicious or unusual.'" | Transcription error |
| 106 | 15 | Insert "enough" between "provide" and "information" | Transcription error |
| 109 | 23 | Add "the" before "United States" | Transcription error |
| 110 | 1 | Change "account. That" to "account that" | Transcription error |
| 112 | 5 | Delete "of the bank," after "history" | Clarification |
| 113 | 2 | Remove "like" before "at" | Transcription error |
| 130 | 9 | Change "I believe I did, yes" to "Yes, I reviewed the English portion of the document." | Clarification |
| 132 | 8 | Add "in the English portion of the document" after "that" and before "." | Clarification |
| 132 | 22 | Add "see that in the English portion of the document" after "do" and before "." | Clarification |
| 133 | 11 | Add "in the English portion of the document" after "that" and before "." | Clarification |
| 134 | 14 | Add "see that in the English portion of the document" after "do" and before "." | Clarification |
| 138 | 16 | Add "see that in the English portion of the document" after "do" and before "." | Clarification |
| 138 | 23 | Add "in the English portion of the document" after "that" and before "." | Clarification |
| 139 | 2 | Add "the" before "customer's" | Transcription error |
| 139 | 4, 8 | Add "in the English portion of the document" after "that" and before "." | Clarification |
| 142 | 23 | Add "see that in the English portion of the document" after "do" and before "." | Clarification |
| 143 | 6 | Add "in the English portion of the document" after "that" and before ", yes." | Clarification |

**CONFIDENTIAL**: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD) (SN), United States District Court for the Southern District of New York.

THIS TRANSCRIPT CONTAINS CONFIDENTIAL MATERIAL

| Page | Line(s) | Change | Reason |
|---|---|---|---|
| 144 | 17 | Add "see that in the English portion of the document" after "do" and before "." | Clarification |
| 144 | 21 | Add "in the English portion of the document" after "that" and before "." | Clarification |
| 145 | 5 | Add "in the English portion of the document" after "that" and before "." | Clarification |
| 148 | 9 | Add "in the English portion of the document" after "that" and before "." | Clarification |
| 148 | 23 | Change "Whatever they – whatever their terminology is, yes." to "I see those words in the English portion of the document.  As to your question, whatever they -- whatever their terminology is, yes." | Clarification |
| 149 | 11 | Add "in the English portion of the document" after "that" and before ", yes." | Clarification |
| 151 | 2 | Change "as you state" to ", as you state," | Punctuation |
| 151 | 7 | Change "Yes." to "Yes, I see that in the English portion of the document." | Clarification |
| 151 | 13 | Add "in the English portion of the document" after "that" and before "." | Clarification |
| 151 | 18 | Add "in the English portion of the document" after "that" and before ", yes." | Clarification |
| 153 | 13 | Add "in the English portion of the document" after "it" and before "." | Clarification |
| 155 | 5 | Change "specially" to "especially" | Transcription error |
| 155 | 20 | Change "Yes, and, again, remind me when this was issued." to "Yes, I see that in the English portion of the document.  And, again, remind me when this was issued." | Clarification |
| 157 | 17, 24 | Add "see that in the English portion of the document" after "do" and before "." | Clarification |
| 158 | 12 | Change "Yes." to "Yes, I see that in the English portion of the document." | Clarification |
| 159 | 16 | Add "English portion of" after "the" and before "document." | Clarification |
| 162 | 22 | Add "the" before "internal discussions" | Transcription error |
| 162 | 23 | Add "the" before "State Department" | Transcription error |
| 167 | 9 | Change "115" to "117" | |
| 167 | 17 | Add ", the First National Bank of Mount Dora." after "It was a small bank in Florida" | Clarification |
| 167 | 24 | Delete "there was" | Clarification |

**CONFIDENTIAL**: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD) (SN), United States District Court for the Southern District of New York.

THIS TRANSCRIPT CONTAINS CONFIDENTIAL MATERIAL

ACKNOWLEDGEMENT OF DEPONENT

I, Robert Pasley, do hereby certify that I have read the pages in the transcript of my deposition on January 31, 2024, in the matter *In Re: Terrorist Attacks On September 11, 2001*, No. 03-md-1570 (S.D.N.Y.), and that the transcript is a correct transcription of the answers given by me to the questions therein propounded, subject to the corrections and changes in form or substance noted in this Errata.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed_____3/18/24_____

_Robert S Pasley_

**CONFIDENTIAL**: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD) (SN), United States District Court for the Southern District of New York.