(Previously Filed Under Seal at ECF No. 8315)

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN) <br><br> ECF Case <br><br> **ORAL ARGUMENT REQUESTED** |

This document relates to:

*Federal Insurance Co., et al. v. Al Qaida, et al.*, 03-cv-06978
*Thomas E. Burnett, Sr., at al. v. Al Baraka Inv. & Dev. Corp., et al.*, 03-cv-09849
*Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-01923
*Continental Casualty Co., et al. v. Al Qaeda, et al.*, 04-cv-05970
*Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.*, 04-cv-07065
*Euro Brokers Inc., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-07279

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT DUBAI ISLAMIC BANK'S MOTION FOR SUMMARY JUDGMENT AND RENEWED MOTION FOR DISMISSAL

August 3, 2022

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ...................................................................................................... 1

FACTUAL BACKGROUND ....................................................................................... 3

LEGAL ARGUMENT ................................................................................................ 10

   A.  Standard of Review ............................................................................... 10

   B.  The Exercise of Personal Jurisdiction over DIB is Appropriate........................................ 11

      1.  DIB Purposefully Directed its Tortious Conduct at the United States.....................12

      2.  DIB is Subject to Jurisdiction as Al Qaeda's Co-Conspirator and Aider and Abettor ......................................................................................... 17

   C.  The CIA Documents Support Plaintiffs' Jurisdictional Claims and Are Admissible ....... 20

      1.  The CIA Documents Provide Factual Support for the Jurisdictional Analysis ............ 20

      2.  The CIA Documents are Admissible ........................................................... 20

   D.  The Exercise of Personal Jurisdiction Comports with Due Process and Serves Paramount National Security and Counterterrorism Interests of the United States .......... 25

   E.  There is a Statutory Basis for Personal Jurisdiction ........................................ 28

CONCLUSION ....................................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AEP-PRI Inc. v. Galtronics Corp.*,
2013 U.S. Dist. LEXIS 114681 (S.D.N.Y. Aug. 13, 2013) ....................................................10

*Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*,
436 F.3d 82 (2d Cir. 2006) ....................................................................................................10

*In re Arcapita Bank B.S.C.(C)*,
640 B.R. 604 (S.D.N.Y. 2022) ..............................................................................................11

*Asahi Metal Indus. v. Super. Ct. of Cal.*,
480 U.S. 102 (1987) ..........................................................................................................12, 26

*Atchley v. Astrazeneca UK Ltd.*,
22 F.4d 204 (D.C. Cir. 2022) .................................................................................................27

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*,
902 F.2d 194 (2d Cir. 1990) ...........................................................................................10, 20

*Bank Leumi USA v. Ehrlich*,
98 F. Supp. 3d 637 (S.D.N.Y. 2015) ......................................................................................11

*Beech Aircraft Corp. v. Rainey*,
488 U.S. 153 (1988) .................................................................................................................21

*Bridgeway Corp. v. Citibank*,
201 F.3d 134 (2d Cir. 2000) .............................................................................................21, 24

*Burger King v. Rudzewicz*,
471 U.S. 462 (1985) .................................................................................................................27

*Charles Schwab Corp. v. Bank of Am. Corp.*,
883 F.3d 68 (2d Cir. 2018) ..............................................................................12, 17, 18, 19

*Chloe v. Queen Bee of Beverly Hills, LLC*,
616 F.3d 158 (2d Cir. 2010) ..................................................................................................10

*Chrysler Capital Corp. v. Century Power Corp.*,
778 F. Supp. 1260 (S.D.N.Y. 1991) .......................................................................................28

*Gelboim v. Bank of Am., Corp.*,
823 F.3d 759 (2d Cir. 2016) ..................................................................................................19

*Gulf Union Ins. Co. Saudi Arabia v. Bella Shipping Co.*,
    1994 U.S. Dist. LEXIS 11788 (S.D.N.Y. Aug. 22, 1994) ....................................................11

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) .................................................................................15, 18, 19

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) .................................................................................................................27

*Int'l Shoe Co. v. Washington*,
    326 U.S. 310 (1945) .............................................................................................................12

*J. McIntyre Machinery, Ltd. v. Nicastro*,
    564 U.S. 873 (2011) .............................................................................................................18

*Kaplan v. Lebanese Canadian Bank, SAL*,
    999 F.3d 842 (2d Cir. 2021) ...................................................................................14, 15, 19

*Leh v. Gen. Petroleum Corp.*,
    382 U.S. 54 (1965) ...............................................................................................................19

*Linde v. Arab Bank, PLC*,
    882 F.3d 314 (2d Cir. 2018) .................................................................................................14

*In re Magnetic Audiotape Antitrust Litig.*,
    334 F.3d 204 (2d Cir. 2003) .................................................................................................12

*Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*,
    84 F.3d 560 (2d Cir. 1996) ...................................................................................................27

*N. River Ins. Co. v. Philadelphia Reinsurance Corp.*,
    63 F.3d 160 (2d Cir. 1995) ...................................................................................................11

*Opperman v. Path, Inc.*
    2014 U.S. Dist. LEXIS 8885 (N.D. Cal. Jan. 22, 2014) ......................................................11

*Owens v. Republic of Sudan*,
    864 F.3d 751 (D.C. Cir. 2017) .............................................................................................21

*Smith v United States*,
    568 U.S. 106 (2013) .......................................................................................................19, 20

*Sokolow v. Palestine Liberation Org.*,
    583 F. Supp. 2d 451 (S.D.N.Y. 2008) .................................................................................11

*Sokolow v. PLO*,
    2011 U.S. Dist. LEXIS 36022 (S.D.N.Y. Mar. 30, 2011) ...................................................10

*Strauss v. Credit Lyonnais, S.A.*,
   925 F. Supp. 2d 414 (E.D.N.Y. 2013) ................................................................25

*In re Terrorist Attacks on Sept. 11, 2001*,
   538 F.3d 71 (2d Cir. 2008) ...................................................................... 12, 16

*In re Terrorist Attacks on Sept. 11, 2001*,
   718 F. Supp. 2d 456 (S.D.N.Y. 2010), *rev'd in part on other grounds,* 714
   F.3d 659 (2d Cir. 2013) .......................................................................... *passim*

*Underwriting Members of Lloyd's Syndicate 2 v. Al Rajhi Bank*,
   779 Fed. Appx. 66 (2d Cir. 2019) ...........................................................15, 16, 17

*United States v. Bryce*,
   208 F.3d 346 (2d Cir.1999).............................................................................24

*United States v. Damrah*,
   412 F.3d 618 (6th Cir.2005) ...........................................................................25

*United States v. Gluk*,
   831 F.3d 608 (5th Cir. 2016) ..........................................................................23

*United States v. Int'l Bhd. of Teamsters*,
   945 F. Supp. 609 (S.D.N.Y. 1996) ...................................................................28

*Waldman v. Palestine Liberation Organization*,
   835 F.3d 317 (2d Cir. 2016)................................................................13, 14, 16, 17

**Statutes**

18 U.S.C. §2334(a) .........................................................................................28

Anti-Terrorism Act ..............................................................................13, 14, 15, 28

Justice Against Sponsors of Terrorism Act ................................................... *passim*

**Other Authorities**

CPLR §302(a)(2) .............................................................................................28

Fed. R. Civ. P. 4(k) ..........................................................................................28

Fed. R. Civ. P. 12(b)(2).....................................................................................10

Fed. R. Evid. 703 .............................................................................................25

Fed. R. Evid. 803(8)..........................................................................................21

Fed. R. Evid. 807 ..........................................................................................21, 24, 25

Rule 56 .............................................................................................................10, 15, 25

Rule 56.1 ...................................................................................................................13

**INTRODUCTION**

On June 17, 2010, this Court denied the motion to dismiss of defendant Dubai Islamic Bank ("DIB"), finding that Plaintiffs' allegations established that "DIB was an intentional, knowing and direct participant in providing money laundering services to al Qaeda which allowed for direct funding of [the 9/11] terrorist attacks." *In re Terrorist Attacks on Sept. 11, 2001*, 718 F. Supp. 2d 456, 489 (S.D.N.Y. 2010) ("*Terrorist Attacks IV*") (ECF No. 2252), *rev'd in part on other grounds*, 714 F.3d 659 (2d Cir. 2013) ("*Terrorist Attacks VII*"). Judge Daniels ruled that it "can be reasonably inferred, from the allegations pled, that DIB personally and intentionally provided material support to al Qaeda in aid of al Qaeda's plan to commit an aggressive terrorist strike against the United States, with knowledge that the United States and its residents would likely bear the brunt of the resulting injuries." *Terrorist Attacks IV*, 718 F. Supp. 2d at 489. This Court further found that DIB had failed to raise any arguments as to the reasonableness of exercising jurisdiction over it, and that in any case "litigation of this matter in the United States will not be so unduly burdensome or inconvenient to DIB so as to unfairly place it at a disadvantage compared to plaintiffs." *Id.* at 490. Accordingly, Judge Daniels found that the exercise of personal jurisdiction over DIB was appropriate and consistent with due process.

Following the denial of DIB's motion to dismiss, Plaintiffs sought to obtain evidence in discovery concerning DIB's provision of financial services to al Qaeda that facilitated and enabled the September 11th attacks. These efforts were hampered by, among other factors, DIB's denial of knowledge of the particular transactions or relationships that had prompted U.S. officials to seek assistance from the Emirati government to shut down DIB's financial relationship with al Qaeda in 1999. DIB now again moves for dismissal, claiming that discovery

1

has revealed no factual support for Plaintiffs' jurisdictional theories.[1] This claim is untrue. In fact, the Central Intelligence Agency ("CIA") declassified several finished intelligence reports on March 29, 2022 (the "CIA Documents"), pursuant to President Biden's Executive Order 14040, which directly address and confirm DIB's extensive, direct, and witting sponsorship of al Qaeda. Along with other facts and evidence of record, the CIA Documents provide ample support to demonstrate that DIB provided support and banking services to al Qaeda with a specific intent to assist al Qaeda's targeting of the United States, and that DIB conspired with and aided and abetted al Qaeda in that mission. Those facts and the evidence underlying them fully support the exercise of personal jurisdiction over DIB, and require denial of its motion.

In its efforts to avoid this outcome and evade the jurisdiction of this Court for its witting sponsorship of al Qaeda, DIB relies on an unduly restrictive view of personal jurisdiction that is neither supported by Second Circuit authority, nor consistent with U.S. national security and counterterrorism policy. *See* ECF 8127, DIB Brief ("DIB Br.") at 21-23. DIB largely predicates its arguments on the content of the (no longer relevant) record prior to the release of the CIA Documents, *id.* at 5-10, and unconvincingly attempts to downplay the devastating significance of the findings and assessments contained in those documents concerning DIB's collaboration with

---

[1] DIB has represented that the limited searches it conducted did not identify accounts for bin Laden's businesses, and that searches for names of certain al Qaeda members also did not result in hits. This is immaterial. To begin with, DIB asserted that burden issues required that its searches be limited to certain legacy databases. Critically, it does not appear that the search protocol proposed by DIB for "accountholders" would have identified beneficiaries of letters of credit or similar financial arrangements. Further, DIB insisted that it could only search for "exact" hits in its accountholder database, meaning that any variation in the spelling of the name (or presence of any additional criteria in the field beyond the name) would result in a negative result, even if an account did in fact exist. Because of transliteration and translation issues, this exact match limitation set a near impossible bar, and may have been subject to other material defects. The recently released CIA Documents confirm the letter of credit arrangements with bin Laden's businesses, which were unknowable prior to the release of the CIA Documents and not within the scope of DIB's searches. And in at least one case, the recently released FBI documents confirm the existence of an account at DIB in the name of one of the individuals within the scope of the searches, but DIB did not identify that account through its searches. *See* Winer Testimony ¶¶ 5.7-5.8, 7.10-7.11.2 (discussing FBI documents confirming the existence of a DIB account for Suleiman al Ali, used to send funds to Omar al Bayoumi). Plaintiffs anticipate addressing these issues further in a separate motion.

al Qaeda, as well as their import to other evidence of record. *Id.* at 23-26. DIB's related attempt

to argue that this Court should disregard the CIA Documents entirely, under the theory that

finished CIA intelligence reports prepared for the highest levels of the U.S. government as

"inadmissible," misconstrues the standards governing the instant motion and is plainly wrong. *Id.*

at 26-28; *infra* at § C.2. In fact, DIB's co-defendant, the Kingdom of Saudi Arabia, has argued

that such reports are not only admissible, but are entitled to considerable weight and deference.

*See* Jan. 18, 2018 Motion to Dismiss Hearing Tr. 20:17-23 ("But the point is, under the federal

rules of evidence, that when a body is charged with sorting through this material and reaching

formal findings and conclusions, as the 9/11 Commission did, as the FBI and the CIA did and as

the 9/11 Review Commission did, that those are to be given special weight in court that a mere

hearsay memoranda reporting a single, isolated interview does not.").

As discussed below, a straightforward application of the Second Circuit's personal

jurisdiction and due process standards to the facts and evidence of record confirms this Court's

prior conclusion that DIB is subject to this Court's jurisdiction for Plaintiffs' claims, and that its

motion should be denied.

## **FACTUAL BACKGROUND**

Headquartered in the United Arab Emirates, DIB was founded by Saeed Lootah, who

served as the bank's Chairman for many decades, until at least 1998. Members of Lootah's

family held positions on DIB's board as well, continuing to this day. Contrary to DIB's efforts to

cast itself as a responsible member of the global financial community that would never wittingly

support terrorism, the evidence shows that DIB was a longstanding, integral, and witting partner

of Osama bin Laden and al Qaeda, and that DIB provided critical support to al Qaeda at the

direction of is most senior officials and with the specific intent to advance al Qaeda's targeting of

the United States. *See* Plaintiffs' Averment of Facts and Counterstatement of Facts Pursuant to Rule 56.1 ("Averment") at ¶¶ 70-190.[2]

The scope and intimacy of DIB's collaboration with al Qaeda came glaringly to light earlier this year, as a result of the release of nearly 900 pages of previously classified intelligence reports of the CIA. Averment ¶¶ 70-99. The CIA Documents include three finished intelligence reports setting forth findings and assessments concerning Osama bin Laden's and al Qaeda's relationships with DIB, members of DIB's senior management, and related parties. *Id.* As stated definitively in those finished intelligence reports, DIB "has served as a key financial conduit for Al-Qa'ida." Averment ¶¶ 79, 81, 84.

Pursuant to DIB's collaboration with al Qaeda, "Bin Ladin's Sudan based companies and his financial officers opened bank accounts and letters of credit at Dubai Islamic Bank (DIB) with the active help of DIB Chairman Sa'id Ahmed Lootah." Averment ¶¶ 92, 108. The CIA specifically determined that "DIB Chairman Lootah personally authorized, stamped, and signed some letters of credit opened by Bin Ladin's companies in Khartoum through DIB," Averment ¶ 84(g), and that al Qaeda financial chief Madani al-Tayyib "and other al-Qaida members held numerous accounts at Dubai Islamic Bank because of Bin Ladin's reported friendship with DIB Chairman, Saeed Ahmed Lootah." Averment ¶¶ 80, 108(a). In addition, DIB Chairman Lootah and his businesses worked with an al Qaeda company in Jabal Ali, UAE, managed by Abu Khalifa al Omani, an al Qaeda member who "handles Bin Ladin's money in the Gulf under Madani Al-((Tayyib))'s supervision." Averment ¶108(c). The al Qaeda company was providing money to "Saudi and Yemeni" groups, while working with Lootah's businesses, "which in turn cooperate with Bin Ladin's companies." *Id.*

---

[2] The Averment, and all supporting documents to the Averment, are attached to and referenced in the Affirmation of J. Scott Tarbutton, filed herewith.

According to the CIA, DIB's support for al Qaeda and bin Laden stood out "because of [its] management's apparent witting involvement in the financial activities" of al Qaeda and several other terrorist organizations, Averment ¶ 84(f), and DIB's "especially close financial and personal ties to Algeria's Islamic Salvation Front (FIS), Egypt's Gama'at al Islamiyya (IB), the Palestinian Islamic Resistance Movement (HAMAS), Saudi exile Usama bin Ladin's terrorist Islamic Army, and other Muslim Brotherhood-backed groups." Averment ¶ 84(a). These assessments are fully supported by the CIA's determinations that Saeed Lootah was a "close friend of Bin Ladin's" who personally took steps to establish the mechanisms to support al Qaeda through DIB, as well as the CIA's findings concerning Lootah's broader linkages to terrorist and militant causes and organizations. Averment ¶¶ 79, 81, 84(b). In this regard, the CIA's finished intelligence assessments reflect that Lootah was "anti-American" and a central figure in the global Muslim Brotherhood, and that he and DIB provided support to a range of extremist organizations even beyond al Qaeda. Averment ¶¶ 84, 169.

While not necessary for establishing that DIB directed its tortious conduct at the United States and conspired with al Qaeda, the evidence also demonstrates that the support DIB provided to al Qaeda played a critical role in enabling al Qaeda to acquire its global strike capabilities, and that DIB's support for al Qaeda remained active even after Lootah's reported departure from the bank in 1998. Indeed, bin Laden's Sudanese businesses that were supported by DIB through the direct involvement of its Chairman Saeed Lootah were part of al Qaeda itself, and played a critical role in sustaining al Qaeda's symbiotic relationship with the National Islamic Front ("NIF") during al Qaeda's Sudanese residency. Averment ¶¶ 100-105. Also during this period, the accounts DIB provided to al Qaeda financial chief Madani al Tayyib were used to facilitate critical fund movements for core al Qaeda operations, as confirmed by al Tayyib's role

at the time and the unusual nature of the transactions carried out through the DIB accounts. Averment ¶¶ 106-116. Significantly, it was during this very period that "al-Qa'ida was transformed from an only partially realized idea to an international organization ready to operate on its own," relying on the essential support provided by DIB. Averment ¶ 117. Thus, DIB's support during this period was critical to the acquisition of resources and skills that were essential to the planning and conduct of the September 11th attacks.

Discovery has established that numerous other high ranking al Qaeda officials and associates held accounts at DIB as well, including Ali Abdul Aziz Ali, Khalid Sheikh Mohammed's nephew and a key figure in the financing of the 9/11 operation. Averment ¶¶ 130-139. Ali opened an account at DIB (Account No. xx-xxx-xxxxx63-01) on August 8, 2000, during the same period he was carrying out orders for his uncle. Averment ¶ 130. During the months that followed, Ali provided financial and logistical assistance to the hijackers. Averment ¶ 131. While it is unclear whether funds were transferred from Ali's DIB account prior to the attacks, to directly support the hijackers' operational activities, the record shows that the funds were available in the account for use in the event that they may have been needed, and that the funds were available, withdrawn, and used immediately before the September 11th attacks to fund Ali's escape. Averment ¶ 132.

While DIB attempts to minimize the significance of these additional al Qaeda accounts based on self-serving denials that it had knowledge of the account holders' affiliation with al Qaeda, the content of the CIA documents suggests otherwise. According to the CIA, al Qaeda's "choice of financial institutions in Sudan and abroad probably is based on personal contacts at the banks and security concerns." CIA_000736.  As to DIB in particular, the CIA concluded that al Qaeda "financial officer Madani al Tayyib and other Al-Qa'ida members held numerous

accounts at Dubai Islamic Bank because of Bin Ladin's reported personal friendship with DIB Chairman, Saeed Ahmed Lootah." Averment ¶¶ 80, 108. These assessments, coupled with the scope, duration, and intimacy of DIB's collaboration with al Qaeda, along with and the evidence that radicals had a broad presence at DIB even after Lootah's departure, at a minimum give rise to an inference that these al Qaeda members established accounts at DIB on the basis of DIB's witting partnership with al Qaeda, and that DIB was aware of their al Qaeda affiliations.

The evidence concerning the U.S. government's high level diplomatic engagements with Emirati officials, aimed at securing cooperation to close the support relationship between DIB and al Qaeda, also indicates that DIB's collaboration with al Qaeda remained ongoing at least into 1999. As reflected in contemporaneous media reports and statements by U.S. officials, the United States initiated a high-level diplomatic mission to the UAE in 1999 "to lobby for a halt to a suspected financial relationship between a Government-controlled bank and Osama bin Laden, the Saudi exile charged in the bombings of United States embassies in Africa last year." Averment ¶ 125. The mission was carried out during a period of intensive focus on al Qaeda's financing. Most obviously, the U.S. government's high-level engagements with Emirati officials in 1999, focused on lobbying for a halt to DIB's supportive relationships with al Qaeda and bin Laden, necessarily indicate that the U.S. government regarded those supportive relationships to remain in place at that time.[3]

The conclusion that DIB's collaboration with al Qaeda was durable and unaffected by Lootah's formal departure is reinforced by evidence from the CIA Documents and adduced in discovery that Lootah built DIB in his image, and that Lootah was by no means the only extremist with a prominent role at DIB. To the contrary, the CIA Documents indicate that

---

[3] DIB attempts to characterize its response to the public reporting and statements concerning the meeting as robust, but in reality it was perfunctory and unserious. Averment at ¶¶ 171-187.

Lootah's "religious conservatism apparently extends to DIB's personnel policy," and that DIB's Board also included Sheikh Yousif Jassim Al Haji, the "chairman of the Kuwait-based International Islamic Charities Organization (IICO)." Averment ¶ 84(g). According to the CIA, IICO "was established in 1986 as a cover entity for the safe and efficient management of MB [Muslim Brotherhood] finances.  [REDACTED] [] the IICO sends funds [REDACTED] to the Peshawar, Pakistan-based Maktab-ul Khedamat, an NGO that coordinates activities of militant Afghanis and supports the Bosnian Mujaheddin." *Id.* The CIA assessed that Jassim likely served as a "principal connection" between DIB and "several NGOs that purportedly fund militant causes." *Id.*

DIB's Shariah Board, in turn, included Islamic scholars who had openly advocated assistance to terrorist organizations and "encouraging one to bomb himself." Averment ¶¶ 144-145. They were Ali Muhyiddin al Qaradaghi ("Qaradaghi") and Dr. Ajeel Jaseem Nashmi ("Nashmi"). *Id.* Both were appointed to the Shariah Board by DIB's Board of Directors, based on their scholarship as to Islamic matters in general. Averment ¶¶ 147, 149. Significantly, Qaradaghi served on DIB's Shariah Board beginning in 1998 and then for five, six, or eight years (that is, until 2003, 2004, or 2006), and Nashmi was appointed to DIB's Shariah Board sometime in 2002 or 2003. Averment ¶ 146. Both thus served after the Emirati governments alleged assumption of management control over DIB, and subsequent to the East African Embassy bombings, public reporting of U.S. concerns relating to DIB's support for al Qaeda, and the September 11th attacks themselves.

And although DIB will no doubt contest the point, the record indicates that the Shariah Board's long-time Chair, Dr. Hussein Hamid Hassan, had significant ties to extremists as well, including Abdullah Azzam, the co-founder of al Qaeda. Averment ¶¶ 151-158. Hassan

acknowledged that he knew Azzam, and the foreword of Azzam's *fatwa* "In Defense of Muslim Lands," the foundational work of the modern jihad, indicates that Hassan reviewed and approved it. Averment ¶¶ 152-156. The record includes additional evidence of Hassan's endorsement of extremism, in the form of an interview and study he authored in 2002. Averment ¶ 158.

Finally, the evidence of record readily shows that DIB was expressly aware that DIB was targeting the United States for attack from the outset, and specifically intended that its support would advance that goal. Averment ¶¶ 159-170. As discussed above, the CIA Documents confirm that Saeed Lootah was an extremist and personal friend of Osama bin Laden's, and prominent figure in the global Muslim Brotherhood with myriad ties to al Qaeda and other militant and extremist entities, including NIF leader Hassan Al Turabi. Averment ¶¶ 80, 84(g), 108, 169. He and DIB were thus quintessential insiders, who had unique and direct access to al Qaeda's agenda and goals from the outset. Averment ¶ 170. As early as 1992 and repeatedly thereafter, bin Laden made clear to his collaborators al Qaeda's targeting of the United States for attack, emphasizing the need to cut off the head of the snake. Averment ¶¶ 160-162. And from 1992 forward, al Qaeda did in fact carry out numerous attacks against the United States, culminating with the September 11th attacks. Averment ¶¶ 163-168. The scope and character of the assistance DIB provided to al Qaeda with this knowledge, coupled with the evidence of Lootah's and DIB's ideological alignment with bin Laden's terrorist mission, establish that DIB specifically intended to support and advance al Qaeda's targeting of the United States.

## **LEGAL ARGUMENT**

### A.    **Standard of Review**

DIB styles its motion as a motion for summary judgment or, in the alternative, a renewed motion to dismiss under Rule 12(b)(2). Following discovery (and deferring, for purposes of the applicable standard, the issue of whether DIB engaged in good faith discovery), Plaintiffs' "*prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant." *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 198 (2d Cir. 1990); *see also Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) (applying prima facie standard, including averment of facts, in post-discovery posture for jurisdictional analysis); *Sokolow v. PLO*, 2011 U.S. Dist. LEXIS 36022, *7 (S.D.N.Y. Mar. 30, 2011) (Daniels, J.) (directing court to accept all averments of jurisdictional facts as true in post-discovery posture).

Pursuant to Rule 56, summary judgment is proper only if, drawing all inferences in favor of the non-moving party, the jurisdictional facts are undisputed, and the undisputed facts are insufficient as a matter of law to sustain a finding of personal jurisdiction. *See* Fed. R. Civ. P. 56; *Ball*, 902 F.2d at 198.[4] Here, Plaintiffs' jurisdictional showing is supported by both facts and

---

[4] With respect to DIB's request that the Court hold an evidentiary hearing should it deem any material fact disputed, any such evidentiary hearing should properly be deferred given that the jurisdictional dispute is intertwined with the merits of Plaintiffs' claims against DIB. In this context, the resolution of the jurisdictional issues must be left for trial. *Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 (2d Cir. 2006) (where "overlap in the evidence is such that fact-finding on the jurisdictional issue will adjudicate factual issues required by the Seventh Amendment to be resolved by a jury, then the Court *must leave the jurisdictional issue for the trial*") (emphasis added); *see also AEP-PRI Inc. v. Galtronics Corp.*, 2013 U.S. Dist. LEXIS 114681, *21 (S.D.N.Y. Aug. 13, 2013) (recognizing Court's discretion to defer jurisdictional issues to trial where jurisdictional issues overlap with evidences on merits).

evidence, and is sufficient to defeat DIB's motion, whether it is treated as a renewed motion to dismiss or a motion for summary judgment.[5]

## B.  The Exercise of Personal Jurisdiction over DIB is Appropriate

DIB's motion principally argues that the exercise of personal jurisdiction over it for the claims at issue would not comport with due process. For purposes of establishing personal jurisdiction, due process simply requires "certain minimum contacts with [the United States] such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Terrorist Attacks VII*, 714 F.3d at 673 (brackets in original; internal quotes omitted). For

---

[5] Further, DIB already moved to dismiss for lack of personal jurisdiction, and the Court denied DIB's motion without opportunity to renew. *See Terrorist Attacks IV*, 718 F. Supp. 2d at 488-89. Given this procedural posture, the normal standard of review for a motion to dismiss or motion for summary judgment based on personal jurisdiction gives way to the much more onerous law of the case standard, because "a decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation." *See In re Arcapita Bank B.S.C.(C*), 640 B.R. 604, 616 (S.D.N.Y. 2022) (citing *In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991)). A court has discretion to depart from the law of the case *only* where: "1) the first decision was clearly erroneous; 2) an intervening change in the law has occurred; 3) the evidence . . . is substantially different; 4) other changed circumstances exist; or 5) a manifest injustice would otherwise result. Failure to apply the doctrine of the law of the case absent one of the requisite conditions constitutes an abuse of discretion." *Opperman v. Path, Inc.*, No. 13-CV-00453-JST, 2014 U.S. Dist. LEXIS 8885, at *16-17 (N.D. Cal. Jan. 22, 2014) (personal jurisdiction determination made by Texas court prior to transfer was law of the case) (quoting *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir.1997)); *N. River Ins. Co. v. Philadelphia Reinsurance Corp.*, 63 F.3d 160, 165 (2d Cir. 1995) (law of the case should not be disturbed "in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice.").

In *In re Arcapita Bank B.S.C.(C)*, a bankruptcy court granted a motion to dismiss for lack of personal jurisdiction. On appeal from the bankruptcy court, Your Honor (Judge Daniels) reversed, finding there was jurisdiction over Bahrain Islamic Bank. 640 B.R. 604, 616-18 (S.D.N.Y. 2022). Following discovery in the bankruptcy court, Bahrain Islamic Bank filed a renewed motion for summary judgment for lack of personal jurisdiction in light of new evidence uncovered. The bankruptcy court denied the renewed motion on law of the case grounds notwithstanding the purported new evidence. On appeal to the district court, Senior District Court Judge Hellerstein affirmed, finding that the prior ruling by Judge Daniels was binding on the bankruptcy court and was not clearly erroneous notwithstanding new evidence. The Court rejected the reasoning in *Bank Leumi USA v. Ehrlich*, 98 F. Supp. 3d 637, 647 (S.D.N.Y. 2015), which held that a motion for summary judgment is subject to a different standard of review than a motion to dismiss, preventing application of law of the case. But even *Bank of Leumi* compels a finding that DIB's renewed motion to dismiss is subject to the law of the case doctrine (even if not its motion for summary judgment) and *Bank of Leumi* confirmed that "the Court, using its good sense, will rely on the reasoning of the Prior Order as appropriate, particularly in instances where Defendants have adduced no additional facts or cases in support of their arguments." 98 F. Supp. 3d 637, 647 (S.D.N.Y. 2015). Indeed, based on plaintiffs' research, renewed motions to dismiss or summary judgment for lack of jurisdiction are generally only filed when previously authorized by the court. *See, e.g.*, *Gulf Union Ins. Co. Saudi Arabia v. Bella Shipping Co.*, No. 91 CIV. 2814 (PKL), 1994 U.S. Dist. LEXIS 11788, at *4 (S.D.N.Y. Aug. 22, 1994) (renewed motion to dismiss specifically authorized after discovery and denied because plaintiffs met burden); *Sokolow v. Palestine Liberation Org.*, 583 F. Supp. 2d 451, 460 (S.D.N.Y. 2008) (defendant's motion to dismiss for lack of personal jurisdiction denied *without prejudice* to renew) (J., Daniels).

these purposes, the touchstone due process inquiry is whether "the defendant's conduct and connection with the forum … are such that he should reasonably anticipate being haled into court there.'" *Id.* (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). This evaluation of fair play and notice is based in part on the strength of the forum's interests at issue. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 317-320 (1945); *Asahi Metal Indus. v. Super. Ct. of Cal.*, 480 U.S. 102, 113 (1987).

Two ways of satisfying the fair warning requirement apply in this case. First, the "fair warning requirement is satisfied if the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." *Terrorist Attacks VII*, 714 F.3d at 674 (internal quotations omitted). In this context, a defendant has "purposefully directed his activities at residents of [this] forum,'" if he "took 'intentional, and allegedly tortious actions … expressly aimed' at the forum" or its residents, *id.* at 674 (quoting *Calder v. Jones*, 465 U.S. 783, 789 (1984)), or was a "primary participant in intentional wrongdoing—albeit extraterritorially—expressly directed at [the] forum." *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 208 (2d Cir. 2003) (characterizing *Calder*'s requirement); *see infra* § B.1. "[T]he fact that harm in the forum is foreseeable, however, is insufficient for the purpose of establishing specific personal jurisdiction over a defendant." *Terrorist Attacks VII*, 714 F.3d at 674; *see In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 95 (2d Cir. 2008) ("*Terrorist Attacks III*"). Second, under a concerted action theory of jurisdiction, a co-conspirator or aider and abettor is subject to personal jurisdiction where the out-of-forum party acts to advance the forum-directed activities of others who cause harm in the forum. *See Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68 (2d Cir. 2018);

*infra* § B.2. Plaintiffs' Averment of Facts and Counterstatement of Facts Pursuant to Rule 56.1

provide ample basis to exercise jurisdiction over DIB on both of these theories.

1.    DIB Purposefully Directed its Tortious Conduct at the United States

Since Congress's 2016 enactment of the Justice Against Sponsors of Terrorism Act,

("JASTA") the Second Circuit has substantially refined and clarified the standards governing

jurisdiction under the purposeful direction test and for assessing facts in the terrorism context,

and these most recent authorities (which DIB largely ignores or mischaracterizes) readily show

that the exercise of jurisdiction over DIB is appropriate.  In *Waldman v. Palestine Liberation*

*Organization*, 835 F.3d 317 (2d Cir. 2016), the Court considered the availability of personal

jurisdiction over the Palestinian Liberation Organization and the Palestinian Authority for claims

arising from various terror attacks *that took place in Israel*, and killed or injured United States

citizens. Although the Second Circuit in *Waldman* declined jurisdiction, it did so on the basis

that there was no "connection between the conduct on which the alleged personal jurisdiction is

based and the forum." *Waldman,* 835 F.3d at 342. The *Waldman* court emphasized the "random

and fortuitous nature of the terror attacks" that took place outside of the United States and did

not specifically target American citizens. *Id.* at 337-38. The *Waldman* court further explained

that a defendant's provision of support to a foreign terrorist organization will not support

jurisdiction in the absence of allegations that the terrorist organization was known to be targeting

the United States. *Id.* at 340.

In reaching its decision, the *Waldman* court drew a stark contract between the claims

before it arising from support for Hamas attacks in Israel and cases arising from the witting

sponsorship of al Qaeda. *Id.* at 338-41. In particular, the court emphasized that the "specific aim

of the group receiving support" is critical to the analysis of personal jurisdiction for claims

arising under the Anti-Terrorism Act ("ATA"), *id.* at 340, and confirmed that al Qaeda has long

13

been known to be targeting the United States. *Id.* Where, as here, the claims arise from the defendant's knowing support of al Qaeda's targeting of the United States, and the injuries directly arise out of that campaign, *Waldman* fully supports the exercise of jurisdiction. *Id.* at 343-44.

The Second Circuit's decisions in *Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018), and *Kaplan v. Lebanese Canadian Bank, SAL*, 2021 U.S. App. LEXIS 17105, 999 F.3d 842 (2d Cir. 2021), in turn, described when allegations regarding knowledge and intent are sufficient to show the terrorist supporter's intention and awareness that it is playing a role in a terrorist group's activities. In *Linde*, the Second Circuit explained the standards governing aiding and abetting liability under the ATA, pursuant to JASTA's amendments, and recognized that allegations satisfying the aiding and abetting standard (including through indirect support and financial services) can give rise to an inference of the defendant bank's own "intent to further [the organization's] terrorist activities." *Linde*, 882 F.3d at 330.  *Linde* confirmed that one who aids and abets a terrorist group with the requisite awareness is "itself assuming a 'role' in terrorist activities" and thereby satisfying the due process requirement of "suit-related conduct." *Id.* at 329. And where that aiding and abetting involves an anti-American terrorist organization like al Qaeda, the nexus to U.S. harm is apparent. *See Waldman*, 835 F.3d at 339-40 (intentional support to organization "known to be targeting the United States" would establish link to U.S. harm).

The Second Circuit's decision in *Kaplan* further clarified the standards that must be applied in construing allegations of terrorist support in an ATA case and assessing a defendant bank's mental state, and expressly confirms that a defendant bank may aid and abet a terrorist organization, with an intent to foster that organization's terrorist agenda, through an

intermediary. *See Kaplan*, 999 F.3d 842. *Kaplan* instructs that the district court is required to assess the facts of record holistically. *Id.* at 865. Further, the Second Circuit expressly recognized that "'[t]he length of time an alleged aider-abettor has been involved with a tortfeasor almost certainly affects the quality and extent of their relationship and probably influences the amount of aid provided as well; additionally, it may afford evidence of the defendant's state of mind.'" *Id.* at 857 (quoting *Halberstam v. Welch*, 705 F.2d 472, 484 (D.C. Cir. 1983)). *Kaplan* further recognized that a bank may aid and abet a terrorist organization and assume a role in its terrorist activities by supporting known intermediaries. *See Kaplan*, 999 F.3d at 856.[6]

Consistent with these standards, the Second Circuit held that plaintiffs in this litigation had presented a *prima facie* showing of jurisdiction as to Al Rajhi Bank based on allegations that "Al Rajhi Bank provided financial services and donations to charities that it knew financially supported al Qaeda and provided financial services to known extremist operatives. They further allege Al Rajhi Bank's provision of financial services was done with the specific intent to further al Qaeda's terrorism against the United States." *Underwriting Members of Lloyd's Syndicate 2 v. Al Rajhi Bank*, 779 Fed. Appx. 66, 68 (2d Cir. 2019). The allegations of specific intent made the claims against Al Rajhi Bank "more direct and one step closer to al Qaeda" than earlier claims where the Second Circuit had found jurisdiction lacking. *Id.* at 69 (internal citations omitted).

These authorities readily establish that the exercise of jurisdiction over DIB for plaintiffs' claims comports with due process. The CIA Documents and other evidence surveyed in plaintiffs' Averment and Rule 56 Statement establish that DIB provided direct and extensive support to al Qaeda over a period of many years, including by issuing letters of credit in favor of

---

[6] *Kaplan*'s treatment of causation and recognition of the broad parameters of aiding and abetting liability under the ATA and JASTA further establish that there is no merit to DIB's claim that the relationship between its conduct and Plaintiffs' injuries is insufficient to support jurisdiction.

bin Laden's businesses and maintaining accounts for al Qaeda's financial chief and numerous other al Qaeda members. Averment ¶¶ 70-99, 100-105, 106-116, 130-139. DIB's partnership with al Qaeda was orchestrated in the first instance by the bank's founder and long-serving Chairman, Saeed Lootah, a personal friend of Osama bin Laden's and prominent figure in the global jihadist movement, who maintained myriad connections to terrorism. Averment at ¶¶108, 139, 169. DIB's support for al Qaeda was "witting" and conducted with a specific awareness and intent that it would foster al Qaeda's targeting of the United States, as reflected by the nature of the support provided and Lootah's personal involvement in establishing several of the key support mechanisms. Averment at ¶¶ 84(f), 159-160; CIA_000728. These facts and the evidence underlying them are, if anything, at least as strong as those the Second Circuit found sufficient to establish jurisdiction as to Al Rajhi Bank, and easily show that DIB purposefully directed its tortious conduct at the United States.

DIB's attempts to avoid this result based on earlier rulings dismissing separate defendants from this litigation on the basis of different allegations are without merit. *See* ECF 8127, DIB Br. at 15, 21-22. At most, those earlier decisions merely support the conclusion that claims of indirect support or the provision of routine banking services, accompanied by allegations of mere foreseeability of harm, are insufficient to establish personal jurisdiction. *See Terrorist Attacks VII*, 714 F.3d at 674; *see In re Terrorist Attacks III*, 538 F.3d at 95. Those decisions do not remotely foreclose the exercise of jurisdiction over DIB for its direct, extensive, and witting support for bin Laden and al Qaeda, especially given the facts and evidence demonstrating DIB's specific intent to advance al Qaeda's targeting of the United States. *See Al Rajhi Bank*, 779 Fed. Appx. at 69; *Waldman*, 835 F.3d at 340. For these same reasons, DIB's attempted reliance on *Waldman* is deeply misplaced, as it ignores that decision's emphasis on the random and

fortuitous nature of the terror attacks at issue in that case, and the specific contrast the *Waldman* court drew between those circumstances and the witting sponsorship of an organization long known to be targeting the United States, such as al Qaeda. *See* ECF 8127, DIB Br. at 25-26; *Waldman*, 835 F.3d at 338-44.

Nor is there any merit to DIB's attempts to evade jurisdiction under the effects test based on its claims that its accounts were not directly used to finance the operational activities of the 9/11 hijackers, or its specious claims that its partnership with al Qaeda concluded in 1998, when Lootah left his formal role at the bank. *See* ECF 8127, DIB Br. at 9, 16-17, Although there is evidence that al Qaeda established an account at DIB to support the 9/11 attacks, the exercise of jurisdiction over DIB does not depend on a showing that it financed specific operational aspects of the 9/11 operation. Rather, its witting support for al Qaeda itself over a period of many years, with a specific awareness of al Qaeda's mission to attack the United States and intent to advance that objective, establish that the exercise of personal jurisdiction comports with due process. *See Al Rajhi Bank*, 779 Fed. Appx. at 69; *Waldman*, 835 F.3d at 339-40. Its arguments about temporal attenuation likewise ignore the relevant legal standard, and are factually meritless in any case. Indeed, the evidence shows both that DIB provided support that was critical to al Qaeda's acquisition of its global strike capabilities, and that its support remained ongoing while the 9/11 operation was underway.

2.     <u>DIB is Subject to Jurisdiction as Al Qaeda's Co-Conspirator and Aider and Abettor</u>

This Court's earlier ruling recognizing that Plaintiffs alleged that DIB purposefully directed its conduct at the United States did not address whether DIB's concerted action also gives rise to personal jurisdiction for aiding and abetting or related allegations of conspiracy, as endorsed by the Second Circuit in *Schwab*, 883 F.3d 68. In *Schwab*, the Second Circuit

recognized an additional basis for personal jurisdiction applicable where an out-of-forum party acts to advance the forum-directed activities of others who cause harm in the forum. *Id.* at 86-87. Under that analysis, personal jurisdiction can be established if the defendant was a participant in a joint action and a co-participant's acts in furtherance of the joint objective created sufficient contacts with the forum. *Id.* at 87. The *Schwab* court cited and endorsed the point set out in *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873, 884 (2011), that personal jurisdiction can be asserted when "'a defendant has followed a course of conduct directed at [a specific] society or economy,'" and that action directed at the United States as a whole may "'subject [a defendant] to the jurisdiction of the courts of the United States … .'" *Schwab*, 883 F.3d at 88. To meet *Schwab*'s test, plaintiffs must show only that the defendant's co-conspirators took actions "in furtherance of the conspiracy" in the relevant forum, *Id.* at 87. And *Schwab's* rationale of how joint action establishes personal jurisdiction over all the joint actors applies to aiders and abettors, as well. *See Halberstam*, 705 F.2d at 477 (aiding and abetting a form of joint and concerted action).

Here, the facts of record easily establish, for purposes of the present motion, that DIB also is subject to personal jurisdiction as a co-conspirator and aider and abettor of al Qaeda. Initially, al Qaeda's campaign of terrorist conduct directed at the United States and contacts in the forum in carrying out the September 11th attacks are beyond dispute. Further, the facts and evidence concerning the support DIB provided to al Qaeda, Saeed Lootah's personal friendship with Osama bin Laden and extensive linkages to and involvement in supporting extremist and terrorist causes, DIB's appointment of extremists to prominent roles at the bank, and CIA's express finding that DIB's assistance of al Qaeda was "witting" more than establish the

"agreement" that is the hallmark of a conspiracy.[7] *Halberstam*, 705 F.2d at 479-80.

"[C]onspiracies are rarely evidenced by explicit agreements" and "nearly always must be proven

through 'inferences that may fairly be drawn from the behavior of the alleged conspirators.'"

*Gelboim v. Bank of Am., Corp.*, 823 F.3d 759, 781 (2d Cir. 2016); *Kaplan*, 999 F.3d at 854

(requiring holistic approach to assessment of facts in terrorism case and discussing inferences

that are properly drawn from same). These facts and the evidence underlying them also establish

that DIB's witting assistance of al Qaeda was substantial, and thus sufficient to amount to aiding

and abetting.

Finally, DIB cannot avoid jurisdiction based on its concerted activity based on its

(inaccurate) claims that its support for al Qaeda ceased before 9/11. As the Supreme Court

explained in *Smith v. United States*, 568 U.S. 106, 107 (2013):

> Since conspiracy is a continuing offense, *United States* v. *Kissel*, 218 U.S. 601,
> 610, 31 S.Ct. 124, 54 L. Ed. 1168 (1910), a defendant who has joined a
> conspiracy continues to violate the law "through every moment of [the
> conspiracy's] existence." *Hyde v. United States,* 225 U.S. 347, 369, 32 S. Ct. 793,
> 56 L. Ed. 1114 (1912), and he becomes responsible for the acts of his co-
> conspirators in pursuit of their common plot, *Pinkerton* v. *United States*, 328 U.S.
> 640, 646, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946). . . .
>
> Passive nonparticipation in the continuing scheme is not enough to sever the
> meeting of minds that constitutes the conspiracy. "[T]o avert a continuing
> criminality" there must be "affirmative action . . . to disavow or defeat
> the purpose" of the conspiracy. *Hyde*, *supra,* at 369, 32 S. Ct. 793, 56 L. Ed.
> 1114.

*Smith*, 568 U.S. at 111-13.

---

[7] To state a claim for conspiracy, a plaintiff must allege "an agreement between two or more persons" to "participate in an unlawful act, or a lawful act in an unlawful manner." *Halberstam*, 705 F.2d at 477. The agreement need relate only to the broad object of the conspiracy (here, advancing the organization's attacks on U.S. interests), not the particular attack resulting in harm. *Schwab*, 883 F.3d at 87-88; *see also Leh v. Gen. Petroleum Corp.*, 382 U.S. 54, 59 (1965).

DIB cannot sustain its burden to establish that it undertook affirmative action to disavow or defeat the purpose of the conspiracy at all, and certainly not for purposes of the present motion. In fact, the record is devoid of any evidence that DIB took affirmative actions to root out the al Qaeda support network at the bank. Instead, it principally argues that Lootah left DIB in 1998 and claims, without support, that ongoing sponsorship of al Qaeda after that point could not have occurred because of the involvement of the government of the UAE with the bank. *See* ECF 8127, DIB Br. at 25-26. These claims are speculative and deeply disputed, but even if credited, would at most suggest passive non-involvement in the conspiracy shortly before 9/11, which is insufficient to sustain a withdrawal defense. *See Smith*, 568 U.S. at 113 ("Passive nonparticipation in the continuing scheme is not enough to sever the meeting of the minds that constitutes the conspiracy").

**C.**     **The CIA Documents Support Plaintiffs' Jurisdictional Claims and Are Admissible**

        1.     The CIA Documents Provide Factual Support for the Jurisdictional Analysis

DIB fares no better in its flailing attempt to persuade the Court to ignore the content of the CIA Documents entirely, under the theory that they are inadmissible. *See* ECF 8127, DIB Br. at 26-28. Initially, these arguments ignore that Plaintiffs carry their burden in the present procedural context based on an averment of facts which, if credited, would be sufficient to establish personal jurisdiction. *See Ball*, 902 F.2d at 198, *supra* § A. Here, Plaintiffs have provided an averment of fact, and the relevant details from the CIA Documents and other evidence of record provides particularized facts that establish jurisdiction.

        2.     The CIA Documents are Admissible

Further still, DIB's assertion that the CIA Documents are inadmissible and thus, irrelevant to the jurisdictional analysis, is plainly wrong. The CIA Documents address sensitive issues of national security, and were compiled by career intelligence officials to distribute to the

highest level of governmental agencies for counterterrorism objectives, and, by this very nature, are reliable. They thus fall squarely within the public records exception of the Federal Rules of Evidence ("FRE"). *See* FRE 803(8). They also are admissible under the residual hearsay exceptions set forth in FRE 807.

### a.     *The Public Records Exception*

FRE 803(8) creates a hearsay exception for public records, which encompasses the CIA Documents. Under FRE 803(8), a record or statement of a public office, such as the CIA, is admissible in a civil case if it sets out factual findings from a legally authorized investigation, and the opponent does not show that the circumstances indicate a "lack of trustworthiness." *See* FRE 803(8)(A)(iii); FRE 803(8)(B); *Owens v. Republic of Sudan*, 864 F.3d 751, 792-93 (D.C. Cir. 2017) (vacated and remanded on other grounds) (applying public records exception to State Department reports containing factual finding and conclusions on Sudan's support of terrorism).

DIB claims that the public records exception is inapplicable because the CIA Documents do not set out "factual findings" of any "public office" and the documents themselves "lack [any] trustworthiness." *See* ECF 8127, DIB Br. at 27. These arguments are unfounded. The Supreme Court has endorsed a "broad approach to admissibility" under Rule 803(8), pursuant to which the phrase "factual findings" includes "conclusion[s] or opinion[s]" contained within a public record. *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170 (1988). Once proffered, a public record is presumptively admissible, and the opponent bears the burden of showing it is unreliable. *See Bridgeway Corp. v. Citibank*, 201 F.3d 134, 143 (2d Cir. 2000).

Here, there can be no reasonable dispute that the documents were prepared by the CIA as part of its legally authorized investigation in gathering and evaluating intelligence concerning al Qaeda's sources of financial and logistic support, and preparing finished intelligence assessments to inform and guide policymaking decisions at the highest levels of the U.S. government. Indeed,

this is evident from the fact of the documents themselves. Further, the reports include particularized facts and conclusions drawn from them by the CIA. As such, they are presumptively admissible.

DIB offers no facts that come close to sustaining its burden to show that the CIA Documents are unreliable. Although DIB notes the distinction between a "final report" of a "government agency" and an "interim report" prepared by staff, it does not present any basis to conclude that the CIA Documents include conclusions that are incomplete or not finalized. *See* ECF 8127, DIB Br. at 27. As Plaintiffs' expert Jonathan Winer explained in his expert report, the CIA Documents constitute "[f]inished intelligence" as distinguished from "raw intelligence" and "consist[] of analytic assessments by career intelligence officials, produced by experts in the areas covered by the finished intelligence product." *See* June 16, 2022 Supplementary Expert Report of Jonathan M. Winer ¶ 3.2, attached as Ex. 4 to the Affirmation of J. Scott Tarbutton. According to Winer, finished reports provide "an authoritative source of the CIA's assessment of facts, situations, events, persons, institutions, and issues" and are built on the "knowledge and expertise of multiple layers of CIA analysts." *Id.*

DIB also fails in its efforts to attack the reliability of the CIA Documents because the documents themselves do not "indicate what the CIA did with them" and also on the basis of their alleged "anonymous authorship." *See* ECF 8127, DIB Br. at 27. Neither claim succeeds. As Winer explained, finished intelligence assessments such as the CIA Documents are "shared with [] the President and his senior staff at the White House and National Security Council [], and senior national security officials in other agencies such as the U.S. Department of State [] and U.S. Department of Defense." Supplemental Report, at 4; *see also* CIA_000012-16; CIA_000230-236; CIA_000663-667. The dissemination of these reports to high-level

government officials confirms their reliability. *See United States v. Gluk*, 831 F.3d 608, 614 (5th Cir. 2016) (when an "agency professional transmits a document to others outside the agency, that document is presumptively a factual finding of the agency"); *see also* Supplemental Report at 4.1 (explaining that White House counter-terrorism czar Richard Clarke tasked the CIA to undertake the finished intelligence report, "Usama Bin Ladin's Finances," which concluded that DIB was a "key financial conduit" for al Qaeda, and thereafter led to diplomatic efforts with the U.A.E. concerning bin Laden's relationship with the bank.)

As to the authorship, the reports contain *redacted* names – they are not anonymous. For example, the bottom of several documents includes contact information to inform the reader who to contact with questions—information that is redacted from the public version of the reports. *See, e.g.*, CIA_000004, 43. The identity of the intelligence officers who authored, analyzed, and vetted the CIA intelligence reports was omitted as a matter of national security because the reports contain sensitive information on terrorism, and not because the authors are unreliable sources, with unknown qualifications. That the authors themselves may not have been present for public hearings, or subject to cross-examination, does not render their conclusions or investigations unreliable. Finally, DIB's claim that the authors had improper motives to formulate their conclusions relating to the long-standing and pervasive relationship between DIB and al Qaeda is entirely unsupported, and assigns malicious intent to senior intelligence officials (as to matters of profound importance to our national security) without a shred of evidence. *See* ECF 8127, DIB Br. at 28.

Ironically, DIB effectively undermines all of its own arguments by pointing out that the 9/11 Commission cited and relied upon each of the reports at issue in its Final Report.[8] *Id.* at 23.

---

[8] Based on the 9/11 Commission's citations to the documents, DIB asserts that "[i]t is no news that the files existed," ECF 8127, DIB Br. at 23, in an apparent effort to suggest that the CIA Documents do not contain material new

DIB readily acknowledges and affirmatively argues that the 9/11 Commission Report is reliable and admissible. From this, it necessarily follows that finished intelligence products the Commission cited and relied upon in support of key findings, including the CIA reports at issue, are themselves reliable and admissible. Put another way, DIB cannot credibly challenge the admissibility of the CIA Documents while at the same time citing to the 9/11 Commission Report as admissible evidence. *See* ECF No. 8127, DIB Br. at 23, 28.[9]

      b.   *The Residual Hearsay Exception*

The CIA Documents also are admissible under FRE 807, the "catch-all" hearsay exception. Under FRE 807, a statement will be admitted if "(i) it is particularly trustworthy; (ii) it bears on a material fact; (iii) it is the most probative evidence addressing that fact; (iv) its admission is consistent with the rules of evidence and advances the interests of justice; and (v) its proffer follows adequate notice to the adverse party." *United States v. Bryce*, 208 F.3d 346, 350-51 (2d Cir.1999).

Plaintiffs satisfy all the elements of FRE 807. As Plaintiffs established above, the CIA Documents are trustworthy. *See supra* §C.2.a. The CIA Documents bear on material facts—describing DIB's material support for Osama bin Laden, his companies, and al Qaeda, and provide the most probative publicly available evidence of DIB's involvement with Osama bin Laden, his companies, and al Qaeda. The admission of the CIA Documents is consistent with the

---

evidence. This is completely false. In fact, while the 9/11 Commission cited to the reports by their titles, and relied upon them in support of findings on certain overarching matters, neither the 9/11 Commission Report nor the titles of the reports pertained to DIB. And none of the specific details and findings in the reports were public prior to their declassification a few months ago.

[9] In addition, the Second Circuit uses four factors to evaluate the trustworthiness of a government report: "(a) the timeliness of the investigation, (b) the special skills or experience of the official, (c) whether a hearing was held and the level at which it was conducted, and (d) possible motivation problems." *Bridgeway*, 201 F.3d at 143. The CIA Documents were developed over years of investigation and prepared by members of the intelligence community working on issues of national security. DIB does not present any facts to support its claim that these factors indicate that the CIA Documents are not trustworthy.

24

Federal Rules of Evidence and advances the interests of justice because it enables Plaintiffs to further Congress's objectives in enacting JASTA, by holding accountable those responsible for terrorist attacks on American soil. Finally, Plaintiffs gave DIB adequate notice it would use the CIA Documents as evidence. Accordingly, the CIA Documents are admissible under FRE 807.

        c.    *Plaintiffs' Expert Properly Relied on the CIA Documents in Support of his Testimony and Supplemental Report*

In further support of their averment of facts and Rule 56 Statements, Plaintiffs have offered testimony of expert Jonathan Winer, concerning the content and import of the newly declassified CIA Documents. As is well established, "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." FRE 703; *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 438-40 (E.D.N.Y. 2013) (admitting Dr. Levitt's opinion testimony over hearsay objection); *United States v. Damrah*, 412 F.3d 618, 625 (6th Cir. 2005) (affirming district court's holding that Dr. Levitt's reliance upon hearsay was permissible—"[g]iven the secretive nature of terrorists, the Court can think of few other materials that experts in the field of terrorism would rely upon."). Winer's testimony concerning the CIA Documents meets all of these requirements, and is therefore admissible for purposes of Plaintiffs' jurisdictional showing.[10]

**D.**    **The Exercise of Personal Jurisdiction Comports with Due Process and Serves Paramount National Security and Counterterrorism Interests of the United States**

DIB's claim that the exercise of personal jurisdiction is "unreasonable" and would place an undue burden on the defendant is deeply misguided. *See* ECF 8127, DIB Br. at 29. Initially,

---

[10] On August 2, 2022, DIB sought leave to file a motion to strike Winer's Supplemental Expert Report. Plaintiffs will respond to that motion, which is without merit, in due course.

this Court already found that the "litigation of this matter in the United States would not be so unduly burdensome or inconvenient as to DIB as to unfairly place it at a disadvantage compared to plaintiffs." *Terrorist Attacks IV*, 718 F. Supp. 2d at 490. Nothing has changed since the Court issued that ruling.

Furthermore, DIB's arguments about burden ignore the actual legal standard governing the reasonableness inquiry. In fact, courts addressing whether due process comports with fair play and substantial justice must balance various factors, including the defendant's burden, the forum's interest, the plaintiff's interest in obtaining relief, judicial efficiency, and social policies. *See Asahi*, 480 U.S. at 113.

This country's vital interest in affording a remedy for American terror victims in its courts provides manifest support for Plaintiffs' position that it is both reasonable and necessary for this Court to exercise jurisdiction over DIB for Plaintiffs' claims. Through its enactment of JASTA in 2016, Congress explicitly affirmed the empirical determinations and social policies central to our nation's security, and recognized that civil litigation directed against the material support of terrorism is an important component of the nation's arsenal of counter-terrorism measures. As Congress explained, JASTA's central purpose, and the touchstone for construing its provisions, is "to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, *wherever acting or wherever they may be found,* that have provided material support, *directly or indirectly*, to foreign organizations or persons that engage in terrorist activity." *See* JASTA § 2(b); 130 Stat. at 853 (emphasis added).

Consistent with its understanding of the systematic manner in which foreign terrorist organizations and their supporters have targeted United States interests with increasing

26

sophistication over the last several decades, Congress found that "[p]ersons, entities, or countries that knowingly or recklessly contribute material support or resources, *directly or indirectly,* to persons or organizations that pose a significant risk of committing acts of terrorism that threaten the security of nationals of the United States or the national security, foreign policy, or economy of the United States, necessarily direct their conduct at the United States, and should reasonably anticipate being brought to court in the United States to answer for such activities." *Id.* at § 2(a)(6); 130 Stat. at 853 (emphasis supplied). DIB's suggestion that the Due Process Clause overrides Congress's legislative choice to subject supporters of terrorism to suit in U.S. courts undermines "the Government's interest in combatting terrorism." *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-36 (2010) (holding courts should defer to factual and policy assessments that inform constitutional determination); *see also Atchley v. Astrazeneca UK Ltd.*, 22 F.4d 204, 234 (D.C. Cir. 2022) (finding minimum contacts comport with due process given vital national security interests).

The national security and counterterrorism interests make evident the reasonableness of this Court's exercise of jurisdiction. The Supreme Court has held that the "fair play and substantial justice" factors "sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Burger King v. Rudzewicz*, 471 U.S. 462, 477 (1985). Here, the forum's interest in adjudicating this dispute, along with the social policies and Plaintiffs' interest in obtaining relief, surely outweigh any perceived burden to DIB. Indeed, given the vital national security interests at stake, personal jurisdiction would be warranted even on a "borderline showing of minimum contacts." *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 569 (2d Cir. 1996). The contacts here are hardly borderline, and in fact establish the defendant's pervasive and witting

support of al Qaeda and its terrorist objectives. On this basis alone, DIB cannot use the Constitution or notions of fair play as a shield to avoid accountability.

## E.     There is a Statutory Basis for Personal Jurisdiction

DIB's claims regarding the lack of a statutory basis for jurisdiction are conclusory and incorrect.  Under CPLR §302(a)(2), personal jurisdiction exists over a person who, personally or through an agent, "commits a tortious act within the state." Because a co-conspirator can be considered an agent, *see Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1266 (S.D.N.Y. 1991), and Plaintiffs have presented facts to support their *prima facie* showing that DIB was a witting participant in al Qaeda's conspiracy to attack the United States, DIB is subject to personal jurisdiction before this act based on the acts of its co-conspirator, al Qaeda.

Federal Rule of Civil Procedure 4(k) provides an additional statutory basis for personal jurisdiction. Rule 4(k)(1) states that service of process establishes personal jurisdiction when service is authorized by a federal statute. The claims against DIB arise under the ATA, which incorporates a nationwide service of process provision. *See* 18 U.S.C. §2334(a); FED. R. CIV. P. 4(k)(1)(D). Rule 4(k)(2) acts "to fill a 'gap' in the enforcement of federal law[,]" permitting the exercise of jurisdiction based on the defendant's minimum contacts in the United States, consistent with principles of due process. *See United States v. Int'l Bhd. of Teamsters*, 945 F. Supp. 609, 616-17 (S.D.N.Y. 1996).

This Court already has held that service of process on DIB was proper. *See Terrorist Attacks IV*, 718 F. Supp. 2d at 498 (denying motion to dismiss for improper service of process). For the reasons set forth in greater detail *supra,* the exercise of personal jurisdiction over DIB comports with due process. Accordingly, Federal Rule 4(k) likewise serves as a statutory basis for personal jurisdiction.

28

## **CONCLUSION**

For the reasons set forth above, Plaintiffs respectfully request that Dubai Islamic Bank's

Motion for Summary Judgment and Renewed Motion for Dismissal be denied, with prejudice.

Dated:  August 3, 2022                    Respectfully submitted,

By:   */s/  Sean P. Carter*
Sean P. Carter, Esq.
J. Scott Tarbutton, Esq.
COZEN O'CONNOR
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Tel:  (215) 665-2000


By:   */s/  Robert T. Haefele*
Robert T. Haefele, Esq.
MOTLEY RICE, LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, SC 29465
Tel:  (843) 216-9000


By:   */s/  Jerry S. Goldman*
Jerry S. Goldman, Esq.
ANDERSON KILL P.C.
1251 Avenue of the Americas
New York, NY 10020
Tel:  (212) 278-1000


By:   */s/  Catherine B. Altier*
Catherine B. Altier, Esq.
FORD MARRIN ESPOSITO WITMEYER &
GLESER LLP
Wall Street Plaza
16th Floor
New York, NY 10005
Tel:  (212) 269-4900

By: _/s/ Kenneth L. Adams_
Kenneth L. Adams, Esq.
ADAMS HOLCOMB LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20006
Tel: (202) 580-8820

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of Plaintiffs' Memorandum of Law in Opposition to Defendant Dubai Islamic Bank's Motion for Summary Judgment and Renewed Motion for Dismissal, was electronically filed this 3rd day of August 2022. Notice of this filing will be served upon all parties in 03 MDL 1570 by operation of the Southern District of New York's Electronic Case Filing ("ECF") system.

_____
J. Scott Tarbutton, Esq.

LEGAL\58995015\1

31