(Previously Filed Under Seal at ECF No. 8316)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN) |
|---|---|
| | ECF CASE |

This document relates to:

*Federal Insurance Co., et al. v. Al Qaida, et al.*, 03-cv-06978
*Thomas E. Burnett, Sr., at al. v. Al Baraka Inv. & Dev. Corp., et al.*, 03-cv-09849
*Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-01923
*Continental Casualty Co., et al. v. Al Qaeda, et al.*, 04-cv-05970
*Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.*, 04-cv-07065
*Euro Brokers Inc., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-07279

## PLAINTIFFS' RESPONSE TO DEFENDANT DUBAI ISLAMIC BANK'S RULE 56.1 STATEMENT OF MATERIAL FACTS

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Plaintiffs submit this response to Defendant Dubai Islamic Bank's statement of material facts in support of its motion for summary judgment and renewed motion for dismissal for lack of personal jurisdiction, to show there are genuine issues of material facts.

## Bank Operations

1.      DIB is a publicly traded banking company organized under the laws of the United Arab Emirates ("UAE"). (Ex. 1, Sharif Decl. ¶ 13.)

**Response:** Undisputed.

2.      DIB has always been headquartered in Dubai, UAE, and has always maintained its principal place of business in Dubai. (Ex. 1, Sharif Decl. ¶ 13.)

**Response:** Undisputed.

3.      The corporate entity DIB has always conducted all its business from Dubai or its other Middle Eastern offices. (Ex. 1, Sharif Decl. ¶ 14.)

**Response:**  Undisputed.

4.      DIB has never been qualified to do its banking business in the United States or sought such qualification. (Ex. 1, Sharif Decl. ¶ 15.)

**Response:**  Undisputed.

5.      DIB has never had offices or affiliates in the United States or provided services there. (Ex. 1, Sharif Decl. ¶ 16.)

**Response:**  Undisputed for purposes of the present motion.  While the phrase "provided services there" is an improper characterization of alleged acts, (i.e., a conclusory opinion), Plaintiffs do not dispute the statement for purposes of the present motion.

6.      Apart from holding correspondent banking accounts, neither DIB nor any of its subsidiaries and affiliates have conducted any banking business in the United States. (Ex. 1, Sharif Decl. ¶¶ 14–17.)

**Response:**  Undisputed for purposes of the present motion.  While the phrase "conducted any banking business in the United States" is an improper characterization of alleged acts, (i.e., a conclusory opinion), Plaintiffs do not dispute the statement for purposes of the present motion.

7.      DIB processed 7,137,666 transactions in 1999; 8,343,935 transactions in 2000; and 10,048,210 transaction in 2001.  DIB had at least 314,100 local currency customer accounts in 1999; 371,686 local currency customer accounts in 2000; and 421,184 local currency customer accounts in 2001.  DIB had at least 203,821 different customers in 1999; 216,547

different customers in 2000; and 247,207 different customers in 2001. (Ex. 4, Dharsey Decl. ¶¶ 10–12.)

**Response:** Undisputed.

### Osama bin Laden

8.      Osama bin Laden was never an accountholder at Dubai Islamic Bank. (Ex. 1, Sharif Decl. ¶¶ 20–26, 43 and Ex. B thereto at 15–41 (certified English translation of the Arabic text in Ex. B available at Ex. 3); Ex. 6, Fine Dep. at 25:18–21, 26:23–27:4, 92:1–11, 102:17–104:11, 110:2–7, 15–19, 121:2–7, 125:9–126:6; DIB_000001–5640.)

**Response:** Disputed.  Mr. Mohamed Saeed al Sharif and Mr. Alan Fine (now Judge Fine) lack personal knowledge, and the evidence lacks foundation.  Further, while DIB has represented that it has searched its records for accounts and wire transfers *in Osama bin Laden's name* and found none, recently declassified CIA intelligence reports and other evidence show that DIB provided banking services for the benefit of Osama bin Laden, his businesses, and al Qaeda members.  *See* Plaintiffs' Averment of Facts and Counterstatement of Facts Pursuant to Rule 56.1 ("Averment") ¶¶ 70-190, attached as Exhibit 1 to the Affirmation of J. Scott Tarbutton.[1]

9.      Dubai Islamic Bank has never maintained bank accounts for a customer with the name of Osama bin Laden.  (Ex. 1, Sharif Decl. Ex. B at 15–41 (certified English translation of the Arabic text available at Ex. 3); Fine Dep. at 25:18–21, 26:23–27:4, 92:1–11, 102:17–104:11, 110:2–7, 15–19, 121:2–7, 125:9–126:6.)

---

[1] DIB's Rule 56.1 Statement ends with ¶ 67.  Consistent with Local Rule 56.1 and to avoid duplication of paragraph numbers, Plaintiffs' Averment of additional paragraphs starts with ¶ 68.

**Response:**  Disputed.  Mr. Mohamed Saeed al Sharif and Mr. Alan Fine (now Judge Fine) lack personal knowledge, and the evidence lacks foundation.  Further, while DIB has represented that it has searched its records for accounts and wire transfers *in Osama bin Laden's name* and found none, recently declassified CIA intelligence reports and other evidence show that DIB provided banking services for the benefit of Osama bin Laden, his businesses, and al Qaeda members.

10.     Osama bin Laden never transferred funds using Dubai Islamic Bank. (Ex. 6, Fine Dep. At 25:18–21.)

**Response:**  Disputed.  Mr. Alan Fine (now Judge Fine) lacks personal knowledge, and the evidence lacks foundation.  Further, recently declassified CIA intelligence reports and other evidence shows that DIB provided banking services for the benefit of Osama bin Laden, his businesses, and al Qaeda members.  This evidence shows that DIB carried out funds transfers for Osama bin Laden, although not necessarily in his own name.  *See e.g.*, Averment ¶¶ 77-99, 100-105, 106-116, 130-139.

11.     Before September 11, 2001 ("9/11"), DIB searched its records for accounts and wire transfers in Osama bin Laden's name (including spelling variations), and found no accounts or wire transfers for bin Laden. (Ex. 1, Sharif Decl. ¶¶ 20–26; Ex. 6, Fine Dep. at 25:18–21, 26:23–27:4, 92:1–11, 102:17–104:11, 110:2–7, 15–19, 121:2–7, 125:9–126:6.)

**Response:**  Disputed.  Mr. Mohamed Saeed al Sharif and Mr. Alan Fine (now Judge Fine) lack personal knowledge, and the evidence lacks foundation.  Further, while DIB has represented that it has searched its records for accounts and wire transfers *in Osama bin Laden's name* and found none, recently declassified CIA intelligence reports and other evidence show that DIB provided banking services for the benefit of Osama bin Laden, his businesses, and al

Qaeda members.  Also, the content of the CIA Documents and recent evidence released by the FBI confirms fundamental flaws in DIB's search methodology for locating requested bank accounts or transactions.  Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to which it is contended that there exists a genuine issue to be tried.  *See e.g.*, Averment ¶¶ 77-99, 100-105, 106-116, 130-139; *see also* June 16, 2022 Supplementary Expert Report of Jonathan M. Winer ¶¶ 5.7, 5.8, 7.10-7.11.2.

12.     After 9/11, DIB again searched its records for accounts for Osama bin Laden, including all name variations provided by the US Treasury Department's Office of Foreign Assets Control ("OFAC") in September and October 2001, and found no accounts for bin Laden. (Ex. 1, Sharif Decl. ¶ 43 and Ex. B thereto at 15–41 (certified English translation of the Arabic text in Ex. B available at Ex. 3).)

**Response:**  It is undisputed that DIB has represented that it has searched its records for accounts *in Osama bin Laden's name* and found none.  To the extent DIB maintains this means that DIB in fact had no accounts or wire transfers for Osama bin Laden, it is disputed.  Recently declassified CIA intelligence reports and other evidence show that DIB provided banking services for the benefit of Osama bin Laden, his businesses, and al Qaeda members.  Also, the content of the CIA Documents and recent evidence released by the FBI confirms fundamental flaws in DIB's search methodology for locating requested bank accounts or transactions. Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to which it is contended that there exists a genuine issue to be tried. *See e.g.*, Averment ¶¶ 77-99, 100-105, 106-116, 130-139; *see also* June 16, 2022 Supplementary Expert Report of Jonathan M. Winer ¶¶ 5.7, 5.8, 7.10-7.11.2.

13.     In response to Plaintiffs' discovery requests, DIB searched its records and found no accounts for any companies of Osama bin Laden that Plaintiffs identified. *E.g.*, ECF 3791-6, nos. 247–60; ECF 3791-11, App. A, nos. 103–05, 109–10, 150–51, 170, 374–76, 390–92; Letter from S. Cottreau to S. Carter (Sept. 10, 2018); DIB_000001–5640; *see also* ECF 3788 at 2–5, ECF 3791, 3791-3 to 3791-5, 3791-7.

**Response:**  It is undisputed that DIB has represented that it conducted searches for accounts in the name of companies of Osama bin Laden identified by Plaintiffs and found no accounts through those searches.  To the extent DIB maintains this means that DIB did not have relationships with those companies, it is disputed.  Recently declassified CIA intelligence reports indicate that DIB issued letters of credit in favor of bin Laden's businesses.  DIB's limited searches of accounts would not have encompassed such letter of credit arrangements.  Also, the content of the CIA Documents and recent evidence released by the FBI confirms fundamental flaws in DIB's search methodology for locating requested bank accounts or transactions.  Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to which it is contended that there exists a genuine issue to be tried.  *See* Averment ¶¶ 79, 84, 92, 108; *see also* June 16, 2022 Supplementary Expert Report of Jonathan M. Winer ¶¶ 5.7, 5.8, 7.10-7.11.2.

### Mustafa Ahmed al-Hisawi

14.     Mustafa Ahmed al-Hisawi has never been an accountholder at Dubai Islamic Bank. (Ex.4, Dharsey Decl. ¶ 14.)

**Response:**  Undisputed for purposes of the present motion.  While Mr. Haroun Dharsey lacks personal knowledge, the evidence lacks foundation, and there were inherent flaws and

limitations in DIB's search methodology, Plaintiffs do not dispute this statement for purposes of the present motion.

15.     For example, DIB has searched its records and found no accounts for Mustafa Ahmed al-Hisawi, including any of 17 name variations provided by Plaintiffs. (Ex. 4, Dharsey Decl. ¶ 14.)

**Response:**  Undisputed for purposes of the present motion.  While Mr. Haroun Dharsey lacks personal knowledge, the evidence lacks foundation, and there were inherent flaws and limitations in DIB's search methodology, Plaintiffs do not dispute this statement for purposes of the present motion.

### Oversight of DIB

16.     The UAE Central Bank did not have concerns about DIB and money laundering or terrorist financing in 1999. (Ex. 1, Sharif Decl. ¶¶ 4–5, 10–12.)

**Response:**  Disputed.  The basis for this statement is the self-serving Declaration of Mr. Mohamed Saeed al Sharif who says he "should have been alerted" to the U.S. government investigating DIB for money laundering and terror financing and he "was not aware" of any meetings between U.S. officials and the United Arab Emirates concerning DIB financing terrorism and was "never aware of" concerns of DIB involvement with terrorist financing or money laundering.  These claims do not support the above statement at all.  Further, the record shows that U.S. officials met with Emirati officials in 1999, to seek assistance in shutting down DIB's financial arrangement with al Qaeda.  The record also indicates that the government of the UAE did not take terrorism financing seriously before 9/11.  Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to

which it is contended that there exists a genuine issue to be tried. *See* Averment ¶¶ 125-128, 171-174, 188-190.

17.     The UAE Central Bank prior to 9/11 never sanctioned or issued a citation against DIB due to money-laundering or terrorist-financing concerns. (Ex. 1, Sharif Decl. ¶ 33.)

**Response:**  It is undisputed that Mohamed Saeed al Sharif states that DIB was never sanctioned for "<u>anti</u>-money laundering or <u>counter</u>-terrorism financing concerns."  To the extent DIB asserts that this demonstrates that it was not involved in terrorist financing activities, it is disputed.  Recently declassified CIA intelligence reports and other evidence show that DIB provided banking services for the benefit of Osama bin Laden, his businesses, and al Qaeda members.  Further, the evidence of record shows that the government of the UAE did not take terrorism financing seriously before 9/11.  Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to which it is contended that there exists a genuine issue to be tried.  *See e.g.*, Averment ¶¶ 70-99, 100-105, 106-116, 130-139, 188-190.

18.     The Dubai government and UAE Central Bank closely supervised DIB in 1998 and 1999, following the discovery of a fraud against DIB in March 1998. (Ex. 1, Sharif Decl. ¶¶ 18, 22; Ex. 6, Fine Dep. at 28:1–20, 29:15–18; Ex. 8 ¶ 25.)

**Response:**  Disputed.  Mr. Mohamed Saeed al Sharif and Mr. Alan Fine (now Judge Fine) lack personal knowledge, and the evidence lacks foundation.  Further, the phrase "closely supervised" is ambiguous and an improper characterization of alleged acts, (i.e. a conclusory opinion).  Also disputed to the extent DIB is relying on this statement to contend that Saeed Ahmed Lootah and other extremists hired throughout DIB no longer influenced DIB operations, or that the Dubai government or UAE Central Bank took actions to terminate DIB's support for

terrorism.  Recently declassified CIA intelligence reports and other evidence show that DIB
provided banking services for the benefit of Osama bin Laden, his businesses, and al Qaeda
members.  There is no evidence that the Dubai government addressed these issues when it
assumed oversight of DIB in 1998.  Plaintiffs submit additional paragraphs containing separate,
short and concise statements of additional material facts as to which it is contended that there
exists a genuine issue to be tried.  *See e.g.*, Averment ¶¶ 70-99, 100-105, 106-116, 130-139, 140-
158, 171-187, 188-190.

19.     The Dubai government intervened in DIB following the discovery of a fraud
against DIB in March 1998, including approving the hiring of DIB's investigator (whose
mandate was to investigate the fraud) and, in conjunction with the UAE Central Bank, installing
new senior leadership, appointing a new Executive Committee in March 1998 to oversee DIB's
operations and run the Bank, displacing the Board of Directors. (Ex. 1, Sharif Decl. ¶ 18–19; Ex.
8, Ansari Decl. ¶ 26, 28–29, 32 and Ex. C thereto; Ex. 6, Fine Dep. at 27:1–28:20, 29:15–18,
30:4–5, 32:2–15, 47:11–18, 69:10–14, 88:10–22, 89:4–7.)

**Response:**  It is undisputed that DIB hired an investigator to investigate an alleged fraud,
and that the Dubai government thereafter initiated changes to the bank's management and
leadership.  However, to the extent DIB claims that these steps resulted in a complete overhaul of
the bank, that is disputed.  Upon information and belief, members of the Lootah family and
others retained positions within the bank.

20.     A new permanent Board of Directors was appointed for DIB by early 1999. (Ex.
8, Ansari Decl. ¶ 29.)

**Response:**  It is undisputed for purposes of the present motion that a new Board of
Directors was appointed in early 1999.  However, to the extent DIB claims that these steps

resulted in a complete overhaul of the bank, that is disputed. Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to which it is contended that there exists a genuine issue to be tried. *See e.g.*, Averment ¶¶ 140-158, 159-170, 188-190.

21.     As DIB's largest shareholder after the fraud, the Dubai government "had the most influence over determining who served on" that Board of Directors, the chairman of which was Mr. Mohammed Khalfan bin Kharbash, the UAE Minister of Financial Affairs and Industry at that time. (Ex. 1, Sharif Decl. ¶ 19; Ex. 8, Ansari Decl. ¶ 29.)

**Response:**  Disputed.  The phrase "had the most influence" is ambiguous and an improper characterization of alleged acts, (i.e. a conclusory opinion).  Plaintiffs do not dispute for purposes of the present motion that the Dubai government had some influence over the composition of the Board of Directors beginning in 1999, or that Mr. Mohammed Khalfan bin Kharbash, the UAE Minister of Financial Affairs and Industry at the time, was chairman.

22.     Following the discovery of the fraud against DIB in 1998, the UAE Central Bank audited DIB daily for months, and DIB employed outside auditors to diagnose what "needed to be cleaned up" to prevent future frauds. (Ex. 6, Fine Dep. at 29:15–18, 48:1–17.)

**Response:**  Disputed as Mr. Alan Fine lacks personal knowledge, and the evidence lacks foundation.  Also disputed to the extent DIB is relying on this statement to contend that the audits were directed at identifying terrorism financing issues.

23.     The fraud against DIB discovered in 1998 had nothing to do with al Qaeda or terrorism. (Ex. 6, Fine Dep. at 89:4–7.)

**Response:** Undisputed.  However, Mr. Fine testified that one of the theories pursued in the investigation was that the funds had been diverted to terrorists or extremists.  *See* October 4, 2019 Deposition of Judge Alan Fine at 26:10-18; 31:17-24; 32:1-13.

### Response to 1999 Article

24.     In response to a July 8, 1999 New York Times article (hereinafter, "July 1999 Article") reporting a DIB relationship with bin Laden, DIB gave instructions to Mr. Alan Fine, DIB's outside US counsel at the time as a result of his retention in 1998 in connection with the fraud against DIB. (Ex. 1, Sharif Decl. ¶¶ 20, 22; Ex. 6, Fine Dep. at 23:7–13, 87, 96–98, 102:17–104:11, 110:2–7, 15–19, 112:2–115:12, 119:24–120:19.)

**Response:** Disputed to the extent DIB seeks to rely on this statement to support the notion that it conducted a thorough investigation into allegations of terror financing.  Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to which it is contended that there exists a genuine issue to be tried.  *See e.g.*, Averment ¶¶ 171-187.

25.     Following the June 1999 Article's publication, Mr. Fine contacted the US State Department in July 1999, seeking additional information to investigate about any suspected relationship with Osama bin Laden and offering DIB's full cooperation. (Ex. 1, Sharif Decl. ¶¶ 20, 22; Ex. 6, Fine Dep. at 23:7–13, 96–98, 102:17–104:11, 110:2–7, 15–19, 112:2–115:12, 119:24–120:19.)

**Response:** Disputed to the extent DIB seeks to rely on this statement to support the notion that it conducted a thorough investigation into allegations of terror financing.  Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional

material facts as to which it is contended that there exists a genuine issue to be tried. *See e.g.*, Averment ¶¶ 171-187.

26.     In response to Mr. Alan Fine's conversations with the US State Department in July 1999, the US government provided no names, dates, or account numbers to search, and no one from the US government ever followed-up with Mr. Fine, despite his request to "please call" with any information. (Ex. 6, Fine Dep. at 113:12–115:12.)

**Response:** Disputed to the extent DIB seeks to rely on this statement to support the notion that it conducted a thorough investigation into allegations of terror financing. Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to which it is contended that there exists a genuine issue to be tried. *See e.g.*, Averment ¶ 177.

27.     After concluding its investigation in response to the July 1999 Article, DIB sought a retraction from the New York Times, which published the July 1999 Article. (Ex. 1, Sharif Decl. ¶¶ 26–30; Ex. 6, Fine Dep. at 115:13–116:14, 124:4–23 and Ex. 7 thereto at 6–7 (retraction request).)

**Response:** Disputed to the extent DIB seeks to rely on this statement to support the notion that it conducted a thorough investigation into allegations of terror financing, especially because the New York Times refused to retract its statement based on CIA evidence. Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to which it is contended that there exists a genuine issue to be tried. *See* Averment ¶¶ 171-187.

**Saeed Ahmed Lootah**

28.     From at least 1995 onwards, Saeed Ahmed Lootah was not involved in DIB's

day-to-day operations. (Ex. 8, Ansari Decl. ¶¶ 34.)

**Response:** Disputed. Mr. Abdulrahman Mohamed al Ansari lacks personal knowledge

of this statement, and the evidence lacks foundation. Further, the phrase "not involved in day-to-

day operations" is ambiguous and an improper characterization of alleged acts (i.e. a conclusory

opinion). Lootah remained Chairman until at least 1998, and to the extent DIB relies on this

statement to contend that Saeed Ahmed Lootah lacked the ability to use DIB to materially

support Osama bin Laden, his businesses, and al Qaeda, CIA intelligence reports and other

evidence contradict this. Plaintiffs submit additional paragraphs containing separate, short and

concise statements of additional material facts as to which it is contended that there exists a

genuine issue to be tried. *See e.g.*, Averment ¶¶ 70-99.

29.     From at least 1995 onwards, Saeed Ahmed Lootah lacked an office at DIB. (Ex.

1, Sharif Decl. ¶ 21; Ex. 8, Ansari Decl. ¶¶ 34.)

**Response:** Disputed. Mr. Abdulrahman Mohamed al Ansari and Mr. Mohamed Saeed al

Sharif lack personal knowledge of this statement, and the evidence lacks foundation. To the

extent DIB relies on this statement to contend that Saeed Ahmed Lootah lacked the ability to use

DIB to materially support Osama bin Laden, his businesses, and al Qaeda, CIA intelligence

reports contradict this. Further, the recently declassified CIA intelligence reports indicate that

Mr. Lootah stayed away from the city because he felt the city was a corrupting influence on

Islam and his extremist beliefs. Accordingly, this statement, if true, says nothing about Mr.

Lootah's role at DIB during the time period, and instead supports Plaintiffs' theory of the case.

Plaintiffs submit additional paragraphs containing separate, short and concise statements of

additional material facts as to which it is contended that there exists a genuine issue to be tried. *See e.g.*, Averment ¶¶ 70-99; *see also* CIA_000734.

30.  From at least 1982 onwards, Saeed Ahmed Lootah never instructed any employee to open any bank accounts for or provide banking services to any particular customer. (Ex. 8, Ansari Decl. ¶¶ 33.)

**Response:**  Disputed.  Mr. Abdulrahman Mohamed al Ansari lacks personal knowledge of this statement, and the evidence lacks foundation.  Further, the Ansari Declaration states only that Lootah never instructed *Mr. al Ansari* to open an account and that he had "never heard" of Lootah instructing any other DIB employee to open any bank account or provide banking services for particular customers.  That obviously is irrelevant as Lootah could have instructed many people other than Mr. al Ansari to open an account and Mr. al Ansari would have no knowledge of that.  To the extent DIB relies on this statement to contend that Saeed Ahmed Lootah lacked the ability to use DIB to materially support Osama bin Laden, his businesses, and al Qaeda, CIA intelligence reports and other evidence contradict this.  Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to which it is contended that there exists a genuine issue to be tried.  *See e.g.*, Averment ¶¶ 70-99, 108, 159-170.

31.  From at least 1995 onwards, Saeed Ahmed Lootah did not serve on any of the Committees that ran DIB prior to 1998. (Ex. 8, Ansari Decl. ¶ 31.)

**Response:**  Disputed. Mr. Abdulrahman Mohamed al Ansari lacks personal knowledge of this statement, and the evidence lacks foundation. Further, Mr. Abdulrahman Mohamed al Ansari's declaration actually states that Mr. Lootah "was named the official Chairman of all four committees" that help run DIB on a day-to-day basis. Ex. 8, Ansari Decl. ¶ 31. To the extent DIB

14

relies on this statement to contend that Saeed Ahmed Lootah lacked the ability to use DIB to materially support Osama bin Laden, his businesses, and al Qaeda, CIA intelligence reports and other evidence contradict this. Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to which it is contended that there exists a genuine issue to be tried. *See e.g.*, Averment ¶¶ ¶¶ 70-99, 108, 159-170.

32. Following the discovery of fraud against DIB in March 1998, the Dubai government and UAE Central Bank intervened in DIB, appointing a new Executive Committee to run the Bank and leading to the installation of a new board of directors. (Ex. 1, Sharif Decl. ¶¶ 18–19; Ex. 8, Ansari Decl. ¶¶ 26, 28–29, 32 & Ex. C thereto; Ex. 6, Fine Dep. at 27:1–28:20, 29:15–18, 30:4–5, 32:2–15, 47:11–18, 69:10–14, 88:10–22, 89:4–7.)

**Response:** It is undisputed that DIB hired an investigator to investigate an alleged fraud, and that the Dubai government thereafter initiated changes to the bank's management and leadership. However, to the extent DIB claims that these steps resulted in a complete overhaul of the bank, that is disputed. Upon information and belief, members of the Lootah family and others retained positions within the bank. Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to which it is contended that there exists a genuine issue to be tried. *See e.g.*, Averment ¶¶ 70-99, 140-158, 159-170.

33. Following changes to the management and board of directors after the discovery of fraud against DIB in March 1998, Saeed Ahmed Lootah lacked any authority at DIB. (Ex. 1, Sharif Decl. ¶ 21; Ex. 8, Ansari Decl. ¶ 32.)

**Response:** Disputed. Mr. Abdulrahman Mohamed al Ansari and Mr. Mohamed Saeed al Sharif lack personal knowledge of this statement, and the evidence lacks foundation. To the extent DIB relies on this statement to contend that Saeed Ahmed Lootah lacked the ability to use

DIB to materially support Osama bin Laden, his businesses, and al Qaeda, CIA intelligence reports and other evidence contradict this. Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to which it is contended that there exists a genuine issue to be tried. *See e.g.*, Averment ¶¶ 70-99, 140-158, 159-170.

34.     Osama bin Laden gave the go ahead for the 9/11 plot after late 1998 or early 1999. (ECF 7344-3 at 23; Jenkins Dep. Tr. 72:18-73:12; M. Crenshaw Expert Rep. at 20–21; D. Lormel Expert Rep. at 7.)

**Response:**  Undisputed.

### Counter-Terrorism Financing

35.     In the fall of 1999, DIB distributed two sanctions lists from OFAC ("Two OFAC Lists") to each section of the Bank where accounts could be opened or transactions could be conducted, to ensure that DIB did not conduct any business with any party named on those lists, which included al Qaeda, bin Laden's Islamic Army, the "Usama Bin Laden Organization," and the "Usama Bin Laden Network." (Ex. 8, Ansari Decl. ¶ 16 and Exs. A, B thereto at 8–20 (certified translation of pages containing Arabic text in Exs. A, B available at Exs. 9, 10.)

**Response:**  Undisputed.

36.     Beginning in the fall of 1999, DIB's branches kept copies of the Two OFAC Lists to ensure no accounts were opened for any of the parties named on those lists. (Ex. 8, Ansari Decl. ¶ 21.)

**Response:**  Undisputed for purposes of the present motion.

37.     Beginning in the fall of 1999, DIB required employees to check the Two OFAC Lists when opening accounts and conducting transactions. (Ex. 8, Ansari Decl. ¶ 21.)

**Response:** Undisputed for purposes of the present motion.

38.     DIB's banking practices before 9/11 were consistent with applicable law and industry standards. (Ex. 12, Maaty Decl. ¶¶ 6–26, 29; Ex. 14, Maazmi Decl. ¶¶ 5–10; S. Nassar Expert Rep. at 16–24.)

**Response:** Disputed.  Declarants' statements omit relevant time periods. For example, Mr. Maaty declares that he audited DIB's account opening procedures beginning in 1999 but fails to discuss auditing prior to 1999.  Further, Mr. Maaty confirms that prior to 2003, there was no centralized location of account opening filings, so prior to that date, DIB's Internal Audit Department would have had to select a specific branch or department to audit.  Mr. Maazmi's Declaration also appears to only discuss procedures after November 2000.  Further Mr. Nassar's expert report is inadmissible.  And recently released CIA intelligence reports and other evidence refute that DIB maintained banking practices consistent with applicable law and industry standards.  Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to which it is contended that there exists a genuine issue to be tried.  *See e.g.*, Averment ¶¶ 70-99, 121-129, 159-170, 171-187, 188-190.

39.     DIB's internal audit programs before 9/11 incorporated UAE Central Bank standards, and DIB always used its best efforts to comply with the Central Bank's rules and directions. (Ex. 12, Maaty Decl. ¶¶ 6–9, 29; Ex. 14, Maazmi Decl. ¶ 19.)

**Response:** Disputed.  Declarants' statements omit relevant time periods.  For example, Mr. Maaty declares that he audited DIB's account opening procedures beginning in 1999 but fails to discuss auditing prior to 1999.  Further, Mr. Maaty confirms that prior to 2003, there was no centralized location of account opening filings, so prior to that date, DIB's Internal Audit Department would have had to select a specific branch or department to audit.  Mr. Maazmi's

17

Declaration also appears to only discuss procedures after November 2000.  And recently released CIA intelligence reports and other evidence show that DIB provided banking services for the benefit of Osama bin Laden, his businesses, and al Qaeda members.  Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to which it is contended that there exists a genuine issue to be tried.  *See e.g.*, Averment ¶¶ 70-99, 121-129, 159-170, 171-187, 188-190.

40.  DIB's auditors reviewed DIB branches and departments to ensure that they followed Central Bank circulars—including the Anti-Money Laundering Circular 24/2000 issued in late 2000. (Ex. 12, Maaty Decl. ¶¶ 6–13; Ex. 14, Maazmi Decl. ¶ 7.)

**Response:**  Disputed.  Declarants' statements omit relevant time periods. For example, Mr. Maaty declares that he audited DIB's account opening procedures beginning in 1999 but fails to discuss auditing prior to 1999.  Further, Mr. Maaty confirms that prior to 2003, there was no centralized location of account opening filings, so prior to that date, DIB's Internal Audit Department would have had to select a specific branch or department to audit.  Mr. Maazmi's Declaration also appears to only discuss procedures after November 2000.  And recently released CIA intelligence reports and other evidence show that DIB provided banking services for the benefit of Osama bin Laden, his businesses, and al Qaeda members.  Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to which it is contended that there exists a genuine issue to be tried. *See e.g.*, Averment ¶¶ 70-99, 121-129, 159-170, 171-187, 188-190.

41.  As part of implementing the UAE Central Bank's Anti-Money Laundering Circular 24/2000, DIB in early 2001 appointed an Anti-Money-Laundering Compliance Officer,

who developed policies and procedures, prepared reports, provided training, and communicated with the Central Bank. (Ex. 14, Maazmi Decl. ¶¶ 5–10.)

**Response:**  Undisputed for purposes of the present motion.  However, Plaintiffs note that this appointment occurred years after DIB was publicly implicated in the sponsorship of al Qaeda.  Plaintiffs further note that the government of the UAE was generally unwilling to provide counter-terrorism financing assistance to the United States prior to 9/11.  Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to which it is contended that there exists a genuine issue to be tried.  *See e.g.*, Averment ¶¶ 171-187, 188-190.

42.     Accounts at DIB could not be opened for any person on the UAE Central Bank's black list, other sanctions lists distributed to DIB's branches, or DIB's own black list. (Ex. 12, Maaty Decl. ¶¶ 14–24.)

**Response:**  Disputed.  Recently released CIA intelligence reports and other evidence show that DIB provided banking services for the benefit of Osama bin Laden, his businesses, and al Qaeda members.  Further, the statement relies on declaration that omits relevant time periods. Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to which it is contended that there exists a genuine issue to be tried. *See e.g.*, Averment ¶¶ 70-99, 121-129, 159-170, 171-187, 188-190.

43.     Before 9/11 and now, DIB would promptly terminate any customer relationship and report the customer to the UAE government if DIB believed the customer was funding or otherwise involved in terrorist activity. (Ex. 1, Sharif Decl. ¶¶ 32, 39; Ex. 14, Maazmi Decl. ¶ 32, Ex. 12, Maaty Decl. ¶ 28; Ex. 8, Ansari Decl. ¶ 23.)

**Response:** Disputed. Declarants lack personal knowledge, and the evidence lacks foundation. Further, recently released CIA intelligence reports and other evidence contradict this statement and confirm that DIB provided banking services for the benefit of Osama bin Laden, his businesses and al Qaeda members. Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to which it is contended that there exists a genuine issue to be tried. *See e.g.*, Averment ¶¶ 70-99, 121-129, 159-170, 171-187, 188-190.

44.     DIB has never supported al Qaeda. (Ex. 1, Sharif Decl. ¶ 36; Ex. 4, Dharsey Decl. ¶ 7; Ex. 8 ¶ 9; Ex. 12 ¶ 32; Ex. 14 ¶ 30.)

**Response:** Disputed. Declarants lack personal knowledge, and the evidence lacks foundation. Further, recently released CIA intelligence reports and other evidence contradict this statement and confirm that DIB provided banking services for the benefit of Osama bin Laden, his businesses and al Qaeda members. Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to which it is contended that there exists a genuine issue to be tried. *See e.g.*, Averment ¶¶ 70-99, 100-105, 106-116, 117-120, 121-129, 130-139, 140-158, 159-170.

45.     DIB never intended to aid a terrorist attack. (Ex. 1, Sharif Decl. ¶¶ 32, 34–39; Ex. 8, Ansari Decl. ¶¶ 9–10, 22–23; Ex. 12, Maaty Decl.¶¶ 26–32; Ex. 14, Maazmi Decl. ¶¶ 29–32; Ex. 4, Dharsey Decl. ¶¶ 7–8; Ex. 5, Hassan Dep. at 175:5–18, 198:2–9.)

**Response:** Disputed. Declarants lack personal knowledge, and the evidence lacks foundation. Further, recently released CIA intelligence reports contradict this statement and confirm that DIB provided banking services for the benefit of Osama bin Laden, his businesses and al Qaeda members. The evidence shows that DIB provided support for al Qaeda with a

specific awareness of al Qaeda's targeting of the United States, and with the specific intent that

its assistance would further that objective. Plaintiffs submit additional paragraphs containing

separate, short and concise statements of additional material facts as to which it is contended that

there exists a genuine issue to be tried. *See e.g.*, Averment ¶¶ 70-99, 100-105, 106-116, 117-

120, 121-129, 130-139, 140-158, 159-170.

46. DIB never intended to support al Qaeda. (Ex. 1, Sharif Decl. ¶¶ 32, 34–39; Ex. 8,

Ansari Decl. ¶¶ 9–10, 22–23; Ex. 12, Maaty Decl. ¶¶ 26–32; Ex. 14, Maazmi Decl. ¶¶ 29–32;

Ex. 4, Dharsey Decl. ¶¶ 7–8; Ex. 5, Hassan Dep. at 175:5–18, 198:2–9.)

**Response:** Disputed. Declarants lack personal knowledge, and the evidence lacks

foundation. Further, recently released CIA intelligence reports contradict this statement and

confirm that DIB provided banking services for the benefit of Osama bin Laden, his businesses

and al Qaeda members. The evidence shows that DIB provided support for al Qaeda with a

specific awareness of al Qaeda's targeting of the United States, and with the specific intent that

its assistance would further that objective. Plaintiffs submit additional paragraphs containing

separate, short and concise statements of additional material facts as to which it is contended that

there exists a genuine issue to be tried. *See e.g.*, Averment ¶¶ 70-99, 100-105, 106-116, 117-120,

121-129, 130-139, 140-158, 159-170.

47. DIB never provided financial services to a customer while knowing the customer

had links to al Qaeda. (Ex. 1, Sharif Decl. ¶¶ 32, 38–39; Ex. 8, Ansari Decl. ¶¶ 22–23; Ex. 12,

Maaty Decl. ¶¶ 27–28; Ex. 14, Maazmi Decl. ¶¶ 31–32; Ex. 4, Dharsey Decl. ¶ 7.)

**Response:** Disputed. Declarants lack personal knowledge, and the evidence lacks

foundation. Further, recently released CIA intelligence reports contradict this statement and

confirm that DIB provided banking services for the benefit of Osama bin Laden, his businesses

and al Qaeda members.  The evidence shows that DIB's assistance was witting, and that DIB provided support for al Qaeda with a specific awareness of al Qaeda's targeting of the United States, and with the specific intent that its assistance would further that objective.  Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to which it is contended that there exists a genuine issue to be tried.  *See* Averment ¶¶ 70-99, 100-105, 106-116, 117-120, 121-129, 130-139, 140-158, 159-170, 171-187.

### Ten Accountholder[2]

48.     Before 9/11, all ten accountholders of interest were provided only financial services available to all customers in the ordinary course of business. (Ex. 4, Dharsey Decl. ¶ 16.)

**Response:**  Disputed as declarant lacks personal knowledge and the evidence lacks foundation.  Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to which it is contended that there exists a genuine issue to be tried.  *See* Averment ¶¶ 70-99, 108, 169, 170.

49.     None of the ten accountholders were, before 9/11, "designated by that name as the subject of sanctions administered by the U.S. Office of Foreign Assets Control or the United Nations Security Council." (Ex. 19, Pls.' Resps. & Objs. to Def. DIB's First Set of Reqs. for Admis. Nos. 1–10 (Mar. 23, 2020).)

**Response:**  Disputed on relevance grounds given that Executive Order 13224 designation program did not exist prior to September 11, 2001, and DIB is required to know its customers.

---

[2] Ali Abdul Aziz Ali, Fayez Rashid Ahmed Hassan Al Qadi, Ali Saleh Mohammad Kahla Al-Marri, Seedi Al Madani Al-Ghazi Mustafa Al Tayyib, Mamdoh Mahmoud Salim Ahmed, Ahmed Ali Jumale, Barakaat Bank of Somalia, Al Baraka Exchange LLC, Khalid Amer Salim Ballayth, and International Islamic Relief Organization (referred to, collectively, as the ten accountholders throughout these related filings).

50.     DIB did not have any knowledge or awareness, prior to the September 11 Attacks, of any involvement in Al Qaeda by any of the ten accountholders. (Ex. 8, Ansari Decl. ¶¶ 9–10, 22–23; Ex. 12, Maaty Decl. ¶¶ 26–32, 31–32; Ex. 1, Sharif Decl. ¶¶ 32, 34–39; Ex. 14, Maazmi Decl. ¶¶ 29–32; Ex. 4, Dharsey ¶ 7; Ex. 5, Hassan Dep. at 175:5–18, 198:2–9; Ex. 6, Fine Dep. at 116:6–14, 130:20–131:11.)

**Response:** Disputed. Declarants lack personal knowledge, and the evidence lacks foundation. Further, the record evidence at a minimum supports an inference that DIB was aware of the account holders' al Qaeda affiliations. Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to which it is contended that there exists a genuine issue to be tried. *See* Averment ¶¶ 70-99, 140-158, 159-170.

51.     DIB did not have any knowledge or awareness, prior to the September 11 Attacks, of any use of any of the ten accountholders' DIB accounts by al Qaeda or for al Qaeda's purposes. (Ex. 8, Ansari Decl. ¶¶ 9–10, 22–23; Ex. 12, Maaty Decl. ¶¶ 26–32, 31–32; Ex. 1, Sharif Decl. ¶¶ 32, 34–39; Ex. 14, Maazmi Decl. ¶¶ 29–32; Ex. 4, Dharsey ¶ 7; Ex. 5, Hassan Dep. at 175:5–18, 198:2–9; Ex. 6, Fine Dep. at 116:6–14, 130:20–131:11.)

**Response:** Disputed. Declarants lack personal knowledge, and the evidence lacks foundation. Further, the record evidence at a minimum supports an inference that DIB was aware of the account holders' al Qaeda affiliations. Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to which it is contended that there exists a genuine issue to be tried. *See* Averment ¶¶ 70-99, 140-158, 159-170.

52.    Plaintiffs have no evidence that money was withdrawn from Ali Abdul Aziz Ali's DIB account to support the 9/11 hijackers or other 9/11 plot principals who carried out the 9/11 operation nor evidence that Ali withdrew funds before the 9/11 attacks in support of his own activities. (Ex. 14, Maazmi Decl. Ex. A at 3457–3458 (account statement) (certified English translation of the Arabic text in Ex. A available at Ex. 15); Ex. 22, Pls.' Second Suppl. Resps. & Objs. to Def. DIB's Second Set of Reqs. for Admis. No. 1 (Apr. 23, 2022).)

**Response:**  It is undisputed that Plaintiffs are not in possession of evidence that money was withdrawn from Ali Abdul Aziz Ali's DIB account for direct support to the 9/11 hijackers or other 9/11 plot principals in carrying out the 9/11 operation nor evidence that Ali withdrew funds before the 9/11 attacks in support of his own activities.  However, evidence exists to indicate the funds were available in the account for use in the event that they may have been needed and that the funds were available, withdrawn, and used immediately before the September 11 Attacks to fund Ali's escape from Dubai to Pakistan.  Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to which it is contended that there exists a genuine issue to be tried.  *See* Averment ¶¶ 130-132.

53.    No money was withdrawn or transferred from Ali Abdul Aziz Ali's DIB account to support the 9/11 hijackers or other 9/11 plot principals in carrying out the 9/11 attacks. (Ex. 14, Maazmi Decl. Ex. A at 3457–3458 (account statement) (certified English translation of the Arabic text in Ex. A available at Ex. 15); Ex. 22, Pls.' Second Suppl. Resps. & Objs. to Def. DIB's Second Set of Reqs. for Admis. No. 1 (Apr. 23, 2022).)

**Response:**  It is undisputed that Plaintiffs are not in possession of evidence that money was withdrawn or transferred from Ali Abdul Aziz Ali's DIB account for direct support to the 9/11 hijackers or other 9/11 plot principals in carrying out the 9/11 attacks.  However, evidence

24

exists to indicate the funds were available in the account for use in the event that they may have been needed and that the funds were available, withdrawn, and used immediately before the September 11 Attacks to fund Ali's escape from Dubai to Pakistan. Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to which it is contended that there exists a genuine issue to be tried. *See* Averment ¶¶ 130-132.

54. Ali Abdul Aziz Ali withdrew or transferred no funds from DIB prior to September 10, 2001. (Ex. 14, Maazmi Decl. Ex. A at 3457–3458 (account statement) (certified English translation of the Arabic text in Ex. A available at Ex. 15); Ex. 22, Pls.' Second Suppl. Resps. & Objs. to Def. DIB's Second Set of Reqs. for Admis. No. 1 (Apr. 23, 2022).)

**Response:** It is undisputed that Plaintiffs are not in possession of evidence that Ali Abdul Aziz Ali withdrew or transferred funds from DIB prior to September 10, 2001. However, evidence exists to indicate the funds were available in the account for use in the event that they may have been needed and that the funds were available, withdrawn, and used immediately before the September 11 Attacks to fund Ali's escape from Dubai to Pakistan. Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to which it is contended that there exists a genuine issue to be tried. *See* Averment ¶¶ 130-132.

55. Plaintiffs have no evidence "tracing the specific use of Ali Abdul Aziz Ali's account at DIB" to "funding al Qaeda through specific transactions." (Ex. 22, Pls.' Second Suppl. Resps. & Objs. to Def. DIB's Second Set of Reqs. for Admis. No. 11 (Apr. 23, 2022).)

**Response:** It is undisputed that Plaintiffs are not in possession of evidence tracing the specific use of Ali Abdul Aziz Ali's account at DIB for funding al Qaeda through specific transactions. However, evidence exists to indicate the funds were available in the account for

use in the event that they may have been needed and that the funds were available, withdrawn, and used immediately before the September 11 Attacks to fund Ali's escape from Dubai to Pakistan. Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to which it is contended that there exists a genuine issue to be tried. *See* Averment ¶¶ 130-132.

56. Aziz Ali's account at DIB was not used to fund Al Qaeda through specific transactions. (Ex. 14a at 3457t–3458t (account statement); Ex. 22, Pls.' Second Suppl. Resps. & Objs. to Def. DIB's Second Set of Reqs. for Admis. No. 11 (Apr. 23, 2022).)

**Response:** It is undisputed that Plaintiffs are not in possession of evidence that Aziz Ali's account at DIB was used to fund al Qaeda through specific transactions. However, evidence exists to indicate the funds were available in the account for use in the event that they may have been needed and that the funds were available, withdrawn, and used immediately before the September 11 Attacks to fund Ali's escape from Dubai to Pakistan. Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to which it is contended that there exists a genuine issue to be tried. *See* Averment ¶¶ 130-132.

57. Plaintiffs have no evidence "tracing the use of specific funds from Fayez Rashid Hassan Al Qadi's account at DIB to specific operational expenditures incurred in carrying out the 9/11 operation." (Ex. 22, Pls.' Second Suppl. Resps. & Objs. to Def. DIB's Second Set of Reqs. For Admis. No. 2 (Apr. 23, 2022).)

**Response:** It is undisputed that Plaintiffs are not in possession of evidence tracing the use of specific funds from Fayez Rashid Hassan Al Qadi's account at DIB to specific operational expenditures incurred in carrying out the 9/11 operation. However, Plaintiffs were provided 13

pages of bank statements from Al Qadi's account with dates ranging from January 1996 at the earliest to December 31, 2000, and these statements show that the funds in the account were available to Al Qadi during the period of preparation for the September 11th Attacks. Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to which it is contended that there exists a genuine issue to be tried. *See* Averment ¶ 138.

58. Fayez Rashid Hassan Al Qadi never used his account at DIB for operational expenditures incurred in carrying out the 9/11 attacks. (Ex. 18 (certified English translation of the Arabic text in account statement); Ex. 22, Pls.' Second Suppl. Resps. & Objs. to Def. DIB's Second Set of Reqs. for Admis. No. 2 (Apr. 23, 2022).)

**Response:** It is undisputed that Plaintiffs are not in possession of evidence that Fayez Rashid Hassan Al Qadi's account at DIB was used for specific operational expenditures incurred in carrying out the 9/11 attacks. However, Plaintiffs were provided 13 pages of bank statements from Al Qadi's account with dates ranging from January 1996 at the earliest to December 31, 2000, and these statements show that the funds in the account were available to Al Qadi during the period of preparation for the September 11th Attacks. Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to which it is contended that there exists a genuine issue to be tried. *See* Averment ¶ 138.

59. Fayez Rashid Hassan Al Qadi ceased using his DIB account over a year before the 9/11 attacks. (Ex. 18 (certified English translation of the Arabic text in account statement).)

**Response:** It is undisputed that Plaintiffs are not in possession of evidence that Fayez Rashid Al Qadi did not cease using his DIB account over a year before the 9/11 attacks. However, Plaintiffs were provided 13 pages of bank statements from Al Qadi's account with

dates ranging from January 1996 at the earliest to December 31, 2000, and these statements show that the funds in the account were available to Al Qadi during the period of preparation for the September 11th Attacks.  Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to which it is contended that there exists a genuine issue to be tried.  *See* Averment ¶ 138.

60.     Plaintiffs have no evidence "tracing the use of specific funds from Fayez Rashid Hassan Al Qadi's account at DIB to funding al Qaeda through specific transactions." (Ex. 22, Pls.' Second Suppl. Resps. & Objs. to Def. DIB's Second Set of Reqs. for Admis. No. 12 (Apr. 23, 2022).)

**Response:**  It is undisputed that Plaintiffs are not in possession of evidence tracing the use of specific funds from Fayez Rashid Hassan Al Qadi's account at DIB to funding al Qaeda through specific transactions.  However, Plaintiffs were provided 13 pages of bank statements from Al Qadi's account with dates ranging from January 1996 at the earliest to December 31, 2000, and these statements show that the funds in the account were available to Al Qadi during the period of preparation for the September 11th Attacks.  Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to which it is contended that there exists a genuine issue to be tried.  *See* Averment ¶ 138.

61.     Fayez Rashid Hassan Al Qadi's account at DIB was not used to fund Al Qaeda through specific transactions. (Ex. 18 (certified English translation of the Arabic text in account statement); Ex. 22, Pls.' Second Suppl. Resps. & Objs. to Def. DIB's Second Set of Reqs. For Admis. No. 12 (Apr. 23, 2022).)

**Response:**  It is undisputed that Plaintiffs are not in possession of evidence that Fayez Rashid Hassan Al Qadi's account at DIB was used to funding al Qaeda through specific

transactions. However, Plaintiffs were provided 13 pages of bank statements from Al Qadi's account with dates ranging from January 1996 at the earliest to December 31, 2000, and these statements show that the funds in the account were available to Al Qadi during the period of preparation for the September 11th Attacks. Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to which it is contended that there exists a genuine issue to be tried. *See* Averment ¶ 138.

62.     Fayez Rashid Hassan Al Qadi ceased using his DIB account before he moved to the US to commit the 9/11 attacks. (Ex. 18 (certified English translation of the Arabic text in account statement); ECF 7344-3 at 32; D. Lormel Expert Rep. at 19–20.)

   **Response:** It is undisputed that Plaintiffs are not in possession of evidence that Fayez Rashid Hassan Al Qadi's did not cease using his DIB account before he moved to the US to commit the 9/11 attacks. However, Plaintiffs were provided 13 pages of bank statements from Al Qadi's account with dates ranging from January 1996 at the earliest to December 31, 2000, and these statements show that the funds in the account were available to Al Qadi during the period of preparation for the September 11th Attacks. Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to which it is contended that there exists a genuine issue to be tried. *See* Averment ¶ 138.

63.     Neither Ali Abdul Aziz Ali nor Fayez Rashid Hassan Al Qadi had any transactions that made use of DIB's correspondent banking accounts in the United States or otherwise had transactions to or through the United States. (Ex. 4, Dharsey ¶ 15.)

   **Response:** It is undisputed that Plaintiffs are not in possession of evidence that Ali Abdul Ali or Fayez Rashid Hassan Al Qadi had any transactions that made use of DIB's correspondent banking accounts in the United States or otherwise had transactions to or through

the United States.  However, evidence exists to indicate the funds in Ali Abdul Aziz Ali's DIB

account were available for use in the event that they may have been needed and that the funds

were available, withdrawn, and used immediately before the September 11 Attacks to fund Ali's

escape.  In addition, Plaintiffs were provided 13 pages of bank statements from Al Qadi's

account with dates ranging from January 1996 at the earliest to December 31, 2000, and these

statements show that the funds in the account were available to Al Qadi during the period of

preparation for the September 11th Attacks.  Plaintiffs submit additional paragraphs containing

separate, short and concise statements of additional material facts as to which it is contended that

there exists a genuine issue to be tried.  *See* Averment ¶¶ 130-132, 138.

64.     Plaintiffs have no evidence "tracing the use of specific funds from" the other eight

accountholders[3] "at DIB to particular operational expenditures incurred in carrying out

the 9/11 operation." (Ex. 22, Pls.' Second Suppl. Resps. & Objs. to Def. DIB's Second Set of

Reqs. for Admis. Nos. 3–10 (Apr. 23, 2022).)

**Response:**  It is undisputed that Plaintiffs are not in possession of evidence tracing the

use of specific funds from the other eight accountholders accounts at DIB to particular

operational expenditures incurred in carrying out the 9/11 operation.  However, for each of the

other eight accountholders, evidence exists to indicate there were funds available in their

accounts for use in the event that they may have been needed, funds were available to these eight

other accountholders during the period of preparation for the September 11th Attacks, and the

eight other accountholders had the ability to transmit these funds in the years before the

---

[3] Ali Saleh Mohammad Kahla Al-Marri, Seedi Al Madani Al-Ghazi Mustafa Al Tayyib, Mamdoh Mahmoud Salim Ahmed, Ahmed Ali Jumale, Barakaat Bank of Somalia, Al Baraka Exchange LLC, Khalid Amer Salim Ballayth, and International Islamic Relief Organization.

September 11ᵗʰ Attacks.  Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to which it is contended that there exists a genuine issue to be tried.  *See* Averment ¶¶ 106-116, 133-139.

65.     Plaintiffs have no evidence "tracing the use of specific funds from" any of the DIB accounts of the ten accountholders "to funding al Qaeda through specific transactions." (Ex. 22, Pls.' Second Suppl. Resps. & Objs. to Def. DIB's Second Set of Reqs. for Admis. Nos. 11– 20 (Apr. 23, 2022).)

**Response:**  It is undisputed that Plaintiffs are not in possession of evidence tracing the use of specific funds from any of the DIB accounts of the ten accountholders to funding al Qaeda through specific transactions.  However, for each of the ten accountholders, evidence exists to indicate there were funds available in their account for use in the event that they may have been needed, funds were available to the ten accountholders during the period of preparation for the September 11th Attacks, and the ten accountholders had the ability to transmit these funds in the years before the September 11ᵗʰ Attacks.  In addition, in the case of Ali Abdul Aziz Ali, evidence exists to indicate that the funds in his DIB account were available, withdrawn, and used immediately before the September 11 Attacks to fund Ali's escape from Dubai to Pakistan.  Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to which it is contended that there exists a genuine issue to be tried. *See* Averment ¶¶ 106-116, 130-139.

66.     No funds from the DIB accounts of any of the ten accountholders were used to fund Al Qaeda through specific transactions. (Ex. 22, Pls.' Second Suppl. Resps. & Objs. to Def. DIB's Second Set of Reqs. for Admis. Nos. 11–20 (Apr. 23, 2022).)

**Response:**  It is undisputed that Plaintiffs are not in possession of evidence that funds from the DIB accounts of any of the ten accountholders were used to fund Al Qaeda through specific transactions.  However, for each of the ten accountholders, evidence exists to indicate there were funds available in their account for use in the event that they may have been needed, funds were available to the ten accountholders during the period of preparation for the September 11th Attacks, and the ten accountholders had the ability to transmit these funds in the years before the September 11th Attacks.  In addition, in the case of Aziz Ali, evidence exists to indicate that the funds in his DIB account were available, withdrawn, and used immediately before the September 11 Attacks to fund Ali's escape. Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to which it is contended that there exists a genuine issue to be tried.  *See* Averment ¶¶ 106-116, 130-139.

67.     No funds in any account at Dubai Islamic Bank were used by the 9/11 hijackers or other 9/11 plot principals in carrying out the 9/11 terrorist attacks. (Ex. 14, Maazmi Decl. Ex. A at 3457–3458 (account statement) (certified English translation of the Arabic text in Ex. A available at Ex. 15); Ex. 18 (certified English translation of the Arabic text in account statement); Ex. 22, Pls.' Second Suppl. Resps. & Objs. to Def. DIB's Second Set of Reqs. for Admis. Nos. 1–10 (Apr. 23, 2022).)

**Response:**  It is undisputed that Plaintiffs are not in possession of evidence that funds in any account at Dubai Islamic Bank were used by the 9/11 hijackers or other 9/11 plot principals in carrying out the 9/11 terrorist attacks.  However, evidence exists to indicate there were funds available in DIB accounts held by a 9/11 hijacker and other 9/11 plot principals for use in the event that they may have been needed, funds were available to these individuals during the period of preparation for the September 11th Attacks, and the hijacker and other plot principals

had the ability to transmit these funds in the years before the September 11th Attacks. In addition, in the case of Aziz Ali, evidence exists to indicate that the funds in his DIB account were available, withdrawn, and used immediately before the September 11 Attacks to fund Ali's escape. In addition, recently released CIA intelligence reports confirm that DIB provided banking services for the benefit of Osama bin Laden, his businesses and al Qaeda members. For example, Bin Laden's Sudan-based companies and his financial officers opened bank accounts and letters of credit at Dubai Islamic Bank (DIB) with the active help of DIB Chairman Sa'id Ahmed Lootah. Plaintiffs submit additional paragraphs containing separate, short and concise statements of additional material facts as to which it is contended that there exists a genuine issue to be tried. *See* Averment ¶¶ 70-99, 100-15, 106-116, 117-129, 130-139, 140-158, 159-170, 171-187, 188-190.

Dated: August 3, 2022                    Respectfully submitted,

                                        By: _/s/ Sean P. Carter_____
                                        Sean P. Carter, Esq.
                                        J. Scott Tarbutton, Esq.
                                        COZEN O'CONNOR
                                        1650 Market Street, Suite 2800
                                        Philadelphia, PA 19103
                                        Tel: (215) 665-2000

                                        By: _/s/ Robert T. Haefele_____
                                        Robert T. Haefele, Esq.
                                        MOTLEY RICE, LLC
                                        28 Bridgeside Boulevard
                                        P.O. Box 1792
                                        Mount Pleasant, SC 29465
                                        Tel: (843) 216-9000

                                        By: _/s/ Jerry S. Goldman_____
                                        Jerry S. Goldman, Esq.
                                        ANDERSON KILL P.C.
                                        1251 Avenue of the Americas
                                        New York, NY 10020
                                        Tel: (212) 278-1000

By:   */s/ Catherine B. Altier*     
Catherine B. Altier, Esq.
FORD MARRIN ESPOSITO WITMEYER &
GLESER LLP
Wall Street Plaza
16th Floor
New York, NY 10005
Tel:  (212) 269-4900

By:   */s/ Kenneth L. Adams*     
Kenneth L. Adams, Esq.
ADAMS HOLCOMB LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20006
Tel: (202) 580-8820

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of Plaintiffs' Response to Defendant Dubai Islamic Bank's Rule 56.1 Statement of Material Facts, was electronically filed this 3rd day of August 2022. Notice of this filing will be served upon all parties in 03 MDL 1570 by operation of the Southern District of New York's Electronic Case Filing ("ECF") system.

J. Scott Tarbutton, Esq.