# Emirates Looked Other Way While Al Qaeda Funds Flowed
*LA Times*
20 January 2002

by Stephen Braun

URL: http://www.latimes.com/news/nationworld/world/la-012002uae.story

Until Sept. 11, Osama bin Laden's terrorists in Afghanistan used the Persian Gulf crossroads of the United Arab Emirates as their lifeline to the outside world. Poor oversight in the loose federation of seven tiny sheikdoms allowed Bin Laden's Al Qaeda network and Taliban agents to set up clandestine arms-trading and money-laundering operations, according to accounts from American, United Nations, Afghan and U.A.E. sources.

In the emirate of Sharjah, Afghan-based militants linked up with Victor Bout, a Russian arms dealer accused of repeatedly violating United Nations weapon sanctions. And millions in Al Qaeda funds cascaded through the freewheeling financial institutions of the neighboring emirate of Dubai. Terrorists used a Somali warlord's money exchange, an Islamic bank once headed by the emirates' finance minister and currency houses that touted their ability to wire $1 million abroad overnight.

The U.S. investigation into the Sept. 11 attacks on the World Trade Center and the Pentagon already has exposed trails leading back to the U.A.E. More than $120,000 was channeled through emirate bank accounts to suicide pilot Mohamed Atta and other suspected hijackers.

The suicide attacks finally prompted U.A.E. officials to crack down on Al Qaeda and its front ventures. But the sudden burst of urgency followed years of passivity.

The U.A.E. was one of only three countries that maintained diplomatic relations with the now-toppled Taliban regime. Despite quiet but persistent prodding by U.S. and other Western diplomats, the emirates' ruling elite was hesitant to reckon with the growing terrorist presence. Regulations that would target terrorists would also interfere with a laissez-faire economy that has bolstered the wealth of their entwined desert kingdoms.

Strategically located between the Arabian Peninsula and South Asia, the emirates' oil-rich confederation is barely 30 years old, a cash-stoked economic wonderland. The emirates are one of the world's busiest sea and air trade hubs, where both legal and illicit freight travels on ancient dhow sailing ships and aging Soviet-era cargo planes.

The emirates' rapid economic progress won admiration from American officials. But the U.S. also grew concerned as prominent entrepreneurs forged financial ties with Islamic militants.

The emirates "moved much too slowly and without adequate dedication to really putting controls into place," said Jonathan Winer, a former deputy assistant secretary of State for international law enforcement.

The U.S. pressed the emirates for tighter banking controls but moved delicately, not wanting to offend an ally in an already-complicated relationship. The emirates allow U.S. naval ships to berth in its harbors but also oppose America's pro-Israel tilt.

Officials with the U.A.E. government, Central Bank and airports in the emirates of Sharjah and Dubai all insisted that the emirates have been vigilant foes of terrorism. "The U.A.E. has been consistent in its cooperation," a Ministry of Information spokesman said. All of the U.A.E. officials declined to be identified by name.

U.S. authorities publicly compliment the emirates on a stepped-up campaign against terrorism since Sept. 11. "I think they get it and are truly being responsive," said R. Richard Newcomb, director of the Treasury Department's Office of Foreign Asset Control. One Western diplomat based in the emirates said emirate officials "were horrified by what happened."

But current and former U.S. officials who urged the U.A.E. government to take action against Al Qaeda before Sept. 11 worry about the durability of the new commitment.

Even in the two months after the Sept. 11 attacks, "we certainly have evidence of money, fees and commissions being directed" to Al Qaeda from the now-closed exchange run by the Somali warlord, said Jimmy Gurule, Treasury's head of enforcement.

Under pressure from international finance ministries, the emirates finally agreed last year to bar their banks and currency exchanges

from concealing funds illegally obtained or meant for criminal purposes, otherwise known as money laundering.

By then, though, Al Qaeda and Taliban operatives had burrowed deep inside the emirates. Bin Laden's terrorists found "deep-pocket contributions, government assistance, charities, banks, couriers and other ways of making money," said one U.S. official. The emirates' "assistance" took the form of "preventing information, preventing action," said one former National Security Council official.

At times, even the emirates' rulers betrayed sympathy for some of Bin Laden's aims.

One telling comment came during a 1999 meeting in the emirates between emirate and American officials on the sensitive topic of money laundering. The session was so important to the U.S. that the request had come from President Clinton himself, in a letter to the emirates' president, and in another from Defense Secretary William S. Cohen to his emirates counterpart.

The Americans were intent on blocking Al Qaeda's money in the wake of its coordinated attacks on two U.S. embassies in east Africa. But a senior sheik said it would be difficult to distinguish between Al Qaeda funds used for criminal activities such as the bombings and money meant for what he viewed as more acceptable training of Islamic rebels in Bosnia and Chechnya.

The visitors were stunned.

"That was a showstopper," said a U.S. official familiar with the conversation.

**Planes Suspected in Arms Trafficking**

The cargo planes that roar along Sharjah International Airport's lone runway are discards from the Soviet empire. Battered Antonovs and Ilyushins fly off every week on freight runs that span from Africa to Central Asia.

Aviation buffs from around the world bring their cameras to snap rare photos of these durable relics. But in the last five years, dozens of the planes have also drawn the focus of investigators and diplomats looking into their clandestine role in the flow of weapons to war-torn hot spots.

In 1999, the government of Swaziland notified the emirates government that more than two dozen Sharjah-based craft might not be airworthy and that the operators may have used the planes in arms trafficking. Two of the companies named were Air Cess and Flying Dolphin, both later identified by a U.N. report as involved in gun running to Africa.

By the time the alert went out, the two businesses had picked up an important client outside of Africa: the Taliban, which had placed their national airline at Al Qaeda's disposal.

The deal came together in Sharjah, at a hotel near the airport in October 1996, just a month after the Taliban took control of Afghanistan.

Two Russians spent hours in a third-floor room that day with young Mullah Farid Ahmed, plucked by the Taliban from his Islamic studies to serve as the emirates' representative for Afghanistan's Ariana Airways.

When the discussion ended, say Afghan and emirates air industry sources, Ahmed had agreed to depend on Air Cess for wheels, tires and other military equipment for Taliban air force planes. Flying Dolphin would provide charter flights when Ariana was unavailable.

Below the surface was another agenda, said an Afghan air expert familiar with the hotel meeting. Air Cess, the expert said, became a conduit for arms and ammunition obtained for the Taliban from several Eastern European countries.

Air Cess, Flying Dolphin and Ariana allegedly came together to support an air network that delivered poison chemicals, weapons, operatives and cash to Al Qaeda and the Taliban, according to accounts from U.N., Afghan and U.S. sources.

Flying Dolphin stepped in after U.S. and U.N. sanctions aimed at stopping terrorists froze Ariana's assets and took away the Afghan firm's international landing rights. For two months in late 2000 and early 2001, a Flying Dolphin Boeing 727 shuttled twice a week to the Taliban headquarters of Kandahar, Afghanistan.

Air Cess was owned by Bout, a former Soviet air force pilot who has been accused in U.N. reports of violating weapon embargoes in Angola, Sierra Leone and Liberia. Flying Dolphin is owned by Sheik Abdullah bin Zayed al Saqr al Nahyan, who was the emirates' ambassador to the U.S. from 1989 to 1992. A member of the ruling family of Abu Dhabi, the dominant emirate, Bin Zayed is described

in a U.N. report as "a business associate of Victor Bout."

A U.S. State Department fact sheet issued in July alleges Bout heads a fleet of 60 cargo planes staffed by 300 pilots and employees and operates a shifting roster of companies used for running assault rifles, ammunition, missile launchers and helicopter gunships to the hot spots.

Repeated attempts to reach Bout through several of the emirate firms he has owned were unsuccessful. Bin Zayed acknowledged in a telephone interview that he knew Bout and Ahmed but insisted he did not work with them and never allowed his planes to be used for smuggling. "If there's anything happening like this," he said, "it's without my knowledge."

Ahmed has disappeared and could not be contacted.

A U.N. inquiry team has begun examining whether Bout was involved in violations of embargoes against the Taliban and Al Qaeda. American authorities are also investigating reports surfacing since Sept. 11 that Bout did business with Al Qaeda. In October, they were approached by a Bout operative who volunteered information about the smuggler's business ties to Al Qaeda.

Bout has never been arrested. A former Sharjah airport trade official familiar with Bout's career disagrees with the picture painted by the U.N. reports. "He's not the monster they say he is," said Richard Chichakli, who was manager of the airport's free-trade zone from 1993 to 1996.

From late 1996 on, Afghan and emirates sources said, the volume of Ariana and charter flights from Sharjah to Kandahar increased to as many as three to four flights a day. Officials of the newly installed Afghan government say many of the Ariana planes carried arms to the Taliban and Al Qaeda.

Shipments of chemical poison were also transported on several flights, said Dr. Ravan Farhadi, the Afghan permanent representative to the U.N. Citing Afghan and American intelligence reports, Farhadi said cyanide and other toxic substances purchased in Germany, the Czech Republic and Ukraine were "channeled through the United Arab Emirates" and flown out of Sharjah on Ariana cargo runs to Kandahar.

The Taliban, Farhadi said, "had nothing to do with this. These chemicals were for Bin Laden and his people. It was some of the chemicals they were using in experiments."

Bout moved his fleet in 1995 to Sharjah from Belgium, where law enforcement was shadowing him. That same year, the emirate opened its airport trade zone in a bid to rival Dubai, the nation's passenger hub. The zone nurtured a booming sea-to-air cargo industry that now moves more than 500,000 tons of freight a year.

The airport boasts on a Web site that its success stems from "the 'laissezfaire' attitude of the concerned governmental authorities such as Security, Immigration and Customs."

A U.A.E. spokesman said any arrangements among Air Cess, Flying Dolphin and Ariana were none of his government's business "as long as they are in accordance with [U.A.E.] laws and international standards." A Sharjah airport spokesman insisted that "there is no possibility that illegal goods are loaded or unloaded at Sharjah airport."

During his tenure, Chichakli said, Sharjah security restricted cargo loading to a monitored indoor facility, a move designed to prevent smuggling.

But Abdul Shukoor Arefee, a former Ariana technical crewman who flew regularly into Sharjah in 1996 and 1997, said Afghan planes would "park in isolated places" outside the loading zone, often at night. Watching crates hefted aboard in the dark, he said, he wondered "what they had in those boxes."

Ariana, Air Cess, Ahmed and Bout faced no pressure to curtail their operations until 1999, when the U.S. and U.N. began imposing sanctions on Al Qaeda and the Taliban. The emirates complied with the Ariana sanctions in 2000, but the Taliban's business contacts in Sharjah found ways to keep flying.

In late 2000, Flying Dolphin applied to the U.N. to take over Ariana's closed routes. Despite their own reports linking Flying Dolphin to arms smuggling, U.N. officials did not oppose the request.

Flying Dolphin's flights to Kandahar were usually half-filled with deported Afghan laborers and relief supplies, such as food and

medicine, Bin Zayed said.

But on Jan. 19, 2001, the U.N. halted the shuttle. Its investigators suspect some of the Flying Dolphin flights may have also carried contraband.

"If that was so," Bin Zayed asked, "why did they give me permission? I went to them and said, 'Gentlemen, I want to fly.' I waited two months. Then they wrote me a letter and told me to stop. I really had no clue what was the reason."

By last year, U.N. teams were also trying to interview emirates officials about Bout's alleged weapon flights from Sharjah--first to African states and then to the Taliban. The teams were alternately rebuffed, delayed and aided grudgingly.

When a panel exploring Bout's role in violating an arms embargo in Angola visited the emirates in early 2000, Mohamed Al-Gaith, the emirates' director-general of civil aviation, told them he had no indication that Bout's firms had transported arms using planes based in Sharjah.

On a second visit in 2001, the U.N. team pressed for a close-up look at Bout's planes, employees and other firms suspected of arms trading. Emirates officials told the team they would have to "leave the country," then restricted them to a brief jeep tour of the Sharjah airport escorted by a U.A.E. intelligence official, said Johan Peleman, a Belgium arms trafficking expert who served on both panels and a subsequent one.

Returning six months ago, this time investigating the trail of weapons to Liberia, the U.N. panel was allowed to inspect Bout's planes and interview his brother, Serguei, who insisted Bout no longer runs Air Cess.

When a new panel pushed for a visit to Sharjah to check whether the Afghan embargo was working, emirates officials offered to meet, but not before the team's term had expired. An emirates government spokesman said "there has been no denial" of help, but Peleman concluded that "the Afghanistan sanctions issue is much more sensitive to the U.A.E. than any African conflict."

The emirates' cooperation likely will be tested again in the next few weeks. A new U.N. team is preparing to ask for a return visit to Sharjah--and for emirates officials' aid in their inquiry into Afghan sanctions violations and the involvement of Ariana, Air Cess and Flying Dolphin.

There are signs U.S. pressure may have paved their way.

At the urging of American officials, the emirates early last year halted the flights of almost all foreign-registered aircraft in Sharjah. Planes already registered in Russia were exempted--and some, Peleman said, may be among those used in the arms trade.

The emirates also began requiring Sharjah's cargo carriers to install expensive airborne collision avoidance systems on all of their planes. The goal, a former National Security Council official said, was to drive up Bout's costs and "drive him away."

Bout moved--but not far. According to Peleman, he has relocated operations to the neighboring emirates of Ajmaan and Ras al Khaima--but one U.A.E. cargo handler said some Air Cess planes are still on the ground in Sharjah.

Flying Dolphin has returned to its charter flights to the Far East and Europe, Bin Zayed said. And after three months of U.S. air attacks that decimated its fleet, Ariana has made a shaky return to service, though it uses a lone Antonov solely for domestic flights in western Afghanistan.

Some U.S. officials wonder if they might have done more early on to stem arms trade between Sharjah and Afghanistan. Their dilemma, a former NSC aide said, was that, as vexing as the weapon pipeline was, there was an even larger terrorism priority in the emirates: Al Qaeda's movement of vast amounts of illicit cash.

"The reason we didn't push harder [on Bout] is that we had to prioritize," the official said. "The money was a bigger one."

**BCCI Scandal Was First Warning Sign**

Dubai is the emirates' capital of cash. Businesspeople bring in suitcases stuffed with currency. Credit cards and checks are rarities, and there are ample reasons to keep stacks of bills on hand: The airport duty-free zone, with the world's cheapest prices on liquor, electronics and jewelry. A hotel in the shape of a billowing dhow sail, where two-story rooms, complete with butler, go for $15,000 a night. An underwater seafood restaurant reached by a two-minute ride on a submarine.

But the most important industry in Dubai is banking, in every form--from the age-old hawala, which moves money informally on an honor system, to the high-tech offshore branches of foreign banks. Al Qaeda used them all.

For years before the Sept. 11 attacks, the process of rooting out Al Qaeda's seams of money in the emirates was filled with frustration for the emirates and the U.S.

From the emirates' perspective, no rules were being broken. The government collects no income tax, so there seemed to be little reason to keep tabs on who was getting what, especially when the lack of money controls made the economy so strong. The U.S. saw in the emirates a nation passive in the face of an urgent problem. "They don't do anything on their own," said Winer, the State Department official.

The first hints of trouble in the emirates' go-go financial attitude came with the 1991 collapse of the Bank of Credit & Commerce International. BCCI was accused of using depositors' money to cover as much as $15 billion in mistakes, payoffs and bad debts. The ruling family of Abu Dhabi, the dominant emirate, owned 77% of the bank.

"BCCI did dirty work for every major terrorist service in the world," said Jack Blum, a Washington money-laundering expert who was a counsel to the U.S. Senate committee that investigated the case. But, he added, "there's a substantial amount that wasn't learned" from the experience.

The emirates focused in BCCI's aftermath on preventing bank fraud, not on the way banks get used by criminal organizations, Blum said.

The emirates were quick to comply when the U.S. asked in 1998 that some Taliban accounts be closed at Dubai Islamic Bank. The bank's chairman, Mohammed Khalfan bin Kharbash, is also the U.A.E. minister for financial and industrial affairs.

But the country did not pass laws that would help prevent or unearth other similar situations. The emirates "considered money laundering to be a drug problem," Winer said. "And as illegal drugs aren't much of a problem in the U.A.E., the U.A.E. always felt it didn't have a money-laundering problem, no matter what we said."

In January 2001, U.S. officials urged U.A.E. authorities to impose reporting requirements on hawalas.

By that time, the U.S. government had been investigating a hawala called Al Barakaat for nearly two years. Al Barakaat catered to Somalis abroad who wanted to send money home. Though the expatriates lived in the U.S. and Western Europe, the last stop before Somalia was always Al Barakaat's global headquarters in Dubai, where an estimated $25 million a year in handling and money-exchange fees were skimmed off for Bin Laden's group, U.S. officials say.

Ahmed Nur Ali Jim'ale, the network's founder, is a "member of the kitchen cabinet" of Bin Laden, said a Bush administration official. Jim'ale, a Somali warlord, started the business in 1989, the same year Bin Laden created Al Qaeda. Jim'ale later opposed the presence of American troops in his homeland, and Bin Laden took credit for helping to stir tribal resistance there.

It was not until Nov. 7 that the emirates moved against Al Barakaat. Emirates agents raided the hawala's office and bank, allowing American investigators to pore over seized records. The move was "a template for our ambitions" to work together, a U.S. official said.

Yet Jim'ale, still in the emirates, has not been questioned, a Central Bank spokesman said, because judicial authorities "are awaiting evidence" from other countries. Jim'ale is contesting the freezing of the hawala's assets. The bank spokesman says of terrorist financing through Al Barakaat: "We believe it did not exist."

In the years preceding the terrorist attacks, American frustration had been mounting. It seemed as if "we spend countless hours cajoling, begging, urging for money-laundering laws, and it never happens," said a former NSC official.

So the U.S. sought outside help in 2000, from an international group of treasury departments known as the Financial Action Task Force (FATF). "What we did was we got 29 other countries to join us in threatening sanctions," said William Wechsler, who tracked terrorist finances for the National Security Council.

In a confidential report to its members in February 2000, the task force conspicuously mentioned that in the emirates "there is essentially no anti-money-laundering" activity. The slight irritated U.A.E. rulers. They summoned the U.S. ambassador to complain.

The emirates were now on notice that the task force would be deciding whether to limit the country's access to Western banks. But the

FED-PEC0212918

terrorists were moving faster than the task force.

In June 2000, Marwan Al-Shehhi received $4,790, wired to Manhattan from the emirates. Al-Shehhi would later help hijack United Airlines Flight 175, which flew into the south tower of the World Trade Center.

The next month, federal court records show, $9,485 was wired from the emirates into a Florida SunTrust bank account in the names of Al-Shehhi and Mohamed Atta, the leader of the hijacking operation.

While those transactions stayed under a $10,000 limit designed to trigger a "suspicious activity report" from banks to the federal government, others did not. On Aug. 30, 2000, $19,985 was wired from the emirates to the SunTrust account of Al-Shehhi and Atta. On Sept. 18, 2000, $69,985 was wired from the emirates to that account.

If the emirates had already put money-laundering laws in place, the sender in the emirates likely would have had to provide identification and an address--information that might have scared off the supplier or sped up any investigation of the transaction.

On Nov. 14, 2000, the emirates issued a regulation to all banks, money-changers, finance companies and other monetary institutions operating in the country. Managers and employees were "obliged personally to report a transaction aimed at money laundering to" a government unit in Abu Dhabi.

American officials were unimpressed. "The enforcement part is nil," Winer said.

By June, Mustafa Ahmed al-Hawsawi used a cash deposit to open an account at a Dubai branch of the London-based Standard Chartered Bank. He would later be tagged "the paymaster" of the Sept. 11 operation. The same day, Fayez Rashid Ahmed Hassan Al Qadi Banihammad used a cash deposit to open savings and checking accounts at the same branch, federal court documents show. He would join Al-Shehhi aboard United Flight 175.

In the summer, as the FATF began considering sanctions against the emirates, the emirates asked the U.S. for help in getting more time to enact a money-laundering law. They also made an offer: If the U.S. provided information about Bout's bank accounts, they would crack down on his assets to prove the emirates could be effective.

On Sept. 8, the top banking authorities of Oman and the emirates held a news conference to announce that they would enact laws to combat money laundering by the end of the year.

The hijackers were already returning their unused funds. On the day of the news conference, Mohamed Atta wired at least $7,860 back to Mustafa Ahmed in the emirates. The next day, hijacker Waleed M. Alshehri wired $5,000 to "Ahamad Mustafa" in the emirates. The day after that, Al-Shehhi wired $5,400 to "Mustafa Ahmad" in the emirates.

On Sept. 11, about $16,300 was deposited into Mustafa Ahmed al-Hawsawi's Dubai bank account. He moved $6,534 from Fayez Ahmed's account using a check signed and dated Sept. 10. He withdrew most of the remaining money with an ATM card.

Al Qaeda's money was on the move again.

— — —

*Times staff writer T. Christian Miller and researcher John Beckham contributed to this report.*

Because of its importance to the events of September 11, 2001, this article has been archived by by the 911truth.org Reading Room

FAIR USE NOTICE: This site contains copyrighted material the use of which has not always been specifically authorized by the copyright owner. We are making such material available in our efforts to advance understanding of criminal justice, political, human rights, economic, democracy, scientific, and social justice issues, etc. We believe this constitutes a 'fair use' of any such copyrighted material as provided for in section 107 of the US Copyright Law. In accordance with Title 17 U.S.C. Section 107, the material on this site is distributed without profit to those who have expressed a prior interest in receiving the included information for research and educational purposes. For more information go to: http://www.law.cornell.edu/uscode/17/107.shtml. If you wish to use copyrighted material from this site for purposes of your own that go beyond 'fair use', you must obtain permission from the copyright owner.