Head Office,
Airport Road,
P.O. Box 1080,
Dubai,
United Arab Emirates.

# Dubai Islamic Bank

| To: | Alan Fine Esq., Fine & Associates | Fax: | 001 305 460 4099 |
|-----|-----------------------------------|------|------------------|
| From: | Rob Ellison | Date: | 8th July, 1999 |
| Re: | Response to Paymentech | Pages: | 2. |

☐ Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

Dear Alan,

News Reports

I understand that stories to the effect that DIB banks for bin Ladin have penetrated as far as Florida; the attached appeared in the London Times last Friday.

The bank has no customer by the name of Bin Ladin and, apparently, never has.

The visit by US Government representatives was prior to the Cruise missile attack on Sudan and Afghanistan, which must now be nearly 12 months ago. I checked the facts with the Ruler's Office today. DIB was not specifically mentioned.

As you know, we have been in regular touch with US Customs and with the Justice Department and no mention has been made of any of these issues.

Of course, if any suspicion still lurks, then no doubt arrangements can be made for any US official to review the bank's records.

During the past 12 months we were for a 6 month period audited on a daily basis by UAE Central Bank. DIB has had KPMG conduct audits as at 31st March 1998 and as at 31st December 1998. Particular attention was paid to the whole area of transfers (bolted horse, so see to the stable door), but particularly to transfers for non-customers.

Previously DIB was, as you know, audited by Ernst & Young who did not raise issues concerning activities for such as bin Ladin. DIB now has Arthur Andersen commencing their interim audit work for the first 6 months of 1999.

Additionally KPMG Forensic Accountants from London went through all areas of the bank, but were particularly interested in the bank's transfer business. We are still hoping to find evidence of the theft of cash from Souk branch turning up in the transfer records; I doubt that any bank has more intensively reviewed its current and past cash transfer activities over such an extended period. Indeed, even I have contributed.

A Sissoko/bin Ladin connection was mooted in March, 1998 but no evidence was ever found. As you know, there is no connection to Islamic institutions in any of the funds tracing carried out to date.

I would appreciate your thoughts on the issue. The immediate reaction in this office is the involvement of financial terrorists or their private bankers. Black propaganda.

Regards,

*[signature]*

Page 1



**CONFIDENTIAL**

This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003159

# US traces bin Laden funds to UAE bank

### FROM IAN BRODIE
### IN WASHINGTON

OSAMA BIN LADEN, the world's most wanted terrorist, has been funnelling money through a bank in the United Arab Emirates, a senior Clinton administration official said yesterday.

A team was sent from Washington to the UAE, an American ally in the Gulf, to plead for the account to be shut down. The official said that the UAE had been "responsive".

The account was seen as hampering America's efforts to halt the extensive network of bin Laden, who is suspected of masterminding the bombings of American embassies in Kenya and Tanzania last year.

The account was reportedly at the Dubai Islamic Bank in Dubai, which is under the effective control of the UAE Government.

The CIA estimates that bin Laden has assets up to $250 million (£160 million) in legitimate and terrorist enterprises. Although exiled by his wealthy Saudi family, he is thought to receive help from Sunni Arabs in the Gulf who share his anti-Western, Islamic fundamentalist beliefs.

In addition to the UAE, a second oil-rich ally, Qatar, was said to be under suspicion of helping a suspected terrorist to escape arrest by the FBI. He was Khaled Shaikh Mohammed, wanted in America in connection with a foiled plot to blow up 12 American passenger flights over the Pacific. He was said to have made his getaway after a tip-off from a Qatari government official.

**CONFIDENTIAL**

This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003160

The Times – London
Observer

Dr. Rohalifor

before aspirin factory was bombed

Christopher Beesh ████ -6606

Thursday 7/5

Public Affairs ── Counter terrorism
Joe Reap ████ -8682

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003161

DIB

Steve Lockhitt                    8947
    ME Chief
Counter Terrorism Section

Probably withdrawals not WT
      or WT w/ U.A.E.

Not in the name of Osama Bin Laden

through cut

Dismiss
Anyway

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

# FINE & ASSOCIATES, P.A.

ATTORNEYS AND COUNSELORS

Alan S. Fine
Edward A. Licitra
Jonathan R. Rosenn

600 Douglas Centre
2600 Douglas Road
Coral Gables, Florida 33134
Telephone   (305) 448-3002
Telefax      (305) 448-3033
E-mail:  firm@fine-law.com

## TELEFAX TRANSMITTAL SHEET

Date:                                July 27, 1999

To:                                  Dubai Islamic National Bank
Attn:                                A.R. Ellison
Telefax Number:            011-971-4-483-446

To:                                  William L. Richey, P.A.
Attn:                                William L. Richey, Esquire
Telefax Number:            561-220-0172
                                          305-372-3669

From:                             Alan S. Fine, Esquire

Re:                                Dubai Islamic Bank v. Sissoko, et al.

Total number of pages:    3

============================

Following please find the draft letter to the New York Times for your review.
Please contact my office with any comments you may have.

### NOTICE TO RECIPIENT

All the pages which constitute this facsimile transmission contain information which is confidential and covered by attorney-client privilege. The information is intended solely for the use of the person to whom it is addressed or directed. If the reader of this notice is not listed above, or if the reader is not an employee or agent responsible for delivering the facsimile transmission to the addressee, then you are hereby notified that any dissemination, distribution or reproduction of any or all of these pages is strictly prohibited. If you have received this facsimile transmission in error please notify us immediately by telephone collect at (305) 448-3002 and return the original facsimile transmission to us at Fine & Associates, P.A., 600 Douglas Centre, 2600 Douglas Road, Coral Gables, Florida 33134 via the U.S. Postal Service. We will reimburse you for the postage. Thank you.

**CONFIDENTIAL**

This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003163

DRAFT

July 27, 1999

Mr. Arthur Ochs Sulzberger, Jr.
Publisher
The New York Times
229 West 43rd street
New York, NY 10035

Mr. James Risen
c/o The New York Times
229 West 43rd street
New York, NY 10035

Mr. Benjamin Weiser
c/o The New York Times
229 West 43rd street
New York, NY 10035

Re:    False Statements About Dubai Islamic Bank in July 8, 1999 Article re:
Osama Bin Laden

Dear Mr. Sulzberger, Mr. Risen, and Mr. Weiser;

We represent Dubai Islamic Bank ("DIB") of the United Arab Emirates, one of the subjects of the article authored by Mr. Risen and Mr. Weiser entitled "U.S. Officials Say Aid for Terrorists Came Through Two Persian Gulf Nations" which appeared in the July 8, 1999 edition of *The New York Times*. Our client intends to file suit for defamation against *The New York Times* for publishing knowingly false articles about DIB in this article and/or placing DIB in a false light. This letter constitutes your notice pursuant to Section 770.01 of the Florida Statutes. Set forth below are the false and defamatory statements of fact in the articles upon which DIB is considering filing suit.

DIB has never dealt directly with Osama Bin Laden, and had no knowledge or reason to believe that anyone acting on Bin Laden's behalf had been laundering his money through DIB. The following statements in the New York Times July 8 article suggest otherwise:

The Central Intelligence Agency has obtained evidence that Mr. Bin Laden has been allowed to funnel money through the Dubai Islamic Bank in Dubai, which the United Arab Emirates Government effectively controls.

The allegations that the Dubai Islamic Bank is dealing with Mr. Bin Laden seem to underscore that this scion of one of Saudia Arabia's wealthiest families retains some support among the elite of the Arab world.

United States intelligence officials said they had evidence that Mr. Bin Laden had a relationship with the bank, which they believed had been arranged with the approval of the officials who control the bank.

A senior United States official who went to the Emirates last week said that officials were "responsive" to American concerns about the Dubai bank's involvement with Mr. Bin Laden. ... The American officials also declined to

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

Mr. Arthur Ochs Sulzberger, Jr.
Mr. James Risen
Mr. Benjamin Weiser
July 27, 1999
Page 2 of 2

**say how much money they believed that Mr. Bin Laden had funneled through the bank.**

Taken as a whole, the article conveys the message that DIB knowingly assisted a terrorist in laundering money. This message is utterly and completely false.

Accordingly, we demand that you print a retraction of the portions of the article listed above. This retraction should indicate that DIB did not have any dealings with Bin Laden and that any money he received from DIB indirectly, through a legitimate customer of DIB, was transmitted to him without the knowledge or intent of DIB and not due to any fault of DIB.

We look forward to hearing from you shortly.

Sincerely,

FINE & ASSOCIATES, P.A.                    WILLIAM L. RICHEY, P.A.


Alan S. Fine                                            William L. Richey

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003165

```
HP LaserJet 3100                              SEND CONFIRMATION REPORT for
Printer/Fax/Copier/Scanner                    FINE & ASSOCIATES, P.A.
                                              305 448 3033
                                              Jul-27-99  10:55AM
```

| Job | Start Time | Usage | Phone Number or ID | Type | Pages | Mode | Status |
|-----|-----------|-------|--------------------|------|-------|------|--------|
| 232 | 7/27 10:54AM | 1'14" | 009714483446 | Send............. | 3/ 3 | EC144 | Completed.............................. |

```
        Total    1'14"    Pages Sent: 3    Pages Printed: 0
```

---

**FINE & ASSOCIATES, P.A.**
ATTORNEYS AND COUNSELORS

Alan E. Fine
Edward A. Lustice
Joachim R. Kroten

600 Douglas Centre
2600 Douglas Road
Coral Gables, Florida 33134
Telephone   (305) 448-1002
Telefax     (305) 448-3033
E-mail: finru@fine-law.com

TELEFAX TRANSMITTAL SHEET

| | |
|---|---|
| Date: | July 27, 1999 |
| To: | Dubai Islamic National Bank |
| Attn: | A.R. Ellison |
| Telefax Number: | 011-971-4-483-446 |
| To: | William L. Richey, P.A. |
| Attn: | William L. Richey, Esquire |
| Telefax Number: | 561-220-0172 |
| | 305-372-3669 |
| From: | Alan E. Fine, Esquire |
| Re: | Dubai Islamic Bank v. Sissoko, et al. |
| Total number of pages: | 3 |

Following please find the draft letter to the New York Times for your review.
Please contact my office with any comments you may have.

NOTICE TO RECIPIENT

All the pages which constitute this facsimile transmission contain information which is confidential and covered by attorney-client privilege. This information is intended solely for the use of the person to whom it is addressed to direct. If the reader of this notice is not named above, or if the reader is not an employee or agent responsible for delivering the facsimile transmission to the addressee, then you are hereby notified that any dissemination, distribution or reproduction of any or all of these papers is strictly prohibited. If you have received this facsimile transmission in error please notify us immediately by telephone (305) 448-1002 and also return the original facsimile transmission to us at Fine & Associates, P.A., 600 Douglas Centre, 2600 Douglas Road, Coral Gables, Florida 33134 via the U.S. Postal Service. We will reimburse you for the postage. Thank you.

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003166

```
HP LaserJet 3100
Printer/Fax/Copier/Scanner
```
```
SEND CONFIRMATION REPORT for
FINE & ASSOCIATES, P.A.
305 448 3033
Jul-27-99  10:56AM
```

| Job | Start Time | Usage | Phone Number or ID | Type | Pages | Mode | Status |
|-----|-----------|-------|--------------------|------|-------|------|--------|
| 233 | 7/27 10:55AM | 0'59" | 15612200172................. | Send............. | 3/ 3 | EC144 | Completed....................... |

Total    0'59"    Pages Sent: 3    Pages Printed: 0

---

## FINE & ASSOCIATES, P.A.
ATTORNEYS AND COUNSELORS

Alan S. Fine
Edward A. Licitra
Jonathan R. Rosen

400 Douglas Centre
2600 Douglas Road
Coral Gables, Florida 33134
Telephone    (305) 448-5002
Telefax    (305) 448-5003
E-mail: firm@fine-law.com

### TELEFAX TRANSMITTAL SHEET

Date: July 27, 1999

To: Dubai Islamic National Bank
Attn: A.R. Ellison
Telefax Number: 011-971-4-483-448

To: William L. Richey, P.A.
Attn: William L. Richey, Esquire
Telefax Number: 561-220-0172
305-372-3659

From: Alan S. Fine, Esquire

Re: Dubai Islamic Bank v. Sissoko, et al.

Total number of pages: 3

Following please find the draft letter to the New York Times for your review. Please contact my office with any comments you may have.

NOTICE TO RECIPIENT

All the pages which constitute this facsimile transmission contain information which is confidential and covered by applicable privilege. The information is intended solely for the use of the addressee to whom it is addressed or his/her. If the reader of this notice is not listed above, or if the reader is not an employee or agent responsible for delivering this facsimile transmission to the addressee, then you are hereby notified that any dissemination, distribution or reproduction of any or all of these pages is strictly prohibited. If you have received this facsimile transmission in error please notify us immediately by telephone collect at (305) 448-5002 and return the original facsimile transmission to us at Fine & Associates, P.A., 400 Douglas Centre, 2600 Douglas Road, Coral Gables, Florida 33134 via the U.S. Postal Service. We will reimburse you for the postage. Thank you.

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003167

```
HP LaserJet 3100                                    SEND CONFIRMATION REPORT for
Printer/Fax/Copier/Scanner                          FINE & ASSOCIATES, P.A.
                                                    305 448 3033
                                                    Jul-27-99  11:02AM
```

| Job | Start Time | Usage | Phone Number or ID | Type | Pages | Mode | Status |
|-----|-----------|-------|--------------------|------|-------|------|--------|
| 234 | 7/27 10:56AM | 0'00" | 3053723669 | Send | 0/ 3 | | Remote Fax was Busy ......... 961 |
| 234 | 7/27 11:00AM | 1'38" | 3053723669 | Send | 3/ 3 | EC 96 | Completed |

Total    1'38"    Pages Sent: 3    Pages Printed: 0

## FINE & ASSOCIATES, P.A.
ATTORNEYS AND COUNSELORS

Alan E. Fine
Edward A. Liptan
Jonathan E. Rosnin

600 Douglas Center
2600 Douglas Road
Coral Gables, Florida 33134
Telephone  (305) 448-3002
Telefax    (305) 448-3033
E-mail  fine@fine-law.com

### TELEFAX TRANSMITTAL SHEET

Date:            July 27, 1999

To:              Dubai Islamic National Bank
Attn:            A.R. Elfson
Telefax Number:  011-971-4-483-446

To:              William L. Richey, P.A.
Attn:            William L. Richey, Esquire
Telefax Number:  561-220-0172
                 305-372-3669

From:            Alan S. Fine, Esquire

Re:              Dubai Islamic Bank v. Blaszko, et al.

Total number of pages:   3

Following please find the draft letter to the New York Times for your review. Please contact my office with any comments you may have.

#### NOTICE TO RECIPIENT

All the pages which constitute this facsimile transmission contain information which is confidential and covered by attorney-client privilege...

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003168

# FINE & ASSOCIATES, P.A.
ATTORNEYS AND COUNSELORS

Alan S. Fine
Edward A. Licitra
Jonathan R. Rosenn

600 Douglas Centre
2600 Douglas Road
Coral Gables, Florida 33134
Telephone  (305) 448-3002
Telefax    (305) 448-3033
E-mail: firm@fine-law.com

### TELEFAX TRANSMITTAL SHEET

Date:                    July 27, 1999

To:                      Dubai Islamic National Bank
Attn:                    A.R. Ellison
Telefax Number:          011-971-4-483-446

To:                      William L. Richey, P.A.
Attn:                    William L. Richey, Esquire
Telefax Number:          561-220-0172
                         305-372-3669

From:                    Alan S. Fine, Esquire

Re:                      Dubai Islamic Bank v. Sissoko, et al.

Total number of pages:   3

========================

Following please find the draft letter to the New York Times for your review.
Please contact my office with any comments you may have.

#### NOTICE TO RECIPIENT

All the pages which constitute this facsimile transmission contain information which is confidential and covered by attorney-client privilege.  The information is intended solely for the use of the person to whom it is addressed or directed.  If the reader of this notice is not listed above, or if the reader is not an employee or agent responsible for delivering the facsimile transmission to the addressee, then you are hereby notified that any dissemination, distribution or reproduction of any or all of these pages is strictly prohibited.  If you have received this facsimile transmission in error please notify us immediately by telephone collect at (305) 448-3002 and return the original facsimile transmission to us at Fine & Associates, P.A., 600 Douglas Centre, 2600 Douglas Road, Coral Gables, Florida 33134 via the U.S. Postal Service.  We will reimburse you for the postage.  Thank you.

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003169

DRAFT

July 27, 1999

Mr. Arthur Ochs Sulzberger, Jr.
Publisher
The New York Times
229 West 43rd street
New York, NY 10035

Mr. James Risen
c/o The New York Times
229 West 43rd street
New York, NY 10035

Mr. Benjamin Weiser
c/o The New York Times
229 West 43rd street
New York, NY 10035

Re: **False Statements About Dubai Islamic Bank in July 8, 1999 Article re: Osama Bin Laden**

Dear Mr. Sulzberger, Mr. Risen, and Mr. Weiser:

We represent Dubai Islamic Bank ("DIB") of the United Arab Emirates, one of the subjects of the article authored by Mr. Risen and Mr. Weiser entitled "U.S. Officials Say Aid for Terrorists Came Through Two Persian Gulf Nations" which appeared in the July 8, 1999 edition of *The New York Times*. Our client intends to file suit for defamation against *The New York Times* for publishing knowingly false articles about DIB in this article and/or placing DIB in a false light. This letter constitutes your notice pursuant to Section 770.01 of the Florida Statutes. Set forth below are the false and defamatory statements of fact in the articles upon which DIB is considering filing suit.

DIB has never dealt directly with Osada Bin Laden, and had no knowledge or reason to believe that anyone acting on Bin Laden's behalf had been laundering his money through DIB. The following statements in the New York Times July 8 article suggest otherwise:

**The Central Intelligence Agency has obtained evidence that Mr. Bin Laden has been allowed to funnel money through the Dubai Islamic Bank in Dubai, which the United Arab Emirates Government effectively controls.**

**The allegations that the Dubai Islamic Bank is dealing with Mr. Bin Laden seem to underscore that this scion of one of Saudia Arabia's wealthiest families retains some support among the elite of the Arab world.**

**United States intelligence officials said they had evidence that Mr. Bin Laden had a relationship with the bank, which they believed had been arranged with the approval of the officials who control the bank,**

**A senior United States official who went to the Emirates last week said that officials were "responsive" to American concerns about the Dubai bank's involvement with Mr. Bin Laden. ... The American officials also declined to**

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003170

Mr. Arthur Ochs Sulzberger, Jr.
Mr. James Risen
Mr. Benjamin Weiser
July 27, 1999
Page 2 of 2

**say how much money they believed that Mr. Bin Laden had funnele** **through the bank.**

Taken as a whole, the article conveys the message that DIB knowingly assisted a terrorist in laundering money. This message is utterly and completely false.

Accordingly, we demand that you print a retraction of the portions of the article listed above. This retraction should indicate that DIB did not have any dealings with Bin Laden and that any money he received from DIB indirectly, through a legitimate customer of DIB, was transmitted to him without the knowledge or intent of DIB and not due to any fault of DIB.

We look forward to hearing from you shortly.

Sincerely,

FINE & ASSOCIATES, P.A.                    WILLIAM L. RICHEY, P.A.

Alan S. Fine                                William L. Richey

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003171

DUBAI ISLAMIC BANK    Fax:009714-2955396         31 Jul '99  11:25    P.01/02



Head Office,
Airport Road,
P.O. Box 1080,
Dubai,
United Arab Emirates.

# Dubai Islamic Bank

| To: | Alan Fine Esq., Fine & Associates | Fax: | 001 305 460 4099 |
| From: | Rob Ellison | Date: | 31ˢᵗ July, 1999 |
| Re: | New York Times | Pages: | 1. |

☐ Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

* * * * * * * * * * * * * * *

Dear Alan,

### New York Times – Unsubstantiated Report - Retraction

While I am in favour of sending the letter as soon as possible, I think it is only worthwhile once I have approval to follow up; the additional legal fees need to be sanctioned.

A further payment to Fine & Associates - outstanding as at 7ᵗʰ June - has now been approved and the paperwork for payment is in preparation

Regards,

A. R. Ellison

Page 1

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

**DUBAI ISLAMIC BANK**

Public Joint Stock Company

( Incorporated in U.A.E. )

**Head Office**





بَنْـكُ دُبَيِّ الإسْــلاَمي

شــركة مساهمة عــامة

(تأسس في دولة الإمارات العربية المتحدة)

المركز الرئيسي

Alan Fine Esq.
Fine and Associates, P.A.,
600 Douglas Centre,
2600 Douglas Road,
Coral Gables,
Florida - 33134.

Sunday November 14, 1999.  (Letter 1).

Dear Alan,

**New York Times**

After a short delay I have now had approval for you to send the letter which you drafted
in response to the article in New York Times and the State Department briefing.

I would be grateful if you could please send the letter and await a response. However , it
is not the bank's immediate intention to issue proceedings.

Yours sincerely,

A. R. Ellison.

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

DIB_003173

**Rob Ellison**
Consulting for

Dubai Islamic Bank pjsc,
P.O. Box 1080,
Airport Road,
Dubai, U.A.E.

| | |
|---|---|
| **To:** | Executive Committee |
| **Date:** | 15th September, 1999. |
| **Subject:** | **New York Times**<br>**United States State Department** |

In July there were news stories about DIB assisting Ossama Bin Ladin by money laundering. There were no facts to back up the story, but the day after the story appeared the US State Department briefing covered the topic and appeared to confirm the story.

I attach copies of the New York Times story and of the transcript of the briefing.

REDACTED

REDACTED

Our Miami lawyers have recommended that they should write to New York Times on DIB's behalf in the form of the attached draft letter, indicating that the story has no basis in fact and push them to print a retraction.

If the New York Times does not have evidence (which seems most unlikely), but has relied on innuendo and rumour, then DIB could consider taking legal action.

The matter does have another and more serious side; it would be possible for the authorities in the USA to freeze DIB's assets if it was considered that there had been assistance to a well-known terrorist.

Also, the reports have raised questions in the minds of DIB's advisers and friends in the USA; it would be best to lay them to rest.

I would like you approval that the attached letter be sent. Whether the matter is taken further would depend on the response made by the New York Times.

A. R. Ellison

*Mr. Rob Ellison.*
*I have discussed this matter with*
*Mr. Ebrahim Fayez & okayed*
*the action*
*Mohamed Alshaik* 13/1/99

Office: Direct Line (Int.+) 971 4 2954973    Fax    (Int.+) 971 4 2955396
Residence: Phone + Fax    (Int.+) ▮▮▮3446
Mobile (U.K. GSM: Int.+) ▮▮▮9208

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DRAFT

Mr. Arthur Ochs Sulzberger, Jr. Mr. James Risen Mr. Benjamin Weiser
Publisher c/o The New York Times c/o The New York Times
The New York Times 229 West 43rd street 229 West 43rd street
229 West 43rd street New York, NY 10035 New York, NY 10035
New York, NY 10035

  Re: **False Statements About Dubai Islamic Bank in July 8, 1999 Article re: Osama Bin Laden**

Dear Mr. Sulzberger, Mr. Risen, and Mr. Weiser:

  We represent Dubai Islamic Bank ("DIB") of the United Arab Emirates, one of the subjects of the article authored by Mr. Rizen and Mr. Weiser entitled "U.S. Officials Say Aid for Terrorists Came Through Two Persian Gulf Nations" which appeared in the July 8, 1999 edition of *The New York Times*. Our client intends to file suit for defamation against *The New York Times* for publishing knowingly false articles about DIB in this article and/or placing DIB in a false light. This letter constitutes your notice pursuant to Section 770.01 of the Florida Statutes. Set forth below are the false and defamatory statements of fact in the articles upon which DIB is considering filing suit.

  DIB has never dealt directly with Osama Bin Laden, and had no knowledge or reason to believe that anyone acting on Bin Laden's behalf had been laundering his money through DIB. The following statements in the New York Times July 8 article suggest otherwise:

> The Central Intelligence Agency has obtained evidence that Mr. Bin Laden has been allowed to funnel money through the Dubai Islamic Bank in Dubai, which the United Arab Emirates Government effectively controls.

> The allegations that the Dubai Islamic Bank is dealing with Mr. Bin Laden seem to underscore that this scion of one of Saudia Arabia's wealthiest families retains some support among the elite of the Arab world.

> United States Intelligence officials said they had evidence that Mr. Bin Laden had a relationship with the bank, which they believed had been arranged with the approval of the officials who control the bank.

> A senior United States official who went to the Emirates last week said that officials were "responsive" to American concerns about the Dubai bank's involvement with Mr. Bin Laden. ... The American officials also declined to

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

Mr. Arthur Ochs Sulzberger, Jr
Mr. James Risen
Mr. Benjamin Weiser
July 27, 1999
Page 2 of 2

say how much money they believed that Mr. Bin Laden had funneled
through the bank.

Taken as a whole, the article conveys the message that DIB knowingly assisted a terrorist in
laundering money. This message is utterly and completely false.

Accordingly, we demand that you print a retraction of the portions of the article listed
above. This retraction should indicate that DIB did not have any dealings with Bin Laden and
that any money he received from DIB indirectly, through a legitimate customer of DIB, was
transmitted to him without the knowledge or intent of DIB and not due to any fault of DIB.

We look forward to hearing from you shortly.

Sincerely,

FINE & ASSOCIATES, P.A.                     WILLIAM L. RICHEY, P.A.

Alan S. Fine                                William L. Richey

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003176

... ... ...          ... ...  12.45,          rage 1/3

# FINE & MARTINEZ, P.A.
ATTORNEYS AND COUNSELORS

Jose M. Ferrer
Alan S. Fine
Edward A. Licitra
Juan C. Martinez
**
Guy A. Rasco
Of Counsel

The Colonnade, Suite 710
2333 Ponce de Leon Boulevard
Coral Gables, Florida 33134
Telephone     (305) 424-2400
Telefax       (305) 424-2401
E-mail: grasco@fine-law.com

## TELEFAX TRANSMITTAL SHEET
## ATTORNEY/CLIENT PRIVILEGED CORRESPONDENCE

| | |
|---|---|
| Date: | October 23, 2001 |
| To: | A.R. Ellison |
| Telefax Number: | 011-9714-295-4973 |
| From: | Edward Licitra, Esq. |
| Re: | DIB |
| Total number of pages: | 3 |

### NOTICE TO RECIPIENT

All the pages which constitute this facsimile transmission contain information which is confidential and covered by attorney-client privilege. The information is intended solely for the use of the person to whom it is addressed or directed. If the reader of this notice is not listed above, or if the reader is not an employee or agent responsible for delivering the facsimile transmission to the addressee, then you are hereby notified that any dissemination, distribution or reproduction of any or all of these pages is strictly prohibited. If you have received this facsimile transmission in error please notify us immediately by telephone collect at (305) 424-2400 and return the original facsimile transmission to us at Fine & Martinez, P.A., The Colonnade, Suite 710, 2333 Ponce de Leon Boulevard, Coral Gables, Florida 33134 via the U.S. Postal Service. We will reimburse you for the postage. Thank you.

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

Dear Mr. Liptak:

    On January 4 of last year, we wrote to Arthur Ochs Sulzberger, Jr., James Risen, and Benjamin Weiser of the *Times* on behalf of our client the Dubai Islamic Bank with regard to an article published in the *Times* on July 8, 1999, under the headline, "U.S. Officials Say Aid for Terrorists Came Through Two Persian Gulf Nations". In that letter we informed you that insofar as your article suggested that Osama bin Laden has "been allowed" to "funnel money" through the Dubai Islamic Bank and otherwise suggested that there is any type of banking relationship between Mr. bin Laden and Dubai Islamic Bank, your article is in error. We requested a retraction.

    You responded by letter dated January 14, 2000, informing us that the *Times* declined our request for a retraction because "[t]he article accurately reported the statements of United States government officials", and because "we believe it to be true" that "the bank did business with Osama Bin Laden". Although we did not find this response satisfactory, no further action was taken on the matter.

    As you will readily understand, it is now a matter of particular urgency to our client that the public not be misinformed by false allegations of a connection with Mr. bin Laden. The economic harm flowing from such falsehoods is particularly acute now that assertions in prestigious newspapers such as the *Times* live forever on the internet (which you may readily see for yourselves by using "Dubai Islamic Bank" in conjunction with "bin Laden" as a Yahoo search term), and are not merely the province of researchers willing to dedicate themselves to hours in front of microfilm viewers.

    First, we would like you to know unequivocally that in the wake of the allegations appearing in your newspaper, the banking authorities in Dubai have conducted an exhaustive search of the records of the Dubai Islamic Bank, and have found no indication that Osama bin Laden was ever a customer of the Bank; that he ever had a "relationship" with the Bank, much less one "arranged with the approval of the officials who control the bank" as alleged in your article; that he ever "funneled money through" the Bank; or much less that he was ever "allowed" to do so as alleged in your article.

    Moreover, we would like you to be aware that the additional support relied on in your letter of January 14 for concluding that there is a bin Laden connection with Dubai Islamic Bank is simply a misinterpretation on your part. While it is true that Dubai Islamic Bank made efforts to "clean up" the bank "and restore its reputation", these efforts were not directed at the nonexistent problem of allowing terrorists to funnel money through the Bank. They were instead directed to a theft of significant amounts of bank funds engineered by persons outside the bank, using a few Bank employees as facilitators. No "cleanup" has been necessary with regard to use of the Bank in support of terrorism.

    That said, we would like to point out to you that your article was not limited to reporting the statements of United States government officials. Among the assertions in your article was the following:

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003187

> The Central Intelligence Agency has obtained evidence that
> Mr. Bin Laden has been allowed to funnel money through
> the Dubai Islamic Bank in Dubai, which the United Arab
> Emirates Government effectively controls.

This passage does not purport to report statements of government officials.
Rather, it is clearly the *Times'* own assertion regarding the existence and significance of
the "evidence" referred to.

If the above-quoted passage is true as your January 14 letter claims, we would ask
that you share with us the evidence referred to so that our client can take whatever steps
are necessary to purge itself of any connection with Mr. bin Laden and his associates – a
matter made more pressing because no such connection has been discovered to date
despite an exhaustive examination by Dubai Islamic Bank and United Arab Emirates
officials. Obviously, your compliance with this request would not merely assist the
Bank, but would favorably impact United States and international security as well.

If, however, you cannot confirm the truth of the above-quoted passage, we again
request in the strongest terms that the *Times* publish a retraction of these inaccurate
statements. The *Times'* failure to do so, in light of the serious ongoing damage to the
Bank's business reputation resulting from the inaccuracies set forth in the article, would
unfortunately obligate the Bank to take more aggressive measures to vindicate its good
name. The *Times* can make any such actions unnecessary by taking the ethically
responsible step of either supporting its claims or retracting them.

We look forward to your prompt reply.

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003188



**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003189

MEMORANDUM

| | |
|---|---|
| **TO:** | Alan Fine |
| **FROM:** | Jonathan Rosenn |
| **RE:** | *DIB*; possible defamation claim against New York Times |
| **DATE:** | March 2, 2000 |

**Facts:** On July 8, 1999, the New York Times published an article entitled *U.S. Officials Say Aid for Terrorists Came Through Two Persian Gulf Nations*, which made the following statements regarding Dubai Islamic Bank and Osama bin Laden, a Saudi exile charged with the bombings of U.S. embassies in Africa in 1998:

> 1. **The Central Intelligence Agency has obtained evidence that Mr. bin Laden has been allowed to funnel money through the Dubai Islamic Bank in Dubai, which the United Arab Emirates Government effectively controls.**

> 2. **The allegations that the Dubai Islamic Bank is dealing with Mr. bin Laden seem to underscore that this scion of one of Saudi Arabia's wealthiest families retains some support among the elite of the Arab world.**

> 3. **United States intelligence officials said they had evidence that Mr. bin Laden had a relationship with the bank, which they believed had been arranged with the approval of the officials who control the bank.**

> 4. **A senior United States official who went to the Emirates last week said that officials were "responsive" to American concerns about the Dubai Islamic Bank's involvement with Mr. bin Laden. ... The American officials also declined to say how much money they believed that Mr. bin Laden had funneled through the bank.**

Contrary to the statements above, Mr. bin Laden never had any relationship with DIB, and any funds that bin Laden may have funneled through DIB were done so without DIB's knowledge or consent (presumably through individual or corporate accountholders at DIB unknowingly connected to bin Laden.)

Nonetheless, at a press conference shortly after the article was published, a spokesperson for the state department in the context of a discussion of the article and of "terrorist money laundering" stated that the "the government of the United Arab Emirates has told us that the Dubai Emirate government has taken steps to clean up the bank, the Dubai Islamic Bank, and restore its reputation".

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

On January 4, 2000, DIB sent the New York Times a letter demanding a retraction of the portions of the article quoted above, and indicating why those statements were false.

On January 14, 2000, the New York Times responded in writing, indicating that it would not print a retraction because it believed the article was factually accurate. Additionally, the letter stated that DIB had misread the article, which did not state that money was laundered through DIB, but only that DIB did business with bin Laden. Finally, the letter mentioned the State Department's after-the-fact "confirmation" of the truth of the statements in the article.

**Issue: Does DIB have a viable claim against the New York Times for libel?**

**Analysis**:   Possibly.   Nonetheless, there are two formidable obstacles to DIB's successful prosecution of a claim for libel on the facts detailed above:

1) **Actual Malice Standard for Public Figures/Officials.**  Where a newspaper or broadcaster publishes allegedly defamatory statements about a matter of public concern *and* regarding a public official or public figure, the plaintiff must show that the published statements were not only false and defamatory but were published with actual malice by the publisher. Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974) (holding that New York Times Co. v. Sullivan standard of actual malice was not applicable to statements about a private person);Miami Herald Publishing Company v. Ane, 458 So.2d 239 (Fla. 1984)(speech is not protected simply because it is directed at a matter of public concern; plaintiff must also be a public figure).

Thus, if DIB is deemed a public figure for first amendment purposes, then DIB would have to prove that the New York Times had actual knowledge of the falsity of its statements *or* reckless disregard for the truth when it published the article at issue. New York Times Co. v. Sullivan, 376 U.S. 254 (1964).   In light of the New York Times' reliance upon government officials as sources of information for the article, proving actual malice would be highly problematic to say the least.

Public figures may be either general or limited.   General public figures are those who, by reason of fame or notoriety in a community, will in all cases be required to prove actual malice.   Saro Corporation v. Waterman Broadcasting Corporation, 595 So.2d 87 (Fla. 2d DCA 1992).   Government employees who have or appear to the public to have substantial responsibility for or control over the conduct of governmental affairs have been held to be general public figures. Clark v. Fernandina Beach News-Leader, Inc., 1994 WL 432980 (Fla. Cir. Ct. 1994), citing Rosenblatt v. Baer, 383 U.S. 75 (1966) (holding that deputy sheriff is a public figure).

Although there is no case law directly on point, it would logically follow that for First Amendment purposes, a foreign government is a public figure (or entity).  DIB is effectively controlled by the government of the United Arab Emirates, as it is a joint

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003191

stock company whose voting shares are government-owned. Accordingly, it is not inconceivable that by extension the bank might be considered a general public figure.

A limited public figure, on the other hand, is one who has acquired fame or notoriety because of involvement in a particular public controversy. Saro at 89. A defendant asserting that a plaintiff is a limited public figure with reference to the published statements must establish (1) that there is a public controversy (2) that the plaintiff played a sufficiently central role in the controversy (3) that the alleged defamation was germane to plaintiff's involvement in that controversy; Friedgood v. Peters Publishing Co., 521 So.2d 236 (Fla. 4th DCA 1988) (holding that daughter of a murder defendant in a highly publicized case was a limited public figure) ; see also Della-Donna v. Gore Newspapers Company, 489 So.2d 72 (Fla. 4th DCA 1986) (holding that attorney involved in dispute with trustees over final disbursement of private donor's 14.5 million-dollar gift to a private university was a limited public figure, because he was centrally involved in a public controversy); see also Southern Air Transport, Inc. v. Post-Newsweek Stations, Florida, Inc., 568 So.2d 927 (Fla. 3d DCA 1990) (holding that air transportation company that covertly supplied arms to Nicaragua in Iron-Contra scandal was a limited public figure).

Although the New York Times might argue that DIB is a limited public figure because of its relationship to known terrorist bin Laden, this is the very fact that DIB disputes as false.    Clearly, one cannot be transformed into a limited public figure through a false and defamatory statement; rather, a plaintiff must be a limited public figure prior to the alleged defamation; Rety v. Green, 546 So.2d 410 (Fla. 3d DCA 1989).

## 2. The Neutral Reporting Privilege

Second, The "neutral reporting privilege" may afford First Amendment protection to the New York Times' publication of remarks by U.S. public officials about DIB. Nonetheless, because the various cases applying the privilege define it differently, the scope of the *neutral reporting privilege* is unclear.

Most of the case law suggests that the privilege is limited to statements made in official public proceedings. In Ortega v. Post-Newsweek Stations, Florida Inc., 510 So.2d 972 (Fla. 3d DCA 1987), for example, the court defined the privilege as the press's qualified right to report on matters brought out in public proceedings. As long as the press takes reasonable measures to insure that the report of the proceeding is accurate, the speech is protected.

In Ortega, two news reports accurately paraphrased allegedly defamatory statements made by a witness in a House Subcommittee hearing. The court held that the television station's broadcast was protected by the neutral reporting privilege. Similarly, in Huszar v. Gross, 468 So.2d 512 (Fla. 1st DCA 1985), the court held that a

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

neutral report on the status of lawsuit and the allegedly defamatory remarks of a government attorney involved in suit was subject to privilege.

Nonetheless, in Smith v. Taylor County Publishing Company, Inc., 443 So.2d 1042 (Fla. 1st DCA 1983) the court applied the privilege to a newspaper article that simply reprinted statements made by police officer and a third party concerning a physical confrontation between the author of a letter to the newspaper about the tactics of another newspaper, and one of the principals of that newspaper. While the opinion does not indicate whether the statements were made in the context of a lawsuit or other public proceeding, the court describes the privilege as extending to a disinterested report of a newsworthy event.

As far as we know in the instant case, the statements relied upon by the New York Times were not made in the context of official proceedings. While the context of the statements requires confirmation, the only official statement that we know of was made by the state department after the article was published.

Moreover, it is clear that the privilege applies only if the newspaper's rendition or paraphrasing of the statements is accurate. Walsh v. Miami Herald Publishing Co., 80 So.2d 669 (Fla. 1955); Ortega at 975.

Assuming the neutral reporting privilege is applicable to statements made outside of official proceedings, these statements would be actionable if the public officials were inaccurately quoted and the inaccuracy were defamatory. Again, we do not know at this point whether the article accurately represents the statements purportedly made by the CIA and other administration officials.

The only statement in the article about DIB not directly attributable to a public official is the one in the fourth paragraph indicating that the CIA has obtained evidence that Mr. bin Laden *has been allowed to funnel money through DIB*. If the CIA has no such evidence, this statement would appear defamatory and non-privileged, as The New York Times is not simply reporting on and reproducing the statement of a public official in a neutral fashion, but asserting the existence of evidence that money was laundered through DIB.

Although the statement utilizes the passive voice, thereby defaming DIB only by implication (i.e. it is not clear *who* has allowed bin Laden to funnel the money through DIB), the words may nonetheless be actionable, as they should be given a reasonable construction if view of their context. Wolfson v. Kirk, 273 So.2d 774 (Fla. 4th DCA 1973); Centro Nautico Representacoes Nauticas Ltda v. International Marine Co-op Ltd., 719 So.2d 967 (Fla. 4th DCA 1998)(quashed on other grounds). In light of the New York Times' assertion that DIB is government-controlled and the statements in the article that bin Laden's relationship with the bank was arranged with the approval of bank officials, it would appear that the article clearly implies that DIB knowingly funneled money to a known terrorist.

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

CONCLUSION: Assuming DIB can prove that it had no connection with bin Laden and did not knowingly or negligently provide him with aid, DIB may have a viable claim against the New York Times. In order to prevail, DIB most likely will have to argue that it is not a general public figure notwithstanding that it is government-controlled, and that the article taken as a whole implies that it knowingly or negligently permitted bin-Laden to launder money.

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003194



Mr. Arthur Ochs Sulzberger, Jr.
Mr. James Risen
Mr. Benjamin Weiser
January 4, 2000
Page 2 of 2

> say how much money they believed that Mr. Bin Laden had funneled
> through the bank.

Taken as a whole, the article conveys the message that DIB knowingly assisted a terrorist in
laundering money. This message is utterly and completely false.

Accordingly, we demand that you print a retraction of the portions of the article listed
above. This retraction should indicate that DIB did not have any dealings with Bin Laden and
that any money he received from DIB indirectly, through a legitimate customer of DIB, was
transmitted to him without the knowledge or intent of DIB and not due to any fault of DIB.

We look forward to hearing from you shortly.

Sincerely,

FINE & ASSOCIATES, P.A.                    WILLIAM L. RICHEY, P.A.

Alan S. Fine                               William L. Richey

FINE & ASSOCIATES, P.A.
ATTORNEYS AND COUNSELORS

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003196



# U.S. Department of State

## Daily Press Briefing

**INDEX**
**THURSDAY, JULY 8, 1999**
**Briefer: JAMES B. FOLEY**

**SINGAPORE**

1      Prospects for Travel by the Secretary to ASEAN Meetings in Singapore

**UNITED ARAB EMIRATES/QATAR**

2-3,4      Counterterrorism Cooperation/ Investigation

**AFGHANISTAN**

3-4      Whereabouts of Bin Ladin

**BALTIC STATES**

5      US-Baltic Partnership Commission Meeting / Prospects for NATO Membership

**DEPARTMENT**

5      Status of US Embassy Operations / Status of US Embassy in Madagascar

**INDIA/PAKISTAN**

5-6      Fighting in Kashmir / Update on Situation

**MIDDLE EAST**

6      Mrs. Clinton's Letter Regarding the Issue of Jerusalem

**NORTH KOREA**

7,12-13      Status/Update on Access to Detained American Citizen

9-10,14      North Korean Missile Activities and Development

10      Status of Dr. Perry's Report

9-10      Japan Diet's Consideration of Legislation on Export Controls

**SOLOMON ISLANDS**

7-8      Update on Violence / Dispute

**DEMOCRATIC REPUBLIC OF THE CONGO**

8      Announced of Ceasefire Agreement / US Efforts

**SERBIA (KOSOVO)**

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003197

# FINE & ASSOCIATES, P. A.

ATTORNEYS AND COUNSELORS

Alan S. Fine
Edward A. Licitra
Jonathan R. Rosenn

600 Douglas Centre
2600 Douglas Road
Coral Gables, Florida 33134
Telephone (305) 448-1002
Telefax (305) 448-3033
E-mail firm@fine-law.com

January 4, 2000

**VIA CERTIFIED MAIL/RRR**

| | | |
|---|---|---|
| Mr. Arthur Ochs Sulzberger, Jr. | Mr. James Risen | Mr. Benjamin Weiser |
| Publisher | c/o The New York Times | c/o The New York Times |
| The New York Times | 229 West 43rd Street | 229 West 43rd Street |
| 229 West 43rd Street | New York, New York 10035 | New York, New York 10035 |
| New York, New York 10035 | | |

Re:  **False Statements About Dubai Islamic Bank in July 8, 1999 Article re: Osama Bin Laden**

Dear Mr. Sulzberger, Mr. Risen, and Mr. Weiser:

We represent Dubai Islamic Bank ("DIB") of the United Arab Emirates, one of the subjects of the article authored by Mr. Risen and Mr. Weiser entitled "U.S. Officials Say Aid for Terrorists Came Through Two Persian Gulf Nations" which appeared in the July 8, 1999 edition of *The New York Times.* Our client intends to file suit for defamation against *The New York Times* for publishing knowingly false articles about DIB in this article and/or placing DIB in a false light. This letter constitutes your notice pursuant to Section 770.01, Florida Statutes. Set forth below are the false and defamatory statements of fact in the articles upon which DIB is considering filing suit.

DIB has never dealt directly with Osama Bin Laden, and has no knowledge or reason to believe that anyone acting on Bin Laden's behalf had been laundering his money through DIB. The following statements in the New York Times July 8 article suggest otherwise:

> **The Central Intelligence Agency has obtained evidence that Mr. Bin Laden has been allowed to funnel money through the Dubai Islamic Bank in Dubai, which the United Arab Emirates Government effectively controls.**

> **The allegations that the Dubai Islamic Bank is dealing with Mr. Bin Laden seem to underscore that this scion of one of Saudia Arabia's wealthiest families retains some support among the elite of the Arab world.**

> **United States intelligence officials said they had evidence that Mr. Bin Laden had a relationship with the bank, which they believed had been arranged with the approval of the officials who control the bank.**

> **A senior United States official who went to the Emirates last week said that officials were "responsive" to American concerns about the Dubai bank's involvement with Mr. Bin Laden. ... The American officials also declined to**

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003195

10-11,12         Status of Kosovo Refugees / Returning Refugees

**RUSSIA/BELARUS**

11-12         Signing of Economic Pact

**UKRAINE**

13         Incident at US Embassy in Kiev

**LIBYA**

13         Prospects for US Removal of Libya from Terrorism List

**INDONESIA**

13         UN Efforts to Ensure Successful Vote

**SPAIN**

14-15         Running of the Bulls

**U.S. DEPARTMENT OF STATE**
**DAILY PRESS BRIEFING**
**DPB #88**
**THURSDAY, JULY 8, 1999, 1:20 P.M. (CORRECTED\*)**
**(ON THE RECORD UNLESS OTHERWISE NOTED)**

**MR. FOLEY:** Good afternoon. Welcome to the State Department briefing.

**QUESTION:** Is the Secretary going to Singapore?

**MR. FOLEY:** I don't think that has been decided yet. As you know, the Secretary is away on vacation now, and I expect that Mr. Rubin will be in a position to talk in detail about her travel plans. We've indicated that she's likely to make a visit to the Middle East in the near future, to be determined, in consultation with the parties, including during Prime Minister Barak's visit here, now set for the 15th of July.

But in terms of her specific travel plans for the latter half of July, I think we'll have to await Mr. Rubin's return on Monday.

**QUESTION:** So you're saying - and we'll report it if we have it right - so let me try again. Secretary Albright hasn't decided yet whether to go to the ASEAN --

**MR. FOLEY:** Well, I can check that for you.

**QUESTION:** Could you, because everybody out there is ready.

**MR. FOLEY:** What do you mean out there?

**QUESTION:** Well, Singapore, they think she's coming. And if you think we ought to tell them that she doesn't know if she's going there yet, we will.

**MR. FOLEY:** Well, I know that you are quick to draw such conclusions, but –

**QUESTION:** I'm not drawing conclusions. You said something, and I'm simply repeating it. Rather

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003198

CaSase0309dr0t67670BGBSASN DDocumeeh10842-40 Ffiddo08Z038224 PaBeg8230f 7474

than leaving the room with what you said, I'm asking you to take another swing at it if I heard you right.

**MR. FOLEY:** Okay, I told you I'd look into it.

**QUESTION:** The New York Times has a report today that two countries in the Persian Gulf -- UAE and Qatar -- have been either cooperating or turning a blind eye to money laundering for the bin Laden organization through their controlled banks. Have you seen it; do you give it any credence?

**MR. FOLEY:** I've seen that report; I read the article that appeared in the newspaper today. We don't have any reason to believe that the Foreign Minister of Qatar had anything to do with what was reported in the article; I can state that. Qatar is a valued ally. We enjoy a close and strong relationship. We work together in many areas, including the containment of Iraq, support for the peace process, maintaining Gulf security and combating terrorism. We are working positively with Qatar on a range of counter-terrorism issues, including improvement of the security of the US mission in Doha.

**QUESTION:** That's a very narrow answer to what I thought a quite broad question, which also included the UAE.

**MR. FOLEY:** Well, in terms of the UAE, we regard the United Arab Emirates, like the other GCC states, as a valued ally with whom we have a close and strong relationship in a broad number of areas. We're also working with the UAE to continue strengthening our counter-terrorism cooperation in many areas, including terrorist money laundering. The government of the United Arab Emirates has told us that the Dubai Emirates Government has taken steps to clean up the bank - the Dubai Islamic Bank - and to restore its reputation.

**QUESTION:** So if they're taking steps to clean up, that implies that something had been amiss in the past at some time.

**MR. FOLEY:** It does imply that, yes.

**QUESTION:** And what was wrong? Was it -

**MR. FOLEY:** I can't get into the details of it. I think what I said is significant enough, however.

**QUESTION:** Well, without getting into the details, since we're talking about a bank, are we also talking about money laundering?

**MR. FOLEY:** Well, as I said, the government has told us that the Dubai Emirate has taking steps to clean up that bank, and we are also cooperating with the UAE on a number of areas involving cooperation against terrorism, and that includes the area of money laundering.

**QUESTION:** Are you satisfied with their cooperation?

**MR. FOLEY:** We believe that in this area it has been sufficient. I know we had a team that was visiting the UAE not long ago, and they had a successful visit there.

**QUESTION:** So the banking problem has been cleaned up?

**MR. FOLEY:** Well, we believe that useful work was accomplished in the team's visit. We are pleased with the responsiveness of the UAE officials. As I said before, we have a strong and cooperative relationship with the United Arab Emirates on a variety of national security issues. As we said at the time of the East Africa bombings, we are working hard to interrupt the flow of money to

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003199

and from the bin Laden organization that supports its terrorist network.

**QUESTION:** Can I go back to Qatar? You said that you didn't think the Foreign Minister had anything to do with it; but what about everybody else in Qatar?

(Laughter.)

**MR. FOLEY:** Well, that's the subject of an ongoing investigation, and I can't comment on it - especially since it does involve intelligence matters.

**QUESTION:** Could you be a little more specific about what kind of team this was that went and when?

**MR. FOLEY:** I don't have information about the team. I believe it was an inter-agency team, recently; I can check that for you after the briefing.

**QUESTION:** The US is conducting an investigation of what happened in Qatar; is that what you're saying? There's an ongoing investigation now in Qatar by US officials?

**MR. FOLEY:** It's a matter that's being looked into. I don't have any details about the investigation, but overall these involve intelligence issues which I can't discuss in a public forum.

**QUESTION:** (Inaudible.)

**MR. FOLEY:** There is an ongoing investigation.

**QUESTION:** Involving the US or not?

**MR. FOLEY:** Well, in terms of who is involved in it, I can check that for you if I can get into that in a public forum.

**QUESTION:** (Inaudible) - and bin Laden. A $5 million reward was issued some time ago and nine newspapers, including - (inaudible) - ads. That means that the $5 million reward is not working, or somebody else is paying him more not to get arrested? And number two, are you putting pressure on those countries who are very close to the Talibans?

**MR. FOLEY:** This question was asked and answered several times when we had a briefing here following the President's signature of the executive order concerning the US relationship with the Taliban. We believe that bin Laden is in Taliban-controlled territory in Afghanistan. Therefore, he enjoys safe haven in Afghanistan. In terms of the possible effect of our reward program, it has been very effective in numerous cases previously. This is an open case, and we very much would like to see Mr. bin Laden brought to justice.

So it's very premature to argue about the effectiveness or applicability of the reward program in this case. We know where he is; he's in Taliban-controlled parts of Afghanistan. I believe the Taliban spokesman today has confirmed the fact that he is in Afghanistan and that some Taliban members know where he is, which was somewhat contradictory to statements they made previously publicly to that effect.

So we are trying to make it very clear to the Taliban, who have the ability to ensure that bin Laden is brought to justice, that they ought to do just that; to allow him to be removed from the country and placed at the disposition of judicial authorities. I believe that the Taliban has a clear choice in this instance. They can continue to harbor him, but if they do, they forego any kind of international respectability and any chance of achieving their aspirations to international respectability and

http://secretary.state.gov/www/briefings/9907/                                    7/12/99

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003200

legitimacy.

**QUESTION:** Just to follow, the Prime Minister of Pakistan, Nawaz Sharif, was here on July 4, Sunday, in Washington, and met with President Clinton. Do you think there's any connection or link between the President's announcement on this Taliban statement on freezing the assets and bin Laden in Afghanistan?

**MR. FOLEY:** If there's a link between what? I didn't -

**QUESTION:** Between Prime Minister Nawaz Sharif's visit on Sunday and the presidential announcement on Afghanistan on Monday.

**MR. FOLEY:** No.

**QUESTION:** Can we go back to this investigation in the Gulf? Is that in both countries, or just in --

**MR. FOLEY:** No, I was referring to Qatar.

**QUESTION:** So there's no investigation in the UAE?

**MR. FOLEY:** Not to my knowledge.

**QUESTION:** Didn't the team go to UAE because of the suspicions and concerns? I mean, was that the reason for their visit?

**MR. FOLEY:** That's my understanding.

**QUESTION:** And you're saying you're going to check on when that visit was.

**MR. FOLEY:** Yes.

**QUESTION:** In your press statement on forthcoming US-Baltic Partnership Commission meeting released yesterday, among the issues that will be discussed in Washington the trans-Atlantic integration of the Baltic states is not even mentioned. What is the position of the State Department on rising concern - (inaudible) - in the Baltic states that because of Kosovo, they get overlooked in the enlargement of NATO?

**MR. FOLEY:** We think that's a false reading of the situation. At the time of the last NATO summit here in Washington, the Alliance made clear that the door to membership of NATO remains open. That was not a mere rhetorical declaration on the part of the NATO leaders, because the summit also instituted a membership action plan which will permit an accelerated and intensive preparation for candidate members of NATO to continue to prepare the transformation that will be necessary for them to qualify for NATO membership. So I expect that that issue will be discussed when Deputy Secretary Talbott meets with the Baltic leaders here.

**QUESTION:** Let's go back to bin Laden. Have any US embassies or posts abroad have seen their operations suspended or been closed in the last days? A few weeks ago, you shut some down or you suspended operations in some African - embassies in Africa. Do you have any today?

**MR. FOLEY:** No, I don't.

**QUESTION:** Madagascar?

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York      DIB_003201

**MR. FOLEY:** The embassies - as of yesterday, it was still closed. I'd have to check and see if that remains the case today.

**QUESTION:** In Kashmir the fighting still goes on, and, at least according to reports from the region, there doesn't seem to be any pull-out seen yet of Pakistani allied forces. Can you give us any update from your point of view on that?

**MR. FOLEY:** Well, the Pakistani Prime Minister Sharif has returned to Islamabad today. We understand he's going to be meeting with political and military leaders tomorrow to discuss his agreement with President Clinton; that concrete steps will be taken for the restoration of the line of control in Kashmir.

We are confident the Prime Minister wishes to see an end to this crisis. Both he and President Clinton agreed that once this crisis is resolved, the dialogue between India and Pakistan, under the Lahore Process, should resume without delay.

In the Kargel sector, fighting continues along the line of control. Indian leaders have declared that military operations will continue until all the forces infiltrated from Pakistan are removed or withdrawn from their side of the line. The US, along with others in the international community, is doing what we can to see the current dangerous crisis resolved as quickly and peacefully as possible.

**QUESTION:** Do you believe that the Pakistani Prime Minister and his government have any control over the Pakistani guerrilla fighters, who are on the wrong side of the line of control?

**MR. FOLEY:** Yes, we do.

**QUESTION:** Does he have sufficient control to evacuate them to the right side?

**MR. FOLEY:** We believe that it is indeed possible, and we think necessary, for Pakistan to ensure that those forces that have crossed from its side of the line of control on to the Indian side be withdrawn. And that is certainly what Prime Minister Sharif committed to do when he was here and met with President Clinton on Sunday.

**QUESTION:** (Inaudible) -- guerrilla fighters?

**MR. FOLEY:** Well, we've not spoken publicly about the composition of those forces, but we have made very clear that they crossed over from the Pakistani side and they should be withdrawn.

**QUESTION:** But really, don't you think he made a promise in Washington with President Clinton that he's already broken? He committed - (inaudible) - but he now - the militants said we will fight until the last drop of blood and we will not withdraw. That means Prime Minister Nawaz Sharif is not in control. So who do you believe - the militants -- (inaudible) - or Sharif or the militants in Pakistan? Who's in control?

**MR. FOLEY:** We work with the government of Pakistan and I think my answer to the previous question is the same answer to your question.

**QUESTION:** On the Middle East, First Lady Hillary Clinton wrote a letter to a Jewish organization in New York supporting the move of the US Embassy in Tel Aviv to Jerusalem. What is the Administration's opinion of that? Does it complicate your policy regarding the peace process?

**MR. FOLEY:** We don't have an opinion of it. The First Lady was expressing her personal views, and it does not complicate in any way our efforts to promote and accelerate the Middle East peace

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003202

process. Our position - the Administration's position on the issue of Jerusalem has not changed. Israel and the Palestinians have agreed that Jerusalem would be one of the issues covered in the permanent status negotiations. This issue needs to be dealt with and resolved by the parties themselves in negotiations.

**QUESTION:** Would you consider taking military action to hit Usama bin Laden?

**MR. FOLEY:** We have taken military action against Usama bin Laden.

**QUESTION:** Would you repeat that?

**MR. FOLEY:** We do not rule out any options in the future for dealing with someone who poses such a direct threat to US national security and who is indicted for terrorist acts in the United States.

**QUESTION:** Follow-up on bin Laden - there's a New York Times article today --

**MR. FOLEY:** (Inaudible.)

**QUESTION:** Oh, did you do that already? I have another question not on bin Laden.

**QUESTION:** If the Taliban agrees that they will get him arrested, is the US ready to make some kind of deals with them? Just like --

**MR. FOLEY:** We announced certain measures earlier this week concerning the Taliban that we would certainly be prepared to review and potentially to rescind if the Taliban do the right thing, which is to ensure that bin Laden is brought to justice. That would be a very positive step on their part.

We have a range of concerns in other areas with the Taliban concerning the future of Afghanistan and its political make-up. But in order to be at the table and recognized internationally as a group that is not besmirched with the reputation of harboring terrorists, it's necessary for the Taliban to take this first essential step.

**QUESTION:** One really quickly. Is there anything new on the American in North Korea?

**MR. FOLEY:** No, nothing new on that.

**QUESTION:** And the second one, do you have anything on this ongoing unpleasantness in the Solomon Islands?

**MR. FOLEY:** Yes, I do. The press reports we've seen give an accurate account of the internal conflict that is now besetting the Solomon Islands. Our embassy in Port Moresby, Papau, New Guinea, which also covers the Solomon Islands, has reported episodes since January of ethnic violence between armed militants native to the island of Guadalcanal and settlers from the neighboring island of Malaita.

On June 10, we issued a public announcement advising American travelers to Guadalcanal to exercise caution. This announcement followed reports of armed clashes that pitted members of the "Guadalcanal Revolutionary Army" against settlers from the outer island of Malaita, and sometimes against law enforcement personnel.

The Prime Minister of the Solomons has invited the commonwealth to mediate this dispute. Former Fiji Prime Minister Rabuka has been designated chief mediator by the commonwealth and has

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003203

reportedly been successful in encouraging some of the parties to the dispute to sign a peace accord. The United States encourages all parties to reach a peaceful resolution of this internal strife.

**QUESTION:** Is the United States thinking about doing anything to help the Congo - help implement the peace agreement that is supposed to take hold in the Congo?

**MR. FOLEY:** Well, we are certainly eager to help in any way we can. The fact is, I think it was the foreign defense ministers, signed the agreement yesterday but it remains to be officially signed by the heads of state on Saturday, this coming Saturday, July 10. We welcome the agreement and we congratulate President Chiluba and the other participants in the talks for their successful efforts. We encourage the parties to the conflict not only to sign the agreement on Saturday, but to implement and to adhere to the proposed cease-fire and to act in good faith to engage the citizens of the Congo and neighboring states to pursue their lives in peace, prosperity and democracy.

President Clinton has stated on previous occasions that we would consider supporting a peacekeeping force if there were an appropriate cease-fire arrangement. We're going to carefully study any proposal for a UN peacekeeping operation, especially its mandate, before making any decisions about US support for the operation or role in it, but we are eager to be supportive. After the agreement is signed and after we have a chance to study it in some detail and consult with the regional states, we'll be in a better position, I think, to assess exactly what will be required to help ensure that the agreement is durable and is successful.

**QUESTION:** How quickly do you think you're going to have to move on it, though? It seems to me that they signed the agreement, you have to get peacekeepers in there fairly quickly.

**MR. FOLEY:** Well, I believe that there are already African peacekeepers there on the ground, and it's a question of determining formally what the peace accord calls for in terms of implementation, in terms of enforcement, and then determining what role would be necessary for African peacekeepers and what role the international community can play to support them.

As I said, we're prepared to play a positive role, and we've indicated all along and we've been involved in the diplomatic efforts that helped achieve this agreement, and we want to make sure that this agreement is successful, given the importance of the Democratic Republic of Congo to stability throughout the whole region there and the fact that so many other countries have been drawn into that struggle. This is an important opportunity to turn the Congo back into a potential successful story, which it certainly has not been. In fact, it's been a drag on the entire region. So we have an important stake in seeing this succeed. But it is a little early for us to determine how this agreement is going to be implemented and enforced. We're going to have to see the details and to consult in the days ahead.

**QUESTION:** Do you have a response to the report that's coming out by the panel headed by former CIA Director Deutch, saying that poor coordination in the government makes it more difficult to fight or limits the US' ability to fight the proliferation of weapons of mass destruction?

**MR. FOLEY:** I've not seen that report; I couldn't comment on it.

**QUESTION:** Oh, it was first reported this morning, I think, in The Baltimore Sun.

Could I just ask you one specific thing about it? Is the US Government looking at ways to improve the coordination with other agencies on that subject?

**MR. FOLEY:** Again, I've not seen the report; I couldn't possibly comment on it.

**QUESTION:** On North Korea, is the US concerned that the North Koreans may be building a new underground missile launching site base?

http://secretary.state.gov/www/briefings/9907/                                    7/12/99

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003204

**MR. FOLEY:** Well, it's certainly well-known that North Korea is actively pursuing development of two long-range ballistic missiles, the Taepo Dong I and the Taepo Dong II. North Korea launched the Taepo Dong I with a third stage in a failed attempt to orbit a very small satellite last October. I can't go beyond that in terms of what we know about the details of North Korea's missile development activities, but they do exist and it is something that we follow and we take with the utmost seriousness.

We view North Korea's missile activities as a serious threat to the region and also to our non-proliferation interests. In past rounds of missile talks with the DPRK and in other bilateral contacts with Pyongyang, we have continued to press vigorously for restraints on North Korea's production, deployment, testing and export of missiles and missile technology. We have repeatedly made clear that further missile tests would have serious consequences for our relations with North Korea, with direct implications for the prospects for improved relations that were discussed during former Secretary Perry's visit to Pyongyang.

We continue to consult closely with our allies, Japan and the Republic of Korea, who share our serious concerns about North Korea's missile proliferation activities.

**QUESTION:** You're saying about the program; the question was about the tunnel. That would be part of the program - maybe they haven't gotten that far. Remember, there was a tunnel looked at and seemed to have passed the test. So the question, I think - I understand your position - but they have ongoing programs to test two missiles. Have they done anything about a tunnel?

**MR. FOLEY:** I can't comment any further.

**QUESTION:** A North Korean defector is saying that the Japanese exported the missile to North Korea. Can you comment on that?

**MR. FOLEY:** *Well, (legislators in) the Japanese Diet now (are reportedly looking at) export controls. What I can tell you is that we share very much the concern with our Japanese friends over North Korea's missile program, and we believe that the Japanese understand fully the importance of effectively controlling exports of sensitive items. Japan is a member of all the multilateral non-proliferation regimes, and we frequently discuss in those contacts with Japan a wide range of non-proliferation and export control issues.

*Japan also shares our serious concerns about the DPRK's missile proliferation activities. Japan has a mature export control system and, as I said, we consult on an ongoing basis regarding ways to improve the effectiveness of export controls; and we certainly support (that).

**QUESTION:** Is William Perry's report close to being finished?

**MR. FOLEY:** It's nearing completion, that's my understanding.

**QUESTION:** Do you know when it will be released?

**MR. FOLEY:** I don't have a date for you.

**QUESTION:** There are some reports that the North Koreans started another construction on another site which can turn out to be a nuclear site. Can you confirm that?

**MR. FOLEY:** I can't confirmed anything having to do with intelligence, but I can't confirm that.

**QUESTION:** Kosovo - what's being done in the United States in terms of returning refugees that are

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003205

here back to Kosovo? Are there sort of steps in the works about when and how they will be returned back to the province?

**MR. FOLEY:** Well, we brought about 9,600 Kosovar Albanian refugees to the US since early May. Of the 4,000 that were processed through Fort Dix, only about 270 have yet to be moved to their final resettlement locations throughout the US. There are some 2,000 Kosovars in Macedonia who have been approved by the INS for relocation to the US but who have not yet traveled. We're continuing to process UNHCR referred cases and cases with close family ties to the US.

However, it's interesting to note that close to half of the refugees scheduled for interview in Macedonia or for travel in recent days have not appeared as scheduled. We believe this is an indication that people are choosing to return to Kosovo rather than to seek resettlement in the US. The UNHCR is holding a meeting in Geneva on July 12, on Monday, to discuss the process of returning refugees to Kosovo who have been evacuated from Macedonia to third countries. The US Government will be represented at that meeting.

We fully intend to honor our commitment to Kosovars relocated in the US by providing return transportation to those who wish to go back to Kosovo. We're developing guidelines for the return program, which we plan to announce shortly after we consult at that Monday meeting with the UNHCR.

Of course, the decision - this is important to emphasize, though, and we stated this at the time that we brought Kosovars into the United States. The decision to return to Kosovo or not would be made by the refugees themselves.

**QUESTION:** Jim, can you say whether any who have come to this country have expressed an interest so far to stay here and not return?

**MR. FOLEY:** I don't know that off hand. I can look into that. You know, we're going to be, as I said, announcing shortly details of our program to help return those who want to go back to Kosovo. I think when we do that, we'll be perhaps ready or in a position to talk about some of those details. I think probably the INS would be the ones who would know whether they've gotten those indications.

It's possible that there are many or some who want to stay who haven't signaled that because they don't have to for the first year. They were allowed to stay in the US for a year and then to adjust their status if they wished, after a year. So we may not, in the government, actually have that information. But I'll look into it, and we will have some kind of a briefing for you on this and we'll make sure we can answer that as best as possible.

I can tell you also UNHCR is reporting that some of the over 91,000 Kosovar refugees who were moved to other countries under the humanitarian evacuation program have begun to return home. This means the wider figure of Kosovars who have gone to many other countries besides the US, this also applies to the approximately 146,000 who have sought asylum apart from this program, of whom about 48,000 are in Germany and 33,000 in Switzerland. Thus far, there have been voluntary returns of refugees from Italy and Canada, and a group was due to leave Germany today.

As I said, the UNHCR is having this meeting on Monday in Geneva, and it will include the 28 countries which have participated in the humanitarian evacuation program to discuss the organized voluntary return of Kosovar refugees and asylum seekers.

**QUESTION:** Do you have any comment on the signing of an economic pact between Russia and Belarus and the comments by the Russian Prime Minister about the imminent unification of the two countries?

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003206

**MR. FOLEY:** Yes. The United States supports the sovereignty, territorial integrity, independence of all the New Independent States. The sovereignty of the NIS countries contributes to the stability of the region. At the same time, we have said that we do not oppose integration as such among the NIS states, as long as such integration reflects the voluntary will of the people expressed through a democratic process, is mutually beneficial, and does not erect barriers to integration with the wider community of nations.

Absent the full restoration of democratic government in Belarus, it's hard to imagine that any popular approval process on union in Belarus would be truly democratic and representative of the will of the people.

**QUESTION:** Jim, back to the question of the Kosovar Albanians that are in the United States - the 9,000-plus you were speaking about. Does this program that is being devised encourage, is it meant to encourage those people to return to Kosovo; and does the United States not wish to encourage those people to go back to help rebuild Kosovo?

**MR. FOLEY:** Well, I was, I think, pretty clear on this a minute ago. It's a very important point that this is entirely up to the refugees themselves to decide whether they want to go back. When we made this offer of accepting up to 20,000 Kosovar refugees in the US, it was with the full knowledge that all of them potentially would indeed have the right to remain in the US if they wanted to. But it may be that indeed they can make a very significant contribution to the rebuilding of Kosovo; and that's not something that we would discourage. But neither are we going to make any kind of pressure on them to make a different decision. They have a right to stay here if they want to; that was the commitment we made.

**QUESTION:** One of the largest US arms company executives - (inaudible) - in Athens. According to press reports, this computer stole several important US security secrets.

**MR. FOLEY:** I've not heard that report.

**QUESTION:** You don't have anything?

**MR. FOLEY:** I've not heard anything about that, sorry.

**QUESTION:** For about 20 days, there has been a Korean-American woman detained in North Korea and the US has asked for the North Koreans to make consulate contact. Is there any update on that; and if not, what are the consequences?

**MR. FOLEY:** Well, I've been asked that question every day and it's a legitimate question. Your colleague, Mr. Lee, here, asked it a few minutes ago; maybe you weren't yet in the room or maybe you didn't get it. I just simply told him that there was nothing new on the issue.

But I can repeat what I have been saying for several days, which is that the DPRK Government has not yet notified the Swedish Charge that he would be permitted to travel to Rajin in order to have consular access to the detained American citizen.

Acting on our behalf, the Swedish protecting power formally requested such consular access on June 23 and June 30. As I've indicated previously, both our bilateral interim consular agreement and the Vienna Convention on Consular Relations provides and necessitates such consular access to detained nationals. We consider a consular visit critical in order to ascertain in person the American's state of health and well being, and to ensure that she has not been mistreated. So we are going to continue to press for consular access at every available opportunity. We have been in communication ourselves with the North Koreans through the New York channel.

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003207

I would note that most offices in the DPRK are closed now for, I believe, a three-day period to mark the fifth anniversary of the death of Kim Il Sung, so that may be a complicating factor in the immediate days. But that doesn't change in any way our determination to ensure that the consular access be achieved.

**QUESTION:** Do you have anything on this attack on the embassy in Kiev?

**MR. FOLEY:** I don't know; do we have anything on that, Julie? I seem to recall something. There was an incident and it was immediately investigated by the Ukrainian authorities. I know we've been cooperating with them, and we're pleased with the work they've done. But I don't have any update today on what the results of the investigation are.

**QUESTION:** At what point does this lack of consular access to the woman who's in North Korea, at what point does the US seek additional steps? I mean, it's been three weeks or so. What are additional steps; what's available to you?

**MR. FOLEY:** Well, I'm not going to speculate or hypothesize about a judgment we haven't made yet. I stated this in response to Matt's question yesterday or the day before that indeed there will come a time, if consular access hasn't been granted, when we are going to conclude that it's not going to be granted. Then it will be truly an important issue -- it already is an important issue because consular access is vital for us to ascertain that this woman is in good shape and that her interests are being represented. But we haven't made that judgment yet.

As I've explained, things can move slowly in North Korea. This is a remote area of the country. We have been in touch with the North Koreans ourselves and the Swedes are ably representing our interests, and we have not concluded that consular access will not happen. We wish it had happened by now, but we still expect that it will happen.

**QUESTION:** Is the Administration considering removing Libya from the State Department terrorism list?

**MR. FOLEY:** No, not at all. That report is wrong.

**QUESTION:** About Indonesia -- as you know, next week the Secretary General of the United Nations is going to take a final decision about the conditions for a fair vote in East Timor. Some say, including in the Senate and the House, that this will be the appropriate moment to put additional pressure on Indonesia from the part of your government; for instance, putting a hold on the money of the World Bank in Indonesia, or even more than that - on arms transfer or military assistance from the United States to Indonesia. Can you respond on that?

**MR. FOLEY:** Well, we think that holding the vote and holding a successful vote - namely, a peaceful vote that produces a genuine reflection of the will of the people on East Timor -- is in the interest of Indonesia as well as in the interest of the people of East Timor and of the region. So I don't believe that Indonesia needs persuading that this is in its interests.

However, we have concerns about the safety of the vote, the integrity of the vote. We believe that a vote is important; we hope it will take place. We support the UN's efforts to ensure that a successful vote take place, but we also want to ensure that the referendum is a peaceful and successful one.

**QUESTION:** Will Assistant Secretary Roth carry this message when he goes to Indonesia this weekend?

**MR. FOLEY:** Yes.

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003208

**QUESTION:** Can you talk - is he going to see Habibie, do you know?

**MR. FOLEY:** I don't know his schedule.

**QUESTION:** Can you see if you can find out?

**MR. FOLEY:** Sure.

**QUESTION:** I want to go back to North Korea. Mr. Foley, you have said that another missile test would produce or create serious consequences. High ranking officials from this building and White House have said also like that. On the other hand, a high ranking official from this building and White House have said also even after another missile test, the United States wants to preserve the framework of the so-called agreed framework. It's not contradiction. I do want to know the United States' view.

**MR. FOLEY:** Well, it's simply a fact that we regard the agreed framework is important to the security of the region and the security of the United States -- the continued freezing of North Korea's nuclear program. But in terms of what the specific negative consequences would be in the event of another North Korean missile test, I'm not prepared to be specific at this stage about what those consequences will be.

**QUESTION:** At the risk of upsetting your no-bull policy, Jim, the -

**MR. FOLEY:** Oh, no.

**QUESTION:** The festival is now in its second day. I understand the State Department's cobbled together some information about advice to give to - (inaudible) - Hemingways --

**MR. FOLEY:** You must have some inside information. Look, I made clear the other day that we have no-bull guidance, and we've never had any bull guidance or uttered any bull guidance from this podium. There was a bull question, and there have been frequent bull questions -

(Laughter.)

- on previous occasions. But without wishing to set any kind of precedent, I do happen to have bull guidance today.

What I can tell you is that given today's security environment, no American can be considered safe from raging bulls.

(Laughter.)

There are, however, some commonsense precautions that US citizens may wish to consider taking to avoid becoming a target of an enraged, horned beast. If you find yourself in a crowd of frenzied, four-footed foreigners - I guess they could be called that - make sure your sneakers are tied, your valuables are safely stowed in your neck pouch and your medical insurance is thoroughly up to date. I have more, but I think that I've exhausted this; and that's no bull.

Thank you.

(The briefing concluded at 2:00 P.M.)

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003209

[end of document]

Back to the Press Briefing Calendar.
Return to the Home Page.
This is an official U.S. Government source for information on the WWW. Inclusion of non-U.S.
Government links does not imply endorsement of contents.

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003210

DIB_003211



FINE & ASSOCIATES, P. A.

ATTORNEYS AND COUNSELORS

600 Douglas Centre
2600 Douglas Road
Coral Gables, Florida

**CERTIFIED**

Z 428 681 312

CORAL GABLES
FL
JAN-3'00

2.98

U.S. POSTAGE

**MAIL**

Mr. James Risen
c/o The New York Times
229 West 43rd Street
New York, NY 10035

Not
N.Y.T

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mr. Arthur Ochs Sulzberger Jr.
Publisher
The New York Times
229 West 43rd Street
New York, New York 10035

2. Article Number (Copy from service label)
2423681311

PS Form 3811, July 1999          Domestic Return Receipt          102595-99-M-1789

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Clearly)    B. Date of Delivery

C. Signature
X _____    ☐ Agent
                    ☐ Addressee

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

3. Service Type
☒ Certified Mail    ☐ Express Mail
☐ Registered        ☒ Return Receipt for Merchandise
☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mr. Benjamin Weiser
c/o The New York Times
229 West 43rd Street
New York, NY 10035

2. Article Number (Copy from service label)
2428681313

PS Form 3811, July 1999          Domestic Return Receipt          102595-99-M-1789

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Clearly)    B. Date of Delivery

C. Signature
X _____    ☐ Agent
                    ☐ Addressee

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

3. Service Type
☒ Certified Mail    ☐ Express Mail
☐ Registered        ☒ Return Receipt for Merchandise
☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

---

US Postal Service
**Receipt for Certified Mail**
No Insurance Coverage Provided.
Do not use for International Mail (See reverse)

Z 426 681 313

Sent to
Street & Number
Post Office, State, & ZIP Code
Postage
Certified Fee
Special Delivery Fee
Restricted Delivery Fee
Return Receipt Showing to Whom & Date Delivered
Return Receipt Showing to Whom, Date, & Addressee's Address
TOTAL Postage & Fees $

PS Form 3800, April 1995

---

US Postal Service
**Receipt for Certified Mail**
No Insurance Coverage Provided.
Do not use for International Mail (See reverse)

Z 426 681 311

Sent to  Sulzberger
Street & Number
Post Office, State, & ZIP Code
Postage
Certified Fee
Special Delivery Fee
Restricted Delivery Fee
Return Receipt Showing to Whom & Date Delivered
Return Receipt Showing to Whom, Date, & Addressee's Address
TOTAL Postage & Fees $

PS Form 3800, April 1995

---

US Postal Service
**Receipt for Certified Mail**
No Insurance Coverage Provided.
Do not use for International Mail (See reversal)

Z 426 681 312

Sent to
Street & Number
Post Office, State, & ZIP Code
Postage
Certified Fee
Special Delivery Fee
Restricted Delivery Fee
Return Receipt Showing to Whom & Date Delivered
Return Receipt Showing to Whom, Date, & Addressee's Address
TOTAL Postage & Fees $

PS Form 3800, April 1995

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003212

# FINE & ASSOCIATES, P. A.

ATTORNEYS AND COUNSELORS

Alan S. Fine
Edward A. Licitra
Jonathan R. Rosenn

600 Douglas Centre
2600 Douglas Road
Coral Gables, Florida 33134
Telephone (305) 448-3002
Telefax (305) 448-3033
E-mail: firm@fine-law.com

January 4, 2000

## VIA CERTIFIED MAIL/RRR

Mr. Arthur Ochs Sulzberger, Jr.
Publisher
The New York Times
229 West 43rd Street
New York, New York 10035

Mr. James Risen
c/o The New York Times
229 West 43rd Street
New York, New York 10035

Mr. Benjamin Weiser
c/o The New York Times
229 West 43rd Street
New York, New York 10035

**Re:** **False Statements About Dubai Islamic Bank in July 8, 1999 Article re:
Osama Bin Laden**

Dear Mr. Sulzberger, Mr. Risen, and Mr. Weiser:

We represent Dubai Islamic Bank ("DIB") of the United Arab Emirates, one of the subjects of the article authored by Mr. Risen and Mr. Weiser entitled "U.S. Officials Say Aid for Terrorists Came Through Two Persian Gulf Nations" which appeared in the July 8, 1999 edition of *The New York Times.* Our client intends to file suit for defamation against *The New York Times* for publishing knowingly false articles about DIB in this article and/or placing DIB in a false light. This letter constitutes your notice pursuant to Section 770.01, Florida Statutes. Set forth below are the false and defamatory statements of fact in the articles upon which DIB is considering filing suit.

DIB has never dealt directly with Osama Bin Laden, and has no knowledge or reason to believe that anyone acting on Bin Laden's behalf had been laundering his money through DIB. The following statements in the New York Times July 8 article suggest otherwise:

**The Central Intelligence Agency has obtained evidence that Mr. Bin Laden
has been allowed to funnel money through the Dubai Islamic Bank in
Dubai, which the United Arab Emirates Government effectively controls.**

**The allegations that the Dubai Islamic Bank is dealing with Mr. Bin Laden
seem to underscore that this scion of one of Saudia Arabia's wealthiest
families retains some support among the elite of the Arab world.**

**United States intelligence officials said they had evidence that Mr. Bin
Laden had a relationship with the bank, which they believed had been
arranged with the approval of the officials who control the bank.**

**A senior United States official who went to the Emirates last week said that
officials were "responsive" to American concerns about the Dubai bank's
involvement with Mr. Bin Laden. ... The American officials also declined to**

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003213

Mr. Arthur Ochs Sulzberger, Jr.
Mr. James Risen
Mr. Benjamin Weiser
January 4, 2000
Page 2 of 2

**say how much money they believed that Mr. Bin Laden had funneled through the bank.**

Taken as a whole, the article conveys the message that DIB knowingly assisted a terrorist in laundering money. This message is utterly and completely false.

Accordingly, we demand that you print a retraction of the portions of the article listed above. This retraction should indicate that DIB did not have any dealings with Bin Laden and that any money he received from DIB indirectly, through a legitimate customer of DIB, was transmitted to him without the knowledge or intent of DIB and not due to any fault of DIB.

We look forward to hearing from you shortly.

Sincerely,

FINE & ASSOCIATES, P.A.                     WILLIAM L. RICHEY, P.A.

Alan S. Fine                                               William L. Richey

FINE & ASSOCIATES, P.A.
ATTORNEYS AND COUNSELORS

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003214

**THE NEW YORK TIMES COMPANY**
LEGAL DEPARTMENT
229 WEST 43 STREET
NEW YORK, N.Y. 10036

SOLOMON B. WATSON IV
*Senior Vice President*
*and*
*General Counsel*

RHONDA L. BRAUER
VERNON R. BYRD, JR.
LAURA J. CORWIN
MAGGIE R. DRUCKER
GEORGE FREEMAN
MARCIJANE KRAFT
ADAM LIPTAK
ELENA PRODANOV
KENNETH A. RICHIERI
LEE K. RIFFATERRE
ALISON C.M. ZOELLNER

FAX NUMBER:
(212) 556-4634

SENDER'S DIRECT
TELEPHONE NUMBER:
(212) 556-1882

January 14, 2000

Alan S. Fine, Esq.
Fine & Associates
600 Douglas Centre
2600 Douglas Road
Coral Gables, Florida 33134

Re: Dubai Islamic Bank Correction Demand

Dear Mr. Fine:

I write in response to your January 4, 2000 letter
to Arthur Sulzberger, Jr., James Risen and Benjamin Weiser.
You take issue with a passage in a July 8, 1999 article
entitled "U.S. Officials Say Aid For Terrorists Came
Through Two Persian Gulf Nations."

The New York Times is always eager to correct
errors of fact in its news coverage. We have reviewed your
letter with care and have concluded that no correction is
warranted here. The article accurately reported the
statements of United States government officials.

Your letter misreads the article in one respect.
It did not say that money was laundered through the Dubai
Islamic Bank but only that the bank did business with Osama
Bin Laden. We believed this to be true when we published
it, and we believe it to be true now.

You appear to be unaware that the State Department
confirmed and perhaps even expanded on the relevant portion
of the article in a public briefing on the day it was
published. In the context of a discussion of, in the State
Department spokesman's words, "terrorist money laundering,

21531

RECEIVED
JAN 2 1 2000
By

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003215

- 2 -

the spokesman stated that "the government of the United
Arab Emirates has told us that the Dubai Emirate government
has taken steps to clean up the bank, the Dubai Islamic
Bank, and restore its reputation."

     For these reasons, we decline to correct the
article.

                         Sincerely,

                         Adam Liptak

/bc

cc: James Risen
    Benjamin Weiser
    Stephen Engelberg

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

*FINE & ASSOCIATES, P.A.*

*600 Douglas Centre*
*2600 Douglas Road*
*Coral Gables FL 33134*

August 3, 1999

A.R. Ellison
Dubai Islamic Bank PJSC
Airport Road, Deria
Dubai, U.A.E.
VIA TELEFAX-0119714.295.5396

Re:        Dubai Islamic Bank v. Sissoko, et al.
Matter #    1700.1

Professional services

Hours

**Redacted**

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003217

A.R. Ellison

Page   2

Hours

**Redacted**

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

A.R. Ellison                                                    Page    3

                                          Hours

**Redacted**

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

A.R. Ellison

_____ Hours

**Redacted**

7/12/99  ASF   Review article from A. R. Ellison;                    4.90

**Redacted**

telephone conference with A. R. Ellison;
telephone conference with Christopher Bush US
Department of State, Public Affairs; research re:
articles and Department of State statements re:
Dubai Islamic Bank; telephone conference with
A. R. Ellison re: same; telephone conference
with John Jacobus re:    **Redacted**    NY
Times article.

**Redacted**

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_005640

A.R. Ellison                                                                    Page    5

                                                                        Hours

                              **Redacted**

7/13/99  ASF   Telephone conference with A. R. Ellison re: New      2.00
               York Times article; telephone conference with
               John Jacobus re: same; telephone conference
               with Alan Fein re: same and strategy for
               retraction.

      JR                     **Redacted**                           5.50

                   **Redacted**      review of
               defamatory article published by New York
               Times alleging that DIB funneled funds
               belonging to a known terrorist, and review of
               sample demand letter in connection therewith.

     MC                      **Redacted**                           4.50

               **Redacted**   telefax to A.R. Ellison and T.
               Barba re: news article;    **Redacted**
                             **Redacted**

                              **Redacted**

                              **Redacted**

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

                                                                    DIB_003221

A.R. Ellison                                                    Page    6

                                                    ___ Hours

                        **Redacted**

7/15/99  ASF              **Redacted**              1.50

                    telephone conference with Steve
              Kashsett, Middle East Chief of State
              Department counterterrorism section.

                        **Redacted**

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

A.R. Ellison

Hours

**Redacted**

**Redacted**

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003223

A.R. Ellison

Hours

**Redacted**

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003224

A.R. Ellison

Hours

**Redacted**

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003225

A.R. Ellison

_____Hours

**Redacted**

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003226

A.R. Ellison

Hours

7/23/99  JR          **Redacted**          3.00
                     draft demand letter to New York
                     Times re: defamatory article.

**Redacted**

**Redacted**

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

A.R. Ellison

Hours

**Redacted**

7/28/99                      **Redacted**

JR    Telephone conference with A. R. Ellison re:        1.40
                **Redacted**        demand
      letter to New York times.

**Redacted**

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003228

A.R. Ellison

Hours

**Redacted**

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003229

A.R. Ellison

Page   14

Hours      Amount

**Redacted**

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

*FINE & ASSOCIATES, P.A.*

*600 Douglas Centre*
*2600 Douglas Road*
*Coral Gables FL 33134*

February 2, 2000

A.R. Ellison
Dubai Islamic Bank PJSC
Airport Road, Deria
Dubai, U.A.E.
VIA TELEFAX-0119714.295.5396

Re:       Dubai Islamic Bank v. Sissoko, et al.
Matter #    1700.1

Professional services

                                                            Hours

**Redacted**

01/04/00  ASF   Review email from A. R. Ellison; finalize letters       0.70
                to New York Times;    **Redacted**
                        **Redacted**

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003231

A.R. Ellison

Hours

**Redacted**

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003232

A.R. Ellison                                    Page    3

                                        ___Hours
                **Redacted**

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003233

A.R. Ellison

Hours

**Redacted**

**CONFIDENTIAL**

This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003234

A.R. Ellison

Hours

**Redacted**

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003235

A.R. Ellison

Hours

**Redacted**

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003236

A.R. Ellison

Hours

**Redacted**

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003237

A.R. Ellison

___ Hours

**Redacted**

___ ___ Amount

**Redacted**

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003238

A.R. Ellison

_____ Amount

**Redacted**

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003239

*FINE & ASSOCIATES, P.A.*

*600 Douglas Centre*
*2600 Douglas Road*
*Coral Gables FL 33134*

February 2, 2000

A.R. Ellison
Dubai Islamic Bank PJSC
Airport Road, Deria
Dubai, U.A.E.
VIA TELEFAX-0119714.295.5396

Re:       Dubai Islamic Bank - Imaging Project
Matter #  1700.2

## Redacted

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

DIB_003240

A.R. Ellison

**Redacted**

**CONFIDENTIAL**
This document is subject to a Protective Order regarding confidential information in
03 MDL 1570 (GBD), United States District Court for the Southern District of New York

DIB_003241