(Previously Filed Under Seal at ECF No. 8505)

## MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES
In re: Terrorist Attacks on September 11, 2001 (S.D.N.Y.)

**VIA ECF**

September 7, 2022

The Honorable Sarah Netburn, U.S. Magistrate Judge
Thurgood Marshall U.S. Courthouse, Room 430
40 Foley Square
New York, NY 10007

Re:   *In Re: Terrorist Attacks on September 11, 2001,* 03 MDL 1570 (GBD) (SN)

Dear Judge Netburn:

In light of newly available evidence that Dubai Islamic Bank ("DIB") possesses, but failed to identify and produce, responsive documents about its witting sponsorship of al Qaeda, Plaintiffs with claims against DIB ask the Court to compel DIB to comply with its continuing duty to supplement deficient discovery responses pursuant to Fed R. Civ. Proc. 26(e) (which continues even after discovery closed). Recent CIA and FBI disclosures of long-classified evidence under Executive Order 14040 ("EO Productions") show the search methodology DIB insisted on using was flawed and failed to identify relevant documents responsive to Plaintiffs' requests. The EO productions confirm the existence of those documents, and DIB is obligated to supplement its productions in light of the new evidence. Plaintiffs therefore ask the Court to compel DIB to conduct appropriate searches and produce documents to meet its Rule 26(e) obligation and this Court's previous Order.[1]

1. **Background and Brief History**

On July 8, 1999, the New York Times published a report titled *U.S. Officials Say Aid for Terrorists Came Through Two Persian Gulf Nations*, indicating that the "[CIA] has obtained evidence that Mr. [Osama] bin Laden has been allowed to funnel money through [DIB]." According to the Times, "United States intelligence officials said they had evidence that Mr. bin Laden had a relationship with the bank, which they believed had been arranged with the approval of the officials who control the bank." When asked about the New York Times' report during an official State Department press briefing that same day, the State Department's spokesperson confirmed the U.S. government was working with the United Arab Emirates ("UAE") to strengthen "our counterterrorism cooperation in many areas, including terrorist money-laundering," and said the UAE government "told us that the Dubai Emirati government has taken steps to clean up [DIB] and to restore its reputation."

Plaintiffs sought to obtain discovery from DIB as to the transactions, relationships, and support activities that prompted U.S. officials to initiate high-level discussions with their Emirati counterparts aimed at closing the backchannel to bin Laden at DIB. Although senior Emirati officials held management roles at DIB at the time of those meetings, and at the time of Plaintiffs' discovery requests, DIB professed to have no information about the issues the U.S. raised and no means to

---

[1] ECF No. 4046 (July 11, 2018). In addition, to the extent the Court agrees that the existing record establishes the availability of jurisdiction over DIB, as Plaintiffs respectfully urge is the case, DIB's obligation to supplement its searches and productions as outlined herein may be required as part of further merits proceedings.

**SUBJECT TO FBI PROTECTIVE ORDER**

Authorized for Public Filing on the MDL Docket by the DOJ/FBI

The Honorable Sarah Netburn
September 7, 2022
Page 2

_____

obtain that information. Plaintiffs also sought to develop that information through discovery directed to the U.S., but the U.S. government refused to provide it on the grounds that it remained classified.

These circumstances compelled Plaintiffs to deduce DIB's relationships that served as conduits (or cut-outs) for the bank's backchannel to bin Laden and al Qaeda. Those through whom Plaintiffs deduced support potentially ran included: (1) al Qaeda's financial officers, including Saidi Madani al Tayyib ("Tayyib")(a/k/a Abu Khalifa al Omani ("Omani")); (2) DIB Chairman Saeed Ahmed Lootah ("Lootah"); (3) bin Laden's businesses operating in Sudan while he and al Qaeda received safe haven from Hassan al Turabi and the National Islamic Front ("NIF"); and (4) terrorist financiers, such as Sulaiman al Ali ("Ali"). Plaintiffs sought to explore those relationships in discovery and DIB agreed to conduct searches in its legacy account database for the names Plaintiffs compiled, but insisted on using an "exact match" search term methodology applied to its accountholder field.[2] On September 10, 2018, DIB informed Plaintiffs it had searched using terms Plaintiffs provided—which included Tayyib, Omani, Lootah, bin Laden's Sudanese Businesses, and Ali[3]—and did not find responsive documents to produce.[4]

In March and April 2022, the CIA released 864 pages of previously classified materials under Executive Order 14040. That production confirms DIB's extensive and witting support for al Qaeda, and reveals that DIB and Chairman Lootah in fact had relationships with bin Laden, his Sudanese businesses, al Qaeda's financial officers (Tayyib), and terrorism financiers (Ali), as described below. Each of those relationships should have been flagged in reasonable searches by DIB. Additional evidence existed—*e.g.*, related to Hisham Ihsan Koprulu, Hassan al Turabi, the NIF, and DIB Board Member Sheikh Yousif Jassim al Haji—that DIB also should have flagged and produced.

The recent EO Productions also confirm that DIB's search methodology was flawed and failed to identify whole categories of relevant documents the EO Productions show exist, resulting in gaps in the productions and depriving Plaintiffs of evidence.[5] Given the newly available information showing gaps in DIB's discovery protocol and productions, DIB is obliged under Rule 26(e) to search for documents related to each of these individuals and entities and update its productions.

During a meet-and-confer call with DIB counsel in mid-April, Plaintiffs raised the new evidence, indicating that it required DIB to supplement its searches and production. Plaintiffs followed up on May 9, 2022 (ex. 2), specifying 5 targeted areas of required supplementation. On June 1, 2022, DIB advised that it intended to respond to Plaintiffs' letter. Then, on June 3, 2022, DIB requested an extension to respond to allow time for the parties to confer confidentially regarding supplemental searches by DIB. Because DIB asked that those discussions (which continued through July 2022) be conducted confidentially, and not subject to disclosure to the Court, Plaintiffs are unable to provide

---

[2] *See* Ex. 1, ECF No. 3791-12, at 3 (DIB would search "for exact matches . . . in the full name accountholder field in DIB's electronic account record keeping system."). Exhibits are to the Decl. of Robert T. Haefele (Aug. 31, 2022).
[3] *See, e.g.,* Ex. 1, where DIB agrees to search for 618 names listed in Appendix B, including Tayyib/Omani (#3-17); Lootah (#571); Ali (#583); bin Laden (#294-300), and his Sudanese Businesses, which include Wadi al Aqiq (#387); Al Hijrah Construction and Development (#354); Taba Investment Company (#386); Al Timar al Mubarikah (#358); Gum Arabic Company (#370); Bin Ladin International (#363); Al Qudarat Transport (#356); Blessed Fruits Company (#364). The term "Bin Ladin's Sudanese Businesses" also includes the Khartoum Tannery. *See* Ex. 2, May 9, 2022, PECs Letter to S. Cottreau & G. Pritsker. DIB had agreed to search for these names before the final search list in the July 11, 2018 Order.
[4] Ex. 11, September 10, 2018 Letter from S. Cottreau to S. Carter.
[5] *See* ECF No. 8471 at 10, n.42.

**SUBJECT TO FBI PROTECTIVE ORDER**

Authorized for Public Filing on the MDL Docket by the DOJ/FBI

The Honorable Sarah Netburn
September 7, 2022
Page 3

_____

further details, other than to say DIB's proposals were inadequate. Plaintiffs also wrote to DIB on July 27, 2022 (after receiving DOJ/FBI permission to share information with DIB counsel), to apprise DIB of the FBI information establishing Suleiman al Ali's accounts at DIB, and to provide other identifying details for those accounts. DIB refused to produce further information about al Ali's account(s), despite the additional identifying information.

2. **Evidence from the EO Productions proves DIB's discovery efforts were flawed.**

*First*, the EO Productions reveal the existence of at least one DIB account for Sulaiman Al Ali, though DIB identified none. The EO Production showed Ali, an associate of 9/11 terrorist facilitator Omar al Bayoumi, maintained at least one DIB account from which he wired money to Bayoumi while Bayoumi was aiding 9/11 hijackers.[6] DIB has represented that it found no relevant information about Ali. Given the evidence that DIB had at least one account for Ali, DIB's searches were deficient and this Court should compel DIB to search for all accounts associated with Ali, which it has to date refused to do despite this new evidence.

*Second*, the EO Productions confirms DIB's relationships with bin Ladin, his organization and affiliated persons, and his Sudanese Businesses, indicating substantial deficiencies in DIB's "exact match" search methodology and its productions in light of its failure to produce results from these areas. The CIA assessed that "[DIB was] a key financial conduit for [bin Laden]'s Islamic Army"[7] that stood out because of DIB's "management's apparently witting involvement in the financial activities of … [bin Laden]'s Islamic Army."[8] The documents reveal that bin Laden had substantial financial and business relationships with DIB and, in particular, Chairman Lootah. For example, CIA documents evidence that bin Laden and his financial officers secured letters of credit from DIB which Chairman Lootah, personally endorsed.[9] The CIA also assessed that "DIB Chairman Saeed Ahmed Lootah is a close friend of [bin Laden]'s" and that "Bin Ladin and his companies maintained … accounts at DIB"[10] The CIA also concluded that Lootah had a financial relationship with "Hisham Ihsan Koprulu, the General Manager of Koprulu Trading Company in Dubai, … a DIB customer who has had regular business and financial dealings with bin Laden, his Al-Hijra company, and Islamic Army members."[11] The CIA found that "Bin Ladin's Sudan-based companies and his financial officers opened bank accounts and letters of credit at [DIB] with the active help of DIB Chairman Sa'id Ahmed Lootah."[12]

---

[6] Ex. 3, at EO14040-002929 (FBI Report investigating bank records associated with Bayoumi refers to "this account" "belonging to Sulaiman El Ali" that wired $190.50 from DIB on November 4, 1999); Ex. 4, at EO14040-003075; *see also* Ex. 3.1, at EO14040-002929-MDL-UPDATED (providing additional account information) [~~SUBJECT TO FBI PROTECTIVE ORDER~~]; Ex. 4.1, at EO14040-003075-MDL (showing "Sulaiman El Ali Sharjah UAE" in the "Originator" field for the November 4, 1999 wire transfer to Bayoumi's account. [~~SUBJECT TO FBI PROTECTIVE ORDER~~] [with authorization to disclose to U.S.-based counsel for DIB who have signed the FBI Protective Order].

[7] Ex. 5, at CIA_000722; *see also* Ex. 8, at CIA_000337 ("[DIB] has served as a key financial conduit for Al-Qa'ida…."); Ex. 5, at CIA_000734 ("[DIB] is a financial conduit for [al-Qaeda]….").

[8] Ex. 5, at CIA_000728.

[9] Ex. 5, at CIA_000747; Ex. 6, at CIA_000045; Ex. 7, at CIA_000426.

[10] Ex. 8, at CIA_000337 (emphasis added); *see* Ex. 5, at CIA_000735 ("Bin Ladin's Sudan-based companies are customers of DIB"); Ex. 5, at CIA_000722 ("Bin Ladin and his Sudan-based companies maintain several accounts at DIB.").

[11] *Id.*

[12] Ex. 6, at CIA_000045.

The Honorable Sarah Netburn
September 7, 2022
Page 4

___

*Third*, the EO Productions reveal DIB evaded production of documents about Al Qaeda's chief financial officer[13] Saidi Madani al Tayyib (a/k/a Abu Khalifa al Omani), who was "the overall supervisor for [Al Qaeda's] financial committee and [was] in charge of all Islamic Army finances."[14] In November 1998, the CIA assessed Tayyib and other Al Qaeda members "held numerous accounts at DIB because of Bin Ladin's reported personal friendship with DIB Chairman, Saeed Ahmed Lootah."[15] CIA documents also evidence that Omani "handle[d] Bin Ladin's money in the Gulf"[16] and managed a business for Al Qaeda in Jabal Ali, UAE that worked with businesses of Chairman Lootah, which then "cooperate[d] with Bin Ladin's companies."[17] Despite the CIA's assessments, DIB produced only a very limited number of documents as to Tayyib.

*Fourth*, the EO Productions confirmed DIB's relationship with Hassan al Turabi and the NIF.[18] Discussing bin Laden's Sudanese businesses, the CIA assessed that "several hundred/thousand [NIF] members worked for Bin Ladin. Every Bin Ladin company had at least some NIF employees."[19]

*Fifth*, the EO Productions reveal that Yousif Jassim al Haji was a board member at DIB.[20] Plaintiffs expert Winer notes that "[t]he CIA found that DIB Board Member Al Haji was also an executive board member of the Khartoum-based Islamic Dawa Organization, an NGO controlled by (Turabi's) NIF."[21] Haji was also the chairman of the International Islamic Charities Organization ("IICO") which was also present on Plaintiffs earliest request for production.[22]

Under Fed. R. Civ. P. 26(g), DIB must "certify that they have conducted a reasonable inquiry in response to a discovery request."[23] Certification recognizes that "[r]esponding parties are best situated to evaluate the procedures, methodologies, and technologies appropriate for preserving and producing their own electronically stored information."[24] However, DIB's conduct—its repeated insistence on the "exact match" methodology—and evidence from the EO Productions flagging gaps in its production, shows that DIB's searches were incapable of locating relevant documents. Indeed, courts in this District insert themselves into discovery processes on "a showing of …, *the failure to produce relevant specific documents known to exist or that are likely to exist*, or other malfeasance."[25]

___

[13] Ex. 8, at CIA_000320; CIA_000322.
[14] Ex. 9, at CIA_000363; *see* Ex. 10, at CIA_000510 ("Tayyib headed the financial and administrative committee, which supervised al-Qa'ida's overall finances and audited al-Qa'da members."); *see also* 9/11 Commission Final Report at 68, 122 (describing Tayyib as the "head of al Qaeda's finance committee" and "an important al Qaeda financial official").
[15] Ex. 8, at CIA_000322; *see* Ex. 8, at CIA_000337 ('[DIB] served as a key financial conduit for Al-Qa'ida and for Bin Ladin's companies in Sudan, [redacted] Bin Ladin and his companies maintained [redacted] accounts at DIB [redacted] DIB Chairman Saeed Ahmed Lootah is a close friend of Bin Ladin's.").
[16] Ex. 7, at CIA_000426.
[17] *Id.*
[18] Ex. 5, at CIA_000734 (stating that Lootah has ties to "NIF Leader Turabi").
[19] Ex. 7, at CIA_000422.
[20] Ex. 12, July 29, 2022, Declaration of Jonathan Winer, Exhibit A, Winer Supplemental Report (ECF No. 8317-4) at 3.10.7, citing CIA_000797 (Ex. 5).
[21] *See id.* at 7.13, citing CIA_000737 (Ex. 5).
[22] *See* Ex. 5, at CIA_000737 (stating "Sheikh Yousif Jassim Al Haji…is chairman of the Kuwait-based International Islamic Charities Organization (IICO);" *See* Ex. 13, October 15, 2010, Requests for Production, Request Nos. 89, 91.
[23] *Brown v. Barnes and Noble, Inc.*, 474 F. Supp. 3d 637 n. 5 (S.D.N.Y. 2019).
[24] *Hyles v. New York City*, No. 10-cv-3119 (AT) (AJP), 2016 WL 4077114, at *3 (S.D.N.Y. Aug. 1, 2016) (quoting The Sedona Principles: 2nd Edition, Best Practices Recommendations, Principle 6).
[25] *Winfield v. City of New York*, 2017 WL 5664852, at *9 (S.D.N.Y. Nov. 27, 2017) (emphasis added).

The Honorable Sarah Netburn
September 7, 2022
Page 5

      Here, only DIB knew where relevant and responsive documents were likely to be located, how files were named, and how to find them. But the record now available shows that DIB's "exact match" protocol set an impossible bar. Indeed, the EO Productions show the accountholder field in DIB's database likely includes information beyond the accountholder's name, as the FBI's production concerning Sulaiman al Ali's DIB account indicates is the case.[26] See Ex. 4.1, EO14040-003075-MDL (**SUBJECT TO FBI PROTECTIVE ORDER**), which shows the originator of the wire transfer to 9/11 facilitator Bayoumi as "Sulaiman El Ali Sharjah," suggesting DIB included the originating branch location (Sharjah) in the account name field. Even if the accountholder field is limited to a name, searches of that database would not identify beneficiaries of letters of credit or other supportive financial relationships DIB held for al Qaeda's benefit, that did not constitute traditional accounts.

    3. **DIB must comply with Rule 26(e).**

      On May 9, 2022, after the CIA's EO Productions, Plaintiffs conferred with DIB to identify five targeted searches for DIB to undertake given the evidence that DIB's searches were inadequate.[27]

1. Records concerning any letters of credit in favor of bin Laden, bin Laden's Sudanese businesses, Saidi Madani al Tayyib (and any business associated with him), and/or Abu Khalifa al Omani (and any business associated with him);

2. Records concerning cooperation between DIB Chairman Saeed Ahmed Lootah and/or his businesses and bin Laden's companies;

3. Records concerning DIB's relationship with Hisham Ihsan Koprulu or Koprulu Trading Company in Dubai;

4. Records concerning the relationships between Chairman Lootah and his businesses and (1) bin Laden or his Sudanese Businesses; (2) Saidi Madani al Tayyib (a/k/a Abu Khalifa al Omani) and companies associated with him; (3) Hassan al Turabi or the NIF; and (4) Hisham Ihsan Koprulu of his companies; and

5. Records concerning DIB Board Member Sheikh Yousif Jassim al Haji.

      DIB is obliged to supplement its deficient discovery responses and productions now that the public record revealed its initial discovery responses are incomplete, or otherwise deficient.[28] DIB has itself suggested that newly discovered facts *could be* a basis for supplemental discovery requests.[29]

      For the foregoing reasons, plaintiffs respectfully request that the Court order DIB to immediately conduct the five targeted searches identified above.

---

[26] Plaintiffs have provided account and reference numbers for Ali's account and asked DIB to provide account records to show how Ali is identified in DIB's database. This information will clarify issues about DIB's search protocol.

[27] Ex. 2, May 9, 2022, Letter from PECs to S. Cottreau and G. Pritsker.

[28] Fed. R. Civ. P. 26(e); *Arthur v. Atkinson Freight Lines Corp.*, 164 F.R.D. 19, 20 (S.D.N.Y. 1995); *see also Allen v. Colgate-Palmolive Co.*, 1985 WL 191, at *1 (S.D.N.Y. Jan. 14, 1985) ("[t]he obligation to update and supplement [discovery] responses continues even after the close of discovery"); *Star Direct Telecom, Inc v. Global Crossing Bandwidth, Inc*, 272 F.R.D. 350, 358 (W.D.N.Y. 2011) ("The duty to supplement continues even after the discovery period has closed").

[29] Ex. 14, August 22, 2012, Letter from S. Cottreau to S. Carter, stating "[n]one of the requests to DIB are the consequence of newly discovered facts."

**SUBJECT TO FBI PROTECTIVE ORDER**

Authorized for Public Filing on the MDL Docket by the DOJ/FBI

The Honorable Sarah Netburn
September 7, 2022
Page 6

_____

Respectfully submitted,

| COZEN O'CONNOR | MOTLEY RICE LLC |
|---|---|
| By: /s/ Sean P. Carter | By: /s/ Robert T. Haefele |
| SEAN P. CARTER | ROBERT T. HAEFELE |
| COZEN O'CONNOR | MOTLEY RICE LLC |
| One Liberty Place | 28 Bridgeside Boulevard |
| 1650 Market Street, Suite 2800 | Mount Pleasant, SC 29465 |
| Philadelphia, Pennsylvania 19103 | Tel.: (843) 216-9184 |
| Tel.: (215) 665-2105 | Email: rhaefele@motleyrice.com |
| Email: scarter@cozen.com | For the Plaintiffs' Exec. Committees |
| For the Plaintiffs' Exec. Committees | |

cc: The Honorable George B. Daniels, via ECF
All Counsel of Record via ECF

**SUBJECT TO FBI PROTECTIVE ORDER**

Authorized for Public Filing on the MDL Docket by the DOJ/FBI