(Previously Filed Under Seal at ECF No. 8563)

# MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES
In re: Terrorist Attacks on September 11, 2001 (S.D.N.Y.)

**VIA ECF**

September 26, 2022

The Honorable Sarah Netburn, U.S. Magistrate Judge
Thurgood Marshall U.S. Courthouse, Room 430
40 Foley Square
New York, NY 10007

      Re:    *In Re: Terrorist Attacks on September 11, 2001,* 03 MDL 1570 (GBD) (SN)

Dear Judge Netburn:

      The Plaintiffs' Executive Committees ("PECs") reply to Dubai Islamic Bank's ("DIB") Opposition at ECF No. 8539 ("Opp."), and in further support of the PECs' motion to compel at ECF No. 8505. DIB repeatedly mischaracterizes the PECs' request as "reopening" discovery to dissuade the Court from requiring DIB to comply with its preexisting obligations under previous orders where recent finished U.S. intelligence assessments (the "EO Productions") show DIB remains noncompliant and obligated to supplement under Rule 26(e).[1] *See* ECF No. 8505 at n. 28.[2]

      ***First***, **Plaintiffs are not seeking to reopen discovery, but instead are asking the Court to compel DIB to cure manifest defects in its prior discovery efforts, as necessitated by new evidence demonstrating the gross inadequacy of those prior efforts.** DIB's revisionist account of discovery and focus on irrelevant minutia cannot distract from the fact that it represented that it was not in possession of documents reflecting relationships with key al Qaeda ("AQ") partners, but CIA intelligence now confirms such documents do exist. Plaintiffs have shown that DIB's productions were noncompliant with this Court's Order—e.g., based on DIB's representation that it located no documents for accounts in Sulaiman al Ali's name. ECF No. 8507-12. The EO Productions lay bare *with certainty* that Sulaiman al Ali *did* maintain at least one account with DIB, which he used to wire money to Omar al Bayoumi while he was aiding the hijackers in the 9/11 Attacks. DIB downplays the EO Productions, first by suggesting that they "simply mirror" Plaintiffs' allegations, and second by noting they revealed only one small transaction from Ali to Bayoumi. DIB misses these salient points: (1) the EO Productions do not just repeat Plaintiffs' allegations, but are *corroborative evidence* that support Plaintiffs' allegations; (2) the amount of a singular transaction is irrelevant for the point made to the Court— that an account existed for Ali that DIB never identified; and (3) we have no information as to who else Ali sent funds to or how much he sent precisely because DIB never flagged the account.[3]

      ***Second***, **DIB's misleading attempts to blame Plaintiffs only underscore its own efforts to design search protocols to avoid the production of damaging evidence.** DIB failed to inform

---

[1] Based on the evidence, DIB remains noncompliant with Plaintiffs' October 15, 2010, First Set of Requests for Production of Documents, as ordered by this Court on July 11, 2018 (ECF No 4046).

[2] Due to space constraints, Plaintiffs cannot comprehensively address every argument DIB raised in its Opposition, where it raised new substantive arguments and mischaracterizations of the parties' discovery history. Plaintiffs oppose DIB's mischaracterizations and do not waive any right to address the miscellaneous additional arguments in future argument.

[3] Again, Plaintiffs even requested that DIB search for Ali's account using reference numbers disclosed in the EO Productions. To date, DIB has declined to do so.

**~~SUBJECT TO FBI PROTECTIVE ORDER~~**

The Honorable Sarah Netburn
September 26, 2022
Page 2

Plaintiffs that, even if it were given Ali's precise name with an endless number of variable spellings in multiple languages, DIB would have returned no "hits" because the field DIB proposed to search included data beyond his name—for which Plaintiffs had no way of accounting.[4] It is unreasonable to place the burden on Plaintiffs to uncover DIB's naming conventions for its internal files. DIB makes Plaintiffs' point: if even DIB (which knows its customers and data better and purports to have experts to avoid terrorist financing) is unable to locate individuals within its own system, how can Plaintiffs be better able to do the same? DIB further argues against itself by noting that use of wildcard characters to capture the number of name variations would result in thousands of purportedly false positives. DIB's admission that many hits would have resulted if they had accounted better for the name variations only heightens the concern that their own exact match protocol turned up zero hits.[5]

DIB repeatedly misrepresents that Plaintiffs agreed to its deficient search methodology. In fact, DIB presented the "exact match" protocol as an ultimatum, insisting it was the only way it would conduct discovery.[6] Rather than opposing DIB without knowing whether its searches would be fruitful, the PECs submitted to DIB's representations and recognized that this was the best approach to see if the proposal worked and reserved the right to follow up if it became apparent the approach was deficient. Once it was clear DIB's methodology yielded deficient results, DIB was obligated to correct the deficiency. DIB extols its efforts to avoid providing financial service support to terrorists but misses that those efforts reveal that DIB must know its customers and has better means to identify when those customers present a risk if the bank providing such services.[7] It is revealing that, even after the EO Productions reveal DIB's searches did not disclose responsive files,[8] DIB still insists that the failed "exact match" protocol continue to be used.

**_Lastly,_ other arguments are red herrings aimed to distract.** DIB's suggestion (Opp. at 1) that it could not know who to flag in its database without the U.S. government sharing AQ-related names,[9] ignores the substantial evidence from the finished intelligence assessments in the EO Productions that Saeed Lootah and other bank personnel were familiar enough with Osama bin Laden and AQ to have known who they were and what their goals were.[10]

DIB gets it backwards where (Opp. at 2) it dismisses as mere speculation Plaintiffs' assertion that the EO Productions evidence that more documentation exists. Where finished intelligence assessments that span years evidence the existence of multiple DIB accounts and relationships related to bin Ladin and AQ, resulting in the CIA's assessment that DIB was a "key financial conduit" for

---

[4] *See* ECF No. 8505, at 3, n. 6 and 5.
[5] If proposed searches produced too many hits, the reasonable approach was to filter results in good faith in consultation with Plaintiffs, instead of rejecting a methodology entirely (and unilaterally) for one that would instead yield zero hits.
[6] ECF No. 8507-1 (March 2017 letter from Katie Barlow).
[7] DIB is aware of this, as it submitted declarations alleging that its AML teams were robust and conducted searches after the 9/11 Attacks. *See* ECF No. 8539-11, Maazmi Decl. at ¶ 5, stating that DIB appointed an AML Compliance Officer in February 2001, and ¶ 32 stating that "In my experience at DIB since July 2001, I believe that DIB **then** and now would promptly terminate any customer relationship and report the customer to the UAE government if DIB believed the customer was funding or otherwise involved in terrorist activity" (emphasis added). DIB contradicts itself, claiming it does not know how to search accounts for terrorists because it is "just a bank" while simultaneously boasting of a well-organized compliance team in 2001.
[8] For example, Sulaiman al Ali's account.
[9] Contradicting itself, DIB submitted a Declaration of a former AML Officer indicating it knew how to search and manage its customer databases to comply with UAE requirements. *See*, *generally*, ECF No. 8539-11 (Maazmi Declaration).
[10] ECF No. 8317-1, Plaintiffs' Averment of Facts and Counterstatement of Facts Pursuant to Rule 56.1 ECF ¶¶ 70-99.

**SUBJECT TO FBI PROTECTIVE ORDER**

The Honorable Sarah Netburn
September 26, 2022
Page 3

AQ, they represent evidence that additional documentation as to those accounts and relationships necessarily exist, but were not produced by DIB. Further, DIB speculates (Opp. at 2) that U.S. officials' "clean up" statement should be viewed in "context" (*i.e.*, that it has nothing to do with terrorism). Once again, this narrative does not comport with the facts or the CIA's assessments.[11]

DIB asserts (Opp. at 2) that the EO Productions do not "allege that DIB knew that any of its customers were terrorists or involved with violence" and "provide no indication that DIB was even warned of any relationships and failed to take action." DIB ignores that the documents state that DIB's management had "witting involvement in the financial activities" of AQ.[12] DIB also ignores other record evidence that it appointed extremists to positions of influence within the bank[13] and that during the period that it was alleged to be providing witting support to bin Laden and AQ, AQ was known to be actively targeting the US.[14]

Next, DIB's tedious explanation (Opp. at 4) that Plaintiffs "do not understand" letters of credit side steps the issue. First, DIB suggests the unlikely scenario that letters of credit personally arranged by the chairman and founder of the bank were not approved as a matter of course. Second, DIB's interpretation is clearly at odds with the CIA's assessments. Finally, DIB's suggestion (Opp. at 4) that discovery Plaintiffs received closes any issues about letters of credit wrongly assumes that Plaintiffs received all discovery on all the relevant accounts despite the flawed "exact match" protocol, and that DIB produced all relevant files. The EO Productions present a different reality than what DIB portrays. But even DIB's absurd reality would not explain why DIB had not flagged and produced documents evidencing *applications* for letters of credit.

DIB then argues, Opp. at 5, that Plaintiffs should have deposed certain witnesses (*e.g.*, Lootah), but it omits DIBs aggressive opposition to any discovery as to those witnesses and the problem of conducting depositions of witnesses.[15] Further, DIB ignores that it did not produce documents relevant to those witnesses, yet still reprimands Plaintiffs for not conducting depositions, where fruitful and comprehensive depositions were impossible absent document discovery. The information in the EO Productions stands in stark contrast to the picture DIB paints now.[16]

Lastly, DIB contends (Opp. at 5) that Hisham Ihsan Koprulu and Koprulu Trading Company are "at best tangential," despite the CIA's findings.[17] DIB once again reprimands Plaintiffs for not seeking discovery related to Koprulu, again ignoring that Plaintiffs did not have this corroborative evidence during discovery.

For the foregoing reasons, Plaintiffs respectfully request that the Court order DIB to immediately conduct the targeted searches identified in our motion to compel.

---

[11] *See* ECF No. 8317-1, Plaintiffs' Averment of Facts and Counterstatement of Facts Pursuant to Rule 56.1, ¶¶ 171-187.
[12] CIA_000728.
[13] *See* ECF No. 8317-1, Plaintiffs' Averment of Facts and Counterstatement of Facts Pursuant to Rule 56.1, ¶¶ 140-158.
[14] *Id.* at ¶¶ 159 – 170.
[15] *See, e.g.,* ECF No. 3057, at 6, n. 3 (accusing plaintiffs of wrongly assessing that DIB Chairman Saeed Ahmed Lootah was the Ahmed Lootah that al Qaeda whistleblower Jamal al Fadl identified as having a relationship with Al-Tayyib).
[16] On page 1, DIB says "DIB unwittingly maintained accounts for people who were later identified as members or supporters of Al Qaeda." This conflicts with CIA accounts of the DIB/Lootah relationships with AQ.
[17] Specifically, that he was a "DIB customer who had regular business and financial dealings with bin Laden, his Al-Hijra company, Islamic Army Members." ECF No. 8507-7, at CIA_000735.

**SUBJECT TO FBI PROTECTIVE ORDER**

The Honorable Sarah Netburn
September 26, 2022
Page 4

---

Respectfully submitted,

| COZEN O'CONNOR | MOTLEY RICE LLC |
|---|---|
| By: /s/ Sean P. Carter | By: /s/ Robert T. Haefele |
| SEAN P. CARTER | ROBERT T. HAEFELE |
| COZEN O'CONNOR | MOTLEY RICE LLC |
| One Liberty Place | 28 Bridgeside Boulevard |
| 1650 Market Street, Suite 2800 | Mount Pleasant, SC 29465 |
| Philadelphia, Pennsylvania 19103 | Tel.: (843) 216-9184 |
| Tel.: (215) 665-2105 | Email: rhaefele@motleyrice.com |
| Email: scarter@cozen.com | For the Plaintiffs' Exec. Committees |
| For the Plaintiffs' Exec. Committees | |

cc: The Honorable George B. Daniels, via ECF
All Counsel of Record via ECF

**SUBJECT TO FBI PROTECTIVE ORDER**