UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

In re:

       TERRORIST ATTACKS ON
       SEPTEMBER 11, 2001

-----------------------------------------------------------------X

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC #:** _____
**DATE FILED:** __1/13/2025__

**03-MD-01570 (GBD)(SN)**

**REPORT &**
**RECOMMENDATION**

**SARAH NETBURN, United States Magistrate Judge.**

**TO THE HONORABLE GEORGE B. DANIELS:**

This document relates to:

       <u>Burnett v. Islamic Republic of Iran</u>, No. 15-cv-09903 (GBD)(SN)

       In the decades since this multidistrict litigation began, the Court has entered thousands of default judgments against Iran. The vast majority of these decisions have relied upon a private right of action that provides an exception to foreign sovereign immunity—but is restricted to United States nationals, military personnel, and government employees. 28 U.S.C. § 1605A(c).

       The <u>Burnett</u> Plaintiffs, who move for entry of partial final default judgment against Defendants the Islamic Republic of Iran, the Islamic Revolutionary Guard Corps, and the Central Bank of the Islamic Republic of Iran (collectively, the "Iran Defendants"), are not U.S. nationals. <u>See</u> Pls.' Mot., ECF Nos. 9733, 9945, 10027, 10045.[1] For that reason, they cannot bring their claims pursuant to the private right of action found at 28 U.S.C. § 1605A(c). Instead, they seek to hold the Iran Defendants accountable through another exception to foreign sovereign immunity, 28 U.S.C. § 1605B(b), and under state tort law.

---

[1] Unless otherwise noted, all ECF numbers refer to the main MDL docket, No. 03-md-01570.

They ask the Court to apply New York law for certain claims, and Virginia law for other claims. Two Burnett Plaintiffs ask to be treated as the functional equivalents of immediate family members to 9/11 decedents. The Court recommends granting their motions in part.

## BACKGROUND

The Court assumes familiarity with this multidistrict litigation and summarizes only the relevant procedural and factual background. On January 31, 2017, the Court granted default judgment as to liability for certain Burnett Plaintiffs against the Iran Defendants. See Op., ECF No. 3443. That judgment was premised on the Court's 2011 decision assessing Iran's role in facilitating the 9/11 Attacks. See In re Terrorist Attacks on Sept. 11, 2001 ("In re 9/11"), No. 03-md-01570 (GBD)(SN), 2011 WL 13244047, at *2–36 (S.D.N.Y. Dec. 22, 2011). In broad terms, the Court found that Iran had waged an "undeclared war" on the United States "through asymmetrical[] or unconventional strategies and terrorism" via "proxies such as . . . al Qaeda." Id. at *3. Iran's "material support" for al Qaeda, the Court concluded, proximately caused the 9/11 Attacks. Id. at *41. And since the claims at issue otherwise satisfied 28 U.S.C. § 1605A(c), the Court held Iran liable for the resulting damages to U.S. national victims and families. See id. at *39–42.

Subsequent rulings confirmed the application to claims brought by non-United States nationals. See In re 9/11, 2024 WL 4268663 (S.D.N.Y. Jan. 5, 2024) ("King R&R"), report and recommendation adopted by 2024 WL 1312504 (Mar. 26, 2024) ("King Opinion") (holding that non-United States nationals may bring claims against the Iran Defendants through § 1605B(b) and under New York tort law).

**DISCUSSION**

The Burnett Plaintiffs' motions require the Court to take up a new issue: the Iran

Defendants' liability to non-U.S. nationals under Virginia tort law. Though the Court has

previously found that non-U.S. nationals—precluded as they are from seeking relief under 28

U.S.C. § 1605A(c)—can hold foreign sovereigns accountable under 28 U.S.C. § 1605B(b), it

never considered whether those same plaintiffs can establish claims pursuant to Virginia tort law.

See King Opinion. The King Opinion, which first opened the door to plaintiffs' § 1605B(b)

claims, addressed an assault and battery claim under New York law. Id. Subsequent decisions

applying King granted relief for wrongful death and intentional infliction of emotional distress

("IIED") under New York law. See In re 9/11, 2024 WL 3046225, at *2 (S.D.N.Y. June 17,

2024). Now, the Burnett Plaintiffs request relief under both New York and Virginia law.

Before it can grant the Burnett Plaintiffs any relief, then, the Court must resolve:

(1) whether the Court has jurisdiction over their claims; (2) whether the Iran Defendants

defaulted; (3) whether the Iran Defendants are liable for wrongful death and/or IIED under

Virginia law; and (4) if so, what damages are due. The Court must also determine (5) whether

two Burnett Plaintiffs should be treated as the functional equivalents of immediate family

members to 9/11 decedents and should thus be entitled to damages.

The Court's 2011 decision bears on many of these questions. But courts cannot take

judicial notice of factual findings made in another case and rely on them "for the truth of the

matter asserted." Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc., 146 F.3d

66, 70 (2d Cir. 1998) (cleaned up). At the same time, the Foreign Sovereign Immunities Act

("FSIA") "does not require courts to relitigate issues that have already been settled in previous

decisions." Lee v. Islamic Republic of Iran, 518 F. Supp. 3d 475, 480 (D.D.C. 2021) (cleaned

up). Courts can respect these limits and avoid duplication of effort by taking judicial notice of

decisions issued in related cases and "review[ing] [the underlying] evidence," thereby obviating the need for its "re-presentment." Id. (quoting Murphy v. Islamic Republic of Iran, 740 F. Supp. 2d 51, 59 (D.D.C. 2010)). The Court leverages this practice as it answers the fact-bound questions below. See ECF Nos. 2431, 2432, 2433, 2473 (documentary evidence cited in In re 9/11, 2011 WL 13244047).

## I.    The Court Has Jurisdiction

The Foreign Sovereign Immunities Act ("FSIA") "supplies the ground rules for 'obtaining jurisdiction over a foreign state in the courts of this country.'" Federal Republic of Germany v. Philipp, 592 U.S. 169, 175 (2021) (quoting Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 443 (1989)). As its name suggests, the FSIA makes foreign states immune from suit by default, conferring jurisdiction over actions only if they meet strict requirements. The Burnett Plaintiffs' suit clears these hurdles, so the Court has jurisdiction over their claims.

### A.    Subject Matter Jurisdiction

Under the FSIA, district courts have subject matter jurisdiction over nonjury civil actions brought *in personam* against foreign states if "one of several enumerated exceptions to immunity applies." Republic of Sudan v. Harrison, 587 U.S. 1, 4 (2019); see 28 U.S.C. §§ 1330(a), 1604.

The Burnett Plaintiffs identify 28 U.S.C. § 1605B(b) as the relevant exception to immunity. It provides:

> A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which money damages are sought against a foreign state for physical injury to person or property or death occurring in the United States and caused by
>
> (1)    An act of international terrorism in the United States; and
>
> (2)    A tortious act or acts of the foreign state, or of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency,

> regardless where the tortious act or acts of the foreign state
> occurred.

Id. § 1605B(b).

The Burnett Plaintiffs' claims plainly satisfy many of 28 U.S.C. § 1605B(b)'s requirements. They are seeking "money damages" from the Iran Defendants. Id.; see Burnett Am. Comp. at 1082–88, No. 15-cv-09903, ECF No. 53. Those damages are for "death[s]" sustained "in the United States" and "caused" by the 9/11 Attacks. 28 U.S.C. § 1605B(b); see Burnett Am. Comp. at 1081. And the 9/11 Attacks were "act[s] of international terrorism" on U.S. soil. 28 U.S.C. § 1605B(b); see Burnett Am. Comp. at 1081.

One element of 28 U.S.C. § 1605B(b) merits closer attention: the requirement that "a tortious act or acts of the foreign state" "caused" the injury. For FSIA purposes, "a tortious act" includes the "knowing or deliberately indifferent provision of material support to terrorists," and "cause" incorporates "the traditional test for proximate causation[:] . . . 'some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered.'" In re 9/11, 298 F. Supp. 3d 631, 643, 645 (S.D.N.Y. 2018) (quoting Owens v. Republic of Sudan, 864 F.3d 751, 794 (D.C. Cir. 2017)). A "foreign state," meanwhile, "includes a political subdivision of [the] foreign state or an agency or instrumentality of [the] foreign state." 28 U.S.C. § 1603(a). In simple terms, there must be a link between a state's support for terrorism and the plaintiff's injuries.

The Court heard evidence linking the Iran Defendants to the 9/11 Attacks in a 2011 hearing. Based on that record, it found that Iran was "aware[] of[] and involve[d] in[]" al Qaeda's plans and provided "material support" to the terrorist group. In re 9/11, 2011 WL 13244047, at *26, 41. It concluded that Iran's "material support" proximately "caused" the 9/11 Attacks and, by extension, the resulting deaths. Id. at *41. And it determined that the Islamic

Revolutionary Guard Corps and the Central Bank of the Islamic Republic of Iran both fall under the FSIA's definition of a "foreign state." In re 9/11, 2011 WL 13244047, at *41 (finding that the Islamic Revolutionary Guard Corps is a political subdivision of the Islamic Republic of Iran "legally identical to Defendant Iran for purposes [of] liability under the FSIA" and the Central Bank of the Islamic Republic of Iran "at all relevant times acted as [an] agent[] or instrumentalit[y] of [D]efendant Iran"). The evidence supporting those findings establishes the last element of 28 U.S.C. § 1605B(b)—that the Iran Defendants' "tortious act[s]" "caused" the deaths underpinning the Burnett Plaintiffs' claims.

The Burnett Plaintiffs' claims, brought *in personam* against the Iran Defendants, accordingly meet all the requirements of the 28 U.S.C. § 1605B(b) exception to sovereign immunity. See Burnett Am. Comp., No. 15-cv-09903, ECF No. 53. The Court therefore has subject matter jurisdiction under 28 U.S.C. § 1330(a).[2]

## B. Personal Jurisdiction

With subject matter jurisdiction established, personal jurisdiction is simply a matter of showing "valid service of process." Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela, 863 F.3d 96, 104 (2d Cir. 2017) (cleaned up); accord 28 U.S.C. § 1330(b). Service on the Iran Defendants is governed by the FSIA.

The FSIA specifies four methods of serving foreign states or their political subdivisions in descending order of preference. See 28 U.S.C. § 1608(a). The first, service by "special arrangement," was impossible because the Burnett Plaintiffs have no such arrangement with the

---

[2] As noted above, 28 U.S.C. § 1330(a) grants jurisdiction over only "nonjury" actions. The Burnett complaint includes a jury demand, but this does not deprive the Court of jurisdiction. See No. 15-cv-09903, ECF No. 53 at 1089; Houston v. Murmansk Shipping Co., 667 F.2d 1151, 1154 (4th Cir. 1982). Where "a complaint contains a request for a jury trial . . . [against a foreign state] defendant," "the sensible practice is simply to strike the jury demand." Houston, 667 F.2d at 1154.

Islamic Republic of Iran or its political subdivision the Islamic Revolutionary Guard Corps. Id. § 1608(a)(1); see Pls.' Mem. of Law at 6, ECF No. 9734. The second, service according to an "international convention on service of judicial documents," was likewise unavailable because there is no service convention between the U.S. and Iran. 28 U.S.C. § 1608(a)(2); see Pls.' Mem. of Law at 6, ECF No. 9734. The third, service by registered "mail," proved ineffective; the Clerk of Court mailed the requisite documents, but neither the Islamic Republic of Iran or Islamic Revolutionary Guard Corps acknowledged receipt. 28 U.S.C. § 1608(a)(3); see Pls.' Mem. of Law at 6–7, ECF No. 9734. The fourth, service via "diplomatic channels," finally succeeded. 28 U.S.C. § 1608(a)(4); see Pls.' Mem. of Law at 7, ECF No. 9734.

For agencies or instrumentalities of foreign states, the FSIA sets out a separate list of three potential methods of service, also in descending order of preference. See 28 U.S.C. § 1608(b). The first is again service by "special arrangement." 28 U.S.C. § 1608(b)(1). Service was impossible under this method because the Burnett Plaintiffs have no such arrangement with the Central Bank of the Islamic Republic of Iran. See Pls.' Mem. of Law at 7, ECF No. 9734. The second method, which allows for service to be delivered "to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States," or according to an "international convention on service of judicial documents," did not apply. 28 U.S.C. § 1608(b)(2); see Pls.' Mem. of Law at 7, ECF No. 9734. So, as permitted by the third method, the Burnett Plaintiffs attempted service by registered "mail," which succeeded. 28 U.S.C. § 1608(b)(3)(B); see Pls.' Mem. of Law at 7–8, ECF No. 9734; Aff. of Service, No. 15-cv-09903, ECF No. 64.

Because the <u>Burnett</u> Plaintiffs properly effectuated service under 28 U.S.C. § 1608(a)(4) and 28 U.S.C. § 1608(b)(3) on claims within the Court's subject matter jurisdiction, the Court has personal jurisdiction over the Iran Defendants.

## II.    The Iran Defendants Have Defaulted

After the <u>Burnett</u> Plaintiffs effectuated service, the Iran Defendants had "sixty days" to "serve an answer or other responsive pleading." 28 U.S.C. § 1608(d). The Iran Defendants did not respond or otherwise appear in that time or since. The Clerk of Court properly entered a Certificate of Default against the Iran Defendants on December 5, 2016. <u>See</u> Clerk's Certificate of Default, No. 15-cv-09903, ECF No. 67.

## III.    The Iran Defendants Are Liable Under State Tort Law

The <u>Burnett</u> Plaintiffs ask the Court to find the Iran Defendants liable under both New York and Virginia tort law. As the Court has confirmed, state tort claims can be brought against foreign states. <u>See</u> <u>King Opinion</u>, at *3 (quoting <u>Cassirer v. Thyssen-Bornemisza Collection Found.</u>, 596 U.S. 107, 114 (2022)) ("[A] foreign state, if found ineligible for immunity [under the FSIA], must answer for its conduct just as any other actor would."). In effect, the FSIA acts as "a 'pass-through' to the substantive law that would govern a similar suit between private individuals." <u>Cassirer</u>, 596 U.S. at 114 (quoting <u>Oveissi v. Islamic Republic of Iran</u>, 573 F.3d 835, 841 (D.C. Cir. 2009)); <u>see</u> <u>In re 9/11</u>, 2023 WL 5132138, at *12 (S.D.N.Y. Aug. 10, 2023) (citing <u>Leibovitch v. Islamic Republic of Iran</u>, 697 F.3d 561, 572 (7th Cir. 2012), and <u>Owens</u>, 864 F.3d at 809, in support of viability of state law claims against Sudan). Accordingly, the Iran Defendants are subject to suit under state tort law.

### A.  Choice of Law

The Court must therefore determine which state's laws apply to which claims. The Court follows New York's choice-of-law doctrine because the Plaintiffs filed their complaint in this

District. See Menowitz v. Brown, 991 F.2d 36, 40 (2d Cir. 1993) (explaining that MDL courts apply the choice-of-law rules of "the jurisdiction in which the action was filed"). New York has different choice-of-law rules for "loss-allocating" and "conduct-regulating" torts, but under either framework, the law of the "place of the tort" controls. In re 9/11, 2023 WL 5207985, at *2–3 (S.D.N.Y. Aug. 14, 2023). Thus, the Court applies the law of the jurisdiction "where the last event necessary to make the [defendant] liable occurred," even if "the defendant's . . . [mis]conduct occur[red] . . . in another [jurisdiction]." Schultz v. Boy Scouts of Am., Inc., 65 N.Y.2d 189, 195 (1985).

For most of these Burnett Plaintiffs, the "last event necessary to make [the Defendants] liable" occurred in New York. Accordingly, the Court will apply New York tort law as it has done in prior cases. For Plaintiff Rui Zheng, however, her parents Shuyin Yang and Yuguang Zheng were on board American Airlines Flight 77 and killed when the hijackers crashed the plane into the Pentagon, placing the "last event necessary to make [the Defendants] liable" in the Commonwealth of Virginia. Schultz, 65 N.Y.2d at 195; see Decl., ECF No. 9947-1. The Court, therefore, applies Virginia tort law to her claims.

## B. Wrongful Death Claims

### 1. The Iran Defendants Are Liable for Wrongful Death Under New York Law

The Court has previously found Iran liable under New York's wrongful death statute. See In re 9/11, 2024 WL 3046225, at *2. In a prior opinion, it also adjudicated the specific wrongful death claims raised in the Burnett motions at issue. See Order, ECF No. 10389 (resolving all New York-based claims in the motion at ECF No. 9733 and leaving Virginia claims for a future decision). But in the interest of completeness, the Court provides a brief analysis here.

Under New York law, a "personal representative . . . may maintain an action to recover damages for a wrongful act . . . which caused the decedent's death against a [defendant] who

would have been liable to the decedent by reason of such wrongful conduct if death had not ensued." N.Y. Est. Powers & Trusts Law § 5-4.1. In asserting claims on behalf of people killed in the 9/11 Attacks, the <u>Burnett</u> Plaintiffs meet this standard. <u>See</u> <u>Burnett</u> Am. Compl. at 1086–87, No. 15-cv-09903, ECF No. 53 (wrongful death cause of action). First, the Court has found that the Iran Defendants' "wrongful act[s]" "caused" the deaths giving rise to the <u>Burnett</u> Plaintiffs' claims. <u>See</u> *supra* I.A at 6; <u>see also</u> <u>In re 9/11</u>, 2011 WL 13244047, at *39–42. Second, since the Iran Defendants' wrongful acts "support liability for personal injuries," they also "satisfy the core requirement that wrongful death claims be predicated on conduct for which the defendant 'would have been liable to the decedent . . . if death had not ensued.'" <u>In re 9/11</u>, 2024 3046225, at *2 (citing <u>King Opinion</u>; and then quoting N.Y. Est. Powers & Trusts Law § 5-4.1(1)). The Iran Defendants are thus liable to the <u>Burnett</u> Plaintiffs under New York's wrongful death statute.

### 2. The Plaintiffs' Request to Withdraw Their Virginia Wrongful Death Claims Is Granted

Ms. Zheng, meanwhile, initially sought damages for her parents' conscious pain and suffering before their deaths under Virginia's survival statute. Virginia's wrongful death statute, however, "provides the exclusive method for recovery 'when a tort victim dies of [his or] her injuries,'" <u>Smith v. Town of S. Hill</u>, 611 F. Supp. 3d 148, 192 (E.D. Va. 2020) (citing <u>El-Meswari v. Washington Gas & Light Co.</u>, 785 F.2d 483, 490–91 (4th Cir. 1986)), and bars recovery for a decedent's pain and suffering, <u>Whitaker v. Hyundai Motor Co.</u>, No. 7:17-cv-00055 (MFU), 2019 WL 8348858, at *2 (W.D. Va. Feb. 12, 2019)). The Court therefore asked the Plaintiffs to brief this issue further, and the Plaintiffs requested to withdraw these claims at this time. <u>See</u> Pls.' Letter, ECF No. 10663. That request is granted: the wrongful death/survival

claims brought on behalf of the estates of Shuyin Yang and Yuguang Zheng are denied without prejudice.

### C. IIED Claims

#### 1. The Plaintiffs' Factual Allegations Support Their IIED Claims

The Plaintiffs next ask the Court to find the Iran Defendants liable for intentional infliction of emotional distress ("IIED"). The Court must first confront the fact that the relevant Amended Complaint does not explicitly include a claim for IIED. See Burnett Am. Compl. at 1082–1088, No. 15-cv-09903, ECF No. 53.

The Court's assessment of the facts—and whether they "constitute a legitimate cause of action"—is not limited to the legal theories raised in the complaint. In re Indus. Diamonds Antitrust Litig., 119 F. Supp. 2d 418, 420 (S.D.N.Y. 2000) (cleaned up); see Bricklayers & Allied Craftworkers Loc. 2 Albany, N.Y. Pension Fund v. Moulton Masonry & Constr., LLC, 779 F.3d 182, 187–89 (2d Cir. 2015) (analyzing well-pleaded facts to determine default liability without reference to theories asserted in complaint). The Court has previously emphasized that "a FSIA plaintiff 'd[oes] not have to identify [a] specific source of law in his complaint' at all." King R&R, at *5 (emphasis in original) (quoting Oveissi, 573 F.3d at 840); cf. Owens v. Republic of Sudan, 531 F.3d 884, 894 (D.C. Cir. 2008) (FSIA cases are not subject to "heightened pleading requirement[s]").

Rather, a district court "retains the power to 'determine whether a cause of action is available under state or foreign law'" and "determine which body of law governs the plaintiffs' claims." King R&R, at *5 (quoting Owens v. Republic of Sudan, 826 F. Supp. 2d 128, 153–54 (D.D.C. 2011); and then quoting Est. of Botvin ex rel. Ellis v. Islamic Republic of Iran, 684 F. Supp. 2d 34, 39 (D.D.C. 2010)). That analysis is "driven by facts." King R&R, at *5. The "factual allegations" are what a defaulting defendant "admits," City of New York v. Mickalis

Pawn Shop, LLC, 645 F.3d 114, 137 (2d Cir. 2011), and the "factual allegations must themselves be sufficient to establish a right to relief," Sanchez v. Ms. Wine Shop Inc., 643 F. Supp. 3d 355, 365 (E.D.N.Y. 2022) (cleaned up).

The Plaintiffs have pleaded factual allegations that cogently charge the Iran Defendants with legal responsibility for the deaths of the 9/11 decedents and the Plaintiffs' resulting emotional distress:

- **"Iran . . . entered into an alliance with al-Qaeda** . . . to work together to conduct terrorist operations against the United States." Burnett Am. Compl. ¶ 4976.

- Through that partnership, **"Iran . . . had actual foreknowledge of[] . . . the 9/11 [A]ttacks** . . . [,] which were carried out by members of al-Qaeda." Id. ¶ 5006.

- In the lead up to 9/11, **"Iran . . . assist[ed] in, and contribut[ed] to, the preparation and execution of the plans" for the Attacks**, id. ¶ 4951, including by providing "instruction, training, direction, financing, and support" to al Qaeda, id. ¶ 5031.

- **"In furtherance of those plans, the al-Qaeda hijackers deliberately caused planes to crash into** the World Trade Center Towers, the Pentagon, and a field in Shanksville, Pennsylvania on September 11, 2001." Id. Those Attacks "**caus[ed]** the deaths of the 9/11 Decedents." Id. ¶ 5015.

- As a result, the "families of those murdered **suffer and will continue to suffer** permanent, physical and emotional **distress**, severe trauma, and lasting physical, emotional, and psychological injuries." Id. ¶ 5065. They "will **forever grieve** the deaths of the 9/11 Decedents." Id. ¶ 5043.

Later, the Plaintiffs identified IIED as an appropriate cause of action. See Pls.' Mem. of Law at 8–19, ECF No. 9946. The Court is thus free to draw on this theory of liability as it considers whether the Burnett Plaintiffs have established their "right to relief by evidence satisfactory to the [C]ourt." 28 U.S.C. § 1608(e).

## 2. The Iran Defendants Are Liable for IIED Under New York and Virginia Law

The Plaintiffs bring their IIED claims under both New York and Virginia state law. In New York, an IIED claim "has four elements: (i) extreme and outrageous conduct; (ii) intent to

cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." Howell v. N.Y. Post Co., Inc., 81 N.Y.2d 115, 121 (1993). In Virginia, an IIED claimant must prove four almost identical elements with sufficient facts to withstand a challenge on demurrer: "(1) the wrongdoer's conduct was intentional or reckless; (2) the conduct was outrageous and intolerable; (3) there was a causal connection between the wrongdoer's conduct and the emotional distress; and (4) the emotional distress was severe." Harris v. Kreutzer, 271 Va. 188, 203 (2006) (citing Womack v. Eldridge, 215 Va. 338, 342 (1974)).

The Plaintiffs' uncontroverted submissions and this case's long record plainly establish all four elements under both New York and Virginia law.[3] Iran knew of "the plan to crash hijacked civilian airliners into American cities." In re 9/11, 2011 WL 13244047, at *22. Iran intentionally "provided direct support to al Qaeda specifically for th[ose] attacks" in the form of "planning, funding, facilitation of the hijackers' travel and training, and logistics, and . . . the provision of services, money, lodging, training, expert advice or assistance, safehouses, false documentation or identification, and/or transportation." Id. at *40. And that support "vastly increased the likelihood of the operational success of the 9/11 plot." Id. at *16.

Such conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Russo v. White, 241 Va. 23, 27 (1991) (quoting Restatement (Second) of Torts § 46 cmt. d (Am. L. Inst. 1965)); see also Howell, 81 N.Y.2d at 122 (quoting Murphy v.

---

[3] The Court has previously found Iran liable for IIED under New York law. See In re 9/11, 2024 WL 3046225, at *3. As it did with the Plaintiffs' wrongful death claims, it includes an overlapping New York analysis for the sake of completeness. Because the elements required to prove an IIED claim in New York and Virginia are nearly identical, the Court analyzes both issues by applying the same facts.

American Home Prods. Corp., 58 N.Y.2d 293, 303 (1983)) (applying the same standard in New York). The 9/11 Attacks, and the Iran Defendants' efforts in precipitating them, stand "contrary to the guarantees 'recognized as indispensable by civilized peoples.'" In re 9/11, 2011 WL 13244047, at *39 (quoting 28 U.S.C. § 1350 note). The Attacks had an "indelible impact on the lives of the victims' families" and left the Plaintiffs in severe emotional distress. In re 9/11, 2012 WL 4711407, at *2 (Oct. 3, 2012).

That leaves causation. And the Court has already found that "Iran's 'material support' proximately 'caused' the 9/11 Attacks. King R&R, at *3 (quoting In re 9/11, 2011 WL 13244047, at *41); see also King Opinion, at *2 (stating that "Iran's tortious acts—specifically, its provision of material support to al Qaeda—proximately caused the 9/11 attacks"). There is thus "a causal connection" between the Iran Defendants' conduct and the Burnett Plaintiffs' distress. Harris v. Kreutzer, 271 Va. at 203; Howell, 81 N.Y.2d at 121. Indeed, subject matter jurisdiction in this matter is premised on that very finding—that "a tortious act or acts of the foreign state" "caused" an "injury" or "death" in the United States. 28 U.S.C. § 1605B(b).

Having established all four elements of their IIED claims, the Burnett Plaintiffs face two remaining hurdles: the so-called "presence" and "contemporaneous perception" limitations found in the Second and Third Restatements of Torts.[4] These rules provide that immediate family members "who are not direct victims of the extreme and outrageous conduct" can recover damages from an IIED claim only if "they [were present during or] contemporaneously

---

[4] Both New York and Virginia look to the Restatements in IIED cases. See Rich v. Fox News Network, LLC, 939 F.3d 112, 121–22 (2d Cir. 2019) (citing Howell, 81 N.Y.2d at 121) ("New York has adopted the Restatement (Second) formulation of IIED."); Russo v. White, 241 Va. at 26 (citing Womack, 215 Va. at 342) (explaining that Virginia's IIED standards are "patterned after the [Second] Restatement definition").

perceived the injurious conduct." Kumar v. Republic of Sudan, No. 2:10-cv-171, 2019 WL

13251350, at *12 (E.D. Va. July 31, 2019).

In such "third person" cases, the Third Restatement—which, its authors relay,

"supersedes" the familiar Second Restatement—"limits recovery for emotional harm to

'bystanders' who are close family members and who contemporaneously perceive the

event." Restatement (Third) of Torts: Liab. for Physical & Emotional Harm ("Restatement

(Third) of Torts") § 46 cmt. a, m (Am. L. Inst. 2012). The Second Restatement, for its part,

restricts third person claims to immediate family members who were "present at the time" the

harmful conduct occurred. Restatement (Second) of Torts § 46.

In the terrorism context, however, courts have consistently carved out an exception to

both the Third Restatement's "contemporaneous perception" restriction and the Second

Restatement's "presence" requirement. See, e.g., Maxwell v. Islamic Republic of Iran, No. 22-

cv-173 (RC), 2024 WL 1342775 (D.D.C. Mar. 29, 2024); Kumar, 2019 WL 13251350; Republic

of Sudan v. Owens, 194 A.3d 38 (D.C. 2018). Because "[a]cts of terrorism are, by their very

nature, designed to create maximum emotional impact, particularly on third parties," Owens, 194

A.3d at 43 (internal citations omitted), and the FSIA's narrow jurisdictional requirements in

terrorism cases "already prevent[] unlimited liability" and "sufficiently limit[] the scope of

potential claimants," Kumar, 2019 WL 13251350, at *13 (internal citation omitted), these courts

have held that an immediate family member of a person killed in a terrorist attack need not have

been present for, or have contemporaneously perceived, the attack to establish an IIED claim,

see, e.g., Owens, 194 A.3d 38 (presence); Kumar, 2019 WL 13251350 (contemporaneous

perception).[5]

---

[5] Other courts have found that family members of terror victims were themselves "direct" targets of an attack and could therefore rely on Restatement (Second) of Torts § 46(1) to establish their IIED claims.

The Plaintiffs argue that their IIED claims should be subject to this terrorism exception. See Pls.' Mem. of Law at 13–16, ECF No. 9946. The Court agrees. Faced with this same issue, the U.S. Court of Appeals for the D.C. Circuit certified to the District of Columbia Court of Appeals the question of whether a claimant alleging emotional distress arising from a terrorist attack that killed a family member had to be present at the attack to state an IIED claim. See Owens v. Republic of Sudan, 864 F.3d 751 (D.C. Cir. 2017) (certifying the question); see also Owens v. Republic of Sudan, 924 F.3d 1256 (D.C. Cir. 2019) (adopting the D.C. Court of Appeals' answer).

The D.C. Court of Appeals answered "No," holding "that the presence requirement does not apply" in such cases. Owens, 194 A.3d at 45. In reaching its conclusion, it outlined three main purposes behind the presence requirement: "(1) to ensure that there is requisite intent to harm the third party; (2) to limit recovery to persons with 'genuine' claims of severe distress; and (3) to prevent 'virtually unlimited' liability for emotional distress." Kumar, 2019 WL 13251350, at *13 (citing Owens, 194 A.3d at 43). "Relaxing the presence requirement" in FSIA terrorism cases does nothing to disturb these underlying goals, the D.C. court concluded. Owens, 194 A.3d

---

See, e.g., Salazar v. Islamic Republic of Iran, 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005) (reasoning that "a terrorist attack—by its nature—is directed not only at the victims but also at the victims' families"); Beaty v. Republic of Iraq, 480 F. Supp. 2d 60 (D.D.C. 2007), rev'd on other grounds, 556 U.S. 848 (2009) (finding IIED claims cognizable under both § 46(1) and § 46(2)(a)). This rationale avoids the Restatement's third-person limitations, but has been criticized even by the Restatement's reporters. See Restatement (Third) of Torts § 46 reporters' note cmt. m (calling this reasoning "questionable"); see also Owens, 194 A.3d at 45 n.8 ("[W]e share the reporters' skepticism.").

Still other courts have adopted the Plaintiffs' alternative argument that they meet the presence requirement because the 9/11 Attacks "were broadcast live around the world in real time." Pls.' Mem. of Law at 15 n.4, ECF No. 9946; see Burnett v. Al Baraka Inv. and Dev. Corp., 274 F. Supp. 2d 86, 108 (D.D.C. 2003) ("Family members here were not physically present at the World Trade Center, or at the Pentagon, or at Shanksville, but the whole world was virtually present, and that is enough."). The Court declines to adopt either of these rationales.

at 44. In fact, it asserted, "rigid adherence to the rule would do little more than shield culpable defendants from liability and deny relief to deserving plaintiffs." Id.

In another case, a federal district court in Virginia found that this same rationale applied to excuse the Third Restatement's contemporaneous perception limitation. See Kumar, 2019 WL 13251350. And in a third case, a different federal district court held that "claims for intentional infliction of emotional distress may be brought by family members" of terrorism victims *under Virginia law* "without having to establish a presence requirement." Peterson v. Islamic Republic of Iran, 515 F. Supp. 2d 25, 43–44 (D.D.C. 2007), abrogated on other grounds by Lin v. United States, 561 F.3d 502 (D.C. Cir. 2009). In other words, it is well settled that an IIED claim arising from a terrorist attack that killed the plaintiff's immediate family member should not be restricted by the Restatement's presence or contemporaneous perception requirements.

The same conclusion applies here. In proximately causing the 9/11 Attacks, the Iran Defendants intentionally precipitated an onslaught that "by [its] very nature" was "designed to create maximum emotional impact, particularly on [the Plaintiffs]." Owens, 194 A.3d at 43. Undeniably, "when foreign states provide material support for terrorist attacks, it should come as no surprise that the acts they facilitated . . . caused severe emotional distress to persons who were not present at the time." Id. And there is no risk that the Plaintiffs' severe emotional distress—as the immediate family members of people killed in the 9/11 Attacks—is not "genuine." Id.

Finally, the FSIA's strict jurisdictional restrictions "guard against potentially unbounded liability." Owens, 194 A.3d at 42. Though Owens and Kumar turned on the specific limits laid out in § 1605A of the FSIA, the same principle applies where jurisdiction is predicated on § 1605B(b). Under § 1605B(b), the terrorism exception remains constrained to claims arising from "act[s] of international terrorism in the United States." 28 U.S.C. § 1605B(b)(1). And while

§ 1605B(b) does widen the availability of the terrorism exception to non-U.S. nationals, the
Court has repeatedly stressed the importance of "restor[ing] a measure of parity to plaintiffs of
different nationalities" in this MDL. King R&R, at *8. The D.C. Circuit Court of Appeals has
even looked approvingly upon expanding the exception in a similarly narrow fashion. See Owens
924 F.3d at 1261 ("We see no reason to anticipate that, in an appropriate case, the D.C. court
would refuse to extend the exception to a private actor, such as al Qaeda.").

For these reasons, and because "[d]oing so will promote the efficient adjudication of this
litigation," the Court recommends applying the terrorism exception to the Plaintiffs' IIED
claims. King R&R, at *8. Therefore, the Court recommends finding the Iran Defendants liable
for IIED under New York and Virginia law.

## IV.    The Plaintiffs Are Entitled to Damages

Next, the Court must decide damages. The Plaintiffs ask the Court to apply the
framework for solatium damages for claims made by U.S. nationals under § 1605A. See Pls.'
Mem. of Law at 16–19, ECF No. 9946. The Court concurs: "considerations of fairness dictate
that the preexisting . . . damages framework applies to non-U.S. nationals as well." King
Opinion, at *5.

Accordingly, the Court recommends granting the Plaintiffs solatium damages for IIED
under New York and Virginia law in the following amounts: $12,500,000 to the spouse of a 9/11
decedent; $8,500,000 to the parent of a 9/11 decedent; $8,500,000 to the child of a 9/11
decedent; and $4,250,000 to the sibling of a 9/11 decedent. See Mem. Decision & Order at 4,
ECF No. 2623. The Court therefore recommends awarding Rui Zheng, the child of Ms. Yang
and Mr. Zheng, solatium damages as set forth in Exhibit A. See Proposed Default J. at 2, ECF

No. 9948-2. And the Court recommends awarding solatium damages to the <u>Burnett</u> Plaintiffs

with New York-based claims as set forth in Exhibit B.[6]

The <u>Burnett</u> Plaintiffs listed in the Court's Exhibits A and B should also be awarded

prejudgment interest at a rate of 4.96 percent per annum, compounded annually for the period

from September 11, 2001, until the date of the judgment.

## V.    Plaintiffs Solomon Gayle and Erica Zimmerman Are the 'Functional Equivalents' of Immediate Family Members

With the Restatement's presence and contemporaneous limitations overcome, the

Plaintiffs must still meet the immediate family requirement to recover for IIED. <u>See</u> Restatement

(Second) of Torts § 46; Restatement (Third) of Torts § 46. The Plaintiffs therefore request that

the two individuals listed in Exhibit C be deemed the "functional equivalents" of an immediate

family member of a 9/11 decedent and awarded solatium damages. <u>See</u> Pls.' Mem. of Law at 19–

25, ECF No. 9946. The Court has consistently awarded solatium damages to those who lost

loved ones in the 9/11 Attacks, but these damages are generally restricted to spouses, parents,

children, and siblings. <u>See</u> ECF No. 2618, <u>adopted at</u> 2623. Where appropriate, the Court has

extended solatium damages to people who are found to be the "functional equivalents" of

immediate family members.

---

[6] In their moving papers, certain Plaintiffs seek treble damages pursuant to the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333. As ATA claims cannot be brought against sovereign defendants, <u>see</u> 18 U.S.C. § 2337(2), the Court recommends that these Plaintiffs' requests for treble damages be denied.

The Court was also unable to find the following claimants in the complaint, amendments, or substitutions referenced in the Plaintiffs' cover sheet: Justin Michael Bennett, Joy Bennett, Angela Elizabeth Rogers, Keith Rogers, Joanna K. Wells. <u>See</u> ECF No. 9948-2. The Court therefore recommends denying their claims without prejudice.

Additionally, the following claimants are listed anonymously in the relevant complaint and are identified only in the Plaintiffs' proposed order; they have not been properly substituted through a motion to substitute: Keith Cudmore (DOE AP265), Timothy John (DOE AP273). The Court therefore recommends denying their claims without prejudice.

To determine whether a plaintiff's relationship is functionally equivalent to that of an immediate family member, the Court uses the <u>Hoglan IV</u> framework. <u>See</u> ECF Nos. 3363, <u>adopted at</u> 3384 (<u>Hoglan II</u>, setting out functional equivalence standards); 3676, <u>adopted at</u> 3795 (<u>Hoglan IV</u>, refining functional equivalence framework). That framework requires a fact-intensive, plaintiff-by-plaintiff analysis. The Court weighs how long the plaintiff and decedent lived together; their degree of emotional, financial, and social connection; and factors particular to certain relationships, such as how long a couple was together, whether they were engaged to be married, the age of a child when a relationship formed, or the continued involvement of a biological parent in a child's life. <u>See</u> ECF Nos. 3363 at 10–12, 14–16; 3676 at 7–8, 11, 13–14.

After the Court finds a functionally equivalent relationship, it must determine the appropriate amount of damages. In most cases, it awards the same amount of solatium damages awarded to immediate family members. Plaintiffs who are functionally equivalent to spouses receive $12,500,000; those functionally equivalent to parents and children receive $8,500,000; and functionally equivalent siblings receive $4,250,000. <u>See</u> ECF No. 2618, <u>adopted at</u> 2623 (establishing solatium damages amounts for immediate family); ECF Nos. 3363 at 16 (applying those amounts to functionally equivalent family members); 4175 at 7 (same); 5483 at 21–23 (same). In some cases, however, the Court awards reduced damages to plaintiffs whose relationships are functionally equivalent but not fully comparable to those of immediate family. <u>See, e.g.</u>, ECF Nos. 3363 at 22 (recommending a stepmother receive half the normal award because she entered the decedent's life when he was 11 years old); 5387 at 7 (recommending a stepsibling receive half the normal award because he began living with the decedent at age 14).

### A. Solomon Gayle

Solomon Gayle and Seilai Khoo met when they were undergraduate students at Columbia University. <u>See</u> Decl. ¶ 3, ECF No. 9947-3. Both computer science majors, Mr. Gayle and Ms.

Khoo quickly struck up a relationship. Id. ¶¶ 3, 5. It would last for 17 years, until Ms. Khoo was tragically killed on September 11, 2001. Id. ¶¶ 5, 8.

After graduation, and after Ms. Khoo obtained her Chartered Financial Analyst designation, the couple settled into an apartment in Jersey City, New Jersey. Id. ¶¶ 14. But this was just their launching pad into the world. As avid travelers, the pair enjoyed short weekend trips to nearby locales like Martha's Vineyard and the Hamptons, and explored many other countries together, such as Austria, Bermuda, France, Mexico, and Mr. Gayle's native Jamaica. Id. ¶¶ 11, 12, 28.

When Mr. Gayle's tech aspirations took him to California, their partnership endured. The couple got engaged before Mr. Gayle's departure, and before long, he moved back to the East Coast "to be with Seilai." Id. ¶¶ 18, 20. After Ms. Khoo passed away, Mr. Gayle served as the executor of her estate. Id. ¶ 26.

Though they did not comingle their finances, Ms. Khoo supported Mr. Gayle "both financially and emotionally" as he launched an early Internet startup. Id. ¶¶ 22, 25. They lived by the mantra "what's mine is yours, and what's yours in mine." Id. ¶ 27. "In every meaningful way," Mr. Gayle attests, they "lived as husband and wife." Id. ¶ 30.

Mr. Gayle and Ms. Khoo's 17-year relationship, engagement, investment in one another, and shared home evidence the commitment and mutual support characteristic of a marriage. The Court therefore recommends finding Mr. Gayle's relationship with Ms. Khoo functionally equivalent to that of a spouse and awarding him $12,500,000 in solatium damages.

## B. Erica Zimmerman

Erica Zimmerman, also known as Erica Zimmerman-Basnicki, is a Canadian citizen whose stepfather, Kenneth William Basnicki, was on a business trip in New York on September

11, 2001. <u>See</u> Decl. ¶ 2, ECF No. 9947-4. He was meeting with colleagues on the 106th floor of the North Tower of the World Trade Center when the first plane hit. <u>Id.</u>

Ms. Zimmerman first met Mr. Basnicki when she was two years old. <u>Id.</u> ¶ 4. When she was four, her mother and Mr. Basnicki got married. <u>Id.</u> From then on, Mr. Basnicki became her "father in every sense of the term." <u>Id.</u> ¶ 5. Ms. Zimmerman, her younger brother, her mother, and Mr. Basnicki all lived together "as a family," <u>id.</u> ¶ 4, and Mr. Basnicki fed, clothed, and provided for Ms. Zimmerman "in every way a parent provides for their children," <u>id.</u> ¶ 5. "He provided emotional, moral and spiritual guidance to me until the day he died," she attests. <u>Id.</u>

By contrast, Ms. Zimmerman's biological father "spent very little time with [her] as [she] was growing up and made no meaningful contribution to [her] upbringing." <u>Id.</u> ¶ 10. Her mother received no financial support from her biological father after their divorce, and Ms. Zimmerman received no direct financial support from him, either. <u>Id.</u> ¶ 11

Given Mr. Basnicki's longstanding emotional, financial, and social support for Ms. Zimmerman throughout her life, as well as Ms. Zimmerman's biological father's lack of support, the Court recommends that Ms. Zimmerman be deemed the functional equivalent of Mr. Basnicki's child. Accordingly, the Court recommends awarding Ms. Zimmerman $8,500,000 in solatium damages.

Both Ms. Zimmerman and Mr. Gayle should also be awarded prejudgment interest at a rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001, until the date of the judgment.

## CONCLUSION

The Court recommends granting the Plaintiffs' motions in part. The Court recommends finding the Defendants liable for IIED under Virginia law; entering a partial final judgment in favor of Ms. Zheng; and awarding her damages as provided in Exhibit A. The Court denies the

Plaintiffs' Virginia wrongful death claims without prejudice. The Court recommends finding the Defendants liable to the Plaintiffs listed in Exhibit B under New York IIED law and awarding them damages as reflected in that Exhibit. The Court further recommends denying certain Plaintiffs' claims without prejudice for the reasons stated *supra* IV at 19 n.6. Finally, the Court recommends finding that the two Plaintiffs listed in Exhibit C are the functional equivalents of immediate family members of 9/11 decedents and awarding them damages as reflected in that Exhibit.

The Plaintiffs listed in the Court's Exhibits A, B, and C should also be awarded prejudgment interest at a rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001, until the date of the judgment. All <u>Burnett</u> Plaintiffs should be permitted to submit further applications for damages, including punitive damages, consistent with any future rulings of the Court.

_____
SARAH NETBURN
United States Magistrate Judge

DATED:        January 13, 2025
              New York, New York


*              *              *

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

The parties shall have 14 days from the service of this Report and Recommendation to file written objections under 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. <u>See</u> Fed. R. Civ. P. 6(a), 6(d). A party may respond to another party's objections within 14 days after being served with a copy. Fed. R. Civ. P. 72(b)(2); <u>see</u> Fed. R. Civ. P. 6(a),

6(d). These objections shall be filed with the Court and served on any opposing parties. <u>See</u> Fed. R. Civ. P. 72(b)(2). Courtesy copies shall be delivered to the Honorable George B. Daniels if required by that judge's Individual Rules and Practices. Any requests for an extension of time for filing objections must be addressed to Judge Daniels. <u>See</u> Fed. R. Civ. P. 6(b). The failure to file timely objections will waive those objections for purposes of appeal. <u>See</u> <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>United States v. James</u>, 712 F.3d 79, 105 (2d Cir. 2013).

# Exhibit A

**EXHIBIT A**
**NON-U.S. NATIONAL SOLATIUM - VIRGINIA IIED**

| Claimant | | | | | 9/11 Decedent | | | | | | | Claim Information | | | Solatium Damages | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| First | Middle | Last | Suffix | Nationality on 9/11 | First | Middle | Last | Suffix | Nationality on 9/11 | Date of Death | 9/11 Site | Case | Complaint | Amendments & Substitutions | Relationship | Documentation | Prior Award | Amount | Treble |
| Rui | | Zheng | | China | Shuyin | | Yang | | China | 9/11/2001 | VA (AA77) | 9903 | 1:15-cv-09903, 53, at 3530 | | Child | | | $ 8,500,000.00 | |
| Rui | | Zheng | | China | Yuguang | | Zheng | | China | 9/11/2001 | VA (AA77) | 9903 | 1:15-cv-09903, 53, at 3531 | | Child | | | $ 8,500,000.00 | |

# Exhibit B

**EXHIBIT B**
**NON-U.S. NATIONAL SOLATIUM - NEW YORK IIED**

| Claimant | | | | | 9/11 Decedent | | | | | | | Claim Information | | | Solatium Damages | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| First | Middle | Last | Suffix | Nationality on 9/11 | First | Middle | Last | Suffix | Nationality on 9/11 | Date of Death | 9/11 Site | Case | Complaint | Amendments & Substitutions | Relationship | Documentation | Prior Award | Amount | Treble |
| Maureen | Elizabeth | Basnicki | | Canada | Kenneth | William | Basnicki | | Canada | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 3563 | | Spouse | | | $ 12,500,000.00 | |
| Brennan | | Basnicki | | Canada | Kenneth | William | Basnicki | | Canada | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 717, at 1 | | Child | | | $ 8,500,000.00 | |
| Brent | | McIntosh | | Canada | Jane | | Beatty | | United Kingdom | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 3607 | | Child | | | $ 8,500,000.00 | |
| Drew | David | McIntosh | | Canada | Jane | | Beatty | | United Kingdom | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 3608 | | Child | | | $ 8,500,000.00 | |
| Malcolm | P. | Campbell | | United Kingdom | Geoffrey | Thomas | Campbell | | United Kingdom | 9/11/2001 | NY | 9903 | 1:15-cv-09903, 53, at 3157 | | Parent | | | $ 8,500,000.00 | |
| Catherine | Mary | Ross | | United Kingdom | Jeremy | Mark | Carrington | | United Kingdom | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 3558 | | Parent | | | $ 8,500,000.00 | |
| Sarah | Jane | Carrington | | United Kingdom | Jeremy | Mark | Carrington | | United Kingdom | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 3561 | | Sibling | | | $ 4,250,000.00 | |
| Grace | Elizabeth | Friend | | Ireland | Joanne | Mary | Cregan | | Ireland | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 3014 | | Sibling | | | $ 4,250,000.00 | |
| Mary | E. | Cregan | | Ireland | Joanne | Mary | Cregan | | Ireland | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 3015 | | Parent | | | $ 8,500,000.00 | |
| Selena | Edna Irene | Dack-Forsyth | | Canada | Caleb | Arron | Dack | | United Kingdom | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 104 | | Parent | | | $ 8,500,000.00 | |
| Helen | K. | Dawson | | United Kingdom | Anthony | Richard | Dawson | | United Kingdom | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 3551 | | Parent | | | $ 8,500,000.00 | |
| David | C. | De Vere | | United Kingdom | Melanie | Louise | De Vere | | United Kingdom | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 3553 | | Parent | | | $ 8,500,000.00 | |
| Ivonne | Pocasangre | Lopez | | El Salvador | Ana | Gloria | deBarrera | | El Salvador | 9/11/2001 | NY (UA175) | 9903 | 1:15-cv-09903, 53, at 3576 | | Sibling | | | $ 4,250,000.00 | |
| Alvaro | | Dominguez | | Australia | Alberto | | Dominguez | | Australia | 9/11/2001 | NY | 9903 | 1:15-cv-09903, 53, at 3519 | | Child | | | $ 8,500,000.00 | |
| Diego | | Dominguez | | Australia | Alberto | | Dominguez | | Australia | 9/11/2001 | NY | 9903 | 1:15-cv-09903, 53, at 3521 | | Child | | | $ 8,500,000.00 | |
| Martha | I. | Dominguez | | Australia | Alberto | | Dominguez | | Australia | 9/11/2001 | NY | 9903 | 1:15-cv-09903, 53, at 3522 | | Spouse | | | $ 12,500,000.00 | |
| Virginia | M. | Dominguez | | Australia | Alberto | | Dominguez | | Australia | 9/11/2001 | NY | 9903 | 1:15-cv-09903, 53, at 3523 | | Child | | | $ 8,500,000.00 | |
| Alberto | | Dominguez | | Australia | Alberto | | Dominguez | | Australia | 9/11/2001 | NY | 9903 | 1:15-cv-09903, 53, at 3518 | | Child | | | $ 8,500,000.00 | |
| Angela | | Ridge | | United Kingdom | Robert | Douglas | Eaton | | United Kingdom | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 3190 | | Sibling | | | $ 4,250,000.00 | |
| Barbara | J. | Stephenson | | United Kingdom | Robert | Douglas | Eaton | | United Kingdom | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 3191 | | Sibling | | | $ 4,250,000.00 | |
| Anna | Maria | Egan | | Canada | Michael | | Egan | | Canada | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 579 | | Spouse | | | $ 12,500,000.00 | |
| Jonathan | Joseph | Egan | | Ireland | Michael | | Egan | | Canada | 9/11/2001 | NY (WTC) | | 1:15-cv-09903, 717, at 3 | | Child | | | $ 8,500,000.00 | |
| Stephan | Joachim | Gerhardt | | Canada | Ralph | | Gerhardt | | Canada | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 3502 | | Sibling | | | $ 4,250,000.00 | |
| Hans | J. | Gerhardt | | Canada | Ralph | | Gerhardt | | Canada | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 3501 | | Parent | | | $ 8,500,000.00 | |
| Deena | Joan | Gilbey | | United Kingdom | Paul | Stuart | Gilbey | | United Kingdom | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 1416 | | Spouse | | | $ 12,500,000.00 | |
| Hannah | Jane Emily | Gilbey | | United Kingdom | Paul | Stuart | Gilbey | | United Kingdom | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 719, at 1 | | Child | | | $ 8,500,000.00 | |
| Colin | Vincent | Gilligan | | United Kingdom | Ronald | L. | Gilligan | | United Kingdom | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 2061 | | Sibling | | | $ 4,250,000.00 | |
| Victoria | | Blaksley | | Argentina | Pedro | | Grehan | | Argentina | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 1727 | | Spouse | | | $ 12,500,000.00 | |
| Camila | | Grehan | | Argentina | Pedro | | Grehan | | Argentina | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 717, at 4 | | Child | | | $ 8,500,000.00 | |
| Patricio | Brendan | Grehan | | Argentina | Pedro | | Grehan | | Argentina | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 717, at 5 | | Child | | | $ 8,500,000.00 | |
| Sofia | | Grehan | | Argentina | Pedro | | Grehan | | Argentina | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 717, at 6 | | Child | | | $ 8,500,000.00 | |
| Susan | | Jones | | United Kingdom | Christopher | D. | Jones | | United Kingdom | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 2883 | | Spouse | | | $ 12,500,000.00 | |
| Liat | | Levinhar | | Israel | Shai | | Levinhar | | Israel | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 3547 | | Spouse | | | $ 12,500,000.00 | |
| Dening | | Lohez | | China | Jerome | | Lohez | | France | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 3509 | | Spouse | | | $ 12,500,000.00 | |
| William | Luke | McNulty | | United Kingdom | Christine | Sheila | McNulty | | United Kingdom | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 3589 | | Sibling | | | $ 4,250,000.00 | |
| Catherine | Ann | McNulty | | United Kingdom | Christine | Sheila | McNulty | | United Kingdom | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 3585 | | Sibling | | | $ 4,250,000.00 | |
| Clive | Desmond | McNulty | | United Kingdom | Christine | Sheila | McNulty | | United Kingdom | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 3586 | | Sibling | | | $ 4,250,000.00 | |
| Helen | Norah | McNulty | | United Kingdom | Christine | Sheila | McNulty | | United Kingdom | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 3587 | | Sibling | | | $ 4,250,000.00 | |
| Michael | Bernard | McNulty | | United Kingdom | Christine | Sheila | McNulty | | United Kingdom | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 3590 | | Sibling | | | $ 4,250,000.00 | |
| Jennifer | Eileen | McNulty-Ahern | | United Kingdom | Christine | Sheila | McNulty | | United Kingdom | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 3588 | | Sibling | | | $ 4,250,000.00 | |
| William | Jorn | Skead | | United Kingdom | Christine | Sheila | McNulty | | United Kingdom | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 3584 | | Spouse | | | $ 12,500,000.00 | |
| Tabitha | Belle McNulty | Skead | | United Kingdom | Christine | Sheila | McNulty | | United Kingdom | 9/11/2001 | NY (WTC) | | 1:15-cv-09903, 717, at 7 | | Child | | | $ 8,500,000.00 | |
| Lachman | | Parbhu | | Guyana | Hardai | | Parbhu | | Guyana | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 3537 | | Sibling | | | $ 4,250,000.00 | |
| Parboti | | Parbhu | | Canada | Hardai | | Parbhu | | Trinidad and Tobago | 9/11/2001 | NY | 9903 | 1:15-cv-09903, 53, at 3541 | | Sibling | | | $ 4,250,000.00 | |
| Gary | Moshe | Saada | | France | Thierry | | Saada | | France | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 3496 | | Sibling | | | $ 4,250,000.00 | |
| Luis | S. | Samaniego | | Paraguay | Carlos | A. | Samaniego | | Paraguay | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 3490 | | Sibling | | | $ 4,250,000.00 | |
| Yishai | | Shefi | | Israel | Hagay | | Shefi | | Israel | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 3507 | | Sibling | | | $ 4,250,000.00 | |
| Pazit | Shefi | Baum | | Israel | Hagay | | Shefi | | Israel | 9/11/2001 | NY | 9903 | 1:15-cv-09903, 53, at 3506 | | Sibling | | | $ 4,250,000.00 | |
| Ann | | Simpkin | | United Kingdom | Jane | Louise | Simpkin | | United Kingdom | 9/11/2001 | NY (UA175) | 9903 | 1:15-cv-09903, 53, at 3486 | | Parent | | | $ 8,500,000.00 | |
| Britt | | Ehnar | | Sweden | David | | Tengelin | | Sweden | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 3534 | | Parent | | | $ 8,500,000.00 | |
| Petra | | Ehnar | | Sweden | David | | Tengelin | | Sweden | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 3536 | | Sibling | | | $ 4,250,000.00 | |
| Patric | | Tengelin | | Sweden | David | | Tengelin | | Sweden | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 3535 | | Sibling | | | $ 4,250,000.00 | |

**EXHIBIT B**
**NON-U.S. NATIONAL SOLATIUM - NEW YORK IIED**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lucy | E. | Thompson | United Kingdom | Clive | | Thompson | United Kingdom | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 1324 | | Spouse | | $ 12,500,000.00 |
| Maria | Teresa | Rueda De Torres | Columbia | Luis | Eduardo | Torres | Columbia | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 3404 | | Parent | | $ 8,500,000.00 |
| Clive | | Hopwood | United Kingdom | Dinah | | Webster | United Kingdom | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 3286 | | Sibling | | $ 4,250,000.00 |
| Julia | Ann | Wells | United Kingdom | Vincent | Michael | Wells | United Kingdom | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 3614 | | Parent | | $ 8,500,000.00 |
| Birgit | Margarete | Wiswe | Germany | Sigrid | Charlotte | Wiswe | Germany | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 2875 | | Sibling | | $ 4,250,000.00 |
| Ajitha | | Vemulapalli | India | Suresh | | Yanamadala | India | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 3543 | | Spouse | | $ 12,500,000.00 |
| | | | | | | | | | | | | | | | $ - |
| Jean Marc | | Saada | France | Thierry | | Saada | France | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 3497 | | Parent | | $ 8,500,000.00 |
| Rudy | | Saada | France | Thierry | | Saada | France | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 3500 | | Sibling | | $ 4,250,000.00 |
| Anthony | | Saada | France | Thierry | | Saada | France | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 3494 | | Sibling | | $ 4,250,000.00 |
| Cindy | | Saada-Haddad | France | Thierry | | Saada | France | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 3495 | | Sibling | | $ 4,250,000.00 |
| Rohy | | Saada | France | Thierry | | Saada | France | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 3499 | | Sibling | | $ 4,250,000.00 |
| | | | | | | | | | | | | | | | $ - |
| Monica | | Guzman | Columbia | Luis | Eduardo | Torres | Columbia | 9/11/01 | NY | | 1:15-cv-09903, 53, at 3405 | | Sibling | | $ 4,250,000.00 |
| Ronald | Patrick | Cregan | Ireland | Joanne | Mary | Cregan | Ireland | 9/11/01 | NY | | 1:15-cv-09903, 53, at 3016 | | Sibling | | $ 4,250,000.00 |
| William | C. | Wells | United Kingdom | Vincent | Michael | Wells | United Kingdom | 9/11/01 | NY | | 1:15-cv-09903, 53, at 3616 | | Sibling | | $ 4,250,000.00 |
| Joanne | | Cudmore | United Kingdom | Neil | James | Cudmore | United Kingdom | 9/11/01 | NY | | 1:15-cv-09903, 53, at 3324 | | Sibling | | $ 4,250,000.00 |

# Exhibit C

**EXHIBIT C**
**NON-U.S. NATIONAL FUNCTIONAL EQUIVALENT**

| Claimant | | | | | 9/11 Decedent | | | | | | | Claim Information | | | Solatium Damages | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| First | Middle | Last | Suffix | Nationality on 9/11 | First | Middle | Last | Suffix | Nationality on 9/11 | Date of Death | 9/11 Site | Case | Complaint | Amendments & Substitutions | Relationship | Documentation | Prior Award | Amount | Treble |
| Erica | | Zimmerman-Basnicki | | Canada | Kenneth | William | Basnicki | | Canada | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 717, at 2 | | Child | | | $ 8,500,000.00 | |
| Solomon | | Gayle | | Jamaica | Seilai | | Khoo | | Malaysia | 9/11/2001 | NY (WTC) | 9903 | 1:15-cv-09903, 53, at 400 | | Spouse | | | $ 12,500,000.00 | |