# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN) |

*This document relates to*:
All Actions

## PLAINTIFFS' OBJECTIONS PURSUANT TO FED. R. CIV. P. 72(a)
## TO THE MAGISTRATE JUDGE'S DECEMBER 11, 2024 OPINION & ORDER
## REGARDING EXPERT OPINIONS
## (ECF No. 10615)

Jodi Westbrook Flowers
Donald A. Migliori
Robert T. Haefele
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29465
Tel.: (843) 216-9184
Email: rhaefele@motleyrice.com

*Co-Chairs and Liaison Counsel for the
Plaintiffs' Executive Committee for Personal
Injury and Death Claims on behalf of the
Plaintiffs*

Sean P. Carter
J. Scott Tarbutton
COZEN O'CONNOR
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
Tel.: (215) 665-2105
Email: scarter1@cozen.com

*Co-Chair and Liaison Counsel for the
Plaintiffs' Executive Committee for
Commercial Claims on behalf of Plaintiffs*

Steven R. Pounian
Andrew J. Maloney, III
James Gavin Simpson
KREINDLER & KREINDLER LLP
485 Lexington Avenue
New York, New York 10017
Tel.: 212-687-8181
Email: spounian@kreindler.com

*Attorneys for Ashton Plaintiffs*

January 31, 2025

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

I. THE ORDER WAS CONTRARY TO LAW AND COMMITTED CLEAR ERROR IN LIMITING THE TESTIMONY OF BASSEM YOUSSEF, FORMER FBI SPECIAL AGENT, LEGAL ATTACHÉ TO SAUDI ARABIA, AND COMMUNICATIONS UNIT CHIEF ................................................................................................. 5

  A. The Order overlooked the complete record of Youssef's counterterrorism experience, specifically his FBI work against Al Qaeda, and failed to consider how Youssef drew upon that experience to reach his opinions ................................................................ 5

  B. The Order's failure to credit Youssef's experience led it to its wrongful limitation of his opinions on reliability and helpfulness grounds ................................................ 9

II. THE ORDER WAS CONTRARY TO LAW AND COMMITTED CLEAR ERROR IN ITS EXCLUSION OF THE TESTIMONY OF PLAINTIFFS' EXPERT EMILE NAKHLEH, FORMER DIRECTOR OF THE POLITICAL ISLAM STRATEGIC ANALYSIS PROGRAM AT THE CIA ................................................................................. 13

  A. The Order failed to give proper credit to Nakhleh's extensive CIA experience, including his specialized knowledge derived from years of dedicated study of Saudi Arabia's support for radical Islam through its government institutions ................................................ 13

  B. The Order was contrary to law and committed clear error in disregarding extensive record evidence showing that Nakhleh reliably connected his experience to his testimony and applied his analytical methodology to render opinions helpful to the finder of fact .......... 18

III. THE ORDER WAS CONTRARY TO LAW AND COMMITTED CLEAR ERROR IN ITS EXCLUSION OF THE TESTIMONY OF PLAINTIFFS' EXPERT ALEXANDER MELEAGROU-HITCHENS, A LEADING AUTHORITY ON EXTREMISM AND THE TERRORIST CLERIC ANWAR AL-AWLAKI ................................................... 22

  A. The Order was contrary to law and overlooked Hitchens's knowledge and experience in questioning his academic research methodology ................................................ 22

  B. The Order overlooked that Hitchens' opinions were soundly based on his new research and findings in this case about Awlaki's pre-9/11 extremism ................................................ 23

IV. THE ORDER WAS CONTRARY TO LAW AND COMMITTED CLEAR ERROR IN ADMITTING THE TESTIMONY OF SAUDI ARABIA'S PROFFERED EXPERT DAVID RUNDELL ................................................................................. 24

CERTIFICATE OF COMPLIANCE ................................................................................. 27

# TABLE OF AUTHORITIES

Page(s)

Cases

*Diaz v. United States*, 602 U.S. 526 (2024) ............................................................ passim

*Du v. Party Perfect Rentals LLC*, 731 F.Supp.3d 392 (E.D.N.Y. 2024) ........................................ 3

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 643 F.Supp.2d 471 (S.D.N.Y. 2009) ........ 4

*In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642 (2d Cir. 2016) .............................................. 4, 17, 18

*In re Terrorist Attacks on September 11, 2001*, 2023 WL 3116763 (S.D.N.Y. Apr. 27, 2023) ...................................................................................................................... 2, 19, 23

*Koppell v. New York State Bd. of Elections*, 97 F.Supp.2d 477 (S.D.N.Y. 2000) .......................... 3

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) ........................................................ 1, 23

*Lickteig v. Cerberus Cap. Mgmt., L.P.*, 589 F.Supp.3d 302 (S.D.N.Y. 2022) ................................ 1

*Linde v. Arab Bank, PLC*, 922 F.Supp.2d 316 (E.D.N.Y. 2013) ................................................ 3, 12

*Mahoney v. JJ Weiser and Co., Inc.*, 2007 WL 3143710 (S.D.N.Y. Oct. 25, 2007) .................... 18

*Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017) .................................................... 11

*SR Int'l Business Ins. Co., Ltd. v. World Trade Ctr. Properties, LLC*, 467 F.3d 107 (2d Cir. 2006) ............................................................................................................ 18

*Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76 (2d Cir. 1997) ........................................................ 1

*United States v. Abu-Jihaad*, 553 F.Supp.2d 121 (D. Conn. 2008) ...................................... 10, 17

*United States v. Amuso*, 21 F.3d 1251 (2d Cir. 1994) ............................................................ 2, 15

*United States v. Farhane*, 634 F.3d 127 (2d Cir. 2011) .......................................................... 2, 23

*United States v. Holy Land Foundation*, 2007 WL 2059722 (N.D. Tex. July 16, 2007) .............. 11

*United States v. Joseph*, 542 F.3d 13 (2d Cir. 2008) ...................................................... passim

*United States v. Napout*, 963 F.3d 163 (2d Cir. 2020) ............................................................ 1

*United States v. Paracha*, 2006 WL 12768 (S.D.N.Y. Jan. 3, 2006) .......................................... 19

*Veleron Holding, B.V. v. Morgan Stanley*, 117 F.Supp.3d 404 (S.D.N.Y. 2015) ...................... 8, 16

*Washington v. Kellwood Co.*, 105 F.Supp.3d 293 (S.D.N.Y. 2015) .................................... 1, 9, 18

Rules

Fed. R. Civ. P. 26(a)(2)(B) .................................................................................... 4, 11

Fed. R. Civ. P. 72(a) ................................................................................................ 1

Fed. R. Evid. 702 .......................................................................................... 1, 2, 3, 4

Fed. R. Evid. 705 ................................................................................................ 4

Fed. R. Evid. 703 .............................................................................................. 11

Plaintiffs respectfully file these Fed.R.Civ.P.72(a) Objections to those portions of the Court's December 11, 2024 Opinion & Order, ECF No. 10615 ("Order") that placed improper limitations on the admitted testimony of Plaintiffs' expert Bassem Youssef; excluded in their entirety the testimonies of Plaintiffs' experts Emile Nakhleh and Alexander Meleagrou-Hitchens ("Hitchens"); and allowed the testimony of David Rundell, an expert proffered by the Defendant Kingdom of Saudi Arabia ("Saudi Arabia"). Those portions of the Order contained conclusions contrary to the Federal Rules of Evidence and Procedure, misapplied the controlling case law on expert testimony, and were otherwise clearly erroneous because important matters in the record were overlooked.

1.    As detailed below, the Order failed to account for key aspects of the background and qualifications of Youssef, Nakhleh and Hitchens (collectively "Plaintiffs' experts") in assessing the reliability and helpfulness of their opinions. The approach taken in the Order was contrary to law because it did not "examine the totality of the witness's background" as required under Fed.R.Evid.702, *Washington v. Kellwood Co.*, 105 F.Supp.3d 293, 304 (S.D.N.Y. 2015), and did not properly apply the Second Circuit's liberal expert qualification standards. ECF No. 9060 at 8 (citing *United States v. Napout*, 963 F.3d 163, 187 (2d Cir. 2020)). Each of Plaintiffs' experts had amassed many years of directly relevant experience from their respective careers at the FBI (Youssef), CIA (Nakhleh), and at several leading research institutions (Hitchens) that amply met Rule 702's requirements. *Lickteig v. Cerberus Cap. Mgmt., L.P.*, 589 F.Supp.3d 302, 329 (S.D.N.Y. 2022) (permitting testimony of expert with "educational and experiential qualifications in a general field closely related to the subject matter in question," citing *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 80 (2d Cir. 1997)).

2.    The Order further overlooked how these years of relevant experience provided Plaintiffs' experts with reliable foundations for their opinions. *Kumho Tire Co., Ltd. v.*

*Carmichael*, 526 U.S. 137, 150 (1999) (for non-scientific experts "the relevant reliability concerns may focus upon personal knowledge or experience"); *United States v. Joseph*, 542 F.3d 13, 21 (2d Cir. 2008) (Rule 702 allows non-scientific "testimony [] whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it"). Among various examples, the Order was contrary to Supreme Court and Second Circuit authorities, which routinely allow qualified experts to provide opinions anchored in their experience regarding the *modus operandi* of criminal actors and entities, including Al Qaeda. *See, e.g., Diaz v. United States*, 602 U.S. 526, 534 (2024) (Drug Enforcement Agent allowed to testify that most drug couriers know they are being hired to carry drugs because an unknowing courier could expose the drug trafficking operation to substantial risk); *United States v. Farhane*, 634 F.3d 127, 159 (2d Cir. 2011) (admitting Plaintiffs' expert Evan Kohlmann upon finding that the rationale to permit expert testimony on "the operational methods of organized crime families…appl[y] with equal force to terrorist organizations, including al Qaeda."); *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994) (allowing FBI agent to testify "regarding the organization, structure, and terminology of organized crime families").

3.    The Order limited or excluded testimony of Plaintiffs' qualified experts by taking sentences from their reports out of context and drawing erroneous conclusions, misapprehending the content and basis for their opinions. The Order allowed Saudi Arabia's expert Rundell to offer opinions based on his purported "background knowledge," Order at 58-59, but wrongly declined to give analogous credit to Plaintiffs' experts' experiences and methodologies. The Order is also contrary to the Court's prior ruling citing Second Circuit law to permit a defense expert in the 9/11 MDL charity proceedings to testify based on his experience and research. *In re Terrorist Attacks on September 11, 2001,* 2023 WL 3116763, at *13 (S.D.N.Y. Apr. 27, 2023).

4.      In addition, the Order made erroneous findings as to the helpfulness of Plaintiffs'
experts' testimonies, including on grounds such as improper factual narrative, speculation, and
*ipse dixit*, again overlooking how each of Plaintiffs' experts drew upon their experience together
with factual summaries in their reports to form their opinions. The Order's findings are contrary
to the appropriate legal standard, which allows experts to "pull[] together information from
discrete sources, including sources that may be independently admissible, and cross-reference[]
it against other supportive or contradictory information in reaching…conclusions." *Linde v. Arab
Bank, PLC*, 922 F.Supp.2d 316, 323 (E.D.N.Y. 2013).

5.      The Order should have used other available options before it limited or excluded
the testimony of Plaintiffs' experts, such as granting Plaintiffs' request for a *Daubert* hearing at
which questions as to the experts' credentials and opinions could have been resolved. *See
Koppell v. New York State Bd. of Elections*, 97 F.Supp.2d 477, 479 (S.D.N.Y. 2000) (two-day
*Daubert* hearing held to review expert testimony). The Order, however, mistakenly denied a
*Daubert* hearing based on distinguishable case law.[1] Further, the Order failed to recognize that
courts in this District routinely address *Daubert* issues at trial in nonjury cases, since there is no
risk of jury prejudice. *See* ECF No. 9092 at 11 n. 1; ECF No. 9163 at 15. Absent a *Daubert*
hearing, the Order's stated concerns as to Plaintiffs' experts should be resolved at trial. The Order
held that Plaintiffs had the burden of proof regarding their experts, citing the December 2023
amendment to Fed.R.Evid.702 (which became effective after the present *Daubert* motions were
briefed), but erred in denying Plaintiffs the opportunity to satisfy their burden at a hearing or
trial, particularly given the complex, voluminous record before the Court. Indeed,

---

[1] The Order relied on *Du v. Party Perfect Rentals LLC*, 731 F.Supp.3d 392 (E.D.N.Y. 2024), Order at 10, but that case allowed a plaintiff's expert to testify in a vehicle accident case and denied a defendant's hearing request. By contrast, Plaintiffs here requested a hearing or trial to properly address their burden of proof, and the record encompasses hundreds of exhibits, scores of depositions, and the outputs of various government investigations spanning three decades.

Fed.R.Civ.P.26(a)(2)(B) "does not limit an expert's testimony simply to reading his report…." The rule contemplates that the expert will "supplement, elaborate upon, explain and subject himself to cross-examination upon his report." *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 643 F.Supp.2d 471, 482 (S.D.N.Y. 2009) (citations omitted). In addition, Fed.R.Evid.705 provides that "an expert may state an opinion — and give the reasons for it — without first testifying to the underlying facts or data" and that "the expert may be required to disclose those facts or data on cross-examination."

6.     Procedural error aside, the Order should have taken care to "exclude only the unreliable testimony" of each expert because "it may be an abuse of discretion to throw the good out with the bad." *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 665 (2d Cir. 2016) (finding that district court abused its discretion in failing to make effort to preserve parts of expert testimony). The Second Circuit held that "parsing expert testimony is consistent with Rule 702's 'liberal admissibility standards.'" *Id.* Alternatively, the Order should have allowed Plaintiffs' experts to testify subject to the Court's limiting instructions to ensure compliance with Fed.R.Evid.702.

These Objections present examples from the record to illustrate errors made in the December 11, 2024 Order. Plaintiffs respectfully incorporate herein and refer the Court to the memoranda of law in support of Plaintiffs' original *Daubert* motion, ECF No. 9092, and in particular Plaintiffs' *Daubert* opposition and reply papers, ECF Nos. 9163 and 9269 (and their accompanying exhibits), citations to which were sparse or absent altogether from the Order.

I.   **THE ORDER WAS CONTRARY TO LAW AND COMMITTED CLEAR ERROR IN LIMITING THE TESTIMONY OF BASSEM YOUSSEF, FORMER FBI SPECIAL AGENT, LEGAL ATTACHÉ TO SAUDI ARABIA, AND COMMUNICATIONS UNIT CHIEF**

A.   **The Order overlooked the complete record of Youssef's counterterrorism experience, specifically his FBI work against Al Qaeda, and failed to consider how Youssef drew upon that experience to reach his opinions**

The Order's proper finding that Youssef possessed "undisputed [relevant] experience" was undermined by its improper finding of only "limited topics" as to which Youssef should be allowed to testify. Order at 14, 21.[2] In its wrongful limitation of Youssef's testimony, the Order overlooked the full extent of his decades of directly relevant FBI counterterrorism work combating Al Qaeda and other closely related Sunni extremist groups. As a result, the Order mistakenly concluded that "[m]uch of Youssef's testimony rests on conclusory assertions of experience," Order at 20, and that "al Qaeda cell operations" were not a "central" focus of Youssef's work. *Id.* at 14. The Order erroneously suggested that Youssef's work on "special techniques used in counterterrorism assessments…is not evident on this record," but its only support for this suggestion was a single sentence from Youssef's report, taken out of context, *id.* at 13, disregarding Youssef's vast relevant experience set forth throughout his report.

Contrary to the Order's assessments, Youssef properly used that experience as the basis for his opinions on Al Qaeda and terrorist cell operations and other matters addressed in his report. The Order's clear errors in this regard are illustrated by the following facts in the motion record that were overlooked.

---

[2] The Order properly found Youssef "qualified to testify about communications analysis and counterterrorism investigations," Order at 14, and admitted Youssef as an expert on "the FBI's Southern California investigations during the 1990s, Saudi Arabia's approach to appointing foreign officials, terrorism organizations' communication security, and phone analysis;" but the Order stated erroneously that Plaintiffs' had not met their burden "outside these limited topics." *Id.* at 21.

1.     The Order overlooked that throughout his 26-year FBI career Youssef acquired unique knowledge and applied it in both investigative and leadership roles that dealt with counterterrorism and Al Qaeda. As one of the FBI's first native Arabic-speaking agents, Youssef's field assignments enabled him to study and understand the methods of Islamic terror groups including Al Qaeda at close quarters. ECF No. 9089-1 at 166. Youssef's work required numerous personal interactions with sources in terror cases and he was regularly consulted by other FBI agents about their own terrorism-related casework. *Id.* at 7, 9, 11, 14, 28. The FBI "identified [Youssef] as a subject matter expert on Middle Eastern and radical Islamic terrorism" and selected him to train fellow FBI Special Agents as well as CIA Case Officers in major counterterrorism cases regarding the threat posed by Al Qaeda and other Islamic extremists. *Id.* at 7, 9. Youssef researched and prepared "numerous reports" and "training manuals" on Al Qaeda and its *modus operandi*, which were used by "FBI and CIA case officers" in their work to combat the terror organization. *Id.*; ECF No. 9089-2 at 92:11-21.[3]

2.     The Order failed to acknowledge that Youssef's work as an FBI Special Agent in the 1990s was directly related to Al Qaeda. Youssef's report detailed how his FBI investigations in Los Angeles and San Diego from 1992 to 1996 addressed not only the Al Gama'a Islamiya terror group but also Al Qaeda itself.[4] Youssef stated that his "investigation determined that Al Gama'a and Al Qaeda members engaged in regular communication and coordination of their operational objectives." ECF No. 9089-1 at 28. Youssef mapped out the close relationship between those terror organizations and explained that he "became deeply familiar with the

---

[3] Plaintiffs' citations to deposition transcripts herein are to ECF page numbers.

[4] Youssef explains that he determined that "members of Al Gama'a, *Al Qaeda*, and other Islamic extremist terror groups used a small mosque in West Los Angeles known as the Ibn Taymiyah Mosque (the predecessor of the King Fahad Mosque) as an operational hub and a safe location for their covert meetings." (Youssef 2) (emphasis added). Youssef also detailed how "[i]n 1993, our investigation also identified a second, related Sunni extremist cell for Al Gama'a *and Al Qaeda* in San Diego operating at the Islamic Center of San Diego (ICSD), also known as the Abu Bakr Mosque." ECF No. 9089-1 at 27 (emphasis added).

history, operations, and leadership of Al Gama'a as well as its close ally Al Qaeda." *Id.* at 8.

Youssef recounted how he led the FBI's successful efforts to foil a planned terror plot in Los

Angeles involving Al Gama'a and Al Qaeda. *Id.* at 28. Youssef's investigations found that

Al Gama'a and Al Qaeda "worked in partnership" to "espouse the same extremist brand of

Islamic religious fundamentalism" and target the U.S. "as an infidel and the prime target…;" and

Youssef cited to a 1999 FBI report — based on Youssef's own work — naming Al Gama'a and

Al Qaeda together as U.S. top priority terror threats. *Id.* at 22.

    **3.**    The Order overlooked that during his time as the FBI's first Legal Attaché in

Riyadh, Saudi Arabia from 1996 to 2000, Youssef met on a nearly daily basis with senior Saudi

government officials and gained "invaluable experience and first-hand knowledge of…Sunni

Islamic extremism in Saudi Arabia," *Id.* at 9, at a time when Al Qaeda was the vanguard of that

militant extremism. Youssef's report details how he witnessed Saudi government "officials who

followed Sunni extremist views and imposed such views on those around them." *Id.* at 39-40.

    **4.**    The Order similarly did not address Youssef's counterterrorism work on Al Qaeda

during his time as Chief of the FBI's Digital Media Exploitation unit, where he analyzed "seized

documents and computer hard drives of virtually every high-profile subject of terrorism

investigations conducted by the FBI." *Id.* at 10. Youssef's work was focused on Sunni Islamic

extremism and Al Qaeda; he led FBI teams that developed key evidence seized from Al Qaeda

operatives such as Dhiren Barot. ECF No. 9165-11 at 33:11-34:15. Most obviously, the analysis

of this primary Al Qaeda evidence yielded specialized knowledge of the *modus operandi* of

Al Qaeda operatives and those who supported them, placing those matters at the very center of

Youssef's work and experience.

    **5.**    The Order overlooked that Youssef's decade-long role as Chief of the FBI's

Counterterrorism Communications Analysis Unit involved analyzing "telephone contacts and

patterns of known Al Qaeda subjects" ECF No. 9089-1 at 10-11. Youssef's work led to the

discovery of the Al Qaeda cell responsible for the murder of the U.S. Ambassador to Libya and

helped to identify the Boston Marathon bombers. *Id.*; ECF No. 9165-11 at 35:1-13. The Order

expressly permitted Youssef to testify on phone analysis and terrorism organizations'

communication security yet neglected to acknowledge that Youssef's top-level FBI work in those

areas provides him with an equally reliable basis for his opinions as to other aspects of

Al Qaeda's operations as well.

      **6.**     The Order overlooked that not only during the 1990s, but throughout his 26-year

FBI career, Youssef fulfilled assignments as "an undercover agent on highly sensitive operations

targeting Middle Eastern and Iranian radical Islamic groups." ECF No. 9089-1 at 9. Youssef

explained his experience in "studying the MO [*modus operandi*]" of terror groups, as follows:

> I didn't gain my experience from reading a book or reading a couple of articles that I put
> in a book, but I've gained all this experience from actually sitting, speaking with
> terrorists, speaking to them on the phone at times as an undercover agent and having a
> vantage point that most people wouldn't have because of the type of work and the
> assignments that I worked on.

ECF No. 9089-2 at 114:18-115:8; *see Veleron Holding, B.V. v. Morgan Stanley*, 117 F.Supp.3d

404, 445 (S.D.N.Y. 2015) (expert testimony based on real world experience "is potentially worth

far more than the opinion of any ivory tower academic."). The Order overlooked not only

Youssef's work on Al Qaeda but also Youssef's experience investigating other Islamic extremist

groups that shared the same goals and used similar tactics as Al Qaeda, and in many cases

coordinated closely with Al Qaeda. *E.g.*, ECF No. 9089-1 at 22-24, 27-30.

***

      In sum, Youssef possesses an extraordinary range of counterterrorism experience

involving the key terror groups of greatest threat to the U.S., including Al Qaeda, active in the

critical period immediately before and after the 9/11 Attacks. The Order was contrary to law and

clearly erroneous because it overlooked the "totality" of Youssef's background and qualifications and placed undue limitations on his testimony.[5] *Kellwood*, 105 F.Supp.3d at 304.

## B. The Order's failure to credit Youssef's experience led it to its wrongful limitation of his opinions on reliability and helpfulness grounds

The Order's failure to give due credit to Youssef for the full gamut of his FBI experience led, in various instances, to the Order's erroneous conclusion that Youssef failed to link his opinions to his experience; engaged in speculation and *ipse dixit*; presented an improper factual narrative; or offered conclusions as to "states of mind." Order at 15-18, 20-24.

Youssef's directly relevant, far-reaching FBI experience entitled him to opine on issues other than the "limited topics" defined by the Order, and certainly on Al Qaeda's *modus operandi* and counterterrorism. *See, e.g., Diaz*, 602 U.S. at 534; *Joseph*, 542 F.3d at 21; Order at 58-59 (allowing defense expert Rundell to testify based on his experience and "the knowledge he gained from serving"). Youssef's detailed report, properly read in its entirety, explained how his experience provided the foundation for his opinions. The Order, however, made a series of erroneous findings by isolating single sentences from Youssef's report and assessing them out of context.

1.     For example, the Order singles out Youssef's opinion that "Al Qaeda and its planners would never have decided on Los Angeles and San Diego, California as the destination for Hazmi and Mihdhar unless there was an entrenched, verified support structure in place..." and incorrectly suggests that Youssef engaged in "speculation" about "what people 'would have' done." Order at 16-17. Youssef, however, was presenting proper expert opinion testimony on

---

[5] The Order stopped short of properly addressing Youssef's qualifications by stating that there were unspecified instances where his testimony "stray[ed] outside [] bounds," and that those instances would be "more cleanly addressed on reliability or helpfulness grounds," Order at 14. Yet the Order failed to revisit the supposed limits on Youssef's qualifications in its later analysis, meaning it gave no consideration to the areas of expertise Youssef possesses and applies reliably beyond the "limited topics" it identified. *See Id.* at 21.

Al Qaeda's *modus operandi*; indeed, the Order overlooked the context Youssef provides immediately before and after the sentence it cited, where he sets forth the basis for his informed opinion on Al Qaeda's *modus operandi* and links it to his FBI experience and knowledge from other terror investigations. ECF No. 9089-1 at 106-108.[6] *See United States v. Abu-Jihaad*, 553 F.Supp.2d 121, 124 (D. Conn. 2008) (approving Plaintiffs' expert Kohlmann to testify as to the "history, structure, and goals of Al Qaeda, the recruitment of Muslim fighters, mujahideen activities....")

    **2.**    The Order similarly faults Youssef's statement that "[f]rom my observations, Bin Laden and his army of mujahedin fighters which came to be known as 'Al Qaeda' played a supporting role for these 1993 terror plots against New York City targets and were closely linked not only to ["Blind Sheikh"] Abdel Rahman but to the terrorists who carried out the attacks," Order at 15 — but discounts Youssef's detailed explanation rooted in his own background and knowledge from his directly relevant FBI investigation work.[7]

    **3.**    The Order questions Youssef's statements about Bayoumi's "tradecraft" in planning a "coincidental" meeting with the hijackers in Los Angeles, as well as Mihdhar's return

---

[6] These statements included Youssef's explanation that his FBI work made him "familiar with the methods and operations of Islamic terror groups including Al Qaeda" and that the decision to send the Al Qaeda operatives to California would "only have been made after detailed planning and discussion" and that "[f]rom past attacks, we knew that Islamic terrorist groups conducted substantial research, sometimes over several years in advance of an attack" and that they deployed "advance teams." ECF No. 9089-1 at 106-08. The Order also overlooked Youssef's explanation that Al Qaeda would typically arrange for its newly placed operatives to stay in private homes of trusted associates, *id.* at 173; the law enforcement techniques Youssef used to put himself in the shoes of the terrorists, *id.* at 170; his knowledge of the advance planning Bin Laden used for the 1998 Embassy bombings, *id.* at 110-11; and his citation to the same conclusion reached by the 9/11 Commission report, which detailed the specific advance planning techniques Al Qaeda used for the 1998 Embassy bombings and for the 9/11 Attacks themselves. *Id.* at 167; *see also* 9/11 Commission Report at 159, 494 n. 60.

[7] Youssef's report discussed in detail the direct ties of Al Qaeda and Osama Bin Laden with the Al Gama'a terror group responsible for the 1993 World Trade Center attack. Youssef described how Ramzi Yousef, the mastermind of the 1993 attack, "was the nephew of Khalid Sheikh Mohamed (KSM), who helped Al Qaeda organize the 9/11 Attacks that targeted the same buildings for destruction" – and how he learned that Ramzi Yousef and KSM shared "close, direct contacts with each other" about terror attacks from unique details they independently revealed during their interrogations. ECF No. 9089-1 at 24 & n.11. Youssef described the FBI's recognition that "Al-Qaeda had operatives who collaborated to perpetrate [the 1993 World Trade Center] attack." ECF No. 9165-11 at 10:13-14.

trip to the Gulf and Afghanistan to report "in person to Al Qaeda about the knowledge he gained…." which was "exactly what Al Qaeda operatives do." Order at 22. The Order mistakenly categorized these opinions as going to "state of mind" when Youssef was properly describing the *modus operandi* of a criminal operation involving Al Qaeda. *See Diaz*, 602 U.S. at 534 (approving an expert's testimony about drug couriers that "in most circumstances, the driver knows they are hired ... to take the drugs from point A to point B.").

4.      The Order faults Youssef for using an improper factual narrative, Order at 21, 24, but this finding is contrary to law because it fails to draw the essential legal distinction for admissibility purposes between Youssef's well-founded *opinions* and his *presentation of the facts* that supported them. Under Fed.R.Civ.P.26(a)(2)(B), Youssef was required to include in his report "the basis and reasons" for his opinions and "the facts or data" he considered in forming those opinions. Youssef duly provided a thorough report meeting those criteria, and the Order cast doubt on only a small subset of the facts, which does not warrant the limitation of Youssef's expert testimony. At most, the Court might instruct Youssef to limit his presentation at trial of the facts undergirding his opinions.[8]

In placing limitations on Youssef's opinions, the Order erroneously diminished the value of what it described as the "mosaic of evidence," Order at 23,[9] that Youssef had exhaustively assembled and properly presented in his report as the basis for his opinions. Youssef's expert

---

[8] Courts have consistently and uniformly recognized that "[t]he testimony of expert witnesses is of crucial importance in terrorism cases…because firsthand evidence of terrorist activities is difficult, if not impossible, to obtain." *Owens v. Republic of Sudan*, 864 F.3d 751, 787 (D.C. Cir. 2017), *vacated and remanded sub nom. on other grounds, Opati v. Republic of Sudan*, 590 U.S. 418 (2020). In presenting such crucial testimony, an expert report must include a recitation of the facts supporting the opinions, which may be predicated, in part, on hearsay. Fed.R.Evid.703. While the court may be required to draw distinctions between the expert's opinions and the facts supporting them, "[t]he purpose of Rule 703 is not to limit the evidence upon which the expert may rely; rather it is designed to limit the portions of the facts or data relied upon that can be disclosed to the jury." *United States v. Holy Land Foundation*, 2007 WL 2059722, at *5 (N.D. Tex. July 16, 2007).

[9] Rejecting defense arguments that Youssef was a "conduit for hearsay" the Order stated that Youssef "does quote FBI reports and other documents, but generally as one piece of a broader mosaic of evidence…." Order at 23.

11

method of building such a "mosaic" was entirely appropriate and fully supports the admission of his opinions: indeed, in its assessment that "[Youssef's] findings may well be correct," *Id.* at 21, the Order appeared to acknowledge that Youssef's opinions are supported by the factual record. Yet the Order did not afford proper credit to Youssef for his analytical process of assembling and evaluating various items of information to reach his findings. *Linde,* 922 F.Supp.2d at 323.

5.      The Order improperly suggested that Youssef "adopts a nefarious explanation" and makes "unfounded conclusions," but again took Youssef's statements out of context without considering his entire report. Order at 17, 24. For example, the Order overlooked Youssef's assessment of the evidence that years after 9/11 Thumairy was still being given perfect ratings by the same supervisor, Sowailem, who himself was personally involved in the 9/11 support plot and received reports from Thumairy and Bayoumi. ECF No. 9089-1 at 233.

6.      While the Order correctly established that a witness may not make credibility assessments *per se*, Order at 23, it should have allowed soundly based expert opinions pointing to factual inconsistencies in the testimony and evidence. ECF No. 9163 at 73-74.

7.      The Order questioned Youssef's "use of anonymous sources," Order at 20, citing his reference to an FBI report of a phone call Thumairy received from Malaysia. *Id.* The Order mistakenly suggested that Youssef bases his opinion on the source information itself. *Id.* (citing Youssef's "reliance on the tip"). But Youssef simply opines that "*this source information is consistent with other evidence*, including the location of Thumairy, Jaithen, and Mersal at the King Fahad Mosque;" "the phone call history;" and the known details regarding the meeting of the hijackers with Al Qaeda operatives including Walid Bin Attash in Malaysia in January 2000. ECF No. 9089-1 at 161 (emphasis added); ECF No. 9165-11 at 13:20-14:17 (Youssef explaining

that Attash, who "was the communications man for Osama bin Laden" and trained with Hazmi and Mihdhar ahead of their deployment, would have known the attack plans).[10]

***

In sum, this Court should hear and consider the totality of Youssef's expert opinions on their merits rather than subject him to the limitations the Order imposed on his testimony. The Order itself acknowledged that "[t]he Court needs greater context if it is to assess whether Youssef reliably applied his experience to the facts of this case…." Order at 15. This Court should allow Youssef to explain that context at a hearing or trial. Indeed, the Order recognized that when given the chance at his deposition, Youssef provided "adequate[] answers" and "gave principled reasons" in support of his testimony. *Id.* at 19-20.

## II. THE ORDER WAS CONTRARY TO LAW AND COMMITTED CLEAR ERROR IN ITS EXCLUSION OF THE TESTIMONY OF PLAINTIFFS' EXPERT EMILE NAKHLEH, FORMER DIRECTOR OF THE POLITICAL ISLAM STRATEGIC ANALYSIS PROGRAM AT THE CIA

### A. The Order failed to give proper credit to Nakhleh's extensive CIA experience, including his specialized knowledge derived from years of dedicated study of Saudi Arabia's support for radical Islam through its government institutions

The Order erroneously excluded all of Nakhleh's testimony because it did not properly credit Nakhleh's vital work on Saudi Arabia and political Islam for the Central Intelligence Agency (CIA) during the years immediately before and after the 9/11 Attacks. The Order mistakenly characterized Nakhleh primarily as an "academic," Order at 25, and overlooked that Nakhleh's analytical and field experience in the CIA provided a solid basis for his opinions

---

[10] Youssef notes that, based on his knowledge of FBI practices, the format of report the FBI used to present the information showed that the FBI had assessed the source of that information to be credible. ECF No. 9089-1 at 161 n.629. The Order, however, mistakenly concluded that Youssef cites that FBI practice as the basis for his opinion. Order at 20.

13

detailing why and how pre-9/11-era Saudi Arabia propagated and supported radical Islam through its Ministry of Islamic Affairs (MOIA).

1.    The Order's summary of Nakhleh's expert credentials buried the lede as to his stellar CIA career and contributions that directly shaped how the administrations of successive U.S. Presidents assessed Saudi Arabia's state-sponsored propagation of its radical Wahhabi doctrine and responded to the related threat of Islamic extremist terrorism. ECF No. 9163 at 21, 22, 29-31; and ECF No. 9089-4, ¶¶ 25-48, 122-137. For the Order to say that Nakhleh merely "advised the intelligence community," Order at 25, failed to recognize Nakhleh's seniority within the CIA's analytical ranks, or to credit the extent to which he "was heavily relied on for authoritative briefings and strategic analysis by the highest-ranking U.S. intelligence and national security officials, including the President of the United States;" in short, his centrality to the nation's counterterrorism strategy during the time most relevant to this case. ECF No. 9163 at 22; ECF No. 9089-4, 2.  Nakhleh founded and operated the CIA's Political Islam Strategic Analysis Program, which was recognized as "the most respected center of Islamic expertise in the U.S. government." ECF No. 9089-5 at 130:1-11); ECF No. 9089-4, ¶¶ 5-12. Nakhleh headed a team of world-leading intelligence professionals, managed the analysis of classified and highly sensitive intelligence product, and achieved extraordinary access and insight by applying his unique scholarship and skillset to a wide range of interactions in the field. Nakhleh's extensive "peer-review[ed]" reports and other government writings based on this work were consistently acclaimed inside the CIA as being of the highest caliber and operational value. *See e.g.* ECF No. 9163 at 22 n. 9 & n. 10.[11]

---

[11] Nakhleh's writings while at the CIA were "subject to peer review, [by his] peers at the agency who are experts in that area or who focus on that;" but "you do not have a peer review of a classified piece outside the Agency by someone who did not have security clearance." ECF No. 9089-5 at 32:18-34:13; *see also id.* 97:9-98:2, no CIA briefing was made to the President or other senior officials "without having it be[ ] reviewed internally."

**2.** The Order erroneously implied that Nakhleh's expertise as to "Saudi Arabia and its institutions" was somehow constrained by these "hav[ing] not been the primary subject of Nakhleh's *public-facing* work." Order at 26 (emphasis added). The Order's underlying premise was wrong, however, because Saudi Arabia was in fact a "prominent case study" throughout Nakhleh's career, encompassing *both* his work in government *and* his public-facing scholarship. ECF No. 9163 at 22-23. Nakhleh published a 1975 book on U.S.-Saudi relations, which examined the Kingdom's religious history, state formation, politics, and foreign policy (and which, as Nakhleh testified, is "still relevant" 50 years later, ECF No. 9089-5 at 19:2-7), as well as his 2008 book, *A Necessary Engagement*, updating and reaffirming his expertise on comparative Islam, including the radical Islamic activism of Saudi Arabia, and the evolving balance of power between political and religious leadership inside the Kingdom. *Id.*

**3.** Moreover, the Order was contrary to law by confining its review of Nakhleh's qualifications to what could be gleaned from his "public-facing work," and considering Nakhleh's experiences in law enforcement and intelligence as "outside the realm" of work that Nakhleh could draw upon when applying his expertise to his testimony. Order at 26. On the contrary, a variety of experts from law enforcement and other professions whose work typically involves classified, privileged, or otherwise non-public material, are routinely permitted to draw upon the expertise they developed through such work and apply it to the facts at issue. *E.g.*, *Diaz,* 602 U.S. at 534 (drug enforcement agent); *Amuso*, 21 F.3d at 1263 (FBI agent).

**4.** The Order found that Nakhleh possessed a "wealth of understanding," Order at 28, yet failed to credit Nakhleh's record of sustained, contemporaneous firsthand engagement with Saudi Arabia's government during the late 1990s and early 2000s, including its MOIA, its religious officials at home and overseas (including those deployed to the U.S.), its educational institutions at all levels, and many individuals who were products of the Saudi system and the

"Wahhabi polity" that prevailed at that time. ECF No. 9163 at 31-32. Contrary to the Order, Nakhleh never hid behind a claim, as to MOIA or any other subject, that "the results of those studies are classified," Order at 26; rather, he testified that "because [he] studied the [MOIA] as part of [his] government career," he necessarily "could not have written anything outside the Agency *during that period*" (ECF No. 9089-5 at 10, *emphasis added*). Nakhleh properly explained his opinions as to MOIA in line with Rule 702's standards for admission.

5.      Nakhleh, a native Arabic speaker, testified about his extensive visits in the relevant period to Saudi Arabia where he met, interviewed and interacted with all manner of Saudi government agents, including MOIA officials and propagators. The Order overlooked that Nakhleh undertook a probing "analysis of the Islamic studies curriculum" of the state-run "Imam Muhammad University in the 1990s," at the very time when Thumairy and other relevant MOIA propagators later deployed to the United States were enrolled in that curriculum at the school. Nakhleh held informative "personal discussions with many members of university faculty, as well as other Islamic activists and jihadists," ECF No. 9089-4, ¶162b, which Nakhleh explained as being among the invaluable real-world insights that "le[d] [him] to the conclusions he reached." *See Veleron*, 117 F.Supp.3d at 445.

6.      The Order similarly overlooked further experiences from Nakhleh's career that he described as directly pertinent and connected to the subject matter of his opinions. These overlooked experiences included:

    a.      Nakhleh's regular visits and meetings with Muslim clerics from around the world, many of whom had been inculcated with the extremism propagated by Saudi Arabia's government, specifically on its MOIA platforms overseas; and

    b.      Nakhleh's leadership of a comprehensive 1990s study into the textbooks and other materials disseminated throughout all levels of schools across Muslim-majority countries,

16

which identified Saudi Arabia's government-run education system as "the instrument of a state agenda to inculcate Wahhabi religious doctrine into the minds of Saudis from a young age." Nakhleh explained that he reviewed hundreds of textbooks published under Saudi Arabia's official state imprimatur and approved by its MOIA. The textbooks presented extremist, jihadist views that were actively hostile to the United States. ECF No. 9089-4, ¶¶ 55-61.

***

The Order mistakenly suggested that certain opinions offered by Nakhleh "fall outside the scope of his expertise," citing a single, flawed example.[12] While the Order did not disqualify Nakhleh based on this suggestion, it erroneously set the stage for the Order to narrowly limit its assessment of the reliability and helpfulness of Nakhleh's testimony in a manner that failed to properly credit the full breadth of Nakhleh's CIA experience and specialized knowledge.

The Order was contrary to law by failing to acknowledge that Nakhleh — an expert who draws upon "[his] 60-year accumulation of unique, first-hand insights and perspectives on the Middle East, on the role of Islam in state formation, including in Saudi Arabia, and on the complexities of support for violent jihad," ECF No. 9163 at 30; *see* ECF No. 9089-5 at 21:1-8 — offered highly relevant testimony of genuine assistance to the Court as trier of fact to understand the issues. *See Abu-Jihaad*, 553 F.Supp.2d at 124.

The Order's wholesale exclusion of Nakhleh's testimony is further contrary to law because it made no effort to retain any of his valuable opinions. *In re Pfizer*, 819 F.3d at 665.

---

[12] The example cited in the Order at 26, ECF No. 9089-4, ¶ 58, contains a quote from Nakhleh's report that has been stripped of context and misapprehended. The observation about "children [being] socialized into their respective societies . . . by the time they are in the fifth grade" was sourced to certain "expertise" Nakhleh had procured for a study he led at the Agency: it was not Nakhleh's own opinion, but that of his "CIA colleagues," as shown by Nakhleh's explanation in the preceding paragraph, *id.*, ¶ 57, about certain "respected sociologists and psychologists who have analyzed this phenomenon — some of whom worked for me and with me at the CIA," who had contributed their professional insights to the study Nakhleh led.

Even if the Court were to find "infirmities" in particular parts of Nakhleh's report, Order at 33, that might have warranted *limitations* on his testimony, it was clear error to reject *all* of Nakhleh's testimony on subject matters that are squarely in the wheelhouse of his extensive experience, including his opinions on Saudi Arabia's MOIA, its propagators, and the paths they followed in supporting extremism. *In re Pfizer*, 819 F.3d at 665; *see Diaz*, 602 U.S. at 534; *Joseph*, 542 F.3d at 21.

**B. The Order was contrary to law and committed clear error in disregarding extensive record evidence showing that Nakhleh reliably connected his experience to his testimony and applied his analytical methodology to render opinions helpful to the finder of fact**

**1.**     The Order's statements that "Nakhleh often fails to connect his experience to his testimony," *Id.*, and that his testimony "omits context explaining how his experience informs his conclusions," *Id.* at 33, were clearly erroneous and contrary to law because the Order (a) failed to consider the complete realm of Nakhleh's CIA experience, *Kellwood Co.*, 105 F.Supp.3d at 304; (b) overlooked Nakhleh's statements where he explained how his experience provided the basis for his opinions; and (c) imposed an improper reliability requirement that each of his opinions be expressly rooted in a specific example of experience or expertise from his career with an individual explanation as to "how he reached [each of] those opinions." Order at 28.

**2.**     The Order was contrary to law and clearly erroneous in its failure to recognize the direct connection between Nakhleh's experience and opinions,[13] or consider that in terrorism cases, where "expert testimony is not of a technical nature, but rather falls within the ambit of

---

[13] *See SR Int'l Business Ins. Co., Ltd. v. World Trade Ctr. Properties, LLC*, 467 F.3d 107, 132 (2d Cir. 2006) (finding that expert witness sufficiently connected experience to opinions where he "testified that he had over 30 years of experience in the insurance industry ... and he was familiar with practices in the industry," and that "through these experiences," he was able to identify customary industry practices); *Mahoney v. JJ Weiser and Co., Inc.*, 2007 WL 3143710, at *5 (S.D.N.Y. Oct. 25, 2007) ("Where, as here, an expert's opinion is based on the expert's experience, courts focus on the relationship between the experience and the opinion and whether the latter is rationally related to the former.")

social science, this Court is guided by the objective of the *Daubert* factors, and not a mechanical application of each one."[14] *United States v. Paracha*, 2006 WL 12768, at *19 (S.D.N.Y. Jan. 3, 2006), *aff'd*, 313 Fed App'x 347, 351 (2d Cir. 2008). The Order not only improperly used a "mechanical" reliability requirement for Nakhleh, but did so inequitably: most notably, it did not use the same standard for defense expert Rundell. Order at 58-59 (crediting Rundell's opinions as "rest[ing] on a reliable foundation" where they meet only a generalized requirement of being "rooted in the knowledge he gained from serving").

3.      The Order erroneously criticized Nakhleh for providing only "vague and isolated descriptions of his methods," Order at 28, but cited only one page of Plaintiffs' *Daubert* opposition brief, ECF No. 9163 at 53, overlooking the other pages in the same section of that brief with detailed references to Nakhleh's report and deposition testimony where he disclosed, thoroughly explained, and demonstrated the reliable application of his analytical methodology. *Id.* at 49-53. The Court overlooked that Nakhleh applied the same "well-structured interdisciplinary approach" that he used at the CIA Political Islam Strategic Analysis Program. Such a methodology — one that "consists of gathering multiple sources of information, including original and secondary sources, cross-checking and comparing new information against existing information" — was clearly sufficient. *Paracha*, 2006 WL 12768, at *20 (applying this standard to admit testimony of Plaintiffs' expert Kohlmann); *In re Terrorist Attacks*, 2023 WL 3116763, at *13 (citing *Paracha* to allow testimony of defense expert).

4.      The Order further erred in finding that Nakhleh "advances reductionist descriptions of Islam in Saudi Arabia," Order at 33, when he consciously described *the Saudi*

---

[14] The Order improperly assessed the reliability of Nakhleh's testimony using an inappropriate comparison with a science-based expert. Order at 28 (comparing Nakhleh's conclusions regarding "terrorist ideologies and operations" to those of "a clinical researcher" who "studied the efficacy of a drug").

*state's* pre-9/11-era religious doctrine, including its historical evolution, its radicalization, and the particularization of its concepts of *jihad*. ECF No. 9089-4, ¶¶25-137. The Order took Nakhleh's words out of context to form an erroneous view that Nakhleh's report "paints Saudi Arabia, its institutions, and its citizenry as largely monolithic — aligned in their collective aim to violently confront the 'enemies' of Islam," *id.* at 29, and extrapolates Nakhleh's opinions on Wahhabism and MOIA's propagation programs into what the Order calls (but Nakhleh himself never called) a "Saudi ideology." *Id.*[15] This framing of Nakhleh's testimony misses the mark, since Nakhleh opined specifically as to the Wahhabi doctrine propagated by the pre-9/11-era Saudi state, through its MOIA, and not as to the individual religious beliefs of each and every Saudi citizen.

5.      The Order further stated, wrongly, that "Nakhleh himself admits his portrayal is not a faithful one," *id.*, implying a concession. But Nakhleh himself did not concede the myth, manufactured by Saudi Arabia's defense counsel, of a "spectrum of… beliefs" existing *within* the Saudi state's MOIA-led religious order. ECF No. 9089-5 at 81:5–82:5. Nakhleh's expert testimony, like his scholarship, consistently acknowledges the alternative beliefs of the different Schools of Islam *elsewhere*, *see e.g.,* ECF No. 9089-4, ¶¶25-35, 229, but emphasizes that the Saudi state's embrace of Wahhabism in the pre-9/11 era — exacerbated by a complex array of factors such as MOIA's intensified focus on *da'wa*, and the Islamization and radicalization of Muslim youth, *id.*, ¶¶ 226-31 — was distinctive to Saudi Arabia. The Order's clearly erroneous adoption of defense arguments that Nakhleh "omi[ts] ideologies that eschew violence" and "gives a skewed impression of Islam in the Kingdom," and its finding of "problematic gaps" in Nakhleh's presentation of Saudi religious doctrine, Order at 29-30, are contrary to the record.

---

[15] What Nakhleh identified – once again based on his own extensive field experience, including "so many interviews I conducted across the Muslim world" – was a nexus during the relevant period between the actions of Al Qaeda terrorist operatives "like the 9/11 hijackers" and "their doctrinal inspirations" from Wahhabi clerics or religious scholars, whom Nakhleh referred to as "Saudi ideological extremists." ECF No. 9089-4, ¶¶ 231-34.

The Order should have granted Plaintiffs' request for a hearing to address the issues, rather than exclude all of Nakhleh's testimony based on such misapprehensions.

6.     The Order further overlooked that Nakhleh possesses unique, detailed insights and specialized knowledge from his CIA work to scrutinize the curriculum at Imam Muhammad University in the 1990s (the very period when Thumairy was studying there to join MOIA), as well as from his discussions with faculty and other Islamic activists. *See e.g.* ECF No. 9089-4, ¶¶160-163, 166. Nakhleh's testimony about Saudi religious education and the elements of that specific curriculum — sharply at odds with Thumairy's testimony — was improperly discarded as "direct attacks on witness credibility," Order at 32, when Nakhleh's basic opinions are proper; his learned assessment is grounded in what he researched, witnessed, and catalogued in the 1990s (as he describes in detail); and his analysis, based on his lifelong study, would be uniquely helpful to the Court. ECF No. 9163 at 34-35. Even if the Court were to regard commentary about the student (Thumairy) as "misplaced," Order at 33, it should preserve the core of Nakhleh's illuminating testimony.

7.     The Order improperly indulged other unfounded defense criticisms as to the reliability and helpfulness of Nakhleh's opinions, erroneously labelling as "speculative" his careful assessments of documentary production, *id.* at 30-31, and misconstruing passages of his report regarding knowledge and doctrine as "weigh[ing] in on subjective 'states of mind'," *Id.* at 32-33. Yet Nakhleh's opinions on 9/11-related events drew on his expert analysis of documents, not on conjecture, *see* ECF No. 9163 at 60-61; and his acknowledged "impressive combination of credentials," Order at 34, should permit Nakhleh to be heard on all the themes that the Order, *id.* at 33, extracted selectively from his report, *see* ECF No. 9163 at 78-79.

***

The Order's complaint that Nakhleh "leaves the Court with too little to go on to assess the reliability of [his] testimony," Order at 29, cannot be sustained given Nakhleh's rigorous presentation on pre-9/11-era Saudi Arabia's support for Wahhabi extremism, which drew directly from Nakhleh's experiences in Saudi Arabia and his years of intensive study of Saudi Arabia's role in political Islam. *See e.g.* ECF No. 9089-4, ¶¶20-24.

### III.  THE ORDER WAS CONTRARY TO LAW AND COMMITTED CLEAR ERROR IN ITS EXCLUSION OF THE TESTIMONY OF PLAINTIFFS' EXPERT ALEXANDER MELEAGROU-HITCHENS, A LEADING AUTHORITY ON EXTREMISM AND THE TERRORIST CLERIC ANWAR AL-AWLAKI

Hitchens, a lecturer and research analyst on terrorism, radicalization, and extremism at Kings' College London, wrote the peer-reviewed book *Incitement: Anwar al-Awlaki's Western Jihad* (Harvard University Press), and has compiled and maintained one of the world's most comprehensive repositories on Awlaki's life and works. ECF No. 9165-7 at 3-4, 10, 50-65.

### A.  The Order was contrary to law and overlooked Hitchens's knowledge and experience in questioning his academic research methodology

The Order was contrary to law and clearly erroneous in excluding Hitchens' opinions regarding Awlaki on reliability and helpfulness grounds. Order at 34-40.

The Order overlooked the core research methodology Hitchens has used as an academic at a world-leading university to study Awlaki for over a decade. ECF No. 9165-7 at 3-4. At his deposition, Hitchens confirmed that his opinions draw upon his "expertise" and "past experience," and he applied the same research practices as when his work was "peer reviewed and approved, again, by top university presses and publishers." ECF No. 9165-13 at 18:3-5.

The Order, however, mistakenly criticized Hitchens for not applying a "social science framework to the facts." Order at 36. This overlooked not only Hitchens' report and testimony but controlling precedent. Hitchens was entitled to rely on his extensive experience and research

on Awlaki to reach his opinions. *Kumho Tire,* 526 U.S. at 150; *Joseph,* 542 F.3d at 21. The Order

is also contrary to Second Circuit cases which allow testimony of academic research experts in

terrorism cases, e.g., *Farhane*, 634 F.3d at 159 (2d Cir. 2011), as well as Southern District case

law, including another ruling in this litigation, allowing experts with research methodologies

similar to the one used by Hitchens. *In re Terrorist Attacks*, 2023 WL 3116763, at *13.

### B. The Order overlooked that Hitchens' opinions were soundly based on his new research and findings in this case about Awlaki's pre-9/11 extremism

The Order erroneously adopted Saudi Arabia's misleading arguments that Hitchens

"changed his opinions about…Awlaki's radicalization." Order at 36-8, 40. The Order overlooked

Hitchens' answers to Saudi Arabia's claims in his report and testimony. First, the suggestion that

Hitchens changed his views is inaccurate; Hitchens' prior work also found that Awlaki expressed

significant animosity towards the U.S. and adopted key principles of Islamic jihadist thought as a

preacher before 9/11. ECF No. 9089-10 at 12. Second, Hitchens explained that while he had

previously devoted greater focus to Awlaki's *post-9/11* activities, it was not until this case that he

conducted an exhaustive review of Awlaki's *pre-9/11* teachings and preachings. Hitchens

reviewed "many, many hours of [Awlaki's] lectures," and "saw new information that [he] was

not [previously] aware of." ECF 9165-13 at 7, 31. Hitchens described how he uncovered

"completely new material" including "crucial and shocking" extremist statements of Awlaki from

2000. *Id*. at 31. Those statements — dated to the same time that Bayoumi and Thumairy

coordinated with Awlaki to provide support to the hijackers in San Diego — showed that Awlaki

held extreme views "directly in line with…al-Qaeda." *Id*.; ECF 9165-7 at 28-36.

The Order, however, mistakenly relied on Saudi Arabia's specious citations to equivocal

statements from Hitchens' book *Incitement*, which preceded his revelatory research, and

Hitchens' deposition testimony that Awlaki did not "specifically" discuss "global jihad." Order at

36-7. The Order overlooked Hitchens' detailed explanations that his book was written before he

discovered Awlaki's pre-9/11 extremist statements (made to private audiences), and that Awlaki

had taken care to avoid specific extremist statements in public. ECF 9165-13 at 26, 31.

Moreover, the Order does not consider that Hitchens wrote in *Incitement* that Awlaki's

relationship with the hijackers involved "unsolved mysteries" that remained an open question for

further research. ECF 9089-9 at 14-15. The Order overlooked that Hitchens, in his expert report,

used his unique knowledge, skills, and resources to conduct his painstaking new research on

Awlaki embodying highly relevant expert evidence that should be heard by this Court.

## IV. THE ORDER WAS CONTRARY TO LAW AND COMMITTED CLEAR ERROR IN ADMITTING THE TESTIMONY OF SAUDI ARABIA'S PROFFERED EXPERT DAVID RUNDELL

The Order mistakenly found that Rundell, a former State Department official, was

qualified to offer his opinion as to what Saudi Arabia would or would not have done in the years

leading up to the 9/11 Attacks.[16] Rundell's resume, however, confirms that the substantive work

and experience he accumulated in Saudi Arabia began well *after* 9/11. Rundell admits that his

opinions were "[b]ased on my experience working on terrorist finance issues in Riyadh," ECF

No. 9118-2 at 40, which according to his resume occurred between July 2004 and July 2006.

ECF No. 9116-11 at 3. Rundell had no experience dealing with terror issues prior to 2004; he

expressly rejected the notion that he would be qualified to discuss the events leading up to the

9/11 Attacks and preferred to claim that he was "familiar with the *post-2001* history of al-Qaeda

in Saudi Arabia." ECF No. 9118-2 at 40 (emphasis added).

The Order made a clear, foundational error in characterizing as "undeniable" Rundell's

"experience in United States-Saudi relations," Order at 60, and in stretching his service to cover

---

[16] Plaintiffs did not concede anything in this regard as the Order would suggest, Order at 58, and in fact unequivocally stated that Rundell "is unqualified to address the issues in this case." ECF No. 9092 at 79.

"most" of his "nearly 30 years in the Foreign Service." To the contrary, Rundell's resume merely asserts that he was in Saudi Arabia for seven out of the 22 years from July 1980 to July 2002. ECF No. 9166-11 at 4. Rundell's pre-9/11 roles in Saudi Arabia were as a functionary who never attained any substantive expertise. *Id.*

The Order wrongly credited Rundell with having "employ[ed] [his] experience" to provide his rebuttal opinions, which it erroneously characterized as "sober critiques," Order at 60. The Order mistakenly allowed Rundell to render unfounded, inadmissible judgments loosely informed by his *post-9/11* experiences in Saudi Arabia. Moreover, Rundell's unrepentant refusal "to analyze the discovery materials" in this case, *id.* at 59, which undeniably shed light on the *pre-9/11* conduct of Saudi Arabia, meant that Rundell's opinions are devoid of any basis in reliable data or methodology. ECF No. 9269 at 30-35. The Order overlooked proof that Rundell offered opinions advocating for the political agenda of Saudi Arabia, the party that engaged him, Order at 59-60 (characterizing Rundell's perspective as "*realpolitik*"), and that he based those opinions on nothing more than his *ipse dixit*. ECF No. 9269 at 35-36. For one example, the Order erroneously failed to address evidence that Rundell improperly functioned not as an expert but as a spokesperson for Saudi government ministers to present their defenses. *Id.* at 33-35. The Order overlooked proof that Rundell blindly relied upon religious documents in Arabic that he obtained from a MOIA official. Rundell admitted that he could not read the documents himself, yet he nonetheless deigned to provide his opinion that the documents supported his central theories regarding Saudi Arabia and Al Qaeda. *Id.* Finally, the Order overlooked that it was inappropriate to permit Rundell's dubious testimony on subjects as to which discovery has not yet been allowed or conducted. ECF No. 9092 at 22 n. 99.

Dated: January 31, 2025

Respectfully submitted,

MOTLEY RICE LLC

By: /s/ Robert T. Haefele
ROBERT T. HAEFELE
JODI WESTBROOK FLOWERS
DONALD A. MIGLIORI
28 Bridgeside Boulevard
Mount Pleasant, SC 29465
Tel.: (843) 216-9184
Email: rhaefele@motleyrice.com

*Liaison Counsel and Co-Chairs of Plaintiffs'*
*Executive Committee for Personal Injury and*
*Death Claims on behalf of the Plaintiffs*

KREINDLER & KREINDLER LLP

By: /s/ Steven R. Pounian
STEVEN R. POUNIAN
ANDREW J. MALONEY, III
JAMES GAVIN SIMPSON
485 Lexington Avenue
New York, New York 10017
Tel.: 212-687-8181
Email: spounian@kreindler.com

*Attorneys for Ashton Plaintiffs*

COZEN O'CONNOR

By: /s/ Sean P. Carter
SEAN P. CARTER
J. SCOTT TARBUTTON
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
Tel.: (215) 665-2105
Email: scarter1@cozen.com

*Co-Chair and Liaison Counsel of the*
*Plaintiffs' Executive Committee for*
*Commercial Claims on behalf of Plaintiffs*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rules 6.3 and 7.1(c), I certify that the foregoing document, which was prepared using Times New Roman 12-point typeface, contains 8,684 words, excluding the parts of the document that are exempted by Local Civil Rule 7.1(c). This certificate was prepared in reliance on the word-count function of the word-processing system (Microsoft Word) used to prepare the document.

Executed on January 31, 2025

/s/    Robert T. Haefele
Liaison Counsel of the Plaintiffs' Executive
Committee for Personal Injury and Death
Claims on behalf of Plaintiffs