UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| In re Terrorist Attacks on September 11, 2001 | 03-md-1570 (GBD)(SN) <br> ECF Case |
|---|---|
| This document relates to: <br> *Ashton et al. v. al Qaeda Islamic Army*, et al., | 02-cv-6977 (GBD)(SN) <br> ECF Case |

**<u>The *Ashton 27* (Revised) Plaintiff's Motion for Final Judgment</u>**

For the reasons set forth below, and the statements contained in the declaration of James P. Kreindler, Esq. ("Kreindler Declaration") and exhibits thereto, the *Ashton* plaintiff set forth in Exhibit B to the Kreindler Declaration, by and through counsel, Kreindler & Kreindler LLP, respectfully move this Court for an Order:

1) Awarding the plaintiff set forth on Exhibit B to the Kreindler Declaration ("*Ashton 27 (revised)* Plaintiff") damages based on the description provided in the Kreindler Declaration, its supporting exhibits and this Court's previously-established framework for traumatic injuries sustained on September 11, 2001 in the terrorist attacks;

2) Awarding the *Ashton 27 (revised)* Plaintiff pre-judgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment for damages;

3) Granting the *Ashton 27 (revised)* Plaintiff permission to seek punitive damages and any other appropriate damages at a later date;

4) Finding that service of process was properly effected upon the Islamic Republic of Iran ("Iran") in accordance with 28 U.S.C. § 1608(a) for sovereign defendants; and,

5) Granting permission for all other plaintiffs in this action not appearing on Exhibit B to the Kreindler Declaration to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed.

This motion is made on behalf of the claimant listed in Exhibit B attached to the Kreindler Declaration (*Ashton 27 (revised)* Plaintiff), in light of this Court's previous order granting permission to allow remaining plaintiffs in the case to move for this relief. (ECF 3300) and this Court's invitation to refile the *Ashton 27* motion (ECF 9879 *et seq*.) to address certain jurisdictional issues (ECF 10708).[1]

As the award set forth in the proposed order represents the only direct recovery against Iran on behalf of the *Ashton 27 (revised)* Plaintiff listed in Exhibit B to the Kreindler Declaration, the proposed order will constitute a final award and judgment against Iran for that claimant.

### I. Procedural Background

On September 4, 2002, the *Ashton* Plaintiffs filed their first complaint against the sponsors of the September 11, 2001 terrorist attacks, which included allegations against the Islamic Republic of Iran ("Iran"). *See* 02-cv-6977 (S.D.N.Y.) ECF 1. Plaintiffs, both United States nationals and non-nationals, asserted federal jurisdiction on several different bases, primarily, as relevant here, pursuant to the Foreign Sovereign Immunities Act as it was in force at the time of the filing (28 U.S.C. § 1605(a)) ("FSIA"). *Id.* at 28, 39 – 40, 43, 48. Iran was listed as a named defendant in the *Ashton* Plaintiffs' Consolidated Master Complaint, filed on March 6, 2003 and each complaint up through the Sixth Amended Complaint, with the same

---

[1] References to the 03-md-1570 docket entries will be noted only by the ECF document number. Any reference to a prior Order or filing on a different docket will include that docket number as well as the ECF document number.

jurisdictional assertions based on the FSIA. *See* 02-cv-6977 (S.D.N.Y.) ECF No. 11-2 at 17, ECF 11-5 at 45 – 49 ; ECF 465 at 2. This *Ashton* complaint was served on Iran in compliance with FSIA requirements through diplomatic channels, but Iran never answered. *See* 02-cv-6977 (S.D.N.Y.), ECF 424 at 2; *see also* 02-cv-6977 (S.D.N.Y.) ECF 358. The *Ashton* Plaintiffs moved for a Certificate of Default, which the Clerk of the Court issued. *See* ECF 2510. In 2008, Congress amended the FSIA with the passage of a new terrorism exception, codified at 28 U.S.C. § 1605A, and again in 2016 with the passage of the Justice Against Sponsors of Terrorism Act ("JASTA"), codified at 28 U.S.C. § 1605B. Section 1605A removed the sovereign immunity from suit in the U.S. for nations that had been formally designated state sponsors of terrorism, allowing U.S. nationals to pursue a claim against a formally designated state-sponsor of terrorism. Section 1605B removed the sovereign immunity from suit in the U.S. of *any* nation for death or injuries caused by an act of terrorism in the U.S. and the tortious acts of the nation state (28 U.S.C. § 1605B(b)); and allowed U.S. nationals to pursue substantive claims based on the federal Anti-Terrorism Act, 28 U.S.C. § 2333 (28 U.S.C. § 1605B(c)).

## II. Jurisdiction

### a. Subject Matter Jurisdiction

It is the FSIA that provides "the ground rules 'for obtaining jurisdiction over a foreign state in the courts' of the United States." *Fed Republic of Germany v. Philipp*, 141 S.Ct. 703, 709 (2021) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989)). While the FSIA historically had been a jurisdictional statute that "creates no cause of action" in and of itself (*McKesson Corp. v. Islamic Republic of Iran*, 672 F.3d 1066, 1075 (D.C.Cir. 2012)), a Court must, as an initial matter, be satisfied that one of the FSIA's exceptions to immunity applies to a foreign sovereign before proceeding to determinations of liability and damages.

3

In 1996, Congress enacted the first "terrorism exception" to foreign sovereign immunity, codified at 28 U.S.C. § 1605(a)(7) and then in 2008 amended the terrorism provision further, placing it in a separate section of the FSIA codified at 28 U.S.C. § 1605A . That provision confers upon the federal courts subject matter jurisdiction over a foreign state that has been formally designated a state sponsor of terrorism under United States law. Iran was at that time and remains today an official state sponsor of terrorism, having been so designated by the U.S. government on January 19, 1984 and, to date, never having been de-designated. (*See* U.S. Department of State, State Sponsors of Terrorism, available at state.gov/state-sponsors-of-terrorism (last accessed Feb. 28, 2025).

The FSIA (both in its 1996 and 2008 incarnations) provided that the terrorism exception to sovereign immunity applied to a claim for damages against a foreign sovereign that had been officially designated as a state sponsor of terrorism in a suit arising out of the personal injury or death caused by certain enumerated acts of terror when "the claimant or victim was, at the time of the act … a national of the United States." 28 U.S.C. § 1605A; 28 U.S.C. § 1605(a)(7) (P.L. 104-132, April 24, 1996, 110 Stat 1214, 1241). For purposes of establishing jurisdiction, "[t]he claimant and victim need not both be American citizens." *Leibovitch v. Islamic Republic of Iran*, 697 F.3d 561, 570 (7th Cir. 2012) (finding that federal court had jurisdiction under 28 U.S.C. § 1605A(a) over non-U.S. nationals' claims against Iran for their individual solatium damages arising out of the death of their U.S.-national immediate family member in a terrorist attack, but that the non-U.S. nationals could not benefit from the substantive cause of action created by 28 U.S.C. § 1605A(c)); *see also Flanagan v. Islamic Republic of Iran*, 190 F. Supp. 3d 138, 168 (D.D.C. 2016) (observing, in case involving U.S. national claimants, that "[o]bviously, because section 1605A's jurisdictional requirement focuses *alternatively* on the claimant *or* the victim,

4

the distinction between jurisdiction and the substantive cause of action means that section 1605A might afford subject-matter jurisdiction irrespective of whether the claimant can assert a valid cause of action under subsection 1605A(c)) (emphasis in original)).[2]

Then, in 2016, with the passage of JASTA, Congress further expanded FSIA liability, providing that, even without formal designation as a sponsor of terror:

> A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which money damages are sought against a foreign state for physical injury to person or property or death occurring in the United States and caused by
>
> (1) An act of international terrorism in the United States; and
>
> (2) A tortious act or acts of the foreign state, or of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, regardless where the tortious act or acts of the foreign state occurred.

28 U.S.C. § 1605B(b). Under that provision, a foreign state is stripped of immunity from a claim for damages caused by and arising out of its tortious acts an act of "international terrorism in the United States" resulting in physical injury, irrespective of the nationality of the victim or claimant.

Thus, as relevant here, under the FSIA, federal courts have subject matter jurisdiction over a suit when a U.S. national "claimant or victim" is seeking "money damages" from "a foreign state for personal injury or death" (28 U.S.C. § 1605A(a)(1)-(2)) and likewise have subject matter jurisdiction over a suit when the claimant or victim is a non-U.S. national if (1) the injury, damage or death "occurred in the United States";

---

[2] While *Leibovitch* concerned actions brought by non-U.S. nationals for the solatium damages they suffered following injury or death of a U.S. national immediate family member, here, the "claimant" is the representative of the Estate of Andrej Cieslik and while she is and was at the time of the 9/11 attacks a U.S. national, she is pursing a damages judgment on behalf of her now-deceased husband, who became a U.S. national after the 9/11 attacks.

(2) was "caused by—an act of international terrorism in the United States;" and (3) "a tortious act or acts of the foreign state, or of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, regardless where the tortious act or acts of the foreign state occurred." 28 U.S.C. § 1605B(b).

This Court has jurisdiction over the claims brought by the *Ashton 27 (revised)* Plaintiff under the FSIA, pursuant to both (or, alternatively) 28 U.S.C. § 1605A and 28 U.S.C. § 1605B.

As to 28 U.S.C. § 1605A, first, while the victim Andrej Cieslik was not a U.S. national at the time of the 9/11 attacks (having become naturalized in 2006, *see* Exhibit C to Kreindler Decl.), the claimant here is the personal representative of the Estate of Andrej Cieslik, his surviving spouse, who became a U.S. citizen in 2000, prior to the 9/11 attacks (Exhibit C to Kreindler Decl.)  Second, he suffered traumatic injuries in the 9/11 attacks, which, as this Court has previously recognized, was a terrorist attack that falls within the scope of the FSIA and the foreign state at issue here, Iran, and its officials, employees and agents provided material support and resources for the 9/11 attacks. ECF 2516; ECF 9506 at 6-7.[3]  Finally, Iran was at the time of the 9/11 attacks and today remains a formally designated state-sponsor of terrorism. *See supra* at 4.  Thus, under 28

---

[3] As this Court has recognized, it is appropriate, in order to "avoid duplication of effort," to "tak[e] judicial notice of decisions issued in related cases" and avoid the need to re-present relevant facts. ECF 9506 at 4-5.  The 2011 decision concluded that Iran bore liability for the 9/11 attacks for purposes of the FSIA. ECF 2516.  This Court has already relied on those findings when weighing claims brought by non-U.S. nationals against Iran (ECF 9506 at 4, 6-7) and should do so again here.

6

U.S.C. § 1605A(a)(1), this Court has jurisdiction over the claims brought by the Estate of Andrej Cieslik against Iran.

Even, however, if this Court concludes that despite the fact that the personal representative of the Estate of Andrej Cieslik was a U.S. national at the time of the 9/11 attacks, it cannot exercise subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1605A(a)(1), it nevertheless has jurisdiction pursuant to 28 U.S.C. § 1605B.[4] The claims brought by the Estate of Andrej Cieslik satisfy all of 28 U.S.C. § 1605B's requirements. The Estate is seeking monetary damages from Iran. The claim for damages arises from "physical injuries" suffered "in the United States." 28 U.S.C. § 1605B. Those injuries were "caused" by the 9/11 Attacks, which were an "act of international terrorism" inside the United States. 28 U.S.C. § 1605B. Last, as to the requirement under 28 U.S.C. § 1605B that a tortious act by Iran "caused" the injuries here, as noted above, this Court previously relied on the findings based on the 2011 hearing to conclude that this final element was satisfied, and should do so again in this case. ECF 9506 at 6-7.[5]

---

[4] While when suit was filed, 28 U.S.C. § 1605B had not yet been enacted, the *Ashton* complaint nevertheless relied on the FSIA as a basis for subject matter jurisdiction. *See* 02-cv-6977 (S.D.N.Y.) ECF 11-2 at 67 (¶ 2) and ECF 465 at 102 (¶ 2).

This Court has on multiple occasions relied on 28 U.S.C. § 1605B as the basis for subject matter jurisdiction over claims brought by non-U.S. nationals in cases where that provision was not named in the complaint cited 28 U.S.C. § 1605A as the basis for jurisdiction (because at the time of filing Section 1605B had not yet passed). *See, e.g.,* ECF 10665 at 4-6 (finding subject matter jurisdiction over claims in *Burnett* complaint, which was filed prior to passage of 28 U.S.C. § 1605B and relied on 28 U.S.C. § 1605A for jurisdiction, 15-cv-9903 (S.D.N.Y.), ECF 53 at 1082-1088) and ECF 10727 at 4-7 (same, as to both *Burnett* and *Ashton* claimants). Indeed, a federal court always has the authority to determine its own jurisdiction. *United States v. Ruiz*, 536 U.S. 622, 628 (2002), citing *United States v. Mine Workers of Am.*, 330 U.S. 258, 291 (1947).

[5] This Court previously found it had subject matter jurisdiction over the claim brought by the *Ashton 27 (revised)* plaintiff, but recommended denying without prejudice the motion for

7

Accordingly, whether under 28 U.S.C. § 1605A or § 1605B, this Court has subject matter jurisdiction as set forth in 28 U.S.C. § 1330(a).

### b. Personal Jurisdiction and Default

For this Court to proceed, it must also be satisfied that the *Ashton 27 (revised)* Plaintiff has satisfied the requirements of personal jurisdiction over Iran. This Court previously concluded that the *Ashton 27 (revised)* Plaintiff had properly served Iran and should do so again now. *See* ECF 10727 at 7-8.[6]

### III. Liability

This Court has already concluded that Iran shares liability for the 9/11 terrorist attacks under 28 U.S.C. § 1605A (ECF 3014 (granting *Ashton* Plaintiffs liability judgment against Iran)), but to the extent jurisdiction under that provision does not extend to this claim for damages brought by an individual who was not a U.S.-national at the time he sustained his injuries, this Court can grant a motion for damages claims here by application of New York law regarding assault and battery, which is supported by the factual and legal allegations set forth in the complaints.

---

damages because the prior motion had relied only on 28 U.S.C. § 1605A's private right of action, and not any other source of law, such as state law. ECF 10727 at 6-7, 12.

[6] The *Ashton* Plaintiffs served Iran with the complaint as required under the FSIA and Iran never answered and they then obtained a certificate of default against Iran from this Court. *See* ECF 1485 (declaration in support of certificate of default, detailing service of Complaint); ECF 2510 (certificate of default against Iran); ECF 3015 (confirming that service of initial complaints was sufficient for purposes of 28 U.S.C. § 1608).

Because Iran was validly served pursuant to 28 U.S.C. § 1608(a)(4), this Court has personal jurisdiction over Iran here. Further, because Iran did not serve an answer or responsive pleading within 60 days of service (28 U.S.C. § 1608(d)) and, indeed, has never answered or responded, the Clerk of the Court properly entered the Certificate of Default.

The *Ashton* Plaintiffs alleged that Iran and its officers, agents and employees, among other things:

- "provided material support and resources" to al Qadea and Osama bin Laden (02-cv-6977 (S.D.N.Y.) ECF 11-2 at 24-25) (¶ 22);
- "supported al Qaeda financially, materially and logistically for over a decade to support its goals" (02-cv-6977 (S.D.N.Y.) ECF 11-2 at 27 (¶ 31);
- worked together with al Qaeda and bin Laden "against their perceived common enemies …, particularly the United States" (02-cv-6977 (S.D.N.Y.) ECF 11-2 at 31 (¶ 43));
- hosted bin Laden's terrorist training camps (02-cv-6977 (S.D.N.Y.) ECF 11-2 at 31 (¶ 44));
- met with bin Laden representatives in 1998 to "establish 'an anti-U.S. alliance,'" with ten percent of bin Laden's calls from his satellite telephone being made to parties inside Iran (02-cv-6977 (S.D.N.Y.) ECF 11-3 at 27 (¶ 205));
- assisted a key al Qadea combat commander in the months leading up to the 9/11 attacks, during which time the operative traveled to Afghanistan from Iran shortly before the 9/11 attacks (02-cv-6977 (S.D.N.Y.) ECF 11-3 at 28 (¶ 208));
- provided escape routes for certain high-profile al Qaeda members after the 9/11 attacks, including Osama bin Laden (02-cv-6977 (S.D.N.Y.) ECF 11-3 at 28 (¶¶ 209-211);
- and, generally, engaged in a pattern of terrorism, providing training, facilities, planning, logistics, escape routes and leadership that enabled bin Laden and al Qadea to carry out acts of terrorism, including the 9/11 Attacks (02-cv-6977 (S.D.N.Y.) ECF 11-3 at 28 (¶ 216).

It was this sort of conduct that previously allowed this Court to conclude that Iran shared in liability for the 9/11 Terrorist Attacks. *See* ECF 2516; 3014. The Court should reaffirm that liability finding again here, on the basis of the same factual allegations and judicial findings.

### IV.     The *Ashton 27 (revised)* Plaintiff is Entitled to Damages Under New York Law

In prior judgments entered on behalf of Plaintiffs in this case against Iran, the Court has looked to 28 U.S.C. § 1605A(c) to provide a cause of action for U.S. nationals injured or killed in terrorist attacks supported by designated state sponsors of terrorism.

9

Assuming this Court cannot use the substantive cause of action set forth in 28 U.S.C. § 1605B(c) (allowing a claim under 18 U.S.C. § 2333 to be brought by a U.S. national, without discussion of when the party had to have been a U.S. national), it can nevertheless apply state law to this claim for damages via 28 U.S.C. § 1605B(b) and 28 U.S.C. § 1606, which provide that a foreign sovereign who is not entitled to immunity "shall be liable in the same manner and to the same extent as a private individual under like circumstances." This section allows "plaintiffs [to] bring state law claims that they could have brought if the defendant were a private individual" against a state whose sovereign immunity has been abrogated. *Oveissi v. Islamic Rep. of Iran*, 573 F.3d 835, 841 (D.C. Cir. 2009). Here, the plaintiff has both stated claims pursuant to the FSIA's terrorism while also asserting claims for assault and battery. ECF 11-5 at 246-47 (¶¶ 604-606). As it has before, this Court should conclude that the plaintiff in this case can pursue a state law damages claim. ECF 9506 at 10 (citing *Cassirer v. Thyssen-Bornemisza Collection Found.*, 596 U.S. 107, 114 (2022) (the FSIA acts as "a 'pass-through' to the substantive law that would govern a similar suit between private individuals.")).

    **A. Choice of Law**

Because this matter was initiated in federal court in New York, this Court must look to New York choice-of law rules. *Menowitz v. Brown*, 991 F.2d 36, 40 (2d Cir. 1993) (explaining that MDL courts apply the choice-of-law rules of "the jurisdiction in which the action was filed").

Under New York's choice-of-law analysis, whether the assault and battery claims plaintiff asserted are considered "loss-allocating" or "conduct-regulating," this Court has

already concluded that the law of the "place of the tort" will control. ECF 9506 at 10-11; *see also Padula v. Lilarn Prop. Corp.*, 84 N.Y.2d 519, 522 (1994) (quoting *Schultz v. Boy Scouts of Am.*, 65 N.Y.2d 189, 196 (1985)). In this case, the relevant "place of the tort" is the location "where the last event necessary to make the [defendant] liable occurred," even if "the defendant's [mis]conduct … occurred … in another [jurisdiction]." *Schultz*, 65 N.Y.2d at 195 (1985). Here, the last events giving rise to the plaintiff's damages occurred when al Qaeda terrorists crashed hijacked passenger jets into the Twin Towers and, accordingly, this claim, brought by the estate of an individual grievously injured on 9/11 in New York City during the terrorist attacks is governed by New York damages law. ECF 9287 at 4.

### B. New York Law

Under New York law, an "assault involves putting" the plaintiff in "fear" or apprehension of a battery, *Rivera v. State*, 34 N.Y.3d 383, 389 (2019), while a battery is committed by "intentional" and "unjustifi[ed]" harmful or offensive "contact" with the plaintiff. *Id*. That contact need not be made by a person him or herself, but can be committed via "means of an instrumentality." *Aberbach v. Biomedical Tissue Servs., Ltd.*, 48 A.D.3d 716, 718 (2d Dep't 2008). Further, under New York law, liability for assault and battery extends to those who aided and abetted the principal tortfeasor. *See Lindsay v. Lockwood*, 625 N.Y.S.2d 393, 396–98 (N.Y. Sup. Ct. 1994). Under an aiding and abetting theory, a plaintiff must show that: (1) a "wrongful act" caused injury to the plaintiff, (2) the defendant "knowingly and substantially assisted" the party whose act injured the plaintiff, and (3) the defendant was "aware of his role" in "tortious activity" when he gave that assistance. *Id*. at 397. The relevant aiding and abetting conduct may

be either "words or [actions]," *McKiernan v. Vaccaro*, 168 A.D.3d 827, 830 (2d Dep't 2019), but must "connect[]" the defendant to the conduct that "caus[ed] the injury," *Lindsay*, 625 N.Y.S.2d at 397. When deciding whether a defendant's conduct meets this standard, New York courts consider "'the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relations to the [tortfeasor,] and his state of mind.'" *Id*. (quoting Restatement (Second) of Torts § 876, cmt. d (Am. L. Inst. 1979)).

This Court has already concluded that the record contains sufficient evidence to hold Iran liable for aiding and abetting assault and battery under New York law based on its assistance to bin Laden, al Qaeda and other terrorist actors involved in the 9/11 Attacks. ECF 9506 at 12-13. As this Court noted in a prior case involving an individual grievously injured in the Twin Towers on 9/11 in the terrorist attacks, previously-presented evidence and sworn allegations about the plaintiff's presence in the 9/11 Attacks and his injuries "leaves little room for debate" that Iran is liable for aiding abetting assault and battery here. ECF 9506 at 12-13. Because the full record of evidence in this MDL satisfactorily establishes the elements of assault and battery under New York law, this Court, pursuant to the FSIA and New York law, should grant the *Ashton 27 (revised)* Plaintiff's motion for damages against Iran.

### C. Appropriate Damages

While under New York law a victim of an assault and battery may in some circumstances recover punitive damages, here, the plaintiff is only seeking compensatory damages at this time and respectfully requests that this Court permit him leave to seek punitive damages at a later

12

time, if appropriate. *Allam v. Meyers*, 906 F. Supp. 2d 274, 286–94 (S.D.N.Y. 2012); Restatement (Second) of Torts § 924 (Am. L. Inst. 1979).

### i. Compensatory Damages

This Court previously established a framework for personal injury claims, with a "baseline" compensatory damages award of $7 million for injuries that are considered "severe." ECF 5879 at 6; ECF 5953 at 3.  This baseline figure for personal-injury damages may be adjusted based on the nature of the injury, how debilitating it was, the treatment it required, and the long-term impact on the victim's life. ECF 5879 at 6-9.  According to the framework, a downward deviation may be warranted if the injuries fall into the "significant" category or an upward deviation may be warranted if the injuries fall into the "devastating" category. ECF. 5953 at 3.  The corresponding compensatory damages awards for such "significant" and "devastating" injuries are $5 million and $10 million, respectively. *Id.*

This Court has previously adopted the same framework set forth above to claims made pursuant to state law and should do so again here. ECF 9506 at 14.  As discussed below, the *Ashton 27 (revised)* Plaintiff's injuries fall within the baseline "severe" category.

### ii. Individualized Case Assessment: Andrzej Cieslik[7]
### Injury Category: Building Collapse / Escape Injuries
### Severity: Severe

Andrzej Cieslik, born in Krakow, Poland but living in the United States since 1982, was forty-eight years old on September 11, 2001 and was working at 2 World Trade Center in the

---

[7] This Court previously denied the motion for Mr. Cieslik's compensatory damages because at the time it was filed Mr. Cieslik was deceased and no representative of the estate had yet been formally appointed. ECF 5953 at 3.  As set forth in the Kreindler Declaration and the accompanying exhibits, Zofia Cieslik, the surviving spouse of Andrzej Cieslik, has now been formally appointed to represent his estate and has moved this Court to substitute her as the plaintiff as the formally-appointed administrator of her late husband's estate. ECF 9868.  This Court granted that motion on June 13, 2024, ECF 9897.

lobby of the second floor on a molding machine for a company based out of Tennessee. Kreindler Decl., Exhibit C (Declaration of Zofia Cieslik) ("Cieslik Decl.") at ¶ 5. Andrzej had trained as an electrician in Poland, was a carpenter by trade in New York and was a long-time member of the Carpenter & Joiners Union Local 608. *Id.* He became a naturalized United States citizen after September 11, 2001, but before he died in 2006. *Id.* at ¶ 4, p. 8.

When United Airlines Flight 175 hit 2 World Trade Center, the force from the crash and subsequent explosion rushed down the elevator shafts, blew through the ground level elevator doors and sent a near-explosive column of hot air into the lobby. *Id.* at ¶ 6. The pressure from this event knocked Andrzej off his feet and slammed him against a marble pillar. *Id.*

Andrzej hit the pillar hard with his right side upper back, shoulder and neck. *Id.* at ¶ 7. The sounds and force of the explosion were terrifying and Andrzej feared for his life. *Id.* After the impact, Andrzej shakily got to his feet and managed to escape from the building. *Id.* He saw an injured co-worker on the ground and helped him out of the building, as well. *Id.* When the two were outside, a police officer directed them to go to a fire station on Liberty Street for first aid. At the fire station, Andrzej was examined and given pain medication. *Id.*

The first building fell when Andrzej was still at the fire station. *Id.* at ¶ 8. The sound of the building collapse was deafening and the sight terrifying. *Id.* Andrzej feared for his life again as a huge white cloud of dust and debris rapidly started to approach near him and covered everything in sight. *Id.* Everyone in the fire station, including Andrzej, began to run in panic. *Id.* When the cloud began to overtake him, Andrzej could not see ahead of him and did not know what to do or where to go. *Id.* He was having trouble breathing and could hear masses of people running through the streets. *Id.* He was terrified he would be trampled in the rush. *Id.* He waited near a mailbox on Fulton Street, and was cowering underneath it when the second building fell.

14

*Id.* After a while, an eerie darkness descended and Andrzej decided to try to escape the area. *Id.* He was disoriented, dizzy and weak and had trouble breathing. *Id.* He did not get far before he lost consciousness and fell to the ground. *Id.* A nearby ambulance took him to Beth Israel Hospital. *Id.*

After 6 to 7 hours at the hospital, where Andrzej's eyes were treated, he was given a general examination received back and neck x-rays and was given pain medication, and he then left. *Id.* at ¶ 9. The x-rays from Andrzej's emergency room visit revealed no broken bones or dislocations at the time. *Id.* The treating physician did, however, detect tissue damage and recommended that Andrzej get an MRI. *Id.* This was done on January 3, 2002. *Id.* at ¶ 9; *see also* Kreindler Decl., Exhibit D (Andrzej Cieslik Medical Records) ("Medical Records") at 6.

Andrzej continued to experience severe back pain and met with two different neurosurgeons in February 2002. Exh. C, Cieslik Decl. at ¶ 9; Exh. D, Medical Records at 2-4. Both agreed that Andrzej had a herniated cervical spinal disc at C6-C7, and that his pain was caused by the impact injuries he sustained on September 11, 2001 at the World Trade Center. *Id.* Both also agreed that he may have ultimately needed surgery, but wanted to try non-invasive treatment first. Exh. C, Cieslik Decl. at ¶ 9. Andrzej received physical therapy to treat the injuries he sustained on September 11, 2001 and continued with the therapy throughout 2002, but his pain was unabated. Exh. D, Medical Records at 8-10.

Andrzej continued to receive medical attention and after an October 2002 follow up examination one of his doctor's concluded that the physical therapy had been of no assistance and stated that surgery was the necessary next step. Exh. C, Cieslik Decl. at ¶ 10, Exh. D, Medical Records at 9. The doctor also noted that Andrzej had increased pain radiating down his right arm with numbness and tingling in his first, second and third fingers, all attributable to the

injuries he sustained in the September 11 Terrorist Attacks. *Id*. According to the doctor, the pain that Andrzej was experiencing indicated more advanced stages of cervical radiculopathy. Exh. C, Cieslik Decl. at ¶ 10, Exh. D, Medical Records at 10. Cervical radiculopathy, can cause intense pain and disability. *See* Magnus W, Viswanath O, Viswanathan VK, et al. Cervical Radiculopathy Jan. 31, 2024, available at https://www.ncbi.nlm.nih.gov/books/NBK441828/#article-19244.s10, last accessed February 28, 2025. The pain can be acute and unpredictable and treatment options vary from physical therapy to surgery but there are documented cases where neither therapy nor surgery provide significant improvement and in those cases the patient is reduced to suffering chronic pain. *Id*. For Andrzej, the pain radiating down his right arm was resistant to treatment, causing not just pain but significant vocational problems, as Andrzej was a right-handed carpenter. Exh. C, Cieslik Decl. at ¶ 10.

In addition to the unrelenting radiating pain down his right arm, Andrzej also experienced acute pain in his right shoulder. Exh. C, Cieslik Decl. at ¶ 12; Exh. D, Medical Records at 6. A December 2002 MRI of that area that showed a full thickness tear in one of his tendons. Exh. C, Cieslik Decl. at ¶ 12; Exh. D, Medical Records at 11. This too was attributed to his accident. *Id*. Andrzej underwent corrective surgery for the tear in January 2003. Exh. C, Cieslik Decl. at ¶ 12; Exh. D, Medical Records at 14-18. However, during a follow up visit in July 2003, his surgeon noted that a partial tear still existed. *Id* at 29.

In light of the ongoing degenerative symptoms in Andrzej's dominant hand and right shoulder and how that interfered with his ability to work, Andrzej filed an application with the New York State Workers Compensation Board. Exh. C, Cieslik Decl. at ¶ 11; Exh. D, Medical Records at 30-32. The Workers Compensation Board sent Andrzej for independent medical

16

examinations, which all confirmed what his other treating physicians had concluded: that Andrzej suffered from herniated and bulging discs and cervical radiculopathy as a result of his traumatic injuries. Exh. C, Cieslik Decl. at ¶ 12; Exh. D, Medical Records at 5-7. Accordingly, the Workers Compensation Board found on repeated occasions that Andrzej was partially disabled as a result of the injuries he sustained on September 11, 2001 in the Terrorist Attacks. Exh. D, Medical Records at 30-32.

For over five years, from September 2001 until his death in October 2006, Andrzej lived with daily severe and debilitating orthopedic pain that was essentially unabated despite his sincere efforts at physical therapy and the hard work of the neurosurgeons to alleviate his physical suffering.

In addition to the physical pain that Andrzej lived with on a daily basis for his final five years, he also suffered severe emotional and psychological distress. As his widow explains, she witnessed first-hand the nightmares, anxiety, anger and sleep disorders that Andrzej struggled with in the aftermath of his near-death experience on September 11, 2001. Exh. C, Cieslik Decl. at ¶ 13. While luckier, of course, than many who were in the World Trade Center on September 11, 2001, Andrzej nevertheless experienced a life changed for the worse and shortened as a result of the injuries he suffered that day.

Under the rubric this Court has previously established, and in light of the five-years of unending physical pain and haunting emotional and psychological trauma that Andrzej suffered before his death, the injuries that Andrzej Cieslik suffered fit within the baseline "severe" category.

### iii.     **Prejudgment Interest**

An award of prejudgment interest is within the sound discretion of a trial court and is warranted when plaintiffs are delayed in recovering compensation for non-economic injuries caused by acts of terrorism. *See Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011). In light of the Court's prior orders granting motions for damages for the deaths and injuries suffered on September 11, 2001 in the terrorist attacks under New York law and applying a 4.96 percent rate to prejudgment interest, the *Ashton 27* (revised) Plaintiff respectfully requests that the clerk be directed to award prejudgment interest at the rate of 4.96 percent per annum, compounded annually, running from September 11, 2001 until the date of the judgment. ECF 9506 at 16.

## V.     **Conclusion**

For all of the reasons herein, as well as those set forth in the submissions of the other plaintiffs in this case and plaintiffs in the other 9/11 related cases in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, the *Ashton 27 (revised)* Plaintiff respectfully requests that this Court award (1) compensatory damages for pain and suffering in the amount set forth in Exhibit B; (2) prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment; (3) leave to seek punitive damages, economic damages, or other damages at a later date; and (4) for all other *Ashton* Plaintiffs to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed.

Dated: February 28, 2025

Respectfully submitted,

KREINDLER & KREINDLER LLP

BY: ___/s/ James P. Kreindler_____
James P. Kreindler, Esq.
485 Lexington Avenue, 28th Floor
New York, New York 10017
Tel: (212) 687-8181
Attorneys for the *Ashton/Iran* Plaintiffs