**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

———————————————————— )
IN RE:  TERRORIST ATTACKS ON          )          Civil Action No. 03 MDL 1570 (GBD) (SN)
SEPTEMBER 11, 2001                             )          ECF Case
———————————————————— )

This document relates to:  *All Actions*

**DEFENDANT KINGDOM OF SAUDI ARABIA'S OPPOSITION
TO PLAINTIFFS' OBJECTIONS TO THE MAGISTRATE JUDGE'S
OPINION & ORDER REGARDING EXPERT OPINIONS**

Michael K. Kellogg
Mark C. Hansen
Gregory G. Rapawy
Andrew C. Shen
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036-3209
(202) 326-7900
(202) 326-7999 (fax)
*Attorneys for the Kingdom of Saudi Arabia*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.................................................................................................. ii

GLOSSARY...................................................................................................................... iv

INTRODUCTION ...............................................................................................................1

BACKGROUND AND SUMMARY OF JUDGE NETBURN'S RULINGS ................................2

LEGAL STANDARD ........................................................................................................10

ARGUMENT ...................................................................................................................11

I.      Judge Netburn's Exclusion of Youssef's Opinions Was Not Clearly
        Erroneous or Contrary to Law ..............................................................................11

        A.      The Record Supports Judge Netburn's Finding That Youssef Had
                Little Experience Investigating Al Qaeda ..............................................11

        B.      Judge Netburn Reasonably Found Youssef's Other Opinions To Be
                Unreliable and Unhelpful ......................................................................15

II.     Judge Netburn's Exclusion of Nakhleh's Opinions Was Not Clearly
        Erroneous or Contrary to Law ..............................................................................18

III.    Judge Netburn's Exclusion of Meleagrou-Hitchen's Opinions Was Not
        Clearly Erroneous or Contrary to Law...................................................................20

IV.     Judge Netburn's Decision Not To Exclude David Rundell's Testimony
        Was Not Clearly Erroneous or Contrary to Law.....................................................22

V.      Judge Netburn Was Not Required To Hold an Evidentiary Hearing ................................23

CONCLUSION.................................................................................................................24

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

Page

CASES

*Aberdeen City Council v. Bloomberg L.P.*, 688 F. Supp. 3d 169 (S.D.N.Y. 2023)......................22

*Air Disaster at Lockerbie Scotland on December 21, 1988, In re*,
    37 F.3d 804 (2d Cir. 1994) ................................................................15

*Atl. Specialty Ins. v. AE Outfitters Retail Co.*, 970 F. Supp. 2d 278 (S.D.N.Y. 2013) ............23, 24

*AU New Haven, LLC v. YKK Corp.*, 2019 WL 1254763 (Mar. 19, 2019),
    *objections overruled*, 2019 WL 2992016 (S.D.N.Y. July 8, 2019)...................................16

*Bazile v. City of New York*, 215 F. Supp. 2d 354 (S.D.N.Y. 2002)....................................13

*Capellupo v. Nassau Health Care Corp.*, 2009 WL 1705749 (E.D.N.Y. June 16,
    2009) ...............................................................................24

*Diaz v. United States*, 602 U.S. 526 (2024) ...........................................................14

*Dolphin v. Synthes (USA) Ltd.*, 2011 WL 1345334 (S.D.N.Y. Mar. 25, 2011) ......................23, 24

*El Ansari v. Graham*, 2019 WL 3526714 (S.D.N.Y. Aug. 2, 2019)...................................23

*Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 523 (E.D.N.Y. 2012)....................................12, 14

*Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461 (S.D.N.Y. 2005)........................16

*Keystone Mfg. Co. v. Jaccard Corp.*, 394 F. Supp. 2d 543 (W.D.N.Y. 2005)..............................23

*Khaldei v. Kaspiev*, 961 F. Supp. 2d 572 (S.D.N.Y. 2013) ......................................10, 13

*Leviton Mfg. Co. v. Greenberg Traurig LLP*, 2011 WL 2946380
    (S.D.N.Y. July 14, 2011) ................................................................10

*Linde v. Arab Bank PLC*, 922 F. Supp. 2d 316 (E.D.N.Y. 2013) ....................................16

*LinkCo, Inc. v. Fujitsu Ltd.*, 2002 WL 1585551 (S.D.N.Y. July 16, 2002)..............................16

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612
    (S.D.N.Y. 2016), *aff'd*, 720 F. App'x 24 (2d Cir. 2017)..............................12, 14

*Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290 (2d Cir. 2008) ......................18

*Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 (2d Cir. 2013) .........................................14, 15, 23

*Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, *In re*,
341 F. Supp. 3d 213 (S.D.N.Y. 2018), *aff'd sub nom. In re Mirena*
*IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113
(2d Cir. 2020) ................................................................................21

*Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244 (6th Cir. 2001) ...................................24

*Pac. Life Ins. Co. v. Bank of New York Mellon*, 571 F. Supp. 3d 106
(S.D.N.Y. 2021) ................................................................................13

*Rezulin Prods. Liab. Litig.*, *In re*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004)................................15, 16

*Tedone v. H.J. Heinz Co.*, 686 F. Supp. 2d 300 (S.D.N.Y. 2009)................................................23

*United States v. Amuso*, 21 F.3d 1251 (2d Cir. 1994) ...................................................14

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) ...............................................16

*United States v. Farhane*, 634 F.3d 127 (2d Cir. 2011).........................................14, 20

*United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008).....................................................14

*United States v. Rahman*, 189 F.3d 88 (2d Cir. 1999) ...................................................14

*United States v. Williams*, 506 F.3d 151 (2d Cir. 2007) ...............................................23

*United States v. Zhong*, 26 F.4th 536 (2d Cir. 2022)......................................................14

*Veleron Holding B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404 (S.D.N.Y. 2015)...............6, 20, 21

*Youssef v. FBI*, 541 F. Supp. 2d 121 (D.D.C. 2008), *aff'd in part, rev'd in part,*
*and remanded*, 687 F.3d 397 (D.C. Cir. 2012)...................................................1

STATUTES AND RULES

28 U.S.C. § 636(b)(1)(A)................................................................................10

Fed. R. Civ. P. 72(a) ................................................................................1, 10

Fed. R. Evid. 703 (1994)................................................................................15-16

Fed. R. Evid. 704(b)................................................................................14

**GLOSSARY**

| | |
|---|---|
| Meleagrou-Hitchens Rep. | Expert Report of Dr. Alexander Meleagrou-Hitchens (Apr. 21, 2022) (ECF No. 9089-6) |
| Meleagrou-Hitchens Tr. | Deposition Transcript of Alexander Meleagrou-Hitchens (June 23, 2022) (excerpts at ECF No. 9089-7) |
| MOIA | Ministry of Islamic Affairs |
| Nakhleh Rep. | Expert Report of Emile A. Nakhleh (May 14, 2022) (ECF No. 9089-4) |
| Nakhleh Tr. | Deposition Transcript of Emile A. Nakhleh (June 15, 2022) (excerpts at ECF No. 9089-5) |
| Rundell CV | Curriculum Vitae of David Henry Rundell (May 16, 2022) (ECF 9166-11) |
| Rundell Rep. | Rebuttal Expert Report of David Henry Rundell (May 16, 2022) (ECF No. 9093-2) |
| Youssef Rep. | Expert Report of Bassem Youssef – with Errata (May 3, 2023) (ECF No. 9089-1) |
| Youssef Tr. | Deposition Transcript of Bassem Youssef (June 29, 2022) (excerpts at ECF No. 9089-2) |

## INTRODUCTION

Judge Netburn's December 11, 2024 Opinion & Order (ECF No. 10615, "Order") properly excludes most of the proffered testimony of Plaintiffs' expert Bassem Youssef and all of the testimony of Plaintiffs' experts Emile Nakhleh and Alexander Meleagrou-Hitchens. It also properly rejects Plaintiffs' groundless arguments for excluding the testimony of Saudi Arabia's expert David Rundell. Plaintiffs do not seriously suggest that Judge Netburn made any error of law. Instead, they argue primarily that she gave too little weight to facts that supposedly favor them. None of those contentions meets Plaintiffs' heavy burden to show that her order was "clearly erroneous or . . . contrary to law." Fed. R. Civ. P. 72(a).

Judge Netburn did not err at all – much less clearly err – in her review of Plaintiffs' experts' reports and deposition testimony. Those reports are full of well-recognized flaws: speculation and conjecture about facts that "would have" or "must have" been the case, unexplained assertions of fact based on purported experience, improper narrative that should be presented (if at all) as argument of counsel, impermissible attempts to testify about the knowledge, purposes, or motives of individuals and organizations, and improper comments on witness credibility. Each of those errors is a recognized ground for excluding witness testimony. The record amply supports Judge Netburn's discretionary determination that Plaintiffs' excluded experts, individually and together, offer little or no help to the Court as finder of fact. And the record also supports her decision to admit Rundell's testimony to rebut Plaintiffs' other experts.

Plaintiffs fail to cast doubt on Judge Netburn's careful approach. Contrary to their assertions that she "overlooked" their points (a word they repeat 33 times), she considered the evidence, gave their arguments fair consideration, and ruled for them on some issues and against them on others. This Court should overrule Plaintiffs' objections to her well-reasoned Order.

## BACKGROUND AND SUMMARY OF JUDGE NETBURN'S RULINGS

1.     **Bassem Youssef.**  Youssef worked for the FBI from 1986 until he retired in 2014. ECF No. 9089-1 ("Youssef Rep."), at 1; ECF No. 9089-2 ("Youssef Tr."), at 208:2-4.  He claims great experience with counterterrorism investigations.  FBI officials, however, have testified that, before the 9/11 attacks, Youssef worked wholly or primarily as a "translator" and never led any investigation.  *Youssef v. FBI*, 541 F. Supp. 2d 121, 132-33 (D.D.C. 2008), *aff'd in part, rev'd in part, and remanded*, 687 F.3d 397 (D.C. Cir. 2012).  Following the 9/11 attacks, Youssef asked to work on the ensuing FBI investigation.  Although that was "the largest and most comprehensive investigation ever conducted by the FBI" employing "more than half of the FBI's agents," his request was denied.  ECF No. 9541, Ex. 105, at 124:7-127:18.  He was assigned instead to the FBI Digital Media Exploitation Unit where his responsibilities were to "catalog[ue] documents." *Id.* at 128:10-129:10.  In 2004, Youssef later became the Chief of the FBI's Communications Analysis Unit.  Youssef Rep. 4.  He led no investigations in that role.  Youssef Tr. 188:16-189:1.

Youssef's primary role is to disagree with the FBI's conclusions that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the [Al Qaeda] hijackers in furtherance of the 9/11 attack" and that, "nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged."  *See* ECF No. 9089-14, at 9-11; Youssef Tr. 342:13, 354:22 (suggesting that FBI reached those results for "political . . . or diplomatic reasons").  Instead, he opines:  (1) that Saudi Arabia established a Sunni extremist support network in Southern California and that Fahad Al Thumairy and Omar Al Bayoumi were part of that support network; (2) Al Qaeda would have sent the hijackers to Southern California only after detailed planning; (3) Al Thumairy was the designated contact person for Al Qaeda in Los Angeles and used members of his "extremist cell"

to assist Nawaf Al Hazmi and Khalid Al Mihdhar; and (4) Al Bayoumi was designated as a
"handler" for Al Hazmi and Al Mihdhar during their time in San Diego. ECF No. 9163, at 6-8.

Based on her review of Youssef's qualifications, reliability, and helpfulness, Judge
Netburn excluded most of his testimony. Order 10-24. She found his qualifications "a close
question." *Id.* at 12. She explained that Youssef's past communications work qualifies him to
interpret phone records, but his "command of other investigative 'skills' . . . is less clear" and he
lacks "a watertight foundation" for his opinions on Al Qaeda cell operations or Saudi Arabia's
U.S. activities. *Id.* at 13-14 (cleaned up). She noted, but "decline[d] to rest [her] analysis on,"
the FBI's testimony that Youssef worked as a translator before the 9/11 attacks. *Id.* at 13 n.3.
Instead, she reasoned that his specific opinions would be better "addressed on reliability or
helpfulness" grounds. *Id.* at 14.

As to reliability, Judge Netburn found that Youssef "frequently cites his 'observations,'
'experience,' or 'knowledge'" without explaining how he uses that information to reach
conclusions. *Id.* at 15-16 (citing examples). In "attempt[ing to] reconstruct events leading
up to the 9/11 Attacks," he interpolates "his own ideas as to what people 'would have' done"
and "leaps" "'to unfounded conclusions.'" *Id.* at 16-17 (cleaned up) (citing examples). He
"repeatedly credits" anonymous sources "without discussing factors typically used to assess
reliability, such as the source's 'relationship' to the events, 'motivation in providing information
or assistance,' 'criminal history,' and 'prior record as a witness.'" *Id.* at 20 (citing examples).
Judge Netburn concluded that these issues "paint a portrait of an expert who has glossed over
weaknesses in his opinion" and that much of Youssef's testimony "rests on conclusory assertions
of experience, anonymous sources, or his own say-so." *Id.* at 20-21.

As to helpfulness, Judge Netburn found that many portions of Youssef's report amount to an "improper factual narrative." *Id.* at 21. She rejected Youssef's attempts to opine on states of mind or "to divine the 'real motive behind certain' actions." *Id.* at 22-23 (citing cases). Finally, she excluded all of Youssef's attempts to assess witness credibility. *Id.* at 23.

Taking those findings as a whole, Judge Netburn excluded most of Youssef's opinions, permitting him to testify only about "the FBI's 1990s Southern California investigations, Saudi Arabia's approach to appointing foreign officials, terrorism organizations' communication security, and testimony based on telephone data analysis." *Id.* at 24.

**2.    Emile Nakhleh.** Nakhleh is a research professor at the University of Mexico and was director of its Global & National Security Policy Institute when he submitted his report. ECF No. 9089-4 ("Nakhleh Rep."), Annex A. He previously worked at Mount St. Mary's University (1967 to 1993) and at the CIA (1993 to 2006). *Id.* At the CIA, he was an intelligence service officer and directed the CIA's Political Islam Strategic Analysis Program. *Id.*

Nakhleh has no degree in Saudi Arabian history, ECF No. 9089-5 ("Nakhleh Tr."), at 36:10-12, and since 1975 has written no peer-reviewed studies on such history, *id.* at 34:9-12. He lacks degrees in Islamic studies, *id.* at 42:8-18, and comparative Islam, *id.* at 43:13-21. He has never published peer-reviewed work on comparative Islam, *id.* at 43:22-44:2, on Islam in Saudi Arabia, *id.* at 44:3-6, or on the Ministry of Islamic Affairs ("MOIA"), *id.* at 23:1-4.

Likewise, Nakhleh has no peer-reviewed publications on Al Qaeda's terrorist attacks in Western countries, *id.* at 44:7-10, on the development of Al Qaeda's Islamic thought, *id.* at 48:8-50:13, or on the 9/11 attacks, *id.* at 50:14-16. He has never before been proffered as an expert witness in any case involving an Al Qaeda attack in a Western country, *id.* at 44:11-14, or in any case relating to the 9/11 attacks, *id.* at 50:17-21. He was not part of the CIA's core investigation into the 9/11 attacks, *id.* at 51:11-17, and did not participate in the FBI's investigation of the 9/11

attacks, *id.* at 113:21-114:2. During his time at the CIA, he conducted no criminal investigations. *Id.* at 363:6-8. He concedes that he is not an expert in truth detection, *id.* at 338:1-339:6, or in psychology or psychiatry, *id*. at 336:21-337:1.

Nakhleh opines on (1) the history and beliefs of the Hanbali Salafist school of Islamic jurisprudence in Saudi Arabia (for which he uses the pejorative term "Wahhabism"), including the alleged interplay between the Saudi government's promotion of violent jihad and Osama bin Laden's terrorist objectives, *see*, *e.g.*, Nakhleh Rep. ¶¶ 25-145, 168-234; (2) alleged support provided to the 9/11 hijackers by a purported network of Saudi government officials and employees, *see*, *e.g.*, *id.* ¶¶ 190-192, 205, 215-218, 233-259; and (3) the credibility of witnesses, *see*, *e.g.*, *id.* ¶¶ 146-167, 192, 218. Nakhleh also opines that Saudi Arabia is a "state sponsor[]" of terror," *id.* ¶ 144, and "precipitated the 9/11 attacks through its ideological and operational support for violent jihad" in the name of "Wahhabism," *id.* ¶ 258.

At his deposition, Nakhleh retreated from the opinions about Saudi religion set out in his report. He acknowledged that experts in Hanbali Salafism divide its adherents into three groups: quietists, activists (or political Salafists), and jihadists. Nakhleh Tr. 134:4-137:17; *see id.* at 138:14-19 (admitting there is a "spectrum of Hanbali Salafists' beliefs"). He conceded that Salafi quietists "do not . . . support violent jihad." *Id.* at 137:18-138:4. He also admitted that in the 1990s this quietist category included King Fahd and others in "the inner circle of the government of Saudi Arabia," as well as Saudi Arabia's Grand Mufti, Ibn Baz. *Id.* at 147:22-148:19, 150:3-9.[1] Nakhleh claims that the remainder of his opinions result from the application

---

[1] Plaintiffs' proffered expert Meleagrou-Hitchens agrees. *See* ECF No. 9370-7, at 61:5-62:8 (agreeing that "quietists are submissive to authority and . . . apolitical" and that a "defining method" of quietism is "peaceful Da'wah"), 91:18-92:8 (agreeing that "quietists don't call for attacks on the West"), 99:10-21 (agreeing that "the Saudi government and the religious establishment in Saudi Arabia" are "categorized most accurately" as being "quietist").

of his experience, "expertise," "authority in political Islam," and "knowledge of Arab and Muslim cultures." Nakhleh Rep. ¶ 19. But, as set forth above, he has no experience in criminal investigation or lie detection. *Supra* p. 5.

Judge Netburn excluded Nakhleh's opinion in its entirety. Order 24-34. She found him qualified to opine on political Islam as well as on "the Saudi Arabian government's alleged support for religious extremism." *Id.* at 26. She then examined the reliability and helpfulness of his opinions in the context of his stated methodology: "a fairly standard application of experience" with no "incorporat[ion] [of] specific social science theories" or "data analysis." *Id.* at 28.

*First*, Judge Netburn found that Nakhleh "admits his portrayal" of Saudi Arabia as endorsing the jihadist and violent form of Hanbali Salafism "is not a faithful one." *Id.* at 29-30 (citing his admissions at his deposition). She further reasoned that his "omission of ideologies that eschew violence gives a skewed impression of Islam in the Kingdom and seriously undermines the reliability of [his] testimony on that front." *Id.* at 30.

*Second*, addressing Nakhleh's opinions on the alleged support provided to the 9/11 hijackers by Saudi government officials, Judge Netburn found that he fails to explain how "his experience 'leads to the conclusions he reached,'" giving her "too little to go on to assess the reliability of this testimony." *Id.* at 28-29 (quoting *Veleron Holding B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 444 (S.D.N.Y. 2015)). She also found Nakhleh's "attempts to divine" what happened in the past and why to be "speculation." *Id.* at 30-31 (cleaned up) (citing examples).

*Third*, as she had with Youssef, Judge Netburn concluded that Nakhleh's opinions on witness credibility and state of mind are inadmissible and must be excluded. *Id.* at 32 (citing examples). Once she had accounted for all the "defects" in Nakhleh's testimony, *id.* at 33-34, nothing remained to which he could testify.

     **3.**     **Alexander Meleagrou-Hitchens.**  Meleagrou-Hitchens is a lecturer and researcher at King's College London, where he teaches on "Terrorism and Radicalization." ECF No. 9089-6 ("Meleagrou-Hitchens Rep."), Annex A. He is a research fellow in the "Program on Extremism" at George Washington University. *Id.* He received his PhD in "War Studies" from King's College London in 2015, studying "the ideology and impact of the American jihadist preacher Anwar al-Awlaki." Meleagrou-Hitchens Rep. ¶ 1 (emphasis omitted).

     In 2020, Meleagrou-Hitchens published a book about Al Awlaki titled *Incitement: Anwar al-Awlaki's Western Jihad*. *See* ECF Nos. 9089-8, 9089-9. The book "was peer-reviewed by Harvard University Press." ECF No. 9089-7 ("Meleagrou-Hitchens Tr."), at 128:22-129:15. It charts Al Awlaki's "ideological evolution," ECF No. 9089-9, at 15, from "a revered mainstream Islamic preacher in America," *id.* at 1, who publicly and privately condemned the 9/11 attacks, *see id.* at 25-27, into someone who "eventually join[ed] al-Qaeda," *id.* at 1-2, and embraced "Salafi-jihadism," *id.* at 15, after the 9/11 attacks. In it, Meleagrou-Hitchens opined that Al Awlaki's interactions with the 9/11 hijackers were innocent:

> That Awlaki, even after openly associating with al-Qaeda for around eight years after 9/11, never made any claims about this suggests that he had no direct knowledge or involvement. Otherwise it would be hard to believe that, during a phase when he was attempting to build up his jihadist credentials, he would not have taken credit for the biggest success the global jihad movement has ever achieved against its archenemy.

*Id.* at 24-25. He also published a 2011 article that similarly covers Al Awlaki's transformation and reaches similar conclusions. *See* ECF No. 9089-10 (*As American as Apple Pie*).

     Meleagrou-Hitchens offers two primary opinions. *First*, he opines that Al Awlaki was "a committed Salafi extremist and a proponent of violent jihad" even before the 9/11 attacks, Meleagrou-Hitchens Rep. ¶ 22, and that he chose in 2005 to "public[ly] manifest[]" those "views he had long held" when he "announced himself as an al-Qaeda supporter," *id.* ¶ 123.

That opinion directly contradicts Meleagrou-Hitchens' published writings before he was retained by Plaintiffs. *Second*, he opines that Al Awlaki assisted the 9/11 hijackers on the East and West Coasts "at the request of individuals linked to Saudi Arabia's Embassy and Consulate." *Id.* ¶ 22.

Judge Netburn found Meleagrou-Hitchens qualified to testify about Awlaki and his "alleged involvement in 'the plot to carry out the' 9/11 Attacks," but not about "operational aspects of the plot" such as what may have been discussed on telephone calls that were made in "rapid succession." Order 38. She further found that Meleagrou-Hitchens does not disclose any particular methodology, a "lack of clarity" that "ma[de] it difficult" to ensure that his opinions were reliable. *Id.* at 36. Most importantly, she found that Meleagrou-Hitchens "materially changed his opinions about the timing of and reasons for Awlaki's radicalization based on less-than-definitive information that he had all along." *Id.* at 37. She explained that his about-face "raises concerns that the process of 'developing opinions expressly for the purposes of testifying' has impacted the analysis" and "seriously undermines his legitimacy." *Id.* at 37-38 (cleaned up). Finally, she excluded his opinions about what individuals "would . . . have" done or what "seems likely" to have occurred as speculative and unreliable, and his various opinions making credibility determinations and regarding state of mind. *Id.* at 38-40. As with Nakhleh, she ultimately excluded all of Meleagrou-Hitchens' opinions.

4.    **David Rundell.** Saudi Arabia retained Rundell to rebut the opinions of Plaintiffs' experts Lawrence Dunham, Steven Simon, and Nakhleh. Rundell served for nearly three decades with the U.S. State Department, including 15 years in Saudi Arabia. *See* ECF No. 9093-2 ("Rundell Rep."), at 1; ECF No. 9166-11 ("Rundell CV"), at 1-3. While stationed in Saudi Arabia, he had political, economic, and commercial roles: in Riyadh, "as a political officer . . . during the early years of Saudi-American cooperation in Afghanistan"; in Jeddah, as "the principal reporting officer on the *Sahwah*, a Muslim-Brotherhood-inspired protest movement

8

which emerged in Saudi Arabia following Operation Desert Storm."  Rundell Rep. 1.  He also

"worked on the Saudi account in the State Department's Office of Congressional Relations"

and "in the Regional Affairs Office of the State Department's Near East Bureau," with "specific

responsibility for following Political Islam and other pan-Islamic movements," including "the

anti-Soviet jihad in Afghanistan." *Id.*

Beginning in 2002, Rundell moved into senior positions in the American Mission in

Saudi Arabia, including Commercial Counselor, responsible for "help[ing] American firms

identify emerging business opportunities, structure strategic partnerships and resolve trade

disputes"; Economic Counselor, "[w]ork[ing] . . .to eliminate funding to terrorist organizations";

and Political Counselor, with "primary responsibility" for the Embassy's relationships with Saudi

Arabia's Ministry of Foreign Affairs and Ministry of Interior.  Rundell CV 1-2.  From 2008 until

his retirement from the State Department in 2009, Rundell served as the Charge d'Affaires and

Deputy Chief of Mission.  *Id.* at 1.

Rundell recently published a peer-reviewed book on Saudi Arabia:  *Vision or Mirage:*

*Saudi Arabia at the Crossroads* (2020), ECF No. 9166-12, which one scholarly reviewer called

" 'a deeply learned and nuanced account of the Kingdom's history, politics and economics,' "

Rundell Rep. 2 (quoting Bernard Haykel, Professor of Near Eastern Studies at Princeton

University), and which the former U.S. Ambassador to Saudi Arabia, Chas Freeman, praised as

"destined to be the best single volume on the [K]ingdom," ECF No. 9166-12 (back cover).

Rundell's report provides a historical summary of Islam as it relates to Saudi Arabia.

It discusses the "history, politics and religion of Saudi Arabia, with a particular focus on its

relationship with the United States."  Rundell Rep. 2.  Rundell rebuts Dunham's opinions that the

Saudi government's practice of posting religious personnel in diplomatic status in the United

States was improper or nefarious; Simon's derogatory opinions about the U.S.-Saudi relationship;

9

and Nakhleh's opinions on Saudi Arabia's history, politics, and religion in the 1990s. Based on

his extensive diplomatic experience in expertise on Saudi-U.S. relations, he concludes that "[i]t

is implausible that the Saudi government funded or supported one of its most dangerous enemies

in an attack on one of its most important strategic allies." *Id.* at 3.

Judge Netburn found that Rundell's long diplomatic career renders him qualified to

testify "at the very least" on "all matters related to United States-Saudi relations during his

tenure in the foreign service." Order 58.[2] His opinions are reliably "rooted in the knowledge

he gained from serving at the United States Embassy in Saudi Arabia," and his opinions on the

importance of "United States-Saudi relations" are helpful to the Court. *Id.* at 58-60.

## LEGAL STANDARD

Parties objecting to a magistrate judge's non-dispositive order bear a "heavy burden."

*Leviton Mfg. Co. v. Greenberg Traurig LLP*, 2011 WL 2946380, at *1 (S.D.N.Y. July 14, 2011).

They must show that the order was "clearly erroneous" or "contrary to law." Fed. R. Civ. P.

72(a); *see* 28 U.S.C. § 636(b)(1)(A). "An order is clearly erroneous only when the reviewing

court on the entire evidence is left with the definite and firm conviction that a mistake has been

committed," while "[i]t is contrary to law if 'it fails to apply or misapplies relevant statutes, case

law or rules of procedure.' " *Khaldei v. Kaspiev*, 961 F. Supp. 2d 572, 575 (S.D.N.Y. 2013)

(citation omitted). Plaintiffs cannot meet those demanding standards.

---

[2] Judge Netburn found that Rundell's resume does not "provide credentials that lend themselves to expertise in" Al Qaeda's development. Order 58. However, she did not exclude any part of his opinion on that basis because the parts of his report that addressed Al Qaeda specifically were rebutting Nakhleh, whose testimony she had excluded. *See id.* at 60.

**ARGUMENT**

I.    **Judge Netburn's Exclusion of Youssef's Opinions Was Not Clearly Erroneous or Contrary to Law**

    A.    **The Record Supports Judge Netburn's Finding That Youssef Had Little Experience Investigating Al Qaeda**

Youssef has little to no experience investigating Al Qaeda. Even setting aside FBI testimony that before the 9/11 attacks he worked primarily as a translator, the record reflects very little relevant experience investigating Al Qaeda. In the early 1990s, he claims to have investigated the Abu Nidal and Al-Gama'a Al-Islamiya terrorist groups. Order 1; Youssef Rep. 1-3. From 1996 to 2000, he worked as a legal attaché stationed at the U.S. Embassy in Riyadh, where he "liais[ed] with law enforcement and security officials in the Gulf region." Order 11. From 2000 to 2002, Youssef worked at the CIA's National Counterintelligence Center. His work in that position was not operational, nor did he conduct investigations. ECF No. 9541, Ex. 105, at 183:22-185:14. His work in the FBI's Digital Media Exploitation Unit from 2002 to 2004 was similarly administrative. *Id.* at 128:10-130:15. His work in the FBI's Communications Analysis Unit from 2004 until his retirement in 2014 was also not operational, and he did not lead investigations. Youssef Tr. 188:16-189:1. And the FBI rejected his request to work on the 9/11 investigation, its most extensive investigation of Al Qaeda. *Supra* p. 2.

Judge Netburn was not required to accept Plaintiffs' generic assertions (*e.g.*, at 6) that Youssef's field assignments gave him an understanding of "Islamic terror groups including Al Qaeda." Instead, she correctly found that his work as a case agent (which allegedly involved other terrorist groups) was "limited to the first few years of his career" and there is nothing "evident" in the record about any "expertise in the special techniques used in counterterrorism assessments." Order 13. Nor does the record shed light on Plaintiffs' contention (at 6) that Youssef prepared unspecified reports and training manuals on Al Qaeda. No such reports are

11

in the record or otherwise publicly available.  *See* Youssef Tr. 92:11-21 (testifying that they

remain "classified").  The same is true with respect to Youssef's claims (at 6 & n.4) that the

investigations he worked on in Southern California revealed that members of Al Qaeda were

present at the Ibn Taymiyah Mosque.  Youssef testified that all of those investigative materials

are classified and refused to testify about their contents.  Youssef Tr. 43:17-45:2*,* 46:19-47:20.

Thus, the record does not show what experience he had in investigating Al Qaeda itself.

Similarly, the record does not support Plaintiffs' claim (at 8) that Youssef's work as a

purported "undercover agent" working on "highly sensitive operations targeting Middle Eastern

and Iranian radical Islamic groups" had any nexus to Al Qaeda.  As such, there is no basis to

conclude that Judge Netburn clearly erred in expressing concern about Youssef's lack of relevant

experience relating to Al Qaeda.  *See Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 523, 541-42

(E.D.N.Y. 2012) (excluding expert testimony based on confidential investigations given the

opposing party's "inability to adequately cross-examine [the expert] as to the basis of his

conclusions"); *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 640

(S.D.N.Y. 2016) (excluding expert testimony where there was "no basis for concluding that [the

expert] ha[d] experience" applying the methodology he purported to rely on, and where "[n]one

of his publications" revealed such experience), *aff'd*, 720 F. App'x 24 (2d Cir. 2017).

None of Youssef's subsequent work experience changes that analysis.  Plaintiffs claim

(at 7) that during Youssef's time working as the legal attaché at the U.S. Embassy in Saudi Arabia

he gained experience in "Sunni Islamic extremism in Saudi Arabia."  Plaintiffs point to nothing

in the record to show that any of this work concerned Al Qaeda.  They claim (at 7) that his role in

the FBI's Digital Media Exploitation unit "focused on Sunni Islamic extremism and Al Qaeda."

In his own lawsuit against the FBI, he asserted that this work was administrative in nature and

involved cataloguing and storing evidence.  ECF No. 9541, Ex. 105, at 128:10-130:15.  Plaintiffs

incorrectly accuse (at 7-8) Judge Netburn of overlooking Youssef's experience in the FBI's

Counterterrorism Communications Analysis Unit. Her Order carefully examines that experience

and finds that it qualifies Youssef to interpret phone records from a terrorism investigation.

What it does not qualify him to do is to testify about Al Qaeda or its *modus operandi*.

In any event, Judge Netburn did not rely solely or even primarily on Youssef's lack of

qualifications. Instead, because many of those opinions were based on nothing more than his

purported experience, she evaluated those opinions in the context of that experience and found

them wanting. Plaintiffs cannot meet their burden to make a "definite and firm" showing that

she erred. *Khaldei*, 961 F. Supp. 2d at 575; *see Bazile v. City of New York*, 215 F. Supp. 2d 354,

365 (S.D.N.Y. 2002) (overruling objections to Magistrate Judge's exclusion of testimony of

expert who "lack[ed] the necessary experience and qualifications," because, "[a]lthough [the

expert] does have experience in drug enforcement and in supervision of law enforcement

personnel, he has none in conducting internal disciplinary investigations, such as the one

involved in the instant case"); *Pac. Life Ins. Co. v. Bank of New York Mellon*, 571 F. Supp. 3d

106, 116-18 (S.D.N.Y. 2021) (holding that it was "not clearly erroneous" for the Magistrate

Judge to exclude expert testimony that was "unreliable" and "unhelpful to the jury" given

"concern[s] about its factual underpinnings").

Plaintiffs contend that Youssef should be able to offer opinions about what Al Qaeda did

or "would have" done based on his understanding of Al Qaeda's *modus operandi*. They claim

(at 9, 11), for instance, that this understanding is the basis for his opinions that Al Qaeda would

not have sent the hijackers to California unless it had a "verified support structure in place"; that

Al Bayoumi's meeting with the hijackers was not coincidental; and that Al Mihdhar returned to

the Middle East and met in person with Al Qaeda about what he learned in California. That

argument fails for three reasons.

*First*, Youssef has little experience with Al Qaeda or its *modus operandi*. *Supra* pp. 2, 11-12. As such, his opinions based on such purported experience lack a reliable basis. *See Gill*, 893 F. Supp. 2d at 536 (holding that plaintiff's expert's experience failed to qualify him "under *Daubert* and Rule 702 to opine as to Hamas's agenda or relationship with terrorist organizations"); *see also LVL XIII Brands*, 209 F. Supp. 3d at 640.

*Second*, even well-grounded knowledge about an organization does not permit an expert to opine that its members took specific actions at specific times. *See*, *e.g.*, *United States v. Zhong*, 26 F.4th 536, 556 (2d Cir. 2022) (explaining that "'the legitimate use of an . . . expert'" who can, for example, "'explicate an organization's . . . structure'" should be "distinguish[ed]" from "'the illegitimate and impermissible substitution of expert opinion for factual evidence'") (quoting *United States v. Mejia*, 545 F.3d 179, 190 (2d Cir. 2008)) (ellipses in *Zhong*); *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (distinguishing appropriate expert testimony about an organization's "general practices" from "adduc[ing] factual details of specific past events"); *see also United States v. Rahman*, 189 F.3d 88, 136, 138 (2d Cir. 1999) (expert testimony "that the trial defendants did not have the necessary funding or expertise to have undertaken the World Trade Center bombing" was "speculation without legal competence" and could not be admitted under the guise that it provided evidence of "past behavior or activities").[3]

---

[3] The cases cited by Plaintiffs (at 2) – *Diaz v. United States*, 602 U.S. 526, 534 (2024); *United States v. Farhane*, 634 F.3d 127, 159 (2d Cir. 2011); and *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994) – are not to the contrary. Those cases allowed qualified experts to testify as to industry practice or *modus operandi*, but not to opine on specific actions by particular individuals or organizations or knowledge that particular individuals or organizations had. *See*, *e.g.*, *Diaz*, 602 U.S. at 534 (holding that expert opinion that *most* drug couriers have knowledge that they are transporting drugs did not violate Federal Rule of Evidence 704(b), which precludes experts in a criminal case from opining on the ultimate mental state of a defendant when that is an element of the offense, because the expert "did not express an opinion about whether Diaz herself knowingly transported methamphetamine").

Youssef's opinions would intrude on the factfinder's role in just those ways. Key examples include his opinions that

> it is highly implausible that Hazmi and Midhdar would have welcomed any interaction or accepted any support from the likes of Thumairy or Bayoumi unless they had already been vetted by Al Qaeda's leadership and the hijackers were specifically directed to seek and connect with Bayoumi and Thumairy for ground support during their stay in Southern California[,]

Youssef Rep. 15, and that certain individuals "asked" another individual "to host the hijackers in his apartment" because "the modus operandi of Al Qaeda was to arrange for its newly placed operatives to stay in a private home of a trusted associate," *id.* at 169. *See* Order 17 (giving additional examples where Youssef presents "his own ideas as to what people 'would have' done" based on "spotty" evidence).

*Third*, an expert may not testify about "motivations and intentions." *Marvel Characters*, 726 F.3d at 136; *see In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 545-47 (S.D.N.Y. 2004) (excluding expert testimony concerning "motive, intent or state of mind"); Order 22 (collecting cases). Youssef does so repeatedly. *See* Youssef Rep. 15 & Youssef Tr. 13:21-14:13, 198:18-199:21 (opining that Al Thumairy, Al Bayoumi, Musaed Al Jarrah, and six other individuals "participated" in a "support plot" for the 9/11 attacks and "had to have known" about Al Hazmi's and Al Mihdhar's Al Qaeda affiliations and violent intentions). Judge Netburn properly excluded all of that testimony as inappropriate.

## B.    Judge Netburn Reasonably Found Youssef's Other Opinions To Be Unreliable and Unhelpful

Judge Netburn acted within her discretion when she rejected Plaintiffs' attempt to introduce a factual narrative into evidence as Youssef's expert opinion. Although an expert may refer to testimony to explain the "'bas[i]s'" of "'an opinion or inference,'" *In re Air Disaster at Lockerbie Scotland on December 21, 1988*, 37 F.3d 804, 826 (2d Cir. 1994) (quoting Fed. R.

15

Evid. 703 (1994)), courts in this District exclude experts whose reports in whole or in significant part are "nothing more than a narrative of the case," *AU New Haven, LLC v. YKK Corp.*, 2019 WL 1254763, at \*24 (Mar. 19, 2019) (cleaned up), *objections overruled*, 2019 WL 2992016 (S.D.N.Y. July 8, 2019).[4] Youssef repeatedly "'propound[s] a particular interpretation of'" individuals' "'conduct,'" *Rezulin*, 309 F. Supp. 2d at 551 (quoting *LinkCo, Inc. v. Fujitsu Ltd.*, 2002 WL 1585551, at \*2 (S.D.N.Y. July 16, 2002)), and then "'stat[es] ultimate legal conclusions based on th[e] facts'" as he sees them, *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 471 (S.D.N.Y. 2005) (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)). Examples abound.[5]

Plaintiffs complain (at 11) that the Order "diminished the value" of the "mosaic of evidence" that Youssef assembled. But that is just the problem: a party that uses an expert witness as a vehicle to "summarize the relevant facts . . . and then opine – or, more accurately, argue – that its theory of the case is the correct one is, in essence, giving a summation from the

---

[4] *Linde v. Arab Bank PLC*, 922 F. Supp. 2d 316 (E.D.N.Y. 2013), is not to the contrary. That case accepted an expert's *methodology* of collecting "information from many sources, which included primary and secondary sources, and cross-referencing them, as well as the examination of new information." *Id.* at 322-23. It did not rule that a party may use an expert to present a factual narrative. To the contrary, it excluded other experts whose testimony amounted to "[n]arrative histories . . . aimed at proving intent." *Id.* at 328.

[5] *See* Youssef Rep. 24-30 (founding and funding of King Fahad Mosque); *id.* at 30-33 (Embassy and MOIA operations); *id.* at 36-41, 60-63 (appointment of Al Thumairy as imam at mosque); *id.* at 42-49 (Al Thumairy's interactions and contacts); *id.* at 49-60 (Al Thumairy's role at mosque); *id.* at 73-82 (Al Bayoumi's secondment to and activities in California); *id.* at 82-84 (Al Bayoumi's contacts with Embassy); *id.* at 85-90 (Al Bayoumi's contacts or alleged contacts in California); *id.* at 91-100 (Al Bayoumi's work at Kurdish mosque and alleged contacts with Al Haramain); *id.* at 102-16 (Al Sadhan's and Al Sudairy's visit to San Diego); *id.* at 139-54 (Al Jaithen's and Al Mersal's visit to San Diego); *id.* at 156-59, 162-70, 175-77 (events in January 2000 at time of hijackers' arrival); *id.* at 177-92 (Al Bayoumi's visit to Los Angeles and encounter with hijackers); *id.* at 192-200 (hijackers' arrival in San Diego); *id.* at 200-12 (alleged assistance to hijackers in San Diego); *id.* at 212-14 (alleged meeting with Al Thumairy); *id.* at 214-17 (other alleged contacts with hijackers); *id.* at 222-25 (hijackers' activities and contacts in Virginia).

witness stand." Order 9 (internal quotation marks omitted; ellipsis in original). Youssef's narrative here is particularly unhelpful and inappropriate because, as Judge Netburn found, he "glosse[s] over weaknesses in his opinion." *Id.* at 20.

Judge Netburn also properly excluded Youssef's many opinions on witness credibility. Plaintiffs concede that experts cannot make credibility assessments, but claim (at 12) that Judge Netburn should have let Youssef testify about "factual inconsistencies in the testimony and evidence." Looking for such inconsistencies is itself the factfinder's job; and, in any event, Youssef did not stop there. He opines on a supposed "pattern of lying by . . . Saudi Government officials" and other witnesses. Youssef Rep. 149. He accuses witnesses of engaging in a "pattern of deception" indicative of "a deliberate effort to obfuscate and obstruct," *id.* at 45, of "l[ying] to the FBI," *id.* at 203 n.831, and of telling "casual lies . . . at [a] deposition," *id.* at 179 n.724. He even stated that he expected "any Saudi official" to testify untruthfully. Youssef Tr. 57:17-20 ("I'm not expecting that any Saudi official would answer in a way that would implicate the Kingdom of Saudi Arabia in their statement.").[6] None of that is within his role.

Finally, Plaintiffs show (at 12) no error, much less clear error, in Judge Netburn's finding that Youssef credits anonymous sources without addressing factors typically used to assess reliability. Plaintiffs specifically address Youssef's opinions based on an FBI summary of a statement from an unnamed source that, "in late December 1999, 'the [King Fahad Mosque] received a phone call from an individual in Malaysia'" who "wanted to speak with Al-Thumairy"

---

[6] *See also* Youssef Rep. 44 (witness employed a "method of evasion"); *id.* at 113 (witness "tried . . . to conceal" information); *id.* at 130 & n.531 ("answers [were] 'deceptive'" and showed a "pattern of lying"); *id.* at 140 n.561 ("pattern of deceptive behavior"); *id.* at 154 ("persistent denials, lying, and diversion"); *id.* at 181 n.736 (witness "clearly . . . engaged in deception"); *id.* at 190 n.777 (witness "lied"); *id.* at 195 (witness's testimony was "unlikely"); *id.* at 203 (witness "gave a false alibi"); *id.* at 219 (witness gave "false[ ]" testimony).

about "the imminent arrival" of "'two brothers . . . who needed their assistance.'"  Youssef Rep.

155 (quoting the public version of ECF No. 9089-20, at 520) (capitalization omitted; ellipsis in

original).  The summary states that, "according to" the source, "[t]hose 'two brothers' were . . .

Nawaf al Hazmi and Khalid al Mihdhar.'"  *Id.* (same).  Youssef does not know the source's

identity, nor does any record evidence corroborate the source's statements:  there are, for instance,

no phone records showing any call from Malaysia to the King Fahad Mosque.  Youssef Tr.

34:10-35:1; *see also id.* at 33:16-19 (same for ECF No. 9089-21).  Yet Youssef purports to detect

from the "manner" in which the FBI "present[ed]" the statement that the FBI "assessed the

source information as credible."  Youssef Rep. 155 n.629.  In his deposition, he went further to

speculate that the person who called to Al Thumairy was Al Qaeda operative Walid Bin Attash,

even though the document does not say that and there is no evidence that Al Thumairy and Bin

Attash ever interacted or knew each other.  Youssef Tr. 19:12-22, 21:10-15; *see also id.* at 28:15-

30:7 (Youssef's further speculation that Bin Attash was in the United States in 2000).  Judge

Netburn correctly excluded such opinions as unreliable "speculation or conjecture."  *Major*

*League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008).

## II.    Judge Netburn's Exclusion of Nakhleh's Opinions Was Not Clearly Erroneous or Contrary to Law

Judge Netburn acted within her discretion in finding Nakhleh's opinions unreliable and

unhelpful to the factfinder.  Contrary to Plaintiffs' assertions (at 13), she did not underrate his

qualifications:  she found that his "expertise in political Islam" qualified him "to analyze the

Saudi Arabian government's alleged support for religious extremism."  Order 26.  What

nevertheless undermined him was his inability to defend his own opinions at his deposition.

In his report, Nakhleh made sweeping claims about the beliefs of so-called "Wahhabis,"

including that they consider the United States an "enemy," Nakhleh Rep. ¶¶ 29, 248; that they

support "violent jihad," *id.* ¶¶ 30, 34, 45, 66, 144, 229-230; and that they support "terrorism" or "terror," *id.* ¶¶ 34-35, 144. He attributed such "Wahhabi" beliefs to "Saudi Arabia," *id.* ¶¶ 28, 35, 39, 44, 49, 62, 144-145, 202, 229, 237, 258, to the "Saudi state," *id.* ¶¶ 27, 64(c), 118, 144-145, and to MOIA, *id.* ¶¶ 50, 99, 209-210, 229-231. At his deposition, however, he conceded that, in the 1990s, Saudi Arabia's King Fahd and others in the "inner circle of the government" were all quietists, who "do not . . . support violent jihad." *See supra* p. 5; *see also* Nakhleh Tr. 137:18-138:4 ("Q. . . . [Y]ou describe that group of quietists as essentially the same as fundamentalists, Christians and Jews, who do not engage [in] or support violent jihad; correct? A. That is correct."). He also retreated from statements that Saudi Arabia or MOIA "support[ed] . . . jihad globally," falling back to a position that only "elements" of the government did so. *Compare* Nakhleh Rep. ¶¶ 92, 169, *with* Nakhleh Tr. 235:4-18, 239:7-241:8, 261:14-262:9.

Judge Netburn reasonably concluded that Nakhleh's inclusion in his report of opinions he could not defend, combined with his omission from that report of Salafist "ideologies that eschew violence, gives a skewed impression of Islam in the Kingdom and seriously undermines the reliability of [his] testimony on this front." Order 30. That reliability concern infects Nakhleh's opinions across the board. For instance, he opines that

> the prevailing view of the "justness" of jihad against the United States also offered the most viable rationale upon which Saudi officials, most of them operating under the Ministry of Islamic Affairs . . . [,] willingly provided support to the 9/11 hijackers.

Nakhleh Rep. ¶ 134. Because his premise about "the prevailing view of the 'justness' of jihad" is unreliable, so are his further opinions – or, rather, speculations – based on that premise.

Plaintiffs' appeal (at 13-14) to Nakhleh's experience in the CIA cannot save his opinions. No amount of experience can resurrect the opinions that he abandoned under cross-examination. Judge Netburn also correctly declined to "accord a presumption of reliability to CIA experience."

Order 27.  Instead, as judges do with any expert relying on experience, she looked to see whether Nakhleh had "explain[ed] how his experience 'leads to the conclusions he reached.'"  *Id.* at 28 (quoting *Veleron Holding*, 117 F. Supp. 3d at 444).  Her finding that Nakhleh "often" failed to do so, *id.* at 28-29, revealed an independently fatal flaw in his testimony.  She also correctly excluded as speculative Nakhleh's attempts to "divine" what happened in the past or to comment on what he believed "would" or "would not have" occurred.  *Id.* at 30-31.  Finally, she properly excluded his opinions on state of mind and credibility for the same reasons she properly excluded Youssef's similar opinions.  *Supra* p. 17.

## III. Judge Netburn's Exclusion of Meleagrou-Hitchen's Opinions Was Not Clearly Erroneous or Contrary to Law

Judge Netburn acted within her discretion in finding Meleagrou-Hitchens' testimony exceeded his qualifications, was unreliable, and was unhelpful.  Plaintiffs mischaracterize (at 22) her Order when they complain that she overlooked his research methodology.  The Order discusses (at 36) that methodology, which Meleagrou-Hitchens identified as "Social Movement Theory" and testified that he used in his published work and writing.  But the Order also explains that Meleagrou-Hitchens' report in this case omits any discussion of how he applied that same methodology to form his opinions.  *See id.* (observing that the omission "makes it difficult to ensure that [his] testimony . . . [is] reliable").

Plaintiffs misplace reliance (at 1-2) on *United States v. Farhane*, 634 F.3d 127 (2d Cir. 2011), and on Judge Netburn's earlier ruling in this case, ECF No. 9060.  Those decisions approved testimony by experts qualified by prior research and experience.  *See Farhane*, 634 F.3d at 158-59; ECF No. 9060, at 15-16.  Neither addressed the further requirement that an expert relying on experience must explain "how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably

applied to the facts." *Veleron Holding*, 117 F. Supp. 3d at 444; *see* Order 8, 15, 28. Judge

Netburn did not err (much less clearly err) by finding that Meleagrou-Hitchens failed that test.

Further, Judge Netburn correctly identified an additional severe flaw in Meleagrou-

Hitchens' opinions:  his about-face from his earlier published work, in which he had concluded

that Al Awlaki did not support violent jihad until well after the 9/11 attacks.  As Judge Netburn

observed, that reversal was not based on newly discovered or analyzed information.  Meleagrou-

Hitchens based his opinions on the same Al Awlaki lectures that he had reviewed before writing

his book and that he then "re-listened to for purpose of the report."  Order 37 (cleaned up).[7]

Judge Netburn reasonably found that his striking change of position after being retained by

Plaintiffs calls into question the reliability both of his purported methodology and of his

conclusions.  *See In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F.

Supp. 3d 213, 294 (S.D.N.Y. 2018) (excluding expert testimony where premise the expert

"endorse[d] in th[e] litigation" was "one that he ha[d] not previously embraced, despite

addressing this subject in a prior writing"), *aff'd sub nom. In re Mirena IUS Levonorgestrel-

Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113 (2d Cir. 2020) (per curiam); *Fireman's Fund

Ins. Co. v. Canon U.S.A., Inc.*, 394 F.3d 1054, 1059 (8th Cir. 2005) (a "sudden reversal of

opinion . . . seriously undermines the reliability of [an] expert['s] opinions").

---

[7] The record does not support Plaintiffs' statement (at 23) that Meleagrou-Hitchens
"uncovered 'completely new material' " that supported his completely different view of Al
Awlaki.  In the cited testimony Meleagrou-Hitchens stated that he found that supposedly "new"
material when he "re-listen[ed]" to the same Al Awlaki lectures that he had listened to before
publishing his book and came across "things" he claimed to have "missed when [he] did the
book."  Meleagrou-Hitchens Tr. 328:7-13.  Judge Netburn did not err (clearly or otherwise) by
declining to treat "missed" material from already-heard lectures as genuinely new information.

## IV.    Judge Netburn's Decision Not To Exclude David Rundell's Testimony Was Not Clearly Erroneous or Contrary to Law

Rundell is amply qualified to rebut Plaintiffs' experts' opinions concerning, "at the very least, all matters related to United States-Saudi relations during his tenure in the foreign service." Order 58.  Plaintiffs incorrectly assert (at 24) that his "substantive work and experience . . . in Saudi Arabia began well *after* 9/11."  They did not preserve any challenge to Rundell's qualifications before Judge Netburn, so their argument is not properly before this Court.[8]  Even if they had preserved it, the argument would lack merit.  Rundell was a foreign service officer in Saudi Arabia for seven years before the 9/11 attacks and for eight years in the aftermath of those attacks.  *Supra* p. 8.  In addition, he has written a well-reviewed history of modern Saudi Arabia, which discusses its politics, its economics, and its longstanding relationship with and support of the United States.  *Id.*  Plaintiffs' dismissive mischaracterization (at 25) of his pre-9/11 role as a "functionary who never attained any substantive expertise" lacks record support and certainly does not establish clear error.

Unlike Youssef, Nakhleh, and Meleagrou-Hitchens, Rundell explains how his experience informs his opinions.  *See*, *e.g.*, Rundell Rep. 33 (explaining how his "Foreign Service" experience informed his opinions regarding the practice of posting religious personnel in diplomatic roles), 38-39 (testifying about his understanding of the Saudi-U.S. relationship based on his "experience working on terrorist finance issues in Riyadh"), 44-46 ("strongly disagree[ing]" with Nakhleh's assertions that Saudi religious clerics supported Al Qaeda based on his "decades-long close relationships with graduates of Imam Mohammad University and Saudi religious scholars").

---

[8] *See* ECF No. 9092, at 66-69 (opening *Daubert* brief, raising no challenge to Rundell's qualifications); ECF No. 9269, at 23 n.26 (reply *Daubert* brief, making argument for first time in footnote); *cf. Aberdeen City Council v. Bloomberg L.P.*, 688 F. Supp. 3d 169, 183 n.8 (S.D.N.Y. 2023) (declining to reach argument first raised "[i]n a footnote in [a] reply brief").

Unlike Nakhleh, Rundell did not abandon opinions in his report at his deposition.  And, unlike Meleagrou-Hitchens, there is no daylight between the opinions Rundell offered in his report and his prior published writing.

Plaintiffs' attempt (at 25) to fault Rundell for not delving into the record evidence deserves no weight.  Experts are permitted to provide "background knowledge or context," as Rundell did.  *See Marvel Characters*, 726 F.3d at 136; Rundell Rep. 30 (making clear that his assignment did not include "addressing the history of [the 9/11 attacks] or attempting to weigh the evidence concerning them").  Nor did Rundell act, as Plaintiffs assert (at 25), "as a spokesman for Saudi government ministers to present their defenses."  As Judge Netburn correctly explained, although Plaintiffs' experts may disagree with Rundell, his opinions are consistent with "his experience in the foreign service."  Order 59-60.  Plaintiffs' (groundless) allegations of bias go, at most, to "'the appropriate weight . . . to be afforded . . . expert testimony,'" not to its admissibility.  *Tedone v. H.J. Heinz Co.*, 686 F. Supp. 2d 300, 311 (S.D.N.Y. 2009) (quoting *Keystone Mfg. Co. v. Jaccard Corp.*, 394 F. Supp. 2d 543, 568 (W.D.N.Y. 2005)); *see also El Ansari v. Graham*, 2019 WL 3526714, at *8 (S.D.N.Y. Aug. 2, 2019) (only "bias of an extraordinary degree" warrants exclusion).

## V.    Judge Netburn Was Not Required To Hold an Evidentiary Hearing

Judge Netburn had discretion to rule on the parties' *Daubert* motions with a hearing or without one.  *See United States v. Williams*, 506 F.3d 151, 161 (2d Cir. 2007) ("While the gatekeeping function requires the district court to ascertain the reliability of [the expert's] methodology, it does not necessarily require that a separate hearing be held in order to do so.").  That is true whether a court admits or denies expert testimony.  *See Atl. Specialty Ins. v. AE Outfitters Retail Co.*, 970 F. Supp. 2d 278, 285-91 (S.D.N.Y. 2013) (excluding expert testimony without conducting an evidentiary hearing where the record had been fully developed); *Dolphin*

*v. Synthes (USA) Ltd.*, 2011 WL 1345334, at \*1 & n.1 (S.D.N.Y. Mar. 25, 2011) (finding it was "unnecessary" to conduct *Daubert* hearing before excluding expert testimony given absence of any "factual dispute"); *Capellupo v. Nassau Health Care Corp.*, 2009 WL 1705749, at \*9 & n.10 (E.D.N.Y. June 16, 2009) (finding expert testimony inadmissible without pretrial evidentiary hearing) (citing, *e.g.*, *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 248-49 (6th Cir. 2001) (holding that district court was not required to hold *Daubert* hearing before excluding evidence)).

Nor was it clear error for Judge Netburn to rule on the *Daubert* motions before trial. Each challenged expert was cross-examined at deposition, and Judge Netburn reviewed and cited that testimony. *See Atl. Specialty Ins.*, 970 F. Supp. at 285-91 (reasoning that "[a] hearing would add nothing to the current record" where the parties "provided extensive briefing on the issue of admissibility, the experts have been deposed, and expert reports are before the Court"); *see also Dolphin*, 2011 WL 1345334, at \*1 & n.1; *Capellupo*, 2009 WL 1705749, at \*9 & n.10. At those depositions, Plaintiffs had ample opportunity to elicit re-direct testimony. Thus, contrary to their suggestion (at 3-4), they and their experts had a fair chance to further explain their proffered expert opinions in response to Saudi Arabia's cross-examination.

## CONCLUSION

This Court should overrule Plaintiffs' objections and adopt Judge Netburn's Order.

Dated:  February 28, 2025        Respectfully submitted,

/s/ *Michael K. Kellogg*

Michael K. Kellogg
Mark C. Hansen
Gregory G. Rapawy
Andrew C. Shen
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036-3209
(202) 326-7900
(202) 326-7999 (fax)

*Attorneys for the Kingdom of Saudi Arabia*

**CERTIFICATE OF SERVICE**

I hereby certify that, on February 28, 2025, I caused a copy of the foregoing Defendant Kingdom of Saudi Arabia's Opposition to Plaintiffs' Objections to the Magistrate Judge's Opinion & Order Regarding Expert Opinions to be served electronically pursuant to the Court's ECF system.


/s/ *Michael K. Kellogg*
Michael K. Kellogg
*Attorney for the Kingdom of Saudi Arabia*