# EXHIBIT E

## Joanne Brown

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03-md-1570 (GBD)(SN)<br>ECF Case |
| This document relates to:<br>*Johnson, et al. v. The Islamic Republic of Iran* | 18-cv-12344 (GBD)(SN)<br>ECF Case |

### DECLARATION OF JOANNE BROWN

I, Joanne Brown, pursuant to 28 U.S.C. § 1746, do hereby declare under penalty of perjury as follows:

1. I am more than eighteen (18) years of age and I have personal knowledge of and am competent to testify to the matters stated in this declaration.

2. I was a citizen of the United States on September 11, 2001, and I remain so today.

3. On September 11, 2001, I was a detective with the New York City Police Department (NYPD). I was assigned to the Missing Persons Unit at One Police Plaza, located only a few blocks away from the World Trade Center (WTC). When the attacks on the WTC occurred, I was among the first to respond.

4. In the immediate aftermath of the attacks, I was assisting with medical triage working with emergency medical technicians on victims. The triage operation was set up across the street from the WTC. A short time after we began working, we heard someone shout for us to get out because the building was coming down. I turned to look back and saw the tower collapsing. Everyone began to run. I was on the corner of Church Street and Dey Street and turned to run away down Dey Street. I was very quickly overtaken by a massive cloud of dust and debris. I stopped momentarily because I could no longer see where I was going. A man ran into me from behind, knocking me to the ground and landing on top of me. He stayed on top of me sheltering

1

somewhat from the debris that was falling everywhere. After ten minutes or so we were able to get up. He asked if I was alright. I told him that I thought I was and that he should leave the area. We began to clear the area of civilians. Within a few minutes we were alerted that the other tower was coming down. I ran down an alleyway on John Street with a group of uniformed officers. Three of us were stuck in the alleyway and could see an avalanche of dust and debris headed toward us. We shielded ourselves as best we could. Once the initial cloud had passed, a NYPD Lieutenant shouted to determine if anyone was out there in the cloud of dust. We told him we were NYPD and he said to follow his voice. When we reached him, I lost consciousness.

5. When I came to, I was wearing an oxygen mask and had no idea where I was. I was in a shelter twenty feet below street level. I found my way back to police headquarters, where I cleaned up and changed clothes. I sat at my desk and felt a sharp pain in my back and neck. A co-worker asked me if I was alright. I could not speak and began to cry. I began shouting about an older woman who was sitting on the sidewalk when the tower began to collapse that we were unable to help when we were forced to run for our lives. A detective told someone to call 911 because he thought I was going into shock. I was taken by EMS to Beekman Downtown Hospital where I was treated and released. I returned to police headquarters later that day and continued to report for duty until October 1, 2001. I reported sick for two weeks and then returned to work at One Police Plaza in mid-October. I continued my duties as a police detective until I retired on January 16, 2002.

6. On 9/11 I was exposed to smoke inhalation, asbestos, fiberglass particles, and I was struck by falling debris. I was forced to run for my life, unable to assist others, when each one of the towers collapsed. When the first tower came down, after running until I could no longer see, I was knocked to the ground, held down, showered with debris, and covered with smoke, ash, and

any substances that had become airborne with the collapse of the tower. My experience when the second tower collapsed was equally terrifying. I was once again forced to run from the area of the towers, but was unable to outrun the avalanche of smoke and debris that came from the base of the tower. In addition to the physical injuries I suffered to my neck, shoulders, and back and others that I later became aware of, I suffered severe psychological trauma from which I have never recovered. The collapse of the buildings caused everyone to flee for their lives. Those who needed assistance and could not flee were killed. Although I know that there was no way to aid any of those people without perishing with them, it does not make the thought of their deaths less painful. I have suffered every day since 9/11 with PTSD as result of the traumatic events I experienced and the horrific sights I saw.

7. I began my involvement with the World Trade Center Health Program (WTCHP), then known as the World Trade Center Worker and Volunteer Medical Screen Program on February 2, 2002. Since then, I have continued to be screened and monitored every year. I have been certified by the WTCHP for sixteen medical and psychological conditions. The conditions I have been certified for include: asthma, chronic cough syndrome, chronic nasopharyngitis, chronic respiratory disorder from fumes and vapors, chronic rhinosinusitis, chronic obstructive pulmonary disease, gastroesophageal reflux disease, obstructive sleep apnea, musculoskeletal disorders of the neck, back, and shoulders requiring multiple surgeries (see attached medical records), traumatic bilateral carpal tunnel syndrome, acute medial nerves and disk disease, restrictive airways dysfunction syndrome, upper airway hyperactivity, and post-traumatic stress disorder (PTSD).

8. Following the evaluation of my conditions by the WTCHP, I pursued claims with the Victim Compensation Fund (VCF) and was found eligible for compensation. The medical injuries I was found eligible for were asthma, chronic cough syndrome, chronic nasopharyngitis,

chronic respiratory disorder from fumes and vapors, chronic rhinosinusitis, chronic obstructive pulmonary disease, gastroesophageal reflux disease, obstructive sleep apnea, musculoskeletal disorders of the neck, back, and shoulders, traumatic bilateral carpal tunnel syndrome, acute medial nerves and disk disease, restrictive airways dysfunction syndrome, upper airway hyperactivity As referenced above, the WTCHP certified these health conditions as covered for treatment, as well PTSD. A true and correct copy of the VCF eligibility determination letter and the letter from the WTCHP documenting the physical and mental injuries I suffered from the attacks on 9/11 are submitted with this declaration as part of this exhibit.

I DECLARE UNDER PENALTY OF PERJURY that the foregoing is true and correct.

DATED this 8th day of June, 2025.

*Joanne Brown*
Declarant Joanne Brown



September 11th
Victim Compensation Fund

August 5, 2014

JOANNE BROWN



Dear Joanne Brown:

### Revised Eligibility Determination: This supersedes any previous Eligibility Determination letter you have received.

Your Eligibility Form for the September 11th Victim Compensation Fund (VCF) has been reviewed. You submitted an Eligibility Form for Personal Injury Claimants. Your claim number is VCF0069080.

### The Decision on your Claim

The VCF has determined that you meet the eligibility criteria established in the statute (the Zadroga Act and the original statute) and regulations[1] and therefore the VCF will review your Compensation Form and supporting materials to determine the amount of any award. Based on the information you submitted and information the VCF has received from the World Trade Center Health Program (WTCHP), you have been found eligible for the following injuries:

- ASTHMA
- CHRONIC COUGH SYNDROME
- CHRONIC NASOPHARYNGITIS
- CHRONIC RESPIRATORY DISORDER/FUMES/VAPORS
- CHRONIC RHINOSINUSITIS
- COPD
- GERD AND RELATED PHYSICAL CONDITIONS VERIFIED BY THE WTCHP: OBSTRUCTIVE SLEEP APNEA
- MUSCULOSKELETAL DISORDERS-NECK, BACK, SHOULDER PAIN; BILATERAL CARPAL TUNNEL SYNDROME, BOTH TRAUMATIC, ACUTE MEDIAN NERVES AND RELATED NECK DISC DISEASE
- REACTIVE AIRWAYS DYSFUNCTION SYNDROME
- UPPER AIRWAY HYPERREACTIVITY

Please note that there are several reasons why an injury that you think should be eligible is not listed above. First, for non-traumatic injuries, the description of the injury is based on the information provided

---

[1] The Statute (the Air Transportation Safety and System Stabilization Act as amended by the Zadroga Act) and the Regulations are located at http://www.vcf.gov/lawRulesOtherDocs.html.



**September 11th Victim Compensation Fund**

by the WTCHP and there can be several alternative descriptions for the same injury. Additionally, a WTCHP physician may have provided testing or treatment for an injury even if the WTCHP has not certified that injury for treatment. Finally, your injury may not be listed if it was only recently certified for treatment by the WTCHP. The VCF regularly receives updated information from the WTCHP and will notify you if additional injuries have become eligible.

## What Happens Next

The VCF will determine your compensation award based solely on the eligible injuries listed above. In order for the VCF to do so, you must submit the Compensation Form for Personal Injury Claimants and the required supporting documents. If you have not already done so, please submit the Compensation Form and the required supporting documents as soon as possible. You are encouraged to submit the Compensation Form through the VCF's web-based claim system at www.vcf.gov. If you wish to complete the Compensation Form in hardcopy, you may request the form by contacting the toll-free Helpline at 1-855-885-1555. For the hearing impaired, please call 1-855-885-1558 (TDD). If you are calling from outside the United States, please call 1-202-353-0356.

In addition to the Compensation Form, please also complete and submit the VCF ACH Payment Information Form. This form can be found on our website in Section 8 of the Frequently Asked Questions (FAQs). The completed form must be submitted before the VCF can arrange for any payment.

The VCF will be able to determine your compensation award based on the eligible conditions after all compensation related documents are submitted. When you receive an award letter, you will have the right to appeal. In that appeal, you have the right to assert additional injuries that you believe are eligible and for which you believe you should be compensated. For purposes of the statutory deadlines, the injuries listed in your claim form and the injuries certified as eligible will be deemed "filed". You will receive instructions on the appeal process when you receive the letter with details of your compensation award.

If you have questions about the information in this letter or the claims process in general, please contact our toll-free Helpline at the number noted above. Every effort will be made to respond to your inquiries as soon as possible.

If you have questions about the information in this letter or the claims process in general, please contact our toll-free Helpline at the number noted above. Every effort will be made to respond to your inquiries as soon as possible.

Sincerely,

September 11th Victim Compensation Fund

WTC Health Program
PO Box 7002
Rensselear, NY 12144



Joanne Brown

Re: 911003414

03/14/2018

Dear Joanne Brown:

This letter is to inform you that after reviewing medical information provided by the New York University Hospital Center (NYU), the World Trade Center (WTC) Health Program has certified the following health condition(s) as covered for treatment benefits:

| Date of Certification | Condition Category on List of WTC-Related Health Conditions* | Certification Category or Injury |
|---|---|---|
| 1/17/2018 | Mental Health | Please Contact your WTC Physician for Specific Information |

* As listed in the James Zadroga 9/11 Health and Compensation Act of 2010 and/or 42 C.F.R. § 88.15

Our records also indicate that you are currently certified for the following health condition(s) as covered for treatment benefits:

| Date of Certification | Condition Category on List of WTC-Related Health Conditions* | Certification Category or Injury |
|---|---|---|
| 12/14/2017 | Asthma | Obstructive Airway Disease Please Contact your WTC Physician for Specific Information |
| 12/14/2017 | Gastroesophageal Reflux Disease (Gerd) | Gastroesophageal Reflux Disease Please Contact your WTC Physician for Specific Information |

* As listed in the James Zadroga 9/11 Health and Compensation Act of 2010 and/or 42 C.F.R. § 88.15

The WTC Health Program will only provide payment for medically necessary treatment(s) authorized by your WTC Health Program physician for your certified health condition(s) by a WTC Health Program participating provider.

If you would like more information or believe that a health condition is missing, incorrect, or should be removed, please discuss this with the New York University Hospital Center (NYU) at 212-562-4572. If the information in this letter is correct, no further action is necessary.

This program is administered by the National Institute for Occupational Safety and Health, Centers for Disease Control and Prevention, and U.S. Department of Health and Human Services

If you have any other questions, you may contact the WTC Health Program at 1-888-982-4748 Monday through Friday, 9 AM to 5 PM (Eastern Time Zone).

Sincerely,



John Howard, M.D.,
Administrator, World Trade Center Health Program
Copy to: Director, Clinical Center of Excellence

FRANCIS A. PFLUM, M.D.
80 WEST 13th STREET
NEW YORK, NEW YORK 10011

Telephone (212) 243-1231
Fax (212) 229-1852

November 5, 2001

Lawrence Fontana, M.D.
36 East 23rd Street
New York, N.Y. 10010

Re: Joann Brown

Dear Dr. Fontana:

On 11-5-01 I examined patient Joann Brown, a 48 year old who was injured on 9/11/01, when she was pushed to the ground and a man fell on her injuring her neck and her back. Since that time, she has had pain in her shoulder. She is working. She also has complaints of pain in her upper thoracic spine. She had a Cat Scan that showed some prominence of the right costal vertebral junction at T4-5. She has decreased range of motion of her right shoulder and she has decreased lateral bending of her cervical spine. An impingement test is performed on the right shoulder with an injection of Marcaine and Triamcinolone into the subacromial space without significant improvement. An x-ray is taken which shows arthritis of the acromioclavicular joint. I believe that she has an impingement syndrome of her shoulder. The x-rays of her cervical spine are inadequate, and she is to return for a repeat lateral tomorrow. I believe that she should have an MRI of her thoracic spine to further evaluate the enlargement of the T4-5 costal vertebral junction. She is given a prescription for the same. She is also given a prescription for Celebrex.

Thank you for this referral.

Sincerely,

*[signature]*

Francis A Pflum, M.D.

FAP/vm

## CABRINI MEDICAL CENTER
227 East 19th Street, New York, NY   10003   (212)995-6000

### OPERATIVE RECORD

BROWN, JOANNE                           05/17/2002       MR# 591873

---

**SURGEON:**                FRANCIS A. PFLUM, M.D.

**ANESTHESIOLOGIST:**       DR. GLADSHTEYN.

**ANESTHESIA:**             SCALENE BLOCK.

**PREOPERATIVE DIAGNOSIS:** ARTHRITIS OF THE ACROMIOCLAVICULAR JOINT, IMPINGEMENT SYNDROME.

**POSTOPERATIVE DIAGNOSIS:** SAME, PLUS A TEAR OF THE ANTERIOR LABRUM.

**PROCEDURE PERFORMED:** ARTHROSCOPY, EXCISION OF THE ANTERIOR LABRUM, SUBACROMIAL DECOMPRESSION WITH A PARTIAL ACROMIONECTOMY AND ARTHROSCOPIC RESECTION OF THE DISTAL CLAVICLE.

**FINDINGS:**

**PROCEDURE:** The patient was prepped and draped in the usual fashion in the Beach Chair position, with the right arm draped free. The posterior portal was made, and a 30 degree arthroscope passed into the glenohumeral joint. Then an anterior portal was made through which a Gray cannula was passed.

Inspection of the joint revealed marked degenerative tear of the anterior aspect of the glenoid labrum which was debrided back to a stable rim. The inspection of the rotator cuff revealed that there was no complete tear. There was hypertrophic changes and hyperemia superiorly. The arthroscope was then placed in the same posterior

## OPERATIVE RECORD

BROWN, JOANNE                05/17/2002                    MR #591873

2

portal into the subacromial space, and a lateral portal was made, and with the use of a 3.5 mm shaver, a subacromial decompression was performed. This was followed by a partial acromionectomy, and then with the use of the shaver, the acromioclavicular joint was identified and debrided. The anterior portal was used with the arthroscope in the lateral portal, and with a combination of a 3.5, 4.5 and 5.5 shavers, and the acromionizer to resect the distal 8-9 mm of the clavicle.

This having been performed, hemostasis was controlled with the Bovie. The area was copiously irrigated with normal saline and evacuated. Three mg of Duramorph, 7 cc of Marcaine were injected into the joint. The portals were closed with staples. A sterile compression dressing was applied. The patient tolerated the procedure well and left the Operating Room in good condition.

FRANCIS A. PFLUM, M.D.

PMC/PB      J: 7122     D: 05/17/2002   T: 05/20/2002

Elle J. Sarkis, M.D.
222-03 Braddock Avenue
Bellerose, New York 11427
Tel: 718-479-4648

To: Dr. Joseph D'Angelo

December 11, 2002

RE: JOANNE BROWN
SS#

Please be advised that the above named patient has been under my Orthopedic care for injuries she sustained on 9-11-01 on the job.

Initial Consultation was on October 8, 2002. She complained of pain in both shoulder, neck low back and chest. She had surgery on her right shoulder, but continues to complain of pain in the shoulder with mild limitation of motion left shoulder is painful and limitation of motion. Pain and tenderness of the cervical spine numbness and tingling of the fingers and fingertips of the right hand. Low back pain lateral bends and extension elicits pain across the lumbosacral region.

Patient was referred for MRI of Cervical spine and left shoulder.

IMPRESSION CERVICAL SPINE: C2/2 THROUGH C6/7 DISC BULGES WHICH IMPRING UPON THE THECAL SAC.
MINIMAL DEGENERATIVE DISEASE.
STRAIGHTNING OF THE CERVCIAL SPINE.

IMPRESSION LEFT SHOULDER: ROTATOR CUFF TENDONITIS.
MINIMAL GLENOHUMERAL JOINT EFFUCISON.
ACROMIOCLAVICULAR JOINT DEGENERATIVE DISEASE.

It is my opinion that she is Totally Disabled due to her injuries.

If yo    ave any questions please call the office.

Thank you,

Elle J. Sarkis, M.D., P.C.

923094
MC

# NEW YORK DOWNTOWN HOSPITAL
170 William Street, New York, NY 10038-2649

## REPORT OF OPERATION

**NAME:** BROWN, JOANNE
**MR#:** 8148315
**DATE OF OPERATION:** 10/19/2012

**PREOPERATIVE DIAGNOSIS:** Torn rotator cuff of the left shoulder with impingement.

**POSTOPERATIVE DIAGNOSIS:** Massive tear rotator cuff left shoulder with impingement and subacromial bursa.

**SURGERY PERFORMED:**
1. Arthroscopically assisted release of impingement, left shoulder.
2. Arthroscopically assisted acromioplasty.
3. Arthroscopically assisted resection of subacromial bursa and open repair of massive tear rotator cuff with three Opus anchors.

**SURGEON:** Joseph D'Angelo, MD

**ASSISTANT:** Cameron Phillips, M.D.

**PROCEDURE:** After suitable regional anesthesia reinforced with general and the patient in the beach chair position, the left shoulder was prepped and draped in the usual manner for surgery. Trocar was inserted into the joint space and the joint was distended with 40 mL of normal saline. A 4.0-mm arthroscope was then inserted. Rotator cuff was no examined. The subscapularis was noted to be detached and there was a small degenerative tear of the anterior capsule. The capsule was debrided and further joint debridement took place. The rotator cuff was also visualized. A massive tear of the rotator cuff was noted. The subacromial space was then entered and the acromioplasty was performed and a subacromial resection of the large subacromial bursa also took place. Once this was accomplished, the rotator cuff was carefully examined. Attempts were made to grasp the rotator cuff, which had retracted substantially medially; significant adhesives were seen. It was felt that an open repair was the treatment of choice. A deltoid splitting incision was now made measuring 3 cm carried down through the subcutaneous tissue by blunt and sharp dissection exposing the subacromial space where the large massive rotator cuff tear was seen. Using a combination of periosteal elevator _____, the rotator cuff was now mobilized after being grasped with Kocher clamps. Once it was satisfactory mobilized, three Opus anchors were inserted and the cuff was now reattached to its previous anatomic position after the humeral head was instrumented with motorized instrumentation to allow for satisfactory healing. Once this was accomplished, the wound was copiously irrigated. All bleeding vessels were cauterized. The deltoid muscle both the superficial and deep fascial layers were closed

with 2-0 Ethibond suture. One subcutaneous layer of 3-0 Vicryl was used and the skin was closed with subcuticular 4-0 Monocryl suture and Steri-Strips and sterile dressing was applied as well as the shoulder immobilizer. The wound was cleaned. The procedure was clean and the patient left the operating room in satisfactory condition with a sterile dressing in place and the shoulder immobilizer in place.

*Electronically Signed by:*
_____
Joseph D'Angelo, MD

JD/AM:122
dd: 10/19/2012 03:50 PM
dt: 10/20/2012 7:04 AM
Job#: 6003481

62609

# NEW YORK DOWNTOWN HOSPITAL
170 William Street, New York, NY 10038-2649

## REPORT OF OPERATION

NAME: BROWN, JOANNE
MR#: 8148315
DATE OF OPERATION: 04/08/2013

PREOPERATIVE DIAGNOSIS: Adhesive capsulitis to the left shoulder post repair of rotator cuff approximately five months ago.

POSTOPERATIVE DIAGNOSIS: Adhesive capsulitis to the left shoulder post repair of rotator cuff approximately five months ago.

SURGERY PERFORMED: Manipulation under anesthesia.

SURGEON: Joseph D'Angelo, MD

ASSISTANT: Dr. Delasotta.

PROCEDURE: After suitable regional block reinforced with sedation, the left shoulder was prepped and draped in the usual manner for surgery and a manipulation was performed under anesthesia. Shoulder was prepped and draped in the usual manner for surgery in preparation for possible other procedures if they were necessary. The manipulation took place. There was significant crepitation. Adhesions were lysed initially until resistance was obtained. Abduction was possible to approximately 95 degrees. Then, the manipulation took place in both abduction and adduction. The adhesions were felt to be lysed with the manipulation. A sling was applied. The case was clean. There were no complications and the patient left the operating room in satisfactory condition with the sling in place.

*Electronically Signed by:*
*Joseph D'Angelo 04/22/2013 11:24 AM*
Joseph D'Angelo, MD

JD/AM:122
dd: 04/08/2013 09:16 AM
dt: 04/09/2013 12:20 AM
Job#: 6572691

62607



Brooklyn, NY 11219

OPERATIVE REPORT

DATE OF OPERATION: 06/06/2016
PATIENT NAME: BROWN, JOANNE
MED REC #: 80831797
ACCOUNT NUMBER: 001529878
ATTENDING PHYSICIAN: JOSEPH P D ANGELO, MD
ASSISTANT PHYSICIAN: David Richardson, MD
ANESTHESIA: Regional anesthesia reinforced with general.

PREOPERATIVE DIAGNOSIS: Torn rotator cuff of the right shoulder.

POSTOPERATIVE DIAGNOSIS: Massive tear of the rotator cuff right shoulder with synovitis.

NAME OF PROCEDURE:
1. Arthroscopically-assisted repair of torn rotator cuff right shoulder with one 5.5 helix anchor.
2. Synovectomy.

DESCRIPTION OF PROCEDURE: After suitable regional anesthesia reinforced with general and the patient in the beach-chair position, the right shoulder was prepped and draped in the usual manner for surgery. Trocars were inserted posteriorly and the shoulder joint was distended with 20 mL of normal saline. The 4.4-mm arthroscope was now inserted. The shoulder joint was inspected. Chronic synovitis was seen. Synovectomy was performed. The shoulder was then further inspected. Massive tear of the rotator cuff was seen with complex components. Once this was identified, the remaining portion of the examination including the anterior labrum. The anterior labrum showed a small proximal tear that did not require repair. It was stable. Attention was then focused on the subacromial area where again massive synovitis components were seen. The wide synovectomy was performed before fully inspecting the rotator cuff. The massive complex tear was noted. The edges were freshened to bleeding tissue. The proximal portion of the humeral head where appropriate attachment of the torn rotator cuff was planned. It was freshened with motorized instrumentation. The torn rotator cuff was mobilized using a periosteal freer to gain satisfactory positioning. Once this was accomplished, helix anchor was inserted which contained 2 sutures. Each suture was now passed

OPERATIVE REPORT
Page 1 of 1



**Maimonides Medical Center**

Brooklyn, NY 11219

OPERATIVE REPORT

DATE OF OPERATION: 06/06/2016
PATIENT NAME: BROWN, JOANNE
MED REC #: 80831797
ACCOUNT NUMBER: 001529878
ATTENDING PHYSICIAN: JOSEPH P D ANGELO, MD

into the rotator cuff for a mattress type suture. The sutures were tied. Two double sutures were used for the repair. It was noted to be extremely stable. Once this was accomplished, the area was copiously irrigated. All bleeding vessels were cauterized. The 3 portals that were used for the repair were all closed with 3-0 nylon suture. A sterile dressing was applied. The case was clean. The patient tolerated the procedure well and left the operating room in satisfactory condition with a sterile dressing in place and shoulder immobilizer in place.

THIS IS A PRELIMINARY REPORT AND MUST NOT BE CONSIDERED FINAL UNTIL ACCOMPANIED BY A PHYSICIAN SIGNATURE.

JOSEPH P D'ANGELO, MD

DICTATED BY: JOSEPH P D ANGELO, MD

JD/5551185
DD: 06/06/2016 14:49
DT: 06/06/2016 15:34
SSI File#: 025098083175 Signed:Joseph D'Angelo MD 1263
06/08/2016 15:19 EDT
Job #: 612786

OPERATIVE REPORT
Page 2 of 1