UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

In re:

      TERRORIST ATTACKS ON
      SEPTEMBER 11, 2001

-----------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: __8/18/2025__

03-MD-01570 (GBD)(SN)

<u>OPINION & ORDER</u>

**SARAH NETBURN, United States Magistrate Judge:**

The Plaintiffs in this multidistrict litigation seek to hold a group of charitable

organizations and associated individuals liable for providing material support to al Qaeda and

facilitating the September 11, 2001 terrorist attacks on the United States (the "9/11 Attacks").

These "Charity Defendants"—the World Assembly of Muslim Youth and World Assembly of

Muslim Youth International (collectively, "WAMY"), International Islamic Relief Organization

("IIRO"), Muslim World League ("MWL"), Abdullah Omar Naseef, Abdullah bin Saleh al

Obaid, Abdullah Mohsen al Turki, Adnan Basha, and Yassin Kadi—contest their liability and, as

part of their defense, move to exclude the testimony of three of the Plaintiffs' expert witnesses.

<u>See</u> ECF Nos. 9246, 9248.[1]

After a careful review of the parties' briefs, expert reports, and exhibits, the Court grants

in part and denies in part the Charity Defendants' motions.

## BACKGROUND

The Court assumes familiarity with this multidistrict litigation and summarizes only the

relevant procedural and factual background. After years of discovery, during which the Plaintiffs

and the Charity Defendants exchanged 23 expert reports, conducted 16 depositions, and

---

[1] Unless otherwise noted, all ECF numbers refer to the main MDL docket, No. 03-md-01570.

produced hundreds of thousands of pages of documents, the parties filed dueling motions challenging the testimony of six expert witnesses. See ECF Nos. 7342, 7345. In a "bellwether" opinion, the Court resolved these motions and established general principles to "guide the parties as they identify or move to exclude other expert witnesses." In re Terrorist Attacks on Sept. 11, 2001 ("In re 9/11"), No. 03-md-01570 (GBD)(SN), 2023 WL 3116763, at *1 (S.D.N.Y. Apr. 27, 2023) ("Charity Daubert I"), ECF No. 9060. The parties then "assured the Court" that their future challenges to expert witness testimony would "reflect the[se] principles." ECF No. 9173 at 1; see also Conference Tr. 15:4, June 26, 2023, ECF No. 9345-21 (discussing the principles as a "roadmap").

The Charity Defendants now move to strike the expert reports and exclude the proffered testimony of three more Plaintiffs' experts: Evan Francois Kohlmann ("Kohlmann"), Dr. Matthew Levitt ("Levitt"), and Victor D. Comras ("Comras").[2] ECF Nos. 9246, 9248. Because these challenges will "streamline summary judgment," the Court addresses them at this stage of the litigation.[3] ECF No. 9173 at 1–2.

## LEGAL STANDARD

Federal courts are the "gatekeep[ers]" of expert evidence—entrusted to "screen[]" an expert's testimony to ensure that it "both rests on a reliable foundation and is relevant to the task at hand" before it is admitted at trial. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 596–97 (1993). To fulfill this function, courts turn to Rule 702 of the Federal Rules of

---

[2] The Charity Defendants move collectively to challenge Kohlmann and Levitt's testimony. ECF No. 9246. Kadi writes separately to challenge Comras's testimony. ECF No. 9248.

[3] The Plaintiffs have deferred further challenges to the Charity Defendants' experts because such motions "would have little impact on summary judgment." ECF No. 9173 at 2. They "will be permitted to challenge additional defense experts in pre-trial briefing" should the case proceed to trial. Id.

Evidence,[4] the Supreme Court's seminal <u>Daubert</u> decision, and decades of precedent interpreting and applying the law.

Rule 702 was recently amended. It now reads:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Advisory Committee on Evidence Rules proposed the changes in response to court decisions that admitted expert testimony too liberally. The revised language, which went into effect on December 1, 2023, clarifies that (i) the party introducing expert testimony has the burden to show that "it is more likely than not that the proffered testimony meets the admissibility requirements," and (ii) "each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." Fed. R. Evid. 702 advisory committee's note to 2023 amendment.

These amendments "reflect an intent to empower courts to take seriously their roles as gatekeepers of expert evidence." <u>United States v. Diaz</u>, No. 24-cv-0032 (MV), 2024 WL 758395, at *5 (D.N.M. Feb. 23, 2024). Because "jurors may lack the specialized knowledge" to evaluate the quality of a witness's opinion and its limitations, it is not enough to "presume[]" "expert

---

[4] Unless otherwise noted, subsequent references to "Rules" are to the Federal Rules of Evidence.

testimony . . . admissible" and relegate issues of reliability to cross-examination. Id. at *4 (first quoting Fed. R. Evid. 702 advisory committee's note to 2023 amendment; and then quoting Proposed Amendments, Excerpt from May 15, 2022 Report of the Advisory Committee on Evidence Rules). Courts must withhold endorsement from expert witnesses who fail to meet Rule 702's standards—they "cannot bypass this gatekeeping responsibility and pass it off to the jury." In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig., No. 14-md-2542 (VSB), 2025 WL 354671, at *2 (S.D.N.Y. Jan. 30, 2025). Indeed, "there are only so many questions of weight that can be tolerated." Id. at *4 (quoting Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 558, 612 (S.D.N.Y. 2007)). With that in mind, the Court summarizes the law governing expert testimony.

**Rule 702** authorizes courts to admit expert testimony that meets three conditions: (1) the witness is "'qualified,'" (2) her "opinion is based upon reliable data and methodology," and (3) her "testimony will '[help] the trier of fact.'" Nimely v. City of New York, 414 F.3d 381, 397 (2d Cir. 2005) (quoting Fed. R. Evid. 702). An expert's testimony is admissible only if the party offering it establishes all three criteria.

**Qualifications**. A witness's qualifications typically show up on her resume. The relevant qualifications depend upon the area of expertise but may include education, technical or practical training, certifications, licenses, or professional, teaching, or other experience. See In re Puda Coal Sec. Inc. Litig., 30 F. Supp. 3d 230, 250 (S.D.N.Y. 2014) (listing "educational background, training, and experience in the field" as relevant qualifications); Focus Prods. Grp. Int'l v. Kartri Sales Co., 647 F. Supp. 3d 145, 234 (S.D.N.Y. 2022) (same as to certifications and accreditations); Tardif v. City of New York, 344 F. Supp. 3d 579, 597 (S.D.N.Y. 2018) (same as to licensure); Capri Sun GmbH v. Amer. Beverage Corp., 595 F. Supp. 3d 83, 138 (S.D.N.Y.

2022) (same as to teaching). In terrorism litigation, experts "generally boast acceptable academic or professional credentials." Charity Daubert I, at *20.

Looking at the "totality of the witness's background," the court asks whether the "area in which the witness has superior knowledge, education, experience, or skill [matches] the subject matter of the proffered testimony." Nat'l Coalition on Black Civic Participation v. Wohl, 661 F. Supp. 3d 78, 97 (S.D.N.Y. 2023) (first quoting Arista Records LLC v. Usenet.com, Inc., 608 F. Supp. 2d 409, 422 (S.D.N.Y. 2009); and then quoting United States v. Tin Yat Chin, 371 F.3d 31, 40 (2d Cir. 2004)); see, e.g., Moncayo v. United Parcel Serv., Inc., No. 23-cv-00161, 2024 WL 461694, at *1 (2d Cir. Feb. 7, 2024) (affirming decision excluding opinions that were "not within [the witness's] area of expertise"). And while the witness may "not . . . be [a] hard scientist[]" or might "rely on sources of information that in other fields would be considered suspect," she is considered qualified where her testimony addresses subjects within her area of expertise. Charity Daubert I, at *20; see also Op. & Order, ECF No. 10615 ("KSA Daubert I") at 7 (setting out same qualifications standard).

**Reliability**. Assessing an expert's reliability requires "rigorous" scrutiny of the standards and methods behind her opinions. Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002). Because "there are many different kinds of experts, and many different kinds of expertise," a one-size-fits-all approach to analyzing reliability is unworkable. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999). Accordingly, judges "have considerable leeway in deciding . . . how to go about determining whether particular expert testimony is reliable." Id. at 152.

Courts may consider the benchmarks identified in Daubert—(i) "a theory's testability," (ii) "whether it has been a subject of peer review or publication," (iii) "the known or potential

rate of error," (iv) "whether there are standards controlling the technique's operation," and (v) "the degree of acceptance within the relevant scientific community." Kumho Tire Co., 526 U.S. at 145, 149 (cleaned up). Or they may look to other factors, such as: (i) the context in which the expert developed her opinion (i.e., for her "'independent research' . . . or . . . 'expressly for purposes of testifying'"); (ii) "whether she 'has unjustifiably extrapolated from an accepted premise to an unfounded conclusion'"; (iii) her success in "account[ing] for . . . alternative explanations"; (iv) whether she is "as careful as [s]he would be in h[er] regular professional work"; and (v) "whether her 'field of expertise . . . is known to reach reliable results for the type of opinion offered.'" Charity Daubert I, at *2–3 (quoting Deutsch v. Novartis Pharms. Corp., 768 F. Supp. 2d 420, 426 (E.D.N.Y. 2011)).

Whatever metrics a court uses to assess a particular expert, the reliability standard is the same: "Rule 702 does not set a lower [bar] for witnesses with 'technical or other specialized knowledge' than for scientists." Restivo v. Hessemann, 846 F.3d 547, 576 (2d Cir. 2017). A witness whose expertise derives from her experience must accordingly "base her opinion on sufficient facts or data, explain how her experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Veleron Holding, B.V. v. Morgan Stanley, 117 F. Supp. 3d 404, 444 (S.D.N.Y. 2015) (cleaned up); accord Fed. R. Evid. 702 advisory committee's note to the 2000 amendment.

Applying these principles, courts exclude opinions that reflect "too great an analytical gap between the data and opinion proffered"—in other words, testimony supported "only by the ipse dixit of the expert." General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) ("Joiner"). The same goes for opinions based on "speculation" or conjecture, Daubert, 509 U.S. at 590, those rooted in a "discipline [that] itself lacks reliability," Kumho Tire Co., 526 U.S. at 151, or even

testimony that "for security reasons . . . would not be open to adequate inquiry on cross-examination," <u>Gill v. Arab Bank, PLC</u>, 893 F. Supp. 2d 523, 530 (E.D.N.Y. 2012). These safeguards ensure that "the courtroom door remains closed" not just "to junk science" but to all unreliable testimony. <u>Amorgianos</u>, 303 F.3d at 267.

**Helpfulness**. Expert testimony is helpful when it "sheds light on activities not within the common knowledge of the average juror." <u>United States v. Wexler</u>, 522 F.3d 194, 204 (2d Cir. 2008). Such testimony "provide[s] the groundwork to enable the [trier of fact] to make its own informed determination[s]" on relevant issues. <u>In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.</u>, 725 F.3d 65, 114 (2d Cir. 2013). So, when an expert offers her opinion, she must take care not to "usurp the role" of the trier of fact by dictating the result or otherwise straying from the expert-witness lane. <u>Nimely</u>, 414 F.3d at 397 (cleaned up); <u>see</u> <u>Mar-Can Transp. Co. v. Loc. 854 Pension Fund</u>, No. 20-cv-08743 (CS), 2024 WL 1250716, at *4 (S.D.N.Y. Mar. 22, 2024).

In concrete terms, this means that experts must not offer "legal conclusions," <u>United States v. Duncan</u>, 42 F.3d 97, 101 (2d Cir. 1994); make "credibility" determinations; or discuss "motivations," "intentions," and other states of mind, <u>Marvel Characters, Inc. v. Kirby</u>, 726 F.3d 119, 135–36 (2d Cir. 2013). In this case, "this means avoiding characterizations of a Defendant['s] conduct as providing 'material support' to al Qaeda or claiming that an individual or organization subjectively intended a specific outcome." <u>Charity Daubert I</u>, at *20 (but permitting testimony about "the type of resources an organization or individual offered and their express aims"). Broadly, experts should steer clear of "'lay matters' which the trier of fact can understand and decide without the expert's help." <u>United States v. Jiau</u>, 734 F.3d 147, 154 (2d Cir. 2013); <u>accord</u> <u>United States v. Zhong</u>, 26 F.4th 536, 555 (2d Cir. 2022).

"Factual narrative[s]" in expert testimony run afoul of many of these principles. Kozak v. Liberty Mar. Corp., 729 F. Supp. 3d 277, 294 (E.D.N.Y. 2024). A party that uses an expert witness as a vehicle to "summarize the relevant facts . . . and then opine—or, more accurately, argue—that" its theory of the case is the correct one is, "in essence, giving a summation from the witness stand." Lippe v. Bairnco Corp., 288 B.R. 678, 687–88 (Bankr. S.D.N.Y. 2003). That is counsel's job. It is "not the function of an expert witness." Id. at 688. Like other opinions that lack "a layer of expertise or cogent analysis beyond that which a lay jury would so clearly understand," factual narratives must be excluded.[5] Est. of Jaquez v. City of New York, 104 F. Supp. 3d 414, 432 (S.D.N.Y. 2015).

The same is true of hearsay evidence. While experts "may rely on hearsay to reach their conclusions," they do not have "a blank check to slip hearsay statements into expert reports." Charity Daubert I, at *20. Experts "synthesize and interpret information for the jury, not parrot other sources." Id. So, when "an expert provides no commentary or analysis" about a topic but instead simply "quotes from a single hearsay source," she "cannot properly testify to that content." Id.

Finally, when evidence is not relevant, it is not helpful. Daubert, 509 U.S. at 591. That is why the Court "will exclude opinions that are not directly relevant to resolving the legal claims at issue." Charity Daubert I, at *20. Measured against the proffering party's theory of the case, In re Pfizer Inc. Sec. Litig., 819 F.3d 642, 659 (2d Cir. 2016), relevance is a low bar: expert testimony is relevant when it "has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be

---

[5] This opinion uses the term "jury" and "factfinder" interchangeably to refer to the finder of fact.

without the evidence," Amorgianos, 303 F.3d at 265 (cleaned up); accord Fed. R. Evid. 401. When expert testimony fails to clear that threshold, it must be excluded.

**Weight**. If an expert's opinion meets the three criteria for admission, any further challenges go to its weight. Fed. R. Evid. 702 advisory committee's note to the 2023 amendment. Daubert advises that the Rules are "designed not for the exhaustive search for cosmic understanding but for the particularized resolution of legal disputes." 509 U.S. at 597. A qualified expert's reliable and helpful testimony, then, may be admissible even when it is "shaky." Id. at 596. Such weaknesses can instead be addressed by "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." Id.

**Rule 403.** A court may also exclude expert testimony "if its probative value is substantially outweighed by the danger of unfair prejudice." United States v. Dukagjini, 326 F.3d 45, 51–52 (2d. Cir. 2003) (citing Fed. R. Evid. 403). Exclusion under Rule 403 is appropriate where the testimony "cloud[s] the issue for the jury," United States v. Gatto, 986 F.3d 104, 118 (2d Cir. 2021), "waste[s] time by diverting attention from the . . . relevant" evidence, United States v. Gabinskaya, 829 F.3d 127, 134 (2d Cir. 2016), or "induc[es] [the jury to] deci[de] [the case] on a purely emotional basis," Fed. R. Evid. 403 advisory committee notes to 1972 proposed rules. Courts have "noted the uniquely important role that Rule 403 has to play in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations." Nimely, 414 F.3d at 397.

**Hearing**. As with many aspects of this process, courts have wide latitude to decide whether to hold a Daubert hearing. No hearing is necessary if a motion challenging expert testimony can be decided on written submissions. Du v. Party Perfect Rentals LLC, 731 F. Supp. 3d 392, 398 (E.D.N.Y. 2024).

**DISCUSSION**

The Court applies the above standards to the three challenged witnesses and their proffered testimony. Though the Court established its bellwether principles to "guide the future" of these pre-trial proceedings without having to "address every single expert and every single challenge," not all experts and not all challenges can be addressed absent the Court's adjudication. ECF No. 9345-21 at 5:16, 5:9–10; see id. (discussing the difficulty of resolving these challenges without the Court's involvement). Thus, the Court addresses the Charity Defendants' challenges to Kohlmann, Levitt, and Comras. There is no need for a Daubert hearing. The request for argument is denied as moot. See ECF No. 9246.

**I.    Evan Kohlmann**

    **A.    Background**

Evan Francois Kohlmann is perhaps the most prolific terrorism expert witness in this nation's history. He has testified in close to 40 terrorism cases, including as an expert witness on behalf of the United States Government in 35 criminal and military prosecutions. ECF No. 9345-1 ("Kohlmann Report") at 2; see also Pls' Opp. Mem. of Law, ECF No. 9344 at 4. He has also testified 12 times before international courts. Kohlmann Report at 1; see also 9345-4 ("Kohlmann CV") at 4–5.

As he describes himself, Kohlmann is "a private International Terrorism Consultant who specializes in tracking Al-Qaida and other contemporary terrorist movements." Kohlmann Report at 1. He "has reviewed thousands of open[-]source documents" about terrorism and has "amassed one of the largest digital collections of terrorist multimedia and propaganda in the world." Id. He is also the co-founder and Chief Innovation Officer of a "business risk intelligence firm" called Flashpoint Global Partners, an "on-air analyst for NBC News," and the "author of the book Al-Qaida's Jihad in Europe: the Afghan-Bosnian Network (Berg/Oxford

International Press, London, 2004)." Kohlmann Report at 1; see also Kohlmann CV at 2, 5
(listing only "Berg Publishers"). Kohlman graduated from college in 2001 and law school in
2004, which is the same year that he founded Flashpoint and that his book was published.
Kohlmann CV at 2, 5.

Beyond his work with Flashpoint, Kohlmann's resume suggests that his primary source
of income is as a consultant or expert witness. Kohlmann CV at 2. He has not worked full-time
for organizations other than his own and has never held a teaching position or a position in
government. Id. He was most prolific as a published writer more than ten years ago, including
four articles published in the *CTC Sentinel*, a monthly publication produced by the Combating
Terrorism Center at West Point, and four articles published in *Foreign Policy*. Id. at 5–7. With
limited exception, he has not published outside of Flashpoint since 2014. Id.

He is not without controversy. In 2010, Kohlmann was the subject of a *New York
Magazine* profile entitled "The Terrorist Search Engine," which reported that he had "earned a
reputation among many scholars as a "'hand for hire[]' . . . working in the 'guilty-verdict
industry.'" Wesley Yang, The Terrorist Search Engine, N.Y. Mag., Dec. 5, 2010,
https://nymag.com/news/features/69920/ (quoting one professor from the London School of
Economics). Eight years later, in 2018, a group of academics and scholars filed an amicus brief
before the Supreme Court supporting that characterization. See Brief for Terrorism and Evidence
Experts as Amici Curiae Supporting Petitioners, Republic of Sudan v. Owens, No. 17-1236 (U.S.
April 5, 2018), https://www.supremecourt.gov/DocketPDF/17/17-
1236/42518/20180405162217825_17-
1236%20tsac%20terrorism%20and%20evidence%20experts.pdf. The purpose of their brief was
to urge the Supreme Court to clarify the "exacting" standards courts must apply when evaluating

expert witness testimony in terrorism cases, in particular. Id. at 3 (quoting Weisgram v. Marley Co., 528 U.S. 440, 455 (2000)); see also id. at 2 (warning that "'hands off' review is incompatible with the courts' Daubert gatekeeping function and threatens to undermine the reliability of judgments in important terrorism cases"). Evan Kohlmann was their primary example of a terrorism expert who did not demonstrate the rigor or experience required under those demanding standards. Id. at 11–14 ("Even more troubling than Mr. Kohlmann's lack of qualifying credentials . . . is the absence of a social-science methodology that can be subjected to peer review or some form of objective evaluation.").

Indeed, dockets across the country are littered with Daubert challenges to Kohlmann's testimony, reflecting his stature as a central, but contested, figure in American terrorism litigation following the 9/11 Attacks. See infra I.C at 14–17. This case is no exception: As one of the Charity Defendants' attorneys put it during a recent hearing, "we all separately and together have a lot at stake with respect to Evan Kohlmann." ECF No. 9345-21 at 21:1–2.

### B.    Report

The Plaintiffs retained Kohlmann to examine four questions: (1) "the degree to which various Saudi-based Islamic 'charitable,' or dawah organizations . . . were involved in financing and directing terrorist activities"; (2) "the degree to which the money, direction, and other forms of material support provided to Al-Qaida through the Saudi-based dawah organizations were a cause of the attacks on September 11, 2001"; (3) "the degree to which financial irregularities and atypical accounting practices on the part of MWL, IIRO, and WAMY reflect typical terrorist financing modes and methodologies"; and (4) "the degree to which any material support from these Saudi-based dawah organizations to al Qaeda and allied jihadists was conducted with the awareness and knowledge of the senior officials who headed those organizations." Kohlmann Report at 4.

To answer those questions, Kohlmann reviewed "thousands of open-source documents and documents produced in discovery (including hundreds of pages of documents produced from inside the files of [the] Saudi dawah organizations at issue)," and came to five principal conclusions, Id.:

    (1)    Before the 9/11 Attacks, "Al-Qaida was largely funded and otherwise supported by money and other support (for example, safe haven, travel documents, access to operatives, training, etc.) that were channeled to Al-Qaida through Saudi-based Islamic 'charitable,' or dawah organizations."

    (2)    "These dawah organizations include (but are not limited to) the Muslim World League (MWL), the International Islamic Relief Organization (IIRO), and the World Assembly for Muslim Youth (WAMY)."

    (3)    "The money and other support that was channeled to Al-Qaida through Saudi-based dawah organizations fueled Al-Qaida's development . . . . Without this fuel, Al-Qaida would not have been a global threat, nor capable of executing sophisticated, elaborate terrorist attacks on a global scale—including the September 11 terrorist attacks on the United States."

    (4)    "Financial irregularities and atypical accounting practices used by these Saudi-based dawah organizations are not bugs, but rather features of these groups—and are consistent with typical terrorist financing modes and methodologies."

    (5)    "The organizational and financial structures of the MWL, IIRO, and WAMY are evidence that their material support of al Qaeda and affiliated organizations was conducted with the awareness and knowledge of the senior officials who headed those organizations."

Kohlmann Report at 6–7.

The Plaintiffs also asked Kohlmann to rebut the testimony of several of the Charity Defendants' experts. See ECF No. 9345-3 ("Kohlmann Rebuttal Report"). His subsequent report critiques the defense experts' testimony on a wide array of topics, including al Qaeda's founding, the relationship between al Qaeda and the Taliban, power dynamics inside of Saudi Arabia, and the alleged role that Islamic charities have played in financing terrorist organizations. See Kohlmann Rebuttal Report at 1, 11, 13, 16, 19, 20, 22, 25, 29, 30 (critiquing the defense experts'

"incorrect or misleading statements"). On this last subject, Kohlmann again concludes that "Saudi Islamic charities have played a pivotal role in supporting international terrorism." Id. at 20.

### C.    Qualifications

First, the Charity Defendants argue that Kohlmann has long embellished his qualifications "to prop himself up as an expert." ECF No. 9247 at 2; see ECF Nos. 9247 at 2–10; 9375 at 2–6. They accuse him of "lies," "dishonesty," and "deception" in reporting his own credentials, and urge the Court to disqualify him because he has "very little, if any, relevant education, training, or experience." ECF No. 9247 at 1–2. Kohlmann has "misrepresent[ed]" his accomplishments for decades, the Charity Defendants protest—by inflating the academic bona fides of his book publisher, massaging the meaning of "peer review" to boost the reliability of his writing, and exaggerating his education. ECF No. 9247 at 6; see ECF Nos. 9247 at 2–10; 9375 at 2–6. This "deceipt[]," they say, "shatters his credibility and corrupts his testimony." ECF No. 9247 at 6. The Plaintiffs, on the other hand, call these arguments an "attempted character assassination." ECF No. 9344 at 2.

With Kohlmann's contentious history at the center of the Charity Defendants' challenge to his qualifications, both parties point the Court to numerous previous decisions evaluating Kohlmann's credentials. Many courts have found Kohlmann qualified to testify as an expert witness. See, e.g., United States v. Paracha, No. 03-cr-1197 (SHS), 2006 WL 12768, at *18–24 (S.D.N.Y. Jan. 3, 2006) (finding Kohlmann qualified after "extensive oral argument" and "a full day evidentiary hearing" because the court ruled, in part, that he had the "sufficient education, training and knowledge" to testify about "the origins and structure of al Qaeda, its leaders, and its use of cells and individuals to provide logistical support"); United States v. Benkahla, 530 F.3d 300, 309 n.2 (4th Cir. 2008) (calling Kohlmann's qualifications "substantial" and

"sufficient"); <u>United States v. Aref</u>, 285 F. App'x. 784, 792 (2d Cir. 2008) (citing Rule 702's

"liberal standard" of admissibility and finding Kohlmann qualified to discuss Jamaat-e-Islami

Bangladesh, the Islamic Movement in Kurdistan, and other Kurdish groups); <u>United States v.</u>

<u>Abu-Jihaad</u>, 600 F. Supp. 2d 362, 366 (D. Conn. 2009) (calling Kohlmann "an expert in

international terrorism and the internet" and noting earlier cases where he had testified); <u>United</u>

<u>States v. Sadequee</u>, No. 06-cr-147 (WSD), 2009 WL 3785566, at *3–4 (N.D. Ga. Nov. 10, 2009)

(relying on Kohlmann's testimony about the Lashkar-e-Tayyiba and Jammaat-U-Dawaah

organizations in Pakistan); <u>United States v. Sabir</u>, No. 05-cr-00673 (LAP), 2007 WL 1373184, at

*10 (S.D.N.Y. May 10, 2007) (crediting <u>Paracha</u>'s reasoning, the court's own review of

Kohlmann's curriculum vitae ("CV"), and his testimony in two prior criminal trials to find him

qualified to testify), <u>aff'd</u> <u>sub nom.</u> <u>United States v. Farhane</u>, 634 F.3d 127, 158 (2d Cir. 2011)

(ruling that the district court had "acted well within its discretion" to find Kohlmann qualified as

an expert);[6] <u>United States v. Abu Ghayth</u>, No. 98-cr-1023 (LAK), 2014 WL 978629, at *1

(S.D.N.Y. Feb. 28, 2014) (finding Kohlmann qualified based on <u>Paracha</u> and his previous expert

testimony experience); <u>United States v. Hassan</u>, 742 F.3d 104, 130–31 (4th Cir. 2014)

---

[6] The Court of Appeals for the Second Circuit stressed the "considerable factual basis" for Kohlmann's testimony, including: "(1) his graduate studies at Georgetown University's School of Foreign Service and Center for Contemporary Arab Studies and at the University of Pennsylvania Law School; (2) his full time employment at two organizations focusing on terrorism and al Qaeda, 'Globalterroralert.com' and the Investigative Project; (3) his authorship of various academic papers and a book on al Qaeda; (4) his provision of consulting services on terrorism and al Qaeda to various federal agencies; and (5) his ongoing efforts to collect, analyze, and catalogue written, audio, and visual materials relevant to terrorism generally and al Qaeda in particular, including the records of guilty pleas and confessions from admitted al Qaeda operatives." <u>Farhane</u>, 634 F.3d at 158. The Court of Appeals further credited the <u>Paracha</u> court's conclusions, adopted in <u>Sabir</u>, "that Kohlmann's work had undergone 'various forms of peer review,' that his opinions were 'generally accepted within the relevant community,' and that his methodology was 'similar to that employed by experts that have been permitted to testify in other federal cases involving terrorist organizations.'" <u>Id.</u> (quoting <u>Sabir</u>, 2007 WL 1373184, at *8). Additionally, the Court of Appeals noted that Kohlmann had been "qualified as an expert on al Qaeda and terrorism in a number of federal prosecutions." <u>Id.</u> at 158 n.32.

(upholding the trial court's conclusion that Kohlmann possessed "the requisite knowledge, skill, experience, training, and education to testify on various aspects of the trend of decentralized terrorism and homegrown terrorism," while calling attention to the lower court's statement "that questions about Kohlmann's credentials and opinions were 'ideal fodder for vigorous cross examination'"); United States v. Kaziu, 559 F. App'x 32, 38 (2d Cir. 2014) (citing Farhane to find Kohlmann qualified because his testimony was based "on specialized research and training removed from the instant case").

Other courts have found Kohlmann unqualified to testify as an expert witness. See, e.g., ECF No. 9250-7, Hr'g Tr. 28:6–10, United States v. Abu Ali, 05-cr-53 (GBL) (E.D. Va. Oct. 28, 2005) (concluding that Kohlmann was not qualified to testify because "he has had no contact with someone from al-Qaeda. All he has done is to read about it. My jury could do an Internet search on Google and read about al-Qaeda."); see also id. 28:13–15 ("I'm not of the opinion that Mr. Kohlmann is an expert because he is not qualified by training, because he has none other than what he is self taught [sic].").[7]

Still other courts have found Kohlmann qualified to testify on certain subjects, but not on all subjects. See, e.g., United States v. Kassir, No. 04-cr-356 (JPK), 2009 WL 910767, at *7 (S.D.N.Y. Apr. 2, 2009). One court in this District, for example, credited Paracha's analysis and found that Kohlmann was qualified to testify as to "the origins, history, structure, leadership and

---

[7] The Charity Defendants cite two other cases as examples of courts precluding Kohlmann's testimony due to his lack of qualifications. Those decisions, however, turned on reliability. See ECF No. 9375 at 2 n.5 (citing ECF No. 9345-24 at 9, United States v. Osmakac, 8:12-cr-00045 (MSS) (AEP) (M.D. Fla. May 19, 2014) ("Kohlmann cannot describe . . . the point at which his confidence level transforms the presence of these factors from purely subjective supposition to a reasonably reliable expert opinion."); Mins. Order at 4–5, United States v. Kabir, No. 5:12-cr-00092 (C.D. Cal. July 7, 2014), ECF No. 433 ("[T]he Government has not sufficiently shown Kohlmann's methodology of constructing and refining the 'homegrown terrorist' profile to be 'reliable.'")). In this latter case, Kohlmann was also ultimately permitted to testify. See, e.g., Appellant's Opening Br., Kabir, No. 15-50078, 2018 WL 2459875, at *41 (9th Cir. May 23, 2018).

various operational methods of al Qaeda and other terrorist groups." Id. "Kohlmann's expertise

and reliability have not diminished," the court reasoned, "and the standard under Rule

702 and Daubert remains the same." Id. But the Court ordered a further Daubert hearing to

evaluate Kohlmann's qualifications to testify about "traditional forensic computer investigation

techniques to track terrorist websites" and other technology-related topics because neither the

record in that case nor Paracha's evidentiary hearing had established Kohlmann's credentials to

speak to those issues. Id. "[I]t remains the Government's burden to establish the qualifications of

its expert, just as it remains the Court's duty to serve as a gatekeeper," the court explained.[8] Id.

These precedents are instructive, but they are not binding. Courts favorably cite prior

expert testimony when analyzing a witness's qualifications, see, e.g., WIZKIDS/NECA, LLC v.

TIII Ventures, LLC, No. 17-cv-02400 (RA), 2019 WL 1454666, at *12 n.4 (S.D.N.Y. Mar. 31,

2019) (finding witness qualified in part because "he has testified as an expert witness . . . in

various federal courts"); United States v. Tanguay, 895 F. Supp. 2d 284, 291 n.3 (D.N.H. Dec. 7,

2012) (same); Seals v. Mitchell, No. 04-cv-3764 (NJV), 2011 WL 1399245, at *10 (N.D. Cal.

Apr. 3, 2011) (same), and credit previous decisions restricting a witness's testimony, see, e.g.,

Topliff v. Wal-Mart Stores East LP, No. 6:04-cv-0297 (GHL), 2007 WL 911891, at *5

(N.D.N.Y. Mar. 22, 2007) (relying in part on previous finding that witness was unqualified to

exclude opinion on apparel flammability). But prior Daubert analyses are by no means

controlling. Charity Daubert I, at *8.

Another court's assessment of an expert witness can be "irrelevant," United States v.

Nacchio, 608 F. Supp. 2d 1237, 1252 n.24 (D. Colo. 2009), because the issues in the prior case

---

[8] Ultimately, the court never held a subsequent Daubert hearing to assess Kohlmann's qualifications because the defense withdrew its challenge to Kohlmann's testimony on those issues. See Letter, United States v. Kassir, No. 04-cr-356 (JPK) (S.D.N.Y. Apr. 7, 2009), ECF No. 77.

may bear little relation to the "unique facts" of the current one, Pedraza v. Davis, No. 2:17-cv-190 (MJK)(LAR), 2020 WL 4698325, at *1 (N.D. Tex. Aug. 13, 2020) (declining to presume that expert was qualified based on prior testimony); see also Charity Daubert I, at *8. Accordingly, while the Court takes these previous analyses into account, it proceeds with its own inquiry into Kohlmann's qualifications.

The Charity Defendants claim that Kohlmann has "misle[d]" courts to believe that Oxford University Press, not Berg/Oxford International Publishers, published his 2004 book;[9] that his work has been widely subjected to formal peer review;[10] and that he holds an advanced degree in "Islamic Studies." See ECF Nos. 9247 at 2–10; 9375 at 2–6. The Court's role, however, is not to relitigate prior cases; it is to decide, based on current evidence, whether Kohlmann's credentials qualify him as an expert fit to testify in *this* case. Cf. Kassir, 2009 WL

---

[9] The Charity Defendants also take issue with Kohlmann's flexible use of the term "university press." See, e.g., ECF No. 9247 at 3–4. A "university press" is a "publisher" whose "mission is to publish work of scholarly, intellectual, or creative merit, often for a small audience of specialists or a regional community of interest." Association of University Presses, About University Presses, https://aupresses.org/the-value-of-university-presses/about-university-presses/ (last visited June 25, 2025). Unlike a commercial publisher, which "focus[es] on making money by publishing for popular audiences," a "university press is an extension of its parent institution . . . charged with serving the public good by generating and disseminating knowledge." Id. Oxford University Press is a university press. Berg/Oxford International Publishers is not.

[10] Fluid definitions of "peer review" have likewise muddied prior evaluations of Kohlmann's work. See, e.g., ECF No. 9344 at 5 (quoting Paracha, 2006 WL 12768, at *20) (finding "that Kohlmann's opinions and conclusions are subjected to *various forms of peer review*" (emphasis added)). "Peer review" is the "process of subjecting an author's scholarly work, research or ideas to the scrutiny of others who are experts in the same field." Jacalyn Kelly, Tara Sadeghieh & Khosrow Adeli, Peer Review in Scientific Publications: Benefits, Critiques, & a Survival Guide, 25(3) EJIFCC 227, 227–43 (2014), https://pmc.ncbi.nlm.nih.gov/articles/PMC4975196/ (providing a detailed breakdown of the formal peer review process); see also Daubert, 509 U.S. at 593 ("submission to the scrutiny of the scientific community"). What constitutes "formal peer review," however, is more difficult to discern. See, e.g., Richard Smith, Peer Review: A Flawed Process at the Heart of Science and Journals, 99(4) J. of the Royal Soc'y of Med. 178, 178 (2006), https://pmc.ncbi.nlm.nih.gov/articles/PMC1420798/ (explaining that, "like poetry, love, or justice," "peer review is impossible to define in operational terms").

910767, at *7 (Indeed, the "standard under Rule 702" no longer "remains the same." <u>See</u> Fed. R.
Evid. 702 advisory committee's note to the 2023 amendment.).

First, Kohlmann represents that his book was published by "Berg/Oxford International
Press, London." Kohlmann Report at 1. His telling is imprecise—the organization's correct name
is Berg/Oxford International *Publishers*. But Kohlmann's imprecision does not confuse the Court
into believing that his book was published by Oxford University Press. On his CV, Kohlmann
properly lists "Berg Publishers." Kohlmann CV at 5. The Court understands that this book was
released by a commercial publisher, not an academic one.

Next, the Court considers the controversy over whether his published work is peer-
reviewed and to what extent that matters. <u>See</u> <u>Charity Daubert I</u>, at *2 (noting that the four
<u>Daubert</u> factors, including peer review, are "poorly suited to terrorism experts"); <u>Daubert</u>, 509
U.S. at 594 (describing peer review as "a relevant, though not dispositive, consideration"). It is
unclear just how much of Kohlmann's work has been formally peer reviewed. <u>Compare</u> ECF No.
9247 at 4 n.17 (calculating that at least 70% of Kohlmann's work has not been formally peer
reviewed), <u>with</u> ECF No. 9344 at 9 n.28 ("Kohlmann has had nearly a dozen of his works
formally peer reviewed."). Kohlmann's report inaccurately intimates that his work is universally
the product of a robust peer review process, <u>see</u> Kohlmann Report at 3 (quoting <u>Paracha</u>
(Kohlmann "subject[s] his opinions and conclusions to peer review . . . .") and <u>Abu-Jihaad</u> ("Mr.
Kohlmann's work receives a considerable amount of peer review from academic scholars and
others . . . .")), but he also acknowledges that at least some of his writing has not been formally
peer reviewed, <u>see</u> ECF No. 9250-43 at 31:2–3 (explaining that "not all of my papers are
formally peer-reviewed, but some of them are"). What is clear, however, is that his publication
history is of limited reliability. He has published only one book, two decades ago (the same year

he graduated from law school), and a significant number of his "major" articles are "Occasional Reports" published between 2005 and 2009 by a 9/11 foundation that is no longer active or, more recently, blog posts published by his own Flashpoint organization. See Kohlmann CV at 5–7; see also, e.g., Evan Kohlmann, ISIS Operations Appear to be Unaffected by Death of al-Baghdadi, Flashpoint (Jan. 29, 2020), https://flashpoint.io/blog/isis-operations-appear-to-be-unaffected-by-death-of-al-baghdadi/. In large part, his resume does not boast publication in academic journals or other publications known for rigorous journalistic standards. Kohlmann CV at 5–7.

        Finally, the Court is not confused by Kohlmann's undergraduate training, which includes a "Certificate in Islam and Christian-Muslim Understanding." See ECF No. 9344 at 10. Kohlmann again misrepresents this credential—listing a "Minor" in "Islamic Studies (Center for Muslim Christian Understanding, Georgetown University)" on his CV, Kohlmann CV at 2, while listing a "certificate in Islamic studies from the Prince Alwaleed bin Talal Center for Muslim-Christian Understanding (CMCU) at Georgetown University" in his report, Kohlmann Report at 1. Neither is accurate. Kohlmann's undergraduate studies alone do not qualify or disqualify him as an expert. But his failure to accurately describe his academic credentials is disquieting. See, e.g., Farhane, 634 F.3d at 158–59 (affirming district court's decision to allow Kohlmann to testify in part based on "his *graduate studies* at Georgetown University's School of Foreign Service and Center for Contemporary Arab Studies" (emphasis added)); Paracha, 2006 WL 12768, at *20 (qualifying Kohlmann based, in part, on his "degree[] in . . . Islamic studies").

        Kohlmann's carelessness with these details is troubling. What gives the Court even greater pause, however, is his lack of training or professionalism beyond his long career as an expert witness. It appears that he has never been employed by the government, a think tank or

policy institute, or a research university. See Kohlmann CV. He purports to have started his "research" into "terrorist recruiters and organizers" in 1997, when he was either in high school or a freshman in college. Kohlmann Report at 1. And his CV makes plain that his "experience" consists of only one full-time job: at a company he created; where he seemingly worked with no expert oversight or guidance; and that began as a website (called Globalterroralert.com) where he reposted terrorist videos and promoted his own book. Kohlmann CV at 2; see, e.g., Alert Archive, Globalterroralert.com (Mar. 26, 2006), https://web.archive.org/web/20060326204300/http://www.globalterroralert.com/archive.html (Internet Archive webpage capture showing Kohlmann's posts between 2004 and 2006). Otherwise, Kohlmann has worked only as a consultant or as a television analyst; invariably, he was hired into these temporary positions while he was still in college or—after going straight to law school—immediately after graduating with his J.D. Kohlmann CV at 2. Kohlmann can hardly be sure, then, that he "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"—because he has no professional experience in the relevant field. Kumho Tire, 526 U.S. at 152.

There is little doubt that Kohlmann has studied terrorism extensively and is thus qualified "by knowledge"; it is much less clear, however, that his "skill, experience, training, or education" renders him qualified under Rule 702. See, e.g., In re Mirena Ius Levonorgestrel-Related Products Liability Litigation (No. II), 341 F. Supp. 3d 213, 240 (S.D.N.Y. 2018) ("In determining whether the witness has the relevant experience, courts consider factors including the degree to which that experience was developed for the litigation."); Sec. & Exch. Comm'n v. Tourre, 950 F. Supp. 2d 666, 677 (S.D.N.Y. 2013) (excluding expert who has "no experience in the CDO industry apart from acting as an expert witness"); Thomas J. Kline, Inc. v. Lorillard,

Inc., 878 F.2d 791, 800 (4th Cir. 1989) ("Although it would be incorrect to conclude that [the proposed expert's] occupation as a professional expert alone requires exclusion of her testimony, it would be absurd to conclude that one can become an expert simply by accumulating experience in testifying.").

Given the centrality of expert testimony in terrorism cases, the Court expresses serious reservations that Kohlmann's lifelong career as an expert witness is sufficient to establish a sturdy foundation for the opinions he seeks to offer. See Sotloff v. Syrian Arab Republic, 525 F. Supp. 3d 121, 134 (D.D.C. 2021) (underscoring that expert testimony is "often 'of crucial importance in terrorism cases . . . because firsthand evidence of terrorist activities is difficult, if not impossible, to obtain,' '[v]ictims of terrorist attacks . . . are often . . . unable to testify about their experiences,' and '[p]erpetrators of terrorism typically lie beyond the reach of the courts and go to great lengths to avoid detection'" (quoting Owens v. Republic of Sudan, 864 F.3d 751, 787 (D.C. Cir. 2017)); Hamen v. Islamic Republic of Iran, 401 F. Supp. 3d 85, 91 (D.D.C. 2019) (Expert testimony "is not only entirely proper, but often sufficient and even indispensable in terrorism cases." (internal citation omitted) (cleaned up)). Nevertheless, recognizing that courts have consistently found Kohlmann qualified to testify about al Qaeda's origins, history, structure, and leadership, the Court does so again in this case. See, e.g., Farhane, 634 F.3d at 159–60. The Court anticipates, however, that further limitations will be placed on his testimony at trial.

**Second**, since Kohlmann's lack of qualifications is most pronounced when he veers beyond the "scope of his limited expertise," ECF No. 9247 at 2, the Charity Defendants contend that he should not be permitted to serve as the "Plaintiffs' expert on all things," id. at 1. At a minimum, they argue, the Court should exclude Kohlmann's testimony about the Defendants'

financial practices, the organizational structures of Islamic charities in Saudi Arabia, and Islam itself. Id. at 7–10.

Kohlmann indeed lacks the formal training and expertise required to testify as an expert on financial accounting and Islam—complex and nuanced subjects that require more than self-directed or introductory study. See ECF No. 9250-43 at 375:12–18; id. at 715:4–716:10. That he has "examine[d]" or "studied" accounting documents "on the side" is inadequate.[11] ECF No. 9345-13 at 715:16–22. His undergraduate certificate in Islam and Christian-Muslim understanding is insufficient to qualify him to testify about religious doctrine. See ECF No. 9344 at 15 (crediting Kohlmann's "formal higher education regarding Islam"). (Nor, for that matter, is "know[ing] about Islamic terminology." ECF No. 9345-13 at 276:8–9.) Kohlmann's testimony explaining how "tenets of Islam are coopted into violent political movements" necessarily requires a level of expertise in Islam "as a religious faith" that he does not possess. ECF No. 9344 at 17; see ECF No. 9250-43 at 213:23–25.

Kohlmann's wheelhouse better aligns with his proffered testimony about the organizational "structures of the Charity Defendants." ECF No. 9247 at 8. He has testified before Congress on the "Role of Saudi Arabian State-Sponsored Charitable Fronts in Providing Material Support to Foreign Paramilitary and Terrorist Organizations," ECF No. 9344 at 15, and has trained investigators from the Internal Revenue Service ("IRS") and Central Intelligence Agency ("CIA") "who are focused on abuse of charitable institutions for terrorist financing purposes," ECF No. 9345-13 at 187:6–8; see also id. at 16:2–10 (describing his work as an instructor

---

[11] The Plaintiffs highlight that Kohlmann has "proffered testimony as to 'terrorist fundraising techniques,'" but that is a different subject entirely. ECF No. 9344 at 13 (quoting Kassir, 2009 WL 910767, at *2). Notably, in Kassir, the court also narrowed the scope of Kohlmann's qualifications and held that he was qualified to offer testimony only on "the origins, history, structure, leadership and various operational methods of al Qaeda and other terrorist groups"—a decision consistent with this Opinion & Order. Kassir, 2009 WL 910767, at *7.

"specifically on the issue of terrorist financing and means of charities for terrorist financing"). There is thus a nexus between Kohlmann's "superior knowledge" and "experience" in this area and "the subject matter of [his] proffered testimony." Nat'l Coalition on Black Civic Participation, 661 F. Supp. at 97. That the substance of Kohlmann's testimony still strays beyond his expertise, see, e.g., Kohlmann Report ¶ 187 ("WAMY's corporate structure has hidden other, darker secrets . . . ."), is better addressed on reliability and helpfulness grounds.

Accordingly, the Court also finds Kohlmann qualified to testify about the organizational structures of the Charity Defendants. But he is not qualified to testify about the Defendants' financial practices or about Islam, given his dearth of "skill, experience, training, or education" in those areas. Fed. R. Evid. 702. As the Court of Appeals has "emphasiz[ed]," just "because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields." Nimely, 414 F.3d at 399 n.13 (citing United States v. Roldan–Zapata, 916 F.2d 795, 805 (2d Cir. 1990).)

The limits of Kohlmann's experience and publication history also inform the Court's reliability and helpfulness inquiries. Though the "threshold question of whether a witness is 'qualified as an expert'" is "separate" from the other analyses Rule 702 requires, Nimely, 414 F.3d at 396 n.11 (citing Fed. R. Evid. 702), the "basis for Kohlmann's testimony, generally, is his years of research and tracking of terrorist information," Kohlmann Report at 6 (describing his own methodology in part by quoting an uncited 2009 court opinion from the Northern District of Georgia). Kohlmann's "case-oriented" approach sees him "juxtapose" specific "instances of a certain phenomenon" to "distill a common, accepted narrative" in his report; in other words, he relies heavily on his knowledge and previous experience to carry out the "comparative analysis" at the heart of his testimony. Kohlmann Report at 4 (internal citations omitted). That the Court

has serious concerns about these qualifications accordingly undermines his reliability and helpfulness to the jury.

Ultimately, the court must "undertake a rigorous examination" of not just "the facts on which the expert relies," but also "the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." Amorgianos, 303 F.3d at 267. And "when an expert opinion is based on . . . a methodology . . . that [is] simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." Id. at 266 (citing Heller v. Shaw Indus., Inc., 167 F.3d 146, 153 (3d Cir. 1999)).

## D.    Reliability

The Charity Defendants challenge Kohlmann's reliability on two main grounds. They contend that he (1) manipulates and manufactures evidence; and (2) resorts to speculation.

**First**, the Charity Defendants argue that Kohlmann manipulates and manufactures evidence, "taint[ing] his entire testimony." ECF No. 9247 at 10. The Plaintiffs respond that the Defendants' object merely to the substance of Kohlmann's testimony—factual disputes that "do not go to the admissibility of his testimony, but only to the weight of his testimony"—or to innocent errors that Kohlmann has since corrected. ECF No. 9344 at 21 (quoting Aventis Env't Sci. USA LP v. Scotts Co., 383 F. Supp. 2d 488, 514 (S.D.N.Y. 2005); see id. at 17–23.

Kohlmann's approach goes beyond factual disputes or meaningless mistakes. In one troubling example, he erases a phrase from a quotation that directly contradicts his thesis. Kohlmann highlights that a handful of Charity Defendants faced consequences after Saudi Arabia rolled out "high-profile regulation and new oversight aimed at curbing the use of charities to fund terrorism." Kohlmann Rebuttal Report ¶ 47. Then, he writes: "[O]n-site inspections of IIRO and WAMY offices in 2016 led to several offices being shuttered for 'several

25

administrative and financial violations . . . to ensure that financial and administrative imbalance is not exploited.'" Id. The original sentence Kohlmann quotes, however, clarified that "several offices were closed with several administrative and financial violations, *not for financing terrorism*, but to ensure that financial and administrative imbalance is not exploited." ECF No. 9247 at 11 (quoting ECF No. 9250-9) (emphasis added). In other words, Kohlmann omitted the phrase "not for financing terrorism" from his report.

To Kohlmann, this omission was entirely reasonable:

> The point of this was not to suggest that the report indicated that there was terrorist fundraising going on, but merely that [the charities] continued to violate [Saudi Arabia's] fundraising laws. So, I mean, I don't disagree with the fact that it says this, yeah, of course, but that's what I said. I said to ensure that financial and administrative imbalance is not exploited.

ECF No. 9345-13 at 761:21–762:5. "I didn't claim it was because of terrorism," he added. ECF No. 9250-43 at 760:24. The Plaintiffs agree, explaining that "Kohlmann's decision to exclude words with the ellipsis was entirely reasonable, because it was extraneous to the point being addressed." ECF No. 9344 at 19.

This is not a credible conclusion. Kohlmann offers this evidence about the Charity Defendants in a section designed to highlight "the role that Saudi-based Islamic charities (and Islamic charities more broadly) have played in financing terrorist organizations[,] including specifically Al-Qaida." Kohlmann Rebuttal Report at 19. The section is titled "The Saudi Government Position On the Role of Islamic Charities in Supporting Al-Qaida." Id. In his own words, Kohlmann's explicit goal is to rebut the defense experts who "fail to address evidence" that "these charities have continued to violate money transfer regulations aimed at preventing terrorist financing." Id. So while he may not directly claim that the IIRO and WAMY offices were "shuttered" "because of terrorism," he highlights these closures—the result of violating

new rules designed to combat terrorism financing—to make that very point: that these
Defendants "played" a "role" in funding terrorism. See id. at 19–20. The Court takes no position
on the substance of that argument, but Kohlmann's decision to omit a phrase disclaiming the
Defendants' connection to terrorism financing in a case about terrorism financing severely
undermines the reliability of his report.[12]

**Second**, the Charity Defendants allege that Kohlmann fails to consider alternative
explanations for his conclusions and resorts to speculation.[13] See ECF Nos. 9247 at 23–30; 9375
at 13–15. Kohlmann often does just that: He extrapolates nefarious narratives from selective
facts and jumps from "accepted premise[s] to . . . unfounded conclusion[s]." Deutsch, 768 F.
Supp. 2d at 426.

For instance, to establish that IIRO engaged in "money laundering" and "terrorist
financing," Kohlmann Report ¶ 77, Kohlmann collects a series of audits that highlight what he

---

[12] In another example, Kohlmann misidentifies a man named Fayez Ahmed Al-Shehri as a 9/11 hijacker, when the hijacker in question was in fact *Waleed* al-Shehri. See ECF Nos. 9247 at 10; 9250-43 at 436:4–6. Only after opposing counsel highlighted the error did Kohlmann correct his report. See ECF Nos. 9344 at 18; 9345-2. At the most basic level, a factfinder must be able to trust that the names of the individuals identified in an expert report are accurate. In failing to correctly provide even this most elemental information, Kohlmann violated a "rule every student knows." Charity Daubert I, at *16. These kinds of errors do "not reflect the level of intellectual rigor Rule 702 contemplated." Id. (internal citation omitted).

[13] The Charity Defendants also attack Kohlmann's reliance on *ipse dixit*. This charge is encompassed by their concerns about speculation. At times, Kohlmann makes pronouncements supported only by his own say-so:

- "The Jeddah-based World Assembly for Muslim Youth (WAMY) is another example of the shadowy Saudi dawah/charitable entities that have helped support Al-Qaida over the past three decades." Kohlmann Report ¶ 158.

- "From its inception, the Benevolence International Foundation (BIF) served as a means for pious, wealthy Muslims to secretly contribute to the jihad in Afghanistan." Kohlmann Report ¶ 196.

Though much of Kohlmann's report is also grounded in outside evidence, these examples and others reflect "too great an analytical gap between the data and opinion proffered." Joiner, 522 U.S. at 146.

27

calls the organization's "critical deficiencies in accounting practices and significant financial irregularities," Kohlmann Report ¶ 130. But Kohlmann never explains why, to his mind, these "deficiencies" and "irregularities" were "vehicles for illicit money laundering and providing material support to terrorists and other violent extremists." ECF No. 9344 at 32 (citing Kohlmann Report ¶ 205). His failure to do so may be, in part, due to his limited experience in accounting and financial forensics, only further buttressing the Court's finding that he is not qualified in this space. See supra I.C at 22–24.

Instead, he simply points to other analyses that suggest a connection between IIRO and terrorism, and admits to building his argument based on inference:

> Q. Do you have any evidence that the fraud that was carried on by the head of the [IIRO] Pakistan office and chief accountant was done in order to funnel money for terrorism?
>
> A. That particular incident I don't. However, I am aware of the fact that the U.S. government and U.S. Treasury Department has multiple times said that the entire IIRO network was used to fund Al Qaeda's organization. And *based on that inference*, I have to say that either it was graph [sic] or it was terrorist funding, I don't know which one it was, but clearly it was illicit.

ECF No. 9250-43 at 384:11–385:2 (emphasis added). This kind of speculation, unsupported by his own analysis, undermines the reliability of his report.[14]

Taken together, Kohlmann's carelessness, selective presentation of the evidence, and reliance on speculation and his own *ipse dixit* severely undercut the reliability of his testimony.

### E.    Helpfulness

Beyond Kohlmann's reliability issues, his testimony faces further challenges on helpfulness grounds. In the Defendants' view, his opinions should be excluded as unhelpful for

---

[14] In another instance of unreliable conjecture, Kohlmann speculates that WAMY was "connect[ed]" to "terrorist financing" because Osama bin Laden's nephew was a leader in WAMY's American chapter. Kohlmann Report ¶ 173.

four reasons: (1) he offers legal conclusions; (2) he testifies about states of mind; (3) he parrots hearsay evidence; and (4) parts of his testimony are irrelevant. See ECF Nos. 9247 at 15–22; 9375 at 8–13.

**First**, the Defendants protest that Kohlmann draws legal conclusions. See ECF Nos. 9247 at 15–17; 9375 at 8–9. He "crosses that line on several occasions." Charity Daubert I, at *10. Kohlmann repeatedly concludes that the Charity Defendants provided "material support [to] al Qaeda and affiliated organizations." Kohlmann Report ¶ 17; see also id. ¶ 205 (stating that the Defendants "provid[ed] material support to terrorists and other violent extremists"). These conclusions, among others, "usurp the jury's function to apply the law to the facts" and directly contravene the Court's instructions to "avoid[] characterizations of a Defendant's conduct as providing 'material support' to al Qaeda." Charity Daubert I, at *10, *20 (internal citations omitted) (cleaned up). They should be excluded.

**Second**, the Defendants take issue with Kohlmann's testimony about states of mind. See ECF Nos. 9247 at 17–18; 9375 at 9–10. Kohlmann repeatedly opines about individuals' and organizations' subjective intent:

- "By clothing their militant activity with charitable ideals, Arab-Afghan leaders including Usama Bin Laden *discovered that they were able to slip below the radar* of many global intelligence agencies." Kohlmann Report ¶ 19 (emphasis added).

- "Contrary to the *wishful thinking* of some former IIRO and MWL employees deposed in the present litigation, quite obviously, the financial irregularities and atypical accounting practices exercised by these dawah organizations were not acceptable for international charitable organizations, and instead represented convenient vehicles for illicit money laundering and providing material support to terrorists and other violent extremists." Kohlmann Report ¶ 205 (emphasis added).

- "*Frustrated* with the feuding at the Services Office, Bin Laden set[]up a new area for foreign mujahideen recruits at Shaykh Sayyaf's Sada training camp without asking for permission or notifying anyone *in hopes of* later presenting it as a fait accompli to Azzam." Kohlmann Rebuttal Report ¶ 14 (emphasis added).

- "*In order to evade* the attention of law enforcement and intelligence agencies, Wali Khan allegedly wired funds destined for the Bojinka plot  . . . ." Kohlmann Rebuttal Report ¶ 31 (emphasis added).

The Court has previously explained that "experts are not permitted to testify to a person's subjective motive, knowledge, or intent." KSA Daubert I (citing Marvel Characters, 726 F.3d at 135–36). That prohibition remains; "such opinions must be excluded." Id.

**Third**, the Charity Defendants claim that Kohlmann "cut[s] and paste[s]" hearsay evidence without providing any of his own analysis. ECF No. 9247 at 20 (citing Charity Daubert I, at *12); see ECF Nos. 9247 at 18–21; 9375 at 10–12. While an expert may "rely" on hearsay evidence, Charity Daubert I, at *20, the Defendants allege that Kohlmann simply "regurgitates" it, ECF No. 9247 at 20 (quoting Charity Daubert I, at *7). The Plaintiffs push back: Kohlmann "did exactly what he's supposed to do as an expert," they say: he "weighed multiple sources, used his expertise, and reached a conclusion." ECF No. 9344 at 26 n.91.

The reality is somewhere in between. At times, Kohlmann incorporates hearsay evidence to paint a more precise picture of his testimony or to inform his own commentary. See Kohlmann Report ¶¶ 20, 22 (quoting the 9/11 Commission Report and a Justice Department brief in context to advance his analysis); Kohlmann Rebuttal Report ¶¶ 60, 81, 84 (same as to just the 9/11 Commission Report); Kohlmann Report ¶¶ 112–13 (quoting a letter from a State Department official to illustrate a larger point about Mohammed Jamal Khalifa's connections to terror groups). Indeed, Kohlmann's "expertise" is in reading open source documents to compile a narrative based on his knowledge in the subject area.

But frequently, he "simply parrot[s] what [he] ha[s] read or heard." Charity Daubert I, at *11. This is most often true with respect to his proffered testimony about the Charity Defendants' finances. See Kohlmann Report ¶¶ 121, 123 (copying wholesale Treasury Department statements with no supporting analysis); id. ¶¶ 131–35 (copying Pakistan court

ruling); <u>id.</u> ¶¶ 190–94 (repeating findings from a Canada Revenue Agency report that do not help clarify his other testimony); <u>see also</u> Kohlmann Rebuttal Report ¶¶ 38, 44 (transcribing extended video clips and providing no original commentary); <u>id.</u> ¶¶ 48–51 (excerpting declassified CIA reports to merely "add additional illustrative sources" without further analysis).

Instead of "piec[ing] together bits of information from different sources and reach[ing] a studied conclusion," <u>Charity Daubert I</u>, at *4 (quoting <u>United States v. Mejia</u>, 545 F.3d 179, 198 (2d Cir. 2008)), Kohlmann commonly "provides no commentary or analysis" at all, <u>Charity Daubert I</u>, at *20. He does not "analyze his source materials so much as repeat their contents." <u>Mejia</u>, 545 F.3d at 198; <u>see also</u> <u>Charity Daubert I</u>, at *12 (finding that an expert "cannot testify to the portions of his opinion that consist of extended quotes from a single hearsay source without any analysis"). Since Kohlmann does not "apply[] [his] expertise to [much of the] hearsay evidence" he includes in his report, <u>Dukagjini</u>, 326 F.3d at 58, he "cannot properly testify to that content." <u>Charity Daubert I</u>, at *20. Instead, the factfinder "should hear it straight" from the original source. <u>Charity Daubert I</u>, at *12; <u>see also</u> <u>Mejia</u>, 545 F.3d at 198 (explaining that when an expert transmits hearsay, he denies "the jury the information it need[s]" to evaluate the credibility of the original source).

**Fourth**, the Defendants argue that much of Kohlmann's testimony is irrelevant. ECF Nos. 9247 at 21–22; 9375 10–12. They contend that his discussion of "tangential issues—far removed from Al Qaeda and 9/11 in time, location, and topic—divert the focus from the 'tort for which plaintiffs seek to impose liability' and are not 'directly relevant to resolving the legal claims at issue.'" ECF No. 9247 at 22 (first quoting <u>Twitter, Inc. v. Taamneh</u>, 598 U.S. 471, 506 (2023); and then quoting <u>Charity Daubert I</u>, at *20). The Plaintiffs maintain that the Defendants misapply the Supreme Court's recent <u>Taamneh</u> decision and this Court's <u>Charity Daubert I</u>

opinion, and misconstrue the evidence that informs Kohlmann's opinions. See ECF No. 9344 at 30–31. "[W]hen viewed in totality," they say, this evidence "relates directly to the tort at issue." ECF No. 9344 at 30.

The Court need not evaluate the downstream effects of the Supreme Court's Taamneh decision here. For this evidentiary challenge, it is sufficient to state that the evidence upon which Kohlmann relies clears the low bar for relevancy—because such evidence informs his opinions about the Charity Defendants' alleged support for the 9/11 Attacks. See Charity Daubert I, at *20 ("[T]he Court will exclude *opinions* that are not directly relevant to resolving the legal claims at issue." (emphasis added)).

## F.    Admissibility

The Court maintains serious reservations about Kohlmann's testimony. When subjected to the "rigorous" standards demanded by Daubert and the revised Federal Rules of Evidence, his expert shine begins to fade. Amorgianos, 303 F.3d at 267. Kohlmann's opinions about the Defendants' financial practices and Islam, in particular, do not stand up to scrutiny. His qualifications in those areas are weak and appear bolstered only by his two-decade career as an expert for hire. He is not a financial forensic analyst or an accountant; he is not a scholar on Islam. His proffered testimony about alleged financial irregularities largely recasts other agencies' investigations. His misleading quotations seriously call into doubt the reliability of his opinions. And his opinions about the purpose or intent of certain financial structures invite improper speculation on the state of mind of actors.

Given the Court's concerns about Kohlmann's "experience" and "training"; the limited pressure testing of his conclusions by real-world exposure or academic review; and his tendency to misstate facts, rely on speculation, and jump from "accepted premise[s] to . . . unfounded conclusion[s]," Deutsch, 768 F. Supp. 2d at 426, the Court is unwilling to allow him to render

broad opinions much beyond his extensive study of al Qaeda and terrorism networks. Kohlmann is qualified to discuss the origins, history, structure, and leadership of al Qaeda, as well as the organizational structures of the Charity Defendants. But his proffered testimony outside of these topics is neither reliable nor helpful.[15]

Whether Kohlmann's authorized testimony will be duplicative of other expert testimony also remains unclear. Where other experts are more reliable, the Court should rely on them instead. Accordingly, the trial court should evaluate whether Kohlmann should be permitted to testify at all, given the serious shortcomings of his qualifications and reliability. The motion to exclude his testimony is thus granted in part.

## II.    Matthew Levitt

### A.    Background

Dr. Matthew Levitt is a Senior Fellow and the Director of the Program on Counterterrorism & Intelligence at the Washington Institute for Near East Policy. ECF No. 9345-6 ("Levitt Report") at 1. He is also an Adjunct Professor at Georgetown University, where he co-teaches a course called "Combating Terrorist Financing." ECF No. 9345-8 ("Levitt CV") at 1. Levitt earned a Ph.D. in international relations from the Fletcher School of Law and Diplomacy at Tufts University in 2005 after completing a thesis that "examine[d] the impact of terrorism on the Arab-Israeli peace process." Levitt Report at 2. His work focuses on the financing, organization, and ideologies of "Middle Eastern terrorist groups." See Levitt Report at 4.

Before his doctoral studies, Levitt worked at the Federal Bureau of Investigation ("FBI") as a counterterrorism intelligence analyst. Levitt Report at 2. There, he "developed a special focus on fundraising and logistical support networks for Middle East terrorist groups" and

---

[15] Those sections of his testimony supporting his fourth conclusion and the parts of his fifth conclusion dealing with financial structures must be excluded. See Kohlmann Report at 7.

contributed to investigations involving the "trends and patterns of international terrorist groups," including in the immediate aftermath of the 9/11 Attacks. Id. He subsequently moved on to revolving roles in government, think tanks, and academia—including spending two years as the Deputy Assistant Secretary for Intelligence and Analysis in the Treasury Department—where he cultivated an "expertise [i]n terrorist financing, countering violent extremist ideology, and trans-national Jihadist terrorism, with a particular focus on al Qaeda and its affiliate and successor groups, including the Islamic State." Levitt Report at 4; see id. at 2–5; Levitt CV at 1.

Levitt has written several articles and books, including Hamas: Politics, Charity and Terrorism in the Service of Jihad (Yale University Press, 2006) and Hezbollah: The Global Footprint of Lebanon's Party of God (Georgetown University Press, 2013), Levitt Report at 3–4; "briefly served as a part-time consultant" to the 9/11 Commission, id. at 3; has testified before the United States Senate and House of Representatives, as well as other governmental bodies worldwide, id. at 6; and has testified as an expert witness in a number of domestic and international court proceedings, Levitt CV at 3–4. He continues to advise governments and private organizations about terrorism-related issues. See Levitt Report at 5; Levitt CV at 2.

### B.    Report

The Plaintiffs engaged Levitt to opine on the "founding and development of al Qaeda, its ideology and focus on targeting America and American interests;" "Al Qaeda's development as a terrorist group and militant organization through the establishment of alliances with other groups and cooption of local conflicts;" "Al Qaeda's radicalization, recruitment and funding modus operandi in the years leading up to the 9/11 attacks;" the "abuse of charity and religious tithing to finance terrorism;" and "Al Qaeda's particular reliance in the years leading up to the 9/11 attacks on abuse of charity and nongovernmental organizations (NGOs)—including several based in Saudi-Arabia—for recruitment, logistics, and fundraising purposes." Levitt Report at 1.

In addition to sharing conclusions about al Qaeda's history, Levitt offers three principal opinions about al Qaeda's fundraising:

> (1) "Critical to the success of al Qaeda, and for the 9/11 operation in particular, was the ability to raise, launder, place, transfer and access funds for al Qaeda's activities. From paying salaries, to bribing officials, to funding travel and training, to procuring weapons and much more, al Qaeda needed reliable funding streams to cover its significant expenses."

> (2) "Especially in the years leading up to 9/11, al Qaeda relied heavily on abuse of charity to raise, launder and move money for its terrorist purposes."

> (3) "Some of the most significant examples of such charities were based in Saudi Arabia and were tied to the Saudi government and its ministries and instrumentalities. The support these entities provided al Qaeda was critical to the terrorist group's development and operational prowess[.]"

Id. at 1–2. In a separate report, he also responds to various expert reports submitted by the Defendants. ECF No. 9345-7 ("Levitt Rebuttal Report").

## C.    Qualifications

Levitt's overall qualifications are difficult to dispute.[16] Still, the Charity Defendants question his credentials on religion, Islam, Shariah, al Qaeda, Saudi Arabian charities, accounting, finance, and auditing. See ECF Nos. 9247 at 41–43; 9375 at 19–20. Some of these challenges are easy to resolve. Levitt is not a religious expert. See ECF No. 9344 at 48 (he is "not offered as an expert on religion, Islam, or Shariah"). His opinions on "*Dawa* in Islam" must therefore be excluded. Levitt Report at 21–22; id. at 23 (asserting that "the *dawa* culture often features anti-democratic and anti-western undertones"). But Levitt's experience, especially at the Treasury Department, qualify him to testify about fundraising by religious or charitable organizations that allegedly supported terrorism. See Levitt Report at 25–28. Thus, Levitt's use

---

[16] Indeed, his work has been favorably cited by the Supreme Court. See Levitt Report at 4; Holder v. Humanitarian L. Project, 561 U.S. 1, 30–31 (2010).

of the term "Economic Jihad" is connected to his core area of expertise and is not testimony about the practice of Islam. See id.

At first blush, Levitt's qualifications to testify about al Qaeda's origins, history, and structure might present a closer question. On the one hand, the Defendants allege that his expertise "pertains to the Palestinian-Israeli conflict, Hamas and Hezbollah, and state sponsors of terrorism like Iran," not to al Qaeda. ECF No. 9247 at 41. They also highlight that Levitt's prior expert testimony has "never" focused on "Al Qaeda's pre-9/11 activity." Id. at 42 (referencing Levitt Dep. Tr. 49:22–50:2, ECF No. 9250-30). On the other hand, Levitt holds himself out as an expert on "Middle Eastern terrorist groups" "with a particular focus on al Qaeda and its affiliate and successor groups, including the Islamic State." Levitt Report at 4. His experience at the FBI included "work on Al Qaeda . . . including a senior analytical position during the millennium plot and also in the 9/11 investigation." ECF No. 9250-30 at 30:7–12. He advised the 9/11 Commission's "al Qaeda and other transnational threats" team, albeit "briefly." Levitt Report at 3. And his scholarship has examined al Qaeda, though often in the post-9/11 context. See Levitt CV at 4–7 (discussing, among other topics, the history of ISIS); see also ECF No. 9250-30 at 49:10–21 (noting "the history of ISIS coming out of Al Qaeda"); id. at 53:10–14 ("I've spent a significant amount of time in and out of government focused on other terrorist groups, most specifically Al Qaeda and more recently the Islamic [S]tate.").

Ultimately, Levitt's "superior knowledge, education, [and] experience," Nat'l Coalition on Black Civic Participation, 661 F. Supp. 3d at 97, are sufficient to "permit him to testify within the scope of his stated expertise" on al Qaeda, Charity Daubert I, at *13. His background in matters "directly or closely related to those at issue here—notwithstanding disputes as to the quantum or depth of his experience—justify finding him qualified to testify." KSA Daubert I at

14. That the Defendants find his expertise "tangential" is a question of weight, not admissibility. ECF No. 9247 at 43.

The same is true of his testimony about Saudi Arabian charities, accounting, finance, and auditing. Levitt's distinguished career makes clear that he "has expertise on 'the issue of terrorist abuse of charities[.]'" ECF No. 9247 at 43 (quoting ECF No. 9250-30 at 53:22–54:2). Although he may not, as the Defendants allege, "have expertise or formal training in accounting or finance or in the evaluation of audit reports," ECF No. 9247 at 41; see also ECF No. 9250-30 at 63:3–7, and may be more "focused on charities based in Palestine and Israel," ECF No. 9247 at 43, he nonetheless possesses considerable "knowledge, education, [and] experience" about terrorism financing in general and about Saudi Arabian charities in particular, Nat'l Coalition on Black Civic Participation, 661 F. Supp. 3d at 97. He has "met with officials of Gulf charities," "provided trainings for Gulf states seeking to put in place charitable oversight structures," ECF No. 9250-30 at 55:7–15, and served as the Deputy Assistant Secretary for Intelligence and Analysis at the Treasury Department, where he evaluated at least one of the charities at issue in this case. See Levitt CV at 1; ECF No. 9247 at 32. He is unqualified to testify directly to the "technical issues" involved in accounting, finance, and auditing, ECF No. 9375 at 19, but he is being offered as an expert only "as those subjects relate to the financing of terrorism"—where he is amply qualified, ECF No. 9344 at 49. The Defendants' concerns about Levitt's testimony on these subjects thus also go to weight instead of admissibility.

In short, Levitt is qualified to testify about al Qaeda's origins, history, and structure; Saudi Arabian charities; and accounting, finance, and auditing as they relate to terrorism financing. He may not testify about religion, Islam, or Shariah.

### D.    Reliability

The Charity Defendants challenge Levitt's reliability only with respect to an "offhand comment" he makes about WAMY in the middle of his report. ECF No. 9247 at 44–45 (citing Levitt Report at 28–29). The Court agrees that Levitt's brief discussion of WAMY does not reflect the kind of rigor and expert analysis required under Rule 702. Kumho Tire, 526 U.S. at 152; Charity Daubert I, at *16.

Levitt's discussion of WAMY is essentially limited to one page and is based almost entirely on a 2005 Dutch General Intelligence and Security Service report, a Canada Revenue Agency decision, and the 9/11 Commission Report. While relying on hearsay evidence is accepted practice in terrorism cases, with regards to WAMY, Levitt offers "no commentary or analysis"—rendering his testimony unreliable. Charity Daubert I, at *20.

### E.    Helpfulness

The Charity Defendants attack Levitt's helpfulness more broadly. They contend that his testimony is unhelpful because (1) he provides legal conclusions; (2) he is a conduit for hearsay; and (3) he offers irrelevant opinions.

**First**, the Defendants challenge Levitt's "impermissible legal conclusions." ECF Nos. 9247 at 37; 9375 at 17. At numerous points throughout his report, Levitt "concludes that Defendants provided 'material support' to al Qaeda." Charity Daubert I, at *10; see, e.g., Levitt Report at 31, 35. That is prohibited. See Charity Daubert I, at *20. Levitt may "speak to the type of resources an organization or individual offered and their express aims," but he may not "speak to Defendants' liability." Id. at *20, *21. Levitt will not be permitted to testify as to whether any support constituted "material support." That is a finding reserved for the factfinder.

**Second**, the Defendants insist that Levitt inappropriately incorporates hearsay into his testimony, arguing that he quotes "extensively from various documents without applying any

analysis or expertise." ECF Nos. 9247 at 37–40; 9375 at 17–18. The Court has repeatedly discussed the use of hearsay in connection with terrorism expert testimony. See Charity Daubert I, at *4, *20. Quoting to support a claim or assessment is permissible; quoting without analysis is not. Id. While Levitt quotes from multiple sources, his conclusions are drawn from his decades of experience analyzing source material, and not from the sources themselves. This use of hearsay evidence is acceptable.

**Third**, the Charity Defendants protest that "Levitt's testimony covers many irrelevant topics." ECF Nos. 9247 at 40; 9375 at 18. As discussed, relevance is a low bar: expert testimony is relevant if it "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Amorgianos, 303 F.3d at 265 (cleaned up) (applying Rule 401 to expert testimony). The Court has previously explained that testimony clears that bar if it provides "helpful context." Charity Daubert I, at *19.

Much of Levitt's disputed commentary meets this standard. His brief discussion of America and Britain's growing awareness of terror financing after 9/11, for example, will inform the jury's understanding of the practice before 9/11. See Levitt Report at 13. His explanation that charities often adopt aliases will help clarify for the jury the mutable non-profit ecosystem it will have to consider. Id. at 14–15. By highlighting that Hamas operatives work day jobs "within the group's network of charities and social service organizations," Levitt's report will shed light on the interplay between charities and terrorist organizations; mentioning IIRO's alleged Hamas support, meanwhile, will offer more context about that specific organization's purported relationship with terror groups. Id. at 14, 37. And Levitt's "[l]imited" mention of other charities "illustrate[s] general principles" that will help the jury navigate the knotty terrain it will have to

traverse in this particularly complex case. <u>Charity Daubert I</u>, at \*14 (citing <u>Sec. & Exch.</u>
<u>Comm'n v. Ambassador Advisors, LLC</u>, 576 F. Supp. 3d 250, 257 (E.D. Pa. 2021) (permitting
experts to "compare a party's conduct to [industry] customs and practices")); <u>see</u> Levitt Report at
17 (discussing the prosecution of the Holy Land Foundation to demonstrate the U.S.
government's "efforts to crack down on the abuse of the charitable sector by terrorist
organizations"), 24 (using the Al Haramain Islamic Foundation as an example to show that "Al
Qaeda took two approaches to using charities for fund-raising"). Ultimately, these select
opinions will help "inform the jury's decision as to whether Defendants' alleged relationships
with terrorist actors constituted material support." <u>Charity Daubert I</u>, at \*6; <u>see also</u> <u>Charity</u>
<u>Daubert I</u>, at \*14 (quoting <u>Marvel Characters</u>, 726 F.3d at 135–35) ("History can provide
important 'background knowledge or context that illuminates or places in perspective past
events.'").

  At the same time, some of Levitt's testimony falls short of the relevancy requirements.
His more "extensive discussions of non-Defendant charities" "will not help the jury understand
the dynamics between the relevant" actors in this case. <u>Charity Daubert I</u>, at \*15, \*19; <u>see</u> Levitt
Report at 24–25, 27 (discussing CARE International); <u>id.</u> at 39–45 (examining the Al Haramain
Islamic Foundation). And his one-paragraph detour into al Qaeda's 2011 operations will not
elucidate the issues that will one day come before the factfinder. <u>See</u> Levitt Report at 12.
"Conscious that the jury deciding this case will be faced with voluminous evidence, the Court
excludes this background information as irrelevant."[17] <u>Charity Daubert I</u>, at \*19 (citation
omitted).

---

[17] The Court has already discussed Levitt's opinions about matters of faith, so need not address them
further. <u>See</u> *supra* II.C at 35–36; Levitt Report at 25–28.

**F.      Rule 403**

Finally, the Charity Defendants argue that Levitt's testimony about the Treasury

Department's designation process violates Rule 403. See ECF Nos. 9247 at 31–36; 9375 at 15–

17; Fed. R. Evid. 403. Because Levitt was intimately involved in the Treasury Department's

designation of two IIRO branch offices "for facilitating fundraising for al Qaida and affiliated

terrorist groups," ECF No. 9250-34, Attachment A at 3, the Defendants allege that his testimony

on the topic "would be unfairly prejudicial and would be likely to confuse and mislead the jury."

ECF No. 9247 at 31. Specifically, they charge that Levitt relies on classified information that

they cannot access; that Levitt's involvement in the IIRO designations allows him to use his

testimony as both a "sword" and a "shield"; and that Levitt's testimony is duplicative of another

expert's description of the designation process. See ECF No. 9247 at 31–36.

The Plaintiffs respond that Levitt's designation testimony withstands scrutiny under Rule

403 because it does not depend on private information; that Levitt relies on his broader Treasury

Department experience—not just his experience evaluating IIRO; and that his testimony is

unique. See ECF No. 9344 at 36–44. Ultimately, the Court must assess whether the probative

value of Levitt's designation testimony is substantially outweighed by the risk of unfair prejudice

or confusion. Fed. R. Evid. 403.

First, the Defendants claim that Levitt relies on classified information to shape his

opinions about the Treasury Department's designation process. See, e.g., ECF No. 9247 at 31.

This argument is unpersuasive. Levitt's testimony relies on public information or information

otherwise accessible to the Defendants, not on classified information. See Levitt Report at 18;

Levitt Rebuttal Report at 4–7; see also ECF No. 9345-14 at 196:4-7 ("The process as we have

discussed it is not itself a classified matter, which is why I'm able to discuss it."); U.S. Gov't

Accountability Off., GAO-15-629, Combatting Terrorism: Foreign Terrorist Organization

Designation Process and U.S. Agency Enforcement Actions (2015),

https://www.gao.gov/assets/gao-15-629.pdf. His challenged testimony addresses the Treasury

Department's designation process *itself*, not the intricacies of the Department's decision to

designate two IIRO offices in 2006. See Levitt Report at 18; Levitt Rebuttal Report at 4–7.

While the Defendants take exception to the Treasury Department's decision to bar Levitt from

testifying as a fact witness about the specifics of the IIRO designations, as well as the secrecy of

the evidentiary package that led to those designations, they are not unfairly prejudiced when it

comes to challenging Levitt's opinions about the designation *process*. See, e.g., ECF No. 9344 at

41–42 n.153 (listing the myriad questions the Defendants asked Levitt about the designation

process during his deposition).

  Second, the Defendants charge that Levitt benefits from an "aura of credibility" derived

from his firsthand experience within the Treasury Department's secretive designation process. In

re Mirena IUD Prods. Liab. Litig., 169 F. Supp. 3d 396, 473 (S.D.N.Y. 2016). Levitt's testimony

about that process, however, is based on his cumulative Treasury experience and on non-

classified information. See Levitt Report at 18. His experience is an asset, not an impediment: as

an expert in the Treasury Department's designation process itself, he can reliably help the

factfinder come to its own conclusions about the IIRO designations in question. Id.

  Nonetheless, Levitt cannot testify as a percipient fact witness. He cannot discuss the

factual or evidentiary predicates for a particular organization's designation and cannot testify to

the "rigor" or "robust[ness]" of the designation process. Id. As the Plaintiffs themselves

acknowledge, the jury need not know that Levitt participated in any specific designation

decisions for him to testify about the process in general. ECF No. 9344 at 43. The Court concurs:

Levitt may testify about the designation process generally but may not discuss specific designation decisions.

Third, Levitt's testimony about the Treasury Department's designation process is not duplicative. While another of the Plaintiffs' experts, Jimmy Gurulé, offers some of the same general information about the process in his report, see ECF No. 9345-9 at 5–8, Levitt delivers a detailed and approachable account of the Government's considerations at every stage. See Levitt Rebuttal Report at 5–7. The probative value of his testimony on the Treasury Department's designation process is therefore not substantially outweighed by a risk of unfair prejudice or confusing the issues. Fed. R. Evid. 403.

### G.    Admissibility

Levitt's testimony must be restricted, but need not be excluded in large part. He may testify about al Qaeda's origins, history, and structure; Saudi Arabian charities; accounting, finance, and auditing as they relate to terrorism financing; "Economic Jihad"; and the Treasury Department's designation process. He may not testify about religion, Islam, or Shariah; his involvement in specific designation decisions; or the quality of the Treasury Department's designation process. Where he draws specific comparisons to non-Defendant charities, his testimony is permissible; but broad, extensive discussions are prohibited. The motion to exclude his testimony is largely denied.

## III.    Victor Comras

### A.    Background

Victor D. Comras has spent a long and distinguished career at the vanguard of efforts to impose economic and financial sanctions across the globe. See ECF No. 9256-1 ("Comras Report") at 1–3. He first became a Foreign Service Officer in 1966 and has since worked in government, diplomacy, and international law, mostly at the State Department and the United

Nations. Id. Notably, he served as the Director of the State Department's Office of Sanctions and Export Controls from 1991 to 1994 and was "the chief U.S. architect of the international economic sanctions against Serbia during the Bosnia and subsequent Kosovo wars." ECF No. 9345-12 ("Comras CV") at 3. Following the 9/11 Attacks, he served as "one of five international monitors charged with overseeing the implementation of UN Security Council measures against al Qaeda and the Taliban." Id. at 4. "In that capacity," he explains, "he led the Monitoring Group's efforts to gather and report information related to the financing of terrorism." Id. Later, he was appointed to represent the United States on "the UN Security Council's special Panel of Experts on the implementation of UN sanctions and mandated export controls on North Korea." Id.

Comras now works as a private attorney and consultant, specializing in "measures to combat money laundering and terrorism financing" and "the development, implementation and enforcement of economic and financial sanctions." Comras Report at 1. He has testified before U.S. Congressional and Canadian Parliamentary committees and has written numerous books and articles about terrorism financing. See Comras CV at 2–3; Comras Report at 3.

### B.    Report

The Plaintiffs asked Comras to provide expert testimony about the allegations that two Saudi nationals, Yassin Kadi ("Kadi") and Wael Jelaidan ("Jelaidan"), supplied material support to Osama bin Laden and al Qaeda to help finance the 9/11 Attacks. See Comras Report at 1. The Court has previously entered a default judgment against Jelaidan. See ECF No. 9241. The current challenge to Comras's testimony therefore focuses only on his testimony as it relates to Kadi. See ECF Nos. 9255, 9374.

Comras testifies that Kadi helped "establish[]" a "financial network" to "channel funds for al Qaeda's organization and its activities." Comras Report at 5. "These funds," Comras

44

maintains, "were provided to Osama bin Laden and al Qaeda through, and with the cooperation of, officials within or closely associated with the Saudi Government." Id. The "government of Saudi Arabia" itself also "supported this effort and/or intentionally turned a blind eye to these activities" for years before and after September 11, 2001, he alleges. Id. at 6. Ultimately, Comras concludes that Kadi's efforts "contributed substantially to al Qaeda's ability to launch coordinated and sophisticated terror attacks against Americans, including the [9/11 Attacks]." Id. at 6.

In a second report, Comras rebuts the testimony of Kadi's expert witness Jonathan Benthall. See ECF No. 9256-2 ("Comras Rebuttal Report"). The Court previously assessed Benthall's reports and largely admitted his testimony. See Charity Daubert I, at *13–15.

## C.    Qualifications

Kadi puts forth a "limited" challenge to Comras's qualifications. ECF No. 9374 at 1; see ECF No. 9255 at 3. He first protests that Comras's experience qualifies him only to "identify perceived risks of future conduct, not to prove past conduct." ECF No. 9255 at 3. Of course, an expert's role is not to "prove" a matter in dispute, but to "assist the trier of fact to understand the evidence or to determine a fact in issue." Daubert, 509 U.S. at 591; see also Mejia, 545 F.3d at 189 (quoting Fed. R. Evid. 702 advisory committee's note) (Rule 702's "Advisory Committee Notes refer to the traditional common law rule that expert testimony is called for when the 'untrained layman' would be unable intelligently to determine 'the particular issue' in the absence of guidance from an expert."). And Comras's extensive "experience" and "superior knowledge" unquestionably enable him to help the trier of fact better understand "the subject matter of [his] proffered testimony": terrorism financing. Nat'l Coalition on Black Civic Participation, 661 F. Supp. 3d at 97.

Second, Kadi questions Comras's qualifications because he has "apparently . . . never served before as an expert witness." ECF No. 9374 at 1. This is a red herring: "even the most qualified expert must have his first day in court." Locascio, 6 F.3d at 937. Accordingly, Comras is qualified to testify.

### D.    Reliability

The bulk of Kadi's critique focuses on reliability. He attacks Comras's testimony on five grounds, arguing that Comras: (1) misapplies his methodology; (2) cherry-picks evidence; (3) traffics in "guilt by association"; (4) resorts to *ipse dixit*; and (5) misrepresents and distorts evidence. He then takes aim at Comras's commentary on one particular subject—the so-called "Maram Affair"—because he argues it is illustrative of Comras's overall unreliability.

**First**, Kadi questions Comras's adherence to his stated methodology. See ECF No. 9255 at 3–12; see also ECF No. 9374 at 5–6, 8. Kadi does not object to Comras's methodology itself—which relies on Comras's vast experience, social science, and forensic accounting to evaluate source information, see Comras Report at 4–5—but instead argues that Comras "ignore[s] the foundational principles" of his own "purported" approach. ECF No. 9255 at 3–4. Kadi takes particular issue with how Comras assesses "red flag" indicators of terrorist financing, as well as his reliance on designations made by the Treasury Department's Office of Foreign Assets Control ("OFAC"). See ECF No. 9255 at 4–7 (red flags), 7–12 (OFAC designations).

Comras relies on "red flag" indicators to "signal[] the potential or likelihood of terrorism financing activities." Comras Report at 4. These signals were "developed by several public and private financial institutions, including" the Financial Action Task Force ("FATF"), Comras Report at 4, whose "anti-money laundering and counter-terrorism finance standards" the Court

has recognized as "global norms," Charity Daubert I, at *8 (internal citation omitted).[18] But Kadi protests that Comras treats these "red flags as evidence of actual terrorist financing rather than as a warning that certain conduct indicates *the possibility* of terrorist financing." ECF No. 9374 at 8 (emphasis in original). A red flag is merely an alert about "*potential* terrorist financing transactions," Kadi stresses, "not a finding that such a transaction has occurred." ECF No. 9255 at 5 (emphasis in original).

That is exactly how Comras describes and deploys red flags. Comras is clear that his enumerated red flags are not *proof* of terrorist financing, but *factors* to "be considered in evaluating the likelihood of terrorist financing." Comras Report at 7. He does not give the impression that finding a red flag in any of Kadi's transactions equates to an open-and-shut case—to the contrary, Comras explains that his goal is to "identify and evaluate 'red flags'" to determine "the *likelihood* [that those transactions] were used to provide resources and financial assistance to bin Laden and other terrorist support groups." Comras Report at 4, 8 (emphasis added); see, e.g., Comras Report at 42 (discussing how a "lack of accounting information . . . raises serious 'red flags' concerning the *potential* that some of these funds were siphoned off for terrorism or related illicit purposes" (emphasis added)). See also Comras Rebuttal Report at 11–12 ("Red flags serve to alert regulators to *potential* money laundering and terrorism financing

---

[18] Comras derives his list of "red flags" not just from the FATF, but from a wider group of leading institutions that also includes the EGMONT Group of Financial Intelligence Units (an informal network of 164 national financial intelligence units), the International Monetary Fund, the Wolfsberg Group (an association of 13 global banks), and the Federal Financial Institutions Examination Council. Comras Report at 4.

activities. However, it is the transactions themselves, not the red flags that raise the specter of culpability." (emphasis added)). Kadi's argument is therefore found wanting.[19]

Kadi also complains that Comras improperly combines the FATF's two types of terrorism financing indicators—merging the less serious "Risk Indicators," which highlight that "support to terrorism is a possible explanation, but not necessarily the only possible explanation" for a transaction, with "Terrorist Abuse Indicators," which "denote a stronger relationship with terrorism-related activities." ECF No. 9256-8 ("FATF Report") at 65; see ECF No. 9255 at 5–7. In doing so, Kadi alleges, "Comras attempt[s] to create the impression in his Report that his methodology ha[s] the imprimatur of the FATF" when he did not follow the FATF's specific approach. ECF No. 9255 at 6; see also ECF No. 9256-3 at 299:6–19 (Comras confirmed at his deposition that he did not distinguish between the two types of indicators: "You're asking me to divide them between terrorist abuse indicators and risk indicator. I'm sorry, that may be an exercise for others. That's not one of the exercises that I went through . . . I did not divide out the two.").

In laying out his methodology, however, Comras does not claim that he followed the FATF's approach precisely. See Comras Report at 4. Instead, marshaling his expertise and experience, he derives his "own list of red flags" by synthesizing indicators used by a group of

---

[19] Kadi also argues that Comras "opines on ultimate issues of liability." ECF No. 9255 at 1. Though this is a matter of helpfulness, not reliability, he appears to weave this critique into his "red flag" argument. See id. at 6–7. Specifically, Kadi takes issue with Comras's discussion about Euroinvest, one of Kadi's companies in Bosnia. See id.; Comras Report at 32–33. Kadi protests that Comras says he "found 'probable terrorism financing' from facts he determined to exist with respect to Euroinvest." ECF No. 9255 at 6–7 (quoting Comras Report at 32). But Comras does not conclude that he "found" probable terrorism financing vis-à-vis Euroinvest. Instead, Comras deduces that Euroinvest's characteristics "*point to* probable terrorism financing"—a far less conclusory claim. Comras Report at 32 (emphasis added).

During this argument, Kadi also makes a one-time appeal to Rule 403. ECF No. 9255 at 7. It is equally ineffectual. The significant probative value of Comras's testimony, which helps to unpack and analyze complex financial networks, is not substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 403.

leading organizations in the field. ECF No. 9256-3 at 297:5–6; see supra III.D at 46–47 n.18. This does not undercut the reliability of his methodology; it strengthens it. See Charity Daubert I, at *3 (quoting Marvel Characters, 726 F.3d at 135–36) (praising an expert's ability to "synthesize dense . . . texts" and "identify, gauge the reliability of, and interpret evidence that would otherwise elude, mislead, or remain opaque to a layperson"). Even the FATF itself acknowledges that "[d]ifferent indicators can be detected by different actors depending on the type of information involved." FATF Report at 65. Kadi's allegations, therefore, largely "amount to disagreements with [Comras]'s conclusions about the weight of the evidence," not with the reliability of his approach. KSA Daubert I at 49.

The same is true of Kadi's concern that Comras improperly relies on OFAC materials. ECF No. 9255 at 7–12. Comras does not draw a straight line from prior OFAC designations to conclude that Kadi "was in fact involved in terrorism financing," as Kadi alleges. ECF No. 9255 at 8. Comras includes these examples as individual pieces of the overall puzzle he is putting together by "apply[ing] his methodology to the facts of the case." Charity Daubert I, at *10. Kadi may challenge these conclusions at trial. But as the Advisory Committee Notes to Rule 702 explain, "proponents 'do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable . . . The evidentiary requirement of reliability is lower than the merits standard of correctness.'" Fed. R. Evid. 702 advisory committee's note to 2023 amendment (citing advisory committee's note to the 2000 amendment). Comras has offered "some explanation as to how [he] came to his conclusion[s] and what methodologies or evidence substantiate" them. Charity Daubert I, at *6 (quoting Riegel

v. Medtronic, Inc., 451 F.3d 104, 127 (2d Cir. 2006)). Kadi's first challenge to the reliability of Comras's testimony is accordingly unpersuasive.

**Second**, Kadi argues that Comras fails to consider the "obvious alternative[s]" to his opinions. ECF No. 9255 at 1 (quoting Charity Daubert I, at *2). He insists that Comras consistently speculates that Kadi's transactions are "suspect" when they "lack[] an explanation." Id. at 12; see id. at 12–14. Once again, however, Kadi's complaint goes to Comras's conclusions. Comras applies his "red flag" methodology to reason that when a "rationale for [certain] transactions is never presented," id. at 12 (quoting Comras Report at 33), or the "original source or purpose of [certain] funds [is] never explained," ECF No. 9255 at 13 (quoting Comras Report at 42), those transactions "rais[e] suspicions," ECF No. 9255 at 14 (quoting Comras Report at 17). See also FATF Report at 68 (demonstrating that it is a Risk Indicator when "[r]equests to transfer [non-profit] funds are accompanied by vague justifications"). Kadi might dispute Comras's conclusions—and the Court takes no position on their substance—but that is a matter of weight, not admissibility.

What is more convincing is Kadi's related critique, scattered throughout his brief, that Comras cherry-picks evidence. See, e.g., ECF Nos. 9255 at 9–12, 17; 9374 at 3–4. For instance, Kadi accuses Comras of downplaying a "three-week on-site investigation of Mr. Kadi's companies in Albania" by OFAC in 2002, allegedly because the investigation "yielded no evidence of any connection between Mr. Kadi and al Qaeda" and "undercut two of Comras's assertions about Mr. Kadi." ECF No. 9255 at 9, 10. Comras reduces this event to a footnote and fails to address any of the investigation's conclusions. See Comras Report at 29 n.108. The Plaintiffs make no attempt to argue otherwise. See ECF No. 9344.

Similarly, Comras neglects to paint a complete picture of Kadi's decision to hire Amir Mehdi as the "local Manager/Regional Director" of Kadi's Muwafaq Foundation in Pakistan. See Comras Report at 40–42. "It was generally known that Amir Mehdi maintained a close association with bin Laden and al Qaeda activists and that he was actively engaged with the Pakistani terrorist group Harakat ul-Mujahidin and Harakat-al-Ansar," Comras reports. Comras Report at 40. But the Swiss police report Comras cites explains that Kadi hired Mehdi "because he had worked as a teacher in Peshawar and Islamabad" and "had excellent local knowledge." ECF No. 9256-16 at 49. Comras likewise omits this justification. See Comras Report at 40.

These omissions "appear[] convenient" and raise questions about Comras's decisions to downplay countervailing evidence—but they "do[] not wholly undermine his analysis."[20] KSA Daubert I at 49. They "warrant[] discounting the weight" of Comras's opinions, not completely excluding his testimony. Id. at 50.

**Third**, Kadi contends that he is tarnished through "guilt by association." ECF No. 9255 at 14; see ECF Nos. 9255 at 14–16; 9374 at 10. The Plaintiffs reply that by discussing Kadi's relationships with "others engaged in terrorist financing activities," Comras is properly "expos[ing] the web of business and financial relationships between these bad actors, which demonstrates their collaborative history of terrorist financing." ECF No. 9344 at 67. This issue presents a close question.

Expert testimony "may not invite the jury to find guilt based on a defendant's associations." United States v. Zhong, 26 F.4th 536, 557–58 (2d Cir. 2022) (collecting cases). In particular, guilt by association is impermissible when it is inferred from the conduct of an

---

[20] The same is true of the fact that Comras did not include a blog post he wrote in 2005, entitled "*It's Time to Put Yasin Al Kadi Out of Business!*," in his list of publications. See ECF No. 9255 at 2; 9374 at 2–3; Comras CV at 4–5.

"unrelated" person. See United States v. Cruz, 981 F.2d 659, 663 (2d Cir. 1992) ("[G]uilt may

not be inferred from the conduct of unrelated persons."); United States v. Castillo, 924 F.2d

1227, 1234 (2d Cir. 1991) ("[W]e take serious issue with the Government's use of an expert

witness to propound the impermissible theory that appellants' guilt could be inferred from the

behavior of unrelated persons."). In Castillo, for example, the Court of Appeals barred an

expert's testimony due to "guilt by alleged association" because the Government attempted to

use that expert's testimony to show that "the defendants in this case acted the way *every* good

drug dealer in Washington Heights acts in the normal course of events." Castillo, 924 F.2d at

1234 (emphasis in original).

Comras, by contrast, does not generally suggest that Kadi is guilty because of an

associational "syllogism." Id. He does not claim that because people "of a certain type classically

engage in a certain kind of behavior," and because Kadi is allegedly connected to those "type[s]"

of people, then Kadi necessarily "engaged in that behavior." United States v. Mulder, 273 F.3d

91, 102 (2d Cir. 2001). Instead, Comras "offer[s] expert testimony both as background for an

offense and," presumably, "to assist in proving one or more elements of the offense." Id. He is

"free" to do so. Id. Even Kadi acknowledges that Comras's testimony about his connections

could "serve as evidentiary support for Comras's opinion that [Kadi] and [the] Muwafaq

Foundation had a 'role in the channeling of funds to al Qaeda.'" ECF No. 9255 at 16 (quoting

Comras Report at 56).

Indeed, when an expert's analysis necessarily requires them to examine and interpret an

individual's relationships, as Comras's methodology does, mere mention of those relationships

cannot *per se* taint their testimony. See Comras Report at 7–8 (listing "red flags," including:

"The parties to the transaction (owner, beneficiary, etc.) are from countries known to support

terrorist activities and organizations"; "Inclusion in the transaction of an associated individual in the United Nations 1267 Sanctions list"; "Media reports that an account holder is linked to known terrorist organizations"). So long as Comras's testimony concerns Kadi's connections as they "relate" to the underlying allegations, then, his testimony is permissible. Cf. Cruz, 981 F.2d at 663; Castillo, 924 F.2d at 1234 (proscribing expert testimony "inferred from the behavior of unrelated persons").

Most of Comras's challenged testimony fits this bill. See Comras Report at 17 (discussing Kadi's relationship with Khalid bin Mahfouz as it relates to evidence of alleged terror financing); 18 (noting Kadi's financial transactions with an associate of the head of the National Islamic Front ("NIF")); 30–33 (examining Kadi's "close relationship" with Jelaidan, especially as it relates to alleged terror financing); 39 (highlighting that Osama bin Laden "was a part owner of the al Shamal Islamic Bank," where Kadi banked); 39, 55 (explaining that Kadi engaged in "unmonitored business transactions" with a Sudanese company owned by the NIF); 40 (spotlighting that Kadi hired an alleged terrorist to run Muwafaq's operations in Pakistan).

Where Comras merely invokes a "troubling link[] to terrorists," however, his testimony must be excluded. 9/11 Commission Staff Report, Monograph on Terrorist Financing 110, https://govinfo.library.unt.edu/911/staff_statements/911_TerrFin_Monograph.pdf (noting that there is "a difference between troubling 'links' to terrorists and compelling evidence of supporting terrorists"); see, e.g., Comras Report at 44 (linking Kadi to a former member of the "Al Muwafaq Brigade" in Bosnia, who was later arrested for a "plot to blow up the Los Angeles airport").

**Fourth**, Kadi objects to Comras's *ipse dixit*. See ECF Nos. 9255 at 14, 18–19, 21–23; 9374 at 4. Throughout his report, Kadi contends, Comras relies only on his own say-so:

- "Together, Yasin Kadi and Khalid bin Mahfouz used their resources to propagate a radical Islamic theology that contributed to the virulence and capabilities of such terrorist organizations as al Qaeda." Comras Report at 16.

- "Between $926,000 and $1.28 million . . . was likely skimmed off for other purposes, including for al Qaeda." Comras Report at 50.

Though not all of the examples that Kadi cites are backed only by Comras's *ipse dixit*, see, e.g., ECF No. 9255 at 14 ("raising suspicions"); see *supra* III.D at 47–50, the above testimony "does not follow from interpreting the record evidence using reliable methods. It ultimately rests on [Comras's] authority and thus does not meet standards of reliability." KSA Daubert I at 52; see Joiner, 522 U.S. at 146. It must be excluded.

**Fifth**, Kadi alleges that Comras "misrepresents and distorts facts and sources." ECF No. 9255 at 1; see ECF Nos. 9255 at 19–24; 9374 at 2–3. For example, Kadi correctly points out that Comras misattributes a chapter in the book The Charitable Crescent to Kadi's expert witness, Jonathan Benthall, when it was actually written by Benthall's co-author, Jérôme Bellion-Jourdan. See Comras Rebuttal Report at 7 n.8 ("In 1996, as a journalist, Mr. Benthall visited a displaced person camp serviced by Muwafaq in Sudan."); ECF No. 9256-25 at 111 (listing Jérôme Bellion-Jourdan as the author of the relevant book chapter), 124 ("I experienced this myself in 1996 when I asked to visit the Jabal Awliya camp . . . on the outskirts of Khartoum."). The offending paragraph and accompanying footnote, while tangential and likely inconsequential to Comras's overall analysis, must nevertheless be excluded.

More troublingly, Kadi identifies an instance in which Comras omits qualifying language from a quotation to buttress one of his central arguments. Comras writes: "In addition, entire charities . . . wittingly participated in funneling money to al Qaeda." Comras Report at 13 (ellipsis in original). The original sentence, however, reads as follows: "In addition, entire charities, such as the al Wafa organization, *may have* wittingly participated in funneling money

to al Qaeda." 9/11 Commission Report at 170 (emphasis added), https://www.9-11commission.gov/report/911Report.pdf. That Comras distorted a quotation to remove the narrowing "may have" raises serious concerns about the reliability of his report—and the misleading quotation must of course be excluded. But "a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible." Amorgianos, 303 F.3d at 267. On its own, then, this questionable decision does not necessitate excluding all of Comras's testimony.[21]

Kadi is free to "quibbl[e]" with his other concerns, which go to weight, "on cross-examination." Charity Daubert I, at *6 (quoting United States v. Joseph, 542 F.3d 13, 21 (2d Cir. 2008)); see, e.g., ECF No. 9255 at 21 (critiquing Comras's reference, in one footnote, to the 9/11 Commission's interview of U.S. Attorney Patrick Fitzgerald, Comras Report at 24 n.89); 22 (questioning the definition of the word "using" in Comras's description of Kadi "using" bearer checks, Comras Report at 14).

**Sixth**, Kadi points to one section of Comras's testimony as particularly illustrative of his report's overall unreliability. See ECF Nos. 9255 at 16–19; 9374 at 4–5. Comras's discussion of what he calls the "Maram Affair" "has the dubious distinction of combining an array of flaws in Comras's work," Kadi contends. ECF No. 9255 at 18. "It represents guilt by association, wild speculation, *ipse dixit* pronouncements, distortion of and cherry-picking the evidence, and unreliable (indeed incomprehensible) methodology." Id. The Plaintiffs, tellingly, do not meaningfully challenge Kadi's critiques. See ECF No. 9344 at 68.

For good reason. In describing a Kadi-funded project to build student housing at a university in Yemen, Comras concludes that the effort constituted "a money darkening scheme"

---

[21] This is distinguishable from Kohlmann's edits, see *supra* I.D at 25–27, because Kohlmann excised a phrase that directly contradicted his thesis.

based only on his own *ipse dixit*; relies on a number of "unrelated" relationships to impugn Kadi by association; and cherry-picks evidence to ignore the alternative explanation that the project was not a terrorist financing front but a student housing construction project after all. See Comras Report at 49–50; see also id. at 50 (acknowledging that the project did, in fact, "purchase," "ship[]," and "install[]" the houses). To punctuate his story, Comras claims that "[b]etween $926,000 and $1.28 million" of the project's funding "remained unaccounted for"— even though he had previously stated that $300,000 had gone missing. Compare Comras Report at 33 ($300,000 missing) with Comras Report at 50 (between $926,000 and $1.28 million missing). He provides no explanation for this discrepancy in his report and the Plaintiffs do not stand by his inflated figures.[22] See ECF No. 9344 at 68 (writing that "the ledgers showed that hundreds of thousands of dollars went missing."). Consequently, Comras's testimony about the "Maram Affair" must be excluded.

### E.    Helpfulness

Kadi also attacks the helpfulness of Comras's testimony by arguing that he (1) opines on states of mind; (2) improperly incorporates hearsay; and (3) acts as a narrator instead of as an expert witness.

**First**, Kadi objects that Comras "comments on motivations and intentions of individuals and entities." ECF No. 9255 at 1 (internal citation omitted) (cleaned up); see ECF Nos. 9255 at 22 n.34, 24; 9374 at 10. For instance, Comras writes:

- "To avoid red flags, Kadi *tried to mask* many of these questionable dealings as business or humanitarian related transactions, using bearer checks, shell companies, and circuitous routings." Comras Report at 14 (emphasis added).

- Kadi "also stated in depositions and in court that he was actively engaged in overseeing the various Muwafaq projects. He had an

---

[22] Comras's attempted explanation at his deposition is also unavailing. See ECF No. 9256-3 at 306:18–310:5.

obligation, therefore, to assure against the diversion of funds to al Qaeda. He failed to do so, more likely than not because he was, in fact, *intentionally*, *knowingly* and *willfully* directing the funds to support al Qaeda and its well[-]publicized intent to kill Americans." Comras Report at 50 (emphasis added).

- "Kadi's transactions with Maram and Wael Julaidan exemplified these failings, and raised substantive reasons for believing that substantial amounts were *knowingly* and *intentionally* siphoned off for al Qaeda just before 9/11." Comras Report at 56 (emphasis added).

- "[I]t is my expert opinion that Yasin Kadi, through his Muwafaq charity and business practices, *knowingly* and *intentionally* participated in a financial network to support Al Qaeda and finance its activities, including during the planning stages for the 9/11 Attacks on the United States." Id. (emphasis added).

The Plaintiffs respond that an "expert can testify to whether a given state of mind is consistent with a given practice." ECF No. 9344 at 70 n.222 (quoting In re Term Commodities Cotton Futures Litig., 2020 WL 5849142, at *14). But "[n]o expert can divine an actor's subjective intent," and that is what Comras attempts to do. Charity Daubert I, at *6. Because a "jury, as much as any expert, can evaluate evidence and draw conclusions about an actor's state of mind," this testimony must be excluded. Id. (citing In re Rezulin Products Liability Litigation, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004)); see also Marvel Characters, 726 F.3d at 135–36.

**Second**, Kadi accuses Comras of regurgitating hearsay. See ECF Nos. 9255 at 7–12; 9374 at 9–10. Comras "simply repeats the material" from OFAC's designations and other reports, Kadi protests, "and treats [it] as accurate without analyzing [it] or viewing [it] in the context of other material." ECF No. 9255 at 7, 9. The Plaintiffs counter that Comras considered multiple sources "reasonably relied upon by experts in the . . . field" and "then utilized his discerning analysis of the available evidence to reach his conclusions." ECF No. 9344 at 65 (first quoting United States v. Abu-Jihaad, 553 F. Supp. 2d 121, 126 (D. Conn. 2008); and then citing Dukagjini, 326 F.3d at 54).

Comras largely stays within the bounds of what is permissible—relying on hearsay to "offer informed, original opinions" instead of merely repeating it. Charity Daubert I, at *20; see ECF No. 9255 at 7–8 (listing hearsay sources). Even where his "opinions are based exclusively on hearsay information," he "synthesize[s] and interpret[s] information for the jury." Charity Daubert I, at *20. On one occasion, however, he breaks that trend. See Comras Report at 47–48 (incorporating OFAC's March 2002 memorandum). In parroting OFAC's reasoning for denying Kadi's reconsideration request and subsuming their decision into his report, Comras "provides no commentary or analysis" of his own. Charity Daubert I, at *20. He offers "nothing more than quotes from a single hearsay source." Id. Therefore, this excerpt must be excluded; the jury should "learn that information, if at all, from the underlying source." Id.

**Third**, Kadi contends that Comras's testimony forms an improper factual narrative. See ECF Nos. 9255 at 12; 9374 at 6. In passing, he asserts that Comras "wrote as an advocate, not an expert witness." ECF No. 9374 at 6. This argument echoes Kadi's earlier claim that Comras cherry-picks evidence: "What is significant," Kadi emphasizes, is that Comras "completely ignored, rather than evaluated, any material tending to contradict his view that Mr. Kadi was a financier of terrorism." ECF No. 9255 at 12.

The Court has already evaluated this argument. See supra III.D at 49–51. Though Comras does neglect some evidence that tends to favor Kadi's version of events, these omissions do "not wholly undermine his analysis." KSA Daubert I at 49. By "shed[ding] light on activities not within the common knowledge of the average juror," Wexler, 522 F.3d at 204, Comras provides a "layer of expertise or cogent analysis" to help the factfinder make sense of a complex issue and make its own determinations about the evidence, Est. of Jaquez, 104 F. Supp. 3d at

432. He does not simply give "a summation from the witness stand." Lippe v. Bairnco Corp., 288 B.R. at 688. Accordingly, these criticisms are matters of weight, not admissibility.

### F.    Admissibility

Comras is qualified to testify as an expert. The Court excludes as unreliable those sections of his report where he relies on limited *ipse dixit*; misrepresents or distorts evidence; and discusses the "Maram Affair." His commentary on states of mind and his improper incorporation of hearsay are also excluded, since they will not assist "the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. And while he may testify about Kadi's relationships to support his analysis, his testimony must be excluded where he merely invokes a "troubling link[] to terrorists." Monograph on Terrorist Financing, at 110. The remainder of his reports are admissible. The motion to exclude his testimony is therefore largely denied.

## CONCLUSION

Expert testimony in terrorism cases is critical to assist the factfinder with its duties. The issues presented often require an understanding of complex information, including history, extremist ideologies, forensic financial analysis, human source intelligence, money laundering tactics, and global terror networks. No lay juror could be expected to comprehend such matters without the guidance of a credible expert. Experts who have demonstrated academic scholarship, training and real-world experience, professionalism, and serious methodology should be granted the privilege of testifying. Those that do not meet Rule 702's exacting standards must be excluded.

Thus, the Charity Defendants' motions are GRANTED in part and DENIED in part. See ECF Nos. 9246 and 9248. Kohlmann, Levitt, and Comras are permitted to testify consistent with

the limitations outlined in this Opinion. The Clerk of the Court is respectfully directed to

terminate the motions at ECF Nos. 9246 and 9248.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED:        August 18, 2025
                    New York, New York