**MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES**
In re: Terrorist Attacks on September 11, 2001 (S.D.N.Y.)

August 26, 2025

The Honorable George B. Daniels
United States District Court for the
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

      Re:    *In Re: Terrorist Attacks on September 11, 2001*, 03-md-1570 (GBD) (SN)

Dear Judge Daniels:

      Plaintiffs with claims against Al Rajhi Bank ("ARB") write in response to ARB's August 19, 2025 letter, ECF No. 11163, concerning the Second Circuit Court of Appeals' month-old decision in *Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420 (2d. Cir. 2025).

      The Second Circuit's ruling in *Ashley* does not address – and has no bearing on – the personal jurisdiction and due process standards governing ARB's renewed motion to dismiss pending before the Court for decision. The personal jurisdiction issues raised by that pending motion are instead governed by the Supreme Court's recent decision in *Fuld v. Palestine Liberation Org.*, 606 U.S. 1 (2025), which makes clear that the exercise of jurisdiction over ARB for Plaintiffs' claims comports with due process and that there is no merit to ARB's pending jurisdictional challenge. *See* Plaintiffs' Supplementary Authority Letter and Reply on *Fuld*, ECF Nos. 11035, 11047. ARB's last-ditch effort to now avoid a determination of its pending motion to dismiss on jurisdictional grounds in the wake of *Fuld*, ARB Ltr. at 5, is foreclosed by Judge Netburn's prior rulings and legally and procedurally improper. Further still, ARB is simply wrong in claiming that *Ashley* provides support for its 12(b)(6) defenses.

      The Court and parties have invested substantial resources to complete the jurisdictional discovery mandated by the Second Circuit and present the jurisdictional issues to the Court for determination. All that remains is for the Court to issue its decision. Upon resolution of ARB's jurisdictional motion, the Court can direct appropriate protocols for presenting and resolving any proper and necessary 12(b)(6) issues, with due regard for the substantial developments in the record and the law in the nearly eight years since ARB filed its 12(b)(6) motion in 2017.

**1.**    ***Ashley*** **Has No Bearing On The Jurisdictional Inquiry Before The Court**

      The Second Circuit's decision in *Ashley* addresses the substantive standards and pleading requirements for stating an aiding and abetting claim under JASTA. *Ashley* did not involve a personal jurisdiction challenge, and the decision does not at all concern the due process issues raised by ARB's pending renewed motion to dismiss for lack of personal jurisdiction. Those questions are instead controlled by the Supreme Court's recent decision in *Fuld*, which provides a straightforward framework for resolving ARB's renewed jurisdictional challenge. Stated simply, *Ashley* has no relevance to the only ripe motion pending before the Court for decision.

The Honorable George B. Daniels
August 26, 2025
Page 2

_____

Because *Ashley* does not concern due process standards at all, ARB hangs its effort to claim some relevance to the issues currently pending before the Court by arguing that Plaintiffs previously argued that "allegations satisfying the aiding and abetting standard" may give rise to an inference of intent to further the terrorist organization's terrorist activities (for purposes of the 14th Amendment purposeful direction test). This argument fails before it starts, as it is directed exclusively at the pre-*Fuld* standards applying the Fourteenth Amendment due process test under the Fifth Amendment. ARB has no viable argument against jurisdiction under *Fuld*, *see* ECF Nos. 11035, 11047, and it admits as much by avoiding that controlling decision entirely in its letter and then urging the Court to move on to its nearly eight-year-old 12(b)(6) challenge without deciding jurisdiction.[1]

2. **ARB's 12(b)(6) Challenge Is Not Properly Before The Court For Determination**

Following the Second Circuit's 2019 decision finding that Plaintiffs' allegations in the present case were "more direct and one step closer to al Qaeda" when compared to the support the Court had previously found inadequate and remanding for jurisdictional discovery, ARB urged the Court to ignore that mandate and proceed to a determination of its 2017 12(b)(6) challenge, without first determining the jurisdictional question. Judge Netburn correctly rejected that request, consistent with the controlling principle that "courts generally may not assume jurisdiction 'for the purpose of deciding the merits of the case.'" *See* ECF No. 6681 at 5 (citing *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007)) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)). The very nature of that ruling rendered it impossible for ARB to sustain valid objections under Rule 72, *see* ECF No. 5892 at 4-8 (Plaintiffs' opposition to ARB's objections), and it forecloses ARB's desperate attempt to avoid a ruling on the jurisdictional question now.

The further proceedings in the litigation against ARB make this conclusion all the more clear, as they have eliminated the (defective) legal and procedural bases ARB previously offered for sidestepping the jurisdictional question. Indeed, in its earlier motion and objections, ARB principally argued that deciding the 12(b)(6) issue could "obviate the need for complex, burdensome and judicially inefficient jurisdictional discovery that could take years to complete." ECF No. 6724 at 4. Its misguided claims that the result of the 12(b)(6) challenge was "foreordained," meanwhile, rested on the inaccurate contention that the allegations against ARB in Plaintiffs' 2017 Amended Complaint were "similar, if not identical" to those against ARB in other cases in this MDL dismissed on 12(b)(6) grounds. *Id.* at 6.

The ship has sailed on both of those theories. Jurisdictional discovery is complete, and *Fuld* provides a straightforward framework for deciding the jurisdictional issue. Further, Plaintiffs have now had the benefit of jurisdictional discovery and the record now before the Court, which includes declassified CIA reports and thousands of pages of evidence from ARB's own files, is markedly different from the limited pre-discovery allegations presented in previous cases. ARB's attempts to claim otherwise, ARB Ltr. at 5 (characterizing Plaintiffs' jurisdictional allegations as "scaled-back"), are not remotely credible, as Plaintiffs have partially explained in the context of the jurisdictional

---

[1] While the 14th Amendment purposeful direction test no longer controls this Court's determination of jurisdiction, ARB's arguments concerning the import of *Ashley* to that former standard conflate distinct legal concepts and deeply mischaracterize the record. In any case, the principles affirmed in *Ashley* underscore that the current factual record concerning ARB's knowing, direct, active, and pervasive support of al Qaeda readily satisfies the requirements for pleading a JASTA aiding and abetting claim.

The Honorable George B. Daniels
August 26, 2025
Page 3

---

briefing. *See* ECF No. 10590.[2] Stated simply, the arguments underpinning ARB's request that the Court sidestep the jurisdictional question and objections to Judge Netburn's ruling denying that request, while never meritorious, have been mooted by subsequent developments.

Even beyond these fatal legal obstacles to ARB's desperate plea to avoid resolution of its jurisdictional motion, the briefing on ARB's 2017 motion to dismiss does not provide an appropriate or competent record for deciding any proper 12(b)(6) challenges ARB may choose to mount. As noted, that briefing was directed to the allegations of Plaintiffs' 2017 Amended Complaint, but the parties have now completed jurisdictional discovery and the U.S. government has declassified finished intelligence assessments concerning ARB's critical support for al Qaeda. The parties have not had an opportunity to submit fulsome briefing on the basis of the current record in the context of any 12(b)(6) dispute. The 2017 briefs also do not address the most relevant current authorities, and the peripheral discussion of those cases in subsequent submissions is superficial and fails to engage the record adequately for purposes of resolving 12(b)(6) challenges to the full range of Plaintiffs' ATA claims.[3]

**3.    ARB's Reliance On The Second Circuit's Decision In *Ashley* Is Misplaced**

Finally, ARB's theory that *Ashley* bolsters its 12(b)(6) defense is misplaced and rests on substantial distortions of the governing legal standards and the factual bases for the present claims. In fact, *Ashley* further shows that ARB's conduct satisfies the requirements for stating an aiding and abetting claim under JASTA, as fulsome briefing will make especially clear.

The Second Circuit's decision in *Ashley* applies JASTA's aiding and abetting framework under *Halberstam v Welch*, 705 F.2d 472 (D.C. Cir. 1983), in light of principles discussed in the Supreme Court's decision in *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023). Among other first principles, *Ashley* reaffirms that a plaintiff states a claim for secondary liability under JASTA by alleging that "the defendant [was] generally aware of his role as part of an overall illegal or tortious activity" and "knowingly" provides "substantial assistance." *Ashley*, 144 F.4th at 435. A defendant may aid and abet terrorism "directly or indirectly," including through assistance provided to an "intermediary." *Id.* at 437. Further, the "twin requirements" of "knowing" and "substantial assistance" work in tandem with one another, such that a lesser showing of one may be offset by a "greater showing of the other." *Id.* at 438. In the end, the crux of this fact-sensitive balancing of the six *Halberstam* substantial assistance factors aims simply to verify that the defendant's conduct is significant and culpable enough to impose aiding and abetting liability. *Id.* at 439. Consistent with these standards, the *Ashley* Court affirmed that the Second Circuit's earlier decision in *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021) was correctly decided and "entirely consistent" with *Twitter*.

Application of these principles to ARB's active, deliberate, and systematic support for core al Qaeda financial components and managers will show that JASTA's aiding and abetting requirements

---

[2] Perhaps recognizing this problem, ARB now attempts to argue that the outcome of its 12(b)(6) challenge is "foreordained" by alleged factual similarities to the claims before the Second Circuit in *Ashley*. There are at least three fatal problems with this argument. First, *Ashley* itself confirms that the aiding and abetting inquiry is intensely fact-sensitive. As such, *Ashley's* analysis of the entirely distinct claims presented in that case cannot possible "foreordain" an outcome here. Second, *Ashley* did not address primary liability claims under the ATA at all. Third, ARB is deeply wrong in claiming that the standards discussed in *Ashley* would support its dismissal on 12(b)(6) grounds.

[3] Plaintiffs further note that ARB's post-discovery jurisdictional motion is governed by different standards of pleading and review than those applicable to any 12(b)(6) challenge.

The Honorable George B. Daniels
August 26, 2025
Page 4

_____

are easily met in the present case, and that ARB's attempts to analogize the present case to the far-flung allegations at issue in *Ashley* has no merit. Indeed, the claims before the Court in *Ashley* rested on "sweeping theories of international criminal conspiracies" involving disparate criminal enterprises far removed from terrorist activity, which are not remotely comparable to the claims at issue in the present case. Instead, the claims against ARB are more akin to those the Second Circuit found sufficient to establish aiding and abetting in *Kaplan*, although stronger still.

While the present letter briefing does not provide a sufficient or proper context for canvassing the full range of recent authorities or presenting the full range of facts that would be relevant in deciding any renewed 12(b)(6) challenge, Plaintiffs briefly explain below some of the most obvious distinctions between *Ashley* and the present case.

4.     **ARB's Culpable Mindset**

Quite unlike the defendants in *Ashley*, the facts in the present case indicate that ARB and its principals shared common cause with bin Laden and al Qaeda, and that ARB's pervasive and active support for al Qaeda's financial managers and components was undertaken for the purpose of advancing al Qaeda's terrorist agenda. *See* Plaintiffs' Opposition ("Opp.") (ECF No. 10590) at 15-34. This culpable mindset is reflected and supported by CIA assessments concerning ARB's and Suleiman al Rajhi's longstanding ties to and support for terrorists, including al Qaeda; the extensive operational and financial partnerships among ARB, Sulieman al Rajhi, his own charity front, and al Qaeda's most notorious financial managers and fronts; the fact that ARB's principals created their own enterprise for laundering funds for terrorism, which incorporated ARB itself; and Suleiman al Rajhi's alignment with and support for several notorious jihadist scholars. *See id.*; *see also* Corrected Averment ("CA") (ECF No. 10582) at 133-187, 204-272, 390-428, 429-488, 509-534, 535-576. The record also shows that ARB engaged in systematic and extraordinary departures from anti-money laundering and counter-terrorism financing requirements in opening and operating accounts for al Qaeda's financial officers and components, circumstances that also evidence ARB's illicit mindset. *See* Opp. at 26-30; CA ¶¶ 273-389. *See also Kaplan*, 999 F.3d at 850 (aiding and abetting sufficient where defendant bank gave its customers "special treatment" by departing from restrictions on cash deposits).

In contrast, the plaintiffs in *Ashley* were unable to present any competent allegations that the defendants were "consciously trying to help" or otherwise participate in the wrongdoing of the terrorist actors at issue in that case, *Ashley*, 144 F.4th at 441, who were themselves several degrees removed from the defendant banks. *Id.* at 445. For this initial reason alone, the claims at issue in *Ashley* are fundamentally distinguishable from those against ARB here.

ARB cannot avoid this conclusion by incorrectly claiming, in conclusory fashion, that its charity front customers were not publicly "well known" for funneling funds to al Qaeda before 9/11, that U.S. officials did not warn ARB that its customers were terrorists, and that ARB was not criminally charged or sanctioned for its terrorist support activities. To begin with, these arguments do not engage the facts showing that ARB and its principals were themselves quintessential al Qaeda insiders with longstanding ties to the very terrorists they served. *See* Opp. at 6; CA ¶¶ 133-187, 204-272. Moreover, Plaintiffs have offered facts showing that ARB's terrorist customers were publicly implicated in terrorist activity before 9/11. *See, e.g.*, CA ¶¶ 233, 290-292; ECF No. 10592-1 at 38-40, 46, 52-54, 59-

61. Further, U.S. officials did undertake remarkable efforts to interdict ARB's support for al Qaeda through diplomatic channels. *See* Opp. at 23, 53; CA ¶¶ 181-203.

5. **ARB's Direct And Active Support To Core Al Qaeda Financial Managers And Components**

Although ARB's illicit mindset would support an aiding and abetting claim based on a lesser showing of assistance, the facts of record also establish that ARB provided direct, systematic, and pervasive support to al Qaeda's most notorious financial officers and components. ARB opened and operated hundreds of effectively anonymous accounts for those terrorists, in contravention of basic money-laundering regulations and ARB's own procedures. Opp. at 27-28; CA ¶¶ 6, 326. ARB actively facilitated the movement of billions of riyals through these accounts, again in ways that contravened basic anti-money laundering regulations. Opp. at 33; CA ¶¶ 7, 206-209, 212-215, 515, 518. ARB also illicitly helped individual al Qaeda financial officers move staggering sums through personal accounts, enabling them to shroud the origin, destination, and purpose of those funds transfers. Opp. at 28-29; CA ¶¶ 9, 171, 172, 228-232, 327-346, 366-376. This pattern of illicit activity through personal accounts intensified at times when the charities were under scrutiny for their terrorist activity, thereby enabling al Qaeda to move funds during periods of intense law enforcement and intelligence activity focused on its charity components. Opp. at 3-4; CA ¶¶ 9, 108, 171, 338-340. These and other facts show that ARB was an active participant at the center of al Qaeda's financial engine before 9/11, providing direct and pervasive assistance to core al Qaeda financial managers and components.

These facts do not remotely resemble the attenuated claims of peripheral support at issue in *Ashley*. Unlike here, the plaintiffs in *Ashley* did not allege that the defendant bank's fertilizer clients were themselves terrorists, or that the defendant did anything active or positive to help the far downstream actors' exploitation of their legal fertilizer products. *Ashley*, 144 F.4th at 440. The plaintiffs in *Ashley* also failed to offer any competent allegations of scienter that would support an inference that the bank's relationship with its customers was anything other than "routine." *Id.* at 441. The *Ashley* plaintiffs' money laundering allegations, meanwhile, "barely offer[ed] any information about the banks' transactions in the money laundering operation" and failed to support any inference that the alleged money laundering activities were designed to aid the relevant terrorists, *id.* at 444, a far cry from Plaintiffs' detailed and exacting accounting of ARB's illicit and irregular services to al Qaeda. As for their Value Added Tax fraud theories, the *Ashley* plaintiffs failed to offer any allegations to support an inference that the banks' officers were aware of the perpetrator's connection to terrorism, *id.* at 446, also in contrast to the record showing exactly the opposite here.

6. **Direct Links To The 9/11 Attacks**

Finally, the limited jurisdictional discovery afforded Plaintiffs also uncovered connections between ARB, the 9/11 hijackers, and members of the 9/11 support network. *See* Opp. at 31-32, 57; CA ¶¶ 176, 265, 458, 471-477, 489-508. These relationships and interactions defy innocent explanation, and ARB's efforts to discount them are not credible and cannot be credited under the standard of review applicable to any 12(b)(6) challenge. These connections between ARB and the 9/11 attacks strengthen the showing of ARB's direct involvement in al Qaeda's terrorist operations, and further distinguish the present case from the remote claims in *Ashley*.

The Honorable George B. Daniels
August 26, 2025
Page 6

_____

Respectfully submitted,

COZEN O'CONNOR

By: */s/ Sean P. Carter*
SEAN P. CARTER
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Tel.: (215) 665-2105
Email: scarter1@cozen.com

*On Behalf of Plaintiffs With Claims Against Defendant Al Rajhi Bank*

LEGAL\79799033\1