**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE:                                                    :

TERRORIST ATTACKS ON                      :
SEPTEMBER 11, 2001                             :

                                                               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

<u>MEMORANDUM DECISION</u>
<u>AND ORDER</u>

03 MDL 1570 (GBD) (SN)

GEORGE B. DANIELS, United States District Judge:

*This document relates to all actions listing Dallah Avco as a defendant.*

  Following jurisdictional discovery, Defendant Dallah Avco Trans Arabia Company moves

to dismiss all claims against it for lack of personal jurisdiction pursuant to Federal Rule of Civil

Procedure 12(b)(2). (Dallah Avco Mot. to Dismiss ("DA Mot."), ECF No. 9362.[1]) In the

alternative, Dallah Avco moves for summary judgment pursuant to Federal Rule of Civil

Procedure 56. (*Id.*) Dallah Avco's Motion to Dismiss for lack of personal jurisdiction is

GRANTED.

## I.  PROCEDURAL HISTORY[2]

  Dallah Avco initially moved to dismiss all claims against it on March 6, 2006. (Mem. of

Law in Support of DA Mot. ("DA Mem."), ECF No. 9363, at 16.) This Court granted Dallah

Avco's initial motion on June 17, 2010. This Court found that Plaintiffs had failed to establish

general or specific personal jurisdiction over Dallah Avco by virtue of the alleged support Omar

al-Bayoumi provided to 9/11 hijackers Nawaf al-Hazmi and Khalid al-Mihdhar while Bayoumi

was employed in the United States. *See In re Terrorist Attacks on Sept. 11, 2001*, 718 F. Supp.

---

[1] Unless otherwise indicated, all ECF citations included herein refer to documents filed on the 9/11 multidistrict litigation docket. *See In re Terrorist Attacks on Sept. 11, 2001*, No. 03-md-1570 (GBD) (SN).

[2] Given the current procedural posture and the extensive record in these consolidated actions, this Court summarizes only the procedural history germane to the instant motion. More detail can be found in this Court's opinion pertaining to Saudi Arabia, which is being issued on the same day as this decision.

2d 456, 474–75, 485 (S.D.N.Y. 2010) ("Plaintiffs have failed to allege any facts from which it can be reasonably inferred that [Bayoumi], who plaintiffs claim only showed up for work on one occasion and performed no traditional duties on behalf of Dallah Avco, committed the alleged wrongful acts in furtherance of Dallah Avco's business interests or at its direction.").

On appeal, the Second Circuit agreed with this Court's conclusion that Bayoumi's alleged actions were neither authorized by Dallah Avco nor performed in furtherance of its business. *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 679 (2d Cir. 2013). The Circuit remanded, however, for this Court to consider Plaintiffs' alternate jurisdictional theory—that "Dallah Avco provided 'cover employment' for [Bayoumi] while he was in the United States and allegedly supporting two September 11, 2001 hijackers," thus "suggest[ing] that Dallah Avco may have directed its activities, related to [Bayoumi']s cover employment, toward the United States." *Id.* As "questions about Dallah Avco's knowledge regarding [Bayoumi']s activities remain[ed]," the Second Circuit remanded for jurisdictional discovery as to Dallah Avco. *Id.*

## A. The Instant Motion

Jurisdictional discovery proceeded under Magistrate Judge Sarah Netburn's supervision. (*See* Order, ECF No. 9562, at 2–3 (describing jurisdictional discovery process).) Following the completion of jurisdictional discovery, Magistrate Judge Netburn set forth a protocol for the motions to dismiss briefing for both this case and Plaintiffs' case against the Kingdom of Saudi Arabia. That jurisdictional-discovery briefing balanced "the parties' positions, the need to provide all litigants with a full and fair hearing, and the Court's interest in reasonably managing this complex litigation." (Order, ECF No. 9026, at 2.) Of particular relevance, Magistrate Judge Netburn noted that

> The parties' briefs on both motions must set forth all pertinent facts. This may not be accomplished by incorporating by reference other documents such as declarations or averments of facts. Instead,

2

> briefs must state all facts relevant to the motion and, for each factual statement, provide one or more citations (with specific page or paragraph numbers) to pleadings, declarations, affidavits, averments, or other documents that have been separately filed.

(*Id.* at 4.)

Dallah Avco filed its motion to dismiss on October 6, 2023. (DA Mot.) Plaintiffs filed their opposition on December 20, 2023. (Pls.' Mem. of Law in Opp'n to DA Mot. ("Pls.' Opp'n"), ECF No. 9484.) Dallah Avco moved to strike portions of Plaintiffs' opposition. In particular, it sought to strike allegedly overbroad citations to Plaintiffs' averments of jurisdictional facts in the opposition briefs, along with allegedly untimely fact and expert declarations. (Dallah Avco Letter-Mot. to Strike, ECF No. 9501.) Magistrate Judge Netburn granted Defendant's motion to strike as to the expert and fact declarations. (*See* ECF No. 9562, at 5–13.) She denied Defendant's motion as to Plaintiffs' averments of fact citations.[3] (*See id.*) Dallah Avco filed a reply in support of its motion to dismiss on March 4, 2024 (Reply Mem. of Law in Support of DA Mot. ("DA Reply"), ECF No. 9607.)

This Court heard oral argument on this motion on July 31, 2024.

## II.    LEGAL STANDARD

"On a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), 'the plaintiff[s] bear[] the burden of establishing that the court has jurisdiction over the defendant.'" *Vasquez v. Hong Kong & Shanghai Banking Corp..*, 477 F. Supp. 3d 241, 250 (S.D.N.Y. 2020) (quoting *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001)). "In deciding a pretrial motion to dismiss for lack of personal jurisdiction a district court has considerable procedural leeway. It may determine the motion on the basis of affidavits alone; or

---

[3] Despite denying Defendants' motion as to Plaintiffs' averments of fact citations, Magistrate Judge Netburn noted that such citations "[a]t the very least . . . violated the spirit" of the motions to dismiss briefing protocol. (ECF No. 9562, at 5.)

it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)).

The procedural posture of the litigation determines the showing plaintiffs must make to satisfy their burden of proof. *See id.* (citing *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). When a defendant files a 12(b)(2) motion following jurisdictional discovery, "the plaintiff[s] need persuade the court only that [their] factual allegations constitute a *prima facie* showing of jurisdiction."[4] *Id.* at 85 (quoting *Ball*, 902 F.2d at 197). "After [jurisdictional] discovery, the plaintiff[s'] *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant." *Id.* (quoting *Ball*, 902 F.2d at 197).

To determine whether plaintiffs have met their burden following jurisdictional discovery, "the court applies a standard . . . akin to that on a motion for summary judgment, construing the pleadings, documents, and other evidentiary materials . . . in the light most favorable to the plaintiff[s] and all doubts are resolved in [their] favor." *Vasquez*, 477 F. Supp. 3d at 250 (ellipses in original) (internal quotation marks omitted) (quoting *Melnick v. Adelson-Melnick*, 346 F. Supp. 2d 499, 503 (S.D.N.Y. 2004)). Accordingly, the court may only consider admissible evidence, pursuant to Federal Rule of Civil Procedure 56. *See id.* at 251.

---

[4] "If the defendant asserts in a Rule 56 motion that undisputed facts show the absence of jurisdiction, the court proceeds, as with any summary judgment motion, to determine if undisputed facts exist that warrant the relief sought." *Dorchester Fin. Sec., Inc.*, 722 F.3d at 85 (quoting *Ball*, 902 F.2d at 197).

## III.    FACTUAL BACKGROUND

### A. Bayoumi's Activities in the United States

During the relevant time period, Omar al-Bayoumi was formally a Saudi civil servant who ostensibly worked for the Presidency of Civil Aviation ("PCA"), Saudi Arabia's civil aviation agency. (*See* Pls.' Opp'n at 5; Statement of Jobs, DA Mot. Ex. 61, ECF No. 9365-64, at 2.)  As will be described more fully in Section B.2, the PCA seconded Bayoumi to the Air Navigation System Support (ANSS) project, a government project that outsourced its human resources operations to Saudi contractor Dallah Avco. (*See* Pls.' Opp'n at 5; *see also* Section B.2, *infra.*) The record does not indicate that Bayoumi performed any meaningful work for Dallah Avco or the ANSS project.  Instead, the PCA—through Dallah Avco—funded Bayoumi's educational studies in the United States. (*See* Pls.' Opp'n at 24–25.)  Plaintiffs contend that Bayoumi's true reason for being in the United States was his purported role as a Saudi intelligence asset. (*See* Pls.' Ex. 2AA, at EO14040-003283-MDL ("Recent source information confirmed that [Bayoumi] was, at the time of the 9/11 attacks, employed as a paid cooptee of Saudi Arabian intelligence services.").)  However, Bayoumi denies any affiliation with Saudi intelligence. (*See* Bayoumi Deposition Tr. ("Bayoumi Dep."), Pls.' Ex. 120, at 724:18–725:13.)  Unless otherwise noted, the following facts are undisputed.

### 1. Bayoumi's Educational Studies

From 1994 to around 2002—the entire duration of his time on the ANSS project—Bayoumi studied at various institutions in the United States for a year or two at a time. (*See* Pls.' Opp'n at 6–13; *see, e.g.*, Letter from San Diego State University (SDSU), DA Mot. Ex. 86, ECF No. 9365-89; West Coast University Transcript, Pls.' Ex. 320, at 44–46). His enrollment in these programs is undisputed.   (Pls.' Opp'n at 10–12.)  Also undisputed is the fact that he received various certificates and degrees from these programs, including a Master's Certificate in Project

Management from George Washington University and a Master of International Business Administration degree from Alliant University, also known as United States International University. (*Id.*)

Bayoumi had a poor record throughout his educational years in the U.S. (*See, e.g.*, Pls.' Opp'n at 24 ("[A]fter 1997, Bayoumi no longer meaningfully attended classes.")) For example, Plaintiffs argue that Bayoumi missed 333 out of 480 class hours while at SDSU, though a letter from the school shows Bayoumi's attendance record as 92%, 89.1%, and 88.5%. (Pls.' Opp'n at 6; DA Mot. Ex. 86, ECF No. 9365-89.) Regardless, Bayoumi received "failure" or "poor" grades in a third of the ELS classes he took after leaving SDSU. (Pls.' Opp'n at 6–7; ELS Language Centers Academic Report, Pls.' Ex. 320, at 35–36.) He was put on probation by Alliant University in July 1997, and he did not receive any credits from Keller Graduate School despite enrolling in two separate semesters. (Probation Notification Letter, Pls.' Ex. 340, at 50; Keller Transcript, DA Mot. Ex. 85, ECF No. 9365-88.) While at Alliant University, Bayoumi paid a professor to assist him with his coursework. (*See* Email Chain with Hamid Rahman, Pls.' Ex. 567, at -011782). There is no evidence that Dallah Avco received any of the above records or other information regarding Bayoumi's poor performance.

Plaintiffs also note the lack of rigor in Bayoumi's programs of choice. For example, at West Coast University, Bayoumi enrolled in one to three classes per each two-month term. (WCU Transcript, Pls.' Ex. 320, at 44–46.) After being put on probation by Alliant, Bayoumi finished his degree by taking an independent study course about marketing in the Arabian Gulf. (Alliant Transcript, Pls.' Ex. 340, at 61.) To obtain his Master's Certificate in Project Management, Bayoumi attended continuing education short-courses offered through an affiliate of George Washington University that were two to five days long. (Pls.' Averment of Facts ("Pls.' Av."), ECF No. 9541-1, at ¶ 681; GWU Transcript, Pls.' Ex. 680C.) And as mentioned above, he does

not seem to have completed any courses at Keller Graduate School. (Keller Transcript, DA Mot. Ex. 85, ECF No. 9365-88.) Regardless, Bayoumi did enough to receive a Master of International Business Administration degree and a Master's Certificate in Project Management. (Alliant Transcript, Pls.' Ex. 340, at 61; GWU Transcript, Pls.' Ex. 680C.) There is no evidence that Dallah Avco was told, either directly or indirectly (through records or transcripts, for example), about the non-rigorous nature of Bayoumi's coursework.

### 2. Bayoumi's Interactions with the Hijackers

On February 1, 2000, Bayoumi met future 9/11 hijackers Nawaf al-Hazmi and Khalid al-Mihdhar at a restaurant in Los Angeles. (Bayoumi Dep. at 390:17–405:2, 410:9–19). Three days later, on February 4, 2000, Bayoumi assisted the hijackers with renting an apartment in the same complex as him and his family. (See Pls.' Resp. to Def. Dallah Avco Trans Arabia Co.'s R. 56.1 Statement of Material Facts ("Pls.' SMF Resp."), ECF No. 9485, at ¶ 178.) In addition, Bayoumi accompanied the hijackers to a bank and helped them open an account, into which the hijackers deposited $9,900. (Id.) Bayoumi then obtained a certified check in his name for the amount of the hijackers' application fee, security deposit, and first month's rent, an amount that the hijackers paid Bayoumi. (Id.; Ratchford Decl., Pls.' Ex. 91, at ¶ 14; DA Mot. Ex. 80 at -504.) This money came out of his Bank of America account. (See DA Mot. Ex. 93.)

On February 17, 2000, Bayoumi hosted a gathering at the hijackers' apartment. (See Pls.' Ex. 10K (videotape of gathering); Pls.' Ex. 10K-TR (transcript of video).) Bayoumi testified at his deposition that he originally planned to host the event at his own apartment but needed to use the hijackers' apartment to ensure that men and women did not mix, as dictated by Islamic law. (See Bayoumi Dep. at 460:12–462:3.) Plaintiffs and Defendants fiercely debate the reason for the gathering. Plaintiffs claim that it was a "welcome party" for the hijackers, intended to introduce them to their support network in San Diego. (See Pls.' Opp'n at 19 (stating that

Bayoumi "hosted a welcome party to honor [the hijackers] and bring them into the like-minded community of support in Southern California.") Defendants, on the other hand, claim that the gathering took place to honor mosque volunteers. (*See* DA Mot. at 14.)

## B. Dallah Avco's Relationship with Bayoumi

### 1. Dallah Avco's General Role with Respect to the PCA

The PCA, a Saudi government agency, oversaw the ANSS project during the relevant time period. (ANSS Contract, DA Mot. Ex. 10, ECF No. 9365-10, at sec. 2, arts. 1(a), 1(d), 2.) The ANSS project involved the installation and maintenance of air traffic control, air navigation, and communications facilities in Saudi airports. (*Id.* at art. 1(f).) Dallah Avco was a private contractor for the ANSS project. *In re Terrorist Attacks on September 11, 2001*, 11-3294-cv(L), Appellee Dallah Avco Trans Arabia Co. Ltd.'s Brief with Respect to Personal Jurisdiction, ECF No. 479, at 1–2.

Dallah Avco fulfilled three main roles for the ANSS project: (1) filling ANSS vacancies by soliciting resumes and forwarding qualified applicants to the PCA for approval; (2) processing payroll for ANSS employees, which included salaries and other allowances for things like housing and transportation, and (3) administrative and logistical support for ANSS, including by fulfilling purchase requests and paying vendors. (Pls.' Opp'n at 5; Pls.' SMF Resp. at ¶¶ 36, 43–44, 72–75.) The PCA reimbursed Dallah Avco for any money paid out, and Dallah Avco made a five to ten percent profit on any payments or expenses processed. (Pls.' SMF Resp. at ¶¶ 45, 48, 75.)

Dallah Avco was not responsible for supervising or directing ANSS employees; the PCA was. (Riaz Khan Dep. Tr. ("Khan Dep."), DA Mot. Ex. 4, ECF No. 9365-4, at 59:7–20.) ANSS employees reported directly to the PCA. (President Abdulaziz Al Angari Dep. Tr. ("Angari Dep."), Da Mot. Ex. 5, ECF No. 9365-5, at 104:13-105:5 & errata, 347:10–349:7.) The Director

General of the PCA, Mohamed al-Salmi, had sole authority over all permanent assignments, foreign travel, and the hiring and firing of employees. (Memo from Salmi to Samir Magboul, DA Mot. Ex. 46, ECF No. 9365-49.) He was also required to sign off on "any distribution letter to PCA/AE employees on any contract matter." (Memo from Salmi to Alawi Kamel, DA Mot. Ex. 47, ECF No. 9365-50.) The parties do not contest Dallah Avco's level of control, supervision, or direction of ANSS employees; Plaintiffs agree that "ANSS employees were employees or agents of the PCA." (*E.g.*, Pls.' SMF Resp. ¶¶ 49, 54, 55.) They also do not contest that Dallah Avco never had any Dallah Avco offices or employees in the United States, and was never licensed to do business here. (Plaintiffs' Averment of Facts, ECF No. 9541-1, ("Pls.' Av.") ¶ 670.)

### 2. Dallah Avco's Interactions with Bayoumi

On May 24, 1995, Bayoumi was seconded to the ANSS project at the PCA's request. Dallah Avco added him to its payroll accordingly. (Pls.' Opp'n at 8; Pls.' Av. ¶¶ 668–69; 674.)

From then until Bayoumi's time with the ANSS ended in 2002, Dallah Avco processed his payroll and expenses as instructed to by the PCA. Dallah Avco paid his salary into a U.S. bank account. (Sean Coombs Dep. Tr. ("Coombs Dep."), Pls.' Ex. 125, at 36:8–37:25.) At the PCA's instruction, Dallah Avco raised Bayoumi's salary when he was promoted in April 2000 and August 2001, then reduced it in November 2001. (April 2000 Request for Modification and/or Authorization of Contract/Agreement, Pls.' Ex. 425; Letter from Salmi to Fareed Bogary, DA Mot. Ex. 24, ECF No. 9365-27; Nov. 2001 Memorandum from Alp Karli to Fareed Bogary, DA Mot. Ex. 25, ECF No. 9365-28.)

Dallah Avco also used its logistics budget to reimburse various allowances, for expenses such as tuition and living expenses, that were paid to Bayoumi by subcontractors such as Avco Overseas and Ercan. (*See* Coombs Dep. at 116:14–23, 124:4–13.) These subcontractors were

not affiliated with Dallah Avco, nor is there any communication or other provision of detail in the record from the subcontractors to Dallah Avco about these payments beyond brief descriptions of what the payments were for. (*See* Ammar Kamel Dep. Tr. ("Kamel Dep."), DA Ex. 2, ECF No. 9365-2, at 130:23-131:23 & errata; Jabir Khalifa Dep. Tr.; DA Ex. 3, ECF No. 9365-3, at 130:16-132:23.) The parties dispute the reason for the PCA using subcontractors to make these payments instead of going through a more formal process. Plaintiffs claim that the use of subcontractors allowed the PCA to pay Bayoumi more than he was entitled to and hide the true source of the funds. (Pls.' SMF Rep. ¶ 38.) Defendants claim that it was simply faster and more convenient, which was also the belief of PCA logistics manager Sean Coombs. (*Id.*; Coombs Dep. at 125:2–126:18.) Although there is no evidence in the record of what the average salary or average allowance amount for a seconded student at ANSS was, there is testimony that Bayoumi's logistics expenses were significantly higher than other students'. (Samuel Coombs Decl. ("Coombs Decl."), Pls.' Ex. 86, at 2–3.)

In sum, Dallah Avco paid Bayoumi through two sources of funding: his salary, which rose with each promotion, and his allowances, which started at $60,000 per year and rose to $90,000 per year in 1996.[5] (Coombs Decl. at 3.) Bayoumi was not the only student on ANSS payroll. In fact, Dallah Avco processed payroll and allowances for 45 to 50 people who were studying in the United States while formally employed by the ANSS project. (Coombs Dep. at 47:18–55:18.) Throughout this time, Dallah Avco received a number of documents regarding Bayoumi's studies in the United States. These included invoices from subcontractors for paid tuition, a letter from SDSU reporting that Bayoumi was progressing steadily, and correspondence

---

[5] Plaintiffs allege that Bayoumi was receiving funding simultaneously from a third source, cash from Salmi (and funneled through Ercan). (*See* Pls.' Opp'n at 15; FBI Bashi Interview Memorandum, Pls.' Ex. 544, at 4.) Even if Bayoumi was receiving this money during his time on Dallah Avco's payroll, this money did not come from or go through Dallah Avco, and there is no evidence that Dallah Avco knew about it. (*See id.*)

between PCA's Director of Personnel and Salmi discussing the nature of Bayoumi's studies. (*See, e.g.*, Avco Overseas Invoice, DA Mot. Ex. 49, ECF No. 9365-52; Letter from SDSU to Salmi, DA Mot. Ex. 33, ECF No. 9365-36; Letter from Personnel Affairs to Salmi, Pls.' Ex. 281; Letter to Personnel Affairs, Pls.' Ex. 424.)

While Bayoumi was studying in the United States, Dallah Avco submitted formal requests for each of his secondment renewals in 1996, 1997, 1998, and 1999. (Pls.' Av. ¶¶ 714, 715, 718, 680.) The parties agree that these requests should be understood as originating from the PCA, and that Dallah Avco simply submitted them at the PCA's direction. (*Id.*) In 1997, before the third secondment renewal, the PCA's Director of Personnel requested more information regarding the reasons for Bayoumi's secondment, the nature of his studies, and what his plans were after the secondment ended. (Letter from Personnel Affairs to Salmi, Pls.' Ex. 281.) Salmi responded that the secondment related to Saudization—the Saudi policy of increasing the number of Saudi nationals in the Saudi workforce in order to decrease reliance on foreign labor—that Bayoumi was preparing to get an MBA and study financial management, and that Bayoumi wanted to return to the PCA after his secondment. (Letter to Personnel Affairs, Pls.' Ex. 424; Pls.' SMF Resp. ¶¶ 2–7.)

In 1999, Dallah Avco wrote to Salmi, explaining that the company did not want to renew Bayoumi's secondment for a fifth year. (Letter from Alawi Mohamed Saeed Kamil to al Salmi, Pls.' Ex. 435.) Salmi responded that the PCA wanted the secondment renewal and directed Dallah Avco to submit the required paperwork; the company did so accordingly. (Letter from Salmi to Dallah Avco, Pls.' Ex. 437; Letter from Dallah Avco to PCA, Pls.' Ex. 182.) Plaintiffs point to this as evidence of a guilty conscience, arguing that Dallah Avco objected to the renewal because it realized that Bayoumi's secondment was a sham and that he was participating in terrorist activity in the U.S. (Pls.' Opp'n at 11.) Defendants argue that Dallah Avco objected

simply because Bayoumi had been away for years already, and that the company did not need to suspect terrorist or criminal activity in order to think that the secondment was an unwise use of resources.  (Dallah Avco's Rep. in Support of its Mot. to Dismiss ("DA Rep."), ECF No. 9607, at 13.)

## IV.    DALLAH AVCO'S MOTION IS GRANTED

The Second Circuit vacated this Court's original dismissal order and remanded for jurisdictional discovery on the question of "Dallah Avco's knowledge of [Bayoumi']s activities in San Diego." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 679.  "To establish personal jurisdiction over a defendant, due process requires a plaintiff to allege (1) that a defendant has 'certain minimum contacts' with the relevant forum, and (2) that the exercise of jurisdiction is reasonable in the circumstances." *Id.* at 673 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

The proper evaluation of a defendant's purported "minimum contacts" depends on whether the defendant's conduct occurred within or outside of the forum.  *See In re Platinum & Palladium Antitrust Litig.*, 449 F. Supp 3d 290, 319 (S.D.N.Y. 2020) (describing the inquiry into such contacts as "independent, if conceptually overlapping" (quoting *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 243 (2d Cir. 2007)), *rev'd in part on other grounds*, 61 F.4th 242 (2d Cir. 2023).  In the context of the instant motion, the relevant forum for this Court to consider is the United States as a whole, rather than any particular state, as "when a civil case arises under federal law and a federal statute authorizes nationwide service of process, the relevant contacts for determining personal jurisdiction are contacts with the United States as a whole." *Id.*; *see also In re Terrorist Attacks on Sept. 11, 2001*, No. 03 MDL 1570 (GBD) (SN), 2023 WL 2430381, at *9 (S.D.N.Y. Mar. 9, 2023).

### A. Dallah Avco's contacts with the U.S. do not constitute purposeful availment under *Licci*

When a claim arises out of a defendant's contacts with the forum—that is, the defendant's in-forum conduct is at issue—sufficient minimum contacts for specific jurisdiction exist "where the defendant purposefully availed itself of the privilege of doing business in the forum," thus gaining the benefits and protections of the forum's laws, such that the defendant "could foresee being haled into court there." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013); *see Hill v. HSBC Bank plc*, 207 F. Supp. 3d 333, 338 (S.D.N.Y. 2016). "Random, fortuitous, or attenuated" contacts do not constitute purposeful availment. *Id.* (internal quotations omitted). For payments sent into the forum state to constitute purposeful availment, the defendant must have "projected himself into [the forum] for the purposes of conducting business there." *Id.* at 338–39 (internal quotations omitted).

In accordance with the company's contract with the PCA, Dallah Avco paid Bayoumi's salary and other allowances into a U.S. bank account. (*See* Coombs Dep. at 36:8–37:25.) Bayoumi also contacted Dallah Avco one time while he was in the United States, presumably to discuss the payments he was receiving from Dallah Avco. (Pls' Av. ¶ 874.) There is no evidence of any other contact between Dallah Avco and Bayoumi while he was in the United States. Thus, for this Court to have personal jurisdiction over Dallah Avco based on *Licci*, Dallah Avco's payments to and single phone conversation with Bayoumi must be sufficient to "project" Dallah Avco into the United States.

*Hill* is instructive here. In *Hill*, the plaintiffs alleged that a bank ignored suspicious conduct that should have alerted the bank to a Ponzi scheme, and that the bank was therefore subject to liability for participating or aiding the scheme. *Hill*, 207 F. Supp. 3d at 336–37. The plaintiffs sought a finding of personal jurisdiction over the bank on the grounds that it, among

13

other things, "directed and facilitated the transfer of" funds into and out of the forum state. *Id.* at 337. The court held that the bank was not subject to personal jurisdiction because its interactions with the forum state were "incidental consequences of fulfilling a foreign contract." *Id.* at 340. In other words, because the bank's communications with and payments to the forum state were "merely to ensure compliance with contract terms negotiated and executed outside of [the forum]," they did not sufficiently "project" the bank into the forum state for a finding of personal jurisdiction. *Id.* at 339.

Here, then, the mere sending of payments to and single instance of communication with someone in the United States, in order to fulfill a contract negotiated and finalized in Saudi Arabia, do not show purposeful availment of United States laws. *See Roper Starch Worldwide, Inc. v. Reymer & Assocs., Inc.*, 2 F. Supp. 2d 470, 475 (S.D.N.Y. 1998) ("[M]erely sending payment to [the forum state] is not sufficient to establish personal jurisdiction over a defendant.") (internal citations omitted); *Casio Computer Co. v. Sayo*, No. 98CV3772 (WK), 2000 WL 1877516, at *26 (S.D.N.Y. Oct. 13, 2000) ("Although . . . the wire transfers reached bank accounts in the United States, such conduct by defendants does not satisfy the level of minimum contacts required to assert personal jurisdiction over them.") There was nothing exceptional about Dallah Avco's relationship to Bayoumi that would render these payments purposefully or uniquely targeted at the United States. Rather, their relationship generally resembled the company's relationship to any other ANSS employee. Dallah Avco simply paid Bayoumi under the terms of its contract with the PCA, and its contacts with the United States were merely "incidental consequences of fulfilling a foreign contract." *Hill*, 207 F. Supp. 3d at 340.

Plaintiffs argue that Bayoumi was unique because he received pay raises at the same time as key events related to the 9/11 hijackers. (*See* Pls.' Opp'n at 23–24.) He received a salary

even though he did no work and rarely attended class. (*See id.*) He also received a significant amount of money through sources other than his salary, such as the logistics budget. (*See id.*) But Plaintiffs cite no evidence that Dallah Avco was even aware of Bayoumi's interactions with the hijackers, let alone able to put two and two together to recognize a correlation with his pay raises. Nor is there evidence that Dallah Avco was ever notified or otherwise knew about Bayoumi's poor performance in school.

There is also no evidence that Dallah Avco knew the "extra" logistics payments were going to Bayoumi at all. (Abdullah Yamani Declaration, DA Ex. 9, ECF No. 9365-9, ¶¶ 47–52.) Even if it did know, the fact that Bayoumi was getting more money than others or money outside of his salary does not, by itself, mean that Dallah Avco was doing more than fulfilling its contractual obligations. It also does not mean that Dallah Avco was purposefully participating in a nefarious scheme. *See Hill*, 207 F. Supp. 3d at 336–40 (bank's lack of response to "red flags" in *Hill* was insufficient to find purposeful availment). From Dallah Avco's perspective, the company paid Bayoumi the money it was contractually obligated to pay. It gleaned the same percentage of profits from this arrangement as it did from its payments to any other ANSS employee. In other words, Dallah Avco did not single out Bayoumi or the United States as a special target for its payments. Dallah Avco therefore did not "project" itself into this forum, and it did not purposefully avail itself of United States laws.

Plaintiffs' cited authorities do not compel a different result. In both *Tianbo Huang v. iTV Media, Inc.*, 13 F. Supp. 3d 246 (E.D.N.Y. 2014) and *First Horizon Bank v. Moriarty-Gentile*, 10-cv-289, 2015 WL 8490982 (E.D.N.Y. Dec. 10, 2015), the employer companies over which the court had jurisdiction were plausibly alleged to be alter egos of the individual defendants. *Tianbo Huang*, 13 F. Supp. 3d at 255; *see First Horizon Bank*, 2015 WL 8490982 at *5, *9. The evidence here indicates that Dallah Avco served merely an administrative and payroll support

role for the PCA, a far cry from the intermingling and control required for an alter ego showing. Thus, the fact that Dallah Avco paid employee salaries does not mean it is subject to jurisdiction here.

Moreover, *Licci* and *Schansman v. Sberbank of Russia PJSC*, 565 F. Supp. 3d 405 (S.D.N.Y. 2014) involved the use of correspondent accounts in New York, and *Strauss v. Credit Lyonnais, S.A.*, 175 F. Supp. 3d 3 (E.D.N.Y. 2016) involved transfers to the defendant's own branch in New York. Both these uses of the New York banking system are purposeful in that they result in benefits to the user. In other words, they constitute the "purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States." *Schansman*, 565 F. Supp. 3d at 413. By contrast, Dallah Avco was not trying to reap the benefits of United States' commercial or banking policies when it paid Bayoumi's salary. It did not purposefully use a United States bank account because that was preferable to using a different one, or because it wanted its payments to be protected by United States law. Dallah Avco paid Bayoumi in the United States because Bayoumi was residing here, and it would have paid Bayoumi through whatever bank account he had in a different country if Bayoumi had been there instead. Thus, Dallah Avco did not purposefully avail itself of United States laws and protections in a way that would make it foreseeable for Dallah Avco to be subject to jurisdiction here.

## B. Plaintiffs do not allege sufficient participation in a conspiracy to find personal jurisdiction

Plaintiffs also argue that Dallah Avco is subject to personal jurisdiction under the "concerted action" test. (Pls.' Opp'n at 26.) Under the concerted action test, the plaintiffs must show that "(1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a

co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with [the forum] state to subject that co-conspirator to jurisdiction in that state." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018) (citing *Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013)); (*see* Pls.' Opp'n at 26.) This test "*serves* the purposeful availment requirement, rather than supplants it." *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 125 (2d Cir. 2021).

Here, Plaintiffs allege that a conspiracy existed to provide Bayoumi with "sham" employment while he operated on the Saudi government's orders. (Pls.' Opp'n at 27, 29.) If Dallah Avco's direct contacts with the United States were not enough for personal jurisdiction, Plaintiffs argue, then the contacts of alleged co-conspirators such as Saudi Arabia and Bayoumi should be imputed to Dallah Avco. (*Id.* at 26–27.)

Regardless of whether this conspiracy existed and whether Bayoumi was in the United States under pretext, Plaintiffs have not shown that Dallah Avco knowingly participated in it. They speak broadly of an "informal agreement" to assist a "Saudi operative," but nothing in the record shows that Dallah Avco or its employees knew or were ever notified that Bayoumi might have been in the United States for anything other than an education. (*Id.* at 27.) There are no facts showing that Dallah Avco was aware of, participated in, or furthered any terrorist activities. The only relevant agreements in this record are Dallah Avco's agreements with the PCA to second and pay Bayoumi, ostensibly for his studies in the United States.

In lieu of direct evidence, Plaintiffs point to the general abnormality of Bayoumi's arrangement, including the length of his stay in the United States, the amount and source of his income, and his poor performance in school. (*See id.* at 30.) As discussed above, however, these abnormalities did not necessitate the conclusion that Bayoumi was doing anything unlawful in the United States, let alone assisting terrorists. None of the explanations, communications, or

17

information Dallah Avco received were glaring indications of terrorist activity. There are many possible explanations that do not involve terrorist activity for an employee who receives an abnormal amount of money to go on secondment or leave in the United States for a long period of time. Plaintiffs have not shown that Dallah Avco knew that those non-conspiratorial explanations were not at play. Furthermore, these sort of "red flags," without more, are not enough to demonstrate participation in a civil conspiracy. *See Heinert v. Bank of Am. N.A.*, 835 F. App'x 627, 630–32 (2d Cir. 2020) (dismissing a claim for conspiracy despite what defendants "should have realized" based on "red flags).

Thus, Plaintiffs have not shown that Dallah Avco participated in a conspiracy in a way sufficient to subject the company to personal jurisdiction in the United States.

### C.  Dallah Avco's out-of-forum conduct does not subject it to personal jurisdiction under the effects test

Plaintiffs' final theory of jurisdiction is the effects test, which is applied when "the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff." *Licci*, 732 F.3d at 173. Under the effects test, the defendant may be subject to personal jurisdiction if it "expressly aimed" intentionally tortious conduct at the forum. *Id.* at 172–73; *see In re Terrorist Attacks*, 714 F.3d at 674. Importantly, the mere fact that harm in the forum was foreseeable as a result of the defendant's conduct is insufficient to establish personal jurisdiction over a defendant. *In re Terrorist Attacks*, 714 F.3d at 674. In other words, "mere knowledge that a plaintiff resides in a specific jurisdiction would be insufficient to subject a defendant to specific jurisdiction in that jurisdiction if the defendant does nothing in connection with the tort in that jurisdiction." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 338 (2d Cir. 2016).

18

Because the relevant conduct at issue is Dallah Avco's paying Bayoumi through an American bank account (in-forum conduct), the effects test does not apply here. Even if it did, however, Plaintiffs would not prevail because Dallah Avco did not expressly aim any tortious activity at the United States. Widespread conduct that is aimed at many different forums does not constitute express aim at any singular forum just because a portion of that conduct was aimed at the forum state. *See Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 207–08 (S.D.N.Y. 2018) (finding no personal jurisdiction when defendants "expressly aimed their conduct at counterparties . . . around the world, some of whom happened to be in the United States"). Dallah Avco paid over a thousand employees in various countries. (Kamel Dep. at 60:4–12 & errata.) The company's limited contacts were payments to Bayoumi, who happened to be in the United States, as well as other employees on ANSS payroll—not activity aimed at the United States itself.

Moreover, the conduct at issue was not intentionally tortious conduct at all because there is no evidence that Dallah Avco was knowingly contributing to the 9/11 terrorist attacks or any other tortious activity. Plaintiffs cite various pieces of evidence that Bayoumi was in the United States under a pretextual secondment. (*See* Pls.' Opp'n at 30–31.) But they do not provide any actual evidence for the idea that Dallah Avco *knew* any of this. There is no factual support for the contention that Dallah Avco knew it was contributing to terrorist assistance in any way or even that it was "harboring a Saudi agent in the United States." (Pls.' Opp'n at 31.) Plaintiffs contend that Dallah Avco did know, given the "red flags" discussed above, as well as the fact that the FBI had investigated Bayoumi at different points for possible ties to terrorist activity. (Pls.' Opp'n at 31; *see, e.g.*, Pls.' Ex. 566.) Dallah Avco argues that these FBI reports are inadmissible and therefore should not be considered. (DA Rep. at 13.) This Court does not need to rule on the reports' admissibility, however, because they are immaterial. Even if they were

19

admissible, Plaintiffs point to no evidence that Dallah Avco was ever aware of the FBI's ongoing investigations, findings, or other suspicions.[6]

Plaintiffs attempt to mitigate this by arguing that Dallah Avco should have known, or had grounds to suspect, that Bayoumi had an "illicit role" in the United States. (Pls.' Opp'n at 30.) As before, Plaintiffs point to the fact that Bayoumi rarely attended classes, had an unusually long secondment to pursue educational studies, and that Bayoumi was receiving multiple streams of money that amounted to more than a usual employee salary. (*Id.* at 30–31.)[7] As discussed above, these factors do not necessitate the conclusion that Bayoumi was the beneficiary of anything beyond standard favoritism. Dallah Avco understood that Bayoumi was not in the United States to complete any work for the ANSS because he was there to complete an education instead. It was not necessarily suspicious that he was on ANSS payroll while not working on a project for the ANSS. Similarly, without any evidence, this Court cannot conclude that Dallah Avco's request to terminate Bayoumi's secondment was borne out of anything beyond a desire to reduce ostensibly wasteful funding. There is no evidence that Dallah Avco deliberately covered up or avoided confirming a suspicion that Bayoumi was interacting with terrorists, because there is no evidence that Dallah Avco had any such suspicion at all. There is also no evidence that Dallah Avco knowingly managed its relationship with Bayoumi any differently than it did for any other ANSS employee. It processed payroll and reimbursements, and otherwise did as it was told by the PCA, Bayoumi's employer.

---

[6] There is also no evidence to support Plaintiffs' assertions that Dallah Avco was aware of Bayoumi's ties with known extremists. (Pls.' Opp'n at 17–18.) As evidence of those ties, Plaintiffs cite videos taken by Bayoumi, phone records, and other similar documentation. (*See, e.g.*, Pls.' Av. ¶ 958–97, 1639.) What Plaintiffs do not cite is any evidence that Dallah Avco had access to or was otherwise aware of any of these exhibits.

[7] Though Coombs thought these payments were excessive, he never voiced his concerns to Dallah Avco. (Coombs Dep. at 150:21–151:20.) And the allegation that the PCA used corrupt practices, including funneling kickbacks through Dallah Avco to conceal the origin of funds and improperly pay employees, is also irrelevant because there is no evidence that Dallah Avco knew that the PCA did those things or was using Dallah Avco to do those things. (*See* Mohammed Basharahil FBI Interview Report, Pls.' Ex. 544, at FBI007996.)

The effects test does not apply in this case, because the relevant conduct did not exclusively occur outside of the forum.  Even if it did, however, the lack of evidence that Dallah Avco expressly aimed its conduct at the United States, or that its conduct was intentionally tortious, would preclude a finding of personal jurisdiction.

### V.    CONCLUSION

Defendant's motion to dismiss for lack of personal jurisdiction is GRANTED.  The Clerk of Court is directed to terminate the motion at ECF No. 9362.

Dated:  New York, New York

AUG 2 8 2025

SO ORDERED.

*George B. Daniels*
GEORGE B. DANIELS
United States District Judge