# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

_____
                                        )
IN RE:  TERRORIST ATTACKS ON            )      Civil Action No. 03 MDL 1570 (GBD) (SN)
SEPTEMBER 11, 2001                      )      ECF Case
_____ )

This document relates to:  *All Actions*


**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR STAY OF PROCEEDINGS PENDING APPEAL OF AUGUST 28, 2025 ORDER (MDL ECF No. 11182) DENYING KINGDOM OF SAUDI ARABIA'S RENEWED MOTION TO DISMISS**

Michael K. Kellogg
Mark C. Hansen
Gregory G. Rapawy
Andrew C. Shen
KELLOGG, HANSEN, TODD, FIGEL
    & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
(202) 326-7999 (fax)

*Attorneys for the Kingdom of Saudi Arabia*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................................... ii

GLOSSARY ............................................................................................................................. v

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ....................................................................................................................... 2

ARGUMENT ............................................................................................................................. 6

I.     Saudi Arabia's Appeal Divests This Court of Jurisdiction To Order Merits
       Discovery and To Conduct Any Trial ........................................................................... 6

II.    Alternatively, the Court Should Grant a Discretionary Stay ........................................ 8

       A.     Further Proceedings and Trial Would Irreparably Deprive Saudi
              Arabia of Its Immunity from Suit ........................................................................ 9

       B.     Plaintiffs Will Suffer No Substantial Harm from a Stay ...................................... 9

       C.     Saudi Arabia's Appeal Is Reasonably Likely To Succeed ................................... 10

       D.     The Public Interest Favors a Stay ........................................................................ 19

CONCLUSION ........................................................................................................................ 19

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

**CASES**

*Actos Antitrust Litig.*, *In re*, 2020 WL 8996696 (S.D.N.Y. Mar. 9, 2020) ......................................9

*All. For Env'l Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82 (2d Cir. 2006) .............3, 13

*Apostol v. Gallion*, 870 F.2d 1335 (7th Cir. 1989) ...............................................................1, 6, 19

*Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*:

   2014 WL 13145490 (S.D.N.Y. Mar. 26, 2014) ..................................................................7

   813 F.3d 98 (2d Cir. 2016)...................................................................................................6

*Beierwaltes v. L'Office Federale De La Culture De La Confederation Suisse*,
   999 F.3d 808 (2d Cir. 2021).............................................................................................13

*Berizzi Bros. Co. v. The Pesaro*, 271 U.S. 562 (1926) ......................................................19

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
   581 U.S. 170 (2017).........................................................................6, 11, 13, 18, 19

*Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020) ................................................................17

*Burrage v. United States*, 571 U.S. 204 (2014) ..............................................................18

*Cathode Ray Tube Antitrust Litig.*, *In re*, 2020 WL 13303644
   (N.D. Cal. Feb. 4, 2020).....................................................................................................7

*Coinbase, Inc. v. Bielski*, 599 U.S. 736 (2023) ..............................................................1, 6, 8, 19

*Dibble v. Fenimore*, 339 F.3d 120 (2d Cir. 2003) ..........................................................9

*Eckert Int'l Inc. v. Gov't of Sovereign Democratic Republic of Fiji*, 834 F. Supp. 167
   (E.D. Va. 1993), *aff'd*, 32 F.4th 77 (4th Cir. 1994)...........................................................7

*Ferring B.V. v. Allergan, Inc.*, 343 F. Supp. 3d 284 (S.D.N.Y. 2018) .........................................19

*France.com, Inc. v. French Republic*, 2020 WL 8172981 (E.D. Va. Feb. 20, 2020)....................7

*Gabay v. Roadway Movers, Inc.*, 2023 WL 3569351 (S.D.N.Y. May 19, 2023) .........................11

*Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56 (1982)....................................................6

*Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009)....................................................................18

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123
   (D.C. Cir. 2004) ..............................................................................................................18

*M.A. Mobile Ltd. v. Indian Inst. of Tech. Kharagpur*, 2014 WL 2216253
(N.D. Cal. May 29, 2014) ...........................................................................................7

*Ministry of Oil of the Republic of Iraq v. 1,032,212 Barrels of Crude Oil Aboard
the United Kalavrvta*, 2015 WL 851920 (S.D. Tex. Feb. 26, 2015)............................7

*Mohammed v. Reno*, 309 F.3d 95 (2d Cir. 2002)............................................................9

*Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169 (5th Cir. 1994)...................................6

*Nam v. Permanent Mission of the Republic of Korea to the United Nations*,
2023 WL 2456646 (S.D.N.Y. Mar. 10, 2023) ...............................8, 9, 10, 13, 19

*Noel Pane v. Town of Greenburgh*, 2012 WL 12886971 (S.D.N.Y. Mar. 21, 2012)....................10

*Philipp v. Fed. Republic of Germany*, 436 F. Supp. 3d 61 (D.D.C. 2020) ................................8, 9

*Plummer v. Quinn*, 2008 WL 383507 (S.D.N.Y. Feb. 12, 2008) .............................................9, 11

*Preble-Rish Haiti, S.A. v. Republic of Haiti*, 2022 WL 209281
(S.D. Tex. Jan. 21, 2022) ...........................................................................................7

*Robinson v. Gov't of Malaysia*, 269 F.3d 133 (2d Cir. 2001).......................................2, 6, 8, 11, 13

*Sanchez v. Clipper Realty, Inc.*, 2022 WL 17091007 (S.D.N.Y. Nov. 21, 2022) ........................11

*Thapa v. Gonzales*, 460 F.3d 323 (2d Cir. 2006).........................................................................9, 10

*Ungar v. Palestine Liberation Org.*, 402 F.3d 274 (1st Cir. 2005) ...............................................7

*United States v. Turkiye Halk Bankasi A.S.*, 16 F.4th 336 (2d Cir. 2021),
*aff'd in part, vacated in part, and remanded*, 598 U.S. 264 (2023)...................................7

*Univ. of Texas S.W. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)....................................................17

*World Trade Ctr. Disaster Site Litig.*, *In re*, 503 F.3d 167 (2d Cir. 2007)....................7, 8, 10, 19


**CONSTITUTION AND STATUTES**

U.S. Const. art. III....................................................................................................................13

Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583, 90 Stat. 2891
(codified as amended at, *inter alia*, 28 U.S.C. §§ 1602-1611) ..............1, 2, 7, 8, 11, 13, 18

28 U.S.C. § 1605(a)(7) (repealed 2008) .........................................................................18

iii

Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852
(2016)......................................................................................................2, 9, 17

    28 U.S.C. § 1605A.............................................................................................18

    28 U.S.C. § 1605B(b) .....................................................................................9, 17

**OTHER MATERIALS**

W. Page Keeton et al., *Prosser and Keeton on Law of Torts* (5th ed. 1984)................................18

September 11th Victim Compensation Fund, *Annual Report 2024*,
    https://www.vcf.gov/sites/vcf/files/media/document/2025-01/
    2024%20Annual%20Report%20-%20508.pdf....................................................10

U.S. Victims of State Sponsored Terrorism Fund, *Special Master's Report
Regarding the Fifth Distribution* (Jan. 2025), https://www.usvsst.com/
    Content/Documents/USVSSTFundCongressionalReport_Jan2025.pdf...........................10

# GLOSSARY

| | |
|---|---|
| 9/11 Rep. | National Commission on Terrorist Attacks Upon the United States, *The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks Upon the United States* (July 2004), https://govinfo.library.unt.edu/911/report/911Report.pdf (excerpts at KSA Ex. 163) |
| Bayoumi Tr. | Deposition Transcript of Omar Al Bayoumi (June 9-11, 2021) (Pls. Ex. 120) |
| KSA Aver. | Kingdom of Saudi Arabia's Averment of Jurisdictional Facts and Evidence in Support of Its Renewed Motion To Dismiss, ECF No. 9370-1 (S.D.N.Y. Oct. 6, 2023) (KSA Ex. 1) |
| KSA Mem. | Memorandum of Law in Support of Kingdom of Saudi Arabia's Renewed Motion To Dismiss, ECF No. 9369 (S.D.N.Y. Oct. 6, 2023) |
| KSA Reply | Reply Memorandum of Law in Support of Kingdom of Saudi Arabia's Renewed Motion To Dismiss, ECF No. 9610 (S.D.N.Y. Mar. 4, 2024) |
| KSA Resp. to Pls. Aver. | Kingdom of Saudi Arabia's Response to Plaintiffs' Corrected Averment of Facts and Evidence in Support of Their Claims Against the Kingdom of Saudi Arabia and Dallah Avco, ECF No. 9611-1 (S.D.N.Y. Mar. 4, 2024) (KSA Ex. 160) |
| Mana Tr. | Deposition Transcript of Ismail Ammar Mohamed Mana (Apr. 21, 2021) (Pls. Ex. 110A) |
| Morgan Decl. | Declaration of Kaysan Morgan (Oct. 29, 2020) (Pls. Ex. 92) |
| Moss Rep. | Rebuttal Expert Report of Douglas M. Moss (May 16, 2022) (KSA Ex. 148) |
| Ratchford Decl. | Declaration of Holly Ratchford (May 29, 2021) (KSA Ex. 90) |
| Schiff Tr. | Deposition Transcript of Barry Schiff (July 11, 2022) (Pls. Ex. 104) |
| Thumairy Tr. | Deposition Transcript of Fahad Al Thumairy (June 28-30, 2021) (Pls. Ex. 107) |

## INTRODUCTION

The Court has denied Saudi Arabia's renewed motion to dismiss on the ground of foreign sovereign immunity. Saudi Arabia has appealed that denial to the Second Circuit. Saudi Arabia has the right to that interlocutory appeal to preserve its immunity from suit, which would otherwise be irrevocably lost. Like any other appeal, Saudi Arabia's appeal divests the district court of jurisdiction over the matter appealed. Here, the matter appealed is whether merits discovery and trial should occur. Accordingly, those proceedings should stop until the appeal is complete. "[I]t 'makes no sense for trial to go forward while the court of appeals cogitates on whether there should be one.'" *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 741 (2023) (quoting *Apostol v. Gallion*, 870 F.2d 1335, 1338 (7th Cir. 1989) (Easterbrook, J.)).

Even if this Court had jurisdiction to proceed to trial (which it does not), the equities would call for a discretionary stay. Saudi Arabia's loss of immunity from suit is an immediate irreparable injury. Plaintiffs face no substantial harm from a stay – only delay in their attempt to recover money damages. Saudi Arabia has a reasonable likelihood of success in an appeal challenging this Court's application of the legal standard for an FSIA motion to dismiss, treatment of the evidentiary record, and adoption of a causation standard that departs from the statutory text. The public interest favors a stay as well, to serve the principle of international comity and to avoid wasting judicial resources on a trial that may be unnecessary.

A final decision on Saudi Arabia's immunity from suit will come only after appellate review. The national and historical importance of this case and its effect on the foreign relations of the United States underscore the need for that review to be thorough. This Court should grant a stay while the Second Circuit performs that necessary function.

## BACKGROUND

1.      On August 28, 2025, this Court issued a Memorandum Decision and Order, ECF No. 11182 ("Order"), denying the renewed motion of Defendant Kingdom of Saudi Arabia ("Saudi Arabia" or "KSA") to dismiss for lack of subject-matter jurisdiction under the Foreign Sovereign Immunities Act of 1976 ("FSIA").  The Order begins with the procedural history of the case, including the Court's previous grant of Saudi Arabia's motion to dismiss, Congress's enactment of the Justice Against Sponsors of Terrorism Act ("JASTA"), the Second Circuit's remand for this Court to apply JASTA in the first instance, this Court's March 28, 2018 order directing jurisdictional discovery into "whether and to what extent [Fahad Al] Thumairy, [Omar Al] Bayoumi, and their agents took actions in 2000, at the direction of more senior Saudi officials, to provide assistance to" the "9/11 hijackers," ECF No. 3946, at 23, and the four years of fact and expert jurisdictional discovery that followed.  Order 1-3.

2.      The Order sets forth the statutory requirements for JASTA's exception to immunity:  "(1) physical injury to a person or property or death occurring in the U.S.; (2) an act of international terrorism in the United States, and a tortious act or acts by a foreign state, or any official, employee, or agent of that state taken while acting within the scope of that person's office, employment, or agency; (3) causation; and (4) damages."  Order 5.  It further sets out the burden-shifting mechanism for determining immunity under the FSIA.  The defendant must first show that it is a foreign sovereign.  The plaintiff must then produce evidence showing that an exception under the FSIA applies.  If that burden of production is satisfied, the foreign sovereign must then show by a preponderance of evidence that the exception does not apply.  *Id*. at 6.

The Order acknowledges that where, as here, Saudi Arabia has challenged the factual basis for jurisdiction, the Court must " 'resolve any disputed issues of fact.' "  *Id.* at 7 (quoting *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 141 (2d Cir. 2001)).  It also states, however, that

2

where there is "overlap between jurisdictional and merits evidence" some "jurisdictional issue[s]" should be "le[ft] . . . for the trial." *Id.*; *see also id.* at 31 ("[T]he right question to ask is whether Plaintiffs could bring a legally cognizable claim of a tortious act, or whether KSA is amenable to suit, not whether Plaintiffs will ultimately prevail in proving their claim."); *id.* at 39-40 (citing *Alliance For Environmental Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 (2d Cir. 2006), for the proposition that "the court may deem it appropriate to make a preliminary finding on jurisdictional facts").

3.    The Order determines that "Plaintiffs have furnished sufficient evidence to raise questions as to the true nature of Bayoumi's and Thumairy's employment with KSA" and that the evidence creates "a reasonable inference that their employment was more than what their official job titles suggest." Order 33. As to Al Bayoumi, the Order points to: (1) his interactions with the hijackers and others who assisted the hijackers; (2) telephone calls among Al Bayoumi, Al Thumairy, and the Saudi Embassy and Consulate; and (3) an increase in Al Bayoumi's salary after the hijackers arrived in the United States, which it states "could be related to the assistance Bayoumi provided to the hijackers at that time." *Id.* at 33-35.

As to Al Thumairy, the Order points to: (1) the hijackers' choice to visit Los Angeles, where Al Thumairy was located; and (2) certain phone calls between Al Bayoumi and Al Thumairy. *Id.* at 35. From that, it concludes that, "assuming Bayoumi was likely employed by KSA to assist the hijackers, Thumairy was coordinating with Bayoumi to some degree for that same goal." *Id.* It then states that:

> [A]ll the evidence taken together creates a strong inference that it is more likely than not that, for the limited purpose of jurisdictional inquiries, Thumairy and Bayoumi were not just acting as an imam and an accountant, respectively. Their employment with KSA likely had some connection with assisting the hijackers.

*Id.* at 35-36.

4.      The Order determines that Plaintiffs have produced evidence that Al Bayoumi and

Al Thumairy assisted the hijackers within the scope of their employment.  Among other things, it

states:  "Plaintiffs have provided evidence that creates the overall impression that Bayoumi and

Thumairy were not just an accountant or an imam as they claim, and their employment had some

connection with assisting the hijackers."  Order 39.  It adds, however, that this is "a preliminary

finding concerning jurisdictional inquiries only, permitting Plaintiffs to pursue their claims."  *Id.*

5.      The Order determines that Plaintiffs have produced evidence that Al Bayoumi and

Al Thumairy had "some knowledge" of the hijackers' tortious activity when providing support

to them.  Order 40.  As to Al Bayoumi, it reasons that (1) he testified that "he had never gone

out of his way to help any other strangers to the degree he helped the hijackers"; (2) based on

"the surrounding circumstances," it is more likely than not that his meetings with the hijackers

"were not just chance meetings"; and (3) an airplane diagram found in Al Bayoumi's possession

"facially connects [him] with knowledge of the 9/11 Attacks."  *Id.* at 40-41.  As to Al Thumairy,

the Order reasons that (1) Al Thumairy met with the hijackers at least once; (2) there were phone

calls between Al Thumairy and Al Bayoumi before and after the hijackers arrived, although

there is no evidence of the content of those calls; and (3) the FBI purportedly had a photo of

Al Thumairy and the hijackers.  *Id.* at 41.[1]

6.      The Order determines that Saudi Arabia "fails to show by a preponderance of

evidence that the JASTA exception does not apply."  Order 43.  It acknowledges that Saudi

Arabia proffered innocent explanations for phone calls between Al Bayoumi, Al Thumairy, the

Embassy, and the Consulate.  *See id.* ("KSA argues that those calls were related to Bayoumi' s

---

[1] The Order rejects as "conclusory" several of Plaintiffs' factual contentions, including
their contentions that certain videotapes show Al Bayoumi held a "welcome party" for the
hijackers and that he " 'cas[ed]' the U.S. Capitol" for a potential attack.  Order 42.

education, requests for religious materials, other administrative matters, or religious questions because the calls occurred during the holy month of Ramadan.").  But it rejects those explanations as "based on speculation rather than direct evidence."  *Id.*  It states that Saudi Arabia "fails to explain why Bayoumi received a significant raise during the time when he assisted the hijackers."  *Id.*  And it rejected as "conclusory" or "self-serving" Saudi Arabia's contentions that "Bayoumi's encounters with the hijackers were coincidences," that he helped the hijackers because he was "good-natured," and that "the airplane drawing was unrelated to the 9/11 Attacks."  *Id.* at 43-44.

      **7.**       In its final pages, the Order observes that "the parties dispute a significant portion of the facts."  Order 44.  It gives examples including whether Al Bayoumi's meetings with the hijackers "were pre-planned or by chance," what his "motive" was for helping the hijackers, and what the "meaning" was of "the airplane drawing."  *Id.* at 44-45.  It then states that "[s]ome of the disputed facts cannot be resolved at this stage of the litigation, because weighing the evidence or assessing witnesses' credibility will need to take place at trial."  *Id.* at 45.  Accordingly, it relies on "undisputed facts[] and the Court's preliminary assessment of certain disputed facts."  *Id.*

      On September 8, 2025, Saudi Arabia appealed from the Order.  ECF No. 11215.

## ARGUMENT

I.  **Saudi Arabia's Appeal Divests This Court of Jurisdiction To Order Merits Discovery and To Conduct Any Trial**

"'[S]overeign immunity under the FSIA is immunity from suit, not just from liability.'" *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 141 (2d Cir. 2001) (quoting *Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir. 1994)) (alteration in *Robinson*); *see also Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 174 (2017) (describing "foreign sovereign immunity's basic objective" as "free[ing] a foreign sovereign from *suit*"); Order 5-6. That "immunity is effectively lost if a case is permitted to go to trial." *Robinson*, 269 F.3d at 141 (cleaned up). For that reason, "it is well-settled that the denial of a defendant's motion to dismiss on sovereign immunity grounds is an immediately appealable collateral order." *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 116 (2d Cir. 2016). Saudi Arabia has taken such an appeal.

"The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982) (per curiam). Where the issue on appeal is immunity from suit, "[t]he trial is inextricably tied to the question of immunity," and the appeal "divests the district court of jurisdiction (that is, authority) to require the appealing defendants to appear for trial." *Apostol v. Gallion*, 870 F.2d 1335, 1338 (7th Cir. 1989) (Easterbrook, J.) (discussing qualified immunity); *see Coinbase, Inc. v. Bielski*, 599 U.S. 736, 741 (2023) (quoting *Apostol*'s reasoning that "it 'makes no sense for trial to go forward while the court of appeals cogitates on whether there should be one'").[2]

---

[2] *Coinbase* held that "a district court must stay its proceedings while [an] interlocutory appeal on arbitrability is ongoing" and cited with approval *Apostol* and other cases requiring a stay of pretrial and trial proceedings during interlocutory appeals involving qualified immunity and double jeopardy. 599 U.S. at 740, 742 n.4.

The Second Circuit followed the same principle in *In re World Trade Center Disaster Site Litigation*, 503 F.3d 167 (2d Cir. 2007), where it initially stayed all proceedings while a qualified immunity appeal was pending, then later, after argument, issued a partial remand "restoring [the district court's] jurisdiction to proceed with pretrial proceedings and a trial." *Id.* at 171. More recently, the Second Circuit stayed all proceedings in a criminal case against a state-owned Turkish bank during an interlocutory appeal in which the bank asserted FSIA immunity. *See United States v. Turkiye Halk Bankasi A.S.*, 16 F.4th 336, 343 (2d Cir. 2021) (discussing procedural history), *aff'd in part on other grounds, vacated in part on other grounds, and remanded*, 598 U.S. 264 (2023). The First Circuit has also recognized that an FSIA appeal "ordinarily divests the district court of jurisdiction to proceed with the litigation pending its resolution." *Ungar v. Palestine Liberation Org.*, 402 F.3d 274, 293 (1st Cir. 2005).

District courts have applied the same principle in FSIA cases. *See Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 2014 WL 13145490, at *1 (S.D.N.Y. Mar. 26, 2014) (after a sovereign defendant's "notice of interlocutory appeal," the court "lack[ed] jurisdiction to proceed with the case" and "all proceedings [we]re stayed"); *see also Preble-Rish Haiti, S.A. v. Republic of Haiti*, 2022 WL 209281, at *2 (S.D. Tex. Jan. 21, 2022); *France.com, Inc. v. French Republic*, 2020 WL 8172981, at *4 (E.D. Va. Feb. 20, 2020); *In re Cathode Ray Tube Antitrust Litig.*, 2020 WL 13303644, at *2-3 (N.D. Cal. Feb. 4, 2020); *Ministry of Oil of the Republic of Iraq v. 1,032,212 Barrels of Crude Oil Aboard the United Kalavrvta*, 2015 WL 851920, at *4 (S.D. Tex. Feb. 26, 2015); *M.A. Mobile Ltd. v. Indian Inst. of Tech. Kharagpur*, 2014 WL 2216253, at *1 (N.D. Cal. May 29, 2014); *Eckert Int'l Inc. v. Gov't of Sovereign Democratic Republic of Fiji*, 834 F. Supp. 167, 174-75 (E.D. Va. 1993), *aff'd on other grounds*, 32 F.4th 77 (4th Cir. 1994).

The Order denies Saudi Arabia's motion to dismiss, directs that "Plaintiffs' claims will proceed to decision on their merits," and states that "weighing the evidence [and] assessing witnesses' credibility will need to take place at trial."  Order 45.  If that occurs, Saudi Arabia's immunity from suit will be "effectively lost."  *Robinson*, 269 F.3d at 141.  It follows that the Second Circuit has jurisdiction over Saudi Arabia's interlocutory appeal and that the appeal divests this Court of jurisdiction to proceed "with pretrial proceedings and a trial," unless and until the Second Circuit "restor[es]" that jurisdiction.  *World Trade Ctr.*, 503 F.3d at 171.  This Court should confirm that all pretrial proceedings are stayed during the interlocutory appeal.[3]

## II.    Alternatively, the Court Should Grant a Discretionary Stay

Some courts have treated a stay of proceedings during an FSIA appeal as a matter of discretion.  *See Nam v. Permanent Mission of the Republic of Korea to the United Nations*, 2023 WL 2456646, at *2 (S.D.N.Y. Mar. 10, 2023); *see also Philipp v. Fed. Republic of Germany*, 436 F. Supp. 3d 61, 65 (D.D.C. 2020) (determining whether to stay proceedings pending petition for a writ of certiorari).  The better view is that jurisdiction transfers automatically upon appeal.  *See World Trade Ctr.*, 503 F.3d at 170 ("If District Court jurisdiction was divested, our stay was superfluous, and if we were to vacate the stay, that action would accomplish nothing unless we were also at least partially to restore the District Court's jurisdiction.").  Nevertheless, if the Court determines that it retains jurisdiction without a remand, it should exercise its discretion to stay proceedings pending appeal.

The four factors for a stay pending appeal are " 'the likelihood of success on the merits, irreparable injury if a stay is denied, substantial injury to the party opposing a stay if one is

---

[3] In most circuits, discovery and trial may proceed while an immunity-based appeal is pending if the district court "certif[ies] that an interlocutory appeal is frivolous."  *Coinbase*, 599 U.S. at 745.  There is no basis for such a certification here.  *See infra* Part II.C.

issued, and the public interest.'" *Thapa v. Gonzales*, 460 F.3d 323, 334 (2d Cir. 2006) (quoting

*Mohammed v. Reno*, 309 F.3d 95, 100 (2d Cir. 2002)).  The Second Circuit treats those factors

"somewhat like a sliding scale":  "'[t]he probability of success that must be demonstrated is

inversely proportional to the amount of irreparable injury.'"  *Id.* (quoting *Mohammed*, 309 F.3d

at 101) (alteration in *Thapa*).  A district court thus should grant a stay even though it "believes

its decision with respect to immunity under the FSIA was proper" if it finds "a possibility that

the Court of Appeals will conclude otherwise."  *Nam*, 2023 WL 2456646, at *3.

### A.    Further Proceedings and Trial Would Irreparably Deprive Saudi Arabia of Its Immunity from Suit

As set forth in Part I, the justification for interlocutory appeal in immunity-from-suit cases

is that "[t]he defendant would irrevocably lose th[e] benefit of immunity if obligated to defend

the case at trial."  *Dibble v. Fenimore*, 339 F.3d 120, 123 (2d Cir. 2003) (discussing intramilitary

immunity).  The prospect that a defendant will be "irreparably harmed" by "los[ing] the benefit

of immunity from suit and trial if the Court of Appeals were to ultimately find that [the defendant]

is immune under the FSIA" "weighs heavily in favor of a stay."  *Nam*, 2023 WL 2456646, at *2

(citing *Plummer v. Quinn*, 2008 WL 383507, at *1 (S.D.N.Y. Feb. 12, 2008)); *see also Philipp*,

436 F. Supp. 3d at 68 (reasoning that a foreign sovereign's "burden of defending against a

lawsuit is irreversible" and constitutes "irreparable harm").

### B.    Plaintiffs Will Suffer No Substantial Harm from a Stay

Plaintiffs seek (and, under JASTA, are limited to) the relief of "money damages."

28 U.S.C. § 1605B(b).  Delay in receiving "monetary damages" is not "substantial injury" that

warrants denial of a stay.  *Nam*, 2023 WL 2456646, at *3 (citing *Plummer*, 2008 WL 383507,

at *1); *see also In re Actos Antitrust Litig.*, 2020 WL 8996696, at *2 (S.D.N.Y. Mar. 9, 2020)

(finding this factor "neutral" where plaintiffs were "seeking money damages").  Nor does this

9

case present a situation where a stay will impede Plaintiffs' ability to "receive compensation while still living and . . . use it to cover medical costs and improve the quality of their lives." *World Trade Ctr.*, 503 F.3d at 170. As the Court is aware, the individual and estate Plaintiffs in this case have received substantial compensation through two mechanisms. One is the September 11th Victim Compensation Fund, which as of its 2024 annual report had paid a total of $14.9 billion to more than 65,600 claimants.[4] The other is the U.S. Victims of State Sponsored Terrorism Fund, which as of its January 2025 report to Congress had "paid or allocated over $7 billion to eligible claimants" and which by statute makes 50% of its payments to 9/11 claimants holding judgments against sovereign defendants.[5] Thus, Plaintiffs' claims against Saudi Arabia are not their only path to compensation.

###    C.    Saudi Arabia's Appeal Is Reasonably Likely To Succeed

Under the sliding-scale approach set forth in *Thapa*, Saudi Arabia's strong showing of irreparable injury and the absence of substantial harm to Plaintiffs reduce the required showing of likelihood of success. Where the "potential for irreparable injury to [a] Defendant is significant, and Plaintiff[s are] not substantially harmed," even "a minimal showing of likelihood of success on appeal" warrants a stay. *Nam*, 2023 WL 2456646, at *3; *see Noel Pane v. Town of Greenburgh*, 2012 WL 12886971, at *4 (S.D.N.Y. Mar. 21, 2012) (applying same "minimal showing" standard

---

[4] *See* September 11th Victim Compensation Fund, *Annual Report 2024*, at 3, 27-28, https://www.vcf.gov/sites/vcf/files/media/document/2025-01/2024%20Annual%20Report%20-%20508.pdf.

[5] U.S. Victims of State Sponsored Terrorism Fund, *Special Master's Report Regarding the Fifth Distribution* 6 (Jan. 2025), https://www.usvsst.com/Content/Documents/USVSSTFundCongressionalReport_Jan2025.pdf.

in a qualified-immunity appeal); *Plummer*, 2008 WL 383507, at *1 (same).[6]  Saudi Arabia's

likelihood of success is far more than minimal.

       **1.**     **Preliminary findings.**  In deciding an FSIA motion to dismiss that raises factual

questions, a district court "take[s] evidence and resolve[s] factual disputes" necessary to resolve

the "jurisdictional questions" before it.  *Helmerich & Payne*, 581 U.S. at 174; *see Robinson*,

269 F.3d at 141.  That includes jurisdictional issues "intertwined" with the merits.  *Helmerich &*

*Payne*, 581 U.S. at 178 (explaining that a court "must still answer the jurisdictional question"

even if, "to do so, it must inevitably decide some, or all, of the merits issues").  The Order

departs from that mandate by making a "preliminary assessment of certain disputed facts" and by

declining to "resolve[ ] at this stage of the litigation" disputes that would require "weighing the

evidence or assessing witnesses' credibility."  Order 45.  In particular, the Order describes its

finding as to scope of employment as "preliminary," *id.* at 39, and its finding as to tortious

conduct as a "show[ing] to support jurisdiction," *id.* at 41-42; *see also id.* at 31 (stating that

jurisdiction requires only "a legally cognizable claim of a tortious act").

       The "dispute[s]" that the Order declined to resolve went to the core of its findings:

"whether" Al Bayoumi's "meetings" with the hijackers "were pre-planned or by chance";

what Al Bayoumi's "motive" was for the "assistance" he offered to the hijackers; and what the

"meaning" was of the "notepad page with an airplane drawing" that was "found in Bayoumi's

home and showed his handwriting."  *Id.* at 44-45.  The Order's findings on other key elements

were similarly "preliminary," including its statements that, "for the limited purpose of

---

      [6] *See also Gabay v. Roadway Movers, Inc.*, 2023 WL 3569351, at *1-3 (S.D.N.Y. May 19, 2023) (granting stay pending interlocutory appeal of order denying arbitration after describing merits of appeal as "non-frivolous" and "potentially substantial but hardly promising"); *Sanchez v. Clipper Realty, Inc.*, 2022 WL 17091007, at *1-3 (S.D.N.Y. Nov. 21, 2022) (same result after describing merits of appeal as "not frivolous" and "comparatively weak").

jurisdictional inquiries," Al Bayoumi's and Al Thumairy's "employment with KSA likely had some connection with assisting the hijackers" and that Plaintiffs' "evidence . . . creates [an] overall impression . . . [of] some [such] connection." *Id.* at 35, 39.

The Court's determination that it would not weigh evidence or assess witness credibility profoundly affected its rulings both on scope of employment and on tortious conduct. Saudi Arabia presented testimony not only from Al Bayoumi and Al Thumairy themselves, but from nine other current and former Saudi officials and employees allegedly involved in the plot, that none of them knew of the hijackers' plans or gave or received any instruction to help them. KSA Mem. 16; KSA Aver. ¶ 232.[7] There was similar testimony from non-Saudi third-party witnesses who allegedly assisted the hijackers, including Johar, Zeid, and Alzamari. KSA Mem. 4, 7-8, 24-25; KSA Aver. ¶¶ 87, 131-133.[8]

Saudi Arabia also presented expert testimony and documentary evidence showing that it practices a quietist form of Islam that condemns violent jihad, that during the 1990s Saudi Arabia sought to stop Al Qaeda and bring Osama bin Laden to justice, that the Saudi religious establishment condemned Al Qaeda's terrorist attacks as "sabotage and depravity" punishable by death, and that Saudi Arabia and the United States have been longstanding allies and strategic partners. KSA Mem. 1, 3, 14; KSA Aver. ¶¶ 4-12; KSA Resp. to Pls. Aver. at 3-4. Every United States government body that has investigated the 9/11 attacks, including the 9/11 Commission,

---

[7] Short citation forms such as "KSA Mem.," KSA Aver.," and "Bayoumi Tr." are the same as those used in the motion briefing. Full references are provided in the Glossary.

[8] Saudi Arabia also presented evidence that Kaysan Morgan, who met the hijackers with Al Bayoumi, saw nothing to indicate that the meeting was "anything other than a coincidence," KSA Mem. 6 n.4; KSA Aver. ¶ 105; and that Abdussattar Shaikh, who rented a room to Nawaf Al Hazmi and Khalid Al Mihdhar and who could not testify because he was deceased, was a longstanding FBI informant who observed nothing "unusual" about the hijackers that would warrant a "report to his law enforcement contacts," KSA Mem. 8; KSA Aver. ¶¶ 141-144.

the 9/11 Review Commission, the CIA, and the FBI, has concluded that no Saudi official or employee knowingly supported the 9/11 attacks.  KSA Resp. to Pls. Aver. at 3-4.

Even if the Order were correct that Plaintiffs had met their burden of production, it still should have considered, determined the credibility of, and weighed all of the record evidence.  Instead, it reserved for trial factual disputes that were key to jurisdiction.  Accordingly, there is a reasonable likelihood that the Second Circuit will conclude that the Order committed the error that the Supreme Court warned against in *Helmerich & Payne*:  it found that Plaintiffs had "good argument[s]" on jurisdictional questions but did not determine whether those arguments were "ultimately []correct."  581 U.S. at 174.[9]

2.    **Application to the record.**  Even if the Second Circuit concludes that the Order applied the correct legal standard, it will still review the Order's application of that standard.[10]  In considering whether to stay proceedings, the Court should not consider whether the Court itself believes that the Order errs.  *See Nam*, 2023 WL 2456646, at *3.  Rather, the Court should consider the "possibility" that the Second Circuit will reach that conclusion.  *Id.*  There are good reasons to believe that the Second Circuit will disagree with the Order's preliminary findings about the scope-of-employment and tortious-conduct issues.

a.    **Telephone calls.**  The Order relies on telephone-call evidence both as to scope of employment and as to tortious conduct.  It states that Saudi Arabia presented "speculation rather than direct evidence" to support its argument that certain phone calls "between Bayoumi and

---

[9] *Alliance For Environmental Renewal*, on which the Order relies (at 39-40), discussed preliminary findings about jurisdictional facts relevant to Article III standing.  *See* 436 F.3d at 88.  Accordingly, it is distinguishable from FSIA cases like *Helmerich & Payne* and *Robinson*.

[10] The Order's legal rulings will be subject to *de novo* review; if it is construed to make factual findings, those findings will be subject to clear-error review.  *See Beierwaltes v. L'Office Federale De La Culture De La Confederation Suisse*, 999 F.3d 808, 817 (2d Cir. 2021).

13

Thumairy, between Bayoumi and the Saudi Embassy, and between Bayoumi and the Saudi

Consulate" were "related to Bayoumi's education, requests for religious materials, other

administrative matters, or religious questions . . . during the holy month of Ramdan."  Order 43.

That statement is incorrect.  Saudi Arabia presented direct (as well as supporting circumstantial)

evidence on each of those points.

      **i.**      **Educational records.**  Al Bayoumi testified that he called the Saudi Embassy

about his educational records, including a specific example in March 2000.  KSA Mem. 29-30

(citing Bayoumi Tr. 766:6-768:2, 776:17-778:8); Bayoumi Tr. 777:22-778:8 (discussing a

document stamped the Hijri-calendar equivalent to "March 24th of 2000").  In one documented

sequence on February 2, 2000, Al Bayoumi called not only the Embassy and the Consulate, but

also the Saudi Arabian Cultural Mission (which supports Saudi students in the United States) and

the Keller Graduate School.  KSA Reply 17; KSA Resp. to Pls. Aver. ¶¶ 1518-1519 (detailing

calls).  The same week, he brought a letter from the Keller Graduate School confirming his

enrollment there, as part of the process of renewing his passport.  KSA Ex. 85, at 6644, 6646-47.

      **ii.**      **Requests for religious materials.**  Al Bayoumi testified that he called the Saudi

Embassy and Saudi Consulate to request religious materials for the Al Madina Mosque, where he

was a volunteer, as well as to request donations.  KSA Mem. 29-30 (citing Bayoumi Tr. 301:13-

303:19); *see also* Bayoumi Tr. 379:10-13 ("I may have called [the Consulate] once, twice or

three times, in order for them to prepare the books.").  His testimony was corroborated by Ismail

Mana, who met Al Bayoumi to provide such materials.  Mana Tr. 134:8-136:22; *see also* Morgan

Decl. ¶ 12 (confirming that Al Bayoumi and Mana "spoke briefly about Mr. al-Bayoumi's interest

in obtaining religious materials, including Korans from the consulate").  Contemporaneous

documentary evidence confirms that the Saudi Consulate provided "Qur'ans" and "books"

for the Al Madina Mosque.  Pls. Ex. 412.

iii.    **Other administrative issues.**  Al Bayoumi testified that he called the Saudi Consulate in late January or early February about the renewal of his own and his family's passports.  Bayoumi Tr. 377:15-19 ("Before I went to the consulate, I made a call.  I spoke to the operat[or] about my intent to go to the consulate to renew the passports and pick up Quran books.").  Contemporaneous documentary evidence confirms that Al Bayoumi's and his family's passports were renewed at that time.  KSA Ex. 85, at 6643 (later Consulate report about visit); *id.* at 6648 (application for passport dated January 31, 2000); *see also* KSA Ex. 42 (passport showing issuance date of February 1, 2000).

iv.    **Religious questions.**  Al Thumairy testified that it was common for him, as an imam, to receive calls about religious questions, especially during Ramadan.  KSA Mem. 29; Thumairy Tr. 495:13-497:13.  Al Bayoumi testified that he called Al Thumairy, among other imams, to ask such questions or to pass on questions from patrons of the Al Madina Mosque. KSA Reply 17; KSA Resp. to Pls. Aver. ¶ 1254; Bayoumi Tr. 451:1-23.  Al Thumairy did not recall Al Bayoumi, but testified that as an imam he interacted with many people and could not remember all of their names.  KSA Resp. to Pls. Aver. ¶ 479; Thumairy Tr. 565:7-566:13.

The Order's statement that there is "no record evidence as to the content of the[] phone calls" is thus not accurate.  Although Plaintiffs indeed presented no such evidence, Saudi Arabia presented evidence showing that there were innocent explanations for the calls and contemporaneous documents corroborating those explanations.  There is a reasonable probability that the Order's refusal to consider that evidence will not withstand review.

b.    **The April 2000 salary increase.**  The Order states that Al Bayoumi's salary increase in April 2000 "could be related to the assistance [he] provided to the hijackers at that time" and that the "record is also unclear as to where the money came from that was provided and expended on behalf of the hijackers."  Order 33-34, 37.  This was important to its scope-of-

15

employment determination.  But there is no record evidence that Al Bayoumi spent money on behalf of the hijackers.  Rather, the record – including Al Bayoumi's contemporaneous bank statement – shows that Al Bayoumi assisted them by providing a certified check for $1,558, but that they reimbursed him for the funds at the same time.  KSA Mem. 7; KSA Aver. ¶¶ 113-115 (citing Bayoumi Tr. 440:14-443:13, 735:21-736:11; KSA Ex. 91; Ratchford Decl. ¶ 14).  That is consistent with the 9/11 Commission's finding that Al Bayoumi did not give money to Al Hazmi or Al Mihdhar, who instead received the money they used in the United States from Al Qaeda member Khalid Sheikh Mohammed.  KSA Aver. ¶ 116 (citing 9/11 Rep. 219).

Further, there is no evidence that Al Bayoumi interacted with the hijackers, much less assisted them, in or after April 2000.  The record shows that he was out of the United States in April 2000 and did not return until May 31, 2000, at the earliest.  KSA Reply 40 & n.35; KSA Resp. to Pls. Aver. ¶¶ 1108, 1758, 1767.  There is no evidence that he interacted with or gave them money after that time.  Thus, the Order draws an unsupported inference that the salary increase was funding financial support that Al Bayoumi never gave to the hijackers.

      **c.**      **The "airplane drawing."**  The Order states that a drawing found in Al Bayoumi's papers, well after the 9/11 attacks, "facially connect[ed]" him "with knowledge of the 9/11 Attacks" and supports a finding of tortious conduct.  Order 40-41; *but see id.* at 45 (describing the "meaning behind" the drawing as a "dispute[d]" issue).  Both parties' aviation experts agreed that the drawing does not match the 9/11 hijackers' actual flight path, KSA Resp. to Pls. Aver. ¶ 1905 (citing Schiff Tr. 75:6-10; Moss Rep. 8-9, 11-16); and Plaintiffs' expert conceded on cross-examination that, if he saw the drawing "in and by itself," he "would have no reason to believe it had anything to do with anything," KSA Resp. to Pls. Aver. ¶ 1898 (quoting Schiff Tr. 50:11-51:21).  Saudi Arabia's expert further opined that the equation on the paper is not commonly used in aviation and would not have been useful to the hijackers.  KSA Resp. to

Pls. Aver. ¶ 1900; Moss Rep. 8-9.  Instead, the equation is a variation of the Pythagorean equation commonly assigned in high-school mathematics homework.  Moss Rep. 7 & nn.12-15 (discussing four textbook examples).

Accordingly, there was record evidence to support an explanation for the drawing that had nothing to do with the 9/11 attacks.  And, to be clear, no direct evidence suggested that the drawing did have anything to do with the attacks:  both sides presented the Court with circumstantial evidence.[11]  To be sure, Al Bayoumi himself did not remember the equation one way or another.  KSA Resp. to Pls. Aver. ¶ 1909; Bayoumi Tr. 290:7-292:9.  But the Second Circuit may conclude that the Order erred in treating Al Bayoumi's unremarkable inability to recall a 20-year-old document as a reason to accept Plaintiffs' sinister explanation for the document and reject Saudi Arabia's innocent one.

3.    **But-for causation.**  The Order reaffirms this Court's earlier ruling that JASTA requires Plaintiffs to show, at the jurisdictional stage, only a "reasonable connection" between the alleged tortious conduct and Plaintiffs' injuries, and does not require them to show that the attacks would not have happened but for the tortious conduct.  The appropriate causation standard will be a question of first impression at the appellate level.  The statute states that the injuries must be "caused by" the tortious act.  28 U.S.C. § 1605B(b).  Since 2018, the Supreme Court has reaffirmed that statutory phrases such as " 'because of' . . . incorporate[ ] the ' "simple" ' and 'traditional' standard of but-for causation."  *Bostock v. Clayton Cnty.*, 590 U.S. 644, 656 (2020) (quoting *Univ. of Texas S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 350, 360 (2013)).

---

[11] The Order quotes Saudi Arabia's counsel's statement at oral argument that there was "no direct evidence from him," that is, Al Bayoumi, Order 29 n.19, to show that the drawing was about a math problem, but omits counsel's immediately following reference to the testimony of the "experts."  ECF No. 10286, at 144:9-15.

17

This Court's contrary ruling rests primarily on cases interpreting 28 U.S.C. § 1605A (and its predecessor § 1605(a)(7) (repealed 2008)), which also contains the words "caused by," to impose a permissive "jurisdictional causation" requirement.  ECF No. 3946, at 13-14 (citing, *e.g.*, *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123 (D.C. Cir. 2004)).  For example, the D.C. Circuit observed in *Kilburn* that "the words 'but for' simply d[id] not appear" in § 1605(a)(7); only 'caused by' d[id]."  376 F.3d at 1128.  But those cases were decided without the benefit of later Supreme Court guidance that a "but-for requirement is part of the *common understanding of cause*."  *Burrage v. United States*, 571 U.S. 204, 211 (2014) (emphasis added).  They were also decided without the benefit of *Helmerich & Payne*'s clarification that, in FSIA cases, jurisdictional elements must be decided on a motion to dismiss even when they "intertwine[ ]" with the merits of the case.  581 U.S. at 178.

There is a reasonable likelihood that the Second Circuit will interpret the phrase "caused by," like the similar phrases "results from" and "because of," to impose "a requirement of actual causality."  *Burrage*, 571 U.S. at 210-13; *see Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176-77 (2009) ("'An act or omission is not regarded as a cause of an event if the particular event would have occurred without it.'") (quoting W. Page Keeton et al., *Prosser and Keeton on Law of Torts* 265 (5th ed. 1984)).  If so, then either the Second Circuit or this Court will have to reconsider whether Plaintiffs have alleged sufficient facts to show that the 9/11 attacks would not have occurred but for Al Bayoumi's or Al Thumairy's conduct.  Given that Al Hazmi's and Al Mihdhar's mission to San Diego ended in failure (neither of them obtained flight training or became pilots, *see* KSA Mem. 4; KSA Reply 57-58), the correct standard will lead to a determination that Plaintiffs have not pleaded, much less proved, actual causation.

### D.    The Public Interest Favors a Stay

Two public interest factors favor a stay.  *First*, foreign sovereign immunity serves important purposes of international comity.  *See Helmerich & Payne*, 581 U.S. at 179 ("To grant [foreign] sovereign entities an immunity from suit in our courts both recognizes the 'absolute independence of every sovereign authority' and helps to 'induce' each nation state, as a matter of 'international comity,' to 'respect the independence and dignity of every other,' including our own.") (quoting *Berizzi Bros. Co. v. The Pesaro*, 271 U.S. 562, 575 (1926)) (cleaned up); *World Trade Ctr.*, 503 F.3d at 170 (recognizing the "public interest in vindicating the immunity of . . . Defendants who might be entitled to immunity from suit").  That principle warrants special care in examining this Court's determination that this case fits within the exception that Congress carved out to the general principle of immunity.

*Second*, "proceeding . . . with [a] trial risks wasting the resources of the parties, the Court, and the public, if Defendant is ultimately found to be immune from suit."  *Nam*, 2023 WL 2456646, at *3 (citing *Ferring B.V. v. Allergan, Inc.*, 343 F. Supp. 3d 284, 292 (S.D.N.Y. 2018)).  That point returns to the Supreme Court's observation in *Coinbase*, quoting Judge Easterbrook in *Apostol*, that "it 'makes no sense for trial to go forward while the court of appeals cogitates on whether there should be one.'"  599 U.S. at 741 (quoting 870 F.2d at 1338).  Both as a matter of jurisdiction and as a matter of prudence, that observation weighs heavily in favor of a stay.

## CONCLUSION

The Court should rule that it lacks jurisdiction to proceed with pretrial and trial proceedings against Saudi Arabia during Saudi Arabia's interlocutory appeal.  Alternatively, the Court should grant a stay of all such proceedings in the exercise of its discretion.

Date:  September 11, 2025                    Respectfully submitted,

                                     /s/ *Michael K. Kellogg*
                                     Michael K. Kellogg
                                     Mark C. Hansen
                                     Gregory G. Rapawy
                                     Andrew C. Shen
                                     KELLOGG, HANSEN, TODD, FIGEL
                                        & FREDERICK, P.L.L.C.
                                     1615 M Street, N.W., Suite 400
                                     Washington, D.C. 20036
                                     (202) 326-7900
                                     (202) 326-7999 (fax)

                                     *Attorneys for the Kingdom of Saudi Arabia*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rules 6.3 and 7.1(c), I certify that the foregoing document, which was prepared using Times New Roman 12-point typeface, contains 6,255 words, excluding the parts of the document that are exempted by Local Civil Rule 7.1(c).  This certificate was prepared in reliance on the word-count function of the word-processing system (Microsoft Office Word 365) used to prepare the document.

/s/ *Michael K. Kellogg*
Michael K. Kellogg

*Attorney for the Kingdom of Saudi Arabia*

**CERTIFICATE OF SERVICE**

I hereby certify that, on September 11, 2025, I caused a copy of the foregoing document to be served electronically pursuant to the Court's ECF system.

/s/ *Michael K. Kellogg*

Michael K. Kellogg

*Attorney for the Kingdom of Saudi Arabia*