Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

In re:

      TERRORIST ATTACKS ON
      SEPTEMBER 11, 2001

-----------------------------------------------------------------X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: __12/11/2024__

**03-MD-01570 (GBD)(SN)**

**OPINION & ORDER**

**SARAH NETBURN, United States Magistrate Judge:**

The Plaintiffs in this multidistrict litigation seek to hold the Kingdom of Saudi Arabia

(the "Kingdom") and Dallah Avco Trans Arabia Company ("Dallah Avco") liable for the

September 11, 2001 terrorist attacks on the United States (the "9/11 Attacks"). After years of

discovery, the Kingdom and Dallah Avco (collectively, the "Defendants") filed renewed motions

to dismiss challenging the Court's jurisdiction over the Plaintiffs' claims. See ECF Nos. 9362,

9368.[1] The parties' arguments for and against dismissal are backed by competing averments of

jurisdictional facts, documentary evidence, witness declarations, and expert reports.

Before the Court are the parties' cross-motions to exclude the testimony of seven expert

witnesses proffered in connection with the jurisdictional litigation. See ECF Nos. 9088, 9091.

After a careful review of thousands of pages of briefing, expert reports, and exhibits, the Court

grants in part and denies in part both motions.

## BACKGROUND

The Court assumes familiarity with this multidistrict litigation and summarizes only the

relevant procedural and factual background.

---

[1] Unless otherwise noted, all ECF numbers refer to the main MDL docket, No. 03-md-01570.

# I.  Kingdom of Saudi Arabia

Litigation over these jurisdictional issues stretches back to 2004, when the Kingdom moved to dismiss claims against it in Federal Insurance Co. v. Al Qaida, No. 03-cv-06978, ECF No. 177, on foreign sovereign immunity grounds. Judge Casey granted the Kingdom's motion, concluding that the "Plaintiffs ha[d] not met their burden of demonstrating an exception to the [Foreign Sovereign Immunity Act] applies to negate the Kingdom's immunity." In re Terrorist Attacks on Sept. 11, 2001, 349 F. Supp. 2d 765, 804 (S.D.N.Y. 2005). His order was affirmed on appeal, In re Terrorist Attacks on Sept. 11, 2001, 538 F.3d 71, 90 (2d Cir. 2008), but the rationale adopted by the Court of Appeals was later partially overruled by Doe v. Bin Laden, 663 F.3d 64 (2d Cir. 2011).

The Plaintiffs then moved for relief from judgment under Federal Rule of Civil Procedure 60(b). Judge Daniels denied the Rule 60(b) motion so the Plaintiffs could seek appellate review on the question: whether the change in law warranted revisiting the jurisdictional issues in the case. See In re Terrorist Attacks on Sept. 11, 2001, 741 F.3d 353, 354–55 (2d Cir. 2013). The Court of Appeals concluded that it did and remanded the action to Judge Daniels for further proceedings.

Following remand, the Kingdom again sought dismissal on foreign sovereign immunity grounds. Judge Daniels granted the motion, holding that the Plaintiffs' "allegations do not strip Defendants of sovereign immunity." In re Terrorist Attacks on Sept. 11, 2001, 134 F. Supp. 3d 774, 782 (S.D.N.Y. 2015). The Plaintiffs appealed.

Then Congress stepped in. It enacted the Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852, 853 (2016) ("JASTA"), which added an exception to foreign sovereign immunity and, separately, a civil cause of action intended to provide "litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief

2

against persons, entities, and foreign countries . . . that have provided material support . . . to foreign organizations or persons that engage in terrorist activities against the United States." In light of this change in law, the Court of Appeals granted the parties' joint motion to vacate the order dismissing the claims against the Kingdom and remanded for further proceedings. See In re Terrorist Attacks on Sept. 11, 2001, No. 15-3426, 2017 WL 8776686 (2d Cir. Feb. 7, 2017).

In 2018, Judge Daniels issued a new decision analyzing the claims against the Kingdom under JASTA. Although he found several of the Plaintiffs' theories insufficient, the allegations as to two Saudi individuals, Fahad al Thumairy and Omar al Bayoumi, "articulated a reasonable basis" for exercising jurisdiction over the Kingdom such that jurisdictional discovery was appropriate. In re Terrorist Attacks on Sept. 11, 2001, 298 F. Supp. 3d 631, 651 (S.D.N.Y. 2018).

According to the Plaintiffs, from 1998 to 2001, "Thumairy was the imam at the Saudi-funded King Fah[a]d Mosque" in Los Angeles County and "an accredited Saudi diplomat working for Saudi Arabia's Ministry of Islamic Affairs" ("MOIA"). Id. at 648. He allegedly "orchestrat[ed] the U.S.-based support network for two of the 9/11 hijackers, Nawaf al Hazmi and Khalid al Mihdhar . . . at the direction of an unnamed senior Saudi official." Id. At Thumairy's behest, Bayoumi, a longtime Saudi government employee seconded to Dallah Avco, allegedly "met with Hazmi and Mihdhar and offered to help them settle in San Diego," which he did by "finding them an apartment . . . , co-signing their lease as a guarantor, helping them open a bank account, and paying their rent on occasion." Id. at 649.

## II.     Dallah Avco

The Dallah Avco litigation mirrored the course of the case against Saudi Arabia. In 2006, Dallah Avco moved to dismiss claims against it on jurisdictional grounds. See ECF No. 1711. The Court granted that motion in 2010 after finding that Dallah Avco's presence in the United

States was insufficient for general jurisdiction and Bayoumi's actions could not be attributed to it for purposes of specific jurisdiction. <u>See</u> ECF No. 2252. The Plaintiffs appealed.

In 2013, the Court of Appeals vacated the dismissal order. <u>In re Terrorist Attacks on Sept. 11, 2001</u>, 714 F.3d 659 (2d Cir. 2013). Explaining that the Plaintiffs' "jurisdictional theory against Dallah Avco is not limited solely to the acts of al Bayoumi," the Court remanded for jurisdictional discovery of allegations that "Dallah Avco provided 'cover employment'" for Bayoumi. <u>Id.</u> at 679.

## III.    Jurisdictional Discovery

Judge Daniels directed the parties to proceed with "limited and targeted" discovery into "whether and to what extent Thumairy, Bayoumi, and their agents took actions in 2000, at the direction of more senior Saudi officials, to provide assistance to" al Qaeda hijackers Nawaf al Hazmi and Khalid al Midhar. <u>In re Terrorist Attacks on Sept. 11, 2001</u>, 298 F. Supp. 3d at 651. Pursuant to that decision, the Plaintiffs have engaged in discovery with the Kingdom, Dallah Avco, and other defendants in this litigation and secured materials from third-party sources such as the Federal Bureau of Investigation ("FBI"), the Central Intelligence Agency ("CIA"), the London Metropolitan Police Service ("MPS"), the Departments of Justice and State, and various telephone companies, banks, universities, and mosques. <u>See, e.g.</u>, ECF No. 9089-1 at 12. The record now includes thousands of pages of documents, multimedia files, witness declarations, depositions, and, as relevant here, expert reports.

Following the close of jurisdictional discovery, the parties filed these cross-motions to exclude expert testimony and then briefed the Defendants' renewed motions to dismiss, which are pending before Judge Daniels.

## LEGAL STANDARD

Federal courts are entrusted with separating the expert testimony wheat from the chaff. That task is guided by Rule 702 of the Federal Rules of Evidence,[2] the Supreme Court's seminal decision in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and decades of precedent interpreting and applying the law.

Rule 702 was recently amended. It now reads:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Advisory Committee on Evidence Rules proposed the changes in response to court decisions that admitted expert testimony too liberally. The revised language, which went into effect on December 1, 2023, clarifies that (i) the party introducing expert testimony has the burden to show that "the proffered testimony meets the admissibility requirements," and (ii) "each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." Fed. R. Evid. 702 advisory committee's note to 2023 amendment.

---

[2] Unless otherwise noted, subsequent references to "Rules" are to the Federal Rules of Evidence.

These amendments "reflect an intent to empower courts to take seriously their roles as gatekeepers of expert evidence." United States v. Diaz, No. 24-cv-0032 (MV), 2024 WL 758395, at *5 (D.N.M. Feb. 23, 2024). Because "jurors may lack the specialized knowledge" to evaluate the quality of a witness's opinion and its limitations, it is not enough to "presume[]" "expert testimony . . . admissible" and relegate issues of reliability to cross-examination. Id. at *4 (first quoting Fed. R. Evid. 702 advisory committee's note to 2023 amendment; and then quoting Proposed Amendments, Excerpt from May 15, 2022 Report of the Advisory Committee on Evidence Rules). Courts must withhold endorsement from expert witnesses who fail to meet Rule 702's standards. With that in mind, the Court summarizes the law governing expert testimony.

**Rule 702** authorizes courts to admit expert testimony that meets three conditions: (1) the witness is "'qualified,'" (2) her "opinion is based upon reliable data and methodology," and (3) her "testimony will '[help] the trier of fact.'" Nimely v. City of New York, 414 F.3d 381, 397 (2d Cir. 2005) (quoting Fed. R. Evid. 702). An expert's testimony is admissible only if the party offering it establishes all three criteria.

**Qualifications**. A witness's qualifications typically show up on her resume. The relevant qualifications depend upon the area of expertise but may include education, technical or practical training, certifications, licenses, or professional, teaching, or other experience. See In re Puda Coal Sec. Inc. Litig., 30 F. Supp. 3d 230, 250 (S.D.N.Y. 2014) (listing "educational background, training, and experience in the field" as relevant qualifications); Focus Prods. Grp. Int'l v. Kartri Sales Co., 647 F. Supp. 3d 145, 234 (S.D.N.Y. 2022) (same as to certifications and accreditations); Tardif v. City of New York, 344 F. Supp. 3d 579, 597 (S.D.N.Y. 2018) (same as

to licensure); <u>Capri Sun GmbH v. Amer. Beverage Corp.</u>, 595 F. Supp. 3d 83, 138 (S.D.N.Y. 2022) (same as to teaching).

Looking at the "totality of the witness's background," the court asks whether the "area in which the witness has superior knowledge, education, experience, or skill [matches] the subject matter of the proffered testimony." <u>Nat'l Coalition on Black Civic Participation v. Wohl</u>, 661 F. Supp. 3d 78, 97 (S.D.N.Y. 2023) (first quoting <u>Arista Records LLC v. Usenet.com, Inc.</u>, 608 F. Supp. 2d 409, 422 (S.D.N.Y. 2009); and then quoting <u>United States v. Tin Yat Chin</u>, 371 F.3d 31, 40 (2d Cir. 2004)); <u>see, e.g.</u>, <u>Moncayo v. United Parcel Serv., Inc.</u>, No. 23-cv-00161, 2024 WL 461694, at *1 (2d Cir. Feb. 7, 2024) (affirming decision excluding opinions that were "not within [the witness's] area of expertise"). If the witness's testimony addresses subjects within her area of expertise, she is considered qualified.

**Reliability**. Assessing an expert's reliability requires "rigorous" scrutiny of the principles and methods behind her opinions. <u>Amorgianos v. Nat'l R.R. Passenger Corp.</u>, 303 F.3d 256, 267 (2d Cir. 2002). Because "there are many different kinds of experts, and many different kinds of expertise," a one-size-fits-all approach to analyzing reliability is unworkable. <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 150 (1999). Accordingly, judges "have considerable leeway in deciding . . . how to go about determining whether particular expert testimony is reliable." <u>Id.</u> at 152.

Courts may consider the benchmarks identified in <u>Daubert</u>—(i) "a theory's testability," (ii) "whether it has been a subject of peer review or publication," (iii) "the known or potential rate of error," (iv) "whether there are standards controlling the technique's operation," and (v) "the degree of acceptance within the relevant scientific community." <u>Kumho Tire Co.</u>, 526 U.S. at 145, 149 (cleaned up). Or they may look to other factors, such as: (i) the context in which the

expert developed her opinion (i.e., for her "'independent research' . . . or . . . 'expressly for purposes of testifying'"); (ii) "whether she 'has unjustifiably extrapolated from an accepted premise to an unfounded conclusion'"; (iii) her success in "account[ing] for . . . alternative explanations"; (iv) whether she is "as careful as [s]he would be in h[er] regular professional work"; and (v) "whether her 'field of expertise . . . is known to reach reliable results for the type of opinion offered.'" In re Terrorist Attacks on Sept. 11, 2001, No. 03-md-01570 (GBD)(SN), 2023 WL 3116763, at *2–3 (S.D.N.Y. Apr. 27, 2023) (quoting Deutsch v. Novartis Pharms. Corp., 768 F. Supp. 2d 420, 426 (E.D.N.Y. 2011)).

Whatever metrics a court uses to assess a particular expert, the reliability standard is the same: "Rule 702 does not set a lower [bar] for witnesses with 'technical or other specialized knowledge' than for scientists." Restivo v. Hessemann, 846 F.3d 547, 576 (2d Cir. 2017). A witness whose expertise derives from her experience must accordingly "base her opinion on sufficient facts or data, explain how her experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Veleron Holding, B.V. v. Morgan Stanley, 117 F. Supp. 3d 404, 444 (S.D.N.Y. 2015) (cleaned up); accord Fed. R. Evid. 702 advisory committee's note to the 2000 amendment.

Applying these principles, courts exclude opinions that reflect "too great an analytical gap between the data and opinion proffered"—in other words, testimony supported "only by the ipse dixit of the expert." General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) ("Joiner"). The same goes for opinions based on "speculation" or conjecture, Daubert, 509 U.S. at 590, those rooted in a "discipline [that] itself lacks reliability," Kumho Tire Co., 526 U.S. at 151, or even testimony that "for security reasons . . . would not be open to adequate inquiry on cross-examination," Gill v. Arab Bank, PLC, 893 F. Supp. 2d 523, 530 (E.D.N.Y. 2012). These

safeguards ensure that "the courtroom door remains closed" not just "to junk science" but to all unreliable testimony. Amorgianos, 303 F.3d at 267.

**Helpfulness**. Expert testimony is helpful when it "sheds light on activities not within the common knowledge of the average juror." United States v. Wexler, 522 F.3d 194, 204 (2d Cir. 2008). Such testimony "provide[s] the groundwork to enable the [trier of fact] to make its own informed determination[s]" on relevant issues. In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig., 725 F.3d 65, 114 (2d Cir. 2013). So when an expert offers her opinion, she must take care not to "usurp the role" of the trier of fact by dictating the result or otherwise straying from the expert-witness lane. Nimely, 414 F.3d at 397 (cleaned up); see Mar-Can Transp. Co. v. Loc. 854 Pension Fund, No. 20-cv-08743 (CS), 2024 WL 1250716, at *4 (S.D.N.Y. Mar. 22, 2024).

In concrete terms, this means that "legal conclusions," United States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994); "credibility" determinations; "motivations," "intentions," and other states of mind, Marvel Characters, Inc. v. Kirby, 726 F.3d 119, 135–36 (2d Cir. 2013); and "'lay matters' which the trier of fact can understand and decide without the expert's help" are off limits to expert witnesses, United States v. Jiau, 734 F.3d 147, 154 (2d Cir. 2013); accord United States v. Zhong, 26 F.4th 536, 555 (2d Cir. 2022).

"Factual narrative[s]" in expert testimony run afoul of many of these principles. Kozak v. Liberty Mar. Corp., No. 20-cv-03684 (MMH), __ F. Supp. 3d __, 2024 WL 1558809, at *11 (E.D.N.Y. Apr. 10, 2024). A party that uses an expert witness as a vehicle to "summarize the relevant facts . . . and then opine—or, more accurately, argue—that" its theory of the case is the correct one is, "in essence, giving a summation from the witness stand." Lippe v. Bairnco Corp., 288 B.R. 678, 687–88 (Bankr. S.D.N.Y. 2003). That is counsel's job. It is "not the function of an

expert witness." Id. at 688. Like other opinions that lack "a layer of expertise or cogent analysis beyond that which a lay jury would so clearly understand," factual narratives must be excluded. Est. of Jaquez v. City of New York, 104 F. Supp. 3d 414, 432 (S.D.N.Y. 2015).

**Weight**. If an expert's opinion meets the three criteria for admission, any further challenges go to its weight. Fed. R. Evid. 702 advisory committee's note to the 2023 amendment. Daubert advises that such weaknesses can be addressed by "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." 509 U.S. at 596.

**Hearing**. As with many aspects of this process, courts have wide latitude to decide whether to hold a Daubert hearing. No hearing is necessary if a motion challenging expert testimony can be decided on written submissions. Du v. Party Perfect Rentals LLC, No. 23-cv-00088 (JAM), __ F. Supp. 3d __, 2024 WL 1617315, at *4 (E.D.N.Y. Apr. 15, 2024).

## DISCUSSION

The Court carefully applies these standards to the seven expert witnesses the parties have challenged. There is no need for a Daubert hearing. The motion for argument is denied as moot. See ECF No. 9281.

## I. Bassem Youssef

### A. Background

Bassem Youssef ("Youssef") is a decorated former FBI agent. He joined the Bureau after graduating from California State University in 1987 with a degree in anthropology. See ECF No. 9165-3 at 3. He was quickly staffed as a special agent on investigations that leveraged his fluency in Arabic. One of those investigations concerned the Abu Nidal Organization, a Palestinian militant group that was active in the United States. See id. The other, based out of the FBI's Los Angeles Field Office, focused on Al-Gama'a Al-Islamiya, an Egyptian Sunni

extremist group and then-designated Foreign Terrorist Organization. See id. As part of his responsibilities, he recruited sources and conducted polygraph exams in Arabic and English. See id.

In 1996, Youssef became the first FBI legal attaché stationed at the U.S. Embassy in Riyadh, Saudi Arabia. See id. at 2. His duties there involved liaising with law enforcement and security officials in the Gulf region. See id. at 3.

Youssef returned to the United States in 2000 to work at the CIA's National Counterintelligence Center before transferring to the FBI's Counterterrorism Division in 2002. See id. at 2. Within that division, he served first as chief of the Digital Media Exploitation Unit, where he developed guidelines and policies for the FBI's efforts to use digital media analysis "in support of Operation Enduring Freedom." Id. at 2. Then from 2004 to 2014 he served as chief of the Communications Analysis Unit, an office "dedicated to analyzing terrorist telephonic and email communications," ECF No. 9089-1 at 10, where he collaborated with "members of the intelligence community and foreign security services . . . in communications analysis," and "[o]versaw multiple highly sensitive and compartmented telecommunication-related projects," ECF No. 9165-3 at 2.

He retired in 2014 after 26 years of service. See id. at 2. His work was recognized with the Director of Central Intelligence Award, 11 FBI commendations, and a commendation letter from British Prime Minister John Major. See id. at 3.

## B. Report

The Plaintiffs retained Youssef as an expert in "counterterrorism investigations and operations, specifically radical Islamic terrorism; Saudi Government political, diplomatic, and intelligence operations; counterintelligence; and communications analysis." See ECF No. 9089-1 at 12. They asked him to review "documents produced and depositions conducted in this case"

and offer his opinion. Youssef examined materials released pursuant to Executive Order 14040;

documents and media turned over by the Kingdom, Dallah Avco, the MPS, the FBI, the CIA,

federal agencies, universities, private companies, religious institutions, charitable organizations,

and other entities; and relevant sources he personally collected.

Youssef analyzed these materials and concluded that "9/11 hijackers Nawaf al Hazmi and

Khalid al Midhar" received knowing and "substantial assistance" from a "terror network inside

California" "covertly operate[d]" by "Sunni Islamic extremists, including Al Qaeda," with the

"support" of "the Kingdom of Saudi Arabia [and] its officials." ECF No. 9089-1 at 15. To

support that conclusion, his report makes four principal findings:

> (1)  "Saudi Arabia, and especially its Ministry of Islamic Affairs ("MOIA") established a longstanding network of Saudi government officials to support Sunni extremism inside the U.S., including in Southern California, and . . . both . . . Thumairy . . . and . . . Bayoumi . . . were part of this network."

> (2)  "Al Qaeda would have sent 9/11 hijackers . . . Hazmi and . . . Midhar to Southern California[] to commence the preparations in the United States for Al Qaeda's most important and ambitious plot[] only after conducting detailed research and planning."

> (3)  "Thumairy was the main designated contact person for Al Qaeda and its two operatives in Los Angeles and . . . used members of his extremist cell at the King Fahad Mosque, including Saudi Consulate employee Ismail Mana ("Mana") and Mohamed Johar ("Johar"), to assist Hazmi and Mihdhar during their time in Los Angeles."

> (4)  "Bayoumi was the designated 'handler' for Hazmi and Mihdhar assigned to relocate Hazmi and Mihdhar to San Diego and support them during their time there."

ECF No. 9163 at 18–20.

### C.   Qualifications

Youssef's qualifications to testify as an expert present a close question. To be sure,

Youssef led a commendable career as an FBI agent, devoting over two decades to serving the

American public. But the question is whether his "area of superior knowledge," "experience,"

and "skill" matches the "subject matter of his testimony." <u>Nat'l Coalition on Black Civic Participation</u>, 661 F. Supp. 3d at 97 (cleaned up).

At first blush, Youssef's career appears tailor-made for this case. His posts in Los Angeles and Riyadh exposed him to extremists operating in California and to Saudi officials—two types of people with key roles in the events at issue here. <u>See</u> ECF No. 9165-3 at 2–3. And he held positions of great trust in FBI offices analyzing communications and investigating terrorism—two specialties relevant to this litigation. <u>See id.</u> Indeed, the parties agree that Youssef is qualified to interpret phone records based on his experience overseeing the "analysis of telephone contacts and patterns" as Chief of the FBI's Communications Analysis Unit. ECF No. 9089-1 at 10; <u>see</u> ECF Nos. 9088 at 27, 9163 at 29.

Youssef's command of other investigative "skill[s]" used in his report is less clear, however. <u>Nat'l Coalition on Black Civic Participation</u>, 661 F. Supp. 3d at 97 (cleaned up). He appeals heavily to his background in "counterterrorism investigations and operations," but his practical experience in the area appears somewhat thin. ECF No. 9089-1 at 12, 14. Youssef's work as a case agent investigating terrorism cells was limited to the first few years of his career. <u>See</u> ECF No. 9088 at 26–27.[3] And although he may well have developed expertise in the special techniques used in counterterrorism assessments during his time in these posts, that is not evident on this record.[4]

---

[3] The Defendants also assert that Youssef's involvement in those investigations was merely as "a translator," citing FBI testimony from an employment discrimination case. ECF No. 9088 at 27 (citing <u>Youssef v. Fed. Bureau of Investigation</u>, 541 F. Supp. 2d 121, 128–29 (D.D.C. 2008)). Because of the procedural posture of the case, the district court never made factual findings as to the scope of his work. <u>See Youssef v. Fed. Bureau of Investigation</u>, No. 03-cv-1551 (D.D.C.). The Court therefore declines to rest its analysis of Youssef's qualifications on these claims.

[4] Youssef's generalized statement that he "was called upon, on a regular basis, to use [his] expertise and knowledge to make counterterrorism assessments based on information collected by the FBI" does not provide sufficient detail to erase these concerns. ECF No. 9089-1 at 14.

Nor does Youssef's specialized "knowledge" furnish a watertight foundation for his opinions. Nat'l Coalition on Black Civic Participation, 661 F. Supp. 3d at 97 (cleaned up). His testimony focuses on al Qaeda cell operations and MOIA activities in the United States, neither of which were central to the FBI work he describes in his report and curriculum vitae. See ECF No. 9089-1 at 15–21 (summarizing opinions about Saudi support for al Qaeda channeled through MOIA). His investigative work centered on other extremist groups (the Abu Nidal Organization and Al-Gama'a Al-Islamiya), and his Saudi government contacts were primarily in law enforcement. See ECF No. 9165-3 at 3.

Ultimately, the daylight between Youssef's expertise and the content of his testimony are reason for pause but not wholesale exclusion. Youssef's distinguished career as an FBI agent and his undisputed experience in subjects directly or closely related to those at issue here— notwithstanding disputes as to the quantum or depth of his experience—justify finding him qualified to testify about communications analyses and counterterrorism investigations. Although Youssef's testimony undoubtedly strays outside these bounds (e.g., his opinion that leading Ramadan prayers "did not involve difficult or 'exhausting' work," ECF No. 9089-1 at 112), these instances can be more cleanly addressed on reliability or helpfulness grounds. Accordingly, the Court declines to preclude Youssef's testimony as unqualified.

### D.  Reliability

**First**, the Defendants protest that the Court cannot assess the reliability of Youssef's testimony because he relies on "confidential or classified" methods or facts. ECF No. 9088 at 31–32. They challenge Youssef's testimony about his experience investigating terrorism cells in Southern California during the 1990s, for example, because materials related to those investigations remain classified. Id. This complaint is easily dispensed with. Youssef stated in his deposition: "all my analysis is in my report." ECF No. 9165-11 at 19:11. Taking him at his word,

the Court analyzes the methodology evident within the four corners of his report. The Defendants' concerns with Youssef's testimony about his early FBI investigations are thus matters of weight, not admissibility.[5]

**Second**, the Defendants argue that Youssef does not adequately explain how his experience "leads to the conclusions he reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Veleron Holding, B.V., 117 F. Supp. 3d at 444 (cleaned up); see ECF No. 9088 at 34–35. Youssef frequently cites his "observations," "experience," or "knowledge," ECF No. 9089-1 at 24, 70, 113, without "reveal[ing] how he has made use of" that information, Primavera Familienstifung v. Askin, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001). He writes, for example:

- "From my observations, Bin Laden and his army of mujahedin fighters which came to be known as 'Al Qaeda' played a supporting role for these 1993 terror plots against New York City targets and were closely linked not only to Abdel Rahman but to the terrorists who carried out the attacks." ECF No. 9089-1 at 24.

- "Based on my knowledge of Saudi Government operations, Sadhan and Sudairy were given instructions to meet with Thumairy immediately upon their arrival in Los Angeles to discuss their mission. Thumairy was the lead MOIA official in California, and Thumairy would have been informed in advance that two MOIA Propagators were assigned to work in Thumairy's area of responsibility." ECF No. 9089-1 at 113.

- "Based on my experience, it is incredible that Jaithen would disobey his written instructions and travel to a location in the U.S. without close consultation with his MOIA superiors." ECF No. 9089-1 at 148.

---

[5] The Defendants' objections to Youssef's qualifications are addressed *supra* I.C at 12–14. He therefore has a basis to testify about Saudi Arabia's historical financial ties with the Ibn Taymiyah Mosque, ECF No. 9089-1 at 18, 27; Al Gama'a Al-Islamiya's relationship with al Qaeda, id. at 22–24, 28–30; and the history of the Islamic Center of San Diego (ICSD), also known as the Abu Bakr Mosque, id. at 27, 91.

Each of these passages offers only "conclusor[y] [assertions] that [Youssef's] experience led to his opinion." Primavera Familienstifung, 130 F. Supp. 2d at 530. The Court needs greater context if it is to assess whether Youssef reliably applied his experience to the facts of this case.

Youssef does occasionally provide the necessary background. For instance, before discussing phone lines attributed to individuals relevant to this case, he writes:

- "In virtually every terrorism investigation and operation I handled or reviewed during my 26 years of service to the FBI, I encountered various forms of communication security used by different organizations, to maintain the secrecy of the operational plans and protect their identity from detection by intelligence/law enforcement agencies.

  In their attempt to shield their calling activity from detection, I have witnessed organizations provide their operatives with telephone numbers that are subscribed under different names and addresses. Operatives would also use several different telephone numbers at different times and may also abandon a particular number if they sense the number has been compromised." ECF No. 9089-1 at 125–26.

And in discussing Saudi Arabia's typical processes for selecting officials for important foreign posts, he sufficiently connects his Riyadh work experience to his opinions:

- "My experience taught me that Saudi officials will always select individuals for important positions that were first recommended by another trusted official. In fact, that recommendation is practically a mandatory requirement for applying for any position of importance and/or responsibility." ECF No. 9089-1 at 42.

- "From my work for the FBI, I know that Thumairy was given diplomatic titles that could only be issued pursuant to directions from high-level Saudi officials in the MOIA and the Ministry of Foreign Affairs." ECF No. 9089-1 at 47.

- "From my observations, the Saudi Government employed a strict hierarchy over its officials, particularly those working in a foreign country." ECF No. 9089-1 at 48.

But this welcome degree of insight is the exception, not the rule.

**Third**, the Defendants protest that Youssef resorts to speculation and conjecture. See ECF No. 9088 at 38–39. His report attempts to reconstruct events leading up to the 9/11 Attacks

and the roles various people played in them, working off an imperfect slate of witness accounts, intelligence reports, and phone records. Where the evidence is spotty, Youssef fills the void with his own ideas as to what people "would have" done, ECF No. 9088 at 38–39 (quoting <u>Major League Baseball Props., Inc. v. Salvino, Inc.</u>, 542 F.3d 290, 311 (2d Cir. 2008)):

- "Bayoumi *would not have* been sent to California and allowed to work there for seven years without the approval of Director General Salmi and other senior Saudi Government officials." ECF No. 9089-1 at 79 (emphasis added).

- "Al Qaeda and its planners *would never have* decided on Los Angeles and San Diego, California as the destination for Hazmi and Mihdhar unless there was an entrenched, verified support structure in place to ensure that its operatives would not be discovered and had sufficient help to safely carry out their plans." ECF No. 9089-1 at 107 (emphasis added).

- "Two trained Al Qaeda operatives *would not have* left a bag with someone and returned to pick it up unless they knew that person was part of their support network." ECF No. 9089-1 at 176 (emphasis added).

Frequently, Youssef leaps from "accepted premise[s] to . . . unfounded conclusion[s]." <u>Deutsch</u>, 768 F. Supp. 2d at 426. He takes neutral or ambiguous facts and interprets them to paint damning portraits of people or events. Two passages cleanly showcase this pattern:

- "The MOIA instructed its propagators Mersal and Jaithen to 'provide a detailed report' about their trip and to fill out a form providing details about 'every organization' visited. Neither man could recall if they prepared these documents, and no documents were produced, indicating that the true nature of their trip could not be set forth in an official report due to its sensitive and covert nature." ECF No. 9089-1 at 150.

- "The involvement of high-level Saudi Government officials in the support plot is confirmed by the facts that all but one of the Saudi Government officials involved in the plot are still working or continued to work for the Kingdom until their death or retirement." ECF No. 9089-1 at 232–33.

In each case, Youssef adopts a nefarious explanation of events without factual support rather than entertaining the possibility that, say, the MOIA lost the form Mersal and Jaithen filled out, or Saudi officials kept their jobs because their superiors were unaware or unconvinced of

17

allegations that they were involved in the 9/11 plot. His failure to "account for [these reasonable] alternative explanations," Deutsch, 768 F. Supp. 2d at 426, exposes the "analytical gap[s] between" the facts and Youssef's opinions, Joiner, 522 U.S. at 146. See ECF No. 9088 at 41–42 (criticizing Youssef's analysis of Saudi officials' involvement as "guilt by association").

**Fourth**, the Defendants attack Youssef's phone record analyses. See id. at 39–41. Youssef reviews call logs and event timelines and purports to divine the content of callers' discussions, even where the identity of the callers is contested. See id. at 39–41 (explaining disputes over the people with access to various phone lines).

- "My opinion is that the calls on December 7 and 8, 1999 comprise a 'call circle' with Thumairy contacting Mersal, Bayoumi, the Saudi Embassy and MOIA about the preparations for the upcoming trip of Mersal and Jaithen." ECF No. 9089-1 at 146.

- "In my opinion, this pattern of calls . . . show[s] that the participants in the calls—Thumairy, Bayoumi, Sowailem, Jaithen, Mersal, and Aulaqi—are all working/coordinating on an important matter/project that warrants the international travel of Jaithen and Mersal from Saudi Arabia to the U.S. to meet in person. . . . When viewed in context of the events occurring before and after these contacts, the project that these individuals must be working on is to handle the arrival of Hazmi and Mihdhar in California. The subsequent interactions of Hazmi and Mihdhar with the various members of this calling circle of individuals shows that the men are their advance team and support network, to assist in their preparation to participate in a mission inside the U.S." ECF No. 9089-1 at 159–60.

- "These calls, following Thumairy's meetings with Hazmi and Mihdhar and timed precisely with their arrival in San Diego and attendance at the ICSD Mosque, indicate that Thumairy was communicating with the ICSD's Imam about the two hijackers." ECF No. 9089-1 at 206.

- "In my opinion, Bayoumi's quick return to San Diego, Bayoumi's call to Sowailem's cell phone, and the sharp spike in calls between Bayoumi and Thumairy, are likely related to discussion of the arrangements being made to provide support for the arrival of 9/11 hijacker Hani Hanjour in San Diego on December 8, 2000, and the departure of Hanjour together with Nawaf al Hazmi from San Diego on December 11, 2000." ECF No. 9089-1 at 225.

Youssef insists that "[a]n analysis of the pattern and timing of phone calls between two individuals in relation to other known events is routinely used to reach conclusions about the substance of the conversations of those individuals." ECF No. 9089-1 at 176. The Defendants acknowledge that Youssef's experience with the FBI qualifies him "for the phone-call part of his analysis," but argue that his assumptions are unreliable. ECF No. 9088 at 19, 40. While the record may establish conflicting reports about the users of certain telephone lines, Youssef explains that his methodology is reliably used by the FBI. The Defendants may challenge these assumptions, but they do not render his opinion categorically unreliable.

**Fifth**, the Defendants object to Youssef's selective reliance on FBI reports. See ECF No. 9088 at 35–37. To be clear, there is nothing inherently wrong with a terrorism expert considering these materials—it is using them inconsistently that raises reliability concerns. Youssef does rely on some FBI assessments more than others. He puts significant weight on materials that support his theory of the case, like the FBI's July 2021 Electronic Communication ("EC"). See ECF Nos. 9089-1 at 16–17, 63–64, 167, 237, 240, 247 (discussing July 2021 EC); 9089-15 (July 2021 EC). And he downplays FBI statements that challenge his opinions, like Assistant Director McGarrity's September 2019 Declaration. See ECF No. 5142 (McGarrity Declaration). An expert's selective reliance on evidence, especially when it lines up with the outcome desired by the party who retained him, opens him up to accusations of "[c]herry-picking." In re Acetaminophen – ASD-ADHD Prods. Liab. Litig., 707 F. Supp. 3d 309, 336 (S.D.N.Y. 2023). Youssef adequately answers those charges in his deposition testimony. When questioned about his understanding of the McGarrity Declaration, which purported to clarify the meaning of a declassified FBI assessment, he gave principled reasons for putting stock in the original

assessment's language. <u>See</u> ECF No. 9089-2 at 100:3–103:6. These and other concerns about Youssef's characterization of FBI materials are thus a matter of weight, not admissibility.

**Sixth**, the Defendants push back on Youssef's use of anonymous sources. <u>See</u> ECF No. 9088 at 37–38. Youssef repeatedly credits source statements without discussing factors typically used to assess reliability, such as the source's "relationship" to the events, "motivation in providing information or assistance," "criminal history," and "prior record as a witness."[6] <u>See, e.g.</u>, ECF No. 9089-1 at 63 (passing off source reporting from ECF No. 9089-22 as FBI findings), 67 (same as to source reporting repeated in ECF No. 9089-14 at 5–6), 171 (citing source reporting without analyzing reliability factors).

In just one example, Youssef cites a source's tip about a phone call between Thumairy and an individual in Malaysia but does not provide any details about the source that suggest the information is trustworthy. <u>See</u> ECF No. 9089-1 at 161. Youssef defends his reliance on the tip by suggesting that he can intuit how the FBI viewed the source's credibility based on the "manner" in which the statements were "present[ed]" in FBI documents. ECF No. 9089-1 at 161 n.629. But nothing in the record indicates that second-hand credibility assessments are standard practice in the FBI or otherwise accepted as reliable.

Taken together, these issues[7] paint a portrait of an expert who has glossed over weaknesses in his opinion. Much of Youssef's testimony rests on conclusory assertions of experience, anonymous sources, or his own say-so. This is not true of Youssef's testimony about

---

[6] Office of the Inspector General, The Federal Bureau of Investigation's Compliance with the Attorney General's Investigative Guidelines, U.S. Dep't of Justice (Sept. 2005), https://oig.justice.gov/sites/default/files/legacy/special/0509/final.pdf (listing factors for evaluating sources pulled from the FBI's Confidential Informant Guidelines).

[7] The Defendants also raise Youssef's "guilty by association" logic. <u>See</u> ECF No. 9088 at 41–42. Because this argument overlaps to a significant degree with witness credibility issues addressed below, the Court declines to discuss it here.

the FBI's Southern California investigations during the 1990s, Saudi Arabia's approach to appointing foreign officials, terrorism organizations' communication security, and phone analysis. On these topics, Youssef's testimony is grounded in his relevant experience. But outside these limited topics, his opinions do not meet Rule 702's standards for reliability. Even though his findings may well be correct—an issue on which the Court takes no position at this time—the portions of his testimony that lack a reliable foundation must be excluded.

### E.    Helpfulness

Reliability aside, Youssef's testimony faces an uphill battle for admission. In the Defendants' view, his opinions should be excluded as unhelpful on four grounds. See ECF No. 9088 at 61–69.

**First**, the Defendants submit that Youssef's testimony amounts to an improper factual narrative. See ECF No. 9088 at 65–66. Examples are easy to provide, such as the following paragraph:

> • "In September 1993, shortly after Abdel Rahman's last visit to California, Prince Abdelaziz, the son of the Saudi King Fahad, visited the Ibn Taymiyah Mosque with his entourage. After meeting with Khalil, the Prince pledged to provide funds to purchase land for a new mosque in honor of his father. This began the project that led to the building of the King Fahad Mosque. Shortly thereafter, the Saudi Embassy provided $1 million to IFSIT for the land purchase, and an additional $4 million to start the construction." ECF No. 9089-1 at 33.

This paragraph, like many others in Youssef's report, pulls together evidence to tell a story. "But this is what a lawyer does in his or her summation to the jury. This is not the function of an expert witness." Lippe, 288 B.R. at 688. The Plaintiffs cannot use Youssef or any other expert to interpret testimony and documents that the factfinder can just as easily review. See Est. of Jaquez v. City of New York, 104 F. Supp. 3d 414, 432 (S.D.N.Y. 2015) (prohibiting expert from giving testimony that constituted "little more than common sense interpretations of the

evidence—a role well-suited for a jury"), aff'd sub nom. Est. of Jaquez by Pub. Adm'r of Bronx

Cnty. v. City of New York, 706 F. App'x 709 (2d Cir. 2017).

**Second**, the Defendants object to Youssef's opinions on states of mind. See ECF No.

9088 at 67–69. Experts cannot opine on "motivations and intentions," Marvel Characters, 726

F.3d at 135–36, "beliefs," United States v. Rahman, 189 F.3d 88, 136 (2d Cir. 1999), or other

"state[s] of mind," In re Fosamax Prods. Liab. Litig., 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009).

Yet Youssef ascribes "actual knowledge," "intent[]," "motive," and "purpose" to people and

entities. ECF No. 9089-1 at 119, 126, 197, 245. Sometimes he does this explicitly, as is the case

here:

> • "According to Morgan, at the time, the whole restaurant encounter
> seemed to him to be coincidental. This is exactly what Bayoumi
> *intended* as part of his tradecraft. Bayoumi *knew* that he needed a
> plausible excuse for meeting two Al Qaeda operatives and bringing
> them to San Diego." ECF No. 9089-1 at 198 (emphasis added).

Other times, his analysis of a person's motives is implicit, like in this passage:

> • "There is no evidence to suggest that the hardened Al Qaeda
> operative was homesick and was abandoning his mission to go
> home. What makes sense is that Mihdhar was doing exactly what Al
> Qaeda operatives do. He was heading back to report in person to Al
> Qaeda about the knowledge he gained from his five months in
> California." ECF No. 9089-1 at 220.

The Plaintiffs argue that these and other opinions are admissible as "'testi[mony] to

whether a given practice is consistent with a given state of mind.'" ECF No. 9163 at 74–75

(quoting United States v. Patel, No. 21-cr-220 (VAB), 2023 WL 2643815, at *39 (D. Conn. Mar.

27, 2023)). Even if this exception (which emerged in the business practices context[8]) applies

here, it does not save Youssef. As the examples above demonstrate, his report does more than

point out consistency—it purports to divine the "'real motive' behind certain" actions. In re

---

[8] See Media Sport & Arts S.R.L. v. Kinney Shoe Corp., No. 95-cv-03901 (PKL), 1999 WL 946354, at *4
(S.D.N.Y. Oct. 19, 1999).

Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004) (quoting Lippe, 288 B.R. at 688). Such testimony must be excluded. See Highland Capital Mgmt., L.P. v. Schneider, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) (excluding testimony about "how obtaining information concerning the McNaughton/Jones merger affected the Schneiders' actions"); see also In re Term Commodities Cotton Futures Litig., No. 12-cv-05126 (ALC), 2020 WL 5849142, at *14 (S.D.N.Y. Sept. 30, 2020) (excluding expert's testimony that the defendants' "motivation for the activity was to squeeze front-month shorts").

**Third**, the Defendants challenge Youssef's witness credibility assessments. See ECF No. 9088 at 66–67. "[T]he job[] of judging . . . witnesses' credibility and drawing inferences from their testimony belong[s] to the factfinder." Marvel Characters, 726 F.3d at 136; accord Nimely, 414 F.3d at 398 (prohibiting even those with special "scientific or technical expertise" in evaluating candor from offering opinions as to credibility). Both judge and jury are capable of "cataloguing . . . inconsistencies in the testimony and evidence" to reach a conclusion about a person's candor—no expert assistance required. ECF No. 9163 at 73. Youssef's accusations that witnesses are "lying," "incredible," "making a deliberate effort to obfuscate and obstruct," or "willing[] to say anything, as absurd as it may sound, to protect . . . superiors" are not helpful to the factfinder. ECF No. 9089-1 at 47, 51, 65, 160. All such testimony is precluded. See, e.g., id. at 75, 76, 77, 100, 119, 126, 132–33, 137–38, 148, 155, 209, 225, 239.

**Fourth**, the Defendants complain that Youssef acts as a conduit for hearsay. See ECF No. 9088 at 61–65. He does quote FBI reports and other documents, but generally as one piece of a broader mosaic of evidence, see, e.g., ECF No. 9089-1 at 63–64, or with his own commentary, see, e.g., id. at 124. This does not make him a Trojan horse for hearsay, so exclusion is not warranted.

23

### F.     Admissibility

Serious issues plague Youssef's opinions. On most topics, he fails to explain how his experience informs certain conclusions, employs unreliable analytical methods, relies on questionable sources of information, and speculates about witnesses' credibility and other individuals' states of mind, all in the service of his version of the events leading to the 9/11 Attacks. This "place[s] [him] not in the role of expert, but of narrator—and not even a reliable narrator, at that." Sec. & Exch. Comm'n v. Terraform Labs Pte. Ltd., 708 F. Supp. 3d 450, 471 (S.D.N.Y. 2023). So, while Youssef doubtless led an exemplary career, and his ultimate conclusions may be correct (a question the Court does not address at this juncture), the Court cannot admit expert testimony that falls below Rule 702's standards. See Fed. R. Evid. 702 advisory committee's note to the 2023 amendment. In light of the pervasive defects in Youssef's report, the motion to exclude his testimony is granted in large part. Youssef may, however, testify about the FBI's 1990s Southern California investigations, Saudi Arabia's approach to appointing foreign officials, terrorism organizations' communication security, and testimony based on telephone data analysis.

## II.     Emile Nakhleh

### A.     Background

Dr. Emile Nakhleh ("Nakhleh") is an academic and retired CIA analyst. See ECF No. 9089-4 at 94. He is fluent in Arabic and holds degrees from Saint John's University, Georgetown University, and American University, where he received a Ph.D. in international relations in 1968. See id. at 96. He began his career as a professor at Mount St. Mary's University, where he conducted field research and published books and articles on religious, ethnic, legal, and political dynamics in the Middle East, North Africa, and the Persian Gulf. See id. at 96–99.

Nakhleh joined the CIA as a scholar in residence in 1990 and transitioned to a career analyst position by 1993. See id. at 94. In that capacity, he advised the intelligence community on "political Islam, radical . . . [and] mainstream interpretations [of Islam], jihad[,] terrorism, and youth recruitment." Id. He later became the founding director of the CIA's Political Islam Strategic Analysis Program, which offered training to government employees and hosted an "annual academic outreach symposium on different facets of . . . Islamization across the Muslim world." Id. at 95. Before his retirement from the CIA in 2006, he received the Distinguished Career Intelligence Medal, the William L. Langer Award, the Director's Award, a Unit Citation Award, and the Intelligence Commendation Medal. See id. at 94, 96.

After leaving the intelligence community, Nakhleh returned to academia. He now serves as the founding director of the Global and National Security Policy Institute at the University of New Mexico. See id. at 94. He also consults with government stakeholders and continues to publish commentary in various outlets. See id. at 98–103.

## B.    Report

The Plaintiffs engaged Nakhleh "as an expert on political Islam, on the ideological and operational approaches to jihad within Wahhabism, and, specifically, on the potential role played by the Kingdom of Saudi Arabia in aiding, abetting and supporting" the 9/11 Attacks. ECF No. 9089-4 at 4.

Nakhleh offers opinions on "Saudi Arabia's 'Wahhabi polity,' the means by which it was implemented and advanced by officials of the MOIA prior to the 9/11 attacks, particularly through *da'wa* overseas, and the connections between 'Wahhabi polity' and violent jihadist attacks." ECF No. 9163 at 23. His report "charts the creation of the Saudi Ministry of Islamic Affairs, its *da'wa* operations and the paths of certain MOIA propagators deployed to the United States, and the roles of Saudi officials in the support network for the 9/11 attacks." Id. at 23–24.

## C.    Qualifications

Nakhleh's career in the intelligence services and as an academic make him well qualified to discuss political Islam, which has been the focus of his work in the CIA and outside it. See ECF No. 9089-4 at 94–97. He defines "political Islam" to encompass "the actions of individuals and groups, lawful and unlawful, to change the political, legal, economic, educational, and judicial nature of public policy—whether locally or on an international scale—according to the activists' interpretations of their faith," ECF No. 9163 at 29 n.23 (quoting Emile A. Nakhleh, A Necessary Engagement: Reinventing America's Relations with the Muslim World xv (Dale F. Eickelman, et al. eds., 2009)). He has applied this lens to the Israel-Palestine conflict, political participation in Bahrain and Qatar, Nigerian terrorism, internal strife in Yemen, and United States-Saudi relations. See ECF No. 9089-4 at 98–103.

Saudi Arabia and its institutions have not been the primary subject of Nakhleh's public-facing work, however. (Nakhleh did "stud[y] the Ministry of Islamic Affairs as part of [his] government career," but the results of those studies are classified. ECF No. 9089-5 at 10.) Generally, testifying on an issue outside the realm of one's work is not permitted. But Nakhleh's expertise in the interplay between politics and religion gives him a foundation from which to analyze the Saudi Arabian government's alleged support for religious extremism.

Accordingly, because Nakhleh has demonstrated his expertise in political Islam, he may properly opine on matters that bring to bear his perspective "as a seasoned thematic expert trained to identify and assess the ideological and operational aspects of support for violent jihad." ECF No. 9163 at 33; see Nat'l Coalition on Black Civic Participation, 661 F. Supp. 3d at 97. To the extent Nakhleh's opinions fall outside the scope of his expertise, see, e.g., ECF No. 9089-4 ¶ 58 (claiming that "children are socialized into their respective societies . . . by the time they are in the fifth grade"), their admission can more efficiently be addressed on other grounds.

### D.    Reliability

**First**, the Defendants protest that the Court cannot judge the reliability of Nakhleh's opinions because "his entire report is 'informed by [his] experience' at the CIA," and is therefore not susceptible to "'effective[] cross-examin[ation].'" ECF No. 9088 at 31, 32 (first quoting ECF No. 9089-4 at 4 (alteration in original); and then quoting Gill, 893 F. Supp. 2d at 541). Nakhleh referenced confidential CIA materials—such as his experience preparing classified briefings—in response to specific questions about his qualifications, not as the basis for his opinions. See ECF Nos. 9088 at 32–33, 9163 at 38–39. And as the Plaintiffs appropriately point out, he "'rendered [his] expert opinions and conclusions . . . upon the maximum amount of factual material and *declassified* investigative product made available to [him].'" ECF No. 9063 at 38 (quoting ECF No. 9089-4 at 12) (first alteration in original) (emphasis added). As the Court does with every expert, it measures the reliability of Nakhleh's testimony by reviewing his methodology and opinions; it does not accord a presumption of reliability to CIA experience.

**Second**, the Defendants contend that Nakhleh fails to identify a methodology or explain how his expertise led to his opinions. See ECF No. 9088 at 42. Nakhleh claims to use a "'comprehensive interdisciplinary methodology' that [is] both 'qualitative and quantitative' in nature." ECF No. 9163 at 50 (quoting ECF No. 9089-5 at 129:16–17). He does not identify the particular disciplines this incorporates, except to say that he used the same ones in his CIA work. ECF No. 9089-5 at 130:1–8.

Counsel cobbles together a more concrete description. According to their brief, Nakhleh's approach includes "a thorough reading" and "'dedicated analysis' of a broad range of relevant documents," "supplemented by Nakhleh's first-hand knowledge and experience, gained from decades of exploratory field trips, interviews and engagement with Qur'anic teachings 'on extended research visits to Muslim majority and Muslim minority countries across the globe.'"

ECF No. 9163 at 51 (quoting ECF No. 9165-4 ¶¶ 9, 10, 17). They also suggest that Nakhleh's

quantitative methodology manifests in his use of "'official' figures" and "numbers [setting

forth] . . . scale and ambition, extent and range of U.S. locations targeted by MOIA, and even

funding structure." ECF No. 9163 at 52 (quoting ECF No. 9165-4 ¶ 171 n.81).

     What his methodology boils down to is a fairly standard application of experience:

Nakhleh considers the evidence in light of his wealth of understanding. He does not incorporate

specific social science theories or conduct data analysis, notwithstanding his penchant for adding

numeric detail to his report.

     Accordingly, Nakhleh must explain how his experience "leads to the conclusions he

reached." Veleron Holding, B.V., 117 F. Supp. 3d at 444 (cleaned up). The Plaintiffs argue that

he has done so, citing statements about how he "weigh[ed]" testimony and "source[s]" as proof

that he adequately explained his conclusions. ECF No. 9165-12 at 32:22, 74:17; see ECF No.

9163 at 53. But these vague and isolated descriptions of his methods do not show whether

Nakhleh reliably applied his experience in this case. Just as we would not admit testimony from

a clinical researcher who did not explain how she studied the efficacy of a drug at issue in a case,

we cannot permit a terrorism expert to make proclamations about terrorist ideologies and

operations without explaining how he reached those opinions. Nakhleh often fails to connect his

experience to his testimony. For instance, he writes:

> • "Importantly, the prevailing view of the 'justness' of jihad against
> the United States also offered the most viable rationale upon which
> Saudi officials, most of them operating under the Ministry of Islamic
> Affairs – whether in Riyadh, Washington DC, or Los Angeles –
> willingly provided support to the 9/11 hijackers. Ministry officials
> and employees stationed at or affiliated with Saudi Embassies and
> Consulates in many countries, including in the United States, not
> only espoused this view, but also propagated it and disseminated
> literature in which it featured, in fulfilment of what was a core
> mission in Saudi foreign policy." ECF No. 9089-4 ¶ 134.

Nowhere does this passage make clear how his experience informs his opinions. The same is true for his testimony that a "[designated MOIA propagator] is also supposed to provide whatever assistance needed to any visitor engaged or planning to engage in jihad, in its broadest meaning." ECF No. 9089-4 ¶ 213. Did he poll Saudi officials? Document a global pattern of connections between propagators and local terrorist cells? Nakhleh's failure to provide this information about these and other opinions leaves the Court with too little to go on to assess the reliability of this testimony.

**Third**, the Defendants contend that Nakhleh advocates a perspective rejected by reputable scholars when he "equates" Saudi ideology "with Al Qaeda's advocacy of mass murder." ECF No. 9088 at 43. The Plaintiffs respond that "what [the Defendants] object[] to are Nakhleh's *opinions* themselves, rather than the *bases* upon which Nakhleh has opined," ECF No. 9163 at 55, and that the Court "must focus not on the substance of the expert's conclusions, but on whether those conclusions were generated by a reliable methodology," ECF No. 9163 at 56 (quoting Linde v. Arab Bank, PLC, 922 F. Supp. 2d 316, 320 (E.D.N.Y. 2013) (cleaned up)). Of course, the Court may consider an expert's conclusions to determine whether his testimony reflects "too great an analytical gap" between the underlying facts and the opinion. Joiner, 522 U.S. at 146.

Here, the Court need not and should not decide the correct way to describe the Saudi religious landscape. Nakhleh himself admits his portrayal is not a faithful one. His report paints Saudi Arabia, its institutions, and its citizenry as largely monolithic—aligned in their collective aim to violently confront the "enemies" of Islam. ECF No. 9089-4 ¶ 230. He counsels that violent jihad is the necessary endpoint of Saudi interpretations of the faith:

- "There is no disconnect, no break in the causal chain, between *da'wa* and violent jihad. *Da'wa* first, yes, but when the enemy is identified and in your sights, Islam demands that Muslims wage jihad. In this

29

> sense, at a minimum, the MOIA through its aggressive *da'wa*
> programs also aided, abetted and sponsored the plots to carry out
> violent jihad." ECF No. 9089-4 ¶ 229.

But his deposition produced the following exchange:

> Q. And, sir, in your report, you don't make any distinction between
> the spectrum of Hanbali Salafist beliefs as you did in your prior
> writings and as plaintiffs' other experts have; correct?
>
> A. It depends on what context you are talking about.
>
> Q. You don't describe what a quietist is or a political Salafist or a
> jihadist Salafist at all in your report; correct?
>
> A. I do not believe I have, unless you have a paragraph – a specific
> paragraph, I'd be happy to look at it.
>
> Q. I haven't seen it in your report, sir. You just lumped together all
> Hanbali Salafists into one category of Wahhabists?
>
> [objection omitted]
>
> [A.] I did so because I was focusing on the – those who support
> violent jihad and who see an enemy. Because once they identify an
> enemy, then violent jihad against that enemy becomes a duty. So
> many of those within the Wahhabi Islam see that enemy and,
> therefore, they support violent jihad.

ECF No. 9089-5 at 81:5–82:5. Whatever his intentions, Nakhleh's omission of ideologies that

eschew violence gives a skewed impression of Islam in the Kingdom and seriously undermines

the reliability of Nakhleh's testimony on this front.

**Fourth**, the Defendants object to Nakhleh's speculation about individuals and entities

involved in the case. See ECF No. 9088 at 49–50. He "attempt[s] to divin[e]" what happened in

the past and why, ECF No. 9089-4 ¶ 88, often using language indicating what someone "would"

or "would not have" done or known, ECF No. 9089-4 ¶ 78. For example:

- "The change in the letter from Kismayo, Kenya to Minneapolis,
  USA (incidentally, I couldn't decipher for sure the word
  Minneapolis in the Arabic hand-written word; 'America' is
  definitely there) *possibly* reflects two reasons: first, that a posting as
  a propagator to the US is more significant than a posting to Kenya;
  and second, someone within the M[OI]A had a reason to send
  Shaykh al-Jaythin to the US as part of a bigger and more sinister plot
  to prepare for the arrival of the two hijackers. In this case, al-Jaythin

would join others in California as an 'advance team.'" ECF No. 9089-4 ¶ 190 (emphasis added).

- "The Saudi government (MOIA) officials from Riyadh to Washington, DC[], and Los Angeles *must have known* in advance that the two visitors from Malaysia were not any ordinary 'two brothers.' They *must have also known* in advance that these 'two brothers' (al-Hamzi and al-Mihdhar) were coming to the US on a mission that was not humanitarian, educational, or propagational." ECF No. 9089-4 ¶ 246 (emphasis added).

Nakhleh's speculative conclusions are unreliable and must be excluded. See Daubert, 509 U.S. at 590.

**Fifth**, the Defendants protest the selective use of the same FBI materials discussed with respect to Youssef's report. See ECF No. 9088 at 47–49. The Court is sensitive to these concerns and agrees that care should be taken when interpreting investigative records. But for the same reasons it articulated it its discussion of Youssef's testimony, *supra* I.D at 19–20, the Court is confident that they can be accounted for as a matter of weight.

Collectively, these attacks on Nakhleh's reliability largely hit their marks. The absence of a clear connection between Nakhleh's experience and opinions, the problematic gaps in his description of Saudi religious doctrine, and his reliance on speculation undercut the reliability of his testimony.

### E.    Helpfulness

Besides these challenges to reliability, Nakhleh faces criticism that his testimony will not be helpful to the trier of fact: the Defendants contend that (1) he acts as a conduit for hearsay; (2) he critiques witnesses' credibility; and (3) he offers opinions on states of mind. See ECF No. 9088 at 61–65, 69–73.

**First**, the Defendants argue that Nakhleh acts as a conduit for hearsay. See ECF No. 9088 at 61–65. Although Nakhleh occasionally quotes material without providing further analysis, these quotes represent a trivial portion of his report. See, e.g., ECF No. 9089-4 ¶¶ 85–87.

Nakhleh's judicious use of hearsay material, like Youssef's, is within the bounds for an expert and need not be excluded.

**Second**, the Defendants object to Nakhleh's opinions on witness credibility. See ECF No. 9088 at 69–71. He devotes whole sections of his report to critiquing Saudi witnesses. See ECF No. 9089-4 ¶¶ 146–67. Citing their religious beliefs, he asserts that all of them would happily commit perjury:

- "Saudi jihadists appearing in the present proceedings would therefore lie, deny, obfuscate, dissimulate, feign ignorance or memory lapses, etc. without any remorse or compunction, because they view such proceedings as a charade." ECF No. 9089-4 ¶ 154.

- "It is my expert opinion that al-Thumayri was deliberately uncooperative with this Court during his deposition: I believe he made a conscious choice to answer questions in a manner that was dishonest and misleading." ECF No. 9089-4 ¶ 157.

- "Al Jaythin's denials, memory lapses, and obfuscation during his deposition undermine his credibility . . . ." ECF No. 9089-4 ¶ 192.

As discussed in detail above, see *supra* I.E at 23, direct attacks on witness credibility are impermissible. See Marvel Characters, 726 F.3d at 136. This is true even where those opinions are purportedly rooted in the expert's special "scientific," "technical," or (in this case) religious knowledge. Nimely, 414 F.3d at 398. It is the factfinder who must judge whether witness statements are trustworthy, not the experts, so Nakhleh's commentary on the veracity of witness testimony is excluded.

**Third**, the Defendants challenge Nakhleh's testimony on states of mind. See ECF No. 9088 at 71–73. Nakhleh undoubtedly offers such opinions: he admits to "[a]nalyzing the state of mind of the signers of [a] document," ECF No. 9089-4 ¶ 196, and claims to know how people "fe[lt]"; what they "hoped," "knew," "believed," and "wanted"; and their "intent[s]," "purpose[s]," "view[s]," "interest[s]," and "motivat[ions]." ECF No. 9089-4 ¶¶ 78, 80, 81, 89, 93, 98, 104, 139; see also id. ¶¶ 94, 106, 110, 132, 133, 134, 140, 184, 195, 212, 235, 237. The

32

Plaintiffs claim that this testimony in nevertheless admissible because it discusses "the history, structure, and goals" of the MOIA and "Saudi Arabia's Wahhabi polity," as well as "actions that bear on" states of mind. ECF No. 9163 at 78 (first quoting Abu-Jihaad, 553 F. Supp. 2d at 123; and then quoting U.S. Commodities Futures Trading Comm'n v. Wilson, No. 13-cv-07884 (AT), 2016 WL 7229056, at *8 (S.D.N.Y. Sept. 30, 2016)). But Nakhleh does not confine himself to those subjects. He writes:

- "The Al-Saud, however, must have *known* that the Salafi Wahhabi *da'wa* overseas was done with a Saudi state imprimatur, using Saudi-produced Qu'rans (printed by the King Fahd Printing Complex in Medina) and Saudi religious literature. The King necessarily *knew*, or at the least *knowingly* and *willfully* turned a blind eye to the reality, that the entire *da'wa* operation overseas was managed by representatives of the Ministry of Islamic Affairs operating, mostly under diplomatic cover[,] out of Saudi embassies and consulates across the globe." ECF No. 9089-4 ¶ 95 (emphasis added).

- "In my expert opinion, Fahd al-Thumayri, a student at Imam Muhammad University and theologian-in-training at the time, would have had to be conversant in its principal themes and *supportive* of its activist thrust." ECF No. 9089-4 ¶ 74 (emphasis added).

- "Obviously, al-Uthaymeen recommended him for a position at MOIA because he *saw* him as a faithful transmitter of this intolerant, narrow-minded interpretation of Islam." ECF No. 9089-4 ¶ 186 (emphasis added).

Because these and other passages weigh in on subjective "state[s] of mind," they are inadmissible. In re Fosamax Prods. Liab. Litig., 645 F. Supp. 2d at 192.

## F.    Admissibility

Nakhleh's testimony suffers from multiple infirmities. It omits context explaining how his experience informs his conclusions, advances reductionist descriptions of Islam in Saudi Arabia, features speculative accounts of past events, and launches misplaced attacks on witness credibility. Whether his conclusions are correct or not, and despite his impressive combination of

credentials, these defects prevent Nakhleh from meeting Rule 702's standards for admission. The

motion to exclude Nakhleh's testimony is therefore granted.

### III.     Alexander Meleagrou-Hitchens

#### A.     Background

Dr. Alexander Meleagrou-Hitchens ("Hitchens") is a lecturer in terrorism and

radicalization at King's College London ("KCL") and a research fellow at George Washington

University's Program on Extremism. See ECF No. 9089-6 at 49. He received a Ph.D. in war

studies from KCL in 2015 with a thesis examining the "[s]pread of the [g]lobal [j]ihad

[movement] in the West" as seen through the life of Anwar al-Awlaki. Id. Starting as a graduate

student, Hitchens held teaching and research positions at various universities and think tanks.

See id. at 49–50. He has published two books, four peer-reviewed journal articles, six book

chapters, and various other reports and essays related to "armed conflict, radicali[z]ation[,] and

terrorism." Id. at 51–53.

#### B.     Report

Hitchens was retained to opine on "Awlaki's connections to the plot to carry out the . . .

9/11 [Attacks]," "including his contacts with certain Saudi government officials in furtherance of

the plot." ECF No. 9089-6 ¶ 2. Hitchens "concluded that by the year 2000, when Awlaki was in

contact with Bayoumi and the hijackers, he had adopted anti-American jihadist views that were

'directly in line with how al-Qaeda . . . presented the world prior to 9/11,' and that Awlaki likely

knew the hijackers were associated with [a]l Qaeda and worked to help the hijackers together

with Saudi officials, who trusted Awlaki as both an 'ideological mentor and an operational

facilitator.'" ECF No. 9163 at 25 (quoting ECF No. 9089-6 at 31, 48).

### C.      Qualifications

Hitchens's extensive knowledge of Anwar al Awlaki, the central figure in his research since graduate school and the subject of his expert report, is difficult to dispute. See ECF No. 9088 at 29. Rather than directly challenge his qualifications to discuss Awlaki's radicalization, the Defendants ask the Court to exclude Hitchens's testimony because it is based on "documents and testimony" that, in their view, he is unqualified to review. Id. Admittedly, Hitchens "has no experience in law enforcement, in supervising or participating in criminal investigations, or in FBI or CIA operations." Id. But he has previously reviewed and analyzed criminal investigative records, and the Defendants identify no aspects of the materials in this case that would make them impenetrable to subject-matter experts like Hitchens. See ECF No. 9089-7 at 7:11–18. Accordingly, Hitchens is qualified to review the discovery materials and address Awlaki's "career, ideology, scholarship, relationships, and influences," as they relate to Awlaki's alleged involvement in "the plot to carry out the" 9/11 Attacks. ECF No. 9089-6 ¶ 21.

Some of Hitchens's testimony strays outside these parameters. For instance, he weighs in on operational aspects of the plot, writing that "calls . . . made in rapid succession" "between Thumairy, Bayoumi, the Saudi Embassy in Washington DC, a motel in San Diego, a Yemeni student . . . , and Awlaki" "indicat[e] a common theme or topic of conversation." ECF No. 9089-6 ¶ 37. This type of analysis is outside Hitchens's wheelhouse and should be excluded.

### D.      Reliability

The Defendants further challenge Hitchens's opinions on reliability grounds. They argue that (1) he fails to adopt a reliable methodology; (2) his conclusions contradict those he drew in published writings before being retained as an expert; (3) he engages in speculation and conjecture; and (4) he selectively cites FBI materials. ECF No. 9088 at 50–57.

**First**, they claim that his report does not disclose what method he leverages or how he leverages it. See ECF No. 9088 at 50–51. In the introductory section of his report, Hitchens explains that in his "prior work," he studied "Awlaki's promotion of the global jihad movement" using "social movement theory." ECF No. 9089-6 ¶ 20. He called on two elements of social movement theory in that research: "framing theory and collective identity formation." Id. ¶ 11. "Framing theory is premised upon a belief that individuals act on behalf of a movement as a result of their adoption of a reality which has been constructed by its leadership figures." Id. "[C]ollective identity construction," on the other hand, "helps to create connections between movement actors . . . and develop a feeling of common purpose, . . . in which activists come to see themselves as deeply linked to each other on the basis of a shared desire to pursue broader collective mobilization." Id. ¶ 17.

Hitchens "set out to offer [his] expert opinions as to how Awlaki channel[]ed his associations – including with official operatives of Saudi Arabia – to conspire in the 'mobili[z]ation' of the violent jihadists who would perpetrate the 9/11 attacks." Id. ¶ 20. Beyond the introductory section, his report makes no mention of social movement theory or framing theory or collective identity formation. If he intended to apply that or some other social science framework to the facts, it is unclear how he did so. This lack of clarity makes it difficult to ensure that Hitchens's testimony meets Rule 702's requirement that an expert's methods are reliable. See Fed. R. Evid. 702 advisory committee's note to the 2023 amendment.

**Second**, the Defendants accuse Hitchens of performing an "[a]bout-face" on a key issue. ECF No. 9088 at 51. Long before the Plaintiffs retained Hitchens as an expert, he wrote a book about the evolution of Awlaki's ideology and eventual embrace of violent jihadism. See ECF Nos. 9089-8, 9089-9, 9089-10. There, Hitchens described Awlaki as a once "leading moderate

Muslim and critic of al-Qaeda" in the West, who "changed after 9/11." ECF No. 9089-10 at 9,

12. That view is consistent with those of others in the field, who "regard[] [Awlaki's 2006

imprisonment in Yemen] as his tipping point"—what "prompt[ed] his decision formally to join

and recruit for al-Qaeda." ECF No. 9089-6 ¶ 108. Hitchens's report, however, dates Awlaki's

radicalization to before the 9/11 Attacks: "In [his] expert opinion, at the time that Awlaki was in

San Diego in 2000 he was already a committed Salafi extremist and a proponent of violent

jihad." ECF No. 9089-6 ¶ 22.

　　　　Acknowledging the tension between his former and current conclusions, Hitchens

testified:

- "Had I been aware of what I am aware of today, I would have made
  more of these connections and, you know, perhaps emphasized a bit
  more that there was even more suspicion about what he may have
  been saying in private than I do any way in the book." ECF No.
  9165-13 at 27:11–16.

　　　　Notably, it appears that the information Hitchens became "aware of" was not newly

uncovered private statements by Awlaki, but the "Awlaki lectures" that he reviewed before

writing his book and then "re-listen[ed] to" "for the purpose of the report." ECF No. 9089-7 at

113:5–8. Whatever he heard in those lectures, it was something less than an endorsement of

terrorism, because when asked:

　　　　Q. You're not aware of anything he said privately or publicly
　　　　supporting global jihad prior to 9/11?

Hitchens answered:

　　　　A. No, not – not – not that specifically, no.

ECF No. 9089-7 at 111:18–22. It appears that Hitchens materially changed his opinions about

the timing of and reasons for Awlaki's radicalization based on less-than-definitive information

that he had all along. This raises concerns that the process of "develop[ing] [opinions] expressly

for the purposes of testifying" has impacted the analysis. Fed. R. Evid. 702 advisory committee's

note to the 2000 amendment. The Court allows that Hitchens's change of perspective may be the product of an honest reappraisal of the evidence, but the Plaintiffs have not met their burden to prove that. On this record, the tension between Hitchens's current and former analyses seriously undermines his legitimacy.

**Third**, Hitchens offers opinions that rest on speculation and conjecture. For instance, he opines:

- "Based on Bayoumi's acknowledged acquaintance with his fellow Saudis Hazmi and Mihdhar, his counsel (which they followed) regarding which city to reside in (San Diego), and his provision of support to the hijackers in areas such as housing (Parkwood Apartments), financial affairs (Bank of America), and assimilation into a multi-layered network of local fellow Muslims (the "Bayoumi party videotape" described by the 9/11 Commission Report), it is my professional opinion with a high degree of confidence, that Bayoumi, a Saudi Wahhabi propagator, *would also have* catered for the hijackers' spiritual affairs, specifically by bringing them to Awlaki's al-Ribat Mosque." ECF No. 9089-6 ¶ 66 (emphasis added).

- "While I do not know whether Awlaki directly encouraged the hijackers to commit the 9/11 attacks, *it seems likely* to me that he did, and that his job was to keep them from straying from the path that they were already on." ECF No. 9089-6 ¶ 93 (emphasis added).

The Plaintiffs argue that Hitchens's conclusions are based on materials in the record and should be admitted. See ECF No. 9163 at 64–65. But when questioned about the grounds for such opinions, Hitchens admitted that they rested on "assum[ptions]" or confessed ignorance to underlying facts. ECF No. 9089-7 at 56:15; see, e.g., ECF No. 9089-7 at 80:4–85:17 (acknowledging ignorance of information relevant to Al Ribat Mosque). The Rule 702 amendments remind us that experts must be cautious to limit their opinions to what can reliably be concluded from the facts. See Fed. R. Evid. 702 advisory committee's note to the 2023 amendment. Hitchens has not done so.

**Fourth**, the Defendants renew their objections to the selective reliance on FBI documents. See ECF No. 9088 at 52–53. For the reasons stated above, *supra* I.D, II.D at 19–20, 31, the Court again adopts the view that these issues are matters of weight, not admissibility.

This last issue aside, these weaknesses collectively undercut the reliability of Hitchens's testimony, implicating both his methods and their application to the facts.

### E.    Helpfulness

The Defendants challenge Hitchens's testimony on the grounds that he acts as a conduit of hearsay, opines on witness credibility, and assesses states of mind. See ECF No. 9088 at 61–65, 73–74. As these issues have been reviewed at length, *supra* I.E, II.E at 22–23, 31–33, the Court discusses them briefly here.

**First**, Hitchens's report does not gratuitously incorporate hearsay. He quotes Awlaki's past statements to illustrate a point, not as a substitute for analysis. See, e.g., ECF No. 9089-6 ¶¶ 76, 78, 79. Accordingly, his opinions will not be excluded on those grounds.

**Second**, Hitchens incorporates credibility determinations into his report. He characterizes witness testimony as "implausible," "dishonest[]," "disingenuous," and "false." ECF No. 9089-7 ¶¶ 37, 67. Such commentary muscles in on the factfinder's job—to weigh testimony and evaluate its candor and persuasiveness—and must be excluded. See Marvel Characters, 726 F.3d at 136.

**Third**, Hitchens regularly discusses states of mind, attempting to divine what people knew, believed, or wanted. See, e.g., ECF No. 9089-6 ¶ 110 (opining that Awlaki had "deliberately dissembled" in discussions of his views with the FBI). In one of his principal conclusions, he states: "I believe it is highly likely that Awlaki played his facilitator role whilst knowing not only that the hijackers were avowed extremists, but also that they were al-Qaeda." ECF No. 9089-6 ¶ 22. Such testimony violates settled law prohibiting expert opinions on states of mind and must be excluded. See Marvel Characters, 726 F.3d at 135–36.

### F.     Admissibility

Hitchens's testimony is based on unclear methods, does not line up with conclusions he reached in work published before he was retained as an expert, and incorporates speculation about the actions, states of mind, and credibility of people involved in the events at issue in this litigation. Despite Hitchens's solid credentials, the Court cannot ignore the Plaintiffs' failure to demonstrate its reliability and helpfulness. The motion to exclude Hitchens's testimony is therefore granted.

## IV.    Barry Schiff

### A.     Background

Captain Barry Schiff ("Schiff") is a retired Trans World Airlines pilot with over "28,000 [flight] hours in 363 types of aircraft." ECF No. 9165-10 at 4. During his 34 years at the airline, he was qualified on Lockheed and Boeing aircraft, including the 707, 727, 747, 757, and 767. See id. He "[s]erved as an FAA-designated check airman on the Boeing 767" and "[p]erformed maintenance- and engineering-related flight testing." Id.

Schiff also has 65 years of experience as a certified flight instructor. See ECF No. 9089-11 at 2. In that time, he has "[o]rganized, established curricula for, and taught FAA-approved flight and ground schools for all levels of pilot certification" and spoken at countless "flight-safety seminars" around the globe. Id. at 17. He has also "[s]erved as chair and participant on numerous FAA-advisory committees" and consulted for "aerospace organizations, insurance companies, and law firms." ECF No. 9165-10 at 4. He has published several acclaimed instructional guides and "more than 1,800 magazine articles regarding flight safety, operational procedures and techniques, and aeronautical theory." Id. at 7–8. Schiff has served on the boards of several aviation organizations and been inducted into four aviation halls of fame. See id. at 6, 10.

**B.     Report**

The Plaintiffs asked Schiff to interpret handwritten notes identified as Bayoumi's that include an equation, a drawing of an airplane, and several variables and numbers. See ECF No. 9163 at 25–26. Schiff opines that "the airplane sketch, equation, and calculations made by Mr. Bayoumi . . . are consistent with preparations made as part of the planning for the 9/11 attacks and were made to assist the 9/11 hijackers in carrying out those attacks." ECF No. 9089-11 at 3.

**C.     Qualifications**

Schiff's qualifications to testify about the meaning of flight-related equations are rightfully undisputed. See ECF No. 9088 at 30. The Defendants do, however, challenge his expertise to consider extrinsic information about Bayoumi's relationship with the hijackers. See id. Schiff does not claim any expertise relevant to criminal investigations generally or terrorism specifically, so opinions that rest on "Bayoumi's contacts with the hijackers" or "the connection between Mr. Bayoumi and the 9/11 hijackers" are outside his wheelhouse and are therefore excluded. ECF No. 9089-11 at 12.

**D.     Reliability**

The Defendants challenge the reliability of Schiff's testimony on four grounds.

**First**, they claim that his report does not explain how his experience informs his opinions. See ECF No. 9088 at 57. The Court need not address this issue because it has already excluded the relevant opinion—that "Al Bayoumi 'prepared' the equation and calculations 'to assist the 9/11 hijackers'"—as one of two that falls outside the scope of his expertise. ECF No. 9088 at 57 (quoting ECF No. 9089-11 at 12); see supra IV.C at 41.

**Second**, the Defendants point to "analytical gap[s]" in Schiff's reasoning. ECF No. 9088 at 58 (quoting Joiner, 522 U.S. at 146). In broad strokes, they argue that Schiff's testimony about the equation's significance is undercut by his own statements that he did not routinely use it or

teach his students to do so. See id. at 58–60. Schiff's explanation for this—that the hijackers may have used the equation and calculations to "prepar[e]" for the 9/11 Attacks even though a commercial airline pilot would not need to perform similar calculations to prepare for flight—is a reasonable one. ECF No. 9089-11 at 3. Similarly, although the calculations may not "match" the path of the hijacked flights, ECF No. 9088 at 59—which were guided first by "radio navigation aids" and then "visual sightings"—the equations may have been used to give the hijackers "a sense of when they would be able to visually acquire the[ir] target[s]," ECF No. 9089-11 at 5, 9. These critiques are not fundamental enough to justify excluding Schiff's testimony altogether.

**Third**, the Defendants object to a single speculative statement Schiff made at his deposition. See ECF No. 9088 at 60. Counsel asked Schiff to explain why the hijackers would need to know the distance between the Very High Frequency Omnidirectional Range Stations and the World Trade Center tower. See id. Schiff posited that it may simply have been "a piece of information" they looked at "in the planning stages" and may not, in the end, "have been important" in carrying out the 9/11 Attacks. ECF No. 9089-12 at 95:8–17. This explanation is not necessary to understand Schiff's opinions. And more to the point, the Defendants do not identify a single speculative opinion in Schiff's report. His testimony need not be excluded as speculative.

**Fourth**, the Defendants argue that Schiff does not consider alternative explanations for the equation. See ECF No. 9088 at 60–61. Specifically, he does not discuss the possibility that the equations were part of Bayoumi's son's mathematics homework or that Bayoumi did not remember their purpose because he had performed the calculations so long ago. See id. Curiously, these alternative explanations were offered by the Kingdom's expert; Bayoumi did

not raise them. See ECF No. 9163 at 68. The former was not obvious enough to occur to the witness himself, so the Court cannot fault Schiff for failing to address it. As for the latter, Schiff rejects it as incredulous (an opinion addressed below on separate grounds). See ECF No. 9089-11 at 12. These challenges therefore go to weight, not admissibility.

### E.     Helpfulness

The Defendants also ask the Court to exclude Schiff's testimony as providing unhelpful opinions on witness credibility and states of mind.

**First**, the Defendants challenge Schiff's commentary on Bayoumi's credibility. See ECF No. 9088 at 75. Schiff reviews a brief exchange from Bayoumi's deposition and concludes that his testimony is "incredulous." ECF No. 9089-11 at 12. This assessment improperly usurps the role of the factfinder and must be excluded. See Marvel Characters, 726 F.3d at 136.

**Second**, the Defendants claim that Schiff improperly opines on states of mind. See ECF No. 9088 at 75. Specifically, they challenge his statement that the "'purpose of the calculations' was to assist the hijackers." Id. (quoting ECF No. 9089-11 at 12). The Court agrees that, to the extent the statement indicates subjective intent, it is improper. See Marvel Characters, 726 F.3d at 135–36. However, the passage can also be read as discussing the practical use of the calculations, which is within Schiff's expertise and the permissible scope of expert testimony. The Court construes it to mean the latter so as to admit it.

### F.     Admissibility

Other than discrete statements that fall outside his expertise or speak to witness credibility, Schiff's report is both reliable and helpful to the trier of fact. The Court precludes Schiff from offering the offending opinions and otherwise denies the motion to exclude his testimony.

## V.      Marc Sageman

The Defendants say that their rebuttal experts are necessary only if the Court permits the Plaintiffs' experts to testify. See ECF No. 9164 at 9. Given the Court's decision to grant the motions to exclude testimony by Youssef (in large part), Nakhleh, and Hitchens, Sageman's opinions rebutting their reports may be superfluous. But because Sageman was also retained to rebut Plaintiffs' experts Evan Kohlmann and Steven Simon, whose testimony the Defendants did not challenge, and because not all of Youssef's testimony was excluded, the admissibility of Sageman's testimony is not obviously resolved by this Order. I thus consider Sageman's testimony on its own merits.

### A.      Background

Marc Sageman ("Sageman") is a scholar and consultant who focuses on political violence. See ECF No. 9166-1 at 2–3. He studied social relations at Harvard before attending New York University, where he earned a medical degree in 1979 and a Ph.D. in sociology in 1982. See id. at 2. He then served for three years as a Navy flight surgeon and seven as a CIA officer.

Sageman returned to academia in 1991. He worked as a clinical assistant at the University of Pennsylvania while he completed an internship and a residency in psychiatry. See id. at 3. He later joined the university faculty and taught students in medicine, psychiatry, psychology, and law. See id. During this time, he also launched a private practice in forensic psychiatry, which led to his involvement in federal terrorism cases. See id.

In the mid-2000s, Sageman began publishing scholarly articles on terrorism and offering his insights to law enforcement, military, and intelligence agencies. See id. at 2. These engagements precipitated stints as a terrorism consultant for the Secret Service's National Threat Assessment Center, a scholar-in-residence at the New York Police Department, and a special

advisor to the Deputy Chief of Staff of the Army addressing insider threats and attacks. See id. at 3. He continues to consult on political violence for various federal agencies and foreign governments. See id. at 2.

### B.    Report

Sageman's report sets out his methodology and then "outlines the evolution of the general relationship between the Kingdom of Saudi Arabia . . . and al Qaeda," "provides an evidentiary narrative of the relevant events in Southern California," "analyzes the evolution of the investigations into the 9/11 attacks," and "addresses the plaintiffs' experts' opinions by reviewing their respective methodologies and confronting their allegations." ECF No. 9118-1 at 3.

Over the course of 730 pages, Sageman concludes in part that "neither Omar al-Bayoumi nor Sheikh Fahad al-Thumairy was a Saudi spy or directed others to help the future hijackers in California"; "[t]he two sets of Saudi preachers who came to California for Ramadan . . . were not scouts on a mission to prepare the hijackers' arrival"; and "all the people who assisted the future hijackers in California were pious mosque goers, who simply assisted Muslim brothers in need." ECF No. 9118-1 at 729, 730. Based on these and other determinations, he finds it "implausible that any official of the kingdom would have tried to help, on behalf of the kingdom, [al Qaeda] or its agents to carry out a devastating operation on its main ally, the United States of America." ECF No. 9118-1 at 728.

### C.    Qualifications

Sageman's experience in "counterterrorism and in clandestine tradecraft" and his scholarly work on "terrorist organizations generally and Al Qaeda specifically" are the basis for his rebuttal of five reports written by experts with a wide range of specialties, including counterterrorism investigations, communications analysis, political Islam, and radicalization.

ECF No. 9164 at 33; see ECF No. 9092 at 19 n.42. The Plaintiffs contend that Sageman's credentials are not broad enough to support opinions on the diverse set of issues his report embraces.

**First**, the Plaintiffs challenge Sageman's qualifications to discuss Saudi Arabian history and government. See ECF No. 9092 at 19–20. Nothing in Sageman's curriculum vitae or the Defendants' briefing suggests that he has "specialized knowledge" about Saudi Arabia that would permit him to analyze Saudi institutions or their policies. Fed. R. Evid. 702. Sections of the report that exclusively pertain to Saudi institutions or their policies thus fall outside Sageman's area of expertise. See, e.g., ECF No. 9118-1 at 269 (describing the MOIA as "strictly a religious institution"). Sections that discuss Saudi policy in relation to al Qaeda, however, are fairly encompassed within Sageman's study of terrorism and are permissible. See, e.g., ECF No. 9118-1 at 62–63 (discussing bin Laden's interactions with high-level Saudi officials).

**Second**, the Plaintiffs object that Sageman lacks the experience or education to discuss matters of faith. See ECF No. 9092 at 20–21. The Defendants respond that Sageman's study of religion in connection with terrorist ideologies qualifies him to opine on beliefs and schools of Islam. See ECF No. 9164 at 34. That experience may qualify him to weigh in on al Qaeda's approach to Islam but does not give him license to analyze Islam in other contexts. Sageman's testimony concerning religious dynamics in Saudi Arabia is therefore beyond what his exposure to Islam supports. See, e.g., ECF No. 9118-1 at 269–70 (describing "various factions" "within Saudi Salafi circles").

**Third**, the Plaintiffs contend that Sageman's expertise does not extend to Al-Gama'a Al-Islamiya and other terrorist groups operating in California in the 1990s. See ECF No. 9092 at 21–25. Conflating qualifications with reliability, they say that he ignores relevant evidence,

adopts positions that run counter to those of authorities in the field, and contradicts intelligence findings and his own prior statements. See id. The Court addresses these arguments with related reliability issues, below. As for qualifications, Sageman's scholarly work on terrorism, which has addressed "Al Gama'a Islamiya and its relationship with Al Qaeda," is sufficient to permit him to testify about the group. ECF No. 9164 at 35.

**Fourth**, the Plaintiffs mount a single-sentence attack on Sageman's qualifications to discuss "law enforcement investigations," "the FBI," and "FBI operations." ECF No. 9092 at 25. Despite its concision, it lands. Sageman's relevant experience—advising "law enforcement agencies" in the United States and abroad and speaking "'with FBI special agents and law enforcement officers' in the years that followed 9/11"—is a little thin. ECF No. 9164 at 37 (quoting ECF No. 9118-1 at 21). To be clear, working as an FBI case officer is not a prerequisite to opining on the Bureau and its investigative practices. But without some showing that he explicitly studied the FBI, Sageman's experiences are too vague and attenuated to establish his expertise.

**Fifth**, the Plaintiffs object to Sageman's phone records opinions. See ECF No. 9092 at 25–30. According to the Defendants, Sageman's testimony is backed by experience in communications analysis, which formed "the backbone of some of [his] investigations," including "several cases that might have involved clandestine use of telephone[s]." ECF No. 9166-2 at 5:6–7, 9:1–3. When pressed on the details at his deposition, he declined to provide specifics, implying that they remain confidential. See id. at 5:12–15. Given the lack of concrete information about his experience with communications analysis, Sageman has not met his burden of showing he is qualified to draw conclusions from phone records. He has, however, demonstrated his expertise in more operational matters. He was trained in communications

tradecraft as a CIA officer, and thus may comment on clandestine communication techniques. See id. at 8:13–19.

**Sixth**, the Plaintiffs assert that Sageman is unqualified to interpret Arabic communications. See ECF No. 9092 at 30. Through counsel, Sageman disclaims any expertise in the Arabic language, so the Court will ignore any opinions contingent on his analysis of Arabic terms. See ECF No. 9164 at 40.

In sum, Sageman is qualified to testify on topics reasonably related to terrorism or tradecraft but is precluded from offering opinions that fall outside those parameters. See, e.g., ECF No. 9118-1 at 329 (Sageman's "analysis of al-Bayoumi's car gas consumption"). He may not testify about Saudi history and institutions, see, e.g., ECF No. 9118-1 at 580 ("MoIA employees were recruited for their loyalty to the royal family."), Islam, see, e.g., id. at 528 ("Even in the KSA, there is a spectrum of Salafi doctrines, some for the government, others against it."), the FBI, see, e.g., id. at 425 ("limiting participation in this investigation to a few within the FBI New York Office also allowed for the self-selection of the most dedicated and zealous agents who were convinced of Saudi complicity to egg each other, to become homogenous in their beliefs and sense of mission, and, due to the lack of internal diversity, to become victims of groupthink"), communications analysis, see, e.g., id. at 465 ("It is not a stretch to assume that many of the calls he made during Ramadan were responses to these inquiries when he called his callers back."), 694 ("I analyzed the calls . . . and concluded that they most likely dealt with a religious question that al-Bayoumi had."), or Arabic, see, e.g., id. at 581 (defending Thumairy's testimony by citing multiple interpretations of the term "imam").

### D.    Reliability

Sageman goes to great lengths to explain his methodology. See ECF No. 9118-1 at 4–27. At the risk of oversimplification, he privileges primary sources over secondary sources,

secondary sources over tertiary ones, and so on. See id. The Plaintiffs do not directly challenge this methodology—instead raising concerns with the reliability of its application and the evidence underlying his opinions. See ECF No. 9092 at 30–70. They attack his conclusions regarding the MOIA, the Kingdom's relationship to Bayoumi, Thumairy, and the King Fahad Mosque, and the presence of a Sunni extremist cell there on the grounds that Sageman: (1) cherry-picks evidence; (2) contradicts himself; (3) engages in speculation; (4) resorts to *ipse dixit*; and (5) grounds his opinions in unreliable facts. See id.

**First**, the Plaintiffs charge Sageman with selectively citing or ignoring evidence. See id. at 30. In many cases, these allegations amount to disagreements with Sageman's conclusions about the weight of the evidence, rather than pernicious cherry-picking. For instance, the Plaintiffs accuse Sageman of absolving the MOIA of responsibility for the 9/11 Attacks without contending with the December 2004 Joint FBI-CIA Assessment, which indicated that the MOIA "'provide[d] financial and logistical support to [some] individuals . . . associated with terrorism-related activity.'" Id. at 31 (quoting ECF No. 9118-61 at 4). Sageman does anything but ignore the assessment's language. He quotes it directly, discussing at length the assessment and its conclusion that "there was no evidence the [Kingdom] . . . knowingly provided support for the 9/11 attacks." ECF No. 9118-1 at 271. The mere fact that Sageman reaches conclusions that disagree with intelligence assessments is not enough to warrant finding his testimony unreliable.

In other contexts, Sageman's focus on certain evidence appears convenient but does not wholly undermine his analysis. One example is Sageman's conclusion that Thumairy did not supervise MOIA propagators. The Plaintiffs claim that Sageman ignored a letter penned by Sowailem "confirming Thumairy's appointment" as a regional authority and "Saudi Embassy payroll records of the propagators working for Thumairy." ECF No. 9092 at 35. Sageman

49

references the letter in his report, see ECF No. 9118-1 at 585 n.2136, but not the payroll records. Omission of the latter warrants discounting the weight of Sageman's opinion but does not establish all-out cherry-picking.

At some point, however, these oversights cross the line. Addressing Sageman's finding that Bayoumi was a full-time student and not an "undisclosed agent of Saudi Arabia," the Plaintiffs complain that he overlooks two facts. ECF No. 9092 at 44. The first—"that Bayoumi did not earn a single course credit after 1997"—Sageman acknowledges, explaining that "no credits were allocated to the[] courses [Bayoumi took in the 1998-1999 academic year]" because "Bayoumi did not take their respective exams." ECF No. 9118-1 at 44, 147 n.553. But he never addresses the second—that when "Dallah Avco objected to keeping Bayoumi on its payroll [while he was purportedly completing studies in the United States], . . . Saudi Arabia ordered Dallah to continue to pay him salary and benefits so that Bayoumi could 'complete the task' assigned to him." ECF No. 9092 at 45 (quoting ECF No. 9118-45 at 2). Given the importance of this exchange to the Plaintiffs' theory of events, Sageman's failure to address it is disquieting.

Collectively, these examples show that while Sageman's lengthy report discusses much of the evidence, it does not consistently provide a full picture. This makes it difficult to trust that Sageman has reliably applied his methodology to the facts.

**Second**, the Plaintiffs claim that Sageman's opinions contradict his prior work. See ECF No. 9092 at 33–34. They cite a passage from his book that suggests Saudi Arabia was obtuse about the internal threat of terrorism until the 2003 Riyadh bombing. See id. (citing Marc Sageman, Understanding Terror Networks 53 (2004)). The theme of this excerpt runs counter to the overall tenor of Sageman's report, which emphasizes the Kingdom's opposition to terrorism generally and al Qaeda specifically both before and after the 9/11 Attacks. See, e.g., ECF No.

9118-1 at 28 ("It is also important to understand the role of the . . . [MOIA], which was created specifically to combat the type of ideology promoted by [al Qaeda]."). But the Plaintiffs do not identify any particular statement in Sageman's report to compare to the passage from his book. Accordingly, the Court stops short of concluding that Sageman's testimony directly conflicts with his past scholarship.

There are also places where Sageman's report appears internally contradictory. For example, Sageman states that "[al Qaeda] specifically instructed its operatives to avoid Muslims abroad and especially politically militant Muslims because it believed, and in retrospect rightly so, that they were already monitored by local security agencies." ECF No. 9118-1 at 136–37. But he also says that the hijackers "followed [Khalid Sheikh Mohammed's] advice of seeking help at the local mosque." ECF No. 9118-1 at 358. Similarly, Sageman repeatedly commends witnesses who give "consistent" accounts of events and questions those with "inconsistent versions." ECF No. 9118-1 at 179. Then, he attacks Youssef's attention to "small inaccuracies and instances of normal forgetting" in Thumairy's statements, explaining that "[p]eople rarely remember things the same way (unless it is something memorized); there are usually differences between various recalls." ECF No. 9118-1 at 586. These conflicting statements raise questions about Sageman's own consistency in his approach to the facts.

**Third**, the Plaintiffs object to Sageman's reliance on speculation. See ECF No. 9092 at 70–72. His report is replete with examples:

- "I *suspect* that he was trying to appropriate the Sahwa religious movement to recruit among its supporters as very few people from the Gulf were coming to Khartoum to join [al Qaeda] during this time." ECF No. 9118-1 at 86 (emphasis added).

- "The 9/11 Commission noted his physical discomfort at the interview but did not realize that it was *probably* because al-Thumairy was concerned about the issue of his diplomatic status, which he probably believed had caused his deportation from the

United States the previous year." ECF No. 9118-1 at 318 (emphasis added).

- "The alleged connection to Abdo Ghanem . . . *seems* simply part of the Small World phenomenon of the small community of Salafis in Southern California being connected." ECF No. 9118-1 at 589 (emphasis added).

- "Given their difficulties with language, they were *probably* discussing how to get there and where to stay when they met al-Bayoumi by chance and he inadvertently told them that he lived in San Diego, prayed at the ICSD, and if they needed help with English language schools, he would try to help." ECF No. 9118-1 at 725 (emphasis added).

These opinions are grounded in Sageman's unproven hypotheses and assumptions, not reliable facts and methods, and are therefore improper. See Daubert, 509 U.S. at 590.

**Fourth**, the Plaintiffs challenge opinions supported only by Sageman's *ipse dixit*. Throughout his lengthy report, Sageman makes statements that are backed only by his say-so:

- "Evidence supporting an agent's hypotheses is more likely to be written down than evidence refuting them." ECF No. 9118-1 at 15.

- "Despite the help that al-Bayoumi provided him and al-Mihdhar, al-Hazmi when he heard from the rumor mill that al-Bayoumi was a Saudi employee, immediately understood that al-Bayoumi was a threat to them." ECF No. 9118-1 at 278.

- "The highest levels of the KSA government would never have taken such a risk that imperiled their critical alliance protecting them from their major foreign enemies, Iraq and Iran." ECF No. 9188-1 at 335.

- "They went to the King Fahad Mosque, because it was a Salafi mosque with a Saudi imam, shortly after their arrival and met Johar." ECF No. 9118-1 at 358.

- "Expatriates from the same area of the world, sharing the same piety, and speaking the same language often congregate together for companionship and to save money." ECF No. 9118-1 at 508.

This testimony does not follow from interpreting the record evidence using reliable methods. It ultimately rests on Sageman's authority and thus does not meet standards of reliability. See Joiner, 522 U.S. at 146.

**Fifth**, the Plaintiffs ask the Court to exclude Sageman's testimony because it rests on unreliable evidence. They object to portions of his report that cite statements made by Khalid Sheikh Mohammed ("KSM") while he was in United States custody. See ECF No. 9092 at 49–53.

KSM, the acknowledged mastermind of the 9/11 Attacks, was apprehended by Pakistani authorities in March 2003 and rendered to a CIA black site. See ECF No. 9118-89 at 111. CIA interrogators immediately resorted to "enhanced interrogation techniques." Id. at 112. They administered "facial and abdominal slaps, the facial grab, stress positions, standing sleep deprivation (with his hands at or above head level), nudity, . . . water dousing," "rectal rehydration . . . without a determination of medical need," "threat[s] [to] KSM's children," and 183 "waterboarding sessions." Id. at 112, 115.

The Senate Select Committee on Intelligence later determined that these techniques were more "brutal . . . than the CIA represented" and "not an effective means of acquiring intelligence or gaining cooperation from detainees." Id. at 13. KSM is a perfect case study. "[A] significant amount of the disseminated intelligence reporting from KSM that the CIA identified as important threat reporting was later identified as fabricated." Id. at 112. The CIA's failures led it to credit fabrications that, in one case, "resulted in the capture and CIA detention of two innocent individuals." Id. at 113. Conversely, some intelligence that the CIA "dismissed as having been provided during the initial 'throwaway stage' of information collection" was later determined to be "accurate." Id. at 126. Given the grave legal and veracity concerns these findings pose, any witness in this litigation who relies on statements procured through so-called "enhanced interrogation techniques" should treat those statements as highly suspect.

Sageman does not cite reports from KSM's CIA interrogations. Instead, he references KSM's 2006 submission in Zacarias Moussaoui's criminal case. See ECF No. 9118-1 at 126 (citing United States v. Moussaoui, No. 01-cr-00455 (E.D. Va.)). And although the Court allows that "brutal" interrogations may have long-term impacts that undermine the credibility of statements made years after the fact, the Plaintiffs have presented no information to that effect. Accordingly, the Court is unwilling to conclude that Sageman's opinions are polluted by the CIA's "enhanced interrogation" methods.

The Plaintiffs instead impugn Sageman's reliance on KSM's statements because they came from an admitted terrorist who has made false statements to authorities. See ECF No. 9092 at 52–53. The Plaintiffs raise analogous issues with Sageman's use of writings attributed to Osama bin Laden. See id. at 53–55. Despite the obvious incentives for terrorists to lie, the Court will not prohibit terrorism experts from considering information directly from the people they study. That would close one of the few windows into the clandestine practices of terrorist cells. Granted, heavy reliance on uncorroborated information from a single source may undermine the strength of a conclusion, but this is a matter of weight rather than admissibility.

Together, Sageman's selective citation to the evidence, conflicting stances on similar issues, and reliance on speculation and his own *ipse dixit* undercut the reliability of significant portions of his testimony.

### E.    Helpfulness

The Plaintiffs primarily attack the helpfulness of Sageman's testimony by arguing that he draws legal conclusions. See ECF No. 9092 at 70–72. They single out statements claiming that "[t]here is no evidence supporting" a given proposition or that certain topics "fall[] outside the relevant scope of this litigation." Id. at 70 (quoting ECF No. 9118-1 at 354, 711). On their face, these excerpts appear to embrace legal issues. In context, the Defendants explain, they simply

"summariz[e]" his opinions or "explain[]" why he has not addressed certain topics. ECF No. 9164 at 64. If that is the case, their exclusion is a small price to pay for ensuring that experts adhere to limitations on offering legal opinions.

In passing, the Plaintiffs separately object to Sageman's commentary on states of mind. See ECF No. 9092 at 69–70. Sageman repeatedly addresses the "fe[elings]," "beliefs," and motivations of individuals and groups of people, ECF No. 9118-1 at 44, 460:

- "Now both the Afghan population and the Taliban *felt* proud to host a group that defied a superpower, raising it to an equal status in their eyes." ECF No. 9118-1 at 115 (emphasis added).

- "Without internal diversity about their beliefs, Operation Encore investigators fell victim to groupthink. Their shared preconceived notion of Saudi guilt led to a presumption of guilt, and they were so *intent* on proving their investigative theory that they could no longer view evidence with equanimity. They only searched (and thought they found) incriminating evidence and ignored or even discarded exonerating evidence as deception. Their strong *beliefs* tainted their reporting. They looked for confirmation of their hunches and ignored any contrary evidence. They justified following their hunch and discarded refuting evidence with *beliefs* about their sources being less than truthful." ECF No. 9118-1 at 460 (emphasis added).

- "Al-Mihdhar returned to Yemen because he was bored in the United States and *yearned* to be with his wife and newborn child." ECF No. 9118-1 at 709 (emphasis added).

As the Court has previously explained, experts are not permitted to testify to a person's subjective motive, knowledge, or intent; such opinions must be excluded. See Marvel Characters, 726 F.3d at 135–36.

The bigger issue with Sageman's testimony, one that the Plaintiffs do not directly raise (presumably to avoid shouts of hypocrisy), is that it offers an improper factual narrative.[9] It is not an expert's place to interpret the evidence if the evidence is within the factfinder's capacity to

---

[9] See In re Mirena IUD Prods. Liab. Litig., 169 F. Supp. 3d 396, 421 n.16 (S.D.N.Y. 2016) ("Although Plaintiffs did not raise this issue [concerning the admissibility of certain expert opinions], it seems important enough for the Court to address *sua sponte*."); see also E.E.O.C. v. Mavis Discount Tire, Inc., 129 F. Supp. 3d 90, 114 (S.D.N.Y. 2015) (explaining the Court's decision to address Daubert issues raised on reply by citing other courts' choices to engage in a Daubert inquiry *sua sponte*).

understand. See Wexler, 522 F.3d at 204. That is the role of an advocate—one Sageman takes on

nowhere more clearly than in his rebuttal of other expert witness. Discussing various Plaintiffs'

experts, Sageman launches inflammatory attacks more appropriate to a high school debate than

an expert report. See, e.g., ECF No. 9118-1 at 610 ("What Youssef does methodologically is

simply calling people names and then taking these insults for reality."), 633 ("My opinion with a

high degree of certainty is that Youssef does not know what an analysis is, leading him to jump

to erroneous conclusions."). This commentary, like his curated narrative of witness accounts and

documentary evidence, is improper.

### F.     Admissibility

Sageman's testimony presents several fundamental issues that are collectively fatal. To

begin, he takes on a vast array of topics that any single person would be hard-pressed to

demonstrate expertise in. On top of that, and despite thoroughly outlining his methodology, he

engages in selective citation and speculation in reaching opinions favorable to the defense. Even

though these problems do not infect every opinion in his report, these reliability issues negate the

value of Sageman's testimony to the Court because it cannot trust that each of Sageman's

opinions is based on a reliable application of his expertise to the facts. Most importantly,

Sageman's testimony had little use to begin with. His report knits together witness statements,

intelligence records, and call logs—materials the factfinder can independently evaluate—in a

700-page summary of the Defendants' theory of the case. That narrative should be reserved for

the Defendants' statements of facts and memoranda of law. The motion to exclude Sageman's

testimony is therefore granted.

## VI.   David Rundell

The Defendants proffer Rundell as an expert to rebut testimony from several Plaintiffs'

experts: Nakhleh, Steven Simon, and Lawrence Dunham. See ECF No. 9118-2 at 5. They assert

in their briefing that rebuttal testimony is only necessary if the Plaintiffs' experts are permitted to testify, so the exclusion of Nakhleh's testimony may make portions of Rundell's report unnecessary. See ECF No. 9164 at 9. Because Rundell also addresses other experts, however, this Order does not clearly obviate the need for his remaining testimony. I, thus, consider Rundell's testimony on the merits.

### A.    Background

David Henry Rundell ("Rundell") is a partner in Arabia Analytica, a consulting firm that provides "services related to Saudi Arabia" to defense, industrial, and financial companies. ECF No. 9166-11 at 2. He served in the Foreign Service for almost thirty years and was based for most of that time in Saudi Arabia. See ECF No. 9166-11 at 2–4. Over the course of his career, he worked as a commercial, economic, and political counselor at the American Embassy in Riyadh before his 2008 promotion to Charge d'Affaires and Deputy Chief of Mission. See ECF No. 9166-11 at 2–3. He holds a master's degree in Near East studies from Oxford University and completed advanced economics training at the Foreign Service Institute in Washington, D.C. See ECF No. 9166-11 at 4. He also learned and achieved proficiency in Arabic. See ECF No. 9166-11 at 5.

### B.    Report

Rundell was retained as an expert on the "history, politics and religion of Saudi Arabia, with a particular focus on its relationship with the United States." ECF No. 9118-2 at 4. At a high level, he critiques Dunham's testimony that "Saudi Arabia's diplomatic and religious activities in the United States suggest impropriety and nefarious intention," Simon's testimony that "Saudi Arabia's relationship with the United States [is] unbalanced," and Nakhleh's testimony "concerning Saudi Arabia's history, politics and religion during the 1990s." ECF No. 9118-2 at 5. He also opines that "[i]t is implausible that the Saudi government funded or

supported one of its most dangerous enemies in an attack on one of its most important strategic allies." ECF No. 9118-2 at 5.

### C.    Qualifications

Rundell's years at the United States Embassy in Saudi Arabia qualify him, as the Plaintiffs concede, "to discuss certain aspects of the Kingdom." ECF No. 9092 at 79. Considering the breadth of his portfolio, these "aspects" should include, at the very least, all matters related to United States-Saudi relations during his tenure in the foreign service.

The two countries' diplomatic relations animate much of Rundell's report, but not all of it. A significant portion of the "Background" section, for instance, canvasses the history and ideological underpinnings of al Qaeda. See ECF No. 9118-2 at 5–34. Although Rundell may be well-read in this area, his resume does not provide credentials that lend themselves to expertise in the terrorist group's development.

### D.    Reliability

Rundell does not describe a methodology. As a rebuttal expert, he is free to simply "attack" the Plaintiffs' experts' "models or methods." In re Digital Music Antitrust Litig., 321 F.R.D. 64, 78 (S.D.N.Y. 2017) (quoting In re Zyprexa Prods. Liab. Litig., 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007)). But when he offers affirmative opinions, he opens himself up to attack on methodological grounds.

**First**, the Plaintiffs argue that Rundell has no methodology and considers no facts. See ECF No. 9092 at 78. From reading his report, it is evident that he relies on his experience. See, e.g., ECF No. 9118-2 at 26 ("I recall from my work during this period . . ."), 33 (". . . then-Deputy Minister of Interior Prince Mohammad bin Naif whom I met with regularly . . ."), 34 ("I know this because I was in Riyadh on both occasions."). Accordingly, where his opinions are rooted in the knowledge he gained from serving at the United States Embassy in Saudi Arabia,

they rest on a reliable foundation. This is true even though he does not purport to analyze the discovery materials. Experts are permitted to provide "background knowledge or context," and this was precisely what Rundell was retained to do. ECF No. 9164 at 68 (quoting Marvel Characters, 726 F.3d at 136); see ECF No. 9118-2 at 4 (describing scope of report).

**Second**, the Plaintiffs argue that the opinions in Rundell's "Conclusion" are "conclusory" and based on his own "*ipse dixit*." ECF No. 9092 at 81. To clarify, some of these opinions address the history of al Qaeda and therefore fall outside his expertise. The remainder summarize the testimony he offers in rebuttal to the Plaintiffs' experts, which are backed by his experience. To illustrate, Rundell writes: "In discussions I attended with King Abdullah after the 9/11 attacks, the King emphasized the importance the Kingdom placed on preserving its relationship with the United States. He stated that the relationship could not survive another 9/11-type attack." ECF No. 9118-2 at 41. This opinion is just one that provides support to Rundell's high-level conclusion that "Saudi Arabia has had a longstanding strategic relationship with the United States that began well before the September 11, 2001 attacks and upon which its own security depends." ECF No. 9118-2 at 50. Accordingly, the Plaintiffs' suggestions that his opinions rely on *ipse dixit* miss the mark.

**Third**, the Plaintiffs challenge Rundell's testimony as biased in favor of Saudi Arabia, "where many of his friends reside." ECF No. 9092 at 79. As evidence, the Plaintiffs quote an answer from his deposition, where Rundell discusses the United States' prioritization of its relationship with Saudi Arabia over condemnation of Jamal Khashoggi's murder. See ECF No. 9092 at 78–79 (quoting ECF No. 9118-5 at 6:10–15, 7:15–24). Rundell's *realpolitik* perspective on the United States-Saudi Arabia relationship may be different from that adopted by the

Plaintiffs' experts, but it is consistent with his experience in the foreign service. His testimony thus does not display bias that would warrant exclusion.

### E.    Helpfulness

The Plaintiffs' sole challenge to the helpfulness of Rundell's testimony is that his opinions on what Saudi Arabia "conceivabl[y]" would have done "undertake[] to tell the jury what result to reach." ECF No. 9092 at 77 (quoting Nimely, 414 F.3d at 398 (2d Cir. 2005)). Although one can read this and select other phrases in Rundell's "Conclusion" to offer speculation about the motivations of the Saudi government, they can also be construed as fervent descriptions of the importance of United States-Saudi relations. The Court interprets them to mean the latter.

### F.    Admissibility

Rundell's experience in United States-Saudi relations is undeniable, and he employs that experience to provide sober critiques of several of the Plaintiffs' experts in his report. Other than sections addressing al Qaeda's history and ideology (areas on which his credentials are not clear) and rebutting Nakhleh's testimony (which the Court has excluded), Rundell's opinions are both reliable and helpful to the trier of fact. The motion to exclude his testimony is therefore denied.

## VII.    Douglas Moss

### A.    Background

Douglas Moss ("Moss") is a veteran pilot, certified flight instructor, and managing member of AeroPacific Consulting LLC, a firm that "[p]rovides technical assistance and consulting services" related to aviation. ECF No. 9118-3 at 41, 42. During his three decades as a pilot in the Air Force, for McDonnell Douglas, and for United Airlines, Moss flew at least 56 types of aircraft and was qualified on military, commercial, and general aviation planes. See ECF No. 9118-3 at 42–44. He has authored numerous technical publications and holds degrees in

nuclear engineering, mechanical engineering, business administration, aviation safety, and law. See ECF No. 9118-3 at 43, 45–46. He currently serves as chairman of a committee charged with drafting industry standards for transport aircraft, a faculty instructor at the University of Southern California, and a member of the National Academy of Sciences Airport Cooperative Research Program. See ECF No. 9118-3 at 41.

### B.   Report

Moss was retained to rebut Schiff's testimony. He evaluates "the significance and purpose of the [e]quation, calculations, and sketch" found at Bayoumi's residence. ECF No. 9118-3 at 8. He specifically addresses: whether the equation is common in aviation; whether it reasonably approximates how far a pilot can see an object on the ground from a given altitude; and whether the equation is consistent with the 9/11 Attacks, considering the hijackers' flight paths, means of navigation, and rate of descent. See ECF No. 9118-3 at 8.

### C.   Qualifications

The Plaintiffs do not dispute that Moss is well-qualified to testify about the significance of flight-related equations.

### D.   Reliability

The Plaintiffs contest the reliability of Moss's opinions regarding the visibility of distant landmarks and Bayoumi's purpose in making the calculations. See ECF No. 9092 at 73–75.

**First**, they argue that Moss "applies no reliable methodology to reach his conclusion" that the hijackers would have needed to be "within 5-10 miles" of the World Trade Center to identify it. ECF No. 9092 at 73. At his deposition, Moss countered that he tested his hypothesis from his back porch using the ForeFlight app, but the Plaintiffs protest that his methods are "not testable" and "were not properly set forth in his report." ECF No. 9092 at 74–75. The Defendants, for their part, disclaim any reliance on Moss's backyard experiment. See ECF No.

9164 at 71–72. The question for the Court, then, is whether Moss's experience is enough to support his opinions. The Court cautiously concludes that it is. Moss's assessment is based on his 30 years observing terrain, buildings, and other landmarks from the pilot's seat. Accordingly, the Court will not outright exclude it.

**Second**, the Plaintiffs contend that Moss's "speculation" about the "purpose behind the Bayoumi formula, calculations and diagram" is improper. ECF No. 9092 at 75. The Court construed the testimony Moss rebuts to avoid impermissible "state of mind" opinions, see *supra* IV.E at 43, so analogous relief is warranted here. The Court construes Moss's testimony to offer alternative scenarios consistent with the equation without speculating as to Bayoumi's motives or intent.

### E.       Helpfulness

The Plaintiffs decline to challenge the helpfulness of Moss's report.

### F.       Admissibility

With the minor limitations discussed in this section, Moss's opinions are admissible. The motion to exclude his testimony is accordingly denied.

## CONCLUSION

The Court is sympathetic to the monumental challenge the parties face in presenting evidence relevant to the Defendants' alleged involvement in the 9/11 Attacks. The record is voluminous. It spans decades and includes terabytes of information from a range of sources— some unimpeachable, some not. The instinct to use experts to cull these materials and shape them into a coherent narrative is understandable, even reasonable. And I trust that the parties and their experts have generally made good faith efforts to interpret facts and present conclusions.

But Rule 702 requires more than good faith. It sets a minimum standard for admitting opinions the factfinder can trust on issues outside a lay person's grasp. The Court's decision to

exclude testimony from four of the seven challenged experts is driven by these principles. Many of the excluded experts analyzed evidence that does not require expert interpretation, resulting in factual narratives that, regardless of how sound or well-informed they are, are not proper subjects of expert testimony. Separately, the excluded experts do not meet their burden to show that their analyses are reliable. This is perhaps not surprising, given the built-in difficulties associated with studying terrorism. Given its clandestine nature, experts already have less data to work with—not just in this case but writ large.

These challenges, while very real, do not excuse the Court from enforcing the requirements of the Federal Rules of Evidence. Therefore, for the reasons set forth in this Order, the Court grants in part and denies in part the parties' Daubert motions. The Clerk of the Court is respectfully directed to terminate the motions at ECF Nos. 9088, 9091, and 9281.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED:          December 11, 2024
                New York, New York