# Exhibit F

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                            :
IN RE:                                      :        <u>MEMORANDUM DECISION</u>
                                            :        <u>AND ORDER</u>
TERRORIST ATTACKS ON                        :
SEPTEMBER 11, 2001                          :        03 MDL 1570 (GBD) (SN)
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GEORGE B. DANIELS, United States District Judge:

This document relates to:

    *All actions*

    This multi-district litigation arises from the injuries and losses caused by the September

11, 2001 terrorist attacks ("9/11 Attacks"). Plaintiffs claim that Defendants are liable because they

intentionally participated, conspired, sponsored, aided and abetted, or materially supported Al

Qaeda in the runup to the 9/11 Attacks. Before this Court is a renewed motion to dismiss all claims

by Defendant Kingdom of Saudi Arabia ("KSA") for lack of subject matter jurisdiction pursuant

to Federal Rule of Civil Procedure 12(b)(1). (KSA Mot. to Dismiss ("KSA Mot."), ECF No.

9368[1].) KSA's renewed motion to dismiss is DENIED.

## I.      PROCEDURAL HISTORY[2]

### A. KSA's Initial Motion to Dismiss

    KSA initially moved to dismiss all claims against it in 2004 and has filed numerous motions

since then. *In re Terrorist Attacks on Sept. 11, 2001*, 134 F. Supp. 3d 774, 778–79 (S.D.N.Y.

2015) ("2015 Decision"). In these motions, KSA argued that it was immune from suit by virtue

of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.* KSA contended that

---

[1] Unless otherwise indicated, all ECF citations included herein refer to documents filed on the 9/11
multidistrict litigation docket. *See In re Terrorist Attacks on Sept. 11, 2001*, No. 03-md-1570 (GBD) (SN).

[2] This Court summarizes only the procedural history germane to the instant motion.

Plaintiffs failed to demonstrate that an FSIA exception applies, which would waive its presumptive immunity from suit. *See In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d 631, 639 (S.D.N.Y. 2018) ("2018 Decision"); *2015 Decision*, 134 F. Supp. 3d at 777.

On September 29, 2015, this Court granted KSA's motion to dismiss, because Plaintiffs had failed to establish the FSIA's noncommercial tort exception. *2015 Decision*, 134 F. Supp. 3d at 780–82. While Plaintiffs' appeal of the 2015 Decision was pending, Congress enacted the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114–222, 130 Stat. 852 (2016) (codified at 28 U.S.C. § 1605B). *See 2018 Decision*, 298 F. Supp. 3d at 639. JASTA creates a new FSIA exception that waives sovereign immunity

> in any case in which money damages are sought against a foreign state for physical injury to person or property or death occurring in the United States and caused by—
> (1) an act of international terrorism in the United States; and
> (2) a tortious act or acts of the foreign state, or of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, regardless [of] where the tortious act or acts of the foreign state occurred.

*Id.* at 642 (quoting 28 U.S.C. § 1605B(b)). Upon the parties' request, the Second Circuit vacated the 2015 Decision so that this Court could consider KSA's motion through JASTA's lens. *See In re Terrorist Attacks on Sept. 11, 2001*, No. 15–3426, 2017 WL 8776686, at *1 (2d Cir. Feb. 7, 2017).

## B. This Court Ordered Limited Jurisdictional Discovery

On remand, this Court concluded in the 2018 Decision that Plaintiffs' allegations of KSA's direct liability were insufficient to establish jurisdiction under JASTA. *See 2018 Decision*, 298 F. Supp. 3d at 647–48. However, this Court noted that Plaintiffs' allegations of KSA's vicarious liability "narrowly articulate[d] a reasonable basis for this Court to assume jurisdiction under JASTA . . ." *Id.* at 640.

The Court explained that "the nature and scope of the agency is somewhat unclear in this case, and the party in the best position to shed light on that inquiry is Saudi Arabia." *Id.* at 651. Therefore, this Court ordered "limited and targeted jurisdictional discovery." *Id.* The discovery was aimed at examining "whether and to what extent Thumairy, Bayoumi, and their agents took actions in 2000, at the direction of more senior Saudi officials, to provide assistance to" 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar. *Id.*

### C. KSA's Renewed Motion to Dismiss

Magistrate Judge Sarah Netburn supervised the jurisdictional discovery. (*See* Order, ECF No. 9562, at 2–3 (describing jurisdictional discovery process).) After its completion, Magistrate Judge Netburn set forth a protocol for the motions to dismiss briefing. (Order, ECF No. 9026, at 2.) This protocol was intended to balance "the parties' positions, the need to provide all litigants with a full and fair hearing, and the Court's interest in reasonably managing this complex litigation." (*Id.*) In particular, she noted:

> The parties' briefs on both motions must set forth all pertinent facts. This may not be accomplished by incorporating by reference other documents such as declarations or averments of facts. Instead, briefs must state all facts relevant to the motion and, for each factual statement, provide one or more citations (with specific page or paragraph numbers) to pleadings, declarations, affidavits, averments, or other documents that have been separately filed.

(*Id.* at 4.)

KSA filed its renewed motion to dismiss on October 6, 2023. (KSA Mot.) Plaintiffs filed their opposition on December 20, 2023.[3] (Pls.' Mem. of Law in Opp'n to KSA Mot. ("Pls. Opp'n"), ECF No. 9486.) KSA filed its reply on March 4, 2024. (Reply Mem. of Law in Support

---

[3] Plaintiffs' Executive Committees and Ashton counsel filed their Memorandum of Law jointly.

of KSA Mot. ("KSA Reply"), ECF No. 9610.) Plaintiffs filed a sur-reply on April 19, 2024. (Pls.' Sur-Reply Mem. of Law in Opp'n to KSA Mot. ("Pls. Sur-Reply"), ECF No. 9706.)

KSA moved to strike portions of Plaintiffs' opposition—in particular, the allegedly overbroad citations to Plaintiffs' averments of jurisdictional facts in the opposition briefs, along with allegedly untimely fact and expert declarations. (KSA Letter Mot. to Strike, ECF No. 9500, at 1.) Magistrate Judge Netburn granted KSA's striking motion concerning the expert and fact declarations, and denied it concerning Plaintiffs' averments of fact citations.[4] (*See* Order, ECF No. 9562, at 5–13.)

This Court heard oral argument on July 31, 2024.

### D. Both Parties' Daubert Motions

Both parties brought Daubert motions to exclude seven expert witnesses' testimony. (KSA's Mot. to Exclude Expert Testimony,[5] ECF No. 9088; Pls.' Mem. of Law in Support of Pls' Daubert Mot. ("Pls.' Daubert Mot."), ECF No. 9092.) Magistrate Judge Netburn granted in part and denied in part the parties' cross-motions, largely excluding four expert witnesses' testimony. (Opinion & Order, ECF No. 10615.) Magistrate Judge Netburn denied KSA's motion for reconsideration. (KSA's Mot. for Reconsideration, ECF No. 10646; Opinion and Order, ECF No. 10694.) Both parties have filed Rule 72(a) objections to Magistrate Judge Netburn's Opinion and Order. (KSA's Obj., ECF No. 10691; Pls.' Obj., ECF No. 10693.) On the same day this Court issues this decision, it also overrules the parties' objections.

---

[4] Despite denying KSA's motion as to Plaintiffs' averments of fact citations, Magistrate Judge Netburn noted that such citations "[a]t the very least . . . violated the spirit" of the motions to dismiss briefing protocol. (Order, ECF No. 9562, at 5.)

[5] Dallah Avco Trans Arabia Company ("Dallah Avco") joined KSA's Daubert Motion. ECF No. 9090.

Additionally, KSA later moved to exclude three more experts proffered by the Plaintiffs. (KSA's Letter Mot. to Exclude Expert Testimony, ECF No. 10667.)  Plaintiffs moved to strike KSA's second Daubert motion.  (Pls.' Mot. to Strike, ECF No. 10670.)  These motions are currently under consideration before Magistrate Judge Netburn.

## II.   LEGAL STANDARDS

### A. Jurisdictional Immunity under FSIA and JASTA Exception

Under the FSIA, foreign sovereigns are presumptively "immune from suit in the United States unless a statutory exception applies." *Hijazi v. Permanent Mission of Saudi Arabia to the United Nations*, 689 F. Supp. 2d 669, 672 (S.D.N.Y. 2010), *aff'd*, 403 F. App'x 631 (2d Cir. 2010). Accordingly, FSIA exceptions are the sole source of subject matter jurisdiction over a foreign sovereign in United States courts. *See In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 109, 114 (2d Cir. 2013).

JASTA was enacted in 2016, "specifically to allow 9/11 suits against foreign states that were not designated state sponsors of terrorism." *In re Terrorist Attacks*, 117 F.4th 13, 19 n.6 (2d Cir. 2024).  It created a new statutory exception to the FSIA under 28 U.S.C. § 1605B(b). *2018 Decision*, 298 F. Supp. 3d at 642.  Plaintiffs must satisfy four elements before this Court can exercise subject matter jurisdiction over KSA: (1) physical injury to a person or property or death occurring in the U.S.; (2) an act of international terrorism in the United States, and a tortious act or acts by a foreign state, or any official, employee, or agent of that state taken while acting within the scope of that person's office, employment, or agency; (3) causation; and (4) damages. *Id.* at 642–43.

In determining whether a FSIA exception applies, "a court normally need not resolve, as a jurisdictional matter, disputes about . . . questions remain[ing] for the merits phase of the litigation." *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S.

170, 174 (2017).  A district court does not decide a case on the merits here, because FSIA provides immunity from suit, not from liability.  *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 141 (2d Cir. 2001) (internal citation omitted).  But, "the district court may examine the defendant's activities to determine whether they confer subject matter jurisdiction[.]"  *Id.* at 141–42 (internal citation omitted).

### B.  Burden of Proof and Review of Evidence

"Once the defendant presents a prima facie case that it is a foreign sovereign, the plaintiff has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted[.]"  *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993) (internal citations omitted).  "[T]he ultimate burden of persuasion remains with the alleged foreign sovereign."  *Id.*  "In defending a motion to dismiss for lack of subject matter jurisdiction, a plaintiff bears the burden of proving the Court's jurisdiction by a preponderance of the evidence."  *Figueroa v. Ministry for Foreign Affs. of Swed.*, 222 F. Supp. 3d 304, 307 (S.D.N.Y. 2016) (citing *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)).  If the plaintiff initially meets this burden, the foreign sovereign defendant then "bears the burden of proving, by a preponderance of the evidence, that the alleged exception does not apply."  *Beierwaltes v. L'Office Federale De La Culture De La Confederation Suisse*, 999 F.3d 808, 816–17 (2d Cir. 2021) (internal citation omitted.)

On a Rule 12(b)(1) motion, the Court generally must accept all material factual allegations as true.  *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004).  However, the Court does not draw all reasonable inferences in the plaintiff's favor.  *See Figueroa*, 222 F. Supp. 3d at 306.  If jurisdictional facts are in dispute, a court "has the power and the obligation" to look to affidavits, documents, and testimony to determine whether subject matter jurisdiction exists.  *Id.* (citing *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003); *Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d

6

1006, 1011 (2d Cir. 1986)).  "In doing so, the Court is guided by the body of decisional law that has developed under Rule 56 of the Federal Rules of Civil Procedure," considering only admissible evidence.  *Id.* (citing *Kamen*, 791 F.2d at 1011).

When the defendant has challenged the factual basis of the court's jurisdiction, as KSA has here, "the [C]ourt must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." *Robinson*, 269 F.3d at 141 (internal citation omitted.)  This means "a district court must review the allegations in the complaint," and "the undisputed facts, if any, placed before [the court] by the parties." *Id.*  "[I]f the plaintiff comes forward with sufficient evidence to carry its burden of production on this issue," the Court must "resolve disputed issues of fact." *Id.*; see also *Beierwaltes*, 999 F.3d at 817 (Courts must endeavor to resolve questions of foreign sovereign immunity as near to the outset of the case as it reasonably possible, even if that requires deciding disputed factual issues) (internal citation omitted).  However, "where the overlap between jurisdictional and merits evidence is such that fact-finding on the jurisdictional issue will adjudicate factual issues required by the Seventh Amendment to be resolved by a jury, then the Court must leave the jurisdictional issue for the trial." *Wiwa v. Royal Dutch Petroleum Co.*, 626 F. Supp. 2d 377, 382 (S.D.N.Y. 2009) (internal citation omitted).

The Court has the discretion to hold an evidentiary hearing, "if necessary."  *See Zappia Middle East Const. Co. Ltd. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000) (citing *Cargill Int'l*, 991 F.2d at 1019); *see also Filetech S.A. v. Fr. Telecom S.A.*, 304 F.3d 180, 183 (2d Cir. 2002) (evidentiary hearing could be necessary if "the resolution of factual issues was not readily ascertainable from the declarations of witnesses or turned on questions of credibility.") (internal citation omitted).

## III.   EVIDENTIARY OBJECTIONS

Because the Court reviews evidence under the Rule 56 standard here, it must rule on evidentiary objections that are material to its decision. *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (internal citation omitted); *see also Ruffin v. Kirschenbaum & Phillips P.C.*, No. 20–CV–05422 (PMH), 2022 WL 704943, at *3 (S.D.N.Y. Mar. 9, 2022) (evidentiary rulings are necessary when a district court is presented with evidence whose admissibility and authenticity is challenged). Therefore, as a preliminary matter before stating the facts, this Court will first address the parties' voluminous evidentiary objections. Other than the parties' Daubert motions, KSA generally objected to the FBI's reports, interview summaries, the source statements therein, and Bayoumi's phonebook in Plaintiffs' exhibits. (KSA Mem. of Law in Support of Mot. to Dismiss ("KSA Mem."), ECF No. 9369, at 13–16, 22–23, 25, and 27; KSA Reply, ECF No. 9610, at 7–13.) Almost all of these objections are based on grounds of hearsay, lack of trustworthiness, and lack of personal knowledge. (*Id.*; KSA Ex.s 161, 162A and 162B.)

The objections here are largely immaterial because this Court's decision rests primarily on evidence to which the parties do not object. For example, regardless of whether the contested experts' testimonies are ultimately admissible, this Court has the same conclusion on KSA's motion to dismiss because the decision on subject matter jurisdiction does not rely on these experts' opinions. The same is true for Bayoumi's phonebook or the phone call records. When the Court very infrequently cites to the FBI's or CIA's reports or interview notes, the Court mainly considers facts that parties do not dispute. Furthermore, the Court focuses on the primary sources these federal agencies relied on and cited to, not the agencies' conclusions themselves unless they are undisputed by both parties. Therefore, it is not necessary for this Court to rule on these objections, and the Court declines to do so at this point. *SIMO Holdings Inc. v. Hong Kong uCloudlink Network Tech. Ltd.*, 376 F. Supp. 3d 369, 377 n.9 (S.D.N.Y. 2019), *rev'd on other*

*grounds*, 983 F.3d 1367 (Fed. Cir. 2021) (denying evidentiary objections as moot because they concern exhibits that are not material to the court's resolution of the instant motion).

Additionally, some of the objected-to evidence could be admissible at trial for a specified purpose. *See* Fed. R. Civ. P. 56(c)(2) (allowing objections to evidence when "the material cited ... cannot be presented in a form that would be admissible in evidence."). When the Court considers the content of the primary sources in the FBI's reports, it assumes that it is possible for the original witnesses to be available at trial, and that the original source statements could be presented in an admissible format then. *See Emanuel v. Gap, Inc.*, No. 19–CV–03617 (PMH), 2022 WL 3084317, at *3 (S.D.N.Y. Aug. 3, 2022) ("It may well be that the facts as presented are not necessarily in admissible form at the time of the motion. They do not have to be."). Parties can dispute at trial whether certain potentially inadmissible facts can be admitted at trial. *Id.*

## IV.    JURISDICTIONAL FACTS

Having addressed the evidentiary objections, the Court now states relevant material facts as they are supported by record evidence.[6] The Court disregards any improper assertions that are conclusory, argumentative, or do not cite to evidence. *See* Fed. R. Civ. P. 56(e); Local Rule 56.1.

### A. KSA sent Omar Al Bayoumi and Al Fahad Thumairy to the U.S.

#### 1. Bayoumi moving to the U.S. in 1994

Bayoumi was employed as a civil servant for KSA's civil aviation agency since 1977. (Pls. Ex. 195, at KSA 629.) He remained as a KSA employee until his retirement in April 2014. (*Id.*)

---

[6] This Court refers to parties' briefs (KSA Mem.; Pls. Opp'n; KSA Reply; and Pls. Sur-Reply), averment of jurisdictional facts and counterstatements (KSA's Averment of Jurisdictional Facts ("KSA Aver."), ECF No. 9390–1; Pls.' Corrected Averment of Facts and Evidence ("Pls. Aver."), ECF No. 9541–1; Pls.' Counterstatement to KSA Aver. ("Pls. Counterstatements), ECF N0. 9542; and KSA's Response to Pls.' Aver. (KSA Aver. Resp.), ECF No. 9611–1), and exhibits thereto. The Court has considered the full record submitted by the parties, but restricts this section to jurisdictional facts material to the instant motion.

In 1994, KSA sent him to San Diego. ((Pls. Ex. 195, at KSA 629.)  He was paid by a Saudi subcontractor, Dallah Avco, and he received salary and stipend from them.  (Pls. Ex. 195, at KSA 629; Ex. 120, Bayoumi Dep., at 759:8–762:1, 65:17–66:11; Pls. Ex. 426, at DA 91; Pls. Ex. 427, at DA 92.)  The official reason that KSA sent Bayoumi to the U.S. was for him to pursue education. (Pls. Ex. 120, Bayoumi Dep., at 632:10–17.)  His secondment was part of the Saudization program, which aimed to increase the number of Saudi nationals in its workforce.[7]  (Pls. Ex. 125, Coombs Dep., at 48:6–55:18; Ex. 424, at DA 44; Ex. 120, Bayoumi Dep., at 621:21–622:2, 653:8–22, 762:8–763:8.)  Although he was given the official title as "senior data processing technician," he did not perform any such work for KSA.  (Pls. Ex. 120, Bayoumi Dep., at 74:6–13; 801:18–21; 807:17–809:14; Ex. 433, at DA 1016.)  Plaintiffs contend that Bayoumi was a cooptee of Saudi intelligence.  (Pls. Opp'n, at 23.)  Bayoumi testifies that he had never been a Saudi intelligence officer.  (Pls. Ex. 120, Bayoumi Dep., at 724:18–725:13.)

## 2.  Bayoumi's School Activities in the U.S.

From 1994 to around 2002, Bayoumi enrolled in various education programs at a few U.S. institutions, and received some certificates and degrees.  (Pls. Ex. 120, Bayoumi Dep., at 764:4–13; Ex. 320; Ex. 678AA, at MPS732_821; Ex. 680C, at KSA 906–907; KSA Ex. 212, at KSA 908; Ex. 213, at KSA 739; Ex. 214, at KSA 740; Ex. 215, at KSA 741.)  Bayoumi testifies that he had enrolled and taken classes at San Diego State University in 1995, ELS Institute, George Washington University, Wisconsin University, Keller School of Management, and U.S. International University.  (Pls. Ex. 120, Bayoumi Dep., at 649:5–650:3, 771:5–16, 776:17–20, 768:23–769:12.)  For some of these classes that he attended, he did not earn credits.  (Pls. Ex. 120,

---

[7] Parties dispute the true nature of Bayoumi's employment by the Saudi government.  Plaintiffs allege that Bayoumi was a covert member of Saudi Arabia's Wahhabi network in the United States, and he was paid as a cooptee of the Saudi General Intelligence Presidency.  (Pls. Aver. ¶¶ 112, 870–872, 876–891, 1371, 1573 (citing Pls. Ex. 2W, EO 2638–43).)

Bayoumi Dep., at 771:17–772:7; Ex. 340, at 50.)  Bayoumi testifies that this is because he did not

take exams.  (*Id.*)  He had also received "poor" or "failure" grades for some of the classes.  (Pls.

Ex. 320, at PEC–KSA1–35.)

### 3. Thumairy

From 1996 to 2003, Thumairy held diplomatic status in the U.S., and his visa listed him as

an Embassy or Consulate Official.  (KSA Ex. 139, at STATE 139; Ex. 48; Ex. 141.)  During the

relevant time period, Thumairy was employed by the Da'wah[8] Office of the Ministry of Islamic

Affairs ("MOIA").  (KSA Ex. 49, at KSA 2694; Ex. 50, at KSA 599.)  KSA and MOIA assigned

him to serve as the imam of the King Fahad Mosque in Los Angeles, California, when the mosque

was opened in 1998.  (KSA Ex. 51, at KSA 8509–10; Ex. 52, at KSA 1260–66; Pls. Ex. 107,

Thumairy Dep., at 90:4–20.)

From 1999 to 2001, a bank account Thumairy had opened received significant funds from

Prince Abdulaziz, a senior member of Saudi Arabia's cabinet.  (Pls. Ex. 107, Thumairy Dep., at

199:11–200:10, 203:20–24, 208:20–23, 209:10–14.)  Thumairy explains that such funds were used

for charitable donations and mosque expenses.  (*Id.*)

Usman Madha, an employee at the King Fahad Mosque, declares that Thumairy was hostile

towards the American and western culture, and led a small group of men at the mosque who held

extremist and anti-American views. (Pls. Ex. 72, Madha Decl. ¶¶ 18–19.)  At Madha's deposition,

however, he states that he has never personally heard Thumairy express any support for terrorism

in his sermons.  (Pls. Ex. 128, Madha Dep., at 38:3–39:17.)  Other witnesses testify that they had

never heard Thumairy expressing any extremist or violent views.  (Pls. Ex. 168, Mana Decl. ¶ 8;

Ex. 101, Alzamari Dep., at 134:15–135:12; Ex. 117, Zeid Dep., at 475:15–24.)

---

[8] Da'wah means propagation of religious belief through missionary work.

### B. Hijackers' Arrival in Los Angeles

#### 1. Background

Nawaf al Hazmi and Khalid al Mihdhar ("hijackers") were two Al Qaeda members who helped carry out the 9/11 attacks. (KSA Ex. 163, 9/11 Rep., at 215.)  In 2000, Al Qaeda sent the hijackers to the U.S. to study English and take flight lessons. (KSA Ex. 163, 9/11 Rep., at 215–16.)  According to FBI interrogations of Khalid Sheikh Mohammed ("KSM"), who was an Al Qaeda member and the principal architect of the 9/11 attacks, these two hijackers did not speak much English before coming to the U.S. and had not spent much time in the West. (KSA Ex. 163, 9/11 Rep., at 147, 215; Pls. Ex. 31, KSM Statement, at 1.)  KSM states that "[A]l Qaeda had no one in California to help the two," and he permitted them to "go to the local mosque to request assistance and advice on functioning in American society." (Pls. Ex. 31, KSM Statement, at 9, 17, and 18.)

#### 2. Arrival and Meeting with Thumairy

On January 15, 2000, the two hijackers arrived at Los Angeles International Airport ("LAX"). (KSA Ex. 163, 9/11 Rep., at 215.)  Mohammed Johar, a congregant at the King Fahad Mosque, testifies that he met the hijackers in front of the mosque sometime after the hijackers' arrival.[9] (Pls. Ex. 116, Johar Dep., at 93:15–94:23, 172:9–24.)  Johar brought them into the mosque and introduce them to Sheikh Al Fahad Thumairy. (Pls. Ex. 116, Johar Dep., at 94:17–18.)  Johar states that he told Thumairy that these two men were newcomers to the U.S. and needed to find a place to stay. (Pls. Ex. 116, Johar Dep., at 81:24–82:2, 93:18–94:23, 96:2–97:8, 98:20–99:4, 101:22–104:3, 180:12–181:11, 181:15–182:13.)

---

[9] Parties dispute whether Johar picked up the hijackers at LAX airport.  Plaintiffs assert that Al Fahad Thumairy sent Johar to LAX on January 15, 2000 to meet the two hijackers and bring them to the mosque to see Thumairy. (Pls. Aver. ¶ 1404, citing Pls. Ex. 2L, OIG Rep., at 520.)  KSA asserts that Thumairy did not ask Johar to pick up the hijackers, and the first time Johar met the hijackers was outside the King Fahad Mosque. (KSA Aver. Resp. ¶ 1174, citing Pls. Ex. 116, Johar Dep., at 381:2–17, 382:13–23.)

Johar recalls that the hijackers and Thumairy spoke for a short period of time. (Pls. Ex. 116 Johar Dep.; at 97:22–98:4, 385:20–386:4.) Johar also testifies that no one, including Thumairy, instructed him to help the hijackers. (Pls. Ex. 116, Johar Dep., at 118:1–2 ("[N]obody told me to do something to somebody, to help them."), 188:4–189:2 ("[Thumairy] never told me, hey, help those two guys. . . . [H]e never asked me to help those two guys."), 190:12–18, 381:2–5, 381:12–17, 383:7–10, 386:14–20, 405:18–22.)

Thumairy states that he did not recall meeting Hazmi or Mihdhar at all, whether in January 2000 or later. (Pls. Ex. 107, Thumairy Dep., at 340:15–341:2, 346:1–19, 348:1–9, 491:4–6.) Thumairy also states that he never received or gave instructions to anyone to assist the hijackers. (Pls. Ex. 107, Thumairy Dep., at 491:7–21, 492:11–493:2.)

According to the FBI's interview of Akram Alzamari, Johar's best friend, Alzamari states that Johar told him that Thumairy had asked Johar to look after two very "significant" people. (Pls. Ex. 462, at FBI 141; Ex. 101, Alzamari Dep., at 47:9–20.) The interview notes show that Alzamari stated that Johar introduced the hijackers to him. (Pls. Ex. 462, at FBI 141.) He also stated that he would see Johar with the hijackers at the King Fahad Mosque almost every day, sometimes in the presence of Thumairy. (Id.) Later at Alzamari's deposition in 2020, he stated that the FBI notes of his statement about Thumairy asking Johar to look after the hijackers were erroneous. (Pls. Ex. 101, Alzamari Dep., at 52:2–53:15.)

### 3. MOIA and other Saudi Officials

While the parties dispute the political reasons behind MOIA's creation and its ideological nature,[10] it is undisputed that MOIA was created in 1993, and it assumed control over mosques,

---

[10] Parties dispute the MOIA's religious leaning. KSA asserts that MOIA is quietist and peaceful. (KSA Aver. ¶6.) Plaintiffs allege that KSA allows MOIA to propagate Wahhabism overseas, which endorses violent and extremist religious views. (Pls. Aver. ¶¶ 20, 21, 34, 48, 52.)

vetting sermons, and Saudi efforts to promote Islam overseas. (Pls. Ex. 113, Khalil Dep., at 34:19–37:8; KSA Aver. Resp. ¶ 42.) According to the FBI's investigation reports, MOIA had provided funding to a terrorist group called Al-Ittihad Al-Islamia ("AIAI"), and Thumairy controlled the bank account that distributed such funds. (Pls. Ex. 2MM, at 563–64.)

Khalid Al Sowailem was the head of the Da'wah Office, which dealt with MOIA employees, including Thumairy. (KSA Ex. 66, at KSA 1234; Ex. 63, at KSA 2612); Ex. 64, at KSA 2572).) Thumairy testifies that Sowailem was the administrative personnel responsible for him. (Pls. Ex. 107, Thumairy Dep., at 52:16–21.) On January 28, 1999, Omar Al Bayoumi wrote a letter as the General Supervisor of the Al Madinah Mosque in San Diego, thanking Sowailem for his attentiveness to the Al Madinah Mosque and other mosques in San Diego. (Pls. Ex. 411.)

Musaed Al Jarrah was the assistant head of the Islamic Affairs Department at the Embassy of Saudi Arabia in Washington, D.C. (KSA Ex. 56, at KSA 8594.) According to an FBI report, Jarrah was responsible for managing and controlling all assignments of Saudi Imams in the U.S. (Pls. Ex. 2BB, at 3431.) Another FBI report indicates that Jarrah and Thumairy had extensive contact. (Pls. Ex. 2OO, at 551–552.) Thumairy testifies that he did not recall Jarrah, and Jarrah states that he recalls only one phone conversation with Thumairy in 2003. (Pls. Ex. 107, Thumairy Dep., at 417:5–418:9; Ex. 118, Jarrah Dep., at 166:24–167: 19, 172:2–8.)

Thumairy left the U.S. for Saudi Arabia shortly before the 9/11 attacks. (Pls. Ex. 72, Madha Decl. ¶¶ 5, 7, 24; Ex. 107, Thumairy Dep., at 360:17–22; Ex. 680G, at KSA 6896.) Five weeks after the 9/11 attacks, some CIA and FBI agents came to the King Fahad Mosque with a picture of Thumairy and the hijackers. (Pls. Ex. 113, Khalil Dep., at 68:20–72:5.) They asked the director of the mosque questions about Thumairy. (*Id.*) Thumairy states that he was never aware of this happening. (Pls. Ex. 107, Thumairy Dep., at 407:5–20.) KSA's Ministry of Foreign Affairs instructed Thumairy not to return to the U.S. without further notice. (KSA Ex. 198, at KSA 7659.)

Jarrah drafted a letter to the Ministry of Foreign Affairs dated November 9, 2001, stating that Thumairy was not a suspect and requesting him to return to work at the King Fahad Mosque. (Pls. Ex. 255.) On November 28, 2001, the King of Saudi Arabia and the Ministry of Foreign Affairs approved Thumairy's return to the U.S. (KSA Ex. 208, at KSA 1204; Ex. 209, at KSA 568; Pls. Ex. 251.) Thumairy returned to Los Angeles in December 2001. (Pls. Ex. 680G, at KSA 6896.) On March 21, 2003, the U.S. State Department revoked Thumairy's visa. (KSA Ex. 141, at KSA 6810.)

### 4. Bayoumi's Trip to LA

Bayoumi made a trip from San Diego to Los Angeles and met with the hijackers there around February 1, 2000.[11] (KSA Ex. 163, 9/11 Rep., at 217.) Bayoumi states that the purpose of his trip was to renew his and his family's passports. (Pls. Ex. 120, Bayoumi Dep., at 357:17–358:15; *see also*, KSA Ex. 85, at KSA 6643 (later Consulate report about visit), at KSA 6648 (application for passport dated January 31, 2000, with issuance date of February 1, 2000); Ex. 42, at KSA 7996 (passport showing issuance date of February 1, 2000).)

Kaysan Morgan was an American who converted to Islam in 1999. (Pls. Ex. 92, Morgan Decl. ¶¶ 5–7.) Bayoumi befriended him earlier at the Islamic Center of San Diego ("ICSD"). (Pls. Ex. 92, Morgan Decl. ¶¶ 5–7.) At Bayoumi's invitation, Morgan accompanied Bayoumi on this trip. (Pls. Ex. 92, Morgan Decl. ¶¶ 5–8; Ex. 112, Morgan Dep., at 95:20–97:9.)

Prior to this trip, Bayoumi had met Thumairy at the King Fahad Mosque. (Ex. 120, Bayoumi Dep., at 215:18–216:8.) Bayoumi made multiple phone calls to Thumairy in January

---

[11] While parties do not dispute that Bayoumi met with the hijackers around February 1, 2000, they dispute the exact dates of Bayoumi's trip to Los Angeles. Plaintiffs allege that Bayoumi traveled to Los Angeles on January 31 and February 1, 2000, and visited the Saudi Consulate two days in a row. (Pls. Aver. ¶¶ 1532–35; Pls. Counterstatement ¶ 99.) KSA contends that there was only one trip to the Consulate that was on or about February 1, 2000. (KSA Aver. Resp. ¶ 1535.) The Court does not resolve this factual dispute because the distinction does not affect the decision here.

2000 prior to his trip. (Pls. Ex. 5, Youseff Rep. at 157–58; Ex. 120, Bayoum Dep., at 448:12–454:22.) Around late January to early February 2000, Bayoumi also made multiple phone calls to the Consulate in Los Angeles, the Saudi Embassy in D.C., the Office of Islamic Affairs, and the Office of Cultural Mission at the Embassy. (Pls. Ex. 12A, at 35–49.)[12] Thumairy had also called Bayoumi on January 17, 2000. (Pls. Ex. 12A.)[13] Thumairy denies that he knew Bayoumi at all. (Pls. Ex. 107, Thumairy Dep., at 307:20–308:7.)

On February 1, 2000, at the consulate, Bayoumi met with Ismail Mana. (KSA Ex. 77, Mana Decl. ¶¶ 3, 10–12, 14; Pls. Ex. 110A, Mana Dep., at 134:8–135:3.) Mana worked at the Ministry of Foreign Affairs within the Los Angeles Consulate. (Pls. Ex. 95, Awad Dep., at 76:9–77:16.) Bayoumi took religious materials from Mana. (Pls. Ex. 120, Bayoumi Dep., at 379:16–22, 383:13–389:24). Morgan states that this meeting lasted approximately 20 to 30 minutes. (Pls. Ex. 92, Morgan Decl. ¶15.) Mana declares this meeting to be no more than one minute. (KSA Ex. 77, Mana Decl. ¶ 12.)

Morgan declares that, after meeting with Mana at the consulate, Bayoumi went to the King Fahad Mosque and met with Thumairy on that same day. (Pls. Ex. 92, Morgan Decl. ¶¶ 16, 21; see KSA Ex. 164, 9/11 Rep. 217–18.) Bayoumi recalls that he and Morgan went directly to lunch and denies that he went to the Mosque that day. (Pls. Ex. 120, Bayoumi Dep., at 390:17–392:5; 403:23–405:16.) Thumairy does not recall meeting Bayoumi. (Pls. Ex. 107, Thumairy Dep., at 493:24–494:2.)

---

[12] KSA object to Plaintiffs' Ex. 12A as improper summary. The Court relies on this exhibit to the extent that KSA does not dispute that the phone calls indeed took place. For example, despite arguing that Plaintiffs' Ex. 12 double-counted and misattributed certain phone calls, KSA admits that the record shows that Bayoumi called the Office of Cultural Mission at the KSA Embassy at least 14 times, and the KSA Embassy at least five times. (KSA Aver. Resp. ¶¶ 1265, 1519, 1527, 1564.)

[13] KSA object to Plaintiffs' Ex. 12A as improper summary, but does not dispute that this call was placed. (KSA Aver. Resp. ¶ 1506.)

### 5. Hijackers' Meeting with Bayoumi in Los Angeles

During the two weeks between the hijackers' arrival in the U.S. on January 15, 2000 and their meeting with Bayoumi around February 1, 2000, they remained in Los Angeles and had multiple interactions with Johar. (Pls. Ex. 116, Johar Dep., at 284:20–286:11.) They asked Johar for help related to housing and restaurants. (Pls. Ex. 116, Johar Dep., at 286:1–11, 284:20–285:5, 285:21–286:11.) Johar took them to a grocery store, to see motels, and to a bus stop, where Johar showed the hijackers a Mediterranean restaurant. (Pls. Ex. 116, Johar Dep., at 104:4–107:22, 144:20–145:5, 237:5–239:14, 239:15–23, 240:9–16.) This is the same restaurant where the hijackers would later meet with Bayoumi. (Pls. Ex. 116, Johar Dep., at 393:18–394:2.) Johar denies that the hijackers stayed with him at his apartment. (Pls. Ex. 116, Johar Dep., at 51:12–52:2, 302:24–303:5, 320:4–329:15, 381:22–382:3.) He also denies that he ever told the FBI about the hijackers staying in his apartment. (Pls. Ex. 116, Johar Dep., at 130:6–131:6; 364:16–365:11.) Johar states that during that two weeks, he did not see the hijackers interact with anyone else other than Thumairy. (Pls. Ex. 116, Johar Dep., at 108:12–109:3.)

On February 1, 2000, Bayoumi and Morgan went to get lunch. They first looked for a restaurant where Bayoumi had been before, but did not eat there. (Pls. Ex. 120, Bayoumi Dep., at 393:12–394:7.) Bayoumi states that it was because the restaurant was closed, and Morgan recalls that it was because that place was a halal meat market. (Pls. Ex. 120, Bayoumi Dep., at 393:12–394:7; Ex. 92, Morgan Decl. ¶16.) They then went to a Mediterranean Café, and when they were ordering food, the hijackers walked in. (Pls. Ex. 120, Bayoumi Dep., at 393:8–395:8; Ex. 92, Morgan Decl. ¶ 16.) Bayoumi overheard the hijackers speaking Arabic to each other. (Pls. Ex. 120, Bayoumi Dep., at 396:8–23.) He then introduced himself to the hijackers. (Pls. Ex. 120, Bayoumi Dep., at 396:8–23; Ex. 92, Morgan Decl. ¶ 17.) Bayoumi claims that this was an unplanned chance meeting. (Pls. Ex. 120, Bayoumi Dep., at 725:19–726:16.)

Bayoumi had a conversation with the hijackers in Arabic, where he shared that he lived in San Diego, close to the ICSD there. (Pls. Ex. 120, Bayoumi Dep., at 399:11–400:1, 402:7–9, 404:20–23.) Bayoumi testifies during his deposition that he did not advise, nor invite the hijackers to San Diego. (Pls. Ex. 120, Bayoumi Dep., at 796:9–13.) He also testifies that he did not offer to help the hijackers in any way. (Pls. Ex. 120, Bayoumi Dep., at 726:23–727:2.) However, when being interviewed by London's Metropolitan Police Services ("MPS"), Bayoumi states that he told the hijackers: "if you need help or something like that, just call me," and he states: "I think I gave them my phone number." (Pls. Ex. 450, MPS, at 193:11–16.) Morgan declares that after the conversation, Bayoumi offered to give the hijackers a ride. (Pls. Ex. 92, Morgan Decl. ¶19.) Bayoumi testifies that he did not know if the hijackers stayed or left the restaurant when he and Morgan left. (Pls. Ex. 120, Bayoumi Dep., at 404:11–23.)

Morgan testifies that the conversation lasted 30 minutes. (Pls. Ex. 112, Morgan Dep., at 97:15–98:4.) Bayoumi testifies that it was two-minute conversation. (Pls. Ex. 120, Bayoumi Dep., at 402:10–20.) Morgan did not speak Arabic. (Pls. Ex. 92, Morgan Decl. ¶¶ 17–18; Ex. 112, Morgan Dep., at 82:4–7.) Bayoumi interpreted the conversation for him, (Pls. Ex. 112, Morgan Dep., at 82:8–84:5; Ex. 120, Bayoumi Dep., at 399:3–10), and Bayoumi testifies that Morgan understood the conversation a little. (Pls. Ex. 120, Bayoumi Dep., at 397:8–10.)

Bayoumi states that since the meeting was a coincidence, no one instructed him to meet with the hijackers. (Pls. Ex. 120, Bayoumi Dep., at 725:14–726:8.) Morgan declares that he told the investigators that he believed the encounter to be a coincidence. (Pls. Ex. 92, Morgan Decl. ¶19.)

After this meeting at the restaurant, Bayoumi and Morgan returned to San Diego. (Pls. Ex. 120, Bayoumi Dep., at 404:24–405:2.) Morgan recalls that they visited the King Fahad Mosque again before returning to San Diego, but Bayoumi testifies that he could not find the mosque and

went directly to San Diego.  (Pls. Ex. 120, Bayoumi Dep., at 403:23–405:2; Ex. 92, Morgan Decl. ¶¶ 20–23; Ex. 112, Morgan Dep., at 98:10–99:12.)  Morgan further states that at the mosque, Bayoumi met with Mana and Thumairy again.  (Pls. Ex. 92, Morgan Decl. ¶¶ 21–23; Ex. 112, Morgan Dep., at 98:10–99:12; Ex. 460, at FBI at 103 (May 17, 2010 interview of Morgan).)

### C.  Hijackers' Time in San Diego

#### 1.  Meeting Bayoumi

A few days after the hijacker's encounter with Bayoumi in Los Angeles, the hijackers traveled to San Diego.  (Pls. Ex. 116, Johar Dep., at 277:4–279:7.)  Johar testifies that he dropped the hijackers off at a bus station in Santa Monica.  (Pls. Ex. 116, Johar Dep., at 148:1–150:21, 154:6–12, 277:4–279:7, 280:4–18, 284:10–13.)  Some witnesses interviewed by the FBI state that Bayoumi drove the hijackers from Los Angeles to San Diego.  (Pls. Ex. 2GG, at 4007; Ex. 455, at FBI 35.)  Bayoumi denies driving them from Los Angels to San Diego.  (Pls. Ex. 120, Bayoumi Dep., at 728:23–730:4.)

Bayoumi recalls meeting the hijackers at the ICSD Mosque.  (Pls. Ex. 120, Bayoumi Dep., at 421:5–422:23.)  On February 2 and February 3, 2000, Bayoumi made phone calls to the Office of Islamic Affairs, and the Office of Cultural Missions at the Saudi Embassy and the Saudi Consulate.  (Pls. Ex. 12A, at 46–49.)  On February 3, Thumairy also called Sowailem at the Islamic Affairs Department.  (Pls. Ex. 12A, at 48.)  During the same time period, Thumairy also made multiple phone calls to Abdeljalil Mezgouri, the imam of the ICSD.  (Pls. Ex. 12A, at 48–49.)[14] Thumairy testifies that he does not know Mezgouri and does not recall calling him.  (Pls. Ex. 107, Thumairy Dep., at 351:9–17.)

---

[14] KSA object to Plaintiffs' Ex. 12A as improper summary, but does not dispute that these calls were placed.  (KSA Aver. Resp. ¶¶ 1529, 1618, 1619.)

### 2. Assistance with Apartment

Bayoumi lived in the Parkwood Apartment Complex ("Parkwood") in San Diego during the relevant time period. (Pls. Ex. 120, Bayoumi Dep., at 440:10–441:8.) The Manager of Parkwood, Holly Ratchford, states that prior to the hijackers' arrival in San Diego, Bayoumi had visited her office five to six times to inquire about apartment availabilities. (Pls. Ex. 91, Ratchford Decl. ¶ 6.) Bayoumi states that if he could refer someone to Parkwood, he could receive a referral fee of one or two hundred dollars from the Manager. (Pls. Ex. 120, Bayoumi Dep., at 733:14–734:17.)

On February 3 and 4, 2000, Bayoumi took the hijackers to the rental office at Parkwood. (Pls. Ex. 120, Bayoumi Dep., at 440:10–13; Ex. 91, Ratchford Decl. ¶¶ 6–10; KSA Ex. 89.) Ratchford declares that Bayoumi told her that the hijackers were staying with him and needed to rent an apartment right away.[15] (Pls. Ex. 91, Ratchford Decl. ¶ 7.) Bayoumi prepared Parkwood "Application to Rent" forms for both Hazmi and Mihdhar, and listed Bayoumi's own address at Parkwood as the "present address" for Hazmi and Mihdhar. (Pls. Ex. 545, at FBI 8026; Ex. 555, at FBI 8276; Ex. 556, at FBI 8278.) On the same forms, Bayoumi also listed himself as the Personal Reference for the hijackers, put "friend" when describing his relationship with the hijackers, and provided himself as the emergency contact for the hijackers. (Pls. Ex. 545, at FBI 8027; Ex. 555, at FBI 8277; Ex, 556, at FBI 8279; Ex. 120, Bayoumi Dep., at 432:12–435:22, 437:10–439:23.) Bayoumi also co-signed the lease as a guarantor for the hijacker's apartment. (Pls. Ex. 91, Ratchford Decl. ¶ 13.)

---

[15] Parties dispute whether the hijackers stayed with Bayoumi in the few days before their Parkwood move-in date. KSA contends that it would have been a serious cultural violation to have adult men stay at Bayoumi's apartment, where his wife and daughter also resided. KSA cites Bayoumi's interview transcripts with MPS investigators. (KSA Ex. 269 (MPS376, Bayoumi Interview Transcript), at 13; Ex. 270 (MPS388, Bayoumi Interview Transcript), at 24; Ex. 260 (MPS390, Bayoumi Interview Transcript), at 13 ("No, not man . . . not man, no. . . . No, no, man, no but women yes . . . [b]ut men, no, no way."); Ex. 260 (MPS390, Bayoumi Interview Transcript), at 24 ("No, they didn't stay at my house.").)

On February 4, 2000, Bayoumi went with the hijackers to a bank to open an account, because Parkwood required a certified check for the first month's rent and deposit. (Pls. Ex. 120, Bayoumi Dep., at 440:14–442:9, 443:10–13; Ex. 91, Ratchford Decl. ¶ 14.) The hijackers deposited cash in the amount of $9,900 into their newly opened account. (Pls. Ex. 550, at FBI 8057.) However, because the bank would not issue a certified check on the same day the account was opened, Bayoumi issued a check under his name, payable to Parkwood. (Pls. Ex. 120, Bayoumi Dep., at 442:13–443:9, 737:3–17.) The hijackers paid Bayoumi back for the same amount. (KSA. Ex. 91, at FBI 2808–09; Pls. Ex. 120, Bayoumi Dep., at 737:3–17.)

Ratchford declares that another man accompanied the hijackers to Parkwood, and she identifies that person as Anwar Al Aulaki based on a picture of him. (Pls. Ex. 91, Ratchford Decl. ¶ 8.) Aulaki was the imam of the Al Ribat Mosque in San Diego, and at some point became an Al Qaeda recruiter and leader. (KSA Ex. 163, 9/11 Rep., at 221.) Bayoumi knew Aulaki. (Pls. Ex. 120, Bayoumi Dep., at 482:12–21, 483:9–13, 589:9–16.)

Bayoumi testifies that it was typical in the Islamic community to help newcomers by co-signing a lease when the newcomers needed to rent an apartment. (Pls. Ex. 120, Bayoumi Dep., at 739:5–11.) Bayoumi also states that he could not recall helping anyone else in the same manner. (Pls. Ex. 120, Bayoumi Dep., at 823:5–824:3.)

The hijackers moved into their Parkwood apartment on February 5, 2000. (Pls. Ex. 91, Ratchford Decl. ¶ 16; Ex. 546, at FBI 8030.)

### 3. Social Gathering at Hijackers' Apartment

Around February 17, 2000, Bayoumi organized a social gathering at the hijackers' apartment, and instructed Morgan to videotape part of the event. (Pls. Ex. 92, Morgan Decl. ¶¶ 24, 27; Ex. 10K (MPS2023–059) (videotape of gathering); Ex. 10K-TR (transcript of video).) Bayoumi states that he originally planned to host the event at his own apartment, but needed to use

the hijackers' apartment for all male guests, because Islamic tradition requires families and unmarried men to be separated. (Pls. Ex. 120, Bayoumi Dep., at 460:12–463:23.) Byoumi testifies that the party was an occasion to honor volunteers at the Al Madinah mosque. (Pls. Ex. 120, Bayoumi Dep., at 460:12–461:7.)

As seen from the video, there were approximately 29 attendees. (Pls. Ex. 10K.) Bayoumi gave thanks to a few guests for their volunteer work and for leading the prayers at the mosque. (*Id.* (e.g. Bayoumi thanking Sheikh Abdulrahman Barzanjee and Al Yafai, and presenting them with plaques).) Bayoumi states to the guests: "this gathering of ours today . . . is for us to see these great faces, these glowing faces. Ah, and also to introduce you to the Sheikh Abu Musleh." (*Id.* at 13:28–58.) Bayoumi also states: "We are welcoming the brothers, in fact… whom we have not yet had the pleasure of meeting." (*Id.* at 14:19.) Bayoumi asked the guests to introduce themselves. (*Id.* at 16:28.) There was a round of introduction, during which many guests referred to themselves as a "brother." (*Id.* at 16:52–19:13.) Hazmi also introduced himself. (*Id.* at 18:41–52.) The video does not show Mihdhar introducing himself. The hijackers can be seen to prepare food and interact with some guests. (*Id.*)

Some of the participants at this gathering had interactions with the hijackers outside this gathering. To name a few, Sheikh Fouad Hamouda and Mezgouri were imams at the ICSD mosque, where the hijackers had visited when living in San Diego, (*Id.* at 00:10, 17:35; 28:36; Pls. Ex. 120, Bayoumi Dep., at 422:2–14, 427:15–428:22, 429:22–430:7); Maen Alkhawaja states that Hazmi had approached him about car rental needs, and he introduced Hazmi to Azzadine Abbadi, who sold his car to the hijackers, (Pls. Ex. 10K, 18:42–18:47; Pls. Ex. 2Q, at 1423); Fathi Aidarus, whose phone Mihdhar had used to make calls to Yemen, (Pls. Ex. 2QQ, at 2812); and Ahmad Mustafa, who, according to the FBI's investigation reports, saw the hijackers at the ICSD mosque

once every week and was a roommate with the hijackers at Parkwood for a while.  (Pls. Ex. 2T, at 1903.)[16]

On February 18 and 19, Bayoumi called a phone number that Plaintiffs claim to be associated with Sowailem.[17]  (Pls. Ex. 12A, at 59–60.)  Between January 19, 2000 and March 24, 2000, Bayoumi made at least 93 calls to the Saudi Embassy, of which 30 were made to the Embassy's Islamic Affairs Department.  (Pls. Ex. 12K, at 35–94.)

### D.  Hijackers Leaving San Diego and Los Angeles

Bayoumi traveled to Saudi Arabia in late March, 2000.  (Pls. Ex. 2X, at 2749–2750, 2759, 2798).  From March to April 2000, Bayoumi's monthly compensation from Dallah Avco more than doubled.  (Pls. Ex. 37; Ex. 430, at DA 641–42.)  According to a "Personnel Status Changes" form, the reason for the increase in salary and benefits is "promotion."  (Pls. Ex. 434, at DA 1054.)  Bayoumi explained that this increase was to compensate for his expenses and work experience.  (Pls. Ex. 120, Bayoumi Dep., at 692:16–693:9, 697:4–11, 699:21–702:7.)  On April 19, 2000, while Bayoumi was in Saudi Abrabia, a phone call was placed from a phone number associated with Bayoumi's wife to a number Plaintiffs claim to belong to Aulaqi.  (Pls. Ex. 200, at 2759.)  On April 25, 2000, there was a phone call between Thumairy and the same number associated

---

[16] Parties dispute whether Adel Muhammad Rafeea, the administrator at the ICSD Mosque, was at the party.  It is undisputed that Rafeea allowed Hazmi to use his bank account to receive a $5,000 wire transfer, made by KSM's nephew.  (KSA Ex. 163, 9/11 Rep., at 220; Pls. Ex. 569, at FBI 13582–3; Pls. Ex. 570, at FBI 13588.)

Parties also dispute the significance of Sheikh Muhammed Al Qahtani's presence at the party.  Plaintiffs claim that Qahtani was a Saudi government religious official.  (Pls. Aver. ¶ 111) KSA contends that there was no evidence that Qahtani was a religious official.  (KSA Aver. Resp. ¶ 1701.)

[17] Parties dispute whether the number Bayoumi called indeed belonged to Sowailem.  Further, KSA contends that there was no evidence that the phone calls were related to the hijackers.  (KSA Aver. Resp. ¶ 1717.)

with Aulaqi. (Pls. Ex. 12J.) Thumairy testifies that he has never heard of Aulaqi and does not remember calling him. (Pls. Ex. 107, Thumairy Dep., at 350:23–351:8.)

Bayoumi returned to San Diego on May 31, 2000. (Pls. Ex. 2V, at 2410–12; Ex. 2GG, at 3913.)

## 1. Hijackers Moving to Lemon Grove, CA

Hijackers' lease at Parkwood ended on May 31, 2000. (Pls. Ex. 91, Ratchford Decl. ¶ 19.) Thereafter, the hijackers moved to Lemon Grove, California and rented a room at Abdussattar Shaikh's home. (KSA Ex. 163, 9/11 Rep., at 223; Pls. Ex. 131, OIG Rep., at 262, 336.) Shaikh was a U.S. citizen and FBI informant, who has since passed away. (Pls. Ex. 131, OIG Rep., at 256 & n.185 (referring to Shaikh as an "asset" or "informant"); *id.* at 260 & n.197 (stating that Shaikh had been an asset since 1994 and that in July 2003 was "given a $100,000 payment.") Bayoumi knew Shaikh from the ICSD Mosque. (Pls. Ex. 120, Bayoumi Dep., at 230:14–15.) Shaikh stated in his interview with the FBI that he believed that Bayoumi was an agent of the government of Saudi Arabia. (Pls. Ex. 2H, at 0279.) Bayoumi denies knowing anything about anyone having stayed with Shaikh. (Pls. Ex. 120, Bayoumi Dep., at 496:1–497:13.)

Shaikh developed a close relationship with Hazmi. (Pls. Ex. 2U, at 2224.) He also helped Hazmi with opening a bank account and preparing his visa extension form in July 2000. (Pls. Ex. 2U, at 2224–26; Ex. 692.) In August 2000, Bayoumi made phone calls to Shaikh's home where Hazmi was living. (Pls. Ex. 490, at FBI 1393.) In December 2000, Bayoumi invited Shaikh to his home for dinner. (Pls. Ex. 10M.) Also, in December 2000, Shaikh emailed Hazmi, who by then had left San Diego for Arizona, and in the email, Shaikh also sent greetings to "Hani." (Pls. Ex. 539, at FBI 7355.) It is unclear whether this is referring to Hani Hanjour, who was the pilot for the plane that the hijackers boarded to carry out the attacks, and who also left San Diego for Arizona with Hazmi. (KSA. 163, 9/11 Rep., at 223.) Shaikh testified to the FBI that he had never

met Hani Hanjour, and could not explain who was the Hani he was referring to. (Pls. Ex. 539, at FBI 7355.)

## 2. Hijackers Returning to Los Angeles

In early June 2000, Hazmi and Mihdhar called Johar, informing him they were coming to Los Angeles. (Pls. Ex. 116, Johar Dep., at 289:14–290:9.) On June 9, 2000, the hijackers and Al-Mohdar Mohammed Abdullah Zeid drove from San Diego to Los Angeles. (KSA Ex. 163, 9/11 Rep., at 220, 222; Pls. Ex. 117, Zeid Dep., at 200:6–202:13.) Zeid was a Yemeni University student whom the hijackers interacted with while in San Diego. (Pls. Ex. 117, Zeid Dep., at 93:8–13, 102:9–19, 120:4–8, 131:17–147:3.) Zeid helped the hijackers obtain their drivers' licenses and apply to language and flight schools. (KSA Ex. 163, 9/11 Rep., at 220.) Bayoumi recalls knowing Zeid from the Al Madinah Mosque, and states that Zeid liked to help anyone, in order to make some money on the side. (Pls. Ex. 120, Bayoumi Dep., at 589:17–590:7, 797:4–5.) Bayoumi denies instructing Zeid to assist the hijackers. (Pls. Ex. 120, Bayoumi Dep., at 724:2–6, 797:2–8.) Zeid denies the same, and further denies any knowledge about the hijackers' plan to commit a terrorist attack. (Pls. Ex. 117, Zeid Dep., at 445:4–446:12, 430:10–431:24, 454:12–455:12, 456:12–22.)

The hijackers and Zeid stayed at Deano's Motel, a short walk away from the King Fahad Mosque. (Pls. Ex. 524, at FBI 4007; Ex. 117, Zeid Dep., at 242:14–245:15.) Zeid testifies that he and the hijackers went to the King Fahad Mosque, and met Thumairy there. (Pls. Ex. 117, Zeid Dep., at 203:17–205:23.) Zeid also recalls having the impression then that Thumairy acted like he had known the hijackers before. (Pls. Ex. 117, Zeid Dep., at 212:3–213:13.)

Another witness present, Alzamari, also testifies about Thumairy's presence with the hijackers on June 9, 2000. (Pls. Ex. 101, Alzamari Dep., at 80:22–81:20, 81:24–82:9, 85:4–11, 86:18–25, 87:24–88:7, 88:24–89:5.) Alzamari was Johar's best friend, and he recalls Johar

introducing him to the hijackers in front of the King Fahad Mosque. (Pls. Ex. 101, Alzamari Dep., at 61:18–62:3, 46:13–15, 47:16–20.) He recalls seeing Hazmi and Thumairy walking out of the library at the mosque together. (Pls. Ex. 101, Alzamari Dep., at 128:17–23.)

According to Zeid's interview with the FBI, later that evening, the hijackers, Johar, Zeid, and Thumairy had dinner at Johar's sister's apartment. (Pls. Ex. 467, at FBI 214.) However, during his deposition, Zeid states that he does not recall whether Thumairy was present at dinner. (Pls. Ex. 117, Zeid Dep., at 230:22–232:21.) Johar testifies that Thumairy was not present at dinner. (Pls. Ex. 116, Johar Dep., at 314:19–316:2.)

During this time, Thumairy had visited the Saudi Embassy in Washington, D.C. and flew to Saudi Arabia thereafter, but it is unclear from the record which exact dates these travels took place.[18]

On June 10, 2000, Mihdhar left the U.S. to return to Yemen. (KSA Ex. 163, 9/11 Rep., at 221–22.) Hazmi returned to San Diego and remained in the U.S. (KSA Ex. 163, 9/11 Rep., at 222.) Hazmi continued living in Shaikh's home in Lemon Grove, California, until December 2000, when he traveled to Arizona. (Pls. Ex. 2U, at 2224–26; KSA Ex. 163, 9/11 Rep., at 223.)

There is a traffic violation ticket dated July 12, 2000, showing that Bayoumi was pulled over by the police at a location a few miles away from the King Fahad Mosque in Los Angeles. (Pls. Ex. 445.)

---

[18] Parties dispute whether Thumairy could have been present on June 9, 2000 at the King Fahad Mosque in Los Angeles to meet with the hijackers because they disagree on the date that Thumairy traveled to Washington D.C. and Saudi Arabia.

KSA assert that there was a letter Thumairy signed in Washington D.C. dated June 9, 2000 and Thumairy's passport shows an entry stamp into Saudi Arabia dated June 10, 2000. (KSA Aver. ¶ 152.) KSA argues that given the transit time and time difference, it would have been impossible for Thumairy to have arrived in Saudi Arabia on June 10, 2000, had he been present in Los Angeles on June 9, 2000. *Id.* Plaintiffs allege that the date for the letter is June 10, 2000 and the date for the entry stamp was June 11, 2000. (Pls. Counterstatement ¶ 152.) Parties disagree on what is the correct conversion of the Hijri calendar date on Thumairy's passport stamp into a Gregorian calendar date. (KSA Aver. Resp. ¶ 1795.)

26

### E. Bayoumi's Video in D.C.

In September 2001, the MPS seized various items from the garage of Bayoumi's home in the U.K. (Pls. Ex. 2U, at 2179–2181 and 2289.) Among these was a video Bayoumi took during his June 1999 trip to Washington, D.C. (Pls. Ex. 312 (Bayoumi's flight from San Diego to Washington, D.C. on June 20, 1999); Ex. 10F; Ex. 11F.)

During this trip and while making this video, Bayoumi was accompanied by two Saudi government officials, Adel Al Sadhan and Mutaeb Al Sudairy. (Ex. 10F.) Both Sadhan and Sudairy were MOIA propagators, employed by the Saudi Embassy. (Pls. Ex. 99, Sadhan Dep., at 273:10–273:19, 287:22–288:5, 305:1–9; Pls. Ex. 119, Sudairy Dep., at 199:11–20.) Sadhan and Sudairy had met Thumairy before, when they traveled from Saudi Arabia to Los Angeles for an imamate program from December 1998 to January 1999 and went to pray at the Ibn Tamiyyah Mosque. (Pls. Ex. 99, Sadhan Dep., at 56:5–15; Ex. 119, Sudairy Dep., at 104:9–13, 111:8–23.) After spending two days in Los Angeles, they traveled to San Diego and prayed at the Al Madinah Mosque. (Pls. Ex. 99, Sadhan Dep., at 123:4–23; 123:24–124:2; Ex. 119, Sudairy Dep., at 78:1–11, 157:15–19.) During that trip, they had also stayed with Shaikh. (Pls. Ex. 99, Sadhan Dep. 87:23–88:4, 104:14–23; Ex. 119, Sudairy Dep. 132:3–5, 166:13–167:6.) In February 1999, Bayoumi sent a letter, as the "General Supervisor" of the Al Madinah Mosque in San Diego, to the Minister of Islamic Affairs, giving thanks to Sadhan and Sudairy for giving prayers at the local mosques. (Pls. Ex. 414.) In that letter, Bayoumi also thanked Sowailem and Thumairy, who "demonstrated full cooperation and coordination." (Pls. Ex. 414.) There is an undated letter from Bayoumi, again as the "General Supervisor" of the Al Madinah Mosque to Thumairy, stating "it is my honor to thank you for your kind efforts in providing us with brothers Mutaeb Al-Sudairy and Adel Al-Sadhan." (Pls. Ex. 678D.)

This D.C. video lasts 1 hour 6 minutes 55 seconds. (Pls. Ex. 10F.) Bayoumi filmed the buildings and things he saw while moving around the city, and gave commentary and explanations throughout the video. (*Id.*) Specifically, the video captures George Washington University buildings, the Saudi Embassy, the Islamic Center, the White House, the Washington Monument, the surroundings of the Capitol Hill building and its inside, the U.S. Supreme Court, some buildings along the National Mall, and the motel Bayoumi was staying at. (*Id.*) The camera frequently zooms in and out to display certain details and the overview. (*Id.*) It also captures flowers, trees, the sky, people on the street, gardens, an airplane in the sky, birds, artworks inside the Capitol Hill building, security officers of the Capitol Hill building, and water fountains, among other things. (*Id.*)

Bayoumi can be heard greeting "esteemed brothers." (*Id.*) He provides explanations and context as he films various buildings, such as, "[t]his is the Congress. Here is where the decisions are made and the procedures are effected." (*Id.* at 38:51–38:56.) "[Congress] has two entrances. One entrance is from this side." (*Id.* at 42:44); or "the Congress . . . are congregating approximately 500," (*id.* at 41:01.) He also makes the following comments at various points in the video: when referring to people setting up a scaffold around the National Mall, "[t]hey say that our kids are demons. However, these are the demons of the White House." (*Id.* at 39:05); and "[i]n front of the Congress. There is no Power nor Strength except through Allah." (*Id.* at 39:36.)

## F. Bayoumi's Airplane Drawing

The MPS also seized a "Note Pad" from the garage of Bayoumi's residence in the U.K. in September 2001. (Pls. Ex. 678M, MPS696_1–7 (copy of pages of PSS/34 "Note Pad" produced by MPS); *see also* Ex. 679B, FBI 1331–1337 (copy produced by FBI).) One page in the notepad shows a handwritten sketch of an airplane along with some numbers, calculations, and notes. (Pls. Ex. 11N, MPS 999x_X0417 at 5 (West Midlands Police Print No. 2) (color photograph of

28

"Bayoumi Airplane Sketch"); *see also* Ex. 678M, MPS696_4; Ex. 679B, FBI at 1334 (copies of page with airplane sketch).) The text on this page states: "h=hight the plane from the earth in mile" and "d distance from the plane to hurrizen." (Pls. Ex. 11N, MPS 999x_X0417 at 5.)

Bayoumi states that it is his own handwriting on this page. (Pls. Ex. 120, Bayoumi Dep., at 290:2–9.) Regarding the purpose of preparing the document, Bayoumi states that he prepared the document to memorize the equation. (Pls. Ex. 120, Bayoumi Dep., at 290:13–16.) Regarding the meaning of the equation, Bayoumi explains that he likes to read and be exposed to things, and states that it is perhaps an equation he studied before in high school. (Pls. Ex. 120, Bayoumi Dep., at 290:17–291:3.) Regarding the reason for him to be calculating the height of a plane from earth in miles, he states that it is "an equation like any other equation" and "just an equation to measure distance." (Pls. Ex. 120, Bayoumi Dep., at 291:21–292:9.)[19]

## V.    SAUDI ARABIA'S MOTION IS DENIED

Parties present dueling narratives on "whether and to what extent Thumairy, Bayoumi, and their agents took actions in 2000, at the direction of more senior Saudi officials, to provide assistance to Hazmi, Mihdhar, and other 9/11 hijackers." *2018 Decision*, 298 F. Supp. 3d at 651. Plaintiffs present sufficient facts to support a reasonable inference that their claims satisfy the JASTA exception, and KSA does not convince this Court, by a preponderance of evidence, that the JASTA exception does not apply. Therefore, this Court denies KSA's motion to dismiss.

---

[19] At the oral argument for this motion, KSA's attorney proffers a different argument, stating: "[W]e think the plausible inference is that he was helping his teenager — he had a 14-year-old son at the time — with his high school math homework and that that was being used in one of the high school math textbooks that are set forth in the exhibits to the Moss report." (Tr., ECF No. 10286, at 143:24–144:5.) The Court asks whether this is "his lawyer's supposition or is there some basis in fact on which that's reasonably inferred?" (*Id.* at 144:6–8.) KSA's attorney responds: "There is no basis in fact. There's no direct evidence from him in the record." (*Id.* at 144:9–10.)

## A. The 2018 Decision

In 2018, this Court noted that in order to invoke the JASTA exception, Plaintiffs must show that the alleged employees, or agents of Saudi Arabia, "while acting within the scope of their office, employment, or agency, knowingly or with reckless indifference, provided material support to al Qaeda in a manner that bears some reasonable connection to the 9/11 Attacks." *Id.* at 648. Further, this Court already found that Plaintiffs alleged facts sufficient to show that: 1) "[Thumairy and Bayoumi] and their agents were following instructions from more senior officials in the Saudi Embassy and, as such, their actions can be attributed to Saudi Arabia for purposes of satisfying JASTA's FSIA exception," and 2) "the assistance Bayoumi provided to Hazmi and Mihdhar, including the individuals he put them in contact with, bear at least some reasonable connection to the 9/11 Attacks." *Id.* at 650.

As stated earlier, there are four elements to the JASTA exception: (1) injury, (2) scope of employment, (3) causation, and (4) damages. *Id.*, at 642–43. Among them, KSA did not dispute elements (1) and (4) before the Court in 2018. *Id.* 632–44. Also, the 2018 Decision ruled that Plaintiffs adequately alleged element (3) on causation. *Id.* at 650–651. Therefore, the only element of the JASTA exception remaining in dispute is the scope of employment element, *i.e.*, whether an employee or agent of Saudi Arabia committed the tortious act, while acting within their scope of employment. This is also precisely why this Court ordered the limited jurisdictional discovery in 2018, because "the nature and scope of the agency is somewhat unclear in this case." *Id.* 651.

Parties now debate whether this Court will need to reevaluate whether a tortious act had occurred and whether the element of causation has been satisfied. KSA argues that on Rule 12(b)(1) motions, a district court is required to do so because these are jurisdictional questions. (KSA Reply, at 4–6.) Further, KSA contends that jurisdictional discovery has disproven Plaintiffs' key allegations, which are no longer sufficient for this post-discovery motion. (KSA Reply, at 30–

31, 57–60.) Plaintiffs disagree, arguing that the proof required for resolving tort claims on the merits are distinct from that for jurisdictional inquiries, and that the issues of tortious act and causation have already been resolved in Plaintiffs' favor in the 2018 Decision. (Pls. Opp'n, at 4, 6–10, 63, 68; Pls. Sur-Reply, at 1–2.)

This Court agrees with each side in part. First, this motion only concerns subject matter jurisdiction, not the extent of the merits of Plaintiffs' claims. Therefore, the Court's task is to review the legal sufficiency of Plaintiff's allegations and the accuracy of the jurisdictional facts. *Robinson*, 269 F.3d at 140–41. Thus, the right question to ask is whether Plaintiffs could bring a legally cognizable claim of a tortious act, or whether KSA is amenable to suit, not whether Plaintiffs will ultimately prevail in proving their claim. *Id.* at 142, 145; *2018 Decision*, 298 F. Supp. 3d at 645 n.8.

In *Robinson*, the Second Circuit clearly instructs that the district court is "required to decide whether [the foreign sovereign's] acts were tortious under" New York law, and whether defendants' action constitute a tort. *Robinson*, 269 F.3d, at 142–43. Therefore, whether a tortious act occurred is certainly a jurisdictional fact that this Court must determine. However, the scope of employment element is also such an issue where "merits and jurisdiction . . . come intertwined." *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 178 (2017). This means that the Court reviews the evidence and conducts a limited examination on the merits when necessary. *Id.*

Additionally, the Court is required to make a finding here on whether the doctrine of respondeat superior applies to the tortious acts of individuals. *Robinson*, 269 F.3d at 144 (citing *Joseph v. Office of the Consulate General of Nigeria*, 830 F.2d 1018 (9th Cir.1987) (approving that the district court made a finding on the scope of employment element, even though the court trying the case on the merits would have had to decide the same respondeat superior question in

31

order to determine whether the defendant government could be held liable for the acts of its employee.)

Second, the primary issue after the 2018 Decision on the jurisdictional dispute is whether Thumairy, Bayoumi, and/or others acted as KSA agents when providing assistance to the hijackers. As the Court articulated in the 2018 decision, this is the limited and targeted issue for jurisdictional discovery. *2018 Decision*, 298 F. Supp. 3d at 651. Because the 2018 Decision found that Plaintiff made sufficient allegations on causation, this element was not part of the jurisdictional discovery. Nonetheless, to the extent KSA could offer contrary evidence disproving Plaintiffs' allegations relating to causation, the Court would consider them and revisit the decision. That is, however, not the case here.

The Court finds no record evidence that significantly challenges Plaintiffs' key causation allegations. As the 2018 Decision noted, we apply the traditional test for proximate causation in the FSIA context, *id.* at 645, looking for "'some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered.'" *Id.* (quoting *Owens v. Republic of Sudan*, 864 F.3d 751, 794 (D.C. Cir. 2017), *vacated in part on other grounds sub nom. Opati v. Republic of Sudan*, 590 U.S. 418 (2020)). The key allegations that the 2018 Decisions relied on remain true after the jurisdictional discovery. These include Thumairy's meeting with the hijackers in Los Angeles after their arrival, Bayoumi's meetings with the hijackers in Los Angeles and San Diego, Bayoumi's assistance with the hijackers' apartment and bank account, and other individuals' assistance with hijackers English and language schools. *Id.* 649–51. They are sufficient, as they were in 2018, to satisfy the substantial factor and reasonable foreseeability elements of the proximate causation test. Therefore, the Court's decision on the causation element remains the same.

**B. Plaintiffs Satisfied their Initial Burden**

Now, the Court proceeds to the analysis on the scope-of-employment element, i.e. whether there was a relevant tortious act attributable to KSA. Plaintiffs allege that KSA government officials charged Thumairy and Bayoumi to carry out covert activities in the U.S. that provided material support and assistance to the 9/11 hijackers. (Pls. Opp'n, at 4, 14.) Plaintiffs contend that they have satisfied the JASTA exception, therefore conferring this Court with jurisdiction over KSA. (Pls. Opp'n at 1–5.) KSA argues that no one from the Saudi Arabian government directed Bayoumi or Thumairy to assist the hijackers, Bayoumi did not knowingly assist them, and Thumairy did not assist or direct anyone to assist them. (KSA Mem., at 13, 17, 22.)

### 1. Nature of Thumairy's and Bayoumi's Employment

Before the Court conducts an inquiry into the issue of scope of employment, we first look into the nature of Bayoumi's and Thumairy's employment with KSA, which is at the heart of the parties' dispute. Officially, KSA employed Bayoumi as an accountant on secondment in the U.S., as part of the Saudization program; and KSA employed Thumairy as an imam of the King Fahad Mosque. (KSA Mem., at 4–5.) Plaintiffs contend that Bayoumi was a covert member of Saudi Arabia's Wahhabi network in the United States, and he was paid as a cooptee of the Saudi General Intelligence Presidency. (Pls. Opp'n, at 23–27.) As to Thumairy, Plaintiffs contend that KSA installed Thumairy as the leader of the extremist network in Southern California, and that he led an extremist cell at the King Fahad Mosque. (Pls. Opp'n, at 19–23; Pls. Aver., ¶¶ 16, 95, 147, 340–343, 355, 359, 370–372,384, 391, 394–395, 397, 399, 412–83, 538–40, 554–55, citing Pls. Ex. 72, Madha Decl. and Ex. 566 (FBI Operation Encore Report).)

Plaintiffs have furnished sufficient evidence to raise questions as to the true nature of Bayoumi's and Thumairy's employment with KSA. When viewed as a whole, the total evidence creates a reasonable inference that their employment was more than what their official job titles suggest. For example, Bayoumi had frequent interactions with the hijackers from January to May

2000 that involved important logistical events for the hijackers' settlement into the U.S. Besides the material assistance Bayoumi himself provided, he also seemed to serve as a connecting point between the hijackers and many other people who had provided assistance to the hijackers at one point or another. For example, Bayoumi knew Thumairy personally and frequented the King Fahad Mosque, where the hijackers visited immediately upon their arrival in Los Angeles (Pls. Ex. 90, at 2; Ex. 450, MPS, at 815:3, 817:22–818:1); Bayoumi knew Aulaki, who was an Al Qaeda recruiter and who visited the Parkwood manager together with the hijackers (Pls. Ex. 120, Bayoumi Dep., at 482:12–18; Ex. 91, Ratchford Decl. ¶ 8); Bayoumi knew Zeid, who assisted the hijackers with English and flight lessons (Pls. Ex. 120, Bayoumi Dep., at 486:2–12); Bayoumi knew Shaikh who provided accommodation for the hijackers after they moved out of Parkwood (Pls. Ex. 120, Bayoumi Dep., at 230:14–15). All these connections raise questions on whether Bayoumi was truly employed as an account. His general activity was inconsistent with his official employment title, and his educational pursuits in the U.S.

Additionally, it is undisputed that Bayoumi knew Sadhan and Sudairy, who worked at the Saudi Embassy in Washington, D.C. and took a video of the city with them present. (Pls. Ex. 10F.) There were also frequent phone calls during the relevant time period between Bayoumi and Thumairy, between Bayoumi and the Saudi Embassy in D.C., and between Bayoumi and the Saudi Consulate in Los Angeles. (Pls. Ex. 12A, at 35–49.)

Lastly, around the time he helped the hijackers get settled in San Diego, there was a significant increase in Bayoumi's salary paid by KSA. (Pls. Ex. 430, at DA 461–62.) KSA and Bayoumi failed to provide a plausible explanation as to why this much increase occurred at this particular time period. KSA, accordingly, failed to rebut the logical inference that the pay raise could be related to the assistance Bayoumi provided to the hijackers at that time.

All this evidence taken together shows that Bayoumi had ties to multiple people working for MOIA and the Saudi government, and casts doubt on whether KSA truly sent Bayoumi to the U.S. to simply pursue studies. By getting himself involved into the hijackers' preparation for a terrorist attack, Bayoumi appears to have done much more than what a typical accountant or data processing technician would do. His involvement appears to bear some connection with his employment by KSA.

As to Thumairy, the Court also finds it significant that, when tracking the hijackers' traveling path in 2000, they chose Los Angeles as their initial destination. (KSA Ex. 163, 9/11 Rep., at 215, 220, 222.) The hijackers also revisited Los Angeles in June of 2000 before Mihdhar's departure, despite not intending to live there. (Pls. Ex. 117, Zeid Dep., at 200:6–202:13.) It makes one wonder, who in Los Angeles did they hope to see or what did they intend to do there? This naturally puts the spotlight on Johar and Thumairy, the two people based in Los Angeles that the hijackers interacted with while being there. Furthermore, Plaintiffs provide ample evidence of Thumairy's and Bayoumi's numerous phone calls during the relevant time period. It suggests, assuming Bayoumi was likely employed by KSA to assist the hijackers, Thumairy was coordinating with Bayoumi to some degree for the same goal. Thumairy also had phone calls with the imam of ICSD, during the time period when hijackers had just arrived at San Diego and met with Bayoumi at the ICSD. This further demonstrates that Thumairy potentially was communicating with the ICSD imam about the hijackers. (Pls. Ex. 12A, at 48–49; Ex. 90, at 2 (Summary of Interview of Bayoumi); Ex. 450, MPS, at 815:3, 817:22–818:1.) Therefore, all the evidence taken together creates a strong inference that it is more likely than not that, for the limited purpose of jurisdictional inquiries, Thumairy and Bayoumi were not just acting as an imam and an accountant, respectively. Their employment with KSA likely had some connection with assisting the hijackers. The inferences are compelling in the absence of an alternative innocent explanation

for conduct which might otherwise support a conclusion of knowing assistance to the 9/11 terrorists.

### 2. Bayoumi and Thumairy Acted within their Scope of Employment

Under New York law,[20] an employer may be vicariously liable for the tortious acts of its employees if those acts were committed in furtherance of the employer's business and within the scope of employment. *Monterey Bay Mil. Hous., LLC v. Ambac Assurance Corp.*, 531 F. Supp. 3d 673, 710 (S.D.N.Y. 2021) (internal citations omitted). An employee's act is within the scope of employment if "the act was done while the servant was doing his master's work," regardless of whether the work was irregular or whether the servant disregarded the master's instructions. *Riviello v. Waldron*, 47 N.Y.2d 297, 302 (1979) (internal quotation marks and citation omitted).

Courts consider five factors in making a scope of employment determination: (1) whether the time, place and occasion for the act was connected to the employment; (2) the history of the employer-employee relationship in actual practice; (3) whether the act is one commonly done by such an employee; (4) the extent to which the act departs from normal methods of performance; and (5) "whether the specific act was one that the employer could reasonably have anticipated." *Riviello*, 47 N.Y.2d at 303. New York courts generally place greater emphasis on the fifth factor. *Adorno v. Corr. Servs. Corp.*, 312 F. Supp. 2d 505, 517 (S.D.N.Y. 2004)(internal quotation marks and citation omitted). This emphasis is grounded in the policy basis of the *respondeat superior* doctrine: "The master . . . is justly held responsible when the servant, through lack of judgment

---

[20] In the 2018 Decision, this Court already determined that, although most of the events relevant to KSA's motion occurred in California, New York law applies, as "the majority of Plaintiffs' injuries arising out of the 9/11 Attacks occurred in New York, and most of the Plaintiffs are domiciled there . . . ." *2018 Decision*, 298 F. Supp. 3d at 643. For the scope of employment inquiry, "[t]he choice-of-law analysis is ultimately of little practical significance since, as Plaintiffs concede, the relevant legal principles under New York and California law are largely the same." *Id.*, at 643 n.7 (internal citation omitted); *see also* Pls. Opp'n, at 58; KSA Reply, at 18.

or discretion . . . goes beyond the strict line of his duty . . . and inflicts an unjustifiable injury upon another." *De Wald v. Seidenberg*, 297 N.Y. 335, 338 (1948).

Applying this test, more factors weigh in favor of finding that Bayoumi and Thumairy acted within their scope of employment. The time, place, and circumstances for Bayoumi's assistance to the hijackers were highly connected to his employment. KSA sent Bayoumi to San Diego in 1994 and had funded his secondment since then. Thus, by the time he started to get involved with assisting the hijackers there, he had been at his then post for six years. (Pls. Ex. 120, Bayoumi Dep., at 632:10–17, 759:8–1, 65:17–66:11.) Similarly, KSA sent Thumairy to Los Angeles on a diplomatic visa in 1996, and he had been working at the King Fahad Mosque since 1998. (KSA Ex. 139, at STATE 139; Ex. 48; Ex 51, at KSA 8509–10; Ex 52, at KSA 1260–1266; Pls. Ex. Thumairy Dep., at 90:4–20.) They each provided assistance to the hijackers at the cities and during the time period they were employed. In actual practice, KSA had a history of an employer-employee relationship with Bayoumi and Thumairy.

Turning to whether the alleged tortious act was commonly done, and whether it departed from normal methods of performance, the Court finds little record evidence to decide one way or another. According to Bayoumi's own testimony, while it was common in the Islamic community to help out newcomers at the great lengths he went to assist the hijackers, he could not himself from his experience think of another example. Common sense suggests that assisting hijackers in the specific ways Bayoumi did was surely unusual for someone employed as an accountant or data processing technician. It is, however, plausibly common for someone employed to provide logistical assistance to the hijackers. The record is also unclear as to where the money came from that was provided and expended on behalf of the hijackers.

Similarly, any record concerning the fourth factor, i.e., information related to whether and how Bayoumi and Thumairy had potentially assisted other terrorists in the past, is not sufficient

for the Court to evaluate whether there was a departure here from normal methods of performance. Plaintiffs allege that Thumairy and Bayoumi routinely hosted other Al Qaeda extremists, including Sadhan, Sudairy, Abdullah Al Jaithen, and Majed Al Mersal. (Pls. Opp'n, at 18–36.) These individuals were MOIA propagators, and their travel paths, logistics arrangements, and the people involved in getting them settled shared some similarities with those of the hijackers. However, it is still a step too far to conclude that they were "advance teams" KSA sent to provide support for the hijackers, as Plaintiffs assert. The Court therefore does not have sufficient admissible evidence to decide whether Bayoumi and Thumairy deviated from their normal methods of performance. However, Bayoumi's assistance to the hijackers bore little relation to his activities as a student pursuing an education in the U.S.

The last and most important factor clearly favors the Plaintiffs. An employee's actions need only be generally, not specifically, foreseeable to the employer to fall within the scope of employment. *Riviello*, 47 N.Y.2d at 304. Because Plaintiffs have demonstrated that Bayoumi's and Thumairy's employment with KSA had some connection with assisting the hijackers, the tortious act here passes the bar of general foreseeability. Their interactions with and assistance to the hijackers were "a natural incident of the employment." *Doe v. Uber Techs.*, Inc., 551 F. Supp. 3d 341, 353 (S.D.N.Y. 2021). The evidence on Bayoumi's pay raise during the time he assisted the hijackers further corroborates the element of general foreseeability. It also adds substance and particularity to Plaintiffs' assertion that KSA had at least some knowledge, and could have reasonably foreseen the injury caused by Bayoumi's and Thumairy's conduct. Plaintiffs sufficiently allege that KSA had reason to believe that Bayoumi and Thumairy would provide material support to the hijackers, and that Bayoumi's and Thumairy's conduct would naturally result from their employment with KSA. *Cf. Rivera v. State*, 34 N.Y.3d 383, 391 (2019) (finding correctional officers' beating of the inmate plaintiff not within the scope of employment

38

because the employer could not "have reasonably anticipated such a flagrant and unjustified use of force.").

Lastly, *Rausman v. Baugh*, 248 A.D.2d 8, 10–11 (2d Dep't 1998) has summarized New York case law applying this five-factor test as follows:

> There is no single mechanical test to determine whether at a particular moment an employee is engaged in the employer's business, but decisional law has yielded various formulations, which are instructive. Did the employee's act ... fall within the direction and control of the employer? Did the employee act under the express or implied authority of the employer? Was the employee's act in furtherance of the employer's interests? Were the employee's acts in the "discharge of duty" to the employer? Was it an act in the execution of the employer's orders or part of the work assigned by the employer? Were the acts "so closely connected" with what the employee was hired to do, and "so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment?

Plaintiffs have provided evidence that creates the overall impression that Bayoumi and Thumairy were not just an accountant or an imam as they claim, and their employment had some connection with assisting the hijackers. They were in direct communication with KSA officials during their relevant activities. Therefore, by assisting and providing support to the hijackers, they acted within the scope of their employment. Because the factors applicable for the doctrine of vicarious liability favor Plaintiffs, Plaintiffs have met their burden to show that the JASTA exception applies.

The Court reiterates that this is a preliminary finding concerning jurisdictional inquiries only, permitting Plaintiffs to pursue their claims. It is worth noting that ultimately, when the question of scope of employment comes again before the Court as factfinder during trial, the factfinder will reach its merits decision based on the evidence presented at trial. *See All. For Env't Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 (2d Cir. 2006) (the court may deem it

appropriate to make a preliminary finding on jurisdictional facts, subject to revision later in the proceedings or at trial).

### 3. Tortious Act

The parties agree that "the knowing or deliberately indifferent provision of material support to terrorists" constitutes a tortious act for JASTA's FSIA waiver. *See 2018 Decision*, 298 F. Supp. 3d at 643. On this motion, Plaintiffs argue that Bayoumi, Thumairy, and other Saudi officials had specific knowledge of the hijackers' tort activity and provided material support and substantial assistance to the hijackers. (Pls. Opp'n, at 63–68.) KSA argues that Thumairy did not assist the hijackers, and Bayoumi did not knowingly support them. (KSA Mem., at 17–25; KSA Reply, at 1, 3.)

Plaintiffs furnished sufficient evidence before the Court to demonstrate, at the very least, that Bayoumi had some knowledge when providing support to the hijackers. By his own admission, he had never gone out of his way to help any other strangers to the degree he helped the hijackers. For example, he assisted with housing and cash, and was a guarantor on a lease for the hijackers. (Pls. Ex. 120, Bayoumi Dep., at 823:5–824:3.) This creates a reasonable inference that all the apartment-related assistance he provided for the hijackers was not just acts of a good Samaritan, but rather that he was following KSA's instructions when he assisted the hijackers. Despite KSA's assertion that Bayoumi's meetings with the hijackers in Los Angeles and San Diego were coincidental (KSA Reply, at 35–36), the Court, when placing these encounters with the surrounding circumstances, finds it more likely than not that they were not just chance meetings. Significant was the degree of his involvement and frequency of his interactions with the hijackers and other key people in this entire series of events during the hijackers' time in Los Angeles and San Diego. The evidence does not support the conclusion that Bayoumi was just an innocent participant without any prior planning or constant coordination with his employer, KSA.

Most tellingly, the drawing of an airplane with equations related to the height and distance of a plane's flight path, for which he could not come up with any reasonable explanation, facially connects Bayoumi with knowledge of the 9/11 Attacks. (Pls. Ex. 678M, MPS696_1–7.)

Although there is less evidence concerning Thumairy, the credible evidence supports the conclusion that Thumairy was working together with Bayoumi to assist the hijackers. The evidence demonstrates that Thumairy met with the hijackers at the mosque at least once soon after their arrival in the U.S. (Pls. Ex. 116, Johar Dep., at 94:17–18, 97:22–98:4, 385:20–386:4), and he had multiple phone calls with Bayoumi before the hijackers' arrival, and in the month of January, 2000. (Pls. Ex. 12A.) Admittedly, there is no evidence as to the content of these calls. But the timing of the phone calls, immediately prior and after the hijacker's arrival, and their frequency tip the balance in Plaintiffs' favor. While KSA asserts that Thumairy did not meet with the hijackers again in June 2000, two witnesses testified that they saw Thumairy interact with the hijackers on June 9, 2000 near the King Fahad Mosque. (Pls. Ex. 117, Zeid Dep., at 203:17–205:23; Ex. 101, Alzamari Dep., at 86:18–25.) Despite Thumairy's failure to recall meeting the hijackers, the FBI agents possessed a photo of Thumairy and the hijackers taken in front of the King Fahad Mosque. Plainly speaking, this does not create an image of an unwitting participant, unaware of his involvement with the hijackers' tortious activities. Instead, the total evidence creates a high probability as to Bayoumi's and Thumairy's roles in the hijackers' plans, and the related role of their employer, KSA. *See Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 208 (2d Cir. 2014) (defining "deliberate indifference" for the purpose of 18 U.S.C. § 2339B(a)(1) as when one "knows there is a substantial probability that the organization engages in terrorism but . . . does not care." (internal citation omitted).). In many instances, it even appeared that Bayoumi actively injected himself into the hijackers' tortious activities. For example, he assisted the hijackers with their housing needs, and had a plane drawing he could not explain. Plaintiffs

41

therefore have shown to support jurisdiction that Bayoumi, Thumairy, and KSA knowingly, or at least with deliberate indifference, participated in supporting the hijackers' terrorist activity.

### C. Plaintiffs' Conclusory Allegations

The Court bases its above findings on the record evidence the parties have presented, and is uninfluenced by parties' mere generic and conclusory allegations lacking any evidentiary support. For example, Plaintiffs argue in their brief that Bayoumi hosted a highly incriminating welcome party in honor of the hijackers. (Pls. Opp'n, at 2). To the Court, however, nothing in the video indicates that the hijackers were the focus of the party. Based on the short and infrequent appearances by the hijackers in the video at their apartment, and the very brief introduction of Hazmi by Bayoumi, the Court finds it overly conclusory for Plaintiffs to allege that the intention of the party was to specifically assist the hijackers to prepare for their terrorist activities. It appears to be simply a social gathering at the hijackers' apartment, which Bayoumi organized, and the hijackers attended. Similarly, all the Court can conclude from what Plaintiffs claim to be a chilling and damning video of Bayoumi "casing" the U.S. Capitol (Pls. Opp'n, at 69), is that he visited Washington, D.C., and filmed the city in the presence of Sadhan and Sudairy. He chose to include many government buildings and provided details, and he also chose to feature buildings and things completely unrelated to the government. Furthermore, in Plaintiffs' 2118 paragraphs of averment of facts, many are not so much "facts" but rather attorney arguments lacking citation, or citing exhibits that do not support the specific allegations.

Despite not giving weight to such overly conclusory statements unsupported by direct, concrete evidence from either party, the Court still finds that Plaintiffs offered sufficient evidence to substantiate their material allegations related to the scope of employment, and made a prima facie case as to the JASTA exception. The burden now shifts to KSA.

### D. KSA did not Satisfy its Ultimate Burden of Persuasion

KSA fails to show by a preponderance of evidence that the JASTA exception does not apply. KSA argues that no one at the Saudi government directed Bayoumi or Thumairy, or anyone else to assist the hijackers. (KSA Mem., at 13–17.) However, the Court finds this assertion lacking force in comparison to multiple pieces of circumstantial evidence creating the reasonable inference that Bayoumi and Thumairy were coordinating with the Saudi government when providing assistance to the hijackers. For example, there were several phone calls made between Bayoumi and Thumairy, between Bayoumi and the Saudi Embassy, and between Bayoumi and the Saudi Consulate during the relevant time period. KSA argues that those calls were related to Bayoumi's education, requests for religious materials, other administrative matters, or religious questions because the calls occurred during the holy month of Ramadan. (KSA Mem., at 29; KSA Reply, at 17.) However, such an explanation is based on speculation rather than direct evidence. It is also unpersuasive given the frequency and timing of the calls, and in particular, how the calls between the relevant individuals seem to follow one after one another during a short relevant time period. Although there is no record evidence as to the content of these phone calls, it is KSA's burden to prove that they were *not* related to the hijackers after Plaintiffs succeeded in creating the inference that they were related. The Court finds that KSA failed to do so.

Furthermore, "[w]hether the employee act[ed] under the express or implied authority of the employer[]" is just one input to the entire scope-of-employment equation. *Rausman*, 248 A.D.2d at 10–11. This factor itself does not end the discussion. Concerning the most important factor, whether Bayoumi's and Thumairy's tortious act was generally foreseeable to KSA, KSA did not meet its burden to show that the JASTA exception should not apply. KSA asserts that Bayoumi was not acting to further his employers' interest (KSA Mem., at 19–21), but fails to explain why Bayoumi received a significant raise during the time when he assisted the hijackers. In other

43

instances, KSA insists that Bayoumi's encounters with the hijackers were coincidences; Bayoumi was simply being good-natured when he provided significant assistance related to the hijackers' apartment; and that the airplane drawing was unrelated to the 9/11 Attacks and was instead just common high school algebra and geometry texts, or likely related to Bayoumi's son's high school assignment. These are all either conclusory attorney speculations not grounded in facts, or self-serving denials or excuses from Bayoumi himself that do not withstand scrutiny. The Court finds such evidence inadequate to pass the preponderance bar. Lastly, the Court finds KSA's argument unconvincing that Bayoumi and Thumairy acted on their own accord for their own personal interests, which would constitute an abandonment of their service, releasing KSA from liability. *See Judith M. v. Sisters of Charity Hosp.*, 93 N.Y.2d 932, 933 (1999) (if the employee "for purposes of his own departs from the line of his duty so that for the time being his acts constitute an abandonment of his service, the master is not liable.").

In other words, Plaintiffs have managed to provide this Court with reasonable evidence as to the roles played by Bayoumi, Thumairy, and KSA, in assisting the hijackers. KSA did not proffer sufficient evidence to the contrary. Although KSA attempts to offer seemingly innocent explanations or context, they are either self-contradictory or not strong enough to overcome the inference that KSA had employed Bayoumi and Thumairy to assist the hijackers.

### E. Plaintiffs are Allowed to Prove their Case at Trial

Overall, the parties dispute a significant portion of the facts and their reasonable conclusions. For the facts they do not dispute, they often each provide their own interpretation and narratives. For example, while there is no dispute as to the dates and locations of Bayoumi's meeting with the hijackers in Los Angeles and San Diego, the parties quarrel over whether the meetings were pre-planned or by chance. It is undisputed that Bayoumi offered various forms of assistance with the hijackers' apartment, including bringing them to Parkwood where he lived,

helping to fill out the application forms for the hijackers, and signing the lease as a guarantor. However, the parties disagree as to Bayoumi's motive. While it is undisputed that a notepad page with an airplane drawing, notes, and numbers was found in Bayoumi's home and showed his handwriting, the parties dispute the meaning behind it. Some of the disputed facts cannot be resolved at this stage of the litigation, because weighing the evidence or assessing witnesses' credibility will need to take place at trial.

Nonetheless, the entire body of undisputed facts, and the Court's preliminary assessment of certain disputed facts, are adequate for the Court to conclude that the exercise of subject matter jurisdiction is appropriate here. The Court's examination is limited to actual direct and circumstantial evidence, and the reasonable inferences to be drawn from such evidence. Putting aside lawyers' characterizations, the evidence does not compel the Court to take KSA's version of the events, or to deny jurisdiction of Plaintiffs' suit.

Because KSA did not carry its burden to convince the Court by a preponderance of the evidence that the JASTA exception does not apply, the Court retains subject matter jurisdiction. Plaintiffs' claims will proceed to decision on their merits.

## VI.    CONCLUSION

KSA's Renewed Motion to Dismiss for lack of jurisdiction under JASTA is DENIED. The Clerk of Court is directed to terminate the motion at ECF No. 9368.

Dated:  New York, New York
August 28, 2025

SO ORDERED.

GEORGE B. DANIELS
United States District Judge

45