# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN) |

*This document relates to*:
All Actions

### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
### TO KINGDOM OF SAUDI ARABIA'S MOTION FOR STAY (ECF No. 11226)
### PENDING APPEAL OF THIS COURT'S AUGUST 28, 2025 ORDER (ECF No. 11182)
### DENYING SAUDI ARABIA'S RENEWED MOTION TO DISMISS

MOTLEY RICE LLC
ROBERT T. HAEFELE
JODI WESTBROOK FLOWERS
DONALD A. MIGLIORI
28 Bridgeside Boulevard
Mount Pleasant, SC 29465
Tel.: (843) 216-9184
Email: rhaefele@motleyrice.com

*Liaison Counsel and Co-Chairs of Plaintiffs'
Executive Committee for Personal Injury and
Death Claims on behalf of the Plaintiffs*

COZEN O'CONNOR
SEAN P. CARTER
J. SCOTT TARBUTTON
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
Tel.: (215) 665-2105
Email: scarter1@cozen.com

*Co-Chair and Liaison Counsel of the
Plaintiffs' Executive Committee for
Commercial Claims on behalf of Plaintiffs*

KREINDLER & KREINDLER LLP
STEVEN R. POUNIAN
ANDREW J. MALONEY, III
JAMES GAVIN SIMPSON
485 Lexington Avenue
New York, New York 10017
Tel.: 212-687-8181
Email: spounian@kreindler.com

*Attorneys for Ashton Plaintiffs*

## <u>TABLE OF CONTENTS</u>

PRIOR PROCEEDINGS ................................................................................................ 3

A.   The FSIA jurisdictional discovery and motion .................................................. 3

B.   The Court's central factual findings on jurisdiction ......................................... 4

   1.   KSA and its employees Thumairy and Bayoumi coordinated to provide material support to the Al Qaeda hijackers................................................................................. 5

   2.   Bayoumi's encounters with the hijackers were pre-planned and coordinated with Saudi Arabia. ........................................................................................................... 6

   3.   Thumairy was the trusted first point of contact for the hijackers upon their arrival in the United States............................................................................................... 6

   4.   Bayoumi provided material support to the hijackers pursuant to Saudi Arabia's instructions. ..................................................................................................... 7

   5.   Bayoumi's airplane sketch and equations were linked to the 9/11 Attacks...................... 7

   6.   Patterns of phone calls show KSA's coordinated assistance at key times. ....................... 7

   7.   Bayoumi's role was integral to the hijackers' settlement and support network. .............. 8

   8.   Saudi Arabia compensated Bayoumi for his assistance to the hijackers. ......................... 8

ARGUMENT: SAUDI ARABIA FAILS TO MEET ITS BURDEN TO JUSTIFY A STAY …..9

A.   SAUDI ARABIA FAILS TO SHOW ANY LIKELIHOOD OF SUCCESS ON APPEAL .......................................................................................................11

   1.   The Order is not appealable under the collateral order doctrine. ....................................11

   2.   The Court applied the New York state scope-of-employment and tort standards as Saudi Arabia argued ................................................................................................ 12

   3.   This Court applied the procedures for jurisdictional fact finding as Saudi Arabia advocated ...................................................................................................... 12

   4.   The Court made decisive rulings, while Saudi Arabia improperly reargues the facts. ... 13

   5.   Saudi Arabia's "causation" argument is both legally and factually meritless. ............... 15

B.   SAUDI ARABIA WILL NOT BE IRREPARABLY INJURED BY PROCEEDING TO TRIAL............................................................................................................ 17

C.   PLAINTIFFS WILL BE SUBSTANTIALLY HARMED BY A STAY............................ 18

D.   THE PUBLIC INTEREST IS OVERWHELMING ......................................................... 19

E.   THIS COURT CAN ENSURE THAT NO PARTY IS UNFAIRLY PREJUDICED IN SETTING THE PRETRIAL PROCEEDINGS AND TRIAL ......................................... 20

CONCLUSION................................................................................................................ 20

# <u>TABLE OF AUTHORITIES</u>

Page(s)

Cases

*Apostol v. Gallion*, 870 F.2d 1335 (7th Cir. 1989) ............................................................2, 11, 17

*APWU v. Potter*, 343 F.3d 619 (2d Cir. 2003) ............................................................ 12

*Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193 (2d Cir. 2016) ................................... 13

*Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98 (2d Cir. 2016) 17

*Carroll v. Trump*, 88 F.4th 418 (2d Cir. 2023) ............................................................ 10

*Coinbase, Inc. v. Bielski*, 599 U.S. 736 (2023) ............................................................11

*Fuld v. Palestine Liberation Org.*, 606 U.S. 1 (2025).................................................... 19

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co., 581 U.S. 170 (2017)*.................................................................................................... 17

*In re Actos Antitrust Litig.*, 2020 WL 8996696 (S.D.N.Y. Mar. 9, 2020) .................................... 19

*In re World Trade Ctr. Disaster Site Litig.*, 469 F. Supp. 2d 134 (S.D.N.Y. 2007)...................... 10

*In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167 (2d Cir. 2007)............................. passim

*In Re: Terrorist Attacks on September 11, 2001,* 298 F. Supp. 3d. 631 (S.D.N.Y. 2018) ............. 3

*Johnson v. Jones*, 515 U.S. 304 (1995)....................................................................1, 11, 12

*Kaplan v. Lebanese Can. Bank, SAL*, 610 F. Supp. 3d 533 (S.D.N.Y. 2022) .............................. 18

*Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83 (2d Cir. 2012) ............................... 9, 20

*Nam v. Permanent Mission of the Republic of Korea*, 2023 WL 2456646 (S.D.N.Y. March 10, 2023) .................................................................................................. 17, 19

*Nken v. Holder*, 556 U.S. 418 (2009)....................................................................9, 11, 18

*Plummer v. Quinn*, 2008 WL 383507 (S.D.N.Y. Feb. 12, 2008) .................................................. 19

*Robinson v. Gov't of Malaysia,* 269 F.3d 133 (2d Cir. 2001)............................................... 17

*United States v. Rodgers*, 101 F.3d 247 (2d Cir. 1996)................................................... 9

*Watson v. Kingdom of Saudi Arabia*, 2023 WL 4047586 (N.D. Fla. May 11, 2023), 2024 WL 1344643 (N.D. Fla. Mar 30, 2024) ....................................................................... 15

Statutes

28 U.S.C. § 1602.......................................................................................... 1

Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 (2016) ...... passim

28 U.S.C. § 1605B ........................................................................................ 1, 19

49 U.S.C. § 40101 ........................................................................................ 19

Rules

Fed. R. Civ. P. 54(b).................................................................................... 14

Other Authorities

Exec. Order No. 14040 ................................................................................... 2, 3

This Court's August 28, 2025 Order, ECF No. 11182 ("Order"), determined that the Kingdom of Saudi Arabia ("Saudi Arabia" or "KSA") is subject to jurisdiction under the exception to foreign sovereign immunity established by the Justice Against Sponsors of Terrorism Act ("JASTA"),[1] codified at § 1605B of the Foreign Sovereign Immunities Act ("FSIA").[2] This Court's determination of jurisdiction was undertaken with careful adherence to the applicable procedures and soundly based on the evidentiary record before it. This Court reviewed the totality of the record evidence, made the required findings of fact, ruled KSA's proffer of evidence and argument insufficient to carry its burden of persuasion, and ultimately concluded that "Plaintiffs are Allowed to Prove their Case at Trial." Order 44.

In a filing made on the 24th anniversary of the September 11th attacks, Saudi Arabia moved to stay any further proceedings before this Court, while it attempts to pursue an appeal of the Order. *See* KSA's Brief in Support of Motion for Stay of Proceedings, ECF No. 11227 ("KSA Br.").  Saudi Arabia cannot meet its heavy burden to justify an indefinite stay of this case, which has already been pending for over two decades. This Court should exercise its discretion to deny KSA's motion and press forward to complete the final preparations for a trial on the merits.

*First,* Saudi Arabia fails to show any likelihood of success on appeal. Its arguments incorrectly assume that this Court's Order is appealable under the collateral order doctrine. But appeals of collateral orders, including those raising immunity questions, are reserved for pure issues of law, not fact-intensive disputes on the sufficiency of the evidence underlying a district court's jurisdictional findings. *See Johnson v. Jones,* 515 U.S. 304 (1995) (collateral order appeals reserved for "abstract issues of law"). Moreover, this Court followed the governing New York law standards advocated by Saudi Arabia on scope of employment and tortious conduct,

---

[1] Pub. L. No. 114-222, § 2(b), 130 Stat. 852, 853 (2016) (codified at 28 U.S.C. § 1605B note).
[2] 28 U.S.C. § 1602 *et seq*.

and KSA fails to identify any legal error for appellate review. Likewise, this Court's procedures for deciding the jurisdictional facts applied the terms advocated by Saudi Arabia. And KSA provides no basis for the Second Circuit to address — much less overturn — this Court's evidentiary determinations. In addition, this Court used the same causation test uniformly applied by all other federal courts, under which "but for" causation is readily established on the motion record. *Second*, Saudi Arabia's claims that it would incur irreparable injury from allowing the case to proceed are hollow and undermined by its own actions. Saudi Arabia could have immediately appealed this Court's causation ruling in 2018 but made a strategic choice not to do so. *Third*, the plaintiffs would suffer severe and unfair prejudice by further delay in this decades-old litigation, including the potential loss of witnesses and evidence. *Fourth*, a trial of this case is a matter of great public interest — as amply reflected by Congress's enactment of JASTA, Exec. Order No. 14040, and the intensive media attention. In sum, the entire circumstances show that KSA's motion for a stay was improperly brought, and that its real objective is delay.

Contrary to KSA's argument, KSA Br. 1, this is not a case where "[i]t makes no sense for trial to go forward while the court of appeals cogitates on whether there should be one." *Apostol v. Gallion*, 870 F.2d 1335, 1338 (7th Cir. 1989). Quite the opposite: it makes no sense during KSA's appeal to halt proceedings before the very Court to which the case will ultimately be returned for further proceedings and trial. To grant a stay would subvert, rather than serve, the fundamental objective of judicial economy. This Court should not depart or retreat from its ruling, Order 45, that "Plaintiffs' claims will proceed to a decision on their merits," and should allow this litigation to move forward without delay.

## PRIOR PROCEEDINGS

### A.  The FSIA jurisdictional discovery and motion

In its Memorandum Opinion and Order issued on March 28, 2018 ("2018 Decision"), this Court denied without prejudice KSA's motion to dismiss for lack of subject matter jurisdiction, finding that jurisdictional discovery was warranted as to "whether and to what extent [Fahad Al] Thumairy, [Omar Al] Bayoumi and their agents took actions in 2000, at the direction of more senior Saudi officials, to provide assistance to Nawaf Al Hazmi, Khalid Al Mihdhar and other 9/11 hijackers." *In Re: Terrorist Attacks on September 11, 2001,* 298 F. Supp. 3d. 631 651 (S.D.N.Y. 2018). KSA chose not to pursue an appeal of that threshold denial of its sovereign immunity, instead electing to proceed with discovery and to invite this Court's jurisdictional fact-finding process.

Since then, this Court has overseen "limited" and "targeted" jurisdictional discovery into the matters set forth in the 2018 Decision encompassing, *inter alia*, document discovery of Saudi Arabia, depositions of Saudi Arabia's witnesses and third parties, production by the FBI of investigative reports from its 9/11 investigations in response to both a subpoena and Exec. Order No. 14040, production by the United Kingdom's Metropolitan Police Service (MPS) of materials seized from Bayoumi upon his arrest in 2001, and expert reports and depositions.

In October 2023, following the completion of jurisdictional discovery, Saudi Arabia renewed its motion to dismiss on grounds of foreign sovereign immunity. ECF No. 9369. In articulating its view of the standards governing resolution of that motion, Saudi Arabia stated that plaintiffs bore an "initial burden of production." As Saudi Arabia acknowledged, if plaintiffs met their burden, then Saudi Arabia would bear "the ultimate burden of persuasion… by a preponderance of the evidence." *Id.* at 12.

Saudi Arabia further argued that the Court should "resolve" factual disputes for purposes of the jurisdictional determination, and that it could and should do so based on the paper record submitted on KSA's motion and without holding a hearing. Reply Memorandum of Law in Support of Saudi Arabia's Renewed Motion to Dismiss ("KSA Reply"), ECF No. 10190 at 11-13. Saudi Arabia thus made a strategic choice to rely solely on the paper record in attempting to meet its burden of persuasion on its motion, rather than presenting its witnesses to face cross-examination.

The motion record comprised four rounds of party submissions, including briefs, averments of facts and evidence, and hundreds of exhibits — including documents, videotapes and other materials — obtained largely from the years-long discovery effort directed by the Honorable U.S. Magistrate Judge Sarah Netburn and this Court. On July 31, 2024, the Court heard extensive oral argument from Saudi Arabia and the Plaintiffs on KSA's motion and the parties' competing presentations of the evidence. *See* Transcript of Oral Argument, ECF No. 10286. At that argument, KSA again declined to ask for an evidentiary hearing on its motion.

### B. The Court's central factual findings on jurisdiction

The Court ruled that "the entire body of undisputed facts, and the Court's preliminary assessment of certain disputed facts, are adequate for the Court to conclude that the exercise of subject matter jurisdiction is appropriate here." Order 45. Referring to its review of the "total evidence," *id.* 33, the Court found that "Plaintiffs have managed to provide this Court with reasonable evidence as to the roles played by Bayoumi, Thumairy, and KSA, in assisting the hijackers," and that "KSA had employed Bayoumi and Thumairy to assist the hijackers," *id.* 44.

The Court determined that the extensive proof it reviewed, as well as its application of "common sense," *id.* 37, supports the conclusion that Bayoumi and Thumairy were "working

4

together" and "coordinating with the Saudi government when providing assistance to the hijackers." *id.* 41, 43. The Court further found that Saudi Arabia failed to meet its burden of persuasion on the motion, rejecting its arguments as "self-contradictory or not strong enough to overcome the inference[s]" the Court drew from the evidence. Order 44.

In establishing jurisdiction over KSA, the Court made a series of factual findings directly addressing the scope-of-employment issue. Saudi Arabia misstates or disregards those findings.

### 1. KSA and its employees Thumairy and Bayoumi coordinated to provide material support to the Al Qaeda hijackers.

Having reviewed the entire record, the Court concluded that "Bayoumi, Thumairy, and KSA knowingly, or at least with deliberate indifference, participated in supporting the hijackers' terrorist activity." Order 42. The Court found that "the total evidence creates a high probability as to Bayoumi's and Thumairy's roles in the hijackers' plans, and the related role of their employer, KSA." *Id.* 41. The Court found that "multiple pieces of circumstantial evidence creat[e] the reasonable inference that Bayoumi and Thumairy were coordinating with the Saudi government when providing assistance to the hijackers," including, *inter alia*, their "direct communication with KSA officials during their relevant activities," as well as "the frequency and timing" and the sequencing of phone calls among Thumairy, Bayoumi, the Saudi Embassy, and the Saudi Consulate. *Id.* 39, 43.[3]

---

[3] Saudi Arabia fails to engage with the Court's "high probability" findings that KSA and its employees knowingly or deliberately supported Al-Qaeda's terror plot. Rather than confronting those findings, KSA recycles arguments about outdated U.S. agency conclusions that the Court considered — but declined to credit — in reaching its decision. *See* KSA Br. 12-13 (positing that "no Saudi official or employee knowingly supported the 9/11 attacks"). KSA also attempts to sow doubt by plucking words from the Order — "preliminary," "some connection" — and using them out of context. But KSA's selective *faux*-quotations cannot rewrite the Court's *actual* reasoning or the powerful evidence-based conclusions it drew against KSA. KSA Br. 11-12.

**2. Bayoumi's encounters with the hijackers were pre-planned and coordinated with Saudi Arabia.**

This Court rejected "KSA's assertion that Bayoumi's meetings with the hijackers in Los Angeles and San Diego were coincidental," finding that "when placing these encounters with the surrounding circumstances… it [is] more likely than not that they were not just chance meetings." Order 40.[4] The Court emphasized "the degree of [Bayoumi's] involvement and frequency of his interactions with the hijackers and other key people in this entire series of events," finding that "[t]he evidence does not support the conclusion that Bayoumi was just an innocent participant without any prior planning or constant coordination with his employer, KSA." *Id.*

**3. Thumairy was the trusted first point of contact for the hijackers upon their arrival in the United States.**

The Court found it "significant" that the hijackers "chose Los Angeles as their initial destination" in January 2000 and returned there in June 2000, raising the obvious question: "who in Los Angeles did they hope to see or what did they intend to do there?" Order 35. The Court answered that question by finding that the facts "naturally put[] the spotlight on Johar and Thumairy, the two people based in Los Angeles that the hijackers interacted with while being there." *Id.* The Court further emphasized the "numerous" phone calls between Thumairy and Bayoumi, as well as Thumairy's calls with the Imam of the Islamic Center of San Diego ("ICSD"), "during the time period when [the] hijackers had just arrived at San Diego and met with Bayoumi at the ICSD." *Id.*[5]

---

[4] KSA's motion states that the Court "declined to resolve… 'whether' Al Bayoumi's 'meetings' with the hijackers 'were pre-planned or by chance….'" KSA Br. 11. That statement is unsustainable in light of the clear findings in the Order.

[5] KSA motion simply ignores the Order's findings about Thumairy in their entirety and belabors the myth that Thumairy's communications were all about "religious questions." KSA Br. 15.

6

**4. Bayoumi provided material support to the hijackers pursuant to Saudi Arabia's instructions.**

The Order drew "a reasonable inference that all the apartment-related assistance [Bayoumi] provided for the hijackers was not just acts of a good Samaritan, but rather that he was following KSA's instructions when he assisted the hijackers." Order 40. The Court reviewed, among other things, Bayoumi's admission that "he had never gone out of his way" to provide similar help to others, that he brought the hijackers to his apartment complex, and that he signed their lease as a guarantor. *Id*. 40, 44.[6]

**5. Bayoumi's airplane sketch and equations were linked to the 9/11 Attacks.**

The Order concluded that "[m]ost tellingly, the drawing of an airplane with equations related to the height and distance of a plane's flight path, for which he could not come up with any reasonable explanation, facially connects Bayoumi with knowledge of the 9/11 Attacks." Order 41. The Order found KSA's counter-arguments "inadequate to pass the preponderance bar," calling them "either conclusory attorney speculations not grounded in facts, or self-serving denials or excuses from Bayoumi himself that do not withstand scrutiny." *Id*. 44.[7]

**6. Patterns of phone calls show KSA's coordinated assistance at key times.**

The Order identified "numerous phone calls during the relevant time period" supporting its finding that Thumairy and Bayoumi were "coordinating… to some degree for the same goal," including "multiple phone calls" in the lead-up to and during the key month of January 2000. Order 41. The timing of those calls, "immediately prior [to] and after the hijackers' arrival," and their "frequency," constitute "credible evidence support[ing] the conclusion that Thumairy was

---

[6] Contrary to KSA's characterization that the Court "declined to resolve…Bayoumi's 'motive,'" KSA Br. 11, the Order expressly addressed Bayoumi's state of mind when assisting the hijackers, and properly drew the inference based on the total record that he acted under "instructions" from KSA. Order 40.

[7] KSA's assertion that the Court "declined to resolve…the 'meaning'" of the airplane sketch, KSA Br. 11, ignores the plain language and reasoning of the order.

working together with Bayoumi to assist the hijackers." *Id.* The Court also reviewed the timing and convergence with other relevant events of Bayoumi's and Thumairy's numerous phone calls to the Saudi Embassy, including calls to Khalid Al Sowailem, head of the U.S. operations of the Saudi government's Ministry of Islamic Affairs. *Id.* 19, 23.[8]

### 7. Bayoumi's role was integral to the hijackers' settlement and support network.

The Court made explicit tortious-conduct findings regarding Bayoumi, including that: Bayoumi had "frequent interactions" with the hijackers over many months, involving "important logistical events for the hijackers' settlement;" Bayoumi himself provided "material assistance" to the hijackers; and Bayoumi served as the "connecting point" between the hijackers and "many other people who… provided assistance." Order 33-34.[9]

### 8. Saudi Arabia compensated Bayoumi for his assistance to the hijackers.

The Court found that in April 2000 there was a "significant increase in Bayoumi's salary paid by KSA," and that neither KSA nor Bayoumi offered a plausible explanation "as to why this much… at this particular time." Order 34. The Court found that the "logical inference" for why Bayoumi's "monthly compensation… more than doubled" was that it "related to the assistance that Bayoumi provided to the hijackers at that time." *Id.* 23, 34. KSA mistakenly claims the Court drew an "unsupported inference" that the increase funded direct financial assistance to the hijackers. KSA Br. 16.  In its Order, however, after considering the totality of the evidence presented, the Court found that Saudi Arabia gave Bayoumi the "pay raise" as compensation for his services related to helping the hijackers. Order 23, 34.[10]

---

[8] KSA's motion acknowledges "telephone calls among Bayoumi, Thumairy, and the Saudi Embassy and Consulate," KSA Br. 3, but omits mention of the convergence in timing and sequencing of those calls with support to the hijackers, which forms the nub of the Court's findings. *See* Order 35, 41.

[9] KSA belittles this evidence as mere "interactions," KSA Br. 3, resisting the Court's findings as to Bayoumi's (and KSA's) acts of material, coordinated support. *Id.*

[10] Although Saudi Arabia had failed to raise any plausible challenge to plaintiffs' allegations and theories of causation in its initial motion to dismiss, the Court nonetheless assessed the evidence as to causation for purposes of

# ARGUMENT

## SAUDI ARABIA FAILS TO MEET ITS BURDEN TO JUSTIFY A STAY

The twin issues of (a) whether to grant a stay in the district court and (b) whether an appeal divests the district court of jurisdiction are "inextricably intertwined" and "involve similar if not identical considerations." *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170-71 (2d Cir. 2007) ("*World Trade Ctr. I*"). The Supreme Court has defined those considerations as comprising four traditional factors, *Nken v. Holder*, 556 U.S. 418, 426-7 (2009),[11] which are addressed below and weigh against KSA's request to stay. The proper application of the four factors "is dependent upon the circumstances of the particular case" and is "left to the court's discretion." *Id.* at 433-34. "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 433-34; *see also United States v. Rodgers*, 101 F.3d 247, 251 (2d Cir. 1996) (divestiture is not *per se*); *Nken*, 556 U.S. at 433 ("[a] stay…is not a matter of right…."). KSA has not met that burden.

The Second Circuit rarely overturns a district court's denial of a stay because a defendant-appellant bears a "heavy" burden to establish an abuse of discretion and must at minimum make a showing of "substantial prejudice." *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 100 (2d Cir. 2012) (observing that for over 30 years, only one decision had overturned the denial of a stay). The broad grant of discretion to a district court is rooted in the "power inherent in every court to control the disposition of the causes on its docket with economy of time and effort…." *Id.* at 96. The Second Circuit has likewise declared that "'our

---

deciding KSA's renewed motion. The Court found that the essential assistance provided to the hijackers by Saudi Arabia and its agents — including meetings, help with "housing and cash," and an airplane sketch and equations — satisfied causation. Order 32.

[11] The four factors are: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.*

application of the divestiture rule must be faithful to the principle of judicial economy from which it springs,' and 'it should not be employed to defeat its purposes or to induce endless paper shuffling.'" *Carroll v. Trump*, 88 F.4th 418, 433-34 (2d Cir. 2023); *World Trade Ctr. I*, 503 F.3d at 171.[12]

In attempting to carry its heavy burden to justify a stay or a claim of divestiture, KSA does not faithfully engage either the law or the facts. It claims that all immunity determinations are immediately appealable by generically citing prior immunity appeals that, unlike this case, addressed clear questions of law. KSA Br. 6. KSA further asserts in the most conclusory terms that it would suffer "irreparable harm" if the case were permitted to proceed. *Id.* at 9. Ignoring the severe unfair prejudice to plaintiffs, including the potential loss of witnesses and evidence, KSA audaciously claims that this case — one of historic importance arising from the murder of nearly 3,000 innocent people — is about nothing more than "money damages" and that individual plaintiffs have already received compensation from other sources. Finally, KSA broadly mischaracterizes the Order and process to argue that its appeal presents some prospect for success, when it plainly does not.

As discussed below, Saudi Arabia's arguments are meritless and do not withstand even modest scrutiny. Indeed, its effort to brand its appeal as involving a typical review of an

---

[12] KSA concedes that Second Circuit precedent treats a stay of proceedings as a discretionary matter for the district court, even while KSA insists that "the better view" is an automatic divestiture rule. KSA Br. 8. The only case it cites — *World Trade Ctr. I* — actually undermines that premise. There, the Second Circuit upheld the exercise of discretion in applying the four traditional stay factors when deciding whether to retain jurisdiction or issue a stay. 503 F.3d at 170-71. Indeed, the district court in that case denied the defendants' stay motion. Judge Hellerstein held that an appeal of his immunity ruling "does not divest the Court of jurisdiction..." because "delay would be unconscionable, given the intense public interest in reaching an expeditious resolution to this litigation." *In re World Trade Ctr. Disaster Site Litig.*, 469 F. Supp. 2d 134, 145 (S.D.N.Y. 2007). Although a motions panel initially entered a stay, the Second Circuit in *World Trade Ctr. I* revisited the issue, weighed the discretionary stay factors, and lifted the stay, allowing the case to proceed in the district court during the pendency of the appeal.

"immunity" decision "do[es] nothing but illustrate the tyranny of labels." *Apostol*, 870 F.2d at 1338.[13]

Analysis of the four traditional stay factors, independently and collectively, underscores this conclusion.

## A.  SAUDI ARABIA FAILS TO SHOW ANY LIKELIHOOD OF SUCCESS ON APPEAL

KSA effectively acknowledges that it cannot meet this factor, by urging the Court to "reduce the required showing of likelihood of success" based on its dubious claims that it would suffer irreparable harm and that plaintiffs would face no substantial harm.  KSA Br. at 10.

### 1.  The Order is not appealable under the collateral order doctrine

Saudi Arabia's entitlement to interlocutory review is doubtful at best. Any appeal it may be permitted to pursue now would be severely limited in ways that leave no prospect for success.

The availability of collateral order review is subject to the limitations pronounced by the Supreme Court in *Johnson v. Jones*, 515 U.S. 304, 314 (1995). *Johnson* held that the collateral order doctrine did not apply to district court determinations of "'evidence sufficiency,' – *i.e.*, which facts a party may, or may not, be able to prove at trial." *Id*. at 313.

The prudential considerations underpinning the doctrine do not support immediate review of fact-bound, evidence sufficiency determinations. *Johnson* explained that assessments of evidence sufficiency are the province of trial judges and "appellate judges enjoy no comparative expertise in such matters." *Id*. at 316. Moreover, review of such decisions would also waste inordinate amounts of appellate time and result in undue delay given the "vast pretrial record,

---

[13] KSA relies on *Coinbase, Inc. v. Bielski*, 599 U.S. 736 (2023), but that case is inapposite. *Coinbase* required a stay under a statute that expressly authorized an interlocutory appeal from an order denying arbitration. The Court concluded that a stay pending such an appeal was necessary to preserve the statutory right. *Id*. at 743. *Coinbase* does not affect the discretionary application of the four stay factors in other contexts. The Supreme Court's decision in *Nken* is the governing standard applicable here.

with numerous conflicting affidavits, depositions, and discovery materials" in many such cases, and the likelihood that the appellate court will be confronted with the same factual issue and a similar record after trial. *Id.* at 316-17.

### 2. The Court applied the New York state scope-of-employment and tort standards as Saudi Arabia argued

Saudi Arabia does not identify any New York tort or scope of employment legal standard applied by the Court that is meaningfully different from what Saudi Arabia itself advocated, much less any controlling issue that would lead to its immunity being reinstated as a matter of law.

### 3. This Court applied the procedures for jurisdictional fact finding as Saudi Arabia advocated

District courts are afforded broad discretion in determining the procedures they use to resolve questions of jurisdiction under the FSIA's exceptions. *APWU v. Potter,* 343 F.3d 619, 627 (2d Cir. 2003) ("[a] district court retains considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction.") (cleaned up).

At no time during the jurisdictional proceedings did Saudi Arabia object to the procedures used by this Court. Saudi Arabia did not question this Court's decision to hold a period of targeted jurisdictional discovery on scope of employment. Nor did Saudi Arabia object to the manner by which the Court made its jurisdictional findings. Saudi Arabia agreed that if Plaintiffs met their burden of production then it had the burden of persuasion on the motion. ECF No. 9369 at 12. And despite bearing that burden, Saudi Arabia argued that the Court should resolve fact disputes on the paper motion record and did not need to hold an evidentiary hearing.[14]

---

[14] Saudi Arabia claims the Court should have resolved some unspecified "credibility" issues, KSA Br. At 13, yet if KSA wanted a fuller airing of such issues to meet its burden on its motion, it should have demanded (instead of

12

The Order's plain language demonstrates that Saudi Arabia is wrong in claiming that the Court misunderstood its role or failed to resolve factual disputes for purposes of jurisdiction. The Court explicitly stated at the outset of its analysis that its assessment of jurisdiction after discovery required it to "resolve any disputed issues of fact" relevant to jurisdiction. Order 7. The Court further held that "whether a tortious act occurred is certainly a jurisdictional fact that the Court must determine" and that "the Court is required to make a finding here whether the doctrine of respondeat superior applies to the acts of individuals." *Id*. at 31. Saudi Arabia's arguments simply ignore the Court's clear statements concerning its factfinding obligations and the very process it undertook.

### 4. The Court made decisive rulings, while Saudi Arabia improperly reargues the facts

Saudi Arabia fares no better in its efforts to claim that the Court failed to follow through on the precise factfinding exercise that it expressly said it was undertaking. In the face of the Order's central findings of jurisdictional fact, *see* Prior Proceedings § B, *infra,* KSA simply pretends that the Order's decisive conclusions on the scope-of-employment and tortious-conduct issues do not exist. Specifically, among the findings KSA omits are those determining: Bayoumi's "motive;"[15] that Bayoumi was a "connecting point" among those who supported the hijackers, with "ties to multiple people working for MOIA and the Saudi government;"[16] that

---

opposing) a hearing. *See Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 208 (2d Cir. 2016) (plaintiff who failed to request a hearing had no grounds to question the district court's exercise of discretion in deciding an FSIA jurisdictional inquiry on the motion record).

[15] Order 40: "that all the apartment-related assistance [Bayoumi] provided for the hijackers was not just acts of a good Samaritan, but rather that he was following KSA's instructions when he assisted the hijackers;" and "The evidence does not support the conclusion that Bayoumi was just an innocent participant without any prior planning or constant coordination with his employer, KSA."

[16] Order 34-5: "Besides the material assistance Bayoumi himself provided, he also seemed to serve as a connecting point between the hijackers and many other people who had provided assistance to the hijackers;" and "All this evidence taken together shows that Bayoumi had ties to multiple people working for MOIA and the Saudi government… [while] getting himself involved into the hijackers' preparation for a terrorist attack[]. His involvement appears to bear some connection with his employment by KSA."

"Thumairy was working together with Bayoumi;"[17] and that "KSA had employed Bayoumi and Thumairy to assist the hijackers."[18] KSA instead manipulates the record through wordplay and promotes the falsehood that the Order did not make binding jurisdictional findings. KSA Br. 11. Saudi Arabia further distorts the record by recycling its dubious narratives and pretending that they somehow remain in dispute for purposes of the jurisdictional inquiry, even though the Court directly and methodically addressed and rejected those narratives in its Order.

Saudi Arabia's efforts to cast doubt on the sufficiency or concreteness of the Court's determinations of jurisdictional fact, based on the Court's language clarifying that its factual determinations may not be binding on the merits, simply takes those statements out of context and distorts their meaning. The Court's statements that certain of its findings were "preliminary" jurisdictional determinations do not render them any less conclusive for purposes of jurisdiction, but simply acknowledge that the record at trial may be different. That is certainly true, and largely attributable to Saudi Arabia's insistence that discovery in the jurisdictional phase be "limited" and "targeted" and that it could not be burdened to provide all discovery relevant to the merits before jurisdiction was resolved. More generally, any finding of jurisdictional facts is necessarily preliminary to trial. Fed. R. Civ. P. 54(b) ("any order… that… does not end the action… may be revised at any time before the entry of a judgment….") Here, the Court properly made findings of jurisdictional facts based on the record evidence and correctly stated that "when

---

[17] Order 41-2: "the credible evidence supports the conclusion that Thumairy was working together with Bayoumi to assist the hijackers;" and "that Bayoumi, Thumairy, and KSA knowingly, or at least with deliberate indifference, participated in supporting the hijackers' terrorist activity."

[18] Order 44: "Plaintiffs have managed to provide this Court with reasonable evidence as to the roles played by Bayoumi, Thumairy, and KSA, in assisting the hijackers;" and "[a]lthough KSA attempts to offer seemingly innocent explanations or context, they are either self-contradictory or not strong enough to overcome the inference that KSA had employed Bayoumi and Thumairy to assist the hijackers."

the question of scope of employment comes again before the Court as factfinder during trial, the factfinder will reach its merits decision based on the evidence presented at trial." Order 39.

To the extent Saudi Arabia's argument is that the Court should have issued determinations that would also be binding on the merits, pursuant to the procedures Saudi Arabia itself advocated, we already know that result. The Order undertook an evaluation of the full evidentiary record, weighed the credibility of the parties' competing evidence, and ruled that Plaintiffs' evidence is more credible. *See, e.g.,* Order 44 ("Saudi Arabia's attempts to offer seemingly innocent explanations or context [] are either self-contradictory or not strong enough to overcome [plaintiffs' evidence] that KSA had employed Bayoumi and Thumairy to assist the hijackers"). Since Saudi Arabia expressly waived its right to an evidentiary hearing on the disputed facts, any process to use the motion record to make determinations on the merits would lead to the same conclusions. An appeal on that basis would therefore achieve nothing but delay.

### 5. Saudi Arabia's "causation" argument is both legally and factually meritless

The Court's 2018 Decision and the Order both held that JASTA's exception to immunity required a showing of traditional proximate causation. That holding is consistent with the rulings of every federal court that has considered the issue, all of which have held that proximate cause, not "but for" causation, is the proper test under JASTA's framework. *Watson v. Kingdom of Saudi Arabia*, 2023 WL 4047586, at *10 (N.D. Fla. May 11, 2023), 2024 WL 1344643 (N.D. Fla. Mar 30, 2024) (adopting report and recommendation); ECF No. 3782 at 28-31; ECF No. 3781 at 66-68. Those rulings find further support in the decisions of the D.C. and Fourth Circuits, and numerous district courts, applying a proximate causation standard under the identical causation language used in another FSIA exception. As this Court recognized, JASTA's sponsors expressly stated that the proximate causation test adopted in those cases would apply to JASTA as well.

ECF No. 3782 at 15-17. Given this backdrop, it is not surprising that Saudi Arabia chose not to appeal this Court's 2018 Decision adopting the proximate causation standard, and Saudi Arabia's arguments for a different test present no likelihood for success on appeal.

Further still, even in the highly unlikely event Saudi Arabia could persuade the Second Circuit to break ranks with every other federal court that has considered the issue in the terrorism context and apply a "but for" causation test, it could not lead to a finding of immunity but would at most simply result in a remand for further discovery and trial. Order 32 (noting that causation was not part of jurisdictional discovery). Given this Court's findings that Saudi Arabia's agents provided the essential reception, safe harbor, and support in California that the Al Qaeda hijackers needed to plan, prepare, and perpetrate their complex and coordinated terror plot, Plaintiffs would easily meet their burden even under a "but for" causation standard. That conclusion is especially clear given the Court's findings that Bayoumi's notepad containing a "drawing of an airplane with equations … facially connects Bayoumi with knowledge of the 9/11 Attacks." KSA Br. At 41.[19]  And to the extent that were not evident based on the Court's existing findings, adoption of a "but for" causation test would simply result in remand for this Court to consider the causation issue under that standard, a process that would itself involve the very types of discovery and trial KSA claims its appeal is aimed to obviate.

In sum, KSA's asserted right to appeal and the appeal itself are without merit and KSA offers no meaningful prospect of altering the course of this litigation.

---

[19] Saudi Arabia's sole retort is that the hijackers' "mission to San Diego ended in failure," KSA Br. 18 — notwithstanding Hazmi's appointment as "second-in-command" of the entire 9/11 operation, Mihdhar's pivotal role as a coordinator of the non-pilot hijackers, and both men's active participation in the meticulously planned terror attack. Pls. Av. ¶¶ 1021, 1267.  To claim any break in the causal chain between "the roles played by Bayoumi, Thumairy, and KSA, in assisting the hijackers," Order 44, and the carrying out of the hijackers' deadly mission is contrary to the evidence and an affront to common sense.

### B.  SAUDI ARABIA WILL NOT BE IRREPARABLY INJURED BY PROCEEDING TO TRIAL

The cases KSA cites to illustrate potential "injury" to a foreign sovereign are distinguishable because they all involved discrete legal issues on jurisdiction that were deemed appropriate for appeal as a matter of law.[20]  By contrast, KSA's appeal impermissibly seeks to reweigh this Court's extensive fact-findings, turning its motion to stay into a diversionary and delay tactic that will unfairly prejudice the Plaintiffs. Further, Saudi Arabia has demonstrated through its own elections that evidentiary inquiries concerning its agents' roles in providing a support network for the first-arriving hijackers do not cause it any "irreparable injury."

Saudi Arabia's claims that proceeding to the additional discovery and trial contemplated by this Court's Order would cause it "irreparable injury" are not credible. After KSA chose not to pursue an appeal of the Court's 2018 Decision, this Court oversaw five years of jurisdictional discovery. KSA has demonstrated that it has ample resources to participate in such discovery and factfinding provided it perceives a strategic benefit in doing so. Saudi Arabia's plea for a stay has nothing to do with avoiding any burden of litigation, but is simply an effort to delay the case and further disadvantage plaintiffs. *See Apostol,* 870 F.2d at 1339 (stating that a party that is attempting to "help themselves to a postponement by lodging a notice of appeal" and "play games with the district court's schedule forfeit their entitlement to a pre-trial appeal.")

This Court is well within its discretion to order Saudi Arabia to participate in a final round of discovery and prepare for trial. *World Trade Ctr. I*, 503 F.3d at 170. KSA's appeal seeks

---

[20] *E.g.*, *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 178-79 (2017) (whether the property at issue was taken in violation of international law);  *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 145-46 (2d Cir. 2001) (whether a foreign state could be held liable as a landlord for a third party's negligence); *Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 102 (2d Cir. 2016) (whether there was a direct effect in the U.S. from misrepresentations made to securities investors outside the U.S.); *Nam v. Permanent Mission of the Republic of Korea*, 2023 WL 2456646, at *2 (S.D.N.Y. March 10, 2023) (whether plaintiff's employment at a diplomatic mission fell within the FSIA commercial exception).

only to consume judicial resources in unauthorized appellate litigation and to foment delay. Even if KSA could show that further proceedings may result in some prejudice to its claim to immunity, this Court has discretion to move forward. *World Trade Ctr. I*, 503 F.3d at 170 (removing stay and retaining jurisdiction in district court despite defendants' immunity appeal, having weighed the competing factors, including passage of time, substantial injuries to Ground Zero employees, and the public interest); *see Nken*, 556 U.S. at 433 ("[a] stay is not a matter of right, even if irreparable injury might otherwise result.") (citation omitted).

### C.  PLAINTIFFS WILL BE SUBSTANTIALLY HARMED BY A STAY

A stay of this litigation would inflict substantial, irrecoverable harm on Plaintiffs, who have waited years for a trial of their claims against Saudi Arabia. There are thousands of wrongful death and personal injury claimants in this case, all of whom deserve the opportunity to see their case through to its completion, to seek accountability, and to obtain justice. With each passing year, there is significant attrition in the numbers of living Plaintiffs.  Relatedly, the continued passage of time threatens the availability of witnesses and diminishes the prospects for their testimony at trial.[21]

In 2007, addressing a motion to stay claims of Ground Zero injury plaintiffs seeking compensation from various defendants, the Second Circuit recognized that the harm from delay "has increased in significance with the passage of time since among the Plaintiffs are many people with life-threatening injuries, some of whom have died since the litigation began." *World Trade Ctr. I*, 503 F.3d at 170. Now, over 18 years later, the compelling concerns the Second

---

[21] *Kaplan v. Lebanese Can. Bank, SAL*, 610 F. Supp. 3d 533, 535 (S.D.N.Y. 2022) ("there is prejudice to Plaintiffs in a continued stay of discovery given the age of these cases. As more time passes, the higher the risk that witnesses will become unavailable and memories will fade."). Several fact witnesses died prior to jurisdictional discovery in this case, including Abdusattar Shaikh (whom Bayoumi knew, and who hosted both MOIA propagators and the hijackers in his home, Order 24, 27, 34) and Khalid Al Sowailem (head of the MOIA office in the Saudi Embassy, to whom and about whom both Thumairy and Bayoumi reported, Order 14, 19, 23, 27).

Circuit articulated resonate even more profoundly for the Plaintiffs in this litigation against Saudi Arabia.

Saudi Arabia's contention that the "only delay" Plaintiffs would suffer relates to their "recover[y] [of] money damages," KSA Br. 1, disrespects the far broader range of equities and historical truth-seeking motivations that the 9/11 Families have at stake in this case. Moreover, KSA's claim that a delay in receiving "monetary damages" is not a "substantial injury" mischaracterizes the holding in *World Trade Ctr. I*.[22] The authorities KSA relies on do not involve personal injury or death claimants and bear no resemblance to the prejudice from delay here.[23] KSA also advances the dubious and legally unsupported argument that collateral source payments to some victims mitigate the impact of a stay.[24]

### D.  THE PUBLIC INTEREST IS OVERWHELMING

Denying a stay would serve the powerful public interest in justice and accountability for victims of terror attacks inside the United States. Congress enacted JASTA in recognition of the Nation's "vital interest" in providing "full access" and the "broadest possible basis" for the plaintiffs in this case to pursue timely civil suits against foreign states "that have knowingly or recklessly provided material support or resources, directly or indirectly, to the persons or organizations responsible for their injuries." JASTA, 28 U.S.C. § 1605B note. More recently, the Supreme Court in *Fuld v. Palestine Liberation Org*., 606 U.S. 1, 15–16 (2025), recognized "the

---

[22] Contrary to KSA's arguments, KSA Br. 10, a stay here, like in *World Trade Ctr. I*, will impede Plaintiffs' right to "receive compensation while still living" and would serve to "improve the quality of their lives." In addition, some personal injury plaintiffs do seek "medical costs."

[23] KSA Br. 9-10, *citing Nam*, 2023 WL 2456646, at *3 (employment claim for lost income); *Plummer v. Quinn*, 2008 WL 383507, at *1 (S.D.N.Y. Feb. 12, 2008) (civil rights action claim for damages); *In re Actos Antitrust Litig.*, 2020 WL 8996696, at *2 (S.D.N.Y. Mar. 9, 2020) (antitrust claim for drug price manipulation).

[24] Saudi Arabia cites to the 9/11 Victim Compensation Fund, which did not affect suits against a foreign state and allowed actions against those who provided material support for the Al Qaeda terror plot. 49 U.S.C. § 40101 note.

National Government's interest in holding accountable those who perpetrate an 'act of violence against' U.S. nationals" and in ensuring recovery "to victims of international terrorism."

KSA's motion disregards the paramount public interest in having the claims against Saudi Arabia resolved promptly. KSA cites *World Trade Ctr. I* for the public interest in vindicating a defendant's immunity but overlooks the Second Circuit's holding of an even *greater* public interest: the prompt resolution of litigation, which outweighs immunity considerations and justifies allowing pretrial proceedings to continue. 503 F.3d at 170.

### E.  THIS COURT CAN ENSURE THAT NO PARTY IS UNFAIRLY PREJUDICED IN SETTING THE PRETRIAL PROCEEDINGS AND TRIAL

This Court holds the discretionary authority to deny KSA's motion and determine on an ongoing basis how discovery should proceed. *See Louis Vuitton*, 676 F.3d at 102 (Second Circuit describing how "the district court did not leave the defendants without remedy" to request relief as required, even after lifting stay).  This Court can move forward with pretrial proceedings; issue a scheduling order for discovery and trial; and, when appropriate, hold a trial to determine the merits of Plaintiffs' claims. *World Trade Ctr. I*, 503 F.3d at 170 (Second Circuit ordered "pretrial proceedings" to continue).

### CONCLUSION

Saudi Arabia's motion to stay the proceedings should be denied.

Dated: September 26, 2025

Respectfully submitted,

MOTLEY RICE LLC                          COZEN O'CONNOR

By: /s/ Robert T. Haefele                By: /s/ Sean P. Carter
ROBERT T. HAEFELE                        SEAN P. CARTER
JODI WESTBROOK FLOWERS                    J. SCOTT TARBUTTON
DONALD A. MIGLIORI                        One Liberty Place
28 Bridgeside Boulevard                   1650 Market Street, Suite 2800
Mount Pleasant, SC 29465                  Philadelphia, Pennsylvania 19103
Tel.: (843) 216-9184                      Tel.: (215) 665-2105
Email: rhaefele@motleyrice.com            Email: scarter1@cozen.com

*Liaison Counsel and Co-Chairs of Plaintiffs'*    *Co-Chair and Liaison Counsel of the*
*Executive Committee for Personal Injury and*     *Plaintiffs' Executive Committee for*
*Death Claims on behalf of the Plaintiffs*        *Commercial Claims on behalf of Plaintiffs*


KREINDLER & KREINDLER LLP

By: /s/ Steven R. Pounian
STEVEN R. POUNIAN
ANDREW J. MALONEY, III
JAMES GAVIN SIMPSON
485 Lexington Avenue
New York, New York 10017
Tel.: 212-687-8181
Email: spounian@kreindler.com

*Attorneys for Ashton Plaintiffs*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c), I certify that the foregoing document, which was prepared using Times New Roman 12-point typeface, contains 6,928 words, excluding the parts of the document that are exempted by Local Civil Rule 7.1(c). This certificate was prepared in reliance on the word-count function of the word-processing system (Microsoft Word) used to prepare the document.

Executed on September 26, 2025

*/s/ Robert T. Haefele*
Liaison Counsel of the Plaintiffs' Executive
Committee for Personal Injury and Death
Claims on behalf of Plaintiffs