# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                    :

IN RE:                     :

TERRORIST ATTACKS ON    :
SEPTEMBER 11, 2001        :
                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

<u>MEMORANDUM DECISION</u>
<u>AND ORDER</u>

03-MDL-1570 (GBD)

MAR 2 8 2018

This document relates to:

*Ashton, et al. v. Al Qaeda Islamic Army, et al.*, No. 02-cv-6977
*Fed. Ins. Co., et al. v. Al Qaida, et al.*, No. 03-cv-6978
*Vigilant Ins. Co., et al. v. Kingdom of Saudi Arabia, et al.*, No. 03-cv-8591
*Thomas Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, No. 03-cv-9849
*Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.*, No. 04-cv-1922
*Cont'l Cas. Co., et al. v. Al Qaeda Islamic Army, et al.*, No. 04-cv-5970
*Cantor Fitzgerald Assocs. L.P., et al. v. Akida Inv. Co., et al.*, No. 04-cv-7065
*Pac. Emp'rs Ins. Co., et al. v. Kingdom of Saudi Arabia, et al.*, No. 04-cv-7216
*Euro Brokers Inc., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, No. 04-cv-7279
*Beazley Furlonge Ltd. v. Saudi Binladin Grp., Inc., et al.*, No. 16-cv-7456
*Bowrosen, et al. v. Kingdom of Saudi Arabia*, No. 16-cv-8070
*McCarthy, et al. v. Kingdom of Saudi Arabia*, No. 16-cv-8884
*Aguilar, et al. v. Kingdom of Saudi Arabia, et al.*, No. 16-cv-9663
*Addesso, et al. v. Kingdom of Saudi Arabia, et al.*, No. 16-cv-9937
*Hodges, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-117
*DeSimone v. Kingdom of Saudi Arabia*, No. 17-cv-348
*Aiken, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-450
*Ashton, et al. v. Kingdom of Saudi Arabia*, No. 17-cv-2003
*The Underwriting Members of Lloyd's Syndicate 53, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-2129
*The Charter Oak Fire Ins. Co., et al. v. Al Rajhi Bank, et al.*, No. 17-cv-2651
*Gen. Reinsurance Corp., et al. v. Kingdom of Saudi Arabia*, No. 17-cv-3810
*Abarca, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-3887
*Arrowood Indem. Co. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-3908
*Abrams, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-4201
*Abtello, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-5174
*Aasheim, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-5471
*Abedhajajreh, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-6123
*Allianz Versicherungs-Aktiengesellschaft, et al. v. Kingdom of Saudi Arabia*, No. 17-cv-6519
*Fraser, et al. v. Al Qaeda Islamic Army, et al.*, No. 17-cv-7317
*Muenchener Rueckversicherungs-Gesellschaft Aktiengesellschaft in Muenchen, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-7914
*Abbate, et al. v. Kingdom of Saudi Arabia, et al.*, No 17-cv-8617
*Behette, et al. v. Kingdom of Saudi Arabia, et al.*, No. 18-cv-538
*Abarca, et al. v. Kingdom of Saudi Arabia, et al.*, No. 18-cv-947

GEORGE B. DANIELS, United States District Judge:

Plaintiffs in this multidistrict litigation seek to hold multiple defendants liable for allegedly financing, sponsoring, conspiring to sponsor, aiding and abetting, or otherwise providing material support to Osama bin Laden and the terrorist organization known as al Qaeda, for the physical destruction, deaths, and injuries suffered as a result of the terrorist attacks on September 11, 2001 (the "9/11 Attacks").[1] Plaintiffs allege here that Defendant Kingdom of Saudi Arabia ("Saudi Arabia") bears responsibility for the 9/11 Attacks because its agents and employees directly and knowingly assisted the hijackers and plotters who carried out the attacks. Plaintiffs allege further that al Qaeda's development into a terrorist organization and its ability to carry out the 9/11 Attacks was made possible through the financial and operational support it received from charity organizations established and controlled by the Saudi government, including Defendant Saudi High Commission for Relief in Bosnia and Herzegovina ("SHC"). (*See generally* Consolidated Amended Complaint ("CAC"), ECF No. 3463;[2] Complaint, *Kathleen Ashton, et al. v. Kingdom of Saudi Arabia*, No. 17-cv-2003 (S.D.N.Y Mar. 20, 2017) ("*Ashton* Compl."), ECF No. 1.)[3]

---

[1] The relevant procedural background of this multidistrict litigation was discussed at length in this Court's September 29, 2015 opinion, (ECF No. 3046), and is incorporated by reference herein. This Court will only restate relevant factual background as necessary to address the pending motions.

[2] Unless otherwise indicated, all references made herein to the docket sheet refer to the main docket sheet for this multidistrict litigation, 1:03-MDL-1570-GBD-SN.

[3] After the United States Court of Appeals for the Second Circuit remanded these cases to this Court on the parties' consent, as noted below, the Plaintiffs' Executive Committees filed the CAC on behalf of plaintiffs in nine separate actions that are part of this multidistrict litigation (the "CAC Plaintiffs"). (*See* CAC at 101–04.) Since that time, plaintiffs in a number of actions have either filed notices to conform their pleadings to the CAC or adopted its allegations through short-form complaints in the manner approved by Magistrate Judge Sarah Netburn. (*See* Order dated May 3, 2017, ECF No. 3543.) Plaintiffs in three cases—*Bowrosen, et al. v. Kingdom of Saudi Arabia*, No. 16-cv-8070, *DeSimone v. Kingdom of Saudi Arabia*, No. 17-cv-348, and *The Underwriting Members of Lloyd's Syndicate 53, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-2129—have filed their own complaints that are substantially similar to the CAC but which do not formally incorporate its allegations. The plaintiffs in *Ashton* also filed their own complaint against Saudi Arabia. (*See Ashton* Compl.) Defendants move to dismiss against all of these respective pleadings. (*See* Mem. in Supp. of Saudi

Defendants Saudi Arabia and the SHC (the "Moving Defendants") previously moved to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure on grounds that they were immune from suit by virtue of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.* (*See* ECF No. 2893.) They argued, among other things, that the noncommercial tort exception and its "entire tort" rule did not apply because Plaintiffs had failed to allege or present evidence that any official or employee of Saudi Arabia or the SHC committed a tortious act entirely within the United States within the scope of their office or employment. *See In re Terrorist Attacks on September 11, 2001 ("Terrorist Attacks XI"*), 134 F. Supp. 3d 774, 779–80 (S.D.N.Y. 2015). This Court granted their motions to dismiss. *See id.* at 782–87. Plaintiffs appealed to the United States Court of Appeals for the Second Circuit. (*See* Notice of Appeal, ECF No. 3075.)

During the pendency of Plaintiffs' appeal, Congress enacted the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852 (2016) (codified at 28 U.S.C. § 1605B). As described more fully below, JASTA created, among other things, a new exception to the FSIA which does not incorporate the noncommercial tort exception's entire tort rule and, unlike the FSIA's terrorism exception, does not require that the defendant be designated a state sponsor of terrorism by the Secretary of State. *See* 28 U.S.C. § 1605B(b). In addition, JASTA now permits United States nationals to bring claims against foreign sovereigns under the Antiterrorism Act ("ATA"), 18 U.S.C. § 2333, provided that JASTA's requirements for withholding sovereign immunity are otherwise met. *See* 28 U.S.C. § 1605B(c).

Recognizing that "JASTA was intended to apply to this case[,]" and that its enactment "raise[d] numerous questions that have not yet been addressed by the district court[,]" the parties jointly requested that the Second Circuit vacate this Court's September 29, 2015 Opinion and Order

---

Arabia Mot. to Dismiss ("KSA Mem."), ECF No. 3668, at 10 n.15; Mem. in Supp. of SHC Mot. to Dismiss ("SHC Mem."), ECF No. 3671, at 7–8.)

dismissing, under the FSIA, all claims against Saudi Arabia and the SHC and remand the case to this Court for further proceedings in light of JASTA. *See* Joint Mot. to Vacate and Remand at 2, *In re Terrorist Attacks on September 11, 2001*, No. 15-3426 (2d Cir. Oct. 21, 2016), ECF No. 255-1. The Second Circuit granted that motion and remanded the case to this Court to consider how, if at all, JASTA affects the Moving Defendants' claim for immunity under the FSIA. (*See* Mandate dated March 9, 2017 ("3/9/17 Mandate"), ECF No. 3457, at 1.) On remand, Defendants Saudi Arabia and the SHC have renewed their motions to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, arguing that their immunity under the FSIA remains intact even after JASTA's enactment.[4] (*See* Kingdom of Saudi Arabia Mot. to Dismiss ("KSA Mot."), ECF No. 3667, at 1–2; Saudi High Commission for Relief of Bosnia and Herzegovina Mot. to Dismiss ("SHC Mot."), ECF No. 3670, at 1–2.) Saudi Arabia also contends that JASTA is unconstitutional since it infringes on the powers of the courts to decide cases and controversies free from congressional control. (KSA Mem. at 70–74.) Plaintiffs oppose the motions to dismiss and seek leave to conduct jurisdictional discovery, claiming that many of the relevant facts necessary to establish jurisdiction are uniquely within Saudi Arabia's knowledge and control. (CAC Plaintiffs Mem. in Opp'n ("CAC Opp'n"), ECF No. 3782, at 72–73; *Ashton* Plaintiffs Mem. in Opp'n ("*Ashton* Opp'n"), ECF No. 3781, at 4–6.) This Court heard oral argument on the Moving Defendants' renewed motions to dismiss on January 18, 2018.

Because Plaintiffs' allegations, accepted as true for purposes of resolving the instant motions, narrowly articulate a reasonable basis for this Court to assume jurisdiction under JASTA over

---

[4] Also pending before this Court are three motions to dismiss for lack of personal jurisdiction brought by Defendants National Commercial Bank ("NCB"), Al Rajhi Bank ("ARB"), and the Saudi Binladin Group ("SBG"). (*See* ECF Nos. 3691, 3700, 3702.) For logistical reasons, however, this opinion addresses only the motions to dismiss brought by Saudi Arabia and SHC; the motions to dismiss brought by NCB, ARB, and SBG are addressed in a separate opinion filed today.

Plaintiffs' claims against Saudi Arabia, this Court will exercise its discretion to allow Plaintiffs limited jurisdictional discovery. Such discovery is be to be conducted under Magistrate Judge Sarah Netburn's supervision and shall proceed in a prompt and expeditious manner by focusing only on those allegations of specific facts described below relevant to the FSIA immunity determination. Accordingly, Defendant Saudi Arabia's motion to dismiss is DENIED. Plaintiffs' recycled allegations as to the SHC, by contrast, remain insufficient to overcome the presumption of immunity afforded to it by the FSIA. Defendant SHC's motion to dismiss is therefore GRANTED.

## I.     LEGAL STANDARDS

### A. The Foreign Sovereign Immunities Act

Federal district courts are courts of limited jurisdiction; "[t]hey possess only that power authorized by [the] Constitution and [by] statute." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005) (internal quotation marks and citation omitted). It is well settled that "[t]he FSIA 'provides the sole basis for obtaining jurisdiction over a foreign state in federal court.'" *Chettri v. Nepal Rastra Bank*, 834 F.3d 50, 55 (2d Cir. 2016) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989)). The FSIA renders foreign states, as well as their agencies and instrumentalities, 28 U.S.C. § 1603(a), "presumptively immune from the jurisdiction of United States courts[,]" unless a specific exception applies. *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993); *see also First Fid. Bank, N.A. v. Gov't of Antigua & Barbuda—Permanent Mission*, 877 F.2d 189, 195 (2d Cir. 1989) ("The FSIA begins with a presumption of immunity which the plaintiff must overcome by showing that the defendant sovereign's activity falls under one of the statutory exceptions.").[5] Accordingly, "[o]nce the defendant presents a prima facie case that it is a foreign sovereign [or an instrumentality of a foreign sovereign], the plaintiff has the burden of going forward

---

[5] The parties do not dispute that Defendant SHC is an agency or instrumentality of Saudi Arabia within the meaning of the FSIA. (KSA Mem. at 1; SHC Mem. at 1; *Ashton* Opp'n at 42; CAC Opp'n at 62.)

with evidence showing that, under exceptions to the FSIA, immunity should not be granted, although the ultimate burden of persuasion remains with the alleged foreign sovereign." *In re Terrorist Attacks on September 11, 2001* ("*Terrorist Attacks VIII*"), 714 F.3d 109, 114 (2d Cir. 2013) (internal quotation marks and citation omitted).

"Determining whether this burden is met involves a review of the allegations in the complaint, the undisputed facts, if any, placed before the court by the parties, and—if the plaintiff comes forward with sufficient evidence to carry its burden of production on this issue—resolution of disputed issues of fact." *In re Terrorist Attacks on Sept. 11, 2001* ("*Terrorist Attacks III*"), 538 F.3d 71, 80 (2d Cir. 2008) (quotation marks and alterations omitted), *abrogated on other grounds by Samantar v. Yousuf*, 560 U.S. 305 (2010); *see also MMA Consultants 1, Inc. v. Republic of Peru*, 245 F. Supp. 3d 486, 497 (S.D.N.Y. 2017) ("When resolving issues of subject matter jurisdiction, a district court is not confined to the complaint and may refer to evidence outside the pleadings, such as affidavits and exhibits.") (citation omitted). In doing so, the court "generally must accept the material factual allegations in the complaint as true, but does not draw all reasonable inferences in the plaintiff's favor." *Figueroa v. Ministry for Foreign Affairs of Sweden*, 222 F. Supp. 3d 304, 307 (S.D.N.Y. 2016). "[B]y permitting the district court to go beyond the bare allegations of the complaint, it preserves the effectiveness of the immunity doctrine by avoiding putting the foreign government defendant to the expense of defending what may be a protracted lawsuit without an opportunity to obtain an authoritative determination of its amenability to suit at the earliest possible opportunity." *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 142 (internal quotation marks and citation omitted); *see also Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1317 (2017) ("[C]onsistent with foreign sovereign immunity's basic objective, namely, to free a

foreign sovereign from *suit*, the court should normally resolve . . . factual disputes and reach a decision about immunity as near to the outset of the case as is reasonably possible.") (citation omitted).

## B. Jurisdictional Discovery

It is well established that district courts have "broad latitude to determine the scope of discovery and to manage the discovery process." *See EM Ltd. v. Republic of Argentina* ("*EM Ltd. I*"), 695 F.3d 201, 207 (2d Cir. 2012) (citing *In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 103 (2d Cir. 2008)). However, since "sovereign immunity protects a sovereign from the expense, intrusiveness, and hassle of litigation, a court must be circumspect in allowing discovery before the plaintiff has established that the court has jurisdiction over a foreign sovereign defendant under the FSIA." *EM Ltd. I*, 695 F.3d at 210 (internal quotation marks and citation omitted); *Stutts v. De Dietrich Grp.*, 465 F. Supp. 2d 156, 169 (E.D.N.Y. 2006) ("District courts in this circuit routinely reject requests for jurisdictional discovery where a plaintiff's allegations are insufficient to make out a *prima facie* case of jurisdiction.").

Accordingly, a court may permit jurisdictional discovery from a foreign sovereign only where the party seeking discovery can "articulate a 'reasonable basis' for the court first to assume jurisdiction." *Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 206–07 (2d Cir. 2016) (quoting *Filus v. Lot Polish Airlines*, 907 F.2d 1328, 1332 (2d Cir. 1990)); *cf. Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185 (2d Cir. 1998) (jurisdictional discovery was not appropriate because the plaintiff's allegations "lack[ed] the factual specificity" and "supporting facts" necessary to confer jurisdiction). Yet, in the FSIA context, even in those instances where jurisdictional discovery is warranted, "discovery should be ordered circumspectly and only to verify allegations of specific facts crucial to an immunity determination." *First City, Texas-Houston, N.A. v. Rafidain Bank*, 150 F.3d 172, 176 (2d Cir. 1998) (citation omitted).

7

## II.   MOTIONS TO DISMISS

The sole issue presented by the Moving Defendants' renewed motions to dismiss is whether

JASTA provides a basis for this Court to exercise subject matter jurisdiction over claims asserted

against Saudi Arabia and its instrumentality, the SHC, where none existed before.

### A. The Justice Against Sponsors of Terrorism Act

Congress enacted JASTA in September 2016 "in part to allow suits against Saudi Arabia for

the September 11 attacks." *Lelchook v. Islamic Republic of Iran*, 224 F. Supp. 3d 108, 113 n.1 (D.

Mass. 2016); *see also* 162 Cong. Rec. S6166-03 (daily ed. Sept. 28, 2016) (statement of Sen. Richard

Blumenthal) ("If the Saudi Government had no involvement in 9/11, it has nothing to fear.  But if it

was culpable, it should be held accountable.  That is the basic principle of [JASTA].").  As the plain

text of the statute indicates, its aim

> is to provide civil litigants with the broadest possible basis, consistent with
> the Constitution of the United States, to seek relief against persons, entities,
> and foreign countries, wherever acting and wherever they may be found, that
> have provided material support, directly or indirectly, to foreign
> organizations or persons that engage in terrorist activities against the United
> States.

JASTA, § 2(b), Pub. L. No. 114-222, 130 Stat. at 853.  JASTA seeks to achieve this purpose by,

among other things, creating a new statutory exception to the FSIA.[6]  *See* 28 U.S.C. § 1605B(b);

---

[6] JASTA changes the relevant statutory landscape in two other significant ways.  First, it permits United States
nationals to assert claims against foreign states under the ATA, provided that the requirements of its newly-
created FSIA exception are otherwise met.  *See* 28 U.S.C. § 1605B(c).  Pre-JASTA, the ATA had explicitly
barred claims brought thereunder from being asserted against foreign states.  *See* 18 U.S.C. 2337.  Second,
JASTA also amends the ATA to specifically authorize claims against "any person who aids and abets, by
knowingly providing substantial assistance, or who conspires with the person who committed . . . an act of
international terrorism."  *See id.* § 2333(d)(2); *see also Linde v. Arab Bank, PLC*, 882 F.3d 314, 319–20 (2d
Cir. 2018).  Before Congress enacted JASTA, the ATA was construed to preclude such claims.  *See, e.g.,
Rothstein v. UBS AG*, 708 F.3d 82, 97–98 (2d Cir. 2013); *Boim v. Holy Land Found. for Relief and Dev.*, 549
F.3d 685, 689 (7th Cir. 2008).

*Lelchook*, 224 F. Supp. 3d at 113 n.1. JASTA provides, in pertinent part, that immunity under the FSIA is waived

> in any case in which money damages are sought against a foreign state for physical injury to person or property or death occurring in the United States and caused by—
> (1) an act of international terrorism in the United States; and
> (2) a tortious act or acts of the foreign state, or of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, regardless [of] where the tortious act or acts of the foreign state occurred.

28 U.S.C. § 1605B(b).

The JASTA exception to FSIA immunity thus has four discrete elements, each of which must be satisfied before this Court can exercise subject matter jurisdiction over Plaintiffs' claims against the Moving Defendants: (1) physical injury to a person or property or death occurring in the United States; (2) an act of international terrorism in the United States, *and* a tortious act or acts by a foreign state, or *any* official, employee, or agent of that state taken while acting within the scope of that person's office, employment, or agency; (3) causation; and (4) damages. Plaintiffs argue that this new exception to the FSIA "readily encompasses [their] claims" against Saudi Arabia and the SHC. (CAC Opp'n at 8.) The Moving Defendants, in turn, dispute only whether Plaintiffs' allegations satisfy the second and third elements, *i.e.* whether their employees, officials, or agents engaged in a tortious act or acts within the scope of their employment, office, or agency that caused the 9/11 Attacks. (*See* KSA Mem. at 24–25; SHC Mem. at 11–12.)

1. Tortious Acts

In order to give rise to jurisdiction under JASTA, the foreign sovereign defendant's actions, or those of its officials, employees, and agents, must be "tortious." 28 U.S.C. § 1605B(b)(2). Although JASTA does not itself define what acts are considered tortious for purposes of satisfying the statute's FSIA exception, the parties agree that it at least includes the knowing or deliberately

indifferent provision of material support to terrorists. (*See* KSA Mem. at 12–13; SHC Mem. at 14–15; CAC Opp'n at 9–10.) The congressional findings set forth in JASTA suggest that such acts were indeed intended to be covered by the statute. *See, e.g.*, JASTA, § 2(a)(7) ("The United States has a vital interest in providing persons and entities injured as a result of terrorist attacks committed within the United States with full access to the court system in order to pursue civil claims against persons, entities, or *countries* that have *knowingly or recklessly provided material support or resources*, directly or indirectly, to the persons or organizations responsible for their injuries.") (emphases added). JASTA does, however, specifically preclude the exercise of jurisdiction over claims against foreign states on "the basis of an omission or a tortious act or acts that constitute mere negligence." 28 U.S.C. § 1605B(d).

   2.   Scope of Office, Employment, or Agency

JASTA waives FSIA immunity for claims caused by the tortious acts of a foreign state, or of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency. *See* 28 U.S.C. § 1605B(b). This represents an important change since the last time this Court considered motions to dismiss by the Moving Defendants; whereas the noncommercial tort exception waives immunity only for tortious acts committed by *officials* or *employees* of the foreign state, JASTA extends the waiver of immunity to tortious acts committed by its *agents*. *See id.* § 1605(a)(5).

The parties dispute which state's laws govern scope-of-employment and related principles of vicarious liability. (*Compare* KSA Mem. at 11–12 (arguing that law of the place where the injury occurred—here, New York—should apply), *with* CAC Opp'n at 12 n.8 (arguing that California law should apply since that is where most of the alleged tortious acts occurred). Since the majority of Plaintiffs' injuries arising out of the 9/11 Attacks occurred in New York, and most of the Plaintiffs

are domiciled there, this Court looks to New York law to determine the relevant scope of vicarious liability under JASTA.[7] *See Swarna v. Al-Awadi*, 622 F.3d 123, 144 (2d Cir. 2010) (applying law of the state in which the locus of injury occurred); *GlobalNet Financial.Com, Inc. v. Frank Crystal & Co., Inc.*, 449 F.3d 377, 384–85 (2d Cir. 2006) (law of the parties' domiciles should be applied where the conflict of laws involves loss allocation rules, such as "vicarious liability rules, or immunities from suit").

"Under New York law, an employee's act is within the scope of employment if 'the act was done while the servant was doing his master's work, no matter how irregularly, or with what disregard of instructions.'" *Smith v. Brown*, — F. Supp. 3d —, No. 17 Civ. 2743 (GWG), 2017 WL 4863099, at *4 (S.D.N.Y. Oct. 27, 2017) (quoting *Riviello v. Waldron*, 391 N.E.2d 1278, 1281 (N.Y. 1979)). To be held vicariously liable for the acts of its employee, an employer "need not have foreseen the precise act or the exact manner of the injury as long as the general type of conduct may have been reasonably expected." *Riviello*, 391 N.E.2d at 1282. By contrast, an employee does not act within the scope of his employment where he is "acting solely for personal motives unrelated to the furtherance of the employer's business." *White v. Alkoutayni*, 794 N.Y.S.2d 667, 668 (App. Div. 2d Dep't 2005). The same is true where, as here, the employee is alleged to have engaged in intentional torts. *See Ramos v. Jake Realty Co.*, 801 N.Y.S.2d 566, 567 (App. Div. 1st Dep't 2005). New York courts typically consider five factors in determining whether an employee's tortious acts fall within the scope of his employment:

> [1] the connection between the time, place and occasion for the act; [2] the history of the relationship between employer and employee as spelled out in actual practice; [3] whether the act is one commonly done by such an employee; [4] the extent of departure from normal methods of performance;

---

[7] The choice-of-law analysis is ultimately of little practical significance since, as Plaintiffs concede, the relevant legal principles under New York and California law are largely the same. (*See* CAC Opp'n at 12 & n.9.)

[5] and whether the specific act was one that the employer could reasonably have anticipated.

*Smith*, 2017 WL 4863099, at *4 (citation omitted). Ultimately, the analysis turns on whether the employee was acting on his own behalf or in the service of his employer. *See id.* at *5.

Similar rules govern the liability of a principal for the acts of its agents. "[A]n agency relationship results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act." *N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112, 122 (2d Cir. 2001) (internal quotation marks and citation omitted). The law of New York provides that principals may generally be held liable for the torts and crimes committed by their agents when such agents act within the scope of their agency. *See Bigio v. Coca-Cola Co.*, 675 F.3d 163, 175 (2d Cir. 2012); *In re Parmalat Sec. Litig.*, 474 F. Supp. 2d 547, 550 (S.D.N.Y. 2007). "Under New York law, an agent acts outside the scope of its agency if it is motivated solely by personal motives unrelated to the furtherance of the principal's business." *John St. Leasehold, LLC v. Capital Mgmt. Res., L.P.*, 154 F. Supp. 2d 527, 543 (S.D.N.Y. 2001), *aff'd*, 283 F.3d 73 (2d Cir. 2002); *accord Duane Thomas LLC v. Wallin*, 779 N.Y.S.2d 466, 466–67 (App Div. 1st Dep't 2004). Where, however, "a principal authorizes the agent's commission of a crime or an intentional tort, the principal will be subject to liability for the agent's wrongdoing." Restatement (Third) of Agency § 2.02 cmt. h (2006).

3. Causation

The parties also disagree about what measure of causation need be shown to establish jurisdiction under JASTA. The Moving Defendants contend that JASTA's "caused by" language incorporates principles of but-for and traditional proximate causation. (*See* KSA Mem. at 14–18; SHC Mem. at 20–24.) The *Ashton* Plaintiffs concede that JASTA requires proximate causation, but assert that that "[n]o terrorism case has ever imposed a 'but for' standard [of causation]." (*See Ashton*

12

Opp'n at 58.) The CAC Plaintiffs argue that JASTA only requires a more flexible standard of "some reasonable connection between the act or omission of defendant and the damages which the plaintiff has suffered." (CAC Opp'n at 18–19 (citation omitted).)

JASTA's "caused by" requirement was not meant to incorporate principles of "but for" causation for three reasons. First, courts construing the exact same language in other FSIA exceptions have considered and rejected that very argument. *See Rux v. Republic of Sudan*, 461 F.3d 461, 473 (4th Cir. 2006); *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1127–28 (D.C. Cir. 2004); *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 66 (D.D.C. 2010); *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009); *see also Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 536 (1995) (noting, in the context of a different jurisdictional statute, that "the phrase 'caused by' . . . requir[es] what tort law has traditionally called 'proximate causation.'") (citations omitted). Second, as the Fourth Circuit observed in *Rux*, adopting a more stringent "but for" standard of causation "would require a plaintiff to plead sufficient facts to chart a direct and unbroken causal line between a state's provision of material support and an ultimate act of terrorism." 461 F.3d at 473. Yet neither the plain text of JASTA nor its stated purpose of providing plaintiffs with "the broadest possible basis . . . to seek relief against . . . foreign countries . . . that have provided material support, *directly or indirectly*, to foreign organizations or persons" engaging in terrorism against the United States, JASTA, § 2(b) (emphasis added), support the adoption of such a rigid standard of causation. Third, JASTA's legislative history explicitly suggests that the *Rux* and *Kilburn* courts' causation analysis, including their rejection of "but for" causation, was intended to govern cases brought thereunder.[8] *See* 162 Cong. Rec. S2845-01 (daily ed. May 17,

---

[8] The Moving Defendants' reliance on the Supreme Court's opinion in *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006), as well as the Second Circuit's decisions in *In re Terrorist Attacks on September 11, 2001* ("*Terrorist Attacks IX*"), 714 F.3d 118 (2d Cir. 2013), and *Rothstein v. UBS AG* are misplaced. (*See* KSA Mem. at 14–16; SHC Mem. at 21–23.) The portions of the cases they cite address standards for proximate

13

2016) (statement of Sen. John Cornyn) ("Th[e] ['caused by'] language, which requires a showing of jurisdictional causation, is drawn from decisions of Federal courts interpreting [the FSIA's terrorism exception]. Courts interpreting [JASTA] should look to cases like *Kilburn*, *Rux*, and *Owens*, the analysis of which we intend to incorporate here.").

Accordingly, at this stage of the proceedings, this Court adopts the traditional test for proximate causation that has been applied elsewhere in the FSIA context: "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." *Owens*, 864 F.3d at 794.[9] This inquiry contains two separate but related elements. First, the defendant's conduct "must be a 'substantial factor' in the sequence of events that led to the plaintiff's injury." *Id.* (quoting *Rothstein*, 708 F.3d at 91). Second, the plaintiff's injury "must have been reasonably foreseeable or anticipated as a natural consequence of" the defendant's actions. *Owens*, 864 F.3d at 794 (internal quotation marks and citation omitted). The proximate cause requirement is designed "to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity." *Paroline v. United States*, 134 S. Ct. 1710, 1719 (2014).

*       *       *

With the foregoing principles in mind, this Court will now turn to Plaintiffs' substantive allegations to assess whether they plausibly "articulate a reasonable basis[,]" *Arch Trading*, 839 F.3d

---

cause necessary to state claims under the ATA and RICO statutes. It is well settled, however, that jurisdictional causation under the FSIA is distinct from and more liberal than the substantive causation elements of any one claim. *See Rux*, 461 F.3d at 472; *see also Owens v. Republic of Sudan*, 864 F.3d 751, 778 (D.C. Cir. 2017) ("Establishing . . . causation for jurisdictional purposes is a lighter burden than proving a winning case on the merits."). Whether Plaintiffs will ultimately be able to provide proof of causation sufficient to prevail on the substantive causes of action they assert against Saudi Arabia and SHC is a question separate and apart from the jurisdictional one raised here.

[9] An earlier decision in the *Owens* litigation, presumably the one referenced in JASTA's legislative history, used the same principal formulation. *See Owens v. Republic of Sudan*, 531 F.3d 884, 895 (D.C. Cir. 2008).

at 207, for this Court to conclude that Saudi Arabia, the SHC, or the employees, officials, or agents of either engaged in tortious acts within the scope of their employment, office, or agency that had "some reasonable connection[,]" *Owens*, 864 F.3d at 794, to the 9/11 Attacks. This inquiry will necessarily take into account the connections between Saudi Arabia and the SHC and the individuals and charity organizations identified in the complaints, as well as the extent to which, if at all, there exists an adequate causal nexus between their alleged tortious actions and Plaintiffs' injuries arising out of the attacks.

## B. Tortious Acts Committed By SHC

Plaintiffs allege that the SHC is one of several organizations established by the Saudi government to conduct proselytizing activities and otherwise advance the Wahhabi sect of Islam. (CAC ¶¶ 59–60.) Plaintiffs also allege that SHC and similar organizations provided funding and other forms of material support to al Qaeda during the 1990s that enabled it to acquire the global strike capabilities employed with devastating effect on September 11, 2001. (*Id.* ¶¶ 30–31.) For example, they claim that from 1992 through 1996, SHC provided financial and logistical support to al Qaeda and its operatives fighting in the Bosnian War, and that from 1996 through 1999, SHC "funneled hundreds of thousands of dollars to al Qaeda" under the pretext of doing construction work in Bosnia. (*Ashton* Compl. ¶¶ 39(v), 43(s)–(t).) They also claim that in 1993, SHC provided arms to a Somali faction trained by al Qaeda, which were used to fight American military personnel providing security for a United Nations humanitarian mission in Somalia. (*Id.* ¶ 43(u); Averment of Facts, ECF No. 3463-1, ¶ 313.) Plaintiffs allege further that between 1992 and 1995, the head of the SHC transferred more than $120 million "from his personal accounts and SHC accounts under his control" to an organization that transferred the funds to al Qaeda fighters operating in the Balkans. (Averment

of Facts ¶ 530.)  Based on SHC's activities in support of al Qaeda, United States counterterrorism officials included it in a group of terrorist fronts labeled as the "dirty dozen."  (CAC ¶ 81.)

In addition, Plaintiffs claim, al Qaeda members were "broadly embedded" in SHC offices and used SHC facilities "to plot attacks against the West." (*Id.* ¶ 96.)  They allege that a counterterrorism raid of the SHC's Sarajevo office conducted after the 9/11 Attacks uncovered evidence "confirming the SHC's direct involvement in the portfolio of plots al Qaeda was developing . . . to attack the American homeland[.]"  (*Id.* ¶ 94.)  That evidence allegedly consisted of photographs of the World Trade Center, before and after its collapse, as well as photographs of the United States embassies in Kenya and Tanzania and the U.S.S. Cole.  According to Plaintiffs, investigators also recovered photographs and maps of Washington, D.C. marking prominent government buildings and information on how to deploy chemical agents with crop dusters and create counterfeit "State Department badges."  (*Id.*)  Plaintiffs also allege that in October 2001, Bosnian police arrested six members of the al Qaeda network, all of whom were on the SHC's payroll, for plotting to conduct terrorist attacks on United States targets in Bosnia.  (Averment of Facts ¶ 535.)

These allegations do not provide a basis to assert jurisdiction under JASTA over the claims asserted against the SHC.  Plaintiffs fail to plead any specific, non-conclusory allegations that the SHC, or any of its employees or agents operating within the scope of their employment or agency, knowingly or with deliberate indifference provided material support directly to al Qaeda to aid in planning or facilitating the 9/11 Attacks.  Nor do they plausibly allege that any of the SHC's conduct during the 1990s bears any reasonable connection whatsoever to the 9/11 Attacks.  Indeed, *all* of the factual allegations as to SHC relate to its support of al Qaeda's activities far removed, both in time and place, from the 9/11 Attacks.

The only apparent connection to the 9/11 Attacks are the photographs found in the SHC's Sarajevo offices depicting the World Trade Center before and after the terrorist attacks. But that fact, by itself, does not support the inference that the SHC, or any of its employees or agents, played a role—directly or indirectly—in funding, planning, facilitating, or otherwise participating in the 9/11 Attacks. Even if they suggest that the SHC generally supported al Qaeda's efforts, or had more than a fleeting association with the terrorist organization, they do not implicate the SHC's personal involvement, or that of any of its employees or agents, in any particular tortious act or acts that caused the 9/11 Attacks.

Because Plaintiffs' guilt-by-association allegations as to the SHC do not suffice to rebut the presumption of immunity afforded to it by the FSIA, Defendant SHC's motion to dismiss is GRANTED.

### C. Tortious Acts Committed By Saudi Arabia

Plaintiffs allege that Saudi Arabia is directly liable for its own tortious actions that proximately caused the 9/11 Attacks. These allegations largely focus on Saudi Arabia's alleged "cleans[ing]" of the 9/11 hijackers' Saudi passports and its issuance of a fraudulent Saudi passport in July 2001 to 9/11 mastermind Khalid Sheikh Mohammed. (*See Ashton* Compl. ¶¶ 43(k), (m).)

These allegations do not establish a basis for this Court to exercise jurisdiction under JASTA. Plaintiffs' allegations as to Saudi Arabia's involvement in cleansing passports for the 9/11 hijackers are conclusory and entirely based on the incoherent and hearsay-within-hearsay testimony provided by former al Qaeda operative Zacarias Moussaoui. (*See* Kreindler and Pounian Aff., ECF No. 3780, ¶ 44.) With respect to Khalid Sheikh Mohammed, Plaintiffs' allegations do not plausibly suggest that Saudi Arabia knowingly issued a passport to him, as he had used a fake alias in applying for one, nor do they suggest that the passport was used in furtherance of the 9/11 Attacks. (*See id.* ¶ 45.) Although

Plaintiffs allege that Khalid Sheikh Mohammed used the Saudi passport to obtain a visa to enter the United States, they concede that "[h]e never used that visa" to do so, offering only that he "*may* have used the . . . passport to facilitate and hide travel related to the 9/11 plot." (*Id.* (emphasis added); *see also* 9/11 and Terrorist Travel: Staff Report of the Nat'l Comm'n on Terrorist Attacks Upon the United States, Kreindler and Pounian Aff., Ex. 53, at 18 ("There is no evidence that [Khalid Sheikh Mohammed] ever used this visa under this alias to enter the United States.").)  Such allegations are inadequate to withstand scrutiny under Rule 12. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully."); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007) (a complaint must plead "enough facts" to "raise a right to relief above the speculative level").

Plaintiffs also seek to hold Saudi Arabia responsible for the acts of its officials, employees, and agents, as well as the acts taken by several charity organizations that they claim operated as "arms" of the Saudi state, for allegedly providing material support to al Qaeda and its operatives in connection with the 9/11 Attacks.

1.  The Individuals

Plaintiffs' allegations focus on eight individuals, all of whom are alleged employees and agents of the Saudi government who allegedly provided material assistance to the hijackers and plotters responsible for the 9/11 Attacks.  To invoke the JASTA exception to FSIA immunity, Plaintiffs must show that these individuals are officials, employees, or agents of Saudi Arabia who, while acting within the scope of their office, employment, or agency, knowingly or with reckless indifference, provided material support to al Qaeda in a manner that bears some reasonable connection to the 9/11 Attacks.

### a. Fahad al Thumairy and Omar al Bayoumi

From 1998 through 2001, Fahad al Thumairy was the imam at the Saudi-funded King Fahd Mosque near Los Angeles, California, where he was employed and appointed by Saudi Arabia's Head of Islamic Affairs in Washington, D.C. (CAC ¶ 165; *Ashton* Compl. ¶ 39(g).) During the same time period, Thumairy was an accredited Saudi diplomat working for Saudi Arabia's Ministry of Islamic Affairs at the Saudi Consulate in Los Angeles, a position in which he reported to more senior officials inside the Saudi Embassy in Washington, D.C. (CAC ¶ 166; *Ashton* Compl. ¶ 39(g).) According to Plaintiffs, Thumairy was responsible for orchestrating the U.S.-based support network for two of the 9/11 hijackers, Nawaf al Hazmi and Khalid al Mihdhar, upon their arrival in the United States in January 2000, at the direction of an unnamed senior Saudi official based in the Saudi Embassy in Washington, D.C. (CAC ¶¶ 160, 169; *Ashton* Compl. ¶ 44(b).) As detailed in the 9/11 Commission Report, Hazmi and Mihdhar were "ill-prepared for a mission in the United States" as "[n]either had spent any substantial time in the West, and neither spoke much, if any, English." (9/11 Comm'n Report, Decl. of Gregory G. Rapawy, ECF No. 3669, Ex. 1, at 215.) Accordingly, the 9/11 Commission Report concluded, "it is unlikely that Hazmi and Mihdhar . . . would have come to the United States without arranging to receive assistance from one or more individuals informed in advance of their arrival." (*Id.*) According to Plaintiffs, Thumairy and his associates were charged by more senior Saudi officials to provide Hazmi and Mihdhar with such assistance.

On February 1, 2000, just two weeks after 9/11 hijackers Hazmi and Mihdhar arrived in Los Angeles, Thumairy met with an individual named Omar al Bayoumi for an hour inside Thumairy's office at the Saudi Consulate in Los Angeles.[10] (CAC ¶ 170; Averment of Facts ¶¶ 145, 161.) At the

---

[10] Although the stated purpose of the trip was to resolve a visa issue and obtain Islamic religious materials, Bayoumi allegedly told at least one person he was traveling to the Los Angeles to pick up visitors. (Averment of Facts ¶ 161.)

time, Bayoumi was a Saudi national living in San Diego, California, who had been employed by Saudi Arabia since at least the 1970s. (CAC ¶ 170; *Ashton* Compl. ¶ 39(j); Averment of Facts ¶ 153.) Bayoumi moved to the United States in 1994 to study English at San Diego State University on a scholarship provided by the Saudi government and, one year later, he was granted a secondment by the Saudi government to work as an employee of the Dallah Avco Trans Arabia Company ("Dallah Avco").[11] (CAC ¶ 158(h); Averment of Facts ¶¶ 153, 156.) Plaintiffs allege that Saudi Arabia continued paying Bayoumi approximately $3,000 per month, with a stipend of about $465, despite his failure to perform any work or enroll in classes. (CAC ¶ 158(h); *Ashton* Compl. ¶ 39(j)–(k); Averment of Facts ¶¶ 184–85.)

Following the meeting with Thumairy at the Saudi Consulate in Los Angeles, Bayoumi traveled to a Middle Eastern restaurant in the Los Angeles area where he met with Hazmi and Mihdhar and offered to help them settle in San Diego, the city that al Qaeda leadership had designated as the preferred location for the hijackers to carry out their preparations for the 9/11 Attacks. (CAC ¶ 172; Averment of Facts ¶ 172.) Three days later, on February 4, 2000, Hazmi and Mihdhar arrived in San Diego and sought out Bayoumi to take him up on his offer of help. (Averment of Facts ¶ 173; 9/11 Comm'n Report at 219.) Bayoumi immediately assisted Hazmi and Mihdhar by finding them an apartment in San Diego, co-signing their lease as a guarantor, helping them open a bank account, and paying their rent on occasion. (CAC ¶ 173; *Ashton* Compl. ¶ 44(d); 9/11 Comm'n Report at 219.) Bayoumi also provided Hazmi and Mihdhar with his cell phone until a landline telephone was installed in their apartment. (9/11 Comm'n Report at 516 n.26.)

---

[11] Dallah Avco, a contractor for Saudi Arabia's civil aviation authority, is a wholly-owned subsidiary of the Dallah al Baraka Group, which is owned by a wealthy Saudi businessman named Saleh Abdullah Kamel. (Averment of Facts ¶¶ 150, 156.) According to Plaintiffs, Kamel has been publicly identified on the "Golden Chain" as one al Qaeda's principal financiers. (*Id.* ¶ 156.)

In addition, the same day Hazmi and Mihdhar arrived in San Diego, Bayoumi put them in contact with Anwar al Aulaqi, an imam and covert recruiter for al Qaeda.[12] (CAC ¶¶ 174–76, 179–80.) Bayoumi also introduced Hazmi and Mihdhar to another individual, Mohdhar Mohamed Abdullah, whom Bayoumi enlisted to assist the hijackers. (*Id.* ¶ 185.) Abdullah, who was a member of Aulaqi's mosque at the time, later told U.S. law enforcement that Bayoumi specifically tasked him with "be[ing] the individual to acclimate the hijackers to the United States, particularly San Diego, California." (9/11 Comm'n Report at 516 n.20; *see also* CAC ¶ 188.) At Bayoumi's instruction, Abdullah helped Hazmi and Mihdhar locate and apply to English language and flight schools and assisted them in translating between English and Arabic. (CAC ¶ 189.) Abdullah also helped Hazmi and Mihdhar obtain multiple fake driver's licenses and perform surveillance of Los Angeles International Airport, including through the use of video camera recording equipment. (*Id.* ¶¶ 189–92; *Ashton* Compl. ¶ 44(e).)

Based on these alleged facts, Plaintiffs claim that Thumairy and Bayoumi were directed by someone within the Saudi Embassy in Washington, D.C. to help Hazmi and Mihdhar acclimate and settle in the United States to begin their preparations for the 9/11 Attacks. (CAC ¶¶ 244–45; *Ashton* Compl. ¶ 44(b).) According to Plaintiffs, around the same time that Hazmi and Mihdhar arrived in the United States, Bayoumi received a sharp increase in the stipend he received from Saudi Arabia of about $4,000, which Plaintiffs attribute to the assistance Bayoumi was providing to the hijackers. (*Ashton* Compl ¶ 39(k); Averment of Facts ¶ 186; 9/11 Comm'n Report at 515 n.18.) Also coincident with the hijackers' arrival in the United States, Bayoumi's telephone records reveal that he placed

---

[12] Aulaqi left San Diego in mid-2000 and took a position with a mosque in Falls Church, Virginia. (CAC ¶ 181.) When Hazmi and fellow 9/11 hijacker Hani Hanjour arrived in Virginia in April 2001, they immediately sought out Aulaqi, who put them in contact with a Jordanian national named Eyad al Rababah. (*Id.* ¶ 182.) Rababah found Hazmi and Hanjour an apartment in Alexandria, Virginia, where they were joined one month later by 9/11 hijackers Ahmed al Ghamdi and Majed Moqed. (*Id.*)

telephone calls to Saudi Consulates in the United States approximately seventy-four times between January and March 2000, including thirty-four calls to the Saudi Consulate in Los Angeles, where Thumairy worked. (CAC ¶ 226.)

These allegations, unrebutted by any contrary evidence from Saudi Arabia, are sufficient to create a reasonable basis for this Court to exercise jurisdiction over the claims Plaintiffs assert against Saudi Arabia to justify allowing jurisdictional discovery to proceed as to Thumairy and Bayoumi. The only apparent arguments advanced by Saudi Arabia in support of its motion to dismiss with respect to these two individuals are that this Court previously rejected similar allegations and that the 9/11 Commission Report's conclusions foreclose Plaintiffs' claims. (KSA Mem. at 26–28, 31–32.) Neither argument is availing.

First, this Court did, in fact, reject Plaintiffs' past attempts to assert jurisdiction over Saudi Arabia based on the alleged tortious acts of Thumairy and Bayoumi but only because there were insufficient allegations that they provided material support to Hazmi and Mihdhar "within the scope of [their] employment." *Terrorist Attacks XI*, 134 F. Supp. 3d at 786–87. However, while Thumairy and Bayoumi may not have been acting within the scope of their employment, as imam and employee of Dallah Avco, respectively, Plaintiffs allege facts sufficient to show that they and their agents were following instructions from more senior officials in the Saudi Embassy and, as such, their actions can be attributed to Saudi Arabia for purposes of satisfying JASTA's FSIA exception. At this stage, Plaintiffs have also sufficiently alleged that the assistance Bayoumi provided to Hazmi and Mihdhar, including the individuals he put them in contact with, bear at least some reasonable connection to the 9/11 Attacks.

Second, neither the 9/11 Commission Report, nor any other governmental report, adequately and specifically refutes Plaintiffs' allegations. As to Bayoumi, the 9/11 Commission Report found

that Bayoumi was an "unlikely candidate for clandestine involvement with Islamist extremists." (9/11 Comm'n Report at 218.) The 9/11 Commission Report further found that Bayoumi did not give money directly to Hazmi or Mihdhar. (*Id.* at 219.) Saudi Arabia also cites a joint FBI and CIA report from 2005, which found "no information to indicate that" Bayoumi was an "intelligence officer[] of the Saudi Government[.]" (2005 FBI/CIA Report, Decl. of Gregory G. Rapawy, Ex. 4, at 2.) None of these findings, however, directly contradict Plaintiffs' allegations that Bayoumi was tasked by Thumairy, at the behest of a more senior Saudi official, with providing substantial assistance to Hazmi and Mihdhar. The same is true of the 9/11 Commission Report's finding of no evidence that Thumairy provided assistance to the two operatives. (9/11 Comm'n Report at 217.) That finding does not specifically contradict Plaintiffs' allegation that Thumairy designated others, including Bayoumi, to carry out his directives.

Accepting Plaintiffs' well-pled allegations as true for purposes of resolving the instant motion, and in the absence of contrary evidence from Saudi Arabia, Plaintiffs have therefore articulated a reasonable basis for Saudi Arabia to be held responsible for the conduct of its agents, Thumairy and Bayoumi, as well as those whom they appointed as subagents. Since, however, the nature and scope of the agency is somewhat unclear in this case, and the party in the best position to shed light on that inquiry is Saudi Arabia, Plaintiffs shall be permitted to conduct limited and targeted jurisdictional discovery critical to answering that question, *i.e.* whether and to what extent Thumairy, Bayoumi, and their agents took actions in 2000, at the direction of more senior Saudi officials, to provide assistance to Hazmi, Mihdhar, and other 9/11 hijackers. *See Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986) ("[T]he party asserting jurisdiction [should] be permitted discovery of facts demonstrating jurisdiction[] . . . where the facts are peculiarly within the knowledge of the opposing party."); *1964 Realty LLC v. Consulate of the State of Qatar-New York*, No. 14 Civ. 6429 (ER), 2015

WL 5197327, at *8 (S.D.N.Y. Sept. 4, 2015) (denying motion to dismiss and allowing jurisdictional discovery to proceed on issue of agent's authority, which was "peculiarly within the knowledge of [the] Defendant . . . and . . . crucial to an immunity determination" under the FSIA) (internal quotation marks and citations omitted); *see also Int'l Diamond Imps., Inc. v. Oriental Gemco (N.Y.), Inc.*, 64 F. Supp. 3d 494, 519–20 (S.D.N.Y. 2014) (granting plaintiff jurisdictional discovery to determine if a domestic company committed a tortious act "while acting as the agent" of the foreign defendant); *Tese-Milner v. De Beers Centenary A.G.*, 613 F. Supp. 2d 404, 417 (S.D.N.Y. 2009) (permitting jurisdictional discovery on scope of agency issues where the plaintiff's allegations were "neither sparse nor insufficiently specific but . . . simply insufficiently developed . . . to permit judgment as to whether . . . jurisdiction is appropriate") (internal quotation marks and citation omitted).

    *b.  Osama Basnan*

Plaintiffs allege that Osama Basnan[13] was an "employee and agent of the Saudi government engaged in performing undisclosed functions for and at the direction of the extremists in the Ministry of Islamic Affairs' offices in the United States and elsewhere." (CAC ¶ 198.) According to Plaintiffs, Basnan told an FBI informant after the 9/11 Attacks that he did more to help the hijackers than Bayoumi. (*Id.* at ¶ 201.) Beyond that, however, the allegations tying Basnan to both Saudi Arabia and the 9/11 Attacks are sparse. For example, Plaintiffs claim that there were a series of transfers from a bank account associated with the Saudi Embassy in Washington, D.C., to Basnan and his wife from 1998 to 2001. (*Ashton* Compl. ¶¶ 39(l), 44(h).) Plaintiffs also allege that Basnan worked for the Saudi Embassy in 1992 and that in that capacity, he hosted an event to honor the Blind Sheikh, who was later convicted as the mastermind behind a foiled terrorist attack targeting New York City. (*Id.* ¶ 44(h).) Plaintiffs further claim that the FBI's 9/11 investigation has documented "contact"

---

[13] Basnan is sometimes spelled as "Bassnan" in the various pleadings.

between Hazmi and Mihdhar and a close friend of Basnan's, who was a commercial airline pilot and certified flight instructor living in San Diego. (CAC ¶ 203.) Finally, according to Plaintiffs, Basnan lived across the street from the apartment rented by Hazmi and Mihdhar in San Diego and he provided them with support and resources, including by putting them in touch with his friend, the flight instructor. (*Ashton* Compl. ¶ 44(g).)

These allegations are insufficient to permit this Court to exercise jurisdiction over Plaintiffs' claims against Saudi Arabia. Plaintiffs do not adequately allege that Basnan was an employee or agent of the Saudi government, or that he provided material assistance to Hazmi, Mihdhar, or any of the other 9/11 hijackers within the scope of his employment or agency. More specifically, there is no allegation or evidence that the funds transferred to Basnan and his wife were used to aid the hijackers or otherwise help facilitate the 9/11 Attacks. Nor is there any allegation or evidence that Basnan continued working for the Saudi Embassy after 1993, or that his contacts with Hazmi and Mihdhar were within the scope of his undefined relationship with the Saudi government.

Accordingly, Plaintiffs' allegations as to Osama Basnan are insufficient to permit jurisdiction under JASTA.

### c. *Mohammed al Qudhaeein and Hamdan al Shalawi*

Like Basnan, Mohammed al Qudhaeein and Hamdan al Shalawi were also "undeclared employees and agents of the Saudi government," who allegedly worked on behalf of Saudi Arabia's Ministry of Islamic Affairs. (CAC ¶ 267.) Qudhaeein, who was in the United States as a student, was in contact with various Saudi government offices throughout the United States and received money from the Saudi government. (*Id.* ¶ 268.) Shalawi was a "long time employee of the Saudi government as well," and he, too, received a stipend from the Saudi government. (*Id.* ¶ 272.) Both are alleged to have conducted a "dry run" for the 9/11 Attacks by twice attempting to enter the cockpit

on a 1999 flight from Phoenix to Washington, D.C. to test and learn airline security protocols and procedures. (*Id.* ¶ 270; *Ashton* Compl. ¶ 44(k).) At the time, both were on their way to a symposium hosted by the Saudi Embassy in Washington, D.C. and had their travel expenses paid by the Saudi Embassy. (CAC ¶¶ 273–74; *Ashton* Compl. ¶ 44(l).) According to Plaintiffs, Shalawi had also trained in a terrorist training camp in Afghanistan in 2000, where several 9/11 hijackers were simultaneously receiving training. (CAC ¶ 279; *Ashton* Compl. ¶ 44(m).) Plaintiffs also allege that Qudhaeein and/or Shalawi met with 9/11 hijacker Hani Hanjour at some point between 1997 and 1999 at a Saudi-funded mosque in Tempe, Arizona. (*Ashton* Compl. ¶ 44(m).)

These allegations fail to support jurisdiction over the claims asserted against Saudi Arabia for two independent, but related, reasons. First, there is no specific, non-conclusory allegation that at any relevant time period, Qudhaeein and/or Shalawi were acting as officials, employees, or even agents of Saudi Arabia. Accordingly, their acts may not be used to establish jurisdiction under JASTA over Plaintiffs' claims against Saudi Arabia. Second, even if there were allegations adequately connecting the two individuals to Saudi Arabia, Plaintiffs do not allege or come forward with evidence showing that any of their actions provided material assistance to the 9/11 hijackers or otherwise caused the 9/11 Attacks. For example, even assuming that Qudhaeein and Shalawi did, in fact, conduct a dry run for the 9/11 Attacks, there is no allegation that they conveyed their knowledge or any information they obtained to the 9/11 hijackers, let alone that such information was used in some material way to facilitate the 9/11 Attacks. There is also no specific, non-conclusory allegation or evidence to suggest that Shalawi provided assistance to the 9/11 hijackers at the terrorist training camp in Afghanistan.

For these reasons, Plaintiffs' allegations as to Mohammed al Qudhaeein and Hamdan al Shalawi fall short of demonstrating that this Court may exercise jurisdiction under JASTA over Plaintiffs' claims against Saudi Arabia.

### d.  Saleh al Hussayen

Saleh al Hussayen was a senior Saudi cleric who held various positions in the Saudi government over many years, including as an employee of the Ministry of Interior.  (CAC ¶¶ 281, 285.)  Plaintiffs allege that Hussayen was in the United States in the weeks before the 9/11 Attacks on a fundraising mission with members of the Islamic Association of North America, a "radical Islamic organization" based in Michigan.  (*Id.* ¶ 282.)  They allege further that on September 6, 2001, he arrived in Herndon, Virginia, and that just days before the 9/11 Attacks, he abruptly moved from his original hotel to the hotel where 9/11 hijackers Hazmi, Mihdhar, and Hanjour were staying on the evening of September 10, 2001.   (*Id.* at ¶ 283; *Ashton* Compl. ¶ 44(o).)

This Court previously held that it could not exercise jurisdiction over claims asserted against Saudi Arabia based on these allegations since they "do not permit the court to infer more than the mere possibility of misconduct."  *See Terrorist Attacks XI*, 134 F. Supp. 3d at 785 (quoting *Iqbal*, 556 U.S. at 679).   For the same reasons, and because Plaintiffs still do not allege that he provided any of the 9/11 hijackers with any form of material assistance during his stay at their hotel, Plaintiffs' allegations as to Saleh al Hussayen fail to give rise to jurisdiction under JASTA.

### e.  Muhammed Jaber Fakihi

Muhammed Jabar Fakihi was employed by Saudi Arabia's Ministry of Islamic Affairs and, beginning in June 2000, served as head of the Islamic Affairs Office in the Saudi Embassy in Berlin, Germany.  (CAC ¶ 288; *Ashton* Compl. ¶ 39(m).)  Plaintiffs allege that Fakihi was in direct contact with members of the al Qaeda cell in Hamburg, Germany, that coordinated the 9/11 Attacks.  (CAC

¶¶ 289–90; Averment of Facts ¶ 258.)  They also allege that Fakihi sought to turn the Al Nur Mosque in Berlin into a center for Islamic missionary activity aimed at populations in Eastern Europe and that he arranged for Saudi charities to fund the expansion of the mosque.  (CAC ¶ 293; Averment of Facts ¶ 257.)  According to Plaintiffs, Fakihi ensured the delivery of at least $1 million from the Saudi Embassy in Berlin to support al Qaeda in Germany and the Al Nur Mosque.  (*Ashton* Compl. ¶¶ 39(m)–(o).)

These allegations are also insufficient to give rise to jurisdiction under JASTA over claims against Saudi Arabia.  Assuming Fakihi was acting at all relevant times within the scope of his office, employment, or agency, there is no allegation or evidence that the funds he diverted from the Saudi Embassy in Berlin were ever provided directly to al Qaeda, or that the funds were in any way used to help plan or facilitate the 9/11 Attacks.  Nor is there any allegation or evidence that his contact with members of the al Qaeda cell in Hamburg consisted of assistance that he provided as an agent or employee of the Saudi Embassy.

Thus, Plaintiffs' threadbare allegations as to Muhammed Jaber Fakihi are insufficient to create a basis for this Court to exercise jurisdiction under JASTA.

### f. *Omar Abdi Mohamed*

Omar Abdi Mohamed entered the United States in 1998 as a religious worker.  (CAC ¶ 302.) At the time, he was employed by Saudi Arabia's Ministry of Islamic Affairs as a "propagator" of Islam, though he did not disclose that fact to United States immigration officials on his visa application.  (*Id.* ¶ 303.)  After he arrived in the United States, and while under the supervision of officials in the Ministry of Islamic Affairs, he established a charity organization in San Diego called the Western Somali Relief Agency ("WSRA") to serve as a fundraising front for al Qaeda.  (*Id.* ¶¶ 304–05; *Ashton* Compl. ¶ 39(c).)

Between December 1998 and May 2001, the WSRA issued 65 checks totaling nearly $400,000 to Dahab Shil, a money transfer agency whose office in Pakistan was controlled by 9/11 mastermind Khalid Sheikh Mohammed. (CAC ¶ 305; *Ashton* Compl. ¶ 39(d)–(e).) According to the 9/11 Commission Report, the 9/11 plotters spent between $400,000 and $500,000 over the two years preceding the 9/11 Attacks to plan and facilitate the attacks. (9/11 Comm'n Report at 172.) The Report indicates further that the 19 hijackers were funded through wire transfers or cash provided by Khalid Sheikh Mohammed.[14] (*Id.*)

After oral argument, Plaintiffs moved to supplement the record as to Omar Abdi Mohamed with two newly discovered pieces of evidence. (*See* Mot. for Leave to Supplement the Record, ECF No. 3926, at 1.) The first concerns statements made in a legal memorandum filed by Immigration and Customs Enforcement ("ICE"), in connection with its removal proceedings against Mohamed (the "ICE Memorandum").[15] (*See* ICE Memorandum, Pounian Decl., ECF No. 3930, Ex. 1.) The ICE Memorandum states that Mohamed was "tasked" by the Saudi government to undertake "intelligence gathering missions in his employment as a 'propagator'" by, among other things, providing Saudi Arabia with information about converts to Islam living in the United States and monitoring media outlets to ensure that Saudi Arabia's views were represented in the media. (*Id.* at 4.) The second is an investigative report prepared by the United States Customs Service (the "Customs Investigative Report"), which indicates that as of January 1998, an individual named Sheik Fahd bin Ibrahim Al-Thumairi was appointed "to oversee the propagators working in the State of

---

[14] The 9/11 Commission Report also notes, however, that there has been "no credible evidence that any person in the United States" or foreign government or official supplied substantial financial assistance to the 9/11 hijackers. (9/11 Comm'n Report at 172.)

[15] ICE initiated removal proceedings against Mohamed in or about 2004 after he was indicted in federal court for failing to disclose material facts on his naturalization application, including the fact of his employment by Saudi Arabia. (*See* ICE Memorandum at 1.)

California." (*See* Customs Investigative Report, Pounian Decl., Ex. 2, at 2.) Plaintiffs claim that this newly discovered evidence shows that Mohamed was part of the same Southern California al Qaeda cell as Thumairy and Bayoumi, among others, and that Mohamed provided money-laundering services for al Qaeda at the direction of senior Saudi officials. (Pls. Mem. in Supp. of Mot. to Supplement, ECF No. 3928, at 2–3.)

Even assuming that the funds the WSRA provided to al Qaeda were actually used to help plan and facilitate the 9/11 Attacks, Plaintiffs allege no non-conclusory facts, and provide no evidence, to support the claim that Mohamed did so within the scope of his employment as a missionary. Plaintiffs' newly discovered evidence does little to change that conclusion. Plaintiffs argue that the ICE Memorandum shows that Mohamed was not a "propagator," but rather an undercover intelligence officer working for the Ministry of Islamic Affairs. (*Id.* at 2.) The ICE Memorandum, however, shows just the opposite, and explicitly states that Mohamed *was* a missionary. (*See* ICE Memorandum at 4.) Moreover, none of the tasks that ICE described as "intelligence gathering," (*id.*) included raising funds for al Qaeda, or anyone else for that matter. In addition, the Customs Investigative Report's conclusory statement that Thumairy supervised Mohamed's missionary activities—assuming that Thumairy is even the individual referenced in that report—does not support the inference that Mohamed was part of the cell that Thumairy directed to provide support to the 9/11 hijackers upon their arrival in California. Nor does it suggest, as Plaintiffs argue, that Thumairy, or any other Saudi official, directed Mohamed to deliver funds to al Qaeda.

Plaintiffs argue that they are entitled to jurisdictional discovery with respect to Mohamed because Saudi Arabia "holds the key evidence sought . . . regarding [his] employment, authority and instructions, [Saudi Arabia's] involvement in the WSRA scheme, the WSRA's records[,] and the ultimate beneficiary of the covert funds sent to Dahab Shil." (*Ashton* Opp'n at 19.) While that may

30

be the case, Plaintiffs must first demonstrate that a reasonable basis for jurisdiction exists based on Mohamed's alleged tortious acts. In this regard, Plaintiffs' allegations as to Omar Abdi Mohamed come up short.

### 2. The Charities

Plaintiffs identify several charity organizations, including Defendant SHC, that Plaintiffs allege operated as fundraising fronts for al Qaeda and provided financial and logistical support to al Qaeda during the decades preceding the 9/11 Attacks. (*See* CAC ¶¶ 75, 86; *Ashton* Compl. ¶¶ 39, 42–44.) These recycled allegations fail for two reasons. First, Plaintiffs do not articulate a valid basis for holding Saudi Arabia vicariously liable for the acts of the charity organizations. Second, even if the tortious acts of the charity organizations, or those of any of their officials, employees, and agents, may be attributed to Saudi Arabia, Plaintiffs still fail to adequately allege that those acts caused the 9/11 Attacks.

### a. Vicarious Liability for the Acts of the Charities

Defendant Saudi Arabia contends that the actions taken by the charity organizations may not be attributed to it for purposes of establishing vicarious liability because of the Supreme Court's decision in *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba* ("*Bancec*"), 462 U.S. 611 (1983), and its progeny.[16]  (*See* KSA Mem. at 49–51.)  *Bancec* held that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such[,]" 462 U.S. at 626–27, absent "evidence establishing an alter-ego relationship between the instrumentality and the sovereign state that created it." *EM Ltd. v. Banco*

---

[16] The charities identified in Plaintiffs' complaints as alleged front organizations for al Qaeda include the SHC, the Muslim World League, the International Islamic Relief Organization, the Al Haramain Islamic Foundation, the Al Haramain al Masjed al Aqsa, the Rabita Trust, the World Assembly of Muslim Youth, the Saudi Red Crescent Society, the Saudi Joint Relief Committee for Kosovo and Albania, and the Benevolence International Foundation. (*See* CAC ¶ 31; *Ashton* Compl. ¶ 9.)

*Cent. De La Republica Argentina* ("*EM Ltd. II*"), 800 F.3d 78, 90 (2d Cir. 2015). Saudi Arabia argues that Plaintiffs have failed to demonstrate that any of the charities were alter-egos of the sovereign. (KSA Mem. at 52–58.)

The *Bancec* "presumption of separateness" is supported by sound public policy justifications. *EM Ltd. II*, 800 F.3d at 90. First and foremost, the presumption is grounded in principles of international comity and "[d]ue respect for the actions taken by foreign sovereigns." *Bancec*, 462 U.S. at 626. In addition, as the Second Circuit has explained, "[f]reely ignoring the separate status of government instrumentalities would result in substantial uncertainty for sovereigns and creditors alike." *Arch Trading*, 839 F.3d at 201 (internal quotation marks and citation omitted). Finally, the doctrine is designed to encourage foreign courts to respect the separate corporate structures of American entities operating abroad. *See EM Ltd. II*, 800 F.3d at 90 ("If U.S. law did not respect the separate juridical identities of different agencies or instrumentalities, it might encourage foreign jurisdictions to disregard the juridical divisions between different U.S. public corporations or between a U.S. public corporation and its independent subsidiary.") (citation omitted).

An alter-ego relationship sufficient to rebut the *Bancec* presumption may be established if: "(1) the instrumentality is so extensively controlled by its owner that a relationship of principal and agent is created; or (2) the recognition of an instrumentality's separate legal status would work a fraud or injustice." *Id.* (internal quotation marks and citations omitted). Several indicia guide the "extensive control" analysis, but the touchstone inquiry is "whether the sovereign state exercises significant and repeated control over the instrumentality's day-to-day operations." *Id.* at 91. The "fraud or injustice" prong, by contrast, is concerned with "prevent[ing] foreign states from avoiding their obligations by engaging in abuses of [the] corporate form." *Id.* at 95 (internal quotation marks and citation omitted).

Here, Plaintiffs seek to predicate Saudi Arabia's vicarious liability for the acts of the charities based only on the "extensive control" prong. (*See* CAC Opp'n at 66–71; *Ashton* Opp'n at 27–29, 33–36.) They claim that the charities were established and created by the Saudi government; that they receive financial support and other assistance from the Saudi government; that the Saudi government appoints, and has the power to remove, their officers and directors; that Saudi government officials and employees were also employed by the charities; that the Saudi government provides them with "administrative guidance"; that Saudi Arabia's Ministry of Islamic Affairs supervises and directs their operations and activities; and that Saudi diplomats and embassies provide assistance to their offices located abroad. (*See* CAC ¶¶ 121–27, 130–31; *Ashton* Compl. ¶ 46.) The same allegations are repeated virtually verbatim with respect to each of the identified charity organizations. (*See Ashton* Compl. ¶¶ 47–51.)

Plaintiffs' allegations fail to show that the charity organizations were alter-egos of Saudi Arabia. This Court previously considered and rejected substantially similar allegations as those alleged here as inadequate, "conclusory, [and] largely boilerplate," *Terrorist Attacks XI*, 134 F. Supp. 3d at 783–84 & n.9, and Plaintiffs do not allege anything materially new or different in the CAC, the *Ashton* Complaint, or any other supporting documents to justify a different result. Moreover, the Second Circuit has expressly rejected such allegations as insufficient to demonstrate extensive control by the sovereign. *See Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107, 130 (2d Cir. 2016) (rejecting as insufficient to show day-to-day control allegations that entity was created by the Shah of Iran, the Ayatollah had authority to remove its board members, and Iran's Ambassador to the United Nations "had some supervisory role" over the entity), *cert. denied sub nom. Alavi Found. v. Kirschenbaum*, 137 S. Ct. 1332 (2017), *and abrogated on other grounds by Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018); *Arch Trading*, 839 F.3d at 204 ("nonspecific oversight" is insufficient);

33

*EM Ltd. II*, 800 F.3d at 92–93 (rejecting as inadequate allegations that the government of Argentina had the power to hire and fire the entity's board members or officers, shared goals and policies with the entity, and coordinated its activities with the entity); *see also Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 852 (D.C. Cir. 2000) (the provision of state funds "was a normal aspect of the relation between a government and a government-owned corporation, not an instance of 'day-to-day' involvement in the affairs of the corporation"); *NML Capital, Ltd. v. Republic of Argentina*, No. 09 Civ. 7013 (TPG), 2011 WL 524433, at *3, *6–7 (S.D.N.Y. Feb. 15, 2011) (no alter ego status where Argentina appointed the majority of entity's board and the entity "relies entirely on the Republic for funding").

Plaintiffs make three additional arguments in support of Saudi Arabia's vicarious liability for the acts of the charities, none of which are availing. First, Plaintiffs argue that Saudi Arabia can be held liable for the acts of the charities because they are "organs" of the Saudi government.[17] (CAC Opp'n at 66 (citing 28 U.S.C. § 1603).) Even accepting that factual allegation as true, it says nothing about whether Saudi Arabia can be held vicariously liable for the consequences of the charities' conduct. If the acts of an agency or instrumentality of a foreign sovereign could be attributed to the sovereign merely because they were committed by an agency or instrumentality of that state, *Bancec* would be rendered a dead letter.

---

[17] For purposes of the FSIA, an "agency or instrumentality of a foreign state" is defined to include any entity:

> (1) which is a separate legal person, corporate or otherwise, and
> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
> (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b).

34

Second, Plaintiffs assert that the tortious acts of the charities are attributable to Saudi Arabia because they perform "core functions of the Saudi state." (CAC ¶ 105; CAC Opp'n at 71.) The Second Circuit held in *Garb v. Republic of Poland*, 440 F.3d 579 (2d Cir. 2006), that the *Bancec* presumption of separateness does not apply where the instrumentality exists as a political unit of the state such that "no meaningful legal distinction" can be drawn between the two. *Servaas Inc. v. Republic of Iraq*, 653 F. App'x 22, 24 (2d Cir. 2011) (quoting *Garb*, 440 F.3d at 592). In *Garb*, the Second Circuit held that Poland's Ministry of the Treasury was "an integral part of Poland's political structure and that its *core function*—to hold and administer the property of the Polish state—is indisputably governmental." 440 F.3d at 595 (emphasis added) (citation omitted). Central to that court's holding was the fact that the ministry is part of the government and that it exists solely to act on behalf of the state by managing property and representing the state with respect to financial claims brought against it. *Id.* at 595.

Similar reasoning was applied in *Servaas*, where the court held that the Iraqi Ministry of Industry was a political subdivision of the state, in part, because it "is charged with reviewing and recording applications for trademark registration, a regulatory function that we view as quintessentially governmental." 653 F. App'x at 25; *see also Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 153 (1994) (Bolivia's air force performs inherently sovereign act of providing military air defense and is therefore "so closely bound up with the structure of the state . . . [as to] be considered . . . the 'foreign state' itself, rather than a separate 'agency or instrumentality' of the state"). The same cannot be said for the charities, whom, according to Plaintiffs, engage primarily in "proselytizing work" and "are the principal instruments through which the Saudi government fulfills its state duty to propagate Wahhabi Islam[.]" (CAC ¶¶ 119, 128.) These sorts of activities, while

35

perhaps important to the religious aims of the Saudi government, lack the essential qualities of governmental functions identified in *Garb*.

Finally, Plaintiffs argue that the acts of the charities may be attributed to Saudi Arabia under ordinary agency principles without having to demonstrate alter-ego status. (CAC ¶ 105; CAC Opp'n at 14, 70.)   Indeed, JASTA does permit a foreign sovereign to be held liable for the tortious acts of its agents, *see* 28 U.S.C. § 1605B(b)(2), and "[t]he level of state control required to establish an 'alter ego' relationship is more extensive than that required to establish 'agency.'" *Kirschenbaum*, 830 F.3d at 137.  Plaintiffs' allegations, however, still fall short because they do not show that the charities' provision of material support to terrorists was committed within the scope of their agency—*i.e.* providing humanitarian aid and propagating Wahhabi Islam—much less that their actions *caused* Plaintiffs' injuries arising out of the 9/11 Attacks.[18]   Moreover, allowing Plaintiffs to hold Saudi Arabia liable for the acts of the charities, whom they describe as "arms and components of the Saudi government," (CAC ¶ 31), as ordinary *agents* would sanction an end-run around *Bancec* and the significant public policy goals it serves.

The acts of the charity organizations identified in Plaintiffs' complaints therefore cannot be attributed to Saudi Arabia or used to provide a basis under JASTA for this Court to exercise jurisdiction over the claims Plaintiffs assert against it.

> b.  *Tortious Acts Committed by the Charities*

Plaintiffs' allegations principally focus on a number of charity organizations that, they claim, provided material support to al Qaeda and enabled it to carry out the 9/11 Attacks.  More specifically, Plaintiffs principally allege that the charities knowingly provided:

- Financial support to other entities who, in turn, provided al Qaeda and its operatives with funds, including through donations to a mosque in

---

[18] *See infra* Section II.C.2.b.

Germany frequented by several of the 9/11 hijackers, (*Ashton* Compl. ¶¶ 39(n)–(o), (q), (t)–(v), (x), (z), (aa); Averment of Facts ¶¶ 350, 354, 363, 367, 417, 425, 504);

- Funds, equipment, and supplies to establish terrorist training camps in Afghanistan and to enable al Qaeda operatives—including "some or all of the September 11 hijackers"—to travel to such facilities, (CAC ¶¶ 80, 86; *Ashton* Compl. ¶¶ 42–43; Averment of Facts ¶¶ 315, 377–78, 382, 422);

- Travel documentation and visas, including for travel to terrorist training camps in Afghanistan, (*Ashton* Compl. ¶ 43(n); Averment of Facts ¶ 377); and

- Secret courier services for al Qaeda, (*Ashton* Compl. ¶ 43(o)).

These allegations do not provide a basis to exercise jurisdiction under JASTA over Plaintiffs' claims against Saudi Arabia. Plaintiffs' allegations are conclusory, largely boilerplate, and concern conduct too temporally and geographically remote from the 9/11 Attacks to have proximately caused Plaintiffs' injuries. For instance, the vast majority of Plaintiffs' allegations involve alleged acts by the charities to aid and support al Qaeda's efforts in Europe, Africa, the Middle East, and the Far East during the 1980s and 1990s; none bear any definite and specific, articulable connection to the 9/11 Attacks or those who carried them out. Moreover, as the Second Circuit has held, allegations that the charities provided funding to entities that are known to support terrorism that, in turn, provided funding to al Qaeda and other terrorist organizations are insufficient for proximate causation purposes. *See Terrorist Attacks IX*, 714 F.3d at 124.

In short, Plaintiffs fail to demonstrate that any of the support the charities provided al Qaeda or its operatives was used to help fund or facilitate the 9/11 Attacks in any meaningful way. Because the alleged tortious acts by the charities did not proximately cause Plaintiffs' injuries, they provide no basis under JASTA for this Court to exercise jurisdiction over the claims asserted against Saudi Arabia.

### D. Saudi Arabia's Constitutional Challenge to JASTA

Defendant Saudi Arabia challenges JASTA's constitutionality on two separate but related grounds. First, it argues that JASTA violates the separation of powers in attempting to direct a certain outcome in this case and thereby infringing on the judicial power of the courts under Article III. (KSA Mem. at 70–71.) Second, it claims that Congress overstepped its bounds by creating a new set of legal rules to apply to cases that had already been decided.[19] (*Id.* at 71–74.) More specifically, it claims that when the Second Circuit granted Plaintiffs relief from the final judgments entered by United States District Judge Casey in favor of Saudi Arabia and the SHC under Rule 60(b) of the Federal Rules of Civil Procedure, the court determined that those judgments should be reopened to apply a particular set of legal rules established in *Doe v. Bin Laden*, 663 F.3d 64 (2d Cir. 2011), and "Congress was not free to step in and create another set of rules entirely."[20] (KSA Mem. at 71.) Saudi Arabia's constitutional arguments lack merit.

---

[19] Saudi Arabia also contends that JASTA violates its due process rights by purporting to extend personal jurisdiction to conduct not expressly aimed at the United States and by creating new liability and penalties for conduct that occurred in the past. (KSA Mem. at 74–75.) However, as Saudi Arabia concedes, (*id.* at 75), it is well settled that foreign sovereigns do not have standing to assert due process claims. *See Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 329 (2d Cir. 2016) (citing *Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 396–400 (2d Cir. 2009)).

[20] As explained more fully in this Court's September 29, 2015 Opinion and Order, Judge Casey, who presided over this multidistrict litigation until 2007, issued an opinion in 2005 granting Saudi Arabia and the SHC immunity under the FSIA and holding that the discretionary function exclusion to the noncommercial tort exception applied to bar Plaintiffs' claims. *Terrorist Attacks XI*, 134 F. Supp. 3d at 778. In 2008, the Second Circuit affirmed on a different basis, finding "that the FSIA's noncommercial tort exception cannot apply to claims based on alleged involvement in terrorist activities." *Id.* (citation omitted). In 2011, however, the Second Circuit decided *Doe v. Bin Laden*, 663 F.3d 64 (2d Cir. 2011), which partially overruled its earlier ruling and held that the noncommercial tort exception *could* be invoked in terrorism cases. *Terrorist Attacks XI*, 134 F. Supp. 3d at 779. Plaintiffs thereafter moved under Rule 60(b) for relief from the judgments entered by Judge Casey, which this Court denied but which the Second Circuit held should have been granted since the "incorrect decision in *Terrorist Attacks III* caused a disparity between the *Terrorist Attacks* plaintiffs and the *Bin Laden* plaintiff where none should ever have existed." *In re Terrorist Attacks on September 11, 2001* ("*Terrorist Attacks X*"), 741 F.3d 353, 359 (2d Cir. 2013). The Second Circuit remanded the case, *id.*, after which this Court decided *Terrorist Attacks XI* and found that Plaintiffs' claims did not fall within the noncommercial tort exception's entire tort rule. *See Terrorist Attacks XI*, 134 F. Supp. 3d at 787.

As an initial matter, nothing in JASTA's text directs—or even purports to direct—a particular result in this case. JASTA is a statute of general applicability that, while perhaps motivated by this Court's and the Second Circuit's rulings in this multidistrict litigation, creates a new exception to the FSIA and leaves it to the judiciary to apply the new legal standards to the facts as it finds them.[21] As the Supreme Court recently affirmed, "Congress may . . . direct courts to apply newly enacted, outcome-altering legislation in pending civil cases . . . [and] a statute does not impinge on judicial power [by merely] direct[ing] courts to apply a new legal standard to undisputed facts." *Bank Markazi*, 136 S. Ct. at 1325. Insofar as JASTA "changed the law by establishing new substantive standards, entrusting to the District Court application of those standards to the facts (contested or uncontested) found by the court[,]" *id.* at 1326, it does not violate the separation of powers.

Moreover, it is well established that the political branches, Congress included, enjoy wide latitude in exercising control over foreign affairs. *See Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2090 (2015) ("In a world that is ever more compressed and interdependent, it is essential the congressional role in foreign affairs be understood and respected."). Before the FSIA was enacted in 1976, the President had the authority to make case-specific determinations as to whether sovereign immunity should be recognized and it was never "for the courts to deny an immunity which our government has seen fit to allow, or to allow an immunity on new grounds which the government has not seen fit to recognize." *Republic of Mexico v. Hoffman*, 324 U.S. 30, 35 (1945). When Congress enacted the FSIA, it transferred that power from the Executive to the Judiciary and vested the courts with the primary responsibility for determining the amenability of foreign states to suit. *Bank Markazi*, 136 S. Ct. at 1329. Then, however, as now, "it remains Congress' prerogative to alter a

---

[21] Even if JASTA were enacted for the narrow purpose of affording relief to victims of the 9/11 Attacks, it would still pass muster. *See Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1328 (2016) ("This Court and lower courts have upheld as a valid exercise of Congress' legislative power diverse laws that governed one or a very small number of specific subjects.")

foreign state's immunity and to render the alteration dispositive of judicial proceedings in progress."
*Id.*

Saudi Arabia's reliance on *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211 (1995), is misplaced. There, the Supreme Court held that Congress may not pass a law directing Article III courts to retroactively reopen final judgments, finding that such a law encroaches on the power of courts "to say what the law is." *Id.* at 218–19 (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)). The Court expressly rejected the argument that the statute was akin to Rule 60(b) of the Federal Rules of Civil Procedure, which the Court noted "does not impose any legislative mandate to reopen upon the courts, but merely reflects and confirms the courts' own inherent and discretionary power . . . to set aside a judgment whose enforcement would work inequity." *Id.* at 233–34 (internal quotation marks and citation omitted). Saudi Arabia argues that Congress, in enacting JASTA, is seeking to "control the courts' independent constitutional authority to reopen a final judgment based on the law in effect when that judgment was rendered." (KSA Mem. at 73 (internal quotation marks and citation omitted).) JASTA, however, does no such thing. It merely provides courts with new legal principles to apply, retroactively and prospectively, in determining claims for sovereign immunity, a power that Saudi Arabia concedes Congress has. (*See id.* (citing *Bank Markazi*, 136 S. Ct. at 1325).) Because it is undisputed that the Second Circuit—*not Congress*—directed that the judgments entered by Judge Casey be reopened, *Plaut* is distinguishable.

In addition, it is clear that once the judgments were reopened, courts must apply the law that exists at the time, including newly enacted legislation given retroactive effect, like JASTA. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 273 (1994) ("[A] court should apply the law in effect at the time it renders its decision, even though that law was enacted after the events that gave rise to the suit.") (internal quotation marks and citation omitted); (*contra* KSA Mem. at 73 ("Congress cannot

40

constitutionally direct the courts to apply new standards to this case that are different from either the law applied in *Terrorist Attacks III* or the law applied in *Doe* [*v. Bin Laden*].").) Here, rather than doing so itself, the Second Circuit remanded the case to this Court—on the parties' *joint* application— to decide in the first instance how, if at all, JASTA changes the foreign sovereign immunity analysis as it relates to Plaintiffs' claims against Saudi Arabia arising out of the 9/11 Attacks. (*See* 3/9/17 Mandate at 1.)

Accordingly, Saudi Arabia's constitutional challenges to JASTA are without merit.

## III. CONCLUSION

Defendant SHC's motion to dismiss for lack of subject matter jurisdiction, (ECF No. 3670), is GRANTED. Defendant Saudi Arabia's motion to dismiss, (ECF No. 3667), is DENIED. Limited jurisdictional discovery on specific factual allegations critical to the immunity determination shall proceed promptly and expeditiously in the manner described above as to the alleged tortious acts by alleged Saudi agents Fahad al Thumairy and Omar al Bayoumi.

The Clerk of Court is directed to close the motions at ECF Nos. 3667 and 3670 accordingly.

Dated: March 28, 2018
New York, New York

SO ORDERED.

*George B. Daniels*
GEORGE B. DANIELS
United States District Judge