**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE:                         :       <u>MEMORANDUM DECISION</u>
                                   :          <u>AND ORDER</u>

TERRORIST ATTACKS ON      :
SEPTEMBER 11, 2001            :      03 MDL 1570 (GBD) (SN)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

This document relates to: *All Actions*

GEORGE B. DANIELS, United States District Judge:

Plaintiffs in this multidistrict litigation seek to hold multiple defendants liable for allegedly financing, sponsoring, conspiring to sponsor, aiding and abetting, or otherwise providing material support to Osama bin Laden and the terrorist organization known as al Qaeda in the physical destruction, deaths, and injuries stemming from the terrorist attacks on September 11, 2001 (the "9/11 Attacks").[1] On March 28, 2018, this Court granted Plaintiffs limited jurisdictional discovery against Defendant Saudi Arabia on allegations of specific facts relevant to the immunity determination under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq. In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d 631, 640 (S.D.N.Y. 2018) (the "Order").

On December 7, 2021, Plaintiffs asserting claims against Saudi Arabia through the Plaintiffs' Executive Committees' Consolidated Amended Complaint ("CAC," ECF No. 3463) (hereinafter "CAC Plaintiffs") filed the instant motion to revise this Court's Order pursuant to Federal Rule of Civil Procedure 54(b) and this Court's inherent powers.[2] (CAC Mot. to Revise, ECF No. 7431.) Relatedly, *Ashton* Plaintiffs filed a motion to compel Saudi

---

[1] This Court assumes familiarity with the general background of this case and will only restate relevant factual background as necessary to address the pending motions.

[2] Unless otherwise indicated, all references made herein to the docket sheet refer to the main docket sheet for this multidistrict litigation, No. 03-md-1570.

Arabia to produce documents pursuant to the "limited jurisdictional discovery" granted in the Order. (*Ashton* Mot. to Compel, ECF No. 7481.) Both motions argue that two recent cases from the United States Court of Appeals for the Second Circuit, *Kaplan v. Lebanese Canadian Bank*, 999 F.3d 842 (2d Cir. 2021) ("*Kaplan*"), and *Honickman v. BLOM Bank SAL*, 6 F.4th 487 (2d Cir. 2021) ("*Honickman*"), require this Court to revise its Order. *Ashton* Plaintiffs also argue that newly declassified evidence requires this Court to reopen document discovery and reconsider previous discovery orders against Saudi Arabia.

For the reasons stated herein, both CAC Plaintiffs' and *Ashton* Plaintiffs' motions are DENIED.

## I.    BACKGROUND

Plaintiffs have alleged that Defendant Saudi Arabia bears responsibility for the 9/11 Attacks because its agents and employees directly and knowingly assisted the hijackers and plotters who carried out the attacks. (*See generally* CAC; Compl., *Kathleen Ashton, et al. v. Kingdom of Saudi Arabia*, No. 17-cv-2003 (S.D.N.Y Mar. 20, 2017), ECF No. 1.) Defendants Saudi Arabia and the Saudi High Commission for Relief in Bosnia and Herzegovina ("SHC") previously moved to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure on grounds that they are immune from suit by virtue of the FSIA. (*See* Mot. to Dismiss, ECF No. 2893.) On September 29, 2015, this Court granted their motion to dismiss due to Plaintiffs' failure to allege or present evidence that any official or employee of Saudi Arabia or the SHC committed a tortious act entirely within the United States in the scope of their office or employment. *See In re Terrorist Attacks on September 11, 2001*, 134 F. Supp. 3d 774, 777–80 (S.D.N.Y. 2015).

2

Plaintiffs appealed that decision to the Second Circuit Court of Appeals. (*See* Notice of Appeal, ECF No. 3075.)

In 2016, during the pendency of Plaintiffs' appeal, Congress enacted the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852 (2016) (codified in part at 28 U.S.C. § 1605B). JASTA created, among other things, a new exception to the FSIA which does not incorporate the noncommercial tort exception's entire tort rule and, unlike the FSIA's terrorism exception, does not require that the defendant be designated a state sponsor of terrorism by the U.S. Secretary of State. *See* 28 U.S.C. § 1605B(b). In addition, JASTA permits U.S. nationals to bring claims against foreign sovereigns under the Antiterrorism Act ("ATA"), 18 U.S.C. § 2333, provided that JASTA's requirements for withholding sovereign immunity are otherwise met. *See* 28 U.S.C. § 1605B(c).

At the joint request of the parties on appeal, the Second Circuit vacated this Court's September 29, 2015 Opinion and Order that had dismissed under the FSIA all claims against Saudi Arabia and the SHC, and remanded the case to this Court to consider how, if at all, JASTA affects the moving Defendants' claim for immunity under the FSIA. (*See* March 9, 2017 Mandate, ECF No. 3457.) Defendants Saudi Arabia and the SHC renewed their motions to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, arguing that their immunity under the FSIA remained intact even after JASTA's enactment. (*See* Saudi Arabia's Mot. to Dismiss, ECF No. 3667, at 1–2; SHC's Mot. to Dismiss, ECF No. 3670, at 1–2.)

On March 28, 2018, following oral argument, this Court granted SHC's motion to dismiss but denied Saudi Arabia's motion to dismiss. *In re Terrorist Attacks*, 298 F. Supp.

3

3d at 640. This Court found that Plaintiffs' claims against Saudi Arabia articulated a reasonable basis for jurisdiction under JASTA, thereby allowing Plaintiffs limited jurisdictional discovery. *Id.* Specifically, the Order permitted Plaintiffs to conduct limited and targeted jurisdictional discovery critical to answering the question of whether and to what extent Fahad al Thumairy, Omar al Bayoumi, and their agents took actions in 2000, at the direction of more senior Saudi officials, to provide assistance to Nawaf al Hazmi, Khalid al Mihdhar, and other 9/11 hijackers.[3] *In re Terrorist Attacks*, 298 F. Supp. 3d at 651. Based on Plaintiffs' insufficient allegations, this Court rejected jurisdiction under JASTA as to allegations against Osama Basnan, Mohammed al Qudhaeein, Hamdan al Shalawi, Saleh al Hussayen, Muhammed Jaber Fakihi, Omar Abdi Mohamed, and several charity organizations. *Id.* at 651–59.

CAC Plaintiffs filed the instant motion pursuant to Rule 54(b) and this Court's inherent powers to revise the Order. (*See* CAC Mot. to Revise.) CAC Plaintiffs ask this Court to apply the Second Circuit's decisions in *Kaplan* and *Honickman* by revising the Order insofar as it "rejected Plaintiffs' arguments that this Court possesses jurisdiction over Plaintiffs' statutory and common law secondary and primary liability claims against [Saudi Arabia]." (*Id.*) Namely, CAC Plaintiffs allege that their claims "are predicated on [Saudi Arabia's] aiding and abetting and provision of material support to al Qaeda, thereby fostering al Qaeda's terrorism including its attacks in the United States on September 11, 2001." (CAC Mem. of Law on Mot. to Revise, ECF No. 7432, at 1.)

Additionally, *Ashton* Plaintiffs filed a motion to compel Saudi Arabia to produce documents pursuant to the "limited jurisdictional discovery" granted in the Order. (*See*

---

[3] Nawaf al Hazmi and Khalid al Mihdhar were two of the five hijackers of American Airlines Flight 77, which they crashed into the Pentagon as part of the 9/11 Attacks.

*Ashton* Mot. to Compel at 1.) Specifically, *Ashton* Plaintiffs seek an order from this Court compelling Saudi Arabia to produce documents concerning the work, assignments, supervision, travel, and financial activities of Adel al Sadhan, Mutaeb al Sudairy, and Omar Abdi Mohamed. (*Id.*) *Ashton* Plaintiffs argue that recently declassified documents confirm the necessity of these document requests because they are relevant to the limited jurisdictional discovery granted by this Court's Order and the principles established in *Kaplan* and *Honickman*.[4] (*See id.*) *Ashton* Plaintiffs also join in the CAC Plaintiffs' motion to revise this Court's Order based on *Kaplan* and *Honickman*. (*Id.* at 2.) Defendant Saudi Arabia opposes both motions. (*See* Saudi Arabia's Op. to Mot. to Revise, ECF No. 7648; Saudi Arabia's Op. to *Ashton* Mot. to Compel, ECF No. 7584.)

## II. LEGAL STANDARD

### A. The Foreign Sovereign Immunities Act

Federal district courts are courts of limited jurisdiction; "[t]hey possess only that power authorized by [the] Constitution and statute." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005) (quotation marks and citation omitted). It is well settled that "[t]he FSIA 'provides the sole basis for obtaining jurisdiction over a foreign state in federal court.'" *Chettri v. Nepal Rastra Bank*, 834 F.3d 50, 55 (2d Cir. 2016) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989)); *see also In re Terrorist Attacks*, 298 F. Supp. 3d at 640 (quoting same). The FSIA renders foreign states, their agencies, and their instrumentalities "presumptively immune from the jurisdiction of United States courts[,]" unless a specific exception applies. *Saudi Arabia v.*

---

[4] *Ashton* Plaintiffs rely on the declassification pursuant to President Joseph Biden's Executive Order titled Declassification Reviews of Certain Documents Concerning the Terrorist Attacks of September 11, 2001, Exec. Order No. 14040, 86 Fed. Reg. 50439 (Sept. 3, 2021).

*Nelson*, 507 U.S. 349, 355 (1993).  Accordingly, "[o]nce the defendant presents a *prima facie* case that it is a foreign sovereign . . . , the plaintiff has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted, although the ultimate burden of persuasion remains with the alleged foreign sovereign."  *In re Terrorist Attacks on September 11, 2001* ("*Terrorist Attacks VIII*"), 714 F.3d 109, 114 (2d Cir. 2013) (quotation marks and citation omitted).

### B.  Revising Non-Final Judgments under Rule 54

Pursuant to Rule 54(b), non-final judgments "may be revised at any time before the entry of a [final judgment.]"  Fed. R. Civ. P. 54(b).  Additionally, "so long as the district court has jurisdiction over the case, it possesses inherent power over interlocutory orders, and can reconsider them when it is consonant with justice to do so."  *United States v. LoRusso,* 695 F.2d 45, 53 (2d Cir. 1982) (quoting *United States v. Jerry,* 487 F.2d 600, 605 (3d Cir. 1973)).  Reconsideration may be appropriate where there is "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."  *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.,* 729 F.3d 99, 108 (2d Cir. 2013) (quoting *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)).  In such circumstances, reconsideration can promote the interests of justice and efficiency by "avoiding a second, unnecessary battle in the Court of Appeals."  *S.E.C. v. Amerindo Inv. Advisors, Inc.*, No. 05 CIV. 5231 RJS, 2014 WL 405339, at *3 (S.D.N.Y. Feb. 3, 2014), *aff'd sub nom. S.E.C. v. Amerindo Inv. Advisors*, 639 F. App'x 752 (2d Cir. 2016).

This standard for reconsideration is "strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court

overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Van Buskirk v. United Grp. of Cos.*, 935 F.3d 49, 54 (2d Cir. 2019) (quotation marks and citation omitted); *see also Zdanok v. Glidden Co.*, 327 F.2d 944, 953 (2d Cir. 1964) ("[W]here litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.").

A purported change in law warrants reconsideration only where new authority leaves a court with a "clear conviction of error with respect to a point of law on which its previous decision was predicated." *North River Ins. Co. v. Philadelphia Reinsurance Corp.*, 63 F.3d 160, 165 (2d Cir. 1995) (quotation marks and citation omitted). Courts in this District apply the "clear conviction of error" standard to motions for reconsideration of an interlocutory decision. *See, e.g.*, *Breitman v. Xerox Educ. Servs., LLC*, No. 12 CIV. 6583 PAC, 2015 WL 13652883, at *1 (S.D.N.Y. Jan. 7, 2015); *Cohen v. UBS Fin. Servs., Inc.*, No. 12 CIV. 02147 LGS, 2014 WL 240324, at *2 (S.D.N.Y. Jan. 22, 2014), *aff'd*, 799 F.3d 174 (2d Cir. 2015). As here, "[t]he moving party bears the burden of demonstrating the need for reconsideration," and, "'generally, there is a strong presumption against amendment of prior orders.'" *Breitman*, 2015 WL 13652883, at *1 (quoting *Bergerson v. N.Y. State Off. of Mental Health*, 652 F.3d 277, 288 (2d Cir. 2011)).

### C. Reopening Document Discovery

District courts have "broad latitude to determine the scope of discovery and to manage the discovery process." *See EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 207 (2d Cir. 2012) (citing *In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 103 (2d Cir. 2008)). However, since "sovereign immunity protects a sovereign from the expense, intrusiveness, and hassle of litigation, a court must be circumspect in allowing discovery before the plaintiff

7

has established that the court has jurisdiction over a foreign sovereign defendant under the FSIA." *EM Ltd. I*, 695 F.3d at 210 (quotation marks and citation omitted); *see also Stutts v. De Dietrich Grp.*, 465 F. Supp. 2d 156, 169 (E.D.N.Y. 2006) ("District courts in this circuit routinely reject requests for jurisdictional discovery where a plaintiff's allegations are insufficient to make out a *prima facie* case of jurisdiction.").

Accordingly, a district court may deny jurisdictional discovery from a foreign sovereign where "the party seeking discovery cannot articulate a 'reasonable basis' for the court first to assume jurisdiction." *Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 206–07 (2d Cir. 2016) (quoting *Filus v. Lot Polish Airlines*, 907 F.2d 1328, 1332 (2d Cir. 1990)); *see also Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185 (2d Cir. 1998) (jurisdictional discovery was not appropriate because the plaintiff's allegations "lack[ed] the factual specificity" and "supporting facts" necessary to confer jurisdiction). In the FSIA context, even in those instances where jurisdictional discovery is warranted, "discovery should be ordered circumspectly and only to verify allegations of specific facts crucial to an immunity determination." *First City, Texas-Houston, N.A. v. Rafidain Bank*, 150 F.3d 172, 176 (2d Cir. 1998) (quotation marks and citation omitted).

The legal standard for allowing additional document discovery is "good cause." Fed. R. Civ. P. 16(b)(4) (where court enters a discovery schedule, it "may be modified only for good cause and with the judge's consent."). Courts in this District determine whether good cause has been established through a variety of factors, such as whether the moving party was diligent in obtaining discovery within the guidelines established by the court and whether the nonmoving party would be prejudiced. *See Rubik's Brand Ltd. v. Flambeau, Inc.*, 329 F.R.D. 55, 58 (S.D.N.Y. 2019). Courts have refused to reopen discovery when "the

8

marginal utility of the documents requested, if any, is outweighed by the burdens and delays that would be imposed." *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*, 328 F.R.D. 450, 452 (S.D.N.Y. 2018).

Additionally, for reconsideration of the Court's prior discovery orders, Local Rule 6.3 generally requires the moving party to file a notice of motion for reconsideration within fourteen days after the order. The "strict" standard for reconsideration is not satisfied when a party "seeks solely to relitigate an issue already decided." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995); *see Sys. Mgmt. Arts Inc. v. Avesta Techs., Inc.*, 106 F. Supp. 2d 519, 521 (S.D.N.Y. 2000) ("Local Rule 6.3 is to be narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the court."); *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 43 F. Supp. 3d 369, 373 (S.D.N.Y. 2014) (standard under Local Rule 6.3 same as Rule 59(e)), *aff'd sub nom. Lowinger v. Morgan Stanley & Co.*, 841 F.3d 122 (2d Cir. 2016).

### III. THE RECENT SECOND CIRCUIT DECISIONS DO NOT MERIT REVISION OF THIS COURT'S 2018 ORDER

#### A. Plaintiffs' Arguments Seek to Apply *Kaplan* and *Honickman*'s Interpretation of 18 U.S.C. § 2333(d) to Their Allegations Against Saudi Arabia

The CAC Plaintiffs principally rely on the Second Circuit's decision in *Kaplan* to argue that they have adequately pled aiding and abetting claims against Defendant Saudi Arabia. *Kaplan* concerned U.S. citizens who were victims of rocket attacks in Israel in the summer of 2006. 999 F.3d at 845. *Kaplan* plaintiffs sought to hold defendant Lebanese Canadian Bank, SAL liable (1) as a principal under the ATA, *see* 18 U.S.C. §§ 2331(1), 2333(a), for providing banking services to certain individuals or entities alleged to be part of or closely affiliated with the foreign terrorist organization ("FTO") Hizbollah that carried

9

out the attacks; and (2) as a coconspirator or an aider and abettor under JASTA, *see* 18 U.S.C.

§ 2333(d)(2), in Hizbollah's terrorist attacks. *Kaplan,* 999 F.3d at 845. This Court granted

the Lebanese Canadian Bank's motion to dismiss pursuant to Federal Rule of Civil Procedure

12(b)(6) for failure to state a claim due to the lack of plausible, nonconclusory factual

allegations. *Id.*; *see also Kaplan v. Lebanese Canadian Bank, SAL*, 405 F. Supp. 3d 525,

528 (S.D.N.Y. 2019). The plaintiffs appealed to the Second Circuit on the dismissal of only

their JASTA aiding-and-abetting claims, arguing that this Court did not correctly apply the

analytical framework set out in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), when

assessing the plausibility and permissible inferences of their claims. *Kaplan*, 999 F.3d at

845.

The Second Circuit agreed with the plaintiffs, vacating that portion of this Court's

judgment that dismissed the plaintiffs' JASTA aiding-and-abetting claims, and remanded the

case for further proceedings. *Id.* at 867. The Second Circuit court reasoned that the plaintiffs

had proffered sufficient factual allegations with respect to the "general awareness" and

"knowing and substantial assistance" elements of its ATA § 2333(d)(2) aiding-and-abetting

claims. *Id.* at 863–66. "Congress in enacting JASTA stated that the proper legal framework

for assessing JASTA [aiding-and-abetting and conspiracy] claims is that set out in

*Halberstam*, 705 F.2d 472."[5]  *Id.* at 856; *see also Kaplan*, 405 F. Supp. 3d at 533.

*Halberstam* articulated three elements of aiding-and-abetting liability:

> (1) "the party whom the defendant aids must perform a wrongful act
> that causes an injury,"

---

[5] JASTA provides, "The decision of the United States Court of Appeals for the District of
Columbia in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), which has been widely
recognized as the leading case regarding Federal civil aiding and abetting and conspiracy liability,
including by the Supreme Court of the United States, provides the proper legal framework for how
such liability should function in the context of chapter 113B of title 18, United States Code." *Id.* §
2(a)(5), 130 Stat. at 852.

10

> (2) "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance," and
>
> (3) "the defendant must knowingly and substantially assist the principal violation."

705 F.2d at 477; *see also Kaplan*, 999 F.3d at 856 (citing same). For the third element, *Halberstam* also identified six factors when determining whether the defendant's assistance constitutes "substantial":

> (1) the nature of the act encouraged,
> (2) the amount of assistance given by defendant,
> (3) defendant's presence or absence at the time of the tort,
> (4) defendant's relation to the principal,
> (5) defendant's state of mind, and
> (6) the period of defendant's assistance.

*Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018) (citing *Halberstam*, 705 F.2d at 483–84); *see also Kaplan*, 999 F.3d at 856 (citing same). Also in 2021, the Second Circuit applied *Kaplan*'s principles in *Honickman* by holding that the *Honickman* plaintiffs failed to allege the defendant bank was "generally aware" of any connection between its customers and the FTO Hamas at the time it provided banking services to those customers, thus failing to state a JASTA aiding-and-abetting claim. 6 F.4th at 501–03.

Here, CAC Plaintiffs argue that this Court's 2018 Order rested on "now-impermissible rationales" and was "otherwise inconsistent" with the above principles of *Kaplan* and *Honickman*. (*See* CAC Mem. of Law on Mot. to Revise at 12.) Namely, CAC Plaintiffs state that their allegations cannot now be found deficient based on the Order's conclusions that the charities and supported individuals were not or did not act as agents or alter-egos of Saudi Arabia, that al Qaeda did not directly receive Saudi Arabia's support, that the support provided to al Qaeda was insufficiently related to the 9/11 Attacks themselves, or that Saudi Arabia did not intend to facilitate the attacks. (*See id.*) Rather, CAC Plaintiffs

urge this Court to find under *Kaplan* and *Honickman* that (1) Saudi officials, employees, and agents were "generally aware" of their role in al Qaeda's violent activities through their multifaceted support of purported charitable organizations and various individuals that were "closely intertwined" with al Qaeda; and (2) Saudi Arabia knowingly provided substantial support to al Qaeda. (*See id.* at 11.)

## B. JASTA Does Not Create Aiding-and-Abetting Liability Against Foreign States

In interpreting a statute, a court begins its statutory analysis by looking to the ordinary meaning of the statutory text, rules of grammar, and statutory context. *See N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 299–301 (2017). Where the text is clear, "extra-textual evidence" of "legislative history, purpose, and post-enactment practice" are unnecessary. *Id.* at 305; *see also United States v. Sampson*, 898 F.3d 287, 302 (2d Cir. 2018) (looking to the "plain language" of the statutory text rather than legislative history). Under the "whole-text canon," courts "do not . . . construe statutory phrases in isolation; [they] read statutes as a whole." *United States v. Morton*, 467 U.S. 822, 828 (1984). Writing for the Supreme Court in 1804, Chief Justice John Marshall noted

> That a law is the best expositor of itself, that every part of an act is to be taken into view, for the purpose of discovering the mind of the legislature; and that the details of one part may contain regulations restricting the extent of general expressions used in another part of the same act, are among those plain rules laid down by common sense for the exposition of statutes which have been uniformly acknowledged.

*Pennington v. Coxe*, 6 U.S. 33, 52–53 (1804).

Turning to the ATA, Plaintiffs cite the text of the "FINDINGS AND PURPOSE" section of JASTA to support their arguments that Congress intended to waive foreign

sovereign immunity for aiding-and-abetting terrorism claims. JASTA's purpose section reads

> The purpose of this Act is to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States.

JASTA § 2(b), 130 Stat. at 853; *see also id.* § 2(a)(6)–(7), 130 Stat. at 852–53. Yet, a "prefatory clause" of a statute that "announces an objective . . . does not change the plain meaning of the operative clause." *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 173 (2016). This Court evaluated this same purpose language of JASTA in its Order and then outlined the specific elements that a party must satisfy to meet the JASTA exception to FSIA immunity under § 1605B(b). *See In re Terrorist Attacks*, 298 F. Supp. 3d at 642; *see also Kaplan*, 999 F.3d at 855 (quoting JASTA § 2(b), 130 Stat. at 853). Similarly here, this Court must look to the operative clauses for aiding-and-abetting claims in applying the plain language of the statute to which the members of Congress agreed. *See Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1725 (2017) ("Legislation is, after all, the art of compromise, the limitations expressed in statutory terms often the price of passage, and no statute yet known 'pursues its [stated] purpose[] at all costs.'") (quoting *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987) (per curiam)) (alterations in *Henson*).

JASTA establishes civil liability of foreign states for international terrorism in the United States. Pre-JASTA, the ATA had explicitly barred claims brought thereunder from being asserted against foreign states. *See* 18 U.S.C. § 2337(2). While ATA § 2333 outlines the civil remedies available against parties responsible for acts of international terrorism,

ATA § 2337(2) reads that "[n]o action shall be maintained under section 2333 of this title

against . . . a foreign state, an agency of a foreign state, or an officer or employee of a foreign

state or an agency thereof acting within his or her official capacity or under color of legal

authority." *Id.* With the passage of JASTA, however, U.S. nationals may now assert claims

against foreign states under the ATA, "[n]otwithstanding section 2337(2) of title 18,"

provided that the requirements of JASTA's newly created FSIA exception in 28 U.S.C. §

1605B(b) are otherwise met. 28 U.S.C. § 1605B(c); *see also In re Terrorist Attacks*, 298 F.

Supp. 3d at 642 n.6. In turn, this FSIA exception of § 1605B(b) provides that a foreign

state's immunity under the FSIA is waived

> in any case in which money damages are sought against a foreign
> state for physical injury to person or property or death occurring in
> the United States and caused by—
> (1) an act of international terrorism in the United States; and
> (2) a tortious act or acts of the foreign state, or of any official,
> employee, or agent of that foreign state while acting within the scope
> of his or her office, employment, or agency, regardless where the
> tortious act or acts of the foreign state occurred.

28 U.S.C. § 1605B(b).

Section 1605B expressly establishes primary liability against a foreign state for acts

of international terrorism, not aiding-and-abetting liability. While JASTA's first significant

statutory change to the ATA was permitting U.S. nationals to assert claims thereunder

against foreign states, *see* 28 U.S.C. § 1605B(b), the second significant change was to

authorize claims against "any *person* who aids and abets, by knowingly providing substantial

assistance, or who conspires with the person who committed . . . an act of international

terrorism," *see* 18 U.S.C. § 2333(d)(2) (emphasis added); *see also In re Terrorist Attacks*,

298 F. Supp. 3d at 642 n.6. Looking to the "whole text" of JASTA to see how a foreign

state's immunity under the FSIA is waived provides the key that Plaintiffs overlook:

14

> Notwithstanding section 2337(2) of title 18, a national of the United States may bring a claim against a foreign state *in accordance with section 2333* of that title if the foreign state would not be immune under subsection (b).

28 U.S.C. § 1605B(c) (emphasis added). That is, JASTA's waiver of foreign sovereign immunity, effectively abrogating the ATA's original restrictive language in 18 U.S.C. § 2337(2) for suits against foreign sovereigns, explicitly provides that such suits must be in accordance with the language of 18 U.S.C. § 2333.

Section 2333(a) provides that any U.S. national "injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue . . . ." Then, JASTA's added language to § 2333 reads

> (d) LIABILITY.—
> (1) DEFINITION.— In this subsection, *the term 'person' has the meaning given the term in section 1 of title 1*.
> (2) LIABILITY.— In an action under subsection (a) for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization . . . , *liability may be asserted as to any person who aids and abets*, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism.

18 U.S.C. § 2333(d) (emphases added). Thus, the waiver of foreign sovereign immunity in § 2337(2) directs the courts to find liability "in accordance with" § 2333, which in turn adds a subsection for aiding-and-abetting liability that construes "person" as defined in 1 U.S.C § 1 (the "Dictionary Act"), *id.* § 2333(d)(1). This definition of "person" includes "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C § 1. Sovereigns are not included in this definition, nor should they be implied. *See, e.g., Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (noting the *expressio unius est exclusio alterius* canon applies "when the

15

items expressed are members of an 'associated group or series,' justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence") (citation omitted); *Breard v. Greene*, 523 U.S. 371, 378 (1998) (per curiam) (foreign sovereign not a "'person' as that term is used in [42 U.S.C.] § 1983"); *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 780 (2000) (applying the "longstanding interpretive presumption that 'person' does not include the sovereign").

JASTA does not subject foreign sovereigns to liability because Congress provided a narrower definition of "person" in the aiding-and-abetting subsection of § 2333(d)(1) than the ATA's "Definitions" section. *See* 18 U.S.C. § 2331(3) ("the term 'person' means any individual or entity capable of holding a legal or beneficial interest in property"). Courts generally read as meaningful "the exclusion of language from one statutory provision that is included in other provisions of the same statute." *Hamdan v. Rumsfeld*, 548 U.S. 557, 578 (2006). Here, rather than leave the ATA's broader definition of "person" in place for § 2333(d), or provide for aiding-and-abetting liability against a foreign state in its waiver of foreign sovereign immunity in 28 U.S.C. § 1605B(b), Congress enacted the aiding-and-abetting amendment with a narrowed definition which does not include a foreign state.[6] Through this narrowed definition of "person," as with all Congressional amendments, this Court must presume that Congress intended its restrictive "amendment to have real and

---

[6] Congress had innumerable other statutory methods to hold foreign sovereigns liable for aiding-and-abetting international terrorism under the ATA. For example, in waiving foreign sovereign immunity in JASTA § 1605B(c), Congress could have said a U.S. national "may bring a claim against a foreign state in accordance with section *2333(d)(2)*," as opposed to "in accordance with section *2333*," which would have demonstrated that foreign state defendants would be liable under the aiding-and-abetting subsection of § 2333(d)(2) and not merely the other subsections of § 2333. *See* 28 U.S.C. § 1605B(c) (emphases added). Alternatively, to avoid any apparent conflict with the Dictionary Act, Congress could have simply defined "person" in § 2333(d)(1) to include foreign states.

substantial effect." *See Stone v. INS*, 514 U.S. 386, 397 (1995); *see also Pennington*, 6 U.S. at 52 ("the details of one part may contain regulations restricting the extent of general expressions used in another part of the same act").

Construing the "statute[] as a whole," *see Morton*, 467 U.S. at 828, also bolsters the interpretation that JASTA excludes foreign states from aiding-and-abetting liability. Plaintiffs urge this Court to consider the prefatory language in the Dictionary Act, which advises that a word's definition applies "unless the context indicates otherwise." (CAC Reply re Mot. to Revise, ECF No. 7740, at 3 (quoting 1 U.S.C. § 1).) Here, in the context of JASTA, Congress contemporaneously waived foreign sovereign immunity for principal acts of international terrorism through an amendment to FSIA (28 U.S.C. § 1605B) and also created aiding-and-abetting liability for acts of international terrorism under the ATA without including the liability of foreign sovereigns (18 U.S.C. § 2333(d)(2)). That is, Congress considered and amended foreign sovereign immunity in one section of the Act but provided no explicit waiver of foreign sovereign immunity in its aiding-and-abetting amendment. These contemporaneous decisions in the same Act support the conclusion that Congress intentionally narrowed the definition of "person" § 2333(d)(1) to place foreign states beyond the reach of § 2333(d)(2). As a federal statute, JASTA is inherently a "settlement" and "grand bargain" from Congress that sought to balance conflicting goals, *see Sturgeon v. Frost*, 139 S. Ct. 1066, 1083–84, 1087 (2019), and it is not surprising that Congress would employ different methods when countering international terrorism in the disparate contexts of private actors and foreign governments.

Further, the text of JASTA's aiding-and-abetting liability amendment provides under the caption "EFFECT ON FOREIGN SOVEREIGN IMMUNITIES ACT" that "[n]othing

in the amendment [to § 2333] made by this section affects immunity of a foreign state . . . from jurisdiction under other law." JASTA § 4(b), 130 Stat. at 854. Given that the amendment already excludes a foreign state from its definition of a "person" who may be held liable for aiding and abetting acts of international terrorism, this text is superfluous for the purpose of interpreting § 2333. Such ambiguous language should not be construed as implying a waiver of foreign sovereign immunity in JASTA's amendment to § 2333. *See, e.g.*, *F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164 (2004) ("[T]his Court ordinarily construes ambiguous statutes to avoid unreasonable interference with the sovereign authority of other nations."). Instead, this text in JASTA § 4(b) appears to be an instance of redundant language both affirming the longstanding presumption of foreign sovereign immunity and an attempt to avoid "affect[ing the] immunity of a foreign state" through the "other law" that JASTA amends, *i.e.*, the amendment of FSIA through the added § 1605B exception. Congress may have employed the redundant language of JASTA § 4(b) inadvertently or to intentionally ensure that JASTA § 4(a) (18 U.S.C. § 2333(d)) would not waive foreign sovereign immunity for ATA aiding-and-abetting claims. *See, e.g.*, *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 106 (2011) (finding that "no interpretation" of the relevant statute "avoids excess language"); *Atl. Richfield Co. v. Christian*, 140 S. Ct. 1335, 1350 n.5 (2020) ("find[ing] it much more likely that Congress employed a belt and suspenders approach" to achieve its objectives).

Reading § 2333(d)(2) narrowly also conforms with longstanding precedent regarding foreign states and international law. As the Supreme Court recently reaffirmed in a unanimous opinion, courts must "interpret the FSIA as [they] do other statutes affecting international relations: to avoid, where possible, 'producing friction in our relations with

18

[other] nations and leading some to reciprocate by granting their courts permission to embroil the United States in expensive and difficult litigation.'" *Fed. Republic of Germany v. Philipp*, 141 S. Ct. 703, 714 (2021) (citations omitted). Reading "foreign state" into the Dictionary Act's definition of "person" is a recipe for "producing friction in our relations with [other] nations." *Id.* Moreover, doing so without explicit Congressional direction aggrandizes this Court into rendering a decision that may "lead[] some [nations] to reciprocate by granting their courts permission to embroil the United States in expensive and difficult litigation," *see id.*, through what foreign states might consider "international terrorism" under their own laws, *cf.* 18 U.S.C. § 2331(1). Congress has the power to create a FSIA exception for a foreign state that aids and abets international terrorism, if that is clearly its intention.

### C. *Kaplan* and *Honickman* Are Inapposite to Plaintiffs' Claims Against Defendant Saudi Arabia

Returning to the CAC Plaintiffs' arguments in their instant motion, neither *Kaplan* nor *Honickman* alters—nor could they—the statutory provisions that foreclose an aiding-and-abetting international terrorism claim against a foreign state. An intervening legal decision that concerns a different legal issue is "inapplicable to the question currently before this Court," and thus "cannot be considered controlling" so as to warrant reconsideration. *Cohen*, 2014 WL 240324, at *4. Here, both *Kaplan* and *Honickman* concern civil actions against privately owned Lebanese banks. *See Kaplan*, 999 F.3d at 849 (Defendant Lebanese Canadian Bank, SAL "was a banking corporation organized under the laws of Lebanon and headquartered in Beirut, Lebanon."); *Honickman*, 6 F.4th at 491 ("[Defendant] BLOM Bank is a Lebanese bank that operates internationally."). Neither case concerned a foreign state, and the Second Circuit did not interpret JASTA aiding-and-abetting liability against a

19

foreign state in either case. This Court thus lacks a "clear conviction of error with respect to a point of law on which its previous decision was predicated." *North River Ins. Co*, 63 F.3d at 165 (quotation marks and citation omitted).

Therefore, the principles of *Kaplan* and *Honickman* for evaluating aiding-and-abetting claims against a "person" under ATA § 2333(d), as guided by *Halberstam*, do not apply to CAC Plaintiffs' claims here against "non-person" Defendant Saudi Arabia. Indeed, *Kaplan* and *Honickman*'s brief discussion of the term "person" in § 2333(d)(2) conforms with the above approach for interpreting the subsection. *See Kaplan*, 999 F.3d at 854 (defining "person" by reference to § 2333(d)(1)); *Honickman*, 6 F.4th at 494 n.8 (finding "[t]he term 'person' includes corporations" because § 2333(d)(1) "incorporate[es] the definition of 'person' in 1 U.S.C. § 1").

Nothing in this decision should be construed as foreclosing Plaintiffs' primary liability claims against Saudi Arabia as permitted by JASTA. As noted above and in the 2018 Order, JASTA permits U.S. nationals to bring primary liability claims against foreign states for acts of international terrorism under the ATA, provided that JASTA's requirements for withholding sovereign immunity are otherwise met. *In re Terrorist Attacks*, 298 F. Supp. 3d at 639 (citing 28 U.S.C. § 1605B(c)). This Court will not now disturb its Order granting Plaintiffs limited jurisdictional discovery against Defendant Saudi Arabia for primary liability claims in accordance with JASTA. *Id.* at 640. The analyses in *Kaplan* and *Honickman* are in the context of aiding-and-abetting claims under § 2333(d), not primary liability claims. *See Kaplan*, 999 F.3d at 845 ("we address only [plaintiffs'] JASTA aiding-and-abetting claims" because plaintiffs "abandoned" their other claims); *Honickman*, 6 F.4th at 490 (plaintiffs claimed "BLOM Bank aided and abetted Hamas's attacks in violation of

20

JASTA"). Thus, because *Kaplan* and *Honickman* do not address primary liability, they cannot constitute "an intervening change in controlling law" for Plaintiffs' primary liability claims.[7] *See Kolel Beth*, 729 F.3d at 108 (citation omitted).

## IV. NEITHER THE RECENT SECOND CIRCUIT DECISIONS NOR THE NEWLY DISCLOSED EVIDENCE JUSTIFY FURTHER JURISDICTIONAL DISCOVERY

*Ashton* Plaintiffs move this Court for an order to compel Saudi Arabia to produce documents concerning the work, assignments, supervision, travel, and financial activities of Adel al Sadhan, Mutaeb al Sudairy, and Omar Abdi Mohamed from January 1, 1998 to September 11, 2001. (*Ashton* Mot. to Compel at 1.) Despite the referral order to Magistrate Judge Sarah Netburn on discovery disputes, (*see* Am. Order of Reference, ECF No. 4018), this Court will address the motion to compel as it relates to the CAC Plaintiffs' motion to revise, as well as the *Ashton* Plaintiffs' challenge to the limited jurisdictional discovery granted by this Court in its 2018 Order. Here, *Ashton* Plaintiffs have a two-fold burden: they must (1) demonstrate good cause to reopen document discovery and (2) point to new, material information that might cause this Court to reconsider its previous orders.

### A. Prior Discovery Orders Concerning Mohamed, Sadhan, and Sudairy

This Court's March 2018 Order denied jurisdictional discovery against Saudi Arabia with respect to Omar Abdi Mohamed based on the insufficiency of facts surrounding Mohamed's alleged tortious acts within the scope of his employment. *In re Terrorist Attacks*, 298 F. Supp. 3d at 653–55. In April 2020, upon denying Plaintiffs' motion to compel the FBI to undertake additional searches for documents relating to Mohamed,

---

[7] Similarly, this Court will not revise its Order by applying *Kaplan* and *Honickman* to Plaintiffs' state and federal common law claims, which lie beyond the framework of the Second Circuit's § 2333(d) analysis.

Magistrate Judge Netburn reiterated this Court's 2018 holding and found that "Plaintiffs do not allege any specific fact that suggests that Abdi Mohamed was part of a cell directed by Thumairy and Bayoumi to assist the hijackers." (April 27, 2020 Order, ECF No. 6582 (public and redacted), at 14–15.)

In November 2018, Magistrate Judge Netburn denied Plaintiffs' requests for document discovery concerning Adel al Sadhan and Mutaeb al Sudairy. (*See* Nov. 29, 2018 Order, ECF No. 4261.) Upon Plaintiffs' motion to vacate, Magistrate Judge Netburn stated that document discovery was over and again denied Plaintiffs' requests for further jurisdictional discovery due to insufficient evidence linking the men to the hijackers. (*See* Jan. 3, 2020 Order, ECF No. 6580 (public and redacted), at 8 ("Plaintiffs fail . . . to provide concrete allegations that either [Sadhan or Sudairy] assisted the hijackers.").) Then, in a subsequent order denying Plaintiffs' motion for reconsideration, Magistrate Judge Netburn found the evidence insufficient to show that Sadhan and Sudairy took part in the alleged plot to assist the hijackers and reiterated Plaintiffs' burden to articulate specific facts about Sadhan and Sudairy relevant to the FSIA immunity determination. (May 7, 2020 Order, ECF No. 6583 (public and redacted), at 6.) Magistrate Judge Netburn noted, however, that Plaintiffs were permitted to ask questions of Saudi government officials regarding Sadhan and Sudairy during then-upcoming depositions. (*Id.*) This Court adopted Magistrate Judge Netburn's findings. (Feb. 4, 2021 Order, ECF No. 6614, at 3 ("Plaintiffs failed to provide concrete allegations that either Al Sadhan or Al Sudairy assisted the 9/11 hijackers.").)

In the interim, Magistrate Judge Netburn also denied Plaintiffs' motion to compel the FBI to undertake additional searches for documents relating to Sadhan and Sudairy due to

22

the absence of any "specific allegation, supported by the factual record, that Sadhan and Sudairy were involved in assisting the hijackers." (April 27, 2020 Order at 12–13.)

## B. *Ashton Plaintiffs'* Motion to Compel Fails to Demonstrate Good Cause to Reopen Discovery or Point to New Evidence to Reconsider Previous Orders

Due to the inapplicability of *Kaplan* and *Honickman*'s principles on aiding-and-abetting liability under § 2333(d) for claims against a foreign state under 28 U.S.C. § 1605B, *Kaplan* and *Honickman* do not justify further jurisdictional discovery against Defendant Saudi Arabia. Neither *Kaplan* nor *Honickman* constitutes "an intervening change of controlling law" against a foreign sovereign. *See Kolel Beth*, 729 F.3d at 108 (citation omitted); *see also* discussion *supra* Section III. Thus, for the reasons stated above, *Ashton* Plaintiffs cannot rely on *Kaplan* and *Honickman*'s interpretation of § 2333(d) to justify an order to compel Saudi Arabia to produce additional documents.

### 1. *New Evidence as to Adel al Sadhan and Mutaeb al Sudairy*

This Court also rejects *Ashton* Plaintiffs' arguments that "new evidence" justifies reopening document discovery and revising previous discovery orders. *Ashton* Plaintiffs fail to demonstrate good cause for altering this Court's previous orders on jurisdictional discovery and production of documents against Saudi Arabia pertaining to Adel al Sadhan and Mutaeb al Sudairy. The Court must conduct jurisdictional discovery circumspectly and only to verify allegations of specific facts crucial to Saudi Arabia's immunity determination. *See In re Terrorist Attacks*, 298 F. Supp. 3d at 641. Here, the newly disclosed FBI documents fail to resolve the precise issue the Court identified on multiple occasions, *i.e.*, Plaintiffs' inability to provide specific allegations that Sadhan and Sudairy aided the hijackers and facilitated the 9/11 Attacks.

Just as Magistrate Judge Netburn found two years ago, the *Ashton* Plaintiffs' new "evidence connects Sadhan and Sudairy to Bayoumi and Thumairy," but it "fail[s] . . . to provide concrete allegations that either official assisted the hijackers." (Jan. 3, 2020 Order at 8.) The FBI's criminal investigation titled Operation Encore began in 2007 to determine how 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar integrated into Southern California in 2000. (*See e.g.*, Operation Encore [redacted] Overview, ECF No. 7482-1, at EO14040-000583.)[8]  Sadhan and Sudairy worked as Saudi Ministry of Islamic Affairs propagators in the United States between 1998 and 2002. (*See* Jan. 3, 2020 Order at 7; *Ashton* Mot. to Compel at 5.)   *Ashton* Plaintiffs highlight an FBI overview report on Operation Encore for the theory that Sadhan and Sudairy "*possibly* served in the capacity of an advance intelligence team involved in laying the groundwork for 9/11 hijackers al-Hazmi and al-Mihdhar, before their arrival in Southern California in early 2000." (*See Ashton* Mot. to Compel at 6 (quoting Operation Encore [redacted] Overview, at EO14040-000583) (emphasis added).) The FBI report qualifies the "advance intelligence team" theory merely as "possibl[e]," (*see* Operation Encore [redacted] Overview, at EO14040-000583), and the Court has previously emphasized necessary caution when "relying on unsupported 'conclusions' in investigative documents," (*see* Nov. 25, 2019 Order, ECF No. 6579, at 13–14 n.5).

Moreover, the FBI report's following sentence undercuts the *Ashton* Plaintiffs' theory by reiterating the absence of any direct link between Sadhan and Sudairy and the 9/11 hijackers. (*See* Operation Encore [redacted] Overview, at EO14040-000583 ("There is no indication al-Sadhan and al-Sudairy had direct contact with the hijackers, however similar

---

[8] References herein to EO14040 are to the Bates numbers assigned to the documents as produced by the FBI pursuant to President Biden's Executive Order 14040.

associations, communications, and logistics mirror those of the hijackers upon their arrival.").) Other excerpts from the FBI reports similarly convey that the allegations against Sadhan and Sudairy consist of theories describing only what "may" have happened. (*See, e.g.*, Sept. 28, 2010 FBI Report, ECF No. 7482-1, at EO14040-000591 ("Al Sadhan and Al Sudairy may have served as an advance team"); *id.* at EO14040-000596 ("Al Sadhan and Al Sudairy may have assisted in laying the groundwork").) The Operation Encore summary noted that, aside from "suspicious" patterns and associates, there was "no independent [redacted] information that [Sadhan and Sudairy] were working at the behest of a terrorist network." (Operation Encore [redacted] Overview, at EO14040-000585.) The FBI ultimately rejected the operative theories about Sadhan and Sudairy when it closed Operation Encore in May 2021 without "identif[ying] additional groups or individuals responsible for the [9/11 Attacks] other than those currently charged, which is consistent with the final conclusion of the [2004] 9/11 Commission Report . . . ." (FBI Administrative Case Closure, ECF No. 7584-1, at EO14040-000011.)

Thus, *Ashton* Plaintiffs have neither demonstrated good cause to reopen discovery nor provided new evidence to justify reconsidering the Court's past discovery orders at this late date. Plaintiffs took the depositions of Sadhan and Sudairy, which corroborated the newly disclosed FBI report on the lack of "direct contact" or other assistance between the men and 9/11 hijackers Hazmi or Mihdhar. (*Compare* Saudi Arabia's Op. to *Ashton* Mot. to Compel at 7–8 (summarizing Sadhan and Sudairy's denial of any contact with or aid to the hijackers), *with* Operation Encore [redacted] Overview, at EO14040-000583–85 (no indication Sadhan or Sudairy had direct contact with or work at the behest of a terrorist organization).) Further, Magistrate Judge Netburn's April 27, 2020 Order already addressed

the arguments that *Ashton* Plaintiffs now rehash through the newly disclosed FBI reports. (*Compare* April 27, 2020 Order at 12 (Plaintiffs' newly available evidence involving Bayoumi "does not suggest that Sadhan and Sudairy had any connection with the hijackers."), *with Ashton* Mot. to Compel at 6 ("There is no indication al-Sadhan and [a]l-Sudairy had direct contact with the hijackers . . . ." (quoting EO14040-000583)).)

After repeated discovery orders concerning Sadhan and Sudairy, *Ashton* Plaintiffs impermissibly use their motion to compel as "a vehicle for relitigating old issues" and for "otherwise taking a [fifth] bite at the apple." *See Analytical Survs., Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012) (quotation marks and citation omitted); *see* discussion of four previous discovery orders *supra* Section IV.A. While reconsideration may be appropriate where there is "the availability of new evidence, or the need to correct a clear error or prevent manifest injustice," *Kolel Beth*, 729 F.3d at 108 (citation omitted), "[a] motion for reconsideration is not an opportunity for a losing party to advance new arguments to supplant those that failed in the prior briefing of the issue." *Weiss v. El Al Isr. Airlines, Ltd.*, 471 F. Supp. 2d 356, 358 (S.D.N.Y. 2006). As the Court already stated in its previous discovery order, "the availability of new evidence" must be sufficient to "alter[] the Court's prior conclusions." (*See* May 7, 2020 Order at 5–6 (quotation marks and citation omitted).) Plaintiffs have not met their burdens.

### 2. *New Evidence as to Omar Abdi Mohamed*

The newly disclosed FBI documents also fail to justify additional discovery from Saudi Arabia concerning Omar Abdi Mohamed. Mohamed entered the United States in 1998 as a religious worker and was also employed by the Saudi Ministry of Islamic Affairs as a propagator of Islam. *In re Terrorist Attacks*, 298 F. Supp. 3d at 653–54. In its original Order

26

evaluating the facts of Mohamed's alleged conduct, this Court concluded that "Plaintiffs allege no non-conclusory facts, and provide no evidence, to support the claim that Mohamed [funneled money to al Qaeda to help plan and facilitate the 9/11 Attacks] within the scope of his employment as a missionary." *Id.* at 654.

Here, *Ashton* Plaintiffs do not point to any newly disclosed FBI documents to bolster their rehashed and unsubstantiated allegations against Mohamed as a funder of al Qaeda within the scope of his employment. *Ashton* Plaintiffs state, without any specific citation to new evidence, that "the documents show that Thumairy and others within the Saudi government directed Abdi Mohamed's money laundering activities for al Qaeda." (*Ashton* Mot. to Compel at 12.)

Instead, the new evidence *Ashton* Plaintiffs do selectively cite includes a newly released FBI report about payments from an account allegedly tied to Thumairy that dispersed payments to someone associated with members of the Somali-based terrorist organization Al-Ittihad Al-Islamia (AIAI). (*See Ashton* Reply re Mot. to Compel, ECF No. 7605, at 10 (quoting Feb. 19, 2009 FBI Report, ECF No. 7482-1, at EO14040-000563).) The report states that Mohamed was a leader of AIAI and "received a portion of the Saudi largess [sic] for his activities." (*See id.* (quoting Feb. 19, 2009 FBI Report, at EO14040-000564).) As in 2018, *Ashton* Plaintiffs "claim that this newly discovered evidence shows that Mohamed was part of the same Southern California al Qaeda cell as Thumairy and Bayoumi, among others, and that Mohamed provided money-laundering services for al Qaeda at the direction of senior Saudi officials." *In re Terrorist Attacks*, 298 F. Supp. 3d at 654; (*see also Ashton* Reply re Mot. to Compel at 9–10). Yet, as this Court found in 2018 regarding

Mohamed's allegedly illicit terrorist funding through the Western Somali Relief Agency, the FBI report on a Thumairy-linked account that paid either Mohamed or the AIAI

> does not support the inference that Mohamed was part of the cell that Thumairy directed to provide support to the *9/11 hijackers* upon their arrival in California. Nor does it suggest, as Plaintiffs argue, *that Thumairy, or any other Saudi official, directed Mohamed to deliver funds to al Qaeda.*

*Id.* at 655 (emphases added). As in March 2018, Plaintiffs' newly discovered evidence of allegations as to Omar Abdi Mohamed come up short. *See id.* Plaintiffs have neither demonstrated good cause to reopen document discovery against Saudi Arabia nor provided evidence to justify reconsideration of the Court's past discovery orders at this late date.

## V. CONCLUSION

Because *Kaplan* and *Honickman*'s principles of aiding-and-abetting liability under 18 U.S.C. § 2333(d) are inapposite to Plaintiffs' claims against a foreign state under 28 U.S.C. § 1605B, CAC Plaintiffs' motion to revise the March 2018 Order is DENIED. For the same reasons and for the lack of good cause to reopen document discovery or to reconsider previous discovery orders, *Ashton* Plaintiffs' motion to compel production is also DENIED.

The Clerk of Court is directed to close the open motion at ECF No. 7481.

Dated: February 7, 2023
New York, New York

SO ORDERED.

GEORGE B. DANIELS
United States District Judge

28