```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  9/26/2025
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ABRAHAM FRAENKEL, et al.,

                              Plaintiffs,

          v.

STANDARD CHARTERED BANK,

                              Defendant.

No. 24-CV-4484 (MMG) (RWL)

---

SHMUEL BRAUNER, et al.,

                              Plaintiffs,

          v.

STANDARD CHARTERED BANK,

                              Defendant.

No. 24-CV-5788 (MMG) (RWL)

**OPINION & ORDER**

---

MARGARET M. GARNETT, United States District Judge:

Plaintiffs are ninety victims, or representatives of victims, who were tragically injured or killed in a series of terrorist attacks in Israel and Iraq between 2010 and 2019 (the "Attacks"). In June and July 2024, Plaintiffs commenced two separate but related actions against Standard Chartered Bank ("SCB" or "Defendant") in this district. Each suit brought claims pursuant to the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), *id.* § 2333(d)(2), asserting that SCB aided and abetted the Attacks by providing financial and logistical support to individuals and entities that funded the foreign terrorist organizations ("FTOs") responsible for the Attacks. These actions have been provisionally consolidated.

Pending before this Court is SCB's motion to dismiss the consolidated amended complaint ("Complaint"), which argues that Plaintiffs have failed to state a claim, that this Court lacks personal jurisdiction over it, and that claims arising from attacks in 2010 and 2011 are time-barred under ATA's statute of limitations. For the reasons set forth below, the Court finds that Plaintiffs have failed to state a plausible claim for relief under JASTA and accordingly the motion to dismiss is GRANTED. Plaintiffs will be afforded an opportunity to amend if they have a good faith basis to do so in light of the findings in this Opinion.

## BACKGROUND

### I.    RELEVANT FACTS

The following facts are drawn from the Complaint and documents incorporated by reference. Well-pleaded, non-conclusory allegations are assumed to be true for purposes of resolving the pending motion to dismiss. *See Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017).

#### A.    The Parties

Plaintiffs are ninety individuals, each of whom was a victim—or is the family member or representative of a victim[1]—in one of twelve different terrorist attacks that occurred in Israel and Iraq between 2010 and 2019. Dkt. No. 34 ("FAC") ¶ 15.[2] Each Attack was "committed, planned, or authorized" by one or more of four purported FTOs: Hezbollah,[3] Hamas, Palestinian Islamic Jihad ("PIJ"), and Jaysh al-Mahdi ("JAM").[4] FAC ¶¶ 2, 1170. Each FTO is a "prox[y]

---

[1] Each Plaintiff is a U.S. national or the survivor, heir, or estate of U.S. national. FAC ¶ 16.

[2] Docket numbers refer to *Fraenkel v. Standard Chartered Bank*, No. 24-CV-4484, which is the lead case for the two related, and currently consolidated, actions.

[3] This Opinion employs the spelling of Hezbollah that Plaintiffs primarily use in the Complaint, except where quoting from documents that use an alternate spelling.

[4] SCB disputes that JAM has ever been designated an FTO. *See* Mot. to Dismiss 9 n.6.

for elements of the Iranian government committed to financing terrorist attacks," which Plaintiffs refer to as "Iran's Terrorist Sponsors." *Id.* ¶ 2; *see also id.* ¶¶ 49–50 (In order "to force the [United States] to exit the Middle East and abandon its allies there . . . the Iranian regime developed . . . a vast infrastructure of institutions organized within the government to facilitate terrorist attacks by proxies throughout the region."). Among "Iran's Terrorist Sponsors," Plaintiffs allege, are (1) the Foundation for the Oppressed; (2) the Supreme Leader Ayatollah Ali Khamenei and The Supreme Leader's Office ("SLO"); (3) the Islamic Revolutionary Guard Corps ("IRGC"); (4) Hezbollah; and (5) the Friday Prayer Leader Organization. *Id.* ¶ 50. Plaintiffs assert that these "Terrorist Sponsors" are "the world's foremost sponsors of anti-American terrorism, and they are adept at converting their financial resources into American casualties—both directly and through a robust network of terrorist proxies including Hezbollah, Hamas, Jaysh Al-Mahdi, and Palestinian Islamic Jihad." *Id.* ¶ 13. Plaintiffs further allege that SCB knew these facts. *Id.*

Defendant SCB is a wholly-owned subsidiary of Standard Chartered PLC ("SC PLC"), a non-party international bank that operates in more than sixty countries. *Id.* ¶¶ 17–18. Both SCB and SC PLC have their principal place of business in London, England. *Id.* As an international bank, SCB has branches globally, including in Dubai in the United Arab Emirates, The Gambia, and—before relocation of the branch—in Tehran, Iran. *Id.* ¶¶ 8, 21, 186, 483. Notably, SCB also operates a New York branch in Manhattan, where its principal U.S. corporate office is located. *Id.* ¶ 19. Among other financial and logistical services, SCB's New York branch helps customers convert payments from foreign currencies into U.S. dollars, a process known as "U.S. dollar clearing." *Id.* ¶ 20. "U.S. dollar clearing is the process by which U.S. dollar-denominated transactions are satisfied between counterparties through a U.S. bank; payments are converted

3

from a foreign currency into U.S. dollars." *Id.* ¶ 473.  U.S. dollar clearing is a valuable, and legitimate, service.  Indeed, Plaintiffs allege that "[p]articipation in global commerce depends on access to U.S. dollars and dollar clearing services."  *Id.*  The "cornerstone" of SCB's business strategy in the Middle East was its provision of such services to its customers.  *Id.* ¶ 473.  During the relevant time period, Plaintiffs allege that "nearly all of SCB's relevant transactions were denominated in U.S. dollars and therefore cleared and settled in New York through the NY Branch."  *Id.* ¶ 22.

The core of Plaintiffs' theory of liability is that SCB aided and abetted the Attacks by "systematically and knowingly enabl[ing] fronts and agents for Iran's Terrorist Sponsors to finance terrorist operations by transferring billions of dollars on their behalf while helping them evade counterterrorism controls," despite "receiv[ing] numerous direct warnings from U.S. government officials and others that Iran's Terrorist Sponsors were using fronts and agents, particularly in its oil and gas sector, to provide critical financial and logistical support to anti-American terrorists worldwide."  *Id.* ¶ 3; *see also id.* ¶ 477 (alleging that, from 2001 until 2014 or 2015, SCB "engaged in a deceptive and illegal scheme to provide its Iranian customers with covert and largely unfettered back-door access to the U.S. financial system").  Put differently, Plaintiffs allege that SCB aided and abetted the Attacks by providing both legitimate and illegitimate financial services to customers that were agents or funders of the "Terrorist Sponsors," which in turn funded the FTOs that committed the Attacks.

### B. Relevant SCB Customers Alleged to be Agents or Funders of Terrorist Sponsors

#### 1. The Central Bank of Iran, Bank Saderat, and Bank Melli

Plaintiffs allege that SCB aided and abetted the Attacks through its provision of financial services to several banks who were themselves affiliated with Iran's Terrorist Sponsors, namely

4

the Central Bank of Iran, Bank Saderat, and Bank Melli. *Id.* ¶ 4. SCB purportedly "facilitated these banks' access to New York's financial system and U.S. dollar clearing while laundering their transactions to hide Iran's role." *Id.* ¶ 4. In so doing, SCB disregarded U.S. counter-terrorism warnings and controls. *Id.* ¶ 6. As early as 2006, for example, the U.S. Department of the Treasury ("Treasury") stated that "Bank Saderat facilitates Iran's transfer of hundreds of millions of dollars to Hizballah and other terrorist organizations each year." *Id.* ¶ 729. In 2007 and 2008, the Secretary of Treasury warned that "the Central Bank of Iran was sending money through Bank Saderat to Hizballah," members of Congress "call[ed] for the bank's designation as a 'terrorist entity,'" and other Congressional members called it the "central bank of terrorism" and stated that it was "heavily involved in the funding of terrorism." *Id.* ¶ 564.

### 2. Caspian Petrochemical FZE

Plaintiffs allege that SCB further aided and abetted the Attacks by "mov[ing] at least $150 million" for Caspian Petrochemical FZE ("Caspian"), an Iranian petrochemical company, which SCB purportedly "knew was a front for Iran's Terrorist Sponsors." *Id.* ¶ 9. Caspian was not "a normal company," but rather "was fully captured by the IRGC, led by, and comprised of, avowed supporters and financiers of [FTOs], and operated for the benefit of their shared mission to sponsor terrorist attacks targeting the United States." *Id.* ¶ 376. It "provided key financial and logistical aid to acts of terrorism committed by Hezbollah" and other organizations "by directing funds to the IRGC through a web of contracting arrangements with other IRGC businesses." *Id.* ¶ 375.

SCB's support of Caspian, therefore, "enabled Iran's Terrorist Sponsors and its terrorist proxies to access the resources they needed to carry out vicious terrorist attacks on Americans, including the attacks that injured Plaintiffs." *Id.* ¶ 9. In particular, SCB "falsified customer due

diligence documents, stripped wires, lied to [the Office of Foreign Assets Control ("OFAC")], and coached [Caspian] about how to evade counterterrorism controls, enabling it to move money through the U.S. financial system and providing covert access to prohibited U.S. dollar services." *Id.* ¶ 9.  SCB committed these acts despite U.S. government warnings that "Iran was using its oil and gas sector to fund terrorism, and that Iran's Terrorist Sponsors had effectively seized control of the sector."  *Id.* ¶¶ 8–9.

### 3.  Mahmoud Reza Elyassi

Mahmoud Reza Elyassi is an Iranian national and "likely IRGC agent" who was another customer of SCB.  *Id.* ¶ 594.  Plaintiffs allege that SCB aided and abetted the Attacks by "[p]rovid[ing] evasion advice and prohibited financial services to IRGC agent Mahmoud Reza Elyassi and his companies."  *Id.* ¶¶ 10, 597; *see also id.* ¶ 809 (explaining the belief that Elyassi was "an agent for the IRGC and SLO" because "no Iranian national could have displayed the profile, or engaged in the transactions, like Elyassi, without the IRGC's and SLO's knowledge"). Elyassi's purported "business activities" all "occurred in sectors over which the IRGC had monopolies."  *Id.* ¶ 10.  Although Elyassi "claimed to operate an import-export business," Plaintiffs say, he "in fact operated a currency exchange that allowed money to flow in and out of Iran in tremendous quantities."  *Id.*  SCB's "coaching [of] Elyassi and his businesses about ways to evade sanctions, deceiving their own compliance personnel into approving prohibited transactions, and obscuring who the bank was dealing with" therefore generated or made available funds that in turn "fueled terrorist violence against Americans."  *Id.*  Elyassi was later indicted in the United States for evading sanctions on Iran, aided by SCB employees in Dubai. *Id.* ¶¶ 11, 594.

6

### 4. Individuals and Companies Led by Muhammad Bazzi

Plaintiffs further assert that SCB aided and abetted the Attacks through its Gambian branch's provision of services to individuals and companies led by Muhammad Bazzi, as well as the Bazzi-affiliated entity Euro African Group Ltd. ("EAGL"). *Id.* ¶¶ 377–8, 380. OFAC designated an associate of Bazzi, as well as his telecom companies, as Specially Designated Global Terrorists ("SDGTs") in 2016. *Id.* ¶ 380. OFAC designated Bazzi, EAGL, and related companies as SDGTs in 2018. *Id.* ¶¶ 380, 676. Plaintiffs assert that these designations "confirm[ed] both [Bazzi's] corrupt dealings with [his business associate], and his longstanding ties to Hezbollah's narcotics and money laundering operations." *Id.* ¶ 380. In 2024, Bazzi pled guilty in the Eastern District of New York to conspiracy to conduct, and to cause United States persons to conduct, unlawful transactions with an SDGT. *Id.*

### 5. Tajco Ltd.

Tajco Ltd. was a customer of SCB between 2008 and 2010. Plaintiffs say that SCB violated JASTA by helping Tajco to "access the international financial system," despite knowing that it was co-owned by the Tajideen brothers, "who had multiple businesses acting as fronts to provide funding and resources to Hezbollah." *Id.* ¶ 383. In May 2009, the U.S. Department of the Treasury designated Kassim Tajideen an SDGT for supporting Hezbollah and stated, among other things, that "Kassim Tajideen and his brothers run cover companies for Hizballah in Africa." *Id.* ¶ 382. Plaintiffs allege that, "[a]s of February 2007, Kassim Tajideen owned Tajco and used proceeds from this business to provide millions of dollars in financial support to Hizballah." *Id.* ¶ 381.

### C. Publication of SCB's Misconduct

The Complaint relies heavily on the admissions of misconduct contained in agreements

SCB entered with U.S. authorities in 2012 and 2019, including two deferred prosecution agreements with the Department of Justice.  *Id.* ¶¶ 4–7, 11, 31.  These agreements revealed SCB's "disregard of" certain counterterrorism measures regarding Iran, including sanctions that largely barred Iran and certain Iranian nationals and entities from the U.S. financial system.  *Id.* ¶¶ 6, 477, 502.  A consent order with the New York Department of Financial Services stated, for example, that "SCB designed and implemented an elaborate scheme by which to use its New York branch as a front for prohibited dealings with Iran—dealings that indisputably helped sustain a global threat to peace and stability."  *Id.* ¶ 7.

Pursuant to the various 2012 agreements, SCB paid "millions of dollars and promised that its offending conduct had ceased in 2007."  *Id.* ¶ 7.  SCB's conduct nonetheless continued between 2008 and 2015, as the Dubai branch of SCB—newly relocated from Iran—"continued to covertly move money for fronts and agents of Iran's Terrorist Sponsors."  *Id.* ¶ 8.  In 2019, a second deferred prosecution agreement became public.  Pursuant to this 2019 agreement, SCB made admissions and paid additional penalties for violations of Iran-related sanctions it committed between 2009 and 2014.  *Id.* ¶ 11.  An SCB employee, who managed Defendant's relationship with Caspian and Elyassi, also pled guilty to criminal charges.  *Id.* ¶ 11.

### D.  SCB's Knowledge of its Customers' Connections to Terrorist Activity

Plaintiffs assert that SCB was aware that its customers were linked to "Terrorist Sponsors."  SCB helped Iranian customers "to make, move, and spend hundreds of millions of dollars" for more than a decade, despite explicit and dire warnings from governmental authorities about the risks associated with these transactions.  *Id.* ¶¶ 13, 14; *see also id.* ¶ 406 (citing 2008 fact sheet published by the Treasury, warning of "the extreme risk that illicit Iran-related transactions processed through the U.S. banking system funded IRGC-sponsored acts of

terrorism").  Defendant helped its Iranian customers evade the sanctions regime despite the issuance of public statements by the U.S. and other countries that their sanctions were specifically intended to reduce acts of terrorism by starving sponsors of money.  *See id.* ¶ 416.  SCB knew, Plaintiffs say, that these "Terrorist Sponsors" were not simply government agencies or officials, but controlled well over half of the Iranian economy, *id.* ¶ 424, and held a monopoly over certain sectors of the economy, including "oil, gas, construction, import/export, and communications," *id.* ¶ 431.  SCB knew these facts through its own due diligence on its customers, its internal intelligence and analyst function, its contacts with other banks and with regulators, and its offices and employees in Iran until 2012 and later in Dubai, where "[t]he pervasive role that Iran's Terrorist Sponsors and their fronts played in the Iranian economy was a matter of common knowledge."  *Id.* ¶¶ 480–83.  In response to concerns that SCB's New York employees raised in 2006 regarding the company's business with Iranians, an Executive Director from London responded, "You fucking Americans. Who are you to tell us, the rest of the world, that we're not going to deal with Iranians."  *Id.* ¶ 6 (emphasis omitted).  Plaintiffs allege that this statement "conveyed SCB's prevalent attitude," *id.*, and demonstrated SCB's general awareness "that the bank was playing a role in very serious unlawful activities," *id.* ¶ 553.

## II.    PROCEDURAL HISTORY

In June 2024, a subset of Plaintiffs commenced *Fraenkel v. Standard Chartered Bank*, No. 24-CV-4484.  Soon after, the remainder of Plaintiffs brought *Brauner v. Standard Chartered Bank*, No. 24-CV-5788, and Judge Abrams—to whom this matter was previously assigned—accepted the second action as related.  *See* Dkt. No. 22 ("Stipulation and Order") at 2.  Consistent with the Stipulation and Order, Plaintiffs filed the Complaint on October 29, 2024.  Dkt. No. 33.

Plaintiffs moved to consolidate the actions.  Dkt. No. 29.  Finding the motion premature, Magistrate Judge Lehrburger, to whom this matter was referred for resolution of all pretrial matters, granted consolidation of the actions through the motion to dismiss stage, and otherwise denied the motion without prejudice to renewal at the appropriate time.  Dkt. No. 36.

Defendants thereafter moved to dismiss the Complaint.  Dkt. No. 40 ("Mot. to Dismiss").  Plaintiffs opposed the motion.  Dkt. No. 43 ("Opp.").  The parties each filed a number of subsequent letters calling the Court's attention to supplemental authorities in this Circuit.  *See* Dkt. Nos. 51–56.

On September 8, 2025, Judge Abrams recused herself from this action and the action was reassigned to the undersigned.

**DISCUSSION**

SCB principally moves to dismiss the Complaint under Rule 12(b)(6) for failure to state a claim, and also argues that any claims arising from attacks in 2010 and 2011 are time-barred in any event.  SCB also seeks dismissal under Rule 12(b)(2) due to the asserted lack of personal jurisdiction over SCB.  For the reasons set forth below, the Court GRANTS SCB's motion to dismiss for failure to state a claim and denies the motion in all other respects.

I.    **LEGAL STANDARDS**

A.  **Rule 12(b)(6)**

To survive a motion to dismiss under Rule 12(b)(6), the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).[5]  "A claim has facial plausibility when the plaintiff pleads factual content that

---

[5] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes and omissions, and adopt alterations.

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge [plaintiff's] claims across the line from conceivable to plausible." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678. When considering a Rule 12(b)(6) motion, the Court must "accept plaintiffs' plausible allegations as true and draw all reasonable inferences in their favor." *Fernandez v. Zoni Language Ctrs., Inc.*, 858 F.3d 45, 48 (2d Cir. 2017).

An action must also be dismissed pursuant to Rule 12(b)(6) where the applicable statute of limitations bars it. Dismissal at the complaint stage is warranted when "it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Sewell v. Bernardin*, 795 F.3d 337, 339 (2d Cir. 2015).

### B. Rule 12(b)(2)

"In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013). "Determining personal jurisdiction over a foreign defendant in a federal-question case such as this requires a two-step inquiry." *Id.* at 168. The Court examines first whether there is "a statutory basis for personal jurisdiction." *Pharmacy-Checker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*, 530 F. Supp. 3d 301, 321 (S.D.N.Y. 2021). "If jurisdiction lies, [the Court] consider[s] whether the district court's exercise of personal jurisdiction over a foreign defendant comports with due process protections established under the United States Constitution." *Licci*, 732 F.3d at 168.

11

**II.      The Court Declines to Strike Material Under Rule 8**

As an initial matter, Defendant raises the specter of a Rule 8 challenge, asserting that Plaintiffs' "extraneous allegations violate Rule 8(a)." Mot. to Dismiss 11. SCB does not, however, explicitly move this Court to strike any portion of the complaint or to dismiss it on this basis. Even if it had, the Court would decline the invitation.

Federal Rule of Civil Procedure 8 requires, in pertinent part, that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "The statement should be short because unnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage." *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). "When a complaint does not comply with the requirement that it be short and plain, the court has the power, on its own initiative or in response to a motion by the defendant, to strike any portions that are redundant or immaterial, or to dismiss the complaint." *Id.* The Second Circuit has cautioned that dismissal is "usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Id.* That is not the case here.

While the Court generally shares Defendant's sentiment that Plaintiffs' 427-page amended complaint is unnecessarily prolix, no portions will be stricken, as the subject matter is undeniably complex and the pleading does not "overwhelm the defendants' ability to understand or to mount a defense" nor is it "so lacking in form as to warrant dismissal." *Wynder v. McMahon*, 360 F.3d 73, 80 (2d Cir. 2004). Accordingly, to the extent Defendant makes a Rule 8 challenge to the Complaint, it is denied.

**III.    The Complaint Fails to State a Claim**

Defendant primarily argues that Plaintiffs have not stated a plausible claim under JASTA. The Court agrees.[6]

**A.  JASTA**

The ATA authorizes "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, [to] sue therefor in any appropriate district court of the United States."  18 U.S.C. § 2333(a).  In 2016, Congress amended the ATA to create a cause of action for secondary liability under JASTA.  *See Siegel v. HSBC Bank USA, N.A.*, No. 17-CV-06593 (DLC), 2018 WL 3611967, at *4 (S.D.N.Y. July 27, 2018), *aff'd sub nom. Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217 (2d Cir. 2019).  Pursuant to JASTA, "for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization . . . , liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism."  18 U.S.C. § 2333(d)(2).

"When Congress enacted JASTA, it explicitly endorsed the D.C. Circuit's analysis in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), as the proper legal framework for assessing aiding-and-abetting claims."  *Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420, 435 (2d Cir. 2025).  "*Halberstam* outlined three elements for aiding-and-abetting liability":

> First, the party whom the defendant aids must perform a wrongful act that causes an injury. Second, the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance. Finally, the defendant must knowingly and substantially assist the

---

[6] SCB also moved to dismiss Plaintiffs' claims arising from Attacks in 2010 and 2011 as time-barred pursuant to Rule 12(b)(6).  Because the entire action is dismissed for failure to state a claim, the Court does not reach the merits of this claim.

principal violation. *Halberstam* further identified six factors relevant to whether a defendant's assistance qualified as substantial: (1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance.

*Id.* at 435.

The Second Circuit has applied this framework on multiple occasions since JASTA's enactment. In *Siegel v. HSBC North American Holdings, Inc.*, 933 F.3d 217 (2d Cir. 2019), the defendant banks had purportedly provided services to a third-party bank, which had helped to finance the FTO that committed the attacks on the plaintiffs. The Second Circuit concluded that the plaintiffs had not plausibly alleged "that [the defendants] knowingly assumed a role in . . . terrorist activities or substantially assisted" in those activities. *Id.* at 225–26. The Court reasoned that the pleadings "establish[ed], at most" that the defendant banks had "helped" the third-party bank to "violate banking regulations despite knowing that [that third-party bank] supported terrorist organizations"—but this did not amount to knowing and substantial assistance of the FTO or the attacks under JASTA. *Id.* Accordingly, the Court affirmed the dismissal of the plaintiffs' JASTA claim. *See also Honickman v. BLOM Bank SAL*, 6 F.4th 487, 502–03 (2d Cir. 2021) (concluding that plaintiffs had not plausibly alleged defendant's general awareness that customers had connections to FTO, where such connections were not "public knowledge during the relevant period").

In *Kaplan v. Lebanese Canadian Bank, SAL*, by contrast, the Court vacated the dismissal of a JASTA claim predicated on the defendant bank's provision of financial services to individuals "integral" to the FTO that had committed attacks by which the plaintiffs were injured. 999 F.3d 842 (2d Cir. 2021). The Court reasoned that the plaintiffs had plausibly alleged the bank's "general awareness" that customers were "playing a role in" the FTO's

14

terrorist activities, because, in the years leading up to the attacks, the FTO had published statements that the defendant's customers were "integral parts of" the FTO. *Id.* at 864–67. With these pleadings—as well as the plaintiffs' plausible allegations that the defendant had "knowingly" given its customers "special treatment" that allowed them to "circumvent[]" antiterrorism sanctions, *id.*—the plaintiffs had stated a JASTA claim.

   Not long after *Kaplan*, the Supreme Court issued its decision in *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), further clarifying the common law principles and the *Halberstam* framework for assessing JASTA claims.  The *Twitter* plaintiffs claimed that the petitioner and named defendants—known when the suit commenced as Twitter, Inc., Facebook, Inc., and Google, Inc., *see id.* at 479 & n.3—had each aided and abetted ISIS by failing to stop it from using their platforms "to recruit new terrorists and to raise funds for terrorism," despite knowing that ISIS was using their platforms.  *Id.* at 478.  The *Twitter* Court explained that "both JASTA and *Halberstam*'s elements and factors rest on the same conceptual core that has animated aiding-and-abetting liability for centuries: that the defendant consciously and culpably participated in a wrongful act so as to help make it succeed."  *Id.* at 493.  "The phrase 'aids and abets' in § 2333(d)(2), as elsewhere," it explained, "refers to a conscious, voluntary, and culpable participation in another's wrongdoing."  *Id.*  Accordingly, the factors articulated in *Halberstam* "should be understood in light of the common law and applied as a framework designed to hold defendants liable when they consciously and culpably participated in a tortious act in such a way as to help make it succeed."  *Id.* at 497.  The point of the six *Halberstam* factors, then, "is to help courts capture the essence of aiding and abetting: participation in another's wrongdoing that is both significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor."  *Id.* at 504.

The Court concluded that plaintiffs' allegations "f[e]ll short" of showing that the defendant platforms "gave such knowing and substantial assistance to ISIS that they culpably participated in the . . . attack" by which the plaintiffs were injured. *Id.* at 497. The plaintiffs had not alleged "affirmative misconduct" on the part of defendants—such as "special treatment," "words of encouragement," or "screen[ing] any content before allowing users to upload it"—but rather "passive nonfeasance" by failing to stop ISIS from using its platforms. *Id.* at 498–500. Because "both tort and criminal law have long been leery of imposing aiding-and-abetting liability" in such circumstances, to establish culpability for an attack in such circumstances, "a strong showing of assistance and scienter would thus be required." *Id.* at 500. The pleadings could not meet that standard.

Furthermore, the Court concluded that the plaintiffs had failed to allege a nexus between the defendants' conduct and the attacks, as JASTA so requires. Although this nexus need not be "strict," in this case the relationship was too "highly attenuated" to give rise to liability. *Id.* at 497. In the absence of a "concrete nexus," the Supreme Court explained that plaintiffs may show that defendants "systemically and pervasively assisted" the FTO such that they "could be said to aid and abet every single" one of their attacks, *id.* at 501–502 (explaining that the provision of "dangerous wares . . . could constitute aiding and abetting a foreseeable terror attack")—but the plaintiffs had not made such allegations in *Twitter*. Accordingly, the Court concluded that the plaintiffs had not stated a JASTA claim.

The Second Circuit applied *Twitter* for the first time in *Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420 (2d Cir. 2025), a case which guides the Court's analysis today. In *Ashley*, victims of terrorist attacks in Afghanistan and their families—represented by the same counsel as here—filed suit against SCB and two international banks for aiding and abetting those

attacks, in violation of JASTA.  The plaintiffs alleged that the defendant banks had provided
routine as well as fraudulent banking services to customers linked to a "web of terrorists"
associated with the attacks.  *Id.* at 427.  The Second Circuit affirmed the district court's dismissal
of these claims.

      *Ashley*'s summary of the requirements of JASTA is instructive.  It explained: "The first
requirement under *Halberstam*'s framework is that the party whom the defendant aids must
perform a wrongful act that causes an injury."  *Id.* at 437.  This includes conduct where the
"relevant substantial assistance was given to an intermediary," "so long as the defendant's acts
aided and abetted the principal."  *Id.*

      Second, the defendant "must be generally aware of his role as part of an overall illegal or
tortious activity at the time that he provides the assistance."  *Id.* at 438.  In cases involving banks,
a court may ask "(1) whether the bank was aware of the customers' connections with the terrorist
organization before the relevant attacks; and (2) whether the customers were so closely
intertwined with the terrorist organization's violent terrorist activities that one can reasonably
infer that the bank was generally aware of its role in unlawful activities from which the attacks
were foreseeable while it was providing financial services to those customers."  *Id.*  A plaintiff
may plausibly allege awareness through citation to "public sources, such as media articles
predating the attacks," even in the absence of allegations that the bank saw or should have seen
the source.  *Id.*

      Third, a plaintiff must establish "that the defendant provide[d] knowing and substantial
assistance."  *Id.*  These "twin requirements . . . work in tandem—a lesser showing of one
demands a greater showing of the other."  *Id.*  This third element "is designed to capture the
defendants' state of mind with respect to their actions and the tortious conduct."  *Id.*  Relatedly,

the plaintiff must allege that the defendant actually "aid[ed] and abet[ed] the act of international terrorism that injured the plaintiffs," although *Twitter* instructs that this element "does not always demand a strict nexus." *Id.* at 439.

Finally, the court must apply the "six substantial assistance factors," which "requires balancing the nature and amount of assistance on the one hand and the defendant's scienter on the other." *Id.* "The six factors are a tool to identify participation in another's wrongdoing that is both significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor." *Id.*

As in *Twitter* and *Ashley*, for purposes of the motion to dismiss, the parties here do not dispute that the Attacks were acts of international terrorism, which were committed, planned, or authorized by an FTO so-designated at the time of the attack. *See Twitter*, 598 U.S. at 484.[7] SCB contests only whether Plaintiffs have plausibly alleged that it was "generally aware" *before* the Attacks that its banking services (whether licit or illicit) assisted illegal or tortious activity, and that it "knowingly and substantially assist[ed]" these acts of terrorism. *Ashley*, 144 F.4th at 435. Failure to satisfy either element is fatal to Plaintiffs' claim.

### B. The Complaint Does Not Plausibly Allege Knowing and Substantial Assistance

Plaintiffs' JASTA claim must be dismissed because they have not plausibly alleged that SCB knowingly and substantially assisted the Attacks. To establish this element, Plaintiffs must allege either a "concrete nexus" between SCB's activity and the Attacks or SCB's "pervasive, systemic, and culpable" assistance of the FTOs. *Ashley*, 144 F.4th at 444. "[I]t is not enough to

---

[7] In a footnote, SCB states that JAM is not an FTO, Mot. to Dismiss 9 n.6, although Plaintiffs allege that it is, FAC ¶¶ 2, 258, 1170, and SCB does not make any argument to dismiss on this basis. For purposes of this Opinion, the Court will assume without deciding that JAM was an FTO at the time of any attack attributed to it in the Complaint.

say that the defendant assisted the terrorist organization's activities in general," without

"offer[ing a] discernable nexus between [Defendant's conduct] and the attacks committed against

Plaintiffs." *Id.* The Supreme Court summarized in *Twitter*:

> When there is a direct nexus between the defendant's acts and the tort, courts
> may more easily infer such culpable assistance. But, the more attenuated the
> nexus, the more courts should demand that plaintiffs show culpable
> participation through intentional aid that substantially furthered the tort. And,
> if a plaintiff's theory would hold a defendant liable for all the torts of an
> enterprise, then a showing of pervasive and systemic aid is required to ensure
> that defendants actually aided and abetted each tort of that enterprise.

598 U.S. at 506.

The nexus between (i) SCB's purported clearing and laundering of money for customers

connected to Iran or Iran's Terrorist Sponsors in some way and (ii) any of the Attacks is too

attenuated to give rise to JASTA liability here. Plaintiffs contend that SCB "engaged in a

deceptive and illegal scheme to provide its Iranian customers with covert and largely unfettered

back-door access to the U.S. financial system," despite its "violat[ion of] U.S. sanctions and

other laws and regulations designed to prevent the U.S. financial system from being used to

finance terrorism," and "despite knowing, or at least being aware of a high probability, that

several of its Iranian customers were agents and fronts for Iran's Terrorist Sponsors." FAC

¶ 477. In other words, Plaintiffs allege that SCB assisted its customers with both routine and

fraudulent financial transactions, and that these customers were agents or fronts for organizations

or government entities that then funded the FTOs that then committed the Attacks that injured

Plaintiffs. Even though SCB clearly engaged in some wrongdoing with regard to evading

sanctions regimes and assisting customers to evade those sanctions, this conduct is far too

attenuated to establish a direct nexus between SCB's conduct and the Attacks. *See Ashley*, 144

F.4th at 145 (In *Siegel*, "even though the defendant-bank purportedly gave 'hundreds of millions

19

of dollars' to the Saudi bank and helped the bank 'flout' U.S. sanctions laws, plaintiffs failed to plausibly suggest that the U.S. bank 'knew or intended that [the FTO] would receive the funds.'" (quoting *Siegel,* 933 F.3d at 221, 225)).

Furthermore, Plaintiffs offer no coherent theory of how SCB's conduct connected to the Attacks.  In a supplemental letter, Plaintiffs argue that the connection is explained by the following: "SCB here provided services to terrorist fronts under IRGC control, and . . . IRGC systematically used such fronts to finance the attacks that killed or injured Plaintiffs."  Dkt. No. 56 (Pls.' Aug. 5, 2025 Letter) at 3.  Far from demonstrating a concrete nexus, however, Plaintiffs' theory of liability would "hold [SCB] liable for all the torts of an enterprise," but without the corresponding "pervasive and systemic" support of terroristic activities that *Twitter* demands. 598 U.S. at 506.

Like in *Ashley*, Plaintiffs' primary theory of nexus is "based on money's fungibility: because Defendants engaged in widespread money laundering [and other financial services] for individuals and entities with an apparent or possible connection to terrorists, some of the money [freed up by these activities] must have gone to the terrorists' violent activities."  *Ashley*, 114 F.4th at 444; *see* Opp. 26 (arguing that JASTA's nexus requirement is satisfied "where the inference is plausible that money or other fungible aid would be received by an FTO, even only indirectly").  But *Ashley* rejected this theory of liability, reasoning that it would undermine the principle "central" to JASTA "that the defendant is not liable for the principal's wrongs without understanding, to some extent, the foreseeable consequences of the defendant's actions."  *Ashley*, 114 F.4th at 444.  "In other words," *Ashley* concluded, "it is not enough to say that facilitating the money laundering operations, which are not themselves [FTOs], results in substantial support to the [FTO]."  *Id.*  Likewise, it is not enough for Plaintiffs to say that SCB aided and abetted the

Attacks that harmed Plaintiffs by moving money for people or entities who were not themselves FTOs but had apparent connections to entities in Iran known to support terrorist activities, which activities included funding or sponsoring some of the FTOs that then carried out the Attacks.

Perhaps sensing that their pleadings cannot satisfy the standard in *Ashley*, Plaintiffs posit that this case is more like the Second Circuit's decision in *Kaplan*, which vacated the dismissal of a JASTA claim. The *Kaplan* plaintiffs pled that members of Hezbollah repeatedly made public statements that the defendant-bank's customers were "integral" to Hezbollah's organization. 999 F.3d at 862. Hezbollah was an FTO that had carried out the 2006 rocket attacks that caused the injuries at the heart of the *Kaplan* plaintiffs' complaint. Accordingly, the Court reasoned that it was "a permissible inference" that the defendant-bank "understood that the money in [the customers'] accounts either belonged to . . . , or would be received by . . . , or would be paid out as directed by" Hezbollah, who was directly responsible for the plaintiffs' injuries. *Id.* at 865. There are no comparable allegations here, where even under the most generous reading of the allegations there are several steps between any conduct by SCB and the actions of those who directly perpetrated the Attacks. The Complaint, for all of its exhaustive treatment of the history of the Iranian regime's involvement in terrorism, falls far short of an allegation that, for example, SCB itself assumed a role in any of the Attacks or provided substantial assistance to any of the FTOs that perpetrated them. *Id.* at 862–63.

This action is more like *Siegel* than *Kaplan*. In *Siegel*, the Court affirmed dismissal of a JASTA claim. 933 F.3d at 225–26. Even though the defendant bank had "helped [its customers] violate banking regulations despite knowing that [they] supported terrorist organizations," the Circuit reasoned that the plaintiffs had "failed to allege that [the bank-defendant] knowingly

assumed a role in . . . or substantially assisted" the terrorist activities.  *Id.*  So too here.  And, as in *Siegel*, Plaintiffs' JASTA claim must fail.[8]

## IV.    Personal Jurisdiction

SCB argues that, if this Court dismisses the Complaint for failure to state a claim, it should "assume jurisdiction" without deciding the question.  Mot. to Dismiss 28.  But if the Court does not agree the case should be dismissed under Rule 12(b)(6), Defendant asks this Court to dismiss for lack of personal jurisdiction because SCB is neither "at home" in New York for purposes of general jurisdiction, nor does its suit-related conduct give rise to a substantial enough connection with the forum state to establish specific jurisdiction.  *Id.*  Plaintiffs, of course, dispute the issue without commenting on whether the Court may "assume jurisdiction" in the event of a Rule 12(b)(6) dismissal.  The Court finds that SCB's proposed approach of assuming personal jurisdiction is warranted in this action.

"Ordinarily, [the court] would address any challenge to personal jurisdiction prior to deciding the merits of the cause of action."  *Chevron Corp. v. Naranjo*, 667 F.3d 232, 246 n. 17 (2d Cir. 2012); *see also Koulkina v. City of New York*, 559 F. Supp. 2d 300, 310 (S.D.N.Y. 2008) ("Where a Court is asked to rule on a combination of Rule 12 defenses, it will pass on the jurisdictional issues before considering whether a claim is stated in the complaint.").  The Second Circuit has instructed however, that, where dismissal is granted on the merits, it is appropriate for a court to "assume jurisdiction" under certain circumstances.  *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 347 (2d Cir. 2018) (Calabresi, J., concurring).  Among these are when a

---

[8] Nothing in this Opinion is intended to in any way minimize or excuse SCB's deplorable conduct with regard to the evasion and undermining of sanctions regimes intended to limit the access of rogue states or terrorist-affiliated entities to the global banking system or the U.S. banking system specifically. That misconduct appears to have been addressed through other regulatory and enforcement mechanisms. The only question before the Court is whether these particular Plaintiffs, advancing these particular claims, can recover against SCB.

prior controlling decision clearly resolves the merits of the pending 12(b)(6) motion. *See Center for Reproductive Law and Policy v. Bush*, 304 F.3d 183, 194 (2d Cir. 2002) (holding that a court need not reach a challenge to personal jurisdiction "in those peculiar circumstances where the outcome on the merits has been foreordained by another case such that the jurisdictional question could have no effect on the outcome, provided the court does not use the pretermission of the jurisdictional question as a device for reaching a question of law that otherwise would have gone unaddressed").

The Supreme Court's decision in *Twitter*, as well as the Second Circuit's decision in *Ashley* "foreordain" the outcome of this case. *Id.* Accordingly, because the Court has resolved the Rule 12(b)(6) motion without ruling on any "question of law that otherwise would have gone unaddressed," the Court assumes personal jurisdiction exists for purposes of deciding the motion to dismiss. *Id.*; *see also Wildman v. Deutsche Bank Aktiengesellschaft*, No. 21-CV-04400, 2022 WL 17993076, at *2 n.2 (E.D.N.Y. Dec. 29, 2022) ("Because the Court grants Defendants' motions to dismiss [JASTA claims] for failure to state a claim, it does not reach the merits of these other arguments" under Rules 8, 12(b)(2), and 12(b)(5).). Accordingly, Defendant's 12(b)(2) motion is denied as moot.

## V.    Leave to Amend

SCB asks this Court to dismiss the amended complaint with prejudice. The Federal Rules of Civil Procedure instruct that a court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). "[W]hen a motion to dismiss is granted, the usual practice" is to grant such leave. *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007). Although Plaintiffs have already had an opportunity to amend, they have not yet done so with the benefit of the Court's ruling on the motion to dismiss. Accordingly, the Court will dismiss the Complaint

without prejudice and allow Plaintiffs an opportunity to amend.

## CONCLUSION

For the foregoing reasons, the Court GRANTS SCB's motion to dismiss the Complaint for failure to state a claim. Should they elect to do so, Plaintiffs may submit a second amended complaint within thirty (30) days of the issuance of this Opinion, provided they have a good-faith basis for amendment. If Plaintiffs decide not to amend, they shall notify the Court by letter within 30 days so that judgment can be entered and Plaintiffs can pursue an appeal if they choose. The Clerk of Court is respectfully directed to terminate Dkt. No. 39 in *Fraenkel v. Standard Chartered Bank*, No. 24-CV-4484, and Dkt. No. 30 in *Brauner v. Standard Chartered Bank*, No. 24-CV-5788.

SO ORDERED.

Dated:    September 26, 2025
        New York, New York

                                              MARGARET M. GARNETT
                                              United States District Judge