# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN) |
| | ECF Case |

*This document relates to:*

*Burnett, et al., v. Al Baraka Investment & Dev. Corp., et al.; Case No. 03-cv-9849*
*Euro Brokers Inc., et al. v. Al Baraka Investment & Dev. Corp., et al., Case No. 04-cv-7279*
*Abreu, et al. v. Kingdom of Saudi Arabia; Case No. 1:18-cv-12318*
*Adams, et al. v. Kingdom of Saudi Arabia; Case No. 1:18-cv-11493*
*Actisdano, et al. v. Kingdom of Saudi Arabia; Case No. 1:18-cv-11504*
*Anderson, et al. v. Kingdom of Saudi Arabia; Case No. 1:18-cv-11509*
*Abraham, et al. v. Kingdom of Saudi Arabia Case No. 1:18-cv-11515*
*Abrahams, et al. v. Kingdom of Saudi Arabia; Case No. 1:18-cv-11519*
*Agri, et al. v. Kingdom of Saudi Arabia; Case No. 1:18-cv-11619*
*Arias, et al. v. Kingdom of Saudi Arabia; Case No. 1:18-cv-11582*
*Barrera, et al. v. Kingdom of Saudi Arabia; Case No. 1:18-cv-11624*
*Ando, et al. v. Kingdom of Saudi Arabia; Case No. 1:18-cv-11664*
*Aepelbacher, et al. v. Kingdom of Saudi Arabia; Case No. 1:18-cv-12030*
*Adam, et al. v. Kingdom of Saudi Arabia; Case No. 1:18-cv-12118*
*Odland v. Kingdom of Saudi Arabia; Case No. 1:19-cv-00026*
*Parks, et al. v. Kingdom of Saudi Arabia; Case No. 1:18-cv-12322*

## NOTICE OF CONDITIONAL CROSS-APPEAL

NOTICE is hereby given that, in the event the United States Court of Appeals for the Second Circuit finds that it possesses jurisdiction as to the Kingdom of Saudi Arabia's interlocutory appeal (MDL ECF No. 11215), all Plaintiffs in the above-captioned actions hereby cross-appeal to the United States Court of Appeals for the Second Circuit from (1) the Memorandum Decision and Order of the United States District Court for the Southern District of New York dated March 28, 2018 (MDL ECF No. 3946) ("MTD Denial Order"), a copy of which is attached as Exhibit A, to the extent the MTD Denial Order declined or failed to consider certain of Plaintiffs' alternative theories of jurisdiction under the Foreign Sovereign Immunities Act

and/or related theories of liability, including without limitation Plaintiffs' theories concerning additional tortious conduct of the Kingdom of Saudi Arabia and/or the tortious conduct of additional agents and officials of the government of Saudi Arabia, Plaintiffs' theories of secondary liability, and/or Plaintiffs' theories of jurisdiction under the non-commercial tort-exception; (2) the Memorandum Decision and Order of the United States District Court for the Southern District of New York, dated August 28, 2025 (MDL ECF No. 11180) ("Rule 72 Order"), a copy of which is attached as Exhibit B, overruling Rule 72 objections to Magistrate Judge Netburn's December 11, 2024 Opinion & Order (MDL ECF No. 10615), a copy of which is attached as Exhibit C, to the extent the Rule 72 Order excludes certain of Plaintiffs' expert witnesses from testifying or limits the scope of their testimony in relation to the jurisdictional inquiry under the Foreign Sovereign Immunities Act or otherwise; (3) the Order of the United States District Court for the Southern District of New York, dated January 26, 2024 (MDL ECF No. 9562), a copy of which is attached as Exhibit D, striking declarations from Plaintiffs' fact and expert witnesses; (4) the Memorandum Decision and Order of the United States District Court for the Southern District of New York, dated February 7, 2023 (MDL ECF No. 8862), a copy of which is attached as Exhibit E, declining to revise the Court's MTD Denial Order and find jurisdiction pursuant to certain theories under the Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 (2016) and related law, including theories of jurisdiction and liability under principles of secondary liability; and (5) the Memorandum Decision and Order of the United States District Court for the Southern District of New York, dated August 28, 2025 (MDL ECF No. 11182) ("Renewed MTD Denial Order"), a copy of which is attached as Exhibit F, to the extent the Renewed MTD Denial Order incorporated or rested upon aspects of the prior orders referenced in (1)-(4) above.

This is a conditional cross-appeal, filed solely to preserve Plaintiffs' appellate rights in light of the Kingdom of Saudi Arabia's Notice of Appeal on September 8, 2025 (MDL ECF No. 11215). Plaintiffs submit that the Second Circuit lacks jurisdiction over the Kingdom of Saudi Arabia's interlocutory appeal as not falling within the collateral order doctrine. If the Second Circuit nevertheless concludes that it does have appellate jurisdiction, then Plaintiffs intend to proceed with their cross-appeal from the rulings as indicated above.

Dated: September 19, 2025

Respectfully submitted,

MOTLEY RICE LLC

/s/ Robert T. Haefele
Robert T. Haefele, Esq.
28 Bridgeside Boulevard
Mount Pleasant, SC 29465
rhaefele@motleyrice.com
Tel.: (843) 216-9184

*Attorneys for Plaintiffs-Appellees in Above-Referenced Cases*

3

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the Notice of Conditional Cross-Appeal was electronically filed this 19th day of September 2025. Notice of this filing will be served upon all parties in 03 MDL 1570 by operation of the Southern District of New York's Electronic Case Filing ("ECF") system.

Robert T. Haefele

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE:                 :

                          :       <u>MEMORANDUM DECISION</u>

TERRORIST ATTACKS ON       :         <u>AND ORDER</u>

SEPTEMBER 11, 2001        :       03 MDL 1570 (GBD) (SN)

                           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GEORGE B. DANIELS, United States District Judge:

This document relates to:

     *All actions*

     This multi-district litigation arises from the injuries and losses caused by the September 11, 2001 terrorist attacks ("9/11 Attacks"). Plaintiffs claim that Defendants are liable because they intentionally participated, conspired, sponsored, aided and abetted, or materially supported Al Qaeda in the runup to the 9/11 Attacks. Before this Court is a renewed motion to dismiss all claims by Defendant Kingdom of Saudi Arabia ("KSA") for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). (KSA Mot. to Dismiss ("KSA Mot."), ECF No. 9368[1].) KSA's renewed motion to dismiss is DENIED.

## I.    PROCEDURAL HISTORY[2]

### A. KSA's Initial Motion to Dismiss

     KSA initially moved to dismiss all claims against it in 2004 and has filed numerous motions since then. *In re Terrorist Attacks on Sept. 11, 2001*, 134 F. Supp. 3d 774, 778–79 (S.D.N.Y. 2015) ("2015 Decision"). In these motions, KSA argued that it was immune from suit by virtue of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.* KSA contended that

---

[1] Unless otherwise indicated, all ECF citations included herein refer to documents filed on the 9/11 multidistrict litigation docket. *See In re Terrorist Attacks on Sept. 11, 2001*, No. 03-md-1570 (GBD) (SN).

[2] This Court summarizes only the procedural history germane to the instant motion.

Plaintiffs failed to demonstrate that an FSIA exception applies, which would waive its presumptive

immunity from suit. *See In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d 631, 639

(S.D.N.Y. 2018) ("2018 Decision"); *2015 Decision*, 134 F. Supp. 3d at 777.

On September 29, 2015, this Court granted KSA's motion to dismiss, because Plaintiffs

had failed to establish the FSIA's noncommercial tort exception. *2015 Decision*, 134 F. Supp. 3d

at 780–82. While Plaintiffs' appeal of the 2015 Decision was pending, Congress enacted the

Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114–222, 130 Stat. 852 (2016)

(codified at 28 U.S.C. § 1605B). *See 2018 Decision*, 298 F. Supp. 3d at 639. JASTA creates a

new FSIA exception that waives sovereign immunity

> in any case in which money damages are sought against a foreign
> state for physical injury to person or property or death occurring in
> the United States and caused by—
>> (1) an act of international terrorism in the United States; and
>> (2) a tortious act or acts of the foreign state, or of any official,
> employee, or agent of that foreign state while acting within the scope
> of his or her office, employment, or agency, regardless [of] where
> the tortious act or acts of the foreign state occurred.

*Id.* at 642 (quoting 28 U.S.C. § 1605B(b)). Upon the parties' request, the Second Circuit vacated

the 2015 Decision so that this Court could consider KSA's motion through JASTA's lens. *See In

re Terrorist Attacks on Sept. 11, 2001*, No. 15–3426, 2017 WL 8776686, at *1 (2d Cir. Feb. 7,

2017).

**B. This Court Ordered Limited Jurisdictional Discovery**

On remand, this Court concluded in the 2018 Decision that Plaintiffs' allegations of KSA's

direct liability were insufficient to establish jurisdiction under JASTA. *See 2018 Decision*, 298 F.

Supp. 3d at 647–48. However, this Court noted that Plaintiffs' allegations of KSA's vicarious

liability "narrowly articulate[d] a reasonable basis for this Court to assume jurisdiction under

JASTA . . ." *Id.* at 640.

2

The Court explained that "the nature and scope of the agency is somewhat unclear in this case, and the party in the best position to shed light on that inquiry is Saudi Arabia." *Id.* at 651. Therefore, this Court ordered "limited and targeted jurisdictional discovery." *Id.* The discovery was aimed at examining "whether and to what extent Thumairy, Bayoumi, and their agents took actions in 2000, at the direction of more senior Saudi officials, to provide assistance to" 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar. *Id.*

### C.   KSA's Renewed Motion to Dismiss

Magistrate Judge Sarah Netburn supervised the jurisdictional discovery. (*See* Order, ECF No. 9562, at 2–3 (describing jurisdictional discovery process).) After its completion, Magistrate Judge Netburn set forth a protocol for the motions to dismiss briefing. (Order, ECF No. 9026, at 2.) This protocol was intended to balance "the parties' positions, the need to provide all litigants with a full and fair hearing, and the Court's interest in reasonably managing this complex litigation." (*Id.*) In particular, she noted:

> The parties' briefs on both motions must set forth all pertinent facts. This may not be accomplished by incorporating by reference other documents such as declarations or averments of facts. Instead, briefs must state all facts relevant to the motion and, for each factual statement, provide one or more citations (with specific page or paragraph numbers) to pleadings, declarations, affidavits, averments, or other documents that have been separately filed.

(*Id.* at 4.)

KSA filed its renewed motion to dismiss on October 6, 2023. (KSA Mot.) Plaintiffs filed their opposition on December 20, 2023.[3] (Pls.' Mem. of Law in Opp'n to KSA Mot. ("Pls. Opp'n"), ECF No. 9486.) KSA filed its reply on March 4, 2024. (Reply Mem. of Law in Support

---

[3] Plaintiffs' Executive Committees and Ashton counsel filed their Memorandum of Law jointly.

of KSA Mot. ("KSA Reply"), ECF No. 9610.) Plaintiffs filed a sur-reply on April 19, 2024. (Pls.'
Sur-Reply Mem. of Law in Opp'n to KSA Mot. ("Pls. Sur-Reply"), ECF No. 9706.)

KSA moved to strike portions of Plaintiffs' opposition—in particular, the allegedly
overbroad citations to Plaintiffs' averments of jurisdictional facts in the opposition briefs, along
with allegedly untimely fact and expert declarations. (KSA Letter Mot. to Strike, ECF No. 9500,
at 1.) Magistrate Judge Netburn granted KSA's striking motion concerning the expert and fact
declarations, and denied it concerning Plaintiffs' averments of fact citations.[4] (*See* Order, ECF
No. 9562, at 5–13.)

This Court heard oral argument on July 31, 2024.

### D. Both Parties' Daubert Motions

Both parties brought Daubert motions to exclude seven expert witnesses' testimony.
(KSA's Mot. to Exclude Expert Testimony,[5] ECF No. 9088; Pls.' Mem. of Law in Support of Pls'
Daubert Mot. ("Pls.' Daubert Mot."), ECF No. 9092.) Magistrate Judge Netburn granted in part
and denied in part the parties' cross-motions, largely excluding four expert witnesses' testimony.
(Opinion & Order, ECF No. 10615.) Magistrate Judge Netburn denied KSA's motion for
reconsideration. (KSA's Mot. for Reconsideration, ECF No. 10646; Opinion and Order, ECF No.
10694.) Both parties have filed Rule 72(a) objections to Magistrate Judge Netburn's Opinion and
Order. (KSA's Obj., ECF No. 10691; Pls.' Obj., ECF No. 10693.) On the same day this Court
issues this decision, it also overrules the parties' objections.

---

[4] Despite denying KSA's motion as to Plaintiffs' averments of fact citations, Magistrate Judge Netburn
noted that such citations "[a]t the very least . . . violated the spirit" of the motions to dismiss briefing
protocol. (Order, ECF No. 9562, at 5.)

[5] Dallah Avco Trans Arabia Company ("Dallah Avco") joined KSA's Daubert Motion. ECF No. 9090.

Additionally, KSA later moved to exclude three more experts proffered by the Plaintiffs. (KSA's Letter Mot. to Exclude Expert Testimony, ECF No. 10667.) Plaintiffs moved to strike KSA's second Daubert motion. (Pls.' Mot. to Strike, ECF No. 10670.) These motions are currently under consideration before Magistrate Judge Netburn.

## II.   LEGAL STANDARDS

### A. Jurisdictional Immunity under FSIA and JASTA Exception

Under the FSIA, foreign sovereigns are presumptively "immune from suit in the United States unless a statutory exception applies." *Hijazi v. Permanent Mission of Saudi Arabia to the United Nations*, 689 F. Supp. 2d 669, 672 (S.D.N.Y. 2010), *aff'd*, 403 F. App'x 631 (2d Cir. 2010). Accordingly, FSIA exceptions are the sole source of subject matter jurisdiction over a foreign sovereign in United States courts. *See In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 109, 114 (2d Cir. 2013).

JASTA was enacted in 2016, "specifically to allow 9/11 suits against foreign states that were not designated state sponsors of terrorism." *In re Terrorist Attacks*, 117 F.4th 13, 19 n.6 (2d Cir. 2024). It created a new statutory exception to the FSIA under 28 U.S.C. § 1605B(b). *2018 Decision*, 298 F. Supp. 3d at 642. Plaintiffs must satisfy four elements before this Court can exercise subject matter jurisdiction over KSA: (1) physical injury to a person or property or death occurring in the U.S.; (2) an act of international terrorism in the United States, and a tortious act or acts by a foreign state, or any official, employee, or agent of that state taken while acting within the scope of that person's office, employment, or agency; (3) causation; and (4) damages. *Id.* at 642–43.

In determining whether a FSIA exception applies, "a court normally need not resolve, as a jurisdictional matter, disputes about . . . questions remain[ing] for the merits phase of the litigation." *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S.

170, 174 (2017). A district court does not decide a case on the merits here, because FSIA provides immunity from suit, not from liability. *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 141 (2d Cir. 2001) (internal citation omitted). But, "the district court may examine the defendant's activities to determine whether they confer subject matter jurisdiction[.]" *Id.* at 141–42 (internal citation omitted).

### B. Burden of Proof and Review of Evidence

"Once the defendant presents a prima facie case that it is a foreign sovereign, the plaintiff has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted[.]" *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993) (internal citations omitted). "[T]he ultimate burden of persuasion remains with the alleged foreign sovereign." *Id.* "In defending a motion to dismiss for lack of subject matter jurisdiction, a plaintiff bears the burden of proving the Court's jurisdiction by a preponderance of the evidence." *Figueroa v. Ministry for Foreign Affs. of Swed.*, 222 F. Supp. 3d 304, 307 (S.D.N.Y. 2016) (citing *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). If the plaintiff initially meets this burden, the foreign sovereign defendant then "bears the burden of proving, by a preponderance of the evidence, that the alleged exception does not apply." *Beierwaltes v. L'Office Federale De La Culture De La Confederation Suisse*, 999 F.3d 808, 816–17 (2d Cir. 2021) (internal citation omitted.)

On a Rule 12(b)(1) motion, the Court generally must accept all material factual allegations as true. *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004). However, the Court does not draw all reasonable inferences in the plaintiff's favor. *See Figueroa*, 222 F. Supp. 3d at 306. If jurisdictional facts are in dispute, a court "has the power and the obligation" to look to affidavits, documents, and testimony to determine whether subject matter jurisdiction exists. *Id.* (citing *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003); *Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d

6

1006, 1011 (2d Cir. 1986)). "In doing so, the Court is guided by the body of decisional law that has developed under Rule 56 of the Federal Rules of Civil Procedure," considering only admissible evidence. *Id.* (citing *Kamen*, 791 F.2d at 1011).

When the defendant has challenged the factual basis of the court's jurisdiction, as KSA has here, "the [C]ourt must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." *Robinson*, 269 F.3d at 141 (internal citation omitted.) This means "a district court must review the allegations in the complaint," and "the undisputed facts, if any, placed before [the court] by the parties." *Id.* "[I]f the plaintiff comes forward with sufficient evidence to carry its burden of production on this issue," the Court must "resolve disputed issues of fact." *Id.*; see also *Beierwaltes*, 999 F.3d at 817 (Courts must endeavor to resolve questions of foreign sovereign immunity as near to the outset of the case as it reasonably possible, even if that requires deciding disputed factual issues) (internal citation omitted). However, "where the overlap between jurisdictional and merits evidence is such that fact-finding on the jurisdictional issue will adjudicate factual issues required by the Seventh Amendment to be resolved by a jury, then the Court must leave the jurisdictional issue for the trial." *Wiwa v. Royal Dutch Petroleum Co.*, 626 F. Supp. 2d 377, 382 (S.D.N.Y. 2009) (internal citation omitted).

The Court has the discretion to hold an evidentiary hearing, "if necessary." *See Zappia Middle East Const. Co. Ltd. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000) (citing *Cargill Int'l*, 991 F.2d at 1019); *see also Filetech S.A. v. Fr. Telecom S.A.*, 304 F.3d 180, 183 (2d Cir. 2002) (evidentiary hearing could be necessary if "the resolution of factual issues was not readily ascertainable from the declarations of witnesses or turned on questions of credibility.") (internal citation omitted).

## III.    EVIDENTIARY OBJECTIONS

Because the Court reviews evidence under the Rule 56 standard here, it must rule on evidentiary objections that are material to its decision. *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (internal citation omitted); *see also Ruffin v. Kirschenbaum & Phillips P.C.*, No. 20–CV–05422 (PMH), 2022 WL 704943, at *3 (S.D.N.Y. Mar. 9, 2022) (evidentiary rulings are necessary when a district court is presented with evidence whose admissibility and authenticity is challenged). Therefore, as a preliminary matter before stating the facts, this Court will first address the parties' voluminous evidentiary objections. Other than the parties' Daubert motions, KSA generally objected to the FBI's reports, interview summaries, the source statements therein, and Bayoumi's phonebook in Plaintiffs' exhibits. (KSA Mem. of Law in Support of Mot. to Dismiss ("KSA Mem."), ECF No. 9369, at 13–16, 22–23, 25, and 27; KSA Reply, ECF No. 9610, at 7–13.) Almost all of these objections are based on grounds of hearsay, lack of trustworthiness, and lack of personal knowledge. (*Id.*; KSA Ex.s 161, 162A and 162B.)

The objections here are largely immaterial because this Court's decision rests primarily on evidence to which the parties do not object. For example, regardless of whether the contested experts' testimonies are ultimately admissible, this Court has the same conclusion on KSA's motion to dismiss because the decision on subject matter jurisdiction does not rely on these experts' opinions. The same is true for Bayoumi's phonebook or the phone call records. When the Court very infrequently cites to the FBI's or CIA's reports or interview notes, the Court mainly considers facts that parties do not dispute. Furthermore, the Court focuses on the primary sources these federal agencies relied on and cited to, not the agencies' conclusions themselves unless they are undisputed by both parties. Therefore, it is not necessary for this Court to rule on these objections, and the Court declines to do so at this point. *SIMO Holdings Inc. v. Hong Kong uCloudlink Network Tech. Ltd.*, 376 F. Supp. 3d 369, 377 n.9 (S.D.N.Y. 2019), *rev'd on other*

*grounds*, 983 F.3d 1367 (Fed. Cir. 2021) (denying evidentiary objections as moot because they concern exhibits that are not material to the court's resolution of the instant motion).

Additionally, some of the objected-to evidence could be admissible at trial for a specified purpose. *See* Fed. R. Civ. P. 56(c)(2) (allowing objections to evidence when "the material cited ... cannot be presented in a form that would be admissible in evidence."). When the Court considers the content of the primary sources in the FBI's reports, it assumes that it is possible for the original witnesses to be available at trial, and that the original source statements could be presented in an admissible format then. *See Emanuel v. Gap, Inc.*, No. 19–CV–03617 (PMH), 2022 WL 3084317, at *3 (S.D.N.Y. Aug. 3, 2022) ("It may well be that the facts as presented are not necessarily in admissible form at the time of the motion. They do not have to be."). Parties can dispute at trial whether certain potentially inadmissible facts can be admitted at trial. *Id.*

## IV.    JURISDICTIONAL FACTS

Having addressed the evidentiary objections, the Court now states relevant material facts as they are supported by record evidence.[6] The Court disregards any improper assertions that are conclusory, argumentative, or do not cite to evidence. *See* Fed. R. Civ. P. 56(e); Local Rule 56.1.

### A. KSA sent Omar Al Bayoumi and Al Fahad Thumairy to the U.S.

#### 1. Bayoumi moving to the U.S. in 1994

Bayoumi was employed as a civil servant for KSA's civil aviation agency since 1977. (Pls. Ex. 195, at KSA 629.) He remained as a KSA employee until his retirement in April 2014. (*Id.*)

---

[6] This Court refers to parties' briefs (KSA Mem.; Pls. Opp'n; KSA Reply; and Pls. Sur-Reply), averment of jurisdictional facts and counterstatements (KSA's Averment of Jurisdictional Facts ("KSA Aver."), ECF No. 9390–1; Pls.' Corrected Averment of Facts and Evidence ("Pls. Aver."), ECF No. 9541–1; Pls.' Counterstatement to KSA Aver. ("Pls. Counterstatements), ECF N0. 9542; and KSA's Response to Pls.' Aver. (KSA Aver. Resp.), ECF No. 9611–1), and exhibits thereto. The Court has considered the full record submitted by the parties, but restricts this section to jurisdictional facts material to the instant motion.

In 1994, KSA sent him to San Diego. ((Pls. Ex. 195, at KSA 629.) He was paid by a Saudi subcontractor, Dallah Avco, and he received salary and stipend from them. (Pls. Ex. 195, at KSA 629; Ex. 120, Bayoumi Dep., at 759:8–762:1, 65:17–66:11; Pls. Ex. 426, at DA 91; Pls. Ex. 427, at DA 92.) The official reason that KSA sent Bayoumi to the U.S. was for him to pursue education. (Pls. Ex. 120, Bayoumi Dep., at 632:10–17.) His secondment was part of the Saudization program, which aimed to increase the number of Saudi nationals in its workforce.[7] (Pls. Ex. 125, Coombs Dep., at 48:6–55:18; Ex. 424, at DA 44; Ex. 120, Bayoumi Dep., at 621:21–622:2, 653:8–22, 762:8–763:8.) Although he was given the official title as "senior data processing technician," he did not perform any such work for KSA. (Pls. Ex. 120, Bayoumi Dep., at 74:6–13; 801:18–21; 807:17–809:14; Ex. 433, at DA 1016.) Plaintiffs contend that Bayoumi was a cooptee of Saudi intelligence. (Pls. Opp'n, at 23.) Bayoumi testifies that he had never been a Saudi intelligence officer. (Pls. Ex. 120, Bayoumi Dep., at 724:18–725:13.)

### 2. Bayoumi's School Activities in the U.S.

From 1994 to around 2002, Bayoumi enrolled in various education programs at a few U.S. institutions, and received some certificates and degrees. (Pls. Ex. 120, Bayoumi Dep., at 764:4–13; Ex. 320; Ex. 678AA, at MPS732_821; Ex. 680C, at KSA 906–907; KSA Ex. 212, at KSA 908; Ex. 213, at KSA 739; Ex. 214, at KSA 740; Ex. 215, at KSA 741.) Bayoumi testifies that he had enrolled and taken classes at San Diego State University in 1995, ELS Institute, George Washington University, Wisconsin University, Keller School of Management, and U.S. International University. (Pls. Ex. 120, Bayoumi Dep., at 649:5–650:3, 771:5–16, 776:17–20, 768:23–769:12.) For some of these classes that he attended, he did not earn credits. (Pls. Ex. 120,

---

[7] Parties dispute the true nature of Bayoumi's employment by the Saudi government. Plaintiffs allege that Bayoumi was a covert member of Saudi Arabia's Wahhabi network in the United States, and he was paid as a cooptee of the Saudi General Intelligence Presidency. (Pls. Aver. ¶¶ 112, 870–872, 876–891, 1371, 1573 (citing Pls. Ex. 2W, EO 2638–43).)

Bayoumi Dep., at 771:17–772:7; Ex. 340, at 50.) Bayoumi testifies that this is because he did not take exams. (*Id.*) He had also received "poor" or "failure" grades for some of the classes. (Pls. Ex. 320, at PEC–KSA1–35.)

### 3. Thumairy

From 1996 to 2003, Thumairy held diplomatic status in the U.S., and his visa listed him as an Embassy or Consulate Official. (KSA Ex. 139, at STATE 139; Ex. 48; Ex. 141.) During the relevant time period, Thumairy was employed by the Da'wah[8] Office of the Ministry of Islamic Affairs ("MOIA"). (KSA Ex. 49, at KSA 2694; Ex. 50, at KSA 599.) KSA and MOIA assigned him to serve as the imam of the King Fahad Mosque in Los Angeles, California, when the mosque was opened in 1998. (KSA Ex. 51, at KSA 8509–10; Ex. 52, at KSA 1260–66; Pls. Ex. 107, Thumairy Dep., at 90:4–20.)

From 1999 to 2001, a bank account Thumairy had opened received significant funds from Prince Abdulaziz, a senior member of Saudi Arabia's cabinet. (Pls. Ex. 107, Thumairy Dep., at 199:11–200:10, 203:20–24, 208:20–23, 209:10–14.) Thumairy explains that such funds were used for charitable donations and mosque expenses. (*Id.*)

Usman Madha, an employee at the King Fahad Mosque, declares that Thumairy was hostile towards the American and western culture, and led a small group of men at the mosque who held extremist and anti-American views. (Pls. Ex. 72, Madha Decl. ¶¶ 18–19.) At Madha's deposition, however, he states that he has never personally heard Thumairy express any support for terrorism in his sermons. (Pls. Ex. 128, Madha Dep., at 38:3–39:17.) Other witnesses testify that they had never heard Thumairy expressing any extremist or violent views. (Pls. Ex. 168, Mana Decl. ¶ 8; Ex. 101, Alzamari Dep., at 134:15–135:12; Ex. 117, Zeid Dep., at 475:15–24.)

---

[8] Da'wah means propagation of religious belief through missionary work.

## B. Hijackers' Arrival in Los Angeles

### 1. Background

Nawaf al Hazmi and Khalid al Mihdhar ("hijackers") were two Al Qaeda members who helped carry out the 9/11 attacks. (KSA Ex. 163, 9/11 Rep., at 215.) In 2000, Al Qaeda sent the hijackers to the U.S. to study English and take flight lessons. (KSA Ex. 163, 9/11 Rep., at 215–16.) According to FBI interrogations of Khalid Sheikh Mohammed ("KSM"), who was an Al Qaeda member and the principal architect of the 9/11 attacks, these two hijackers did not speak much English before coming to the U.S. and had not spent much time in the West. (KSA Ex. 163, 9/11 Rep., at 147, 215; Pls. Ex. 31, KSM Statement, at 1.) KSM states that "[A]l Qaeda had no one in California to help the two," and he permitted them to "go to the local mosque to request assistance and advice on functioning in American society." (Pls. Ex. 31, KSM Statement, at 9, 17, and 18.)

### 2. Arrival and Meeting with Thumairy

On January 15, 2000, the two hijackers arrived at Los Angeles International Airport ("LAX"). (KSA Ex. 163, 9/11 Rep., at 215.) Mohammed Johar, a congregant at the King Fahad Mosque, testifies that he met the hijackers in front of the mosque sometime after the hijackers' arrival.[9] (Pls. Ex. 116, Johar Dep., at 93:15–94:23, 172:9–24.) Johar brought them into the mosque and introduce them to Sheikh Al Fahad Thumairy. (Pls. Ex. 116, Johar Dep., at 94:17–18.) Johar states that he told Thumairy that these two men were newcomers to the U.S. and needed to find a place to stay. (Pls. Ex. 116, Johar Dep., at 81:24–82:2, 93:18–94:23, 96:2–97:8, 98:20–99:4, 101:22–104:3, 180:12–181:11, 181:15–182:13.)

---

[9] Parties dispute whether Johar picked up the hijackers at LAX airport. Plaintiffs assert that Al Fahad Thumairy sent Johar to LAX on January 15, 2000 to meet the two hijackers and bring them to the mosque to see Thumairy. (Pls. Aver. ¶ 1404, citing Pls. Ex. 2L, OIG Rep., at 520.) KSA asserts that Thumairy did not ask Johar to pick up the hijackers, and the first time Johar met the hijackers was outside the King Fahad Mosque. (KSA Aver. Resp. ¶ 1174, citing Pls. Ex. 116, Johar Dep., at 381:2–17, 382:13–23.)

Johar recalls that the hijackers and Thumairy spoke for a short period of time. (Pls. Ex. 116 Johar Dep.; at 97:22–98:4, 385:20–386:4.) Johar also testifies that no one, including Thumairy, instructed him to help the hijackers. (Pls. Ex. 116, Johar Dep., at 118:1–2 ("[N]obody told me to do something to somebody, to help them."), 188:4–189:2 ("[Thumairy] never told me, hey, help those two guys. . . . [H]e never asked me to help those two guys."), 190:12–18, 381:2–5, 381:12–17, 383:7–10, 386:14–20, 405:18–22.)

Thumairy states that he did not recall meeting Hazmi or Mihdhar at all, whether in January 2000 or later. (Pls. Ex. 107, Thumairy Dep., at 340:15–341:2, 346:1–19, 348:1–9, 491:4–6.) Thumairy also states that he never received or gave instructions to anyone to assist the hijackers. (Pls. Ex. 107, Thumairy Dep., at 491:7–21, 492:11–493:2.)

According to the FBI's interview of Akram Alzamari, Johar's best friend, Alzamari states that Johar told him that Thumairy had asked Johar to look after two very "significant" people. (Pls. Ex. 462, at FBI 141; Ex. 101, Alzamari Dep., at 47:9–20.) The interview notes show that Alzamari stated that Johar introduced the hijackers to him. (Pls. Ex. 462, at FBI 141.) He also stated that he would see Johar with the hijackers at the King Fahad Mosque almost every day, sometimes in the presence of Thumairy. (Id.) Later at Alzamari's deposition in 2020, he stated that the FBI notes of his statement about Thumairy asking Johar to look after the hijackers were erroneous. (Pls. Ex. 101, Alzamari Dep., at 52:2–53:15.)

### 3. MOIA and other Saudi Officials

While the parties dispute the political reasons behind MOIA's creation and its ideological nature,[10] it is undisputed that MOIA was created in 1993, and it assumed control over mosques,

---

[10] Parties dispute the MOIA's religious leaning. KSA asserts that MOIA is quietist and peaceful. (KSA Aver. ¶6.) Plaintiffs allege that KSA allows MOIA to propagate Wahhabism overseas, which endorses violent and extremist religious views. (Pls. Aver. ¶¶ 20, 21, 34, 48, 52.)

vetting sermons, and Saudi efforts to promote Islam overseas. (Pls. Ex. 113, Khalil Dep., at 34:19–37:8; KSA Aver. Resp. ¶ 42.) According to the FBI's investigation reports, MOIA had provided funding to a terrorist group called Al-Ittihad Al-Islamia ("AIAI"), and Thumairy controlled the bank account that distributed such funds. (Pls. Ex. 2MM, at 563–64.)

Khalid Al Sowailem was the head of the Da'wah Office, which dealt with MOIA employees, including Thumairy. (KSA Ex. 66, at KSA 1234; Ex. 63, at KSA 2612); Ex. 64, at KSA 2572).) Thumairy testifies that Sowailem was the administrative personnel responsible for him. (Pls. Ex. 107, Thumairy Dep., at 52:16–21.) On January 28, 1999, Omar Al Bayoumi wrote a letter as the General Supervisor of the Al Madinah Mosque in San Diego, thanking Sowailem for his attentiveness to the Al Madinah Mosque and other mosques in San Diego. (Pls. Ex. 411.)

Musaed Al Jarrah was the assistant head of the Islamic Affairs Department at the Embassy of Saudi Arabia in Washington, D.C. (KSA Ex. 56, at KSA 8594.) According to an FBI report, Jarrah was responsible for managing and controlling all assignments of Saudi Imams in the U.S. (Pls. Ex. 2BB, at 3431.) Another FBI report indicates that Jarrah and Thumairy had extensive contact. (Pls. Ex. 2OO, at 551–552.) Thumairy testifies that he did not recall Jarrah, and Jarrah states that he recalls only one phone conversation with Thumairy in 2003. (Pls. Ex. 107, Thumairy Dep., at 417:5–418:9; Ex. 118, Jarrah Dep., at 166:24–167: 19, 172:2–8.)

Thumairy left the U.S. for Saudi Arabia shortly before the 9/11 attacks. (Pls. Ex. 72, Madha Decl. ¶¶ 5, 7, 24; Ex. 107, Thumairy Dep., at 360:17–22; Ex. 680G, at KSA 6896.) Five weeks after the 9/11 attacks, some CIA and FBI agents came to the King Fahad Mosque with a picture of Thumairy and the hijackers. (Pls. Ex. 113, Khalil Dep., at 68:20–72:5.) They asked the director of the mosque questions about Thumairy. (*Id.*) Thumairy states that he was never aware of this happening. (Pls. Ex. 107, Thumairy Dep., at 407:5–20.) KSA's Ministry of Foreign Affairs instructed Thumairy not to return to the U.S. without further notice. (KSA Ex. 198, at KSA 7659.)

Jarrah drafted a letter to the Ministry of Foreign Affairs dated November 9, 2001, stating that
Thumairy was not a suspect and requesting him to return to work at the King Fahad Mosque. (Pls.
Ex. 255.) On November 28, 2001, the King of Saudi Arabia and the Ministry of Foreign Affairs
approved Thumairy's return to the U.S. (KSA Ex. 208, at KSA 1204; Ex. 209, at KSA 568; Pls.
Ex, 251.) Thumairy returned to Los Angeles in December 2001. (Pls. Ex. 680G, at KSA 6896.)
On March 21, 2003, the U.S. State Department revoked Thumairy's visa. (KSA Ex. 141, at KSA
6810.)

### 4. Bayoumi's Trip to LA

Bayoumi made a trip from San Diego to Los Angeles and met with the hijackers there
around February 1, 2000.[11] (KSA Ex. 163, 9/11 Rep., at 217.) Bayoumi states that the purpose of
his trip was to renew his and his family's passports. (Pls. Ex. 120, Bayoumi Dep., at 357:17–
358:15; see also, KSA Ex. 85, at KSA 6643 (later Consulate report about visit), at KSA 6648
(application for passport dated January 31, 2000, with issuance date of February 1, 2000); Ex. 42,
at KSA 7996 (passport showing issuance date of February 1, 2000).)

Kaysan Morgan was an American who converted to Islam in 1999. (Pls. Ex. 92, Morgan
Decl. ¶¶ 5–7). Bayoumi befriended him earlier at the Islamic Center of San Diego ("ICSD"). (Pls.
Ex. 92, Morgan Decl. ¶¶ 5–7.) At Bayoumi's invitation, Morgan accompanied Bayoumi on this
trip. (Pls. Ex. 92, Morgan Decl. ¶¶ 5–8; Ex. 112, Morgan Dep., at 95:20–97:9.)

Prior to this trip, Bayoumi had met Thumairy at the King Fahad Mosque. (Ex. 120,
Bayoumi Dep., at 215:18–216:8.) Bayoumi made multiple phone calls to Thumairy in January

---

[11] While parties do not dispute that Bayoumi met with the hijackers around February 1, 2000, they dispute
the exact dates of Bayoumi's trip to Los Angeles. Plaintiffs allege that Bayoumi traveled to Los Angeles
on January 31 and February 1, 2000, and visited the Saudi Consulate two days in a row. (Pls. Aver. ¶¶
1532–35; Pls. Counterstatement ¶ 99.) KSA contends that there was only one trip to the Consulate that
was on or about February 1, 2000. (KSA Aver. Resp. ¶ 1535.) The Court does not resolve this factual
dispute because the distinction does not affect the decision here.

2000 prior to his trip. (Pls. Ex. 5, Youseff Rep. at 157–58; Ex. 120, Bayoum Dep., at 448:12–454:22.) Around late January to early February 2000, Bayoumi also made multiple phone calls to the Consulate in Los Angeles, the Saudi Embassy in D.C., the Office of Islamic Affairs, and the Office of Cultural Mission at the Embassy. (Pls. Ex. 12A, at 35–49.)[12] Thumairy had also called Bayoumi on January 17, 2000. (Pls. Ex. 12A.)[13] Thumairy denies that he knew Bayoumi at all. (Pls. Ex. 107, Thumairy Dep., at 307:20–308:7.)

On February 1, 2000, at the consulate, Bayoumi met with Ismail Mana. (KSA Ex. 77, Mana Decl. ¶¶ 3, 10–12, 14; Pls. Ex. 110A, Mana Dep., at 134:8–135:3.) Mana worked at the Ministry of Foreign Affairs within the Los Angeles Consulate. (Pls. Ex. 95, Awad Dep., at 76:9–77:16.) Bayoumi took religious materials from Mana. (Pls. Ex. 120, Bayoumi Dep., at 379:16–22, 383:13–389:24). Morgan states that this meeting lasted approximately 20 to 30 minutes. (Pls. Ex. 92, Morgan Decl. ¶15.) Mana declares this meeting to be no more than one minute. (KSA Ex. 77, Mana Decl. ¶ 12.)

Morgan declares that, after meeting with Mana at the consulate, Bayoumi went to the King Fahad Mosque and met with Thumairy on that same day. (Pls. Ex. 92, Morgan Decl. ¶¶ 16, 21; see KSA Ex. 164, 9/11 Rep. 217–18.) Bayoumi recalls that he and Morgan went directly to lunch and denies that he went to the Mosque that day. (Pls. Ex. 120, Bayoumi Dep., at 390:17–392:5; 403:23–405:16.) Thumairy does not recall meeting Bayoumi. (Pls. Ex. 107, Thumairy Dep., at 493:24–494:2.)

---

[12] KSA object to Plaintiffs' Ex. 12A as improper summary. The Court relies on this exhibit to the extent that KSA does not dispute that the phone calls indeed took place. For example, despite arguing that Plaintiffs' Ex. 12 double-counted and misattributed certain phone calls, KSA admits that the record shows that Bayoumi called the Office of Cultural Mission at the KSA Embassy at least 14 times, and the KSA Embassy at least five times. (KSA Aver. Resp. ¶¶ 1265, 1519, 1527, 1564.)

[13] KSA object to Plaintiffs' Ex. 12A as improper summary, but does not dispute that this call was placed. (KSA Aver. Resp. ¶ 1506.)

### 5.  Hijackers' Meeting with Bayoumi in Los Angeles

During the two weeks between the hijackers' arrival in the U.S. on January 15, 2000 and their meeting with Bayoumi around February 1, 2000, they remained in Los Angeles and had multiple interactions with Johar. (Pls. Ex. 116, Johar Dep., at 284:20–286:11.) They asked Johar for help related to housing and restaurants. (Pls. Ex. 116, Johar Dep., at 286:1–11, 284:20–285:5, 285:21–286:11.) Johar took them to a grocery store, to see motels, and to a bus stop, where Johar showed the hijackers a Mediterranean restaurant. (Pls. Ex. 116, Johar Dep., at 104:4–107:22, 144:20–145:5, 237:5–239:14, 239:15–23, 240:9–16.)  This is the same restaurant where the hijackers would later meet with Bayoumi. (Pls. Ex. 116, Johar Dep., at 393:18–394:2.)  Johar denies that the hijackers stayed with him at his apartment. (Pls. Ex. 116, Johar Dep., at 51:12–52:2, 302:24–303:5, 320:4–329:15, 381:22–382:3.)  He also denies that he ever told the FBI about the hijackers staying in his apartment. (Pls. Ex. 116, Johar Dep., at 130:6–131:6; 364:16–365:11.) Johar states that during that two weeks, he did not see the hijackers interact with anyone else other than Thumairy. (Pls. Ex. 116, Johar Dep., at 108:12–109:3.)

On February 1, 2000, Bayoumi and Morgan went to get lunch.  They first looked for a restaurant where Bayoumi had been before, but did not eat there. (Pls. Ex. 120, Bayoumi Dep., at 393:12–394:7.)  Bayoumi states that it was because the restaurant was closed, and Morgan recalls that it was because that place was a halal meat market. (Pls. Ex. 120, Bayoumi Dep., at 393:12–394:7; Ex. 92, Morgan Decl. ¶16.)  They then went to a Mediterranean Café, and when they were ordering food, the hijackers walked in. (Pls. Ex. 120, Bayoumi Dep., at 393:8–395:8; Ex. 92, Morgan Decl. ¶ 16.)  Bayoumi overheard the hijackers speaking Arabic to each other. (Pls. Ex. 120, Bayoumi Dep., at 396:8–23.)  He then introduced himself to the hijackers. (Pls. Ex. 120, Bayoumi Dep., at 396:8–23; Ex. 92, Morgan Decl. ¶ 17.)  Bayoumi claims that this was an unplanned chance meeting. (Pls. Ex. 120, Bayoumi Dep., at 725:19–726:16.)

17

Bayoumi had a conversation with the hijackers in Arabic, where he shared that he lived in San Diego, close to the ICSD there. (Pls. Ex. 120, Bayoumi Dep., at 399:11–400:1, 402:7–9, 404:20–23.) Bayoumi testifies during his deposition that he did not advise, nor invite the hijackers to San Diego. (Pls. Ex. 120, Bayoumi Dep., at 796:9–13.) He also testifies that he did not offer to help the hijackers in any way. (Pls. Ex. 120, Bayoumi Dep., at 726:23–727:2.) However, when being interviewed by London's Metropolitan Police Services ("MPS"), Bayoumi states that he told the hijackers: "if you need help or something like that, just call me," and he states: "I think I gave them my phone number." (Pls. Ex. 450, MPS, at 193:11–16.) Morgan declares that after the conversation, Bayoumi offered to give the hijackers a ride. (Pls. Ex. 92, Morgan Decl. ¶19.) Bayoumi testifies that he did not know if the hijackers stayed or left the restaurant when he and Morgan left. (Pls. Ex. 120, Bayoumi Dep., at 404:11–23.)

Morgan testifies that the conversation lasted 30 minutes. (Pls. Ex. 112, Morgan Dep., at 97:15–98:4.) Bayoumi testifies that it was two-minute conversation. (Pls. Ex. 120, Bayoumi Dep., at 402:10–20.) Morgan did not speak Arabic. (Pls. Ex. 92, Morgan Decl. ¶¶ 17–18; Ex. 112, Morgan Dep., at 82:4–7.) Bayoumi interpreted the conversation for him, (Pls. Ex. 112, Morgan Dep., at 82:8–84:5; Ex. 120, Bayoumi Dep., at 399:3–10), and Bayoumi testifies that Morgan understood the conversation a little. (Pls. Ex. 120, Bayoumi Dep., at 397:8–10.)

Bayoumi states that since the meeting was a coincidence, no one instructed him to meet with the hijackers. (Pls. Ex. 120, Bayoumi Dep., at 725:14–726:8.) Morgan declares that he told the investigators that he believed the encounter to be a coincidence. (Pls. Ex. 92, Morgan Decl. ¶19.)

After this meeting at the restaurant, Bayoumi and Morgan returned to San Diego. (Pls. Ex. 120, Bayoumi Dep., at 404:24–405:2.) Morgan recalls that they visited the King Fahad Mosque again before returning to San Diego, but Bayoumi testifies that he could not find the mosque and

18

went directly to San Diego. (Pls. Ex. 120, Bayoumi Dep., at 403:23–405:2; Ex. 92, Morgan Decl.
¶¶ 20–23; Ex. 112, Morgan Dep., at 98:10–99:12.)  Morgan further states that at the mosque,
Bayoumi met with Mana and Thumairy again.  (Pls. Ex. 92, Morgan Decl. ¶¶ 21–23; Ex. 112,
Morgan Dep., at 98:10–99:12; Ex. 460, at FBI at 103 (May 17, 2010 interview of Morgan).)

### C. Hijackers' Time in San Diego

#### 1. Meeting Bayoumi

A few days after the hijacker's encounter with Bayoumi in Los Angeles, the hijackers
traveled to San Diego.  (Pls. Ex. 116, Johar Dep., at 277:4–279:7.)  Johar testifies that he dropped
the hijackers off at a bus station in Santa Monica.  (Pls. Ex. 116, Johar Dep., at 148:1–150:21,
154:6–12, 277:4–279:7, 280:4–18, 284:10–13.)  Some witnesses interviewed by the FBI state that
Bayoumi drove the hijackers from Los Angeles to San Diego.  (Pls. Ex. 2GG, at 4007; Ex. 455, at
FBI 35.)  Bayoumi denies driving them from Los Angels to San Diego.  (Pls. Ex. 120, Bayoumi
Dep., at 728:23–730:4.)

Bayoumi recalls meeting the hijackers at the ICSD Mosque.  (Pls. Ex. 120, Bayoumi Dep.,
at 421:5–422:23.)  On February 2 and February 3, 2000, Bayoumi made phone calls to the Office
of Islamic Affairs, and the Office of Cultural Missions at the Saudi Embassy and the Saudi
Consulate.  (Pls. Ex. 12A, at 46–49.)  On February 3, Thumairy also called Sowailem at the Islamic
Affairs Department.  (Pls. Ex. 12A, at 48.)  During the same time period, Thumairy also made
multiple phone calls to Abdeljalil Mezgouri, the imam of the ICSD.  (Pls. Ex. 12A, at 48–49.)[14]
Thumairy testifies that he does not know Mezgouri and does not recall calling him.  (Pls. Ex. 107,
Thumairy Dep., at 351:9–17.)

---

[14] KSA object to Plaintiffs' Ex. 12A as improper summary, but does not dispute that these calls were
placed.  (KSA Aver. Resp. ¶¶ 1529, 1618, 1619.)

### 2. Assistance with Apartment

Bayoumi lived in the Parkwood Apartment Complex ("Parkwood") in San Diego during the relevant time period. (Pls. Ex. 120, Bayoumi Dep., at 440:10–441:8.) The Manager of Parkwood, Holly Ratchford, states that prior to the hijackers' arrival in San Diego, Bayoumi had visited her office five to six times to inquire about apartment availabilities. (Pls. Ex. 91, Ratchford Decl. ¶ 6.) Bayoumi states that if he could refer someone to Parkwood, he could receive a referral fee of one or two hundred dollars from the Manager. (Pls. Ex. 120, Bayoumi Dep., at 733:14–734:17.)

On February 3 and 4, 2000, Bayoumi took the hijackers to the rental office at Parkwood. (Pls. Ex. 120, Bayoumi Dep., at 440:10–13; Ex. 91, Ratchford Decl. ¶¶ 6–10; KSA Ex. 89.) Ratchford declares that Bayoumi told her that the hijackers were staying with him and needed to rent an apartment right away.[15] (Pls. Ex. 91, Ratchford Decl. ¶ 7.) Bayoumi prepared Parkwood "Application to Rent" forms for both Hazmi and Mihdhar, and listed Bayoumi's own address at Parkwood as the "present address" for Hazmi and Mihdhar. (Pls. Ex. 545, at FBI 8026; Ex. 555, at FBI 8276; Ex. 556, at FBI 8278.) On the same forms, Bayoumi also listed himself as the Personal Reference for the hijackers, put "friend" when describing his relationship with the hijackers, and provided himself as the emergency contact for the hijackers. (Pls. Ex. 545, at FBI 8027; Ex. 555, at FBI 8277; Ex, 556, at FBI 8279; Ex. 120, Bayoumi Dep., at 432:12–435:22, 437:10–439:23.) Bayoumi also co-signed the lease as a guarantor for the hijacker's apartment. (Pls. Ex. 91, Ratchford Decl. ¶ 13.)

---

[15] Parties dispute whether the hijackers stayed with Bayoumi in the few days before their Parkwood move-in date. KSA contends that it would have been a serious cultural violation to have adult men stay at Bayoumi's apartment, where his wife and daughter also resided. KSA cites Bayoumi's interview transcripts with MPS investigators. (KSA Ex. 269 (MPS376, Bayoumi Interview Transcript), at 13; Ex. 270 (MPS388, Bayoumi Interview Transcript), at 24; Ex. 260 (MPS390, Bayoumi Interview Transcript), at 13 ("No, not man . . . not man, no. . . . No, no, man, no but women yes . . . [b]ut men, no, no way."); Ex. 260 (MPS390, Bayoumi Interview Transcript), at 24 ("No, they didn't stay at my house.").)