unqualified to testify about Bayoumi's relationship with the hijackers. (Order at 41.) The Order concludes that Schiff's testimony only has minor analytical gaps and one potentially speculative statement, which are not sufficient to undermine the reliability of his report. (Order at 42.) Lastly, the Court agrees with Magistrate Judge Netburn that Schiff has legitimate reasons to not consider alternative explanations for the equations. (*Id.* at 42–43.) Finally, the Order properly concludes that other than the comments on Bayoumi's credibility as a witness, his testimony does not raise major helpfulness issues. (*Id.* at 43.)

### III. MAGISTRATE JUDGE NETBURN DOES NOT CLEARLY ERR IN DENYING A *DAUBERT* HEARING

Plaintiffs argue that the Order should have granted Plaintiffs' request for a *Daubert* hearing to resolve questions regarding the experts' credentials and opinions. (Pls. Objs. at 3 (citing *Koppell v. New York State Bd. of Elections*, 97 F. Supp. 2d 477, 479 (S.D.N.Y. 2000).) However, district courts are not mandated to hold *Daubert* hearings. *See Molina*, 199 F. Supp. 2d at 70. This Court finds no issue with Magistrate Judge Netburn's decision not to hold a *Daubert* hearing based on her thorough review of both parties' expert testimonies and written submissions, which are sufficient for her and the Court to reach their decisions. *See e.g.* United States v. Williams, 506 F.3d 151, 161 (2d Cir.2007) (courts possess latitude in deciding whether or not a *Daubert* hearing is needed.); *United States v. Santiago,* 199 F.Supp.2d 101, 112 (S.D.N.Y.2002) (finding that a *Daubert* hearing was not necessary where a reliability determination could be established through foundation questions at trial and noting that defendants are free to challenge witnesses qualifications of his methodology through voir dire.)[3]

---

[3] In the context of a non-jury trial, the Court's decision today does not preclude reconsideration of the relevant testimony or a *Daubert* hearing later. *See Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting & Env't Consulting, Inc.*, 743 F. Supp. 3d 530, 537 (S.D.N.Y. 2024) (because *Daubert* standard does not apply straightforwardly in the context of bench trials, courts can reserve judgment on ruling on *Daubert*

## IV.   CONCLUSION

The Parties' Rule 72 objections to Magistrate Judge Netburn's December 11, 2024 Order are OVERRULED.  Magistrate Judge Netburn's Order is ADOPTED in its entirety.


Dated: August 28, 2025
       New York, New York

SO ORDERED.

George B. Daniels

GEORGE B. DANIELS
UNITED STATES DISTRICT JUDGE

---

motions, and later, after the evidence is presented at trial, determine whether it meets the requirement of *Daubert*.) (Internal citation and quotation marks omitted.)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X

In re:

    **TERRORIST ATTACKS ON**
    **SEPTEMBER 11, 2001**

-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___12/11/2024___

**03-MD-01570 (GBD)(SN)**

<u>**OPINION & ORDER**</u>

**SARAH NETBURN, United States Magistrate Judge:**

    The Plaintiffs in this multidistrict litigation seek to hold the Kingdom of Saudi Arabia (the "Kingdom") and Dallah Avco Trans Arabia Company ("Dallah Avco") liable for the September 11, 2001 terrorist attacks on the United States (the "9/11 Attacks"). After years of discovery, the Kingdom and Dallah Avco (collectively, the "Defendants") filed renewed motions to dismiss challenging the Court's jurisdiction over the Plaintiffs' claims. See ECF Nos. 9362, 9368.[1] The parties' arguments for and against dismissal are backed by competing averments of jurisdictional facts, documentary evidence, witness declarations, and expert reports.

    Before the Court are the parties' cross-motions to exclude the testimony of seven expert witnesses proffered in connection with the jurisdictional litigation. See ECF Nos. 9088, 9091. After a careful review of thousands of pages of briefing, expert reports, and exhibits, the Court grants in part and denies in part both motions.

## BACKGROUND

    The Court assumes familiarity with this multidistrict litigation and summarizes only the relevant procedural and factual background.

---

[1] Unless otherwise noted, all ECF numbers refer to the main MDL docket, No. 03-md-01570.

## I.    Kingdom of Saudi Arabia

Litigation over these jurisdictional issues stretches back to 2004, when the Kingdom moved to dismiss claims against it in <u>Federal Insurance Co. v. Al Qaida</u>, No. 03-cv-06978, ECF No. 177, on foreign sovereign immunity grounds. Judge Casey granted the Kingdom's motion, concluding that the "Plaintiffs ha[d] not met their burden of demonstrating an exception to the [Foreign Sovereign Immunity Act] applies to negate the Kingdom's immunity." <u>In re Terrorist Attacks on Sept. 11, 2001</u>, 349 F. Supp. 2d 765, 804 (S.D.N.Y. 2005). His order was affirmed on appeal, <u>In re Terrorist Attacks on Sept. 11, 2001</u>, 538 F.3d 71, 90 (2d Cir. 2008), but the rationale adopted by the Court of Appeals was later partially overruled by <u>Doe v. Bin Laden</u>, 663 F.3d 64 (2d Cir. 2011).

The Plaintiffs then moved for relief from judgment under Federal Rule of Civil Procedure 60(b). Judge Daniels denied the Rule 60(b) motion so the Plaintiffs could seek appellate review on the question: whether the change in law warranted revisiting the jurisdictional issues in the case. <u>See</u> <u>In re Terrorist Attacks on Sept. 11, 2001</u>, 741 F.3d 353, 354–55 (2d Cir. 2013). The Court of Appeals concluded that it did and remanded the action to Judge Daniels for further proceedings.

Following remand, the Kingdom again sought dismissal on foreign sovereign immunity grounds. Judge Daniels granted the motion, holding that the Plaintiffs' "allegations do not strip Defendants of sovereign immunity." <u>In re Terrorist Attacks on Sept. 11, 2001</u>, 134 F. Supp. 3d 774, 782 (S.D.N.Y. 2015). The Plaintiffs appealed.

Then Congress stepped in. It enacted the Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852, 853 (2016) ("JASTA"), which added an exception to foreign sovereign immunity and, separately, a civil cause of action intended to provide "litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief

against persons, entities, and foreign countries . . . that have provided material support . . . to foreign organizations or persons that engage in terrorist activities against the United States." In light of this change in law, the Court of Appeals granted the parties' joint motion to vacate the order dismissing the claims against the Kingdom and remanded for further proceedings. See In re Terrorist Attacks on Sept. 11, 2001, No. 15-3426, 2017 WL 8776686 (2d Cir. Feb. 7, 2017).

In 2018, Judge Daniels issued a new decision analyzing the claims against the Kingdom under JASTA. Although he found several of the Plaintiffs' theories insufficient, the allegations as to two Saudi individuals, Fahad al Thumairy and Omar al Bayoumi, "articulated a reasonable basis" for exercising jurisdiction over the Kingdom such that jurisdictional discovery was appropriate. In re Terrorist Attacks on Sept. 11, 2001, 298 F. Supp. 3d 631, 651 (S.D.N.Y. 2018).

According to the Plaintiffs, from 1998 to 2001, "Thumairy was the imam at the Saudi-funded King Fah[a]d Mosque" in Los Angeles County and "an accredited Saudi diplomat working for Saudi Arabia's Ministry of Islamic Affairs" ("MOIA"). Id. at 648. He allegedly "orchestrat[ed] the U.S.-based support network for two of the 9/11 hijackers, Nawaf al Hazmi and Khalid al Mihdhar . . . at the direction of an unnamed senior Saudi official." Id. At Thumairy's behest, Bayoumi, a longtime Saudi government employee seconded to Dallah Avco, allegedly "met with Hazmi and Mihdhar and offered to help them settle in San Diego," which he did by "finding them an apartment . . . , co-signing their lease as a guarantor, helping them open a bank account, and paying their rent on occasion." Id. at 649.

## II.    Dallah Avco

The Dallah Avco litigation mirrored the course of the case against Saudi Arabia. In 2006, Dallah Avco moved to dismiss claims against it on jurisdictional grounds. See ECF No. 1711. The Court granted that motion in 2010 after finding that Dallah Avco's presence in the United

States was insufficient for general jurisdiction and Bayoumi's actions could not be attributed to it for purposes of specific jurisdiction. See ECF No. 2252. The Plaintiffs appealed.

In 2013, the Court of Appeals vacated the dismissal order. In re Terrorist Attacks on Sept. 11, 2001, 714 F.3d 659 (2d Cir. 2013). Explaining that the Plaintiffs' "jurisdictional theory against Dallah Avco is not limited solely to the acts of al Bayoumi," the Court remanded for jurisdictional discovery of allegations that "Dallah Avco provided 'cover employment'" for Bayoumi. Id. at 679.

## III.    Jurisdictional Discovery

Judge Daniels directed the parties to proceed with "limited and targeted" discovery into "whether and to what extent Thumairy, Bayoumi, and their agents took actions in 2000, at the direction of more senior Saudi officials, to provide assistance to" al Qaeda hijackers Nawaf al Hazmi and Khalid al Midhar. In re Terrorist Attacks on Sept. 11, 2001, 298 F. Supp. 3d at 651. Pursuant to that decision, the Plaintiffs have engaged in discovery with the Kingdom, Dallah Avco, and other defendants in this litigation and secured materials from third-party sources such as the Federal Bureau of Investigation ("FBI"), the Central Intelligence Agency ("CIA"), the London Metropolitan Police Service ("MPS"), the Departments of Justice and State, and various telephone companies, banks, universities, and mosques. See, e.g., ECF No. 9089-1 at 12. The record now includes thousands of pages of documents, multimedia files, witness declarations, depositions, and, as relevant here, expert reports.

Following the close of jurisdictional discovery, the parties filed these cross-motions to exclude expert testimony and then briefed the Defendants' renewed motions to dismiss, which are pending before Judge Daniels.

Case 1:03-md-01570-GBD-SN   Document 10615   Filed 12/11/24   Page 5 of 63

## LEGAL STANDARD

Federal courts are entrusted with separating the expert testimony wheat from the chaff. That task is guided by Rule 702 of the Federal Rules of Evidence,[2] the Supreme Court's seminal decision in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), and decades of precedent interpreting and applying the law.

Rule 702 was recently amended. It now reads:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Advisory Committee on Evidence Rules proposed the changes in response to court decisions that admitted expert testimony too liberally. The revised language, which went into effect on December 1, 2023, clarifies that (i) the party introducing expert testimony has the burden to show that "the proffered testimony meets the admissibility requirements," and (ii) "each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." Fed. R. Evid. 702 advisory committee's note to 2023 amendment.

---

[2] Unless otherwise noted, subsequent references to "Rules" are to the Federal Rules of Evidence.

These amendments "reflect an intent to empower courts to take seriously their roles as gatekeepers of expert evidence." United States v. Diaz, No. 24-cv-0032 (MV), 2024 WL 758395, at *5 (D.N.M. Feb. 23, 2024). Because "jurors may lack the specialized knowledge" to evaluate the quality of a witness's opinion and its limitations, it is not enough to "presume[]" "expert testimony . . . admissible" and relegate issues of reliability to cross-examination. Id. at *4 (first quoting Fed. R. Evid. 702 advisory committee's note to 2023 amendment; and then quoting Proposed Amendments, Excerpt from May 15, 2022 Report of the Advisory Committee on Evidence Rules). Courts must withhold endorsement from expert witnesses who fail to meet Rule 702's standards. With that in mind, the Court summarizes the law governing expert testimony.

**Rule 702** authorizes courts to admit expert testimony that meets three conditions: (1) the witness is "'qualified,'" (2) her "opinion is based upon reliable data and methodology," and (3) her "testimony will '[help] the trier of fact.'" Nimely v. City of New York, 414 F.3d 381, 397 (2d Cir. 2005) (quoting Fed. R. Evid. 702). An expert's testimony is admissible only if the party offering it establishes all three criteria.

**Qualifications**. A witness's qualifications typically show up on her resume. The relevant qualifications depend upon the area of expertise but may include education, technical or practical training, certifications, licenses, or professional, teaching, or other experience. See In re Puda Coal Sec. Inc. Litig., 30 F. Supp. 3d 230, 250 (S.D.N.Y. 2014) (listing "educational background, training, and experience in the field" as relevant qualifications); Focus Prods. Grp. Int'l v. Kartri Sales Co., 647 F. Supp. 3d 145, 234 (S.D.N.Y. 2022) (same as to certifications and accreditations); Tardif v. City of New York, 344 F. Supp. 3d 579, 597 (S.D.N.Y. 2018) (same as

Case 1:03-md-01570-GBD-SN Document 10615 Filed 12/11/24 Page 7 of 63

to licensure); <u>Capri Sun GmbH v. Amer. Beverage Corp.</u>, 595 F. Supp. 3d 83, 138 (S.D.N.Y. 2022) (same as to teaching).

Looking at the "totality of the witness's background," the court asks whether the "area in which the witness has superior knowledge, education, experience, or skill [matches] the subject matter of the proffered testimony." <u>Nat'l Coalition on Black Civic Participation v. Wohl</u>, 661 F. Supp. 3d 78, 97 (S.D.N.Y. 2023) (first quoting <u>Arista Records LLC v. Usenet.com, Inc.</u>, 608 F. Supp. 2d 409, 422 (S.D.N.Y. 2009); and then quoting <u>United States v. Tin Yat Chin</u>, 371 F.3d 31, 40 (2d Cir. 2004)); <u>see, e.g.</u>, <u>Moncayo v. United Parcel Serv., Inc.</u>, No. 23-cv-00161, 2024 WL 461694, at *1 (2d Cir. Feb. 7, 2024) (affirming decision excluding opinions that were "not within [the witness's] area of expertise"). If the witness's testimony addresses subjects within her area of expertise, she is considered qualified.

**Reliability.** Assessing an expert's reliability requires "rigorous" scrutiny of the principles and methods behind her opinions. <u>Amorgianos v. Nat'l R.R. Passenger Corp.</u>, 303 F.3d 256, 267 (2d Cir. 2002). Because "there are many different kinds of experts, and many different kinds of expertise," a one-size-fits-all approach to analyzing reliability is unworkable. <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 150 (1999). Accordingly, judges "have considerable leeway in deciding . . . how to go about determining whether particular expert testimony is reliable." <u>Id.</u> at 152.

Courts may consider the benchmarks identified in <u>Daubert</u>—(i) "a theory's testability," (ii) "whether it has been a subject of peer review or publication," (iii) "the known or potential rate of error," (iv) "whether there are standards controlling the technique's operation," and (v) "the degree of acceptance within the relevant scientific community." <u>Kumho Tire Co.</u>, 526 U.S. at 145, 149 (cleaned up). Or they may look to other factors, such as: (i) the context in which the

Case 1:03-md-01570-GBD-SN   Document 10615   Filed 12/11/24   Page 8 of 63

expert developed her opinion (i.e., for her "'independent research' . . . or . . . 'expressly for purposes of testifying'"); (ii) "whether she 'has unjustifiably extrapolated from an accepted premise to an unfounded conclusion'"; (iii) her success in "account[ing] for . . . alternative explanations"; (iv) whether she is "as careful as [s]he would be in h[er] regular professional work"; and (v) "whether her 'field of expertise . . . is known to reach reliable results for the type of opinion offered.'" In re Terrorist Attacks on Sept. 11, 2001, No. 03-md-01570 (GBD)(SN), 2023 WL 3116763, at *2–3 (S.D.N.Y. Apr. 27, 2023) (quoting Deutsch v. Novartis Pharms. Corp., 768 F. Supp. 2d 420, 426 (E.D.N.Y. 2011)).

Whatever metrics a court uses to assess a particular expert, the reliability standard is the same: "Rule 702 does not set a lower [bar] for witnesses with 'technical or other specialized knowledge' than for scientists." Restivo v. Hessemann, 846 F.3d 547, 576 (2d Cir. 2017). A witness whose expertise derives from her experience must accordingly "base her opinion on sufficient facts or data, explain how her experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Veleron Holding, B.V. v. Morgan Stanley, 117 F. Supp. 3d 404, 444 (S.D.N.Y. 2015) (cleaned up); accord Fed. R. Evid. 702 advisory committee's note to the 2000 amendment.

Applying these principles, courts exclude opinions that reflect "too great an analytical gap between the data and opinion proffered"—in other words, testimony supported "only by the ipse dixit of the expert." General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) ("Joiner"). The same goes for opinions based on "speculation" or conjecture, Daubert, 509 U.S. at 590, those rooted in a "discipline [that] itself lacks reliability," Kumho Tire Co., 526 U.S. at 151, or even testimony that "for security reasons . . . would not be open to adequate inquiry on cross-examination," Gill v. Arab Bank, PLC, 893 F. Supp. 2d 523, 530 (E.D.N.Y. 2012). These

Case 1:03-md-01570-GBD-SN   Document 10615   Filed 12/11/24   Page 9 of 63

safeguards ensure that "the courtroom door remains closed" not just "to junk science" but to all unreliable testimony. <u>Amorgianos</u>, 303 F.3d at 267.

**Helpfulness**. Expert testimony is helpful when it "sheds light on activities not within the common knowledge of the average juror." <u>United States v. Wexler</u>, 522 F.3d 194, 204 (2d Cir. 2008). Such testimony "provide[s] the groundwork to enable the [trier of fact] to make its own informed determination[s]" on relevant issues. <u>In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.</u>, 725 F.3d 65, 114 (2d Cir. 2013). So when an expert offers her opinion, she must take care not to "usurp the role" of the trier of fact by dictating the result or otherwise straying from the expert-witness lane. <u>Nimely</u>, 414 F.3d at 397 (cleaned up); <u>see</u> <u>Mar-Can Transp. Co. v. Loc. 854 Pension Fund</u>, No. 20-cv-08743 (CS), 2024 WL 1250716, at *4 (S.D.N.Y. Mar. 22, 2024).

In concrete terms, this means that "legal conclusions," <u>United States v. Duncan</u>, 42 F.3d 97, 101 (2d Cir. 1994); "credibility" determinations; "motivations," "intentions," and other states of mind, <u>Marvel Characters, Inc. v. Kirby</u>, 726 F.3d 119, 135–36 (2d Cir. 2013); and "'lay matters' which the trier of fact can understand and decide without the expert's help" are off limits to expert witnesses, <u>United States v. Jiau</u>, 734 F.3d 147, 154 (2d Cir. 2013); <u>accord</u> <u>United States v. Zhong</u>, 26 F.4th 536, 555 (2d Cir. 2022).

"Factual narrative[s]" in expert testimony run afoul of many of these principles. <u>Kozak v. Liberty Mar. Corp.</u>, No. 20-cv-03684 (MMH), __ F. Supp. 3d __, 2024 WL 1558809, at *11 (E.D.N.Y. Apr. 10, 2024). A party that uses an expert witness as a vehicle to "summarize the relevant facts . . . and then opine—or, more accurately, argue—that" its theory of the case is the correct one is, "in essence, giving a summation from the witness stand." <u>Lippe v. Bairnco Corp.</u>, 288 B.R. 678, 687–88 (Bankr. S.D.N.Y. 2003). That is counsel's job. It is "not the function of an

expert witness." Id. at 688. Like other opinions that lack "a layer of expertise or cogent analysis beyond that which a lay jury would so clearly understand," factual narratives must be excluded. Est. of Jaquez v. City of New York, 104 F. Supp. 3d 414, 432 (S.D.N.Y. 2015).

**Weight**. If an expert's opinion meets the three criteria for admission, any further challenges go to its weight. Fed. R. Evid. 702 advisory committee's note to the 2023 amendment. Daubert advises that such weaknesses can be addressed by "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." 509 U.S. at 596.

**Hearing**. As with many aspects of this process, courts have wide latitude to decide whether to hold a Daubert hearing. No hearing is necessary if a motion challenging expert testimony can be decided on written submissions. Du v. Party Perfect Rentals LLC, No. 23-cv-00088 (JAM), __ F. Supp. 3d __, 2024 WL 1617315, at *4 (E.D.N.Y. Apr. 15, 2024).

## DISCUSSION

The Court carefully applies these standards to the seven expert witnesses the parties have challenged. There is no need for a Daubert hearing. The motion for argument is denied as moot. See ECF No. 9281.

### I.     Bassem Youssef

#### A.     Background

Bassem Youssef ("Youssef") is a decorated former FBI agent. He joined the Bureau after graduating from California State University in 1987 with a degree in anthropology. See ECF No. 9165-3 at 3. He was quickly staffed as a special agent on investigations that leveraged his fluency in Arabic. One of those investigations concerned the Abu Nidal Organization, a Palestinian militant group that was active in the United States. See id. The other, based out of the FBI's Los Angeles Field Office, focused on Al-Gama'a Al-Islamiya, an Egyptian Sunni

extremist group and then-designated Foreign Terrorist Organization. See id. As part of his

responsibilities, he recruited sources and conducted polygraph exams in Arabic and English. See

id.

In 1996, Youssef became the first FBI legal attaché stationed at the U.S. Embassy in

Riyadh, Saudi Arabia. See id. at 2. His duties there involved liaising with law enforcement and

security officials in the Gulf region. See id. at 3.

Youssef returned to the United States in 2000 to work at the CIA's National

Counterintelligence Center before transferring to the FBI's Counterterrorism Division in 2002.

See id. at 2. Within that division, he served first as chief of the Digital Media Exploitation Unit,

where he developed guidelines and policies for the FBI's efforts to use digital media analysis "in

support of Operation Enduring Freedom." Id. at 2. Then from 2004 to 2014 he served as chief of

the Communications Analysis Unit, an office "dedicated to analyzing terrorist telephonic and

email communications," ECF No. 9089-1 at 10, where he collaborated with "members of the

intelligence community and foreign security services . . . in communications analysis," and

"[o]versaw multiple highly sensitive and compartmented telecommunication-related projects,"

ECF No. 9165-3 at 2.

He retired in 2014 after 26 years of service. See id. at 2. His work was recognized with

the Director of Central Intelligence Award, 11 FBI commendations, and a commendation letter

from British Prime Minister John Major. See id. at 3.

### B.    Report

The Plaintiffs retained Youssef as an expert in "counterterrorism investigations and

operations, specifically radical Islamic terrorism; Saudi Government political, diplomatic, and

intelligence operations; counterintelligence; and communications analysis." See ECF No. 9089-1

at 12. They asked him to review "documents produced and depositions conducted in this case"

11

and offer his opinion. Youssef examined materials released pursuant to Executive Order 14040; documents and media turned over by the Kingdom, Dallah Avco, the MPS, the FBI, the CIA, federal agencies, universities, private companies, religious institutions, charitable organizations, and other entities; and relevant sources he personally collected.

Youssef analyzed these materials and concluded that "9/11 hijackers Nawaf al Hazmi and Khalid al Midhar" received knowing and "substantial assistance" from a "terror network inside California" "covertly operate[d]" by "Sunni Islamic extremists, including Al Qaeda," with the "support" of "the Kingdom of Saudi Arabia [and] its officials." ECF No. 9089-1 at 15. To support that conclusion, his report makes four principal findings:

(1) "Saudi Arabia, and especially its Ministry of Islamic Affairs ("MOIA") established a longstanding network of Saudi government officials to support Sunni extremism inside the U.S., including in Southern California, and . . . both . . . Thumairy . . . and . . . Bayoumi . . . were part of this network."

(2) "Al Qaeda would have sent 9/11 hijackers . . . Hazmi and . . . Midhar to Southern California[] to commence the preparations in the United States for Al Qaeda's most important and ambitious plot[] only after conducting detailed research and planning."

(3) "Thumairy was the main designated contact person for Al Qaeda and its two operatives in Los Angeles and . . . used members of his extremist cell at the King Fahad Mosque, including Saudi Consulate employee Ismail Mana ("Mana") and Mohamed Johar ("Johar"), to assist Hazmi and Mihdhar during their time in Los Angeles."

(4) "Bayoumi was the designated 'handler' for Hazmi and Mihdhar assigned to relocate Hazmi and Mihdhar to San Diego and support them during their time there."

ECF No. 9163 at 18–20.

## C.   Qualifications

Youssef's qualifications to testify as an expert present a close question. To be sure, Youssef led a commendable career as an FBI agent, devoting over two decades to serving the American public. But the question is whether his "area of superior knowledge," "experience,"

and "skill" matches the "subject matter of his testimony." Nat'l Coalition on Black Civic Participation, 661 F. Supp. 3d at 97 (cleaned up).

At first blush, Youssef's career appears tailor-made for this case. His posts in Los Angeles and Riyadh exposed him to extremists operating in California and to Saudi officials—two types of people with key roles in the events at issue here. See ECF No. 9165-3 at 2–3. And he held positions of great trust in FBI offices analyzing communications and investigating terrorism—two specialties relevant to this litigation. See id. Indeed, the parties agree that Youssef is qualified to interpret phone records based on his experience overseeing the "analysis of telephone contacts and patterns" as Chief of the FBI's Communications Analysis Unit. ECF No. 9089-1 at 10; see ECF Nos. 9088 at 27, 9163 at 29.

Youssef's command of other investigative "skill[s]" used in his report is less clear, however. Nat'l Coalition on Black Civic Participation, 661 F. Supp. 3d at 97 (cleaned up). He appeals heavily to his background in "counterterrorism investigations and operations," but his practical experience in the area appears somewhat thin. ECF No. 9089-1 at 12, 14. Youssef's work as a case agent investigating terrorism cells was limited to the first few years of his career. See ECF No. 9088 at 26–27.[3] And although he may well have developed expertise in the special techniques used in counterterrorism assessments during his time in these posts, that is not evident on this record.[4]

---

[3] The Defendants also assert that Youssef's involvement in those investigations was merely as "a translator," citing FBI testimony from an employment discrimination case. ECF No. 9088 at 27 (citing Youssef v. Fed. Bureau of Investigation, 541 F. Supp. 2d 121, 128–29 (D.D.C. 2008)). Because of the procedural posture of the case, the district court never made factual findings as to the scope of his work. See Youssef v. Fed. Bureau of Investigation, No. 03-cv-1551 (D.D.C.). The Court therefore declines to rest its analysis of Youssef's qualifications on these claims.

[4] Youssef's generalized statement that he "was called upon, on a regular basis, to use [his] expertise and knowledge to make counterterrorism assessments based on information collected by the FBI" does not provide sufficient detail to erase these concerns. ECF No. 9089-1 at 14.

Nor does Youssef's specialized "knowledge" furnish a watertight foundation for his opinions. Nat'l Coalition on Black Civic Participation, 661 F. Supp. 3d at 97 (cleaned up). His testimony focuses on al Qaeda cell operations and MOIA activities in the United States, neither of which were central to the FBI work he describes in his report and curriculum vitae. See ECF No. 9089-1 at 15–21 (summarizing opinions about Saudi support for al Qaeda channeled through MOIA). His investigative work centered on other extremist groups (the Abu Nidal Organization and Al-Gama'a Al-Islamiya), and his Saudi government contacts were primarily in law enforcement. See ECF No. 9165-3 at 3.

Ultimately, the daylight between Youssef's expertise and the content of his testimony are reason for pause but not wholesale exclusion. Youssef's distinguished career as an FBI agent and his undisputed experience in subjects directly or closely related to those at issue here— notwithstanding disputes as to the quantum or depth of his experience—justify finding him qualified to testify about communications analyses and counterterrorism investigations. Although Youssef's testimony undoubtedly strays outside these bounds (e.g., his opinion that leading Ramadan prayers "did not involve difficult or 'exhausting' work," ECF No. 9089-1 at 112), these instances can be more cleanly addressed on reliability or helpfulness grounds. Accordingly, the Court declines to preclude Youssef's testimony as unqualified.

### D.   Reliability

**First**, the Defendants protest that the Court cannot assess the reliability of Youssef's testimony because he relies on "confidential or classified" methods or facts. ECF No. 9088 at 31–32. They challenge Youssef's testimony about his experience investigating terrorism cells in Southern California during the 1990s, for example, because materials related to those investigations remain classified. Id. This complaint is easily dispensed with. Youssef stated in his deposition: "all my analysis is in my report." ECF No. 9165-11 at 19:11. Taking him at his word,

the Court analyzes the methodology evident within the four corners of his report. The

Defendants' concerns with Youssef's testimony about his early FBI investigations are thus

matters of weight, not admissibility.[5]

**Second**, the Defendants argue that Youssef does not adequately explain how his

experience "leads to the conclusions he reached, why that experience is a sufficient basis for the

opinion, and how that experience is reliably applied to the facts." Veleron Holding, B.V., 117 F.

Supp. 3d at 444 (cleaned up); see ECF No. 9088 at 34–35. Youssef frequently cites his

"observations," "experience," or "knowledge," ECF No. 9089-1 at 24, 70, 113, without

"reveal[ing] how he has made use of" that information, Primavera Familienstifung v. Askin, 130

F. Supp. 2d 450, 529 (S.D.N.Y. 2001). He writes, for example:

- "From my observations, Bin Laden and his army of mujahedin fighters which came to be known as 'Al Qaeda' played a supporting role for these 1993 terror plots against New York City targets and were closely linked not only to Abdel Rahman but to the terrorists who carried out the attacks." ECF No. 9089-1 at 24.

- "Based on my knowledge of Saudi Government operations, Sadhan and Sudairy were given instructions to meet with Thumairy immediately upon their arrival in Los Angeles to discuss their mission. Thumairy was the lead MOIA official in California, and Thumairy would have been informed in advance that two MOIA Propagators were assigned to work in Thumairy's area of responsibility." ECF No. 9089-1 at 113.

- "Based on my experience, it is incredible that Jaithen would disobey his written instructions and travel to a location in the U.S. without close consultation with his MOIA superiors." ECF No. 9089-1 at 148.

---

[5] The Defendants' objections to Youssef's qualifications are addressed *supra* I.C at 12–14. He therefore has a basis to testify about Saudi Arabia's historical financial ties with the Ibn Taymiyah Mosque, ECF No. 9089-1 at 18, 27; Al Gama'a Al-Islamiya's relationship with al Qaeda, id. at 22–24, 28–30; and the history of the Islamic Center of San Diego (ICSD), also known as the Abu Bakr Mosque, id. at 27, 91.

Each of these passages offers only "conclusor[y] [assertions] that [Youssef's] experience led to his opinion." <u>Primavera Familienstifung</u>, 130 F. Supp. 2d at 530. The Court needs greater context if it is to assess whether Youssef reliably applied his experience to the facts of this case.

Youssef does occasionally provide the necessary background. For instance, before discussing phone lines attributed to individuals relevant to this case, he writes:

> • "In virtually every terrorism investigation and operation I handled or reviewed during my 26 years of service to the FBI, I encountered various forms of communication security used by different organizations, to maintain the secrecy of the operational plans and protect their identity from detection by intelligence/law enforcement agencies.
>
>   In their attempt to shield their calling activity from detection, I have witnessed organizations provide their operatives with telephone numbers that are subscribed under different names and addresses. Operatives would also use several different telephone numbers at different times and may also abandon a particular number if they sense the number has been compromised." ECF No. 9089-1 at 125–26.

And in discussing Saudi Arabia's typical processes for selecting officials for important foreign posts, he sufficiently connects his Riyadh work experience to his opinions:

> • "My experience taught me that Saudi officials will always select individuals for important positions that were first recommended by another trusted official. In fact, that recommendation is practically a mandatory requirement for applying for any position of importance and/or responsibility." ECF No. 9089-1 at 42.
>
> • "From my work for the FBI, I know that Thumairy was given diplomatic titles that could only be issued pursuant to directions from high-level Saudi officials in the MOIA and the Ministry of Foreign Affairs." ECF No. 9089-1 at 47.
>
> • "From my observations, the Saudi Government employed a strict hierarchy over its officials, particularly those working in a foreign country." ECF No. 9089-1 at 48.

But this welcome degree of insight is the exception, not the rule.

**Third**, the Defendants protest that Youssef resorts to speculation and conjecture. <u>See</u> ECF No. 9088 at 38–39. His report attempts to reconstruct events leading up to the 9/11 Attacks

16

and the roles various people played in them, working off an imperfect slate of witness accounts,

intelligence reports, and phone records. Where the evidence is spotty, Youssef fills the void with

his own ideas as to what people "would have" done, ECF No. 9088 at 38–39 (quoting Major

League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 311 (2d Cir. 2008)):

- "Bayoumi *would not have* been sent to California and allowed to work there for seven years without the approval of Director General Salmi and other senior Saudi Government officials." ECF No. 9089-1 at 79 (emphasis added).

- "Al Qaeda and its planners *would never have* decided on Los Angeles and San Diego, California as the destination for Hazmi and Mihdhar unless there was an entrenched, verified support structure in place to ensure that its operatives would not be discovered and had sufficient help to safely carry out their plans." ECF No. 9089-1 at 107 (emphasis added).

- "Two trained Al Qaeda operatives *would not have* left a bag with someone and returned to pick it up unless they knew that person was part of their support network." ECF No. 9089-1 at 176 (emphasis added).

Frequently, Youssef leaps from "accepted premise[s] to . . . unfounded conclusion[s]."

Deutsch, 768 F. Supp. 2d at 426. He takes neutral or ambiguous facts and interprets them to paint

damning portraits of people or events. Two passages cleanly showcase this pattern:

- "The MOIA instructed its propagators Mersal and Jaithen to 'provide a detailed report' about their trip and to fill out a form providing details about 'every organization' visited. Neither man could recall if they prepared these documents, and no documents were produced, indicating that the true nature of their trip could not be set forth in an official report due to its sensitive and covert nature." ECF No. 9089-1 at 150.

- "The involvement of high-level Saudi Government officials in the support plot is confirmed by the facts that all but one of the Saudi Government officials involved in the plot are still working or continued to work for the Kingdom until their death or retirement." ECF No. 9089-1 at 232–33.

In each case, Youssef adopts a nefarious explanation of events without factual support

rather than entertaining the possibility that, say, the MOIA lost the form Mersal and Jaithen filled

out, or Saudi officials kept their jobs because their superiors were unaware or unconvinced of

allegations that they were involved in the 9/11 plot. His failure to "account for [these reasonable] alternative explanations," Deutsch, 768 F. Supp. 2d at 426, exposes the "analytical gap[s] between" the facts and Youssef's opinions, Joiner, 522 U.S. at 146. See ECF No. 9088 at 41–42 (criticizing Youssef's analysis of Saudi officials' involvement as "guilt by association").

**Fourth**, the Defendants attack Youssef's phone record analyses. See id. at 39–41. Youssef reviews call logs and event timelines and purports to divine the content of callers' discussions, even where the identity of the callers is contested. See id. at 39–41 (explaining disputes over the people with access to various phone lines).

- "My opinion is that the calls on December 7 and 8, 1999 comprise a 'call circle' with Thumairy contacting Mersal, Bayoumi, the Saudi Embassy and MO1A about the preparations for the upcoming trip of Mersal and Jaithen." ECF No. 9089-1 at 146.

- "In my opinion, this pattern of calls . . . show[s] that the participants in the calls—Thumairy, Bayoumi, Sowailem, Jaithen, Mersal, and Aulaqi—are all working/coordinating on an important matter/project that warrants the international travel of Jaithen and Mersal from Saudi Arabia to the U.S. to meet in person. . . . When viewed in context of the events occurring before and after these contacts, the project that these individuals must be working on is to handle the arrival of Hazmi and Mihdhar in California. The subsequent interactions of Hazmi and Mihdhar with the various members of this calling circle of individuals shows that the men are their advance team and support network, to assist in their preparation to participate in a mission inside the U.S." ECF No. 9089-1 at 159–60.

- "These calls, following Thumairy's meetings with Hazmi and Mihdhar and timed precisely with their arrival in San Diego and attendance at the ICSD Mosque, indicate that Thumairy was communicating with the ICSD's Imam about the two hijackers." ECF No. 9089-1 at 206.

- "In my opinion, Bayoumi's quick return to San Diego, Bayoumi's call to Sowailem's cell phone, and the sharp spike in calls between Bayoumi and Thumairy, are likely related to discussion of the arrangements being made to provide support for the arrival of 9/11 hijacker Hani Hanjour in San Diego on December 8, 2000, and the departure of Hanjour together with Nawaf al Hazmi from San Diego on December 11, 2000." ECF No. 9089-1 at 225.

Youssef insists that "[a]n analysis of the pattern and timing of phone calls between two individuals in relation to other known events is routinely used to reach conclusions about the substance of the conversations of those individuals." ECF No. 9089-1 at 176. The Defendants acknowledge that Youssef's experience with the FBI qualifies him "for the phone-call part of his analysis," but argue that his assumptions are unreliable. ECF No. 9088 at 19, 40. While the record may establish conflicting reports about the users of certain telephone lines, Youssef explains that his methodology is reliably used by the FBI. The Defendants may challenge these assumptions, but they do not render his opinion categorically unreliable.

**Fifth**, the Defendants object to Youssef's selective reliance on FBI reports. See ECF No. 9088 at 35–37. To be clear, there is nothing inherently wrong with a terrorism expert considering these materials—it is using them inconsistently that raises reliability concerns. Youssef does rely on some FBI assessments more than others. He puts significant weight on materials that support his theory of the case, like the FBI's July 2021 Electronic Communication ("EC"). See ECF Nos. 9089-1 at 16–17, 63–64, 167, 237, 240, 247 (discussing July 2021 EC); 9089-15 (July 2021 EC). And he downplays FBI statements that challenge his opinions, like Assistant Director McGarrity's September 2019 Declaration. See ECF No. 5142 (McGarrity Declaration). An expert's selective reliance on evidence, especially when it lines up with the outcome desired by the party who retained him, opens him up to accusations of "[c]herry-picking." In re Acetaminophen – ASD-ADHD Prods. Liab. Litig., 707 F. Supp. 3d 309, 336 (S.D.N.Y. 2023). Youssef adequately answers those charges in his deposition testimony. When questioned about his understanding of the McGarrity Declaration, which purported to clarify the meaning of a declassified FBI assessment, he gave principled reasons for putting stock in the original

assessment's language. See ECF No. 9089-2 at 100:3–103:6. These and other concerns about Youssef's characterization of FBI materials are thus a matter of weight, not admissibility.

**Sixth**, the Defendants push back on Youssef's use of anonymous sources. See ECF No. 9088 at 37–38. Youssef repeatedly credits source statements without discussing factors typically used to assess reliability, such as the source's "relationship" to the events, "motivation in providing information or assistance," "criminal history," and "prior record as a witness."[6] See, e.g., ECF No. 9089-1 at 63 (passing off source reporting from ECF No. 9089-22 as FBI findings), 67 (same as to source reporting repeated in ECF No. 9089-14 at 5–6), 171 (citing source reporting without analyzing reliability factors).

In just one example, Youssef cites a source's tip about a phone call between Thumairy and an individual in Malaysia but does not provide any details about the source that suggest the information is trustworthy. See ECF No. 9089-1 at 161. Youssef defends his reliance on the tip by suggesting that he can intuit how the FBI viewed the source's credibility based on the "manner" in which the statements were "present[ed]" in FBI documents. ECF No. 9089-1 at 161 n.629. But nothing in the record indicates that second-hand credibility assessments are standard practice in the FBI or otherwise accepted as reliable.

Taken together, these issues[7] paint a portrait of an expert who has glossed over weaknesses in his opinion. Much of Youssef's testimony rests on conclusory assertions of experience, anonymous sources, or his own say-so. This is not true of Youssef's testimony about

---

[6] Office of the Inspector General, The Federal Bureau of Investigation's Compliance with the Attorney General's Investigative Guidelines, U.S. Dep't of Justice (Sept. 2005), https://oig.justice.gov/sites/default/files/legacy/special/0509/final.pdf (listing factors for evaluating sources pulled from the FBI's Confidential Informant Guidelines).

[7] The Defendants also raise Youssef's "guilty by association" logic. See ECF No. 9088 at 41–42. Because this argument overlaps to a significant degree with witness credibility issues addressed below, the Court declines to discuss it here.

the FBI's Southern California investigations during the 1990s, Saudi Arabia's approach to appointing foreign officials, terrorism organizations' communication security, and phone analysis. On these topics, Youssef's testimony is grounded in his relevant experience. But outside these limited topics, his opinions do not meet Rule 702's standards for reliability. Even though his findings may well be correct—an issue on which the Court takes no position at this time—the portions of his testimony that lack a reliable foundation must be excluded.

### E.    Helpfulness

Reliability aside, Youssef's testimony faces an uphill battle for admission. In the Defendants' view, his opinions should be excluded as unhelpful on four grounds. See ECF No. 9088 at 61–69.

**First**, the Defendants submit that Youssef's testimony amounts to an improper factual narrative. See ECF No. 9088 at 65–66. Examples are easy to provide, such as the following paragraph:

> • "In September 1993, shortly after Abdel Rahman's last visit to California, Prince Abdelaziz, the son of the Saudi King Fahad, visited the Ibn Taymiyah Mosque with his entourage. After meeting with Khalil, the Prince pledged to provide funds to purchase land for a new mosque in honor of his father. This began the project that led to the building of the King Fahad Mosque. Shortly thereafter, the Saudi Embassy provided $1 million to IFSIT for the land purchase, and an additional $4 million to start the construction." ECF No. 9089-1 at 33.

This paragraph, like many others in Youssef's report, pulls together evidence to tell a story. "But this is what a lawyer does in his or her summation to the jury. This is not the function of an expert witness." Lippe, 288 B.R. at 688. The Plaintiffs cannot use Youssef or any other expert to interpret testimony and documents that the factfinder can just as easily review. See Est. of Jaquez v. City of New York, 104 F. Supp. 3d 414, 432 (S.D.N.Y. 2015) (prohibiting expert from giving testimony that constituted "little more than common sense interpretations of the

Case 1:03-md-01570-GBD-SN   Document 10615   Filed 12/11/24   Page 22 of 63

evidence—a role well-suited for a jury"), aff'd sub nom. Est. of Jaquez by Pub. Adm'r of Bronx

Cnty. v. City of New York, 706 F. App'x 709 (2d Cir. 2017).

     **Second**, the Defendants object to Youssef's opinions on states of mind. See ECF No.

9088 at 67–69. Experts cannot opine on "motivations and intentions," Marvel Characters, 726

F.3d at 135–36, "beliefs," United States v. Rahman, 189 F.3d 88, 136 (2d Cir. 1999), or other

"state[s] of mind," In re Fosamax Prods. Liab. Litig., 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009).

Yet Youssef ascribes "actual knowledge," "intent[]," "motive," and "purpose" to people and

entities. ECF No. 9089-1 at 119, 126, 197, 245. Sometimes he does this explicitly, as is the case

here:

> - "According to Morgan, at the time, the whole restaurant encounter seemed to him to be coincidental. This is exactly what Bayoumi *intended* as part of his tradecraft. Bayoumi *knew* that he needed a plausible excuse for meeting two Al Qaeda operatives and bringing them to San Diego." ECF No. 9089-1 at 198 (emphasis added).

Other times, his analysis of a person's motives is implicit, like in this passage:

> - "There is no evidence to suggest that the hardened Al Qaeda operative was homesick and was abandoning his mission to go home. What makes sense is that Mihdhar was doing exactly what Al Qaeda operatives do. He was heading back to report in person to Al Qaeda about the knowledge he gained from his five months in California." ECF No. 9089-1 at 220.

     The Plaintiffs argue that these and other opinions are admissible as "'testi[mony] to

whether a given practice is consistent with a given state of mind.'" ECF No. 9163 at 74–75

(quoting United States v. Patel, No. 21-cr-220 (VAB), 2023 WL 2643815, at *39 (D. Conn. Mar.

27, 2023)). Even if this exception (which emerged in the business practices context[8]) applies

here, it does not save Youssef. As the examples above demonstrate, his report does more than

point out consistency—it purports to divine the "'real motive' behind certain" actions. In re

---

[8] See Media Sport & Arts S.R.L. v. Kinney Shoe Corp., No. 95-cv-03901 (PKL), 1999 WL 946354, at *4 (S.D.N.Y. Oct. 19, 1999).

Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004) (quoting Lippe, 288 B.R. at 688). Such testimony must be excluded. See Highland Capital Mgmt., L.P. v. Schneider, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) (excluding testimony about "how obtaining information concerning the McNaughton/Jones merger affected the Schneiders' actions"); see also In re Term Commodities Cotton Futures Litig., No. 12-cv-05126 (ALC), 2020 WL 5849142, at *14 (S.D.N.Y. Sept. 30, 2020) (excluding expert's testimony that the defendants' "motivation for the activity was to squeeze front-month shorts").

**Third**, the Defendants challenge Youssef's witness credibility assessments. See ECF No. 9088 at 66–67. "[T]he job[] of judging . . . witnesses' credibility and drawing inferences from their testimony belong[s] to the factfinder." Marvel Characters, 726 F.3d at 136; accord Nimely, 414 F.3d at 398 (prohibiting even those with special "scientific or technical expertise" in evaluating candor from offering opinions as to credibility). Both judge and jury are capable of "cataloguing . . . inconsistencies in the testimony and evidence" to reach a conclusion about a person's candor—no expert assistance required. ECF No. 9163 at 73. Youssef's accusations that witnesses are "lying," "incredible," "making a deliberate effort to obfuscate and obstruct," or "willing[] to say anything, as absurd as it may sound, to protect . . . superiors" are not helpful to the factfinder. ECF No. 9089-1 at 47, 51, 65, 160. All such testimony is precluded. See, e.g., id. at 75, 76, 77, 100, 119, 126, 132–33, 137–38, 148, 155, 209, 225, 239.

**Fourth**, the Defendants complain that Youssef acts as a conduit for hearsay. See ECF No. 9088 at 61–65. He does quote FBI reports and other documents, but generally as one piece of a broader mosaic of evidence, see, e.g., ECF No. 9089-1 at 63–64, or with his own commentary, see, e.g., id. at 124. This does not make him a Trojan horse for hearsay, so exclusion is not warranted.

### F.     Admissibility

Serious issues plague Youssef's opinions. On most topics, he fails to explain how his experience informs certain conclusions, employs unreliable analytical methods, relies on questionable sources of information, and speculates about witnesses' credibility and other individuals' states of mind, all in the service of his version of the events leading to the 9/11 Attacks. This "place[s] [him] not in the role of expert, but of narrator—and not even a reliable narrator, at that." Sec. & Exch. Comm'n v. Terraform Labs Pte. Ltd., 708 F. Supp. 3d 450, 471 (S.D.N.Y. 2023). So, while Youssef doubtless led an exemplary career, and his ultimate conclusions may be correct (a question the Court does not address at this juncture), the Court cannot admit expert testimony that falls below Rule 702's standards. See Fed. R. Evid. 702 advisory committee's note to the 2023 amendment. In light of the pervasive defects in Youssef's report, the motion to exclude his testimony is granted in large part. Youssef may, however, testify about the FBI's 1990s Southern California investigations, Saudi Arabia's approach to appointing foreign officials, terrorism organizations' communication security, and testimony based on telephone data analysis.

## II.     Emile Nakhleh

### A.     Background

Dr. Emile Nakhleh ("Nakhleh") is an academic and retired CIA analyst. See ECF No. 9089-4 at 94. He is fluent in Arabic and holds degrees from Saint John's University, Georgetown University, and American University, where he received a Ph.D. in international relations in 1968. See id. at 96. He began his career as a professor at Mount St. Mary's University, where he conducted field research and published books and articles on religious, ethnic, legal, and political dynamics in the Middle East, North Africa, and the Persian Gulf. See id. at 96–99.

Case 1:03-md-01570-GBD-SN    Document 10615    Filed 12/11/24    Page 25 of 63

Nakhleh joined the CIA as a scholar in residence in 1990 and transitioned to a career analyst position by 1993. See id. at 94. In that capacity, he advised the intelligence community on "political Islam, radical . . . [and] mainstream interpretations [of Islam], jihad[,] terrorism, and youth recruitment." Id. He later became the founding director of the CIA's Political Islam Strategic Analysis Program, which offered training to government employees and hosted an "annual academic outreach symposium on different facets of . . . Islamization across the Muslim world." Id. at 95. Before his retirement from the CIA in 2006, he received the Distinguished Career Intelligence Medal, the William L. Langer Award, the Director's Award, a Unit Citation Award, and the Intelligence Commendation Medal. See id. at 94, 96.

After leaving the intelligence community, Nakhleh returned to academia. He now serves as the founding director of the Global and National Security Policy Institute at the University of New Mexico. See id. at 94. He also consults with government stakeholders and continues to publish commentary in various outlets. See id. at 98–103.

### B.    Report

The Plaintiffs engaged Nakhleh "as an expert on political Islam, on the ideological and operational approaches to jihad within Wahhabism, and, specifically, on the potential role played by the Kingdom of Saudi Arabia in aiding, abetting and supporting" the 9/11 Attacks. ECF No. 9089-4 at 4.

Nakhleh offers opinions on "Saudi Arabia's 'Wahhabi polity,' the means by which it was implemented and advanced by officials of the MOIA prior to the 9/11 attacks, particularly through *da'wa* overseas, and the connections between 'Wahhabi polity' and violent jihadist attacks." ECF No. 9163 at 23. His report "charts the creation of the Saudi Ministry of Islamic Affairs, its *da'wa* operations and the paths of certain MOIA propagators deployed to the United States, and the roles of Saudi officials in the support network for the 9/11 attacks." Id. at 23–24.