urge this Court to find under *Kaplan* and *Honickman* that (1) Saudi officials, employees, and agents were "generally aware" of their role in al Qaeda's violent activities through their multifaceted support of purported charitable organizations and various individuals that were "closely intertwined" with al Qaeda; and (2) Saudi Arabia knowingly provided substantial support to al Qaeda. (*See id.* at 11.)

### B. JASTA Does Not Create Aiding-and-Abetting Liability Against Foreign States

In interpreting a statute, a court begins its statutory analysis by looking to the ordinary meaning of the statutory text, rules of grammar, and statutory context. *See N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 299–301 (2017). Where the text is clear, "extra-textual evidence" of "legislative history, purpose, and post-enactment practice" are unnecessary. *Id.* at 305; *see also United States v. Sampson*, 898 F.3d 287, 302 (2d Cir. 2018) (looking to the "plain language" of the statutory text rather than legislative history). Under the "whole-text canon," courts "do not . . . construe statutory phrases in isolation; [they] read statutes as a whole." *United States v. Morton*, 467 U.S. 822, 828 (1984). Writing for the Supreme Court in 1804, Chief Justice John Marshall noted

> That a law is the best expositor of itself, that every part of an act is to be taken into view, for the purpose of discovering the mind of the legislature; and that the details of one part may contain regulations restricting the extent of general expressions used in another part of the same act, are among those plain rules laid down by common sense for the exposition of statutes which have been uniformly acknowledged.

*Pennington v. Coxe*, 6 U.S. 33, 52–53 (1804).

Turning to the ATA, Plaintiffs cite the text of the "FINDINGS AND PURPOSE" section of JASTA to support their arguments that Congress intended to waive foreign

sovereign immunity for aiding-and-abetting terrorism claims. JASTA's purpose section reads

> The purpose of this Act is to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States.

JASTA § 2(b), 130 Stat. at 853; *see also id.* § 2(a)(6)–(7), 130 Stat. at 852–53. Yet, a "prefatory clause" of a statute that "announces an objective . . . does not change the plain meaning of the operative clause." *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 173 (2016). This Court evaluated this same purpose language of JASTA in its Order and then outlined the specific elements that a party must satisfy to meet the JASTA exception to FSIA immunity under § 1605B(b). *See In re Terrorist Attacks*, 298 F. Supp. 3d at 642; *see also Kaplan*, 999 F.3d at 855 (quoting JASTA § 2(b), 130 Stat. at 853). Similarly here, this Court must look to the operative clauses for aiding-and-abetting claims in applying the plain language of the statute to which the members of Congress agreed. *See Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1725 (2017) ("Legislation is, after all, the art of compromise, the limitations expressed in statutory terms often the price of passage, and no statute yet known 'pursues its [stated] purpose[] at all costs.'") (quoting *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987) (per curiam)) (alterations in *Henson*).

JASTA establishes civil liability of foreign states for international terrorism in the United States. Pre-JASTA, the ATA had explicitly barred claims brought thereunder from being asserted against foreign states. *See* 18 U.S.C. § 2337(2). While ATA § 2333 outlines the civil remedies available against parties responsible for acts of international terrorism,

ATA § 2337(2) reads that "[n]o action shall be maintained under section 2333 of this title

against . . . a foreign state, an agency of a foreign state, or an officer or employee of a foreign

state or an agency thereof acting within his or her official capacity or under color of legal

authority." *Id.* With the passage of JASTA, however, U.S. nationals may now assert claims

against foreign states under the ATA, "[n]otwithstanding section 2337(2) of title 18,"

provided that the requirements of JASTA's newly created FSIA exception in 28 U.S.C. §

1605B(b) are otherwise met. 28 U.S.C. § 1605B(c); *see also In re Terrorist Attacks*, 298 F.

Supp. 3d at 642 n.6. In turn, this FSIA exception of § 1605B(b) provides that a foreign

state's immunity under the FSIA is waived

> in any case in which money damages are sought against a foreign
> state for physical injury to person or property or death occurring in
> the United States and caused by—
>   (1) an act of international terrorism in the United States; and
>   (2) a tortious act or acts of the foreign state, or of any official,
> employee, or agent of that foreign state while acting within the scope
> of his or her office, employment, or agency, regardless where the
> tortious act or acts of the foreign state occurred.

28 U.S.C. § 1605B(b).

Section 1605B expressly establishes primary liability against a foreign state for acts

of international terrorism, not aiding-and-abetting liability. While JASTA's first significant

statutory change to the ATA was permitting U.S. nationals to assert claims thereunder

against foreign states, *see* 28 U.S.C. § 1605B(b), the second significant change was to

authorize claims against "any *person* who aids and abets, by knowingly providing substantial

assistance, or who conspires with the person who committed . . . an act of international

terrorism," *see* 18 U.S.C. § 2333(d)(2) (emphasis added); *see also In re Terrorist Attacks*,

298 F. Supp. 3d at 642 n.6. Looking to the "whole text" of JASTA to see how a foreign

state's immunity under the FSIA is waived provides the key that Plaintiffs overlook:

14

> Notwithstanding section 2337(2) of title 18, a national of the United States may bring a claim against a foreign state *in accordance with section 2333* of that title if the foreign state would not be immune under subsection (b).

28 U.S.C. § 1605B(c) (emphasis added). That is, JASTA's waiver of foreign sovereign immunity, effectively abrogating the ATA's original restrictive language in 18 U.S.C. § 2337(2) for suits against foreign sovereigns, explicitly provides that such suits must be in accordance with the language of 18 U.S.C. § 2333.

Section 2333(a) provides that any U.S. national "injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue . . . ." Then, JASTA's added language to § 2333 reads

> (d) LIABILITY.—
>  (1) DEFINITION.— In this subsection, *the term 'person' has the meaning given the term in section 1 of title 1.*
>  (2) LIABILITY.— In an action under subsection (a) for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization . . . , *liability may be asserted as to any person who aids and abets*, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism.

18 U.S.C. § 2333(d) (emphases added). Thus, the waiver of foreign sovereign immunity in § 2337(2) directs the courts to find liability "in accordance with" § 2333, which in turn adds a subsection for aiding-and-abetting liability that construes "person" as defined in 1 U.S.C § 1 (the "Dictionary Act"), *id.* § 2333(d)(1). This definition of "person" includes "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C § 1. Sovereigns are not included in this definition, nor should they be implied. *See, e.g., Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (noting the *expressio unius est exclusio alterius* canon applies "when the

15

items expressed are members of an 'associated group or series,' justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence") (citation omitted); *Breard v. Greene*, 523 U.S. 371, 378 (1998) (per curiam) (foreign sovereign not a "'person' as that term is used in [42 U.S.C.] § 1983"); *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 780 (2000) (applying the "longstanding interpretive presumption that 'person' does not include the sovereign").

JASTA does not subject foreign sovereigns to liability because Congress provided a narrower definition of "person" in the aiding-and-abetting subsection of § 2333(d)(1) than the ATA's "Definitions" section. *See* 18 U.S.C. § 2331(3) ("the term 'person' means any individual or entity capable of holding a legal or beneficial interest in property"). Courts generally read as meaningful "the exclusion of language from one statutory provision that is included in other provisions of the same statute." *Hamdan v. Rumsfeld*, 548 U.S. 557, 578 (2006). Here, rather than leave the ATA's broader definition of "person" in place for § 2333(d), or provide for aiding-and-abetting liability against a foreign state in its waiver of foreign sovereign immunity in 28 U.S.C. § 1605B(b), Congress enacted the aiding-and-abetting amendment with a narrowed definition which does not include a foreign state.[6] Through this narrowed definition of "person," as with all Congressional amendments, this Court must presume that Congress intended its restrictive "amendment to have real and

---

[6] Congress had innumerable other statutory methods to hold foreign sovereigns liable for aiding-and-abetting international terrorism under the ATA. For example, in waiving foreign sovereign immunity in JASTA § 1605B(c), Congress could have said a U.S. national "may bring a claim against a foreign state in accordance with section *2333(d)(2)*," as opposed to "in accordance with section *2333*," which would have demonstrated that foreign state defendants would be liable under the aiding-and-abetting subsection of § 2333(d)(2) and not merely the other subsections of § 2333. *See* 28 U.S.C. § 1605B(c) (emphases added). Alternatively, to avoid any apparent conflict with the Dictionary Act, Congress could have simply defined "person" in § 2333(d)(1) to include foreign states.

substantial effect." *See Stone v. INS*, 514 U.S. 386, 397 (1995); *see also Pennington*, 6 U.S. at 52 ("the details of one part may contain regulations restricting the extent of general expressions used in another part of the same act").

Construing the "statute[] as a whole," *see Morton*, 467 U.S. at 828, also bolsters the interpretation that JASTA excludes foreign states from aiding-and-abetting liability. Plaintiffs urge this Court to consider the prefatory language in the Dictionary Act, which advises that a word's definition applies "unless the context indicates otherwise." (CAC Reply re Mot. to Revise, ECF No. 7740, at 3 (quoting 1 U.S.C. § 1).) Here, in the context of JASTA, Congress contemporaneously waived foreign sovereign immunity for principal acts of international terrorism through an amendment to FSIA (28 U.S.C. § 1605B) and also created aiding-and-abetting liability for acts of international terrorism under the ATA without including the liability of foreign sovereigns (18 U.S.C. § 2333(d)(2)). That is, Congress considered and amended foreign sovereign immunity in one section of the Act but provided no explicit waiver of foreign sovereign immunity in its aiding-and-abetting amendment. These contemporaneous decisions in the same Act support the conclusion that Congress intentionally narrowed the definition of "person" § 2333(d)(1) to place foreign states beyond the reach of § 2333(d)(2). As a federal statute, JASTA is inherently a "settlement" and "grand bargain" from Congress that sought to balance conflicting goals, *see Sturgeon v. Frost*, 139 S. Ct. 1066, 1083–84, 1087 (2019), and it is not surprising that Congress would employ different methods when countering international terrorism in the disparate contexts of private actors and foreign governments.

Further, the text of JASTA's aiding-and-abetting liability amendment provides under the caption "EFFECT ON FOREIGN SOVEREIGN IMMUNITIES ACT" that "[n]othing

17

in the amendment [to § 2333] made by this section affects immunity of a foreign state . . .
from jurisdiction under other law." JASTA § 4(b), 130 Stat. at 854. Given that the
amendment already excludes a foreign state from its definition of a "person" who may be
held liable for aiding and abetting acts of international terrorism, this text is superfluous for
the purpose of interpreting § 2333. Such ambiguous language should not be construed as
implying a waiver of foreign sovereign immunity in JASTA's amendment to § 2333. *See,
e.g., F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164 (2004) ("[T]his Court
ordinarily construes ambiguous statutes to avoid unreasonable interference with the
sovereign authority of other nations."). Instead, this text in JASTA § 4(b) appears to be an
instance of redundant language both affirming the longstanding presumption of foreign
sovereign immunity and an attempt to avoid "affect[ing the] immunity of a foreign state"
through the "other law" that JASTA amends, *i.e.*, the amendment of FSIA through the added
§ 1605B exception. Congress may have employed the redundant language of JASTA § 4(b)
inadvertently or to intentionally ensure that JASTA § 4(a) (18 U.S.C. § 2333(d)) would not
waive foreign sovereign immunity for ATA aiding-and-abetting claims. *See, e.g., Microsoft
Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 106 (2011) (finding that "no interpretation" of the
relevant statute "avoids excess language"); *Atl. Richfield Co. v. Christian*, 140 S. Ct. 1335,
1350 n.5 (2020) ("find[ing] it much more likely that Congress employed a belt and
suspenders approach" to achieve its objectives).

Reading § 2333(d)(2) narrowly also conforms with longstanding precedent regarding
foreign states and international law. As the Supreme Court recently reaffirmed in a
unanimous opinion, courts must "interpret the FSIA as [they] do other statutes affecting
international relations: to avoid, where possible, 'producing friction in our relations with

18

[other] nations and leading some to reciprocate by granting their courts permission to embroil the United States in expensive and difficult litigation.'" *Fed. Republic of Germany v. Philipp*, 141 S. Ct. 703, 714 (2021) (citations omitted). Reading "foreign state" into the Dictionary Act's definition of "person" is a recipe for "producing friction in our relations with [other] nations." *Id.* Moreover, doing so without explicit Congressional direction aggrandizes this Court into rendering a decision that may "lead[] some [nations] to reciprocate by granting their courts permission to embroil the United States in expensive and difficult litigation," *see id.*, through what foreign states might consider "international terrorism" under their own laws, *cf.* 18 U.S.C. § 2331(1). Congress has the power to create a FSIA exception for a foreign state that aids and abets international terrorism, if that is clearly its intention.

### C. *Kaplan* and *Honickman* Are Inapposite to Plaintiffs' Claims Against Defendant Saudi Arabia

Returning to the CAC Plaintiffs' arguments in their instant motion, neither *Kaplan* nor *Honickman* alters—nor could they—the statutory provisions that foreclose an aiding-and-abetting international terrorism claim against a foreign state. An intervening legal decision that concerns a different legal issue is "inapplicable to the question currently before this Court," and thus "cannot be considered controlling" so as to warrant reconsideration. *Cohen*, 2014 WL 240324, at *4. Here, both *Kaplan* and *Honickman* concern civil actions against privately owned Lebanese banks. *See Kaplan*, 999 F.3d at 849 (Defendant Lebanese Canadian Bank, SAL "was a banking corporation organized under the laws of Lebanon and headquartered in Beirut, Lebanon."); *Honickman*, 6 F.4th at 491 ("[Defendant] BLOM Bank is a Lebanese bank that operates internationally."). Neither case concerned a foreign state, and the Second Circuit did not interpret JASTA aiding-and-abetting liability against a

19

foreign state in either case. This Court thus lacks a "clear conviction of error with respect to a point of law on which its previous decision was predicated." *North River Ins. Co*, 63 F.3d at 165 (quotation marks and citation omitted).

Therefore, the principles of *Kaplan* and *Honickman* for evaluating aiding-and-abetting claims against a "person" under ATA § 2333(d), as guided by *Halberstam*, do not apply to CAC Plaintiffs' claims here against "non-person" Defendant Saudi Arabia. Indeed, *Kaplan* and *Honickman*'s brief discussion of the term "person" in § 2333(d)(2) conforms with the above approach for interpreting the subsection. *See Kaplan*, 999 F.3d at 854 (defining "person" by reference to § 2333(d)(1)); *Honickman*, 6 F.4th at 494 n.8 (finding "[t]he term 'person' includes corporations" because § 2333(d)(1) "incorporate[es] the definition of 'person' in 1 U.S.C. § 1").

Nothing in this decision should be construed as foreclosing Plaintiffs' primary liability claims against Saudi Arabia as permitted by JASTA. As noted above and in the 2018 Order, JASTA permits U.S. nationals to bring primary liability claims against foreign states for acts of international terrorism under the ATA, provided that JASTA's requirements for withholding sovereign immunity are otherwise met. *In re Terrorist Attacks*, 298 F. Supp. 3d at 639 (citing 28 U.S.C. § 1605B(c)). This Court will not now disturb its Order granting Plaintiffs limited jurisdictional discovery against Defendant Saudi Arabia for primary liability claims in accordance with JASTA. *Id.* at 640. The analyses in *Kaplan* and *Honickman* are in the context of aiding-and-abetting claims under § 2333(d), not primary liability claims. *See Kaplan*, 999 F.3d at 845 ("we address only [plaintiffs'] JASTA aiding-and-abetting claims" because plaintiffs "abandoned" their other claims); *Honickman*, 6 F.4th at 490 (plaintiffs claimed "BLOM Bank aided and abetted Hamas's attacks in violation of

JASTA"). Thus, because *Kaplan* and *Honickman* do not address primary liability, they cannot constitute "an intervening change in controlling law" for Plaintiffs' primary liability claims.[7] *See Kolel Beth*, 729 F.3d at 108 (citation omitted).

## IV.   NEITHER THE RECENT SECOND CIRCUIT DECISIONS NOR THE NEWLY DISCLOSED EVIDENCE JUSTIFY FURTHER JURISDICTIONAL DISCOVERY

*Ashton* Plaintiffs move this Court for an order to compel Saudi Arabia to produce documents concerning the work, assignments, supervision, travel, and financial activities of Adel al Sadhan, Mutaeb al Sudairy, and Omar Abdi Mohamed from January 1, 1998 to September 11, 2001. (*Ashton* Mot. to Compel at 1.) Despite the referral order to Magistrate Judge Sarah Netburn on discovery disputes, (*see* Am. Order of Reference, ECF No. 4018), this Court will address the motion to compel as it relates to the CAC Plaintiffs' motion to revise, as well as the *Ashton* Plaintiffs' challenge to the limited jurisdictional discovery granted by this Court in its 2018 Order. Here, *Ashton* Plaintiffs have a two-fold burden: they must (1) demonstrate good cause to reopen document discovery and (2) point to new, material information that might cause this Court to reconsider its previous orders.

### A.  Prior Discovery Orders Concerning Mohamed, Sadhan, and Sudairy

This Court's March 2018 Order denied jurisdictional discovery against Saudi Arabia with respect to Omar Abdi Mohamed based on the insufficiency of facts surrounding Mohamed's alleged tortious acts within the scope of his employment. *In re Terrorist Attacks*, 298 F. Supp. 3d at 653–55. In April 2020, upon denying Plaintiffs' motion to compel the FBI to undertake additional searches for documents relating to Mohamed,

---

[7] Similarly, this Court will not revise its Order by applying *Kaplan* and *Honickman* to Plaintiffs' state and federal common law claims, which lie beyond the framework of the Second Circuit's § 2333(d) analysis.

Magistrate Judge Netburn reiterated this Court's 2018 holding and found that "Plaintiffs do not allege any specific fact that suggests that Abdi Mohamed was part of a cell directed by Thumairy and Bayoumi to assist the hijackers." (April 27, 2020 Order, ECF No. 6582 (public and redacted), at 14–15.)

In November 2018, Magistrate Judge Netburn denied Plaintiffs' requests for document discovery concerning Adel al Sadhan and Mutaeb al Sudairy. (*See* Nov. 29, 2018 Order, ECF No. 4261.) Upon Plaintiffs' motion to vacate, Magistrate Judge Netburn stated that document discovery was over and again denied Plaintiffs' requests for further jurisdictional discovery due to insufficient evidence linking the men to the hijackers. (*See* Jan. 3, 2020 Order, ECF No. 6580 (public and redacted), at 8 ("Plaintiffs fail . . . to provide concrete allegations that either [Sadhan or Sudairy] assisted the hijackers.").) Then, in a subsequent order denying Plaintiffs' motion for reconsideration, Magistrate Judge Netburn found the evidence insufficient to show that Sadhan and Sudairy took part in the alleged plot to assist the hijackers and reiterated Plaintiffs' burden to articulate specific facts about Sadhan and Sudairy relevant to the FSIA immunity determination. (May 7, 2020 Order, ECF No. 6583 (public and redacted), at 6.) Magistrate Judge Netburn noted, however, that Plaintiffs were permitted to ask questions of Saudi government officials regarding Sadhan and Sudairy during then-upcoming depositions. (*Id.*) This Court adopted Magistrate Judge Netburn's findings. (Feb. 4, 2021 Order, ECF No. 6614, at 3 ("Plaintiffs failed to provide concrete allegations that either Al Sadhan or Al Sudairy assisted the 9/11 hijackers.").)

In the interim, Magistrate Judge Netburn also denied Plaintiffs' motion to compel the FBI to undertake additional searches for documents relating to Sadhan and Sudairy due to

Case 1:03-md-01570-GBD-SN   Document 8862   Filed 02/07/23   Page 23 of 29

the absence of any "specific allegation, supported by the factual record, that Sadhan and Sudairy were involved in assisting the hijackers." (April 27, 2020 Order at 12–13.)

### B. *Ashton Plaintiffs'* Motion to Compel Fails to Demonstrate Good Cause to Reopen Discovery or Point to New Evidence to Reconsider Previous Orders

Due to the inapplicability of *Kaplan* and *Honickman*'s principles on aiding-and-abetting liability under § 2333(d) for claims against a foreign state under 28 U.S.C. § 1605B, *Kaplan* and *Honickman* do not justify further jurisdictional discovery against Defendant Saudi Arabia. Neither *Kaplan* nor *Honickman* constitutes "an intervening change of controlling law" against a foreign sovereign. *See Kolel Beth*, 729 F.3d at 108 (citation omitted); *see also* discussion *supra* Section III. Thus, for the reasons stated above, *Ashton* Plaintiffs cannot rely on *Kaplan* and *Honickman*'s interpretation of § 2333(d) to justify an order to compel Saudi Arabia to produce additional documents.

#### 1. *New Evidence as to Adel al Sadhan and Mutaeb al Sudairy*

This Court also rejects *Ashton* Plaintiffs' arguments that "new evidence" justifies reopening document discovery and revising previous discovery orders. *Ashton* Plaintiffs fail to demonstrate good cause for altering this Court's previous orders on jurisdictional discovery and production of documents against Saudi Arabia pertaining to Adel al Sadhan and Mutaeb al Sudairy. The Court must conduct jurisdictional discovery circumspectly and only to verify allegations of specific facts crucial to Saudi Arabia's immunity determination. *See In re Terrorist Attacks*, 298 F. Supp. 3d at 641. Here, the newly disclosed FBI documents fail to resolve the precise issue the Court identified on multiple occasions, *i.e.*, Plaintiffs' inability to provide specific allegations that Sadhan and Sudairy aided the hijackers and facilitated the 9/11 Attacks.

Just as Magistrate Judge Netburn found two years ago, the *Ashton* Plaintiffs' new "evidence connects Sadhan and Sudairy to Bayoumi and Thumairy," but it "fail[s] . . . to provide concrete allegations that either official assisted the hijackers." (Jan. 3, 2020 Order at 8.)  The FBI's criminal investigation titled Operation Encore began in 2007 to determine how 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar integrated into Southern California in 2000. (*See e.g.*, Operation Encore [redacted] Overview, ECF No. 7482-1, at EO14040-000583.)[8]  Sadhan and Sudairy worked as Saudi Ministry of Islamic Affairs propagators in the United States between 1998 and 2002. (*See* Jan. 3, 2020 Order at 7; *Ashton* Mot. to Compel at 5.)  *Ashton* Plaintiffs highlight an FBI overview report on Operation Encore for the theory that Sadhan and Sudairy "*possibly* served in the capacity of an advance intelligence team involved in laying the groundwork for 9/11 hijackers al-Hazmi and al-Mihdhar, before their arrival in Southern California in early 2000." (*See Ashton* Mot. to Compel at 6 (quoting Operation Encore [redacted] Overview, at EO14040-000583) (emphasis added).)  The FBI report qualifies the "advance intelligence team" theory merely as "possibl[e]," (*see* Operation Encore [redacted] Overview, at EO14040-000583), and the Court has previously emphasized necessary caution when "relying on unsupported 'conclusions' in investigative documents," (*see* Nov. 25, 2019 Order, ECF No. 6579, at 13–14 n.5).

Moreover, the FBI report's following sentence undercuts the *Ashton* Plaintiffs' theory by reiterating the absence of any direct link between Sadhan and Sudairy and the 9/11 hijackers. (*See* Operation Encore [redacted] Overview, at EO14040-000583 ("There is no indication al-Sadhan and al-Sudairy had direct contact with the hijackers, however similar

---

[8] References herein to EO14040 are to the Bates numbers assigned to the documents as produced by the FBI pursuant to President Biden's Executive Order 14040.

associations, communications, and logistics mirror those of the hijackers upon their arrival.").) Other excerpts from the FBI reports similarly convey that the allegations against Sadhan and Sudairy consist of theories describing only what "may" have happened. (*See, e.g.,* Sept. 28, 2010 FBI Report, ECF No. 7482-1, at EO14040-000591 ("Al Sadhan and Al Sudairy may have served as an advance team"); *id.* at EO14040-000596 ("Al Sadhan and Al Sudairy may have assisted in laying the groundwork").) The Operation Encore summary noted that, aside from "suspicious" patterns and associates, there was "no independent [redacted] information that [Sadhan and Sudairy] were working at the behest of a terrorist network." (Operation Encore [redacted] Overview, at EO14040-000585.) The FBI ultimately rejected the operative theories about Sadhan and Sudairy when it closed Operation Encore in May 2021 without "identif[ying] additional groups or individuals responsible for the [9/11 Attacks] other than those currently charged, which is consistent with the final conclusion of the [2004] 9/11 Commission Report . . . ." (FBI Administrative Case Closure, ECF No. 7584-1, at EO14040-000011.)

Thus, *Ashton* Plaintiffs have neither demonstrated good cause to reopen discovery nor provided new evidence to justify reconsidering the Court's past discovery orders at this late date. Plaintiffs took the depositions of Sadhan and Sudairy, which corroborated the newly disclosed FBI report on the lack of "direct contact" or other assistance between the men and 9/11 hijackers Hazmi or Mihdhar. (*Compare* Saudi Arabia's Op. to *Ashton* Mot. to Compel at 7–8 (summarizing Sadhan and Sudairy's denial of any contact with or aid to the hijackers), *with* Operation Encore [redacted] Overview, at EO14040-000583–85 (no indication Sadhan or Sudairy had direct contact with or work at the behest of a terrorist organization).) Further, Magistrate Judge Netburn's April 27, 2020 Order already addressed

the arguments that *Ashton* Plaintiffs now rehash through the newly disclosed FBI reports. (*Compare* April 27, 2020 Order at 12 (Plaintiffs' newly available evidence involving Bayoumi "does not suggest that Sadhan and Sudairy had any connection with the hijackers."), *with Ashton* Mot. to Compel at 6 ("There is no indication al-Sadhan and [a]l-Sudairy had direct contact with the hijackers . . . ." (quoting EO14040-000583)).)

After repeated discovery orders concerning Sadhan and Sudairy, *Ashton* Plaintiffs impermissibly use their motion to compel as "a vehicle for relitigating old issues" and for "otherwise taking a [fifth] bite at the apple." *See Analytical Survs., Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012) (quotation marks and citation omitted); *see* discussion of four previous discovery orders *supra* Section IV.A. While reconsideration may be appropriate where there is "the availability of new evidence, or the need to correct a clear error or prevent manifest injustice," *Kolel Beth*, 729 F.3d at 108 (citation omitted), "[a] motion for reconsideration is not an opportunity for a losing party to advance new arguments to supplant those that failed in the prior briefing of the issue." *Weiss v. El Al Isr. Airlines, Ltd.*, 471 F. Supp. 2d 356, 358 (S.D.N.Y. 2006). As the Court already stated in its previous discovery order, "the availability of new evidence" must be sufficient to "alter[] the Court's prior conclusions." (*See* May 7, 2020 Order at 5–6 (quotation marks and citation omitted).) Plaintiffs have not met their burdens.

### 2. *New Evidence as to Omar Abdi Mohamed*

The newly disclosed FBI documents also fail to justify additional discovery from Saudi Arabia concerning Omar Abdi Mohamed. Mohamed entered the United States in 1998 as a religious worker and was also employed by the Saudi Ministry of Islamic Affairs as a propagator of Islam. *In re Terrorist Attacks*, 298 F. Supp. 3d at 653–54. In its original Order

evaluating the facts of Mohamed's alleged conduct, this Court concluded that "Plaintiffs allege no non-conclusory facts, and provide no evidence, to support the claim that Mohamed [funneled money to al Qaeda to help plan and facilitate the 9/11 Attacks] within the scope of his employment as a missionary." *Id.* at 654.

Here, *Ashton* Plaintiffs do not point to any newly disclosed FBI documents to bolster their rehashed and unsubstantiated allegations against Mohamed as a funder of al Qaeda within the scope of his employment. *Ashton* Plaintiffs state, without any specific citation to new evidence, that "the documents show that Thumairy and others within the Saudi government directed Abdi Mohamed's money laundering activities for al Qaeda." (*Ashton* Mot. to Compel at 12.)

Instead, the new evidence *Ashton* Plaintiffs do selectively cite includes a newly released FBI report about payments from an account allegedly tied to Thumairy that dispersed payments to someone associated with members of the Somali-based terrorist organization Al-Ittihad Al-Islamia (AIAI). (*See Ashton* Reply re Mot. to Compel, ECF No. 7605, at 10 (quoting Feb. 19, 2009 FBI Report, ECF No. 7482-1, at EO14040-000563).) The report states that Mohamed was a leader of AIAI and "received a portion of the Saudi largess [sic] for his activities." (*See id.* (quoting Feb. 19, 2009 FBI Report, at EO14040-000564).) As in 2018, *Ashton* Plaintiffs "claim that this newly discovered evidence shows that Mohamed was part of the same Southern California al Qaeda cell as Thumairy and Bayoumi, among others, and that Mohamed provided money-laundering services for al Qaeda at the direction of senior Saudi officials." *In re Terrorist Attacks*, 298 F. Supp. 3d at 654; (*see also Ashton* Reply re Mot. to Compel at 9–10). Yet, as this Court found in 2018 regarding

Mohamed's allegedly illicit terrorist funding through the Western Somali Relief Agency, the

FBI report on a Thumairy-linked account that paid either Mohamed or the AIAI

> does not support the inference that Mohamed was part of the cell
> that Thumairy directed to provide support to the *9/11 hijackers* upon
> their arrival in California. Nor does it suggest, as Plaintiffs argue,
> *that Thumairy, or any other Saudi official, directed Mohamed to
> deliver funds to al Qaeda.*

*Id.* at 655 (emphases added). As in March 2018, Plaintiffs' newly discovered evidence of

allegations as to Omar Abdi Mohamed come up short. *See id.* Plaintiffs have neither

demonstrated good cause to reopen document discovery against Saudi Arabia nor provided

evidence to justify reconsideration of the Court's past discovery orders at this late date.

## V.    CONCLUSION

Because *Kaplan* and *Honickman*'s principles of aiding-and-abetting liability under

18 U.S.C. § 2333(d) are inapposite to Plaintiffs' claims against a foreign state under 28

U.S.C. § 1605B, CAC Plaintiffs' motion to revise the March 2018 Order is DENIED. For

the same reasons and for the lack of good cause to reopen document discovery or to

reconsider previous discovery orders, *Ashton* Plaintiffs' motion to compel production is also

DENIED.

The Clerk of Court is directed to close the open motion at ECF No. 7481.

Dated: February 7, 2023
       New York, New York

                                        SO ORDERED.

                                        *George B. Daniels*
                                        GEORGE B. DANIELS
                                        United States District Judge

28

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    In re:  TERRORIST ATTACKS ON              03 MDL 1570 (GBD)
              SEPTEMBER 11, 2001
 4                                              Conference
      ------------------------------x
 5
                                                New York, N.Y.
 6                                              April 12, 2018
                                                4:00 p.m.
 7

 8    Before:

 9            HON. SARAH NETBURN

10                                              Magistrate Judge

11
              APPEARANCES
12

13    KREINDLER & KREINDLER
              Attorneys for Plaintiffs
14    BY:  JAMES P. KREINDLER
           STEVEN R. POUNIAN
15         ANDREW MALONEY

16    COZEN O'CONNOR
              Attorneys for Plaintiffs
17    BY:  STEPHEN COZEN
           SEAN P. CARTER
18
      MOTLEY RICE LLC
19            Attorneys for Plaintiffs
      BY:  ROBERT T. HAEFELE
20
      ANDERSON KILL P.C.
21            Attorneys for Plaintiffs
      BY:  JERRY S. GOLDMAN
22
      KELLOGG HANSEN TOOD FIGEL & FREDERICK PLLC
23            Attorneys for Saudi Arabia
      BY:  MICHAEL K. KELLOGG
24         MARK C. HANSEN
           GREGORY G. RAPAWY
25         ANDREW C. SHEN
```

Case 1:03-md-01570-GBD-SN   Document 3964   Filed 04/18/18   Page 2 of 33

```
1              (Case called)

2              THE COURT:  Welcome.

3              One housekeeping issue.  I have been asked to request

4       that counsel state your name before you begin to speak.  That

5       will assist the court reporter so that he can make sure that he

6       is keeping everybody straight.

7              The primary purpose of today's conference is to

8       discuss a discovery schedule for the jurisdictional discovery

9       that Judge Daniels authorized in his March 28th memorandum

10      decision and order.  I want to talk with the parties about the

11      types of discovery that is contemplated, the participants from

12      whom discover is going to be sought, and how long the parties

13      expect this discovery process to take.

14             In addition, I have applications, primarily from the

15      plaintiffs' executive committee, asking for a modification to

16      the process for adding new cases to this MDL, which I

17      understand is an application unopposed by the defendants.  We

18      will address that secondarily.

19             Let's begin to talk about the discovery here.  Can I

20      ask one question, which may betray some ignorance here.  What

21      is the status of Mr. Thumairy and Mr. al Bayoumi.  Where are

22      they?  Are they alive?  Does anyone have contact with them?

23             MR. KELLOGG:  They are both alive.  They are in Saudi

24      Arabia.  My understanding is that Mr. al Thumiary continues to

25      work for the Ministry of Islamic Affairs, but Mr. Bayoumi is
```

 1    retired.

 2             THE COURT:  I assume that they are aware of Judge

 3    Daniels' decision?

 4             MR. KELLOGG:  I'm not sure if they are or not, your

 5    Honor.

 6             THE COURT:  Then you can't answer my second question,

 7    which is whether or not they intend to cooperate with

 8    discovery.

 9             MR. KELLOGG:  Certainly Mr. al Thumairy continues to

10    be a government employee and will make every effort to ensure

11    that both he and their former employee Mr. al Bayoumi

12    cooperate.

13             THE COURT:  Wonderful.  Thank you.  Why don't I begin

14    with the plaintiffs here.  Mr. Carter, are you going to take

15    the lead on this, since you're sitting in the hot seat?

16             MR. CARTER:  Your Honor, I'm going to take the lead,

17    Mr. Pounian may fill in any gaps.  At the outset we would like

18    to make a relatively basic observation that we view the

19    discovery process as a truth-seeking exercise.  Our sole

20    objective-agenda-priority here is to carry out that truth-

21    seeking exercise with regard to the matters for which discovery

22    has been authorized in the most efficient, fair, and practical

23    way possible.  That is our only objective.

24             THE COURT:  May I interrupt you for one second.  Can

25    you move the microphone closer to you.

```
1              MR. CARTER:  Sure.

2              THE COURT:  Thank you.  I did hear what you said

3    though.

4              MR. CARTER:  As plaintiffs, we have an interest in

5    moving this process forward quickly and as quickly as is

6    reasonable while still honoring the ultimate objective of

7    getting to the facts.  We have confidence in our case.  We

8    think that once all the relevant information comes out and the

9    evidence is on the table, we are going to be authorized to

10   proceed to a full merits proceeding, and we obviously want to

11   get to that.  We understand that the defense may not agree with

12   our perspective on this issue.  But our goal here is to do this

13   as quickly as possible.

14             Your Honor hit at the key issues: what are we

15   expecting to do; how are we expecting to do it; and given what

16   we contemplate doing, where we are seeking discovery, what is a

17   reasonable schedule to do that.

18             The first thing we want to observe is that although we

19   had been proceeding on two tracks to some degree with the

20   Ashton plaintiffs on a separate complaint and separate briefing

21   from the consolidated amended complaint plaintiffs, our intent

22   is to proceed with discovery on a coordinated, consolidated

23   basis.

24             THE COURT:  Good.

25             MR. CARTER:  To that end we have had a number of
```

1    conferences together to bring everybody under the tent and

2    address how to do this.  A working group of the committee had a

3    long meeting yesterday, we have another one scheduled for next

4    week.  That is all with the aim of getting on the same page and

5    getting us focused and precise as we can with our areas of

6    discovery.

7            In terms of what we intend to do, there is nothing

8    exotic about the methodologies of discovery we intend to use

9    here to try and get to the truth.  We want to serve document

10   requests.  Our sense is that we will be through the process of

11   meeting and getting everyone on a same page to serve those

12   within two weeks from today.

13           THE COURT:  Upon whom do you intend to serve those?

14           MR. CARTER:  The document request will be directed to

15   the kingdom.  We think we would be in a position to serve these

16   within two weeks.  We also believe some initial interrogatories

17   are going to be helpful in ferreting out facts relevant to

18   jurisdictional inquiry contemplated in the Court's decision.

19           We are mindful that this is not a circumstance in

20   which we have rule 26 initial disclosures, so we want to ask

21   some questions to enable us to identify witnesses with relevant

22   knowledge through some identification interrogatories.  We do

23   think some additional interrogatories about chains of command,

24   the nature of the roles that were being carried out by certain

25   individuals at the heart of the court's decision will move the

Case 1:03-md-01570-GBD-SN   Document 3964   Filed 04/16/18   Page 6 of 33

```
 1   ball substantially forward.  We expect to serve those at

 2   essentially the same time.

 3           THE COURT:  Within two weeks?

 4           MR. CARTER:  We would be in a position within two

 5   weeks.  That triggers some process on the other side that I

 6   think you will hear about from the kingdom.  We have had two

 7   meet-and-confers with the kingdom over the last several days.

 8   They have indicated that they would be in a position to respond

 9   to document requests and present their responses and

10   objections, not the documents, on an expedited basis, within

11   ten days.

12           Once we receive the responses and objections, I think

13   we will have a better sense of two things: one, the extent of

14   the objections they are raising to the scope of the discovery

15   that we are pursuing through our document requests and whether

16   or not they believe that we have gone beyond the scope of

17   discovery authorized by the court's order; second, the nature

18   of any other objections or privileges that the kingdom might be

19   asserting and interposing to avoid producing documents that

20   might be responsive.

21           With regard to the scope issue, the kingdom has said

22   it has an incentive to get that resolved early so it can

23   conduct searches to retrieve the documents.  We have no problem

24   prioritizing that once we get the responses.  They are talking

25   ten days after we serve the document requests.  If we could do
```

1   that motion practice within the next 30 days, that's fine by

2   us.  With regard to the interrogatories, those answers can just

3   be provided in accordance with the rules.

4          There is third-party discovery contemplated and in

5   fact already ongoing as well, your Honor.  Let me give you a

6   couple of examples.  Judge Daniels' decision cited a number of

7   facts that we had offered from relevant portions of FBI reports

8   and FBI investigations.  Most notable just by way of example

9   was the content of the FBI report saying that an individual

10  whose name was relationship redacted from the report was tasked

11  by al Thumairy with assisting the hijackers.  We have

12  subpoenaed the FBI seeking further information relating to that

13  investigation, the investigation in which Bayoumi and Thumairy

14  are subjects.  That is material directly cited in the Court's

15  opinion.

16         Another example.  Thumairy said during the course of

17  interviews of the 9/11 commission that his role for the

18  government included working as an imam in carrying out

19  functions at the King Fahad Mosque.  So the King Fahad Mosque

20  is an entity, a third party, in direct possession in our view

21  of documents relating to Thumairy's role, function, and scope

22  of agency with the government of the Saudi Arabia.

23         There are also some subagents identified in our

24  pleadings, people who were undertaking activities at the behest

25  of Thumairy and Bayoumi.  Those are third parties from whom we

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

 1    would be seeking information about the instructions they

 2    received, from whom they received them, and the activities they

 3    carried out.

 4           THE COURT:  Those are also agents of the Saudi

 5    kingdom?

 6           MR. CARTER:  The Court's order contemplated under-

 7    taking discovery about the activities of the agents and their

 8    superiors as well as the subagents that they enlisted to carry

 9    out support for the hijackers.  When I was referring to those

10    individuals, those are the subagents who actually dealt

11    directly with the hijackers in most cases.

12           We have some third-party discovery, mostly via

13    subpoenas, that will go out to these third parties to gather

14    information.  Our view is that the Second Circuit FSIA cases

15    actually encouraged the gathering of information from third

16    parties because it is not an encroachment on the immunity of a

17    foreign sovereign.  So it is a traditional process, one we

18    think is entirely appropriate, and we are prepared to move

19    forward with again on a relatively quick basis.

20           Once we get through all that, we are going to get to a

21    point where we expect there is going to be some motion practice

22    with regard to the document requests and the other discovery.

23    Again, we indicated that once we get the objections to scope,

24    we can deal with that relatively early on.

25           THE COURT:  As I'm understanding the process, it

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

 1    sounds like there are two different buckets of discovery.  With

 2    respect to the discovery as against Saudi Arabia, your

 3    intention is to propound framing document requests to see what

 4    their response is and then propound a broader set of document

 5    demands once you and counsel for Saudi Arabia have either

 6    reached agreement or failed to reach agreement on the scope of

 7    discovery?  Is that what you are contemplating?

 8           MR. CARTER:  No, your Honor.  We are planning to serve

 9    our actual document requests in two weeks.  We expect from our

10    conversations that the kingdom is going to take a view that

11    some of those requests go beyond the scope of the discovery

12    authorized by the Court and that they should not be compelled

13    to search for information responsive to those.

14           What we are envisioning is when we got those

15    responses, say, around May 6th or so, there would be a 30-day

16    period for us to try and brief the scope issues separately.

17    There may be objections based on privilege or other grounds, we

18    don't know yet.  Those in our view could be a bit more nuanced

19    legally, maybe even somewhat esoteric.  We believe those can be

20    addressed in a second phase separate briefing.

21           THE COURT:  Got it.  Let me ask you a question with

22    respect to the other what I call bucket of discovery, which is

23    the third-party discovery.  You identified the FBI and the King

24    Fahad Mosque.  With respect to the FBI, I have to believe that

25    your committee is in contact with relevant people there.  Do

Case 1:03-md-01570-GBD-SN   Document 3964   Filed 04/18/18   Page 10 of 33 10

1  you have a sense of whether or not that is going to be objected

2  to?  Have you spoken with the government in the sense of

3  whether they are going to be cooperative with any subpoena that

4  you serve upon them?

5       MR. CARTER:  Your Honor we don't know, in part because

6  it took several days to get the subpoena served.  It is a bit

7  of an unusual process.  The process server has to wait in the

8  lobby for someone from the general counsel's office to come

9  down and take it.  They frequently tell them there is no one

10  available, go home and come back tomorrow.

11       It was served, if I recall correctly, two days ago,

12  and we haven't heard from them.  Years ago there was some

13  contacts in the FBI.  I don't know that we have any designated

14  liaison person within the FBI at this moment to deal with us,

15  but it is something that we are hoping to get.

16       THE COURT:  With respect to the mosque, the documents

17  that you are seeking are going back several decades.  Do you

18  have a sense of whether or not the documents have been

19  preserved, if there are preservation orders issued in earlier

20  litigations?  Do you have any sense of what you are going to

21  get?

22       MR. CARTER:  We do not, your Honor.  I think we

23  probably likely have a subpoena that we plan to issue to the

24  state department as well.  If your Honor will recall from the

25  briefing, the state department was the component of the U.S.

```
 1     government that made the assessment that Thumairy was connected

 2     to terrorism and ultimately decided to deny him reentry to the

 3     United States on that basis.  That is in the 9/11 Commission

 4     report.  There are underlying state department records relating

 5     to that.  We are going to ask for those.

 6              We are not talking about a hundred subpoenas here.  We

 7     are talking about a universe of subpoenas that go right to the

 8     heart of allegations we have made in support of our claims

 9     about the nature of the activities undertaken by these

10     individuals and their agency that we are trying to verify

11     through the discovery process.  That will go forward in part

12     based on how responsive the recipients of the subpoenas are,

13     just like in any other case.

14              Beyond that, we want to take some depositions,

15     including of representatives of the kingdom and former

16     representatives of the kingdom.  Your Honor raised the question

17     that we also raised.  We asked about three witnesses in

18     particular to begin the dialogue about their availability and

19     to try and start moving that process forward and get dates,

20     even if after document discovery, to have a sense of whether we

21     are going to depose these folks.

22              With Bayoumi, as Mr. Kellogg mentioned, we are told

23     that he is no longer an employee of the government and that it

24     is not possible for the kingdom at this moment to commit to

25     whether or not he would be available.  So we may have to assess
```

1   whether or not there are legal processes available to the

2   kingdom to make witnesses in this jurisdiction with knowledge

3   relative to our proceeding here available.  That is something

4   we want to pursue because he is a critical witness.

5          The same with Khalid al Swailem, who is the

6   representative of the Ministry of Islamic Affairs set above

7   Thumairy at the embassy in Washington.  We asked about him.  So

8   far we have been told that the kingdom isn't sure where he is

9   right now, whether he is employed.  We are still waiting on

10  that.

11         We don't know yet who is going to be identified as a

12  witness with knowledge.  We can see within the Dallah Avco

13  discovery that we have received that there are a number of

14  individuals within the ministry of defense and aviation who

15  were involved in some way in coordinating, maintaining the

16  secondment that we view as a coverage op.  So we have those

17  people.  We obviously have people directly involved.

18         We may also want to have a 30(b)(6) witness.

19  Particularly to the extent that some of these people are no

20  longer available, we need to gather information from a

21  knowledgeable party in that way.

22         My co-counsel is urging me to be clear that with

23  regard to the third-party discovery, we are not talking about a

24  hundred.  It is not specifically limited to the FBI and the

25  King Fahad Mosque.  I mentioned the state department.  There

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300