```
1    are probably a few others that we will determine whether we

2    should go forward with.

3         With all of that out there, we think the document

4    phase of this can be done over the course of several months,

5    that we can then take depositions, and that we should be in a

6    position to complete this in line with the schedule that is

7    already in place for jurisdictional discovery as to the other

8    defendants, which is January 31st.  That will be our proposal.

9         We view active engagement with the Court throughout

10   this process to set interim deadlines as vital to this.  We

11   would be supportive of conferences every few weeks based on

12   what your Honor thinks is most appropriate.  We had that

13   process at one point with Judge Maas, and it was pretty

14   effective when we were in a very active phase of discovery.  We

15   think it makes sense to make sure we stay on track here and

16   that we resolve any disputes as they arise.

17         Thank you.

18         THE COURT:  When we did merits discovery in the case,

19   as you will recall, we had a full-blown deposition protocol

20   which I thought was really important given the number of moving

21   parties.  For this phase of the litigation I don't think that

22   is necessary.  Do you think the parties need to come up with

23   some sort of protocol to agree upon, locations, etc?  Some of

24   the witnesses may be unable or unwilling to come to the U.S.

25   for deposition.  There may be issues about where depositions
```

1   take place.  Do you think at this point that is something the

2   parties can work out together or do you envision rolling out

3   protocol like we did for the merits discovery?

4           MR. CARTER:  Your Honor, one of the reasons that we

5   started trying to talk about depositions now was to determine

6   whether or not we needed to enter into a dialogue about a

7   formal process.  We are just not sure at this point.  It may be

8   a little premature to iron that out without knowing who the

9   witnesses all are because we haven't seen the documents.

10          We have been down that road.  We are happy to go there

11  if necessary.  We were focused, given your Honor's order, on

12  looking at the schedule and trying to figure out what we wanted

13  to do, and therefore adopt a schedule that reasonably would

14  accommodate that but still get us done as quickly as possible.

15  We are happy to pursue dialogues about any sort of formalities

16  within the process that are necessary procedurally,

17  logistically, or otherwise.

18          THE COURT:  Good.  It looks like you have put a lot of

19  thought towards this.  I appreciate that.

20          Mr. Kellogg.

21          MR. KELLOGG:  Thank you, your Honor.  Our objectives

22  here are twofold.  First, we want to fully and in good faith

23  comply with the discovery directed by the district court.

24  Second, at the same time we want to ensure that the process

25  proceeds expeditiously and is not an undue burden on a

1  sovereign nation.  The way to do that we think is to comply

2  strictly with the scope of discovery as articulated by Judge

3  Daniels.

4         Specifically, that is discovery to confirm specific

5  allegations made by the plaintiffs and therefore limited to

6  persons, time frames, and subject matters directed by the

7  Court.  The Court's remark on this is that it is discovery

8  critical to answering a single question: whether and to what

9  extent Thumairy, Bayoumi, and their agents took action in 2000

10 at the direction of more senior Saudi officials to provide

11 assistance to Hazmi, Mihdhar, and other 9/11 hijackers.

12        The focus as we see it is vertical.  Thumairy and

13 Bayoumi, he says it is alleged that an unknown supervisor

14 directed them to help the hijackers and they in turn recruited

15 subagents to help the hijackers.  It is a very vertical line of

16 inquiry.

17        We think going off on a side tangent with third-party

18 discovery would not be consistent with the Court's directive,

19 which basically said the reason he was ordering discovery was

20 that the information relevant to the issues was in the

21 possession of the kingdom itself.  We are prepared to provide

22 that discovery within the limits set by the Court, but we think

23 it is very important to have presumptive limits on the time

24 frame for discovery and on the scope of discovery.

25        Where we disagree with the plaintiffs is on both of

 1   those issues.  We would rather have things go faster and have

 2   any issues regarding appropriate scope resolved early on.

 3   Specifically, they already served discovery requests.  Both the

 4   Ashton plaintiffs and the executive committee served

 5   illustrative discovery requests.  Some of those requests are

 6   pertinent to the discovery ordered by the district court.

 7        We don't really see why it should take them two weeks

 8   to develop a new set of specific document production requests

 9   or interrogatories.  We would propose a faster schedule that

10   would have them, say, next Friday, the 20th, provide the new

11   consolidated document request.  We would be subject to the same

12   schedule if we had any document request.  And also to limit the

13   number of interrogatories presumptively to five at the outset

14   per side.  If showing is made later on that more are required,

15   we can revisit the issue at that time.

16        Then we would like, as Mr. Carter said, to try to

17   provide any objections to the requests for production within 10

18   days of that time, that is, by April 30th, and then have an

19   expedited process for bringing any existing disputes after the

20   meet-and-confer to the attention of the Court so they can be

21   resolved up front.

22        By mid May our hope is to go to Saudi Arabia for a

23   two-week period to gather the relevant documents, make sure we

24   are complying fully with the Court's instructions, and provide

25   a preliminary set of document production to the plaintiffs as

1    well as their interrogatory answers by the end of May.

2              Part of our hurry is, frankly, driven by the Muslim

3    holidays of Ramadan, which starts in mid May.  That is still a

4    time when we can get over there and recover documents.  At the

5    end of Ramadan, they have a significant holiday after that

6    period which then blends into the summertime.  We are advised

7    by Saudi counsel that it would be much better for us to do our

8    document gathering in the latter half of May.  That's why we

9    are proposing that schedule.

10             We then proposed a tentative date for complete

11   document discovery of July 31st, at which point there would be

12   45 days for depositions.  We propose an initial limit of 5

13   depositions.  Again on good cause showing, based on documents

14   or other 30(b)(6) witnesses, they could ask for additional

15   depositions on request and leave of the Court.  The idea is to

16   target a complete end of discovery by October 15th so that

17   renewed motions to dismiss could be filed by as early as

18   December 1st and the Court could have those before it.

19             One of the reasons we do not believe in going sideways

20   in terms of discovery, such as the rather expansive subpoena

21   that they have served on the FBI, is that the Touhy process in

22   pressing such a subpoena could easily last a year or more.

23   They already have numerous documents declassified by the FBI

24   involving the interview memos and such that they have tried to

25   rely on before the Court.  We have pointed out to the Court

Case 1:03-md-01570-GBD-SN   Document 3964   Filed 04/18/18   Page 16 of 33   16

1   that those are not actually admissible evidence because they

2   simply report second-hand interviews.  The only relevant

3   evidence is the final reports of the 9/11 Commission and the

4   FBI and the CIA, all of which dismissed their allegations.

5        We do not see any productive basis for the plaintiffs

6   to try to gather additional nonadmissible hearsay materials,

7   such as 302 reports of agents regarding interviews.  We think

8   they have gotten declassified information as well and that the

9   Court was really contemplating this sort of vertical discovery,

10  not tangential horizontal discovery which plaintiffs will then

11  using as a reason for dragging out the discovery process.

12       They will be coming back to the Court saying the FBI

13  hasn't responded to our subpoena yet, we have to go through

14  this lengthy process, everything should be held up, we can't

15  conduct depositions.  None of that is really relevant to the

16  specific issues the Court identified.  The specific issue

17  really is Thumairy, Bayoumi, their alleged supervisor, what

18  instructions they were given, what instructions in turn did

19  they give to their alleged subagents.

20       We are happy to cooperate with providing a list of

21  names to try to determine where these people are if we know, if

22  they are still employed by Saudi Arabia, if they are still

23  alive, where they are living to the extent that we have that

24  information.  We strongly urge the Court to cabin it along the

25  lines that Judge Daniels articulated and believe that it will

Case 1:03-md-01570-GBD-SN   Document 3964-11   Filed 04/16/18   Page 19 of 35

1    be possible to end discovery by mid October if we do so.

2              THE COURT:  Thank you.

3              Mr. Carter, anything you want to say in response?

4              MR. CARTER:  Your Honor, I would like to offer a

5    response.  The reason I began by saying we view this as a

6    truth-seeking exercise is because we anticipated this response.

7    None of the limitations that Mr. Kellogg has proposed are

8    geared at getting to the truth and helping the Court gather the

9    evidence that would answer the questions raised in its March

10   28th decision.  Quite to the contrary, they are incompatible

11   with that view.

12             If we just look at the FBI report that we are talking

13   about -- we are trying to get a less redacted version of it --

14   it is that report that includes the name of the person who

15   tasked Bayoumi and Thumairy.  But that name has been redacted.

16   We are trying to persuade the FBI to give us that name.

17             It may very well be that that information resides

18   totally in the FBI from its investigation and would provide the

19   name from whom we want to seek a deposition of the kingdom.  So

20   the information in these third-party sources goes to the direct

21   heart of this matter.

22             There is nothing in the Court's decision that suggests

23   that it contemplated that the traditional tools of discovery

24   would not be available, and there is no burden on the kingdom

25   in the event that the FBI agrees that it should turn this stuff

Case 1:03-md-01570-GBD-SN   Document 3964-11   Filed 04/18/18   Page 20 of 33

1    over and gives it to us.

2            Mr. Kellogg began his speech by saying the purpose of

3    this is for us to verify the allegations that we have offered

4    as to these people.  Part of that is verifying what the FBI

5    found.  He said that none of the reports that we have offered

6    are evidence.  If that's the case, then we need to go back to

7    the FBI and get as much information as possible so we can

8    distill this information into admissible evidence.  All of this

9    is geared to making it less like that we will ultimately come

10   to a fulsome truth in the proceeding.

11           THE COURT:  I do take a little issue with the except

12   that this process is about the search for truth.  I understand

13   that that sounds nice.  But Judge Daniels did limit the scope

14   of discovery.  Your burden right now is not to find out whether

15   or not Saudi Arabia is complicit in the 9/11 attacks.  Your

16   burden right now is to find out whether or not these two

17   individuals acted as agents for the government in support of

18   the terrorist attacks.  The search for the truth is always what

19   we say litigation is about, but in this instance we are

20   focusing on a narrow area.

21           In my reading of the decision I identified nine topics

22   that Judge Daniels relied upon as allegations that the

23   plaintiffs pointed to, things like phone communications, things

24   like the scope of the job, those types of topics.  When Mr.

25   Kellogg talks about a vertical approach to discovery, the way I

 1    see it, and I'm not sure if we are speaking at odds, is there

 2    are a set of topics that Judge Daniels has identified.  Like I

 3    said, my count was about nine areas.

 4            Within each area I think the plaintiffs are entitled

 5    to probe or drill down into those particular areas, but I do

 6    intend to cabin you to those areas.  So, if you serve discovery

 7    on the kingdom that it opposes that seeks information that does

 8    not appear in Judge Daniels' decision and seems to me to be

 9    part of your effort in the search for truth but not something

10    you alleged in your complaint, I am going to deny that

11    discovery.

12            All of your discovery demands -- we are talking about

13    pages 19 to 23 I think, so we are talking about four pages here

14    which I intend to keep by my side at all times during this

15    process -- all discovery that you are seeking needs to be

16    tethered to one of those allegations that Judge Daniels relied

17    upon and is allowing you to pursue.

18            So yes, we are searching for truth, but it is not

19    global truth, it is truth as to these particular allegations.

20    I want to urge you to make sure that your discovery is tailored

21    to that because you won't be successful in your discovery

22    demands if they do go off the rails.

23            That said, I am going to allow the plaintiffs to probe

24    within each of those areas of factual allegations that Judge

25    Daniels identified.  For instance, he talks about

Case 1:03-md-01570-GBD-SN   Document 3984-11   Filed 04/18/18   Page 22 of 33

```
 1    communications between Thumairy and Bayoumi regarding their

 2    February 1st, 2000, meeting at the Saudi consulate in Los

 3    Angeles.  I am going to allow full discovery into that meeting

 4    and what happened at the meeting and how it was set up and if

 5    there was any information or plans that came after that.

 6            That doesn't mean that I'm going to allow discovery

 7    into every single point of contact with the consulate.  But

 8    that was a meeting that was alleged to be something you suspect

 9    as part of this conspiracy.  I want to make sure that all of

10    your discovery demands, and I'm sure you will do this, are

11    tethered to the allegations in the complaint.

12            To facilitate this process, it might be in your

13    interest for each discovery demand to identify at least in some

14    simple form, if you can orchestrate this, why this demand is

15    specific to this particular allegation.  Or maybe issue your

16    demands in groups so that you say we are searching for

17    documents that speak to this particular allegation.  That will

18    help the parties, and ultimately the Court if necessary, to

19    decide whether or not the discovery that you are seeking truly

20    is tailored toward a particular allegation that you need to

21    prove or is beyond that scope.

22            MR. CARTER:  Your Honor, a couple of things.  We are

23    very much mindful that we are conducting discovery pursuant to

24    the Court's order, and pages 19 to 23 of the decision are ones

25    that have been right here in front of me.  It is relative to
```

1    those allegations that are described in those pages that we are

2    pursuing some of this third-party discovery.  We are not asking

3    every question that could potentially be relevant with the FBI

4    about Saudi Arabia being bad.  That is not the intention.

5            But it is clear that these third parties do have

6    information that speaks directly to it.  I mentioned earlier

7    that it is the FBI report that talks about there being a person

8    who tasked Bayoumi and Thumairy.  That is clearly something

9    contemplated by the Court's order that be we are trying to

10   develop through the third-party process.

11           THE COURT:  I don't know that the committee has

12   standing to object to your efforts to uncover discovery from

13   the FBI.  To the extent what Mr. Kellogg fears is realized,

14   meaning that if that process bleeds beyond the limited time

15   frame that I impose, I'm not going to allow that to hold up the

16   kingdom's right to file a new motion to dismiss once a

17   reasonable period of discovery has concluded.  But I think that

18   is an issue we can deal with if it arises.

19           MR. CARTER:  We do as well, your Honor.  Also, Mr.

20   Kellogg mentioned two other things.  He suggested setting as we

21   sit here today presumptive limits on the number of depositions

22   at 5, a presumptive limit on the number of interrogatories at

23   5.  We think that those limits are unwarranted and incompatible

24   with the Court's decision.  Even if we are just looking at the

25   precise actors who were involved in the activities described in

1  the decision, we get beyond 5.  And we haven't seen who

2  internally in the government was within this chain of command

3  and involved.

4       THE COURT:  I'm not going to set a limit on

5  depositions now.  I will set a limit, but I think it is fair to

6  at least look at the documents and see what we are talking

7  about.  It may be that 5 is all you need and it may be that the

8  number is much larger.  We will deal with that when we get

9  there.  So I'm not going to set a limit for the number of

10  depositions.

11       I also think 5 interrogatories is too few.  I was

12  curious if you have a sense of what you are talking about here.

13  Are we talking about 25 interrogatories?  Are we talking about

14  500 interrogatories?

15       MR. CARTER:  We are talking about 25, your Honor.

16       THE COURT:  I think that's reasonable.

17       Mr. Kellogg asks you to serve those discovery requests

18  by April 20th rather than April 24th, something like that.  The

19  difference seems slightly immaterial to me.  I'm fine if you

20  take the two weeks, but do you think you can accommodate

21  defendants and get that request served by next Friday, or do

22  you want your weekend?

23       MR. CARTER:  We have been shuffling a lot of

24  schedules.  We really do look at this pretty aggressively.

25       THE COURT:  I think the difference between 7 business

 1   days and 10 business days is not material.  You should serve

 2   your discovery demands 2 weeks from today.  Since it is not my

 3   courtroom, I didn't take my calendar with me.  I think that

 4   would be the 26th of April.

 5        The kingdom has represented that it will make its

 6   initial responses and objections within 10 business days, I'm

 7   assuming.  Mr. Mendieta can we go two weeks beyond that.

 8   Presumptively the kingdom's response will be May 11th.  That

 9   gives you two weeks.  I assume when you said 10 days you were

10   speaking business days.  So May 11th.

11        MR. KELLOGG:  Yes.

12        THE COURT:  Why don't we schedule a follow-up call to

13   check in.  Let's say a conference.  I'll ask you whether it

14   should be a call in a minute.  Do you think if we schedule for

15   the end of May, that will be enough time for the plaintiffs

16   committee as a whole to meet and confer and then for the

17   parties to meet and confer?

18        MR. CARTER:  We do, your Honor.

19        MR. KELLOGG:  Yes, your Honor, that should be fine

20   subject to our trip to Saudi Arabia.  We'll try to work around

21   that.

22        THE COURT:  Okay.  I will schedule a conference for --

23   I may need to look at my calendar.  I'm not sure I can do it

24   from here.  Let me ask another question.  Do we think this

25   should be an in-person conference or telephone conference?

1   Maybe I'll help you come up with an answer there.

2          If we think this is going to be a substantive

3   discussion about the scope of discovery and the like, I'm

4   inclined to have it be in person.  If we think it is going to

5   be a check-in about where things stand and is only going to be

6   15 minutes or so, we can do it by phone.  Otherwise, I think in

7   person probably is better.

8          MR. CARTER:  Our view is that if we schedule an

9   in-person, we all have it on our schedule, and we can always

10  change it if it becomes unnecessary to be here in person.

11         MR. KELLOGG:  Your Honor, it will almost certainly be

12  substantive.  We are happy to appear before you.

13         THE COURT:  I am going to schedule a conference for

14  Thursday the 24th in the morning rather than schedule it for

15  the Friday before Memorial Day weekend in the afternoon, which

16  is a favor I'm offering to everybody in the room.

17         MR. CARTER:  Thank you, your Honor.

18         THE COURT:  Let's schedule that for 10 o'clock on

19  Thursday the 24th.  We will issue an order so we have that

20  there.  I will probably ask for some letters in advance just so

21  I know where things stand.  At that point we can start to talk

22  about depositions and deadlines.  I think we will have a better

23  sense then about production and hopefully even where some of

24  the third-party discovery is.

25         I appreciate the kingdom's representation that they

Case 1:03-md-01570-GBD-SN   Document 3984   Filed 04/18/18   Page 27 of 33

1  believe that discovery can and should be completed by the

2  middle of October.  I think everybody shows an interest in

3  moving this case forward.  If that is possible, we will get

4  there.  January 31st is what the plaintiffs committee proposed

5  should be sort of a back end.  Let's see whether between mid

6  October and the end of January we can complete this process.

7  I'm not going to set a deadline today until we have a better

8  sense of exactly what we are talking about.  I think that makes

9  the most sense.

10         Anything else for us to discuss at this time on

11  discovery?

12         MR. KREINDLER:  Your Honor, Jim Kreindler.  One thing

13  to add that might become relevant, because I think you like to

14  know of all 9/11-related events.  This may turn out to be

15  nothing, but it may happen.

16         This week in both the Senate and the House,

17  Republicans and Democrats, are discussing a resolution to call

18  for the release of millions of pages of 9/11 documents that the

19  government has.  I want to alert your Honor to that discussion.

20  That there might be such a resolution and there might be a

21  significant release of information, hopefully in the near

22  future.

23         We don't know what's happening.  Washington is hard to

24  predict.  But I do want to mention it because it bears upon the

25  information we might have to draw on.

```
 1              THE COURT:  That's fine.  Thank you.

 2          The second issue that we were to discuss today is the

 3     plaintiffs executive committee's request that we modify the way

 4     the new complaints are being filed.  I want to talk about this

 5     issue.  I see Mr. Maloney will be leading the conversation.

 6     Let me tell you some concerns I have here.

 7          One thing I would like to hear from you is what's

 8     wrong with the system we have and why you think it needs to be

 9     modified.  My concern with what you have proposed, which as I

10     understand it is essentially to file something akin to a notice

11     in any existing complaint that says we are now adding the

12     following 100 people as plaintiffs to this case, my concern

13     with that is manyfold.

14          One, I am concerned that those names will never make

15     their way onto the caption of the docket; we would have

16     problems with issuing judgments should that time come, also

17     with public access to the information and not having every

18     party's name on the complaint.

19          That may also cause problems if and when anyone should

20     be removed from the caption either because they elect to

21     withdraw or -- I don't envision this happening -- to the extent

22     some cases settle out and other cases go forward.  I don't

23     think that lends itself to that particular concern of mine, but

24     it is one.

25              I am also concerned about it from the court's
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:03-md-01570-GBD-SN   Document 3964   Filed 04/18/18   Page 29 of 33

```
 1    perspective.  Typically, we manage MDLs by having individual

 2    cases filed.  It is strongly held preference of our clerk of

 3    court as far as management of the court's docket on the whole

 4    to have these cases filed individually.

 5            So I am reluctant to conclude, at least not on the

 6    record before me, that there is a real problem with what we

 7    have, given some of the competing interests that the public has

 8    and that the court has as far as its administration.  With that

 9    as my preamble, let me hear from you.

10            MR. MALONEY:  We were trying to make it easier for the

11    court and the clerk's office than more difficult.  Many years

12    ago, when we first started, Judge Casey issued a case

13    management order that allowed the plaintiffs to periodically

14    amend the complaint by adding new names to the caption.  They

15    were uploaded back then.

16            Since we have filed the case against the kingdom last

17    year, we have had additional plaintiffs retain various members

18    of the committee.  We have also had other plaintiffs retain

19    other counsel.  As your Honor knows, other complaints have been

20    filed.  They have been sort of me-too complaints, they have

21    been issued new docket numbers, and they are represented by

22    other counsel who are not on the committee but they essentially

23    are sort of riding the coattails.

24            For plaintiffs that are retaining members of the

25    committee or lawyers that already have existing complaints, we
```

1    thought it would be logistically easier for the clerk's office

2    for us to amend them and add them and make sure that they were

3    bound to any of the prior or future rulings for those

4    particular cases.

5         We can do it either way.  We can file a new complaint

6    that essentially mirrors what we already have with a new

7    caption, with new plaintiffs.  We thought that would actually

8    clog up the docket more than keeping it as small as we could.

9         THE COURT:  I know you can't really answer this

10   question, but I'll ask it anyway.  Do you have a sense of how

11   many more plaintiffs are likely to appear in the case?  We've

12   got another eight months under the statute of limitations.

13        MR. MALONEY:  The January 2, 2019 date, we are looking

14   at as the end.  There are arguments for extending that, but we

15   plan on making sure everybody who is retaining us has retained

16   us and has a complaint on file before then.  Right now there

17   are probably a few thousand additional plaintiffs, which is a

18   combination of additional death cases, solacium claims that are

19   separate and apart from them but tied to death cases, and then

20   personal injury claims.  So there are several thousand more.

21        THE COURT:  When you say a few thousand, you're

22   referring to claims by estates for people who died as a result

23   of the attacks, the solacium claims of those family members,

24   and individuals who did not die or were injured as a result of

25   the attacks?

1      MR. MALONEY:  Correct, your Honor.

2      THE COURT:  You think that number is several thousand?

3      MR. MALONEY:  I don't want to hazard a guess.  It is

4  certainly a few thousand collectively, not just my firm but all

5  the other firms that I am aware of.

6      THE COURT:  I can tell you that the strongly held view

7  of the administrative arm of the court is that we continue to

8  file new cases with new docket numbers and that those cases

9  proceed under the protocol that I put in place in May, so they

10  automatically get related and they get bound by every decision

11  of the MDL.  That is the system that our MDL coordinator

12  prefers, that our clerk of court prefers.

13      I don't think there is any reason to have piecemeal

14  filings, at least of the firms that are already in the case.

15  They can file one complaint in October or November that lists

16  all of their new clients rather than file seriatim.  But I

17  think we are going to want to have new docket numbers with new

18  captions and have those cases related over.

19      MR. MALONEY:  We can do that, your Honor.  It's not a

20  problem.  We thought it might be easier for the Court when we

21  talk about the Ashton case that we know that the Kreindler firm

22  is essentially the lead counsel for the Ashton cases and now

23  the Kreindler firm may have Ashton and Jones and Smith.  We are

24  trying to avoid that.  But whatever the Court decides is fine.

25      THE COURT:  I appreciate that.  I think we want

Case 1:03-md-01570-GBD-SN   Document 3984   Filed 04/18/18   Page 92 of 93

1   Ashton, Jones, and Smith as opposed to just one.

2          MR. HAEFELE:  Your Honor, that may be one thing I want

3   your Honor to consider.  There is a circumstance that came up

4   in a case of the Iran judgments where there is at least a

5   rationale to have the solacium claims put together with the

6   estates that they are part of.  That may be a reason to perhaps

7   address the solacium claimants, amending and adding them in

8   with the estates in the same case.  I'm asking that your Honor

9   consider that as one middle ground regarding at least a group

10  of the claims.

11         THE COURT:  You have instances where the estate has

12  already filed a complaint but maybe the spouse never filed her

13  own complaint?

14         MR. HAEFELE:  The spouse or child.  For example, some

15  of them were minors at the time and they may not have been

16  named, and they may be of majority age now and they may want to

17  have a claim of their own as a solacium claim as a child or a

18  spouse or a sibling or a parent.

19         THE COURT:  I agree with you as a general matter that

20  it is preferable, though maybe not critical, that solacium

21  claims are in the same case as the underlying death claim.

22         MR. HAEFELE:  I think it would help your Honor to

23  manage the judgments as well.  Least from what we saw with

24  Iran, it seems it is easier if they are all in the same

25  judgment from the same case.

```
 1              THE COURT:  Potentially.  But I think in that instance

 2    the court as a whole, not just me, would prefer the filing of

 3    an amended complaint that adds the names.  That may not be

 4    preferable from an administrative perspective on your end.  Let

 5    me think about that particular issue and whether or not there

 6    should be two different sections, one for entirely new cases

 7    where nobody has filed yet and one for cases where we have part

 8    of a family already proceeding and we want to add new family

 9    members.

10              MR. HAEFELE:  Thank you.

11              THE COURT:  Thank you.  Anything further on that

12    particular issue?

13              MR. MALONEY:  No, your Honor.

14              THE COURT:  I will see you all on the 24th.  I will

15    issue an order with those dates.  Thank you everybody.

16              (Adjourned)

17

18

19

20

21

22

23

24

25
```