**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X

In re:

      **TERRORIST ATTACKS ON**
      **SEPTEMBER 11, 2001**


------------------------------------------------------------------X

```
┌─────────────────────────────┐
│ USDC SDNY                   │
│ DOCUMENT                    │
│ ELECTRONICALLY FILED        │
│ DOC #: _____      │
│ DATE FILED: 11/12/2025      │
└─────────────────────────────┘
```

**03-MD-01570 (GBD)(SN)**

**REPORT &**
**RECOMMENDATION**

**SARAH NETBURN, United States Magistrate Judge.**

**TO THE HONORABLE GEORGE B. DANIELS:**

This document relates to:

      Knight v. Islamic Republic of Iran, No. 18-cv-12398 (GBD)(SN)
      Rodriguez v. Islamic Republic of Iran, No. 18-cv-12347 (GBD)(SN)

      Fourteen Plaintiffs seek partial final default judgments against the Islamic Republic of

Iran ("Iran") for personal injuries sustained as a result of the 9/11 Attacks. See ECF Nos. 10849

(Knight), 10921 (Rodriguez).[1] Their claims stem from the latent conditions—aerodigestive

disorders, cancers, and other chronic diseases—that they developed following 9/11-related

environmental exposures. Unlike the fatal latent injuries that the Court has previously addressed,

these injuries have not proved lethal for the Knight and Rodriguez plaintiffs (together, the

"Plaintiffs"). Some claims also raise causation issues. Certain Plaintiffs were exposed to toxins

from the World Trade Center ("WTC") site in the days following the 9/11 Attacks or at offsite

locations. But under applicable law, and given the similarities between these Plaintiffs and those

awarded damages for their latent injuries, Iran is still liable to the Plaintiffs. The Court therefore

recommends GRANTING the Plaintiffs' motions.

-----

[1] Unless otherwise noted, all ECF numbers refer to the main MDL docket, No. 03-md-01570.

## BACKGROUND

The Court assumes familiarity with this multidistrict litigation and summarizes only the relevant factual and procedural background.

### I.    9/11 Environmental Exposures

The Plaintiffs are among the civilians and first responders who were exposed to the hazardous conditions created by the 9/11 Attacks. On September 11, 2001—and in the days, weeks, and months that followed—ordinary citizens, professionals, and volunteers inhaled a toxic combination of fumes, smoke, and particulates at the three 9/11 crash sites. See Toxins and Health Impacts, 9.11 World Trade Ctr. Health Program, Ctrs. For Disease Control & Prevention (July 30, 2024), https://www.cdc.gov/wtc/exhibition/toxins-and-health-impacts.html. They escaped, dug through, and cleaned up the rubble at Ground Zero and the other sites. Id. In the process, they ingested contaminants loaded with asbestos, silica, metals, concrete, and glass. Id. Many then developed severe medical conditions linked to these exposures—including asthma, gastro-esophageal reflux disease, lung diseases, and various types of cancer—that have required extensive medical treatment. The Plaintiffs seek recovery for these latent conditions. See, e.g., ECF Nos. 10851-2 at 3, 10924-2 at 4 (declarations recounting latent conditions).

### II.    Victim Compensation Fund

In the aftermath of the 9/11 Attacks, Congress passed the Air Transportation Safety and System Stabilization Act, Pub. L. No. 107-42, 115 Stat. 230 (2001) (codified at 49 U.S.C. § 40101 note). That statute created the original Victim Compensation Fund, which Congress designed to "provide full compensation to any individual . . . who was physically injured or killed as a result of the terrorist-related aircraft crashes of [9/11], or the rescue and recovery efforts during the immediate aftermath of such crashes." 49 U.S.C. § 40101 note. The program lapsed three years later. ECF No. 5484 at 2. But Congress revived it in 2011 and permanently

authorized it in 2019. See James Zadroga 9/11 Health and Compensation Act of 2010, Pub. L. No. 111-347, 124 Stat. 3623 (2011) (codified at 26 U.S.C. § 5000C, 42 U.S.C. § 300mm, and 49 U.S.C. § 40101 note) ("Zadroga Act"); Never Forget the Heroes: James Zadroga, Ray Pfeifer, and Luis Alvarez Permanent Authorization of the September 11th Victim Compensation Fund Act, Pub. L. No. 116-34, 133 Stat. 1040 (2019) (codified at 49 U.S.C. § 40101 note). These statutes created the current Victim Compensation Fund ("VCF") and also established the Word Trade Center Health Program ("WTC Health Program") to provide medical monitoring and health services to certain first responders and other attack survivors. Zadroga Act § 101.

Under the current VCF regime, claimants are eligible for compensation if they, among other things, show that (1) they were "present at a 9/11 crash site" (2) "at the time of, or in the immediate aftermath of" the 9/11 Attacks, and (3) they suffered "physical harm" (4) as a "direct result of the crashes or the rescue and recovery efforts or debris removal." 28 C.F.R. § 104.2(b)(1). VCF regulations expound on these requirements:

- The **"9/11 crash site"** includes the areas hit by plane crashes—the World Trade Center site ("WTC" or "Ground Zero"), the Pentagon site, and the Shanksville, PA site—plus a defined exposure zone in Lower Manhattan and "[a]ny area related to, or along, routes of debris removal, such as barges and Fresh Kills" in Staten Island, NY (if the individual participated in the debris-removal operation). Id. § 104.2(j); see 49 U.S.C. § 40101 note.

- The **"immediate aftermath"** of the 9/11 Attacks includes any period between September 11, 2001, and May 30, 2002. 28 C.F.R. § 104.2(c); see 49 U.S.C. § 40101 note.

- A **"physical harm"** means a physical injury to the body treated by a medical professional or a "WTC-Related Physical Health Condition," but not certain mental health conditions. In turn, a "WTC-Related Physical Health Condition" eligible for compensation is defined by statute or designated by the WTC Health Program Administrator through rulemaking.[2] 28 C.F.R. § 104.2(i); see 42 U.S.C. §§ 300mm-22(a), 300mm-32(b).

---

[2] The WTC Health Program's list of covered conditions currently includes certain aerodigestive disorders, cancers, acute traumatic or musculoskeletal injuries, and specific mental health disorders. See Covered

To qualify, a claimant must be examined by the WTC Health Program or a private physician and obtain a certification that her 9/11-related exposure was "substantially likely to be a significant factor in aggravating, contributing to, or causing" her condition. 42 U.S.C. § 300mm-22(a)(1)(A)(i). Once approved, the claimant receives an eligibility decision letter from the VCF confirming the agency's findings.

Before seeking default judgments, the Plaintiffs submitted VCF claims as described above. Each received an eligibility decision letter from the VCF stating that the Plaintiff was "found eligible for the following injuries" and listing those injuries. See, e.g., ECF Nos. 10851-2 at 5 (Bastible), ECF 10924-2 at 6 (Barnes).

## III.    Latent and Personal Injury Frameworks

In 2023, the Court determined for the first time that Iran was liable to a group of plaintiffs that succumbed to their latent injuries. See In re Terrorist Attacks on Sept. 11, 2001 ("In re 9/11"), No. 03-md-1570 (GBD)(SN), 2023 WL 2529061 (S.D.N.Y. Mar. 3, 2023) ("Latent Injury I R&R"), report and recommendation adopted, 2023 WL 5109691 (Aug. 9, 2023) ("Latent Injury I Opinion"); see also ECF No. 9216 (addressing supplemental evidence for a subset of latent-injury plaintiffs). Earlier this year, the Court awarded damages to another group of plaintiffs who developed chronic and ultimately fatal medical conditions after 9/11-related environmental exposures. See In re 9/11, No. 03-md-1570 (GBD)(SN), 2025 WL 2166082

---

Conditions, 9.11 World Trade Ctr. Health Program, Ctrs. For Disease Control & Prevention (July 8, 2024), https://www.cdc.gov/wtc/conditions.html. To be certified for some conditions by the WTC Health Program, claimants must meet time-interval or latency requirements that depend on their condition. Id. Additionally, the WTC Health Program has requirements for the timing, duration, and level of exposure to toxins at the 9/11 crash sites. See Section 1: Eligibility Criteria and Deadlines, Sept. 11 Victim Comp. Fund, https://www.vcf.gov/policy/eligibility-criteria-and-deadlines. The VCF's requirements are "not dependent on the length of time the individual was at the site." Id.; see also ECF No. 5484 at 4.

(S.D.N.Y. Feb. 28, 2025) ("Latent Injury II R&R"), report and recommendation adopted, 2025 WL 949547 (S.D.N.Y. Mar. 28, 2025) ("Latent Injury II Opinion").

These prior decisions established and elaborated a damages framework for latent injuries by drawing on the Court's framework for personal injury damages. The Court first set out its framework for personal injury damages for then-living plaintiffs in Burnett I. See ECF No. 5879. The framework divides injuries into three categories with corresponding damages: a baseline award ($7,000,000) for "severe" injuries, a downward departure ($5,000,000) for "significant" injuries, and an upward departure ($10,000,000) for "devastating" injuries. Id. at 6–10. For rare individuals with exceptionally traumatic injuries, the Court has recommended damages above $10 million. See, e.g., ECF No. 5909 at 11–13 (awarding damages of $25,000,000 to a plaintiff whose injuries were "beyond devastating"). Conversely, "[t]he absence of medical records supporting and providing further information regarding an affiant's claims may support a downward departure in an award determination." ECF No. 5879 at 9.

For latent injuries, the Court similarly established a baseline damages award of $7 million for the pain and suffering decedents experienced "when they developed 9/11-related illnesses and ultimately died." Latent Injury I R&R at *8. The Court also permitted upward and downward departures for latent injuries, including an award of $10 million to one plaintiff who died from "devastating" latent injuries. Id. at *9–10. But despite its prior analogies to the Burnett I personal injury framework, the Court has not yet considered recovery for claims by living plaintiffs for personal injuries solely due to latent conditions.[3]

---

[3] The Court established its framework for evaluating fatal latent injury claims after a productive dialogue with the Plaintiffs' Executive Committee ("PEC") for Personal Injury and Death Claims. See, e.g., ECF No. 5484 (PECs' letter explaining distinctions between personal injury claims and latent injury claims); ECF No. 5704 (PECs' letter detailing concerns about non-PEC attorneys filing latent injury claims before the Court determined liability or established a clear rubric for evaluating such claims); Latent Injury I

Finally, because the plaintiffs in <u>Burnett I</u> and <u>Latent Injury I R&R</u> relied on a private right of action that is reserved for United States nationals, military personnel, and government employees, the Court's framework thus far has limited recovery to claims by members of those groups. 28 U.S.C. § 1605A(c).

## DISCUSSION

The moving Plaintiffs are all United States nationals who seek to hold Iran liable for their 9/11-related latent injuries per § 1605A. To establish their "claim[s] or right to relief by evidence satisfactory to the court," they have filed individual declarations and VCF letters that detail their conditions. 28 U.S.C. § 1608(e); <u>see</u> ECF Nos. 10851-2, 10851-3, 10851-4, 10851-5, 10851-6, 10851-7, 10851-8, 10851-9, 10924-2, 10924-3, 10924-4, 10924-5, 10924-6, 10924-7 (declarations attaching VCF letters). In evaluating that record, the Court may "accept as true the plaintiffs' uncontroverted evidence," including their affidavits. <u>Elahi v. Islamic Republic of Iran</u>, 124 F. Supp. 2d 97, 100 (D.D.C. 2000); <u>see</u> <u>Weinstein v. Islamic Republic of Iran</u>, 184 F. Supp. 2d 13, 16-17 (D.D.C. 2002). To grant the Plaintiffs relief, the Court must resolve (1) whether it has jurisdiction over their claims; (2) whether Iran defaulted; (3) whether Iran is liable; and (4) if all else is true, what damages are due.

---

R&R at *10 (recommending liability and a damages framework for latent injuries that caused the plaintiffs' deaths).

Before and after establishing this latent-injury framework, the Court granted personal injury damages to plaintiffs with cancers resulting from 9/11-related environmental exposures—but it premised its awards namely on the plaintiffs' other injuries. See <u>Burnett VI</u>, ECF No. 8258 at 10–11, 11 n.5 (recommending a $5 million award to a plaintiff who "suffered injuries to his right knee, neck, and back, chronic rhinitis, asthma, obstructive airway disease, GERD, and PTSD," even if the Court credited his reported prostate cancer); ECF No. 9216 at 2–3 (recommending a $5 million award for a plaintiff who had VCF-certified skin cancer and suffered non-VCF-certified respiratory and kidney injuries because his injuries were "analogous to the types of injuries considered 'significant' under the Court's personal injury framework"); <u>Burnett VII</u>, ECF No. 9358 at 2–3 (recommending a $5 million award to a plaintiff who suffered trampling injuries to his back, right hip, and right leg, as well as PTSD, asthma, and esophageal reflux—but also crediting his "prostate cancer linked to the 9/11 Attacks").

## I.    The Court Has Jurisdiction Under the FSIA

The Foreign Sovereign Immunities Act ("FSIA") "supplies the ground rules for 'obtaining jurisdiction over a foreign state in the courts of this country.'" Federal Republic of Germany v. Philipp, 592 U.S. 169, 175 (2021) (quoting Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 443 (1989)). As its name suggests, the FSIA makes foreign states immune from suit by default and confers jurisdiction over actions only if they meet strict requirements. The Plaintiffs' claims clear these hurdles, so the Court has jurisdiction over them.

### A.    Subject Matter Jurisdiction

Under the FSIA, district courts have subject matter jurisdiction over nonjury civil actions brought *in personam* against foreign states if "one of several enumerated exceptions to immunity applies." Republic of Sudan v. Harrison, 587 U.S. 1, 4 (2019); see 28 U.S.C. §§ 1330(a), 1604. The nature of the Plaintiffs' claims satisfies all elements except immunity. See Latent Injury I R&R at *3; Latent Injury II R&R at *2. The Plaintiffs rely on the immunity exception codified at 28 U.S.C. § 1605A(a),[4] which allows U.S. nationals to hold a foreign state sponsor of terrorism accountable for "acts of terrorism or the provision of material support or resources for acts of terrorism" when those acts are undertaken "by an official, employee, or agent of the foreign state while acting within the scope of his or her office, employment, or agency." ECF No. 5879 at 2 (citing 28 U.S.C. § 1605A(a)(1)). The Court has found that it possessed subject matter jurisdiction under § 1605A because the Plaintiffs' injuries "occurred either as a direct result of the 9/11 attacks, the ensuing chaos from the attacks in the immediate aftermath, or as a result of

---

[4] As the Court has previously explained, the elements of § 1605A(a) "almost total[ly] overlap" with the § 1605A(c) cause of action that the Plaintiffs assert here. Latent Injury II R&R at *3 (quoting Force v. Islamic Republic of Iran, 464 F. Supp. 3d 323, 369 (D.D.C. 2020)). The only relevant distinction is that § 1605A(c) applies to a more limited set of plaintiffs than § 1605A(a). See Force, 464 F. Supp. 3d at 369. But a qualifying "plaintiff that offers proof" of one "has also established" the other. Id. The Court has accordingly collapsed the jurisdictional and liability inquiries for § 1605A and discusses both below.

first responders attempting to assist the injured or endangered fleeing from the scene." ECF No. 5879 at 3; see ECF No. 10988 at 2. Section 1605A further details that damages are available "for personal injury or death," and allows for "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c)(4). The moving Plaintiffs seek pain and suffering damages for their personal injuries sustained as a result of the 9/11 Attacks. Accordingly, the Court has subject matter jurisdiction over the Plaintiffs' claims under § 1605A.

### B.    Personal Jurisdiction

With subject matter jurisdiction established, personal jurisdiction is simply a matter of showing "valid service of process." Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela, 863 F.3d 96, 104 (2d Cir. 2017) (cleaned up); accord 28 U.S.C. § 1330(b). The FSIA specifies four methods of serving foreign states in descending order of preference. See 28 U.S.C. § 1608(a). The first, service by "special arrangement," was impossible because the Plaintiffs have no such arrangement with Iran. Id. § 1608(a)(1); see ECF Nos. 10850 at 11, 10922 at 11. The second, service according to an "international convention on service of judicial documents," was unavailable because there is no service convention between the U.S. and Iran. 28 U.S.C. § 1608(a)(2); see ECF Nos. 10850 at 11, 10922 at 11. The third, service by registered "mail," proved ineffective; the Clerk of Court mailed the requisite documents, but Iran failed to acknowledge receipt or refused service. 28 U.S.C. § 1608(a)(3); see No. 18-cv-12398, ECF No. 13; No. 18-cv-12347, ECF No. 11. The fourth, service via "diplomatic channels," finally succeeded. 28 U.S.C. § 1608(a)(4); see ECF Nos. 10850 at 11–12, 10922 at 11; see also Aff. of Service, No. 18-cv-12398, ECF No. 71; Aff. of Service, ECF No. 8438 (Rodriguez). Because the Plaintiffs properly effectuated service under 28 U.S.C. § 1608(a)(4) on claims within the Court's subject matter jurisdiction, the Court has personal jurisdiction over Iran.

## II.    Iran Defaulted

After the Plaintiffs effectuated service, Iran had "sixty days" to "serve an answer or other responsive pleading." 28 U.S.C. § 1608(d). Iran did not respond or otherwise appear in that time or since. The Clerk of the Court therefore entered Certificates of Default against Iran on August 24, 2022 (Rodriguez) and February 15, 2024 (Knight). See Clerk's Certificate of Default, ECF No. 8442 (Rodriguez); Clerk's Certificate of Default, No. 18-cv-12398, ECF No. 74.

## III.    The Plaintiffs Establish Liability Under § 1605A

The Plaintiffs request liability judgments. See ECF Nos. 10849, 10921. Section 1605A(c) provides a cause of action for claims (1) brought by a United States national or her representative (2) against a designated state sponsor of terrorism that (3) directly, or through a state official, employee, or agent, committed or provided material support or resources for (4) "an act of torture, extrajudicial killing, aircraft sabotage, or hostage taking" that (5) caused (6) personal injury or death.[5] 28 U.S.C. § 1605A(a)(1), (c).

The Plaintiffs' claims easily meet five of these six elements. First, the Plaintiffs were all U.S. citizens on September 11, 2001. See ECF Nos. 10851-1, 10924-1 (listing "Nationality on

---

[5] The courts are split as to the requirements of § 1605A(c). Some say that the provision requires plaintiffs to articulate a claim sounding in tort. In Friends of Mayanot Inst., Inc. v. Islamic Republic of Iran, 313 F. Supp. 3d 50 (D.D.C. 2018), for example, the district court explained that "[i]n order to satisfy the statutory elements of causation and injury, plaintiffs in actions arising under companion [§] 1605A(c) 'must articulate the justification for such recovery, generally through the lens of civil tort liability.'" Id. at 61 (quoting Rimkus v. Islamic Republic of Iran, 750 F. Supp. 2d 163, 176 (D.D.C. 2010)). On this interpretation, "a claimant 'must identify a particular theory of tort liability—e.g., intentional infliction of emotional distress, wrongful death, [or] battery'"—to properly pursue a § 1605A(c) claim. Id. (quoting Stansell v. Republic of Cuba, 217 F. Supp. 3d 320, 341 (D.D.C. 2016)). Other courts simply analyze the elements of § 1605A(c) as written in the statute, using background tort principles where necessary or useful. See, e.g., Roberts v. Islamic Republic of Iran, 581 F. Supp. 3d 152, 173 (D.D.C. 2022) (analyzing § 1605A(c) claims without referencing theory of tort liability).

As in prior decisions, the Court declines to recommend one or the other approach at this time because the choice is not outcome determinative. See, e.g., Latent Injury II R&R at *3 & n.3. Out of caution and where helpful, the Court draws on both approaches to analyze liability.

9/11" of each Plaintiff). Second, Iran has been a designated state sponsor of terrorism since 1984. State Sponsors of Terrorism, Bureau of Counterterrorism, U.S. Dep't of State, https://www.state.gov/state-sponsors-of-terrorism (last visited Oct. 27, 2025). Third, Judge Daniels held a hearing on the adequacy of the evidence of Iran's culpability and found that "Iran provided direct support to Al Qaeda specifically for the [9/11 Attacks]." In re 9/11, No. 03-md-01570, 2011 WL 13244047, at *40 (S.D.N.Y. Dec. 22, 2011) ("Havlish I"). He then held that the evidence satisfied 28 U.S.C. § 1608(e)'s requirements for a default judgment. See id. at *39. The motions incorporate that evidence, see, e.g., ECF Nos. 10850 at 17, 10922 at 19, and the Court has granted numerous motions on that same evidence. See, e.g., Latent Injury I R&R at *4; Latent Injury II R&R at *4; see also Anderson v. Islamic Republic of Iran, 753 F. Supp. 2d 68, 75 (D.D.C. 2010) (permitting courts "in subsequent related cases to rely upon the evidence presented in earlier litigation . . . without necessitating the formality of having that evidence reproduced" (quoting Rimkus, 750 F. Supp. 2d at 172)). Fourth, "the 9/11 attacks and the resulting death constitute 'extra judicial killings.'" Havlish I at *39 (quoting 28 U.S.C. § 1605A(c)). As the sixth element, the Plaintiffs suffered the injuries documented in their declarations and VCF letters. See ECF Nos. 10851-2, 10851-3, 10851-4, 10851-5, 10851-6, 10851-7, 10851-8, 10851-9, 10924-2, 10924-3, 10924-4, 10924-5, 10924-6, 10924-7.

The main question is whether the Plaintiffs can show causation under § 1605A(c). Courts interpret § 1605A(c) causation using "well-established principles of law, such as those found in [the] Restatement (Second) of Torts and other leading treatises." Bodoff v. Islamic Republic of Iran, 907 F. Supp. 2d 93, 103 (D.D.C. 2012) (cleaned up). Those principles require plaintiffs to demonstrate "proximate cause," Roberts, 581 F. Supp. 3d at 170, a characteristically opaque term

for "scope of liability," Restatement (Third) of Torts: Liab. For Physical & Emotional Harm Ch. 6, Special Note on Proximate Cause (Am. Law Inst. 2010).

Because some of the Plaintiffs' claims raise causation issues and expand the scope of eligible plaintiffs, the Court first reviews its previous decisions on latent-injury causation, then analyzes the Plaintiffs' claims under applicable law.

### A.    Previous Decisions on Causation

The Court has held that Iran proximately caused latent injuries and the resulting deaths that flowed from the 9/11 Attacks. See Latent Injury I Opinion at *2; Latent Injury II Opinion at *2. Applying the two-pronged test from Owens v. Republic of Sudan, the Court explained that proximate cause exists where the plaintiffs show that (1) the defendant's actions were a "'substantial factor' in the sequence of events that led to" their injuries, and (2) their injuries were "reasonably foreseeable or anticipated as a natural consequence" of the defendants' conduct. 864 F.3d 751, 794 (D.C. Cir. 2017) (quoting Rothstein v. UBS AG, 708 F.3d 82, 91 (2d Cir. 2013)), vacated and remanded on other grounds by Opati v. Republic of Sudan, 590 U.S. 418 (2020).

First, the Court found that Iran's tortious conduct was a "substantial factor" that led to the deaths of the latent injury decedents. See Latent Injury I R&R at *5–6; Latent Injury I Opinion at *2; Latent Injury II R&R at *5; Latent Injury II Opinion at *2. The Court relied on VCF letters and affidavits from the decedents' surviving family members to reach its conclusions. Latent Injury I R&R at *5–6; Latent Injury II R&R at *5. The VCF letters reflected the VCF's analysis that the decedents' injuries were a "direct result" of the 9/11 Attacks. 28 C.F.R. § 104.2(b). The Court endorsed "the quality of th[ose] conclusions" and "accept[ed]" the letters "as evidence establishing that 9/11 was a substantial factor leading to the Latent Injury Decedents' medical conditions." Latent Injury I R&R at *5. Family members' declarations then established "that

11

9/11 was a substantial factor also in [the decedents'] deaths" by demonstrating "in moving detail how those conditions eventually cut [the decedents'] lives short." Id. at *5–6; Latent Injury II R&R at *5. In the most recent decision, the Court also credited the latent injury decedents' "Award Detail" letters, which demonstrated that they each received an award for both a "personal injury" claim and a "deceased claim" from the VCF. Latent Injury II R&R at *5. Those letters buttressed the decedents' "substantial factor" argument. Id.

Second, the Court found that the latent injury decedents' deaths were a "reasonably foreseeable" consequence of Iran's material support to al Qaeda. Owens, 864 F.3d at 794; see Latent Injury I R&R at *5–6; Latent Injury I Opinion at *2; Latent Injury II R&R at *5; Latent Injury II Opinion at *2. Because "Iran's material support for al Qaeda proximately caused the 9/11 Attacks and resulting deaths," the Court reasoned, the plaintiffs' latent injury deaths were "necessarily" reasonably foreseeable. Latent Injury I R&R at *6 (citing Havlish I at *41). With both Owens factors satisfied, the Court accordingly found that Iran had proximately caused the latent injury plaintiffs' injuries and deaths. See Latent Injury I R&R at *5–6; Latent Injury II R&R at *5.

Additionally, in prior orders, the Court declined to find Iran liable for emotional distress suffered by the surviving family members of latent injury decedents. See Latent Injury I Opinion at *2; Latent Injury II Opinion at *3–4. While surviving family members' harms are significant, the Court determined they "no longer have the 'reasonable connection' to the Defendant's conduct that proximate cause requires for holding Defendant liable for such harms." Latent Injury I Opinion at *2 (quoting Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc., 191 F.3d 229, 235 (2d Cir. 1999)). The chain of causation linking Iran to the surviving family members' claims for solatium damages was too attenuated to permit recovery. See Latent Injury

I Opinion at *2; Latent Injury II Opinion at *3–4 (reaching the same conclusion despite plaintiffs' new arguments for recovery).

In light of the Court's prior decisions, and after reviewing the Knight and Rodriguez Plaintiffs' filings, the Court solicited counsel's views on the scope of eligible latent-injury plaintiffs. See ECF No. 11245. Specifically, the Court asked them to address: "whether a plaintiff's eligibility for relief from latent injuries requires that the plaintiff died as a result of the injuries, or that the plaintiff developed the latent injuries due to exposure (1) on September 11, 2001, or (2) at the immediate location of the attacks." ECF No. 11245. Counsel for the Knight and Rodriguez Plaintiffs and the Plaintiffs Executive Committees filed their responses. See ECF Nos. 11348, 11368.

### B.     Iran Caused the Plaintiffs' Latent Injuries

The Plaintiffs argue that they are all eligible for compensation because they were exposed, at various locations and times, to environmental toxins because of the 9/11 Attacks, and their exposures led to serious medical conditions that personally injured them. They explain that the causation standard under § 1605A in material-support cases is "liberally construed" and does not require the Plaintiffs to "demonstrate any direct nexus between the material support and eventual terrorist act." ECF No. 10850 at 18. Consistent with the Court's prior decisions, Owens is the applicable test for proximate causation. The Plaintiffs must therefore show that (1) Iran's actions were a "'substantial factor' in the sequence of events that led to" their latent injuries, and (2) their latent injuries were "reasonably foreseeable or anticipated as a natural consequence" of Iran's conduct. Owens, 864 F.3d at 794 (quoting Rothstein, 708 F.3d at 91).

### 1.     Iran's Actions Were a Substantial Factor

The Court has already found that Iran's "provision of material support to al Qaeda" was a substantial factor leading to the 9/11 Attacks. Havlish I at *41. The critical step is therefore

connecting the 9/11 Attacks to each of the Plaintiffs' latent injuries.[6] The Plaintiffs seek to do so through their VCF eligibility determination letters, which reflect the agency's conclusion that a person's injuries are a "direct result" of the 9/11 Attacks. 28 C.F.R. § 104.2(b). The VCF issues these letters only after a physician determines that a person's "exposure to airborne toxins, any other hazard, or any other adverse condition resulting from the [9/11 Attacks] . . . is substantially likely to be a significant factor in aggravating, contributing to, or causing the illness or health condition." 42 U.S.C. § 300mm-22(a)(1)(A)(i). All the Plaintiffs submitted VCF letters confirming that each Plaintiff suffered from at least one—and often multiple—latent conditions eligible for VCF compensation. See ECF Nos. 10851-2, 10851-3, 10851-4, 10851-5, 10851-6, 10851-7, 10851-8, 10851-9, 10924-2, 10924-3, 10924-4, 10924-5, 10924-6, 10924-7 (attaching VCF letters for each Plaintiff to their declarations). The letters demonstrate that, according to the VCF, the Plaintiffs suffered "physical harm . . . as a direct result of the [9/11] crashes or the rescue and recovery efforts or debris removal." 28 C.F.R. § 104.2(b)(1).

The Court has, on multiple occasions, accepted VCF eligibility determination letters "as evidence establishing that 9/11 was a substantial factor leading to the [plaintiffs'] medical conditions." Latent Injury I R&R at *5–6; Latent Injury I Opinion at *2; Latent Injury II R&R at *5; Latent Injury II Opinion at *2. There is no basis to alter that conclusion for these Plaintiffs.

The VCF and WTC Health Program remain the best positioned entities for evaluating medical facts related to the Plaintiffs' conditions. As the Court has explained, the programs "leverage the expertise of medical experts and rigorous research" and employ eligibility determination processes with "robust procedural protections." Latent Injury I R&R at *5. The

---

[6] Unlike prior latent-injury decisions, this is the only remaining link in the causation chain. For latent injury decedents, the Court relied on declarations from surviving family members to establish that the plaintiffs died from their VCF-eligible, 9/11-related conditions. Latent Injury I R&R at *6; Latent Injury II R&R at *5. The Plaintiffs here are all living, so that extra step is unnecessary.

claim-review process is "the same for both living and deceased claimants," as the Plaintiffs explain. ECF No. 11348 at 1 (citing VCF Claim Review Process, Sept. 11 Victim Comp. Fund (Mar. 2019), https://www.vcf.gov/sites/vcf/files/resources/VCFProcess.pdf). For each of the Plaintiffs to receive a VCF eligibility determination, he or she submitted to an examination for their latent conditions, and their conditions satisfied the WTC Health Program's regulations, including any applicable time-interval, latency, or exposure-level requirements. See 28 C.F.R. § 104.2(i) (defining the "physical harm[s]" eligible for VCF compensation by reference to the WTC Health Program's covered conditions); 42 U.S.C. §§ 300mm-22(a), 300mm-32(b) (listing the covered conditions). The Plaintiffs' eligibility determinations were individualized and consistent with the "generous and remedial remit" of the VCF and WTC Health Program, ECF No. 11368 at 2, as Congress designed those programs.

The PECs argue that VCF eligibility is an "imperfect substitute" for legal causation. Id. They suggest that the Plaintiffs, and similarly situated future plaintiffs, should instead submit expert opinions—"showing by a preponderance of the evidence that the plaintiff's latent injury was proximately caused by exposure to the toxins known to have been present at the disaster zone"—and work records or third-party declarations confirming their presence at the 9/11 crash sites. Id. at 3. Requiring such submissions would not only duplicate effort but introduce unnecessary administrative complexity at the default-judgment stage. The Court is still "confident in the quality of the conclusions the VCF reaches." Latent Injury I R&R at *5. Moreover, before rendering its decision on liability, the Court evaluates the evidence beyond the Plaintiffs' VCF letters, including their declarations, their counsel's declarations, and any medical records. Those submissions provide additional facts relevant to the causation analysis, such as confirmation of each Plaintiff's presence at a 9/11 crash site during the relevant time period,

which the Court addresses in its foreseeability analysis below. Accordingly, the Court credits its

Havlish I findings and the Plaintiffs' VCF letters and concludes that Iran's conduct was a

substantial factor in the events leading to the Plaintiffs' latent injuries.

### 2.    The Plaintiffs' Latent Injuries Were Reasonably Foreseeable

Next, the Court must determine whether the Plaintiffs' latent injuries were a "reasonably

foreseeable" consequence of Iran's material support to al Qaeda. Because Iran's material support

for al Qaeda proximately caused the 9/11 Attacks and resulting deaths, the Court has already

found that deaths from latent injuries were necessarily reasonably foreseeable. See Havlish I at

*41; Latent Injury I R&R at *6; Latent Injury I Opinion at *2; Latent Injury II R&R at *5; Latent

Injury II Opinion at *2. Plaintiffs' latent injuries—which have caused pain and suffering but not

death—are not legally distinct.

The Court's familiar Burnett personal injury framework has applied to injuries that

"occurred either as a direct result of the 9/11 attacks, the ensuring chaos from the attacks in the

immediate aftermath, or as a result of first responders attempting to assist the injured or

endangered fleeing from the scene." ECF No. 5879 at 3. The Court built the latent-injury

framework on this foundation and applied it to plaintiffs who developed latent conditions due to

exposures within Burnett's time and place parameters. See, e.g., Latent Injury I R&R at *9–10

(recommending awards to plaintiffs that suffered devastating or severe, and ultimately fatal,

latent conditions stemming from their rescue work at Ground Zero on 9/11). But the Court has

also relied on basic tort principles in defining the contours of causation in this case. "While a

plaintiff must establish that a harm was within the ambit of reasonably foreseeable risk, a

plaintiff need not demonstrate that the precise manner in which the [harm] happened, or the

extent of the injuries, was foreseeable." Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P., 737

F.3d 166, 177 (2d Cir. 2013) (cleaned up); see also Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 29 cmt. o (Am. Law Inst. 2010) (explaining that the "manner in which the harm occurs" is typically "irrelevant . . . so long as the harm is foreseeable"). On this basis, the Court reasoned that the plaintiffs who died from latent injuries sustained during the chaos at the WTC site on 9/11 "need not show that particular kinds of latent injuries were foreseeable, or that those injuries foreseeabl[y] caused their deaths." Latent Injury I R&R at *6.

Here, the Plaintiffs allege only the predicate harm: latent injuries of various types. If deaths due to latent injuries are reasonably foreseeable, then the harms associated with the latent injuries are necessarily "reasonably foreseeable." Even in the absence of the Court's prior findings, it is reasonably foreseeable that survivors of the immediate impact of "commercial aircrafts slamming into buildings," or those coming to their rescue, would experience hazardous conditions from "[c]arcinogens from building materials, gases, and jet fuel" and suffer in the days, months, and years after their exposures. Latent Injury I R&R at *6. The Plaintiffs that escaped from the WTC site, or aided in the rescue and recovery efforts there, on September 11 plainly clear the "reasonably foreseeable" bar.

While all the Plaintiffs were escapees or first responders, some have more unique stories. Certain Plaintiffs were present at the World Trade Center site only on September 12 or later. See ECF Nos. 10924-5 (Discala), 10924-7 (Snickles). One Plaintiff was never at the site; she participated only in processing debris from the WTC site in a different borough. See ECF Nos. 10851-7, 11341 (K. Seminerio). These Plaintiffs' claims stretch the chain of causation further than the Court has recognized thus far. But applicable tort law and the nature of their injuries still justify recovery for these Plaintiffs.

First, the Restatement supports broad liability for intentional torts, as the Court has recognized. Latent Injury I R&R at *6. The Restatement asserts that "[a]n actor who intentionally causes harm is subject to liability for that harm even if it was unlikely to occur" and advises courts to consider "the moral culpability of the actor" and the "seriousness of harm intended" when analyzing the scope of a defendant's liability. Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 33 (Am. Law Inst. 2010). As the Plaintiffs emphasize, "[t]he intent of the 9/11 Attacks was clearly to cause as much death and destruction as possible." ECF No. 11348 at 2. The grave harm caused by the 9/11 Attacks, and Iran's culpability in that endeavor, favor granting recovery for the latent injuries of all the Plaintiffs—even those removed a step or two from the exact location and time of the Attacks. The Court weighed similar factors before concluding, for the first time, that Iran was liable to plaintiffs that developed and died from individual cancers or respiratory disorders. Latent Injury I R&R at *6 ("[A]lthough an individual cancer or respiratory disorder may be statistically unlikely, Iran's culpability in the grave harm caused by terrorist attacks favors imposing liability."). The Plaintiffs, who suffer from similar conditions, should also recover under the Restatement's broad standard.

Second, the Plaintiffs' injuries are like those of prior plaintiffs who were granted awards. Heroic responders engaged in rescue and recovery efforts at the 9/11 sites for months following the Attacks, and that repeated exposure contributed to their latent conditions and resulting injuries. See, e.g., ECF Nos. 10851-2 at 2 (Bastible), 10851-3 at 2 (Daoust), 10924-6 (Dousmanis), 10924-7 (Snickles). When the recovery effort spilled over to other sites, like the Fresh Kills Landfill in Staten Island, responders were exposed to debris transported from the WTC site and therefore the same toxins present at that site. See ECF Nos. 10851-3 (Daoust), 10851-7 (K. Seminerio), 10924-3 (Brager). In fact, the VCF regulations treat these Plaintiffs the

same as prior plaintiffs who were granted awards. Even if the Plaintiffs entered the WTC site after September 11, or worked only at the Fresh Kills Landfill, because they met all other VCF requirements, they were "present at a 9/11 crash site at the time of, or in the immediate aftermath of" the 9/11 Attacks and therefore VCF-eligible. See 28 C.F.R. §§ 104.2(b)(1), (c), (j) (defining the "9/11 crash site" to include "[a]ny area related to, or along, routes of debris removal, such as barges and Fresh Kills," and the "immediate aftermath" as any period between September 11, 2001, and May 30, 2002); 49 U.S.C. § 40101 note (same). Because this small group of Plaintiffs offers the same type of evidence to support their latent injury claims, and given that all the Plaintiffs were exposed to common toxins and suffered similar VCF-eligible conditions, the Court holds that the Plaintiffs' harms were all reasonably foreseeable.

Finally, the Court's causation analysis for the surviving family members of latent injury decedents does not warrant a different outcome. See Latent Injury I R&R at *7-8; Latent Injury II R&R at *6–8. Surviving family members sought solatium damages under § 1605A for the emotional distress they experienced at their family members' later deaths. The Court declined to find Iran liable. The chain of causation—from Iran's support for al Qaeda to the emotional injuries tied to family members' deaths from latent medical conditions—was "far too long to constitute proximate cause." Latent Injury I R&R at *8 (quoting MF Global Holdings Ltd. v. PricewaterhouseCoopers LLP, 43 F. Supp. 3d 309, 314 (S.D.N.Y. 2014)). These Plaintiffs' latent-injury claims are distinguishable. They seek recovery for their own latent injuries, just like those estates that were awarded damages for latent-injury-related deaths. Thus, the Court can draw a more direct line from the 9/11 Attacks to the Plaintiffs' injuries. Moreover, in rejecting the surviving family members' solatium claims, the Court sought to avoid "a potentially

unlimited class." Id. at *7–8. The class of plaintiffs who themselves developed latent conditions following exposure on or immediately after the 9/11 Attacks is more defined.

Accordingly, all of the Plaintiffs' claims clear both the "substantial factor" and "reasonable foreseeability" hurdles, so the Court concludes that Iran proximately caused their latent injuries. Owens, 864 F.3d at 798. The Court therefore has subject matter jurisdiction under § 1605A(a) and personal jurisdiction over Iran. As a result, Iran is liable for the Plaintiffs' 9/11-related latent injuries under § 1605A(c). The Court recommends granting the Plaintiffs' motions for default judgment.

## IV.    The Appropriate Damages Framework and Individual Applications

The only remaining question is damages. The Plaintiffs seek compensatory damages for the pain and suffering traceable to the latent personal injuries they sustained in the 9/11 Attacks. ECF Nos. 10849 at 1–2, 10921 at 1. As explained above, Plaintiffs' claims implicate the Court's existing frameworks for (1) personal injury damages established in Burnett I and (2) deaths due to latent injuries established in Latent Injury I R&R. Both frameworks use a three-pronged system: a baseline award ($7,000,000) for "severe" injuries, a downward departure ($5,000,000) for "significant" injuries, and an upward departure ($10,000,000) for "devastating" injuries. ECF No. 5879 at 6–10; Latent Injury I R&R at *9. In the personal-injury context, the Court reasoned that plaintiffs in this MDL were entitled to an elevated baseline number (compared to the $2 million awards to the estates of those killed in the 9/11 Attacks) because the personal injury plaintiffs "cannot escape the memory of 9/11." ECF No. 5879 at 5–6. Similarly, decedents who suffered from latent injuries "lived with the physical and emotional consequences of the 9/11 Attacks for many years" and "developed serious, painful health conditions that required years of treatment before ultimately killing them." Latent Injury I R&R at *9. The Court awarded the

latent injury decedents an elevated baseline award of $7 million "as a reflection of the 'severe' nature of the medical conditions that killed them." Id.

Drawing on its experience adjudicating both categories of claims, the Court recommends adopting the same framework here. The latent injuries that the Plaintiffs document are serious and painful health conditions that require extensive treatment. They force the Plaintiffs to carry the physical and emotional consequences of the 9/11 Attacks. And they are an inescapable reminder of 9/11 and the difficult days and weeks that followed. The Court therefore analyzes each of the Plaintiffs' claims for pain and suffering individually based on this framework.[7]

### A.    Knight, ECF No. 10849

#### 1.    Kimberly Bastible

Kimberly Bastible, an investigator for the New York City Office of Chief Medical Examiner ("OCME"), was dispatched to Ground Zero shortly after the 9/11 Attacks on the World Trade Center. ECF No. 10851-2 ¶¶ 3–4. When she arrived, she encountered an "apocalyptic" scene. Id. ¶ 5. Smoke, soot, ash, dust, and debris filled the air, rendering the sky "dark and gray." Id. Thrust into a "chaotic" and "extremely compromised" environment, she struggled to breathe. Id. ¶¶ 5-6. She "inhaled large quantities of smoke and dust," which "burned and irritated" her nose, throat, and lungs. Id. ¶ 6.

Bastible worked to "determine whether bones and indistinguishable parts of bodies recovered from the carnage were human or animal remains." Id. ¶ 7. That work would continue

---

[7] The moving Plaintiffs have supplied only their sworn declarations and VCF eligibility letters to support their claims. See ECF Nos. 10851, 10924. Although the Court credits these submissions, future applications should also include Plaintiffs' citizenship records and detailed medical records, where possible. See, e.g., ECF No. 9663 (default judgment motion including declarations from each plaintiff that attached, under seal, the plaintiff's citizenship and relevant medical records); see also ECF No. 5879 at 9 ("The absence of medical records supporting and providing further information regarding an affiant's claims may support a downward departure in an award determination.").

for months.[8] Day after day, she reported to OCME's office "on-site at Ground Zero," where she "was constantly reminded of the horror" of 9/11. Id. ¶ 9. She "continued to be exposed . . . to chemical and other toxic substances present at the site." Id.

Bastible sought medical treatment following her "exposure to the chemicals, fumes, gases and dust on September 11 and thereafter". Id. ¶ 10. She reports that she developed bleeding gastric ulcers in 2002 and has been "under the care of a pulmonologist for asthma" since the Attacks. Id. ¶ 11. The VCF determined that she is eligible for compensation for chronic rhinitis; gastro-esophageal reflux disease ("GERD") without esophagitis; asthma; and sinusitis and related conditions, including a cough. Id. at 5–6. Because Bastible was "covered in dust [and] debris" and suffered "significant respiratory ailments including nasal irritations, chest pain, and asthma" from inhaling "smoke, soot, and dust," the Court recommends a $5 million award for her significant injuries. ECF No. 5879 at 6–7.

### 2.    Richard Daoust

On September 11, 2001, Richard Daoust worked as a Sergeant with the New York Police Department ("NYPD"). ECF No. 10851-3 ¶ 4. After learning of the Attacks on the WTC, he joined the rest of his unit at their assigned police station in Queens. Id. A bus transported them to Lower Manhattan and arrived "shortly after the towers collapsed." Id. ¶ 5.

At Ground Zero, he was met with "total chaos." Id. The air was "full of debris from the buildings." Id. "[F]ires, smoke, and ash" clouded his vision. Id. The smell was "difficult to describe," but Daoust still calls it "unforgettable." Id. "It did not smell like a normal fire," he

---

[8] Bastible's declaration contains dates that the Court interprets as typos. See ECF No. 10851-2 ¶ 9 ("Our office was on-site at Ground Zero, identifying human remains, from September 1, 2001 until May 2004."). But see id. ("In the *months* that followed the attacks, the OCME office continued to maintain a presence at Ground Zero" (emphasis added)).

recalls. Id. His "eyes, nose, and throat burned from exposure to the smoke, ash, and whatever chemicals were in the air." Id. ¶ 6.

Daoust stayed at Ground Zero for more than 24 hours. Id. ¶ 8. Only by the evening of September 12 did he return to his station in Queens, "shower, change clothes[,] and get some rest." Id. He was "covered in ash." Id. He had spent the morning desperately pulling debris from the pile with firemen, "listening for anyone who might be trapped underneath" and "hoping we could find someone." Id. ¶ 7. He "did not go home for three days." Id. ¶ 8. He would spend the next six weeks working every day as part of the rescue and recovery effort. Id. His assignments differed each day, but they included "traffic control around the site of the attacks, the morgue, or working on the conveyor at Fresh Kills Landfill on Staten Islan looking for evidence and human remains in the rubble being brought from the WTC." Id.

Daoust reports that his "nose, throat, and lungs have never recovered from the exposure" to toxins on 9/11 and in the months that followed. Id. ¶ 11. He "continue[s] to receive medical treatment," id. ¶ 13, and the "nodules on [his] lungs must be monitored on an ongoing basis." Id. ¶ 11. His VCF letter confirms that he is eligible for compensation for chronic rhinitis, chronic sinusitis, and asthma. Id. at 5. These are significant injuries for which the Court recommends a $5 million award.

### 3.    John Highfield

John Highfield arrived at the PATH train station in Lower Manhattan shortly before 9:00 a.m. on September 11, 2001. ECF No. 10851-4 ¶ 4. He immediately recognized that "something catastrophic had happened." Id. ¶ 5. "Police were shouting for everyone to exit the station," he reports. Id. "The air was full of black and gray smoke." Id. As he exited the station, he "looked up and saw that one of the towers was on fire and had a gaping hole in it." Id.

Still, he pressed on towards the Stock Exchange, where he worked as the managing director of the banking and brokerage firm Tucker Anthony. Id. ¶¶ 4, 6. He reached the intersection of Broadway and Wall Street when the second plane struck the South Tower. Id. ¶ 6. The impact, he says, "felt like an earthquake." Id. Highfield ran to the Stock Exchange, where he remained until around 11:00 a.m. Id. ¶¶ 6-8. When he left the building, "everything was covered with dust and ash." Id. ¶ 8. "It looked as if four inches of gray snow had fallen," he explains. Id. He breathed in the "thick" air and "felt like [he] had sand in [his] mouth." Id. That "would not be the last time [he] had that feeling." Id. Highfield continued to work on Wall Street until 2007. Id.

Highfield then reports that by late 2006 or early 2007, he "began having difficulty, discomfort swallowing" and experiencing "discomfort in [his] chest." Id. ¶ 9. He has since been diagnosed with stomach cancer and has undergone at least 30 endoscopic procedures "for the removal of lesions." Id. ¶ 10. This treatment "is ongoing," and he remains "under the care of a gastroenterologist." Id. His VCF letter confirms his eligibility for compensation for GERD with esophagitis. Id. at 5. Highfield's stomach cancer is not listed in his VCF letter. Id. While the Court credits Highfield's reported stomach cancer, his GERD, coupled with his exposure to toxins near Ground Zero, is sufficient to find that he has suffered a "significant respiratory ailment[]" caused by the "inhalation of smoke, soot and dust." ECF No. 5879 at 6–7. Accordingly, the Court recommends a $5 million award.

### 4. Oscar Perez

Oscar Perez worked for the NYPD on 9/11, supervising police officers stationed in the city's public schools. ECF No. 10851-5 ¶ 4. That morning, he was at P.S. 319 in Brooklyn. Id. When he learned that the WTC had been attacked, he "immediately returned to the School Safety Division Brooklyn North Command" and was deployed to Lower Manhattan. Id. He arrived

around 2:00 p.m. and was "assigned to keep traffic and pedestrians clear of the area for emergency vehicles." Id. He cannot recall how close he was stationed to Ground Zero but remembers that "the streets and vehicles in that area were all covered with soot and ash." Id. ¶ 5. "Smoke," he says, "was still thick in the air." Id. He worked for approximately ten hours, until midnight. Id. Throughout, his "eyes burned from the smoke and ash and [he] felt a tightness in [his] throat and lungs." Id. The NYPD had not provided him with a mask or any other protective equipment. Id. When he returned home the next morning, he was "completely covered in ash." Id. ¶ 6. He took two showers to "get the ash, soot, and dirt from the debris off [of him]." Id. He then worked "in Manhattan assisting the task force" for two more days. Id.

Perez did not immediately feel any adverse health effects. Id. ¶ 7. But he "gradually began to have more difficulty breathing and it became harder to perform normal activities." Id. His chest and throat tightened, and he developed a "more persistent cough." Id. In 2006, he sought medical help. Id. He now reports that he has "permanent" lung damage that is "chronic," "incurable," and "progressive." Id. ¶ 8. As a result, he says he "can expect [his] condition to deteriorate further as [he] age[s]." Id. He also reports that he suffers from depression and post-traumatic stress disorder ("PTSD") Id. His VCF letter, meanwhile, lists him as eligible for compensation for chronic obstructive pulmonary disease. Id. at 5. The Court finds that these are significant injuries and recommends a $5 million award.

### 5.    Giovanni Seminerio

Giovanni Seminerio ("Giovanni") was on duty with New York City Emergency Medical Services ("EMS") on September 11, 2001, when he learned that a plane had hit the World Trade Center. ECF No. 10851-6 ¶ 4. Just after 9:00 a.m., he was notified that a second plane had hit the second tower. Id. ¶ 4. He quickly "responded to the scene." Id. At the WTC, Giovanni

25

"provide[d] first aid and other medical treatment to survivors." Id. ¶ 5. He "witnessed people running in all direction[s] to escape, as well as people jumping from the burning towers in desperation." Id. He was just one block from the WTC when the first tower collapsed. Id. ¶¶ 5, 6. "[S]moke, fire, dust, and debris" engulfed the area. Id. ¶ 6. "There was at least a foot of ash and dust covering everything," he reports. Id. And then the second tower "dropped." Id.

The site was "post-apocalyptic." Id. ¶ 7. Giovanni could only see "the bottoms of buildings with twisted steel and debris covering the site." Id. The ground where the World Trade Center had just stood was now "littered with the partial remains of those who had been killed." Id. Giovanni smelled "a mixture [of] burning chemicals and burning flesh." Id. He worked— "treating people and putting them into ambulances"—for 36 hours. Id. ¶ 8. He then returned to the hospital and worked in shifts, "returning to the site every eight to ten hours." Id. He had "no protective equipment other than paper masks," which did not "sufficiently filter the air." Id. ¶ 9. His "eyes, nose, and throat burned from the beginning of the day through the end of the next day." Id. Breathing grew increasingly difficult. Id.

Giovanni's records confirm his VCF eligibility for compensation for chronic rhinitis and esophageal reflux. Id. at 5. He reports that he continues to be treated for "periodic difficulty breathing, problems with [his] nose and throat, as well as chronic cough, chest pain, and stomach pain." Id. ¶ 10. For these significant injuries, the Court recommends a $5 million award.

### 6.     Kary Seminerio

Kary Seminerio ("Kary") was a first responder during the 9/11 Attacks that worked primarily at Fresh Kills Landfill in Staten Island, NY. After reviewing Kary's submissions, including her initial declaration, ECF No. 10851-7 ("Decl."), the Court requested additional information about the working conditions at Fresh Kills Landfill and Kary's time there. ECF No.

11245. Kary provided a supplemental declaration, ECF No. 11341 ("Supp. Decl."). The facts below come from Kary's initial and supplemental filings.

On September 11, 2001, Kary was a member of the Cresskill, New Jersey Volunteer Fire Department. Decl. ¶ 4. Kary was at home when the first tower fell; soon, she was summoned to the firehouse to "prepare to go into the City." Id. But Kary never made it into Manhattan that day. Id. ¶ 5. Instead, when Kary's unit arrived at the George Washington Bridge in Fort Lee, NJ, law enforcement personnel instructed them to remain "on the New Jersey side of the bridge" and assist anyone escaping the devastation in New York. Id. Kary's unit waited at that location until 9:00 p.m., but "[n]o one ever came across the bridge." Id.

The next day, Kary travelled to the Fresh Kills Landfill "where the debris from the WTC attacks was being brought by barges and trucks." Id. ¶ 6. She explains that Fresh Kills is "an immense site" that was entirely "filthy." Supp. Decl. ¶ 3. "Everything," Kary explains, "was covered with thick layers of dust . . . and ash." Decl. ¶ 7. Trucks bringing in the debris "continually stirred and spread the dust and ash over the site and into the air." Supp. Decl. ¶ 3. The "very hot" weather "added to the already uncomfortable conditions." Id. The working conditions were "oppressive." Id.

During their first week at the site, the Cresskill unit was directed "to cut the emergency vehicles apart . . . to determine if there were any people inside." Decl. ¶ 6. The only tools available were the "jaws of life" (or Hurst tool) and pry bars. Supp. Decl. ¶ 4. As the firefighters cut through emergency vehicles, they encountered human remains. Decl. ¶ 7. The area smelled "of death." Id. During the following three weeks, the unit, working by hand, either loaded debris onto conveyor belts or sorted through debris piles. Supp. Decl. ¶ 4. Throughout the work, Kary and the rest of her unit wore their firefighting bunk pants, boots, and gloves but T-shirts and ball

caps "[d]ue to the heat." Id. "We had no personal protective equipment . . . [or] masks or respirators and were told that we did not need them by the officials managing the site," Kary explains. Id. But on the day that she left with her unit, Kary "saw workers arriving in Tyvek suits." Id.

The debris-process operation at Fresh Kills was managed by the Joint Terrorism Task Force, including the FBI and NYPD, among others. Id. ¶ 6. Kary recalls that her unit was "instructed on where to go and what to do at the landfill by an NYPD detective." Id. The FBI performed the sifting operation and processed human remains, personal effects, or anything that "might have evidentiary value" unearthed from the unit's sorting effort. Id.

Kary worked at Fresh Kills, amid the toxins, for one month. Decl. ¶ 8. She worked eight to ten hours a day, five days a week. Supp. Decl. ¶ 5. The "dust and ash-laden environment" provoked coughing fits and "affect[ed] [her] eyes, nose, and throat." Decl. ¶ 9. "As a result of my exposure to the chemicals, dust, and ash at Fresh Kills Landfill in the month following 9/11," Kary explains, "I have continued to suffer from medical issues." Id. ¶ 11. Kary reports "problems with my nose, throat, and lungs" and "breathing and other respiratory problems that developed following my exposure to the environment at Fresh Kills Landfill." Id. ¶ 10. Kary has sought medical attention and continues to be treated for these issues. Id. ¶¶ 10, 11. The VCF confirmed that she is eligible for compensation for asthma, simple chronic bronchitis, and sinusitis. Id. at 5.

Although Kary was not present at the WTC site or surrounding area on September 11, 2001, she was exposed to toxins from the WTC site at the Fresh Kills Landfill in the weeks that followed the Attacks. Per the Court's causation analysis above, and given her VCF-eligible conditions, the Court finds that Kary may recover on her claim. For her significant respiratory injuries, the Court recommends a $5 million award.

### 7. Patricia Jirak

Patricia Jirak was meeting a friend in a coffee shop across the street from St. Paul's Chapel, just a few short blocks away from the World Trade Center, when she heard the first plane crash. ECF No. 10851-8 ¶ 4. She headed towards the marina to hop on a ferry back to New Jersey, where she lived, to "get away from the WTC." Id. She saw people "running in all directions up and down the river." Id. ¶ 4. "The scene" became "more and more chaotic." Id. Eventually, it turned into "pandemonium." Id. On the ferry, a woman collapsed in front of her. Id. Jirak had almost 20 years of experience as an EMT, so she began to administer CPR. Id. Sadly, she "was not able to save her." Id.

That could have been the end of Jirak's 9/11 story. But, selflessly, Jirak "decided to go back across the river to New York to see if [she] could help in the rescue effort." Id. ¶ 6. At the Staten Island ferry terminal, she encountered a group of nurses who were looking for St. Vincent's Hospital. Id. She escorted them onto a tugboat, which chugged past Ground Zero as smoke and dust billowed into the air, and dropped them off at 14th Street—pointing them towards the hospital nearby. Id. She then tried to help at Chelsea Piers, where doctors and nurses were setting up an emergency treatment center, but no patients came in. Id. ¶ 7. Finally, she returned to Ground Zero—but she was turned away. Id. ¶ By 11:00 p.m., she was back home in New Jersey. Id.

Still, her commitment to caring for others sent her back across the river the next day. This time, she was able to enter the WTC site. Id. ¶ 8. "Everything was covered with debris, glass, and dust," she explains. Id. For the next five days, Jirak worked at Ground Zero: she "assisted emergency personnel by cleaning debris," "provid[ed] first aid to the emergency workers,"

"hand[ed] out safety equipment," and "served on the 'bucket brigade' removing debris from the WTC site." Id.

One month later, she "began to be concerned about [her] health." Id. ¶ 10. She began wheezing for the first time and had "difficulty completing tasks." Id. She continues to "tire easily" and experiences "recurrent episodes whe[re] [she] cannot swallow." Id. ¶ 12. She reports that she has "experienced increasing difficulty breathing, walking, and performing most activities of daily life." Id. Her VCF records confirm that she is eligible for compensation for asthma, chronic airway obstruction, chronic rhinitis, and esophageal reflux. Id. at 5. She has also been diagnosed with PTSD, id. at 8, as well as "WTC-Exacerbated Chronic Obstructive Pulmonary Disease (COPD)." Id. at 9.

The Court finds Jirak's injuries to be significant, not severe. See ECF No. 5879 at 6–8. They fall into the first category initially established in Burnett I, which includes significant respiratory ailments and mental health trauma. Id. Because Jirak was doubtlessly exposed to significant toxins as she fled the WTC site and then sought to assist those injured in the 9/11 Attacks, the Court recommends that she be awarded $5 million.

### 8.    Ava Becklund

After hearing "a roar and then an explosion" in her apartment on the morning of September 11, 2001, Ava Becklund turned on the television. ECF No. 10851-9 ¶ 4. She learned that a plane had struck the World Trade Center. Id. She "immediately went to check on [her] grandmother," who lived in a nearby apartment at 40 Harrison Street. Id. ¶ 5. From the 36th floor, the two watched the second plane strike the South Tower. Id. "Paper and other debris from the impact began hitting the windows of the apartment," she reports. Id. She could "hear the

sirens" and "see the towers burning and people jumping to their deaths." Id. As the towers

collapsed, smoke—"so thick at that point we could no longer see outside"—filled the air. Id.

Becklund and her grandmother left 40 Harrison Street and returned to Becklund's

apartment, where her mother was waiting. Id. ¶ 6. The three women stayed together for the rest

of the day and night, watching the events unfold on the news. Id. The next morning, and in the

days that followed, Becklund walked around the neighborhood "to see what had happened."

Id. ¶ 7. "Everything was covered with dust and debris," she explains. Id. ¶ 6. A "weird smell"

lingered in the air "for months." Id. ¶ 7.

Approximately one and a half years later, Becklund "began experiencing shortness of

breath, wheezing, and difficulty breathing in general." Id. ¶ 8. She was diagnosed with asthma,

then with GERD. Id. Her VCF letter confirms these diagnoses. Id. at 5. To this day, she

"continue[s] to experience breathing problems and shortness of breath." Id. ¶ 9. She has

"difficulty with loud noises, especially airplanes." Id. And she reports that she is under the care

of a psychologist who helps treat her depression, which "stem[s] from the horrific and gruesome

things [she] saw on 9/11 and in the days that followed." Id. The Court finds that these injuries are

significant and thus recommends a $5 million award. See ECF No. 5879 at 6–7.

**B.    Rodriguez, ECF No. 10921**

      **1.    James Barnes**

James Barnes worked as an NYPD detective when planes struck the World Trade Center

on September 11, 2001. ECF No. 10924-2 ¶ 2. He was scheduled to be off duty that day, but "he

immediately reported to [his] unit" when he learned of the Attacks. Id. He "arrived in Lower

Manhattan within an hour after the towers fell." Id. There, he found the streets "clogged with

vehicles." Id. ¶ 3. "The city was covered in ash and soot," which "continued to fall and was so

dense and widespread [that] it looked like snow." Id. He could see buildings still burning; the

piles of debris were stacked "five or six stories high." Id. He "began the search and rescue effort, looking for anyone who might be trapped under the rubble." Id. ¶ 4.

He worked until 5:00 a.m. the next morning. Id. ¶ 5. He continued to search—first for survivors, then, in time, for remains—in "twelve-hour shifts which routinely lasted for fourteen hours or more." Id. From September 11, 2001, until June 6, 2002, Barnes "spent fifteen days a month at Ground Zero." Id. He knew that "there would be health consequences from [his] exposure" to "the noxious environment that existed in the aftermath of the attacks." Id. ¶ 6. Indeed, he describes how his boots disintegrated "from the heat of the debris we were walking through" within weeks. Id.

His medical issues began "within months." Id. ¶ 7. By December, he was diagnosed with asthma. He developed chronic rhinitis and sinusitis. Id. A decade later, in 2012, he was diagnosed with prostate cancer. Id. ¶ 8. He reports that he underwent "a radical prostatectomy" to surgically remove the cancer. Id. He had retired from the police force by then but was forced to leave his new job "working with explosive detection dogs in New York City." Id. ¶ 9. He now takes "three different medications daily to help [him] breathe." Id. Barnes's VCF letter confirms his compensation eligibility for asthma, chronic rhinosinusitis, and malignant neoplasm of the prostate. Id. at 6.

Barnes continues to suffer from "significant respiratory ailments," which fall into the first Burnett category. ECF No. 5879 at 6. His reported prostate cancer is VCF-approved, which the Court credits, but Barnes did not file medical records on the surgery or any other conditions. For these reasons, the Court finds that Barnes's injuries are significant and recommends that he be awarded $5 million for his pain and suffering.

### 2. Robert Brager

Robert Brager worked as a narcotics officer for the NYPD on September 11, 2001. ECF No. 10924-3 ¶ 2. He was at his precinct in Brooklyn when he learned that a plane had hit the World Trade Center. Id. He volunteered to respond. Id. ¶ 3. When he reached Lower Manhattan, he began helping people who were evacuating the towers. Id. Suddenly, a "cloud of dust swept over [him] and made it impossible to see anything." Id. He was "two or three blocks" away from the WTC site. Id. When "the dust began to settle," he "realized the entire South Tower had come down." Id.

He moved towards the North Tower and "witnessed the chaos as people poured out of the building." Id. ¶ 4. Then, he "heard a loud noise" and "realized that the North Tower was collapsing." Id. ¶ 5. He ran. Id. He "made it about a half-block" before "the pressure of the debris cloud" knocked him to the ground. Id. He was "dragged" into a nearby store and found "cuts and bruises on [his] legs where [he] had been struck by the debris." Id. When the dust cleared once more, he "went back to the pile and began to sort through the debris looking for any survivors." Id. ¶ 6. He worked—digging through the debris without any protective equipment—until "1:00 or 2:00 a.m. the next morning." Id. At 6:00 a.m., he reported back to the precinct—but was told to seek medical assistance at a hospital. Id. ¶ 7. He did. Id. Brager spent the next two months sorting through debris at the Fresh Kills Landfill. Id. ¶ 8.

Brager has since been diagnosed with asthma, chronic rhinitis, chronic pharyngitis, sinusitis, esophageal reflux, and chronic airway obstruction. Id. ¶ 13. To "relieve symptoms and control the progression" of these ailments, he is "required to take four different types of medicine each day." Id. ¶ 12. His VCF letter confirms these conditions. Id. at 7. The Court finds that these are significant injuries and recommends a $5 million award.

33

### 3.    Kevin Burke

Kevin Burke worked as a Lieutenant with the Suffolk County Police Department on September 11, 2001. ECF No. 10924-4 ¶ 2. "In the early afternoon," once the towers had fallen, he was "escorted down to the WTC and assigned the task of setting up a temporary morgue for the bodies of victims recovered during the ongoing rescue effort." Id. ¶ 3. His unit initially set it up "in the atrium, or what had been the atrium[,] of the WTC." Id. By then, the "area was enveloped in a fog of debris and ash, floating down like snow." Id. But once it became clear that "no bodies were being recovered" in the "chaotic hours after the attacks," he was reassigned to help with the recovery effort. Id.

Burke traversed "what remained" of the World Trade Center, "walk[ing] through knee-deep pulverized concrete and ash, removing debris while looking and listening for anyone who might have miraculously survived." Id. ¶ 4. "The area was still burning," he reports. Id. Tragically, he "found no survivors . . . , only human remains." Id. He did not leave the site for five days. Id. ¶ 5. And for the next 10 to 12 days, he worked 12-hour shifts at Ground Zero. Id. After that, his units assisted in screening debris brought to Fresh Kills Landfill until December 2001, but Burke "only recall[s] personally being at the site on one occasion during this time." Id.

Now, Burke is experiencing "increasing difficulty with [his] breathing," which has "limited [his] mobility and restricted [his] physical activities." Id. ¶ 8. He is "under the care of a pulmonologist" and has been diagnosed with chronic rhinitis, sinusitis, esophageal reflux, asthma, and obstructive sleep apnea. Id. ¶ 8. His VCF letter confirms these conditions. Id. at 6. As a result, the Court recommends a $5 million award for his significant injuries.

4.    **Frank Discala**

On September 11, 2001, Frank Discala worked for the Nassau County Police Department. ECF No. 10924-5 ¶ 2. He was off duty that day but reported "to command" when a radio call summoned "all police officers" to respond after the second plane struck the South Tower. Id. He was assigned to "secure the boundary between Nassau County and Queens County along Hempstead Turnpike." Id. His role was to ensure that "no civilian traffic . . . enter[ed] New York City." Id. He remained there, about an hour-long drive from Manhattan, "until 11:00 p.m. that night." Id.

Early the next day, Discala was assigned to Ground Zero and tasked with "looking through the debris and assisting in any way [he] could." Id. ¶ 3. His work there included searching the surrounding buildings for any survivors and handling security in the area, both "in the immediate vicinity of Ground Zero and later as far north as Canal Street." Id. Discala was present at Ground Zero for "15 hours or more" on September 12—as the debris still "burn[ed] and smolder[ed]," the "ground was littered with twisted iron," and "smoke and ash" filled the air, id. ¶ 3—and was exposed to toxins at a morgue near Ground Zero where "[e]verything . . . was covered in soot and ash." Id. ¶ 4. After that first day, Discala provided security at the morgue "a total of six times," in "twelve-hour shifts," over the following months. Id.

In 2002, Discala began to experience a series of health issues involving his eyes, nose, and throat. He was diagnosed with sleep apnea and GERD and learned there were "abnormalities with [his] thyroid function." Id. ¶ 5. He eventually developed nodules on this thyroid and liver. Id. In 2011, he "suffered a collapsed lung during physical training," was hospitalized, and underwent "surgery to repair [his] lung" following a recurrence. Id. His VCF letter confirms his eligibility for chronic pharyngitis, chronic sinusitis, GERD, and obstructive sleep apnea. Id. at 5.

Although Discala was not present at the WTC site on September 11, 2001, he was exposed to the toxins there on the next day and several days afterward. Per the causation analysis above, and given his VCF-eligible conditions, the Court finds that Discala may recover on his claim. For his significant injuries, the Court recommends a $5 million award.

### 5. Nick Dousmanis

Nick Dousmanis worked as a NYPD police officer on September 11, 2001. ECF No. 10924-6 ¶ 2. He was "on duty at a footpost in Brooklyn" when the first plane hit the World Trade Center. Id. He was instructed to return to his precinct and was deployed to "the Brooklyn and Manhattan Bridges to expedite the exodus of people from Manhattan and ensure that no unauthorized vehicles were allowed to cross the river into the city." Id. ¶ 3. Throughout the day, he was posted at both bridges. Id. Whether he was stationed on the Manhattan or Brooklyn side of each bridge is unclear. Id. He reports that "[f]rom the Manhattan Bridge, [he] could see the towers burning and watched them as they collapsed." Id. He remained there—posted at one of the bridges—until 1:00 a.m. Id.

The following day, Dousmanis was sent to Ground Zero. Id. ¶ 4. He "search[ed] through rubble" there for the next number of "months," only "periodically" leaving to work security in other areas. Id. ¶ 5. The ground at Ground Zero was "covered in deep ash." Id. ¶ 4. Smoke "poured out . . . as it continued to burn." Id. By the end of his 12-hour shift on September 12, Dousmanis was completely "covered with dust." Id.

"[S]everal years later," he began to "have increasing difficulty breathing with physical activity." Id. ¶ 6. He reports that he has since "developed additional medical issues;" has been diagnosed with GERD, chronic obstructive pulmonary disease, and obstructive sleep apnea; and continues to receive treatment for all of these conditions. Id. But he has not provided the Court

with any medical documentation to support these diagnoses or treatments. See id. Then, in 2016, he was tested for and was "subsequently diagnosed with prostate cancer." Id. ¶ 7. He has not had surgery but explains that his "condition is being very closely monitored." Id. His VCF letter demonstrates that he is eligible for compensation for his cancer only. Id. at 5.

Although Dousmanis was not present at the WTC site on September 11, 2001, he was regularly exposed to the toxins there in the following days. Per the Court's causation analysis above, and given his VCF-eligible prostate cancer, the Court finds that Dousmanis may recover on his claim. For his significant injury, the Court recommends a $5 million award.

### 6.    Timothy Snickles

On September 11, 2001, Timothy Snickles worked as a New York State Trooper in Essex County. ECF No. 10924-7 ¶ 3. When he "learned of the terrorist attacks on the World Trade Center," he reported to his troop's headquarters. Id. ¶ 4. He learned that he would be a part of the "New York State Police (NYSP) presence in Lower Manhattan," where he would "patrol[] and provid[e] security around Ground Zero and the area in its immediate vicinity beginning soon after the attacks." Id. ¶ 5. His first seven-day patrol in Lower Manhattan began on September 15, 2001. Id. He went on to "serve seven, seven-day tours between September 15, 2001 and February 2002." Id. Each day he worked a twelve-hour shift, "from 7:00 p.m. to 7:00 a.m." Id.

Snickles recounts that in between shifts, he also "assisted the recovery effort by working on the pile with firemen and others clearing debris in the 'bucket brigade.'" Id. ¶ 6. At some points, they "were working six stories below the street level in what had been the foundation of the towers." Id. Snickles recounts that "[d]ust and ash covered everything for blocks in all directions" and that parts of site were still "burning" or "smoldering" months after the 9/11 Attacks. Id. ¶ 7. His only protective gear was a paper mask. Id.

In May 2003, Snickles was hospitalized for seven days. Id. ¶ 9. He explains that he was "experienc[ing] what felt like a broken bone in [his] foot" and was also "having problems with persistent cough, a burning sensation in [his] chest and shortness of breath." Id. By July 2003, doctors discovered that he was "suffering from blastomycosis, a fungal infection in [his] lungs." 10. His foot was also infected and required surgery. Id. ¶ 10. Snickles reports that he "continue[s] to have health problems as a result of [his] exposure to the dust, ash, chemicals, and other toxins [he] was exposed to in the days and months following the terrorist attacks." Id. ¶ 11. His VCF letter confirms his eligibility for "interstitial lung disease and related physical conditions: dyspnea." Id. at 5.

Snickles was not present at the WTC site on September 11, 2001, but entered the site just four days later, when "dust, ash, chemicals, and other toxins" were still present. Id. ¶ 7. Snickles contributed to the recovery effort for several months following the 9/11 Attacks. Consistent with the Court's causation analysis above, and given his VCF-eligible conditions, the Court finds that Snickles may recover on his claims. Although Snickles' VCF letter does not contain any information about his foot infection, it confirms his eligibility for significant respiratory conditions. The Court therefore recommends a $5 million award.

## CONCLUSION

The Court recommends GRANTING the Plaintiffs' motions for partial default judgments and awarding pain and suffering damages as follows:

| **Plaintiff** | **Case** | **Pain and Suffering Damages** |
|---|---|---|
| Kimberly Bastible | Knight | $5 million |
| Richard Daoust | Knight | $5 million |
| John Highfield | Knight | $5 million |
| Oscar Perez | Knight | $5 million |

| Plaintiff | Case | Pain and Suffering Damages |
|---|---|---|
| Giovanni Seminerio | Knight | $5 million |
| Kary Seminerio | Knight | $5 million |
| Patricia Jirak | Knight | $5 million |
| Ava Becklund | Knight | $5 million |
| James Barnes | Rodriguez | $5 million |
| Robert Brager | Rodriguez | $5 million |
| Kevin Burke | Rodriguez | $5 million |
| Frank Discala | Rodriguez | $5 million |
| Nick Dousmanis | Rodriguez | $5 million |
| Timothy Snickles | Rodriguez | $5 million |

The Court also recommends awarding these Plaintiffs prejudgment interest at a rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001, until the date of the judgment. The Plaintiffs should also be permitted to submit additional applications for damages, including punitive damages, consistent with any future rulings of the Court.

_____

SARAH NETBURN
United States Magistrate Judge

DATED:    November 12, 2025
          New York, New York

\*          \*          \*

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS
TO THIS REPORT AND RECOMMENDATION**

The parties shall have 14 days from the service of this Report and Recommendation to file written objections under 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 6(a), 6(d). A party may respond to another party's objections

within 14 days after being served with a copy. Fed. R. Civ. P. 72(b)(2); see Fed. R. Civ. P. 6(a), 6(d). These objections shall be filed with the Court and served on any opposing parties. See Fed. R. Civ. P. 72(b)(2). Courtesy copies shall be delivered to the Honorable George B. Daniels if required by that judge's Individual Rules and Practices. Any requests for an extension of time for filing objections must be addressed to Judge Daniels. See Fed. R. Civ. P. 6(b). The failure to file timely objections will waive those objections for purposes of appeal. See Thomas v. Arn, 474 U.S. 140 (1985); United States v. James, 712 F.3d 79, 105 (2d Cir. 2013).