RECEIVED
SDNY PRO SE OFFICE

2025 DEC 30  PM 4: 25

**KRISTEN BREITWEISER**
**PLAINTIFF, MDL 1570**

December 23, 2025

The Honorable George B. Daniels
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Re: Administrative Request Concerning MDL Oversight and Judicial Process Integrity

**The undersigned respectfully submits this letter as a request for administrative relief
pursuant to the Court's inherent supervisory authority, Federal Rule of Civil Procedure
83(b), and 28 U.S.C. § 455(a). This submission concerns the administration and integrity of
the judicial process and does not seek merits relief or advance litigation strategy. The
undersigned respectfully requests that the letter be placed on the public docket so that all
Plaintiffs in this MDL may be informed of the matters raised.**

Dear Judge Daniels:

I write to clarify the scope and purpose of the December 10, 2025 non-motion letter (ECF No.
11426), in light of the Plaintiffs' Executive Committee's correspondence filed on December 22,
2025 (ECF No. 11439), which reflects a misunderstanding of the nature of the request. Although
the letter was submitted under my name, it reflected concerns shared by multiple 9/11 widows
and children who asked that these administrative issues be brought to the Court's attention.

The December 10 letter did not seek legal relief, reconsideration of prior merits rulings, or re-
litigation of issues previously adjudicated by this Court or reviewed on appeal. Nor did it raise
arguments previously presented by my counsel. Rather, the letter sought the Court's
administrative and supervisory consideration of matters that are new, distinct, and independent of
prior legal determinations.

Specifically, the letter requested the Court's consideration of the following administrative
safeguards:

1.  Whether a new hearing on solatium damages is warranted, in light of subsequently
    surfaced information bearing on the appearance of impartiality in prior proceedings;

2.  Whether appointment of conflicts counsel is appropriate to ensure adequate and un-
    conflicted representation of 9/11 widows and children, given the structural and financial
    divergences among plaintiff subgroups; and

3.  Whether creation of a victim steering committee would assist the Court in addressing subclass-specific concerns in the ongoing administration of this MDL.

These requests arise from information and circumstances not previously before the Court, were not raised by my counsel, and fall squarely within the Court's inherent authority to supervise MDL proceedings and safeguard the integrity and public confidence of the judicial process. They do not depend upon, nor seek to disturb, prior rulings on choice of law, solatium frameworks, or appellate outcomes. It may be helpful to note, however, that the solatium damages structure adopted by the Court has not been reviewed by any appellate court. Because of the MDL's procedural posture, prior petitions for review—including interlocutory appeal, mandamus, and certiorari—were dismissed as premature, without a hearing on the merits.

With respect to the appearance-of-impropriety issue referenced in the December 10 letter, I emphasize that the concern is institutional and prospective, not accusatory. It does not allege misconduct, bias, or wrongdoing. Rather, it reflects the settled principle that judicial proceedings must not only be fair, but must appear fair[1]—particularly where newly revealed information could reasonably call prior processes into question in the eyes of litigants and the public. This issue was not previously litigated, waived, or adjudicated, and therefore cannot be dismissed as duplicative of earlier merits arguments.

The appearance concern is further informed by prior terrorism-related legislative advocacy concerning the enactment of 28 U.S.C. § 1605A, and by the subsequent litigation use of that statutory change to pursue expanded remedies, including solatium damages. The attached materials are submitted solely for contextual completeness and to ensure an accurate understanding of the basis for the appearance issue.

Given the length, complexity, and gravity of this MDL, and the ordinary consultative role magistrate judges may play in case administration, I believed it necessary to raise these matters directly and transparently with the Article III Court, rather than permit them to be framed or resolved indirectly or implicitly.

I submit this clarification to ensure the Court has an accurate understanding of the administrative nature of the request. I recognize the limits of my role as a plaintiff and do not seek to engage in litigation strategy or re-argue settled issues. However, I do respectfully ask the Court to consider whether the interests of fairness, independence, and integrity might now warrant:

1.  A new hearing on solatium damages before a judicial officer unconnected to any appearance-related concerns raised here;

2.  The appointment of conflicts counsel to ensure that structurally divergent plaintiff groups receive un-conflicted representation; and

3.  The creation of a victim steering committee to provide the Court with direct input from those most affected.

---

[1] *See* 28 U.S.C. § 455(a).

These requests are grounded in good faith concern about the long-term fairness and transparency of the MDL process. I respectfully defer to the Court as to whether any inquiry, clarification, or further administrative steps may be appropriate.

**Respectfully submitted,**

Kristen Breitweiser
Plaintiff, 03-MD-1570
kdianbreit@aol.com

**Attachments:**
**Exhibit A** — Emery Celli Brinckerhoff & Abady LLP Letter (2024)
(Public correspondence confirming Judge Sarah Netburn's prior professional affiliation with Emery Celli and the firm's involvement in terrorism-related legislative advocacy concerning amendments to the Foreign Sovereign Immunities Act.)
**Exhibit B** — Declaration of Sarah Netburn
*Hurst v. Socialist People's Libyan Arab Jamahiriya*

## EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP

JONATHAN S. ABADY
MATTHEW D. BRINCKERHOFF
ANDREW G. CELLI, JR.
RICHARD D. EMERY
DEBRA L. GREENBERGER
DIANE L. HOUK
DANIEL J. KORNSTEIN
JULIA P. KUAN
HAL R. LIEBERMAN
ILANN M. MAAZEL
KATHERINE ROSENFELD
ZOE SALZMAN
SAM SHAPIRO
EARL S. WARD
O. ANDREW F. WILSON

ATTORNEYS AT LAW
600 FIFTH AVENUE AT ROCKEFELLER CENTER
10TH FLOOR
NEW YORK, NEW YORK 10020

TEL: (212) 763-5000
FAX: (212) 763-5001
www.ecbawm.com

MONDAIRE JONES
VASUDHA TALLA

ERIC ABRAMS
NICK BOURLAND
DANIEL M. EISENBERG
ARIADNE M. ELLSWORTH
SARA LUZ ESTELA
LAURA S. KOKOTAILO
SONYA LEVITOVA
SARAH MAC DOUGALL
SANA MAYAT
HARVEY PRAGER
VIVAKE PRASAD
MAX SELVER
EMILY K. WANGER

May 10, 2024

The Honorable Dick Durbin
Chair
Committee on the Judiciary
224 Dirksen Senate Office Building
Washington, DC 20510

The Honorable Lindsey Graham
Ranking Member
Committee on the Judiciary
224 Dirksen Senate Office Building
Washington, DC 20510

*Re: Chief Magistrate Judge Sarah Netburn's Nomination to the United
States District Court for the Southern District of New York*

Dear Chair Durbin and Ranking Member Graham:

We are partners in the law firm Emery Celli Brinckerhoff Abady Ward & Maazel LLP, a nationally recognized litigation boutique that focuses on civil rights, commercial, criminal, and ethics matters. It is with great pleasure that we deliver this letter, which expresses our enthusiastic support for the confirmation of our former law partner, Sarah Netburn, who currently serves as Chief Magistrate Judge for United States District Court for the Southern District of New York, to serve as a United States District Judge.

Chief Magistrate Judge Netburn joined the firm in 2002 as an associate lawyer following her clerkship for the Hon. Harry Pregerson, Circuit Judge for the Ninth Circuit Court of Appeals. Judge Netburn became a partner at the firm and remained with us until 2010, when she left to serve as the Southern District of New York's Chief Counsel to the Office of *Pro Se* Litigation. In that role, Judge Netburn worked to help unrepresented people litigate their cases in the federal court system and seek *pro bono* representation for parties with meritorious cases who lacked counsel.

While practicing at our firm, we knew Judge Netburn to be a tremendously gifted legal thinker and legal writer. She represented both plaintiffs and defendants—individuals, corporations, and non-profit organizations—in a broad range of matters ranging from business disputes to constitutional litigation. She brought her impressive intellect, litigation skills, and

EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP
Page 2

exemplary work ethic to every matter. She has a deep commitment to excellence, to the quality of her work, and to getting it right no matter what.

Beyond her undeniable legal acumen, however, what distinguished Judge Netburn as a lawyer and person during her eight years at the firm was her profound devotion to our clients and her commitment to achieve justice on their behalf. Among her most significant cases, Judge Netburn represented families who lost loved ones flying on Pan Am Flight 103 over Lockerbie, Scotland, when the plane was destroyed by state-sponsored terrorists from Libya. Judge Netburn pursued claims against the government of Libya on behalf of their surviving family members. This case involved novel legal theories and contributed to the terrorist exception to the Foreign Sovereign Immunities Act. In addition to its legal significance, Judge Netburn was a tireless advocate for her clients, who had suffered the most profound imaginable loss and immense emotional pain because of the bombing. Judge Netburn was often the families' closest point of connection at our firm; she forged relationships with these clients and fought for them with all her might. We remain tremendously proud of Judge Netburn's and the firm's work to seek justice for these families.

Judge Netburn is also an active and generous contributor to legal education. She is a wonderful mentor and supporter of more junior colleagues in the legal profession, both when she was at the firm and now as a judge. She has hired law clerks from the broadest possible range of law schools, not just the traditional so-called "elite" schools, demonstrating her commitment to increasing opportunity beyond the traditional paths.

We are confident that Judge Netburn, who has already devoted a substantial portion of her career to judicial and public service, will continue to bring fairness, rigor, and dedication to her position as a district court judge if confirmed.

Sincerely,

/s/
Katherine Rosenfeld

Jonathan S. Abady
Matthew D. Brinckerhoff
Andrew G. Celli, Jr.
Richard D. Emery
Debra L. Greenberger
Diane L. Houk
Daniel J. Kornstein
Julia P. Kuan
Ilann M. Maazel
Zoe Salzman
Sam Shapiro
Earl S. Ward
O. Andrew F. Wilson

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
-------------------------------------------------------------------x
ETHEL HURST, et al.,

                **02 Civ. 2147 (HHK)**

          Plaintiffs,

       -against-               **DECLARATION OF**
                                    **SARAH NETBURN**

THE SOCIALIST PEOPLE'S LIBYAN ARAB
JAMAHIRIYA, et al,

          Defendants.
-------------------------------------------------------------------x

       SARAH NETBURN declares under penalty of perjury, pursuant to 28 U.S.C.

§ 1746, that the following is true and correct:

       1.     I am associated with the law firm of Emery Celli Brinckerhoff & Abady

LLP, counsel for Plaintiffs. I submit this declaration in support of Plaintiffs' Motion to File a

Second Amended Complaint.[1]  A copy of the proposed Second Amended Complaint is attached

hereto as Exhibit A.

       2.     On December 21, 1988, Pan Am Flight 103, en route from London to New

York, exploded over the town of Lockerbie, Scotland. All 259 people on board the flight were

killed. Eleven residents of Lockerbie were also killed from falling debris.

       3.     Plaintiffs – the mothers and siblings of individuals who died on Flight 103

– filed this action in October 2002 in the United States District Court for the District of

Columbia. Service was effected on Libya through diplomatic channels. *See* 28 U.S.C.

§ 1608(a)(4). Plaintiffs filed a First Amended Complaint on January 13, 2006.

       4.     Plaintiffs asserted numerous claims against Libya in their First Amended

Complaint, including, without limitation, claims under the Foreign Sovereign Immunities Act

---

[1] Counsel for Libya does not consent to this motion. Counsel for Al-Megrahi was unable to respond to our request for consent.

("FSIA") (Count Two) and the Flatow Amendment (Count Three).  Plaintiffs allege that Libya is liable under these statutes directly and pursuant to a *respondeat superior* theory.

5.     On February 1, 2007, this Court issued a Memorandum Decision and Order (the "Opinion"), which granted Plaintiffs summary judgment against Libyan agent Al-Megrahi.

6.     The Court also granted Libya's motion to dismiss Plaintiffs' federal claims, holding that "[n]either the FSIA nor the Flatow Amendment, 'nor the two considered in tandem,' however, create a cause of action against a foreign state."  Opinion at 7 (citing *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1033 (D.C. Cir. 2004)).  The Court permitted Plaintiffs to proceed on their claims against Libya for intentional infliction of emotional distress and civil conspiracy.  Opinion at 12.

7.     The Court also held that Libya and its intelligence agency, the JSO, may not be held liable for punitive damages.  Opinion at 13.

8.     On January 28, 2008, Congress enacted Section 1083 of the National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, 122 Stat. 3, __-__ (Jan. 28, 2008) ("Section 1083").  This provision amends the FSIA in several respects, among them incorporating a new provision: 28 U.S.C. § 1605A ("Section 1605A").  A copy of Section 1083 is attached as Exhibit B.  The congressional remarks of Senator Lautenberg in support of this new provision are attached as Exhibit C.

9.     Section 1605A creates a statutory private right of action against a state sponsor of terrorism.  Section 1605A(c) ("Private Right of Action").  In relevant part, the provision states:

> A foreign state that is or was a state sponsor of terrorism . . . shall be liable to (1) a national of the United States . . . for personal injury . . . caused by [aircraft sabotage] for money damages. Section 1605A(c).

10.     The "money damages" for which a state sponsor of terrorism may be

liable includes "economic damages, solatium, pain and suffering, and punitive damages." Section 1605A(c).

11.    Plaintiffs' proposed Second Amended Complaint reflects these developments in the law by asserting a federal claim against Libya under Section 1605A, including claims for punitive damages.

12.    Finally, Section 1083 gives Plaintiffs the statutory right to file an amended complaint asserting claims under Section 1605A. *See* Section 1083(c)(2) ("Application to Pending Cases – Prior Actions").

13.    A motion to amend a complaint to add claims under Section 1605A may be filed within 60 days of the date of its enactment of Section 1083 (January 28, 2008) in cases (i) which were brought under section 1605(a)(7) (the "predecessor statute"), (ii) where the parties had relied upon that predecessor statue as creating a cause of action against the state, (iii) but have been adversely affected on the ground that the predecessor statute fails to create a cause of action against the state, and (iv) which are before any court in any form as of January 28, 2008.

14.    *Hurst* satisfies these conditions: (i) Plaintiffs' First Amended Complaint pleads claims against Libya under the 28 U.S.C. § 1605(a)(7), the Flatow Amendment and *respondeat superior* liability; (ii) Plaintiffs relied upon earlier cases authorizing such claims; (iii) the Court dismissed Plaintiffs' federal claims against Libya in its February 1, 2007 Opinion; and (iv) the action is still pending.

15.    Even apart from the right given Plaintiffs to amend their complaint by Section 1083(c)(2), leave to amend should be "freely given when justice so requires." Fed. R. Civ. P. 15(a). A significant intervening change in the law plainly justifies Plaintiffs' amendment.

16.    Allowing Plaintiffs to file a Second Amended Complaint will not unfairly prejudice defendants. Plaintiffs have promptly moved to amend the complaint within the 60

days allowed under Section 1083(c)(2) so that there is no legitimate claim of delay. The amended complaint does not assert any new factual allegations nor does it meaningfully alter the theories of liability Plaintiffs originally asserted against Libya. Libya cannot, therefore, complain of surprise or lack of notice. Finally, the Court having granted in part and denied in part Libya's motion to dismiss, Plaintiffs' common law claims against Libya remain to be litigated.

17.    For all these reasons, Plaintiffs' motion to amend – authorized by the statute itself – should be granted.

Dated:  March 28, 2008
        New York, New York

                                            _____/s/_____
                                            Sarah Netburn

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
--------------------------------------------------------------------x
ETHEL HURST, individually and as personal
representative of the Estate of Eugene Hurst;
939 Fountain Run, Naples, FL 34119;

SPENCER HURST; 718 Rojean Ct.,
Ellisville, MO 63021;

MITCHELL HURST; 1555 Royal Blvd.,                          **02 CIV 2147 (HHK)**
Glendale, CA 91207;

                                                           **SECOND AMENDED**
SHARON HURST DUROSS; 770 Eagle Creek,                      **COMPLAINT**
Drive, Naples, FL 34113;

MARY DIAMOND; c/o Michelle Porter,
570 E. 93rd Street, Brooklyn, NY 12236;

GWENNTH FORDE; P.O. Box 1483,
St. Vincent, W.I.;

VICTORIA PORTER; c/o Michelle Porter,
570 E. 93rd Street, Brooklyn, NY 12236;

OLGA HUSBANDS; Michelle Porter,
570 E. 93rd Street, Brooklyn, NY 12236;

VERNON DRUSES; Michelle Porter,
570 E. 93rd Street, Brooklyn, NY 12236;

RANDOLPH PORTER; Michelle Porter,
570 E. 93rd Street, Brooklyn, NY 12236; and

JAMES MULROY; 84 Hill View Crescent Banbury,
Oxon, United Kingdom, OX161BP,

                -against-

THE SOCIALIST PEOPLE'S LIBYAN ARAB
JAMAHIRIYA; LIBYAN EXTERNAL SECURITY
ORGANIZATION; LIBYAN ARAB AIRLINES;
ABDEL BASSET ALI AL-MEGRAHI; LAMEN

KHALIFA FHIMAH; and JOHN DOES # 1-20,

                Defendants.
--------------------------------------------------------------------x

Plaintiffs Ethel Hurst, individually and as personal representative of the Estate of Eugene

Hurst, Spencer Hurst, Mitchell Hurst, Sharon Hurst Duross, Mary Diamond, Gwennth Forde,

Victoria Porter, Olga Husbands, Vernon Druses, Randolph Porter, and James Mulroy

("plaintiffs"), as and for their Second Amended Complaint allege as follows:

1.  This is a proceeding for monetary damages arising out of the terrorist bombing of Pan

American Flight 103 ("Pan Am Flight 103") by the defendant, the Socialist People's

Libyan Arab Jamahiriya, its instrumentalities, agents and employees.

## THE PARTIES

2.  Plaintiff Ethel Hurst is a citizen of the United States who resides in Naples, FL.  She is

the mother of Roger Hurst, who was killed while an airline passenger in the terrorist

bombing of Pan Am Flight 103.  She is the widow and personal representative of Eugene

Hurst, who was the father of Roger Hurst, and who died in 1994, after the bombing of

Pan Am Flight 103.

3.  Plaintiff Spencer Hurst is a citizen of the United States who resides in Ellisville, MO.  He

is the brother of Roger Hurst, who was killed while an airline passenger in the terrorist

bombing of Pan Am Flight 103.

4.  Plaintiff Mitchell Hurst is a citizen of the United States who resides in Glendale, CA.  He

is the brother of Roger Hurst, who was killed while an airline passenger in the terrorist

bombing of Pan Am Flight 103.

5.  Plaintiff Sharon Hurst Duross is a citizen of the United States who resides in Naples, FL.

She is the sister of Roger Hurst, who was killed while an airline passenger in the terrorist

bombing of Pan Am Flight 103.

2

6. Plaintiff Mary Diamond is a citizen of the United States who resides in Brooklyn, New York. She is the mother of Walter Porter, who was killed while an airline passenger in the terrorist bombing of Pan Am Flight 103.

7. Plaintiff Gwenneth Forde is a citizen of the United States who resides in St. Vincent, West Indies. She is the sister of Walter Porter, who was killed while an airline passenger in the terrorist bombing of Pan Am Flight 103.

8. Plaintiff Victoria Porter is a citizen of the United States who resides in Brooklyn, New York. She is the sister of Walter Porter, who was killed while an airline passenger in the terrorist bombing of Pan Am Flight 103.

9. Plaintiff Olga Husbands is a citizen of the United States who resides in Brooklyn, New York. She is the sister of Walter Porter, who was killed while an airline passenger in the terrorist bombing of Pan Am Flight 103.

10. Plaintiff Vernon Druses is a citizen of the United States who resides in Brooklyn, New York. He is the brother of Walter Porter, who was killed while an airline passenger in the terrorist bombing of Pan Am Flight 103.

11. Plaintiff Randolph Porter is a citizen of the United States who resides in Brooklyn, New York. He is the brother of Walter Porter, who was killed while an airline passenger in the terrorist bombing of Pan Am Flight 103.

12. Plaintiff James Mulroy is a citizen of Great Britain who resides in Oxon, United Kingdom. He is the brother of John Mulroy and the brother of Bridget Concannon, both of whom were killed while airline passengers in the terrorist bombing of Pan Am Flight 103.

13. Defendant the Socialist People's Libyan Arab Jamahiriya ("Libya") is a foreign state, as defined in 28 U.S.C. § 1603(a), located in northern Africa.

14. Defendant Libyan External Security Organization, a/k/a Jamahiriya Security Organization ("JSO"), is an agency or instrumentality of Libya. The JSO is the Libyan intelligence service through which Libya conducted acts of extrajudicial killing, aircraft sabotage and other acts of terrorism, including the acts of extrajudicial killing and aircraft sabotage alleged herein.

15. Defendant Libyan Arab Airlines ("LAA") is an agency or instrumentality of Libya. The LAA is an airline owned by Libya and operated as a commercial enterprise of Libya. LAA actively and knowingly participated in its government's terrorist activities, including the acts of extrajudicial killing and aircraft sabotage alleged herein.

16. Defendants Abdel Basset Ali Al-Megrahi, a/k/a Abdelbaset Ali Mohmed, a/k/a AbdelBaset Ali Mohmed Al Megrahi, a/k/a "Mr. Baset," a/k/a Ahmed Khalifa Abdusamad, and a/k/a Abd al-Basit al-Megrahi ("Al-Megrahi"), and Lamen Khalifa Fhimah, a/k/a Al Amin Khalifa Fhimah and a/k/a "Mr. Lamin" ("Fhimah") are citizens of Libya and are intelligence agents or officials of Libya and its intelligence service and at times during the perpetration of the terrorist acts alleged herein were or continue to be employees of the LAA. At all relevant times, Al-Megrahi and Fhimah acted in both their official and personal capacities.

17. Defendants John Does #1-20 are employees, agents, and/or representatives of the JSO who actively and knowingly participated in Libya's terrorist activities, including, without

4

limitation, having commanded, ordered, supervised, and funded the bombing of Pan Am
Flight 103.

## OTHER RELEVANT PERSONS

18. At all relevant times, Pan American World Airways, an airline corporation registered
under 49 U.S.C. § 20, provided commercial passenger air service between the United
States and Europe. In December 1988, Pan American World Airways operated a leased
civil aircraft bearing number N739PA. The civil aircraft bearing number N739PA was
registered with the Federal Aviation Administration pursuant to federal law and operated
within the special aircraft jurisdiction of the United States. On December 21, 1988, the
civil aircraft bearing number N739PA was designated by Pan American World Airways
as Flight 103 ("Pan Am Flight 103").

## JURISDICTION AND VENUE

19. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1330, 1331, 1332(a)(2),
1350, and 18 U.S.C. § 2333(a). Jurisdiction is also invoked pursuant to 18 U.S.C. § 7 et
seq., commonly known as the Special Maritime and Territorial Jurisdiction Act.

20. Libya, the JSO, LAA and the individual defendants are subject to suit in the courts of the
United States pursuant to 28 U.S.C. §§ 1330, 1605(a)(7), 1605A, 1605 note and
18 U.S.C. § 2333(a).

21. Venue is proper in the United States District Court for the District of Columbia pursuant
to 28 U.S.C. § 1391(f)(4).

## FACTUAL ALLEGATIONS

22. On December 21, 1988, Roger Hurst, Walter Porter, John Mulroy, and Bridget
    Concannon were passengers on board Pan Am Flight 103. The flight, which originated in
    Frankfurt, Germany, departed London, U.K. bound for New York's John F. Kennedy
    Airport.

23. At approximately 7:03 p.m. GMT, an explosive device in a suitcase placed by Al-
    Megrahi, Fhimah and unknown others detonated. As a result of the explosion, the
    aircraft broke apart in Scottish airspace while at an attitude of 31,000 feet and then
    crashed to the ground.

24. All passengers and crew on board were killed. Eleven residents of the Scottish town of
    Lockerbie were also killed by falling debris.

25. The bomb which caused the crash of Pan Am Flight 103 was placed on board the aircraft
    and detonated by and at the direction of Libya, acting through agents of the JSO,
    including Al-Megrahi, Fhimah, and John Does # 1-20. Agents of the JSO, including John
    Does #1-20, acting on behalf and at the direction of Libya, arranged to smuggle the bomb
    on to Pan Am Flight 103 through Libya's airline facilities in Malta. Fhimah and Al-
    Megrahi, with unknown others, including John Does #1-20, constructed an improvised
    explosive device consisting of plastic explosives containing the substances RDX and
    PETN, which had been purchased by Libya and provided to them by the JSO, and an
    MST-13 prototype digital electronic timer, which had been specially manufactured for
    and purchased by Libya.

6

26. This explosive device was placed and purposely concealed inside a portable Toshiba radio cassette player which was then packed inside the large, brown Samsonite suitcase brought to Malta by Fhimah and Al-Megrahi.

27. The JSO used the LAA to perpetrate and facilitate this terrorism. Covert intelligence operatives in the employ of the JSO and LAA, including Al-Megrahi and Fhimah, had access to the luggage-handling facilities of Air Malta and arranged to have the bomb sent to and placed on board Pan Am Flight 103.

28. Immediately after the bombing, news reports were broadcast throughout the United States and the world, to which plaintiffs were subjected, depicting the tragedy. Images depicting the tragedy included the burning plane, the wreckage of the site, and the recovery of the bodies. Such broadcasts continued for 24-hours a day for several days following the bombing.

29. Many family members traveled to the scene at Lockerbie in the days and weeks that followed the bombing of Pan Am Flight 103.

30. On or about November 14, 1991, the United States and the United Kingdom simultaneously and in conjunction with each other filed criminal indictments against Al-Megrahi and Fhimah in their capacity as Libyan agents, charging them with planning and implementing the deliberate destruction of Pan Am Flight 103 and the deaths of the 270 persons.

31. On January 31, 2001, defendant Al-Megrahi was convicted of murder of the passengers and crew on board Pan Am Flight 103, as well as the residents of Lockerbie who were killed by falling debris. The Scottish High Court of Justiciary at Camp Zeist issued its

7

opinion in *Her Majesty's Advocate v. Abdelbaset Ali Mohamed Al Megrahi and Al Amin
Khalifa Fhimah, Prisoners in the Prison of Zeist, Camp Zeist (Kamp van Zeist), The
Netherlands*, Case No. 1475/99. The Court applied the criminal standard that "before
either [Al-Megrahi or Fhimah] could be convicted we would have to be satisfied beyond
reasonable doubt as to his guilt and that evidence from a single source would be
insufficient." The Court unanimously found Al-Megrahi guilty of 270 counts of murder.
The Court acquitted Fhimah due to "insufficient corroboration for any adverse inference
that might be drawn from" certain circumstantial evidence.

32. The Appeal Court of the Scottish High Court of Justiciary unanimously affirmed al-
Megrahi's conviction on March 14, 2002.

33. Plaintiffs incorporate by reference the decision issued by the Scottish High Court of
Justiciary, including all findings of fact concluded therein, as well as the decision issued
by the Appeal Court of the Scottish High Court of Justiciary.

34. The governments of the United States and the United Kingdom have concluded and
affirmed that Libya bears full responsibility, through its acts and those of its
instrumentalities and agents, for the deliberate destruction of Pan Am Flight 103.

35. Libya has guaranteed payment of any judgments entered against Al-Megrahi and/or
Fhimah for the terrorist bombing of Pan Am Flight 103.

36. On or about February 27, 1992, the Ibrahim Bishari, Secretary of Libya's People's
Committee for Foreign Liaison and International Cooperation, wrote to the Secretary
General of the United Nations guaranteeing "the payment of any compensation that might

8

be incurred by the responsibility of the two suspects [Al-Megrahi and Fhimah] who are
its nationals in the event they are unable to pay."

37. By this language, Libya agreed to guaranty payment of any judgment rendered against its
agents Al-Megrahi and Fhimah as a result of the terrorist bombing of Pan Am Flight 103.

38. On August 15, 2003, the Chargé d'Affaires of the Permanent Mission of the Libyan Arab
Jamahiriya to the United Nations issued a letter to the President of the United Nations
Security Council stating that Libya "[h]as facilitated the bringing to justice of the two
suspects charged with the bombing of Pan Am 103 and accepts responsibility for the
actions of its officials." United Nations Doc. S/2003/818.

39. Libya, the JSO, LAA, Al-Megrahi and Fhimah conspired together and acted in concert to
commit the sabotage and destruction of Pan Am Flight 103 and the extrajudicial killing of
its passenger

40. In arranging for the placement and detonation of a bomb on Pan Am Flight 103,
defendants intended to cause severe emotional distress to the immediate family members
of Roger Hurst, Walter Porter, John Mulroy, Bridget Concannon, and the other
passengers and crew of Pan Am Flight 103.

41. The criminal acts committed by Al-Megrahi, Fhimah, and John Does #1-20 that resulted
in the destruction of an American aircraft are within the special aircraft jurisdiction of the
United States, and give rise to a civil cause of action by those injured insofar as such acts
are within the competence of a United States district court.

42. Al-Megrahi and Fhimah served as agents of Libya and the JSO and as employees of LAA
during the relevant periods surrounding the planning and implementation of the bombing

9

of Pan Am Flight 103. Without their activities and the support provided to them by
Libya, including its instrumentalities, the bombing of Pan Am Flight 103 would not have
occurred. LAA's management knew or should have known that LAA aircraft and
facilities were being utilized for activities that violated Libya's domestic laws, the laws of
the United States and the law of nations.

43. Such activities constituted violations of the law of nations and of several United States
statutes, and resulted in the injury and death of Roger Hurst, Walter Porter, John Mulroy,
and Bridget Concannon.

44. The surviving family members of Roger Hurst, Walter Porter, John Mulroy, and Bridget
Concannon, including plaintiffs, have suffered immense emotional and psychological
pain and suffering as a result of the bombing of Pan Am Flight 103 by defendants.

## FIRST CAUSE OF ACTION
### (Antiterrorism Act)

45. Plaintiffs repeat and reallege all preceding paragraphs.

46. The Antiterrorism Act provides a remedy for "[a]ny national of the United States injured
in his or her person, property, or business by reason of an act of international terrorism,
or his or her estate, survivors, or heirs." 18 U.S.C. § 2333(a).

47. Defendants engaged in acts of international terrorism, including violent acts that were
dangerous to human life and in violation of the criminal laws of the United States or of
any State, or would be a criminal violation if committed within the jurisdiction of the
United States or of any State. Such acts appear to be intended to intimidate or coerce a

10

civilian population, influence the policy of a government by intimidation or coercion, or affect the conduct of a government by assassination.

48. The bombing of Pan Am Flight 103 was an act of international terrorism and constituted an extrajudicial killing and aircraft sabotage.

49. Defendants' conduct transcends national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

50. In bombing Pan Am Flight 103, defendants Al-Megrahi and/or Fhimah were acting within the scope of their employment as officers and/or employees of the JSO and LAA.

51. Defendant Al-Megrahi is estopped from denying the essential allegations of the charges for which the Scottish High Court of Justiciary convicted him. See also 18 U.S.C. § 2333(c).

52. Defendants Libya, the JSO, and LAA provided material support and resources to defendants Al-Megrahi and/or Fhimah for the bombing of Pan Am Flight 103.

53. Defendants conspired among themselves to bomb Pan Am Flight 103 in violation of the Antiterrorism Act, and took numerous overt steps in furtherance of such conspiracy.

54. Plaintiffs Ethel Hurst, Eugene Hurst, Spencer Hurst, Mitchell Hurst, Sharon Hurst Duross, Mary Diamond, Gwennth Forde, Victoria Porter, Olga Husbands, Vernon Druses, and Randolph Porter are nationals of the United States personally injured by reason of defendants' acts of international terrorism, or are the survivors or heirs of persons killed on board Pan Am Flight 103.

11

55. Plaintiffs sue to recover threefold the damages they sustained, not limited to intense
    emotional and psychological pain and suffering and the loss of the society and comfort of
    their family members who were killed on board Pan Am Flight 103, and the costs of suit,
    including attorneys' fees.

## SECOND CAUSE OF ACTION
### (Foreign Sovereign Immunities Act)

56. Plaintiffs repeat and reallege all preceding paragraphs.

57. The Foreign Sovereign Immunities Act waives sovereign immunity for claims against a
    foreign government for personal injury or death that was caused by an act of terrorism,
    including aircraft sabotage, if that foreign state was designated as a state sponsor of
    terrorism at the time it committed the terrorist act, or was so designated as a result of such
    act. 28 U.S.C. § 1605A(a).

58. Such a designated state sponsor of terrorism, and its officials, employees, or agents while
    acting within the scope of their office, employment or agency, are liable for personal
    injury or death caused by the act of terrorism, and damages may include economic
    damages, solatium, pain and suffering, and punitive damages. 28 U.S.C. § 1605A(c).

59. A foreign state shall also be vicariously liable for the acts of its officials, employees, or
    agents. 28 U.S.C. § 1605A(c).

60. Libya was designated as a state sponsor of terrorism in 1979 pursuant to § 6(j) of the
    Export Administration Act of 1979.

12

61. By bombing Pan Am Flight 103 and killing its passengers, including Roger Hurst, Walter Porter, John Mulroy, and Bridget Concannon, defendants caused plaintiffs personal injury, including emotional distress.

62. Libya is liable for the personal injuries suffered by plaintiffs, including, but not limited to, intense emotional and psychological pain and suffering and the loss of the society and comfort of their family members killed on board Pan Am Flight 103, and punitive damages.

63. Defendants Al-Megrahi and Fhima are liable for the personal injuries suffered by plaintiffs, including, but not limited to, intense emotional and psychological pain and suffering and the loss of the society and comfort of their family members killed on board Pan Am Flight 103, and punitive damages.

64. Libya is also vicariously liable for the acts of its officials, employees or agents, including Defendants Al-Megrahi and Fhima.

## THIRD CAUSE OF ACTION
### (*Flatow* Amendment)

65. Plaintiffs repeat and reallege all preceding paragraphs.

66. The Flatow Amendment creates an independent cause of action by providing that "[a]n official, employee, or agent of a [designated foreign state] . . . shall be liable to a United States national or the national's personal representative for personal injury or death . . . for money damages which may include . . . solatium . . . ." 28 U.S.C. § 1605 note.

13

67. By bombing Pan Am Flight 103 and killing its passengers, including Roger Hurst, Walter Porter, John Mulroy, and Bridget Concannon, defendants caused plaintiffs personal injury, including emotional distress.

68. Libya is liable for such personal injury "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606.

69. Libya is also liable for the acts of the individual defendants – including its employees and agents Al-Megrahi and Fhima – under the doctrine of *respondeat superior*. By "accept[ing] responsibility for the actions of its officials," Libya has acknowledged and conceded such liability.

70. Defendant Al-Megrahi is estopped from denying the essential allegations of the charges for which he was convicted by the Scottish High Court of Justiciary.

### FOURTH CAUSE OF ACTION
### (Torture Victim Protection Act)

71. Plaintiffs repeat and reallege all preceding paragraphs.

72. The Torture Victim Protection Act, 28 U.S.C. § 1350 note, provides a cause of action for torture and extrajudicial killing by any individual acting under the actual or apparent authority or color of law of any foreign state.

73. Defendants' bombing of Pan Am Flight 103 was an extrajudicial killing.

74. In bombing Pan Am Flight 103, defendants Al-Megrahi and Fhimah were acting within the scope of their employment as officers and/or employees of the JSO and LAA, and under actual or apparent authority or color of law.

14

75. Defendants conspired among themselves to bomb Pan Am Flight 103 in violation of the Torture Victim Protection Act, and took numerous overt steps in furtherance of such conspiracy.

76. The deaths of Roger Hurst, Walter Porter, John Mulroy, and Bridget Concannon, and the personal injuries suffered by plaintiffs, including, but not limited to, intense emotional and psychological pain and suffering and the loss of the society and comfort of their family members killed on board Pan Am Flight 103, were proximately caused by the willful and deliberate activities of Al-Megrahi and Fhimah.

## FIFTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)

77. Plaintiffs repeat and reallege all preceding paragraphs.

78. The bombing of Pan Am Flight 103 was extreme and outrageous conduct and in violation of state and federal law, as well as the law of nations and numerous international treaties.

79. By bombing Pan Am Flight 103 and killing its passengers, including Roger Hurst, Walter Porter, John Mulroy, and Bridget Concannon, defendants intended to cause severe emotional distress among the immediate members of the decedents' family, including plaintiffs.

80. By bombing Pan Am Flight 103, Libya and other defendants did cause personal injuries to plaintiffs Ethel Hurst, Eugene Hurst, Spencer Hurst, Mitchell Hurst, Sharon Hurst Duross, Mary Diamond, Gwennth Forde, Victoria Porter, Olga Husbands, Vernon Druses, Randolph Porter, and James Mulroy, including, but not limited to, intense

15

emotional and psychological pain and suffering and the loss of the society and comfort of their family members killed on board Pan Am Flight 103.

81. All defendants, including Libya, are liable for the intentional infliction of emotional distress of plaintiffs.

82. Libya is liable for the intentional infliction of emotional distress of plaintiffs "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606.

83. Libya is also liable for the acts of the individual defendants – including its employees and agents Al-Megrahi and Fhima – under the doctrine of *respondeat superior*. By "accept[ing] responsibility for the actions of its officials," Libya has acknowledged and conceded such liability.

## SIXTH CAUSE OF ACTION
### (Civil Conspiracy)

84. Plaintiffs repeat and reallege all preceding paragraphs.

85. Defendants did knowingly and willfully conspire to commit the following offenses:

     (a)    the deliberate and wrongful deaths of Roger Hurst, Walter Porter, John Mulroy, and Bridget Concannon;

     (b)    the violation of the Antiterrorism Act;

     (c)    the violation of the Foreign Sovereign Immunities Act

     (d)    the violation of the *Flatow* Amendment;

     (e)    the violation of the Torture Victims Protection Act; and

     (f)    the intentional infliction of emotional distress upon plaintiffs.

16

86. The objects of the conspiracy were the sabotage and destruction of Pan Am Flight 103, the foreseeable resulting deaths of, among others, Roger Hurst, Walter Porter, John Mulroy, and Bridget Concannon, the intentional infliction of emotional distress on the survivors of these decedents, and through the suffering of the survivors, the traumatization of the entire nation. The destruction of the plane, the deaths of the passenger and crew, and the emotional distress of the survivors were proximately caused by this conspiracy.

87. Defendants took numerous overt steps in furtherance of such conspiracy.

88. Defendants were acting pursuant to the actual or apparent authority or color of law of Libya, and are liable for conspiring to commit the aforementioned offenses. Defendants Al-Megrahi and Fhimah were also acting in their personal capacity by carrying out these criminal acts. Defendants are liable for conspiring to commit the aforementioned offenses among themselves as well as with others whose identities are unknown at this time.

## SEVENTH CAUSE OF ACTION
### (Guaranty Contract)

89. Plaintiffs repeat and reallege all preceding paragraphs.

90. Libya, in consideration for greater international respectability and improved relations with the members of the United Nations, has guaranteed payment of any judgments entered against Al-Megrahi and Fhimah with respect to the bombing of Pan Am Flight 103.

91. Libya's guaranty contract obligates it to pay any unsatisfied judgments obtained against Al-Megrahi and Fhimah.

17

**WHEREFORE**, plaintiffs respectfully requests judgment as follows:

(a) on the First Cause of Action, compensatory damages, including, without limitation, economic loss, pain and suffering, and solatium damages in an amount to be determined at trial, multiplied by three pursuant to 18 U.S.C. § 2333(a); punitive damages in an amount to be determined at trial; and, special damages, including, without limitation, costs associated with psychological counseling, travel expenses related to the bombing, loss of earnings tied to the bombing;

(b) on the Second Cause of Action, compensatory damages, including, without limitation, economic loss, pain and suffering, and solatium damages in an amount to be determined at trail; punitive damages in an amount to be determined at trial; and, special damages, including, without limitation, psychological counseling, travel expenses related to the bombing, loss of earnings tied to the bombing;

(c) on the Third Cause of Action, compensatory damages, including, without limitation, economic loss, pain and suffering, and solatium damages in an amount to be determined at trail; punitive damages in an amount to be determined at trial; and, special damages, including, without limitation, psychological counseling, travel expenses related to the bombing, loss of earnings tied to the bombing;

(d) on the Fourth Cause of Action, compensatory damages, including, without limitation, economic loss, pain and suffering, and solatium damages in an amount to be determined at trail; punitive damages in an amount to be determined at trial; and, special damages, including, without limitation, psychological counseling, travel expenses related to the bombing, loss of earnings tied to the bombing;

18

(e) on the Fifth Cause of Action, compensatory damages, including, without limitation, economic loss, pain and suffering, and solatium damages in an amount to be determined at trail; punitive damages in an amount to be determined at trial; and, special damages, including, without limitation, psychological counseling, travel expenses related to the bombing, loss of earnings tied to the bombing;

(f) on the Sixth Cause of Action, compensatory damages, including, without limitation, economic loss, pain and suffering, and solatium damages in an amount to be determined at trail; punitive damages in an amount to be determined at trial; and, special damages, including, without limitation, psychological counseling, travel expenses related to the bombing, loss of earnings tied to the bombing;

(g) on the Seventh Cause of Action, against Libya, payment of all or any unpaid part of any judgment(s) obtained in this action against Al-Megrahi and/or Fhima;

(h) such other legal and equitable relief as this Court deems just and proper, together with attorneys' fees, interest, costs and disbursements of this action pursuant to 18 U.S.C. § 2333(a).

Dated: March 28, 2008
New York, New York

EMERY CELLI BRINCKERHOFF &
ABADY LLP

_____/s/_____
Sarah Netburn
Richard D. Emery
75 Rockefeller Plaza
New York, New York 10019
(212) 763-5000

19

MARK S. ZAID, P.C.
1250 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20036
(202) 454-2809

# EXHIBIT B

H. R. 4986

# One Hundred Tenth Congress
## of the
## United States of America

### AT THE SECOND SESSION

*Begun and held at the City of Washington on Thursday,*
*the third day of January, two thousand and eight*

## An Act

To provide for the enactment of the National Defense Authorization Act for Fiscal Year 2008, as previously enrolled, with certain modifications to address the foreign sovereign immunities provisions of title 28, United States Code, with respect to the attachment of property in certain judgments against Iraq, the lapse of statutory authorities for the payment of bonuses, special pays, and similar benefits for members of the uniformed services, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

### SECTION 1. SHORT TITLE; TREATMENT OF EXPLANATORY STATEMENT.

(a) SHORT TITLE.—This Act may be cited as the "National Defense Authorization Act for Fiscal Year 2008".

(b) EXPLANATORY STATEMENT.—The Joint Explanatory Statement submitted by the Committee of Conference for the conference report to accompany H.R. 1585 of the 110th Congress (Report 110–477) shall be deemed to be part of the legislative history of this Act and shall have the same effect with respect to the implementation of this Act as it would have had with respect to the implementation of H.R. 1585, if such bill had been enacted.

### SEC. 2. ORGANIZATION OF ACT INTO DIVISIONS; TABLE OF CONTENTS.

(a) DIVISIONS.—This Act is organized into three divisions as follows:

(1) Division A—Department of Defense Authorizations.
(2) Division B—Military Construction Authorizations.
(3) Division C—Department of Energy National Security Authorizations and Other Authorizations.

(b) TABLE OF CONTENTS.—The table of contents for this Act is as follows:

Sec. 1. Short title; treatment of explanatory statement.
Sec. 2. Organization of Act into divisions; table of contents.
Sec. 3. Congressional defense committees.

DIVISION A—DEPARTMENT OF DEFENSE AUTHORIZATIONS

TITLE I—PROCUREMENT

Subtitle A—Authorization of Appropriations

Sec. 101. Army.
Sec. 102. Navy and Marine Corps.
Sec. 103. Air Force.
Sec. 104. Defense-wide activities.
Sec. 105. National Guard and Reserve equipment.

Subtitle B—Army Programs

Sec. 111. Multiyear procurement authority for M1A2 Abrams System Enhancement Package upgrades.
Sec. 112. Multiyear procurement authority for M2A3/M3A3 Bradley fighting vehicle upgrades.

H. R. 4986—336

(B) what criteria and considerations are appropriate to determine whether additional Civil Support Teams are needed and, if so, where they should be located.

(e) COOPERATION OF OTHER AGENCIES.—

(1) IN GENERAL.—The advisory panel required by subsection (a) may secure directly from the Department of Defense, the Department of Homeland Security, the Department of Energy, the Department of Justice, the Department of Health and Human Services, and any other department or agency of the Federal Government information that the panel considers necessary for the panel to carry out its duties.

(2) COOPERATION.—The Secretary of Defense, the Secretary of Homeland Secretary, the Secretary of Energy, the Attorney General, the Secretary of Health and Human Services, and any other official of the United States shall provide the advisory panel with full and timely cooperation in carrying out its duties under this section.

(f) REPORT.—Not later than 12 months after the date of the initial meeting of the advisory panel required by subsection (a), the advisory panel shall submit to the Secretary of Defense, and to the Committees on Armed Services of the Senate and the House of Representatives, a report on activities under this section. The report shall set forth—

(1) the findings, conclusions, and recommendations of the advisory panel for improving the capabilities of the Department of Defense to provide support to United States civil authorities in the event of a chemical, biological, radiological, nuclear, or high-yield explosive incident; and

(2) such other findings, conclusions, and recommendations for improving the capabilities of the Department for homeland defense as the advisory panel considers appropriate.

## SEC. 1083. TERRORISM EXCEPTION TO IMMUNITY.

(a) TERRORISM EXCEPTION TO IMMUNITY.—

(1) IN GENERAL.—Chapter 97 of title 28, United States Code, is amended by inserting after section 1605 the following:

## "§ 1605A. Terrorism exception to the jurisdictional immunity of a foreign state

"(a) IN GENERAL.—

"(1) NO IMMUNITY.—A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

"(2) CLAIM HEARD.—The court shall hear a claim under this section if—

"(A)(i)(I) the foreign state was designated as a state sponsor of terrorism at the time the act described in paragraph (1) occurred, or was so designated as a result of such act, and, subject to subclause (II), either remains

H. R. 4986—337

so designated when the claim is filed under this section or was so designated within the 6-month period before the claim is filed under this section; or

"(II) in the case of an action that is refiled under this section by reason of section 1083(c)(2)(A) of the National Defense Authorization Act for Fiscal Year 2008 or is filed under this section by reason of section 1083(c)(3) of that Act, the foreign state was designated as a state sponsor of terrorism when the original action or the related action under section 1605(a)(7) (as in effect before the enactment of this section) or section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 (as contained in section 101(c) of division A of Public Law 104–208) was filed;

"(ii) the claimant or the victim was, at the time the act described in paragraph (1) occurred—

"(I) a national of the United States;

"(II) a member of the armed forces; or

"(III) otherwise an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment; and

"(iii) in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration; or

"(B) the act described in paragraph (1) is related to Case Number 1:00CV03110 (EGS) in the United States District Court for the District of Columbia.

"(b) LIMITATIONS.—An action may be brought or maintained under this section if the action is commenced, or a related action was commenced under section 1605(a)(7) (before the date of the enactment of this section) or section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 (as contained in section 101(c) of division A of Public Law 104–208) not later than the latter of—

"(1) 10 years after April 24, 1996; or

"(2) 10 years after the date on which the cause of action arose.

"(c) PRIVATE RIGHT OF ACTION.—A foreign state that is or was a state sponsor of terrorism as described in subsection (a)(2)(A)(i), and any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, shall be liable to—

"(1) a national of the United States,

"(2) a member of the armed forces,

"(3) an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or

"(4) the legal representative of a person described in paragraph (1), (2), or (3),

for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States

H. R. 4986—338

may maintain jurisdiction under this section for money damages. In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages. In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents.

"(d) ADDITIONAL DAMAGES.—After an action has been brought under subsection (c), actions may also be brought for reasonably foreseeable property loss, whether insured or uninsured, third party liability, and loss claims under life and property insurance policies, by reason of the same acts on which the action under subsection (c) is based.

"(e) SPECIAL MASTERS.—

"(1) IN GENERAL.—The courts of the United States may appoint special masters to hear damage claims brought under this section.

"(2) TRANSFER OF FUNDS.—The Attorney General shall transfer, from funds available for the program under section 1404C of the Victims of Crime Act of 1984 (42 U.S.C. 10603c), to the Administrator of the United States district court in which any case is pending which has been brought or maintained under this section such funds as may be required to cover the costs of special masters appointed under paragraph (1). Any amount paid in compensation to any such special master shall constitute an item of court costs.

"(f) APPEAL.—In an action brought under this section, appeals from orders not conclusively ending the litigation may only be taken pursuant to section 1292(b) of this title.

"(g) PROPERTY DISPOSITION.—

"(1) IN GENERAL.—In every action filed in a United States district court in which jurisdiction is alleged under this section, the filing of a notice of pending action pursuant to this section, to which is attached a copy of the complaint filed in the action, shall have the effect of establishing a lien of lis pendens upon any real property or tangible personal property that is—

"(A) subject to attachment in aid of execution, or execution, under section 1610;

"(B) located within that judicial district; and

"(C) titled in the name of any defendant, or titled in the name of any entity controlled by any defendant if such notice contains a statement listing such controlled entity.

"(2) NOTICE.—A notice of pending action pursuant to this section shall be filed by the clerk of the district court in the same manner as any pending action and shall be indexed by listing as defendants all named defendants and all entities listed as controlled by any defendant.

"(3) ENFORCEABILITY.—Liens established by reason of this subsection shall be enforceable as provided in chapter 111 of this title.

"(h) DEFINITIONS.—For purposes of this section—

"(1) the term 'aircraft sabotage' has the meaning given that term in Article 1 of the Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation;

"(2) the term 'hostage taking' has the meaning given that term in Article 1 of the International Convention Against the Taking of Hostages;

H. R. 4986—339

"(3) the term 'material support or resources' has the meaning given that term in section 2339A of title 18;

"(4) the term 'armed forces' has the meaning given that term in section 101 of title 10;

"(5) the term 'national' of the United States' has the meaning given that term in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22));

"(6) the term 'state sponsor of terrorism' means a country the government of which the Secretary of State has determined, for purposes of section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371), section 40 of the Arms Export Control Act (22 U.S.C. 2780), or any other provision of law, is a government that has repeatedly provided support for acts of international terrorism; and

"(7) the terms 'torture' and 'extrajudicial killing' have the meaning given those terms in section 3 of the Torture Victim Protection Act of 1991 (28 U.S.C. 1350 note).".

(2) AMENDMENT TO CHAPTER ANALYSIS.—The table of sections at the beginning of chapter 97 of title 28, United States Code, is amended by inserting after the item relating to section 1605 the following:

"1605A. Terrorism exception to the jurisdictional immunity of a foreign state.".

(b) CONFORMING AMENDMENTS.—

(1) GENERAL EXCEPTION.—Section 1605 of title 28, United States Code, is amended—

(A) in subsection (a)—

(i) in paragraph (5)(B), by inserting "or" after the semicolon;

(ii) in paragraph (6)(D), by striking "; or" and inserting a period; and

(iii) by striking paragraph (7);

(B) by repealing subsections (e) and (f); and

(C) in subsection (g)(1)(A), by striking "but for subsection (a)(7)" and inserting "but for section 1605A".

(2) COUNTERCLAIMS.—Section 1607(a) of title 28, United States Code, is amended by inserting "or 1605A" after "1605".

(3) PROPERTY.—Section 1610 of title 28, United States Code, is amended—

(A) in subsection (a)(7), by striking "1605(a)(7)" and inserting "1605A";

(B) in subsection (b)(2), by striking "(5), or (7), or 1605(b)" and inserting "or (5), 1605(b), or 1605A";

(C) in subsection (f), in paragraphs (1)(A) and (2)(A), by inserting "(as in effect before the enactment of section 1605A) or section 1605A" after "1605(a)(7)"; and

(D) by adding at the end the following:

"(g) PROPERTY IN CERTAIN ACTIONS.—

"(1) IN GENERAL.—Subject to paragraph (3), the property of a foreign state against which a judgment is entered under section 1605A, and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity, is subject to attachment in aid of execution, and execution, upon that judgment as provided in this section, regardless of—

H. R. 4986—340

"(A) the level of economic control over the property by the government of the foreign state;

"(B) whether the profits of the property go to that government;

"(C) the degree to which officials of that government manage the property or otherwise control its daily affairs;

"(D) whether that government is the sole beneficiary in interest of the property; or

"(E) whether establishing the property as a separate entity would entitle the foreign state to benefits in United States courts while avoiding its obligations.

"(2) UNITED STATES SOVEREIGN IMMUNITY INAPPLICABLE.—Any property of a foreign state, or agency or instrumentality of a foreign state, to which paragraph (1) applies shall not be immune from attachment in aid of execution, or execution, upon a judgment entered under section 1605A because the property is regulated by the United States Government by reason of action taken against that foreign state under the Trading With the Enemy Act or the International Emergency Economic Powers Act.

"(3) THIRD-PARTY JOINT PROPERTY HOLDERS.—Nothing in this subsection shall be construed to supersede the authority of a court to prevent appropriately the impairment of an interest held by a person who is not liable in the action giving rise to a judgment in property subject to attachment in aid of execution, or execution, upon such judgment.".

(4) VICTIMS OF CRIME ACT.—Section 1404C(a)(3) of the Victims of Crime Act of 1984 (42 U.S.C. 10603c(a)(3)) is amended by striking "December 21, 1988 with respect to which an investigation or" and inserting "October 23, 1983, with respect to which an investigation or civil or criminal".

(c) APPLICATION TO PENDING CASES.—

(1) IN GENERAL.—The amendments made by this section shall apply to any claim arising under section 1605A of title 28, United States Code.

(2) PRIOR ACTIONS.—

(A) IN GENERAL.—With respect to any action that—

(i) was brought under section 1605(a)(7) of title 28, United States Code, or section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 (as contained in section 101(c) of division A of Public Law 104–208), before the date of the enactment of this Act,

(ii) relied upon either such provision as creating a cause of action,

(iii) has been adversely affected on the grounds that either or both of these provisions fail to create a cause of action against the state, and

(iv) as of such date of enactment, is before the courts in any form, including on appeal or motion under rule 60(b) of the Federal Rules of Civil Procedure,

that action, and any judgment in the action shall, on motion made by plaintiffs to the United States district court where the action was initially brought, or judgment in the action was initially entered, be given effect as if the action had

H. R. 4986—341

originally been filed under section 1605A(c) of title 28, United States Code.

(B) DEFENSES WAIVED.—The defenses of res judicata, collateral estoppel, and limitation period are waived—

(i) in any action with respect to which a motion is made under subparagraph (A), or

(ii) in any action that was originally brought, before the date of the enactment of this Act, under section 1605(a)(7) of title 28, United States Code, or section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 (as contained in section 101(c) of division A of Public Law 104–208), and is refiled under section 1605A(c) of title 28, United States Code,

to the extent such defenses are based on the claim in the action.

(C) TIME LIMITATIONS.—A motion may be made or an action may be refiled under subparagraph (A) only—

(i) if the original action was commenced not later than the latter of—

(I) 10 years after April 24, 1996; or

(II) 10 years after the cause of action arose; and

(ii) within the 60-day period beginning on the date of the enactment of this Act.

(3) RELATED ACTIONS.—If an action arising out of an act or incident has been timely commenced under section 1605(a)(7) of title 28, United States Code, or section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 (as contained in section 101(c) of division A of Public Law 104–208), any other action arising out of the same act or incident may be brought under section 1605A of title 28, United States Code, if the action is commenced not later than the latter of 60 days after—

(A) the date of the entry of judgment in the original action; or

(B) the date of the enactment of this Act.

(4) PRESERVING THE JURISDICTION OF THE COURTS.— Nothing in section 1503 of the Emergency Wartime Supplemental Appropriations Act, 2003 (Public Law 108–11, 117 Stat. 579) has ever authorized, directly or indirectly, the making inapplicable of any provision of chapter 97 of title 28, United States Code, or the removal of the jurisdiction of any court of the United States.

(d) APPLICABILITY TO IRAQ.—

(1) APPLICABILITY.—The President may waive any provision of this section with respect to Iraq, insofar as that provision may, in the President's determination, affect Iraq or any agency or instrumentality thereof, if the President determines that—

(A) the waiver is in the national security interest of the United States;

(B) the waiver will promote the reconstruction of, the consolidation of democracy in, and the relations of the United States with, Iraq; and

(C) Iraq continues to be a reliable ally of the United States and partner in combating acts of international terrorism.

H. R. 4986—342

(2) TEMPORAL SCOPE.—The authority under paragraph (1) shall apply—

(A) with respect to any conduct or event occurring before or on the date of the enactment of this Act;

(B) with respect to any conduct or event occurring before or on the date of the exercise of that authority; and

(C) regardless of whether, or the extent to which, the exercise of that authority affects any action filed before, on, or after the date of the exercise of that authority or of the enactment of this Act.

(3) NOTIFICATION TO CONGRESS.—A waiver by the President under paragraph (1) shall cease to be effective 30 days after it is made unless the President has notified Congress in writing of the basis for the waiver as determined by the President under paragraph (1).

(4) SENSE OF CONGRESS.—It is the sense of the Congress that the President, acting through the Secretary of State, should work with the Government of Iraq on a state-to-state basis to ensure compensation for any meritorious claims based on terrorist acts committed by the Saddam Hussein regime against individuals who were United States nationals or members of the United States Armed Forces at the time of those terrorist acts and whose claims cannot be addressed in courts in the United States due to the exercise of the waiver authority under paragraph (1).

(e) SEVERABILITY.—If any provision of this section or the amendments made by this section, or the application of such provision to any person or circumstance, is held invalid, the remainder of this section and such amendments, and the application of such provision to other persons not similarly situated or to other circumstances, shall not be affected by such invalidation.

# TITLE XI—CIVILIAN PERSONNEL MATTERS

Sec. 1101. Extension of authority to waive annual limitation on total compensation paid to Federal civilian employees working overseas under areas of United States Central Command.
Sec. 1102. Continuation of life insurance coverage for Federal employees called to active duty.
Sec. 1103. Transportation of dependents, household effects, and personal property to former home following death of Federal employee where death resulted from disease or injury incurred in the Central Command area of responsibility.
Sec. 1104. Special benefits for civilian employees assigned on deployment temporary change of station.
Sec. 1105. Death gratuity authorized for Federal employees.
Sec. 1106. Modifications to the National Security Personnel System.
Sec. 1107. Requirement for full implementation of personnel demonstration project.
Sec. 1108. Authority for inclusion of certain Office of Defense Research and Engineering positions in experimental personnel program for scientific and technical personnel.
Sec. 1109. Pilot program for the temporary assignment of information technology personnel to private sector organizations.
Sec. 1110. Compensation for Federal wage system employees for certain travel hours.
Sec. 1111. Travel compensation for wage grade personnel.
Sec. 1112. Accumulation of annual leave by senior level employees.
Sec. 1113. Uniform allowances for civilian employees.

# EXHIBIT C

Case 1:03-md-01570-GBD-SN    Document 11450    Filed 12/30/25    Page 41 of 45

*August 2, 2007*  Case 1:02-cv-02147-HHK    Document 71-1    Filed 03/28/08    Page 36 of 37
CONGRESSIONAL RECORD — SENATE    **S10793**

school facilities. However, the distribution of these recent investments has been overwhelmingly slanted to the most affluent communities which are better able to fund new investments without outside assistance. A 2006 study released by the Building Educational Success Together, BEST, coalition found that the quality of your child's school is dependent upon his or her racial or ethnic background and whether they live in a rich or poor neighborhood.

Local spending on school facilities in affluent communities is almost twice as high as in our most disadvantaged communities, as measured on a per-pupil basis. The report also found that school districts with predominantly caucasian enrollment benefited from about $2000 more per student in school repair and construction spending than their peers living in school districts with predominantly minority enrollment.

The Public School Repair and Renovation Act addresses that inequity by targeting school renovation grants to those communities that have struggled to fund needed repairs. The bill builds on the model States found successful in the fiscal year 2001 program. States would receive funding based on their most recent Title I allocation to initiate a competitive grant program targeted to poor and rural school districts. States have the discretion to require matching funds from the local district bringing the potential funding to much more than the $1.6 billion Federal investment.

I would like to thank my colleagues, Senators KENNEDY, CLINTON, and MIKULSKI for signing on to this bill. In addition, I am pleased to report this legislation has the support of a diverse group of national education organizations representing teachers, school boards, school administrators, and principals.

The Public School Repair and Renovation Act takes a much needed step forward in fixing the inequity in public school facilities. Something is seriously wrong when children go to modern, gleaming movie theaters, shopping malls, and sports arenas, but attend public schools with crumbling walls and leaking roofs. This sends exactly the wrong message to children about the importance of education.

I hope that my colleagues will support the Public School Repair and Renovation Act.

----

By Mr. LAUTENBERG (for himself, Mr. SPECTER, Mr. MENENDEZ, Mr. CORNYN, Mr. COLEMAN, Mr. LOTT, Mr. LIEBERMAN, Mr. SCHUMER, Mrs. CLINTON, Mr. CASEY, Ms. COLLINS, Mr. GRAHAM, Mr. BIDEN, Mr. STEVENS, and Mrs. FEINSTEIN):

S. 1944. A bill to provide justice for victims of state-sponsored terrorism; to the Committee on the Judiciary.

Mr. LAUTENBERG. Mr. President, I rise to introduce the Justice for Vic-

tims of State Sponsored Terrorism Act with my colleagues, Senators SPECTER, MENENDEZ, CORNYN, COLEMAN, LOTT, LIEBERMAN, SCHUMER, CLINTON, CASEY, COLLINS, GRAHAM, BIDEN, STEVENS, and FEINSTEIN.

I am proud to introduce this legislation on behalf of the many Americans who have suffered at the hands of State sponsors of terrorism. This important legislation will allow victims of state sponsored terrorism to have their day in court. It will do so by enabling these individuals to both sue for liability and seek financial compensation from the states, such as Iran, which committed these murderous acts, thereby starving them of the funds that they use to strike at innocent victims.

In 1983, the U.S. Marine Corps barracks in Beirut, Lebanon, was bombed by the Lebanese terrorist organization Hezbollah, killing 241 servicemen and wounding 100 others. In 2003, the U.S. District Court in Washington, DC, found the Republic of Iran, which directly supports Hezbollah, guilty of masterminding that bombing. The victims and their families have the right to sue their tormentors and have judgments against Iran, yet the judgments are not being enforced.

In 1996, the President signed into law legislation that I wrote to amend the Foreign Sovereign Immunities Act to give private American citizens the right to hold U.S. Department of State-designated state sponsors of terrorism liable in U.S. courts. This legislation, also known as the Flatow amendment, needs to be clarified and updated. The bill I am introducing today will bring clarity to this law on behalf of victims of terrorism and reaffirm their right to sue and collect damages from state sponsors of terrorism.

There are several reasons why the law needs to be improved. First, the courts decided in 2004 in Cicippio-Puleo v. Islamic Republic of Iran that, contrary to the intent of the Flatow amendment, there would be no Federal private right of action against foreign governments. The ruling stated that there could only be legal action against individual officials and employees of that government. Second, current law permits judgment holders to only seize assets over which a terrorist state has day-to-day managerial control, thereby allowing terrorist states to hide their assets from the victims who have successful judgments against them. Third, state sponsors of terrorism, such as Libya, which is still responsible for terrorist acts it committed in the past, have consistently abused the appeals process to delay litigation proceedings.

My new legislation will address these issues and improve the ability of victims to hold state sponsors of terrorism accountable. First, it will update the Flatow amendment to improve its enforcement by reaffirming the right of private citizens to sue state sponsors of terrorism. Second, it will allow for the seizure of hidden commercial assets belonging to the

terrorist state so that the victims of terrorism can be justly compensated. Third, it will limit the number of appeals that the terrorist state can pursue in U.S. courts. In addition, my legislation will provide foreign nationals working for the U.S. Government, if they are victims of a terrorist attack during their official duties, to be covered by these same provisions.

While nothing can bring back innocent lives lost to terrorism, the state sponsors of these horrific acts must be made to pay for their crimes. We are united in our belief that state-sponsored terrorism is wrong and that the perpetrators of terrorism must be brought to justice. This legislation will also strengthen our national security by combating the desire and ability of foreign nations to both finance and support terrorism. Most importantly, it will empower those innocent victims who have suffered from terrorism to seek justice through the rule of American law.

I urge my colleagues on both sides of the aisle to support justice for victims of state sponsored terrorism by supporting this important bill. I ask unanimous consent that the text of the bill be printed in the RECORD.

There being no objection, the text of the bill was ordered to be printed in the RECORD, as follows:

S. 1944

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Justice for Victims of State Sponsored Terrorism Act".

**SEC. 2. TERRORISM EXCEPTION TO IMMUNITY.**

(a) IN GENERAL.—Chapter 97 of title 28, United States Code, is amended by inserting after section 1605 the following:

**"§ 1605A. Terrorism exception to the jurisdictional immunity of a foreign state**

"(a) IN GENERAL.—

"(1) NO IMMUNITY.—A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

"(2) CLAIM HEARD.—The court shall hear a claim under this section if—

"(A) the foreign state was designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979 (50 U.S.C. app. 2405 (j)) or section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371) at the time the act occurred, unless later designated as a result of such act;

"(B) the claimant or the victim was—

"(i) a national of the United States (as that term is defined in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22));

"(ii) a member of the Armed Forces of the United States (as that term is defined in section 976 of title 10); or

Case 1:03-md-01570-GBD-SN    Document 11450    Filed 12/30/25    Page 42 of 45

**S10794** Case 1:02-cv-02147-HHK    Document 71-1    Filed 03/28/08    Page 37 of 37
**CONGRESSIONAL RECORD — SENATE**    *August 2, 2007*

"(iii) otherwise an employee of the government of the United States or one of its contractors acting within the scope of their employment when the act upon which the claim is based occurred; or

"(C) where the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration.

"(b) DEFINITION.—For purposes of this section—

"(1) the terms 'torture' and 'extrajudicial killing' have the meaning given those terms in section 3 of the Torture Victim Protection Act of 1991 (28 U.S.C. 1350 note);

"(2) the term 'hostage taking' has the meaning given that term in Article 1 of the International Convention Against the Taking of Hostages; and

"(3) the term 'aircraft sabotage' has the meaning given that term in Article 1 of the Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation.

"(c) TIME LIMIT.—An action may be brought under this section if the action is commenced not later than the latter of—

"(1) 10 years after April 24, 1996; or

"(2) 10 years from the date on which the cause of action arose.

"(d) PRIVATE RIGHT OF ACTION.—A private cause of action may be brought against a foreign state designated under section 6(j) of the Export Administration Act of 1979 (50 U.S.C. 2405(j)), and any official, employee, or agent of said foreign state while acting within the scope of his or her office, employment, or agency which shall be liable to a national of the United States (as that term is defined in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22)), a member of the Armed Forces of the United States (as that term is defined in section 976 of title 10), or an employee of the government of the United States or one of its contractors acting within the scope of their employment or the legal representative of such a person for personal injury or death caused by acts of that foreign state or its official, employee, or agent for which the courts of the United States may maintain jurisdiction under this section for money damages which may include economic damages, solatium, pain, and suffering, and punitive damages if the acts were among those described in this section. A foreign state shall be vicariously liable for the actions of its officials, employees, or agents.

"(e) ADDITIONAL DAMAGES.—After an action has been brought under subsection (d), actions may also be brought for reasonably foreseeable property loss, whether insured or uninsured, third party liability, and life and property insurance policy loss claims.

"(f) SPECIAL MASTERS.—

"(1) IN GENERAL.—The Courts of the United States may from time to time appoint special masters to hear damage claims brought under this section.

"(2) TRANSFER OF FUNDS.—The Attorney General shall transfer, from funds available for the program under sections 1404C of the Victims Crime Act of 1984 (42 U.S.C. 10603c) to the Administrator of the United States District Court in which any case is pending which has been brought pursuant to section 1605(a)(7) such funds as may be required to carry out the Orders of that United States District Court appointing Special Masters in any case under this section. Any amount paid in compensation to any such Special Master shall constitute an item of court costs.

"(g) APPEAL.—In an action brought under this section, appeals from orders not conclusively ending the litigation may only be taken pursuant to section 1292(b) of this title.

"(h) PROPERTY DISPOSITION.—

"(1) IN GENERAL.—In every action filed in a United States district court in which jurisdiction is alleged under this section, the filing of a notice of pending action pursuant to this section, to which is attached a copy of the complaint filed in the action, shall have the effect of establishing a lien of lis pendens upon any real property or tangible personal property located within that judicial district that is titled in the name of any defendant, or titled in the name of any entity controlled by any such defendant if such notice contains a statement listing those controlled entities.

"(2) NOTICE.—A notice of pending action pursuant to this section shall be filed by the clerk of the district court in the same manner as any pending action and shall be indexed by listing as defendants all named defendants and all entities listed as controlled by any defendant.

"(3) ENFORCEABILITY.—Liens established by reason of this subsection shall be enforceable as provided in chapter 111 of this title.".

(b) AMENDMENT TO CHAPTER ANALYSIS.— The chapter analysis for chapter 97 of title 28, United States Code, is amended by inserting after the item for section 1605 the following:

"1605A. Terrorism exception to the jurisdictional immunity of a foreign state.".

### SEC. 3. CONFORMING AMENDMENTS.

(a) PROPERTY.—Section 1610 of title 28, United States Code, is amended by adding at the end the following:

"(g) PROPERTY IN CERTAIN ACTIONS.—

"(1) IN GENERAL.—The property of a foreign state, or agency or instrumentality of a foreign state, against which a judgment is entered under this section, including property that is a separate juridical entity, is subject to execution upon that judgment as provided in this section, regardless of—

"(A) the level of economic control over the property by the government of the foreign state;

"(B) whether the profits of the property go to that government;

"(C) the degree to which officials of that government manage the property or otherwise control its daily affairs;

"(D) whether that government is the sole beneficiary in interest of the property; or

"(E) whether establishing the property as a separate entity would entitle the foreign state to benefits in United States courts while avoiding its obligations.

"(2) UNITED STATES SOVEREIGN IMMUNITY IN-APPLICABLE.—Any property of a foreign state, or agency or instrumentality of a foreign state, to which paragraph (1) applies shall not be immune from execution upon a judgment entered under this section because the property is regulated by the United States Government by reason of action taken against that foreign state under the Trading With the Enemy Act or the International Emergency Economic Powers Act.".

(b) VICTIMS OF CRIME ACT.—Section 1404C(a)(3) of the Victims of Crime Act of 1984 (42 U.S.C. 10603c(a)(3)) is amended by striking "December 21, 1988, with respect to which an investigation or" and inserting "October 23, 1983, which respect to which an investigation or civil or criminal".

(c) GENERAL EXCEPTION.—Section 1605 of title 28, United States Code, is amended—

(1) in subsection (a)—

(A) in paragraph (5)(B), by inserting "or" after the semicolon;

(B) in paragraph (6)(D), by striking "; or" and inserting a period; and

(C) by striking paragraph (7); and

(2) by striking subsections (e) and (f).

### SEC. 4. APPLICATION TO PENDING CASES.

(a) IN GENERAL.—The amendments made by this Act shall apply to any claim arising under section 1605A or 1605(g) of title 28, United States Code, as added by this Act.

(b) PRIOR ACTIONS.—Any judgment or action brought under section 1605(a)(7) of title 28, United States Code, or section 101(c) of Public Law 104-208 after the effective date of such provisions relying on either of these provisions as creating a cause of action, which has been adversely affected on the grounds that either or both of these provisions fail to create a cause of action opposable against the state, and which is still before the courts in any form, including appeal or motion under Federal Rule of Civil Procedure 60(b), shall, on motion made to the Federal District Court where the judgment or action was initially entered, be given effect as if it had originally been filed pursuant to section 1605A(d) of title 28, United States Code. The defenses of res judicata, collateral estoppel and limitation period are waived in any re-filed action described in this paragraph and based on the such claim. Any such motion or re-filing must be made not later than 60 days after enactment of this Act.

────

By Mr. DURBIN (for himself, Mr. OBAMA, and Mr. BROWN)

S. 1945. A bill to provide a Federal income tax credit for Patriot employers, and for other purposes; to the Committee on Finance.

Mr. DURBIN. Mr. President, when companies make headlines today it is often for all the wrong reasons: fraud, tax avoidance, profiteering, etc. Yet many of the companies that are currently providing jobs across America are conscientious corporate citizens that strive to treat their workers fairly even as they seek to create good products that consumers want and to maximize profits for their shareholders. I believe that we should reward such companies for providing good jobs to American workers, and create incentives that encourage more companies to do likewise. The Patriot Employers bill does just that.

This legislation, which I am introducing today along with Senators OBAMA and BROWN, would provide a tax credit to reward the companies that treat American workers best. Companies that provide American jobs, pay decent wages; provide good benefits, and support their employees when they are called to active duty should enjoy more favorable tax treatment than companies that are unwilling to make the same commitment to American workers. The Patriot Employers tax credit would put the tax code on the side of those deserving companies by acknowledging their commitments.

The Patriot Employers legislation would provide a tax credit equal to 1 percent of taxable income to employers that meet the following criteria:

First, invest in American jobs, by maintaining or increasing the number of full-time workers in America relative to the number of full-time workers outside of America, by maintaining their corporate headquarters in America if the company has ever been headquartered in America, and by maintaining neutrality in union organizing drives.

KRISTEN BREITWEISER
PLAINTIFF, MDL 1570

RECEIVED
SDNY PRO SE OFFICE

2025 DEC 30  PM 4: 25

December 23, 2025

Clerk of Court / Pro Se Intake Office / Chambers of Judge George B. Daniels
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re: *In re Terrorist Attacks on September 11, 2001*,
03-MD-1570 (GBD)

**Administrative Request Concerning MDL Oversight and Judicial Process Integrity**

Dear Sir or Madam:

Enclosed please find a **pro se administrative submission** in the above-referenced matter,
consisting of a signed letter and two attached exhibits.

This submission is respectfully provided pursuant to the Court's inherent supervisory authority,
Federal Rule of Civil Procedure 83(b), and 28 U.S.C. § 455(a). **It does not seek merits relief or
advance litigation strategy.**

I respectfully request that the enclosed materials be accepted and placed on the public docket for
MDL 1570.

Thank you for your attention to this matter.

Respectfully submitted,

Kristen Breitweiser
Plaintiff, Pro Se
Email: kdianbreit@aol.com
Phone: 908.902.4545

For Docketing - MDL 1570

Request For Administrative Ruling - MDL 1570

Attention: Clerk For Docketing

RECEIVED
SDNY PRO SE OFFICE
2025 DEC 30 PM 4:25



ORIGIN ID:FNLA (908) 902-4545
KRISTEN BREITWEISER
PLANTIFF MDL 1570
2200 EAGLES NEST DR

LAFAYETTE, CO 80026
UNITED STATES US

SHIP DATE: 23DEC25
ACTWGT: 1.00 LB
CAD: 6570663/ROSA2670

TO  CLERK OF COURT— CIVIL DOCKETING
US DIST—COURT— SOUTH DIST NY
500 PEARL STREET
RM 120
NEW YORK NY 10007
(000) 000-0000      REF: REQ FOR ADMIN RELIEF-- MDL1570

FedEx
Express

FRI — 26 DEC 5:00P
** 2DAY **

TRK# 8873 8363 6602

SS PCTA      Pro se      ASR
10007
NY—US EWR



RECEIVED
SDNY PRO SE OFFICE

2025 DEC 30  PM 4: 25

RECEIVED
DEC 3 0 2025
CLERK'S OFFICE
S.D.N.Y.



Align top of FedEx Express® shipping label here.

TO REUSE: Mark through all previous shipping labels and barcodes.