**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X

In re:

    **TERRORIST ATTACKS ON**
    **SEPTEMBER 11, 2001**

-------------------------------------------------------------------X

```
┌─────────────────────────────┐
│ USDC SDNY                   │
│ DOCUMENT                    │
│ ELECTRONICALLY FILED        │
│ DOC #:                      │
│ DATE FILED:  1/20/2026      │
└─────────────────────────────┘
```

**03-MD-01570 (GBD)(SN)**

**REPORT &**
**RECOMMENDATION**

**SARAH NETBURN, United States Magistrate Judge.**

**TO THE HONORABLE GEORGE B. DANIELS:**

This document relates to:

    Johnson v. Islamic Republic of Iran, No. 18-cv-12344 (GBD)(SN)
    Gaston v. Islamic Republic of Iran, No. 18-cv-12337 (GBD)(SN)

    Twenty plaintiffs seek partial final default judgments against the Islamic Republic of Iran

("Iran") for personal injuries or deaths caused by the 9/11 Attacks. See ECF Nos. 11037

(Johnson Plaintiffs), 11106 (Gaston Plaintiffs).[1] Nineteen Plaintiffs sustained personal injuries as

a result of 9/11 Attacks or developed latent conditions—aerodigestive disorders, cancers, and

other chronic diseases—following 9/11-related environmental exposures. One Plaintiff is the

estate of a first responder who developed fatal medical conditions from similar exposures. Under

the Court's existing personal and latent injury frameworks, Iran is liable to the Plaintiffs. The

Court therefore recommends GRANTING the Plaintiffs' motions.

## BACKGROUND

    The Court assumes familiarity with this multidistrict litigation and summarizes only the

relevant factual and procedural background. On September 11, 2001—and in the days, weeks,

---

[1] Unless otherwise noted, all ECF numbers refer to the main MDL docket, No. 03-md-01570.

and months that followed—ordinary citizens, professionals, and volunteers inhaled a toxic combination of fumes, smoke, and particulates at the three 9/11 crash sites. See Toxins and Health Impacts, 9.11 World Trade Ctr. Health Program, Ctrs. For Disease Control & Prevention (July 30, 2024), https://www.cdc.gov/wtc/exhibition/toxins-and-health-impacts.html. They escaped, dug through, and cleaned up the rubble at Ground Zero and the other sites. Id. In the process, they ingested contaminants loaded with asbestos, silica, metals, concrete, and glass. Id. Many then developed severe medical conditions linked to these exposures—including asthma, gastroesophageal reflux disease ("GERD"), lung diseases, and various types of cancer—that have required extensive medical treatment. The Plaintiffs are among the first responders and civilians who were exposed to the hazardous conditions created by the 9/11 Attacks. They primarily seek recovery for their latent conditions. See, e.g., ECF Nos. 11039-3, 11109-2 (declarations on non-fatal latent conditions); ECF No. 11039-12 (declaration on fatal latent conditions). Certain Plaintiffs seek recovery for personal injuries sustained on 9/11. See ECF Nos. 1.1039-4, 11039-5 (declarations documenting musculoskeletal injuries).

In 2023, the Court determined for the first time that Iran was liable to a group of plaintiffs that succumbed to their latent injuries. See In re Terrorist Attacks on Sept. 11, 2001 ("In re 9/11"), No. 03-md-1570 (GBD)(SN), 2023 WL 2529061 (Mar. 3, 2023) ("Latent Injury I R&R"), report and recommendation adopted, 2023 WL 5109691 (S.D.N.Y. Aug. 9, 2023) ("Latent Injury I Opinion"); see also ECF No. 9216 (addressing supplemental evidence for a subset of latent-injury plaintiffs). The Court then awarded damages to another group of plaintiffs that developed chronic and ultimately fatal medical conditions after 9/11-related environmental exposures. See In re 9/11, No. 03-md-1570 (GBD)(SN), 2025 WL 2166082 (Feb. 28, 2025) ("Latent Injury II R&R"), report and recommendation adopted, 2025 WL 949547 (S.D.N.Y.

Mar. 28, 2025) ("Latent Injury II Opinion"). Late last year, the Court extended these decisions to hold Iran liable to a group of plaintiffs that suffered non-fatal latent injuries. ECF No. 11400 at 20 ("Latent Injury III R&R").

These prior decisions established and elaborated a damages framework for latent injuries by drawing on the Court's framework for personal injury damages. The Court first set out its framework for personal injury damages in Burnett I, ECF No. 5879. The framework divides injuries into three categories with corresponding damages: a baseline award ($7,000,000) for "severe" injuries, a downward departure ($5,000,000) for "significant" injuries, and an upward departure ($10,000,000) for "devastating" injuries. Id. at 6–10. For rare individuals with exceptionally traumatic injuries, the Court has recommended damages above $10 million. See, e.g., ECF No. 5909 at 11–13 (awarding damages of $25,000,000 to a plaintiff whose injuries were "beyond devastating"). Conversely, "[t]he absence of medical records supporting and providing further information regarding an affiant's claims may support a downward departure in an award determination." Burnett I at 9.

For latent injuries, the Court similarly established a baseline damages award of $7 million for the pain and suffering decedents experienced "when they developed 9/11-related illnesses and ultimately died." Latent Injury I R&R at *8. The Court also permitted upward and downward departures for these fatal latent injuries, including an award of $10 million to one plaintiff who died from "devastating" latent injuries. Id. at *9–10. Recently, the Court adopted the same damages framework for plaintiffs seeking recovery for non-fatal latent injuries because those injuries are "serious and painful health conditions that require extensive treatment," and they likewise "force the [p]laintiffs to carry the physical and emotional consequences of the 9/11 Attacks." Latent Injury III R&R at 21.

Finally, because the plaintiffs in Burnett I and Latent Injury I R&R relied on a private right of action that is reserved for United States nationals, military personnel, and government employees, the Court's frameworks thus far have limited recovery to personal- and latent-injury claims by members of those groups. 28 U.S.C. § 1605A(c). Numerous United States nationals have since recovered pain and suffering awards under these frameworks. See, e.g., Burnett II, ECF No. 5888; Burnett III, ECF No. 5909; Ashton I, ECF No. 5914; Burnett IV, ECF No. 5932; Burnett V, ECF No. 7323 (personal injuries); Latent Injury I Opinion at *2; Latent Injury II Opinion at *2 (latent injuries).

## DISCUSSION

The Johnson and Gaston Plaintiffs are all United States nationals who seek to hold Iran liable for their 9/11-related injuries pursuant to § 1605A. To establish their "claim[s] or right to relief by evidence satisfactory to the court," they have filed individual declarations, VCF letters, and medical records that detail their injuries and conditions. 28 U.S.C. § 1608(e); see ECF Nos. 11039-3, 11039-4, 11039-5, 11039-6, 11039-7, 11039-8, 11039-9, 11039-10, 11039-11, 11039-12, 11109-2, 11109-3, 11109-4, 11109-5, 11109-6, 11109-7, 11109-8, 11109-9, 11109-10, 11109-11 (declarations attaching VCF letters and, in some cases, medical records). In evaluating this record, the Court may "accept as true the plaintiffs' uncontroverted evidence," including their affidavits. Elahi v. Islamic Republic of Iran, 124 F. Supp. 2d 97, 100 (D.D.C. 2000); see Weinstein v. Islamic Republic of Iran, 184 F. Supp. 2d 13, 16-17 (D.D.C. 2002).

To grant the Plaintiffs relief, the Court must resolve (1) whether it has jurisdiction over their claims; (2) whether Iran defaulted; (3) whether Iran is liable; and (4) if all else is true, what damages are appropriate.

## I.     The Court Has Jurisdiction Under the FSIA

The Foreign Sovereign Immunities Act ("FSIA") "supplies the ground rules for 'obtaining jurisdiction over a foreign state in the courts of this country.'" Federal Republic of Germany v. Philipp, 592 U.S. 169, 175 (2021) (quoting Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 443 (1989)). As its name suggests, the FSIA makes foreign states immune from suit by default and confers jurisdiction over actions only if they meet strict requirements. The claims of the Johnson and Gaston Plaintiffs clear these hurdles, so the Court has jurisdiction over them.

### A.     Subject Matter Jurisdiction

Under the FSIA, district courts have subject matter jurisdiction over nonjury civil actions brought in personam against foreign states if "one of several enumerated exceptions to immunity applies." Republic of Sudan v. Harrison, 587 U.S. 1, 4 (2019); see 28 U.S.C. §§ 1330(a), 1604. The nature of the Plaintiffs' claims satisfies all elements except immunity. See Latent Injury I R&R at *3; Latent Injury II R&R at *2; In re 9/11, No. 03-md-1570 (GBD)(SN), 2025 WL 807416 at *2 (Feb. 19, 2025) ("Ashton/Burnett R&R"), report and recommendation adopted, 2025 WL 785755 (S.D.N.Y. Mar. 12, 2025) ("Ashton/Burnett Opinion"). The Plaintiffs rely on the immunity exception codified at 28 U.S.C. § 1605A(a),[2] which allows U.S. nationals to hold a foreign state sponsor of terrorism accountable for "acts of terrorism or the provision of material support or resources for acts of terrorism" when those acts are undertaken "by an official,

---

[2] As the Court has previously explained, the elements of § 1605A(a) "almost total[ly] overlap" with the § 1605A(c) cause of action that the Plaintiffs assert here. Latent Injury II R&R at *3 (quoting Force v. Islamic Republic of Iran, 464 F. Supp. 3d 323, 369 (D.D.C. 2020)). The only relevant distinction is that § 1605A(c) applies to a more limited set of plaintiffs than § 1605A(a). See Force, 464 F. Supp. 3d at 369. But a qualifying "plaintiff that offers proof" of one "has also established" the other. Id. The Court has accordingly collapsed the jurisdictional and liability inquiries for § 1605A and discusses both below. It exercises jurisdiction over claims for which it finds the liability requirements satisfied.

employee, or agent of the foreign state while acting within the scope of his or her office, employment, or agency." Burnett I at 2 (citing 28 U.S.C. § 1605A(a)(1)). The Court found that it possessed subject matter jurisdiction under § 1605A because plaintiffs' personal or latent injuries "occurred either as a direct result of the 9/11 attacks, the ensuing chaos from the attacks in the immediate aftermath, or as a result of first responders attempting to assist the injured or endangered fleeing from the scene." Burnett I at 3; see ECF No. 10988 at 2 (personal injuries); Latent Injury II Opinion at *3 (latent injuries). Section 1605A further details that damages are available "for personal injury or death" and allows for "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c)(4). The Johnson and Gaston Plaintiffs seek pain and suffering damages for their personal and latent injuries sustained as a result of the 9/11 Attacks. Accordingly, the Court has subject matter jurisdiction over the Plaintiffs' claims under § 1605A.

**B.    Personal Jurisdiction**

With subject matter jurisdiction established, personal jurisdiction is simply a matter of showing "valid service of process." Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela, 863 F.3d 96, 104 (2d Cir. 2017) (cleaned up); accord 28 U.S.C. § 1330(b). The FSIA specifies four methods of serving foreign states in descending order of preference. See 28 U.S.C. § 1608(a). The first, service by "special arrangement," was impossible because the Plaintiffs have no such arrangement with Iran. Id. § 1608(a)(1); see ECF Nos. 11038 at 11, 11107 at 11. The second, service according to an "international convention on service of judicial documents," was unavailable because there is no service convention between the United States and Iran. 28 U.S.C. § 1608(a)(2); see ECF Nos. 11038 at 11, 11107 at 11. The third, service by registered "mail," proved ineffective; the Clerk of the Court mailed the requisite documents, but Iran failed to acknowledge receipt or refused service. 28 U.S.C. § 1608(a)(3); see No. 18-cv-12344, ECF

No. 11; No. 18-cv-12337, ECF No. 12. The fourth, service via "diplomatic channels," finally succeeded. 28 U.S.C. § 1608(a)(4); see ECF Nos. 11038 at 11–12, 11107 at 11–12; see also Aff. of Service, No. 18-cv-12344, ECF No. 45; Aff. of Service, No. 18-cv-12337, ECF No. 51. Because the Plaintiffs properly effectuated service under 28 U.S.C. § 1608(a)(4) on claims within the Court's subject matter jurisdiction, the Court has personal jurisdiction over Iran.

## II.     Iran Defaulted

After the Plaintiffs effectuated service, Iran had "sixty days" to "serve an answer or other responsive pleading." 28 U.S.C. § 1608(d). Iran did not respond or otherwise appear in that time or since. The Clerk of the Court therefore entered Certificates of Default against Iran on September 6, 2022 (Johnson) and November 13, 2023 (Gaston). See Clerk's Certificate of Default, No. 18-cv-12344, ECF No. 48; Clerk's Certificate of Default, No. 18-cv-12337, ECF No. 92.

## III.    The Plaintiffs Establish Liability Under § 1605A

The Plaintiffs request liability judgments. See ECF Nos. 11038 at 19, 11107 at 19. Section 1605A(c) provides a cause of action for claims (1) brought by a United States national or her representative (2) against a designated state sponsor of terrorism that (3) directly, or through a state official, employee, or agent, committed or provided material support or resources for (4) "an act of torture, extrajudicial killing, aircraft sabotage, or hostage taking" that (5) caused (6) personal injury or death.[3] 28 U.S.C. § 1605A(a)(1), (c).

---

[3] The courts are split as to the requirements of § 1605A(c). Some say that the provision requires plaintiffs to articulate a claim sounding in tort. In Friends of Mayanot Inst., Inc. v. Islamic Republic of Iran, 313 F. Supp. 3d 50 (D.D.C. 2018), for example, the district court explained that "[i]n order to satisfy the statutory elements of causation and injury, plaintiffs in actions arising under companion [§] 1605A(c) 'must articulate the justification for such recovery, generally through the lens of civil tort liability.'" Id. at 61 (quoting Rimkus v. Islamic Republic of Iran, 750 F. Supp. 2d 163, 176 (D.D.C. 2010)). On this interpretation, "a claimant 'must identify a particular theory of tort liability—e.g., intentional infliction of emotional distress, wrongful death, [or] battery'"—to properly pursue a § 1605A(c) claim. Id. (quoting Stansell v. Republic of Cuba, 217 F. Supp. 3d 320, 341 (D.D.C. 2016)). Other courts simply analyze the

The Plaintiffs' claims easily meet five of these six elements. First, the Plaintiffs were all U.S. citizens on September 11, 2001. See ECF Nos. 11040-2, 11040-3, 11110-2 (listing "Nationality on 9/11" as "US" for each Plaintiff or decedent). Second, Iran has been a designated state sponsor of terrorism since 1984. State Sponsors of Terrorism, Bureau of Counterterrorism, U.S. Dep't of State, https://www.state.gov/state-sponsors-of-terrorism (last visited Jan. 15, 2026). Third, Judge Daniels held a hearing on the adequacy of the evidence of Iran's culpability and found that "Iran provided direct support to Al Qaeda specifically for the [9/11 Attacks]." In re 9/11, No. 03-md-01570, 2011 WL 13244047, at *40 (S.D.N.Y. Dec. 22, 2011) ("Havlish I"). He then held that the evidence satisfied 28 U.S.C. § 1608(e)'s requirements for a default judgment. See id. at *39. The Plaintiffs' motions incorporate that evidence. See, e.g., ECF Nos. 11038 at 17–19, 11107 at 17–19. And the Court has granted numerous motions on that same evidence. See, e.g., Latent Injury I Opinion at *2 (adopting Latent Injury I R&R at *4); Latent Injury II Opinion at *2 (adopting Latent Injury II R&R at *4); see also Anderson v. Islamic Republic of Iran, 753 F. Supp. 2d 68, 75 (D.D.C. 2010) (permitting courts "in subsequent related cases to rely upon the evidence presented in earlier litigation . . . without necessitating the formality of having that evidence reproduced" (quoting Rimkus, 750 F. Supp. 2d at 172)). Fourth, "the 9/11 attacks and the resulting death constitute 'extra judicial killings.'" Havlish I at *39 (quoting 28 U.S.C. § 1605A(c)). As to the sixth element, the Plaintiffs suffered the injuries documented in their declarations, VCF letters, and medical records. See ECF Nos. 11039-3,

---

elements of § 1605A(c) as written in the statute, using background tort principles where necessary or useful. See, e.g., Roberts v. Islamic Republic of Iran, 581 F. Supp. 3d 152, 173 (D.D.C. 2022) (analyzing § 1605A(c) claims without referencing theory of tort liability).

As in prior decisions, the Court declines to recommend one or the other approach at this time because the choice is not outcome determinative. See, e.g., Latent Injury II R&R at *3 & n.3; Latent Injury III R&R at 9 & n.5. Out of caution and where helpful, the Court draws on both approaches to analyze liability.

11039-4, 11039-5, 11039-6, 11039-7, 11039-8, 11039-9, 11039-10, 11039-11, 11109-2, 11109-3, 11109-4, 11109-5, 11109-6, 11109-7, 11109-8, 11109-9, 11109-10, 11109-11. One estate seeks recovery for the decedent's fatal latent condition. See ECF No. 11039-12.

The main question is whether the Plaintiffs can show causation under § 1605A(c). Courts interpret § 1605A(c) causation using "well-established principles of law, such as those found in [the] Restatement (Second) of Torts and other leading treatises." Bodoff v. Islamic Republic of Iran, 907 F. Supp. 2d 93, 103 (D.D.C. 2012) (cleaned up). Those principles require plaintiffs to demonstrate "proximate cause," Roberts, 581 F. Supp. 3d at 170, a characteristically opaque term for "scope of liability," Restatement (Third) of Torts: Liab. for Physical & Emotional Harm Ch. 6, Special Note on Proximate Cause (Am. Law Inst. 2010). Because the Plaintiffs assert three distinct types of claims, the appliable prior decisions differ by claim. The following sub-sections address the causation element for each claim type.

### A.    Personal Injuries

Two Johnson Plaintiffs seeks compensation for personal injuries sustained on 9/11, in addition to non-fatal latent conditions they developed months and years later. See ECF Nos. 11039-4 at 5 (Blackmon), 11039-5 at 6 (Brown). In many prior decisions, the Court has held Iran liable to U.S. nationals that suffered personal injuries on the day of the 9/11 Attacks, based on its Havlish I findings and the order granting the Burnett Plaintiffs' default judgment as to liability. See ECF No. 3443 (Burnett liability judgment); Ashton/Burnett R&R at *3 (finding causation element satisfied for the Burnett Plaintiffs). These Johnson Plaintiffs' claims therefore plainly satisfy the causation element.

### B.    Fatal Latent Injuries

One Johnson Plaintiff, the Estate of Albert Filosa (the "Filosa Estate"), seeks recovery for Filosa's latent injuries and subsequent death. See ECF No. 11039-12 ¶ 15. In a recent line of

9

decisions, the Court held that Iran proximately caused the latent injuries and deaths that flowed

from the 9/11 Attacks. See Latent Injury I Opinion at *2; Latent Injury II Opinion at *2.

Applying the two-pronged test from Owens v. Republic of Sudan to fatal latent injuries, the

Court explained that proximate cause exists where the plaintiffs show that (1) the defendant's

actions were a "'substantial factor' in the sequence of events that led to" their latent injuries, and

(2) their latent injuries were "reasonably foreseeable or anticipated as a natural consequence" of

the defendant's conduct. 864 F.3d 751, 794 (D.C. Cir. 2017) (quoting Rothstein v. UBS AG, 708

F.3d 82, 91 (2d Cir. 2013)), vacated and remanded on other grounds by Opati v. Republic of

Sudan, 590 U.S. 418 (2020).

First, the Court found that Iran's tortious conduct was a "substantial factor" that led to the

deaths of the latent injury decedents. See Latent Injury I R&R at *5–6; Latent Injury I Opinion at

*2; Latent Injury II R&R at *5; Latent Injury II Opinion at *2. The Court relied on VCF letters[4]

and affidavits from the decedents' surviving family members to reach its conclusions. Latent

Injury I R&R at *5–6; Latent Injury II R&R at *5. The VCF letters reflected the VCF's

conclusion that the decedents' injuries were a "direct result" of the 9/11 Attacks. 28 C.F.R. §

104.2(b). The Court endorsed "the quality of th[ose] conclusions" and "accept[ed]" the letters

"as evidence establishing that 9/11 was a substantial factor leading to the Latent Injury

Decedents' medical conditions." Latent Injury I R&R at *5. Family members' declarations then

established "that 9/11 was a substantial factor also in [the decedents'] deaths" by demonstrating

"in moving detail how those conditions eventually cut [the decedents'] lives short." Id. at *5–6;

---

[4] Congress created the current Victim Compensation Fund ("VCF") to provide compensation to those
injured because of the 9/11 Attacks and has reauthorized it several times. See Latent Injury III R&R at 2–
3 (providing background on the VCF and WTCHP). VCF regulations determine whether claimants are
eligible for compensation for their injuries. See id. at 3–4. To qualify, a claimant must be examined by the
WTCHP or a private physician, obtain a certification that 9/11-related exposures likely caused their
injuries, and receive a VCF letter confirming their eligibility for compensation. See id. at 3 n.2, 4.

Latent Injury II R&R at *5. The Court also credited the latent injury decedents' "Award Detail" letters, which demonstrated that they each received a VCF award for both a "personal injury" claim and a "deceased claim." Latent Injury II R&R at *5. Those letters buttressed the decedents' "substantial factor" argument. Id.

Second, the Court found that the latent injury decedents' deaths were a "reasonably foreseeable" consequence of Iran's material support for al Qaeda. Owens, 864 F.3d at 794; see Latent Injury I R&R at *5–6; Latent Injury I Opinion at *2; Latent Injury II R&R at *5; Latent Injury II Opinion at *2. Because "Iran's material support for al Qaeda proximately caused the 9/11 Attacks and resulting deaths," the Court reasoned, the plaintiffs' latent injury deaths were "necessarily" reasonably foreseeable. Latent Injury I R&R at *6 (citing Havlish I at *41). With both Owens factors satisfied, the Court accordingly found that Iran proximately caused the plaintiffs' injuries and deaths. See Latent Injury I R&R at *5–6; Latent Injury II R&R at *5.

The Filosa Estate similarly demonstrates that Iran's tortious conduct was a "substantial factor" in the events leading to Albert ("Al") Filosa's death and that his death was a "reasonably foreseeable" consequence of Iran's actions. Owens, 864 F.3d at 794. First, the Court already found that Iran's "provision of material support to al Qaeda" was a substantial factor leading to the 9/11 Attacks. Havlish I at *41. The critical step is connecting the 9/11 Attacks to Al's latent injuries and death. See Latent Injury I R&R at *5. The Filosa Estate does so by furnishing a VCF letter reflecting the agency's conclusion that Al's injuries were a "direct result" of the 9/11 Attacks. 28 C.F.R. § 104.2(b); see ECF No. 11039-12 at 7 (listing conditions). The declaration of Julia Filosa, Al's surviving spouse, then recounts in detail Al's pain and suffering and confirms that Al died from his 9/11-related and VCF-certified injuries. See ECF No. 11039-12 at 2–6, 9

(attaching a certificate of death). The Court credits these submissions together[5] as "evidence

establish[ing] that Iran's conduct was a substantial factor leading to the Latent Injury Decedents'

deaths," including Al's death. Latent Injury I R&R at *6. Second, Al's death, just like the deaths

of previous latent injury plaintiffs, was "necessarily" a reasonably foreseeable consequence of

Iran's material support for al Qaeda. See Latent Injury I R&R at *6 (citing Havlish I, 2011 WL

13244047 at *41). The Filosa Estate's claim therefore passes both prongs of the Owens test for

proximate causation.

### C.    Non-Fatal Latent Injuries

A majority of the Johnson Plaintiffs and all of the Gaston Plaintiffs seek recovery for

non-fatal latent conditions linked to environmental exposures on or immediately after 9/11. See,

e.g., ECF Nos. 11039-6 at 6 (Fargione), 11039-7 at 6 (D. Gough), 11109-3 at 5 (Blacksberg),

11109-5 at 5 (C. Kelly). Based on its decisions on fatal latent injuries, the Court recently held

that, under the two-pronged Owens test, Iran also proximately caused non-fatal latent injuries.

Latent Injury II R&R at 13–20.[6] First, Iran's conduct was a substantial factor in the events

leading to the plaintiffs' latent injuries because the plaintiffs each filed VCF letters confirming

their eligibility, under applicable laws and regulations, for compensation from their non-fatal

latent conditions. Id. at 14. The Court reaffirmed that VCF determination letters provide

evidence establishing the substantial-factor prong. Id. Second, the Court concluded that, like fatal

---

[5] When a plaintiff's VCF letter does not indicate what type of claim—a "personal injury claim" or a "deceased claim"—for which the VCF found the plaintiff eligible, the Court has required additional evidence to connect the plaintiff's VCF-certified conditions to their death, such as a surviving family member's affidavit and a death certificate. See Latent Injury I R&R at *6; Latent Injury II R&R at *5 & n.4. Al's VCF letter does not specify whether he was found eligible for a "deceased claim," but Julia's declaration and Al's death certificate are sufficient for connecting Al's 9/11-related latent conditions to his death.

[6] No party filed objections to the Court's Report & Recommendation by the deadline of November 26, 2025. See Latent Injury III R&R at 39.

latent conditions, the plaintiffs' non-fatal latent conditions were a "reasonably foreseeable" consequence of Iran's material support to al Qaeda and the resulting destruction, rescues, and recovery effort. Id. at 17 (citing Latent Injury I R&R at *6). Under the broad standard of intentional tort law, the plaintiffs that were "removed a step or two from the exact time and location of the Attacks," but otherwise VCF-certified, still had reasonably foreseeable injuries for which Iran was liable.[7] Id. at 17–18.

Consistent with past decisions, the Johnson and Gaston Plaintiffs show that Iran proximately caused their non-fatal latent injuries. First, these Plaintiffs each submitted VCF determination letters stating that the Plaintiffs were "found eligible for the following injuries" and listing out the (often multiple) latent conditions. See ECF Nos. 11039-3, 11039-5, 11039-6, 11039-7, 11039-8, 11039-9, 11039-10, 11039-11, 11109-2, 11109-3, 11109-4, 11109-5, 11109-6, 11109-7, 11109-8, 11109-9, 11109-10, 11109-11 (attaching VCF letter for each Plaintiff to their declaration). The letters demonstrate that, according to the VCF, the Plaintiffs suffered "physical harm . . . as a direct result of the [9/11] crashes or the rescue and recovery efforts or debris removal." 28 C.F.R. § 104.2(b)(1). This evidence is enough to meet the "substantial factor" prong under the familiar Owens test. See Latent Injury I R&R at *5–6; Latent Injury I Opinion at *2; Latent Injury II R&R at *4–5; Latent Injury II Opinion at *2; Latent Injury III

---

[7] In prior orders, the Court also declined to find Iran liable for emotional distress suffered by the surviving family members of latent injury decedents. See Latent Injury I Opinion at *2; Latent Injury II Opinion at *3–4. While surviving family members' harms are significant, the Court determined they "no longer have the 'reasonable connection' to the Defendant's conduct that proximate cause requires for holding Defendant liable for such harms." Latent Injury I Opinion at *2 (quoting Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc., 191 F.3d 229, 235 (2d Cir. 1999)). The chain of causation linking Iran to the surviving family members' claims for solatium damages was too attenuated to permit recovery. See Latent Injury I Opinion at *2; Latent Injury II Opinion at *3–4 (reaching the same conclusion despite plaintiffs' new arguments for recovery). In contrast, the Court could "draw a more direct line from the 9/11 Attacks to the Plaintiffs' injuries" in the most recent case of the plaintiffs who developed non-fatal latent conditions from exposure on or immediately after the 9/11 Attacks. Latent Injury III R&R at 19–20.

R&R at 14 (reaffirming that "[t]he VCF and WTC Health Program remain the best positioned entities for evaluating medical facts related to the Plaintiffs' conditions").

Second, the Johnson and Gaston Plaintiffs' latent injuries were a "reasonably foreseeable" consequence of Iran's material support to al Qaeda. The Court has already found that deaths from latent injuries were necessarily reasonably foreseeable. See Havlish I at *41; Latent Injury I Opinion at *2; Latent Injury II Opinion at *2. These Plaintiffs' non-fatal latent injuries are "not legally distinct." Latent Injury III R&R at 16. The declarations of most Plaintiffs confirm that the exposures leading to their latent conditions "occurred either as a direct result of the 9/11 attacks, the ensuing chaos from the attacks in the immediate aftermath, or as a result of first responders attempting to assist the injured or endangered fleeing from the scene." Burnett I at 3; see Latent Injury I R&R at *9–10 (recommending awards to plaintiffs that suffered devastating or severe, and ultimately fatal, latent conditions stemming from their rescue work at Ground Zero on 9/11); Latent Injury III R&R at 17 (finding that plaintiffs "that escaped from the [World Trade Center ("WTC")] site, or aided in the rescue and recovery efforts there, on September 11 plainly clear the 'reasonably foreseeable' bar"). Causation is therefore satisfied.

Certain Johnson and Gaston Plaintiffs were present at the WTC site or Fresh Kills Landfill only on September 12th or later. See, e.g., ECF No. 11039-8 ¶ 4 (R. Gough); ECF No. 11109-6 ¶ 4 (M. Kelly). Under VCF regulations, all of these Plaintiffs were still present at a "9/11 crash site" in the "immediate aftermath" of the 9/11 Attacks. See 28 C.F.R. §§ 104.2(b)(1), (j) (defining the "9/11 crash site" to include areas hit by the plane crashes, plus a defined exposure zone on Lower Manhattan and "[a]ny area related to, or along, routes of debris removal, such as barges and Fresh Kills"); id. § 104.2(c) (defining the "immediate aftermath" as any period between September 11, 2001, and May 30, 2002). Consistent with the logic of the

Court's most recent decision, (1) these Plaintiffs' VCF-certified injuries are similar to those of prior plaintiffs who received awards, and (2) tort law's broad liability for intentional torts favors granting recovery for these Plaintiffs. See Latent Injury III R&R at 17–19 (citing Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 33 (Am. Law Inst. 2010); 28 C.F.R. §§ 104.2(b)(1), (c), (j); and 49 U.S.C. § 40101 note). As a result, the Court holds that these Plaintiffs' claims clear the reasonably-foreseeable bar.

Accordingly, all of the Plaintiffs' claims, across the above three categories, satisfy both the "substantial factor" and "reasonably foreseeable" requirements, so the Court concludes that Iran proximately caused their personal and latent injuries. Owens, 864 F.3d at 798. The Court therefore has subject matter jurisdiction under § 1605A(a) and personal jurisdiction over Iran. As a result, Iran is liable for the Plaintiffs' 9/11-related injuries under § 1605A(c). The Court recommends granting the Plaintiffs' motions for default judgment.

## IV.    The Appropriate Damages Framework and Individual Applications

The only remaining question is damages. The Johnson and Gaston Plaintiffs seek pain and suffering damages traceable to the personal or latent injuries they sustained because of the 9/11 Attacks. See ECF Nos. 11037 at 1–2, 11106 at 1. As explained above, the Plaintiffs' claims implicate the Court's existing frameworks for (1) personal injury damages, as established in Burnett I; and (2) latent injury damages, established in Latent Injury I R&R for fatal latent conditions and extended in Latent Injury III R&R to non-fatal latent conditions. Both frameworks use a three-pronged system: a baseline award ($7,000,000) for "severe" injuries, a downward departure ($5,000,000) for "significant" injuries, and an upward departure ($10,000,000) for "devastating" injuries. Burnett I at 6–10; Latent Injury I R&R at *8–9; Latent Injury III R&R at 20–21. The Johnson and Gaston Plaintiffs propose a baseline award of $7 million for each Plaintiff, including the Filosa Estate. See ECF Nos. 11039-1 at 2, 11039-2 at 2,

11109-1 at 2. As support for their claims, many Plaintiffs submitted only their sworn declarations and VCF eligibility letters and did not include citizenship records or detailed medical records. See, e.g., ECF Nos. 11039-3 (Arthur), 11109-3 (Blacksberg). The Court therefore analyzes each of the Plaintiffs' claims for pain and suffering individually based on the applicable framework. See Burnett I at 9 ("The absence of medical records supporting and providing further information regarding an affiant's claims may support a downward departure in an award determination.").

### A.    **Johnson Plaintiffs**

#### 1.    **Gary Arthur**

Gary Arthur, a police officer with the New York Police Department ("NYPD"), was mid-patrol on the morning of 9/11 when he heard on the radio that a plane had hit the WTC. ECF No. 11039-3 ¶ 3. He returned to his precinct and was assigned responsibility for emergency communications, but he remained at the precinct that day. Id. The next day, he "was sent to Ground Zero as part of crime scene security." Id. ¶ 4. He recalls the "ankle deep" debris at the site and the "ash, soot, and paper particles" filling the air that day and "for weeks after the attacks." Id. Arthur performed security detail at Ground Zero for the next two months and worked on "twelve-hour shifts which generally lasted longer than twelve hours." Id. The only protective equipment his detail received were paper masks (provided in their "second week at Ground Zero") and "masks with filters" (distributed "[a] few weeks later"). Id. ¶ 5. Arthur notes that Ground Zero "continued to burn [the] entire time [he] was there." Id. ¶ 4.

Several months after he left the site, Arthur reports that he developed respiratory problems (including "irritation of my nose and throat and . . . shortness of breath") and started seeing his primary care doctor for these symptoms. Id. ¶ 6. The VCF eventually found Arthur eligible for compensation for "asthma, unspecified, unspecific status" and "chronic rhinitis." Id. at 4–5. Because Arthur has suffered from "significant respiratory ailments including nasal

irritations, . . . [and] asthma" from inhaling "smoke, soot, and dust," Burnett I at 6–7, the Court recommends a $5 million award for his latent injuries.

### 2. Anthony Blackmon

On 9/11, Anthony Blackmon was a police officer with the NYPD assigned to "headquarters security at One Police Plaza, eight blocks from the WTC." ECF No. 11039-4 ¶ 2. Blackmon was recovering from a surgery to his right knee that he underwent the previous winter, so he was on "light duty." Id. ¶ 3. When the NYPD was mobilized throughout the City, Blackmon remembers his sergeant telling him to "'drop the cane[,]' we are going to the WTC." Id. He followed orders and rushed to the WTC with his fellow officers. Id.

Blackmon did not make it to the site. The first tower came down when Blackmon and his unit were "within two blocks of the WTC." Id. ¶ 4. They turned around to "avoid the avalanche of dust and debris" rapidly heading toward them. Id. As Blackmon ran to escape the debris, he "felt a sharp pop in [his] right knee" that turned into a "sharp pain" as his knee "began to crack." Id. Now covered in debris, Blackmon realized that he "was not able to walk, much less run, with [his] knee in this condition." Id. Two officers assisted Blackmon back to the station and took him to the triage area for treatment. By that time, "[his] right knee was swollen to twice its normal size." Id. Despite his injury, Blackmon remained in the triage area assisting others as he could until other responders helped him return home that night. Id.

The next day, Blackmon was "unable to walk." Id. ¶ 5. He saw the same doctor that performed his surgery, and that doctor diagnosed him with a severe sprain of his right knee. Id. As a result, Blackmon was placed on medical leave for three weeks and returned to One Police Plaza on restricted duty for the remainder of 2001. Id. After receiving approval for "accident disability retirement," Blackmon eventually retired from the NYPD in early 2002. Id.

Since leaving the NYPD, Blackmon has "undergone multiple knee injections and additional knee surgery." Id. ¶ 6. His physician informed him that he will eventually need knee replacement surgery. Id. Blackmon's VCF letter confirms his eligibility for compensation for the severe sprain of his right knee. Id. at 5. Blackmon also reports that he "developed rhinitis affecting my nose and throat and obstructive sleep apnea," id., but his VCF letter does not confirm these reported injuries. The Court therefore recommends that Blackmon receive a $5 million award for his VCF-approved knee injury because it fits within the category of "significant orthopedic injuries such as strains, sprains, or fractures that cause continuing intermittent plain and may require surgery." Burnett I at 7.

### 3.    Joanne Brown

On 9/11, Joanne Brown was an NYPD detective assigned to the Missing Persons Unit at One Police Plaza and one of the first professionals to respond to the attacks. ECF No. 11039-5 ¶ 3. She was assisting the medical triage operation across the street from the WTC when the towers began to collapse. Id. ¶ 4. She fled down Dey Street but was "quickly overtaken by a massive cloud of dust and debris" and stopped because she could not see ahead of her. Id. She was "covered with smoke, ash, and any substances that had become airborne with the collapse of the tower," including "asbestos" and "fiberglass particles." Id. ¶ 6. She recalls that a man "ran into me from behind, knocking me to the ground, and landing on top of me." Id. ¶ 4. That man remained on top of Brown "sheltering [her] somewhat from the debris that was falling everywhere," id., but falling debris still struck her. Id. ¶ 6. After ten minutes, they were both able to get up and continue evacuating the area. Id. As she worked to clear the area of civilians, Brown received an alert that the other tower was about to collapse. Id. This "caused everyone to flee for their lives." Id. ¶ 6. Brown took shelter in an alleyway on John Street with two other

officers but saw "an avalanche of dust and debris headed towards [them]." Id. ¶ 4. After shielding herself from the "initial cloud," Brown followed the voice of an NYPD Lieutenant calling out for survivors, but when she reached him, she "lost consciousness." Id.

Brown awoke "wearing an oxygen mask" with "no idea where [she] was." Id. ¶ 5. She eventually discovered she was "in a shelter twenty feet below street level," and she navigated back to police headquarters. Id. Once there, Brown cleaned up and changed clothes but began to feel "a sharp pain in [her] back and neck." Id. She remembers crying when a coworker asked if she was alright. Id. And she recounts "shouting about an older woman who was sitting on the sidewalk when the tower began to collapse that [the officers] were unable to help when [they] were forced to run for [their] lives." Id. Brown was taken to Beekman Downtown Hospital for treatment and eventually released. Id. She returned to police headquarters later in the day on 9/11 and continued to report for duty until October 1, 2001. Id. After taking two weeks of sick leave in early October, Brown worked as a police detective until retiring on January 16, 2002. Id.

Brown describes her experience running from both collapsing towers on 9/11 as "equally terrifying." Id. ¶ 6. She suffered "physical injuries to [her] neck, shoulders, and back." Id. Brown also reports that she has "suffered every day since 9/11 with [post-traumatic stress disorder ("PTSD")] as a result of the traumatic events [she] experienced and the horrific sights [she] saw." Id. Her VCF letter confirms her eligibility for compensation for a number of conditions: asthma; chronic cough syndrome; chronic nasopharyngitis; chronic respiratory disorder from fumes and vapors; chronic rhinosinusitis; chronic obstructive pulmonary disease ("COPD"); GERD; obstructive sleep apnea; musculoskeletal disorders of the neck, back, and shoulders; traumatic bilateral carpal tunnel syndrome; acute medial nerves and neck disk disease; reactive airways dysfunction syndrome; and upper airway hyperactivity. Id. at 6–7. Brown attaches a

letter from the WTC Health Program ("WTCHP") certifying her asthma, GERD, and "Mental Health" (which she refers to as PTSD). Id. at 8–9. She also includes medical records confirming multiple surgeries on her shoulders, back, and neck between 2002 and 2016. Id. at 10–18.

Brown's VCF-certified injuries include both personal injuries sustained on 9/11 and latent conditions that she developed in the months and years following the Attacks. Her injuries to her neck, back, and shoulders (which required multiple documented surgeries) are the type of "severe orthopedic trauma" and "significant injuries from falling, being buried, or being trampled" for which the Court has authorized the baseline award. Burnett I at 7. Brown has also suffered from a number of "significant respiratory ailments" due to her exposure to dust and debris at Ground Zero on the day of the attacks. Id. at 6–7. The Court therefore recommends a $7 million award for her "severe" injuries.

### 4. Carl Fargione

Carl Fargione was a firefighter with the New York City Fire Department ("FDNY") on 9/11. ECF No. 11039-6 ¶ 3. He was off duty on the morning of the attacks but drove to his assigned firehouse in Brooklyn after he saw the plane strike the second tower. Id. ¶ 4. He eventually reached Ground Zero in the early afternoon. Id. ¶¶ 4–5. At the site, Fargione "trudged through ash and debris that was ankle deep, and in some places deeper" and smelled "smoke and acrid fumes" that were "unforgettable." Id. ¶ 5. When WTC Building 7 collapsed, Fargione was able to escape "the falling debris and the cloud that it created," but he recalls a "surreal" scene afterwards, with burning piles of rubble "several stories high" and debris "strewn as far as you could see in every direction." Id. Fargione and his colleagues worked through the afternoon and into the night to search for survivors. Fargione arrived home, "covered with ash and soot, at 1:00

or 2:00 a.m." Id. ¶ 6. He learned that many fellow firefighters, including a close friend from the same Engine Company, lost their lives that day. It was "an indescribably difficult time." Id.

Fargione continued to work at Ground Zero on September 12, 2001, and for the following three months in "long shifts five days a week." Id. ¶ 7. He worked "on the bucket brigade and searched underground below the collapsed towers for the remains of the victims." Id. ¶¶ 7–8. He did this work without "respirators or other protective equipment or clothing other than our firefighting gear." Id. ¶ 7. Like the other responders, Fargione "developed a persistent cough" that did not go away. Id.

Fargione first noticed "truly adverse health issues" in 2008. Id. ¶ 9. After being examined, a doctor told him that he had nodules on his lungs and severe emphysema, which meant he "likely could not tolerate any additional smoke inhalation from active duty." Id. As a result, Fargione retired from the FDNY after 25 years of service. Id. His VCF letter confirms his eligibility for simple chronic bronchitis, other chronic bronchitis, unspecified sinusitis, emphysema, and esophageal reflux. Id. at 6–7. Because Fargione has suffered from "significant respiratory ailments including nasal irritations, chest pain, and asthma from inhalation of smoke, soot, and dust," Burnett I at 6–7, the Court recommends a $5 million award.

### 5.    Dawn Gough

On 9/11, Dawn Gough was a school crossing guard employed by the Lakehurst Police Department. ECF No. 11039-7 ¶ 3. After she had supervised all her children that morning, she watched on the television as "the second plane hit the other tower and realized that we were under attack." Id. ¶¶ 3–4. Dawn called her husband, who was a paramedic at Monmouth Ocean Hospital Service, and offered her services as a trained emergency medical technician. Id. ¶ 5. Later that afternoon, she went to her husband's office and was placed on standby. Id. She does

"not recall any other details that day other than the drive home that evening." Id. On September 14, 2001, Dawn and her husband volunteered to help with the recovery effort, and they were assigned "to the pit to assist on the bucket brigade moving debris and evidence off the pile" at Ground Zero. Id. ¶¶ 6–7. Dawn recalls walking "through ankle deep gray mud from the dust and debris from the collapse of the buildings." Id. ¶ 6. She worked for 16 hours that day and rode back home with her husband "in silence." Id. ¶ 7. From September 16 to October 24, 2001, Dawn also volunteered at the Fresh Kills Landfill in Staten Island. Id. ¶ 8.

Dawn began "coughing up thick, gray phlegm and mucus" on September 14 and for weeks afterward. Id. ¶ 9. She also began "experiencing nightmares of the incident and deployments" and having "olfactory flashbacks" (causing her to "smell the strong odors from the pit and from Staten Island"). Id. She has "been in therapy for many years trying to deal with the things [she] saw and experienced at Ground Zero and the landfill." Id. Dawn's VCF letter confirms her eligibility for compensation for asthma, esophageal reflux, chronic rhinitis, and chronic laryngitis. Id. at 6–7. She attaches a WTCHP letter that certifies her for treatment for several other conditions: GERD, upper respiratory disease, obstructive airway disease, obstructive sleep apnea, and PTSD. Id. at 8–9. The Court finds that Dawn's VCF-approved injuries are significant and therefore recommends a $5 million award. See Burnett I at 6–7.

### 6. Raymond Gough

Raymond Gough was a paramedic and manager at Monmouth Ocean Hospital Service on 9/11. ECF No. 11039-8 ¶ 3. He "was attending an association meeting at a hotel in Monmouth County" when he heard that planes had hit the WTC. Id. His association's president told everyone "to go to our operation bases and prepare for emergency deployment." Id. That day, Raymond was responsible for "the logistics of getting the ambulances and trucks to where

patients were expected to be brought from the WTC" and for "securing spare ambulances and supplies and coordinating their distribution through the communications center." Id. ¶ 4.

Raymond also volunteered with his wife Dawn on September 14, 2001, for "sixteen hours." Id. ¶¶ 4, 6. He ended up working in the pit "to help remove debris to make a path for the bucket brigade" to sift through the rubble. Id. ¶ 5. Raymond wore a respirator he had brought with him "approximately 10 percent of the time" but reports that the respirator was "very difficult to work in," was "extremely hot," and made it "impossible to communicate." Id. Raymond also states that the Environmental Protection Agency told him and others "that the air quality was good," so he was "not as concerned as [he] would have been otherwise." Id. Like his wife, Raymond then worked at Fresh Kills from September 16 to October 24, 2001. Id. ¶ 6. He recalls that during his time at the landfill he "recovered human remains including soft tissue, bone and on one occasion a left arm, shoulder to fingertips." Id.

Raymond developed a cough "[t]he first day [he] worked at Ground Zero," and the cough "stayed for a long time after [he] had left both Ground Zero and the landfill." Id. ¶ 7. He also struggled with PTSD. He has "experienced flashbacks through all [his] senses, visual, auditory, olfactory, and tactile," as well as nightmares and night terrors. Id. Before beginning treatment, he attempted suicide. Id. In 2003, he received a PTSD diagnosis and began "seven years of therapy and medication." Id. Despite the treatment, Raymond still struggles with PTSD to this day. Id.

Raymond's VCF letter confirms his eligibility for compensation for a number of conditions: chronic airway obstruction, chronic laryngitis, chronic nasopharyngitis, chronic rhinitis, esophageal reflux, chronic bronchitis, chronic sinusitis, and obstructive sleep apnea. Id. at 6–7. He states that he was also diagnosed with reactive airways dysfunction syndrome and PTSD, id. ¶ 10, but he does not provide any documentation supporting those diagnoses. The

Court therefore finds that Raymond's VCF-certified injuries are significant and recommends a $5 million award. See Burnett I at 6–7.

### 7.    Robert Intartaglio

On 9/11, Robert Intartaglio was a police officer with the NYPD on election duty at PS 29 in Staten Island. ECF No. 11039-9 ¶ 2. He received notice of the department-wide mobilization and was assigned to provide security to a National Grid Gas facility in Staten Island (in case there were "additional attacks on New York's infrastructure"). Id. Intartaglio remained at the facility until he was relieved "sometime late that evening." Id. Intartaglio then worked at Ground Zero and at Fresh Kills Landfill during the following weeks. From September 12 to 24, 2001, he worked nine 12-hour shifts at Ground Zero. Id. ¶ 3. He performed multiple jobs: "working on the bucket brigade looking for evidence and human remains," "perimeter security," and "escorting civilians into and out of buildings that had not been destroyed" so they could collect the essential items they abandoned on 9/11. Id. Intartaglio recalls that the entire area was burning and "gray ash was falling from the sky to such an extent that it appeared as if it was snowing." Id. He received no protective gear but saw "crews from Con Edison wearing full protective suits with masks and face shields." Id. Intartaglio then worked six shifts at Fresh Kills Landfill from September 25 to October 3, 2001. Id. ¶ 4. He "sift[ed] through the material that had been brought in from Ground Zero looking for evidence and the remains of victims of the attacks." Id.

Intartaglio reports that during his shifts, he "began having difficulty breathing, chest and back pain, and flu-like symptoms." Id. ¶ 5. He was eventually hospitalized on October 18, 2001. Id. He was diagnosed with pneumothrax and pneumonia, his chest was drained of fluid, and he received antibiotics and morphine (which continued for several weeks). Id. Intartaglio learned that he suffered from empyema, a condition "where pus accumulates in the pleural area between

the lungs and the chest wall." Id. He was eventually discharged on October 27, 2001, remained on sick leave until December 18, and returned to full duty on January 3, 2002. Id. Since 2002, Intartaglio has suffered from chest pain, shortness of breath, and soreness in his nose and mouth. His VCF letter certifies his asthma, chronic rhinitis, and esophageal reflux. Id. at 5–6. He did not submit medical records substantiating any of his other reported conditions. The Court therefore finds that Intartaglio's VCF-certified injuries are significant and recommends a $5 million award. See Burnett I at 6–7.

### 8. Adam Noble

On the morning of 9/11, Adam Noble was preparing for his day as an emergency medical technician and operator for Citywide Mobile Response ("CMR"), a private ambulance company. ECF No. 11039-10 ¶ 3. As he and his partner drove to Bellevue Hospital, Noble heard that a second plane had struck the WTC. At Bellevue, he was eventually able to inform CMR that he and his partner would head to the WTC. Id. They made it "within two blocks" when firefighters flagged them down to transport an emergency patient with a broken femur to St. Vincent's Hospital. Id. ¶ 4. They did so and then returned to the WTC. Id. On his second arrival to the WTC, Noble saw one of his CMR coworkers entering the lobby of the north tower, and he prepared to follow with a stretcher. Id. But at that moment, the south tower collapsed, and Noble immediately dove under the ambulance, "sure [he] would be crushed at any moment." Id. After the noise stopped, Noble crawled out from under the vehicle "into what look[ed like] snow falling." Id. He and his partner, who was still sitting in the ambulance, managed to drive away from the area but only made it to Broadway, where they were again flagged down to treat first responders. Id. They eventually made it back to St. Vincent's, where Noble's partner "suffered an anxiety attack and had to be left there." Id. Noble then drove to Stuyvesant High School near

25

the WTC. Id. ¶ 5. He treated some first responders, and after CMR's communication system came back online, he retrieved his partner at St. Vincent's and drove to their base at Jacobi Hospital in the Bronx. That drive took eight hours. Id.

Noble returned to the WTC several times over the following days. He recalls that "[i]n all the time I was there I was only able to help two or three people" and says that "I always had the feeling that I did not do enough." Id. ¶ 6. He worked in 12-hour shifts until May 2002. Id. During his shifts, Noble "wore no personal protective equipment" because he was "frequently told by officials that were responsible for monitoring air quality, that the air quality was fine." Id.

After Noble started working for the FDNY in 2005, he began feeling short of breath and sluggish and started "losing weight for no reason." Id. ¶ 9. He was diagnosed with asthma, GERD, chronic rhinitis, and PTSD. He has continued to "experience nightmares, night sweats, and panic attacks." Id. And he currently sees a psychologist twice a month and a psychiatrist once a month. Id. Noble's VCF letter certifies his conditions other than PTSD. See id. at 6–7. He also attaches a letter from the WTCHP approving his reported conditions, including "Mental Health" for his PTSD. Id. at 8. The Court finds that these VCF-eligible injuries are significant and recommends at $5 million award. See Burnett I at 6–7.

### 9.    Terrence Webb

On 9/11, Terrence Webb "was employed by the New York Department of Corrections" and was a member of the Army National Guard. ECF No. 11039-11 ¶ 3. His National Guard unit arrived at Ground Zero "at approximately 1:30 p.m." that day. Id. ¶¶ 3–4. Webb recalls that the area "looked like a war zone" because "[t]he towers and other structures were destroyed, buildings were burning, and human body parts were all over the site." Id. ¶ 4. He says it was

"very difficult to see through the smoke, ash, and falling debris" despite it being mid-afternoon. Id. Webb and his unit were assigned to maintain a security perimeter around the WTC. Id.

Until "late 2001," Webb worked 12-hour shifts at Ground Zero. Id. ¶¶ 5, 8. In addition to providing security, his team searched through the rubble for victim remains. They worked first without any personal protective equipment, then with paper masks ("which were ineffective at filtering out all the smoke and chemicals that remained in the air"), and finally with masks with filters. Id. ¶ 5. He recalls that "OSHA continued to tell us that the air quality was safe." Id. Webb returned home each day "completely covered in ash." Id. ¶ 7. His uniforms worn at the site became as "stiff as a board" and "literally impossible to bend." Id.

After a few days, Webb "began to have difficulty breathing, tightness in [his] chest, nose and throat irritation, chronic cough, and headaches." Id. ¶ 6. He initially did not think much about his medical conditions. In March 2002, his unit was activated and deployed to Iraq. He served on active military duty from then until July 2007. Id. ¶ 8. On this return, he resumed work despite "having an abnormal chest x-ray and being diagnosed with asthma and obstructive sleep apnea." Id. ¶ 9. Webb eventually sought out the WTCHP and VCF. His VCF letter confirms his eligibility for compensation for asthma only. See id. at 5–6. The Court finds that this is a significant injury and recommends a $5 million award. See Burnett I at 6–7.

### 10.    Estate of Albert Filosa

Albert ("Al") Filosa was a firefighter with the FDNY for 20 years. ECF No. 11039-12 ¶ 5. On 9/11, Al responded to the FDNY's summons to the WTC and was attempting to extinguish the fires in Tower 7 when it collapsed. Id. Al escaped but "was showered with debris from the building." Id. While searching for survivors, Al's foot became "trapped in a hole concealed by the debris and ash"; he pulled his foot out of his boot and retrieved another, "ill-

fitting" boot from a nearby firetruck. Id. Julia Filosa (Al's surviving spouse) reports that two days later, Al returned home for the first time since responding to the summons "covered with white dust." Id. ¶ 6. Al took his foot out of the replacement boot, and it was "covered with blisters." Id. After Julia "cut open the blisters and wrapped his foot with duct tape," Al returned to work at Ground Zero. Id. He worked and stayed at Ground Zero "for the next three months." Id. During this period, Julia talked to Al on the phone but did not see him. Id.

Al retired from the FDNY in August 2003. Id. ¶ 7. He had begun to suffer from shortness of breath and fatigue and was diagnosed with COPD. Id. ¶ 8. He was later diagnosed with both non-Hodgkin lymphoma ("NHL") and stage 4 prostate cancer, which had metastasized throughout his body. Id. Al's NHL treatment involved "excruciatingly painful" radiation treatments that caused severe burns and led to Al losing all teeth in his lower jaw. Id. ¶ 9. Al also received "aggressive chemo-therapy." Id. When neither course of treatment was successful, Al underwent "stem cell reinfusion," which involved a 46-day period of isolation at the hospital and successfully led to remission of his NHL. Id. ¶ 10. But Al continued to receive hormone therapy for his prostate cancer and eventually underwent hip replacement surgery in 2021 due to the cancer destroying his femur. Id. ¶¶ 11–12. After the surgery, he "never regained his ability to ambulate without assistance." Id. ¶ 12. In 2022, Al suffered acute kidney failure, was admitted to the intensive care unit at the hospital for a week, and started chemotherapy again. Id. ¶ 13. Al's condition further deteriorated in 2023. His cancer had metastasized to his lungs, causing one to collapse, and "[h]e was no longer able to care for himself at all." Id. ¶ 14. He entered hospice care before passing away on August 28, 2023. Id.

Al's VCF letter from 2015 confirmed his eligibility for compensation for "Hodgkin's disease," malignant neoplasm of the prostate, chronic bronchitis, and emphysema. Id. at 7–8.

Julia submitted with her declaration a copy of Al's death certificate, which lists as Al's cause of death "Malignant Neoplasm of Prostate with metastasis to Lung," with contributing conditions hypertension, COPD, and Hodgkin's lymphoma in remission. Id. at 9. Al's VCF-certified injuries are analogous to "severe pulmonary or neurological traumas" and "severe orthopedic trauma[s] requiring significant or multiple surgeries and/or causing severe constant pain or debilitation." Burnett I at 7–8. Al's injuries "required lengthy hospital stays" and resulted in "burns," "severe flesh wounds," and "other permanent injuries." Id. Moreover, Al's VCF-certified conditions included "significant respiratory ailments" that the Court has independently compensated. Id. at 6. Accordingly, the Court recommends awarding the Filosa Estate $7 million for Al's "severe" latent injuries.

B.    **Gaston Plaintiffs**

1.    **Mark Bernheimer**

Mark Bernheimer was walking up the stairs to the Manhattan Civil Courthouse when he heard the first plane hit the north tower of the WTC. ECF No. 11109-2 ¶ 3. All court proceedings, including his trial, were canceled. Id. Bernheimer left the courthouse and "was showered with a fine cloud of debris containing particles of glass." Id. He then "moved out of Lower Manhattan as quickly as possible." Id.

The next day, Bernheimer went to the Javits Center to volunteer with FEMA. He "initially worked outside the Javits Center in tents that had temporarily been set up to store food and other supplies to be taken to Ground Zero." Id. ¶ 4. He recalls that "[a]fter having witnessed the devastation and carnage on 9/11, it took several days before I was able to return to the WTC site." Id. When Bernheimer did volunteer at Ground Zero, he "began working with the Salvation Army Command Center." Id. Until June 2002, he continued to volunteer there, in the morgue at Ground Zero, and at Fresh Kills Landfill. Id.

29

Following his volunteer work, Bernheimer "developed asthma, a very persistent cough and . . . severe headaches." Id. ¶ 5. He "suffered from [GERD] for the first time in [his] life" and was diagnosed with PTSD. Id. While working for the Salvation Army, he also "sustained injuries to both shoulders" and "developed a double hernia." Id. He reports that he underwent surgery for these injuries. Id. Bernheimer's VCF letter confirms his eligibility for compensation for asthma only. Id. at 4–5. He represents that he has "not yet submitted all the documentation related to all [his] conditions to the VCF," but he does not attach a WTCHP letter or any other medical records. Bernheimer VCF-certified asthma is a "significant respiratory ailment," and the Court therefore recommends a $5 million award. Burnett I at 6–7.

### 2.    David Blacksberg

On the morning of 9/11, David Blacksberg was an emergency medical technician for the FDNY. ECF No. 11109-3 ¶ 4. He and his partner were in their ambulance at the base of the Brooklyn Bridge, across the river from Manhattan, when they saw the first plane hit the WTC. Id. They "immediately headed into Manhattan" and "arrived at the WTC within minutes." Id. ¶¶ 4–5. They started to help evacuate people from the north tower when the second plane hit the south tower. Id. ¶ 5. The ensuing scene was "chaos"—with "a lot of debris coming down," "bodies everywhere," "people jumping from buildings," and "people screaming and the bodies landing." Id. ¶ 6. Blacksberg and his partner began treating people with lacerations and burns. Id. As Blacksberg was treating people, he "heard a noise coming from one of the buildings and saw it starting to come down." Id. ¶ 7. He began to run away, looked back, and saw "a cloud of smoke and debris, like an avalanche, tumbling right at [him]." Id. The cloud "quickly overtook" him, and in the mist of the "dust, smoke, and whatever else was in the cloud," there was "no

visibility." Id. He and his partner eventually arrived at Battery Park, where they directed people

to get into city buses parked there because "the air inside would be better than it was outside." Id.

Blacksberg and his partner soldiered on back past the WTC and towards the Staten Island

Ferry Terminal, where a makeshift hospital was established. Id. ¶ 8. He remembers that "[n]o

one could breathe" and that "smoke, ash, dust, and debris were stuck in everyone's eyes, mouths,

and throats." Id. ¶ 7. They continued to assist people, but with not many people arriving to be

treated, Blacksberg doubled back to Ground Zero "to help the firefighters and other first

responders who were digging through the rubble looking for survivors." Id. ¶ 8.

Blacksberg remained at and around Ground Zero for "the next thirty-five hours" after the

first plane hit the north tower. Id. ¶ 9. From September 2001 to June 2002, he worked at Ground

Zero "every week for three to five days." Id. In 2002, Blacksberg began to experience medical

problems, including issues with his chest, nose, throat, and eyes, and suffered "from the

emotional trauma of what [he] had been through and what [he] had seen." Id. ¶ 10. Based on the

Fire Department Medical Board's recommendation, he received a disability retirement from the

FDNY. Id. Blacksberg's VCF letter confirms his eligibility for compensation from asthma,

esophageal reflux, and bronchiectasis and related physical conditions. Id. at 5–6. The Court finds

that these are significant injuries and recommends a $5 million award. See Burnett I at 6–7.

### 3.    Carlos Fraga

On 9/11, Carlos Fraga was a college student at New York University ("NYU") and a

member of the New York Army National Guard, 69th Infantry Regiment. ECF No. 11109-4

¶¶ 4–5. When his regiment was activated in response to the Attacks, Fraga reported to the 68

Lexington Avenue Armory in Manhattan on September 12, 2001. Id. Fraga's unit took 12-hour

shifts "searching in and under the pit for human remains." Id. "The site was on fire the entire

time" he was present. Id. When FEMA arrived at the scene, Fraga's unit provided security. There was "no personal protective equipment available to [them]." Id. While working at Ground Zero, Fraga "had difficulty breathing, was consumed with nausea causing vomiting," and "felt as if [his] skin was on fire." Id. ¶ 5. His time at the site "disturbed [him] greatly." Id. He searched through "several feet of ash for human remains" and all around the site "found body parts of all description, which [he] bagged so they might later be identified." Id. At the end of each shift, his uniform was "covered in dust." Id.

When Fraga reported for duty in response to 9/11, he was 27 years old and "in excellent health." Id. ¶ 6. After his work at Ground Zero, he "never went a month without being sick." Id. He reports dealing with diarrhea, nausea, vomiting, chest pain, and respiratory issues. He underwent therapy for PTSD for "two or three years" but still has nightmares and "see[s] images of the gruesome things [he] saw at Ground Zero." Id. In October 2001, after finishing his shifts at the WTC, Fraga took a flight from New York to San Francisco and "suffered a panic attack in the air." Id. He never went back to school at NYU because he "could not bring [himself] to go below 14th Street in Manhattan," where NYU is located. Id. Finally, Fraga underwent "sinus surgery to try to alleviate some of [his] breathing problems, gallbladder surgery for cancer[,] and a laparotomy to find the cause of [his] abdominal pain." Id. ¶ 7. His VCF letter certifies his intrinsic asthma and esophageal reflux only. Id. at 5–6. The Court therefore finds that Fraga's VCF-eligible injuries are significant and recommends a $5 million award. See Burnett I at 6–7.

### 4. Christopher Kelly

Christopher Kelly was off duty from the FDNY on the morning of 9/11. ECF No. 11109-5 ¶ 3. After hearing about the Attacks on the car radio, he reported to his firehouse for Ladder Company 55 in the South Bronx. Id. But Christopher's company was not sent to the

WTC that day—and "specifically told not to proceed to the WTC on [their] own." Id. The next day, Christopher and his company joined the search-and-rescue effort at Ground Zero. Id. ¶ 4. They were sent into the subway to search for any survivors, and they had to crawl to access most areas. Id. The subway "looked like something out of science fiction," with "no noise," "no people," and areas "completely covered with collapsed concrete and rock." Id. Christopher's unit found no survivors. Id. Over the next few months, Christopher's assignments varied. He worked shifts lasting "24 hours on/24 hours off" at either Ground Zero or one of the firehouses in Manhattan that needed reinforcements to operate because it had lost so many firefighters on 9/11. Id. ¶ 5. He spent "ten or twelve days" at Ground Zero in the weeks after the Attacks and "months" at firehouses in Manhattan and the Bronx. Id. While at Ground Zero, he worked "with no special personal protective equipment in addition to our normal firefighting gear." Id. Instead, Christopher used the provided N90 masks, which he reports "were difficult to work in" and "ineffective at filtering the particulate matter swirling throughout the site." Id.

In the summer of 2002, Christopher began having "problems with [his] sinuses which caused severe, debilitating headaches." Id. ¶ 6. He began receiving monitoring and treatment through the WTCHP. He was treated for sinusitis, esophageal reflux, basal cell carcinoma of the skin, and melanoma on his back (which he had excised). Id. His VCF letter confirms all of these conditions. Id. at 5–6. The Court finds that these injuries are significant and therefore recommends a $5 million award. See Burnett I at 6–7.

### 5.    Marianne Kelly

On 9/11, Marianne Kelly was a police officer with the NYPD assigned to the Deputy Commissioner for Community Affairs. ECF No. 11109-6 ¶ 3. That morning, she was off duty and went for a run, but her husband picked her up after hearing about the Attacks on the radio.

Id. Because Marianne's sister's husband worked for Cantor Fitzgerald in the north tower of the WTC, Marianne went to her sister's house "to be with her," and she ultimately "spent the first three days after the attacks" there. Id. ¶ 4. During those days, Marianne took her sister to Ground Zero to the "viewing area where she could witness the rescue and recovery efforts." Id. Marianne continued to visit Ground Zero in the following months. She was "assigned to work with people who had lost loved ones, helping them to navigate a myriad of agencies that had been set up to help the victims' families, escorting them to the viewing area at Ground Zero, and providing any other assistance [she] could through [the] NYPD." Id. She spent "every day, five days a week, for six months" at Ground Zero. Id. ¶ 5. Her shifts typically lasted 16 hours. Id. The site "smelled like burning flesh," but she wore "no personal protective equipment during [those] days." Id.

Marianne began having health issues years later. She attended therapy sessions for two years. Id. ¶ 6. In 2017, she was diagnosed with squamous cell carcinoma "on the skin just below my collarbone," for which she received surgery. Id. In 2025, she was diagnosed with Stage 1 breast cancer, for which she was scheduled for surgery in July 2025. Id. Marianne's VCF letter certifies only her squamous cell carcinoma of the skin. Id. at 5–6. She also filed a letter from the WTCHP certifying for treatment both her squamous cell carcinoma and the malignant neoplasm of her breast (as of June 3, 2025). Id. at 7–8. The Court finds that Marianne's VCF-approved skin cancer is a significant injury and recommends a $5 million award. See Burnett I at 6–7; Latent Injury III R&R at 36–37 (awarding $5 million to plaintiff with VCF letter certifying prostate cancer only).

### 6. Basilio Stewart

On 9/11, Basilio Stewart was a service inspector employed by the Office of the Mayor of New York City. ECF No. 11109-7 ¶ 4. He was in the parking lot of 100 Church Street (only a

few blocks from Ground Zero) when the first plane struck the towers. Id. He was on the

Brooklyn Bridge when the second plane hit. Id. After the attacks, "travel through the city was

difficult," and Stewart had "no way to contact [his] wife or daughters." Id. ¶ 5. He did not return

home to Staten Island until "late that night." Id.

Stewart worked in several locations over the following weeks. From September 12 to 14,

2001, he "was stationed in upper Manhattan to field and direct calls from citizens searching for

information about the attacks and missing loved ones." Id. ¶ 6. During the next few days, he

reported to "Pier 94 as well as 40 Worth Street and 253 Broadway, where [he and his colleagues]

made ourselves available to address questions and concerns from the public." Id. Then, from

September 17 to 24, 2001, Stewart "returned to the office at 100 Church Street, in order to

remove materials, papers, and other items from the building." Id. Throughout this period, Stewart

commuted "via the ferry from Staten Island and walk[ed] on Broadway." Id. ¶ 7. He reports that

he almost immediately "noticed that [he] was coughing more frequently and [his] breathing was

impacted." Id. He eventually "began coughing blood, and lost sufficient weight that [his]

coworkers noticed." Id. Stewart later sought treatment and was diagnosed with sarcoidosis in

2004. Id. ¶ 8. His VCF letter confirms this condition. Id. at 4–5. It is a significant injury, for

which the Court recommends a $5 million award.

### 7.    James Toledo

On 9/11, James Toledo was a member of Ironworker Local 580 assigned to finish the

glass crown at the top of the Bear Stearns building at 383 Madison Avenue in midtown

Manhattan. ECF No. 11109-8 ¶ 4. He was on top of the building when he "saw a passenger plane

pass by . . . at a very low altitude"—"no higher than the top of the building where [he] was

working." Id. ¶ 5. "Seconds later [he] saw the plane slam into the North Tower" of the WTC. Id.

As he and his coworkers prepared to exit the building, Toledo saw the second plane hit the south tower. Id. ¶ 6. After evacuating, he watched "the tops of the [WTC] towers disappear as the buildings collapsed." Id. ¶ 7. Along with his coworkers, Toledo volunteered to help with the rescue effort at Ground Zero. Id. ¶¶ 7–8. At the site, he recalls that "[t]he scene was utter chaos," the air was "filled with smoke, soot, and dust," and "[i]t appeared to be 'snowing' pumice as if a volcano had erupted." Id. ¶ 8. "Lower Manhattan was covered with smoke and fire," and "mangled steel was everywhere." Id. Until 2:00 a.m. the following morning, Toledo "assisted the firefighters and other first responders by standing in a line on the smoldering mound of rubble" and "removing and passing debris, hand to hand, to try to uncover any survivors who might be trapped." Id. ¶¶ 9–10. He had no safety equipment or protective gear. Id. ¶ 9.

The next day, Toledo returned to the WTC and received "3M masks without respirators and gloves." Id. ¶ 10. He continued working for four days following the attacks. Id. ¶ 11. His work included "cutting into garages and basements to look for survivors," but Toledo's team instead found "the partial remains of victims virtually everywhere." Id. Toledo became "increasingly short of breath and began experiencing chest pains." Id. Three weeks later, he was hospitalized with pneumonia and spent one week in the hospital. Id. ¶ 12. Toledo has continued to have "periodic difficulty breathing combined with discomfort in [his] chest" and "intermittent severe asthma attacks." Id. His VCF letter confirms his mild intermittent asthma. Id. at 5–6. The Court therefore recommends a $5 million award. See Burnett I at 6–7.

### 8.    Thomas Vairo

On 9/11, Thomas Vairo was a police officer with the NYPD on temporary assignment as an instructor with the Disorder Control Unit in the Bronx. ECF No. 11109-9 ¶ 3. That morning, his girlfriend (a flight attendant) called him from Newark Liberty International Airport "in

hysterics to tell me that a plane had crashed into the WTC." Id. Vairo headed to his precinct, grabbed a patrol car, and started driving to the WTC. Id. ¶¶ 3–4. While on FDR Drive, he saw the second tower collapse. Id. He also passed by the Brooklyn Bridge "as pedestrians covered with ash and soot made their way out of Manhattan." Id. Vairo eventually made it near Ground Zero, where he parked a few blocks away and "walked in from there." Id. He confronted a "surreal" scene: "smoke and ash covered everything," "shells of city buses, crushed taxis and firetrucks [were] strewn about," and "virtually no people" were in the typically crowded area. Id. "[W]ith the limited visibility, it was very disorienting," and Toledo realized "there was nothing [he] could do at that time at that location." Id. He drove his car to the NYPD mobilization point on the West Side Highway, where he "assisted unloading trucks that were bringing in supplies and taking those supplies to the firefighters." Id. There he witnessed the collapse of the WTC 7 building. Id. Around midnight, he finally left to go home. Id.

For the next two weeks, Vairo worked 12-hour shifts at Ground Zero. He hauled supplies, worked for the decontamination unit, and volunteered in the pit to help on the bucket brigade. Id. ¶ 5. After the two weeks, he alternated between working at Ground Zero and working patrol for his original precinct. Id. His assignments at Ground Zero also included handling site security or controlling traffic entering or leaving the site. Id. Vairo recalls that he began wearing "paper masks" toward the end of September 2001. Id. His rotations continued until the end of 2001. Id.

In the following years, Vairo suffered from "recurring sinus infections" and was diagnosed with bronchitis. Id. ¶ 6. His VCF letter confirms his chronic rhinitis, chronic sinusitis, and GERD with esophagitis. Id. at 5–6. The Court finds that these are significant injuries and therefore recommends a $5 million award. See Burnett I at 6–7.

### 9.    Joseph Viscuso

Joseph Viscuso was a commodities clerk and assistant commodities broker for Scott

Nash. ECF No. 11109-10 ¶ 3. On the morning of 9/11, he had "just stepped into the revolving

doors on the first floor entering the WTC when the elevator doors in the lobby blew off and an

enormous fireball shot out." Id. He was "propelled backward by the blast at least ten to twenty

feet in the air" and landed on the ground "singed and covered with ash." Id. He does not

remember how long he remained on the ground, but "[a]t one point a firefighter entered the

building and told [him] to stay there, help was on the way." Id. Despite this warning, Viscuso

says "I knew I had to get out and away from the building." He could not breathe, thought he had

broken his back, and felt the building shake after the second plane hit the towers. Id. He crawled

to an escalator, somehow exited the building, and "lay on the pavement outside the WTC" when

the building began to collapse. Id.

Viscuso then "somehow managed to get to [his] feet and began walking aimlessly away

from the WTC." Id. ¶ 4. He "could not see where [he] was going." Id. But his friend from work

stopped to help him and took him to his friend's home near St. Vincent's hospital, where that

friend's wife worked as a nurse. She came home to examine and treat Viscuso. Id. Although he

confesses "[his] memory is not completely clear," Viscuso states that he stayed at his friend's

house "for a day or two after 9/11." Id. On the Monday following 9/11, Viscuso reported to

work, despite his injuries, because the Commodity Exchange was open. Id. ¶ 5. The building

where he worked "was surrounded by buildings that were still on fire and smoldering." Id.

Viscuso was told that "the air quality was good" but received a paper mask anyway. Id.

Viscuso continued to work for another two years, but he has "not been able to work at

any occupation since 2004." Id. Viscuso now "cannot walk a single block without stopping," is

"continually short of breath," and must wear a CPAP machine to sleep. Id. ¶ 8. He suffers from "recurrent nightmares from which [he] awaken[s] in a pool of sweat, screaming and/or crying." Id. He "can no longer take care of [him]self and [his] daily needs." Id. He receives "disability" payments and has "a nurse who attends to [him] seven days a week five hours a day." Id. Viscuso has been diagnosed with COPD, GERD, obstructive sleep apnea, and PTSD. Id. ¶ 7. He submits a WTCHP letter certifying these conditions for treatment. Id. at 6–7 (listing conditions, including "Mental Health" for his PTSD). Viscuso's VCF letter[8] confirms his COPD and obstructive sleep apnea only. Id. at 5. The Court finds that these are significant injuries and therefore recommends a $5 million award. See Burnett I at 6–7.

### 10.   Tracy Young

On 9/11, Tracy Young was a police officer with the NYPD and a member of the New York Army National Guard. ECF No. 11109-11 ¶ 4. She commanded the Alpha Company, 1st Battalion of the 101st Calvary, which was activated that day in response to the Attacks. Id. Young "led an advance team with medics and mechanics into New York City to Ground Zero." Id. They were "among the first military units to respond, arriving twelve hours after the attacks." Id. At the site, Young led the team in "setting up an aid station, establishing a security perimeter . . . , and assisting in the search and rescue mission by clearing debris and searching for survivors." Id. She remained at Ground Zero "until the evening of September 13." Id.

Young then worked at Ground Zero, in 12-hours shifts, until September 25, 2001. Id. ¶ 5. Her unit continued to assist in the recovery effort and provided security and logistical and administrative support. Id. During those initial weeks, Young "wore no personal protective

---

[8] Viscuso submits only the first page of his VCF letter, see ECF No. 11109-10 at 5, but the Court accepts this as sufficient evidence of his VCF-certified conditions. The Plaintiffs should ensure that all parts of their relevant documents are included in future filings.

equipment other than [her] uniform and paper masks[,] which were not very effective against the dust, soot, and other fuel and chemical compounds that were in the air." Id. ¶ 7. Young then returned to NYPD service. From December 2001 until June 2002, she worked at both Ground Zero and the Fresh Kills Landfill—for a total of "at least two hundred and fifty hours at each of these locations." Id. ¶ 6. At both sites, she "sift[ed] through debris searching for evidence and human remains." Id. At the landfill, she wore "clothing, boots, gloves, and respirators." Id. ¶ 7.

Young has dealt with a "cough and other respiratory and sinus issues for several years" following her work at the 9/11 sites. Id. ¶ 8. In 2016, her health "took a dramatic turn for the worse" when she developed pneumonia, strep throat, and an ear infection in addition to her persistent conditions. Id. She subsequently was diagnosed with sleep apnea and melanoma on her right leg, which she underwent surgery to remove and continues to monitor. Id. Young's VCF letter confirms her chronic rhinitis, sinusitis, GERD, obstructive sleep apnea, and malignant melanoma of the lower right limb. Id. at 5–6. Consistent with past decisions, the Court finds that these are significant injuries and recommends a $5 million award. See Burnett I at 6–7.

## CONCLUSION

The Court recommends GRANTING the Filosa Estate's motion for partial default judgment and awarding pain and suffering damages of $7 million. The Court also recommends GRANTING the remaining Johnson and Gaston Plaintiffs' motions for partial default judgments and awarding pain and suffering damages as follows:

| **Plaintiff** | **Case** | **Pain and Suffering Damages** |
|---|---|---|
| Gary Arthur | Johnson | $5 million |
| Anthony Blackmon | Johnson | $5 million |
| Joanne Brown | Johnson | $7 million |
| Carl Fargione | Johnson | $5 million |

| Plaintiff | Case | Pain and Suffering Damages |
|---|---|---|
| Dawn Gough | Johnson | $5 million |
| Raymond Gough | Johnson | $5 million |
| Robert Intartaglio | Johnson | $5 million |
| Adam Noble | Johnson | $5 million |
| Terrence Webb | Johnson | $5 million |
| Mark Bernheimer | Gaston | $5 million |
| David Blacksberg | Gaston | $5 million |
| Carlos Fraga | Gaston | $5 million |
| Christopher Kelly | Gaston | $5 million |
| Marianne Kelly | Gaston | $5 million |
| Basilio Stewart | Gaston | $5 million |
| James Toledo | Gaston | $5 million |
| Thomas Vairo | Gaston | $5 million |
| Joseph Viscuso | Gaston | $5 million |
| Tracy Young | Gaston | $5 million |

Finally, the Court recommends awarding all Plaintiffs prejudgment interest at a rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001, until the date of the judgment. The Plaintiffs should be permitted to submit additional applications for damages, including punitive damages, consistent with any future rulings of the Court.

SARAH NETBURN
United States Magistrate Judge

DATED:    January 20, 2026
          New York, New York

*       *       *

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

The parties shall have 14 days from the service of this Report and Recommendation to file written objections under 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 6(a), 6(d). A party may respond to another party's objections within 14 days after being served with a copy. Fed. R. Civ. P. 72(b)(2); see Fed. R. Civ. P. 6(a), 6(d). These objections shall be filed with the Court and served on any opposing parties. See Fed. R. Civ. P. 72(b)(2). Courtesy copies shall be delivered to the Honorable George B. Daniels if required by that judge's Individual Rules and Practices. Any requests for an extension of time for filing objections must be addressed to Judge Daniels. See Fed. R. Civ. P. 6(b). The failure to file timely objections will waive those objections for purposes of appeal. See Thomas v. Arn, 474 U.S. 140 (1985); United States v. James, 712 F.3d 79, 105 (2d Cir. 2013).