UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN) |

**DECLARATION OF ROBERT T. HAEFELE IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL COMPLIANCE WITH RULE 45 SUBPOENA DIRECTED TO THE CENTRAL INTELLIGENCE AGENCY IN MARCH 2025**

I, **Robert T. Haefele**, declare as follows:

1. I am an attorney at Motley Rice LLC, attorneys for Plaintiffs in the above-referenced multidistrict litigation, and Liaison Counsel for the Plaintiffs' Executive Committee for Personal Injury and Death Claims in *In re Terrorist Attacks on September 11, 2001*, MDL No. 03-1570 (GBD) (SN).

2. I submit this Declaration in support of Plaintiffs' Motion to Compel the Central Intelligence Agency ("CIA") to comply with Plaintiffs' Rule 45 Subpoena, served on the CIA in March 2025 ("Subpoena").

3. I have personal knowledge of the facts stated below based on my participation in meet-and-confer communications with counsel for the United States Department of Justice ("DOJ"), acting on behalf of the CIA.

   A. **Identification of Exhibits Attached to this Declaration and Cited in Plaintiffs' Brief and in this Declaration.**

4. Attached to this Declaration and cited herein and in Plaintiffs' Brief in support of the motion to compel the CIA are true and correct copies of the following exhibits:

Exhibit A – March 18, 2025 Rule 45 Subpoena Addressed to the Central Intelligence Agency, in *In re Terrorist Attacks on September 11, 2001*, 1:03-cv-1520-GBD-SN (S.D.N.Y.) ("MDL 1570");

Exhibit B – Excerpts of the Hearing in In re Terrorist Attacks on September 11, 2001, before Magistrate Judge Sarah Netburn (Feb. 4, 2025);

Exhibit C - Excerpts of the Hearing in In re Terrorist Attacks on September 11, 2001, before Magistrate Judge Sarah Netburn (May 30, 2025);

Exhibit D – April 10, 2025 Letter from S. Normand of the Department of Justice, for the CIA and other United States Agencies to Plaintiffs' Counsel;

Exhibit E - May 1, 2025 Letter from Plaintiffs' Counsel to S. Normand of the Department of Justice, for the CIA and other United States Agencies;

Exhibit F - May 27, 2025 Letter from Plaintiffs' Counsel to S. Normand of the Department of Justice, for the CIA and other United States Agencies;

Exhibit G – July 23, 2025 Letter from Plaintiffs' Counsel to J.D. Barnea of the Department of Justice, for the CIA and other United States Agencies;

Exhibit H – August 22, 2025 Email from Plaintiffs' Counsel to J.D. Barnea of the Department of Justice, for the CIA and other United States Agencies;

Exhibit I – November 24, 2025 Email from J.D. Barnea of the Department of Justice, for the CIA and other United States Agencies to Plaintiffs' Counsel;

Exhibit J – December 11, 2025 Email from Plaintiffs' Counsel to J.D. Barnea of the Department of Justice, for the CIA and other United States Agencies;

Exhibit K – January 22, 2026 Email from Plaintiffs' Counsel to J.D. Barnea of the Department of Justice, for the CIA and other United States Agencies; and

Exhibit L – August 5, 2025 Email from Plaintiffs' Counsel to J.D. Barnea of the Department of Justice, for the CIA and other United States Agencies (with attached string of emails from May 23, 2022, June 7, 2022, June 8, 2022, June 22, 2022 and June 24, 2022).

### B. The Court-Identified Need for Third-Party Discovery From the U.S. Government Agencies, Including the CIA, Considering Sudan's Spoliation.

5. From the outset of discovery concerning Sudan, Plaintiffs have sought to obtain contemporaneous Sudanese government records bearing on the Sudan's cooperative relationship with Osama bin Laden and al Qaeda during the 1990s, including but not limited to the extensive support and protection Sudan provided to al Qaeda that allowed it to transform into a functioning and sophisticated worldwide terrorist organization, capable of carrying out large-scale global terrorist attacks such as the September 11, 2001 attacks.

6. At the February 4, 2025 hearing in this MDL, after Plaintiffs raised concerns about the status of Sudan's document repositories and whether Sudan had undertaken efforts to preserve evidence responsive to this litigation, Magistrate Judge Sarah Netburn directed Plaintiffs to proceed with interrogatories and related discovery to establish "the current status of the evidence." Exhibit B, Hr'g Tr. at 5:6–9:1 (Feb. 4, 2025).

7. On March 11, 2025, Plaintiffs served their initial sets of discovery on Sudan, which included Plaintiffs' First Set of Consolidated Requests for Production of Documents and Plaintiffs' First of Interrogatories. Those discovery requests sought documents and information identifying and describing, among other things, the existence and location of any and all repositories of government records, and all efforts Sudan has undertaken during the course of the litigation to retain, preserve, and prevent the destruction of relevant documents and electronically stored information ("ESI").

8. In response, Sudan represented that it was unable to produce responsive documents because Sudan's government repositories had been destroyed during the ongoing

3

conflict in Sudan and that no meaningful electronic or archived records were available. *See* ECF No. 10968 at 1, 3 (stating that most, if not all, of the Sudanese government buildings that stored documents and data that may have been relevant to the litigation and responsive to Plaintiffs' discovery "have been burned or completely destroyed," including General Intelligence Service buildings, Ministry of Foreign Affairs, Ministry of Justice, Presidential Palaces, and others).

9. Sudan maintained that the relevant repositories were inaccessible or had been reduced to rubble and that servers and other electronic media housed in those facilities were likewise destroyed. *See* ECF No. 10968; Exhibit C, Hr'g Tr. at 4:23–5:16 (May 30, 2025); *id.* at 17:1–18:8.

10. Against that backdrop, Plaintiffs advised the Court of Plaintiffs' intention to seek sanctions against Sudan for its spoliation of discovery that had been housed in the now destroyed or inaccessible repositories. Exhibit C, Hr'g Tr. at 3:24–4:3 (May 30, 2025).

11. However, the Court made clear that any assessment of prejudice from Sudan's loss of evidence must turn on whether Plaintiffs had been prevented from obtaining substitute evidence from alternative sources, including the United States government. Specifically, at the May 30, 2025 hearing, Judge Netburn explained that she would be unable to evaluate prejudice unless Plaintiffs first pursued such third-party discovery and cautioned that otherwise she would be "left wondering… is there really prejudice?" *Id.* at 6:4–19.

12. The Court stated that it would be "better for [Plaintiffs] to conduct all of the discovery that [they] are able to do" and then, if those efforts failed, return to the Court to demonstrate that they were "blocked everywhere [they] went." *Id.* at 6:20–7:4.

4

13.     The Court further emphasized that government records were a potential substitute for the destroyed Sudanese materials and that their availability was central to the prejudice inquiry. *Id.* at 6:9–25; *see also id.* at 35:1-5 ("[t]o the extent you want to wait until you've seen what the government can produce . . . , that would make sense to me."]. Consistent with those directives, the Court ordered Plaintiffs to pursue discovery designed to determine whether alternative evidence existed and make sure "every stone has been turned over.". *Id.* at 37:23.

### C.    The Subpoena and the CIA Records at Issue

14.     In March 2025, Plaintiffs served a Rule 45 subpoena on the CIA seeking decades-old intelligence reports and other records detailing the Sudanese government's relationship with, and state support for, Osama bin Laden and al Qaeda during the 1990s. Exhibit A to Haefele Decl.

15.     Consistent with the Court's instructions to conduct discovery directed at assessing prejudice from Sudan's spoliation, Plaintiffs' Subpoena seeks records that may substitute for or corroborate the Sudanese government records Sudan has represented were destroyed, or otherwise address issues relevant to Plaintiffs' claims against Sudan, including but not limited to: (1) Sudanese Intelligence files concerning Osama bin Laden, al Qaeda, and terrorism provided to the CIA by the government of Sudan beginning in or around 2001; (2) documents concerning the U.S. government's designation of Sudan as a State Sponsor of Terrorism between 1993-2020; (3) documents concerning the Sudanese government's issuance of passports and diplomatic papers to bin Laden and al Qaeda operatives; and (4) documents concerning the establishment, control, and oversight of al

5

Qaeda terrorist training camps in Sudan by the Sudanese government, National Islamic Front ("NIF"), Sudanese intelligence, and/or Sudanese military.

16. The existence of relevant intelligence reporting and other records concerning the Sudanese government's cooperative relationship with Osama bin Laden and al Qaeda in the possession of the CIA is not a secret.

17. The CIA has publicly acknowledged that it has collected intelligence concerning Sudan's extensive support for al Qaeda and generated numerous intelligence assessments and reports addressing those activities, by virtue of their production in response to E.O. 14040 and Freedom of Information Act ("FOIA") requests.

18. The CIA has additionally produced Sudan-related intelligence reports, memoranda, diplomatic cables, and other documents to the 9/11 Commission, which are cited in the endnotes to the 9/11 Commission Final Report.

19. Former Sudanese government intelligence and security officials have confirmed the CIA's involvement in al Qaeda investigations in Sudan, CIA's partnership with the Sudanese government on counter-terrorism issues, and the exchange of intelligence between the two countries. *See* Declaration of Yasir Al Tayen Al Mahdi, former Sudanese Intelligence official, ECF No. 10968-5 at ¶ 7 ("Sudanese intelligence cooperated extensively with the CIA and provided information and facts requested by the CIA about certain individuals, facilities, and companies within and outside Sudan."); ¶ 12 (stating that he "met with the CIA at least two times a week" and "exchanged intelligence during those meetings"); *see also* Declaration of Salah Abdalla Mohamed, former Sudanese Internal

6

Security Service official, ECF No. 10968-3 at ¶ 44 (stating that the CIA came to Sudan "to review bin Laden's former properties and activities").

20. In addition, public media reporting indicates that Sudanese Intelligence amassed a trove of information concerning Osama bin Laden and al Qaeda during the 1990s, and turned that intelligence over to the CIA beginning in or around 2001. *See* Exhibit A, Plaintiffs' Subpoena at p. 3, n. 1.

21. These decades-old materials are relevant to Plaintiffs' claims under the state-sponsor-of-terrorism exception and to factual issues this Court has already deemed central in this MDL.

### D. Plaintiffs Engaged in a Good-Faith Meet-and-Confer

22. Shortly after Plaintiffs served the CIA Subpoena, Plaintiffs and the CIA began the nearly year-long meet-and-confer process addressing the CIA's obligation to respond.

23. On April 10, 2025, the CIA transmitted a letter asserting generalized objections and requesting additional information to permit the CIA to "evaluate" the Subpoena requests. Exhibit D (Apr. 10 Ltr from S. Normand).

24. The April 10 letter did not identify any concrete search efforts the CIA had undertaken, did not quantify the burden of compliance, and did not commit the CIA to conducting searches for responsive records.

25. Instead, it conditioned any further consideration of compliance on Plaintiffs' provision of additional information beyond the face of the Subpoena.

26. Plaintiffs promptly responded to the DOJ's April 10 objections. On May 1, 2025 and May 27, 2025, Plaintiffs gave the CIA detailed written responses explaining the

7

relevance of each of the Subpoena requests, supplied exemplar documents, identified specific CIA reports cited in the public record, and addressed each of the DOJ's asserted objections. Exhibits E and F (May 1, 2025 & May 27, 2025 Ltrs to S. Normand).

27. Since then, Plaintiffs have held multiple lengthy meet-and-confers—including on June 23, 2025, July 31, 2025, August 5, 2025, December 11, 2025, January 11, 2026, January 20, 2026, and most recently on February 10, 2026—to discuss the CIA production obligation.

### E. The June 23, 2025 Meet-and-Confer

28. At the outset of a meet-and-confer on June 23, 2025, DOJ counsel explained that the CIA will not search for documents responsive to Plaintiffs' Subpoena Requests Nos. 1-13, asserting that the CIA is immune from participating in discovery and would not acknowledge the presence or existence of responsive documents in its possession, but would only search for publicly identified documents cited in Request No. 14 (CIA reports and cables previously produced via FOIA with significant redactions), and Request No. 15 (CIA reports and cables identified in 9/11 Commission Final Report).

29. Plaintiffs asked that the CIA present its proposal and the principal supporting rationales for its position in writing, noting the length and fluid nature of the telephonic meet-and-confer and need for clarity.

30. When the CIA failed to do so, Plaintiffs transmitted a letter to DOJ counsel on July 23, 2025, detailing the parties' principal areas of disagreement, based on Plaintiffs' understanding of the CIA's positions. Exhibit G (July 23, 2025 Ltr to J.D. Barnea).

**F.     The July 31, 2025 Meet-and-Confer**

31.     Following further written exchanges, the parties held a follow-up meet-and-confer on July 31, 2025.

32.     During that meeting the CIA's position remained essentially unchanged. DOJ counsel informed Plaintiffs that, while the CIA would consider reviewing the already-public CIA reports identified in Subpoena Request Nos. 14 and 15 to determine whether existing redactions could be lifted and reproduced, the CIA generally declined to respond to the Subpoena further.

33.     Plaintiffs again asked the CIA to provide its proposal and supporting rationales on paper for the Plaintiffs to consider, and once again, the CIA failed to do so.

34.     Despite the CIA's refusal to search for documents responsive to Subpoena Request Nos. 1-13, and unwillingness to articulate its proposal in writing, Plaintiffs continued to engage in good-faith efforts to reach a compromise.

**G.     The August 5, 2025 Meet-and-Confer**

35.     The parties held another meet-and-confer on August 5, 2025, during which DOJ counsel asserted for the first time that the CIA did not have the ability to search its electronic databases for documents responsive to Plaintiffs' Subpoena.

36.     Plaintiffs explained that the CIA had previously agreed in 2022 to search its electronic databases for documents responsive to Plaintiffs' subpoena concerning defendant Al Rajhi Bank ("ARB") and produce reports with the greatest number of references to ARB.

37.     In an email to DOJ counsel that same day following the meet-and-confer, Plaintiffs provided the DOJ and CIA with the 2022 communications reflecting the searching

agreement between Plaintiffs and CIA concerning ARB and asked for clarification on the CIA's capacity to conduct systemwide searches for relevant documents. *See* Exhibit L (August 5, 2025 Email to J.D. Barnea).

### H. Plaintiffs' August 24, 2025 Proposal to CIA

38. Following additional discussions and communications with the DOJ, on August 24, 2025, at the request of the DOJ and CIA, Plaintiffs proposed a limited and structured approach under which the CIA would conduct targeted searches of its repositories for relevant Sudan-related reports, using specific search terms that Plaintiffs would provide to enhance the likelihood of capturing the most relevant documents sought by Plaintiffs' Subpoena. Exhibit H (August 22, 2025 Ltr to J.D. Barnea).

39. The proposal offered a non-exhaustive set of examples of search terms (e.g., Turabi, Bashir, Sudanese intelligence, passport, weapons, and Popular Arab and Islamic Conference) intended to lead to the location and production of key CIA reports and evidence supporting the core of Plaintiffs' claim that the Sudanese government and the National Islamic Front ("NIF") knowingly provided critical and extensive support to Osama bin Laden and al Qaeda, thereby allowing al Qaeda to transform into a sophisticated terrorist organization with the capabilities to conduct global terrorist attacks.

40. Pursuant to that proposal, the CIA would use those search terms to identify and review a relatively smaller subset of responsive documents (Plaintiffs proposed twenty-five reports) that the CIA would then produce.

41. Plaintiffs' proposal also contemplated that the CIA would conduct declassification reviews consistent with E.O. 14040 of CIA Sudan-related intelligence reports

10

and other documents that had been previously publicly produced but with significant redactions.

42. Between September 2, 2025 and November 24, 2025, Plaintiffs asked DOJ counsel on multiple occasions for the CIA's response to the August 22 proposal, but received none until November 24, 2025.

## I. CIA's November 24, 2025 Rejection of Plaintiffs' Proposal and the CIA's Counterproposal

43. On November 24, 2025, the CIA rejected Plaintiffs' August 22 proposal and offered a counterproposal that drastically constrained both the scope of searches and the number of documents to be produced, while still refusing Plaintiffs' requests to explain the CIA's search capabilities or the basis for its asserted refusal to agree to Plaintiffs' proposal. Exhibit I (Nov. 24, 2025 Ltr from J.D. Barnea).

44. The CIA's counterproposal imposed a set of 69 search terms the CIA devised unilaterally and reduced the number of documents to be produced from the already small universe of twenty-five to fifteen documents.

45. Almost two-thirds of the CIA's 69 search terms emphasize two issues anticipated to skew production results away from issues of most interest to the Plaintiffs (who served the Subpoena) and toward issues that could be exploited as support for Sudan's defense narratives. *See* Exhibit I.

46. For example, 32 of the CIA's 69 terms focus on al Qaeda-controlled businesses established and operated by bin Laden in Sudan during the 1990s, and 12 of the remaining 37 terms focus on Sudanese banks used by bin Laden and other members of al Qaeda.

11

47.  The CIA's heavy focus on these two issues in particular are anticipated to skew searching results away from the Sudanese government's extensive support of Osama bin Laden and al Qaeda, and toward documents and information that could be exploited to support Sudan's defenses, including that Osama bin Laden was simply a wealthy Saudi businessman who came to Sudan in the early 1990s with his family's multinational construction company as part of an initiative to stimulate and encourage investment in Sudan, and that he used the country's banks for routine banking services and established businesses in Sudan in furtherance of that endeavor.

### J.  The December 11, 2025 and January 20, 2026 Meet-and-Confers

48.  During meet-and-confers held on December 11, 2025, and January 20, 2026, Plaintiffs raised concerns with DOJ counsel regarding the CIA's November 24, 2025 counterproposal, the manner in which the CIA would implement its searches, and the inherent risks that the CIA's search proposal may skew results to Plaintiffs' prejudice. Notwithstanding the CIA's apparent unwillingness to change its position, Plaintiffs continued to seek compromise and offered a proposed solution to the CIA search protocol and search terms to ameliorate the risk. *See* Exhibit J (December 11, 2025 Ltr to J.D. Barnea).

49.  When Plaintiffs voiced these same concerns during the January 20, 2026 meet-and-confer, DOJ counsel informed Plaintiffs that the CIA would not accept additional search terms from the Plaintiffs, and that the Plaintiffs would have to rely solely on the CIA's search terms identified in the November 24, 2025 counterproposal. DOJ counsel also advised that the CIA would not agree to conduct a declassification review of the Sudan-

12

related CIA reports produced pursuant to E.O. 14040, as Plaintiffs had requested in the August 22, 2025 proposal.

50. Notwithstanding CIA's refusal to consider additional search terms from the Plaintiffs, DOJ counsel invited Plaintiffs to offer Plaintiff-proposed search terms that he would forward to CIA, adding caution that the CIA may refuse to consider them.

51. On January 22, 2026, Plaintiffs provided DOJ counsel with an alternative list of search terms that align with Plaintiffs' purpose of serving the Subpoena and ameliorated the identified risk of prejudice. Exhibit K (January 22, 2026 Email to J.D. Barnea).

52. The Plaintiff-proposed terms, which were drawn directly from declassified and publicly released CIA documents concerning Sudan, al Qaeda, and Osama bin Laden, as well as specific terms referenced in the Court's decisions at ECF Nos. 9278 and 7942 denying Sudan's motion to dismiss and authorizing Plaintiffs to proceed to merits discovery, focused on targeting intelligence reports and documents in the CIA's possession that demonstrate that the Sudanese government provided critical safe haven, resources, and support to Osama bin Laden that allowed him to establish, build, and sustain al Qaeda as a global terrorist organization.

53. That support from the Sudanese government and the NIF included, among other things, (1) providing Sudanese citizenship, passports, and diplomatic papers to al Qaeda operatives and other Islamic fighters from Afghanistan; (2) establishing cooperation agreements between al Qaeda and other terrorists (Hezbollah) and terrorist states (Iran) via the Popular Arab and Islamic Conferences held in Sudan; (3) the direct involvement of Sudanese Intelligence in al Qaeda's efforts to acquire weapons, ammunition, and explosives,

as well as recruitment of new members; (4) establishing and overseeing al Qaeda terrorist training camps in Sudan; and (5) encouraging and assisting al Qaeda with the movement of weapons, communications equipment, military trainers, and terrorist fighters to Somalia to attack U.S. troops.

### K.     The February 10, 2026 Meet-and-Confer and the CIA's Refusal to Use Search Terms Identified By Plaintiffs

54.     On February 10, 2026, I participated, along with other Plaintiffs' counsel, in a meet-and-confer telephone call with DOJ counsel Jean-David Barnea and Jennifer Jude, who stated at the outset of the call that they had recently spoken with the CIA and were conveying the CIA's final position regarding Plaintiffs' Rule 45 Subpoena.

55.     According to DOJ counsel, the CIA insisted on the absolute right to select the search terms to be used, rather than use or accept search terms proposed by the Plaintiffs

56.     DOJ counsel further advised that, according to the CIA, engaging in any discussion regarding Plaintiffs' proposed search terms—including whether particular terms could be used or whether searches would yield responsive documents—could itself reveal classified information.

57.     Specifically, DOJ counsel stated that such discussion could reveal information about what records the CIA possesses, how those records are organized, the language used in CIA documents, or the CIA's search capabilities.

58.     Plaintiffs' counsel responded that many of Plaintiffs' proposed search terms were drawn directly from declassified and publicly released CIA documents concerning Sudan, al Qaeda, and Osama bin Laden.

14

**L.     CIA's Conditional Production Proposal**

59.     DOJ counsel stated that, although the CIA would not use Plaintiffs' search terms, it was willing to increase the proposed production.

60.     DOJ counsel represented that the CIA would produce **20 documents per side**, for a total of **40 non-overlapping documents**, if Plaintiffs accepted the CIA's proposed approach.

61.     DOJ counsel stated that the CIA would apply only its internally selected search terms, collect documents responsive to those terms, and then conduct a **responsiveness review** to select the 20 documents for each side.

62.     DOJ counsel confirmed that no searches pursuant to this proposal had yet been conducted.

**M.     CIA's Non-Negotiable Position and Refusal to Provide a Written Explanation**

63.     Plaintiffs' counsel requested that DOJ counsel provide a written explanation of the CIA's rationale for refusing to use Plaintiffs' search terms.

64.     DOJ counsel declined to do so, stating that the explanation provided on the call was counsel's best recollection and summary of a lengthy conversation with the CIA, but not something he wanted Plaintiffs to quote him on. DOJ counsel further stated that any authoritative explanation would appear only in a **formal CIA declaration filed in response to a motion to compel**.

65.     DOJ counsel stated that the CIA's position was **non-negotiable**, that the CIA was not willing to be flexible, and that there would be **no further discussion** regarding search terms.

66. DOJ counsel stated that Plaintiffs' options were to accept the CIA's proposal or litigate the issue.

### N. Status of the Dispute

67. Plaintiffs' counsel stated that, even with a responsiveness review, the CIA's refusal to use Plaintiffs' search terms risked searching an incomplete or incorrect universe of documents, skewed away from the universe the Subpoena was intended to capture.

68. As of the conclusion of the meet-and-confer, the **only unresolved issue** was whether the CIA must use Plaintiffs' proposed search terms, or provide a meaningful and particularized explanation for refusing to do so, in responding to Plaintiffs' Rule 45 Subpoena.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on February 20, 2026
Mount Pleasant, South Carolina


/s/ *Robert T. Haefele*
**Robert T. Haefele**
Motley Rice LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
Tel.: (843) 216-9184
Email: rhaefele@motleyrice.com
Liaison Counsel for Plaintiffs' Executive Committee