# EXHIBIT C

```
        P5UETERRH
                                                                         1

 1      UNITED STATES DISTRICT COURT
        SOUTHERN DISTRICT OF NEW YORK
 2      ------------------------------x

 3      IN RE:   TERRORIST ATTACKS ON
        SEPTEMBER 11, 2001.
 4                                                  03 MD 1570 (GBD)(SN)

 5                                                  MDL Hearing
        ------------------------------x
 6
                                                    New York, N.Y.
 7                                                  May 30, 2025
                                                    10:00 a.m.
 8      Before:

 9                         HON. SARAH NETBURN,

10                                                  District Judge

11                           APPEARANCES
        COZEN O'CONNOR
12           Attorney for Plaintiffs and DECs
        BY:  SEAN P. CARTER
13
        MOTLEY RICE LLC
14           Attorney for Plaintiffs
        BY:  ROBERT T. HAEFELE
15           DONALD A. MIGLIORI

16      KREINDLER & KREINDLER LLP
             Attorneys for the Ashton Plaintiffs
17      BY:  STEVEN R. POUNIAN
             JAMES GAVIN SIMPSON
18           ANDREW MALONEY

19      ANDERSON KILL, P.C.
             Attorneys for Plaintiffs
20      BY:  JERRY S. GOLDMAN
             ALEXANDER GREENE
21           BRUCE STRONG

22      WHITE & CASE, LLP
             Attorneys for Defendant Republic of the Sudan
23      BY:  NICOLE ERB
             CELIA A. McLAUGHLIN
24
        SARAH S. NORMAND and JD BARNEA
25           Attorneys for Interested Party FBI
```

P5UETERRH

1           And I'll just note that we have AUSA Sarah Normand and
2    JD Barnea here.  I know you're sitting back away from me, but
3    I'm glad that you're here because I may need something from
4    you.
5           Okay.  Good morning to you all.  Nice to see
6    everybody.  I hope everybody is doing well.
7           I want to confirm what I have.  This conference is
8    following from our conference in February where we discussed
9    setting a discovery schedule to move the case forward.  I have
10   letters from both sides dated May 23, and then I additionally
11   have a letter from Sudan dated also May 23 regarding its
12   request for certain discovery from the plaintiffs, the PEC's
13   response dated May 29, and then the defendant's response filed
14   last night also dated May 29.  I've reviewed all of these
15   documents.
16          Is there anything else that the parties want me to
17   have for today?
18          Mr. Carter.
19          MR. CARTER:  No, your Honor.
20          THE COURT:  Okay.
21          Ms. Erb.
22          MS. ERB:  No.
23          THE COURT:  Okay.  Great.
24          So, let's get started.  I understand the following:
25          The plaintiffs are interested in pursuing their motion

1   for spoliation on the grounds that the documents that might
2   have been produced 17 years ago have now been destroyed or lost
3   as a result of both the passage of time and war.
4           Is that correct, Mr. Carter?
5           MR. CARTER:  Correct, your Honor.
6           THE COURT:  Okay.  I also, in preparing for today's
7   conference, reviewed the February transcript which you
8   submitted.  Thank you.  And you indicated at that time that you
9   were interested in taking 30(b)(6) depositions for the purposes
10  of exploring whether or not there are any documents that are
11  available, where they might be held.
12          I notice that nobody is really talking so much about
13  electronic discovery here.  My assumption when people send
14  pictures about burned down buildings is that paper is lost but
15  it's possible that there's electronic discovery.
16          So, Mr. Carter, is that still something that you all
17  are interested in?
18          MR. CARTER:  Your Honor, I think that the responses
19  that we've received, if we understand them correctly, have
20  resolved those issues or largely resolved those issues.  The
21  documents have been destroyed in all of the repository that
22  Sudan has been able to access.  There are two that it has not
23  yet been able to access, but based on public information and
24  imagery, we expect that the condition of those facilities is
25  the same, so we think that essentially all of the relevant

documents from Sudan's government records are no longer available and that Sudan is not in a position to fulfill its obligation to produce any of them.

With regard to electronic, we have asked that specific question. We've been told that, thus far, all of the servers that would have housed electronic information in the same repositories have been destroyed as well. We have asked whether or not any of the information that would have been responsive had ever been uploaded to some sort of cloud or other archive which would have protected it from some destruction; there are some sort of international norms that indicate that that's an appropriate step for governments to take to protect their historic and other records. As far as we know, that has never been done. So, I think we've sort of resolved all of those questions.

Our view, I think, is that based on the passage of time and the fact that these documents, at least in Sudan's telling, were available to be produced 17 years ago when Sudan was obligated to appear in the litigation and to have produced them. The passage of time and the willful delay in commencement of discovery is itself the intentional wrongdoing that should be the focus of the motion practice and that dictates that Sudan is not capable of fulfilling its discovery obligations.

We're open to taking a deposition if the Court wants

1   us to explore further why other steps weren't taken to preserve

2   the documents, although we think the reality speaks for itself:

3   They don't exist.

4              THE COURT:  So, here's my question:  I'm concerned

5   that what's going to happen at the end of the spoliation motion

6   is I'm going to be wondering whether or not there are

7   appropriate documents for you from other places like the

8   government, and I know that you indicated in your letter that

9   you're in contact with the government, United States

10  government, engaging in meet and confers.  I mean, I think a

11  significant portion of the documents that you relied on as

12  against the Kingdom came from United States government

13  agencies.  I suspect that will be true for the claims against

14  Sudan as well, and so I don't want to put forward a motion and

15  all of the work that goes into that if at the end of that

16  process, I'm going to be left wondering, well, is there really

17  prejudice?  Maybe all of these documents the government, in its

18  criminal investigation, obtained, or maybe there are people who

19  can speak about this.

20             And so I guess my question to you is, what is the

21  purpose of front-loading this motion when there are still

22  avenues of exploration that are open to you?  And wouldn't it

23  be better for you to conduct all of the discovery that you are

24  able to do, and then at the appropriate time, potentially the

25  end of fact discovery or even the end of expert discovery or

1    even as part of a motion for summary judgment, say we just got
2    blocked everywhere we went and now you should enter the
3    ultimate sanction.  That seems to me like a more complete
4    motion for you to make because I just don't want to have a
5    whole motion where I'm going to be left wondering about what
6    else is there.
7             MR. CARTER:  Well, your Honor, a few things:
8             I think potential that the government may produce the
9    records in its possession can't change the fact that Sudan is
10   in default on its discovery obligations.  And under the law,
11   Sudan has to bear the consequences for that.
12            There is also no potential that the government's
13   production to us can supplant the nature of the records that
14   would have been available in Sudan's files concerning its
15   relationship with bin Laden and al Qaeda.  As your Honor
16   observed in the prior rulings, this was an expansive state
17   program of support for bin Laden that was occurring in real
18   time via hand-and-glove relationships between Sudanese
19   intelligence and al Qaeda members, the leadership of Sudan and
20   al Qaeda members.  We can never recreate that.  The
21   government's assessments may be helpful in us ultimately
22   establishing that there's evidence satisfactory to the Court to
23   enter a default judgment as to Sudan, but it can't serve to
24   alter the fact that we've been prejudiced by the lack of
25   availability of firsthand documents from Sudan.

1  was dismissed because the plaintiffs did not pursue their

2  default judgment. And the time period was much shorter.

3  So, when we're talking about what we're looking at

4  today, Sudan appeared in 2020. Sudan has been actively

5  litigating in these cases since then. What happened from 2023

6  to 2025 in Khartoum is a tragedy. It is epic. It is

7  devastating for Sudan. Sudan is as much a victim of that loss

8  of exculpatory evidence as plaintiffs are as to the loss of

9  evidence they might want to use in this case.

10  In terms of what Sudan has done in addition to combing

11  the rubble and trying to determine what is left, if anything,

12  your Honor mentioned electronic equipment. We have seen

13  evidence of some computers and servers. We are trying to

14  determine whether there is anything recoverable from those. At

15  this point, we are not optimistic, I'm being honest, but we are

16  trying. And we have seen --

17  THE COURT: Sorry.

18  Are you trying to recover from physical hard drives

19  that are on the ground or --

20  MS. ERB: Yes. Yes.

21  THE COURT: -- there cloud servers?

22  MS. ERB: We're not aware of anything available in the

23  cloud at this time, but what we're trying to do is as the Army

24  has gone into Khartoum, we've been working through the

25  litigation committee and the Army representatives on the

1    ground.  We actually had a committee representative go to
2    Khartoum.  There were no flights because of the destruction of
3    the airport, so he traveled by car for a day to go to Khartoum
4    and try and work with the Army.
5         We have seen some footage of servers.  We are not in a
6    position to state, your Honor, that there's nothing
7    recoverable, but I will be honest that we're not optimistic
8    that much is recoverable there, but we are trying.  We are
9    trying to ensure that we've really left no stone unturned,
10   literally, in this situation.
11        In light of that, Sudan has identified four
12   plaintiffs, a number of witnesses.  Actually, in our
13   interrogatory responses, we provided a list of nine former
14   government officials.  We are aware and are looking into
15   nonparty witnesses that also may have information, a lot of
16   former U.S. government officials.
17        With respect to Salah Gosh, I'm confused.  Plaintiffs
18   requested that we make Salah Gosh available.  We have located
19   him in Cairo.  He is available and he is currently willing to
20   testify, and he submitted a declaration which we attached to
21   our letter on May 23.  So, we are trying to accommodate the
22   plaintiffs' request for witness testimony as well.
23        With respect to President Bashir, that is a much more
24   complicated process, as you can imagine, but the committee is
25   actively working on that and trying to see if there is a way to

|   |   |
|---|---|
| 1 |         To the extent you want to wait until you've seen what |
| 2 | the government can produce because those documents may be |
| 3 | relevant and helpful, that would make sense to me, but I'd like |
| 4 | to start having the conversation about what those depositions |
| 5 | are going to look like. |
| 6 |         Sudan suggested a close of fact discovery by |
| 7 | February 2026.  I think that that's a reasonable date. |
| 8 |         Mr. Carter, I know you have a particular view about |
| 9 | discovery which is that there should be none, but to the extent |
| 10 | we're moving forward, does that sound like a reasonable |
| 11 | deadline to you? |
| 12 |         MR. CARTER:  Your Honor, I guess it sort of depends on |
| 13 | how long the process with the government takes.  If we are |
| 14 | going to be in a situation where we're deposing these people, |
| 15 | it's certainly not going to be feasible to do that in an |
| 16 | effective way without a very fulsome set of government records. |
| 17 |         THE COURT:  Understood. |
| 18 |         My dream is that you're taking depositions in the fall |
| 19 | and winter, and so I'd like to be working towards that kind of |
| 20 | a schedule.  So, we should be identifying the folks from Sudan. |
| 21 | I think getting names from Sudan may also help you in your meet |
| 22 | and confers with the government so you can identify officials |
| 23 | by name that maybe they can also use to determine whether they |
| 24 | have relevant information. |
| 25 |         I intend to either have status conferences or at least |

1  get status letters from you all on a pretty regular basis
2  because I do want to move this forward.
3         With respect to the discovery that Sudan is seeking,
4  Mr. Carter, I appreciate your willingness to confirm that
5  you've produced everything that would be appropriate.  It
6  sounds like this agreement that the parties have reached as to
7  the other case is a good thing.  To the extent there is
8  documents to supplement, you should do that.  Contention
9  interrogatories we're going to put a hold on and request to
10 admit until an appropriate time, and I'm sure there will be
11 litigation over what those look like.  I don't think that
12 should be the focus.  Right now we're trying to identify
13 individuals, set up depositions, get as much discovery from
14 either the government or potentially there may be nonparties or
15 organizations or charitable groups or banks that might have
16 appropriate discovery that would be relevant.  I'd like to be
17 pursuing all of that right now.
18         Does all of that make sense?
19         MR. CARTER:  It does, your Honor.
20         The only issue that occurs to me with regard to us
21 providing everything to Sudan is any potential limitation based
22 on the FBI protective order.  And I candidly don't know whether
23 there is any such limitation --
24         THE COURT:  Understood.
25         MR. CARTER:  -- but that's the one issue that we'd

1    have to tackle.

2             THE COURT:  Okay.

3             Ms. Normand, can you just make sure that either you or

4    you replacement can figure out what can be produced?

5             MS. NORMAND:  Certainly, your Honor.  We've typically

6    resolved those issues readily.

7             I would like to introduce my colleague, JD Barnea --

8    for the court reporter, it's B-A-R-N-E-A -- who is going to be

9    taking the lead on the Sudan issues.

10            THE COURT:  Great.

11            Welcome, Mr. Barnea.

12            MR. BARNEA:  Thank you, your Honor.

13            THE COURT:  All right.  I think we have a working plan

14   here.

15            Again, Mr. Carter, I'm not going to preclude you from

16   filing your motion for spoliation, but my recommendation, if

17   you want my free legal advice, is to wait and let's see what it

18   looks like.  It may be that the motion is well brought at the

19   appropriate time, I'm not prejudging it.  I understand your

20   arguments, but I think it'll be a better motion, for my

21   purposes, for evaluating whether that sort of ultimate sanction

22   is appropriate against a sovereign nation once I'm satisfied

23   that really every stone has been turned over.

24            MR. CARTER:  I understand, your Honor.

25            THE COURT:  Okay.