# EXHIBIT F

# MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES
In re: Terrorist Attacks on September 11, 2001 (S.D.N.Y)

**VIA EMAIL**

May 27, 2025

Sarah S. Normand, Assistant U.S. Attorney
Office of the United States Attorney for the
Southern District of New York
86 Chambers Street
New York, NY 10007

      RE:   *In Re: Terrorist Attacks on September 11, 2001,* 03 MDL 1570 (GBD) (SN)

Dear Sarah:

    We write in response to the April 10, 2025 Department of Justice ("DOJ") letter objecting to Plaintiffs' subpoenas directed to the Central Intelligence Agency ("CIA"), Federal Bureau of Investigation ("FBI"), Department of State ("State"), and U.S. Marshals Service ("USMS") (collectively, the "Agencies"). We disagree with the Agencies' positions and respond as follows.

**1.**    **The Subpoenas Seek Relevant Documents Proportional to the Needs of the Case**

    With respect to the Agencies' first concern that the *Touhy* requests do not correlate to the categories of documents sought in the subpoenas, that is incorrect. The *Touhy* requests list the exact same documents requested as the subpoenas. *E.g.*, *compare* FBI Subpoena, Attachment A, dated March 21, 2025 to *Touhy* Letter to FBI, Appendix A, dated March 21, 2025. The Agencies appear to take issue with the fact that the *Touhy* requests *also* include a helpful list of six overarching non-exhaustive topics that the requests were designed to cover. Plaintiffs highlighted these six categories of documents to help the Agencies search for and produce the requested documents and to assist the Agencies in promptly providing the documents in accordance with law.

    Plaintiffs respectfully take issue with the Agencies' contention that the categories of requested documents are not proportional to the needs of the case. It is disheartening that the DOJ and Agencies would suggest nearly 25 years after the attacks, and even when this very litigation has uncovered new evidence of culpability in the attacks, that the work to achieve true transparency is too much of a bother. We urge the Agencies to drop their proportionality objections to searching for the requested, highly relevant documents.[1] The 9/11 case is uniquely important, involving a

---

[1] For these same reasons, Plaintiffs satisfy the proportionality considerations identified in Fed. R. Civ. P. 26(b)(1). The importance of the issues at stake, the vast damages entailed, the government's relative superior resources and access to the information sought, and the outlined relevance of the discovery, all tilt heavily toward allowing the discovery. In considering proportionality, Plaintiffs note that the Agencies' proportionality concerns are all expressed in terms of the relevance of the document categories. *See, e.g.*, pages 4-5 of the Agencies' letter, questioning proportionality premised on the relevance of requests about al Qaeda businesses in Sudan, Sudanese Banks, al Qaeda training camps, certain specified individuals and documents (p. 4), and questioning the proportionality of requests for documents regarding the Landmark Plot based on questioning its relevance (p. 5). Plaintiffs address here each of these concerns by detailing the relevance of each of these categories sufficient to meet Plaintiffs' initial burden to show

Sarah S. Normand
May 27, 2025
Page | 2

critical and tragic day in American history that killed thousands of innocent souls. As just one example, the FBI's own website contains a history of the 9/11 investigation, citing it as the "largest case ever," and confirms it "requires new special agents and intelligence analysts to visit the National September 11 Memorial & Museum to remind them of their role to protect the American people and to remember the sacrifices of their brothers and sisters who rose to the occasion and responded on 9/11."[2] "When you have tough days," the FBI Website continues, "remember this day and let it bring you back to the core of your job." *Id.*

Plaintiffs further disagree with the Agencies' related concern that the categories of requested documents are not relevant to the case against Sudan. Relevance is broadly defined in the context of discovery. Fed. R. Civ. P. 26(b)(1); *Convolve, Inc. v. Compaq Computer Corp.*, 223 F.R.D. 162, 168 (S.D.N.Y. 2004); *Melendez v. Greiner*, No. 01 Civ. 7888, 2003 WL 22434101, at *1 (S.D.N.Y. Oct. 23, 2003); *Zanowic v. Reno*, No. 97 Civ. 5292, 2000 WL 1376251, at *2 (S.D.N.Y. Sept. 25, 2000). Here, as detailed immediately below, the categories of documents sought are plainly relevant to Plaintiffs' claims that the National Islamic Front ("NIF") and the Sudanese government played an invaluable role in providing critical support and resources to a nascent al Qaeda that allowed it to transform into a functioning and sophisticated terrorist organization, capable of conducting large-scale, global terrorist attacks, including the attacks on September 11, 2001.

### a) Al Qaeda-Controlled Businesses

The Agencies' relevance objections to Plaintiffs' al Qaeda-controlled business requests conflict with the Court's decisions denying Sudan's motion to dismiss and authorizing Plaintiffs to proceed to merits discovery. *See* ECF No. 7942 (Magistrate Judge Netburn's May 2, 2022 "Report & Recommendation") and ECF No. 9278 (Judge Daniels' August 10, 2023 "Memorandum Decision & Order"). The Court credited Plaintiffs' allegations detailing the critical importance of the al Qaeda-controlled businesses to the growth and development of the al Qaeda organization in Sudan during the 1990s, and further pointed out that Sudan itself benefited from the relationship, with the businesses completing civil infrastructure projects on the regime's behalf.[3] *See, e.g.*, ECF No. 7942 at 11 ("Sudan and bin Laden benefited from a mutually profitable business relationship too. Bin Laden completed civil infrastructure projects and started numerous enterprises with wealthy NIF members…. These ventures included banks that allowed al Qaeda to access the international monetary system."); *id.* at 11-12 ("In addition to banks, Sudan and al Qaeda set up agricultural enterprises that maintained a near-monopoly over key exports, … front

---

"any possibility of relevance sufficient to warrant discovery." *Royal Park Invests. SANV v. Deutsche Bank Nat'l Trust Co.*, 2016 WL 4613390, at *7 (quoting *Condit v. Dunne*, 225 F.R.D. 100, 106 (S.D.N.Y. 2004) (quoting *A.I.A. Holdings S.A. v. Lehman Bros.*, No. 97 Civ. 4978, 2000 WL 763848, at *3 (S.D.N.Y. June 12, 2000)) (internal quotes omitted). The Agencies now bear the burden to show that, "despite the broad and liberal construction afforded the federal discovery rules," proportionality considerations support the discovery being denied. *Royal Park*, 2016 WL 4613390, at *7.

[2] 9/11 Investigation, available at https://www.fbi.gov/history/famous-cases/911-investigation#:~:text=FBI%20Agent%20Lenny%20Hatton%E2%80%94who,visit%20our%20Multimedia%20website%EF%BB%BF (last visited May 2, 2025) ("FBI Website").

[3] *See, e.g.*, CAC ¶¶ 122-125, 132-136 (discussing the al Qaeda-controlled businesses); *see also Ashton* Complaint ¶¶ 31-38 (same).

Sarah S. Normand
May 27, 2025
Page | 3

charities to generate revenue and cover operatives' movements, … and a host of other enterprises that gave al Qaeda and its operatives access to cash and jobs.").

The Court additionally noted that when bin Laden and al Qaeda relocated to Afghanistan in 1996, several of the al Qaeda-controlled businesses continued to operate in Sudan through at least 2000, and that the Sudanese government attempted to conceal those operations. *See* ECF No. 7942 at 13-14 ("Yet State Department reports suggest that several of bin Laden's businesses continued to operate by June 2000 and that the Sudanese government may have worked to conceal bin Laden's ties to these enterprises."); *see also* ECF No. 9278 at 12 ("U.S. State Department reports indicate that several of bin Laden's businesses were still operating in Sudan by June 2000, with possible concealment by the Sudanese government.").

Moreover, the 9/11 Commission Final Report, declassified CIA and FBI reports, and other credible sources further demonstrate the relevance of the al Qaeda-controlled businesses to Plaintiffs' claims against Sudan. Those sources are clear that the al Qaeda-controlled businesses (1) were used to buy, transport, and store weapons and explosives for both al Qaeda and the NIF;[4] (2) completed infrastructure projects for the benefit of the NIF, including projects critical to the war in South Sudan;[5] and (3) were jointly owned by the NIF and thus financially benefited from their ownership and association with the bin Laden businesses.

   b) **Sudanese Banks**

The Agencies' relevance objections to Plaintiffs' requests concerning the Sudanese banks further conflict with the Court's rulings crediting Plaintiffs' allegations detailing the importance of the Sudanese banking system to Osama bin Laden and al Qaeda, including the use of the Sudanese banks by al Qaeda operatives to "access the international monetary system" and "launder money."[6] *See, e.g.*, ECF No. 7942 at 11 ("These ventures included banks that allowed al Qaeda to access the international monetary system…. Critically, this meant that 'Sudan allowed its banking institutions to be used by Al Qaeda to launder money.'"); *id.* at 14 ("Banks and companies owned by the NIF and the government of Sudan are alleged to have actively participated in a 1999-2000 money laundering plot to help bin Laden move between $26 and $28 million out of Sudan."); *id.* at 21 ("Sudanese-al Qaeda joint venture banks provided the terror group financial services."). *See also* ECF No. 9278 at 11 ("The Sudanese government and al Qaeda also maintained an economic relationship. 'Bin Laden completed civil infrastructure projects [in Sudan] and started numerous

---

[4] *See, e.g.*, 9/11 Commission Final Report at p. 57 (stating that "al Qaeda finance officers and top operatives used their positions in Bin Ladin's businesses to acquire weapons, explosives, and technical equipment for terrorist purposes"); CIA 352-359 at 354-355 (stating that explosives were shipped to the Sudanese Ministry of Defense and transported throughout Sudan using trucks from bin Laden's Al Hijra Construction Company); April 2 and 9, 1998 FBI 302, Interview of Jamal al Fadl at 3 (Fadl "advised that while in Sudan (approximately 1990), Abu Rida was purchasing a lot of AK-47's, RPG's and light machine guns from China through Bin Ladin's Al-Hijra Construction Company for Al-Qaida and the NIF/PDF at Bin Ladin's request.").
[5] *See, e.g.*, CIA 372-378 at 375 ("Wadi Al-Aqiq's first project was to construct a road between Damazin and Kurmuk. This road was Bin Ladin's 'gift' to the NIF, which needed a road that would enable Sudanese troops to rapidly deploy to southern Sudan for the civil war.").
[6] For details concerning Sudan's support for al Qaeda and the preferred access al Qaeda was given to Sudan's banking sector, *see* CAC ¶¶ 16, 91, 123, 126-129, 131, 146. See also *Ashton* Complaint ¶¶ 23, 24-30, 35, 87, 105, 107, 109, 113.

Sarah S. Normand
May 27, 2025
Page | 4

enterprises with wealthy NIF members,' to include banks that enabled 'al Qaeda to access the international monetary system.'"); *id.* ("Sudan allowed its banking institutions to be used by Al Qaeda to launder money," which included "a scheme that moved $26 to 28 million from Sudan for bin Laden.").

Moreover, declassified CIA and FBI reports support Plaintiffs' allegations that bin Laden, al Qaeda financial officers, and the al Qaeda-controlled businesses made extensive use of the Islamic banks in Sudan during the 1990s. According to those reports: (1) bin Laden personally invested in Al Shamal Bank and others;[7] (2) the al Qaeda-controlled businesses held accounts at, and conducted business through, several Sudanese banks;[8] and (3) Saidi Madani al Tayyib, the overall supervisor of al Qaeda's Financial and Administrative Committee, and Abu Hammam al Saudi, another al Qaeda financial officer, conducted extensive banking transactions with a number of Sudanese banks on behalf of bin Laden and al Qaeda.[9]

### c) Training Camps

In denying Sudan's motion to dismiss and authorizing merits discovery, the Court further cited to Plaintiffs' allegations concerning the establishment and operation of al Qaeda training camps in Sudan and the efforts by Sudanese intelligence to protect the camps.[10] *See, e.g.*, ECF No. 7942 at 10 (stating that "al Qaeda operated six training camps in Sudan" which "were protected from local police by Sudanese intelligence"); *id.* at 13 ("In 1998, the State Department's *Patterns of Global Terrorism* report stated that 'Sudan continued to serve as a meeting place, safe haven, and training hub for a number of international terrorist groups, particularly Usama Bin Ladin's al-Qaida organization.'"); *id.* at 21 ("Sudanese troops and intelligence services provided security for bin Laden, his second in command, and al Qaeda training camps."); *see also* ECF No. 9278 at 10-

---

[7] *See, e.g.*, CIA 317-338 at 326 (stating that Al Shamal Islamic Bank, Animal Resources Bank, and Farmer's Bank were all partly capitalized by bin Laden); CIA 440-445 at 441 (indicating the bin Laden was a shareholder in Animal Resources Bank and Farmer's Bank); CIA 440-445 at 442-443 (stating that bin Ladin held a personal account at Al Shamal Islamic Bank, and other accounts under the names of Ladin International and Taba Investments).
[8] *See, e.g.*, CIA 720-804 at 736 (stating that the businesses and Islamic Army conducted substantial business through Albaraka Bank (Sudan), Al Shamal Islamic Bank, Faisal Islamic Bank of Sudan, and Tadamon Islamic Bank); *see also* January 8, 1998 FBI 302, Interview of Jamal al Fadl at 5-6 (Fadl "advised that during the earlier part of Osama Bin Ladin's stay in Sudan, most of the business accounts were with Al-Shamal Bank and Faisal Islamic Bank.").
[9] *See, e.g.*, CIA 440-445 at 442-443 (stating that Tayyib and Abu Hammam al Saudi "have true name and alias accounts at Al Shamal Bank"); *see also* January 8, 1998 FBI 302, Interview of Jamal al Fadl at 6 (Fadl "advises that Al-Tayyib held other accounts at the following banks in Sudan: Islamic West Bank, Bank of Khartoum, Bank of Saudi-Sudani, Al-Baraka Sudanese Bank, Animal Resources Bank, and Nileim Industrial Development Bank.").
[10] *See, e.g.*, CAC ¶ 140 (discussing the establishment of six al Qaeda training camps in Sudan, and stating: "The camps provided training not just for al Qaeda's operatives, but also for Sudan's Popular Defense Force ("PDF"), the para-military force responsible for terrorizing the non-Arab and Christian population in the south of Sudan."); *see also Ashton* Complaint ¶ 56 ("Bin Laden organized al Qaeda into camps throughout Sudan, the main one being a 20-acre site near Soba, 10 kilometers south of Khartoum. Camps provided training for al Qaeda's operatives as well as training for the Sudan's Popular Defense Forces, the para-military force terrorizing the population in the south of Sudan.").

Sarah S. Normand
May 27, 2025
Page | 5

11 ("Sudanese intelligence and security services worked with al Qaeda to vet potential recruits and protected al Qaeda's six militant training camps in Sudan.").[11]

### d) Al Qaeda Members and Financiers

The Agencies further contend that it is unclear how certain individuals identified in the subpoenas relate to Plaintiffs' claims against Sudan. Each of the Agencies, however, are in possession of documents and information identifying these individuals and their relevance. Plaintiffs provide the following information to help facilitate the Agencies' compliance with the subpoenas.

• <u>Jamal Ahmed Mohamed al Fadl</u> – As each of the Agencies knows well, Jamal al Fadl is a former Sudanese member of al Qaeda who repudiated Osama bin Laden in the 1990s and became a principal witness for the U.S. government in several al Qaeda terrorism trials. Fadl provided key information in his FBI interviews concerning, inter alia: (1) Osama bin Laden and members of al Qaeda and their roles, responsibilities, and activities in the terror organization while in Sudan; (2) the relationship between Osama bin Laden, al Qaeda, and the NIF and its leadership; (3) the establishment and operations of the al Qaeda-controlled businesses operating in Sudan; (4) the banking activities of bin Laden, al Qaeda financial officers, and the al Qaeda-controlled businesses while in Sudan, including the specific Sudanese banks and members of the NIF associated with those banking activities; (5) the al Qaeda training camps established in Sudan with the assistance of the NIF and Sudanese government; (6) al Qaeda's procurement of weapons and explosives for al Qaeda and the NIF with assistance from Sudanese intelligence; and (7) al Qaeda's operations in Somalia targeting the United States and United Nations, with the support of the Sudanese government. *See* CAC ¶¶ 49, 68, 90, 151, 153, 154, 191; *see also Ashton* Complaint ¶¶ 28, 92.

• <u>Yassin Qadi</u> – Yassin Qadi, a defendant in the litigation, was designated by the U.S. government as an Executive Order 13224 Specially Designated Global Terrorist ("SDGT") on October 12, 2001, for being "a financial supporter of Usama bin Laden and other known Islamic extremists." According to the CIA, Qadi "founded the Saudi-based Al-Muwafaq which he used to remit funds to al-Qaida and other terrorist groups until 1998." *See* CIA 193-199 at 195; CIA 38-53 at 45 (indicating that Qadi "served as Bin Ladin's financial manager in Sudan"). *See also Ashton* Complaint ¶¶ 35, 48, 107.

• <u>Adil Batarji</u> – Adil Batari was designated by the U.S. government as an Executive Order 13224 Specially Designated Global Terrorist ("SDGT") on December 21, 2004, for being "one of the world's foremost terrorist financiers, who employed his private wealth and a network of charitable fronts to bankroll the murderous agenda of al Qaida." *See* CIA 38-53 at 45 (indicating that Batarji "served as Bin Ladin's financial manager in Sudan"). *See also* CAC ¶ 146; *Ashton* Complaint ¶¶ 27, 105.

---

[11] *See also* CIA 352-359 at 354-355 (describing how explosives obtained by Sudan's Ministry of Defense were delivered to the al Qaeda training camp at Soba Farm "where they would be used for training Islamic Army members in explosives techniques.").

Sarah S. Normand
May 27, 2025
Page | 6

• <u>Saeed Ahmed Lootah</u> – Saeed Ahmed Lootah served as the Chairman of Dubai Islamic Bank and provided significant support to Osama bin Laden, members of al Qaeda, and the al Qaeda-controlled businesses in Sudan during the 1990s. *See, e.g.*, CIA 38-53 at 45 ("Bin Ladin's Sudan-based companies and his financial officers opened accounts and letters of credit at Dubai Islamic Bank (DIB) with the active help of DIB Chairman Sa'id Ahmed Lootah."); CIA 720-804 at 747 ("DIB Chairman Lootah personally authorized, stamped, and signed some letters of credit opened by Bin Ladin's companies in Khartoum through DIB.").

• <u>Saidi Madani al Tayyib</u> – Saidi al Tayyib was an al Qaeda Shura Council member, served as the overall supervisor of al Qaeda's Financial and Administrative Committee, and held numerous accounts at Sudanese banks, including Al Shamal Bank, Faisal Islamic Bank, Islamic West Bank, Bank of Khartoum, Bank of Saudi-Sudani, Al-Baraka Sudanese Bank, Animal Resources Bank, and Nileim Industrial Development Bank. *See* January 8, 1998 FBI 302, Interview of Jamal al Fadl at 6. *See also* 9/11 Commission Final Report at 68, 112 (describing Tayyib as the "head of al Qaeda's finance committee" and "an important al Qaeda financial official").

• <u>Abu Hammam al Saudi</u> – Abu Hammam al Saudi was one of Osama bin Laden's closest advisors who escorted bin Laden to Sudan in 1991. *See* CIA 372-378 at 375 (also indicating that al Saudi "had been in charge of Al-Qaida military affairs"). Al Saudi served as the "Emir of Finance" for al Qaeda and further helped establish and manage certain of the al Qaeda-controlled businesses, including Wadi al Aqiq and Al Hijra Construction Company. *See* January 8, 1998 FBI 302, Interview of Jamal al Fadl at 3; November 4 and 5, 1996 FBI 302, Interview of Jamal al Fadl at 7. *See also* CAC ¶ 124 (indicating that OBL's Al Hijra Construction in Sudan was run by Abu Hammam al Saudi and other al Qaeda members).

• <u>Mustafa Ahmad Uthman Abu al Yazid</u> – Mustafa al Yazid was a longtime associate of Osama bin Laden and served with him in Afghanistan. "Sa'id then followed Bin Ladin to Sudan and initially served as the commercial director for one of Bin Ladin's companies in Khartoum. Sa'id was later promoted to chief accountant and then to the position of director general of the company. During that time, he maintained frequent contact with Bin Ladin, especially dealing with al-Qa'ida's financial activities." *See* CIA 54-56 at 54 (also indicating that Yazid served as a financial officer for several of the al Qaeda-controlled companies, including Wadi al Aqiq).

• <u>Mohammed Loay Bayazid</u> – Mohammed Loay Bayazid (a/k/a Abu Rida al Suri) was an important member of al Qaeda during the Sudan years, serving on al Qaeda's Shura Council, purchased weapons and explosives for al Qaeda, established training camps, and helped establish and manage certain of the al Qaeda-controlled businesses, including Wadi al Aqiq and Al Hijra Construction Company. *See, e.g.*, 9/11 Commission Final Report at p. 521, n.58 (describing Bayazid as "an al Qaeda arms procurer and trainer"); CIA 352-359 at 357 (stating that Bayazid and NIF members often traveled to Czechoslovakia, China, and Japan to purchase weapons and explosives). *See also* CAC ¶ 124 (indicating that the Al Hijra Construction in Sudan was run by Abu Rida al Suri and other al Qaeda members).

• <u>Mubarak al Douri</u> – Mubarak al Douri managed the al Qaeda-controlled business Wadi al Aqiq. *See* CIA 38-52 at 50-51. *See also* Ken Silverstein, *Official Pariah Sudan Available to America's War on Terrorism*, Los Angeles Times, April 29, 2005 (reporting that Sudanese intelligence

Sarah S. Normand
May 27, 2025
Page | 7

arranged for the FBI to interview "several longtime Al Qaeda members residing in Khartoum," including Mubarak al Douri.).

• L'Houssaine Kherchtou – Like Jamal al Fadl, L'Houssaine Kherchtou defected from al Qaeda and became a key witness for the U.S. government in a number of terrorism trials, offering testimony regarding al Qaeda. In 1993, Kherchtou traveled to Somalia to join up with al Qaeda's forces in the region, and returned to Sudan with al Qaeda in 1994. *See* Bergen, Peter, *The Osama bin Laden I Know*, 2006, at 141, 154.

• Tawfiq Muhammad Bin Salah Bin Rushayd Bin Attash – Tawfiq bin Attash (a/k/a Khallad) was a member of al Qaeda and trained at the camps in Sudan.

• Mamdouh Mahmud Salim – Mamdouh Salim (a/k/a Abu Hajir al Iraqi) was a senior member of al Qaeda who was tasked with obtaining chemical, biological, nuclear, and radiological materials for al Qaeda and the NIF. *See* CIA 38-52 at 44 ("Chemical, Biological, Nuclear, and Radiological (CBRN) Programs. Al-Qa'ida and Sudan also shared the goal of producing chemical, biological, and possible nuclear or radiological weapons. Senior al-Qa'ida members Mamdouh Mahmoud Salim, a.k.a. Abu Hajir al-Iraqi, and Muhammad Luay Bayazid, a.k.a. Abu Rida al-Suri, were al-Qa'ida's point persons in this effort."); CIA 380-385 at 382 ("In addition, an agreement was concluded between the Iranian government, the Islamic Army, and the NIF regarding military production. The purpose of the project is to achieve self-sufficiency in the areas of ammunition, light weapons, and mines. The primary negotiators were NIF leader Hasan al Turabi, Bin Ladin, and unidentified officials of the Iranian government. Islamic Army members Abu Hajir al Iraqi, aka Mamdouh Salim; Abu al Rida al Suri; and Abu Ibrahim al Iraqi also were involved in the negotiations.").

    e) **The Landmark Plot**

Plaintiffs further disagree with the Agencies' contention that the Landmark Plot is of limited relevance to Plaintiffs' claims against Sudan. The Court's rulings denying Sudan's motion to dismiss and authorizing merits discovery specifically credited Plaintiffs' allegations detailing the Landmark Plot and the involvement of the Sudanese government.[12] As the Court described, "a Sudanese cell in New York was to execute follow-up attacks to the 1993 World Trade Center Bombing," which "led the United States to brand Sudan a state sponsor of terrorism." *See* ECF No. 7942 at 17. The Court further pointed out that NIF leader Hasan al Turabi "issued commands to senior Sudanese diplomatic officials" in support of the "attempted terror attack by Sudanese intelligence officers." *Id.* at 23; *see also* ECF No. 9278 at 14-15 ("Sudan is alleged to have aided radical Islamic terrorists in planned attacks on six New York City landmarks…. The FBI foiled the plot, and U.S. Secretary of State Warren Christopher consequently designated Sudan a state sponsor of terrorism, announcing that 'Sudan is a country which has repeatedly provided support for acts of international terrorism.'").

---

[12] *See, e.g.*, CAC ¶¶ 112-115 (detailing the Landmark Plot); *see also Ashton* Complaint ¶¶ 77-79 (same).

Plaintiffs respectfully submit that evidence concerning the Sudanese government's direct and active role in planning an attack on the United States is relevant to Sudan's mental state and goals in hosting and supporting al Qaeda during the exact same period, and to rebut Sudan's defense that its support and associations with bin Laden were not aimed at directing harm against the United States.[13]

Moreover, the Agencies' claim that the Landmark Plot was not an al Qaeda operation ignores the close relationship between al Qaeda and the terror group leader Omar Abdel Rahman, as well as the realities of the ongoing collaborations between Sudan and al Qaeda at the very time the attack was being planned and orchestrated. *See supra* at 2-7 (discussing the Sudan-al Qaeda collaboration with respect to the al-Qaeda controlled businesses and infrastructure projects; the Sudanese banks and money laundering operations; establishment of terrorist training camps; the procurement of weapons and explosives for al Qaeda and the NIF; constructing military production facilities in Sudan; operations in Somalia targeting the United States and United Nations; and other collaborative efforts).

Finally, the Agencies reiterate their proportionality concerns because certain requests do not include date restrictions, and certain requests are "duplicative" because Plaintiffs sent the same requests to multiple Agencies.

Regarding the Agencies' concern that certain requests do not include a date restriction, Plaintiffs note that many of the requests seek specific documents, such as transcripts or reports about particular al Qaeda entities or individuals where a date restriction would not be appropriate. Further, date restrictions are generally used by parties as a loose approximator of relevancy, but in this case where Sudan's material support of al Qaeda occurred many years prior to the 9/11 attacks, and the Agencies' investigation into the 9/11 attacks spanned decades afterwards, it would be entirely artificial for Plaintiffs to include an arbitrary date restriction on their requests. For example, if Plaintiffs used an arbitrary date of 10 years before or after the 9/11 attacks as a cut off, but the FBI or another agency happened to conduct an interview of an al Qaeda individual a month before or after the cutoff, that potentially highly relevant transcript would be inappropriately excluded from production. Indeed, even Sudan's document requests to the Agencies include a date range from January 1991 to the present, a period of over 35 years, precisely because imposing a narrowed date range would hinder discovery of relevant information.

Lastly, the Agencies' claim that certain requests are "duplicative" because they were sent to multiple agencies is meritless. As Plaintiffs conducted research and carefully drafted their requests, it became clear that each of the Agencies have conducted separate investigations and authored reports with respect to the same individuals and/or events identified in Plaintiffs' subpoenas. For example, Jamal al Fadl worked extensively with the FBI and USMS as a government witness in U.S. terrorism trials, and was also the subject of al-Qaeda related

---

[13] *See also* Opening Statement of Senator John Ashcroft, Hearing of the Subcommittee on African Affairs, Committee on Foreign Relations, One Hundred and Fifth Congress, S. Hrg. 105-223, May 15, 2007 ("Two Sudanese diplomats at the United Nations in New York conspired to help Jihad terrorists gain access to the U.N. complex to bomb the building."). *See also* Irvin Molotsky, *U.S. Expected to Place Sudan on Terrorist List*, The New York Times, August 17, 1993 (identifying Siraj Yousif and Ahmed Yousef Mohamed as Sudanese diplomats and intelligence officers involved in the Landmark Plot).

Sarah S. Normand
May 27, 2025
Page | 9

investigations by the CIA and State. It logically follows that Plaintiffs would have submitted requests relating to Fadl to each of those agencies. Similarly, the Landmark Plot and its conspirators were the subject of separate investigations by the FBI, CIA, and State. Plaintiffs justifiably requested relevant records from those agencies relating to the Plot.

**2.    The Subpoenas Do Not Impose an Undue Burden on the Agencies**

The Agencies further argue that it would be unduly burdensome to search their records for various categories of documents identified in the subpoenas, asserting inter alia that (1) the categories of documents requested are too broad because they require the Agencies to review voluminous amounts of material, which would be difficult to narrow, and some materials are potentially in off-site archives given their age; (2) the request for underlying documents supporting particular Agency reports are overly burdensome because they would be difficult to locate; and (3) once documents are identified, conducting privilege reviews would be painstaking and time-consuming. Plaintiffs respond to these concerns as follows.

First, as noted above, this case is unique. Tasks that may be "unduly burdensome" in other cases may be quite reasonable in this context. The Agencies were previously directed in Executive Order 14,040 that "information collected and generated in the United States Government's investigation of the 9/11 terrorist attacks should now be disclosed, except when the strongest possible reasons counsel otherwise." The Agencies must review these materials and make them available to the 9/11 community and the public at large.

With respect to the Agencies' concerns that the categories of documents requested are too broad or vague and require the Agencies to review voluminous amounts of materials, Plaintiffs respectfully disagree. Each of the requests were carefully drafted and specify particular individuals, entities, and events of interest. Notwithstanding, Plaintiffs are willing to work with the Agencies to develop search terms and/or provide additional information to assist them with the search for responsive materials. In fact, Plaintiffs have already provided copies of CIA and State Department reports/cables to the Agencies on May 1 and 15, 2025 in response to their requests.

The Agencies have also raised concerns that many of the documents are off-site and difficult to review. Plaintiffs are willing to accommodate the Agencies' review of off-site documents by staggering discovery deadlines, such that certain more readily accessible repositories would be reviewed first, while some of the more difficult repositories could be reviewed on a different schedule. Plaintiffs are willing to work with the Agencies to develop such a schedule.

The Agencies further claim that the underlying documents supporting reports generated by the Agencies may be difficult to find unless they are attached to or specifically referenced in the reports themselves. Plaintiffs are willing to meet and confer about how best to capture those supporting documents.

The Agencies have also expressed concerns that once responsive documents are identified, reviewing them for privilege or declassification would be unduly burdensome. Plaintiffs respectfully refer the Agencies to Executive Order 14,040 which requires a declassification review.

Sarah S. Normand
May 27, 2025
Page | 10

Notwithstanding, Plaintiffs have previously agreed to a protective order in this litigation to help facilitate the sharing of documents. Plaintiffs are willing to meet and confer about the potential for a similar arrangement if necessary to facilitate the productions. Plaintiffs reiterate that they are willing to work with the Agencies to develop a reasonable production timeline, where documents can be provided on a rolling basis.

Finally, the Agencies assert that "the documents sought in the Subpoenas do not appear to fall in the scope of the records subject to declassification review in [E.O. 14,040]." Plaintiffs respectfully disagree. The Executive Order quite clearly extends to "information collected and generated in the United States Government's investigation of the 9/11 terrorist attacks," and includes "all records . . . relevant to the 9/11 terrorist attacks or to any of the individual subjects' connection to an agency relationship with a foreign government," among other records. Please identify the categories of documents the Agencies believe are outside of this Executive Order and explain the basis for same.

**3.      The Subpoenas Request Documents as Authorized by Applicable Law**

The Agencies object to the instructions in the subpoenas "to the extent they exceed authority provided in Rule 45, the Local Rules of this District, or the Individual Rules or Orders of Judges Daniels or Netburn." Plaintiffs request that the Agencies please identify any instruction they believe is not authorized by applicable law and to indicate whether the Agencies intend to comply with the instructions as written in the subpoenas.

The Agencies also note that due to the breadth of the subpoenas, it would be unduly burdensome to identify all objections that may apply to specific information or requested documents and reserve rights to assert these objections at a later time. Plaintiffs defer to the application of Rule 45(d)(2)(B) to the Agencies' obligation to object, but acknowledge the Agencies' reservation of rights and also reserve rights regarding same.

Plaintiffs thank the Agencies for their attention to these matters of extreme importance to the 9/11 community and the public at large. Please advise when the DOJ is available to meet and confer about these issues.

Respectfully,

| COZEN O'CONNOR | MOTLEY RICE LLC |
|---|---|
| By: */s/ Sean P. Carter* | By: */s/ Robert T. Haefele* |
| SEAN P. CARTER | ROBERT T. HAEFELE |
| 1650 Market Street, Suite 2800 | 28 Bridgeside Boulevard |
| Philadelphia, PA 19103 | Mount Pleasant, SC 29465 |
| Tel.: (215) 665-2105 | Tel.: (843) 216-9184 |
| Email: scarter1@cozen.com | Email: rhaefele@motleyrice.com |
| *For the Plaintiffs' Executive Committees* | *For the Plaintiffs' Executive Committees* |

Sarah S. Normand
May 27, 2025
Page | 11

KREINDLER & KREINDLER LLP

By: */s/ Steven R. Pounian*
STEVEN R. POUNIAN
485 Lexington Avenue
New York, New York 10017
Tel.: 212-687-8181
Email: spounian@kreindler.com

*For the Ashton Plaintiffs*

LEGAL\77961853\1