**WHITE & CASE**

March 6, 2025

**VIA ECF**

Honorable Sarah Netburn
United States District Court
Southern District of New York
Thurgood Marshall U.S. Courthouse, Room 430
40 Foley Square
New York, NY 10007

White & Case LLP
701 Thirteenth Street, NW
Washington, DC 20005-3807
T +1 202 626 3600

**whitecase.com**

RE:   *In re: Terrorist Attacks on September 11, 2001*, 03 MDL 1570 (GBD) (SN)

Dear Judge Netburn:

Pursuant to this Court's January 21, 2026 Order (ECF 11474), Defendant the Republic of the Sudan respectfully writes to join in part Plaintiffs' Motion to Compel (ECF 11796), and moves to compel the Central Intelligence Agency to comply with the subpoena that Sudan served on the CIA on April 25, 2025 (Erb Ex. A). Sudan adopts parts of Plaintiffs' Brief in Support of Motion, ECF 11797, specifically, the arguments setting forth the legal basis for this Court's authority to compel the CIA to comply with non-party subpoenas (*id.* at 9-10) and for the CIA's obligations to cooperate in discovery (*id.* at 10-12). Sudan categorically rejects and opposes Plaintiffs' unfounded spoliation assertions (*e.g.*, *id.* at 4-5), a subject that this Court already recognized would be addressed, if needed, at a later time. *See* May 30, 2020 Hearing Tr. (Erb. Ex. K) at 37:15-23.

For nearly a year, Sudan has conferred in good faith with the CIA in an effort to minimize the CIA's compliance burden by proposing incremental document searches and productions and proposing to defer any motion to compel, if such motion is needed, until later in the proceedings. Erb Decl. ¶¶ 2-12. Regrettably, the CIA's ultimatum to Sudan is unacceptable. It is inadequate in its coverage of document categories, opaque in its search methodology, and arbitrary in its limits on production (*id.* ¶¶ 9-11). The CIA's refusal to comply with Sudan's subpoena prejudices Sudan's defense. Accordingly, Sudan now joins in part Plaintiffs' motion to compel, in accordance with this Court's prior orders (ECF 11139, 11248, 11408) and in the interest of judicial efficiency.

Specifically, with respect to Sudan's subpoena, Sudan requests that this Court direct the CIA to:

1. Produce documents responsive to each of Sudan's Request Nos. 1-18;

2. Search all categories of documents, including classified documents, documents the CIA has not yet acknowledged, and documents Sudan has not expressly identified in its requests or communications with the CIA;

3. Search all repositories, subject to an appropriately supported demonstration of burden;

4. Confer with Sudan and agree on search terms and a search methodology, and, within fourteen days of the Court's Order on Sudan's motion to compel, submit with Sudan a joint letter to the Court confirming the parties' agreement; and

5. Complete production by the close of document discovery, provided that Sudan is afforded the opportunity to seek from the Court, if necessary, further relief in support of its discovery of the United States, including the CIA.

The Honorable Sarah J. Netburn
March 6, 2026

### A. Sudan adopts Plaintiffs' position that the CIA must comply with Sudan's Rule 45 subpoena insofar as the CIA does not establish—with admissible, non-conclusory evidence—that compliance would be unduly burdensome under Rule 26.

Sudan adopts Plaintiffs' arguments that (a) Rule 45 of the Federal Rules of Civil Procedure authorizes this Court to compel the CIA to produce documents in response to Rule 45 subpoenas, and (b) this Court should resolve these disputes via Rule 26(b)(1)'s relevance requirement and Rule 45's "undue burden" standard. *See* Pls.' Br. 9-10; *see also In re Terrorist Attacks on September 11, 2001*, 523 F. Supp. 3d 478, 488-89 (S.D.N.Y. 2021) (confirming Federal Rules of Civil Procedure govern motions to compel non-party federal agencies' subpoena responses). The U.S. Attorney's Office has acknowledged the Federal Rules as applicable in these proceedings. *See* May 9, 2025 Ltr. (Erb Ex. C) at 4.

### B. Sudan's document requests are relevant to Sudan's defenses and proportional to the needs of this case, and the documents are likely to be found in CIA files.

Sudan categorically denies Plaintiffs' allegations that Sudan proximately caused the September 11, 2001 terrorist attacks by providing purported support to Osama Bin Laden and his associates when Bin Laden lived in Sudan in the early 1990s and after Sudan expelled Bin Laden from the country in May 1996. *Ashton* Am. Compl. ¶¶ 10-11, ECF 6537; Consolidated Am. Compl. ("CAC") ¶¶ 14-17 (ECF 6539). To defend itself, Sudan seeks CIA records concerning Sudan's purported conduct during the period before and after the 9/11 Attacks. Those records will demonstrate that the CIA's conclusory intelligence cannot be relied on as fact, and in any event is insufficient to establish any part of Plaintiffs' claims. Because Plaintiffs rely on CIA reports covering Bin Laden's sojourn in Sudan, Sudan is entitled to responsive records and documents within the CIA's possession or control that concern or underly the subjects of those reports.

**Request Nos. 1, 13-14**: Whether Bin Laden was present in Sudan in the 1990s as a business investor bears on Sudan's defense. Accordingly, Sudan's Request No. 1 seeks records on Bin Laden's business activities in Sudan during that period. And Request Nos. 13-14 seek CIA records—including purported support for two reports relied on by Plaintiffs (CAC ¶¶ 44, 52)—that facially address the reasons for Bin Laden's presence in Sudan.

**Request Nos. 2-7, 15-17**: The circumstances of Sudan's expulsion of Bin Laden from the country in May 1996—five years before the 9/11 Attacks—are relevant to Sudan's defense. Accordingly, Request Nos. 2-7 seek documents concerning the circumstances surrounding Bin Laden's departure from Sudan, including evidence that in 1996 Sudan offered to extradite Bin Laden to the United States, and later expelled him and seized his remaining assets. *See, e.g.*, Timothy Carney & Mansoor Ijaz, *Intelligence Failure?* Wash. Post (June 29, 2002) (Erb Ex. I) (former U.S. ambassador to Sudan discussing Sudan's "offer to extradite" Bin Laden); 9/11 Comm'n Report 65 (acknowledging that in 1996 "[t]he Sudanese government had canceled the registration of the main business enterprises [Bin Laden] had set up there and then put some of them up for public sale. . . .[T]he government of Sudan seized everything Bin Ladin had possessed there."). Request Nos. 15-17 seek CIA records including purported support for two reports—relied on by Plaintiffs (CAC ¶¶ 75, 84, 101)—that facially address the nature and timing of alleged support for Al Qaeda from the National Islamic Front.

WHITE & CASE

The Honorable Sarah J. Netburn
March 6, 2026

**Request Nos. 8-9, 18**: Evidence that before and after the 9/11 Attacks Sudan endeavored to share intelligence with the United States in support of U.S. counterterrorism efforts would belie Plaintiffs' allegation that Sudan consciously, culpably, and voluntarily participated in the 9/11 Attacks. Accordingly, Request Nos. 8-9 seek documents concerning communications between Sudan and the United States about the sharing of counterterrorism intelligence. And Request No. 18 seeks CIA records, including purported support for one report—relied on by Plaintiffs (CAC ¶ 177)—that facially addresses the intelligence community's response to Bin Laden and Al Qaeda.

**Request Nos. 10-12**: Plaintiffs allege that U.S. missile strikes on the Al-Shifa pharmaceutical plant evidence Sudan's complicity with Al Qaeda after Bin Laden's 1996 expulsion from Sudan. But Sudan is aware that the CIA evidence on Al-Shifa that led to the strikes was questionable. *See, e.g.*, 9/11 Comm'n Report 117 (reporting NSC senior director's caution that "we will need much better intelligence on this facility before we seriously consider" strikes); *id.* at 118 (stating that "[n]o independent evidence has emerged to corroborate the CIA's assessment" of Al-Shifa, "a seemingly harmless facility"). Accordingly, Request No. 10 seeks CIA documents relevant to Sudan's defense concerning the strikes on Al Shifa.

Similarly, Plaintiffs and public CIA reports rely heavily on the testimony of Al Qaeda malcontent and embezzler Jamal Al Fadl. *See, e.g.*, CAC ¶¶ 49, 53, 67-68, 90, 125, 138 151-54, 191 (alleging Sudan was complicit in terrorist training and financing, weapons manufacture and procurement); 9/11 Comm'n Report 185-86 ("Much of the early reporting on al Qaeda's financial situation and its structure came from Jamal Ahmed al Fadl[.]" (citing CIA Analytic Report, OTI 97-10035CX, Dec. 1997)). Yet this Court has found that Al Fadl's belief that "avoiding prison, like his hopes for staying in this country, depended on his trial testimony not 'going wrong'" could have supported "a significant attack on al-Fadl's credibility[.]" *United Stated v. Usama Bin Laden*, 397 F. Supp. 2d 465, 493-94 (S.D.N.Y. 2005). Accordingly, Request No. 11 seeks documents concerning Al Fadl's activities in Sudan and cooperation as a U.S. government witness (excluding documents pertaining to his whereabouts or those that would compromise his physical security).

Furthermore, Sudan is aware, based on public reporting and statements from the former U.S. Ambassador to Sudan, that in 1996 the U.S. government was forced to withdraw false intelligence reports of Sudan's purported support for terrorism. *See* Carney & Ijaz, *Intelligence Failure*. The withdrawal of these reports directly undercuts Plaintiffs' allegations based on CIA intelligence from that era. Request No. 12 seeks documents relevant to Sudan's defense concerning the U.S. withdrawal of intelligence reports on Sudan.

### C. Sudan's Requests are not unduly burdensome.

Because Sudan's requests are relevant, the onus is on the CIA to establish that these requests are *unduly* burdensome considering countervailing factors. *See In re Terrorist Attacks*, 523 F. Supp. 3d at 490 ("To the extent such information satisfies Rule 26's broad definition of relevance, the district court may decline to order the agencies to search for that information only if the agencies satisfy their heavy burden of proving oppressiveness or establish some other recognized ground for modifying or quashing subpoenas for relevant information."). To assess burden, this Court considers factors including: "whether discovery is 'unreasonably cumulative or duplicative'; whether requested records 'can be obtained from another source that is more convenient, less burdensome, or less expensive'; whether a party has had 'ample opportunity' to obtain the

requested information through discovery; and whether the proposed discovery is outside of scope permitted by Rule 26(b)(1)." *Id.* at 489.

Sudan's requests narrowly focus on the CIA's activities and information the CIA collected on Sudan. *See generally* Apr. 25, 2025 Ltr. (Erb Ex. B). In the years before the 9/11 Attacks, the CIA had a unique role in monitoring Bin Laden, monitoring Sudanese affairs and carrying out U.S. policy in Sudan, and maintaining communications with Sudan. *See, e.g.*, 9/11 Comm'n Report 349 ("Before 9/11, no agency had more responsibility—or did more—to attack al Qaeda . . . than the CIA."); 9/11 Comm'n, Mem. for the Record of Interview with CIA Employee #26, available at https://catalog.archives.gov/id/2610164 (discussing intelligence gathered on Bin Laden's pre-9/11 financing and his businesses in Sudan). Sudan is unaware of any other source of the CIA's reports, communications, and underlying records. Sudan's requests for *CIA* documents cannot be cumulative or duplicative of requests to *other* agencies.

The CIA's conclusory assertion of "undue burden" (Erb Ex. C at 5) cannot justify the CIA's noncompliance with Sudan's subpoena and its failure, to date, to engage in even incremental production. Any burden the CIA might ultimately establish with specific facts must be weighed against the importance of the issues at stake and Sudan's need for access to relevant information. Fed. R. Civ. P. 26(b)(1); *In re Terrorist Attacks*, 523 F. Supp. 3d at 494 (stating that "reasonable inconvenience must be borne" by a federal agency and that case importance "is relevant in determining the reasonableness of the subpoena"). Sudan, a foreign sovereign, faces grave accusations by thousands of Plaintiffs that Sudan caused the 9/11 Attacks. Should Plaintiffs' selected snippets of public CIA documents be admissible without the CIA's compliance with Sudan's subpoena requests, Sudan will be seriously prejudiced in mounting its defense.

The DOJ's boilerplate objections on behalf of multiple U.S. agencies also fail to identify any specific objections to producing relevant documents under the CIA's *Touhy* regulations (32 C.F.R. §§ 1605.1, *et seq.*) or based on any privilege. The AUSA merely speculated that the subpoenas request information "*likely* to be classified, privileged, or otherwise protected." *See* Erb Ex. C at 6 (emphasis added). The CIA cannot refuse to conduct searches based on such speculation. *See* Fed. R. Civ. P. 45(e)(2)(A); *see also Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency*, No. 1:13-cv-1053, 2019 WL 5864595, at *3-4 (D.D.C. Nov. 8, 2019) (rejecting the "vague assertion" that document requests are likely to be subject to privilege assertions). Nor should this Court presume that any intelligence risk would result from searching and declassifying—pursuant to applicable redaction regulations—documents regarding events from over *thirty* years ago.

### D.  The CIA's unilaterally narrowed response to Sudan's subpoena is impermissible.

The CIA's intended approach—to re-process redactions to already declassified documents, conduct limited searches on search terms unilaterally selected by the agency, and produce just fifteen reports (*see* Nov. 24, 2025 E-mail (Erb Ex. F))—is improper for several reasons. The CIA has refused to explain its search process, *i.e.*, what repositories it will search, how it will combine terms, or how it will select what it considers the fifteen most responsive reports (especially given the risk of false hits). Fifteen reports is an arbitrary number, apparently set by the CIA before conducting any searches, and likely is prejudicially underinclusive. By limiting its searches and productions to finished intelligence reports (*see id.*), the CIA's proposal also neglects whole swaths of responsive materials, including underlying documents on which the reports are based and other

The Honorable Sarah J. Netburn
March 6, 2026

as-yet unidentified reports. Furthermore, the CIA's proposal necessarily excludes materials responsive to Sudan's request for documents concerning *withdrawn* intelligence reports.

### E. Sudan has made good-faith efforts to minimize the CIA's compliance burden.

Sudan has consistently worked in good faith to minimize the CIA's burden in complying with Sudan's subpoena. *See* Erb Decl. ¶¶ 4-10. Sudan provided the CIA with publicly available information demonstrating the relevance of Sudan's requests and its bases for understanding that the CIA has responsive documents. *See* Erb Decl. ¶ 4; May 29, 2025 Ltr. (Erb Ex. D) at 1-5. Sudan also agreed, reserving all rights, to proceed with the AUSA's proposal that the U.S. State Department attempt to respond in the first instance to Sudan's Request No. 12 for documents concerning intelligence reports about Sudan withdrawn by the CIA in 1996. Erb Decl. ¶ 7; July 9, 2025 Ltr. (Erb Ex. E) at 2. However, the State Department has yet to produce any documents responsive to this request. When the CIA proposed to re-process redactions on previously disclosed reports, Sudan identified extensive passages of CIA reports (of which Sudan was aware) that are irrelevant and that therefore do *not* require re-processing. Erb Decl. ¶ 10; Second Dec. 12, 2025 E-mail (Erb Ex. H). The CIA has never agreed. Sudan even provided the CIA with suggested search terms, including alternate spellings of Arabic names, which the CIA refused to apply. *Id.* ¶¶ 10-11; First Dec. 12, 2025 E-mail (Erb. Ex. G).

### F. Allegations of spoliation by Sudan are irrelevant and unfounded.

Plaintiffs' suggestion (Pls.' Br. at 4-5) that Sudan engaged in spoliation is baseless. Sudan has not destroyed relevant documents, let alone with a culpable state of mind. *See Williamson v. Verizon Comm'ns Inc.*, 2013 U.S. Dist. LEXIS 209465 (S.D.N.Y. July 23, 2013) (collecting authorities that, "where the evidence is lost as a result of events beyond the control of the party bearing the obligation to preserve evidence, courts have declined to find spoliation").

Since 2023, Sudan has endured a violent internal armed conflict. As previously explained, the war has not only caused widespread death, injury, famine, and internal displacement, but has also led to the total ruin of Sudan's government buildings and archives. *See* Status Ltr. (May 23, 2025), ECF 10968 (demonstrating destruction of Sudan's document repositories). Any loss of relevant documents in Sudan's possession has been outside of Sudan's control and prejudicial *to Sudan*. *See* Erb Ex. K at 17:7-9.

In any event, having represented to this Court their readiness to present their case *without any further discovery*, Plaintiffs cannot credibly suggest that the loss of documents during Sudan's armed conflict has irreparably prejudiced their ability to prove their claims. *See* Aug. 5, 2025 Hearing Tr. (Erb Ex. J) at 16:10-13 (Plaintiffs' counsel stating: "We are in a position now to present a robust body of eviden[ce] in that default hearing and we are essentially ready to go . . . .").

\* \* \*

For the foregoing reasons, Sudan respectfully requests that this Court compel the CIA to comply with Sudan's subpoena in the manner set forth above by the document-discovery deadline of June 30, 2026, and afford Sudan the opportunity to seek additional relief as necessary in support of its discovery of the United States, including the CIA. Sudan reserves all rights with regard to any objections or disputes that may arise over the course of the CIA's document production. Sudan also preserves and expressly does not waive any of its rights, defenses, privileges, and immunities, including those based on jurisdiction and sovereign immunity.

WHITE & CASE

The Honorable Sarah J. Netburn
March 6, 2026

Respectfully submitted,

WHITE & CASE

<u>/s/ *Nicole Erb*</u>
Christopher M. Curran
Nicole Erb
Nicolle Kownacki
Celia McLaughlin
701 Thirteenth Street, NW
Washington, DC 20005
Phone: (202) 626-3600
Fax: (202) 639-9355
ccurran@whitecase.com
nerb@whitecase.com
nkownacki@whitecase.com
cmclaughlin@whitecase.com

*Counsel for the Republic of the Sudan*

cc: Counsel of Record (via ECF)