# EXHIBIT B

WHITE & CASE

White & Case LLP
701 Thirteenth Street, NW
Washington, DC 20005-3807
T +1 202 626 3600

whitecase.com

April 25, 2025

**VIA CERTIFIED MAIL**

Central Intelligence Agency
c/o Litigation Division
Office of General Counsel
Washington, DC 20505

*Re:  In re Terrorist Attacks on September 11, 2001*, Case No. 1:03-md-1570-GBD-SN (S.D.N.Y.): Subpoena to Produce Documents

To whom it may concern:

Our firm represents the Republic of the Sudan in the above-referenced civil action pending in the U.S. District Court for the Southern District of New York before the Honorable George B. Daniels and the Honorable Sarah Netburn. Pursuant to 32 C.F.R. §§ 1904.1 *et seq.*, enclosed please find a subpoena for documents, electronically stored information, or tangible things related to the civil action.

These documents and records are sought in connection with fact discovery that the Court ordered to commence on February 5, 2025. We ask that you produce the requested documents and records by **May 27, 2025**.

The requested documents and records are relevant to this litigation. Specifically, Plaintiffs in this action allege that Sudan provided material support to Osama Bin Laden and his associates during the time that Bin Laden lived in Sudan in the early 1990s, and that Sudan continued to provide such support after it expelled Bin Laden from the country in May 1996. Plaintiffs further allege that such support proximately caused the September 11, 2001 terrorist attacks. Sudan expresses its deepest sympathies to the victims of the September 11, 2001 terrorist attacks and their family members, but Sudan denies that it provided material support to Bin Laden or his associates or that it proximately caused the September 11 attacks. Further, Sudan expelled Bin Laden from Sudan in 1996, thereby breaking any causal link between Bin Laden's time in Sudan and the September 11, 2001 attacks years later. *See* Nat'l Comm'n on Terrorist Acts Upon the United States, The 9/11 Comm'n Report 62-63, 109-10 ("9/11 Comm'n Report").

During the times relevant to this action, the CIA was involved in monitoring Bin Laden, as well as affairs in Sudan, advising the President and other federal agencies on matters pertaining to Sudan, setting and carrying out U.S. policy with respect to Sudan, and maintaining communications with Sudan. *See, e.g.*, Nat'l Comm'n on Terrorist Attacks on the United States, Mem. for the Record (MFR) of an Interview with CIA Employee #26, available at https://catalog.archives.gov/id/2610164 ("CIA Employee #26"). In addition, the Complaint relies

Litigation Division, Office of the General Counsel, CIA
April 25, 2025

WHITE & CASE

on reports and other documents, such as the 9/11 Commission Report, which in turn repeatedly reference intelligence reports originating from the CIA. *See, e.g.*, Consolidated Am. Compl. ¶¶ 52-53, ECF No. 6539 ("CAC") (citing Nat'l Comm'n on Terrorist Acts Upon the United States, The 9/11 Comm'n Report ("9/11 Comm'n Report") 57-59); *see also, e.g.*, 9/11 Comm'n Report at 88-93 (discussing CIA's pre-9/11 counter-terrorism role); *id*. at 109 (discussing formation of CIA's "Bin Ladin Unit"); *id*. at 118 (discussing "reams of new information that the CIA's Bin Ladin unit had been developing since 1996"); *id*. at 349 ("Before 9/11, no agency had more responsibility—or did more—to attack al Qaeda, working day and night, than the CIA."). The documents and records requested are relevant to evaluating the bases for those intelligence reports.

The attachment below, entitled "Additional Information in Support of Sudan's Requests," sets forth, with as much specificity as possible, the documents and records requested and the nature of the official information sought, including, where possible, the exact or approximate dates of relevant events, documents, or communications, the precise subject matter at issue, the specific individuals or entities involved, and the authors and/or recipients of specific documents and communications. Appendix A sets out the list of documents requested as well as relevant definitions and instructions. The Plaintiffs' complaints are enclosed for reference in Appendices B and C.

Please feel free to contact us directly to discuss the requests and coordinate your production. We will work with you to make the process of responding to the subpoena as minimally burdensome as possible.

Best regards,

Christopher M. Curran
Nicole Erb
Celia McLaughlin


Enclosures

cc (via email): Sarah Normand
 Jennifer Jude
 Assistant United States Attorneys
 Southern District of New York
 86 Chambers Street
 New York, NY 10007
 Sarah.Normand@usdoj.gov
 Jennifer.Jude@usdoj.gov

2

Litigation Division, Office of the General Counsel, CIA
April 25, 2025

WHITE & CASE

# ATTACHMENT: ADDITIONAL INFORMATION IN SUPPORT OF SUDAN'S REQUESTS

**Request No. 1**

**All Documents Concerning the activities of Osama Bin Laden in Sudan from 1991-1996, including without limitation all Communications Concerning Osama Bin Laden in Sudan from 1991-1996.**

**Request No. 2**

**All Documents Concerning the departure of Osama Bin Laden from Sudan in or around May 1996.**

**Request No. 3**

**All Documents Concerning the activities of Osama Bin Laden and his associates after Bin Laden departed Sudan in or around May 1996 through 2001.**

**Request No. 4**

**All Documents concerning Osama Bin Laden's purported businesses in Sudan and al Qaeda's purported activities in Sudan, including without limitation a purported CIA report titled "Usama Bin Ladin's Finances: Some Estimates of Wealth, Income, and Expenditures, November 17, 1998," and a purported CIA report titled "Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions, December 1997," as well as all Documents that may tend to contradict the allegations or conclusions in these reports.**

   **Additional Support for Request Nos. 1-4**

As discussed above, Sudan is preparing to defend itself against serious allegations that it provided material support to Osama Bin Laden and al Qaeda in the early-/mid-1990s that purportedly caused the terrorist attacks on September 11, 2001.

It is undisputed that the CIA played a major role investigating Bin Laden in the mid-to-late 1990s. Publicly available information shows that CIA monitored and collected intelligence on terrorist activity in the Middle East and North Africa throughout the 1990s, and on Bin Laden himself beginning in the early- to mid-1990s. *See, e.g.*, Declaration of John E. Cloonan, ¶ 3, *Owens v. Republic of Sudan*, No. 01-2244-JDB (D.D.C. March 10, 2004), ECF No. 49-2 ("Cloonan Decl.") ("In the Spring of 1996, I began working on the Osama bin Laden case. I became part of a joint FBI/CIA operation that was legally authorized and responsible for neutralizing Osama bin Laden as a threat to United States national security."); 9/11 Comm'n Report 88-93 (discussing CIA's pre-9/11 counter-terrorism role); *id*. at 109 (discussing formation of CIA's "Bin Ladin Unit"); *id*. at 118 (discussing "reams of new information that the CIA's Bin Ladin unit had been developing since 1996"); *id*. at 349 ("Before 9/11, no agency had more responsibility—or did more—to attack al Qaeda, working day and night, than the CIA.").

Litigation Division, Office of the General Counsel, CIA
April 25, 2025

WHITE & CASE

Sudan's requests are tailored to uncover information collected by the CIA through its investigations that is relevant to this litigation. For example, investigative records from this period may bear on Plaintiffs' allegations that "[t]he success of the September 11th attacks was made possible by Sudan's pervasive state sponsorship of al Qaeda beginning in 1989" and that "Sudan served as a critical incubator for al Qaeda from its nascent stages." CAC ¶¶ 14-15.

These documents are also necessary to determine the extent to which the United States considered Bin Laden to be a threat to United States interests during the time he lived in Sudan. *See, e.g.*, 9/11 Comm'n Report 108 ("Until 1996, hardly anyone in the U.S. government understood that Usama Bin Ladin was an inspirer and organizer of the new terrorism.").

The CIA's records are also relevant to Plaintiffs' allegations that Bin Laden continued to hold business interests in Sudan after his expulsion in 1996. *See, e.g.*, CAC ¶ 135 & n.74 ("According to a June 20, 2000 State Department cable, 'Several Bin Ladin businesses . . . are run by al-Qa'ida lieutenants and still operate in Sudan. . . . Sudan maintains a financial stake in some of these companies and has tried to obscure Bin Ladin's commercial ties by changing the name of at least one of his companies.'"). These allegations directly contrast with the 9/11 Commission's express findings. *See* 9/11 Comm'n Report 65 (citing DOS Cable, Nairobi 11468, "Sudan: Major Usama Bin Ladin Asset Deregistered," Aug. 6, 1996) ("Bin Laden was in his weakest position since his early days in the war against the Soviet Union. The Sudanese government had canceled the registration of the main business enterprises he had set up there and then put some of them up for public sale. According to a senior al Qaeda detainee, the government of Sudan seized everything Bin Ladin had possessed there."); *id*. at 62 ("Not until 1998 did al Qaeda undertake a major terrorist operation of its own, in large part because Bin Ladin lost his base in Sudan."); *id.* at 63 (stating Bin Ladin left Sudan "significantly weakened"); *id*. at 170 ("Nor were Bin Ladin's assets in Sudan a source of money for al Qaeda. When Bin Ladin lived in Sudan from 1991 to 1996, he owned a number of businesses and other assets. These could not have provided significant income, as most were small or not economically viable. When Bin Ladin left in 1996, it appears that the Sudanese government expropriated all his assets: he left Sudan with practically nothing.").

Indeed, on Sudan's Motion to Dismiss, the Court disregarded the 9/11 Commission's findings in favor of the allegations based on the State Department's purported cable. *See* Report & Recommendation 13 (May 3, 2022), ECF No. 7942 (Netburn, M. J.) ("R&R") ("The business infrastructure developed in the early 1990s may also have endured. Sudan reports that bin Laden was left with nothing following his departure because the government took all his assets. Yet State Department reports suggest that several of bin Laden's businesses continued to operate by June 2000 and that the Sudanese government may have worked to conceal bin Laden's ties to these enterprises.").

We know that the CIA was involved in monitoring and reporting on the state of Bin Laden's finances when he was in Afghanistan, and on the Sudanese government's seizure of his assets before it expelled him. A CIA employee informed the 9/11 Commission that Bin Laden arrived in Afghanistan "with very little money," because "[t]here were very few successful businesses in Sudan," but "[t]hose assets were frozen by the Sudanese government" and "Bin Laden received 'pennies on the dollar' for his assets in Sudan." *See* CIA Employee #26, available at

4

Litigation Division, Office of the General Counsel, CIA
April 25, 2025

WHITE & CASE

https://catalog.archives.gov/id/2610164. We are also aware of certain reports produced by the CIA concerning the businesses and finances of Bin Laden.

Sudan is entitled to test the accuracy, validity, and correct interpretation of the content of the purported State Department cable on which Plaintiffs rely, with reference to material in the possession of the CIA.

**Request No. 5**

**All Documents Concerning the offers made by Sudan to extradite or otherwise deliver the individual known as Osama Bin Laden to the United States in 1996 or earlier, and the CIA's consideration and acceptance or rejection of those offers.**

**Request No. 6**

**All Documents Concerning the offers made by Sudan to extradite or otherwise deliver the individual known as Osama Bin Laden to Saudi Arabia in 1996 or earlier, and Saudi Arabia's and/or the CIA's consideration and acceptance or rejection of those offers.**

**Request No. 7**

**All Documents Concerning the offers made by Sudan to extradite or otherwise deliver the individual known as Osama Bin Laden to any country other than the United States or Saudi Arabia in 1996 or earlier, and that country's and/or the CIA's consideration and acceptance or rejection of those offers.**

    **Additional Support for Request Nos. 5-7**

Publicly available reports show that Sudan offered to extradite or otherwise deliver Bin Laden to the United States prior to expelling him, and that the United States refused the offer. *See, e.g.*, Timothy Carney and Mansoor Ijaz, *Intelligence Failure? Let's Go Back to Sudan*, WASH. POST, June 30, 2002 (noting that "after offering to hand bin Laden over to U.S. authorities, Sudan expelled him"); STEVE COLL, GHOST WARS 324 (2004) (quoting President Clinton as stating, "We couldn't indict him because he hadn't killed anybody in America. He hadn't done anything to us.").

Public information likewise suggests that the CIA was aware of, and directly involved in, negotiations regarding an offer by Sudan to extradite or otherwise hand over Bin Laden to either the United States or Saudi Arabia. *See, e.g.*, Barton Gellman, *U.S. Was Foiled Multiple Times in Efforts to Capture Bin Laden or Have Him Killed*, WASH. POST, Oct. 3, 2001 ("The government of Sudan, employing a back channel direct from its president to the Central Intelligence Agency, offered in the early spring of 1996 to arrest Osama bin Laden and place him Saudi custody, according to officials and former officials in all three countries. The Clinton administration struggled to find a way to accept the offer in secret contacts that stretched from a meeting at a Rosslyn hotel on March 3, 1996, to a fax that closed the door on the effort 10 weeks later."); COLL

Litigation Division, Office of the General Counsel, CIA
April 25, 2025

WHITE & CASE

324 ("The Saudis 'were afraid [taking Bin Laden] was too much of a hot potato, and I understand where they were,' [President] Clinton recalled.").

News articles state that Sudan's offers to extradite Bin Laden were not limited to the United States or Saudi Arabia. *See, e.g.*, Gellman, *U.S. Was Foiled Multiple Times* ("In one formulation, [Sudanese envoy Elfatih] Erwa said Sudan would consider any legitimate proffer of criminal charges against the accused terrorist."). And when Sudanese officials asked where to send Bin Laden, Ambassador Carney gave Sudanese officials "the official line from Washington: 'Anywhere but Somalia.'" MINITER 124 (2003).

Request Nos. 4–6 seek documents relevant to understanding whether Sudan's offers were received, considered and rejected by the United States. The CIA would have unique records concerning any such offers by Sudan, and these documents cannot be obtained from any other source.

**Request No. 8**

**All Documents Concerning Communications from Sudan to the United States concerning requests to share intelligence or other information about Osama Bin Laden from 1991-2002, including the Communications themselves and any responses by the United States. Responsive Documents include but are not limited to:**

    a. **All Documents Concerning Meetings or Communications between the United States and Elfatih Erwa in or around March 1996.**

    b. **All Documents Concerning Communications from Sudan in July 1996, including the Communications themselves, offering the United States permission to photograph two locations in Sudan — the Sudan Military Academy in North Omdurman and a facility/area in Merkyhiat — and the CIA's acceptance or rejection of those offers.**

    c. **All Documents Concerning an April 1997 Communication from President Bashir to President Bill Clinton offering the United States access to Sudan's counter-terrorism intelligence, including the Communication itself and any response by the United States.**

    d. **All Documents Concerning Meetings or Communications with Ambassador Mahdi Ibrahim Mohamed regarding Sudan's offer to share counter-terrorism intelligence with the United States from 1996-1999, including the Communications themselves and any responses by the United States.**

    e. **All Documents Concerning Meetings or Communications with Mansoor Ijaz from 1996-2002 regarding Sudan's offer to share counter-terrorism intelligence with the United States, including any Communications from Mansoor Ijaz and any responses by the United States.**

      **f. All Documents Concerning Meetings or Communications with Salah Gosh from 1991-2002 regarding Sudan's offer to share counter-terrorism intelligence with the United States, including any responses by the United States.**

**Request No. 9**

**All Documents Concerning any actual exchange of intelligence or other information between Sudan and the United States concerning Osama Bin Laden and/or Al Qaeda from 1991-2002.**

      **Additional Support for this Request Nos. 8-9**

Numerous public sources have identified the CIA as central to the receipt, consideration of, and response to Sudan's offers to share counter-terrorism intelligence and other information about Bin Laden with the United States.

For example:

a) Ambassador Carney and numerous additional sources have reported that in March 1996, Elfatih Erwa, as an envoy of the Sudanese government, had multiple meetings with U.S. representatives, including Ambassador Carney and David Shinn of the Department of State, at the Hyatt Hotel in Rosslyn, Virginia for talks on improving U.S.-Sudan relations. *See, e.g.*, Carney and Ijaz, *Intelligence Failure?*; Gellman, *U.S. Was Foiled Multiple Times*. Sources also report that Erwa offered to extradite or otherwise deliver Bin Laden to either the United States or Saudi Arabia at these meetings. *See, e.g.*, Carney and Ijaz, *Intelligence Failure?*; Gellman, *U.S. Was Foiled Multiple Times*.

b) Ambassador Carney has written that Sudan "offered FBI and CIA counter-terrorism units unfettered and unconditional access to Khartoum's intelligence," including permission to photograph two alleged camps in July 1996, but the U.S. "failed to follow up." Carney and Ijaz, *Intelligence Failure?* There are also reports that Sudan sent letters to President Clinton and Secretary of State Albright "extending an invitation for a U.S. counterterrorism inspection mission to visit Sudan" in February 1997. 9/11 Comm'n Report Ch. 4 n.7 (citing, *inter alia*, interview with former FBI Agent David Williams).

c) Ambassador Mohamed served as Sudan's Ambassador to the United States from 1996-1999, and while in the United States, "conveyed an open offer: the C.I.A. and F.B.I. could send a joint investigative team, which could travel freely throughout the country," but this offer was apparently refused. Rose, *Osama Files*.

d) Mansoor Ijaz served as a point-person for ongoing efforts by the Sudanese government to engage with Washington, and relayed repeated offers from Sudan to share its counter-terrorism intelligence with the United States. Carney and Ijaz, *Intelligence Failure?*

e) Numerous press outlets have reported that Salah Gosh, Sudan's former intelligence chief, worked with the U.S. government on counter-terrorism measures. *See, e.g.*, Andrew McGregor, *Terrorism and Violence in the Sudan*, Terrorism Monitor (June 17, 2005) ("The

Litigation Division, Office of the General Counsel, CIA
April 25, 2025

WHITE & CASE

> CIA has initiated close contacts with Sudanese intelligence director Major-Gen. Salah Abdallah Gosh."); David Hearst et al., *Sudanese spy chief 'met head of Mossad to discuss Bashir succession plan'*, Middle East Eye (Mar. 1, 2019), https://www.middleeasteye.net/news/exclusive-sudanese-spy-chief-met-head-mossad-discuss-bashir-succession-plan (describing Gosh as "CIA's man in Khartoum" and stating, "Gosh is well known in Washington, where he earned a reputation during the 2000s as a spy chief with whom the CIA could work in the 'war on terror' against al-Qaeda, even visiting the US in 2005."); Glenn Kessler, *Sudanese Official Is a No-Show at State Department*, Wash. Post (May 13, 2006) (noting Gosh "traveled to Washington last year to meet with CIA officials").

The CIA's communications regarding Sudan's offers to share intelligence with the United States are relevant to this litigation. To the extent that any offers were accepted in any way, and relevant intelligence was exchanged, this is also relevant.

The CIA is in a unique position to have documents and communications regarding offers received by its officials. Furthermore, the CIA's documents regarding its consideration of such offers, and the U.S. government's response to them, cannot be obtained from any other source.

**Request No. 10**

**All Documents Concerning the bombing of the pharmaceutical factory in Khartoum, Sudan known as "Al-Shifa" or "El-Shifa" on August 20, 1998.**

   **Additional Support for this Request**

In purported retaliation for the 1998 embassy attacks — for which Al Qaeda claimed credit — President Clinton ordered and the United States carried out missile strikes on the El-Shifa pharmaceutical plant in Khartoum, which the Clinton administration claimed was owned by associates of Bin Laden and was used to produce chemical weapons, including nerve gas. *El-Shifa Pharm. Indus. Co. v. United States*, 378 F.3d 1346, 1349 (Fed. Cir. 2004).

Plaintiffs cite these missile strikes as evidence of Sudan's complicity in Al Qaeda's attacks on the U.S. embassies. *See Ashton Am.* Compl. ¶ 85, ECF No. 6537 ("*Ashton* Comp.) ("*Ashton* Compl.") ("On August 20, 1998, 'To preempt additional attacks, the United States launched military cruise missile strikes against terrorist targets in Afghanistan and Sudan.' One of those targets was a Sudanese government chemical factory north of Khartoum.").

The Court has also placed particular emphasis on the United States's decision to carry out strikes against the El-Shifa plant, finding, "most dramatically—the United States launched cruise missile strikes on terrorist targets in Sudan in 1998, two years after bin Laden's departure. Thus, evidence indicates that 'Sudan's support to Al Qaeda continued even after Bin Laden's expulsion from the country in 1996. . . .'" R&R 14 (citing *Ashton* Compl. ¶ 85 and quoting *Rux*, 495 F. Supp. 2d at 551). Indeed, the Court expressly found that "the 1998 missile strikes are arresting evidence that the U.S. did not consider Sudan's break with al Qaeda two years earlier to be particularly clean." *Id*. at 17.

Litigation Division, Office of the General Counsel, CIA
April 25, 2025

WHITE & CASE

Yet numerous public officials have questioned the evidence that the United States used to justify the attack. *See, e.g.*, 9/11 Report 117 (discussing internal dissent over El-Shifa attacks); James Astill, *Strike One*, The Guardian (Oct. 2, 2001), available at https://www.theguardian.com/world/2001/oct/02/afghanistan.terrorism3; Carney and Ijaz, *Intelligence Failure?* We understand that the CIA was responsible for gathering the purported evidence used to justify the attack, and that prior to the attack, "[s]enior agency officials" at Langley expressed skepticism about the intelligence and worries about the selection of the El-Shifa plant as a target. James Risen, *QUESTION OF EVIDENCE: A special report; To Bomb Sudan Plant, or Not: A Year Later, Debates Rankle*, N.Y. Times (Oct. 27, 1999), available at https://www.nytimes.com/1999/10/27/world/question-evidence-special-report-bomb-sudan-plant-not-year-later-debates-rankle.html. Reports also demonstrate that, after the attack, numerous high-ranking CIA officials — including the head of the CIA's Directorate of Operations, the head of the Africa division at the Directorate of Operations, and the chief of the CIA Counterterrorism Center — "believed that the attack was not justified." *Id*.

The CIA's documents surrounding the bombing of the El-Shifa plant and the evidence used to justify the strike are relevant to Plaintiffs' allegation, credited by the Court, that the U.S. decision to carry out strikes against the El-Shifa plant is evidence that Sudan supported Al Qaeda.

**Request No. 11**

**All Documents Concerning Jamal al Fadl's activities in Sudan and Jamal al Fadl's cooperation as a government witness in the United States.**

### Additional Support for this Request

The Plaintiffs rely heavily on the testimony of Jamal al Fadl, a witness for the United States in the case *United States v. Bin Laden*, No. 98-cr-1023 (S.D.N.Y. Sept. 21, 1998) who had formerly acted as a "business agent" of Bin Laden. 9/11 Comm'n Report 62. Indeed, Mr. al Fadl's testimony is the direct source of many of Plaintiffs' allegations. *See, e.g.*, CAC ¶¶ 49-51, 53, 67-73, 90, 109, 124-25, 136-39, 151-54, 191; *Ashton* Compl. ¶¶ 13, 28, 92. But more importantly, the Court, in denying Sudan's motion to dismiss, relied extensively on allegations based on Mr. al Fadl's testimony. *See, e.g.*, R&R 10, 11, 16, 21.

Given the Court's reliance on Mr. al Fadl's prior testimony, obtaining the information underlying his testimony is vital to Sudan's defense. Sudan is entitled to test the accuracy, validity, and correct interpretation of the content of Mr. al Fadl's testimony.

We understand that the CIA was involved in interviewing and handling Mr. al Fadl. *See, e.g.*, 9/11 Comm'n Report 185 (discussing how, in large part thanks to al Fadl's information, "the CIA obtained a general understanding of how al Qaeda raised money" and understood "the loose affiliation of financial institutions, businesses, and wealthy individuals who supported extremist Islamic activities"); *see also* Jane Mayer, *Junior*, THE NEW YORKER (Sept. 3, 2006), available at https://www.newyorker.com/magazine/2006/09/11/junior ("C.I.A. officials debriefed Fadl for a month and a half. In the fall of 1996, the C.I.A. flew him from Eritrea to a U.S. military base in Germany, where he entered the custody of the F.B.I."). The documents and records of those interviews and assessments are relevant to this litigation.

Litigation Division, Office of the General Counsel, CIA
April 25, 2025

WHITE & CASE

In addition, documents that underlie Mr. al Fadl's testimony would add context to his statements and Plaintiffs' allegations. For example, Plaintiffs cite to Mr. al Fadl's testimony to support their allegation that, "[t]he explosives used in the attack on the U.S.S. Cole originated in Sudan." CAC ¶ 191. However, Mr. al Fadl gave no such testimony and, in fact, the U.S. prosecutor in the Bin Laden trial informed the court that the U.S. government had "stipulated that these weapons were never used against Americans" and that "it is not the government's contention that anything contained in those crates was ever in fact used against the American military." *United States v. Bin Laden*, Case No. 198-CR-1023, Trial Tr. at 342:1-13 (Feb. 6, 2001).

Furthermore, given its role in monitoring terrorist activities and Bin Laden throughout the 1990s, the CIA would have unique documents and records relating to Mr. Al Fadl's activities prior to his becoming a government witness.

**Request No. 12**

**Information sufficient to establish and explain the withdrawal of approximately 100 United States intelligence reports regarding Sudan in 1996.**

   **Additional Support for this Request**

Ambassador Carney and others have reported that in 1996, more than 100 intelligence reports were "scrapped" when the United States determined that its "key source had either embellished or wholly fabricated information." *See, e.g.*, Carney and Ijaz, *Intelligence Failure?* The Department of State's decision to vacate the U.S. Embassy in Sudan was based on these reports, yet even after determining that the intelligence was false, the Department of State refused to send its diplomats back. *Id.*

The CIA's documents surrounding the withdrawal of more than 100 intelligence reports are relevant to this litigation. The CIA is in a unique position to have documents and communications regarding the rescission of these intelligence reports. Furthermore, the CIA's documents regarding its role in the withdrawal of such reports cannot be obtained from any other source.

**Request No. 13**

**All Documents concerning a purported CIA report titled "Al-Qaida in Sudan, 1992-1996: Old School Ties Lead Down Dangerous Paths, March 10, 2003" (see CAC ¶ 44 n.14), including the report itself, and including all Documents that may tend to contradict the statements in this report.**

**Request No. 14**

**All Documents concerning a purported CIA report titled "Historical Background of the Islamic Army and Bin Ladin's Move from Afghanistan to Sudan, November 26, 1996" (*see* CAC ¶ 52 n.18), including the report itself, and including all Documents that may tend to contradict the allegations or conclusions in this report.**

Litigation Division, Office of the General Counsel, CIA
April 25, 2025

WHITE & CASE

**Request No. 15**

All Documents concerning a purported CIA report titled "Terrorism: Establishment of a Tripartite Agreement Among Usama Bin Laden, Iran and the NIF, January 31, 1997" (*see* CAC ¶ 75 n.31), including the report itself, and including all Documents that may tend to contradict the allegations or conclusions in this report.

**Request No. 16**

All Documents concerning a purported CIA report titled "Terrorism: Cooperation Among Usama Bin Ladin's Islamic Army, Iran, and the NIF, January 31, 1997" (*see* CAC ¶ 84 n.36), including the report itself, and including all Documents that may tend to contradict the allegations or conclusions in this report.

**Request No. 17**

All Documents concerning a purported CIA report titled "Terrorism: Usama Bin Laden's Activities in Somalia and Sudanese NIF Support, April 30, 1997" (*see* CAC ¶ 101 n.48), including the report itself, and including all Documents that may tend to contradict the allegations or conclusions in this report.

**Request No. 18**

All Documents concerning a purported CIA report titled "The Rise of UBL and Al-Qa'ida and the Intelligence Community Response, March 19, 2004" (*see* CAC ¶ 177 n.93), including the report itself, and including all Documents that may tend to contradict the allegations or conclusions in this report.

    **Additional Support for Request Nos. 13-18**

Plaintiffs' Complaints extensively cite these purported CIA reports. *See, e.g.*, CAC ¶¶ 44 n.14, 52 n.18, 75 n.31, 81 n. 34, 82 n. 35, 84 n.36, 101 n.48, 176 n. 92, 177 n.93. More importantly, the Court relied on allegations based on these reports, directly quoting from the Complaint's recitations of the reports themselves. *See, e.g.*, R&R 12 (citing CAC ¶ 44); *id*. at 16 (citing CAC ¶ 82). Sudan is entitled to test the accuracy, validity, and correct interpretation of the content of the relevant reports with reference to the underlying source material. Moreover, if the CIA reports were based on faulty intelligence, Sudan is entitled to discovery of same. *See, e.g.*, Carney and Ijaz, *Intelligence Failure?* (noting that the State Department vacated its embassy in Sudan based on reports that were "scrapped" when it was determined the source had "either embellished or wholly fabricated information," and subsequently refused to reopen the embassy even after determining the reports were false).