# EXHIBIT D

WHITE & CASE

White & Case LLP
701 Thirteenth Street, NW
Washington, DC 20005-3807
T +1 202 626 3600

whitecase.com

May 29, 2025

**VIA EMAIL**

Sarah S. Normand
Jean-David Barnea
Assistant United States Attorneys
Southern District of New York
86 Chambers Street
New York, New York 10007

*In re Terrorist Attacks on September 11, 2001*, Case No. 1:03-md-1570-GBD-SN (S.D.N.Y.): **Subpoenas to CIA, FBI, USMS, and State Department**

Dear Counsel:

This responds to your May 9, 2025 letter, which sets forth the "objections" of the CIA, FBI, USMS, and State Department ("the Agencies") to the subpoenas for the production of documents that Sudan served on each of the Agencies on April 25, 2025.

We address below the government's two blanket relevance objections and its generalized burden objection as set forth in the May 9 letter. We request to meet and confer (i) to discuss any *specific* objections to any specific request made to any specific agency, (ii) to discuss the timeline for production in response to Sudan's requests, and, if necessary, (iii) to address briefing schedules for motions by Sudan to compel production. To make the Agencies' search for responsive documents as minimally burdensome as possible, we are also providing you with the documents cited in Sudan's subpoenas and in its *Touhy* letters to each Agency. We are available to meet and confer on the following dates and times: Wednesday, June 4, between 11:30 AM – 2 PM; Thursday, June 5, between 10 AM – 2 PM; Friday, June 6, between 11 AM – 2 PM; or the following week, June 9, 12 or 13, after 1 PM. Please advise if any of these times works for the government.

### A. Sudan's Requests Are Relevant to Plaintiffs' Complaint and Sudan's Defenses

The government's May 9 letter identifies only two relevance objections. The government's letter purports to assert these objections to all of the requests on behalf of all four Agencies without specifying what, if any, *specific* objection any Agency has to any *specific* document request made by Sudan. The government's general, blanket objections are thus deficient under the federal rules. *In re Terrorist Attacks on September 11, 2001*, No. 03-md-1570, 2023 WL 4447869, at *2 (S.D.N.Y. 2023) (holding that "'general and conclusory objections . . . are insufficient' to tip the scales against disclosure") (quoting *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 298 F.R.D. 184, 186 (S.D.N.Y. 2014)).

*First*, the government's letter (at 4) makes a generalized and categorical objection to Sudan's requests to the CIA, FBI, and State Department that "are not limited to records regarding Bin Laden or Al Qaeda's connections with the Sudanese government," stating that such requests "seek substantial information with no or minimal apparent relevance to the claims or defenses at issue." It is unclear to which specific requests this objection is directed, but in any event such a generalized objection is "'insufficient' to tip the scales against disclosure." *In re Terrorist Attacks on September 11, 2001*, 2023 WL 4447869, at *2 (requiring responding party to "give 'specifics' to support their objections").

Regrettably, the government's letter does not respond to the detailed explanation of relevance in the *Touhy* letters that Sudan sent to the CIA, FBI, USMS, and State Department with the respective subpoenas served on each Agency. Sudan's *Touhy* letters not only explain the relevance of the information Sudan seeks but also provide the basis for Sudan's belief that each specific Agency has information responsive to each request served on that particular Agency. And, where possible, the letters — like the requests themselves — identify specific individuals, entities, documents, reports, cables, letters, meetings, and events about which Sudan seeks information. If, for example, the government is referring to requests to the CIA, FBI, and State Department for documents concerning (i) Osama bin Laden's activities in Sudan from 1991 to 1996, his departure in or around 1996, and his activities (and those of his associates) after he departed Sudan in or around May 1996 through 2001, and (ii) purported businesses of Bin Laden and Al Qaeda in Sudan (May 9 Ltr. 4), then the *Touhy* letters that Sudan sent to each Agency provide detailed explanations of the relevance of the information sought by those requests. *See* Sudan's April 25, 2025 Letter to the CIA at pp. 3-5 (discussing Request Nos. 1-4); Sudan's April 25, 2025 Letter to the FBI at pp. 3-4 (discussing Request Nos. 1-4); Sudan's April 25, 2025 Letter to the State Department at pp. 3-7 (discussing Request Nos. 1-4).

To reiterate what is explained in detail in Sudan's *Touhy* letters, responsive records that are not directly "regarding Bin Laden or Al Qaeda's [purported] connections with the Sudanese government" are nevertheless relevant to Plaintiffs' allegations and Sudan's defenses. For instance, records of the FBI's investigations into Bin Laden that indicate an *absence* of evidence connecting the Sudanese government to Bin Laden or al Qaeda's terrorist activities would be relevant to Sudan's defenses. *See* Apr. 25, 2025 Ltr. to FBI at 4 (quoting Cloonan Decl. ¶ 7 ("Had there been any evidence of Sudan's involvement in or support for the embassy bombings, I am very confident I would have developed it. . . . I certainly was actively looking for such evidence in my investigation, since as noted I was trying to build a conspiracy case against bin Laden.")). Likewise, records about Bin Laden's purported businesses in Sudan, regardless of whether they directly implicate the Sudanese government, are relevant to Plaintiffs' allegations that Bin Laden continued to hold business interests in Sudan after his 1996 expulsion. *See* Apr. 25, 2025 Ltr. to CIA at 8-9. And records showing how Bin Laden financed his activities in Afghanistan after 1996 are also relevant to rebutting allegations that his purported businesses *in Sudan* were a source of funding for Al Qaeda's terrorist activities. *Id*. at 4-5.

As to the relevant time period for these requests, Sudan appreciates the Agencies' position that Sudan's requests cover a period of more than ten years. However, Plaintiffs' discovery requests to Sudan assert that the scope of relevant documents dates from January 1, 1989 through

Sarah S. Norman, Assistant U.S. Attorney
May 29, 2025

**WHITE & CASE**

December 31, 2002. Unless Plaintiffs' discovery period is substantially narrowed, then a corresponding period for Sudan's requests is appropriate.

***Second***, the government's May 9 letter (at 4) concludes that Sudan's request to the FBI for "information sufficient to establish the FBI's conclusions regarding which individuals or entities were responsible for the September 11, 2001 attacks" is "entirely irrelevant." However, as explained in Sudan's April 25, 2025 Letter to the FBI (at 11-12), Sudan is facing litigation from Plaintiffs who allege that *Sudan* is responsible for the 9/11 Attacks. If the FBI, after two decades of investigation, concluded that individuals and entities *other than Sudan* are responsible for the 9/11 Attacks, that is directly relevant to Sudan's defense.

Contrary to the government's letter (at 4), the May 27, 2021 FBI Electronic Communication ("EC") establishes the relevance of this request. (Whether the EC "closed" a "discrete" investigation or the entire PENTTBOM investigation is immaterial. Contrary to the government's characterization, Sudan's April 25, 2021 letter to the FBI does not state a position either way.) The May 2021 EC makes clear that the FBI's decades-long investigation has not changed its understanding of who was responsible for the 9/11 Attacks. Likewise, the EC plainly indicates why its reference to the 9/11 Commission's findings only supports Sudan's request. As noted in Sudan's April 25 letter to the FBI (at 11), the EC states the FBI's "Conclusion" that: "After nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged, which is consistent with the final conclusion of the 9/11 Commission Report which stated that 'no new information to date that would alter the original findings of the 9/11 Commission regarding the individuals responsible for the 9/11 attacks or for supporting those responsible for the attacks.'" Sudan is seeking documents sufficient to establish the *FBI*'s "Conclusion" that it had identified no group or individual "responsible" for the 9/11 Attacks beyond those identified in the 9/11 Commission's original findings.

No Agency challenges the relevance of any other specific request.

### B. Sudan's Requests Are Proportionate to the Needs of the Case

As the government's May 9 letter acknowledges (at 4), the proportionality analysis of the subpoenas served by Sudan on the Agencies is governed by Rule 26 of the Federal Rules of Civil Procedure. *See In re Terrorist Attacks on September 11, 2001*, 523 F. Supp. 3d at 488-89 (holding that agency responses to subpoenas in this MDL are assessed under Rule 26); Fed. R. Civ. P. 26(b)(1) ("Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.").

Because relevance has been established — and not specifically disputed as to most requests — any objecting Agency has the burden to show that production would be "unduly burdensome." *Fairholme Funds v. Fed. Hous. Fin. Agency*, No. 13-cv-1053, 2019 WL 5864595, at *2 (D.D.C.

Sarah S. Norman, Assistant U.S. Attorney  
May 29, 2025

**WHITE & CASE**

Nov. 8, 2019) (citing *In re Micron Tech., Inc. Sec. Litig.*, 264 F.R.D. 7, 9 (D.D.C. 2010)); *see also In re Terrorist Attacks on September 11, 2001*, No. 03-md-1570, 2020 U.S. Dist. LEXIS 247199, at *350 (S.D.N.Y. Apr. 27, 2020) (granting discovery requests where FBI failed to meet its burden of showing that requests were unduly burdensome). "Vague and conclusory assertions are not sufficient." And "[e]ven if the entity objecting to the subpoena proves that there is some burden, that burden must be balanced against other factors before it can truly be considered undue." *Fairholme Funds*, 2019 WL 5864595, at *2.

The government's letter offers no more than "[v]ague and conclusory assertions" that Sudan's requests are "disproportionate" and present "undue burden." The government's letter contains only generalized claims of proportionality and burden, not even specific to any Agency. None of the government's attempts to establish that Sudan's requests are disproportionate can withstand scrutiny.

### 1. Sudan's Requests Are Appropriately Tailored to the Needs of the Case

Putting aside the government's inconsequential blanket assertion (May 9 Ltr. 4) that the "[s]ubpoenas as a whole" are "overbroad," (*see Fairholme Funds*, 2019 WL 5864595, at *2 ("[A] showing of undue burden 'must be specific' and concrete.")), the government's letter fails to take into account that Sudan's document requests place relevant time limitations on the information sought, identify the names of relevant individuals and entities, and even identify specific documents, reports, cables, letters, and meetings about which information is sought. *See, e.g.*, CIA Request Nos. 13-18 (requesting specific purported CIA reports cited in Plaintiffs' Complaints); State Department Request No. 10 (seeking "all documents concerning the efforts by former U.S. Ambassador Timothy Carney, through his counterpart Ali Osman Taha, to open diplomatic channels between the United States and Sudan from 1995-1997"); FBI Request No. 8 (seeking documents concerning specific meetings and communications, and providing dates and names of recipients). These factors weigh against any determination that the subpoena is overbroad or unduly burdensome. *See United States v. Int'l Bus. Machines Corp.*, 83 F.R.D. 97, 104 (S.D.N.Y. 1979) (holding that factors to consider in assessing burden include "relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed").

### 2. Sudan's Requests Appropriately Seek Documents from Each of the Agencies

The government's May 9 letter incorrectly assumes (at 4) that, because Sudan's subpoenas seek similar categories of documents from each of the Agencies, the requests are improperly "duplicative." This assumption misconstrues the requests.

To confirm, Sudan is seeking the responsive documents that each Agency possesses, including each Agency's *own* documents. And because Plaintiffs' allegations refer to specific Agencies' interactions with Sudan, it is relevant to Sudan's defenses to determine through discovery which documents are in the possession of each Agency. The requests are thus not "duplicative." In any event, without knowing which Agency possesses particular documents, Sudan could not have tailored the requests any further, and it is not obliged to do so.

Even so, Sudan's *Touhy* letters to each Agency explain in detail why Sudan believes that each particular Agency is likely to have documents responsive to each request. *See, e.g.*, Apr. 25, 2025 Ltr. to CIA at 3-4 (describing CIA's role in investigating Bin Laden); Apr. 25, 2025 Ltr. to FBI at 7-9 (describing FBI's role in receiving and responding to requests from Sudan to share intelligence); Apr. 25, 2025 Ltr. to State Department at 4-5 (describing State Department's role in discussions with Sudan about expelling Bin Laden).

And where appropriate, Sudan has taken pains to identify specific documents or specific events about which Sudan is seeking information, identify specific individuals at each Agency who were involved in the events and documents at issue, and explain the Agency's connection to those documents or events. *See, e.g.*, CIA Requests Nos. 13-18 (seeking specific reports purportedly prepared by the CIA); FBI Request No. 8 (seeking information about specific events and communications, and identifying FBI agents involved); State Department Request Nos. 11-12 (requesting information about specific meetings and communications).

Furthermore, the 9/11 Commission Report establishes that, in the period before the 9/11 Attacks, the CIA, FBI, and State Department (among others) failed to share information and coordinate with each other. *See, e.g.*, 9/11 Commission Report 353-56 (detailing the missed opportunities to thwart the 9/11 plot because FBI and CIA failed to share information). The 9/11 Commission Report thus supports Sudan's understanding that the different Agencies will have different information reflecting different intelligence and analysis. Sudan is entitled to that information.

### 3. The Government Has Not Shown that Any Particular Request on Any Agency Is Unduly Burdensome

The government's May 9 letter (at 5) does not set forth the burden that any particular Agency would face in complying with any specific request. *See In re Terrorist Attacks on September 11, 2001*, 2020 U.S. Dist. LEXIS 247199, at *335 (holding that agency resisting subpoena has "burden" to "demonstrate undue burden," and declining to accept FBI's undue-burden argument).

The government's generalized assertions of burden also ignore that at least some of the Agencies have *already* collected and reviewed many of the nonpublic materials requested by Sudan. For instance, Executive Order 14040, signed on September 3, 2021, directed the FBI, CIA, and other agencies or departments with responsive records to complete a declassification review of many documents relating to the 9/11 Attacks, including any found through a search of "of all interview reports, analytical documents, documents reporting investigative findings, or other substantive records (including phone records and banking records, if any) from the FBI's initial investigation of the 9/11 terrorist attacks." In addition, as the government's letter acknowledges (at 5), the Agencies have already collected and reviewed extensive documents in response to Plaintiffs' requests in this MDL. And as shown in the attached correspondence, in discovery in the *Kumar v. Republic of Sudan* litigation:

- The USMS collected all responsive materials in compliance with nearly identical requests, and the FBI undertook its classification review of those materials, as discussed above. *See*

Sarah S. Norman, Assistant U.S. Attorney
May 29, 2025

WHITE & CASE

- Dec. 20, 2019 Ltr. from White & Case to USMS (Attachment A); Dec. 26, 2019 Ltr. from USMS to White & Case (Attachment B).

- The State Department searched for, collected and reviewed documents responsive to similar requests, and began to make productions. *See* Nov. 25, 2019 Ltr. from White & Case to State Dept. (Attachment C); Jan. 9, 2020 Ltr. from State Dept. to White & Case (Attachment D).

Sudan expects that, in these prior review efforts, the Agencies collected responsive records in a centralized and organized manner, and digitized them or otherwise rendered them searchable for review purposes. If the Agencies failed to do so, they cannot now rely on any poor recordkeeping or inefficient discovery practices to avoid producing relevant information. *See S.E.C. v. Collins & Aikman Corp.*, 256 F.R.D. 403, 413 (S.D.N.Y. 2009) (holding that SEC must respond to discovery requests, even if requests involve "large disorderly databases").

### 4. The Government's Generalized Burden Assertions Do Not Outweigh the Remaining Rule 26 Proportionality Factors

Even if any of the Agencies could establish some burden with respect to any specific request, the discovery Sudan seeks is still proportionate to the needs of the case. *See Fairholme Funds*, 2019 WL 5864595, at *2. The requests are relevant, as discussed above, and each of the remaining Rule 26(b)(1) factors supports production, including "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, [and] the importance of the discovery in resolving the issues."

As explained in our prior correspondence, Sudan is preparing to defend itself against the extremely serious allegations that it provided material support to Osama Bin Laden and al Qaeda, and that this material support purportedly caused the 9/11 Attacks. Sudan is a foreign sovereign entitled to respect, comity, and a presumption of immunity. Meanwhile, each Agency unquestionably possesses documents responsive to Sudan's requests in support of its defense. The "importance of the issues at stake" and the "importance of the discovery in resolving the issues" can hardly be overstated.

Crucially, moreover, Sudan has no way other than through this discovery process to obtain the information, critical to its defense, that it seeks from the Agencies. Most obviously, Sudan has no other way to acquire U.S.-government documents that have not already been made available to the public. And any U.S.-government documents that might have been shared with Sudan's government likely are not available. As the U.S. government is aware, the ongoing armed conflict in Sudan has wrought mass-scale destruction that has increased the difficulty of recovering documents from Sudan's government repositories. *See, e.g.*, Ltr. to Judge Netburn 2-4 (May 23, 2025), ECF No. 10968 (describing challenges in assessing repositories and documenting destruction of government buildings in Khartoum). The discovery that Sudan seeks from the Agencies is proportional given its importance to the litigation and because it cannot be obtained from any other source. *See In re Terrorist Attacks on September 11, 2001*, 2020 U.S. Dist. LEXIS 247199, at *348, 350 (granting motion to compel certain discovery from FBI after "weigh[ing]

Sarah S. Norman, Assistant U.S. Attorney
May 29, 2025

**WHITE & CASE**

Plaintiffs' need for the information against the burden imposed on the FBI," even though "declassification review in particular is painstaking and time-consuming for the FBI," because discovery was "not unreasonably cumulative, cannot be obtained from another more convenient source, and is not . . . outside the scope permitted by Rule 26(b)(1)").

### C. Key Responsive Documents Are Indisputably Maintained by USMS and the S.D.N.Y. U.S. Attorney's Office

We were surprised by the government's assertion (May 9 Ltr. 3) that USMS would not have "field reports prepared by USMS inspectors," or "interview reports, summaries, and investigative or intelligence reports" related to interviews of Jamal al Fadl.

Sudan's request and its *Touhy* letter to USMS made clear that it Sudan seeks specific transcripts and videos of custodial interviews of Jamal al Fadl that are *known* to be in USMS's possession, and field reports pertaining to those custodial interviews that are also known to be in USMS's possession.  As stated in our April 25, 2025 *Touhy* letter to USMS: "The Court in *United States v. Bin Laden*, 397 F. Supp. 2d 465 (S.D.N.Y. 2005), attached as Appendix B to the subpoena, made detailed factual findings on the creation, distribution, and maintenance of these records and documents."  Indeed, *Bin Laden* makes clear that these materials are not only in possession of USMS — they are in possession of the S.D.N.Y. U.S. Attorney's Office.

As the Court found in *Bin Laden*, in 1999, the S.D.N.Y. Assistant U.S. Attorneys asked the USMS "WitSec" team to install videoconferencing equipment in al-Fadl's relocation area to facilitate their interviews with him.  *Id*. at 475.  The USMS "inspector" responsible for overseeing and facilitating these interviews recorded "approximately twenty-hours of video teleconference on six videotapes" between January 21, 2000 and January 14, 2002.  *Id*. at 475-76.  Following "each conference," the USMS inspector "prepared a USMS Field Report ("USM 210")," printed it, deleted it from the computer system, and forwarded the report to "USMS headquarters," where the report was reviewed and "placed in al-Fadl's file."  *Id*. at 476.  The videotapes were then "secured" in the USMS Inspector's "office safe."  *Id*.  The Court thus found that the USMS WitSec team, including the inspector, was "part of the prosecution team," because they "sought to aid the investigative effort."  *Id*. at 485.

The S.D.N.Y. U.S. Attorney's Office learned of the tapes in January 2002, received edited copies of the tapes in March 2002 (with portions removed "for security reasons"), "had them transcribed," and then "redacted various portions to protect the identities of certain individuals and to protect operational information."  *Id*. at 477-78.

And critically, the *Bin Laden* ruling includes selected excerpts from the transcripts, *id*. at 493-505, which demonstrate that the interviews pertain directly to Fadl's trial testimony, on which Plaintiffs' rely extensively, as explained in our April 25 letter.

None of these factual findings were challenged on appeal.  *See In re Terrorist Bombings of U.S. Embassies in E. Afr. v. Odeh*, 552 F.3d 93, 142 (2d Cir. 2008).

Sarah S. Norman, Assistant U.S. Attorney
May 29, 2025

WHITE & CASE

The decision thus makes clear that, contrary to the government's May 9 letter: (i) the tapes, transcripts, and field reports exist and are in USMS's possession (and your office's possession); (ii) these records do not "overlap substantially with those sought from the FBI," because USMS did not share the recordings or reports with DOJ; (iii) the materials are not limited to "custodial or security-related records," but rather amount to 28 hours of interviews that are highly relevant to Plaintiffs' allegations based on al-Fadl's testimony; and (iv) USMS played an "investigative" role, and prepared reports accordingly.

Moreover, in 2019, Sudan sought these same records in a subpoena that it served on USMS in the case *Kumar v. Republic of Sudan*, No. 2:10-cv-00171-RGD-TEM (E.D. Va.). As shown in the attached correspondence between Sudan's counsel and USMS Associate Deputy General Counsel Harvey Smith, the USMS in that case agreed to gather the responsive videos, transcripts, and field reports, transmit them to the FBI for review, and then produce them to Sudan. *See* Attachments A, B.

The *Kumar* litigation concluded before the USMS made any production, but presumably the FBI made substantial progress in its review of the material. And as shown in *Bin Laden*, your office has also already reviewed the tapes and transcripts and made redactions for security and operational reasons. We thus expect that USMS can produce this material quickly.

Given that the government does not object to any request directed to the USMS on either relevance or burden grounds, please confirm when USMS expects to produce the requested materials. Sudan reserves the right to object to any redactions or withholding of responsive tapes and documents.

### D. The Government's Letter Does Not Establish Any Basis to Withhold Any Records As Classified, Privileged, or Otherwise Protected

No Agency has discharged its burden of establishing the applicability of any privilege — indeed, the government's May 9 letter (at 6) does not identify any privilege that might apply to any document, or any request, for any Agency. Simply stating that responsive records are likely to implicate privileges is "far too general" to enable either Sudan or, eventually, a court to determine "whether the documents withheld are, in fact, covered by the various privileges asserted." *In re Apollo Group, Inc. Sec. Leg.*, No. 06-558, 2007 WL 778653, at *7 (D.D.C. March 12, 2007) (ordering federal agency to produce privilege log enabling parties and court to assess validity of agency's claimed privileges); *see also Fairholme Funds*, 2019 WL 5864595, at *3-4 (rejecting "vague assertion" that "several of the requests implicate documents that are likely to be subject to various privilege assertions" and ordering the U.S. Treasury to produce privilege log); *In re Terrorist Attacks on September 11, 2001*, 523 F. Supp. 3d at 496 ("To invoke the state secrets privilege, there must be (1) a formal claim of privilege, (2) lodged by the head of the department which has control over the matter, (3) after actual personal consideration by that officer. It is of the utmost importance that the Government comply with the formal requisites for assertion of the claim." (internal quotation marks, alteration, and citations omitted)); *id*.at 501 (holding that to meet agency's "burden" of establishing law enforcement privilege, "(1) there must be a formal claim of privilege by the head of the department having control over the requested information; (2) assertion of the privilege must be based on actual personal consideration by that official; and (3) the

Sarah S. Norman, Assistant U.S. Attorney
May 29, 2025

WHITE & CASE

information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege" (citation omitted)).

If any Agency intends to withhold any responsive documents, please let us know when that Agency anticipates producing a privilege log. *See* Fed. R. Civ. P. 45(e)(2)(A); *see also Tuite v. Henry*, 98 F.3d 1411, 1416-17 (D.C. Cir. 1996) (holding that subpoenaed party claiming privilege must provide "full description" of withheld documents "within a reasonable time").

\* \* \*

As stated in each of Sudan's *Touhy* letters to the Agencies, we are happy to work with each Agency to make the process of responding to the subpoenas "as minimally burdensome as possible." If there are specific requests that a particular Agency considers unduly burdensome, then we will consider proposals to narrow those requests, including by considering specific databases or custodians. We are also prepared to work with you on a deadline for production that allows the Agencies to complete their processes while also meeting the Court-ordered discovery schedule.

Please provide us with your availability to meet and confer on the dates identified above.

Best regards,

Christopher M. Curran
Nicole Erb
Celia McLaughlin

*Counsel for the Republic of the Sudan*

Enclosures