# EXHIBIT E

WHITE & CASE

July 9, 2025

White & Case LLP
701 Thirteenth Street, NW
Washington, DC 20005-3807
T +1 202 626 3600

whitecase.com

**VIA EMAIL**

Jean-David Barnea
Assistant United States Attorney
Southern District of New York
86 Chambers Street
New York, New York 10007

*In re Terrorist Attacks on September 11, 2001*, Case No. 1:03-md-1570-GBD-SN (S.D.N.Y.): Sudan's Subpoena to the CIA

Dear Counsel:

We write regarding Sudan's April 25, 2025 subpoena to the CIA.

### A. Sudan's Response to the CIA's Proposal to Review Documents Produced in Response to Earlier FOIA Requests

Based on the offer from the CIA that you relayed during our meet-and-confer call on June 13, 2025, we understand that the CIA proposes as follows: The CIA will not conduct any new searches for documents responsive to Sudan's subpoena. Instead, the CIA proposes to review documents that it has already produced in response to certain, unspecified FOIA requests, and assess whether any material previously withheld in those documents can now be declassified.

You explained during our June 13 call that you did not know who had made the FOIA requests that were the subject of the CIA's proposal, or what documents those FOIA requests sought. It is thus unclear to us whether those FOIA requests covered the types of documents that Sudan is seeking, and so before Sudan can respond to the CIA's proposal, we will need more information. In particular:

- What are the specific FOIA requests that the CIA is referencing in its proposal and what documents do those FOIA requests seek?

- How did the CIA conduct its searches for documents responsive to those FOIA requests? For example, what repositories did the CIA search? Did it use keyword searches, and if so, what were the keywords? Did it only search for specific reports, and if so, for which reports did it search?

Jean-David Barnea, Assistant U.S. Attorney
July 9, 2025

WHITE & CASE

- Does the CIA's proposal contemplate review of documents that were declassified under Executive Order 14040, which directed "Declassification Reviews of Certain Documents Concerning the Terrorist Attacks of September 11, 2001"? *See* Exec. Order No. 14040, 86 FR 50439 (Sept. 3, 2021) (attached).

- Were there any responsive documents that the CIA withheld in their entirety from the CIA's FOIA productions or, if applicable, its EO 14040 declassification review? If so, will the CIA review those previously withheld documents to determine whether they can now be declassified, in whole or in part?

**B. Sudan's Response to the CIA's Refusal to Search for Documents Relating to Withdrawal of U.S. Intelligence Reports Regarding Sudan**

When we asked specifically about Request No. 12, which seeks "Information sufficient to establish and explain the withdrawal of approximately 100 United States intelligence reports regarding Sudan in 1996," you stated that the CIA has asked that the State Department attempt to respond to this request in the first instance. Sudan has made an identical request to the State Department, and, reserving all rights, is fine with this approach. Sudan is not seeking to impose duplicative efforts.

You further stated that the CIA may still resist this request, even if the State Department does not produce responsive documents. To be clear, Sudan reserves all rights to seek documents responsive to this request from the CIA. Contrary to your understanding on our call, the basis for this request is not grounded only in a newspaper article. The issuance and subsequent withdrawal of these intelligence reports is a matter of public record, confirmed by multiple credible sources:

- Ambassador Timothy Carney, who served as U.S. Ambassador to Sudan from 1995-1997, has written that more than 100 intelligence reports were "scrapped" when the United States determined that its "key source had either embellished or wholly fabricated information." Timothy Carney and Mansoor Ijaz, *Intelligence Failure? Let's Go Back to Sudan*, WASH. POST, June 30, 2002 (attached).

- Ambassador Carney submitted a sworn declaration in another litigation stating "I know that more than 100 United States intelligence reports, most of which dated back to 1993 and some of which alleged that elements of the Sudanese government planned actions against United States personnel in Khartoum, were withdrawn as exaggerated or fabricated in early 1996." *See* Carney Decl. ¶ 10, *Owens v. Sudan*, 01-cv-2244 (D.D.C. Mar. 10, 2004) (attached).

- Ambassador Donald Petterson, who served as U.S. Ambassador to Sudan from 1992-1995, informed the 9/11 Commission that the U.S. government "ordered the departure of non-essential personnel at Embassy Khartoum" based on "intelligence" on plots to harm Americans in Sudan. *See* Memorandum for the Record of the interview with Ambassador Donald Petterson, 9/11 Commission (Sept. 30, 2003)), https://catalog.archives.gov/id/2610532 (attached). He further informed the Commission that, "Although those reports were later determined to be false, the US suspended Embassy operations in 1996 due to the

threat to Americans in Sudan. In 1997, the State Department was going to re-open the Embassy in Khartoum. However, Congress and the NSC objected so the State Department had to revise its objective." *Id*.

- Ambassador Stephen Schwartz, who was the Sudan desk officer from 1996-1998 and Special Assistant to the Under Secretary of State for Political Affairs, covering Africa from 1998-1999 (and later served as U.S. Ambassador to Somalia) confirmed these accounts as well as the CIA's role, in his interview with the 9/11 Commission. *See* Memorandum for the Record of the interview with Stephen Schwartz, 9/11 Commission (Dec. 30, 2003), https://catalog.archives.gov/id/2610615 (attached). He explained that "[i]n 1997, State and the CIA agreed that the security situation in Sudan was such that the USG could re-establish a physical presence in Khartoum," but National Security Advisor Sandy Berger "forced" the State Department "to reverse the decision." *Id*.

C. **Sudan's Proposal to Reduce the CIA's Purported Burden in Conducting Declassification Reviews**

You noted in our June 13 call that the declassification review process for the CIA could be time-consuming. As we have repeatedly stated, we are happy to make the process of responding to the subpoenas as minimally burdensome as possible.

To that end, before the CIA's expends its resources conducting a re-review of documents that have already been produced with redactions, we are happy to review the redacted versions of those documents, and inform you whether another review is necessary from our perspective. If the CIA is amenable to this approach, then please direct us to the redacted documents that the CIA intends to review anew, and we will identify any documents for which we would request another declassification review.

We also note that Director of National Intelligence Tulsi Gabbard has stated that U.S. intelligence agencies are now relying on artificial intelligence to review documents and identify potentially classified material much faster than through manual review. *See, e.g.*, *Gabbard says AI is speeding up intel work, including the release of the JFK assassination files*, ASSOCIATED PRESS (June 10, 2025), https://apnews.com/article/gabbard-trump-ai-amazon-intelligence-beca4c4e25581e52de5343244e995e78 (attached) (explaining that U.S. intelligence committee used AI to scan "tens of thousands of pages" of documents related to Kennedy assassinations for classified material before release). DNI Gabbard explained that AI can "scan sensitive documents ahead of potential declassification," rather than have humans "look at every single one of those pages." *Id*.

Jean-David Barnea, Assistant U.S. Attorney
July 9, 2025

**WHITE & CASE**

Would the CIA be willing to use this approach, endorsed by DNI Gabbard and already being utilized by U.S. intelligence agencies, to speed up the declassification review process here?

Sincerely,

Christopher M. Curran
Nicole Erb
Celia McLaughlin

*Counsel for the Republic of the Sudan*

*Enclosures*