**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re

TERRORIST ATTACKS ON SEPTEMBER 11, 2001.

No. 03 MDL 1570 (GBD) (SN)

## MEMORANDUM OF LAW IN OPPOSITION TO
## THE PARTIES' MOTIONS TO COMPEL THE CENTRAL INTELLIGENCE AGENCY
## TO RESPOND TO SUBPOENAS

JAY CLAYTON
United States Attorney for the
Southern District of New York
Attorney for the United States
86 Chambers Street, Third Floor
New York, New York 10007
Tel: (212) 637-2679/2633
*Attorney for the Central Intelligence Agency*

JEAN-DAVID BARNEA
JENNIFER JUDE
*Assistant United States Attorneys*
   – Of Counsel –

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT.................................................................................................... 1

BACKGROUND ........................................................................................................................... 2

    A.   The Subpoenas .................................................................................................................2

    B.   The Government's Objections ..........................................................................................3

    C.   The Government and the Parties Reach an Impasse and Attempt to Overcome It ...........4

    D.   The Parties' Motions ........................................................................................................8

STANDARD OF REVIEW ...........................................................................................................8

ARGUMENT................................................................................................................................10

    A.   Requiring the CIA to Respond to the Subpoenas as Written Would Be an Undue
        Burden...........................................................................................................................11

    B.   The CIA Cannot Process the Subpoenas Because They Implicate Large Amounts of
        Classified Information....................................................................................................13

    C.   The CIA's Proposed Approach to the Subpoenas Is Reasonable ...................................16

CONCLUSION............................................................................................................................. 18

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*ACLU v. CIA,*
24 F.4th 863 (2d Cir. 2022) ...................................................................................... 15

*ACLU v. Dep't of Justice,*
681 F.3d 61 (2d Cir. 2012) ........................................................................................ 14

*ACLU v. U.S. Dep't of Defense,*
901 F.3d 125 (2d Cir. 2018) ...................................................................................... 14

*Agility Public Warehousing Co. K.S.C.P. v. U.S. Dep't of Defense,*
246 F. Supp. 3d 34 (D.D.C. 2017)............................................................................... 9

*CIA v. Sims,*
471 U.S. 159 (1985). ........................................................................................... 14, 15

*Edwards v. U.S. Dep't of Justice,*
43 F.3d 312 (11th Cir. 1994) ....................................................................................... 9

*Hayden v. NSA,*
608 F.2d 1381 (D.C. Cir. 1979)................................................................................. 15

*In re Sept. 11 Litig.,*
621 F. Supp. 2d 131 (S.D.N.Y. 2009)......................................................................... 8

*In re Terrorist Attacks on Sept. 11, 2001,*
523 F. Supp. 3d 478 (S.D.N.Y. 2021)...................................................................... 8, 9

*Larson v. Dep't of State,*
565 F.3d 857 (D.C. Cir. 2009)............................................................................. 14, 15

*Wertheim Schroder & Co. v. Avon Products,*
No. 91-CV-2287 (PKL), 1995 WL 6259 (S.D.N.Y. Jan. 9, 1995) ............................. 9

*Wilner v. NSA,*
592 F.3d 60 (2d Cir. 2009) ................................................................................... 15, 17

**Statutes, Regulations, and Rules**

Administrative Procedure Act,
5 U.S.C. § 702 *et seq.*................................................................................................. 8

5 U.S.C. § 706.............................................................................................................. 8

Central Intelligence Act,
50 U.S.C. § 3501 *et seq.* ............................................................................................. 3, 4

National Security Act,
50 U.S.C. § 3001 *et seq.* ................................................................................................ 3

32 C.F.R. §§ 1905.1 to 1905.4 .......................................................................................... 9

Fed. R. Civ. P. 26................................................................................................................ 8

Fed. R. Civ. P. 45................................................................................................................ 8

## PRELIMINARY STATEMENT

Nonparty the Central Intelligence Agency ("CIA"), by its counsel Jay Clayton, United States Attorney for the Southern District of New York, respectfully submits this memorandum of law in opposition to the motion of the Plaintiffs' Executive Committee ("Plaintiffs"), ECF No. 11797 ("Pls'. Mot."), and the joinder of the Republic of Sudan ("Sudan," and together with Plaintiffs, the "Parties"), ECF No. 11854 ("Sudan Mot."), to compel the CIA's response to their respective subpoenas (the "Subpoenas").

As explained herein and in the accompanying declaration of Mary C. Williams, the CIA's Litigation Information & Investigations Review Officer ("Williams Decl."), the CIA has agreed to process records that the Parties specifically identified in their Subpoenas and to conduct certain searches for records responsive to the remaining requests. Because it is an intelligence agency that deals principally in classified information, the CIA generally cannot respond to information requests in the same way as an ordinary litigant or subpoena recipient. Instead, the CIA must tailor its response to safeguard classified information while providing the requester whatever information it is able to. That is what happened here. After a careful review of the Subpoenas and a lengthy consultation with the Parties, the CIA proposed a process by which it will provide responsive records, which appropriately balances the CIA's needs to conserve scarce agency resources and to protect classified information against the Parties' need for information. This Court should deny the Parties' motions, and either limit the CIA's subpoena response to the specifically identified documents, or in the alternative, also endorse the agency's responsible approach to searching for additional responsive documents.

## BACKGROUND

### A. The Subpoenas

As part of this longstanding multidistrict litigation, the Parties issued extremely broad nonparty subpoenas to the CIA (and other federal agencies) relating to Plaintiffs' claims against Sudan in March (Plaintiffs) and April (Sudan) of 2025. *See* Williams Decl. ¶¶ 11, 14; Declaration of Robert T. Haefele ("Haefele Decl."), ECF No. 11798, Ex. A ("Plaintiffs' Requests"); Declaration of Nicole Erb ("Erb Decl."), ECF No. 11855, Ex. A ("Sudan Requests"). For example, Plaintiffs sought "all documents" on a wide variety of topics, including the U.S. government's designation of Sudan as a state sponsor of terrorism, certain individual members of Al Qaeda, certain businesses controlled by Al Qaeda, the relationship between Al Qaeda and various Sudanese banks, and a foiled Al Qaeda plan to blow up the United Nations building and other New York City landmarks in the mid-1990s. *See* Plaintiffs' Requests ¶¶ 1, 6, 8-9, 11-13. Plaintiffs also requested "all documents supporting" various CIA "assessments"—that is all documents underlying statements in CIA reports—pertaining to Osama Bin Laden and Al Qaeda. *See id.* ¶¶ 3-5.

Sudan similarly sought a wide array of documents, including "all documents" relating to "the activities of Osama Bin Laden in Sudan from 1991-1996," his departure from Sudan in 1996, and the "activities of . . . Bin Laden and his associates after Bin Laden departed Sudan in or around May 1996 through 2001," as well as any provision of intelligence information from Sudan to the United States about Bin Laden, the bombing of a Sudanese pharmaceutical factory in 1998, and numerous other topics. *See* Sudan Requests ¶¶ 1-10. In addition to these broad requests, each of the Parties sought the processing of numerous alleged CIA documents identified by name, many of which had been cited in *The 9/11 Commission Report*. *See* Plaintiffs' Requests ¶¶ 14-15; Sudan Requests ¶¶ 13-18.

### B. The Government's Objections

On April 10, 2025, the U.S. Attorney's Office for the Southern District of New York (the "government") responded to Plaintiffs on behalf of all the agencies that had received subpoenas. *See* Williams Decl. ¶ 12; Haefele Decl. Ex. D. The letter noted numerous concerns with the subpoenas to the CIA and the other agencies, including relevance and proportionality, undue burden, and the need to protect classified and other statutorily protected information. *See* Haefele Decl. Ex. D. Specifically, the government noted that the subpoena went far beyond what appeared to be necessary to litigate this case, and asked Plaintiffs to substantially narrow their requests and explain in greater detail what specific records they needed and why they would be relevant. *See id.* at 5-6. Relatedly, the letter explained that the broadly worded requests were "overbroad and extremely burdensome" in that they requested "all documents concerning" various wide-ranging topics and individuals—which "would make it impossible to conduct narrowly targeted searches, meaning that a likely voluminous amount of material would need to be reviewed just to identify any responsive material that may exist." *Id.* at 6-7. The letter further explained that it would be unduly burdensome—and likely impossible—to identify "all documents supporting" various CIA and other agency assessments, as requested, "unless they are attached to or cited in the documents containing the assessments." *Id.* at 7. Finally, the letter noted that many of the requested documents were likely classified, privileged or protected by statute, including pursuant to the National Security Act, 50 U.S.C. § 3001 *et seq.*, and the Central Intelligence Agency Act, 50 U.S.C. 3501 *et seq.*, and noted that due to the Subpoena's breadth, "it would be unduly burdensome for the Agencies to identify all the potential privileges, statutes, rules, regulations, or Executive Orders that may apply to specific information in the requested documents." *Id.* at 8.

The government sent a similar letter to Sudan's counsel on May 9, 2025. *See* Williams Decl. ¶ 15; Erb Decl. Ex. C. This letter also noted that Sudan's requests were "manifestly

3

overbroad and disproportionate to the needs of the case" and sought "substantial information with no or minimal apparent relevance to the claims or defenses at issue"—such as a broad swath of information relating to Osama Bin Laden in the 1990s that is "not limited to records regarding [his] or Al Qaeda's connections with the Sudanese government." Erb Decl. Ex. C at 4. The government thus asked Sudan to "substantially narrow the Subpoena[] to focus on information that is actually relevant to Plaintiffs' claims against Sudan and proportional to the needs of the case." *Id.* Like the letter to Plaintiffs, the letter to Sudan also noted that searching for the broad requests in the Subpoena would impose an undue burden and would result in large amounts of classified and other information that is protected from disclosure, and having to identify that information to protect from disclosure would be additionally burdensome for the agencies (including the CIA). *Id.* at 5-6.

### C. The Government and the Parties Reach an Impasse and Attempt to Overcome It

Neither of the Parties narrowed their Subpoenas in response to the government's letters. *See* Williams Decl. ¶¶ 13, 16. Instead, they each submitted letters explaining the basis for and the supposed relevance of their far-reaching requests to the litigation in this case. *See id.*; Haefele Decl. Ex. F; Erb Decl. Ex. D. After further discussion, the government informed the Parties that the CIA could not respond to most of the requests in the Subpoenas due to their extraordinary overbreadth and the need to protect classified information—including information about whether the CIA has records pertaining to particular individuals, entities, or events. *See* Williams Decl. ¶ 18. In particular, the government explained that responding to requests seeking "all documents" on specific topics would reveal substantial classified information about the existence, nature, and scope of the CIA's intelligence interest in those topics, its sources and methods devoted to those topics (or lack thereof), and possible intelligence gaps. *Id.*

4

As explained to the Parties, the Subpoenas request documents whose existence or nonexistence constitutes a classified fact; the CIA thus cannot admit or deny the existence or nonexistence of such documents, or even acknowledge that there exist locations for the agency to search for such documents, without revealing classified information. *Id.* ¶ 19. And given the ways in which the CIA's compartmented and decentralized systems and search capabilities are different from those of other agencies, the government indicated to the Parties that even asking the CIA to perform the numerous searches that would be entailed in identifying whether the agency had responsive records to each of the requests in the Subpoenas would be extraordinarily time-consuming and resource-intensive. *Id.* The government stated that the CIA would thus process only the specific documents identified by name in the Subpoenas (Plaintiffs' Requests 14-15 and Sudan Requests 13-18), to the extent it could confirm that they were agency documents. *Id.* ¶ 18. Sudan tentatively agreed to this approach. *Id.* ¶ 20.

Plaintiffs' counsel then pointed to the CIA's handling of a different subpoena—relating to a separate defendant, Al Rajhi Bank—earlier in this multidistrict litigation. *Id.* ¶ 21 & n.10. In response to that broad subpoena—which like the ones at issue here, sought "all documents" on certain topics—the government and Plaintiffs ultimately agreed that the CIA would process and produce one particular identified report and three other analytic documents that the agency would identify through a search, which contained the greatest number of references to Al Rajhi Bank. *Id.* ¶ 21 & n.11. The government informed the Plaintiffs that if they were interested in a similar approach for the instant subpoena, the CIA would be willing to consider such a proposal. *Id.* ¶ 21. Plaintiffs indicated that they were interested in such a resolution. *Id.* ¶¶ 21-22.

In August 2025, Plaintiffs proposed that the CIA process an unspecified number of additional agency reports to be identified by name (beyond the numerous reports already listed in

5

requests 14-15 of their subpoena), as well as 25 reports that would be responsive to a set of search terms that Plaintiffs would propose (but did not propose at the time). *Id.* ¶ 22. The CIA's November 2025 response—delayed by the 43-day government shutdown last fall—counter-proposed that the agency conduct searches using a set of search terms that the agency had developed based on Plaintiffs' subpoena (and shared with Plaintiffs) and produce 15 responsive documents. *Id.* ¶ 23. The government made the same offer to Sudan, with a distinct set of search terms it had developed based on Sudan's subpoena (and shared with Sudan's counsel), and explained that the 15 documents it would produce to each party would be distinct (*i.e.*, non-overlapping)—for a total of 30 documents. *Id.* The search terms that the CIA provided the Parties as part of these proposals were developed by an agency subject-matter expert based on a careful review of the Subpoenas and "in light of the expert's understanding of the CIA's holdings and search capabilities as well as the limits on the CIA's ability to acknowledge—or not—the possible existence of certain categories of CIA information." *Id.*

After receiving the CIA's proposal, the Parties responded in December 2025 with questions and further counterproposals. *Id.* ¶¶ 24-26. Plaintiffs stated that they wanted to propose search terms for the CIA to use (rather than using the agency's proposed terms), and that the CIA should run iterative searches such that Plaintiffs could see the results of an initial search (for 10 documents) before finalizing the parameters of a second search the agency would conduct (for an additional 10 documents). *Id.* ¶ 25. Plaintiffs indicated that they were motivated by a concern that the CIA's proposed search terms would not unearth documents covering the full scope of their requests. *Id.* Furthermore, Plaintiffs asked the CIA to process 26 additional reports that were not listed in their Subpoena, all of which the agency had released in redacted form a few years ago, in

response to Executive Order 14,040. *Id.* Sudan also proposed adding a few search terms to those developed by the CIA. *Id.* ¶ 26.

The government informed the Parties in January 2026 that the CIA could not conduct multiple searches or change or add to its proposed search terms. *Id.* ¶ 27. The government explained that the CIA would conduct a responsiveness review of the documents it locates through its proposed searches to ensure that the documents it produces are responsive to the Parties' respective Subpoenas. *Id.* The CIA also declined Plaintiffs' request that the agency process 26 additional documents that had not been identified in Plaintiffs' subpoena—and in any event had been previously processed and released only a few years ago and thus were unlikely to yield substantial additional information if reprocessed. *Id.*

Plaintiffs then sent the CIA a set of search terms that they suggested the agency could use in lieu of the terms the CIA had proposed. *Id.* ¶ 28. Many of these terms do not appear in the Plaintiffs' subpoena. *Id.* ¶ 28 n.14. The government informed Plaintiffs that the CIA could not accept changes to its proposed search terms, explaining again that its terms had been developed by agency personnel based on a careful review of the Subpoenas, as well as an understanding of the CIA's record systems, search capabilities, and the agency's ability to acknowledge (or not acknowledge) certain information. *Id.* ¶ 28. As a concession, the CIA offered to process 20, rather than 15, documents responsive to Plaintiffs' subpoena—and to do the same for Sudan's subpoena, for a total of 40 documents. *Id.* Given the lengthy back and forth, and the agency's inability to compromise on the search-term issue, the government indicated that this would be the CIA's final proposal. *Id.*

Plaintiffs informed the government that they could not accept the CIA's proposed search terms because they were concerned the terms would favor Sudan's defense in this litigation. *Id.*

¶ 29. Plaintiffs then informed the Court that the government and the Parties could not reach agreement and would litigate their dispute. *Id.*

### D. The Parties' Motions

On February 20, 2026, Plaintiffs moved to compel the CIA to respond to its subpoena. The motion asks the Court to direct the CIA to use Plaintiffs' proposed search terms or to develop different search terms in consultation with Plaintiffs, and to produce an unlimited number of documents responsive to those searches (rather than the 15 or 20 documents per party contemplated by the discussions between Plaintiffs and the government). Pls.' Mot. at 10-12. Seemingly in the alternative, Plaintiffs ask the Court to direct the CIA to explain in writing its objections to the use of search terms other than those the agency developed. *Id.* at 12.

On March 6, 2026, Sudan filed a letter joining in Plaintiffs' motion. For its part, Sudan asks this Court to direct the CIA to search for all documents responsive to each of its many subpoena requests in "all [agency] repositories," using search terms and search methodologies developed in consultation with Sudan's counsel, and to complete its production by the close of fact discovery in this case (in around three months). Sudan Mot. at 1-2.

### STANDARD OF REVIEW

As the Parties note, this Court previously held in this case that the standard of review applicable to disputes involving nonparty government agencies' responses to subpoenas is the general standard for third-party discovery. *See In re Terrorist Attacks on Sept. 11, 2001*, 523 F. Supp. 3d 478, 488-89 (S.D.N.Y. 2021).[1] Under that standard, which applies Federal Rules of Civil

---

[1] Other courts have concluded that the applicable standard is the abuse of discretion standard used for cases under the Administrative Procedure Act, 5 U.S.C. § 702 *et seq. See, e.g.*, *In re Sept. 11 Litig.*, 621 F. Supp. 2d 131, 144-45 (S.D.N.Y. 2009). Although the Second Circuit has not weighed in on this question, there is "an entrenched circuit split, with the D.C. Circuit and Ninth Circuit applying the standard of the Federal Rules and the Fourth Circuit and Eleventh Circuit applying

Procedure 26 and 45, the party making the discovery request must establish the relevance of the materials sought and the recipient may show that it would be an undue burden to provide them. *See id.* at 489. These rules thus authorize courts to quash a subpoena based on "undue burden" or the potential "disclosure of privileged or otherwise protected material." Fed. R. Civ. P. 45(d)(3)(A).

The undue-burden standard requires courts to be particularly sensitive to costs imposed on nonparties. *See In re Terrorist Attacks*, 523 F. Supp. 3d at 488-89. And even among nonparties, courts must be especially concerned about undue burdens on government agencies, and ensure that discovery "accommodate[s] the government's serious and legitimate concern that its employees not be commandeered into service by private litigants to the detriment of the smooth functioning of government operations." *Id.* at 489-90 (internal quotation marks omitted).

Supreme Court authority and agency regulations permit the government to "'restrict the release of its information.'" *Id.* at 490 (quoting *Edwards v. U.S. Dep't of Justice*, 43 F.3d 312, 317 (11th Cir. 1994)). The decision to produce documents "'rests with the agency, based on the factors provided in the agency's *Touhy* regulations,'" and "'[e]ven if the information the party seeks is relevant to the underlying litigation, [the party] is not automatically entitled to the documents it has requested.'" *Id.* (quoting *Agility Public Warehousing Co. K.S.C.P. v. U.S. Dep't of Defense*, 246 F. Supp. 3d 34, 44 (D.D.C. 2017)) (brackets omitted). A court may thus "'take steps to relieve a nonparty of the burden of compliance even when such accommodations might not be provided to a party.'" *Id.* (quoting *Wertheim Schroder & Co. v. Avon Products*, No. 91-CV-2287 (PKL), 1995 WL 6259, at *6 (S.D.N.Y. Jan. 9, 1995)).

---

the arbitrary and capricious standard of [5 U.S.C. §] 706." *Harrison v. City of New York*, __ F. Supp. 3d __, 2025 WL 3204962, at *4 (E.D.N.Y. Nov. 17, 2025) (internal quotation marks omitted). As a result, some district courts in this Circuit have considered both standards to avoid deciding which one should be applied. *See id.*

9

The CIA's *Touhy* regulations permit the agency to provide information in response to a subpoena only if the agency determines that certain factors favor production. *See* 32 C.F.R. §§ 1905.1 to 1905.4. Those factors include whether production is appropriate in light of any privilege or the applicable discovery rules; whether disclosure would reveal classified information; and whether disclosure would unduly interfere with the orderly conduct of the CIA's functions. *See id.* § 1905.4(c).

## ARGUMENT

The Court should deny the Parties' motions. The Subpoenas to the CIA are unquestionably overbroad and would impose an undue burden on the agency, and—more importantly—seek a substantial amount of classified information. At the request of the parties, the CIA has been negotiating in good faith for several months in an effort to substantially narrow and tailor the requests in a way that would alleviate these concerns. After a substantial back and forth, the CIA offered to process and produce the few dozen documents specifically identified in the Subpoenas, plus 40 (20 per party) additional documents that are responsive to the Subpoenas to be located using search terms that an agency official put together using not just the Subpoenas themselves, but also the official's "understanding of the CIA's holdings and search capabilities as well as the limits on the CIA's ability to acknowledge—or not—the possible existence of certain categories of CIA information." Williams Decl. ¶ 23. While the Parties would undoubtedly prefer to have more control over the CIA's searches in response to their Subpoenas, the unique circumstances here make this unworkable. The Court should thus rule that the CIA's response to the Subpoenas is appropriately limited to processing the documents specifically identified by the Parties or, in the alternative, endorse the agency's supplemental search protocol.

10

### A. Requiring the CIA to Respond to the Subpoenas as Written Would Be an Undue Burden

As explained in the CIA's declaration, searching for the documents requested in the original Subpoenas would impose a substantial, and undue, burden on the CIA. Unlike the systems used by most government agencies (and nongovernment organizations), the CIA's systems are decentralized and compartmented to limit access and to enhance their physical security. *Id.* ¶ 31. Only a select number of CIA employees and contractors are able to search for documents within certain systems, and these individuals also have other important responsibilities. *Id.* Once searches are conducted, any documents identified undergo a time-consuming review process by agency information-review professionals (and sometimes also by subject-matter experts) to determine each document's responsiveness. *Id.* ¶ 33. This responsiveness review is, as the CIA explains, "cumbersome and burdensome," in that only a small number of agency employees are authorized to conduct it, often multiple employees are needed, and it requires review of and familiarity with previously released documents as well as more subtle factors such as timing or context, even when documents on their face may appear to be responsive. *Id.* It is thus not uncommon for such responsiveness reviews alone to take several days, even for limited search strings with limited results. *Id.*

Once the responsiveness review is completed, any documents determined to be responsive must then undergo a line-by-line classification review, which also can be time- and resource-intensive. *Id.* ¶ 34. Conducting such a review often requires significant research and coordination with stakeholders to enable the CIA to determine whether release of the information would damage national security. *Id.* This determination involves not only ascertaining whether any damage could be caused by releasing each document separately, but also "considerations of whether seemingly disparate pieces of information can be assembled into a coherent picture that can reveal classified

11

information." *Id.* Such analysis thus requires review of considerable materials beyond the particular documents being considered for release, and coordination with multiple CIA components with subject-matter expertise (who themselves have many other important responsibilities, including actual intelligence-gathering). *Id.* ¶¶ 37-38. It may also require coordination with senior CIA officials, who have many other critical obligations. *Id.* ¶ 41. In addition to the classification review, the CIA must also determine, for each document considered for release, whether it is protected from disclosure by statute, such as the National Security Act, the Central Intelligence Act, or the Privacy Act. *Id.* ¶ 39.

After all reviews are conducted, any redactions suggested by the various stakeholders must be carefully applied and double-checked by a subject-matter expert to ensure that no classified or protected information will be released. *Id.* ¶ 40. Only then can documents be released to a requester. *Id.* As an example, reviewing the 42 documents the CIA released to the Parties (and the nine documents withheld in full) on March 20, 2026 (which were identified by name in the Subpoenas, and thus did not need to be located through broad searches or reviewed for responsiveness) required more than 100 hours of review by CIA personnel before they could be released. *Id.* ¶ 42.

Requiring the CIA to conduct the dozens upon dozens of broad searches that would be required to identify all documents responsive to the Parties' sprawling Subpoenas would require an inordinate effort, and impose an undue burden on the nonparty agency. To take just one example, the first three requests in Sudan's subpoena ask for "all documents" in the CIA's possession about "the activities of Osama Bin Laden in Sudan from 1991-1996, including without limitation all Communications Concerning . . . Bin Laden in Sudan from 1991-1996," "the departure of . . . Bin Laden from Sudan in or around May 1996," and "the activities of . . . Bin Laden and his associates

after Bin Laden departed Sudan in or around May 1996 through 2001." Sudan Requests 1-3. These requests would require the CIA to identify and process every document it has relating to Bin Laden covering a full decade leading up to, and including, the terrorist attacks in September 2001, and apparently including documents created after the relevant time period. Conducting the relevant searches for just these parts of one of the Subpoenas at issue would undoubtedly be a considerable undertaking.

**B. The CIA Cannot Process the Subpoenas Because They Implicate Large Amounts of Classified Information**

In addition to determining whether particular documents responsive to a request may be classified in whole or in part, the CIA must determine whether it can even acknowledge that it does or does not have any documents responsive to a particular request. *See* Williams Decl. ¶¶ 45-48. In some circumstances, the agency cannot acknowledge—one way or the other—whether it has responsive documents. *Id.* ¶ 48. That is because the very existence or nonexistence of responsive CIA documents is sometimes a classified fact. *Id.* In such cases, confirming this type of information would "reveal the CIA's intelligence interest"—or lack of interest—"in, or clandestine connection to, a particular individual or activity," and would "tend to expose a particular intelligence activity or otherwise reveal previously undisclosed information about CIA sources, capabilities, vulnerabilities, authorities, interests, relationships with domestic or foreign entities, strengths, weaknesses, and/or resources, or conversely expose the lack thereof." *Id.* ¶ 46.

This analysis is conducted at quite a granular level; although the CIA has previously produced certain documents relating to some the topics at issue in the current litigation, it may not be able to acknowledge whether it has documents about what may appear to be closely related topics. *Id.* ¶ 52. For example, a released document confirming that the CIA Director attended a particular meeting about a particular Al Qaeda activity would not necessarily allow the CIA to

13

acknowledge what other intelligence interest the agency had in Al Qaeda (or even whether the CIA Director attended other meetings on related topics). *Id.* ¶ 53.

Here, the CIA has determined that confirming or denying the existence of certain records responsive to the Subpoenas "reasonably could be expected to cause damage to national security by disclosing intelligence activities, sources, and methods, or the lack thereof." *Id.* ¶ 49. There has been "no official public acknowledgement by the CIA on the specific topics for which the CIA declines to confirm or deny the existence or nonexistence of responsive documents." *Id.* "Disclosing whether or not the CIA possesses the types of information requested on these topics would acknowledge the existence or nonexistence of certain CIA intelligence information, thereby providing the CIA's adversaries with insight into the [a]gency's intelligence priorities and capabilities and impacting the CIA's ability to utilize intelligence activities, sources, and methods in the interest of national security." *Id.* In light of the substantial breadth of the Parties' requests, if the CIA had to disclose that it had records responsive to certain portions of those requests but not as to other portions, that would tend to show that the agency considered the former topics to be "of intelligence value," and for the latter topics, that the agency "did not consider these subjects to be of sufficient intelligence interest to warrant an analysis or assessment, or that the [a]gency was unable to collect . . . foreign intelligence on the topic, thereby demonstrating a weakness in CIA's intelligence capabilities." *Id.* ¶ 50. Even on topics for which the CIA has already acknowledged some level of interest by releasing a document or documents relating to such topics, the agency may, and does, "decline to confirm the existence or nonexistence of related records to prevent further disclosure of information that would reveal the depth, breadth, and duration of the CIA's interest in the topic where such details about the topic remain classified." *Id.* ¶ 52.

14

The CIA's determinations on national security issues are entitled to substantial deference. *See CIA v. Sims*, 471 U.S. 159, 179 (1985); *ACLU v. U.S. Dep't of Defense*, 901 F.3d 125, 134 (2d Cir. 2018) ("This Court and others have consistently deferred to executive declarations predicting harm to the national security, and have found it unwise to undertake searching judicial review."); *ACLU v. Dep't of Justice*, 681 F.3d 61, 69 (2d Cir. 2012) (government declarations are entitled to "substantial weight" in the national security context); *Larson v. Dep't of State*, 565 F.3d 857, 865 (D.C. Cir. 2009) ("The judiciary is in an extremely poor position to second-guess the predictive judgments made by the government's intelligence agencies" about national security risks of disclosure).

This deference specifically applies to agency determinations that even seemingly minor details cannot be revealed without compromising classified information. *See Sims*, 471 U.S. at 179 (recognizing that "the mere explanation of why information must be withheld can convey valuable information to a foreign intelligence agency"); *Larson*, 565 F.3d at 864 ("Minor details of intelligence information may reveal more information than their apparent insignificance suggests because, much like a piece of jigsaw puzzle, each detail may aid in piecing together other bits of information even when the individual piece is not of obvious importance in itself. The CIA has the right to assume that foreign intelligence agencies are zealous ferrets." (cleaned up; citation omitted)); *Hayden v. NSA*, 608 F.2d 1381, 1385 (D.C. Cir. 1979) (NSA need not justify its withholdings where "[h]arm could follow from the disclosure of any material that might help to identify the communications intercepted by NSA"). Indeed, the Second Circuit has endorsed the "mosaic theory" of non-disclosure because "minor details of intelligence information may reveal more information than their apparent insignificance suggests." *ACLU v. CIA*, 24 F.4th 863, 868 (2d Cir. 2022). It has also affirmed intelligence agencies' invocation of the *Glomar* doctrine

15

whereby agencies refuse to confirm or deny the existence of requested records where acknowledgement of such a fact is itself classified information. *See Wilner v. NSA*, 592 F.3d 60, 64-65 (2d Cir. 2009).

The CIA thus cannot respond to the Subpoenas because they potentially implicate not just individual classified documents, but also entire topics for which the agency cannot reveal, one way or the other, whether it has responsive documents.

### C. The CIA's Proposed Approach to the Subpoenas Is Reasonable

Given the substantial burdens precluding the CIA from responding to the Subpoenas as written, the agency reasonably proposed a compromise whereby it would process the documents identified by name in each of the Subpoenas, and perform a set of limited searches—using search terms the agency developed—to identify manageable sets of responsive documents to process. As proposed by Plaintiffs, this approach was informed by the CIA's response to a previous subpoena in this case relating to Al Rajhi Bank, where the agency agreed to produce just three responsive documents in response to a broad subpoena seeking "all documents" about various topics. *See* Williams Decl. ¶ 21 & n.11. (The CIA did not accept search terms from any party for its Al Rajhi search. *Id.* ¶ 21 n.11.) Capping the number of responsive documents enables the agency to limit the volume of time-consuming reviews that would be required for potentially much larger numbers of documents.

The Parties' principal objection to the CIA's approach centers on the agency's proposed search terms. *See* Pls.' Br. at 10-11; Sudan Br. at 1. As discussed, the CIA developed these search terms after both a "careful review of the subpoenas," and consideration and "understanding of the CIA's holdings and search capabilities as well as the limits on the CIA's ability to acknowledge—or not—the possible existence of certain categories of CIA information." Williams Decl. ¶ 23. The Parties' desire to include additional or different search terms, while understandable, is not feasible

16

given the constraints on the CIA's ability to acknowledge information. The agency employees who developed the search terms "are knowledgeable about CIA systems and their varying search capabilities," and "understand which types of search terms, or combinations thereof, are most likely to yield responsive documents, as well as the terms that may skew results." *Id.* ¶ 32. These are the individuals the CIA "trusts . . . to conduct searches in response to a wide variety of requests." *Id.*

Specifically, the CIA developed search terms that—"*when presented as a conjoined set*"—"the [a]gency can acknowledge publicly without risking the revelation of classified information." *Id.* ¶ 57 (emphasis added). In creating its list, the CIA "had to consider whether the search terms were likely to produce at least 15 documents," as originally proposed to the Parties, because if not "that would tend to show that the [a]gency did not consider the subjects to be of sufficient intelligence interest to warrant an analysis or assessment, or that the [a]gency was unable to collect . . . foreign intelligence on the topic, thereby demonstrating a weakness in CIA's intelligence capabilities." *Id.* On the other hand, if the search terms "contained only a few highly specific terms, the fact that CIA has at least 15 documents on the narrow subject" would "show[] the CIA had determined the topics to be of intelligence value." *Id.* For these reasons, "allowing either of the parties to add or remove search terms—which could result in too few results or too narrow a list of [issues]—risks revealing aspects of the [a]gency's intelligence collection, which itself constitutes an intelligence method." *Id.*[2]

The Court should not allow the Parties to second-guess the agency's considered judgment in developing search terms for the materials responsive to the Subpoenas. *See Wilner*, 592 F.3d at

---

[2] Relatedly, while the CIA indicated that its searches would use "combinations of the [search] terms," the agency did not specify which combinations it would use, "as doing so could reveal classified information." *Id.* ¶ 58.

76 ("We affirm our deferential posture in FOIA cases regarding the uniquely executive purview of national security. Recognizing the relative competencies of the executive and judiciary, we believe that it is bad law and bad policy to second-guess the predictive judgments made by the government's intelligence agencies . . . ." (citation and internal quotation marks omitted)). Instead, the Court should limit the CIA's response to the Subpoenas to processing the documents identified by the Parties, or, in the alternative, endorse the CIA's proposed search protocol and permit it to respond to the remaining portions of the Subpoenas by running searches using the sets of search terms the agency developed and limiting its production to 15 or 20 documents per party.

## CONCLUSION

For the foregoing reasons, the Court should deny the Parties' motion to compel the CIA to respond to the Subpoenas.

Dated: March 23, 2026

Respectfully submitted,

JAY CLAYTON
United States Attorney


By: */s/ Jean-David Barnea*
JEAN-DAVID BARNEA
JENNIFER JUDE
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, NY 10007
Telephone: (212) 637-2679/2663
Email: Jean-David.Barnea@usdoj.gov
        Jennifer.Jude@usdoj.gov

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c), the above-named counsel hereby certifies that this memorandum complies with the word-count limitation of this Court's Local Civil Rules. As measured by the word processing system used to prepare it, this memorandum contains 5,653 words.

New York, New York
March 23, 2026

/s/ Jean-David Barnea
JEAN-DAVID BARNEA
Assistant United States Attorney

19