**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **IN RE: TERRORIST ATTACKS ON SEPTEMBER 11, 2001.** | 03 MDL 1570 (GBD)(SN) |

**DECLARATION OF MARY C. WILLIAMS,**
**LITIGATION & INVESTIGATIONS INFORMATION REVIEW OFFICER FOR THE**
**INFORMATION REVIEW AND RELEASE DIVISION,**
**CENTRAL INTELLIGENCE AGENCY**

I, MARY C. WILLIAMS, hereby declare and state:

## I.    INTRODUCTION

1.    I currently serve as a Litigation Information & Investigations Review Officer ("LI/IRO") for the Information Review and Release Division at the Central Intelligence Agency ("CIA" or "Agency"), a position I have held since November 2023. As the LI/IRO, I am responsible for ensuring that any determinations as to the release or withholding of documents or information under my purview are proper and do not jeopardize the national security of the United States. I am also responsible for, among other things, the classification review of CIA documents and information that may be the subject of civil court proceedings.

2.    I am a senior CIA official and hold original classification authority at the TOP SECRET level under written

delegation of authority pursuant to section 1.3(c) of Executive Order ("E.O.") 13526, 75 Fed. Reg. 707 (Jan. 5, 2010). I am therefore authorized to assess the current, proper classification of CIA information, up to and including TOP SECRET information, based on the classification criteria of E.O. 13526 and applicable regulations.

3.    Prior to serving as the LI/IRO, I served as the Acting Information Review Officer ("IRO") for the Litigation Information Review Office for four months, performing the same duties I presently perform as the LI/IRO. Prior to that, I served as the Criminal and Civil Team ("CCT") Lead in the Litigation Information Review Office for 45 months, where I was responsible for, among other things, reviewing CIA information that is subject to the Classified Information Procedures Act ("CIPA") (18 U.S.C. App. 3 §§ 1-16) in connection with criminal proceedings. As CCT Lead, I was responsible for ensuring that any determinations to the release of Agency information under my purview were proper and did not jeopardize the national security. Prior to becoming CCT Lead, I served as an Associate IRO for 19 months. In that role, I was responsible for conducting second-line reviews of Agency-wide information subject to pending litigation, and making classification and release determinations regarding such information when necessary. Prior to that, I served as a Security Specialist with

2

the United States Department of Justice ("DOJ") for over 15 years.

### A. Purpose of Declaration

4.     Through the exercise of my official duties, I have become familiar with this civil action and the Plaintiffs' Motion to Compel pursuant to Federal Rule of Civil Procedure 45, with which the Republic of the Sudan ("Sudan") joins in part. The purpose of this declaration is to address several issues relevant to the CIA's production of documents in response to non-party document subpoenas, served on CIA in March 2025 and April 2025, that were raised, respectively, in Plaintiffs' motion to compel and Sudan's letter to the Court, dated 6 March 2026. For the Court's convenience, I have divided the remainder of this declaration into five parts: Part II explains the classification authorities and standards relevant to this matter; Part III provides the procedural background, including the CIA's engagement with the parties, through respective counsel, in the meet-and-confer process; Part IV addresses the resources required by CIA to undertake to search for documents responsive to the parties' subpoenas, as well as the additional resources necessitated by the line-by-line review process that the CIA must conduct prior to the release of any responsive documents the search may identify, should there be any; Part V addresses the classified information implicated in responding

substantively to the subpoenas and explains why CIA cannot agree to search terms identified by the parties; and Part VI contains my conclusions.

5.    I make the following statements based upon my personal knowledge and information made available to me in my official capacity as the LI/IRO.

## II.  CLASSIFICATION AUTHORITIES AND STANDARDS

7.    Relevant to this matter is E.O. 13526, which governs the classification, declassification, and safeguarding of national security information. Section 6.1 of that Order defines "national security" as "the national defense or foreign relations of the United States," and defines "information" as "any knowledge that can be communicated or documentary material, regardless of its physical form or characteristics, that is owned by, produced by or for, or is under the control of the United States Government."

8.    Section 1.1(a) of E.O. 13526 provides that information may be originally classified under the terms of this order if the following conditions are met: (1) an original classification authority is classifying the information; (2) the information is owned by, produced by or for, or is under the control of the U.S. Government; (3) the information falls within one or more of the categories of information listed in Section 1.4 of E.O. 13526; and (4) the original classification authority determines

that the unauthorized disclosure of the information reasonably could be expected to result in some level of damage to the national security, and the original classification authority is able to identify or describe the damage. In addition, in accordance with section 1.7(a) of the Order, information may not be classified in order to conceal violations of law, inefficiency or administrative error; prevent embarrassment to a person, organization, or agency; restrain competition; or prevent or delay the release of information that does not require protection in the interests of national security.

9.   As described further below, I have determined that certain CIA information at issue here consists of national security information as defined by Section 6.1 of E.O. 13526. I have also determined the information falls within the substantive categories of national security information that are eligible for classification set forth in E.O. 13526 because it pertains to intelligence activities; intelligence sources and methods; and foreign relations or activities of the United States. See E.O. 13526, §§ 1.4(c)-(d).

III. **Procedural Background**

10.   This matter concerns Plaintiffs' subpoena, dated 18 March 2025 ("Plaintiffs' subpoena") and Sudan's subpoena, dated 25 April 2025 ("Sudan's subpoena") (the "subpoenas").

**A. Plaintiffs' Subpoena**

11.  On 18 March 2025, Plaintiffs served upon DOJ, which accepted on behalf of the CIA, a 15-part[1] subpoena seeking the following records and information:

> (1) All documents concerning the U.S. government's designation of the Republic of Sudan as a State Sponsor of Terrorism on August 12, 1993; and the U.S. government's subsequent assessments and determinations that Sudan should remain on the State Sponsor of Terrorism List through December 14, 2020;
>
> (2) The Sudanese Mukhabarat's intelligence file(s) concerning Osama bin Laden and al Qaeda[2] allegedly provided to the Federal Bureau of Investigation ("FBI") and/or CIA by the government of Sudan in or around 2001;
>
> (3)-(5) All documents supporting certain CIA "assessment[s]" in certain documents;
>
> (6) All documents concerning four specific individuals identified as al Qaeda members and financial officers;[3]
>
> (7) All documents concerning terrorist training camps established and operating in Sudan during the 1990s under the control and oversight of Osama bin Laden, al Qaeda, the [National Islamic Front], Sudanese intelligence and/or the Sudanese military, including but not limited to seven identified camps;[4]

---

[1] I understand from DOJ that Plaintiffs served subpoenas on the FBI, the Department of State, and the U.S. Marshals Service. I further understand that, combined, these subpoenas seek the same or similar records as those requested in parts (1)-(2) and (6)-(13) of the subpoena to CIA.

[2] The subpoenas use varying spelling, capitalization, and hyphenation to refer to al Qaeda. When describing a specific part of a subpoena, I will use the term(s) used in that part.

[3] The four individuals are: Abu Hammam al Saudi, Saidi Madani al Tayyib, Mustafa Ahmad Uthman Abu al Yazid, and Jamal Ahmed al Fadl.

[4] Hilat Koko camp, Soba camp, Damazine camp, Merkhiyat camp, Al Shambat camp, Al Mazraa camp, and Elefansa Popular Defense camp.

(8)-(9) All documents concerning at least 23 "Al-Qaeda-controlled businesses," and any association between Osama bin Laden, al Qaeda, or the Al-Qaeda-controlled businesses and 11 banks operating in Sudan during the 1990s;

(10) All documents concerning the issuance of government documents by the Government of Sudan to Osama bin Laden and members of al Qaeda;

(11)-(13) All documents concerning the U.S. government's investigation of the New York City "Landmark Plot," thwarted in June 1993, and the alleged involvement in the Landmark Plot of the Sudanese Mission to the United Nations and two individuals identified as Sudanese intelligence officers[5]; and

(14)-(15) 38 CIA reports, cables, memoranda, or other documents cited in *The 9/11 Commission Report* or otherwise identified in the CIA subpoena.

12.  On 10 April 2025, the CIA sent a letter, through DOJ, outlining its objections to Plaintiffs' subpoena and asking Plaintiffs to substantially narrow the subpoena and provide additional information to assist the CIA in evaluating the request under the CIA's *Touhy* regulations.

13.  On 1 May 2025, Plaintiffs provided the CIA with copies of CIA documents in Plaintiffs' possession that Plaintiffs referenced in their subpoena. Several weeks later, on 27 May 2025, Plaintiffs responded to the CIA's 10 April 2025 letter. Plaintiffs did not, however, narrow the subpoena.

---

[5] Siraj Yousif and Ahmed Yousef Mohamed.

## B. Sudan's Subpoena

14.    On 25 April 2025, Sudan served upon DOJ, which accepted on behalf of the CIA, an 18-part[6] subpoena and accompanying *Touhy* request seeking the following records and information:

> (1) All documents concerning the activities of Osama Bin Laden in Sudan from 1991-1996;
>
> (2) All documents concerning the departure of Osama Bin Laden from Sudan in or around May 1996;
>
> (3) All documents concerning the activities of Osama Bin Laden and his associates after Bin Laden departed Sudan in or around May 1996 through 2001;
>
> (4) All documents concerning Osama Bin Laden's purported businesses in Sudan and al Qaeda's purported activities in Sudan, without date limitation;[7]
>
> (5)-(7) All documents concerning offers made by Sudan to extradite or otherwise deliver Osama Bin Laden to the United States, Saudi Arabia, or any other country in 1996 or earlier, and the CIA's consideration and acceptance or rejection of such offers;
>
> (8) All documents concerning communications from Sudan to the United States concerning requests to share intelligence or other information about Osama Bin Laden from 1991-2002;
>
> (9) All documents concerning any actual exchange of intelligence or other information between Sudan and the United States concerning Osama Bin Laden and/or Al Qaeda from 1991 to 2002;

---

[6] I understand from DOJ that Sudan served subpoenas on the FBI, the Department of State, and the U.S. Marshals Service. I further understand that, combined, these subpoenas seek the same or similar records as those requested in parts (1)-(12) of the subpoena to CIA

[7] Including, without limitation, two purported CIA reports, as well as all documents that may tend to contradict the allegations or conclusions in the reports.

(10) All documents concerning the bombing of a pharmaceutical factory in Khartoum, Sudan known as "Al-Shifa" or "El Shifa" on August 20, 1998;

(11) All documents concerning Jamal al Fadl's activities in Sudan and his cooperation as a government witness in the United States;

(12) Information sufficient to establish and explain the "withdrawal" of approximately 100 United States intelligence reports regarding Sudan in 1996;

(13)-(18) All documents concerning six purported CIA reports cited in Plaintiffs' complaints.

15. On 9 May 2025, the CIA sent a letter, through DOJ, outlining its objections to Sudan's subpoena and asking Sudan to substantially narrow the subpoena and provide additional information to assist the CIA in evaluating the request under CIA's *Touhy* regulations.

16. On 29 May 2025, Sudan responded to the CIA's 9 May 2025 letter and provided the CIA with copies of CIA documents in Sudan's possession that Sudan referenced in its subpoena. Sudan did not, however, narrow the subpoena.

**C. Meet-and-Confers**

17. I understand that, since June 2025, DOJ, on behalf of the CIA, has engaged on several occasions with Plaintiffs' counsel and Sudan's counsel in a meet-and-confer process.

18. I understand that in June 2025, DOJ conveyed to both parties the CIA's offer to process and release the specific documents identified in parts 14 and 15 of Plaintiffs' subpoena and parts 13 through 18 of Sudan's subpoena, to the extent the

documents have been officially acknowledged by CIA and contain relevant information. I also understand DOJ informed the parties that the CIA was unable to conduct searches in response to the remaining requests, which seek "all documents" on a variety of topics. DOJ explained that the CIA is uniquely situated as an intelligence agency and that revealing "all documents" the CIA has on a topic would reveal substantial classified information about the existence, nature, and scope of the CIA's intelligence interest in the topic, its sources and methods devoted to that topic (or lack thereof), and possible intelligence gaps.

19. In meet-and-confer discussions with counsel for Plaintiffs and Sudan in July 2025, I understand that DOJ reiterated the CIA's offer to review the CIA reports identified in the subpoenas and provided additional information regarding the CIA's inability to conduct searches as to the rest of the parts of the subpoenas. Specifically, DOJ explained that the subpoenas request documents where the existence or nonexistence of which constitutes a classified fact. Consequently, the CIA cannot admit or deny the existence or nonexistence of such documents, or even acknowledge that locations exist for the CIA to search for such documents, without revealing classified information. DOJ also explained how the CIA's search capabilities are different than those of many other government agencies, as the CIA's systems are highly compartmented and

10

decentralized, making a search even for documents the existence or nonexistence of which is not a classified fact, a time-consuming and resource-intensive process. Lastly, I understand DOJ discussed with both parties that the existence or nonexistence of documents regarding the topics of information identified in the subpoenas remains classified notwithstanding certain prior acknowledgements of related information.[8]

20.   In late July 2025, DOJ informed the CIA that Sudan had indicated its tentative agreement to the CIA's proposal to review and process for production the specific documents identified in the subpoenas. However, on 1 August 2025, DOJ relayed to the CIA that Plaintiffs intended to move to compel the CIA to comply with Plaintiffs' subpoena in its entirety.[9]

21.   In a subsequent meet-and-confer discussion, I understand that Plaintiffs pointed to the CIA's handling of a

---

[8] I provide further detail regarding the classified nature of the information at issue in these subpoenas in part IV below.

[9] Although the parties ultimately did not accept the CIA's offer to review the documents identified in parts 14 and 15 of Plaintiffs' subpoena and parts 13 through 18 of Sudan's subpoena as full compliance with those subpoenas, the CIA nonetheless dedicated significant Agency resources in the ensuing months to process the documents. On 20 March 2026, CIA released in part 36 documents (235 pages) and withheld in full nine documents (50 pages) identified in parts 14 and 15 of Plaintiffs' subpoena, and released six documents (116 pages) identified in parts 13 through 18 of Sudan's subpoena. CIA is still looking into certain pieces of part 15 of Plaintiffs' subpoena.

2021 subpoena[10] as evidence of the CIA's ability to conduct searches in response to the subpoenas currently at issue.[11] Although the 2021 subpoena is fundamentally different from the present subpoenas, the CIA offered to consider a proposal from Plaintiffs if the proposal significantly narrowed the scope of Plaintiffs' subpoena, as the CIA had requested in its 10 April 2025 letter.

22.    On 24 August 2025, I understand that Plaintiffs sent a proposal to the CIA, through DOJ, (1) seeking to add an unspecified number of documents to the list of documents identified in their subpoena to be reviewed and processed by the CIA and (2) proposing that the CIA search for and produce 25 additional reports responsive to search terms that Plaintiff would provide at a future date.

23.    On 24 November 2025, following the 43-day lapse in government funding, the CIA responded to Plaintiffs' proposal by explaining that the CIA was amenable to conducting a limited

---

[10] In 2021, Plaintiffs served upon the CIA a 7-part subpoena seeking, among other things, "all documents" concerning various allegations pertaining to Al Rajhi Bank.

[11] With respect to Plaintiffs' 2021 Al Rajhi Bank subpoena, the CIA agreed to process and produce redacted versions of (1) a CIA report identified in Plaintiffs' subpoena and (2) three additional analytic documents identified in a search by the CIA for records responsive to the subpoena that contained the greatest number of references to Al Rajhi Bank. CIA did not accept search terms from any party before conducting its search. As a condition of the CIA's processing and production of redacted versions of these four documents, Plaintiffs agreed to accept the production as full compliance with the subpoena.

search but that it was unable to accept search terms from Plaintiffs. The CIA offered, instead, to conduct a search using combinations and variations of a set of search terms the CIA crafted using the categories of information identified in Plaintiffs' subpoena. Recognizing the need to treat both parties consistently, the CIA made the same offer to Sudan, proposing to use combinations and variations of a set of search terms the CIA crafted using the categories of information identified in Sudan's subpoena. Both sets of terms were developed by a subject matter expert IRO after the IRO's careful review of the subpoenas, and in light of the expert's understanding of the CIA's holdings and search capabilities as well as the limits on the CIA's ability to acknowledge — or not – the possible existence of certain categories of CIA information. The CIA identified the proposed search terms in its proposal to the parties. Under this proposal, the CIA offered to process and produce 15 documents in response to each subpoena, for a total of 30 non-overlapping documents.

24.   In December 2025, I understand that Plaintiffs and Sudan responded to the CIA's proposed way forward.

25.   Plaintiffs rejected the CIA's proposal and, despite the CIA's prior stated inability to conduct searches using specific search terms identified by Plaintiffs, due to the tendency of such searches to reveal classified information,

offered a counterproposal that reverted back to Plaintiffs' request for CIA to use terms that Plaintiff would derive and provide to CIA at a later date. Plaintiffs' counterproposal also imposed additional requirements. Due to apparent concerns that the CIA's proposed search terms, which the CIA's IRO selected directly from Plaintiffs' subpoena, would cause the results to be unreasonably skewed, Plaintiffs asked the CIA to agree to an iterative process whereby the CIA would conduct an initial search using Plaintiffs' proposed terms, review and produce 10 responsive documents to Plaintiffs, allow Plaintiffs the opportunity to refine its proposed search terms after reviewing the produced documents, conduct a second search using Plaintiffs' new terms, then review and produce an additional 10 documents to Plaintiffs. Plaintiffs' counteroffer also requested that the CIA re-review and reprocess 26 partially-redacted CIA reports that were made public in response to Executive Order 14040.[12] Review and processing of these documents would be in addition to the documents identified in Plaintiffs and Sudan's respective subpoenas, which the CIA was in the process of reviewing for release.

---

[12] None of the 26 additional documents are specifically requested in Plaintiffs' subpoena.

26. In response to the CIA's offer, I understand that Sudan asked several questions, including whether the CIA would consider adding four terms[13] to the CIA's proposed search terms.

27. In January 2026, I understand that the CIA, through DOJ, responded to each party, informing them both that the CIA could not agree to searches using terms identified by either party. However, to assuage Plaintiffs' concerns about any potential skewing of results, CIA offered to conduct a relevance review to ensure that the documents produced to each party are responsive to their respective subpoenas. The CIA also explained to Plaintiffs that the 26 additional documents Plaintiffs asked the CIA to re-review and re-reprocess all had been reviewed and released within the previous three to four years and that, given the subject matter and the limited amount of time that had passed since that review and release, the CIA assessed that additional information likely would not be released in connection with a re-review.

28. Despite the CIA's assurance that the documents produced to Plaintiffs under the CIA's proposal would be responsive to their subpoena, Plaintiffs rejected the CIA's offer and asked, once again, that the CIA use search terms identified by Plaintiffs. Plaintiffs provided a list of search

---

[13] None of Sudan's four proposed terms appear in Sudan's subpoena.

15

terms to the CIA, via DOJ.[14] The CIA reiterated that it was unable to negotiate search terms, as doing so could reveal classified information, and that any agreement would need to include only CIA-proposed terms. In light of this constraint, and in hopes of reaching an agreement with the parties, the CIA offered to produce 20 documents to each party, for a total of 40 non-overlapping documents, even though searching for and processing this volume of documents, in addition to the documents CIA was already in the process of reviewing, would require significant Agency resources and delay the completion of other CIA business.

29.    I understand that Plaintiffs again rejected the CIA's proposed way forward and, on 20 February 2026, filed a motion to compel the CIA to comply with Plaintiffs' subpoena. By letter to the Court, dated 6 March 2026, Sudan joined, in part, Plaintiffs' motion, asking the Court to compel the CIA to comply with Sudan's subpoena.

---

[14] Plaintiffs' list included 41 total terms. Of those 41 terms, 15 were also included in the CIA's proposed set of terms and 26 were not. Of the 26 terms not included in the CIA's proposed set of terms, 22 are not found anywhere in Plaintiffs' subpoena. The four remaining terms found in Plaintiffs' subpoena and not included in CIA's proposed set of terms are: "intelligence," "weapons," "security," and "passport." The terms "weapons" and "security" only appear in the titles of CIA documents listed in parts 14 and 15, which CIA already agreed to process and produce.

## IV.  AGENCY RESOURCES AND BUSINESS PROCESSES IMPLICATED BY THE SUBPOENAS

30.  In this section, I discuss the resources and procedures the Agency uses to search for, identify, and process documents for public release. Such review and release occurs in a variety of CIA mission-related contexts – including in connection with the government's discovery obligations in criminal prosecutions, pursuant to the Agency's statutory requirements under FOIA and the Privacy Act, and in response to mandated or requested declassification actions – all of which requires the input, review, and work of the same small team of professionals.

### A. The CIA's Search Process for Responsive Records

31.  A search for documents responsive to Plaintiffs' and Sudan's multi-part subpoenas, should any such documents exist, would require significant Agency resources. Initially, Agency search professionals would need to identify the Agency system or systems most likely to contain documents potentially responsive to the subpoenas, should any such systems exist. Due to the highly classified and sensitive nature of many aspects of the CIA's mission, many Agency systems are decentralized and compartmented to limit access and to enhance their physical

17

security.[15] As a result, only a select number of CIA employees and/or contractors are assigned to search for documents contained within certain systems. These individuals are also responsible for other duties and search activities. Accordingly, search requests are prioritized depending on the mission need for the information or the exigency of the request, which can be driven by court-ordered or statutorily-imposed deadlines.

32.    The Agency's search professionals are knowledgeable about CIA systems and their varying search capabilities. Moreover, they understand which types of search terms, or combinations thereof, are most likely to yield responsive documents, as well as the terms that may skew results. Accordingly, the Agency trusts these individuals to conduct searches in response to a wide variety of requests.

33.    Next, should a search result in potentially responsive documents, a more time-consuming review process must then take place. Each document must be reviewed by information review professionals and, in some circumstances, subject matter experts to determine whether it is in fact responsive to the request at issue. This responsiveness review ensures that potentially responsive documents reference the individual or topic that was

---

[15] I note that, given the CIA's national security mandate, specific information about Agency databases and precisely how these records repositories are structured or queried cannot be described in great detail publicly.

the subject of the search, and not a different individual or topic, which in turn ensures that only those persons with a "need to know" the information handle it in connection with further review, to prevent sensitive classified information about unrelated persons or intelligence matters from being inappropriately distributed. In addition, often times, even if a document pertains to the general topic or person that is the subject of the request, it may be non-responsive based on factors such as timing or context. In other words, the process of reviewing documents to determine if they are in fact responsive can be time-consuming and require input from multiple reviewers. Documents also must be reviewed to ensure that they are not duplicative of other documents already identified earlier in the review or, for example, in an earlier production (such as the CIA's review and release of the documents identified in the subpoenas). This first-line responsiveness review is cumbersome and burdensome, as documents can be lengthy and sometimes duplicated within systems. Thus, it is not uncommon for these reviews to take several days, for even very limited search strings with limited results.

**B. The CIA's Review Process for Classified, Statutorily-Protected, and Privileged Information**

34.   Following identification of documents responsive to the subpoenas, should such documents exist, CIA officers then

would conduct a line-by-line classification review of each document, identifying any currently and properly classified information that must be withheld from release. That review includes considering information that was previously determined to be classified and deciding whether it continues to meet the standards for classified information set forth in Executive Order 13526. As described in more detail below, this review often involves a significant amount of research and coordination with multiple stakeholders who are best positioned to assess the damage to national security that reasonably could be expected to result from disclosure. Classification review also includes considerations of whether seemingly disparate pieces of information can be assembled into a coherent picture that can reveal classified information.

35.    The records requested by Plaintiffs and Sudan would be no exception to the CIA's practice of conducting a line-by-line classification review. While certain CIA information surrounding al Qaeda, Osama Bin Laden, and the 11 September 2001 terrorist attacks has been declassified, officially acknowledged, and/or publicly released over time, much of the information on these topics remains classified. Determining whether certain information remains classified, and, if so, at what level of classification, can turn on subtle nuances, carefully parsed distinctions, and the context of a proposed disclosure.

20

36.   In the field of foreign intelligence, disclosure of a discrete piece of information by itself may seem innocuous, but its release in conjunction with other, seemingly harmless material may result in the disclosure of sensitive information that could harm national security. Therefore, the classification review of documents must be thorough and exacting. In reviewing documents that may contain or relate to information that has been released previously -- such as information relating to the attacks of September 11th -- it is often necessary to analyze considerable material beyond the particular documents responsive to the document request in order to ascertain whether a particular word, phrase, or sentence remains classified or otherwise protected from disclosure. The review of this additional material, which can be voluminous, adds additional time – often a significant amount of time – to the review of each document.

37.   Responsive records of the type the parties' subpoenas seek also may contain sensitive information from more than one CIA component. The originating component of each piece of information is uniquely knowledgeable about the kind of disclosures that could, for example, jeopardize specific intelligence sources or methods, and is therefore best qualified to determine what damage, if any, to the national security reasonably could be expected to result from an unauthorized

release of the information. This review is critical because the significance of one item of information often depends upon the knowledge of other items of information, the value of which cannot be considered without expertise from subject-matter experts who have knowledge of the entire landscape. For that reason, responsive documents may need to be referred to multiple CIA components having equities in the documents, as well as potentially to other federal agencies that may have equities represented in the documents.

38.   Upon referral, these entities must also conduct a line-by-line review to determine whether any information is classified, privileged, or statutorily-protected from disclosure. Many of the relevant CIA components' subject matter experts are also tasked with mission-critical duties such as collecting, analyzing, and preparing intelligence for distribution to policymakers and CIA partners. Taking time away from those duties to conduct classification reviews pulls intelligence officers from the central focus of their mission.

39.   In addition to the classification review, the CIA also conducts a review to determine if the documents are protected from disclosure (in whole or in part) by statute, to include the National Security Act of 1947, 50 U.S.C. § 3001 et seq.; the Central Intelligence Agency Act of 1949, 50 U.S.C. § 3501 et seq.; and the Privacy Act of 1974, 5 U.S.C. § 552a; or are

subject to privileges, including the deliberative process privilege; the attorney-client privilege; and the attorney work product doctrine, among others. As with classification reviews, reviews focused on statutorily-protected and privileged information may require significant research and coordination.

40.  Once all reviews have been completed, information review professionals must then incorporate all entities' recommended redactions as appropriate into one final copy of each document. Upon preparation of this final version, a senior review takes place, with a subject matter expert IRO reviewing each document line-by-line once again to confirm that the proposed redactions are correct and that the information being released is both unclassified and not subject to any statutory protection or relevant privilege.

41.  Additionally, the review of classified material related to such highly sensitive topics may in some cases require coordination with senior CIA officials as to whether the release of the information at issue reasonably could be expected to cause identifiable damage to the national security. These judgments cannot be made solely by IROs; rather, they must be made by senior officials who are actively involved in the conduct and management of intelligence collection or analytical activities. Such officials are often called upon to respond quickly to a variety of CIA mission-related issues. Requiring

these officials to turn from these obligations to provide input in civil litigation can have negative repercussions for the CIA's intelligence activities, which are this Agency's primary responsibility.

42.    In sum, the time and resources required for this type of review are substantial. For example, the CIA agreed to reprocess the documents identified in parts 14 and 15 of Plaintiffs' subpoena and parts 13 through 18 of Sudan's subpoena. On 20 March 2026, CIA produced to the parties 42 partially-redacted documents and withheld in full an additional nine documents.[16] These 51 documents totaled 401 pages. For this production alone, which did not require the first-line search and responsiveness review process discussed above because the documents were specifically identified in the subpoenas, CIA dedicated 100 hours, if not more, across multiple Agency officers.

## V.    CLASSIFIED INFORMATION

43.    I have determined that the acknowledgement of the existence or nonexistence of records responsive to certain parts of the parties' subpoenas would reveal classified information. I have further determined that, due to the risk of revealing

---

[16] CIA determined that the nine documents withheld in full do not contain any meaningfully segregable unclassified or otherwise non-privileged information.

24

classified information, the CIA is unable to accept the parties' input regarding specific terms to use in any potential search for responsive records that would reveal an open, unclassified, or officially acknowledged affiliation or relationship between the subject matter of the request and the Agency.

**A. Classified Information Implicated By The Parties' Subpoenas**

44.    Consistent with Section l.l(a) of E.O. 13526, and as described below, I have determined that the acknowledgement of the existence or nonexistence of certain types of records responsive to Plaintiffs' subpoena might reveal currently and properly classified information that concerns Sections l.4(c) and (d) of the E.O., "intelligence activities, "intelligence sources and methods," and "foreign relations or foreign activities of the United States." The "fact of" the existence or nonexistence of the records is information owned by and under the control of the United States government, and the unauthorized disclosure of information confirming or denying the existence or nonexistence of such records reasonably could be expected to result in damage to the national security.[17]

---

[17] In accordance with section l.7(a) of E.O. 13526, my determination that the existence or nonexistence of the requested records is classified has not been made to conceal violations of law, inefficiency, or administrative error; to prevent embarrassment to a person, organization, or agency; to restrain competition; or to prevent or delay the release of information that does not require protection in the interests of national security.

45.   In some cases, for example, when a member of the public submits a request to the CIA — pursuant to, *e.g.*, the Freedom of Information Act ("FOIA") — for information on a particular subject, the CIA conducts a search of relevant records systems and advises whether responsive records were located. If records are located, the CIA provides the requester with any non-exempt information contained in those records. In such cases, the Agency's response confirms the existence or nonexistence of CIA records related to the subject of the request. The CIA is able to disclose the fact that it possesses or does not possess records because such disclosure poses no harm to the national security or clandestine intelligence activities and is therefore not classified.

46.   In other situations, however, the Agency cannot publicly reveal whether or not it possesses records on a particular subject because doing so could reasonably be expected to result in damage to the national security. Given the CIA's mandate to collect and analyze foreign intelligence and to conduct counterintelligence, there are instances in which the mere fact of whether the Agency possesses responsive records may itself reveal the CIA's intelligence interest in, or clandestine connection to, a particular individual or activity. Revealing the existence or non-existence of records in these cases would tend to expose a particular intelligence activity or otherwise

26

reveal previously undisclosed information about CIA sources, capabilities, vulnerabilities, authorities, interests, relationships with domestic or foreign entities, strengths, weaknesses, and/or resources, or conversely expose the lack thereof. Accordingly, in such situations the Agency responds by declining to confirm or deny the existence or nonexistence of responsive records.[18]

47.    In order to maintain its effectiveness, the CIA issues this type of response consistently and categorically, even where no responsive records exist and the nonexistence of such records may appear to be of little consequence. Declining to confirm or deny the existence of responsive records only when responsive records exist would have the effect of confirming the existence of classified information -- namely, confirming the fact that the Agency has such records. If the Agency declined to confirm or deny the existence of responsive records only when responsive records exist, over time the response would serve to identify the particular subjects in which the CIA has an intelligence interest. Doing so could reasonably be expected to cause damage to the national security because our adversaries would begin to

---

[18] In the FOIA context, this type of response is colloquially referred to as a "Glomar" response. This term is derived from the case Phillippi v. CIA, 546 F.2d 1009 (D.C. Cir. 1976), which affirmed CIA's use of the "neither confirm nor deny" response to a FOIA request for records concerning CIA's reported contacts with the media regarding Howard Hughes's ship, the "Hughes Glomar Explorer."

be able to piece together a picture of the Agency's intelligence interests, activities, capabilities, and/or vulnerabilities. When the Agency determines that declining to confirm or deny the existence of certain records is appropriate, it does not search for responsive records. Doing so, only to later decline disclosure of the fact of the existence or nonexistence of records, would be a meaningless and costly endeavor. Moreover, if the CIA were to confirm that it had conducted a search, the CIA's admission that it has (or does not have) locations to search inherently would reveal the classified information the CIA is trying to protect through its response declining to confirm or deny the existence of records —- namely, that the CIA does or does not maintain the types of records sought.

48.  In cases such as this one, the CIA may be able to respond to a request substantively in part but decline to confirm or deny the existence of records responsive to the rest. In such scenarios, the CIA: 1) conducts a limited search of the specific records system(s) deemed most likely to contain responsive records that reveal open or acknowledged CIA information; 2) produces any responsive non-exempt information found pursuant to that search; and 3) declines to confirm or deny the existence of records that would reveal a classified or statutorily-protected fact. As with a response fully declining to confirm or deny the existence of responsive records, in

situations where the existence or nonexistence of records responsive to a portion of the request may be acknowledged, but the existence or nonexistence of records responsive to another portion of the request may not be acknowledged, the CIA does not search for records the existence or nonexistence of which would reveal a classified or unacknowledged fact.

49.   I have determined that confirming or denying the existence of certain responsive records in this particular case reasonably could be expected to cause damage to national security by disclosing intelligence activities, sources, and methods, or the lack thereof. There has been no official public acknowledgement by the CIA on the specific topics for which the CIA declines to confirm or deny the existence or nonexistence of responsive documents. Disclosing whether or not the CIA possesses the types of information requested on these topics would acknowledge the existence or nonexistence of certain CIA intelligence information, thereby providing the CIA's adversaries with insight into the Agency's intelligence priorities and capabilities and impacting the CIA's ability to utilize intelligence activities, sources, and methods in the interest of national security.

50. Both parties' subpoenas seek a wide range of records on topics implicating classified information.[19] If the CIA were to confirm the existence of records responsive to certain parts of the request, such confirmation would tend to show the CIA had determined these topics were of intelligence value. And, if the CIA denied possessing such records, that response would tend to show that the Agency did not consider these subjects to be of sufficient intelligence interest to warrant an analysis or assessment, or that the Agency was unable to collect the foreign intelligence on the topic, thereby demonstrating a weakness in CIA's intelligence capabilities. In either case, disclosing whether or not the CIA possesses responsive records would reveal aspects of the Agency's intelligence collection, which itself constitutes an intelligence method.

51. The effective collection and analysis of intelligence requires the Agency to prevent disclosures to our adversaries of the specific persons, organizations, and areas in which the CIA

---

[19] Parts 14 and 15 of Plaintiffs' subpoena and parts 13 through 18 of Sudan's subpoena seek specific CIA documents either cited in the endnotes to the Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Report") or officially acknowledged and cleared in part for previous release. Because parts 14 and 15 of Plaintiffs' subpoena and parts 13 through 18 of Sudan's subpoena seek records that the CIA has previously released (and therefore acknowledged), confirming the existence or non-existence of responsive records, at least in part, would not divulge heretofore unacknowledged CIA intelligence sources and methods and therefore is not reasonably likely to result in harm to the national security.

is interested and upon which it focuses its methods and resources. Every country and group, to include the CIA, has finite resources and capabilities to engage in intelligence activities. The disclosure to a potential U.S. intelligence target of the areas, organizations, and persons of CIA interest, or lack thereof, at any given time, would reveal how the CIA allocates its resources. Here, acknowledging the existence or nonexistence of records could be expected to cause damage to the national security by divulging methods the CIA employed or did not employ with regard to foreign intelligence collection on the topics requested in Plaintiffs' and Sudan's subpoenas, thereby providing a concrete example of CIA's intelligence collection activities (or lack thereof) and providing additional insight into methods and techniques that CIA may be employing today.

52.  Notwithstanding the CIA's acknowledgment of the existence of the specific documents identified throughout Plaintiffs' and Sudan's subpoenas or the information contained therein, the CIA maintains that it can neither confirm nor deny the existence of responsive records not previously acknowledged by the Agency. Nothing revealed in the referenced documents constitutes in any way an acknowledgment — either explicit or implicit — of a relationship with, intelligence interest in, or collection on, the information or subjects requested in the subpoenas beyond what is specifically contained in the four

31

corners of the released documents themselves. Although a released record may acknowledge the CIA's interest in a topic to some extent, the Agency can and does decline to confirm the existence or nonexistence of related records to prevent further disclosure of information that would reveal the depth, breadth, and duration of the CIA's interest in the topic where such details about the topic remain classified.

53. For example, suppose a publicly released document reveals that on 1 January 1999, the Director of the CIA attended a meeting at the White House to discuss a specific activity of al Qaeda. This release would not constitute an acknowledgment of any fact other than the fact of the CIA Director having attended a meeting on a particular date to discuss a specific activity of al Qaeda. It would not constitute an acknowledgment that the Agency had or did not have an intelligence interest in al Qaeda or its activities, nor would it constitute an acknowledgement as to whether the CIA was actively pursuing collection on al Qaeda's activities. It also would not constitute an acknowledgement as to whether the CIA Director attended other meetings on al Qaeda's specific activity or other activities on other dates. The CIA could continue to decline to confirm the existence, or nonexistence, of other records, to the extent that revealing such existence or nonexistence could reasonably be expected to result in damage to the national security.

32

54.    Terrorist organizations, foreign intelligence services, and other hostile groups continually gather details regarding the CIA's specific intelligence capabilities, authorities, and interest. They attempt to use this information to their advantage and to the United States' disadvantage. In order to effectively collect and analyze foreign intelligence, the Agency must avoid disclosing its intelligence activities, sources, and methods.

55.    For the foregoing reasons, I have determined that confirming the existence or nonexistence of certain records responsive to Plaintiffs' and Sudan's subpoenas pertains to one or more of the categories of information identified in section 1.4 of Executive Order 13526 and could reasonably be expected to cause damage to national security, and is therefore a currently and properly classified fact.

**B. Classified Information Potentially Revealed Through Further Discussion of Search Terms**

56.    As with responding to certain parts of the parties' subpoenas, engaging in discussion regarding specific search terms or allowing the parties to dictate the terms CIA uses could reveal classified information.

57.    In order to answer the parties' subpoenas in a manner that is both responsive and permits the Agency to openly acknowledge the searches performed, a CIA subject matter expert

33

IRO, using the requests written by the parties, developed a list of search terms that, when presented as a conjoined set, the Agency can acknowledge publicly without risking the revelation of classified information. The IRO had to consider whether the search terms were likely to produce at least 15 documents, the number of documents CIA initially offered to produce to each party. If CIA's search did not produce at least 15 documents, that would tend to show that the Agency did not consider the subjects to be of sufficient intelligence interest to warrant an analysis or assessment, or that the Agency was unable to collect the foreign intelligence on the topic, thereby demonstrating a weakness in CIA's intelligence capabilities. Conversely, if CIA's list of search terms contained only a few highly specific terms, the fact that CIA has at least 15 documents on the narrow subject shows the CIA had determined the topics to be of intelligence value. For these reasons, allowing either of the parties to add or remove search terms -- which could result in too few results or too narrow of a list of terms -- risks revealing aspects of the Agency's intelligence collection, which itself constitutes an intelligence method.

58.   Similarly, although the CIA explained that its proposed search would utilize combinations of the terms, the CIA could not specify which combinations it would use, as doing so could reveal classified information. For instance, if the CIA

agrees to conduct a search using the terms "A," "B," and "C" but only produces documents containing "A" and "B," that would tend to show that the CIA does not have intelligence on "C" as it relates to "A" and "B."

## VI.    Conclusion

59.    As discussed above, responding to either party's subpoena involves substantial Agency resources and impacts the orderly conduct of the CIA's mission. Additionally, certain parts of the parties' subpoenas seek documents the existence or nonexistence of which would reveal a classified connection between the subjects of the requests and the CIA, or the lack thereof, or the Agency's intelligence interest in the subjects of the requests, or the lack thereof. Disclosing this information could be reasonably expected to cause damage to the national security and is therefore currently and properly classified. Moreover, for the reasons outlined above, allowing the parties to add or remove proposed search terms could also reveal classified information.

*   *   *

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this **23rd** day of March 2026.


_____
Mary C. Williams
Litigation & Investigations
Information Review Officer
Information Review & Release Division
Central Intelligence Agency

36