**MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES**
In re: Terrorist Attacks on September 11, 2001 (S.D.N.Y.)

**VIA ECF**

April 3, 2026

The Honorable George B. Daniels
United States District Court for the
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

  Re: *In Re: Terrorist Attacks on September 11, 2001*, 03-md-1570 (GBD) (SN)

Dear Judge Daniels:

Plaintiffs with claims against Al Rajhi Bank ("ARB") write in response to ARB's March 24, 2026 supplemental authority letter, ECF No. 11905, concerning the district court decision in *Troell v. Binance Holdings Ltd.*, No. 24-cv-7136 (JAV), 2026 WL 636849 (S.D.N.Y. Mar. 6, 2026) – the third letter ARB has submitted in an effort to persuade the Court *to refrain from deciding ARB's own motion to dismiss for lack of personal jurisdiction*.

Plaintiffs previously have explained why ARB's efforts to bypass resolution of its own personal jurisdiction motion are procedurally improper. *See* ECF No. 11171. Even if ARB's 12(b)(6) arguments were properly before the Court, ARB's characterization of *Troell* is materially incomplete and inaccurate, and sidesteps key controlling principles announced by the Second Circuit in *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021), and *Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420 (2d Cir. 2025). *Kaplan* and *Ashley* readily confirm that Plaintiffs' claims would defeat any proper 12(b)(6) challenge. *See* ECF No. 11171. The D.C. Circuit's recent authoritative decision in *Atchley v. AstraZeneca UK Ltd.*, 165 F.4th 592 (D.C. Cir. 2026) reinforces that conclusion.

**1. <u>ARB's Jurisdictional Challenge is the Only Motion Properly Before the Court</u>**

Plaintiffs have explained already why ARB's request that the Court bypass resolution of its jurisdictional motion is contrary to the controlling principle that courts do not assume jurisdiction for purposes of deciding the merits of a claim; foreclosed by the Second Circuit's mandate remanding ARB for resolution of the personal jurisdiction question and Judge Netburn's decision rejecting the very request ARB makes again now; and otherwise improper given developments in the litigation against ARB since its 12(b)(6) motion was filed in 2017. *See* ECF No. 11171 at 1-3. Plaintiffs will not repeat those arguments here, but two additional points warrant brief emphasis in light of ARB's most recent letter.

The Honorable George B. Daniels
April 3, 2026
Page 2

_____

First, ARB's "supplemental authority" letters – which amount to an improper attempt to brief 12(b)(6) issues by letter campaign[1] – do not present any challenge that is cognizable under the Federal Rules. Indeed, whereas a Rule 12 motion is directed at the allegations of the complaint, ARB's letters purporting to advance defenses under Rule 12(b)(6) are directed primarily at the content of an evidentiary averment submitted solely for purposes of jurisdiction and limited to evidence admissible for purposes of Rule 56. *See e.g.*, ECF Nos. 11163 at 3-5, 11905 at 4. ARB compounds this problem by predicating several of its arguments on claims about what the "evidence" purportedly shows. *See e.g.*, ECF Nos. 11190 at 1-3, 11905 at 4. ARB's hybrid arguments have no basis in the Rules and only underscore why the existing pleadings and briefing do not provide a proper record to decide any 12(b)(6) challenges. *See* ECF No. 11171 at 3.

Second, *Troell* provides no support for ARB's argument that this Court may bypass jurisdiction and instead decide the case on the merits. To the contrary, the *Troell* court itself acknowledged the controlling principle that a court ordinarily must "'address any challenge to personal jurisdiction prior to deciding the merits of the cause of action'" *Troell*, 2026 WL 636849 at *25 (quoting *Chevron Corp. v. Naranjo*, 667 F.3d 232, 246 n. 17 (2d Cir. 2012)). However, the *Troell* court found that it was permitted to decide the 12(b)(6) motions before it under a narrow exception applicable "'in cases such as this one with multiple defendants – over some of whom the court indisputably has personal jurisdiction – in which all defendants collectively challenge the legal sufficiency of the plaintiff's cause of action.'" *Id*. (quoting *Chevron*, 667 F.3d at 246 n. 17). That narrow exception is wholly inapplicable in the present case.

For these and the reasons previously offered, ARB's pending jurisdictional challenge is the only motion properly before the Court, and *Troell* has no bearing on that motion.

**2.    <u>ARB's Reliance on *Troell* is Misplaced</u>**

While not ripe for consideration at this time, ARB's arguments that *Troell* bolsters its potential 12(b)(6) defenses ignore key controlling legal principles and obvious distinctions between the sprawling and amorphous claims at issue in that case and those arising from ARB's active, deliberate, and systematic support for core al Qaeda financial components and managers.

The district court decision in *Troell* applied JASTA's aiding and abetting standards, as clarified by *Taamneh v. Twitter*, 598 U.S. 471 (2023), and the Second Circuit's decisions in *Kaplan* and *Ashley*, to claims seeking to hold a cryptocurrency exchange liable for sixty-four distinct terrorist attacks committed by nine different organizations — including the IRGC, ISIS, and North Korea's Reconnaissance General Bureau — spanning more than a dozen countries over eight years. *Troell*, 2026 WL 636849 at *1-2. As the *Troell* court recognized at the outset, *id.* at *13, the

_____

[1] *See* Local Rule 7.1.

The Honorable George B. Daniels
April 3, 2026
Page 3

_____

court's core role in applying the *Halberstam* factors in a JASTA case is simply to assess whether the defendant's "participation in another's wrongdoing is significant and culpable enough to justify attributing the principal wrongdoing" to the defendant. *Taamneh*, 598 U.S. at 504. Consistent with this focus, the Second Circuit has emphasized that the "twin requirements" of "knowing" and "substantial assistance" work in tandem with one another, such that a lesser showing of one may be offset by a "greater showing of the other." *Ashley*, 144 F.4th at 438.

Plaintiffs already have explained how application of these and other controlling principles to an updated pleading presenting all factual allegations warranted by the current record will show that JASTA's aiding and abetting requirements are easily met in the present case. ECF No. 11171 at 3-5. In stark contrast to the cases cited by ARB, including *Troell*, the facts and allegations relevant to any 12(b)(6) motion will show that ARB and its principals shared common cause with al Qaeda, and that ARB's pervasive support for al Qaeda's financial managers and components was undertaken for the purpose of advancing al Qaeda's terrorist agenda. *Id.* ARB provided this direct, systematic, and pervasive support to al Qaeda's most notorious financial officers and components, through bespoke departures from governing money laundering standards and ARB's own practices. *Id.* The record relevant to any 12(b)(6) challenge would additionally present facts showing direct connections between ARB, the 9/11 hijackers, and members of the 9/11 support network. *Id.* at 5. These and other facts and allegations Plaintiffs would offer in response to any proper 12(b)(6) motion would readily satisfy JASTA's aiding and abetting requirements.

The D.C. Circuit's recent decision in *Atchley* reinforces this conclusion. On remand from the Supreme Court and applying *Twitter*, the *Atchley* Court held that pharmaceutical companies' cash bribes and provision of free goods to a terrorist organization (Jaysh al-Mahdi) were sufficient to state JASTA aiding-and-abetting claims. *Atchley*, 165 F.4th at 605-613. The *Atchley* Court explained that when a defendant provides assistance to a terrorist organization in an "unusual and unlawful" manner — departing from accepted business practices to serve the terrorist organization's needs — that departure evidences the culpable association required by *Twitter*. *Id.* at 596-97. A defendant who structures transactions in an unusual way for a known bad actor cannot hide behind the label of "routine services." *Id.* at 610.

ARB maintained at least ninety-four accounts for Al Haramain alone, facilitating more than 2.1 billion Saudi Riyals — approximately $533 million — in irregular deposits during the five-year jurisdictional discovery period. *See* Corrected Averment at ECF No. 10582 ("CA") ¶¶ 206-208. ARB enabled al Qaeda's senior financial officers to move an additional tens of millions of dollars through personal nominee accounts with no due diligence; facilitated concentrated cash deposits followed by massive single-event withdrawals presenting obvious red flags; and allowed its founder and chairman to route contributions to al Qaeda through ARB's own Chase Manhattan Bank PTA in a structure deliberately designed to conceal his identity as originator. CA ¶¶ 9, 52,

The Honorable George B. Daniels
April 3, 2026
Page 4

_____

253-257, 273-389, 410-411. In connection with this assistance, ARB engaged in systematic violations of anti-money laundering standards and ARB's own procedures, for the specific purpose of shrouding the source and destination of al Qaeda funds. *See* ECF No. 11171 at 5. At all times, ARB's principals were al Qaeda insiders who possessed explicit knowledge of the customers' al Qaeda roles. *Id.* at 4-5. This is not routine banking. It is precisely the kind of unusual and unlawful assistance demonstrating culpable association under *Twitter*. *Atchley,* 165 F.4th at 609-611.

*Atchley* also puts to rest ARB's oft-repeated argument that Plaintiffs are required to trace specific ARB funds to the 9/11 attacks. The D.C. Circuit expressly rejected a "direct traceability" test, holding that a nexus is established where the attacks were the "predictable, virtually inevitable fallout" of the defendants' assistance, and that the statute does not require plaintiffs to "spell out how" the terrorist organization "converted defendants' assistance into weapons or equipment to carry out each specific attack." *Atchley*, 165 F.4th at 606-607. Even where the nexus is somewhat indirect, plaintiffs establish liability by showing the assistance was substantial and defendants were aware of how it was being used — not by tracing individual dollars to individual attacks. That bar is cleared here many times over. In fact, CIA finished intelligence identified ARB as al Qaeda's "bank of choice" and a "conduit" for the September 11th hijackers; ARB moved the bulk of al Qaeda's funds in the years immediately preceding September 11, 2001; and ARB's founder channeled funds through ARB's own U.S. correspondent account to al Qaeda fronts in the United States. CA ¶¶ 7, 155, 176, 206-217, 265-267, 459-488.  Under *Atchley*, the September 11th attacks were the predictable, virtually inevitable product of that sustained, knowing support.[2]

The unique factual issues and perceived deficiencies that led the *Troell* court to dismiss the claims before it do not (and could not) alter the analysis above and do not help ARB in this case. Initially, the *Troell* court expressly held that the complaint adequately alleged Binance's general awareness of its role in terrorist financing, *Troell*, 2026 WL 636849 at *16, but concluded that the plaintiffs failed to satisfy the knowing and substantial assistance prong. While the court's rationales for the disparate organizations and attacks at issue varied somewhat based on the particular facts, its holding as to the IRCG claims is illustrative. In dismissing those claims, the *Troell* court emphasized that the plaintiffs had offered "no information" concerning the nature of the alleged relationship between the IRCG and the cryptocurrency wallets at issue, or even identified who owned or controlled the wallets or what information may have been available to the defendants about the owner's terrorist connection.  *Id*. at *17. The court found that the absence of those facts made it impossible to infer that, by allowing the wallets to operate, "Defendants culpably and consciously sought to associate themselves with the IRCG." *Id.* The court found that the claims attempting to link the defendants' cryptocurrency exchange to additional terrorist

_____

[2] *Atchley* also distinguished cases involving alleged passive malfeasance in relation to arms-length business dealings, such as those at issue in *Twitter*, from those involving special or tailored assistance via illicit means. *Atchley*, 165 F.4th at 612. ARB's support for al Qaeda involved the latter.

The Honorable George B. Daniels
April 3, 2026
Page 5

_____

organizations and attacks rested on wholly conclusory allegations that offered no factual details, *id.* at *20 (al Qaeda); isolated or limited transactions where the plaintiffs failed to show a benefit to the responsible terrorist organization, *id.* at *19 (Hezbollah); allegations that failed to detail the alleged support even occurred before the terrorist attacks at issue *id.* at *20 (ISIS); or the lack of any allegations indicating that the defendants' activities were "designed or performed with intent to aid" the terrorist organization, *id.* at *21-22 (Hamas and PIJ). The court assessed that these deficiencies similarly made it impossible to infer conscious and culpable assistance.

The claims at issue in *Troell* are not remotely comparable to those at issue here, and the particularized factual deficiencies that prompted the *Troell* court to dismiss the sprawling claims before it have no bearing on the present claims. As discussed above and in Plaintiffs' prior submissions, the facts relevant to any 12(b)(6) challenge in this case will show that ARB and its principals acted on the basis of their ideological alignment with al Qaeda and in order to further al Qaeda's terrorist agenda. ECF No. 11171 at 3-5. ARB did so through illegal departures from international anti-money laundering requirements and ARB's own regulations in ways that were tailored to suit al Qaeda's needs. *Id.* Through those bespoke arrangements, ARB was responsible for moving the bulk of al Qaeda's funds via accounts maintained and operated on behalf of al Qaeda's most important financial components and managers, including the bank's own Chairman Suleiman al Rajhi and the enterprise he created to fund al Qaeda. *Id.* At all times, ARB and its principals were expressly aware of the customers' nexus to al Qaeda, by virtue of their own status as al Qaeda financial insiders, public reporting, and other information. *Id.*

Finally, ARB's characterization of Plaintiffs' oral argument as a "concession" that no nexus exists between ARB's services and the September 11th attacks is both immaterial and inaccurate. The questioning did not address 12(b)(6) standards or the factual allegations that would be relevant to any 12(b)(6) challenge, and occurred amidst an active exchange about particular accounts and covering a broad range of issues. In any case, Plaintiffs' counsel explained how al Qaeda's interest in the funds was inherent in the identity of the accountholders and the scope and nature of the illicit transactions. Tr. at 94. The record also establishes how the illicit financial assistance provided by ARB directly enabled al Qaeda's terrorist activities, *see e.g.*, CA ¶¶ 509-534, establishing that acts of terrorism – including the 9/11 attacks – were a "natural and virtually inevitable consequence of [ARB's] unusual, corrupt, and plentiful assistance." *Atchley*, 165 F.4th at 597. And the record relevant to any 12(b)(6) would also show links among ARB, the 9/11 hijackers, and the 9/11 support network. ECF No. 11171 at 5.

For these reasons, the Court should again reject ARB's effort to avoid resolution of its own pending jurisdictional motion. When any 12(b)(6) challenges are properly before the court, the record relevant to any such motion will confirm that this case readily satisfies the governing standards under *Twitter*, *Ashley*, and *Atchley*.

The Honorable George B. Daniels
April 3, 2026
Page 6

---

Respectfully submitted,

COZEN O'CONNOR

By: */s/ Sean P. Carter*
SEAN P. CARTER
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Tel.: (215) 665-2105
Email: scarter1@cozen.com

Robert C. Sheps
SHEPS LAW GROUP, P.C.
25 High Street
Huntington, NY 117430
Tel: (631) 249-5606
Email: rsheps@shepslaw.com

*On Behalf of Plaintiffs With Claims*
*Against Defendant Al Rajhi Bank*

cc:  The Honorable Sarah Netburn (via ECF)

LEGAL\114542195\1