23-258 (L); 23-354 (L)
*Havlish v. Taliban; Aliganga v. Taliban*

# In the
# United States Court of Appeals
## for the Second Circuit

AUGUST TERM 2024

| USDC SDNY |
| --- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: ___4/10/2026___ |

No. 23-258-cv (L)
No. 23-263-cv (CON)
No. 23-304-cv (CON)
No. 23-346-cv (CON)
No. 23-444-cv (CON)

FIONA HAVLISH, ET AL., JOHN DOES 1 THROUGH 7, FEDERAL INSURANCE
CO., ET AL., RAYMOND ANTHONY SMITH, ET AL., KATHLEEN ASHTON, ET
AL.,
*Plaintiffs-Appellants,*

v.

THE TALIBAN,
*Defendant-Appellee,*

FEDERAL RESERVE BANK OF NEW YORK,
*Garnishee-Interested-Party-Appellee,* [1]

---

[1] The Clerk of Court is directed to amend the official caption as shown
above.

On Appeal from the United States District Court
for the Southern District of New York

———————

No. 23-354-cv (L)
No. 23-797-cv (C)

ESTATE OF JESSE NATHANAEL ALIGANGA, ET AL., RIZWAN KHALIQ, ET
AL., JAMES OWENS, ET AL.,
*Plaintiffs-Appellants*,

v.

TALIBAN, AKA THE ISLAMIC EMIRATE OF AFGHANISTAN,
*Defendant-Appellee*.

———————

On Appeal from the United States District Court
for the Southern District of New York

———————

ARGUED: OCTOBER 9, 2024
DECIDED: AUGUST 26, 2025

———————

Before: CALABRESI, CABRANES, and SULLIVAN, *Circuit Judges*.

———————

We consider here claims brought by two different sets of
plaintiffs. The first set of plaintiffs, the Pre-Judgment Plaintiffs, sought
confirmation of a pre-judgment attachment order concerning
"blocked" funds held by the Afghan central bank (Da Afghanistan

2

Bank, or "DAB") at the Federal Reserve Bank of New York (the "FRBNY"). Pre-Judgment Plaintiffs did so to preserve their chance to collect on a potential future judgment in their lawsuit against the Taliban for its alleged role in the East Africa embassy bombings of August 7, 1998. The United States District Court for the Southern District of New York (Valerie E. Caproni, *Judge*) denied their motion in an Opinion and Order dated February 24, 2023.

The second set of plaintiffs (comprising four groups of judgment creditors), the Judgment Plaintiffs, moved for turnover of those same "blocked" funds held by DAB at the FRBNY to satisfy judgments they held against the Taliban stemming, primarily, from the terrorist attacks of September 11, 2001. The United States District Court for the Southern District of New York (George B. Daniels, *Judge*) denied their motion in a Memorandum Decision and Order dated February 21, 2023.

There are two principal questions before us. The first is whether the Afghan central bank, DAB, is immune from attachment under the Foreign Sovereign Immunities Act (the "FSIA"), 28 U.S.C. §§ 1602-1611. If it is, then Pre-Judgment Plaintiffs' pre-judgment attachment order as to its assets must fail.

The second question is whether § 201 of the Terrorism Risk Insurance Act of 2002 (the "TRIA") applies to blocked assets in DAB's name held at the FRBNY. To do so, the TRIA would need to (1) abrogate any immunity afforded to DAB by the FSIA *and* (2) have each of its statutory prerequisites satisfied. If the TRIA does not so apply,

3

Judgment Plaintiffs' turnover motions as to DAB's assets, likewise, must fail.

Judge Sullivan concurs in part and dissents in part.

———————

> MATTHEW D. MCGILL, Gibson, Dunn & Crutcher LLP, Washington, D.C. (Jessica L. Wagner, Gibson, Dunn & Crutcher LLP, Washington, D.C.; Robert L. Weigel, Jason W. Myatt, Gibson, Dunn & Crutcher LLP, New York, NY; Clifton S. Elgarten, Emily M. Alban, Crowell & Moring LLP, Washington, D.C.; Jane Carol Norman, Bond & Norman Law, PC, Rockville, MD, *on the brief*), *for Plaintiffs-Appellants* Estate of Jesse Nathanael Aliganga, et al., Rizwan Khaliq, et al., and James Owens, et al.
>
> IAN HEATH GERSHENGORN, Jenner & Block LLP, Washington, D.C. (Douglass A. Mitchell, Jenner & Block LLP, Washington, D.C.; Lee Wolosky, Benjamin D. Alter, Jenner & Block LLP, New York, NY; Andrianna D. Kastanek, Jenner & Block LLP, Chicago, IL; David A. Barrett, Boies Schiller Flexner LLP, New York, NY; Stuart H. Singer, Boies Schiller Flexner, Fort Lauderdale, FL;

4

Timothy B. Fleming, Wiggins Childs Pantazis Fisher Goldfarb, PLLC, Washington, D.C., *on the brief*), *for Plaintiffs-Appellants* Fiona Havlish, et al., *Appellants* in 23-258.

SAMUEL ISSACHAROFF, New York University School of Law, New York, NY (Andrew J. Maloney, III, Kreindler & Kreindler LLP, New York, NY; Noam Biale, Sher Tremonte, LLP, New York, NY, *on the brief*), *for Plaintiffs-Appellants* Kathleen Ashton, et al., *Appellants* in 23-444.

John Thornton, Orlando do Campo, do Campo & Thornton, P.A., Miami, FL, *for Plaintiffs-Appellants* John Does 1 through 7, *Appellants* in 23-263.

Sean P. Carter, Stephen A. Cozen, Cozen O'Connor, Philadelphia, PA; Richard Klingler, Ellis George Cipollone O'Brien Annaguey LLP, Washington, D.C.; Carter G. Phillips, Sidley Austin LLP, Washington, D.C., *for Plaintiffs-Appellants* Federal Insurance Co., et al., *Appellants* in 23-346.

Dion G. Rassias, The Beasley Firm, LLC, Philadelphia, PA, *for Plaintiffs-Appellants*

5

Raymond Anthony Smith, et al., *Appellants* in 23-304.

———————

JOSÉ A. CABRANES, *Circuit Judge*:

We consider here claims brought by two different sets of plaintiffs. The first set of plaintiffs, the Pre-Judgment Plaintiffs, sought confirmation of a pre-judgment attachment order concerning "blocked" funds held by the Afghan central bank (Da Afghanistan Bank, or "DAB") at the Federal Reserve Bank of New York (the "FRBNY"). Pre-Judgment Plaintiffs did so to preserve their chance to collect on a potential future judgment in their lawsuit against the Taliban for its alleged role in the East Africa embassy bombings of August 7, 1998. The United States District Court for the Southern District of New York (Valerie E. Caproni, *Judge*, hereinafter District Court [VEC]) denied their motion in an Opinion and Order dated February 24, 2023.

The second set of plaintiffs (comprising four groups of judgment creditors), the Judgment Plaintiffs, moved for turnover of those same "blocked" funds held by DAB at the FRBNY to satisfy judgments they held against the Taliban stemming, primarily, from the terrorist attacks of September 11, 2001. The United States District Court for the Southern District of New York (George B. Daniels, *Judge*, hereinafter District Court [GBD]) denied their motion in a Memorandum Decision and Order dated February 21, 2023.

6

There are two principal questions before us. The first is whether the Afghan central bank, DAB, is immune from attachment under the Foreign Sovereign Immunities Act (the "FSIA"), 28 U.S.C. §§ 1602-1611. If it is, then Pre-Judgment Plaintiffs' pre-judgment attachment order as to its assets must fail.

The second question is whether § 201 of the Terrorism Risk Insurance Act of 2002 (the "TRIA") applies to blocked assets in DAB's name held at the FRBNY. To do so, the TRIA would need to (1) abrogate any immunity afforded to DAB by the FSIA *and* (2) have each of its statutory prerequisites satisfied. If the TRIA does not so apply, Judgment Plaintiffs' turnover motions as to DAB's assets, likewise, must fail.

We answer the question of whether DAB is immune from attachment under the FSIA in the affirmative. DAB is the agency or instrumentality of the foreign state of Afghanistan, which itself continues to be recognized as an independent state by the Executive Branch of the United States. This makes DAB itself a "foreign state" pursuant to § 1603(a) and (b) of the FSIA and imbues it with attachment and execution immunity under § 1609. Moreover, none of the exceptions to attachment and execution immunity in § 1610 pertain.

We therefore **AFFIRM** the order of the District Court (VEC) denying Pre-Judgment Plaintiffs' motion to confirm the pre-judgment attachment order on the basis that DAB's funds are immune from attachment under the FSIA.

7

We answer the question of whether § 201 of the TRIA applies to blocked assets in DAB's name held at the FRBNY in the negative. Although we conclude that the TRIA abrogates any immunity afforded to DAB under the FSIA, we find that at least one of the TRIA's statutory prerequisites is not satisfied—to wit, we find that DAB is not an agency or instrumentality of a terrorist party as required by the TRIA.

Consistent with our precedent, we evaluate the meaning of an "agency or instrumentality" under the TRIA differently from that same term's meaning under the FSIA. Similarly, we hold for the first time that the date at which we must determine an entity's agency or instrumentality status is different under the TRIA than it is under the FSIA. Specifically, an entity's agency or instrumentality status under § 201 of the TRIA must be determined as of the date that the assets sought in the turnover motion were blocked. Applying our TRIA-based definition of agency or instrumentality to DAB as of August 15, 2021—the date its FRBNY-held funds were blocked—we conclude that DAB is not an agency or instrumentality of the Taliban for purposes of the TRIA.

Accordingly, we likewise **AFFIRM** the order of the District Court (GBD) denying Judgment Plaintiffs' turnover motions. While we hold, contrary to the District Court, that the TRIA abrogates immunity granted to DAB by the FSIA and independently establishes subject matter jurisdiction, we agree that Judgment Plaintiffs fail to satisfy the TRIA's requirement that the blocked assets be either the

8

assets of the terrorist party or the assets of the terrorist party's agency or instrumentality.

## I. BACKGROUND

Today we decide two matters arising from a related set of facts. The first case is brought by plaintiffs (the "Pre-Judgment Plaintiffs") seeking pre-judgment attachment for damages they allege the Taliban has caused. The second case is brought by plaintiffs (the "Judgment Plaintiffs") seeking to satisfy judgments they hold against the Taliban for its role in various terrorist attacks. Both sets of plaintiffs target blocked funds of Da Afghanistan Bank ("DAB"), the central bank of the independent state of Afghanistan, that are held at the Federal Reserve Bank of New York (the "FRBNY").

### A. Factual Background

These cases emerge from the atrocities committed by al-Qaeda—with support from the Afghan Taliban (the "Taliban")—on August 7, 1998, and September 11, 2001.[2]

On August 7, 1998, al-Qaeda perpetrated simultaneous suicide bombings at the U.S. embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania. These embassy bombings killed over two hundred individuals and injured several thousand others. On September 11, 2001, al-Qaeda hijacked several passenger aircraft, flying them into the

---

[2] They also include a suicide bomb attack perpetrated by the Taliban on January 4, 2016. *See* Judgment Plaintiffs' Appendix ("Judgment App'x") at 326.

twin towers of the World Trade Center in New York, NY, the Pentagon in Washington, D.C., and an open field in Somerset County, PA. These aircraft hijackings killed several thousand individuals and injured many others.

The Taliban provided considerable support to al-Qaeda in both sets of devastating terrorist attacks. This includes the Taliban's provision to al-Qaeda of a "base of operations, training bases, and safe haven."[3] Indeed, the historical record reveals "that the [United States Government] believed that the Taliban had the capacity to shut down Al Qaeda operations in Afghanistan but refused to do so."[4] Because of the Taliban's role in al-Qaeda's terrorist attacks and the ongoing threat it posed to the United States and U.S. nationals, the United States designated the Taliban as a Specially Designated Global Terrorist (an "SDGT") in July 2002.[5] To this day, the Taliban remains an SDGT.

The Taliban first rose to power in Afghanistan in 1996 and ruled until 2001, when the United States headed a coalition force that invaded Afghanistan and removed the Taliban from its position of de facto control. Though stripped of power, the Taliban maintained an insurgency in Afghanistan for the next two decades. Following an agreement that the United States formed with the Taliban in 2020 to withdraw U.S. troops from Afghanistan, and the subsequent

---

[3] Judgment App'x 256.

[4] *Id.* at 516.

[5] Exec. Order No. 13,268, 67 Fed. Reg. 44751 (July 2, 2002); *see also* Exec. Order No. 13,224, 66 Fed. Reg. 49079 (Sep. 23, 2001).

withdrawal of those troops in the summer of 2021, the Taliban insurgency mounted an offensive which culminated in the capture of Afghanistan's capital, Kabul, on August 15, 2021. As a result, the Taliban once more seized de facto control over most of Afghanistan— but not formal authority, as no country has recognized the Taliban as Afghanistan's legitimate government.

That same day—August 15, 2021—the U.S. Treasury Department blocked all assets held in the Federal Reserve Bank of New York (the "FRBNY") by the central bank of Afghanistan, Da Afghanistan Bank ("DAB").[6] By the time the Taliban was ousted (if only temporarily) in 2001, DAB had just $90,000 in foreign exchange reserves.[7] That sum swelled to over $10 billion in assets as of June 21, 2021,[8] consisting primarily of foreign exchange funds provided by international donors—such as the United States and other Western countries. The majority of DAB's assets—totaling approximately $7 billion—were held in the FRBNY.[9]

As the Taliban seized control over Afghanistan, many senior DAB officials—including its Acting Governor—either left Afghanistan or went into hiding. The Taliban proceeded to fill those leadership

---

[6] Clayton Thomas, CONG. RSCH. SERV., *Taliban Government in Afghanistan: Background and Issues for Congress* 39 (2021).

[7] *Id.* at 38.

[8] *Id.*

[9] Clayton Thomas, CONG. RSCH. SERV., *Taliban Government in Afghanistan: Background and Issues for Congress* 38-39 (2021).

positions, which included appointing a new Acting Governor on August 23, 2021.[10] The Taliban also appears to have installed individuals designated as terrorists by the Department of the Treasury's Office of Foreign Assets Control ("OFAC") as DAB's First Deputy Governor and Second Deputy Governor.[11] There is little question that the Taliban has attained de facto control over DAB; as former Treasury Department and National Security Council official Adam Smith testified before the U.S. Senate Committee on Banking, Housing, and Urban Affairs on October 5, 2021, DAB "is now under control of the Taliban."[12] From its position of de facto control over both Afghanistan and DAB, the Taliban demanded immediate receipt of the approximately $7 billion in DAB assets held in the FRBNY.

The United States did not accede to the Taliban's request. On February 11, 2022, then-President Joe Biden issued an Executive Order titled "Protecting Certain Property of Da Afghanistan Bank for the Benefit of the People of Afghanistan" (the "Executive Order").[13] The Executive Order asserted that Afghanistan was experiencing a "widespread humanitarian crisis" which, combined with "the potential for a deepening economic collapse in Afghanistan," constituted "an unusual and extraordinary threat to the national

---

[10] The new Acting Governor, Haji Mohammed Idris, was reported to be a "Taliban loyalist." Pre-Judgment Plaintiffs' Appendix **("**Pre-Judgment App'x") at 338.

[11] Pre-Judgment App'x 340-54.

[12] *Id.* at 363.

[13] Exec. Order No. 14,064, 87 Fed. Reg. 8391 (Feb. 11, 2022).

security and foreign policy of the United States."[14] It proclaimed a "national emergency" to address the threat and asserted that preserving the U.S.-held assets of DAB—which it defined as the "Central Bank of Afghanistan"—was "of the utmost importance to addressing this national emergency and the welfare of the people of Afghanistan."[15] Accordingly, the Executive Order formally blocked DAB's property in the United States and ordered that the property be transferred "into a consolidated account held at the [FRBNY]."[16] The Executive Order authorized the Secretary of the Treasury to "take such actions . . . as may be necessary to carry out the purposes of this order."[17]

Later that day and pursuant to the authority granted by the Executive Order, OFAC issued a license (the "OFAC License") directing the FRBNY to transfer $3.5 billion to a separate blocked account.[18] The OFAC License set forth that the $3.5 billion could be transferred from the account "for the benefit of the people of Afghanistan" provided that the transfer was initiated by

---

[14] *Id.*

[15] *Id.* at 8391-92.

[16] *Id.* at 8391.

[17] *Id.* at 8392.

[18] Pre-Judgment App'x 297.

"individual(s) certified by the Secretary of State pursuant to Section 25B of the Federal Reserve Act."[19]

The Secretary of State has since certified two individuals as accredited representatives of Afghanistan, giving them joint control over the $3.5 billion that was transferred to a blocked account pursuant to the OFAC License.[20] These accredited representatives founded the Fund for the Afghan People (the "Afghan Fund") and transferred the $3.5 billion to an account at the Bank of International Settlements in Switzerland.[21]

The United States has represented that this approach enables the "$3.5 billion of Afghan central bank reserves to be used for the benefit of the people of Afghanistan while keeping them out of the hands of

---

[19] *Id.* at 298. Section 25B(3) of the Federal Reserve Act provides that the certified individual must be "a representative of such foreign state who is recognized by the Secretary of State as being the accredited representative of such foreign state." *See* 12 U.S.C. § 632.

[20] Press Release, U.S. Dep't of the Treasury, Joint Statement by U.S. Treasury and State Department: The United States and Partners Announce Establishment of Fund for the People of Afghanistan (Sep. 14, 2022), https://home.treasury.gov/news/press-releases/jy0947 [https://perma.cc/952K-6TEY].

[21] *Id.* As of December 31, 2024, the Afghan Fund's assets totaled $3.94 billion. Gene Aloise, SIGAR Quarterly Report to the United States Congress, 45 (Jan. 30, 2025), https://www.sigar.mil/Portals/147/Files/Reports/Quarterly-Reports/2025-01-30qr.pdf [https://perma.cc/2KBA-2K9Z]. As of January 30, 2025, the Afghan Fund "ha[d] not yet made any disbursements to entities on behalf of Afghanistan." *Id.*

the Taliban and other malign actors."[22] While the United States recognizes these reserves as funds belonging to DAB, and in the long run envisions retuning these funds to DAB, it has "made clear that [it] will not support the return of these funds until DAB" meets three criteria, one of which concerns demonstrating independence from the Taliban.[23]

DAB's remaining U.S.-held assets—totaling approximately $3.5 billion—continue to reside at the FRBNY.[24] These assets lie at the crux of the instant litigation.

## B. Procedural Background

We have before us two separate cases, each with its own set of Plaintiffs-Appellants.

The set of plaintiffs in the first case comprises victims of al-Qaeda's suicide bombings at the U.S. embassies on August 7, 1998 (the

---

[22] Press Release, U.S. Dep't of the Treasury, Joint Statement by U.S. Treasury and State Department: The United States and Partners Announce Establishment of Fund for the People of Afghanistan (Sep. 14, 2022), https://home.treasury.gov/news/press-releases/jy0947 [https://perma.cc/952K-6TEY].

[23] *Id.* These three requirements are that DAB: "(1) Demonstrates its independence from political influence and interference; (2) Demonstrates it has instituted adequate anti-money laundering and countering-the-financing-of-terrorism (AML/CFT) controls; and (3) Completes a third-party needs assessment and onboards a reputable third-party monitor." *Id.*

[24] Martin A. Weiss, Clayton Thomas, & Jennifer K. Elsea, CONG. RSCH. SERV., *Afghanistan Central Bank Reserves* 1 (2023).

15

"Pre-Judgment Plaintiffs"). The set of plaintiffs in the second case comprises primarily victims of al-Qaeda's aircraft hijackings on September 11, 2001 (the "Judgment Plaintiffs").[25]

### 1. Pre-Judgment Plaintiffs

On March 8, 2022, Pre-Judgment Plaintiffs filed a complaint against the Taliban, alleging that it was directly and proximately liable for the embassy attacks and seeking compensatory damages.[26] That same day, Pre-Judgment Plaintiffs also filed an *ex parte* emergency motion to attach DAB's funds held at the FRBNY, alleging that those funds belonged to the Taliban.

The District Court (VEC) granted Pre-Judgment Plaintiffs' motion to attach on March 21, 2022, and issued its opinion regarding the same on April 11, 2022. Pre-Judgment Plaintiffs moved to confirm the order of attachment on May 2, 2022. In an Opinion and Order issued on February 24, 2023, the District Court declined to confirm its attachment order, finding that since DAB is the central bank of Afghanistan, its funds are immune from attachment under the FSIA. It therefore denied Pre-Judgment Plaintiffs' motion to confirm and vacated its own order of March 21, 2022 (in which it had granted *ex parte* emergency attachment). The District Court subsequently denied Pre-Judgment Plaintiffs' motion to stay its decision denying

---

[25] Judgment Plaintiffs also include victims of the Taliban's suicide bomb attack on January 4, 2016.

[26] While Pre-Judgment Plaintiffs initially filed their complaint on March 8, 2022, they modified it on March 9, 2022, after incurring a filing error.

16

confirmation of its pre-judgment attachment order. Pre-Judgment Plaintiffs timely appealed from the District Court's order denying their motion to confirm the *ex parte* attachment order and vacating the attachment.

## 2. *Judgment Plaintiffs*

Judgment Plaintiffs comprise four groups of judgment creditors who hold judgments against the Taliban for its role in terrorist attacks.[27] They seek to satisfy their judgments against the Taliban with the blocked DAB funds held at the FRBNY. On August 26, 2022, a magistrate judge recommended denying these turnover motions for three reasons: (1) DAB is immune to the district court's jurisdiction, (2) the district court is constitutionally restrained from finding that the TRIA mandates authorization of the turnover, and (3) the TRIA requires a consent-based agency relationship between DAB and the Taliban, which was lacking. Judgment Plaintiffs filed objections to the magistrate judge's Report and Recommendation on November 10, 2022. On February 21, 2023, the District Court (GBD) denied Judgment Plaintiffs' turnover motions, adopting the first two of the magistrate

---

[27] There is also a fifth group of plaintiffs-appellants: plaintiffs in Kathleen Ashton, et al. ("Ashton Plaintiffs"). Ashton Plaintiffs seek attachment, whereas Judgment Plaintiffs seek turnover. However, their arguments against the District Court (GBD)'s order largely overlap with those of Judgment Plaintiffs. Indeed, Ashton Plaintiffs note their agreement with Judgment Plaintiffs on "th[e] threshold legal issues." Ashton Plaintiffs' Br. at 3; *see also id.* at 17. Ashton Plaintiffs' remaining arguments as to the distribution of DAB's funds are mooted by our judgment.

judge's three reasons for denial. Judgment Plaintiffs timely appealed from the District Court's order.

## II. DISCUSSION

"We review the district court's ruling on a request for an order of attachment for abuse of discretion."[28] We likewise review "a denial of a . . . turnover order for abuse of discretion."[29] The district court abuses its discretion if it commits an error of law, such as in its application of the FSIA or the TRIA.[30] "We review *de novo* a district court's legal conclusions under the FSIA, including whether a foreign state or its property is or is not shielded by immunity."[31] A district court's legal conclusions under the TRIA are likewise subject to our *de novo* review.

We have jurisdiction over Pre-Judgment Plaintiffs' appeal under 28 U.S.C. § 1291 and the collateral-order doctrine. As instructed by the

---

[28] *Aurelius Capital Partners, LP v. Republic of Argentina*, 584 F.3d 120, 129 (2d Cir. 2009).

[29] *Mohammad Ladjevardian, Laina Corp. v. Republic of Argentina*, 663 F. App'x 77, 79 (2d Cir. 2016).

[30] *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 472 (2d Cir. 2007).

[31] *Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107, 122 (2d Cir. 2016).

Supreme Court, district court orders denying security are immediately appealable pursuant to the collateral-order doctrine.[32]

We have jurisdiction over Judgment Plaintiffs' appeal under 28 U.S.C. § 1291, as the District Court (GBD)'s Memorandum Decision and Order denying their motions for turnover was a final order.

## A. The District Court (VEC) Was Permitted to Address the Applicability of Attachment Immunity *Sua Sponte*

Pre-Judgment Plaintiffs contend that the District Court (VEC) erred when it addressed the applicability of an attachment immunity provision in the FSIA—namely, 28 U.S.C. § 1611(b)—*sua sponte*.[33] We disagree.

Section 1611(b) sets forth that "[n]otwithstanding the provisions of section 1610 of this chapter, the property of a foreign state *shall* be immune from attachment and from execution" provided certain conditions pertain.[34] We have previously determined that nearly identical language in the FSIA "places no limit on the district court's authority to recognize execution immunity."[35] We have further

---

[32] *See Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 543, 546-47 (1949); *Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A.*, 339 U.S. 684, 689 (1950).

[33] Pre-Judgment Plaintiffs' Br. at 35-41.

[34] 28 U.S.C. § 1611(b) (emphasis added).

[35] *Walters v. Indus. and Com. Bank of China, Ltd.*, 651 F.3d 280, 291 (2d Cir. 2011). The language to which we referred was section 1609's statement that "the property in the United States of a foreign state shall be immune from attachment[,]

concluded that "the statute's use of the mandatory form—providing that such property 'shall be immune' from execution absent a statutory exception—signals that, at least where there is no dispute that the targeted property is owned by a foreign sovereign, execution immunity inures in the property itself and applies without regard to how the issue is raised."[36] These basic principles weigh heavily in favor of finding that district courts possess the authority to review attachment (and execution) immunity *sua sponte*.

Pre-Judgment Plaintiffs argue otherwise. In the main, they assert that an exception to the district court's authority to exercise its *sua sponte* review of immunity arises when "the sovereign status of the property at issue is disputed."[37] It is true that we have stopped short of expressly holding that a district court may consider attachment and execution immunity *sua sponte* in the face of a disputed foreign sovereign.[38] But in doing so, we explicitly left that issue open to be resolved another day.[39]

---

arrest[,] and execution except as provided in sections 1610 and 1611 of this chapter." 28 U.S.C. § 1609.

[36] *Id*. at 291. The District Court (VEC) thus correctly noted that we have "signaled that Section 1611's use of the term 'shall' indicates that execution immunity inures in property that belongs to a foreign sovereign." *Owens v. Taliban*, No. 22-cv-1949, 2023 WL 2214887, at *5 (S.D.N.Y. Feb. 24, 2023).

[37] Pre-Judgment Plaintiffs' Br. at 35-36.

[38] *Walters*, 651 F.3d at 293-94.

[39] *Id*. at 294 n.11.

That day is upon us. Pre-Judgment Plaintiffs dispute whether DAB's assets are the property of a foreign sovereign,[40] and thus we must determine whether a district court may consider the attachment immunity and execution immunity of those assets *sua sponte*.

We conclude that it may. We see no good reason to foreclose disputed sovereign assets from a court's *sua sponte* consideration of attachment or execution immunity. "Both the Supreme Court and the Second Circuit have long held that courts may dismiss actions on their own motion in a broad range of circumstances where they are not explicitly authorized to do so by statute or rule"[41] and we "identify no doctrinal bar to a district court's applying execution immunity on its own initiative consistent with the terms of the FSIA."[42] We add to that only to note that we likewise identify no doctrinal bar to a district court's *sua sponte* application of attachment or execution immunity even when the sovereign status of the property at issue is disputed.

## B. As an Agency or Instrumentality of a Foreign State to Which No Enumerated Exceptions Apply, DAB Is Entitled to Execution Immunity Under the Foreign Sovereign Immunities Act

We next turn to the matter of whether DAB qualifies for execution immunity under the Foreign Sovereign Immunities Act (the "FSIA"). The FSIA is a statute containing "a comprehensive set of legal

---

[40] Pre-Judgment Plaintiffs' Br. at 35.

[41] *Snider v. Melindez*, 199 F.3d 108, 112 (2d Cir. 1999).

[42] *Walters*, 651 F.3d at 293.

standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies or instrumentalities."[43] "[T]he FSIA imposes a bright-line rule: foreign states and their instrumentalities are immune from suit unless one of the Act's enumerated exceptions applies."[44]

The FSIA was enacted in 1976 with the purpose of "codify[ing] the restrictive theory of sovereign immunity" presented in the Tate Letter.[45] In 1952, motivated by the "widespread and increasing practice on the part of governments of engaging in commercial activities,"[46] Acting Legal Advisor Jack Tate of "the State Department announced the 'restrictive' theory of foreign sovereign immunity, under which immunity was typically afforded in cases involving a foreign state's public acts, but not its strictly commercial acts."[47] However, during the following decades, "[d]ebates over the degree of immunity foreign sovereigns should enjoy in this Nation's courts followed."[48] Accordingly, the FSIA was introduced to "standardize the

---

[43] *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 488 (1983).

[44] *CC/Devas (Mauritius) Ltd. v. Antrix Corp. Ltd.*, 145 S. Ct. 1572, 1578 (2025).

[45] *Samantar v. Yousuf*, 560 U.S. 305, 319 (2010); *see also Bartlett v. Baasiri*, 81 F.4th 28, 31-32 (2d Cir. 2023).

[46] *See* Letter from Acting Legal Adviser Jack B. Tate to Acting Attorney General Philip B. Perlman (May 19, 1952), *reprinted in Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 711-715 (1976).

[47] *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 271 (2023).

[48] *Republic of Hungary v. Simon*, 604 U.S. 115, 119 (2025).

judicial process with respect to immunity for foreign sovereign entities in civil cases."[49]

Importantly, while the FSIA "defin[es] the circumstances in which foreign states are immune from suit," the FSIA emphatically does *not* charge the Judiciary with the threshold power to determine whether the basic legal existence of a foreign state is *recognized*, especially in contravention of the Executive.[50] The FSIA neither defines what a foreign state is nor provides the Judiciary with a statutory scheme to determine the "qualifications for statehood or [whether] a particular regime is the effective government of a state."[51]

Indeed, thirty-nine years after the FSIA was enacted, the Supreme Court held in *Zivotofsky ex rel. Zivotofsky v. Kerry* that it is the "exclusive power of the President to control recognition determinations, including formal statements by the Executive Branch acknowledging the legitimacy of a state or government."[52] Critically, the *Zivotofsky* Court explained that "[l]egal consequences follow formal recognition," including the "benefit [of] sovereign immunity

---

[49] *Turkiye Halk Bankasi*, 598 U.S. at 272.

[50] *Id.* at 274 (internal quotation marks and citation omitted) (emphasis omitted).

[51] *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 11 (2015) (internal quotation marks and citation omitted).

[52] *Id*. at 32. Some international-law scholars distinguish between the recognition of states and the recognition of governments. *See* Ian Brownlie, PRINCIPLES OF PUBLIC INTERNATIONAL LAW 134-156 (9th ed. 2019). *Zivotofsky* appears to hold that the President's exclusive power extends to both.

23

when [recognized sovereigns] are sued."[53] And sovereign immunity is only of moment in the context of the FSIA, as both the Supreme Court[54] and the FSIA itself[55] have made plain. As a result, while the FSIA's reach is a "pure question of statutory construction" that is "well within the province of the Judiciary," the FSIA must be interpreted in a manner consistent with the Constitutional authority of the Executive to legally recognize the existence of foreign states.[56]

We return, then, to the FSIA. The FSIA contemplates two types of immunity that can apply to the political subdivisions or agencies and instrumentalities of foreign states: jurisdictional immunity (or immunity from suit) and execution immunity (or immunity from attachment of property).

---

[53] *Id*. at 11.

[54] *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989) ("We think that the text and structure of the FSIA demonstrate Congress' intention that the FSIA be the sole basis for obtaining jurisdiction over a foreign state in our courts."). One can read this holding as suggesting that while the FSIA is the means by which we answer the question of whether a foreign state is entitled to sovereign immunity, the more basic question of whether a foreign state is legally recognized at all is assessed prior to, and independently of, the FSIA's framework. To analogize to mathematics or programming, a foreign state is an "input" used to generate results from the FSIA function, rather than an "output" of that function.

[55] *See* 28 U.S.C. § 1602 ("Claims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter.").

[56] *Republic of Austria v. Altmann*, 541 U.S. 677, 701 (2004) (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446, 448 (1987)); *see also* 28 U.S.C. § 1602.

24

These two different types of immunity are covered in two different parts of the FSIA. 28 U.S.C. § 1604 sets forth that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter."[57] 28 U.S.C. § 1609 sets forth that "the property in the United States of a foreign state shall be immune from attachment[,] arrest[,] and execution except as provided in sections 1610 and 1611 of this chapter."[58]

While both types of immunity turn on whether the relevant entity is a political subdivision or an agency or instrumentality of a foreign state, "the FSIA's provisions governing jurisdictional immunity, on the one hand, and execution immunity, on the other, operate independently."[59] In other words, exceptions to jurisdictional immunity do not compel a finding that execution immunity has also been abrogated, or vice versa.[60] This can also be seen from the fact that "the execution immunity afforded sovereign property is broader than the jurisdictional immunity afforded the sovereign itself."[61] This "special protection afforded to the property of a foreign sovereign"[62]

---

[57] 28 U.S.C. § 1604.

[58] *Id.* § 1609.

[59] *Walters v. Indus. and Com. Bank of China, Ltd.*, 651 F.3d 280, 288 (2d Cir. 2011).

[60] *Id.* at 289.

[61] *Id.*

[62] *Id.*

derives from the fact that "at the time the FSIA was passed, the international community viewed execution against a foreign state's property as a greater affront to its sovereignty than merely permitting jurisdiction over the merits of an action."[63]

Here, the District Court (VEC) determined that DAB was entitled to execution immunity, and did not assess whether jurisdictional immunity applied. For DAB's assets held in the FRBNY to receive execution immunity under section 1609, DAB must be "a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b)" such that DAB itself qualifies as a "foreign state."[64]

Because DAB is an agency or instrumentality of the State of Afghanistan, which is itself recognized as a foreign state by the Executive, and because we find that no exceptions to immunity apply, we hold that DAB's assets held in the FRBNY are entitled to execution immunity under the FSIA.

### 1. Afghanistan Is a Foreign State for the Purposes of the FSIA

As DAB—a central bank—is not itself a foreign state, for it to be considered a "foreign state" under the FSIA it must either be the

---

[63] *Id*. (quoting *Conn. Bank of Com. v. Republic of Congo*, 309 F.2d 240, 255-56 (5th Cir. 2002)).

[64] 28 U.S.C. § 1603(a). It is therefore the case that, under the FSIA, the definition of "foreign state" expands beyond foreign states (*i.e.*, foreign countries) themselves. Foreign states are "foreign states" under the FSIA, but so too are their political subdivisions and their agencies or instrumentalities.

political subdivision or the agency or instrumentality of a foreign state.[65] In this case, the relevant foreign state is the independent state of Afghanistan.

As stated earlier, the FSIA does not define what a foreign state is. It merely provides that the category of "foreign state" is capacious enough to capture the undefined state's political subdivisions and agencies or instrumentalities. The FSIA's silence on this threshold issue makes sense. As the Supreme Court explained in *Zivotofsky*, it is the power of the Executive to legally determine whether "a particular entity possesses the qualifications for statehood or that a particular regime is the effective government of a state," including for the purposes of sovereign immunity.[66]

The question of whether Afghanistan qualifies as a foreign state for the purposes of our FSIA analysis is not close. We find that the Executive Branch continues to afford formal recognition to the *state* of Afghanistan, even as it denies formal recognition of any *government* thereof. This is seen most plainly by reviewing the U.S. Department of State's "Fact Sheet" detailing the entities that the United States recognizes as "independent states," where that term is defined as "a people politically organized into a sovereign state with a definite territory recognized as independent by the [United States]."[67] One

---

[65] *Id.*

[66] *Zivotofsky*, 576 U.S. at 11 (internal quotation marks and citation omitted).

[67] U.S. Department of State, *Fact Sheet: Independent States in the World*, Bureau of Intelligence and Research (Mar. 12, 2025), https://www.state.gov/independent-

27

need only turn to the very top of the alphabetically arranged table of 197 independent states to find the state of Afghanistan counted among their ranks. This table was last updated in March 2025—well after Kabul fell to the Taliban. Consequently, while the *Taliban* is not a formally recognized *government*, *Afghanistan* continues to be a formally recognized *state*. With this determination by the Executive in hand, we are bound to acknowledge that Afghanistan is a foreign state for the purpose of our analysis of DAB under the FSIA.

Notably, Pre-Judgment Plaintiffs contend in a footnote in their brief that there is "good reason to conclude that Afghanistan no longer qualifies as a 'foreign state' for purposes of the FSIA."[68] But their reasoning relies entirely on the definition of statehood found in the Third Restatement of Foreign Relations Law of the United States—a definition which our Court has turned to only in the absence of formal recognition by the Executive Branch.[69] In such cases, we will only find

---

states-in-the-world [https://perma.cc/XX9Q-KGPA]; *see also* Letter from the United States, 22-cv-1949, ECF No. 81 at 2 (Feb. 24, 2023) (in which the Department of Justice confirms that the official position of the United States is that DAB is the central bank of the State of Afghanistan).

[68] Pre-Judgment Plaintiffs' Br. at 57 n.6.

[69] The Third Restatement identifies a two-step test for determining whether a foreign state legally exists for purposes of further analysis of the relevant state under the FSIA.

First—and in complete consonance with the Supreme Court's later analysis in *Zivotofsky*—we are to look to the Executive Branch. A President's determination that a state is a foreign state is "binding on . . . the courts." Restatement (Third) of

a not-formally recognized state to qualify as a foreign state for purposes of the FSIA if it (1) "has a defined territory and a permanent population" that is (2) "under the control of its own government" and that (3) "engages in, or has the capacity to engage in, formal relations with other such entities."[70]

For example, in *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, which was decided before *Zivotofsky*, we went beyond the explicit directives of the FSIA to evaluate whether the Palestinian Liberation Organization (the "PLO") was a foreign state entitled to immunity.[71] There, we were not able to rely on an express determination from the Executive Branch; the United States had "not recognized the PLO" or

---

the Foreign Relations Law of the United States § 204(a) (1987). If the Executive so determines, we have our answer, and do not proceed to the second step.

Rather, we only move to step two—application of the Third Restatement's definition of statehood—"[i]n the absence of a Presidential decision." *Id.* At that point, we would decide for ourselves "whether to treat an entity as a state" by applying the definition we have adopted for a foreign state. *Id.*

This approach is consistent with that described in the Fourth Restatement, which sets forth that "[w]hether a particular party is a 'state' under the [FSIA] . . . is a question of statutory interpretation, informed by the views of the executive branch." Restatement (Fourth) of the Foreign Relations Law of the United States § 452(a) (2018).

[70] *Nat'l Petrochemical Co. of Iran v. M/T Stolt Sheaf*, 860 F.2d 551, 553-554 (2d Cir. 1988) (quoting Restatement (Third) of the Foreign Relations Law of the United States § 201 (1987)).

[71] *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria,* 937 F.2d 44 (2d Cir. 1991).

"extended it formal diplomatic recognition."[72] We thus proceeded to apply the Third Restatement to assess whether the PLO met the definition of a "state," and determined that it did not.

That same logic does not apply here. Here, we *do* have a determination from the Executive Branch: the United States continues to recognize Afghanistan as an independent state.[73] We can—and indeed *must*—rely upon the Executive's recognition of Afghanistan's statehood. This is our clear directive from *Zivotofsky*.[74]

Finally, we emphasize, consistent with the FSIA's statutory scheme, that the question of whether the Executive has recognized the legal existence of a state is distinct from questions regarding which entities and activities of a foreign state enjoy sovereign immunity. Our more recent decision in *Kirschenbaum v. 650 Fifth Avenue & Related Properties* is instructive as to this distinction.[75] In *Kirschenbaum*, we inquired into whether a particular foundation and New York partnership with a relation to the state of Iran "bore traditional attributes of statehood (or otherwise qualified as a subdivision,

---

[72] *Id.* at 48-49.

[73] *See ante* note 67.

[74] In addition, as we explain in *ante* note 69, the very source of law upon which we based our "foreign state" analysis in *Klinghoffer*—the Third Restatement—makes plain that "a court will decide whether to treat an entity as a state" only "[i]n the absence of a Presidential decision." Restatement (Third) of the Foreign Relations Law of the United States § 204 (1987).

[75] 830 F.3d 107 (2d Cir. 2016).

agency, or instrumentality)."[76] Such a determination is undoubtedly the province of the Judiciary, to be evaluated according to the FSIA's text—and not by any proclamation of the Executive. Accordingly, we properly determined that while the Executive had issued an order that broadly defined "the 'Government of Iran' to include 'any person owned or controlled by, or acting for or on behalf of, the Government of Iran,'"[77] the Judiciary was not permitted to rely on that definition to "*expand* sovereign statehood under the FSIA for a single 'foreign state.'"[78] However, we did not apply the Third Restatement's definition to determine whether Iran, *itself*, was a foreign state. Instead, implicitly relying on the Executive's formal recognition, we observed that Iran "certainly is" a foreign state.[79]

By contrast, Pre-Judgment Plaintiffs argue that in this highly unusual case, the Court should effectively withdraw the Executive's legal recognition of the state of Afghanistan based on the Court's own analysis of the changing use of force and territorial integrity of a region. Such an approach is inconsistent with the FSIA and this Court's precedents and contradicts the Supreme Court's clear direction in *Zivotofsky*. Accordingly, we proceed to analyze whether DAB is a

---

[76] *Id.* at 125.

[77] *Id.* at 124 (quoting Exec. Order No. 13,599, 77 Fed. Reg. 6659 (Feb. 5, 2012)).

[78] *Id.* at 125 (emphasis added).

[79] *Id.*

political subdivision or an agency or instrumentality of the foreign state of Afghanistan under the FSIA.

### 2. DAB, as the Agency or Instrumentality of the State of Afghanistan, Is a "Foreign State" Under the FSIA

Having determined that Afghanistan is a foreign state under the FSIA, we proceed to consider whether DAB is its political subdivision or its agency or instrumentality. If it is, then DAB would also be considered a "foreign state" for purposes of the FSIA.[80] Both district courts below found that DAB was an agency or instrumentality of Afghanistan and, therefore, was a "foreign state" for purposes of the FSIA.[81] We agree.

Returning to the statute, we assess whether DAB is either (1) a political subdivision of Afghanistan or (2) an agency or instrumentality of Afghanistan.

While the FSIA fails to define the term "political subdivision," we have previously held that an entity is a political subdivision of a

---

[80] *See* 28 U.S.C. § 1603(a) ("A 'foreign state' . . . includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).").

[81] *Owens v. Taliban*, No. 22-cv-1949, 2023 WL 2214887, at *5 (S.D.N.Y. Feb. 24, 2023) (recognizing "DAB's status as Afghanistan's central bank, and, therefore, its status as a sovereign's agency or instrumentality whose assets are afforded immunity from attachment under the FSIA"); *In re Terrorist Attacks on September 11, 2001*, 657 F. Supp. 3d 311, 326 (S.D.N.Y. 2023) ("Therefore, as a central bank, DAB is the instrumentality of the foreign state of Afghanistan.").

foreign state when its core functions are predominantly governmental rather than commercial.[82] This is known as the "core functions test."[83]

The FSIA draws clearer lines for us to follow in determining which entities are agencies or instrumentalities of foreign states. It sets forth that:

> An "agency or instrumentality of a foreign state" means any entity—(1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.[84]

Particularly relevant to our present inquiry is the fact that DAB is the central bank of the state of Afghanistan.[85] We have consistently

---

[82] *Garb v. Republic of Poland*, 440 F.3d 579, 590-96 (2d Cir. 2006); *see also id.* at 599-600 (Straub, J., dissenting) ("The majority chooses the narrower core functions test, holding that *any* government entity whose core functions are governmental rather than commercial is by definition a political subdivision rather than an agency or instrumentality.").

[83] *See Schansman v. Sberbank of Russia PJSC*, 128 F.4th 70, 77 (2d Cir. 2025) (noting our articulation of "the core functions test" in *Garb*).

[84] 28 U.S.C. § 1603(b).

[85] Afghanistan Bank Law, art. 1.1 (Dec. 17, 2003), https://dab.gov.af/sites/default/files/2018-12/DABLaw1English_2.pdf [https://perma.cc/L2TR-Y5Z9] (setting forth that "Da Afghanistan Bank is the central bank of Afghanistan").

recognized that central banks qualify as agencies or instrumentalities of foreign states under the FSIA.[86] Indeed, we have previously gone so far as to assert that central banks are "the paradigm of a state agency or instrumentality," noting that "the House Report . . . specifically identified state central banks . . . in its discussion of qualifying entities for purposes of § 1603(b)."[87] Accordingly, from the outset, it appears probable that DAB, as the central bank of the state of Afghanistan, is its agency or instrumentality. For that reason, we will first assess whether DAB is an agency or instrumentality of Afghanistan before considering whether it is a political subdivision of Afghanistan.

Pre-Judgment Plaintiffs argue that it is not. Specifically, they contend that DAB is not an agency or instrumentality of Afghanistan because it does not satisfy the criteria set forth in 28 U.S.C. §

---

[86] *See, e.g., S & S Mach. Co. v. Masinexportimport*, 706 F.2d 411, 414 (2d Cir. 1983) (holding that "[s]tate-owned central banks indisputably are included in the § 1603(b) definition" of an agency or instrumentality); *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 472 (2d Cir. 2007) (citing the aforementioned holding in *S & S Mach.*); *Chettri v. Nepal Rastra Bank*, 834 F.3d 50, 55 (2d Cir. 2016) (noting that plaintiffs-appellants "do not dispute the district court's determination that . . . Rastra Bank[, the central bank of Nepal,] is an agency or instrumentality of a foreign state"); *Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 133 (2d Cir. 2022) (noting that plaintiffs-appellants concede "that BDL, as the central bank of Lebanon, is an agency or instrumentality of the Lebanese state").

[87] *S & S Mach. Co.*, 706 F.2d at 414; *see also* H.R. Rep. No. 1487, 94th Cong., 2d Sess. 15-16, *reprinted in* 1976 U.S. Code Cong. & Ad. News 6604, 6614 ("[A]s a general matter, entities which meet the definition of an agency or instrumentality of a foreign state could assume a variety of forms, including . . . a central bank . . . .").

1603(b)(2).[88] To satisfy this subsection, an entity must either (1) be "an organ of a foreign state or political subdivision thereof" or (2) have the "majority of [its] shares or other ownership interest . . . owned by a foreign state or political subdivision thereof."[89]

Pre-Judgment Plaintiffs argue that because "DAB is supposed to be 'entirely independent'" under "the Afghanistan banking law that originally created [it]," the second part of section 1603(b)(2) is inapplicable.[90] We disagree.

First, we note that the Afghanistan banking law referenced by Pre-Judgment Plaintiffs helpfully establishes the other two criteria that an entity must satisfy to be considered an agency or instrumentality under the FSIA: that the entity is "a separate legal person, corporate or otherwise" and that the entity "is neither a citizen of a State of the United States . . . nor created under the laws of any third country.[91]

---

[88] Pre-Judgment Plaintiffs' Br. at 55.

[89] 28 U.S.C. § 1603(b)(2).

[90] Pre-Judgment Plaintiffs' Br. at 55.

[91] 28 U.S.C. § 1603(b)(1) and (b)(3). Article 1.1 of the Afghanistan Bank Law establishes DAB as "the central bank of Afghanistan" and Article 1.2 establishes that DAB "is a juridical person with full capacity under the law." Afghanistan Bank Law, art. 1.1-1.2 (Dec. 17, 2003), https://dab.gov.af/sites/default/files/2018-12/DABLaw1English_2.pdf [https://perma.cc/L2TR-Y5Z9]. Accordingly, DAB is a "separate legal person" under section 1603(b)(1) and is "neither a citizen of the United States . . . nor created under the laws of any third country" under section 1603(b)(3).

35

Contrary to Pre-Judgment Plaintiffs' position, it also satisfies the contested criteria—namely, the second part of section 1603(b)(2), which requires that a majority of the entity's "shares or other ownership interest is owned by a foreign state or political subdivision thereof."[92]

Pre-Judgment Plaintiffs correctly observe that the Afghanistan banking law vests DAB with substantial autonomy.[93] But they mistakenly conclude from that premise that Afghanistan does not hold the majority of DAB's ownership interest. Significantly, the Afghanistan banking law sets forth the "[t]he capital of Da Afghanistan Bank shall belong to the State [of Afghanistan]."[94] And indeed, a study analyzing the structure of central banks finds that DAB is subject to "100% state ownership."[95]

Accordingly, DAB—a juridical person created under the laws of Afghanistan that is 100% owned by Afghanistan—meets each of the

---

[92] 28 U.S.C. § 1603(b)(2). Accordingly, as 28 U.S.C. § 1603(b)(2) sets forth a disjunctive test, we do not need to consider whether DAB is also properly considered an "organ" of Afghanistan under the first part of that subsection.

[93] *See* Afghanistan Bank Law, art. 3 (Dec. 17, 2003), https://dab.gov.af/sites/default/files/2018-12/DABLaw1English_2.pdf [https://perma.cc/L2TR-Y5Z9].

[94] *Id.* at art. 27.2. The banking law further sets forth that "Da Afghanistan Bank shall establish and maintain the international reserves of Afghanistan." Art. 72.1.

[95] *See* Jan Weidner, The Organisation and Structure of Central Banks, Dissertation, Appendix Central Bank Handbook 192 (2017), https://d-nb.info/1138787981/34 [https://perma.cc/P5TN-UZBY].

three requirements set forth in section 1603(b).[96] It is therefore an agency or instrumentality of Afghanistan under the FSIA.[97]

### 3. DAB Has Execution Immunity Under the FSIA

To conclude our FSIA analysis, we turn to 28 U.S.C. §§ 1609-1611 to determine if DAB's FRBNY-held assets are afforded execution immunity.

28 U.S.C. § 1609 states in relevant part that "the property in the United States of a foreign state shall be immune from attachment[,] arrest[,] and execution except as provided in sections 1610 and 1611 of this chapter."[98] None of the exceptions in section 1610 apply to DAB or the independent state of Afghanistan, and Pre-Judgment Plaintiffs do not argue otherwise.[99]

Section 1611 provides exceptions that, in effect, counteract the exceptions to immunity contained in section 1610: In other words,

---

[96] There is therefore no need to assess whether DAB also qualifies as a political subdivision of Afghanistan, and we make no determinations on that front.

[97] We agree with Pre-Judgment Plaintiffs that the Judiciary cannot rely on an articulation by the Executive to resolve the matter of agencies or instrumentalities under the FSIA. *See* Pre-Judgment Plaintiffs' Br. at 42, 47-48. But as both courts below noted, and as we hold today, DAB unquestionably meets the FSIA's definition of agency or instrumentality by virtue of being Afghanistan's state-owned central bank.

[98] 28 U.S.C. § 1609.

[99] Section 1610 contains various exceptions to a foreign state's immunity from attachment or execution, but none apply to the case at hand. *See* 28 U.S.C. § 1610.

some of what section 1610 lays bare, section 1611 recloaks in immunity. As none of section 1610's exceptions apply, we need not reach section 1611.[100] Accordingly, we conclude that the FSIA also vests DAB with execution immunity.

## C. The Terrorism Risk Insurance Act Abrogates Jurisdictional and Execution Immunity Afforded an Entity Under the Foreign Sovereign Immunities Act, but it Does Not Apply to This Case Because DAB Is Not an Agency or Instrumentality of the Taliban Under the TRIA

Having found that DAB has execution immunity under the FSIA, and assuming, *arguendo*, that DAB is also entitled to jurisdictional immunity under the FSIA (as was determined by the District Court [GBD]), we must now consider whether those grants of immunity withstand another statute: the Terrorism Risk Insurance Act of 2002 (the "TRIA"). If either or both survive the TRIA, and if jurisdictional immunity inures to DAB's benefit, then we lack subject matter jurisdiction to consider Judgment Plaintiffs' case, as the court below held. If neither survives, then we must move on to consider whether the TRIA applies to the facts before us.

### 1. The TRIA Abrogates Jurisdictional and Execution Immunity and Independently Provides Subject Matter Jurisdiction

---

[100] So, while we agree with the District Court (VEC) that DAB has execution immunity under the FSIA, we do not reach section 1611(b)(1) to make this determination; instead, we rely on section 1609. *See Owens v. Taliban*, No. 22-cv-1949, 2023 WL 2214887, at *5-6 (S.D.N.Y. Feb. 24, 2023).

Congress enacted the TRIA in 2002. Section 201(a) of the TRIA sets forth that:

> Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.[101]

The first clause of the statute—which provides that the TRIA applies "[n]otwithstanding any other provision of law"—carries great weight in our analysis of how the TRIA interacts with the FSIA. The Supreme Court has observed that "notwithstanding" clauses, like the one contained in the TRIA, have generally been "interpreted . . . to supersede all other laws," and that to provide a "clearer statement [of a drafter's intent that they so supersede] is difficult to imagine."[102]

---

[101] Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, § 201(a), 116 Stat. 2337, 2337-40, *as amended*, Pub. L. No. 112-158, 126 Stat. 1214, 1260 (*codified at* note following 28 U.S.C. § 1610).

[102] *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993) (internal quotation marks and citation omitted).

Indeed, the Supreme Court has spoken in such terms of the TRIA's own "notwithstanding" clause.[103]

Our own, earlier consideration of the TRIA's "notwithstanding" clause had been to the same effect. We noted that it is a "broad provision"[104] that overcomes any other provision of the law that "conflicts with [the] TRIA."[105]

The question, then, is whether the immunity provisions in the FSIA conflict with the TRIA. If they do, those immunity provisions are rendered inoperative in the face of the TRIA.

The District Court (GBD) analyzed this question, finding that while the FSIA conflicted with the TRIA with respect to execution immunity, it did not with respect to jurisdictional immunity.[106] We agree with its first assessment, but differ on the second.

First, we pause to observe that there can be no doubt that the FSIA's execution immunity provisions are superseded by the TRIA. The Supreme Court has already held that "the FSIA's central-bank

---

[103] *Bank Markazi v. Peterson*, 578 U.S. 212, 217 n.2 (2016) (identifying that the TRIA "take[s] precedence over 'any other provision of law'" and, therefore, is not limited by "the FSIA's central-bank immunity provision").

[104] *Peterson v. Islamic Republic of Iran*, 758 F.3d 185, 190 n.2 (2d Cir. 2014), *aff'd sub nom. Bank Markazi v. Peterson*, 578 U.S. 212 (2016).

[105] *Smith ex rel. Estate of Smith v. Fed. Reserve Bank of N.Y.*, 346 F.3d 264, 271 (2d Cir. 2003).

[106] *In re Terrorist Attacks on September 11, 2001*, 657 F. Supp. 3d 311, 328-29 (S.D.N.Y. 2023).

immunity provision," which provides for execution immunity under §§ 1609 and 1611(b)(1), does not "limit[] . . . the TRIA."[107] Binding Supreme Court precedent thus holds that the TRIA supersedes the FSIA's grant of execution immunity.

The tougher question is whether the TRIA also overrides any jurisdictional immunity that might be granted by the FSIA under § 1604. The District Court (GBD) determined that it does not, because no conflict exists between the FSIA and the TRIA as to jurisdictional immunity.[108] This is so because, according to the District Court, the TRIA is an execution statute, not a jurisdictional statute.[109] The District Court reasoned that the language of the TRIA closely resembled "the other execution immunity language in the FSIA, distinguishing it from the FSIA's language abrogating jurisdictional immunity" and, moreover, that TRIA § 201(a) exists as a note within 28 U.S.C. § 1610, which is the section of the FSIA governing exceptions to execution immunity.[110]

---

[107] *Bank Markazi v. Peterson*, 578 U.S. 212, 217 n.2 (2016). The Supreme Court explained that Congress enacted the TRIA "[t]o lessen . . . enforcement difficulties," with one of those difficulties being the execution immunity granted property of foreign central banks under section 1611(b)(1). *Id.* at 217. Unsurprisingly, a sister Circuit has likewise noted that "§ 201(a) of the TRIA supersedes" § 1609 of the FSIA. *Greenbaum v. Islamic Republic of Iran*, 67 F.4th 428, 432 (D.C. Cir. 2023).

[108] *In re Terrorist Attacks on September 11, 2011*, 657 F. Supp. 3d 311, 328-329 (S.D.N.Y. 2023).

[109] *Id.* at 329.

[110] *Id.* at 328.

However well-reasoned the District Court (GBD)'s analysis may be, we find that it is foreclosed by our decision in *Weinstein v. Islamic Republic of Iran*.[111] In *Weinstein*, Bank Melli, an instrumentality of a terrorist party (the state of Iran), argued that the TRIA did not establish jurisdiction over it. One of the reasons it offered to the court in support of this proposition was the fact that "the TRIA has been codified as a note to Section 1610 rather than in the sections of the FSIA more directly addressed to exceptions to jurisdictional immunity."[112] We disagreed. First, we explained that "the plain language of the statute cannot be overcome by its placement in the statutory scheme."[113] Turning to that plain language, we concluded that TRIA § 201(a)'s "notwithstanding" clause "mak[es] plain that the force of the section extends everywhere."[114]

Consistent with the foregoing, we hold that TRIA § 201(a) supersedes the FSIA's jurisdictional immunity provisions in addition to its execution immunity provisions. We therefore conclude that neither jurisdictional nor execution immunity can prevent us from subjecting DAB to our jurisdiction under the TRIA.[115]

---

[111] *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43 (2d Cir. 2010).

[112] *Id.* at 49.

[113] *Id.*

[114] *Id.*

[115] This finding is consistent with our prior observation that "at the time the FSIA was passed, the international community viewed execution against a foreign

42

In the alternative, the District Court (GBD) held that TRIA §
201(a) does not provide it with the necessary subject matter
jurisdiction to review the case at hand.[116] Not so. In *Weinstein*, we
"f[ou]nd it *clear beyond cavil* that Section 201(a) of the TRIA provides
courts with subject matter jurisdiction over post-judgment execution
and attachment proceedings against property held in the hands of an
instrumentality of the judgment-debtor, even if the instrumentality is
not itself named in the judgment."[117]

The case before us concerns the post-judgment execution
proceedings brought by Judgment Plaintiffs. It is against property
(DAB's FRBNY-held funds) *allegedly* owned by an instrumentality
(DAB) of the judgment-debtor (the Taliban). The TRIA thus plainly
provided the District Court with subject matter jurisdiction.

The District Court (GBD) found otherwise, reading *Weinstein*'s
holding as applying only to the instrumentalities and agencies of

---

state's property as a greater affront to its sovereignty than merely permitting
jurisdiction over the merits of an action." *Walters v. Indus. and Com. Bank of China,
Ltd.*, 651 F.3d 280, 289 (2d Cir. 2011) (quoting *Conn. Bank of Com. v. Republic of Congo*,
309 F.3d 240, 255-56 (5th Cir. 2002)). It can therefore be of little surprise that the
TRIA, which indisputably abrogates attachment and execution immunity—which
*Walters* would characterize as the "greater affront"—also abrogates jurisdictional
immunity—the lesser affront.

[116] *In re Terrorist Attacks on September 11, 2011*, 657 F. Supp. 3d 311, 330-331
(S.D.N.Y. 2023).

[117] *Weinstein*, 609 F.3d at 50 (emphasis added).

43

foreign states that have been stripped of immunity under the FSIA.[118] But the holding cannot be so limited. We reached it after examining the meaning of the TRIA and analyzing its legislative history, and we did not conclude that it had the limits now drawn by the District Court.[119]

Nor could we have done otherwise. As already discussed, the TRIA applies "[n]otwithstanding any other provision of the law."[120] Yet the District Court (GBD)'s proposed articulation of *Weinstein*'s holding suggests that the TRIA's subject matter jurisdiction is curtailed by the very law it was intended to supersede. It would mean that the TRIA, despite its clear language stating that the blocked assets of a terrorist party's agency or instrumentality "shall be subject to execution or attachment" notwithstanding "any other provision of law," would have a built-in exception for certain entities that, in addition to being the agencies or instrumentalities of a terrorist party, were also separately designated as the agencies or instrumentalities of

---

[118] *In re Terrorist Attacks on September 11, 2001*, 657 F. Supp. 3d 311, 330-331 (S.D.N.Y. 2023) (examining *Weinstein* and concluding that the TRIA only grants subject matter jurisdiction over agencies and instrumentalities not named in the original judgment when "the sovereign's loss of jurisdictional immunity in the underlying judgment flows through to the instrumentality in the attachment proceeding").

[119] *Weinstein*, 609 F.3d at 49-50 (finding that the "plain language of Section 201(a)" constituted "an independent grant of jurisdiction over the agencies and instrumentalities" and that "even if . . . there were an ambiguity here, it would be resolved in plaintiff's favor by the legislative history").

[120] TRIA § 201(a).

a foreign state granted immunity under the FSIA. Such an interpretation would betray the plain language of the TRIA's "notwithstanding" clause by limiting its jurisdiction with back-reference to an FSIA immunity determination—marking an unmistakable conflict between the TRIA and the FSIA that is flatly prohibited by § 201(a)'s "notwithstanding" clause.[121]

In sum, we find that the TRIA overrides any jurisdictional or execution immunities granted to DAB by the FSIA and creates an independent basis for the court to exercise subject matter jurisdiction over DAB's blocked assets—provided that DAB is an agency or instrumentality of the Taliban.

## 2. DAB Is Not an Agency or Instrumentality of the Taliban Under the TRIA

Herein lies the rub. When reviewing the applicability of the TRIA, the District Court (GBD) went through the statutory criteria and held that Judgment Plaintiffs "satisf[ied] all but one element."[122] That one element was the TRIA's requirement that "the blocked assets must be the assets of the terrorist party or the terrorist party's agency or

---

[121] This analysis also forecloses the suggestion that the TRIA could only be wielded against DAB if Afghanistan were designated as a state sponsor of terrorism. *In re Terrorist Attacks on September 11, 2001*, 657 F. Supp. 3d 311, 331-332 (S.D.N.Y. 2023).

[122] *In re Terrorist Attacks on September 11, 2001*, 657 F. Supp. 3d 311, 333 (S.D.N.Y. 2023).

45

instrumentality."[123] We agree with the District Court that this element is missing (albeit for a different reason than the one articulated by the District Court [GBD]), and we find that the TRIA is ultimately inapplicable to the case before us.[124] We therefore affirm the District Court's judgment denying Judgment Plaintiffs' motions for turnover of DAB funds.

As noted earlier, the TRIA sets forth in relevant part that "the blocked assets of th[e] terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment."[125] Judgment Plaintiffs argue that while the blocked assets are not those of the terrorist party at issue here (the Taliban), they *are* the blocked assets of an agency or instrumentality of the Taliban: DAB.[126] We must therefore determine whether DAB is

---

[123] *Id.*

[124] The District Court (GBD) reaches this conclusion by reasoning that it was constitutionally restrained from finding that the Taliban controlled the funds of the central bank of Afghanistan, as doing so would recognize the Taliban as the government of Afghanistan and contravene the Executive's recognition power. *In re Terrorist Attacks on September 11, 2001*, 657 F. Supp. 3d 311, 333-336 (S.D.N.Y. 2023). We decide on a different ground, and thus do not reach this issue pursuant to our general rule regarding the avoidance of constitutional issues. *See Allstate Ins. Co. v. Serio*, 261 F.3d 143, 149-150 (2d Cir. 2001) ("It is axiomatic that the federal courts should, where possible, avoid reaching constitutional questions.").

[125] TRIA § 201(a).

[126] Judgment Plaintiffs' Br. on behalf of *Havlish, Doe, Federal Insurance*, and *Smith* Creditors at 1.

46

properly considered an agency or instrumentality of the Taliban under the TRIA. We conclude that it is not.

Though we must first turn to the plain language of the statute, we note that, unlike the FSIA, the TRIA fails to provide a definition for "agency or instrumentality."[127] We have previously held that the FSIA's definition cannot double as the TRIA's,[128] and have instead fashioned our own definition of those terms "according to their ordinary meanings."[129] In that earlier case—*Kirschenbaum*—we held that an entity is an agency or instrumentality of a terrorist party under the TRIA if it "(1) was a means through which a material function of the terrorist party is accomplished, (2) provided material services to, on behalf of, or in support of the terrorist party, *or* (3) was owned, controlled, or directed by the terrorist party."[130] As the disjunctive "or" indicates, an entity is an agency or instrumentality of a terrorist party under the TRIA as long as it satisfies at least one of these three conditions.

---

[127] *See Kirschenbaum v. 650 Fifth Ave. and Related Props.*, 830 F.3d 107, 132 (2d Cir. 2016) ("While the FSIA defines 'agency or instrumentality,' the TRIA, unfortunately, does not." (internal citations omitted)).

[128] *Id.* at 133 (holding that "applying the FSIA's definition of agency or instrumentality" would "contravene a plain reading of the TRIA").

[129] *Id.* at 135.

[130] *Id.*

It is thus clear what definition we are to use to determine whether DAB is an agency or instrumentality of the Taliban. What is less clear is *when* we are to apply that definition to DAB.

In *Kirschenbaum*, the case in which we defined "agency or instrumentality" for purposes of the TRIA, we concluded that, under the FSIA, "an entity's agency or instrumentality status . . . 'is determined at the time of the filing of the complaint'" because "jurisdiction 'depends upon the state of things at the time . . . the action [is] brought'" and "not necessarily 'as of the time an alleged tort or other actionable wrong occurred.'"[131] Nowhere did we analyze when an entity's agency or instrumentality status should be determined *under the TRIA*. Instead, after holding that the FSIA's definition of "agency or instrumentality" does not apply to the TRIA, we appeared to transport, in passing and without explanation, the same timing test we use to make the "agency or instrumentality" determination under the FSIA.[132]

But that timing test cannot be appropriate in the TRIA context for at least two reasons. First, the logic undergirding the timing test for FSIA agency or instrumentality determinations that we recounted in

---

[131] *Id.* at 126 (quoting *Dole Food Co. v. Patrickson*, 538 U.S. 468, 471, 478, 480 (2003)).

[132] *Id.* at 136 ("Further, insofar as Plaintiffs contend that Alavi itself was sufficiently owned, controlled, or directed by Iran to render it an agency or instrumentality of a terrorist party under the TRIA, questions of fact exist as to whether Alavi was so owned, controlled, or directed *at the time Plaintiffs' complaints were filed*." (emphasis added)).

48

2016 in *Kirschenbaum*—and, indeed, the test itself—no longer controls in our Circuit. In *Bartlett v. Baasiri* (2023), we held that "immunity under the [FSIA] may attach when a defendant becomes an instrumentality of a foreign sovereign *after* a suit is filed."[133] We made this determination by examining the "structure of the FSIA"[134] and the purposes of foreign sovereign immunity.[135] Accordingly, we can no longer say, as we seemed to suggest in *Kirschenbaum*, that FSIA immunity is determined at the time of the complaint's filing because jurisdiction depends on the state of affairs at the time the action was brought; both the rule and its rationale were plainly unseated by our holding in *Bartlett*.

Second, for the same reason that it is improper to simply adopt the FSIA's definition of "agency or instrumentality" for purposes of the TRIA, it is improper to transpose our rule governing the time at which we evaluate an entity's "agency or instrumentality" status for

---

[133] *Bartlett v. Baasiri*, 81 F.4th 28, 33 (2d Cir. 2023) (emphasis added). We reaffirmed this was so in a later case. *See Schansman v. Sberbank of Russia PJSC*, 128 F.4th 70, 79 (2d Cir. 2025) (holding that "an entity's status as an agency or instrumentality" need not be determined "at the time an action is filed," an issue that we "squarely decided" in *Bartlett*).

[134] *Bartlett*, 81 F.4th at 33 (noting that the FSIA "gives foreign states immunity not only from judgments, but from process, too," so there is "no reason why that protection should apply only if the defendant had sovereign status from the beginning of the suit").

[135] *Id.* (discussing the reason for foreign sovereign immunity as opposed to other immunities, and noting that it seeks to give foreign states "some protection from the inconvenience of suit as a gesture of comity between the United States and other sovereigns" (quoting *Dole Food*, 538 U.S. at 479)).

purposes of the FSIA onto our test governing the same under the TRIA. The TRIA is a fundamentally different statute than the FSIA, and it is a mistake to uncritically apply precepts from our FSIA jurisprudence in the TRIA context. Under the FSIA, we are using the "agency or instrumentality" test to, in substantial part, determine whether an entity should be granted jurisdictional or execution immunity. This is the logic that guides our new rule in *Bartlett* concerning *when* we evaluate an entity's possible status as an agency or instrumentality. But as set forth above, the TRIA cares nothing for immunity. Accordingly, ensuring that we capture an entity's present-day immunity eligibility under the FSIA cannot be the controlling factor for deciding the time at which we must evaluate whether an entity is an agency or instrumentality for purposes of the TRIA.

To determine what time *is* appropriate, we first turn to the text of the TRIA. While no guidance is provided there for determining the date of assessment, we find particularly relevant the TRIA's requirement that the property subject to execution or attachment is an entity's "blocked assets."[136] The TRIA sets forth that a "blocked asset" is "any asset seized or frozen by the United States" under one of three statutory provisions.[137] From review of these statutes, it emerges that "blocking" is a status imposed by the United States at a certain time. As blocking is also a critical factor upon which TRIA applicability

---

[136] TRIA § 201(a).

[137] TRIA § 201(d)(2)(A). Those statutory provisions are "section 5(b) of the Trading With the Enemy Act (50 U.S.C. App. 5(b))" and "sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701; 1702)." *Id.*

turns, there is some immediate appeal to utilizing the blocking date as the relevant time at which to assess the agency or instrumentality question.

The attractiveness of this approach only deepens with further consideration of both what the blocking mechanism entails and the purpose of the TRIA. Once an entity's asset is seized or frozen, the entity can exert no control over it; the entity cannot use the asset to further its own objectives or the objectives of any party for which it operates as an agency or instrumentality.[138] There is thus great value in determining what a given entity's status was in relation to a given terrorist party at the time those assets were blocked: If an entity becomes an agency or instrumentality of a terrorist party *after* that entity's property is blocked, those blocked assets cannot have been utilized to further the mission of the terrorist party.

The blocking date therefore serves as a critical inflection point ripe for determining the time at which we should evaluate an entity's status under the TRIA as an agency or instrumentality. This approach is buttressed by consideration of the purpose of the statute. As Congress set forth, the purpose of TRIA § 201 is to enable the victims of terrorism to collect on judgments against terrorist parties "through

---

[138] For example, the Office of Foreign Asset Control sets forth that when property is blocked, while "[t]itle to the blocked property remains with the blocked [entity] . . . the exercise of powers and privileges normally associated with ownership is prohibited without authorization from OFAC." United States Department of the Treasury, OFAC FAQs No. 9 (Sep. 10, 2002), https://ofac.treasury.gov/faqs/9 [https://perma.cc/2A8R-ZLTE] (last updated Aug. 21, 2024).

the attachment of blocked assets of terrorist parties."[139] Surely, though, blocked assets are not "of" a terrorist party if those assets did not belong to either the terrorist party, or an entity then operating as an agency or instrumentality of the terrorist party, as of the date that the assets were blocked. Accordingly, while we apply a broader definition of agency or instrumentality under the TRIA than we do under the FSIA, understanding that terrorist parties "may operate with less transparency than other sovereign countries,"[140] we do not do so free of rational limits. Today we identify one such limit: When we determine whether an entity is an agency or instrumentality of a terrorist party under the TRIA, we assess that entity's status as of the date that the assets at issue were blocked.

In the case before us, it is uncontested that the blocking date was August 15, 2021—which, not coincidentally, was the same date that Kabul fell to the Taliban.[141] We therefore assess DAB's status as of that date and examine whether it satisfies any of the three independently sufficient prongs of the TRIA definition of "agency or instrumentality" that we set forth in *Kirschenbaum*. We find that it does not.

First, there is no evidence that DAB "was a means through which a material function of the [Taliban] is accomplished."[142] Indeed,

---

[139] H.R. Conf. Rep. 107-779, 2002 WL 31529126, at *27 (2002).

[140] *Kirschenbaum*, 830 F.3d at 134.

[141] *See* Judgment Plaintiffs' Br. at 12, 24.

[142] *Kirschenbaum*, 830 F.3d at 135.

it is hard to imagine how it could have been, when the Taliban did not even seize Kabul until August 15, 2021. There is no suggestion that DAB was aiding the Taliban in any manner as of the date its FRBNY-held assets were blocked.

Second, for similar reasons, there is no evidence that DAB "provided material services to, on behalf of, or in support of the [Taliban]" as of August 15, 2021.[143] Indeed, the President blocked the assets precisely to "keep[] them out of the hands of the Taliban and other malign actors."[144]

Third and finally, there is no evidence to suggest that DAB "was owned, controlled, or directed by the [Taliban]" as of that date.[145] Even assuming *arguendo* that the Taliban "controlled" DAB when it installed an alleged loyalist to head the organization, the Taliban did not do so until August 23, 2021—more than a week after the relevant date for evaluating "agency or instrumentality" status.[146]

In sum: There is quite simply no plausible foothold in the record that would enable Judgment Plaintiffs to mount a credible argument

---

[143] *Id.*

[144] Press Release, U.S. Dep't of the Treasury, Joint Statement by U.S. Treasury and State Department: The United States and Partners Announce Establishment of Fund for the People of Afghanistan (Sep. 14, 2022), https://home.treasury.gov/news/press-releases/jy0947 [https://perma.cc/952K-6TEY].

[145] *Kirschenbaum*, 830 F.3d at 135.

[146] Judgment App'x 265-67.

that DAB was an agency or instrumentality of the Taliban on the date its FRBNY-held funds were blocked on August 15, 2021. We are thus required to hold that DAB is not an agency or instrumentality of the Taliban under the TRIA, and consequently, that the TRIA does not apply to the case before us. We therefore affirm the District Court (GBD)'s denial of Judgment Plaintiffs' motions for turnover of DAB funds.

### III. CONCLUSION

To summarize, we hold as follows:

(1) A district court may consider the applicability of attachment or execution immunity *sua sponte* even when the sovereign status of the property at issue is disputed;

(2) The Executive Branch's formal recognition of a state or government establishes that state or government as a foreign state for purposes of the Foreign Sovereign Immunities Act;

(3) Because the Executive Branch formally recognizes Afghanistan as an independent state, Afghanistan is a foreign state for the purpose of our analysis of DAB under the Foreign Sovereign Immunities Act;

(4) Under the Foreign Sovereign Immunities Act, DAB is an "agency or instrumentality" of the foreign state of Afghanistan, and is therefore entitled to execution immunity under 28 U.S.C. § 1609;

(5) The Terrorism Risk Insurance Act abrogates any jurisdictional or execution immunity granted by the Foreign Sovereign Immunities Act;

(6) The Terrorism Risk Insurance Act provides district courts with an independent basis to exercise subject matter jurisdiction over the blocked assets of a terrorist party's agency or instrumentality;

(7) An entity's "agency or instrumentality" status under the Terrorism Risk Insurance Act is to be assessed as of the date that the assets at issue were blocked; and

(8) The Terrorism Risk Insurance Act does not apply to this case because DAB was not an agency or instrumentality of the Taliban when its FRBNY-held assets were blocked.

For the foregoing reasons, we **AFFIRM** the District Court (VEC)'s order denying Pre-Judgment Plaintiffs' motion to confirm the pre-judgment attachment and we likewise **AFFIRM** the District Court (GBD)'s order denying Judgment Plaintiffs' turnover motions.

**United States Court of Appeals for the Second Circuit**
**Thurgood Marshall U.S. Courthouse**
**40 Foley Square**
**New York, NY 10007**

**DEBRA ANN LIVINGSTON**
CHIEF JUDGE

Date: August 26, 2025
Docket #: 23-258cv
Short Title: Havlish v. Bin-Laden

**CATHERINE O'HAGAN WOLFE**
CLERK OF COURT

DC Docket #: 03-cv-9848
DC Court: SDNY (NEW YORK CITY)DC Docket #: 03-md-1570
DC Court: SDNY (NEW YORK CITY)DC Docket #: 20-mc-740
DC Court: SDNY (NEW YORK CITY)DC Docket #: 03-md-1570
DC Court: SDNY (NEW YORK CITY)DC Docket #: 01-cv-10132
DC Court: SDNY (NEW YORK CITY)DC Docket #: 03-md-1570
DC Court: SDNY (NEW YORK CITY)DC Docket #: 03-cv-6978
DC Court: SDNY (NEW YORK CITY)DC Docket #: 03-md-1570
DC Court: SDNY (NEW YORK CITY)DC Docket #: 02-cv-6977
DC Court: SDNY (NEW YORK CITY)DC Docket #: 03-md-1570
DC Court: SDNY (NEW YORK CITY)
DC Judge: Daniels
DC Judge: Maas
DC Judge: Netburn

## BILL OF COSTS INSTRUCTIONS

The requirements for filing a bill of costs are set forth in FRAP 39. A form for filing a bill of costs is on the Court's website.

The bill of costs must:
*   be filed within 14 days after the entry of judgment;
*   be verified;
*   be served on all adversaries;
*   not include charges for postage, delivery, service, overtime and the filers edits;

\*   identify the number of copies which comprise the printer's unit;

\*   include the printer's bills, which must state the minimum charge per printer's unit for a page, a cover, foot lines by the line, and an index and table of cases by the page;

\*   state only the number of necessary copies inserted in enclosed form;

\*   state actual costs at rates not higher than those generally charged for printing services in New York, New York; excessive charges are subject to reduction;

\*   be filed via CM/ECF or if counsel is exempted with the original and two copies.

**United States Court of Appeals for the Second Circuit**
**Thurgood Marshall U.S. Courthouse**
**40 Foley Square**
**New York, NY 10007**

**DEBRA ANN LIVINGSTON**
CHIEF JUDGE

Date: August 26, 2025
Docket #: 23-258cv
Short Title: Havlish v. Bin-Laden

**CATHERINE O'HAGAN WOLFE**
CLERK OF COURT

DC Docket #: 03-cv-9848
DC Court: SDNY (NEW YORK CITY)DC Docket #: 03-md-1570
DC Court: SDNY (NEW YORK CITY)DC Docket #: 20-mc-740
DC Court: SDNY (NEW YORK CITY)DC Docket #: 03-md-1570
DC Court: SDNY (NEW YORK CITY)DC Docket #: 01-cv-10132
DC Court: SDNY (NEW YORK CITY)DC Docket #: 03-md-1570
DC Court: SDNY (NEW YORK CITY)DC Docket #: 03-cv-6978
DC Court: SDNY (NEW YORK CITY)DC Docket #: 03-md-1570
DC Court: SDNY (NEW YORK CITY)DC Docket #: 02-cv-6977
DC Court: SDNY (NEW YORK CITY)DC Docket #: 03-md-1570
DC Court: SDNY (NEW YORK CITY)
DC Judge: Daniels
DC Judge: Maas
DC Judge: Netburn

**VERIFIED ITEMIZED BILL OF COSTS**

Counsel for

_____

respectfully submits, pursuant to FRAP 39 (c) the within bill of costs and requests the Clerk to prepare an itemized statement of costs taxed against the

_____

and in favor of

_____

for insertion in the mandate.

Docketing Fee          _____

Costs of printing appendix (necessary copies _____ )  _____

Costs of printing brief (necessary copies _____ ____)  _____

Costs of printing reply brief (necessary copies _____ )  _____


**(VERIFICATION HERE)**


                                                                _____
                                                                Signature