23-258(L)
*Havlish v. Taliban*

RICHARD J. SULLIVAN, *Circuit Judge*, concurring in part and dissenting in part:

The Supreme Court has long made clear that interpretation of the "reach" of the Foreign Sovereign Immunities Act (the "FSIA") is a "pure question of statutory construction" that is "well within the province of the [j]udiciary." *Republic of Austria v. Altmann*, 541 U.S. 677, 701 (2004) (internal quotation marks omitted). Our caselaw likewise recognizes that the FSIA "vested *sole* responsibility for applying [its] standards in the federal judiciary." *Beierwaltes v. L'Office Federale de la Culture de la Confederation Suisse*, 999 F.3d 808, 818 (2d Cir. 2021) (emphasis added). Remarkably, the majority today turns those foundational principles on their head, concluding that "[t]he Executive Branch's formal recognition of a state or government establishes that state or government as a foreign state for purposes of the [FSIA]." Maj. Op. at 54. To reach this conclusion, the majority turns a blind eye to the history of the FSIA, ignores nearly thirty-five years of our own precedents, and misinterprets a single Supreme Court decision involving an unrelated statute to obscure the Court's clear precedent on the FSIA.

The majority's error is compounded by its flawed interpretation of the Terrorism Risk Insurance Act of 2002 ("TRIA"). Even though this issue was never considered by the district court, briefed by the parties, or discussed at oral

argument, the majority reaches out to hold, for the first time, that "[a]n entity's 'agency or instrumentality' status under [TRIA] is to be assessed as of the date that the assets at issue were blocked." *Id.* at 55. This conclusion is unsupported by any legal authority. More importantly, it is at odds with the text and purpose of TRIA and our longstanding approach to determining immunity from execution, which looks to conditions at the time the writ of execution is issued.

The majority's interpretive gymnastics risk upending a carefully constructed statutory scheme and may have unforeseen downstream consequences for future FSIA (and TRIA) cases. It is for this reason the Supreme Court has taken pains to emphasize that "it is not our role to rewrite the FSIA"; that task lies squarely with Congress. *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 280 (2023). Accordingly, I respectfully dissent.

## I. The District Court Was Permitted to *Sua Sponte* Consider the Issue of Attachment Immunity

As a threshold matter, I agree with the majority that a district court may, but is not required to, *sua sponte* consider the issue of attachment (or execution) immunity "even when the sovereign status of the property at issue is disputed." Maj. Op. at 20–21. I therefore concur with Section II.A of the majority opinion, which is clearly supported by both the text and structure of the FSIA.

2

As the majority rightly notes, the FSIA's mandatory language that certain property "shall be immune," 28 U.S.C. § 1609, "signals that . . . immunity inures in the property itself and applies without regard to how the issue is raised," *Walters v. Indus. & Com. Bank of China, Ltd.*, 651 F.3d 280, 291 (2d Cir. 2011). For this reason, the Seventh Circuit has explained that "immunity does not depend on the foreign state's appearance in the case." *Rubin v. The Islamic Republic of Iran*, 637 F.3d 783, 799 (7th Cir. 2011). Rather, "immunity is presumed[,] and the court must find an exception – with or without an appearance by the foreign state – . . . to give effect to the statutory scheme." *Id.* at 800; *see also Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1125 (9th Cir. 2010) ("The structure of the FSIA – which codifies the background rule that foreign states are immune from suit and execution, and then creates narrow exceptions – suggest[s] that courts must begin with the presumption that a foreign state is immune and then the plaintiff must prove that an exception to immunity applies."). Likewise, the fact that execution immunity does not apply where the foreign state waives immunity, *see* 28 U.S.C. § 1610(a)(1), "strongly suggests that immunity from execution is presumed and waiver of immunity is the exception," *Rubin*, 637 F.3d at 800. This interpretation of the FSIA is further supported by "the common-law practice" whereby courts regularly

3

determined immunity "without regard to the foreign state's appearance in the case." *Id.* at 800–01; *see also Peterson*, 627 F.3d at 1126–27.

The *Aliganga* plaintiffs nevertheless insist that the district court had no authority to *sua sponte* consider attachment immunity because the sovereign status of the property at issue was disputed. But that is hardly dispositive, since each of the above arguments based on the text and structure of the FSIA applies with equal force even when the sovereign status of the property is disputed. I therefore agree with the majority that the district court in *Aliganga* did not err in *sua sponte* examining the immunity issue. That, however, is where my agreement with the majority's interpretation of the FSIA ends.

## II.    Afghanistan Is Not a Foreign State Within the Meaning of the FSIA

The majority concludes that the Da Afghanistan Bank ("DAB") funds are immune from attachment and execution under FSIA section 1609, which provides that "the property in the United States of a foreign state shall be immune from attachment[,] arrest[,] and execution." 28 U.S.C. § 1609.

Naturally, the first step in determining whether section 1609 applies is to identify whether Plaintiffs seek to attach the property *of a foreign state*. While the FSIA does not define what constitutes a foreign state, our binding caselaw "has limited the definition of 'state' to entities that have a defined territory and a

4

permanent population, that are under the control of their own government, and that engage in, or have the capacity to engage in, formal relations with other such entities." *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 937 F.2d 44, 47 (2d Cir. 1991) (alterations accepted and internal quotation marks omitted); *see also, e.g.*, *Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107, 123 (2d Cir. 2016) (applying *Klinghoffer* definition of foreign state).

Applying that definition here, Afghanistan clearly lacks the core attributes of statehood. It is undisputed that Afghanistan is no longer "under the control of [its] own government," *Klinghoffer*, 937 F.2d at 47 (internal quotation marks omitted), but rather is controlled by a non-state actor, the Taliban. The previous government of Afghanistan fled the country and is now defunct. There is not even a government in exile seeking to assert its right to govern the territory. Tellingly, the United States does not recognize "the Taliban or any other entity as the Government of Afghanistan or as part of such a government." Bureau of S. & Cent. Asian Affs., *U.S. Relations with Afghanistan*, U.S. Dep't of State (Aug. 15, 2022), https://perma.cc/T45B-WQ8A; *cf. Baker v. Carr*, 369 U.S. 186, 212 (1962) ("[W]ithout executive recognition[,] a foreign state has been called a republic of

whose existence we know nothing." (internal quotation marks omitted)). Nor has any other country recognized the Taliban as the government of Afghanistan. *See Aliganga App'x* at 283. In fact, the United Nations has repeatedly refused to grant diplomatic credentials to Taliban officials. *See* Michelle Nichols, *Afghan Taliban Administration, Myanmar Junta Not Allowed into United Nations for Now*, Reuters (Dec. 14, 2022, 8:29 PM ET), https://perma.cc/HYL4-D2L2. And even if the Taliban may one day be vanquished and a democratic government may return to Afghanistan, "the status quo continues" today, *Morgan Guar. Tr. Co. of N.Y. v. Republic of Palau*, 924 F.2d 1237, 1244 (2d Cir. 1991), and we must determine immunity based on conditions "at the time the writ of attachment or execution [was] issued," *Aurelius Cap. Partners, LP v. Republic of Argentina*, 584 F.3d 120, 130 (2d Cir. 2009) (emphasis omitted).

Afghanistan – as distinct from the Taliban – no longer "engage[s] in, or [has] the capacity to engage in, formal relations with other" states. *Klinghoffer*, 937 F.2d at 47 (internal quotation marks omitted); *see also* Restatement (Third) of the Foreign Relations Law of the United States § 201 cmt. e (Am. L. Inst. 1987) ("An entity is not a state unless it has competence, within its own constitutional system, to conduct international relations with other states, as well as the political, technical,

and financial capabilities to do so.").  Many of Afghanistan's embassies have been forced to close, and its former diplomats face the risk of deportation.  *See, e.g.*, Lara Jakes, *Afghan Embassy, Now out of Money, Will Shut Down, U.S. Says*, N.Y. Times (Mar. 11, 2022), https://perma.cc/WZ7C-RWM7.  And even though one of the *amici* in these appeals calls himself the *Chargé D'Affaires* of the Permanent Mission of the Islamic Republic of Afghanistan to the United Nations, he openly admits that "he does not represent the former government of Afghanistan nor the interest of any political group" but rather "strives to represent the interests of the Afghan people."  Faiq Amicus Br. at 1–2 (alterations accepted and internal quotation marks omitted).

At present, Afghanistan is more akin to a failed state.  *See Failed State, Black's Law Dictionary* (12th ed. 2024) ("A state that does not or cannot meet or maintain some of the basic social, economic, or political conditions and responsibilities of a sovereign government.").  Attributes of a failed state – each of which are present here – "include the loss of physical control of its territory, an inability to provide reasonable public services, and the erosion of legitimate authority."  *Id.*  It is therefore clear to me that Afghanistan no longer meets the definition of a foreign state and thus the DAB funds are not covered by the FSIA.

But rather than engage in this inquiry, the district court in *Aliganga* simply accepted the Executive Branch's assertion that the DAB funds were the property of a foreign state and thus immune from attachment. In fact, the district court issued its decision refusing to confirm its prejudgment attachment order *the very same day* that the Executive Branch outlined its views on immunity without giving Plaintiffs any opportunity to respond. Such blind deference to the Executive runs contrary to the purpose of the FSIA and longstanding precedent.

As the Supreme Court has recounted, prior to the passage of the FSIA, immunity determinations were left to the Executive Branch, which generated countless problems because "foreign nations often placed diplomatic pressure on the State Department in seeking immunity," causing "political considerations," rather than predictable legal principles, to dictate the outcome. *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 487 (1983). As a result, Congress passed the FSIA to strip the immunity determination from the Executive Branch and ensure that it was "made on purely legal grounds and under procedures that insure due process." *Id.* at 488 (internal quotation marks omitted). The FSIA therefore "vested *sole* responsibility for applying [its] standards in the federal judiciary." *Beierwaltes*, 999 F.3d at 818 (emphasis added). And "[w]hile the United States'

views on [immunity] are of considerable interest," the Supreme Court has emphatically held that such views "merit no special deference." *Altmann*, 541 U.S. at 701.

The majority endorses the district court's error by holding that "[t]he Executive Branch's formal recognition of a state or government establishes that state or government as a foreign state for purposes of the Foreign Sovereign Immunities Act." Maj. Op. at 54. This case marks the first time that *any* Circuit across the country has reached such a sweeping conclusion. Not only does this holding fly in the face of the well-established principles that courts have used to interpret the FSIA, it also effectively overrules our decision in *Klinghoffer*. It is axiomatic that we are "bound by the decisions of prior panels until such times as they are overruled either by an *en banc* panel of our Court or by the Supreme Court." *United States v. Peguero*, 34 F.4th 143, 158 (2d Cir. 2022) (internal quotation marks omitted). Neither has occurred here.

The majority advances three arguments in an attempt to escape the conclusion that it is single-handedly overturning Circuit precedent, but none is persuasive.

9

*First*, the majority seeks to cabin our use of the *Klinghoffer* definition to situations in which there is no "express determination from the Executive Branch" on whether to recognize a foreign state. Maj. Op. at 29. But there is nothing in *Klinghoffer* or our subsequent caselaw to even remotely suggest that our use of that definition is limited to contexts where the Executive Branch has not made a formal recognition decision.

*Second*, the majority asserts that its holding is compelled by the Supreme Court's more recent decision in *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1 (2015). *Zivotofsky*, of course, did not involve the FSIA but rather examined the constitutionality of a statute that required American embassy officials, upon request, to list on passports that Israel was the place of birth of American children born in Jerusalem. *See id.* at 7. The majority latches onto the Supreme Court's unremarkable statement that it is the "exclusive power of the President to control recognition determinations," *id.* at 32, to conflate the formal recognition of a foreign state, which is within the sole province of the Executive, with a determination of whether an entity is covered by the FSIA, which is a task for the judiciary.

Indeed, in *Zivotofsky*, the Supreme Court made clear that "[t]he Executive's exclusive power extends *no further* than his formal recognition determination," and affirmed that Congress could take a variety of actions that might "express its disagreement with the President" on the issue of recognition, such as by declining to confirm an ambassador or fund an embassy, enacting an embargo, or declaring war. *Id.* at 30 (emphasis added). In other words, *Zivotofsky* drew a line between "an official executive statement implicating recognition" – which is the sole prerogative of the Executive – and other acts that fall short of formal recognition and can be undertaken by other branches. *Id.*

The determination of whether an entity is entitled to immunity under the FSIA clearly falls into the latter category. As the Supreme Court has explained, "interpretation of the FSIA's reach" is a "pure question of statutory construction." *Altmann*, 541 U.S. at 701 (internal quotation marks omitted); *see also* Restatement (Fourth) of the Foreign Relations Law of the United States § 452 rptr. n.1 (Am. L. Inst. 2018) (noting that "the President has the exclusive power to recognize foreign states for diplomatic purposes," but "[c]lassification as a foreign state for FSIA purposes is a matter of statutory interpretation"). A court's interpretation of whether a certain entity constitutes a foreign state within the meaning of the FSIA

does not tread on the Executive's authority to formally recognize (or withdraw recognition of) that entity, nor does it compel any diplomatic action from the Executive. As Professor William Burke White, who submitted an expert declaration in the *Havlish* case, explained, "recognition of a foreign government is a formal act that is circumscribed by form, and can generally be accomplished *only* by express, unambiguous statements or a narrow subset of diplomatic actions." Havlish App'x at 661 (emphasis added). These actions include "concluding a bilateral treaty or . . . sending or receiving diplomatic agents," neither of which is at issue here. *Id.* at 666 (internal quotation marks omitted); *see also* Restatement (Third) of Foreign Relations Law § 204 rptr. n.2 ("Recognition of a state has been effected by express official declaration, by the conclusion of a bilateral agreement with the state, by the presentation of credentials by a United States representative to the authorities of the new state, and by receiving the credentials of a diplomatic representative of that state."). In other words, a court's legal conclusion as to whether an entity falls within the coverage of the FSIA does not constitute an act of recognition and thus does not infringe on the exclusive powers of the

Executive.[1]  Accordingly, it seems clear to me that *Zivotofsky* has not abrogated the rule we set forth in *Klinghoffer*, which thus remains binding authority.  *See Peguero*, 34 F.4th at 158.

*Third*, the majority contends that the Restatement (Third) of Foreign Relations Law, which was the basis for *Klinghoffer*'s definition of a foreign state, establishes "a two-step test for determining whether a foreign state legally exists for purposes of" the FSIA.  Maj. Op. at 28 n.69 (citing Restatement (Third) of Foreign Relations Law § 204 cmt. a).  That is simply not correct.  For starters, *Klinghoffer* never cited section 204 of the Restatement, so the majority's reliance on it is misplaced.  But more importantly, nothing in section 204's general observations about the President's recognition authority explains how courts should interpret the statutory text of the FSIA.  In fact, the Restatement (Fourth) of Foreign Relations Law makes clear that "the views of the executive branch should not control the question of whether, under the FSIA, a foreign state . . . is entitled to immunity."  Restatement (Fourth) of Foreign Relations Law § 452 rptr. n.1.

---

[1] The majority hangs onto a single statement in *Zivotofsky* that "[l]egal consequences follow formal recognition" because "[r]ecognized sovereigns . . . may benefit from sovereign immunity when they are sued."  576 U.S. at 11.  Besides the fact that this statement is dicta, it is clear that the Court was referring to the common-law immunity that foreign states enjoyed prior to the enactment of the FSIA.  *See id.* (citing *National City Bank of New York v. Republic of China*, 348 U.S. 356, 358–59 (1955), which predated enactment of the FSIA).

For all these reasons, I am convinced that when interpreting and applying the FSIA, we remain bound by the definition of foreign state that we set forth in *Klinghoffer*, and that Afghanistan clearly fails to meet that definition. As a result, I would (1) hold that the DAB funds are not entitled to immunity under the FSIA, (2) vacate the rulings of the district courts, and (3) remand this case for the district courts to apply New York attachment and execution law to determine whether Plaintiffs can use the DAB funds to satisfy their judgments against the Taliban.

## III.    DAB Is Not an Agency or Instrumentality of a Foreign State

But even if the majority is correct that we are bound by the Executive Branch's recognition decision and that the notional state of Afghanistan constitutes a foreign state, the DAB funds are still not entitled to immunity under the FSIA. That is because, in my view, DAB no longer constitutes an agency or instrumentality of a foreign state.

To qualify as an agency or instrumentality of a foreign state under the FSIA, the entity must, among other things, be "an organ of a foreign state or political subdivision thereof, or a majority of [its] shares or other ownership interest [must be] owned by a foreign state or political subdivision thereof." 28 U.S.C. § 1603(b)(2). To determine whether an entity constitutes an organ of a foreign state, we look to five factors:

> (1) whether the foreign state created the entity for a national purpose; (2) whether the foreign state actively supervises the entity; (3) whether the foreign state requires the hiring of public employees and pays their salaries; (4) whether the entity holds exclusive rights to some right in the [foreign] country; and (5) how the entity is treated under foreign state law.

*Filler v. Hanvit Bank*, 378 F.3d 213, 217 (2d Cir. 2004) (internal quotation marks omitted).

As the *Aliganga* Plaintiffs amply demonstrated before the district court, DAB is no longer supervised by the state of Afghanistan but rather by the Taliban. Indeed, the Taliban now controls the hiring of DAB employees, "purging prior leadership and technocrats and installing its own unqualified loyalists," including designated terrorists, at the highest levels of DAB's leadership structure. Aliganga App'x at 407. "[A]ny remaining DAB personnel who are not directly affiliated with the Taliban are . . . subject to intimidation and subjugation, preventing them from acting independently." *Id.* at 443. The Taliban has also prohibited women from working at DAB, mandated that employees grow beards and pray five times per day, and required that the Taliban flag be flown at DAB meetings. On this record, it cannot credibly be disputed that the notional state of Afghanistan no longer "actively supervises" DAB, and thus DAB cannot be considered an organ of Afghanistan. *Filler*, 378 F.3d at 217 (internal quotation marks omitted).

The majority sidesteps this analysis entirely and concludes that DAB is still an agency or instrumentality of a foreign state because "a majority of [its] shares or other ownership interest is owned by" the state of Afghanistan.  28 U.S.C. § 1603(b)(2).  Even though this theory was never raised by the parties or considered by the district court, the majority hangs its hat on a clause in the Afghanistan Bank Law, which states that "[t]he capital of [DAB] shall belong to the State, and shall not [be] subject to lien or to encumbrance."  Afghanistan Bank Law, art. 27.2 (Dec. 17, 2003), https://perma.cc/NM8N-3U9P.  But this single sentence cannot carry the heavy weight the majority places on it.  For starters, the Afghanistan Bank Law was passed in December 2003 and thus was not necessarily in force and effect "at the time the writ of attachment [was] issued" in 2022 or confirmation of attachment was sought in 2023.  *Aurelius Cap. Partners*, 584 F.3d at 130 (emphasis omitted).  Indeed, the *Aliganga* Plaintiffs documented that, at the time of attachment, DAB was openly flouting the Bank Law, including provisions related to the appointment of DAB's governor and first deputy governor, and that the Taliban had "established a committee" to replace the Bank Law with "traditional Islamic banking."  Aliganga App'x at 413.  What's more, it is not clear that ownership of DAB's capital is the same as the ownership of DAB itself, which

16

is what section 1603 requires for an entity to be considered an agency or instrumentality of a foreign state. In fact, the *Aliganga* Plaintiffs argue that DAB "does not have or issue ownership shares." Aliganga Br. at 55.

With nothing in the record to suggest that DAB's "shares . . . [are] owned by a foreign state," 28 U.S.C. § 1603(b)(2), the majority reaches outside the record to locate a doctoral dissertation that asserts, without any citation or support, that DAB has "100% state ownership," Maj. Op. at 36 & n.95 (citing Jan Weidner, The Organisation and Structure of Central Banks 192 (Apr. 20, 2007) (Dr. rer. pol. dissertation, Technische Universität Darmstadt), https://perma.cc/P5TN-UZBY). But this cherrypicked statement is simply not sufficient, in my view, to establish that DAB remains an agency or instrumentality of the notional state of Afghanistan.

## IV.    The DAB Funds Were Not Being Used for Central Banking Functions

Upon finding that DAB is an agency or instrumentality of Afghanistan, the majority concludes that the DAB funds are entitled to immunity under FSIA section 1609 and ends its analysis there. But the *Aliganga* district court focused on FSIA section 1611, which provides that "the property of a foreign state shall be immune from attachment and from execution, if . . . the property is that of a foreign central bank or monetary authority held for its own account." 28 U.S.C. § 1611(b).

17

While it is true that "funds . . . held in an account in the name of a central bank or monetary authority . . . are presumed to be immune from attachment under [section] 1611(b)(1)," a plaintiff "can rebut that presumption by demonstrating with specificity that the funds are not being used for central banking functions as such functions are normally understood." *NML Cap., Ltd. v. Banco Cent. de la Republica Argentina*, 652 F.3d 172, 194 (2d Cir. 2011). Our decision in *NML Capital* did not offer a list of those central banking functions, but we relied extensively on a law-review article that provided such a list. These functions include the:

> (1) issu[ance] of notes, coin, and legal tender, (2) custody and administration of the nation's monetary reserves through the holding of gold, silver, domestic and foreign securities, foreign exchange, acceptances and other credit instruments, and IMF Special Drawing Rights, (3) establishment and maintenance of reserves of depository institutions, (4) discounts and advances to depository institutions, (5) receipt of deposits from the government, international organizations, depository institutions, and in special cases, private persons, (6) open market operations, (7) credit controls, and (8) licensing, supervision, and inspection of banks.

Ernest T. Patrikis, *Foreign Central Bank Property: Immunity from Attachment in the United States*, 1982 U. Ill. L. Rev. 265, 274; *see also Central Bank, Black's Law Dictionary* (12th ed. 2024) ("A central bank normally issues currency, functions as the government's bank, regulates the credit system, provides oversight for

commercial banks, manages exchange reserves, and implements monetary policy.").

As the *Aliganga* plaintiffs demonstrated through their expert affidavits, DAB no longer functioned as a central bank at the time of attachment in April 2022. For example, DAB was no longer able to print afghanis; DAB curtailed its auctions of U.S. dollars, which had been used to support the value of the afghani; and foreign currency and aid arriving in Afghanistan were routed through private banks and informal transfer systems rather than DAB. *See* Aliganga App'x at 414, 416. For these reasons, one expert reasonably concluded that DAB "cannot execute central bank functions." *Id.* at 419. That being the case, DAB's assets are not entitled to immunity under FSIA section 1611.

## V. Even If It Could Be Argued That the FSIA Applies Here, TRIA Abrogates the Immunity of an Entity That Is an "Agency or Instrumentality of a Terrorist Party" at the Time of the Turnover Order

Because the majority concludes that the DAB funds are immune under the FSIA from attachment and execution, the majority must still contend with whether TRIA abrogates that immunity for the *Havlish* appeal. TRIA states that "[n]othwithstanding any other provision of law, . . . the blocked assets of [a] terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution

19

in order to satisfy [a] judgment" against that party. TRIA § 201(a). I agree with the majority that TRIA abrogates both jurisdictional and execution immunity and independently provides a grant of subject-matter jurisdiction over post-judgment execution and attachment proceedings. *See* Maj. Op. at 38–45. The majority nevertheless neuters that conclusion by insisting that an entity's status as an agency or instrumentality of a terrorist party under TRIA must "be assessed as of the date that the assets at issue were blocked," *id.* at 55 – an issue that was never considered by the district court, briefed by the parties, or discussed at oral argument.

In *Kirschenbaum*, we previously suggested that an entity's agency or instrumentality status under TRIA should be assessed as of the date the complaint was filed. *See* 830 F.3d at 136. I agree with the majority that *Kirschenbaum's* bright-line rule has been "unseated" by our subsequent caselaw, Maj. Op. at 49, which has made clear that developments subsequent to the filing of a complaint may affect whether an entity is entitled to immunity, *see Barlett v. Baasiri*, 81 F.4th 28, 33–37 (2d Cir. 2023); *Schansman v. Sberbank of Russ. PJSC*, 128 F.4th 70, 79–80 (2d Cir. 2025). But I disagree with the majority's holding that an entity's status as an

agency or instrumentality of a terrorist party must "be assessed as of the date that the assets at issue were blocked." Maj. Op. at 55.

For starters, this reading imposes an extratextual limitation on plaintiffs' ability to enforce judgments against terrorist parties. Nowhere does the plain text of TRIA confine its applicability to assets that belonged to the terrorist party (or its agency or instrumentality) at the time those assets were blocked. In other words, the unambiguous language of the statute makes clear that as long as (1) the assets are blocked and (2) they belong to a terrorist party (or its agency or instrumentality), those assets can be used to satisfy a judgment against the terrorist party.

To hold otherwise runs contrary to the statute's purpose, which "is to deal comprehensively with the problem of enforcement of judgments issued to victims of terrorism in any U.S. court by enabling them to satisfy such judgments from the frozen assets of terrorist parties." *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 50 (2d Cir. 2010) (internal quotation marks omitted). Indeed, we have recognized that "TRIA establishes once and for all, that such judgments are to be enforced against *any* assets available in the [United States]." *Id.* (emphasis added) (internal quotation marks omitted). And yet, under the majority's interpretation, if a

21

terrorist party were to gain control over an entity whose assets were already blocked, those assets could not be used to satisfy a judgment against the terrorist party. In addition to defying logic, such an approach would defeat TRIA's objective of making "any assets available" to the victims of terrorism. *Id.* (internal quotation marks omitted).

The better approach, in my view, is to assess whether an entity is an agency or instrumentality of a terrorist party at the time of the turnover order. This would accord with the approach we have taken to determining attachment and execution immunity under the FSIA, which looks to conditions at the time of attachment or execution. *See Aurelius Cap. Partners*, 584 F.3d at 130. It would also avoid reading extratextual limitations into TRIA and would maximize the assets available to victims of terrorism to enforce judgments against terrorist parties, which was the clear purpose of the statute.

In response, the majority argues that we should look to conditions at the time the assets were blocked because "[i]f an entity becomes an agency or instrumentality of a terrorist party *after* that entity's property is blocked, those blocked assets cannot have been utilized to further the mission of the terrorist party." Maj. Op. at 51. But the majority cites no authority – nor am I aware of any

– to suggest that Congress intended to limit TRIA's reach to assets that were "utilized to further the mission of the terrorist party." *Id.* Rather, as noted above, TRIA simply functions to ensure that the maximum assets are available to victims of terrorism.

The majority also make the semantic argument that "blocked assets are not 'of' a terrorist party if those assets did not belong to either the terrorist party, or an entity then operating as an agency or instrumentality of the terrorist party, as of the date that the assets were blocked." *Id.* at 52. But once again, the plain text of TRIA contains no such limitation, and it strains credulity to suggest that Congress intended to create roadblocks preventing victims of terrorism from accessing the assets of terrorist organizations.

For all these reasons, I would hold that an entity's status as an agency or instrumentality of a terrorist party for purposes of TRIA should be determined as of the date of the turnover order. Applying that test here, I would easily conclude that DAB was an agency or instrumentality of the Taliban when the district court issued its decision on the turnover motion in March 2023. At a minimum, as outlined above, DAB was "controlled[] or directed by" the Taliban as of that date. *Kirschenbaum*, 830 F.3d at 135. As the majority acknowledges, *see* Maj. Op. at 47,

23

that is sufficient to be considered an agency or instrumentality of a terrorist party under our caselaw.

*    *    *

To sum up, I concur with the majority's holding that a district court may, but is not required to, *sua sponte* consider the issue of attachment (or execution) immunity even when the sovereign status of the assets at issue is disputed. But I disagree with the majority's novel conclusion that "[t]he Executive Branch's formal recognition of a state or government establishes that state or government as a foreign state for purposes of the [FSIA]." *Id.* at 54. That holding effectively overrules three decades of our precedents and ignores longstanding caselaw from the Supreme Court that makes clear the interpretation of the FSIA is purely a task for the judiciary. I would instead apply the test we set forth in *Klinghoffer*, conclude that Afghanistan no longer constitutes a foreign state for purposes of the FSIA, and thus hold that the DAB funds are not entitled to immunity from attachment or execution. I also disagree with the majority's holding that an entity's status as an agency or instrumentality of a terrorist party under TRIA must "be assessed as of the date that the assets at issue were blocked," *id.* at 55, as opposed to the date of the turnover order.

Case 1:03-md-01570-GBD-SN Document 9582, 36 Filed 04/10/25 Page 25 of 25

25

Accordingly, I would vacate the judgments below and remand for the district courts to apply New York attachment and execution law to determine whether Plaintiffs can use the DAB funds to satisfy their judgments against the Taliban.

For all the above reasons, I respectfully dissent.