**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | 03-MD-01570 (GBD)(SN)<br><br>ECF Case<br><br>**ORAL ARGUMENT REQUESTED** |

This document relates to:

*Kathleen Ashton, et al. v. Al Qaeda Islamic Army, et al.*, 02-cv-06977
*Gladys H. Salvo, et al. v. Al Qaeda Islamic Army, et al.*, 03-cv-05071
*Federal Insurance Co., et al. v. Al Qaida, et al.*, 03-cv-06978
*Thomas E. Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 03-cv-09849
*Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-01923
*Continental Casualty Co., et al. v. Al Qaeda, et al.*, 04-cv-05970
*Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.*, 04-cv-07065
*Euro Brokers Inc., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-07279
*Maher, et al. v. Islamic Emirate of Afghanistan a/k/a The Taliban, et al.*, 1:23-cv-02845

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT**
**MUSLIM WORLD LEAGUE'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................ iv

GLOSSARY OF ABBREVIATIONS ................................................................................... xv

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

I.    The Muslim World League Is an NGO with a Stellar Reputation for Its
      Charitable Work Across the Globe ........................................................................ 3

II.   MWL Was Not Involved in the Founding or Activities of Al Qaeda .................... 5

      A.    The Services Bureau Predated Al Qaeda ..................................................... 5

      B.    Al Qaeda ....................................................................................................... 6

III.  There Is No Evidence—None—Linking MWL to the 9/11 Attacks and No
      Evidentiary Support for the Alleged and Attenuated Connections to Al Qaeda ... 6

      A.    MWL Had No Knowledge of or Involvement in the 9/11 Attacks ............. 7

      B.    MWL Did Not Knowingly Fund or Otherwise Support Al Qaeda ............. 7

      C.    MWL Established or Helped to Establish Two Organizations With
            Separate Corporate Governance that Were Not Connected to Bin Laden,
            Al Qaeda or the 9/11 Attacks .................................................................... 10

            1.    The International Islamic Relief Organization ............................... 10

            2.    The Rabita Trust ............................................................................. 12

      D.    Other Groups Were Not Involved in the 9/11 Attacks and, in Any Event,
            MWL Had No Knowledge of Purported Connections With Al Qaeda ...... 13

            1.    Abu Sayyaf Group .......................................................................... 14

            2.    MILF ............................................................................................... 14

            3.    Missionaries .................................................................................... 15

      E.    The MWL Journal Reveals No Support for Al Qaeda Much Less 9/11 .... 16

      F.    The Acts of Individuals Do Not Connect MWL to Al Qaeda or the 9/11
            Attacks ........................................................................................................ 17

1.    Jelaidan ................................................................................................ 17

2.    Khalifa.................................................................................................. 18

IV.    Procedural Posture ...................................................................................... 20

A.    The Court Dismissed Most of Plaintiffs' Claims........................................ 20

B.    There Are No Independent Allegations Against MWL ................................ 21

C.    Discovery ............................................................................................ 21

D.    Plaintiffs' ATA Claims Have Been Significantly Weakened............................ 21

E.    Courts Have Made Several Relevant Decisions Concerning JASTA................... 24

F.    The Court Excluded Key Portions of Plaintiffs' Expert Testimony ...................... 24

ARGUMENT.......................................................................................................... 26

I.    Summary Judgment Is Appropriate Because There Is No Genuine Issue of
Material Fact ..................................................................................................... 26

II.    There Is No Basis to Find that MWL Is Directly Liable for the 9/11 Attacks ................. 27

A.    MWL Did Not Proximately Cause the Plaintiffs' Injuries .................................. 28

B.    MWL Did Not Have the Requisite Mental State .............................................. 31

C.    MWL Did Not Commit an Act of International Terrorism ................................ 33

1.    MWL Did Not Provide "Material Support" to Al Qaeda ........................... 33

2.    The Material Support Statutes Do Not Apply Retroactively ....................... 34

3.    The Other Requirements of an Act of International Terrorism Are
Not Satisfied........................................................................................ 37

D.    MWL Did Not Owe Any Duty to Plaintiffs.............................................. 38

III.    MWL Did Not Aid and Abet the 9/11 Attacks ................................................. 39

A.    MWL Did Not Engage in an Affirmative Act to Facilitate the 9/11
Attacks ............................................................................................. 40

B.    MWL Did Not Knowingly Assist Al Qaeda in Carrying out the 9/11
Attacks ............................................................................................. 42

ii

        1.    MWL Was Not "Generally Aware" of its Alleged Role in Illegal
Activity ............................................................................................... 42

              a.    Defendants Cannot Show a Direct Relationship Between MWL
and Al Qaeda................................................................................ 42

              b.    Plaintiffs Cannot Show General Awareness Through an
Intermediary ............................................................................... 43

        2.    MWL Did Not Knowingly and Substantially Assist the 9/11 Attacks ........ 46

    C.    There Is No Nexus Between MWL's Acts and the 9/11 Attacks ......................... 49

    D.    MWL Did Not Provide Pervasive and Systemic Support to Al Qaeda ................. 51

IV.    MWL Did Not Conspire to Commit the 9/11 Attacks........................................................ 53

V.    MWL Is Not Liable for Actions Taken by Others................................................................ 55

    A.    There Was No Alter Ego Relationship Between MWL and IIRO or
Rabita Trust.................................................................................................................... 55

        1.    There Is no Alter Ego Liability Under Saudi Law...................................... 55

        2.    New York Law Requires "Complete Domination" to Establish
Alter Ego Liability ...................................................................................... 56

              a.    There Is No Evidence that IIRO Was an Alter Ego of MWL............. 57

              b.    There Is Also No Support for a Finding that Rabita Trust
Was MWL's Alter Ego ................................................................... 60

              c.    There Was No Agency Relationship Between MWL and IIRO
or Rabita Trust ............................................................................. 61

    1.    IIRO Did Not Act as MWL's Agent.................................................................. 62

    2.    Rabita Trust Did Not Act as MWL's Agent ........................................................ 62

    B.    MWL Is not Liable for Any Actions Taken by Employees When They
Were Not Employed by MWL or that Were Outside the Scope of Their
Employment ................................................................................................................... 62

CONCLUSION................................................................................................................................ 65

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdulaziz v. McKinsey & Co., Inc.*,
  2022 WL 2444925 (2d Cir. July 5, 2022)..................................................................................38

*Ahmad v. Christian Friends of Israeli Communities*,
  2014 WL 1796322 (S.D.N.Y. May 5, 2014), *aff'd*, 600 F. App'x 800 (2d Cir. 2015)............31

*Allen v. Cuomo*,
  100 F.3d 253 (2d Cir. 1996)....................................................................................................27

*In re Arab Bank, PLC Alien Tort Statute Litig.*,
  808 F.3d 144 (2d Cir. 2015)....................................................................................................53

*In re Arcapita Bank B.S.C.(C)*,
  640 B.R. 604 (S.D.N.Y. 2022)...........................................................................................30, 49

*Ashley v. Deutsche Bank Aktiengesellschaft*,
  144 F.4th 420 (2d Cir. 2025) ...........................................39, 42, 44, 46, 47, 49, 50, 51, 52, 53

*Averbach v. Cairo Amman Bank*,
  2026 WL 865682 (S.D.N.Y. Mar. 30, 2026) ...........................................................................47

*Ayco Co., L.P. v. Frisch*,
  2012 WL 42134 (N.D.N.Y. Jan. 9, 2012)...................................................................57, 58, 61

*Backuswalcott v. Common Ground Cmty. HDFC, Inc.*,
  104 F.Supp.2d 363 (S.D.N.Y. 2000)........................................................................................58

*Barrett v. Black & Decker (U.S.) Inc.*,
  2008 WL 5170200 (S.D.N.Y. Dec. 9, 2008) ...........................................................................27

*Bartlett v. Baasiri*,
  81 F.4th 28 (2d Cir. 2023) .......................................................................................................35

*Bartlett v. Societe Generale de Banque Au Liban SAL*,
  2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020)..........................................................................38

*Bender v. City of New York*,
  78 F.3d 787 (2d Cir. 1996).......................................................................................................32

*Bernhardt v. Islamic Republic of Iran*,
  47 F.4th 856 (D.C. Cir. 2022)..................................................................................................55

*Bigio v. Coca-Cola Co.*,
  675 F.3d 163 (2d Cir. 2012)................................................................................................53

*Boim v. Holy Land Found. for Relief and Dev.*,
  549 F.3d 685 (7th Cir. 2008) ............................................................................................34

*Boim v. Quranic Literacy Inst.*,
  127 F.Supp.2d 1002 (N.D. Ill. 2001), *aff'd*, 291 F.3d 1000 (7th Cir. 2002) ..........................37

*Bonacasa v. Standard Chartered PLC*,
  2023 WL 7110774 (S.D.N.Y. Oct. 27, 2023) ...................................................................45, 48

*Bondi v. Bank of Am.
  Corp. (In re Parmalat Sec. Litig.)*, 383 F.Supp.2d 587 (S.D.N.Y. 2005)................................63

*Boroditskiy v Eur. Specialties LLC*,
  314 F.Supp.3d 487 (S.D.N.Y. 2018)......................................................................57, 58, 60, 61

*Brill v. Chevron Corp.*,
  2018 WL 3861659 (N.D. Cal. Aug. 14, 2018) .......................................................................48

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993).............................................................................................................27

*Cardell Fin. Corp. v. Suchodolski Assocs., Inc.*,
  2012 WL 12932049 (S.D.N.Y. July 17, 2012) ......................................................................58

*Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*,
  2 F.3d 24 (2d Cir. 1993)................................................................................................57, 58, 61

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)..............................................................................................................27

*Cid v. BB Mgmt. of New York Corp.*,
  2022 WL 4095910 (S.D.N.Y. Sept. 7, 2022) (Daniels, J.) ..............................................26, 27

*City of Harper Woods Employees' Ret. Sys. v. Olver*,
  589 F.3d 1292 (D.C. Cir. 2009) ...........................................................................................56

*Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures, LLC*,
  851 F.Supp.2d 504 (S.D.N.Y. 2012)......................................................................................57

*Cortlandt St. Recovery Corp. v. Bonderman*,
  207 N.Y.S.3d 52 (1st Dep't 2024) .......................................................................................57

*Craig v. Sandals Resorts Int'l*,
  69 F.Supp.3d 322 (E.D.N.Y. 2014) ......................................................................................62

v

*In re Digital Music Antitrust Litig.*,
    812 F.Supp.2d 390 (S.D.N.Y. 2011)............................................................................56

*Doheny v. Int'l Bus. Machines, Corp.*,
    2024 WL 382142 (S.D.N.Y. Feb. 1, 2024)....................................................................56

*Dole Food Co. v. Patrickson*,
    538 U.S. 468 (2003).......................................................................................................35

*E. Hampton Union Free Sch. Dist. v. Sandpebble Builders, Inc.*,
    66 A.D.3d 122, 884 N.Y.S.2d 94 (2d Dep't 2009)...............................................57, 61

*Etage Real Est. LLC v. Stern*,
    211 A.D.3d 632, 182 N.Y.S.3d 47 (1st Dep't 2022) ....................................................56

*Fantazia Int'l Corp. v. CPL Furs New York, Inc.*,
    67 A.D.3d 511, 889 N.Y.S.2d 28 (1st Dep't 2009) .....................................................58

*Finan v. Lafarge S.A.*,
    2025 WL 2504317 (E.D.N.Y. Aug. 29, 2025)......................................................43, 51

*Plumbers, Pipefitters & Apprentices Loc. Union No. 112 Pension, Health & Educ.*
    *& Apprenticeship Plans ex rel. Fish v. Mauro's Plumbing, Heating & Fire*
    *Suppression, Inc.*,
    84 F.Supp.2d 344 (N.D.N.Y. 2000)......................................................................59, 61

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
    592 U.S. 351 (2021).................................................................................................22, 50

*Fraenkel v. Standard Chartered Bank*,
    2025 WL 2773251 (S.D.N.Y. Sept. 26, 2025)......................................46, 50, 51, 52

*Freeman v. HSBC Holdings PLC*,
    465 F.Supp.3d 220 (E.D.N.Y. 2020) ...........................................................................48

*Freeman v. HSBC Holdings PLC*,
    57 F.4th 66 (2d Cir. 2023), *cert. denied,* 144 S. Ct. 83 (2023).............................53, 55

*Gayle v. Villamarin*,
    2021 WL 4173987 (S.D.N.Y. Sept. 14, 2021) (Daniels, J.) .......................................27

*Gill v. Arab Bank, PLC*,
    893 F.Supp.2d 474 (E.D.N.Y. 2012) ...........................................................................31

*Hakimyar v. Habib Bank Ltd.*,
    2025 WL 605575 (S.D.N.Y. Feb. 25, 2025)...........................................................43, 44

*Halberstam v. Welch*,
   705 F.2d 472 (D.C. Cir. 1983) ..................................................................................................42

*Hamilton v. Beretta U.S.A. Corp.*,
   96 N.Y.2d 222 (Apr. 26, 2001) ...........................................................................................38, 39

*Hamlen v. Gateway Energy Services Corp.*,
   2017 WL 6398729 (S.D.N.Y. Dec. 8, 2017) ............................................................................56

*Harris v. Key Bank Nat'l. Ass'n.*,
   193 F.Supp.2d 707 (W.D.N.Y. 2002), *aff'd*, 51 F. App'x 346 (2d Cir. 2002) ........................27

*Hawknet Ltd. v. Overseas Shipping Agencies*,
   2009 WL 1309854 (S.D.N.Y. May 6, 2009) .................................................................59, 60, 61

*Heath v. EcoHealth Alliance*,
   2025 WL 2658252 (2d Cir. Sept. 17, 2025) ..............................................................................39

*Holder v Humanitarian Law Project*,
   561 U.S. 1 (2010).......................................................................................................................34

*Honickman v. BLOM Bank SAL*,
   6 F.4th 487 (2d Cir. 2021) ....................................................................................................42, 44

*Hussein v. Dahabshiil Transfer Servs. Ltd.*,
   230 F.Supp.3d 167 (S.D.N.Y. 2017), *aff'd*, 705 F. App'x 40 (2d Cir. 2017).........................31

*Jacobson v. Metro. Switchboard Co.*,
   2007 WL 1774911 (E.D.N.Y. June 18, 2007) ....................................................................59, 61

*Kanter v. Feature Enters., Inc.*,
   1993 WL 267373 (S.D.N.Y. July 15, 1993) ..............................................................................59

*Kaplan v. Lebanese Canadian Bank, SAL*,
   405 F.Supp.3d 525 (S.D.N.Y. 2019) (Daniels, J.), *vacated in part on other grounds*,
   999 F.3d 842 (2d Cir. 2021).......................................................................................................38

*Kaplan v. Lebanese Canadian Bank, SAL*,
   999 F.3d 842 (2d. Cir 2021)..................................................................................................52, 53

*King v. Habib Bank Ltd.*,
   2023 WL 8355359 (S.D.N.Y. Dec. 1, 2023) .............................................................................47

*Landgraf v. USI Film Prods.*,
   511 U.S. 244 (1994)...................................................................................................................35

*Lavi v. UNRWA USA Nat'l Comm., Inc.*,
   2025 WL 2300038 (D. Del. Aug. 8, 2025) ..........................................................................44, 50

*Linde v. Arab Bank, PLC,*
    353 F.Supp.2d 327 (E.D.N.Y. 2004) ...............................................................................36

*Linde v. Arab Bank, PLC,*
    882 F.3d 314 (2d Cir. 2018) ..............................................................................32, 33, 37

*LiquidX Inc. v. Brooklawn Cap., LLC,*
    254 F.Supp.3d 609 (S.D.N.Y. 2017) ...............................................................................57

*Long v. MTN Grp. Ltd.,*
    2025 WL 2827899 (E.D.N.Y. Sept. 25, 2025) .................................................................51

*Louis Vuitton S.A. v. Spencer Handbags Corp.,*
    765 F.2d 966 (2d Cir. 1985) ............................................................................................35

*MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC,*
    268 F.3d 58 (2d Cir. 2001) ..............................................................................................57

*Major League Baseball Properties, Inc. v. Salvino, Inc.,*
    542 F.3d 290 (2d Cir. 2008) ............................................................................................27

*Mega Tech Int'l Corp. v. Al-Saghyir Establishment,*
    1999 WL 269896 (S.D.N.Y. May 3, 1999), *adhered to on reconsideration,*
    1999 WL 314179 (S.D.N.Y. May 18, 1999) ....................................................................56

*Menowitz v. Brown,*
    991 F.2d 36 (2d Cir. 1993) ..............................................................................................56

*Merino v. Beverage Plus Am. Corp.,*
    2011 WL 3739030 (S.D.N.Y. Apr. 12, 2011), *report & recommendation*
    *adopted,* 2011 WL 3734241 (S.D.N.Y. Aug. 23, 2011) ...............................................56

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.,*
    175 F.Supp.2d 593 (S.D.N.Y. 2001) ...............................................................................55

*Miller v. Astucci U.S. Ltd.,*
    2007 WL 102092 (S.D.N.Y. Jan. 16, 2007) ....................................................................27

*Monterey Bay Mil. House., LLC v. Ambac Assurance Corp.,*
    531 F.Supp.3d 673 (S.D.N.Y. 2021) ...............................................................................62

*Morris v. New York State Dep't of Taxation & Fin.,*
    82 N.Y.2d 135 (1993) ......................................................................................................56

*Moss v. First Premier Bank,*
    2024 WL 4274780 (E.D.N.Y. Aug. 2, 2024) ..............................................................53, 55

*Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*,
975 F.Supp.2d 392 (S.D.N.Y. 2013)...................................................................56

*Nebraska v. Wyoming*,
507 U.S. 584 (1993)..........................................................................................27

*Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP*,
2004 WL 112948 (S.D.N.Y. Jan. 22, 2004) ..................................................61, 62

*O'Sullivan v. Deutsche Bank AG*,
2018 WL 1989585 (S.D.N.Y. Apr. 26, 2018)................................................53, 54

*Ofisi v. BNP Paribas, S.A.*,
77 F.4th 667 (D.C. Cir. 2023)............................................................................55

*Owens v. BNP Paribas S.A.*,
235 F.Supp.3d 85 (D.D.C. 2017) ......................................................................34

*Owens v. Republic of Sudan*,
864 F.3d 751 (D.C. Cir. 2017)..........................................................................50

*Palsgraf v. Long Island R.R. Co.*,
248 N.Y. 339 (1928) .........................................................................................38

*Parizer v. AJP Educ. Found., Inc.*,
2025 WL 2382933 (E.D. Va. Aug. 15, 2025).....................................48, 49, 51, 53

*In re Parmalat Sec. Litig.*,
594 F.Supp.2d 444 (S.D.N.Y. 2009)..................................................................61

*In re Parmalat Sec. Litig.*,
659 F.Supp.2d 504 (S.D.N.Y. 2009); *aff'd in part, vacated in part on other grounds*,
412 F. App'x 325 (2d Cir. 2011) .......................................................................63

*In re Parmalat Sec. Litig.*,
684 F.Supp.2d 453 (S.D.N.Y. 2010)..................................................................63

*In re PCH Assocs.*,
949 F.2d 585 (2d Cir. 1991)..............................................................................30

*Pittman by Pittman v. Grayson*,
149 F.3d 111 (2d Cir. 1998)..............................................................................53

*Raanan v. Binance Holdings Ltd.*,
2025 WL 605594 (S.D.N.Y. Feb. 25, 2025).......................................................38

*Rivera v. State*,
34 N.Y.3d 383 (2019) .......................................................................................63

*Riviello v. Waldron*,
 47 N.Y.2d 297 (1979) ................................................................................................63

*RJR Nabisco v. European Community*,
 579 U.S. 325 (2016) .................................................................................................34

*Rosemond v. United States*,
 572 U.S. 65 (2014) ...................................................................................................41

*Rothstein v. UBS AG*,
 708 F.3d 82 (2d Cir. 2013).................................................................................23, 29

*Rubens v. Mason*,
 387 F.3d 183 (2d Cir. 2004)......................................................................................27

*Sahu v. Union Carbide Corp.*,
 2012 WL 2422757 (S.D.N.Y. June 26, 2012), *aff'd*, 528 F. App'x 96 (2d Cir. 2013)............60

*Scribner v. Summers*,
 84 F.3d 554 (2d Cir. 1996).......................................................................................31

*Seijas v. Republic of Argentina*,
 2009 WL 10700009 (S.D.N.Y. Aug. 19, 2009) .........................................................61

*Shantou Real Lingerie Mfg. Co., Ltd. v Native Group Intl., Ltd.*,
 401 F.Supp.3d 433 (S.D.N.Y. 2018)...........................................................56, 57, 58, 59

*Shostack v. Diller*,
 2016 WL 958687 (S.D.N.Y. Mar. 8, 2016) (Daniels, J.).......................................60

*Siegel v. HSBC N. Am. Holdings, Inc.*,
 933 F.3d 217 (2d Cir. 2019)...........................................................................41, 46, 51

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*,
 605 U.S. 280 (2025)......................................................................................39, 41, 51

*Sokolow v. Palestine Liberation Org.*,
 60 F.Supp.3d 509 (S.D.N.Y. 2014) (Daniels, J.) ............................................28, 31

*Spagnola v. Chubb Corp.*,
 264 F.R.D. 76 (S.D.N.Y. Jan. 7, 2010)......................................................58, 59, 60

*Stogner v. California*,
 539 U.S. 607 (2003)..................................................................................................34

*Strauss v. Credit Lyonnais, S.A.*,
 2006 WL 2862704 (E.D.N.Y. Oct. 5, 2006) ............................................................34

x

*Tardif v. City of New York,*
   991 F.3d 394 (2d Cir. 2021)........................................................................................31

*In re Terrorist Attacks on Sept. 11, 2001,*
   134 F.Supp.3d 774 (S.D.N.Y. 2015), *vacated on other grounds,*
   2017 WL 8776686 (2d Cir. Feb. 7, 2017)....................................................................63

*In re Terrorist Attacks on Sept. 11, 2001,*
   2008 WL 7073447 (S.D.N.Y. Dec. 23, 2008) .............................................................29

*In re Terrorist Attacks on Sept. 11, 2001,*
   2021 WL 1164087 (S.D.N.Y. Mar. 26, 2021) .............................................................28

*In re Terrorist Attacks on Sept. 11, 2001,*
   2022 WL 4227151 (S.D.N.Y. May 3, 2022) ..................................................35, 36, 54

*In re Terrorist Attacks on Sept. 11, 2001,*
   2023 WL 1797629 (S.D.N.Y. Feb. 7, 2023)..................................................................2

*In re Terrorist Attacks on Sept. 11, 2001,*
   2023 WL 2430381 (S.D.N.Y. Mar. 9, 2023) .....................................................5, 22, 30, 50

*In re Terrorist Attacks on Sept. 11, 2001,*
   2023 WL 3116763 (S.D.N.Y. Apr. 27, 2023)...............................................24, 25, 26

*In re Terrorist Attacks on Sept. 11, 2001,*
   2023 WL 5132138 (S.D.N.Y. Aug. 10, 2023)........................................23, 28, 31, 35

*In re Terrorist Attacks on Sept. 11, 2001,*
   2023 WL 5207985 (S.D.N.Y. Aug. 14, 2023)..............................................................55

*In re Terrorist Attacks on Sept. 11, 2001,*
   2025 WL 2205263 (S.D.N.Y. Aug. 4, 2025).................................................................56

*In re Terrorist Attacks on Sept. 11, 2001,*
   2025 WL 2383768 (S.D.N.Y. Aug. 18, 2025)...............................................24, 25, 26

*In re Terrorist Attacks on Sept. 11, 2001,*
   2025 WL 2485427 (S.D.N.Y. Aug. 28, 2025)...............................................62, 63, 65

*In re Terrorist Attacks on Sept. 11, 2001,*
   2026 WL 769787 (S.D.N.Y. Mar. 18, 2026) .................................................2, 24, 26

*In re Terrorist Attacks on Sept. 11, 2001,*
   295 F.Supp.3d 416, 423 n.8 (S.D.N.Y. 2018), *rev'd and remanded as to
   another defendant sub nom., Underwriting Members of Lloyd's Syndicate 2
   v. Al Rajhi Bank,* 779 F. App'x 66 (2d Cir. 2019)..............................................22, 50

*In re Terrorist Attacks on Sept. 11, 2001*,
    298 F.Supp.3d 631 (S.D.N.Y. 2018)..............................................2, 23, 29, 30, 31, 49, 50, 65

*In re Terrorist Attacks on Sept. 11, 2001*,
    349 F.Supp.2d 765 (S.D.N.Y. 2005)............................................................21, 22, 38

*In re Terrorist Attacks on Sept. 11, 2001*,
    392 F.Supp.2d 539 (S.D.N.Y. 2005)...................................................................21, 22

*In re Terrorist Attacks on Sept. 11, 2001*,
    714 F.3d 118 (2d Cir. 2013)................................................................21, 22, 23, 29, 30

*In re Terrorist Attacks on Sept. 11, 2001*,
    718 F.Supp.2d 456 (S.D.N.Y. 2010)...............................................................30, 50

*In re Terrorist Attacks on Sept. 11, 2001*,
    740 F.Supp.2d 494 (S.D.N.Y. 2010)..........................................................21, 22, 23, 31, 34

*In re Terrorist Attacks on Sept. 11, 2001*,
    840 F.Supp.2d 776 (S.D.N.Y. 2012)...............................................................................50

*Troell v. Binance Holdings Ltd.*,
    2026 WL 636849 (S.D.N.Y. Mar. 6, 2026) ........................................................41, 46

*Trustees of Mosaic & Terrazzo Welfare, Pension, Annuity & Vacation Funds v.
    High Performance Floors, Inc.*,
    233 F.Supp.3d 329 (E.D.N.Y. 2017) ................................................................59, 61

*Twitter, Inc. v. Taamneh*,
    598 U.S. 471 (2023)..........................................39, 40, 41, 42, 47, 49, 50, 51, 52, 53

*U.S. v. Fidse*,
    778 F.3d 477 (5th Cir. 2015) ....................................................................................36

*UMG Recordings, Inc. v. Grande Commc'ns Networks, L.L.C.*,
    118 F.4th 697 (5th Cir. 2024), *vacated on other grounds sub nom. Grande Commc'ns
    Networks v. UMG Recordings, Inc.*,
    2026 WL 922501 (U.S. Apr. 6, 2026) ...................................................................52

*United States. v. Abdi*,
    498 F.Supp.2d 1048 (S.D. Ohio 2007) ...................................................................36

*United States v. Funds Held in the Name or for the Benefit of Wetterer*,
    210 F.3d 96 (2d Cir. 2000)........................................................................................56

*United States v. Marzook*,
    426 F.Supp.2d 820 (N.D. Ill. 2006) ....................................................................36

*United States v. Stewart*,
  590 F.3d 93 (2d Cir. 2009)..............................................................................................32

*United States v. TDC Mgmt. Corp.*,
  263 F.Supp.3d 257 (D.D.C. 2017) ..................................................................................55

*In re Vitamins Antitrust Litig.*,
  2000 WL 1511376 (D.D.C. Oct. 6, 2000) .......................................................................35

*Weingarten v. United States*,
  865 F.3d 48 (2d Cir. 2017)..............................................................................................35

*Weiss v. Nat'l Westminster Bank PLC*,
  278 F.Supp.3d 636 (E.D.N.Y. 2017) ..........................................................................35, 36

*Weiss v. Nat'l Westminster Bank PLC*,
  768 F.3d 202 (2d Cir. 2014)............................................................................................32

*Weiss v. Nat'l Westminster Bank, PLC.*,
  993 F.3d 144 (2d Cir. 2021)............................................................................................37

*Yousef v. Al Jazeera Media Network*,
  2018 WL 1665239 (S.D.N.Y. Mar. 22, 2018) ................................................................61

*Zobay v. MTN Grp. Ltd.*,
  695 F.Supp.3d 301 (E.D.N.Y. 2023) .........................................................45, 46, 48, 49, 52

**Statutes**

8 U.S.C. § 1189...................................................................................................................47

18 U.S.C. § 2331(1) ..........................................................................................33, 35, 36, 37, 54

18 U.S.C. § 2333..........................................................................................30, 34, 35, 36, 47

18 U.S.C. § 2333B .............................................................................................................34

18 U.S.C. § 2339A.......................................................................................31, 32, 33, 34, 35, 36, 37

18 U.S.C. § 2339B .......................................................................................31, 32, 33, 35, 36, 37

18 U.S.C. § 2339C .......................................................................................................35, 36

Justice Against Sponsors of Terrorism Act, Pub. L. 114-222, § 4(a), 130 Stat. 852 (2016)
  (codified at 18 U.S.C. § 2333(d)(2))...................................................................24, 47, 53, 54

**Other Authorities**

Fed. R. Civ. P. 56..........................................................................................................26, 27

Fed. R. Evid. 702 ...........................................................................................................25

Restatement (Third) Of Agency § 1.01 (Am. L. Inst. 2006) .........................................62

**GLOSSARY OF ABBREVIATIONS**

| | |
|---|---|
| **al Fadl** | Jamaal al Fadl |
| **Al-Obaid** | Abdullah bin Saleh Al-Obaid, Ph.D. |
| **Al-Turki** | Abdullah bin Abdul Mohsen Al-Turki, Ph.D. |
| **ASG** | Abu Sayyaf Group |
| **Azzam** | Abdullah Azzam |
| **Basha** | Adnan Basha, Ph.D. |
| **Bin Laden** | Osama Bin Laden |
| **GOP** | Government of Pakistan |
| **Jelaidan** | Wael Jelaidan |
| **Khalifa** | Muhammad Jamaal Khalifa |
| **KSM** | Khalid Sheikh Muhammad |
| **MAK** | Services Bureau (Maktab al-Khidamat in Arabic) |
| **MILF** | Moro Islamic Liberation Front |
| **Missionaries** | Missionaries that coordinated with MWL |
| **Naseef** | Abdullah Naseef, Ph.D. |
| **OFAC** | Office of Foreign Assets Control |
| **Rabita Trust** | The Rabita Trust |
| **Shah** | Wali Khan Amin Shah |
| **Yousef** | Ramzi Yousef |

**INTRODUCTION**

The Muslim World League ("MWL") has unequivocally condemned and continues to condemn the September 11 attacks ("9/11 Attacks") and expresses deep sympathy for Plaintiffs' profound losses. The heinous and indefensible attacks caused immense suffering and loss, for which Plaintiffs understandably seek justice. However, the issue before the Court is not whether the 9/11 Attacks grievously harmed Plaintiffs, but whether the evidence adduced over two decades can reasonably support a finding at trial that MWL is liable. The sympathy that is properly felt for Plaintiffs cannot convert a charity that inarguably had nothing to do with the 9/11 Attacks into a responsible party.

After more than twenty years of litigation, Plaintiffs have been forced to confront the lack of evidence substantiating the claim that MWL is liable for the 9/11 Attacks under any reasonable (or even unreasonable) theory of causation. MWL played no role whatsoever in planning, supporting, assisting or carrying out the 9/11 Attacks. MWL did not know about Al Qaeda's plans to carry out the attacks, which were fundamentally at odds with MWL's mission and decades of charitable work. With no evidence directly linking MWL to 9/11, Plaintiffs have relentlessly pursued an agenda-driven scattershot effort to establish purported indirect links that do not exist and do not add up to anything. They advance the theory that MWL somehow contributed to Al Qaeda's "global strike capabilities,"[1] supported only by a sprawling narrative spanning decades and continents and involving individuals and entities unrelated to—or far removed from—MWL. Their theory is rooted in alleged actions taken in the late 1970s to late 1980s when various factions in Afghanistan were fighting the Soviet Union with the active support of the United States.

---

[1] *See e.g.*, ECF No. 7606, Pls.' Opp'n. to Defs.' Mot. to Exclude Expt. Testimony of Jenkins and Winer (Jan. 14, 2022) 15; ECF No. 9344, Pls.' Opp'n. to Defs.' Mot. to Exclude Testimony of Kohlmann and Levitt (Sept. 15, 2023) 30.

Plaintiffs continue to cite allegations that the Court already concluded do not "bear any definite and specific, articulable connection to the 9/11 Attacks or those who carried them out,"[2] and they rely on a self-proclaimed terrorism expert whom this Court found to have "questionable experience and training" and a "tendency to misstate facts, rely on speculation, and jump from accepted premises to unfounded conclusions."[3] Plaintiffs draw from unsubstantiated CIA reports and other inconclusive government materials, while disregarding the detailed reports of the 9/11 Commission and the FBI, which do not name MWL either as a participant in the 9/11 Attacks or a knowing and intentional financier of Al Qaeda.

Plaintiffs simply cannot show MWL's intentional participation in the 9/11 Attacks, and by advancing the theory that MWL contributed to Al Qaeda's "global strike capabilities," Plaintiffs effectively concede that they cannot establish the required causal nexus between any of MWL's alleged acts and the 9/11 Attacks. At best, the evidence, if credited, shows *unintentional* and *discrete* acts or statements over many years by individuals who were affiliated with MWL long before 9/11, and were multiple steps removed from Al Qaeda.

Plaintiffs have conducted a twenty-year-long fishing expedition against MWL, which has caught nothing to connect MWL with the 9/11 Attacks. Plaintiffs' patchwork of unconnected bits and pieces never gets close to a tenable theory of liability. On this evidence, Plaintiffs cannot remotely carry their burden to prove direct or even secondary liability. No reasonable jury could conclude otherwise. MWL is entitled to judgment as a matter of law.

---

[2] *In re Terrorist Attacks on Sept. 11, 2001* ("*Terrorist Attacks XIV*"), 298 F.Supp.3d 631, 659 (S.D.N.Y. 2018). Five years later, the Court denied Plaintiffs' motion to revise this decision. *In re Terrorist Attacks on Sept. 11, 2001*, 2023 WL 1797629, at *13 (S.D.N.Y. Feb. 7, 2023) (denying motion to revise order dismissing charity-centered allegations because, *inter alia*, JASTA does not provide for aiding and abetting liability against sovereigns).
[3] *In re Terrorist Attacks on Sept. 11, 2001*, 2026 WL 769787, at *5 (S.D.N.Y. Mar. 18, 2026) (cleaned up).

## BACKGROUND

I.     **The Muslim World League Is an NGO with a Stellar Reputation for Its Charitable Work Across the Globe**

MWL was founded in Makkah, Saudi Arabia, in 1962. SOF ¶ 8. At all relevant times, MWL was an international Islamic non-governmental organization ("NGO") that carried out worldwide charitable projects. *Id.* ¶¶ 7-8.[4] Through its more than 200 employees and approximately 30 global offices and cultural centers in countries ranging from Nigeria and Australia to Denmark and Trinidad, MWL promoted cross-cultural and religious dialogue, worked to spread moderate Islamic values, and countered extremism through a message of peace and harmony and through educational, religious, and cultural projects, including conferences and cultural centers (including in Italy, Switzerland, and Brazil). *Id.* ¶¶ 8-25. MWL's offices, cultural centers, and 200+ employees prioritized education, including by distributing scholarships and books and supporting schools around the globe, creating radio programs, and responding to inquiries about Islam. *Id.* ¶¶ 8, 18-27. MWL also supervised halal certification processes. *Id.* ¶ 28. Between 1992 and 2016, four individuals served as Secretary General ("SG"), the most senior role within the organization: Abdullah Naseef, Ph.D. ("**Naseef**")[5] (1980-1993), Dr. Ahmed Mohamed Ali (1994-1995), Abdullah bin Saleh Al-Obaid, Ph.D. ("**Al-Obaid**") (1996-2000), and Abdullah bin Abdul Mohsen Al-Turki, Ph.D. ("**Al-Turki**") (2000-2016). *Id.* ¶¶ 31-36.[6] They and their subordinates regularly traveled to promote MWL's mission, including to Egypt, Italy, Bosnia, and Uganda. *Id.* ¶¶ 37-43.

In 1979, MWL was granted general, consultative status with the United Nations Economic and Social Council in recognition of its important work for the public good. *Id.* ¶ 29-30. MWL

---

[4] Citations to "SOF" are to MWL's Local Rule 56.1 statement submitted herewith. Cited exhibits are attached to the accompanying declaration of Aisha E. R. Bembry.

[5] Individuals and entities in bold font are catalogued in the glossary attached to this memorandum.

[6] **Naseef** passed away in 2025. ECF No. 11366.

was only the fourteenth organization ever granted this status. *Id*. MWL's employees worked tirelessly to accomplish its mission. *Id.* ¶ 9.

MWL's foreign offices carried out MWL's mission, advised Head Office on which projects to pursue, such as establishing educational and charitable programs, and provided support for those projects. *Id.* ¶¶ 12-14. MWL required employees to prepare project progress and completion reports to ensure proper oversight. *Id.* ¶¶ 48-49. MWL aimed to hire only well-respected individuals who passed background checks. *Id.* ¶ 51. MWL employees were expected to conduct themselves in accordance with MWL regulations, directives, and bylaws, which were consistent throughout the relevant timeframe. *Id.* ¶¶ 44-46, 48-49. These policies prohibited employees from, *inter alia*, spending MWL funds without authorization or participating in activities that conflicted with MWL values or objectives. *Id.* ¶¶ 47, 49. Foreign office personnel were required to follow their host country laws and were prohibited from participating in, or using MWL resources for, political activities, personal ventures, or violence, extremism, or terrorism. *Id.* ¶¶ 50, 52. These were the clear policies and procedures of MWL.

MWL relied on internal and external auditors to ensure procedures and financial controls were followed within the organization. *Id.* ¶¶ 53-55. Internal auditors were responsible for supervising and auditing financial accounts, confirming the accuracy of inventory records, verifying compliance with financial and administrative regulations, submitting quarterly reports, reviewing instances of misconduct, and issuing recommendations to prevent future misconduct. *Id.* ¶ 54. External auditors provided an additional level of financial control by inspecting all books and records to ensure that procedures were followed, verifying MWL's assets and liabilities, examining final accounting statements, and comparing financial transactions with project completion to ensure regularity and detect any apparent misconduct. *Id.* ¶ 55. In addition, the Saudi

4

General Auditing Bureau routinely audited MWL.[7] *Id.* ¶ 95. Even with auditing and other controls, issues arise in any large and complex organization, particularly one operating in many countries with limited infrastructure. When they arose within MWL, it had reporting policies and procedures for addressing them. *Id.* ¶¶ 47-49, 53-57.

## II.    MWL Was Not Involved in the Founding or Activities of Al Qaeda

Plaintiffs have alleged that MWL activities during the Soviet era in Afghanistan somehow contributed to Al Qaeda's founding. The allegation is irrelevant to this case and without factual basis. Its only purported support is an inaccurate and distorted version of long-ago events, conflating organizations fighting the Soviets with U.S. support and much later and unrelated actors and incidents.

### A.    The Services Bureau Predated Al Qaeda

In the mid-1980s, following the Soviet invasion of Afghanistan in 1979, Abdullah Azzam ("**Azzam**") founded the Services Bureau ("**MAK**").[8] *Id.* ¶¶ 243-44. Osama Bin Laden ("**Bin Laden**") provided funding for the **MAK**, which worked to attract Arab volunteers to the Afghan jihad and to support and unify people engaged in *jihad*, known as *mujahideen*, in Afghanistan against the Soviet Union, which had occupied the country and was propping up a puppet government. *Id.* ¶¶ 243-44, 409. During this period, the U.S. and other Western nations strongly supported the Afghan *mujahideen* and **MAK**, with hundreds of millions of dollars, advanced weaponry, and American military advisers. *Id.* ¶¶ 245-46, 408.[9] MWL participated in relief efforts and called for peace; but, unlike the U.S. Government, did not provide the *mujahideen* with any funding or weapons. *Id.* ¶¶ 247-48, 408.

---

[7] MWL received its funding its funding in the form of an annual grant from the Saudi government. SOF ¶ 56. MWL disbursed funds via issued checks or bank authorization letters and did not use the hawala system. *Id.* ¶ 57.

[8] The Arabic name for the Services Bureau was often abbreviated as "MAK."

[9] *See In re Terrorist Attacks on Sept. 11, 2001*, 2023 WL 2430381, at *5 n.5 (S.D.N.Y. Mar. 9, 2023).

### B.    Al Qaeda

**Bin Laden** withdrew his funding and left the **MAK** in the late 1980s to form Al Qaeda. *Id.* ¶¶ 265-66, 362. Significantly, much of Plaintiffs' purported evidence relates to the Soviet period in Afghanistan before there was an Al Qaeda. In its early years, Al Qaeda was not focused on targeting Americans or the United States. *Id.* ¶¶ 362. Its focus was on the regimes in the Middle East; **Bin Laden** fled from Saudi Arabia, which had revoked his passport and then his citizenship in 1994. *Id.* ¶¶ 267-68, 362. The regimes that he viewed as un-Islamic were his enemy, primarily Saudi Arabia. *Id.* ¶¶ 268, 278-289. In August 1996, Al Qaeda first called for the expulsion of American soldiers from Arabia. *Id.* ¶¶ 269-71. In February 1998, Al Qaeda first called for the killing of American civilians and soldiers outside Arabia. *Id.* ¶¶ 272-74. The 9/11 plot began in *the spring of 1999*. *Id.* ¶¶ 308-10. On October 8, 1999, Al Qaeda was first designated a Foreign Terrorist Organization ("FTO"). *Id.* ¶ 275. Yet most of Plaintiffs' allegations about MWL substantially precede 1999. These allegations do not support liability and are completely irrelevant to responsibility for the 9/11 Attacks.

### III.    There Is No Evidence—None—Linking MWL to the 9/11 Attacks and No Evidentiary Support for the Alleged and Attenuated Connections to Al Qaeda

There is no evidence—none—linking MWL to the 9/11 Attacks. At best, Plaintiffs have adduced suggestions of attenuated connections to Al Qaeda, but even those are unsubstantiated. Plaintiffs have relentlessly pursued evidence of connections through events and individuals unrelated to 9/11, alleged intermediaries, distinct charitable organizations, and ex-employees. This narrative, spanning decades before 9/11 and multiple continents, includes many individuals and entities unrelated to MWL or whose actions are far removed from it. After two decades of investigation and discovery, no evidence has emerged to prove that MWL had any knowledge of or involvement in the 9/11 Attacks or that it was involved with Al Qaeda. *Id.* ¶¶ 1-6. Nor is there any factual basis for the alleged connections to Al Qaeda through purported intermediaries, other

6

charities, or ex-employees, or evidence that MWL had knowledge before 9/11 of any such alleged connections. Moreover, MWL's mission and principles are and have always been anathema to the nihilistic violence of Al Qaeda, *Id.* ¶¶ 9-11, 14, 29, 38-40, 250-64, 312-13, a fact that Plaintiffs ignore.

### A.    MWL Had No Knowledge of or Involvement in the 9/11 Attacks

Plaintiffs have no evidence that MWL, through its senior leaders, employees or agents, had knowledge of, participated in, or financed the 9/11 Attacks. *Id.* ¶¶ 1-2, 250-259, 276-77, 311-14. *Not a single dollar of MWL funds* has been traced to the planning or execution of the 9/11 Attacks. *Id.* ¶¶ 2-3. The 9/11 Commission, created in 2002 to investigate 9/11, does not name MWL among the multiple entities it did conclude had a role in the 9/11 Attacks. *Id.* ¶¶ 6, 330-33, 336, 338-39, 341.[10] In 2021, the FBI concluded that it "has not identified additional groups or individuals responsible for the attack other than those currently charged, which is consistent with the final conclusion of the 9/11 Commission Report." *Id.* ¶ 1. These facts alone should be decisive of this motion and compel the granting of summary judgment.

### B.    MWL Did Not Knowingly Fund or Otherwise Support Al Qaeda

MWL leadership did not know **Bin Laden**. *Id.* ¶¶ 255, 261. MWL never gave funds to **Bin Laden** or Al Qaeda, *id.* ¶¶ 4, 250, 257, and Plaintiffs have no evidence tracing a single dollar from MWL to **Bin Laden** or Al Qaeda. *Id.* The 9/11 Commission Report does not conclude that MWL funded Al Qaeda. *Id.* ¶¶ 6, 330-33, 336, 338-39, 341.

Plaintiffs rely on speculative and inconclusive statements contained in certain CIA reports from the late 1990 and early 2000s to assert connections between MWL and Al Qaeda. At best, these reports document unsubstantiated rumors and accusations. According to the 9/11

---

[10] The Commission issued a comprehensive report that examined allegations that, *inter alia*, Saudi-affiliated charities may have funded Al Qaeda, but its conclusions identify only the Al Haramain and al Wafa. SOF ¶ 332.

Commission Staff, "[t]errorist financing was not a priority for either domestic or foreign intelligence collection. As a result, intelligence reporting on the issue was episodic, insufficient, and often inaccurate." *Id.* ¶ 326-27. Indeed, the 9/11 Commission reported that the CIA knew early on about "loose affiliations" and that "[m]uch of [its] early reporting on al Qaeda's financial situation and its structure came from Jamal Ahmed al Fadl…." *Id.* ¶¶ 338, 419. As further detailed in the brief submitted on even date by the International Islamic Relief Organization ("IIRO Brief"),[11] many of the (false) accusations connecting MWL to Al Qaeda came from a single source, Jamaal al Fadl ("**al Fadl**"), who defected from Al Qaeda in 1996 after he was caught embezzling money to become a paid informant for the U.S. Government. *Id.* ¶¶ 413-17. His statements are inadmissible hearsay and unreliable, and in any case nothing he has to say can be relevant, because he left Al Qaeda three years before the planning of the 9/11 Attacks commenced.[12] *Id.* ¶¶ 415-416. Although **al Fadl** was subpoenaed and his deposition was properly noticed in this MDL, he did not appear and did not provide testimony under oath. *Id.* ¶¶ 431-32.

As for the reports' contents, a January 11, 1999 CIA Report describes MWL as having "possible," "questionable," and "less direct" ties to **Bin Laden** and notes that MWL was "apparently used as a cover organization" by **Bin Laden** associates, but includes no factual support for any of these suggested connections. *Id.* ¶¶ 342, 345-46. A November 2002 CIA report on "Saudi-based Financial Ties for Terrorists Organizations," describes five "Saudi-based NGOs that [Al Qaeda] has been able to exploit by diverting funds from legitimate activities to finance [Al Qaeda]" and identifies MWL as one whose funds were allegedly diverted to Al Qaeda. *Id.* ¶¶ 375-378, 380. However, the CIA traces these assertions to an unidentified "press reporting" and

---

[11] Consistent with the Court's Order on summary judgment briefing (ECF No. 11419), MWL hereby incorporates by reference Background, Section V.A. of the IIRO Brief discussing Jamal al Fadl. *See also* SOF ¶¶ 413-430.
[12] *See* IIRO Brief at Background, Section V.A. (discussing inadmissibility of **al Fadl's** unreliable, hearsay statements), which MWL hereby incorporates by reference.

otherwise bases them on the mere association of two former MWL employees with **Bin Laden**, even though both left MWL long before 9/11. *Id.* ¶¶ 380-81. This is not evidence; it is recycled rumor without a finding of wrongdoing by MWL.

Illustrating the point, there are other CIA reports that do not support—and indeed contradict—Plaintiffs' assertions of a connection between MWL and Al Qaeda: a January 27, 1999 report notes Bin Ladin's exploitation of some international Islamic NGOs for financial and logistical support, but it does *not* include MWL as part of Bin Ladin's terrorist network (*id.* ¶¶ 334-35); an April 1999 report states that MWL Head Office "*avoids* extremist causes" and does *not* conclude MWL provided funds to Al Qaeda (*see id.* ¶¶ 347-48 (emphasis added)); an October 2001 CIA report identifies and describes seventeen "Islamic charities" from whom "Bin Ladin derives much of his funds" and does *not* mention MWL (*id.* ¶¶ 365-70); and a June 2002 report does *not* mention MWL when identifying four Saudi NGOs that have been connected to **Bin Laden** outside of the Philippines (*id.* ¶¶ 371-74). Thus, following the unsubstantiated report dated January 11, 1999, more than 2 years and 8 months before 9/11, there were multiple additional reports devoid of any reference to MWL. The fair inference to be drawn is that the earlier preliminary reporting was found not to be sufficiently reliable. *See Id.* ¶¶ 326-327.

In any event, none of the largely unsubstantiated assertions contained in the CIA reports supports the conclusion that MWL funded Al Qaeda, much less that it did so *knowingly*. *Id.* ¶¶ 342-360, 365-386. The 9/11 Commission and its staff cited that early (Jan. 11, 1999) CIA report related to Al Qaeda funding by NGOs when discussing the difficulties of tracking Al Qaeda's financial transactions (*id.* ¶ 341), but it names only two charities (the al Haramain Islamic Foundation and al Wafa) as unwitting or witting financiers of Al Qaeda. *Id.* ¶ 332. *Neither the 9/11*

9

*Commission Report nor the Monograph on Terrorist Financing ("Staff Monograph")*[13] *conclude that MWL provided funds to Al Qaeda. Id.* ¶¶ 328-360, 365-394. After exhaustive investigation, the most comprehensive report by the U.S. government did not credit the January 11, 1999 CIA report as supporting any inference of knowing support of Al Qaeda by MWL.

Plaintiffs' theory is also illogical. **Bin Laden**, who was independently wealthy, self-financed Al Qaeda at least until 1992. *Id.* ¶ 266. The uncontroverted evidence further establishes that **Bin Laden** disdained Saudi-affiliated charities, like MWL, and twice publicly encouraged donors *not* to donate to them. *Id.* ¶¶ 278-89. Yet Plaintiffs maintain the fantastical proposition that **Bin Laden** was getting money from these same charities, even though extensive discovery over many years failed to identify a single penny going from MWL to Al Qaeda.

MWL did not knowingly or tacitly employ Al Qaeda members, support Al Qaeda, or authorize employees to support or fund Al Qaeda. *Id.* ¶¶ 249-61. Contrary to Plaintiffs' allegations, MWL worked to counter Al Qaeda's ideology and relied on background checks from local governments when hiring personnel to ensure its relief mission was not compromised by association with Al Qaeda or extremist organizations. *Id.* ¶¶ 9, 51, 216, 254-55, 260, 262-63.

C.    **MWL Established or Helped to Establish Two Organizations With Separate Corporate Governance that Were Not Connected to Bin Laden, Al Qaeda or the 9/11 Attacks**

1.    **The International Islamic Relief Organization**

Plaintiffs allege that MWL should be liable for IIRO's alleged actions. However, the evidence does not corroborate these allegations. MWL established IIRO in 1978 as an affiliate to provide humanitarian aid to impoverished people, emergency aid after crises and natural disasters, and sustainable development around the globe. *Id.* ¶¶ 58-62. At all relevant times, IIRO was affiliated with the United Nations and worked with other relief organizations like the Red Cross

---

[13] The Staff Monograph refers to a paper released by the Commission's staff focused on terrorist financing.

and the United Nations High Commissioner for Refugees ("UNHCR"). *Id.* ¶ 62-63. The SG was the most senior position within IIRO, and Adnan Basha, Ph.D. **("Basha")** served in that role from 1997-2013. *Id.* ¶¶ 68-70.[14] IIRO operated in 120 countries through 50 offices inside and outside of the Kingdom of Saudi Arabia. *Id.* ¶¶ 74-76. IIRO had approximately 1,000 employees during this period. *Id.* ¶ 73.

Despite Plaintiffs' contrary allegations, discovery has confirmed that IIRO was not MWL's subsidiary; it was an independent affiliate. *Id.* ¶¶ 115-16. The two organizations maintained their corporate separation, *id.* ¶¶ 81-82, 119, with separate board meetings and minutes, separate head offices in different cities, separate payrolls, taxes, human resource departments, employee codes, bank accounts, budgets, legal departments, and internal and external auditors. *Id.* ¶¶ 83-94, 97-98, 119. They did not commingle or use each other's funds, each had sufficient assets for its liabilities, and they did not take on each other's debts or loan each other funds. *Id.* ¶¶ 88-93, 96, 112-114. The two also operated independently: MWL did not control where or how IIRO carried out its activities or rely on IIRO for its operations, *id.* ¶¶ 99-107, 111, and IIRO also had sole decision-making authority with respect to its operations, employees, and financing, including in deciding where to open offices, where to deliver relief and aid, and which programs and projects to pursue. *Id.* ¶¶ 108-10. IIRO did not and was not authorized to take any actions on MWL's behalf or tell others it was doing so, or vice versa. *Id.* ¶¶ 81-82, 100-06, 111, 119-21.

Each of the MWL SGs served as *ex officio* Chair of the IIRO Board of Directors (the "IIRO Board"), which consisted of twelve to twenty-four members. *Id.* ¶¶ 64-65. The IIRO Board was not involved in daily IIRO operations. *Id.* ¶¶ 66-67. Occasionally, individuals held positions at foreign branch offices of both IIRO and MWL. *Id.* ¶¶ 97-98. In these instances, the operations and

---

[14] Adnan Basha worked for MWL from 1977 to 1997 and again from 2013 until his retirement in 2016. SOF ¶ 36.

finances of these offices were not combined, and employees received separate compensation, budgets, and instructions from each organization. *Id.* ¶¶ 98, 117-18.

### 2. The Rabita Trust

Plaintiffs allege a connection between **Rabita Trust** and Al Qaeda, and that MWL should be liable for **Rabita Trust's** actions. However, the evidence does not support these allegations. *Id.* ¶¶ 123-26. In 1988, the Government of Pakistan ("**GOP**") and MWL jointly established the **Rabita Trust**, a charitable organization based in Islamabad. *Id.* ¶ 122. **Rabita Trust's** mission was to repatriate and build homes for Biharis—Pakistanis living in Bangladesh after the Indo-Pakistani War. *Id.* ¶¶ 122, 127. The President or Prime Minister of Pakistan often served as the Chairman of the **Rabita Trust** board of directors, and a senior **GOP** official and the SG of MWL jointly served as the Vice Chairmen. *Id.* ¶¶ 131, 134-35, 149-151. The **GOP** and MWL each nominated half of the other board members. *Id.* ¶¶ 130, 141. MWL provided $2.5 million in funds to the **Rabita Trust** upon its founding and the **GOP** provided at least $12 million. *Id.* ¶ 129. MWL had a limited role in **Rabita Trust's** operations, with the **GOP** largely supervising and funding the organization. *Id.* ¶¶ 129-33, 135-39, 142-48, 157-65, 170.

In October 1992, the Prime Minister of Pakistan appointed then-MWL employee, Wael Jelaidan ("**Jelaidan**"), as project director of the **Rabita Trust** and a member of its board of directors. *Id.* ¶ 175-77; *see also* ¶ 156. By 1993, **Rabita Trust** had built 1,000 residential units in Pakistan and repatriated approximately 70 Bihari families. *Id.* ¶ 127. However, governmental support for the project waned, and would not revive until Pakistani Prime Minister Nawaz Sharif returned to power in the late 1990s. *Id.* ¶¶ 128, 147. The intervening lack of support led to the dilapidation of the residential units (meant to house the remaining approximately 900 families waiting for repatriation) and left the **Rabita Trust** unable to continue repatriating Biharis. *Id.* ¶ 155.

In 1996, when **Al-Obaid** became SG of MWL and consequently *ex officio* Vice Chairman of the **Rabita Trust** board, **Rabita Trust** was essentially defunct. *Id.* ¶ 140; *see also* ¶¶ 152-54. Beginning in the late 1990s, the **Rabita Trust** was revived and the **GOP** nominated new members to its board. *Id.* ¶¶ 147-48. Because of the relationship between **Jelaidan** and the Prime Minister of Pakistan Nawaz Sharif, the **GOP** proposed that **Jelaidan** be appointed Secretary General of the **Rabita Trust**. *Id.* ¶¶ 177-80. **Al-Obaid**, in his role as *ex officio* Vice Charman, was asked to approve the appointment, which he did as of February 15, 1999, even though he did not know **Jelaidan**, because he understood the decision to belong to the **GOP**. *Id.* ¶¶ 178-81; ¶ 133.

Plaintiffs have no evidence that **Rabita Trust** had any foreknowledge of or was involved in the planning or execution of the 9/11 Attacks. *Id.* ¶ 123. They have no evidence tracing **Rabita Trust** funds or in-kind support to the planning or execution of the 9/11 Attacks. *Id.* ¶¶ 124-25. **Rabita Trust** was not designated by the Office of Foreign Assets Control ("**OFAC**")[15] as a SDGT until after 9/11. *Id* ¶ 169. In any event, Plaintiffs have no evidence that MWL had knowledge before 9/11 of any connection between **Rabita Trust** and Al Qaeda. *Id* ¶¶ 126, 166-68.

### D.     Other Groups Were Not Involved in the 9/11 Attacks and, in Any Event, MWL Had No Knowledge of Purported Connections With Al Qaeda

Plaintiffs' narrative of an indirect link between MWL and Al Qaeda rests on allegations of connections between Al Qaeda and purported intermediaries who were not themselves involved in 9/11. For each purported intermediary, discovery revealed no evidence that: (1) the intermediary was involved in the 9/11 Attacks; or (2) MWL had knowledge before 9/11 of a connection to Al Qaeda, if in fact there was one.

---

[15] MWL disputes that designations by **OFAC** are proof that an entity or individual was engaged in terrorist activity. Designations under EO 13224 are unilateral, unchallenged determinations based on undisclosed information, whereby even individuals or entities who unknowingly, unwittingly, or inadvertently finance terrorism may be subject to designation. SOF ¶¶ 395-402. *See* IIRO Brief at Background, Section V.C. (discussing OFAC designation), which MWL hereby incorporates by reference.

### 1. Abu Sayyaf Group

Plaintiffs assert a convoluted connection between Abu Sayyaf Group ("**ASG**") and Al Qaeda, on the one hand, and **ASG** and MWL—through MWL's connections to IIRO and Muhammad Jamal Khalifa ("**Khalifa**")[16]—on the other hand. The contention, which is not substantiated, is that **Khalifa** employed an **ASG** member through IIRO-Philippines and funded **ASG**.[17] In any event, the evidence does not support a connection between MWL and Al Qaeda.

The **ASG** emerged in the Philippines in the early to mid-1990s, attacking Christian missionaries and committing robberies and kidnappings. *Id.* ¶ 240. The **ASG** was enmeshed in local politics and local power structures and did not have objectives in the U.S. or the West. *Id.* ¶¶ 241-42. **ASG** was designated as an FTO on October 8, 1997, but was not designated by **OFAC** until after 9/11. *Id.* ¶¶ 238-39.

Plaintiffs have no evidence that **ASG** had any foreknowledge of or was involved in the planning or execution of the 9/11 Attacks. *Id.* ¶ 231. They also have no evidence tracing **ASG** funds or in-kind support to the planning or execution of the 9/11 Attacks or to Al Qaeda. *Id.* ¶¶ 232-33. Even if Plaintiffs did have such evidence, there is no evidence that MWL was the source of such funds or in-kind support. *Id.* ¶¶ 234-36. They also have no evidence that MWL was aware or had knowledge before 9/11 of any connection between the **ASG** and Al Qaeda. *Id.* ¶ 237.

### 2. MILF

As with **ASG**, Plaintiffs assert a connection between the Moro Islamic Liberation Front ("**MILF**") and Al Qaeda, and then a connection between **MILF** and MWL through IIRO and **Khalifa**. Once again, these connections are both unsubstantiated and irrelevant. *Id.* 224-30. **MILF**

---

[16] **Khalifa** served as Director and later Supervisor of IIRO's office in the Philippines from 1988 until his resignation in 1993. *Id.* ¶¶ 194, 196-97. He also served as director of MWL's office in the Philippines. *Id.* ¶ 195. Plaintiffs' allegations focus on **Khalifa's** tenure with IIRO.

[17] *See* IIRO Brief at Background, Section V.C.2., discussing **Khalifa** allegations.

14

was a different Islamist separatist group established in 1984 in the Philippines. *Id.* ¶¶ 224-25. In the 1990s, MWL assisted the Philippines government and **MILF** in negotiating a peaceful resolution of their conflict, *id.* ¶¶ 226-28, and in the 1990s, *before 9/11*, the Philippines government invited **Al-Obaid**, then SG of MWL, to attend a peace ceremony between the two. *Id.* ¶ 229. **MILF** has never been designated by **OFAC**. *Id.* ¶ 221.

Plaintiffs have no evidence that **MILF** had any foreknowledge of or was involved in the planning or execution of the 9/11 Attacks. *Id.* ¶ 218. They also have no evidence tracing **MILF** funds or in-kind support to the planning or execution of the 9/11 Attacks or to Al Qaeda. *Id.* ¶¶ 219-20. Even if Plaintiffs did have such evidence, there is no evidence that MWL was the source of such funds or in-kind support. *Id.* ¶ 222. Plaintiffs also have no evidence showing that MWL was aware or had knowledge before 9/11 of any connection between **MILF** and Al Qaeda, which does not exist. *Id.* ¶¶ 221, 223, 230.

### 3. Missionaries

Plaintiffs have asserted that missionaries affiliated with "charities" taught "the ideology of jihad," "propagate[ed] ultra-conservative Wahhabi ideology," and were "primarily focused on propagating the Salafist interpretation of Islam."[18] According to Plaintiffs, this Islamophobia masquerading as expertise connects MWL to Al Qaeda and thus the 9/11 Attacks. But there is no evidence of these alleged connections to Al Qaeda.

Missionaries that coordinated with MWL ("**Missionaries**"), like missionaries of all faiths, went into the field and preached Islam, including the Philippines. The **Missionaries** operated independently of MWL, which did not dictate how or when they operated or preached. *Id.* ¶¶ 213-

---

[18] *E.g.*, Winer Rpt. ¶¶ 9.10.1, 9.16 (ECF No. 7344-1), Levitt Rpt. at 29 (ECF No. 9250-33). To the extent MWL cites expert testimony that was excluded following *Daubert* challenges, MWL does so to illustrate Plaintiffs' assertions only and does not assert or concede that any such excluded testimony is part of the record.

17. MWL paid the **Missionaries** a *de minimis* annual or bi-annual stipend, however they were not MWL employees and did not receive a salary or any other benefits. *Id.* 217.

Plaintiffs have no evidence the **Missionaries** had any foreknowledge of or were involved in the planning or execution of the 9/11 Attacks. *Id.* ¶ 208. They also have no evidence tracing the **Missionaries'** funds or in-kind support to the planning or execution of the 9/11 Attacks or to Al Qaeda. *Id.* ¶¶ 209-10. Even if Plaintiffs did have such evidence, there is no evidence that MWL was the source of such funds or in-kind support. *Id.* ¶ 211. Plaintiffs also have no evidence showing that MWL was aware or had knowledge before 9/11 of any connection between the **Missionaries** who coordinated with MWL and Al Qaeda. *Id.* ¶ 212.

### E. The MWL Journal Reveals No Support for Al Qaeda Much Less 9/11

Plaintiffs point to a handful of articles appearing in a journal published by MWL long before 9/11 and allege that they show active support for Al Qaeda.[19] *Id.* ¶¶ 315, 317-18, 324. They do not. The MWL Journal included articles by authors unaffiliated with MWL, and MWL explicitly disclaimed acceptance of the views expressed in the journal, writing: "Views expressed in the columns of The MWL Journal do not necessarily represent those of the Editorial Board or the Muslim World League." *Id.* ¶¶ 322, 325. One article that Plaintiffs cite, published in 1981, predates the founding of Al Qaeda by nearly a decade. *Id.* ¶ 316. According to Plaintiffs, another article published in 1994, *Child Upbringing in Islam,* advocates children participating in jihad.[20] *Id.* ¶ 319. But the article is about children's education, and the specific subsection cited by Plaintiffs emphasizes a peaceful upbringing, concluding that a child "should be taught how to live in peace with non Muslims in so far as they have not prevented him from following his religion interact with them respect and help them just as the Noble Prophet and his companions treated

---

[19] *See*, *e.g.*, Kohlman Rpt. ¶¶ 30, 36-48 (citing various publications dating between 1981 and 1995); Levitt Rpt. ¶¶ 92.1-92.4 (same).
[20] Kohlman Rpt. ¶ 42 n.49; Levitt Rpt. at 28 (ECF No. 9250-33).

them during their period." *Id.* ¶¶ 320. The rest of the article contains a mélange of instructions on child-rearing, including encouraging children to love and avoid selfishness. *Id.* ¶ 321. In any event, the author, Abdul Malik Bappa Mahmud, was not affiliated with MWL, as reflected by the fact that he was not listed on the masthead, and MWL explicitly declined to adopt the views stated therein. *Id.* ¶¶ 322-23. Plaintiffs' cherry-picked quotes are taken out of context. The publications simply do not show any support for Al Qaeda, much less any involvement in the 9/11 Attacks.

**F.    The Acts of Individuals Do Not Connect MWL to Al Qaeda or the 9/11 Attacks**

Plaintiffs allege that two former MWL employees, **Jelaidan** and **Khalifa**, were connected to Al Qaeda. Both were members of the **MAK**, but neither joined **Bin Laden** when he left to form Al Qaeda. SOF ¶¶ 187, 203-04. **Khalifa**, who married one of **Bin Laden's** half-sisters in the early 1980s, opposed **Bin Laden's** decision to leave, and this led to a falling out between the two men. *Id.* ¶¶ 203. In any case, there is no evidence MWL had knowledge before 9/11 of a connection between **Jelaidan** or **Khalifa** and Al Qaeda — if one existed. *Id.* ¶¶ 189, 205.

**1.    Jelaidan**

**Jelaidan** was an employee of MWL for approximately five years, serving as director of the Pakistan office in Islamabad from 1990 until 1994, and then briefly working in the Head Office, until his resignation on November 1, 1995. *Id.* ¶ 175-76. **Jelaidan** did not return to work for MWL after this date, which was nearly six years before the 9/11 Attacks. *Id.* ¶ 176.

In 2002, about seven years *after* he left MWL and *after* 9/11, **Jelaidan** was designated by **OFAC** and the UN. *Id.* ¶¶ 183, 185.[21] **OFAC** designated the **Rabita Trust**—which it alleges supported Al Qaeda—because it was run by **Jelaidan**, and later designated **Jelaidan** for running the **Rabita Trust**. *Id.* ¶ 184. The purported bases for the designation of **Jelaidan** are unsubstantiated and inconclusive. *Id.* ¶¶ 403-12. In any event, any alleged support for Al Qaeda

---

[21] The UN designated **Jelaidan** in September 2002 but later delisted him on August 26, 2014. *Id.* ¶¶ 185-86.

during the time he ran the Rabita Trust (beginning February 15, 1999) was not given during his tenure with MWL (1990-1995) and, in any case, would have been outside of the scope of his employment and in violation of MWL policies. *Id.* ¶¶ 50, 176, 178.

Plaintiffs have no evidence that **Jelaidan** had any foreknowledge of or involvement in the planning or execution of the 9/11 Attacks. *Id.* ¶ 171. They also have no evidence tracing **Jelaidan's** funds or in-kind support to the planning or execution of the 9/11 Attacks or to Al Qaeda. *Id.* ¶¶ 172-73. Even if Plaintiffs did have such evidence, there is no evidence that MWL was the source of such funds or in-kind support. *Id.* ¶ 174. Plaintiffs also have no evidence showing that MWL was aware or had knowledge before 9/11 of any connection between **Jelaidan** and Al Qaeda. *Id.* ¶¶ 182, 187-89.

### 2.    Khalifa

Plaintiffs contend that **Khalifa**—through his work for IIRO—supported Al Qaeda, **ASG,** and **MILF,** and that this support created an indirect link between IIRO and Al Qaeda, and an even more attenuated link, between MWL and Al Qaeda. The evidence does not substantiate these assertions. *Id.* ¶¶ 202-07, 377. **Khalifa** resigned from both MWL and IIRO in 1993. *Id.* ¶¶ 194, 197. Plaintiffs' allegations focus on **Khalifa's** tenure with IIRO and purport to link his work through IIRO (not MWL) to **ASG** and **MILF**. **Khalifa** was involved in several independent business projects which were unrelated to his work with IIRO or MWL. *Id.* ¶¶ 199-200. **Khalifa** had no connection with MWL following his resignation from MWL in 1993.[22] *Id.* ¶ 201.

Plaintiffs have no evidence that **Khalifa** had any foreknowledge of or involvement in the planning or execution of the 9/11 Attacks. *Id.* ¶ 190. They also have no evidence tracing **Khalifa's** funds or in-kind support to the planning or execution of the 9/11 Attacks or to Al Qaeda. *Id.* ¶¶

---

[22] **Khalifa** was arrested in 1994 in the United States and extradited to Jordan, where he had been tried in absentia for his alleged involvement in the bombing of a theater there, but he was then acquitted and freed. SOF ¶ 198. When arrested in 1994, Muhammad Jamal Khalifa had no relationship whatsoever to MWL. *Id.*

191-92. Even if Plaintiffs did have such evidence, there is no evidence that MWL was the source of such funds or in-kind support. *Id.* ¶ 193. Plaintiffs also have no evidence that MWL was aware or had knowledge before 9/11 of any connection between **Khalifa** and Al Qaeda. *Id.* ¶ 202, 205.

### G. In the 1990s, Individuals and Groups Not Affiliated with Bin Laden or Al Qaeda Planned and Executed Terrorist Attacks

Plaintiffs attempt to connect MWL to certain pre-9/11 attacks that did not involve **Bin Laden** or Al Qaeda. There is no evidence connecting MWL to these attacks, which are not relevant to Plaintiffs' claims in any case. *Id.* ¶¶ 290, 293, 300, 304-06. In 1993, Ramzi Yousef ("**Yousef**"), who was not a member of Al Qaeda, masterminded the bombing of the parking garage of the World Trade Center. *Id.* ¶ 291. Al Qaeda was not involved in the World Trade Center Bombing. *Id.* ¶ 292. There is also no evidence that MWL had any knowledge of or involvement in the World Trade Center Bombing. *Id.* ¶ 290.

The Bojinka Plot refers to a collection of planned attacks in 1995 by **Yousef**, Khalid Sheikh Muhammad ("**KSM**"), and Wali Khan Amin Shah ("**Shah**"), which, fortunately, did not occur. *Id.* ¶ 294. The plan included bombing American planes over the Pacific, bombing cargo carriers, and assassinating President Clinton and the Pope. *Id.* Al Qaeda did not direct the Bojinka Plot, and **Yousef**, **KSM**, and **Shah** were not Al Qaeda members at the time. *Id.* ¶¶ 295-99. There is no evidence that MWL had any knowledge of or involvement in the Bojinka Plot. *Id.* ¶ 293. Plaintiffs' attempts to throw these events into the mix is illustrative of the incoherent jumble of events that they argue were somehow part of a path to 9/11.

There is no reliable evidence that Al Qaeda was behind the so-called Indian Consulates Plot, involving a purported plan to attack U.S. consulates in Madras and Calcutta. The 9/11 Commission Report does not mention the plot. *Id.* ¶ 303. In any case, Plaintiffs have no evidence

19

that MWL had knowledge of or involvement in the Indian Consulates Plot, *id.* ¶¶ 302-04, which

has nothing to do with 9/11.

### H. MWL Was Not Involved in the 1998 African Embassy Bombings or the U.S.S. Cole Bombing

There is no evidence that MWL had any knowledge of or involvement in the 1998 African

Embassy Bombings or the U.S.S. Cole Bombing, ¶¶ 300-01, 305-07, which like all the other events

discussed in this section, were horrific. Plaintiffs allege that two purported employees of MWL—

Wadih el Hage and Ihab Ali—were involved in the embassy bombings. However, there is no

evidence that either of these individuals ever worked for MWL in any capacity, or that MWL

otherwise had any knowledge of or involvement in these attacks. *Id.* ¶ 300. In any event, the

purported employment of these individuals by MWL, even in Plaintiffs' telling, occurred in the

1980s, more than a decade before these attacks and three years before 9/11.[23] Therefore, even if

these two individuals had been employed by MWL over a decade before 9/11, such employment

would be irrelevant to the attacks, which are themselves not relevant to 9/11.

Plaintiffs also cannot connect MWL to the 2000 U.S.S. Cole Bombing. There is no

evidence that MWL had any knowledge of or involvement in this attack, *id.* ¶¶ 305-06, which, like

all the other events discussed in this section, was horrific, but not what is at issue in this case. It is

yet another attempt to lump together a long series of unrelated events and should be disregarded.

### IV. Procedural Posture

### A. The Court Dismissed Most of Plaintiffs' Claims

Plaintiffs initially asserted federal and state law claims against MWL, including violations

of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Torture Victims

Protection Action ("TVPA"), the Alien Tort Statute ("ATA"), and the Alien Tort Claims Act

---

[23] *See* ECF No. 1463 ¶¶ 224-25.

("ATCA"), as well as claims for violations of international law, negligence, conspiracy, aiding and abetting, and certain intentional torts. As detailed in the Procedural Posture Section of the IIRO Brief, which MWL hereby incorporates by reference, the Court dismissed most of these claims as against IIRO, leaving only the ATA claims, the ATA-associated claims, such as wrongful death and survival, which were revived when Congress adopted JASTA, and certain timely-asserted intentional tort claims.

### B.    There Are No Independent Allegations Against MWL

Although MWL did not move to dismiss Plaintiffs' claims, the Court explained that Plaintiffs assert liability against MWL only by imputing to it IIRO's liability.[24] Therefore, the claims previously dismissed as against IIRO should also be dismissed as to MWL.[25]

### C.    Discovery

In the course of this litigation, MWL and IIRO produced approximately 500,000 pages of documents to Plaintiffs. SOF ¶¶ 433-34. Eight facts witnesses, including **Al-Turki, Al-Obaid,** and **Basha,** were deposed. *Id.* ¶ 435. Plaintiffs and MWL and IIRO proffered 11 experts, who produced reports and declarations and were deposed. *Id.* ¶ 436. As discussed below, much of the testimony of Plaintiffs' experts was excluded following Defendants' *Daubert* challenges. Plaintiffs did not take a 30(b)(6) deposition of MWL or IIRO. *Id.* ¶ 437.

### D.    Plaintiffs' ATA Claims Have Been Significantly Weakened

Although the Court permitted Plaintiffs' ATA claims against IIRO to proceed, subsequent orders significantly weakened them. In 2005, the Court found that the allegations contained in the *Ashton*, *Burnett*, and *Federal* complaints "stated a claim under the ATA in that IIRO has allegedly

---

[24] *See In re Terrorist Attacks on Sept. 11, 2001* ("*Terrorist Attacks II*"), 392 F.Supp.2d 539, 563 (S.D.N.Y. 2005) (citing *Ashton* and *Federal* complaints).

[25] *See id*. at 566, 575; *In re Terrorist Attacks on Sept. 11, 2001* ("*Terrorist Attacks I*"), 349 F.Supp.2d 765, 829 (S.D.N.Y. 2005); *In re Terrorist Attacks on Sept. 11, 2001* ("*Terrorist Attacks V*"), 740 F.Supp.2d 494, 514, 514 n.6, 515 (S.D.N.Y. 2010); *In re Terrorist Attacks on Sept. 11, 2001* ("*Terrorist Attacks IX*"), 714 F.3d 118, 125-26, 126 n.4 (2d Cir. 2013).

21

funded Al Qaeda training camps in Afghanistan, supported Al Qaeda guest houses, and been involved in other terrorist attacks and plots . . . [t]hrough its relationship with Mohammed Jamal Khalifa," who headed IIRO's Philippines branch office.[26] Plaintiffs' claims against **Khalifa** were later dismissed on personal jurisdiction grounds because "allegations of Khalifa's involvement in terrorist activities, during the 1990's," are too remote from the 9/11 Attacks to establish causation.[27] The Court also rejected the evidence on which Plaintiffs' allegations against IIRO relied: (1) Plaintiffs had no evidence that funds in IIRO's Dubai Islamic Bank ("DIB") account were used "to fund Al Qaeda or carry out 9/11;"[28] and (2) excerpts of *The Muslim World* regarding Prince Sultan's donations to IIRO contained *"no indication . . . that IIRO . . . was funneling donations to Al Qaeda."*[29] These findings preclude reliance on such evidence against MWL or IIRO in this action.

In its 2010 decision granting several defendants' motions to dismiss, the Court made four findings relevant to Plaintiffs' ATA claims against IIRO. *First*, the ATA does not impose direct liability on "those who allegedly aided, abetted, conspired and/or provided material support to

---

[26] *Terrorist Attacks II*, 392 F.Supp.2d at 563, 569.

[27] *Terrorist Attacks V*, 740 F.Supp.2d at 509. For this reason, the Court found that "Plaintiffs have failed to demonstrate that Khalifa is subject to personal jurisdiction." *Id. See also In re Terrorist Attacks on Sept. 11, 2001* ("Terrorist Attacks XIII"), 295 F.Supp.3d 416, 423 n.8 (S.D.N.Y. 2018), *rev'd and remanded as to another defendant sub nom.*, *Underwriting Members of Lloyd's Syndicate 2 v. Al Rajhi Bank*, 779 F. App'x 66 (2d Cir. 2019) (finding Saudi Binladin Group's alleged support to **Khalifa** insufficient to subject it to personal jurisdiction because Plaintiffs "do not allege that Khalifa . . . was connected in any material way to the 9/11 Attacks"). Although made in the personal jurisdiction context, this finding of a lack of connection between **Khalifa** and the 9/11 Attacks is relevant to the merits of Plaintiffs' ATA claim, which requires a stronger showing of causation than is necessary for personal jurisdiction. *Compare Terrorist Attacks IX*, 714 F.3d at 123-24 (ATA requires proximate causation), *with Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021) (indicating that the specific-jurisdiction inquiry has not been framed "as always requiring proof of causation" and "some relationships will support jurisdiction without a causal showing").

[28] *See In re Terrorist Attacks on Sept. 11, 2001*, 2023 WL 2430381, at *5, *5 n.4 (noting that "[n]one of these [Dubai Islamic Bank] accountholders"—including IIRO—"appeared on pre-9/11 OFAC lists," rejecting Plaintiffs' argument that "this fact is irrelevant," and further finding, "Plaintiffs present no evidence that individuals or entities [including IIRO] used money from these DIB accounts to fund Al Qaeda or carry out 9/11"); *see also id.*, at *12 ("But there is no specific evidence that any of the accounts held by individuals or individuals with links to Al Qaeda [allegedly including IIRO] provided funding for the terrorist organization's operations, let alone for the 9/11 Attacks.").

[29] *See Terrorist Attacks I*, 349 F.Supp.3d at 799 ("Exhibits 21-24 are excerpts from *The Muslim World* regarding Prince Sultan's donations to IIRO and the Joint Saudi Committee for Relief of Kosovar Refugees ("JSCRS"). *There is no indication in these exhibits that IIRO or JSCR was funneling donations to Al Qaeda*.") (emphasis added).

other terrorist organizations that were affiliated with Al Qaeda" but did not play any "specific role" in the 9/11 Attacks.[30] *Second*, there is no direct liability under the ATA for: (a) promoting an ideology that is supported by Al Qaeda; (b) expressing support for Al Qaeda through activities protected by the First Amendment, such as advocacy or lobbying; or (c) engaging in conduct that promotes one's own ideological goals (such as publishing religious statements) but does not involve support "to" Al Qaeda.[31] *Third*, an entity defendant is not liable for wrongful conduct committed by its "independent subsidiaries" or "purported subsidiaries."[32] *Fourth*, provision of material support to Osama **Bin Laden** while he was in Sudan during the early 1990s, when "[t]he United States had not even been targeted by Al Qaeda," is too temporally remote to support proximate causation.[33] These findings render irrelevant virtually all of the evidence on which Plaintiffs have relied in formulating their claims.

In 2013, the Second Circuit substantially narrowed the reach of the ATA. It reaffirmed that the statute requires proximate causation between a defendant's act and the plaintiff's injuries, and as a result does not provide for aiding and abetting liability.[34] In the case of charities, proximate causation requires allegations that "the money allegedly donated [to the charities] actually was transferred to Al Qaeda and aided in the September 11, 2001 attacks."[35] Here again, the facts that

---

[30] *Terrorist Attacks V*, 740 F.Supp.2d at 513.

[31] *Id.* at 518-520, 523 (dismissing claims against Council on American-Islamic Relations and Islamic Assembly of North America).

[32] *Id.* at 521.

[33] *Id.* In 2023, the Court held that Sudan's support for **Bin Laden** during this same time period satisfied proximate causation for purposes of subject-matter jurisdiction under the Foreign Sovereign Immunities Act (FSIA). *See In re Terrorist Attacks on Sept. 11, 2001*, 2023 WL 5132138, at *5-8 (S.D.N.Y. Aug. 10, 2023). The Court then cited exclusively to this finding on subject-matter jurisdiction when holding that merits proximate causation under the ATA was also satisfied. *See id.*, at *10. However, the Court conflated its findings on jurisdictional proximate causation under the FSIA with merits proximate causation under the ATA; in 2018, the Court rejected this very equivalence between the two statutes' approaches to proximate causation: "The portions of the cases [Defendants] cite address standards for proximate cause necessary to state claims under the ATA and RICO statutes. It is well settled, however, that jurisdictional causation under the FSIA is distinct from *and more liberal than* the substantive causation elements of any one claim." *Terrorist Attacks XIV*, 298 F.Supp.3d at 645 n.8 (emphasis added).

[34] *Terrorist Attacks IX*, 714 F.3d at 123-24 (citing *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013)).

[35] *Id.*

virtually all of the allegations are multiple steps removed from Al Qaeda and the 9/11 Attacks and date back to the 1980s, and that there is not a single piece of hard evidence tracing funds from MWL to Al Qaeda are fatal to Plaintiffs' case under the Second Circuit's ruling in this MDL.

### E.    Courts Have Made Several Relevant Decisions Concerning JASTA

In 2016, Congress amended the ATA with JASTA, which extends liability to a party who "aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism."[36] This Court, the Second Circuit, and the Supreme Court have issued several relevant decisions concerning JASTA, which are discussed below in relevant part.

### F.    The Court Excluded Key Portions of Plaintiffs' Expert Testimony

In April 2023 and August 2025, Judge Netburn granted in part MWL's and others' *Daubert* motions to exclude the testimony of Plaintiffs' proffered experts.[37] Judge Netburn excluded significant portions of these proffered experts' reports and testimonies because, *inter alia*, she concluded that they were unqualified to opine on various topics, attempted to mislead the Court about their qualifications, improperly offered legal conclusions or opined on states of mind, reached conclusions based only on their own *ipse dixit*, included substantial irrelevant background materials, and laundered hearsay. For example, she ruled that Jonathan Winer, whose "naked use of 'cut and paste' [of the 9/11 Commission Report] has no place in an expert report," "engages in speculation," "imagine[s] new [facts]," takes irrelevant "detours into the lifestyles of the rich and famous," and, in a "disturbing turn," "traffick[s] in stereotypes" about persons of Middle Eastern

---

[36] *See* Justice Against Sponsors of Terrorism Act, Pub. L. 114-222, § 4(a), 130 Stat. 852, 854 (2016) (codified at 18 U.S.C. § 2333(d)(2)).

[37] *See In re Terrorist Attacks on Sept. 11, 2001* ("*Charity Daubert I*"), 2023 WL 3116763 (S.D.N.Y. Apr. 27, 2023), *report and recommendation adopted*, 2026 WL 769787 (S.D.N.Y. Mar. 18, 2026); *In re Terrorist Attacks on Sept. 11, 2001* ("*Charity Daubert II*"), 2025 WL 2383768 (S.D.N.Y. Aug. 18, 2025), *report and recommendation adopted*, 2026 WL 769787 (S.D.N.Y. Mar. 18, 2026).

origin.[38] Such strong language reflects the degree to which Plaintiffs have used unqualified ideologues to attempt to convert untenable opinions into an evidentiary basis for this case. Judge Netburn also excluded Matthew Levitt from testifying on religious matters, on which he is not an expert, offering legal conclusions "throughout his report," and opining on irrelevant non-Defendant charities.[39]

Judge Netburn also made a litany of disqualifying findings as to Evan Kohlmann. Among his shortcomings are his "disquieting" misrepresentations of his credentials, his inaccurate intimation that his work is universally peer reviewed, that "his 'experience' consists of only one full-time job," that he "has no professional experience in the relevant field," that his work has not been published in "academic journals or other publications known for rigorous journalistic standards," and his "imprecision" about the publisher of his book.[40] As to reliability, "[i]n one troubling example, he erases a phrase [("not for financing terrorism")] from a quotation that directly contradicts his thesis," and also misidentified individuals, including *erroneously identifying an individual as being a 9/11 hijacker*.[41] As a result, his report did not "reflect the level of intellectual rigor Rule 702 contemplated."[42] Overall, Kohlmann demonstrated "carelessness, selective presentation of the evidence, and reliance on speculation and his own *ipse dixit*."[43] His report is not helpful because he "crosses th[e] line on several occasions" into offering legal conclusions, "repeatedly opines about individuals' and organizations' subjective intent," and "frequently, he simply parrots [hearsay] he has read or heard."[44] Judge Netburn found such

---

[38] *Charity Daubert I*, 2023 WL 3116763, at *10-12.
[39] *Charity Daubert II*, 2025 WL 2383768, at *19-20.
[40] *Id.,* at *9-11, *9 n.9 (after suggesting that Oxford University Press published his book, he admitted the publisher was Berg and declared it a university press).
[41] *Id.*, at *13, *13 n.12.
[42] *Id.*, at *13 n.12 (quoting *Charity Daubert I*, 2023 WL 3116763, at *16).
[43] *Id.*, at *14.
[44] *Id.*, at *14-15.

25

"serious shortcomings of his qualifications and reliability" that, in addition to excluding much of his testimony, she recommended that the trial court "evaluate whether Kohlmann should be permitted to testify at all" or whether it should instead rely on "other experts" where they are "more reliable."[45] Here again, strong language to capture the outrageousness of the expert's deficiencies.

By contrast, as to MWL and IIRO's experts, Judge Netburn "largely admitted" Jonathan Benthall's report and admitted all of John Sidel's testimony, except for a few pages of background information, which she found not relevant.[46] This Court adopted Judge Netburn's *Daubert* decisions "in their entireties"[47] and specified that Judge Netburn "properly concluded that there were serious concerns about Mr. Kohlmann's testimony, especially based on his questionable 'experience' and 'training,' the limited pressure testing of his conclusions by real-world exposure or academic review, and his tendency to misstate facts, rely on speculation, and jump from 'accepted premises to unfounded conclusions.'"[48]

Effectively, Plaintiffs try to use terrorism "experts" to speculate that propagating Islam is somehow synonymous with promoting terror. This Court's rulings eviscerates that tactic.

## ARGUMENT

### I.    Summary Judgment Is Appropriate Because There Is No Genuine Issue of Material Fact

Courts grant summary judgment "when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."[49] While the moving party bears the "burden of demonstrating that no genuine issue of material fact exists," the opposing party may not "rely on conclusory allegations or unsubstantiated speculation" or "simply show that there is

---

[45] *Id.*, at *16.

[46] *Id.*, at *22 (noting that in her prior opinion, Judge Netburn "largely admitted [Mr. Benthall's] testimony") (citing *Charity Daubert I*, 2023 WL 3116763, at *13-15).

[47] *In re Terrorist Attacks on Sept. 11, 2001*, 2026 WL 769787, at *6 (S.D.N.Y. Mar. 18, 2026).

[48] *Id.*, at *5 (alterations adopted).

[49] *Cid v. BB Mgmt. of New York Corp.*, 2022 WL 4095910, at *1 (S.D.N.Y. Sept. 7, 2022) (Daniels, J.) (citing Fed. R. Civ. P. 56(a)).

some metaphysical doubt as to the material facts" to raise a genuine issue of material fact.[50] A fact is material when it might affect the outcome of the suit; a genuine issue of material fact exists if the admissible evidence is such that a reasonable jury could return a verdict for the nonmoving party.[51] Expert opinions that are conclusory or that lack factual basis and are based on speculation or conjecture are "inappropriate material for consideration on a motion for summary judgment,"[52] and where an expert's testimony conflicts with the indisputable record, that expert's testimony cannot generate an issue of fact.[53] Where, as here, "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to its case."[54] Consequently, a "defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case."[55]

## II.    There Is No Basis to Find that MWL Is Directly Liable for the 9/11 Attacks

Following 20 years of litigation, Plaintiffs have been forced to confront the lack of any evidence substantiating their allegations that MWL is directly liable for the 9/11 Attacks. Plaintiffs cannot show that MWL knew a single thing about Al Qaeda's plans to carry out the 9/11 Attacks,

---

[50] *Id.* (quotations omitted).

[51] *Id.*; *see also Rubens v. Mason*, 387 F.3d 183, 189 (2d Cir. 2004) (at summary judgment, courts "may rely only on material that would be admissible at trial").

[52] *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008).

[53] *See Barrett v. Black & Decker (U.S.) Inc.*, 2008 WL 5170200, at *7 (S.D.N.Y. Dec. 9, 2008) (quoting *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 242 (1993)) ("When an expert opinion is not supported by sufficient facts to validate it [under] the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."); *Harris v. Key Bank Nat'l. Ass'n.*, 193 F.Supp.2d 707, 716 (W.D.N.Y. 2002), *aff'd*, 51 F. App'x 346 (2d Cir. 2002) (Expert opinion cannot create an issue of fact if it "is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable.") (quotation omitted); *Miller v. Astucci U.S. Ltd.*, 2007 WL 102092, at *14 (S.D.N.Y. Jan. 16, 2007) ("[P]ortions of [expert's] testimony and Report will be excluded to the extent he seeks to assert [facts] … completely contrary to the record.").

[54] *Gayle v. Villamarin*, 2021 WL 4173987, at *2 (S.D.N.Y. Sept. 14, 2021) (Daniels, J.) (quoting *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993)).

[55] *Id.* (quoting *Allen v. Cuomo*, 100 F.3d 253, 258 (2d Cir. 1996); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

let alone that MWL supported those plans. Instead, Plaintiffs theorize that MWL contributed to Al Qaeda's "global strike capabilities," whatever that is supposed to mean. In any event, it does not mean the 9/11 Attacks. This "global strike capabilities" theory is also not supported by the evidence, but even if it were, it would not be enough. To satisfy a direct liability claim under the ATA, Plaintiffs must prove that MWL (1) committed an act of international terrorism, (2) had the requisite mental state, and (3) proximately caused Plaintiffs' injuries.[56] Plaintiffs fail totally on all three elements.

By pursuing this "global strike capabilities" theory, Plaintiffs effectively concede that there is no nexus between MWL's alleged acts and the 9/11 Attacks. Plaintiffs' intentional tort claims likewise require a showing that MWL knew about and intended to aid Al Qaeda in its plan to carry out the 9/11 Attacks, and that conduct by MWL proximately caused the 9/11 Attacks. For the same reasons that Plaintiffs cannot succeed on their ATA claims, they also cannot establish that MWL committed any intentional tort.

### A.    MWL Did Not Proximately Cause the Plaintiffs' Injuries

All of Plaintiffs' direct liability claims fail because Plaintiffs cannot even begin to prove that MWL proximately caused the 9/11 Attacks. To establish proximate causation,[57] Plaintiffs must show that: (1) MWL's "acts were a 'substantial factor' leading to the injury and (2) the injury was a "'reasonably foreseeable' or 'natural consequence' of those actions."[58] There is no way for

---

[56] *Sokolow v. Palestine Liberation Org.*, 60 F.Supp.3d 509, 514-15 (S.D.N.Y. 2014) (Daniels, J.); *see also In re Terrorist Attacks on Sept. 11, 2001*, 2023 WL 5132138, at *10 (subsequent history omitted).

[57] *See In re Terrorist Attacks on Sept. 11, 2001*, 2021 WL 1164087, at *2 (S.D.N.Y. Mar. 26, 2021) (noting that "proximate causation" is "necessary to sustain a claim of primary liability under the ATA").

[58] *In re Terrorist Attacks on Sept. 11, 2001*, 2023 WL 5132138, at *5, *clarified on reconsideration on other grounds,* 2024 WL 809887 (S.D.N.Y. Feb. 27, 2024), *appeal dismissed,* 117 F.4th 13 (2d Cir. 2024) (citations omitted). *See also id.* ("As the Report details, Plaintiffs have adequately pled that: (1) Sudan's provision of support to Al Qaeda was a 'substantial factor' in the 9/11 Attacks; and (2) mass death, injury, and destruction on 9/11 were 'reasonably foreseeable' consequences of Sudan's support.").

28

Plaintiffs to make this showing, and summary judgment on all of Plaintiffs' direct liability claims is justified on this basis alone.[59]

On the same attenuated allegations before the Court today, this Court already decided that MWL *did not* "*cause[]* Plaintiffs' injuries arising out of the 9/11 Attacks."[60] In 2018, this Court considered the motion to dismiss for lack of subject matter jurisdiction of Saudi Arabia and rejected Plaintiffs' theory that Saudi Arabia proximately caused the 9/11 Attacks *through* MWL (and other charities) because the allegations were insufficient to establish proximate causation as to the charities themselves.[61] In effect, Plaintiffs sought to hold Saudi Arabia liable for alleged actions of MWL based on an agency or alter ego theory. But the Court explicitly found that the allegations, even if the acts could be attributed to Saudi Arabia, were insufficient to establish liability as alleged.[62] As that decision held, only actions connected proximately in time and causation to the 9/11 Attacks can support claims against MWL; these claims were insufficient, and therefore even if Saudi Arabia was responsible for the alleged actions of MWL, there was no subject matter jurisdiction.[63] Thus, there is already a ruling in this case that Plaintiffs' attenuated allegations against MWL are insufficient. If they were insufficient against Saudi Arabia as a derivative matter, they are necessarily insufficient against MWL.

---

[59] *See, e.g.*, *Terrorist Attacks IX*, 714 F.3d at 126 (affirming dismissal of intentional infliction of emotional distress, assault and battery, trespass, and wrongful death claims for failure to establish proximate causation); *id.* at 123-24 (citing *Rothstein*, 708 F.3d at 97) (ATA requires proximate causation, and for charities, proximate causation requires that "the money allegedly donated [to the charities] actually was transferred to Al Qaeda and aided in the September 11, 2001 attacks"); *In re Terrorist Attacks on Sept. 11, 2001*, 2008 WL 7073447, at *4 (S.D.N.Y. Dec. 23, 2008) (proximate causation necessary to sustain negligence claim).

[60] *Terrorist Attacks XIV*, 298 F.Supp.3d at 658 (emphasis in original); *see also id.* at 655 n.16 (identifying MWL as one of the charities to which the Court's finding applies).

[61] *Id.* at 658-59; *see also id.* at 645 n.8 (explaining that establishing proximate cause for substantive liability demands more than is required to establish FSIA jurisdiction).

[62] *Id.* at 658-59.

[63] *Id.*

The allegations that were found insufficient included that the charities, including MWL, knowingly provided: (1) support to *other entities* that directed funds to Al Qaeda; (2) funds, equipment, and supplies to establish terrorist training camps in Afghanistan and to enable Al Qaeda operatives—including "some or all of the September 11 hijackers"—to travel to such facilities; (3) travel documentation and visas, including for travel to terrorist training camps in Afghanistan; and (4) secret courier services for Al Qaeda.[64] The Court found that "the vast majority of Plaintiffs' allegations involve[d] alleged acts by the charities to aid and support Al Qaeda's efforts in Europe, Africa, the Middle East, and the Far East during the 1980s and 1990s," and thus did not "bear any definite and specific, articulable connection to the 9/11 Attacks or those who carried them out."[65] The same logic applies to Plaintiffs' other stale (and often unsubstantiated) allegations. *See supra* Background, Section III. The 2018 Opinion makes very clear that the focus of this action is 9/11, not a twenty-year path that lacks temporal or factual congruence with the 9/11 Attacks. Plaintiffs are even worse off now on summary judgment because they cannot prove their (already insufficient) allegations.[66]

In fact, in this MDL, the Court has only found proximate causation *at the motion to dismiss stage* based on allegations that defendants *participated in the 9/11 Attacks* or *provided support directly to Al Qaeda*,[67] such as by providing "extraordinary banking services for Al Qaeda" including "direct and specific" transfers of money to two of the 9/11 hijackers for use in the attacks;[68] providing guidance, diplomatic passports, and other resources *close in time* to the attacks

---

[64] *Id.*

[65] *Id.* at 659.

[66] *See In re Arcapita Bank B.S.C.(C)*, 640 B.R. 604, 616 (S.D.N.Y. 2022) (citing *In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991)) ("[A] decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation.").

[67] *Terrorist Attacks IX*, 714 F.3d at 124 (absence of proximate cause foreclosed section 2333(a) and state-law claims).

[68] *In re Terrorist Attacks on Sept. 11, 2001* ("*Terrorist Attacks IV*"), 718 F.Supp.2d 456, 493 (S.D.N.Y. 2010). DIB has now been dismissed. *In re Terrorist Attacks on Sept. 11, 2001*, 2023 WL 2430381, at *5 (finding no evidence of any money from any DIB account being used for the attacks).

30

(until at least 2000) that "increased Al Qaeda's 'operating capacity'";[69] and raising and laundering funds for Al Qaeda, performing reconnaissance missions, and facilitating Al Qaeda training camps.[70] None of that happened here, and Plaintiffs cannot argue otherwise. This lack of "any definite and specific, articulable connection to the 9/11 Attacks or those who carried them out," coupled with attenuated allegations that lack temporal proximity to 9/11, precludes a finding of proximate causation as a matter of law,[71] particularly at the summary judgment stage where Plaintiffs' burden increases from plausible allegations to presenting sufficient, admissible evidence.

### B.    MWL Did Not Have the Requisite Mental State

Also dispositive of Plaintiffs' direct liability claims is the lack of any evidence that MWL knew about or intended to support Al Qaeda's plans to commit the 9/11 Attacks. To succeed on their ATA direct liability claims, Plaintiffs must establish that MWL had the mental state required for the underlying "predicate act."[72] Plaintiffs will likely point to 18 U.S.C. §§ 2339A and 2339B, both of which require Plaintiffs to show that MWL knew it was supporting terrorism. The ATA *also* requires Plaintiffs to establish that MWL "*committed a terrorist act* intentionally, knowingly, or recklessly."[73] Plaintiffs cannot make either of these showings. The knowledge threshold is similar for Plaintiffs' intentional tort claims, and equally unattainable.[74] In sum, Plaintiffs must

---

[69] *In re Terrorist Attacks on Sept. 11, 2001*, 2023 WL 5132138, at *7 (finding FSIA terrorism exception requires proximate causation and noting fungibility of funds); *but see infra* at Argument, Section III.B.1.b (explaining that fungibility of funds fails general awareness element of aiding and abetting claim).

[70] *Terrorist Attacks V*, 740 F.Supp.2d at 519-20.

[71] *Terrorist Attacks XIV*, 298 F.Supp.3d at 659; *see also* ECF No. 8862 (Feb. 2023) (denying reconsideration of dismissed Plaintiffs' charity-centered allegations in March 2018); *Terrorist Attacks V*, 740 F.Supp.2d at 508-09 (for jurisdictional purposes, any involvement by **Khalifa** in terrorist activities during the 1990s, including the 1993 World Trade Center Bombing and the 1995 Bojinka Plot, too far removed in time from 9/11); SOF ¶ 197 (**Khalifa** left IIRO in 1993).

[72] *Ahmad v. Christian Friends of Israeli Communities*, 2014 WL 1796322, at *3 (S.D.N.Y. May 5, 2014), *aff'd*, 600 F. App'x 800 (2d Cir. 2015) (citing *Gill v. Arab Bank, PLC*, 893 F.Supp.2d 474, 504 (E.D.N.Y. 2012)).

[73] *Sokolow*, 60 F.Supp.3d at 515 (emphasis added); *accord Hussein v. Dahabshiil Transfer Servs. Ltd.*, 230 F.Supp.3d 167, 170-71, 171 n.2 (S.D.N.Y. 2017), *aff'd*, 705 F. App'x 40 (2d Cir. 2017).

[74] *See Scribner v. Summers*, 84 F.3d 554, 557 (2d Cir. 1996) (trespass requires *intentional* invasion of property); *Tardif v. City of New York*, 991 F.3d 394, 410 (2d Cir. 2021) (assault requires *intentional* placing of another person in fear of

31

prove that MWL knew that it was supporting the 9/11 Attacks and that it did so intentionally, but there is no evidence that MWL had any knowledge of the 9/11 Attacks before 9/11, let alone that it intentionally supported them.

Both "predicate acts" underlying Plaintiffs' ATA claims require that the defendant had actual knowledge of its support of terrorism. A Section 2339A violation requires knowledge or intent that the defendant's "material support" will be used to aid an enumerated terrorism-related crime.[75] A Section 2339B violation requires knowledge by the defendant both that it was providing material support to an FTO and that the FTO engaged in terrorist activity.[76] MWL did not know or intend—and could not have known or intended—that any alleged "material support" that it provided would be used in aid of 9/11, because MWL did not know about Al Qaeda's plans to carry out the 9/11 Attacks (or any other attacks) until after they happened. MWL also could not have known that any alleged "material support" that it purportedly provided *would* be directed to an FTO because Al Qaeda was not designated until much later.[77] For these reasons, Plaintiffs cannot show that MWL committed a terrorist act intentionally, knowingly, or recklessly.

As explained in Background, Section III. F and Argument, Section V, there is also no evidence that any employees or agents of MWL knew about the 9/11 Attacks, and even less so that any employee or agent acquired knowledge about the 9/11 Attacks "during the course of

---

harm; battery is *intentional* wrongful physical contact); *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996) (intentional infliction of emotional distress requires *intentionally* causing severe emotional distress).

[75] *See Linde v. Arab Bank, PLC* ("*Linde II*"), 882 F.3d 314, 330 n.11 (2d Cir. 2018) (explaining that 2339A requires "proof of knowledge or intent that material support be used in preparation for or in carrying out specified crimes"); *United States v. Stewart*, 590 F.3d 93, 113 (2d Cir. 2009) ("Section 2339A, however, in contrast to section 2339B, does not penalize the provision of material support without regard to what the support is for. Section 2339A requires instead that the defendant provide support or resources *with the knowledge or intent* that such resources be used to commit specific violent crimes.").

[76] *Weiss v. Nat'l Westminster Bank PLC* ("*Weiss I*"), 768 F.3d 202, 208 (2d Cir. 2014).

[77] *See infra* Argument, Section II.C.1, 2 (describing intentional mental state and lack of evidence thereof).

performing his or her job responsibilities" for MWL.[78] Therefore, Plaintiffs cannot prove that MWL had the required mental state to support their direct liability claims.[79]

### C.     MWL Did Not Commit an Act of International Terrorism

Plaintiffs must also show that MWL committed an "act of international terrorism," which is defined in 18 U.S.C. § 2331(1) to require: (i) a violation of federal or state law; (ii) involving violence or endangering human life; (iii) appearing to be intended to intimidate or coerce a civilian population or to influence or affect a government; and (iv) having occurred primarily outside U.S. territorial jurisdiction or transcending national boundaries.[80]

Plaintiffs may identify two "predicate acts" as "act[s] international terrorism": (i) the 9/11 Attacks; and (ii) the provision of material support to Al Qaeda. There is no evidence whatsoever that MWL committed the 9/11 Attacks, SOF ¶ 1, so this "predicate act" cannot support liability. For the provision of material support to Al Qaeda to constitute "a violation of federal or state law," Plaintiffs must show that MWL violated one of the material support statutes: 18 U.S.C. §§ 2339A, 2339B, or 2339C. Plaintiffs cannot do so.

### 1.     MWL Did Not Provide "Material Support" to Al Qaeda

Plaintiffs cannot satisfy the requirements of any of the material support statutes, because MWL did not provide "material support" to Al Qaeda at any time, and certainly not after the statute's enactment. Plaintiffs have asserted that MWL provided support to Al Qaeda through the *mujahideen* during the Soviet occupation of Afghanistan in the 1980s, but the statute had not been enacted then and any support would have constituted "[h]umanitarian assistance," which was excepted from the definition of "material support" in any case. This is part of Plaintiffs' strategy of conflating one war with another, and even in the Soviet war, Plaintiffs have adduced no evidence

---

[78] *Id.*
[79] *Id.*
[80] *Linde II*, 882 F.3d at 326 (citing 18 U.S.C. § 2331(1)).

that MWL directly or knowingly provided anything to Al Qaeda. Plaintiffs have also asserted that MWL provided support to Al Qaeda through **Jelaidan** and **Khalifa**, but both left MWL long before the statute's enactment. SOF ¶¶ 175-76, 194-97, 201. In any case, there is no evidence that either of these ex-employees supported or participated in the 9/11 Attacks. Finally, Plaintiffs have asserted that MWL supported Al Qaeda through the *MWL Journal* or **Missionaries**. As discussed in Background, Section III,D.3., the **Missionaries** did not act for MWL and have not been linked to Al Qaeda. And MWL explained that the views expressed in the journal, which did not express support for Al Qaeda in any case, do not necessarily represent the views of the organization. Moreover, to the extent that any statements in the journal or any conduct by the **Missionaries** are attributed to MWL, they only engaged in conduct that promoted their own ideological goals, which does not constitute material support *to* any third-party.[81]

### 2.    The Material Support Statutes Do Not Apply Retroactively

Plaintiffs cannot show that MWL provided "material support" to Al Qaeda at any time, let alone after the enactment of the material support statutes, which do not apply retroactively. Since Plaintiffs' theory of liability relies entirely on alleged acts taken by MWL before the statutes were enacted, Plaintiffs cannot establish "a violation of federal or state law."[82]

Criminal statutes ordinarily apply only prospectively[83] and within U.S. territory. [84] The ATA adopts the ordinary presumption of prospective application but extends extraterritorially. Section 2333, which provides for a civil cause of action for acts of "international terrorism," "uses

---

[81] *See Holder v Humanitarian Law Project*, 561 U.S. 1, 23 (2010); *Terrorist Attacks V*, 740 F.Supp.2d at 518-520, 523.
[82] *See Boim v. Holy Land Found. for Relief and Dev.*, 549 F.3d 685, 691 (7th Cir. 2008) (reversing judgment because defendant must have "provid[ed] material support *after* the effective date of section 2339A . . . to be liable under section 2333.") (emphasis added); *Owens v. BNP Paribas S.A.*, 235 F.Supp.3d 85, 98 (D.D.C. 2017) (claims dismissed where "the enactment of § 2339C in 2002 post-dates the relevant conduct"); *Strauss v. Credit Lyonnais, S.A.*, 2006 WL 2862704, at *6, 14 (E.D.N.Y. Oct. 5, 2006) (applying version of section 2333B in effect at time of alleged material support).
[83] *Stogner v. California*, 539 U.S. 607, 610-12 (2003).
[84] *RJR Nabisco v. European Community*, 579 U.S. 325, 335-36 (2016).

34

the present tense," referring to acts that "are" a violation of criminal law, and the Supreme Court has admonished that courts "must give that choice 'real significance.'"[85] Acts that "are" violations of criminal law therefore cannot include violations of laws not yet enacted. By contrast, Congress chose to specify that Section 2331(1) broadens the territorial application of criminal laws by including as "international terrorism" an act that "would be a criminal violation if committed within the jurisdiction of the United States or of any State." Congress did not use similar language to extend liability to past violations of criminal law. This contrast must be given effect.

Ordinary canons of statutory construction bolster the conclusion that Section 2333 applies only prospectively. First, "[c]ourts generally disfavor statutory effects that 'impair rights a party possessed when he acted [or] increase a party's liability for past conduct….'"[86] Second, although Section 2333 provides for civil liability, its "punitive treble damages provision" presents "a potential *ex post facto* problem."[87] For these reasons, the material support statutes, as incorporated into the ATA, do not apply retroactively.[88]

To support their claim that MWL is directly liable under the ATA, Plaintiffs rely on alleged actions taken by MWL (or erroneously attributed to MWL) in the 1980s and early 1990s that, they

---

[85] *Bartlett v. Baasiri*, 81 F.4th 28, 32 (2d Cir. 2023) (citing *Dole Food Co. v. Patrickson*, 538 U.S. 468, 478 (2003).

[86] *Weingarten v. United States*, 865 F.3d 48, 56 (2d Cir. 2017) (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994)); *see also Weiss v. Nat'l Westminster Bank PLC* ("*Weiss II*"), 278 F.Supp.3d 636, 650 (E.D.N.Y. 2017) ("Defendant argues that the [claims] should be dismissed in part because § 2339C was enacted after the attacks occurring [in 2001 and 2002], and it cannot be applied retroactively. … The Court agrees with Defendant.").

[87] *Louis Vuitton S.A. v. Spencer Handbags Corp.*, 765 F.2d 966, 972 (2d Cir. 1985); *see also In re Vitamins Antitrust Litig.*, 2000 WL 1511376, at *5 (D.D.C. Oct. 6, 2000).

[88] 18 U.S.C. § 2333(a). In her Report and Recommendation addressing defendant Sudan's motion to dismiss, Judge Netburn applied the versions of § 2339A and § 2339B in effect from October 11, 1996, through October 25, 2001, to the "material support" claims against defendant Sudan, who allegedly aided Al Qaeda "beginning in the early 1990s." *In re Terrorist Attacks on Sept. 11, 2001*, 2022 WL 4227151, at *1, *20 (S.D.N.Y. May 3, 2022), *adopted in part, rejected in part,* 2023 WL 5132138 (S.D.N.Y. Aug. 10, 2023). To the extent Judge Netburn intended to imply that the statutory versions in effect as of the 9/11 Attacks retroactively govern alleged "material support" predating October 1996, that approach would depart from the ordinary rules of statutory construction and should not control here. It is more likely, however, that Judge Netburn relied on the allegation that Sudan's support to Al Qaeda continued throughout the 1990s and "at least until 2000," *id.*, at *7, making it unnecessary for her ruling to parse the alleged conduct into distinct statutory periods.

assert, supported Al Qaeda. Even if these allegations were supported by credible evidence, which they are not, they cannot satisfy the statutory requirements because the alleged acts preceded the adoption of the material support statutes and any relevant amendments.

First, this Court has already decided that Section 2339C cannot provide a basis for liability because it was not in effect on September 11, 2001.[89] Second, Section 2339A was enacted on September 13, 1994 and prohibited a person "within the United States" from "provid[ing] material support…knowing or intending" that the support would "be used in [certain statutory violations].[90] "Material support" expressly excluded "[h]umanitarian assistance to persons not directly involved in such violations," and that exception was revised to "medicine or religious materials," on April 24, 1996.[91] Section 2339B, enacted on April 24, 1996,[92] prohibits the "knowing[]" provision of "material support" to an FTO.[93] It does not apply because there is no evidence that MWL provided any support to Al Qaeda after it was designated an FTO on October 8, 1999 (SOF ¶ 275). Civil liability under Section 2333 requires a "violation of the criminal laws of the United States."[94] Since Plaintiffs cannot prove that MWL provided any "material support" to Al Qaeda after its designation, Section 2339B could not be violated and thus Section 2333 cannot be satisfied.[95]

---

[89] *In re Terrorist Attacks on Sept. 11, 2001*, 2022 WL 4227151, at *20 n.12 (citing *Weiss II*, 278 F.Supp.3d at 650) (finding that claims based on § 2339C should be dismissed because the statute was not in effect at the time of the relevant terrorist attack).
[90] 18 U.S.C. § 2339A (Sept. 13, 1994 version).
[91] *Compare* 18 U.S.C. § 2339A (Sept. 13, 1994) *with id.* (April 24, 1996), and *id.* (Oct. 26, 2001).
[92] *See* Pub L. No. 104-132, § 303(a), 110 Stat. 1214, 1250 (Apr. 24, 1996).
[93] 18 U.S.C. § 2339B(a)(1) (Apr. 24, 1996).
[94] *Linde v. Arab Bank, PLC* ("*Linde I*"), 353 F.Supp.2d 327, 331 (E.D.N.Y. 2004) ("[T]he private right of action in Section 2333(a) arises from injuries caused by an act of international terrorism, which requires, as part of its definition, 'a violation of the criminal laws of the United States or of any State.' … Thus, there is no claim under Section 2333(a) absent a criminal act.") (quoting 18 U.S.C. § 2331(1)(A)).
[95] Courts have uniformly held that the provision of "material support" to an organization prior to its designation as an FTO cannot support criminal liability under Section 2339B. *See United States. v. Abdi*, 498 F.Supp.2d 1048, 1084 (S.D. Ohio 2007) ("[A] conspiracy to provide material support to Al Qaeda would not have been an offense under § 2339B on April 27, 1999 because it had not yet been designated an FTO."); *United States v. Marzook*, 426 F.Supp.2d 820, 826 (N.D. Ill. 2006) ("The government concedes that a violation of the material support statute, 18 U.S.C. § 2339B, cannot be sustained until Hamas was designated a FTO.") (quotations omitted); *see also U.S. v. Fidse*, 778 F.3d 477, 481-82 (5th Cir. 2015) (criminal defendant's material support to group prior to its FTO designation could not support "federal crime of terrorism" sentencing enhancement). The same rule has been applied in the civil context.

Nearly all alleged actions taken by MWL allegedly in support of Al Qaeda preceded the enactment of the material support statutes or the designation of Al Qaeda. *See generally supra* Background, Section III. Those that possibly remain—perhaps work in connection with the **Missionaries** that Plaintiffs do not date—cannot constitute "material support" as it was expressly excluded from Section 2339A. Therefore, the material support statutes are not satisfied.

### 3. The Other Requirements of an Act of International Terrorism Are Not Satisfied

Even if MWL had provided "material support" to Al Qaeda after the enactment of the material support statutes—which it did not—that would not mean that MWL had engaged in an "act of international terrorism."[96] Instead, Plaintiffs must prove that *MWL's conduct* also (i) "involve[d] violent act or acts dangerous to human life;" and (ii) "appear[ed] to be intended[] to intimidate or coerce a civilian population," or "to influence" or "affect" a government."[97] The Second Circuit held that a voluntary suicide bomber would meet these other ATA requirements.[98] But courts have found that other conduct does not: "providing routine financial services to members and associates of terrorist organizations" is insufficient,[99] as is enabling customers associated with terrorists to engage in cryptocurrency transactions, and providing financial services to customers affiliated with FTOs or engaged in legitimate business with some connection

---

*See Boim v. Quranic Literacy Inst.*, 127 F.Supp.2d 1002, 1016-17 (N.D. Ill. 2001), *aff'd*, 291 F.3d 1000 (7th Cir. 2002) (explaining that § 2339B claim would not be dismissed because plaintiff alleged that support continued after Hamas's FTO designation).

[96] *Linde II*, 882 F.3d at 326; *Weiss v. Nat'l Westminster Bank, PLC.* ("*Weiss III*"), 993 F.3d 144, 153 (2d Cir. 2021) (primary liability under the ATA for material support under 2339B requires more than simply violating 2339B.).

[97] 18 U.S.C. 2331(1) (Oct. 29, 1992); *see also Linde II*, 882 F.3d at 326; *Weiss III*, 993 F.3d at 153 ("[A] bank's provision of material support to a known terrorist organization is not, by itself, sufficient to establish the bank's liability under the ATA. . . . [F]or civil liability as a principal, the 'defendant's act must,' *inter alia*, '*also* involve violence or endanger human life. Further, the act must appear to be intended to intimidate or coerce a civilian population or to influence or affect a government.'") (internal citations omitted).

[98] *Linde II*, 882 F.3d at 326.

[99] *Id.* at 327.

to terrorism.[100] In any event, MWL did not commit or support *any* acts of violence; there is no possibly equivalency to the acts of a suicide bomber, and, even accepting Plaintiffs' allegations, MWL's alleged actions are even less significant than those that courts have found do not constitute "act[s] of international terrorism." Plaintiffs' assertions—even if supported by the evidence, which they are not—that MWL supported third parties that it did not know to be connected to Al Qaeda is not conduct that "involves violence or endangers human life" or that "appears to be intended to intimidate or coerce a civilian population or to influence or affect a government." Therefore, the statutory requirements are not satisfied.

### D.    MWL Did Not Owe Any Duty to Plaintiffs

Any negligence claim is also not viable because MWL did not owe any duty to Plaintiffs. Plaintiffs cannot establish the "most basic element of a negligence claim"—the "existence of a duty owed to [them] by defendants."[101] In response to the motions to dismiss filed by IIRO and other defendants, the Court found that "there is no basis to find that these defendants owed a duty to plaintiffs to protect[] them from the intentional torts committed by others," and therefore dismissed Plaintiffs' negligence claims. The key question is whether "the defendant's relationship with either the tortfeasor or the plaintiff places the defendant in the best position to protect against the risk of harm."[102] MWL, like IIRO, had no relationship with Al Qaeda or Plaintiffs, and

---

[100] *Raanan v. Binance Holdings Ltd.*, 2025 WL 605594, at *16 (S.D.N.Y. Feb. 25, 2025) (crypto); *Kaplan v. Lebanese Canadian Bank, SAL*, 405 F.Supp.3d 525, 532 (S.D.N.Y. 2019) (Daniels, J.) ("*Kaplan I*"), *vacated in part on other grounds*, 999 F.3d 842, 853 (2d Cir. 2021); *Bartlett v. Societe Generale de Banque Au Liban SAL*, 2020 WL 7089448, at *7 (E.D.N.Y. Nov. 25, 2020) (collecting cases); *id.*, at *8 ("Although I conclude that the Amended Complaint sufficiently alleges that Defendants knowingly provided substantial assistance to Hezbollah, I agree with the *Kaplan* court's conclusion on the question of primary liability that providing financial services such as those alleged here is not an act which is 'violent or dangerous to human life' as contemplated by the ATA.") (internal citation omitted).

[101] *Terrorist Attacks I*, 349 F.Supp.2d at 830 (citing *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 342 (1928)); *see also Abdulaziz v. McKinsey & Co., Inc.*, 2022 WL 2444925, at *2 (2d Cir. July 5, 2022) ("Any claim sounding in negligence under New York law must be based in the breach of a legally cognizable duty of care.").

[102] *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 233 (Apr. 26, 2001). A duty may also arise if there is a relationship "between defendant and plaintiff that requires defendant to protect plaintiff from the conduct of others." *Id.*

therefore did not owe Plaintiffs any duty.[103] As a result, Plaintiffs cannot establish a negligence claim against MWL.

### III.    MWL Did Not Aid and Abet the 9/11 Attacks

Plaintiffs' aiding and abetting claims fare no better than their direct liability claims. To succeed on a JASTA aiding and abetting claim, Plaintiffs must show that MWL's acts amounted to "intentional participation" in the 9/11 Attacks.[104] This requires Plaintiffs to identify an "affirmative act" that MWL took with the intent of facilitating the 9/11 Attacks; omissions, inactions, or nonfeasance rarely if ever suffice.[105] In addition, Plaintiffs must show that the party that MWL aided performed a wrongful act that caused an injury (the "causal" element); that MWL was generally aware of its role as part of an illegal or tortious activity at the time it provided the assistance, from which the terrorist act was foreseeable (the "general awareness" element); and MWL knowingly and substantially assisted the principal violation (the "knowing and substantial assistance" element).[106] Finally, Plaintiffs must either demonstrate a "concrete nexus" between MWL's affirmative and intentional conduct and the commission of the 9/11 Attacks,[107] or, failing that, satisfy the "high bar" of showing that MWL's "participation" was so "pervasive, systemic, and culpable" that it "aided every wrongful act" of Al Qaeda.[108]

---

[103] *See Heath v. EcoHealth Alliance*, 2025 WL 2658252, at *1-2 (2d Cir. Sept. 17, 2025); *Hamilton*, 96 N.Y.2d at 233-34 (defendant gun manufacturers had no special relationship with downstream users of their products).

[104] *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 490, 497 (2023).

[105] *See Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 281 (2025) ("[A]iding and abetting usually requires misfeasance rather than nonfeasance. Absent an 'independent duty to act,' a person's 'failure[s],' 'omissions,' or 'inactions'…will rarely support aiding-and-abetting liability.") (citing *Taamneh*, 598 U.S. at 489, 500). S*ee also Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420, 445 (2d Cir. 2025).

[106] *Taamneh*, 598 U.S. at 486.

[107] *Id.* at 501.

[108] *Ashley*, 144 F.4th at 445 (quoting *Smith & Wesson*, 605 U.S. at 292). *See also Taamneh*, 598 U.S. at 506 ("The point of aiding and abetting is to impose liability on those who consciously and culpably participated in the tort at issue. … [T]he more attenuated the nexus, the more courts should demand that plaintiffs show culpable participation through intentional aid that substantially furthered the tort.").

Plaintiffs cannot establish any of these requirements. MWL did not aid Al Qaeda, which carried out the attacks without any assistance from MWL. MWL had no role and accordingly could not have been generally aware of any such role or have foreseen any wrongful acts. MWL did not provide any assistance, let alone knowing and substantial assistance. And there was no substantial causal nexus between anything MWL did and the 9/11 Attacks.

### A.    MWL Did Not Engage in an Affirmative Act to Facilitate the 9/11 Attacks

Plaintiffs have no shred of evidence of MWL's "conscious, voluntary, and culpable" participation in the 9/11 Attacks. MWL did not plot or execute the attacks, provide knowing financial or other support to Al Qaeda, or employ or otherwise assist any of the hijackers. SOF __. *Nearly 25 years after 9/11, there is simply no evidence that MWL provided direct, affirmative assistance to Al Qaeda or that it participated in any way in the 9/11 Attacks.* Plaintiffs allege certain links that at best are highly attenuated in time and location between MWL and Al Qaeda, that are not supported by the evidence and—even if they were—that do not remotely amount to "intentional participation"[109] sufficient to impose liability.

Plaintiffs' allegations of affirmative acts can be grouped into two categories: (1) conduct from the 1980s and early-to-mid 1990s—nearly all of which can be traced to an unreliable source whose testimony is inadmissible hearsay (**al Fadl**)—that this Court previously concluded did not "bear any definite and specific, articulable connection to the 9/11 Attacks or those who carried them out" [110] (discussed *supra* at Background, Section III.B); and (2) speculative or conclusory assertions that MWL supported unrelated, alleged intermediaries (like **ASG** and **MILF**, discussed *supra* at Background, Section III.D.1, 2) or ex-employees (like **Jelaidan** and **Khalifa**, discussed *supra* at Background, Section III.F.1, 2) that Plaintiffs allege are somehow linked to Al Qaeda.

---

[109] *Taamneh*, 598 U.S. at 490.
[110] [cite KSA opinion]

Discovery failed to substantiate Plaintiffs' contrived connections to Al Qaeda because, on many points, there is simply no evidence, and on other points, any purported evidence lacks factual support for conclusory assertions, is devoid of definitive findings of wrongdoing by MWL (i.e., speculative), or is inadmissible hearsay. *Supra* at Background, Section III. Indeed, of the two sources of definitive findings about those who participated in the 9/11 Attacks or financed or otherwise supported Al Qaeda, neither named MWL among the entities that had a role in 9/11 or that financed Al Qaeda. SOF ¶¶ 1, 328-33, 336, 339, 359.[111]

Moreover, even if purported connections between MWL and Al Qaeda through intermediaries and ex-employees or affiliates could be established through admissible evidence (which they cannot), they still are insufficient. At best, Plaintiffs can show a vague and unspecified "connection" years before the attacks, but they still cannot show an affirmative act by MWL "*with the intent of facilitating*" the attacks.[112] The "connection" alone is not enough. Plaintiffs cannot make the required showing because *even if* they manage to identify an affirmative act by MWL directed at a purported intermediary,[113] and *even if* they can also show that intermediary directed funding or other support to Al Qaeda in aid of the 9/11 Attacks (both of which they cannot do), there is **no evidence** that MWL **was aware before the 9/11 Attacks** of any purported intermediary's alleged connection to Al Qaeda. SOF ¶¶ 166-68, 189, 205, 212, 223, 237. *Supra* at Background, Section III.D.[114]

---

[111] The 9/11 Commission Report notes that "*Much of the early reporting on al Qaeda's financial situation and its structure came from Jamal Ahmed al Fadl.*" . SOF ¶ 419.

[112] *Taamneh*, 598 U.S. at 490 (quoting *Rosemond v. United States*, 572 U.S. 65, 71 (2014)); s*ee also Smith & Wesson*, 605 U.S. at 281.

[113] *See Troell v. Binance Holdings Ltd.*, 2026 WL 636849, at *17 (S.D.N.Y. Mar. 6, 2026) ("That Defendants engaged in affirmative acts of misconduct does not end the inquiry, however. 'The fundamental question of aiding-and-abetting liability [is whether] defendants consciously, voluntarily, and culpably participate in or support the relevant wrongdoing.'") (quoting *Taamneh*, 598 U.S. at 505).

[114] *See Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 224 (2d Cir. 2019) (no aiding-and-abetting liability where defendant provided business services to third party but lacked plausible awareness that the third party, in turn, provided services to an FTO).

B.      **MWL Did Not Knowingly Assist Al Qaeda in Carrying out the 9/11 Attacks**

As with Plaintiffs' direct liability claims, the absence of evidence that MWL knew that Al Qaeda was planning the 9/11 Attacks is also fatal to the aiding and abetting claims. Among the essential elements is the requirement that Plaintiffs prove MWL's "general awareness" of its alleged role in illegal activity, as well as an even higher level of knowledge: that it "***knowingly*** and substantially assist[ed] the principal violation."[115] MWL did not have "general awareness" that it was involved in unlawful conduct, and therefore it could not have "knowingly" assisted that conduct. On this basis alone, summary judgment on Plaintiffs' aiding and abetting claims is appropriately granted. Beyond that, there is no evidence that MWL knowingly provided substantial assistance (or any assistance) to Al Qaeda in the 9/11 Attacks.

1.      **MWL Was Not "Generally Aware" of its Alleged Role in Illegal Activity**

There is no evidence that MWL was "generally aware" that it had a role in *any* illegal activity, let alone that that illegal activity might lead to a terrorist attack. Absent such general awareness, Plaintiffs cannot establish an aiding and abetting claim.[116]

a.      **Defendants Cannot Show a Direct Relationship Between MWL and Al Qaeda**

There is no evidence of any direct link between MWL and Al Qaeda or the 9/11 Attacks, and Plaintiffs effectively must acknowledge this. Plaintiffs cannot trace a single dollar—or any other support—directly from MWL to Al Qaeda. Plaintiffs also cannot show that MWL was "generally aware" that any of its employees or agents was a member of or otherwise directly connected to Al Qaeda. Plaintiffs' allegations focus on **Jelaidan**, who left MWL more than *six years* before the 9/11 Attacks. SOF ¶ 176. This timing is fatal to Plaintiffs' theory, as is the lack

---

[115] *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 494 (2d Cir. 2021) (citing *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)); *accord Taamneh*, 598 U.S. at 495-96.

[116] *Ashley*, 144 F.4th at 438.

of evidence that MWL knew before 9/11 of *any* alleged connection between **Jelaidan** and Al Qaeda. *Id.* ¶¶ 189. **Jelaidan's** appointment, *after he left MWL*, to head a largely defunct charity controlled by the **GOP** similarly cannot support any inference of knowing support by MWL of Al Qaeda or the 9/11 Attacks. Plaintiffs are grasping at irrelevant straws.

These circumstances sharply contrast with those present in cases where courts have found general awareness based on a *direct and knowing link* between the defendant and a terrorist group. Two recent cases illustrate this contrast. In *Finan v. LaFarge*, the Eastern District found that the defendants were "generally aware of their role as part of ISIS and ANF's overall scheme to attack the United States by murdering U.S. citizens" because they possessed clear evidence that ISIS was a terrorist organization, but nevertheless willingly continued to pay ISIS 20% of their revenue.[117] And in *Hakimyar v. Habib Bank Ltd.*, Judge Schofield of this Court found that the defendant bank had general knowledge that the banking services it provided "were helping to facilitate the al-Qaeda Terror Syndicate's unlawful activities," based on its knowledge that the customers it provided banking services to had "well-documented, public links to Al Qaeda," one customer was a "known al-Qaeda front," individual customers, including the founders of al-Qaeda, had been designated by OFAC, and the bank continued to provide non-routine services to these customers, with direct customer contact, while attacks were ongoing.[118] There are no similarities between the knowing conduct of the defendants in these cases and the conduct (or lack thereof) of MWL.

### b.   Plaintiffs Cannot Show General Awareness Through an Intermediary

Since Plaintiffs cannot show a direct connection between MWL and Al Qaeda, they will likely assert that MWL aided Al Qaeda through a purported "intermediary," that was in turn

---

[117] *Finan v. Lafarge S.A.*, 2025 WL 2504317, at *18 (E.D.N.Y. Aug. 29, 2025).
[118] *Hakimyar v. Habib Bank Ltd.*, 2025 WL 605575, at *7 (S.D.N.Y. Feb. 25, 2025).

connected to Al Qaeda. General awareness can only be found in these circumstances if (1) the defendant was aware of the *intermediary's* connection to the terrorist organization before the attack; ***and*** (2) the intermediary was "so closely intertwined with" the terrorist organization's "violent terrorist activities that one can reasonably infer" that the defendant "was generally aware of its role in unlawful activities from which the attacks were foreseeable."[119] Neither of these requirements is satisfied here.

Illustrating their scattershot approach, Plaintiffs have identified as possible "intermediaries" **ASG** and **MILF**; however, there is no evidence that MWL knew prior to 9/11 – and to the extent that MWL had any relationship at all with these organizations – that either of them was connected to Al Qaeda. SOF ¶¶ 223, 237. Furthermore, there is no evidence that these organizations themselves knew about or supported the 9/11 Attacks. *Id.* ¶¶ 218-20, 231-33. Any contact between MWL and these purported "intermediaries" was at best extremely limited and unconnected in time or space to the 9/11 Attacks. General awareness often cannot be shown where, as here, at the time of the defendant's acts, there was no public record of the connection between the intermediary and the terrorist group. In this case, there is also no basis to suggest that MWL had knowledge of these organizations' activities.[120] There was no public information about any alleged ties between **MILF** and Al Qaeda prior to 9/11. SOF ¶ 221. **ASG** was designated as an FTO in 1997, but Plaintiffs do not allege any connection between **MWL** and **ASG** after that designation. *Id.* ¶¶ 231-42. Therefore, there is no basis on which to conclude that MWL was

---

[119] *Id.*, at *6 (quoting *Honickman*, 6 F.4th at 499). *See also Lavi v. UNRWA USA Nat'l Comm., Inc.*, 2025 WL 2300038, at *4 (D. Del. Aug. 8, 2025) (plaintiffs cannot rely on alleged events that occurred after the relevant attack to show general awareness via intertwinement).

[120] *Ashley*, 144 F.4th at 440 (dearth of public records linking persons to terror at time of defendant's actions disproves general awareness); *Lavi*, 2025 WL 2300038, at *6 (public record at time disproved general awareness).

generally aware of its role in any terrorist activities of Al Qaeda four years later through a purported intermediary halfway around the world.

Plaintiffs also cannot satisfy the second requirement for a finding of general awareness through an intermediary. None of the purported "intermediaries" could have been "so closely intertwined with" Al Qaeda's "violent terrorist activities" that it can be "reasonably infer[red]" that MWL was aware of its role in terrorist activities from which the 9/11 Attacks were foreseeable, particularly given that the purported intermediaries were regional separatists focused on local issues. Again, Plaintiffs cannot prove that any of the purported "intermediaries" themselves knew about or were involved in the 9/11 Attacks, and they certainly were not "closely intertwined" with Al Qaeda. SOF ¶¶ 218-42.

These are not remotely the types of circumstances that courts have found to satisfy the second prong of the general awareness test. In *Bonacasa v. Standard Chartered PLC*, Judge Ramos of this Court found the defendant bank to be generally aware of its role in terrorist activity because it continued to provide "specialized, individualized financial services" to the manufacturer of the main explosive ingredient in IEDs *after it was specifically informed by U.S. government officials* that those financial services were enabling the manufacturer to continue to supply the explosives to Al Qaeda, for use in attacks on U.S. service members. [121] Likewise, in *Zobay v. MTN Group Ltd.*, the court found general awareness through an intermediary where the defendant telecommunications company did business with Iranian companies *known to be fronts* for the military side of the IRGC (an Iranian military unit)—which was publicly connected to support for terrorism—to provide funding, embargoed technologies, and logistical support to the IRGC's terrorist proxies. [122] In both cases, and unlike here, the defendant knew about the connection

---

[121] *Bonacasa v. Standard Chartered PLC*, 2023 WL 7110774, at *10 (S.D.N.Y. Oct. 27, 2023).
[122] *Zobay v. MTN Grp. Ltd.*, 695 F.Supp.3d 301, 343 (E.D.N.Y. 2023).

between the intermediary and the terrorist group, and the intermediary was closely intertwined with the terrorist group's violent terrorist activities.[123]

Finally, courts have concluded that general awareness cannot be shown where (i) claims are based on the fungibility of money, or (ii) the defendant ceased an activity a significant time before the terrorist attack occurred.[124] As the Second Circuit held in *Ashley*, "[a] 'central' tenet of JASTA aiding-and-abetting liability is . . . that the defendant is not liable for the principal's wrongs without understanding, to some extent, the foreseeable consequences of the defendant's actions. A fungibility theory would 'evade' that principle entirely."[125] Even if Plaintiffs could identify a transaction flowing from MWL through an intermediary to Al Qaeda (which they cannot), that transaction would constitute nothing more than the type of "attenuat[ed]" support that the *Ashley* court rejected.[126] And given that ***all*** purported links long pre-date the 9/11 Attacks, they are, as a matter of law, far too remote.[127]

### 2.    MWL Did Not Knowingly and Substantially Assist the 9/11 Attacks

Even if Plaintiffs could show that MWL knew that Al Qaeda was planning the 9/11 Attacks, their inability to show "knowing and substantial assistance" would also be fatal to their aiding and abetting claims. The "knowing and substantial assistance" element of an aiding and abetting claim is intended "to capture the defendants' state of mind with respect to their actions."[128] It has two prongs, which should be considered "in tandem" and operate on a paired sliding scale: a lower

---

[123] *Id.* at 340.

[124] *Ashley*, 144 F.4th at 444 (fungibility), 447 (ceased activity one year prior to attacks); *see also Siegel*, 933 F.3d at 224 ("[P]laintiffs concede that, in January 2005—ten months before the November 9 Attacks—HSBC ceased doing business with ARB altogether. HSBC's decision not to provide banking services to ARB for the ten months preceding the November 9 Attacks makes it implausible under the circumstances that HSBC had knowingly assumed a role in the Attacks.").

[125] *Ashley*, 144 F.4th at 444 (internal citation omitted). The *Fraenkel v. Standard Chartered Bank* court nested this fungibility analysis in its nexus discussion within the knowing and substantial assistance element. 2025 WL 2773251, at *10 (S.D.N.Y. Sept. 26, 2025), however the analysis and outcome are the same, and no liability can attach.

[126] *Ashley*, 144 F.4th at 444.

[127] *See id.* at 447 (ceased activity one year prior to attacks); *Siegel*, 933 F.3d at 224 (ten months before attacks).

[128] *Troell*, 2026 WL 636849, at *17 (quoting *Ashley*, 144 F.4th at 438).

46

level of knowledge can be overcome with a high level of assistance (and vice versa). [129] But neither can be shown here, let alone a high level of one or the other to balance out a minimal showing on the other side of the scale. To determine whether a defendant's assistance was knowing and substantial, courts consider six factors, focusing on the "common conceptual core" that animates the inquiry into whether the defendant "***consciously and culpably*** participated in" the specific terrorist act that injured the plaintiffs "so as to help make it succeed:"[130] (1) the nature of the act assisted, (2) the amount of assistance provided, (3) whether the defendant was present at the time of the principal tort, (4) the defendant's relation to the tortious actor, (5) the defendant's state of mind, and (6) the duration of the assistance given."[131]

If Plaintiffs cannot establish general awareness, they certainly cannot go even further to establish that MWL ***knowingly*** and substantially assisted the 9/11 Attacks.[132] As to MWL's "state of mind," the record is clear: *MWL did not know about the 9/11 Attacks or that any alleged assistance it provided (it provided none) would assist Al Qaeda in carrying out the 9/11 Attacks or any other terrorist attacks. Supra* at Background, Section III.A, B. And even if MWL should have known that something it did would have assisted Al Qaeda, that would not be enough. Courts have explicitly rejected the argument that this requirement is satisfied where the defendant "should

---

[129] *Ashley*, 144 F.4th at 438 (quoting *Taamneh*, 598 U.S. at 491-92).

[130] *Taamneh,* 598 U.S. at 492-93 (emphasis added) (quotations omitted). Also, the "act of international terrorism" must have been "committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under [8 U.S.C. § 1189] as of the date on which such act of international terrorism was committed, planned, or authorized." *Taamneh*, 598 U.S. at 484 (alteration in original) (quoting 18 U.S.C. §§ 2333(a), (d)(2)).

[131] *Id.* at 486.

[132] *See King v. Habib Bank Ltd.*, 2023 WL 8355359, at *3 (S.D.N.Y. Dec. 1, 2023) ("The analysis of 'knowing' assistance as assistance that is neither innocent nor inadvertent goes beyond the 'general awareness' analysis."); *see also Averbach v. Cairo Amman Bank*, 2026 WL 865682, at *5 (S.D.N.Y. Mar. 30, 2026).

have known" but did not actually know about a future terrorist attack.[133] Without actual knowledge, the "knowing and substantial assistance" element cannot be established.[134]

Plaintiffs also cannot show any assistance, let alone substantial assistance, at a high enough level to overcome the absence of any knowledge. As discussed above, *supra* at Background, Section III.A, B, MWL was not present at the 9/11 Attacks and was not involved in their planning or execution. It also did not finance or otherwise have any direct connection to Al Qaeda. The only acts that MWL is alleged to have taken were not directly connected to Al Qaeda or substantially predate the planning of the 9/11 Attacks, and even the formation of Al Qaeda itself. The allegations of indirect connections through purported intermediaries cannot be substantiated and are too attenuated.

Thus, if it could be said that MWL assisted the 9/11 Attacks at all—which it did not—that assistance was not conscious or culpable, but rather unintentional and innocent. MWL did not know it was playing a role in terrorist activities, because it did not have one. All of the knowing and substantial assistance factors point to the same conclusion: MWL could not have "consciously and culpably participated in" the 9/11 Attacks because it was not involved in the attacks themselves and it did not know that any alleged assistance it provided would assist Al Qaeda in carrying out the attacks.

By contrast, in *Bonacasa*, defendants were warned—in person—by the U.S. government that they were funding the manufacture of chemicals used for IEDs and still chose to fund the facilities making the chemicals.[135] And in *Zobay*, the defendant spearheaded procurement efforts

---

[133] *Brill v. Chevron Corp.*, 2018 WL 3861659, at *3 (N.D. Cal. Aug. 14, 2018) (claim that defendant "should have known that it was contributing to terrorism and chose to ignore the possible consequences … is in effect an allegation of recklessness, but JASTA requires more"); *accord Freeman v. HSBC Holdings PLC*, 465 F.Supp.3d 220, 233 (E.D.N.Y. 2020).

[134] *See Parizer v. AJP Educ. Found., Inc.*, 2025 WL 2382933, at *19 (E.D. Va. Aug. 15, 2025) ("Plaintiffs do not even allege sufficient facts to plausibly show that Defendants had prior knowledge of the October 7, 2023 attack.").

[135] 2023 WL 7110774, at *11.

48

for embargoed dual-use technologies that assisted terrorist campaigns, facilitated a steady flow of funds to the IRGC, populated a floor of its offices with military intelligence, and continued to work with the entity after its designation as an FTO.[136] There is no such evidence of conscious and culpable conduct present here.

### C.    There Is No Nexus Between MWL's Acts and the 9/11 Attacks

These fatal deficiencies in Plaintiffs' aiding and abetting claims are compounded by Plaintiffs' inability to show a "concrete nexus" between MWL's affirmative and intentional conduct (of which there is none) and the commission of the 9/11 Attacks.[137] The absence of a "concrete nexus" cannot be overcome by showing that MWL assisted terrorist activities generally.[138] Yet this is exactly what Plaintiffs seek (and fail) to show, contending that MWL contributed generally to Al Qaeda's "global strike capabilities," rather than the 9/11 Attacks specifically. This focus on MWL's alleged contributions to Al Qaeda's "global strike capabilities," effectively concedes what is apparent from the evidence: Plaintiffs cannot show the "concrete nexus" that the law requires.

As discussed in Argument, Section II (direct liability), this Court has already found that the required nexus is lacking because the same stale allegations of MWL's (and other charities') actions do not "bear any definite and specific, articulable connection" to the 9/11 Attacks or Al Qaeda."[139] There is no basis to reach a different conclusion now.[140] Moreover, this Court has already decided that actions taking during the mid-1990s and earlier are too far removed in time

---

[136] 695 F.Supp.3d at 346.

[137] *Taamneh*, 598 U.S. at 501.

[138] *See Ashley*, 144 F.4th at 444 ("[I]t is not enough to say that the defendant assisted the terrorist organization's 'activities in general.'") (citing *Taamneh*, 598 U.S. at 503); *id.* at 448 ("defendant must aid and abet a specific act"); *see also See Parizer*, 2025 WL 2382933, at *23 ("Under *Taamneh*, allegations of 'systemic' support do not circumvent the necessity to sufficiently allege 'defendants actually aided and abetted each tort of that enterprise.'") (quoting *Taamneh*, 598 U.S. at 506).

[139] *Terrorist Attacks XIV*, 298 F.Supp.3d at 658-59.

[140] *See Arcapita Bank*, 640 B.R. at 616 (prior decision is law of the case).

from 9/11 to establish a nexus to the 9/11 Attacks. The Court has found that: "[a]lleged acts by the charities to aid and support Al Qaeda's efforts…during the 1980s and 1990s,"[141] operations that ceased seven years before the attacks,[142] support rendered during Al Qaeda's "formative years,"[143] support that ceased in 1993,[144] and activity that "occurred in the 1990s,"[145,] were all too remote in time to support liability, as were all alleged actions taken by MWL.[146]

At best, Plaintiffs' strands of "evidence," if credited, shows unintentional and discrete acts by MWL, all years before 9/11, several steps removed from Al Qaeda, and involving unrelated individuals and organizations spread across the globe.[147] Even if MWL had contributed to Al Qaeda's "global strike capabilities" (it did not), such general assistance to Al Qaeda would not satisfy the "concrete nexus" requirement.[148]

---

[141] *Terrorist Attacks XIV*, 298 F.Supp.3d at 659.

[142] *Terrorist Attacks IV*, 718 F.Supp.2d at 472.

[143] *Id.* at 486-87.

[144] *Terrorist Attacks XIV*, 298 F.Supp.3d at 652; *Terrorist Attacks XIII*, 295 F.Supp.3d 416, 429-30.

[145] *In re Terrorist Attacks on Sept. 11, 2001,* 2023 WL 2430381, at *12 (withdrawals and deposits from account in 1990s too remote); *Terrorist Attacks XIV*, 298 F.Supp.3d at 652 (work at Saudi Embassy prior to 1993 too remote); *In re Terrorist Attacks on Sept. 11, 2001*, 840 F.Supp.2d 776, 782 (S.D.N.Y. 2012) (alleged support in 1993 "too temporally remote"); *Terrorist Attacks IV*, 718 F.Supp.2d at 483, 486-87 (alleged provision of support "in the early 1990's" and in Al Qaeda's "formative years" too remote).

[146] Some of the Court's decisions regarding temporal proximity were made in the context of assessing personal jurisdiction, so the Court applied a broader, less stringent standard. *See Ford Motor Co.*, 592 U.S. at 362 (due process inquiry "contemplates that some relationships will support jurisdiction without a causal showing"); *Terrorist Attacks XIV*, 298 F.Supp.3d at 645 n.8 (acknowledging that "causation for jurisdictional purposes is a lighter burden than proving a winning case on the merits") (quoting *Owens v. Republic of Sudan*, 864 F.3d 751, 778 (D.C. Cir. 2017)). Where a temporal nexus is too attenuated in the jurisdictional context, it is certainly insufficient to establish liability.

[147] *Lavi*, 2025 WL 2300038, at *8 (citing *Taamneh*) ("[T]he Complaint does not allege that any of Defendant's aid was transferred to Hamas or otherwise used in connection with the October 7th attack. To hold Defendant liable under an aiding-and-abetting theory, Plaintiffs must show that there exists a nexus between Defendant's aid and the October 7th attack.").

[148] *Ashley*, 144 F.4th at 444; *Taamneh*, 598 U.S. at 489-90, 493, 495, 501. Some courts place the nexus analysis in the third element. *See, e.g., Fraenkel*, 2025 WL 2773251, at *10. Whether analyzed as a component of knowing and substantial assistance or otherwise, the conclusion is the same: there is no nexus between MWL's acts and the 9/11 Attacks. *See id.* ("Plaintiffs argue that the connection is explained by the following: 'SCB here provided services to terrorist fronts under IRGC control, and IRGC systematically used such fronts to finance the attacks that killed or injured Plaintiffs.' Far from demonstrating a concrete nexus, however, Plaintiffs' theory of liability would 'hold SCB liable for all the torts of an enterprise,' but without the corresponding "pervasive and systemic" support of terrorist activities that *Twitter* demands.") (cleaned up).

Courts have squarely rejected aiding and abetting claims even where there is a much clearer nexus than alleged here. For example, in *Finan*, the Eastern District found that the defendants were generally aware of their role in a terrorist scheme to attack the United States, but still rejected aiding and abetting liability because, though defendants made regular payments to ISIS while knowing they were a terrorist organization, plaintiffs had failed to allege that defendants "culpably associated themselves" with the specific attacks that caused injury to Plaintiffs.[149] And in *Fraenkel*, Judge Garnett of this Court rejected allegations similar to those here, concluding that no nexus existed where a bank "assisted its customers with both routine and fraudulent financial transactions," and those "customers were agents or fronts for organizations or government entities that then funded the FTOs that then committed the Attacks that injured Plaintiffs."[150] If there was no nexus in these cases, there cannot be one here.

### D.       MWL Did Not Provide Pervasive and Systemic Support to Al Qaeda

If Plaintiffs cannot show a "concrete nexus" between MWL and the 9/11 Attacks, but instead can only show "a broad category of misconduct" (which they also cannot do), Plaintiffs must meet a "high bar" and establish that MWL provided "pervasive, systemic, and culpable" aid, such that it aided every wrongful act of Al Qaeda.[151] Plaintiffs cannot meet this "drastically increase[d]" burden,[152] because MWL did not "affirmatively g[i]ve aid that would assist each of [Al Qaeda's] terrorist acts" or "form[] a near-common enterprise" with Al Qaeda.[153] Absent

---

[149] *Finan*, 2025 WL 2504317, at *19 ("Indeed, the Complaints do not allege any concrete connection between the attacks and any of the alleged payments that Defendants made to ISIS or ANF."); *see also Parizer*, 2025 WL 2382933, at *19 ("[T]he further inferences leading to Plaintiffs' ultimate conclusion that Defendants both knew of the October 7, 2023 attack before it happened and contributed to the attack such that they may be held liable for it, are not supported by any non-conclusory factual allegations in the Amended Complaint."); *Ashley*, 144 F.4th at 447 (no aiding and abetting liability where alleged support ceased one year prior to attacks); *Siegel*, 933 F.3d at 224.

[150] *Fraenkel*, 2025 WL 2773251, at *9.

[151] *Ashley*, 144 F.4th at 445 (quoting *Smith & Wesson*, 605 U.S. at 292); *see also Long v. MTN Grp. Ltd.*, 2025 WL 2827899, at *6 (E.D.N.Y. Sept. 25, 2025) (citing *Taamneh*, 598 U.S. at 496).

[152] *Taamneh*, 598 U.S. at 503; *see also Ashley,* 144 F.4th at 445 (describing required showing as "high bar").

[153] *Taamneh*, 598 U.S. at 502.; *Parizer*, 2025 WL 2382933, at *23 (plaintiff must show defendant aided and abetted each tort of enterprise).

51

evidence of any direct link between MWL and Al Qaeda, or any involvement by MWL in any terrorist attack carried out by Al Qaeda, there is no basis to conclude that the organizations were involved in a "near-common enterprise."

Allegations of indirect assistance to terrorist groups via intermediaries are not sufficient. In *Fraenkel*, the plaintiff failed to establish "pervasive and systemic" support where the defendant allegedly provided financial services to non-FTOs connected to entities known to support terrorist activities, but had no direct role in the attacks and provided no direct aid to the perpetrator.[154] Pervasive and systemic support cannot be shown where, "[e]ven under the most generous reading of the allegations there are several steps between any conduct by [the defendant] and the actions of those who directly perpetrated the Attacks."[155] Other decisions highlight the lack of pervasive assistance here. In *Zobay*, the plaintiffs sufficiently pleaded pervasive assistance because the defendant provided "many millions of dollars in funding, embargoed dual-use technologies, and operational or technical support," created a "joint venture with a known terrorist front," and took up "a leadership role" in a procurement scheme, while knowing that a significant portion of its annual profits would flow to the IRGC and ultimately be used to fund terrorist operations."[156] In *Kaplan*, the defendant bank directly assisted with laundering money for clients who were "clearly and publicly identified as part of the terrorist organization."[157]

Finally, "pervasive and systemic" assistance must also be "*culpable*"—in other words, "designed or performed with the intent to aid" the commission of terrorism.[158] Even in *Ashley*,

---

[154] *Fraenkel*, 2025 WL 2773251, at *10.
[155] *Id.*
[156] *Zobay,* 695 F.Supp.3d at 348.
[157] *Ashley,* 144 F.4th at 445 (citing *Kaplan v. Lebanese Canadian Bank, SAL* ("*Kaplan II*"), 999 F.3d 842, 858, 865 (2d. Cir 2021)).
[158] *Id*. (emphasis added); *see also UMG Recordings, Inc. v. Grande Commc'ns Networks, L.L.C.,* 118 F.4th 697, 714 (5th Cir. 2024), *vacated on other grounds sub nom. Grande Commc'ns Networks v. UMG Recordings, Inc.*, 2026 WL 922501 (U.S. Apr. 6, 2026) (holding that, under *Twitter,* "when no direct nexus exists," "participation through intentional aid" is required).

52

culpability could not be established, even though the defendant bank's money laundering operations opened its "doors to criminals with ties to terrorists to clean their money—a portion of which was likely to end up in the [terrorist organization's] pile of resources."[159] If the *Ashley* plaintiffs could not establish the required pervasive, systemic, and culpable support, Plaintiffs here clearly cannot do so either.[160]

## IV.      MWL Did Not Conspire to Commit the 9/11 Attacks

For the same reasons that Plaintiffs' direct liability and aiding and abetting claims fail, Plaintiffs cannot succeed on their conspiracy claims. To prove a conspiracy, Plaintiffs must show that there was an agreement between two or more persons to participate in an unlawful act and an unlawful, overt act that results in an injury.[161] The co-conspirators must have shared a "common intent," and the overt acts must have been foreseeable and furthered the conspiracy.[162] In addition, Plaintiffs must show that the defendant conspired with the principal tortfeasor,[163,164] and that it "kn[e]w the wrongful nature of the primary actor's conduct" and intentionally participated in it.[165]

---

[159] *Ashley*, 144 F.4th at 445 (quoting *Taamneh*, 598 U.S. at 502).

[160] *See Parizer*, 2025 WL 2382933, at *23 ("Under *Taamneh*, allegations of 'systemic' support do not circumvent the necessity to sufficiently allege 'defendants actually aided and abetted each tort of that enterprise.'").

[161] *O'Sullivan v. Deutsche Bank AG*, 2018 WL 1989585, at *5 (S.D.N.Y. Apr. 26, 2018).

[162] *Freeman v. HSBC Holdings PLC*, 57 F.4th 66, 80 (2d Cir. 2023), *cert. denied,* 144 S. Ct. 83 (2023) (common intent required); *id.* at 82 (foreseeability insufficient) ("The mere fact that certain conduct may be the natural and foreseeable consequence of the conspiracy is therefore not enough to meet the in-furtherance-of requirement at the heart of a conspiracy claim.").

[163] *See Taamneh*, 598 U.S. at 489–90 (noting that "conspiracy…require[s] [an] agreement with the primary wrongdoer to commit wrongful acts"); *Kaplan II*, 999 F.3d at 855 ("JASTA states that to be liable for conspiracy a defendant would have to be shown to have 'conspire[d] with' the principal) (quoting 18 U.S.C. § 2333(d)(2)); *O'Sullivan*, 2018 WL 1989585, at *7 (JASTA "requires a defendant to conspire with the person who committed an act of international terrorism") (cleaned up).

[164] *Freeman*'s observation that conspiracy does not require this direct relationship with the principal is dicta and incorrect. 57 F.4th at 84-85 (Jacobs, J., concurring). Two years earlier the Second Circuit reached the opposite conclusion. *Id.* at 85 n.3 ("The Majority acknowledges that in [*Kaplan II*, 999 F.3d at 855] we emphasized that 'JASTA states that to be liable for conspiracy a defendant would have to be shown to have 'conspire[d] with' the principal.'"). And the Supreme Court then clarified that conspiracy liability requires an agreement with the principal wrongdoer. *Taamneh*, 598 U.S. at 489–90. *See In re Arab Bank, PLC Alien Tort Statute Litig.,* 808 F.3d 144, 154-55 (2d Cir. 2015) (courts must follow intervening Supreme Court precedent where there is "a conflict, incompatibility, or inconsistency between this Circuit's precedent and the intervening Supreme Court decision").

[165] *Pittman by Pittman v. Grayson*, 149 F.3d 111, 123 (2d Cir. 1998) (NY state law); *see also Bigio v. Coca-Cola Co.*, 675 F.3d 163, 176 (2d Cir. 2012) (conspiracy requires "parties' intentional participation in the furtherance of a plan or purpose"); *Moss v. First Premier Bank*, 2024 WL 4274780, at *15 (E.D.N.Y. Aug. 2, 2024) (in RICO action,

53

Since conspiracy liability under JASTA is tied to an ATA violation, Plaintiffs in this case must also show that defendant "agreed to commit terrorist acts to intimidate civilians and influence U.S. policy."[166]

Plaintiffs' inability to show that MWL knew about and intended to support the 9/11 Attacks is not only fatal to their direct liability and aiding and abetting claims, but also to their conspiracy claims. Their conspiracy claims also fail because they cannot show that MWL entered into any agreement with Al Qaeda to commit the 9/11 Attacks or otherwise. Even if an agreement with an intermediary, rather than with Al Qaeda, were enough, which it is not, Plaintiffs also cannot prove that MWL conspired with anyone else to commit the 9/11 Attacks.[167]

Plaintiffs also cannot show a common intent between MWL and Al Qaeda. MWL was dedicated to countering the extremist ideologies of Bin Laden, Al Qaeda, and other affiliated terrorist groups, and it denounced acts of terrorism. SOF ¶¶ 38, 41, 50, 253-56, 262-64, 311-13. There is no evidence that MWL intended to support an attack on the United States or otherwise to

---

conspirator must have "intent to commit the offenses that are its object, that is, with the affirmative intent to make the conspiracy succeed") (citation & subsequent history omitted); *O'Sullivan*, 2018 WL 1989585, at *5 ("[C]onspiracy involves an agreement to participate in a wrongful activity.").

[166] *In re Terrorist Attacks on Sept. 11, 2001*, 2022 WL 4227151, at *26 ("Applying this to the ATA, § 2333(d) provides for liability with those who 'conspire with the person who committed an act of international terrorism.' Acts of terror, in turn, involve dangerous or violent acts designed to intimidate civilians and influence government policy. 18 U.S.C. § 2331(1). Sudan and Al Qaeda must therefore have agreed to commit terrorist acts to intimidate civilians and influence U.S. policy.") (cleaned up).

[167] *See O'Sullivan*, 2018 WL 1989585, at *7 (finding conspiracy allegations insufficient because they "do not show a conspiracy or agreement between any defendant and a foreign terrorist organization as opposed to a conspiracy or agreement between a defendant and Iran or the Agents and Proxies sponsoring such organizations") (emphasis in original).

support Al Qaeda's objectives. [168] To the extent that Plaintiffs can show that MWL inadvertently supported Al Qaeda in some way, this would not support a finding of common intent. [169]

## V.    MWL Is Not Liable for Actions Taken by Others

Plaintiffs contend that MWL is liable for actions taken by IIRO and **Rabita Trust**, presumably on a theory of agency or alter ego, but there is no evidence that IIRO or **Rabita Trust** themselves supported Al Qaeda's plan to carry out the 9/11 Attacks at MWL's instruction or otherwise, [170] or that either organization was an agent or alter ego of MWL.

### A.    There Was No Alter Ego Relationship Between MWL and IIRO or Rabita Trust

Neither the facts nor the law support a finding that IIRO or **Rabita Trust** acted as an alter ego of MWL. Saudi law governs the question of whether IIRO was an alter ego of MWL and requires a finding that it was not. Even if the Court instead applies New York law, it should reach the same conclusion as to both organizations.

#### 1.    There Is no Alter Ego Liability Under Saudi Law

The choice of law rules in the relevant jurisdictions, including D.C. and New York, and also federal common law, [171] all point to application of the law of the place of incorporation to

---

[168] *See Freeman*, 57 F.4th at 80 (concluding that there was no common intent between defendant banks and terrorist groups where there was no allegation "that the Banks intended to kill or injure U.S. service members"); *Ofisi v. BNP Paribas, S.A.*, 77 F.4th 667, 672 (D.C. Cir. 2023) (concluding that the defendant bank's goal of evading U.S. sanctions was fundamentally different from Al Qaeda's goal of committing embassy bombings, and such orthogonal objectives could not sustain a conspiracy); *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 873 (D.C. Cir. 2022) (finding no conspiracy where "HSBC was trying to make 'substantial profits' by evading sanctions, whereas al-Qaeda sought to 'terrorize the U.S. into retreating from the world stage'; 'use long wars to financially bleed the U.S. while inflaming anti-American sentiment'; 'defend the rights of Muslims'; and 'obtain global domination through a violent Islamic caliphate,'" as "[t]hese objectives are wholly orthogonal to one another.").

[169] *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 175 F.Supp.2d 593, 634 (S.D.N.Y. 2001) ("Accidental, inadvertent, or negligent participation in a common scheme does not amount to a conspiracy."); *Moss*, 2024 WL 4274780, at *16 (finding evidence that defendant "negligently aided in [another]'s scheme" unavailing [b]ecause conspiracy requires specific intent.").

[170] SOF ¶¶ 71-72, 77-80; *see also* Background, Section III.C.2 of this brief as to **Rabita Trust**.

[171] *United States v. TDC Mgmt. Corp.*, 263 F.Supp.3d 257, 266 n.8 (D.D.C. 2017) ("Federal common law . . . govern[s] the veil-piercing question . . . in cases where some federal interest is implicated by the decision whether to pierce the corporate veil."); *In re Terrorist Attacks on Sept. 11, 2001*, 2023 WL 5207985, at *2 (S.D.N.Y. Aug. 14, 2023) (explaining that in an MDL m

determine whether to disregard an entity's corporate form. [172] MWL and IIRO were formed in Saudia Arabia, SOF ¶¶ 7-8, 58-59, so Saudi law applies.[173] Saudi law does not recognize the concept of veil piercing and would preclude a finding that one entity is liable for the actions of another.

### 2. New York Law Requires "Complete Domination" to Establish Alter Ego Liability

Even if the Court applies New York law, the result would be the same. Under New York law, "Plaintiffs who seek to pierce the corporate veil bear a heavy burden," [174] and courts apply veil piercing only with "extreme reluctance." [175] Courts consider whether one entity exercised complete domination over the other with respect to the transaction at issue.[176]

---

atter, courts apply "the substantive state law, including choice-of-law rules, of the jurisdiction in which the action was filed") (quoting *Menowitz v. Brown*, 991 F.2d 36, 40 (2d Cir. 1993)). *Thomas E. Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, No. 03-cv-09849, was first filed in D.D.C. and transferred to S.D.N.Y. *See* ECF No. 9 (transfer Order); *see also In re Terrorist Attacks on Sept. 11, 2001*, 2025 WL 2205263, at *2 (S.D.N.Y. Aug. 4, 2025) ("Because Plaintiffs filed their action in [the S.D.N.Y.], this Court looks to New York's choice-of-law rules.").

[172] Whether one applies the choice-of-law rules of D.C., New York, or federal common law, the result is the same. *See City of Harper Woods Employees' Ret. Sys. v. Olver*, 589 F.3d 1292, 1298 (D.C. Cir. 2009) ("When a claim addresses matters of corporate governance or other internal affairs of a company, D.C. courts apply the law of the state of incorporation. … [T]his internal affairs doctrine applies to corporations incorporated outside of the United States.") (applying D.C. law choice of law rules); *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 975 F.Supp.2d 392, 401 (S.D.N.Y. 2013) ("CPS, the subsidiary, is a Delaware-based corporation, and Cummins, the parent, is an Indiana-based corporation. Because Plaintiff seeks to disregard the subsidiary's (CPS's) corporate form and hold the parent (Cummins) liable, Delaware law governs Plaintiff's veil-piercing attack.") (applying New York choice of law rules); *Merino v. Beverage Plus Am. Corp.,* 2011 WL 3739030, at *5 (S.D.N.Y. Apr. 12, 2011), *report & recommendation adopted*, 2011 WL 3734241 (S.D.N.Y. Aug. 23, 2011) ("Federal courts determining whether a corporate veil can be pierced apply the law of the state of incorporation.") (applying federal common law choice of law rules).

[173] *See Mega Tech Int'l Corp. v. Al-Saghyir Establishment*, 1999 WL 269896, at *8 (S.D.N.Y. May 3, 1999), *adhered to on reconsideration*, 1999 WL 314179 (S.D.N.Y. May 18, 1999) ("It is settled that the propriety of piercing the corporate veil in such situations must be assessed pursuant to the law of the place where the defendant is incorporated. In this case, we evaluate Plaintiff's argument under Saudi Arabian, rather than New York, law. Plaintiff has not refuted the Defendants' claims that Saudi Arabian law does not recognize the concept of veil-piercing in these circumstances and that under Saudi Arabian law, the two Defendants are legally discrete entities.") (internal citation omitted); *Doheny v. Int'l Bus. Machines, Corp.*, 2024 WL 382142, at *16 (S.D.N.Y. Feb. 1, 2024) (citations and quotations omitted) ("Where a conflict exists, the law of the state of incorporation determines when the corporate form will be disregarded. Where no conflict exists, New York law applies.").

[174] *Etage Real Est. LLC v. Stern*, 211 A.D.3d 632, 633, 182 N.Y.S.3d 47, 48 (1st Dep't 2022).

[175] *Shantou Real Lingerie Mfg. Co., Ltd. v Native Group Int'l., Ltd.,* 401 F.Supp.3d 433, 439 (S.D.N.Y. 2018) (alterations adopted) (quoting *United States v. Funds Held in the Name or for the Benefit of Wetterer*, 210 F.3d 96, 106 (2d Cir. 2000)).

[176] *In re Digital Music Antitrust Litig.*, 812 F.Supp.2d 390, 418 (S.D.N.Y. 2011); *see also Hamlen v. Gateway Energy Services Corp.*, 2017 WL 6398729, at *11 (S.D.N.Y. Dec. 8, 2017); *Morris v. New York State Dep't of Taxation & Fin.,* 82 N.Y.2d 135, 141-42 (1993).

To determine whether there is complete domination, New York courts consider the totality of the facts[177]—several of which are more relevant for individual, rather than corporate, owners[178]—including: (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers; (6) the degree of discretion exercised by the allegedly dominated corporation; (7) whether dealings between the entities are at arm's length; (8) whether the entities are treated as independent profit centers; (9) payment or guarantee of the entity's debts by the dominating entity; and (10) intermingling of property.[179] Consideration of these factors must reveal actual, exercised domination,[180] that reflects a "virtual abandonment of separateness."[181] Control alone is insufficient.[182]

### a.    There Is No Evidence that IIRO Was an Alter Ego of MWL

Plaintiffs cannot satisfy the requirements for establishing that IIRO was an alter ego of MWL. MWL created IIRO as a separate affiliate to handle relief functions. That affiliate relationship was fully disclosed. The evidence shows that MWL and IIRO were run as separate entities that maintained corporate separation.

---

[177] *LiquidX Inc. v. Brooklawn Cap., LLC*, 254 F.Supp.3d 609, 617 (S.D.N.Y. 2017); *Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures, LLC*, 851 F.Supp.2d 504, 509 (S.D.N.Y. 2012) (applying totality of circumstances, federal common law).

[178] These include: the absence of formalities, comingling of funds, overlaps in ownership, officers, directors, and personnel, and business discretion. *See Shantou,* 401 F.Supp.3d at 440.

[179] *MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 63 (2d Cir. 2001); *see also Cortlandt St. Recovery Corp. v. Bonderman*, 207 N.Y.S.3d 52, 54 (1st Dep't 2024) (applying these factors); *Boroditskiy v Eur. Specialties LLC*, 314 F.Supp.3d 487, 494 (S.D.N.Y. 2018).

[180] *Ayco Co., L.P. v. Frisch*, 2012 WL 42134, at *8 (N.D.N.Y. Jan. 9, 2012); *see also Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 29 (2d Cir. 1993) ("[J]ust as there can be no doubt as to the power of Diners Club and Citicorp to control CBI's actions, there can be no question that the potential control and domination were actually exercised here.").

[181] *Boroditskiy*, 314 F.Supp.3d at 494 (quotation omitted).

[182] *E. Hampton Union Free Sch. Dist. v. Sandpebble Builders, Inc.*, 66 A.D.3d 122, 126, 884 N.Y.S.2d 94, 98-99 (2d Dep't 2009).

The evidence does not show the dominance or "virtual abandonment of separateness"[183] required to satisfy the first requirement of the alter ego test. Instead, MWL and IIRO had minimal physical and personnel overlap in a small fraction of branch office locations. However, each organization respected corporate formalities, *see supra* at Background, Section III.C.1;[184] SOF ¶¶ 81-83, 85, and they were administratively, financially, and structurally independent from one another, *id.* ¶¶ 81-96, with separate head offices, activities, and funding. *Id.* ¶ 84, 88-92, 100. New York law does not support piercing the corporate veil in these circumstances.[185]

MWL and IIRO also had different missions and generally performed their work in different locations. SOF ¶¶ 15-16, 74-76 (comparing office locations). MWL's offices, cultural centers, and 200+ employees promoted dialogue, spread moderate Islamic values, prioritized education, including by distributing scholarships and books, and countered extremism through educational, religious, and cultural projects, including by promoting and attending conferences worldwide, creating radio programs, and responding to inquiries about Islam. *Id.* ¶¶ 8-29. IIRO provided

---

[183] *Boroditskiy*, 314 F.Supp.3d at 494; *see also Ayco Co.*, 2012 WL 42134, at *8. *Cf. Shantou*, 401 F.Supp.3d at 440-42 (dominated company had "virtually no corporate records that would evidence the workings of an actual corporation," company's funds were commingled with owner's personal funds, and controlling party was company's "sole owner, officer, and shareholder"); *Carte Blanch*, 2 F.3d at 29 (alter ego found where dominated company had no "bank accounts, offices, stationery, transactions, or any other activities . . . maintained or carried on in [its] name").

[184] *See Fantazia Int'l Corp. v. CPL Furs New York, Inc.*, 67 A.D.3d 511, 512, 889 N.Y.S.2d 28, 29-30 (1st Dep't 2009) (fact that entities "were incorporated at different times for legitimate business purposes, [and] filed separate tax returns" prevented alter ego finding); *Backuswalcott v. Common Ground Cmty. HDFC, Inc.*, 104 F.Supp.2d 363, 369-70 (S.D.N.Y. 2000) (maintaining separate payrolls and filing separate payroll taxes resulted in no alter ego finding); *cf. Cardell Fin. Corp. v. Suchodolski Assocs., Inc.*, 2012 WL 12932049, at *21 (S.D.N.Y. July 17, 2012) (failure to keep corporate records or hold corporate meetings favored alter ego finding).

[185] *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 87-88 (S.D.N.Y. Jan. 7, 2010) (collecting cases) ("[C]ourts routinely refuse to pierce the corporate veil based on allegations limited to the existence of shared office space or overlapping management, [or] allegations that one company is the wholly-owned subsidiary of another."); *Boroditskiy*, 314 F.Supp.3d at 495 ("The fact that two members of BEAW are now members of OAWD, and that OAWD now operates out of the same office space that BEAW occupied, without more, does not support a finding that Petitioners were the alter egos of BEAW during the pendency of the Agreement."); *Backuswalcott*, 104 F.Supp.2d at 369-70 ("[W]e have no evidence whatsoever that (1) the two entities intermingle funds or otherwise operate as a single economic enterprise, beyond the sharing of facilities and employees; (2) either is inadequately capitalized; or (3) they have not followed proper formalities. In short, the record fails to show that the Hotel has none of its own functions, fulfilled by its own officers and staff and financed by its own bank accounts. This arrangement does not constitute the sort of total domination that would lead us to pierce the veil in this context.").

general humanitarian aid to impoverished people and emergency aid in response to specific crises and natural disasters, including medical clinics, vaccine programs, and food distribution. *Id.* ¶¶ 60-63 (IIRO).[186] While MWL and IIRO sometimes worked together on specific projects, each maintained autonomy over its own operations. SOF ¶¶ 99-111.

In addition, IIRO exercised significant discretion in its operations, deciding where to open offices, where to deliver relief and aid, and which programs and projects to pursue. *Id.* ¶ 109.[187] It also had sole authority over its own employment and financial matters. *Id.* ¶ 110. While the MWL SGs and other employees served in certain instances as IIRO board members, they, along with a large group of other board members who were not associated with MWL, were not involved in IIRO's daily operations, *id.* ¶¶ 64-66, but instead only addressed specific issues such as the investigation of allegations of misconduct. *Id.* ¶ 67. Neither this limited oversight by MWL personnel nor the minimal overlap between the organizations reflects the "virtual abandonment of separateness" necessary for an alter ego finding.[188]

---

[186] *Cf. Trustees of Mosaic & Terrazzo Welfare, Pension, Annuity & Vacation Funds v. High Performance Floors, Inc.*, 233 F.Supp.3d 329, 337-38 (E.D.N.Y. 2017) (finding alter ego relationship where entities had a similar business purpose; both prepared concrete floors, installed resinous flooring, and used the same flooring vendor); *Plumbers, Pipefitters & Apprentices Loc. Union No. 112 Pension, Health & Educ. & Apprenticeship Plans ex rel. Fish v. Mauro's Plumbing, Heating & Fire Suppression, Inc.*, 84 F.Supp.2d 344, 350 (N.D.N.Y. 2000) (finding alter ego where "[b]oth companies perform light commercial, commercial, and residential plumbing work"); *Jacobson v. Metro. Switchboard Co.*, 2007 WL 1774911, at *6 (E.D.N.Y. June 18, 2007) ("[B]oth companies are engaged in the manufacture of panel boards and switchboards for electronic equipment."); *Hawknet Ltd. v. Overseas Shipping Agencies*, 2009 WL 1309854, at *3-5 (S.D.N.Y. May 6, 2009) (finding no alter ego where deposition evidence, articles of incorporation, correspondence, and wire transfers listed separate addresses despite corporate registration evidence that entities shared an address).

[187] *Cf Shantou*, 401 F.Supp.3d at 442 (alter ego found where individual exercised "unfettered discretion with respect to the corporation and its business decisions").

[188] *See Spagnola* 264 F.R.D. at 87-88 ("Although Plaintiffs have alleged facts to suggest some overlap between the operations of Chubb and its subsidiaries, this overlap is not unusual and Plaintiffs' allegations do not rise to the level that indicates…complete domination and control."); *Hawknet*, 2009 WL 1309854, at *7 (partial overlap is insufficient, full control is required); *Kanter v. Feature Enters., Inc.,* 1993 WL 267373, at *3-*4 (S.D.N.Y. July 15, 1993) (dismissing alter ego claim as insufficient as matter of law, even taking as true allegations that same person was officer of one company and chairman of the board of related company, and an employee of first company was compensated by related company).

Finally, Plaintiffs contend that veil piercing is appropriate because MWL controls IIRO through an alleged parent-subsidiary relationship.[189] However, the evidence shows that IIRO is not a subsidiary of MWL. *Id.* ¶¶ 115-16. And even if it were, "[i]t is a bedrock principle of New York law that a parent corporation is not liable for the actions of a subsidiary absent extraordinary circumstances justifying piercing the corporate veil."[190] For the reasons discussed above, Plaintiffs cannot show such "extraordinary circumstances."

### b. There Is Also No Support for a Finding that Rabita Trust Was MWL's Alter Ego

Applying these same factors to the relationship between **Rabita Trust** and MWL yields the same result—**Rabita Trust** was not MWL's alter ego. Plaintiffs cannot establish that MWL "complete[ly] dominat[ed]" **Rabita Trust**. The evidence shows that at all relevant times—and to the extent it undertook any functions at all—**Rabita Trust** was controlled by the **GOP**, not MWL. SOF ¶ 133. In the years leading up to 9/11, **Rabita Trust** did nothing and was operationally defunct. *Id.* ¶¶ 140-41, 152.

**Rabita Trust** was independent from MWL and, when it was functional, maintained its own corporate governance, functions, identity, operations, payrolls, budgets, and more. *Id.* ¶¶ 159-65. MWL did not and could not control **Rabita Trust** which was instead largely controlled by the **GOP**. The **GOP** supervised **Rabita Trust**'s operations, with the President or Prime Minister serving as Chairman and another senior official serving as Vice Chairman of the board of directors. *Id.* ¶¶ 131-33, 135. The **GOP's** dominant role in controlling **Rabita Trust** is also underscored by

---

[189] *E.g.,* SAC ¶¶ 218-19, 236, 377 (alleging variously that MWL was IIRO's parent organization, IIRO was MWL's operational arm, MWL was an umbrella organization above IIRO, or IIRO was MWL's subsidiary); Expt. Rpt. of Matthew Levitt at 33 (contending that MWL is "mother of IIRO" and citing immigration court testimony in Canada for proposition) [hereinafter, "Levitt Rpt."]; Rpt. of Jonathan Winer ¶¶ 10.9, 12.18.2 (concluding without citation that IIRO is MWL's subsidiary) [hereinafter, "Winer Rpt."].

[190] *Sahu v. Union Carbide Corp.,* 2012 WL 2422757, at *18 (S.D.N.Y. June 26, 2012), *aff'd*, 528 F. App'x 96 (2d Cir. 2013); *see also Shostack v. Diller,* 2016 WL 958687, at *3 (S.D.N.Y. Mar. 8, 2016) (Daniels, J.) (applying New York law); *Spagnola,* 264 F.R.D. at 87–88; *Boroditskiy,* 314 F.Supp.3d at 495; *Hawknet,* 2009 WL 1309854, at *3.

its funding and financial control. The **GOP** contributed five times more to **Rabita Trust** upon its creation than MWL, *id.* ¶ 129, and coordinated the management of **Rabita Trust**'s assets, audited its accounts, and took responsibility for its finances. **Rabita Trust** conducted its own fundraising and had its own bank accounts operated jointly by two board members. *Id.* ¶¶ 137, 165.

MWL and **Rabita Trust** also had very different missions. **Rabita Trust**'s mission was to repatriate Biharis, *id.* ¶ 122, while MWL had a distinct mission, which included promoting cross-cultural and religious dialogue, spreading moderate Islamic values, and countering extremism through a message of peace and harmony.[191] *Id.* ¶¶ 9-29. The minimal overlap that existed between the two organizations falls well short of the type of overlap that is needed to support an alter ego finding.[192] That MWL helped to establish **Rabita Trust**, provided limited initial capital, and had personnel serving on its board of directors, is insufficient to support an alter ego finding.[193]

### c.    There Was No Agency Relationship Between MWL and IIRO or Rabita Trust

Under New York law, an agency relationship exists "when there is an agreement between the principal and the agent that the agent will act for the principal, and the principal retains a degree of control over the agent."[194] That control is "paramount," and there "is no agency relationship without the principal's "right of control over the alleged agent.""[195] Whether "an agency exists

---

[191] *See Trustees of Mosaic*, 233 F.Supp.3d at 337; *Plumbers*, 84 F.Supp.2d at 350; *Jacobson*, 2007 WL 1774911, at *6; *Hawknet*, 2009 WL 1309854, at *3.

[192] *E. Hampton*, 66 A.D.3d at 127; *Ayco*, 2012 WL 42134, at *8; *Carte Blanche*, 2 F.3d at 29; *Boroditskiy*, 314 F.Supp.3d at 494.

[193] *Id.*; s*ee also Yousef v. Al Jazeera Media Network*, 2018 WL 1665239, at *7 (S.D.N.Y. Mar. 22, 2018) (in legal analysis of parent's control over subsidiary, "'[s]tart-up capital contribution[s]' do not establish financial dependence"); *Seijas v. Republic of Argentina,* 2009 WL 10700009, at *2 (S.D.N.Y. Aug. 19, 2009) (even investment of "hundreds of millions of dollars" by Argentine government in airline insufficient to establish alter ego, absent evidence that Argentina exercised "day-to-day control" over airline's operations).

[194] *In re Parmalat Sec. Litig.* ("*Parmalat I*"), 594 F.Supp.2d 444, 451 (S.D.N.Y. 2009).

[195] *Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP*, 2004 WL 112948, at *5 (S.D.N.Y. Jan. 22, 2004) (quotation omitted).

depends upon the actual interactions of the putative agent and principal[,] not on the perception a third party may have of the relationship,"[196] and the agent must consent to its role.[197]

### 1.    IIRO Did Not Act as MWL's Agent

No agency relationship existed between MWL and IIRO. There is no evidence that MWL and IIRO agreed that IIRO would act for MWL, and MWL did not control IIRO. SOF ¶¶ 102-106. As explained in the section regarding alter ego, MWL could not and did not control IIRO's activities, manage its day-to-day operations, direct it to take any actions, rely on it to carry out any MWL operations, dictate how or where it could operate, or provide it with any financing. *Id.* ¶¶ 88-92, 103, 106, 108.

### 2.    Rabita Trust Did Not Act as MWL's Agent

There was also no agency relationship between MWL and **Rabita Trust**. To the contrary, the evidence reflects that MWL and **Rabita Trus**t were separate and independent entities, that MWL did not control **Rabita Trust**, which was instead substantially controlled by the **GOP**, and that **Rabita Trust** was defunct in the period leading up to 9/11. *Id.* ¶¶ 133, 137, 140-56, 159-65.

### B.    MWL Is not Liable for Any Actions Taken by Employees When They Were Not Employed by MWL or that Were Outside the Scope of Their Employment

There is also no evidentiary basis to conclude that MWL is liable for any alleged tortious conduct by individuals who were not in fact employed by MWL at the time, or by employees who acted against MWL's interests and outside of the scope of their employment. Under New York law, an employer is not vicariously liable for the tortious acts of its employees unless those acts were committed in furtherance of the employer's business and within the scope of employment.[198]

---

[196] *Id.*, at *4 quotation omitted).

[197] *See* Restatement (Third) Of Agency § 1.01 (Am. L. Inst. 2006); *Craig v. Sandals Resorts Int'l*, 69 F.Supp.3d 322, 328 (E.D.N.Y. 2014) ("Actual authority arises from a manifestation of consent from principal to agent.") (quotation omitted).

[198] *In re Terrorist Attacks on Sept. 11, 2001*, 2025 WL 2485427, at *18 (S.D.N.Y. Aug. 28, 2025) (citing *Monterey Bay Mil. House., LLC v. Ambac Assurance Corp.*, 531 F.Supp.3d 673, 710 (S.D.N.Y. 2021)).

"Courts consider five factors in making a scope of employment determination: (1) whether the time, place and occasion for the act was connected to the employment; (2) the history of the employer-employee relationship in actual practice; (3) whether the act is one commonly done by such an employee; (4) the extent to which the act departs from normal methods of performance; and (5) whether the specific act was one that the employer could reasonably have anticipated."[199] The fact that the employee's conduct was unauthorized by the employer or contravened the employer's instructions is relevant under the fourth factor.[200] Likewise, under the fifth factor, which is the "most important,"[201] an employer is not reasonably expected to foresee an "egregious" or "flagrant and unjustified" violation of its policies.[202] Similarly, the diversion of the employer's funds for the benefit of the employee or a third party, at the employer's expense, does not further the employer's business,[203] and is "not imputable to the[] employer[]."[204]

This Court has applied the scope-of-employment requirements strictly in this litigation and has only found them satisfied where an employee's employment actually involved helping terrorists.[205] The employment of the only two individuals identified by Plaintiffs—**Khalifa** and **Jelaidan**—certainly did not involve helping terrorists, and, in any case, it ended long before 9/11.

**Jelaidan** is alleged to have engaged in tortious actions in the 1980s and then again beginning in 1999, but he was only employed by MWL from 1990 until 1995. SOF ¶ 175-76.

---

[199] *Id.,* at *19 (citing *Riviello v. Waldron*, 47 N.Y.2d 297, 303 (1979)).

[200] *Rivera v. State*, 34 N.Y.3d 383, 391 (2019).

[201] *In re Terrorist Attacks*, 2025 WL 2485427, at *20.

[202] *Rivera*, 34 N.Y.3d at 391.

[203] *See In re Parmalat Sec. Litig.* ("*Parmalat III*"), 684 F.Supp.2d 453, 472-73 (S.D.N.Y. 2010).

[204] *In re Parmalat Sec. Litig.* ("*Parmalat II*"), 659 F.Supp.2d 504, 518 (S.D.N.Y. 2009); *aff'd in part, vacated in part on other grounds,* 412 F. App'x 325 (2d Cir. 2011); *see also Bondi v. Bank of Am.* Corp. *(In re Parmalat Sec. Litig.)*, 383 F.Supp.2d 587, 599 (S.D.N.Y. 2005) (theft from corporation not imputed to corporation).

[205] *In re Terrorist Attacks on Sept. 11, 2001* ("*Terrorist Attacks XI*"), 134 F.Supp.3d 774, 785-76 (S.D.N.Y. 2015), *vacated on other grounds* (enactment of JASTA), 2017 WL 8776686 (2d Cir. Feb. 7, 2017) (plaintiffs did not meet burden of showing that alleged Saudi government employees provided "material support" to 9/11 hijackers "within the scope of their office or employment").

63

Therefore the first factor in the scope-of-employment inquiry is dispositive: the "time" of any alleged tortious conduct does not coincide with his employment with MWL. He could not have acted within the scope of this employment with MWL because he was not an employee at the time.

Plaintiffs point to conduct that allegedly occurred during **Jelaidan**'s tenure as **Rabita Trust** Secretary General, which began in 1999, four years after he left MWL. *Id.* ¶ 178. Plaintiffs also cite actions allegedly taken by **Jelaidan** *before* he joined MWL. But that does not resolve the timing problem. Plaintiffs allege that **Jelaidan** is a founding member of Al Qaeda because he fought with bin Laden in Afghanistan *in the 1980s*.[206] Even if true, this preceded the start of **Jelaidan**'s employment with MWL in 1990, and dates back to a period when the *mujahadeen* were coordinating with the United States in fighting the Soviets. *Id.* ¶¶ 245-46. Surely, the Reagan Doctrine in Afghanistan was not a charter for terrorism. Effectively, Plaintiffs ask this Court to ignore the facts and timing of employment and attribute everything **Jelaidan** may have done years before or after to MWL. But even if **Jelaidan** had been an employee throughout this time, any alleged activities would have fallen outside the scope of his employment.

**Khalifa** left MWL in 1993, nearly a decade before the 9/11 attacks, such that anything he is alleged to have done while employed by MWL was too remote in time from 9/11 to support liability. *See supra* Background, Section III.F.2. He also did not engage in any of the alleged acts cited by Plaintiffs within the scope of his employment with MWL. Plaintiffs allege that **Khalifa**, almost exclusively in connection with his employment by IIRO, collected and laundered money for Al Qaeda's operations, and that he built a school to indoctrinate students into jihadism.[207] Even if Plaintiffs were able to establish these allegations through admissible evidence (which they cannot), there is no evidence that **Khalifa** engaged in these activities from MWL's offices or

---

[206] *See e.g.*, Levitt Rpt. (ECF 9250-33) at 30.
[207] Compl. ¶ 229.

64

during his working hours, or that he utilized MWL funds. There is also no suggestion that MWL knew about or approved of such activity. SOF ¶ 189. Indeed, any support for terrorism would have been anathema to MWL's objectives and would have violated MWL's policies.

The circumstances here are akin to those in which the Court has rejected employer liability in this MDL. The Court found that the head of the Islamic Affairs Office in the Saudi Embassy in Germany was *not* acting within the scope of his employment when he met in-person with the plotters of the 9/11 Attacks in Hamburg in 2000, despite the overlap in time, place, and (at a very high level) religion between the individual's employment and the tortious conduct.[208] This Court also rejected a claim that a missionary working for the Saudi Ministry of Islamic Affairs acted within the scope of his employment when allegedly establishing a charity as a fundraising front for Al Qaeda."[209] On the other hand, this Court recently found that two individuals employed by Saudi Arabia as an accountant and missionary were acting within the scope of their employment *when they helped the hijackers establish themselves* in the United States shortly before 9/11, because "the total evidence creates a reasonable inference that the[ir] employment was more than what their official job titles suggest," and their actual roles with the Saudi Government "had some connection with assisting the hijackers."[210] None of that occurred here. To the extent that either of the employees that Plaintiffs have identified did anything to assist Al Qaeda or the 9/11 Attacks while they were employed by MWL (and there is no such evidence), MWL did not know about it, could not have foreseen it, and certainly did not condone it; Al Qaeda's plan to carry out the 9/11 Attacks was anathema to MWL's mission.

## CONCLUSION

For the reasons herein, the Court should grant MWL's motion for summary judgment.

---

[208] *Terrorist Attacks XIV*, 298 F.Supp.3d at 653.
[209] *Id.* at 654.
[210] *In re Terrorist Attacks,* 2025 WL 2485427, at *17-20.

65

April 15, 2026                                Respectfully submitted,

                                             /s/ *Aisha E. R. Bembry*
                                             Eric L. Lewis
                                             Aisha E. R. Bembry (admitted *pro hac vice*)
                                             Sumayya Khatib (admitted *pro hac vice*)
                                             Lewis Baach Kaufmann Middlemiss PLLC
                                             1050 K St NW, Suite 400
                                             Washington, DC 20001
                                             Telephone: (202) 833-8900
                                             Fax: (202) 466-5738
                                             Email: eric.lewis@lbkmlaw.com
                                             Email: aisha.bembry@lbkmlaw.com
                                             Email: sumayya.khatib@lbkmlaw.com

                                             *Counsel for Defendant Muslim World League*