# EXHIBIT 001

This Transcript Contains Confidential Material

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

IN RE: TERRORIST ATTACKS    )   03-MDL-1570 (GBD)(SN)

ON SEPTEMBER 11, 2001       )

                            )

— — —

Tuesday, July 13, 2021

— — —

THIS TRANSCRIPT CONTAINS

CONFIDENTIAL MATERIAL

— — —

Remote video-recorded deposition of JONATHAN M. WINER, held at the location of the witness, commencing at 10:04 a.m., on the above date, before Debra A. Dibble, Certified Court Reporter, Registered Diplomate Reporter, Certified Realtime Captioner, Certified Realtime Reporter and Notary Public.

— — —

GOLKOW LITIGATION SERVICES

877.370.DEPS | fax 917.591.5672

deps@golkow.com

Page 142

MR. MOHAMMEDI: It's 170, I'm sorry, 170 and 171.

(Winer Deposition Exhibit 907, The 9/11 Commission Report, was marked for identification.)

MR. HAEFELE: You're not putting up the pages he referenced, you're putting up different pages.

A. No, these are the pages I referenced.

MR. HAEFELE: These are page 170. These are the pages that he wanted.

A. If we go to the first, second, third paragraph -- hold on. Fourth paragraph one, two, three, four. There's the following sentences, and I'd like to read those sentences and then comment on them with my understanding.

Al-Qaeda also collected money from employees of corrupt charities. It took two approaches for using charities for fundraising. One was to rely on al-Qaeda sympathizers in specific foreign branch offices of large, international charities, particularly those with lax external oversight and ineffective internal controls, such as the Saudi-based al-Haramain Islamic Foundation. Similar charities in various parts of the globe were

Page 143

funded by these large Gulf charities and had employees who would siphon the money to al-Qaeda.

Q. (BY MR. MOHAMMEDI) So it says al-Haramain. It doesn't say WAMY, it doesn't say Muslim World League, correct?

MR. HAEFELE: Objection to form and objection to the interruption.

A. It says, smaller charities in various parts of the globe were funded by these large Gulf charities. The al-Haramain reference is a reference to an entity which Saudi Arabia joined and sanctioned, and it is a "such as." Such as means it's not the only one. Now, there were a limited number of large international charities in Saudi Arabia. And the one the United States government referred to repeatedly as a particular concern in public testimony and in private communications to the Saudi Arabian government were IIRO, the Muslim World League, and WAMY.

Q. (BY MR. MOHAMMEDI) So here, if you -- Mr. Winer, what does it say on those pages that WAMY, Muslim World League, and IIRO played any role in helping create al-Qaeda's global infrastructure. What does it say here?

A. I believe it says, the statement, large

Page 144

international charities such as, which set up, were supporting, smaller charities, is a reference to those three entities.

Q. But my question is very specific. Has it said those names that they form helping create al-Qaeda global infrastructure. Based on your statement in 5.1: Central role in helping al-Qaeda creates its global infrastructure, uniting disparate Muslim groups, in different parts of the world into a common extremist cause. I'm just asking, does -- is it true that WAMY, Muslim World League, and IIRO were not named in this; correct?

MR. HAEFELE: Objection to form.

Q. (BY MR. MOHAMMEDI) That is 9/11 Commission report; correct?

MR. HAEFELE: The report is reticent on the names of who the other large international charities were.

Q. (BY MR. MOHAMMEDI) You're -- but, Mr. Winer, you're the one who wanted to refer me to page 170, 171 to support your opinions; right? Correct?

A. Yes, I'm asking to you understand this in connection with many statements made by U.S. government officials in other forums about these

Page 145

entities, and you put two and two together and it makes four.

Now, if you look on page 171 --

Q. These are your assumptions; correct?

A. I beg your pardon?

Q. These are your assumptions; correct?

A. This is my understanding. Page 171, please. The end of the first paragraph, the first full paragraph: This conclusion does not exclude the likelihood that charities with significant Saudi government sponsorship -- charities -- diverted funds to al-Qaeda. Charities is more than one. It's not just al-Haramain.

Q. First of all, it does not say WAMY, Muslim World League, and IIRO, correct?

MR. HAEFELE: Objection. Argumentative.

A. It is reticent on the identity of those charities.

Q. (BY MR. MOHAMMEDI) And that's based on your assumption, correct?

MR. HAEFELE: Objection.

A. Based on the other statements made by U.S. government officials in a number of other contexts. That is what I believe, correct.

This Transcript Contains Confidential Material

Page 338

THE WITNESS:  I will accommodate and be at 9:30.  I hope that you will have a much more limited time that is not a credit towards the clock tomorrow.  There was a lot of time tolled that was not credited towards the clock, which is why this has gone on now for almost ten hours.

MR. MOHAMMEDI:  And we appreciate that, Mr. Winer.  Thank you very much for being gracious.

THE VIDEOGRAPHER:  Are we all done?

MS. BEMBRY:  Yep.

THE VIDEOGRAPHER:  This ends today's deposition.  We're going to go off the record at 7:54 p.m.

(Time noted: 7:54 p.m. EDT)

--o0o--

Page 340

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections.  You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within sixty (60) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 339

CERTIFICATE

I, DEBRA A. DIBBLE, Registered Diplomate Reporter, Certified Realtime Reporter, Certified Court Reporter and Notary Public, do hereby certify that prior to the commencement of the examination, JONATHAN M. WINER was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that pursuant to FRCP Rule 30, signature of the witness was not requested by the witness or other party before the conclusion of the deposition.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

_____
DEBRA A. DIBBLE, RDR, CRR, CRC
NCRA Registered Diplomate Reporter
NCRA Certified Realtime Reporter
Certified Court Reporter

Dated: 8-3-2021

Page 341

ERRATA

PAGE  LINE  CHANGE

____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____

This Transcript Contains Confidential Material

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

IN RE: TERRORIST ATTACKS    )  03-MDL-1570 (GBD) (SN)

ON SEPTEMBER 11, 2001       )

                            )

— — —

Wednesday, July 14, 2021

— — —

THIS TRANSCRIPT CONTAINS

CONFIDENTIAL MATERIAL

— — —

Remote video-recorded deposition of JONATHAN M. WINER, VOLUME II, held at the location of the witness, commencing at 9:36 a.m., on the above date, before Debra A. Dibble, Certified Court Reporter, Registered Diplomate Reporter, Certified Realtime Captioner, Certified Realtime Reporter and Notary Public.

— — —

GOLKOW LITIGATION SERVICES

877.370.DEPS | fax 917.591.5672

deps@golkow.com

This Transcript Contains Confidential Material

Page 357

Q.   (BY MR. LEWIS)  The Islamist parties. Islamist is his words.  I'll withdraw "radical."

A.   Yeah, generally speaking, Hegghammer is very good.  I prefer to look at his work in its full context.  I believe this material that you just quoted from appears to refer to U.S. support for Afghans, not U.S. support for foreign fighters out of the Gulf.

Q.   Well, the foreign fighters were in many parts of the Afghan-Soviet war fighting with the Afghans; correct?

A.   Yes, but they were a different constellation of people, and there were different consequences.  The United States was not attacked on 9/11 by a bunch of Afghans.

Q.   Well, they were -- I didn't ask you that question, I asked you whether the Arab fighters fought with the Afghans, "yes" or "no."

MR. HAEFELE:  Object to form.

A.   Yes, they fought alongside the Afghans in that vicinity, and they were a separate constellation with separate agendas that went beyond the agenda of the local Afghans, which was focused on Afghan only.

Q.   (BY MR. LEWIS)  Mr. Winer, I'm not asking

Page 358

you about their agenda.  I asked you whether they fought together.  We're not reading their minds. You're going to have to answer my questions as asked or we're going to be here a long time.

Now, let me move on.  Mr. Hegghammer estimates the amount spent by the United States at $10 billion on the Afghan-Soviet war.  Is that consistent with your understanding of the expenditures by the United States during the 1980s with respect to the Afghan-Soviet war?

A.   They were substantial but I don't have a number in front of me.  I'd have to look that number up.  You're reading from something.  It's not in front of me.

Q.   I'm also reading from Hegghammer but I'm just asking you what you know.

A.   The U.S. support for the Afghans was substantial.

Q.   You also reference at 7.3.4.3 on page 41 of your report that during this first Afghanistan period, the CIA learned from an informant that IIRO also provided funding for six terrorist training camps.  Do you see that on page 41 at the bottom of that paragraph?

A.   Yes.

Page 359

Q.   And you are referring to the CIA report that was discussed at length yesterday?

A.   It was discussed in passing yesterday.  I would not say it was discussed at length.

Q.   We'll discuss it at length today, then.

You also say at 10.9.2.1, on page 75, that.  The IIRO Pakistan branch office was the very office identified in the 1996 CIA report that had been used by the IIRO to fund six al-Qaeda training camps.  Do you see that?

A.   Yes.

Q.   Now, the CIA report doesn't say terrorist training camps or al-Qaeda training camps, does it?

A.   It says militant training camps, I believe was the word they used at the time.

Q.   Right.  Is militant the same as terrorist to you?

A.   It depends on the context, really.

Q.   Okay.

A.   And the context of this environment, it became the same because when you took people outside their native countries and they moved from country to country on behalf of a religious war, on behalf of compatriots, it very readily merges from one into the other, particularly when it's directed by

Page 360

someone like Osama bin Laden.  That's what actually happened.

And yes, they were al-Qaeda training camps not just militant training camps.

Q.   Al-Qaeda training camps, when al-Qaeda didn't exist until the last year of this; correct? You don't know when these -- this helping of funding militant training camps happened, do you?  You don't know what year.  You don't even know whether al-Qaeda existed, do you?

MR. HAEFELE:  Objection to form.

A.   In my experience in the area of terrorism, terrorist groups are constantly changing and evolving in their labels.  Sometimes the labels can change in a week or a month or a year.  You have a certain cast of characters who come together for one purpose.  It evolves to another purpose.  And when it begins to involve militants, military combatant activity, the range of tactics go all the way from shooting people to bombing people, to bombing airplanes, to a wide range of threats.

Q.   (BY MR. LEWIS)  That happened during the Afghan-Soviet war?

A.   The foundations for that were in the Afghan-Soviet war.  It evolved further, as I

This Transcript Contains Confidential Material

Page 361

testified yesterday, from Afghanistan to Bosnia to Chechnya and so on, and metastasized further. The training that was received in connection with the foreign fighters in Afghanistan began within the -- at the end of that first period. And the reason why I divide it into periods is because different things happened in different periods, and the end of the first period was the period when al-Qaeda was formed, and -- as al-Qaeda, which itself was an outgrowth of the service office of the MAK. A foreign body itself.

MR. LEWIS: Objection to strike.

Q. (BY MR. LEWIS) We're not going to filibuster this, Mr. Winer. I asked you a question: Do you know when IIRO allegedly helped fund militant training camps, "yes" or "no"?

MR. HAEFELE: Objection, form.

A. I don't have the dates. It was in the course by 1996, and I don't know how many years prior to 1996.

Q. (BY MR. LEWIS) Well, you list it in the first Afghan period, correct?

A. I list the foundations of the -- in the first Afghan period because of the foundations of the service bureau, which was receiving funding from

Page 362

a variety of Islamic charities, including Azzam's position at the World Muslim League --

Q. Again --

A. -- at the Muslim World League, excuse me.

Q. You're going have to answer my question and not break into argument, Mr. Winer. I really want to be polite and courteous, but I am trying to ask you very specific questions.

So let's move forward. You talked about militant training camps. You said they were militant training camps. Did you consider them Islamist militants or just plain old militants?

MR. HAEFELE: Object to form.

A. Oh, they were Islamist militants.

Q. (BY MR. LEWIS) And you don't know, sitting here today, whether the camps that IIRO may have helped fund were camps for Afghans or for Arabs or for anyone, do you?

A. I know that there were camps for people who were trained to be fighters, yes.

Q. And the United States was supporting Islamist militants, too; correct?

MR. HAEFELE: Objection.

A. The United States was supporting the Afghan resistance.

Page 363

Q. (BY MR. LEWIS) And you also are aware that when al-Qaeda came into existence, Osama bin Laden set up his own specialized al-Qaeda training camps; correct?

A. He built on the work that had already been done. And further developed --

Q. He set up separate training camps. That's what I asked.

MR. HAEFELE: Objection to form, and objection on interrupting the witness's answer.

MR. LEWIS: He's going have to answer my question.

A. My understanding is that there were existing training camps and additional training camps were developed.

Tracing who developed which camps when is not something that I've done.

Q. (BY MR. LEWIS) Right. But you know other scholars have and reached that conclusion, including Hegghammer; correct?

A. I would again have to look at Hegghammer's text on that point.

Q. If you don't know, you don't know; that's fine. We'll move on.

Page 364

Have you seen any primary evidence of funding by IIRO of any training camps in Afghanistan?

A. No.

Q. Now, you are aware that the UN report says that IIRO knowingly or unknowingly may have assisted in funding al-Qaeda. So you -- the UN couldn't make a definitive determination; correct?

A. That's your characterization of their finding, but I would prefer to see the finding up and we can go through their exact words together. So what I don't wish to do is to opine on a mixture of their words and your words.

Q. Well, you quote it, and I'm quoting your report quoting that report.

A. So bring me to that quote, please.

Q. You're not remembering it?

Go to page 22 if you don't have it in mind. It's in your report. 6.2.3, sir.

TRIAL TECHNICIAN: Do you know what page that's on?

THE WITNESS: Yes. It's the top of 22. What the report -- what I quoted is as follows: The UN report then named IIRO as an important example of the use by al-Qaeda of

This Transcript Contains Confidential Material

Page 553

Q.   Okay.

A.   And that's what's going on.  It's much easier for me now if I'm allowed to look at material that's basic material that goes with my opinions in which I'm able to have articulated answers, I'll answer the questions that I was asked more precisely, closer to the material than just plucking things out of memory.

MS. PRITSKER:  Mr. Winer, my apologies.  I'm going to interrupt you right now.  I'm going to object and move to strike most of your answer as nonresponsive to my question.  I understand that you are tired.  Would you like to take a break before we continue?

THE WITNESS:  Sure.

MS. PRITSKER:  Okay.

MR. HAEFELE:  While we're on the break, let me just comment that, you know, I understand what you're doing and I'm not going to stop you from doing it, but my understanding was that this was not an endurance contest and that you weren't going to be testing his memory on names that are easily something that an expert would get off

Page 554

of a report somewhere rather than testing his memory for names that, you know, if there's names that you want him to know maybe -- he's right, maybe it would be better if you were to put some document in front of him rather than test his memory like you're testing him right now.

MR. MOHAMMEDI:  Robert, he claims to be an expert, should have at least a name or two he can remember.  He's claiming to be an expert.  Then he should have a name.  At least one or two.

MR. HAEFELE:  My bet is that some things that are fairly common on the tip of your tongue may be not after 12 and a half hours of questioning.  So, you know, you can do what you want.  You can do what you want, but I do think it's going to come out that it makes much --

MR. COTTREAU:  Why don't you just do your witness coaching in the private room.  Okay?  Thanks.

MR. HAEFELE:  I'm not -- he said it.  I'm not saying --

MR. COTTREAU:  Thank you very much.

Page 555

Thank you.

MR. MOHAMMEDI:  You are coaching him, yes.

MR. HAEFELE:  Let's take a break.

MR. MOHAMMEDI:  Go take a break, tell him what to answer.  Okay?  Thanks.

THE VIDEOGRAPHER:  We're going to go off the record.  The time is 4:40 p.m.

(Recess taken, 4:40 p.m. to 4:46 p.m. EDT)

THE VIDEOGRAPHER:  We are back on the record at 4:47 p.m.

Q.   (BY MS. PRITSKER)  Prior to the break we were discussing the Bojinka plot and its participants, but before I go into my questioning again, I will ask again, Mr. Winer, if you could just please pay attention to the exact question that I ask and limit your answer to answering the question that I've put on the record.

We will get through the rest of my questioning a lot faster if we do that.  Thank you.

Can you please list all the names of everyone you can recall here today as who was involved in the Bojinka plot?

A.   Khalid Sheikh Mohammed, Ramzi Yousef were

Page 556

the two critical actors.

Q.   Aside from Khalid Sheikh Mohammed and Ramzi Yousef, can you recall of any other participants of the Bojinka plot?

A.   Not currently.  It's not in my head currently.

Q.   And at the time of the Bojinka plot, was Khalid Sheikh Mohammed a member of al-Qaeda?

A.   He is someone who had met with Bin Laden and had undertaken work with Bin Laden.  The question of when he became a member of al-Qaeda is one that there are different views amongst the scholars.  This goes, again, to the question of what is al-Qaeda, when.

Q.   Do you have an opinion of when Khalid Sheikh Mohammed became a member of al-Qaeda?

A.   My opinion is that it's the distinction of what label a person is putting on themselves at a particular moment of these fellow travelers is not very important.  Because they were engaged in a common purpose, and the common purpose was to develop global strike capacities, targeting the United States.  And as part of their efforts to impose their radical vision of a theocratic rule and weaken secular rule and get people out of Muslim --

This Transcript Contains Confidential Material

Page 557

non-Muslims out of Muslim lands. Essentially the al-Qaeda ideology.

MS. PRITSKER: I'm going to object as nonresponsive to my question --

MR. HAEFELE: I object.

MS. PRITSKER: -- and I move to strike. I'm going to repeat my question. Please listen to my question and answer it as I ask it.

Q. (BY MS. PRITSKER) Do you have an opinion for the purposes of this case as to when Khalid Sheikh Mohammed became a member of al-Qaeda?

A. I would have to go back and study the record further to develop an opinion on that specific issue of which I was not asked.

MR. HAEFELE: Yes.

Q. (BY MS. PRITSKER) Sitting here today, do you currently have an opinion for the purposes of this case as to when Khalid Sheikh Mohammed became a member of al-Qaeda?

MR. HAEFELE: Objection.

A. Sitting here today without studying the record, which is what I always try to do before I form an opinion further, I cannot provide a day. I would not do that.

Page 558

Q. (BY MS. PRITSKER) Do you have an opinion on whether Ramzi Yousef was a member of al-Qaeda at the time of the Bojinka plot?

A. Affiliated with is more an accurate description, I think, than member. He was part of a common purpose. Beyond that, it's theological distinctions, which I'm not prepared to make. Again, this was not the subject of my opinion, and I don't like to make fresh opinions without being able to take time to study the record and make sure they're absolutely accurate.

Q. Can you please provide every basis that you have for providing the opinion that Ramzi Yousef was affiliated with al-Qaeda?

MR. HAEFELE: Object to the form.

A. That's a mischaracterization, I believe, of what I just said. We could go back and read what I just said. Why don't we do that.

Q. (BY MS. PRITSKER) Was Ramzi Yousef affiliated with al-Qaeda?

A. He was associated with al-Qaeda.

Q. What is every reason you have to believe that Ramzi Yousef was associated with al-Qaeda?

A. I can't provide that orally when I have listed a lot of information in a report that took me

Page 559

an extended period of time to write. It's not a simple question, and I'm not prepared today to be able to answer that question with precision and surety in the absence of looking at the materials, which I would always do before rendering an opinion.

Q. What is your methodology that you applied in this case?

MR. HAEFELE: Objection, asked and answered.

A. About 12 hours of testimony ago, I discussed my methodology. Do you want me to again discuss my methodology?

Q. (BY MS. PRITSKER) Yes, please describe your methodology that you applied in this case.

A. Sure.

When I was asked to undertake this expert work, I was given a set of questions. I've read to you earlier today, beginning of my -- your questioning of me, what those questions were.

Those questions were: What were al-Qaeda and its funding needs before 9/11. What was Saudi Arabia's role as a source of funds for al-Qaeda terrorism to 9/11. What was the role of the charities as a source of funds for al-Qaeda and terrorism to 9/11. What were the charities' impact

Page 560

to build al-Qaeda's global strike capabilities. What was the role of training camps in building al-Qaeda capabilities --

Q. Mr. Winer, you're not answering the question that I asked you. I expect you to answer --

My apologies for interrupting, but you are filibustering my question and wasting time on the record rereading your opinions in this case when my question was very simple: What was the methodology you applied to reach your opinions in this case, not what were your opinions about in this case.

So I'm going to move to strike your answer as nonresponsive, and I'm going to ask you please, again, what was the methodology that you applied in this case?

MR. HAEFELE: I'm going to object to the fact that you're interrupting the witness in the middle of his answer and he was trying to answer your question. I know you may not like the answer, but the fact is he was going through and trying to answer the question. So I'm going to object to you preventing the witness from answering your questions.

Page 577

CERTIFICATE

I, DEBRA A. DIBBLE, Registered Diplomate Reporter, Certified Realtime Reporter, Certified Court Reporter and Notary Public, do hereby certify that prior to the commencement of the examination, JONATHAN M. WINER, was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that pursuant to FRCP Rule 30, signature of the witness was not requested by the witness or other party before the conclusion of the deposition.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

_____
DEBRA A. DIBBLE, RDR, CRR, CRC
NCRA Registered Diplomate Reporter
NCRA Certified Realtime Reporter
Certified Court Reporter

Dated: 8-5-2021

Page 578

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections.  You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within sixty (60) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 579

ERRATA

PAGE  LINE  CHANGE

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

Page 580

ACKNOWLEDGMENT OF DEPONENT

I, JONATHAN M. WINER, do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
JONATHAN M. WINER                DATE

Subscribed and sworn to before me this
_____ day of _____, 20 _____.
My commission expires: _____

_____
Notary Public