# EXHIBIT 002

FD-1057 (Rev. 5-8-10)



OFFICIAL RECORD
Document participants have digitally signed.
All signatures have been verified by a
certified FBI information system.

# FEDERAL BUREAU OF INVESTIGATION
### Electronic Communication

**Title:** [ ] To administratively close case    **Date:** 05/27/2021

**CC:** [                    ] (S), (G)

**From:** NEW YORK
[ ] (G)
**Contact:** [                    ] (S)

**Approved By:** [                    ] (S)

**Drafted By:** [                    ] (S)

**Case ID #:** [          ] (F)    [ ] OPERATION ENCORE –

[                                        ] (F)

**Synopsis:** [          ] To administratively close case

[                    ] (G)

**Details:**

[                    ]

EO14040-000001

Title: [REDACTED] To administratively close case
Re: [REDACTED] (F)    05/27/2021

**Case Background**

On 11 September 2001 four coordinated suicide attacks occurred in the United States in New York City and the Washington D.C. area. 19 terrorists from the Islamist militant group, al-Qaeda (AQ), hijacked four passenger jets and intentionally crashed two planes, American Airlines Flight 11 and United Airlines Flight 175, into the Twin Towers of the World Trade Center in New York City. Hijackers crashed American Airlines Flight 77 into the Pentagon in Arlington, Virginia. The fourth jet, United Airlines Flight 93, crashed into a field near Shanksville, Pennsylvania, after passengers attempted to take control before it could reach the hijacker's intended target in Washington D.C.

The FBI investigation into the attacks, internally named PENTTBOM, which included the cooperation of local, state, and other federal agencies, identified the 19 hijackers and linked the hijackers to AQ. Subsequently, in a number of publicized video, audio, interview, and printed statements, senior members of AQ asserted responsibility for organizing the September 11 attacks. Ultimately, the core investigation revealed that Usama Bin Laden (UBL) and Khalid Sheikh Mohammed (KSM) each played critical roles in the 9/11 attack plot.

In June 2007, the FBI's New York field office (NYO) opened a subfile under the PENTTBOM investigation file to organize information obtained from the planned exploitation of intelligence targets that were previously identified throughout the PENTTBOM investigation. Specifically, the NYO sought to obtain a greater understanding of 9/11 hijackers Nawaf al-Hazmi's (Hazmi) and Khalid al-Mihdhar's (Mihdhar) past interaction with and connectivity to the Southern California Muslim community in an attempt to explain how they may have gained assistance after their arrival in Los Angeles in January 2000.

In October 2007, the NYO administratively moved the

EO14040-000002

Title:          ▮▮▮▮    To administratively close case
Re:      ▮▮(F)▮▮    05/27/2021

aforementioned subfile to its own separate NYO investigation casefile named "Operation Encore." The predication of the investigation had the same purpose as the original PENTTBOM subfile investigation in that it served as an enterprise counterterrorism investigation into a possible network of individuals who were suspected of providing assistance to the hijackers and as an intelligence gathering operation into AQ's tactics and tradecraft. Specifically the named main subjects, Fahad Al-Thumairy (Thumairy), Omar Al-Bayoumi (Bayoumi), and Musaed Al-Jarrah (Al-Jarrah), allegedly provided (or directed others to provide) Hazmi and Mihdhar with assistance in daily activities, including procuring living quarters and assistance with assimilating into Southern California. The investigation sought to determine whether these three subjects wittingly provided such assistance with the knowledge that Hazmi and Mihdhar were here to commit an act of terrorism.

▮▮▮▮ Additionally, separate full investigations on other associated individuals from other field offices, some of which were opened before and after Operation Encore, were also administratively consolidated under the Operation Encore casefile. *Refer to* ▮▮(F)▮▮ *Serial* ▮(F)▮

▮▮(G)▮▮

▮▮▮▮ Thumairy, Bayoumi, and Al-Jarrah, all NON-USPERs, remain OCONUS, and are believed to live in Saudi Arabia. ▮(A),(G),(J-1)▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮ **Investigation Summary**

▮▮▮▮ The investigation was predicated upon the theory that Al-Jarrah used his position as the Head of Islamic Affairs at the Saudi Arabian Embassy in Washington D.C. to oversee and direct the facilitation of the hijackers through his subordinates, Thumairy and Bayoumi, as well as, his

EO14040-000003

Title: ▢ To administratively close case
Re: ▢ (F) 05/27/2021

own personal contact with the hijackers.

▢ *Al-Jarrah*

▢ Al-Jarrah, a Saudi national, was listed as an accountant for the Embassy of the Kingdom of Saudi Arabia on the United States Department of State diplomat's list.

▢ A ▢ (O-1) CHS reported in March 2003 that Al-Jarrah was the director of Islamic Affairs at the Saudi Arabian Embassy in Washington D.C. beginning in February 1991 and his official responsibilities were to manage and control all assignments of Saudi Imams in the United States and facilitate the issuance of diplomatic visas to these individuals. Saudi Arabian Imams who were assigned to the United States through this process reported to Al-Jarrah and he served as the coordinator of their activity while they were inside the United States. He reportedly left his post in 2005 after serving approximately fourteen years in such position.

▢ (O-1) Al-Jarrah may have been trying to bring Saudi Sunni Salafi extremists into the United States through his position at the Embassy of the Kingdom of Saudi Arabia. (O-1) ▢ (O-1) Al-Jarrah was heavily connected to Saudi Sunni extremists operating inside the United States, specifically with the Southern California based network of Mohammed al-Muhannah (Muhannah) and Thumairy. Lastly, ▢ (O-1) Al-Jarrah was a controlling, guiding, and directing influence on all aspects of Sunni extremist activity in Southern California and had been directing, controlling and funding Muhannah and Thumairy since their arrival in the United States.

▢ The investigation into Al-Jarrah ▢ (A),(G),(J-1),(D) (A),(G),(J-1),(D) however, No additional information was

4

Title: ▓▓▓▓▓ To administratively close case
Re: ▓▓ (F) ▓▓ 05/27/2021

revealed outside of the CHS reporting and telephone information.

▓▓▓ Al-Jarrah was also the subject of an FBI ▓▓ (A),(G),(J-1) ▓▓ investigation opened in January 2003 predicated upon information ▓▓ (A),(G),(J-1) ▓▓ He was interviewed twice by the FBI in 2004 in connection with that investigation. Al-Jarrah permanently departed the United States in July 2006 (J-3) ▓▓ (J-3) ▓▓. While Al-Jarrah maintained regular contact with the Saudi Embassy after leaving the United States, he was no longer employed there. The investigation was closed in July 2007.

▓▓ *Thumairy*

▓▓ Thumairy, a Saudi national, was an Imam at the King Fahd Mosque (KFM) in Culver City, California and was described in United States State Department documentation as an Administrative Officer at the Consulate of the Kingdom of Saudi Arabia in Los Angeles, California. ▓▓ (C-1) ▓▓

▓▓ Prior to Operation Encore, Thumairy was a main subject of a Los Angeles full investigation based on his phone connectivity with Bayoumi and his potential association to Hazmi and Mihdhar. Furthermore (A), (G), (J-1) reported that he was a "hard core extremist" whose sermons at the KFM appealed to the extremist and militant attendees of the mosque.

▓▓ Lastly, a review of Thumairy's financial transactions revealed connections with a Saudi individual, Jarallah Al-Jarallah, which were believed to be linked to a Saudi based money laundering scheme to move money around the Middle East region. FBI Los Angeles opened a full investigation into those transactions in April 2005 and closed it in

5

EO14040-000005

Title: ▮▮▮▮    To administratively close case
Re: ▮▮▮▮ (F)    05/27/2021

April 2006.

▮▮▮▮ Operation Encore also looked into the activity associated with Yemen-based number +9671200578. This phone number first came to the FBI's attention shortly after the attacks on the United States Embassies in Nairobi, Kenya, and Dar Es Salaam, Tanzania, on 07 August 1998. Khaled Rasheed Daoud Al-Owhali (Al-Owhali), one of the two suicide attackers in Nairobi, survived the attack and called this number for assistance in fleeing Kenya. Al-Owhali was later captured in Kenya and identified this number during his confession to the FBI, at which time he admitted to calling this number both before and after the attack. Al-Owhali identified the telephone number as belonging to a close friend, Ahmad Al-Hada (Al-Hada), with whom he fought along side of in Afghanistan. Subsequent investigation determined that this number was located in Sanaa, Yemen, and was subscribed to by Al-Hada. It was later reported that one of his daughters was married to Khalid al-Mihdhar and another to Ahmed Muhammad al-Darbi, a known AQ member and former Guantanamo Bay Detainee.

(A), (G), (J-1),(D)

▮▮▮▮ The investigation to determine Thumairy's association with the 9/11 hijackers was closed in December 2008 due to the following:

6

EO14040-000006

Title: [redacted] To administratively close case
Re: [redacted] (F) 05/27/2021



Thumairy was also interviewed by the FBI at the Los Angeles International Airport on 08 May 2003. He was refused entry into the United States and was returned to Saudi Arabia. He was re-interviewed in February 2004 by FBI agents at [redacted (C-1)] No new information was garnered as a result of either of these interviews.

iii.) the U.S. Attorney's Office conclusion that there was insufficient evidence to prosecute Thumairy at such time.

*Bayoumi*

Bayoumi, a Saudi national, arrived in the United States in June 1995 on [redacted (J-3)] to study and also worked for the Saudi aviation company, Dallah AVCO.



Bayoumi co-signed the Parkwood apartment lease agreement for

7

Title: ▓▓▓▓▓▓  To administratively close case
Re: ▓▓▓ (F) ▓▓▓  05/27/2021

Hazmi and Mihdhar in San Diego, California in February 2000 because the hijackers did not have the necessary credit history for the rental application and also because the leasing company did not permit cash payments. In the fall of 2000, Bayoumi moved to Birmingham, England, where he resided with his family and attended Aston University. Bayoumi was detained by New Scotland Yard (NSY) ▓▓▓ (C-1) ▓▓▓ (C-1) ▓▓▓▓▓▓▓▓

In a 2003 interview in Riyadh, Saudi Arabia, Bayoumi stated he received a salary from his employer, Dallah AVCO, and a stipend to cover tuition fees, housing, and other living expenses while he attended school in the United States.

According to Telephone Application (TA) there was telephone connectivity between Bayoumi and Thumairy beginning in December 1998 and then sporadically until Bayoumi left the country in the fall of 2000. Connection periods included periods of time when Hazmi and Mihdhar were in the Los Angeles and San Diego areas; however the nature and/or content of those discussions were not revealed as part of the investigation efforts.

**Investigative Evidence**

As part of the investigation that spanned from 2007 to 2016, the case team reviewed financial records, telecommunication records, travel records, conducted hundreds of interviews relating to the main subjects in addition to known associates (voluntarily ▓▓▓ (D) ▓▓▓ , conducted search warrants of various residences in Southern California,

8

EO14040-000008

Title: _____ (F) _____ To administratively close case
Re: _____ 05/27/2021

including a review of materials collected by New Scotland Yard via search warrant, _____ (A),(G), (J-1) _____ and coordinated efforts with foreign partners, in order to determine if the Southern California Muslim community had a pre-existing support network in place with advanced knowledge that the hijackers, Hazmi and Mihdhar, were in the United States to commit an act of terrorism.

_____ Additionally, during 2019 and 2020, the FBI re-examined the Operation Encore case file to identify any missed leads, opportunities, or investigative actions which may advance the case, including the summarization ECs serials in _____ (F) _____ Serials _____ (F) _____ documented in April 2016. Various CONUS based persons of interest were re-interviewed; no additional information was obtained as part of those interviews and no material contradicting statements were made as compared to the initial interviews.

**AQ Tradecraft**

_____ Consent statements from various AQ members, including KSM, Abdul Rahim Abdu Al Nashiri, Walid Muhammad Salih Khallad Bin Attash, Ramzi Bin Al Shibh, Abd Al Aziz Ali Ali aka Ammar Al Baluchi, and Mustafa Ahmed Al Hawsawi, regarding the operational planning of AQ's larger scale terrorist attacks, 9/11 and USS Cole, indicated that the AQ leadership compartmentalized the attack groups and roles within the operation. They did not make the attack plans known in advance to others for fear the nature of the attack would be discovered, which is consistent with the FBI's assessment of the last two decades of large scale AQ-related attacks. Specifically, in relation to the 9/11 attacks, the hijackers knew there was a martyrdom operation, but did not know about the nature of the operation until shortly before the attack for operational security reasons. *Refer to* _____ (F) _____ *Serials* _____ (F) _____

_____ This information corroborated that Thumairy, Bayoumi, and Al-

EO14040-000009

Title:                To administratively close case
Re:          (F)       05/27/2021

Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack.

## Material Support to Terrorism

For federal criminal charges of conspiracy to provide material support and resources to terrorists to be filed in accordance with 18 U.S.C. 2339B, the totality of evidence from the investigation needed to establish that Thumairy, Bayoumi, and Al-Jarrah each had "knowledge that the organization is a designated terrorist organization...that the organization has engaged or engages in terrorist activity...or that the organization has engaged or engages in terrorism (section 6603(c)(2))."

As further explained in United States vs Warsame, 537 F.Supp.2d 1005 (D.Minn. 2008), "under the plain language of 2339B...the government must prove that the defendant 'knowingly provides material support or resources to a Foreign Terrorist Organization [FTO]', rather than to individuals who happen to be FTO members...In other words, even where a donor's contribution to an individual FTO member confers some benefit upon the terrorist organization, the prosecution must prove that the donor knew the intended recipient of his contribution was a designated FTO...Whether the donor knew the recipient was a member of a FTO could, of course, be relevant to a determination that the donor ultimately intended the contribution to go to the FTO itself. Nonetheless, the prosecution must prove that the donor knowingly provided material support or resources to the FTO."

Based on the the totality of these investigative efforts and in coordination with the Assistant United States Attorneys of the Southern District of New York, it was jointly determined, that insufficient evidence existed to prosecute Thumairy, Bayoumi, and Al-Jarrah for wittingly conspiring to assist the AQ hijackers in furtherance of the 9/11 attack. The United States Attorney's Office for the Southern

EO14040-000010

Title: ░░░░░ To administratively close case
Re: ░░░░ (F) ░░░░ 05/27/2021

District of New York (USAO-SDNY) was consulted regarding FBI-NYO's intent on closing this investigation. USAO-SDNY had no objection to the closing of this investigation.

**Conclusion**

After nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged, which is consistent with the final conclusion of the 9/11 Commission Report which stated that "no new information to date that would alter the original findings of the 9/11 Commission regarding the individuals responsible for the 9/11 attacks or for supporting those responsible for the attacks."

The NYO completed all logical and reasonable investigative steps in accordance with established CTD guidance. No potential criminal violations or priority threats to national security warranting further investigation were identified. All leads have been completed. The NYO is closing captioned matter. In the event additional derogatory information is discovered regarding the captioned subjects, NYO will consider re-opening this investigation.

Lastly, the SDNY concurs with the closing of the investigation; SDNY is willing to re-engage investigative measures if new information comes to light which may bear investigation.



EO14040-000011