# EXHIBIT 032

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re: Terrorist Attacks on September 11, 2001 ) No. 03 MDL 1570 (GBD) (SN)

This applies to:

*Ashton, et al. v. Al Qaeda Islamic Army, et al., Case No.* 02-cv-6977;
*Burnett, Sr., et al. v. Al Baraka Investment & Development Corp., et al.*, Case No. 03-cv-9849;
*Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.*, Case No. 04-cv-7065;
*Salvo, et al. v. Al Qaeda Islamic Army, et al.*, Case No. 03-cv-05071;
*Continental Casualty Co., et al. v. A1 Qaeda et al.*, Case No. 04-cv-05970;
*Euro Brokers Inc., et al. v. Al Baraka, et al.*, Case No. 04-cv-7279;
*Federal Insurance Co., et al. v. A1 Qaida, et al.*, Case No. 03-cv-6978;
*O'Neill, Sr., et al. v. Al Baraka et al.*, Case No. 04-cv-1923;
*Maher, et al. v. Islamic Emirate of Afghanistan a/k/a The Taliban, et al.*, Case No. 1:23-cv-02845

**DECLARATION OF MOHAMED HELLES**

1. I, Mohamed Helles, hereby declare that I am over the age of eighteen years and of sound mind to make this declaration. I have personal knowledge of the facts set forth below. If called as a witness, I could and would testify to the statements and facts contained herein, all of which are true and accurate to the best of my knowledge and belief.

2. I studied at the University of Al-Imam Mohammed Bin Saud in Riyadh attaining a Bachelor's degree in Economics before entering the work force in 1993, when I joined the Secretariat General at the International Islamic Relief Organization ("IIRO") in Jeddah, Saudi Arabia. I have worked at IIRO since 1993, holding several positions since I joined. I started as a Secretary in the Department of Regional Affairs. In approximately 1995, the name of this department changed to the Department of External Offices. In approximately 1997, I was promoted to the position of Researcher. In approximately 1998, the Department of External Offices and the Department of Local Offices merged to become the Department of Offices, but I remained in my role. In approximately 2020, I was promoted to the position of Consultant in the same department. In these various roles I became familiar with IIRO's regulations for employees, foreign offices protocols, and several other topics, which I address herein. Unless otherwise stated, my declaration concerns the time period from 1993, when I joined IIRO, through December 31, 2004.

3. As an international aid organization in the humanitarian field, IIRO provided humanitarian relief and supported sustainable development across the globe by providing clothing, medicine, shelter, healthcare, education, and more to individuals affected by natural disasters. IIRO frequently responded to large-scale humanitarian disasters in several regions and enjoyed an outstanding reputation for its work.

4.      I joined IIRO because I believed in its mission and work. During my tenure at IIRO, my colleagues and I worked hard to help those in need, consistent with IIRO's mission. I am proud of IIRO's humanitarian efforts and of my career at IIRO.

5.      The Secretary General, the top official at IIRO, and his advisors, the Assistant Secretaries General, and the various departments and their directors formed the Secretariat General. The Secretariat General was the main executive body of IIRO.

6.      IIRO established local offices in Saudi Arabia and foreign offices outside of Saudi Arabia. IIRO had approximately 50 local and foreign offices combined and engaged in humanitarian activities in more than 120 countries.

7.      IIRO employees, including directors of the local and foreign offices, were required to dedicate their working hours to their official duties at IIRO, unless an exception was authorized by the Secretariat General.

8.      IIRO employees, including local and foreign office directors, were prohibited from engaging in personal commercial ventures, political activities, or violent, extremist, or terrorist activities or using IIRO resources for these purposes.

9.      The Local and Foreign Offices Department (and later the Department of Offices), which was a part of the Secretariat General, conducted oversight of the local and foreign offices, including monitoring the performance and accomplishments of these offices as well as the administrative and financial transactions between these offices and the Secretariat General.

10.     In coordination with the Head Office, local offices were assigned specific foreign offices to oversee. In some instances, multiple local offices oversaw the same foreign offices.

11.     As assigned by and in coordination with the Head Office, local offices conducted oversight of program and project implementation by foreign offices and assessed their progress.

12.     IIRO's local offices, together with the Head Office, handled the collection of donations, and participated in planning IIRO's programs, preparing annual budgets, and conducting oversight of overseas programs and projects through field visits.

13.     IIRO local offices provided a monthly report on general and earmarked donations to the Head Office's Financial Department and the relevant Head Office welfare departments (e.g., Social Welfare, Healthcare Department, Education Department, etc.).

14.     Local offices were prohibited from sending funds directly to foreign offices or other affiliates.

15.     Local offices were required to transfer donations to the Head Office, which in turn sent money to foreign offices for programs and projects previously adopted in their approved budget.

16. The Department of External Offices, and later the Department of Offices, coordinated with, monitored, and provided administrative oversight of the foreign branch offices, including the implementation of projects and programs undertaken by those offices.

17. Foreign offices were tasked with implementing projects under specific programs developed by the Head Office. Programs covered areas such as health and social welfare and were comprised of designated projects to be implemented by IIRO foreign offices. Projects referred to the type of assistance provided by IIRO under each program; for example, the operation of vaccination and health clinics and the digging of wells.

18. Foreign offices were responsible for managing IIRO projects and programs that were being undertaken in their host country within the confines of the previously approved budget.

19. Foreign office directors reported and were accountable to the Secretariat General.

20. Foreign offices were also accountable to local authorities under applicable local laws.

21. Foreign offices coordinated with the Head Office to determine which programs and projects to implement, proposed budgets for programs and projects, and reported periodically on the status of those programs and projects.

22. IIRO established guidelines and regulations (hereinafter, the "Protocols") that were applicable to all foreign offices throughout my tenure. The Head Office supplemented these Protocols, including via circulars and resolutions (hereinafter, the "Directives") that it distributed from time to time. When Dr. Adnan Basha became Secretary General, he implemented a more comprehensive version of these guidelines and regulations.

23. Foreign office directors ran and managed foreign office affairs, including by ensuring compliance with IIRO's Protocols and Directives.

24. Under these Protocols and Directives, foreign office directors were, among other things, required to: (i) safeguard IIRO interests and preserve IIRO property, investments, and funds; (ii) provide regular reports to Head Office regarding the office's performance, projects, programs, and employees; (iii) facilitate and assist with field visits by other IIRO representatives, including by answering any questions; and (iv) safeguard funds transferred by the Secretariat General to the foreign office and provide receipts and other documentation of expenditures.

25. Under these Protocols and Directives, foreign office directors were, among other things, prohibited from: (i) exploiting their position at IIRO for personal gain or advancing their personal interests at IIRO's financial or reputational expense; (ii) opening bank accounts without the Secretary General's prior approval; (iii) transferring funds between projects or using funds for purposes other than those previously approved absent the Secretary General's prior approval; (iv) committing or promising funding to others; (v) borrow funds from IIRO; (vi) selling, renting, or gifting IIRO assets or property; (vii) taking business trips without the approval of Head Office; (viii) interfering in the politics of the host country or favoring a particular group; or (ix) participating in events or conferences without prior approval from the Secretary General.

26.     The hiring process for new employees for foreign offices required the foreign office director to present potential candidates to the Secretariat General. The submission was to include certain documents, including the candidate's educational credentials, identification, a letter of recommendation, a health certification, a criminal background check, and a declaration by the candidate that he/she is not a member of any political organization or party. A candidate is only hired with the approval of the Secretary General.

27.     Each foreign office employed a Financial Officer, who served as the office's accountant or treasurer. IIRO established Protocols applicable to all Financial Officers.

28.     IIRO donor funds earmarked for specific locations could not be transferred to another location except with the approval of the donor and the Secretariat General.

29.     Representatives from Head Office and local offices were tasked with conducting field visits to foreign offices and submitting visit reports to the Secretary General or the Assistant Secretary General of Finance.

30.     The main purpose of these field visits was to verify that IIRO's Protocols and Directives were being implemented and followed.

31.     During field visits to foreign offices, IIRO representatives coordinated with foreign office directors and reported to the relevant Head Office department on their visit.

32.     Local office representatives conducting field visits had no discretion to approve the implementation of new programs, projects, or funding.

33.     Local office representatives were required to prepare a report of the visit and submit it to the Head Office.

34.     During my tenure, all IIRO employees were required to adhere to ethical standards, including understanding their job descriptions, following IIRO's Protocols and Directives, and complying with instructions from superiors. They were expected to report on time, avoid conflicts of interest, and protect IIRO's interests. Employees were prohibited from using their positions at IIRO for personal gain, disclosing confidential information, violating IIRO's mission, or engaging in political activities.

35.     IIRO periodically reviewed and evaluated its financial and administrative protocols to ensure they complied with industry-standard best practices, and IIRO required its departments and branches to comply with them to enhance its financial and administrative standards.

36.     Missionaries were not employed by IIRO. As part of IIRO's educational programing, IIRO provided missionaries with a de minimis stipend.

37.     IIRO conducted its own fundraising.

38. I have been made aware of a post-9/11 allegation that Dr. Abdul Hamid al-Mujil, who worked as the Executive Director, and then the General Supervisor, of the Eastern Province, supported Islamic militant groups and was described by someone in the US government as the "million dollar man"; however, I never heard these allegations before 9/11 and have no knowledge of any facts that would support them. During my tenure in the Local and Foreign Offices Department and thereafter in the Department of Offices, I worked with and interacted with directors and employees from the local and foreign offices, including Dr. al-Mujil. I did not observe and was not made aware of any behavior by Dr. Abdul Hamid al-Mujil that suggested he supported Al Qaeda's mission or that he was assisting Al Qaeda in any way, financially or otherwise.

39. I have been made aware of a post-9/11 allegation made in this litigation that Samir Al Hasan, a Yemeni, worked for IIRO in Afghanistan. I have never heard of an IIRO employee by that name.

40. I have been made aware of a post-9/11 allegation made in this litigation that IIRO employee, Yusuf Al-Hamdan, was associated with Al Qaeda. Al-Hamdan's employment with IIRO ended on November 29, 1995. During his tenure, I did not observe and was not made aware of any behavior by Al-Hamdan that suggested he supported Al Qaeda's mission or that he was assisting Al Qaeda in any way, financially or otherwise.

41. I have been made aware of post-9/11 allegations made in this litigation that Mahmoud Afif was an IIRO Philippines director who funneled funds to the Abu Sayyaf Group. Mahmoud Afif was not an IIRO Philippines director. He was a representative in Zamboanga City in the Philippines. In his role as an IIRO representative, he reported to the IIRO Philippines director. He did not control finances nor did he have any access to IIRO's bank accounts. Afif's employment with IIRO ended on November 12, 1996. During his tenure with IIRO, I did not observe and was not made aware of any behavior by Afif that suggested he supported the Abu Sayyaf Group, or any other extremist group.

42. I have been made aware of post-9/11 allegations made in this litigation that Abdulhadi Daguit funneled IIRO funds to the Abu Sayyaf Group. I have no knowledge of or facts to support these allegations. During his twenty-year tenure, I did not observe and was not made aware of any behavior by Daguit that suggested he supported the Abu Sayyaf Group or any other extremist group.

43. During my tenure at IIRO, I did not observe the organization or anyone within the organization providing any support, whether implicit or explicit, to Al Qaeda or any other terrorist organizations, including terrorist or militant training camps. To my knowledge, IIRO did not employe any members of al-Qaeda or anyone known to be an Al Qaeda sympathizer.

I, Mohamed Helles, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

[signed]
Mohamed Helles

Executed On: 13/4/2026

محكمة مقاطعة الولايات المتحدة
مقاطعة نيويورك الجنوبية

في القضية المتعلقة بهجمات إرهابية في 11 سبتمبر 2001

رقم 3 MDL 1570 (SN) (GBD)

يطبق على الاتي:

*أشتون وآخرون ضد القاعدة الإسلامية العسكرية وآخرين، قضية رقم 02-cv-6977 ؛*
*بورنت وآخرون ضد مؤسسة البركة للاستثمار والتنمية وآخرين، قضية رقم 03-cv- 9849 ؛*
*كانتور فيتزجرالد وشركائه وآخرون ضد بنك اكيدة الخاص (ش.م.م.) وآخرين، قضية رقم 04-cv-7065 ؛*
*سالفو وآخرون ضد القاعدة الإسلامية العسكرية وآخرين، قضية رقم 03-cv-05071 ؛*
*شركة كونتيننتال كاجولتي وآخرون ضد القاعدة وآخرين، قضية رقم 04-cv-05970 ؛*
*يورو بروكرز إنك وآخرون ضد البركة وآخرين، قضية رقم 04-cv-7279 ؛*
*شركة التأمين الفدرالي وآخرون ضد القاعدة وآخرين، قضية رقم 03-cv-6978 ؛*
*أونيل وآخرون ضد البركة وآخرين، قضية رقم 04-cv-1923 ؛*
*ماهر وآخرون ضد الإمارة الإسلامية في أفغانستان المعروفة أيضاً بالطالبان وآخرين، قضية رقم 1:23-cv-02845*

**تصريح محمد حلس**

1. أنا محمد حلس أصرّح بموجبه بأنني تجاوزت الثامنة عشرة من عمري وأنني بكامل قواي العقلية لأقوم بهذا التصريح. لدي معرفة شخصية بالوقائع المبيّنة أدناه. إذا تم استدعائي كشاهداً، أنا قادر وسأشهد على البيانات والوقائع الواردة هنا والتي هي كلها صحيحة ودقيقة على حد علمي واعتقادي.

2. درست في جامعة الإمام محمد بن سعود في الرياض وحصلت على درجة باكلوريوس بالإقتصاد قبل أن ألتحق بسوق العمل في عام 1993 عندما انضممت إلى الأمانة العامة لهيئة الإغاثة الإسلامية العالمية ("الهيئة") في جدة، السعوديّة. عملت في الهيئة منذ عام 1993 وشغلت عدة مناصب منذ انضمامي إليها. بدأت كسكرتير في ادارة الشؤون الإقليميّة وفي حوالي 1995 تغير مسمى هذه الإدارة إلى إدارة المكاتب الخارجية ومن ثم ترقيت الى منصب باحث في حوالي 1997. في حوالي 1998 دمجت ادارة المكاتب الخارجية وادارة المكاتب المحلية لتصبح إدارة المكاتب ولكنني استمريت في منصبي. في حوالي 2020 ترقيت الى مستشار في نفس الإدارة. بحكم هذه المناصب المختلفة اكتسبت معرفة باللوائح الخاصة بالموظفين وبروتوكولات المكاتب الخارجية والعديد من المواضيع الأخرى التي سأعرضها فيما يلي. ما لم يُذكر خلاف ذلك فإن تصريحي يغطي فترة انضمامي إلى الهيئة منذ 1993 وحتى 31 ديسمبر 2004.

3. كمنظمة عالمية في المجال الإنساني، قدمت الهيئة الإغاثة الإنسانية ودعمت التنمية المستدامة حول العالم من خلال توفير الملابس والأدوية والمأوى والرعاية الصحية والتعليم والمزيد من المساعدة للأشخاص المتضررين من الكوارث الطبيعية. استجابت الهيئة في كثير من الأحيان إلى عدة مناطق عانت من كوارث إنسانية كبرى وكانت تتمتع بسمعة ممتازة بسبب أعمالها.

4. انضممت إلى الهيئة لأنني كنت مؤمنًا برسالتها وأعمالها. وخلال عملي لدى الهيئة، عملت مع زملائي بجد لمساعدة المحتاجين بما يتماشى مع رسالة الهيئة. أنا فخور بجهود الهيئة الإنسانية وبمسيرتي المهنية في الهيئة.

5. شكّل الأمين العام وهو أعلى مسؤول في الهيئة، مع مستشاروه ومساعدو الأمناء العامين والإدارات المختلفة ومديروها الأمانة العامة/المكتب الرئيسي. كانت الأمانة العامة هي الجهاز التنفيذي الرئيسي للهيئة.

6. أنشأت الهيئة مكاتب داخل وخارج المملكة العربية السعودية. . بلغ عدد مكاتب الهيئة حوالي 50 مكتبًا داخل المملكة وخارجها وقد شاركت في أنشطة إنسانية في أكثر من 120 دولة.

7. كان على موظفو الهيئة، بما فيهم مديري المكاتب المحلية والخارجية، تكريس ساعات عملهم لأداء مهامهم المتعلقة بالهيئة ما لم تُجز الأمانة العامة استثناءً.

8. كان يُحظر على موظفي الهيئة، بمن فيهم مدراء المكاتب المحلية والأجنبية، الانخراط في مشاريع تجارية شخصية أو أنشطة سياسية أو أنشطة عنيفة أو متطرفة أو إرهابية، أو استخدام موارد الهيئة لهذه الأغراض.

9. قامت إدارة المكاتب المحلية والخارجية (ولاحقاً إدارة المكاتب) والتي كانت جزءًا من الأمانة العامة بالإشراف على المكاتب المحلية والخارجية بما في ذلك مراقبة أداء وإنجازات هذه المكاتب وكذلك المعاملات الإدارية والمالية بين هذه المكاتب والأمانة العامة.

10. بالتنسيق مع المكتب الرئيسي، تم تكليف بعض المكاتب المحلية بالإشراف على مكاتب خارجية معينة. في بعض الحالات، أشرفت عدة مكاتب محلية على نفس المكاتب الخارجية.

11. بناءً على التكليف الصادر من المكتب الرئيسي وبالتنسيق معه كانت المكاتب المحلية تشرف على تنفيذ المشاريع والبرامج من قبل المكاتب الخارجية وتقيم تطوراتهم.

12. تولت المكاتب المحلية والمكتب الرئيسي معاً مسؤولية جمع التبرعات وشاركت في تخطيط برامج الهيئة وإعداد الميزانيات السنوية والإشراف على البرامج والمشاريع الخارجية من خلال زيارات ميدانية.

13. قامت المكاتب المحلية بتقديم تقارير شهرية على التبرعات العامة والمخصَّصة إلى الإدارة المالية في المكتب الرئيسي وإلى الإدارات المعنية بالرعاية (مثل الرعاية الاجتماعية، الرعاية الصحية، رعاية التعليمية وغيرها).

14. كان يحظر على المكاتب المحلية إرسال المبالغ المالية مباشرة إلى المكاتب الخارجية أو جهات تابعة أخرى.

15. كان يتوجب على المكاتب المحلية تحويل التبرعات إلى المكتب الرئيسي، الذي بدوره أرسل المبالغ إلى مكاتب خارجية للبرامج والمشاريع المعتمدة مسبقاً في ميزانياتهم المصادق عليها.

16. قامت إدارة المكاتب الخارجية، ولاحقًا إدارة المكاتب، بالتنسيق مع المكاتب الفرعية الخارجية ومراقبتها، وتوفير الرقابة الإدارية عليها، بما في ذلك تنفيذ المشاريع والبرامج التي تقوم بها تلك المكاتب.

17. كانت من مهمة مكاتب الهيئة الخارجية تنفيذ مشاريع ضمن برامج محددة يضعها المكتب الرئيسي. وقد شملت هذه البرامج مجالات مثل الصحة والرعاية الاجتماعية، وتكوّنت من مشاريع مخصّصة تنفذ من قبل المكاتب الخارجية للهيئة. ويُقصد بالمشاريع نوع المساعدات التي تقدمها الهيئة ضمن كل برنامج، مثل تشغيل عيادات التطعيم والعيادات الصحية وحفر الآبار.

18. كانت المكاتب الخارجية مسؤولة عن إدارة مشاريع وبرامج الهيئة المنفذة في دولة الاستضافة وذلك ضمن حدود الميزانية المعتمدة مسبقًا.

19. مديري المكاتب الخارجية كانوا يخضعوا لإشراف الأمانة العامة ومسؤولين اتجاهها.

20. كما كانت المكاتب الخارجية خاضعة للمساءلة أمام السلطات المحلية وفقًا للقوانين المحلية السارية.

21. كانت المكاتب الخارجية تنسّق مع المكتب الرئيسي لتحديد البرامج والمشاريع التي سيتم تنفيذها وتقترح الميزانيات الخاصة بهذه البرامج والمشاريع كما كانت ترفع تقارير دورية عن حالة تلك البرامج والمشاريع.

22. وضعت الهيئة إرشادات ولوائح (فيما يلي "البروتوكولات") تطبق على جميع المكاتب الخارجية خلال مدّة عملي. قام المكتب الرئيسي باستكمال هذه البروتوكولات بما في ذلك من خلال تعاميم وقرارات (يُشار إليها فيما يلي بـ"التوجيهات") تم توزيعها من وقت لآخر. عندما أصبح د. عدنان باشا أمينًا عامًا نفذ نموذج أكثر شمولية من هذه الإرشادات والبروتوكولات.

23. كان مديرو المكاتب الخارجية يتولّون إدارة وتسيير شؤون تلك المكاتب بما في ذلك ضمان الامتثال لبروتوكولات وتوجيهات الهيئة.

24. بموجب هذه البروتوكولات والتوجيهات، تعين على مديري المكاتب الخارجية، من بين أمور أخرى، أن: (1) يحرصوا على مصالح الهيئة ويحافظوا على ممتلكاتها واستثماراتها وأموالها؛ (2) يقدموا تقارير دورية للهيئة بشأن أداء مشاريع وبرامج وموظفي المكتب ؛ (3) تسهيل ومساعدة الزيارات الميدانية للممثلين الآخرين للهيئة بما يشمل الإجابة على أي أسئلة؛ و (4) يحافظوا على أموال يتم تحويلها من الأمانة العامة للمكتب الخارجي ويقدموا إيصالات ومستندات أخرى توثق النفقات.

25. بموجب هذه الإرشادات، مُنع مديري المكاتب الخارجية، من بين أمور أخرى، أن: (1) يستغلوا مناصبهم في الهيئة لتحقيق مكاسب شخصية أو لتعزيز مصالحهم الخاصة على حساب الهيئة ماليًا أو على صعيد سمعتها؛ (2) يفتحوا حسابات مصرفية دون الحصول على موافقة مسبقة من الأمين العام؛ (3) يحوّلوا مبالغ مالية بين مشاريع أو يستخدموا مبالغ لأغراض غير تلك الموافق عليها مسبقاً دون الحصول على موافقة مسبقة من الأمين العام ؛ (4) يخصصوا تمويل أو يعدوا بذلك لآخرين ؛ (5) يقترضوا مبالغ من الهيئة؛ (6) يبيعوا أو يؤجروا أو يهبوا أصول أو ممتلكات الهيئة ؛ (7) يقوموا برحلات عمل دون موافقة المكتب الرئيسي ؛ (8) يتدخلوا في السياسة الخاصة بالدولة المضيفة أو تفضيل مجموعة معينة ؛ أو (9) يشاركوا في الفعاليات أو المؤتمرات دون الحصول على موافقة مسبقة من الأمين العام.

٢٠٢٤/٤/١٣

26. كانت عملية توظيف موظفين جدد في المكاتب الخارجية تتطلب من مدير المكتب الخارجي عرض المرشحين المحتملين على الأمانة العامة. وكان يتعيّن أن يتضمن هذا العرض مستندات محددة بما في ذلك المؤهلات العلمية للمرشح وإثبات الهوية وخطاب توصية وشهادة صحية وسجل عدلي وإقرار من المرشح بأنه/بأنها ليس عضوًا في أي منظمة أو حزب سياسي. يتم توظيف المرشح بموافقة الأمين العام فقط.

27. كان لكل مكتب خارجي موظف مالي يتولى مهام المحاسب أو أمين الصندوق. وقد وضعت الهيئة بروتوكولات تسري على جميع الموظفين الماليين.

28. لا يجوز تحويل أموال المتبرعين المخصصة لمواقع محددة في الهيئة إلى موقع آخر إلا بموافقة المتبرع والأمانة العامة.

29. كُلّف ممثلو المكتب الرئيسي والمكاتب المحلية بإجراء زيارات ميدانية للمكاتب الخارجية ورفع تقارير الزيارة إلى الأمين العام أو الأمين العام المساعد للشؤون المالية.

30. كان الهدف الرئيسي من هذه الزيارات الميدانية التأكد من تنفيذ البروتوكولات والتوجيهات الخاصة بالهيئة والامتثال لها.

31. أثناء الزيارات الميدانية للمكاتب الخارجية، كان ممثلو الهيئة ينسّقون مع مديري المكاتب الخارجية ويرفعون تقارير عن زيارتهم إلى القسم المعني في المكتب الرئيسي.

32. لم يكن لممثلي المكاتب المحلية الذين يجرون الزيارات الميدانية أي صلاحية للموافقة على تنفيذ برامج أو مشاريع جديدة أو على صرف التمويل.

33. كان يتوجب على ممثلي المكاتب المحلية إعداد تقرير عن الزيارة ورفعه إلى المكتب الرئيسي.

34. خلال فترة عملي، كان يُطلب من جميع موظفي الهيئة الالتزام بالمعايير الأخلاقية بما في ذلك فهم أوصاف وظائفهم واتباع بروتوكولات وتوجيهات الهيئة والامتثال لتعليمات المسؤولين عنهم. وكان من المتوقع منهم الحضور في الوقت المحدد وتجنب تضارب المصالح وحماية مصالح الهيئة. كما كان يُحظر على الموظفين استغلال مناصبهم في الهيئة لتحقيق مكاسب شخصية أو الكشف عن معلومات سرية أو خرق مهمة الهيئة أو الانخراط في أنشطة سياسية.

35. كانت الهيئة تقوم بشكل دوري بمراجعة وتقييم بروتوكولاتها المالية والإدارية لضمان امتثالها لأفضل الممارسات المعتمدة في القطاع وكانت تُلزم أقسامها وفروعها بالامتثال لها لتعزيز معاييرها المالية والإدارية.

36. لم يتم توظيف الدعاة من قبل الهيئة. وضمن برامج الهيئة التعليمية، كانت تقدم الهيئة بدلًا رمزيًا ضئيلًا للدعاة.

37. كانت الهيئة تقوم بجمع التبرعات لذاتها.

38. لقد تم إعلامي بادعاء بعد 11\9 أن الدكتور عبد الحميد المعجل الذي عمل كمدير تنفيذي ثمّ كمشرف عام للمنطقة الشرقية دعم الجماعات المسلحة الإسلامية وتم وصفه من قبل شخص ما في الحكومة الأمريكية كـ"رجل المليون دولار"، لكنني لم أسمع بهذه الادعاءات قبل 11\9 وليس لدي أي معرفة بأي حقائق تأييدها. خلال فترة عملي في إدارة المكاتب المحلية والخارجية ولاحقاً إدارة المكاتب تعاملت وتفاعلت مع مديري وموظفي المكاتب المحلية والخارجية بما في ذلك الدكتور المعجل. لم ألاحظ ولم يُبلغني أحد عن أي سلوك من قبل الدكتور عبد الحميد المعجل يوحي بأنه دعم مهمة القاعدة أو أنه كان يساعد القاعدة بأي شكل من الأشكال، ماليًا أو غيره.

39. لقد تم إعلامي بادعاء بعد 11\9 مقدم في هذه الدعوى، مفاده أن سمير الحسن، يمني الجنسية، عمل لدى الهيئة في أفغانستان. لم أسمع عن موظف في الهيئة بهذا الاسم.

40. لقد تم إعلامي بادعاء بعد 11\9 مقدم في هذه الدعوى، مفاده أن موظف الهيئة يوسف الحمدان كان مرتبطًا بالقاعدة .وقد انتهى عمل الحمدان مع الهيئة في 29 نوفمبر 1995. خلال فترة عمله، لم الاحظ ولم يُبلغني أحد عن أي سلوك من الحمدان يوحي بأنه دعم مهمة القاعدة أو أنه كان يساعد القاعدة بأي شكل من الأشكال، ماليًا أو غيره.

41. لقد تم إعلامي بادعاءات ما بعد 11\9 والمقدمَة في هذه الدعوى، مفادها أن محمود عفيف كان مديرًا للهيئة في الفلبين وقام بتحويل أموال إلى مجموعة أبو سياف. محمود عفيف لم يكن مديرًا للهيئة في الفلبين بل كان ممثلًا للهيئة في مدينة زامبوانغا في الفلبين .وضمن دوره كممثل للهيئة، كان يرفع تقاريره إلى مدير الهيئة في الفلبين. لم يكن لديه السيطرة على الشؤون المالية ولا أي وصول إلى حسابات الهيئة المصرفية. وانتهى عمل عفيف مع الهيئة في 12 نوفمبر 1996. خلال فترة عمله في الهيئة، لم الاحظ ولم يُبلغني أحد عن أي سلوك من قبل عفيف يوحي بأنه دعم مجموعة أبو سياف أو أي مجموعة متطرفة أخرى.

42. لقد تم إعلامي بادعاءات ما بعد 11\9 والمقدمَة في هذه الدعوى، مفادها أن عبد الهادي داجيت قام بتحويل أموال عائدة للهيئة إلى مجموعة أبو سياف. ليس لدي أي معرفة أو حقائق تدعم هذه الادعاءات. خلال فترة عمله التي امتدت عشرين عامًا، لم ألاحظ ولم يُبلغني أحد عن أي سلوك من قبل داجيت يوحي بأنه دعم مجموعة أبو سياف أو أي مجموعة متطرفة أخرى.

43. خلال فترة عملي في الهيئة، لم ألاحظ أن الهيئة أو أي شخص ضمنها قدّم أي دعم، سواء ضمنيًا أو صريحًا، للقاعدة أو أي منظمات متطرفة أخرى، بما في ذلك معسكرات تدريبية متطرفة أو مسلحة. وبحسب علمي، لم تقم الهيئة بتوظيف أي من أعضاء القاعدة أو أي شخص معروف بأنه متعاطف مع القاعدة.

أنا محمد حلس أصرّح تحت طائلة عقوبة الحنث باليمين بموجب قوانين الولايات المتحدة الأمريكية أن ما تقدم حقيقي وصحيح.

نُفذ في: ١٣/٤/٢٠٢٦

محمد حلس

**DAOU TRANSLATION AND SERVICES**
ضو للترجمة والخدمات
Tahwitat Furn El Chebbek – St. Nohra street – Ghawi Building – Baabda – Mount Lebanon – Ground floor
**MOF#: 2859768 – Telephone No.: +961 1 284 725 – Gsm: +961 70 953 809 – Email: daouservices@gmail.com**

## CERTIFICATE OF TRANSLATION

**Title of Source Document:** M. Helles Declaration

**Source language:** Arabic **Translated to:** English

**TRANSLATOR STATEMENT**

I, Joyce Hani DAOU, am competent to translate from Arabic into English, and certify under penalty of perjury that the translation of the foregoing document is true and accurate to the best of my abilities.

**Translator qualifications:**

15 years translation experience (Arabic-English and English-Arabic)

Sworn translator before the Lebanese courts as per oath taking report issued by the Ministry of Justice in Lebanon under No. 291 dated 26/02/2011

**Signature of translator:** **Date:** 11 April 2026

