# EXHIBIT 065

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

|  |  |  |
|---|---|---|
| In re: Terrorist Attacks on September 11, 2001 | ) ) ) ) | No. 03 MDL 1570 (GBD) (SN) |

_____

This applies to:

*Ashton, et al. v. Al Qaeda Islamic Army, et al.*, Case No. 02-cv-6977 (GBD) (SN);
*Burnett, Sr., et al. v. Al Baraka Investment & Development Corp., et al.*, Case No. 03-cv-9849 (GBD) (SN);
*Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.*, Case No. 04-cv-7065 (GBD) (SN);
*Salvo, et al. v. Al Qaeda Islamic Army, et al.*, Case No. 03-cv-05071 (GBD)(SN);
*Continental Casualty Co., et al. v. A1 Qaeda et al.*, Case No. 04-cv-05970 (GBD) (SN);
*Euro Brokers Inc., et al. v. Al Baraka, et al.*, Case No. 04-cv-7279 (GBD)(SN);
*Federal Insurance Co., et al. v. A1 Qaida, et al.,* Case No. 03-cv-6978 (GBD) (SN);
*O'Neill, Sr., et al. v. Al Baraka et al.*, Case No. 04-cv-1923 (GBD) (SN);
*Maher, et al. v. Islamic Emirate of Afghanistan a/k/a The Taliban, et al.*, Case No. 1:23-cv-02845 (GBD)(SN).

## <u>DECLARATION OF DR. ADNAN BASHA</u>

1.   I, Dr. Adnan Basha, hereby declare that I am over the age of eighteen years and of sound mind to make this declaration.  I have personal knowledge of the facts set forth below.  If called as a witness, I could and would testify to the statements and facts contained herein, all of which are true and accurate to the best of my knowledge and belief.

2.   I have previously submitted sworn statements in this proceeding, including declarations dated September 19 and 30, 2017 (ECF 3764), and July 13, 2018 (ECF 4063).  The statements and facts contained in these previous declarations remain true and accurate to the best of my knowledge and belief, and if called as a witness, I could and would testify to the statements and facts contained therein.

3.   From 1977 until 1997, and then again from 2013 until my retirement in 2016, I served in various roles at the Muslim World League ("MWL").  From 1997 until 2013, I served as Secretary General of the International Islamic Relief Organization ("IIRO"), which had a head office in Jeddah in the Kingdom of Saudi Arabia ("Head Office"). The position of Secretary General was the most senior position within the organization.  Unless otherwise indicated, the statements and facts contained herein refer to the period of my tenure at each organization.

4.   MWL was founded in 1962 as an international non-governmental Islamic organization. During my two tenures, MWL promoted dialogue across cultures and religions, sought to

spread moderate Islamic values, and countered extremist ideology through its educational, religious and cultural projects.  MWL operated approximately 30 offices and cultural centers throughout the world, and had a general, consultative status with the United Nations' Economic and Social Council (ECOSOC).

5.     As an international aid organization, IIRO provided humanitarian relief all over the world and sustainable development in various countries through its mission to provide services to individuals impacted by natural disasters, including emergency relief like clothing, medicine, and shelter, care for orphaned children, educational support, health care, vocational training, well-digging and mosque construction.  Individual donors provided all the funding for IIRO. IIRO had a special, consultative status with the United Nations' Economic and Social Council

6.     As Secretary General of IIRO, based on the powers conferred upon me per its bylaws, I was responsible for managing IIRO's operations, including supervising all the department directors, who managed IIRO's day-to-day affairs according to their job descriptions and the responsibilities defined therein. I had oversight of the directors of the various departments; but, consistent with my role and responsibilities, which accounted for IIRO's large size and variety of work, I did not participate in every aspect of IIRO's daily operations. Having served as IIRO's Secretary General for more than a decade, I am familiar with its many activities and operations. IIRO had approximately one thousand employees across its offices during my tenure there.

7.     IIRO's Secretary General reported to the Board of Directors, chaired by the Secretary General of MWL *ex officio*.  Through his position as Chairman of the Board, the MWL Secretary General was involved at a very high level with IIRO's operations; for example, presiding over the meetings of the board of directors.  The Chairman of the Board did not exercise control over or supervise IIRO's day-to-day operations.

8.     IIRO and MWL were independent of one another in accordance with the bylaws of each of them. IIRO maintained separate corporate governance, functions, identities, and operations from MWL. For instance, IIRO had separate accounting departments, payrolls, bank accounts, budgets, and document management systems.  IIRO conducted separate board meetings with separate minutes of those meetings, maintained a separate head office from MWL, and separate files.

9.     When legal consultation was required in issues between MWL and IIRO, there was an independent legal representative for each one of them to clarify its legal position and to defend its interests and rights.

10.     IIRO maintained its funds separately in independent bank accounts and did not comingle its funds with MWL's funds. IIRO was responsible for its own capitalization and debts.

11.     While some employees in foreign branch offices held dual posts at IIRO and MWL, they received separate compensation, instructions, and budgets for IIRO and MWL projects and work.

12. While the branches of MWL and IIRO sometimes worked together on specific projects in the respective host countries, MWL could not and did not control IIRO's activities or its management, and IIRO could not and did not act on MWL's behalf. Nor was IIRO engaged or entrusted to or given the authority to take decisions or act on MWL's behalf.

13. MWL could not and did not tell IIRO to perform acts on behalf of MWL. IIRO did not seek or otherwise agree to operate on MWL's behalf. To my knowledge, MWL did not indicate or represent to others that IIRO was performing acts on MWL's behalf or with MWL's consent. IIRO did not indicate or represent to others that it was performing acts on MWL's behalf or with MWL's consent.

14. IIRO did not give advice to MWL. MWL did not rely on IIRO to carry out MWL's operations, goals, or processes. MWL acted independently of IIRO in carrying out MWL's operations, goals, or processes. IIRO did not hold any property of MWL in trust.

15. MWL could not and did not dictate to IIRO how or where IIRO was to operate. For example, IIRO had sole decision-making authority on matters such as how to manage employees, finances, or processes, where to open local or foreign offices, where to deliver relief and aid, or which programs and projects IIRO pursued. MWL could not and did not dictate who IIRO could hire. IIRO and MWL had separate codes of conduct for their employees, separate compliance policies, and separate human resources departments. MWL could not and was not required to approve IIRO's operations, actions, or processes.

16. IIRO could not and did not sign contracts or enter into agreements on MWL's behalf. IIRO could not and did not sell MWL's real estate. IIRO could not and did not purchase goods or services on MWL's behalf. IIRO could not and did not hire employees on MWL's behalf for MWL. Neither MWL nor IIRO sold or leased the other's property at artificially low prices. IIRO had its own legal department.

17. MWL and IIRO did not file joint tax returns.

18. IIRO's liabilities never exceeded its assets.

19. IIRO's funds were not used by MWL. MWL's funds were not used by IIRO. For example, IIRO did not use MWL's funds to pay for IIRO's operating costs and expenses or vice versa. IIRO did not pay the salaries of MWL employees or vice versa. MWL did not transfer funds in and out of IIRO for MWL's purposes.

20. MWL did not loan money to IIRO.

21. I am aware of the allegations relating to Rabita Trust, which was an entity independent of IIRO. IIRO could not and did not control the Rabita Trust's activities or management. The Rabita Trust could not and did not act on IIRO's behalf.

22. Neither I nor IIRO had knowledge of any activities or financing that the Rabita Trust conducted or provided in support of Al Qaeda or any other terrorist organization. If any such activities occurred, they were not approved tacitly or explicitly by either IIRO or me.

23. Neither I nor IIRO had knowledge of any activities or financing that IIRO allegedly conducted or provided in support of Al Qaeda or any other terrorist organization.

24. Neither I nor IIRO authorized or instructed, explicitly or implicitly, IIRO employees to provide any form of support, whether financial or otherwise, to Al Qaeda or any other terrorist organization.

25. Neither I nor IIRO had a relationship with Al Qaeda.

26. Neither I nor IIRO supported Al Qaeda or any other terrorist organization.

27. Neither I nor IIRO knowingly or tacitly employed members of Al Qaeda or individuals known as Al Qaeda sympathizers to work for or within IIRO.

28. I have never agreed with Al Qaeda's aims or acts. I have worked actively to counter Al Qaeda's ideology.

29. I am not aware of any action taken by or on behalf of IIRO to facilitate or support any terrorist organization or any acts of terrorism.

30. I have never financed or supported Al Qaeda or any of its affiliates in any capacity.

31. IIRO did not finance or support Al Qaeda or any of its affiliates.

32. IIRO did not provide Al Qaeda with assistance in recruitment, transportation, logistics, or safe havens. IIRO did not finance the establishment or operation of training facilities for use by Al Qaeda or its associates. IIRO did not knowingly work with or employ any individual known to be associated with Al Qaeda or any of its affiliates.

33. One of the conditions of applying for employment within IIRO was the existence of a "clear history" certificate from the relevant government security entity in the country of the job applicant. IIRO required this to ensure that its relief and humanitarian activities were not politicized by idealogues, parties, or political or Islamic groups, be they regional or international. I also insisted on this in every Arab, Islamic and international forum that invited me or sought my participation.

34. The Taliban attempted to interfere with several IIRO projects, including an orphanage and a university, which were closed as a result in the summer of 2001. In early to mid-2000, the Taliban also attempted to interfere with two hospital projects in Afghanistan, where IIRO treated both genders in the same facility. IIRO refused to relent to the Taliban's interference and stopped supporting the hospital thereafter.

35.  I am aware of allegations made in this litigation that IIRO funded six Al Qaeda training camps.  These allegations are false. IIRO did not fund any training camps, extremist or otherwise, for any group, including Al Qaeda.

36.  I am aware of an allegation made in this litigation that Sayed Abu Nasir, who allegedly plotted to attack U.S. consulates in India, stated that 40-50% of IIRO's funds were being diverted to terrorist training camps in Afghanistan and Kashmir. This is false. IIRO did not have training camps in Afghanistan or Kashmir (or anywhere else). When I first learned of Sayed Abu Nasir's name in connection with this allegation, I initiated a search for information concerning any affiliation between him and IIRO but found no evidence of his employment in IIRO's personnel files.

37.  I am aware that a 2006 cable from the United States Consular General in Jeddah states mistakenly that I admitted to "IIRO's inability to control potential extremist lecturers at youth summer camps." I distinctly recall this conversation with the U.S. official, and I did not make such a statement. To the contrary, we discussed a news report regarding statements made by a lecturer – who had no employment relationship with IIRO – at a summer youth camp in the Kingdom of Saudi Arabia ("KSA").  This camp did not have any relationship with IIRO; rather, some local Saudi schools used to operate summer camps for students to pursue hobbies and interests.  I am unsure of the reason for the Consular General's assumption that these camps were IIRO camps or related to IIRO in any way, nor did he imply or expressly state that the camps at issue were operated by IIRO.  Indeed, we discussed that IIRO did not have such activities in the KSA.  IIRO did not sponsor nor did it operate any summer camps, in the summer or any other season, in the KSA or outside the KSA.

38.  I am aware that allegations have been made that IIRO issued identification cards to Al Qaeda members. These allegations are false. IIRO did not issue identification cards to Al Qaeda members. IIRO would never have authorized the issuance of identification cards to Al Qaeda members, members of other terrorist organizations, or anyone who was not an IIRO employee. I am aware of instances when individuals who had been arrested would claim to be an employee of IIRO or another NGO. In all such instances of which I am aware, the investigations IIRO conducted confirmed that these individuals were not employed by IIRO.

39.  IIRO did not support and was not involved in the August 1998 East African Embassies bombings in Dar Es Salaam, Tanzania and Nairobi-Kenya.

40.  The Kenyan government temporarily closed the IIRO office in Nairobi (along with other NGOs in Kenya) in the aftermath of the bombings, although the closure did not include the IIRO-World Food Program joint project in Elwak, on the Somali border.  A Kenyan government committee then investigated the reasons for the closure of the IIRO Kenyan office and cleared it, permitting it to reopen in December 1998, and returned everything that was seized.  The IIRO office continued operating without closure and was operating at the time of my departure from IIRO.  Given the serious nature of the allegations, IIRO also initiated an independent investigation that revealed no involvement by IIRO or IIRO

employees in the terrorist attacks in Nairobi, which corroborated the conclusion reached by the Kenyan government.

41. Neither I nor IIRO had knowledge of any assistance (financial or otherwise) provided by the IIRO Head Office or the IIRO office in the Philippines ("IIRO-Philippines") to the Moro Islamic Liberation Front ("MILF").

42. I am aware of allegations made in this litigation relating to the Saudi Joint Relief Committee for Kosovo and Chechnya ("SJRC") and its alleged relationship with Al Qaeda. Neither I nor IIRO had knowledge of any alleged activities that the SJRC conducted or financing that the SJRC provided in support of Al Qaeda or any other terrorist organization. If any occurred, they were not approved tacitly or explicitly by either IIRO or me.

43. During the Kosovo war in the late 1990s, the SJRC was established by the KSA Government to consolidate and coordinate the collection of donations in the KSA – both from government and private entities – and the charitable work and disbursement of those donations to the people in need in the relevant region. The role of SJRC was to accept requests for assistance from local government and to distribute the requests to the members of SJRC so that the members may coordinate their humanitarian efforts amongst themselves so that there is no duplication in the assistance provided.

44. All NGOs in the KSA operating in Kosovo, including IIRO, were required to join this coordinating committee to ensure that aid was being allocated evenly in the affected areas, and to reduce duplication of efforts by those NGOs. While the SJRC, in its coordinating role, at times assigned specific types of projects in specific locations to those NGOs, including IIRO, it did not control or interfere in the projects or operations of IIRO. The SJRC did not have the authority to bind IIRO's specific assignments.

45. The IIRO office in Kosovo was located in the SJRC building, along with other NGOs, which operated out of different sections of the building. As a tenant, IIRO paid rent to the SJRC for its lease of the office.

46. IIRO subjected its financial and administrative protocols to periodic review and evaluation and required its departments and branches to comply with them to enhance its financial and administrative standards. Given the size of the organization, and the locations of some of the branches in third world countries often affected by civil strife or natural disasters, it was not always possible for branches to perfect their implementation of the financial and administrative regulations. If an issue was identified, the Head Office would take corrective action and follow-up with these branches to improve their compliance.

47. IIRO also established an internal auditing department that periodically produced auditing reports of IIRO's foreign offices. IIRO's internal auditing department placed a priority on certain foreign offices operating on a large scale, as those offices typically had sizeable budgets or higher than average petty cash balances. In addition to the internal auditing department, IIRO also established a Financial Oversight Department at the Head Office. Both of these departments periodically conducted unannounced field visits to IIRO's

offices and operations worldwide to monitor compliance with its financial and administrative regulations and to supervise the distribution of humanitarian assistance and project implementation. These unannounced visits and the internal audits occasionally identified partial non-compliance with technical financial and administrative protocols, typically due to local conditions and prevailing work cultures, which were mostly in underdeveloped countries. In instances where non-compliance was identified, it was investigated and corrective action taken.

48.  I am not aware of a single instance of non-compliance that revealed evidence that an IIRO office funded or supported terrorist organizations or militants or other violent acts.  To my knowledge, not a single instance of non-compliance with Head Office protocols or procedures ever resulted in IIRO's funds being diverted to Al Qaeda.

49.  IIRO regulations required foreign branch offices to obtain approval from the Head Office regarding various matters, such as making any structural or administrative changes to the office, opening a bank account, participating in conferences, workshops or activities, or entering into any contracts or agreements on behalf of IIRO.

50.  The foreign branch offices were required to conduct field visits to supervise the implementation of their projects. They were also required to submit periodic reports to the Head Office regarding the progress of the operations and activities of the office.

51.  IIRO foreign branch offices were required to submit a yearly work plan and a proposed budget for the following year for approval by the Head Office. The foreign offices were permitted to disburse funds only for approved projects in the budget covering or supporting the services highlighted in paragraph 5 above. IIRO foreign branch offices were also required to submit original receipts, invoices, and other financial documentation to the Head Office to support the Head Office's disbursements on its approved projects. The Head Office would then inspect and review the disbursements of the foreign branch office to ensure implementation of the financial protocols and distribution of funds for their intended purpose.

52.  IIRO foreign branch offices were not permitted to fund or otherwise support terrorist organizations or militants or other violent acts. The foreign branch offices were not permitted to intervene in the internal affairs of the host country or support any specific party in the country.

53.  IIRO built auditing protocols into its financial processes. External auditors conducted yearly audits of IIRO Head Office accounts and sampled foreign offices on a periodic basis. These external auditors were reputable, international companies; I recall that IIRO engaged Arthur Anderson, KPMG, and Ernst & Young, among others, over the years.

54.  Prior to 2001, IIRO's branch office in Pakistan ("IIRO-Pakistan") was defrauded by its then-director, Moayad Al-Butairi, and its then-financial officer, Amir Jasim, both of whom were hired by IIRO prior to my tenure. Prior to the discovery of the fraud, both men

occupied important positions within IIRO-Pakistan and neither had ever been involved in any wrongdoing or accused of misappropriation of IIRO funds.

55.    In late 2000, I learned of a suspicion that fraud was occurring in the Pakistan office. In response, I sent financial investigators from the Head Office to the Pakistan office to investigate the matter. Rahmatullah Nazir Khan Gari, then-head of the IIRO Bangladesh office, was appointed to take over the management of the Pakistan office during the investigation.

56.    IIRO also hired a local outside auditing company, Sidat Hydar, to examine the extent of the fraud. IIRO later learned that Amir Jasim had deliberately burned and destroyed documents archived in the Pakistan office, creating an obstacle for the Pakistani auditors. When Amir Jasim's destruction of documents was discovered, IIRO arranged for a team of outside auditors to travel to the Head Office in order to review the relevant and voluminous documents maintained there. However, the original documents maintained at the Head Office were in Arabic, which created a language barrier for the Urdu and English-speaking auditors.

57.    Soon after the fraud was discovered, IIRO filed a criminal complaint, and Amir Jasim was arrested. The case floundered for years in Pakistan, with no tangible progress. The case moved slowly for a number of reasons, including the changing of judges, resetting of hearings, and the inadequate role of the investigating officer. When IIRO discovered that Amir Jasim had burned IIRO documents maintained in the Pakistan office, the original documents, which were stored at the Head Office, were submitted to the court, but those documents were subsequently lost by the court officer. Pakistani courts required these original documents to proceed with the criminal case and, thus, were required to hold Amir Jasim without bail. Because those documents were lost, Amir Jasim was released on bail.

58.    During the course of its internal investigation, IIRO also investigated Moayad Al-Butairi. Moayad Al-Butairi was not cooperative at first, but ultimately, he cooperated with the investigators and provided information that assisted IIRO's investigation committee with its efforts in tracking the funds that had been embezzled. As a result of the investigation, it was discovered that Moayad Al-Butairi used the embezzled funds to establish three medical clinics in Pakistan for personal gain. Moayad Al-Butairi eventually turned over to IIRO the three clinics that he established with IIRO's funds; the combined value of the clinics was equivalent to the value of the stolen funds. Following the conclusion of its internal investigation, Moayad Al-Butairi was terminated from IIRO.

59.    After years of languishing in the courts, IIRO concluded that the costs associated with its lawsuit against Amir Jasim outweighed its benefits. IIRO received a signed confession from Amir Jasim, admitting to the embezzlement and taking responsibility for his actions, and the suit was subsequently dismissed.

60.    At the conclusion of their investigation, the auditors with Sidat Hydar submitted to IIRO a report that was beyond their remit and which contained conclusions lacking supporting evidence. The auditors did not follow the protocol of presenting the audit and its

conclusions to the relevant department at IIRO for comment or providing IIRO an opportunity to present documentation regarding the issues referenced in the report. Furthermore, the report's tone and tenor were hostile towards IIRO, and the report contained broad sweeping and unsupported conclusions.

61.     There is no evidence that the fraud committed by Moayad Al-Butairi and Amir Jasim resulted in IIRO's funds being diverted to Al Qaeda. Neither I nor IIRO had knowledge of or was provided with any evidence that the Pakistan office ever funded or supported Al Qaeda, its affiliates, or any other terror groups.

62.     During my tenure, IIRO-Pakistan received letters of commendation from the Government of Pakistan in recognition of the office's good works in the country.

63.     IIRO operated a branch office, the Eastern Province office ("IIRO-EP"), in Dammam, Saudi Arabia, which was established prior to my joining IIRO. Prince Turki Bin Jalawi was its General Supervisor until 2003, when I asked him to resign from his position for refusing to comply with IIRO's directives. In response, Prince Turki Bin Jalawi resigned from his position at IIRO-EP; had he not done so, I would have terminated him. Dr. Abdel Hamid al-Mojil was assigned as the office's Acting Director after Prince Turki Bin Jalawi's departure.

64.     Through the IIRO Head Office's routine financial and administrative processes, it was revealed that IIRO-EP implemented certain projects in foreign countries without prior approval from Head Office, which was a violation of protocol requiring local and foreign offices to provide the Head Office departments of programs, sponsorships and finances with reports on all field projects that the local and foreign offices implemented. Once these violations were identified, the Head Office warned the individuals involved and insisted that IIRO-EP seek prior approval as required by IIRO protocols.

65.     In my capacity as Secretary General of IIRO, I worked to increase Head Office supervision and control, requiring all project funding flow through the Head Office.

66.     IIRO commissioned external accountants to review IIRO-EP's operations. These external accountants determined that IIRO-EP was implementing and funding foreign projects without IIRO Head Office's prior approval, and that, in some circumstances, it failed to comply with various IIRO financial regulations, including that the foreign office receive funds from the Head Office and the requirement that the transactions be accompanied by all supporting documentation. The investigation of the external accountants did not reveal any evidence that the identified instances of non-compliance with Head Office protocols resulted in funds being diverted to Al Qaeda, its affiliates, or other terror groups.

67.     There is no evidence that the instances of non-compliance by IIRO-EP with Head Office protocols resulted in IIRO funds being diverted to Al Qaeda. Neither I nor IIRO had knowledge of or was provided with any evidence that IIRO-EP funded or supported Al Qaeda, its affiliates, or other terror groups.

68. Audits of the IIRO office in Indonesia ("IIRO-Indonesia") covering the years before and after 9/11 reveal no evidence of funding for or support of Al Qaeda, its affiliates, or other terror groups.

69. IIRO Head Office performed audits of its branch offices, including IIRO-Indonesia. While the audit results identified certain infractions and made some procedural recommendations as corrective actions, the results of the audits did not reveal any evidence of funding or support of Al Qaeda, its affiliates, or other terror groups.

70. There is no evidence that the instances of non-compliance by IIRO-Indonesia with Head Office protocols resulted in IIRO funds being diverted to Al Qaeda. Neither I nor IIRO had knowledge of or was provided with any evidence that IIRO-Indonesia funded or supported Al Qaeda, its affiliates, or other terror groups.

71. I am aware of allegations made in this litigation regarding the operations of the IIRO-Philippines office, and reference has been made in this litigation to a July 1998 field visit report issued by the Supervisor of the Social Care Department.

72. In accordance with IIRO's policy to conduct field visits of the IIRO offices and operations worldwide, in July 1998, the Supervisor of the Social Care Department visited the Philippines to supervise and inspect the Social Care Department projects, including orphan financial disbursements and visits to various orphanages and healthcare clinics. The supervisor issued a report highlighting the obstacles and challenges faced by the Philippines office and included some criticism of the office and its operations for their non-compliance with certain Head Office protocols. Furthermore, the report included its recommended corrective actions in order to improve the office's operations and compliance with Head Office requirements. Lastly, the supervisor met with the deputy director of the office to discuss the recommendations in order to confirm the deputy director's understanding of IIRO's regulations.

73. This is an example of IIRO's efforts in supervising its operations worldwide and following up with its offices in order to increase and maintain compliance with the financial and administrative protocols of the Head Office.

74. There is no evidence that the instances of non-compliance by IIRO-Philippines with Head Office protocols resulted in IIRO funds being diverted to Al Qaeda. Neither I nor IIRO had knowledge of or was presented with any evidence that IIRO-Philippines funded or supported Al Qaeda, its affiliates, or other terror groups.

75. An IIRO internal audit of the Jordan office ("IIRO-Jordan") conducted by the specialized department at the Head Office for FY 1999-2000 found that IIRO-EP sent funds directly to IIRO-Jordan rather than through the IIRO Head Office, which was in violation of Head Office protocol. Upon learning of this violation, IIRO soon after engaged an external auditor to review IIRO-EP's operations. Ultimately, IIRO-EP's General Supervisor, Prince Jalawi, resigned for not complying with IIRO's directives.

76. There is no evidence that the instances of non-compliance by IIRO-Jordan with Head Office protocol resulted in IIRO funds being diverted to Al Qaeda. Neither I nor IIRO had knowledge of or was provided with any evidence that IIRO-Jordan funded or supported Al Qaeda, its affiliates, or other terror groups.

77. Wael Jelaidan was never an IIRO employee. He served as Secretary of the Urgent Relief Committee, which was based in Pristina and was not affiliated with IIRO. The Urgent Relief Committee studied the humanitarian need in Kosovo and submitted its recommendations to its competent authority, the SJRC.

78. Muhamad Jamal Khalifa was employed by IIRO in the Philippines from 1988 until his resignation in 1993, before I was IIRO Secretary General, and he did not return to IIRO or have any association with it after his departure.

79. No IIRO employee, member of management or affiliated office was designated by the US Treasury Department's Office of Foreign Assets Control ("OFAC") as a Specifically Designated Terrorist prior to September 11, 2001.

80. Neither I nor IIRO had knowledge of any connection between Dr. Abdel Hamid Al-Mujil and Al Qaeda or any funding or support that Dr. Abdel Hamid Al-Mujil allegedly provided to Al Qaeda, its affiliates, or other terrorist groups.

81. Following the designation of Dr. Abdel Hamid Al-Mujil, IIRO-Indonesia, and IIRO-Philippines by OFAC, IIRO investigated the allegations contained in OFAC's press release concerning these designations. Dr. Abdel Hamid Al-Mujil was delisted by the United Nations Security Council in 2013.

82. IIRO conducted an investigation to verify the limited information contained within OFAC's press release, including by examining internal records relating to the two designated offices, as well as the IIRO-EP, and reviewing financial statements from those offices. In addition, IIRO reviewed the staff files of employees at all three offices, including the file of Dr. Abdel Hamid Al-Mujil.

83. IIRO's investigation did not find any support for the allegations listed in OFAC's press release concerning purported funding for or support to Al Qaeda or any other terrorist organization. As a result of the OFAC designations, no penalties or adverse action was taken by the local authorities and the Indonesia and Philippines offices remained opened and operational.

84. IIRO-Indonesia continued to operate following OFAC's 2006 designations, even receiving two letters in 2007 from high-ranking Indonesian officials indicating that since 1992 there had been no issues or allegations of impropriety against IIRO.

85. After the designation by OFAC in 2006, IIRO-Philippines continued its operations for a short time before closing later that year. IIRO-Philippines was registered with the government and opened again in 2011 but then closed on March 17, 2013.

86. Neither I nor IIRO had knowledge of any assistance (financial or otherwise) provided by either the IIRO Head Office or IIRO-Philippines to the Abu Sayyaf Group.

87. Neither I nor IIRO had knowledge of any assistance (financial or otherwise) provided by either the IIRO Head Office or IIRO-Indonesia to the Jemaah Islamiyah.

88. Neither I nor IIRO had knowledge of any assistance (financial or otherwise) provided by either the IIRO Head Office or IIRO-Kenya or IIRO-Tanzania to the Al-Jihad group.

89. IIRO-Indonesia did not finance the establishment or operations of training facilities for use by Al Qaeda, Al Qaeda affiliates or Al Qaeda associates.

90. IIRO-Indonesia and IIRO-Philippines petitioned OFAC for de-listing in 2014 and the two were granted removal from OFAC's sanction list on August 16, 2016. After listing IIRO-Indonesia and IIRO-Philippines by the United Nations Security Council in 2006, the names of the two offices were delisted on January 6, 2014. The European Union and the United Kingdom also delisted the names of the two offices in January 2014.

Pursuant to 28 U.S.C. § 1746, I, Adnan Basha, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

[signed]

Adnan Basha

Executed On: 5-21-2024

محكمة مقاطعة الولايات المتحدة
مقاطعة نيويورك الجنوبية

_____

في القضية المتعلقة بهجمات إرهابية في 11 سبتمبر 2001     رقم *3 MDL 1570* (GBD) (SN)

يطبق على الاتي:

*أشتون وآخرون ضد القاعدة الإسلامية العسكرية وآخرين، قضية رقم 02-cv-6977*(GBD) (SN) ؛
*بورنت وآخرون ضد مؤسسة البركة للاستثمار والتنمية وآخرين، قضية رقم 03-cv- 9849* **(GBD)** (SN) ؛
*كانتور فيتزجرالد وشركائه وآخرون ضد بنك اكيدة الخاص (ش.م.م.) وآخرين، قضية رقم 04-cv-7065* (GBD) **(SN)** ؛
*سالفو وآخرون ضد القاعدة وآخرين، قضية رقم 03-cv-05071* (GBD) (SN) ؛
*شركة كونتينينتال كاجولتي وآخرون ضد القاعدة وآخرين، قضية رقم 04-cv–05970* (GBD) (SN)؛
*يورو بروكرز إنك وآخرون ضد البركة وآخرين، قضية رقم 04-cv–7279* (GBD) (SN)؛
*شركة التأمين الفدرالي وآخرون ضد القاعدة وآخرين، قضية رقم 03-cv-6978* (GBD) (SN)؛
*أونيل وآخرون ضد البركة وآخرين، قضية رقم 04-cv-1923* (GBD) (SN) ؛
*ماهر وآخرون ضد إمارة أفغانستان الإسلامية المعروفة أيضا بإسم الطالبان وآخرين، قضية رقم 1:23-cv-02845* (GBD) (SN)**.**

## تصريح د.عنان باشا

1. أنا د. عدنان باشا أصرح بموجبه بأنني تجاوزت الثامنة عشرة من عمري وأنني بكامل قواي العقلية لأقوم بهذا التصريح. لدي معرفة شخصية بالوقائع المبينة أدناه. إذا تم استدعائي كشاهد أنا قادر وسأشهد على البيانات والوقائع الواردة هنا والتي هي كلها صحيحة ودقيقة على حد علمي واعتقادي.

2. لقد سبق وقدمت بيانات تحت هذا القسم في هذه القضية بما في ذلك التصريحين المؤرخين في 19 و 30 سبتمبر 2017 ECF) (3764 و 13 يوليو 2018 (ECF 4063). تظل البيانات والوقائع الواردة في هذه التصريحات السابقة صحيحة ودقيقة على حد علمي واعتقادي وإذا استدعيت كشاهد أنا قادر وسأشهد على البيانات والوقائع الواردة فيها.

3. من عام 1977 حتى عام 1997 وبعدها من عام 2013 حتى تقاعدي في عام 2016 شغلت مناصب مختلفة في رابطة العالم الإسلامي ("الرابطة"). من عام 1997 حتى عام 2013 شغلت منصب أمين عام هيئة الإغاثة الإسلامية العالمية ("الهيئة") وكان مكتبه الرئيسي (الأمانة العامة) في جدة في المملكة العربية السعودية. وكان منصب الأمين العام أعلى منصب داخل المنظمة. ما لم يُذكر خلاف ذلك تشير البيانات والوقائع الواردة هنا إلى فترة عملي في كل منظمة.

4. تأسست رابطة العالم الإسلامي في عام 1962 كمنظمة إسلامية دولية غير حكومية. خلال الفترتان اللذان عملت بهما، شجعت الرابطة الحوار بين الثقافات والأديان وسعت على نشر القيم الإسلامية المعتدلة وقاومت الفكر المتطرف من خلال مشاريعها التعليمية والدينية والثقافية. كانت الرابطة تدير ما يقارب 30 مكتبًا ومركزًا ثقافيًا في أنحاء العالم وتمتعت بصفة عامة بمركز استشاري لدى المجلس الاقتصادي والاجتماعي التابع للأمم المتحدة (ECOSOC) .

5. كمنظمة مساعدات دولية قدمت الهيئة الإغاثة الإنسانية في جميع أنحاء العالم والتنمية المستدامة في مختلف البلدان من خلال مهمتها لتقديم الخدمات للأفراد المتضررين من الكوارث الطبيعية بما في ذلك الإغاثة العاجلة مثل الملابس والطب والمأوى ورعاية الأيتام ودعم التعليم والرعاية الصحية والتدريب المهني وحفر الآبار وبناء المساجد. كان المتبرعون الأفراد من قدم كل التمويل للهيئة. تمتعت الهيئة بصفة خاصة بمركز استشاري لدى المجلس الإقتصادي والإجتماعي للأمم المتحدة.

6. بصفتي الأمين العام للهيئة وبناءً على الصلاحيات المخولة لي بموجب النظام الأساسي، كنت مسؤولاً عن إدارة الأعمال في الهيئة ومن ضمن ذلك الإشراف على مديري الإدارات والذين كانوا يمارسوا الأعمال اليومية الإعتيادية التي تتناسب المسؤوليات المقررة في التوصيف الوظيفي بهم. كنت أشرف على مديري الإدارات المختلفة ولكن طبقاً لدوري ومهماتي والأخذ بالإعتبار حجم العمل الكبير والمتعدد في الهيئة لم أشارك في كل جانب من جوانب عمليات الهيئة اليومية بعد أن عملت كأمين عام للهيئة لأكثر من عقد أنا على دراية بالعديد من أنشطتها وعملياتها. وكان للهيئة حوالي ألف موظف في خلال المكاتب المتعددة في وقت عملي هناك.

1

7. المرجع الإداري لأمين عام الهيئة هو مجلس الإدارة الذي يرأسه الأمين العام للرابطة بحكم منصبه. من خلال منصبه كرئيس لمجلس الإدارة كان الأمين العام للرابطة يشارك على المستوى العالي جداً في عمليات الهيئة مثلا برئاسة إجتماعات مجلس الإدارة. لم يتولى رئيس المجلس التحكم أو الإشراف على عمليات الهيئة اليومية.

8. كانت الهيئة والرابطة مستقلة عن بعض وفقاً للنظام الأساسي لكل منهم. حافظت الهيئة على حوكمة مؤسسية و وظائف وهويات وعمليات منفصلة عن الرابطة. على سبيل المثال كان لدى الهيئة ادارة مالية وكشوف رواتب وحسابات مصرفية وميزانيات وأنظمة إدارة مستندات منفصلة. عقدت الهيئة اجتماعات مجلس إدارة منفصلة ووضعت محاضر منفصلة لتلك الاجتماعات وكان لديها مقر منفصل عن الرابطة واحتفظت بملفات منفصلة.

9. إذا تطلب الأمر استشارة قانونية في الأمور بين الرابطة والهيئة فإن لكل منهما ممثل قانوني مستقل يوضح موقفها القانوني ويدافع عن مصالحها وحقوقها.

10. احتفظت الهيئة بأموالها بحسابات بنكية مستقلة بشكل منفصل ولم يتم اختلاط أموالها بأموال الرابطة. كانت الهيئة مسؤولة عن رؤوس أموالها الخاصة وعن ديونها.

11. بينما شغل بعض الموظفين في مكاتب الفروع الخارجية وظائف مزدوجة في الهيئة والرابطة إلّا أنهم تلقوا المكافآت وتعليمات وميزانيات منفصلة لمشاريع وعمل الهيئة والرابطة.

12. في حين أن فروع الرابطة والهيئة عملت معاً في بعض الأحيان على مشاريع معينة في البلدان المضيفة المعنية لم تتمكن ولم تتحكم الرابطة في أنشطة الهيئة أو إدارتها ولم تتمكن ولم تتصرف الهيئة نيابة عن الرابطة. لم تكن الهيئة معينة أو مكلفة أو لها الصلاحية باتخاذ قرارارت أو تصرفات نيابة عن الرابطة.

13. لم تستطع ولم تطلب الرابطة من الهيئة القيام بأعمال نيابة عنها . لم تسعى أو توافق الهيئة خلاف ذلك على العمل نيابة عن الرابطة. على حد علمي لم تشير ولم توصف الرابطة للآخرين أن الهيئة كانت تؤدي أعمالاً نيابة عن الرابطة أو بموافقتها. الهيئة لم تشير ولم توصف للاخرين أن الرابطة كانت تؤدي أعمالاً نيابة عن الهيئة أو بموافقتها.

14. لم تقدم الهيئة المشورة للرابطة. لم تعتمد الرابطة على الهيئة للقيام بعملياتها أو أهدافها أو إجراءاتها. تصرّفت الرابطة بشكل مستقلّ عن الهيئة في القيام بعملياتها وأهدافها أو إجراءاتها. لم تمتلك الهيئة على سبيل الأمانة أي ملكية تابعة للرابطة.

15. لم تستطع الرابطة ولم تملي على الهيئة كيفية أو مكان عمل الهيئة. على سبيل المثال كان للهيئة الصلاحية المنفردة لأخذ القرارت عن أمور بما في ذلك عن ادارة الموظفين والأموال والعمليات وأين تفتح مكاتب محلية وخارجية وأين ترسل الإغاثة والمساعدات أو أي مشاريع وبرامج ستستهدفها الهيئة. لم تستطع ولم تملي الرابطة على الهيئة من يمكنها تعيينه. كان لكلّ من الرابطة والهيئة قواعد سلوك منفصلة لموظفيهم وسياسات امتثال منفصلة وادارة موارد بشرية منفصلة. لم تتمكن الرابطة ولم تكن مطالبة بالموافقة على عمليات أو أفعال أو إجراءات الهيئة.

16. لم تتمكن الهيئة ولم تقم بتوقيع العقود أو الدخول في اتفاقيات نيابة عن الرابطة. لم تستطع الهيئة ولم تقم ببيع عقارات الرابطة. لم تتمكن الهيئة ولم تقم بشراء البضائع أو الخدمات نيابة عن الرابطة. لم تتمكن الهيئة ولم تقم بتعيين موظفين للرابطة نيابة عنها. لم تقم أي من الرابطة أو الهيئة ببيع أو تأجير ممتلكات الطرف الآخر بأسعار مصطنعة ومنخفضة. كان لدى الهيئة ادارة قانونية منفصلة.

17. لم تقدم الرابطة والهيئة تصاريح ضريبية مشتركة.

18. لم تتجاوز التزامات الهيئة أصولها أبدًا.

19. لم يتم استخدام أموال الهيئة من قبل الرابطة. لم يتم استخدام أموال الرابطة من قبل الهيئة. على سبيل المثال، لم تستخدم الهيئة أموال الرابطة لدفع تكاليف تشغيل الهيئة ومصاريفها ولا العكس بالعكس. لم تدفع الهيئة رواتب موظفي الرابطة ولا العكس بالعكس. لم تقم الرابطة بتحويل أموال من أو إلى الهيئة لغايات الرابطة.

20. لم تقم الرابطة بإقراض أموال إلى الهيئة.

21. أنا على علم بالادعاءات المتعلقة بوقف الرابطة وكان هو كيان مستقل عن الهيئة. لم تتمكن ولم تتحكم الهيئة في أنشطة أو إدارة وقف الرابطة. لم يتمكن و لم يتصرف وقف الرابطة بالنيابة عن الهيئة.

2

22. لا علم لي ولا للهيئة بأي أنشطة أو تمويل قام به وقف الرابطة أو قدمته لدعم القاعدة أو أي منظمة إرهابية أخرى. في حالة حدوث أي من هذه الأنشطة، لم تتم الموافقة عليها ضمنيًا أو صراحة من قبل الهيئة أو مني.

23. لم يكن لي ولا للهيئة أي علم بأي أنشطة أو تمويل مزعوم أنه قامت به الهيئة أو قدمته لدعم القاعدة أو أي منظمة إرهابية أخرى.

24. أكان صراحةً أو ضمنياً،لم نقم لا أنا ولا الهيئة بإعطاء إذن أو أمر لموظفي الهيئة بتقديم أي شكل من أشكال الدعم، سواء كان ماليًا أو غير ذلك، إلى القاعدة أو أي منظمة إرهابية أخرى.

25. لم نكن لا أنا ولا الهيئة على علاقة بالقاعدة.

26. لم نقم لا أنا ولا الهيئة بدعم القاعدة أو أي منظمة إرهابية أخرى.

27. لم نقم لا أنا ولا الهيئة بتوظيف أعضاء من القاعدة أو أشخاص معروفين كمتعاطفين مع القاعدة، أكان عن علم أو ضمنياً للعمل في أو للهيئة.

28. أنا لا أتفق أبداً مع أهداف القاعدة أو أفعالها. لقد عملت بنشاط لمواجهة إيديولوجية القاعدة.

29. ليس لدي علم عن أي عمل اتخذته الهيئة أو نيابة عنها بتسهيل أو دعم أي منظمة إرهابية أو أي أعمال إرهابية.

30. لم أمول أو أدعم أبدا القاعدة أو الجماعات التابعة لها بأي صفة كانت.

31. الهيئة لم تمول أو تدعم القاعدة أو الجماعات التابعة لها.

32. لم تقم الهيئة بتقديم مساعدة للقاعدة في التجنيد والنقل والخدمات اللوجستية والملاذات الآمنة. لم تقم الهيئة بتمويل إنشاء أو عمليات مرافق تدريب ليستخدمها القاعدة أو شركاؤها. الهيئة لم تعمل مع أو توظف عن علم أي فرد معروف أنه مرتبط بالقاعدة أو الكيانات التابعة لها.

33. كان أحد شروط التقديم لوظيفة في الهيئة وجود شهادة "خلو سوابق" من الجهة الحكومية الأمنية المعنية من بلد الموظف المتقدّم للوظيفة بالهيئة. حرصت الهيئة على ذلك للتأكيد بإبقاء أنشطتها الإغاثية والإنسانية بعيدة عن التسييس من خلال التكتلات والأحزاب والجماعات السياسية أوالإسلامية أكانوا إقليمياً أو دولياً. وأصررت أيضا على ذلك في كل المحافل العربية والإسلامية والدولية التي دعوني أو طلبوا مشاركتي.

34. حاولت الطالبان التدخل في العديد من مشاريع الهيئة بما في ذلك دار أيتام وجامعة واللذان أغلقى بسبب ذلك في صيف 2001. في أوائل الى نصف 2000 حاولت الطالبان أيضا بالتدخل في مشروعان مستشفيتان في أفغانستان حيث عالجت الهيئة كلا الجنسين في نفس المرفق. رفضت الهيئة الرضوخ لتدخل طالبان ومن ثم توقفت الهيئة عن دعم المستشفى.

35. أنا على علم بمزاعم في هذه القضية أن الهيئة مولت ستة معسكرات تدريب للقاعدة. هذه الادعاءات باطلة. لم تقم الهيئة بتمويل أي معسكرات تدريب متطرفة أو غيرها لأي جماعة بما في ذلك القاعدة.

36. أنا على بادعاء في هذه القضية أن سيّد أبو نصير الذي يُزعم أنه تآمر لمهاجمة القنصليات الأمريكية في الهند، صرّح أن 40-50٪ من أموال الهيئة تم تحويلها إلى معسكرات تدريب إرهابية في أفغانستان وكشمير. هذا غير صحيح. لم يكن لدى الهيئة معسكرات تدريب في أفغانستان أو كشمير (أو في أي مكان آخر). عندما علمت لأول مرة اسم سيّد أبو نصير فيما يتعلق بهذا الإدعاء بدأت البحث عن معلومات بخصوص أي علاقة بينه والهيئة ولكن لم أجد أي دليل على عمله في ملفات موظفي الهيئة.

37. أنا على علم بوجود برقية للقنصلية العامة الأمريكية في جدّة لعام 2006 تنص بطريقة مغلوطة بأنني اعترفت "بعدم قدرة الهيئة على السيطرة على المحاضرين المتطرفين المحتملين في المعسكرات الصيفية للشباب." أتذكر بوضوح هذه المحادثة مع المسؤول الأمريكي ولم أدلِ بأي تصريح من هذا القبيل. على عكس ذلك، ناقشنا تقريرًا إخباريًا بشأن تصريحات أدلى بها محاضر لا علاقة وظيفية له بالهيئة في معسكر شبابي صيفي في المملكة العربية السعودية ("المملكة"). لم يكن لهذا المخيّم أي علاقة بالهيئة وإنما بعض المدارس المحلية السعودية كانت تقيم مخيمات صيفيّة للطلاب لممارسة هواياتهم

3

واهتماماتهم . لست متأكدًا من سبب اعتقاد القنصل العام أن هذه المعسكرات كانت للهيئة أو لها علاقة بالهيئة اطلاقا ولم يلمّح أو يصرّح القنصل بأنه يعتقد بأن المخيمات الصيفية مدار الحديث تقيمها الهيئة. بالفعل تحدثنا أن الهيئة لا تدير تلك النشاطات داخل المملكة. الهيئة لم ترعى ولم تدير أية معسكرات صيفية في الصيف أو في أي موسم اخر داخل المملكة وخارجها.

38. أنا على علم بوجود مزاعم أن الهيئة أصدرت بطاقات هوية لأعضاء في القاعدة. هذه الادعاءات باطلة. لم تصدر الهيئة بطاقات هوية لأعضاء في القاعدة. من المستحيل أن تكون الهيئة سمحت بإصدار بطاقات هوية لأعضاء في القاعدة أو أعضاء منظمات إرهابية أخرى أو أي شخص لم يكن موظفًا في الهيئة. إنني على علم بحالات ادعى فيها أفراد تم القبض عليهم بأنهم موظفون في الهيئة أو منظمة غير حكومية أخرى. وفي كافة تلك الأحوال الذي كنت على علم بها أكدت التحقيقات التي أجرتها الهيئة بأن أولئك الأشخاص لم يكونوا موظفين في الهيئة .

39. لم تؤيد ولم تشارك الهيئة في تفجيرات أغسطس 1998 لسفارات شرق إفريقيا في دار السلام – تنزانيا ونيروبي – كينيا.

40. أغلقت الحكومة الكينية مؤقتًا مكتب الهيئة في نيروبي (إلى جانب منظمات غير حكومية أخرى في كينيا) في أعقاب التفجيرات ولكن لم يشمل الإغلاق المشروع المشترك بين الهيئة وبرنامج الغذاء العالمي في إلواك على الحدود الصومالية. ثم قامت لجنة كينية حكومية بالتحقيق في أسباب إغلاق مكتب الهيئة في كينيا وبرّأته مما سمح بإعادة فتحه في ديسمبر 1998 واعادة كل ما صادرته واستمرّ المكتب في العمل دون إغلاقه وكان يعمل عندما تركت العمل بالهيئة. ونظراً لخطورة الإدعاءات فتحت الهيئة أيضا تحقيقاً مستقل والذي بين بعدم علاقة مكتب الهيئة وموظفيه بالهجمات الإرهابية في نيروبي تأييدا للنتيجة التي توصلت لها الحكومة الكينية.

41. لا علم لي ولا للهيئة بأي مساعدة (مالية أو غير ذلك) مقدمة من الأمانة العامة للهيئة أو مكتب الهيئة في الفلبين إلى جبهة تحرير مورو الإسلامية.

42. أنا على علم بالادعاءات في هذه القضية المتعلقة باللجنة السعودية المشتركة للإغاثة في كوسوفو والشيشان ("اللجنة") وعلاقتها المزعومة بالقاعدة. لا علم لي ولا للهيئة بأي أنشطة مزعومة قامت به اللجنة أو تمويل مقدم من اللجنة لدعم القاعدة أو أي منظمة إرهابية أخرى. في حالة حدوث أي منها لم تتم الموافقة عليها ضمنيًا أو صراحةً من قبل الهيئة أو مني.

43. خلال حرب كوسوفو في أواخر التسعينيات أنشأت حكومة المملكة العربية السعودية اللجنة السعودية المشتركة للإغاثة في كوسوفو والشيشان لتوحيد وتنسيق جمع التبرعات في المملكة العربية السعودية – من الكيانات الحكومية والخاصة على حدّ سواء – والعمل الخيري وصرف تلك التبرعات للمحتاجين في المنطقة المعنيّة. وكان دور اللجنة إستقبال طلبات المساعدة من الحكومة المحلية وتوزيع تلك الطلبات على أعضاء اللجنة لكي ينسق الأعضاء جهودهم الأنسانية فيما بينهم حتى لا تحدث إزدواجية في تقديم المساعدات.

44. فُرض على جميع المنظمات غير الحكومية في السعودية العاملة في كوسوفو بما في ذلك الهيئة الإنضمام إلى هذه اللجنة المنسقة لضمان تخصيص المساعدات بالتساوي بين المناطق المتضررة وللحد من ازدواجية الجهود التي تبذلها تلك المنظمات. في حين أن اللجنة في دورها التنسيقي قامت في بعض الأحيان بتسليم أنواع محددة من المشاريع في مواقع محددة لتلك المنظمات بما فيها الهيئة إلّا أنها لم تتحكم ولم تتدخل في مشاريع أو عمليات الهيئة. لم يكن لدى اللجنة السلطة بإلزام الهيئة بمهام محددة.

45. كان مكتب الهيئة في كوسوفو موجوداً في مبنى اللجنة إلى جانب منظمات غير حكومية أخرى التي شغلت أقساماً مختلفة من المبنى. بصفتها مستأجرة دفعت الهيئة بدل إيجار إلى اللجنة مقابل تأجيرها للمكتب .

46. أخضعت الهيئة لوائحها المالية والإدارية للمراجعة والتقويم الدوري وفرضت على إدارتها وفروعها الإمتثال لها لتجويد معاييرها المالية والإدارية. نظرًا لحجم المنظمة وكون مواقع بعض فروعها في دول العالم الثالث التي تتأثر غالبًا بالحرب الأهلية أو الكوارث الطبيعية، لم يكن دائمًا من الممكن للفروع أن تتقن تنفيذ الأنظمة المالية والإدارية. وإذا تحددت أي مسألة قامت الأمانة العامة بإجراء تصحيحي وبالمتابعة مع هذه الفروع لتحسين امتثالها.

47. أنشأت الهيئة أيضًا قسم تدقيق داخلي أصدر تقارير تدقيق دورية لمكاتب الهيئة الخارجية. وضع قسم التدقيق الداخلي للهيئة الأولوية على بعض مكاتب الهيئة الخارجية التي تسير على حجم أكبر لأن تلك المكاتب اجمالا كانت لديها ميزانية كبيرة أو أرصدة نثرية مرتفعة أكثر من المتوسط. بالإضافة الى قسم التدقيق الداخلى أنشأت الهيئة أيضا إدارة المتابعة المالية في الأمانة العامة. قامت تلك الإدارتين بزيارات ميدانية دورية مفاجئة إلى مكاتب الهيئة وعملياتها في جميع أنحاء العالم لمراقبة الامتثال لأنظمتها المالية والإدارية والإشراف على توزيع المساعدة الإنسانية وتنفيذ المشاريع. هذه الزيارات المفاجئة

4

والتدقيق المالي أحيانا حدد عدم الإمتثال الجزئي للوائح المالية والإدارية الفنية إجمالا لسبب يتعلق بالأوضاع المحلية والثقافة التي تسود المنطقة التي كانت في الغالب في بلدان غير متطورة. في حالات تحديد عدم الإمتثال، حقق فيه وأقاموا بإجراءات تصحيحية.

48. ليس لدي علم بحالة واحدة لعدم امتثال بينت أن هناك للهيئة قام بتمويل أو دعم المنظمات الإرهابية أو المسلحين أو أعمال العنف الأخرى. لحد علمي ليس هناك أي حالة واحدة أبدا لعدم امتثال لأنظمة وإجراءات الأمانة العامة أدت الى تحويل أموال الهيئة للقاعدة.

49. فرضت أنظمة الهيئة على مكاتب الفروع الخارجية الحصول على موافقة الأمانة العامة فيما يتعلق بأمور مختلفة مثل إجراء أي تغييرات هيكلية أو إدارية على المكتب وفتح حساب مصرفي والمشاركة في مؤتمرات أو ورش عمل أو أنشطة أوإبرام أي عقود أو اتفاقيات نيابة عن الهيئة.

50. فُرض على مكاتب الفروع الخارجية القيام بزيارات ميدانية للإشراف على تنفيذ مشاريعها كما فُرض عليها تقديم تقارير دورية إلى الأمانة العامة فيما يتعلق بسير عمليات وأنشطة المكتب.

51. فُرض على مكاتب الفروع الخارجية للهيئة تقديم خطة عمل سنوية وميزانية مقترحة للسنة التالية للموافقة عليه من قبل الأمانة العامة. سُمح للمكاتب الخارجية بصرف الأموال فقط للمشاريع الموافق عليها بالميزانية والتي تغطي أو تدعم الخدمات المذكورة في الفقرة 5. كما فُرض على مكاتب الفروع الخارجية للهيئة إرسال الى الأمانة العامة أصل الإيصالات والفواتير ومستندات مالية أخرى التي تدعم مدفوعات الأمانة العامة على المشاريع الموافق عليها. تقوم الأمانة العامة بعد ذلك بتدقيق ومراجعة مصروفات المكتب الخارجي الفرعي للتأكيد على تطبيق اللوائح المالية وصرف الأموال على الغرض المقصود.

52. لم يُسمح لمكاتب الفروع الخارجية للهيئة بتمويل أو غير ذلك بدعم المنظمات الإرهابية أو المسلحين أو أي أعمال عنف أخرى. لم يُسمح لمكاتب الفروع الخارجية التدخل في الشؤون الداخلية للبلد المضيف أو دعم أي جهة معينة في الدولة.

53. أسست الهيئة لوائح للتدقيق في إجراءاتها المالية. أجرى مدققون خارجيون دورياً عمليات تدقيق سنوية لحسابات الأمانة العامة للهيئة ولعينات من المكاتب الخارجية. كان المدققون الخارجيون من شركات دولية لها سمعة طيبة. أذكر أن الهيئة عينت خلال السنين Arthur Anderson و KPMG و Ernst and Young من بين غيرهم.

54. قبل 2001 تعرض مكتب فرع الهيئة في باكستان لعملية إحتيال من قبل مديره السابق (مؤيد البتيري) ومسؤوله المالي السابق (عامر جاسم) وهما موظفان معينين بالهيئة قبل قدومي لها. قبل اكتشاف عملية الاحتيال تلك الرجلين كانا يشغلا منصبين مهمين في مكتب باكستان ولم يكن أيا منهم منخرط في أي سوء عمل أو متهم بسوء استعمال اموال الهيئة.

55. في اواخر 2000 علمت بأن هناك شك بحدوث تلاعب في مكتب باكستان. ردأ على ذلك أرسلت محققين ماليين من الأمانة العامة إلى مكتب باكستان ليحققوا في الأمر. عين رحمة الله نذير خان قاري مدير مكتب الهيئة في بنغلاديش في حينها ليتولى إدارة مكتب الهيئة في باكستان في وقت التحقيق.

56. كما وكلّفت الهيئة شركة مدقق خارجي محلي (سيدات حيدر) للتدقيق في مدى العمليّة الاحتيالية. علمت الهيئة فيما بعد أن عامر جاسم قد أحرق عمداً المستندات المؤرشفة في مكتب باكستان وأتلفها مما خلق عائق للمدققين الباكستانيين. عندما تم اكتشاف إتلاف عامر جاسم للوثائق قامت الهيئة بترتيب سفر إلى الأمانة العامة لفريق من المدققين الخارجيين من أجل مراجعة الوثائق الضخمة ذات الصلة المحفوظة هناك. لكن المستندات الأصلية المحفوظة في الأمانة العامة كانت باللغة العربية وذلك شكل حاجز لغوي لمدققين الذين يتكلّمون الأردية والإنجليزية.

57. بعد وقت قصير من تاريخ اكتشاف عملية الاحتيال قدمت الهيئة شكوى جنائية وتم القبض على عامر جاسم. بقيت القضية متعثرة لسنوات في باكستان دون أي تقدم ملموس. تحركت القضية ببطء لعدد من الأسباب بما في ذلك التغيير للقضاة وإرجاء جلسات الاستماع والدور الضعيف لضابط التحقيق. عندما اكتشفت الهيئة أن عامر جاسم قد أحرق مستندات الهيئة المحفوظة في مكتب باكستان قدمنا المستندات الأصلية التي كانت محفوظة في الأمانة العامة للمحكمة ولكن فقد ضابط المحكمة تلك المستندات بعد ذلك. تطلبت المحاكم الباكستانية هذه المستندات الأصلية للشروع في القضية الجنائية وبالتالي لإحتجاز عامر جاسم بدون كفالة. وبسبب ضياع هذه الوثائق أطلق سراح عامر جاسم مقابل كفالة.

58. أثناء قيامها بتحقيقها الداخلي قامت الهيئة بالإستقصاء أيضاً عن مؤيّد البتيري. لم يكن مؤيّد البتيري متعاونًا في البداية لكنّه في النهاية تعاون مع المحققين وزوّد معلومات ساعدت لجنة التحقيق التابعة للهيئة في جهودها في تعقب الأموال المختلسة.

5

نتيجة للتحقيق اكتشف بأن مؤيّد البتيري استخدم الأموال المختلسة لإنشاء ثلاث عيادات طبية في باكستان لمنفعته الشخصية. في النهاية قام مؤيّد البتيري بتسليم الهيئة العيادات الثلاث التي أنشأها بمال الهيئة. كانت القيمة الإجمالية للعيادات تعادل قيمة الأموال المسروقة. بعد انتهاء التحقيق الداخلي تم فصل مؤيّد البتيري من الهيئة.

59. بعد سنوات من المعاناة في المحاكم خلصت الهيئة إلى أن التكاليف المرتبطة بالدعوى ضد عامر جاسم فاقت فوائدها. تلقت الهيئة اعترافًا موقعًا من قبل عامر جاسم يقر فيه بالاختلاس ويتحمل مسؤولية أفعاله والدعوى أنهيت بعد ذلك.

60. في نهاية تحقيقهم قام المدققون من سيدات حيدر بتقديم للهيئة تقرير خارج نطاق اختصاصهم متضمنا استنتاجات تفتقر إلى الأدلة الداعمة. لم يتبع المدقق البروتوكول الخاص بتقديم التدقيق وخلاصاته إلى الإدارة المعنية في الهيئة للتعليق أو لإتاحة فرصة للهيئة لتقديم وثائق متعلقة بالمسائل المشار إليها في التقرير. علاوة على ذلك كانت لهجة التقرير ومضمونه عدائيين تجاه الهيئة واحتوى التقرير على استنتاجات عامة وغير مدعومة.

61. ليس هناك أي دليل بأن التلاعب الذي ارتكب من قبل مؤيد البتيري وعامر جاسم أدى الى تحويل أموال الهيئة الى القاعدة. لم نكن لا أنا ولا الهيئة على علم ولم نتلقى أي دليل على أن مكتب الهيئة في باكستان اطلاقا موّل أو دعم القاعدة أو كيان تابع لها أو أي جماعات إرهابية أخرى.

62. في فترة عملي تلقى مكتب الهيئة في باكستان خطابات ثناء من الحكومة الباكستانية تمييزا بأعمالها الجيدة في البلد.

63. كانت الهيئة تدير مكتباً فرعياً وهو مكتب المنطقة الشرقية في الدمام، المملكة العربية السعودية، أنشئ قبل إنضمامي للهيئة. كان الأمير تركي بن جلوي المشرف العام له حتى عام 2003 عندما طلبت منه أن يستقيل لأنه رفض الإمتثال بأوامر الهيئة. استجابة لذلك استقال الأمير تركي بن جلوي من منصبه في مكتب الهيئة في المنطقة الشرقية وكنت سأقيله إن لم يفعل ذلك. وكلف الدكتور عبد الحميد المعجل بالعمل كمديراً بالنيابة للمكتب بعد رحيل الأمير تركي بن جلوي.

64. من خلال الإجراءات الإدارية والمالية الإعتيادة تبين للأمانة العامة بأن مكتب المنطقة الشرقية نفذ بعض المشاريع في البلدان الخارجية دون الحصول على الموافقة المسبقة من الأمانة العامة مخالفةً لأنظمة الهيئة التي تلزم المكاتب المحلية والخارجية بتقديم تقارير لإدارات البرامج والرعاية الإجتماعية والمالية بالهيئة عن المشاريع الميدانية المنفّذة من قبل المكاتب المحلية والخارجية. عندما حددت هذه المخالفات تلقى الأشخاص المعنيين إنذارات من الأمانة العامة وأصررت بأن يجب على مكتب المنطقة الشرقية بأن يحصل على الموافقة المسبقة كما هو مطلوب وفقا للوائح الهيئة.

65. بصفتي أمينًا عامًا للهيئة عملت على زيادة إشراف الأمانة العامة ورقابته فارضاً أن تمرّ جميع تمويل المشاريع عبر الأمانة العامة.

66. كلفت الهيئة محاسبين خارجيين ليراجعوا أعمال مكتب الهيئة في المنطقة الشرقية. وبت المحاسبون الخارجيون بأن الهيئة في المنطقة الشرقية كانت تنفذ وتمول مشاريع في الخارج بدون الحصول على الموافقة المسبقة من الأمانة العامة للهيئة وفي بعض الحالات فشل بالإمتثال للأنظمة المالية المختلفة للهيئة بما في ذلك استلام المكاتب الخارجية للأموال من الأمانة العامة و وجوب ارفاق المعاملات بكل الوثائق المساندة. لم يبين تحقيق المحاسبين الخارجيين أي دليل بأن الحالات المحددة بعدم الإمتثال لأنظمة الأمانة العامة أدت الى تحويل أموال إلى القاعدة أو الكيانات التابعة لها أو جماعات إرهابية أخرى.

67. ليس هناك أي دليل بأن حالات عدم الإمتثال لأنظمة الأمانة العامة من قبل المكتب في المنطقة الشرقية أدى الى تحويل أموال الهيئة للقاعدة. لم نكن لا أنا ولا الهيئة على علم بأي دليل ولم نتلقى أي دليل على أن الهيئة في المنطقة الشرقية مولت أو دعمت القاعدة أو الكيانات التابعة لها أو جماعات إرهابية أخرى.

68. عمليّات التدقيق بمكتب الهيئة في إندونيسيا التي تغطي السنوات قبل وبعد 11 من سبتمبر لا تظهر وجود دليل بتمويل أو دعم للقاعدة أو الكيانات التابعة لها أو جماعات إرهابية أخرى.

69. أجرت الأمانة العامة للهيئة عمليات التدقيق في المكاتب الفرعية ومن ضمنها مكتب الهيئة في إندونيسيا. بينما حدد نتائج التدقيق بعض المخالفات والتوصيات الإجرائية عن بعض الإجراءات التصحيحية إلا أن نتيجة التدقيق لم تظهر أي دليل بتمويل أو دعم للقاعدة أو الكيانات التابعة لها أو لجماعات إرهابية أخرى.

70. ليس هناك أي دليل أن حالات عدم الإمتثال بأنظمة الأمانة العامة من قبل مكتب الهيئة في إندونيسيا أدت الى تحويل أموال الهيئة للقاعدة. لم نكن لا أنا ولا الهيئة على علم ولم نتلقى أي دليل على أن مكتب الهيئة في إندونيسيا قام بتمويل أو دعم القاعدة أو الكيانات التابعة لها أو جماعات إرهابية أخرى.

6

71. إنني على علم بالادعاءات الواردة في هذه الدعوى فيما يتعلق بعمليات مكتب الهيئة في الفلبين وقد تمت الإشارة في هذه القضية إلى تقرير الزيارة الميدانية الصادر في يوليو 1998 من قبل المشرف على إدارة الرعاية الاجتماعية.

72. وفقاً لسياسة الهيئة لإجراء زيارات ميدانية لمكاتب وعمليات الهيئة في جميع أنحاء العالم، قام المشرف على إدارة الرعاية الاجتماعية بزيارة الفلبين في يوليو 1998 للإشراف على مشاريع إدارة الرعاية الاجتماعية والتحقق منها بما في ذلك المدفوعات المالية للأيتام و زيارات إلى دور الأيتام وعيادات الرعاية الصحية المختلفة. اعدّ المشرف تقريراً سلط فيه الضوء على العقبات والتحديات التي يواجهها مكتب الفلبين وتضمن بعض الانتقادات للمكتب وعملياته لعدم امتثالهم لبعض سياسات الأمانة العامة. علاوة على ذلك تضمن التقرير الإجراءات التصحيحية الموصى بها من أجل تحسين عمليات المكتب والإمتثال لمتطلبات الأمانة العامة. أخيرًا، التقى المشرف مع نائب مدير المكتب لمناقشة تلك التوصيات لكي يتأكد من تفهم نائب مدير المكتب لأنظمة الهيئة.

73. هذا هو أحد الأمثلة على جهود الهيئة في الإشراف على عملياتها في جميع أنحاء العالم والمتابعة مع مكاتبها من أجل ازدياد واتباع الإمتثال للوائح المالية والإدارية للأمانة العامة.

74. ليس هناك أي دليل أن حالات عدم الإمتثال بأنظمة الأمانة العامة من قبل مكتب الهيئة في الفلبين أدت الى تحويل أموال الهيئة للقاعدة. لم نكن لا أنا ولا الهيئة على علم ولم نتلقى بأي دليل على أن مكتب الهيئة في الفلبين مول أو دعم القاعدة أو الكيانات التابعة لها أو الجماعات الإرهابية الأخرى.

75. كشف تدقيق داخلي أجرته الإدارة المختصة في الأمانة العامة لمكتب الهيئة في الأردن للسنة المالية 1999-2000 أن مكتب الهيئة في المنطقة الشرقية أرسل أموالاً إلى مكتب الهيئة في الأردن بشكل مباشر وليس عبر الأمانة العامة للهيئة مخالفة للوائح الأمانة العامة. عندما علمت بتلك المخالفة قامت الهيئة إثر ذلك بتعيين مدقق خارجي لمراجعة مكتبها في المنطقة الشرقية. في النهاية استقال المشرف العام لمكتب الهيئة في المنطقة الشرقية الأمير جلوي لعدم إمتثاله لأوامر الهيئة.

76. ليس هناك أي دليل أن حالات عدم الإمتثال بأنظمة الأمانة العامة من قبل مكتب الهيئة في الأردن أدت الى تحويل أموال الهيئة للقاعدة. لم نكن لا أنا ولا الهيئة على علم ولم نتلقى أي دليل على أن مكتب الهيئة في الأردن موّل أو دعم القاعدة أو الكيانات التابعة لها أو جماعات إرهابية أخرى.

77. وائل جليدان لم يكن قط موظفاً في الهيئة فهو شغل منصب سكرتير لجنة إغاثة كوسوفو ومقرها في برشتينا وهي ليست تابعة للهيئة. درست لجنة الإغاثة حاجة المساعدات الإنسانية في كوسوفو وقدمت توصياتها إلى الجهة المختصة: اللجنة السعودية المشتركة للإغاثة.

78. محمد جمال خليفة كان موظف الهيئة في الفلبين من عام 1988 الى استقالته في عام 1993 قبل أن أكون أمين العام للهيئة ولم يعد إلى الهيئة ولم يكن له أي ارتباط بها بعد مغادرته.

79. لم يتم تصنيف أي موظف في الهيئة أو أي عضو إداري أو أي مكتب فرعي من قبل مكتب مراقبة الأصول الأجنبية ("الأوفاك") التابع لوزارة الخزانة الأمريكية كإرهابي مصنف على وجه التحديد قبل 11 سبتمبر 2001.

80. لم نكن لا أنا ولا الهيئة على علم بأي صلة بين الدكتورعبدالحميد المعجل والقاعدة أو أي تمويل أو دعم يُزعم أن الدكتور عبدالحميد المعجل قدمه للقاعدة أو الكيانات التابعة لها أو لجماعات إرهابية أخرى.

81. بعد تصنيف الدكتور عبدالحميد المعجل ومكتب الهيئة في إندونيسيا ومكتب الهيئة في الفلبين من قبل الأوفاك قامت الهيئة بتحقيق في الادعاءات الواردة في الإصدار الصحفي للأوفاك بخصوص التصانيف. تمت إزالة اسم الدكتور عبدالحميد المعجل من قائمة مجلس أمن الأمم المتحدة في 2013.

82. أجرت الهيئة تحقيقاً للتحقق من المعلومات المحدودة المتضمنة في الإصدار الصحفي للأوفاك بما فيها التدقيق بالسجلات الداخلية المتعلقة بالمكتبين المعنيين و بالهيئة في المنطقة الشرقية ومراجعة البيانات المالية لتلك المكاتب. بالإضافة إلى ذلك قامت الهيئة بمراجعة ملفات الموظفين العائدة للمكاتب الثلاثة بما في ذلك ملف الدكتور عبدالحميد المعجل.

83. لم تظهر تحقيقات الهيئة أي دعم للإدعاءات المدرجة في الإصدار الصحفي للأوفاك بالتمويل أو الدعم المزعوم للقاعدة أو أي منظمة إرهابية أخرى. لم يكن هناك أي عقوبات أو اجراءات سلبية من قبل السلطات المحلية نتيجة تصنيف الأوفاك وبقيا مكتبا الهيئة في إندونيسيا والفلبين مفتوحان ويعملان.

7

84. واصل مكتب هيئة الإغاثة الإسلامية العالمية في إندونيسيا عمله عقب تصنيفه من قبل الأوفاك عام 2006 حتى أنه تلقى رسالتين في عام 2007 من مسؤولين بجمهورية إندونيسيا تشير إلى أنه منذ عام 1992 لم يكن هناك قضايا أو ادعاءات بارتكاب مخالفات ضد الهيئة.

85. واصل مكتب الهيئة في الفلبين العمل بعد تصنيفه من قبل الأوفاك في 2006 لفترة قصيرة حتى أغلق في وقت لاحق من ذلك العام. سجل مكتب الهيئة في الفلبين مع الحكومة واعيد فتحه في عام 2011 ولكن أغلق مرة أخرى في 17 مارس 2013.

86. لم نكن لا أنا ولا الهيئة على علم بأي مساعدة (مالية أو غير ذلك) مقدمة سواء من الأمانة العامة للهيئة أو مكتبها في الفلبين إلى مجموعة أبو سياف.

87. لم نكن لا أنا ولا الهيئة على علم بأي مساعدة (مالية أو غير ذلك) مقدمة سواء من الأمانة العامة للهيئة أو الهيئة في إندونيسيا للجماعة الإسلامية.

88. لم نكن لا أنا ولا الهيئة على علم بأي مساعدة (مالية أو غير ذلك) مقدمة سواء من الأمانة العامة للهيئة أو الهيئة في كينيا أو الهيئة في تنزانيا لمجموعة الجهاد.

89. لم تمول الهيئة في إندونيسيا إنشاء أو عمليات مرافق تدريب لتستخدمها القاعدة أو التابعيين للقاعدة أو شركاء القاعدة.

90. الهيئة في إندونيسيا والهيئة في الفلبين قدما التماساً للأوفاك لإلغاء الإدراج في عام 2014 وتمت إزالة إسمي المكتبين من قائمة عقوبات الأوفاك في 16 أغسطس 2016. بعد تصنيف مكتب الهيئة في اندونيسيا ومكتب الهيئة في الفلبين في عام 2006 من قبل مجلس الأمن للأمم المتحدة تمت إزالة اسمي المكتبين في 6 يناير 2014. وتمت أيضاً إزالة اسمي المكتبين من قبل الإتحاد الأوروبي والمملكة المتحدة في 2014.

وفقًا لقانون 1746 § .U.S.C 28، أنا عدنان باشا ، أقر تحت طائلة عقوبة الحنث باليمين بموجب قوانين الولايات المتحدة الأمريكية أن ما تقدم حقيقي وصحيح.

عدنان باشا

نفذ في: 05/21/2024

8

## DAOU TRANSLATION AND SERVICES
### ضو للترجمة والخدمات

Tahwitat Furn El Chebbek – St. Nohra street – Ghawi Building – Baabda – Mount Lebanon – Ground floor

MOF#: 2859768 – Telephone No.: +961 1 284 725 – Gsm: +961 70 953 809 – Email: daouservices@gmail.com

## CERTIFICATE OF TRANSLATION

**Title of Source Document:** Dr. Basha Declaration (90 Paragraphs)

**Source language:** Arabic                    **Translated to:** English

## TRANSLATOR STATEMENT

I, Joyce Hani DAOU, am competent to translate from Arabic into English, and certify under penalty of perjury that the translation of the foregoing document is true and accurate to the best of my abilities.

## Translator qualifications:

15 years translation experience (Arabic-English and English-Arabic)

Sworn translator before the Lebanese courts as per oath taking report issued by the Ministry of Justice in Lebanon under No. 291 dated 26/02/2011

**Signature of translator:**                    **Date:** 11 April 2026