**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | 03-MD-01570 (GBD)(SN)<br><br>ECF Case<br><br>**ORAL ARGUMENT REQUESTED** |

This document relates to:

*Kathleen Ashton, et al. v.* Al Qaeda *Islamic Army, et al.*, 02-cv-06977
*Gladys H. Salvo, et al. v.* Al Qaeda *Islamic Army, et al.*, 03-cv-05071
*Federal Insurance Co., et al. v. Al Qaida, et al.*, 03-cv-06978
*Thomas E. Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 03-cv-09849
*Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-01923
*Continental Casualty Co., et al. v.* Al Qaeda*, et al.*, 04-cv-05970
*Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.*, 04-cv-07065
*Euro Brokers Inc., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-07279
*Maher, et al. v. Islamic Emirate of Afghanistan a/k/a The Taliban, et al.*, 1:23-cv-02845

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT INTERNATIONAL ISLAMIC RELIEF ORGANIZATION'S**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

                                                                                        **Page**

TABLE OF AUTHORITIES ................................................................................................. iv

GLOSSARY OF ABBREVIATIONS ................................................................................ xii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 3

I.    The International Islamic Relief Organization ........................................................ 3

II.   The Muslim World League ..................................................................................... 5

III.  IIRO Was Not Involved in the Founding of Al Qaeda .......................................... 5

      A.    The Services Bureau Pre-Dates and is Distinct from Al Qaeda ................ 6

      B.    The Formation of Al Qaeda ....................................................................... 6

IV.   IIRO Had No Knowledge of or Involvement in the 9/11 Attacks ......................... 6

V.    Plaintiffs Rely on Speculative, Unsubstantiated, and Inadmissible Accusations to
      Assert a Connection to Al Qaeda .......................................................................... 7

      A.    Jamal Al Fadl, the Primary Source of Plaintiffs' Allegations of Purported
            Connections to Al Qaeda, Is an Unreliable and Untrustworthy Source .... 7

      B.    Al Fadl's Accusations are Unsubstantiated and Often Contradicted by
            Reliable Evidence. ................................................................................... 12

      C.    OFAC Designations of Two Southeast Asia Offices Are Not Evidence of
            Involvement in the 9/11 Attacks ............................................................... 16

      D.    The Other Alleged Connections to Al Qaeda Are Even More Attenuated ... 19

            1.    There Is No Evidence That Any of IIRO's Local or Foreign Offices
                  Participated in the 9/11 Attacks or Supported Al Qaeda ............... 19

                  a.    IIRO Established Policies to Prevent and Investigate Misconduct ........ 20

                  b.    Head Office Conducted Oversight of Its Local and Foreign Offices ..... 20

                  c.    IIRO Enforced Financial Controls and Conducted Regular Audits ....... 21

                  d.    Claims of Terrorist Financing through Local and Foreign Offices
                        are Unsupported and Have No Discernable Connection to Al Qaeda.... 21

2.    Plaintiffs' Attempts to Link IIRO to Various Attacks in the Decade before the 9/11 Attacks Are Unsupported ................................................................ 24

3.    IIRO Cannot Be Connected to Al Qaeda or the 9/11 Attacks through the Taliban ............................................................................................................... 26

4.    IIRO Cannot Be Connected to Al Qaeda or the 9/11 Attacks through Individuals Who Themselves Were not Connected to the 9/11 Attacks or Al Qaeda ........................................................................................................... 26

      a.    Muhammad Jamaal Khalifa ................................................................... 27

      b.    Abdulhadi Daguit ................................................................................... 28

      c.    Abdul Hamid Mujil ................................................................................ 29

5.    Other Groups and Organizations Were Not Involved In the 9/11 Attacks and, In Any Event, IIRO Had No Knowledge of Purported Connections With Al Qaeda ........................................................................................................... 29

      a.    ASG ........................................................................................................ 30

      b.    MILF ...................................................................................................... 30

      c.    Jemaah Islamiyah ................................................................................. 31

      d.    The Saudi Joint Relief Committee ........................................................ 31

PROCEDURAL POSTURE ........................................................................................................ 32

I.    The Court Dismissed Most of Plaintiffs' Claims .................................................... 32

II.    Plaintiffs' ATA Claims Have Been Significantly Weakened ................................... 34

III.    Courts Have Made Several Relevant Decisions Concerning the JASTA ................ 36

IV.    Discovery & *Daubert* Challenges ............................................................................ 36

ARGUMENT ............................................................................................................................... 37

I.    There Is No Basis to Find that IIRO Is Directly Liable for the 9/11 Attacks .......... 37

    A.    IIRO Did Not Proximately Cause the 9/11 Attacks ................................... 38

    B.    IIRO Did Not Have the Requisite Mental State .......................................... 40

    C.    IIRO Did Not Commit an Act of International Terrorism ........................... 42

      1.    IIRO Did Not Provide "Material Support" to Al Qaeda ........................ 42

2.     The Material Support Statutes Do Not Apply Retroactively ........................... 43

3.     The Other Requirements of an Act of International Terrorism Are Not Satisfied ..................................................................................................... 45

II.     IIRO Did Not Owe Any Duty to Plaintiffs ............................................................. 47

III.     IIRO Did Not Aid and Abet the 9/11 Attacks ...................................................... 47

A.     IIRO Did Not Engage in an Affirmative Act to Facilitate the 9/11 Attacks ............. 48

B.     IIRO Did Not Knowingly Assist Al Qaeda in Carrying out the 9/11 Attacks .......... 50

1.     IIRO Was Not "Generally Aware" of Its Alleged Role in Illegal Activity ...... 51

a.     Plaintiffs Cannot Show a Direct Relationship Between IIRO and Al Qaeda ...................................................................................... 51

b.     Plaintiffs Cannot Show General Awareness Through An Intermediary ..................................................................................... 52

2.     IIRO Did Not Knowingly and Substantially Assist the 9/11 Attacks .............. 55

C.     There Is No Nexus Between IIRO's Acts and the 9/11 Attacks ............................... 57

D.     IIRO Did Not Provide Pervasive and Systemic Support to Al Qaeda ...................... 59

IV.     IIRO Did Not Conspire to Commit the 9/11 Attacks .......................................... 61

V.     IIRO Is Not Liable for Any Actions Taken By Employees When They Were Not Employed by IIRO or that Were Outside the Scope of their Employment ......................... 63

CONCLUSION ......................................................................................................... 65

iii

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdulaziz v. McKinsey & Co., Inc.*,
  2022 WL 2444925 (2d Cir. July 5, 2022) ...................................................................47

*Ahmad v. Christian Friends of Israeli Communities*,
  2014 WL 1796322 (S.D.N.Y. May 5, 2014), *aff'd*, 600 F. App'x 800 (2d Cir. 2015) ............40

*In re Arab Bank, PLC Alien Tort Statute Litig.*,
  808 F.3d 144 (2d Cir. 2015) ...................................................................................61

*In re Arcapita Bank B.S.C.(C)*,
  640 B.R. 604 (S.D.N.Y. 2022) ..........................................................................39, 58

*Ashley v. Deutsche Bank Aktiengesellschaft*,
  144 F.4th 420 (2d Cir. 2025) ........................................47, 48, 51, 53, 54, 55, 57, 58, 59, 60, 61

*Averbach v. Cairo Amman Bank*,
  2026 WL 865682 (S.D.N.Y. Mar. 30, 2026) ........................................................50, 56

*Bartlett v. Baasiri*,
  81 F.4th 28 (2d Cir. 2023) .......................................................................................43

*Bartlett v. Societe Generale de Banque Au Liban SAL*,
  2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020) .........................................................46

*Bender v. City of New York*,
  78 F.3d 787 (2d Cir. 1996) ......................................................................................41

*Bernhardt v. Islamic Republic of Iran*,
  47 F.4th 856 (D.C. Cir. 2022) .................................................................................62

*Bigio v. Coca-Cola Co.*,
  675 F.3d 163 (2d Cir. 2012) ....................................................................................61

*Boim v. Holy Land Found. for Relief and Dev.*,
  549 F.3d 685 (7th Cir. 2008) ...................................................................................43

*Boim v. Quranic Literacy Inst.*,
  127 F.Supp.2d 1002 (N.D. Ill. 2001), *aff'd*, 291 F.3d 1000 (7th Cir. 2002) .........................45

*Bonacasa v. Standard Chartered PLC*,
  2023 WL 7110774 (S.D.N.Y. Oct. 27, 2023) .....................................................53, 54, 57

*Bondi v. Bank of Am. Corp. (In re Parmalat Sec. Litig.)*,
　383 F.Supp.2d 587 (S.D.N.Y. 2005)........................................................................................63

*Brill v. Chevron Corp.*,
　2018 WL 3861659 (N.D. Cal. Aug. 14, 2018) ........................................................................56

*Clark v. United States*,
　365 F.Supp.2d 553 (S.D.N.Y. 2005)........................................................................................10

*Dole Food Co. v. Patrickson*,
　538 U.S. 468 (2003)..................................................................................................................43

*Finan v. Lafarge S.A.*,
　2025 WL 2504317 (E.D.N.Y. Aug. 29, 2025)......................................................51, 52, 58, 59

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
　592 U.S. 351 (2021)..................................................................................................................34

*Fraenkel v. Standard Chartered Bank*,
　2025 WL 2773251 (S.D.N.Y. Sept. 26, 2025)......................................................54, 58, 59, 60

*Freeman v. HSBC Holdings PLC*,
　465 F.Supp.3d 220 (E.D.N.Y. 2020) .......................................................................................56

*Freeman v. HSBC Holdings PLC*,
　57 F.4th 66 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 83 (2023).........................................61, 62

*Gill v. Arab Bank, PLC*,
　893 F.Supp.2d 474 (E.D.N.Y. 2012) .......................................................................................40

*Gill v. Arab Bank*,
　PLC, 893 F.Supp.2d 523 (E.D.N.Y. 2012) .............................................................................16

*Hakimyar v. Habib Bank Ltd.*,
　2025 WL 605575 (S.D.N.Y. Feb. 25, 2025)............................................................................52

*Halberstam v. Welch*,
　705 F.2d 472 (D.C. Cir. 1983)..................................................................................................50

*Hamilton v. Beretta U.S.A. Corp.*,
　96 N.Y.2d 222 (Apr. 26, 2001)................................................................................................47

*Heath v. EcoHealth Alliance*,
　2025 WL 2658252 (2d Cir. Sept. 17, 2025) ............................................................................47

*Honickman v. BLOM Bank SAL*,
　6 F.4th 487 (2d Cir. 2021) ..................................................................................................50, 52

*Hussein v. Dahabshiil Transfer Servs. Ltd.*,
  230 F.Supp.3d 167 (S.D.N.Y. 2017), *aff'd*, 705 F. App'x 40 (2d Cir. 2017).........................41

*Kaplan v. Lebanese Canadian Bank, SAL*,
  405 F.Supp.3d 525 (S.D.N.Y. 2019) (Daniels, J.), *vacated in part on other grounds*,
  999 F.3d 842 (2d Cir. 2021)...............................................................................................46

*Kaplan v. Lebanese Canadian Bank, SAL*,
  999 F.3d 842 (2d Cir. 2021)...............................................................................32, 60, 61

*King v. Habib Bank Ltd.*,
  2023 WL 8355359 (S.D.N.Y. Dec. 1, 2023) .............................................................50, 56

*Landgraf v. USI Film Prods.*,
  511 U.S. 244 (1994)............................................................................................................44

*Lavi v. UNRWA USA Nat'l Comm., Inc.*,
  2025 WL 2300038 (D. Del. Aug. 8, 2025) ...............................................................52, 53, 58

*Linde v. Arab Bank, PLC*,
  353 F. Supp. 2d 327 (E.D.N.Y. 2004) ...............................................................................45

*Linde v. Arab Bank, PLC*,
  882 F.3d 314 (2d Cir. 2018)...............................................................................41, 42, 46

*Long v. MTN Grp. Ltd.*,
  2025 WL 2827899 (E.D.N.Y. Sept. 25, 2025) .......................................................................59

*Louis Vuitton S.A. v. Spencer Handbags Corp.*,
  765 F.2d 966 (2d Cir. 1985)...............................................................................................44

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
  175 F.Supp.2d 593 (S.D.N.Y. 2001)...................................................................................62

*Monterey Bay Mil. House., LLC v. Ambac Assurance Corp.*,
  531 F.Supp.3d 673 (S.D.N.Y. 2021)....................................................................................63

*Moss v. First Premier Bank*,
  2024 WL 4274780 (E.D.N.Y. Aug. 2, 2024)..................................................................61, 62

*O'Sullivan v. Deutsche Bank AG*,
  2018 WL 1989585 (S.D.N.Y. Apr. 26, 2018)..................................................................61, 62

*Ofisi v. BNP Paribas, S.A.*,
  77 F.4th 667 (D.C. Cir. 2023).............................................................................................62

*Owens v. BNP Paribas S.A.*,
  235 F.Supp.3d 85 (D.D.C. 2017).........................................................................................43

*Palsgraf v. Long Island R.R. Co.*,
    248 N.Y. 339 (1928) .................................................................................................47

*Parizer v. AJP Educ. Found., Inc.*,
    2025 WL 2382933 (E.D. Va. Aug. 15, 2025) ......................................................56, 57, 59, 61

*In re Parmalat Sec. Litig.*,
    659 F.Supp.2d 504 (S.D.N.Y. 2009); *aff'd in part, vacated in part on other grounds,*
    412 F. App'x 325 (2d Cir. 2011) ...............................................................................63

*In re Parmalat Sec. Litig.*,
    684 F.Supp.2d 453 (S.D.N.Y. 2010) ...........................................................................63

*In re PCH Assocs.*,
    949 F.2d 585 (2d Cir. 1991) .....................................................................................39

*Picard v. Sage Realty*,
    2021 WL 6052422 (S.D.N.Y. Dec. 21, 2021) ..................................................................8

*Pittman by Pittman v. Grayson*,
    149 F.3d 111 (2d Cir. 1998) (NY state law) ...................................................................61

*Raanan v. Binance Holdings Ltd.*,
    2025 WL 605594 (S.D.N.Y. Feb. 25, 2025) ....................................................................46

*Rivera v. State*,
    34 N.Y.3d 383 (2019) .............................................................................................63

*Riviello v. Waldron*,
    47 N.Y.2d 297 (1979) .............................................................................................63

*RJR Nabisco v. European Community*,
    579 U.S. 325 (2016) ...............................................................................................43

*Rosemond v. United States*,
    572 U.S. 65 (2014) .................................................................................................50

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013) ....................................................................................35, 38

*Scribner v. Summers*,
    84 F.3d 554 (2d Cir. 1996) .......................................................................................41

*Siegel v. HSBC N. Am. Holdings, Inc.*,
    933 F.3d 217 (2d Cir. 2019) .............................................................................50, 54, 55, 59

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*,
    605 U.S. 280 (2025) .....................................................................................47, 48, 50, 59

*Sokolow v. Palestine Liberation Org.*,
 60 F. Supp. 3d 509 (S.D.N.Y. 2014) (Daniels, J.) ..........................................................37, 41

*Stogner v. California*,
 539 U.S. 607 (2003)..............................................................................................................43

*Strauss v. Credit Lyonnais, S.A.*,
 2006 WL 2862704 (E.D.N.Y. Oct. 5, 2006)..........................................................................43

*Tardif v. City of New York*,
 991 F.3d 394 (2d Cir. 2021)..................................................................................................41

*In re Terrorist Attacks on Sept. 11, 2001*,
 134 F.Supp.3d 774 (S.D.N.Y. 2015), *vacated on other grounds*,
 2017 WL 8776686 (2d Cir. Feb. 7, 2017)..............................................................................65

*In re Terrorist Attacks on Sept. 11, 2001*,
 2008 WL 7073447 (S.D.N.Y. Dec. 23, 2008) ........................................................................38

*In re Terrorist Attacks on Sept. 11, 2001*,
 2021 WL 1164087 (S.D.N.Y. Mar. 26, 2021) ........................................................................38

*In re Terrorist Attacks on Sept. 11, 2001*,
 2022 WL 4227151 (S.D.N.Y. May 3, 2022) ...................................................................44, 62

*In re Terrorist Attacks on Sept. 11, 2001*,
 2023 WL 1797629 (S.D.N.Y. Feb. 7, 2023)............................................................................2

*In re Terrorist Attacks on Sept. 11, 2001*,
 2023 WL 2430381 (S.D.N.Y. Mar. 9, 2023) ...............................................11, 12, 34, 40, 58

*In re Terrorist Attacks on Sept. 11, 2001*,
 2023 WL 3116763 (S.D.N.Y. Apr. 27, 2023)........................................................................36

*In re Terrorist Attacks on Sept. 11, 2001*,
 2023 WL 5132138 (S.D.N.Y. Feb. 27, 2024).........................................................37, 38, 40, 44

*In re Terrorist Attacks on Sept. 11, 2001*,
 2025 WL 2383768 (S.D.N.Y. Aug. 18, 2025).................................................................22, 36

*In re Terrorist Attacks on Sept. 11, 2001*,
 2025 WL 2485427 (S.D.N.Y. Aug. 28, 2025).................................................................63, 65

*In re Terrorist Attacks on Sept. 11, 2001*,
 2026 WL 769787 (S.D.N.Y. Mar. 18, 2026).......................................................2, 22, 36, 37

*In re Terrorist Attacks on Sept. 11, 2001*,
 295 F.Supp.3d 416 (S.D.N.Y. 2018), *rev'd and remanded as to another defendant
 sub nom.*, *Underwriting Members of Lloyd's Syndicate 2 v. Al Rajhi Bank*,
 779 F. App'x 66 (2d Cir. 2019) ....................................................................................34, 58

*In re Terrorist Attacks on Sept. 11, 2001*,
 298 F.Supp.3d 631 (S.D.N.Y. 2018)..........................................................2, 38, 39, 40, 58, 65

*In re Terrorist Attacks on Sept. 11, 2001*,
 349 F.Supp.2d 765 (S.D.N.Y. 2005).......................................................................33, 35, 47

*In re Terrorist Attacks on Sept. 11, 2001*,
 392 F.Supp.2d 539 (S.D.N.Y. 2005), *aff'd*, 538 F.3d 71 (2d Cir. 2008) ...........................33, 34

*In re Terrorist Attacks on Sept. 11, 2001*,
 714 F.3d 118 (2d Cir. 2013)..............................................................................34, 35, 38, 40

*In re Terrorist Attacks on Sept. 11, 2001*,
 718 F.Supp.2d 456 (S.D.N.Y. 2010)...............................................................................40, 58

*In re Terrorist Attacks on Sept. 11, 2001*,
 840 F.Supp.2d 776 (S.D.N.Y. 2012)....................................................................................58

*In re Terrorists Attacks on Sept. 11, 2001*,
 740 F.Supp.2d 494 (S.D.N.Y. 2010), *aff'd*, 714 F.3d 118 (2d Cir. 2013) .......33, 34, 35, 40, 47

*Troell v. Binance Holdings Ltd.*,
 2026 WL 636849 (S.D.N.Y. Mar. 6, 2026) ....................................................................50, 55

*Twitter, Inc. v. Taamneh*,
 598 U.S. 471 (2023).......................................47, 48, 49, 50, 55, 57, 58, 59, 60, 61

*U.S. v. DeLucia*,
 1997 WL 616006 (2d Cir. Oct. 7, 1997)................................................................................9

*U.S. v. Fidse*,
 778 F.3d 477 (5th Cir. 2015) ..............................................................................................45

*UMG Recordings, Inc. v. Grande Commc'ns Networks, L.L.C.*,
 118 F.4th 697 (5th Cir. 2024), *vacated on other grounds sub nom. Grande
 Commc'ns Networks v. UMG Recordings, Inc.*,
 2026 WL 922501 (U.S. Apr. 6, 2026) ...............................................................................60

*United States. v. Abdi*,
 498 F.Supp.2d 1048 (S.D. Ohio 2007) ...............................................................................45

*United States v. Marzook*,
 426 F.Supp.2d 820 (N.D. Ill. 2006) ...................................................................................45

*United States v. Stewart,*
    590 F.3d 93 (2d Cir. 2009)........................................................................................41

*Upstate Shredding, LLC v. Northeastern Ferrous, Inc.,*
    2016 WL 865299 (N.D.N.Y. Mar. 2, 2016) ............................................................9

*In re Vitamins Antitrust Litig.,*
    2000 WL 1511376 (D.D.C. Oct. 6, 2000) ............................................................44

*Weingarten v. United States,*
    865 F.3d 48 (2d Cir. 2017)........................................................................................44

*Weiss v. Nat'l Westminster Bank PLC,*
    278 F.Supp.3d 636 (E.D.N.Y. 2017) ......................................................................44

*Weiss v. Nat'l Westminster Bank PLC,*
    768 F.3d 202 (2d Cir. 2014)......................................................................................41

*Weiss v. Nat'l Westminster Bank, PLC.,*
    993 F.3d 144 (2d Cir. 2021)......................................................................................46

*Zobay v. MTN Grp. Ltd.,*
    695 F.Supp.3d 301 (E.D.N.Y. 2023) ..........................................................54, 57, 60

**Statutes**

8 U.S.C. § 1189............................................................................................................55

18 U.S.C. § 2331(1) ..............................................................................42, 43, 45, 46, 62

18 U.S.C. § 2333 ................................................................32, 40, 43, 44, 45, 55

18 U.S.C. § 2333B .......................................................................................................43

18 U.S.C. § 2339A ..............................................................40, 41, 42, 43, 44, 45

18 U.S.C. § 2339B ..............................................................40, 41, 42, 44, 45

18 U.S.C. § 2339C .......................................................................................................44

Justice Against Sponsors of Terrorism Act, Pub. L. 114-222, § 4(a),
    130 Stat. 852 (2016) (codified at 18 U.S.C. § 2333(d)(2)).........................36, 55, 61

**Other Authorities**

Fed. R. Evid. 803(8)..........................................................................................11, 12

Fed. R. Evid. 805 ......................................................................................................8

x

Fed. R. Evid. 807 ..................................................................................................................................9

xi

**GLOSSARY OF ABBREVIATIONS**

| | |
|---|---|
| **al Fadl** | Jamal Ahmed al Fadl |
| **ASG** | Abu Sayyaf Group |
| **Azzam** | Abdullah Azzam |
| **Basha** | Adnan Basha, Ph.D. |
| **Bin Laden** | Osama Bin Laden |
| **Butairi** | Moayyid bin Al-Butairi |
| **Daguit** | Abdulhadi Daguit |
| **EO 13224** | Executive Order 13224 signed by President George W. Bush |
| **Jasim** | Amir Jasim |
| **Jelaidan** | Wael Jelaidan |
| **JI** | Jemaah Islamiyah |
| **Khalifa** | Muhammad Jamaal Khalifa |
| **KSM** | Khalid Sheikh Muhammad |
| **MAK** | Services Bureau (Maktab al-Khidamat in Arabic) |
| **MILF** | Moro Islamic Liberation Front |
| **Mujil** | Abdul Hamid Mujil |
| **OFAC** | Office of Foreign Assets Control |
| **Prince Jalawi** | Prince Turki bin Jalawi |
| **SDGT** | Specially Designated Global Terrorist |
| **Shah** | Wali Khan Amin Shah |
| **SJRC** | Saudi Joint Relief Committee |
| **Yousef** | Ramzi Yousef |

**INTRODUCTION**

International Islamic Relief Organization ("IIRO") has unequivocally and repeatedly condemned, and continues to condemn, the September 11 attacks ("9/11 Attacks") and expresses deep sympathy for Plaintiffs' profound losses. The heinous and indefensible attacks caused immense suffering and loss, for which Plaintiffs understandably seek justice. However, the issue before the Court is not whether the 9/11 Attacks grievously harmed Plaintiffs, but whether the evidence adduced over two decades can reasonably support a finding at trial that IIRO is legally liable. The sympathy that is properly felt for Plaintiffs cannot convert a leading charity fulfilling its mission to provide relief to those in need, and that inarguably had nothing to do with the 9/11 Attacks, into a responsible party.

IIRO played no role whatsoever in planning or carrying out the 9/11 Attacks and, after more than twenty years of litigation, Plaintiffs have no evidence—none—to suggest otherwise. Nevertheless, they continue to push their baseless theories, even after their purported "terrorism expert," Evan Kohlmann, was forced to admit that he erroneously claimed that an IIRO employee was one of the 9/11 hijackers. Plaintiffs were likewise undeterred when their "star" informant, Jamal Al Fadl—who Plaintiffs acknowledge was the source of the government's early attention to IIRO and who is demonstrably unreliable and untrustworthy—refused to provide sworn testimony in this MDL. The conclusions of the 9/11 Commission and the FBI did not deter them either. In 2004, the 9/11 Commission issued a 585-page report that did not name IIRO among the entities that financed the 9/11 Attacks or Al Qaeda. Then, in 2021, the FBI concluded that it "has not identified additional groups or individuals responsible for the attack other than those currently charged [which did not include IIRO], which is consistent with the final conclusion of the 9/11

Commission Report."[1]

With no evidence linking IIRO to 9/11 through any reasonable chain of causation, Plaintiffs have relentlessly pursued a result-driven scattershot effort to establish purported indirect links that do not exist and do not add up to anything. They advance the theory that IIRO somehow contributed to Al Qaeda's "global strike capabilities,"[2] based on a hodgepodge of actors, institutions, timeframes, and geographies that Plaintiffs string together using unsourced, unsubstantiated, and inadmissible accusations. The very fact that Plaintiffs have concocted a theory based not upon recognized principles of proximate causation but on some attenuated and made-up notion of "global strike capabilities" essentially concedes an absence of a recognized concept for liability.

Plaintiffs' theory is rooted in alleged actions taken in the late 1970s to late 1980s when various factions in Afghanistan were fighting the Soviet Union with the active support of the United States. Somehow, according to Plaintiffs, those ambiguous events of decades before carry forward to 9/11. But this Court has already concluded that those allegations do not "bear any definite and specific, articulable connection to the 9/11 Attacks or those who carried them out."[3] Also crucial to Plaintiffs' narrative is a self-proclaimed terrorism expert, Evan Kohlmann, whom this Court found to have "questionable experience and training" and a "tendency to misstate facts, rely on speculation, and jump from accepted premises to unfounded conclusions."[4]

---

[1] SOF ¶ 1. Citations to "SOF" are to IIRO's Local Rule 56.1 statement submitted herewith. Cited exhibits are attached to the accompanying declaration of Aisha E. R. Bembry.

[2] *See e.g.*, Pls.' Opp'n. to Defs.' Mot. to Exclude Expt. Testimony of Jenkins and Winer, ECF No. 7606, at 15 (Jan. 14, 2022); Pls.' Opp'n. to Defs.' Mot. to Exclude Testimony of Kohlmann and Levitt, ECF No. 9344, at 30 (Sept. 15, 2023).

[3] *In re Terrorist Attacks on Sept. 11, 2001* ("*Terrorist Attacks XIV*"), 298 F.Supp.3d 631, 659 (S.D.N.Y. 2018). Five years later, the Court denied Plaintiffs' motion to revise this decision. *In re Terrorist Attacks on Sept. 11, 2001*, 2023 WL 1797629, at *13 (S.D.N.Y. Feb. 7, 2023) (denying motion to revise order dismissing charity-centered allegations because, *inter alia*, JASTA does not provide for aiding and abetting liability against sovereigns).

[4] *In re Terrorist Attacks on Sept. 11, 2001*, 2026 WL 769787, at *5 (S.D.N.Y. Mar. 18, 2026) (cleaned up).

Plaintiffs simply cannot show IIRO's intentional participation in the 9/11 Attacks. Any alleged connections between IIRO and Al Qaeda are *at best* so highly attenuated in time and location that they cannot sustain a claim, and, in any event, even those purported connections are not supported by reliable evidence. Plaintiffs cannot remotely carry their burden to prove direct or secondary liability. No reasonable jury could conclude otherwise. Accordingly, IIRO is entitled to judgment as a matter of law.

## BACKGROUND

### I.   The International Islamic Relief Organization

IIRO was founded in 1978 and is based in Jeddah, Saudi Arabia. SOF ¶¶ 7-8. At all relevant times, IIRO was an international Islamic non-governmental organization ("NGO") that carried out worldwide charitable projects. Through 50 global offices in 120 countries and with over 1,000 employees, *id.* ¶¶ 22, 30, IIRO provided emergency aid, regardless of race or creed, in response to crises and natural disasters, as well as general humanitarian and infrastructure support for impoverished communities worldwide. *Id.* ¶¶ 9-15. IIRO enjoyed a stellar reputation for its work, which included delivering to impoverished communities clothing, medicine, water, blankets, food, and shelter, providing care for orphaned children, educational and health care services, and even vocational training, and contributing to local infrastructure through the construction of mosques and the digging of wells. *Id.* ¶¶ 10-19, 561-64. For example, in 2000-2001 alone, IIRO health facilities treated over 1.7 million patients. *Id.* ¶ 16. IIRO delivered aid in coordination with organizations like the United Nations High Commission on Refugees, the Red Cross, and the U.N. Peacebuilding Commission, and had special consultative status with the United Nations Economic and Social Council. *Id.* ¶¶ 11, 13, 26.

Plaintiffs' allegations have focused on two IIRO offices in far-flung Southeast Asian countries. IIRO-Philippines provided charitable and emergency relief programs from 1986 to 2006

3

and again from 2011 to 2013. *Id.* ¶¶ 215, 232. Its programs ranged from medical and educational support to construction and emergency relief. *Id.* ¶¶ 18, 220-23. The office in Manila ran health clinics, medical dispensaries, maternity homes, orphanages, and emergency relief programs; provided Ramadan meals and educational scholarships, primarily to secular schools; financed teacher salaries at a Filipino government-run school; and constructed mosques and wells. *Id.* IIRO-Indonesia worked with the Indonesian government to deliver aid and engage in relief projects. *Id.* ¶¶ 246-47. IIRO-Indonesia's work included constructing mosques and wells for low-income communities, operating health clinics, delivering emergency relief programs and Ramadan meals, and operating ten orphanages for over 1500 orphans. *Id.* ¶¶ 244-45.

The most senior role at IIRO was that of Secretary General, and the Secretary General, along with his advisors, the Assistant Secretaries General, and various department heads, formed the Head Office, also known as the Secretariat General, which functioned as IIRO's main executive body. *Id.* ¶¶ 27-28. The Secretary General was responsible for managing the organization, including supervising department directors, but, as with any head of a large and complex multinational operation, was not involved in every aspect of IIRO's day-to-day operations. *Id.* ¶¶ 30-31. Adnan Basha, Ph.D. ("**Basha**")[5] served as Secretary General from 1997 to 2013. *Id.* ¶ 29. IIRO carried out its work through offices within Saudi Arabia—Local Offices—and outside of Saudi Arabia—Foreign Offices. *Id.* ¶¶ 22-25.

IIRO conducted its own fundraising, mainly through individual donors. *Id.* ¶ 20. Local Offices were responsible for collecting donations and transferring them to Head Office, which was responsible for managing the organization's revenues and expenditures. *Id.* ¶¶ 359, 362. Local Offices were prohibited from sending funds directly to Foreign Offices and could not transfer

---

[5] Individuals and entities in bold font are catalogued in the glossary attached to this memorandum.

4

earmarked donor funds from one project to another without prior approval. *Id.* ¶¶ 361, 363. Working in conjunction with Head Office, Local Offices and Foreign Offices planned and supervised programs for the organization. *Id.* ¶¶ 360, 365-67. IIRO established robust policies, which included requirements that all employees abide by a code of conduct. *Id.* ¶¶ 354-56, 358, 364, 372-84, 389, 407. The code prohibited employees from exploiting their positions for personal profit or participating in local political activities. *Id.* ¶ 355. The policies required Foreign Offices to submit to Head Office reports detailing the progress of their programs and projects, and the approval of Head Office was required for all expenditures. *Id.* ¶¶ 367-71. The policies forbid Foreign Offices and their employees from engaging in any political activities, let alone providing support to terrorists or militants. *Id.* ¶¶ 372-73. Head Office regularly audited Local and Foreign Offices to ensure compliance with the policies, including by conducting field visits and engaging external auditors for regular audits. *Id.* ¶¶ 382, 385-86, 389, 394, 399-402. When indicated, Local Offices assisted Head Office to supervise Foreign Offices. *Id.* ¶¶ 384-86, 388-90.

## II.   The Muslim World League

At all relevant times, the Muslim World League ("MWL") was an international Islamic NGO based in Makkah, Saudi Arabia. *Id.* ¶¶ 33-34. MWL established IIRO, and each MWL Secretary General served *ex officio* as Chair of the Board of Directors of IIRO (the "**Board**"). *Id.* ¶¶ 7, 35; *see* 37-41. The **Board**, which ranged from 12 to 24 members, *id.* ¶ 36,[6] did not control or supervise IIRO's day-to-day operations. *Id.* ¶ 42.

## III.   IIRO Was Not Involved in the Founding of Al Qaeda

Plaintiffs have alleged that IIRO activities during the Soviet era in Afghanistan somehow had a connection to the founding of Al Qaeda. The allegation is both irrelevant to this case and without factual basis, relying on distorted version of long-ago events and conflating organizations

---

[6] As IIRO Secretary General, **Basha** reported to the IIRO **Board**. *Id.* ¶¶ 29, 35.

fighting the Soviets with U.S. support with much later and unrelated actors and events.

### A.      The Services Bureau Pre-Dates and is Distinct from Al Qaeda

As detailed in the brief submitted on even date by MWL ("MWL Brief"),[7] Abdullah Azzam ("**Azzam**") founded an entity in the mid-1980s to support the fighters against the Soviets that was called the Services Bureau ("**MAK**").[8] ¶ 175. It received funding from Osama Bin Laden ("**Bin Laden**"). *Id.* ¶ 176. In support of the *mujahideen* in Afghanistan, the **MAK** resisted the Soviet invasion and enjoyed the military and financial support of the U.S. and others. *Id.* ¶¶ 177-78.

### B.      The Formation of Al Qaeda

**Bin Laden** withdrew his funding and left the **MAK** in 1988 and formed a new organization that he called Al Qaeda.[9] *Id.* ¶ 200. The organization was directed against the Saudi regime for its initial years; Al Qaeda later began to target Americans in Saudi Arabia in 1996 and plotting against America itself in 1998. *Id.* ¶¶ 202-07, 458-69. The 9/11 plotting began no earlier than Spring 1999. *Id.* ¶¶ 446-47. Yet as the Court will see, effectively all of what Plaintiffs have to say about IIRO took place well before 1999. Not only do these assertions not support liability, but they are also completely irrelevant to the question of responsibility for 9/11. In essence, Plaintiffs have no facts that they can prove that would be material to a claim for responsibility for the 9/11 Attacks.

### IV.      IIRO Had No Knowledge of or Involvement in the 9/11 Attacks

After extensive discovery over many years, Plaintiffs have no evidence that IIRO had any knowledge of or involvement in the 9/11 Attacks. *Id.* ¶¶ 1-3, 445, 448-50. *Plaintiffs failed to trace a penny from IIRO to Al Qaeda or 9/11. Id.* ¶¶ 1-6, 179-80, 241, 271, 353, 357, 472. Undeterred, Plaintiffs rely on unsubstantiated accusations and the alleged actions of individuals, including individuals who resisted the Soviets and who came and went from IIRO well before the genesis of

---

[7] IIRO hereby incorporates by reference Background, Section II. A. of the MWL Brief, per the Court's briefing order. ECF No. 11419.

[8] The Services Bureau in Arabic was often abbreviated as "MAK."

[9] *See* MWL Brief Background, Section II.B., which IIRO hereby incorporates.

the 9/11 Attacks, and unrelated entities to somehow implicate IIRO.

IIRO's mission and principles are anathema to the nihilistic violence of Al Qaeda, *id.* ¶¶ 9, 188, 196, 198-99, 212, 449-50, a fact that Plaintiffs ignore. However, what they cannot ignore is that they have ***no evidence*** showing that IIRO participated in or financed the 9/11 Attacks, that it had any knowledge of their planning, or that it assisted Al Qaeda in any knowing or material way in carrying them out.

## V.     Plaintiffs Rely on Speculative, Unsubstantiated, and Inadmissible Accusations to Assert a Connection to Al Qaeda

Plaintiffs also have no reliable evidence of any direct connection between IIRO and Al Qaeda.  There is no evidence showing that IIRO ever gave funds to **Bin Laden** or Al Qaeda. *Id.* ¶¶ 1-6, 32, 179-80, 213-14, 241, 271, 353, 357, 472. At best, Plaintiffs have adduced suggestions of highly attenuated connections to Al Qaeda, but none relate to the planning or execution of 9/11. And the developed record does not support their narrative. Instead of facts supported by admissible evidence, Plaintiffs have speculation and accusations that are largely informed by an unreliable source, or that bear no specific, articulable connection to the 9/11 Attacks or Al Qaeda.

### A.     Jamal Al Fadl, the Primary Source of Plaintiffs' Allegations of Purported Connections to Al Qaeda, Is an Unreliable and Untrustworthy Source

Jamal Ahmed al Fadl **("al Fadl")**, a former member of Al Qaeda, who defected and became a paid informant for the U.S. Government, is the primary source of the false rumors and accusations about IIRO and MWL. *Id.* ¶¶ 110-126. One of the earliest documented reports upon which Plaintiffs rely asserts that IIRO helped "fund six militant training camps in Afghanistan." *Id.* ¶117. This unverified document dates back to 1996,[10] the same year that **al Fadl** became an informant. *Id.* ¶¶ 112, 117-118. While the 1996 document cites a "clandestine source" for this

---

[10] *See* Kohlmann Rpt., ECF No. 9250-2, ¶¶ 21, 21 n.9, 83, 83 n.115. Plaintiffs' experts assert that the 1996 document is a CIA report. *Id.* ¶ 21 & n.9; Winer Rpt., ECF No. 7344-1, ¶ 6.6 & n.28; Levitt Rpt. 11-12 & n.30. IIRO disputes the admissibility of the 1996 document. It contains hearsay, is unreliable, and unauthenticated.

allegation, there are multiple indicia that **al Fadl** was the source and one of Plaintiffs' expert makes that connection as well. *Id.*[11]

A January 1999 CIA report makes a similar allegation concerning "military" camps, asserting that IIRO "funds a military camp associated with Usama [Bin Laden]." *Id.* ¶¶ 494-96. Though the 1999 CIA report does not name the source of the accusation, the 9/11 Commission reported, in 2004, that the CIA knew early on about "loose affiliations" and had obtained much of its early reporting *from al Fadl*: the CIA "knew relatively early, for example, about the loose affiliation of financial institutions, businesses, and wealthy individuals who supported extremist Islamic activities. *Much of the early reporting on al Qaeda's financial situation and its structure came from Jamal Ahmed al Fadl….*" *Id.* ¶ 115 (citing 9/11 Commission Report at 185). Plaintiffs likewise admit that **al Fadl** was a principal source, recently asserting as undisputed that:

> ***The United States gained considerable insights into this financial infrastructure from Jamal Ahmed al Fadl***, an al Qaeda financial manager who joined al Qaeda in 1988 and dealt directly with bin Laden and the al Qaeda leadership, until he defected and became a cooperating witness for the United States in 1996. See Ex. 40, 9/11 Commission Report at 62 (explaining that al Fadl . . . "defected and became a star informant for the United States"); id. at 109 (stating that al Fadl "provided a major breakthrough of intelligence on the creation, character, direction, and intentions of al Qaeda"); id. at 185 (". . . Much of the earlier reporting on al Qaeda's financial situation and its structure came from Jamal Ahmed al Fadl."). See also Ex. 4, Winer Report at 81.[12]

The "insight" that **al Fadl** provided was as broad in scope as the incentives he would receive as an informant were lucrative. **Al Fadl** was interviewed by the FBI *at least 11 times* between 1996 and 2004, and the summary of his statements contained in various FBI 302 reports[13]

---

[11] Winer connects **al Fadl** statements with that of the "clandestine source" in the 1996 document. Winer Rpt., ECF No. 7344-1, ¶¶ 6.6.10, 7.3.4.3, 15.2 n.247.

[12] Pls.' Averment of Jurisdictional Facts and Evidence and/or Statement of Facts Pursuant to Rule 56.1 (submitted against Al Rajhi Bank) ("Pls. Averment of Facts"), ECF No. 10582, ¶ 67.

[13] FBI 302 Reports contain two layers of hearsay: the FBI agent who drafted the report, and the statements of the interviewee therein. *See Picard v. Sage Realty*, 2021 WL 6052422, at *3 (S.D.N.Y. Dec. 21, 2021); Fed. R. Evid. 805. While the former may be admissible, the latter are not. **Al Fadl's** statements do not fit within any specific hearsay exception, and given his motive, falsehoods, inaccuracies, and unwillingness to testify, they lack the "sufficient

are relied upon heavily by Plaintiffs' experts. *Id.* ¶ 127.[14] Among the (false) accusations made by

**al Fadl** and relied upon by Plaintiffs and their experts are the following:

- **ID Cards to Al Qaeda**: "In a debrief to U.S. investigators, al Fadl explained that bin Ladin and al Qaeda used Wael Julaidan as the head of IIRO in Peshawar, Pakistan, to create ID cards for al Qaeda people so that they could cross the Pakistan-Afghanistan border without a problem." Winer Rpt. ¶ 12.19.3 (citations omitted).

- **IIRO funding six terrorist training camps**: Plaintiffs' expert Jonathan Winer draws the connection between **al Fadl** and the supposed "clandestine source" in the 1996 purported CIA document. Winer cites several statements by **al Fadl** concerning IIRO before adding, "As set forth in Section 6.6.10 of my Expert Report, the CIA learned from an informant that IIRO also provided funding for six terrorist training camps in Afghanistan." Winer Rpt. ¶ 7.3.4.3; *id*. ¶ 6.6.10 (citing 1996 "CIA" document).

- **IIRO "interwoven" into Al Qaeda**: "[A]l Fadl described the involvement of Islamic charities as interwoven into al Qaeda. For example, in 1996, he identified the head of IIRO in Peshawar as a 'good friend' of bin Ladin who 'would contribute funds or contacts' to specific al Qaeda operations. In videotaped interviews with U.S. federal law enforcement officials, al Fadl described how IIRO was used to provide cover documents for al Qaeda by giving them documentation falsely stating that they were relief workers, so that they could get visas to travel 'to England, or if you want to go to anywhere in the world.'" Winer Rpt. ¶ 7.4.6. (citations omitted).

- **Muslim Charities as Source of Al Qaeda Funding**: "In conversations with former senior Al-Qaida lieutenant Jamal Ahmed Al-Fadl, Usama Bin Laden identified several prominent international Muslim charities as the primary sources of Al-Qaida financial and fundraising activity." Kohlmann Rpt. ¶ 21 (citing "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." *United States of America v. Enaam M. Arnaout*. United States District Court Northern District of Illinois, Eastern Division, Case #: 02 CR 892 (January 31, 2003) at p. 25).

- **Al Qaeda Guesthouse linked to IIRO**: "According to former Al-Qaida member Jamal al-Fadl, IIRO ran an Al-Qaida guesthouse in Peshawar, Pakistan." Kohlmann Rpt. ¶ 77 (citing Cooperating Witness Statement (January-February 1998) (PEC-KSA 2144-2157), at p. 3).

---

guarantees of trustworthiness" to satisfy the residual exception (FRE 807), which is to be used "very rarely." *See Upstate Shredding, LLC v. Northeastern Ferrous, Inc.*, 2016 WL 865299, at *13 (N.D.N.Y. Mar. 2, 2016); *see also U.S. v. DeLucia*, 1997 WL 616006, at *1 (2d Cir. Oct. 7, 1997) (rejecting application of residual exception to statements in 302 Report).

[14] *See, e.g.*, Kohlmann Rpt. ¶¶ 21-22, 77-80, 137, 156. To the extent IIRO cites expert testimony that was excluded following *Daubert* challenges, IIRO does so to illustrate Plaintiffs' assertions only and does not assert or concede that any such excluded testimony is part of the record.

- **IIRO personnel in the "Golden Chain" list funded Al Qaeda**: **Al Fadl** identified a scrap of paper which listed the names of certain IIRO personnel as the "Golden Chain" list--alleged to be a list of individuals who regularly provided al Qaida with money. Kohlmann Rpt. ¶ 156 (citing Transcript of FBI interview of Jamal Ahmed Al-Fadl. Dated August 29, 2002).

- **Wael Jelaidan ("Jelaidan") was Bin Laden's closest friend**: "During his debriefing, al-Fadl 'further advised that the manager and person who ran the IRO at the time was Wael Julidan whose alias was Abu Al-Hassan Al-Madani… Julidan was one of Bin Laden's closest friends at the time." Kohlmann Rpt. (citations omitted).

- **Jelaidan funded Al Qaeda via the "hawala" system while working for IIRO**: "…the U.S. Federal Bureau of Investigation ("FBI") shared information obtained from its interviews with al-Fadl concerning Julaidan's involvement with al Qaeda. Al-Fadl stated that Julaidan also went by the name Abu Hassan al Madani. . . . While working for the IIRO, Julaidan funded al Qaeda via the hawala system, with cash transferred from the IIRO HQ in Saudi Arabia and via the Peshawar branch of the Habib Bank." Victor Comras Rpt., ECF No. 9251-1, at 24 (citations omitted).

The foregoing accusations (the "al Fadl Accusations") constitute the vast majority of the purported direct "connections" to Al Qaeda alleged, further demonstrating that **al Fadl** was a primary source of the rumors and speculation that IIRO (and MWL) funded or otherwise supported Al Qaeda. But **al Fadl's** credibility is severely compromised due to his past affiliations and actions, and his accusations constitute inadmissible hearsay from an unreliable and untrustworthy source.[15] And even more important, even if everything he said was admissible and credible, he had nothing to say about anything that happened *after 1996*, when he defected from Al Qaeda and became an FBI paid informant. SOF ¶¶ 112-13. So, anything he has to say cannot bear upon the issue of responsibility for the 9/11 Attacks for which planning began, in 1999, more than three years later.

**Al Fadl** admits he was a former member of a terrorist organization, and he became a paid

---

[15] *See Clark v. United States*, 365 F.Supp.2d 553, 564 (S.D.N.Y. 2005) ("The statements of the informant within the police reports were not part of a business record because the declarant had no duty to report the information he was quoted as having given. . . . Moreover, the admission of the informant's statements within the exception for reports of public agencies or the catch-all exceptions depends upon the trustworthiness of the statements—which is clearly lacking here.") (citing *Bortnovsky*, 879 F.2d at 34–35) (cleaned up).

10

informant for the U.S. government[16] only after **Bin Laden** discovered that he was embezzling funds.[17] SOF ¶¶ 110-13. The record reveals that **al Fadl** has a documented history of providing false information *to U.S. agents. Id*. ¶ 114. Among his many lies, he fabricated stories about his own life, including that he trained with Ramzi Yousef ("**Yousef**"), the mastermind of the 1993 World Trade Center Bombing, before admitting that they never met. *Id.* ¶ 114.[18] Not surprisingly, **al Fadl** did not appear to testify under oath in this MDL despite being subpoenaed, thereby preventing IIRO and MWL from questioning him about the multitude of inflammatory and incendiary accusations he made while on the Government's payroll. *Id*. ¶ 128. Yet now Plaintiffs seek to rely on hearsay statements from a witness who will not be questioned under oath.

They also rely on speculative and inconclusive statements contained in reports from the late 1990s and early 2000s authored by the CIA, whom Plaintiffs and the 9/11 Commission agree gained much of its early reporting on al Qaeda's financial infrastructure *from al Fadl*. At best, the cited CIA reports document unsubstantiated rumors and accusations. Indeed, according to the 9/11 Commission Staff, "[t]errorist financing was not a priority for either domestic or foreign intelligence collection. As a result, *intelligence reporting on the issue was episodic, insufficient, and often inaccurate*." Id. ¶ 470; 471 (emphasis added). The conclusory assertions of IIRO's connections to Al Qaeda contained in the CIA reports are inadmissible, as are the CIA reports themselves.[19]

---

[16] **Al Fadl** approached the U.S. Government, in 1996, falsely portraying himself as a Sudanese dissident before disclosing his association with Al Qaeda. This led to a financially beneficial agreement with the U.S., whereby he became an informant, and in exchange received financial incentives. SOF ¶¶ 111-13.

[17] 9/11 Commission Rpt. at 62 ("Then Bin Ladin discovered that Fadl had skimmed about $110,000, and he asked for restitution. Fadl resented receiving a salary of only $500 a month while some of the Egyptians in al Qaeda were given $1,200 a month. He defected and became a star informant for the United States.")].

[18] Among his other false claims, he also falsely claimed that he witnessed the death of Abu'l-'Abbas al-Madani by gunshot wound to the head in Afghanistan when Abu'l-'Abbas al-Madani actually died in Bosnia. SOF ¶ 114.

[19] In ruling on the motion for summary judgment filed by Dubai Islamic Bank, this Court previously ruled that the CIA files were admissible "for the limited purposes of th[at] motion." *In re Terrorist Attacks on Sept. 11, 2001*, 2023 WL 2430381, at *7 (S.D.N.Y. Mar. 9, 2023). But the Court noted that Rule 803(8) provides a hearsay exception for

**B.    Al Fadl's Accusations are Unsubstantiated and Often Contradicted by Reliable Evidence.**

**Al Fadl's** Accusations, which feature prominently in Plaintiffs' experts' reports (*id.* ¶¶ 116-26), have not been substantiated or corroborated, and are contradicted by reliable evidence.

***IIRO did not fund or otherwise support training camps.*** As noted above, an unverified document from 1996 alleges that IIRO "helps fund six militant training camps in Afghanistan," *id.* ¶ 117, 473, and a 1999 CIA report similarly claims that IIRO "funds a military camp associated with Usama [Bin Laden]," but does not cite a source. *Id.* ¶ 496. Then, in December 2003, the UN, citing the 1996 document, makes a similar allegation but further embellishes it, referring to "Al-Qaida" training camps, though the word "Al-Qaida" did not appear in the 1996 or 1999 documents. *Id.* ¶¶ 474-75.

Other than the unsupported allegations by the "clandestine source" referenced in the 1996 document, Plaintiffs have no evidence that IIRO funded "militant training camps" or "Al-Qaida training camps." *Id.* ¶¶ 472-75. To the contrary, the only credible evidence shows that IIRO never had or funded "militant" or "terrorist" training camps, and instead that IIRO funded "camps" for orphan children (like the Al-Bukhari orphanage camp in Afghanistan for boys and girls). *Id.* ¶¶ 17, 476. Moreover, even the CIA itself appears to have subsequently abandoned this contention: no subsequent CIA report reprises this allegation. *Id.* ¶¶ 501-07, 509-15, 520-43.[20] After more than two decades, Plaintiffs have not developed any evidence to support the pre-1999 claim of IIRO

---

government records that "(1) set out 'factual findings from a legally authorized investigation,' *if (2)* '*the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.*'" *Id.*, at *6 (emphasis added) (quoting FRE 803(8)). The foregoing discussion of **al Fadl,** the unreliable source of "much of" the CIA's early reporting (9/11 Commission Report at 185), indicates a lack of trustworthiness, rendering the government records exception inapplicable here.

[20] Plaintiffs may cite to a hearsay statement by an alleged IIRO employee that 40-50% of IIRO's funds were diverted to terrorist training camps in Afghanistan and Kashmir, but that statement is inadmissible and false in any case. *See id.* ¶¶ 478-80. The purported source was never an IIRO employee. *Id.* ¶ 479. And there is no reliable or admissible evidence that IIRO ran or funded terrorist training camps in Afghanistan, Kashmir, or anywhere else. In fact, the evidence shows the opposite. *Id.* ¶¶ 472-80.

funding a "militant" or "terrorist" camp. The claim is a vague and abandoned rumor masquerading as evidence.

**_IIRO did not provide ID Cards to Al Qaeda Members._** Plaintiffs also contend that **Bin Laden** used **Jelaidan**, "head of IIRO in Peshawar, Pakistan," to provide identification cards to Al Qaeda members to help them travel without detection. Again the source for this rumor appears to be **al Fadl**, _id._ ¶¶ 121, 414, who seems to miss the verifiable fact that **Jelaidan** never worked for IIRO. _Id._ ¶¶ 109, 572. In any case, IIRO investigated the allegation of unauthorized conduct and found no evidence to support it, _id._ ¶¶ 408-12; it would have long predated 9/11, since **Jelaidan** ceased his affiliation even with MWL in 1995, _id._ ¶ 573, and there is evidence that Al Qaeda produced its own identification cards through its forgery operation anyway. _Id._ ¶ 413.

**_IIRO did not fund and was not "interwoven" with Al Qaeda_**. Plaintiffs have no evidence that IIRO funded or was "interwoven" with Al Qaeda. _Not a cent was ever traced from IIRO to Al Qaeda_. _Id._ ¶¶ 1-6, 179-80, 241, 271, 353, 357, 472. Plaintiffs received IIRO's financial records in discovery and cannot point to a single transaction. _Id._ ¶¶ 2-4, 44, 46, 91, 93, 132, 148, 163, 209, 404. IIRO leadership did not know **Bin Laden**. _Id._ ¶ 197. IIRO did not employ and would not have knowingly employed any member of Al Qaeda. _Id._ ¶¶ 181-82. Indeed, IIRO had a policy intended to exclude such extremist individuals, conducting its own due diligence, and relying on local governments to conduct background checks as well. _Id._ ¶¶ 183, 378.

Plaintiffs' theory is also illogical. **Bin Laden**, who was independently wealthy, self-financed Al Qaeda at least until 1992. _Id._ ¶ 201. The uncontroverted evidence further establishes that **Bin Laden** disdained Saudi-affiliated charities, like IIRO, and at least twice publicly encouraged donors not to donate to them. _Id._ ¶¶ 461, 468-69. Yet Plaintiffs maintain the fantastical proposition that **Bin Laden** was getting money from these same charities, even though extensive

13

discovery over many years failed to identify a single penny going from IIRO to Al Qaeda.

Significantly, the 9/11 Commission's report does not name IIRO among the entities it concluded funded terrorist activities. *Id.* ¶¶ 481, 484-92. Rather, in investigating the allegation that charities were a source of funding for al Qaeda, the 9/11 Commission names *only* the al Haramain Islamic Foundation as an example of a "large, international charit[y]" with "lax external oversight and ineffective internal controls," whose foreign offices have "al Qaeda sympathizers" diverting money to al Qaeda and names *only* "the al Wafa organization" as an example of "entire charities" who "may have wittingly participated in funneling money to al Qaeda." *Id.* ¶ 485. And while the Commission's report states that the CIA knew about "loose affiliation of financial institutions, business, and wealthy individuals who supported extremist Islamic activities," citing a December 1997 CIA report*, it does not include any finding of wrongdoing by IIRO. Id.* ¶¶ 491-93.[21]

Even the CIA reports, which Plaintiffs prop up as evidence despite their lack of factual support and other evidentiary issues, do not include any concrete information to support a conclusion that IIRO funded Al Qaeda. *Id.* ¶¶ 487-90, 493, 495-543. To the contrary, an October 2001 CIA report is just one example of the absence of evidence against IIRO. It identifies and discusses seventeen "Islamic charities" from which "Bin Ladin derives much of his funds," but does *not* mention IIRO. *Id.* ¶ 521. Similar—or even less specific—allegations of Al Qaeda "connections" in the CIA reports are either unsourced and unsubstantiated, plainly inconclusive, or even demonstrably false. For example, an April 1999 report claims that the "IIRO office[] in…Afghanistan…gravitate[s] toward extremist activities," even though there was no IIRO

---

[21] The 1997 CIA report includes a conclusory statement that "at least some funds" dedicated for Islamic causes "are diverted to militants and terrorists" and identifies MWL and IIRO. *Id*. ¶ 493. However, the report did not cite any factual support for this statement. *Id*. The 9/11 Commission did not adopt this finding (*id.* ¶¶ 481, 483), and Plaintiffs also have been unable to identify any evidence that IIRO diverted funds to Al Qaeda as discussed, *supra*, Background, Section IV.

Afghanistan office at that time, *id.* ¶¶ 509-11, and that the director of IIRO Azerbaijan diverted approximately $1.5 million to Egyptian Islamic Jihad, even though that amount exceeded that office's entire budget. *Id.* ¶¶ 506-08.

In any event, none of these largely unsubstantiated statements contained in the CIA reports supports the conclusion that IIRO funded Al Qaeda, much less that it did so *knowingly*. The 9/11 Commission and its staff cited the April 1999 CIA report related to Al Qaeda funding by NGOs only for the proposition that "it remained difficult to distinguish Al Qaeda's financial transactions among the vast sums moving in the international financial system." *Id.* ¶ 494. And in the end, *neither the 9/11 Commission Report nor the Monograph on Terrorist Financing ("Staff Monograph"), conclude that IIRO provided funds to Al Qaeda. Id.* ¶¶ 2, 481-551. After exhaustive investigation, the most comprehensive report by the U.S. government did not credit the April 1999 report as supporting any inference of knowing support of Al Qaeda by IIRO.

*__The Remaining Al Fadl Accusations are Conclusory and Unsubstantiated__*. The accusations of connections between **Jelaidan** and **Bin Laden** are conclusory and lacking in crucial detail, including the time period of the alleged connections. *Id*. ¶¶ 116, 120-21, 123, 125-26. It is therefore unclear whether they refer to the period during the Soviet invasion of Afghanistan when the two men were known to be part of **MAK**, fighting the Soviets *with U.S. support*. *Id*. ¶ 179-80, 414.[22] The fact that **Jelaidan** knew **Bin Laden** during this period, while true, is not evidence of a connection to Al Qaeda, which did not exist at that time (*id.* ¶¶ 175-78, 200, 414), let alone the 9/11 Attacks. The assertion that **Jelaidan** used the hawala system to funnel IIRO funds to Al Qaeda also is demonstrably false: **Jelaidan** was not an IIRO employee and would not have had access to or control of any IIRO funds, and IIRO did not use the hawala system. *Id.* ¶¶ 21, 109, 572. The

---

[22] **Jelaidan** was a member of the **MAK** but did not join **Bin Laden** when he left to form Al Qaeda. SOF ¶¶ 179-80.

15

other allegations are entirely speculative and unsubstantiated.

### C.    OFAC Designations of Two Southeast Asia Offices Are Not Evidence of Involvement in the 9/11 Attacks

Plaintiffs and their experts also rely heavily on the Office of Foreign Assets Control ("**OFAC**") designations of two IIRO offices, IIRO-Indonesia and IIRO-Philippines, and one individual, Abdul Hamid Mujil ("**Mujil**"), who worked for IIRO-Eastern Provinces from 1989 – 2006. *Id.* ¶¶ 97, 101, 225, 251, 580-81. But a designation by **OFAC** itself is not evidence of knowing support for Al Qaeda let alone the 9/11 Attacks, *id.* ¶¶ 553, 555-57, 560, and unsourced and unsubstantiated allegations in a designation press release or memorandum are not reliable evidence. *Id.*; *see also id.* ¶¶ 565-579 (detailing factual errors and heavy redactions in the relevant Treasury memoranda). Designations are unilateral, unchallenged determinations, often based on undisclosed, confidential information that, as Plaintiffs' own expert confirmed, *would not have evidentiary value in a court proceeding*. *Id.* ¶¶ 553-60.

### 1.    OFAC Designations Are Not Designed to Produce Evidence Suitable for Court Proceedings

After the 9/11 Attacks, President George W. Bush signed Executive Order 13224 ("**EO 13224**"), which sought to cast a wide net with the goal of disrupting the channels of terrorist financing. *Id.* ¶ 552. The designation process is an *administrative action*, not an adjudication of guilt or innocence. *Id.* ¶ 556. **EO 13224** does not articulate a standard for what is required before an individual or entity can be designated a Specially Designated Global Terrorist ("**SDGT**"), but the standard is clearly lower than the preponderance of the evidence standard that applies in civil litigation.[23] SOF ¶ 554. The government is not required to establish the existence of evidence that

---

[23] *See Gill v. Arab Bank*, PLC, 893 F.Supp.2d 523, 535 (E.D.N.Y. 2012), where the court, considering a variety of Daubert motions, permitted plaintiffs' expert to explain the designation process, but opined that "[a]n individual's or organization's status as an FTO, SDT, or SDGT, however, will have limited bearing on issues such as the Bank's conduct or mental state. Designation of an organization as an FTO, SDT, or SDGT is subject to a standard of proof that is lower than the preponderance of the evidence standard that plaintiff must meet in this case."

an act of terrorism *actually occurred* or that the target for designation *actually intended* to support terrorism in any way. *Id.* ¶ 557. A person who *unknowingly*, *unwittingly*, and *inadvertently* financed terrorism may be subject to designation. *Id.* ¶¶ 555-57.

As confirmed by Plaintiffs' expert Jimmy Gurulé—who served as Under Secretary (Enforcement) for the U.S. Department of Treasury from 2001-2003[24]—the type of evidence that can be considered in the **SDGT** designation process is very broad and can include, for example, rumors from the internet that would have no evidentiary value in civil litigation. SOF ¶ 558. The target of the designation is not permitted to rebut the accusations or offer otherwise exculpatory evidence prior to the designation. *Id.* ¶ 559. The information that is released to the public after a designation via a press release or, in the case of this MDL, to litigants via memoranda from the Treasury Department—is speculative and unsubstantiated. *Id.* ¶¶ 565-79, 581.

With regard to the memoranda concerning the designations of IIRO's two offices, nearly all citations to the sources of information are redacted from the document, leaving the conclusory assertions unsubstantiated and precluding verification. *Id.* ¶¶ 565-69, 574-79. As defense expert Vahid Brown put it: an **OFAC** designation "only documents the fact of a US government suspicion of such an association and does not itself constitute evidence of such an association, nor does it prove the existence of any such evidence." *Id.* ¶ 560. Yet that is exactly what the Plaintiffs attempt to use the designations for here. Plaintiffs' experts repeatedly cite to the designations or press releases announcing the designations, *id.* ¶¶ 580-81,[25] repurposing speculative and conclusory assertions into something they are not—reliable evidence. At this stage, factual support in the form of reliable, admissible evidence is required. And in any event, to the extent that the basis of the designations of two far-flung Southeast Asian offices can be discerned, SOF ¶¶ 22, 24, it appears

---

[24] *See* Expert Opinion Report of Jimmy Gurulé, ECF 9250-38, at 1.
[25] *See e.g.,* Kohlmann Rpt. ¶¶ 121, 123; Winer Rpt. ¶ 12.9.2.

17

that it relates to alleged conduct having nothing to do with 9/11, long pre-dating or post-dating the 9/11 Attacks, performed by employees who were long gone from IIRO before the planning the 9/11 Attacks, or that involved non-Al Qaeda entities.

### 2.    The Asserted Bases for the Designations of IIRO's Offices Remain Unsourced and Unsubstantiated, and Some are Demonstrably False

In 2006, **OFAC** designated two IIRO foreign offices: IIRO-Philippines and IIRO-Indonesia. *Id.* ¶¶ 225, 251. **OFAC's** press release announcing these designations contains no source information.[26] *Id.* ¶ 581. And, again, to the extent that the bases can be discerned, it is for activity involving separatist groups in Southeast Asia having nothing remotely to do with 9/11. *Id.*

*IIRO-Philippines.* Plaintiffs rely on the **OFAC** press release asserting that IIRO-Philippines funneled money to the Abu Sayaf Group **("ASG")** and further asserting that **Khalifa**, "working as the director of IIRO-P[hilippines] . . . employed an ASG intelligence officer as the provincial director . . . in the Tawi-Tawi region . . ." *Id.* ¶ 581a. But IIRO *did not have an office in the Tawi-Tawi region*, never funded **ASG** or employed any **ASG** member, and IIRO-Philippines employees never worked with any individual associated with **ASG**. *Id.* ¶¶ 148, 150, 156-59. They also rely on the assertion that "[i]n the mid 1990s, a major ASG supporter, Mahmud Abd Al-Jalil Afif, served as the director of the IIRO-P[hilippines] and used the organization to funnel money to terrorist groups including the ASG." *Id.* ¶ 581a. But Afif *was never an IIRO-Philippines director*; he was an IIRO employee with limited responsibility, who did not have access to IIRO's bank account or control over IIRO's finances. *Id.* ¶ 231. And even if **OFAC** had its facts straight, there is no nexus between activities involving separatist groups in the Philippines and the 9/11 Attacks. *Id.* ¶¶ 145-48. There is no actual evidence that IIRO-Philippines funded or otherwise

---

[26] IIRO investigated and found no support for any of the allegations in the press releases that accounted the designations of these two offices and **Mujil**. *Id.* ¶¶ 102-05; 228-30; 254-62.

supported **ASG**. *Id.* ¶¶ 148, 150, 158-59. IIRO-Philippines was de-designated in August 2016. *Id.* ¶ 226; *see id.* ¶ 227.

*IIRO-Indonesia.* The **OFAC** press release itself, which Plaintiffs' experts prop up, even questions the veracity of its own assertions as to IIRO-Indonesia, stating that "[a]s of late 2002, IIRO-Indonesia *allegedly* financed the establishment of training facilities for use by Al Qaeda associates [not Al Qaeda]." *Id.* ¶ 581b. This allegation remains unsubstantiated. Through another attenuated contention, the press release asserts that IIRO-Indonesia provided assistance to Jemaah Islamiyah ("**JI**") (not Al Qaeda) *in 2006* (years after 9/11). *Id.* IIRO-Indonesia was established in Jakarta in 1990 and remained fully operational, even after the designation, until 2013. *Id.* ¶¶ 243, 258-62. IIRO-Indonesia was de-designated by **OFAC** in August 2016. *Id.* ¶ 252; *see id.* ¶ 253. There is no actual evidence that IIRO-Indonesia funded or otherwise supported Al Qaeda. *Id.* ¶¶ 163, 168-72, 238-42, 248-50, 254-60, 263-64.

### D.    The Other Alleged Connections to Al Qaeda Are Even More Attenuated

Plaintiffs' other allegations of IIRO's purported connections to Al Qaeda are even more attenuated than the **al Fadl** Accusations and the unsupported assertions in the designation file.

### 1.    There Is No Evidence That Any of IIRO's Local or Foreign Offices Participated in the 9/11 Attacks or Supported Al Qaeda

Plaintiffs cannot connect IIRO to Al Qaeda or the 9/11 Attacks through any alleged actions by its Local or Foreign Offices. Plaintiffs have no evidence that any Local or Foreign Office contributed to Al Qaeda or the 9/11 Attacks. Instead, Plaintiffs cite to a few minor policy violations within the organization, which are unsurprising given its size. Though there is no evidence that any of these internal violations involved support for Al Qaeda, Plaintiffs concoct an absurd story that they reflect a nefarious plan that somehow leads to 9/11. They do not. Far from suggesting a sponsor of terrorism, the record reflects an organization with established policies designed to root out and correct employee misconduct.

19

### a. IIRO Established Policies to Prevent and Investigate Misconduct

IIRO established policies and procedures designed to maximize oversight of its Local and Foreign Offices. SOF ¶¶ 364, 407. For example, in 1993, IIRO established strict financial procedures applicable to its Foreign Offices, and expanded them in 1997. *See id.* ¶¶ 29, 364. Foreign Offices were required to obtain prior approval from Head Office for all projects and to submit to Head Office original receipts, invoices, and other financial documentation supporting any disbursements on those projects. *Id.* ¶¶ 365-71. The directors of Foreign Offices were required to report to the Secretariat General and were accountable to it and local authorities. *See id.* ¶¶ 371, 374, 390. They were also required to comply with additional professional guidelines. *Id.* ¶¶ 375-77. Foreign Offices were required to submit materials to Head Office when requesting hiring approval, including criminal background checks and more. *Id.* ¶ 378. All new hires had to be approved by Head Office. *Id.*

### b. Head Office Conducted Oversight of Its Local and Foreign Offices

Head Office was responsible for oversight of Local and Foreign Offices. *Id.* ¶ 380. Head Office regularly performed audits to ensure compliance with organizational policies and sent staff to conduct field visits to supervise and inspect projects. *See id.* ¶¶ 381-86. It also investigated all reports of policy violations and took remedial action to improve compliance standards. *Id.* ¶ 383. In addition to the oversight performed by Head Office, certain Local Offices were assigned some oversight responsibility of specific Foreign Offices, in which case the Local Office also conducted field visits and prepared reports for submission to Head Office. *Id.* ¶¶ 384-89. Can IIRO guarantee that every employee was 100% compliant? Of course not, no employer can. But it is absurd to try to convert technical violations of established controls into some sort of conspiracy to support terrorism.

### c. IIRO Enforced Financial Controls and Conducted Regular Audits

IIRO required all project funding to flow through the Head Office, with the goal of increasing Head Office's visibility and supervision of the organization's work. *Id.* ¶ 391. IIRO implemented and relied on many controls on funding and expenditures. *See, e.g.*, *id.* ¶¶ 358-59, 361-64, 367-71, 377, 382-407. IIRO required an annual budgeting process, tracked all expenditures, and engaged both internal and external auditors. *See id.* The internal auditors were responsible for producing auditing reports of Foreign Offices, prioritizing certain Foreign Offices that operated on a large scale. *Id.* ¶¶ 394-97. The internal auditors, along with personnel of the Financial Oversight Department, also conducted periodic unannounced field visits to IIRO's worldwide offices and operations to ensure compliance with policies and to supervise the implementation of projects and the distribution of humanitarian assistance. *Id.* ¶ 394. IIRO's external auditors, including large and reputable firms such as Arthur Anderson, KPMG, and Ernst & Young, conducted yearly audits of Head Office accounts, and periodic audits of select Foreign Offices, including IIRO-Pakistan. *Id.* ¶¶ 399-402.

IIRO had other controls in place as well. Foreign Offices employed their own financial officers, who served as the offices' accountants. *Id.* ¶ 379. IIRO used traditional banking for all operations, rather than the hawala system (a cash-based system for moving money). *Id.* ¶ 21. And IIRO periodically reviewed and evaluated its financial and administrative procedures to ensure compliance with industry-standard best practices. *Id.* ¶ 392.

### d. Claims of Terrorist Financing through Local and Foreign Offices are Unsupported and Have No Discernable Connection to Al Qaeda

Plaintiffs assert that that a handful of Local and Foreign Offices funded Al Qaeda or the 9/11 Attacks. The record does not support Plaintiffs' claims. Plaintiffs invite the Court to speculate that if *any* auditing issues were identified, this was evidence of funds being diverted to terrorist organizations and then covered up. Yet they cannot point to a single transaction, a single penny,

going from a Local or Foreign Office to a terrorist organization. *E.g., id.* ¶¶ 309, 352-53. This is a case about terrorist financing, not about auditing issues.[27]

*IIRO-Pakistan.* IIRO maintained a Foreign Office in Pakistan. *Id.* ¶ 455. Moayyid bin Al-Butairi ("**Butairi**") was the office director from 1996 until 2001, and Amir Jasim ("**Jasim**") was the financial officer from 1991 to 2001. *Id.* ¶¶ 338-40. Plaintiffs imply that funds were diverted from that office to Al Qaeda by **Butairi** and **Jasim.** However, the evidence shows that **Butairi** and **Jasim** embezzled IIRO-Pakistan funds designated for a medical clinic to open three of their own income-generating clinics *that would benefit them personally*. *Id.* ¶¶ 335-37. There is no evidence that the embezzled funds were used to support Al Qaeda.[28] *Id.* ¶¶ 352-53. Plaintiffs' speculation without evidence that any audit irregularities must have gone to Al Qaeda is not only not evidence; it is contradicted by a documented and more quotidian explanation—employees were stealing. *See also id.* ¶¶ 309-12.

The embezzlement was discovered and investigated by senior management at IIRO *before the 9/11 Attacks,* cutting against the untethered suggestion that this was part of a grand plan to divert charitable funds to Al Qaeda. *Id.* ¶¶ 341-44, 347-49, 351. IIRO filed a criminal complaint against and terminated **Jasim,** then later terminated **Butairi**. *Id.* ¶¶ 338-39, 346, 348. The investigation revealed that the combined value of the three clinics opened by **Butairi** and **Jasim** equaled the total amount of the embezzled funds. *See id.* ¶¶ 343-45. The investigation did not produce any evidence that anyone else within IIRO knew about or was involved in the

---

[27] Plaintiffs point to criticism that IIRO Philippines "failed to achieve 100% compliance" with Head Office protocols, but there is no evidence that any protocol violation resulted in support for Al Qaeda. SOF ¶¶ 235-36. So too for IIRO-Indonesia, where audits covering 1999 to 2006, revealed only minor violations of IIRO accounting regulations and no evidence of support to Al Qaeda. *Id.* ¶¶ 238-41, 263-66.

[28] *See, e.g., In re Terrorist Attacks on Sept. 11, 2001* ("*Charity Daubert II*"), 2025 WL 2383768, at *14, *16 (S.D.N.Y. Aug. 18, 2025), *report and recommendation adopted*, 2026 WL 769787 (S.D.N.Y. Mar. 18, 2026) (criticizing Kohlmann's speculation that IIRO-Pakistan fraud was linked to terrorism, and excluding his testimony on this and other topics).

embezzlement. *Id.* ¶¶ 349-50. Nor did it reveal that any of the embezzled funds went to Al Qaeda or any other terrorist organization. *Id.* ¶¶ 352-53.

***IIRO-Eastern Provinces.*** IIRO-EP was a Local Office located in Damman, Saudi Arabia. *Id.* ¶ 267. It was responsible for gathering donations for Head Office and supporting oversight of certain Foreign Offices. *See, e.g., id.* ¶¶ 359, 384. Plaintiffs assert that IIRO-EP, through **Mujil**, funneled money to Muslim separatist groups in Southeast Asia and then, somehow without proof or coherent explanation, to Al Qaeda. In 2003, Head Office's routine financial and administrative reviews, including audits for 1999-2000 and 2003, revealed that IIRO-EP was violating the organization's policies by directly implementing and funding projects in foreign countries. *Id.* ¶¶ 268-70, 274-75. But while the external auditors identified policy violations, they found no evidence that any funds were diverted to Al Qaeda. *Id.* ¶¶ 271-73. Here again, this is not a case about NGO governance; it is about funding Al Qaeda and 9/11 and there is no evidence of that.

As a result of its investigation, Head Office disciplined the individuals involved in the policy violations and insisted that IIRO-EP seek prior approval for projects, as required. *Id.* ¶¶ 269, 276. Rather than comply, the then-office supervisor, Prince Turki bin Jalawi ("**Prince Jalawi**"), *id.* ¶¶ 98-99, 276, resigned from his position effective June 29, 2003. *See id.* ¶¶ 276-77. **Mujil**, who had not been involved in the policy violations, was assigned to replace **Prince Jalawi** on an acting basis. *Id.* ¶¶ 100, 278. Neither man was ever implicated in the 9/11 Attacks or linked through any credible evidence to terror financing. *Id.* ¶¶ 101-07; 271-73.

***IIRO-Sarajevo.*** IIRO established several Foreign Offices in the Balkans, including IIRO-Sarajevo in 1992, in response to the Bosnian war that lasted until 1996, and that involved massacres of civilians and rape on an industrial scale, as the United States recognized in intervening to bomb Serbia and protect Muslim populations. *Id.* ¶¶ 280-81; 284; 307; 330-31. This office was focused

23

on distributing aid, including food, clothing, and medical supplies, in refugee camps and to other communities and supporting orphanages. *Id.* ¶¶ 282-83. The city of Sarajevo, where the IIRO office was located, was besieged, and these circumstances required aid organizations to use tunnels or rely on the United Nations to bring in supplies. *Id.* ¶¶ 284-293. The IIRO-Sarajevo office was regarded as nothing less than heroic in its efforts to save lives during the Bosnian war under horrific conditions.[29] *See, e.g.*, *id.* ¶¶ 289-300; 210-11. Plaintiffs assert that offices in the Balkans supported Al Qaeda fighters, including with transportation and employment. Plaintiffs have cited State Department reports of Bosnian Serbs allegedly smuggling weapons to IIRO, *id.* ¶ 313, but that is nonsensical—the conflict was between Bosnian Serbs and Bosnian Muslims, with the latter receiving assistance from IIRO. *See id.* ¶¶ 294, 301-06, 308 314. This allegation is also devoid of reliable evidentiary support and irrelevant, as the alleged conduct post-dates 9/11. *Id.* ¶¶ 313-14. In any event, IIRO's support of Bosnian Muslims suffering from genocide has nothing to do with Al Qaeda or 9/11 and the association is as offensive as it is baseless.

### 2. Plaintiffs' Attempts to Link IIRO to Various Attacks in the Decade before the 9/11 Attacks Are Unsupported

There is no evidence connecting IIRO to certain pre-9/11 attacks, which are not relevant to Plaintiffs' claims in any case. *Id.* ¶¶ 415-16, 420, 428-30, 439-40, 442-43. Plaintiffs' attempts to throw these various attacks at the wall to see what might stick is illustrative of the incoherent jumble of events that it somehow argues was part of a path to 9/11.

In February 1993, the parking garage of the World Trade Center was bombed in an attack masterminded by Ramzi Yousef ("**Yousef**"). *Id.* ¶ 417. He was not an Al Qaeda member, and Al Qaeda was not involved in the bombing. *Id.* ¶¶ 418-19. There is also no evidence that IIRO had

---

[29] The Bosnian government granted IIRO-Sarajevo the Golden Shield award for its role in serving the Bosnian people during the war. SOF ¶ 294.

24

any knowledge of or involvement in the World Trade Center bombing. *Id.* ¶¶ 415-16.

The Bojinka Plot refers to a collection of plans allegedly involving **Yousef**, Khalid Sheikh Muhammad ("**KSM**"), and Wali Khan Amin Shah ("**Shah**") to be carried out in 1995, which, fortunately, did not occur. The plan included bombing American planes over the Pacific, bombing cargo carriers, and assassinating President Clinton and the Pope. *Id.* ¶ 421. Al Qaeda did not direct the Bojinka Plot, and **Yousef**, **KSM**, and **Shah** were not Al Qaeda members at the time. *Id.* ¶¶ 422-27. But more important, there is no evidence that IIRO had any knowledge of or involvement in the plot. *Id.* ¶ 420. Plaintiffs may contend that **Khalifa's** alleged network in the Philippines supported the Bojinka Plot, but by the time that this plot began, **Khalifa** was no longer an employee of IIRO, and his network did not overlap with the Bojinka plotter's operations. *See id.* ¶¶ 50-67, 420-27. In any event, no IIRO employee had any involvement in the plot.

In August 1998, Al Qaeda bombed the American embassies in Tanzania and Kenya. *See id.* ¶ 432-33. In the immediate aftermath of the bombings, the Kenyan government closed IIRO's Foreign Office in Nairobi, along with numerous other NGOs operating in the country. *Id.* ¶ 434. IIRO, behaving as one would expect of a responsible NGO, investigated the bombings in detail, finding no evidence that any IIRO employee was involved. *Id.* ¶¶ 431, 438. In December 1998, after the investigation, the Kenyan government cleared the IIRO Nairobi office and permitted it to reopen, returning seized items, and issuing an apology. *Id.* ¶¶ 435-37. There is no other evidence that IIRO had any knowledge of or involvement in the 1998 Bombings. *Id.* ¶¶ 431, 438.

The 9/11 Commission does not mention the planning of an attack on U.S. consulates in Madras and Calcutta. *Id.* ¶ 441. There is no evidence that IIRO had any knowledge of or involvement in the Indian Consulates Plot, which has nothing to do with 9/11. *Id.* ¶¶ 439-40.

Plaintiffs also cannot connect IIRO to the bombing of the U.S.S. Cole in December 2000.

*See id.* ¶ 444. Again, IIRO was not involved, *id.* ¶¶ 442-43, and there is nothing other than offensive speculation that this is somehow part of Plaintiffs' concocted "global strike capabilities" theory that imagines a straight line from fighting the Soviets in the 1970s to 9/11.

### 3. IIRO Cannot Be Connected to Al Qaeda or the 9/11 Attacks through the Taliban

Plaintiffs may assert that IIRO supported Al Qaeda by supporting the Taliban, but there is no credible evidence to support this assertion. Through its Pakistan office, IIRO engaged in important relief work in Afghanistan, where the Taliban was the government at relevant times. *See, e.g.*, *id.* ¶¶ 17, 455-57, 511. However, IIRO did not provide support to, and often was at odds with, the Taliban. *Id.* ¶ 453-55. For example, IIRO was forced to close an orphanage and a university in the Summer of 2001 in response to the Taliban's efforts to interfere in its charitable projects. *Id.* ¶ 456. The Taliban also attempted to interfere with two hospital projects in Afghanistan because IIRO treated both male and female patients in the same facility. *Id.* ¶ 457. IIRO did not relent to the Taliban's interference and continued to support the hospitals. *Id*. Plaintiffs may point to a *Washington Post* article paraphrasing **Basha** and stating that IIRO provided $60 million to the Taliban: however the reliable evidence shows that **Basha's** statements were about the aid provided *to the Afghan people*, and not the Taliban. *See id.* ¶¶ 451-52. In any event, for the years 1998 to 2001, IIRO's entire budget for projects in Afghanistan did not surpass $4m, further demonstrating the absurdity of the $60 million allegation. *Id.* ¶ 455. IIRO provides relief in the most horrific conflict zones in the world and deals with the governments that are in place to the extent that it must to save lives. That is not support for terrorism.

### 4. IIRO Cannot Be Connected to Al Qaeda or the 9/11 Attacks through Individuals Who Themselves Were not Connected to the 9/11 Attacks or Al Qaeda

Plaintiffs also try to link IIRO to Al Qaeda by arguing that the actions of certain individuals who worked for or with IIRO across various IIRO offices should be attributed to IIRO. However,

26

Plaintiffs have no reliable evidence connecting these individuals to Al Qaeda and, in any event, many of the actions allegedly taken by these individuals were too remote in time to be relevant to the 9/11 Attacks. IIRO is responsible for its actions, but to the extent any of its approximately 1,000 employees may have taken actions completely contrary to IIRO's mission and without its knowledge, that does not conceivably create liability for IIRO.

### a.  Muhammad Jamaal Khalifa

**Khalifa** had a five-year tenure with IIRO from 1988 to 1993. *Id.* ¶ 50. He was the director of IIRO-Philippines until 1992, when he was demoted and his responsibilities changed. *Id.* ¶¶ 51-52. He resigned the following year, *id.* ¶ 53 and had no further involvement with IIRO. *Id.* ¶¶ 77, 103. **Khalifa** also ran several independent, personal businesses, for which he employed his own staff and used his own funds. *Id.* ¶¶ 54-55, 58-61, 64-66, 69-71. These personal ventures were not authorized, disclosed to, or approved by IIRO. *Id.* ¶¶ 56-57, 62, 68-72.

Plaintiffs contend that **Khalifa,** from his post as director of IIRO-Philippines, funneled funds to terror groups (such as **ASG**), maintained links to Al Qaeda in Southeast Asia, and permitted his network to be used to support the Bojinka Plot. However, **Khalifa** left IIRO in 1993—long before the Bojinka Plot and eight years before the 9/11 Attacks. *See id.* ¶¶ 50, 53. Moreover, he was not involved in the financial operations of IIRO-Philippines, had no authority to send funds to any groups, and, in any event, the alleged conduct would have been anathema to IIRO's mission, values and policy. *Id.* ¶¶ 9-12, 51-52, 73. Plaintiffs' allegations concerning **ASG** are irrelevant for the same reasons (**Khalifa** departed IIRO in 1993, four years before **ASG** was designated an FTO and eight years before the 9/11 Attacks). *Id.* ¶ 151; *see* ¶ 49. **ASG** in any event was a local, religious sectarian militant group that devolved into a criminal gang. *Id.* ¶¶ 152-53. Whatever their agenda or methods, it had nothing to do with the 9/11 Attacks, their planning or funding, and it long pre-dated them.

The year after he left IIRO, **Khalifa** was arrested in the U.S. and extradited to Jordan where he was acquitted of involvement in certain bombings. *Id.* ¶ 79-84. **Khalifa** was never charged or convicted of any other crime in any country. *Id.* ¶ 85.

Thus, Plaintiffs have no evidence that **Khalifa** had any foreknowledge of or were involved in the planning or execution of the 9/11 Attacks, *Id.* ¶ 43. They also have no evidence tracing funds or in-kind support from **Khalifa** to the planning or execution of the 9/11 Attacks or to Al Qaeda. *Id.* ¶¶ 44-45. Even if Plaintiffs did have such evidence, there is no evidence that **IIRO** was the source of such funds or in-kind support, which would have violated IIRO policy. *Id.* ¶ 46. Plaintiffs also have no evidence showing that IIRO was aware or had knowledge before 9/11 of any connection between **Khalifa** and Al Qaeda, if there was any. *Id.* ¶¶ 47, 74, 77-78, 86, 208.

### b. Abdulhadi Daguit

**Daguit** worked at IIRO-Philippines from 1986 to 2006, holding roles from office secretary to acting director. *Id.* ¶ 216. During his twenty-year career, he was involved in the office's operations and interacted with and visited Head Office. *See, e.g.*, *id.* ¶¶ 216, 366, 391. **Daguit** is highly respected in the Philippines, teaching Arabic at the University of the Philippines and serving on various Philippines government commissions, including the National Commission on Muslim Filipinos, which focuses on the welfare of Muslims in the Philippines and reports to the Office of the President. *Id.* ¶ 218. Plaintiffs assert, again without evidence, that **Daguit** was a "trusted associate" of **Khalifa**, but all that they can say is the obvious; they worked together in the office from 1988 to 1993, when **Khalifa** left IIRO. *Id.* ¶¶ 87-89. There is no evidence connecting **Daguit** to the 9/11 attacks, Al Qaeda, **ASG** or **MILF,** nor is there any evidence of any improper "association" between **Daguit** and **Khalifa**. *See, e.g.*, *id.* ¶¶ 87-89, 140-41, 156-59, 217, 219, 232-34. And there is certainly no evidence that IIRO had knowledge before 9/11 of any of these purported connections. *See, e.g.*, *id.* ¶¶ 87-89, 139-41 150, 158-59, 217, 224, 233-37. This is yet

another example of claims cobbled together with various vague and attenuated assertions and suggestions of guilt by association.

### c.  Abdul Hamid Mujil

As discussed above, **Mujil** worked at IIRO-EP from 1989 to 2006, serving as the office's executive director until 2003, when he became acting office supervisor. *Id.* ¶¶ 97-100. Plaintiffs assert that **Mujil** funded Muslim separatist groups and Al Qaeda in Southeast Asia. In 2006, **Mujil** was sanctioned by **OFAC**. *Id.* ¶¶ 101, 108. **OFAC's** press release announcing the designation, upon which Plaintiffs rely, contains unsourced and unsubstantiated assertions of purported connections of **Mujil** to Al Qaeda. *Id.* ¶¶ 580-81. In any event, the assertions long pre-date or post-date 9/11 and are unrelated to any involvement in the 9/11 Attacks.

Plaintiffs have no evidence that **Mujil** had any foreknowledge of or was involved in the planning or execution of the 9/11 Attacks. *Id.* ¶ 90. They also have no evidence tracing funds or in-kind support from **Mujil** to the planning or execution of the 9/11 Attacks or to Al Qaeda. *Id.* ¶¶ 91-92. Even if Plaintiffs did have such evidence, there is no evidence that **IIRO** was the source of such funds or in-kind support, which would have violated IIRO policy. *See, e.g.*, *id.* ¶¶ 93, 183-98. Plaintiffs also have no evidence showing that IIRO was aware or had knowledge before 9/11 of any connection between **Mujil** and Al Qaeda, if there was any. *Id.* ¶ 94.

> **5.      Other Groups and Organizations Were Not Involved In the 9/11 Attacks and, In Any Event, IIRO Had No Knowledge of Purported Connections With Al Qaeda**

Plaintiffs' narrative of connections to Al Qaeda rests on the further removed contention that there is some link between Al Qaeda and purported intermediaries who were not themselves involved in 9/11. For each purported intermediary, discovery revealed no evidence that: (1) the intermediary was involved in the 9/11 Attacks or closely intertwined with Al Qaeda; or (2) IIRO had any knowledge before 9/11 of a connection between the intermediary and Al Qaeda, if indeed

they were connected.

### a. ASG

As discussed above, Plaintiffs assert connections between IIRO personnel and **ASG,** on the one hand, and **ASG** and Al Qaeda, on the other hand. **ASG** emerged in the Philippines in the early to mid-1990s, attacking Christian missionaries and committing robberies and kidnappings. *Id.* ¶¶ 152-53. **ASG** was a criminal group in Southeast Asia, without objectives in the U.S. or West, but rather seeking to take power in Muslim majority regions of the Philippines. *See id.* ¶¶ 154-55, 229-30. **ASG** was designated by **OFAC** *after* the 9/11 Attacks. *Id.* ¶¶ 224-25.

Plaintiffs have no evidence that **ASG** had any foreknowledge of or was involved in the planning or execution of the 9/11 Attacks. *Id.* ¶ 145. They also have no evidence tracing **ASG** funds or in-kind support to the planning or execution of the 9/11 Attacks or to Al Qaeda. *Id.* ¶¶ 146-47. Even if Plaintiffs did have such evidence, there is no evidence that IIRO was the source of such funds or in-kind support. *Id.* ¶ 148. Plaintiffs also have no evidence showing that IIRO was aware or had knowledge before 9/11 of any connection between **ASG** and Al Qaeda. *Id.* ¶ 149.

### b. MILF

As with **ASG**, Plaintiffs assert connections between and funding from IIRO personnel and **MILF** and then through **MILF** to Al Qaeda in order to assert a connection between IIRO and Al Qaeda. **MILF** is an Islamist separatist group established in 1984 in the Philippines, whose more militant activities there began in late 1993. *Id.* ¶¶ 137-138, 142-43. Plaintiffs have no evidence that **MILF** was involved in or had foreknowledge of the 9/11 Attacks. *Id.* ¶ 129. They also have no evidence tracing **MILF** funds or in-kind support to the planning or execution of the 9/11 Attacks or to Al Qaeda. *Id.* ¶¶ 130-31. Even if Plaintiffs did have such evidence, there is no evidence that IIRO was the source of such funds or in-kind support. *Id.* ¶ 132. Plaintiffs also have no evidence showing that IIRO was aware or had knowledge before 9/11 of any connection between **MILF**

30

and Al Qaeda. *See id.* ¶¶ 133-36, 144.

### c.  Jemaah Islamiyah

Plaintiffs assert connections between and funding flowing from IIRO personnel and Jemaah Islamiyah ("**JI**") and from **JI** and Al Qaeda in an attempt to assert a connection between IIRO and Al Qaeda. **JI** was an Islamic terrorist group based in Indonesia that focused on Western targets only after 9/11. *Id.* ¶¶ 165-67. **JI** was designated by **OFAC** after 9/11, on October 23, 2002. *Id.* ¶¶ 173-74. Plaintiffs have no evidence that **JI** was involved in or had foreknowledge of the 9/11 Attacks. *Id.* ¶ 160. They also have no evidence tracing **JI** funds or in-kind support to the planning or execution of the 9/11 Attacks or to Al Qaeda. *Id.* ¶¶ 161-62. Even if Plaintiffs did have such evidence, there is no evidence that IIRO was the source of such funds or in-kind support. *Id.* ¶¶ 163, 168-72. Plaintiffs also have no evidence showing that IIRO was aware or had knowledge before 9/11 of any connection between **JI** and Al Qaeda. *Id.* ¶¶ 164, 168-72.

### d.  The Saudi Joint Relief Committee

The Saudi government established the Saudi Joint Relief Committee ("**SJRC**") to consolidate and coordinate the collection of donations in Saudi Arabia and the use of those donations in connection with the war in Kosovo, another horrific genocide in the heart of Europe in the 1990s. *See, e.g., id.* ¶¶ 315-17. While the **SJRC** assigned projects to Saudi NGOs, including IIRO, it did not control these operations or IIRO's operations in Kosovo. *Id.* ¶¶ 318-20. IIRO-Kosovo was based in Pristina, and provided emergency healthcare, sanitary supplies, and school reconstruction. *Id.* ¶¶ 325-26. It was also involved in building, humanitarian, IT, and language training projects. *Id.* ¶ 325. This office was well regarded, *see id.* ¶¶ 325-29 and partnered with international organizations.[30]

IIRO-Kosovo and other NGOs rented office space in the **SJRC**-owned building, but IIRO-

---

[30] IIRO-Kosovo coordinated its efforts with NATO and the United Nations Mission in Kosovo. SOF ¶ 327.

31

Kosovo had its section of the building, and did not share common areas or entrances with the **SJRC**. *Id.* ¶¶ 321-23. Plaintiffs allege that the **SJRC** was "a 'cover'" for al Qaeda operatives, but there is no evidence to support this allegation. *Id.* ¶¶ 324, 332-34.

Plaintiffs have no evidence that **SJRC** was involved in or had foreknowledge of the 9/11 Attacks. *Id.* ¶ 324. They also have no evidence tracing **SJRC** funds or in-kind support to the planning or execution of the 9/11 Attacks or to Al Qaeda. *Id.* Even if Plaintiffs did have such evidence, there is no evidence that IIRO was the source of such funds or in-kind support. *Id.* Plaintiffs also have no evidence showing that IIRO was aware or had knowledge before 9/11 of any connection between the **SJRC** and Al Qaeda. *Id.*

## PROCEDURAL POSTURE

### I.    The Court Dismissed Most of Plaintiffs' Claims

Plaintiffs' initially asserted federal and state law claims against IIRO, including violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Torture Victims Protection Action ("TVPA"), the Alien Tort Statute ("ATA"), and the Alien Tort Claims Act ("ATCA"), as well as claims for violations of international law, negligence, conspiracy, aiding and abetting, and certain intentional torts. The Court dismissed most of these claims,[31] leaving only the ATA claims and the ATA-associated claims, such as wrongful death and survival and certain timely-asserted intentional tort claims, which were revived when Congress adopted JASTA.[32]

---

[31] The Plaintiffs' Executive Committee maintains that the claims for contribution and indemnity from the *Cantor Fitzgerald* action (No. 04-cv-07065-GBD-SN) remain pending. [*See* Oct. 23, 2023 letter]. However, only one set of plaintiffs in that action, the "Port Authority plaintiffs," brought the contribution and indemnity claims, and those same plaintiffs voluntarily dismissed their action, including the contribution and indemnity claims, against Defendants IIRO and MWL in 2010. *See* First Am. Compl. ¶¶ 240-242 (Count Thirteen), *Cantor Fitzgerald Assocs., L.P. v. Akida Inv. Co., Ltd.*, No. 04-cv-07065-GBS-SN (S.D.N.Y. Sept. 10, 2004), ECF No. 5-2; Stipulation of Voluntary Dismissal by Port Auth. Pls., *Cantor Fitzgerald*, No. 04-cv-07065-GBS-SN (S.D.N.Y. Oct. 18, 2010), ECF No. 387.

[32] Only injured U.S. nationals or their estates, survivors, or heirs may sue under the ATA. 18 U.S.C. § 2333(a). IIRO therefore moves for summary judgment as to all non-U.S. national Plaintiffs. *See Kaplan v. Lebanese Canadian Bank, SAL* ("*Kaplan II*"), 999 F.3d 842, 847 (2d Cir. 2021) ("[T]he ATA grants a private right of action only to nationals of the United States.") (internal brackets and quotations omitted).

32

In 2005, the Court dismissed the RICO, TVPA, and negligence claims brought against IIRO in the *Ashton*, *Burnett*, and *Federal* actions.[33] The Court also dismissed as time-barred the intentional tort claims in the *Federal* action,[34] and held that aircraft hijacking is a violation of international law that could support an ATCA claim, but the Court did not make findings that the alien Plaintiffs had properly pled ATCA claims against any particular defendant.[35]

In 2010, the Court reiterated and expanded its conclusions. "[R]esolv[ing] all the remaining motions filed by defendants seeking dismissal on various grounds, including . . . failure to state a claim upon which relief can be granted," the Court concluded that: (1) the "RICO causes of action" were "deficiently pled" in all of the complaints; (2) the TVPA claims failed because the allegations were insufficient to demonstrate that "any of the moving defendants were themselves individuals acting under color of state authority, or that they were acting in concert with such an individual;" (3) because "there is no basis to find that these defendants owed a duty to plaintiffs to protect[] them from the intentional torts committed by others" the negligence claim was dismissed; (4) because "no independent cause of action exists for punitive damages, conspiracy, or aiding and abetting, those purported causes of action" were dismissed; (5) the intentional tort claims against IIRO in the *Federal* action were "dismissed as time-barred;" and (6) the ATCA claim failed because the allegations were insufficient to demonstrate that any of the defendants acted with the necessary *mens rea* under international law.[36] Importantly, the Court found it "of great significance" that there was "no appreciable substantive difference in the factual allegations pled

---

[33] *In re Terrorist Attacks on Sept. 11, 2001* ("*Terrorist Attacks II*"), 392 F.Supp.2d 539, 575 (S.D.N.Y. 2005), *aff'd*, 538 F.3d 71 (2d Cir. 2008).

[34] *In re Terrorist Attacks on Sept. 11, 2001* ("*Terrorist Attacks I*"), 349 F.Supp.2d 765, 829 (S.D.N.Y. 2005). This finding was made with respect to the claims against "the SAAR Network," *id.*, but the Court earlier indicated that this network, as alleged, included "the U.S. branches of MWL [and] IIRO." *Id.* at 822. In a later opinion in 2010, the Court confirmed that the *Federal* intentional tort claims against IIRO were also time barred. *In re Terrorists Attacks on Sept. 11, 2001* ("*Terrorist Attacks V*"), 740 F.Supp.2d 494, 514 n.6 (S.D.N.Y. 2010), *aff'd*, 714 F.3d 118 (2d Cir. 2013).

[35] *Terrorist Attacks II*, 392 F.Supp.2d at 565.

[36] *Terrorist Attacks V*, 740 F.Supp.2d at 514, 514 n.6, 515; *see also Terrorist Attacks* II, 392 F.Supp.2d at 566.

against each of the moving defendants, in the various complaints in which each is named as a defendant." [37] The Second Circuit upheld these dismissals. [38]

## II. Plaintiffs' ATA Claims Have Been Significantly Weakened

Although the Court permitted Plaintiffs' ATA claims against IIRO to proceed, subsequent orders significantly weakened them. In 2005, the Court found that the allegations contained in the *Ashton*, *Burnett*, and *Federal* complaints "stated a claim under the ATA in that IIRO has allegedly funded Al Qaeda training camps in Afghanistan, supported Al Qaeda guest houses, and been involved in other terrorist attacks and plots . . . [t]hrough its relationship with Mohammed Jamal **Khalifa**," who headed IIRO's Philippines branch office. [39] Plaintiffs' claims against **Khalifa** were later dismissed on personal jurisdiction grounds because "allegations of **Khalifa**'s involvement in terrorist activities, during the 1990's," are too remote from the 9/11 Attacks to establish causation.[40] The Court also rejected the evidence on which Plaintiffs' allegations against IIRO relied: (1) Plaintiffs had no evidence that funds in IIRO's Dubai Islamic Bank account were used "to fund Al Qaeda or carry out 9/11;" [41] and (2) excerpts of *The Muslim World* regarding Prince

---

[37] *Terrorist Attacks V*, 740 F.Supp.2d at 512.

[38] *In re Terrorist Attacks on Sept. 11, 2001* ("*Terrorist Attacks IX*"), 714 F.3d 118, 126, 126 n.4 (2d Cir. 2013); *see also id.* at 125 (upholding ATCA/international law dismissal because "no universal norm against 'terrorism' existed under customary international law (*i.e.* the 'law of nations') as of September 11, 2001").

[39] *Terrorist Attacks II*, 392 F.Supp.2d at 563, 569.

[40] *Terrorist Attacks V*, 740 F.Supp.2d at 509. For this reason, the Court found that "Plaintiffs have failed to demonstrate that Khalifa is subject to personal jurisdiction." *Id. See also In re Terrorist Attacks on Sept. 11, 2001* ("Terrorist Attacks XIII"), 295 F.Supp.3d 416, 423 n.8 (S.D.N.Y. 2018), *rev'd and remanded as to another defendant sub nom.*, *Underwriting Members of Lloyd's Syndicate 2 v. Al Rajhi Bank*, 779 F. App'x 66 (2d Cir. 2019) (finding Saudi Binladin Group's alleged support to Khalifa insufficient to subject it to personal jurisdiction because Plaintiffs "do not allege that Khalifa . . . was connected in any material way to the 9/11 Attacks"). Although made in the personal jurisdiction context, this finding of a lack of connection between **Khalifa** and the 9/11 Attacks is relevant to the merits of Plaintiffs' ATA claim, which requires a stronger showing of causation than is necessary for personal jurisdiction. *Compare Terrorist Attacks IX*, 714 F.3d at 123-24 (ATA requires proximate causation), *with Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021) (indicating that the specific-jurisdiction inquiry has not been framed "as always requiring proof of causation" and "some relationships will support jurisdiction without a causal showing").

[41] *See In re Terrorist Attacks on Sept. 11, 2001*, 2023 WL 2430381, at *5, *5 n.4 (noting that "[n]one of these [Dubai Islamic Bank] accountholders"—including IIRO—"appeared on pre-9/11 OFAC lists," rejecting Plaintiffs' argument that "this fact is irrelevant," and further finding, "Plaintiffs present no evidence that individuals or entities [including IIRO] used money from these DIB accounts to fund Al Qaeda or carry out 9/11"); *see also id.*, at *12 ("But there is no specific evidence that any of the accounts held by individuals or individuals with links to Al Qaeda [allegedly including IIRO] provided funding for the terrorist organization's operations, let alone for the 9/11 Attacks.").

Sultan's donations to IIRO contained *"no indication . . . that IIRO . . . was funneling donations to Al Qaeda."* [42]

In its 2010 decision granting several defendants' motions to dismiss, the Court made four findings about Plaintiffs' ATA claims against IIRO. *First*, the ATA does not impose direct liability on "those who allegedly aided, abetted, conspired and/or provided material support to other terrorist organizations that were affiliated with Al Qaeda," but did not play any "specific role" in the 9/11 Attacks.[43] *Second*, there is no direct liability under the ATA for: (a) promoting an ideology that is supported by Al Qaeda; (b) expressing support for Al Qaeda through activities protected by the First Amendment, such as advocacy or lobbying; or (c) engaging in conduct that promotes one's own ideological goals (such as publishing religious statements) but does not involve support "to" Al Qaeda.[44] *Third*, an entity defendant is not liable for wrongful conduct committed by its "independent subsidiaries" or "purported subsidiaries." [45] *Fourth*, provision of material support to Osama **Bin Laden** while he was in Sudan during the early 1990s, when "[t]he United States had not even been targeted by Al Qaeda," is too temporally remote to support proximate causation.[46]

In 2013, the Second Circuit substantially narrowed the reach of the ATA. It reaffirmed that the statute requires proximate causation between a defendant's act and the plaintiff's injuries, and as a result does not provide for aiding and abetting liability.[47] In the case of charities, proximate causation requires allegations that "the money allegedly donated [to the charities] actually was transferred to Al Qaeda and aided in the September 11, 2001 attacks."[48]

---

[42] *See Terrorist Attacks I*, 349 F.Supp.3d at 799 ("Exhibits 21–24 are excerpts from *The Muslim World* regarding Prince Sultan's donations to IIRO and the Joint Saudi Committee for Relief of Kosovar Refugees ("JSCRS"). *There is no indication in these exhibits that IIRO or JSCR was funneling donations to Al Qaeda*.") (emphasis added).
[43] *Terrorist Attacks V*, 740 F.Supp.2d at 513.
[44] *Id.* at 518-520, 523.
[45] *Id.* at 521.
[46] *Id.*
[47] *Terrorist Attacks IX*, 714 F.3d at 123-24 (citing *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013)).
[48] *Id.*

### III.    Courts Have Made Several Relevant Decisions Concerning the JASTA

In 2016, Congress amended the ATA with the JASTA, which establishes the liability of a party who "aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism."[49] This Court, the Second Circuit, and the Supreme Court have made several relevant decisions concerning the JASTA, which decisions are discussed below in relevant part.

### IV.    Discovery & *Daubert* Challenges

Fact and expert discovery have been extensive. In April 2023 and August 2025, Judge Netburn granted in part Certain Defendants' *Daubert* motions to exclude the testimony of Plaintiffs' proffered experts.[50] Judge Netburn excluded significant portions of these proffered experts' reports and testimonies because, *inter alia*, she concluded that they were unqualified to opine on various topics, attempted to mislead the Court about their qualifications, improperly offered legal conclusions or opined on states of mind; rested their conclusions on only their own *ipse dixit*, included in their opinions substantial irrelevant background materials, and/or laundered hearsay. Judge Netburn highlighted "one troubling example" where the expert "erases a phrase [("not for financing terrorism")] from a quotation that directly contradicts his thesis,"[51] and also misidentified individuals, including *erroneously identifying an individual as being a 9/11 hijacker*.[52] This Court adopted Judge Netburb's *Daubert* decisions "in their entireties"[53] and, in particular, noted that Judge Netburn "properly concluded that there were serious concerns about Mr. Kohlmann's testimony, especially based on his questionable 'experience' and 'training'; the

---

[49] *See* Justice Against Sponsors of Terrorism Act, Pub. L. 114-222, § 4(a), 130 Stat. 852, 854 (2016) (codified at 18 U.S.C. § 2333(d)(2)).

[50] *In re Terrorist Attacks on Sept. 11, 2001* ("*Charity Daubert I*"), 2023 WL 3116763 (S.D.N.Y. Apr. 27, 2023); *Charity Daubert II*, 2025 WL 2383768 (S.D.N.Y. Aug. 18, 2025).

[51] *Id.*, at *13 ("In other words, Kohlmann omitted the phrase 'not for financing terrorism' from his report.").

[52] *Id.*, at *13 n.12.

[53] *In re Terrorist Attacks on Sept. 11, 2001*, 2026 WL 769787, at *6 (S.D.N.Y. Mar. 18, 2026).

limited pressure testing of his conclusions by real-world exposure or academic review; and his tendency to misstate facts, rely on speculation, and jump from 'accepted premises to unfounded conclusions."[54]

## ARGUMENT

**I.     There Is No Basis to Find that IIRO Is Directly Liable for the 9/11 Attacks**

Following 20 years of litigation, Plaintiffs have been forced to confront the lack of any evidence substantiating their allegations that IIRO is directly liable for the 9/11 Attacks. Plaintiffs cannot show that IIRO knew anything about Al Qaeda's plans to carry out the 9/11 Attacks, let alone that IIRO supported those plans. Instead, Plaintiffs theorize that IIRO contributed to Al Qaeda's "global strike capabilities," whatever that means. In any event, it does not mean the 9/11 Attacks. This theory is also not supported by the evidence, but even if it were, it would not be enough. To satisfy a direct liability claim under the ATA, Plaintiffs must prove that IIRO (1) committed an act of international terrorism, (2) had the requisite mental state, and (3) proximately caused Plaintiffs' injuries.[55] Plaintiffs fail totally on all three elements.

By pursuing this "global strike capabilities" theory, Plaintiffs effectively concede that there is no nexus between IIRO's alleged acts and the 9/11 Attacks. Plaintiffs' intentional tort claims likewise require a showing that IIRO knew about and intended to aid Al Qaeda in their plan to carry out the 9/11 Attacks, and that conduct by IIRO proximately caused the 9/11 Attacks. For the same reasons that Plaintiffs cannot succeed on their ATA claims, they also cannot establish that IIRO committed any intentional tort.

---

[54] *Id.*, at *5 (alterations adopted). In accordance with the Court's order on briefing and consolidation (ECF No. 11419), IIRO hereby incorporates Procedural Posture, Sections IV.C., F of the MWL Brief, which provides additional detail on discovery and the *Daubert* challenges. In addition, IIRO also incorporates the summary judgment standard set forth in Argument, Section I of the MWL Brief.

[55] *Sokolow v. Palestine Liberation Org.*, 60 F. Supp. 3d 509, 514-15 (S.D.N.Y. 2014) (Daniels, J.); *see also In re Terrorist Attacks on Sept. 11, 2001*, 2023 WL 5132138, at *10 (S.D.N.Y. Feb. 27, 2024) (subsequent history omitted).

### A.    IIRO Did Not Proximately Cause the 9/11 Attacks

All of Plaintiffs' direct liability claims fail because Plaintiffs cannot begin to prove that IIRO proximately caused the 9/11 Attacks. To establish proximate causation,[56] Plaintiffs must show that that: (1) IIRO's "acts were a 'substantial factor' leading to the injury and (2) the injury was a "'reasonably foreseeable' or 'natural consequence' of those actions."[57] There is no way for Plaintiffs to make this showing, and summary judgment on all of Plaintiffs' direct liability claims is justified on this basis alone.[58]

On the same attenuated allegations before the Court today, this Court has already decided that IIRO *did not* "*cause[]* Plaintiffs' injuries arising out of the 9/11 Attacks."[59] In 2018, the Court considered the motion to dismiss for lack of subject matter jurisdiction of Saudi Arabia and rejected Plaintiffs' theory that Saudi Arabia proximately caused the 9/11 Attacks *through* IIRO (and other charities) because the allegations were insufficient to establish proximate causation as to the charities themselves.[60] In effect, Plaintiffs sought to hold Saudi Arabia liable for alleged actions of IIRO based on an agency or alter ego theory. But the Court explicitly found that those allegations (articulated below), even if they could be attributed to Saudi Arabia, were insufficient to establish liability as alleged.[61] As that decision held, only actions connected proximately in time

---

[56] *E.g., In re Terrorist Attacks on Sept. 11,* 2021 WL 1164087, at *2 (S.D.N.Y. Mar. 26, 2021) (noting that proximate causation is "necessary to sustain a claim of primary liability under the ATA.").

[57] *In re Terrorist Attacks on Sept. 11, 2001*, 2023 WL 5132138, at *5 (citations omitted). *See also id.* ("As the Report details, Plaintiffs have adequately pled that: (1) Sudan's provision of support to Al Qaeda was a 'substantial factor' in the 9/11 Attacks; and (2) mass death, injury, and destruction on 9/11 were 'reasonably foreseeable' consequences of Sudan's support.").

[58] *See, e.g.*, *Terrorist Attacks IX*, 714 F.3d at 126 (affirming dismissal of intentional infliction of emotional distress, assault and battery, trespass, and wrongful death claims for failure to establish proximate causation); *id.* at 123-24 (citing *Rothstein*, 708 F.3d at 97) (ATA requires proximate causation, and for charities, proximate causation requires that "the money allegedly donated [to the charities] actually was transferred to Al Qaeda and aided in the September 11, 2001 attacks"); *In re Terrorist Attacks on Sept. 11, 2001*, 2008 WL 7073447, at *4 (S.D.N.Y. Dec. 23, 2008) (proximate causation necessary to sustain negligence claim).

[59] *Terrorist Attacks XIV*, 298 F. Supp. 3d at 658 (emphasis in original); *see also id.* at 655 n.16 (identifying IIRO as one of the charities to which the Court's finding applies).

[60] *Id.* at 658-59; *see also id.* at 645 n.8 (explaining that establishing proximate cause for substantive liability demands more than is required to establish FSIA jurisdiction).

[61] *Id.* at 658-59.

38

and causation to the 9/11 Attacks could support claims against IIRO; these claims were insufficient, and therefore even if Saudi Arabia was responsible for the alleged actions of IIRO, there was no subject matter jurisdiction. Thus, there was already a ruling in this case that Plaintiffs' attenuated allegations against IIRO were insufficient. If they were insufficient against Saudi Arabia as a derivative matter, they are necessarily insufficient against IIRO.

The allegations that were found insufficient included that the charities, including IIRO, knowingly provided: (1) support to other entities that directed funds to Al Qaeda; (2) funds, equipment, and supplies to establish terrorist training camps in Afghanistan and to enable al Qaeda operatives—including "some or all of the September 11 hijackers"—to travel to such facilities; (3) travel documentation and visas, including for travel to terrorist training camps in Afghanistan; and (4) secret courier services for al Qaeda.[62] This Court found that "the vast majority of Plaintiffs' allegations involve[d] alleged acts by the charities to aid and support al Qaeda's efforts in Europe, Africa, the Middle East, and the Far East during the 1980s and 1990s," and thus did not "bear any definite and specific, articulable connection to the 9/11 Attacks or those who carried them out."[63] The same logic applies to Plaintiffs' other stale (and often unsubstantiated) allegations. The 2018 Opinion made very clear that the focus of this action was on 9/11, not a twenty-year path that lacks temporal or factual congruence with the 9/11 Attacks. Plaintiffs are even worse off now on summary judgment because they cannot prove their (already insufficient) allegations.[64]

In fact, in this MDL, the Court has only found proximate causation *at the motion to dismiss stage* based on allegations that defendants *participated in the 9/11 Attacks or provided support*

---

[62] *Id.*

[63] *Id.* at 659.

[64] *See In re Arcapita Bank B.S.C.(C)*, 640 B.R. 604, 616 (S.D.N.Y. 2022) (citing *In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991)) ("[A] decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation.").

*directly to al Qaeda*,[65] such as by providing "extraordinary banking services for Al Qaeda" including "direct and specific" transfers of money to two of the 9/11 hijackers for use in the attacks;[66] providing guidance, diplomatic passports, and other resources *close in time* to the attacks (until at least 2000) that "increased al Qaeda's 'operating capacity'";[67] and raising and laundering funds for al Qaeda, performing reconnaissance missions, and facilitating al Qaeda training camps.[68] None of that happened here, and Plaintiffs cannot argue otherwise. This lack of "any definite and specific, articulable connection to the 9/11 Attacks or those who carried them out," coupled with attenuated allegations lacking temporal proximity to 9/11 precludes a proximate causation finding as a matter of law,[69] particularly at the summary judgment stage where Plaintiffs' burden increases from plausible allegations to presenting sufficient, admissible evidence.

**B.    IIRO Did Not Have the Requisite Mental State**

Also dispositive of Plaintiffs' direct liability claims is the lack of any evidence that IIRO knew about or intended to support Al Qaeda's plans to commit the 9/11 Attacks. To succeed on their ATA direct liability claims, Plaintiffs must establish that IIRO had the mental state required for the underlying "predicate act."[70] Plaintiffs will likely point to 18 U.S.C. §§ 2339A and 2339B, both of which require Plaintiffs to show that IIRO knew it was supporting terrorism. The ATA *also* requires Plaintiffs to establish that IIRO "*committed a terrorist act* intentionally, knowingly,

---

[65] *Terrorist Attacks IX*, 714 F.3d at 124 (absence of proximate cause foreclosed section 2333(a) and state-law claims).

[66] *In re Terrorist Attacks on Sept. 11, 2001* ("*Terrorist Attacks IV*"), 718 F.Supp.2d 456, 493 (S.D.N.Y. 2010). DIB has now been dismissed. *In re Terrorist Attacks on Sept. 11, 2001*, 2023 WL 2430381, at *5 (finding no evidence of any money from any DIB account being used for the attacks).

[67] *In re Terrorist Attacks on Sept. 11, 2001*, 2023 WL 5132138, at *7 (finding FSIA terrorism exception requires proximate causation and noting fungibility of funds); *but see infra* Argument, Section III.B.1.b. (explaining that fungibility of funds fails general awareness element of aiding and abetting claim).

[68] *Terrorist Attacks V*, 740 F.Supp.2d at 519-20.

[69] *Terrorist Attacks XIV*, 298 F.Supp.3d at 659; *see also* ECF No. 8862 (Feb. 2023) (denying reconsideration of dismissed Plaintiffs' charity-centered allegations in March 2018); *Terrorist Attacks V*, 740 F.Supp.2d at 508-09 (for jurisdictional purposes, any involvement by Khalifa in terrorist activities during the 1990s, including the 1993 World Trade Center Bombing and the 1995 Bojinka Plot, too far removed in time from 9/11); SOF ¶ 53 (**Khalifa** left IIRO in 1993).

[70] *Ahmad v. Christian Friends of Israeli Communities*, 2014 WL 1796322, at *3 (S.D.N.Y. May 5, 2014), *aff'd*, 600 F. App'x 800 (2d Cir. 2015) (citing *Gill v. Arab Bank, PLC*, 893 F.Supp.2d 474, 504 (E.D.N.Y. 2012)).

or recklessly.[71] Plaintiffs cannot make either of these showings. The knowledge threshold is similar for Plaintiffs' intentional tort claims, and equally unattainable.[72] In sum, Plaintiffs must prove that IIRO knew that it was supporting the 9/11 Attacks and that it did so intentionally, but there is no evidence that IIRO had any knowledge of the 9/11 Attacks before 9/11, let alone that it intentionally supported them.

Both "predicate acts" underlying Plaintiffs' ATA claims require that the defendant had actual knowledge of its support of terrorism. A Section 2339A violation requires knowledge or intent that the defendant's "material support" will be used to aid an enumerated terrorism-related crime.[73] A Section 2339B violation requires knowledge by the defendant both that it was providing material support to an FTO and that the FTO engaged in terrorist activity.[74] IIRO did not know or intend—and could not have known or intended—that any alleged "material support" that it provided would be used in aid of 9/11, because IIRO did not know about Al Qaeda's plans to carry out the 9/11 Attacks (or any other attacks) until after they happened. IIRO also could not have known that any alleged "material support" that it purportedly provided *would* be directed to an FTO because Al Qaeda was not designated until much later.[75] For these reasons, Plaintiffs cannot show that IIRO committed a terrorist act intentionally, knowingly, or recklessly.

As explained herein, there is also no evidence that any employees or agents of IIRO knew

---

[71] *Sokolow*, 60 F.Supp.3d at 515 (emphasis added); *accord Hussein v. Dahabshiil Transfer Servs. Ltd.*, 230 F.Supp.3d 167, 170-71, 171 n.2 (S.D.N.Y. 2017), *aff'd*, 705 F. App'x 40 (2d Cir. 2017).

[72] *See Scribner v. Summers*, 84 F.3d 554, 557 (2d Cir. 1996) (trespass requires *intentional* invasion of property); *Tardif v. City of New York*, 991 F.3d 394, 410 (2d Cir. 2021) (assault requires *intentional* placing of another person in fear of harm; battery is *intentional* wrongful physical contact); *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996) (intentional infliction of emotional distress requires *intentionally* causing severe emotional distress).

[73] *See Linde v. Arab Bank, PLC* ("*Linde II*"), 882 F.3d 314, 330 n.11 (2d Cir. 2018) (explaining that 2339A requires "proof of knowledge or intent that material support be used in preparation for or in carrying out specified crimes"); *United States v. Stewart*, 590 F.3d 93, 113 (2d Cir. 2009) ("Section 2339A, however, in contrast to section 2339B, does not penalize the provision of material support without regard to what the support is for. Section 2339A requires instead that the defendant provide support or resources *with the knowledge or intent* that such resources be used to commit specific violent crimes.").

[74] *Weiss v. Nat'l Westminster Bank PLC* ("*Weiss I*"), 768 F.3d 202, 208 (2d Cir. 2014).

[75] *See infra* Argument, Section I.C.1, 2 (describing intentional mental state and lack of evidence thereof).

41

about the 9/11 Attacks, and even less so that any employee or agent acquired knowledge about the 9/11 Attacks "during the course of performing his or her job responsibilities" for IIRO.[76] Therefore, Plaintiffs cannot prove that IIRO had the required mental state to support their direct liability claims.[77]

### C.    IIRO Did Not Commit an Act of International Terrorism

Plaintiffs must also show that IIRO committed an "act of international terrorism," which is defined in 18 U.S.C. § 2331(1) to require: (i) a violation of federal or state law; (ii) involving violence or endangering human life; (iii) appearing to be intended to intimidate or coerce a civilian population or to influence or affect a government; and (iv) having occurred primarily outside U.S. territorial jurisdiction or transcending national boundaries.[78]

Plaintiffs may identify two "predicate acts" as acts of "international terrorism": (i) the 9/11 Attacks; and (ii) the provision of material support to Al Qaeda. There is no evidence that IIRO committed the 9/11 Attacks, SOF ¶¶ 1-3, 6, 179-80, so this "predicate act" cannot support liability. For the provision of "material support" to Al Qaeda to constitute "a violation of federal or state law," Plaintiffs must show that IIRO violated one of the material support statutes: 18 U.S.C. §§ 2339A, 2339B, or 2339C. Plaintiffs cannot do so.

### 1.    IIRO Did Not Provide "Material Support" to Al Qaeda

Plaintiffs cannot satisfy the requirements of any of the material support statutes, because IIRO did not provide "material support" to Al Qaeda at any time, and certainly not after the statute's enactment. There is no evidence that IIRO directly or knowingly provided anything to Al Qaeda. The Plaintiffs' only source, **al Fadl**, is untrustworthy and refused to provide testimony under oath so his statements are hearsay. In any event, **al Fadl** left Al Qaeda in 1996, so he has

---

[76] *Id.*
[77] *Id.*
[78] *Linde II*, 882 F.3d at 326 (citing 18 U.S.C. § 2331(1)).

nothing to say about conduct that is close in time to 9/11. There is also no evidence supporting Plaintiffs' assertions, made through far-fetched, invented and unsupported connections, that any IIRO employees or purported "intermediaries" supported or participated in the 9/11 Attacks.

## 2.    The Material Support Statutes Do Not Apply Retroactively

Plaintiffs cannot show that IIRO provided "material support" to Al Qaeda at any time, let alone after the enactment of the material support statutes, which do not apply retroactively. Since Plaintiffs' theory of liability relies entirely on alleged acts by IIRO before the statutes were enacted, Plaintiffs cannot establish "a violation of federal or state law."[79]

Criminal statutes ordinarily apply only prospectively[80] and within U.S. territory.[81] The ATA adopts the ordinary presumption of prospective application but extends extraterritorially. Section 2333, which provides for a civil cause of action for acts of "international terrorism," "uses the present tense," referring to acts that "are" a violation of criminal law, and the Supreme Court has admonished that courts "must give that choice 'real significance.'"[82] Acts that "are" violations of criminal law therefore cannot include violations of laws not yet enacted. By contrast, Congress chose to specify that Section 2331(1) broadens the territorial application of criminal laws by including as "international terrorism" an act that "would be a criminal violation if committed within the jurisdiction of the United States or of any State." Congress did not use similar language to extend liability to past violations of criminal law. This contrast must be given effect.

Ordinary canons of statutory construction bolster the conclusion that Section 2333 applies

---

[79] *See Boim v. Holy Land Found. for Relief and Dev.*, 549 F.3d 685, 691 (7th Cir. 2008) (reversing judgment because defendant must have "provid[ed] material support *after* the effective date of section 2339A . . . to be liable under section 2333.") (emphasis added); *Owens v. BNP Paribas S.A.*, 235 F.Supp.3d 85, 98 (D.D.C. 2017) (claims dismissed where "enactment of § 2339C in 2002 post-dates the relevant conduct"); *Strauss v. Credit Lyonnais, S.A.*, 2006 WL 2862704, at *6, 14 (E.D.N.Y. Oct. 5, 2006) (applying version of section 2333B in effect at time of alleged material support).

[80] *Stogner v. California*, 539 U.S. 607, 610-12 (2003).

[81] *RJR Nabisco v. European Community*, 579 U.S. 325, 335-36 (2016).

[82] *Bartlett v. Baasiri*, 81 F.4th 28, 32 (2d Cir. 2023) (citing *Dole Food Co. v. Patrickson*, 538 U.S. 468, 478 (2003).

only prospectively. First, "[c]ourts generally disfavor statutory effects that impair rights a party possessed when he acted [or] increase a party's liability for past conduct."[83] Second, although Section 2333 provides for civil liability, its "punitive treble damages provision" presents "a potential *ex post facto* problem."[84] For these reasons, the material support statutes, as incorporated into the ATA, do not apply retroactively.[85]

To support their claim that IIRO is directly liable under the ATA, Plaintiffs rely on alleged actions taken by IIRO (or erroneously attributed to IIRO) in the 1980s and early 1990s that, they assert, supported Al Qaeda. Even if these allegations were supported by credible evidence, which they are not (*see* Background, Section V.), they cannot satisfy the statutory requirements because the alleged acts preceded the adoption of the material support statutes and any relevant amendments.

First, this Court has already decided that Section 2339C cannot provide a basis for liability because it was not in effect on September 11, 2001.[86] Second, Section 2339A was enacted on September 13, 1994 and prohibited a person "within the United States" from "provid[ing] material

---

[83] *Weingarten v. United States*, 865 F.3d 48, 56 (2d Cir. 2017) (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994)); *see also Weiss v. Nat'l Westminster Bank PLC* ("*Weiss II*"), 278 F.Supp.3d 636, 650 (E.D.N.Y. 2017) ("Defendant argues that the [claims] should be dismissed in part because § 2339C was enacted after the attacks occurring [in 2001 and 2002], and it cannot be applied retroactively. … The Court agrees with Defendant.").

[84] *Louis Vuitton S.A. v. Spencer Handbags Corp.*, 765 F.2d 966, 972 (2d Cir. 1985); *see also In re Vitamins Antitrust Litig.*, 2000 WL 1511376, at *5 (D.D.C. Oct. 6, 2000).

[85] 18 U.S.C. § 2333(a). In her Report and Recommendation addressing defendant Sudan's motion to dismiss, Judge Netburn applied the versions of § 2339A and § 2339B in effect from October 11, 1996, through October 25, 2001, to the "material support" claims against defendant Sudan, who allegedly aided Al Qaeda "beginning in the early 1990s." *In re Terrorist Attacks on Sept. 11, 2001*, 2022 WL 4227151, at *1, *20 (S.D.N.Y. May 3, 2022), *adopted in part, rejected in part,* 2023 WL 5132138 (S.D.N.Y. Aug. 10, 2023). To the extent Judge Netburn intended to imply that the statutory versions in effect as of the 9/11 Attacks retroactively govern alleged "material support" predating October 1996, that approach would depart from the ordinary rules of statutory construction and should not control here. It is more likely, however, that Judge Netburn relied on the allegation that Sudan's support to Al Qaeda continued throughout the 1990s and "at least until 2000," *id.*, at *7, making it unnecessary for her ruling to parse the alleged conduct into distinct statutory periods.

[86] *In re Terrorist Attacks on Sept. 11, 2001*, 2022 WL 4227151, at *20 n.12 (citing *Weiss II*, 278 F.Supp.3d at 650) (finding that claims based on § 2339C should be dismissed because the statute was not in effect at the time of the relevant terrorist attack).

44

support…knowing or intending" that the support would "be used in [certain statutory violations].[87]

"Material support" expressly excluded "[h]umanitarian assistance to persons not directly involved in such violations," and that exception was revised to "medicine or religious materials," on April 24, 1996.[88] Third, Section 2339B does not apply because there is no evidence that IIRO provided any support to Al Qaeda after it was designated an foreign terrorist organization ("FTO"). Section 2339B, enacted on April 24, 1996,[89] prohibits the "knowing[]" provision of "material support" to an FTO.[90] Civil liability under Section 2333 requires a "violation of the criminal laws of the United States."[91] Since Plaintiffs cannot prove that IIRO provided any "material support" to Al Qaeda after its designation, Section 2339B could not be violated and thus Section 2333 cannot be satisfied.[92]

Nearly all alleged actions taken by IIRO allegedly in support of Al Qaeda preceded the enactment of the material support statutes or the designation of Al Qaeda. Therefore, the material support statutes are not satisfied.

### 3. The Other Requirements of an Act of International Terrorism Are Not Satisfied

Even if IIRO had provided "material support" to Al Qaeda after the enactment of the

---

[87] 18 U.S.C. § 2339A (Sept. 13, 1994 version).

[88] *Compare* 18 U.S.C. § 2339A (Sept. 13, 1994) *with id.* (April 24, 1996), and *id.* (Oct. 26, 2001).

[89] *See* Pub L. No. 104-132, § 303(a), 110 Stat. 1214, 1250 (Apr. 24, 1996).

[90] 18 U.S.C. § 2339B(a)(1) (Apr. 24, 1996).

[91] *Linde v. Arab Bank, PLC* ("*Linde I*"), 353 F. Supp. 2d 327, 331 (E.D.N.Y. 2004) ("[T]he private right of action in Section 2333(a) arises from injuries caused by an act of international terrorism, which requires, as part of its definition, 'a violation of the criminal laws of the United States or of any State.' … Thus, there is no claim under Section 2333(a) absent a criminal act.") (quoting 18 U.S.C. § 2331(1)(A)).

[92] Courts have uniformly held that the provision of "material support" to an organization prior to its designation as an FTO cannot support criminal liability under Section 2339B. *See United States. v. Abdi*, 498 F.Supp.2d 1048, 1084 (S.D. Ohio 2007) ("[A] conspiracy to provide material support to Al Qaeda would not have been an offense under § 2339B on April 27, 1999 because it had not yet been designated an FTO."); *United States v. Marzook*, 426 F.Supp.2d 820, 826 (N.D. Ill. 2006) ("The government concedes that a violation of the material support statute, 18 U.S.C. § 2339B, cannot be sustained until Hamas was designated a FTO.") (quotations omitted); *see also U.S. v. Fidse*, 778 F.3d 477, 481-82 (5th Cir. 2015) (criminal defendant's material support to group prior to its FTO designation could not support "federal crime of terrorism" sentencing enhancement). The same rule has been applied in the civil context. *See Boim v. Quranic Literacy Inst.*, 127 F.Supp.2d 1002, 1016-17 (N.D. Ill. 2001), *aff'd*, 291 F.3d 1000 (7th Cir. 2002) (refusing to dismiss § 2339B claim because plaintiff alleged that support continued after Hamas's FTO designation).

material support statutes—which it did not—that would not mean that IIRO had engaged in an "act of international terrorism."[93] Instead, Plaintiffs must prove that *IIRO's conduct* also (i) "involve[d] violent act or acts dangerous to human life;" and (ii) "appear[ed] to be intended[] to intimidate or coerce a civilian population," or "to influence" or "affect" a government."[94] The Second Circuit held that a voluntary suicide bomber would meet these other ATA requirements.[95] But courts have found that other conduct does not: "providing routine financial services to members and associates of terrorist organizations" is insufficient,[96] as is enabling customers associated with terrorists to engage in cryptocurrency transactions, and providing financial services to customers affiliated with FTOs or engaged in legitimate business with some connection to terrorism.[97] In any event, IIRO did not commit or support *any* acts of violence; there is no possible equivalency to the acts of a suicide bomber, and, even accepting Plaintiffs' allegations, IIRO's alleged actions are less significant than those that courts have found do not constitute "act[s] of international terrorism." Plaintiffs' assertions—even if supported by the evidence, which they are not—that IIRO supported third parties that it did not know to be connected to Al Qaeda is not conduct that "involves violence or endangers human life" or that "appears to be intended to intimidate or coerce a civilian population or to influence or affect a government." Therefore, the

---

[93] *Linde II*, 882 F.3d at 326; *Weiss v. Nat'l Westminster Bank, PLC.* ("*Weiss III*"), 993 F.3d 144, 153 (2d Cir. 2021) (primary liability under the ATA for material support under 2339B requires more than simply violating 2339B.).

[94] 18 U.S.C. 2331(1) (Oct. 29, 1992); *see also Linde II*, 882 F.3d at 326; *Weiss III*, 993 F.3d at 153 ("[A] bank's provision of material support to a known terrorist organization is not, by itself, sufficient to establish the bank's liability under the ATA. . . . [F]or civil liability as a principal, the 'defendant's act must,' *inter alia*, '*also* involve violence or endanger human life. Further, the act must appear to be intended to intimidate or coerce a civilian population or to influence or affect a government.'") (internal citations omitted).

[95] *Linde II*, 882 F.3d at 326.

[96] *Id.* at 327.

[97] *Raanan v. Binance Holdings Ltd.*, 2025 WL 605594, at *16 (S.D.N.Y. Feb. 25, 2025) (crypto); *Kaplan v. Lebanese Canadian Bank, SAL*, 405 F.Supp.3d 525, 532 (S.D.N.Y. 2019) (Daniels, J.) ("*Kaplan I*"), *vacated in part on other grounds*, 999 F.3d 842, 853 (2d Cir. 2021); *Bartlett v. Societe Generale de Banque Au Liban SAL*, 2020 WL 7089448, at *7 (E.D.N.Y. Nov. 25, 2020) (collecting cases); *id.*, at *8 ("Although I conclude that the Amended Complaint sufficiently alleges that Defendants knowingly provided substantial assistance to Hezbollah, I agree with the *Kaplan* court's conclusion on the question of primary liability that providing financial services such as those alleged here is not an act which is 'violent or dangerous to human life' as contemplated by the ATA.") (internal citation omitted).

statutory requirements are not satisfied.

## II.    IIRO Did Not Owe Any Duty to Plaintiffs

Any negligence claim is also not viable because IIRO did not owe any duty to Plaintiffs. Plaintiffs cannot establish the "most basic element of a negligence claim"—the "existence of a duty owed to [them] by defendants."[98] This Court already found, in response to the motions to dismiss by IIRO and other defendants, that "there is no basis to find that these defendants owed a duty to plaintiffs to protect[] them from the intentional torts committed by others," and therefore dismissed Plaintiffs' negligence claims.[99] The key question is whether "the defendant's relationship with either the tortfeasor or the plaintiff places the defendant in the best position to protect against the risk of harm."[100] IIRO had no relationship with Al Qaeda or Plaintiffs, and therefore did not owe Plaintiffs any duty.[101] As a result, Plaintiffs cannot establish a negligence claim.

## III.    IIRO Did Not Aid and Abet the 9/11 Attacks

Plaintiffs' aiding and abetting claims fare no better than their direct liability claims. To succeed on a JASTA aiding and abetting claim, Plaintiffs must show that IIRO's acts amounted to "intentional participation" in the 9/11 Attacks.[102] This requires Plaintiffs to identify an "affirmative act" that IIRO took with the intent of facilitating the 9/11 Attacks; omissions, inactions, or nonfeasance do not suffice.[103] In addition, Plaintiffs must show that the party that IIRO aided not

---

[98] *Terrorist Attacks I*, 349 F.Supp.2d at 830 (citing *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 342 (1928)); *see also Abdulaziz v. McKinsey & Co., Inc.*, 2022 WL 2444925, at *2 (2d Cir. July 5, 2022) ("Any claim sounding in negligence under New York law must be based in the breach of a legally cognizable duty of care.").

[99] *Terrorist Attacks V*, 740 F.Supp.2d at 514 n.6.

[100] *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 233 (Apr. 26, 2001). A duty may also arise if there is a relationship "between defendant and plaintiff that requires defendant to protect plaintiff from the conduct of others." *Id.*

[101] *See Heath v. EcoHealth Alliance*, 2025 WL 2658252, at *1-2 (2d Cir. Sept. 17, 2025); *Hamilton*, 96 N.Y.2d at 233-34 (defendant gun manufacturers had no special relationship with downstream users of their products).

[102] *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 490, 497 (2023).

[103] *See Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 281 (2025) ("[A]iding and abetting usually requires misfeasance rather than nonfeasance. Absent an 'independent duty to act,' a person's 'failure[s],' 'omissions,' or 'inactions'…will rarely support aiding-and-abetting liability.") (citing *Taamneh*, 598 U.S. at 489, 500). S*ee also Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420, 445 (2d Cir. 2025).

only performed a wrongful act that caused an injury (the "causal" element); that IIRO was generally aware of its role as part of an illegal or tortious activity at the time it provided the assistance, from which the terrorist act was foreseeable (the "general awareness" element); and IIRO knowingly and substantially assisted the principal violation (the "knowing and substantial assistance" element).[104] Finally, Plaintiffs must either demonstrate a "concrete nexus" between IIRO's affirmative and intentional conduct and the commission of the 9/11 Attacks,[105] or, failing that, satisfy the "high bar" of showing that IIRO's "participation" was so "pervasive, systemic, and culpable" that it "aided every wrongful act" of Al Qaeda.[106]

Plaintiffs cannot establish any of these requirements. IIRO did not aid Al Qaeda, which performed its wrongful acts without any assistance from IIRO. IIRO had no role and accordingly could not have been generally aware of any such role or foreseen any wrongful acts. IIRO did not provide any assistance let alone knowing and substantial assistance. And there was no substantial causal nexus between anything IIRO did and the 9/11 Attacks.

### A.     IIRO Did Not Engage in an Affirmative Act to Facilitate the 9/11 Attacks

Plaintiffs have no shred of evidence of IIRO's "conscious, voluntary, and culpable" participation in the 9/11 Attacks. IIRO did not plot or execute the attacks, provide knowing financial or other support to Al Qaeda, or employ or otherwise assist any of the hijackers. *E.g.*, SOF ¶¶ 1-6. *Nearly 25 years after 9/11, there is simply no evidence that IIRO provided direct, affirmative assistance to Al Qaeda or that it participated in any way in the 9/11 Attacks*. Plaintiffs allege certain links between IIRO and Al Qaeda that at best are highly attenuated in time and

---

[104] *Taamneh*, 598 U.S. at 486.
[105] *Id.* at 501.
[106] *Ashley*, 144 F.4th at 445 (quoting *Smith & Wesson*, 605 U.S. at 292). *See also Taamneh*, 598 U.S. at 506 ("The point of aiding and abetting is to impose liability on those who consciously and culpably participated in the tort at issue. … [T]he more attenuated the nexus, the more courts should demand that plaintiffs show culpable participation through intentional aid that substantially furthered the tort.").

48

location and are not supported by reliable evidence. But even if they were, they do not remotely amount to "intentional participation"[107] sufficient to impose liability on IIRO.

Plaintiffs' allegations of affirmative acts by IIRO can be grouped into three categories: (1) conduct from the 1980s and early-to-mid 1990s—nearly all of which can be traced to an unreliable source whose testimony is inadmissible hearsay (**al Fadl**)— that this Court previously concluded did not "bear any definite and specific, articulable connection to the 9/11 Attacks or those who carried them out"; (2) discrete employee policy violations with no discernable link to Al Qaeda or the 9/11 Attacks (*supra* Background, Section V.D.1); and (3) speculative or conclusory assertions that **Mujil** funded terror or that IIRO has "connections" to (a) unrelated events (like the Bojinka Plot); (b) purported intermediaries (like **ASG** and **MILF** and **JI**); or (c) ex-employees who left IIRO long before 9/11 or whose alleged conduct long pre-dates or post-dates 9/11 (like **Khalifa**) that Plaintiffs allege are somehow linked to Al Qaeda (*supra* at Background, Section V.D.4). Discovery failed to substantiate Plaintiffs' contrived "connections" to Al Qaeda because, on many points, there is simply no evidence, and on other points, any purported evidence consists almost entirely of inadmissible hearsay and unsourced or unsubstantiated conclusory assertions, with no definitive findings of wrongdoing by IIRO. *Supra* at Background, Section V.D. Indeed, of the two sources of definitive findings about those who participated in the 9/11 Attacks or financed or otherwise supported Al Qaeda, neither named IIRO among the entities that had a role in 9/11 or that financed Al Qaeda. SOF ¶¶ 1-6, 46, 93, 132, 148, 163, 481, 484-86, 488-92.

But even if the Plaintiffs' purported connections could be established through reliable, admissible evidence (which they cannot), *they still are insufficient*. At best, Plaintiffs can show a vague and unspecified "connection" years before the attacks, but they still cannot show an

---

[107] *Taamneh*, 598 U.S. at 490.

affirmative act by IIRO taken "*with the intent of facilitating*" the attacks.[108] The "connection" alone is not enough. Plaintiffs cannot make the required showing because *even if* they manage to identify an affirmative act by IIRO directed at a purported intermediary or third party,[109] and *even if* they can also show that purported intermediary or third party directed funding or other support to Al Qaeda in aid of the 9/11 Attacks (both of which they cannot do), there is ***no evidence*** that IIRO ***was aware before the 9/11 Attacks*** of any purported intermediary's or third party's alleged connection to Al Qaeda.[110] *Supra* Background, Section V.D.5.

## B.    IIRO Did Not Knowingly Assist Al Qaeda in Carrying out the 9/11 Attacks

As with Plaintiffs' direct liability claims, the absence of evidence that IIRO knew that Al Qaeda was planning the 9/11 Attacks is fatal to the aiding and abetting claims. Among the essential elements is the requirement that Plaintiffs prove IIRO's "general awareness" of its alleged role in illegal activity, as well as an even higher level of knowledge: that it "***knowingly*** and substantially assist[ed] the principal violation."[111] IIRO did not have "general awareness" that it was involved in unlawful conduct, and therefore it could not have "knowingly" assisted that conduct.[112] On this basis alone, summary judgment on Plaintiffs' aiding and abetting claims is appropriately granted. Beyond that, there is no evidence that IIRO knowingly provided substantial assistance (or any assistance) to Al Qaeda in the 9/11 Attacks.

---

[108] *Taamneh*, 598 U.S. at 490 (quoting *Rosemond v. United States*, 572 U.S. 65, 71 (2014)); s*ee also Smith & Wesson*, 605 U.S. at 281.

[109] *See Troell v. Binance Holdings Ltd.*, 2026 WL 636849, at *17 (S.D.N.Y. Mar. 6, 2026) ("That Defendants engaged in affirmative acts of misconduct does not end the inquiry . . . 'The fundamental question of aiding-and-abetting liability [is whether] defendants consciously, voluntarily, and culpably participate in or support the relevant wrongdoing.'") (quoting *Taamneh*, 598 U.S. at 505).

[110] *See Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 224 (2d Cir. 2019) (no aiding-and-abetting liability where defendant provided business services to third party but lacked plausible awareness that the third party, in turn, provided services to an FTO).

[111] *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 494 (2d Cir. 2021) (citing *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)); *accord Taamneh*, 598 U.S. at 495-96.

[112] *See King v. Habib Bank Ltd.*, 2023 WL 8355359, at *3 (S.D.N.Y. Dec. 1, 2023) ("The analysis of 'knowing' assistance as assistance that is neither innocent nor inadvertent goes beyond the 'general awareness' analysis."); *see also Averbach v. Cairo Amman Bank*, 2026 WL 865682, at *5 (S.D.N.Y. Mar. 30, 2026).

### 1.    IIRO Was Not "Generally Aware" of Its Alleged Role in Illegal Activity

There is no evidence that IIRO was "generally aware" that it had a role in *any* illegal activity, let alone that that illegal activity might lead to a terrorist attack. Absent such general awareness, Plaintiffs cannot establish an aiding and abetting claim.[113]

### a.    Plaintiffs Cannot Show a Direct Relationship Between IIRO and Al Qaeda

There is no evidence of any direct link between IIRO and Al Qaeda or the 9/11 Attacks, and Plaintiffs effectively must acknowledge this. Plaintiffs cannot trace a single dollar—or any other support—directly from IIRO to Al Qaeda. *See* SOF ¶¶ 2, 4-6, 32, 179-91, 213-14, 521, 525, 540-43. Plaintiffs also cannot show that IIRO was "generally aware" that any of its employees or agents was a member of or otherwise directly connected to Al Qaeda. Plaintiffs' allegations against IIRO focus on **Khalifa** and **Mujil.** But **Khalifa** left IIRO long before the 9/11 Attacks. *Id.* ¶ 53. This timing is fatal to Plaintiffs' theory, as is the lack of evidence that IIRO knew before 9/11 of *any* alleged connection between **Khalifa** and Al Qaeda. *Id.* ¶ 47. As to **Mujil**, there is no evidence that **Mujil** supported the 9/11 Attacks, no evidence substantiating allegations that **Mujil** funded or otherwise supported Al Qaeda (much less on behalf of IIRO); and no evidence that IIRO knew before 9/11 of *any* alleged connection between **Mujil** and Al Qaeda. *Id.* ¶¶ 90-94, 106-07.

These circumstances sharply contrast with those present in cases in which courts have found general awareness based on a *direct and knowing link* between the defendant and a terrorist group. Two recent cases illustrate this contrast. In *Finan v. LaFarge*, the Eastern District found that the defendants were "generally aware of their role as part of ISIS and ANF's overall scheme to attack the United States by murdering U.S. citizens" because they possessed clear evidence that ISIS was a terrorist organization, but nevertheless willingly continued to pay ISIS 20% of their

---

[113] *Ashley*, 144 F.4th at 438.

revenue.[114] And in *Hakimyar v. Habib Bank Ltd.*, Judge Schofield of this Court found that the defendant bank had general knowledge that the banking services it provided "were helping to facilitate the al-Qaeda Terror Syndicate's unlawful activities," based on its knowledge that the customers it provided banking services to had "well-documented, public links to al Qaeda," one customer was a "known al-Qaeda front," individual customers, including the founders of al-Qaeda, had been designated by **OFAC**, and the bank continued to provide non-routine services to these customers, with direct customer contact, while attacks were ongoing.[115] There are no similarities between the knowing conduct of the defendants in these cases and the conduct (or lack thereof) of IIRO.

### b. Plaintiffs Cannot Show General Awareness Through An Intermediary

Since Plaintiffs cannot show a direct connection between IIRO and Al Qaeda, they will likely assert that IIRO aided Al Qaeda through a purported "intermediary," that was in turn connected to Al Qaeda. General awareness can only be found in these circumstances if (1) the defendant was aware of the *intermediary's* connection to the terrorist organization before the attack; ***and*** (2) the intermediary was "so closely intertwined with" the terrorist organization's "violent terrorist activities that one can reasonably infer" that the defendant "was generally aware of its role in unlawful activities from which the attacks were foreseeable."[116] Neither of these requirements is satisfied here.

Illustrating its scattershot approach, Plaintiffs have identified as possible "intermediaries" **ASG**, **MILF**, **JI**, and **SJRC**; however, there is no evidence that IIRO knew prior to 9/11—and to

---

[114] *Finan v. Lafarge S.A.*, 2025 WL 2504317, at *18 (E.D.N.Y. Aug. 29, 2025).

[115] *Hakimyar v. Habib Bank Ltd.*, 2025 WL 605575, at *7 (S.D.N.Y. Feb. 25, 2025).

[116] *Id.*, at *6 (quoting *Honickman*, 6 F.4th at 499). *See also Lavi v. UNRWA USA Nat'l Comm., Inc.*, 2025 WL 2300038, at *4 (D. Del. Aug. 8, 2025) (plaintiffs cannot rely on alleged events that occurred after the relevant attack to show general awareness via intertwinement).

the extent that IIRO had any relationship at all with these organizations—that any was connected to Al Qaeda. *See id.* ¶¶ 47-49, 94-96, 133-34, 149-50, 157-59, 164, 324. Furthermore, there is no evidence that these organizations themselves knew about or supported the 9/11 Attacks. *Id.* ¶¶ 129-31, 145-47, 160-62, 325. Any contact between IIRO and these purported "intermediaries" was at best extremely limited and unconnected in time or space to the 9/11 Attacks. General awareness often cannot be shown where, as here, at the time of the defendant's acts, there was no record of the connection between the intermediary and the terrorist group. In this case, there is also no basis to suggest that IIRO otherwise had knowledge of these organizations' activities.[117] *Id.* ¶¶ 134, 139-41, 149-50, 156-59, 168-72, 315-24. There was no public information about any alleged ties between **MILF**, **JI**, or **SJRC** and Al Qaeda prior to 9/11. *See id.* ¶¶ 133-34, 136, 173-74, 324. **ASG** was designated as an FTO in 1997, but Plaintiffs do not allege any connection between IIRO and **ASG** after that designation. *Id.* ¶¶ 149, 151, 231-42. Therefore, there is no basis on which to conclude that IIRO was generally aware of its role in any terrorist activities of Al Qaeda years later through intermediaries halfway around the world.

Plaintiffs also cannot satisfy the second requirement for a finding of general awareness through an intermediary. None of the purported intermediaries could have been "so closely intertwined with" Al Qaeda's "violent terrorist activities" that it can be "reasonably infer[red]" that IIRO was aware of its role in terrorist activities from which the 9/11 Attacks were foreseeable, particularly given that the purported intermediaries were regional separatists focused on local issues. *Id.* ¶¶ 138, 143-44, 154, 165-67, 315-16.

These are not remotely the types of circumstances that courts have found to satisfy the second prong of the general awareness test. In *Bonacasa v. Standard Chartered PLC,* Judge Ramos

---

[117] *Ashley*, 144 F.4th at 440 (dearth of public records linking persons to terror at time of defendant's actions disproves general awareness); *Lavi*, 2025 WL 2300038, at *6 (public record at time disproved general awareness).

of this Court found the defendant bank to be generally aware of its role in terrorist activity because it continued to provide "specialized, individualized financial services" to the manufacturer of the main explosive ingredient in IEDs *after it was specifically informed by U.S. government officials* that those financial services were enabling the manufacturer to continue to supply the explosive material to Al Qaeda, which it was using in attacks on U.S. service members.[118] Likewise, in *Zobay v. MTN Group Ltd.*, the Court found general awareness through an intermediary where the defendant telecommunications company went into business with Iranian companies *known to be fronts* for the military side of the IRGC (an Iranian military unit)—which was publicly connected to support for terrorism—to provide funding, embargoed American technologies, and logistical support to the IRGC's terrorist proxies.[119] In both cases, and unlike here, the defendant knew about the connection between the intermediary and the terrorist group, and the intermediary was closely intertwined with the terrorist group's violent terrorist activities.[120]

Finally, courts have concluded that general awareness cannot be shown where (i) claims are based on the fungibility of money, or (ii) the defendant ceased an activity a significant time before the terrorist attack occurred.[121] As the Second Circuit held in *Ashley*, "[a] '[central] tenet of JASTA aiding-and-abetting liability is…that the defendant is not liable for the principal's wrong without understanding, to some extent, the foreseeable consequences of the defendant's actions. A fungibility theory would 'evade' that principle entirely."[122] Even if Plaintiffs could identify a

---

[118] *Bonacasa v. Standard Chartered PLC*, 2023 WL 7110774, at *10 (S.D.N.Y. Oct. 27, 2023).

[119] *Zobay v. MTN Grp. Ltd.*, 695 F.Supp.3d 301, 343 (E.D.N.Y. 2023).

[120] *Id.* at 340.

[121] *Ashley*, 144 F.4th at 444 (fungibility), 447 (ceased activity one year prior to attacks); *see also Siegel*, 933 F.3d at 224 ("[P]laintiffs concede that, in January 2005—ten months before the November 9 Attacks—HSBC ceased doing business with ARB altogether. HSBC's decision not to provide banking services to ARB for the ten months preceding the November 9 Attacks makes it implausible under the circumstances that HSBC had knowingly assumed a role in the Attacks.").

[122] *Ashley*, 144 F.4th at 444 (internal citation omitted). The *Fraenkel v. Standard Chartered Bank* court nested this fungibility analysis in its nexus discussion within the knowing and substantial assistance element. 2025 WL 2773251, at *10 (S.D.N.Y. Sept. 26, 2025). However, the analysis and outcome are the same, and no liability can attach.

transaction flowing from IIRO through an intermediary to Al Qaeda (which they cannot), that transaction would constitute nothing more than the type of "attenuat[ed]" support that the *Ashley* court rejected.[123] Moreover, the vast majority of the purported links long pre-date the 9/11 Attacks and any such asserted link would, as a matter of law, be far too remote.[124]

### 2.    IIRO Did Not Knowingly and Substantially Assist the 9/11 Attacks

Even if Plaintiffs could show that IIRO knew that Al Qaeda was planning the 9/11 Attacks, their inability to show "knowing and substantial assistance" would also be fatal to their aiding and abetting claims. The "knowing and substantial assistance" element of an aiding and abetting claim is intended "to capture the defendants' state of mind with respect to their actions."[125] It has two prongs, which should be considered "in tandem" and operate on a paired sliding scale: a lower level of knowledge can be overcome with a high level of assistance (and vice versa).[126] But neither can be shown here, let alone a high level of one or the other to balance out a minimal showing on the other side of the scale. To determine whether a defendant's assistance was knowing and substantial, courts consider six factors, focusing on the "common conceptual core" that animates the inquiry into whether the defendant "***consciously and culpably*** participated in" the specific terrorist act that injured the plaintiffs "so as to help make it succeed:"[127] (1) the nature of the act assisted, (2) the amount of assistance provided, (3) whether the defendant was present at the time of the principal tort, (4) the defendant's relation to the tortious actor, (5) the defendant's state of mind, and (6) the duration of the assistance given."[128]

---

[123] *Ashley*, 144 F.4th at 444.

[124] *See id.* at 447 (ceased activity one year prior to attacks); *Siegel*, 933 F.3d at 224 (ten months before attacks).

[125] *Troell*, 2026 WL 636849, at *17 (quoting *Ashley*, 144 F.4th at 438).

[126] *Ashley*, 144 F.4th at 438 (quoting *Taamneh*, 598 U.S. at 491-92).

[127] *Taamneh,* 598 U.S. at 492-93 (emphasis added) (quotations omitted). Also, the "act of international terrorism" must have been "committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under [8 U.S.C. § 1189] as of the date on which such act of international terrorism was committed, planned, or authorized." *Taamneh*, 598 U.S. at 484 (alteration in original) (quoting 18 U.S.C. §§ 2333(a), (d)(2)).

[128] *Id.* at 486.

If Plaintiffs cannot establish general awareness, they certainly cannot go even further to establish that IIRO **knowingly** and substantially assisted the 9/11 Attacks.[129] As to IIRO's "state of mind," the record is clear: *IIRO did not know about the 9/11 Attacks or that any alleged assistance it provided (it provided none) would assist Al Qaeda in carrying out the 9/11 Attacks or any other terrorist attacks.* And even if IIRO should have known that something it did would have assisted Al Qaeda, that would not be enough. Courts have explicitly rejected the argument that this requirement is satisfied where the defendant "should have known" but did not actually know about a future terrorist attack.[130] Without actual knowledge, the knowing and substantial assistance element cannot be established.[131]

Plaintiffs also cannot show any assistance, let alone substantial assistance at a high enough level to overcome the absence of any knowledge. As discussed above (Background, Section IV), IIRO was not present at the 9/11 Attacks and was not involved in their planning or execution. It also did not finance or otherwise have any direct connection to Al Qaeda. The only acts that IIRO is alleged to have taken were not directly connected to Al Qaeda or substantially predate the planning of the 9/11 Attacks, and even the formation of Al Qaeda itself. *See supra* at Background, Section V.A., B. The allegations of indirect connections through purported "intermediaries" like **ASG**, **MILF**, **JI, and SJRC** cannot be substantiated with admissible evidence despite decades of investigation and discovery and are too attenuated. *See supra* at Background, Section V.D.5.

Thus, if it could be said that IIRO assisted the 9/11 Attacks at all—which it did not—that

---

[129] *See King v. Habib Bank Ltd.*, 2023 WL 8355359, at *3 ("The analysis of 'knowing' assistance as assistance that is neither innocent nor inadvertent goes beyond the 'general awareness' analysis."); *see also Averbach*, 2026 WL 865682, at *5.

[130] *Brill v. Chevron Corp.*, 2018 WL 3861659, at *3 (N.D. Cal. Aug. 14, 2018) (claim that defendant "should have known that it was contributing to terrorism and chose to ignore the possible consequences … is in effect an allegation of recklessness, but JASTA requires more"); *accord Freeman v. HSBC Holdings PLC*, 465 F.Supp.3d 220, 233 (E.D.N.Y. 2020).

[131] *See Parizer v. AJP Educ. Found., Inc.*, 2025 WL 2382933, at *19 (E.D. Va. Aug. 15, 2025) ("Plaintiffs do not even allege sufficient facts to plausibly show that Defendants had prior knowledge of the October 7, 2023 attack.").

56

assistance was not conscious or culpable, but rather unintentional and innocent. IIRO did not know it was playing a role in terrorist activities, because it did not have one. All of the knowing and substantial assistance factors point to the same conclusion: IIRO could not have "consciously and culpably participated in" the 9/11 Attacks because it was not involved in the attacks and it did not know that any alleged assistance it provided would assist Al Qaeda in carrying out the attacks.

By contrast, in *Bonacasa*, defendants were warned—in person—by the U.S. government that they were funding the manufacture of chemicals used for IEDs and still chose to fund the facilities making the chemicals.[132] And in *Zobay*, the defendant spearheaded procurement efforts for embargoed dual-use technologies that assisted terrorist campaigns, facilitated a steady flow of funds to the IRGC, populated a floor of its offices with military intelligence, and continued to work with the entity after its designation as an FTO.[133] There is no such evidence of conscious and culpable conduct present here.

### C. There Is No Nexus Between IIRO's Acts and the 9/11 Attacks

These fatal deficiencies in Plaintiffs' aiding and abetting claim are compounded by Plaintiffs' inability to show a "concrete nexus" between IIRO's affirmative and intentional conduct (of which there is none) and the commission of the 9/11 Attacks.[134] The absence of a "concrete nexus" cannot be overcome by showing that IIRO assisted terrorist activities generally.[135] Yet this is exactly what Plaintiffs seek (and fail) to show, contending that IIRO contributed generally to Al Qaeda's "global strike capabilities," rather than the 9/11 Attacks specifically. This focus on IIRO's

---

[132] 2023 WL 7110774, at *11.

[133] 695 F.Supp.3d at 346.

[134] *Taamneh*, 598 U.S. at 501.

[135] *See Ashley*, 144 F.4th at 444 ("[I]t is not enough to say that the defendant assisted the terrorist organization's 'activities in general.'") (citing *Taamneh*, 598 U.S. at 503); *id.* at 448 ("defendant must aid and abet a specific act"); *see also See Parizer*, 2025 WL 2382933, at *23 ("Under *Taamneh*, allegations of 'systemic' support do not circumvent the necessity to sufficiently allege 'defendants actually aided and abetted each tort of that enterprise.'") (quoting *Taamneh*, 598 U.S. at 506).

alleged contributions to Al Qaeda's "global strike capabilities," effectively concedes what is apparent from the evidence: Plaintiffs cannot show the "concrete nexus" that the law requires.

As discussed in Argument, Section I., the Court has already found that the required nexus is lacking because the same stale allegations of IIRO's (and other charities') actions, do not "bear any definite and specific, articulable connection" to the 9/11 Attacks or Al Qaeda.[136] There is no basis to reach a different conclusion now.[137] Moreover, this Court has already decided that actions taking during the mid-1990s and earlier are too far removed in time from 9/11 to establish a nexus to the 9/11 Attacks.[138] At best, Plaintiffs' strands of "evidence", if credited, show discrete acts by IIRO personnel all years before 9/11, several steps removed from Al Qaeda, and involving unrelated individuals or organizations spread across the globe.[139] Even if IIRO had contributed to Al Qaeda's "global strike capabilities" (it did not), such general assistance to Al Qaeda would not satisfy the "concrete nexus" requirement.[140]

Courts have squarely rejected aiding and abetting claims even where there is a much clearer nexus than alleged here. For example, in *Finan*, the Eastern District found that the defendant was

---

[136] *Terrorist Attacks XIV*, 298 F.Supp.3d at 658-59.

[137] *See Arcapita Bank*, 640 B.R. at 616 (prior decision is law of the case).

[138] *Terrorist Attacks XIV*, 298 F.Supp.3d at 659; *Terrorist Attacks IV*, 718 F.Supp.2d at 472, 486-87; *Terrorist Attacks XIV*, 298 F.Supp.3d at 652; *Terrorist Attacks XIII*, 295 F.Supp.3d 416, 429-30l *In re Terrorist Attacks on Sept. 11, 2001,* 2023 WL 2430381, at *12 (withdrawals and deposits from account in 1990s too remote); *Terrorist Attacks XIV*, 298 F.Supp.3d 631, 652 (S.D.N.Y. 2018) (work at Saudi Embassy prior to 1993 too remote); *In re Terrorist Attacks on Sept. 11, 2001*, 840 F.Supp.2d 776, 782 (S.D.N.Y. 2012) (alleged support in 1993 "too temporally remote"); *Terrorist Attacks IV*, 718 F.Supp.2d at 483, 486-87 (alleged provision of support "in the early 1990's" and in Al Qaeda's "formative years" too remote).

[139] *Lavi*, 2025 WL 2300038, at *8 (citing *Taamneh*) ("[Complaint does not allege that any of Defendant's aid was transferred to Hamas or otherwise used in connection with the October 7th attack. To hold Defendant liable under an aiding-and-abetting theory, Plaintiffs must show that there exists a nexus between Defendant's aid and the October 7th attack.").

[140] *Ashley*, 144 F.4th at 444; *Taamneh*, 598 U.S. at 489-90, 493, 495, 501. Some courts place the nexus analysis in the third element. *See, e.g., Fraenkel*, 2025 WL 2773251, at *10. Whether analyzed as a component of knowing and substantial assistance or otherwise, the conclusion is the same: there is no nexus between MWL's acts and the 9/11 Attacks. *See id.* ("Plaintiffs argue that the connection is explained by the following: 'SCB here provided services to terrorist fronts under IRGC control, and IRGC systematically used such fronts to finance the attacks that killed or injured Plaintiffs.' Far from demonstrating a concrete nexus, however, Plaintiffs' theory of liability would 'hold SCB liable for all the torts of an enterprise,' but without the corresponding "pervasive and systemic" support of terroristic activities that *Twitter* demands.") (cleaned up).

generally aware of its role in a terrorist scheme to attack the United States, but still rejected aiding and abetting liability because, though defendants made regular payments to ISIS while knowing they were a terrorist organization, plaintiffs had failed to allege that defendants "culpably associated themselves" with the specific attacks that caused injury to Plaintiffs.[141] And in *Frankel*, Judge Garnett of this Court rejected allegations similar to those here, concluding that no nexus existed where a bank "assisted its customers with both routine and fraudulent financial transactions," and those "customers were agents or fronts for organizations or government entities that then funded the FTOs that then committed the Attacks that injured Plaintiffs."[142] If there was no nexus in these cases, there cannot be one here.

### D.    IIRO Did Not Provide Pervasive and Systemic Support to Al Qaeda

If Plaintiffs cannot show the required "concrete nexus" between IIRO and the 9/11 Attacks, but instead can only show "a broad category of misconduct" (which they also cannot do), Plaintiffs must meet a "high bar" and establish that IIRO provided "pervasive, systemic, and culpable" aid, such that it aided every wrongful act of Al Qaeda.[143] Plaintiffs cannot meet this "drastically increase[d]" burden,[144] because IIRO did not "affirmatively g[i]ve aid that would assist each of [Al Qaeda's] terrorist acts" or "form[] a near-common enterprise" with Al Qaeda.[145] Absent evidence of any direct link between IIRO and Al Qaeda, or any involvement by IIRO in any terrorist attack carried out by Al Qaeda, there is no basis to conclude that the organizations were

---

[141] *Finan*, 2025 WL 2504317, at *19 ("Indeed, the Complaints do not allege any concrete connection between the attacks and any of the alleged payments that Defendants made to ISIS or ANF."); *see also Parizer*, 2025 WL 2382933, at *19 ("[T]he further inferences leading to Plaintiffs' ultimate conclusion that Defendants both knew of the October 7, 2023 attack before it happened and contributed to the attack such that they may be held liable for it, are not supported by any non-conclusory factual allegations in the Amended Complaint."); *Ashley*, 144 F.4th at 447 (no aiding and abetting liability where alleged support ceased one year prior to attacks); *Siegel*, 933 F.3d at 224.

[142] *Fraenkel*, 2025 WL 2773251, at *9.

[143] *Ashley*, 144 F.4th at 445 (quoting *Smith & Wesson*, 605 U.S. at 292); *see also Long v. MTN Grp. Ltd.*, 2025 WL 2827899, at *6 (E.D.N.Y. Sept. 25, 2025) (citing *Taamneh*, 598 U.S. at 496).

[144] *Taamneh*, 598 U.S. at 503; *see also Ashley,* 144 F.4th at 445 (describing required showing as "high bar").

[145] *Taamneh*, 598 U.S. at 502.; *Parizer*, 2025 WL 2382933, at *23 (plaintiff must show defendant aided and abetted each tort of enterprise).

involved in a "near-common enterprise."

Allegations of indirect assistance to terrorist groups via intermediaries are not sufficient. In *Fraenkel*, the plaintiff failed to establish "pervasive and systemic" support where the defendant allegedly provided financial services to non-FTOs connected to entities known to support terrorist activities, but had no direct role in the attacks and provided no direct aid to the perpetrator.[146] Pervasive and systemic support cannot be shown where, "[e]ven under the most generous reading of the allegations there are several steps between any conduct by [the defendant] and the actions of those who directly perpetrated the Attacks."[147] Other decisions highlight the lack of pervasive assistance here. In *Zobay*, the plaintiffs sufficiently pleaded pervasive assistance because the defendant provided "many millions of dollars in funding, embargoed dual-use technologies, and operational or technical support," created a "joint venture with a known terrorist front," and took up "a leadership role" in a procurement scheme, while knowing that a significant portion of its annual profits would flow to the IRGC and ultimately be used to fund terrorist operations."[148] In *Kaplan*, the defendant bank directly assisted with laundering money for clients who were "clearly and publicly identified as part of the terrorist organization."[149]

Finally, "pervasive and systemic" assistance must also be "*culpable*"—in other words, "designed or performed with the intent to aid" the commission of terrorism.[150] Even in *Ashley*, culpability could not be established, even though the defendant bank's money laundering operations opened its "doors to criminals with ties to terrorists to clean their money—a portion of

---

[146] *Fraenkel*, 2025 WL 2773251, at *10.
[147] *Id.*
[148] *Zobay,* 695 F.Supp.3d at 348.
[149] *Ashley,* 144 F.4th at 445 (citing *Kaplan II*, 999 F.3d 842, 858, 865 (2d. Cir 2021)).
[150] *Id*. (emphasis added); *see also UMG Recordings, Inc. v. Grande Commc'ns Networks, L.L.C.,* 118 F.4th 697, 714 (5th Cir. 2024), *vacated on other grounds sub nom. Grande Commc'ns Networks v. UMG Recordings, Inc.*, 2026 WL 922501 (U.S. Apr. 6, 2026) (holding that, under *Twitter,* "when no direct nexus exists," "participation through intentional aid" is required).

which was likely to end up in the [terrorist organization's] pile of resources."[151] If the *Ashley* plaintiffs could not establish the required pervasive, systemic, and culpable support, Plaintiffs here clearly cannot do so either.[152]

## IV. IIRO Did Not Conspire to Commit the 9/11 Attacks

For the same reasons that Plaintiffs' direct liability and aiding and abetting claims fail, Plaintiffs cannot succeed on their conspiracy claims. To prove a conspiracy, Plaintiffs must show that there was an agreement between two or more persons to participate in an unlawful act and an unlawful, overt act that results in an injury.[153] The co-conspirators must have shared a "common intent," and the overt acts must have furthered the conspiracy.[154] In addition, Plaintiffs must show that the defendant conspired with the principal tortfeasor,[155, 156] and that it "kn[e]w the wrongful nature of the primary actor's conduct" and intentionally participated in it.[157] Since conspiracy liability under JASTA is tied to an ATA violation, Plaintiffs in this case must also show that the

---

[151] *Ashley*, 144 F.4th at 445 (quoting *Taamneh*, 598 U.S. at 502).

[152] *See Parizer*, 2025 WL 2382933, at *23 ("Under *Taamneh*, allegations of 'systemic' support do not circumvent the necessity to sufficiently allege 'defendants actually aided and abetted each tort of that enterprise.'").

[153] *O'Sullivan v. Deutsche Bank AG*, 2018 WL 1989585, at *5 (S.D.N.Y. Apr. 26, 2018).

[154] *Freeman v. HSBC Holdings PLC*, 57 F.4th 66, 80 (2d Cir. 2023), *cert. denied,* 144 S. Ct. 83 (2023) (common intent required); *id.* at 82 (foreseeability insufficient) ("that certain conduct may be the natural and foreseeable consequence of [a] conspiracy is . . . not enough to meet the in-furtherance-of requirement at the heart of a conspiracy claim.").

[155] *See Taamneh*, 598 U.S. at 489–90 (noting that "conspiracy…require[s] [an] agreement with the primary wrongdoer to commit wrongful acts"); *Kaplan II*, 999 F.3d at 855 ("JASTA states that to be liable for conspiracy a defendant would have to be shown to have 'conspire[d] with' the principal) (quoting 18 U.S.C. § 2333(d)(2)); *O'Sullivan*, 2018 WL 1989585, at *7 (JASTA "requires a defendant to conspire with the person who committed an act of international terrorism") (cleaned up).

[156] *Freeman*'s observation that conspiracy does not require this direct relationship with the principal is dicta and incorrect. 57 F.4th at 84-85 (Jacobs, J., concurring). Two years earlier the Second Circuit reached the opposite conclusion. *Id.* at 85 n.3 ("The Majority acknowledges that in [*Kaplan II*, 999 F.3d at 855] we emphasized that 'JASTA states that to be liable for conspiracy a defendant would have to be shown to have 'conspire[d] with' the principal.'"). And the Supreme Court then clarified that conspiracy liability requires an agreement with the principal wrongdoer. *Taamneh*, 598 U.S. at 489–90. *See In re Arab Bank, PLC Alien Tort Statute Litig.,* 808 F.3d 144, 154-55 (2d Cir. 2015) (courts must follow intervening Supreme Court precedent where there is "a conflict, incompatibility, or inconsistency between this Circuit's precedent and the intervening Supreme Court decision").

[157] *Pittman by Pittman v. Grayson*, 149 F.3d 111, 123 (2d Cir. 1998) (NY state law); *see also Bigio v. Coca-Cola Co.*, 675 F.3d 163, 176 (2d Cir. 2012) (conspiracy requires "parties' intentional participation in the furtherance of a plan or purpose"); *Moss v. First Premier Bank*, 2024 WL 4274780, at *15 (E.D.N.Y. Aug. 2, 2024) (in RICO action, conspirator must have "intent to commit the offenses that are its object, that is, with the affirmative intent to make the conspiracy succeed") (citation & subsequent history omitted); *O'Sullivan*, 2018 WL 1989585, at *5 ("[C]onspiracy involves an agreement to participate in a wrongful activity.").

61

defendant "agreed to commit terrorist acts to intimidate civilians and influence U.S. policy."[158]

Plaintiffs' inability to show that IIRO knew about and intended to support the 9/11 Attacks is not only fatal to their direct liability and aiding and abetting claims, but also to their conspiracy claims. Their conspiracy claims also fail because they cannot show that IIRO entered into any agreement with Al Qaeda to commit the 9/11 Attacks or otherwise. Even if an agreement with an intermediary, rather than with Al Qaeda, were enough, which it is not, Plaintiffs also cannot prove that IIRO conspired with anyone else to commit the 9/11 Attacks.[159]

Plaintiffs also cannot show a common intent between IIRO and Al Qaeda. IIRO was dedicated to working to counter the anti-western ideologies of **Bin Laden**, Al Qaeda, and other affiliated terrorist groups, and it denounced acts of terrorism. SOF ¶¶ 184-99, 209, 212 448-50. There is no evidence that IIRO intended to support an attack on the United States or otherwise to support Al Qaeda's objectives.[160] To the extent that Plaintiffs could show that IIRO inadvertently supported Al Qaeda in some way, this would not support a finding of common intent.[161]

---

[158] *In re Terrorist Attacks on Sept. 11, 2001*, 2022 WL 4227151, at *26 ("Applying this to the ATA, § 2333(d) provides for liability with those who 'conspire with the person who committed an act of international terrorism.' Acts of terror, in turn, involve dangerous or violent acts designed to intimidate civilians and influence government policy. 18 U.S.C. § 2331(1). Sudan and Al Qaeda must therefore have agreed to commit terrorist acts to intimidate civilians and influence U.S. policy.") (cleaned up).

[159] *See O'Sullivan*, 2018 WL 1989585, at *7 (finding conspiracy allegations insufficient because they "do not show a conspiracy or agreement between any defendant and a [FTO] as opposed to a conspiracy or agreement between a defendant and Iran or the Agents and Proxies sponsoring such organizations") (emphasis in original).

[160] *See Freeman*, 57 F.4th at 80 (concluding that there was no common intent between defendant banks and terrorist groups where there was no allegation "that the Banks intended to kill or injure U.S. service members"); *Ofisi v. BNP Paribas, S.A.*, 77 F.4th 667, 672 (D.C. Cir. 2023) (concluding that the defendant bank's goal of evading U.S. sanctions was fundamentally different from Al Qaeda's goal of committing embassy bombings, and such orthogonal objectives could not sustain a conspiracy); *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 873 (D.C. Cir. 2022) (finding no conspiracy where "HSBC was trying to make 'substantial profits' by evading sanctions, whereas al-Qaeda sought to 'terrorize the U.S. into retreating from the world stage'; 'use long wars to financially bleed the U.S. while inflaming anti-American sentiment'; 'defend the rights of Muslims'; and 'obtain global domination through a violent Islamic caliphate,'" as "[t]hese objectives are wholly orthogonal to one another.").

[161] *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 175 F.Supp.2d 593, 634 (S.D.N.Y. 2001) ("Accidental, inadvertent, or negligent participation in a common scheme does not amount to a conspiracy."); *Moss*, 2024 WL 4274780, at *16 (finding evidence that defendant "negligently aided in [another]'s scheme" unavailing [b]ecause conspiracy requires specific intent.").

## V.   IIRO Is Not Liable for Any Actions Taken By Employees When They Were Not Employed by IIRO or that Were Outside the Scope of their Employment

There is also no evidentiary basis to conclude that IIRO is liable for any alleged tortious conduct by individuals who were not in fact employed by IIRO at the time, or by employees who acted against IIRO's interests and outside of the scope of their employment. Under New York law, an employer is not vicariously liable for the tortious acts of its employees unless those acts were committed in furtherance of the employer's business and within the scope of employment.[162] "Courts consider five factors in making a scope of employment determination: (1) whether the time, place and occasion for the act was connected to the employment; (2) the history of the employer-employee relationship in actual practice; (3) whether the act is one commonly done by such an employee; (4) the extent to which the act departs from normal methods of performance; and (5) whether the specific act was one that the employer could reasonably have anticipated."[163] The fact that the employee's conduct was unauthorized by the employer or contravened the employer's instructions is relevant under the fourth factor.[164] Likewise, under the fifth factor, which is the "most important,"[165] an employer is not reasonably expected to foresee an "egregious" or "flagrant and unjustified" violation of its policies.[166] Similarly, the diversion of the employer's funds for the benefit of the employee or a third party, at the employer's expense, does not further the employer's business,[167] and is "not imputable to the[] employer[]."[168]

---

[162] *In re Terrorist Attacks on Sept. 11, 2001*, 2025 WL 2485427, at *18 (S.D.N.Y. Aug. 28, 2025) (citing *Monterey Bay Mil. House., LLC v. Ambac Assurance Corp.*, 531 F.Supp.3d 673, 710 (S.D.N.Y. 2021)).

[163] *Id.,* at *19 (citing *Riviello v. Waldron*, 47 N.Y.2d 297, 303 (1979)).

[164] *Rivera v. State*, 34 N.Y.3d 383, 391 (2019).

[165] *In re Terrorist Attacks*, 2025 WL 2485427, at *20.

[166] *Rivera*, 34 N.Y.3d at 391.

[167] *See In re Parmalat Sec. Litig.* ("*Parmalat III*"), 684 F.Supp.2d 453, 472-73 (S.D.N.Y. 2010).

[168] *In re Parmalat Sec. Litig.* ("*Parmalat II*"), 659 F.Supp.2d 504, 518 (S.D.N.Y. 2009); *aff'd in part, vacated in part on other grounds,* 412 F. App'x 325 (2d Cir. 2011); *see also Bondi v. Bank of Am. Corp. (In re Parmalat Sec. Litig.)*, 383 F.Supp.2d 587, 599 (S.D.N.Y. 2005) (theft from corporation not imputed to corporation).

As part of its theory of indirect connections between IIRO and Al Qaeda generally and its concocted "global strike capabilities" theory, Plaintiffs have alleged that **Khalifa, Daguit, Mujil, Butairi** and **Jasim** provided material support to Al Qaeda. Even if the admissible evidence supported Plaintiffs' assertion (it does not), it would still not permit attribution of any such actions to IIRO. **Mujil** worked at IIRO-EP from 1989 to 2006, including as Executive Director. Plaintiffs' claim that he funneled donations collected by IIRO to Al Qaeda is not supported by admissible evidence, and even if it were, it would not have been within the limited scope of his employment.[169] IIRO could not have reasonably foreseen any alleged tortious conduct by **Mujil**. The organization imposed limits on his authority, following policy violations by his predecessor. To the extent that he found a way around those limits without IIRO's knowledge, his actions would have been at IIRO's expense and in violation of its policies, not in furtherance of its business.

Plaintiffs allege that **Khalifa** collected and laundered money for Al Qaeda's operations and built a school to indoctrinate students into jihadism.[170] Even if Plaintiffs could establish these allegations through admissible evidence (they cannot), this conduct would not have been within the scope of **Khalifa's** position with IIRO. There is no evidence that **Khalifa** engaged in these activities from IIRO's offices, during work hours, or using IIRO funds, nor is there any suggestion that IIRO knew or approved of these activities. SOF ¶¶ 67-73, 87-89. Any support for terrorism would have been anathema to IIRO's objectives and would have violated IIRO's policies.

Plaintiffs also assert that **Butairi** and **Jasim** provided material support to Al Qaeda, but the evidence does not support this assertion. Instead, it shows that **Butairi** and **Jasim** embezzled IIRO funds for their own personal gain. *Id.* ¶ 335. The thefts were clearly outside of the scope of **Butairi's** and **Jasim's** employment and not authorized by IIRO. Immediately upon learning of the

---

[169] SOF ¶ 97.
[170] Compl. ¶ 229

thefts, IIRO engaged external auditors to investigate and filed criminal charges, *id.* ¶¶ 341-49, reinforcing that this conduct was at IIRO's expense and not in furtherance of its business.

This Court has applied the scope-of-employment requirement strictly in this litigation and has only found them satisfied where an employee's employment involved helping terrorists.[171] The circumstances here are akin to those in which the Court has rejected employer liability in this MDL. The Court found that the head of the Islamic Affairs Office in the Saudi Embassy in Germany was *not* acting within the scope of his employment when he met in-person with the plotters of the 9/11 Attacks in Hamburg in 2000, despite the overlap in time, place, and (at a very high level) religion between the individual's employment and the tortious conduct.[172] On the other hand, this Court recently found that two individuals employed by Saudi Arabia as an accountant and missionary were acting within the scope of their employment when they *helped the hijackers establish themselves in the United States* shortly before 9/11, because "the total evidence creates a reasonable inference that the[ir] employment was more than what their official job titles suggest," and their actual roles with the Saudi Government "had some connection with assisting the hijackers."[173] None of that occurred here. To the extent that any employees may have done anything to assist Al Qaeda or the 9/11 Attacks while they were employed by IIRO (and there is no such credible evidence) IIRO did not know about it, could not have foreseen it, and certainly did not condone it; Al Qaeda's plan to carry out the 9/11 Attacks was anathema to IIRO's mission.

## CONCLUSION

For these reasons, the Court should grant IIRO's motion for summary judgment.

---

[171] *In re Terrorist Attacks on Sept. 11, 2001* ("*Terrorist Attacks XI*"), 134 F.Supp.3d 774, 785-76 (S.D.N.Y. 2015), *vacated on other grounds* (enactment of JASTA), 2017 WL 8776686 (2d Cir. Feb. 7, 2017) (plaintiffs did not meet burden of showing that alleged Saudi government employees provided "material support" to 9/11 hijackers "within the scope of their office or employment").

[172] *Terrorist Attacks XIV*, 298 F.Supp.3d at 653; *see also id.* at 654 (rejecting a claim that missionary was working within the scope of his employment when allegedly establishing a charity as a fundraising front for Al Qaeda).

[173] *In re Terrorist Attacks,* 2025 WL 2485427, at *17-20.

April 15, 2026

Respectfully submitted,

*/s/ Aisha E. R. Bembry*

Eric L. Lewis
Aisha E. R. Bembry (admitted *pro hac vice*)
Sumayya Khatib (admitted *pro hac vice*)
Lewis Baach Kaufmann Middlemiss PLLC
1050 K St NW, Suite 400
Washington, DC 20001
Telephone: (202) 833-8900
Fax: (202) 466-5738
Email: eric.lewis@lbkmlaw.com
Email: aisha.bembry@lbkmlaw.com
Email: sumayya.khatib@lbkmlaw.com

*Counsel for Defendant International Islamic Relief Organization*