# EXHIBIT 06

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____
                                                           )
In re: Terrorist Attacks on                        )
September 11, 2001                                )          No. 03 MDL 1570 (GBD) (SN)
_____  )

This applies to:

*Ashton, et al. v. Al Qaeda Islamic Army, et al.*, *Case No.* 02-cv-6977;
*Burnett, Sr., et al. v. Al Baraka Investment & Development Corp., et al.*, Case No. 03-cv-9849;
*Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.*, Case No. 04-cv-7065;
*Salvo, et al. v. Al Qaeda Islamic Army, et al.*, Case No. 03-cv-05071;
*Continental Casualty Co., et al. v. A1 Qaeda et al.*, Case No. 04-cv-05970;
*Euro Brokers Inc., et al. v. Al Baraka, et al.*, Case No. 04-cv-7279;
*Federal Insurance Co., et al. v. A1 Qaida, et al.,* Case No. 03-cv-6978;
*O'Neill, Sr., et al. v. Al Baraka et al.*, Case No. 04-cv-1923;
*Maher, et al. v. Islamic Emirate of Afghanistan a/k/a The Taliban, et al.*, Case No. 1:23-cv-02845

## DECLARATION OF SAEED SARHAN

1.     I, Saeed Sarhan, hereby declare that I am over the age of eighteen years and of sound mind to make this declaration. I have personal knowledge of the facts set forth below. If called as a witness, I could and would testify to the statements and facts contained herein, all of which are true and accurate to the best of my knowledge and belief.

2.     I studied at the Hilwan University in Egypt attaining a Bachelor's degree in Accounting Business Management before entering the work force in 1983. I worked for private entities before joining the Secretariat General at the International Islamic Relief Organization ("IIRO"). IIRO's Head Office was located in Jeddah, Saudi Arabia, and was also known as the "Secretariat General." IIRO also had other local offices in Saudi Arabia as well as foreign offices in other countries. I have worked at IIRO since 1993, holding several positions in departments in the financial sector during my tenure, including Accountant from 1993 to 2000; Chief of Accounts from 2000 to 2006; Chief of Accounts Section from 2006 to 2013; and Auditor Prior to my dismissal from 2013 to 2019.

3.     In these roles I became familiar with IIRO employees and financial regulations, and several other topics, which I address herein. IIRO's regulations were revised and updated from time to time, and this declaration concerns the time period from my joining IIRO through December 31, 2004.

4.     As an international aid organization, IIRO provided humanitarian relief and sustainable development across the globe by offering clothing, medicine, shelter, healthcare, education, and more to individuals affected by natural disasters. IIRO frequently responded to large-scale humanitarian disasters, and enjoyed an outstanding reputation for its work.

1

5.    I joined IIRO because I believed in its mission and work. In my experience, my colleagues, worked hard to help those in need, consistent with IIRO's mission. I am proud of IIRO's humanitarian efforts and of my career at IIRO.

6.    During my tenure at IIRO, I did not observe and was not made aware of any behavior of Dr. Abdul Hamid al-Mujil that suggested he supported Al Qaeda's mission or that he was assisting Al Qaeda in any way, financially or otherwise.

7.    IIRO employees, including local and foreign office directors, were required to dedicate their working hours to their IIRO duties.

8.    IIRO employees, including local and foreign office directors, were not permitted to engage in or to use IIRO resources for personal commercial ventures, political activities, or violent, extremist, or terrorist activities.

9.    IIRO's local offices handled the collection of donations, and, in coordination with the Head Office, participated in planning IIRO's programs, preparing annual budgets, and conducting oversight of overseas programs and projects through field visits and follow up with the foreign offices.

10.   IIRO local offices provided a monthly report on general and earmarked donations to the Head Office's Financial Department and the relevant Head Office welfare department (e.g., Social Welfare, Healthcare Department, Education Department, etc.).

11.   Local offices were prohibited from sending funds directly to foreign offices or other affiliates.

12.   Local offices transferred donations to the Head Office, which in turn sent money to foreign offices for programs and projects that have been approved in the budget.

13.   Foreign office directors managed foreign office affairs, including by ensuring compliance with IIRO's financial guidelines and regulations (hereinafter, the "Protocols"), resolutions, and circulars (hereinafter, the "Directives").

14.   Under these Protocols and Directives, foreign office directors were, among other things, required to: (i) safeguard IIRO interests and preserve IIRO property, investments, and funds; and (ii) provide regular reports to Head Office regarding the office's performance, projects, programs, and employees.

15.   Under these Protocols and Directives, foreign office directors were, among other things, prohibited from: (i) exploiting their positions at IIRO for personal gain or advancing their personal interests at IIRO's financial or reputational expense; (ii) opening bank accounts without the Secretary General's prior approval; (iii) transferring funds between projects or using funds for purposes other than those they are allocated for without a prior written approval of the Secretary General; (iv) committing or promising funding to others; (v)

2

borrowing IIRO funds; (vi) selling, renting, or gifting IIRO assets or properties; (vii) taking business trips without the approval of Head Office; (viii) interfering in the politics of the host country or favoring a particular group; or (ix) participating in events or conferences without prior approval from the Secretary General.

16. IIRO foreign offices employed a Financial Officer, who served as the office's accountant or treasurer. IIRO established Protocols applicable to all Financial Officers throughout my tenure. The Head Office supplemented these Protocols, including via circulars and resolutions that it distributed from time to time.

17. The Financial Department at the Head Office coordinated, monitored and supervised the financial officers at the foreign offices by reviewing required documentation and reports submitted to it by the office directors under applicable regulations, and following up regarding those submissions.

18. Under these Protocols and Directives, Financial Officers had to apply particular accounting rules and principles to foreign office accounts and follow the Head Office's directives by, among other actions: (i) recording entries in daily ledgers and reconciling accounts; (ii) maintaining separate accounting records for each project, regularly recording the project's revenues and expenses, and creating the required accounting entries and then transferring them to the general ledger; (iii) preparing requests for payment and revenue documents and verifying the accuracy of invoices and statements; (iv) recording transactions in the general ledger at the end of each period; (v) reconciling bank accounts after receipt of monthly bank statements; (vi) participating in the yearly inventory of assets, including properties, and periodically conducting an inventory of cash as well as settlement of disbursements and advance payments for employees; (vii) providing a second signature on checks; (viii) preparing proposed annual budgets for programs; (ix) not engaging on behalf of IIRO in commercial projects or investments; (x) reviewing and auditing each project's revenues and expenses and preparing receipts, invoices, quarterly reports, and related financial documents for the Secretariat General; (xi) providing Head Office's Financial Department with an inventory of projects.

19. IIRO also regulated how foreign offices maintained cash and prohibited foreign offices from keeping more than US$1,000 in petty cash in local currency. When cash withdrawals in excess of this amount were needed, certain rules had to be followed, including (i) transferring the cash from the bank to the office safe during morning office hours; (ii) taking precautionary and security measures to handle the cash and its transfer; (iii) ensuring recipients or their representatives were present to receive the cash; (iv) returning any extra cash to the bank that same day.

20. IIRO implemented rules on the transfer of allocated funds between and within programs and projects; and any changes to allocated program budgets had to be approved by the Secretary General, and changes to allocated project budgets in the same program could be approved by program supervisors in the respective department at the Head Office. Programs covered areas such as health and social welfare and were comprised of specific projects to be implemented by IIRO foreign offices. Projects were specific projects under

3

each program; for example, the operation of vaccination and health clinics and the digging of wells.

21. IIRO donor funds earmarked for specific locations could not be transferred to another location except with the approval of the donor and the Secretariat General.

22. Head Office instructed foreign offices on how to spend funds according to the approved budget. In coordination with the Head Office, certain local offices were assigned specific foreign offices to oversee. In some instances, multiple local offices oversaw certain foreign offices in cooperation with the Head Office.

23. IIRO did not provide IIRO-sponsored missionaries with any benefits apart from a de minimis stipend.

24. IIRO regulations set expenditure rules including that: (i) funds could only be used to achieve IIRO's objectives; and (ii) disbursement from Head Office and branch offices had to correspond with previously approved budget items and be consistent with IIRO's financial regulations.

25. IIRO appointed an internal auditor who: (i) verified compliance with record keeping requirements and financial regulations and procedures; (ii) verified the accuracy of accounting records and financial, accounting, and statistical information; and (iii) certified year-end closing statements. The internal auditor was appointed by the Chairman of the Board and reported to the Chairman of the Board and the IIRO Secretary General.

26. IIRO also assigned an independent external auditor to audit IIRO's accounts. The external auditor reviewed books, records, and documents to prepare the end-of-year financial statements and the Statement of Activities.

27. IIRO also assigned external consultants to conduct comprehensive organizational and administrative studies of the systems that IIRO had in place, including the audit and control systems, the system for preparing budgets, and the financial processes. External consultants were also charged with drafting operating manuals for provisional budgets, internal auditing, financial and accounting processes.

28. IIRO conducted its own fundraising.

29. IIRO did not use hawala service to transfer funds.

30. During my tenure at IIRO, I did not observe the organization or anyone within the organization providing any support, tacit or explicit, to Al Qaeda or any other terror organizations. To my knowledge, IIRO did not knowingly employ any members of Al Qaeda or anyone known to be an Al Qaeda sympathizers.

4

I, Saeed Sarhan, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


[Signed]
_____

Saeed Sarhan


Signature Date: 8/10/1448 H

محكمة مقاطعة الولايات المتحدة

مقاطعة نيويورك الجنوبية

في القضية المتعلقة بهجمات إرهابية في 11 سبتمبر 2001        رقم *3 MDL 1570* (GBD) (SN)

يطبق على الاتي:

أشتون وآخرون ضد القاعدة الإسلامية العسكرية وآخرين، قضية رقم *02-cv-6977*؛

بورنت وآخرون ضد مؤسسة البركة للاستثمار والتنمية وآخرين، قضية رقم *03-cv- 9849* ؛

كانتور فيتزجرالد وشركانه وآخرون ضد بنك اكيدة الخاص (ش.م.م.) وآخرين، قضية رقم *04-cv-7065*؛

سالفو وآخرون ضد القاعدة الإسلامية العسكرية وآخرين، قضية رقم *03-cv-05071*؛

شركة كونتينينتال كاجولتي وآخرون ضد القاعدة وآخرين، قضية رقم *04-cv-05970*؛

يورو بروكرز إنك وآخرون ضد البركة وآخرين، قضية رقم *04-cv-7279*؛

شركة التأمين الفدرالي وآخرون ضد القاعدة وآخرين، قضية رقم *03-cv-6978*؛

أونيل وآخرون ضد البركة وآخرين، قضية رقم *04-cv-1923*؛

ماهر وآخرون ضد الإمارة الإسلامية في أفغانستان المعروفة أيضاً بالطالبان وآخرين، قضية رقم *1:23-cv-02845*.

<u>تصريح سعيد سرحان</u>

1. أنا سعيد سرحان أصرّح بموجبه بأنني تجاوزت الثامنة عشرة من عمري وأنني بكامل قواي العقلية لأقوم بهذا التصريح. لدي معرفة شخصية بالوقائع المبيّنة أدناه. إذا تم استدعائي كشاهداً، أنا قادر وسأشهد على البيانات والوقائع الواردة هنا والتي هي كلها صحيحة ودقيقة على حد علمي واعتقادي.

2. درست في جامعة حلوان في مصر وحصلت على درجة باكلوريوس في إدارة أعمال المحاسبة قبل أن ألتحق بسوق العمل في عام 1983. عملت في كيانات خاصة قبل أن أنضم إلى الأمانة العامة لهيئة الإغاثة الإسلامية العالمية ("الهيئة"). المكتب الرئيسي للهيئة كائن في جدة-المملكة العربية السعودية ويعرف أيضاً بالمسى "الأمانة العامة". كان للهيئة مكاتب محليّة أخرى في المملكة العربية السعودية إضافةً إلى مكاتب خارجية في دول أخرى. شغلت عدة مناصب في إدارات القطاع المالي منذ انضمامي إلى الهيئة في عام 1993 بما في ذلك محاسب من 1993 إلى 2000 ورئيس حسابات من 2000 إلى 2006 ورئيس قسم الحسابات من 2006 إلى 2013 ومراقب مالي قبل الصرف من 2013 إلى 2019.

3. بحكم هذه المناصب اكتسبت معرفة بلوائح الهيئة الخاصة بالموظفين والشؤون المالية والعديد من المواضيع الأخرى التي سأعرضها فيما يلي. كانت لوائح الهيئة تراجع وتحدّث من وقت إلى آخر وتصريحي هذا يغطي فترة انضمامي إلى الهيئة وحتى 31 ديسمبر 2004.

4. كمنظمة دولية تقدم المساعدة، قدمت الهيئة الإغاثة الإنسانية والتنمية المستدامة حول العالم من خلال توفير الملابس والأدوية والمأوى والرعاية الصحية والتعليم والمزيد من المساعدة للأشخاص المتضررين من

1

الكوارث الطبيعية. استجابت الهيئة تكرارا الى كوارث إنسانية كبيرة وكانت تتمتع بسمعة ممتازة بسبب أعمالها.

5. انضممت إلى الهيئة لأنني كنت مؤمنًا برسالتها وأعمالها. وبحسب تجربتي عمل زملائي بجد لمساعدة المحتاجين بما يتماشى مع رسالة الهيئة. أنا فخور بجهود الهيئة الإنسانية وبمسيرتي المهنية في الهيئة.

6. خلال مدّة عملي لدى الهيئة لم ألاحظ أي سلوك أو أعلم بأي تصرف للدكتور عبد الحميد المعجل يوحي أنه يدعم أهداف القاعدة أو أنه ساعد القاعدة بأي شكل من الأشكال، ماديًا أو غيرها.

7. كان على موظفو الهيئة بما فيهم مديري المكاتب المحلية والخارجية تكريس ساعات عملهم لأداء مهامهم المتعلقة بالهيئة.

8. يمنع على موظفي الهيئة بما في ذلك مديري المكاتب المحلية والخارجية  في تشغيل موارد الهيئة أو استخدامها في مشاريع تجارية أو أنشطة شخصية أو أنشطة سياسية أو أنشطة عنيفة أو متطرفة أو إرهابية.

9. تولت المكاتب المحلية للهيئة جمع التبرعات وبالتنسيق مع المكتب الرئيسي شاركت في تخطيط برامج الهيئة وإعداد الميزانيات السنوية والإشراف على البرامج والمشاريع الخارجية من خلال زيارات ميدانية والمتابعة مع المكاتب الخارجية.

10. قدمت المكاتب المحلية للهيئة تقريرًا شهريًا عن التبرعات العامة والمخصصة لإدارة الشؤون المالية لدى المكتب الرئيسي والرعاية المعنية في المكتب الرئيسي (مثل: الرعاية الاجتماعية والرعاية الصحية والرعاية التعليمية إلخ).

11. يحظر على المكاتب المحلية إرسال مبالغ مباشرة إلى المكاتب الخارجية أو جهات تابعة أخرى.

12. قامت المكاتب المحلية بتحويل المبالغ المالية المُحصلة إلى المكتب الرئيسي الذي بدوره أرسل المبالغ إلى مكاتب خارجية لتمويل البرامج والمشاريع المعتمدة بالميزانية.

13. قام مديرو المكاتب الخارجية بإدارة شؤون المكاتب الخارجية بما في ذلك ضمان الإلتزام بالإرشادات واللوائح (فيما يلي "البروتوكولات") والقرارات والتعاميم (فيما يلي "التعليمات") المالية للهيئة.

14. بموجب هذه البروتوكولات والتعليمات تعين على مديري المكاتب الخارجية من بين أمور أخرى أن: (1) يحرصوا على مصالح الهيئة ويحافظوا على ممتلكاتها واستثماراتها وأموالها؛ و (2) يقدموا تقارير دورية للمركز الرئيسي بشأن أداء المكتب والمشاريع والبرامج والموظفين.

15. بموجب هذه البروتوكولات والتعليمات مُنع مديري المكاتب الخارجية من بين أمور أخرى أن: (1) يستغلوا مناصبهم في الهيئة أو يطوروا مصالحهم الشخصية على حساب مصالح الهيئة المالية أو سمعتها؛ (2) يفتحوا حسابات مصرفية دون الحصول على موافقة مسبقة من الأمين العام؛ (3) يقوموا بتحويل مبالغ مالية من مشروع لآخر أو يستخدموا الأموال لأغراض غير المخصصة لها دون الحصول على موافقة خطية مسبقة من الأمين العام؛ (4) يقوموا بتمويل أي جهة أو التعهد بذلك؛ (5) يقترضوا مبالغ مالية من الهيئة ؛ (6)

2

يبيعوا أو يؤجروا أو يهبوا أصول أو ممتلكات تابعة للهيئة؛ (7) يقوموا برحلات عمل دون موافقة المكتب الرئيسي؛ (8) يتدخلوا في السياسة الخاصة بالدولة المضيفة أو تفضيل مجموعة معينة؛ أو (9) يشاركوا في مناسبات أو المؤتمرات دون الحصول على موافقة مسبقة من الأمين العام.

16. قامت مكاتب الهيئة الخارجية بتعيين مسؤول مالي وكان يعمل كمحاسب أو أمين صندوق المكتب. وضعت الهيئة بروتوكولات تطبق على جميع الموظفين الماليين طوال فترة عملي في الهيئة. قام المكتب الرئيسي باستكمال هذه البروتوكولات بما في ذلك من خلال تعاميم وقرارات تم توزيعها من وقت إلى آخر.

17. قامت الإدارة المالية في المكتب الرئيسي بتنسيق ومراقبة وإشراف موظفي المالية في المكاتب الخارجية من خلال مراجعة الوثائق والتقارير المطلوبة المقدمة إليها من قبل مدراء المكاتب وفقًا للأنظمة المعمول بها ومتابعة ما يقدم منها.

18. بموجب هذه البروتوكولات والتعليمات تعين على الموظفين الماليين تطبيق قواعد ومبادئ محاسبية معينة على حسابات المكاتب الخارجية واتباع توجيهات المكتب الرئيسي من خلال الإجراءات التالية من بين أمور أخرى: (1) تسجيل المدخلات في السجلات اليومية ومطابقة الحسابات؛ (2) الاحتفاظ بسجلات محاسبية منفصلة لكل مشروع حيث يقومون بتسجيل إيرادات ومصروفات المشروع بانتظام وعمل القيود المحاسبية اللازمة ومن ثم ترحيلها للأستاذ العام؛ (3) إعداد طلبات الدفع ومستندات الإيرادات والتحقق من دقة الفواتير والبيانات؛ (4) تسجيل المعاملات في نهاية كل فترة في دفتر الأستاذ العام ؛ (5) تسوية حسابات البنوك بعد استلام كشوفات الحسابات الشهرية؛ (6) المشاركة في الجرد السنوي للأصول بما في ذلك الممتلكات وإجراء جرد دوري للنقد وكذلك تسوية العهد والمدفوعات المسبقة للموظفين؛ (7) إعطاء توقيع ثانٍ على الشيكات؛ (8) إعداد ميزانيات سنوية مقترحة للبرامج؛ (9) عدم المشاركة نيابة عن الهيئة في مشاريع تجارية أو استثمارات؛ (10) مراجعة وتدقيق إيرادات ومصروفات كل مشروع وإعداد الإيصالات والفواتير والتقارير الربع سنوية والمستندات المالية المتعلقة بالمشروع للأمانة العامة؛ (11) تزويد الإدارة المالية بالمكتب الرئيسي بجرد المشاريع.

19. قامت الهيئة أيضاً بتنظيم كيفية احتفاظ المكاتب الخارجية بالنقد ومنعتها من الاحتفاظ بأكثر من 1000 دولار في صندوق النثريات بالعملة المحلية. عند لزوم إجراء عمليات سحب نقدي تتخطى هذا المبلغ كان لا بد من اتباع قواعد معينة بما في ذلك (1) نقل النقد من البنك إلى خزينة المكتب خلال ساعات العمل الصباحية؛ (2) اتخاذ تدابير احترازية وأمنية للتعامل مع النقد ونقله؛ (3) التأكد من حضور المستفيدين أو ممثليهم لاستلام النقد؛ (4) إعادة أي فائض نقدي إلى البنك في نفس اليوم.

20. طبقت الهيئة قواعد بنقل المبالغ المالية بين وداخل البرامج والمشاريع وأي تعديلات على ميزانيات البرامج المخصصة يجب أن تحصل على موافقة الأمين العام، ولمشرفي البرامج في الإدارة المعنية بالمكتب الرئيسي الموافقة على تعديلات على ميزانيات المشاريع المخصصة في نفس البرنامج. وكانت البرامج تغطي مجالات مثل الرعاية الصحية والرعاية الاجتماعية وكانت تتألف من مشاريع محددة يتم تنفيذها بواسطة المكاتب الخارجية للهيئة. والمشاريع هي مشاريع معينة تحت كل برنامج؛ على سبيل المثال، تشغيل عيادات التطعيم والصحة وحفر الآبار.

21. لا يمكن نقل أموال المانحين المخصصة لقطاع جغرافي معين إلى قطاع آخر إلا بموافقة الجهة المانحة والأمانة العامة.

3

22. قام المكتب الرئيسي بإعطاء تعليمات للمكاتب الخارجية بشأن كيفية صرف الأموال وفقًا للميزانية المعتمدة. بالتنسيق مع المكتب الرئيسي تم تكليف بعض المكاتب المحلية بالإشراف على مكاتب خارجية محددة. وفي بعض الحالات، قامت عدة مكاتب محلية بالإشراف على مكاتب خارجية معينة بالتعاون مع المكتب الرئيسي.

23. لم تقدم الهيئة للدعاة المتعاونين معها أي مزايا باستثناء مخصصات مالية صغيرة.

24. حددت لوائح الهيئة قواعد الإنفاق بما في ذلك أن: (1) لا يمكن إنفاق الأموال إلا لتحقيق أهداف الهيئة؛ و (2) صرف المال من المكتب الرئيسي والمكاتب الفرعية يجب أن تتوافق مع بنود الميزانية المعتمدة وأن تتوافق مع لوائح الهيئة المالية.

25. قامت الهيئة بتعيين مدقق داخلي قام بالتالي: (1) التحقق من الإلتزام بمتطلبات حفظ السجلات والأنظمة والإجراءات المالية؛ (2) التحقق من دقة السجلات المحاسبية والمعلومات المالية والمحاسبية والإحصائية و (3) تصديق البيانات السنوية الختامية. عين المدقق الداخلي من قبل رئيس مجلس الإدارة وقدم تقاريره لرئيس المجلس والأمين العام.

26. قامت الهيئة أيضاً بتكليف مدقق حسابات خارجي لتدقيق حسابات الهيئة. قام المدقق الخارجي بمراجعة الدفاتر والسجلات والمستندات للعمل على تقرير الحسابات الختامية والمركز المالي للهيئة.

27. قامت الهيئة أيضاً بتكليف مستشارين خارجيين لإجراء دراسات تنظيمية وإدارية شاملة لأنظمة الهيئة والتي تضمنت دراسات حول نظام التدقيق والرقابة ونظام إعداد الميزانية والنظام المالي. كما تم تكليف المستشارين الخارجيين بصياغة أدلة تشغيل الميزانيات المؤقتة والتدقيق الداخلي والشؤون المالية والمحاسبة.

28. قامت الهيئة بجمع التبرعات لذاتها.

29. لم تستخدم الهيئة خدمة الحوالة السريعة لتحويل الأموال.

30. خلال فترة عملي مع الهيئة، لم أشهد أن المنظمة أو أي من العاملين فيها قدموا أي دعم، سواء كان ضمنيًا أو صريحًا، لمنظمات إرهابية بما في ذلك القاعدة. على حد علمي لم تقم الهيئة عن علم بتوظيف أعضاء من تنظيم القاعدة أو أفراد معروفين بأنهم متعاطفون مع القاعدة.

أنا سعيد سرحان أصرّح تحت طائلة عقوبة الحنث باليمين بموجب قوانين الولايات المتحدة الأمريكية أن ما تقدم حقيقي وصحيح.

سعيد سرحان

تاريخ التوقيع: ١٤٤٧/١٠/٨ ⑤

4

## DAOU TRANSLATION AND SERVICES
### ضو للترجمة والخدمات

Tahwitat Furn El Chebbek – St. Nohra street – Ghawi Building – Baabda – Mount Lebanon – Ground floor

MOF#: 2859768 – Telephone No.: +961 1 284 725 – Gsm: +961 70 953 809 – Email: daouservices@gmail.com

### CERTIFICATE OF TRANSLATION

**Title of Source Document:** Saeed Sarhan Declaration

**Source language:** Arabic                    **Translated to:** English

**TRANSLATOR STATEMENT**

I, Joyce Hani DAOU, am competent to translate from Arabic into English, and certify under penalty of perjury that the translation of the foregoing document is true and accurate to the best of my abilities.

**Translator qualifications:**

15 years translation experience (Arabic-English and English-Arabic)

Sworn translator before the Lebanese courts as per oath taking report issued by the Ministry of Justice in Lebanon under No. 291 dated 26/02/2011

**Signature of translator:**                    **Date:** 11 April 2026