# EXHIBIT 17

Marc Sageman, M.D., Ph.D.
402 King Farm Blvd, Ste 125-222
Rockville, MD 20850

August 6, 2020

**In Re Terrorist Attacks on September 11, 2001, 03-MDL-1570 (GBD)**

Dear Mr. Omar Mohammedi,

You have retained me in the above litigation as an expert to address certain issues beyond the ken of the factfinder. My qualifications are outlined in my attached C.V. I have been qualified as an expert witness on terrorism in multiple federal jurisdictions including the SDNY. In the process of attaining opinions in this matter, I have reviewed the complete discovery material produced by all seven sets of plaintiffs as well as the World Assembly of Muslim Youth (henceforth WAMY) that you have sent me on a hard drive, which total more than hundreds of thousands of pages. These documents are too numerous to list.

This report is divided into four parts. The first describes my methodology and that of two of the plaintiffs' experts used to address the relevant issues. The second outlines the evolution of al Qaeda and the 9/11 terrorists in order to provide a chronological context to plaintiffs' allegations. The third addresses the plaintiffs' multiple allegations against WAMY in chronological order in order to assess them in their respective contexts. The fourth provides my opinion on the pertinent issues in this litigation concerning WAMY in terms of the 9/11 attacks.

## I.    Methodology

An expert report meant to educate a factfinder must reach its opinions based on accepted scientific methodology according to the *Daubert* standard. This section covers the methodology used in deriving the opinions proffered in this report. This is basically the same methodology that I have used in multiple scientific peer-reviewed publications.[1]

---

[1] See Marc Sageman, 2017, *Turning to Political Violence: The Emergence of Terrorism*, Philadelphia: University of Pennsylvania Press, at xiv–xxii; and Marc Sageman, 2019, *The London Bombings*, Philadelphia: University of Pennsylvania Press, at 3–8.

1

### A. Methodology in this report

Plaintiffs make many claims about the relationship between WAMY and the perpetrators of the 9/11/01 attacks and their allies. In their complaints, they do not provide any evidence for these claims, but in their respective discovery material, they provided a wealth of documents, mostly newspaper and other media articles; articles, opinions and testimonies of some commentators and a few government officials; trial documents and transcripts–some of which are relevant to their claims and others not. There were lots of claims and opinions about the 9/11/01 attacks on the United States shortly after the attacks, which were later refuted. This is a normal state of affairs–in the military, such confusion during war operations is called the "fog of war" and there is a similar fog after terrorist attacks. One has to wait until primary sources and relevant testimonies surface later on to establish facts. Therefore, in the present report, I shall privilege primary sources as much as I can to confront some of the secondary evidence and claims provided in the discovery material. These primary sources will either be the words of people directly involved in events in question (interviews; speeches; affidavits; testimonies, declarations, and depositions under oath) and authenticated relevant documents that have surfaced over time, often in a legal context. These two sources of reliable information are used to corroborate or refute various accounts that emerged over time about events surrounding the people who eventually became the 9/11 terrorists and their proximate material supporters. Through a process of triangulation, these primary sources will help to evaluate the validity or reliability of various past and present claims.

It is very important to understand these primary sources in their context. The discovery of a new document is the start of an investigation, not its end. All too often in the field of terrorism research, the discovery of new documents has generated erroneous claims as researchers jumped to conclusion to fit the new material in a preconceived framework that later turned out to be wrong. For instance, during the decade after the 9/11 Attacks, the press heralded the killing or capture of the "number three guy" in al Qaeda and scholars basing their work on open sources have followed suit. Al Qaeda had a clear leader, Osama bin Laden, and deputy, Ayman al-Zawahiri, but there was no official number three position. In fact, the person most commonly tagged as the number three man in al Qaeda, Zain al-Abedin Muhammad Husain, better known to the public as Abu Zubaydah, was not even a member of al Qaeda. Further investigation showed that he was a prominent member of the global neo-jihad but not the person many

counter-terrorist experts in and out of government believed he was.[2] In this report, to the extent possible, I focus on putting each relevant primary source document in its context to understand it without quickly jumping to conclusions that may turn out to be erroneous.

War situations, especially the Afghan Soviet War, present further challenges to historians. Much of the press reporting from Peshawar was one sided and deeply flawed. Some journalists reported the sensationalistic and inaccurate "Peshawar rumor mill" (none of the intelligence agents in the know felt compelled to illuminate journalists at the time about what they had learned from reliable human, electronic, and satellite intelligence). These journalists interviewed mujahedin commanders or their agent in Peshawar, who took the opportunity to solicit more help from the U.S. Government. During the last two and a half years of the Soviet Afghan War, I was the CIA case officer in charge of Ahmad Shah Masoud, the legendary Afghan commander, who successfully resisted the Soviet invasion. I grew tired of Masoud's people complaining that they were getting no help from the CIA or the Pakistanis when, in fact, I personally provided him $200,000 a month throughout my time in Pakistan.[3] More seriously, in a time before the prominence of fake news, some unscrupulous journalists filmed fake battle

---

[2] Much of the original and mistaken claims about Abu Zubaydah came from one source, the widely exaggerated confessions by Ahmed Ressam, the would-be Los Angeles Airport bomber arrested in December 1999. It took years to undo these mistaken assumptions about Abu Zubaydah's alleged links to al Qaeda, as illustrated by his 2008 JTF-GTMO Detainee Assessment, at BUR-PEC-076501–14. The final refutation of all these erroneous claims was the discovery of a contemporaneous diary he wrote during the 1990s and that was released to the public after a decade of litigation. See the reporting of Jason Leopold, who released the six volumes of the diary to the public, at http://america.aljazeera.com/articles/abu-zubaydah-diaries.html.

[3] This complaint was frequently repeated and most recently by Abdullah Anas, one of Masoud's close collaborator in the field, but not privy to his clandestine relationship with the CIA. See Abdullah Anas with Tam Hussein, 2019, *To the Mountains: My Life in Jihad from Algerian to Afghanistan*, London: Hurst & Company, at 62. The amount of the cash subsidy and its intermediary, Masoud's younger brother, is revealed in Steve Coll, 2004, *Ghost Wars: The Secret History of the CIA, Afghanistan, and Bin Laden, from the Soviet Invasion to September 10, 2001*, New York: The Penguin Press, at 191 and confirmed by my successor in the field in Gary Schroen, 2005, *First In: An Insider's Account of How the CIA Spearheaded the War on Terror in Afghanistan*, New York: Ballantine Books, at 61–2. So, throughout my time in Pakistan, I personally gave Masoud through his brother, Ahmed Zia Masoud, about $5 million. Ahmed Zia much later went on to become the vice president of Afghanistan. This was a clandestine relationship and even though Abdullah Anas knew Ahmed Zia (see the photographic insert in Anas and Hussein, 2019), he was not privy to our clandestine relationship.

scenes that were broadcast on major U.S. news channels, like CBS or ABC.[4] Some of my time at the CIA Islamabad Station was spent dispelling this fake news to CIA Headquarters and policy-makers, who questioned us about the "largest tank battle since the World War II Battle of Kursk" that allegedly had taken place along the Kabul Jalalabad highway in 1988. We had not heard about it and a quick fly-over from one of our satellites over the whole highway was able to refute this story. Therefore, especially after war situations, a scholar has to triangulate information from many sources and eliminate the obviously wrong and sensational propaganda to reconstruct what went on during these confusing times.

A competent scholar or expert cannot simply accept uncritically third-party assertions without checking them out. As mentioned, documents, especially if they are secondary sources based on third hand information, are the start of an investigation, not the end of it. One must find out their context, their audience, their purpose, and especially their credibility when compared to other sources of information. Are the allegations in the documents true? What is the chain of information to the events depicted to the documents? Of course, primary sources are better than secondary sources. Likewise, first-hand information is better than second-hand or even third-hand information. Sources of information closer or with direct access to events depicted in the documents should be prioritized over less reliable information. Is a piece of evidence based on a primary source, an eyewitness to the event in question? Even in this case, one must corroborate what a source says when other more reliable documents are available. For instance, a journalist can report that an interviewee is the chairman of an organization. This is easy to fact check through an authenticated organigram of the organization. In case of disagreement, the authenticated organigram is far more credible than the words of a source that could have been misinterpreted by the reporter. Is a piece of information based on a third party who talked to an eyewitness, further distancing the document from the event described in it? Is the document based on speculation, informed or not? For instance, speculation that a person *may* have used his position in a humanitarian organization to help a terrorist organization is simply speculation, especially if such speculation is derived from torture. Such accusation must be handled not as an established fact but simply as speculation that needs to be confirmed through independent and

---

[4] See also Mary Williams Walsh, 1990, "Mission Afghanistan," *Columbia Journalism Review*, (January/February), at 27–36; Erwin Knoll, 1990, "Journalistic Jihad: Holes in the coverage of a holy war," *The Progressive*, (May) at 17–22.

more reliable information. Is there any follow up investigation on the claim in the document? Since research based on the discovery material is basically an archival exercise, experts must adhere to at least basic archival methodology.

Official government documents and government officials making statements in their official capacity are not exempt from this type of scrutiny in these times of "fake news" or "alternative facts" or even plain old spin. Government documents and officials' statements do not have a special status and cannot be simply taken at face value: their evidentiary basis must also be closely examined. This is especially true when these documents or statements are generated not in the course of careful official investigations, like the 9/11 Commission Report,[5] but in the context of adversarial proceedings like a trial or politically motivated administrative findings. These are documents like any other and should be investigated like any other. Science does not bow to official authority but only to the facts as best determined.

Experts cannot just select documents that only support their side of an argument. The scientific method is to analyze all the documents since reality is complex and generates contradictory claims and facts. A competent expert cannot simply omit evidence he does not like. In fact, physical or social science methodology is the opposite: it is the search for disconfirming evidence to one's hypothesis in order to approximate elusive reality. Since reality resists positive proof, one must argue that one's theory of reality has so far resisted all attempts at disproof. This gives a scientist a certain quantifiable confidence that she is on the right track.[6] For lawyers, such an exercise is contrary to the essence of a regular legal brief, which is usually the best argument in a legal dispute on behalf of one's client. Two of the experts, Kohlmann and Winer, are lawyers, but, in this litigation, they are acting in a capacity not as lawyers but as experts. They should respect the *Daubert* guidance on admissibility of expert evidence. Therefore, the third part of the present report searches for the best evidence contrary to the argument that WAMY has not supported al Qaeda and the 9/11 terrorists or, eliminating the awkward double negative, that WAMY has supported al Qaeda and played a role in the 9/11 attacks. This search is facilitated by the plaintiffs' experts, who, I assume, present the most compelling evidence that

---

[5] National Commission on Terrorist Attacks Upon the United States, 2004, *The 9/11 Commission Report,* New York: W. W. Norton & Company, henceforth 9/11 Commission Report.
[6] See for example, among others, Peter Godfrey-Smith, 2003, *Theory and Reality: An Introduction to the Philosophy of Science*, Chicago: University of Chicago Press, for an introduction to the essence of the scientific method.

WAMY has supported al Qaeda and played a role in the 9/11 attacks that harmed the plaintiffs. After finding disconfirming evidence, an expert must then carefully balance the totality of the information, all the evidence present in the discovery material and in the larger set of evidence about terrorism and specifically al Qaeda terrorism and the 9/11 attacks, in his analysis to suggest where the reality of the events lie. On the basis of this careful analysis of all the evidence, an expert concludes with an opinion that fits most closely this full and complex evidence.

### B. Plaintiffs' Experts' Methodology

#### 1. Kohlmann's Methodology

This careful process of triangulation, comparison of contradicting sources, and corroboration of material in context distinguishes the present report from the methodology used by plaintiffs' experts, Messrs. Kohlmann and Winer and Dr. Levitt. I address Mr. Jenkins's report in the next part of this report, setting up the historical context of plaintiffs' allegations. Of these four expert reports, only Kohlmann provided a few paragraphs about his methodology.

##### a) Past and Present General Critiques of Kohlmann's Methodology

In his report, Mr. Kohlmann selectively quotes from judges who have praised his work.[7] However, this favorable selection must be balanced with other rulings that criticized his methodology. In *U.S. v. Babar Ahmad*, he had to withdraw his report.[8] *In U.S. v. Kabir et al*, his testimony was limited to providing facts, explaining terms and phrases, and describing Islamic terrorist organizations' use of social media and the Internet. He was not allowed to discuss his method of identification of homegrown terrorists as the judge noted that Kohlmann "is unfamiliar with basic terms and theories of social science research (such as 'variable,' 'attribute,' 'operational definition,' and 'grounded theory'), he has not submitted the profile and its application for rigorous peer review (despite his claim that it represents reliable theory of identifying 'homegrown terrorists'), and he does not employ recognized social scientific tools

---

[7] Expert Report of Evan Francois Kohlmann, henceforth Kohlmann report, paragraphs 7–10, at 3.

[8] *U.S. v. Babar Ahmad*, Conn, No. 3:04-CR-00301-JCH (2014).

(such as random sampling and blind tests) to control for bias or error."[9] Other courts have also discredited Mr. Kohlmann's testimony for lack of methodological rigor and reliability.[10]

Unlike the magistrates' mixed reception of his work, scholars–Kohlmann's peers–have universally criticized his work for his very loose and flawed methodology. His present report is no exception and therefore it is pertinent to address these previous methodological critiques that are unfortunately still relevant. In 2003, he submitted a draft of a manuscript on the Arab fighters during the Bosnian War to the University of Pennsylvania press. I was chosen to be the referee and turned it down because his methodology was too flawed to make a convincing argument worthy of peer reviewed publication.[11] Mr. Kohlmann went to British publisher, BERG press, and published it in 2004 under the title *Al-Qaida's Jihad in Europe: The Afghan-Bosnian Network*.[12] The title sums up his thesis that al Qaeda established a base in Bosnia, which was "a useful stepping stone for Al-Qaida's entrance into Europe," where terrorist recruits could "train, coalesce into cells, and seek shelter from prosecution by foreign law enforcement." "Bosnia provided the ultimate meeting ground for the … lieutenants of Usama bin Laden and the North African jihad foot-soldiers."[13] Although he completely revised the manuscript that I reviewed, the book was so full of inaccuracies that it is still useless as a reference, despite Mr. Kohlmann's multiple boasts that it was used by the 9/11 Commission and once in a seminar at Harvard.

Three examples of his flawed methodology come to mind. His first major character in his book that showed the al Qaeda link to the Bosnian War was "Shaykh Abu Abdel Aziz 'Barbaros' (literally meaning 'the red bearded,' also known as Abdelrahman al-Dosari) … born in Saudi Arabia … of Indian-Hyderabadi ethnic descent." Although al-Dosari worked as an administrator for Saudi Airline, he was also "a widely respected Islamic lecturer in the Arabian Gulf who had no hesitation in urging confrontation with the corrupt Saudi regime." Kohlmann claimed that Abu Abdel Aziz gained the nickname "Hown" during the Afghan war for his proficiency with Russian-made "Hound" artillery rockets and was inducted early into nascent al-Qaeda. After the

[9] *U.S. v. Sohiel Omar Kabir et al*, E.D.C.R. California, No. 12-0092-VAP, Minute Order, July 7, 2014, at 4.
[10] Amicus Brief to the U.S. Supreme Court in support of petitioners in *Republic of Sudan v. James Owens, et al*, No. 17-1236, April 5, 2018, at 10–14.
[11] Email to Peter Agree, dated 10 June 2003.
[12] Evan Kohlmann, 2004, *Al-Qaida's Jihad in Europe: The Afghan-Bosnian Network*, Oxford: BERG.
[13] Kohlmann, 2004, at 226, 230, and 231 respectively.

7

fall of Kabul in 1992, he and other Arab Afghans[14] came to Bosnia and he became the first Amir, or commander, of the Bosnian Arab Afghans.[15]

The facts are quite different. Sheikh Abd al-Rahman al-Dawsari (this spelling is the more commonly accepted one) was indeed a famous preacher in the Gulf and critic of the Saudi royal family, but he died in 1979, before the start of the Soviet Afghan war.[16] In fact, the true name of the Bosnian "Abu Abd al-Aziz" is Mahmud Bahadhiq, born not in Saudi Arabia but in Hyderabad of Yemeni descent. He later went to Saudi Arabia, where he worked as an administrator for Saudi Airline. He was extensively interviewed by Darryl Li and is one of the main characters in Dr. Li's study of Arabs who fought in the Bosnian War.[17] After retirement, Bahadhiq went briefly to Afghanistan in 1988, but spent only one night at the front, where he could hear sounds of gunfire in the distance. He definitely was not a member of al Qaeda. Instead, he spent most of his time hanging out with Pakistani activists, who later formed Lashkar e-Toyba, a Pakistani terrorist group focused on liberating Indian-held Kashmir. He returned to Jeddah and, in the summer 1992, he traveled to Bosnia and saw the devastation there. He returned to Jeddah, raised money, and returned to Bosnia, where he spent the rest of the summer and fall fighting and proselytizing especially to foreign journalists, hence his notoriety. He left Bosnia in December 1992 and for the next two years went around the world proselytizing for the Arab forces fighting in Bosnia and claimed to be their leaders, a claim that generated a rebuke from the foreign *Katiba* (battalion) in Bosnia that corrected the record.[18]

This was not the only time that Kohlmann was confused and lumped several people into one character. He claimed that Abu Zubair al-Haili, who came from the same area of Saudi Arabia as bin Laden, had been a fearless commander in Afghanistan before serving as an artillery expert with the Arabs in Bosnia. He had lived in London and sent young recruits to al Qaeda

---

[14] In the literature, Arab Afghans are also called Afghan Arabs. They refer to foreigners, often Arab Muslims, who fought in Afghanistan in the 1980s and early 1990s. I define them more precisely later one.

[15] Kohlmann, 2004, at 16–18.

[16] See Stéphane Lacroix, 2011, *Awakening Islam: The Politics of Religious Dissent in Contemporary Saudi Arabia*, Cambridge: Harvard University Press, at 56–58.

[17] Darryl Li, 2020, *The Universal Enemy: Jihad, Empire, and the Challenge of Solidarity*, Stanford, CA: Stanford University Press.

[18] Darryl Li, 2020, at 29–44. Dr. Li published two photographs of Abu Abd al-Aziz from 1992 and 2014 (when he interviewed him), at 30 and 37 respectively, and the resemblance is still striking.

training camps. He went to Afghanistan where he served as a deputy to Abu Zubaydah, a ruthless "Al-Qaida terrorist training camp manager, a rumored veteran of the Bosnian war." After 9/11, he went to Morocco to plot a suicide mission against U.S. and British ships in Gibraltar.[19]

There is much to unpack from this string of erroneous information. Abu Zubayr, as his kunya indicates, came from the Saudi town of Hail, different from Riyadh, where bin Laden was born, or Jeddah, where bin Laden lived most of his life in Saudi Arabia. Little is known about Abu Zubayr's first time in Afghanistan, but he became famous for forming a small independent group of Arab fighters near Zenica, which did not abide by the strict regimentation that either the Arab Katiba in Bosnia or al Qaeda (in Afghanistan or Sudan) enforced in terms of their members' habits. For instance, Abu Zubayr's fighters could smoke, making it unlikely that it was associated with al Qaeda at all.[20] After the war, Abu Zubayr went to England but to my knowledge he provided an introduction for only Saajid Badat's travel to Afghanistan.[21] Apparently after 1999, Abu Zubayr went to Afghanistan, where he became the amir of an al Qaeda guesthouse in Qandahar around 2000. So, even if Abu Zubayr was not al Qaeda and did not conform to al Qaeda behavior in Bosnia, he may have joined al Qaeda after he went to Afghanistan. After 9/11, he was detained by another country, which shared information he provided with the CIA. Specifically, he identified Badat.[22] He may have been arrested in Morocco in June 2002 and rendered to Saudi Arabia, as the press reported at the time. However, at the same time, three *other* Saudis were arrested in Morocco plotting to attack British and U.S. warships in Gibraltar. One of them was named Zuhair Hilal Mohamed al Tabayti. He was definitely not Abu Zubayr, who was known to weigh more than 300 pounds. Zuhair was a very skinny person from the picture I saw of him. Nevertheless, the similarity of their names and the fact that they might both have been arrested around the same time in Morocco sowed a lot of confusion, including for Kohlmann in his book. To add to this confusion, Kohlmann also

---

[19] Kohlmann, 2004, at 29.

[20] Li, 2020, at 88–89.

[21] See Badat's long debrief by the British Security Service, which was part of the discovery material in *U.S. v. Babar Ahmad*, Conn, No. 3:04-CR-00301-JCH. Both Mr. Kohlmann and I were expert witnesses on this case, and he had the opportunity to read this debrief.

[22] Senate Select Committee on Intelligence, 2014, *Committee Study of the Central Intelligence Agency's Detention and Interrogation Program: Findings and Conclusions, Executive Summary*, at 292–3 (PEC-WAMY034222–3).

claimed that Abu Zubayr al-Haili was Mohammed Haydar Zammar, a Syrian-German person, a third person different from either Abu Zubayr or Zuhair Hilal al-Tabayti![23]

The major reason I rejected Kohlmann's manuscript was that he simply made up stories about facts with which I was very familiar. His account of the campaign of bombings by the Algerian Groupes Islamiques Armés (GIA) in France in the summer of 1995 links the French accomplices, Khaled Kelkal and Karim Koussa, to Algerian fighters in Bosnia and Afghanistan, based on extrapolation of some English language summaries of articles published in the French press.[24] He completely made up links from Osama bin Laden to Abu Abdel Aziz "Barbaros" and Abu el-Mali, to Fateh Kamel, and to Khaled Kelkal and Karim Koussa.[25] This third hand information combined with a fertile imagination made him jump to false conclusions and prematurely connect unlinked dots, from which he crafted a false narrative. The judgments of two large trials, involving more than 40 defendants, summarized the evidence of the investigation conducted on these bombings. Neither Kelkal nor Koussa went to either Afghanistan or Bosnia. Kelkal went to Algeria for a short time the year before the bombings. In fact, both were selected as accomplices by the bombing leaders because their first choices, who had both gone to Afghanistan and Bosnia, refused to carry out terrorist operations in France! Fateh Kamel, the alleged al Qaeda link to Kelkal and Koussa, is not even mentioned in the definitive summary of the official French investigation into the 1995 GIA campaign of bombings.[26] He is linked to another group, the Roubaix gang, but that is another story.

Kohlmann's alarmist claim that Bosnia was a platform for al Qaeda to carry out future terrorist operations in Europe did not materialize, except for one series of attacks for a few days

---

[23] Evan Kohlmann, 2002, "Released! Al Qaeda mastermind not a criminal in the Kingdom," *National Review Online*, December 5, 2002 (web link no longer active). Both Abu Zubayr and Zammar weighed more than 300 pounds and Zammar was also arrested in Morocco but in December 2001 and rendered to Syria. Contrary to many reports, it appears that Zammar had never been a member of al Qaeda but liked to boast that he had recruited some of the terrorist pilots of the 9/11 attacks. See Liz Sly, 2018, "This is the man who recruited the 9/11 hijackers," *Washington Post*, November 30, 2018; Andreas Lunser, Christoph Reuter and Fidelius Schmid, 2018, "Interview with Suspected 9/11 Recruiter," *Der Spiegel*, November 23, 2018.

[24] Kohlmann, 2004, at 142–4, and FN 64–88, at 147–8.

[25] See the wire diagram at Kohlmann, 2004, at 207.

[26] *Ministère Public c/ Jaime, Vallat, Saibi et autres*, Tribunal de Grande Instance de Paris, 14eme chambre, No d'affaire : 9524339016, 18 février 1998; and *Ministère Public c/ Koussa, Maameri, Bouhadjar et autres*, Tribunal de Grande Instance de Paris, 14eme chambre, No d'affaire : 9527039040, 15 septembre 1999.

in early 1996 in the north of France, carried out by Bosnia war veterans – the just mentioned Roubaix gang. By the time that Kohlmann wrote his book, Europe had been free from any terrorist attack that had any link to Bosnia for more than eight years. Other academics also criticized the scholarship of his only published book. Darryl Li, who carried out extensive interviews of former fighters in Bosnia in the field, wrote, "Kohlmann's book is based almost entirely on English-language press clippings interwoven with court pleadings, along with a dash of plagiarism."[27] (Li, 2020, at 34; see also his FN 20 at 233–4). Ironically, one of the major sources of information for Kohlmann's book were propaganda vignettes written, recorded and disseminated by Babar Ahmad through Azzam.com. Both Dr. Li and I have extensively interviewed Ahmad while he was in prison in the United States, but Mr. Kohlmann never did. These vignettes are just propaganda and not true history.

Kohlmann's lack of scholarly credentials has been repeatedly pointed out by prominent academic scholars in terrorism research. David Miller and Tom Mills singled him out for his lack of scholarly training.[28] Magnus Ranstorp, the former director of the University of St Andrew's Center for the Study of Terrorism and Political Violence, also singled out Mr. Kohlmann in a section entitled "The art of masquerading evidence in terrorism research" in an article "Mapping terrorism studies after 9/11."

> Considering himself an academic and a 'micro-historian,' Kohlmann skillfully mastered the 'art of court diving,' volunteering to become an expert witness for the prosecution where he gains access to all discovery material, which in turn, through snowballing is reused in his analysis elsewhere. There is, of course, nothing innately wrong with this practice… Subsequently, without any Ph.D. degree in a cognate social science subject or few publications in any peer-reviewed scholarly journals, Kohlmann managed to testify as an expert witness…
>
> The fact that the prosecution needs to rely on what they themselves describe as a 'self-made al-Qaeda expert' as one of their principal witnesses, undermines severely the credibility of the proceedings and makes mockery of the principle of scientific expertise.

---

[27] Li, 2020, at 34; see also his FN 20 at 233–4.
[28] David Miller and Tom Mills, 2009, "The terror experts and the mainstream media: the expert nexus and its dominance in the news media," *Critical Studies on Terrorism*, Vol. 2, No. 3 (December): 428

Furthermore, it should bewilder most observers that a 'self-made al-Qaeda expert' becomes the custodian in the portrayal of the evolution of al-Qaeda, rather than seasoned scholars with superior knowledge and decades of experience in the region. Probably the answer is simply a financially-driven pliability to stay on message for the prosecution that would not easily exist with a reputable academic with his or her hard-earned reputation at stake.

A principal problem with charlatans and self-proclaimed terrorism expertise in a court of law setting is that 'calling expert witnesses in legal cases is predicated on the assumption that the evidence given will be objective and factually correct – governed by the principle of professional, scientific neutrality.'[29] The court records show contradictory evidence, as only a handful of self-proclaimed experts become 'hired guns' for the prosecution without regard for any scientific rigor or principles of impartiality.[30]

I agree with my colleague Ranstorp. Even academics who became counter-terrorism practitioners, like Philip Giraldi, a Ph.D. in history and a former CIA case officer, writes, "Within the intelligence community and at the Pentagon, Kohlmann, like many of his expert colleagues, is widely considered a phony who has somehow ingratiated himself with those who want an affable young media resource who will just say the right things when it comes to terrorism, keeping the public suitably alarmed while exuding a facile expertise."[31]

### b) Kohlmann's Alleged "Comparative Analysis" Methodology

In the past, Kohlmann claimed to "engage in a traditional social science method known as 'comparative analysis'" to determine the provenance of particular secondary or tertiary sources. "This requires me to compare and contrast particular sources in question with other analogous sources contained in my digital archive, searching for common threads and themes. By drawing from a wide assortment of primary and secondary sources, I establish a single, objective narrative – while simultaneously noting any significant factual discrepancies or

---

[29] The quote within the quote is from John Crace, 2008, "Just How Expert are the Expert Witnesses?" *Guardian*, May 12, 2008 available at http://www.theguardian.com/education/2008/may/13/highereducation.academicexperts.

[30] Magnus Ranstorp, 2009, "Mapping terrorism studies after 9/11," in Richard Jackson, Marie Breen Smyth & Jeroen Gunning, 2009, *Critical Terrorism Studies: A new research agenda*, London: Routledge: 27 – 28.

[31] Philip Giraldi (July 28, 2011), "Terrorism Experts on Parade," Antiwar.com, at http://original.antiwar.com/giraldi/2011/07/27/terrorism-experts-on-parade/

12

conflicting data."[32] In his present report, Kohlmann still claims to be using a "comparative analysis"[33] but now cites a chapter written by a prominent Italian sociologist, Donatella della Porta,[34] who has written extensively on 1970s Italian Leftist terrorist organizations and has published a renowned comparative analysis of them and 1970s German Leftist terrorist organizations.[35] Kohlmann does not describe his method, just attribute about it: "a central place in social science research."[36] He further claimed that his methodology is "'case-oriented,' with the aim to juxtapose 'rich descriptions of a few instances of a certain phenomenon' and to distill a common, accepted narrative."[37] This quote is taken out of context and does not make any scientific sense. It is not what della Porta's chapter is about. She makes an argument for comparative analysis *bridging* the gap between "case-oriented" and "variable-oriented" approaches. Comparative analysis is *not* a "case-oriented" approach, which Kohlmann, lacking a background in social science methodology, confuses. His claim that he employs "comparative analysis" and "case-oriented" methodology is nonsense as the two are not compatible: in fact, della Porta's chapter is an argument for a superseding methodology ("comparative analysis") bridging case-oriented and variable-oriented approaches.

Della Porta and Keating define their terms in a glossary at the end of their book, "In a broad sense, the comparative method refers to social science based on comparison of cases. This includes variable-based [experimental method and statistical method] and case-based approaches."[38] Comparative analysis or method is a form of analysis generating or testing hypotheses and *not* just to generate a narrative. It necessarily *compares* one case with another (between case analysis) or at least two events within the same case (within case analysis). In

---

[32] *In re Terrorist Attacks on September 11, 2001*, S.D.N.Y., 03 MDL 1570 (GBD), Affirmation of Evan F. Kohlmann, April 22, 2010, Paragraphs 17–8, at 5–6, FED-PEC0201918–9.

[33] Kohlmann report, paragraph 12, at 4.

[34] Donatella della Porta, 2008, "Comparative Analysis: case-oriented versus variable-oriented research," in Donatella della Porta and Michael Keating, 2008, *Approaches and Methodologies in the Social Sciences: A Pluralistic Perspective*, New York: Cambridge University Press, at 198–222.

[35] Donatella della Porta, 1995, *Social Movements, Political Violence, and the State: A Comparative Analysis of Italy and Germany*, Cambridge: Cambridge University Press.

[36] Kohlmann report, paragraph 12, at 4.

[37] Kohlmann report, paragraph 12, at 4. The quotes within the quotes are from della Porta's chapter, at 198.

[38] Della Porta and Keating, 2008, at 349.

13

other words, it compares A to B, analyzes similarities and differences between them, and draws some preliminary inferences from such comparison. Della Porta argues that the "comparative method" (comparative analysis for her includes the experimental method, statistical method, and comparative method[39]) is the only serious choice for controlling hypotheses when units are too few for statistical analysis. It attempts to "*go beyond descriptive statistical measures, towards an in-depth understanding of historical processes and individual motivations.*"[40] In her own field, "in this approach, understanding political violence would imply in-depth description of the contexts in which violence developed, locating the specific process of evolution of violent actors in their broader environment."[41] The aim is to understand through an analysis of similarities and differences in various contexts. Comparative analysis is an analysis of comparison between or within cases. In a comparative analysis, the number of cases compared cannot be less than two, with the exception of a single within case comparison. Kohlmann provides no example of comparison in his report that would justify calling his crafting of a narrative a comparative analysis. In contrast, I give a few examples of comparative analysis later in this report.

Although Kohlmann likes to give lip service to "comparative analysis," he simply crafts stories that are quite one-sided and far from being a distillation to "a common, accepted narrative."[42] I found no evidence that he ever used comparative analysis in his book, testimonies, PowerPoint presentations, or reports including the present one. In fact, his methodology is to take bits of information out of context, as are his citations from della Porta's article. As in his mischaracterization of della Porta's argument, his citations are often irrelevant to his argument, but give the appearance of being scientific. His methodology is that of a legal brief in an adversarial system, but not of social science, where on the contrary, one searches for disconfirming evidence in order to disprove or sharpen one's hypotheses. Kohlmann is a lawyer,[43] not a social scientist.

## 2. Levitt's Methodology

---

[39] Della Porta, 2008, at 200–1.

[40] Della Porta, 2008, at 202. Kohlmann, at 4, quotes the statement in italics out of context.

[41] Della Porta, 2008, at 206.

[42] Kohlmann report, paragraph 12, at 4.

[43] In his report, at paragraph 15, at 5, he cites the praise from a judge for his methodology, but not from his peers, as suggested by *Daubert*.

14

Matthew Levitt's methodology is not free of controversy either and the critiques leveled at it in the past are still relevant in the present report. In 2006, he published a book on Hamas by Yale University Press[44] to the acclaim of the non-peered reviewed press.[45] His book essentially argues that Hamas is all about terrorism and nothing else. He published it just before Hamas won a stunning victory in the Palestinian 2006 elections, which gave Hamas political legitimacy far beyond its indisputable role in terrorism. This did not escape the notice of academics like Laleh Khalili from the London School of Oriental and African Studies, who attributed Levitt's inability to see Hamas as a broader political and social organization on Levitt's methodology. "Levitt uses declassified documents primarily drafted by Israeli and US security agencies (whose colossal recent failures should give anyone pause about using their analyses uncritically), as well as English-language news reports and court documents. Levitt consults no Arabic sources, conducts no interviews with Hamas members or leaders, and relies on documents produced by Hamas's avowed political adversaries to illuminate the organization." She concludes, "this book seems like a post hoc justification of US and Israeli policies towards Hamas rather than a scholarly examination of its internal political and organizational dynamics and their complex influence on its decision-making."[46] She recommended the reader to read instead two available classical books on Hamas that Levitt ignored.[47]

The book generated serious controversy and polarization within academia. Sara Roy, from Harvard University, complained that she had been commissioned to write a review for *The Fletcher Forum of World Affairs*, but she saw that the editorial staff excised two critical sentences from her review.[48] After her protest, the sentences were reinstated and she was thanked

---

[44] Matthew Levitt, 2006, *Hamas: Politics, Charity, and Terrorism in the Service of Jihad*, New Haven: Yale University Press.

[45] Barry Rubin, "A Review that Speaks Volumes," *Jerusalem Post*, June 26, 2006.

[46] Laleh Khalili, 2007, "Book Review," *International Affairs*, Vol 83, No. 3, at 604–5. This was written after the intelligence fiasco that led to the US and British invasion of Iraq in 2003. Schmid makes the same points in her review, Dorothée Schmid, 2007, "Lectures," *Politique étrangère*, Vol. 72, No. 2 (été), at 465–7.

[47] Khaled Hroub, 2000, *Hamas: Political Thought and Practice*, Washington, D.C.: Institute for Palestine Studies; and a book by two Israeli academics, Shaul Mishal and Avrahma Sela, 2000/2006, *The Palestinian Hamas: Vision, Violence, and Coexistence*, New York: Columbia University Press.

[48] One of the sentences repeated previous complaint that "Levitt's presentation reduces this increasingly complex and sophisticated organization to an insular, one-dimensional … entity

for a "good review." However, a few days later, the editor-in-chief notified her that several editors and an external editor disagreed with publication because they found the piece one-sided.[49] So, she sent her original review to *Middle East Policy*, which agreed to publish it unchanged. She commented on Levitt's methodology, which was "more often than not based on assumption, extrapolation, and generalization." She gave several examples of this. She concluded, "His is not a work of analysis or scholarship, to say the least, and despite certain points that are interesting and accurate, anyone wishing to gain a substantive, reasoned and critical understanding of Hamas would do well to look elsewhere."[50]

Pete Moore characterized Levitt's methodology as a typical example of "beltway social science. Here is how it goes: start with your conclusion, select evidence that fits the conclusion, glorify the evidence because it was classified at one point, and in all cases conclude with policy…. But empirical accuracy is not the goal here; justifying the immediate policy direction and delivering the desired product to a client is the game."[51] Levitt's book elicited extensive book-length refutations of his simplistic argument that Hamas was simply a terrorist organization, like al Qaeda, and all its activities supported this main function.[52] Azzam Tamimi published his book as "an attempt to redress the imbalance in contemporary literature on Hamas," as illustrated by Levitt's book.[53] Jeroen Gunning also starts his book by articulating a critique of Levitt's methodology, namely his reliance on secondary sources and lack of field work and interviews, ignorance of historical and socio-political context, and imposition of a theoretical model that did not fit the reality on the ground.[54] Sara Roy, mentioned above,

---

dedicated solely to violence … and Israel's destruction." Sara Roy, 2007, "Book Review," *Middle East Policy*, Vol. 14, No. 2, (Summer), 162–6, at 163.

[49] Levitt earned his Ph.D. from the Fletcher School of Law and Diplomacy at Tuft's University.

[50] Roy, 2007, at 164, 166.

[51] Pete Moore, 2009, "Review Essay: HAMAS inside the Beltway," *Middle East Law and Governance* 1, 117–123, at 117.

[52] Levitt, 2006, at 2–7.

[53] Azzam Tamimi, 2007, *Hamas: A History from Within*, Northampton, Mass.: Olive Branch Press, at 2.

[54] Jeroen Gunning, 2008, *Hamas in Politics: Democracy, Religion, Violence*, New York: Columbia University Press, at 1–15.

published her own book-length refutation of Levitt's definition of Hamas as only a terrorist organization.[55]

Levitt's book was also subject of a libel lawsuit filed in California in 2007.[56] KinderUSA objected to the sentences, "Even after the closure of the Holy Land Foundation in 2001, other U.S. based charities continue to fund Hamas. One organization that has appeared to rise out of the ashes … is KinderUSA… 'the federal government has targeted KinderUSA for investigation.' … The formation of KinderUSA highlights an increasingly common trend: banned charities continuing to operate by incorporating under new names, either in response to designation as terrorist entities or in an effort to evade attention. This trend is also seen with groups raising money for al-Qaeda."[57] Yale University Press filed a so-called anti-"SLAPP" (Strategic Lawsuits Against Public Participation) motion that would have required Kinder USA to prove they had a viable case or pay the defendants' legal costs. After that motion, Kinder USA withdrew its suit. Although Levitt claimed that the "dropping of the suit meant a complete victory for … me,"[58] a lawyer for KinderUSA said that its decision to withdraw was "not because of 'anything we perceive in weaknesses in the actual case,' but out of a desire to focus on the group's 'limited resources' on its mission of helping 'Palestinian children in need.'"[59] Given the U.S. Government's known aggressiveness to prosecute any potential case of material support for terrorism, as we shall see in this report, the fact that Kinder USA is still active in Gaza and the West Bank in 2020 seems to support KinderUSA's claim.[60]

The fact that academics publicly (as opposed to privately) criticize Kohlmann and Levitt is quite rare in terrorism research. Most of the time, my colleagues in the field simply adopt a polite silence when confronted with a colleague with little scholarly integrity. That Kohlmann

---

[55] Sara Roy, 2011, *Hamas and Civil Society in Gaza: Engaging the Islamist Social Sector*, Princeton: Princeton University Press, at 2–5, and especially her 5th chapter at 97–160.

[56] *Kids in Need of Development, Education, and Relief, Inc et al v. Yale University Press et al*, Los Angeles County Superior Court Central District, No. BC 370155, filed April 26, 2007.

[57] Levitt, 2006, at 151–2.

[58] Matthew Levitt, 2007, "Chilling Effect," *The New Republic*, October 12, 2007.

[59] Scott Jaschik, 2007, "A University Press Stands Up – and Wins," *Inside Higher Ed*, August 16, 2007, Available at https://www.insidehighered.com/news/2007/08/16/university-press-stands-and-wins.

[60] See its website at https://www.kinderusa.org.

and Levitt are exceptions to this live and let live atmosphere in this field indicates that they have crossed a threshold of methodological mediocrity.

### 3. Winer's Methodological Argument

Like Levitt, Winer does not provide a methodological section in his report. However, he makes an interesting methodological point in the middle of his report in a section entitled, *Would You Expect the Internal Records of Charities That Were Involved in Supporting al Qaeda to Document Their Support for al Qaeda? If not, why not?*[61] He makes several arguments that makes it unlikely that the records from Islamic charities like WAMY would contain any incriminating records because essentially their material support of al Qaeda was clandestine. While some of his reasons like "the ideology promulgated by major Islamic charities was in alignment with that of al Qaeda prior to 9/11,"[62] are not related to the possibility that he might not find any charity internal records of support, his main argument must of course be considered in an investigation of such support. It seems that Winer is hinting that he might not find such evidence that supports his conviction that WAMY supported al Qaeda. I address this argument in my opinion after having the opportunity to evaluate the evidence on this issue.

### C. Updating Some Conceptual Issues for This Case

The issues in the lawsuit impose categories that were not yet understandable at the time when a lot of the alleged activities took place. I was privileged to have been a CIA case officer who served on the Afghan Task Force at Headquarters in Washington under Jack Devine[63] from the summer 1986 to the spring 1987 and in Islamabad under Milt Bearden[64] from the spring of 1987 to the summer of 1989. As my assignment was to run the unilateral operations with Afghan mujahedin commanders, I spent a significant part of my time in Peshawar during that time. I was therefore familiar with how people thought about themselves and the categories they used in

---

[61] Expert Report of Jonathan M. Winer, henceforth Winer report, section 9, at 55–66. Italics in the original.

[62] Winer report, at subsection 9.4, at 55–9.

[63] Jack Devine with Vernon Loeb, 2014, *Good Hunting: An American Spymaster's Story*, New York: Farrar, Straus and Giroux, at 25–41, 91–106.

[64] Milt Bearden and James Risen, 2003, *The Main Enemy: The Inside Story of the CIA's Final Showdown with the KGB*, New York: Random House, at 206–367.

thinking about their respective roles. Some of the following comments come from my own recollection of these times.

The category "terrorist" did not exist at the time in relation to the Islamist foreign militants who came to Peshawar to help the Afghans. At the time, it was only used in connection to a Pakistan International Airline plane hijacking in Karachi in March 1981, led by Murtaza Bhutto[65] to avenge his father's and former Prime Minister Zulfiqar Ali Bhutto's execution by President Zia ul-Haq. The category did not apply to Afghans or the *ansar* who came to help them. Still, it is of course legitimate to ask whether the ansar contributed to the attacks of 9/11. However, in terms of how people understood what they were doing at the time, no one would have had the imagination to conceive the future 9/11 attacks. Doing so is teleological, collapsing time and projecting backward a perspective that simply did not exist at that time.

What I later called the global Salafi jihad[66] and then global neo-jihad[67] did not yet exist, nor the type of terrorism that later became unfortunately more common, like the 1995 campaign of bombings in France, the East Africa U.S. embassies bombings in 1998, and of course the 9/11 attacks. As Jenkins in his report pointed out, at the time, terrorism was almost synonymous of plane hijacking.[68] Suicide operations, like the 9/11 attacks, emerged first in Lebanon carried out by Shi'a militants, who were strongly rejected by the overwhelming majority of the ansar that came to Pakistan because they were mostly Salafi militants, who regarded Shi'a Muslims as

---

[65] Murtaza Bhutto was the brother of future Prime Minister Benazir Bhutto, both of whom were children of former Prime Minister Zulfiqar Ali Bhutto.

[66] Marc Sageman, 2004, *Understanding Terror Networks*, Philadelphia: University of Pennsylvania Press, at 1. As I wrote then, it sets "its violence against foreign non-Muslim governments and their populations in furtherance of Salafi objectives." See for instance, Peter Bergen and Paul Cruickshank, 2012, "Revisiting the Early al Qaeda: An Updated Account of its Formative Years," *Studies in Conflict and Terrorism*, Vol. 35, No. 1: 1–36, at 31, for someone else using this expression attributed to me.

[67] I believe this is a more accurate expression for the social movement that carried out the 9/11 attacks. See Marc Sageman, 2019, FN 2, at 251: "I have not found an elegant way to characterize this threat. It is global in the sense that its agents target what they call the 'far enemy,' the West, rather than the 'near enemy,' local despots in Muslim countries. It is 'neo-jihad' because fighters in its cause call themselves mujahedin or jihad fighters, while the vast majority of Muslims worldwide reject the notion that it is a jihad, a war with very stringent rules about what is and is not permitted. As no one has yet come up with a better term, I compromise between these two arguments and call it neo-jihadi, like jihad, but not precisely jihad."

[68] Brian Michael Jenkins's report in this litigation, "The Road to 9/11: The September 11 Terrorist Attack on the World Trade Center," henceforth Jenkins report, at 7 – 9.

19

heretics. Palestinian (Sunni) suicide bombings emerged in Israel in the mid-1990's but were still very much absent from the repertoire of activities among people who later carried out a global neo-jihad against the West. The bombing campaign in France in 1995 did not include any suicide operations. Therefore, in analyzing the causation link leading to the 9/11 attacks, we must be careful not to impose anachronistic categorization upon contemporary participants in addressing the legal issue posed in this litigation. Instead, we must try to understand their view of their roles that eventually led to the 9/11 attacks.

At the time when I came to Pakistan in early 1987, I had not yet heard about the Arabs, who had come to help their fellow Muslim Afghans. In fact, none of the contemporaneous Western sources, whether journalists or covert sources, mentioned them. I first heard about them shortly after my arrival from Afghan commanders, who addressed them as "Wahabis," a derogatory term for the ansar since many were Salafi and looked down on Afghans as backward and not well educated in Islam. Obviously, since they met with me, these commanders cooperated with the U.S. Government and looked down on these foreigners, who were becoming more and more anti-Western. The ansar believed that only they had a legitimate right to support their fellow Muslims and sought to replace U.S. and Western support in general with Muslim support. As we shall see, by the end of the Afghan Soviet War, they believed that the war would lead to the establishment of an ideal Islamic state, devoid of the corruption and persecution they experienced in their home countries. In the creation of such a state, Western non-Muslim support had no place.

I only heard the expression Arab Afghans later, around the time of the 1995 GIA campaign of bombings in France. At the time, the narrative was that they were to blame for both the raging civil war in Algeria and its spillover in France. Only after the 1998 East Africa U.S. embassies bombings did I start hearing about al Qaeda, and the lumping together of all foreigners that had traveled to help oppressed fellow Muslims as al Qaeda or Arab Afghans. After the 9/11/01 attacks, they were viewed as being indirectly or even directly responsible for the 9/11 attacks.[69]

---

[69] See Jean-Charles Brisard and Guillaume Dasquié, 2001, *Ben Laden: La vérité interdite*, Paris: Éditions Denoël; Steven Emerson, 2002, *American Jihad: The Terrorists Living Among US*, New York: The Free Press; Rohan Gunaratna, 2002, *Inside Al Qaeda Global Network of Terror*, New York: Columbia University Press; Anonymous (Rita Katz), 2003, *Terrorist Hunter*, New York: HarperCollins Publishers; Kohlmann, 2004; Anonymous (Michael Scheuer), 2002, *Through Our*

At the time, I never dealt directly with the foreign Islamist militants who had come to Peshawar to help the Afghan insurgents, so I did not know how they understood their role in the war. Later on, I spoke to some of them and I learned that they viewed themselves as the *ansar*.[70] This is an Arabic term meaning helper and refers to the tradition of the Prophet. When he immigrated to Medina with his Muslims, he was welcomed and helped by some people in Medina, who later converted to Islam. They were called *al Ansar*.[71] Those Arabs who came to help the Afghans called themselves *al Ansar al Arab* (the Arab Helpers).[72] When these Arabs established a camp for themselves in Jaji, they called it *Masada al Ansar* (the Lions' Den of the Helpers). One of their guesthouses in Peshawar was called *Bayt al Ansar*, the house of the helpers. Later, the Muslim foreigners who came to help the Bosnians during the war against the Serbs were also called the ansar.[73] These foreign Muslim helpers were not necessarily soldiers but also humanitarians, who came to help. In this report, I distinguish between Afghan fighters and the foreign helpers, who I call the ansar.

---

*Enemies' Eyes: Osama bin Laden, Radical Islam, and the Future of America*, Washington, D.C.: Brassey's, Inc, especially at 137–43. At one point, both Katz and Kohlmann worked for Steven Emerson. Even a scholar like Gilles Kepel got caught into the trap of believing that all the various jihads around the world were physically connected, see Gilles Kepel, 2002, *Jihad: The Trail of Political Islam*, Cambridge, Mass.: Harvard University Press, at 239, 250. They were the first to publish on the subject and framed future discussions on the 9/11 terrorists that lumped them all into one basket, resulting in inaccuracies even in the 9/11 Commission Report. Under the same confusion, the U.S. Government pressured Bosnian authorities to arrest six Bosnian Arabs and rendered to GTMO under the allegation that they were planning to attack the U.S. Embassy there or go to Afghanistan to fight U.S. forces. These six detainees were the subjects of the landmark case *Lakhdar Boumediene et al v. George W. Bush*, 553 U.S. 723 (2008) and were ordered released by the U.S. District Court judge, who commented that the government's case rested on "so *thin* a reed." *Lakhdar Boumediene et al v. George W. Bush*, District of Columbia, Civil Case No. 04-1166 (RJL), Memorandum Order (November 20, 2008), at 11. It took about ten years for terrorism research to recover and set the record approximately straight. See Bergen and Cruickshank, 2012; Leah Farrall, 2017, "Revisiting al-Qaeda's Foundation and Early History," *Perspective on Terrorism*, Vol. 11, No. 6 (December), at 17–37.

[70] See also Basil Muhammad, 1991, *Al Ansar al Arab fi Afghanistan* (The Arab Helpers in Afghanistan) Jeddah: House of Learning Printing Press Co., P.O. Box 4797 Jeddah 21412, Kingdom of Saudi Arabia.

[71] Marshall Hodgson, 1974, *The Venture of Islam: Conscience and History in a World Civilization, Volume One: The Classical Age of Islam*, Chicago: University of Chicago Press, at 174.

[72] See Muhammad, 1991.

[73] Darryl Li, 2020, *The Universal Enemy: Jihad, Empire, and the Challenge of Solidarity*, Stanford, Ca: Stanford University Press, *passim*.

21

Now that I've established some methodological guidance and updated some concepts for my analysis, it is important to set up the context of the various plaintiffs' allegations against WAMY.

## II.    Historical Context

WAMY was established after authorization by royal decree as a charitable organization in Kingdom of Saudi Arabia (KSA) in 1972 and grew into the largest Muslim youth organization in the world with multiple international offices with headquarters in Riyadh, KSA. According to its constitution, its main mission is to serve the Islamic Dawah (call to Islam) in matters of *Aqeedah* (Islamic creed), Shariah (Islamic law) and social behavior among the Muslim youth of the world. It aims to deepen a sense of pride in Islam among them, enhance their knowledge about Islam, support Muslim organizations targeting young people and students… WAMY implements these goals through publications, international meetings, and youth camps.[74] As a former WAMY Assistant Secretary General testified, WAMY began providing relief operations to the Islamic refugees because the youth or society are affected by the impact of natural disasters of wars.[75] Over time, WAMY's humanitarian activities grew to include building schools and dormitories, mosques and Islamic centers, hospitals and medical clinics; digging wells; feeding the needy; running medical camps; and sponsoring orphans and students.[76] In the past three decades, WAMY has assisted refugees from Afghanistan, Chechnya, Kosovo, Albania, Bangladesh, and Kashmir.

### A.  Formation of Maktab al-Khadamat

Brian Jenkins wrote a short paper that attempts to set the historical context of this litigation.[77] Jenkins of course has been a prominent expert in terrorism research for the past half century. His report summarizes terrorist violence in the West over that period. However, Mr. Jenkins is not an al Qaeda expert and his report comes from secondary sources, mostly the 9/11

---

[74] The Constitution of WAMY, WAMY-SA E001045–52. Please note the address at the bottom of each page of the document, namely P.O. Box 10845 Riyadh 11443, KSA.

[75] Deposition transcript of Abdul Wahab Noorwali, henceforth Noorwali deposition, July 23, 2019, at 79–80.

[76] PEC-WAMY030235–40.

[77] The Jenkins Report.

Commission Report, published more than 15 years ago. Since then, good scholarship and new primary sources have changed our understanding of the road to 9/11. His dated report is also too superficial to provide a context helping factfinders evaluate the plaintiffs' allegations against WAMY. Therefore, it is important to start my report with an up to date and accurate historical context that helps assess the validity of the plaintiffs' allegations.

The Soviet-Afghan War of 1979–89 was a crucial turning point in 20th century world history, which is pertinent to this litigation as what became al Qaeda that carried out the 9/11 Attacks emerged out of that war. On Christmas Eve 1979, the Soviet Union invaded Afghanistan and, over the next three years, killed about a tenth of its population of 15 million and displaced another third as refugees, three million in Pakistan and two million in Iran.[78] Afghans resisted the Soviet invasion and hundreds of thousands became mujahedin (those who do jihad or jihadi soldiers, henceforth I reserve this term exclusively for Afghan fighters against the Soviet) defending their country. The word jihad in Arabic has many meanings, and one of them is violent resistance to foreign non-Muslim invasion of one's country as sanctioned by religious authorities.[79] The Saudi Grand Mufti Sheikh Abd al-Aziz bin Baz declared the Afghan War a legitimate jihad,[80] and Afghans fighting Soviets invaders and their allies were seen as legitimate mujahedin.

The United States government immediately supported the Afghan mujahedin with military aid starting in January 1980. The program expanded geometrically, almost doubling every year, and reached figures of about $470 million for fiscal year 1986 and $630 million for 1987.[81] This aid included the provision of weapons, training Pakistani troops to train Afghan mujahedin, and cash for incidentals.[82] This aid was matched dollar for dollar by the Saudi King.

---

[78] Richard Nyrop and Donald Seekins, 1986, *Afghanistan: a country study*, Washington, D.C.: American University Foreign Area Studies, at xxi, 304, 343.

[79] The most sophisticated analysis on the topic is still Richard Bonney, 2004, *Jihad: From Qur'an to bin Laden*, New York: Palgrave Macmillan.

[80] Muhammad, 1991, at 74; Thomas Hegghammer, 2010, *Jihad in Saudi Arabia: Violence and Pan-Islamism since 1979*, Cambridge: Cambridge University Press, at 29.

[81] Steve Coll, 2004, *Ghost Wars: The Secret History of the CIA, Afghanistan, and bin Laden, from the Soviet Invasion to September 10, 2001*, New York: The Penguin Press, at 151.

[82] See George Crile, 2003, *Charlie Wilson's War: The Extraordinary Story of the Largest Covert Operation in History*, New York: Atlantic Monthly Press, for a romanced version of the first six years of the war as seen from Washington; Milt Bearden and James Risen, 2003, at 207–367, for the last three years of the war as seen from the field; Mohammad Yousaf and Mark Adkin, 1992,

23

Complementing the covert military aid to the mujahedin was a large project of cross-border humanitarian aid for mujahedin controlled areas inside Afghanistan that grew to about $80 to $100 million in 1989 employing about 11,000 Afghans operated by Lawrence Crandall for the U.S. Agency for International Development (USAID).[83] The USAID aid went hand in glove with the CIA's covert military program. For instance, USAID provided "whatever commodities we could think of that could be useful to the resistance… These included portable drilling machines for digging into the sides of mountains to create small caves for housing and shelter from Soviet bombs."[84] A very important problem that emerged during the course of the war was logistic transportation of weapons, medicines, and food into Afghanistan. USAID provided 1,000 Toyota pickup trucks to the Afghan mujahedin to transport weapons, medicine, and food into Afghanistan.[85] However, for passage into East and North Afghanistan, there were no roads and the material had to be transported by mules. The CIA shipped mules to Afghanistan from Egypt and China while USAID shipped them from Tennessee and Missouri via chartered Boeing 747.[86] Again, the same mules were used to transport both military and humanitarian aid to their recipients inside Afghanistan. It was impossible to separate military from humanitarian aid. Wars are messy things.

The Islamic charities came gradually to Peshawar. The Saudi Red Crescent and the Kuwaiti Red Crescent started to operate in 1980 and 1981. The International Islamic Relief Organization (IIRO) came in 1983, and the Muslim World League (MWL) in 1985. The Kuwaiti Lajnat al-Dawaa al-Islamiya (LDI, Committee of Islamic Appeal) arrived around 1984, and the Saudi Lajnat al-Birr al-Islamiya (LBI, Islamic Benevolence Committee) began operations around

---

*Afghanistan – The Bear Trap: The Defeat of a Superpower*, Havertown, PA: Casemate, for the years 1983 to 1987; and Coll, 2004, at 21–186.

[83] The lower figure is quoted in Peter Tomsen, 2011, *The Wars of Afghanistan: Messianic Terrorism, Tribal Conflicts, and the Failures of Great Powers*, New York: Public Affairs, at 280; the larger figure came from Lawrence Crandall, in John Pielemeier, 2018, "Interview with Lawrence Crandall," The Association for Diplomatic Studies and Training, Foreign Affairs Oral History Project, at 32, available at https://adst.org/wp-content/uploads/2018/02/Crandall-Lawrence-K-1.pdf.

[84] Pielemeier, 2018, at 22.

[85] Pielemeier, 2018, at 22.

[86] Divine and Loeb, 2014, at 39; Pielemeier, 2018, at 24–5; Susan Orleon, 2010, "Riding High: Mules in the Military," *The New Yorker*, February 15, 2010.

1987.[87] These were some of the major Islamic charities in addition to dozens of small ones competing with dozens of Western charities. The two sets of charities were separate and avoided each other. The Islamic charities tried to cooperate with each other but, in parallel to the backstabbing of their Afghan clients, they quickly sank into competition with each other despite establishing a series of committees to coordinate their activities.[88]

The Arab ansar trickled into Peshawar very gradually. As previously mentioned, before I arrived in Pakistan in early 1987, I had not heard about them. The most prominent of them was Sheikh Abdullah Azzam, a Palestinian scholar, who came to teach at the International Islamic University in Islamabad in order to be close to the mujahedin. He proselytized about the war in Islamic forums and at the annual Hajj in Mecca. He collected stories of battlefield *karamat* (miracles from God) – mujahedin's bodies did not decompose and smelled of musk; many died with a smile on their face; birds deflected missiles, etc… – allegedly told to him by mujahedin and started publishing them in the Arab press in 1982. By early 1983, he had enough to compile them into a small book, *Signs of the Merciful in the Afghan Jihad*.[89] The book became so popular and inspiring for young Arabs that it went through more than ten editions.[90] It became a recruiting instrument as Azzam[91] argued, "If the citizens of the Islamic state are unable to repel the enemy … the duty then devolves on all those Muslims who are closest to the Muslims under attack. The Jihaad becomes Fardh-e-Ain [individual obligation] upon them…. [T]he duty will devolve to the closest Muslim country, then the next, and then the next."[92] He elaborated on his argument the next year in a fatwa (religious ruling) *Defense of Muslim Lands* that concluded, "Jihad by your person is Fard Ayn upon every Muslim in the earth."[93] Azzam claimed that Saudi

---

[87] Thomas Hegghammer, 2020, *The Caravan: Abdullah Azzam and the Rise of Global Jihad*, Cambridge: Cambridge University Press, at 153–7 and FN 135, at 572.

[88] Hegghammer, 2020, at 177–204.

[89] Shaykh Abdullah Azzam (Edited by A.B. al-Mehri), n.d., *Signs of ar-Rahman in the Jihad of Afghanistan*, Birmingham, England: Maktabah Booksellers and Publishers.

[90] Hegghammer, 2010, at 41; Hegghammer, 2020, at 143–77, 294–99.

[91] Muhammad, 1991, at 73.

[92] Azzam (ed al-Mehri), n.d., at 60. See also Mathias Ghyoot Müller, 2019, "Signs of the Merciful: 'Abdullah 'Azzam (d. 1989) and the Sacralization of History in Jihadist Literature, 1982–2002," *Journal of Religion and Violence*, Vol. 7, No. 2: 91–127.

[93] Abdullah Azzam (translated by Brothers in Ribatt), n.d., *Defense of the Muslim Lands: The First Obligation After Iman*, at 32, available at https://web.archive.org/web/20121009171634/http://www.kalamullah.com/Books/defence.pdf; Hegghammer, 2020, at 299–306.

Grand Mufti Sheikh bin Baz approved his fatwa, but Sheikh bin Baz only ruled that "helping and aiding our fighting and exiled Afghan brothers is an individual duty on Muslims today, financially and physically or one of the two according to one's ability, and especially propagandists, doctors, engineers, and teachers with qualification and competence."[94] This ambiguous statement does not command Muslims to fight in Afghanistan. It only commands them to help their Afghan brothers. Nevertheless, it was enough to justify young Muslims traveling to Peshawar as ansar for the Afghans.

A few Arab ansar had already arrived in Peshawar before Sheikh Azzam issued his fatwa at the *hajj* (annual pilgrimage) in 1984 (around September). Mustafa Hamid (Abu Walid al-Masri [the Egyptian]) had arrived in 1981 and took part in an Afghan training camp with other ansar in the fall of 1984. Two of his fellow trainees were Abu Hafs al-Masri (real name, Subhi Abu Sita) and Abu Ubaydah, later known as al-Banshiri (real name, Ali-Amin al-Rashidi).[95] Abdullah Anas (real name Boudjema Bounoua) arrived in October 1983 on Sheikh Azzam's invitation and, shortly thereafter, participated along with a dozen ansar in the Badr Afghan training camp in Pabbi in a large refugee camp under the control of Afghan party leader Sayyaf.[96]

The tragedy of the Afghan insurgency was its internal division, which led to bloodshed inside Afghanistan in the 1980s, peaked in a devastating civil war in the 1990s, and still continues today. Many Afghan mujahedin factions competed for U.S. support delivered through the Pakistani military. The Pakistanis appointed seven Afghan resistance parties in Peshawar, who were in essence middlemen for the supply of food, medicine, weapons, and ammunition for local commanders fighting the Soviets inside Afghanistan. These local commanders affiliated with the Peshawar parties according to ethnic, family, and religious ties. However, these ties did not withstand the promise of material support from rivals and commanders inside occasionally switched "parties" in favor to whoever offered them a better deal. This internal division among Afghan "parties" prevented them from achieving unity of action in the field necessary to repel

---

[94] See Muhammad, 1991, at 74; Hegghammer, 2010, at 29, Hegghammer, 2020, at 198–9.

[95] See Mustafa Hamid and Leah Farrall, 2015, *The Arabs at War in Afghanistan*, London: Hurst & Company, at 58; real names for the last two Egyptians come from Anonymous (Michael Scheuer), 2002, at 94–5.

[96] Abdullah Anas with Tam Hussein, 2019, *To the Mountains: My Life in Jihad, from Algeria to Afghanistan*, London: Hurst & Company, at 42–3.

the foreign invader. Their major international supporters like Pakistan, Saudi Arabia, and the United States continuously attempted to unify them into a single formidable fighting force of more than 100,000 mujahedin.

Because the border between Afghanistan and Pakistan is mountainous, the major problem for the mujahedin inside was logistics since there were no roads to supply them with food, medicine, weapons, and ammunition. With all parties competing against each other, supplying the combatants inside Afghanistan was very inefficient. As U.S. aid increased, supplies to the mujahedin still suffered while their party leaders in Peshawar seemed to materially benefit from it, generating continuous criticism from commanders living in miserable conditions inside Afghanistan directed at their Peshawar leaders, living in increasingly luxurious conditions. Sheikh Abdullah Azzam wanted to unify the divided insurgency through education, training, and streamlining the logistics to the mujahedin inside Afghanistan. In discussion with a young Saudi donor, Osama bin Laden (Abu Abdullah), and Abdullah Anas, Azzam started to unify his fund raising (bin Laden had previously given his money to an Islamist Pakistani political party for the mujahedin but later switched to an Afghan political leader) and to organize its distribution to insure that needed supplies would actually reach the mujahedin inside Afghanistan. He had sent several ansar, including Anas, inside Afghanistan to assess the situation, needs and distribution on the ground. Bin Laden picked up the rent of a martyred ansar's house, which became their part time residence and office when he and Azzam were in Peshawar. Up to that point, he had mainly funded Sayyaf, who was a fluent Arabic speaker and had even changed his name from Abd al-Rasul (servant of the Prophet) Sayyaf to Abd al-Rabb (servant of God) al-Rasul Sayyaf to conform to the doctrine that one should only worship God and not even the Prophet. During the 1984 annual hajj to Mecca, which fell in the first half of September, Azzam, bin Laden, and Sayyaf agreed to formalize what Azzam was already doing.[97] The *Maktab al-Khadamat* (MaK, Service Bureau) was established upon their return to Peshawar in October 1984, with Azzam as its *amir* (literally prince, leader in Arabic), and bin Laden as its main financial backer, to the tune of about $3,000 a month.[98] Its staff consisted of mostly Palestinians and Jordanians as Azzam and bin Laden were only occasionally there. Azzam divided his time teaching in Islamabad, teaching religious education at camp Badr, and traveling around the world to preach on behalf of

[97] Muhammad, 1991, at 88; conversation with Abdullah Anas, on January 15, 2020.
[98] Anas and Hussein, 2019, at 150.

the Afghan jihad. Bin Laden occasionally commuted from Jeddah and stayed just a few days in Peshawar.[99] The MaK's main activity was publicizing the Afghan jihad (Azzam started publication of a monthly magazine, *al Jihad*, in December 1984); raising money; transforming the Badr camp, entirely funded by another Saudi, Saleh Kamel, to unify and educate Afghans mujahedin from different factions; and providing humanitarian aid to refugees in combination with other Islamic humanitarian organizations. The ansar, fighters and humanitarians, frequently interacted and mutually supported each other in their activities in Peshawar. This did not mean that they supported terrorism, as the Afghan mujahedin were viewed as freedom fighters and not terrorists. In fact, by far the largest humanitarian support for the Afghan refugees and mujahedin at the time was still USAID.[100]

Partly as a result of Azzam's proselytism, more ansar came to Pakistan to support their fellow Muslim Afghans to fight the Soviets.[101] Since there was no organization helping them, the MaK started to take care of them and housed them in a nearby student dormitory. Many of these newcomers were Islamist dissidents, who were persecuted in their own country and fled to Peshawar to escape and further their ideal of establishing a truly Islamic state. When the students decided not to shelter the foreign newcomers, the MaK building had to accommodate them: about 40 slept on the floor in its office house.[102] Gradually, the MaK rented more local houses and transformed them into hostels for the ansar. The number of hostels reached seven in 1987,

---

[99] Muhammad, 1991, at 119.

[100] Muhammad, 1991, at 99–108; Hamid and Farrall, 2015, at 65–87; Hegghammer, 2020, at 205–37; Farrall, 2017, at 17–19; and Anas and Hussein, 2019, at 141–154. Abdullah Anas was a founder of the MaK and would become Azzam's son-in-law. Of course, the role of USAID is ignored by all these ansar sources who pretended that only they supported the Afghan refugees. Likewise, with the huge CIA military support for the insurgency, as described in Crile, 2003; Bearden and Risen, 2003; and even in Yousaf and Adkin, 1992, as Brigadier Yousaf, who was in charge of the Pakistani Inter-Service Intelligence (ISI) Directorate cell that provided U.S. aid and training to the Afghan mujahedin, was not a friend of the United States, as his book makes it clear.

[101] See a contemporaneous article written about this new phenomenon of Arab Islamists coming to help Afghans, James Rupert, 1986, "Dreams of Martyrdom Draw Islamic Arabs to Join Afghan Rebels," *Washington Post*, July 21, 1986, available at https://www.washingtonpost.com/archive/politics/1986/07/21/dreams-of-martyrdom-draw-islamic-arabs-to-join-afghan-rebels/860cd7a0-3b25-4fb4-8d25-4a6d31f2c552/

[102] Muhammad, 1991, at 105; Anas and Hussein, 2019, at 149–50; Hegghammer, 2020, at 244–70.

after which different groups established their own guest houses. From this ansar eventually emerged the group that later became known as al Qaeda.

The newcomers wanted to help in any way, which meant that they wanted to get some kind of military training supervised by Afghan trainers in case they would have to defend physically their Afghan brothers. Among the first to come was Wali Khan Amin Shah (a.k.a. Osama Azmarai), who underwent training at Pabbi along with other ansar in early 1985.[103] Shortly thereafter came two ansar who were studying in the United States, Mohamed Loay Bayazid (Abu Rida al-Suri [the Syrian]) and Wael Julaidan (Abu Hasan al-Madani [from Medina]). They went through their training among the second cohort of about 25 ansar at Pabbi around April 1985. They got seven to ten days training shooting various weapons, but they felt it was not enough. They went to a front inside Afghanistan for three weeks to organize religious training among the mujahedin and saw the shelling of an Afghan regime post.[104]

Meanwhile Anas coming back from his long reconnaissance mission inside Afghanistan reported to Azzam that Sayyaf had very few followers inside Afghanistan. They decided that the supply of food, medicine, clothing, and weapons should be distributed according to the needs of the mujahedin inside Afghanistan instead of the popularity of a party in Peshawar or the Gulf. They started to provide money for transportation as the independent Afghan businessmen in charge of the caravans going inside Afghanistan needed to cover their extensive costs (maintenance of animal fodder, payments to animal handlers, bribes for local commanders for safe passage, and coverage of risk as Soviet and regime forces tried to interdict the supplies…). Azzam was able to convince the Saudi Relief Organization that had just been established in Peshawar to centralize transportation subsidies into the hands of MaK. It was able to send a five-truck food and aid caravan to Zabul Province inside Afghanistan with aid provided by the Saudi Red Crescent.[105] Anas took another caravan of supplies to Ahmad Shah Masoud in the Panjshir Valley and a few ansar to provide care, education, and training there. Anas wanted to take

---

[103] He was a Saudi of Uzbek descent. He was close to bin Laden at the beginning but went on to separate himself from bin Laden and form his own group and training camp near Jalalabad around 1989. He was later involved in the Bojinka Plot in the Philippines, arrested, extradited to the United States, where he was convicted in *U.S. v. Ramzi Yousef et al*, S.D. New York, S12 93 CR 180-KDT (1996). See also Hamid and Farrall, 2015, at 169–72.

[104] Muhammad, 1991, at 112.

[105] Muhammad, 1991, at 122.

Julaidan, who had shown some remarkable organizational skills with him, but Azzam refused and said he needed Julaidan to organize the overall transportation of supplies into Afghanistan.[106]

Under pressure from the Pakistani, U.S., and Saudi governments, the various Sunni Afghan parties in Peshawar formed an umbrella organization, the Islamic Union of Afghan Mujahedin with its own *shura* council to resolve internal disputes. However, they resisted setting up any enforcement mechanism of their resolutions, which stayed empty words. The mujahedin stayed deeply divided. In the summer of 1985, a crisis was mounting. The summer months were the time when passage into Afghanistan was open before the winter snow closed mountain passes for about six months. As aid supplies to Afghanistan increased exponentially from year to year, the ability to transport this humanitarian and military aid inside Afghanistan was decreasing with the deaths of pack animals and the lack of trucks. Food, medicine, clothes, weapons, and ammunition were accumulating at the Pakistani border, unable to cross over into Afghanistan.[107] This is when Crandall of USAID bought 1,000 Toyota pickup trucks and the CIA embarked on a program of shipping foreign mules to Afghanistan. Julaidan, whom Anas described as a "force of nature in Peshawar," started supervising all the transportation into Afghanistan. From August 1985 to January 1986, he spent about $3.5 million on transportation. Until the withdrawal of Soviet forces in February 1989, he shipped 13.5 million metric tons inside Afghanistan for about $18 million, of which $15 million came from the Saudi Aid Committee and the rest came from other Islamic charities via the MaK. In addition, he purchased an additional $14 million worth of food for shipment inside Afghanistan and this money came from charity via the MaK.[108] In a crisis, emergency, or war, people are concerned about getting the job done and record keeping falls to a very low priority. By the end of the war, Julaidan became the head of the World Muslim League and the Saudi Red Crescent in Peshawar.[109]

By the end of 1985, the MaK had grown to an annual operating budget of about $300,000[110] and was formally divided into several committees. Jamal Khalifa (Abu al-Baraa, a

---

[106] Anas and Hussein, 2019, at 56.

[107] Muhammad, 1991, at 139.

[108] Muhammad, 1991, at 141. As one can see, this amount of money although very significant pales in comparison to the $80 to $100 million that Randy Crandall of USAID was disbursing for the year 1989 alone.

[109] Anas and Hussein, 2019, at 166.

[110] Isam Diraz, in Abdullah Azzam, 2003, *The Lofty Mountain*, London: Azzam Publications, at 93; Muhammad, 1991, at 198.

childhood friend of bin Laden who later married bin Laden's sister) launched a large educational project that included education in Afghan refugee camps and schools inside Afghanistan. A medical committee in conjunction with the Saudi Red Crescent and the Saudi Relief Committee established a large medical laboratory, a surgical hospital in Baluchistan, a rehabilitation center for disabled refugees, and dispatched physicians and nurses to work inside Afghanistan. There was a medical education program inside Afghanistan, the Challenge Project, whose ambition was nothing less than the complete replacement of Western aid. A technological committee was responsible for obtaining and repairing electronic and communication equipment for the mujahedin. An information committee published the magazine *al Jihad* and produced videos documenting life inside Afghanistan. Finally, a military committee attempted to relieve the factionalism of the mujahedin. It brought a number of them affiliated with different parties into Pabbi to take the same military and religious training course. The mujahedin rejected this idea and trained separately in their respective camps. Azzam still insisted that the ansar was there to support the mujahedin and spread them to all the different parties in order to encourage mujahedin cooperation in the field, even if this was impossible in Peshawar. However, with the leaders of the MaK (Azzam, bin Laden, and Anas) absent most of the time and Julaidan too busy with the cross-border aid, the staff was in constant disarray and its manager had returned to Jordan. Mamdouh Mahmud Salim (Abu Hajir al-Iraqi),[111] an Iraqi military officer who had deserted and recently arrived in Peshawar, joined the MaK in November 1985 and was voted its manager by the staff in 1986 to his great surprise. The MaK's management improved around 1988 when Sheikh Tameen al-Adnani became its executive director. In addition to its failure to successfully coordinate Islamic charity help to the refugees and mujahedin, the MaK failed to provide training and combat action for the newcomers eager for such experience. This problem eventually led Osama bin Laden to break away from the MaK and form a separate special force: al Qaeda.[112]

### B. Masada and the Emergence of al Qaeda

---

[111] He was later arrested in Germany in 1998 in connection to the East Africa embassies bombings, but his case was bifurcated from the other defendants when he stabbed a prison officer in an attempt to murder him. He was convicted and eventually sentenced to life in prison without parole.

[112] Hegghammer, 2020, at 237–43; Muhammad, 1991, at 193–8.

In March 1986, bin Laden relocated with his family to Peshawar in part to help run the MaK, which was plagued by persistent administrative problems.[113] The source of bin Laden's fundraising is still mysterious. It appears that the head of the bin Laden family, his half-brother Salem and his friends, provided him with cash. Salem was very supportive and publicized his brother's humanitarian work, personally contributed to him, supplied him with construction equipment, tried to procure him weapons, and solidified his brother's relations with the royal family. All of this promoted Osama's credibility as a fundraiser.[114] This fundraising emphasized humanitarian support (food, shelter, medical supplies) for the Afghan mujahedin and refugees, whose needs greatly exceeded the efforts of USAID.[115] Some of Salem's friends also contributed cash. For instance, Sheikh Khalid bin Mahfouz made a donation of about $270,000 to assist the U.S. backed Afghan mujahedin.[116]

In April 1986, the Soviets attacked the mujahedin camps along supply lines into Afghanistan. About 60% of all the supplies passed through the area between Zhawar and Ali Khel. Zhawar was under the command of Jalaluddin Haqqani, who decided to defend his base, which he had previously reinforced with trenches and caves, instead of withdrawing as was the classical guerilla warfare strategy. The Soviets bombed his base for at least three weeks and eventually a Soviet Afghan force of several thousand overran it. When they withdrew, Haqqani's mujahedin came back. The mujahedin suffered about 300 killed and about the same number wounded. The Soviet and Afghan forces allegedly lost about 2,000 dead and 4,000 wounded.[117] The significance of this engagement is that it was the first time that the ansar participated in some number. During the battle, Abu Hafs, Abu Ubaydah, and al-Khalifa were injured, and Julaidan was temporarily buried under rubble in a cave. Hamid and Azmarai also participated in it. As the battle raged for weeks, bin Laden came back from Jeddah and assembled about 45

---

[113] Muhammad, 1991, at 198; Steve Coll, 2008, *The Bin Ladens: An Arabian Family in the American Century*, New York: The Penguin Press, 282, wrote that Azzam asked him to relocate to run the MaK.
[114] Coll, 2008, at 334.
[115] Coll, 2008, at 305.
[116] Coll, 2008, at 304. This occurred before May 1988, before the emergence and prominence of takfiris in Peshawar.
[117] See Ali Ahmad Jalali and Lester Grau, 2001, *Afghan Guerilla Warfare: In the Words of the Mujahideen Fighters*, St. Paul, MN: MBI Publishing Company, at 322–6; Yousaf and Adkin, 1992, at 164–73.

ansar to go and relieve the mujahedin. This unit called itself the *Katiba* (brigade) of the Strangers. By the time it arrived in Miram Shah, a border town in Pakistan, the fight was over before it could get to the battlefield. Its members were not used to mountains and had so much trouble moving in this terrain that the Afghan mujahedin did not want them. The kabita disbanded in humiliation. Salim summed this episode up by calling this unit the Katiba of the Ridiculous.[118]

The failure of the ansar to help the mujahedin at Zhawar brought home the fact that they were completely unprepared to fight. Under the leadership of Sheikh Azzam, their training at Pabbi was more spiritual and religious than military. The MaK reached an agreement with Sayyaf to establish a new base camp exclusively for the ansar at a new location at Sadda ("Echo"), closer to the Afghan border. At the beginning, Sadda consisted of five or six tents in addition to a tent that served as a mosque. As the ansar newcomers, mostly teenagers on school vacation, started their training there, the Soviets continued their campaign of destroying the mujahedin logistics supply lines into Afghanistan. In June 1986, they attacked Sayyaf's camp at Jaji, Afghanistan, located near the border between Ali Khel and Zhawar. Bin Laden again wanted to join the battle. He assembled about 32 trainees and went to the Sayyaf camp. Again, they felt helpless against the relentless intensity of Soviet bombings that lasted about two weeks. Feeling useless, bin Laden and the ansar retreated to the safety of Sadda.[119] This second disappointment in less than three months convinced bin Laden that he should create a katiba of ansar able to fight as a unit. He later complained that the Afghan mujahedin treated him and the ansar as guests and did not allow them to fight. "[T]he Arab men wanted to be mujahideen, and to do the work of the mujahideen: they did not come to Afghanistan as guests. Due to this, I came up with the idea of forming a place where the Arab brothers could be received and trained to fight."[120] He tried to set up a separate camp at Sadda, but Sheikh Azzam, who wanted to integrate rather than separate the ansar from the mujahedin, found out about it and put an end to it. The heavy bombardment at Jaji also convinced bin Laden of the necessity of building defensive positions such as safe shelters and tunnels. He started to fund this project by bringing

---

[118] Muhammad, 1991, at 173–9; Hamid and Farrall, 2015, at 84; Hegghammer, 2020, at 332–4; and Lawrence Wright, 2006, *The Looming Tower: Al-Qaeda and the Road to 9/11*, New York: Alfred A. Knof, at 110.
[119] Muhammad, 1991, at 184–9.
[120] Osama bin Laden, in Azzam, 2003, at 94–5.

heavy construction equipment from his family construction business in the fall of 1986. He invested all his contribution to this new project and stopped donating to the MaK around that time.[121]

During the summer 1986, as Anas was again returning to bring supplies to Ahmad Shah Masoud, Abu Hafs and Abu Ubaydah, who had recovered from their wounds, asked to come along. Anas hesitated because they were known to be part of the Egyptian *Tanzim al-Jihad* (the Jihad Organization), which was starting to sow dissention among the ansar in Peshawar. He accepted to take them along if they came as individuals, not as members of al-Jihad, and promised to obey their Afghan commander. The Egyptians agreed. Along the way, Abu Hafs's bad knee forced him to abandon the arduous journey and return to Peshawar. On the other hand, Abu Ubaydah distinguished himself in Masoud's conquest of Annahrayn and was wounded in the action. He returned triumphant to Peshawar and was henceforth recognized as Abu Ubaydah al-Banshiri (from Panjshir).[122]

In the fall of 1986, Abu Burhan al-Suri, a former Syrian military officer, who had come to Peshawar in June, became an instructor at Sadda. He was a student of military affairs and over time compiled the encyclopedia of the Afghan Jihad, which included most of the training course that were eventually offered at Sadda and later Khalden.[123] Across the border, bin Laden and his construction crew started building roads and tunnels in Sayyaf's al-Areen camp in Jaji. He was there with Azmarai when some exploring young ansar reported to him that the top of a hill about ten miles from the camp had a great view to monitor the movement of the enemy. The site had been left vacant because it was too exposed to enemy attacks and bombardments and its supply roads were blocked by ice in the winter. Bin Laden asked Sayyaf for permission to build a road to the site and trenches to protect it from bombardments. Sayyaf accepted. The original plan was just to set up an advanced post. He started digging tunnels and trenches at the site in October 1986, but when he invited mujahedin to come and occupy the space, no one came. Afghans believed that site was not defensible and was another example of a rich Saudi wasting his money.

---

[121] Muhammad, 1991, at 205–7.

[122] Anas and Hussein, 2019, at 87–90.

[123] When Sadda was later closed by the Pakistani authorities, Abu Burhan created Khaldan camp inside Afghanistan and stayed there until 1993. He was its commander until 1992 but stayed an extra year as consultant for the new leadership. He does not seem to have been a member of al Qaeda. See Hamid and Farrall, 2015, at 84–5, 114; Muhammad, 1991, at 211.

So, only ansar came to stay at the new site, which bin Laden called *Masada* (Lion's Den). When bin Laden transformed the site into a real camp exclusively for the ansar, it became known as Masada al-Ansar.[124] He asked advice from all the experienced military men he knew about the best way to set it up, but they unanimously told him that its over-exposure to the enemy and unreliable supply routes did not make the site viable. Instead, they all recommended a return to the safety of Sadda.

Nevertheless, bin Laden persisted in building his new military base and filled it with new arrivals from the Gulf with no military experience. Abu Burhan agreed to train bin Laden's new recruits at Sadda before sending them to the new site. Bin Laden asked Abu Ubaydah to come and become the military commander of Masada and the Egyptian reluctantly agreed to do so for ten days because he felt he could not let his Saudi friend down. He ended up staying for months and brought along his friends, Abu Hafs and Salim. Together, they tried to instill some military discipline and training in the teenager recruits.[125]

Bin Laden, Abu Ubaydah, Abu Hafs, and Salim would go on to become the core of what eventually became al Qaeda. When bin Laden directed Bayazid (Abu Rida), the MaK secretary, to put both Abu Ubaydah and Abu Hafs on the MaK payroll[126] (Salim was already a MaK officer) in January 1987, this to me is the origin of al Qaeda.[127] I am not convinced that there was a formal meeting establishing al Qaeda. This group gradually consolidated into a formal organization that was already active at the time of its alleged founding meeting in August 1988. In fact, it seems that the formalization of an organization is the end of a long process of discussions and activities, as we have already seen with the formation of the MaK, and now al Qaeda, which was referred to as the Sheikh's group until the end of the 1990's.[128]

---

[124] Anas and Hussein, 2019, at 178; Muhammad, 1991, at 240; Peter Bergen, 2006, *The Osama bin Laden I Know: An Oral History of Al Qaeda's Leader*, New York: Free Press, at 51; Isam Diraz, in Azzam, 2003, at 88, 93; Osama bin Laden, in Azzam, 2003, at 97, and in Lawrence, 2005, at 32; Hegghammer, 2020, at 339–40; Kim Cragin, 2008, "Early History of Al-Qa'ida," *The Historical Journal*, Vol. 51, No. 4 (December), 1047–67, at 1055.

[125] Hamid and Farrall, 2015, at 89–97; Muhammad, 1991, at 211–51.

[126] BUR-PEC-005710. Their monthly salary was about RS4,500 or about $300 at the time.

[127] Farrall, 2017, at 23, shares this opinion.

[128] Hegghammer, 2020, at 345, also views it as a progressive process: "The establishment at al-Ma'sada initiated a self-reinforcing process of separation between the pragmatists in the Services Bureau and the militarists around Bin Ladin. Al-Ma'sada attracted people who were more militaristically inclined, and it bonded them through training and shared combat experiences,

Bin Laden was often absent from Masada as he was still commuting to Jeddah and there were rarely more than 20 ansar staying there at any one time in the first months of 1987.[129] The ansar were eager to fight, and this was not limited to the teenagers. Sheikh Tameen al-Adnani, a 45-year-old Palestinian accountant working in Saudi Arabia and weighing more than 350 pounds, had been a dedicated fund raiser for the jihad. He came to Peshawar in 1987 with $1.1 million and stopped at Masada in March when bin Laden was not there. He talked to Salim, who had been left in charge, to allow him to go and fire a rocket at a nearby Afghan government post. He was on his way there when bin Laden came back and ordered him to return via radio. He was allowed to fire a mortar on the post three days later.[130] Sheikh Tameen eventually became a staunch supporter of Azzam, took over as the MaK executive director, and was viewed as Azzma's deputy in relation to bin Laden and his group. He continued to be a prolific fund raiser traveling the world, raising money for the MaK. He died of a heart attack in Florida in October 1989 on one of his fundraising trips.

On April 17, 1987, bin Laden's ansar conducted their first unilateral operation in Afghanistan. Abu Burhan brought his latest trainees from Sadda, which swelled the Masada forces to about 120 ansar. Half of this force under the leadership of Abu Ubaydah, Abu Hafs, Abu Khaled al-Masri, and Azmarai tried to overrun a nearby Afghan outpost with the support of Sayyaf's and Gulbuddin Hekmatyar's 107 mm rockets. Despite their planning, the attack was disorganized, and the rocket attack came before the ansar was in position. Afghan and Soviet forces replied with an artillery barrage of their own, and the ansar had to withdraw without even attempting an assault. Bin Laden, Azzam, and al-Adnani, with the other half of the troops, watched from the safety of the camp. Expecting some retaliation on the base, the additional troops evacuated Masada. Despite failing at their mission, the ansar was elated by their first opportunity to engage the enemy as a group.[131]

At the end of May, the Soviets resumed their campaign to cut off the mujahedin's supply lines into Afghanistan. Masada at Jaji was in the middle of the largest corridor into Afghanistan.

---

while keeping them apart from the pragmatists in Peshawar. The result was a tightly knit community with a more martial culture than that of the Services Bureau." Hamid and Farrall, 2015, at 107–43, also agree.

[129] Muhammad, 1991, at 243–5.

[130] Abdullah Azzam, 2003, *The Lofty Mountain*, London: Azzam Publications, at 38–9.

[131] Azzam, 2003, at 101–5; Muhammad, 1991, at 261–280, 300.

The Soviets put Masada under intense aerial and artillery bombardment for four days. Its intensity was so fierce that Abu Ubaydah ordered the evacuation of the base, except for a nine-man skeleton crew. On May 28, the Soviets believed that Masada had been abandoned and, around nightfall, sent about half a dozen tanks and a dozen armored personnel carriers as well as two squads of airborne Soviet special forces (Spetsnaz) to destroy it. Meanwhile, during the night, bin Laden and Julaidan convinced Sayyaf that Masada was worth holding on to and he allowed them to return there with two dozen ansar. At dawn, Sayyaf's forces opened fire on the armored column forcing it to retreat. Still believing the camp empty, the two Spetsnaz squads advanced, fell into two ambushes prepared by Abu Ubaydah and Abu Hafs respectively, and were completely obliterated.[132] The repulsion of the Soviet attack on the holiday of Eid al-Fitr (May 29, 1987) was hailed as a great victory among the ansar and the mujahedin in Peshawar. Despite the small number of participants (basically 20 Soviet vehicles and two squads of Spetsnaz against three dozen ansar resulting in about a dozen Soviets and eight ansar killed) and its insignificance in the course of the Afghan Soviet War, bin Laden waxed grandiosely about this skirmish. "This battle will go down in history as one of the great battles of contemporary Islamic times … a decisive and conclusive battle towards the end of the 20th Century."[133] Certainly, the Arab media, eager for Arab (not Afghan) victories, blew it completely out of proportion and bin Laden even suggested that this skirmish was the main reason for the Soviet withdrawal from Afghanistan.[134] In his mind, he probably believed that this trivial Arab success in the course of nine years of combat otherwise totally fought by Afghan mujahedin had won the Afghan Soviet War.

Shortly after the Masada skirmish, the military committees of three Afghan mujahedin parties and Azzam, al-Adnani, bin Laden, and Abu Hafs discussed the future of Masada because of its obvious vulnerability. They decided to transfer the camp to Sayyaf's troops as a forward outpost, and the ansar evacuated the site.[135] As bin Laden was mostly absent during the next year or so, Abu Ubaydah selected a site in Khowst Province near Zhawar in an area controlled by Jalaluddin Haqqani, and set up a military camp to train the numerous recruits from the Arab

---

[132] Azzam, 2003, at 105–18; Muhammad, 1991, at 305–39.
[133] Written in October 1989 in Azzam, 2003, at 77.
[134] Bin Laden, in Azzam, 2003, at 86.
[135] Muhammad, 1991, 346.

world that were flocking to it, inspired by the Masada myth. The new base (al Qaeda, in Arabic) retained the name Masada and was now restricted to Arab youth. When Jamal Khashoggi visited it in the spring of 1988, he reported that as many as 1,000 Arab youths were in Afghanistan.[136] With time, Abu Ubaydah selected an elite group from the large number of trainees and fashioned it into a new group, al Qaeda al-Ansar.[137] In a later interview, bin Laden confirms this chronology. "That particular name [al Qaeda, the organization] is very old, and came about quite independently of me. Brother Abu Ubaida al-Banshiri created a military base to train the young men to fight against the Soviet empire…. So, this place was called "The Base", as in a training base, and the name grew from it."[138]

With time, the skirmish of Masada became the stuff of legend and created the myth of al Qaeda (the military base).[139] This myth inspired thousands of Arabs to flock to Masada, but most of them came for a short time to have their picture taken in a mujahedin outfit and a Kalashnikov in their hands in order to prove their jihadi credentials to friends back home. Few stayed longer and even fewer were selected by Abu Ubaydah to become members of the sheikh's (bin Laden)

---

[136] Jamal Khashoggi, 1988, "Arab youths fight shoulder to shoulder with Mujahedeen," *Arab News*, May 4, 1988, at 8–9. It is clear from the article that the new base was in Haqqani's area and no longer in Jaji, in Sayyaf's area, as was the original Masada al-Ansar.

[137] Hamid and Farrall, 2015, at 101, 111.

[138] Bruce Lawrence, ed. (translated by James Howarth), 2005, *Messages to the World: The Statements of Osama bin Laden*, London: Verso, at 120. This was an interview bin Laden gave to al Jazeera's correspondent Taysir Alluni on October 21, 2001. Mustafa Hamid makes the same point in Hamid and Farrall, 2015, at 111–112. Sayyid Imam al-Sharif also gave a similar version ("they changed the name from *al-Masadah* to *al-Qa'ida al Ansar al Arab* which came to be known as *al-Qa'ida*") in Sayyid Imam al Sharif, 2010, "The Future of the Struggle Between the Taliban and America in Afghanistan," *Al-Sharq al-Awsat Online*, January 25, translated by the Open Source Center GMP20100218452002.

[139] Gunaratna falsely attributes al Qaeda's origin to Azzam because he used the word (in a different sense, as in an abstract foundation rather than a military base) in an *al Jihad* editorial written in April 1988 (Gunaratna, 2002, at 3 [he dated the editorial to April 1987 in his text], and FN 1, at 243 [where he correctly dates the editorial to April 1988]). Unfortunately, the 9/11 Commission Report adopted his erroneous interpretation (at 56, FN 24 at 467). Kohlmann (2004, at 9, FN 15 at 13) followed suit. However, as Li points out, their reference to the editorial in *al Jihad* is wrong. The editorial appeared in pages 4–6 (4 through 6), not on page 46, as the footnotes in Gunaratna, Kohlmann, and the 9/11 Commission all claimed. See Darryl Li, 2011, "Lies, Damned Lies and Plagiarizing 'Experts'," *Middle East Report*, No 260 (Fall), at 5. As we saw and will become even clearer in the next section, al Qaeda grew *in opposition* to Azzam and the group around him. Bergen corrects this mistake.

group or the group of the Base (al Qaeda) as they were called. In other words, al Qaeda at least in its first phase was already operating well before its alleged foundation in the summer 1988.[140]

### C.  Splintering of the Ansar; Separation from the Maktab al Khadamat

By 1987, Islamist militants from all over the Muslim world were congregating in Peshawar. Among them were Egyptian militants who fled persecution at home. One group, Tamzin al-Jihad, was developing the doctrine of takfir that argued that Muslims who did not follow a specific fundamentalist way were no longer true Muslims and had become heretics. Since Muslims could not kill Muslims, this notion allowed for their murder. The most prominent advocates of this notion were two Egyptian surgeons practicing in Peshawar, Dr. Sayyid Imam al-Sharif (Dr. Fadl, or Sheikh Abd al-Qadir bin Abd al-Aziz) and Dr. Ayman al-Zawahiri (Dr. Abdel Mu'iz). This intolerance for Muslims that did not conform to this extremist version of Islam gradually eroded the solidarity of the ansar. Both the Egyptian military leaders of bin Laden's group, Abu Ubaydah and Abu Hafs were members of Tanzim al-Jihad. Bin Laden, who was absent most of the time, sided with them when he was back in Peshawar and Afghanistan.

When Abdullah Anas returned to Peshawar from his long trip to the north of Afghanistan in the middle of 1987, he noticed that the atmosphere among the ansar had considerably changed. Bin Laden had left the MaK and ran his own operations. He remembered that Bayt al-Ansar (house of the ansar), a guesthouse that the MaK and bin Laden jointly ran, was sharply divided between the followers of bin Laden and Azzam.[141] The new group financed by bin Laden but run at the base (al Qaeda) by Abu Ubaydah focused exclusively on military training and no longer sent any trainee to fight alongside Afghan mujahedin. This contradicted Azzam's desire to help the Afghans both the refugees outside Afghanistan and the invaded population inside through humanitarian activities and cross-border aid as well as to support and unify the divided Afghan mujahedin. Azzam still remotely directed the MaK to continue its ansar activities. By 1987, most of the MaK's activities were humanitarian rather than military, although the MaK still maintained the training camp at Sadda, where Azzam continued to teach religious studies.

---

[140] This interpretation is shared by Hamid and Farrall, 2015, at 105, 111; Hegghammer, 2020, 328–68; and Farrall, 2017, at 24.

[141] Anas and Hussein, 2019, at 179–85.

Azzam was partially responsible for this situation. The Arab youths coming to Peshawar and al Qaeda's camp had been inspired by his book *Signs of the Merciful in the Afghan Jihad* and of course the news of the "major victory" of Masada.[142] This meant that their focus was no longer on helping Afghans liberate their country but on their desire for martyrdom and entering paradise. They were no longer helpers for the benefit of Afghans, the ansar, but fought for individualistic reasons: they became Arab Afghans, who had trained in Afghanistan but did not help Afghans fight the Soviets. Their goal was "jihad, the performance of religious duty, and the search for martyrdom for the sake of Allah…. [Their secondary goal was to] topple apostate governments in their country and establish Islamic governments governing according to Allah's Shari'ah."[143] In other words, al Qaeda's Arab Afghans were no longer part of the ansar.

Friction soon developed between Arab Afghans, who were mostly Salafis, and the Afghans, who were Hanafis and often Sufis. The newcomers told their hosts they were bad Muslims as they worshipped saints (forbidden in Salafi doctrine) and did not know how to be real Muslims. Separation of the Arab newcomers from the Afghans and mujahedin further aggravated the situation as the newcomers started to develop a social identity in contrast to Afghans. They looked down on Afghans and no longer identified with them. The Arab Afghans no longer believed that Afghans could create a true Islamic state even after the Soviets' departure. In fact, the germ of a new idea emerged among the newcomers in Peshawar that jihad was no longer for the defense of invaded Muslim lands, but for the development of a true Islamic state, different from existing corrupt so-called Muslim regimes. Sayyid Imam al-Sharif's influential takfiri book *al-Umdah fi Idad al-Uddah* (Essentials of Preparation [for Jihad]) written around that time preached this idea and persuaded many Peshawar militants.[144] This idea took longer to take hold among bin Laden's followers, at least until the end of their stay in Sudan.

---

[142] See for instance, Nasser al-Bahri, 2010, *Dans l'ombre de Ben Laden*, Neuilly-sur-Seine : Éditions Michel Lafon, at 22–23. Al-Bahri is better known as Abu Jandal, bin Laden's main bodyguard from 1998 to 2000.

[143] Umar Abd al-Hakim (Mustafa bin Abd al-Qadir Setmariam Nasar, better known as Abu Musab al-Suri, translated by CENTRA), 2004, *The Call for Global Islamic Resistance*, Place and publisher unknown, at 707.

[144] See Hamid and Farrall, 2015, at 164; Anas and Hussein, 2019, at 151, 183; Abd al-Hakim (Abu Musab al-Suri), 2004, at 718, called it "one of the most important books ever written (by an Arab Afghan). This book was important for discipline in the Arab camp in that time. It is still one of the most important books in the jihadist movement."

On May 29, 1988, Salem bin Laden, the head of the family and an active supporter of his half-brother Osama, died in aircraft crash in Texas.[145] Osama went to his funeral in Saudi Arabia. In his brother's death, he had lost his main supporter and fundraiser. He returned to Peshawar, now characterized by the journalist Jamal Khashoggi as a horrible place: "Arabs who don't like each other. Takfiris. Tensions … Splinters, fanatic groups."[146] To improve this poisonous situation, the leaders of the MaK and al Qaeda decided to form an Advisory Council to solve some of their disputes. Bin Laden was elected the Amir of this council, despite the objection of Sheikh Tameen al-Adnani, who was a vocal supporter of Azzam.[147] It seems that the minutes of the alleged "founding documents"[148] of al Qaeda are really about this council rather than al Qaeda, which was already functioning.

These documents were found in files 50, 54, and 55 respectively in a folder of a computer confiscated in Sarajevo in 2002.[149] I refer to them as document 50, 54, and 55 respectively. Documents 50 and 54 have been called the minutes of the foundation of al Qaeda.[150] Document 50 is the minutes of an August 11, 1988 meeting between perhaps bin Laden and Bayazid. According to the only writer who interviewed a person who claimed to have been at the meeting, it appears that Abu Hafs, Abu Ubaydah, Salim, Dr. al-Sharif, Julaidan, and Sheikh Azzam were also there.[151] In fact, Azzam had called the meeting. The presence of both al Qaeda members and

---

[145] Coll, 2008, at 322–5.

[146] Quoted in Coll, 2008, at 340.

[147] See Hamid and Farrall, 2015, at 109–112; Anas and Hussein, 2019, at 194–7.

[148] Peter Bergen and Paul Cruickshank, 2012, "Revisiting the Early Al Qaeda: An Updated Account of its Formative Years," *Studies in Conflict & Terrorism*, Vol. 35, No. 1, 1–36, at 3.

[149] The three documents were found in files 50 (BUR-PEC-005775–9), 54 (BUR-PEC-005780–3), and 55 (BUR-PEC-005787–97) respectively in the *Tareekh Osama* (Osama's history) file of a computer confiscated during the Bosnian authorities' raid of the Benevolence International Foundation in Sarajevo in March 2002.

[150] Peter Bergen, 2006, at 78–81. In his book, Bergen provides only excerpts of these two documents and carefully avoids reference to document 55, which changes the meaning of the other two. See also Cragin, 2008, at 1056. However, Wright mentions someone else who had joined al Qaeda prior to this meeting, indicating that al Qaeda was already in existence, see Wright, 2006, 133.

[151] Bergen, 2008, at 78, claims this meeting is about the establishment of al Qaeda, but Anas insists that Bayazid, who had spent a long time with him in the field, was never part of al Qaeda, see Anas and Hussein, 2019, at 249. Lawrence Wright, who is the writer referred to in the text, interviewed both Bayazid and Julaidan, who provided him with this information, see Wright, 2006, at 131, 402. Hegghammer, 2020, at 354–5, noticed that the "sheikh" is not identified in the document and believes that it refers not to bin Laden but to Sheikh Tameen al-Adnani.

non-al Qaeda members (Bayazid, al-Sharif, Julaidan,[152] and Azzam) seems to indicate that it was a Peshawar Arab Afghan Advisory Council meeting, which addressed a pressing issue. In fact, there were two issues. The first was the withdrawal of Soviet forces from Afghanistan by February 15, 1989. The second was that Bin Laden's only base (al Qaeda) in Zhawar had just closed the previous month (July 1988) because of a training accident, causing the death of twelve people, eight of them Arab trainees.[153]

The opening discussion regarding the establishment of a new military program or camp may have referred to either issue.[154] There was consideration of a three-step process: training in a general camp; then in a more specialized camp; and finally, at the base (al Qaeda). Bayazid made three points. Had the council taken Azzam's opinion into account now that bin Laden's military camp was closed? This future project seemed to be in the interest of the Egyptians (Dr. al-Sharif's Tanzim al-Jihad). There were disagreements about taking the next stage, meaning foreign projects, although weapons were plentiful (should they extend the jihad to other countries?). Someone suggested returning to the original issue of the meeting. After a year since the Masada victory, they were back to square one. Someone (probably a MaK member) asked, why were the Arab youths separated from the Afghans?[155] It seems that bin Laden took personal credit for all the achievements so far. He said that the Egyptians were not to blame even if they meant "it" (not further specified in the document). They shared the same fundamental interests for Afghanistan, and they stood "with us" in the worst of times. Someone said that their primary goals had not yet been achieved. Bin Laden replied that they now had trained, obedient, and faithful youth. Although the notes did not reflect it, they voted to continue the jihad after the Soviets were gone.[156] In the meanwhile, within six months (coinciding with the date of the departure of the Soviets), the base (al Qaeda) should produce 314 brothers trained and ready.[157] Shortly after this meeting, bin Laden established a new camp, Jihadwal, in an area controlled by

---

[152] Again, Anas claims that Julaidan never belonged to al Qaeda, see Anas and Hussein, 2019, at 144, 167. Likewise, al-Sharif was many things, but he never was an al Qaeda member, like his colleague Zawahiri. In fact, al-Sharif and Zawahiri became bitter enemies in the late 1980s.

[153] Hamid and Farrall, 2015, at 113.

[154] BUR-PEC-005775.

[155] Bergen skipped over this whole section in his book. Bergen, 2006, 79.

[156] Wright, 2006, at 132, based on his interviews with Bayazid and Julaidan.

[157] BUR-PEC-005776. The number of 314 is very significant in Islam because this was the number of Muslim fighters at the fabled Battle of Badr.

Hekmatyar. It appears that the document refers to the formation of a jihadi special force rather than to a separate organization altogether.[158]

The next two documents cover the same time period, August 17, 18, and 20, 1988, but document 54 added two paragraphs dated September 10 and 20 respectively. Furthermore, document 54 refers to document 55, which makes it very confusing. Document 54 states, "The brothers mentioned in the second page[159] [probably a reference to document 55] attended the Sheikh's house to discuss the case of the Advisory Council and the new distribution in Peshawar mentioned in the attached document [again document 55]. Most of the discussion was about choosing an Advisory Council, which is accepted by all who are present in the arena."[160] So, the 14 people who assembled in bin Laden's house for an al Qaeda follow up meeting were not those listed in document 54, but those listed at the top of document 55.[161] The members of the Peshawar Advisory Council were bin Laden, Abu Ubaydah, Abu Burhan, al-Adnani, Salim, Anas, Julaidan, and two more. The meeting was a litany of complaints listed in document 55 about the MaK's mismanagement and poor performance involving administrative and humanitarian issues, showing that the gap between the MaK and al Qaeda factions had become unbridgeable. Anas wrote that Azzam organized the meeting but stayed in Sadda. At the meeting, his most vocal supporter, al-Adnani, refused to back bin Laden as the council's Amir and left before the election.[162] Bin Laden was elected Amir of the Arabs (an honorary title because he had no authority over those he did not pay), Azzam Amir of Sadda, and Julaidan Amir of Peshawar activities (namely, humanitarian and cross-border aid).[163]

Returning to document 54, two thirds down the page began al Qaeda's business. The three-phase plan suggested in document 50 was accepted. New recruits would go to Sadda, where they would get trained and distributed to Afghan fronts under the supervision of the

---

[158] This is also the interpretation of Hegghammer, 2020, at 350–362.

[159] Bergen, 2006, at 80 omits the expression "in the second page," to imply that the people listed in document 54 are the founding members of al Qaeda. They were not: Sheikh Tameem was definitely not part of al Qaeda, nor was Julaidan, and probably not Abu Burhan (on the last one, see Hamid and Farrall, 2015, at 114).

[160] BUR-PEC-005780. The date of this al Qaeda meeting was August 20, 1988.

[161] BUR-PEC-005787.

[162] Anas and Hussein, 2019, at 194–6. Anas did not remember the presence of Julaidan at the meeting.

[163] Farrall, 2017, at 25.

43

council.[164] Those willing to commit to jihad for a long period of time would be sent to a more specialized camp, and the best candidate from this second camp would be selected to enter the al Qaeda camp. At this point, al Qaeda was "an organized Islamic faction. Its goal will be to lift the word of God, to make His religion victorious." Membership requirements included long term commitment, obedience, good [Islamic] manners, a trusted sponsor, and adherence to al Qaeda statutes and instructions. Candidates were required to pledge an oath to their superiors. On September 10, 1988, the new al Qaeda camp (not the organization) started with 15 people, including a camp commander (Abu Ayoub), a military supervisor (Abu Usama al-Jazairi [the Algerian]) and six other administrators, whose name matched the attendees of the August 20 al Qaeda meeting listed in document 55. Ten days later, Abu Ubaydah reported that there were now 30 people in the al Qaeda camp.[165] Document 55 appears to be the discussion leading to the formation of the Peshawar Advisory Council, while document 54 shows a consolidation and formalization of an already existing al Qaeda rather than its formation.

The formation of the Advisory Council of course did not stop the quarrels among the Arab Afghans in Peshawar, especially between the MaK and al Qaeda factions. By October, the divisions within the Arab community had reached a point that prominent Azzam supporters like al-Adnani were boycotting the council in protest.[166] At one point about ten Arab Afghans, who had never met Ahmad Shah Masoud, accused him of lewd behavior with French nurses in bikinis by a swimming pool and of being an Iranian spy–in other words a Shia and not a Sunni. This might have led to his excommunication by takfiris (and death is the appropriate punishment for heretics). Masoud was disliked by both takfiri Arabs and his main rival Gulbuddin Hekmatyar. The Arab notables of Peshawar convened in a trial. Anas came back from the Panjshir Valley to defend Masoud and confront his friend's accusers. The MaK faction of Azzam, Julaidan, and al-Adnani sided with Masoud while the al Qaeda faction led by bin Laden, who was getting close to Hekmatyar, sided with the accusers. Anas refuted all 70 accusations but to keep the peace in

---

[164] BUR-PEC-005780. Abu Burhan, whose name figures first on the document 55 list, was probably not al Qaeda, but since he was in charge of training at Sadda, which was a MaK facility, he had to agree to this plan, which is probably why he was invited to this al Qaeda meeting.

[165] BUR-PEC-005781.

[166] See PEC-WAMY009193. The people present at the Peshawar *shura* (advisory council) were bin Laden, Salim, Abu Ubaydah, Julaidan, and Abu Ibrahim al-Iraqi.

Peshawar, a compromise was reached that the charges were unfounded, and the accusers prohibited from spreading calumnies but, on the other hand, Azzam was not allowed to praise Masoud or fund him through the MaK or Anas.[167]

Another incident was directed against Azzam and Julaidan by Egyptian humanitarian Ahmed Said Khadr (Abu Abdel Rahman al-Kanadi) who had immigrated to Canada and came to Peshawar in the mid-1980s. Khadr accused the MaK, under Azzam and Julaidan, of stealing his *al-Tahadi* Project (Challenge Project), which aimed to match and displace Western cross-border humanitarian aid into Afghanistan. Adel Batterjee from Lajnat al-Birr al-Islamiya was its main financier.[168] Both Khadr and Julaidan had initiated the project together but Khadr accused Julaidan and the MaK of stealing his project and freezing him out of their bank account when he had been abroad on a fund-raising tour. He accused Azzam of being a Saudi spy and thief. This was a serious charge as it challenged Azzam's reputation. The dispute divided the Peshawar Arab community and the Egyptian takfiris sided with Khadr. Both parties agreed to an arbitration/trial by Salim and Dr. al-Sharif, which took place at the end of December 1988. Azzam boycotted the proceeding and presented no defense. The arbitrators awarded the project to Khadr but told him to cease his calumnies against Azzam and Julaidan.[169]

The atmosphere in Peshawar among Arab Afghans had become poisonous. Mustafa Hamid, who was there at the time, described multiple warring Salafi factions. One was pro-Saudi and included most Saudi charities, like the Saudi Red Crescent. It supported the MaK, Azzam, Julaidan (now local director of the Saudi Red Crescent), and an Afghan Salafi in Kunar Province named Jamil al-Rahman. Opposed to them were Salafis centered at the Kuwaiti Red Crescent, where Khadr had an office and in whose hospital Drs. Zawahiri and al-Sharif practiced. Close to this second faction were bin Laden's "al Qaeda," the Tanzim al-Jihad, nascent nationalist groups like the Algerians who went on to become the core of the GIA a few years later, and a few other

---

[167] Anas and Hussein, 2019, at 198–202. Anas could not remember the date of this incident but was sure that it happened before the second incident. See also Tam Hussein's blog , "Musa al-Qarni on the Afghan Jihad," February 24, 2017, available at https://www.tamhussein.co.uk/2017/02/musa-al-qarni-on-the-afghan-jihad/.

[168] BUR-PEC-005672.

[169] BUR-PEC-005651–74; Anas and Hussein, 2019, at 203–204, who seem make this incident more serious than it was; Hegghammer, 2020, at 422–5; Wright, 2006, at 126–7; and Michelle Shephard, 2008, *Guantanamo's Child: The Untold Story of Omar Khadr*, Mississauga, Ontario: John Wiley & Sons Canada, Ltd, at 33–4.

takfiri factions. This created confusion among the Arab Afghans. The takfiris started to argue that the jihad in Afghanistan was not legitimate because the Afghans were not "true Muslims." They advocated that their first priority was to transform Afghanistan into a "true Muslim" country and that they should first fight the Shi'as and Hanafis of Afghanistan before taking on the Kabul regime.[170] In other words, a takfiri faction was undergoing a complete reversal of the Peshawar foreign Muslim community's original mission: from helpers (ansar) to the Afghans to the enemies of the Afghans.

The previous paragraphs give a sense of the deep division in Peshawar among the Arab Afghans, who were no longer united as an ansar to the Afghan mujahedin. By 1988, al Qaeda existed and had been created *in opposition* to the MaK. Lumping all the Arab Afghans together, supporters of MaK, supporters of al Qaeda, and even more extreme takfiris in Peshawar, has no basis in the factual evidence of the time.

### D.  Disaster at Jalalabad and First Contraction of al Qaeda

In early 1989, two events aggravated the situation among the Afghan Arabs in Peshawar. With the Soviet withdrawal from Afghanistan, they had lost what had unified them, namely the occupying foreign infidels. Instead, they were now helping fight a native Afghan regime that pretended to have given up its Communism and become Islamic. To the Arab Afghans, the regime was still a puppet of the Soviet Union. The second was the death of Zia ul-Haq in August 1988, which led to the election of opposition party leader Benazir Bhutto in the fall 1988. The new Bhutto government wanted to get some credit for the anticipated mujahedin victory and pushed for a decisive showdown in Jalalabad between the mujahedin and the Afghan regime.[171] The ISI Directorate quickly mustered forces from the major Afghan resistance parties and, for the first time, allowed Arab Afghans to participate as a group on the same footing as the other parties.

---

[170] See Mustafa Hamid, n.d., "Chatting on Top of the World: 10," Harmony Database AFGP-2002-600088-HT-NVTC, West Point: Combating Terrorism Center, at 54, available at https://ctc.usma.edu/app/uploads/2013/10/Mustafa-Hamid's-Analysis-of-Mujahidin-Activities-Translation.pdf. Hamid's book is derived from his contemporaneous diary.

[171] See Henry Kamm, 1989, "Pakistan Officials Tell of Ordering Afghan Rebel Push," *New York Times*, April 23, at 1.

46

The ISI Directorate, like many people in Pakistan at the time, anticipated that the Kabul regime demoralized by the Soviet withdrawal would quickly collapse at the sight of a large assembled mujahedin force. However, an incident early on in mid-March changed the course of the battle and the next three years. The mujahedin had taken the initiative, overrun an outlying government post, and divided the prisoners among the six mujahedin parties and the Arab Afghan faction. Traditionally, Afghans disarm their enemies and let them go home after a promise to cease fighting. The Arab Afghans instead murdered their prisoners and sent a truck full of the mutilated bodies to Jalalabad as a warning sign that this was the fate of heretics. This had a very chilling effect on regime troops, who decided that they might as well fight to escape this horrible death.[172] Now, the anticipated victory without a fight turned into the Battle of Jalalabad and required the ISI Directorate to transform the mujahedin, who had been fighting hit-and-run guerilla warfare, into a coordinated unit fighting conventional warfare. Needless to say, the ISI Directorate was unable to coordinate the competing and very independent minded factions. Some groups attacked while others simply watched them from an adjacent hill. The fight became a battle of attrition, which turned to the regime's advantage with its superior artillery, aerial bombardment, and Scud missiles. The mujahedin, not used to this type of warfare, gradually withdrew. By May 1989, most observers declared the battle lost.

While the mujahedin withdrew, the Arab Afghans, who had advanced to a flat, exposed, and deserted area south of the Jalalabad airport, stayed put. "Arabs consider withdrawal an act of cowardice and a religious taboo."[173] Bin Laden returned from Saudi Arabia and took personal command of the Arab Afghan forces, seconded by Abu Ubaydah. He stopped all al Qaeda training activities and ordered everyone to Jalalabad. Azzam in Peshawar supported him and wrote glorious celebrations of the martyrs in *al Jihad*, which brought new Arab volunteers from

---

[172] I heard about this incident through my agents at the time. The rumor about it was strong in Peshawar and reported in Tomsen, 2011, at 306; Yousaf and Adkin, 1992, at 230; Gilles Dorronsoro, 2000, *La révolution afghane; Des communistes aux tâlebân*, Paris: Éditions Karthala, at 251; Jean-Christophe Notin, 2011, *La guerre de l'ombre des Français en Afghanistan, 1979–2011*, Paris: Librairie Arthème Fayard, at 407. Wright, 2006, at 403, noted that Essam Deraz, an Egyptian journalist who was covering the battle, did not remember this incident but said that Olivier Roy, a scholar of Afghanistan, heard about it from Afghans inside Jalalabad. In essence, it does not matter whether the incident happened or not. If the regime forces believed the rumor, it certainly motivated them greatly to fight instead of being slaughtered like sheep.

[173] Hamid, n.d., AFGP-2002-600088-HT-NVTC, at 26.

47

abroad that were rushed to the battle without adequate training. Bin Laden led his approximately 500 Arab Afghans in an early July offensive, which was easily repulsed by government forces resulting in a bloodbath.[174] *Al Jihad* reported 80 Arabs killed and more than 100 wounded.[175]

The Arab participation in the siege of Jalalabad exposed them for the first time to Western journalists, who noted their virulent antagonism against the West.[176] This is when the first accusations emerged that U.S. aid to Afghanistan was breeding Islamist fundamentalists, who were training to become terrorists and hijackers.[177] Western public opinion started to turn against the war in Afghanistan, now that the Soviets had withdrawn.

Among Arab Afghans, Bin Laden was blamed and heavily criticized for his role in this senseless slaughter of young Arabs. Hamid was especially vocal at the time complaining about the crime of needlessly spilling so much Arab blood. "Had I been in charge, I would court martial Abu Abdullah [bin Laden], Abu Ubaydah and Abu Hafs and sentence them to death."[178] Discredited, bin Laden returned to Saudi Arabia in early November, leaving behind al Qaeda in disarray as many of his followers drifted away and few replaced them. Jalalabad was the last time that al Qaeda fought as a unit until a decade later. From then on, al Qaeda in Afghanistan focused exclusively on training and rebuilding. In Saudi Arabia, bin Laden shifted his attention to unifying Yemen under Islamist rule and using his Afghanistan trained followers to accomplish this task.[179] Azzam also shared in the blame for the disaster because his hagiographic fantasies in *al Jihad* had inspired many young Arabs to rush to their needless deaths.

Arab anger in Peshawar at bin Laden and Azzam further fragmented the Arab Afghan community as its two anchors, the MaK and al Qaeda, had been discredited. This opened the door for a proliferation of small takfiri groups and camps of all kinds in liberated territories along the Pakistani border.[180] A few prominent al Qaeda members left to establish their own camp, like the Algerians who later went back to their country to form the core of the GIA. Of note, this is

---

[174] Hamid and Farrall, 2015, at 145–58.

[175] Quoted in Bergen, 2006, at 87.

[176] See Bergen, 2006, at 88–91, for two examples of such reporting.

[177] Hamid, n.d., AFGP-2002-600088-HT-NVTC, at 32–3.

[178] Hamid, n.d., AFGP-2002-600088-HT-NVTC, at 2.

[179] Umar Abd al-Hakim (Mustafa bin Abd al-Qadir Setmariam Nasar, better known as Abu Musab al-Suri,), 2004, *The Call for Global Islamic Resistance*, translated by CENTRA, Place and publisher unknown, at 711.

[180] Hamid and Farrall, 2015, at 160–76.

when Samir al-Suwaylim (better known as ibn Khattab) and Osama Azmarai established their respective small camps and groups around Jalalabad.[181]

Undeterred, Azzam and Anas continued their attempt to unify the mujahedin and tried to reconcile its two major factions inside Afghanistan commanded respectively by Hekmatyar and Masoud. They accompanied Hekmatyar during a tour of his commanders around Kabul. When they were in the north of the capital, Azzam and Anas pressed Hekmatyar to meet with Masoud, his great rival. They had almost convinced him when the news of the Farkhar Province massacre of July 9, 1989 reached them. One of Hekmatyar's commanders had ambushed and killed 31 of Masoud's commanders who were traveling through his territory with a safe conduct pass. This of course eliminated the possibility of any meeting between Masoud and Hekmatyar,[182] and was the trigger for the Afghan Civil War, which became a fight of all groups against all groups.

The Afghan Civil War was strictly among Muslims, now that the Soviets had left. The West gradually lost patience with the mujahedin, who were now openly fighting among themselves, and stopped supporting them. Even the Saudi establishment issued fatwas declaring that what was going on in Afghanistan was now just a civil war and no longer a jihad. This removed the legitimacy for any Muslim to come and fight in Afghanistan and for financial contributions for military operations. Aid for Afghan refugees and victims, although decreased, still remained legitimate for Islamic and Western charities.[183]

The death of Salem bin Laden, Osama's supporter, raised the issue of the inheritance of all the bin Laden siblings. In 1989, the new head of the bin Laden family, Osama's half-brother Bakr bin Laden, endorsed a major distribution to all the heirs according to Saudi Islamic law. The estimate of Osama's share was about $18 million, the same as his half-brothers. The 9/11 Commission staff estimated that between 1970 and 1994, bin Laden received a total of about $24 million in annual allowances and dividends as well as the 1989 distribution. After subtracting

---

[181] Muhammad al-'Ubaydi, 2015, *Khattab*, Jihadi Bios Project, West Point: Combating terrorism Center, at 9–12, available at https://ctc.usma.edu/app/uploads/2015/03/CTC_Khattab-Jihadi-Bio-February2015-3-1.pdf.

[182] Anas and Hussein, 2019, at 106–113.

[183] Hamid, n.d., AFGP-2002-600088-HT-NVTC, at 55.

this one-time distribution, bin Laden's annual installments during 1983 and 1994 would have been about half a million dollars.[184]

### E.  Sheikh Abdallah Azzam's Assassination and the Afghan Civil War

Finally, on November 24, 1989, a massive car bomb killed Sheikh Abdullah Azzam and two of his sons as they were on their way to Friday prayers.[185] The disappearance of the last unifying factor of the Arab community in Peshawar shattered it forever. This murder is still unsolved. Azzam's ecumenical message of helping and unifying Afghans to fight against the Communist Kabul regime had become unpopular. His death temporarily brought all the Arab Afghans together in mourning him, but the fragmentation of this community resumed after this brief interlude. Now that he was dead, he became a legend and every future Islamism group would claim him as their founder.

As Arab Afghans fighting in support of mujahedin in Afghanistan decreased, political talk in Peshawar increased. Young Islamists continued to come, and the talk turned to the politics of their own countries. Takfiris from North African countries, Egypt, but also from Saudi Arabia and Yemen started making takfir (declaring them kuffar, non-Muslim, or more precisely heretics since they had been born Muslim) on their respective leaders and governments. Discussions about armed resistance against their own rulers became more prominent among the trainees at the various takfiri camps. Now, the newcomers came only for training and no longer as ansar for the Afghan mujahedin. Some of the newcomers were chemists, like Midhat Mursi (better known as Abu Khabab al-Masri),[186] and exploited their knowledge into explosive expertise. The various camps that emerged, including Sadda, now competed with each other for the best explosive training. "Training notes on explosives and other topics proliferated to the extent that they were sold in photocopy centers in Peshawar. The owners of these shops were holding their own copies–without the knowledge of the owners of the notes–and then sold them to young

---

[184] John Roth, Douglas Greenburg, and Serena Wille, 2004, *Monograph on Terrorist Financing: Staff Report to the Commission*, National Commission on Terrorist Attacks Upon the United States, at 20. Steve Coll independently arrived at the same estimate, in Coll, 2008, at 351–2.
[185] Hegghammer, 2020, at 436–55.
[186] He became the best-known explosive expert in Afghanistan. He had originally joined al Qaeda but branched out on his own and opened his own camp near Derunta, Jalalabad in the 1990's. He also conducted chemical warfare experiments. He manufactured the shoe bombs for would be bombers for Richard Reid and Sajit Badat. He was killed by U.S. forces in early 2006.

Arabs."[187] This new addition to the training of the Arabs, obviously no longer meant for the Afghan scene, alarmed Arab governments. They tightened the aid for mujahedin and Afghan refugees from their own charities and complained to Pakistani authorities which started to make it more difficult for the foreigners to stay in Pakistan.[188] In 1989, Pakistani authorities tried to impose some order on this Arab Afghan community by requiring all charities to register in Peshawar and visas for all visitors.[189] They also banned Arabs from receiving any training at Sadda after Azzam's death. So, Abu Burhan moved his training camp across the border to Khost Province and called it Khalden. Takfiris gradually infiltrated this camp, which in time became the bastion of takfiris. By 1992, Khalden welcomed a large amount of Algerian takfiris who went back to their country to fight a civil war. Abu Burhan retired around 1992 but stayed an extra year as an advisor to the new camp commander, Ali Muhammad al-Fakheri (better known as ibn al-Sheikh al-Libi), one of his protégés. In turn, al-Fakheri recruited Zain Abidin Mohammed Husain (better known as Abu Zubaydah) to help him with the recruits' logistic needs in Peshawar. Contrary to the conventional wisdom shortly after 9/11, Khalden was never part of the al Qaeda network, but a rival network.

Meanwhile, Abu Ubaydah and Abu Hafs started rebuilding al Qaeda that had more or less disintegrated after the disaster of Jalalabad and bin Laden's departure. They reopened Jihadwal, which had been temporarily closed in the mobilization for the Battle of Jalalabad, added a large camp, al-Faruq, and two smaller camps, al-Saddiq and Khalid bin Walid, in its vicinity. Al-Faruq became for a while the Arab Afghans' largest training camp and could accommodate just under 200 people and Khalden was second with a capacity of about 100. This chain of camps in Khost province temporarily made al Qaeda the most important training organization for Islamist newcomers.[190] Arab Afghans confined their activities to training because they no longer believed that an Islamic state could be established in Afghanistan because

---

[187] Hamid and Farrall, 2015, at 141.

[188] Hamid and Farrall, 2015, at 140–1. The ISI Directorate was making it more difficult for Arab Afghans to stay in Peshawar even before the 1992 crackdown, as seen in the accounts of Abdullah Anas, Mustafa Hamid (the collection of his writings at the Harmony Database), and the diaries of Zain Abidin Mohammed Husain (Abu Zubaydah).

[189] Hegghammer, 2020, at 180.

[190] Hamid and Farrall, 2015, at 133–5.

of the corruption of the Afghan leaders in Peshawar.[191] Although both al Qaeda military leaders stayed, most of their Egyptian colleagues who also belonged to Tanzim al-Jihad split from al Qaida and left for Sudan to be near Egypt. An Islamist government had taken control of that country in a bloodless coup in June 1989.

The Iraqi invasion of Kuwait in early August 1990 affected Islamists worldwide. They had no sympathy for Saddam Hussain or the United States but could not stay on the sideline. Bin Laden in Saudi Arabia volunteered his Arab Afghans to liberate Kuwait just as he claimed they had defeated the Soviet Union. He sent a message to his camps in Khost for all the Gulf members of al Qaeda to be on alert to come back and defend the kingdom against a possible Iraqi invasion.[192] The Saudi government, fully aware of the minuscule role that Arab Afghans had played in the war, rejected the offer and turned to U.S. military forces for help. The presence of a large contingent of U.S. troops in Saudi Arabia sowed confusion in the Peshawar Arab community. Should they fight alongside American troops to defend Saudi Arabia? Those who depended on Saudi funding did not want to lose it and sided with Saudi Arabia while takfiris continued to condemn America and the West in general. Al Qaeda members in the Afghan theater refrained from commenting. An Islamic scholar came from Saudi Arabia to explain that since Saddam Hussain was working with Russia, the American presence in the kingdom was permissible, but it would have to leave as soon as the operation was over.[193] Arab Afghans started experiencing harassment from Saudi and their own government's intelligence services and Pakistani authorities.[194]

In Saudi Arabia, bin Laden felt humiliated by the royal family's rejection of his help. The kingdom's authorities also started to harass him because of his opposition to the U.S. military presence in the kingdom. In May 1991, he tricked the Saudi government into letting him leave

---

[191] Mustafa Hamid, n.d., "A Mother's Deep Sorrow/The Airport Project," Harmony Database, AFGP-2002-600092, West Point: Combating Terrorism Center, at 79, available at https://ctc.usma.edu/app/uploads/2013/09/A-Mothers-Deep-SorrowThe-Airport-Project-Translation.pdf.

[192] Robert Lacey, 2009, *Inside the Kingdom: Kings, Clerics, Modernists, Terrorists, and the Struggle for Saudi Arabia*, New York: Viking, at 148–50; Hamid, n.d., AFGP-2002-600092, at 13–4.

[193] Hamid, n.d., AFGP-2002-600092, at 49, 98.

[194] Hamid, n.d., AFGP-2002-600092, at 18, 55–6, 95; Abd al-Hakim (Abu Musab al-Suri), 2004, at 52; see also Brynjar Lia, 2008, *Architect of Global Jihad: The Life of Al-Qaida Strategist Abu Mus'ab al-Suri*, New York: Columbia University Press, at 69–108.

for Peshawar in order to help put an end to the Afghan Civil War.[195] By the time he returned to Peshawar, al Qaeda had shrunk to about 60 trained members.[196] Bin Laden had already decided to move to Sudan with his organization and most of his resources were transferred there. Not much is known about bin Laden's activities during this return to Peshawar. Al Qaeda was not very active in the fight against the Kabul regime to the frustration of the ansar still involved in supporting the Afghan mujahedin.[197]

During this period, an al Qaeda member conducted the organization's first act of political violence outside of the Afghan theater. It was a bizarre attempt on the life of former Afghan King Zahir Shah, who was in exile in Rome. The perpetrator was a Portuguese convert, Paulo Jose de Almeida Santos, who had come to participate in the Afghan conflict on the invitation of some Afghans during Umra, the lesser pilgrimage to Mecca. He arrived in March 1990 (a year after the Soviet withdrawal), trained in an al Qaeda camp and was recruited into the organization. After the fall of Khost in 1991, al Qaeda had grown close to Gulbuddin Hekmatyar, who threatened to kill the king if he dared to come back and re-establish the monarchy. That gave Almeida Santos the idea to go and kill the king. As al Qaeda was still informal at the time, he briefed bin Laden in Peshawar about his intention. When he asked whether it was permissible to attack the king if a child was present, bin Laden replied, "No, no way… We are Muslims, we do not eliminate children." At the end of the discussion, bin Laden was non-committal and did not give Almeida Santos any order. He went to Rome in November 1991 and got invited to the king's house for coffee. After an hour sipping coffee with the king, Almeira Santos stabbed him. The king barely survived. The perpetrator did not defend himself at trial: "It was an act of war in a country that was not at war, so I had to pay the consequences."[198]

---

[195] Lacey, 2009, at 154–6; Coll, 2008, at 381.

[196] This is Hamid's estimate since al Qaeda provided him with most of its forces for an operation in Afghanistan. Hamid and Farrall, 2015, at 178.

[197] For instance, see Hamid, n.d., AFGP-2002-600092, passim; Hamid and Farrall, 2015, at 177–92.

[198] Almeida Santos's interview is translated and published in Bergen, 2006, at 116–20. The initiative came from the perpetrator and, from the perpetrator's confession, it is unclear whether it was sanctioned by al Qaeda, which of course did nothing to stop him. To my knowledge, al Qaeda or bin Laden never took credit for this assassination attempt.

Bin Laden and most of his deputies, Abu Ubaydah, Abu Hafs, Mustafa Abu al-Yazid (Sheikh Saeed al-Masri), and Salim, moved to Khartoum in late 1991[199] or early 1992,[200] leaving behind two consolidated camps, Jihadwal and al-Faruq. Mustafa Hamid used al-Faruq for his Furqan Project, the training of Uzbek, Tajik, and Chechen cadres for the Islamic liberation of their respective countries.[201] However, by the end of 1994, bin Laden closed both camps and their skeleton crew including Hamid left for Khartoum in early 1995.[202] Al Qaeda no longer had any presence in Afghanistan and Pakistan after that, leaving the training of Islamist militants to its rival, Khalden.

The Afghan Peshawar phase of al Qaeda is important to understand because during that period, all Arab Afghans mingled with each other as they formed the Arab expatriate community in Peshawar. Their association, even if they did not collaborate, may have given the appearance of being together, mutually supporting each other. As the narrative makes clear, this was far from what happened on the ground. Toward the end of this phase, bin Laden became critical of the royal family and Saudi charities turned away from him. He seemed to have raised his own money during his tours in the kingdom and had his own money. Many of the plaintiffs' allegations come from this period, which is why I described it in such detail.

### F.  A Saudi Charity in Peshawar: Lajnat al-Birr al-Islamiya

Before leaving Peshawar, let us focus on a Saudi charity, which is at the center of the allegation that WAMY materially supported al Qaeda and the 9/11 terrorists. We have already encountered it in the dispute about the *al-Tahadi* (Challenge) project between the MaK in the

---

[199] Ali Mohammed claimed that he helped transport him to the Sudan in 1991 at his plea agreement hearing, *U.S. v. Ali Mohamed*, S.D. New York, S(7) 98 Cr. 1023 (LBS), October 20, 2000, at 27, at PEC-WAMY015985.

[200] Julaidan, in Bergen, 2006, at 129.

[201] Hamid and Farrall, 2015, at 197–205.

[202] Abu 'Ata al-Sharqi, 1994, "Report from Afghanistan," West Point: Combating Terrorism Center, available at https://ctc.usma.edu/app/uploads/2013/10/Abu-Ata-Al-Sharqi-Reports-from-Afghanistan-Translation.pdf; Vahid Brown, 2008, "Abu'l Walid al-Masri: A Biographical Sketch," West Point: Combating Terrorism Center, available at https://ctc.usma.edu/app/uploads/2011/06/Abul-Walid.pdf

persons of its executives Azzam and Julaidan and Egyptian humanitarian Ahmed Said Khadr.[203] Adel Batterjee from Lajnat al-Birr al-Islamiya (Islamic Benevolence Committee, LBI) was its main financier.[204] Before the present litigation, there have been very few documents about LBI, except for scans of a few scraps of paper found on a computer file in a 2002 police raid of another charity in Sarajevo. Much of the allegations about WAMY's alleged support of al Qaeda focus on LBI's head in Peshawar, Adel Batterjee.

Batterjee was born in 1946 into a rich family in Jeddah, Saudi Arabia. His family made its fortune through pharmaceuticals. A profile written by FBIS (Foreign Broadcast Information Center, which later became the Open Source Center) and dated July 2005 reports that he graduated from the University of Kansas in 1968 with a degree in mathematics.[205] Adel Batterjee became a wealthy businessman in his own right and also volunteered for charity work. In the mid-1980s, he wanted to get involved in humanitarian work in support of the Afghan refugees. At some time in the mid-1980s, Batterjee approached WAMY Secretary General, Dr. Maneh al-Johani, with the idea of creating an organization under the auspices of WAMY to work with Afghan refugees.[206]

The exact date of the foundation of LBI is not clear. Dr. Noorwali was vague about this date in his two declarations and at his deposition. This is not unusual for people who are raised and work every day under the Hijri calendar to have difficulties converting it to the Gregorian calendar. I also have trouble doing this conversion and rely on various tools available on the Internet. Let me try to approximate this date. A typed LBI document dated March 1989 stated, "In the few years that LAJNAT AL-BIRR was established…"[207] indicating that LBI was already a few years old. LBI's 7th meeting of its council of supervisors took place on July 13, 1993.[208]

---

[203] BUR-PEC-005651–74; Anas and Hussein, 2019, at 203–204, who seem make this incident more serious than it was; Hegghammer, 2020, at 422–5; Wright, 2006, at 126–7; and Michelle Shephard, 2008, *Guantanamo's Child: The Untold Story of Omar Khadr*, Mississauga, Ontario: John Wiley & Sons Canada, Ltd, at 33–4.

[204] BUR-PEC-005672.

[205] PEC-WAMY019289. This FBIS analysis is so full of errors that I will not use it beyond this piece of information.

[206] Dr. Abdul Wahab Noorwali's Deposition Transcript (henceforth Dr. Noorwali deposition), July 24, 2019, at 228.

[207] WAMYSA031288, WAMYSA031306.

[208] WAMYSA1235455, Noorwali deposition, Exhibit 266.

Dr. Noorwali stated in his second declaration that LBI's board met on an annual basis.[209] Backtracking six years gives 1987 as its first meeting, probably its foundation meeting. So, I estimate 1987 as LBI's foundation year. This is confirmed in a mid-1990s petition requesting a change of name from LBI to WAMY (Pakistan), which states that LBI started to function in 1987[210] and that it had established the Imam Abu-Hanifa Teachers Training Institute in Peshawar, which had graduated 38 teachers in 1987.[211]

When Batterjee approached Dr. al-Johani with his proposal, WAMY was in the business of receiving ideas for potential projects from its overseas offices in various countries. If a project fit with WAMY policies, WAMY would seek funding for that project. If not, it was not funded. So, WAMY's funding was project specific, not organization specific. WAMY's policy was not to send any funds unless they were being allocated for specific projects and activities. When a project was funded, WAMY sent money from its bank account in Saudi Arabia to the project or its chapter carrying out this project. When the project was completed, the chapter overseeing the project sent a project report and financial statement. WAMY's finance department reviewed all incoming funds and deposits and properly allocated them to these specific projects based on the annual budget. This department reviewed all the invoices, requested transactions, and project finance documentation, including the provision of aid to individuals or funding of projects. WAMY's field offices in various countries would send all project invoices to the appropriate office in Saudi Arabia (Pakistan came under the Jeddah office) to confirm the expenditures. WAMY's accountants reviewed these documents and submitted their approval. Once the finance department gave its approval, the chief accountant reviewed the requests and had to give his approval before a project was funded or a check was sent.[212]

There was a policy of tight supervision of all the projects at WAMY's headquarters in Riyadh. There were monthly meetings to discuss the progress of each project. WAMY Saudi Arabia followed up on every project, including a field review if necessary. If project reports and financial reports were not received, WAMY sent someone from Jeddah to review the project on

---

[209] Declaration of Dr. Abdul Wahab Noorwali in Support of Defendant World Assembly of Muslim Youth, March 4, 2019 [I assume that the date 4/3/2019, which appears at 14 of the document, refers to the European way of writing dates], henceforth Noorwali declaration II, at 8.
[210] LBI Summary sheet, at WAMYSA028420.
[211] See WAMY028427.
[212] Noorwali declaration II, at 4–6.

the ground and get financial records. Annual external audits were carried out for all projects to authenticate WAMY's accounting procedures and track where it spent its money. In 2008, there was a massive flood in Jeddah that destroyed or carried away many records that were lost.[213]

Apparently after Dr. al-Johani accepted his proposal, Batterjee agreed to this bookkeeping requirement and they created LBI, which operated as a separate and independent charity in Jeddah and Peshawar under WAMY's auspices and chapter. Batterjee was never a WAMY executive[214] or even a WAMY employee to my knowledge and from my review of the discovery material. To implement LBI, Dr. al-Johani established a board of supervisors in Saudi Arabia, of which he appointed himself the chairman and to which he invited Dr. Noorwali to become a member from its inception. This board held annual meetings to review LBI's proposed projects for the year, grant its approval if warranted, and supervise Batterjee's handling of the specific projects in the field.[215]

Batterjee was in charge of the operations in the field. LBI operated in Pakistan and Afghanistan and provided social welfare assistance and support programs for the needy; established and supported orphanages, schools and educational programs in Peshawar and Afghanistan, hospitals and primary health care; provided university scholarships; funded technical and vocational training programs; and established teachers and special education training programs, like the Abu Hanifa Institute in Peshawar. It also operated camps for refugees in Afghanistan as well as a 100-bed hospital in Paktia, Afghanistan and was involved with orphanage centers inside Afghanistan.[216]

In its first two years of operation, LBI sponsored over 10,000 orphans; established and operated 12 orphan support centers, four specialized clinics, and five surgical hospitals inside Afghanistan; and supported eight emergency teams inside Afghanistan. It printed and distributed more than 900,000 textbooks annually. It also established and supported nine girls' schools, three secondary schools for boys, 205 primary schools inside Afghanistan, and two vocational training centers.[217] In 1989, LBI proposed at least two new projects to WAMY: the establishment of an

---

[213] Noorwali declaration II, at 6–7.

[214] FED-PEC0049569.

[215] Noorwali deposition, July 24, 2019, at 226–9, 231–2; Noorwali declaration II, at 8. Dr. Noorwali is listed as a founder of LBI in WAMYSA031300.

[216] Noorwali declaration II, at 8–9; WAMYSA031300.

[217] WAMYSA031308.

LBI office inside Afghanistan starting January 1, 1989, and costing U.S. $118,718, of which LBI would finance half through private donations,[218] and an agricultural and water resources development project that started in Kunar Province Afghanistan in February 1989, with an estimated cost of U.S. $444,622, of which LBI had already started to fund from private donations and requested from WAMY only 40% to 45% of funding.[219]

In 1989, LBI had an estimated budget of more than U.S. $8 million. The major part of this budget was funded through private donations from the citizens of Saudi Arabia.[220] WAMY provided funds for less than half of the cost of each project as can be seen from the above two examples. So, in addition to receiving funds from WAMY for specific projects, LBI also undertook fundraising activities on its own to support its projects. WAMY was not involved in any LBI fundraising. Initially and for at least three years, Batterjee kept extensive and thorough records of LBI's activities. He routinely provided written operation reports for LBI projects for discussion at annual LBI board [of supervisors] meetings.[221] For example, for each of the two projects mentioned in the previous paragraph, LBI provided a very detailed budget.[222]

In October 1988, LBI tried to register as a voluntary agency with support from the Saudi Red Crescent for Afghan Refugees in Pakistan,[223] but its application was turned down in May 1989 by the central government of Pakistan in Islamabad for unknown reasons.[224] The Commissioner for Afghan refugees in Peshawar appealed this rejection in November 1989 by noting that Western and United Nations humanitarian organizations were experiencing donor fatigue in contrast to Islamic charities that needed encouragement.[225] The appeal worked and the Commissioner for Afghan Refugees notified LBI in June 1990 that the Government of Pakistan had no longer any objections to their application.[226] Finally, on March 12, 1991, Lajnat al-Birr al Islamiah was formally registered with the North-West Frontier Province of Pakistan.[227]

---

[218] WAMYSA031309–14.

[219] WAMYSA031293–8 and WAMYSA031301.

[220] WAMYSA031308.

[221] Noorwali declaration II, at 8, 10.

[222] WAMYSA031289–92, and WAMYSA031302–4, respectively.

[223] WAMYSA063930.

[224] WAMYSA063931.

[225] WAMYSA027705.

[226] WAMYSA027716.

[227] WAMYSA057751, WAMYSA031896.

So, at least up to 1989, Batterjee complied with the strict WAMY bookkeeping requirements allowing WAMY to keep track of the funds it disbursed for each specific project. This was an important date because, as shown in a previous section, al Qaeda dramatically contracted after the defeat of Jalalabad in the first half of that year. Most of its members were discouraged with bin Laden's leadership, left and went home or joined even more extreme groups. Facing intense criticism in Peshawar, bin Laden returned to Saudi Arabia for the next two years and did not return to Pakistan. The al Qaeda camps functioned at a much lower level than before and eventually closed down in early 1994. In fact, al Qaeda moved to Sudan in 1992 and left a skeleton crew in Afghanistan until even this last contingent also moved to Sudan in early 1994.

As a prominent member of the Arab ansar supporting Afghans, Batterjee no doubt interacted with other prominent members of this expatriate community, including Azzam, bin Laden, Julaidan, Abdel Said Khadr…[228] Even if, as a hypothetical, one assumes for the sake of argument that he helped members of this community, given WAMY's control of its funds that were totally earmarked for specific pre-approved projects, he would have done so out of his own money or money that he had raised himself, independent of WAMY funds.

While Batterjee certainly associated with Arab Afghans who later became terrorists, they were freedom fighters (as defined by the United States) at the time. They were not yet considered terrorists and had not yet conducted any terrorism operations. That would come much later. However, with the departure of many of the foreigners from Peshawar, it seems that Batterjee became much closer to Afghan warlord Gulbuddin Hekmatyar. People who were in Peshawar at the time told me that Batterjee was at Hekmatyar's side around Kabul when this warlord, who had just been appointed prime minister of Afghanistan, tried to conquer Kabul in April 1992. When Hekmatyar failed to do so and Afghanistan disintegrated into a civil war of former mujahedin fighting against each other, a sort of free for all, completely destroying the dream of the Arab ansar of establishing an Islamic state in Afghanistan, Batterjee became disillusioned and left Afghanistan and Pakistan.

This appears to be when he gradually neglected his reporting requirement to WAMY. His relationship with WAMY deteriorated in terms of his financial, administrative, and reporting

---

[228] BUR-PEC-005651–74.

59

obligations. He disregarded WAMY's procedures and it no longer became clear to the board of supervisor what he was doing. He gave the LBI board incomplete evidence of projects performed or reported on them after the fact. Although WAMY made available a support team for him, he avoided it and started to conduct his operations alone. Dr. Noorwali was part of a financial management team to help him, but Batterjee refused to cooperate with it. He became a one-man show.[229]

WAMY's progressive disappointment with Batterjee's accounting practices came to a head in the summer of 1992. WAMY's secretary general and his two assistants met with Batterjee in Jeddah on July 7, 1992 to sort this out. They all agreed to freeze LBI's donation collections for three months until they could reach an agreement with the Saudi authorities. They also asked Batterjee for a report about the activities of LBI. Two days later, WAMY's secretary general sent a letter to the Saudi authorities explaining the relationship between WAMY and LBI. On July 11, 1992, the WAMY Board of Trustees met and resolved to freeze the activities of LBI.[230] WAMY's progressive disappointment with Batterjee was compounded by the fact that he also carried out some activities in Sudan and Bosnia, which had not been pre-approved by the LBI supervisory council.[231] WAMY Secretary General Dr. Maneh al-Johani forced Batterjee's resignation from LBI altogether and appointed Dr. Hasan Bahafzallah as the interim LBI executive director for a period of six months. The exact date of Batterjee's dismissal is not positively known but his replacement with Dr. Bahafzallah is well documented. Minutes of the WAMY Board of Trustees dated January 13, 1993 indicate that Batterjee was still the LBI executive director and a member of the LBI council of supervisors.[232] However, at the 7th Annual meeting of LBI supervisory council on July 8, 1993, the dismissal of Batterjee was mentioned and the council approved Dr. Bahafzallah's appointment for another six months, starting July 21, 1993.[233] Counting six months backward from that date suggests that Dr. Bahafzallah's was first

---

[229] Declaration of Dr. Abdul Wahab Noorwali in Support of Defendant World Assembly of Muslim Youth, March 30, 2018, Exhibit Noorwali 254, henceforth Noorwali declaration I, at 5–6; Noorwali declaration II, at 11–2; Noorwali deposition, July 24, 2019, at 236–9.
[230] WAMYSA1235429–34.
[231] Letter from Dr. al-Johani to Prince Salman bin Abdul Aziz, May 11, 1993, at WAMYSA061345. The date in the translated document is wrong. The Arabic document is dated 19/11/1413, which corresponds to May 11, 1993.
[232] WAMYSA1235442–3.
[233] WAMYSA1235458.

appointed on January 22, 1993, implying that Batterjee was dismissed before that date but after January 13, 1993.

Although WAMY now no longer had any relationship with Batterjee, it discovered that Batterjee tried to solicit donations in the kingdom in a fraudulent manner and ran into trouble with the Saudi authorities.[234] Unbeknownst to WAMY, Batterjee had created a different organization, Benevolence International Foundation, in Chicago. In his corrected declaration Enaam Arnaout stated that BIF was founded in 1992, opened its first office in Fort Lauderdale, Florida in 1993 and later that year moved its office to Illinois.[235] However, the documentary evidence shows that the Benevolence International Foundation (BIF, or *Monathamat al-Birr al-Dawaliyya* in Arabic) was incorporated on March 30, 1992, in the State of Illinois with an address in Burbank, Cook county. Batterjee and two other Saudis were listed as its officers.[236] According to its statutes,[237] BIF was "established as an international charity foundation having Liechtenstein as its country of domicile … its head office in the city of Chicago and … an executive office in the city of Jeddah."[238] There was no mention of either WAMY or LBI in the document. On April 4, 1992, Batterjee and two others opened a new account (separate from LBI) with Emirates Bank International Limited in Peshawar for BIF.[239] About nine months later, on January 2, 1993, BIF was registered as a society in Peshawar, listing its address as Park Road, University Town, Peshawar (same address as LBI).[240] BIF received tax-exempt status from Illinois on February 11, 1993.[241] The next day, an agent tried to register BIF as a non-profit in Florida, listing Batterjee as its president.[242] A BIF annual report dated February 23, 1993 lists Adel Batterjee its president, secretary, and one of its directors.[243]

---

[234] Noorwali declaration I, at 6; Noorwali declaration II, at 12.

[235] PEC-WAMY009091.

[236] FED-PEC0049416–8.

[237] WAMYSA057723–44.

[238] WAMYSA057723.

[239] WAMYSA031887. See WAMYSA064048 for the constitution of this organization, called Benevolence International Organization.

[240] WAMYSA034246, WAMYSA064048.

[241] FED-PEC0056680.

[242] FED-PEC0056678–9. For some reason, Florida revoked its authority to transact business in Florida on August 26, 1994. FEC-PEC056675.

[243] FED-PEC0061795.

Up to February 1993, BIF was not active. However, at the end of February 1993, which was the start of Ramadan when Muslims give to charity, BIF distributed leaflets soliciting donations for education of Muslim children for two bank accounts in Saudi Arabia. It listed its address as P.O. Box 7600 Jeddah 21472 and five phone numbers in Jeddah, Ottawa, Canada, Chicago, Khartoum, and Zagreb.[244] The leaflets were very similar to authentic LBI leaflets soliciting funds for orphans. The authentic LBI leaflets gave different bank accounts and an address in Jedda (P.O. Box 9072 Jeddah 21413), Riyadh, Medina, and Dammam. Both leaflets had the same logo of two hands touching over a globe. WAMY's secretariat was notified about this deception on 25–6 February 1993.[245] Charitable organizations must be accredited in Saudi Arabia and solicitation of cash donations requires authorization from the Saudi government. WAMY (and LBI functioning under its auspices) was accredited and had such authorization to raise money in the kingdom, but not BIF, which had nothing to do with WAMY and was completely separate from LBI. Because of the similarity of the names (the use of the noun al-Birr, benevolence, in both) and logos between LBI and BIF, WAMY believed that it was inappropriate for Batterjee to use this similarity which might confuse potential donors about these two organizations.[246]

As a result, WAMY through its Secretary General Dr. al-Johani immediately sent Batterjee (incidentally addressing him not as the LBI executive director since he was no longer with LBI, but as the BIF chairman) a letter on 26 February 1993 to the effect that WAMY had "learnt about your formation of an organization bearing the name Benevolence International Foundation. Since the similarity between the Foundation [BIF] and the Benevolence Islamic Committee [LBI] within the Assembly [WAMY] is clear, in terms of the unified emblem of both of them and their role and function, I request of your Excellency that this be in consideration in the future, since it may have a confusing effect on the dealers and the donors, despite the fact that the two are not organizationally or administratively related. I urge you to alert those who deal with your organization to be observant of that issue, if the Foundation's [BIF] emblem and name remain the same, since the Assembly [WAMY], along with its affiliate Benevolence Committee [LBI], is not responsible for the Foundation's [BIF] activities or advertisements. I also wish to

---

[244] WAMYSA057782, WAMYSA034247.
[245] See and contrast WAMYSA057782, WAMSA029936.
[246] Noorwali deposition, July 24, 2019, at 256–9; Noorwali declaration II, at 12–3.

alert those who cooperate with the Foundation [BIF], in donation-collection within the Kingdom, to not confuse the Committee [LBI] and the Foundation [BIF], considering the importance of this matter."[247]

About two and a half months later, on May 11, 1993, Dr. al-Johani also informed Prince (now King) Salman bin Abdul Aziz, who was coordinating Islamic relief in Afghanistan, about Batterjee's dismissal from LBI and apparent deception to try to pass his personal charity (BIF) as LBI, an approved charity functioning under the sponsorship of WAMY. "The *former* [LBI] executive director Sheikh Adel Batterjee has proactively done some activities in Sudan, Bosnia and Herzegovina, which were not pre-approved by the supervisory council. He has also done some activities related to fund-raising domestically, which were questionable to the officials in Makah [Mecca] as well as in the Ministry of Interior. The Assembly's [WAMY] Board of Trustees has convened and made a decision to review the Committee's [LBI] activities and define the reasons that have led to some administrative violations. Following that, the supervisory council convened and made a decision to appoint a new executive director and dismiss Sheikh Adel Batterjee from the Committee's administration." Dr. al-Johani summed up the current situation: "Sheikh Adel Batterjee is no longer associated with the administration of the Benevolence Committee [LBI]. He has also resigned from the supervisory council. I have recently known that he has formed a foundation under the name 'Benevolence International Foundation' [BIF] that has offices in a number of countries overseas. Its logo resembles the logo of the Benevolence Committee [LBI]. Likewise, its name indicates such resemblance. I have written him a letter in which I asserted that the Assembly [WAMY] is not responsible for this organization [BIF]. I also emphasized that the similarities between both names should not [be] exploited to do any activities that might be ascribed to the Assembly [WAMY]. Such an organization [BIF] does not have an official presence within the Kingdom."[248] As BIF's fraudulent attempts to raise money in the kingdom brought WAMY and LBI under the scrutiny of the Kingdom's security services, Dr. al-Johani requested from the prince that both WAMY and LBI be allowed to continue to raise money for the needy Muslims all over the world.[249]

---

[247] FED-PEC0114419.
[248] WAMYSA061345. Italics added for emphasis.
[249] WAMYSA061346.

Dr. Noorwali, an LBI board of supervisor member, later confirmed that WAMY Secretary General Dr. al-Johani had forced Batterjee to resign at the early 1993 meeting of the WAMY Board of Trustees because of Batterjee's because of his multiple reporting failures and apparent fraudulent attempt to raise money in the kingdom and to confuse potential donors.[250] Minutes of the LBI board of supervisor annual meeting on July 8, 1993 confirmed that Dr. Hasan Bahafzallah had replaced Batterjee as LBI executive director.[251] Batterjee's resignation from LBI in early 1993 completely ended his relationship with WAMY. LBI, now without Batterjee, continued to work independently, but still under the umbrella of WAMY.[252] Batterjee's dismissal from LBI generated some strong antagonism between him and WAMY, which required the intervention of several prominent third parties to smooth things between them.[253]

Apparently, despite Batterjee's complete dismissal from LBI in early 1993, the confusion generated by him persisted and the WAMY Board later decided to dissolve LBI and replace it with a WAMY field office in July 1995. "This was done in order to clearly cut ties with Adel Batterjee and to ensure that his activities with BIF were not attributed to or affiliated with WAMY."[254] On July 26, 1995, the Saudi Ministry of Interior issued an order to shut down LBI and close its headquarters in the Kingdom of Saudi Arabia. Around that time, Dr. Esam al-Filali replaced Dr. Hasan Bahafzalllah as LBI executive director. On April 2, 1996, WAMY's secretary general sent a proposal to the Saudi Ministry of Islamic Affairs to liquidate LBI and transfer its funds back to WAMY. On May 23, 1996, the WAMY Board of Trustees issued its decision to liquidate LBI and to form a committee to oversee LBI's liquidation process.[255] Six days later, Dr. al-Filali resigned and Dr. Ibrahim Saleh Abul-Ela was appointed in its place to undertake the liquidation and dissolution of LBI. On June 2, 1996, The Saudi Ministry of Interior instructed WAMY to deposit LBI's funds into the account of the Saudi Ministry of Islamic Affairs. On June 14, 1996, the LBI dissolution committee discussed the procedures of dissolving LBI, its employees' affairs, its projects, and deal with its income and expenditures.[256] On June

---

[250] Noorwali declaration II, at 11–13; Noorwali deposition, July 24, 2019, at 236–9, 259.
[251] WAMYSA1235458; Noorwali deposition, July 24, 2019, at 239–40.
[252] Noorwali deposition, July 24, 2019, at 239.
[253] Noorwali deposition, July 24, 2019, at 244–5; WAMYSA1235456.
[254] Noorwali declaration II, at 13. See also WAMYSA065181–5.
[255] WAMYSA032007–13.
[256] WAMYSA032014–20.

24, 1996, the Saudi Ministry of Islamic Affairs issued a letter directing LBI to stop its activities, close its headquarters and submit an inventory of its properties. On October 2, 1996, LBI transferred Saudi SR 8,130,982 (about $ 2 million), the sum total of LBI's funds, to the account of the Saudi Ministry of Islamic Affairs. On March 4, 1997, WAMY's secretary general cancelled a number of jobs at the WAMY office in Pakistan. The Saudi Ministry of Islamic Affairs then reimbursed WAMY the amount of LBI's money in order to continue WAMY's financial commitments for specific projects that had been initiated by LBI.[257] The Peshawar post office box number 1055 that both LBI and WAMY used for its correspondence belonged to the Abu Hanifa Teachers Training Institute in Peshawar.[258] Batterjee had also used it when he was in Peshawar up to 1993. This complete dissolution of LBI and the establishment of WAMY (Pakistan) was a clean break between LBI and WAMY (Pakistan), which replaced it Pakistan. As Dr. Noorwali stated, "the relationship with Adel Batterjee was cut, ended, and he used to carry out his activities in Benevolence International Foundation, of which we do not know any details. And our offices in the field, whether in Pakistan or other regions, did not deal with Benevolence International Foundation."[259]

As Drs. Bahafzallah and al-Filali took over as LBI chairmen, respectively, they submitted LBI to annual external auditing by the Pakistani firm of Sidat Hyder Qamar Maqbook & Co., a representative of Arthur Anderson.[260] LBI was operating in Pakistan and Afghanistan only, and its total expenditures for the year 1993–4 was Rs 59.7 million (U.S. $ 1.9 million)[261]; 1994–5, Rs 47.3 million (U.S. $ 1.5 million)[262]; 1995–6, Rs 43.4 million (U.S. $1.38 million).[263] The 1996–7 audit report specified that the organization petitioned to change its name to WAMY in December 1996 and the permission was granted in July 1997.[264] Afterwards, the organization was called WAMY-Pakistan Office. There was no mention of Benevolence International Foundation or BIF anywhere in the audit reports. From all the audits carried out when the organization was still

---

[257] WAMYSA065183–5.

[258] WAMYSA065185.

[259] Noorwali deposition, July 24, 2019, at 267.

[260] WAMYSA018660–83.

[261] WAMYSA018683, with the conversion of 31.5 Pakistani rupees to a U.S. dollar.

[262] WAMYSA018683, with the conversion of 31.5 Pakistani rupees to a U.S. dollar.

[263] WAMYSA018671, with the conversion of 31.5 Pakistani rupees to a U.S. dollar.

[264] WAMYSA018655.

named LBI,[265] it was clear that LBI had its main assets in Pakistan and Afghanistan, and not in Bosnia or Sudan.[266]

As for Batterjee's involvement with BIF, according to USA Fitzpatrick's proffer and as per the minutes of BIF's Board of Directors on March 15, 1993, Batterjee and his two other board members were replaced by Arnaout as executive director and two others. At that point, nothing much had been accomplished in the United States.[267] This was confirmed by an Arnaout memorandum stating that he had learned that Batterjee had incorporated BIF in the United States but had not yet conducted any business through that entity. "Mr. Arnaout convinced Mr. Batterjee to let him run BIF-USA as a Muslim charity, and, with $50,000 of seed money provided by Mr. Batterjee, began the operations of BIF-USA in May 1993…. Mr. Arnaout assumed full control of BIF-USA and at all times ran that organization as an independent business with no affiliations to LBI or any of the organizations run by Mr. Batterjee. Mr. Arnaout did have occasional contacts with Mr. Batterjee, and on a couple of occasions met individuals associated with LBI or other charitable organizations."[268] This change of directors was reflected in the paperwork submitted to the state of Illinois.[269] The minutes of the BIF meeting of September 15, 1994 showed that Arnaout was its executive director and Loay Bayazid its president. BIF had offices in Chicago, Jeddah, and Sudan.[270] There was no mention of a BIF office in Pakistan. Nor is there any mention of WAMY in any of the early BIF documents. LBI and BIF clearly were different and separate Islamic charities.

### G. Re-emergence of al Qaeda in Sudan

BIF but not LBI followed al Qaeda to Sudan. The four years that bin Laden and al Qaeda spent there are relatively neglected in the al Qaeda literature.[271] Apparently, bin Laden had

---

[265] WAMYSA018648–83.

[266] See also the report on LBI at WAMYSA065181–5.

[267] BUR-PEC-014544.

[268] *U.S. v. Arnaout*, N.D. Illinois, Eastern Division, No. 02 CR 892 (SBC), Defendant's Sentencing Memorandum, filed June 9, 2003, at 3–4.

[269] FED-PEC0049420.

[270] PEC-WAMY009236.

[271] The standard reference books on the history of al Qaeda leading to the 9/11 attacks like Anonymous (Scheuer) (2002), Coll (2004), Bergen (2006), and Wright (2006) devote only a few pages to this long episode, which lasted almost as long as the initial Afghan/Peshawar period

carefully prepared his move to Khartoum at the invitation of the new Sudanese government.[272] He sent a team to explore the possibility of the move and it came back with a positive recommendation. He then sent a small contingent to prepare the ground for the move. Jamal al Fadl, a Sudanese member of al Qaeda, was tasked to rent or buy real estate to facilitate al Qaeda's relocation. Bin Laden invested heavily in the Sudanese economy to generate a stream of revenue for al Qaeda. In quick succession, he created Wadi al-Aqiq, a holding company for his various enterprises that included the Laden International Company (for export), Taba Investment, and al-Hijra Construction for road and other infrastructure construction.[273] The Sudanese government sometimes paid bin Laden in real estate. He also had an agricultural company, al Thimar al-Mubaraka, which had a huge one-million-acre farm at al-Damazin, which employed approximately 4,000 people and from which he exported sesame, peanuts, white corn, and gum Arabic.[274] Rumors of bin Laden's wealth were picked up by the C.I.A., which believed that he had invested $50 million in a local bank.[275] As we saw in the previous estimate of his wealth, this seems much beyond bin Laden's financial capability.

Bin Laden of course did not forget military training for al Qaeda. He set up a refresher training camp for weapons and explosives at the Damazin farm.[276] Several journalists have accused al Qaeda of sending some of its members to Bosnia.[277] However, they did not provide

---

from al Qaeda's creation to its departure to the Sudan and the later Afghan period when it returned to Afghanistan from the Sudan to the 9/11 attacks. Each of these periods lasts about four years. The exception is the Combating Terrorism Center monograph, Clint Watts, Jacob Shapiro, Vahid Brown, 2007, *Al-Qaida's (Mis)Adventures in the Horn of African*, West Point: Combating Terrorism Center, available at https://ctc.usma.edu/app/uploads/2010/06/Al-Qaidas-MisAdventures-in-the-Horn-of-Africa.pdf. Unfortunately, much of what we know about this crucial period of al Qaeda's evolution comes from Jamal al Fadl, who turned out to be an unreliable source.

[272] Testimony of al Fadl, *U.S. v. Usama bin Laden et al*, S.D.N.Y., S(7) 98 Cr. 1023-LBS, henceforth Fadl testimony, February 6, 2001, at 233–4.

[273] Fadl testimony, February 6, 2001, at 240–3.

[274] Wright, 2006, at 168, Mohamed Zeki Mahjoub, in Bergen, 2006, 126–8.

[275] Anonymous (Scheuer, the CIA chief of the station dedicated to bin Laden), 2002, at 123. In fact, the CIA greatly overestimated bin Laden's wealth until the 9/11 Commission investigation.

[276] Fadl testimony, February 6, 2001, at 244–6. This must have been later on during bin Laden's stay in the Sudan, since Mahjoub, who ran the farm until May 1993 swore there were no terrorist activities that took place there (Bergen, 2006, 128) and the instructors (Sayf al-Islam and Sayf al-Adl) that al Fadl named did not come to the Sudan until after their stay in Somalia, as we shall soon see.

[277] Kohlmann, 2004; Bergen, 2006, at 108; and Coll, 2008, at 399, 409.

any evidence of this claim.[278] Some former Arab Afghans, like Abdullah Anas, came to Bosnia early in the fighting in 1992, to explore the possibility of moving and establishing a MaK there.[279] They may have included a few disillusioned former al Qaeda members, who had drifted away from the organization during its disintegration after the Jalalabad disaster. They came to Bosnia on their own and were not sent there by bin Laden or al Qaeda. Most of the newcomers who had been in Afghanistan had nothing to do with al Qaeda. After the end of the Bosnian War, some Arab Bosnians, like Abu Zubayr al-Haili, who had been an Afghan veteran but not an al Qaeda member at the time, later joined al Qaeda after 1998 in Afghanistan.

On the contrary, several sources denied that al Qaeda participated in Bosnia. Hamid, who had taught at al Qaeda camps in Afghanistan before they closed and then stayed with bin Laden in Khartoum from the beginning of 1995 until May 1996, wrote that al Qaeda did not become involved in Bosnia or Chechnya. In fact these two conflicts took potential recruits away from al Qaeda, which only offered them administrative work in Sudan.[280] Nasir al-Bahri, for instance, a Saudi from Yemeni descent, who later became bin Laden's bodyguard, went to Bosnia to fight in the second half of 1995 and when the fight was over, he tried to go to Chechnya. His book never mentions al Qaeda in Bosnia.[281] More likely was bin Laden's financial contribution to the Bosnian mujahedin,[282] but I found no primary source evidence for this. The most comprehensive analysis of the Bosnian jihad did not find any direct involvement by al Qaeda.[283]

---

[278] We dealt with Kohlmann in the methodology part of this report. He does not name a single confirmed al Qaeda member in his account besides al Fadl who came on an exploratory trip. See Li, 2020, at 34–5, for an analysis of Kohlmann's claim. Bergen just makes his claim that al Qaeda sent some of its members to Bosnia, but none of his more than 60 excerpts in the section where he makes this claim deals with Bosnia. Coll cites an article of an interview with Nasir al-Bahri (Abu Jandal) for his statement, but al-Bahri was just recounting rumors as he did not meet bin Laden and al Qaeda until early 1997, more than a year after the end of the Bosnian conflict. See al-Bahri, 2010, at 69–71.

[279] Anas and Hussein, 2019, at 236.

[280] Hamid and Farrall, 2015: 193–4.

[281] Al-Bahri, 2010, at 43–58.

[282] See Anonymous (Scheuer), 2002, 138 – 140. Scheuer uses secondary sources, like foreign press articles, for his claims.

[283] Darryl Li, 2012, *Jihad and Other Universalisms: Arab-Bosnian Encounters in US. World Order*, Ph.D. Dissertation, Anthropology and Middle Eastern Studies, Cambridge, Mass.: Harvard University; and Darryl Li, 2020.

Instead of Bosnia, bin Laden and al Qaeda focused on nearby Somalia. By 1992, Somalia faced a widespread famine aggravated by a complete breakdown of order, preventing the distribution of food to the starving population. A U.N. sanctioned Operation Restore Hope led by the United States was carried out in Somalia from early December 1992 and credited with saving more than 100,000 lives in the spring of 1993. However, U.S. forces got entangled in the free-for-all situation in the war-torn country as each local warlord wanted to keep his respective area of control. This culminated in the famous "Blackhawk Down" incident on October 3, 1993, resulting in two U.S. helicopters shot down with RPGs and the deaths of 18 U.S. troops and two Malaysian soldiers and 84 wounded, while the Somalis claimed to have suffered 312 dead and 814 wounded. This bloody incident led to the decision to withdraw U.S. troops from Somalia, a task accomplished by March 31, 1994.[284]

The heralded arrival of U.S. troops in Somalia alarmed bin Laden and al Qaeda, whose paranoia matched their grandiosity in their beliefs that this humanitarian intervention was not directed at famine relief but at them. At their Thursday evening discussions, Abu Ubaydah was convinced that it was just a pretense to invade Sudan and destroy them in a pincer movement from Saudi Arabia and Somalia. Now that the Soviet Union had collapsed, al Qaeda's main enemy was the United States, the head of the snake, and they had to stop it. Al Qaeda's religious adviser argued that, in attacking their enemy, they should not worry too much about civilian collateral damage. If the victim was a good Muslim, he would be welcomed in paradise. If he was a bad person, he would go to hell.[285] This permission to kill civilians as collateral damage in accomplishing one's mission was a critical step toward al Qaeda's path toward becoming a full-blown terrorist organization. The decision was made to send al Qaeda trainers to Somalia to help expel U.S. troops from that country and to re-create in Somalia what Afghanistan had been for the ansar.

---

[284] Walter Poole, 2005, *The Effort to Save Somalia, August 1992 – March 1994*, Washington, D.C.: Office of the Chairman of the Joint Chiefs of Staff, Joint History Office, available at https://www.jcs.mil/Portals/36/Documents/History/Monographs/Somalia.pdf; see also the journalistic account, Mark Bowden, 2000, *Black Hawk Down: A Story of Modern War*, New York: Penguin Books.

[285] Fadl testimony, February 6, 2001, at 269–70; see also bin Laden's CNN interview with Peter Arnett in 1977, in Lawrence, 2005, at 54.

The first incident involving al Qaeda was an incident that took place on December 29, 1992 in Aden, Yemen, where U.S. troops stopped over on their way to Somalia. Al Qaeda bombed two hotels where they believed the troops were quartered. They were wrong, but two tourists were killed, and seven people wounded. This incident escaped notice from U.S. forces at the time and U.S. intelligence learned about it later from al Qaeda sources.[286] Nevertheless, al Qaeda transformed in their mind this mistaken killing of innocent civilians into a great victory, as U.S. troops left the country (on their way to Somalia). Bin Laden boasted to a friend visiting him in Khartoum, "We hit them in Aden, and they left. We hit them in Somalia, and they left again."[287] In his later interview with Peter Arnett, bin Laden boasted that Aden was an American defeat, after Vietnam and Beirut, and before Somalia.[288]

Bin Laden dispatched Abu Hafs back to Peshawar to brief its camps' trainers and send them on to Somalia. Only Sayf al-Adl (and soon even he would go there) and Mustafa Hamid remained, forming a skeleton crew for the two remaining al Qaeda camps in Afghanistan. The trainers' mission was to find a location for military operations that would replace Afghanistan, be near Arab countries, and help Muslims in Somalia and Ogaden. They left in early February 1993 and flew to Nairobi, where they met with Abu Ubaydah, who filled them in on details. They were divided into two small teams of trainers to help al-Ittihad al-Islam forces and a larger team of nine trainers to set up a military camp in the Ogaden region. Despite the presence of its military leaders in Somalia for a year and a half, al Qaeda failed to turn Somalia into another Afghanistan or establish a beachhead in that country.

Although al Qaeda's expedition to Somalia was a failure, it later claimed that it was a victory and boasted that it downed the two helicopters in the Black Hawk Down incident leading to U.S. withdrawal from Somalia.[289] This seems very unlikely. Al Qaeda trainers were far away, not in the Mogadishu area, and they trained al-Ittihad-al-Islam factions, not the people involved in the firefight.[290] There were multiple reasons for al Qaeda's failure: Somalia was simply too far

---

[286] Anonymous (Scheuer), 2002, at 135. Since there is very little information about this incident, it is difficult to understand the degree of involvement of al Qaeda personnel.

[287] Wright, 2006, 200.

[288] Lawrence, 2005, at 54–5.

[289] Watts, Shapiro, and Brown, 2007, at 93–4.

[290] Hamid, who was a close friend of Abu Hafs, wrote that his friend trained Somali Islamists, not Mohamed Farah Aideed's secular militia, which was involved in the fighting. Abu Hafs and al Qaeda did not participate in the fight. Hamid and Farrall, 2015, at 189–90.

from Sudan and too expensive to operate in; the Somali were Sufi and not receptive to al Qaeda's Salafi message; al Qaeda's trainers were too elitist and cut off from the locals; and al Qaeda got caught in the chaos of the Somali civil war.[291] The investment of all the senior al Qaeda military leaders in the Somali campaign prevented them from being involved in any other theaters such as Bosnia or Chechnya.[292] Al Qaeda's military capacity was simply too small and got all sucked up in that adventure.

Nairobi became al Qaeda's intermediary station between its "Africa Corps" in Somalia and its Khartoum headquarters. Abu Ubaydah was the overall commander of the Africa Corps from Nairobi. Khalid al-Fawwaz set up al Qaeda's office there and started a car business to create some cover and income. Wadih el-Hage created a charity organization that provided al Qaeda members with backstopped documents and a cover for their presence there. Abu Hafs was a frequent visitor. In December 1993, Ali Mohammed, a former Egyptian and U.S. military man and a member of Tanzim al-Jihad who became one of the senior trainers for al Qaeda, conducted surveillance on American and other Western targets in Nairobi for possible retaliation against U.S. involvement in Somalia. Among them was the American Embassy and Mohammed took pictures of it, which he then showed to bin Laden in Khartoum in the presence of Abu Ubaydah and Abu Hafs. Bin Laden pointed to a spot where a truck could go as a suicide bomber. The operation was shelved when the U.S. contingent withdrew from Somalia in March 1994.[293] Al Qaeda's willingness to carry out such an operation in 1994 showed that it had finally crossed the line into terrorism.

In Khartoum, al Qaeda financially supported two Egyptian terrorist groups, the Islamic Group and the Tanzim al-Jihad, and the Algerian GIA, which during this period carried out

---

[291] Saif al-Islam, 1993, *Al Qaida's Operations in Africa*, Harmony Database, AFGP-2002-800621, West Point: Combating Terrorism Center, available at https://ctc.usma.edu/app/uploads/2013/10/Letters-on-al-Qaida's-Operations-in-Africa-Translation1.pdf; Saif al-Islam, 1994, *The Ogaden File*, Harmony Database, AFGP-2002-600104, West Point: Combating Terrorism Center, available at https://ctc.usma.edu/app/uploads/2013/09/The-Ogaden-File-Operation-Holding-Al-Msk_Translation.pdf. Sayf al-Islam al-Masri was the head of the Jihadwal camp until his departure. See also Watts, Shapiro, and Brown, 2007, at 29–46.

[292] Al Fadl testified that he learned that al Qaeda supported mujahedin in Chechnya during 1995, Fadl testimony, February 6, 2001, at 301–304

[293] *U.S. v. Ali Mohamed*, S.D.N.Y., S(7) 98 Cr. 1023 (LBS), October 20, 2000, at 27–8, at PEC-WAMY015985–6.

terrorist attacks in Cairo, Addis Ababa, Islamabad, Algeria, and France. Al Qaeda also linked up with the Lebanese Hezbollah. Ali Mohammed later confessed that he had arranged security for a meeting between bin Laden and Imad Mughniyeh, who had masterminded the truck bomb attacks against the U.S. Embassy and the Marine barracks in Beirut in 1983.[294] Al Qaeda sent three senior military men, including Sayf al-Islam al-Masri, former head of Jihadwal and one of the Africa Corps' leaders to Lebanon to train with Hezbollah.[295] This may be how al Qaeda learned about suicide bombing tactics. Hezbollah had initiated them, Hamas used them in Israel a decade later, Tanzim al-Jihad used a truck bomb suicide operation against the Egyptian Embassy in Islamabad in 1995, and finally al-Qaeda used the same tactics in 1998 in East Africa.

During al Qaeda's stay in Khartoum, an event took place which influenced al Qaeda. On February 26, 1993, Abdul Basit Abdul Karim (better known as Ramzi Yousef) exploded a truck in the basement of the World Trade Center, New York. He was not connected to al Qaeda but seemed to be one of the takfiris left behind on the Afghan Pakistani border. The explosion killed six people and injured more than a thousand others. This attack by Arab Afghan takfiris in the United States jolted the Saudi establishment to crackdown on dissidents, including Osama bin Laden, who had criticized the Saudi government and supported terrorist operations worldwide. Saudi organizations immediately examined their own staffs and projects to make sure they were not directly or indirectly contributing to dissidents or, worse, to terrorists that might embarrass the government. This was also around the time that WAMY became aware of Adel Batterjee's fraudulent attempts to solicit money for BIF by mimicking LBI and forced Batterjee's resignation from LBI. On June 16, the head of the bin Laden family, Bakr bin Laden, proceeded to expel Osama as a shareholder of the two major bin Laden companies because of the harm to the family's business caused by Osama's criticism. This process which lasted until the end of the year deprived Osama of access to any funds derived from his family's business. His share totaled about $10 million, which was frozen under court supervision and put in a trust for him, if he ever reconciled with the kingdom, or his heirs. In February 1994, his family publicly repudiated him and in April 1994, the ministry of interior stripped him of his Saudi citizenship.[296]

---

[294] *U.S. v. Ali Mohamed*, S.D. New York, S(7) 98 Cr. 1023 (LBS), October 20, 2000, at 29, at PEC-WAMY015987.

[295] Fadl testimony, February 6, 2001, at 290–8.

[296] Coll, 2008, at 405–9.

Bin Laden's presence in Khartoum did not put him beyond the reach of Peshawar takfiris. On February 4, 1994, three of them led by a Libyan, who had been under the influence of takfiris in Peshawar, went to the mosque where bin Laden prayed and fired indiscriminately into the crowd, killing 16 people and wounding about 20 others. The next day, they drove by and shot at the Wadi al Aqiq office. In the afternoon, they shot up bin Laden's compound, but bin Laden's guards responded. The firefight resulted in the death of two of the assailants and injuries to the last one as well as some of the al Qaeda guards. Bin Laden asked Ali Mohammed, the former Egyptian and American army officer, to train his bodyguards.[297]

Bin Laden retaliated against the Saudi royals for the freezing his assets in the kingdom. Two major Saudi dissidents had fled to England, where they set up shop, flooding the kingdom with faxes from their respective London offices.[298] Bin Laden followed suit and joined them in opposing the Saudi royal family. He dispatched Khaled al-Fawwaz from Nairobi to London to open the office of the Advice and Reform Committee, which became al Qaeda's semiofficial news agency. In his first fax, on April 12, 1994, bin Laden criticized King Fahd's foreign and domestic policies. On December 29, he faxed an open letter to Grand Mufti Sheikh bin Baz urging him to distance himself from the tyrannical regime. Over the next year, he escalated his criticisms of the royal family, culminating in his "open message to King Fahd" on August 3, 1995, in which he accused the king of corruption, mismanagement, straying away from religion, and urged him to accept responsibility and resign.[299]

On August 12, the Saudi Interior Minister escalated the conflict with dissident Islamists when it announced that it had executed Abdallah al-Hudhayf, an Arab Afghan who had believed that the Saudi police were torturing Islamists and had thrown sulfuric acid at a policeman's face. The disfigured policeman survived, which meant that the death penalty was legally not applicable. His execution outraged his friends, who swore revenge. On November 13, 1995, a truck bomb blew up the Saudi Arabian National Guard (SANG) barracks in Riyadh, killing seven people, including five Americans, and wounding 34 more. This was the first large scale

---

[297] Wright, 2006, at 192–3.

[298] Mamoun Fandy, 2001, *Saudi Arabia and the Politics of Dissent*, New York: Palgrave, at 115–175.

[299] Osama bin Laden, 1994–8, *Letters from bin Laden*, Harmony Database, AFGP-2002-003345, West Point: Combating Terrorism Center, statements 1, 11, and 17, available at https://ctc.usma.edu/app/uploads/2013/10/Letter-from-Bin-Laden-Translation.pdf.

bombing in the country's history and triggered a large-scale crackdown on Afghan and Bosnian veterans in the kingdom. Four friends of al-Hudhayf confessed under torture to carrying out the bombing and having been inspired by bin Laden's faxes. They were immediately executed before a more comprehensive investigation could be carried out.[300] The SANG bombing and the quick executions of the alleged perpetrators consummated the final break between bin Laden and the royal family. In the next three years, the Saudi government carried out three more waves of large-scale arrests (totaling more than 3,000 people) of dissidents and especially Afghan and Bosnia veterans.[301]

Bin Laden's poor business decisions in Sudan further aggravated al Qaeda's financial status. For instance, he wasted a quarter of a million dollars for the purchase of a plane that he only used once. In early 1993, he tasked Wadih el-Hage to ask Essam al-Ridi, an Egyptian American flight instructor in Texas, to buy for about $250,000 a jet airplane with a range of 2,000 miles able to transport missiles from Peshawar to Khartoum. Al-Ridi found a T-39 aircraft in storage[302] and refurbished it for $230,000. Because its range was limited to 1,500 miles, al-Ridi flew it to Khartoum from Dallas, via Sault Ste Marie (Canada), Frobisher Bay (Iqaluit, Canada), Iceland, London, Rome, Cairo, and finally Khartoum.[303] Bin Laden offered al-Ridi $1,200 per month, the highest salary offered by bin Laden, for "flying the airplane, doing the crop dusting and the cargo."[304] Al-Ridi turned him down and returned to the United States. "A few months" later, el-Hage called him to fly the aircraft with five passengers from Khartoum to Nairobi, which he did and immediately returned to the U.S.[305] Sometime later, el-Hage called

---

[300] Wright, 2006, 210–1; Coll, 2008, 432; Hegghammer, 2010, at 70–3. No evidence ever surfaced that the perpetrators were linked to bin Laden or al Qaeda.

[301] Hegghammer, 2010, at 74.

[302] Testimony of Essam al-Ridi, *U.S. v. Usama bin Laden et al*, February 14, 2001, henceforth Ridi testimony, at 564–6. Bergen, 2006, at 130 mistakenly reported that it was a "T389" airplane, which to my knowledge does not exist. Looking further into this mystery, I noted that Gunaratna, 2002, at 37, had made the same mistake.

[303] Ridi testimony, at 567. Gunaratna neglects the London stop in his book and, four years later, Bergen makes the same mistake.

[304] Ridi testimony, at 575. For some reason, Gunaratna, at 37, added, "Al-Ridi was tasked to learn about crop-dusting before returning from the U.S. [sic], a technique that can also be used to disperse chemical or biological agents." This was not even raised in the testimony. Gunaratna's carelessness with details and frequent insinuations, as just illustrated, quickly undermined his credibility among counter-terrorism scholars.

[305] Ridi testimony, at 579–80.

74

him again to fly the airplane. In his testimony, al-Ridi was not sure of the time, but it happened after November 1993 and el-Hage was living in Nairobi. He believed it must have been a year and a half later.[306] The aircraft had been parked for all this time and was in "very terrible condition" from heat and sandstorm damage. Al-Ridi cleaned up the twin turbojets, inflated the tires, recharged the batteries and hydraulics with the help of the airport staff, which had experience servicing only propeller airplanes. When he turned on the engines, a lot of fire came out burning off the remaining sand. Then he performed a few touch-and-goes before landing. The main brake system failed as did the alternate brake system and the hand brake. He turned off the engines to slow down, but could not prevent the aircraft from running out of runway and crashing into a sandpile. Al-Ridi immediately returned to Cairo as he did not want to be known as an associate of bin Laden.[307] The plane was a total loss resulting in a complete waste of money as bin Laden just used the airplane once.

Other examples of waste of money was the fact that bin Laden fell for a scam to buy Uranium for $1,500,000[308] and he tried to import bicycles from Azerbaijan to Sudan, where no one rode bicycles.[309] The Sudanese business environment was not conducive to recover these losses. Bin Laden's poor business acumen had previously been offset by injections from his own money to fill in financial needs. Without this cushion now that his money was frozen, his poor business judgment especially in the Sudanese environment burned the remains of what bin Laden had inherited from the 1989 distribution of the family holdings. His opposition to the royal family dried up any possibility that Saudi organizations or supporters might overtly bail out al Qaeda's growing deficit because they were strongly influenced by the internal politics of Saudi Arabia. Bin Laden's strong complaints about Saudi charities were a common theme in his anti-government faxes from London. He advised Saudis to donate directly to trusted individuals or organizations for use for Muslim causes and urged them to avoid Saudi charities, presumably

---

[306] Ridi testimony, 584–5. El-Hage moved to Nairobi when al-Fawwaz moved to London in early spring 1994.

[307] Ridi testimony, 588–93.

[308] Fadl testimony, February 7, 2001, at 360–6. Al-Fadl testified that he was given a $10,000 bonus for his involvement in this purchase. However, al-Fadl seems to be the only source for this scam, and some of my colleagues are skeptical that it ever happened.

[309] Fadl testimony, February 6, 2001, at 304–5.

including WAMY, and use instead the "trusted … charitable societies in Qatar, Kuwait, Sudan, Yemen, and Jordan."[310]

In a paradoxical way, the disappearance of Saudi funds to bin Laden might have freed him from the constraints imposed by his dependence on them. Before, his dependence on his family money and charitable contributions was a check on bin Laden's path to political violence. Now that he was completely abandoned by his family and his country, he was free from any constraint.

Bin Laden's and al Qaeda's cash flow crisis at the end of 1994 probably prevented al Qaeda from participating in the jihad in Bosnia and Chechnya in 1994–6 for lack of funds. The crisis also undermined the solidarity predicated on financial security. On a personal level, one of his wives divorced him and returned to live in Saudi Arabia. His eldest son, Abdullah, abandoned him as well in order to live in the same comfort as his cousins in the kingdom.[311] Al Qaeda's head of finances, Madani al-Tayeb (Abu Fadl al-Makki), who was married to one of bin Laden's cousins, defected back to the kingdom as well.[312] Al-Yazid (Sheikh Saeed) replaced him. Strapped for cash, al-Fadl, who was on al Qaeda's financial committee's staff, embezzled $110,000 which eventually forced him to betray al Qaeda.[313] When L'Houssaine Kherchtou, who went to flight school in Nairobi in 1993–4 at al Qaeda's expense to become bin Laden's pilot, returned to Khartoum, bin Laden told him that he lost all his money and there was none left. He reduced people's salary and could not pay for Kherchtou's return to Nairobi to renew his pilot's license. Later in December 1995, when Kherchtou's wife needed $500 to deliver their baby via a Caesarian section, Sheikh Saeed, the new head of al Qaeda's finance, told him that there simply was no money left. Kherchtou had to borrow the money elsewhere. When al Qaeda moved back to Afghanistan, Kherchtou left the organization.[314]

---

[310]  Bin Laden, 1995, *Letters from Bin Laden*, Harmony Database, AFGP-2002-003345, West Point: Combating Terrorism Center, available at https://ctc.usma.edu/app/uploads/2013/10/Letter-from-Bin-Laden-Translation.pdf. See especially Statements 13 "Prince Salman and Ramadan Alms" (February 12) and Statement 18 "The Bosnia Tragedy and the Deception of the Servant of the Two mosques" (August 3). The quote is at 92.

[311] Coll, 2008, at 414–5.

[312] *U.S. v Usama bin Laden et al*, February 15, 2001, at 840–3; Wright, 2006, at 199.

[313] Fadl testimony, February 7, 2001, at 383–92. He claimed that he paid back about $30,000 when he was discovered.

[314] L'Houssaine Kherchtou, *U.S. v. Usama bin Laden et al*, February 22, 2001, henceforth Kherchtou testimony, at 1283–8.

In terms of money transfers, al Qaeda used personal couriers. At the East Africa Embassies Bombings trial, various witnesses testified how they personally carried cash abroad. Al Fadl delivered $100,000 to Jordan;[315] Khechtou $10,000 to Nairobi;[316] and Abdullah Muhammad Fazul (Harun) was Abu Ubaydah's personal cash courier in Nairobi.[317] Al Qaeda also exploited some charities like Mercy International Relief Agency to get some identity cards from them through one of the charity's employees who had previously been an al Qaeda member.[318] This charity based in Ireland was closed shortly after the embassy bombing. Al Qaeda members also created bogus charities like Help Africa People, founded by Wadih el-Hage in Nairobi to provide them with cover to stay in the country.[319]

By 1995, terrorism had climbed to the top of the U.S. national security agenda. The Japanese cult Aum Shinrikyo had carried out a Sarin attack on the Tokyo metro in March 1995. The discovery of a plot to blow up a dozen airliners over the Pacific surprised the administration. The devastation of the April Oklahoma City bombing woke up U.S. officials to the possibility of a large-scale terrorist attack on American soil. The World Trade Center bombing two years before was still on everyone's mind. On June 27, 1995, the Islamic Group carried out an attempt on Egyptian President Hosni Mubarak in Addis Ababa. On November 13, Arab Afghans bombed the SANG headquarters in Riyadh. Six days later, the Tanzim al-Jihad bombed the Egyptian Embassy in Islamabad. The two Egyptian groups were headquartered in Sudan, which, bowing to international pressure, expelled them from the country, severing the close ties between al Qaeda and Tanzim al-Jihad. For the United States government, this was not enough. Although there did not seem to be any coordination between these terrorist attacks, bin Laden was seen as their financier. U.S. government officials saw bin Laden as the Ford Foundation of terrorism: aspiring terrorists approached him with proposals, and he would fund the worthy projects. U.S. embassy staff in Khartoum also felt harassed by people connected with bin Laden. The White House decided to close its embassy there and pulled its personnel out in February 1996. The U.S. ambassador serviced the country with trips from abroad. A few weeks later, the United States presented at the U.N. evidence of Sudanese official involvement in the Addis Ababa attack as

---

[315] Fadl testimony, February 6, 2001, at 318–20.

[316] Kherchtou testimony, February 21, 2001, at 1185.

[317] Ashrak Hussein (Sikander Juma), *U.S. v. Usama bin Laden et al*, April 18, 2001, at 4288–9.

[318] Kherchtou testimony, February 21, 2001, at 1188–9.

[319] Watts, Shapiro, and Brown, 2007, at 94–5.

well as another attempt on the Egyptian president in New York. Sanctions were imposed on Sudan. In response, the Sudanese government suggested expelling bin Laden to reestablish normal relationship with the United States. The Department of Justice had not yet any ground to indict him and declined to ask for his extradition. The Saudis also refused to take him back.[320]

Sudanese officials told bin Laden he had to go. The Sudanese government had paid him in land and factories for his investments in Sudanese infrastructure. On his way out, bin Laden was forced to sell them at a small fraction of their worth. He lost most of his money in this fire sale, which probably amounted to about $10–15 million or just about all the money left at his disposal.[321] He reached out to friends in Afghanistan who welcomed him. He only invited a few al Qaeda members to return with him to that country. Many, including Mamdouh Salim, decided not to follow him and were each given $2,400 and a plane ticket home.[322] The Sudanese government chartered two planes from Ariana Airlines for bin Laden, and he flew to Afghanistan with his family and about 50 followers on May 18, 1996.[323] Three days later, Abu Ubaydah drowned in a ferry that sank on Lake Victoria, killing more than 600 people.[324]

Bin Laden returned to Afghanistan nearly destitute. As the 9/11 Commission staff concluded, "When bin Laden was pressured to leave Sudan in 1996, the Sudanese government apparently expropriated his assets and seized his accounts, so that he left Sudan with practically nothing. When bin Laden moved to Afghanistan in 1996, his financial situation was dire; it took months for him to get back on his feet."[325] From $29 million that he had invested in Sudan, bin

---

[320] Daniel Benjamin and Steven Simon, 2002, *The Age of Sacred Terror*, New York: Random House, at 228 – 47. The authors were members of the National Security Council at the time. See also Coll, 2004, at 318–26.

[321] This is far off from the rumor mill at the time, reflected in Abdel Bari Atwan, 2006, *The Secret History of al Qaeda*, Berkeley, California: University of California Press, at 52. Atwan claims that bin Laden told him that the Saudi government had frozen his assets of $200–300 million and that he had lost $165 million in Sudanese projects. According to Coll, 2008, at 492–5, the CIA and the U.S. Government in general had uncritically accepted this inflated figure of $300 million as the amount of bin Laden's wealth on the basis of no solid information.

[322] Kherchtou testimony, February 22, 2001, at 1286.

[323] Wright, 2006, at 222–3; Hamid and Farrall, 2015, at 207–11.

[324] *U.S. v Usama bin Laden et al*, February 14, 2001, at 628.

[325] Roth, Greenburg, and Wille, 2004, at 20. See also, *9/11 Commission Report*, at 170 (FN 114, at 506, based on several NSC memos). These conclusions are based on extensive investigations by the FBI, the CIA, the Financial Crimes Enforcement Network (FinCEN), the interrogations of plot participants, and the Commission staff investigations.

Laden left with just $1.1 million[326] to run an organization of several dozen people and more than a hundred dependents. Al Qaeda underwent a second large contraction, like the previous one after the disaster of Jalalabad, and had to rebuild from the ground up.

The Sudanese phase of al Qaeda is crucial and often neglected by scholars. Al Qaeda became a terrorist organization during that period. Before, al Qaeda seemed focused on training to help local Islamist movements trying to liberate their respective countries from their tyrannical regimes. It had not yet carried out any terrorist operation anywhere (with the exception of the bizarre attempt on King Zahir Shah's life). Even in Sudan, it did not carry out any terrorist attack (with the possible exception of the Aden attack on which very little is known and therefore it is hard to credit al Qaeda for it). However, during the Sudanese exile, al Qaeda became a truly terrorist organization, ready to take on the United States. Ironically, as Western intelligence agencies started to view bin Laden as the financier of terrorism, he stopped being so because of his own financial woes. All the restraints on bin Laden from Saudi influence and especially in terms of fundraising in the kingdom disappeared as bin Laden broke with the royal family and joined Saudi dissidents. Because of it, Saudi charities avoided him and his organization, as was clear from his faxed complaints from London.[327]

Specifically, on February 12, 1995, bin Laden complained that the "Saudi regime" prevented funds from reaching deserving Muslims, and presumably his own organization. According to him, the regime "was dissolving charitable organizations that used to deliver donations from citizens to the many needy people inside and outside the country. It replaced them with organizations and foundations subservient to royal family members and particularly, Prince Salman." Bin Laden continued, "we … wish to draw the attention of all donors to the danger of donating funds or zakat to these foundations and organizations. The regime is using them against Allah and his Messenger. We are asking the donors to provide these funds directly to the needy, whether, inside or outside the country. They could also provide it to those trusted

---

[326] See the document found in the 2011 Abbottabad raid, often referred to bin Laden's will, but more formally titled, "In Regard to the Money that is in Sudan," available at https://www.dni.gov/files/documents/ubl2016/english/In%20regard%20to%20the%20money%20that%20is%20in%20Sudan.pdf. There is no date on this document.

[327] Bin Laden, 1995, *Letters from Bin Laden*, Harmony Database, AFGP-2002-003345, West Point: Combating Terrorism Center, available at https://ctc.usma.edu/app/uploads/2013/10/Letter-from-Bin-Laden-Translation.pdf.

individuals who will deliver them (TN: to trusted people). This way, hearts will be assured that these donations are delivered to legitimate needy people, without having abusers from the al-Sa'ud (family) meddle with it. Allah says, 'Allah orders you to give consignment to his people.' It is known that these leaders cannot be trusted. There are other safe ways you that [sic, that you?] can assist in delivering funds to those who deserve them. Among them are, Benevolence Foundations in Qatar, Kuwait, Jordan, Yemen, Sudan, and others. To assure that the funds transfer to these foundations' bank accounts, we draw your attention to the importance of transferring these funds outside the peninsula, away of the pursuing regime's spies."[328] Presumably, the Saudi charities that bin Laden urged Saudi citizens to avoid included WAMY.

Seven months later, on August 3, 1995, bin Laden repeated his warnings for Saudi citizens not to contribute to Saudi charities in relation to helping Muslim victims worldwide, especially Palestine, Bosnia, and elsewhere, because of the regime's alleged diversion of these funds. "We are drawing their attention to the risk of forwarding those contributions through the ruling regime and its organizations. We are advising them to deliver their contributions directly to the people or through safe hands of individuals, organizations, and societies that are trusted, such as the charitable societies in Qatar, Kuwait, Sudan, Yemen, and Jordan. We are advising them to be careful that their contributions stay far from the pursuit of the servant of the two holy mosques and his agents, and to make sure that the money will reach the people it is intended for. They must be sure that the money does not fall into the hands of the shameless members of the Saudi family."[329] Again, presumably, WAMY is included in the Saudi charities to avoid according to bin Laden.

From the start of the Khartoum exile on, Saudi charities (BIF was not a Saudi charity because it was headquartered in Chicago) played no further role in the evolution of al Qaeda to 9/11. Because al Qaeda lost almost all of its money, whatever contribution to al Qaeda that these charities might have made prior to the move to Sudan was completely wiped out as bin Laden returned to Afghanistan.

---

[328] Bin Laden, 1995, "Prince Salman and Ramadan Alms," (Statement 13), in *Letters from Bin Laden*, Harmony Database, AFGP-2002-003345, West Point: Combating Terrorism Center, February 12, at 51-2.
[329] Bin Laden, 1995, "The Bosnian Tragedy and the Deception of the Servant of the Two Mosques," (Statement 18), in *Letters from Bin Laden*, Harmony Database, AFGP-2002-003345, West Point: Combating Terrorism Center, August 3, 1995, at 91–2.

### H.  Return to Afghanistan: Declaration of War on the United States

In order to raise money and attract new recruits, bin Laden needed publicity. During his exile in Sudan, bin Laden had shied away from any interview, except for one given to *al Quds al Arabi* in the wake of the attempt on his life. For two years, he had periodically issued statements through his Advice and Reform Commission office in London, but no interviews. After landing in Jalalabad, he started writing a long epistle declaring war on the United States, which he hoped might catch people's attention. He also started giving interview for journalists. In the half year after his return, he gave five interviews[330] and published his epistle declaring "Jihad Against the Americans Occupying the Land of the Two Holy Mosques."[331] In 1997, he gave eight press interviews[332] in addition to two television interviews, a brief one for London Channel 4, broadcast on February 20, 1997[333] and a longer one for CNN's Peter Arnett, broadcast on May 12, 1997.[334] In the first half of 1998, bin Laden gave another ten interviews to the press before the East Africa Embassy bombings.[335] In addition, he led other jihadi leaders in issuing a fatwa (authoritative legal opinion) under the name of the "World Islamic Front" urging "Jihad against Jews and Crusaders" on February 23,[336] held a press conference at his Jihadwal camp in Khost

---

[330] I suspect that the first one by Fayizah Sad published in Rose al-Yusuf on June 17, 1996 might have been some form of disinformation to discredit bin Laden because of the vast number of inaccuracies and the allegation that he had ties with Iran. For the rest of the interviews, see *Compilation of Usama Bin Ladin Statements, 1994 – January 2004*, FBIS Reports, January 2004. Bin Laden also gave a lengthy interview online on the Nida'ul Islam website in November 1996, reproduced in Lawrence, 2005, 31–43.

[331] The full text of the "Ladenese Epistle" published on August 23, 1996, is at *Compilation of Usama Bin Ladin Statements, 1994–January 2004*, at 13–28, and is excerpted at length with a different translation in Lawrence, 2005, 23–30.

[332] *Compilation of Usama Bin Ladin Statements, 1994–January 2004*, at 38–55.

[333] *Compilation of Usama Bin Ladin Statements, 1994–January 2004*, at 37–38.

[334] Reproduced in its entirety in Lawrence, 2005, at 44–57. See Peter Bergen, 2001, *Holy War, Inc.: Inside the Secret World of Osama bin Laden*, New York: The Free Press, at 1–23, and Bergen, 2006, at 197–86, for the cloak and dagger background of how this interview came about.

[335] *Compilation of Usama Bin Ladin Statements, 1994–January 2004*, at 55–74.

[336] See Lawrence, 2005, at 58–62.

on May 26,[337] and gave a television interview at his al-Faruq camp to John Miller of ABC News on May 28, which was broadcast two weeks later and again on September 18, 2001.[338]

Within two years after his return, bin Laden's perspective on his enemy evolved. In his August 1996 epistle, he no longer focused on the Saudi regime, which he still claimed had desecrated its legitimacy, but on the true enemy of God and Islam. He therefore urged Muslims everywhere to conduct jihad against Israelis and Americans so as to expel them in defeat and humiliation from the holy places of Islam (which included Israel).[339] By March 1997, he told CNN's Peter Arnett, "our main problem is the US government, while the Saudi regime is but a branch or an agent of the US."[340] His call for jihad was focused "on striking at the [U.S.] soldiers in Saudi Arabia." He warned that "even though American civilians are not targeted in our plan, they must leave." Furthermore, "regarding the American people, they are not exonerated from responsibility, because they chose this government and voted for it despite their knowledge of its crimes in Palestine, Lebanon, Iraq, and in other places, and its support of its client regimes."[341] In his February 1998 World Islamic Front fatwah, he hardened his position and took it to its extreme conclusion, "To kill the American and their allies–civilians and military–is an individual duty upon every Muslim in all countries, in order to liberate the al-Aqsa Mosque and the Holy Mosque from their grip,"[342] With this fatwah, the stage for indiscriminate murder of civilians was now set.

Shortly after bin Laden's return, the Taliban captured Kabul and became the ruler of most of Afghanistan. It extended hospitality to bin Laden and al Qaeda, but Bin Laden's growing visibility and his declaration of jihad against the United States drew some criticism from his

---

[337] See Bergen, 2006, at 202–4; *Compilation of Usama Bin Ladin Statements, 1994–January 2004*, at 68–71; Al-Bahri, 2010, at 88.

[338] *Compilation of Usama Bin Ladin Statements, 1994–January 2004*, at 104–6; Bergen, 2006, at 415, FN 47. See also John Miller's cloak and dagger account of his interview and longer portions of the interview in John Miller, 1999, "Greetings, America. My name is Osama bin Laden. A conversation with the most dangerous man in the world," *Esquire*, (February), at 96, available at https://www.esquire.com/news-politics/a1813/osama-bin-laden-interview/; Al-Bahri, 2010, at 88–90.

[339] *Compilation of Usama Bin Ladin Statements, 1994–January 2004*, at 13–28, and Lawrence, 2005, 23–30.

[340] Lawrence, 2005, at 45.

[341] Lawrence, 2005, at 47.

[342] Lawrence, 2005, at 62.

hosts. In fact, the Taliban's leader, Mullah Omar ordered bin Laden to stop talking to the media. Bin Laden disregarded the order and continued giving press interviews to the irritation of his hosts.[343]

All this publicity attracted only a trickle of followers to train in al Qaeda's newly re-established camps. Most of the Muslim youths in search of jihad after the end of the Bosnian war were looking for a conflict where Muslims were fighting infidels. One of them was still Somalia and its province of Ogaden, but the conditions there discouraged most foreigners from getting involved.[344] In the mid-1990s, the major attraction for restless and belligerent young Muslims in search of a semi-sanctioned jihad was Chechnya.[345] The champion of the Arab ansar in Chechnya was Samir al-Suwaylim (ibn Khattab) who had his own resources and funds. He was a rival of bin Laden and, at the time, far more popular among Gulf youths, perhaps because he supported the royal family as he sometimes fought under the Saudi flag. The cease-fire in Chechnya in August 1996 and consequent withdrawal of Russian troops gave Suwaylim a victorious reputation.[346] As the two most prominent neojihadis of the mid-1990s, he and bin Laden reached out to each other. However, "Khattab did not like al-Qaeda. They exchanged a few letters but that was it. Khattab was the victorious one. He did not need al-Qaeda. His front was more popular."[347] There did not seem to be a relationship between the Arab ansar in Chechnya, dominated by Suwaylim, and al Qaeda.[348]

---

[343] Hamid and Farrall, 2015, at 217–22.

[344] Al-Bahri, 2010, at 57–62.

[345] See for example, Aukai Collins, 2002, *My Jihad: The True Story of An American Mujahid's Amazing Journey from Usama Bin Laden's Training Camps to Counterterrorism with the FBI and CIA*, Guilford, Connecticut: The Lyons Press, at 41–130. The Saudi religious establishment sanctioned this conflict as a jihad, see Muhammad al-Ubaydi, 2015, *Khattab*, Jihadi Bios Project, West Point: Combating Terrorism Center, at 20–1, available at https://ctc.usma.edu/app/uploads/2015/03/CTC_Khattab-Jihadi-Bio-February2015-3-1.pdf; and Hamid and Farrall, 2015, at 248.

[346] Al-Ubaydi, 2015, at 21.

[347] Hamid, in Hamid and Farrall, 2015, at 184.

[348] Hamid (Hamid and Farrall, 2015, at 184) recalled a fighter, Abu Islam al-Masri, who had left al Qaeda in the early 1990s and later went to fight in Chechnya, but he did not do so as an al Qaeda member. Al-Fadl testified that Madani al-Tayeb told him that al Qaeda had set up a "relief organization" in Baku to smuggle people into Chechnya. However, the testimony was garbled due to poor translation and it is unclear whether this office already existed or al-Tayeb wanted al-Fadl or Wadih el-Hage to go there and set it up, Fadl testimony, February 6, 2001, at 301–4. Later, when the Russians chased Suwaylim out of Chechnya to Dagestan, bin Laden invited his

After the Chechen Russian cease-fire, Arab volunteers shifted their focus to the ongoing civil war in Tajikistan. A group of about three dozen Arabs traveled to Pakistan and Afghanistan up to the border of Tajikistan. Allegedly, bin Laden gave them $35,000 for their mission. When they crossed into Tajikistan, their hosts turned out to be unreliable and tried to exploit them rather than welcome them as ansar. The volunteers were forced to return to Afghanistan and temporarily rested at a local guesthouse in Jalalabad just before Ramadan, which started on January 9, 1997.[349] There, bin Laden, Abu Hafs, Sayf al-Adl and others tried to convince them to attend his re-opened training camp in Khost. Half of the group, mostly coming from the Gulf, accepted while the rest returned home. Toward the end of Ramadan, a group of Afghans hired by the Saudi consulate in Peshawar attacked bin Laden's compound. As a result, at the end of March, Mullah Omar ordered the entire Arab community to relocate to Qandahar for their protection. Al Qaeda leaders temporarily moved into houses and established guesthouses in Qandahar. To house the Arabs, Mullah Omar provided them with a large walled compound, the Tarnak Farm, located outside the airport complex and surrounded by agricultural land, where al Qaeda could grow wheat. The newcomers rehabilitated this former abandoned Soviet barracks into a large housing complex, with 80 housing units sheltering about 200 Arabs, including all the leaders' families. The compound featured a store, a mosque, and its own generator. It also included a six-story office building, which became Al Qaeda's administrative headquarters.[350]

After al Qaeda's return to Afghanistan, it re-opened al-Faruq, Jihadwal, and al-Sadiq camps in the Khost region. They taught basic training and more advanced courses on explosives and spy tradecraft for sleeper cells. Al-Faruq became al Qaeda's largest camp. The Gulf volunteers mentioned above went to Jihadwal for basic training, which was taught by Sayf al-Adl himself. At the end, only ten decided to stay and join bin Laden.[351] This was an important development for two reasons. First, it infused al Qaeda, devasted by its expulsion from Sudan,

---

rival to come to Afghanistan as his subordinate, which Suwaylim declined (Hamid and Farrall, 2015, at 248–9). Yossef Bodansky, 2007, *Chechen Jihad: Al Qaeda's training Ground and the Next Wave of Terror,* New York: HarperCollins, implies in his provocative title that al Qaeda was involved in Chechnya. However, his book, which contains no footnote or bibliography, lumps all foreigners who trained in Afghanistan or fought in Chechnya as al Qaeda without providing any evidence for this claim.

[349] Al-Bahri, 2010, at 63–70.

[350] Hamid and Farrall, 2015, at 223–5; Al-Bahri, 2010, at 70–7, 82, 103–4; Coll, 2004, at 342–3.

[351] Al-Bahri, 2010, at 79–81.

with needed new recruits in one shot. Most of these ten newcomers would play important operational roles in upcoming al Qaeda attacks, including the East Africa embassies[352] and the *USS Cole* bombings.[353] They also became the core of bin Laden's bodyguards.[354] The fact that these ten newcomers were quickly promoted to such position of responsibility within a year of joining illustrates how thinly manned al Qaeda was prior to late 1999. Second, it opened up al Qaeda, whose leadership was heavily Egyptian, for Gulf Arab recruitment, as many Yemenis and Saudis later joined from friendship and kinship connections to this seed group.

Around this time, several Afghan Arabs who had stayed in Afghanistan throughout the 1990's joined al Qaeda, including Nashwan Abd al-Baqi (Abd al-Hadi al-Iraqi) and Mustafa al-Uzaybi (Abu Faraj al-Libi). In the spring of 1997, Ahmad Shah Masoud's troops threatened Kabul and Mullah Omar asked bin Laden for help. Many of al Qaeda's future military commanders fought in this defense of the Afghan capital. Their participation in that battle was crucial to forging close military bonds between al Qaeda and the Taliban. At the time, most Arab Afghans in the country were associated with Khalden camp, whose leaders discouraged them from fighting with non-Salafi Muslims like the Taliban.[355] Al Qaeda had lost ground to Khalden, which had become the pre-eminent training camp during al Qaeda's Sudanese exile. Except for Somalia, al Qaeda had not been involved in the training of fighters of the major conflicts of the mid-1990s, namely Bosnia, Chechnya, or Algeria while Khalden had trained and sent them to these theaters of conflict. Al Qaeda's morale was low, especially among those who did not want to return to Afghanistan; it had few recruits, lacked money, and, at first, was heavily criticized

---

[352] Jihad Mohammed Ali al-Harazi, "Azzam," the Nairobi suicide bomber was part of the group, al-Bahri, 2010, at 148.

[353] One of its two organizers, Abdul Rahim al-Nashiri (Mullah Bilal, and cousin of Jihad Ali al-Harazi) was a member of this group, al-Bahri, 2010, at 221; *9/11 Commission Report*, at 152. Muhannad bin Attash, brother of the other main organizer of the *USS Cole* attack, Walid bin Attash (Khallad), was a leading member of this group and the person who got this group's money from bin Laden and later introduced its members to him. Muhannad was killed a few months later fighting Masoud's forces in the north of Kabul while Khallad lost his leg in that battle. Al-Bahri, 2010, at 65, 70.

[354] Nasser al-Bahri and Salim Hamdan, who also became bin Laden's chauffeur. Al-Bahri, 2010, passim.

[355] Al-Bahri, at 79–91; Hamid and Farrall, 2015, at 221–9.

for fighting alongside the Taliban.[356] However, al Qaeda's alliance with the Taliban would give it a decisive advantage over its Arab rivals in Afghanistan.

As the Taliban was able to impose some semblance of law and order on most of Afghanistan, many Islamist militants who were persecuted in their own country came to Afghanistan. They established their own guesthouses and started their own training camps for new recruits. By far, the largest foreign militant faction in Afghanistan (much larger than Arabs of all kinds, including al Qaeda) were Uzbeks, who had previously gone to Tajikistan to help Tajik militants but had to leave as a condition of the resolution of that civil war. In the summer of 1998, they officially formed the Islamic Movement of Uzbekistan, whose leaders Tahir Yoldashev and Juma Khojaev (Namangani) pledged *bayah* (allegiance) to Mullah Omar.[357] The Eastern Turkmen militants from Xinjiang, China, also pledged bayah to Mullah Omar. Members of the Egyptian Islamic Group and Tanzim al-Jihad also returned to Afghanistan but did not have their own training camps. Then more groups from Algeria, Morocco, Tunisia, Libya, Turkey and Kurdistan, Jordan, and Palestine also came to Afghanistan. Many trained at Khalden, which probably produced the largest number of graduates during this period, or set up their own camps. There were also more specialized camps, like Midhat Mursi (Abu Khabab al-Masri)'s camp for explosives and chemical weapons training in Darunta and Mustafa Setmariam Nasar (Abu Musab al-Suri)'s al-Ghuraba's camp that emphasized political as well as military training.[358] Many scholars and journalists lump all these various groups into one basket that they label al Qaeda. Not only were they divided and disagreed with each other, but they were strong rivals to each other, in competition for relatively scarce funds and recruits. All these groups except al Qaeda, Khalden, Darunta, and al-Ghuraba had a nationalist agenda and were not interested in al Qaeda's global neojihad against the United States.[359]

---

[356] Hamid and Farrall, 2015, at 230–1.

[357] Guido Steinberg, 2013, *German Jihad: On the Internationalization of Islamist Terrorism*, New York: Columbia University Press, at 180–2.

[358] This non-exhaustive list is derived from al-Hakim (Setmariam Nasar, Abu Musab al-Suri), 2004, at 724–9; see also Lia, 2008, at 246–78.

[359] See Vahid Brown, 2007, *Cracks in the Foundation: Leadership Schisms in al-Qa'ida, 1989 – 2006*, West Point: Combating Terrorism Center, at 12–8, available at https://ctc.usma.edu/cracks-in-the-foundation-leadership-schisms-in-al-qaida-from-1989-2006/; Hamid and Farrall, 2015, 229–30.

The source of al Qaeda's funding is still shrouded in mystery.[360] During the few months that he was in Jalalabad, bin Laden received $800,000 in compensation from the Sudanese government in compensation for his abandoned investments.[361] But this was not enough to run an organization like al Qaeda. After his return to Afghanistan, it took months for bin Laden to get back on his feet. He reinvigorated his fundraising effort, but the general penury lasted. Apparently, al Qaeda's funding was cyclical, and it received most of its money around the month of Ramadan (about December/January in 1997–2000), which is a time of zakat donation for Muslims.[362] Sheikh Saeed was the director of its finance committee and Mohammed Fateh al-Masri was in charge of its payroll. Since there was no formal large bank in Qandahar, al Qaeda received money through its Pakistani representative, who retrieved the money in Quetta, and gave it to the al Qaeda courier, Nimatullah, who traveled daily back and forth between Quetta and Qandahar.[363]

### I.    East Africa Embassies' Bombings and the Rapid Expansion of Al Qaeda

On August 7, 1998, al Qaeda simultaneously bombed two U.S. Embassies in Nairobi and Dar Es Salaam, killing 224 people and wounding more than 5,000. Bin Laden, Abu Hafs and Sayf al Adl had started planning the twin bombings operation shortly after the February 23, 1998 World Islamic Front declaration of "Jihad against Jews and Crusaders." This was a suicide operation. The Dar Es Salaam truck was driven by Egyptian bomb instructor Hamdan Alal Awad (Ahmed al-Alamani, "Ahmed the German" because he looked German).[364] The two Nairobi suicide bombers were Saudis: Mohamed Rashid al Owhali and Jihad Mohammad Ali al-Harazi (Abu Ubaydah al-Makki but called "Azzam" by the other conspirators). They had all fought at the battle of Kabul against Masoud in 1997. The organizer, Abdullah Ahmed Abdullah (Abu Mohamed al-Masri, called "Saled" by the other conspirators), al Qaeda's chief of training, and

---

[360] Even Nasser al-Bahri, 2010, who is so detailed about all the other aspects of al Qaeda is silent about its fundraising.

[361] See bin Laden, not dated, "In Regard to the Money that is in Sudan," available at https://www.dni.gov/files/documents/ubl2016/english/In%20regard%20to%20the%20money%20that%20is%20in%20Sudan.pdf.

[362] Roth, Greenburg, Wille, 2004, at 21.

[363] Al-Bahri, 2010, at 112, 117.

[364] Hamid claimed that he was an Islamic Group member, who wanted to retaliate for Sheikh Omar Abdul Rahman's imprisonment in the United States. Hamid and Farrall, 2015, at 241.

the master bomber, Mushin Musa Matwalli Atwah (Abdel Rahman al-Muhajir), al Qaeda's chief bomb instructor, were helped locally by al Qaeda members left behind: Khalfan Khamis Mohammed and Mustafa al-Fadl in Dar Es Salaam; and Mohammad Odeh and Abdullah Muhammad Fazul (Harun) in Nairobi. The local members bought all the equipment, and Atwah flew in during the last week to build the two bombs. Abdullah supervised both operations in the field. Al-Hazari flew in seven weeks before the operation while the other two suicide bombers came in during the last week. The day before the operation, everyone left their respective cities except for K.K. Mohamed and Fazul tasked to clean out the respective bomb factories before leaving.[365]

The attacks on the U.S. embassies were a deadly example of propaganda by the deed, an attempt to attract people and money to bin Laden's cause. Despite the attention it got in the Western press, his World Islamic Front fatwah had failed to recruit Arab fighters. Few had come to join al Qaeda, which was still viewed as doing nothing. Bin Laden was desperate and had to do something to regain his belligerent reputation that he had lost to his rival Suwaylim, who was still active in Chechnya and Dagestan. At the time of the operation, there were about 50 people left in al Qaeda and up to ten each in the Egyptian Islamic Group and Tanzim al-Jihad. The U.S. embassies attacks involved a large portion of al Qaeda's senior cadres, about ten of them, which shows how important a gamble the attacks were for bin Laden.[366]

The U.S. government retaliated on August 20, 1998 by bombing with cruise missiles the three al Qaeda camps in Khost. It had intelligence that the al Qaeda leaders would be there, but on the way there, their convoy decided to go to Kabul instead.[367] Although its leaders survived, the missiles completely destroyed al Qaeda's three camps as well as one of Jalaluddin Haqqani's weapons depot in Zhawar, killing 7 foreigners, 7 Pakistanis, and 20 Afghans. This eliminated all of al Qaeda's training camps, and, over the next few months, some rare training sessions were

---

[365] *U.S. v. Usama bin Laden*, 2001; 9/11 Commission Report, at 68–70. See also al-Bahri, 2010, at 145–55, and Ali Soufan with Daniel Freedman, 2011, *The Black Banners: The Inside Story of 9/11 and the War Against al-Qaeda*, New York: W. W. Norton & Company, at 75–80, 93–5. The post bombing FBI raid on the charity Help Africa People led to the discovery of files of photos of the al Qaeda leadership for the manufacture of false passports. It became the first FBI al Qaeda photo book.
[366] Hamid and Farrall, 2015, at 232–41.
[367] Al-Bahri, 2010, at 149–50.

conducted at Tarnak Farm. The temporary absence of al Qaeda training camps coincided with a lack of recruits.[368]

The U.S. missile strike changed the relationship between the Taliban and bin Laden. Most Taliban leaders were against al Qaeda because they believed it was undermining their ability to govern Afghanistan by bringing international sanctions on the country for harboring terrorists. Mullah Omar at first did not believe that al Qaeda had carried out the bombings and was keeping the criticism at bay. After the missile strikes on Afghan territory, anger at al Qaeda turned to anger at the United States. Afghans were angry that their guests had been attacked, a clear violation of Pushtunwali, the Afghan traditional code of conduct. Now both the Afghan population and the Taliban felt proud to host a group that defied a superpower, raising it to an equal status in their eyes. The bombings also introduced al Qaeda to the world, and Islamist militants started to take notice. From their reaction, al Qaeda members gradually felt proud that they had become famous and many started to believe that they were heroes, equal in status to America, which was afraid of them.[369]

Before this sense of pride set in, al Qaeda went through very tough times over the next few months. The bombings triggered a crackdown on al Qaeda fundraising. Pakistani authorities put al Qaeda's Pakistani representative Abu Hafs al-Sindi under close surveillance. No money came in through couriers. Bin Laden had no money to re-open his training camps for a while. He had to reduce the monthly payments to al Qaeda families from $200 to $50. There was little food available. About 15 of its members left Tarnak Farm during the fall 1998. Finally, a big influx of money came with Ramadan (mid-December) in 1998.[370] Perhaps this came from the $1.25 million that bin Laden received from the Sudanese government in compensation for his abandoned investment there.[371] Optimism came back and, to cash in on their new fame, Abu Hafs called the Al Jazeera correspondent in Islamabad for an interview with bin Laden, which took place at the end of December.[372] Al Qaeda opened a new but small training camp at Mes

---

[368] Hamid and Farrall, 2015, 242–3.

[369] Hamid and Farrall, 2015, 243–5; Al-Bahri, 2010, 178–84.

[370] Al-Bahri, 2010, 169–72.

[371] See bin Laden, not dated, "In Regard to the Money that is in Sudan," available at https://www.dni.gov/files/documents/ubl2016/english/In%20regard%20to%20the%20money%20that%20is%20in%20Sudan.pdf.

[372] Bergen, 2006, at 241–2.

Aynak, in an abandoned Russian copper mine in Logar, not far from Kabul to accommodate the few Arab volunteers starting to trickle in. This would remain al Qaeda's only training camp in 1999 with occasional sessions at Tarnak Farm.[373]

Probably the most important development for al Qaeda in 1999 was the publicity it got from the Al Jazeera interview. The long-awaited program on bin Laden was broadcast on June 10, 1999 with the title "Destroying the Bases [al Qaeda]." Al Jazeera had advertised it for one month, with the caption, "A man against a state and a state against a man." When it aired, the streets of the major Saudi cities were deserted.[374] The one-and-a-half-hour-long program was not a straightforward broadcast of his interview,[375] but a compilation of excerpts of his interview spliced with commentaries that painted a very sympathetic portrait of a heroic young man standing up to an evil superpower. Abd al-Bari Atwan, a British journalist, introduced him, "I found him to be a man who is very modest in nature. He believes in every word he says. He does not lie. He does not exaggerate"[376] The program host, Salah Najm, said that bin Laden was "the man that the United States has declared war on, and who has declared war in return. An attempt to assassinate him has cost several hundreds of millions of dollars that fell in the form of Cruise missiles on his camp in Khost mountain in Afghanistan. It is the same camp that the United States called the base [al Qaeda]."[377] Jamal Ismail commented, "It goes without saying that he feels that he is under siege…. All that he is currently doing on Afghan territory is confined to addressing appeals, engaging in media-related activities, and issuing fatwas, along with a group of Afghan or other clergymen, promoting fighting, which Taleban cannot ban or restrain, because this is enshrined in Koranic verses and traditions of the prophet." The host interjected,

---

[373] *9/11 Commission Report*, at 157.

[374] See Bergen, 2006, at 242–3. The full transcript of the program is found in *Compilation of Usama Bin Ladin Statements, 1994–January 2004*, at 119–33. The title is a pun on the destruction of the bases (al Qaeda in Arabic) or camps in Khost on August 20, 1998. It does not refer to the destruction of al Qaeda, the organization.

[375] The full interview was broadcast on Al Jazeera nine days after the 9/11 attacks on September 20, 2001. A full transcript of it is at *Compilation of Usama Bin Ladin Statements, 1994–January 2004*, at 158–78. Lawrence, 2005, at 66–94, provided a more elegant translation.

[376] *Compilation of Usama Bin Ladin Statements, 1994–January 2004*, at 121.

[377] *Compilation of Usama Bin Ladin Statements, 1994–January 2004*, at 121. This of course reversed the chronology and made bin Laden appear like a victim of U.S. aggression. There was no mention yet of the East Africa bombings and the strike on the Khost camps seemed disconnected to them and coming out of nowhere.

"The base [al Qaeda] was destroyed, but Bin Ladin survived."[378] Bin Laden concluded that he saw the emergence of a new generation that acknowledges the necessity for jihad. "The people who had the honor of engaging in jihad in Afghanistan, Bosnia-Herzegovina, Chechnya–we had such an honor–are certain that the nation nowadays can, God willing, engage in jihad against the enemies of Islam, particularly, the external arch-enemy, the Crusader-Jewish alliance."[379]

The U.S. State Department designated al Qaeda a Foreign Terrorist Organization on October 8, 1999.[380] This was the date that al Qaeda and its members officially became terrorists for the United States. All those who refer to them as terrorists before this date are guilty of anachronism from an official U.S. perspective.

The Al Jazeera broadcast inspired Gulf Arabs, but they were still not flocking to Afghanistan to join al Qaeda and bin Laden. Instead, they wanted to join bin Laden's rival Suwaylim (ibn Khattab) in Chechnya, where a Russian invasion re-ignited the conflict in 1999 with great levels of ferocity on both sides, especially on the Russian one.[381] Gulf youths, confused by bin Laden's concept of global jihad against the United States, easily apprehended the more classical jihad of defending Muslim Chechnya against invading infidel Russia. Russian atrocities amounting to close to a genocide, coverage by Al Jazeera, and the example of the Saudi Suwaylim inspired hundreds to flock to Turkey on their way to Chechnya.[382] Because Russia had carefully closed the border into Chechnya before invading and the Islamist leaders were unable to welcome large numbers of volunteers, many were diverted to Afghanistan for training before they could come to Chechnya. Suwaylan had a relationship with Khalden camp, and the newcomers went there for training, not to al Qaeda camps, which at the time had not yet

---

[378] *Compilation of Usama Bin Ladin Statements, 1994–January 2004*, at 132.

[379] *Compilation of Usama Bin Ladin Statements, 1994–January 2004*, at 133. Lawrence, 2005, at 80, translated this last quote, which came out in the middle of the interview rather than its end: "Know … that it is right that whoever those whom God Almighty has blessed with *jihad* [should fight], as happened in Afghanistan, Bosnia, and Chechnya–and God blessed us with that, for we are certain that our *umma* today is able to wage *jihad* against the enemies of Islam, and especially against the greatest external enemy, the Crusader-Jewish alliance." [Italics in original.]

[380] See list maintained on the State Department website, available at https://www.state.gov/foreign-terrorist-organizations/ accessed on January 2, 2020

[381] See Collins, 2002, at 217–46, and Anna Politkovskaïa, 2003, *Tchétchénie, le déhonneur russe*, Paris : Gallimard Folio Documents, for first hand descriptions.

[382] Hegghammer, 2010, at 57, 79; Murad Batal al-Shishani, 2006, *The Rise and Fall of Arab Fighters in Chechnya*, Washington, D.C.: The Jamestown Foundation, at 17, shows that about 80% of the foreign fighters that went to Chechnya came from the Gulf.

been re-established. Most of the Arabs in Afghanistan wanted to go to Chechnya and, as one of the al Qaeda leaders wrote, had its border been opened, about 70% of all Arabs who came to Afghanistan would have gone there.[383] Bin Laden spared no effort to try to unify Arab militants under his command, but they strongly rejected his invitations, including Suwaylim.

The years 1999-2000 saw Afghanistan flooded with foreigners looking for training. There were more than a dozen different groups, each with their own training camp. Most were nationalist militants, like the Algerians, Tunisians, Moroccans, Libyans, Turks (Kurds), Jordanians/Palestinians, in addition to the Uzbeks and Uyghurs, who had very little interest in al Qaeda and its global neo-jihad against the United States. This created a state of confusion and disorder and the Taliban decided to close these autonomous camps, except for the al Qaeda and Uzbek camps, or move them to Kabul, where they could be monitored. A Kabul camp was usually a large house, where training took place. Khalden was forced first to move to Kabul and then close in the summer of 2000. At the same time, al Qaeda opened a new al-Faruq camp in Garamwak, near Qandahar, in early 2000 and expanded its training facility at Tarnak Farm. So, as new recruits unable to get to Chechnya kept pouring into Afghanistan, al Qaeda's rivals were forced to close, and al Qaeda expanded its facilities to provide them with training. In essence, just as an influx of Arabs came to Afghanistan for military training (Uzbeks and Uyghurs took care of their own), the Taliban provided al Qaeda with a monopoly on such training. Al Qaeda took full advantage of this monopoly to double or triple its membership as it selected the best candidates from their performance and behavior at al-Faruq. Its membership reached about 250–300 people on the eve of the attacks of 9/11.[384]

Money restarted flowing into al Qaeda's war chest feeding its camp construction and training and allowing it to resume operations. On October 12, 2000, a two-man suicide team composed of Hassan al-Khamiri (who had been in charge of Jihadwal when U.S. cruise missiles hit it two years earlier) and Ibrahim al-Thawer on a small boat blew a large hole in a U.S. destroyer, the *USS Cole*, refueling in the port of Aden, killing 17 sailors and wounding 39. The "boat operation" had started shortly after the World Islamic Front fatwah when bin Laden tasked

---

[383] Nashwan Abd al-Baqi (Abd al-Hadi al-Iraqi), 2002, "Notes," Harmony Database, AFGP-2002-000091, available at https://ctc.usma.edu/app/uploads/2013/10/Notes-from-Abd-al-Hadi-Translation.pdf.

[384] Hamid and Farrall, 2015, at 247–80.

two of his lieutenants of Yemeni descent, Walid bin Attash (Khallad) and Abd al-Rahman al-Nashiri, to case Yemen for possible simultaneous bombings of passing U.S. flagged ships. They decided that the only viable option was to attack U.S. warships refueling in the port of Aden. They temporarily stood down right after the U.S. embassies bombings because of heightened security fears and lack of money. They resumed the operation, but Khallad was arrested by local authorities while transporting explosives to Aden around May 1999. He was released from prison, returned to Afghanistan but relieved of his role due to security concerns. Nashiri was left as the overall commander of this operation and took detailed instructions from Mushin Atwah (the U.S. embassies master-bomber) during the summer. A first attack was attempted on January 3, 2000 against the *USS Sullivans* refueling in Aden, but the suicide boat got stuck in the sand from the weight of the explosive. However, the operation was not detected and Nashiri and his team tried again when the *USS Cole* dropped anchor at the port in October.[385]

In September 2000, the Second Intifada erupted in Israel and Palestine. There is no evidence that al Qaeda funded the intifada or that Palestinians funded al Qaeda. As previously noted, al Qaeda and Hezbollah had a relationship when al Qaeda was in Sudan. In late 1999, Ahmad al-Khaleyleh (better known as Abu Musab al-Zarqawi) fled his native Jordan to Afghanistan, where he asked bin Laden to support his plan to set up his camp. Bin Laden saw it as an opportunity to undermine his rival, Setmariam Nasar (Abu Musab al-Suri) for they both competed for the same pool of potential recruits: Lebanese, Palestinians, Syrians, and Jordanians. He provided seed money for al-Khaleyleh to open up a camp and form his group around Herat. Both this new camp and Nasar's camp (which was really a big house in Kabul) stayed open when the Taliban ordered other foreign camps closed as bin Laden vouched for al-Khaleyleh while Nasar had his own relationship with Mullah Omar.

Likewise, when the small war between India and Pakistan erupted around Kargil in the early summer of 1999, there did not seem to be any al Qaeda contribution for Kashmiri rebels. Later, after the U.S. invasion of Afghanistan, Pakistani and Kashmiri groups helped Arab Afghans escape from Afghanistan around 2002 and some Pakistanis might have trained in old al Qaeda camps. However, both the Palestinians and Kashmiris were too involved with their own respective conflicts in Palestine/Israel and Indian Kashmir to be able to contribute to al Qaeda.

---

[385] Soufan with Freedman, 2011, at 149–268.

### J.   Khalid Sheikh Mohammed

Parallel to the "boat operation" was the "planes operation." Its originator was Khalid Sheikh Mohammed (KSM). KSM was born in 1965 just south of Kuwait City, Kuwait. His parents were Baluchi, who had come in 1956 at the start of the Kuwait oil boom. They had nine children and KSM was one of the last ones. His older brothers, Zahed and Abed, directed his education. He was close to the son of one of his much older sisters, Abdul Basit Abdul Karim (alias Ramzi Yousef), who was just three years younger than him. Zahed joined the Muslim Brotherhood at Kuwait University and KSM attended some of the Brotherhood camps as a teenager. KSM did well in school and was selected by his family to go and study engineering in the United States. He arrived at Chowan College in North Carolina in January 1984. After a semester there, he transferred to North Carolina Agricultural and Technical State University in Greensboro. He was part of the foreign religious Muslim students, who stayed among themselves and away from their hosts, whom they disliked. He graduated at the end of 1986, disenchanted with American life and politics. When he was in the United States, his brother Zahed was selected by a large Kuwaiti charity, Lajnat al-Dawaa al-Islamiya (Committee for Islamic Relief, LDI) to go to Peshawar and run its war-relief program. Zahed hired his two younger brothers Aref and Abed to come along with him. Zahed was the most moderate among the brothers and Abed the most militant. When KSM finished school, Zahed hired him as well and KSM arrived in Peshawar in early 1987. Like many of the newly arrived ansar, he went through the MaK's Sadda camp for training and then worked at Sayyaf's newspaper. In addition, he taught engineering for Afghan refugee students at Sayyaf's Dawaa al-Jihad University in Pabbi, near Peshawar. Around that time, he married a second cousin. In 1987, he was hired as a hydraulic engineer for a Japanese company, Maruzen, and maintained and repaired hydraulic drills used in digging trenches and caves in Afghanistan. He and his brother Abed then taught school together. Abed participated in the 1989 battle of Jalalabad and was killed.[386]

---

[386] Terry McDermott and Josh Meyer, 2012, *The Hunt for KSM: Inside the Pursuit and Takedown of the Real 9/11 Mastermind, Khalid Sheikh Mohammed*, New York: Little, Brown and Company, at 23–40; Department of Defense, 2006, JTF-GTMO Assessment for Khalid Shaykh Muhammad, ISN: US9KU-010024DP, December 8, 2006 (henceforth KSM JTF-GTMO Assessment), at 2–3, available at https://wikileaks.org/gitmo/pdf/ku/us9ku-010024dp.pdf.

KSM's nephew Abdul Basit, who had graduated from an engineering school in Wales, came to Peshawar in 1991. He trained at Khalden and developed a reputation as a clever designer of explosive devices. He stayed at the camp and taught courses in bomb making. The Afghan jihad had degenerated into civil war and the United States had invaded Iraq and established a strong presence in Saudi Arabia. Arab Afghans in Peshawar were restless. KSM tried to move on to the next jihad and briefly went to Bosnia but did not stay long. Instead, he was invited to come to Qatar by Abdullah bin Khalid al-Thani, a minister and member of the ruling family, to work as a project engineer in the Ministry of Electricity and Water. He moved his family to Doha in 1993. His nephew Abdul Basit also left Afghanistan for New York where he arrived on September 1, 1992 under the false identity of Ramzi Yousef. For the next few months, Basit looked for a target to bomb. KSM wired him $660 to cover some of his expenses. Basit carried out the truck bombing of the World Trade Center on February 26, 1993 and flew back to Pakistan that evening.[387]

Neither KSM nor Basit had any contact with bin Laden or al Qaeda. They were just freelance bombers for the cause of the global neo-jihad. After the World Trade Center bombing, Basit became a celebrity in the neo-jihadi world. He hid in Pakistan and recruited his childhood best friend Abdul Hakim Murad into his terrorist enterprise. They brainstormed about potential operations and Murad, who had spent years becoming a pilot, suggested packing an aircraft full of explosives and dive bombing it into the Pentagon or CIA headquarters. In Karachi, they met Wali Khan Amin Shah (Osama Azmarai), bin Laden's childhood friend who had drifted apart from his friend after Jalalabad. Azmarai joined their enterprise. Basit taught Murad how to build bombs, but he lost partial sight in one eye when a detonator exploded in his face during a demonstration. KSM visited his nephew in Karachi but stayed away from the other two.[388]

KSM and Basit lacked a focused ideology but considered themselves at war with the United States and Christianity in general. They moved to Manila in July and August 1994 respectively. They dated local girls and brainstormed about possible operations. They experimented with miniature bombs to blow up commercial airliners. Azmarai joined them in early fall and moved in with a local bar girl. While working on their schemes, they learned that the pope was scheduled to come to the Philippines in mid-January 1995 and decided to

---

[387] McDermott and Meyer, 2012, at 40–8.
[388] McDermott and Meyer, 2012, at 54–8.

assassinate him. They continued to refine their project to blow up several commercial airliners simultaneously over the Pacific with small devices smuggled on board timed to explode after the bomber had deplaned at a stopover. They identified a dozen American-flagged jumbo jet flights and called the plan Bojinka, Serbo-Croatian for "big noise." They successfully tested their device in a movie theater and then on a plane to Tokyo with a layover in Cebu where Basit got off after placing a bomb under the seat in front of him. One passenger was killed, but the pilot's heroics managed to save the plane. A slightly larger device would have destroyed the plane. Just after Christmas 1994, Basit was mixing some explosive substance to be used on a bomb when it caught fire, partially burning down the apartment. Murad was caught by the police and Azmarai and Basit temporarily escaped to Malaysia and Pakistan respectively but were tracked down and caught within a few months. They were tried and convicted in New York and sentenced each to 240 years in prison. KSM, who had only been in Manila for the summer, disappeared. He went home to Qatar and tried to join Suwaylim in Chechnya in 1995 but was unable to do so. In the fall, he went to Bosnia to work for an Egyptian charity in support of Bosnian Muslims. He returned home to Qatar before Christmas. The U.S. government finally located him there in the spring of 1996 and tried to arrest him for his role in the World Trade Center bombing. Apparently tipped off, he escaped to Karachi.[389]

In late 1996, KSM sought a meeting with bin Laden in Jalalabad. Both men knew about each other, KSM as the uncle of Abdul Basit and bin Laden as the man with resources. KSM pitched an idea based on Basit's idle discussions with Murad that never got past the idea stage. He suggested training pilots to hijack as many as ten planes in the United States and crash them into buildings. He would land a final plane in the middle of the country and explain to the American people why he had conducted this attack and how to prevent them in the future. Bin Laden thanked KSM for his idea and told him he would think about it. Although bin Laden was non-committal about such an ambitious plan, KSM intermittently returned to meet with al Qaeda deputies Abu Hafs and Sayf al-Adl, assisted them with computer and media projects, and cultivated their friendship.[390]

### K. The Planes Operation

---

[389] McDermott and Meyer, 2012, at 59–114.
[390] McDermott and Meyer, 2012, at 115–8; *9/11 Commission Report*, at 154.

It is hard to pin down precisely when the 9/11 conspiracy started. After the East Africa bombings, KSM became convinced that bin Laden was committed to attacking the United States. On the other hand, in late 1998 and early 1999, bin Laden held conversations about KSM's idea with his deputy Abu Hafs, who urged him to approve a more modest version of the project. In March or April 1999, bin Laden called KSM to Qandahar to tell him he had thought more about the proposal and liked its basic premise but wanted to trim it down to four or five planes in the United States, perhaps combined with simultaneous explosions over the Pacific if that could be arranged. He would support this more modest version of the proposal, which he referred to as the "planes operation." He asked KSM to join al Qaeda, something that KSM had resisted in order to seek another sponsor had bin Laden rejected the plan. Now that bin Laden accepted the plan, he pledged bayat to bin Laden.[391] According to KSM, this is when the conspiracy started. Bin Laden had selected Khallad (no longer on the boats operation), Nawaf al-Hazmi, Khalid al-Midhar, and Suhail al-Sharabi (Abu Bara al-Yemeni, one of bin Laden's bodyguards)[392] as his candidate suicide operatives for the operation.[393] Al-Hazmi and al-Midhar were Saudi nationals, who had fought in Bosnia and at the Kabul battle against Masoud. They applied for a U.S. visa from Jeddah in early April while Khallad applied for one from Sanaa. As the FBI reconstruction of the events leading to the 9/11 attacks noted, "[t]he first indication of concrete steps for the attacks were in April 1999 when Nawaf al-Hazmi and Khalid al-Mihdhar got their US visas."[394] However, the two Yemenis' application was rejected.[395] KSM modified his plan by splitting his operation in order to include the Yemenis. One group of operatives would crash airliners into buildings in the United States and the other, for those who could not get visas to the United

---

[391] *9/11 Commission Report*, at 154; McDermott and Meyer, 2012, at 137–8.

[392] JTF-GTMO Detainee Assessment, Suhail al-Sharabi, ISN US9YM-000569DP, available at https://wikileaks.org/gitmo/pdf/ym/us9ym-000569dp.pdf. Throughout his book, Soufan seems to mistake al-Shurabi with Abdul Aziz bin Attash, Khallad's younger brother, whose kunya (nom de guerre) was also al-Bara.

[393] Khalid Sheikh Mohammed, DX 941, Substitution for the Testimony of Khalid Sheikh Mohammed, *U.S. v. Zacarias Moussaoui*, E.D. Virginia (Alexandria Division), No. 1:01cr455-LMB (2006), henceforth KSM statement, paragraph 6, at 4–5.

[394] Hyon Kim, 2003, "Penttbom Timeline Briefing," Memorandum for the Record, FBI Headquarters, December 11, 2003, at BUR-PEC-043636–43. The quote is from BUR-PEC-043638.

[395] National Commission on Terrorist Attacks Upon the United States Staff, 2004, *9/11 and Terrorist Travel*, Frankin, Tennessee: Hillsboro Press, at 13–14. Khallad was denied a visa from Sanaa.

States, would blow them up over the Pacific. All of this would occur near simultaneously.[396] KSM, who lived in Karachi, moved to Qandahar part time to devote his time to this project and al Qaeda's media committee.[397]

Around September 1999, Bin Laden sent 30 veterans, including the four above candidates, to an exclusive special training session at Mes Aynak that spared no expense and focused on physical fitness and close quarter combat. At the end of the course, they went to Qandahar to meet with bin Laden.[398] Khallad, al-Hazmi, and al-Sharabi then went to Karachi, where KSM instructed them for two weeks on Western culture, a few English expressions and how to behave in the United States. Then he sent them all to Kuala Lumpur, where al-Midhar joined them, to familiarize themselves with airport and airliner security. From there, Khallad called Fahd al-Quso, a friend from the boat operation in Yemen, to bring $36,000 that Khallad's father in Saudi Arabia had wired to Ibrahim al-Thawar (known as Nibras, a Bosnian veteran, who would later become one of the *USS Cole* suicide bomber). Both al-Quso and Nibras flew to meet Khallad to give him the money and returned to Yemen. Khallad gave the money to al-Hazmi and al-Midhar, who flew to Los Angeles and start flight school in California, while Khallad and al-Sharabi returned to Karachi.[399]

By the time al-Hazmi and al-Midhar landed in Los Angeles on January 15, 2000, bin Laden had found four other promising candidates who had just arrived in Qandahar: the Egyptian Mohamed Atta, Yemeni Ramzi bin al-Shibh, Emirati Marwan al-Shehhi, and Lebanese Ziad Jarrah. They were close friends from Hamburg, who had become committed to jihad together while studying there and had wanted to go to Chechnya to fight the Russians. Someone advised them that the border to Chechnya was closed and instead they should go to Afghanistan for training while waiting for the border's reopening. Atta, al-Shehhi, and Jarrah arrived in

---

[396] KSM statement, paragraph 7, at 5–6; *9/11 Commission Report*, at 156.

[397] *9/11 Commission Report*, at 145–50, 153–4.

[398] Al-Bahri, 2010, at 189–90; *9/11 Commission Report*, at 155, 157.

[399] Soufan with Freedman, 2011, at 238–40; *9/11 Commission Report*, at 157–159. The figure of $36,000 is from al-Quso's interrogation by Soufan, while Khallad claimed it was only $12,000, see *9/11 Commission Report*, FN 61, at 494. The origin of this cash is unknown, whether it was sent to Khallad's father or whether he raised it himself. However, it is clear that it helped finance the 9/11 terrorists.

Afghanistan the last week of November while bin al-Shibh arrived two weeks later and learned that his friends had pledged bayat to bin Laden and urged him to do so as well.[400]

It is unclear how al Qaeda spotted the friends from Hamburg. Al-Bahri, who had also completed the training course at Mes Aynak, was recovering from malaria in Qandahar, where he was amir of one of al Qaeda's guesthouses. He remembered that the first three lived in town and not at a training camp, and he was their instructor during a two-week course, which consisted of security, intelligence, and special operations (kidnapping, assassination, and introduction to explosives). Ramadan (it was from December 8, 1999 to January 7, 2000) came and they tried to fast during the day. Shehhi had just undergone a surgical operation to help him lose weight and should not have fasted. He did so anyway and got very sick. Al-Bahri spoon-fed him and nursed him back to health. Al-Shehhi had to return home to Dubai before the others and was issued a U.S. visa there on January 18, 2000.[401]

Bin Laden chose Atta to lead the attack, and al-Hazmi to be his deputy. Jarrah, bin al-Shibh and Atta met with Abu Hafs, who told them to enlist in flight training. Atta met with bin Laden, Abu Hafs, and KSM several times to discuss potential targets. Bin Laden wanted to hit military, political, and economic targets. They selected both towers of the World Trade Center, the Pentagon, the U.S. Capitol, and perhaps additional targets such as the White House, the Sears Tower, and a foreign embassy in Washington.[402] The three Hamburg friends asked for military training and the opportunity to fight against Masoud's forces, but bin Laden insisted that they proceed as soon as possible to flight training. Eventually, all the friends returned to Hamburg and decided that it would be easier and cheaper to take flight training in the United States. Atta got his visa on May 17 and Jarrah his on May 25, both from Berlin U.S. consulate. Bin al-Shibh's multiple applications for a visa were rejected, and he was invited to be the coordinator of the project, the link between Atta and KSM.[403]

Meanwhile in San Diego, both al-Hazmi and al-Midhar failed to progress in English and flunked their flight lessons. Al-Midhar gave up and returned to Yemen on June 10, while al-

---

[400] *9/11 Commission Report*, at 160–6.

[401] Al-Bahri, 2010, 234–5; Soufan with Freedman, 2011, at 294–5, 317; *9/11 and Terrorist Travel*, at 15.

[402] KSM statement, at 12–3; *9/11 Commission Report*, at 166–7.

[403] *9/11 Commission Report*, at 167–8; *9/11 and Terrorist Travel*, at 15–6; KSM, Moussaoui statement, at 12–3, 22.

Hazmi settled in and worked at a gas station while waiting for the rest of the conspirators to arrive. Al-Shehhi arrived in the United States on May 29, Atta on June 3, and Jarrah on June 27. They all enrolled in flight school in Florida, Atta and al-Shehhi together and Jarrah at a second school.[404] In the spring, bin Laden canceled the Pacific portion of the planes operation as too complex.[405]

At this point, there were only three potential pilots to conduct the ambitious planes operation. In the spring of 2000, just after al-Faruq camp was re-opened, Abu Hafs spotted on a trainee application form that a Saudi was already a licensed commercial pilot, trained in the United States. He was Hani Hanjour, a veteran Arab Afghan. Abu Hafs interrupted his training after two weeks and sent him straight to KSM in Karachi. KSM trained him in communication tradecraft for about two or three days. KSM told Hanjour that he wanted him as the most skilled pilot in order to strike the Pentagon, a tough target because it was not a tall building. Hanjour returned home on June 20. He applied for a U.S. student visa in Jeddah on September 25 and went to Dubai to meet Ali Abdul Aziz Ali (Ammar al-Baluchi), KSM's cousin and facilitator for the plot from Dubai. Hanjour flew to the United States on December 8 and went to San Diego to meet with al-Hazmi. They left San Diego for Mesa, Arizona, where Hanjour took a flight refresher course and started training on multi-engine planes. Atta, al-Shehhi, and Jarrah in Florida passed their commercial pilot tests and got their licenses in mid-December 2000. The all began training to fly large jets on flight simulators.[406]

KSM's plan required a group of militants who could seize an airliner and control the passengers to protect their pilot. This would group would later be called "the muscle." In late 1999 and throughout 2000, the vast majority of volunteers wanted to fight in Chechnya. So did the vast majority of those who would become the muscle. On their way to Chechnya, in Turkey, they found the road through Georgia closed. Nor could Suwaylim, under heavy fire from the Russians, accept and accommodate them. Instead, the person who sheltered them in Turkey contacted Abu Zubaydah, the outside coordinator for Khalden, who agreed to have them train at Khalden until Suwaylim could incorporate them in his rank when conditions improved. They

---

[404] *9/11 and Terrorist Travel*, at 16–7; *9/11 Commission Report*, at 215–25.
[405] *9/11 Commission Report*, at 159; KSM statement, at 6.
[406] KSM statement, at 23–4 (KSM testified that Hanjour met al-Hawsawi, not his cousin, in Dubai); *9/11 Commission Report*, at 225–7; *9/11 and Terrorist Travel*, at 23.

arrived at Khalden and trained there until it closed permanently in 2000. By that time, al Qaeda had gotten permission from the Taliban to open the new al-Faruq camp. Two volunteers finished their training at Khalden and were later recruited from al Qaeda guesthouses in Afghanistan; some started their training at Khalden and finished it at al-Faruq; and about seven just went to al-Faruq, where they were spotted and recruited. Of the estimated 700 to 1,500 trainees at al-Faruq after it reopened, only about 100 were invited to formally join al Qaeda, increasing its total membership to at most 300 people.[407] The reason that 12 of the eventual 13 muscle men were Saudis was simply that the Saudis constituted the vast majority of the newcomers and al Qaeda was looking for them since they could easily get visas to the United States.

The muscle men seemed to have come to Afghanistan in friendship or kinship (two sets of brothers) clusters. Four came from three towns in the al Bahah region of Saudi Arabia and were in their twenties, unemployed and without an education. Five came from the Asir province of the kingdom and had a university education. They all wanted to go to Chechnya, which undermines the claim that they had been sent to Afghanistan by al Qaeda recruiters in the kingdom. KSM later claimed that they were recruited on the basis of their willingness to become martyrs and demonstrable patience because he expected the preparation for the operation to take a long time. Once spotted, they were sent to bin Laden, who would assess them quickly, ask those selected to immediately swear bayat to him, and send the successful candidates to KSM for further training in tradecraft and record a martyrdom video. After this training, KSM would give about $2000 to each for them to return to Saudi Arabia to obtain a U.S. visa. He instructed them to come back to Afghanistan afterwards for further training.[408]

They all got their visas from either Riyadh or Jeddah between September and November 2000.[409] A few changed their minds and others could not get their visa. The successful candidates came back to Afghanistan in later 2000 for special training, which was conducted at Tarnak Farm by Abu Turab al-Jordani, who taught them how to conduct hijackings, disarm air marshals, and handle explosives. He also taught them a few basic English expressions and emphasized bodybuilding. At one point the trainees went to al-Faruq to butcher a sheep and a camel with a knife. After their special training, they traveled to KSM in Karachi who sent them

---

[407] Hamid and Farrall, 2015, at 259 – 62; *9/11 Commission Report*, at 231–4.
[408] *9/11 Commission Report*, at 231–5.
[409] *9/11 and Terrorist Travel*, at 18–22.

to the United Arab Emirates, where Ali Abdul Aziz Ali and Mustafa Hawsawi assisted them with opening bank accounts, clothing, and final logistics such as plane tickets.[410]

Between the end of April and the middle of June 2001, the muscle trickled into Florida, where Atta welcomed them, and New York, where al-Hazmi and Hanjour sheltered them in Patterson, N.J. The last to come was Khalid al-Midhar, who had rejoined the operation and flew in on July 4, 2001.[411] During the summer, some of the pilots went on cross-country flights and flew practice flights near their targets, while the muscle built up their strength in gyms. Atta and al-Hazmi met and reapportioned the muscle according to need and linguistic ability to have at least a decent English speaker in each group. In mid-July 2001, Atta went to Spain to meet with bin al-Shibh for an extensive pre-attack briefing. On August 29, Atta called bin al-Shibh to confirm in code the date of the attack, September 11, 2001, as Congress would return at the time. The targets were the World Trade Center towers, the Pentagon, and the U.S. Capitol. All the tickets for the perpetrators were bought between August 25 and September 5. Bin al-Shibh, Ali, and Hawsawi left for Pakistan before the attacks.[412] On the morning of September 11, four teams of al Qaeda attackers hijacked four transcontinental airliners and crashed them into both towers of the World Trade Center, the Pentagon, and in a field in Pennsylvania, murdering close to 3,000 people and injuring more than 25,000, in the greatest terrorist attack in world history.

### L.  The Investigation of the Funding of al Qaeda and the 9/11 Attacks

After the East Africa embassies' bombings, there was a realization that attacks of this scope had to be well financed. Richard Clark at the White House wanted to duplicate with al Qaeda the success of choking off money to the Cali Cartel.[413] He started asking questions about al Qaeda finances. In November 1998, the CIA gave a "reasonable estimate" that bin Laden had inherited approximately $300 million when his father died. However, after an interagency team investigated bin Laden's finances with his family over the next year and a half, it discovered that bin Laden had received a total of $27 million over his lifetime and that his dividends and other

---

[410] *9/11 Commission Report*, at 235–7.
[411] *9/11 Commission Report*, at 237–40; *9/11 and Terrorist Travel*, at 28–37.
[412] *9/11 Commission Report*, at 237–50.
[413] Richard Clarke, 2004, *Against All Enemies: Inside America's War on Terror*, New York: Free Press, at 190–1.

income had stopped in 1993–4 when his money was put in a frozen account.[414] Although the myth of the $300 million was put to rest, the intelligence community was still unclear about the source of al Qaeda's money.

The 9/11 Commission assigned a whole team to study al Qaeda's financing. The financing of the 9/11 attacks themselves was easy to unravel and the 9/11 Commission concluded, "the 9/11 plot cost al Qaeda approximately $400,000–500,000, of which approximately $300,000 was deposited into U.S. bank accounts of the 19 hijackers. Al Qaeda funded the hijackers in the United States by three primary and unexceptional means: (1) wire transfers from overseas to the United States, (2) the physical transport of cash or traveler's checks into the United States, and (3) the accessing of funds held in foreign financial institutions by debit or credit cards. Once here, all of the hijackers used the U.S. banking system to store their funds and facilitate their transactions."[415]  This conclusion was based on primary sources, such as receipts for transactions and interrogations of facilitators.

On the other hand, the source of the money remained mysterious. The Report states its conclusion no less than three times in the section on al Qaeda's financing, "A Money Trail?" The first is at the beginning of this section: "The origin of the funds remains unknown, although we have a general idea of how al Qaeda financed itself during the period leading up to 9/11."[416] The second was at the end of this section, "To date, the U.S. government has not been able to determine the origin of the money used for the 9/11 attacks."[417] And the third was in the subsection on "The Funding of the 9/11 Plot": "Our knowledge of the funding during this period, before the operatives entered the United States, remains murky."[418]

In elaborating this conclusion, the Commission's Terrorist Financing staff quotes from a CIA report, "Usama Bin Ladin's financial assets are difficult to track because he uses a wide variety of mechanisms to move and raise money[;] … he capitalizes on a large, difficult-to-identify network with few long-lasting nodes for penetration. It is difficult to determine with any degree of accuracy what percentage of each node contributes to his overall financial position. Gaps in our understanding contribute to the difficulty we have in pursuing the Bin Ladin

---

[414] Roth, Greenburg, and Wille, 2004, at 20; Coll, 2008, at 489–93.
[415] Roth, Greenburg, and Wille, 2004, at 13.
[416] *9/11 Commission Report*, at 169.
[417] *9/11 Commission Report*, at 172.
[418] *9/11 Commission Report*, at 172.

financial target."[419] The *9/11 Commission Report* states, "Al Qaeda appears to have relied on a core group of financial facilitators who raised money from a variety of donors and other fund-raisers, primarily in the Gulf countries and particularly in Saudi Arabia…. These financial facilitators also appeared to rely heavily on certain imams at mosques who were willing to divert zakat donations to al Qaeda's cause. Al Qaeda also collected money from employees of corrupt charities. It took two approaches to using charities for fund-raising. One was to rely on al Qaeda sympathizers in specific foreign branch offices of large, international charities – particularly those with lax external oversight and ineffective internal controls, such as the Saudi-based al Haramain Islamic Foundation. Smaller charities in various parts of the globe were funded by these large Gulf charities and had employees who would siphon the money to al Qaeda."[420] However, this was not based on primary sources but on intelligence analysts' estimates. The Terrorist Financing staff of the commission admitted in a special appendix on the funding to the 9/11 attacks, "To date, the U.S. government has not been able to determine the origin of the money used for the 9/11 attacks. As we have discussed above, the compelling evidence appears to trace the bulk of the funds directly back to KSM … but no further. Available information on this subject has thus far not been illuminating."[421]

From the preceding chronological account of al Qaeda, it appears that the funding for the 9/11 attacks was generated after December 1998 since prior to that date al Qaeda was almost bankrupt. This means that any allegation of funding of al Qaeda prior to that date would not have flowed to the 9/11 attacks. Likewise, it appears that any funding for other theaters of the global neo-jihad, since as Bosnia, Chechnya, Kashmir, or Palestine did not flow into the 9/11 attacks as well. There is no evidence that al Qaeda was directly involved in these theaters or the organizations involved in these theaters funded al Qaeda. Al Qaeda might have contributed some money for these theaters, but it would have taken money away from the 9/11 attacks and there is no evidence that this money returned to al Qaeda for the 9/11 attacks. So, it appears that although the source of the funding for the 9/11 attacks is still unknown, this money came directly to al

---

[419] CIA analysis quoted in Roth, Greenburg, and Wille, 2004, at 18.

[420] *9/11 Commission Report*, at 170. The sourcing for these statements, FN 115 – 9, at 498, were briefings by two analysts, Frank G. and Mary S., as well as CIA analytic reports.

[421] Roth, Greenburg, and Wille, 2004, at 144.

Qaeda, not from other theaters, around the time that the 9/11 conspiracy emerged in early 1999
and not before.

### III.   Addressing Plaintiffs' Specific Allegations

What is specifically missing from the 9/11 Commission investigation, the origin of the
funds for the 9/11 attacks, is the core of the plaintiffs' allegation that WAMY provided material
support for the 9/11 attackers and is therefore liable for the damages to the plaintiffs. To support
their case, they make multiple allegations, which now must be put in the context of the evolution
of the 9/11 terrorists or al Qaeda in general. It's a truism that one cannot prove a negative. In
terms of this litigation, I cannot prove the negative that WAMY has not supported al Qaeda or
did not play a role in the 9/11 attacks. All I can do is to address each and every one of the
plaintiffs' allegations about WAMY through the experts they retained. In this part of the report, I
examine these allegations in chronological order since al Qaeda evolved over time.

I do not address Mr. Jenkins' report in this part because it does not mention WAMY and
makes no allegations against it. Dr. Levitt makes just one general and one specific allegations
against WAMY in his report. I address them when appropriate in this part of the report. Most of
the allegations against WAMY come from Messrs. Kohlmann and Winer and they are the focus
of this part of the report. These allegations are both general and specific. Let's first address the
general ones and then move on to the specific ones in chronological order.

### A. General Denigration of WAMY

Both Kohlmann and Winer denigrate WAMY by noting that JTF GTMO detainee
assessments characterized WAMY as a "Tier 1 NGO Counterterrorism NGO target, defined as
those that have demonstrated sustained and active support for terrorist organizations willing to
attack US persons or interests."[422] This quote in Kohlmann's report comes from a JTF GTMO
detainee assessment from a person who had applied for a job with WAMY but was not hired.
The quote comes from an analyst's note at FN 2 of that assessment.[423] I am not sure why

---

[422] Kohlmann report, paragraph 159, at 47; Jonathan Winer in Expert Report of Jonathan Winer,
henceforth Winer report, section 12.10.3, at 101.

[423] Department of Defense, 2006, JTF GTMO Detainee Assessment, Rashid Awad Khaliaf
Bilkhayr, ISN: UA9SA-000186DP, June 28, 2006, FN2, at 2, available at

Kohlmann decided to use this specific quote from a document that is irrelevant to WAMY since this organization had declined to hire the person in question. However, the quote captures what JTF GTMO analysts believed about WAMY as will be seen.

Kohlmann and Winer continue, quoting from Guantanamo Bay documents, especially about Adel Hassan Hamad, whom I examine in more detail later. Kohlmann stated, "The DoD has privately accused WAMY of being 'affiliated' and 'associated with Usama Bin Laden and al Qaeda operations': 'According to top WAMY officials, both the United States and Israel must be destroyed. WAMY provides financial support to the Palestinians fighting against Israel. In addition, WAMY has put forward a proposal that the Palestinians should declare open war on Israel.'"[424] Despite having the same quotes, Kohlmann and Winer gave different citations. Kohlmann cited two JFT GTMO Detainee assessments for this quote.[425] I read them both and failed to detect the quotes in either document. Winer also gave two citations:[426] one of them is bizarre and is from the summary of the JTF GTMO Administrative Review Board (ARB) proceedings for ISN 939 (Mammar Ameur). These proceedings consisted of a designated military officer reading accusations from the summary of unclassified evidence against the detainee, to which the detainee replied one item at a time. The relevant exchange is the following:

> Designated Military Officer: The Detainee was arrested with an individual, who worked for several years for a Saudi organization called WAMY.
> Detainee: That's true.
> Designated Military Officer: The World Assembly of Muslim Youth (WAMY) is an NGO operating in Afghanistan and may be associated with Usama bin Laden and/or al Qaida.
> Detainee: I really don't know how to answer it because I never worked with this organization. I don't think so but whether it is or not, I don't know.

https://assets.documentcloud.org/documents/82673/isn-186-rashed-awad-khalaf-balkhair-jtf-gtmo.pdf.

[424] Kohlmann report, paragraph 159, at 47; Winer report, section 12.10.3, at 101.
[425] Kohlmann report, FN 230, at 47. They refer respectively to Department of Defense, 2005, JTF GTMO Detainee Assessment, Mammar Ameur, ISN: US9AG-000939DP, April 13, 2005, at PEC-WAMY029019–26; and Department of Defense, 2005, JTF GTMO Detainee Assessment, Adel Hassan, ISN: US9SU-000940P, March 25, 2005, at PEC-WAMY029011–8.
[426] Winer report, FN 196, which is not accurate, and FN 197, which is, at 101.

Designated Military Officer: You have no opinion one way or another?

Detainee: I don't think so but … I don't believe so.[427]

Kohlmann's quotes come from the summary of JTF GTMO ARB proceedings for ISN 940 (Adel Hassan Hamad).[428] The relevant exchange is the following:

Designated Military Officer: WAMY is a non-government organization operating in Afghanistan that may be affiliated with Usama Bin Laden and al Qaida operations.

Detainee: I worked at the surgical hospital that falls under the World Assembly for Muslim Youth in Afghanistan in the area of (Shaharnu), Chamkani, on the Pakistani border as an administrative manager and not as a director as you mentioned.

Designated Military Officer: According to top WAMY officials, both the United States and Israel must be destroyed. WAMY provides financial support to the Palestinians fighting against Israel. In addition, WAMY has put forward a proposal that the Palestinians should declare open war on Israel.

Detainee: What WAMY's highest officials said I have never heard of, and if they said that, I have nothing to do with it, for I am an employee; I do my job and earn wages for it.[429]

The allegations against WAMY are not really evidence in the legal sense of the term. It is a set of accusations which a defendant, or detainee in this case, must address. To characterize these statements as "the government stated" as Winer wrote is too strong. Here, Kohlmann is more accurate when he wrote, "DoD has privately accused WAMY…" These are only allegations, which, in the end, were never confirmed. Hamad was never formally charged, was released from GTMO, and returned home to his family in December 2007.[430]

I wondered about this classification of WAMY as a Tier 1 NGO. I am familiar with Tier I terrorist organizations, which under the Immigration and Naturalization Act are defined as foreign terrorist organizations (FTO) designated by the U.S. Secretary of State. However,

---

[427] Summary of Administrative Review Board Proceedings for ISN 939, at 3, available at https://assets.documentcloud.org/documents/77596/isn-939-mammar-ameur-administrative-review-board.pdf.

[428] Summary of Administrative Review Board Proceedings for ISN 940, FED-PEC0141770–86.

[429] FED-PEC0141772.

[430] Steven Wax, 2008, *Kafka Comes to America: Fighting for Justice in the War on Terror: A Public Defender's Inside Account*, New York: Other Press, at 327.

WAMY is definitely not on the State Department FTO designated list. Kohlmann provided the answer to this attribution puzzle by citing a DoD document, "JTF-GTMO Matrix of Threat Indicators for Enemy Combatants."[431] This internal JTF GTMO document appears to be a guideline for its analysts to be used in JTF GTMO detainee assessments to assess the threat a detainee would pose if he were freed, but "***not as evidence to prove a detainee's guilt or innocence***."[432] In this document, WAMY was listed under "associated forces" defined as "those militant forces and organizations with which al-Qaida, the al-Qaida network, or the Taliban had or has an established working, supportive, or beneficiary relationship for the achievement of common goals. Associated forces are identified in intelligence reports and US government terrorism lists." The document enumerated several lists at the Departments of State (FTO list) and Treasury (SDGT list), but I checked them, and none contained WAMY. The last two categories in the JTF GTMO document are the classified National Intelligence Priorities Framework (NIPF) and a waste basket category. I do not believe that WAMY is on the NIPF list, so it leaves the last category of "terrorist support entities … identified in assessments, intelligence reporting and US Government designated terrorism lists."[433] There is no way to know whether WAMY was ever on such a list or still is, but it is listed in this dated document without any further clarification.

Without any further evidence for the accusation that WAMY materially supported al Qaeda, its network, or the Taliban, I will treat these statements by Kohlmann and Winer as an allegation rather than a U.S. Government conclusion or even evidence of any material support for al Qaeda. Certainly, I am not aware of any U.S. Government designation of WAMY as a terrorist entity or any action that it has legally carried out against WAMY. To my knowledge, the DoD never conducted any field investigation to corroborate or refute any of the allegations derived from detainee questioning, sometimes under torture. JTF GTMO analysts' suppositions on the basis of very tainted evidence are at best speculations. In any case, Kohlmann and Winer just quote these allegations without providing any support for them. As we shall see, JTF GTMO analysts have generally greatly exaggerated the charges against the vast majority of the detainees, who have since been quietly discharged. The lack of fair procedural justice in

---

[431] PEC-WAMY013648–64.

[432] PEC-WAMY013648, italics and bold script in the original.

[433] PEC-WAMY013662. WAMY appears on the JTF-GTMO matrix at PEC-WAMY013664.

Guantanamo proceedings is still a black mark for American justice. The allegations of the Guantanamo detainees connected to WAMY have not been born out and Hamad has been released. Use of allegations from GTMO analysts do not reach a level of credibility in any fair legal proceedings. I return to this when I take up Hamad again and more generally the reliability of JFT GTMO documents in this part and in the opinion part of this report. I suspect that Kohlmann's and Winer's purpose for quoting this tainted allegation against WAMY is to frame and set the tone of the rest of their respective sections on WAMY. Quoting a third party's accusation without further support is just an allegation and definitely not evidence of any wrongdoing.

### B. WAMY's General Publications and Indoctrination

This allegation is general, namely that WAMY general publications created an ideological atmosphere that made the 9/11 attacks possible.[434] The assumption behind this allegation is that the attacks were ideologically driven, and the ideology propagated in these publications led to the attacks. I shall not get into the details of WAMY's ideology as I am not an expert in Islamist ideology or Islam in general. Both Kohlmann and Winer seem to imply that simple exposure to a given ideology especially at a young and vulnerable age inevitably results in terrorism attacks. They gave some examples of what was taught at WAMY summer camps to imply that they had a role in the 9/11 terrorist attacks.

Kohlmann's evidence is presented in paragraphs 160 and 161 of his report. The first item are excerpts from a song published in a 1987 WAMY publication, translated in English in 1990, on the objectives, program outlines, and preparatory steps for Islamic camps.[435] Winer also includes this song as evidence of WAMY's ideological support for al Qaeda.[436] The song is

---

[434] This is made explicitly in Winer report, in section 12.11, at 102–3; and in Kohlmann report, paragraphs 160–1, at 48–9.

[435] WAMY INTL E002177–241, portions of this pamphlet are in the plaintiffs' discovery material at PEC-WAMY006031–42.

[436] Winer report, in section 12.11.1.1, at 102. Winer does not quote from the original document, portions of which are included in the discovery material (WAMY INTL E002231–2) but from a secondary source, namely a document submitted in *U.S. v. Soliman Biheiri*, E.D. Virginia, Alexandria Division, No. 03-365-A, Supplemental Declaration in Support of Pre-Trial Detention, September 11, 2003, submitted by ICE Senior Special Agent David Kane, henceforth Kane declaration, at 8 (PEC-WAMY001703–13, the quote is from PEC-WAMY001710). In his declaration, Kane cites both plaintiffs' experts Winer and Levitt (paragraphs 33 and 34

entitled *Youth of the True (Religion)*. Kohlmann manages to include a few errors in his quote, where the relevant passage is, "Bring back the glory to it's [sic, but correctly translated as its in original] lions/ And restore the zeal to its soldiers/ Flatten evil in its cradle/ And unsheath [sic, incorrect as well in original] the swords…. Hail! Hail! O sacrificing soldiers!/ To us! To us! So we may defend the flag. [no period in original]/ On this Day of Jihad, are you miserly with your blood?!"[437] Winer adds more of the refrain, "And has life become dearer to you? And staying behind sweeter? Is staying in this world of torment more pleasing to us? You are amongst those called upon by Destiny. Come! So we may revive the times the times [sic, Winer repeats Kane's error of repeating the phrase the times, which is not in the original] of our predecessors!"[438]

Both Kohlmann and Winer take these excerpts out of context in order to suggest that the song encourages young Muslims to become al Qaeda suicide bombers. But this is not the meaning of the song when read in its entirety. The song advocates the youth to return to the right path after veering off course. "Alas, we have forgotten our position here (now)/ And we've abandoned the shariah and our role/ Error has built in our territory whatever it has/ And it has built nothing but weakness and ruin/ And we nurture nothing but weakness and ruin." After the beginning of the refrain that hails and glorifies the past soldiers of Islam, the song ends not as Winer writes "So we may revive the times of our predecessors!" but in a longer sentence, "So we may revive the times of our predecessors/ and establish Truth amongst the successors/ Come! Allah forgives that which has passed/ For Allah never abandons one who supplicates and repents!"[439] There is no exclamation point after predecessors as Kane declared. The song simply glorifies past Muslim heroes but only calls young people to adopt a Salafi version of Islam. The passage just before the refrain and its ending give the true meaning of the song, which can only be misinterpreted when excerpts are taken out of context, as Kane, Winer, and Kohlmann do. Again, as argued in the methodological part of this report, one must put documents in their proper context. The original document, not a secondary version like Kane's, is the start of the investigation, not its end.

---

respectively) at PEC-WAMY001712. This creates circular citation: Kane cites Winer, who cites Kane…

[437] Kohlmann report, at 48, original is WAMY INTL E002231–2.

[438] Winer report, at 102; *U.S. v. Biheiri*, 2003, Kane's declaration, at 8.

[439] WAMY INTL E002232.

*Youth of the True (Religion)* is typical of patriotic songs anywhere in the world. It is pretty mild compared to the French national anthem, *La Marseillaise*: "Arise, children of the Fatherland / the day of glory has come! / Against us, tyranny / The bloody flag is raised, (bis) / do you hear, in the countryside / the roar of those ferocious soldiers? / They're coming right into your arms / to cut the throats of your sons, your women! / To arms, citizens, / form your battalions, / march, march / let impure blood / irrigate our furrows!"[440] This is basically the only part of the national anthem that most French people know and sing at patriotic events. It even has themes that are now seen as "jihadi," namely the cutting of people's throat and the notion of impure blood ("the blood of the *kufar* [infidel] is *halal* [permissible]"). Although all French children learn this song by heart and continue singing it throughout their lives, very few Frenchmen ever go on to become terrorists.

### 1.  Winer's Allegations

Winer provides another example of WAMY's ideological support of al Qaeda in paragraph 12.11.1.2, which also comes from the Kane declaration. Kane, who does not read or speak Arabic, admitted that he reviewed an alleged translation of a portion of an Arabic book published by WAMY entitled *A Handy Encyclopedia of Contemporary Religions and Sects*.[441] It is hard to comment on excerpts that are far removed from the original document (shortest possible access to this information by Winer is: original document in Arabic → excerpts selected from it and taken out of their contexts → translations → selection by Kane → selection by Winer). I need the context of these excerpts to avoid misinterpreting these excerpts as I do not know their original context or even if they are related to WAMY. I am told by an Arabic speaker who reviewed the encyclopedia that the alleged section quoted by Kane does not exist. However, on their face value and without such context, as a child of holocaust survivors, I find this excerpt very offensive and typical of the defamation of Jews found in anti-Semitic conspiracy theories. Modern neo-jihadi anti-Semitism has adopted a one-thousand-year-old Christian tradition of anti-Semitism, initiated at the start of the crusades in the late 11th century and exacerbated by the Black Death, the world wide pandemic of plague in the mid-14[th] century,[442] the European Wars

---

[440] From memory and translation mine.

[441] Kane's declaration, at 9 (PEC-WAMY001711).

[442] See Leon Poliakov, 2003, *The History of Anti-Semitism, Volume I: From the Time of Christ to the Court Jews*, Philadelphia: University of Pennsylvania Press: 41–169.

of Religion in Europe in the 16th and 17th centuries, the Russian waves of anti-Semitism at the end of the Romanov regime, and fascist anti-Semitism of the 20th century in Europe. These types of statements are unfortunately not unique or specific to fundamentalist Muslims.

Winer provides a second set of three items for his allegation of WAMY's ideological support of al Qaeda, all taken from another secondary source: Steve Emerson's testimony before the 9/11 Commission.[443] Emerson is not a reliable source and in fact has a well-known history of making false allegations. He is notorious for having first blamed the April 19, 1995 Murrah Federal Building bombing in Oklahoma City on Muslims. In front of a national audience on CBS News that evening, he confidently claims, "Oklahoma City, I can tell you, is probably considered one of the largest centers of Islamic radical activity outside the Middle East… [The bombing] was done with the intent to inflict as many casualties as possible. That is a Middle Eastern trait."[444] This was not Emerson's only gross error. In the wake of the terrorist attack on the *Charlie Hebdo* magazine in January 2015, Emerson declared on Fox News: "In Britain, it's not just no-go zones, there are actual cities like Birmingham that are totally Muslim where non-Muslims just simply don't go in."[445] When British Prime Minister David Cameron heard about these comments, he choked on his porridge and replied that Emerson was "clearly a complete idiot."[446]

---

[443] Winer report, paragraph 12.11.2, at 103, the original Steve Emerson document is at PEC-WAMY000349.

[444] Mark Potok, 2015, "Remembering Oklahoma," *Intelligence Report*, 2015 Summer Issue, June 10, 2015, available at https://www.splcenter.org/fighting-hate/intelligence-report/2015/remembering-oklahoma. See also, Council on American-Islamic Relations, 1995, *A Rush to Judgment: A Special Report on Anti-Muslim Stereotyping, Harassment and Hate Crimes Following the Bombing of Oklahoma City's Murrah Federal Building, April 19, 1995*, available at https://www.cairoklahoma.com/wp-content/uploads/2016/07/1995-A_rush_to_judgement.pdf, which documents the series of hate crimes committed against Muslims following the bombing of the Murrah Federal Building. Emerson's quote is at 4. Steve Emerson published his explanation for his claim a week later in Steven Emerson, 1995, "Why Islamic Extremists Were the First Suspects," *Washington Times*, April 27, 1995.

[445] A 44 second video of his statement is available at https://www.theguardian.com/media/shortcuts/2015/jan/12/steven-emerson-muslims-birmingham-error-fox-news.

[446] Matthew Holehouse, 2015, "David Cameron: US terror 'Expert' Steve Emerson is a 'complete idiot'," *Telegraph*, January 12, 2015, available at https://www.telegraph.co.uk/news/uknews/terrorism-in-the-uk/11340399/David-Cameron-US-terror-expert-Steve-Emerson-is-a-complete-idiot.html. Again, Emerson issued an apology on his

Winer's quotes refer to an Arabic book *Islamic Views* allegedly written by WAMY and printed by the Saudi government's armed forces printing press. All references to this book are circular: Steve Emerson, David Kane, Jonathan Levin, but no production to the actual documents. I am told that WAMY never published a book entitled *Islamic Views*. Nor was the book ever produced by plaintiffs' experts. I cannot comment on third hand allegations (Winer, citing Emerson, citing other documents, which he could not read in the original since Emerson does not read Arabic) without seeing the original in context.

Finally, Winer produces a last example for his allegation that WAMY's ideological support of al Qaeda taken from the Canadian Revenue Agency's (CRA) audit of WAMY Canada, dated August 23, 2011.[447] Winer's quote is, "Muslims in the east … have always enjoyed the tolerance and good treatment of Islam… [u]unfortunately [sic], Western Christians preferred and still prefer to be the enemies of Islam and Muslims."[448] This must be a misquotation because it does not make sense: "Muslims … have always enjoyed the tolerance and good treatment of Islam!?" Indeed, this is not the original quote. The CRA document actually states, "Christians living with Muslims in the east … have always enjoyed the tolerance and good treatment of Islam."[449] By cutting off the beginning of the quote, Winer made his statement nonsense, while the CRA statement does make sense.

However, the CRA also relies on secondary sources and therefore must be verified as well. It admits that the quote came from a Muslim World League pamphlet, which was allegedly distributed by WAMY (Canada). The pamphlet is *A Dialogue on the Internet: MWL Series on Islam, No. 29*, by Dr. Arafat el-Ashi.[450] As can be seen from its title, this is a Muslim World League document, distributed by the MWL, not by WAMY. As will be discussed later, at one point, the director of WAMY Canada was also an employee of the MWL and may have mixed documents from these two organizations. The context of the quote is a series of questions asked

---

website, https://www.investigativeproject.org/4730/emerson-with-judge-pirro-no-go-islamic-zones.

[447] Winer report, paragraph 12.11.3, at 103, the original CRA document is at PEC-WAMY031447–68.

[448] Winer report, paragraph 12.11.3.1, at 103.

[449] Canada Revenue Agency, Audit of the World Assembly of Muslim Youth, August 23, 2011, at 18 (PEC-WAMY031464).

[450] Dr. Arafat El Ashi, *A Dialogue on the Internet: MWL Series on Islam, No. 29*, Etobicoke, Ontario: Muslim World League, Canadian Office, PEC-WAMY030087.

on the Internet by a student. The relevant question seems to be question 7: "How would you assess modern day Islam–Christian relations?"[451] The full answer is, "Modern Muslim Christian relationship is of two types: Christians living with Muslims in the east. These have always enjoyed the tolerance and good treatment of Islam and Muslims. Unfortunately, Western Christian preferred and still prefer to be the enemies of Islam and Muslims. One example is the colonial rule of Muslim countries committed by Christian powers in the 19th century. Muslims are always ready to improve this relationship if Christians do their part."[452] The last two sentences, omitted by the CRA and Winer, clearly downplay the hostility implied in the quote taken out of context.

Winer concludes this section by arguing that the above and similar material written, published, and/or disseminated by WAMY prior to the 9/11 attacks, provided religious and ideological justification for jihad and Islamic martyrdom, two concepts that were among the foundations for justifying al Qaeda's program of suicide bombings and terrorist attacks. However, nothing that Winer presented justified suicide bombings or terrorist attacks. Some were anti-Semitic and other deeply prejudicial, but nothing mentioned or advocated suicide attacks or terrorism.

### 2. Kohlmann's Allegations about Suleman Ahmer

In his attempt to implicate WAMY in trying to indoctrinate young Muslims to fight jihad, Kohlmann provides the example of a lecture, "Jihad, the Misunderstood Word," by Suleman Ahmer presented at a WAMY camp in Okeechobee, Florida on July 26, 1996.[453] He quotes from the lecture that Ahmer had spent months in Bosnia and Chechnya and saw things that were very motivational and was going to motivate the children. Ahmer was going to tell them positive things about jihad. Ahmer said that if the Chechens and Bosnians fight, they were called terrorists. Immediately after this statement, Kohlmann quotes him, "without jihad the evil forces will overwhelm you and that's why Allah has given you so much promises to you, to people who do jihad, to people who struggle." Kohlmann goes on to comment, "Ahmer described the challenge during the Bosnian war of indoctrinating non-Arabic-speaking European Muslims in fundamentalist Islamic principles," and illustrates it by quoting Ahmer saying that Bosnians did

---

[451] PEC-WAMY030086.
[452] PEC-WAMY030087.
[453] Kohlmann report, paragraph 161, at 48.

not know the word mujahedin. After seeing the foreign mujahedin fight, they began to practice Islam. Kohlmann concludes with a last quote from Ahmer, "See, jihad, how it establishes Islam?"[454]

The narrative flow of Kohlmann's paragraph is that Ahmer tried to convince the young Muslims at the camp to take to violent jihad. He does so by distorting Ahmer's lecture through juxtaposition of unrelated quotes and omission of their context. In fact, he uses this device of juxtaposition and omission repeatedly throughout his report. Ahmer's lecture was proselytism, not for violent jihad but for Islam. He did start by saying that he had spent some months in Bosnia and Chechnya and saw things that had motivated him and hoped would also motivate his audience. Kohlmann omits Ahmer's illustration of what he meant in a vignette from his student days, when a friend complained that non-Muslims were so numerous and Muslims so few. He became depressed and felt overwhelmed until another person reframed the issue for him that Haq, truth, was like a light and darkness was just an absence of light. This brought him to the topic of jihad. "What is jihad? The word comes from the word jihad, which means to struggle. What we have understood of the word is that it is a struggle and an effort to establish Islam in the world. This is jihad. There are all these different levels when you want to establish Islam in the world. Where do you start first? Yourself. That is why Jihad when you fight against evil, when we fight against temptation, we are trying to make jihad and bring jihad into ourselves, our communities, societies, and our world."[455]

Kohlmann goes on to ignore Ahmer's teaching that there is no compulsion in Islam. "Every person has a right to choose. If this person is a non-Muslim, right, he has a right to choose. If you go to him and say, 'Do you want to become a Muslim?' and he says, 'No, I don't want to be a Muslim,' then fine. There's no compulsion. He has a right to live in peace with you no problem."[456] Ahmer then went on to say, "when the Muslims are attacked you have to defend yourself." Ahmer explained, and this is the full quote that Kohlmann condenses, "When I was flying to Orlando yesterday, I was going through details of how Russians are killing the Muslims in Chechnya. What is their crime? Just because they are Muslim, right? They [the Russians] are

---

[454] Kohlmann report, paragraph 161, at 48.
[455] Suleman Ahmer, 1996, "Jihad, the Misunderstood Word," transcript of a lecture given at WAMY – Okeechobee Summer Da'wah Camp, July 26, 1996, at 1–2.
[456] Ahmer, 1996, at 3.

coming in, they are sealing whole villages and they are bombing them. They are not allowing kid, women, men to leave. What is this? If the Chechens come up and they fight, if the Bosnians come up and they fight, you call them terrorists! This is unfair. Under no circumstances are we allowed to just sit down and let them kill us. And if they fight, they have a right to fight. So, jihad has many forms, from individual struggle, to struggle to establish Islam, to a struggle to protect ourselves, this is all jihad."[457]

Ahmer went on to talk about the importance of the struggle to establish Islam, which he also calls jihad, meaning struggle. "Why is it so important? Because without jihad the evil forces will overwhelm you and that's why [Allah] has given you so much promises to you, to people who do jihad, to people who struggle. It's not for us as Muslims, it's not a matter of choice that, yes, I want to establish Islam or, no, I don't want to establish Islam. It doesn't work. It is a responsibility on every one of us, on each one of us, a responsibility to make sure that Islam is established."[458]

The above paragraph was a different topic, namely the duty of proselytism of Islam, from that of the previous paragraph, violent jihad to defend yourself. Yet, by juxtaposing the two sentences from these two different paragraphs, Kohlmann links them together and the reader would naturally understand that the two uses of the word jihad are the same, namely violent jihad. So, by Kohlmann's quick juxtaposition of two unrelated and different meanings of the word jihad and omission of the sentences between these two different uses of the word jihad, the reader would assume that the sentence "without jihad, the evil forces will overwhelm you and that's why [Allah] has given you so much promises to you, to people who do jihad, to people who struggle" refers to violent jihad, while from the context, it clearly refers to proselytism as its illustrating vignette and commentary discusses the duty to spread the gift of Allah to the world.

Kohlmann claims that Ahmer then went on to discuss the challenge of indoctrinating Bosnians, who were non-Arabic-speaking European Muslims, in fundamentalist Islamic principles. I read the lecture very carefully and Ahmer said no such thing. The story about the Bosnian is not about indoctrination at all, but gratitude for help from other Muslims. Ahmer had moved on to a third and unconnected topic, namely that Muslims help each other, and Allah helps them. Ahmer started the story saying that Muslims came spontaneously at their own

---

[457] Ahmer, 1996, at 3.
[458] Ahmer, 1996, at 3.

expense from all over the Muslim world to defend their Bosnian Muslim brothers. The full quote is, "They [the foreigners] went to the front and started fighting against the Serbs who had attacked the Muslims. You know what? They didn't even ask questions. They just went, took a gun and started fighting. And you know who was really amazed? The Bosnians were really surprised. They saw these people coming in and going to the front and fighting and dying and they said, 'Thank you very much. Thanks a lot, guys. But tell us, who gave you money to come? Who sent you?' They [foreigners] said, 'Nobody.' They [Bosnians] said, 'Really? Nobody gave you money to come? But why did you come? We thank you and are very appreciative that you are dying for our honor and our lives but WHY? WHY? What made you come?' They [foreigners] said, 'We are Muslims. We are Muslims and Allah has told us you must make jihad, that if your brother and sister is being killed, you should be the first one to die for them.' They [Bosnians] said, 'Really?' Because the Bosnians were well away from Islam at that time, they said 'Really?!' They couldn't even say the world 'jihad.' They used to call 'mujahedin,' 'muhajedin.' It took them many months to learn the right word. They said if this really, if this is what Islam teaches you, we are fools if we don't practice Islam. See, jihad, how it establishes Islam??"[459]

In order to make sure that the campers understood the meaning of his lecture, Ahmer summarized it. "Until this point, we have talked about three things.

1. What is Jihad?
2. Why is it so important? Because we have to establish the deen [way] of Allah and we talked about why is it important that each one of us make jihad and struggle for the deen of Islam.
3. How Allah will help us and how Allah is helping us in such instances."[460]

In any case, Kohlmann's quotes in paragraph 161 do not seem very controversial. From time immemorial, people have a right to defend themselves when invaded and killed, as happened to Poland in 1939, Russia in 1941, and Muslims in Bosnia and Chechnya in the 1990s. It does not matter what people call it, resistance, freedom fight, jihad, or terrorism. In fact, during World War II, French resistance fighters were called terrorists by the Vichy government. Only after the withdrawal of Nazi forces from France, were they retrospectively called the glorious

---

[459] Ahmer, 1996, at 6.
[460] Ahmer, 1996, at 9.

*résistants*. Many Islamic scholars called Afghanistan (1980s), Bosnia (early 1990s), and Chechnya (both 1994-6 and 1999-2002) a legitimate defensive jihad. Indeed, the U.S. government condemned the Soviet invasion in Afghanistan, the Serbian aggression against Muslims in Bosnia, and the Russian intervention in Chechnya during both rounds of the Chechen War. The rest of the lecture seems to be about proselytizing a Salafi version of Islam. This is not extremist indoctrination as Kohlmann argues but simply Salafi proselytism.

The last four lines in Kohlmann's paragraph 161 have nothing to do with the above Suleman Ahmer lecture in Florida in 1996. They refer to a cable written in 2006 (about a decade after the above lecture) by the political officer at the U.S. consulate in Jeddah, who interviewed the then WAMY Secretary General Dr. Saleh al-Wohaibi on multiple topics.[461] This is a different secretary general than the one that was in charge of WAMY at the time of the above lecture, Dr. Dr. Maneh al-Johani, who died in 2002 and was replaced by Dr. al-Wohaibi. When the political officer complained about an anti-American lecture accusing Saudi journalists of being agents of the West, given by a Sheikh al-Break [sic] at a WAMY summer camp in 2006 in Saudi Arabia, Dr. al-Wohaibi replied, "although it was unfortunate that al-Break comments sparked such controversy in the media, it is 'not possible to control' all the information given during these lectures. WAMY is a major organizer of summer camps for children … and its focus is to encourage youth to engage in positive activities, such as sport and religious study during their summer vacation. If some lectures share extremist ideologies with the children, it is unintentional."[462] This cable strongly implies that this sheikh gave his lecture in the summer of 2006, five years after the 9/11 attacks and much too late to have played any role in them.

So, clearly the two events are unrelated, referred to different lectures, given by different lecturers, a decade apart, and in different countries. The juxtaposition of these two unrelated items and the omission of the end of Dr. al-Wohaibi's quote makes it appear that the WAMY Secretary General at the time (Dr. al-Johani) was *condoning* the first lecture while this is definitely not the case. This is another example of Kohlmann's tendency to juxtapose unrelated items and to omit their context, and won't be the last one in his report.

### 3. Kohlmann's Allegations against Sheikh Buraik

---

[461] Kohlmann report, FN 237, at 49, citing FED-PEC0210330–1.

[462] FED-PEC0210330–1.

Kohlmann later returns to Sheikh Saad [not Saleh as Kohlmann calls him] al-Buraik, if it is the same Sheikh mentioned in the U.S. State Department cable of the previous section, in paragraphs 183 and 184.[463] Let me first start with paragraph 184.[464] At first glance, this series of quotes seems concerning: "Islam spread when the blood of its companions was shed on the land of jihad… This religion will only spread by Jihad… If you die in the land of … Jihad, you are with the martyrs… This is how religions spread… no idea spreads unless its people water it with their own blood." This conjures up images of suicide bombers (martyrs) murdering people in order to spread Islam. However, Kohlmann's quotes are taken out of context distorting their original meaning in order to give this impression.

The above quotes come from a eulogy, "The Martyr of Jihad, Abdullah Azzam," that Sheikh Buraik gave around 1990 in memory of Sheikh Abdullah Azzam, who had just been assassinated.[465] As the title of the talk makes clear, this is a eulogy and the jihad is the Afghan jihad of the 1980s, which the U.S. Government funded and supported along with Saudi Arabia. The eulogy opened with a summary of its main points: "In Islam, there are men who sacrificed their worldly life with its pleasures to uphold the word of Allah, and who devoted their time and efforts for the sake of Allah. Though we might feel sad at the death of the heroes, consolation is all about the paradise. In this article, you find consolation to the Muslims for the loss of the nation's deceased and the father of Jihad in this era, Sheikh Abdullah Azzam." Sheikh Buraik went on to talk about the assassination of Azzam on November 24, 1989.[466] Then Sheikh Buraik discussed the piety of Sheikh Abdullah Azzam. This brings us to the section of the eulogy, "Jihad and its importance in spreading religion," where the deaths or martyrdom of jihadi leaders would not stop the spread of Islam. On the contrary, their martyrdom would inspire people to take to Islam and spread the religion.

---

[463] Kohlmann report, paragraph 183, at 55. His footnote 276, at 55 specifically cites the above State Department cable.

[464] Kohlmann report, at 56.

[465] The date of the eulogy can be approximated by the fact that Sheikh Buraik named Jamil al-Rahman, the Salafi commander in Kunar Valley, as one of the leaders of the Afghan jihad, who was not dead, and whose death would not end the Afghan jihad. Jamil al-Rahman was assassinated on August 30, 1991. So, the eulogy must have been given before his death. See part II of this report for the role of Sheikh Abdullah Azzam in the Afghan jihad. See Sheikh Saad Buraik, 1990, "The Martyr of Jihad, Abdullah Azzam."

[466] See section II.E of this report.

The full version of the relevant paragraph is: "O brothers, Islam spread when the blood of its companions was shed on the land of Jihad. The Islamic conquests expanded when the blood of the companions, the followers, and the Muslim soldiers was shed on the land of the East and the West. This is the Sunnah of Allah, and Jihad goes on until the judgment day. This religion will only spread by Jihad for the sake of Allah, the Sharia of the nation, the Sharia[467] of immortality, and the Sharia of survival. If you are alive, you are happy, and if you die in the land, in the land of Jihad, you are with the martyrs. The Muslims live this way. O servants of Allah, many people were known for their thought, good intention, and sincerity only after they died. Their name spread and their status was known." Sheikh Buraik then named Sayyid Qutb, the Egyptian ideologue, who was executed in prison on August 29, 1966 during the Gamal Abdel Nasser regime in Egypt. On the day of Qutb's execution, he was given a chance to renounce his ideas, but he refused and died as a martyr, like Sheikh Abdullah Azzam. Sheikh Buraik commented, "This is how religions spread. This is how religion and doctrines spread. Without this, no idea spreads unless its people water it with their own blood… Azzam is like him [Qutb]. And before them there are the imams of the Da'wah in Najd and all over the world. When they offered their blood to Allah, monotheism spread, the Da'wah spread, and their thoughts spread."[468]

It is clear from the fuller quote that Sheikh Buraik was praising Azzam and Qutb, who were preachers, not soldiers. They died for what they believed and therefore became martyrs to their cause. As a result, their reputation and their ideas spread, inspiring new people to take their cause. Sheikh Buraik could have made the same point about the early Christian martyrs who died for their cause and helped spread Christianity during the Roman Empire. In fact, his mention of monotheistic religions in general may have been such a referral. They were not soldiers, and did not spread religion through violence, but through their faith, for which they were willing to die. In this context, the meaning of jihad is that of a struggle for the sake of God, and not violence. What is clear from this analysis of the context of Kohlmann's carefully selected quotes is that

---

[467] Although the Arabic word Sharia has come to mean Islamic law, in the context that it is used here, it reverts back to its original etymology, namely "path" or "way," like sheep finding a path to water (a permanent well) in a nomadic society.
[468] Buraik, 1990.

there is no evidence that WAMY, through Sheikh Buraik's lectures, was trying to or even did indoctrinate vulnerable young Muslims to go on and carry out the 9/11 attacks.

Again, through his previously demonstrated rhetorical device of juxtaposition of unrelated items and careful omission of the context, Kohlmann leads a reader to draw erroneous conclusions. Although I found the quote from his paragraph 183 on the Internet, I could not find the full lecture to provide its context. At this point, given Kohlmann's tendency to juxtapose unrelated quotes and to omit crucial contextual meaning, I need more information to assess his claim. Furthermore, it is unclear whether these two lectures involved WAMY at all. They seem to be two separate lectures and their footnotes are not connected to a WAMY organization or website.[469] A quote, like any document, is the start and not the end of any investigation for any scholar.

In the following paragraph 185, Kohlmann places Sheikh Buraik at an IIRO youth camp in Saudi Arabia.[470] Looking at the footnote citing this third lecture, WAMY is not mentioned[471] and what Sheikh Buraik might have said at a 2006 summer youth camp[472] is irrelevant as to whether WAMY had anything to do with the 9/11 attacks, which occurred five years before the lecture. The U.S. State Department cable cited in the footnote is thirdhand information. Again, I need more information about this specific lecture and its context to analyze it in connection to WAMY and the 9/11 attacks.

Kohlmann has not shown a nexus between the 1996 Ahmer Florida lecture and the undated (but probably given in 1990) Buraik lectures and the 9/11 attacks. To my knowledge, none of the future 9/11 terrorists, their trainers, or their funders were present at the Okeechobee WAMY camp or listened to Buraik's lectures, one of which seemed to have taken place after the attacks. There were not many people involved in the 9/11 attacks, perhaps three dozen at most. None were present in Florida at this time. Several came to Florida, but this was four or five years after the lecture was given and there is no evidence that any attended a WAMY camp.

---

[469] Kohlmann report, FN 277 and FN 278, at 56.

[470] Kohlmann report, at 56.

[471] Kohlmann report, FN 279, at 56.

[472] The date of the cable is October 9, 2006. It refers to a conversation that the Riyadh U.S. Embassy political officers had with the IIRO secretary general on September 18, 2006 and refers to a lecture Sheikh al-Break gave this summer, meaning the summer 2006. See U.S. Embassy Riyadh cable, "IIRO Secretary-General Talks of Saudi Programs and Expansions," dated 9 October 2006, released by Wikileaks, at FED-PEC0220554–6.

#### 4. Plaintiffs' Experts' Lumping of all Salafis Together

Neither Winer nor Kohlmann explain the process of how WAMY's activities may result in terrorism. Proselytism of any creed is a legitimate activity and the combination of charity and missionary activities are legitimately performed by many evangelical organizations, whether they are Christian or Salafi, as pointed out in the quote from the Dutch General Intelligence and Security Service (AIVD) cited in Levitt's report.[473] This particular report focuses on Saudi Salafi imams in the Netherlands, but that was not how young Dutch neo-jihadis got radicalized as I found out in my own field research in the Netherlands. They were radicalized through their own informal leaders, who were not connected to Salafi mosques in the Netherlands.[474] WAMY had no role in the radicalization of Dutch terrorists and Levitt's quote is irrelevant to this litigation.

All three experts focus on al Qaeda's ideology, which calls for the restoration of Islamic grandeur of the 7th and 8th centuries and defense of the Muslim community (or what they view as the Muslim community, namely other people that are like them, which I call the neo-ummah) through violence against the "far enemy," namely the West and especially the United States, which they view as attacking Muslims around the world.[475] The three plaintiffs' experts present no evidence at all that WAMY is preaching this type of ideology. The reason for this is simple: WAMY's ideology is not al Qaeda's ideology. WAMY's ideology, quietist Salafism, is one that al Qaeda members despise and refer to as madkhalism, from Rabi al-Madkhali, a Salafi scholar, who preached obedience to one's ruler. Madkhalis may still resent the West for its past imperialism in the Middle East, but there is a huge gap between resentment and taking action, which the Madkhalis avoid. Madkhalis and neo-jihadis are constantly engaged in shouting matches on the Internet and neo-jihadis use the derogatory expression "dollar scholars" for

---

[473] Expert report of Dr. Matthew Levitt, at 29. The quote is from an AIVD report, "Saudi influences in the Netherlands. Links between the Salafi mission, radicalization processes and Islamic terrorism," at 3, posted on June 1, 2005 is available at https://english.aivd.nl/publications/publications/2005/01/06/saudi-influences-in-the-netherlands.

[474] This is essentially corroborated in Janny Groen and Annieke Kranenberg, 2010, *Women Warriors for Allah: An Islamist Network in the Netherlands*, Philadelphia: University of Pennsylvania Press, and Bart Schuurman, 2017, *Becoming a European homegrown jihadist: A multilevel analysis of involvement in the Dutch Hofstadgroup*, 2002 – 2005, Leiden: Ph.D. dissertation, Leiden University.

[475] See my summary of this ideology in Marc Sageman, 2004, *Understanding Terror Networks*, Philadelphia: University of Pennsylvania Press, at 1–24.

Madkhali scholars. The three plaintiffs' experts simply lump together various versions of Salafi Islam that are very different and antagonistic to each other.

As to the influence of WAMY's camp and literature, I found no evidence that 9/11 terrorists ever attended a WAMY camp or read WAMY literature. In reading their respective biographies, the name WAMY did not surface anywhere. Ideology played a minor role in the 9/11 attacks. In fact, as mentioned in part II of this report, KSM, the mastermind and organizer of the 9/11 attacks, was not ideologically driven. He was religious but did not seem to follow the strict Salafi prescriptions in his behavior. He was more of a freelance terrorist against the West and Christianity, driven by political motives (the issues of Palestine and the alleged Western War on Islam). The narrative of the road to 9/11 presented above shows that political factors were the main motivation of the 9/11 attacks. This is consistent with my research of several decades on the process by which people turn to the type of political violence known as terrorism.[476] The 9/11 attacks were carried out for mostly political reasons as part of a campaign of political violence. Almost all the perpetrators that carried out the 9/11 attacks came to Afghanistan as a second choice because their first choice of fighting in Chechnya was closed to them. So, even if for argument's sake we entertain the hypothetical that they had been influenced by WAMY's books and camps, they actually wanted to fight in Chechnya, in a more traditional and classical jihad rather than bin Laden's global neo-jihad. Once in Afghanistan, they were recruited by al Qaeda more for al Qaeda's political agenda rather than a religious agenda as promoted by WAMY, which, to my knowledge, never advocated bin Laden's global neo-jihad. The global neo-jihad cannot be lumped with the Salafi creed or even Islam as too many self-promoting counter-terrorism experts tend to do.

None of the plaintiffs' experts articulated any specific connection between WAMY camps, literature, or lectures to the 9/11 Attacks or those who carried them. They simply speculate that such a connection exists without showing any real link between the ideology and the attacks. Without any specific evidence connecting WAMY's ideological dimension and the 9/11 attacks, it is difficult to postulate any proximate relationship between them.

### C. WAMY's Alleged Funding of al Qaeda at the end of the Soviet Afghan War.

---

[476] See Sageman, 2017, at 48–108.

WAMY was not formally on the ground in Peshawar until 1996 when it took over Lajnat al-Birr al-Islamiyya (LBI). Winer's and Kohlmann's allegations concerning WAMY's funding al Qaeda in the late 1980s and early 1990s in Peshawar are confusing and need to be analyzed.

### 1. Kohlmann's allegations

Let me quickly address Kohlmann's allegations since they are shorter and consist of one short paragraph, which states: "WAMY's corporate structure has hidden other, darker secrets as well – such as the benignly-named Benevolence International Foundation (BIF), a.k.a. Lajnat al-Birr al-Islamiyya. Lajnat Al-Birr, the precursor to BIF, was established in 1987 in Pakistan and Saudi Arabia by Shaykh Adel Batterjee, a powerful Saudi business magnate in Jeddah."[477]

In the past, Kohlmann has resorted to "cut and paste" scholarship, where he simply copied whole paragraphs from previous reports and pasted them into new reports. This report is no exception. Paragraph 187 is an exact word for word duplicate of at least two of his previous reports dating back a decade and a half. The first appeared in a March 3, 2006 memorandum for the Guantanamo Bay ARB and Combat Status Review Tribunal (CSRT).[478] It also appeared in a 2006 paper published by the Danish Institute for International Studies, *The Role of Islamic Charities in International Terrorist Recruitment and Financing*.[479]

In previous documents available in the discovery material, Kohlmann has consistently confused Lajnat al-Birr al-Islamiyyah (LBI) with the Benevolence International Foundation (BIF).[480] As section II.F of this report makes clear, they are two different organizations. In his report, Kohlmann's relative silence on Adel Batterjee's activities in Peshawar in the late 1980s is surprising because, in the discovery material, he had a lot to say about him, LBI, and BIF. In 2004, he swore two affidavits in relation to this litigation making specific allegations against Batterjee during this Peshawar period. The first affidavit was dated June 3, 2004 and seemed to try to refute an undated but probably early 2004 declaration by Adel Batterjee[481] also in connection to this litigation, in which Batterjee denied that he ever wrote a biography of bin

---

[477] Kohlmann report, paragraph 187, at 56.

[478] The first four lines of the second paragraph in PEC-WAMY009292 are identical to this paragraph.

[479] PEC-WAMY000654–76. Kohlmann report, paragraph 187 is lifted word for word from the first four lines of the only full paragraph on PEC-WAMY000663.

[480] See his sworn Affidavit, dated October 18, 2004, at 4 (PEC-WAMY029212).

[481] FED-PEC0049568–70.

Laden or that he had ever served as any executive of WAMY, let alone as its Secretary General.[482] At the time, an allegation had surfaced that Batterjee (who was identified as a former Secretary General of WAMY) under the pseudonym of Basil Muhammad had written and published via LBI and WAMY *Al Ansar al Arab fi Afghanistan* (The Arab Helpers in Afghanistan)[483], which I used liberally in part II of this report. In fact, even the usually reliable *9/11 Commission Report* states, "For a particularly useful insight into the evolution of al Qaeda – written by an early bin Ladin associate, Adel Batterjee, under a pseudonym – see Basil Muhammad, Al Ansar al Arab fi Afghanistan (The Arab volunteers in Afghanistan) (Benevolence International Foundation (BIF) and World Association of Muslim Youth, 1991)."[484] In his expert report, Kohlmann refers to this book and still gives its publisher as "The Committee for Islamic  Benevolence Publications."[485]

Basil Muhammad is actually a real person, quite different from Adel Batterjee. He was a Syrian journalist exiled to the United Arab Republic and came periodically to Peshawar in the late 1980s to report on the Soviet Afghan War. He decided to record the activities of the ansar in Peshawar for posterity through a series of interviews with its prominent members, including Mustafa Hamid and Abdullah Anas. Hamid refers to him occasionally in his contemporaneous diaries, now preserved on the website of West Point's Combating Terrorism Center. As intended, Muhammad's book is invaluable and has been used by many scholars,[486] including myself in part II of this report and Kohlmann in his. I called Abdullah Anas in London and asked him about both Batterjee and Basil Muhammad. He assured me that they were two different people. He said that Batterjee did indeed write a book on Afghanistan, but about the battle for Kabul in 1992 and that the book was bizarrely inaccurate and quite biased in favor of Gulbuddin Hekmatyar.

Basil Muhammad's book is available on the Internet, posted by Thomas Hegghammer.[487] It is not a biography of bin Laden, although he figures prominently in the book. It is rather a

---

[482] Paragraphs 9 and 8 respectively, FED-PEC0049569.

[483] See PEC-WAMY033600. This is the start of some carefully selected translated excerpts of the book, PEC-WAMY033600–40, also BUR-PEC-063170–210.

[484] *9/11 Commission Report*, FN 25, at 467.

[485] Kohlmann report, FN 5, at 8.

[486] For example, see Hamid and Farrall, 2015, and Hegghammer, 2020.

[487] Muhammad, Basil, 1991, *Safahat min sijill al-ansar al-arab fi Afghanistan* (Pages from the Registry of the Arab Helpers in Afghanistan), Second Edition, Jeddah: House of Learning

history of the Arab ansar in Pakistan and Afghanistan from its early days in early 1980s to about 1987, when the book ends. On the second page of the book, it states, "Published by House of Learning printing press Co" and gives its address as "P.O. Box 4797, Jeddah 21412, Kingdom of Saudi Arabia."[488] What may have caused the confusion is that on the very next page, it stated, "Checked and Revised by the Documentation and Studies Administration at Lajnat al-Birr Islamiyyah."[489] So it seems that LBI or WAMY did not publish it but LBI's staff reviewed it and revised it. There is no sign of its first edition.

Coming back to Kohlmann's first affidavit, he swore that he had read an article in *Arab News* that stated that "Batterji has written another book, which is under print, on Afghan jihad."[490] He also swore that on June 23, 2000, he sent an e-mail to Batterjee under a pseudonym (Youcef Abdelkader) stating, "I simply wish to know if your book on Afghan jihaad is still in print, and where it may be purchased from. I have been told it is one of the best accounts of the struggle, and I very much wish to read it." Batterjee replied to him a day later, did not confirm that he was its author, but offered to send him the book, "If you provide me with a mailing address, I will send you a copy." Kohlmann did so and received the book in the mail in July 2000.[491] He attached to the affidavit the first five pages of the book he had received. I suspect that they correspond to five unlabeled copies of the first five pages of an Arabic book in the discovery material.[492] Pages one, three, four, and five correspond to the first four pages of Muhammad's book posted by Hegghammer. Page two consisting of a single Arabic calligraphy[493] is not present in the book posted by Hegghammer on the Internet. Kohlmann apparently assumed that his receipt of Muhammad's book was Batterjee's confirmation that he had written the book. Of course, another explanation is that Batterjee immediately understood that Kohlmann meant Muhammad's book and not his and sent him Muhammad's book.

---

Printing Press Co, available at https://azzambooknet.files.wordpress.com/2019/07/al-ansar-al-arab-fi-afghanistan.pdf.
[488] Muhammad, 1991, at 2.
[489] Muhammad, 1991, at 3.
[490] FED-PEC0056595–6.
[491] FED-PEC0056596. The e-mail chain is at FED-PEC0055693.
[492] FED-PEC0055486–90.
[493] FED-PEC0055487. The calligraphy probably means, "In the Name of the Lord the most Gracious most Forgiving."

Kohlmann's second sworn affidavit,[494] also in connection to the present litigation, is dated October 18, 2004. In it, he swore, "Acting on behalf of Usama Bin Laden was an influential extremist Saudi religious benefactor named Shaykh Adel Batterjee. As an enthusiastic supporter of the jihad in Afghanistan, Batterjee established Lajnat Al-Birr Al-Islamiyya (a.k.a. Lajnat al-Birr al-Dawaliyya, Benevolence International Foundation) in 1987 in Pakistan and Saudi Arabia. From its inception, Benevolence International Foundation (BIF) served as a means for pious, wealthy Muslims to secretly contribute to the foreign mujahedin in Afghanistan."[495] Here, Kohlmann extends his confusion in believing that LBI, BIF, and *Lajnat* al-Birr al-Dawaliyya are one and the same entity. They are two separate organizations and Lajnat al-Birr al-Dawaliyya does not exist. The Arabic translation for Benevolence International Foundation (BIF) is *Monathamat* al-Birr al-Dawaliya.[496] These types of confusion where he fuses different entities or people into one are present throughout his scholarship as we saw in the methodology section. His second affidavit and his expert report are two more examples of this lumping different things together, resulting in erroneous conclusions.

Kohlmann takes to task WAMY Secretary General Dr. al-Wohaibi's declaration that WAMY has never had any connection with BIF. On the contrary, claims Kohlmann, "there is a wealth of documentary evidence proving that this statement is completely false."[497] In lieu of this wealth, Kohlmann provides just two sets of "troubling" connections between them. The first was that Adel Batterjee claimed to be a former chairman of WAMY and reportedly founded BIF as an affiliate branch of WAMY. His evidence consists of three items: two newspaper articles and WAMY USA's IRS 990 forms for fiscal years 1993 to 1999. The first article was published in the *New York Times* by Chris Hedges, who reported that Batterjee was chairman of WAMY. It will be discussed at length in the next section as Winer relied heavily on it. The next article simply stated that LBI in Jeddah moved to new more spacious premises and it was affiliated with WAMY.[498] There is no mention of BIF at all in this article and I suspect that Kohlmann again

---

[494] PEC-WAMY029209–25.

[495] PEC-WAMY029212.

[496] LBI and BIF should not be confused with a third organization that was present in Peshawar, Lajnat al-Dawa al-Islamiyya (LDI). This third organization will be addressed in the section on Adel Hamad.

[497] Kohlmann report, paragraph 188, at 57.

[498] Omar Basaddiq, 1994, "Islamic Charity Committee moves to new premises," *Arab News*, May 22, 1994, at PEC-WAMY012003–4.

confuses LBI for BIF. I was able to locate the WAMY International, Inc (another name for WAMY USA) IRS 990 Forms for 1993,[499] 1994,[500] 1995,[501] 1998,[502] 1999[503] and found no reference whatsoever to either BIF or even LBI in these forms.

The second set of evidence that Kohlmann lists for refuting Dr. al-Wohaibi's declaration is that BIF and WAMY shared the same address in Pakistan: P.O. Box 1055 in Peshawar.[504] As we saw in section II.F of this report, P.O. Box 1055 in Peshawar was the address of the Imam Abu Hanifa Teachers Training Institute.[505] LBI established the Abu Hanifa Institute in 1987, which became the biggest educational training center in Peshawar and taught subjects like modern Islam, English, Arabic, computer studies, journalism, mathematics, social sciences, Da'wah, Hadiths, Fiqh, and peace studies. Its graduates include a future Deputy Minister of Haj in Afghanistan, Director for a cell telephone company for Eastern Afghanistan, Afghan Minister of Finance's legal advisor, a program officer at the U.S. Institute of Peace, and various United Nations officials.[506] LBI and later WAMY Pakistan used this address. So did Batterjee and he used this address to register BIF in Peshawar. The use of the same mailbox is common for many people and companies in the developing world. It does not mean that all the users are part of the same entity or company. My address in Pakistan was the U.S. Embassy, Islamabad, Pakistan, like all of my colleagues at the embassy. We were different individuals working in different organizations within the embassy compound and the mail person at the embassy was able to distinguish between us.

So, Kohlmann's "wealth of documentary evidence" refuting the statement that WAMY had nothing to do with BIF evaporates under further scrutiny. He simply makes strong allegations, which do not amount to much when one bothers to verify his claims.

## 2. Winer's allegations

---

[499] WAMY INTL E014697–708.

[500] WAMY INTL E014615–27.

[501] WAMY INTL E014537–52.

[502] PEC-WAMY012067–80.

[503] WAMY INTL E014912–26, PEC-WAMY012054–66.

[504] Kohlmann report, paragraph 189, at 57.

[505] See WAMYSA065185.

[506] See the declarations of Zia ul Haq Amarkhil dated June 11, 2020 and Assadullah Sahil dated May 16, 2020.

Winer's allegations against WAMY during the Peshawar time period of late 1980s and early 1990s are much more extensive and run for eleven paragraphs over five pages.[507] His allegations are poorly sourced as he includes only eight citations, three from Dr. Abdul Wahab Noorwali's declaration,[508] an exhibit from Dr. Noorwali's deposition,[509] three press releases from the U.S. Treasury Department and Department of Justice,[510] and the previously mentioned *New York Times* article.[511] For the sake of clarity, I break down this section according to Winer's relevant paragraphs dealing with WAMY's alleged terrorist financing in Peshawar in the late 1980s and early 1990s.

### a) Winer's Paragraph 12.12

Winer starts by stating his general argument that he did not expect to see any evidence "expressly stating that WAMY provided financial and other support to al Qaeda and bin Laden." However, he claims that WAMY did so "through other charities, such as Benevolence (BIF), which WAMY funded or with which it had an affiliation, and whose officers simultaneously shared positions with WAMY and with the charities that they were heading which they used directly to provide material support to bin Laden."[512] To restate Winer's argument, Winer admits that he does not have any evidence that WAMY funded al Qaeda and bin Laden. He speculates that WAMY funded al Qaeda through BIF, "which WAMY funded and with which it had an affiliation." He further claims that WAMY shared the same officers with BIF.

I agree with Winer that there is no evidence that WAMY provided financial or other support to al Qaeda and bin Laden. As far as BIF, WAMY did not have any relationship with BIF and did not share any common officers with BIF. I believe that, like Kohlmann, Winer is confusing BIF and LBI, two different organizations, as demonstrated in section II.F of this report.

### b) Winer's Paragraph 12.12.1

---

[507] Winer report, paragraphs 12.12, 12.12.1, 12.12.2, 12.12.4, 12.12.5, 12.12.6, 12.12.7, 12.12.8, 12.12.9, 12.12.10, 12.12.11, at 104–8. I shall deal with the allegations about Bosnia in a later section.

[508] Winer report, FN 203, 204, and 206, at 105–6.

[509] Winer report, FN 201, at 104.

[510] Winer report, FN 205, 207, and 208, at 106–8.

[511] Winer report, FN 202, at 104.

[512] Winer report, paragraph 12.12, at 104.

In the next paragraph, Winer claims that one of the three major charities that bin Laden and al Qaeda relied on was LBI, which was funded by WAMY, until their merger (in 1996). In my research, I found no evidence for this statement and Winer provides no citation to any evidence in support of his extraordinary claim. Winer then stated that Batterjee headed both organizations. This is puzzling since Winer cites both Noorwali's deposition and declaration, where Noorwali clearly stated that Batterjee was not and never had been the head of WAMY. Nor do any of the documents provided by WAMY show that Batterjee was ever the leader of WAMY. On the other hand, Batterjee was a founder and leader of LBI, and WAMY did have a relationship with LBI. I believe that Winer is referring to a 1992 *New York Times* article written by Chris Hedges that reported "Adel A. Batterjee, the chairman of the World Assembly of Muslim Youth."[513]

Winer repeats this claim that Batterjee was the chairman or leader of WAMY several times in this six-page section on WAMY's terrorism financing and uses it as one of his main pieces of evidence to build his argument that WAMY funded al Qaeda and bin Laden. Fact checking this assertion, it becomes clear that WAMY did not have a chairman position. Its senior officers are its president and its secretary general. During the time frame relevant to this litigation, WAMY's president was Sheikh Hasan bin Abdullah al-Sheikh until 1994, then Dr. Abdullah al-Turki.[514] WAMY's Secretary General was Dr. Maneh al-Johani from 1986 to 2002 (the relevant time period in the present litigation), followed by Dr. Saleh al-Wohaibi from 2002 onward .[515] This information was provided in sworn depositions by Dr. Saleh al-Wohaibi, WAMY's Secretary General himself  and by Dr. Abdul Wahab Noorwali, a WAMY Assistant Secretary General during the period in question. These are both primary sources on these facts. This is backed up by further primary sources, namely the voluminous correspondence of

---

[513] Chris Hedges, 1992, "Muslims from Afar Joining 'Holy War' in Bosnia," *The New York Times*, December 5, at 6, FED-PEC0057642–4, the quote is from FED-PEC0057644, third paragraph from the top.

[514] WAMYSA1248923. Sheikh Hasan al-Sheikh was the Saudi Minister of Higher Education until 1993. When the Ministry of Islamic Affairs, Endowments, Dawah, and Guidance this ministry was established, WAMY was transferred under its care and its General Secretariat's Council selected its Minister Dr. Abdullah al-Turki as its president.

[515] Dr. Saleh al Wohaibi Deposition Transcript, October 23, 2019, (henceforth Dr. al Wohaibi deposition), at 20–32; Dr. Abdul Wahab Noorwali's Deposition Transcript (henceforth Dr. Noorwali deposition), July 23, 2019, at 86; and Dr. Saleh al-Wohaibi's declaration, October 30, 2005, at 2 (FED-PEC0114416).

WAMY's secretary general, whether Drs. al-Johani or al-Wohaibi, in the discovery material. So, the allegation that Adel Batterjee was ever a chairman of WAMY is false. Batterjee was chairman of the board of directors of Lajnat al-Birr al-Islamiyyah (LBI) until early 1993,[516] but held no position within WAMY itself. In late 1992, he was still LBI chairman when he talked to Chris Hedges. Perhaps he might have told Hedges that LBI operated under the auspices of WAMY and Hedges might have confused the two organizations because he was not familiar with either of them. In any case, Hedges's statement is clearly false as any quick fact-checking would have revealed. Yet, both Winer and Kohlmann rely heavily on this false statement in their evidence that WAMY funded al Qaeda.

At the end of paragraph 12.12.1, Winer wrote that Batterjee was later designated by the U.S. Treasury Department and the U.N. Security Council for sanctions due to his role in raising funds for al Qaeda. This designation of Batterjee took place in 2004, more than eleven years after he was dismissed from LBI by WAMY. I return to the Treasury designation in part IV of this report.

### c) Winer's Paragraph 12.12.2

In the next paragraph, Winer stated that Jamal al-Fadl told the U.S. government that bin Laden had told him that al Qaeda relied on Benevolence (BIF), Muslim World League, and the Qatar Charitable Society for its funds.[517] However, he does not provide a citation for this statement but I suspect that Winer alludes to the proffer of a confidential FBI source who had agreed to testify in the Arnaout criminal trial. This proffer is based on an interview with an FBI confidential source.[518] In the proffer, USA Patrick Fitzgerald wrote, "[i]n or about 1993, Bin Laden advised an *al Qaeda* member that *al Qaeda* was using several charities to fund its operations overseas, including *al Birr*."[519] He named the Muslim World League and the Qatar Charitable Society as two other charities funding al Qaeda operations.[520] This source, assumed to be al-Fadl, said that bin Laden made that claim during a conversation with him that took place in

---

[516] WAMYSA057746, WAMYSA057748, WAMYSA031306.

[517] Winer report, at 104.

[518] PEC-WAMY033545–68.

[519] *U.S. v. Enaam Arnaout*, N.D. Illinois, Eastern Division, No. 02 CR 892 SBC, Government's Evidentiary Proffer Supporting the Admissibility of Coconspirator statements, filed on January 6, 2003, henceforth Arnout evidentiary proffer, at 23, BUR-PEC-014523.

[520] Arnaout evidentiary proffer, FN 14, at 23, BUR-PEC-014523.

Sudan after the assassination attempt on Egyptian President Hosni Mubarak in Addis Ababa, which took place on June 27, 1995. "Bin Laden and al Qaeda were continuing to utilize Qatar Charitable Society, al-Birr al-Dawalia and other charities to fund operations. Bin Laden did not want people to find out that al Qaeda was using these charities as a source of funding."[521]

USA Fitzgerald's source clearly estimated that the conversation took place in 1995 (after the Mubarak assassination attempt) and not in 1993 as Fitzgerald wrote in the proffer.[522] Hence it was further removed from the short period of overlap in 1993 when Batterjee was both the head of LBI and BIF. By mid-1995, LBI had cut off all ties to Batterjee for more than two years. Second, Fitzgerald used the term al-Birr (benevolence) in the proffer, which could of course refer to both charities that have the Arabic name al-Birr in it, namely Lajnat al-Birr al-Islamiyyah (LBI) and *Monathamat al-Birr al-Dawaliyya* (or Benevolence International Foundation, BIF), sowing confusion whether it was LBI or BFI. Fitzpatrick's source always used the name al-Birr al-Dawalia, never just al-Birr in his interview as Fitzgerald wrote in the proffer. In fact, he used al-Birr al-Dawalia meaning BIF no less than twelve times in two pages of the proffer.[523] LBI was very different and completely separate from BIF. LBI was never in Sudan, but BIF was. LBI in 1995 had no relationship with BIF. In early 1993, the two organizations shared some common leadership, but this was ended in April 1993. In any case, WAMY never had anything to do with BIF.

Winer continued and claimed that LBI was BIF's precursor and was a subsidiary of WAMY providing relief services in Afghanistan/Pakistan and Bosnia. Winer gives a citation for this statement, FN 201.[524] I checked on the document cited, and there is no mention of Bosnia in it. Winer is again confusing LBI with BIF because BIF was certainly in Sudan and Bosnia but LBI was not. It was in Peshawar and catered to Afghans, as we saw in section II.F of this report.

### d) Winer's Paragraph 12.12.4

---

[521] PEC-WAMY033561.

[522] The source estimated that the conversation "occurred during approximately 1995 at Bin Laden's big guest house in Section 9, Riyadh City, Khartoum, Sudan." PEC-WAMY033560.

[523] PEC-WAMY033559–61.

[524] Winer report, at 104. The document is LBI (WAMY) Administrative Resolution No 37, Dated May 28, 1996 describing the merger that day of LBI into WAMY. (WAMYSA027804)

In this paragraph, Winer summarized Dr. Noorwali's declaration,[525] but mischaracterized some of its statements. Winer claimed that "it was WAMY's practice to fund operations and activities for Batterjee and LBI in Pakistan and Afghanistan."[526] Instead, Dr. Noorwali stated that WAMY funded *specific projects*,[527] although he was not very clear about it in his first declaration. Dr. Noorwali did not imply that WAMY funded Batterjee's or LBI's "operations and activities" as Winer suggests. Winer further reported that "Batterjee has 'some financial, administrative, and report delivering with Adel Batterjee,' as 'WAMY is very strict with regards to reporting.'"[528] This statement does not make sense and Winer clearly misquoted Noorwali declaration I, which states, "Over time … *WAMY* had some financial, administrative and report delivering *disagreements* with Adel Batterjee. WAMY is very strict with regards to reporting."[529] Winer further reports, "WAMY opposed his [Batterjee's] naming the successor organization BIF with a name similar to LBI."[530] Nowhere in the Noorwali declaration I is BIF characterized as LBI's *successor*.

The first step in any attempt to refute an argument is to quote it accurately, otherwise one just refutes one's own mischaracterization, not the original argument. Noorwali's declaration is clear that the two organizations are separate, had operations in different countries, and have nothing to do with each other, except their common founder, Batterjee. BIF is not a successor to LBI. In fact, the declaration states that it was specifically Batterjee's founding of BIF that led to his dismissal from LBI because "it was inappropriate for him [Batterjee] to start this organization [BIF] with a similar name to confuse people. Donors may be confused and think that BIF is affiliated with LBI (Benevolence Islamic Committee), as the names – and the logo Batterjee created for BIF – were very similar. WAMY did not condone such behavior and demanded that he cease and desist."[531]

### e)  Winer's Paragraph 12.12.5

---

[525] Declaration of Dr. Abdul Wahab Noorwali in Support of Defendant World Assembly of Muslim Youth, March 30, 2018, Exhibit Noorwali 254, henceforth Noorwali declaration I.

[526] Winer report, paragraph 12.12.4, at 104.

[527] Noorwali declaration I, paragraphs 13–9, at 3.

[528] Winer report, paragraph 12.12.4, at 105.

[529] Noorwali declaration I, paragraph 30, at 5. Emphasis added to show what Winer omitted from the original and erred in misquoting the declaration.

[530] Winer report, paragraph 12.12.4, at 105.

[531] Noorwali declaration I, paragraph 40, at 6–7.

In this paragraph, Winer attempts to refute Noorwali's declaration I because of its "internal contradictions, as well as characterizations of events that is in important areas inconsistent with *other information I have reviewed*."[532] The only other information Winer cites is a U.S. Treasury press release on December 21, 2004 reporting Batterjee's designation as a SDGT (Specially Designated Global Terrorist)[533] and the above mentioned flawed *New York Times* article by Hedges. Although Winer used an exhibit from Noorwali's deposition, he does not refer to the deposition itself, which took place on July 23 and 24, 2019, nor did he refer to Dr. Noorwali's second declaration,[534] which clarifies his earlier declaration, nor to any of the other primary source material exhibited at Dr. Noorwali's deposition or in the full discovery material, all of which *support* Dr. Noorwali's declaration and deposition. I am not sure to what internal contradictions in Noorwali declaration I Winer refers. He just makes that allegation and does not elaborate on it. I certainly did not find even one such internal contradiction, let alone many. On the contrary, certain points that Noorwali made in his first declaration were later clarified in his second declaration and in his deposition. At some points, Dr. Noorwali like most people using a Hijri calendar has trouble quickly translating Hijri dates into a Gregorian ones, but these are not internal contradictions.

Winer goes on to mischaracterize Noorwali declaration I "that WAMY *funded* LBI, that Batterjee's operations were non transparent and the documentation on funds coming in and funds coming out could not be relied on and that WAMY fired him *as a result* in 1993."[535] This is not what Dr. Noorwali stated in his first or second declarations or in his deposition. WAMY did not fund LBI generally but, instead, funded *specific projects* run by LBI.[536] Initially, Batterjee <u>did</u> provide "extensive and thorough reports on his activities" and "routinely provided written operations reports for LBI projects for discussion at annual LBI Board meetings."[537] Examples of

---

[532] Winer report, at 105. Emphasis added.
[533] Winer report, FN 205, at 106. The cited document is FED-PEC0083715–7.
[534] Declaration of Dr. Abdul Wahab Noorwali in Support of Defendant World Assembly of Muslim Youth, March 4, 2019 [I assume that the date 4/3/2019, which appears at 14 of the document, refers to the European way of writing dates], henceforth Noorwali declaration II.
[535] Winer report, at 105. Emphasis added.
[536] Noorwali declaration II, paragraphs 15, 17, 20, 22, 23, 24, at 4–7. This declaration also states that there was a massive flood in Jeddah that involved WAMY's office, causing a loss of many records in that flood. See paragraph 25, at 7.
[537] Noorwali declaration II, paragraphs 27 and 28, at 8.

strict financial reporting for two projects are provided in the discovery material and will be described in the next section.[538] For each project, LBI provided a very detailed budget.[539] However, over time, WAMY's relationship with Batterjee gradually deteriorated with financial, administrative, and reporting disagreements. Partly as a result of this, Batterjee was forced to resign from LBI in 1993.[540] (As noted in section II.F, the main reason for Batterjee's forced resignation was his duplicity in attempting to solicit donations.) Besides Dr. Noorwali's various testimonies, a primary source in the same pile of documents as the one cited by Winer in his report[541] supports Dr. Noorwali's narrative.[542]

Winer tries to refute his own mischaracterization of Noorwali declaration I by citing Hedges' article (again), implying that the claim that WAMY fired him in 1993, "the year after Batterjee told the New York Times he was the *global* chairman of WAMY"[543] is simply not credible. Instead, as previously discussed, Hedges' claim that Batterjee was chairman of WAMY was simply false. Batterjee was forced to resign from LBI four months after the appearance of Hedges's article, which never reported that Batterjee was the *global* chairman of WAMY. Winer added the adjective "global."

The second item that Winer used to try to discredit Dr. Noorwali was the Treasury Department press release on Batterjee in December 2004. Winer introduces his full quotation of the sixth paragraph of the press release by again mischaracterizing it: "Batterjee's *terrorist finance activities* began many years before his departure from WAMY … during the period he was working with and *for* WAMY."[544] This is not what the Treasury Department press release stated. It does not say that Batterjee engaged in *terrorist* finance activities. It says simply, "In the late 1980s, Batterjee … [through LBI] provided financial and operational support to mujahideen elements in Afghanistan … including fighters associated with UBL and Gulbuddin Hekmatyar,

---

[538] WAMYSA031309–14; WAMYSA031293–8 and WAMYSA031301.

[539] WAMYSA031289–92, and WAMYSA031302–4, respectively.

[540] Noorwali declaration I, paragraph 34–9, at 5–6; Noorwali declaration II, paragraphs 45–51; Noorwali deposition, July 24, 2019, at 236–9 and 244–5.

[541] Noorwali deposition exhibit 254 (Noorwali declaration I).

[542] WAMYSA1235455–9, Noorwali deposition exhibit 266.

[543] Winer report, paragraph 12.12.5, at 105. Emphasis added because Winer keeps adding the adjective "global" to Hedges's article, as previously discussed.

[544] Winer report, paragraph 12.12.5, at 105. Emphasis mine.

who was named a SDGT by the Treasury on February 18, 2003,"[545] which Winer quotes accurately in his report.[546] The press release is careful not to label either UBL or Hekmatyar terrorists in the late 1980s. They were not considered terrorists at all at the time, but freedom fighters by the U.S. government. In fact, the U.S. government was funding Hekmatyar with hundreds of millions of U.S. dollars at the time in addition to weapons and training through the ISI Directorate.[547] Hekmatyar received 20% of the total U.S. support for the Afghan mujahedin during the Soviet Afghan War, which amounted to several hundred of millions of U.S. dollars. After the U.S. invasion of Afghanistan in October 2001, Hekmatyar did not change and continued to defend his homeland against foreign invaders. However, by that time, the U.S. government had changed and instead of being on the same side as Hekmatyar, it had become the invader of Hekmatyar's homeland. It was the U.S. perception of Hekmatyar that had changed. From the U.S. perspective, Hekmatyar did not become an enemy until after the U.S. invasion of Afghanistan. The U.S. Treasury Department listed him as specially designated a global terrorist (SDGT) in early 2003. This was more than a year after the U.S. invasion and more than 11 years after he allegedly received some aid from people associated with LBI. So, to claim that Batterjee engaged in *terrorism* financing in the late 1980s is an anachronism and completely inaccurate. This is why I have provided a narrative of events in part II of this report in order to be able to put any claim in context. This is one example where Winer takes things totally out of context and collapses time in order to come up with an erroneous conclusion.

Winer's claim that Batterjee worked for WAMY is also not accurate. Batterjee certainly worked *with* WAMY, but not *for* WAMY. He was an independent person working *under the auspices of* WAMY. When he was forced to resign from LBI, he continued to do his own thing, but completely independently from WAMY. Furthermore, as shall be demonstrated in the next section, the Treasury press release is inaccurate. As already demonstrated in part II.F of this report, LBI is not the precursor to BIF; the Maktab al-Khadamat was not the precursor of al Qaeda; and the claim that "LBI joined al Qaida upon the dissolution of MK" is plainly wrong.

f)    **Winer's Paragraphs 12.12.6 and 12.12.7**

---

[545] FED-PEC0083715.
[546] Winer report, paragraph 12.12.5, at 105–6.
[547] See Yousaf and Adkin, 1992.

Winer's paragraph 12.12.6 was a fair summary of the end of Noorwali declaration I, but he used it to set up a set of accusations directed at Noorwali in the next paragraph. How did Noorwali know that neither WAMY nor LBI ever sent money or funds to al Qaeda? Winer wrote that he found no documentary evidence that an audit was conducted by WAMY or LBI to check on the funds provided to Batterjee "as he was engaged in terrorist financing activities for al Qaeda."[548] This is a surprising statement since Dr. Noorwali clearly explained that WAMY did not fund Batterjee or LBI, but *specific projects* run by Batterjee and LBI, as again previously mentioned.

In his second declaration, Dr. Noorwali described the policy of the WAMY funding process, "It is WAMY's policy to not send any funds unless they are being allocated for specific projects and activities…. If and when a given project is funded, the money is sent from a WAMY bank account in Saudi Arabia to the project or the chapter carrying out the project…. When the project is completed, the chapter overseeing the project sends a project report and a financial statement….  The Finance Department reviews all incoming funds and deposits and properly allocates them to projects based on the annual budget. Additionally, the Department reviews all invoices, requested transactions, and project finance documentation, including the provision of aid to individuals or funding of projects…. Throughout the course of the projects run by the chapters, WAMY Saudi Arabia would follow up on every project, including field review if necessary. If project reports and financial reports were not received, WAMY would send someone from Jeddah to review the project on the ground and get financial records. An annual audit is performed by external auditors each year in order to authenticate WAMY's accounting procedures and track where WAMY spends its money."[549]

Winer overlooked the documentation of the two 1989 LBI projects cited earlier of establishing an office inside Afghanistan and providing agricultural and water resources development, along with their clear financial budgets.[550] Again, Dr. Noorwali referred to the massive flood in Jeddah during which WAMY lost many records.[551] I suspect that Winer did not

---

[548] Winer report, paragraph 12.12.7, at 106.
[549] Noorwali declaration II, paragraphs 17, 20–4, at 5–7.
[550] WAMYSA031289–92, and WAMYSA031302–4, respectively.
[551] Noorwali declaration II, paragraph 25, at 7.

137

find any documentary evidence because, as his report shows, he is not familiar with the discovery material, where documents clearly refuting his claims are found.

Since the above paperwork dates back to 1989, it is clear that during that time, Batterjee met the record keeping requirements imposed by WAMY. He was a rich man and also used his own personal money or money that he had personally raised to partially fund the LBI projects. The two sets of 1989 LBI project documents show that he was funding half and more than half of each of these projects from his own money, not WAMY's money. Besides LBI projects, WAMY was not aware whatever else Batterjee might have done in Peshawar. Even for argument's sake if we consider the hypothetical that he might independently have given money to either bin Laden's or Hekmatyar's groups, Batterjee would still have not been engaged in *terrorist* financing activities because neither group was considered terrorist at the time: they were still "freedom fighters" as the U.S. government called them. It is very important to put events and facts in their proper context, as described in section II.F of this report.

Contrary to Winer's claim that "WAMY did not track what Batterjee did with funds provided by these charities," WAMY appeared to keep a tight control on funds disbursed for its specific projects run by LBI and Batterjee. Winer goes on to mischaracterize again Noorwali statement in his declaration I that "Batterjee's management of LBI prior to his departure in 1993 had not been transparent, and one could not track sources or funds or expenditures."[552] This is not what Dr Noorwali stated. "*Over time*, as WAMY's relationship with Adel Batterjee and LBI *progressed*, WAMY had some financial, administrative and report delivery disagreements with Adel Batterjee."[553] This means that Batterjee's relationship with WAMY changed over time. Indeed, Dr. Noorwali clarified in his second declaration that "[e]xtensive and thorough reports were kept by Mr. Adel Batterjee, the founder of LBI, regarding LBI's activities *initially*…. Mr. Batterjee routinely provided written operation reports for LBI projects for discussion at annual LBI Board meetings."[554] Apparently, Batterjee changed and by 1992, his reporting requirements were neglected, he "*started* to give the Board incomplete evidence of projects performed or would only report on activities after the fact," and his attitude toward running LBI projects had

---

[552] Winer report, paragraph 12.12.7, at 106.
[553] Noorwali declaration I, paragraph 34, at 5. Emphasis added.
[554] Noorwali declaration II, paragraphs 27–8, at 8. Emphasis added.

changed to become "a one-man show."[555] This neglect alarmed two LBI board members, who resigned, and the WAMY Secretary General Dr. al-Johani forced Batterjee to resign from LBI in 1993.[556] In other words, Batterjee at first fulfilled his reporting obligations to WAMY and when he changed and stopped doing them, WAMY reacted and fired him.

Winer concluded, "Accordingly, I read Noorwali's statement merely to mean that neither WAMY nor LBI maintains records showing that they funded al Qaeda and that they cannot track their funding of Batterjee's activities to show whether he used the funds provided to him while he was a senior officer of WAMY to support al Qaeda or not."[557] This is an egregious mischaracterization of the facts as contained in the discovery material. Winer's conclusion is more indicative of his lack of familiarity with the discovery material and jumping to conclusion than what Dr. Noorwali stated or the evidence in the discovery material shows. Winer perseveres in bringing up journalist Hedges' claim that Batterjee was a senior officer of WAMY. As Noorwali explained it, the relationship between Batterjee and WAMY was quite different. "[Batterjee] is the one who had the idea for LBI…. [T]he idea was proposed to the then Secretary General of WAMY and the decision was made that LBI could operate as a separate charity under WAMY's auspices and charter."[558] In his deposition, Dr. Noorwali elaborated on the foundation of Lajnat al-Birr al-Islamiyyah. "Adel Batterjee … was from a wealthy family, and he came to Dr. Maneh al-Johani [WAMY's Secretary General] in order to use the WAMY as an umbrella … to work with the Afghan refugees. And he came with the idea of Lajnat al-Birr… Dr. Maneh accepted the project and formed a board under the name of Lajnat al-Birr so to work … under the umbrella or auspices of WAMY."[559] Dr. al-Johani created a board to oversee LBI and was its chairman, from LBI's formation onward. He invited Dr. Noorwali to sit on the LBI board since its inception.[560] This is supported by various primary sources that list Dr. Noorwali as a founding member of LBI,[561] and a member of its "general assembly"[562] or its "members"[563] in 1989. He

---

[555] Noorwali declaration I, paragraph 35–6, at 6. Emphasis added.
[556] Noorwali declaration II, paragraphs 48 and 51, at 11–2.
[557] Winer report, paragraph 12.12.7, at 106.
[558] Noorwali declaration II, paragraph 29, at 8.
[559] Noorwali deposition, July 24, 2019, at 228–9.
[560] Noorwali deposition, July 24, 2019, at 227–8.
[561] WAMYSA031300.
[562] WAMYSA031306.
[563] WAMYSA057748.

was still a member of its "council of supervisors" in July 1993, after Batterjee had been forced out.[564] As an LBI board member from its inception to its dissolution, Dr. Noorwali was in a position to witness and know what happened with LBI throughout its existence. He was a primary source on LBI.

### g) Winer's Paragraph 12.12.8

The next paragraph that starts with, "Of course, no one should expect any charity to maintain records that its funds are being used by al Qaeda, for … terrorist purposes,"[565] is simply a restatement of Winer's argument that he did not expect to find any evidence that WAMY funded al Qaeda. This is simply a rhetorical argument and not evidence that WAMY funded al Qaeda and the 9/11 terrorists. Instead of persevering in believing something for which there is no evidence, a true social scientist and expert must keep an open mind and go where the data and facts lead him. A parsimonious explanation for any lack of evidence, especially after almost two decades of intensive search, is that there is nothing there, no WAMY financial or other support for the 9/11 terrorists.

### h) Winer's Paragraph 12.12.9

In the next paragraph, Winer states that that Dr. Noorwali's account is inconsistent with the facts set out in the indictment of Enaam Arnaout. But instead of quoting from the indictment itself, which is easily available in the discovery material,[566] he quotes long passages from the U.S. Attorney Patrick Fitzgerald's *press release about* the indictment, which I suspect he got from the Internet rather than the discovery material since his footnote does not provide a Bates stamp but a URL link.[567] Winer concludes the paragraph, "*Based on all the information I have reviewed*, I find this account persuasive. To the extent that Noorwali's version of events differs from the Justice Department's assessment, I conclude the Justice Department's assessments to be accurate."[568] I have not been impressed by the amount of information Winer has seen or reviewed in this case. As mentioned several times already, he is not familiar with the discovery

---

[564] WAMYSA1235455, also Exhibit 266 for Noorwali deposition.
[565] Winer report, paragraph 12.12.8, at 8. Winer devotes a whole section of his report to this argument, see section 9, at 55–67.
[566] PEC-WAMY029364–89.
[567] FN 207, at 107. The Bates stamp for this document is PEC-WAMY031565–73.
[568] Winer report, paragraph 12.12.9, at 106–7. Emphasis added.

material, has not reviewed many primary sources, and has relied heavily on secondary sources, like Hedges' inaccurate *New York Times* article and USA Fitzgerald's motions.

As a lawyer, Mr. Winer must certainly know that an indictment is the prosecution's best case and is not a conclusion or a finding of facts. Only after a trial, where the defense has an opportunity to present its case, does the factfinder, often a jury or a judge, determine the facts of a case. USA Fitzgerald's indictment is full of critical errors. For instance, he claimed, "In the early 1990s, LBI was renamed Benevolence International Foundation, referred to in Arabic as "*Al Birr al Dawalia*," and incorporated in the United States."[569] BIF was indeed incorporated in the United States, but it was not a renamed LBI. They were two separate and different organizations, as demonstrated in section II.F of this report. Benevolence International Foundation is not *Al-Birr al-Dawalia* in Arabic but *Monathamat al-Birr al-Dawalia*, as Dr. Noorwali reported in his deposition.[570] Fitzgerald confused the two different charities and lumped them into one. Both Winer and Kohlmann followed him in this confusion.

Winer discusses Enaam Arnaout's alleged activities in Pakistan and Afghanistan in the late 1980s and 1990s. Winer claims that bin Laden and al Qaeda relied on various charities "to transfer money and provide cover for traveling al Qaeda members and associates."[571] The implication is clearly that LBI was one of these charities. Although USA Fitzgerald did not make this explicit claim in his press release, he explicitly did so in the indictment itself: "LBI also provided cover for fighters to travel in and out of Pakistan and obtain immigration status."[572] I do not believe this was true. As shown in section II.G of this report, al Qaeda certainly used charities to provide cover for its operations in the East Africa bombings, but this was later and elsewhere, not in Pakistan in the late 1980s and early 1990s. USA Fitzgerald's allegations, echoed by Winer, that Arnaout was director of communications in "al Masada" camp in Jaji distributing weapons and later was employed by LBI to buy rockets and rifles in large quantities have not been substantiated.

### i) Winer's Paragraph 12.12.10

---

[569] PEC-WAMY031566, also at PEC-WAMY029366 in the actual indictment.
[570] Noorwali deposition, July 24, 2019, at 259.
[571] Again, this is lifted straight out of the press release at PEC-WAMY031567.
[572] PEC-WAMY029366, paragraph G.

141

This paragraph is a repeat of the Treasury Department press release announcing that Batterjee was designated an SDGT. It added a paragraph from its Under Secretary Stuart Levey praising this designation of Batterjee.[573] It adds no evidence. The rest of the paragraph is a verbatim repeat of paragraph 12.12.5, and I shall not repeat my comments on that specific quote.

### j)    Winer's Paragraph 12.12.11

In this paragraph, Winer (again) repeats that Batterjee was both chairman of WAMY and founder of one of al Qaeda's central vehicles for funding terrorism, LBI/Benevolence. At the risk of sounding monotonous, Batterjee was never the chairman of WAMY. He was the founder of both LBI and BIF, but they are separate and different entities, not the same organization as Winer suggests. WAMY certainly had a relationship with LBI, which ran joint projects under WAMY's auspices, but had no relationship with BIF. Winer goes on to argue that the inter-relationship of these charities was Janus-faced: one face provided humanitarian services, the other face supported jihad and terrorism. Jihad has many meanings, but I suspect that Winer means the military resistance to Soviet invasion in the 1980s and later against the Najibullah regime in Kabul until 1992. WAMY's joint projects with LBI supported the refugees and victims of the Soviet invasion. So, indirectly by taking care of Afghan mujahedin's families they supported the resistance against the Soviets and the Kabul communist regime. Neither organization supported terrorism as neither Hezb e-Islami, Gulbuddin Hekmatyar's organization, nor even al Qaeda in the late 1980s or early 1990s were viewed or labeled terrorist by Western powers, including the U.S. government: they were freedom fighters at the time.

Paragraphs 12.12.15 and 12.12.16 are just rhetorical arguments and present no additional evidence. The remaining paragraphs in section 12.12 of Winer's report deal with Bosnia or Canada and will be dealt in other sections of this report.

This section on WAMY's alleged funding of al Qaeda in the late 1980s or early 1990s in Peshawar began with LBI chairman Adel Batterjee. Winer made him the central piece of his argument that WAMY supported the 9/11 terrorists by citing the allegation that he was both the global chairman of WAMY and the head of LBI/BIF, assumed to be the same organization. He actually cited this alleged "fact" no less than eight times in his section 12.12. As just shown, Batterjee was indeed chairman of LBI since its inception to about January 22, 1993 at the latest.

---

[573] FED-PEC0083715.

However, he was never an executive of WAMY or even a WAMY employee. He also founded the Benevolence International Foundation (BIF) in the United States and got its non-profit status on February 11, 1993 from the state of Illinois. He officially left BIF on March 15, 1993. So, there was no overlap between January 22, 1993, by which his abrupt resignation from LBI had taken place, and February 11, 1993, the date at which BIF got its non-profit status in the United States. Furthermore, contrary to Fitzpatrick's claim, who probably did not have the opportunity to review WAMY documents or to interview any WAMY employee, LBI and BIF were different organizations. In fact, WAMY reprimanded Batterjee for the appearance of being deceptive in setting up an organization (BIF) with a name, logo and function similar to LBI in order to raise money in Saudi Arabia (BIF has not acquired the Saudi government's permission to solicit donations in the kingdom while LBI was permitted to do so under WAMY sponsorship) and then forced his resignation as LBI chairman shortly thereafter. As Fitzpatrick pointed out, around this time, there was little that BIF did in the United States.

In other words, there is no evidence of WAMY funding the future 9/11 terrorists, but on the contrary, there is ample evidence of WAMY adhering to strict bookkeeping standards to track its funding for LBI projects to ensure that it went to these projects that had nothing to do with terrorism. WAMY was not even aware of BIF until it noted BIF's deceptive and fraudulent practices of passing as LBI in order to raise money in Saudi Arabia, after WAMY had fired Batterjee for other reasons. WAMY immediately reprimanded Batterjee for them, and shortly thereafter and notified Prince (now King) Salman. WAMY never funded BIF or had anything to do with BIF or any of its projects. I did not investigate allegations that BIF might have funded foreign fighters in Bosnia or Chechnya because they were not pertinent to this litigation since WAMY was not involved with BIF. Batterjee and BIF could have funded whatever and whoever they liked, but this was completely independent of WAMY.

### D. WAMY's Alleged Support of South Indian Terrorists
#### 1. Dr. al-Johani's Alleged Support for Kashmir Rebels

In paragraphs 164 and 165, Kohlmann implies that WAMY materially supported Kashmir rebels. In the first paragraph, he has an extensive quote from a June 3, 1991 newspaper

143

article entitled "WAMY calls for Jihad in Kashmir" about a conference on Kashmir held in Riyadh. Kohlmann's quote is:

> "Dr. Johani said that according to the Islamic faith, Jihad could be performed in many forms. Muslims can go to the battlefield to wage a war against the enemies of Islam or they can give their moral, physical, and financial support [to] the cause of Jihad. The Muslims in the Kingdom … should have a sense of responsibility to help their brethren to secure their freedom through Jihad, he said… Dr. Johani pointed out that there is an organized effort to crush the Muslims in many parts of the world. Some of these destructive elements could be seen while other cannot be seen, he said. 'Jihad is the only way out for us to get emancipated from these cruel hands,' he added."[574]

This sounds very ominous: "Jihad … wage war … secure their freedom through Jihad … Jihad is the only way." But Kohlmann achieves this impression that Dr. Johani is calling for a violent jihad only by abbreviating the quote through key omissions. The article actually described a World Kashmir Freedom Movement meeting of a large number of Kashmiri expatriates in Riyadh on May 16, 1991. Dr. al-Johani was one of the speakers. The full quote is:

> "Dr. Johani said that according to the Islamic faith, Jihad could be performed in many forms. Muslims can go to the battlefield to wage a war against the enemies of Islam or they can give their moral, physical and financial support [to] the cause of Jihad. The Muslims in the Kingdom, *particularly the Kashmiris*, should have a sense of responsibility to help their brethren to secure their freedom through Jihad, he said. *They can extend financial support, create an awakening among Muslims on the problems of Kashmiris and prepare literature to project the cause of Kashmiris.*
>
> Dr. Johani pointed out that there is an organized effort to crush the Muslims in many parts of the world. Some of these destructive elements could be seen while others cannot be seen, he said. 'Jihad is the only way out for us to get emancipated from these cruel hands,' he added.
>
> *The Wamy chief said it was unfortunate that India is insensitive to any of the demands of the world's Muslims regarding the Kashmir issue, whereas the Pakistani government has been more sympathetic towards the demand for peaceful solution of the problem.*

---

[574] Kohlmann report, paragraph 164, at 49–50.

*"Whatever the case may be, the Muslims in all parts of the world should be united to fight against the atrocities committed against the Muslim minorities," he said."*[575] (Italics added for all the omitted passages)

Kohlmann's strategically placed omissions imply that Dr. al-Johani seems to advocate violent jihad. The full quote is more nuanced. Dr. al-Johani explained that jihad meant to "extend financial support, create an awakening among Muslims on the problems of Kashmiris and prepare literature to project the cause of the Kashmiris." Dr. al-Johani expressed strong support for Muslims' right to defend themselves against organized efforts to crush them in many parts of the world.

Paragraph 165 refers to another newspaper article dated December 8, 1995. It alleges that "Kashmiri political activist Chaudhry Yaqub held a press conference in which he 'lauded the efforts of the World Assembly of Muslim Youth (WAMY) and other charitable organizations in helping the mujahedin in their struggle for independence from India'– emphasizing 'that WAMY in particular is supporting the cause of Kashmiris through its Kashmir Committee in its Riyadh headquarters.'"[576] Again, this quote sounds ominous: "Kashmiri political activist … WAMY … helping the mujahedin in their struggle." Was WAMY providing Kashmiri fighters with (perhaps lethal) aid?

The actual article has a very different tone to it. It starts as Kohlmann had it, "A Kashmiri leader has lauded the efforts of the World Assembly of Muslim Youth (WAMY) and other charitable organizations in helping the mujahideen in their struggle for independence from India." But, who was this "political activist" as Kohlmann called him? The article describes him as, "Chaudhry Mohammad Yaqub, *a member (senator) of Azad Kashmir Council* said here Wednesday evening that WAMY in particular is supporting the cause of Kashmiris through its Kashmir Committee in its Riyadh headquarters." This "*elected member of the council*" discussed the situation in Kashmir with Dr. al-Johani. "*He said about 50,000 people have been killed during their five years struggle and over 75,000 people have been handicapped or crippled during this period.*" Senator Yaqub went on to say, "*peace and security can be realized only after giving the birth right to the people of Kashmir through a plebiscite, as guaranteed by the*

---

[575] "Wamy calls for Jihad to free Kashmir," *Alam Al-Islami*, June 3, 1991, at PEC-WAMY000615.

[576] Kohlmann report, at 50.

145

*UN Security Council.*" What did WAMY provide for the people in Kashmir? "*He said people from the Kingdom have donated generously to help the suffering people in Kashmir. Now, in the winter season, he added, they needed more help including money, blankets, tents and food supplies.*"[577] (Italics added for Kohlmann's omitted passages.) The actual article does not imply that WAMY gave material support to the Kashmir fighters. On the contrary, the elected Kashmiri senator was thanking WAMY for "money, blankets, tents and food supplies" and advocated "a plebiscite, as guaranteed by the UN Security Council."

In both cases, the clever omission of crucial details generates a narrative far more ominous than is the actual report. In any case, they are irrelevant to this lawsuit since al Qaeda or the 9/11 terrorists were never not involved in the fighting in Kashmir at any point up to the 9/11 attacks. Any WAMY support to Kashmir mujahedin would not have contributed to the 9/11 attacks. In addition, both articles date back to more than three years before the 9/11 conspiracy started, further weakening any potential link between WAMY's peaceful help for Kashmiri refugees and the 9/11 terrorists.

### 2. WAMY's Alleged Support of LeT and JeM

Related to the allegation of WAMY supporting Kashmiri fighters is Kohlmann's allegation that the Indian government had closed "WAMY's offices in that country for allegedly financing banned terrorist groups, including Lashkar e-Taiba (LeT) and Jaish e-Mohammed (JeM)." He cited an Indian newspaper article in his footnote for that statement.[578] I checked the document, and it is about WAMY coming to Hyderabad. This made the local police suspicious and they arrested some local youth, who confessed that WAMY was sponsoring their trip for training (no further information on what kind of training it was) in Pakistan. The article then reported, "WAMY is reportedly providing funds for several organizations including Lashkar-e-Toiba (LeT) and Jaish-e-Mohammed (JeM), besides the Students Islamic Movement of India (SIMI), all banned by the Center. Police officials say that WAMY has its presence in Delhi, Mumbai, Thirvuanathapuram, Lucknow, Aligarth, besides Hyderabad. It had its offices in Mumbai and Delhi which were closed soon after the Centre imposed a ban on SIMI. Intelligence

---

[577] Furqan Ahmed, "Kashmiri leader thanks WAMY for help," *Riyadh Daily*, December 8, 1995, at PEC-WAMY000451.

[578] Kohlmann report, paragraph 175, FN 264, at 53. The document is FED-PEC0234023–4, which is Shaik Ahmed Ali, 2001, "WAMY sets its foot in Hyderabad," *The Times of India*, November 6, 2001.

agencies are planning to submit a report on their findings about WAMY's activities [in] the city to the Centre by the end of this month."[579] In other words, the article reported an allegation and seemed to indicate that the Indian government had closed WAMY's office in only two of six Indian cities because of its support to SIMI, not LeT and JeM. SIMI is not a Kashmiri organization. If memory serves me right, SIMI, an India-wide organization, had previously clashed with the Indian police especially in the context of the destruction of the Babri Mosque. It was not a terrorist organization. After the 9/11 attacks, on September 26, 2001, the Indian government imposed a two year ban on it on suspicion of involvement with terrorism, similar to our material support statute.  The Indian Supreme Court lifted the ban, but a special court reinstituted it in 2008. Indian law enforcement authorities have accused SIMI of involvement of a terrorist group, the Indian Mujahideen, but failed to reveal its evidence in public. Kohlmann's allegation that WAMY helped LeT and JeM comes from a newspaper report, which acknowledged that it was just a vague allegation by using the word "reportedly."

The person in charge of the social section in WAMY-Pakistan testified that he had no knowledge and did not recall receiving any Indian youth for training in Pakistan during this time frame. He also did not recall any accounts of WAMY funding LeT or JeM.[580] Kohlmann's third hand information is surely not the type that should be used in legal context. It is just an insinuation, no more. In any case, al Qaeda was not in Kashmir and was not part of either LeT or JeM. After the post 9/11 attacks and the U.S. invasion of Afghanistan, many al Qaeda members fled the country and were helped by members of LeT and JeM. But neither LeT or JeM had any role in the 9/11 attacks and any alleged help to them did not flow to the 9/11 terrorists.

### 3. WAMY's Alleged bin Laden Courier

In the same paragraph 175, Kohlmann's very next sentence, right next to an allegation that WAMY's offices in India were closed because of its funding two terrorist organizations (LeT and JeM), was, "A year later, in November 2002, international media reported that WAMY Peshawar office was raided in a joint FBI-Pakistani intelligence operation. A WAMY employee was subsequently questioned for allegedly hand delivering a recorded message from Usama Bin Laden to local media. In that tape, bin Laden praised various terrorist attacks – including the Bali

---

[579] FED-PEC0234023–4
[580] Transcript of deposition of Ibrahim Anwar Ibrahim, November 8, 2019, henceforth Ibrahim Anwar deposition, at 290–1.

nightclub bombing that killed over 200 people and the Chechen takeover of a theater in Moscow that led to over 150 deaths."[581]

This is a puzzling series of juxtapositions: "WAMY office in Hyderabad … LeT/JeM … WAMY office Islamabad … FBI/Pakistani raid … WAMY employee … bin Laden audiotape … terrorist attacks … 200 people killed … 150 deaths." What do Indian suspicions of a WAMY office in Hyderabad have to do with an FBI raid of a WAMY office in Islamabad a year later? Were these two examples of WAMY local offices being shut down or raided because of the *same* reason, namely their funding or aiding local terrorist organizations (LeT and JeM in India, al Qaeda in Pakistan)? Are these offices' closure or raid by local authorities (and even the FBI) indicative of a pattern of WAMY funding or aiding local terrorist organization? What was the connection between WAMY-Islamabad and bin Laden? Did a WAMY employee really deliver a bin Laden audiotape to a local media? Since it happened 18 years ago, what happened to this employee?

Winer also cites the same wire service article reporting the questioning of a WAMY employee about delivering a Usama bin Laden tape to local media as evidence that WAMY helped the 9/11 terrorists.[582] The very short referenced article stated, "Police are questioning a Sudanese man they suspect delivered a tape-recorded message last month from Osama bin Laden to an Arab television network reporter in Islamabad, a security official said Monday. The man worked for the World Assembly of Muslim Youth, a Saudi Arabian-based charity, said the security official, who spoke on condition of anonymity. The office of the charity was raided last week by Pakistani intelligence officials and American FBI agents, he said. It wasn't immediately known what evidence they may have gathered."[583]

That's it! There was no follow up to the story as far as I can tell. I have followed closely all al Qaeda related news in the past two decades and I can't recall any more information on this questioning of a WAMY employee about the bin Laden audiotape or the raiding of the WAMY office in Peshawar. Since I have not heard anything about it for almost two decades, I assume that nothing came of it. Nor do the plaintiffs' experts provide any more information than the

---

[581] Kohlmann report, paragraph 175, at 53.
[582] Winer report, paragraph 12.13.1, at 110.
[583] Janullah Hashmizada, 2002, "Pakistan Questions Sudan Man About Tape," *Associated Press*, December 9, 2002 (FED-PEC0024183)

reference to the same vague wire service report, based on anonymous secondhand information. The incident about the transfer of the tape is captured in Peter Bergen's book on the search for bin Laden:

> [A]t 10:00 p.m. on November 12, 2002, … Ahmad Zaidan, the Al Jazeera bureau chief in Pakistan, received a call on his cell phone from a strange number. A man with a Pakistani accent said in English, "I have something interesting and a scoop for you. Meet me at Melody Market, behind the Islamabad hotel." Zaidan drove through a heavy rainstorm and parked his car at the market, usually crowded with hawkers and shoppers, but now deserted because of the bad weather and late hour. As soon as he got out of the car, a man with his face wrapped in a scarf approached him and handed him an audiotape, saying, "This is from Osama bin Laden."
>
> Zaidan demanded "Hold on," but bin Laden's messenger vanished as quickly as he had materialized.[584]

This account contradicts the allegation that the courier was in fact the alleged Sudanese WAMY employee. Zaidan remembered a "Pakistani" accent. In any case, this is very weak evidence that WAMY supported al Qaeda and the 9/11 terrorists. This incident happened more than a year after the 9/11 attacks and could not have contributed to the attacks.

Kohlmann's linking of an incident in India and another in Pakistan a year later, both of which apparently amounted to nothing again gives the impression that WAMY was involved in some mischief in both cases and linked it to bin Laden. Here, it is no longer carefully selected omission that gives a nefarious tone to these incidents, but a clever juxtaposition of unrelated incidents. I simply cannot find a link between these two incidents and WAMY, except typing the words "WAMY" and "arrest" in a google search, which makes both stories pop out. The same search also generated an *Arab News* report that Dr. al-Wohaibi denied that the WAMY office in Islamabad had been raided or that any WAMY employee had been questioned by the FBI or Pakistani intelligence![585] Dr. al-Wohaibi later gave a sworn statement that no WAMY offices in

---

[584] Peter Bergen, 2012, *Manhunt: The Ten-Year Search for Bin Laden from 9/11 to Abbottabad*, New York: Broadway Paperbacks, at 60. This was based on Bergen's an interview with Zaidan.
[585] "WAMY Denies Arrest Report," Arab News, December 5, 2002, available at https://www.arabnews.com/node/226684.

Pakistan were raided by authorities after the 9/11 attacks.[586] Again, the person in charge of WAMY-Pakistan's social section and was in the office at the time of the alleged raid testified that this raid did not happen. Nor did he recall that any WAMY employee was questioned for delivering a bin Laden audiotape at the time.[587]

Likewise, Rustum Shah Mahmand, a former Home and Interior Secretary in Pakistan, former Pakistani Ambassador to Afghanistan, former Commissioner for Afghan refugees in Pakistan, and former member of WAMY's Advisory Board in Pakistan stated that "I never heard or received any negative report about WAMY doing anything outside their charter/mission. There were never any allegations of WAMY funding mujahedeen or Al Qaeda or being associated with them in any manner…. Upon my information and a government representative at that time WAMY Peshawar Pakistan offices were not raided in 2002. Even if an organization is raided after 9/11 does not establish any guilt. During the NGO-raid period, many innocent people were captures [sic], tortured, and released. After 2002 WAMY has been operating without issues in Pakistan."[588]

Secretary Mahmand's mention that many people were captured, tortured, and released around that time provides a clue that dovetails with my personal experience of journalism in Pakistan where one event is transformed into an unrelated event. As we shall later see, a Sudanese WAMY employee, Adel Hassan Hamad, was captured in a joint Pakistani-U.S. raid on his home in July 2002 in Peshawar, three months before this alleged bin Laden courier incident. I suspect, and this is only speculation but consistent with the speculations in Winer's and Kohlmann's reports, that the Peshawar rumor mill transformed this arrest into a raid on the WAMY office in Peshawar in connection to the courier incident. In any case, there is no evidence that the vague newspaper story based on third hand information, which forms the basis of both Winer's and Kohlmann's identical allegation, is true. Neither of them bothered to fact check the story before including this allegation in their respective reports. As the quip about the Peshawar rumor mill went, this story is simply too good to check.

---

[586] Transcript of the deposition of Dr. Saleh al Wohaibi, October 23, 2019, henceforth Dr. al Wohaibi deposition, at 123.

[587] Ibrahim Anwar deposition, at 292.

[588] *In re Terrorist Attacks on September 11, 2001*, S.D.N.Y. No 03-MD-1570 (GBD)(FM), Declaration of Rustum Shah Mahmand, May 8, 2020, at 2.

### 4. Allegation about WAMY Training Fighters in Pakistan

Winer alleges that WAMY trained fighters[589] and cites Steve Emerson's testimony before the 9/11 Commission as his source. Emerson, whom I already established as an unreliable source, cites an article in a Pakistani newspaper *The News*, which had allegedly been translated by FBIS.[590] I was surprised because *The News* is the largest English language newspaper of Pakistan. The article, written by Arif Jamal in English, is entitled "By the Book, for the Book," and describes the Jamiat Taleba (also seen spelled Talaba, Tulaba, or Talba) Arabia (Arabic Student Group), which "remains little known outside its own circles."[591] The organization was founded in 1975 and is the only Pakistani student association which is consciously Pan-Islamic in its ideology. Most of its members come from madrassas controlled by the Jamaat Islami, a conservative Islamic political party in Pakistan, which is a member of WAMY.[592] Jamal goes on to write, "WAMY is also involved in religious and jehadi training for its member organizations. It also has a very close working relationship with many other Islamic and Islamist societies, engaged in proselytize [sic] and jehadi activities around the globe. These include, among others, the Jamiatul Khaira of Qatar, Ittehadul Munzamat Al-Tulabiyya or Kuwait, and the Muslim United Students Association of Maldives."[593]

From the longer quote, it seems that the author is speculating that WAMY is involved in Jihadi training for a lot of Islamic organizations in the world. None of the other three organizations named are violent military organizations. Jihad has many meanings and WAMY is certainly not providing military training for the other organizations. If Jamal meant that WAMY was involved in military training for Jamiat Talaba Arabia, he did not provide any evidence for it in his article. Nowhere else in the discovery material did I see WAMY involved in military training for any organization. Without any more evidence, this allegation is similar to Chris Hedges's reporting that Batterjee was the chairman of WAMY.

---

[589] Winer report, paragraph 12.13.2, at 110.

[590] BUR-PEC-064049.

[591] Arif Jamal, 2001, "By the Book, for the Book," *The News (Islamabad)*, March 25, 2001, FBIS Document Number: FBIS-NES-2001-0326 (FED-PEC0236350–2). The quote is from FED-PEC0236350.

[592] Its membership certificate is at WAMYSA056841.

[593] FED-PEC0236350.

The article states that *members* of Jamiat Talaba Arabia were involved in Afghanistan since the beginning and fought for Gulbuddin Hekmatyar's Hizb Islami, the largest recipient of U.S. military aid during that conflict. After the Soviet withdrawal, some of its members fought in Kashmir under the jihadi organization, Hizbul Mujahideen. The Jamiat Arabia, not WAMY, "organizes military training programmes every year after the annual convention at different places in Pakistan and Azad Kashmir. All Jamiat members are required to undergo military training even if they do not wage jehad. The annual exercise, spread over 15 to 30 days, refreshes their military skills." Although most sensational, the military training is not as important as the educational training the members undergo every year. They spend 35 days training for teaching Hadith, another ten days sharpening their oratory skills, and honing on their skills in Arabic throughout the year. Because of this emphasis on Arabic, "[t]he knowledge of the Arabic language of the members of the Jamiat Talaba Arabia is better than those from the madrassas of other sects."[594]

So, it appears that this student association that focuses on Arabic and religious education is also involved in some form of military training of its members. It is unclear how much WAMY was involved in this martial activity. On the other hand, there is evidence for WAMY's support of the Jamiat's educational programs.[595] The Jamiat never fought as a group and has not been designated a terrorist organization. However, some of its members individually joined other organizations as freedom fighters or terrorists, depending on which side the reader is. In any case, whatever aid WAMY provided to the Jamiat, if any was far removed from the 9/11 attacks. None of the 9/11 terrorists ever had any involvement with the Jamiat. Nor is there any evidence that the Jamiat ever provided any type of support to al Qaeda or the 9/11 terrorists. So, any WAMY aid to the Jamiat could not flow into the 9/11 attacks and was too far removed to be a proximate causation for the 9/11 attacks.

### E.  Ahmad Ajaj's Manual Envelope

---

[594] FED-PEC0236351.

[595] See for instance the letter of the president of Jamiat Talaba Arabia thanking WAMY for sending the Jamiat copy of a book on the life of Muhammad as a gift for its library, WAMYSA056840.

152

The "WAMY" "arrest" google search also turned up a story on Ahmad Ajaj. On February 26, 1993, the same day when WAMY sent a letter to Batterjee to tell him to cease and desist from deceptively mimicking LBI, a truck bomb exploded in the basement parking lot of the World Trade Center in New York. One of the convicted conspirators involved in this terrorist act was Ahmed Ajaj. Kohlmann seems to implicate WAMY in this terrorist act: "When … Ahmed Ajaj was arrested in New York, authorities seized an envelope from him containing Arabic-language terrorist training manuals. The envelope was marked with the letterhead of BIF, with the notation explaining that BIF is a branch of the 'World Assembly of Muslim Youth.'" His citation for this claim was the 2001 trial of "*U.S. v. Usama bin Laden et al*, S(7) 98 Cr. 1023 (LBS) United States District Court, Southern District of New York. Government Exhibit 2800-A."[596]

Ahmad Ajaj was indeed arrested on September 1, 1992 when he arrived at John F. Kennedy International Airport as he was proceeding through immigration. He was carrying in his bag manuals and notebooks on bomb making and clandestine tradecraft.[597] After the World Trade Center bombing, the FBI arrested him in relation to that bombing since he had been traveling with the master-bomber, Ramzi Yousef. He was convicted on nine counts of having played a role in the early stages of the conspiracy to bomb the World Trade Center and sentenced to 240 years in prison. The manual and the envelope containing the manual were entered into evidence at his trial as government exhibit 2800-A.

The exhibit number is consistent with Kohlmann's paragraph, but the rest of Kohlmann's information is false. Ajaj was tried in *U.S. v. Mohammad Salameh*, et al, S.D.N.Y., No S593CR.180 (KTD). He was the fourth defendant listed at that trial, which took place between October 4, 1993 and May 24, 1994. This was the trial about the 1993 World Trade Center bombing. The trial that Kohlmann cites was the trial of the 1998 East Africa U.S. Embassies' bombings, *U.S. v. Usama bin Laden, et al*, S.D.N.Y., S(7) 98 Cr. 1023 (LBS), which took place between February 5, 2001 and July 10, 2001.[598] There was also a manual entered in that trial,

---

[596] Kohlmann report, paragraph 195, FN 295, at 58.
[597] *U.S. v. Salameh et al*, S.D.N.Y., S593CR.180 (KTD), October 4, 1993, at 21–2.
[598] *U.S. v. Usama bin Laden, et al*, S.D.N.Y., S(7) 98 Cr. 1023 (LBS).

called the Manchester Manual by the Intelligence Community,[599] but it is not the Ajaj manual. The Manchester manual was entered as evidence in the Embassies' bombings trial as government exhibit GX 1677.[600] Ajaj had nothing to do with bin Laden or al Qaeda or the 9/11 terrorists. He came to Pakistan after bin Laden had left the country and he trained at Khalden,[601] which was not an al Qaeda camp. Kohlmann confused the two trials and the two manuals.

As to the envelope of GX-2800A, I could not find a copy of the envelop of *Salameh*'s GX-2800A to examine. I dispatched a collaborator to the courthouse, but the exhibits were no longer available. However, the translator at the trial read the return address on the envelope: "World Assembly of Muslim Youth. Jeddah, PO Box 7600, Jeddah, 21472, Saudi Arabia... I'm going to skip the rest of that and go down a couple of lines. Peshawar, Pakistan, University Town, 77-D/B Park Road. Telephone 42249/41485."[602] The two addresses are usually what appeared on LBI stationary in Peshawar.[603] There is no trace of BIF mentioned in the *Salameh* testimony. Indeed, BIF had just recently been incorporated in Illinois, but it was dormant until May 1993, months after Ajaj's arrest and it was not yet incorporated in Pakistan before Ajaj left Pakistan. I suspect that Kohlmann again confused LBI with BIF. Nor is there any mention of a notation explaining that BIF was a branch of WAMY.

Citing the wrong trial for the exhibit is such a strange mistake that I explored how Kohlmann could have made it. I tracked the statements of his former employer and mentor, the unreliable Steven Emerson. In his written testimony before the 9/11 Commission on July 9, 2003, he stated "When Ajaj was arrested in 1992 investigators confiscated his belongings. Among them was an official WAMY envelope printed with the organization's return address in Saudi Arabia."[604] In his citation, he wrote, "Government Exhibit 2800-A S5 93 CR 189."[605] This of course refers to the Salameh trial and is close enough even though the last digit is wrong.

---

[599] See Ali Soufan, 2011, *The Black Banners: The Inside Story of 9/11 and the War Against al-Qaeda*, New York: W. W. Norton & Company, at 113–6. Soufan was the one who realized the importance of that manual in a 1999 police raid in Manchester, England.

[600] In the discovery material, it is at PECFOIA00041430–597.

[601] *U.S. v. Salameh et al*, S.D.N.Y., S593CR.180 (KTD), January 27, 1994, at 7349.

[602] *U.S. v. Salameh et al*, S.D.N.Y., S593CR.180 (KTD), January 31, 1994, at 7453.

[603] See for instance the bottom of WAMYSA056645.

[604] Steven Emerson, "Terrorism, Al Qaeda, and the Muslim World; The Challenge Within the Muslim World," The National Commission on Terrorist Attacks Upon the United States, July 9, 2003, BUR-PEC-064036–71, with the first page BUR-PEC-064036 blacked out.

[605] FN 66, at BUR-PEC-064050.

Three weeks later, at a Senate testimony on July 31, 2003, Emerson added in the name of the trial in his citation, "United States of America v. Usama bin Laden, et al, S5 93 CR 180, Government Exhibit 2800-A."[606] I am not sure why Emerson added the name of the wrong case in his second testimony, but Kohlmann followed him in his error. However, Kohlmann knew the correct cite for *U.S. v. Usama bin Laden et al* and so corrected his mention in his report, not realizing that the original case number was right, but the name of the case was wrong.

Although Kohlmann's citation is to a primary source, it is obvious that he did not really look it up or he would have seen that he referred to the wrong trial. Nor did he see BIF on the envelope or any notation on it explaining that BIF was a branch of WAMY. I suspect that Kohlmann just quoted Emerson and put the correct case number for *U.S. v. Usama bin Laden et al*, not realizing that it was the wrong case. What is disturbing is his attempt to disguise his taking a shortcut by citing a primary source which he did not consult, as he preached that he would do whenever possible in his methodology section.

The fact that LBI and WAMY are shown as the return address on the envelope carrying a terrorist manual does not necessarily imply that WAMY had anything to do with the manual or Ajaj or the World Trade Center bombing. At the Salameh trial, there was no mention of any LBI or WAMY marking on the manual itself. Even though I have not been able to inspect the exhibit, I suspect that it is an envelope large enough to include a more than a hundred-page manual. Such large envelopes were rare in Peshawar and Ajaj or whoever gave him the manual took one of the few large envelopes available and put the manual in it. Such manuals were common in Peshawar at the time and not necessarily associated with a specific organization or training camp. As Hamid recalled, "Training notes on explosives and other topics proliferated to the extent that they were sold in photocopy centres in Peshawar. The owners of these shops were holding their own copies–without the knowledge of the owners of the notes–and then sold them to young Arabs. The copies they held included various types of notes, papers and books. One day, in a moment of humour, one of the Arabs said, 'Young people are taking photocopies of everything that falls into their hands, even a copy of the Qur'an.'"[607] As we do not know the origin of either the manual or the envelope containing it, it is too much of a stretch to implicate WAMY for the 1993 World Trade Center bombing or even the 9/11 Terrorists since the perpetrators of that

---

[606] FN 257, at PEC-WAMY000111.
[607] Hamid and Farrall, 2015, at 141.

155

terrorist bombing had nothing to do with bin Laden, al Qaeda, or the people who later perpetrated the 9/11 attacks.

### F.  WAMY's Alleged Funding of al Qaeda in Bosnia

Both Winer and especially Kohlmann allege that WAMY funded al Qaeda in Bosnia. As noted in section II.G of this report, al Qaeda never fought as a group in Bosnia. There was an exploratory visit to Bosnia by al-Fadl, definitely an al Qaeda member, to assess the situation there or individuals who might have formerly been members of al Qaeda and might have gone to Bosnia, but from my reading of al Qaeda history, I did not see any evidence that al Qaeda as a group fought in Bosnia.

The issue of al Qaeda's alleged presence in Bosnia is a good opportunity to use a comparative analysis. Expeditions like al Qaeda's venture into Somalia leave documentary traces. The existence or absence of such traces provides a strong indication of whether an organization like al Qaeda had sent troops to Bosnia. A comparison of al Qaeda documents captured by U.S. troops after their invasion of October 2001 in relation to Somalia and Bosnia invites the type of comparative analysis that Kohlmann claims to be using in his report but in fact does not. These documents were posted on West Point's Combating Terrorism Center website for all scholars to examine. Such a comparative analysis of the evidentiary traces left behind by al Qaeda for its activities in Bosnia and Somalia respectively would test the main thesis of Kohlmann's book that al Qaeda fought in Bosnia. If the traces are similar, this would be a good indication that al Qaeda sent squads of members to both these countries. If the evidence left behind is one sided, this is an indication that al Qaeda sent troops to only one country. If there is no evidence left behind, then it would appear that al Qaeda did not send troops to either country. As demonstrated in section II.G of this report, the documents illustrate that al Qaeda sent about two dozen al Qaeda members to Somalia to train Islamic Somali rebels but is silent on a similar expedition to Bosnia. First, there were after-action reports from al Qaeda leaders for Somalia but not Bosnia in the captured al Qaeda documents in Afghanistan after the U.S. invasion of October 2001. Second, al Qaeda leaders referred to their expedition in Somalia as the "Africa Corps." There was never any similar mention of an expedition in Bosnia as the "European Corps." Third, very senior al Qaeda leaders like Abu Ubaydah al-Banshiri, Abu Hafs al-Masri, Sayf al-Adl…

156

visited and operated in Somali. There were no such visits to Bosnia during the Bosnian conflict at all. The only documented visit was low level member Jamal al-Fadl going to Zagreb to assess the situation on the ground, and perhaps Abu Zubair al-Madani but it is unclear whether the latter went there as an al Qaeda member or had left al Qaeda to fight in Bosnia. He went there allegedly to establish training camps, but nothing came of this plan as he was killed early in the fighting. In any case, Abu Zubair's lonely presence in Bosnia is qualitatively different from al Qaeda's presence in Somalia during approximately the same time in history. Fourth, there was no al Qaeda camp in Bosnia unlike the well-documented al Qaeda camps in Somalia. In his book on Bosnia, Kohlmann lumps all the Islamist foreign fighters together and assumes they are al Qaeda. Bin Laden probably did want to help the Bosnians and establish an al Qaeda base in Europe, but nothing came of it. As just shown, a comparative analysis of the evidentiary traces left behind by al Qaeda strongly suggests that al Qaeda did not have of a presence or fight as a group in Bosnia, unlike its expedition to Somalia.

Let us examine Winer's and Kohlmann's specific allegations about Bosnia.

### 1. Winer's Allegations

In his paragraphs 12.12.13 to 12.12.16, Winer's allegations center on Islamic charity Third World Relief Agency (TWRA) but he provides no evidence that al Qaeda or bin Laden was in Bosnia. Winer noted that WAMY (Jeddah) transferred ATS 399,067.15 to TWRA on March 25, 1992, according to a German report.[608] This money transfer happened more than a week before the outbreak of hostilities in early April 1992.[609] There is no mention in the German

---

[608] [German] Federal Office of Criminal Investigation, 2003, *Expert Report Concerning the Area – Financial Investigations [for the International Court of Criminal Justice for the former Yugoslavia relating to TWRA]*, ST 54-2 – 185/02, Meckenheim, August 28, 2003 (FED-PEC0106588–650), at 58 (FED-PEC0106645). I believe that Winer has his date wrong, as the date of this transaction is 1992 and not 2002 as written in his report. This transaction amounted to about $34,000 at the time. This of course pales compared to the total amount of donations made to TWRA during the Bosnian war, which reached more than $200 million. It appears from the German report that $80 million cash had unknown destination, at 61 (FED-PEC0106648).
[609] Chuck Sudetic, 1998, *Blood and Vengeance: One Family's Story of the War in Bosnia*, New York: W. W. Norton & Company, at 101.

report where the money went, but neither bin Laden nor al Qaeda is mentioned in this report in connection to Bosnia.[610]

Winer goes on to claim that the head of TWRA Elfatih Ali Hassanein (I believe that this is his real name, not the variations in Winer's report) "served at the same time as the director of the WAMY Austria and Eastern Europe [office]." His evidence is in footnote 212.[611] In the footnote, he refers to an internal WAMY report[612] that shows on 30/2/92 [sic], "Mr. Fateh Ali Hussein, Director of the Office of WAMY office in Austria and Eastern Europe" sending a letter to Dr. Ahmed Totonji, identified in the previous line as "Secretary of the Union of Muslim Students in Italy," about "Paying amounts of money to associations for specific projects."[613] The previous page of the same document lists a Dr. Fatih Ali Hassanein, "Director of the Office of the seminar in Austria," receiving a letter from Dr. al-Johani on 15/3/1413H (corresponding to September 12, 1992) "Thanking for efforts in Bosnia and Herzegovina."[614]

WAMY has denied that Hassanein ever worked for it or that it had an office in Austria. Hassanein was involved as a volunteer in some WAMY projects in Austria and the Balkans, and it is impossible to know how these volunteers represent themselves to journalists or in correspondence. For instance, in a summary of the activities sponsored by WAMY during 1993, there is a mention that a camp in Albania was not held because Dr. Hassanein was too busy.[615] On January 30, 1994, WAMY Secretary General Dr. al-Johani sent a letter to Dr. Hassanein, "WAMY representative in Austria," regarding the preparation of a translation of the Holy Quran in the languages of Eastern European countries. Dr. al-Johani asked Dr. Hassanein to send a report about the progress of this project.[616] On October 18, 1994, under the letterhead of the Islamic Council for East Europe, Dr. Hassanein, as its executive director, invited the WAMY Secretary General to attend and participate in the Council's Second Conference in Istanbul.[617] On October 25, 1994, under the letterhead and logo of the Third World Relief Agency (Verein Zur

---

[610] Wael Julaidan was mentioned in connection to bin Laden and al Qaeda, but only in the context of U.S. litigation about him, not al Qaeda in the context of Bosnia (FED-PEC0106601).
[611] Winer report, paragraph 12.12.14, FN 212, at 109.
[612] Document 3912-36, Filed 2/28/18, no Bates stamp.
[613] Document 3912-36, Filed 2/28/18, no Bates stamp, at 3.
[614] Document 3912-36, Filed 2/28/18, no Bates stamp, at 2.
[615] WAMYSA1105168.
[616] WAMYSA1235382.
[617] WAMYSA1235383.

Unterstutzung der 'Dritten Welt', TWRA), Dr. Hassanein told the WAMY Secretary General that he had received books and mentioned that he needed copies of the Holy Quran translated in French, English, and German.[618] On October 26, 1994, WAMY Secretary General apologized to Dr. Hassanein, "the Executive Director of the Islamic Council of Eastern Europe," for not being able to attend the conference because of previous commitments.[619]

The importance of this correspondence between Dr. Hassanein and Dr. al-Johani is that one can check how they address each other and compare the letterheads and logo of Dr. Hassanein's organizations to LBI and WAMY USA, one a known independent organization under the sponsorship of WAMY (LBI) and the other a WAMY field office (WAMY USA). This is another example of comparative analysis touted by Kohlmann in his methodological section but fails to use in his report. When WAMY Saudi Arabia writes to the director of one of its field offices, it uses the director's title. For instance, when Assistant Secretary General Dr. Babear wrote to Abdullah Binladen, the director of WAMY USA, it addressed Binladen as "Director of the North American Office."[620] When the director of a field office writes to either the WAMY Secretary General or Assistant Secretary General, he signs the letter, Director of WAMY, (country field office), like Engineer Talha al-Jarad, Director of WAMY, Canada.[621] Since Dr. Hassanein was never addressed as director of Austrian office and never signed his correspondence with WAMY as director of WAMY, Austria, this suggests that Dr. Hassanein was not a director of a WAMY field office.

Was TWRA an organization under the sponsorship of WAMY, like LBI was from 1987 to 1996? We can compare the letterhead and logo of LBI to TWRA. Since LBI was under the sponsorship of WAMY, it was allowed to write under its name (Lajnat Al-Birr Al-Islamiah) the name of World Assembly of Muslim Youth in smaller print and in parentheses.[622] However, neither TWRA nor the Islamic Council for East Europe, the two organizations headed by Dr. Hassanein, wrote World Assembly of Muslim Youth in smaller print and in parentheses in their

---

[618] WAMYSA1235384.

[619] WAMYSA1235381.

[620] See WAMY SA 4484.

[621] See PEC-WAMY030899–900.

[622] See for instance, WAMYSA028420–8 on each page on the letterhead in English and WAMYSA061335 for the same in Arabic.

respective logo.[623] This suggests that neither organizations affiliated with Dr. Hassanein were under the sponsorship of WAMY. In other words, a comparison of WAMY's correspondence with Dr. Hassanein and its own field offices or organization under its sponsorship supports WAMY's statement that Dr. Hassanein was nothing more than just a volunteer for them.

Winer rejects WAMY's denial and a fragmented list of some communications between Dr. Hassanein and others was enough for him to conclude that Dr. Hassanein was both chairman of TWRA and director of WAMY-Austria. As I repeat several times in this report, a document is only the beginning of an investigation about its contents, which must be validated in terms of accuracy. In this one document, Hassanein's name is spelled two different ways and his position is also given two different titles. This list of WAMY communications is obviously not a primary source on these communications, but a secondary quick summary, which was then translated with unknown accuracy. Winer does not refer to the communications themselves (unlike me in the preceding paragraph), which would of course have been primary sources. This is quite a burden of evidence to put on this document in order to make it another centerpiece of Winer's argument that Dr. Hussanein was a WAMY director at the time of the Bosnian War.

This may strike the reader as a very thin basis for making a strong positive statement that Dr. Hassanein is director of WAMY-Austria, but it does not deter Winer who confidently goes on to restate that, in addition to being chairman of TRWA, Dr. Hassanein was doing "simultaneous work on behalf of bin Ladin and Al Qaeda, and his simultaneous work for WAMY."[624] His reference was another footnote, where he simply repeats that "Hassanein was simultaneously the head of TWRA and a facilitator for Qaeda, while he was also the head of WAMY's Vienna office … as described in an extensive 1996 article in The Washington Post."[625] He quotes at length from the article, which was written by John Pomfret on September 22, 1996.[626] The article makes no mention of WAMY at all. It mentions bin Laden as a *donor* to TWRA, *not a recipient* of TWRA money, and makes no mention of al Qaeda at all. So, Dr. Hassanein is *not* described as a *facilitator for* al Qaeda, but a possible *beneficiary* of bin Laden's

---

[623] See the logos of TWRA and the Islamic Council for East Europe at WAMYSA1235384 and WAMYSA1235383 respectively.
[624] Winer report, paragraph 12.12.14, at 109.
[625] Winer report, FN 213.
[626] John Pomfret, 1996, "Bosnia's Muslims Dodged Embargo," *The Washington Post*, September 22, 1996, at A01.

money. Nor is there anything in the article about Dr. Hassanein doing work on behalf of bin Laden and al Qaeda. He might just have been a beneficiary of bin Laden's generosity. Winer's claim of Dr. Hassanein's simultaneous work for WAMY and al Qaeda is not supported by Pomfret's article, the source of his claim.

In speculating on Dr. Hassanein's role in Bosnia, Winer gave the analogy to Batterjee's alleged role as chairman of WAMY and referred (again) to Hedges' *New York Times* article. The implication from Hedges' article was that a former relief worker could be involved in military activities and still be "unofficially" but technically not officially with the charity. In other words, nothing would change except the official label of his involvement with "WAMY."[627] However, as shown in section II.F, Batterjee was never a chairman of WAMY or a WAMY employee. There is no evidence that Batterjee used WAMY funds for Bosnia in later 1992. WAMY funded LBI's *projects* in Afghanistan and Pakistan. In any case, any funding to Bosnian mujahedin would not go to al Qaeda, as it was not present in Bosnia, as demonstrated in section II.G. Therefore, any support for Bosnian fighters would not flow to the 9/11 terrorists.

Winer's four paragraphs on Bosnia are very confusing and poorly sourced. They are more argumentative than substantive in terms of providing any evidence that WAMY funded al Qaeda in Bosnia. Although Winer lists an Interpol Fusion Taskforce document in his references,[628] he does not cite it. The document references TWRA and Dr. Hassanein but makes no mention of either WAMY or al Qaeda or bin Laden.[629] On the other hand, it states, "During 1988/1989, he [Hassanein] was the president of IIRO."[630]

As shown in section II.G of this report, al Qaeda and bin Laden were not in Bosnia. Winer's allegation was that TWRA provided funding for fighters in Bosnia. Since neither al Qaeda nor bin Laden were there, they did not receive any money from TWRA. If anything, bin Laden might have given money to some of the fighters in Bosnia, but he certainly did not receive any money intended for Bosnia, whether from TWRA or even, under the hypothetical that Winer is right, WAMY. It is irrelevant whether WAMY Eastern Europe and TWRA shared the same

---

[627] Winer report, paragraph 12.12.16, at 110.
[628] Interpol Fusion Taskforce, 2003, *Financing of Terrorism: Interim Analytical Report Executive Directorate*, March 2003, at PEC-WAMY040296–45.
[629] PEC-WAMY040232–4.
[630] PEC-WAMY040232. This was a repeat of an earlier mention, "During 1988/1989, he was the president of IIRO." PEC-WAMY040224.

leadership as Winer claims, whatever money was distributed by TRWA went to Bosnia, not al Qaeda. If anything, according to Pomfret's article, al Qaeda might have provided money for Bosnia. If so, the flow of money was from al Qaeda to Bosnia, not the other way around. So, even assuming Winer's arguments are right about WAMY supporting Bosnia, this support would not have gone to al Qaeda or the 9/11 terrorists. If anything, this would have taken money away from resources that could have gone to al Qaeda and the 9/11 terrorists.

### 2. Kohlmann's Allegations

Kohlmann with his book Al-Qaida's Jihad in Europe[631] is of course the champion of the claim that al Qaeda fought in Bosnia and established a foothold on the European continent. I have already dealt with the methodological flaws of his book in the methodology section. In this section, I address the specific claims against WAMY in his report.

Kohlmann tries to tie WAMY, Bosnia, and al Qaeda in ten paragraphs of his report: 162–3, 174, 196–203.

### a) Kohlmann's paragraphs 162 – 3

In paragraph 162, Kohlmann wrote, "from the early days of the Bosnian war, WAMY was 'deeply involved' in supporting Saudi jihadists seeking to take part in the conflict. A WAMY representative was quoted in *The New York Times* …"[632] This is of course Chris Hedges' flawed *New York Times* article that wrongly claimed that Batterjee was WAMY's chairman.[633] The second quote in the first paragraph is from the same article and was uttered by some unknown Saudi official, who was clearly not Batterjee, and has nothing to do with WAMY.[634] However, Kohlmann's juxtaposition of the two quotes from different people makes it seem that the second quote is also attributable to a "WAMY representative" and when he said that "most of the money raised for relief has been turned over to the Bosnians for weapons," it may seem that this was WAMY's money when it fact it is not what the anonymous Saudi official said or even implied. Kohlmann's juxtaposition of unrelated items to give the impression that they are related seems to be one of his favorite methodological devices.

---

[631] Evan Kohlmann, 2004, *Al-Qaida's Jihad in Europe: The Afghan-Bosnian Network*, Oxford: BERG.
[632] Kohlmann report, at 49.
[633] FED-PEC0057642–4, FED-PEC0057644.
[634] The quote is from the last paragraph of FED-PEC0057643.

The quote from paragraph 163 is from the same article and describes WAMY flying back wounded Saudi fighters and providing free medical care in a Saudi German hospital. I am not sure whether the article is correct, but I have not checked it because providing medical care is a legitimate humanitarian activity. As a physician, I swore to not discriminate and to give the same medical care to everyone who needed it.

### a) Kohlmann's Paragraph 174

This paragraph centers on TWRA and alleges that WAMY transferred money to TWRA. This is similar to Winer's allegations in the previous section. Again, TWRA was not al Qaeda and did not fund al Qaeda. Even if bin Laden's contribution to TWRA is substantiated, the flow of money was not from TWRA to bin Laden and the 9/11 terrorists but in the opposite direction, from bin Laden to TWRA. So, if substantiated, any WAMY contribution to TWRA was not support for al Qaeda or the 9/11 Terrorists.

### b) Kohlmann's Paragraphs 196–203

All eight of these paragraphs deal with BIF. WAMY is not mentioned at all. The implicit allegation in these paragraphs is that BIF is the same thing as LBI, which is a subsidiary of WAMY. This has been dealt extensively in section II.F of this report. WAMY had nothing to do with BIF, and therefore the allegations in these paragraphs are not relevant to this litigation since they do not make any explicit allegations against WAMY. Furthermore, these paragraphs are based on USA Fitzgerald evidentiary proffer in *Arnaout*, filed on January 6, 2003,[635] (Kohlmann cites this proffer eight times in the framework of these paragraphs)[636] and we saw that there are some serious of factual problems with this proffer since it confused BIF with LBI.

### 3. No Relationship Between Bosnia and the 9/11 Attacks

Although WAMY did not fund or support al Qaeda in Bosnia because al Qaeda was not in Bosnia as a group, Bosnia did have a small contribution to the 9/11 attacks. As part II of this report showed, there were three 9/11 terrorists who had been involved in Bosnia: KSM, Khalid al-Midhar, and Nawaf al-Hazmi. KSM went twice to Bosnia, in early 1992 and again in 1995. His stays were very short, and there is no evidence that he took part in the fighting. During his second trip there, he worked for an Egyptian charity, the Egyptian Humanitarian Relief

---

[635] BUR-PEC-014501–97. Kohlmann gives the wrong date (January 31, 2003) for the filing of this proffer.

[636] Kohlmann report, FN 296, 299, 300, 302, 303, 304, 310, 313, at 59–62.

Agency.[637] There is no evidence that he received any support from either WAMY or projects that WAMY funded.

Al-Midhar and al-Hazmir were childhood friends from Mecca and very little is known about their stay in Bosnia, only that they had been there.[638] Although the Congressional Joint Inquiry wrote that al-Hazmi first traveled to Afghanistan in 1993 as a teenager and came into contact with a key al Qaeda facilitator in Saudi Arabia in 1994, this is unlikely. At that time, the U.S. intelligence community still lumped all Islamist Arab militants into al Qaeda,[639] and al Qaeda was mostly gone from Afghanistan and kept just a skeleton crew there until it withdrew all forces in 1994. That skeleton crew mostly trained central Asians in Project Furqan. I strongly suspect that al-Hazmi trained in a non-al Qaeda camp like Khalden in 1993. The Bosnian conflict ended at the end of 1995. Both friends came to Afghanistan in 1996 and joined al Qaeda shortly thereafter. They volunteered for the 9/11 conspiracy in the spring of 1999 and carried out it first concrete steps when they got their U.S. visas from Saudi Arabia in April 1999, as noted in section II.K of this report. As shown earlier, the 9/11 attacks conspiracy began in early 1999, as one of the Plaintiffs' experts correctly noted.[640] Even assuming for argument's sake the hypothetical that Saudi charities, including WAMY, materially supported Saudi fighters in Bosnia (and plaintiffs' experts failed to show this), this gap of four years between the time when they were in Bosnia and not even members of al Qaeda to the inception of the 9/11 conspiracy is simply too large to be proximately linked to the 9/11 attacks.

### G.  WAMY's Alleged Support of the Mujahedin in Chechnya II

---

[637] McDermott and Meyer, 2012, at 93.

[638] U.S. Senate Select Committee on Intelligence and U.S. House Permanent Select Committee on Intelligence, 2002, *Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001*, December 2002, at 131 ("In 1995, al-Hazmi and al-Mihdhar traveled to Bosnia to fight with other Muslims against the Serbs.") (PEC-WAMY040280–1136, at PEC-WAMY040462); 9/11 Commission Report, at 155; Terry McDermott, 2005, *Perfect Soldiers: The Hijackers: Who They Were, Why They Did It*, New York: HarperCollins Publishers, at 191.

[639] For instance, just in the very next sentence from the one quoted in the preceding footnote, the *Joint Inquiry* wrote, "Al-Hazmi came into contact with al-Qa'ida leader Abu Zubaydah … in 1996." As seen in part II of this report, Abu Zubaydah was never al Qaeda and certainly not in 1996 when he ran Khalden, a camp rival to al Qaeda and which al Qaeda forced him to close in 2000.

[640] As noted in Brian Jenkins's report, at 23.

None of the plaintiffs' experts claim that WAMY supported the Chechen mujahedin against the Russians in the first Chechen War (1994–6) despite the fact that both bin Laden and BIF explored ways to help the Chechens. They were right: al Qaeda was not present in Chechnya either during the first or the second round of the war.

Kohlmann makes allegations against WAMY during the second Chechen War in paragraphs 166–7. In paragraph 166, he quotes at length from an article, "The Chechen Tragedy – The Reality and the Required Role," that Dr. al-Johani published in Al Jazeera on January 15, 2000. Kohlmann, who does not speak or read Arabic fluently, provided a citation to an Internet link (its URL is strangely repeated twice in two of his footnotes) to the newspaper, which is no longer functioning, and a bates stamp to the Arabic version of this article.[641] However, the plaintiffs provided their own English translation of selected excerpts with passages in bold script for emphasis from the Arabic in the discovery material.[642] The English translation follows immediately the Arabic version. Kohlmann's translation is different from the plaintiffs' translation. The first long quote in his paragraph is simply Dr. al-Johani's recapping the history of the Chechen tragedy and praising the Chechen mujahedin who fought Russian aggression and "deserve our support, prayers, and all of our energies to support them so that they would defeat the enemy again."[643] Does this mean that WAMY sent military aid to the Chechen mujahedin, as the quote implies?

Dr. al-Johani went on to list what WAMY actually did in support of the Chechens, which consisted of setting up a Youth Committee to distribute aid and dawa and then to send in two convoys of aid to the Chechen people.

1. The dispatch of two containers of 20 tons each, containing foodstuffs, clothing, blankets and medical supplies for the Chechen refugees.

2. The purchase of two ambulances to transfer the wounded to hospitals.

3. Distribution of foodstuffs, clothing and blankets to Chechen refugees.

4. Implementation of the fast-breaking project for the Chechen refugees.

5. Defining places for the refugees, determining an aid program for them and studying their needs.

---

[641] Kohlmann report, FN 242 and FN 243, at 50. The citation is to FEC-PEC0233836–43.
[642] FED-PEC0233844–51.
[643] Kohlmann report, paragraph 166, at 50.

6. Conducting Da'awa and media activities to teach people about the Chechen issue.

7. Participation in programs about aid to Chechnya on the satellite station Iqra.

8. Implementation of mail campaign in the Riyadh area to explain the Chechen tragedy.

9. Dispatch of more than twenty tons of dates for the Chechen refugees.

10. Holding a press conference on the state of the Chechen refugees.

11. Participation in several radio and television programs, interviews in the press and lectures to explain this important issue.[644]

WAMY also did more of the same in cooperation with other charities. As Dr. al-Johani summarized, "All of our aid program to the Chechen people, which is the program of the Joint Saudi Committee for Aid to Kosovo and Chechnya, is expressed in four fields: administrative programs, media coverage, field visits, implementation of diverse aid programs."[645] What is missing from this long list is military aid to the mujahedin. By omitting the full quote from al-Johani's article, Kohlmann again gives the impression that WAMY had sent military aid to Chechen fighters.

Kohlmann goes on to provide a second lengthy quote from Dr. al-Johani's article:

"The question that arises is: What do the Chechen Muslims need from us today? They need money to buy weapons and gear…. The young children should know their cause. We should motivate them to donate to them and console them as much as we can. The Islamic awakening is growing, praise be to Allah. Perhaps this is what worries the Communist East and the polytheistic West. They fear that they will wake up some day to find the Muslims ordering them to pay the tribute."[646]

This quote sounds very ominous: "money to buy weapons and gear … young children should know their cause. We should motivate them … The Islamic awakening is growing … polytheistic West … fear that they will wake up some day to find the Muslims ordering them to pay the tribute." This last reference implies that Muslim forces will conquer the West and force non-Muslims to pay the Jizya, the tribute that non-Muslim subjects pay to their Muslim conquerors. However, the full version of Dr. al-Johani's article is the following:

"**The question is asked: What do the Chechen Muslim need from us today?**

---

[644] FED-PEC0233848–9.
[645] FED-PEC0233850.
[646] Kohlmann, at 50.

166

1. **They need money to buy arms and ammunition**
2. They need food, cover, medicines and tents.
3. They need preachers and Da'awa material to create Islamic awareness. They are Sunnis and have had Islam hidden from them for almost 70 years and they have adhered to it in difficult circumstances almost like the inquisition. Today, they are yearning to return to its principles.
4. They need us to pray for them in our prayers.
5. **They need praise for their jihad and for their resolve, and that we should halt the tongues which are trying to describe their Jihad as national or that they did not prepare or organize themselves properly.**
6. They need a united Islamic stand, which should start with the individual, on the family level and the nation and homeland as a whole. Every small child must know about this issue and we must encourage them to donate and we will assist them as much as we can with this tragedy. We will reduce our leisure times and will tell our children that this is our nation's minimal contribution of conscience, to those who are being destroyed only because they are Muslim. We will boycott every Russian product and each and every one of us will give part of his income to help them.
7. There is no choice but to let the Islamic voice against the Russian aggression be heard on every plane, official and unofficial, by urging the Islamic countries and people to protest against the Russian government's aggression in every place and to every international organization in the world."[647] (Bold script in the original provided by plaintiffs)

There two quotes are different. As mentioned, Kohlmann does not speak or read Arabic with any type of fluency to be able to translate the passages himself and he certainly does not use the translation that the plaintiffs provided. He completely omits from his two quotes what WAMY actually did and implies that WAMY is providing money to the Chechen mujahedin to buy weapons and gear. Dr. al-Johani does say that the mujahedin need money for weapons and ammunition, but he does not commit his own organization to supply them with money for this purpose. I could not find Kohlmann's last two sentences in his quote in the translation provided

---

[647] FED-PEC0233850–1.

by the plaintiffs. The translation provided states that, in summary, "Al-Juhani proclaims that victory is near because the Islamic reawakening is growing and Russia's situation is less stable."[648] There is nothing about "the Communist East and the polytheistic West" or their "fear that they will wake up some day to find the Muslims ordering them to pay the tribute." I am not sure where Kohlmann got that. But these two passages are again examples of Kohlmann's methodological use of strategic omissions and clever juxtapositions to distort the meaning of the contents of a document.

In paragraph 167, Kohlmann quotes former WAMY president Minister of Islamic Affairs Sheikh al-Sheikh who, in January 2000, sent Dr. al-Johani a note and a check for SR 20,000 for the Muslims in Chechnya. There was no controversial statement in the note. However, in the footnote citing the note, Kohlmann refers to a second document, where Dr. Johani was allegedly "discussing the collection of monetary donations and informing that a WAMY delegation made contact with the fighters."[649] Usually, the juxtaposition of two items without any other comment implies that they are linked: "WAMY's SR 20,000 … WAMY delegation … contact with the fighters." I looked up this second document, and it is an article from February 1995, from the *first* Chechen War, or five years before the donation was made![650] The article described that WAMY had sent a fact-finding delegation to Chechnya, where it visited camps of about half-a-million refugees fleeing the capital Grozny. So, this was about five years before Minister al-Sheikh's donation to the Chechens in the *second* Chechen War. The article further reported that the team had entered Chechnya "through Baku in Azerbaijan. Contact was made with the fighters who gave them gruesome pictures of the dead and the dying in the siege by Russian forces and the inhuman conditions many people are living under."[651]

Right after the quote about Minister al-Sheikh's note, Kohlmann quotes Dr. al- Johani's thank you note to the minister for his generous donation. In the footnote citing this new quote, Kohlmann writes "See also FED-PEC 234930-234931 (WAMY Secretary General Dr. Maneh al-Johani explaining that 'WAMY's office in Chechnya along with other Islamic social

---

[648] FED-PEC0233851.

[649] Kohlmann report, FN 244, at 51. The document is FED-PEC0233243–4.

[650] Mahmood Saberi, "Wamy begins aid campaign for Muslims of Chechnya," *Saudi Gazette*, February 24, 1995, at FED-PEC0234243–4.

[651] FED-PEC0234244.

organizations operating in that country were ordered closed down.').''[652] Again, the implication here is that if WAMY's office in Chechnya was closed down, it must have done something wrong. I looked up this new document and it is an article about Dr. al-Johani describing the situation in Chechnya in November 1999, or two months before the minister's donation.[653] I am not sure how the article relates to the minister's donation at all. In the article, Dr. al-Johani "called on member states of Organization of Islamic Conference (OIC) to sever economic and political relations with Russia to bring it to the negotiating table on the current Chechnya crisis." Russia had imposed a ban on all the flights from OIC countries in a move to close Chechnya's borders. Dr. al-Johani said that the Russian invasion had killed a large number of innocent civilians and displaced half a million Chechens from their own home. "Many men, women and children are held in the open land without shelter, food or medicine. The Russian troops are not allowing relief material to reach these people, who are suffering under bone-chilling winter temperatures, he said. 'The WAMY's office in Chechnya along with other Islamic social organizations operating in that country were ordered close down,' he said." Dr. al-Johani planned to send relief aid to Chechnya through its neighboring countries Azerbaijan and Georgia.[654]

I am not sure what was the purpose of putting irrelevant, out of context, and falsely denigrating comments in footnotes to a laudable attempt to help desperate refugees. The footnotes imply that WAMY was in contact with fighters and that local authorities had closed its local offices. This pattern of twin juxtapositions of unrelated events crafting an ominous development and omissions of critical relevant information that clarifies the meaning of a quote is the hallmark of Kohlmann's methodology throughout his report. All the evidence that Kohlmann can muster for his allegation that WAMY supported the Chechen fighters are egregious distortions of Dr. al-Johani's statements, taken out of context.

In any case, as part II of this report shows, al Qaeda was not in Chechnya during either the first or second round of the Chechen wars. The "Arab Chechens" fighting in Chechnya were under the leadership of Samir al-Suwaylim (ibn Khattab), a rival and competitor of bin Laden. So even had WAMY provided material support to the Chechen mujahedin, and I saw no

---

[652] Kohlmann report, FN 245, at 51.
[653] Shahid Ali Khan, 1999, "WAMY urges OIC to sever ties with Russia over Chechen issue," *Saudi Gazette*, November 11, 1999, at FED-PEC0234930–1.
[654] FED-PEC0234930.

evidence that it did, it would not have flowed to the 9/11 terrorists. In other words, any WAMY support for Chechen mujahedin would not have affected the 9/11 attacks.

Chechnya II had a distant relevance to the 9/11 attacks. Many of the Saudis who later became 9/11 terrorists wanted to go and fight in Chechnya against the Russian invasion of a Muslim land. They believed it was a legitimate jihad in defense of a Muslim land against an infidel invader and sanctioned by a legitimate government. However, as Dr. al-Johani said in the above article, Russia had closed the borders of Chechnya to all and the Saudi volunteers could not join Chechen mujahedin. Disappointed, those who wanted to join the fight never got to Chechnya, went instead to Afghanistan, where some eventually joined in the conspiracy that became the 9/11 attacks.

## H.  WAMY's Alleged Support of Palestinian Terrorist Organizations

Kohlmann alleges that WAMY funded Hamas and the Palestinian Islamic Jihad in paragraphs 178–82.[655] His evidence was that the U.S. Treasury Department designated the charity "Union of Good" as an SDGT on November 12, 2008. According to its press release, Hamas "created the Union of Good in late-2000 … in order to facilitate the transfer of funds to Hamas."[656] Although Kohlmann calls the Union of Good a "subsidiary charity with WAMY officers at the helm," the Treasury press release is completely silent about WAMY. The U.S. Treasury is also careful to clarify its designation of Union of Good as Hamas related but not as al Qaeda related.[657] As soon as the Union of Good was designated, WAMY totally stopped any involvement with this charity.[658] Kohlmann bases his claim that WAMY funds Hamas on the fact that WAMY's Secretary General, first Dr. al-Johani and then Dr. al-Wohaibi, and WAMY Assistant Secretary General Dr. Noorwali sat on the Union of Good board of trustees.[659] Since Kohlmann presents no proof that WAMY funded the Union of Good, he instead stigmatizes these WAMY officers who were also Union of Good trustees.

In the post-9/11 period, there were strong criticisms of Islamic charities in the Western press. Dr. al-Wohaibi protested against these widespread Western attacks on Islamic charities

---

[655] Kohlmann report, at 54–5.
[656] https://www.treasury.gov/press-center/press-releases/Pages/hp1267.aspx.
[657] https://www.treasury.gov/resource-center/terrorist-illicit-finance/Pages/protecting-fto.aspx.
[658] Dr. al-Wohaibi deposition, at 135.
[659] Kohlmann report, paragraph 179, at 54.

and branding them as terrorist organizations. Dr. Noorwali also protested against Western double standards in Palestine. Both Kohlmann and Winer distort an interview given by Dr. Noorwali[660] to imply that he (and WAMY) supported (Palestinian) terrorism.

Kohlmann writes that Dr. Noorwali was "questioning the definition of 'terrorism.'"[661] This is not what Dr. Noorwali said in his interview. He said, "There must be established a world definition of 'terrorism.'"[662] Dr. Noorwali was absolutely right. There still is no accepted definition of terrorism either in academia or international politics.[663] As the saying goes, "one man's terrorist is another's freedom fighter." Dr. Noorwali went on, as Kohlmann quotes him: "People should differentiate between 'self-defense,' which is the correct word for 'Jihad,' and 'terrorism.' Palestinians defending their home and families against the Israeli occupier are not terrorists. There are some extreme attitudes toward Islam in the world that are presented by western media to give a wrong conception of Islamic Jihad."[664] Kohlmann stops at this point.

However, Winer, who also quotes from the same Noorwali interview, picks up the baton and continues, "The word jumps to the world's mind with every single bombing, though most of the time those responsible are not Muslims. The world must know that what terrorist groups are doing is far from the right Islamic path."[665] While Kohlmann ignores Dr. Noorwali's explanation, Winer distorts it. In his interview, Dr. Noorwali's explained, "Jihad in Islam has laws and requirements that only Muslim scholars and authorities have the right to apply, for certain causes which are 'pure self-defense'. No Muslim individual can undertake it as a personal decision, for this is not accepted at all by Islam."[666] Here the astute reader will notice that Dr. Noorwali is explicitly rejecting Sheikh Abdullah Azzam's theory of Jihad as an individual duty, as presented in part II of this report, and therefore explicitly rejecting al Qaeda's ideology, which is built on Azzam's theory. Dr. Noorwali's defense of Palestinians is therefore not indicative of

---

[660] Khouloud Soliman, 2001, "WAMY team in Afghanistan risks life to deliver aid," *Saudi Gazette*, November 20, 2001, at FED-PEC0235725–30.

[661] Kohlmann report, paragraph 182, at 55.

[662] The quote is at FED-PEC0235728.

[663] See Joseph Easson and Alex Schmid, 2013, "250-plus Academic, Governmental and Intergovernmental Definitions of Terrorism," in Alex Schmid, ed., 2013, *The Routledge Handbook of Terrorism Research*, Abington, Oxon: Routledge, at 99–157. The authors give more than 250 definitions of terrorism, showing that there is no accepted definition of terrorism.

[664] Kohlmann report, paragraph 182, at 55.

[665] Winer report, paragraph 12.13.4, at 111.

[666] FED-PEC0235728.

support for al Qaeda, as Kohlmann and Winer imply. In fact, in this interview, Dr. Noorwali implicitly rejects al Qaeda's ideology.

Winer stretches Dr. Noorwali's explanation beyond recognition in a bizarre argument that leads him to adopt false premises ("providing Islamic fighters in Chechnya and elsewhere during that period: First, funding for weapons to fight with…"[667]), shows his lack of understanding of the definitional problem of the concept of terrorism, and makes him jump to an erroneous conclusion based on his own false premises: "I assess that this merger of 'self-defense' into 'terrorism' is what happened with WAMY's operations in the field, as it acted as the 'mother' of organizations such as IIRO and Benevolence [I assume that Winer means al-Birr, which perpetuates the confusion between BIF and LBI] and others who provided ongoing direct support to al Qaeda."[668]

In effect, neither Kohlmann nor Winer present any evidence that WAMY funded Hamas or the Palestinian Islamic Jihad. They just distort the meaning of Dr. Noorwali's words to imply that WAMY funded Palestinian terrorists. What is surprising is that it was Kohlmann and Winer among the plaintiffs' experts who made this charge, because they are not experts on Hamas. Another of the plaintiffs' experts, Matthew Levitt, promotes himself as an expert on Hamas and has written a controversial book on this organization. In his report, Levitt wisely refrains from linking WAMY, Hamas, and al Qaeda. This absence of a link between Palestinian and al Qaeda fund raising was explicitly noted by the 9/11 Commission Staff on Terrorist Financing. "[C]ontrary to some public reports, we have not seen substantial evidence that al Qaeda shares a fund-raising infrastructure in the United States with Hamas, Hezbollah, or Palestinian Islamic Jihad. None of the witnesses we interviewed, including the FBI's leading authorities on terrorist financing generally and its expert on Palestinian extremist fund-raising specifically, reported evidence of this overlap, although supporters of Palestinian extremist groups travel in the same general circles as suspected al Qaeda supporters and have some contact with them. In fact, there is far more evidence of fund-raising collaboration between Hamas and Hezbollah than between either of these groups and al Qaeda, according to the FBI official responsible for tracking these group's funding."[669]

---

[667] Winer report, paragraph 12.13.5, at 111.
[668] Winer report, paragraph 12.13.5, at 111–2.
[669] Roth, Greenburg, and Wille, 2004, at 24.

In any case, as Kohlmann pointed out, the Union of Good only received money from the outside world to fund Palestinian projects. It did not fund non-Palestinian organizations like al Qaeda. Any money sent to the Union of Good, which was designated SDGT in 2008 (seven years after 9/11), would not have flowed to al Qaeda or the 9/11 terrorists. Each Middle Eastern terrorist organization is unique: lumping them together demonstrates a lack of understanding for them. This allegation that WAMY funded Palestinian organizations is not relevant to the 9/11 attacks, which are the subject of the present case.

## I.  WAMY–US/ WAMY USA's Alleged Support of Terrorism

In paragraph 173 of his report, Kohlmann writes, "[t]here are numerous other connections linking WAMY to international terrorist organizations and terrorist financing. In fact, the U.S. branch of WAMY was incorporated in 1992 by Usama bin Laden's own nephew Abdullah in Falls Church, Virginia."[670] However, Kohlmann makes no other allegation except for the fact that the head of WAMY–US was a half-nephew of al Qaeda's leader. There is not even an allegation on how WAMY–US spent its money, just that all its funding came from WAMY Saudi Arabia. So, I take it that the link between WAMY to international terrorism was just a family link–guilt by association, or more precisely guilt by family. There is no allegation that Abdullah Binladin (this is how he spells his name) was a terrorist, linked to al Qaeda, or linked to the 9/11 terrorists.

The 9/11 Commission failed to find evidence of American funds for al Qaeda: "there is little hard evidence of substantial funds from the United States actually going to al Qaeda. A CIA expert on al Qaeda financing believes that any money coming out of the United States for al Qaeda is 'minuscule.' Domestic law enforcement officials, acknowledging the possibility of schemes that they have not identified, generally state it is impossible to know how much, if any, funding al Qaeda receives out of the United States. These officials agree that any funds al Qaeda raises in the United States amount to much less than is raised by other terrorist groups, such as Hamas and Hezbollah, and that the United States is not a primary source of al Qaeda funding."[671]

In his sworn declaration, Abdullah Binladin stated that his mother was one of the 54 children of bin Laden's father, making her Osama bin Laden's half-sister. Abdullah was

---

[670] Kohlmann report, at 52.
[671] Roth, Greenburg, and Wille, 2004, at 24.

173

therefore one of Osama's numerous half-nephews. He had not seen his half-uncle since approximately 1990. In 1991, while he was working as an administrative officer at the Saudi Arabian Embassy in Washington, he established WAMY–US, a Virginia non-profit corporation with its office in northern Virginia. He worked for WAMY–US as a volunteer and represented WAMY at various events. He swore that he never provided support of any nature whatsoever to al Qaeda or any other terrorist organization. To his knowledge, during the period he was involved with WAMY–US, that organization had no dealing or association with and provided no support to al Qaeda or any other terrorist organization. In the 1990s, three FBI agents interviewed him regarding his family's ties to his uncle Osama. He cooperated fully with them and the U.S. government never took any actions against him or WAMY–US when he was associated with it. He returned to Saudi Arabia in late 2000 and WAMY appointed a successor for WAMY–US. He concluded, "I have never provided support to any terrorist, terrorist group, or terrorist activity. I was appalled by the horrific events of September 11, 2001 and I reject and condemn such violence."[672]

Binladin's successor was Dr. Ibrahim Abdullah, who was a Saudi student in the Washington, D.C. area and had encountered Binladin as a student. When he came back to the United States to study for his Ph.D. in Information Technology at George Mason University in 1999, Binladin asked him to take over his position as a WAMY USA (he called it differently than Binladin) representative. He accepted the offer. He volunteered for WAMY (he has always been a volunteer even later as a director and was never compensated for his work) and came to the office once a month to develop its website. After three months, he took over as director of WAMY USA, a position he held from 1999 to 2004. During his tenure, the management of WAMY USA was vested in a Board of Directors, who were mostly students. Although WAMY USA already had bank accounts, it had no funds, no employees and no activities. It took Dr. Abdullah about four months to get the office running. He started receiving all his funds from WAMY headquarters in Saudi Arabia, hired a secretary, and got some projects going. He denied that WAMY camps, which were part of his projects, promoted any sort of violence. He got his Ph.D. in 2004 and two days before his scheduled departure back to Saudi Arabia, around late June or early July 2004, he was arrested on an alleged visa violation that he was receiving money

---

[672] *In re Terrorist Attacks on September 11, 2001*, S.D.N.Y., No. 03 MDL 1570 (RCC), Affidavit of Abdullah Awad Binladin, November 19, 2005.

from WAMY while on a student visa. He denied that WAMY ever paid him as he was a volunteer. His lawyer advised him to plead guilty in order to expedite his departure, which he did and left the country soon afterward. A few days after his arrest, the WAMY USA office was raided.[673]

### 1. WAMY USA Links with Anwar al-Awlaki and to the 9/11 Terrorists

Kohlmann alleges that WAMY USA was connected to the 9/11 terrorists through Anwar al-Awlaki, the imam of the Dar al-Hijrah Mosque in northern Virginia. Kohlmann calls al-Awlaki a senior member of al Qaeda in the Arabian Peninsula (AQAP) and the "spiritual mentor" of no less than five 9/11 terrorists: Nawaf al-Hazmi, Khalid al-Midhar, Hani Hanjour, Ahmed al-Ghamdi, and Majed Moqed.[674]

To put these allegations in context, it is important first to summarize al-Awlaki's life history. Anwar al-Awlaki was born in 1971 in New Mexico where his father was a graduate student at the time. His family returned to Yemen six years later, and al-Awlaki spent the next thirteen years in Sanaa. He graduated from Yemen's only private school in 1989. He did not come from a religious family and was not religious growing up. After a year teaching, he got a scholarship to study hydrology at Colorado State University where he studied for four years, from 1990 to 1994, when he got his B.S. in civil engineering. However, during his first winter break, he met someone from the Tablighi Jamaat, became more religious and was elected president of the school's Muslim Student Association for two years. He became politically conscious during the first Gulf War, when the United States military started bombing Baghdad in January 1991. He was also inspired by the jihad in Afghanistan. During the winter break of his sophomore year, he went to Afghanistan to join the fight, but he was disappointed as he did "nothing." He married a distant cousin in the summer of 1994 and started working at an engineering firm in Denver. However, his heart was not in hydrology but in Islam and he got a part time job as an imam at the Al-Noor Mosque in Denver. In 1996, his reputation for preaching grew and the Al-Ribat Mosque in San Diego hired him as its head imam. He was a Salafi but not yet a neo-jihadi. He started taping his lectures on the "Life of the Prophet" in 2000 and his lectures became very popular among Muslims, who tried to learn about their religion. His

---

[673] *In re Terrorist Attacks on September 11, 2001*, S.D.N.Y., No. 03 MDL 1570 (RCC), Declaration of Ibrahim Sulayman Abdullah, March 2, 2019, henceforth Abdullah declaration II.
[674] Kohlmann report, paragraph 186, at 56.

lectures were fairly straight forward, with a Salafi bent to them. As the other mosque in the city was quite liberal, most Islamist militants in San Diego came to pray at this mosque. Given his contacts with suspected militants, the FBI opened an investigation on him in 1999 but closed the inquiry the next year. He was arrested twice for soliciting (prostitution) in San Diego. During his last year in San Diego, Nawaf al-Hazmi and Khalid al-Midhar came to worship at his mosque. It seems a stretch to call him their "spiritual mentor," as he seldom met at length with them. However, he was the spiritual mentor of the overall mosque.[675]

In 2000, al Awlaki got accepted into a doctorate program at the George Washington University, which coincided with a job offer as an imam at the Dar Al-Hijrah Mosque in Falls Church, Virginia. He accepted both offers, left San Diego in June for an extended stay in Yemen and Saudi Arabia and arrived in Virginia in January 2001 to start his job.[676] This job would later lead to a lot of speculations, including Kohlmann's. As journalist Scott Shane accurately wrote, "Later the mosque would have to fend off hyperventilating accusations of guilt by association with terrorists, notably Awlaki himself, and would be given a scurrilous label in the right-wing media, 'the 9/11 mosque.' Given that subsequent history, the motive of Dar Al-Hijrah leaders when they offered Awlaki a job as imam at the end of 2000 was more than a little ironic: they hired him specifically because they were worried about the dangers of radicalization. They feared that Dar Al-Hijrah, in suburban Falls Church, Virginia, was losing young people to a nearby, more overtly militant storefront mosque … Dar al Arqam [where] a charismatic bioscientist named Ali al-Timimi was drawing young people with a hard line: [no voting, no serving in the military]."[677] Dar Al-Hijrah was far more accommodating and wanted to keep young Muslims from drifting to Dar al Arqam. In 2001, by all reliable accounts, al-Awlaki was a Salafi but not yet a neo-jihadi.

---

[675] See the twelve volume FBI file on Anwar al-Awlaki (spelled Aulaqi in the FBI file), available at https://vault.fbi.gov/anwar-nasser-aulaqi. See also Scott Shane, 2015, *Objective Troy: A Terrorist, a President, and the Rise of the Drone*, New York: Tim Duggan Books, at 47–65.

[676] Shane, 2015, at 64–5. Al-Awlaki gave the same timeline to the FBI SA Wade Ammerman, who interviewed him on September 15, 17, and 19, 2001. See the FBI 302 on these three interviews in his file.

[677] Shane, 2015, at 64. To compound the irony further, since the mosque is one of the largest one in the region and in the vicinity of the Central Intelligence Agency, a lot of Muslim CIA officers, whom I know, also prayed there.

After the 9/11 attacks, al-Awlaki emailed his younger brother about the attacks: "I personally think it was horrible. I am very upset about it." When the FBI came to interview him on September 15, he "stated that he absolutely 'strongly condemns the attacks'."[678] When the FBI returned two days later with photographs, he recognized Nawaf al-Hazmi from San Diego but not the others.[679] The FBI file later revealed that one of the mosque regulars remembered that al-Hazmi and another 9/11 terrorist, Hani Hanjour, had come to the mosque earlier that summer to ask whether al-Awlaki could help them find an apartment. The FBI started a second full field investigation on al-Awlaki and conducted electronic (emails and telephone) and physical surveillance on him starting September 26, 2001 and continuing until he left the United States at the end of March 2002. As al-Awlaki was articulate, he became the focus of many media interviews and appeared on multiple television channels. His sermons from that period were taped (and monitored by the FBI) and some are still available on the Internet. I listened to some of his early lectures dating from 2000 to 2002: they have a Salafi bent and start with stories from either the Quran, the hadith, or the lives of his companions. Al-Awlaki advocated a type of moral equivalence that disturbed many Americans: he simultaneously condemned the terrorist attacks on the United States, which killed 3,000 innocent Americans and the U.S. attacks on Muslims, which also killed many innocent Muslims. He saw himself as a bridge between Muslims and non-Muslims.[680]

Al-Awlaki became one of the most sought-after Muslim speakers in the country. In July 2001, he preached at the regular Friday Muslim prayer at the U.S. Capitol and in February 2002, he spoke at the Pentagon. No one was scandalized by his lectures.[681] He was constantly on the move, as he told the FBI. "Over the past six months, Aulaqi has traveled quite extensively. In mid-August [2001], he took a three-week trip to Sanaa… For the past three weeks, Aulaqi traveled every weekend. Over the weekend of 9/1/01, he traveled to Chicago to attend the Islamic Society of America Conference [His lecture there was "Tolerance: A Hallmark of Muslim Character."[682]]. He was also in the United Kingdom on the weekend of 8/25/01, and last

---

[678] FBI 302 of Aulaqi, dated 9/15/2001, at 2.

[679] FBI 302 of Aulaqi, dated 9/17/2001, at 1–2.

[680] Shane, 2015, at 82–105.

[681] Shane, 2015, at 99, 101–2.

[682] Shane, 2015, at 99.

weekend, 9/9/01 he spoke in San Diego at a conference … organized by the Muslim Student Association."[683]

In March 2002, a multi-agency task force conducted Operation Green Quest over a two-day period in northern Virginia raiding Muslim institutions, businesses and homes. In one home, federal agents handcuffed the wife and daughter of a prominent Muslim leader at gunpoint and held them for four hours, not allowing them to get their head scarves. Al-Awlaki reacted in his next sermon: "So this is not now a war on terrorism…. This is a war against Muslims… it is happening here in America, that is claiming to be fighting this war for the sake of freedom while it's infringing on the freedom of its own citizens–because they're Muslim, for no other reasons." But instead of a violent response to this provocation, al-Awlaki advocated a civil right struggle for Muslims to stand for their rights against government intervention: "there are no rights unless there is struggle for those rights. And the history of America in that sense is very clear. African Americans in this country had to go through a struggle. Their rights were not handed to them."[684]

So, even though Kohlmann tries to build a case against WAMY USA through guilt by association, his various attributes of al-Awlaki up to the 9/11 terrorist attacks do not stand up to scrutiny. Al-Awlaki later became a leader of AQAP, but this probably happened around 2008, about seven years after the 9/11 attacks. As far as being a "spiritual mentor" to five 9/11 terrorists, "[t]he label that later came to be paired with Awlaki's name–'spiritual advisor' to one [al-Hazmi] or both [and al-Midhar] future hijackers–appears in early FBI documents but seems to be based on nothing more specific than the vague recollections of worshippers who thought they had seen the men, or at least Hazmi, in the imam's office."[685] I have not seen any evidence of al-Awlaki interacting with either Ahmed al-Ghamdi or Majed Moqed, and Kohlmann does not provide any in this report. Al-Awlaki seems to have had a close association with WAMY USA for a few months when he was the imam of Dar Al-Hijrah, which was located about seven minutes away from the WAMY USA office. WAMY may have distributed his early sermons, but they were not radical, extreme, or neo-jihadi. In fact, I learned a lot from them when I listened to them. He only started having controversial lectures when he released *Constants on the Path of Jihad* four years later from Yemen. WAMY invited him to lecture at several WAMY USA

---

[683] FBI 302 of Aulaqi, dated 9/15/2001, at 1–2.
[684] Quoted in Shane, 2015, at 104, 118.
[685] Shane, 2015: 114.

camps, but he probably only lectured at local ones. He certainly did not lecture at the summer 2002 camps in Texas referred to in Kohlmann's report because he was already out of the country as he left in March 2002.[686] At the same time, he spoke on national television, the U.S. Congress, and the Pentagon, none of which are known to be hotbeds of radicalism. Being a prominent preacher and within minutes of WAMY USA, he did coordinate some activities with WAMY USA like meeting with a visiting scholar,[687] but there was nothing wrong with that.

When al-Awlaki was in the United States, until his departure, he had no links to terrorism at all. As mentioned, right after the 9/11 attacks, the FBI became suspicious of him again and opened a full field investigation that filled 12 volumes and more than 6,000 pages. They surveilled him every day, physically and electronically, and listened to his phone conversations. Yet, they could not build a case against him. However, during their surveillance they discovered that he regularly used escort services in Virginia and the District of Columbia. They tried to build a criminal case against him for crossing state lines to hire the services of prostitutes, but it was so weak that the prosecutors turned it down. They also discovered that he had lied when he came to the United States in 1990 by claiming that he was born in Yemen in order to hold onto his college scholarship. He applied for a social security card with this false place of birth and got a U.S. passport with this social security card in 1993. This type of passport fraud had a ten-year statute of limitation. So, a warrant for his arrest was issued in June 2002 in Colorado. However, when the prosecutor found out that al-Awlaki had corrected this false information when he sought a replacement for his social security card in 1996, he withdrew the warrant. More than a decade after these events, the FBI was unequivocal: "Extensive investigation by the FBI has not developed any evidence that Awlaki had advance knowledge of or any involvement in the 9/11 attacks, nor has the FBI developed evidence that he knowingly provided support to any hijacker in furtherance of that plot."[688] Kohlmann's quote from President Barak Obama at the end of

---

[686] Kohlmann, in FN 280, at 56, is referring to WAMYSA030079 – 81. Al-Awlaki was invited in May 2002 to give lectures at these camps in July 2002 after he had already left the United States in March 2002.

[687] WAMY SA 1519. I believe Dr. Abdullah in his deposition, gives the wrong date for this note. See Dr. Ibrahim Abdullah's Deposition Transcript (henceforth Dr. Abdullah deposition), October 21, 2019, at 67. It cannot be about 2000 because al-Awlaki was still in San Diego until June and in Yemen for the rest of his time. The note was written in 2001, after al-Awlaki came to Virginia and became one of the imams of Dar Al-Hijrah.

[688] Shane, 2015, at 106–25, the quote is at 113.

paragraph was about al-Awlaki *after* he had joined al Qaeda in the Arabian Peninsula, or about him after 2008, seven years after the 9/11 attacks. It did not pertain to al-Awlaki in 2001, which is the time period at issue in the present litigation.

Had Kohlmann again applied the "comparative analysis" he claims to use, he would have compared al-Awlaki to other people involved in the 9/11 plot: KSM, Ramzi bin al-Shibh, Mustafa al-Hawsawi, Ali Abd al-Aziz Ali (Ammar al-Baluchi), and Walid bin Attash (Khallad) or even people who knew about it: Said Bahaji and Zakariya Essabar. All seven of them have something in common: they all went to Afghanistan days before the attack after they were warned about it. Al-Awlaki, on the other, stayed put and did not leave the country. This is a strong indicator that he did not know anything about it and was not involved as the FBI realized. Six months later, he did flee the United States, but for a totally different reason. He had just discovered from one of the escort services he used that FBI agents regularly interviewed it about all the prostitutes he had hired and had a whole file on him. Realizing that it would completely destroy his reputation as an imam, he fled the country almost immediately to escape the scandal.[689]

Kohlmann's allegation that WAMY supported the 9/11 terrorist through its link with Anwar al-Awlaki is based on guilt by association compounded by anachronism, projecting backward to 2001 al-Awlaki's 2009–11 involvement with AQAP. Although AQAP has the name al Qaeda in it, it is a different organization from al Qaeda and was only created in its final version, the one that al-Awlaki was associated with, in January 2009 from the merger of two branches of the remains of Saudi and Yemeni neo-jihadis,[690] more than *seven* years after the 9/11 attacks.

### J.  WAMY Canada Alleged Funding of Terrorism

Three plaintiffs' experts allege that WAMY funded terrorism through its Canadian office, WAMY Canada. They all refer to the same document, namely the Canadian Revenue Agency's (CRA) audit of WAMY Canada.[691] Their allegations are similar: a) WAMY Canada had

---

[689] Shane, 2015, at 106–9, 116–21. His FBI file is full of details of his sexual escapades, almost every other week, on December 13, 2001; January 8 and 18, 2002; February 4, 2002…

[690] Shane, 2015, at 31, 40.

[691] Levitt report, at 29; Winer report, paragraph 12.12.12, at 108; Kohlmann report, paragraphs 190–4, at 57–8. The document they are referring to is the CRA's audit of WAMY dated August

significant financial irregularities and deficient accounting practices;[692] b) WAMY (Saudi Arabia) maintained substantial control over WAMY Canada, which was of concern because of adverse reporting on WAMY (Saudi Arabia) providing support to terrorist organizations;[693] c) WAMY Canada was closely associated with BIF Canada and BIF USA, in that it shared a common bank account and a common director (WAMY Canada and BIF Canada);[694] d) WAMY (unspecified, but I suspect that they meant WAMY Canada) provided funds to BIF USA and/or BIF Canada, which "provided resources to entities engaged in terrorist activities";[695] and e) WAMY Canada distributed "literature and other material produced by WAMY Saudi Arabia which 'in our view, appears to promote intolerance of, and/or advocate violence against, non-Muslims and/or the use of violence as a means to bring about political or societal change.'"[696]

Before dealing with these allegations, let us first put them in context. WAMY Canada's first director, Mohammed al-Khatib declared that WAMY USA director Binladin had approached him to represent WAMY USA in Canada, to which al-Khatib agreed around 1997.[697] WAMY Canada was incorporated on December 10, 1997.[698] Al-Khatib applied for income tax registration for Canadian charities on June 7, 1998, listing his home address as the WAMY Canada's address.[699] WAMY Canada was registered with CRA as a charity for tax exempt status

---

23, 2011 (Winer has the wrong date in his FN 209) which is an audit of WAMY (Canada) from January 1, 2000 to December 31, 2003 (Kohlmann in paragraph 191 has the wrong terminal date); its accompanying letter dated January 5, 2012; and appendix A, stating the relevant provisions of the Income Tax Act. It is present in multiple places in the discovery material, and Kohlmann refers specifically to FED-PEC0218179–203. I use PEC-WAMY031447–68 because it appears to be the CRA's own file on WAMY Canada (PEC-WAMY030839–1430, PEC-WAMY031431–611) and contains copies of what the CRA used as evidence for its claims.

[692] Kohlmann report, paragraph 191, at 57–8. In this paragraph, Kohlmann wrote that the CRA audit was from January 1, 2000 to December 31, 2000, it was to December 31, 2003. See CRA Audit, at 1 (PEC-WAMY031447).

[693] Kohlmann report, paragraph 192, at 58; Levitt report, at 29.

[694] Kohlmann report, paragraph 193, at 58; Levitt report, at 29, which adds that BIF was on the U.N.'s list of entities tied to al Qaeda; Winer, paragraph 12.12.12., at 108, which adds that the Canadian and USA branches of BIF also shared a common director, Arnaout, who had pled guilty to racketeering charges in the U.S. for providing financial assistance to individuals engaged in violent activities overseas.

[695] Kohlmann report, paragraphs 190, 193, at 57–8; Winer, paragraph 12.12.12, at 108.

[696] Kohlmann report, paragraph 194, at 58.

[697] Declaration of Mohammed al-Khatib, March 29, 2018, henceforth Khatib declaration, at 1.

[698] WAMYSA057575–9.

[699] WAMYSA057580–1.

on February 28, 2000 effective for January 1, 1999.[700] WAMY Canada started running in 1997, organizing annual camps for boys and girls, basketball tournaments, and Umra (pilgrimage) trips to Saudi Arabia for the youth, and its annual operating budget was approximately $10,000 to $15,000.[701] WAMY Canada was a one-person (al-Khatib) show by an unpaid volunteer.[702] It came under the umbrella of WAMY USA, which received the comprehensive budget for North America operations from WAMY Saudi Arabia. WAMY USA then divided the funds according to the budget and operations of both WAMY USA and WAMY Canada. WAMY Canada submitted project proposals to WAMY USA, which forwarded the large ones to WAMY Saudi Arabia. If the projects were small, WAMY USA would approve them and fund them directly. It also funded directly WAMY Canada' operating expenses. If the projects were large, WAMY USA would send the proposals to Riyadh for approval by WAMY Saudi Arabia. The only source of funds for WAMY Canada was from WAMY USA or WAMY Saudi Arabia.[703]

Apparently, there was tension between the two North American branches of WAMY as al-Khatib failed to provide the required financial reports to Binladin, who stopped sending al-Khatib any funds.[704] Al-Khatib tried to bypass Binladin by appealing directly to WAMY's Assistant Secretary General, on April 3, 1999, to come directly under WAMY Saudi Arabia. However, the Assistant Secretary General notified Binladin on April 16, 1999, that he did not want such change and asked Binladin to take care of the situation.[705] Binladin fired al-Khatib in the spring of 1999 for failing to provide the required financial reporting.[706]

When Dr. Abdullah took over WAMY USA, he resurrected WAMY Canada. He contacted al-Khatib in the spring of 2000 to revive WAMY Canada under his leadership, to which al-Khatib once again agreed. At his deposition, Dr. Abdullah explained that al-Khatib had a good reputation in Canada and was effective in organizing youth camps. Dr. Abdullah therefore had decided to give al-Khatib a second chance. Dr. Abdullah sent him his operating budget for 2000, an amount not specified but probably in the vicinity of about $12,000, but al-

---

[700] WAMYSA057559.

[701] Khatib declaration, at 1–2; WAMY Intl E000078 (Dr. Abdullah Deposition Exhibit 292); Abdullah deposition, at 147, 151–2, 161–2.

[702] Abdullah deposition, at 154.

[703] Abdullah declaration II, at 5–7; Dr. Abdullah deposition, at 123–32.

[704] Khatib declaration, at 1–2.

[705] WAMY SA 4484.

[706] Khatib declaration, at 1; Dr. Abdullah deposition, at 150.

182

Khatib failed to report back on his activities and expenses. Dr. Abdullah suspended any payment to WAMY Canada in mid-2000 until further notice. In early March 2001, Dr. Abdullah learned that while al-Khatib was volunteering for WAMY, he was an employee of the Muslim World League. This was an unacceptable conflict of interest and Dr. Abdullah called al-Khatib and confronted him with this information, which al-Khatib confirmed. Dr. Abdullah sent him a letter on March 17, 2001 asking him to resign as director of WAMY Canada, which al-Khatib did on March 20, 2001.[707]

In a letter to WAMY Assistant Secretary General Dr. Babaer dated April 19, 2001 but faxed a day later, Dr. Abdullah explained that "al Khatib has submitted his resignation because he is busy representing 4 Muslim organizations simultaneously, leading to duplicity resulting in a bad reputation for the Assembly [WAMY] in Canada because he attended each event under a different title. We have received complaints to that effect which we have verified. Last year, Brother Mohammed al Khatib presented only one event which the Assembly [WAMY Canada] participated in poorly despite the high cost of US $3000, for which he submitted a flimsy report. Over the last years, Brother Mohammed was working under the supervision of America office [WAMY USA] and his performance was not satisfactory, and was previously dismissed from representing the Assembly [WAMY] by Brother Abdullah Binladen, and I personally interfered to reinstate him in the office, but his performance has not improved…. Please be informed that the resignation of Brother Mohammed al Khatib was finalized amicably and cooperatively because he is a praiseworthy man… he did not delay delivering what was in his possession in the form of finances and accounts to Brother Talhah al Jarad."[708]

Immediately after al-Khatib's termination, Dr. Abdullah hired Talhah al-Jarad as the new director for WAMY Canada, who declared: "When I began as executive director of WAMY Canada, I asked that the prior executive director, Mr. Al Khatib, close all of the existing bank accounts. I did not know what accounts he had or where they were. This was simply my preference starting as the new executive director. I wanted to start with a clean slate. He told me

---

[707] Khatib declaration, 1–4; Abdullah declaration II, at 6–7; Dr. Abdullah deposition, at 158–68; Declaration of Ibrahim Sulayman Abdullah, dated March 29, 2018 (Abdullah declaration I), at 5; al-Khatib's letter of resignation at WAMYSA9978.

[708] WAMYSA9972. The date in the translated document, 26/6/1420 Hijri, is inaccurate. The Arabic document clearly shows a date of 24/1/1422, which corresponds to April 19, 2001.

he would take care of this. He also told me there was only a few hundred dollars left in the accounts and that they would be used to cover any remaining expenses."[709]

No one in the United States or in Saudi Arabia was aware of the problem with BIF until the CRA audit of WAMY Canada in 2011. Dr. Binladin's declaration from 2005 does not mention it. Dr. Abdullah testified that he learned that al-Khatib was receiving and raising money on behalf of BIF when he was preparing for his deposition.[710] His first declaration, dated March 29, 2018, stated, "[w]hile at WAMY USA, I was un-aware that Mohamad Al Khatib had deposited non-WAMY funds into WAMY Canada's accounts. I was not aware that he was also representative of BIF. I was equally unaware that he had opened sub-accounts for other organizations under WAMY Canada's bank accounts. I discovered this in this litigation."[711] After al-Jarad took over as director for WAMY Canada in the spring of 2001, Dr. Abdullah resumed funding WAMY Canada under this new leadership until he left to return to Saudi Arabia in 2004.

Unbeknownst to any one at either WAMY USA or WAMY Saudi Arabia, al-Khatib had also started to work as the director of a new charitable foundation that he established, BIF Canada. He had met Enaam Arnaout at a conference and Arnaout had told him that he was the head of the Benevolence International Foundation (Monathamat al-Birr al-Dawalia) registered in Chicago as a charitable organization raising funds for orphans worldwide, particularly Kashmir, Chechnya, and Bosnia. Arnaout wanted to expand BIF operations into Canada and specifically asked al-Khatib's assistance with fundraising efforts for orphans through BIF. Al-Khatib agreed and started the process of registering BIF Canada as a non-profit organization in 2000. He used his home address to register BIF Canada as he had used it with WAMY Canada. He never notified WAMY either in the U.S. or Saudi Arabia that he had done so and that now the two organizations shared the same address. BIF hired him as the head of its Canadian office on a part time basis for which he earned $8,000 to $9,000 a year. Arnaout also hired someone else in Toronto to help al-Khatib. Al-Khatib declared that he did not inform WAMY because he did not believe it was necessary as he was only a volunteer for WAMY Canada and not an employee. He

---

[709] Declaration of Talhah al-Jarad, March 2, 2019 (henceforth Jarad declaration), at 3.
[710] Dr. Abdullah deposition, at 169.
[711] Abdullah declaration I, at 6.

also did not believe that his work with BIF would affect or interfere with any of his work for WAMY Canada.[712]

Again without notifying anyone at WAMY either in the U.S. or Saudi Arabia, al-Khatib had temporarily used WAMY Canada's charitable organization designation for BIF until BIF Canada was designated a charity and, on October 24, 2000, opened a subsidiary account for BIF at the Bank of Montreal under the name "World Assembly of Muslim Youth o/a BIF."[713] Despite its name, this account was dedicated strictly for BIF and BIF Canada funds never commingled with WAMY Canada funds. He used WAMY's name so that donors to BIF could get a tax deduction before BIF Canada received its charitable status. BIF Canada was not yet a charity. This apparent deception had nothing to do with allegations of terrorism but was intended to allow donors to benefit from tax exempt status. After WAMY found out about al-Khatib's employment with the Muslim World League, he was forced to resign on March 17, 2001. In the process of leaving WAMY Canada, he transferred all BIF funds out of the Bank of Montreal account. This included all funds raised for BIF Canada and all funds sent from BIF USA to BIF Canada. The funds transferred back to BIF included approximately $50,200 that had been received into that account in a wire transfer about March 20, 2001.[714] This money was not WAMY funds but BIF funds for orphan projects that had been stored in the BIF account deceptively named "World Assembly of Muslim Youth o/a BIF." When al-Jarad replaced him, WAMY Canada wanted a clean cut between the two executive directors and all accounts that al-Khatib had opened were closed (he closed the Bank of Montreal account on June 12, 2001[715]) while al-Jarad opened new accounts.[716] Al-Jarad declared that al-Khatib told him that he was the director of BIF Canada, which raised money in Canada to buy shoes for needy orphans.[717] Now, let's proceed to the allegations.

### 1. WAMY Canada's Financial Irregularities and Deficient Accounting

---

[712] Khatib declaration, at 1–2.

[713] PEC-WAMY031590.

[714] See the wire transfer for $50,293.13 on March 20, 2001, at WAMY SA 001885 (Exhibit 294, Dr. Abdullah deposition).

[715] PEC-WAMY031591.

[716] Khatib declaration, at 2–4.

[717] Jarad declaration, at 4. He did not specify when he learned about al Khatib's involvement with BIF, but it seems that he did so after al Khatib was fired and al Jarad became director of WAMY Canada.

185

These allegations were true and bothered WAMY USA and WAMY Saudi Arabia just as they bothered the CRA in its audit of WAMY Canada. They reflect the shortcomings of al-Khatib as director of WAMY Canada. In fact, WAMY took action against these shortcomings eleven years before the CRA. They were a long enduring source of frustration for WAMY USA and WAMY Saudi Arabia, which, at the time, were not even aware of his involvement with other charities such as BIF and MWL. When WAMY USA found out about his involvement with MWL, creating an obvious conflict of interest, it notified WAMY Saudi Arabia and, with the parent organization's approval, immediately forced al-Khatib to resign from WAMY Canada in March 2001. WAMY Canada's financial irregularities and deficient accounting were not endemic to the Canadian organization because they disappeared as soon as al-Jarad replaced al-Khatib. Al-Jarad performed very well at his volunteer job as director of WAMY Canada until he moved on two years later. In any case, these irregularities are not tied to any allegations of supporting terrorist organization, al Qaeda or the 9/11 terrorists. WAMY took action against people who did not comply with its reporting mechanism and acted alone, as it did with the respective dismissals of Batterjee in 1993 and al-Khatib in 2001.

## 2.  WAMY KSA Control of WAMY Canada Concerning Adverse Reporting

Both Kohlmann and Levitt paraphrase the CRA Audit section on the relationship between WAMY [Canada] & WAMY (Saudi Arabia). I believe the CRA Audit is confused and did not take into consideration that there was a WAMY USA intermediary between WAMY Canada and WAMY Saudi Arabia, as described in the previous section. WAMY USA provided WAMY Canada's operational funds, not WAMY Saudi Arabia as the CRA Audit believes. The larger projects were funded directly by WAMY Saudi Arabia after their approval by WAMY North American Committee dominated by WAMY USA. When al-Khatib (director of WAMY Canada) tried to go directly to WAMY Saudi Arabia and bypass WAMY USA in April 1999, he was rebuffed and then fired by the then director of WAMY USA, Dr. Binladin, for his accounting reporting failings. When he was rehired the next year, al-Khatib continued to fail to provide his accounting and was suspended and then fired in March 2001. In order for a supervising organization to have control over a subordinate one, it must get information on what the subordinate is doing. WAMY Canada continuously failed to report back to WAMY USA about its activities, leading WAMY USA, with approval from WAMY Saudi Arabia, to suspend him quickly. It was because WAMY USA and WAMY Saudi Arabia believed they did not know

186

what WAMY Canada was doing and therefore were not in control of that office that they fired its director, not once but twice. When its director was replaced by a more competent one, one could say that WAMY USA and WAMY Saudi Arabia were in control of their field office in Canada.

However, the larger point that WAMY Canada was supposed to carry out WAMY Saudi Arabia's objectives and implement its strategy and policies in Canada is correct from my review of the evidence. This was of great concern to the CRA as its audit points out, "WAMY (Saudi Arabia)'s apparent control over the projects and activities to which WAMY allocates its resources is of concern to us in light of the allegations that WAMY (Saudi Arabia), along with other WAMY branches, presumably with the approval of WAMY (Saudi Arabia), have provided support to terrorist organizations."[718] The CRA concern was legitimate as far as it was a regulatory agency trying to control Canadian charitable organizations. However, there is no indication that the CRA raised the allegations included in the adverse reporting with the former directors of WAMY Canada during their respective interviews.[719] As examples of adverse reporting on WAMY (Saudi Arabia), the CRA Audit lists three newspaper articles, two think tank papers, and a testimony by Kohlmann.[720] It appears that the CRA administrator did a quick and superficial search of WAMY and terrorism and listed six items of at best third-hand information. As this list broke no new primary evidence, I addressed only those items that plaintiffs' experts included in their respective reports. In fact, CRA's concern that "WAMY (Saudi Arabia) along with other WAMY branches, presumably with the approval of WAMY (Saudi Arabia), have provided support to terrorist organizations" is the subject of the present litigation and this report.

### 3.  WAMY Canada Close Association with BIF Canada and BIF USA

Kohlmann, Levitt, and Winer cited the CRA Audit section on connections to Benevolence International Fund (BIF-Canada) and Benevolence International Foundation (BIF-USA). The Audit's evidence for a close connection between WAMY and BIF-Canada was that they shared a common director (al-Khatib), a common address (al-Khatib's home address), and a common bank account.[721] In actuality, the two organizations were completely separate and

---

[718] CRA Audit, at 9 (PEC-WAMY031455).
[719] See PEC-WAMY031442–6.
[720] CRA Audit, at 9–12 (PEC-WAMY031455–8).
[721] CRA Audit, at 12–3, (PEC-WAMY031458–9).

WAMY (USA and Saudi Arabia) did not know that al-Khatib was also director of BIF-Canada until after he was fired from as WAMY Canada director. WAMY had fired al-Khatib because he was also an employee of another charity, the MWL, which, to them, constituted an unacceptable conflict of interest. So, although al-Khatib was both director of WAMY Canada and BIF-Canada, these organizations did not *share* him as a *common* director since in fact WAMY USA or Saudi Arabia did not know he also worked for BIF-Canada. They were just two separate organizations that were represented by the same person as their respective local branch director. Likewise, al-Khatib ran all three charities from his own home and registered both WAMY Canada and BIF-Canada with his home address. This did not mean that WAMY USA and WAMY Saudi Arabia knew that he was also director of BIF-Canada. As previously mentioned, in 2001, ten years before the result of the CRA audit, WAMY dismissed al-Khatib for his lack of reporting and wearing too many hats, which might confuse the public about which organization he represented. There is no evidence that WAMY was aware that he had opened a bank account under WAMY's name for another organization, regardless whether such an organization was legitimate or not.

The Bank of Montreal bank account appears to have been a BIF-Canada bank account, deceptively called "World Association of Muslim Youth o/a BIF" in order to receive and donate money under tax free status at a time that BIF-Canada was not yet a registered charity. The facts seem to bear this out. The account was opened on October 24, 2000 and closed on June 12, 2001 at the Bank of Montreal. As previously stated, in his declaration, al-Khatib swore that the Bank of Montreal was a BIF account and his use of WAMY title was to allow his donors to get a tax deduction at a time when BIF-Canada was not yet a registered charity. This is consistent with Dr. Abdullah's deposition, where he testified that, because al-Khatib was not reporting his activities, he cut off WAMY Canada's funds for seven or eight months before firing al-Khatib.[722] Since he fired al Khatib in mid-March 2001, this would put his suspension of WAMY Canada's funds at around July–August 2000, or at least two months before al Khatib opened the Bank of Montreal account. So, the money going into the Bank of Montreal account was not WAMY money since throughout the eight-month existence of that account, WAMY Canada was not getting any money from WAMY USA, through which all WAMY money to WAMY Canada flowed. Even

---

[722] Dr. Abdullah deposition, at 165–6.

the money from WAMY Saudi Arabia going directly to WAMY Canada projects went through WAMY USA.

In summary, WAMY Canada and BIF-Canada happened to have the same person as director, but they did not share anything in common. A person can have two independent positions but not share anything from one with the other. This is common among married intelligence officers. They do not share with their spouse any information from work. Nor do they bring their troubles at home to work. Likewise, al-Khatib was director of both WAMY Canada and BIF-Canada, but that does not mean that he mixed their funds together. He used his home address for his activities. The two organizations did not share the same bank account at the Bank of Montreal as it was completely dedicated to BIF-Canada even though it was deceptively called "WAMY o/a BIF." The testimony of the former director of WAMY USA corroborates the declaration by the account's owner. So, it appears there was no association between WAMY and BIF-Canada.

### 4.   WAMY Provided Funds to BIF USA and BIF Canada

All three plaintiffs' experts echo the CRA Audit claim that WAMY provided funding to BIF-USA.[723] The audit cites a 2001 $50,246 transaction as its evidence, claiming that it was a WAMY payment to the Orphan Program of BIF-USA. This does not make sense. The money was wired into the Bank of Montreal account on March 20, 2001, three days after al-Khatib, the director of WAMY Canada, was forced to resign. Why would WAMY fund someone that it had just fired? There was no one else in WAMY Canada: it was a one-man show. On the business banking statement of the account for the month of March 2001, someone scribbled BIF KSA for the provenance of this wire transfer, meaning that it came from BIF in Saudi Arabia.[724] In his declaration, al-Khatib swore that this particular money transfer came from BIF and not WAMY,[725] corroborating Dr. Abdullah's deposition that WAMY sent no money to al-Khatib in March 2001. The CRA Audit just makes this statement but does not provide any evidence supporting it. The weight of the evidence suggests that the CRA's statement is false.

---

[723] CRA Audit, at 13–14 (PEC-WAMY031459–60).

[724] WAMY SA 001885. The scribbled note on the bank statement is in the Dr. Abdullah deposition exhibit 294.

[725] Khatib declaration, paragraphs 44–5, at 4.

The CRA Audit links BIF-Canada and BIF-USA with the fact that Arnaout was a director for both organizations. It then quoted Arnaout's guilty plea that he provided assistance to people engaged in violent activities overseas. Both of these facts are true, as opposed to the CRA Audit's last item, namely that Batterjee was chairman of WAMY (Saudi Arabia) as well as the founder of BIF-USA. Its citations for this last claim were Chris Hedges' *New York Times* article and a 2006 Danish Institute of International Studies paper written by … Kohlmann.[726] It concludes that these three items indicated that "WAMY maintained close relationships with and provided funding to organizations that were engaged in providing resources to entities engaged in terrorist activities."[727] In turn, Kohlmann quotes this CRA Audit passage in full in his report.[728]

This is an example of a circular echo effect: Kohlmann make allegations (his 2006 DIIS Paper), which are picked up by the CRA, which are then cited by Kohlmann in his report as evidence for his original allegations! The CRA allegations continued to be based on a quick investigation of third-hand information by the Canadian administration, which does not stand up to more rigorous scrutiny. It did not conduct any more serious investigation in the field, but to its credit it interviewed the target of its audit but did not ask them about the adverse reporting on WAMY. I have already addressed the absence of relationship between WAMY and BIF in section II.G of this report.

In summary, the evidence that WAMY funded BIF-USA is based on a false attribution to a wire transfer that probably did not come from WAMY. The link between BIF-Canada and BIF-USA is true, but not between WAMY and BIF-USA, based on Hedges' ubiquitous but flawed article and Kohlmann's own allegations.

### 5. WAMY Canada's Literature Promoting Intolerance and Violence

Finally, Kohlmann echoes the CRA Audit section 2.4 "Lack of Public Benefit / Promotion of Intolerance"[729] alleging that WAMY–Canada distributed "literature and other

---

[726] CRA Audit, FN 48, at 14 (PEC-WAMY031460), which states that "BIF appears to have been established by Mr. Batterjee as an affiliate of WAMY (Saudi Arabia)" citing Evan Kohlmann, 2006, *The Role of Islamic Charities in International Terrorist Recruitment and Financing*, Danish Institute for International Studies Working Paper No 2006/7, available at PEC-WAMY000654–76.

[727] CRA Audit, at 14 (PEC-WAMY031460).

[728] Kohlmann report, paragraph 190, at 57.

[729] PEC-WAMY031463–5.

material produced by WAMY–Saudi Arabia which 'in our view, appears to promote intolerance of, and/or advocate violence against, non-Muslims and/or the use of violence as a means to bring about political or societal change.'"[730] The evidentiary basis for this allegation is an MWL pamphlet, a reference in a scholarly article to David Kane's affidavit, and a book by Maududi handed over by WAMY Canada during its 2004 audit.

WAMY is not MWL. They are two different charities and al-Khatib was also an MWL officer. Kane's affidavit was already addressed in the section on ideology. Providing Maududi's book to the CRA auditor does not mean that WAMY Canada was distributing it. The pamphlet and the book apart, the reference to Kane's affidavit came from a quick search that resulted in finding an article that referenced Kane's affidavit. This is again typical of an administrative investigation, which relies on easily available public information, usually online and without context, and of questionable reliability.

In addition, as argued in the previous section, the alleged promotion of intolerant and violence in Canada is not a proximate causation of the 9/11 attacks since, to my knowledge, none of the 9/11 terrorists were in Canada in the mid-2000 to March 2001 and attended a WAMY camp.

In summary, all three plaintiffs' experts cite the CRA Audit as key evidence for their case that WAMY funded or contributed to the 9/11 attacks. This is a weak argument because of the weak evidentiary basis of the CRA Audit allegations based on a quick Internet search resulting in information that has been debunked later on, and the fact that any of these specific allegations are not proximate causation to the 9/11 Attacks.

### K.  WAMY Employees Helping al Qaeda (Adel Hassan Hamad)

Kohlmann devotes five paragraphs to former WAMY employee Adel Hassan Hamad as a key link between WAMY and al Qaeda.[731] Both he and Winer also implicitly refer to Hamad's GTMO case when they discussed the fact that DoD analysts refer to WAMY as a "Tier 1 NGO" or a "Tier 1 Counterterrorism NGO target."[732] I have already addressed this DoD labeling earlier.

---

[730] Kohlmann report, paragraph 194, at 58. The quote is from PEC-WAMY031463–4.
[731] Kohlmann report, paragraphs 168–72, at 51–2.
[732] Kohlmann report, paragraph 159, at 47; Winer report, at paragraph 12.10.3, at 101.

Let us now focus on Kohlmann's allegations about Hamad as a link between WAMY and al Qaeda. First, let us examine his background and the context of these allegations.

### 1. Hamad's Background

Adel Hassan Hamad was born in 1958 in northern Sudan. His father was a physician's assistant, which meant that he was a physician in the rural area where Hamad grew up. After high school, Hamad studied air conditioning at a trade school in Alexandria, Egypt. After graduation, he returned to Sudan, where he worked on the air conditioning system of a textile factory. He joined the Muslim Brotherhood in 1984 but grew disillusioned and stopped attending meetings two years later. In 1986, he got a job with Lajnat al-Daawa al-Islamiya (LDI, the Committee of Islamic Appeal), a Kuwaiti charity. It sent him to Peshawar to work as a schoolteacher at the Hira Institute in Pabbi with Afghan refugee children and help with administrative tasks and some food delivery. In 1987, he married back in Sudan and returned with his bride to Pabbi. They eventually had five daughters.[733]

The director of LDI's Peshawar office was Zahed Sheikh Mohammed, KSM's older brother, a moderate Muslim Brother, who has never been accused of being involved in any violent action. After finishing college in the United States, KSM was hired by LDI and came to Peshawar. Since Hamad and KSM circulated in the same circles and worked for the same company for a short time, it is possible that they met. When his later attorney asked Hamad whether he met KSM, Hamad replied that it was possible, but he did not remember him and had never been introduced to him by his brother. There were a lot of ansar working in Peshawar in the late 1980s.[734]

In 1993, Hamad was promoted to do some administrative work and bookkeeping at the LDI main office in Peshawar, where he moved his family. At the same time, he completed a master's degree in Peshawar in 1995. Over time, Kuwaiti funding for LDI dried up and Hamad was laid off in 1999. He tried his hand importing small electronic goods from Xinjiang Province,

---

[733] Steven Wax, 2008, *Kafka Comes to America: Fighting for Justice in the War on Terror: A Public Defender's Inside Account*, New York: Other Press, at 47–55, 98–103. Steven Wax was Hamad's attorney. See also PEC-WAMY029012; FED-PEC0141770–86.

[734] Terry McDermott and Josh Meyer, 2012, *The Hunt for KSM: Inside the Pursuit and Takedown of the Real 9/11 Mastermind, Khalid Sheikh Mohammed*, New York: Little, Brown and Company, at 34–9; Wax, 2008, at 103; Department of Defense, 2006, JTF-GTMO Detainee Assessment, Khalid Shaykh Muhammad, ISN: US9KU-010024DP, December 8, 2006, at 3.

China for several months until he got hired by WAMY Pakistan in 2000 to be the chief administrator for its Chamkani hospital in Paktia Province, Afghanistan. The hospital had a reputation for excellence and its small staff worked and lived together there for 22 to 25 days straight with 6 to 8 days off. Hamad returned to Peshawar to be with his family on his days off. They lived in a second-floor apartment of a building where the first floor housed fellow humanitarian, Mammar Ameur, who was registered as a U.N. refugee from Algeria. By mid-2002, many Arab speakers had left Pakistan and the Sudanese government closed the school where Hamad's children were studying. Since he wanted them to continue their education, he faced the choice of returning home with his family or moving with them to Islamabad, where there was an Arabic-language school. The family left for its annual trip back to Sudan in June still undecided. During the trip, it decided to stay in Khartoum while Hamad returned to Peshawar on July 14. On July 18, 2002, very early in the morning, an ISI Directorate squad accompanied by an American officer stormed his building looking for an al Qaeda safehouse. The search failed to find anything compromising and the assault team turned to the American, who told them to book both Hamad and Ameur.[735]

### 2. Kohlmann's Allegations

In paragraph 168, Kohlmann accurately quotes from the unclassified transcripts of the proceedings of the Combatant Status Review Tribunal (CSRT) for Adel Hassan Hamad (ISN940).[736] In paragraph 169, Kohlmann stated that Hamad worked for LDI before WAMY and that LDI was later designated an SDGT on January 9, 2003 (the U.N. followed suit on February 20, 2003). He then quotes from a Treasury Department press release that gave additional background, "LDI is one of the most active Islamic NGO to give logistical and financial support to the mujahedeen operating in the Pakistan-Afghanistan area." The press release went on to

---

[735] Steven Wax, 2008, at 104–106. See FED-PEC141772; PEC-WAMY029012; WAMY SA E00 1088–91; WAMY SA E00 1093.

[736] The first quote in this paragraph is from the allegation 3.a.1. (at 1) stating that he had been employed by WAMY in Pakistan and Afghanistan for about one and a half years before his arrest. The next two quotes are his replies that he was the manager of the WAMY hospital in Afghanistan and after September 2001, he returned to WAMY's main office from where he distributed aid supplies to the refugee camps in Pakistan (at 2–3).

claim that several LDI employees were al Qaeda members, including Ramzi Yousef and KSM, who was the "head of the Peshawar branch of LDI from 1988 to 1995."[737]

Kohlmann quotes the Treasury Department press release accurately but as shown in section II.J of this report, Abdul Basit Abdul Karim (Ramzi Yousef's real name) was never a member of al Qaeda. He came to Peshawar in 1991, underwent training at Khalden (a non-al Qaeda camp and its big rival) and stayed there teaching courses on bomb making.[738] To my knowledge, Abdul Karim never worked for LDI. KSM did work for LDI for a short time in 1987, but he was not its director.[739] This was his older brother Zahed, as the summary of the evidence of Hamad's Administrative Review Board that Kohlmann also quotes, clearly states.[740] Nor was KSM a member of al Qaeda at the time he worked for LDI. He joined much later, in early 1999, as shown in section II.J of this report. These Treasury allegations, on the basis of which some organizations are designated SDGT, are examples of poor research and investigation, as have been illustrated throughout this report.

Kohlmann ends paragraph 169, "Hassan met with Khalid Sheikh Mohammed (KSM) while working at the same refugee camp run by LDI. That camp, the Jelazee Refugee Camp, was overseen by KSM's brother, Zahid Al-Sheikh."[741] Kohlmann quotes the military prosecutor in Hamad's ARB proceedings, and not the answer given by Hamad. Here is the full exchange between Hamad and his prosecutor:

> Designated Military Officer: The Detainee met Khalid Sheikh Mohammed at the Jelazee Refugee Camp in 1987. Khalid Sheikh Mohammed operated a "cultural center" located at the camp. The center was used to prepare Afghan people who had been recruited for the jihad against the Russians.

---

[737] "Protecting Charitable Organizations – I: Additional Background Information on Charities Designated Under Executive Order 13224," U.S. Department of the Treasury Resource Center, available at https://www.treasury.gov/resource-center/terrorist-illicit-finance/Pages/protecting-charities_execorder_13224-i.aspx#ldi.

[738] MacDermott and Meyer, 2012, at 41. See also the transcripts of *U.S. v. Ramzi Yousef et al*, S.D.N.Y., No. S1293CR.180 (KTD) tried from May 29 to September 5, 1996.

[739] Wax, 2008, at 102–3; MacDermott and Meyer, 2012, at 34–8; JTF-GTMO KSM Assessment, at 3.

[740] See FED-PEC0181050, paragraph b.2. Kohlmann cites this document in FN 248, at 51.

[741] Kohlmann report, paragraph 169, at 51.

Detainee: I never met Khalid Al Sheikh and I don't have any personal relationship with him. I used to see him from afar and I know that he had a cultural center for some Afghani students to prepare them for fighting the Russian forces in the Afghani jihad against the Russians.

Designated Military Officer: Khalid Sheikh Mohammed's older brother, Zahid Al-Sheikh, was the director of the Jelazee Refugee Camp *and LDI in Peshawar, Pakistan*.

Detainee: *Zahid Al-Sheikh was a former manager of LDI* and not the manager of the camp.[742]

Please note that Kohlmann's omission in italics contradicts the Treasury false allegation that KSM was LDI's director, which of course is a far more serious indictment of LDI and Hamad because KSM is of course directly linked to the 9/11 attacks. As seem in so many parts of his report, this type of careful and subtle anachronisms and critical omissions in quoting documents is a hallmark of Kohlmann's methodology.

In paragraph 170, Kohlmann quotes accurately from Hamad's JFT GTMO Detainee Assessment that *at the time* Hamad was employed by LDI, LDI was *now* assessed to have been a Tier 2 NGO, that is one that had demonstrated the intent and willingness to support terrorist organizations willing to attack US persons. It was downgraded on March 3, 2004. However, the lack of consistency among U.S. government analysts whether at the Department of Defense or Department of Treasury is shown by the fact that they rated WAMY and LDI in opposite ways. JTF GTMO analysts assessed WAMY as a Tier 1 NGO but LDI only as a Tier 3. Yet, Treasury analysts saw it the opposite way. Treasury analysts correctly never designated WAMY as an SDGT but designated LDI as one and the U.N. followed suit the next month.

As the 9/11 Commission staff on Financing Terrorist had stated, once designated by Treasury, it was difficult to get delisted for a multitude of reasons. However, a decade later, the U.N. established an office of the Ombudsman to look into the complaints of wrongful listing of innocent companies. On September 4, 2013, the Security Council Al-Qaida Sanctions Committee deleted Lajnat Al Daawa Al Islamiya from its sanction list after a careful full field investigation by the office of the ombudsman.[743] This greatly weakens Kohlmann's insinuation that LDI

---

[742] Department of Defense, Summary of Administrative Review Board Proceedings for ISN 940, at FED-PEC0141773–4. Italics added to emphasize what Kohlmann omitted in his account.
[743] https://www.un.org/press/en/2013/sc11109.doc.htm.

supported terrorists. Though LDI has nothing to do with WAMY, Kohlmann is trying to implicate Hamad as a material supporter of al Qaeda with one organization (LDI), which may imply that he continued support of al Qaeda when he went to work for another organization, WAMY. Of course, all of this is just insinuation as neither JFT GTMO nor anyone else has ever shown that Hamad ever supported al Qaeda or any terrorist organizations in the first place.

In paragraph 171, Kohlmann correctly quotes from Hamad's JFT-GTMO Detainee Assessment that Hamad was captured with Mammar Ameur, who had been "assessed as an Al-Qaida facilitator due to his associations and employment with WAMY, who has ties to extremist organizations."[744] In paragraph 172, Kohlmann quotes from Ameur's own JFT-GTMO Detainee Assessment,[745] which never states that Ameur ever worked for WAMY. Ameur worked for only Afghan Reconstruction (ARCON), the Egyptian Human Relief Organization (EHRO), the African Muslim Agency (AMA), a U.N. refugee, and ran a honey shop. There is no mention of WAMY as an employer for Ameur at all.[746] The only mention of WAMY in Ameur's JTF GTMO assessment is in connection to Ameur's neighbor, Adel Hamad, who worked for WAMY.[747]

So, twice in three paragraphs, Kohlmann was faced with contradictions in the documents he not only reviewed but cited. In both cases, he simply ignored the one that did not directly or indirectly implicate WAMY and quoted only from the one that did. This is not accepted methodology, which directs experts to evaluate all the evidence and draw conclusions from a careful analysis of it. Kohlmann simply buries the exonerating evidence and emphasizes only the incriminating one. A sounder methodological statement, based on a *comparative analysis* of the relevant documents involved, would state: on the weight of the evidence, namely the actual listing of Ameur's curriculum vitae in his own JTF-GTMO assessment, the summary of his ARB

[744] Kohlmann report, paragraph 171, at 52, quoting Hamad's detainee assessment: Department of Defense, 2005, JTF-GTMO Detainee Assessment, Adel Hassan, ISN: US9SU-000940P, March 25, 2005, at 7 (PEC-WAMY029017 or FEC-PEC0197478)

[745] Kohlmann report, paragraph 172, FN253, at 52.

[746] Department of Defense, 2005, JTF-GTMO Detainee Assessment, Mammar Ameur, ISN: US9AG-000939DP, April 13, 2005, at 2 (PEC-WAMY029020).

[747] Department of Defense, 2005, JTF-GTMO Detainee Assessment, Mammar Ameur, ISN: US9AG-000939DP, April 13, 2005, at 5 (PEC-WAMY029023).

proceedings,[748] and his summarized sworn statement at his Combatant Status Review Tribunal (CSRT),[749] it is far more likely than not that Ameur never worked for WAMY. Instead, Kohlmann avoids doing the very comparative analysis of all the relevant documents that he claimed to be using in his methodology section, and selectively quotes only the ones that support the argument of the plaintiffs' lawyers who retained him that WAMY supported al Qaeda.

Kohlmann concludes his remarks about Hamad, "According to the DOD, other Guantanamo Bay prisoners like Hamad who were working under the auspices of WAMY were 'likely using [their] employment in Non-Government Organizations (NGOs) to facilitate funds and personnel for Al-Qaida and its global terrorist network.'"[750] His quote is not from Hamad's JTF-GTMO detainee assessment but to his former downstairs neighbor Ameur[751] as previously mentioned. This is surprising: why would Kohlmann not quote from Hamad's own JTF-GTMO detainee assessment? First, let us look at the actual sentence in Ameur's assessment that Kohlmann quotes. It states, "Detainee was likely using *his* employment in Non-Government Organizations (NGOs) to facilitate funds and personnel for Al-Qaida and its global terrorist network."[752] I put in italics the word that Kohlmann modified in the quote. The statement was clearly only referring to Ameur and not to other GTMO prisoners. As we just saw, Ameur's former employers were ARCON, EHRO, and AMA. There is no mention of WAMY at all. Kohlmann's juxtaposition of WAMY to this statement incriminates WAMY when WAMY was never mentioned in the original statement. Kohlmann did not just rely on grammatical understanding of relevance to incriminate WAMY, he changed "his" to "their" in the original sentence to lump WAMY together with ARCON, EHRO, and AMA as one of the NGOs facilitating funds and personnel for al Qaeda. I have no idea if the allegations about the other NGOs are correct or not and it is not this report's task to find out. But, clearly WAMY was not included in the original list of incriminated organization. This intentional inclusion of WAMY is just another example of Kohlmann's manipulations of documents to give the impression that

---

[748] https://assets.documentcloud.org/documents/77596/isn-939-mammar-ameur-administrative-review-board.pdf.

[749] https://assets.documentcloud.org/documents/77597/isn-939-mammar-ameur-combatant-status-review.pdf.

[750] Kohlmann report, paragraph 172, at 52.

[751] PEC-WAMY029020, paragraph 3.b.

[752] PEC-WAMY029020, italics added to show how Kohlmann modified the original sentence quoted.

they support his contention that WAMY funded al Qaeda when such allegation is not present in the original document.

Nevertheless, I believe that Kohlmann did capture the spirit of JTF GTMO analysts, who strongly believed that all Islamist charities materially supported al Qaeda and classified them all as terrorist organizations. My comments in the previous paragraph were more about how Kohlmann inadvertently revealed his methodology of intentionally changing the contents of documents to make them consistent with his claim. The surprise is that he did not have to do that at all. Hamad's own JFT-GTMO detainee assessment contained the same pithy sentence (now correctly referring to WAMY) summarizing the JTF GTMO analysts' blatant prejudice against all Islamist charities: "Detainee was likely using his employment in Non Governmental Organizations (NGOs) to facilitate funds and/or personnel for Al-Qaida and/or its global terrorist network. Detainee was always employed by organizations that espoused radical Islamic views and/or assisted individuals who were part of Al-Qaida or were associated with Usama Bin Laden (UBL). Detainee was always associated with Islamic radicals, yet claimed to have avoided any participation in jihad or terrorist activities."[753] In other words, Hamad and all humanitarians like him in Peshawar were all guilty by association with organizations that JTF GTMO analysts assumed were all terrorist organizations.

As mentioned in my methodology section, the documents are the start of an investigation, not its end. So, what happened to Hamad and his downstairs neighbor Ameur?

### 3. Follow up Investigation of Hamad

Hamad's supervisor at WAMY-Pakistan testified in a deposition that Hamad worked for him as the administrative officer of the WAMY Hospital in Chamkani, Afghanistan.[754] WAMY Secretary General al-Wohaibi testified that Hamad did not have any access to WAMY funds. After his arrest, WAMY conducted an internal investigation, which revealed that Hamad had no relation to anything else except for providing relief and aid, medical aid or supplies, follow up schools, and follow up agricultural programs. He could not have diverted any aid materials under his control because he did not have access to it. WAMY's programs were very specific and

---

[753] PEC-WAMY029012 or FEC-PEC0197473.
[754] Ibrahim Anwar Deposition, at 293–7.

198

assigned or destined to hospitals, to schools, food supplies, agricultural programs, and Hamad was committed to these programs.[755]

Steven Wax's book is about Hamad, who was assigned to Public Defender Wax as a client by the court. He tells his Kafkaesque experience trying to defend his client when he was denied documents and even the nature of the allegations against his client. He finally got the CSRT and ARB proceedings and Hamad gave him five more pages stating the ARB's assessment of the situation. Wax saw it all as guilt by association. There was nothing in the material that Hamad had ever been on a battlefield, been a terrorist, or harmed anyone. He had never been accused of financing terrorism or being an arms runner. His material support role was not demonstrated but assumed. While WAMY was listed as a Tier 1 NGO by JFT GTMO analysts, no one else in the government ever listed it on any antiterrorism watchlist. No one including the CIA, FBI, or the military had ever bothered trying to confirm or refute Hamad's account that he was a full-time humanitarian without any connection to terrorism.[756]

Hamad underwent a CSRT review conducted by a three-member panel CSRT. It decided that Hamad met the criteria for the designation of Enemy Combatant, but the decision was not unanimous. An army major rejected the notion of guilt by association and found insufficient the allegation that Hamad be classified as an enemy combatant. He argued that, even if LDI and WAMY had supported terrorist organizations, it did not incriminate all their employees. Doing so would declare all physicians, nurses, and aid workers (like Hamad) enemy combatants. "To reach such a conclusion would provide for unconscionable results."[757] The dissenter even questioned the *JFT-GTMO Matrix of Threat Indicators for Enemy Combatants*.[758] "Even if these NGO's provided some support to these 'terrorist ideals and causes', this fact would not qualify them as being 'associated forces that are engaged in hostilities against the U.S. or its coalition partners.' Otherwise, every NGO that has some members who provided some support engaged in hostilities against the U.S. or its coalition partners would qualify as 'associated forces'."[759] The dissenter concluded his opinion,

---

[755] Dr. al Wohaibi deposition, at 126–9.
[756] Wax, 2008, at 109–11.
[757] The dissent is at WAMYSA571159–61, the quote is at WAMYSA571160.
[758] PEC-WAMY013648–64. This is the guideline discussed in section III.A.
[759] WAMYSA571160.

In essence, the Unclassified Summary (R1) amounts to saying that the Detainee is an enemy combatant because he was employed by NGO's that provided some support for "terrorist ideals and causes" and because he "came in contact" with al Qaida members. While this information may raise some suspicion, it does not provide a basis for an enemy combatant determination. Absent any allegations that the Detainee himself "directly supported hostilities in aid of enemy armed forces", the Unclassified Summary (R1) fails to even state a prima facie case that he has been properly classified as an enemy combatant. Simply stated, even assuming all the allegations in Exhibit R1 are accurate, the Detainee does not meet the definition of an enemy combatant. Consequently, the Detainee has constructively been denied his right to prepare and participate in the Tribunal. The Detainee could not prepare for an overall allegation that he is an enemy combatant when the supporting allegations do not even qualify him as an enemy combatant. Based upon this failure to even state a prima facie case and upon the analysis of the classified evidence (see Enclosure (3)(b)), the Author finds that the Detainee has been improperly classified as an enemy combatant.[760]

Wax and his team conducted a full field investigation in Afghanistan, Pakistan, and Sudan of Hamad's constant protests that he had nothing to do with terrorism. They traveled to Kabul, met with Hamad's former colleagues at the 60-bed surgical and gynecological hospital, of which he had been the administrator. They went to Pakistan and talked to the staff of WAMY Pakistan as well. They made some videos of their interviews.[761] They went to Sudan and talked to his family. They enlisted the help of the Sudanese Foreign Minister. Finally, Hamad was discharged from GTMO on December 10, 2007. He landed in Khartoum at 1 A.M. on December 13. As his Habeas Corpus lawyer wrote, "Upon arrival in his country, the Sudanese intelligence authorities who took custody of Adel brought him inside the terminal and gave him a beautiful new jallabiyah and kufi. After a short debriefing, he was taken to a hospital for a checkup and then driven home. At 5 A.M. he was reunited with his family after five years, four months, and twenty-five days of imprisonment."[762]

---

[760] WAMYSA571161.

[761] WAMYSA571238–46.

[762] Wax, 2008, at 215–36, 267–328, the quote is from 327.

Ameur was also released ten months later, on October 6, 2008, and went back to Algeria. It is easy to make uncorroborated allegations and refuse to seriously investigate them as Hamad's legal team did and documented their findings. On the basis of all the evidence, and not on just flawed interrogations conducted at GTMO, Hamad's history is unlike any confirmed enemy combatant I have studied. He and Ameur sued the U.S. government for their imprisonment, but their respective suits were dismissed for lack of subject matter jurisdiction. With Hamad and Ameur, like with hundreds of JFT-GTMO detainees, the initial accusations were never confirmed. They were quietly released without fanfare toward the end of the George W. Bush presidency when there was no evidence to try them even in military proceedings stacked against them.

Contrary to Kohlmann's reliance on unsubstantiated allegations in unreliable JTF-GTMO detainee assessments, the weight of the evidence generated from field investigation[763] does not support the allegation that Hamad was a link between WAMY and al Qaeda.

### L.  WAMY Allegedly Sponsored Ansar al Islam

Kohlmann claimed that WAMY sponsored an event in late 2002 featuring an Ansar al-Islam commander.[764] Since the event occurred after the 9/11 attacks, WAMY's alleged involvement in it could not have had any role the 9/11 attacks. I did not look further into this allegation on that basis.

Section III has systematically and thematically analyzed all the plaintiffs' experts' allegations that WAMY funded or materially supported al Qaeda and refuted each and every one of them. In the process of evaluating plaintiffs' experts' claims in their report, I noticed a disturbing pattern of violations of accepted social scientific methodology that undermine the basis of their opinions. It is this pattern that I now wish to address.

---

[763] This evidence that I reviewed comes from the investigation carried by Steven Wax's team and described in Wax, 2008. It includes affidavits from Hamad's family, photographs corroborating Hamad's narrative, and video testimonies from Hamad's work colleagues.

[764] Kohlmann report, paragraph 177, at 53–4.

201

## IV.   Opinion

In this part, I focus on Kohlmann's and Winer's reports because Jenkins does not make any allegations against WAMY and Levitt barely mentions it in his report. In arguing that WAMY provided material support to the 9/11 terrorists, Kohlmann and Winer have tried "to distill a common, accepted narrative."[765] In fact, the historiography of al Qaeda[766] and the alleged Islamic charity support for it are deeply contested in the scholarly literature.[767] Instead of addressing this complexity, they used flawed methodology to craft a narrative that is simple, linear, compressed, and wrong. Their flawed methodology violated common rules of the scientific method with their over-reliance on unreliable secondary sources; lumping unrelated things together and neglecting disconfirming evidence; disregarding the complex evolution of al Qaeda, Islamic charities, and the 9/11 conspiracy and straightening these convoluted narratives into linear ones that leave out critical information; and compressing time to generate anachronistic and chronologically impossible arguments. Kohlmann also stands out with his use of clever juxtapositions of unrelated material to imply a link between them and strategic omissions of critical parts of documents that contradict his arguments. Both plaintiffs' experts also neglect to address the court's guidance on proximate causation in their allegations about the 9/11 attacks.

Let me now illustrate the pattern of violations of the scientific method in their methodology.

### A. Over-reliance on Flawed Secondary Sources

I assume that plaintiffs' attorneys provided their experts with access to the full discovery material upon which to form an opinion based on their expertise. The discovery material is full

---

[765] Kohlmann report, paragraph 12, at 4.

[766] See part II of this report.

[767] See Jonathan Benthall and Jérôme Bellion-Joudan, 2009, *The Charitable Crescent: Politics of Aid in the Muslim World*, London: I.B. Tauris; Abdel-Rahman Ghandour, 2002, *Jihad Humanitaire: Enquête sur les ONG islamiques*, Paris: Flammarion; Robert Lacy and Jonathan Benthall, eds., 2014, *Gulf Charities and Islamic Philanthropy in the "Age of Terror" and Beyond*, Berlin: Gerlach Press; Marie Juul Petersen, 2015, *For Humanity or for the Umma? Aid and Islam in Transnational Muslims NGOs*, London: Hurst & Company; and Ibrahim Warde, 2007, *The Price of Fear: The Truth Behind the Financial War on Terror*, Berkeley, California: University of California Press, for a few academic studies on this topic.

of primary source documents helpful to arrive at such opinion. This litigation has generated many primary source documents, which are priceless for true counterterrorist scholars and have been incorporated in new research.[768] Yet, all of plaintiffs' experts' reports are relatively devoid of references to such documents. Even Jenkins's narrative of The Road to 9/11 lacks a single citation to the discovery material. Instead, Kohlmann, Levitt, and Winer rely on secondary sources that have been shown to be unreliable since the time of their appearance. Below are just a few examples of their over-reliance on flawed secondary sources.

### 1.  JTF GTMO Documents

Both Kohlmann and Winer start their respective sections on WAMY by accusing it of funding al Qaeda on the basis of Department of Defense JTF GTMO documents.[769] Later in his account, Kohlmann again uses these same documents to accuse Adel Hassan Hamid, a WAMY employee, of providing WAMY funds directly to al Qaeda.[770] In his section on WAMY, Kohlmann cites these documents 13 times, and Winer three times. Neither one of them bothers to ask whether these documents are reliable in terms of their respective contents. As previously mentioned in my methodology section, a document is only the start of a serious investigation, not its end. One must ascertain its credibility, reliability, context, and purpose.

The JTF GTMO documents are particularly unreliable as a source for legal proceedings. They appear to be internal documents, not to be shared with the outside public. They were classified secret, have been leaked, and now appear in the discovery material and in the public domain. The internal Matrix used by JTF GTMO analysts was simply a guidance for interrogation and assessment of the detainees. As shown in section III.A of this report, it was to be used "***not as evidence to prove a detainee's guilt or innocence***" (italics and bold script in the original for emphasis).[771] Its list of NGO associated forces[772] is not consistent with even with the low standards of Treasury's list of SDGT (see the next section). As the anonymous dissenter in Hamad's CSRT review argued, the Matrix was flawed because it was far too broad to be useful

---

[768] See Bergen, 2006; Bergen and Cruickshank, 2012; Cragin, 2008; Farrall, 2017; Hamid and Farrall, 2015; Hegghammer, 2020; and Wright, 2006, for some scholars using documents uncovered in this litigation.

[769] Kohlmann report, paragraph 159, at 47–8; Winer report, paragraph 12.10.3, at 101–2.

[770] Kohlmann report, paragraphs 168–72, at 51–2.

[771] PEC-WAMY013648.

[772] At PEC-WAMY013664.

to distinguish any real enemy combatants from innocent bystanders.[773] To my knowledge, the Matrix list, protected by the shroud of secrecy, has never been examined for credibility and reliability. Science requires that evidence be examined and tested to establish at least credibility and reliability, something that the Matrix lacks. To my knowledge, its reliability as a source as evidence has never been tested according to the preponderance of evidence standard required in civil litigation.

The JFT GTMO Detainee Assessments, upon which Kohlmann extensively relied on for five paragraphs of his report, are just as flawed as evidence. I do not want to argue that all the information that they contained was not credible and unreliable, but they consist mainly of analysts' speculations about a given detainee. In fact, after viewing dozens of them about people, with whose history I am familiar, I only found parts of their section 4 useful, namely the parts that deal with a detainee's prior history and capture information. The rest is often unreliable. Take for instance, two of the very few cases that have undergone outside impartial scrutiny in a court of law, Lakhdar Boumediene and Mustafa Ait Idir. Although they have nothing to do with this litigation, the assessment and process they underwent at JFT GTMO are the same as Hamad's and Ameur's in this litigation, who have not had the opportunity of such outside examination.

Both Boumediene and Idir were picked up in Bosnia for allegedly planning a terrorist plot against the U.S. Embassy in Sarajevo.[774] They were mentioned by President Bush in his January 29, 2002, State of the Union Address, "Our soldiers, working with the Bosnian government, seized terrorists who were plotting to bomb our embassy."[775] At the time of their respective assessments in 2008, they were both assessed to be "a HIGH risk, as he is likely to pose a threat to the US, its interests, and allies."[776] Boumediene and Idir were assessed to be of medium and high intelligence value respectively to report on Bosnia based NGOs. In other

---

[773] WAMYSA571160.

[774] Department of Defense, 2008, JTF-GTMO Detainee Assessment Lakhdar Boumediene, ISN US4AG-010005DP, April 1, 2008, at 4; Department of Defense, 2008, JTF-GTMO Detainee Assessment Mustafa Ait Idr, ISN US4AG-010004DP, June 30, 2008, at 4.

[775] George W. Bush, 2002, *The President's State of the Union Address*, The United States Capitol, Washington, D.C., January 29, 2002, available at https://georgewbush-whitehouse.archives.gov/news/releases/2002/01/20020129-11.html.

[776] Same wording for both detainees, at 2 of their respective assessments, just cited in the preceding FN.

words, despite having very little intelligence value (seven years of detention for intelligence on NGOs), they continued to be interrogated regularly up to the time of their respective assessments. When they did not confess to their interrogators' various accusations, the assessment was that they were deceptive. Their respective assessments took place more than *six* years after Bosnian authorities had completed their investigation and concluded, "the Investigative Judge and Prosecutor found no firm evidence that the suspects were involved in terrorist activities…. Due to the lack of evidence for the charges against these men, the investigative bodies suggest that the suspects be released from detention."[777]

Both Boumediene and Idir became famous for having submitted a writ of *habeas corpus* that was heard by the U.S. Supreme Court, which opined that the constitutionally guaranteed right of *habeas corpus* review applied to Guantanamo detainees.[778] The petition went to a *civilian* U.S. District Court for the District of Columbia, where both the government and the petitioners presented their respective cases. The court ruled for the petitioners, ordered that their writ of habeas corpus be granted, and ordered their release. As to the government evidence (basically similar to the allegations against Hamad in their respective detainee assessments), the court declared, "[t]o allow enemy combatancy to rest on so *thin* a reed would be inconsistent with this Court's obligation … to protect petitioners from the risk of erroneous detention" (italics in the original).[779] Boumediene and Idir were sent back to Bosnia and eventually released, with Boumediene choosing to live in France. Despite their assessment of being a high risk of threat to the U.S., they have lived quiet lives for the past decade.[780]

In the process of writing their book, Boumediene and Idir had two of their collaborators interview the Army analyst who had been responsible for their arrests in Bosnia and later became one of JFT GTMO's analysts in charge of their case. In his interview, the analyst said that the government would classify Boumediene and Idir as recidivists if they wrote a book. He continued, "They had not provided enough intelligence when they were fresh and new and bright

---

[777] Affidavit of Bosnian Prime Minister Behmen, reproduced in Lakhdar Boumediene and Mustafa Ait Idir, 2017, *Witnesses of the Unseen: Seven Years in Guantanamo*, Stanford, California: Stanford University Press, at 239.

[778] *Boumediene et al v. George W. Bush et al*, 553 U.S. 723 (2008).

[779] *Lakhdar Boumediene, et al., v. George W. Bush, et al*., U.S.D.C. District of Columbia, Civil Case No. 04-1166 (RJL), Memorandum Order U.S. District Judge Richard J. Leon, November 20, 2008, at 11.

[780] Boumediene and Idir, 2017.

and shiny. They had not provided anything of value." The interrogators and their boss were "very frustrated, because there was a lot of pressure from the legal teams, the *habeas* teams." Finally, the analyst concluded, "Seven years [in captivity]. That's inexcusable. The government knew they didn't have the intelligence on them. They interrogated them. They didn't get intelligence on them. They interrogated other people, and didn't get intelligence that would implicate their involvement. And they still held onto them for seven years. That doesn't make any sense. And at what cost?" This analyst contradicts the assessments on Boumediene and Idir, which he might have written in the first place. He concluded, "I'm honored to be part of this [interview]. And I'm eager to be on the record for you, because I want my story to be told as well. Part of my story is that I was involved in Bosnia. Part of my story is that I was involved in GTMO. And I want to be able to lend credence to their story by saying, 'Yeah, it's true. We didn't have intelligence on these guys. This was a wrong time, wrong place kind of thing.' And we can argue about whether or not that was an acceptable, appropriate, justifiable thing to do. But what certainly is not up for debate is that it should not have taken seven years to rectify that problem."[781]

So, despite spending years using various mild forms of torture allowed by the Department of Defense for the JTF GTMO,[782] the task force was unable to generate any form of useful intelligence on Boumediene and Idir. I admit that they were not the type of torture practices by the CIA, but they seem to have been just as unreliable.[783] My goal in presenting Boumediene's and Idir's cases is to challenge the credibility and reliability of the type of JTF GTMO documents that both Kohlmann and Winer used in relation to Hamad and WAMY. Their context was the hostile world reaction to the U.S. government's illegal attempts to escape international law and the Geneva Conventions. Their purpose was to provide some covert justification for GTMO's unjustifiable detention, no matter how transparently deceptive they were, as the dissenter in Hamad's CSRT review pointed out.

---

[781] Boumediene and Idir, 2017, 253, 256, 265–6.

[782] See Boumediene and Idir, 2017, at 260. I refused to use the euphemism Enhanced Interrogation Techniques that deceptively hides their true nature and are not compatible with a liberal democracy.

[783] Senate Select Committee on Intelligence, 2014, *Committee Study of the Central Intelligence Agency's Detention and Interrogation Program, Findings and Conclusions, Executive Summary*, December 3, 2014, PEC-WAMY033905–4429.

In support for Hamad, former Chief of Staff to the Secretary of State during the relevant period 2002–5, Lawrence Wilkerson, provided a sworn declaration, which is a real indictment of the JTF GTMO process and documents. He declared that "many of the prisoners detained at Guantanamo had been taken into custody without regard to whether they were truly enemy combatants, or in fact whether many of them were enemies at all … many of the detainees were, in fact, victims of incompetent battlefield vetting …  simply innocent civilians picked up on a very confused battlefield or in the territory of another state such as Pakistan."[784] Most of the prisoners were turned over by either Afghan or Pakistani forces and "often absolutely no evidence relating to the detainee was turned over, so there was no real method of knowing why the prisoner had been detained in the first place…. While Mr. Hamad was brought to Guantanamo after August 2002, I have no reason to believe that any more thorough process was used to determine whether his seizure or transfer to Guantanamo was justified."[785]

Wilkerson explained the reasons for continued detentions of innocent victims at GTMO. "I came to understand that there were several different reasons for refusal to release detainees in Guantanamo, even those who were likely innocent…. At least part of the problem was that it was politically impossible to release them. The concern expressed was that if they were released … the leadership of the Defense Department would be left without any plausible explanation to the American people, whether the released detainee was subsequently found to be innocent by the receiving country, or whether the detainee was truly a terrorist and, upon release were it to then occur, would return to the war against the U.S. Another concern was that the detention efforts at Guantanamo would be revealed as the incredibly confused operation that they were. Such results were not acceptable to the Administration and would have been severely detrimental to the leadership at DOD. Another part of the political dilemma originated in the Office of Vice President Richard B. Cheney, whose position could be summed up as 'the end justifies the mean,' and who had absolutely no concern that the vast majority of Guantanamo detainees were innocent, or that there was a lack of useable evidence for the great majority of them. If hundreds

---

[784] *Adel Hamad v. George Bush et al*, District of Columbia, CV 05-1009 JBD, Declaration of Colonel Lawrence B. Wilkerson (RET), March 24, 2010 (WAMYSA014776–84), at WAMYSA014779.

[785] WAMYSA014780.

of innocent individuals had to suffer in order to detain a handful of hardcore terrorists, so be it. That seemed to be the philosophy that ruled in the Vice President's Office."[786]

Wilkerson explained his involvement in the Hamad case, "I have made a personal choice to come forward and discuss the abuses that occurred because knowledge that I served in an Administration that tortured and abused those it detained at the facilities at Guantanamo Bay and elsewhere and indefinitely detained innocents for political reasons has marked a low point in my professional career and I wish to make the record clear of what occurred. I am also extremely concerned that the Armed Forces of the United States, where I spent 31 years of my professional life, were deeply involved in these tragic mistakes."[787]

Wilkerson's declaration is a strong indictment of GTMO and the generation of JTF GTMO assessments. The point of this whole section is that a true scholar or expert cannot just accept at face value any document, let alone JFT GTMO documents. By now the reader knows my mantra: a document is just the start and not the end of an investigation. Documents must be analyzed for their credibility, reliability, and context which affects their meaning, and their purpose, which could be some sort of political deception on the writer's part.

### 2. Treasury Administrative Documents

Kohlmann and Winer (and the CRA) also like to use the U.S. Treasury Department designation of some NGOs as SDGT as evidence for WAMY's alleged support for al Qaeda. Although the Treasury Department has never designated WAMY itself as an SDGT, Kohlmann and Winer used justifications in other designations to accuse WAMY indirectly of supporting al Qaeda. Many scholars have criticized Treasury's process of designation for its lack of transparency, inaccuracies, and unfairness.[788] Even the 9/11 Commission commented on the low standards of the Treasury Department's investigation for a designation as an SDGT. "The administrative record needed to justify a designation can include newspaper articles and other

---

[786] WAMYSA014781.

[787] WAMYSA014784.

[788] For instance, see Ibrahim Warde, 2007, *The Price of Fear: The Truth Behind the Financial War on Terror*, Berkeley, California: University of California Press, and Robert Lacey and Jonathan Benthall, eds., 2014, *Gulf Charities and Islamic Philanthropy in the "Age of Terror" and Beyond*, Berlin: Gerlach Press, especially chapters 8 and 9: 199–257.

hearsay normally deemed too unreliable for a court of law."[789] The 9/11 Commission staff explained, "In the United States … the power to designate derives from the executive's power to wage war against foreign enemies. As a result, the executive may rely on *less evidence than is required in a criminal or civil trial*. The judicial review that is afforded a designation is *extremely deferential to the executive's judgment*. In other countries, a designation is viewed as a judicial or quasi-judicial act, in which the accused is afforded a right to answer the charges and the standard of evidence is at least as high as would be needed to sustain a civil lawsuit."[790] The result of this low evidentiary bar and deference to the executive branch is that "[a] designated entity can challenge the designation in court, but its chances of success are limited. The legal standard for overturning the designation is favorable to the government, and the government can rely on classified evidence that it can show to the judge but not defense counsel, depriving the designated entity of the usual right to confront the evidence against it."[791]

Kohlmann has cited Treasury's press releases on the designations of BIF, Batterjee, and LDI as SDGT as strong evidence that WAMY supported al Qaeda and the 9/11 terrorists. The Benevolence International Foundation was indeed designated by Treasury's Office of Foreign Assets Control (OFAC). The 9/11 Commission staff used it as a case study in its monograph. BIF had been under intensive FBI full field investigation since 1998. On the basis of foreign intelligence reports, the FBI started its investigation of BIF, which featured surveillance, digging through garbage (which was very fruitful as BIF threw everything out), recruitment of inside sources, scrutiny of bank accounts, telephone bills (but not yet electronic surveillance) and so on. However, the FBI was unable to trace BIF's money directly to its ultimate destination overseas and therefore could not open a criminal case against Arnaout or BIF.[792]

After the 9/11 attacks, Congress passed the USA Patriot Act loosening the prior requirement for an electronic surveillance warrant, which was then approved on BIF. While a criminal case required strong evidence to convict a person, the same was not true for administrative procedures. On the basis of a clarification by the USA Patriot Act, OFAC "could freeze the assets belonging to a suspected terrorist supporter 'during the pendency of an

---

[789] Roth, Greenburg, and Wille, 2004, at 112.
[790] Roth, Greenburg, and Wille, 2004, at 84, italics added.
[791] Roth, Greenburg, and Wille, 2004, at 112.
[792] Roth, Greenburg, and Wille, 2004, at 95–7.

investigation.' Only a single piece of paper, signed by the director of OFAC, was required. OFAC announced this action on December 14, 2001, thereby effectively shutting down" BIF.[793] BIF challenged this action.

Meanwhile, on the criminal side, the new U.S. Attorney in Chicago, Patrick Fitzgerald, who had previously prosecuted an al Qaeda case in New York, interviewed a cooperating witness from that case, who said that BIF funded al Qaeda in Sudan.[794] The offices of BIF in the United States and abroad were raided and the police raid in Sarajevo yielded a treasure trove of old documents on bin Laden. On their basis, on April 30, 2002, Arnaout and BIF were charged with two counts of perjury. Arnaout was taken into custody and denied bail. The court dismissed the charges against BIF, which was not charged again. On the other hand, Arnaout was charged in October 2002 with material support of al Qaeda through BIF.[795] I address the Arnaout litigation in two sections, here I focus strictly on Treasury's handling of BIF. The criminal proceedings are examined in section IV.A.4.

OFAC designated BIF as a SDGT on November 19, 2002 and the U.N. followed suit two days later.[796] With limited assets because of the previous OFAC freeze, BIF elected not to challenge OFAC's designation and focused exclusively on Arnaout's criminal issues. In any case, it could no longer function as an American charity because its ruined reputation would have prevented it from raising money from donors. In this part of the litigation, its lawyers had been "stunned to see that the administrative record supporting BIF's designation included newspaper articles and other rank hearsay." To them, this process seemed manifestly unfair but OFAC maintained that U.S. courts had upheld their process and standards.[797]

The next two cases had a different outcome because the entities were not American and got a fairer hearing. On December 21, 2004, OFAC designated Batterjee an SDGT with great fanfare.[798] The U.N. Security Council Al-Qaida Sanctions Committee followed suit two days later, on December 23, 2004, and put him on the list to have his assets frozen and to have him

---

[793] Roth, Greenburg, and Wille, 2004, at 99.

[794] Roth, Greenburg, and Wille, 2004, at 97–9; the proffer from the source, probably Jamal al-Fadl, is PEC-WAMY033545–68. The incriminating statements about BIF (under its partial Arabic name, Al-Birr al-Dawalia) are at PEC-WAMY033559–61.

[795] PEC-WAMY029364–89.

[796] Roth, Greenburg, and Wille, 2004, at 100–7; PEC-WAMY029579; PEC-WAMY017290–1.

[797] Roth, Grunberg, Wille, 2004, at 107.

[798] FED-PEC0083715–7.

subjected to a travel ban and arms embargo.[799] The U.N. did not conduct an independent investigation but relied on the U.S. Treasury Department designation. However, as time went on, OFAC designated more and more people and organizations, who were not located in the United States and complained to their respective states and U.N. committees that they could not challenge their U.N. listing. So, the Security Council Al-Qaida Sanctions Committee established an Office of the Ombudsperson in 2010 so she could investigate petitioners' requests to challenge their status and appointed Canadian international Judge Kimberly Prost to the position.

As the U.N. Office of the Ombudsperson explained in an official document, "since its establishment, [it] has provided individuals and entities listed by the Al-Qaida sanctions Committee with a fair and accessible recourse, which includes an independent review of factual information and is consistent with the fundamental precepts of fairness…. Because there is recourse available at the international level through which individuals and entities can challenge their inclusion in the list, the need to resort to domestic or regional courts is reduced. Further, as the protections are built into the system at the international level, they can properly reflect a uniform approach, regardless of the location of the petitioner, and ensure the application of standards appropriate for a procedure related to the sanctions measures of the Security Council."[800] Judge Prost reviewed the material pertaining to the Batterjee case (including LBI and BIF financial records), conducted a field investigation (unlike the U.S. Treasury) and confronted him extensively in Jeddah. On October 10, 2012, she submitted a comprehensive report to the Committee, presented her findings on November 6, and on January14, 2013, the U.N. Committee decided to delist Batterjee.[801]

On January 9, 2003, OFAC also designated Lajnat al Dawaa al Islamiya (LDI) as an SDGT, and the U.N. followed suit on February 20, 2003. LDI was cited by Kohlmann in Adel Hamad's GTMO case because he had been one of its employees for more than a decade. The Treasury press release stated, "Several workers of LDI in Peshawar belonged to al Qaida, including Ramzi Yussef [sic], who has been convicted in his role in the 1993 bombing of the

---

[799] http://www.unis.unvienna.org/unis/en/pressrels/2004/sc8280.html.

[800] Report of the Office of the Ombudsperson pursuant to the Security Council resolution 2162 (2014), at 12. Available at https://undocs.org/pdf?symbol=en/S/2015/80.

[801] WAMYSA014859. See also Report of the Office of the Ombudsperson pursuant to the Security Council resolution 2162 (2014), at 18 – 9. Available at https://undocs.org/pdf?symbol=en/S/2015/80.

World Trade Center. Khalid Sheikh Mohammed, considered as one of the most important operational officers for al Qaida, was head of the Peshawar branch from 1988 to 1995."[802] Kohlmann quotes these two sentences in full in his report.[803] Winer also uses the press release extensively in Section 7 of his report. It would be a challenge to pack more erroneous information into two sentences. 1) To my knowledge, there is no evidence that LDI employees were al Qaeda members, as shown in part II of this report. The two positions are full time that do not allow its holder to do both. 2) Abdul Basit Abdul Karim (Ramzi Yousef's real name) was never an al Qaeda member. He trained at Khalden, a rival camp. 3) Again, to my knowledge, Abdul Basit was never employed by LDI. He came late in Peshawar and went straight to training camp. 4) KSM was never the head of the Peshawar branch of LDI. He worked for LDI for a short time in 1987. The head of LDI was his older brother Zahed. 5) KSM did not stay in Peshawar until 1995. He traveled extensively starting in 1992, went briefly to Bosnia, moved to Qatar with his family in 1993, met with Abdul Basit in Karachi and Manila, went to Bosnia again and even tried to meet ibn Khattab in Chechnya around 1995. These gross errors in just two sentences specifically selected by Kohlmann are simply indicative of very poor investigation and erroneous assertions. For all my criticism of the JTF GTMO documents, they are examples of credible information at least as far as their inmate prior history when compared to the Treasury Department press releases. In any case, LDI had nothing to do with the 9/11 attacks.

Since LDI is a Kuwaiti charity, operating outside the United States, it petitioned the U.N. ombudsperson to review its listing on the sanctions list. After a thorough investigation Judge Prost submitted a comprehensive report on LDI to the Security Council Al-Qaida Sanctions Committee on April 15, 2013, presented her findings on July 2, and the Committee decided to delist it on September 4, 2013.[804]

The U.S. Treasury Department is still listing both Batterjee and LDI as SDGT as of March 20, 2020, when I last checked. It has not instituted anything comparable to the U.N.

---

[802] "Protecting Charitable Organizations – I: Additional Background Information on Charities Designated Under Executive Order 13224," U.S. Department of the Treasury Resource Center, available at https://www.treasury.gov/resource-center/terrorist-illicit-finance/pages/protecting-charities_execorder_13224-i.aspx.

[803] Kohlmann report, paragraph 169, at 51.

[804] Report of the Office of the Ombudsperson pursuant to the Security Council resolution 2162 (2014), at 21. Available at https://undocs.org/pdf?symbol=en/S/2015/80; see also https://www.un.org/press/en/2013/sc11109.doc.htm.

Security Council al-Qaida Sanctions Committee Office of the Ombudsperson to review the fairness of its administrative decisions.[805] Its press releases on SDGT are not reliable documents, as we just saw, and especially not in relation to legal proceeding as its evidentiary standards are much below a civil court's standard. Indeed, as we just saw, they are flawed and should be fact checked for any assertion they make. Like any other document, such press release is the start of an investigation, not its conclusion.

### 3.  Uncorroborated Press Reports

Both Kohlmann and Winer (and CRA) rely extensively on newspaper articles. The *New York Times* prides itself of being one of the newspapers of record in the United States. However, occasionally it fails spectacularly as in the run-up to the 2003 Iraq War, when it beat the drums of war and printed a series of erroneous reports on weapons of mass destruction fed to its reporters by Iraqis allied to the U.S. government.

### a.  Chris Hedges's article in the *New York Times*.

Both Kohlmann and especially Winer make Chris Hedges' 1992 article "Muslims From Afar Joining 'Holy War' in Bosnia"[806] a center piece of their argument that WAMY supported al Qaeda in Bosnia. In his article, Hedges reported that Batterjee was the chairman of WAMY. Winer repeats this claim that Batterjee was the chairman or global chairman of WAMY no less than eight times in his six-page section on WAMY's terrorism financing – I did not check in the rest of the report.[807] Apparently, Winer really believes that Batterjee was the chairman of

---

[805] Report of the Office of the Ombudsperson pursuant to the Security Council resolution 2162 (2014), at 21. Available at https://undocs.org/pdf?symbol=en/S/2015/80, at 2–12.

[806] Chris Hedges, 1992, "Muslims From Afar Joining 'Holy War' in Bosnia," *The New York Times*, December 5, at FED-PEC0057642–4.

[807] Winer's report, paragraph 12.12: ""Benevolence (BIF) … whose officers simultaneously shared positions with WAMY," at 104; paragraph 12.12.1: "LBI … WAMY … both organizations were headed by the same person [I assume he means Batterjee]," at 104; paragraph 12.12.3, "Adel Batterjee, identified himself to the New York Times as the *global* [emphasis added because this is not what Hedges wrote in his article] chairman of WAMY," at 104; paragraph 12.12.5, "Batterjee told the New York Times he was the *global* [emphasis added] chairman of WAMY," at 105; paragraph 12.12.7, "Batterjee's activities … while he was a senior officer of WAMY," at 106; paragraph 12.12.11, "Batterjee's joint role as chairman of WAMY and … LBI/Benevolence," at 108; paragraph 12.12.14, "Batterjee's simultaneous roles as chairman of WAMY," at 109; paragraph 12.12.15, "Batterjee … identified himself to the New York Times in 1992 as the global chairman of WAMY," at 109–10.

213

WAMY and uses Hedges's article throughout his section 12 on terrorist finance to incriminate WAMY. Kohlmann also repeats Hedges's claim three times that Batterjee "claims to be a former 'chairman' of WAMY."[808] However, from his hedge in the use of the verb "claims," it seems that Kohlmann probably knows that this is false. Yet, by not challenging this statement, he still leaves the insinuation that Batterjee might have been a chairman of WAMY, which then apparently involves WAMY in Batterjee's unrelated activities. Even the CRA audit cites Hedges' article as part of its basis for revoking WAMY's privilege.[809]

Whether or not Batterjee was ever a chairman of WAMY is easy to resolve. One has only to look at WAMY's abundant documents to look up who was its chairman. As soon as one does this, it becomes clear that WAMY does not and never did have such a position.[810] The two senior officers of WAMY are its president and its Secretary General. During the relevant time period, WAMY's president was Sheikh Hasan bin Abdullah al-Sheikh until 1994, then Dr. Abdullah al-Turki.[811] Batterjee was also never a WAMY Secretary General. Since its inception, WAMY had only five Secretaries General: Dr. Abdul Hameed Abu Solima, Dr. Ahmed Abdul Qadir Bi Hafidh Allah, Dr. Tawfeeq ibn Ahmed al Qaseer, Dr. Maneh al-Johani, and Dr. Saleh al-Wohabi. During the relevant period to this litigation, they were Dr. Maneh al-Johani from 1986 to 2002, followed by Dr. Saleh al-Wohaibi from 2002 onward.[812] There is a voluminous correspondence of the WAMY Secretary General in the discovery material and only those two names come up as the holders of this position. This information was provided in a sworn deposition by both Dr. Saleh al-Wohaibi, WAMY's Secretary General, and Dr. Abdul Wahab Noorwali, a WAMY Assistant Secretary General during the period in question. They are both primary sources on these facts. So, the allegation that Adel Batterjee was ever a chairman of WAMY is false. Both

---

[808] Kohlmann report, paragraphs 162, 163, and 188 and FN 238, 239, and 283, at 49, 57.

[809] CRA audit, at 14 (PEC-WAMY031460).

[810] See article 6 of WAMY's constitution, which states "The organizational structure of the World Assembly of Muslim Youth (WAMY) shall consist of the General Assembly, the President and the Vice President, the General Council, the Secretary General and the Assistant Secretary General(s)." (WAMY-SA E001056)

[811] WAMYSA1248923. Sheikh Hasan al-Sheikh was the Saudi Minister of Higher Education until 1993. When the Ministry of Islamic Affairs, Endowments, Dawah, and Guidance this ministry was established, WAMY was transferred under its care and its General Secretariat's Council selected its Minister Dr. Abdullah al-Turki as its president.

[812] Dr. Noorwali deposition, July 23, 2019, at 86; Dr. Wohaibi deposition; and Dr. Saleh al-Wohaibi's declaration, October 30, 2005, at 2 (FED-PEC0114416).

Kohlmann and Winer had ample time to check this claim with the evidence provided by WAMY and the rest of the discovery material. Yet, they persevered in making false claims in their reports. This demonstrates a blindness to the necessity of fact checking in a litigation where they claim to be expert witnesses.

I do not know what Batterjee said to Chris Hedges. He may have lied about his position in WAMY or Hedges may have misunderstood him. Batterjee was of course a primary source on his own position within WAMY, and Hedges is a secondary source on whether Batterjee was WAMY's chairman. Hedges could easily have fact checked the claim, but he did not, and he published a false claim. The fact that *The New York Times* published the statement that Batterjee was chairman of WAMY does not make this a fact in reality. Since both Kohlmann and Winer are so fond of quoting Hedges' article on this fact, they could have fact checked this claim, but did not. Kohlmann is a little more sophisticated and carefully crafts his statement on something he probably knows is wrong but leaves the insinuation unchallenged. On the other hand, Winer completely accepts the claim and in fact, by repeating it seven times, uses it as his central piece of "evidence" that WAMY funded al Qaeda in Bosnia. To put it plainly, this claim is either deceptive or very sloppy scholarship. This sloppy use of mostly secondary evidence for Winer and very selective evidence for Kohlmann is consistent throughout their respective reports. Their handling of this simple claim illustrates so well their flawed methodology and cavalier attitude for the facts of this litigation.

Batterjee was chairman of the board of directors of Lajnat al-Birr al-Islamiyyah (LBI), a charity that operated in the Afghan theater, until early 1993.[813] In late 1992, he was still its chairman when he talked to Chris Hedges. Perhaps he might have told Hedges that LBI operated under the auspices of WAMY and Hedges might have confused the two organizations because he probably was not familiar with either one of them. In any case, Hedges's reporting that Batterjee was chairman of WAMY was clearly wrong. He and those who relied on his reporting should have fact checked this claim. Perhaps from their perspective the story was simply too good to check. A document from any source is the start of an investigation, not its end…

### b. Vague and Uncorroborated Articles from Developing Countries

---

[813] WAMYSA057746, WAMYSA057748, WAMYSA031306.

215

Although the Western press has a reputation for reliable reporting, the previous section demonstrated it is not always so. In the developing world, journalistic standards are much poorer. When I was living in South Asia, I personally tried to teach apprentice journalists how to fact check stories. I simply could not persuade them to question authorities. Their attitude was, "If it's good enough for the governor, it's good enough for me."

Both Kohlmann and Winer have relied on vague uncorroborated stories from non-Western journalists to reinforce their arguments, especially when making claims about WAMY support of South Asian terrorists (see section III.D in this report). They both cite the same Associated Press wire by Janullah Hashmizada about the alleged Sudanese WAMY employee who acted as bin Laden's courier leading to the WAMY Pakistan office being "raided in a joint FBI-Pakistan intelligence operation."[814] Both experts write confidently, in the active voice, about this incident. Yet, curiously, there is no other reference to this incident other than Hashmizada's vague three lines. Both a local supervisor at the WAMY Pakistan office and WAMY's secretary general testified under oath that this incident never happened.[815] At the time, WAMY's secretary general had also denied that either incidents (WAMY Sudanese employee questioned by authorities and WAMY Pakistan office raided) had happened.[816] Bergen in his account described the courier with a Pakistani accent rather than a Sudanese person as Hashmizada alleged. Looking closer at all these documents, it seems that the handover of the audiotape took place on November 12, 2002, more than a year after the 9/11 attacks. Three weeks later, there must have been some rumors that a Sudanese employee of WAMY Pakistan had been questioned about it and the office was raided because Dr. Wohaibi, from Saudi Arabia, denied either events (the questioning and the raid) on December 5. Hashmizada's story was written three or four days later, depending on the reader's time zone. The story was therefore not about a recent event, but a past event, which puts even more distance between the alleged facts and the AP story. It seems that Hashmizada was just reporting the local rumor mill (anonymous security official) and not events he had personally witnessed. Again, as previously mentioned, as someone who has lived in Pakistan and professionally reported on events that occurred there, I am quite familiar with the

---

[814] Kohlmann report, paragraph 175, at 53; Winer report, paragraph 12.13.1, at 110; the article is Janullah Hashmizada, 2002, "Pakistan Questions Sudan Man About Tape," *Associated Press*, December 9, 2002 (FED-PEC0024183).

[815] Ibrahim Anwar deposition, at 292; Dr. al Wohaibi deposition, at 123.

[816] "WAMY Denies Arrest Report," *Arab News*, December 5, 2002.

frustration of reporting in a country where the rumor mill is taken as fact by its inhabitants (because of the lack of transparency of its government and the long tradition of flourishing conspiracy theories in an oral culture). Any local story must be treated with caution and subjected to good fact checking, as any competent expert must do. One cannot just rely on such vague uncorroborated stories.

Because of the lack of corroboration, Hashmizada's story does not stand on its own. It is the start of an investigation about its contents (credibility, reliability, context, purpose) and a suggestion for an expert of where to look in order to find corroboration. If none is found, as in this case, it must be put aside and referred to as just an allegation and not referred to in positive terms as if it were already an establish fact, as Kohlmann and Winer do in their respective reports. Without more, it cannot be relied on as a fact since the preponderance of the evidence– namely the denials of people who should have known about this fact and the different descriptions of the person in question in an independent source. The weight of the evidence seems to indicate that this story is probably not true.

Kohlmann also cites a story by Shaik Ahmed Ali in *The Times of India*[817] as indication that "the Indian government shuttered WAMY's offices in that country for allegedly financing banned terrorist groups, including Lashkar-e-Taiba (LET) and Jaish-e-Mohammed (JEM)."[818] This looks bad: WAMY funding terrorist organizations. Again, I found no other evidence that WAMY ever funded LeT or JeM. Nor is this what Ali wrote in his article. He just reported *allegations* that WAMY had funded LeT and JeM. But this was not the reason the Indian government shut two of WAMY's six offices in India. They were closed there "after the Center imposed a ban on SIMI [the Student Islamic Movement of India]." SIMI is not a terrorist organization, but has been suspected of aiding a terrorist organization, the Indian Mujahideen. Again, the allegation that WAMY's office in India was closed because it funded two terrorist organizations is not even suggested in Ali's article. I don't know if the Indian government shut down WAMY's offices in Delhi and Mumbai, whether temporarily or permanently. The story line appeared to be Hyderabad, quite far away from those two cities, and I would look for some reporting in those affected cities, which have a large reporting community, indeed the largest

---

[817] Shaik Ahmed Ali, 2001, "WAMY sets its foot in Hyderabad," *The Times of India*, November 6, 2001.
[818] Kohlmann report, paragraph 175, at 53.

217

ones in India. There is no need to cite an article from Hyderabad for significant (for this litigation) events that might have taken place in faraway Delhi or Mumbai–Indians are not as mobile as Americans. My experience from reporting in South Asia, in both Pakistan and India, is that the longer the chain of access to the information about an event in South Asia, the less credible is the story about the event. This is very similar to the legal hearsay rule on admissibility of evidence. In any case, the over-reliance on such vague and uncorroborated sources of information is not adequate evidence for the allegation that WAMY funded al Qaeda. Over-reliance on such sources indicates a flawed methodology in a civil lawsuit context.

### 4. Use of Prosecutorial Documents

Both Kohlmann and especially Winer extensively use prosecutorial documents, such as indictments, proffers, or affidavits for warrants as their evidence for their claims. This is surprising because they are both lawyers and should know that prosecutorial documents are one-sided, presenting only the prosecution's theory of the case and illustrating its best-case arguments. Prosecutors and law enforcement officials select only incriminating evidence in an adversarial process of jurisprudence, unlike many European judiciaries based on an inquisitorial process. The prosecution's arguments are just the opening salvo of a trial, which tests their allegations by confronting them to the defenses' arguments. I have not seen the plaintiffs' experts use any (criminal) defense documents in these cases. A scholar and expert must be more neutral and impartial and evaluate these prosecutorial arguments and their corresponding facts in the light of all the evidence, and weigh their respective reliability and validity to arrive at an opinion. In this section, I examine the crucial documents used by the plaintiffs' experts to evaluate whether they should be accepted at face value as Kohlmann and Winer do.

### a. USA Fitzgerald's Evidentiary Proffer in the Arnaout Litigation

Both Kohlmann and Winer relied heavily on this USA Fitzgerald's Evidentiary Proffer in the Arnaout trial.[819] Kohlmann cited it eight times in the last four pages of his report[820] and I did not check the rest of his report. This proffer came with many exhibits that strongly influenced

---

[819] *U.S. v. Enaam Arnaout*, N.D. Illinois, Eastern Division, No. 02 CR 892 (SBC), Government's Evidentiary Proffer Supporting the Adminissibility of Coconspirator Statements, January 6, 2003, which I previously labeled Arnaout evidentiary proffer, PEC-WAMY018176–272.
[820] Kohlmann report, FN 296, 299, 300, 302, 303, 304, 310, and 313, at 59–62.

most writing on al Qaeda after their revelation when the proffer and their exhibits became public–this proffer was initially submitted under seal. So, not only has this proffer been influential but its attached exhibits even more so. They are scattered around in the discovery material.[821] Many of these exhibits were scans of documents stored in folders in a computer at the BIF office in Sarajevo raided by local authorities in March 2002. These exhibits are priceless primary sources on events that occurred in the late 1980s and early 1990s in Peshawar and Afghanistan and are the basis of other secondary source materials such the 9/11 Commission Report itself, which the plaintiffs' experts also used, significantly expanding the importance of this proffer in this litigation. This report has also used these exhibits generously in the narrative of al Qaeda's evolution in part II of this report.

It is hard to describe the excitement among al Qaeda scholars when these documents trickled into the public domain. Ironically, their entrance into the public domain is the present litigation as plaintiffs' attorneys made them available to some journalists[822] and later scholars. They are a gold mine of primary source documents for scholars, who know how to put them in their proper context in order to understand how they clarify the past that had been shrouded in secrecy. A few scholars have examined these primary sources in the context of other primary sources, like the captured documents posted on West Point's Combating Terrorism Center website[823] and in the context of people who were present in Peshawar and witnessed many of these historical events. Some had even written contemporaneous diaries[824] and later written books.[825] When properly analyzed and put in context, these documents became the basis of good scholarship on the early years of al Qaeda[826], as I have tried to do in part II of this report.

Unfortunately, USA Fitzgerald is not a scholar but was then a prosecutor in a hurry, who relied on a very uneven source, which resulted in confusion that is still with us. The post-9/11 attacks were scary times when many believed that there was a second wave of al Qaeda attacks coming. Speed was of the essence. It was important to interdict funding to al Qaeda and Arnaout

---

[821] See for instance, PEC-WAMY041353–771.

[822] See for instance, Bergen, 2006, FN 3, at 410.

[823] Available at https://ctc.usma.edu.

[824] For instance, Hamid's many documents at West Point's CTC; Muhammad, 1991.

[825] For instance, Hamid and Farrall, 2015; Anas and Hussein, 2019; Umar Abd al-Hakim (Mustafa Setmariam Nasar, Abu Musab al Suri), 2004.

[826] See Bergen and Cruickshank, 2012; Hamid and Farrall, 2015; Hegghammer, 2020; Farrall, 2017.

was suspected of being such a material supporter of al Qaeda. It was important to keep him in jail and convict him of material support of terrorism. After translating some of the folders on the BIF computer, he showed them to a cooperating witness, widely believed to be Jamal al-Fadl, willing to authenticate them at a trial and interpret them for a jury.

### i)    Al-Fadl's Interview in Preparation for the Arnaout Trial

Al-Fadl had been the government's star witness at the East Africa embassies' bombings trials in 2001. He had walked into a U.S. embassy in Africa in June 1996 and been the U.S. government's first source on al Qaeda. One of his FBI handlers described him as the "Rosetta stone" to understanding al Qaeda.[827] He was born in Sudan in 1963, and in 1986 came to Brooklyn, New York, where he worked for Mustafa Chalabi, who raised money in the United States for the MaK. Around 1988, Chalabi urged him to go and join the jihad in Peshawar and al-Fadl stayed at a MaK guesthouse before going to an al Qaeda training camp, Khalid bin Walid, for a month and a half. He seemed to have drifted from camp to local fronts to guesthouses to camp, until he joined al Qaeda at al-Faruq around '89–90. He claimed that this was al Qaeda's first meeting ever and he had been its third member. He testified that when the Russians had left Afghanistan, bin Laden created al Qaeda. At the end of 1990, al Qaeda decided to relocate to Sudan, and al-Fadl, being a Sudanese, was sent ahead of the rest to prepare the group's arrival. After al Qaeda relocated there, al-Fadl worked in al Qaeda's finance committee under Madani al-Tayeb. He described some of the businesses that bin Laden owned in Sudan and said that al Qaeda had established a training camp at a farm bin Laden owned. Al-Fadl attended some of the Thursday evening meetings that bin Laden held for al Qaeda members in Khartoum. He was sent as a courier to take money to people and at one time Madani al-Tayeb sent him to Zagreb to assess the situation there for business investments. At the end of 1995, he was arrested by the Sudanese authorities for defaulting on a personal loan. When he got out, he embezzled $110,000 from al Qaeda and bought some land with it. He was discovered and bin Laden asked him to pay it back. He only paid back about $25,000-$30,000 when he fled al Qaeda and Sudan.[828]

---

[827] Former FBI Special Agent Dan Coleman used this description in Jane Mayer, 2006, "Junior: The clandestine life of America's top Al Qaeda source," *The New Yorker*, September 11, 2006.
[828] *U.S. v. Usama bin Laden, et al.*, S.D.N.Y., No. S(7) 98 Cr. 1029-LBS, February 6 and 7, 2001, testimony of Jamal al Fadl, at 162–392.

So, to recap, al-Fadl was a low-level Arab Afghan from around 1989 to 1990 when he joined al Qaeda as a foot soldier. He was sent as an advance team to Sudan probably because he was familiar with his country of origin and went there to welcome the group when it came later. He worked in the finance office of bin Laden's businesses and al Qaeda but was never part of its inner leadership circle. He was basically absent from al Qaeda when he got arrested in late 1995 and then embezzled funds from it, which was quickly discovered. In other words, al-Fadl was at too low a level and away from Peshawar in the late 1980s and early 1990s to be privy to what was happening in Peshawar. Although he claimed to know who was in al Qaeda, this membership was secret and he could only guess at the membership of some of the prominent leaders (bin Laden, Salim, Abu Ubaydah, Abu Hafs, Abu Ayoub al-Iraqi). He left Peshawar in late 1990 and no longer had any firsthand information on what was going on there. During the Africa embassies' bombings trial, USA Fitzgerald had been careful in conducting his direct examination of him to limit him to very short answers.

When I read al-Fadl's testimony I was struck by his vagueness and inability to recall dates. I was also struck that he did not mention the defeat at Jalalabad, a traumatic experience for anyone in al Qaeda at the time and said that the first camp he trained at was Khalid bin Walid, which I believe was established in 1989. When I read more of his debriefs and even read a long transcript of recorded conversation, he seemed very careless with details and had trouble saying that he did not know things that he should have known. He mostly begged for favors from his FBI handlers. My impression was that he was a decent but not precise source on events that he witnessed but not on events that he did not. He simply repeated some of the rumor mill or made things up from what he knew to be true.

As a result of this litigation, I got to read his first interviews with the FBI and USA Fitzgerald in November 1996 in Europe. He claimed to have worked for bin Ladin and his "Islamic Army" from 1987 to 1995. He said that Azzam and bin Ladin established the MaK in 1987. He confused the Islamic Army and the MaK. He claimed that "there are many divisions in the Islamic Army with various names created to confuse governments if a soldier is captured. This would make it difficult for those groups to be traced back to bin Ladin's Islamic Army…. [E]ach cell has its own goals and objectives, or services that they specialized in. These groups would not go beyond what their specialty or goal was, i.e. reconnaissance, operations, recruiting, etc." He remembered that Azzam's deputy was "Adnan Tamimi." He said that bin Ladin's

221

objective was to utilize the Islamic Army in and out of Afghanistan. On the other hand, Azzam said that it was illegal to spend any jihad money meant for Afghanistan outside of Afghanistan. Bin Ladin broke with Azzam about a month before Azzam was killed. He stated that "when he was in Afghanistan there was an organization called al Qaida or 'The Base'. This organization would train people, and the Emir would select certain individuals based on their skills to participate in certain assignments. There was a written contract made between the Emir and the person being trained … At the end of the contract there was a statement that loyalties were to the Emir, as well as the leader bin Ladin, and the rules and regulations must be followed whether they like it or not. Gamal stated that the contract was kept at Al Qaida…. When he went to Sudan, there was a new contract that needed to be signed for the Islamic Army, that was more detailed and comprehensive." "[W]hen bin Ladin left Afghanistan for Sudan in the spring of 1991, he traveled through Saudi Arabia first." "Gamal embezzled money from bin Ladin companies because he believed he had a right to do so. Gamal stated that when they found out, it was a big problem for him, so he left Sudan [in February 1996] without informing anyone." "[I]n the beginning of 1992, all the basic rules for the Islamic Army were in place. At this time a fatwa was issued by the Islamic Army declaring that all foreign forces must be fought, especially in Saudi and the Gulf. The presence of forces in Mecca and Medina legitimized the fatwa. The fatwa indicated that it was necessary to strike at American forces because the American forces were like the 'head of the snake.'" "Gamal advised that he believes that the Riyadh bombing [SANG bombing in 1995] was an Islamic Army operation." "Gamal advised that a Khalifah al-Omani told him that our people were involved in the World Trade Center bombing."[829]

As the alert reader familiar with the history of al Qaeda in part II of this report will realize, al-Fadl's reporting has the large themes right: there was a neo-jihadi group of Arab Afghans led by bin Laden that emerged from Afghanistan and became a terrorist group in Sudan. However, he got many of the details wrong since he was not in Peshawar, as he came late around 1989 and stayed mostly inside Afghanistan before being dispatched to Sudan around 1990-1. In this litigation, the details are extremely important. Perhaps bin Laden was helped by some Islamic charities in general, but, in this case, which specific ones helped him? Al-Fadl's distinction between the Islamic Army and al Qaeda is intriguing and I have not seen it elsewhere.

---

[829] FBI 302 summary of an interview with Gamal Ahmed Mohamed al-Fadel, November 10, 1996, at PEC-WAMY020932–49.

He no longer mentioned it four years later when he testified at the East African embassies trial. Did he not realize until after he left Sudan and after speaking to the FBI that the Islamic Army and al Qaeda were one and the same? What did he think al Qaeda was when he was still a member?

Now that we've established that al-Fadl is not the most reliable source, good enough in general, but not with dates, names, and specific events, let us come back to the trove of documents that USA Fitzgerald had obtained during the raid on the BIF office in Sarajevo. These documents had been saved by Arnaout in several folders, like a person keeps vacation pictures as reminders of his cherished experiences. Unfortunately, these documents were about facts and events in Peshawar in the late 1980s and early 1990s, most of them took place before al-Fadl arrived on the scene. Nor could he authenticate the documents as, at that time, he was definitely not privy to the various machinations of Arab Afghan leaders in Peshawar. He simply did not travel in these circles as he was mostly drifting from one training camp to another.

In order to prepare an indictment against Arnaout, Fitzgerald sent a team to show al-Fadl the scanned BIF documents and get his interpretation in order to use the information for the upcoming Arnaout trial.[830] It is unclear if Fitzgeral was present at al-Fadl's debrief since this part of the August 29, 2002 interview was blacked out. In the interview, al-Fadl identified the many names in the documents of people who had come to the camps where he was training. He was silent on other names he did not recognize. He made many errors, such as claiming that Jalaluddin Haqqani was a commander under Gulbuddin Hekmatyar.[831] I'm not sure how anyone who spent any time in Afghanistan in that time period could have made that mistake. They were both very prominent Afghan leaders well-known to all the Arab Afghans and personal acquaintances if not friends to the most prominent Arab Afghans. Haqqani was one of Yunis Khales's commanders. It's true that both Khales and Hekmatyar headed parties called Hezb Islami. This was because they were both in the same party until the late 1970s, when they split up. They both kept the name of their original party. To distinguish them, one was called Hezb Islami (Hekmatyar) and the other Hezb Islami (Khales). They were different and rival at the time. They fought against each other in the late 1990s as Haqqani joined the Taliban while Hekmatyar fought against them. The point again is that al-Fadl is an uneven source, his claims

---

[830] The interview is at PEC-WAY033545–68.
[831] PEC-WAMY033550.

must be fact checked, and the summary of his interview cannot be cited as evidence until his claims are independently corroborated.

More pertinent to this litigation, when al-Fadl was shown an organizational chart with a lot of names on it (Tareekh Osama, Folder 56, Document 136), showing bin Laden at the top and Azzam as one of his four deputies, he commented on what he knew about each name. For the name Adel Farhat, he stated that an "Adel Farhat and bin Laden were very close. Source believed that Adel Farhat may have run the al-Birr al-Dawalia charity organization for a period of time. Source recalled that al-Birr al-Dawali had an office in Sudan during the early 1990's. Source noted that al-Birr al-Dawali also had an office in Zagreb, Croatia at one point in time. Source advised that Bin Laden specifically used these two al-Birr al-Dawalia offices as a means to move money to al Qaeda."[832]

As argued, Jamal al-Fadl was a reasonably reliable source on information to which he had direct access but not on information to which he heard second or probably third hand. The chart is definitely not an al Qaeda chart and was probably another aspirational attempt to reconcile Azzam and bin Laden by inviting bin Laden to be the head of another Peshawar coordinating council to bridge the growing gap between them.[833] The chart probably lists most of the prominent ansar or Arab Afghans connected to the MaK in Peshawar. Al-Fadl makes a few errors in his comments about these people, as he claims that Abu Burhan (whom he claims is Iraqi instead of Syrian), Sheikh Tameem al-Adnani, and Abdullah Anas are all al Qaeda members. Here he confuses two organizations. The chart was probably created before the summer of 1988 when reconciliation between bin Laden and Azzam was still possible and at a time when al-Fadl had not yet arrived in Peshawar. He believes that Adel Farhat ran al-Birr al-Dawalia in Peshawar. He knew al-Birr al-Dawalia from Sudan. I believe that he referred to the Benevolence International Foundation (BIF), which is Monathamat al-Birr al-Dawaliya in Arabic. Al-Fadl shortens it to just al-Birr al-Dawaliyya. However, BIF started operating only in the spring of 1993, after Arnaout took its direction and indeed came to Khartoum. But there was no al-Birr al-Dawalia or BIF in Peshawar until after al-Fadl had left. There was of course Lajnat al-Birr al-Islamiyyah (LBI) in Peshawar, which was run by Adel Batterjee. There was never any LBI in Sudan. Nor was there any Adel Fahrat among the lists of LBI employees in the late 1980s

---

[832] PEC-WAMY033554.

[833] Hegghammer, 2020, at 362–3 shares this interpretation.

and early 1990s. Although al-Fadl later identified Fahrat as Batterjee, it is unclear why Batterjee appeared in a different name since he usually appears as Batterjee, in true name, in the all the other documents stored in the BIF computer from Sarajevo. I suspect that because of the use of the word benevolence, al-Fadl simply confused both organizations and fused them into one. Al-Fadl was rarely in Peshawar and just a foot soldier, who did not circulate among the Arab Afghan leaders in Peshawar. He was not privy to their confidences and secrets. He knew some by reputation, and from his mischaracterizations of them, probably not very well. He talked about al-Birr al-Dawalia in Khartoum and Zagreb, two places where indeed the Monathamat al-Birr al-Dawaliya (BIF) had offices, but again not in Peshawar. He simply confused BIF with LBI. This confusion was indeed what Batterjee seemed to have intended when he used the name benevolence (al-Birr) for his new organization, BIF, in order to fool Saudi donors to give money to BIF when they believed that they were donating to LBI.[834]

Al-Fadl was also shown Tareekh Osama, Folder 41, Document 108, which is a list of 20 names in Arabic alongside other names in parentheses.[835] He referred to it as the "Golden Chain," which "consisted of wealthy individuals from the Gulf region who provided bin Laden and al Qaeda with money on a regular basis."[836] He recognized two names as donors because his boss in Sudan, Madani al-Tayeb, told him that they donated their zakat funds to bin Laden. "Source noted that the name Baterjee appearing to the right of many of the names on the document is the same name of the individual who Source referred to earlier as one of the main people who operated al Birr al Dawalia."[837] Indeed, the name Batterjee appears in parentheses alongside the 4th, 5th, 6th, 8th, 14th, and 16th names.[838]

### ii)  The Arnaout Evidentiary Proffer

In his superseding indictment, USA Fitzgerald embraced al-Fadl's confusion and wrote that in "the early 1990's, LBI was renamed 'Benevolence International Foundation' (thereafter 'BIF), referred to in Arabic as 'Al Birr al Dawalia,' and incorporated in the United States."[839]  A

---

[834] See section II.F of this report.

[835] PEC-WAMY041353–5.

[836] PEC-WAMY033567.

[837] PEC-WAMY033568.

[838] PEC-WAMY041354.

[839] *U.S. v. Enaam Arnaout*, N.D. Illinois, Eastern Division, No. 02 CR 892 (SBC), Indictment, WAMY029366.

few weeks later, he elaborated on the charges in his January 6, 2003 evidentiary proffer.[840] In it, he stated, "In or about 1991, at the time when the leadership of the *al Qaeda* organization relocated to Sudan, the LBI/BIF organization (each referred to in Arabic as '*al Birr,*' or 'Benevolence') followed suit and opened its first office in Sudan specifically to support *al Qaeda* and the mujahideen in Sudan."[841] He stated that his source would testify that in Bosnia "BIF (referred to as '*al Birr*') was providing money for weapons for al Qaeda."[842] His source would say that bin Laden advised him that "*al Qaeda* was using several charities to fund its operations overseas, including *al Birr.*[843] Later, he claimed that "*Lajnat Al-Birr Al-Islamiah* … evolved into BIF."[844] In a section entitled, "Shift from 'LBI' to 'BIF'," he outlined the formation of BIF in Illinois and claimed, "BIF and LBI remained one organization, under Batterjee's control, and their assets were interchangeable."[845] Unlike many of his other claims in the proffer, he did not append an exhibit to support this claim.

Please note the shift over time in the Arabic name for BIF in the documents. Benvolence International Foundation translates into Monathamat al-Birr al-Dawaliya in Arabic. Al-Fadl consistently referred to it as al-Birr al-Dawaliya and only as al-Birr al-Dawaliya in the more than a dozen time he used this name in his discussion with FBI agents. Fitzgerald used al-Fadl's terminology in his October 2002 indictment and called BIF al-Birr al-Dawaliya. Winer specifically cites this document to state that BIF in Arabic is simply "Al Birr al Dawalia."[846] By January 2003, Fitzgerald changed his terminology and lumped both LBI (Lajnat al-Birr al-Islamiya) and BIF, two separate charities with very different names, and used the only word they had in common al-Birr to refer to both of them. Voilà, the trick is done! By dropping all the words in Arabic that distinguished the names of these two organizations and reducing both names to their only Arabic common word, (Lajnat) al-Birr (al-Islamiya) becomes (Monathamat) al-Birr (al-Dawaliya), and LBI becomes BIF! This magical and false transformation is critical in this litigation because WAMY is connected to LBI, but not BIF. Ironically, Batterjee's deception

---

[840] Arnaout evidentiary proffer, BUR-PEC-014501–97.
[841] BUR-PEC014521.
[842] BUR-PEC014522–3.
[843] BUR-PEC014523.
[844] BUR-PEC014526.
[845] BUR-PEC014544.
[846] Winer report, FN 66, at 47.

226

attempting to fool Saudi donors to give to BIF instead of LBI did not get the opportunity to fool them, but it certainly fooled al-Fadl and then USA Fitzgerald and a whole slew of self-promoted experts who did not bother to check with primary sources whether the claim LBI=BIF was true or not. In fairness to Fitzgerald, in 2002, he was probably not aware of Batterjee's history and his separate establishment of BIF, which led Batterjee to be fired from LBI by WAMY, as outlined in section II.F of this report. However, his role as prosecutor was to incriminate Arnaout, not to exonerate him. This was the role of Arnaout's defense. But the plaintiffs' experts had plenty of time in the past 18 years with the emergence of all the relevant documents in the discovery material of this litigation to set the record straight. Instead, they chose to rely on a now obsolete document after all this new evidence surfaced.

Nor are these constant claims that LBI is BIF the only errors in the evidentiary proffer. BIF did not support the fighters in Afghanistan.[847] BIF was not yet in existence at the time since it was incorporated in 1992. Fitzgerald cleverly injects BIF into his narrative from the start when it did not exist and sowed confusion. Hekmatyar never served under Yunis Khales.[848] They had been part of the same organization, Hezb Islami in the 1970s, which was headed by Hekmatyar and not Khales at the time. After their split at the end of the 1970s, Khales kept the same name for his organization, creating confusion as they had the same name. Al-Fadl had made the same error. To my knowledge, Hekmatyar's Hezb Islami was not involved in Chechnya.[849] It was a strictly Afghan organization and had its hands full fighting for its life in the Afghan Civil War, for which it was partially responsible. Al Qaeda did not fight in Chechnya. Ibn Khattab did not work with bin Laden in Afghanistan[850] but was a rival to bin Laden there. When ibn Khattab went to Chechnya, he established a rival organization to al Qaeda. When ibn Khattab was later forced to leave Chechnya, bin Laden wanted him to join al Qaeda, which ibn Khattab always declined. I do not believe I need to go on to show that the Arnaout evidentiary proffer is not a reliable document, not to be taken at face value as conclusive evidence in litigation. Like any other prosecutorial claim, it must be tested and confronted with the totality of the discovery

---

[847] BUR-PEC014516.
[848] BUR-PEC014518.
[849] BUR-PEC014518–9.
[850] BUR-PEC014524.

material and, for experts, the totality of what is known about a certain topic. Again, the Arnaout evidentiary proffer should be the start of an investigation, not its conclusive end.

USA Fitzgerald also adopted the expression "Golden Chain" that al-Fadl had coined for the list of names in Tareekh Osama document 108. "Bin Laden … received financial support from a group of wealthy donors from the Gulf area known as the 'Golden Chain,' linked to Adel Batterjee, the Saudi founder of both LBI and BIF."[851] When the proffer was unsealed, there were immediate speculations that this was the smoking gun of donors to al Qaeda and that Batterjee received money from them on behalf of al Qaeda.[852] The 9/11 Commission picked up the expression,[853] and so did Kohlmann and Winer in their respective reports.[854]

The point of the above is that prosecutorial documents do not stand on their own as evidence. They are secondary sources. To his credit, in addition to al-Fadl's interpretations, Fitzgerald provided the primary sources he relied on as voluminous exhibits to his proffer. He was more of a scholar than the plaintiffs' experts, who simply accepted his secondary source documents at face value. They did not bother to examine the basis of his claims: they did not investigate the credibility of al-Fadl's interpretations by confronting them with other facts that we know to be true about the Arab Afghans in Peshawar at the time. In other words, these experts erred in their methodology by over-relying on flawed secondary source documents and not confronting them with relevant primary sources that refute their interpretations. Winer is especially at fault here since he constantly refers to Dr. Noorwali's deposition but ignores the primary source documents presented at his deposition that directly contradict al-Fadl's and Fitzgerald's interpretations. Instead, he basically claims that the Arnaout evidentiary proffer contradicts Dr. Noorwali's deposition, which therefore must be wrong despite the fact that Dr. Noorwali was a primary source on these events. Winer acted as a self-appointed prosecutor, denying or minimizing disconfirming evidence in order to build his accusation. This is not the role of a scholar or expert, who must reach a conclusion on the basis of a careful examination of all the evidence in a case. Kohlmann simply ignores any refuting evidence to his crafted arguments and acts as if it does not exist.

---

[851] BUR-PEC014518, see also BUR-PEC014527–8.
[852] FED-PEC0132304–8.
[853] 9/11 Commission Report, at 55; Roth, Grunberg, and Wille, 2004, at 94, 103.
[854] Kohlmann report, paragraph 156, at 46; Winer report, paragraph 6.3.1, at 22.

228

Since WAMY was never connected to BIF, contrary to Fitzgerald's assertion to the contrary, I shall not address the allegations against BIF since they become irrelevant to this litigation against WAMY. However, it is instructive to learn how the litigation based on these allegations fared. As we have seen in section IV.A.2, BIF became subject to OFAC administrative sanctions, but here I focus on the criminal case against Arnaout. According to the 9/11 Commission staff, although the evidentiary proffer provided voluminous documents, Arnaout argued that the proffer "essentially boiled down to BIF diverting charitable funds to support Chechen and Bosnian fighters, and had nothing to do with bin Laden, terrorism, or al Qaeda."[855] He challenged the proffer, and in a first minute order before the start of the trial, the presiding court ruled that the defendant "persuasively argues that a significant amount of the government's … proffer contains materials that are not relevant to him nor probative of the charges in the indictment(s), but rather are highly prejudicial matters suggesting guilt by association."[856] In a separate opinion three days later, the court ordered, "[g]iven the insufficiency of the … proffer, the court cannot find by a preponderance of the evidence that the proffered statements are admissible under the co-conspirator exception to the hearsay rule before trial."[857] I share the court's opinion.

This forced USA Fitzpatrick to drop all the terrorism related charges against Arnaout and reach a plea bargain with Arnaout pleading guilty to just one count of racketeering conspiracy for fraudulent diversion of charitable donations to promote overseas combatants.[858] Although the government declared victory for the conviction, it could not hide the fact that neither Arnaout nor BIF admitted to supporting al Qaeda or any other terrorism group. To the contrary, as the presiding federal district court judge pointed out, "Arnaout does not stand convicted of a terrorism offense. Nor does the record reflect that he attempted, participated in, or conspired to commit any act of terrorism. In its written plea agreement, the government agreed to dismiss sensational and highly publicized charges of providing material support to terrorists and terrorist organizations." The court found that Arnaout's offense, racketeering conspiracy, was not a crime

---

[855] Roth, Greenburg, and Wille, 2004, at 108.

[856] *U.S. v. Arnaout*, N.D. Illinois, Eastern Division, No. 02 CR 892 (SBC), Minute Order, January 30, 2003, PEC-WAMY041905, item 162.

[857] *U.S. v. Arnaout*, N.D. Illinois, Eastern Division, No. 02 CR 892 (SBC), Memorandum Opinion and Order, February 3, 2003, docketed February 4, 2003, at 4.

[858] PEC-WAMY031575 – 87.

of terrorism as defined by law and refused to apply the terrorism enhancement because "[t]he government has not established that the Bosnian and Chechen recipients of BIF aid were engaged in a federal crime of terrorism, nor that Arnaout intended the donated boots, uniforms, blankets, tents, x-ray machine, ambulances, nylon and walkie-talkies to be used to promote a federal crime of terrorism."[859] The Seventh Circuit Court of Appeals affirmed the District Court's refusal to apply the terrorism enhancement.[860] Despite the voluminous evidentiary proffer, Arnaout and BIF were vindicated of any charge of supporting terrorism. As it was found to be inadmissible, the evidence in the proffer was never tested or challenged in a court of law. As we just saw, some of the proffer's claims were erroneous when confronted with primary source evidence.

The 9/11 Commission staff on terrorist financing concluded, "[d]espite these troubling links, the investigation of BIF … revealed little compelling evidence that [BIF] … actually provided financial support to al Qaeda–at least after al Qaeda was designated a foreign terrorist organization in 1999. Indeed, despite unprecedented access to the U.S. and foreign records of these organizations, one of the world's most experienced and best terrorist prosecutors has … resolved the investigation of BIF without a conviction for support of terrorism. Although OFAC action shut down BIF … that victory came at a considerable cost of negative public opinion in the Muslim and Arab communities, who contend that the government's destruction of these charities reflects bias and injustice with no measurable gain to national security."[861]

Nor did the allegations about the "Golden Chain" fare better in court proceedings. The document containing the list so labeled was picked up by plaintiffs in the present litigation and challenged by various defendants. In 2005, Judge Richard C. Casey ruled with respect to this list, "Even assuming as the Court must, that the 'Golden Chain' refers to … [one of the original defendants in this litigation], with no indication of who wrote the list, when it was written, or for what purpose, the Court cannot make the logical leap that the document is a list of early al Qaeda supporters."[862] As the court properly understood, a document is just the start of an investigation

---

[859] *U.S. v. Arnaout*, N.D. Illinois, Eastern Division, No. 02 CR 892 (SBC), Memorandum Opinion and Order, July 17, 2003, at 6, 9–10.

[860] *U.S. v. Arnaout*, 431 F.3d 994 (2005), at 1003, WAMYSA570941.

[861] Roth, Greenburg, and Wille, 2004, at 111.

[862] *In re: Terrorist Attacks on September 11, 2001*, S.D.N.Y., No. 03 MDL 1570 (RCC), Opinion and Order, January 18, 2005, at 41.

230

and does not stand on its own. Without more context, I am not convinced that the Golden Chain is a list of donors to al Qaeda.

### b.  Other Prosecutorial Documents

As we just saw, USA Fitzgerald's indictment against Arnaout shares the same flaws as his evidentiary proffer. Kohlmann and Winer use it independently in various sections of their respective reports.[863] My objections to using the indictment as evidence in an expert report are the same as that of the proffer and won't be repeated again. In fact, most of the indictment's charges were dropped and Arnaout was convicted only on a non-terrorism related charge, which had nothing to do with al Qaeda and the 9/11 terrorists.

Another set of legal documents that plaintiffs' experts like to cite uncritically are law enforcement officers' (whether FBI or ICE special agents) affidavits in relation for application for various warrants or in support of pre-trial detention. Such law enforcement sworn statements rarely undergo independent scrutiny and therefore should not be accepted as accurate, credible, and reliable documents to be taken at face value but must undergo further investigation as to the evidentiary basis of their respective claims. Both Kohlmann[864] and Winer[865] (and even the CRA audit[866]) quoted the same such document, a declaration by ICE Senior Special Agent David Kane in support of a pre-trial detention.[867]

The relevant part of Kane's declaration for this litigation is his section on Abdullah Binladin (which he misspells). Kane swore that Biheiri said that Ahmad Totonji was the first secretary of WAMY and the founder of the organization.[868] As the reader knows by now, WAMY does not have first secretaries, but only a secretary general assisted by assistant secretaries general. To my knowledge, Totonji was not either one or a founder of WAMY. Two

---

[863] Winer report, FN 207, at 107. Actually, Winer uses USA Fitzgerald's press release about the indictment rather than the indictment itself.

[864] Kohlmann report, paragraph 21, FN 9, at 8 – 9, paragraph 25, FN 16, at 10. Kohlmann actually quotes one of Kane's other affidavits in the same *Biheiri* case. What is at issue here is not the actual content of the affidavit but the quality and accuracy of these affidavits.

[865] Winer report, paragraphs 12.11.1.1 and 12.11.1.2, at 102–3, FN 198, at 103.

[866] CRA Audit, at 18, PEC-WAMY031464.

[867] *U.S. v. Soliman Biheiri*, E.D. Virginia, Alexandria Division, No. 03-365-A, Supplemental Declaration in Support of Pre-trial Detention, ICE Senior SA David Kane, September 11, 2003, PEC-WAMY001703 – 13, henceforth Kane declaration.

[868] Kane declaration, at 6 (PEC-WAMY0108).

paragraphs later, Kane states that Binladin was the President of WAMY.[869] He was not. He was president of WAMY International, Inc., the U.S. branch of WAMY. The WAMY President is an honorary position. The Saudi government suggests a candidate to the WAMY General Assembly, which elects him. The president of WAMY has no substantive responsibility with respect to WAMY. The president was either the Saudi minister of higher education until 1994 or the minister of Islamic Affairs after this ministry was created.[870] Dr. Binladin was neither. Then Kane goes on to quote a song in a WAMY publication about Islamic Camps, but manages to repeat in error the phrase "the times" in the last verse of the song,[871] which is not in the original.[872] Also Kane ends the song, with "So we may revive the times the times of our predecessors!"[873] which seems indeed quite ominous especially with the exclamation mark. The actual song does not end that way, but goes on, "So we may revive the times of our predecessors and establish Truth amongst the successors. Come! Allah forgives that which has passed [,] for Allah never abandons one who supplicates and repents."[874] So, no exclamation mark, which Kane has injected into the song while omitting the rest, which modifies the meaning of the song. This song does not imply an invitation to violence as Kane suggests.

Kane goes on to quote from an article posted on www.nationalreviewonline.com. This is no longer an active link but was the web branch of the *National Review*. Apparently, the article by Jonathan Levin, "Roots of Terror," was never published by this conservative magazine but just posted online on December 5, 2002. Another article by him published in the magazine described him as a researcher at the Investigative Project.[875] Indeed, Steve Emerson's (as previously mentioned, a notoriously unreliable commentator) Investigative Project has preserved a copy of Jonathan Levin's "Roots of Terror" that Kane quotes.[876] In his article, Levin wrote, "WAMY was founded in the United States by Osama bin Laden's brother, Abdullah." As we saw, Binladin was not Osama's brother but a half-nephew. WAMY, a Saudi organization

---

[869] Kane declaration, at 7 (PEC-WAMY001709).

[870] Dr. al-Wohaibi deposition, at 28–30, 143.

[871] Kane declaration, at 8 (PEC-WAMY001710).

[872] At PEC-WAMY006038.

[873] Kane declaration, at 8 (PEC-WAMY001710).

[874] At PEC-WAMY006038.

[875] See https://www.nationalreview.com/2003/11/convenient-concession-jonathan-levin/.

[876] Jonathan Levin, 2002, "The Roots of Terror," National Review Online, December 5, 2002, available at https://www.investigativeproject.org/165/the-roots-of-terror.

founded in Saudi Arabia, was not founded in the United States by him, only WAMY's American branch. Levin then gives a quote from an alleged WAMY book printed by the Saudi Armed Forces Printing Press, which Kane quotes.[877] This creates a long chain of information back to the original text since neither Levin nor Kane read Arabic, as far as I know: original text in Arabic (if accurately described) → excerpts selected from it (if accurate) and taken out of context → translation (if accurate) → selection by Levin (if accurate) → quoted by Kane.[878] This is a long chain, prone to errors and misinterpretations especially as it is taken out of context.

Kane goes on to state that he had reviewed "a translation of various portions" of an Arabic language encyclopedia that allegedly has a section, "Heroes from Palestine," which praised Palestinian terrorists who killed more than a dozen people.[879] I am not an Arabic reader nor was I able to read the cited encyclopedia. But an Arabic speaker, who had access to it, disputes that there is such a section in the encyclopedia, no such section exists.[880]

I'll stop here since I believe I have demonstrated that such law enforcement agents' affidavits, like Kane's, used in litigation suffer from multiple defects such as unverified, inaccurate, or inadequately supported facts, as well as typographical errors. A recent review of such documents has been conducted in light of a recent highly political case. A review of 42 applications submitted by FBI agents, identified 39 with "a total of about 390 issues, including unverified, inaccurate, or inadequately supported facts, as well as typographical errors."[881] Although the affidavits in this review were FBI FISA applications, I suspect they are of the same quality as any other law enforcement affidavits used in litigation. The point I am trying to make is that they cannot be accepted as accurate, credible and reliable documents at face value. Like any other documents, they are the start not the end of an investigation.

---

[877] Kane declaration, at 8 (PEC-WAMY001710).

[878] Although Winer quotes from Kane declaration, he quotes this specific passage from a testimony by Steve Emerson, in Winer report, paragraph 12.11.2.2, at 103.

[879] Kane declaration, at 9 (PEC-WAMY001711).

[880] Letter by Omar Mohammedi to CRA, September 3, 2015, at 8–9 (WAMYSA065464–5).

[881] U.S. Department of Justice, Office of the Inspector General, 2020, *Management Advisory Memorandum for the Director of the Federal Bureau of Investigation Regarding the Execution of Woods Procedures for Applications Filed with the Foreign Intelligence Surveillance Court Relating to U.S. Persons*, March 2020, at 5, available at https://oig.justice.gov/reports/2020/a20047.pdf.

Given the general unreliability of these documents, they should not have been accepted on their own as evidence for plaintiffs' experts without further investigation of their evidentiary basis. The CRA, which is an administrative agency, can of course do what it wants because it sets its own administrative standards of evidence. But plaintiffs' experts should at least adhere to the preponderance standards in civil litigation. Social scientists have much higher standards, as my colleagues' complaints against both Kohlmann and Levitt quoted in the methodological part of this report showed, but this is another topic.

### 5. The 1996 CIA Report on NGOs with Terror Links

Both Kohlmann[882] and Winer[883] also rely on a leaked "1996 CIA report" on NGOs with terror links.[884] Although I cannot authenticate this report, Winer, who served at the State Department at the time, remembers it and claims it was produced by the CIA.[885] In fact, he quotes most of the alleged CIA document in his report. The report is about Islamic NGOs operating in Bosnia during the Bosnian war. The introductory part of the report consists of generalized remarks about NGOs and the second part profiles 16 NGOs with extremist ties in Bosnia. WAMY is not cited at all in the report, but one organization of interest is: LBI.

Under Lajnat al-Birr al-Islamiya (LBI), the CIA report states, "AKA: Islamic Charity Committee; Probably a subsidiary of the Saudi-based Muslim World League." Really? Everything about this statement is false: the translation from the Arabic is Committee for Islamic Benevolence and it was under the auspices of WAMY, not the MWL. I hope by now the reader knows better, as section II.F of this report shows.

The CIA report continues: "Offices: Zagreb and Zenica. Headquarters in Jiddah, Saudi Arabia." LBI was still active in Peshawar at the beginning of 1996 and was taken over by WAMY later that year. It had no office in the old Yugoslavia. It seems that the CIA also confused LBI for BIF, which was in Zagreb and Zenica.

The CIA report continues, "One Zagreb employee, identified as Syrian-born US citizen Abu Mahmud, was in Pakistan at an unspecified time, according to a foreign government

---

[882] Kohlmann report, paragraph 21, FN 9, at 8; paragraph 24, FN 16, at 10.
[883] Winer report, section 6.6, at 23–31. This runs to a total of 30 paragraphs.
[884] Central Intelligence Agency, 1996, *Report on NGOs with Terror Links*, January 9, 1996, available at https://en.wikisource.org/wiki/CIA_Report_on_NGOs_With_Terror_Links
[885] Winer report, section 6.6, at 23.

service. He matches the description, provided by a clandestine source, of a man who was allegedly involved in the kidnapping of six Westerners in Kashmir in July 1995, and who left Pakistan in early October via the United States. The source said that he worked at various times for LBI, Maktab al-Khidmat, and Benevolence Foundation in Pakistan." The Abu Mahmud seems to be Arnaout, whose *kunya* (nom de guerre) was indeed Abu Mahmud. However, I have not seen anywhere else the accusation that Arnaout was involved in the tragic case of the six Westerners kidnapped in Kashmir in July 1995 and then killed. If memory serves me right, it was carried out by an obscure group that called itself al-Faran, which was probably a cover for another group. The hostages were killed in late December 1995, probably too late to make it into the January 6, 1996 CIA report. Nor was there a Benevolence Foundation in Pakistan, as the reader now knows.

I hope that the reader by now can pick up all the errors in the very short paragraph of the CIA report on Islamic NGOs in Bosnia and realize that it simply does not deserve to be used as evidence for any expert report, like the plaintiffs' experts do. In any case, since al Qaeda was not in Bosnia, any of the money allegedly going to Bosnian fighters did not flow to al Qaeda or the 9/11 terrorists. In essence, besides being unreliable as evidence, the CIA report is not relevant at all to this litigation. It is surprising that Kohlmann and Winer use it.

### 6. Deference to Political Authorities

Winer is fond of quoting former colleagues and senior government officials' testimonies as part of his evidence. In his report, he provides a whole section of "excerpts of statements from senior U.S. government officials about the role of charities played in financing al-Qaeda and its terrorist activities."[886] In his section 6.7, comprised of 35 full paragraphs, he quotes from half a dozen former officials, including himself.[887] Most of the remarks were general about "charities," but WAMY was specifically mentioned twice: once to express that WAMY "continue[s] to cause us concern,"[888] and the other to express that "appropriate regulatory oversight of organizations … such as … WAMY is absolutely necessary."[889] None of the testimonies before

---

[886] Winer report, paragraph 6.7, at 31.
[887] Winer report, section 6.7, at 31–7.
[888] Stuart Levey, quoted in Winer report, paragraph 6.7.1.8, at 32.
[889] Anthony Wayne, quoted in Winer report, paragraph 6.7.3.3, at 33.

235

Congress ranging from 2002 to 2005 specifically implicated WAMY in financing of al Qaeda or the 9/11 terrorists, just concerns that its internal oversight might not be adequate.

Winer's use of senior government officials' testimonies is indicative of misunderstanding of the scientific method. Science does not rely on or defer to political or religious authorities, as the famous (perhaps apocryphal) story of Galileo and the Catholic Church illustrated: one cannot dictate to science from authority. Only the facts and data themselves are the ultimate arbiter of what is accurate and acceptable as evidence for a hypothesis or argument, not political authority. Around the same time as Winer's political authorities testified before Congress, the political consensus including testimonies before Congress was that Saddam Hussein had weapons of mass destruction; Saddam Hussein was linked to the 9/11 attacks; the impending Iraq War would pay for itself from Iraq's oil revenue; there were al Qaeda sleeper cells in the United States waiting to strike in a second wave… Of course, none of these officials' beliefs turned out to be true.

Political consensus about something is essentially political, not scientific. Those who disagree are often dismissed from their office, as famously happened around that time to Chief of Staff of the Army, General Eric Shinseki, who disagreed with the Secretary and Deputy Secretary of Defense on the manpower needs for an occupation of Iraq. Of course, nowadays, this strategy of dismissing dissenters has been pushed to the extreme, but 15–20 years ago, this was already in place as General Shinseki's dismissal shows. Usually, the pressure to achieve a collective political consensus that turns out to be wrong is far more subtle and ubiquitous, as demonstrated by social scientists. The classical study of this phenomenon that caused the Vietnam disaster generated a label that entered common usage, "groupthink."[890]

Reliance on and deference to political authority is not indicative of sound methodology, and is in fact contrary to it, as Galileo's condemnation by the Church (at the time it was both a religious and very much a political power) became legendary among the scientists as exactly the difference between scientific and political methodology (which consists of relying on political authority). Winer combines this deference on political authority with a lack of reliance on facts or data (the ultimate arbiter of scientific disputes): his report lacks substantive citations to primary source material (he has only 28 footnotes in his section on WAMY, and none refer to primary sources, except Dr. Noorwali's deposition and declaration I; he does not even use Bates

---

[890] Irving Janis, 1972, *Victims of Groupthink*, Boston: Houghton Mifflin Company.

stamps in his report). This apparent unfamiliarity with the discovery material and complete neglect of disconfirming material in his report undermines some of his assertions, like "based on all the information I have reviewed,"[891] and his opinions based on them.

Winer's report's combination of deference to political authority and lack of reliance on primary sources shows his lack of understanding of scientific methodology, in which he has no training as his background is the law, not science. But his report is supposed to be an expert report, based on sound scientific methodology as advocated in *Daubert*, not a legal brief.

### 7.  CRA Audit

Kohlmann,[892] Winer,[893] and Levitt[894] also rely on the CRA audit[895] in their respective reports. My objection to using the CRA audit is basically the same as my objections to other government administrative documents (U.S. Treasury press releases) that failed to conduct an independent investigation on the basis of primary sources and instead relied on flawed secondary sources. To its credit, the CRA was far more transparent than OFAC in terms of providing the basis of its decision. It listed the material it reviewed for its concerns about adverse reporting on WAMY Saudi Arabia, close association with BIF Canada and BIF USA, and promotion of literature advocating intolerance and violence.[896] The material consists of about three dozen newspaper articles, two think tank reports (one of them by Kohlmann for DIIS), six testimonies before the U.S. Congress, and some Department of Justice press releases in the Arnaout litigation. All of these are the types of secondary source documents that I have objected to for use by experts in one's field because they are too poorly sourced and suffer from significant flaws. They may be fine to make an administrative judgment, but not to be used as the basis of an expert opinion, which must rely on sounder methodological grounds.

In terms of this litigation, the core incriminating element of the CRA's concerns were the about $52,000 that went to an alleged BIF fund for orphans. As we saw in section III.J of this report, Dr. Abdullah testified under oath that this was not WAMY money and al-Khatib declared

---

[891] Expressed in Winer report, paragraph 12.12.9, at 107.
[892] Kohlmann report, paragraphs 190–4, at 57–8.
[893] Winer report, paragraph 12.12.12, at 108.
[894] Levitt report, at 29.
[895] CRA Audit, PEC-WAY031447–68.
[896] See the list at PEC-WAMY030839–41, and PEC-WAMY031432.

under oath that this was not WAMY money. But even exploring the hypothetical that it was (WAMY funding BIF's orphans fund) for the argument's sake, there is still no evidence that this money ever went to the 9/11 terrorists. The monetary chain from BIF fund for orphans to al Qaeda is simply assumed and elicits no evidence in the discovery material. One cannot just assume that some money unaccountable in al-Khatib's bookkeeping irregularities in his handling of BIF Canada and WAMY Canada funds went directly or indirectly to the 9/11 terrorists without further evidence. This is a too huge a leap to make over the large gaps in the evidence in the discovery material. Nowhere is it even suggested in the discovery material that BIF provided money to bin Laden after the start of the 9/11 conspiracy, which took place around March-April 1999.

### 8.    Relative Neglect of Scholarly Research or Investigations into Al Qaeda

Science is based on cumulative research in a scientific community. The surprising thing about Kohlmann's and Winer's respective reports is the absence of reference to other academic research on terrorism. They basically relied on the type of secondary evidence that I have just criticized but not on good academic studies that were based on extensive field research and careful weighing of primary evidence. The one exception, and to their credit, they cited the 9/11 Commission Report, which was based on a thorough investigation (but still has some errors as we have seen in this report), but only for general comments and general speculations about the funding for the 9/11 operations. But even the 9/11 Commission Report concludes, "[t]*he origin of the funds [for the 9/11 attacks] remain unknown*, although we have a *general* idea of how al Qaeda financed itself."[897] "Al Qaeda *appears* to have relied on a core group of financial facilitators who raised money from a variety of donors and other fund-raisers, primarily in the Gulf countries and particularly in Saudi Arabia…. These financial facilitators also *appeared* to rely heavily on certain imams at mosques who were willing to divert zakat donations to al Qaeda's cause."[898] "Saudi Arabia has long been *considered* the primary source of al Qaeda funding, but we have found *no evidence* that the Saudi government as an institution or senior Saudi officials individually funded the organization. (This conclusion does not exclude the *likelihood* that charities with significant Saudi government sponsorship diverted funds to al

---

[897] 9/11 Commission Report, at 169. Italics added for emphasis.
[898] 9/11 Commission Report, at 170. Italics added for emphasis.

Qaeda.)[899] "To date, *the U.S. government has not been able to determine the origin of the money used for the 9/11 attacks.*"[900]

The reader can see how carefully crafted the 9/11 Commission Report is in respect to the funds for the 9/11 attacks. The bottom line is that we don't know where the money came from. This does not prevent the commission from speculating, but it is clear that this is just speculation with the use of hedge words like "appears," "considered," "likelihood." What is surprising to me is that the plaintiffs' experts ignore the excellent Monograph on Terrorist Financing by the commission staff,[901] which is more useful and specific to the present litigation because it uses BIF as one of its case studies. It refutes a lot of the plaintiffs' experts' claims about BIF and I have used it throughout this report.

Nor have the plaintiffs' experts shown any familiarity with the excellent scholarship on several very pertinent issues raised in this litigation. I am referring to the recent excellent scholarship of Professor Leah Farrall on the origin of al Qaeda and the Arab Afghans,[902] Professor Darryl Li on the Islamic fighters and humanitarian in the Bosnian War,[903] and Professor Thomas Hegghammer on Abdallah Azzam and the Arab Afghans.[904]

Nor have the plaintiffs' experts relied on the work of reliable journalists that are pertinent to the issues raised in this litigation. I am of course referring among others to the works of Steve Coll,[905] Lawrence Wright,[906] Peter Bergen,[907] Scott Shane,[908] Terry McDermott,[909] and Tam Hussein,[910] who have all done extensive field research on their respective subjects.

Nor have the plaintiffs' experts used the growing amount of primary source material on pertinent issues available, at West Point's Combating Terrorism Center, and especially in the discovery material itself. Levitt just offers two general paragraphs as his evidence that WAMY

---

[899] 9/11 Commission Report, at 171. Italics added for emphasis.
[900] 9/11 Commission Report, at 172. Italics added for emphasis.
[901] Roth, Greenburg, and Wille, 2004.
[902] Hamid and Farrall, 2015, and Farrall, 2017.
[903] Li, 2020.
[904] Hegghammer, 2020.
[905] Coll, 2004 and 2008.
[906] Wright, 2006.
[907] Bergen, 2006.
[908] Shane, 2015.
[909] McDermott and Meyer, 2012.
[910] Anas and Hussein, 2019.

239

funded terrorism: one to a general intelligence report on Salafi Islam in the Netherlands, which has little relevance to this litigation, and one to the CRA audit. Winer has only 28 citations and references in his 12-page section on WAMY and all to secondary source documents and none to any primary source evidence, with the exception of Dr. Noorwali's deposition and first declaration, which he distorts. Kohlmann is very selective and extremely one-sided in his very occasional use of primary sources.

In conclusion to this section, my opinion with a strong degree of certainty is that Kohlmann, Levitt, and Winer have failed to use reliable and primary evidentiary sources in their methodology to arrive at their respective opinion.

## B. Over-simplification of the Data

Kohlmann's and Winer's common methodology is to craft a simplistic narrative by lumping together complex phenomena and ignoring contradictory evidence. This is the opposite of good social science methodology, which is to examine these complex phenomena and make subtle distinctions in order to understand underlying mechanisms, and to search for disconfirming evidence to one's hypothesis in order to incorporate it and refine one's theory in order to approximate complex reality.

### 1. Lumping everything and everyone together

Their respective overall arguments are simple in that they lump together complex phenomena, such as families of beliefs, different types of aid and support in war situations, and different and separate combatants that superficially share some ideological elements.

One of these complex phenomena are religious beliefs. Levitt quotes a long passage from a Dutch intelligence analysis of Salafi implantation in the Netherlands. It correctly notes that many Saudi charities are proselytizing organizations, attempting to spread Salafi interpretations of Islam around the world. But Levitt's inclusion of this Dutch analysis in his report basically implies that WAMY supported al Qaeda is that such proselytizing activities were instrumental in spreading al Qaeda's ideology. He implicitly lumped different Salafi versions of Islam together: the traditional one proselytized by the Saudi government and clerics and al Qaeda's ideology. There are many versions of Salafi beliefs,[911] and the one sponsored by the Saudi establishment is

---

[911] See for instance, Mohamed-Ali Adraoui, 2013, *Du Golfe aux banlieues : Le salafisme mondialisé*, Paris : Presses Universitaires de France ; Hegghammer, 2010 ; Stéphane Lacroix,

one that swears allegiance to one's legitimate ruler, as promoted by Sheikh Rabi al-Madkhali. This version of Salafism is the one practiced by the vast majority, probably more than 90%, of Salafis worldwide. Al Qaeda of course rejects this version of Salafism promoted by what they call "dollar scholars" and argues that Saudi authorities have coopted them with large amounts of money. Instead al Qaeda promotes the idea that one's ruler may have sunk to the level of the age of ignorance (*jahiliya* in Arabic) that marked the pre-Islamic era. Being a Salafi, or adopting the Madkhali version of Salafism, means being a quietist Muslim, usually staying loyal to one's ruler and often staying away from politics. In fact, the Madkhalis and neo-jihadis are not only different but actual enemies, as demonstrated by their violent verbal disputes on Internet chatrooms dedicated to Salafism. Adopting a Salafi version of Islam does not necessary lead to the neo-jihadism of al Qaeda. Quite the opposite is true. Lumping both versions of Salafism together indicates a lack of understanding of this complex issue.

Kohlmann lumps all Saudi Islamic charities together by deliberately omitting the specific charities mentioned in the 9/11 Commission Report to make it appear that its remarks pertained to all Saudi charities. As quoted in the previous section on the origin of the 9/11 financing, the commission report is crystal clear: "The origin of the funds remains unknown."[912] Kohlmann omitted this overall conclusion of the Commission in his report to incriminate WAMY. Instead, he implies in a long quote[913] that two instances of al Qaeda's raising money from some Saudi charities, specifically the al-Haramain Islamic Foundation and the al-Wafa organization respectively, pertained to all Saudi charities by omitting to list these specific charities and replacing them by ellipses in his quote. In his next paragraphs,[914] Kohlmann described findings involving other charities, not WAMY, and implied that they involved all Saudi charities. By lumping them all together, what one did pertained to all the others, guilt by being in the general category of Saudi charities. By lumping all Islamic charities together, Kohlmann may have confused himself about them. In his report, he claims that Ramzi Yousef "'visited' the office of

---

2011, *Awakening Islam : The Politics of Religious Dissent in Contemporary Saudi Arabia*, Cambridge, Mass: Harvard University Press.
[912] 9/11 Commission Report, at 169.
[913] Kohlmann report, paragraph 20, at 8.
[914] Kohlmann report, paragraphs 21–6, at 8–11.

Lajnat al-Dawa [LDI] in Jalalabad."[915] As reference, he cites the 9/11 Commission Report.[916]

However, this is not what the 9/11 Commission Report stated. It stated that KSM helped run an

NGO "in Peshawar and Jalalabad; sponsored by Sayyaf, it was designed to aid young Afghan

mujahideen."[917] The footnote stated, "KSM claims that Ramzi Yousef visited the NGO's

establishment in Jalalabad, while Yousef was undergoing training."[918] LDI was of course a

prominent Kuwaiti NGO, which was not sponsored by Sayyaf. I suspect that this unnamed NGO

in Jalalabad was not LDI, but another NGO run by Sayyaf and sponsored schools for Afghan

children. Abdul Basit, Yousef's real name, came to Afghanistan around 1991. KSM's JTF

GTMO Detainee Assessment stated, "Four months later, detainee traveled to Pakistan with his

brother Abid to teach school. After Abid's death, detainee took over Abid's work at the

Peshawar school. To solicit support for the school, in 1991 detainee … visited Sayyaf in

Afghanistan. Sayyaf agreed to pledge money, support, and land in support of the school."[919]

Another source also names Sayyaf as providing financial support for the school.[920] So, a

preponderance of the evidence, granted very thin, indicates that this was not LDI but another

NGO run by Sayyaf. By lumping all the NGOs together, Kohlmann confuses them and

incriminates all of them.

Winer also lumped all Saudi charities together in his report in a long section on the role

that Saudi charities played in providing funding or other support for al Qaeda and the 9/11

attacks in the United States.[921] He cites the 9/11 Commission Report extensively.[922] However,

like Kohlmann, he carefully omits the 9/11 Commission's conclusion, stated no less than three

times in the section of the Commission's report on terrorist financing, entitled "A Money

Trail?"[923] Its conclusion is clearly stated in the introduction of this section, "The origin of the

funds remains unknown."[924] It is restated at the conclusion of the subsection on General

---

[915] Kohlmann report, paragraph 25, at 10.

[916] 9/11 Commission Report, FN 5, at 488.

[917] 9/11 Commission Report, at 146–7.

[918] 9/11 Commission Report, FN 5, at 488.

[919] Department of Defense, 2006, *JTF-GTMO Detainee Assessment Khalid Shaykh Muhammad*, ISN: US9KU-010024DP, December 8, 2006, at 3.

[920] McDermott and Meyer, 2012, at 40.

[921] Winer report, Section 6, at 21–37.

[922] Winer report, five paragraphs in section 6.3, paragraphs 6.4 and 6.5, at 22–3.

[923] 9/11 Commission Report, section 5.4, at 169–73.

[924] 9/11 Commission Report, at 169.

Financing, "To date, the U.S. government has not been able to determine the origin of the money used for the 9/11 attacks."[925] And it repeats it for good measure in the following subsection on The Funding of the 9/11 Plot, "Our knowledge of the funding during this period, before the operatives entered the United States remains murky."[926] After selectively quoting the commission report on examples of NGOs other than WAMY helping al Qaeda in its history, basically the same quotes that Kohlmann used, but in a more straight forward manner, Winer concludes, "I assess these conclusions of the 9/11 Commission to be correct, so far as they go."[927] This is a surprising statement since its conclusions are contrary to what Winer tries to demonstrate. But Winer implies that the conclusion of the Commission is the opposite of what it actually concluded. He implies that the Commission had concluded that Saudi charities, lumped together, played a role "in funding al Qaeda's ability to attack the United States on 9/11."[928] He stated, "But the 9/11 Commission did not identify all of the charities or charity officials that funneled money and other support to al Qaeda. Instead, it identified a few examples of the charities' involvement in supporting al Qaeda, using the phrase 'such as,' rather than providing assessments about each charity about which it had evidence."[929]

To bolster his claim that the Commission simply did not identify all the charities that poured funds into al Qaeda, Winer goes on to quote very extensively, practically the whole document, word for word, the deeply flawed CIA report that I have criticized in section IV.A.5.[930] He neglects to mention that this document is irrelevant to al Qaeda and the 9/11 attack because the report allegedly addresses NGOs that funded Muslim combatants *in Bosnia*, and we saw that al Qaeda was not involved in the fighting during the Bosnian war. Apparently for Winer, all Muslim combatants are the same, and he lumps them all into one basket. I am not going to repeat my critique of this CIA report, but I am shocked at his praise of such a mediocre and flawed report. Although WAMY is not mentioned once in the CIA report, Winer cannot resist in incriminating it because the CIA report mentioned LBI, "a charity used directly to support al Qaeda and to provide arms to fighters in Afghanistan, was rolled up and incorporated

---

[925] 9/11 Commission Report, at 172.

[926] 9/11 Commission Report, at 172.

[927] Winer report, paragraph 6.5, at 23.

[928] Winer report, paragraph 6.3, at 22.

[929] Winer report, paragraph 6.5, at 23.

[930] Winer report, section 6.6 consisting of 30 paragraphs, at 23 – 31.

into the Saudi-state sponsored WAMY in 1996, while an offshoot, Benevolence International Foundation, was established and headquartered in the United States as a cover for continued support to al Qaeda."[931] As shown in my examination of the CIA report, it simply confused LBI with BIF and the rest of Winer's comments on LBI are simply an indication of both his lack of knowledge of LBI and BIF as well as his very fertile imagination. In this sentence, he lumps together fighters in Afghanistan and Bosnia with al Qaeda, and WAMY with LBI (partially correct until April 1993) and BIF.

Kohlmann also lumps together legitimate humanitarian relief for refugees with military support of fighters. During the Afghan War, this occurred as neither the United States Government and charities it sponsored through USAID nor the Saudi charities were carefully separating these two forms of support for the Afghan mujahedin. As a result of the confusion from that war, charities, Western and Islamic, learned their lessons and were careful to separate these two types of support[932] but this distinction escaped Kohlmann. He tried to implicate WAMY's legitimate support for Kashmiri victims by suggesting it was military support for Kashmiri fighters by clever omissions from two of Dr. al-Johani's speeches in support of victimized Kashmiris.[933] Kohlmann again tries to incriminate WAMY's legitimate humanitarian support of Chechen refugees by attempting to transform it into military support of Chechen fighters with crucial omissions from Dr. al-Johani's article about the Chechen tragedy.[934]

Furthermore, both Kohlmann and Winer lump together all types of Muslim fighters with al Qaeda. Kohlmann cites vague allegations that WAMY supported Bosnian fighters,[935] LeT and JeM, two Kashmiri terrorist groups,[936] Bosnian fighters,[937] Chechen fighters,[938] Afghan fighters,[939] as evidence that WAMY played a role in the 9/11 attacks. Winer also lumps any support for Bosnian fighters[940] as evidence that WAMY played a role in funding the 9/11 attacks.

---

[931] Winer report, paragraph 6.6.6.2, 26.

[932] See Benthall and Bellion-Jourdan, 2003; Ghandour, 2002; Lacey and Benthall, eds., 2014; and Petersen, 2015.

[933] Kohlmann report, paragraphs 164 and 165, at 49–50.

[934] Kohlmann report, paragraph 166–7, at 50–1.

[935] Kohlmann report, paragraph 162, at 49.

[936] Kohlmann report, paragraph 175, at 53.

[937] Kohlmann report, paragraphs 174, 197–203, at 52–3, 59–63.

[938] Kohlmann report, paragraphs 166–7, at 50–1.

[939] Kohlmann report, paragraphs 168–72, 51–2.

[940] Winer report, paragraphs 12.12.13–12.12.16, at 108–10.

It is as if these two experts argue that there is a sort of al Qaeda international that coordinated a unified global network of neo-jihadi terror that included the 9/11 attacks. The disputes, rivalries, backbiting and murders in Peshawar when they were together as well as the rivalries in Afghanistan ten years later should put to rest any theory of a unified global terror network, where all are in the same bag conspiring to do 9/11. As shown in both parts II and III of this report, WAMY did not support fighters in these conflicts. Furthermore, al Qaeda was not present in any of them, except for Afghanistan and Somalia, and any support from any other sources for fighters in these conflicts did not go to al Qaeda and the 9/11 terrorists. Bringing irrelevant conflicts to the issues in the present litigation either indicates confusion for plaintiffs' experts or attempts to confuse the factfinder by throwing at them irrelevant and uncorroborated information that appears incriminating but in fact does not involve WAMY.

### 2. Ignoring Contradictory Evidence

All the evidence cited by plaintiffs' experts involve war situations. Such situations are very complex and confusing, poetically labelled the "fog of war." Because of their complexity and confusion, they generate contradictory evidence difficult to interpret. Yet, I have not seen in Kohlmann's and Winer's respective reports any evidence that they dealt with, analyzed or weighed any contradictory evidence to their arguments that WAMY funded al Qaeda. Ignoring contrary evidence is the absolute opposite of the scientific method, whether in the natural or social sciences. The methodology of social science is to search for evidence disconfirming one's hypothesis or argument in order to either reject or refine a given theory. Unlike the present report which examines their claims and arguments in the context of all the evidence, Kohlmann and Winer completely ignore disconfirming evidence. They lack training and experience in the scientific method.

The plaintiffs' experts' most egregious willful avoidance of disconfirming evidence is of course the conclusion of the 9/11 Commission Report, elaborated in its Terrorist Financing staff report, that the origin of the money for the 9/11 attacks is unknown. Both Kohlmann and Winer carefully avoid mentioning this conclusion, even when they extensively quote from the very section of the report that contains this conclusion in three places. Their respective report avoids scientific methodology which would have started with an examination of the evidentiary basis of this conclusion.

245

My opinion with a high degree of certainty is that Kohlmann's and Winer's common simplifications violate the established methodology for the social sciences for making distinctions among complex but similar phenomena and searching for disconfirming evidence in order to reach sound conclusions.

### C.  Crafting a Linear Narrative

Kohlmann and Winer in essence argue that al Qaeda was formed during the Soviet Afghan War, which necessarily led to the 9/11 attacks, and whoever helped al Qaeda along the way provided material support for the 9/11 terrorists. This simple linear narrative ignores most of the information that scholars have learned about al Qaeda, WAMY, and the 9/11 attacks, some of which are contained in the discovery material that the plaintiffs' experts mostly neglect.

### 1.  Al Qaeda: The Twisted Road to 9/11

Jenkins presents a brief and dated outline of the road to 9/11. Unfortunately, his account is too superficial to capture some of the complexities of al Qaeda's evolution whose details are crucial to the present litigation.

As shown in part II of this report, al Qaeda was established gradually in the late 1980s on the Afghan-Pakistan frontier in the midst of a war against the Soviet Union, buoyed by Arab propaganda about Arab Afghans' relative success in a minor skirmish during that conflict. At the time, it was grudgingly allied with U.S. policy against the Soviet Union. Al Qaeda gradually separated itself from the MaK, which was founded originally to help the Afghan mujahedin and progressively had gone on to support first the Arab ansar and then Arab Afghans that came to Peshawar. Al Qaeda participated in a disastrous campaign in Jalalabad against Kabul regime forces which temporarily discredited it in the eyes of Arab Afghans. This led to a dramatic contraction of al Qaeda as many of its members drifted away from it. Bin Laden returned home and much of al Qaeda's activities were curtailed to training. So, some of the support that al Qaeda received during this first frontier phase of its evolution, from its creation to its departure to Sudan, was wiped out by the defeat of Jalalabad and the departure or death of many of its cadres. In this phase, al Qaeda was not yet a terrorist organization, as it did not promote terrorism as a strategy or carry out any terrorist operations.

The second phase of al Qaeda's evolution was its Sudanese phase. Bin Laden, its leader, invested heavily in Sudanese infrastructure projects the money that had been raised in al Qaeda's

246

first phase. During the Sudanese phase, al Qaeda sent an "expedition" to Somalia, but was not involved in either Bosnia or Chechnya (I), two wars that emerged during this phase. During this phase, al Qaeda became a full-fledged terrorist organization, willing, capable, and ready to conduct terrorist operations against the United States, especially vulnerable embassies abroad in Africa but still distinct from the 9/11 plot. U.S. withdrawal from its humanitarian mission in Somalia postponed any terrorist operations against the U.S. Because of al Qaeda's support of Saudi dissidents against the Saudi royal family, Saudi charities took precautions against supporting bin Laden and his group. Under Saudi government influence, bin Laden's family froze his assets, which were no longer available to him. This twin closing off of funding had a dramatic effect on al Qaeda and its members starting 1994 in Sudan. Bin Laden complained about this severance of funding in his faxes from London and urged Saudi supporters to use non-Saudi charities to channel funds for him and al Qaeda. Because of its support of other Egyptian and Algerian terrorist groups, Egypt, the U.S. and the U.N. put pressure on the Sudanese government to expel al Qaeda. Both the Saudi and U.S. governments turned down an offer to extradite bin Laden to their respective countries. So, the Sudanese government expelled a shrunken al Qaeda and essentially expropriated most of bin Laden's and al Qaeda's assets. Bin Laden and al Qaeda left Sudan greatly impoverished, essentially wiping out all previous monetary contributions to al Qaeda as it lost them in unwise investments in Sudan and elsewhere (buying an airplane that got destroyed, attempt to buy Uranium…). In his alleged will, bin Laden reported that he left Sudan with just $1.1 million left out of an original investment of $29 million while he faced the expenses of moving to Afghanistan and running his organization and all its dependent families.

The third phase of al Qaeda's evolution was its Afghan phase, which started when the remnant of al Qaeda, reduced to about four dozen members, returned to Afghanistan in May 1996. During the first two and a half years of this third phase, al Qaeda was still small but focused on publicity (including carrying out the twin embassy bombings in Africa as propaganda by the deed) and rebuilding its revenue stream. Times were still hard for al Qaeda until six months after the twin embassy bombings in Africa, when it finally established a reliable stream of funding by Ramadan of that year (about December 1998). Shortly thereafter, probably in March or April 1999, al Qaeda embarked on the 9/11 conspiracy, which it called the Planes

247

Operation. Unfortunately, as the 9/11 Commission Report stated several times, the sources of al Qaeda's funding during this period are unknown.

So, the road to 9/11 was not straight-forward, but a twisted road, with periods of starts and stops, contractions and rebuilding of al Qaeda, interspersed with times of penury and loss of assets. It was more a history of perseverance in the face of obstacle than a smooth linear road to 9/11.

### 2. Saudi Islamic Charities and WAMY

Although several Saudi Islamic charities had been involved in relief of a global famine in Africa in the 1970s, the Soviet Afghan War was their first test as humanitarian relief charities in a war situation. Around 1987, WAMY established Lajnat al-Birr al-Islamiya (LBI) with wealthy businessman Adel Batterjee as an independent organization under its auspices but run by Batterjee in Peshawar. By all accounts, the work of the Islamic charities was chaotic, and they did not strictly distinguish humanitarian relief of refugees from support of mujahedin and then Arab Afghans. In this aspect, they followed the general trend established by USAID, which did not distinguish strict humanitarian work from support of the mujahedin, as its 1,000 Toyota pick-up trucks had the dual purpose of transporting food, medicine, blankets, and ammunition inside Afghanistan in its huge cross border aid project. Some Islamic charity volunteers wanted to fire a shot at the Soviets or Kabul government forces, and most of these specific volunteers went through a short session of military training. This was mostly symbolic as the Arab Afghans never achieved a significant fighting role in Afghanistan. At the time, the Arab Afghans, even those who went on to join al Qaeda, were not considered terrorists: on the contrary, they were celebrated as heroes, Muslim freedom fighters. Any support that Islamic charities gave for Arab Afghans was part of the larger and more general support given by the West and Muslim countries to fighters against the Soviet Union and its puppet regime in Kabul.

WAMY's contribution to LBI was not as freewheeling as some of the other charities in Peshawar at that time. WAMY did not give blank checks in support of the refugees or fighters in general but for specific projects to alleviate the suffering of the Afghans. We saw that one was the establishment of an LBI office inside Afghanistan and another was an agricultural and water resources development project in the Kunar Valley, both started at the beginning of 1989. There is no evidence that WAMY funded projects that directly contributed to the military activities of

248

al Qaeda. Batterjee also raised money himself and not all LBI projects were WAMY supported projects.

The Saudi government and Saudi charities, which are sensitive to the priorities of the Saudi government, started tightening up on their activities around 1989 when they discovered that some of the camps, where Saudis trained, offered courses in explosives. Mustafa Hamid's description of the crackdown by Saudi officials on his family at the Saudi school in Islamabad was indicative of this tightening and greater supervision of Saudi aid. Arab Afghans had to become more clandestine in their activities, outside the suspicious monitoring of the Saudi embassy. When Saddam Hussein invaded Kuwait in 1990 and Saudi Arabia organized its rescue in the Gulf War, some Arab Afghans sided with Hussein and the major Saudi charities further tightened up their aid to Arab Afghans in Peshawar.

When war broke out in Bosnia in 1992, the Saudi charities that went there to help Bosnian Muslims had learned their lessons from the chaos of Peshawar and were better at coordinating their overall help to the Bosnians. Saudi charities shed their reliance on volunteers and became more professional in term of hiring experts that were effective in the field rather than ideologically driven amateurs, as had been the case in Peshawar. In terms of WAMY and LBI, WAMY had become displeased with Batterjee, who had started to neglect his bookkeeping and reporting duties to WAMY for the funds that WAMY provided for specific projects. This neglect of his reporting obligations eventually led WAMY to force his resignation from LBI around January 1993 at the latest. When Batterjee established BIF, a separate organization that mimicked LBI to fraudulently solicit donations in Saudi Arabia, WAMY reprimanded him immediately on learning this development in February 1993 and sent him a letter to cease and desist and notified the kingdom (Prince, now King, Salman) of this new development. WAMY never had any type of relationship with BIF, which established offices in Bosnia and Sudan. LBI never had offices in Bosnia or Sudan. Much of the plaintiffs' evidence rests on the U.S. Government's confusion between BIF and LBI. Ironically, although Batterjee's deception to fraudulently solicit donations did not fool WAMY, it certainly fooled the U.S. government, especially USA Fitzgerald. LBI continued to function in Peshawar until 1996 when it was completely taken over by WAMY as one of WAMY's field offices. Since Batterjee's forced departure from LBI in 1993, LBI/WAMY Pakistan was able to produce annual audits of its activities, from 1994 to 2002, and of course they showed no funding at all for al Qaeda.

249

In the early 1990's, Saudi charities, WAMY included, became much more careful in terms of ensuring that their funds were used efficiently for their intended appropriate purposes. They became more professionalized as their hired trained humanitarians and relied less on dedicated amateurs.[941] As mentioned, bin Laden's family, sensing this new government priority, froze his funds in 1993, cutting him off from his personal fortune. Bin Laden no longer could raise money through Saudi charities as his faxed complaints against them from London indicated. Al Qaeda members in Khartoum suffered from lack of funds starting in 1994 as a result of this interruption of the flow of money coming from al Qaeda supporters in Saudi Arabia. The SANG bombing in Riyadh in 1995 triggered the first of several waves of arrests and general crackdown on Saudi Afghans as well. The Saudi government and charities were now at war against bin Laden and al Qaeda.

Since there is no evidence past 1993, when Batterjee was forced out of LBI, that plaintiffs produced in terms of LBI's alleged relationship with people who later formed al Qaeda, I will stop this narrative about the developments in Saudi charities at this point, two full years after Batterjee was forced out of LBI.

### 3. Evolution of the 9/11 Conspiracy

As previously argued, the 9/11 conspiracy started in earnest around March or April 1999, when bin Laden agreed to fund a reduced version of KSM's original proposal. That proposal was itself shaped by KSM's previous conversations with his nephew Abdul Basit, who got the idea of crashing an airplane into a U.S. Government building from idle discussions with his friend Abdul Hakim Murad. This notion of crashing an airplane into a building was new, but it never got beyond the brainstorming idle talk stage. In contrast, the Bojinka Plot of simultaneously blowing up eleven airliners in the air was a continuation and a dramatic expansion of various airplane terrorist attacks in the 1980s, like the Air India 182 mid-air explosion on June 23, 1985 or the Pan Am 103 mid-air explosion on December 21, 1988. I disagree with Brian Jenkins that the Bojinka Plot was the precursor of the 9/11 attacks.[942] Bojinka was the precursor of another al

---

[941] This gradual professionalization of Islamic charities in the 1990s was analyzed by several scholars. See among others, Jonathan Benthall and Jérôme Bellion-Jourdan, 2009, *The Charitable Crescent: Politics of Aid in the Muslim World*, London: I.B. Taurus, at 79–81; and Marie Juul Petersen, 2015, *For Humanity or for the Umma? Aid and Islam in Transnational Muslim NGOs*, London: Hurst & Company, at 115–136.

[942] Jenkins report, at 11.

Qaeda plot, namely what later became known as the Shoe Bomber failed plot, which planned to blow up simultaneously two airliners in flight from Europe to the United States in December 2001. One of the bombers, Richard Reid, attempted to carry it out while the other, Saajit Badat, declined to follow through. The germ of the 9/11 attacks came from the idea of crashing an airplane into a building instead of exploding them in the air, which Murat and Basit had discussed without any more action and therefore did not rise to the level of a plan. That was the innovation, not the simultaneity of several airplanes, which had already been carried out in the famous Black September incident when the Popular Front for the Liberation of Palestine hijacked four airliners at the same time in September 1970, as noted by Jenkins.[943] Instead of exploding several airplanes in the air (the Bojinka Plot), KSM expanded the Murad-Basit idle talks of crashing an airplane into a building to crashing a dozen airplanes into buildings simultaneously.

KSM ran the planes operation and funded it from money he received from al Qaeda, but the source of that money is still obscure. That secret probably will remain forever as the two people who knew where the money came from, bin Laden and probably Sheikh Saeed, are dead. Bin Laden fancied himself a good judge of character and he personally recruited all the direct participants in the attacks, except those involved in logistics. His first four recruitments were a disaster. Two could not get visas to the United States and the other two were incompetent and never learned enough English for flight training. Abu Hafs discovered the Hamburg friends who would become pilots in the attacks and their main coordinator. He later discovered the fourth pilot who was already a pilot. Bin Laden chose the rest of the "muscle" hijackers, who were given special physical training to be able to overtake an airplane in flight. After that, it was just a matter of time, letting the three pilot candidates learn how to fly, infiltrating the muscle into the United States, and initiating the attack.

As repeated several times in the 9/11 Commission Report and elaborated in its Terrorist Financing staff report, the origin of al Qaeda's money in the third Afghan phase of its history is unknown outside of the $2 million that bin Laden received from the Sudanese government in compensation of his abandoned investments.

---

[943] Jenkins report, at 10.

251

The path to 9/11 was not linear, but followed a twisted path, which involved several instances when early contributions to the group that eventually became the 9/11 terrorists, especially in their early frontier phase, were wiped out especially when bin Laden and al Qaeda were expelled from Sudan and lost everything there. They rebuilt their organization in the third Afghan phase of their history, but unfortunately the evidence is silent about the origin of the money in this third phase that funded the 9/11 operation.

### D. Compressing Time

Not only is the plaintiffs' experts' narrative linear, but there does not seem to be any time gap between the formation of al Qaeda and the 9/11 attacks. In essence, they argue, al Qaeda was created, the 9/11 attacks happened. Whatever happened on the Afghan Pakistani frontier in the late 1980s and early 1990s is directly linked to the September 11, 2001 attacks.

#### 1. Al Qaeda in 1988 is Not al Qaeda on the Eve of the 9/11 Attacks

Kohlmann and Winer spent much time on what happened in the frontier phase of al Qaeda, based on the BIF documents found on its computer confiscated in the 2002 Sarajevo raid. They constitute the basis of USA Fitzgerald's Arnaout evidentiary proffer. They describe various activities of the Arab Afghans in the late 1980s and early 1990s along the Afghan Pakistani border. But the group that hung out around bin Laden then was definitely not the same group that carried out the 9/11 attacks. The group that fought the Soviet forces in May 1987 at Masada and from which emerged the core of the group that later became known as al Qaeda was fighting the war against the Soviets on the same side as the U.S. Government. I was the one that first reported this skirmish for the U.S. Government, and it was received with great acclaim. These Arab Afghans were far from being terrorists at the time. They were heroes to us. Even though they claimed to have bought their weapons on the open market in the Federally Administered Tribal Area of Pakistan, these weapons were very probably the ones that the U.S. Government supplied to the Afghan mujahedin for free (and were probably then resold by a few on the open market). Plaintiffs' allegations seem to imply that al Qaeda was formed as a full terrorist group and the 9/11 attacks were the logical foreseeable and inevitable conclusion of the process of formation of this group. The evolution of al Qaeda and all its vicissitudes (Jalalabad, Gulf War, Sudanese Exile, return to Afghanistan destitute…) refutes this perspective. This view of al Qaeda suffers from retrospective knowledge of what happened and projects what we know now about al Qaeda

252

back to al Qaeda then, collapsing time, as if the al Qaeda of 2001 was the al Qaeda of 1987 or al Qaeda of 1991.

The group of Arab Afghans that became al Qaeda evolved and became a full-fledged terrorist organization in its second Sudanese phase. As mentioned in section I.C of this report, even the categories now used to discuss the events of the first frontier phase of al Qaeda do not correspond to the reality then. Using them, as Kohlmann and Winer do in their respective reports, represents an anachronism. Any type of support to Arab Afghan fighters at the time, and here I am referring to the allegations that LBI supported some of these fighters, does not mean that they were "aware" that their support might eventually play a role in international terrorism much later on. From my extensive readings of their writings at the time and their later memoirs, they could not even conceive that the fighters that emerged from the skirmish of Jaji at the end of Ramadan in 1987 would much later transform themselves into a terrorist organization carrying out the 9/11 attacks. The term Arab Afghans was not yet used even within the foreign Arab community in Peshawar at the time. The decision to attack the United States came later during the second Sudanese phase of al Qaeda, and the idea of the 9/11 attacks, in other words when the 9/11 conspiracy really started, came even later during the third Afghan phase of the organization. Al Qaeda was not designated by the U.S. State Department as a Foreign Terrorist Organization until much later, on October 8, 1999.

Writing about the people who much later became the 2001 al Qaeda as if they were already members of this later organization more than a decade before the 9/11 attacks commits the methodological error of anachronism and should be corrected by the plaintiffs' experts.

## 2. Retrospective Designation of Future Terrorist Groups

Another methodological error is Kohlmann's and Winer's respective tendency to immediately affix to any organization they discuss the much later designation as an SDGT by OFAC. In discussing WAMY in 2000–2, both Kohlmann and Winer immediately state that it was designated a "Tier 1 NGO" by JFT-GTMO analysts,[944] something which happened after 2002. No one knew or could have anticipated before that the JTF-GTMO would label it as such. As previously mentioned, this assessment was not shared by either the Departments of State or of

---

[944] Kohlmann report, paragraph 159, at 47; Winer report, paragraph 12.10.3, at 101.

253

the Treasury (specifically OFAC), the only two entities of the U.S. government statutorily and specifically tasked to designate them as terrorists or its supporters.

Likewise, when people worked for LDI from the mid-1980s to the late 1990s, they did not know that OFAC would designate their employer an SDGT a full four years after they left this organization. In the late 1980s, when KSM temporarily worked for it, LDI was not an organization supporting terrorism, as understood 15 years later.[945] Both Kohlmann and Winer also mention Batterjee's designation as an SDGT by OFAC in December 2004.[946] Winer adds that Gulbuddin Hekmatyar was also designated an SDGT by OFAC in February 2003,[947] but this was *not* for activities that took place in the *late 1980s or early 1990s*, the time period when LBI had some interaction with him (the time period relevant to the events in Winer's paragraph), but for Hekmatyar's activities *after* the U.S. invasion of Afghanistan in October 2001, when Hekmatyar fought the invaders. In the earlier time period (late 1980s and early 1990s), Hekmatyar was an ally of the United States and the *largest* recipient of *U.S. military* aid to the Afghan mujahedin.

Even Levitt also engages in this anachronistic exercise when he writes that "WAMY provided thousands of dollars to U.N.-sanctioned Benevolence International Foundation (BIF), an entity on the U.N.'s list of entities tied to al Qaeda."[948] At the time WAMY (Canada) allegedly provided a little more than $52,000 to BIF, BIF was not yet under U.N. sanctions by more than a year.

Kohlmann's mention of Ansar al-Islam as an SDGT to defame WAMY for things that happened *after* the 9/11 attacks[949] is bizarre in terms of any evidence that WAMY funded the 9/11 attacks. So is his mention that OFAC designated the "Union of the Good" an SDGT in *November 2008*,[950] more than seven years after the 9/11 attacks. Kohlmann also neglects to say that, as soon as WAMY learned about this designation, it immediately distanced itself from this organization.

---

[945] See the juxtaposition of SDGT designation of LDI to the activities of this organization in 1987 in Kohlmann report, paragraph 169, at 51.

[946] Kohlmann report, paragraph 188, at 57; Winer report, paragraph 12.12.5, at 105–6, paragraph 12.12.10, at 107–8.

[947] Winer report, paragraph 12.12.5, at 105, paragraph 12.12.10, at 108.

[948] Levitt report, at 29.

[949] Kohlmann report, paragraph 177, at 53–4.

[950] Kohlmann report, paragraph 178, at 54.

This methodological foreshadowing works well in fiction to keep a reader's attention when he or she does not yet understand the importance of a subject or an event, whose significance becomes clear only at the end of the plot. However, such foreshadowing in a scientific report must be carefully explained that this was a label retrospectively applied in order not to fall into the error of anachronism. Otherwise, it is only used to defame an organization when the writer has found no contemporaneous or even any other evidence to incriminate the organization.

In summary, both Kohlmann's and Winer's reports are methodologically flawed in that they compress time to make it appear that what happened more than a decade before the 9/11 attacks was still present or relevant in the later time period and influenced these attacks. The use of such anachronism has no place in social scientific or historical methodology.

### E. Kohlmann's Unique Handling of the Content of Documents

In his methodological section, Kohlmann promises to employ "comparative analysis" to formulate his expert opinion.[951] It is an empty promise: there is not a single example of comparative analysis in his section on WAMY, probably because his discussion of this method shows that he does not understand what it is. I illustrate the use of this method a few times in this report to give an example of what it looks like. Instead of using solid social science methodology, Kohlmann's report uses two very dubious methodological devices when quoting the content of documents: juxtaposition of unrelated material and critical omissions to project wrong implications that are often explicitly contradicted in the omitted text.

#### 1. Juxtaposition of Unrelated Material:

In part III of this report, I pointed out to several instances of Kohlmann's use of juxtapositions of unrelated material to give the impression that they were somehow connected.[952] For instance, in paragraph 161, he juxtaposed a Florida lecture by Suleman Ahmer in 1996 with Dr. al-Wohaibi's interview by a political officer in Jeddah in 2006, making it appear that the WAMY Secretary General (who was not secretary general in 1996) is condoning Ahmer's lecture while the two events separated by a decade were clearly unrelated and Dr. al-Wohaibi was definitely not referring to the Florida lecture. In paragraph 166, Kohlmann juxtaposes two

---

[951] Kohlmann report, paragraph 12, at 4.
[952] Kohlmann report, at 48–9.

unrelated quotes from an article by Dr. al-Johani, "The Chechen Tragedy," in support of the Chechens that gives the impression that Dr. al-Johani is talking about military aid, while he omits the list of the actual support that WAMY had provided, which of course does not contain any hint of military aid for the fighters.[953] In paragraph 175, he juxtaposed the Indian government's closing of WAMY's offices in *Delhi and Mumbai* in *November 2001* (for support of SIMI, not LeT or JeM as Kohlmann misleadingly writes) with the alleged *December 2002* FBI/ISI Directorate raid on WAMY *Peshawar* (which probably did not happen) as if they were connected and establish a pattern of WAMY's alleged support of terrorism (LeT and JeM in India and al Qaeda in Pakistan).[954] These are just three instances of Kohlmann's juxtapositions of unrelated material in his report, and I will not repeat the rest since I believe I have made my point.

The grammatical convention about juxtaposition is that given humans' cognitive tendency to maximalize relevance, juxtaposing two unrelated items connects them in a relevant way.[955] Kohlmann deliberately plays on this cognitive search for relevance, which attributes relevance to the placement of two events next to each other in a communicative process. I write "deliberately" because Kohlmann does it too many times in his report to be accidental or inadvertent. When the reader reads his juxtaposition, her cognitive predisposition to put meaning in such placement leads her to assume some linkage between unrelated events and connect them. Kohlmann's clever juxtaposition, a term he used in his methodology section, implies connection between events when in reality there is no such link. Combined with another methodological device, namely omission, it certainly gives a false impression even if the implication is not explicitly stated.

### 2. Critical Omissions that Affect the Meaning of a Document.

Of course, the most significant omission by Kohlmann, which is also shared by Winer, is their omission, nay their avoidance, of the 9/11 Commission Report's conclusion in terms of the source of financing of the 9/11 attacks. As mentioned, the Report mentions it at the beginning of its section on terrorist financing of al Qaeda, repeats it at the end of this section, and repeats it

---

[953] Kohlmann report, at 50.

[954] Kohlmann report, at 53.

[955] See Dan Sperber and Deirdre Wilson, 1995, *Relevance: Communication and Cognition*, Oxford: Blackwell Publishers Ltd.

256

again on the subsection on the financing of the 9/11 attacks themselves.[956] This conclusion that the Commission did <u>not</u> find the source of this financing is elaborated in the Commission's Terrorist Financing staff monograph on the subject, which both experts omit.[957] This critical omission is common to both experts, but this is not what I would like to examine in terms of Kohlmann's peculiar methodology.

Kohlmann uses omissions of critical contextual material in the text of a document that give a totally different meaning to his quotes. He does this either by itself, or in combination with juxtaposition as described in the previous section. He uses it alone for instance, when he partially quotes the song *Youth of the True (Religion)* omitting the context of his quote, which shows that the song is not a celebration of jihad and suicide bombing ("are you miserly with your blood?!") but just a glorification of Muslim heroes that only calls young people to adopt a Salafi version of Islam.[958] An egregious example of omission by itself are his quotes from OFAC's designation of LDI as an SDGT and the JFT-GTMO prosecutor's accusation against Hamad at Hamad's ARB proceedings while carefully omitting Hamad's answers to the prosecutor and part of the prosecutor's accusation, which directly contradicted OFAC's claims.[959] He also often uses omissions in combination with juxtaposition of unrelated material, like he did in Dr. al-Johani's article on "The Chechen Tragedy." I believe my discussion of the combined juxtapositions and omissions with respect to Dr. al-Johani's article were covered in full in section III.G of this report and do not have to be repeated here. There are many more instances of the twin uses of juxtaposition and omission in Kohlmann's report, as pointed out in part III of this report.

Kohlmann compounds his disingenuousness in using this twin device of juxtaposition and omission by applying them to obscure stories, difficult to find even in the world of the internet, in an attempt to hide his manipulation of the contents of the documents he quotes. I was able to find some through exhaustive search and demonstrated his manipulation in part III of this report. Since I noticed this pattern of manipulation, I reserve comments on the documents I have not been able to find and review, like Sheikh Saad Buraik's lecture, "The Favor of Jihad Over Other Acts," (Section III.B.3 of this report).

---

[956] 9/11 Commission Report, at 169, 172, and 172 respectively.
[957] Roth, Grunberg, and Wille, 2004.
[958] Kohlmann report, paragraph 160, at 48.
[959] Kohlmann report, paragraph 169, at 51.

Kohlmann started out his report by describing his methodological "aim to juxtapose 'rich descriptions of a few instances of a certain phenomenon' and to distill a common, accepted narrative."[960] He was almost right: the methodological pattern in his report is to cleverly juxtapose completely unrelated events and omit critical context to distill a peculiar, unaccepted, and distorted narrative to incriminate WAMY.

### F. Opinion on Kohlmann's and Winer's Methodology

In summary to this methodological portion of my opinion, my opinion with a high degree of certainty is that Kohlmann's and Winer's reports suffer from flawed methodology, namely over-reliance on secondary sources based at most on third hand information; over-simplification of the data including lumping together unrelated events and total avoidance of disconfirming evidence; crafting a linear narrative that eliminates any of the complexity of the evolution of events; collapsing time into anachronisms; undue deference to political authority in Winer's case; and deliberate manipulation of the contents of documents by juxtaposition of unrelated events and omission of critical contextual content in Kohlmann's case. These consistent violations of the scientific method irreparably damage the basis upon which they form their respective opinions.

### G. Plaintiffs' Experts' Allegations and their Respective Opinions

In part III of this report, I evaluated each plaintiffs' expert's allegation against WAMY and showed that there was no evidence that WAMY funded the 9/11 terrorists at any point in time in the discovery material or elsewhere. However, part III was organized along themes that the plaintiffs' experts raised in their respective report. Here in continuing my search for any evidence that WAMY materially supported the 9/11 terrorists, I switch tack and examine each expert's evidentiary basis he used to reach his opinions despite his flawed methodology. I conclude this section with my overall opinion of the weight of the evidence about possible WAMY funding of al Qaeda and the 9/11 attacks.

#### 1. Jenkins' Claims and Evidence

---

[960] Kohlmann report, paragraph 12, at 4. The quotes within the quotes are from della Porta's chapter, at 198.

258

Let me start with Jenkins who does not implicate WAMY at all. He does not opine on WAMY's alleged role in the 9/11 attacks. There is no need to address his report any further.

### 2.  Levitt's Claims and Evidence

Let me go on to Levitt since he presents the second fewest number of arguments. His report presents a history of al Qaeda and its funding relying exclusively on heavily processed government analytic secondary sources, which, as we have seen in a previous opinion section, are of variable reliability and should be the start of an authentic investigation rather than a substitute for it. He does not mention WAMY much in his report and only presents two arguments with respect to it.[961]

- The first claim basically implies that WAMY is part of a group of proselytizing NGOs in the Netherlands. This does not implicate WAMY at all in the 9/11 attacks and is therefore irrelevant to the pertinent issues in this litigation.

- The second claim repeats the CRA audit's claim that WAMY allegedly provided money to BIF. I addressed this allegation in a previous section, and, on the weight of the evidence, it is not solidly founded. There is no evidence that any money, like the $52,000 for an orphans' fund under BIF control, ever flowed to al Qaeda and the 9/11 terrorists (see section III.J.4 of this report).

Levitt therefore provides no evidence of WAMY's support of al Qaeda or the 9/11 terrorists. He just points at the CRA Audit's conclusion of bookkeeping irregularities in WAMY Canada, but even the CRA report did not show that the money with mysterious provenance and destination ever flowed to al Qaeda and the 9/11 terrorists. In his opinion, Levitt makes no specific allegations against WAMY.

### 3.  Kohlmann's Claims and Evidence

Kohlmann presents multiple claims about WAMY's funding of the 9/11 terrorists. I have already criticized his flawed methodology, but let's look at the substance of his claims and the evidence behind them.

---

[961] Levitt report, at 29.

- He starts by referring to JFT-GTMO analysts label of WAMY as a Tier 1 NGO (henceforth, Kohlmann's paragraphs in parentheses, 159). He points to no evidence behind this label. As shown, this label contradicts other parts of the U.S. government that failed to list WAMY as an al Qaeda supporter (sections III.A and IV.A.1 of this report). Furthermore, the follow-up of Hamad, the individual implicated in this accusation, showed that he was discharged without any charges, undermining the essence of this accusation.[962]

- Kohlmann then points to a song sung in a WAMY camp and a speech given at a Florida camp as indicative of WAMY's material support for the 9/11 terrorists (160–1). Even assuming that these two verbal praises of jihad are true, there is a huge gap in the chain of events that need to happen between verbal support of jihad to funding the 9/11 terrorists. He does not provide evidence for a single link in this chain.[963]

- He then cites a *New York Times* report's false claim that Batterjee is chairman of WAMY as evidence that WAMY funded the 9/11 terrorists (162–3). This just shows that Kohlmann is not discriminating about his sources of information and does not fact check them. WAMY's humanitarian support of Saudi fighters in Bosnia does not imply WAMY funding for the 9/11 terrorists.[964]

- He then cites WAMY Secretary General Dr. al-Johani's support of Kashmiri Muslims as evidence that WAMY funded the 9/11 terrorists (164–5). He completely manipulated the content of the news articles referring to Dr. al-Johani, whose humanitarian drive to support victims of the Kashmiri conflicts does not reveal any evidence that he funded al Qaeda or the 9/11 terrorists.[965]

- He then cites an article by Dr. al-Johani in support of Chechen victims as evidence that WAMY funded the 9/11 terrorists (166–7). He manipulated the contents of this article through clever juxtapositions and critical omissions to give the false impression that Dr. al-Johani was promoting military support for Chechen fighters. WAMY's humanitarian support for Chechen victims does not imply that WAMY funded the 9/11 terrorists.[966]

---

[962] See sections III.K.3 and IV.A.1 of this report.
[963] See section III.B of this report.
[964] See section IV.A.3.a of this report.
[965] See sections III.D.1 and IV.E of this report.
[966] See sections III.G and IV.E of this report.

- He then returns to JTF-GTMO analysts' allegation against Hamad because he had been an employee of Lajnat al-Daawa al-Islamiya (LDI) (168–70). WAMY never had anything to do with LDI, a Kuwaiti charity.[967]

- Staying with JTF-GTMO analysts' allegations, he again repeats their allegations that WAMY had ties with extremist organizations (171–2). This is essentially a repeat of his first claim in paragraph 159, which was already addressed.

- He then points to Dr. Binladin of WAMY USA as the nephew of Osama bin Laden and the fact that the FBI raided the WAMY USA office as evidence that WAMY USA funded the 9/11 terrorists (173, 176). As the 9/11 Commission Report stated, no money for the 9/11 terrorists came from the United States.[968]

- He goes on to cite TWRA's alleged support for Bosnian fighters as indicative of WAMY's funding of the 9/11 terrorists because TWRA and WAMY Austria Eastern Europe allegedly shared the same director and the same address (174). Al Qaeda was not in Bosnia and if anything might have been a donor for TWRA, not the recipient of any WAMY money. Since al Qaeda was not in Bosnia, any TWRA money (and alleged WAMY money to TWRA) would not have flowed to al Qaeda or the 9/11 terrorists.[969]

- He further cites the fact that India closed down two of WAMY's six offices in India as evidence that WAMY funded the 9/11 terrorists (175). The evidence for this was that an article claimed that WAMY had funded SIMI, an Indian Muslim student association. We are still far from the 9/11 terrorists.[970]

- In the same paragraph, he cites an allegation that the FBI/ISI Directorate raided WAMY Pakistan and that a WAMY employee was a courier for bin Laden as evidence that WAMY funded the 9/11 terrorists (175). As shown, the preponderance of the evidence is that these events never occurred.[971]

---

[967] See section III.K.2 of this report.
[968] See section III.I of this report.
[969] See section III.F of this report.
[970] See section III.D.2 of this report.
[971] See sections III.D.3 and IV.E of this report.

- Next, he cites some connection between WAMY and Ansar al-Islam, an organization that did not exist at the time of the 9/11 attacks as evidence that WAMY funded the 9/11 terrorists (177). This is a temporal impossibility.[972]

- He then cites a connection between WAMY and the Palestinian "Union of Good" and its support for Hamas as evidence that WAMY funded the 9/11 terrorists (178–9). There is no connection between Palestinian organizations and the 9/11 terrorists. Palestinian funds have been severely limited by Israeli authorities and there has not been any evidence that Palestinian organizations have supported al Qaeda and the 9/11 terrorists.[973]

- He moves on to cite two interviews by new WAMY Secretary General Dr. al-Wohaibi given after the 9/11 attacks defending Saudi charities' past humanitarian aid in Afghanistan in the 1980s and complaining about being the target of Western accusations as evidence that WAMY funded the 9/11 terrorists (180–1). Dr. al-Wohaibi does not mention any WAMY support for the 9/11 terrorists in his two interviews and his remarks seem irrelevant to the present litigation.

- He quotes from WAMY Assistant Secretary General Dr. Noorwali's accurate observation that there no accepted definition of terrorism as evidence that WAMY funded the 9/11 terrorists (182). The leap from an accurate theoretical observation to funding the 9/11 terrorists is simply too great to deserve any further comment, otherwise my agreement with Dr. Noorwali's accurate observation would also be counted as evidence that I funded the 9/11 terrorists.[974]

- He then mentions Sheikh al-Buraik's alleged remarks in lectures (one of which is unavailable), whose links with WAMY is uncertain, as evidence that WAMY funded the 9/11 terrorists (183–5). Given his demonstrated manipulation of the contents of lectures, I reserve judgment on this issue. In any case, there is no link between the sheikh's lectures and funding for the 9/11 terrorists.[975]

- He then cites WAMY USA's occasional relationship with Sheikh Anwar al-Awlaki and its invitation for him to come and lecture at one of its summer camps as evidence that

---

[972] See section III.L of this report.
[973] See section III.H of this report.
[974] See section III.H of this report.
[975] See section III.B of this report.

WAMY funded the 9/11 terrorists (186). As mentioned, the 9/11 Commission Report did not find any evidence that money from the United States funded the 9/11 terrorists.[976]

- He then asserts that there is a "wealth of documentary evidence" that WAMY had a connection to BIF and cites the *New York Times* erroneous claim that Batterjee was the chairman of WAMY and the fact that OFAC had listed the WAMY Peshawar office address as BIF's address in Pakistan as evidence that WAMY had funded the 9/11 terrorists (187–9). I covered the alleged connection between WAMY and BIF in multiple sections of this report. It rests on confusion by an FBI informant, which found an echo chamber among U.S. Attorneys and multiple branches of the executive branch of the government, and then repeated by plaintiffs' experts without any new evidence in support of it.[977]

- He then focuses on CRA's revocation of WAMY Canada's non-profit privileges as evidence that WAMY funded the 9/11 terrorists (190–4). I have already addressed this issue in Levitt's claims.[978]

- He points to the fact that a conspirator in the 1993 World Trade Center bombing was arrested at JFK Airport with an LBI/WAMY Pakistan envelope containing a terrorist manual as evidence that WAMY funded the 9/11 terrorists (195). Anyone could have picked up such an envelope in Peshawar and it is unrelated to the 9/11 attacks.[979]

- He then goes on to discuss BIF's alleged activities in the Bosnian war as evidence that WAMY funded the 9/11 terrorists (196–203). As already stated, there was no connection between WAMY and BIF and, even had there been any, any funding of the Bosnian fighters would not have flowed to the 9/11 terrorists as al Qaeda was not fighting in Bosnia.[980]

On the basis of the above claims, Kohlmann concludes, that WAMY among others "endorsed the concept of violent jihad, have pushed young Muslims to join violent jihadist organizations, and have provided critical support and resources to al Qaeda and its affiliates." However, Kohlmann provides no evidence for any parts of this statement as I have listed the

---

[976] See section III.I.1 of this report.
[977] See sections II.F, III.C.1, IV.A.2, IV.A.3.a, and IV.A.4 of this report.
[978] See sections III.J and IV.A.7 of this report.
[979] See section III.E of this report.
[980] See section III.F.2 of this report.

totality of the evidence he presented in his report. Kohlmann then opines, "It is my professional opinion that the tens of millions of dollars in support provided by these dawah organizations was the fuel for Al Qaida's engine in the period leading up to the September 11th Attacks, and that Al-Qaida could not have successfully planned and carried out the attacks without that funding."[981] As just demonstrated, Kohlmann provides no evidence whatsoever linking WAMY and al Qaeda and the 9/11 terrorists, let alone any evidence that it provided monetary fuel for it and its attack. In fact, his opinion contradicts the conclusion of the 9/11 Commission that I have already cited multiple times in this report.

In the last paragraph of his report, Kohlmann addresses the awareness of one's role in terrorist activity prong of aiding-abetting within JASTA. He writes, "There is a litany of documentary evidence … demonstrating how the senior leadership of … WAMY were well aware of the ideological agenda being pushed by their respective groups, the suspicious financial practices used by their employees, and the growing list of connections between their entities and violent jihadi extremists, mostly notably al Qaeda. Once again, the question begs itself–if top officials like former WAMY Secretary General Maneh al-Johani … explicitly endorse the concept of violent jihad (and the linked notion of "jihad by wealth") in their own dawah publications, if they refer to the U.S. and the West as the 'enemies of Islam,' and if they whitewash the illicit activities of their own employees–including the diversion of money, weapons, and travel documents to al Qaeda–what other result could they have logically expected?" This is a long and dense statement that needs to be unpacked.

In my long experience researching al Qaeda or in the discovery material, I have not seen any document supporting Kohlmann's allegations, and, as just shown, Kohlmann in his report fails to provide any. WAMY's leaders were of course aware of WAMY's agenda involving educational and relief work. WAMY's ideological agenda is not the terrorists' agenda. Its agenda follows Sheikh Rabi al-Madkhali's loyalty to one's ruler, while neo-jihadis reject their own rulers and declare them apostates. WAMY's leaders supervised closely the financial practices of their employees and when they strayed from WAMY's strict bookkeeping requirements, they forced these employees or volunteers to resign, as happened to Batterjee (LBI) and al-Khatib twice (WAMY Canada). In my review of all of his sections devoted to WAMY, Kohlmann failed

---

[981] Kohlmann report, paragraph 204, at 62.

264

to show any connection whatsoever between WAMY and al Qaeda. The point of an expert report is to show evidence for one's assertions, Kohlmann's assertions are devoid of evidence.

Kohlmann cites Dr. al-Johani in paragraphs 164–7 of his report. These are the very paragraphs where he manipulates the content of Dr. al-Johani's remarks through juxtaposition of unrelated material and omission of critical content that gives the true meaning of Dr. al-Johani's remarks to give the impression that Dr. al-Johani supports "violent Jihad." Jihad has many meanings in Arabic and for Muslims. Dr. al-Johani's concept of jihad is very different and indeed contrary to al Qaeda's concept of jihad. In the first speech, Dr. al-Johani endorses financial support for Kashmiris, creation of an awakening among Muslims on the problems of Kashmiris and advertisement of the cause of Kashmiris. In the second speech, Dr. al-Johani endorses not violent jihad, but a plebiscite guaranteed by the UN Security Council. In his editorial "Chechen Tragedy," Dr. al-Johani listed all the humanitarian support that WAMY was sending to the Chechen people, none of which was military aid. He did mention that the Chechens need money to buy arms and ammunition, but this is the general right of self-defense against outside aggression, as the Chechen War II was. He did not suggest that WAMY was providing money for this military material. Instead of endorsing the neo-jihadi concept of "violent Jihad," he was endorsing a more traditional concept of jihad as the right to self-defense, which all countries, Muslim or not, endorse. Only through distortion of Dr. al-Johani's remarks does Kohlmann try to make him appear that he is endorsing the neo-jihadi concept of jihad. I carefully reread Kohlmann's paragraphs on Dr. al-Johani and I failed to see where Dr. al-Johani referred to the U.S. and the West as the "enemies of Islam." I did not check whether anyone else said that, but it was not Dr. al-Johani as claimed by Kohlmann.

Finally, far from "whitewashing the illegal activities of their own employees," WAMY leaders tried to keep tight reins on them and forced them to resign if there seemed to have been any neglect of bookkeeping reporting as the forced resignations of Batterjee and al-Khatib illustrate. Nor has Kohlmann even cited a single example of any WAMY "diversion of money, weapons, and travel documents to al Qaeda" in his report.

Kohlmann fails to present any shred of evidence that WAMY played any role in the 9/11 attacks. Since WAMY did not play any role in these attacks, its leadership could not have been aware that it had played any role in them. Kohlmann just makes empty boasts about his evidence that are easy to fact-check and they are not backed up by the evidence he presents. He simply

265

throws up a lot of information that is irrelevant to al Qaeda and the 9/11 terrorists and hopes that some may implicate WAMY.

### 4. Winer's Claims and Evidence

Winer also makes a multitude of claims about WAMY's funding of the 9/11 terrorists in sections 12.10 to 12.14 of his report. I have already criticized his flawed methodology, but let's look at the substance of his claims and the evidence behind them.

- Winer starts by claiming that WAMY's support for al Qaeda emerged in the course of its engagement with Islamic refugee groups (henceforth all numbers alone in parentheses refer to Winer's paragraphs, here 12.10.2). He cites a controversial book that was withdrawn from the market by its publisher as evidence for this claim[982] but his citation does not support his claim and he does not present any new independent evidence to support his claim.

- He goes on to cite the JTF-GTMO analysts' label on WAMY as a Tier 1 NGO as evidence that WAMY supported the 9/11 terrorists (12.10.3). I have already addressed this issue in the section on Kohlmann, who made the same claim.[983]

- He then cites excerpts of a song sang in WAMY camps, as evidence that WAMY supported the 9/11 terrorists (12.11.1.1). I have already addressed this in the section on Kohlmann, who cited the same song.[984]

- He cites several excerpts from an affidavit by an ICE agent (ICE agent Kane, paragraph 12.11.1.2.), who quoted from a WAMY encyclopedia about an alleged excerpt about Jews, and a well-known Islamophobic journalist (Steven Emerson, paragraph 12.11.2), who quoted from a book, *Islamic Views*, allegedly written and published by WAMY. Neither Kane, nor Emerson, nor Winer read Arabic and could not have read these excerpts that were in Arabic, nor have they produced the original in the discovery material. In any case, none of these alleged WAMY remarks are relevant to the 9/11 terrorists.[985]

---

[982] J. Millard Burr and Robert Collins, 2006, *Alms for Jihad*, Cambridge: Cambridge University Press.
[983] See sections III.A and IV.A.1 of this report
[984] See section III.B of this report.
[985] See section III.B of this report.

- He also refers to the CRA audit citation of an MWL pamphlet as evidence that WAMY supported the 9/11 terrorists (12.11.3). WAMY is not MWL.

- He then turns to WAMY's alleged financial support of al Qaeda and bin Laden, by claiming that WAMY funded LBI, which was one of the three charities that bin Laden and al Qaeda relied on (12.12.1 to 12.12.11). WAMY did fund some LBI projects in Pakistan until 1996 when LBI became WAMY Pakistan. However, LBI was not one of the three major charities funding al Qaeda. This was BIF, which an FBI informant alleged that it funded al Qaeda *in Sudan*. LBI never operated in Sudan. Here, there is a confusion of two different and separate organizations and an anachronism. WAMY forced the resignation of Batterjee from LBI in early 1993. WAMY never had anything to do with BIF. Not only does Winer confuse LBI with BIF, he also perseveres in believing that Batterjee was a chairman of WAMY as erroneously reported in the *New York Times*.[986]

- He then cites the CRA audit as evidence that WAMY supported the 9/11 terrorists (12.12.12). I have already addressed this issue in both Levitt's and Kohlmann's sections as they made the same argument.[987]

- He goes on to cite WAMY's alleged support of TWRA in the Bosnian War as evidence of WAMY's support of the 9/11 terrorists (12.12.13 to 12.12.16, 12.13.3). However, al Qaeda did not fight in Bosnia and any financial or military support by some possible intermediary organization to the Bosnian fighters did not flow to the 9/11 terrorists.[988]

- He repeats that a WAMY employee was a courier for bin Laden in Islamabad in 2002 as evidence that WAMY supported the 9/11 terrorists (12.13.1). I have already addressed this issue in the Kohlmann section as he made the same allegation.[989]

- He alleges that WAMY trained some Pakistani student group as evidence that WAMY supported the 9/11 terrorists (12.13.2). Again, even if true, which it is probably not, this training would not have helped the 9/11 terrorists. There was no connection between these Pakistani students and the 9/11 terrorists.[990]

---

[986] See sections III.C.2, IV.A.3.a and IV.A.4 of this report.
[987] See sections III.J and IV.A.7 of this report.
[988] See section III.F.1 of this report.
[989] See section III.D.3 of this report.
[990] See section III.D.4 of this report.

- He also cites the same article by Dr. al-Johani in support for Chechen victims as evidence that WAMY provided weapons to Chechen fighters and evidence that WAMY supported the 9/11 terrorists (12.13.3). I already addressed this issue as Kohlmann made the same point.[991]

- He quoted Dr. Noorwali comments on jihad as evidence that WAMY supported the 9/11 terrorists (12.13.4). I have also already addressed this issue as Kohlmann made the same point.[992]

Winer concluded, "these facts, coupled with additional information set forth in the documentation that I have reviewed, provide examples of how WAMY funded al Qaeda and associated Islamic terrorist organizations and separatist movements; provided them with financial and logistical support; helped recruit and facilitate the movement of Islamic fighters and terrorists into conflict zones; provided weapons to al Qaeda, as well as Islamic soldiers and terrorists involved in affiliated or associated causes; recruited young Muslims to join separatist organizations and causes, including becoming martyrs for Islam; served as distribution channel for transmitting information and documents to and from al Qaeda and within and among Islamic terrorist organizations and associated separatist movements; disseminated hate speech against Christians and Jews designed to advance al Qaida's radical Islamist ideology throughout the Muslim world and legitimize violent jihad against 'infidels;' and urged young Muslims to take up arms against secular, non-Islamist societies."

Winer has shown no evidence for the allegations in his conclusion. As mentioned throughout this report, I have not been impressed by his review of "additional information" and I found his ignorance about al Qaeda or the content of the discovery material surprising in a retained expert. Specifically in relation to the 9/11 terrorists, he definitely has not shown that WAMY "funded" them; "provided them with financial and logistical support;" "helped recruit them and facilitate their movement;" "provided them with weapons [the box cutters?];" "[again] recruited them… to become martyrs for Islam;" "served as their communication system;" and "urged them to take up arms against [the United States]." Nor is WAMY's proselytism of al-Madkhali's version of Salafism the same as global neo-jihadi ideology. In fact, they are very hostile to each other. Winer makes a detailed set of claims about what he has shown in his

---

[991] See section III.G of this report.
[992] See section III.H of this report.

conclusion, but even a superficial reading of his report, let alone a detailed one as done in the present report, shows that he has no evidence supporting these claims. He has shown no evidence whatsoever that WAMY supported the 9/11 terrorists in any way.

Winer anticipated his failure to find any evidence for WAMY's funding of the 9/11 terrorists by borrowing a famous argument articulated by former Defense Secretary Donald Rumsfeld that "absence of evidence is not evidence of absence."[993] Of course Rumsfeld uttered this expression in response to questions about Iraq's connection to the 9/11 attacks and its possession of weapons of mass destruction. The point was of course that, just like Winer argues that such help would be clandestine and unlikely to be recorded, Iraq's link to the 9/11 attacks and possession of WMDs would have been clandestine and difficult to trace. As we now know, Secretary Rumsfeld was spectacularly wrong about both claims, undermining the justification for invading Iraq, and led the United States and its allies into an unprovoked attack on and invasion of Iraq. In that case, absence of evidence was indeed evidence of absence. Here, again, the fact that a claim is false is the most parsimonious explanation for the fact that there is absence of evidence for that claim. A presumption that a claim is false must therefore be the default assumption behind any absence of evidence. This implies that the burden of proof lies squarely on the side of the people claiming any wrongdoing to find evidence of this wrongdoing. I hope that Winer is not arguing that the defendants have the burden of proving their innocence in the face of the absence of evidence of any wrongdoing. From a scientific point of view, the law is right: it is the plaintiffs' burden of proof by a preponderance of the evidence (a lower standard than for scientific conclusions) that WAMY played a role in the 9/11 attacks.

### H.  Opinion about the evidence that WAMY Supported the 9/11 Terrorists

My opinion with a reasonable degree of professional certainty is that the plaintiffs' experts have failed to show any evidence that WAMY has ever supported the 9/11 terrorists.

The plaintiffs' experts kick up a lot of irrelevant dust and falsely claim that it is really smoke, which is indicative of a fire somewhere. It is just dirt and there is no fire. Their respective

---

[993] Donald Rumsfelt, 2002, Press Conference, NATO Headquarters, Brussels, June 6, 2002, available at https://www.nato.int/docu/speech/2002/s020606g.htm. This is the essence of Winer's argument in section 9 of his report entitled, "*Would You Expect the Internal Records of Charities That Were Involved in Supporting al Qaeda to Document Their Support for al Qaeda? If not, why not?*" at 55–67.

reports lack balanced and nuanced investigations of the facts and instead repeat the same old worn-out accusations against Islamic charities that have long been discredited. In essence, their reports are akin to legal briefs that simply advocate for their sides, not expert reports relying on sound methodology to help the factfinder understand the factual issues at hand, beyond his or her ken.

Despite the lack of any evidence that WAMY or LBI helped al Qaeda, let's play devil's advocate and assume a hypothetical that Batterjee, while he was LBI's executive director in Peshawar, provided some money to Arab Afghans who later became part of al Qaeda during its historical first frontier phase. This appears to be what Winer hints at, but his report is marred by his great confusion of that time, place, and actors. As some of the documents captured in the 2002 raid on the BIF office in Sarajevo demonstrate, the MaK and other Islamic charities supported Afghan refugees, Afghan mujahedin, and Arab Afghans, including those who later became al Qaeda. At the time, LBI was present in Peshawar as an independent organization but under the sponsorship of WAMY, which funded some of its specific programs.

The point of this hypothetical exercise is to draw its implications for any possible hypothetical WAMY involvement in the 9/11 attacks.

First, this hypothetical contribution to what later became al Qaeda was very remote in time, about a decade before the 9/11 attacks, and that in the interval, al Qaeda was on the verge of bankruptcy several times: after the disaster of Jalalabad in 1989, the loss of its income in Sudan around 1995, the loss of its assets in Sudan when it was expelled from that country, and the decrease of its income in the second half of 1998, all described in part II of this report. The point is that these lean times wiped out any contribution that might have been made to al Qaeda in the late 1980s or early 1990s in Peshawar and such a contribution would no longer have been available for use in the 9/11 attacks. In other words, this hypothetical contribution in 1988–91 would have been too remote to have had any influence on the 9/11 attacks.

Second, I keep writing "that later became al Qaeda" because the al Qaeda of 1988–91 was very different from the al Qaeda of 2001. Al Qaeda of 1988 was still fighting to liberate Afghanistan from the Soviet Union and its puppet regime in Kabul, therefore a *de facto* ally of the United States and the West against Soviet aggression, and not yet a terrorist organization. It was fighting on the same side as the United States. Al Qaeda of 2001 was definitely a terrorist organization bent on attacking its enemy the United States. There is a huge interval between al

270

Qaeda of 1988 and al Qaeda of 2001 during which al Qaeda evolved dramatically. It would have been inconceivable in 1988–91 to imagine that the people who had coalesced around their victorious skirmish against the Soviets at the end of Ramadan 1987 would one day attack simultaneously the economic, military, and political headquarters of the United States. Over time, al Qaeda became a terrorist organization but did so after it had moved to Sudan, where neither WAMY nor LBI were present. When al Qaeda returned to Afghanistan in 1996, there is no evidence that WAMY ever helped al Qaeda (LBI had been dissolved and WAMY Pakistan had taken over its projects). Indeed, the U.S. State Department designated al Qaeda as a foreign terrorist organization only on October 8, 1999. So, any contribution to the al Qaeda in 1988–91, when al Qaeda was not yet a terrorist organization, was not support for the al Qaeda of 2001 the terrorist organization that carried out the 9/11 attacks.

Third, in a related argument, had Batterjee provided money to Arab Afghans who later became al Qaeda, he would have supported U.S. allies, not terrorists at the time. The documents in the Tareekh Osama folder captured in the 2002 raid on the BIF office in Sarajevo deal with people around bin Laden from 1987 to 1989. The documents in the Tareekh Masada folder deal with people who were in Masada inside Afghanistan. And the documents in the Tareekh Jabal folder deal with a Hekmatyar camp around 1990–1. Most of the documents scanned in these folders did not imply any relationship with LBI. They dealt mostly with MaK and Hezb Islami (both Hekmatyar and Khales) business. But a very few are on LBI letterhead, which may suggest that someone in the LBI office was involved. This is still not established because, as most of the documents are scraps of paper, it is possible that the writer just had a small stack of blank LBI letterhead papers to be used as scrap. In any case, Gulbuddin Hekmatyar, Abdul Rabb Rasul Sayyaf, and Yunes Khales's were allies of the United States and direct recipients of United States military and humanitarian aid. Likewise, al Qaeda of 1988–9 was fighting on the same side as the United States against Soviet aggression and was not a terrorist organization. Furthermore, at the time, al Qaeda was not doing much, just conducting training for new potential recruits and preparing for its move to Sudan. So, any support to Arab Afghans in the late 1980s and early 1990s would have gone to U.S. allies and not enemies of the United States, who carried on the 9/11 attacks.

Fourth, WAMY was not the only source of funding to LBI, as Batterjee was also doing his own fund raising for their common projects. In the two projects whose documentation have

271

survived, WAMY funded less than half of their respective budgets. WAMY's money was earmarked for specific projects to support Afghan refugees and victims and required Batterjee to provide detailed bookkeeping records of his spending. Because of this tight accounting requirement, it was less likely that any contribution of LBI funds to Arab Afghans who later became al Qaeda would have come from WAMY funds that required pre-approval for specific projects. It was far more likely that such hypothetical contribution would have come from Batterjee's own funds (he was independently wealthy) or money that he had raised him, as he had no reporting requirements on this money in contrast to WAMY money, which required both pre-approval for spending and was tightly supervised from WAMY headquarters. He had a much freer hand in disposing of his own money as he pleased than with WAMY's funds. So, had Batterjee provided money to people of al Qaeda of 1988–91, it was more likely than not to have come from his own money (his own wealth or money that he had raised independently from WAMY) rather than from WAMY funds.

Fifth, around 1991 and up to early 1993, Batterjee started neglecting his bookkeeping reporting duties back to WAMY Saudi Arabia. This lack of reporting blinded WAMY leadership in Jeddah or Riyadh as to what Batterjee was actually doing in the field. WAMY's leaders were therefore not aware at all whether any of its money might have been diverted to Arab Afghans who were of course not part of their pre-approved charitable projects. In other words, had Batterjee actually provided money to al Qaeda at the time, WAMY's leaders lacked the awareness that they were assuming a role in "terrorist activities" as Batterjee was hiding his activities from them, let alone aware being aware of any role that they might have had in relation to the 9/11 attacks a decade later. In part, because of this "one-man show" attitude on Batterjee's part and his neglect of keeping WAMY leadership informed of his activities, WAMY's secretary general forced him to resign from LBI, severing his connection to WAMY. Although there is no clear evidence that Batterjee materially supported al Qaeda, assuming that he did for the sake of the hypothetical, he would have kept WAMY's leadership in the dark about it through his neglect of his bookkeeping duties. WAMY's leaders would not have been aware of this contribution. In other words, WAMY's leaders would not have been aware of playing any role in al Qaeda's later activities, including the 9/11 attacks.

I went through this hypothetical exercise to show that, even assuming plaintiffs' experts' claim that Batterjee materially supported al Qaeda in the late 1980s and early 1990s in Peshawar,

and, again, there is no evidence for it, this contribution would have been too remote to have any influence on the 9/11 attacks; a contribution to the al Qaeda of 1988–91 was not one to the al Qaeda of 2001 that carried out the 9/11 attacks; any contribution to the al Qaeda of 1988–91 was in support for a U.S. ally and not an enemy that carried out the 9/11 attacks; any LBI contribution to al Qaeda in the 1988–91 framework was more likely than not to have come from Batterjee own resources and not from WAMY; and had such contribution taken place, WAMY's leaders would not have been aware of it and therefore also not aware of playing any role in the 9/11 attacks. In other words, even assuming this hypothetical, any Batterjee support to al Qaeda in 1988–91 was simply too remote for WAMY to have contributed to the 9/11 attacks.

As I showed in part II of this report, al Qaeda rebuilt its financial network in its third Afghan phase from late 1998 onward. The source of this money is unknown, as the 9/11 Commission Report and its staff repeatedly emphasized. This is the money that funded the 9/11 attacks, and there is no evidence at all that WAMY played any role in this attack.

### I.  My Concluding Opinion

In conclusion, after carefully weighing the evidence for and against WAMY's alleged support for the 9/11 terrorists, my opinion within a reasonable degree of professional certainty is that there is a lack of evidence of any proximate WAMY contribution to the 9/11 attacks, both in the discovery material and in the plaintiffs' experts' reports.

Did WAMY participate in the 9/11 attacks? And did it aid and abet the people involved in the attacks? To answer the first question, from all the evidence reviewed, there is no evidence that WAMY participated in these attacks, planned them, trained any of the perpetrators of these attacks, or requested them to carry out the attacks. In terms of the second question, there is no evidence at all in the discovery material that WAMY encouraged any of the 9/11 terrorists to carry out the 9/11 attacks; knowingly provided funds to them for the 9/11 attacks; maintained any relationship with any of them; provided them with funds that went to support the 9/11 attacks; expressed a desire and intention to assist them commit the 9/11 attacks; and had any relationship with them at all for any duration of time.

As shown in part III of this report, the plaintiffs' experts have tried to implicate WAMY in supporting Arab Afghans at the first frontier phase of al Qaeda, Bosnian fighters, the 1993 World Trade Center bombers, al Qaeda in its second Sudanese phase, Kashmiri fighters,

Chechen fighters, Palestinians, Indian terrorists in the 1980s, 1990s, and even after 9/11/2001…
None have any relations to al Qaeda, except al Qaeda itself, since al Qaeda was not involved in
Bosnia, the 1993 World Trade Center bombing, Kashmir, Chechnya, Palestine, or India. WAMY
did not contribute to any fighters in Bosnia, Kashmir, Chechnya, Palestine, or India. Even if
some of its contributions for war refugees in these regions might have trickled to the respective
fighters in these theaters, al Qaeda was not involved there, and therefore such contribution could
not flow to al Qaeda or the 9/11 terrorists. WAMY was not involved in the 1993 World Trade
Center bombing.

Al Qaeda was of course present in Sudan during its second historical phase, but there is
no evidence that WAMY was involved in funding al Qaeda during the second phase of its
history. Such claims are based on a confusion between LBI, which of course is connected to
WAMY, and BIF, which is not. Nor was WAMY involved in al Qaeda's third Afghan phase of
its history. So, none of WAMY's charitable acts bear any definite and specific, articulable
connection to the 9/11 attacks or those who carried them out. Plaintiffs' experts fail to show that
any of WAMY's charitable acts was used to help fund or facilitate the 9/11 attacks in any
meaningful way.

Nor did WAMY's field offices or organizations under its sponsorship contribute to the
9/11 attacks. WAMY has bookkeeping reporting requirements for its field offices or
organizations it sponsors in order to make sure that its money earmarked to specific projects are
spent according to pre-approved plans. When the executive director of an independent
organization under WAMY sponsorship (Batterjee, the executive director of LBI) stopped
fulfilling his obligations to keep WAMY informed of his activities in the field and tried to solicit
donations fraudulently, WAMY forced him to resign in early 1993 and completely severed any
link that WAMY had with him. When another one of WAMY's field directors (al-Khatib, the
director of WAMY Canada) failed in his reporting obligations, he was fired in 1999. He was
rehired in 2000 in the hope that he would improve, and when he failed again in his duties, he was
again fired in 2001. This demonstrates that WAMY takes its supervision of the funds earmarked
for its specific pre-approved projects very seriously and does not hesitate to fire local leaders not
abiding by its rules. There is no evidence that either WAMY field office contributed to the 9/11
attacks.

So, we are left with the remote hypothetical that some WAMY funds might have been diverted during al Qaeda's first frontier phase of its history through Batterjee. WAMY did all that it could to prevent such a potential diversion through strict bookkeeping reporting requirements. Even assuming for the sake of argument this hypothetical, as we did in the previous section, such a hypothetical diversion of WAMY funds would have been too remote to be a link in the causation chain leading to the 9/11 attacks for WAMY to have played any role in these attacks.

From all of our understanding of the 9/11 attacks, the conspiracy that led to them emerged around early spring of 1999 and their funding came from the last influx of money that al Qaeda received and started around December 1998. The source of this funding is not known, and plaintiffs' experts make no allegation that WAMY contributed to this last infusion of money that went to al Qaeda and funded the 9/11 terrorists. In short, there is no evidence that WAMY contributed in any way to the 9/11 attacks.

Marc Sageman, M.D., Ph.D.

275