# EXHIBIT 25

This Transcript Contains Confidential Material

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - -

IN RE: TERRORIST        :

ATTACKS ON              :      03-MDL-1570

SEPTEMBER 11, 2001  :      (GBD)(SN)

----------------------------------------

- - -

Wednesday, February 20, 2019

- - -

THIS TRANSCRIPT CONTAINS CONFIDENTIAL

MATERIAL

- - -

Day 1 of the videotaped deposition of
ADNAN BASHA, taken pursuant to notice, was held
at the Park Hyatt Jeddah, Al Hamra District,
Southern Corniche, Jeddah, Saudi Arabia, 21432,
beginning at 3:11 p.m., on the above date,
before Lisa V. Feissner, RDR, CRR, Notary
Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph │ 917.591.5672 fax
deps@golkow.com

This Transcript Contains Confidential Material

Page 90

Q. How often would that be done?

A. This is done when the funds are provided in the field to the orphans by individuals from the social care department and individuals from the office that is relevant to that region.

Q. When you say, the office that is relevant to that region, are you referring to an internal or an external IIRO office?

A. Internal office.

Q. So the internal offices in Saudi Arabia had particular regions that they were responsible for?

A. This is determined based on the level of the responsiveness in collecting donations for that country in particular.

Q. But there were instances when one of the internal offices in Saudi Arabia would have been allocated responsibility for verifying the information provided by an external office?

A. The internal office is like a second eye for the General Secretariat for that particular region, and it monitors the project

Page 91

being implemented.

Q. Were the external offices required by the IIRO headquarters to comply with local law?

A. This is ABC in the regulations of the IIRO.

Q. But do you happen to know whether any of the countries where the IIRO external offices were located required those offices to hire external auditors on any periodic basis?

A. This is a part of the annual assessment that is conducted by the external auditor hired by the headquarters for the headquarters.

Q. Did the IIRO require that each of its external offices retain independent auditors to conduct audits of their operations on a periodic basis?

MR. LEWIS: Objection. Could you clarify the time frame, please?

Q. Let's say between 1997 and the end of 2001.

A. The external office is not required to hire an external auditor on annual basis.

Page 92

But all the accounts of the external offices are sent to the General Secretariat, and the General Secretariat has an external auditor who conducts the auditing of the IIRO. And it takes -- the external auditor would take samples of the offices that require further auditing.

MR. CARTER: I'm going to ask the court reporter to mark as Basha-134 the Annual Report for 1999-2000 produced at IIRO 212 through IIRO 330.

MR. LEWIS: Sean, if we're moving on to something new, we're past prayer time. Can -- and I think Dr. Basha would like to take his prayer break now, and then we can --

MR. CARTER: That's fine.

MR. LEWIS: It's 6:42 our time. Shall we come back around 7?

MR. CARTER: Sure.

MR. LEWIS: Maybe a minute or two after. Thank you.

VIDEO OPERATOR: We are now going off the video record. The time is 6:42.

Page 93

(Recess from 6:42 p.m. until 7:10 p.m.)

VIDEO OPERATOR: We are now going back on the video record. The time is 7:10.

BY MR. CARTER:

Q. Dr. Basha, when we left off a moment ago, I was about to request that the court reporter mark as Basha-134 a document produced at IIRO 212 through 330.

(Exhibit Basha-134 marked for identification and attached to the transcript.)

BY MR. CARTER:

Q. Dr. Basha, do you have that document in front of you now?

A. Yes.

Q. Can you tell me what it is?

A. It is the Annual Report for 1999-2000.

Q. And consistent with your prior testimony, would this report have been prepared by the public relations and information department of the IIRO?

24 (Pages 90 to 93)

This Transcript Contains Confidential Material

Page 106

are managed and operated by the IIRO.

Q. Do you know what IIRO office would have been responsible for managing and operating the Zahra Hospital project during this time period?

A. The projects in Afghanistan were managed by the office from Islamabad in Pakistan.

Q. Do you recall who was in charge of the Islamabad Pakistan IIRO office in 1999?

A. I think he was Moayad Al-Botairi.

Q. Do you recall whether the Saudi Ambassador to Pakistan had any role with the IIRO's operations in Pakistan or Afghanistan during this time period?

A. I do not remember.

Q. Moving down a bit in the chart, under Pakistan, it references the Uhud Hospital in Queta. Do you see that?

A. Yes.

Q. Did you ever visit that facility?

A. No.

Q. Would the management and operation of that hospital also have been under the

Page 107

purview of the IIRO's office in Islamabad?

A. Yes.

MR. CARTER: I'm going to ask the court reporter to mark as Basha-135 the 2000-2001 Annual Report produced at IIRO 331 through 441.

(Exhibit Basha-135 marked for identification and attached to the transcript.)

BY MR. CARTER:

Q. Dr. Basha, do you have the document in front of you?

A. Yes.

Q. And can you tell me what the document is?

A. The Annual Report for 2000-2001.

Q. And turning your attention to page 24 of the report, Bates-stamped IIRO 352, there is a table summarizing the IIRO's expenditures for this calendar year by program; is that correct?

A. Yes.

Q. And am I correct, it indicates that the IIRO's total expenditures for the reported

Page 108

calendar year were 137,266,018 riyals?

A. Yes.

Q. And of that amount, a little more than 67 million riyals was spent on the urgent relief program, correct?

A. Yes.

Q. And nearly 37 million riyals was spent on the social welfare program, correct?

A. Yes.

Q. And so again, during this calendar year, 2000 to 2001, the urgent relief and social welfare programs were the largest areas of expenditure for the IIRO, correct?

A. Yes.

Q. Turning your attention to page 90 of the report at IIRO 416.

A. Yes.

Q. There is a heading, Conferences, research and working papers.

Do you see that?

A. Yes.

Q. During your tenure as Secretary General, did the IIRO participate in conferences in furtherance of its mission?

Page 109

A. Yes.

Q. And was there some sort of review process for the IIRO to determine whether to participate in a given conference?

A. For any conference, the invitation is directed to the relevant department. And that department would give the opinion regarding participating or not, and the level of representation.

Q. And would the department's opinion be submitted to you as Secretary General?

A. Yes.

Q. And when the IIRO elected to participate in a conference, was some report typically prepared?

A. Not necessarily.

Q. And did you ever attend any conferences as Secretary General of the IIRO?

A. Yes.

Q. Do you recall whether there were written materials distributed in any of the conferences you attended?

A. Written materials from whom?

Q. From the host of the conference or

28 (Pages 106 to 109)

This Transcript Contains Confidential Material

Page 145

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-   -   -

IN RE: TERRORIST        :

ATTACKS ON              :      03-MDL-1570

SEPTEMBER 11, 2001  :      (GBD)(SN)

------------------------------------------

-   -   -

Thursday, February 21, 2019

-   -   -

THIS TRANSCRIPT CONTAINS CONFIDENTIAL

MATERIAL

-   -   -

Day 2 of the videotaped deposition of

ADNAN BASHA, taken pursuant to notice, was held

at the Park Hyatt Jeddah, Al Hamra District,

Southern Corniche, Jeddah, Saudi Arabia, 21432,

beginning at 3:03 p.m., on the above date,

before Lisa V. Feissner, RDR, CRR, Notary

Public.

-   -   -

GOLKOW LITIGATION SERVICES
877.370.3377 ph │ 917.591.5672 fax
deps@golkow.com

This Transcript Contains Confidential Material

Page 214

A. Amir Jasim.

Q. According to the English translation I have of this draft letter, it indicates that Mr. Jasim was arrested and is under investigation with the reservation of the office's director, who is of a Saudi origin.

What does that language indicating that he was arrested under the reservation of the office's director mean?

A. The financial officer was arrested by the Pakistani police based on a complaint from the IIRO. The complaint was prepared by a lawyer who was appointed for this purpose, and the -- but for the office manager, he was called to Jeddah to answer to the legal department and its requirements.

Q. So as I understand this, the Pakistani financial officer was arrested in Pakistan, correct?

MR. LEWIS: Objection, lack of foundation. He's not Pakistani.

Q. Do you know Mr. Jasim's nationality?

A. Iraqi.

Page 215

Q. Okay. So Mr. Jasim, who is an Iraqi, was arrested in Pakistan, correct?

A. Yes.

Q. And when the IIRO discovered the cheating, forgery, and misuse of funds, it called Mr. Butairi back to Saudi Arabia?

A. Because he was claiming that the only person responsible for this cheating is Amir Jasim in his capacity as the financial officer.

Q. And it was the preference of the IIRO that the inquiry concerning Mr. Butairi and his possible involvement be conducted in Saudi Arabia, correct?

A. For two reasons. The first reason is Moayad Al-Butairi, he held Amir Jasim accountable for that, and he declined any form of responsibility -- sorry, he denied any form of responsibility. And the second reason is that he remained in Pakistan for one week during the stay of the delegation from the IIRO, and he was not arrested by the Pakistani police. And therefore, we preferred to bring him to Saudi Arabia in order not to lose our

Page 216

cards. And therefore, at that time, the conclusive evidences were incomplete.

Q. Did you later receive evidence indicating that Mr. Butairi was himself involved in the cheating, forgery, and misuse of IIRO funds?

A. Yes.

Q. Did the IIRO request that he be prosecuted?

A. In order to have the conclusive evidences, this took some time from us. And it required a lot of patience. And therefore when Moayad Al-Butairi found that he has -- in front of him he has the chance of being arrested, just that, he wrote a waiver -- he wrote a waiver or an assignment of the three clinics he had [unclear words], which he operated from the embezzled funds from the IIRO.

And therefore, in comparison to the long period of time that was consumed with Amir Jasim, in this case the IIRO, in a very short period of time, was able to retrieve its funds, to know -- or to discover how the theft happened, and who stole the money, and to which

Page 217

bank the money was deposited.

Q. Are you saying that the IIRO recovered all of the money that was stolen from its Pakistan branch?

A. After the IIRO examined all the documents -- financial documents and the money transfers, and given the absence of documents that were incinerated by Amir Jasim, the IIRO found that what has been stolen equals to the value of the three clinics that were owned by Amir Jasim and Moayad Butairi from the money they embezzled.

Q. So evidence was destroyed, correct?

A. Yes, incinerated.

Q. And the --

MR. LEWIS: Hang on, he hasn't finished his answer.

A. And Amir Jasim admitted in writing that he was the primary responsible person for all the forgery of documents and cheating. Regardless of that, we did not relieve even Moayad Al-Butairi from the responsibility, and when he knew that we will bring him to justice in Saudi Arabia, he had no option other than

19 (Pages 214 to 217)

Golkow Litigation Services - 1.877.370.DEPS

This Transcript Contains Confidential Material

Page 218

that only option. So he confessed that he owns the three clinics, and he expressed in writing that he's ready to hand them over, and this is what happened.

Q. I take it this was a relatively significant controversy for the IIRO?

MR. LEWIS: Objection to form.

A. For the IIRO, it was a financial problem, but we have managed to contain it and to precisely identify it, and to prevent its recurrence by adopting some mechanisms, and to set an example for other employees that whoever dares to conduct such act will meet the fate of dismissal. And this is what happened to Amir Jasim and Moayad Al-Butairi.

Q. Did the IIRO document all of its analysis of the losses incurred as a result of this activity and valuation of the three clinics that were transferred to it?

MR. LEWIS: Objection to form.

(Witness answers.)

MR. LEWIS: Let the translator --

A. Yes. And this leads me to say something that I did not mention. As soon as

Page 219

that delegation came back from Islamabad, a committee was established in the General Secretariat. And the committee composed of four departments, and it was presided over by a senior official in the IIRO. And the responsibility of the committee was to review all the documents that were obtained.

And sadly, the committee tried to do its best, given the lack of many of the documents, but with the patience and the perseverance of the committee, the committee managed, with all the adverse circumstances it faced, be they in Pakistan, it managed at the end of the day to reach an estimation of the embezzled money.

And it consulted with the lawyer in Pakistan who authorized that, and therefore the settlement was conducted in such a way.

Noting that even the original documents that were in the possession of the finance department in Jeddah, which the Pakistani court requested to obtain so it can issue a judgment in the case of Amir Jasim, these documents were lost in the court after

Page 220

delivering the documents to the court under signature.

So all these adverse circumstances did not deter the IIRO from obtaining its legitimate rights.

Q. So as I understand it, the IIRO decided to have its own internal committee analyze the extent of the losses and their disposition, correct?

A. Yes. And the committee was given all the powers to take the wide decision.

Q. And in the end, Mr. Butairi was not prosecuted, correct?

A. We found it sufficient, based on the advice of the lawyers, to retrieve our funds -- to recover, sorry, to recover our funds, and we considered it closed.

Q. How much did you recover?

A. I do not recall now, but it was based on the estimations of the value of the three clinics.

Q. So you recovered the three clinics, correct?

A. Yes. One in Peshawar, one in

Page 221

Islamabad, and another one in Karachi.

Q. And based on the transfer of those three committees [sic], you resolved your issues with Mr. Butairi?

MR. LEWIS: Objection to form.

A. It's not that we settled, but we have recovered our funds. And actually, this allowed us to conduct a thorough review of the rules and regulations that we had because they contained some gaps that allowed Amir Jasim to do what he did.

Amir Jasim was one of the most efficient accountants and one of the oldest employees in the IIRO, and Moayad Al-Butairi also was receiving the title of the ideal manager. And with all that, they have managed to take advantage of the gaps, but with a review, we have closed them.

Q. So as I understand it, there should be documents reflecting the IIRO's valuation of the three clinics, correct?

MR. LEWIS: Objection to form.

A. This is for sure. These were procedures for the committee, and the committee

20 (Pages 218 to 221)

This Transcript Contains Confidential Material

Page 222

was authorized with all powers. And the members of the committee come from departments that were considered as inspectors of the finance department. So there is no bias to any entity.

Q. Well, if you wanted to avoid bias to any entity, wouldn't you have hired an independent actor to do this process?

MR. LEWIS: Objection to form.

A. I mean that there was no bias. The committee composed of people from the financial follow-up department, which is like a controller, over the performance of the finance department and the offices. And it is the financial -- and the second member was the financial controller before any disbursement, and the third member was from the legal department, and all of these departments are reporting to the Secretary General directly.

Q. During what period did the committee conduct its work?

A. In fact, the committee took long time in this matter because of the lack of evidences. But the waiver -- or the assignment

Page 223

was done three and a half months after the discovery of the theft.

Q. So the committee began its work within three and a half months of the initial discovery of the problem, correct?

A. No. After three and a half months of the incident, the waiver was obtained from Moayad Al-Butairi, when he knew that he will be prosecuted or brought to justice.

Q. The problem with the office was discovered sometime around late 1999 or early 2000, correct?

A. Late 2000.

Q. And did the committee begin its work shortly thereafter?

A. Yes. After the return of the delegation from Pakistan to Jeddah, and presenting its report, the committee was directly established.

Q. And do you know whether the committee completed its work by 2004?

A. It was around -- I do not remember exactly when the work was completed. It was around that date, and it took long time because

Page 224

some of the evidences were incinerated, some of them were lost, and Amir Jasim started to manipulate with the Pakistani judiciary. And we have acted based on an advice from the chief judge in Pakistan. He told us that if you continue this course and you request a full imprisonment of the person, the process may take between 15 to 20 years.

Q. So from that do I understand you decided not to pursue the full prosecution of Mr. Jasim?

A. Yes. Based on the advice from the chief judge.

Q. And as a result, Mr. Jasim was released?

A. Amir Jasim had family problems. His wife was divorced, and he was expelled from Pakistan.

Q. But he was released from jail in Pakistan, correct?

A. On the condition that he is expelled from Pakistan, yes.

MR. CARTER: I'd like the reporter to mark as Basha-149 [sic] a document

Page 225

produced at IIRO 026468 through 026490.

(Exhibit Basha-150 marked for identification and attached to the transcript.)

MR. NASSAR: And Sean, on this document, because there's no Arabic version and the witness reads English very -- kind of slowly, you know, if we could just take our time and point him to which parts of the document that you are asking questions on.

MR. CARTER: That's fine, Waleed. And I know that the translator has asked that we take breaks every 90 minutes. I'm not sure if we're butting up on that.

MR. NASSAR: I think we are.

MR. CARTER: I think we are. So if he wants to break, that's fine.

MR. LEWIS: It's five minutes until prayer time. We can go another five minutes or we can just break. It just may take a little bit longer because it's prayer time in five minutes.

21 (Pages 222 to 225)

This Transcript Contains Confidential Material

Page 226

MR. NASSAR: It came in. We can take the break now.

MR. CARTER: Okay. Why don't we take a break now.

VIDEO OPERATOR: We are now going off the video record. The time is 6:23.

(Recess from 6:23 p.m. until 6:51 p.m.)

VIDEO OPERATOR: We are now going back on the video record. The time is 6:51.

BY MR. CARTER:

Q. Dr. Basha, before we took a break, I asked the court reporter to mark an exhibit, and I misspoke. I said it would be Basha-149. In fact, it's Basha-150. And it's -- bears Bates stamp IIRO 26468 through 26490.

Do you have that document in front of you?

A. Yes.

Q. Do you recall whether you've ever seen this document before?

A. No.

MR. LEWIS: Excluding -- I assume

Page 227

you intend to exclude having been shown it recently by his lawyers.

MR. CARTER: Correct.

Q. Dr. Basha, I understand this to be a report of an audit conducted of the IIRO's Pakistan branch by Ford Rhodes Sidat Hyder & Company. Do you recall whether such an audit was conducted?

MR. LEWIS: Object to the form of the question.

A. What I recall is that I have ordered the delegation that travelled to Pakistan to consult with Judge Cheema to appoint an independent auditor to audit the records and the books of the IIRO office in Pakistan. And this office, the auditor was selected for this assignment.

Q. And turning to the page bearing Bates 26472, there is a section labeled Scope of Work. Do you see that?

MR. LEWIS: Sean, the Bates number is blocked by the logo. So it might be easier to refer to the page number, assuming it's consecutively marked.

Page 228

Q. Yeah, it's page 3.

A. Yes.

Q. And it indicates that the accountants or the auditors were being retained to conduct an audit of the Pakistan branch for the period January 1996 through January 2001.

Is that the scope of the audit you directed to be undertaken?

MR. LEWIS: Object to the form of the question.

A. This is the scope of the audit requested by the IIRO.

Q. And under Roman numeral II, it says that the original scope of work contemplated that the auditors would verify all payments and ensure that all underlying documents are attached to it, and also ensure that attached underlying documents are authentic.

Do you see that?

A. Yes.

Q. And further down on the same page, this report indicates that on July 16, 2000, a letter -- I'm sorry, that through a letter dated July 16, 2001, the auditor's scope of

Page 229

work was restricted to verification of certain areas for the last three years only.

Do you see that?

A. Yes.

Q. Do you know who sent that July 16, 2001 letter changing the scope of the auditor's work?

A. No.

Q. Do you know if --

MR. LEWIS: He's not finished.

A. It is supposed to mention the number of this letter and the name of the person and the department that approved that.

Q. Based on that, is it your understanding that the directive would have come from the IIRO?

MR. LEWIS: Objection to form.

A. It is supposed to be issued from the IIRO and have a number and a date. And not verbal.

Q. Do you know whether or not the IIRO established a special file related to the investigation of the Pakistan office?

A. What I know is that the IIRO, under

22 (Pages 226 to 229)

This Transcript Contains Confidential Material

Page 230

my signature, established a committee, and it was authorized by all the powers to examine the issue of Pakistan.

Q. So based on this document, it appears that in the end, the independent audit of the Pakistan branch was limited to a three-year period and only to the areas mentioned on page 3 of this report, correct?

MR. LEWIS: Object to the form of the question.

A. I cannot assert the correctness of this because I have not seen it.

Q. Turning to page 6 of the report, the auditors indicate that for the period covered by their inquiry, no internal or external audit was ever carried out for the Pakistan branch, and HO, home office, management never asked local management to provide them audit report on some fixed interval/periodic basis.

Do you see that?

MR. LEWIS: I'm sorry, we have a different section that's up on the screen. You're asking about the first

Page 231

paragraph?

MR. CARTER: Yeah, sorry. I think we should have the right one now, Findings.

MR. LEWIS: Okay, let's take a look at that, and maybe we can translate that.

A. Well, when this text is mentioned in auditor's report, and based on my humble experience about the financial reports in the General Secretariat of the IIRO, I find that the auditor's office would start by writing a draft auditor's report highlighting the conclusions it reached and would request the relevant department that was subject of the audit to respond to the questions. And then in the final report, these are either accepted or rejected.

I do not find this in this paragraph. This paragraph seems to be making final conclusions without asking the relevant department whether it is documenting these procedures or not. This is one thing.

On the other hand, there are

Page 232

mechanisms at the level of the General Secretariat. The first manual is the accounting manual of the local offices. Second manual is the accounting manual for the external offices. This is in addition to the financial regulations of the General Secretariat, approved by the general assembly and the board of directors. And the IIRO does not have one external office that is the Pakistan one.

And in the General Secretariat, there is an auditor who reviews or audits the final accounts and presents to the board of directors a report about the final accounts. And this auditor, the IIRO is very keen to choose the auditor from the top three auditors globally.

And I can say that the final accounts of the IIRO were audited by Arthur Andersen, and then KPMG, and now Ernst & Young. And these auditing firms, they take -- they randomly audit the local offices, some local offices, and some external offices, focusing on the important ones. On top of them is the

Page 233

Pakistan office.

And if any auditing firm discovers this case as referenced to in this report, it would have written that and proved that in the report presented to the board of directors and the general assembly.

And we in the IIRO, we do not consider sufficient this control procedure. There are two control entities within the IIRO --

Q. Dr. Basha, the only question I asked was whether you saw the text I was referring to, and you've given a very long speech that was not responsive to that request. And we have limited amount of time. So if you would do us the favor of simply responding to the questions that are posed.

My simple question was, do you see the text?

MR. LEWIS: I think the witness was responding to the substance of the text.

A. Yes, I see it.

MR. CARTER: I didn't ask him to respond to the substance; I asked him if

23 (Pages 230 to 233)

This Transcript Contains Confidential Material

Page 234

he saw it, Eric, and we have limited time.

Q. Dr. Basha, you told me before that aside from the possibility your counsel may recently have shown you this report, you don't recall ever having seen it before, correct?

A. Yes.

Q. And did you have any personal involvement in the audit performed by this member company of Ernst & Young?

MR. LEWIS: Objection to form.

A. No.

Q. And do you have any personal knowledge concerning the inquiries and analysis the auditors conducted in carrying out this audit?

MR. LEWIS: Objection to form.

A. I'm afraid to say something and then you say I'm not answering to your question.

Q. I'm just asking if you know what these auditors did in the performance of their audit.

MR. LEWIS: Objection to form.

Page 235

A. They were commissioned under my name and my order, my signature. And then they're assigned to do the job and to discuss the matter with the committee that has been established for this purpose.

Q. Did the auditors report to you?

A. This report in front of me now is supposed to have been presented to the committee established for this purpose.

Q. Now, the text I was referring to indicates a finding by the auditors that no internal or external audit was ever carried out for the Pakistan branch.

Have you ever personally seen an audit for the Pakistan branch for the three years 1998 through 2001?

A. This is not my personal function.

Q. Turning to page 13 of the report, there's a section on Construction.

A. Yes.

Q. And the auditors found that invoices and supporting documents for construction projects were self-made and that certain of the construction companies did not

Page 236

even seem to exist.

Do you see that?

MR. LEWIS: Once again, that's not what's up on the screen.

MR. CARTER: Now it is.

A. Yes, I have seen it.

Q. Based on your familiarity with the investigation that was conducted of the Pakistan office, is it your understanding that invoices and receipts for construction projects allegedly conducted by that office had been fabricated?

A. These invoices, when they are sent by any external office to the General Secretariat, they do not go to the Secretary General; they go to the relevant department.

Q. Again, my question was different, Dr. Basha. You indicated that you had some involvement in the investigation of the Pakistan office, correct?

A. My responsibility regarding Pakistan was about sending the delegation and appointing the external auditor and forming the committee responsible for examining the

Page 237

documents and obtaining the results. That's it. But I do not get involved in invoices and stuff like that.

Q. And in your role receiving the results of the investigation, did anyone convey to you that the Pakistan office had fabricated receipts for construction projects?

A. The assignment given to the office was related to the imprisonment that took place in the Pakistan office within the time period mentioned in the report, and then when the committee concluded that the stolen funds can be recovered by seizing the three clinics, the assignment was over then. But nothing has been mentioned to me in relation to mosques.

Q. It's your understanding that funds were misappropriated by people at the IIRO Pakistan branch, correct?

A. It is a proven fact for me, based on the documents, that the embezzled funds were stolen by Amir Jasim, with the knowledge of Moayad Al-Butairi.

Q. And as part of its investigation, did the IIRO discover that those individuals

24 (Pages 234 to 237)

This Transcript Contains Confidential Material

Page 238

had fabricated receipts as part of their misappropriation?

A. I have said before that Amir Jasim had made written admissions in this respect, yes. And it was explicit that there was fabrication in invoices, fabrication of documents.

Q. Did Mr. Jasim provide a document to the IIRO making those acknowledgments?

A. Yes, a written document signed by him.

Q. Turning to page 9 of this audit report, under the heading, Conclusion.

A. Yes.

Q. The first sentence indicates that the auditors found, The net unreported amount of US $3,071,659 is unaccounted for and represents the expenditure which was either not recorded and for which no vouchers and supporting documentation is available and/or the amounts which have been misused or misappropriated locally.

Do you see that?

A. Yes, I see this text.

Page 239

Q. Did anyone ever communicate to you that as much as $3 million transferred to the Pakistan branch between 1998 and 2001 had gone missing?

A. I was not notified by this number.

Q. And you don't remember what valuation the IIRO assigned to the three clinics that Butairi turned over, do you?

A. I do not remember this value, but I want to highlight something important. And I don't know whether this report mentions that or not. Number one, the fire that destroyed the documents, which was premeditated, was done by Amir Jasim.

In addition to 15 financial transfers, about them there were discussions and lengthy communications between the IIRO and Al-Rajhi Bank. Because in the records of the General Secretariat, it shows that these transfers were made to Pakistan, but they do not appear in the accounts or the records of the Pakistan office. And therefore, as an assumption, maybe this figure mentioned here represents a substantial part of these

Page 240

transfers.

Q. Do you know when the clinics that Butairi transferred to IIRO were established?

A. I do not know exactly, but it seems that it happened after Amir Jasim and Butairi gained a kind of experience after we have established Al-Khalij [ph] clinic to examine the expatriate workers. After the success of that clinic, they have established three prototypes of it in different parts.

The initial clinic that was established was conducting the medical examination of expatriate workers who are supposed to be coming to the Gulf area, and the money of the tests was paid in cash was received by Amir Jasim, and he was not depositing these funds into the IIRO accounts.

Q. Do you know how much money Butairi and Jasim invested to establish each of the clinics?

A. Of course, we were unable to obtain this information, not from Butairi, nor from Jasim.

And this reminds me of another

Page 241

problem that I want to raise. Even when the IIRO requested from banks the personal accounts of Amir Jasim and Butairi, the banks refused.

Q. But the valuation the IIRO assigned to the clinics at the time of the transfer was based on the value at the time of the transfer, not what Butairi and Jasim invested to establish them, correct?

MR. LEWIS: Objection to form.

A. I think, and this is my personal assumption, that the valuation of these clinics was done based on the value at the time of the equipment and furniture that was found in these clinics.

MR. CARTER: I would ask the reporter to mark as Basha-151 the document produced at IIRO 168291, which should be in the same Redwell.

(Exhibit Basha-151 marked for identification and attached to the transcript.)

BY MR. CARTER:

Q. Dr. Basha, do you recognize that document?

This Transcript Contains Confidential Material

Page 254

some kind of facilitation or assistance.

Q. Do you know whether Ambassador Waly ever intervened to get members of IIRO who had been arrested in the Philippines out of prison?

A. This is the first time I hear that members of the IIRO were arrested in Philippines.

Q. So just to clarify, you don't know whether Ambassador Waly ever intervened to help IIRO employees in the Philippines get out of prison?

A. I do not know that at all.

Q. Dr. Basha, earlier we talked a little bit about the bombings of the U.S. Embassies in Kenya and Tanzania, and you were -- you indicated you were familiar with those attacks, correct?

A. Yes, because sadly, as soon as I joined the IIRO, we had these sad incidents, this sad terrorist attack.

Q. Do you know whether Kenyan authorities closed the IIRO office in Kenya in connection with the investigation of those attacks?

Page 255

A. Yes, they have closed the office and confiscated all the computers. But a week or so after that, everything was reinstated with a polite apology.

Q. Did the IIRO conduct any internal investigation to determine if its branch in Kenya was involved in the attacks?

A. For any problem that arises regarding any of the offices of the IIRO, a thorough inquiry is conducted, administrative, financial, and for the workers in it, and if necessary, the manager of the office will be called for investigation.

Q. So did that process occur with regard to the IIRO office in Kenya or Tanzania after the bombings?

A. Yes.

Q. Do you know whether any documents were created relating to that internal investigation?

A. The investigation is conducted by the relevant departments. In this case it is the legal department. And the conclusions are presented to me only.

Page 256

Q. Do you recall receiving a report from the legal department relating to an inquiry of the Kenya or Tanzania offices?

MR. LEWIS: Objection. You used the term "report." Do you mean to suggest a written report or any sort of report?

MR. CARTER: Any kind of report. He said that the findings would be reported to him.

A. In most of the cases, the findings are discussed in a brief meeting in the office of the Secretary General in the presence of the manager of the concerned office and the manager of the legal department.

(Cross-talk.)

MR. NASSAR: I think he also said, "as well as the financial department."

(The witness and interpreter conferred in Arabic.)

INTERPRETER: Sorry. "And the financial department."

Q. Do you know whether or not the legal department typically creates documents as

Page 257

part of such an inquiry?

A. If it is required, yes.

MR. CARTER: I'd like the reporter to mark as Basha-156 a document produced at IIRO 287007 through 287013.

(Exhibit Basha-156 marked for identification and attached to the transcript.)

MR. LEWIS: Yeah, we've gone about another hour and a half, so if this is a quick document, we can do that, or we can break now. It's really a function -- I think our witness feels fine; it's our translator and our court reporter.

THE WITNESS: (In English.) Let's do this one. It's okay.

MR. CARTER: I'll defer to you guys.

MR. LEWIS: Is this a quick document, Sean?

MR. CARTER: That's not entirely under my control.

MR. LEWIS: Well, I understand

29 (Pages 254 to 257)

This Transcript Contains Confidential Material

Page 258

that, but some are quicker than others.

MR. CARTER: Why don't we take a few minutes.

MR. LEWIS: Why don't we just take a break now. I have 8:18. Shall we start again at 8:30?

MR. CARTER: Okay. Thank you.

VIDEO OPERATOR: We are now going off the video record. The time is 8:18.

(Recess from 8:18 p.m. until 8:35 p.m.)

VIDEO OPERATOR: We are now going back on the video record. The time is 8:35.

BY MR. CARTER:

Q. Dr. Basha, before we took a break, the court reporter marked as Basha-156 a document that I understand to be minutes of a 1999 meeting of the IIRO's executive committee. Is that correct?

A. Yes.

Q. And from the document, I understand that you attended that meeting?

A. Yes.

Page 259

Q. I just have a few questions about it. Under the heading, Fourth Term, it indicates an agenda item involving, reviewed the issue of the fund of Mr. Wa'el Jelaidan.

Do you see that?

A. Yes.

INTERPRETER: The answer was "Yes."

Q. Did you know who -- at the time of this meeting, did you know Mr. Jelaidan?

MR. NASSAR: Sorry, Sean, we have an objection to the translation in the written document. I think the term "fund" should be properly translated as "advance."

MR. CARTER: Okay, noted. Thanks, Waleed.

Q. Mr. Basha, my question was, at the time of this meeting in 1999, did you know Mr. Jelaidan?

A. There was another meeting, I do not remember the exact date of that meeting, it was a meeting for the executive committee, and members of the committee were asked to approve the nomination of Mr. Wa'el Jelaidan as a

Page 260

member in the urgent relief committee. I do not know which meeting was before the other one.

Q. Do you recall when you first met Mr. Jelaidan?

A. The first time I met him was in the meeting of the executive committee in which he was nominated to be a member in the urgent relief committee.

Q. And turning your attention to the ninth agenda item, which appears on the page marked 287012.

A. Yes.

Q. There is a reference to a discussion about adding Mr. Jelaidan to the urgent aid committee. Is that the issue you were just mentioning?

A. Yes.

Q. So based on that, was this the first time you met Mr. Jelaidan?

A. Yes.

Q. Had you communicated with him at any point prior to this meeting?

A. No.

Page 261

Q. Did you know him by reputation prior to this meeting?

A. As a justification for his nomination to be a member of the urgent relief committee, it was said to us in this meeting that he has an experience in the relief operations.

Q. But prior to receiving his credentials for the urgent relief committee, had you ever received information about Mr. Jelaidan previously?

A. I do not recall.

Q. At the time this meeting occurred, had you ever heard that Mr. Jelaidan had a relationship with Osama bin Laden dating to the fighting in Afghanistan against the Soviet Union?

A. For me personally, had I knew that, I would have made reservations against this decision or I would have rejected it.

Q. So based on that, do I understand that your testimony is that you had not received such information as of the time of this meeting?

30 (Pages 258 to 261)

This Transcript Contains Confidential Material

Page 262

A. Yes.

Q. But if you had known that, you would have deemed appointing him to serve on the urgent relief committee inappropriate. Is that correct?

A. Yes.

Q. Turning back to the fourth issue briefly, do you recall what the --

MR. LEWIS: The fourth term?

Q. Fourth term. And do you recall what the discussion about the fund or advance of Mr. Jelaidan was about?

A. What I remember is that he had an advance before he joins the IIRO, but I do not know the background and the details of it.

MR. NASSAR: Sorry, I think the answer -- I think the witness said, "before I joined the IIRO," not before Jelaidan joined.

(The witness and interpreter conferred in Arabic.)

INTERPRETER: "Before I joined the IIRO."

Q. Do you recall what the amount of

Page 263

the advance was?

A. No, I do not recall.

Q. Do you know why the IIRO provided the advance to Mr. Jelaidan?

A. I don't know, but I guess he was working in Pakistan with the Saudi Red Crescent, and maybe an advance was given to him at that time. Maybe. I don't know.

Q. Turning to Term Nine that we were discussing before, you referenced there was a discussion to add Mr. Jelaidan as a member to the urgent aid committee. Do you recall that discussion?

A. Yes.

Q. And was that the urgent aid committee of the IIRO?

A. In the IIRO, we do not have urgent relief committee. We have a department for urgent relief.

Q. So based on your involvement in this, what was Mr. Jelaidan being proposed to join as a member?

A. According to the text I see, it is because of the importance to support the

Page 264

efforts of the IIRO in the field of urgent relief, and the nomination of people who are interested in this field; not only him, another name in the same session was also proposed, Dr. Abdulaziz Jifry.

Q. So Mr. Jelaidan was being proposed to join the urgent aid department of the IIRO, correct?

A. The urgent relief committee.

Q. The urgent relief committee of what?

A. Of the relief for the people of Kosovo.

Q. Was that the Saudi Joint Relief Committee of Kosovo and Chechnya?

A. No. There is an urgent relief committee for Kosovo that is different than the Saudi Joint Committee for the Relief of Bosnia and Herzegovina.

Q. Was the urgent relief --

A. And that committee later on became the Joint Saudi Committee for the Relief of the People of Kosovo.

Q. And do I understand from this

Page 265

document that the IIRO approved the nomination of Jelaidan to serve as the head of that committee?

A. As a secretary for the committee.

Q. As the Secretary General, correct?

A. As a secretary only.

Q. And do you recall who proposed Mr. Jelaidan for that nomination?

A. I do not recall now, but it should be one member of the executive committee.

Q. But you do not recall who that was?

A. I do not recall now.

Q. Turning to the sixth term, it identifies an issue that was discussed regarding the approval of an additional budget for projects of the Eastern district office.

Do you see that?

A. Yes.

Q. And do you recall the discussion?

A. To some extent, yes.

Q. It indicates that there were projects being financed directly by the Eastern district office without the Care entity and the Secretariat General knowing about it.

31 (Pages 262 to 265)

This Transcript Contains Confidential Material

Page 266

Do I understand from that that the Eastern district was independently financing activities outside of Saudi Arabia?

A. Well, in fact, the relationship between the Eastern district office and the General Secretariat is a relationship that is marked by different opinions. The Eastern district office view was that having the project implementation and affiliation to the General Secretariat is something that is bureaucratic. And they justify that by saying the donor wants a quick implementation of the project.

And therefore, their opinion is that having the project go through the General Secretariat and the validation process would take long time. And therefore they implemented the project, but they implemented in the regions where the external IIRO offices are operating.

And therefore, the external offices of the IIRO are the other eye for the General Secretariat. So even if the project is implemented directly by the Eastern district

Page 267

office, the external office would include the project in its reports presented to the General Secretariat.

So this was the point of difference between us and them.

Q. So as I understand it, the office in the Eastern district was sending money overseas on its own to implement projects.

MR. LEWIS: Objection to form.

A. As I said, projects are implemented by the external offices of the IIRO. And therefore, the representative to that project, rather than being sent by the General Secretariat, he or she is sent by the Eastern district office.

Q. Dr. Basha, it's a simple question. Was the Eastern district office sending money overseas on its own for projects?

A. It would send the funds from the accounts of the Eastern district office to the accounts of the external office.

Q. So the Eastern district office was initiating funds transfers from its accounts to offices outside Saudi Arabia, correct?

Page 268

A. Yes, to the external offices of the IIRO outside Saudi Arabia.

Q. And further down in this document, it indicates that the projects of the Eastern district office were being carried out in Thailand, Indonesia, Jordan, Pakistan, Baltistan, Palestine, Lebanon, India, Sudan, Egypt, Philippines, and Ethiopia, correct?

A. Yes.

Q. And who was the head of the Eastern district office at that time?

A. A person named Turki bin Fahad bin Jiluwi.

Q. Was he a member of the Saudi Royal Family?

A. Yes.

Q. Did you ask him to cut it out?

MR. NASSAR: By "cut it out," I think he means "stop."

MR. LEWIS: Objection to form.

A. Yes.

Q. Did he comply with your request?

A. No.

Q. And during the period that this

Page 269

discussion occurred, Mr. Butairi was the head of the Pakistan branch, correct?

A. Yes.

Q. And during that same period, Mr. Jasim was the financial officer of the Pakistan office, correct?

A. Yes.

Q. And Pakistan was one of the areas where the Eastern district office was carrying out these projects, correct?

A. Yes.

MR. CARTER: I'd like the court reporter to mark as Basha-157 a document produced at IIRO 49708. It's actually three related documents, I'm sorry, that were produced at 49708, 49709, and 49710.

(Exhibit Basha-157 marked for identification and attached to the transcript.)

BY MR. CARTER:

Q. Dr. Basha, I want to look first at the top document, 49708.

A. Yes.

32 (Pages 266 to 269)

This Transcript Contains Confidential Material

Page 270

Q. And is this a letter that you sent from -- or you sent to the Secretary General of the Muslim World League concerning a meeting about the Eastern district office?

A. Yes.

Q. Do you know what precipitated this meeting?

A. A report of the auditor contained some remarks about the office. And therefore, the executive manager and the follow-up manager were summoned to the General Secretariat to discuss these issues. These are payments that were made without the supporting documents.

Q. So does this document indicate that an audit discovered that Mr. Khalil Ibrahim of the Eastern district office had made payments without supporting vouchers?

A. Yes.

Q. And do you recall the amount of the payments that were made by Mr. Ibrahim without supporting documentation?

A. No, I do not remember.

Q. Are you able to provide any estimate whatsoever?

Page 271

A. It will be an improvised estimation.

Q. Are you able to provide any fair estimation?

A. I apologize doing that because it has been 19 years.

Q. What was Mr. Ibrahim's position in the Eastern district office?

A. The office manager for the previous regional supervisor.

Q. Do you know who he reported to in that role?

A. The regional supervisor.

Q. And who was that?

A. Prince Turki.

Q. And that's Prince Turki bin Fahad bin Jiluwi, correct?

A. Yes.

Q. And further down in the document, it references that the committee that was studying this issue met with Prince Turki bin Fahad bin Jiluwi before his resignation and discussed the auditor's report.

Do you recall what prompted Prince

Page 272

Turki bin Fahad bin Jiluwi to resign as the supervisor of the regional office?

A. Because the report of the auditors refused the behavior -- the individual behavior of the Eastern district office, and their actions without the knowledge of the General Secretariat, and the financial regulations. And it's a violation of the regulations.

Q. So he resigned in response to the auditor's findings?

A. Because he did not wish to implement the recommendations of the auditor.

MR. CARTER: I'd ask the court reporter to mark as Basha-158 the document produced at IIRO 287391.

(Exhibit Basha-158 marked for identification and attached to the transcript.)

THE WITNESS: Yes.

BY MR. CARTER:

Q. And is this an administrative decision issued under your signature confirming this -- Prince Turki bin Fahad bin Jiluwi's resignation?

Page 273

A. Yes.

Q. And through this same administrative decision, was an individual named Dr. Abdul-Hamid bin Sulaiman Al-Mujil appointed the new executive director of the Eastern district office?

A. He was already the executive director. When Prince Turki was the general supervisor, this person was the executive director. And therefore, he was assigned to be the acting manager or in charge of the office sine die.

(Reporter interruption.)

(Cross-talk.)

Q. Before deciding that Mr. Al-Mujil should be designated to be in charge of managing the Eastern district office going forward, did the IIRO conduct an inquiry to determine whether he was also involved in the problems reflected in the auditor's report?

A. I rely now on my memory. I recall that the auditor's report connected all the violations to requests from the Prince. And therefore Abdul-Hamid Al-Mujil did not have any

33 (Pages 270 to 273)

This Transcript Contains Confidential Material

Page 274

role in these violations.

Q. Was there a written auditor's report that you're referring to?

A. Yes.

MR. CARTER: I'll ask the reporter to mark as Basha-159 a document produced at FED-PEC0202110 through 0202112.

A. But before that I want to mention something important now, that the auditor's report was handed over to the chairman of the board of directors.

Q. And that would have been the Secretary General of the Muslim World League?

A. Yes.

Q. And the IIRO didn't keep a copy of its own auditing department's report?

A. I do not remember receiving a copy of it.

Q. But the report would have been delivered to the Secretary General of the Muslim World League in 2003?

A. Yes, it was delivered to him, but I do not recall the year exactly. It was after the conclusion of the inquiry.

Page 275

Q. And the Secretary General of the Muslim World League at that time was Abdullah bin Abdul Mohsin Al-Turki, correct?

A. I remember that his name was Abdullah Obaid.

Q. Okay. Just turning back to Basha-157, that document is a letter from you concerning the audit addressed to His Highness Dr. Abdullah bin Abdul Mohsin Al-Turki, Secretary General of the Muslim World League. So based on that --

A. Yes.

Q. Okay. So based on that, can you tell me whether, in fact, Dr. Al-Turki was the Secretary General at the time of the audit?

A. I think the report was issued during the tenure of Dr. Abdullah bin Obaid. And he was then replaced by Dr. Abdullah Al-Turki. I'm here relying on my memory.

Q. Okay. But based on the document we marked as Basha-157, you obviously communicated with Dr. Al-Turki about this precise issue, correct?

A. Yes.

Page 276

Q. Dr. Basha, before we pivoted, I had marked a document as Basha-159. And it's in English.

(Reporter interruption.)

(Exhibit Basha-159 marked for identification and attached to the transcript.)

BY MR. CARTER:

Q. Dr. Basha, this is an August 3, 2006 press release from the United States Department of the Treasury relating to the United States' designation of the Philippine and Indonesian branches of the IIRO, and Abdul-Hamid Sulaiman Al-Majil, for facilitating fundraising for Al Qaida.

Were you aware that the U.S. government took those actions against the branches of the IIRO and Mr. Mujil?

A. This is what I was told by the lawyer.

Q. Did the IIRO conduct an investigation, following these designations, into the U.S. claim that the offices referenced and Mr. Mujil were involved in supporting Al

Page 277

Qaida?

A. Yes.

Q. And did the IIRO prepare any written reports as a result of that investigation?

A. The actions taken by the IIRO are that the papers of all these offices were reviewed, the administrative and financial papers, and the files of the staff members who were working in these offices. And the conclusion was that all the procedures were sound for us, but it was not in writing.

The most important thing here is that our office in Indonesia was operating during this designation, and furthermore, it was receiving letters of appreciation in relation to its operations.

As far as the Philippines office is concerned, we had only a mission there --

(In English.) A representative.

INTERPRETER: "A representative," sorry.

A. (Through interpreter.)

-- a representative there who was

34 (Pages 274 to 277)

This Transcript Contains Confidential Material

Page 278

responsible for supervising projects, and these projects did not stop. And this indicates that the responsible governments in these two countries did not have comments on the operations of these offices.

Q. Okay. Well, let's stick to what I'm asking you for the moment. Did -- the document indicates that the U.S. government had concluded that Al-Mujil provided donor funds directly to Al Qaida.

A. We have confronted him by this claim, and he absolutely denied this.

Q. Okay. But you did determine that there were financial improprieties occurring in the Eastern district office, correct?

MR. LEWIS: Objection to the form.

A. Yes. The financial improprieties were there in the office.

Q. Dr. Basha, we obtained information in our investigation indicating that the Saudi Ministry of Interior conducted an investigation of the IIRO Eastern Province branch. Were you aware of that?

Page 279

MR. LEWIS: Objection to form.

A. No.

Q. Do you recall whether the Saudi government ever requested that the IIRO provide information to it so that it could conduct an investigation of the Eastern Province branch and Mr. Mujil?

A. I do not recall that.

Q. Dr. Basha, there's a document I'd like to show you that we're just going to have to post on the screen. It is Defendant IIRO's Amended Answer to Claimant's First Amended Complaint. It is a filing the IIRO submitted to the Court in our case on December 13, 2005.

Dr. Basha, do you know whether or not you ever reviewed this document before it was filed?

A. This is the first time I see it.

Q. If possible, can we turn your attention to the last page of the document, which hopefully is on the screen right now. And it indicates that the document was submitted by a lawyer named Martin McMahon. Do you see that at the bottom?

Page 280

A. Yes, I see it.

Q. And was Mr. McMahon the IIRO's attorney in 2005?

A. I do not recall the date, but he was the lawyer of the IIRO, yes.

Q. And did you have direct contact with Mr. McMahon relating to his representation of the IIRO?

MR. LEWIS: Objection to form.

A. Yes.

Q. Looking up the page, it says, under the title, 13th Affirmative Defense, Immunity, IIRO is an instrumentality of the government of the Kingdom of Saudi Arabia. Accordingly, IIRO is immune from suit.

Do you see that?

A. Yes.

Q. Did you discuss with Mr. McMahon the IIRO's status as an instrumentality of the government of the Kingdom of Saudi Arabia?

MR. LEWIS: I'm going to object to that as privileged. What he discussed with his lawyer at the time is privileged information.

Page 281

You can ask him what his understanding is as to whether it's an instrumentality.

And he also said he's seeing this for the very first time today.

But I don't think you can ask him what he discussed with his lawyer.

MR. CARTER: That's fine.

Q. Dr. Basha, this document was filed by the IIRO stating its position with regard to matters relevant to the lawsuit. And in this document, the IIRO represented to the Court that it was entitled to claim status as instrumentality of the government of the Kingdom of Saudi Arabia and that it was therefore immune.

Do you understand what basis the IIRO had for making that claim?

A. The IIRO never claims that it is an instrument of the government of Saudi Arabia. And its constitution declares that very simply, and in all its publications. And all these documents were given to the lawyer. And when any lawyer wants to change the facts, he should

35 (Pages 278 to 281)

**In re Terrorist Attacks on September 11, 2001, MDL No. 03-1570 (GBD)**

ERRATA SHEET FOR THE TRANSCRIPT OF:

Deponent:  Dr. Adnan Basha
Dep. Date: February 20 & 21, 2019

| PAGE/LINE | CHANGE TRANSCRIPT FROM: | CHANGE TRANSCRIPT TO: | REASON FOR CHANGE/OTHER ISSUE |
|---|---|---|---|
| 12:9-10 | in federal court in Philadelphia in Manhattan. | in federal court in Manhattan. | Interpreter Commentary Added |
| 21:15-18 | In comparison to my Arabic language, I face difficulty because of the  differences of -- in the level of my fluency, both | In comparison to Arabic, there is difficulty because of the differences  between the two languages | Interpreter Mistranslation |
| 25:2-3 | He chairs the administration and the finance of the Muslim World League. | He chairs the MWL, chairs its administrative and financial body. | Interpreter Omission |
| 26:2-5 | To receive all the incoming papers and transactions that are addressed to the Secretary General from the different departments of the League. | To receive all of the incoming documents and communications addressed to the Secretary General from the various departments at the League. | Interpreter Mistranslation |
| 28:6-8 | Yes, either as escorting the Secretary General or accompanying him in some meetings. | Yes, either accompanying the Secretary General or as his representative in some meetings. | Interpreter Mistranslation |
| 29:6-7 | As an organizational chart, you mean? | As an organizational structure? | Interpreter Mistranslation |
| 29:11-15 | The General Secretariat has business and projects outside Saudi Arabia. It has different departments. And the general manager is responsible for supervising these departments. | The MWL's Secretariat General has activities, projects and programs found outside of the Kingdom of Saudi Arabia and there are departments specialized in various fields at the MWL. And the general manager is the administrative person-in-charge or the administrative supervisor over this work. | Interpreter Omission |
| 31:7-9 | The mandate of the Muslim World League is to introduce Islam within the Muslims. | Educate on Islam, the MWL's mission is to educate Muslims about Islam. | Interpreter Mistranslation |

1

| PAGE/LINE | CHANGE TRANSCRIPT FROM: | CHANGE TRANSCRIPT TO: | REASON FOR CHANGE/OTHER ISSUE |
|---|---|---|---|
| 32:3-8 | When we say educating Muslims about Islam, I mean here that Muslims for centuries have been subject to ignorance, and they are away from Islam, and the Muslim World League is introducing to them the principles of Islam and lighting the pathway for them. | What's meant by educating on Islam, when we talk about Muslims, the Muslims have suffered for a long period of time from periods of ignorance and illiteracy during which they deviated from the basic principles and main outlines of Islam. The MWL came to light up this path for them. | Interpreter Mistranslation |
| 39:3 | This is not my function. | This is not part of my duties. | Interpreter Mistranslation |
| 42:23-43:1 | And when the student receives the admission from a particular university and we have the financial resources, we approve it. | When he receives the acceptance and we see that this acceptance is certified and we have the financial resources to fund it, it is accepted. | Interpreter Omission |
| 46:8-10 | I remember once that I was a companion Sheikh Mohammed al-Harkan when he traveled to Pakistan en route to Japan. | I remember that I also once visited Pakistan as a companion as part of a delegation headed by Sheikh Mohammed al-Harkan to visit Pakistan on his way to Japan | Interpreter Omission |
| 49:1 | This was news in all newspapers. | This was being circulated in all of the newspapers. | Interpreter Mistranslation |
| 56:5-7 | The IIRO was established by a resolution from the founding council of the Muslim -- World Muslim League. | The IIRO was established by a resolution from the Constituent Council of the Muslim World League. | Interpreter Mistranslation |
| 57:10-13 | The IIRO, as stipulated in its articles of association or constitution, it is an organization that has its independent administrative and financial structure. | The IIRO, as stipulated in its articles of association and its constitution, that it is an international organization that has its own independent administrative and financial entity. | Interpreter Omission |
| 58:12-13 | When I talk about the time period, I talk about the time period I served in the IIRO, and before that, we had this organizational structure. | When I talk about the time period, I talk about the time period during which I served at the IIRO. Prior to that, this is possibly what was present at that time. | Interpreter Mistranslation |
| 69:14-15 | The IIRO has local offices in Saudi Arabia and different regions of Saudi Arabia. | IIRO-KSA has domestic offices distributed in some regions in the Kingdom. | Interpreter Mistranslation |

| PAGE/LINE | CHANGE TRANSCRIPT FROM: | CHANGE TRANSCRIPT TO: | REASON FOR CHANGE/OTHER ISSUE |
|---|---|---|---|
| 69:24-70:3 | If the relevant department responsible for donations and the General Secretariat wishes to obtain this information, it can obtain it from the local office. | If the department concerned with the donation at the secretariat general wishes to obtain this information it obtains it from the domestic office. | Interpreter Mistranslation |
| 70:17-18 | We were using the system of DataFlex for all the computers in the IIRO. | We were using the DataFlex system for all of the departments at IIRO. | Interpreter Mistranslation |
| 75:8 | The foreword is not signed. | It is not issued with a signature. | Interpreter Mistranslation |
| 78:4-5 | Yes, it is correct, and this is a sort of respect. | Yes, that is correct and this is a matter of respect. Only a matter of respect. | Interpreter omission |
| 80:7-18 | The emergency relief has a specific department in the headquarters, and this department is responsible for the emergency relief operations. But this does not prevent some members of the external offices -- (In English.) Domestic. The domestic. (Through interpreter.) But this does not prevent some members of the domestic offices of the IIRO from engaging if they want to volunteer -- if they want to volunteer in the relief campaigns. | Emergency relief has an independent department at the secretariat general, and this department carries out the emergency relief campaign. This does not preclude the presence of a number of volunteering members of the domestic offices who wish to contribute to this campaign. To the relief campaigns. | Interpreter misinterpretation |
| 90:22-91:1 | The internal office is like a second eye for the General Secretariat for that particular region, and it monitors the project being implemented. | The domestic office to which this mission is assigned serves as the other eye for the Secretariat General for that region and it monitors the progress of the implemented project. | Interpreter Omission |
| 92:1-7 | But all the accounts of the external offices are sent to the General Secretariat, and the General Secretariat has an external auditor who conducts the auditing of the IIRO. And it takes -- the external auditor would take samples of the offices that require further auditing. | However, all the accounts of the office abroad reach the General Secretariat, and the chartered accountant at the secretariat general, when he audits IIRO's annual final accounts, he takes random samples at these offices for auditing and accounting. | Interpreter Mistranslation; |

| PAGE/LINE | CHANGE TRANSCRIPT FROM: | CHANGE TRANSCRIPT TO: | REASON FOR CHANGE/OTHER ISSUE |
|---|---|---|---|
| 97:5-8 | And the Secretary General of the League, who is a member of the board of directors, he's also a member of this council. | And the Secretary General of the MWL, the chairman of the board of directors, is a member of this council. | Interpreter Omission |
| 102:14-15 | Social welfare houses and caring for the orphans. | The social welfare orphanages and orphan sponsorships. | Interpreter Mistranslation |
| 116:13,14 | If someone from the universities, I do not remember. | If it wasn't someone from the universities then I don't remember, I don't remember. | Interpreter Mistranslation |
| 117:19-20 | Mostly it would be the relief department. | Most probably the relief department. | Interpreter Mistranslation |
| 120:9 | It presents only the headings. | It only presents the general outlines. | Interpreter Mistranslation |
| 124:14-16 | In accordance with the constitution, the board of directors would meet twice a year. | In accordance with the constitution and regulations, the board of directors meets twice a year. | Interpreter Omission |
| 132:15-16 | And he endowed a full house for the benefit of the IIRO. | And he endowed an entire orphanage for the benefit of the IIRO. | Interpreter Mistranslation |
| 136:7-12 | Not a coincidence, but to say that for purposes to serve the IIRO -- for example, in saying that Hassan bin Ali Marfak donated a whole building for the IIRO. | It is not a coincidence, but for purposes that serve the IIRO, for example, saying that Hussain Ali Marfak donated a whole building to the IIRO as an endowment. | Interpreter Mistranslation |
| 137:12-16 | If it is so, there are four members of the board of directors of the IIRO who are affiliated with the Muslim World League -- who are members of the Constituent Council of the Muslim World League, four members. | If as such, there are four members of IIRO's Board of Directors who are members of the Constituent Council... as members of the MWL's Constituent Council…four. | Interpreter Mistranslation |

4

| PAGE/LINE | CHANGE TRANSCRIPT FROM: | CHANGE TRANSCRIPT TO: | REASON FOR CHANGE/OTHER ISSUE |
|---|---|---|---|
| 155:6-7 | Not familiar in terms I work for it. | Not familiar as I don't work for it. | Interpreter Mistranslation |
| 156:6 | His name is Abdulaziz Al-Omar. | His name is Abdulaziz Al-Ammar | Transcription Correction |
| 157:6-7 | I do not exactly recall, but I think it's between eight to ten people or more. | I do not remember the exact number but more than 8 to 10 people. | Interpreter Mistranslation |
| 160:12-15 | "Da'wah" means -- "da'wah" means establishing the Islam with Muslims and teaching them the principles and the guidelines of Islam. | Da'wah" means maintaining the faith of the Muslims and their understanding of the principles and the guidelines of Islam. | Interpreter mistranslation |
| 161:4 | propagators | preachers calamities. | Interpreter mistranslation |
| 165:20-22 | The figure 1,000 propagators was estimated. I do not recall the exact number now. | This "approximately 1000 preachers" was an estimated number but I don't remember now the exact number. | Interpreter Mistranslation; Omission |
| 167:7-9 | The text says that. It says "about 1,000." So it means it is less than that in Arabic. | That's what the text says.  It says "approximately." "Approximately" in the Arabic language means a number less than 1000. | Interpreter Mistranslation |
| 167:12 | "About" means "around." | "Approximately" means "around." | Interpreter Mistranslation |
| 167:16 | Enlightened | In writing | Transcription correction |
| 169:12-17 | Here in the letter it says that it is the function of the committee to oversee the propagators, then conduct the courses. But the -- it does not say that the propagators were distributing the publications and the tapes then. | In the text here it says, it is the committee's mission to supervise the missionaries, hold courses and distribute publications. However, this doesn't mean that the missionaries are carrying this out at that time. | Interpreter Mistranslation; |
| 170:1 | propagators | preachers | Interpreter Mistranslation |
| 170:22 | propagators | preachers | Interpreter Mistranslation |

| PAGE/LINE | CHANGE TRANSCRIPT FROM: | CHANGE TRANSCRIPT TO: | REASON FOR CHANGE/OTHER ISSUE |
|---|---|---|---|
| 172:8 | propagators | preachers | Interpreter Mistranslation |
| 173:4-7 | The meaning is that the da'wah is a field for contribution in order to consolidate the efforts, and not to waste the efforts and the capacities. | The meaning in Arabic is that da'wah is a field for the contribution of maintaining the faith of Muslims and to avoid wasting efforts and energies which occur due to the existence of duplication of work. | Interpreter omission |
| 46:1-2 | every charity or party do have political directions, | every association or party has political orientations, | Interpreter Mistranslation; |
| 197:20-198:2 | Well, it -- the decision says that this is a secondment of an employee who works for the Ministry of Islamic Affairs, and in order to transfer the services of this person from his ministry to a new entity, this requires the approval of his direct supervisor. | In the same decision it says that this is a secondment. He is an employee at the Ministry of Islamic Affairs, and therefore the request for the transfer of his the services to the work at IIRO requires the approval of a direct supervisor. And the direct supervisor in this case is must be his minister. | Interpreter Omission |
| 200:4-5 | Yes, in his capacity as in charge of the administrative and financial affairs. | Yes, in his capacity as the person in charge of the financial and administrative affairs. | Interpreter omission |
| 203:1-3 | --after we brought [sic] with the concerned authorities to make sure that the request will be accepted. | After we bring up the possibility of the request being accepted to the concerned authorities. | Interpreter Mistranslation |
| 215:15-216:2 | For two reasons. The first reason is Moayad Al-Butairi, he held Amir Jasim accountable for that, and he declined any form of responsibility -- sorry, he denied any form of responsibility. And the second reason is that he remained in Pakistan for one week during the stay of the delegation from the IIRO, and he was not arrested by the Pakistani police. And therefore, we preferred to bring him to Saudi Arabia in order not to lose our cards. And therefore, at that time, the | For two reason. The first, is that Moayad Al-Butairi, as I previously mentioned, held Amir Jasim accountable and denied any responsibility and denied that he had any involvement in this matter. The second reason is that he remained in Pakistan for a period of one week after the incident, during the presence of the IIRO delegation, and the Pakistani police did not arrest him. Therefore, we preferred to bring him to Saudi Arabia to avoid losing our cards. Therefore, the conclusive evidences at that time were | Interpreter Mistranslation |

| PAGE/LINE | CHANGE TRANSCRIPT FROM: | CHANGE TRANSCRIPT TO: | REASON FOR CHANGE/OTHER ISSUE |
|---|---|---|---|
| | conclusive evidences were incomplete. | incomplete. | |
| 216:10-217:1 | In order to have the conclusive evidences, this took some time from us. And it required a lot of patience. And therefore when Moayad Al-Butairi found that he has -- in front of him he has the chance of being arrested, just that, he wrote a waiver -- he wrote a waiver or an assignment of the three clinics he had [unclear words], which he operated from the embezzled funds from the IIRO. And therefore, in comparison to the long period of time that was consumed with Amir Jasim, in this case the IIRO, in a very short period of time, was able to retrieve its funds, to know -- or to discover how the theft happened, and who stole the money, and to which bank the money was deposited. | To reach the conclusive evidences, this took us some time and a lot of patience. And therefore, when Moayad Al-Butairi found there was no chance in front of him but to be arrested, he wrote a waiver conceding the three clinics affiliated with him and Amir which he operated using the funds embezzled from the IIRO. And therefore, the IIRO was able, in a very short time relative to what took place with Amir Jasim, the matter of which took a long time from us, IIRO was able to retrieve its funds and to find out how the theft was carried out, who stole and at which bank it took place and it regained it. | Interpreter Mistranslation |
| 218:8-15 | For the IIRO, it was a financial problem, but we have managed to contain it and to precisely identify it, and to prevent its recurrence by adopting some mechanisms, and to set an example for other employees that whoever dares to conduct such act will meet the fate of dismissal. And this is what happened to Amir Jasim and Moayad Al-Butairi. | For the IIRO, it was a financial problem that took place, but we were able to overcome, contain, and avoid it in the future by changing some mechanisms and setting an example to all of the other employees that anyone who dares to carry out such an action will be fired and this is what happened to Amir Jasim and Moayad Al-Butairi. | Interpreter Mistranslation |
| 220:10-11 | Yes. And the committee was given all the powers to take the wide decision. | Yes. And it was delegated all the powers to take the suitable decision. | Interpreter Mistranslation |

| PAGE/LINE | CHANGE TRANSCRIPT FROM: | CHANGE TRANSCRIPT TO: | REASON FOR CHANGE/OTHER ISSUE |
|---|---|---|---|
| 220:14-17 | We found it sufficient, based on the advice of the lawyers, to retrieve our funds -- to recover, sorry, to recover our funds, and we considered it closed. | Based on the lawyers' advice, we found it sufficient to obtain our money and the man was terminated. | Interpreter Mistranslation and Omission |
| 221:6-18 | It's not that we settled, but we have recovered our funds. And actually, this allowed us to conduct a thorough review of the rules and regulations that we had because they contained some gaps that allowed Amir Jasim to do what he did. Amir Jasim was one of the most efficient accountants and one of the oldest employees in the IIRO, and Moayad Al-Butairi also was receiving the title of the ideal manager. And with all that, they have managed to take advantage of the gaps, but with a review, we have closed them. | Not that we resolved the matter, we obtained our funds and we don't want more than that. It was also an opportunity to review the rules and regulations through which Amir Jasim was able to…from some of the gaps in them… and who was considered to be one of the first accountants at the IIRO and one of the most competent accountants, and well as Moayad al-Butairi who consistently received the title of model director…but despite this they were able to find gaps and therefore, we were able to fix even the mechanisms that included some gaps. | Interpreter Mistranslation |
| 222:10-19 | I mean that there was no bias. The committee composed of people from the financial follow-up department, which is like a controller, over the performance of the finance department and the offices. And it is the financial -- and the second member was the financial controller before any disbursement, and the third member was from the legal department, and all of these departments are reporting to the Secretary General directly. | What I mean by unbiased entities, is that the committee was made up of members from the Department of Financial Oversight which serves as the financial controller over the performance of the Financial Department and the offices and the pre-disbursement financial controller, the second member, the financial controller. The third member is the legal department and they are all departments affiliated directly with the Secretariat General. | Interpreter Mistranslation |
| 229:11-13 | It is supposed to mention the number of this letter and the name of the person and the department that approved that. | It is supposed to mention the number of the letter, its date, and the name of the man, or the name of the department or director who | Interpreter omission |

| PAGE/LINE | CHANGE TRANSCRIPT FROM: | CHANGE TRANSCRIPT TO: | REASON FOR CHANGE/OTHER ISSUE |
|---|---|---|---|
| | | assigned them with this. | |
| 230:3 | issue of Pakistan. | issue of Pakistan and take the necessary action. | Interpreter omission |
| 231:8-11 | Well, when this text is mentioned in auditor's report, and based on my humble experience about the financial reports in the General Secretariat of the IIRO, | Ok, when this stuff comes from a report from the office of a chartered accountant at this level, from my humble experience in the field of financial reports with regards to the Secretariat General, | Interpreter omission |
| 232:11-14 | And in the General Secretariat, there is an auditor who reviews or audits the final accounts and presents to the board of directors a report about the final accounts. | And at the Secretariat General there is a chartered accountant who annually audits the final accounts and presents a report to the board of directors and general assembly about the final accounts. | Interpreter omission |
| 232:21-233:6 | And these auditing firms, they take -- they randomly audit the local offices, some local offices, and some external offices, focusing on the important ones. On top of them is the Pakistan office. And if any auditing firm discovers this case as referenced to in this report, it would have written that and proved that in the report presented to the board of directors and the general assembly. | And all of these offices randomly audit a number of the domestic offices and some of the offices abroad, and at the top of these are some of the big offices such as the Pakistan office. And if any chartered accountant's office had discovered a mess such as the one mentioned in the report, it would have written and documented this in the report presented to the board of directors and the general assembly. | Interpreter mistranslation |
| 237:9 | imprisonment | embezzlement | Transcription Correction |
| 240:4-17 | I do not know exactly, but it seems that it happened after Amir Jasim and Butairi gained a kind of experience after we have established Al-Khalij [ph] clinic to examine the expatriate workers. After the success of that clinic, they have established three prototypes of it in different parts. The initial clinic that was | I don't remember the date but I link it with [the fact] that after he gained experience, him and Amir Jasim, with the clinic, which we called the Khaleej Clinic for the examination of expatriate workers, and this clinic succeeded, he made prototypes of it in three other regions using the IIRO funds that came from the medical examination, this medical examination | Interpreter Omission |

| PAGE/LINE | CHANGE TRANSCRIPT FROM: | CHANGE TRANSCRIPT TO: | REASON FOR CHANGE/OTHER ISSUE |
|---|---|---|---|
| | established was conducting the medical examination of expatriate workers who are supposed to be coming to the Gulf area, and the money of the tests was paid in cash was received by Amir Jasim, and he was not depositing these funds into the IIRO accounts. | of expatriate workers which was directed at the Gulf and Saudi Arabia. It was in cash and therefore, it was delivered to Amir Jasim and he did not enter it into the IIRO accounts and he took advantage of it. | |
| 250:5-8 | And therefore, I see that the expression to stop all projects is not an accurate expression, and the office found that it is -- this step is risky. | Therefore, it seems that the sentence "cessation of all programs" is an incorrect expression. What he means is that there should be…that even in this step, the office found there to be some risks in it. | Interpreter Omission |
| 253:9 | IIRO Office | Philippines Office | Interpreter mistranslation |
| 254:19-20 | we had these sad incidents, this sad terrorist attack. | very unfortunately, this unfortunate terrorist incident happened, yes. | Interpreter Mistranslation |
| 264:2-5 | and the nomination of people who are interested in this field; not only him, another name in the same session was also proposed, Dr. Abdulaziz Jifry | and the nomination of people who have experience in this field; it was not only him, another name was proposed in the same meeting, in the same session, Dr. Abdulaziz Jifry. | Interpreter Mistranslation |
| 120:12-13 | Of the relief for the people of Kosovo. | What I believe now, the one affiliated with relief for the people of Kosovo. | Interpreter Omission |
| 272:3-8 | Because the report of the auditors refused the behavior -- the individual behavior of the Eastern district office, and their actions without the knowledge of the General Secretariat, and the financial regulations. And it's a violation of the regulations. | Because the auditor's report refused the Office's independent action without the Secretariat General's knowledge and its violation of the IIRO's administrative and financial regulations. | Interpreter mistranslation; |
| 277:15-17 | and furthermore, it was receiving letters of appreciation in relation to its operations. | Furthermore, it received letters of praise and appreciation from the concerned authorities in Indonesia. | Interpreter Omission |

10

| PAGE/LINE | CHANGE TRANSCRIPT FROM: | CHANGE TRANSCRIPT TO: | REASON FOR CHANGE/OTHER ISSUE |
|---|---|---|---|
| 281:21-282:2 | And its constitution declares that very simply, and in all its publications. And all these documents were given to the lawyer. And when any lawyer wants to change the facts, he should have consulted with the concerned people before doing that. | The IIRO does not claim to be an instrument of the government of Saudi Arabia. And its constitution declares this very simply, in Arabic and in English, and these official publications were provided to the lawyer since the first day he was assigned. And when the lawyer, any lawyer, wants to change the facts, he must consult with the concerned people in this matter. | Interpreter Omission |
| 283:21 | cold | cowardly | Transcription Correction |

I, Waleed Nassar, declare under penalty of perjury that the following statement is true as a matter of my personal knowledge:

I am a partner in the law firm Lewis Baach Kaufmann Middlemiss PLLC and co-counsel for Defendant Dr. Adnan Basha in this action. This firm has taken the lead on preparing the foregoing errata sheet, which was done under my direct supervision. With the assistance of an Arabic-speaking Associate and an Arabic-speaking Analyst, we reviewed the video and listened to the audio and compared the testimony to the transcript of Dr. Adnan Basha's deposition. All of the foregoing corrections are based on the review process described herein.

Executed on May 6, 2019

Waleed Nassar

12