# EXHIBIT 29

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————

In re: Terrorist Attacks on                    )
September 11, 2001                              )        No. 03 MDL 1570 (GBD) (SN)

———————————————————————      )

This applies to:

*Ashton, et al. v. Al Qaeda Islamic Army, et al.*, *Case No.* 02-cv-6977;
*Burnett, Sr., et al. v. Al Baraka Investment & Development Corp., et al.*, Case No. 03-cv-9849;
*Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.*, Case No. 04-cv-7065;
*Salvo, et al. v. Al Qaeda Islamic Army, et al.*, Case No. 03-cv-05071;
*Continental Casualty Co., et al. v. A1 Qaeda et al.*, Case No. 04-cv-05970;
*Euro Brokers Inc., et al. v. Al Baraka, et al.*, Case No. 04-cv-7279;
*Federal Insurance Co., et al. v. A1 Qaida, et al.,* Case No. 03-cv-6978;
*O'Neill, Sr., et al. v. Al Baraka et al.*, Case No. 04-cv-1923;
*Maher, et al. v. Islamic Emirate of Afghanistan a/k/a The Taliban, et al.*, Case No. 1:23-cv-02845

## <u>DECLARATION OF ABDERRAOUF KHALAF AL-SHORMAN</u>

1. I, the undersigned, Abdulrauf Khalaf Al-Shorman, hereby declare that the following statements are true as a matter of my personal knowledge.

2. The Sarajevo office of the International Islamic Relief Organization (hereinafter referred to as "IIRO") was established in December 1992 in response to the human catastrophe caused by the Bosnian war, as were many other IIRO offices in the Balkans region.

3. In the 1980s, I came to what was then-known as Yugoslavia as a student in the dental college.  After the war began and the IIRO-Sarajevo office opened, I began working at that office, remaining until 2019.  Initially, I served as a volunteer Orphan Coordinator, and in August 1993, I became an official IIRO employee holding the same position.  In 1999, I became the Chairman of the Administration Committee of the Sarajevo Office, where I effectively served as the Director of IIRO-Sarajevo.

4. During my IIRO-Sarajevo office tenure, and as part of my duties, I interacted routinely and regularly with IIRO's Saudi-Arabia based Head Office in Jeddah concerning our operations and finances. Consequently, I became intimately familiar with the Head Office's protocols and procedures, operations, employees, relationships, and finances, as well as its policies and procedures for supervising the operations of its branch offices.

5. IIRO's humanitarian efforts in the Balkans focused primarily on orphan sponsorships and general aid distribution, such as food, clothing, and medicinal supplies, both in refugee

1

camps and to the general public.  Since the Serbian forces almost completely surrounded the city of Sarajevo during the war (see below), aid was either brought in through a humanitarian tunnel or by the United Nations.

6.  IIRO-Sarajevo generally distributed in kind aid, except for orphan sponsorships of 50 Marks per person per month (approximately 30 US Dollars at the time).  For ease of aid distribution, it was done from central locations, such as mosques, city halls, schools or even directly out of the warehouses.

7.  For projects in the Balkans, the Head Office would disburse funds to the Balkans Regional Office, which in turn would disburse the funds directly to the offices in the Balkans.  Those offices, in turn, would file the necessary paperwork with the Balkans Regional Office to "adjust" their accounts upon disbursement of their funds, and that office would then do the same with the Head Office.  After the transfer of the Balkans' Regional Office to Sarajevo (see below), each branch office started adjusting its accounts directly with the financial department in the Head Office.

8.  Because the Head Office had its own accounting procedures that differed from those in Bosnia, there were some challenges to maintaining full compliance with the Head Office's procedures.  Despite those challenges, all IIRO personnel that I encountered – be they in Bosnia or Saudi Arabia – worked towards the same goal of maximum compliance with applicable policies and procedures with an emphasis on accountability.

9.  In my interactions with the Head Office, including those regarding perceived accounting discrepancies or minor procedural deviations, it was my impression that the Head Office took these matters seriously and investigated all issues, ascertaining whether wrongdoing occurred and helping us to ensure that such issues would not repeat.

10.  The city of Sarajevo, where the IIRO office was located, was under heavy siege by Serbian forces between approximately 1992-1996, making it extremely difficult to receive aid to distribute, as well as to communicate with the outside world, whether the Balkans Regional Office and its Supervisor or the Head Office. After the siege ended, however, we were able to resume normal communications with the Head Office, the Balkans Regional Office, as well as with other local operations both in Bosnia and in neighboring countries.

11.  The practical realities of aid distribution during wartime meant that at times Head Office protocols were impossible to follow, such as when electricity was cut off in besieged Sarajevo, where I operated.  That such protocols were not followed at all times does not mean that anything improper occurred, but rather reflects the reality of relief work in

extremely challenging circumstances, where our every decision could mean life or death to some of the aid recipients.

12. After the war ended and the return of many of the displaced refugees to their homes, IIRO closed some of its local branches and transferred the Balkans Regional Office to the Sarajevo office in January 1997. In this role, IIRO-Sarajevo became the supervisor of operations in the Balkans, including those in countries which did not have an office, and continued to communicate with other branches and project managers throughout the region.

13. IIRO-Sarajevo maintained a great relationship with the Bosnian government and worked closely with the Ministry of Social Welfare and Displaced Persons and Refugees ("Ministry of Social Welfare") during my time with the organization. The Sarajevo office was always keen on meeting the standards set by Bosnian law and never had any negative encounters with Bosnian officials. No employee was ever arrested during his employment for any reason, be it for suspicion of terrorism or otherwise.

14. The Bosnian government has always welcomed IIRO's operations in Sarajevo, especially during the war when it routinely asked for humanitarian assistance. IIRO-Sarajevo would provide aid after receiving the approval and the funds or items from the Head Office, sometimes distributing it with the help of the Ministry of Social Welfare. After the war, IIRO-Sarajevo received the Golden Shield award from the Bosnian government for its role in serving the people of Bosnia during the war.

15. IIRO-Sarajevo always complied with the registration requirements in Bosnia, as was mandated by the Head Office.

16. In 1996, charitable organizations in Bosnia were required to submit requests to the Ministry of Social Welfare in order to receive permits for their various projects. After the implementation of the projects, charitable organizations were also required to submit a report on the projects implemented. IIRO-Sarajevo complied with these requirements on a consistent basis.

17. In addition to requiring the submission of reports, the Ministry of Social Welfare's Department of Control and Inspection also made surprise visits to the offices of NGOs. The surprise visits were random, but routine, and the information that was requested concerned whether organizations were complying with the laws requiring employers to provide benefits to their employees. IIRO was visited in 2000, 2001 and 2002 and always found in compliance.

18. Aside from the Ministry of Social Welfare, IIRO-Sarajevo also cooperated with the Ministry of Health on healthcare projects in the late 1990s and early 21st century. For example, IIRO-Sarajevo and the Bosnian Ministry of Health entered into an agreement regarding a medical center in the mid-90s, whereby the government would provide the facilities and the salaries of the doctors and nurses, and IIRO-Sarajevo would provide the necessary equipment and medicinal supplies. This center offered many services, including in the specialties of ophthalmology, dentistry, internal medicine, pediatrics, and obstetrics and gynecology.

19. IIRO-Sarajevo enjoyed a very strong regional reputation and a great working relationship with the Bosnian government. Indeed, the Bosnian government repeatedly reached out to IIRO-Sarajevo for assistance before and after the 9/11 attacks.

20. IIRO-Sarajevo maintained a cordial relationship with the other NGOs in the region. It did not work closely with any organization in particular but would have meetings to coordinate with the other NGOs through a Coordination Council to ensure humanitarian efforts were not duplicated in the same areas. After the war ended, a representative of the Ministry of Social Welfare of Bosnia also attended these meetings and played a role in coordination.

21. The Coordination Council was established in Croatia at the beginning of the war and was moved to Sarajevo in 1995 or 1996. All Islamic humanitarian organizations were invited to be part of the Coordination Council. Approximately ten organizations were part of the Council, which met approximately once a month, more often if the circumstances required. Each member organization paid a minor monthly fee to cover administrative expenses. Projects were not implemented jointly, nor were funds ever pooled, but coordination was necessary to evaluate the needs of the community as well as prevent duplication of efforts. The Chairman of the Coordination Council was an honorary position headed by directors of the member organizations and periodically rotated.

22. The Saudi High Commission ("SHC") was a large organization that executed significant projects such as building and home reconstruction and the construction of the largest mosque in Sarajevo, the King Fahad Cultural Center, as well as other relief work like orphan sponsorships and aid distribution. The SHC did not interfere with IIRO's operations or projects, and no transfer of funds ever occurred between the two organizations to my knowledge. The SHC's presence in Bosnia diminished in 1999/2000 when its projects were reduced to orphan sponsorships, and even this project was brought to an end soon thereafter. IIRO did not share staff members with the SHC; however, there was one employee who worked at IIRO beginning in 2013, who was previously employed at the SHC.

4

23. I am unaware of the Muslim World League having any activities in Bosnia during the war.

24. The IIRO-Sarajevo office did not provide any assistance to the Arab foreign fighters – or to any fighters – engaged in the Bosnian conflict, nor, to my knowledge, did any other IIRO Balkans office provide any assistance to these fighters.  I have seen no evidence to support the notion that IIRO helped mujahideen enter Bosnia by paying for transportation and lodging.  IIRO did not cover these expenses even for its own employees during this time.  Furthermore, if there had been such an attempt to bring in fighters as "employees," it would have been an issue raised by the local authorities to the IIRO-Sarajevo office. During my tenure, the government raised no such concerns.

25. At no time did the IIRO-Sarajevo office: (1) transport, or assist in the transport of, Al-Qaeda members whether in vehicles bearing the United Nations High Commissioner for Refugees license plates or otherwise; (2) engage in or assist in weapons smuggling into Bosnia; (3) provide employment for mujahideen or Al Qaeda members; (4) provide identification cards for mujahadeen or Al Qaeda members; or (5) support Maktab al-Khidamat.  Nor am I aware of any other IIRO-Balkans office or employee having done so.

26. I have been made aware of an allegation in this litigation that Tariq Mahmoud Ahmed Al Sawah was an IIRO employee in Bosnia and Croatia in the 1990s. There was no employee by that name in IIRO in Bosnia or Croatia. I have never met anybody with that name, and have not heard of others speak of a person with that name.

27. During my tenure at IIRO, I did not observe the organization or anyone within the organization providing any support, tacit or explicit, to Al Qaeda or any other terror organizations. To my knowledge, IIRO did not employ any members of Al Qaeda or anyone known to be an Al Qaeda sympathizer.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____[signed]_____

Abderraouf Khalaf Al-Shorman

Executed On: 6/4/2026

محكمة مقاطعة الولايات المتحدة
مقاطعة نيويورك الجنوبية

في القضية المتعلقة بهجمات إرهابية في 11 سبتمبر 2001      رقم *3 MDL 1570* (GBD) (SN)

يطبق على الاتي:

*أشتون وآخرون ضد القاعدة الإسلامية العسكرية وآخرين، قضية رقم 02-cv-6977؛*
*بورنت وآخرون ضد مؤسسة البركة للاستثمار والتنمية وآخرين، قضية رقم 03-cv-9849 ؛*
*كانتور فيتزجرالد وشركائه وآخرون ضد بنك اكيدة الخاص (ش.م.م.) وآخرين، قضية رقم 04-cv-7065؛*
*سالفو وآخرون ضد القاعدة الإسلامية العسكرية وآخرين، قضية رقم 03-cv-05071؛*
*شركة كونتينينتال كاجولتي وآخرون ضد القاعدة وآخرين، قضية رقم 04-cv-05970؛*
*يورو بروكرز إنك وآخرون ضد البركة وآخرين، قضية رقم 04-cv-7279؛*
*شركة التأمين الفدرالي وآخرون ضد القاعدة وآخرين، قضية رقم 03-cv-6978؛*
*أونيل وآخرون ضد البركة وآخرين، قضية رقم 04-cv-1923؛*
*ماهر وآخرون ضد الإمارة الإسلامية في أفغانستان المعروفة أيضاً بالطالبان وآخرين، قضية رقم 1:23-cv-02845*

## تصريح عبد الرؤوف خلف شرمان

١. أنا الموقع أدناه، عبد الرؤوف خلف شرمان، أقرّ بموجبه بأن البيانات التالية صحيحة بحسب معرفتي الشخصية.

٢. تم انشاء مكتب سراييفو التابع لهيئة الإغاثة الإسلامية العالمية (يشار إليها فيما بعد بعبارة "الهيئة") في ديسمبر ١٩٩٢ تلبية للكارثة البشرية التي سببتها حرب البوسنة مثلما تم انشاء العديد من المكاتب الأخرى للهيئة في منطقة البلقان.

3. اتيت في الثمانينيات كطالب في كلية طب الأسنان إلى ما كانت تعرف بـ "يوغوسلافيا" في وقتها. بعد اندلاع الحرب وإنشاء مكتب الهيئة في سراييفو بدأت العمل في المكتب واستمريت حتى عام 2019. في البداية خدمت كمنسق متطوع للأيتام وفي أغسطس ١٩٩٣ أصبحت موظفًا رسميًا في الهيئة وشغلت المنصب نفسه. في عام ١٩٩٩ أصبحت رئيسًا للجنة الإدارية لمكتب سراييفو حيث عملت فعليًا كمدير الهيئة في سراييفو.

٤. خلال فترة عملي في مكتب الهيئة في سراييفو وكجزء من واجباتي تفاعلت بشكل روتيني ومنتظم مع المكتب الرئيسي للهيئة الكائن في جدة-المملكة العربية السعودية فيما يتعلق بعملياتنا وشؤوننا المالية ونتيجةً لذلك أصبحت على دراية وثيقة ببروتوكولات المكتب الرئيسي وإجراءاته وعملياته وموظفيه وعلاقاته وشؤونه المالية فضلاً عن سياساته وإجراءاته للإشراف على عمليات مكاتبه الفرعية.

٥. ركزت جهود الهيئة الإنسانية في البلقان بشكل أساسي على رعاية الأيتام وتوزيع المساعدات بشكل عام مثل الطعام والملابس والإمدادات الطبية سواء في مخيمات اللاجئين أو لعامة الناس. بما أن القوات الصربية حاصرت مدينة سراييفو بشكل شبه كامل أثناء الحرب (انظر أدناه) تم إدخال المساعدات إما عبر قناة إنسانية أو عن طريق الأمم المتحدة.

٦. وزع مكتب الهيئة في سراييفو بشكل عام مساعدات عينية باستثناء رعاية الأيتام التي تبلغ 50 ماركًا لكل شخص شهريًا (حوالي 30 دولارًا أمريكيًا في ذلك الوقت). لتسهيل عملية توزيع المساعدات تمّ ذلك في مواقع مركزية مثل المساجد وقاعات المدينة والمدارس أو حتى مباشرةً من المستودعات.

٧. بالنسبة للمشاريع في البلقان كان المركز الرئيسي يقوم بصرف الأموال إلى المكتب الإقليمي في البلقان الذي بدوره يصرف الأموال مباشرة إلى المكاتب في البلقان. تقوم هذه المكاتب بدورها بتقديم الأوراق اللازمة إلى المكتب الإقليمي في البلقان من أجل "ضبط" حساباتها عند صرف أموالها ويقوم هذا المكتب بعد ذلك بالشيء نفسه مع المكتب الرئيسي. بعد نقل مكتب الإقليمي في البلقان إلى سراييفو (انظر أدناه) أصبح كلّ مكتب فرعي يقوم بضبط حساباته مباشرة مع الإدارة المالية في المكتب الرئيسي.

1

٨. نظرًا لأن المكتب الرئيسي كان لديه إجراءات محاسبية خاصة به تختلف عن تلك الموجودة في البوسنة، كانت هناك بعض التحديات للحفاظ على الامتثال الكامل لإجراءات المكتب الرئيسي. على الرغم من هذه التحديات عمل جميع موظفي الهيئة الذين قابلتهم ـ سواء كانوا في البوسنة أو المملكة العربية السعودية ـ نحو نفس الهدف وهو الامتثال الأقصى للسياسات والإجراءات المعمول بها مع التركيز على المحاسبة.

٩. خلال تفاعلاتي مع المكتب الرئيسي بما في ذلك تلك المتعلقة بالتناقضات المحاسبية المتصورة أو الانحرافات الإجرائية البسيطة كان انطباعي أن المكتب الرئيسي أخذ هذه الأمور على محمل الجد وقام بالتحقيق في جميع المسائل متأكّدا مما إذا كانت هناك مخالفات قد حدثت وقيامه بمساعدتنا لضمان عدم تكرار مثل هذه المسائل.

١٠. كانت مدينة سراييفو ـ والتي يقع فيه مكتب الهيئة ـ تحت حصار شديد من قبل القوات الصربية بين ١٩٩٢ـ١٩٩٦ تقريبًا مما جعل من الصعب للغاية الحصول على مساعدات لتوزيعها وكذلك التواصل مع العالم الخارجي سواء المكتب الإقليمي في البلقان والمشرف عليه أو المكتب الرئيسي. ولكن بعد انتهاء الحصار تمكنا من استئناف الاتصالات العادية مع المكتب الرئيسي والمكتب الإقليمي في البلقان وكذلك مع العمليات المحلية الأخرى في كل من البوسنة والدول المجاورة.

١١. كان الواقع العملي لتوزيع المساعدات أثناء الحرب يعني أنه في بعض الأحيان كان من المستحيل اتباع بروتوكولات المكتب الرئيسي كما هو الحال عندما انقطعت الكهرباء في سراييفو المحاصرة حيث كنت أعمل. إن عدم اتباع تلك البروتوكولات في كل الأوقات لا يعني حدوث أي شيء غير ملائم بل بعكس واقع أعمال الإغاثة في ظروف صعبة للغاية حيث كل قرار نتخذه قد يعني الحياة أو الموت لبعض متلقي المساعدات.

١٢. بعد انتهاء الحرب وعودة العديد من اللاجئين النازحين إلى ديارهم أغلقت الهيئة بعض فروعها المحلية ونقلت مكتب البلقان الإقليمي إلى مكتب سراييفو في يناير ١٩٩٧. وفي هذا الدور أصبحت الهيئة في سراييفو مشرفة على العمليات في البلقان بما في ذلك البلدان التي ليس لديها مكتب واستمرت في التواصل مع الفروع الأخرى ومديري المشاريع في جميع أنحاء المنطقة.

١٣. حافظ مكتب الهيئة في سراييفو على علاقة عظيمة مع الحكومة البوسنية وعمل بشكل وثيق مع وزارة الرعاية الاجتماعية والنازحين واللاجئين ("وزارة الرعاية الاجتماعية") خلال فترة وجودي مع الهيئة. كان مكتب سراييفو دائمًا حريصًا على التقيّد بالمعايير التي وضعها القانون البوسني ولم يلق أبدًا أية مواجهات سلبية مع المسؤولين البوسنيين. لم يتّم إعتقال أي موظف أثناء عمله لأي سبب سواء للاشتباه في الإرهاب أو غير ذلك.

١٤. لطالما رحبت الحكومة البوسنية بعمليات الهيئة في سراييفو خاصة خلال الحرب عندما طلبت بشكل روتيني المساعدة الإنسانية. كان مكتب الهيئة في سراييفو يقدم المساعدة بعد الحصول على الموافقة والأموال أو السلع من المكتب الرئيسي وفي بعض الأحيان كان يقوم بتوزيعها بمساعدة وزارة الرعاية الاجتماعية. بعد الحرب حصل مكتب الهيئة في سراييفو على جائزة الدرع الذهبي من الحكومة البوسنية لدورها في خدمة شعب البوسنة خلال الحرب.

١٥. دائمًا ما كان يمتثل مكتب الهيئة في سراييفو لمتطلبات التسجيل في البوسنة كما هو مطلوب من قبل المكتب الرئيسي.

١٦. في عام ١٩٩٦ فُرض على المنظمات الخيرية في البوسنة تقديم طلبات إلى وزارة الرعاية الاجتماعية للحصول على تصاريح لمشاريعها المختلفة. بعد تنفيذ المشاريع كان يتوجب على المنظمات الخيرية تقديم تقرير عن المشاريع المنفذة. امتثل مكتب الهيئة في سراييفو لهذه المتطلبات بشكل دائم.

١٧. بالإضافة إلى موجب تقديم التقارير قامت إدارة الرقابة والتفتيش التابعة لوزارة الرعاية الاجتماعية بزيارات مفاجئة إلى مكاتب المنظمات غير الحكومية. كانت الزيارات المفاجئة عشوائية لكنها روتينية والمعلومات المطلوبة تتعلق بما إذا كانت المنظمات تمتثل للقوانين التي تتطلب من أصحاب العمل تقديم مزايا لموظفيهم. تمت زيارة الهيئة في ٢٠٠٠ و ٢٠٠١ و ٢٠٠٢ ووجدت دائمًا في حالة امتثال.

١٨. بجانب وزارة الرعاية الاجتماعية تعاونت الهيئة في سراييفو أيضًا مع وزارة الصحة في مشاريع الرعاية الصحية في أواخر التسعينيات وأوائل القرن الحادي والعشرين. على سبيل المثال أبرم مكتب الهيئة في سراييفو و وزارة الصحة البوسنية اتفاقية بشأن مركز طبي في منتصف التسعينيات حيث توفر بموجبها الحكومة التسهيلات ورواتب الأطباء والممرضات ويوفر مكتب

2

الهيئة في سراييفو ما يلزم من المعدات والمستلزمات الطبية. قدم هذا المركز العديد من الخدمات بما في ذلك إختصاصات طب العيون وطب الأسنان وطب الأمراض الداخلية وطب الأطفال والتوليد وأمراض النساء.

١٩. تمتع مكتب الهيئة في سراييفو بسمعة قوية للغاية في الإقليم وعلاقة عمل رائعة مع الحكومة البوسنية. بالفعل تواصلت الحكومة البوسنية مرارًا مع مكتب الهيئة في سراييفو للحصول على المساعدة قبل وبعد إعتداءات ١١ سبتمبر.

٢٠. حافظ مكتب الهيئة في سراييفو على علاقة ودية مع المنظمات غير الحكومية الأخرى في المنطقة. ولم يعمل عن كثب مع أي منظمة على وجه الخصوص ولكنه ابرم اجتماعات للتنسيق مع المنظمات غير الحكومية الأخرى من خلال مجلس تنسيق لضمان عدم ازدواج الجهود الإنسانية في نفس المجالات. بعد انتهاء الحرب حضر ممثل عن وزارة الرعاية الاجتماعية في البوسنة هذه الاجتماعات أيضاً ولعب دورًا في التنسيق.

٢١. تأسس مجلس التنسيق في كرواتيا في بداية الحرب وتم نقله إلى سراييفو في عام ١٩٩٥ أو ١٩٩٦. تمت دعوة جميع المنظمات الإنسانية الإسلامية لتكون جزءًا من مجلس التنسيق. كانت حوالي عشر منظمات جزءًا من المجلس الذي اجتمع مرة واحدة تقريبًا في الشهر أو أكثر إذا اقتضت الظروف ذلك. دفعت كل منظمة عضو رسومًا شهرية بسيطة لتغطية النفقات الإدارية. لم يتم تنفيذ المشاريع بشكل مشترك ولم يتم دمج الأموال على الإطلاق ولكن كان التنسيق ضروريًا لتقييم احتياجات المجتمع بالإضافة إلى منع ازدواجية الجهود. كان رئيس مجلس التنسيق منصبًا فخريًا يرأسه مديرو المنظمات العضو يتم تناوبهم بشكل دوري.

٢٢. كانت الهيئة السعودية العليا ("الهيئة السعودية") منظمة كبيرة نفذت مشاريع مهمة مثل إعادة بناء المنازل والأبنية وبناء أكبر مسجد في سراييفو (مركز الملك فهد الثقافي) بالإضافة إلى أعمال إغاثية أخرى مثل رعاية الأيتام وتوزيع المساعدات. لم تتدخل الهيئة السعودية في عمليات أو مشاريع الهيئة ولم يحدث أي تحويل للأموال بين المنظمتين على حد علمي. تضاءل وجود الهيئة السعودية في البوسنة في ١٩٩٩/٢٠٠٠ عندما تم تقليص مشاريعها إلى كفالات اليتيم وحتى هذا المشروع تم إنهاءه بعد وقت قصير. لم تتشارك الهيئة الموظفين مع الهيئة السعودية لكن هناك موظف واحد عمل مع الهيئة بداية من 2013 وهو كان موظفًا سابقًا في الهيئة السعودية.

٢٣. لست على علم بأن رابطة العالم الإسلامي كان لديها أي أنشطة في البوسنة أثناء الحرب.

٢٤. لم يقدم مكتب الهيئة في سراييفو أية مساعدة للمقاتلين الأجانب العرب ـ أو لأي مقاتلين ـ المنخرطين في الصراع البوسني وكذلك لم يقدّم أي مكتب آخر لمنظمة الهيئة في البلقان على حدّ علمي أيّة مساعدة لتلك المقاتلين. لم أر أي دليل يدعم فكرة أن الهيئة ساعدت المجاهدين على دخول البوسنة من خلال دفع تكاليف النقل والإقامة. لم تقم الهيئة بتغطية هذه النفقات حتى لموظفيها خلال هذا الوقت. علاوة على ذلك لو كانت هناك محاولة كهذه لاستقدام مقاتلين كـ"موظفين" لكانت السلطات المحلية قد أشارت لتلك المسألة لمكتب الهيئة في سراييفو. خلال فترة عملي لن تشير الحكومة لمخاوفات مثل ذلك.

٢٥. لم يقم مكتب الهيئة في سراييفو في أي وقت (1) بنقل أعضاء القاعدة أو المساعدة في نقلهم سواء في مركبات تحمل لوحات ترخيص المفوضية السامية للأمم المتحدة لشؤون اللاجئين أو غير ذلك (2) الانخراط أو المساعدة في تهريب الأسلحة إلى البوسنة (3) بتوفير فرص عمل للمجاهدين أو أعضاء القاعدة (4) بتوفير بطاقات هوية للمجاهدين أو أعضاء القاعدة أو (5) دعم مكتب الخدمات. كما أنني لست على علم بقيام أي مكتب أو موظف آخر تابع لمنظمة الهيئة في البلقان بذلك.

٢٦. لقد تم إعلامي بادعاء مقدم في هذه الدعوى مفاده أن طارق محمود أحمد السواح عمل لدى الهيئة في البوسنة وكرواتيا في التسعينات. لم يكن هناك أي موظف في الهيئة بهذا الإسم في البوسنة وكرواتيا. لم أقابل اطلاقا أي شخص بهذا الإسم ولم أسمع الاخرون يتكلمون عن شخص بهذا الإسم.

٢٧. خلال فترة عملي مع الهيئة، لم أشهد أن المنظمة أو أي من العاملين فيها قدموا أي دعم، سواء كان ضمنيًا أو صريحًا، للقاعدة أو أي منظمات إرهابية أخرى. على حد علمي لم تقم الهيئة بتوظيف أي عضو من القاعدة أو أي شخص معروف بأنه متعاطف مع القاعدة.

3

أقر تحت طائلة عقوبة الحنث باليمين بموجب قوانين الولايات المتحدة الأمريكية أن ما تقدم حقيقي وصحيح.

عبد الرؤوف خلف الشرمان

حرر في: ٦/٤/٢٠٢٥

4

## DAOU TRANSLATION AND SERVICES
### ضو للترجمة والخدمات

Tahwitat Furn El Chebbek – St. Nohra street – Ghawi Building – Baabda – Mount Lebanon – Ground floor

MOF#: 2859768 – Telephone No.: +961 1 284 725 – Gsm: +961 70 953 809 – Email: daouservices@gmail.com

## CERTIFICATE OF TRANSLATION

**Title of Source Document:** Shorman Declaration

**Source language:** Arabic                    **Translated to:** English

## TRANSLATOR STATEMENT

I, Joyce Hani DAOU, am competent to translate from Arabic into English, and certify under penalty of perjury that the translation of the foregoing document is true and accurate to the best of my abilities.

## Translator qualifications:

15 years translation experience (Arabic-English and English-Arabic)

Sworn translator before the Lebanese courts as per oath taking report issued by the Ministry of Justice in Lebanon under No. 291 dated 26/02/2011

**Signature of translator:**                    **Date:** 11 April 2026