# EXHIBIT 30

This Transcript Contains Confidential Material

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - -

IN RE: TERRORIST      :

ATTACKS ON            :      03-MDL-1570

SEPTEMBER 11, 2001  :      (GBD)(SN)

-------------------------------------------

- - -

Thursday, June 20, 2019

- - -

THIS TRANSCRIPT CONTAINS

CONFIDENTIAL INFORMATION

- - -

Day 1 of the videotaped deposition of ABDERRAOUF KHALAF ALSHORMAN, taken pursuant to notice, was held at the Hotel Indigo Madrid Gran Via, Calle de Silva, 6, 28013 Madrid, Spain, beginning at 9:36 a.m., on the above date, before Lisa V. Feissner, RDR, CRR, Notary Public.

- - -

GOLKOW LITIGATION SERVICES

877.370.3377 ph | 917.591.5672 fax

deps@golkow.com

This Transcript Contains Confidential Material

Page 30

Q.  And when you first learned that your deposition was to be taken, did you do anything to prepare yourself for the deposition?

A.  I just got ready to get my visa so I could be here.

Q.  Did you start to review anything to prepare for your deposition?

A.  No.

Q.  Since that time in November of 2018, have you done anything to prepare for today's deposition?

A.  No.

Q.  I'm going to ask you some questions about your preparation for this deposition beyond what I've already asked.

MR. NASSAR:  We have a continuing objection.  If the interpreter could translate "deposition" as "deposition" in Arabic instead of as "lawsuit," I think that would clarify matters going forward.

MR. HAEFELE:  All right.

INTERPRETER:  Okay.

Page 31

MR. TARBUTTON:  What is the correct word?

MR. NASSAR:  I've provided it to the interpreter.  It's (speaking Arabic).  (Speaking Arabic) means "lawsuit."

INTERPRETER:  Can I just ask a question of Waleed?

MR. NASSAR:  Yeah, of course.

INTERPRETER:  (Speaking Arabic.)

MS. KHATIB:  (Speaking Arabic), "a notice of the deposition."  It's just the noticing he will be deposed.  This is not his testimony right here.

INTERPRETER:  (Speaking Arabic.)

MS. KHATIB:  (Speaking Arabic.)  Yes.

INTERPRETER:  (Speaking Arabic.)  Okay.

Q.  Have you been given any instruction to not tell me any information about your preparation?

A.  No.

Q.  Have you been told to not tell me

Page 32

things about your communication with counsel for Muslim World League and IIRO?

A.  Can you please repeat the question?

Q.  Have you been told to not tell me things about your communications with counsel for Muslim World League and IIRO?

MS. KHATIB:  Sorry, objection.  Not "the officials at IIRO."  It's "with counsel for."

MR. NASSAR:  "With the attorneys."  And I'm going to object to that.  That's privileged.

MR. HAEFELE:  It's not privileged.

MR. NASSAR:  It is privileged.

MR. HAEFELE:  No, it's not.

MR. NASSAR:  It is.  You're asking whether he's been -- whether we have, as attorneys, instructed him on something.

MR. HAEFELE:  It would be improper, so it's not actually --

MR. NASSAR:  It would be improper to give him an explanation as to what's privileged in a deposition?  That's what --

Page 33

MR. HAEFELE:  It would be improper for him to be told to not tell whether or not he communicated with you.

MR. NASSAR:  That's not what you asked.

Q.  Have you been told to not tell me that you've communicated with counsel?

MR. NASSAR:  That's fine.

A.  No.

Q.  All right.  So that we are clear, I am telling you that under the rules that apply to this deposition, you are obligated to answer my questions fully and honestly unless the lawyer for Muslim World League/IIRO indicates to me that there is an objection to the question based on a privilege that is indicated on the record and tells you not to answer the question.

A.  No.  It has not happened.

Q.  All right.  To be clear, you cannot willfully omit information from your answer simply because you've been instructed to limit your questions [sic] in some fashion.  Do you understand that?

This Transcript Contains Confidential Material

Page 126

A. Yes.

Q. Did you use computers in the Sarajevo office in 1999 when you became chair?

A. Yes.

Q. Did you use computers when you started as a volunteer in Sarajevo?

A. Yes.

Q. And were the reports that you did, were they backed up on computer?

A. Not all of them. Because at that period, we did not have electricity. And for a long time, we would just be sitting without electricity. We had the computer, but the problem was on the electricity, that we were not able to obtain or have it.

Q. Was the IIRO Sarajevo office overseen or supervised by any other IIRO office other than the headquarters in Saudi Arabia?

A. Can you clear what you mean?

Q. Was the IIRO office in Sarajevo supervised by the IIRO office in Riyadh?

A. No. We were direct communicating with the Jeddah office.

Q. The headquarters office for IIRO

Page 127

was in Jeddah, right?

A. No. It was in Jeddah.

Q. That's what I said. The headquarters for IIRO was in Jeddah, correct?

A. Yes, in Jeddah, yes.

Q. Did the Riyadh office play any oversight role over the Sarajevo office?

A. No.

MR. NASSAR: Objection to the interpretation. She omitted "oversight." So the question that she translated was, "Did the Riyadh office play any role over the Sarajevo office," not "oversight."

Q. All right. Well, let's be clear. Did the Riyadh office play any oversight role over the Sarajevo office?

A. Not direct role.

(Exhibit Alshorman-215 marked for identification and attached to the transcript.)

BY MR. HAEFELE:

Q. Sir, I'm showing you a document that is marked as Alshorman Exhibit 215. And

Page 128

just for the record, it was produced by IIRO with Bates stamp IIRO 50038, dated 20 September 2003. This is a letter from the director of IIRO Riyadh office, Ali bin Abdullah al-Garees, and addressed to you as the director of the IIRO Sarajevo office, correct?

A. Yes.

Q. Do you know who Mr. al-Garees is?

A. He was the manager of the office in Riyadh.

Q. And the letter in the second full paragraph starts off with, Pursuant to the applicable practical mechanism in the IIRO offices, and since your office is under the supervision of the Riyadh office -- and then it continues from there.

Do you see that?

MR. NASSAR: I would ask the interpreter to just read what's written in the Arabic letter. I don't know why she's changing that.

INTERPRETER: Sorry?

MR. NASSAR: I would just ask you -- he's reading the translation of

Page 129

the Arabic. But the Arabic is right in front of you. I would just read that.

INTERPRETER: Okay. (Speaking Arabic.)

MR. NASSAR: No, you read it to him. So Mr. Haefele is reading the English translation of the Arabic that's right in front of you.

INTERPRETER: Okay. (Speaking Arabic.)

MR. NASSAR: Robert, I believe the interpreter is going beyond the English that you read.

MR. HAEFELE: Let me ask this.

Q. This letter says that your office, the Sarajevo office, is under the supervision of the Riyadh office. Is that statement correct?

A. Maybe this is the interpretation of the office, but this is -- I'm not sure, it's just what I think, maybe it was under the supervision of Riyadh headquarter. But -- sorry, the Jeddah --

(The witness and interpreter

This Transcript Contains Confidential Material

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - -

IN RE: TERRORIST      :

ATTACKS ON            :      03-MDL-1570

SEPTEMBER 11, 2001  :      (GBD)(SN)

-------------------------------------------

- - -

Friday, June 21, 2019

- - -

THIS TRANSCRIPT CONTAINS

CONFIDENTIAL INFORMATION

- - -

Day 2 of the videotaped deposition of ABDERRAOUF KHALAF ALSHORMAN, taken pursuant to notice, was held at the Hotel Indigo Madrid Gran Via, Calle de Silva, 6, 28013 Madrid, Spain, beginning at 9:34 a.m., on the above date, before Lisa V. Feissner, RDR, CRR, Notary Public.

- - -

GOLKOW LITIGATION SERVICES

877.370.3377 ph | 917.591.5672 fax

deps@golkow.com

This Transcript Contains Confidential Material

Page 283

crimes?

A. Not the crimes. They audit activities.

Q. And what do they do as a result of the audits?

A. They would find out where the money was spent. They would look into the allocations.

Q. Are they looking for financial wrongdoing?

A. Maybe.

Q. Do you know a name -- do you know a man named Ali Mizr, M-I-Z-R? It may be Mizar because I think in some places it's M-I-Z-E-R, or A-R.

A. Yes. I heard of him.

Q. And who is he?

A. He was an employee at the Saudi High Commission.

Q. Did he ever do any work for IIRO?

A. I'm not aware of that. In Sarajevo, I'm sure that no.

Q. Do you know a man named Zayed Al Oqaili, Z-A-Y-E-D, A-L, O-Q-A-I-L-I?

Page 284

A. I don't.

Q. Do you know a man named Saleh Al Dubyan, S-A-L-E-H, A-L, D-U-B-Y-A-N?

A. Dubyani.

Q. Who is he?

A. So he's the director of the offices management at the IIRO.

Q. Where is his office?

A. In Jeddah. So one of the offices of the IIRO in Jeddah, one of the offices management.

MS. KHATIB: Objection. "Department" instead of "offices."

INTERPRETER: Yeah, there was like an official translation for that, as far as I recall from the last time.

Q. Do you recall an instance where the Federation of Bosnia and Herzegovina's ministry of financial -- finance -- financial police investigated an instance of more than 80,000 German marks being transferred from the IIRO to an account in the MEB bank in Sarajevo reportedly in connection with the purchase of a Jeep?

Page 285

A. I have heard of it.

Q. What did you recall about that incident?

INTERPRETER: The witness is asking if he can correct the name written.

A. It's Sahd Al Oqaili; it's not Zayed. He's Khaled and not Sahd.

Q. I don't know which name we're talking about.

A. So about this issue, yes, the financial police came and asked me the person named X, did it transfer money to an account in MEB bank, and my answer was that the money was not transferred on our behalf and we did not order this operation. And we are not aware of such thing.

Q. Why would the IIRO's Eastern Province office in Saudi Arabia be questioned about that incident?

MR. NASSAR: Objection, foundation.

A. I'm not aware of that.

INTERPRETER: Most correctly, "I do not know that." More precisely.

Q. Who is Mr. Khalid bin Abdelrahman

Page 286

Alaqili?

A. So this is the person who have done this operation.

Q. Who had done what operation?

A. So he was the man for whom the police -- the financial police came to me to ask about.

Q. And was his office in Sarajevo?

A. Whose office?

Q. Mr. Alaqili.

A. He didn't have an office.

MR. NASSAR: Objection. What year are we talking about?

Q. Let's try 2002.

A. As far as I know, he didn't have an office. I do not know. He previously worked at the Saudi High Commission, and then he went to -- and afterward he went to Kosovo, as far as I know. That's what I know about him.

Q. Do you know a reason why Secretary General Basha would be addressing Mr. Alaqili as the manager of the IIRO office in Bosnia and Herzegovina?

A. I don't know.

Page 311

VIDEO OPERATOR:  We are now going off the video record.  The time is 2:07.

(Recess from 2:07 p.m. until 2:25 p.m.)

VIDEO OPERATOR:  We are now going back on the video record.  The time is 2:25.

EXAMINATION

BY MR. NASSAR:

Q.  Good afternoon, Dr. Alshorman.  I'm going to have a few questions for you, and I will be conducting the questioning in English.  I know we've spoken some in Arabic, but due to the proceeding, we'll do it through the interpreter.

A.  Go ahead.

Q.  And you can still respond in Arabic.

Do you recall the last two days being asked a series of questions concerning events dated between 1992 and 1996?

A.  Yes.

Q.  And where were you between those dates?

Page 312

A.  In Sarajevo.

Q.  And what was happening in Sarajevo between those dates?

A.  In April, in the fourth month of 1992, a war started of ethnic nature where residential neighborhoods were bombed, water was cut, power was cut, and food.  So there was a kind of displacement and ethnic cleansing of some areas of the city, and the neighborhoods became separated from one another.  Serbian forces came to be based in the Sarajevo mountains, and daily bombing started on the city.

Q.  And when you're describing this, did you personally -- strike that.

When you say "ethnic cleansing," were people being killed?

A.  Yes.

Q.  And did you personally know anybody or see anyone who was killed?

A.  Yes.

Q.  When you explain -- the term you described was, Sarajevo was under siege.  Does that mean it was effectively cut off from the

Page 313

outside world?

A.  Completely.

Q.  If someone wanted to enter, say, goods or enter Sarajevo, what were the means of doing so?

A.  In the beginning, there were no means to do so.  The siege was from all directions.

Q.  And then later?

A.  After a while, the UN forces came and took the airport, and via the airport, it was possible to enter and exit Sarajevo.

Q.  Were there also tunnels?

A.  Afterwards, a tunnel -- afterwards, a tunnel was dug under the airport, and it was the only channel to provide food for Sarajevo and to transport wounded.

(Reporter interruption.)

Q.  Would those have still been limited means to connect with the outside world?  Would the tunnels and the access to the airport under the UN have been limited means to connect to the outside world?

MR. HAEFELE:  Object to the form.

Page 314

INTERPRETER:  (Rendering interpretation.)

MR. HAEFELE:  Objection to the form.

INTERPRETER:  I translated.  (Rendering interpretation.)

A.  So the UN forces were the one managing the airport, and the tunnels were under the Bosnian forces.

Q.  Even within Sarajevo, was it easy to travel?

MR. HAEFELE:  Objection to form.

A.  No.

Q.  Why was it not easy to travel within Sarajevo doing this time?

MR. HAEFELE:  Continuing objection to this line.

MR. NASSAR:  What's the -- can you explain the objection?

What's the objection, Robert?

MR. HAEFELE:  There was a continuing objection from the last question because --

MR. NASSAR:  What was that?

Page 315

MR. HAEFELE:  -- it was related to the same question.  That's all.

MR. NASSAR:  No, it's -- the question was, even within Sarajevo, was it easy to travel, and you're objecting to form.  What's the objection?

MR. HAEFELE:  Leading.  Leading.  I think you're leading the witness.

MR. NASSAR:  Okay.

Q.  Within Sarajevo, was it difficult to travel?

MR. HAEFELE:  Objection to form.

A.  Yes, travel was limited.  You couldn't travel in any direction you wanted because people would face the snipers or bombs.

Q.  You testified just now that you yourself had friends and you saw individuals who had been killed; is that correct?  Do you recall that?

A.  Yes.

Q.  Is it easy for you to recall specific events of those days?

A.  No, not at all.

Q.  Is it easy for you to recall

Page 316

specific names of individuals from those days?

A.  A colleague of mine while we were at the students' dorms, a colleague of mine in the university --

(The witness and interpreter conferred in Arabic.)

A.  -- yes, students' residency --

Q.  I'm going to clarify my question.  You've been asked about a series of individuals and entities the last two days.  Do you recall that?

A.  Sort of.

Q.  And do you also recall being asked a series of questions about events between 1992 and 1996?  Do you recall that?

A.  Yes.

Q.  Given some of the events that you've just described, is it easy for you to recall the events of those days?

A.  Some of the events I can recall, and some of the events I do not want to recall.

Q.  Okay, moving on.  In 2013, you testified that you met me.  Do you recall that?

A.  Yes.

Page 317

Q.  Do you recall if I had a colleague with me at that time?

A.  Yes.  There was a colleague with you.

Q.  And that was not Ms. Khatib; is that correct?

A.  The first time, no.

Q.  But this individual, did he speak Arabic?

A.  Yes.

Q.  What was the purpose of our meeting in 2013?

A.  You asked for documents.  You asked for documents, papers from the office about this work.

Q.  And by "this work," do you mean this lawsuit?

A.  Yes.

Q.  You've testified earlier that there were approximately ten files in your office.  Do you recall that?  Let me clarify.  Approximately ten filing cabinets.

A.  Yes.

Q.  Did myself and the colleague who

Page 318

was with me, did we -- did you provide us with access to those records to review?

A.  Yes, of course.

Q.  Did you hold any documents back from our review?

A.  Not at all.

Q.  Did both myself and my colleague set aside documents to be scanned after our review was completed?

A.  Not at all.

Q.  Sorry.  Did we set aside documents to be scanned, is the question.

MR. NASSAR:  So I think there was some confusion.  Let me ask a better question.

(Reporter interruption.)

INTERPRETER:  I couldn't hear him well.

A.  So all the documents were scanned.

Q.  All the documents that both myself and my colleague set aside?  Is that what you're saying?

A.  Yes.

Q.  And who performed that scan?

This Transcript Contains Confidential Material

Page 331

new -- was there a new government formed?

A. The government was present.

Q. A new government, correct, that was not there prior to the war?

A. So governments were there. The governments changed.

Q. And in your view, were these technical violations?

MR. HAEFELE: Objection to form.

A. Kind of.

Q. Can you explain?

MR. HAEFELE: Same objection.

(Interruption.)

A. So we had financial lists of financial statements, and we made financial reports that were sent to the center in Jeddah.

(The witness and interpreter conferred in Arabic.)

A. To the headquarters in Jeddah.

INTERPRETER: I asked about what he meant by "center."

A. But we did not make them according to the Bosnian law. The gentlemen, when they came, we gave them what we had according to the

Page 332

regulations we followed. So they gave us a deadline, and we prepared all the documents except the original bills that were sent. We kept copies of them. And we gave them 99 percent of the documents they required 15 days before the deadline they gave us.

Q. And did you reconcile what had been sent or what had been demanded by the -- sorry, strike that.

Did you reconcile the reports that were provided to head office to Bosnian standards during this time?

A. So the financial statements were given to the office of the accountant who was working according to the local regulations. And this is in 1996, '97, '98. In '99 and 2000, they were already present.

Q. So the records from '99 onward were not in violation of these standards?

A. Yes.

Q. After the conclusion -- we've looked at other documents as well. After the conclusion of this matter, I think it was in September, were there any further difficulties

Page 333

with the financial police?

A. There were no other financial difficulties. Everything they asked for was provided.

Q. Was the office fined as a result of this investigation?

INTERPRETER: "Fined" or "fine"?

MR. NASSAR: "Fined."

A. No. Not at all.

Q. Were there any criminal repercussions for anyone in the office in relation to the matters discussed in this report?

MR. HAEFELE: Objection to form.

A. So the report comprises all the financial matters related to the office. And the conclusion of the report, this is written.

Q. And so there was no more further interaction with this -- with the financial police in relation to this matter?

A. No.

Q. And would you call that a kind result?

MR. HAEFELE: Objection to the

Page 334

form.

A. A kind result? A kind result compared to the time during which we have produced this work.

Q. Moving on, it's the last document, I think we're almost through, Exhibit 234. Can you turn to the page that's been Bates stamped PECFOIA049930. And I'm going to direct you, although I know you don't read English fluently, to the paragraph at the bottom of the page.

Do you recall Mr. Haefele asking you questions in relation to nine Bosnian Serbs who in July were arrested for allegedly smuggling weapons to the IIRO?

A. So we did not deal with them, not even in good matters, so not to mention bad deeds.

Q. And with "them," you're referring to Serbs -- to Bosnian Serbs?

A. Yes.

Q. Okay. So my question is, do you recall Mr. Haefele asking you a series of questions about this document?

Page 335

A. I do remember him asking me questions. I do not remember all of the questions.

Q. Okay. Do you recall testifying that you had heard of these allegations through the newspapers?

A. Yes.

Q. Did you find those reports to be with foundation?

MR. HAEFELE: Objection.

A. So these reports have no foundation at all regarding the IIRO or concerning the IIRO.

Q. In Bosnia, what was the -- strike that.

Would you have investigated these allegations, had you found the source of allegations to be legitimate?

MR. HAEFELE: Objection to form.

A. Of course.

Q. Did the Bosnian -- the local authorities in Bosnia ever investigate allegations relating to nine Bosnian Serbs allegedly smuggling weapons to IIRO?

Page 336

A. With us they did not investigate.

Q. Did you, during your over -- by this point -- strike that.

Did you, during your time beginning in 1992, ever see any evidence of the smuggling of weapons to IIRO?

A. No.

Q. Did the Bosnian government, on the basis of such report, ever investigate the Sarajevo office of IIRO?

A. No.

MR. NASSAR: That's all I have.

EXAMINATION

BY MR. KELLOGG:

Q. Good afternoon, Dr. Alshorman. My name is Michael Kellogg, and I'm a lawyer for the Kingdom of Saudi Arabia.

A. Good afternoon.

Q. Do you recall that yesterday you were asked a series of questions about the relationship between the Saudi Embassy in Bosnia and the IIRO in Sarajevo?

A. Yes.

Q. I have just two questions for you.

Page 337

During the time that you worked at the IIRO in Sarajevo, did the Saudi Embassy in Bosnia ever direct or control the activities of the IIRO in Sarajevo?

MS. KHATIB: Objection to translation, "control."

INTERPRETER: (Speaking Arabic.)

MS. KHATIB: (Speaking Arabic.)

INTERPRETER: (Rendering interpretation.)

MR. KELLOGG: Did he have an answer?

A. Not at all.

Q. And more generally, did the Saudi government, or any ministry, agency, or instrumentality of the Saudi government, during the same period, exercise control or direct the activities of the IIRO in Sarajevo?

A. Not at all.

MR. KELLOGG: Thank you. That's all I have.

MR. HAEFELE: I just have a few follow-up questions. I'm going to work quickly.

Page 338

MR. NASSAR: Did you need a break, or are we going to --

MR. HAEFELE: No. Plow right through.

Now I should ask, Aya, do you need a break?

INTERPRETER: I think we can go because if I need a break, I would need like a lunch break, which doesn't make sense if --

MR. HAEFELE: It may not make sense. Hopefully we should be done faster than --

INTERPRETER: So for next time, maybe to have the lunch break earlier and then continue working normally because I do need a break at 2, normally.

EXAMINATION

BY MR. HAEFELE:

Q. Mr. Alshorman, between the time that -- you remember that I was asking you questions this morning, right?

A. I do remember that.

Page 351

MR. NASSAR: Objection, form.

A. In Sarajevo, there was no Coordination Council. There was no Coordination Council in Sarajevo.

Q. Sarajevo is within Bosnia, right?

A. Yes.

Q. And to the extent that any activity was going on at all with regard to any of the relief committees or relief organizations in Sarajevo, it would fall within the responsibility of the Coordination Council that governed or that worked in the Bosnia-Herzegovina area, correct?

INTERPRETER: He said, "repeat the question."

A. Repeat the question.

INTERPRETER: (Rendering interpretation.)

MR. HAEFELE: Aya, let me repeat it.

INTERPRETER: I'm trying to translate it over again.

MR. HAEFELE: Yeah, let me -- maybe I can shorten it a little.

Page 352

Q. To the extent that any relief organization was doing work in Sarajevo, that work would fall under the purview or responsibility of the Coordination Council for Bosnia-Herzegovina, correct?

A. So in Sarajevo there was no Coordination Council. The committees were there, were present.

MS. KHATIB: Objection to translation. "The organizations." He said (speaking Arabic).

INTERPRETER: Yes.

MS. KHATIB: Just for clarification.

Q. Why is it that the Coordination Council for Bosnia-Herzegovina area didn't have responsibility for any relief organization in the capital of Bosnia?

MR. NASSAR: Objection, foundation.

A. I repeat, we were under siege. We did not have any contact with outside Sarajevo. And that was the difficulty.

Q. I'm going to shift gears and I'm focusing your attention on the report of

Page 353

inspection that's at Exhibit 230. With regard to the documents that were the subject of the report of inspection by the Federation financial police, am I correct to understand that you testified that you prepared those documents pursuant to the regulations of IIRO?

A. The first three years, yes. And the next two years, according to the IIRO regulations and the local regulations.

Q. And "the local regulations" being the Federation of Bosnia-Herzegovina?

A. Yes.

Q. You're not talking about some local Sarajevo regulations; you're talking about the entire Federation?

A. So the ministry of finance.

Q. Of Bosnia-Herzegovina?

A. Yes.

Q. All right. So when you're saying "local," you're distinguishing between Bosnia-Herzegovina versus, for example, Saudi Arabia?

A. Yes.

Q. So what was the year that you

Page 354

changed over and you started doing the financial accounting pursuant to the local regulations?

A. So when I was handed over the chairmanship of the office management.

Q. What year was that?

A. 1999.

Q. So from 1999 and before, the violations that are identified in the report are violations that existed with regard to the financial records of IIRO's Sarajevo office?

A. Which violations?

Q. The failure to have constituted business books prescribed by the laws of accountancy, the absence of annual and semiannual accountancy reports, the lack of coordinating of bookkeeping, and the absence of documents concerning the obtaining and providing financial means as well as records for spending that could be the basis for establishing the sources from which the humanitary organization provided monies, means, prescribed by the federal -- or the Federation's laws as indicated on page 4 of the

**In re Terrorist Attacks on September 11, 2001, MDL No. 03-1570 (GBD)**

ERRATA SHEET FOR THE TRANSCRIPT OF:

Deponent:  Abderraouf Khalaf Alshorman
Dep. Date: June 20-21, 2019

| PAGE/LINE | CHANGE TRANSCRIPT FROM: | CHANGE TRANSCRIPT TO: | REASON FOR CHANGE/OTHER ISSUE |
|---|---|---|---|
| 8:8-9:5 | | | Entire introduction by video operator not interpreted |
| 15:19 | United States | | Interpreter Mistranslation;<br><br>Translated as "Kingdom of the United States" |
| 16:13-14 | Abderraouf Khalaf Alshorman | Abderraouf Khalaf Awad Alshorman | Interpreter Omission |
| 16:19 | 1936 | 1963 | Interpreter Mistranslation |
| 17:18 | Al-Mizhar Shemal | Al Mazar Al Shamali | Transcription Correction |
| 17:22 | Or Serbian or Croatian | Serbo-Croatian or Bosnian | Interpreter Mistranslation; Omission |
| 19:6-7 | What is your understanding of what a deposition is, the process we're in today? | | Interpreter Mistranslation;<br><br>Translated as: "What is your understanding of the case we are in today?" |
| 19:17-19 | This is a deposition that we're in today. What do you understand a deposition to be? | | Interpreter Mistranslation;<br><br>Translated as: "What do you understand about today's case?" |

1

| PAGE/LINE | CHANGE TRANSCRIPT FROM: | CHANGE TRANSCRIPT TO: | REASON FOR CHANGE/OTHER ISSUE |
|---|---|---|---|
| 30:14-16 | I'm going to ask you some questions about your preparation for this deposition beyond what I've already asked. | | Interpreter Mistranslation;<br><br>Translated as: "I'm going to ask you some questions on behalf of what I've asked regarding your preparation for this lawsuit." |
| 31:13 | Noticing | Notice saying | Transcription Correction |
| 31:20 | Instruction | | Interpreter Mistranslation;<br><br>Translated as: "advice" |
| 32:1-2 | Your communication with counsel for Muslim World League and IIRO | | Interpreter Mistranslation;<br><br>Translated as: "Your interactions or discussions with the Islamic Relief organization" |
| 32:4-6 | Have you been told to not tell me things about your communications with counsel for Muslim World League and IIRO? | | Interpreter Mistranslation;<br><br>Translated as: "Did they advise you or tell you not to tell me about the communications between you and the official at the Islamic Relief organization?" |
| 33:6-7 | Have you been told to not tell me that you've communicated with counsel? | | Interpreter Mistranslation;<br><br>Translated as: "Did they advise you or tell you that there has been a discussion between you and your attorney?" |
| 33:11-12 | under the rules that apply to this deposition | | Interpreter Omission |

| PAGE/LINE | CHANGE TRANSCRIPT FROM: | CHANGE TRANSCRIPT TO: | REASON FOR CHANGE/OTHER ISSUE |
|---|---|---|---|
| | | | wouldn't it be normal or expected that you would've received such news?" |
| 281:6-7 | So no one went. I only know that there was a car that was brought to Bosnia. | No one went but Arif brought the car to Bosnia and gave it to me. | Interpreter mistranslation; omission |
| 281:10-11 | And the car was brought to the office, to the representative of the office. | The representative of the office brought the car to the office here. | Interpreter mistranslation; |
| 283:6-8 | They would find out where the money was spent. They would look into the allocations. | They review the disbursements of funds, whether it is for what it was allocated? | Interpreter mistranslation |
| 284:9 | Offices | Departments | Interpreter mistranslation |
| 285:6-7 | It's Sahd Al Oqaili; it's not Zayed. He's Khaled and not Sahd. | Saad al-Aqeeli is not Saad, it's Khalid. He's Khalid, not Saad. | Interpreter mistranslation |
| 285:15 | Operation | Transfer | Interpreter mistranslation |
| 286:18 | Afterward | After the war | Interpreter mistranslation; |
| 289:22-23 | Well, do you recall the Federation financial police investigating IIRO? | | Interpreter mistranslation; <br><br> Translated as: "To your knowledge, did the federation financial police investigate IIRO?" |
| 289:24 | Investigation? Maybe just -- | Investigation? They searched, yes. | Interpreter mistranslation |
| 290:12 | So are you talking about 2002? | Sorry, are you asking about this subject or a different subject? In | Interpreter mistranslation |

| PAGE/LINE | CHANGE TRANSCRIPT FROM: | CHANGE TRANSCRIPT TO: | REASON FOR CHANGE/OTHER ISSUE |
|---|---|---|---|
| | | | orphans?" |
| 348:5-6 | So the main purpose is what I said, and here, it's about all -- it's to -- | The main purpose is what I said, and here it says to strengthen the relationship with the ministries to give them an overview of the work of the organizations and to take the regions that most need assistance | Interpreter mistranslation; omission |
| 348:12-14 | we would advise the ministries about the other relief organizations in order to coordinate their work. | The ministries would be informed of the humanitarian work of the organizations and to ask for the regions that require assistance | Interpreter mistranslation |
| 350:15 | I was not aware of this, and -- | I was not aware of this and I did not see this before | Interpreter omission |
| 352:7 | Committees | Organizations | Interpreter mistranslation |
| 355:11-13 | But they were not elaborated according to the records stipulated by the law there in that period. | But they were not prepared according to the chart that is required by the law in that time period. | Interpreter mistranslation |
| 355:17-20 | The IIRO did not know that the records -- the IIRO did not know that there were no records according by the local regulations, and the -- | IIRO did not know that there were no records, and the Federal government didn't know either because they had | Interpreter mistranslation; omission |

| PAGE/LINE | CHANGE TRANSCRIPT FROM: | CHANGE TRANSCRIPT TO: | REASON FOR CHANGE/OTHER ISSUE |
|---|---|---|---|
| | | not inspected yet, the inspection had not occurred yet.  IIRO did not know that there were no charts in accordance to the local law. | |
| 357:11 | Expression | Statements | Interpreter mistranslation |
| 357:23 | Responsible | The individual responsible | Interpreter mistranslation |
| 358:6 | We were only four | We were only four at the office, and I am the fifth. | Interpreter omission |
| 358:9 | Woman | | Transcription correction; Interpreter was speaking to witness, asking "who else?" |
| 358:10 | employee | employees | Interpreter mistranslation |

I, Waleed Nassar, declare under penalty of perjury that the following statement is true as a matter of my personal knowledge:

I am a partner in the law firm Lewis Baach Kaufmann Middlemiss PLLC and counsel for Defendants the International Islamic Relief Organization and the Muslim World League in this action.  This firm has taken the lead on preparing the foregoing errata sheet, which was done under my direct supervision.  With the assistance of an Arabic-speaking Associate, we reviewed the video and listened to the audio and compared the testimony to the transcript of Dr. Abderraouf Khalaf Alshorman's deposition.  All of the foregoing corrections are based on the review process described herein.

Executed on September 6, 2019

Waleed Nassar