# EXHIBIT 35

This Transcript Contains Confidential Material

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - -

IN RE: TERRORIST ATTACKS     : 03-MDL-1570

ON SEPTEMBER 11, 2001       : (GBD)(SN)

- - -

APRIL 29, 2021

THIS TRANSCRIPT CONTAINS

CONFIDENTIAL MATERIAL

- - -

Remote Videotaped Deposition, taken via Zoom, of JOHN BARRON, commencing at 9:01 a.m., on the above date, before Amanda Maslynsky-Miller, Certified Realtime Reporter and Notary Public in and for the Commonwealth of Pennsylvania.

- - -

GOLKOW LITIGATION SERVICES

877.370.3377 ph| 917.591.5672 fax

deps@golkow.com

This Transcript Contains Confidential Material

Page 130

all relevant controls.

Q. First off, it relates -- you know, fully relates to the Sidat Hyder report, correct?

A. Yes.

Q. And it's opining that the Sidat Hyder auditors erred because they didn't understand all the relevant internal controls?

A. Well, as I said, my opinion is that the opinions they offered, the conclusions they reached, are potentially misleading because they didn't first obtain an understanding of all the relevant controls at IIRO.

Q. Okay. Your second opinion, which is Item -- in Paragraph Number 5, also focuses on the Sidat Hyder report, right?

And you're opining that in addressing fraudulent activities at IIRO's Pakistan branch office, the Sidat Hyder auditors erred by not acknowledging and identifying the limits of internal

Page 131

controls; is that right?

A. Yes.

Q. So in your third opinion, which is at the top of the next page in Paragraph 6, you opine that, Given the nature of the fraud involved, it was unlikely that even well-designed internal controls would have prevented or detected the fraud in the Pakistan office, right?

A. That's right.

Q. And am I correct that your -- that opinion is also related to the review of the Sidat Hyder report, right?

A. Yes.

Q. And in your fourth opinion, in Item Number 7, you opine that, The lack of records in the IIRO Pakistan branch office, which were, in your view, intentionally destroyed by individuals working in that office, did not, in your view, afford Sidat Hyder auditors a basis to conclude that proper records were not maintained before their destruction and

Page 132

that, again, in your view, nothing Sidat Hyder references showed that IIRO's senior management was responsible for the absence of records; is that right?

A. That's right.

Q. And am I correct that this opinion also relates to the events set out in the Sidat Hyder report regarding the IIRO Pakistan branch office?

A. Yes.

Q. And in your fifth opinion in the next paragraph, focusing on language in the Sidat Hyder report, you opine that, The language in the report suggests that the Sidat Hyder auditors may not have been unbiased; is that accurate?

A. Yes. I said it indicated a lack of impartiality and fairness and potential bias.

Q. Okay. Fair enough.

In your sixth and final affirmative opinion, in Item Number 9, you opine that, Actions of the IIRO senior management, in response to the

Page 133

suspected fraud at the IIRO Pakistan office, showed that the senior management was not indifferent to nor tried to cover up the wrongdoing that was indicated in the Sidat Hyder report?

MS. BEMBRY: Objection to form.

BY MR. HAEFELE:

Q. Well, I guess, then, to close it out.

And that you saw nothing indicating that the IIRO senior management knew about the fraud or internal control weaknesses in the branch office, right?

MS. BEMBRY: Objection to form.

THE WITNESS: Well, really, what I'm focusing on here is the response they took to the suspected fraud, which indicated to me that this is not something that you would have expected them to do if they were indifferent or

Page 206

But, again, to the extent this was related to the fraud, whether they had records or not wouldn't have made any difference.

BY MR. HAEFELE:

Q. And, finally, turning to Page 6, starting on Page 6, and the entire section of the report concerns Sidat Hyder's findings about the non-existence of head office monitoring controls at IIRO's head office; isn't that right?

MS. BEMBRY: Do you need to see the whole document?

THE WITNESS: No. I'm sorry, could you repeat the question?

BY MR. HAEFELE:

Q. Turning to Page 6, starting on Page 6 and the entire section, Section 6, that entire section of the report concerns Sidat Hyder's findings about the non-existence of head office monitoring controls at the IIRO's head office; isn't

Page 207

that right?

A. Yes.

Q. And in the findings there on Page 6, the Sidat Hyder auditors wrote that, We found that the internal controls relating to proper monitoring of funding to Pakistan were not in place at the IIRO's home office; is that right?

MS. BEMBRY: Are you asking him if that's what's on the paper? Is that the question, Robert?

BY MR. HAEFELE:

Q. Is that right, Mr. Barron?

A. Yeah.

Again, my problem with it, though, is that they never undertook to understand all the monitoring controls that were in place. So to say they weren't in place, they didn't first undertake an understanding, gain an understanding, of the entirety of the monitoring controls.

Q. Is part of their finding that no external or internal audit was

Page 208

ever carried out for the Pakistan branch?

A. Well, that's -- that's what the report says. But, as I stated in my report, first of all, external audits, external audits encompass the entire organization. External auditors make their own decisions about which locations or branches to visit.

So whether or not they went to the Pakistan office would have been under the judgment of the external auditor who rendered an opinion on the entire entity's financial statements.

Q. Is one of the findings of the Sidat Hyder auditors the finding that no external -- no internal or external audit was ever carried out for Pakistan branch?

MS. BEMBRY: Objection. Asked and answered.

THE WITNESS: Well, that's what it says. But I have no idea what procedure they performed to come to that conclusion. What did

Page 209

they do to determine that it was ever -- and when I say -- when it says "ever," that tells me that it was never, from the beginning of time, no one had ever gone to Pakistan.

And I --

BY MR. HAEFELE:

Q. Let me ask you this: Have you, in all of the work that you've done on this litigation, and the hours you put in reading documents, have you seen any document that is either an internal or external audit carried out for the Pakistan branch of IIRO?

A. Again, I don't have -- I don't have access to what the external auditors did. I haven't looked at their work papers.

Q. Have you seen any audit, aside from -- whether you call this an audit or not, but aside from what is Basha-150, have you seen any audit done of the Pakistan branch of IIRO?

Page 266

don't we take a five-minute break.

VIDEO TECHNICIAN: Going off the record at 2:40 p.m.

- - -

(Whereupon, a brief recess was taken.)

- - -

VIDEO TECHNICIAN: Back on the record at 2:46 p.m.

BY MR. HAEFELE:

Q. Mr. Barron, I'm going to remind you you're under oath still.

During the break, did you have an opportunity to speak to Ms. Bembry?

A. Yes.

Q. And when you spoke to Ms. Bembry, did you discuss at all the pending question that was before you from me?

MS. BEMBRY: I'm going to object to you asking him about the substance of our discussion. The break was for him to review the

Page 267

document. That was what the break was.

MR. HAEFELE: I understand, Aisha, except that there was a pending question.

MS. BEMBRY: Okay. Well --

MR. HAEFELE: And so I am certainly permitted to know whether or not there was a guidance given to a pending question during a break.

I'm not asking him about any other communications between you and him. But if you did communicate with him, giving an answer to a question that was pending, that's inappropriate.

MS. BEMBRY: I am going to object to you asking about whether or not -- about anything about our conversations during the break.

MR. HAEFELE: I'll just put on the record that there was a pending question and that I had no

Page 268

problem with Mr. Barron taking a look at the document to answer the question, but to the extent that there is a pending question and you took a break and it created an ability to communicate with the witness and you don't allow me to understand whether or not you guided the witness during a break, that's inappropriate.

So we can go on, and I'm assuming you're instructing the witness not to answer the question.

MS. BEMBRY: Your objection is noted. You can go on.

MR. HAEFELE: Are you instructing the witness not to answer my question?

MS. BEMBRY: Yes, I am.

MR. HAEFELE: Thank you.

BY MR. HAEFELE:

Q. Can you answer the question, Mr. Barron?

Page 269

MS. BEMBRY: What question?

THE WITNESS: Please repeat it.

MS. BEMBRY: The one I instructed him not to answer, or you have a different question?

BY MR. HAEFELE:

Q. Mr. Barron, do you believe that you had more or less information -- or more or less access to information about IIRO's internal controls than Sidat Hyder had during its audit of IIRO?

MS. BEMBRY: Objection to form. Confusing.

BY MR. HAEFELE:

Q. Mr. Barron --

A. Whether I had access, is that what you're asking?

Q. Yes.

A. All I can say is that their statement that there were no monitoring controls is totally inconsistent with monitoring controls that I've listed in 22.2 and 22.3.

This Transcript Contains Confidential Material

Page 278

contradicts that statement.

BY MR. HAEFELE:

Q. And you're accepting everything that Dr. Basha said as something that actually happened, correct?

MS. BEMBRY: Objection. Objection to form.

THE WITNESS: Basically, if it's testimony, you know, sworn under oath, every -- you know, everything I read I was accepting as true.

BY MR. HAEFELE:

Q. Have you seen any direct evidence that contradicts the findings?

MS. BEMBRY: Which finding?

THE WITNESS: Well, no, I'll answer that.

Again, I just -- I think I just answered it.

Yes, I have seen something that contradicts it, as we have been talking about what's in my

Page 279

report, 22.2 and 22.3. To me, that contradicts what -- you know, saying that they had neither established any system or mechanism for financial discipline or proper reporting, that's -- that's totally contradicted.

BY MR. HAEFELE:

Q. Is there any evidence of any audit at all that covers the IIRO Pakistan office before the Sidat Hyder report?

MS. BEMBRY: Objection. Asked and answered.

THE WITNESS: I don't know whether internal audits -- well, as I said, external audits would have covered it -- encompassed it every single year.

BY MR. HAEFELE:

Q. Have you seen an external audit that covered it?

MS. BEMBRY: Objection. Asked and answered.

Page 280

THE WITNESS: Yes, I have.

BY MR. HAEFELE:

Q. You've seen an external audit that addressed specifically IIRO Pakistan?

MS. BEMBRY: Objection. Asked and answered.

THE WITNESS: That's not the ways external audits work. They encompass the entire organization, including all locations.

BY MR. HAEFELE:

Q. Have you seen an external audit that makes reference to any information about IIRO Pakistan, other than the Sidat Hyder report?

MS. BEMBRY: Objection. Asked and answered. Objection. Argumentative at this point.

He's answered this, Robert. You're just asking it different ways.

MR. HAEFELE: Aisha, you noted your objection. And when

Page 281

you continue on like this, you're going to get Mr. Barron saying, I don't remember what the question was.

Let's not prolong the deposition. I appreciate you stating your objection and not interfering any further with the deposition.

BY MR. HAEFELE:

Q. Mr. Barron, the question is, have you seen any external audit that makes reference to any information about IIRO Pakistan, other than the Sidat Hyder report?

MS. BEMBRY: Objection. Asked and answered, which prolongs the deposition.

THE WITNESS: I'll go ahead and answer it again.

An external audit, by its nature, would not make specific reference to any office.

BY MR. HAEFELE:

This Transcript Contains Confidential Material

Page 314

cannot give a speaking objection.

BY MR. HAEFELE:

Q. Mr. Barron, you can answer the question as asked.

If you have some confusion, you can ask me.

MS. BEMBRY: Objection.

MR. HAEFELE: I'm not going to fight further with your counsel.

MS. BEMBRY: Objection.

THE WITNESS: Let me try it this way.

In forming my affirmative opinions, I was not looking at the documents that were cited by Mr. Kohlmann and Mr. Winer.

I did see those reports, as part of my -- forming my rebuttal opinions.

BY MR. HAEFELE:

Q. Anything else to answer the question?

MS. BEMBRY: Same objection.

Page 315

BY MR. HAEFELE:

Q. Where similar concerns, sir, are identified in multiple offices of IIRO, would that have an impact on your opinions?

MS. BEMBRY: Objection to form.

THE WITNESS: Well, the situation in Pakistan was a -- I'll call it a complex fraud, which is what I was opining on.

I didn't -- I didn't see anything in these other reports that indicated anything like that.

And as far as there being internal control deficiencies, I have to tell you that it's rare, in my experience, to issue -- or to perform an audit and not have identified internal control deficiencies. It's not unusual. In fact, it's very usual to identify control deficiencies.

So, again, seeing that there

Page 316

were control deficiencies in other offices doesn't affect my opinion with respect to what happened in Pakistan.

BY MR. HAEFELE:

Q. And if you were to see the same deficiency, for example, in one office you see a lack of documentation or the records not kept in a sufficient manner, and then you were to go to another office and see that same problem and then another office and see a similar problem and another office and see a similar problem, at what point, if at all, does that become a pattern, from your perspective?

MS. BEMBRY: Objection to form.

THE WITNESS: As I said, it's common to have deficiencies of that type. Some of these deficiencies were bookkeeping, they were -- you know, they were using a single entry versus double

Page 317

entry. Lack of documentation is not unusual.

And so if I don't know how many offices they had, but if -- if I were to see in, let's see, one, two, three, four, five offices they had these types of deficiencies, it wouldn't -- I would report on those deficiencies to management at the highest level, and that's really as far as I would take it.

BY MR. HAEFELE:

Q. And based on your consideration of the documents in the case and the testimony, you're aware, aren't you, that there were financial improprieties occurring in the IIRO's Eastern Province office, aren't you?

MS. BEMBRY: Objection to form.

THE WITNESS: Improprieties, I don't -- you would have to show me where it says that in a report.

This Transcript Contains Confidential Material

Page 370

them and indicate to us whether that's the invoices that you provided?

MS. BEMBRY: You want him to scroll through the whole thing or just the first page?

MR. HAEFELE: Well, I just want him to authenticate the fact that they are indeed his invoices.

THE WITNESS: Looking at the first couple of pages, they are our invoices.

BY MR. HAEFELE:

Q. And the rate you charged in this litigation is $500 an hour for you?

A. That's right.

Q. And do you charge that for litigation and non-litigation purposes?

A. I'm sorry, are you asking what I charge for non-litigation --

Q. I'm asking, do you charge the same rate for litigation and non-litigation or is there a separate rate?

A. No. It is a separate rate.

Page 371

Q. What do you charge for non-litigation purposes?

A. Well, the firm establishes a rate, I don't set it.

But for my role of director of quality control, I think it's about $300 an hour, give or take.

Q. So there's a $200 premium for allowing us to harass you in depositions?

MS. BEMBRY: Objection.

MR. HAEFELE: Withdrawn. I'm kidding.

MS. BEMBRY: Although that might be true.

MR. HAEFELE: I'm surprised you objected to it.

BY MR. HAEFELE:

Q. Have you ever worked professionally for or with Muslim World League or IIRO?

A. No.

Q. What's your -- what's your specific knowledge of the innerworkings

Page 372

of Muslim World League/IIRO; is it just what you've told me about, what you've learned from the documents and what you reviewed from this case?

MS. BEMBRY: Objection. Asked and answered.

THE WITNESS: Well, I mean, I've read that annual report that we had up earlier. I've read that.

BY MR. HAEFELE:

Q. You read that for this case, though, right?

A. Yes.

Q. So other than the materials that are -- other than reviewing the materials that are on your list of reliance materials or considered, is there any other knowledge that you have of Muslim World League or IIRO?

A. No.

Q. Have you ever been to any of the offices of Muslim World League or IIRO?

Page 373

A. No.

Q. Do you know anyone personally or professionally who worked with or for IIRO?

A. No.

Q. Have you ever donated to Muslim World League or IIRO?

A. No.

Q. Am I right that you cannot testify under oath, with any degree of certainty, that IIRO home office did not intend to leave weaknesses in the internal controls system of branch offices?

MS. BEMBRY: Objection to form.

THE WITNESS: Well, two things. One, there's absolutely nothing that I've seen that would indicate that to be the case. And what I have seen would indicate exactly the opposite.

BY MR. HAEFELE:

Q. But you haven't seen all of

This Transcript Contains Confidential Material

Page 378

BY MR. HAEFELE:

Q. Let me re-ask you again, reminding you that there is a designation by the United States government.

MS. BEMBRY: Are you asking a question or arguing with the witness? Objection to that. That is improper, he's answered the question.

MR. HAEFELE: Are you objecting or are you arguing with the witness deposer?

MS. BEMBRY: You are arguing.

MR. HAEFELE: You object. That's fine.

BY MR. HAEFELE:

Q. Mr. Barron, is it true that even if everything that you write in your report is accurate, that you aren't able to testify with any degree of certainty that either -- that Muslim World League did not materially support terrorism through misuse of charitable funds?

Page 379

MS. BEMBRY: Objection to the form of that question. Objection. Legal conclusion. Objection to the form of the question.

BY MR. HAEFELE:

Q. Mr. Barron, you're on. You can answer.

A. Okay.

MS. BEMBRY: And asked and answered.

THE WITNESS: There is nothing -- I've seen nothing that's totally outside of the scope of what -- of what I've done, what I've reported on. I was never asked to determine whether or not there had been any funding by those organizations.

BY MR. HAEFELE:

Q. That's a bit of my point. Is that even if everything you said is true, you can't answer that question, because you haven't been asked

Page 380

to answer that question; is that right?

MS. BEMBRY: Well, ask it -- ask that question. Objection to the form of your question and the characterization of -- suggestion and implication that maybe everything he said isn't true. Objection to the form of the way you are asking this question, Robert.

BY MR. HAEFELE:

Q. Sir, you can answer the question.

A. Isn't it true that? What was the rest of it?

Q. Isn't it true that if everything in your report is taken as true, and I'm not suggesting one way or the other, but if it's all considered to be accurate, that you are not able to offer an opinion -- or you have not offered an opinion, with any degree of certainty, that Muslim World League has not materially supported terrorism

Page 381

through misuse of charitable funds?

MS. BEMBRY: Objection to form. Objection. Asked and answered.

THE WITNESS: Well, when you say any "degree of certainty," the fact that everything I've reviewed, thousands of pages, contain nothing to indicate that that happened, you know, what's the degree of certainty we're talking about? I've seen no evidence of it.

BY MR. HAEFELE:

Q. Well, let me clarify something.

You haven't seen, at least to my knowledge, almost anything about Muslim World League, have you?

MS. BEMBRY: Objection to the form of the question.

THE WITNESS: Well, I have seen things related to Muslim World League. But, again --