**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | 03-MD-01570 (GBD)(SN)<br>ECF Case |

This document relates to:

*Kathleen Ashton, et al. v. Al Qaeda Islamic Army, et al.*, 02-cv-06977
*Gladys H. Salvo, et al. v. Al Qaeda Islamic Army, et al.*, 03-cv-05071
*Federal Insurance Co., et al. v. Al Qaida, et al.*, 03-cv-06978
*Thomas E. Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 03-cv-09849
*Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-01923
*Continental Casualty Co., et al. v. Al Qaeda, et al.*, 04-cv-05970
*Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.*, 04-cv-07065
*Euro Brokers Inc., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-07279
*Maher, et al. v. Islamic Emirate of Afghanistan a/k/a The Taliban, et al.*, 1:23-cv-02845

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS WORLD ASSEMBLY OF MUSLIM YOUTH'S AND WORLD
ASSEMBLY OF MUSLIM YOUTH   INTERNATIONAL'S MOTION FOR SUMMARY
JUDGMENT**

SEN. ARLEN SPECTER: Well, let's focus on economic sanctions, which is my question, before we go into other possible actions. I want to know about the recommendations on economic sanctions as to Saudis, which have been turned down.

RICHARD NEWCOMB: Senator Specter, we've made numerous recommendations including relating to Saudi Arabia and other terrorist support organizations and groups. This goes through a policy coordinating PCC process where all of the equities of the government come to the table.

……

SEN. ARLEN SPECTER: Were there recommendations for sanctions against the World Assembly of Muslim Youth?

RICHARD NEWCOMB: There, as in others, these are issues that we looked at and examined very carefully. There was no recommendation out of our office on either of those.

SEN. ARLEN SPECTER: Well, what conclusions did you come to on the World Assembly of Muslim Youth?

RICHARD NEWCOMB: That, along with the whole variety of charitable organizations operating head offices in Saudi or organizations that we're looking at, as well as the whole range of several hundred or so possible organizations that may be funding terrorist activities, rising to the level of a recommendation is a complicated practice.

SEN. ARLEN SPECTER: Well, I'm not concerned about several hundred others. I'd like to know what about the World Assembly of Muslim Youth. Were they funding terrorist organizations subject to economic sanctions without any action being taken?

RICHARD NEWCOMB: I can't conclude that in this hearing. It is an organization that we—

SEN. ARLEN SPECTER: You say you can't conclude it—

RICHARD NEWCOMB: Cannot. Cannot.

SEN. ARLEN SPECTER: --at this hearing today?

RICHARD NEWCOMB: Well, we did not conclude that in our deliberations, so I can't say that that was a recommendation of our office.[1]

---

[1] See WAMY's Rule 56.1 Statement of Facts ("SOF") at ¶¶ 474-477 (transcript of Congressional testimony of U.S. Dept. of Treasury, Office of Foreign Assets Control ("OFAC") form director R. Richard Newcomb).

i

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES........................................................................................v

INTRODUCTION........................................................................................1

PROCEDURAL HISTORY………………………………………………………… 2

ARGUMENT........................................................................................6

   *I.*  *Summary Judgment Standards*……………………………………………………...6

   *II.* *Federal Claims Against WAMY*………………………………………………….8

     A. **Plaintiffs' Claims under the Anti-Terrorism Act and the Justice Against Sponsors of Terrorism Act: Generally**…………………………………….…8

     B. **JASTA: Aiding and Abetting**………………………………………….………10

       1. WAMY did not provide aid to al Qaeda directly or through any intermediary. ………………………………...………………….....15

         a. WAMY did not raise or launder funds for al Qaeda……………..……..17

         b. WAMY did not engage in any "missions" for al Qaeda, fund its training camps, nor operate as an al Qaeda recruiting center………..……………26

         c. WAMY's moderate literature and publications in no way promote al Qaeda's global terrorism agenda……………………...………………..28

         d. WAMY's youth camps and conferences promote positive Muslim ideals for youth, not the ideological foundations for al Qaeda…………………..32

         e. WAMY provided humanitarian aid to people in need and did not support al Qaeda's militant and terrorist activities..……………………..…..35

       2. Reliable evidence does not show that WAMY was generally aware that it played any role in al Qaeda's illegal activity…………………………49

3.  WAMY never knowingly provided any assistance to al Qaeda and certainly never knowingly provided substantial assistance……….…..58

C.  **JASTA: Conspiracy Liability**………………………………….…………..63

1.  WAMY never entered into an agreement with al Qaeda, directly or indirectly, to commit  terrorist attacks. …………………………………...65

D.  **Primary Liability Under the ATA.** ………………………………….………65

1.  WAMY may not be held liable under the ATA for any alleged provision of material support prior to the effective date of the statute allegedly violated………………………………………………….......67

2.  WAMY did not commit any unlawful predicate act. …………..……........67

3.  WAMY did not have the requisite mental state. . …………..…..……….....68

4.  WAMY did not cause plaintiffs' injuries. . ………….…...……………..69

III. *Claims against WAMY under New York Law.*..……………...………………………70

IV. *Insufficiency of Service of Process by Burnett Plaintiffs.* ………….…...……………72

**CONCLUSION**……………………………………………………………………....74

## TABLE OF AUTHORITIES

**Cases**                                                                     **Pages**

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ………7,8

*Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420
(2d Cir. 2025).....................................................................................8, 10, 14, 15, 48, 50, 58

*Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856 (D.C. Cir. 2022). ………...........................50

*Boim v. Holy Land Foundation,* 549 F.3d 685 (7th Cir. 2008) ………....................................67, 68

*Caldarola v. Calabrese,* 298 F.3d 156 (2d Cir. 2002) ………......................................................7

*Camp v. Dema,* 948 F.2d 455 (8th Cir. 1991) ………...............................................................12

*Chirag v. MT Marida Marguerite Schiffahrts*, 604 F. App'x 16 (2d Cir. 2015) ...........................7

*DeLuca v. Access IT Group, Inc.*, 695 F.Supp.2d 54, (S.D.N.Y. 2010)………..………………...72

*First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)
.....................................................................................................................................................8

*Fraenkel v. Standard Chartered Bank,* 2025 WL 2773251 (S.D.N.Y. 2025). ……...................8, 14

*Freeman v. HSBC Holdings PLC*, 57 F.4th 66 (2d Cir. 2023) ………...................................63,64

*Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002) ………...................................................................7

*Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542 (E.D.N.Y. 2012) ………......................................65

*Goldman v. Weisman*, No. 23-CV-09602 (ER), 2025 WL 448328 (S.D.N.Y. Feb. 10, 2025)….72

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ………...............................10, 13, 15, 63

*Hicks v. Baines,* 593 F.3d 159 (2d Cir. 2010). ………....................................................................8

*Honickman v. BLOM Bank SAL*, 6 F.4th 487 (2d Cir. 2021). .........................10, 15, 49, 50, 58, 66

*Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258 (1992)………………………………………69

*Houser v. Norfolk Southern Railway Co.,* 264 F.Supp. 3d 470 (W.D. N.Y. 2017). .......................7

*Huang v. Fort Greene P'ship Homes Condo.*, 228 A.D.3d 912, 215 N.Y.S.3d 351 (2024)..........71

*In re Terrorist Attacks on September 11, 2001*, 714 F.3d 118 (2d Cir. 2013). ...................2, 69, 70

*In re Terrorist Attacks on September 11, 2001,* 714 F.3d 659 (2d Cir. 2013) .............................41

*In re Terrorist Attacks on September 11, 2001*, 298 F. Supp. 3d 631 (S.D.N.Y. 2018). ..............69

*In re Terrorist Attacks on September 11, 2001*,  718 F. Supp.2d 456 (S.D.N.Y June 17, 2010) ....................................................................................................................................................57, 68, 69

*In re Terrorist Attacks on September 11, 2001*, 740 F. Supp. 2d 494 (S.D.N.Y. 2010) ..2, 3, 4, 16, …………………………………………………………………………………………..37, 66

*In re Terrorist Attacks on September 11, 2001,* 2023 WL 2430381 (S.D.N.Y. March 9, 2023) ................................................................................11,12, 16, 50, 52, 55, 58, 60, 62, 63, 68, 69

*In re Terrorist Attacks on September 11 2001,* 2005 WL 2485412 (S.D.N.Y. August 28, 2025). ....................................................................................................................................................16, 65

*In re Terrorist Attacks on September. 11, 2001*, 2022 WL 4227151, (S.D.N.Y. May 3, 2022) ...67

*In re Terrorist Attacks on September 11, 2001,* 2023 WL 5132138 (S.D.N.Y. August 10, 2023) ....................................................................................................................................................67, 70

*Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co.*, 812 F.2d 786 (2d Cir. 1987) .............................63

*Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021). ………...........10, 50, 55

*Krist v. Beth Israel Medical Center,* 2021 WL 4442943 (S.D.N.Y. 2021) ....................................7

*Kuznitz v. Funk*, 187 A.D.3d 1006, 33 N.Y.S.3d 46 (2020) ………................................................71

*Levine v. Cloudfare, Inc.*, ___F.Supp.3d___, 2025 WL 4349272 (N.D. Fla. 2025) ………..........63

*Lipton v. Nature Co.,* 71 F.3d 464 (2d Cir. 1995) ………......................................................8

*Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018) ………....................10, 15, 16, 66, 68, 69

*Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290 (2d Cir. 2008). ....................8

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 476 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ………...........................................................................................................................7

*Monsanto Co. v. Spray-Rite Serv. Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) ………...........................................................................................................................................63

*Newman v. Associated Press*, 758 F.Supp.3d 1357 (S.D. Fla. 2024) ….......................................63

*North American Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*  883 F.3d 32 (2d Cir. 2018)………...........................................................................................................................63

*Ofisi v. BNP Paribas, S.A.*, 77 F.4th 667 (D.C.Cir. 2023) ………................................................63

*Petrone v. Davidoff Hutcher & Citron, LLP*, 150 A.D.3d 776, 54 N.Y.S.3d 25 (2d Dept. 2017) ………...................................................................................................................71

*Proano v. Gutman*, 211 A.D.3d 978, 180 N.Y.S.3d 279 (2022). ……… ....................................71

*Rosemond v. United States,* 572 U.S. 65, 134 S.Ct. 1240, 188 L.Ed.2d 248 (2014) ....................11

*Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013) ………......................................................69, 70

*Scott v. Harris,* 550 U.S. 372, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) … ..................................7

*Siegel v. HSBC North America Holdings, Inc.*, 933 F.3d 217 (2d Cir. 2019)… ....................58, 62

*Sokolow v. Palestine Liberation Org.*, 60 F. Supp. 3d 509 (S.D.N.Y. 2014)..............65, 66, 68, 69

*Strauss v. Credit Lyonnais, S.A.,* 2017 WL 4481126 (E.D.N.Y. 2017) …....................................67

*Troell v. Binance Holdings Ltd.*, 2026 WL 636849 (S.D.N.Y. Mar. 6, 2026)…...…………12, 55

*Twitter Inc. v. Taamneh,* 598 U.S. 471, 143 S.Ct. 1206, 215 L.Ed.2d 444 (2023). ……..………..
.........................................................................................9, 10, 11, 12, 13, 14, 16, 25, 48, 58

*Weiss v. National Westminster Bank*, 993 F.3d 144 (2d Cir. 2021) ………. ..............15, 16, 58, 68

*United States v. Arnaout*, 431 F.3d 994 (7th Cir. 2005) ………...................................................45

*United States v. Arnaout*, 282 F.Supp.2d 838 (N.D. Ill. 2003). ………......................................45

*United States v. Parker,* 554 F.3d 230 (2d Cir. 2009) ………...................................................63

**Other Authorities**

18 U.S.C. § 1.............................................................................................................................15

18 U.S.C. § 2331(1) ..........................................................................................................16, 66, 67

18 U.S.C. § 2331(1)(A)-(C)………….....................................................................................66

18 U.S.C. § 2333(a) ……… .....................................................................................8, 65, 68, 69

18 U.S.C. § 2333(d)(1)……… ...................................................................................................9

18 U.S.C. § 2333(d)(2) ……… .............................................................................................8, 15

18 U.S.C. § 2339A...................................................................................................................67

18 U.S.C. § 2339B...................................................................................................................67

Fed. R. Civ. P. 4(h)..................................................................................................................72

Fed. R. Civ. P. 4(m) ................................................................................................72

Fed. R. Civ. P. 12(b)(5) ........................................................................................2, 72

Fed. R. Civ. P. 12(b)(6) ...........................................................................................2

Fed. R. Civ. P. 56(a) ................................................................................................6

Fed. R. Evid. 602………………………………………………………………...40

Fed. R. Evid. 801……………………………………………………….………..40

Fed. R. Evid. 802 ...............................................................................................40,46

Fed. R. Evid. 803(8)................................................................................................52

Local Civil Rule of United States District Courts for the Southern and Eastern Districts of New York 56.1…………………………………………………………………………….8

Pub. L. 103-322, tit. XII, § 120005(a); Pub. L. 104-132, tit. III, § 303(a). .................................67

Pub. L. No. 114-222, §2(b), 130 Stat. 852 (2016) .......................................................8, 10

Restatement (Third) of Torts: Liability for Economic Harm § 27 (Am. L. Inst. 2020)…………64

**INTRODUCTION**

After two decades of litigation and years of discovery, Plaintiffs cannot proffer any reliable evidence that the World Assembly of Muslim Youth and World Assembly of Youth International, ("WAMY"), provided any material support to al Qaeda, directly or indirectly, as a principal, aider or abettor, or co-conspirator. Even viewed in a light most favorable to Plaintiffs, the evidence does not show WAMY had anything to do with the horrific events on September 11, 2001, or al Qaeda's terrorist acts. It is now time to bring this litigation with respect to WAMY to an end.

Plaintiffs' case against WAMY lacks factual support and is based on self-serving speculation and conjecture. Plaintiffs deliberately use buzzwords like  "radical," "jihad," "training camps," and "madrassas," to support their misleading and outrageous claim that WAMY is an al Qaeda front.  Nothing could be further from the truth. These buzz words do not remedy the dearth of reliable evidence that WAMY provided any assistance to al Qaeda, much less the 9/11 attacks. Discovery confirms that the charitable entities and persons WAMY assisted were themselves not connected to al Qaeda or, if there were any arguable connections, WAMY was not aware of them at the time the assistance was provided.

Plaintiffs and their experts have had the opportunity to review WAMY's hundreds of thousands of pages of financial records. No expert has identified a single admissible document that demonstrates WAMY materially supported, aided and abetted, or conspired with al Qaeda or its intermediaries and associates to engage in violent act or acts dangerous to human life that led to the 9/11 attacks.

The terrorist attacks of September 11 were horrific acts that caused grievous suffering and harm to Plaintiffs especially and the entire nation. Those responsible—al Qaeda—should be held

accountable. However, it is fundamentally unjust to impose liability on WAMY when it was not involved, directly or indirectly, in bringing about this tragedy. Because there is no genuine issue of material fact demonstrating that WAMY is liable as a principal, aider and abettor, or coconspirator with al Qaeda in bringing about the September 11 attacks, the Court should grant WAMY's motion for summary judgment in its entirety.

## PROCEDURAL HISTORY

Plaintiffs' complaints together alleged fifteen causes of action against WAMY.[2] As the Court summarized the claims:

> The complaints assert federal causes of action under the Anti–Terrorism Act ("ATA"), 18 U.S.C. § 2333, the Alien Tort Statute, 28 U.S.C. § 1350, the Torture Victim Protection Act, 28 U.S.C. § 1350 note (a)(1), and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962. Among the state law claims pled are causes of action for wrongful death and survival, assault and battery, intentional and negligent infliction of emotional harm, trespass, destruction of property, and negligence.

*In re Terrorists Attacks on Sept. 11, 2001*, 740 F. Supp. 2d 494, 513 (S.D.N.Y. 2010), *aff'd sub nom. In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118 (2d Cir. 2013).

On November 1, 2005, WAMY moved to dismiss the MDL complaints pursuant to Fed. R. Civ. P. 12(b)(6) and moved to dismiss the Burnett complaints for insufficient service under Fed.

---

[2] The eight complaints that included WAMY as a defendant are: Kathleen Ashton, et al. v. AI Qaeda Islamic Army, et al., Case No. 02 Civ. 6977; Thomas Burnett, Sr., et al. v. AI Baraka Inv. & Dev. Corp., et al., Case No. 03 Civ. 9849; Federal Insurance Co., et al. v. AI Qaida, et al., Case No. 03 Civ. 6978; Estate of John P. 0 'Neill, Sr., et al. v. AI Baraka., et al., Case No. 04 Civ. 1923; Continental Casualty Co., et al. v. AI Qaeda, et al., Case No. 04 Civ. 5970; Euro Brokers Inc., et al., v. AI Baraka, et al., Case No. 04 Civ. 7279; WTC Properties LLC, et al. v. AI Baraka, et al., Case No. 04 Civ. 7280; New York Marine and General Insurance Company v. Al Qaida, et al., Case No. 04 Civ. 6105. All of these complaints are active except New York Marine and General Insurance Company v. Al Qaida, et al., Case No. 04 Civ. 6105; and WTC Properties LLC, et al. v. AI Baraka, et al., Case No. 04 Civ. 7280. The remaining six complaints alleged the following fifteen causes of action against WAMY: Anti-Terrorism Act (ATA); Alien Tort Statute (ATS); Torture Victims Protection Act (TCPA); Racketeer Influenced and Corrupt Organizations Act (RICO); Assault and Battery; Survival; Negligent Infliction of Emotional Distress; Intentional Infliction of Emotional Distress; Conspiracy; Aiding and Abetting; Negligence; Property Damage and Trespass; Punitive Damages; Violation of International Law; and Wrongful Death.

R. Civ. P. 12(b)(5). This Court granted WAMY's motion in part dismissing Plaintiffs' claims under the Alien Tort Statute, 28 U.S.C. § 1350, the Torture Victim Protection Act, 28 U.S.C. § 1350 note 9(a)(1), and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962.[3] The Court also dismissed the state law claims for punitive damages, conspiracy, aiding and abetting, and negligence.[4] Plaintiffs amended their respective complaints following enactment of the Justice Against Sponsors of Terrorism Act ("JASTA") to add claims of aiding and abetting and conspiracy. Therefore, the remaining claims against WAMY are direct liability under the Anti-Terrorism Act ("ATA") ; aiding and abetting and conspiracy claims under JASTA; and the state law claims of battery, survival, property damage / trespass, and wrongful death.

Importantly, as part of its 2010 Order, this Court also rejected the plaintiffs' "global terrorist network" theory of liability as an attempt to "impermissibly … broaden the scope of liability to include those who allegedly aided, abetted, conspired and/or provided material support to other terrorist organizations that were affiliated with al Qaeda."[5] The Court limited a defendant's liability "to their alleged intentional sponsorship of al Qaeda in furtherance of international terrorism, of which the 9/11 attacks were a foreseeable consequence. It is the alleged intentional provision of material support to sponsor al Qaeda's acts of international terrorism that forms the basis upon which the defendants are accused of having acted in concert, aided and abetted, or conspired with the Osama bin Laden, al Qaeda and the 9/11 hijackers."[6]

---

[3] *In Re Terrorists Attacks*, 740 F.Supp.2d at 513-15.
[4] *Id* at 514 n. 6. The causes of action for intentional infliction of emotional distress and battery, plead in the *Federal* complaint were also dismissed as time barred. Id.
[5] *Id. at* 513.
[6] *Id.*

As to plaintiffs' claims against WAMY under the ATA, at the motion to dismiss stage, this Court found that "mens rea and causation elements are sufficiently pled against both WAMY and WAMY-Int'l" as:

Plaintiffs allege that, for more than a decade, WAMY has knowingly and intentionally used its international infrastructure as a tool to provide support to al Qaeda. Plaintiffs allege that WAMY disseminates literature worldwide calculated to promote global jihadist agenda, convince young Muslims to reject United States and democratic ideas, demonize Christians, Jews and non-Wahhabi Muslims, and convince young Muslims to engage in violent jihad against the West and Israel. WAMY allegedly uses its publications, youth camps, Islamic Centers, mosques conferences and other sponsored events, to provide ideological foundation for the al Qaeda movement, actively advocating for young Muslims to take up arms and engage in a violent jihad against the United States. Plaintiffs allege that WAMY has also supported the militant and terrorist activities of al Qaeda in Bosnia, Chechnya, Kosova, Kashmir, Pakistan, South East Asia, the United States, and elsewhere. Acting on behalf of al Qaeda, WAMY has allegedly raised and laundered funds, performed reconnaissance missions, funded and facilitated al Qaeda training camps, and operated as a recruiting center.

Plaintiffs allege that WAMY had a physical presence in the United States, which it used to channel material support to al Qaeda. In 1992, Osama bin Laden's nephew allegedly established, in Virginia, the United States branch of WAMY, defendant World Assembly of Muslim Youth International ('WAMY-Int'l'). Plaintiffs further allege that, in 2002, federal authorities raided the offices of WAMY-Int'l in Virginia, in connection with an ongoing investigation into the sponsoring of al Qaeda.

Id. at 519.

The parties engaged in discovery spanning over fourteen years. Discovery included the exchange of millions of pages of documents, declarations from fact witnesses, expert reports, and the taking of depositions of fact and expert witnesses. WAMY alone produced more than 1.2 million pages of relevant documents. Following Defendants' *Daubert* motions, this court issued two rulings (2023 and 2025) significantly limiting Plaintiffs' experts' testimony. In her April 27, 2023 Opinion and Order (ECF No. 9060), Magistrate Judge Sarah Netburn limited the testimony of Jonathan Winer as "[h]e had no experience in religion, so his opinions on 'Salafism' and

4

Wahhabism' are excluded"[7] and therefore he is "unqualified to opine on Islam,"[8] nor could he testify on "United Nations sanctions under Resolution 1267."[9]  Additionally, Winer may not speculate about the existence of additional documents or their contents;[10] testify about personal spending habits among the Saudi royal family;[11] draw legal conclusions about Defendants' material support or liability;[12] opine on the intent of individuals, organizations, or cultures;[13]or testify to opinions that consist only of quotes from a single hearsay source.[14]

The Court also largely rejected Plaintiffs' challenge to WAMY's forensic accounting expert, Jonathan Marks.  Finding that Marks possessed certifications in "financial forensics, information technology, chartered global, and fraud examination" and having conducted "multiple Foreign Corrupt Practice Acts investigations" along with a long line of other experiences, Judge Netburn found Marks qualified as an  expert.[15]  Marks can therefore testify about "WAMY's financial records for signs of diversion," "financial information and potential signs of fraud," whether company practices "are not consistent with terrorist financing," or that "in his review of the financial documents, he did not find any suspect transactions or signs that would be consistent with fraud or misappropriation."[16]

---

[7] ECF 9060 at 18.

[8] ECF 9060 at 24.

[9] Id.

[10] Id at 20 ("It is the role of an expert to apply his methodology to the facts of the case, not to imagine new ones").

[11] Id. ("The Court therefore prohibits any detours into the lifestyles of the rich and famous").

[12] Id. at 21 ("Winer crosses that line on several occasions. He concludes that Defendants provided "material support" to al Qaeda, and that the conduct of individuals is attributable to Defendant organizations.").

[13] Id.  ("And, in a disturbing turn, it alleges that "people and institutions" in the Middle East often "inten[d] to avoid direct conflict with the West through duplicity, or engaging in a double game." [] An expert cannot speak to the state of mind of an individual or a corporation, let alone that of a whole region. To do so while trafficking in stereotypes is "'self-evidently improper and prejudicial'").

[14] Id. at 23 ("Winer cannot testify to the portions of his opinion that consist of extended quotes from a single hearsay source without any analysis").

[15] Id. at 32-33.

[16] Id at 33-35

Judge Netburn's August 18, 2025, Opinion and Order ruled on a second round of *Daubert* filings. In this Order, the Court struck nearly all of Plaintiffs' purported terrorism expert Evan Kohlmann's testimony, limiting him to "discuss the origins, history, structure, and leadership of al Qaeda, as well as the organizational structures of the Charity Defendants."[17] Further, because of significant shortcomings in his qualifications and reliability, Judge Netburn recommended that the trial court "evaluate whether Kohlmann should be permitted to testify at all" or whether it should instead rely on "other experts" where they are "more reliable."[18] The Court also precluded Matthew Levitt's, Plaintiffs' al-Qaeda expert, from testifying about WAMY altogether.[19]

On March 18, 2026, the Honorable George B. Daniels, United States District Court Judge for the Southern District of New York, overruled both Plaintiffs' and Defendants' objections to Judge Netburn's *Daubert* orders, and adopted Judge Netburn's April 27, 2023, Opinion and Order and the August 18, 2025, Opinion and Order in their entirety.[20]

This court at the motion to dismiss stage did not have the ability to review the evidence to support Plaintiffs' claims. WAMY will demonstrate in this memorandum that Plaintiffs cannot provide any admissible evidence to support their claims; claims which are misleading at best and scurrilously false at worst. WAMY therefore asks that the Court grants its motion for summary judgement.

**ARGUMENT**

*I. Summary Judgment Standards*

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is

---

[17] ECF No. 11157 at 33
[18] *Id.* at 33.
[19] Id. at 38.
[20] ECF No. 11880.

entitled to judgment as a matter of law."[21]  A motion for summary judgment should be granted when, after considering the evidence in the light most favorable to the nonmoving party, the court determines that no rational jury could find in its favor.[22] When the non-moving party bears the burden of proof at trial, the party moving for summary judgment meets its burden when it shows that the evidentiary materials of record, reduced to admissible evidence, are insufficient to carry the non-moving party's burden of proof at trial.[23]

Once the moving party meets its burden, the nonmoving party "'must do more than simply show that there is some metaphysical doubt as to the material facts….[T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'"[24]  The Court need not accept Plaintiffs' characterization of any evidence.[25] "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."[26] "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[27] "Thus, 'a scintilla of evidence in support of the plaintiff's position will be insufficient [to defeat a motion for summary judgment].'"[28]

"[T]he substantive law…identif[ies] which facts are material," and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry

---

[21] Fed. R. Civ. P. 56(a).
[22] *Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 476 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).
[23] *Houser v. Norfolk Southern Railway Co.,* 264 F.Supp. 3d 470, 474 (W.D. N.Y. 2017).
[24] *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec.,* 475 U.S. at 586-87, 106 S.Ct. 1348) (emphasis in original).
[25] See, e.g., *Chirag v. MT Marida Marguerite Schiffahrts*, 604 F. App'x 16, 19 n.2 (2d Cir. 2015) (declining Plaintiffs' characterization of proffered document).
[26] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L.Ed. 2d 202 (1986) (emphasis in original).
[27] *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal quotations omitted).
[28] *Krist v. Beth Israel Medical Center,* 2021 WL 4442943 at * 4 (S.D.N.Y. 2021) (citing *Anderson*, 477 U.S. at 252).

of summary judgment."[29]   Local Civil R. 56.1 (d) requires that each statement of fact must be followed by citation to evidence which would be admissible.[30] A nonmoving party "may not rely on mere speculation or conjecture as to the true nature of facts to overcome a motion for summary judgment."[31] Rather, the nonmoving party must produce admissible evidence that supports its pleadings.[32] In particular, "[a]n expert's opinions that are without factual basis and are based on speculation or conjecture are…inappropriate material for consideration on a motion for summary judgment."[33]

## II.    *Federal Claims Against WAMY*

### A.  Plaintiffs' Claims under the Anti-Terrorism Act and the Justice Against Sponsors of Terrorism Act: Generally

All plaintiffs bring claims against WAMY under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, and claims under the ATA as amended by the Justice Against Sponsors of Terrorism Act, ("JASTA").[34] The ATA provides that "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue thereof in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees."[35] Congress amended the ATA in 2016 allowing secondary liability for an act of international terrorism under JASTA.[36]  JASTA provides:

---

[29] *Anderson,* 477 U.S. at 248.

[30] Local Civil Rule of United States District Courts for the Southern and Eastern Districts of New York 56.1.

[31] *Lipton v. Nature Co.,* 71 F.3d 464, 469 (2d Cir. 1995) (citations and internal quotations omitted); *Hicks v. Baines,* 593 F.3d 159, 166 (2d Cir. 2010).

[32] *See First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 289–90, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

[33] *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 311 (2d Cir. 2008).

[34] Id § 2333(d)(2).

[35] 18 U.S.C. § 2333(a) (2025).

[36] *See* Pub. L. No. 114-222, 130 Stat. 852 (2016); *Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420, 435 (2d Cir. 2025); *Fraenkel v. Standard Chartered Bank,* 2025 WL 2773251 at * 6 (S.D.N.Y. September 26, 2025).

> In an action under subsection (a) for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism.[37]

JASTA incorporates the definition of "person" under 1 U.S.C. § 1 which includes "…companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals."[38]

"Thus, as the law now stands, those injured by an act of international terrorism can sue the relevant terrorists directly under § 2333(a)––or they can sue anyone 'who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism' under § 2333(d)(2)."[39] Secondary-liability claims have the additional condition that the "'act of international terrorism' must have been 'committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization ["FTO"] under [8 U.S.C. § 1189] as of the date on which such act of international terrorism was committed, planned, or authorized.'"[40]

Under JASTA, aiding-and-abetting liability is available only where: (1) the Plaintiffs' injuries arise from an act of international terrorism "committed, planned, or authorized by an organization that had been designated as an [FTO]," and (2) the defendant "aids and abets, by knowingly providing substantial assistance"[41]

---

[37] 18 U.S.C. § 2333(d)(2) (2025); 1 U.S.C. §1.
[38] 18 U.S.C. § 2333(d)(1) (2025).
[39] *Twitter Inc. v. Taamneh,* 598 U.S. 471, 483, 143 S.Ct. 1206, 215 L.Ed.2d 444 (2023).
[40] *Twitter,* 598 U.S. at 484 (citing 18 U.S.C. § 2333(d)(2)).
[41] 18 U.S.C. § 2333(d)(2).

**B. JASTA: Aiding and Abetting**

In enacting JASTA, Congress directed that the D.C. Circuit Court's framework in *Halberstam v. Welch,* 705 F.2d 472 (D.C. Cir. 1983) was the proper means by which to assess aiding-and-abetting liability for ATA claims.[42] The *Halberstam* framework has three elements:  (1) "the party whom the defendant aids must perform a wrongful act that causes an injury;" (2) "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance;" and (3) "the defendant must knowingly and substantially assist the principal violation."[43]Six *Halberstam* factors are relevant to whether a defendant's assistance qualifies as "substantial": "1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of the defendant's assistance."[44] The point of the six *Halberstam* factors "is to help courts capture the essence of aiding and abetting: participation in another's wrongdoing that is both significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor."[45]

In *Twitter v. Taamneh*, the United States Supreme Court examined the phrase "aids and abets, by knowingly providing substantial assistance" as used in JASTA.[46] The Court noted that these critical terms are not defined in the statute.[47] Acknowledging Congress' direction that *Halberstam* provided the "proper legal framework" for "civil aiding and abetting and conspiracy liability," the

---

[42] JASTA, Pub. L. No. 114-22, §2(b), 130 Stat. 852; *Ashley v. Deutsch Bank Aktiengesellschaft,* 144 F.4th 420, 425 (2d Cir. 2025).

[43] *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018) (citing *Halberstam v. Welch*, 705 F.2d 472, 487 (D.C. Cir. 1983)) ; see also *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 494 (2d Cir. 2021).

[44] *Ashley,* 144 F. 4th at 435-36; *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 856 (2d Cir. 2021)

[45] *Twitter,* 598 U.S.. at 504.

[46] *Twitter,* 598 U.S. at 484.

[47] *Id.*

Supreme Court viewed this "legal framework" "in the context of the common law tradition from which it arose."[48]

*Halberstam's* "basic thrust", the Supreme Court found, rested on the common-law of aiding and abetting, "to which JASTA's common-law terminology points."[49] The basic view of aiding-and-abetting liability, is that "a person may be responsible for a crime he has not personally carried out if he helps another to complete its commission."[50] "Importantly, the concept of 'helping' in the commission of a crime–or a tort–has never been boundless. That is because, if it were, aiding-and-abetting liability could sweep in innocent bystanders as well as those who gave only tangential assistance."[51] In setting boundaries on aiding-and-abetting liability, the Supreme Court recognized that "both criminal and tort law typically sanction only 'wrongful conduct,' bad acts, and misfeasance."[52] The Supreme Court expressly reserved aiding and abetting liability to "cases of truly culpable conduct."[53] To aid and abet an act of international terrorism, as this Court found, "requires more than the provision of material support to a designated terrorist *organization.* Aiding and abetting requires the secondary actor be 'aware' that, by assisting the principal, it is itself assuming a 'role' in terrorist activity."[54]

The twin requirements of knowing and substantial assistance to the primary tortfeasor work in tandem, "with a lesser showing of one demanding a greater showing of the other."[55] Courts move

---

[48] *Twitter,* 598 U.S. at 485.

[49] *Id.* at 488.

[50] *Id* (citing *Rosemond v. United States,* 572 U.S. 65, 70, 134 S.Ct. 1240, 188 L.Ed.2d 248 (2014)).

[51] *Id.*

[52] *Id.* at 489 (citation omitted).

[53] *Id.*

[54] *In re Terrorist Attacks on September 11, 2001,* 2023 WL 2430381 at * 11 (S.D.N.Y. March 9, 2023) (citations omitted, emphasis in original).

[55] *Twitter,* 598 U.S. at 491-92.

back and forth between these guideposts "to ensure that liability fell only on those who had abetted the underlying tort through conscious, 'culpable conduct.'"[56]

As to the question, what precisely must a defendant aid and abet to be liable under JASTA, the Supreme Court concluded:

> …a defendant must have aided and abetted (by knowingly providing substantial assistance) another person in the commission of the actionable wrong–here, an act of international terrorism.[57]

With respect to the 9/11 attacks specifically, this Court held that to establish nexus, a defendant's "support of al Qaeda must have a 'reasonable…temporal, geographical or causal connection, or proximity to the 9/11 attacks."[58] While "a close nexus between the assistance and the tort might help establish that the defendant aided and abetted the tort, …even more remote support can still constitute aiding and abetting in the right case."[59] The absence of a "definable nexus between the defendants' assistance" and the terrorist attack that injured the plaintiffs, however, "drastically increases [the plaintiffs'] burden to show that defendants somehow consciously and culpably assisted the attack."[60] "When there is a direct nexus between the defendant's acts and the tort, courts may more easily infer such culpable assistance. But, the more attenuated the nexus, the more courts should demand that plaintiffs show culpable participation through intentional aid that substantially furthered the tort. And, if a plaintiff's theory would hold a defendant liable for all the torts of an enterprise, then a showing of pervasive and systemic aid is required to ensure that defendants actually aided and abetted each tort of that enterprise."[61]

---

[56] *Id.* at 492 (citing *Camp v. Dema,* 948 F.2d 455, 460 (8th Cir. 1991)).

[57] *Twitter*, 598 U.S. at 495.

[58] *In re Terrorist Attacks on September 11, 2001,* 2023 WL 2430381 at * 11 (S.D.N.Y. March 9, 2023) (citing *In re Terrorist Attacks on September 11, 2001,* 718 F.Supp. 2d 456, 482 (S.D.N.Y. 2010).

[59] *Twitter*, 598 U.S. at 496.

[60] *Troell v. Binance Holdings Ltd.*, No. 24-CV-7136 (JAV), 2026 WL 636849, at *13 (S.D.N.Y. Mar. 6, 2026) (citing *Twitter,* 598 U.S. at 503.

[61] *Twitter,* 598 U.S. at 506.

The *Twitter* plaintiffs, surviving families of an ISIS terrorist attack, claimed that the company then known as Twitter, along with Facebook and Google, each aided and abetted ISIS by failing to stop it from using their respective platforms "to recruit new terrorists and to raise funds for terrorism," despite knowing ISIS was using their platform.[62] Plaintiffs' claims did not show the knowing and substantial assistance required to establish aiding-and-abetting liability, the Supreme Court concluded, as while defendants failed to stop ISIS from using their platforms, they did not give ISIS "special treatment," "words of encouragement," or "selected or took any action at all with respect to ISIS' content (except, perhaps blocking some of it)."[63]

The Supreme Court also found that plaintiffs' claims fell short "[g]iven the lack of any concrete nexus between defendants' services and [the attack]…."[64] Where defendants did not systemically and pervasively assist ISIS, defendants could not aid and abet every single ISIS attack.[65] While "pervasive, systemic, and culpable assistance to a series of terrorist activities could be described as aiding and abetting each terrorist act," the *Twitter* defendants' alleged conduct was not of that type.[66]

The lack of general awareness and knowing and substantial assistance between the *Twitter* defendants and ISIS can be contrasted with that existent between the co-defendant Hamilton and her live-in boyfriend and co-defendant Welch in *Halberstam.* Hamilton was intimately involved in Welch's residential burglary enterprise, including helping him turn stolen goods into wealth, and therefore was liable as an aider and abettor for Welch's murder of Halberstam during a residential burglary "which was a foreseeable result of such crimes."[67] An aider-and-abettor may

---

[62] *Id* at 478.
[63] *Id* at 498.
[64] *Id.* at 501.
[65] *Id.*
[66] *Id* at 502.
[67] *Id.* at 487 (citing *Halberstam*, 705 F.2d at 488-89).

be liable for every wrongful act committed by an illicit enterprise but only if the secondary defendant's role in the illicit enterprise is so systemic that the secondary defendant aids and abets every wrongful act committed by the principal as –as in *Halberstam* itself.[68]

The Second Circuit summarized JASTA's requirements post-*Twitter* in *Ashley v. Deutsche Bank*.[69] The first requirement for aiding-and-abetting liability under JASTA, that the party whom the defendant aids must perform a wrongful act that causes an injury, is met where his relevant substantial assistance was given to an intermediary "so long as the defendant's acts aided and abetted the principal."[70]

With respect to the second requirement, that a defendant must be "generally aware of his role as part of an overall illegal or tortious activity at the time he provides the assistance[,]" the Second Circuit explained "although a defendant need not be aware of its role in the specific terrorist attack that caused the plaintiff's injury, it must be generally aware of its role in some illegal activity from which the terrorist attack was foreseeable."[71]

As to the final requirement for aiding-and-abetting liability under JASTA "that the defendant provides knowing and substantial assistance," "the defendant's knowing assistance is 'designed to capture the defendants' state of mind with respect to their actions and the tortious conduct.'"[72] While "the defendant must aid and abet 'the act of international terrorism that injured the plaintiffs," this "does not always demand a strict nexus between the alleged assistance and the terrorist act."[73]    However, "it is not enough to say that the defendant assisted the terrorist

---

[68] *Twitter,* 598 U.S. at 496..
[69] *Fraenkel v. Standard Chartered Bank,* 2025 WL 2773251 at * 8 (S.D.N.Y. September 26, 2025).
[70] *Ashley,* 144 F.4th at 437.
[71] *Id.* at 438.
[72] *Ashley,* 144 F.4th at 438 (citing *Twitter,* 598 U.S. at 504).
[73] *Ashley,* 144 F.4th at 438-39 (citing *Twitter,* 598 U.S. at 497).

organization's activities in general."[74] 'There must be a "discernable nexus between the [assistance] and the attacks committed against Plaintiffs."[75] Though a defendant need not always know all the particulars of the primary actor's plan or even the particular terrorist act, a close nexus between the assistance and the tort might help establish that the defendant aided and abetted the tort.[76]

Plaintiffs' claim that WAMY is liable for aiding and abetting al Qaeda in the 9/11 attacks lacks evidentiary support and fails to clear all three JASTA hurdles.

### 1   WAMY did not provide aid to al Qaeda directly or through any intermediary.

The first  element has "multiple parts."[77] "The person the defendant is alleged to have aided is the principal; the principal itself must have performed a wrongful act; and the principal's act must have caused an injury."[78] "For an ATA aiding-and-abetting claim, JASTA identifies the principal as an organization that had been designated as a foreign terrorist organization, 18 U.S.C. § 2333(d)(2).[79] The first element "is satisfied  when the party whom the defendant directly or indirectly aided performed the injury-causing act."[80] Even where the alleged substantial assistance was given to an intermediary, the defendant's acts must still aid and abet the principal.[81]

As to the intermediary, Plaintiff need only show that the act of terrorism caused plaintiff's injury, not that the act of the aider and abettor did so.[82]  A plaintiff will not have to prove that a

---

[74] *Id*. at 444, (citations and internal quotations omitted).
[75] *Id.*
[76] *Ashley,* 144 F.4th at 439 (internal citations and quotations omitted and cleaned up).
[77] *Honickman*, 6 F.4th at 495-96; *Weiss v. National Westminster Bank*, 993 F.3d 144, 164 (2d Cir. 2021]
[78] *Weiss v.* 993 F.3d  at 164 (citing to *Halberstam*, 705 F.2d at 484).
[79] *Id*. (internal quotations omitted).
[80] *Honickman,* 6 F.4th at 495.
[81] Id at 495-96.
[82] *Linde*, 882 F.3d at 331.

defendant's own acts constituted international terrorism satisfying all the definitional requirements of § 2331(1), only that of the primary actor.[83]

There is no dispute that al-Qaeda, a designated FTO, perpetrated the terrorist attacks of September 11, 2001. WAMY was never designated and cannot be a principal as a matter of law. Neither is WAMY liable as an accomplice for the 9/11 attacks as there is no reliable evidence that WAMY engaged in wrongful acts or provided any aid to al Qaeda directly or through any intermediary.[84] In other words, while al Qaeda performed the injury causing act, WAMY did not aid al Qaeda.

Over 15 years ago, this Court found that plaintiffs' allegations against WAMY as pled were "sufficient to demonstrate that they are knowingly and intentionally providing material support to al Qaeda."[85] The allegations that WAMY provided aid to al Qaeda fell into the following categories: 1) WAMY raised and laundered funds for al Qaeda, 2) WAMY performed reconnaissance missions, funded and facilitated al Qaeda training camps, and operated as a recruiting center for al Qaeda, 3) WAMY disseminated literature and publications calculated to promote al Qaeda's "global jihadist agenda" convincing young Muslims to engage in "violent jihad" against the West and Israel, 4) WAMY used its youth camps and the like to provide the ideological foundation for the al Qaeda movement, actively advocating for young Muslims to take up arms and engage in "violent jihad" against the United States, and 5) WAMY supported the militant and terrorist activities of al Qaeda in Bosnia, Chechnya, Kosova, Kashmir, Pakistan, South East Asia, the United States and elsewhere.[86]

---

[83] *Id.* at 328; *Weiss*, 993 F.3d at 164.
[84] *Ashley,* 144 F.4th at 437; *Twitter,* 598 U.S. at 489, 492.
[85] *In Re Terrorist Attacks on September 11, 2001,* 740 F.Supp.2d at 519-20.
[86] *Id.*

16

Over a decade and a half of discovery including the production of millions of pages of documents and the depositions of scores of witnesses proves these allegations to be unfounded and without any reliable factual support. Unlike a bank or social media company that provided some aid to an FTO, WAMY did not engage in any wrongful act or provided any aid to the principal who committed the 9/11 attacks, al Qaeda, directly or indirectly.

a.   *WAMY did not raise or launder funds for al Qaeda.*

WAMY was established by royal decree to guide Muslim youth toward constructive societal engagement through education, social development, and charitable work. (SOF ¶¶1–6, 12-15, 20, 150-154). Its founding objectives—religious education, humanitarian relief, schools, institutions, and youth camps—promote civic engagement and personal development while preventing extremism, directly countering al Qaeda's ideology. (SOF ¶¶12–15, 150-154).

There is no evidence that WAMY provided financial aid to al Qaeda directly or through any intermediary. WAMY's financial operations were subject to rigorous, multi-layered oversight. Projects were vetted, reviewed by WAMY's Secretariat, and only funded after verification of legitimacy. (SOF ¶¶117–149). Funding was project-specific and monitored, including requests to donors, budget approvals, bank transfers, expense tracking, monthly and final reports, photographs verifying project completion, and field visits where appropriate. (SOF ¶¶121–149). WAMY funds were allocated to approved humanitarian, educational, and charitable projects, often in coordination with recognized international organizations such as United Nations High Commission for Refugees ("UNHCR"), World Health Organization ("WHO"), the United Nations Children's Fund ("UNICEF"), and other state-run initiatives. (SOF ¶¶ 151–154, 210-212, 215-231).

17

WAMY requires detailed project proposals, budgets, and legitimacy verification before any funds are disbursed. (SOF ¶¶123–127, 132). WAMY maintains project-specific funding to organizations or individuals with oversight on how the funds are spent. (SOF ¶¶128–130). It monitors the use of funds throughout the project, requiring progress and final reports, photographs, and donor verification. (SOF ¶¶130–134, 137). It imposes disciplinary measures against staff who do not follow its rules and reporting requirements, two examples of which are the termination and removal of Adel Batterjee, a board member of a WAMY affiliated charity Lajnat Al-Bir Al-Islamiya ("LBI"), and Mohamed Al Khatib, the director of WAMY's Canadian office. (SOF ¶¶163-164, 168-175, 325-341). It engages external auditors, when necessary, works to improve a centralized IT system, and conducts multi-level internal reviews to ensure transparency and accountability. (SOF ¶¶134–137, 139-149). Completely inconsistent with a "shadowy da'wah organization" that provided support to al Qaeda, in 2000 WAMY actively encouraged employees to enroll in courses with the National Commercial Bank to educate themselves on topics such as anti-fraud and money maundering, detecting forgery and counterfeiting, supervisory skills, and more. (SOF ¶149). These features are wholly incompatible with covert or unlawful financial activity.

Expert analysis confirms the lack of evidence that WAMY raised or laundered funds for al Qaeda. Forensic accountant Jonathan Marks and his team at the international accounting and financial services firm Baker Tilly reviewed hundreds of thousands of pages of WAMY financial records. (SOF ¶¶ 547-550). Marks and his team looked for evidence in the financial records of financial mismanagement or misconduct; red flags indicative of WAMY funding terrorist activities. (SOF ¶ 549) Marks found no such evidence. (SOF ¶¶ 551-568).

Marks analyzed extensive WAMY financial documentation—including audit reports, bank records, and project materials—and found no evidence of financial mismanagement or diversion of funds to terrorism. (SOF ¶¶549–551, 565). Marks did not find evidence of any patterns of funding terrorism, neither hidden nor apparent. (SOF ¶ 564). Marks concluded that WAMY, as an organization, had financial controls, enforced mechanisms of financial controls, and took action against those who did not adhere to them; all of which are inconsistent with an organization providing support to terrorist groups which would seek to hide its illegal contributions. (SOF ¶¶ 565--568). Marks reviewed but not find any evidence of financial irregularities, including in WAMY's offices in Pakistan and Canada. (SOF ¶¶ 548-549, 555-559). Marks concluded WAMY's sources and uses if funds were sufficiently supported, spent for legitimate charitable activities, and not diverted to fund terrorist activities with 98.8% of projects fully documented and no pattern of misuse. (SOF ¶¶561–563). He specifically determined: "I did not observe any financial document indicating material support of terrorist activity, let alone the 9/11 attacks." (SOF ¶565). His findings are wholly inconsistent with and flatly refute plaintiffs' unfounded claims that WAMY raised funds for al Qaeda and laundered the FTO's money.

Regulatory and governmental findings further support the absence of evidence of any financial connection between WAMY and al Qaeda. WAMY has never been designated as a Specially Designated Global Terrorist ("SDGT"), or sanctioned by the Office of Foreign Assets Control ("OFAC") or any other U.S. authority. (SOF ¶¶465–478). Executive Order 13224, issued on September 23, 2001, authorizes designation under a broad and administratively lenient standard, yet no such designation has ever been made with respect to WAMY, and no WAMY assets have been blocked. (SOF ¶465–478). During a July 31, 2003, Senate Governmental Affairs Committee hearing, OFAC Director R. Richard Newcomb confirmed that, beyond never having been

19

sanctioned, OFAC never even recommended that WAMY be considered for designation. (SOF ¶¶473-477). This absence of designation is powerful evidence that WAMY did not provide any aid to al Qaeda nor engage in culpable or wrongful conduct giving rise to liability under JASTA.

The National Commission on Terrorist Attacks Upon the United States in the 9/11 Commission Report, ("9/11 Report"), did not include any finding that WAMY funded or supported al Qaeda. In fact, the 9/11 Report mentions WAMY only once, in a neutral context relating to Saudi charities and religious education, without linking it to terrorist activity. (SOF ¶¶483–485). While the 9/11 Commission examined al Qaeda's funding sources carefully based on an exhaustive and thorough investigation; neither WAMY nor any of its branches were found to be a source of aid to al Qaeda. (SOF ¶¶ 486-498,501-503, 521, 525)

U.S. intelligence reports also do not include reliable evidence that WAMY provided any aid to al Qaeda. The overall amount of CIA intelligence reports that discuss WAMY are few. A January 11, 1999, CIA report does not list WAMY among Saudi NGOs "with the strongest links" to Bin Laden, and in fact noted that alleged "ties" between WAMY and "Usama Bin Ladin" were questionable. (SOF ¶505). The report also incorrectly identified former WAMY Int'l director Abdullah Bin Laden as "Usama's half brother" and identified someone who never held any leadership position within WAMY as having a leadership position, Chairman, that never existed. (SOF ¶¶8-10, 292-293, 506-508). The January 11, 1999, CIA report does not include any facts or information that WAMY ever provided any financial or other support to al Qaeda, directly or indirectly. (SOF ¶ 509-511). Other CIA reports lump WAMY in generally with other Saudi NGOs that "appears to sponsor" training camps or as to which there are "concerns," without any evidentiary support, no basis to conclude it is reliable, and no specific facts as to WAMY indicating when and what it is alleged to have done. (SOF ¶¶512-515, 517, 522-524).

20

Similarly, a 2002 CIA report, mistakenly describing WAMY as a "subsidiary" of the Muslim World League, alleges recruitment for extremist groups but lacks reliable sourcing and instead references lawful activities such as publishing, building mosques, and providing education. (SOF ¶514-517). Such legitimate charitable and religious activities cannot be equated with terrorist support.  A CIA intelligence report from April 9, 1999, discusses the very small number of the thousands of Islamic NGOs and charities that support terrorists and, importantly, does not identify WAMY as a charity that has provided financial or other support to terrorists including "al Qaida" nor is any WAMY official named as an al Qaeda supporter. (SOF ¶¶522–524). Discussing large international NGOs based in Saudia Arabia or a Persian Gulf State in general, the report concludes "[t]errorist abuse of such NGOs takes place at the local branch office rather than at the organizations' headquarters. Senior NGO leaders usually are unwitting of the activity and willing to take corrective action when apprised of the abuse." (SOF ¶ 523).

Independent governmental and financial oversight likewise confirms WAMY's legitimacy. The Saudi Arabian Monetary Authority (SAMA), through senior official Mohammad Al-Juhani, attested in his declaration that WAMY's operations are well documented, that it has never been investigated or suspected of terrorism-related financial activity, and that it operates as a credible charitable organization. (SOF ¶¶516, 518-–520).

U.S. law enforcement investigations reinforce the same conclusion. The FBI's PENTTBOM investigation and subsequent Operation Encore—spanning nearly two decades and involving extensive review of financial records, communications, and witness interviews—identified no additional organizations or individuals responsible for supporting the attacks beyond those already known. (SOF ¶¶526–531). WAMY, its branches, officers, and employees were not identified as having provided support to al Qaeda or the hijackers. (SOF ¶530–531).

21

The record also establishes that Osama Bin Laden viewed Saudi Arabia and its affiliated institutions—including charities such as WAMY—as adversaries, not allies, in the years immediately before the 9/11 attacks. His writings reflect sustained hostility toward the Saudi government, including accusations that it froze his assets, restricted his activities, and opposed his efforts. (SOF ¶¶532–539, 545). He further criticized Saudi-aligned charitable organizations, such as WAMY, as government-controlled and untrustworthy, warning supporters not to route funds through such entities and instead directing them to alternative channels outside the Kingdom. (SOF ¶¶540–542). These statements directly contradict Plaintiffs' unsupported theory that WAMY served as a conduit for al Qaeda funding.

Plaintiffs' aiding-and-abetting claim against WAMY largely rests on the falsehood that a one-time WAMY affiliated charity, LBI, was the same organization as the Benevolence International Foundation ("BIF"). Plaintiffs' fundamentally incorrect theory is that BIF is part of WAMY/LBI, that BIF in turn provided assistance to al Qaeda, thereby causing Plaintiffs' injuries in the September 11 attacks.[87] The undisputed admissible evidence defeats every step of this theory. Plaintiffs cannot prove that WAMY's affiliate LBI is the same organization as BIF or that BIF was ever part of WAMY. Plaintiffs cannot prove that WAMY engaged in wrongful acts. Plaintiffs also cannot establish with admissible evidence that BIF supported al-Qaeda.

The record demonstrates that LBI was a humanitarian relief organization, founded by Adel Batterjee. (SOF ¶¶155-158), that WAMY assumed and maintained oversight over its activities in 1989, (SOF ¶¶59-165), that Adel Batterjee was removed from LBI in 1993 for violating LBI and WAMY's internal reporting policies, (SOF ¶¶168--174), that Adel Batterjee secretly created BIF without WAMY's knowledge and marketed it as related to LBI to deceive donors, (SOF ¶¶175-

---

[87] See e.g. Burnett Complaint at ¶ 229; O'Neill Complaint at ¶ 124.

182), and that WAMY promptly disavowed and distanced itself from Batterjee's BIF upon learning of its existence. (SOF ¶¶183-184). Ultimately, WAMY dissolved LBI entirely to prevent any confusion with Batterjee's unauthorized activities. (SOF ¶¶187-197). Plaintiffs' theory collapses under the weight of the undisputed facts.

Adel Batterjee and two others founded LBI in 1987 to provide humanitarian assistance to Afghan refugees displaced during the Soviet-Afghan war. (SOF ¶¶155-15158). In 1989, at Batterjee's request, WAMY agreed to engage in humanitarian relief efforts through LBI. (SOF ¶160). Because LBI lacked the ability to raise funds or operate formally in Saudi Arabia, WAMY agreed that LBI would operate under WAMY's auspices while remaining an independent entity. (SOF¶¶159, 162-163). This arrangement included formal governance safeguards designed to ensure accountability. First, LBI was required to follow WAMY's project-based funding protocols and operational guidelines. (SOF ¶¶163-164). Second, LBI was required to provide reports to an appointed supervisory board responsible for reviewing its activities and financial reporting. (SOF ¶164-165). The Saudi-based supervisory board was established to monitor LBI's humanitarian work and ensure compliance with reporting requirements. (SOF ¶¶163-165).

The LBI operational board, headed by Adel Batterjee, was responsible for implementing humanitarian programs. (SOF ¶162). While Adel Batterjee held a leadership role in LBI for a time, he never held any executive or leadership position within WAMY. (SOF ¶166).

LBI's operations included operating the Abu Hanifa School in Pakistan which provided education for refugee children, and running the Chamkani District Hospital, which delivered medical services to displaced populations lacking access to healthcare. (SOF ¶¶28-45, 138, 157, 162). LBI also conducted refugee welfare programs, agricultural development projects, and other

23

humanitarian relief initiatives. (SOF ¶¶155-157). These activities are wholly inconsistent with any allegation of terrorist support.

Beginning in 1992, Batterjee stopped providing required project reports and failed to account for expenditures to the Supervisory Board. (SOF ¶¶168-170). He also conducted unauthorized projects and raised funds in public spaces outside approved channels and mismanaged funds without WAMYs' knowledge. (SOF ¶169-170).

As a result, WAMY suspended LBI's fundraising activities for three months and established a committee to review the accounting issues. (SOF ¶¶168-171). When the violations continued, the supervisory board took decisive action. Following a January 1993 board meeting, Batterjee was removed from LBI in early 1993. (SOF ¶172-173). Upon his removal, Batterjee relinquished all LBI assets, property deeds, and endowments. (SOF ¶174). Dr. Hassan Bahafzallah was appointed to replace him as executive director. (SOF ¶173). These actions demonstrate prompt and appropriate corrective measures.

The contemporaneous documentary record confirms the reasons for WAMY's action against Batterjee. In a May 1993 letter from WAMY's Secretary General, Dr. Al-Johani, to Prince Salman, the present King of Saudi Arabia, WAMY explained that Batterjee conducted unauthorized activities in Sudan and Bosnia and engaged in fundraising practices that raised concerns with Saudi authorities. (SOF ¶ 173). The letter informed the Prince of Adel Batterjee's dismissal from LBI. *Id*. The same letter addressed Adel Batterjee secret establishment of BIF and using a similar name in Arabic to LBI as well using the same logo as LBI's to confuse donors and the public. *Id.* The letter further confirmed that Batterjee no longer had any connection to LBI. *Id.*

This contemporaneous correspondence in 1993 confirms that, over eight years before the 9/11 attacks, WAMY took corrective action against those who abused its financial rules and reporting

24

requirements when it became aware of them. LBI, WAMY's affiliate, took action against Adel Batterjee for his failure to comply with the established protocol, related to transparency and documentation of operations. Furthermore, Batterjee's noncompliance does not itself establish that at that time he was involved in any wrongful act under JASTA or that WAMY and its affiliate LBI authorized, endorsed or was even aware of such alleged wrongful conduct, if it occurred.[88]

Adel  Batterjee never held any position within WAMY itself, and certainly never was its "Chairman." (SOF ¶7-11). WAMY in fact has never had a "Chairman," the most senior leadership position being "Secretary General," a position Batterjee never held. *Id*. Plaintiffs can provide no evidence that Batterjee held any position within WAMY itself and no position with any WAMY affiliate organization after 1993.

WAMY cannot be said to have provided any aid to al Qaeda through BIF as WAMY had nothing to do with this entity and it had no relationship whatsoever with WAMY. As discussed extensively in the following sections on the aiding and abetting elements of general awareness and knowing and substantial assistance, Adel Batterjee created BIF without WAMY's knowledge and styled it as a WAMY affiliated charity to defraud donors into giving money to his separate charity.[89] Contrary to plaintiffs' claims, WAMY did not provide any aid to al Qaeda, directly or indirectly, through BIF or otherwise.

---

[88] While most pertinent to the discussions of the "general awareness" and "knowing and substantial assistance" elements discussed below, it is important to note that some bad actors taking advantage of another entity is not enough to establish a defendant aided-and-abetted the principal absent evidence showing the defendant itself was culpable. *Twitter,* supra  at 491, 503.  ("'[c]ulpability of some sort is necessary to justify punishment of a secondary actor.")

[89] See pages 51 to 53 infra.

>    b.  *WAMY did not engage in any "missions" for al Qaeda, fund its training camps, nor operate as an al Qaeda recruiting center.*

There is simply no evidence that WAMY, through its leadership or wittingly through any employee, engaged in any mission of any kind for al Qaeda. Plaintiffs' claim that WAMY "performed reconnaissance missions" for al Qaeda is false. No reliable admissible evidence exists to support this claim.

Plaintiffs' claim that WAMY indoctrinated youth through education or training, operating as an al Qaeda training center and funding al Qaeda's training camps, is also untrue and without evidentiary support. To the contrary, WAMY's education and training programs are legitimate, not wrongful, and bear no connection to terrorism. (SOF ¶¶1–5, 24-50).

Plaintiffs cannot meet their burden at summary judgment because they cannot present facts demonstrating that WAMY's educational institutions or programs were connected to any terrorist act that caused Plaintiffs' injuries. The record instead overwhelmingly and unequivocally demonstrates that WAMY's educational institutions promote academic achievement and peaceful religious instruction. (SOF ¶¶24-45).

WAMY established schools (also referred to as madrassas) in Afghanistan and Pakistan that provided education to both boys and girls. (SOF ¶¶24-25, 27-44). During the first Taliban era in Afghanistan, WAMY operated a school in Kabul that educated approximately 5,000 girls, reflecting a commitment to women's education that stands in stark, undeniable, and irreconcilable contrast to al Qaeda's extremist ideology. (SOF ¶¶25–28). Similarly, the Abu Hanifa School, established in 1987 through WAMY's affiliate LBI, further exemplifies WAMY's bona fide and well-documented educational mission. (SOF ¶¶29–37). The Pakistan school followed a curriculum that included religious studies, mathematics, science, and language instruction to approximately 222 students. (SOF ¶¶29–37). Numerous graduates of the school have gone on to become

26

professionals and government officials in their respective countries, underscoring the school's constructive societal impact and refuting any suggestion of extremist influence. (SOF ¶¶43–44).

WAMY provided assistance to building other schools and education programs for young women in other countries. (SOF ¶ 26). WAMY/LBI established 24 primary schools and eight educational professional institutes, and eleven Quaran teaching centers. (SOF ¶ 27). In coordination with the UNHCR, WAMY, under the auspices of SJRC, renovated schools in Kosovo. (SOF ¶ 404). There is simply no reliable evidence that WAMY's schools or educational programs sought to encourage youth to take up arms and engage in acts of terrorism.

The undisputed testimony of WAMY's students and graduates further refutes Plaintiffs' offensive claims that WAMY schools were al Qaeda training centers. One graduate, Abdullah Sahil, later worked with the United States Agency for International Development ("USAID") in Afghanistan under the U.S. Department of State's Countering Violent Extremism ("CVE") initiative. (SOF ¶37). Sahil explained that the Abu Hanifa School promoted education in both religious and scientific disciplines and emphasized peaceful Islamic values. (SOF ¶36, 38). Many Abu Hanifa graduates continued their education in Western institutions. (SOF ¶37, 39-42). Other former students likewise attest that the school's curriculum includes Arabic, mathematics, science, and instruction promoting peace under Islamic principles. (SOF ¶39–41).

Contrary to plaintiffs' claims that WAMY schools promoted al Qaeda's ideology, Ziaul Amarkhil, like Sahil, attests that Abu Hanifa did not teach students "about infidels or fighting for infidels" nor did it urge students to take up arms against the West but instead advocated peace and respect for all. (SOF ¶¶ 31, 34,-35, 39-43). Plaintiffs' expert Jonathan Winer could not identify any graduate of a WAMY school or youth program who joined al Qaeda. (SOF ¶44.). To the contrary, students of WAMY schools attest that WAMY schools had no association with al Qaeda

27

and did not promote terrorism or violent activities. (SOF ¶45). This undisputed, consistent, and corroborated evidence squarely and decisively refutes Plaintiffs' misleading allegations that WAMY's schools served as forums for terrorist indoctrination resulting in Plaintiffs' injuries. WAMY's involvement in schools and educational initiatives fall squarely within its mission and objectives.  These facts directly undermine the Plaintiffs' misleading assertions.

Nor did WAMY aid al Qaeda, directly or indirectly, though its scholarship programs. Through its affiliate LBI, WAMY provided worldwide scholarships to students in regions affected by war and natural disasters, including Afghanistan, Albania, Kosovo, and Sudan, in coordination and per the demands from international organizations such as the UN. (SOF ¶¶46–48). To ensure accountability, WAMY rigorously and systematically monitored these programs to confirm that scholarship funds were used exclusively for educational purposes, not for any wrongful purpose. (SOF ¶¶47-48). For example, Mustafa Ismail, a recipient of a WAMY scholarship, earned a doctorate in medicine from the University of Khartoum and later became a researcher and lecturer at Bristol University in England. (SOF ¶¶49–50). Ismail described WAMY's assistance as instrumental in allowing him to pursue higher education in Western Europe and to contribute meaningfully to academic research and scholarship. *Id.* These undisputed facts further defeat any attempt to recast WAMY's schools or programs as aiding al Qaeda.

> c. *WAMY's moderate literature and publications in no way promote al Qaeda's global terrorism agenda.*

Plaintiffs' claims that WAMY's publications constitute aid to al Qaeda by promoting its ideology fare no better. Plaintiffs cannot prove with any admissible evidence that WAMY disseminates literature worldwide calculated to promote a global "jihadist agenda," convince young Muslims to reject United States and democratic ideas, and convince young Muslims to

engage in "violent jihad" against Christians, Jews and non-Wahhabi Muslims, the U.S., the West and Israel. These deeply offensive allegations could not be further from the truth. The undisputed record establishes that WAMY's publications were part of its broader educational mission to provide Muslim youth with moderate conservative religious instruction and guidance through its publications on topics such as "Prophethood in Islam," "The Concept of God in Islam," "Human Rights in Islam," "The Concept of Worship in Islam," and "Muslim-Christian Dialogue." (SOF ¶¶ 68-70). None of these publications encourage youth to take up arms, promote violence against the United States or the West, or reference terrorist activity. (SOF ¶¶ 72, 74, 83,85). Rather, they address theological and religious concepts commonly discussed in introductory religious literature. (SOF ¶¶ 72-73, 76-82, 84). Plaintiffs' attempt to recast these materials as extremist propaganda finds no support in the record.

Far from containing any extremist content, Professor of Religion and Islamic Studies Dr. Khalid Blankinship concludes that WAMY's da'wah materials promote moderate Islamic views while maintaining conservative religious teachings. (SOF ¶¶71-73). In stark and unmistakable contrast to al Qaeda or terrorist organizations' messaging, none of WAMY's publications call for violence against the United States, Jews, or Christians, nor do they urge youth to engage in such conduct. (SOF ¶¶2, 74, 83, 85).

Plaintiffs cherry picking passages from a few WAMY publications is both misleading and legally insufficient. Plaintiffs rely on a passage from the WAMY publication "A Handy Encyclopedia of Contemporary Religions and Sects," claiming that it reflects ideological support for terrorism. (SOF ¶75). Plaintiffs egregiously and misleadingly claim that the Encyclopedia has

29

a section that is hate literature against Americans, Christians and Jews and glorifies hijacking of buses and the killing of innocent civilians in Israel.[90] (SOF ¶75). No such section exists.

The Encyclopedia is a general reference work addressing world religions and has no connection to Osama bin Laden, al Qaeda, or the September 11 attacks. The work is a compilation of articles written by multiple authors addressing mainstream religious ideas and historical narratives. (SOF ¶76-77). The text draws upon historical and theological themes and does discuss longstanding tropes and myths appearing in earlier Islamic literature. (SOF ¶¶78–80). Certain passages reflect views that are historically polemical or conspiratorial in nature. (SOF ¶¶81–82). However, the record unequivocally establishes that the work does not prescribe violence or terrorism and instead seeks to encourage Muslim youth to maintain religious identity in the face of perceived outside influences. (SOF ¶¶83-84). Plaintiffs reliance on this text does not create a genuine issue as to any material fact as nothing in the Encyclopedia glorifies attacks on civilians or promotes acts of terrorism. (SOF ¶85).

Plaintiffs reliance on the book "Islamic Views" is similarly misplaced and does not support their theory of liability. The book "Islamic Views" is not a WAMY publication. (SOF ¶ 87). Also translated as Islamic Guidelines for Individual and Social Reform, the book is a scholarly treatise on Islamic jurisprudence rather than a political text. (SOF ¶86). WAMY did not author the work and only reprinted it years after its initial publication by others. (SOF ¶87). The author, Muhammad bin Jamil Zino, was not a WAMY employee and had no organizational relationship with WAMY. (SOF ¶88–89).

The book discusses several historical and theological understandings of "jihad," including the concept of internal spiritual struggle. (SOF ¶90). Its references to jihad in the historical period of

---

[90] See e.g. Ashton Complaint at ¶ 445, Burnett Complaint at ¶233).

the Prophet Mohammed are not directed toward modern conflicts. (SOF ¶91). The text also explains that any offensive form of jihad requires authorization by a legitimate political ruler. (SOF ¶92). While references to Jews in relation to Palestine may be offensive, ultimately, the 1984 work provides an academic discussion of Islamic legal concepts and contains no advocacy of violence and terrorism against the United States or the West. (SOF ¶¶93-94). Plaintiffs can neither attribute this work to WAMY nor transform it into evidence of wrongful conduct.

Plaintiffs reliance on the pamphlet commonly referred to as "Arab Volunteers" is equally unavailing and unsupported by the record. WAMY had nothing to do with its authorship, publication, or distribution. (SOF ¶95). The work was published by the House of Learning Printing Press in 1991. (SOF ¶96). It is a journalistic account of Arab fighters involved in the Soviet-Afghan war during the 1980s and is not a biography of Osama bin Laden. (SOF ¶97). The author, Syrian journalist Basil Muhammad, is unrelated to WAMY. (SOF ¶98). Plaintiffs' claim that one-time WAMY volunteer Adel Batterjee wrote the pamphlet is not supported by any reliable evidence. (SOF ¶¶98-99).

Plaintiffs fail to identify any wrongful or culpable conduct by WAMY through its publications, camps, or schools that can be connected to al Qaeda or its affiliates. There is no genuine dispute that WAMY did not provide any aid to al Qaeda and its terrorist activities, directly or indirectly through any WAMY publication.

Plaintiffs may also claim WAMY provided aid to Al Qaeda based on a purported terrorist training manual discovered among the possessions of one Ahmed Ajaj following his arrest in connection with the 1993 World Trade Center bombing. (SOF ¶100–104). The only alleged connection to WAMY is that the manual was reportedly found inside an envelope with WAMY or LBI markings. (SOF ¶101). Even accepting for the sake of this motion that this is true, there is no

evidence as to how Ajaj obtained the envelope. (SOF ¶102). There is no evidence that WAMY published, distributed, or even knew anything about the manual. (SOF ¶¶103-104). Nothing in the document itself identifies it as a WAMY publication and WAMY was not identified as the source of the document during the criminal proceedings in which the evidence was introduced. (SOF ¶104). The presence of a manual inside an envelope bearing WAMY's or LBI's name or logo is no more evidence that WAMY provided aid to al Qaeda than if the envelope had the name or logo of "Hilton," the United Nations, the Red Cross, or any other large international entity.

> d.  *WAMY's youth camps and conferences promote positive Muslim ideals for youth,*
>     *not the ideological foundation for al Qaeda.*

As with WAMY sponsored schools and scholarship programs, WAMY's youth programs provided no aid to al Qaeda. WAMY sponsors youth summer camps in numerous countries, including the United States, Morocco, Nigeria, Kenya, Brazil, Tanzania, Bangladesh, Malaysia, and Cyprus. (SOF ¶¶51–58). These camps provide seminars and lectures on Islamic values, leadership development, and intercultural understanding, while affirmatively promoting dialogue and actively discouraging extremism and tribalism. (SOF ¶¶54–58). The camps include structured curricula, educational materials, and recreational programs designed to foster teamwork, cultural exchange, and personal development. (SOF ¶¶55–56, 61). In short, the undisputed record conclusively demonstrates that WAMY's programs are educational and humanitarian in nature and provided no aid whatsoever to Al Qaeda. (SOF ¶¶57-58). Plaintiffs' attempt to equate these programs with promoting terrorism completely lacks evidentiary support.

Plaintiffs' allegations regarding WAMY's youth camps are not only unsupported—they are affirmatively contradicted by the record. Importantly, the undisputed record confirms that WAMY youth camps have nothing to do with military training or indoctrination. Students are not trained

32

in the use of weapons, nor are weapons provided at the camps. (SOF ¶57). Instead, the camps focus on lectures, seminars, educational and sport programming intended to guide youth toward responsible citizenship and a correct understanding of Islamic teachings. (SOF ¶58). Invited speakers to the camps address issues facing Muslim youth and emphasize the importance of rejecting extremism and contributing positively to society. (SOF ¶58).

Read in full, the contents of the handbook "Islamic Camps: Objectives, Program Outlines, and Preparatory Steps," first published in 1987, includes topics such as the definition and types of camps, camp objectives, program organization, camp administration, sports committees, health and safety considerations, and skills development activities. (SOF ¶ 59-60). The booklet also includes lessons related to religious practices such as prayer, fasting, charity, and the life of the Prophet, along with guidance on hygiene and personal conduct. (SOF ¶60). These objectives include attention to the participant's spiritual development through prayer and moral instruction; mental and cultural development through lectures, seminars, and debates; and sport and physical development to promote healthy recreation. (SOF ¶60-61).

Plaintiffs take out of context and distort the meaning of a few lines of one song in the handbook, "The Youth of the True Religion," the lyrics of which appear, along with others, in the camp booklet. (SOF ¶62–63).[91] Cultural and inspirational elements of the song reflect early Islamic history, not contemporary political conflicts or terrorist ideology. (SOF ¶¶63–67). When Plaintiffs allege that this song was part of training the Muslim youth to become terrorists, they are either ignorant of or deliberately ignore the fact that the lyrics recount historical events from early Islamic history and reference ancient battles from centuries ago. (SOF ¶¶62–67). The song does not

---

[91] Plaintiffs exploit approximately four lines from the fifty lines of the song: Hail! Hail! O sacrificing soldiers!; To us! To us! So we may defend the flag this Day of Jihad, are you miserly with you blood?!; And has life become dearer to you? And staying behind sweeter? (SOF ¶ 63).

reference modern political events, does not advocate violence against the United States or the West, and bears no connection to the September 11 attacks or any other act of international terrorism. (SOF ¶¶63-64).

The song's purpose is motivational and educational—encouraging youth to avoid selfishness and to reflect on historical experiences within Islamic civilization. (SOF ¶¶64-66). The song's references to historical conflicts are comparable to patriotic songs used in many cultures that recount past wars or historical struggles. (SOF ¶67). Like national anthems such as La Marseillaise, Flower of Scotland, or other historical songs, its references to historical events must be understood in their proper historical and cultural context. (SOF ¶67). Nothing in the camps' curriculum, activities, or materials connects them to any act of international terrorism or any wrongful conduct alleged by Plaintiffs. (SOF ¶¶ 51-67). Plaintiffs' allegations are thus directly contradicted by the very materials they rely upon.

Prof. Blankinship's expert analysis confirms that WAMY's religious and educational activities are incompatible with al Qaeda's ideology. (SOF ¶¶ 569, 571-599). WAMY follows mainstream Saudi Wahhabi doctrine, which emphasizes obedience to authority, doctrinal education, and rejection of unsanctioned violence. (SOF ¶¶571-578, 587-588, 592-599). In contrast, Bin Laden's ideology promotes rebellion and indiscriminate attacks. (SOF ¶¶ 579-587, 598). WAMY's programs; including schools, publications, and community outreach; reflect mainstream religious education, not indoctrination or militancy. (SOF ¶¶ 595–599). WAMY's teachings reject extremism and violence against civilians, and any reference to "jihad" is consistent with accepted doctrinal meanings, not terrorism. (SOF ¶¶ 583-598).

34

e. *WAMY provided humanitarian aid to people in need and did not support al Qaeda's militant and terrorist activities.*

Statements attributed to WAMY's former Secretary General Dr. Maneh al-Johani do not show that WAMY ever provided aid to al Qaeda, directly or through any intermediary. (SOF ¶¶ 105-116). The statements attributed to Dr. al-Johani in a 1991 article in Muslim World News do not establish support for terrorism, al Qaeda or any connection to the acts of the principal that caused Plaintiffs' injuries. In that article, Dr. al-Johani is reported as urging Muslims to support Kashmiri freedom by providing "moral, physical, and financial support" to what the article described as the cause of jihad. (SOF¶ 105). As stated in the article, the word "jihad" refers to a people's defensive struggle, against oppression, not the offensive attacks against innocent civilians promoted by al Qaeda.(SOF ¶¶ 105,583-587, 591-593). The article makes no reference to al Qaeda, Osama bin Laden, the United States, or the West. (SOF ¶107). The statement concerns a regional political conflict and does not identify or endorse any wrongful act related to the terrorist attacks at issue. (SOF ¶¶105-106).

Similarly, purported statements by Dr. al-Johani in a 1993 article discussing the conflict in Bosnia is not evidence WAMY aided al Qaeda, directly or through any intermediary. (SOF ¶107). Assuming for purposes of this motion that the statement was made, the article does not quote Dr. al-Johani as making any reference to terrorism, support for al Qaeda, or express hostility toward the United States or Western nations. (SOF¶108). The statement reflects support for Bosnian self-defense in the context of an ongoing regional armed conflict and humanitarian crises in the early 1990's where genocide was committed against the Bosnians. (SOF ¶¶ 107-08, 414-417, 583-587, 591-593). Plaintiffs cannot show that statements by Dr. al-Johani about the needs of Bosnian refugees in 1993 somehow supported al Qaeda directly or indirectly leading to the 9/11 attacks.

35

Plaintiffs reliance on the 1995 Riyadh Daily article is similarly misplaced and fails to establish WAMY provided aid to al Qaeda directly or through any intermediary. A 1995 Riyadh Daily article reports that Dr. al-Johani met with a Kashmiri political figure who thanked the Kingdom of Saudi Arabia and charitable organizations for humanitarian assistance. (SOF ¶¶ 109-111). The assistance described in the article consisted of money, blankets, tents, and food supplies. (SOF ¶109). Nothing in the article indicates that WAMY or Dr. al-Johani provided weapons or military equipment. (SOF ¶¶110-111). Nor does the article attribute to Dr. al-Johani any statements calling for violence against the United States or other Western nations, or call for support of al Qaeda. Instead, Dr. al-Johani's statements emphasized humanitarian aid and political solutions, including self-determination through international mechanisms such as a United Nations-supervised plebiscite. (SOF ¶¶112). Dr. Johani called for the assistance of the U.N. Security Council, not al Qaeda. (SOF ¶ 111). These statements advocate diplomatic and humanitarian responses to a political dispute rather than violence. Consequently, the article does not demonstrate that WAMY engaged in providing any weapons or ammunition to anyone, let alone providing aid to al Qaeda. (SOF ¶¶ 109-111).

Finally, Plaintiffs' reliance on a 2000 article concerning Chechnya likewise fails to establish WAMY provided aid to al Qaeda, directly or through any intermediary. (SOF ¶¶112–119). The article reflects commentary on a war that many Muslims regard as a legitimate struggle as a result of Russian military actions. (SOF ¶113-114). In the article, Dr. al-Johani describes forms of support that Chechens needed during the conflict, including money to buy "weapons and gear" as well as humanitarian aid such as food, clothing, medicine, and tents. (SOF ¶114). The article also calls for prayers, public awareness, and political protest against Russian military operations. *Id*. Importantly, the article does not state that WAMY provided weapons, military equipment, or

36

combat assistance. (SOF ¶114-116). Nor does it reference al Qaeda or call for attacks against the United States. (SOF ¶114-116). Instead, the statements largely concern what the Chechens in 2000, like the Ukrainians of today, need to defend themselves against violent Russian military aggression. Nothing in the article promotes illegal or culpable action or discusses any connection to al Qaeda. (SOF ¶ 114-116).

Statements of support for Muslims in need in times and areas of conflict fall well short of the "intentional sponsorship of al Qaeda in furtherance of terrorism" required to give rise to liability in this case.[92] Instead, WAMY's operations in Chechnya involved humanitarian aid. (SOF¶¶ 208, 410-413, 420). WAMY's work in Chechnya included supporting mosques, Quran learning centers, providing drinking water, home heating programs, building elementary schools, and providing food baskets for Chechen refugees in Georgia. (SOF ¶¶ 410, 420).

So too did WAMY's efforts in Sudan, a country torn apart by war, internal strife and ongoing poverty. WAMY's activities were exclusively humanitarian, educational, and community-based, and had no connection to BIF or Adel Batterjee. (SOF ¶¶ 208-212). The record demonstrates that WAMY's Sudan office implemented projects consistent with its global mission, including scholarships, youth programs, construction of mosques and wells, and support for orphanages and educational institutions. (SOF ¶¶210–212). These initiatives were publicly documented and supported by approved budgets, verified allocations, and traceable financial transfers for legitimate charitable purposes. (SOF ¶¶211-212). There is no admissible evidence linking these activities to any terrorist organization, let alone to al Qaeda or the September 11 attacks.

Plaintiffs attempt to manufacture a connection between WAMY and terrorist activity in Pakistan is similarly unsupported. (SOF ¶¶ 213-245). Allegations that WAMY's Pakistan office

---

[92] *In Re Terrorist Attacks,* 740 F.Supp. 2d at 513.

was "raided" or that a WAMY employee delivered materials to Osama bin Laden lack any evidentiary basis and are affirmatively contradicted by sworn testimony. (SOF ¶¶225-229). Multiple witnesses with direct knowledge of WAMY's operations—including a Pakistani government official—confirm that no such raid occurred and that no WAMY personnel were involved in any such conduct. (SOF ¶229). Critically, Rustum Shah Mahmand, a former senior Pakistani official with direct supervisory authority over refugee-related NGOs, confirmed that WAMY operated transparently, complied with all legal requirements, and was never the subject of any adverse report or enforcement action. (SOF ¶¶224–231, 235).

WAMY's Pakistan operations were conducted openly in coordination with the United Nations, the Government of Pakistan, and the Agency Coordinating Body for Afghan Relief (ACBAR). (SOF ¶¶216–224). Its activities, ranging from orphan sponsorship and healthcare delivery to education and refugee assistance, were implemented in partnership with reputable international organizations, including UNICEF and other NGOs. (SOF ¶¶217-219, 221-223). Financially, WAMY adhered to reporting and audit protocols, including annual budgets and internal and external audits, with no evidence of diversion of funds. (SOF ¶¶238–2245). The continued authorization of WAMY's operations by Pakistani authorities further confirms its compliance and legitimacy. (SOF ¶¶ 227, 229, 235, 244).  In sum, there is no evidence that any aid went to al Qaeda through WAMY's Pakistan office. (SOF ¶¶ 227, 234-237).

Plaintiffs' claims that WAMY supported al Qaeda directly or indirectly through its one-time employee Adel Hamad are entirely unfounded. (SOF ¶¶ 246-268). Hamad, a low-level hospital administrator, never engaged in terrorism or assisted al Qaeda. (SOF ¶¶ 247-248, 258, 266-267). Hamad was employed by WAMY in its Peshawar, Pakistan office in 2000 as a hospital administrative manager. (SOF ¶¶249-255). He administered aid specifically for hospitals, schools,

38

orphanages, and other humanitarian programs. (SOF ¶¶249-253). Throughout his employment, Hamad never communicated with or supported al Qaeda or was involved in any culpable act. (SOF ¶¶247, 266-268).

In July 2002, after returning from a trip to visit his family in Sudan, Hamad was abducted by Pakistani authorities and subsequently detained by U.S. forces (SOF ¶¶259-261). He was held for six and a half months in Pakistan, then transferred to Bagram prison where he endured torture, including hanging and electric shocks. (SOF ¶261). He was offered release if he could pay ransom but could not obtain the funds. (SOF ¶263). In 2003, he was transferred to Guantanamo Bay, where he remained for four years until 2007, when he was repatriated to Sudan without any charges or findings of wrongdoing. (SOF ¶¶264-267).

Hamad's detention at Guantanamo Bay and imprisonment in Bagram were the result of a deeply flawed process. There is  no admissible evidence that Adel Hamad  or WAMY provided any assistance to al Qaeda. (SOF ¶¶ 247, 258, 266-268, 269-287). Col. Lawrence B. Wilkerson, a retired U.S. Army Colonel and senior State Department official, confirms that detainees like Hamad were often captured without regard to innocence, frequently for bounties, and that the detention process placed individuals outside the U.S. legal system. (SOF ¶¶269-280). Col. Wilkerson observed that many detainees, including Hamad, were captured indiscriminately and placed in Guantanamo without due process. (SOF ¶¶274-278, 280). There was no meaningful mechanism to verify whether detainees were terrorists, Taliban, or innocent civilians, and detention did not reflect guilt. (SOF ¶¶276-278). Hamad's detention mirrors the experiences of other innocent individuals wrongfully detained due to flawed battlefield vetting and extrajudicial procedures. (SOF ¶¶279-280).

During Hamad's threat assessment process prior to his release from Guantanamo, the Department of Defense ("DoD") noted he was employed by WAMY which it stated was a "Tier 1 NGO," purportedly associated with terrorist organizations. (SOF ¶¶281-282). This classification is not admissible evidence that WAMY ever provided aid to al Qaeda. (SOF ¶¶283-288). The classification does not result from any adversarial process, is non-challengeable, and lacks due process. (SOF ¶¶283-288). No factual basis or certainty level is provided, and assessments often rely on unreliable information obtained under torture or from incentivized detainee statements. (SOF ¶¶285-288).

The DoD threat assessment lacks the foundational reliability required to be admitted under Fed. R. Evid. 602 and does not come within any exception to the rules of evidence barring the admission of hearsay evidence. Fed. R.s Evid. 801 and 802. There is not a shred of evidence to support this assessment. Plaintiffs' own expert, Jonathan Winer, agrees that DOD's Tier 1 NGO assessments on WAMY and Guantanamo procedures are unreliable, one-sided, and procedurally deficient. (SOF ¶¶283-284, 288). Plaintiffs' expert Winer agrees that information derived from torture is wholly unreliable. (SOF ¶¶288).

Plaintiffs offer no evidence that WAMY International, since its establishment in the U.S., engaged in laundering money, funding training camps, operating recruiting centers, disseminating ideology, or conducting reconnaissance on behalf of al Qaeda. (SOF ¶¶ 289-390). In 1991, Abdullah Bin Laden ("ABL") incorporated WAMY International in Virginia. (SOF ¶¶289-290). His role was limited to assisting in establishing the organization; he left in 1999 and has resided in Saudi Arabia since then. (SOF ¶¶289-291, 298). Although ABL is a half-nephew of Osama bin Laden, he had no contact with him after approximately 1990 and no involvement in the matters alleged in this case. (SOF ¶¶292-294). ABL has consistently stated that he never provided support

40

to al Qaeda or any terrorist organization, and he had no knowledge of WAMY doing so. (SOF ¶293).

This Court previously addressed Plaintiffs' claims against ABL and dismissed them, finding no evidence that he had knowledge, consent, or control over the alleged wrongful acts. (SOF ¶294). This ruling was affirmed by the Second Circuit Court of Appeals which emphasized that *"no allegations in the voluminous record suggest that Abdullah Bin Laden…played any role in directing any support to benefit al Qaeda."*[93]  That Abdullah Bin Laden shares a last name with al Qaeda's founder certainly is no evidence that WAMY provided aid to al Qaeda.

WAMY International's U.S. operations reflect a small, volunteer-driven charitable organization engaged in routine educational and community outreach, not terrorism. (SOF ¶¶ 295-297). WAMY-USA was established to promote cooperation among humanitarian and Islamic organizations, educate Muslims about Islamic thought, foster dialogue, and maintain charitable funds, not to support al Qaeda. (SOF ¶295).  Its activities included youth camps, Islamic conferences, Quran societies, newsletters, educational materials, and community forums, all educational and religious in nature. (SOF ¶296), These programs were carried out by only two paid employees and volunteers and emphasized moderation, civic responsibility, and rejection of extremism. (SOF ¶¶295-297,  299).

In May 2004, the U.S. Customs Service executed a search warrant at WAMY International's Virginia office. (SOF ¶479). Plaintiffs suggest this proves a link to terrorism, but the record shows otherwise.  Neither WAMY nor any WAMY employee was ever charged with any offense nor sanctioned as a result of this search. (SOF ¶¶480-482). Indeed, WAMY maintains its annual

---

[93] *In re Terrorist Attacks on Sept. 11, 2001,* 714 F.3d 659, 677 (2d Cir. 2013 (*"Terrorist Attacks VII"*) (emphasis in original)

41

registration in Virginia. *Id*. These facts confirm that U.S. authorities found no evidence connecting WAMY to terrorism or evidence showing it provided aid to al Qaeda.

Plaintiffs rely on allegations involving WAMY Canada, the BIF, and a later audit by the Canadian Revenue Agency ("CRA") to suggest that WAMY aided and abetted al Qaeda directly or indirectly, resulting in the 9/11 attacks. (SOF ¶¶ 375-390). The CRA is a tax authority, not a law enforcement or intelligence agency. (SOF ¶¶375, 386). The CRA's findings as to WAMY Canada's tax-exempt status in Canada notwithstanding, the undisputed record demonstrates that WAMY did not provide aid to BIF and, even if it did, this was not aid to al Qaeda. (SOF ¶¶377-390).

WAMY Canada operated as a small, volunteer-based chapter under the supervision of WAMY International. (SOF ¶¶315-316, 318). WAMY Saudi Arabia provided operational funding for North American activities, which WAMY International allocated between itself and WAMY Canada through a bi-annual budget. (SOF ¶¶315, 317, 319-320). WAMY International supervised WAMY Canada's activities, ensuring reporting and compliance obligations. (SOF ¶¶316, 322, 324). WAMY Canada's annual operating budget was modest, approximately $10,000–$12,000. (SOF ¶318). Funding supported legitimate projects such as youth camps, sports programs, publications, conferences, and other humanitarian activities from WAMY Saudi Arabia via WAMY International. (SOF ¶¶319-321). WAMY Canada was required to report all project spending to WAMY International, which in turn reported its own and WAMY Canada's activities to WAMY Saudi Arabia. (SOF ¶¶322-324). This structure reflects oversight and routine reporting, not the independent or clandestine activity Plaintiffs allege.

Without WAMY's knowledge, a director of its Canada office, Mohamed Khatib, had interactions with BIF's USA and Canada offices. (SOF ¶¶335-373). Khatib intermittently served

as director of WAMY Canada beginning in 1997 and ending in early 2001. (SOF ¶¶325,330-332, 336). Khatib incorporated WAMY's Canada office in 1997 using his home address and opened a bank account to receive funds. (SOF ¶¶326, 328). Khatib was removed as director of WAMY Canada in 1999 by the then head of WAMY Int'l, Abdullah Bin Ladin, for failing to meet WAMY's financial reporting requirements. (SOF ¶329-330). In 2000, Khatib was asked to resume his position as director of WAMY Canada by Ibrahim Abdullah, the new head of WAMY USA, as he wanted someone with experience in the position. (SOF ¶¶331-332).

Khatib soon fell back into reporting deficiencies to WAMY USA. (SOF ¶¶333-334). Khatib was also then secretly representing four other organizations, including BIF, in Canada at the same time he was WAMY's representative without WAMY's knowledge. (SOF ¶¶335-337, 339-346). Khatib on behalf of BIF, not WAMY, helped establish BIF Canada and raised funds for humanitarian projects, including assistance for orphans in Bosnia, Chechnya, and Kashmir. (SOF ¶¶345-348).

Khatib did not disclose his relationship with BIF or other organizations to WAMY. (SOF ¶¶ 339, 343). He acknowledged that his work with BIF was separate from and unrelated to his duties for WAMY. (SOF ¶344). Without WAMY's knowledge, as the founder of BIF Canada, Khatib registered the organization using his personal address—the same address he used for WAMY Canada. (SOF ¶345). Unbeknownst to WAMY, Khatib temporarily allowed BIF Canada to use WAMY Canada's tax-exempt status until BIF obtained its own registration. (SOF ¶346-347). Khatib also distributed fundraising materials referencing "WAMY/BIF" without authorization. (SOF ¶347).

These actions were entirely on Khatib's initiative on behalf of BIF Canada, without WAMY's knowledge or authorization, and unrelated to WAMY operations. (SOF ¶¶336-337, 339, 343-344,

43

363, 365-366, 371). At that time, WAMY stopped financial support to WAMY Canada due to lack of reporting. (SOF ¶334). Khatib as the head of BIF Canada, without WAMY's knowledge or permission, used its Canadian tax identification to open bank account # 0430 8086-611 with the Bank of Montreal under the name "World Assembly of Muslim Youth o/a BIF." (SOF ¶¶ 357-359). WAMY had no knowledge of this account or any funds going into or out of it including a $50,293.13 wire transfer into this account on March 20, 2001. (SOF ¶¶ 358, 361). These funds came from BIF USA, not WAMY. (SOF ¶¶ 358-359, 361-362). There is no evidence the transfer originated from WAMY Saudi Arabia, WAMY International, or any WAMY entity. (SOF ¶361). Funds in this account were exclusively for BIF activities, from BIF, not WAMY. (SOF ¶362). WAMY Canada had a separate bank account with the Bank of Montreal, account# 2422-8094-951, and WAMY funds were never comingled with BIF funds. (SOF ¶¶ 360, 363).

As it did with Batterjee when he ran afoul of WAMY's policies, (SOF ¶¶168-174), WAMY USA forced Khatib to resign as director of WAMY Canada in March 2001 once Ibrahim Abdullah learned that Khatib was representing multiple other charities in Canada as well as WAMY. (SOF ¶¶ 336-338, 340-341). After he was dismissed from his position as director of WAMY Canada, Khatib transferred the funds he received from BIF in BIF Canada's account back to BIF USA. (SOF ¶ 369). WAMY would never have allowed Khatib to use a WAMY bank account for another organization. (SOF ¶ 373). Though neither WAMY SA or WAMY Int'l had any knowing connection to or interaction with BIF, there is no evidence that any funds from BIF Canada went to al Qaeda or that BIF provided any support to al Qaeda. (SOF ¶374).

The head of BIF, Enaam Arnaout, was convicted of racketeering fraud conspiracy in the United States district Court for the Northern District of Illinois, for defrauding BIF donors by making them believe they were making donations for humanitarian work when the money went to fund

44

military operations in Bosnia and Chechnya.[94] (See also SOF ¶374). While the Government sought to increase Arnaout's offense under U.S.S.G. § 3A1.4 for "attempted, participated in, or conspired to commit any act of terrorism," the District Court found the evidence did not support application of the terrorism enhancement.[95] The Seventh Circuit Court of Appeals affirmed concluding that the district court's finding that "the government had not established that the Bosnian and Chechen recipients of BIF aid were engaged in a federal crime of terrorism, or that Arnaout intended the donated boots, uniforms, blankets, tents, X-ray machine, ambulances, nylon or walkie talkies to be used to promote a federal crime of terrorism."[96] Thus, there is no evidence that any funds from BIF went to support al Qaeda let alone that any WAMY funds went to al Qaeda.

The CRA Report concerning WAMY-Canada's charitable tax status does not provide any evidence to the contrary. (SOF ¶¶ 375-390). The CRA audited WAMY Canada's operations from January 1, 2000, to December 31, 2003, in connection with alleged non-compliance with the requirements of Canada's Income Tax Act. (SOF ¶¶ 377-380). The CRA revoked WAMY Canada's tax-exempt status for failing to comply with record-keeping, registration, and reporting requirements. (SOF ¶¶381-382). The CRA report did not revoke WAMY Canada's corporate registration. (SOF ¶ 388). It did not freeze its bank accounts, impose or recommend any criminal charges, or even recommend that WAMY Canada be subject to any administrative sanctions or penalties. (SOF ¶¶387, 389-390). The CRA did not make any finding that WAMY Saudi Arabia of WAMY Canada provided any support to al Qaeda, directly or indirectly. (SOF ¶ 383).

---

[94] *U.S. v. Arnaout*, 282 F.Supp.2d 838, 840 (N.D. Ill. 2003).
[95] *Id.*
[96] *United States v. Arnaout*, 431 F.3d 994, 1002 (7th Cir. 2005)

While the CRA noted WAMY Saudi Arabia had been the subject of adverse reporting with allegations of terrorism, including claims by the discredited witness Evan Kohlmann, there was no independent investigation of these allegations nor finding that they were reliable or credible. (SOF ¶¶ 384-386). Further, a few media reports and blog posts asserting that WAMY has claimed connection to terrorism are hearsay, inadmissible under Fed. R. Evid. 801 and 802. They should not be considered by this Court in determining whether a genuine dispute of a material fact exists.

Plaintiffs  rely on WAMY's humanitarian operations in Kosovo, Chechnya, and Bosnia, coordinated in part under the Saudi Joint Relief Committee ("SJRC"), to suggest that WAMY aided and abetted al Qaeda directly or indirectly. The record demonstrates that these operations were strictly for specific charitable purposes and did not provide direct or indirect support to al Qaeda or Osama Bin Laden, and therefore do not support Plaintiffs' claims.

In 1999, King Fahad bin Abdul Aziz of Saudi Arabia established SJRC to coordinate Saudi-led humanitarian relief to Albanian refugees from conflicts in the former Yugoslavia (Kosovo and Bosnia). (SOF ¶¶391-392). The order directed SJRC to include representatives from the National Guard, Ministry of Defense and Aviation, Ministry of Interior, Presidency of Intelligence, Ministry of Finance, Ministry of Information, and Ministry of Labor and Social Affairs. (SOF ¶392). WAMY was explicitly included among the participating charitable societies. (SOF ¶393). SJRC's aims were to unify and coordinate Saudi humanitarian relief, provide medical care, food, clothing, shelter, and guidance to refugees, and promote cultural and religious comfort—not extremism. (SOF ¶394). SJRC's structure and purpose were entirely humanitarian, and WAMY's participation was consistent with its mission and objectives, operating solely for charitable purposes. (SOF ¶¶396-398).

WAMY provided aid to Bosnians during the 1992–1995 conflict and later, in collaboration with SJRC, during the Kosovar and Chechen conflicts. (SOF ¶¶391-413). These humanitarian operations were conducted with Saudi government approval and often used Albania as a base. (SOF ¶¶399-400, 405-406). WAMY collected donations for war-torn Bosnians and collaborated with local organizations, such as United Muslim Youth of Albania and League of Islamic Youth in Albania, exclusively for refugee assistance. (SOF ¶¶416-418). WAMY's programs included refugee camp assistance, youth camps, student support, and assistance consistent with its universal humanitarian mission. (SOF ¶¶405-407, 410-411, 415-418). There is no evidence that such humanitarian assistance aided al Qaeda, directly or indirectly, resulting in the 9/11 attacks. Such conduct is not wrongful or culpable. (SOF ¶¶ 397, 402, 409, 413).

WAMY's Bosnia activities were entirely humanitarian, transparent, and coordinated with local authorities, providing no basis for aiding or abetting claims. Saudi Arabia funded SJRC's staff, headquarters, and operations. (SOF ¶¶415-418). Later, WAMY donated financial support to SJRC projects and maintained records documenting humanitarian operations. (SOF ¶) 400. No governmental authority designated or sanctioned SJRC, confirming there is no credible association between the SJRC and terrorism. (SOF ¶401).

Under SJRC, WAMY assisted Kosovars during the late 1990s conflict by providing mattresses, food, temporary housing, medical and psychological care, clothing, tents, healthcare, education, and cultural programs for refugees. (SOF ¶¶ 403-405). WAMY coordinated with UNHCR for construction projects, including schools, and with local families for refugee housing. (SOF ¶405). When refugees returned to Kosovo from Albania, WAMY assisted with repatriation and rehabilitation, including training local doctors in Saudi hospitals. (SOF ¶¶405-407). These

47

activities did not support fighters or terrorist activities, nor is there evidence they aided al Qaeda directly or indirectly to cause the 9/11 terrorist attack.  (SOF ¶410).

Similarly, WAMY, under SJRC, provided relief to Chechen refugees in 1999–2000, not fighters. (SOF ¶¶410--411). Aid included food, blankets, medicines, clothing, tents, emergency assistance, and housing camps, all under humanitarian oversight. (SOF ¶411). SJRC ended its Kosovo relief work in June 2000, with WAMY continuing operations in Chechnya. (SOF ¶408, 410). There is no evidence that WAMY's relief work in Chechnya was wrongful or illegal and supported al Qaeda or Osama Bin Laden, directly or indirectly. (SOF ¶¶412-413). These operations were consistent with WAMY's charitable mission.

WAMY's operations under SJRC in Kosovo, Chechnya, and Bosnia were charitable, humanitarian, and fully supervised. (SOF ¶¶403-422). No funds were used for a wrongful purpose, assistance, or aid al Qaeda. SOF ¶¶ 397, 402, 409, 413). The law is clear: JASTA aiding and abetting liability extends only to truly culpable parties.[97]

WAMY's Kashmir office likewise conducted routine charitable programs, including outreach, feeding programs, youth camps, and social services. (SOF ¶¶451-457). There is no evidence linking these activities to al Qaeda or the September 11 attacks. (SOF ¶454). Furthermore, even though not relevant to the claims in this case, there is also no reliable evidence that through its activities in Kashmir, WAMY provided any aid  to Lashkar-e-Taiba, Hizb-ul-Mujahideen, or the Students Islamic Movement of India. (SOF ¶¶455-457, 463-464). Allegations concerning former WAMY employee Nazir Qureshi rely on inadmissible sources through an unknown Indian newspaper; allegations which were shown to be unfounded after WAMY's investigation. (SOF ¶¶463-464). Qureshi was a low-level administrative clerk with no authority over finances or

---

[97] See *Ashley*, 144 F.4th at 437; *Twitter*, 598 U.S. at 489.

projects, and auditors confirmed he never received or transferred WAMY funds. (SOF ¶¶ 458-462).

WAMY's routine relief work focusses on providing humanitarian aid to people in need across different parts of the world. Such relief efforts are not culpable acts. Rather they align with the values of charity, compassion and social responsibility that are deeply rooted in WAMY's work and the cultural and societal framework of Saudi Arabia. (SOF ¶521). WAMY's provision of humanitarian aid or assistance in Bosnia, Chechnya, Kosovo, Kashmir, and other areas of conflict alone is not evidence it financed al Qaeda. (See gen., SOF ¶ 521).

Taken together, the undisputed record demonstrates that: (1) WAMY has never been designated or sanctioned (SOF ¶¶ 478, 481); (2) it faced no charges following U.S. investigations (SOF ¶480); (3) it was not identified by the 9/11 Commission or credible intelligence as supporting al Qaeda (SOF ¶¶485, 496, 498, 500, 504, 505, 509, 511, 516, 520, 524, , 525, 531); and (4) it operates transparently and lawfully, as confirmed by governmental authorities and expert review. Plaintiffs offer no admissible evidence to the contrary. Accordingly, WAMY did not aid, abet, or provide material support to Al Qaeda—directly or indirectly—and cannot be held liable under JASTA for Plaintiffs' injuries.

2. Reliable evidence does not show that WAMY was generally aware that it played any role in al Qaeda's illegal activity.

To establish general awareness, Plaintiffs must show that WAMY was "generally aware of [its] role as part of an overall illegal or tortious activity" at the time it allegedly provided assistance.[98]  While "a defendant need not be aware of its role in the specific terrorist attack that caused the plaintiff's injury, it must be generally aware of its role in some illegal activity from

---

[98] *Honickman*, 6 F.4th at 496.

which the terrorist attack was foreseeable."[99] More specifically, plaintiffs must show that WAMY must have been generally aware that is was playing a role in al Qaeda's violent or life-threatening activities.[100]

Knowingly providing material support to an FTO, without more, is not sufficient to establish the general awareness element as a matter of law.[101] The Second Circuit has rejected a broad scope of aiding-and-abetting liability based on a "fungibility of money theory."[102] Distinguishing aiding and abetting liability under JASTA from a material support claim under 18 U.S.C. § 2339B, the Second Circuit held that "[i]mporting the fungibility rationale from the material support statute into the JASTA context 'erase[s]' the difference between the two statutes."[103] "A 'central' tenet of JASTA aiding-and-abetting liability is the 'foreseeability principle'-that the defendant is not liable for the principal's wrongs without understanding, to some extent, the foreseeable consequences of the defendant's actions."[104] "A fungibility theory would 'evade' that principle entirely."[105]

General awareness itself contains two sub-elements: (1) as a threshold requirement, that WAMY was aware of the intermediaries' connections with al Qaeda before the 9/11 attacks; and (2) that the intermediaries were so closely intertwined with al Qaeda's violent terrorist activities that WAMY could reasonably be inferred to be generally aware that it was playing a role in unlawful activities from which the 9/11 attacks were foreseeable at the time it provided the assistance.[106]

---

[99] *Ashley,* 144 F.4th at 438.

[100] *In re Terrorist Attacks on September 11, 2001,* 2023 WL 2430381 at * 11.

[101] *Honickman,* 6 F.4th at 499 (citing *Kaplan,* 999 F.3d at 860).

[102] *Ashley,* 144 F.4th at 444 (citing *Honickman,* 6 F.4th at 498-99).

[103] *Ashley,* supra.

[104] *Id* (citations omitted).

[105] *Id.*

[106] *Honickman*, 6 F.4th at 501 (citing *Kaplan*, 999 F.3d at 860); *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 868 (D.C. Cir. 2022).

There is no reliable evidence showing that WAMY was aware that any entity it supported or interacted with had any connection to al Qaeda before the terrorist attacks of September 11, 2001. Indeed, there is no genuine dispute of material fact that WAMY provided aid or support to any organization or individual that had any connection to al Qaeda before the terrorist attacks at issue. Certainly, no third party with whom WAMY interacted prior to the terrorist attacks of September 11, 2001, was so closely intertwined with al Qaeda's violent terrorist activities that WAMY could reasonably be inferred to be generally aware that it was playing a role in the unlawful activities from which the 9/11 attacks were foreseeable at the time any assistance was provided.

WAMY certainly provided assistance to LBI  during the period when it was affiliated with WAMY, from 1989 to 1997. (SOF ¶¶160-162, 193). While affiliated with WAMY, LBI's work consisted of providing medical assistance, social welfare, and agricultural and rural development. (SOF  ¶162). LBI also provided educational programs, scholarships, and schools, primarily in Pakistan, including the Abu Hanifa Teachers Training Institute. (SOF ¶¶ 27-28, 157).

Adel Batterjee was involved with LBI when it was a WAMY affiliate for the limited period from 1989 to early 1993. (SOF ¶¶155, 158-163, 172-174). WAMY dismissed Batterjee from  LBI in early 1993. (SOF ¶¶ 172-174). Eleven years after his termination from LBI and the end of his relationship with WAMY, Batterjee was designated as a SDGT by OFAC. (SOF ¶ 185).

As discussed above, around the time when he began failing to follow WAMY's reporting requirements with LBI, unbeknownst to WAMY, Batterjee created a separate charity, Benevolence International Foundation ("BIF") based in Chicago, Illinois. (SOF ¶¶175-184).[107] After WAMY terminated its relationship with Batterjee, it first became aware that he had created BIF and was deceiving donors into thinking his new charity had some relationship with WAMY. (SOF ¶¶180-

---

[107] The lack of a relationship between WAMY/LBI and BIF is discussed at pages 22 to 25 supra.

51

181, 183-184). The lengths of Batterjee's deception went to copying LBI's logo and mimicking its written materials. (SOF ¶ 181). Multiple contemporaneous primary source documents show Batterjee's efforts to falsely claim BIF had some relationship with LBI/WAMY and WAMY's efforts to get Batterjee to stop this fraud. (SOF ¶¶ 181-182, 184). WAMY ultimately began dissolving LBI in 1995 and moved oversight of its humanitarian and educational programs to WAMY's Pakistan office; this in a further effort to avoid any confusion between Batterjee's BIF and LBI. (SOF ¶¶187-197).

No reliable evidence establishes that LBI ever had any connection to al Qaeda, certainly during its time as a WAMY affiliate. A 1996 document of unknown provenance includes "information" received from a "source" that LBI had some unspecified connection to "Afghan veterans." (SOF ¶¶199-202). This document is not a finished intelligence report and lacks the foundation to be admitted under Fed. R. Evid. 803(8).[108] The document does not include any facts showing the source's reliability, the basis of their claimed knowledge, or that any information has been confirmed or corroborated by any other source or method. Further, the information includes plainly erroneous facts including that LBI was a subsidiary of the Muslim World League.[109] Similarly, a CIA report from January 11, 1999, while including information that Usama Bin Ladin funded LBI's offices in Afghanistan and Pakistan, provides no facts as to the source of the information, the source's reliability, the source's basis of knowledge, that the information was corroborated, or even information as to when or how this claimed funding occurred. (SOF ¶¶509-511).

These isolated and unreliable documents do not establish that WAMY was aware that LBI had any relationship with al Qaeda. Nor do they show that, while LBI was a WAMY affiliate from

---

[108] While this Court has held that finished CIA intelligence reports are admissible under Fed. R. Evid. 803(8), this 1996 document has never been authenticated as a finished CIA intelligence report. *In re Terrorist Attacks on September 11, 2001,* 2023 WL 2430381 at * 6-7.
[109] *Id.*

52

1989 through 1997, LBI was so intertwined with al Qaeda's violent terrorist activities that WAMY was generally aware that through LBI it was playing a role in al Qaeda's terrorism from which the terrorist attacks of September 11, 2001, were foreseeable at the time. To the contrary, LBI was never designated by any sanctions regime. (SOF ¶207) Further, Osama Bin Laden did not issue his first "public fatwa" against the United States until 1996 and al Qaeda was not designated as an FTO until 1999; both of which occurred years after WAMY removed Adel Batterjee from any involvement with LBI. (SOF ¶¶543, 546).

Further, to the extent WAMY had any arguable connection to BIF through the one-time head of WAMY Canada, Mohammed Khatib, as discussed above,  Khatib's connection to BIF  was not related to WAMY and was entirely without WAMY's knowledge and behind WAMY's back.[110] WAMY dismissed Khatib from his position as director of WAMY Canada when it found out he was representing multiple agencies.  Moreover, there is no evidence that BIF played any role in al Qaeda's activities, certainly no role that WAMY would have been aware of. Thus, the evidence does not at all support that WAMY was generally aware that it played any role in al Qaeda's terrorist activities due to its relationship with Mohammed Khatib, who in turn secretly had a relationship with BIF, which in turn provided no support to al Qaeda.

WAMY's providing humanitarian aid and assistance in areas of great need is consistent with its mission and does not establish that it was generally aware that it played any role in Al Qaeda's violent acts of terrorism. Under the Saudi Joint Relief Commission, WAMY provided aid to refugees from conflicts in Bosnia, 1992 to 1995, and later Chechnya and Kosovo in 1998-2000. (SOF  ¶403, 408, 411, 415-416, 422). As part of these humanitarian efforts, WAMY coordinated relief efforts with different local organizations including the United Muslim Youth of Albania, the

---

[110] See pages 42 to 44 supra.

League of Islamic Youth in Albania, Catholic refugee camps in Bosnia and  the Third World Relief Agency ("TWRA"). (SOF ¶¶404, 417, 422, 424).

WAMY provided assistance to TWRA; a humanitarian assistance organization that, inter alia, worked with the Bosnian government to provide food, clothes, blankets, medicines, and the like to Bosnian refugees; related to its work in Bosnia in 1992. (SOF ¶¶423-424) TWRA was never sanctioned or designated. (SOF ¶436). Fatih Hassenian, director of TWRA and also onetime WAMY representative in Austria, was never designated. (SOF ¶¶ 437-442) WAMY's work with TWRA's director Hassanein reflect only his role as a local coordinator assisting humanitarian activities. (SOF ¶¶ 437, 439, 441).

There is no evidence that any of the limited funds WAMY provided to TWRA went to anything other than the humanitarian projects for which they were intended. (SOF ¶¶423-424, 431, 433). An identified transfer of approximately $32,000 from between WAMY to TWRA occurred on March 25, 1992, for legitimate operations and not wrongful conduct; nine years before the 9/11 attacks. (SOF ¶433). There is no evidence that this transfer was used for anything other than legitimate humanitarian and educational programs. (SOF ¶433). Investigators reviewing TWRA's financial records found no evidence of misuse. (SOF ¶427). At that time, TWRA operated as a humanitarian organization assisting refugees. (SOF ¶423). TWRA dissolved in the 1990's, further defeating any causal link. (SOF ¶435).

WAMY also worked with Taibah International to provide humanitarian aid to refugees and education to Islamic youth in Bosnia and Kosovo in the 1990s; not related to any wrongful act. (SOF ¶¶443-449). The assistance was limited and any report of a two-million-dollar transfer of funds from WAMY to Taibah is not support by any reliable evidence. (SOF ¶¶444, 449). It was not until 2004, long after WAMY stopped providing assistance to Taibah, that the U.S.

54

Department of Treasury designated Taibah's Bosnian branch in part for its ties to the Global Relief Foundation. (SOF ¶¶445-447). These undisputed facts show WAMY humanitarian engagement with a non-designated charity twelve years before any designation and nine years before the 9/11 attacks. [111]

With respect to any of these third parties; LBI, SJRC, TWRA, and Taibah International; there is no evidence that WAMY would have been aware of any connection they may have had with al Qaeda at the time of the assistance before the 9/11 attacks. Unlike the intermediary account holders in *Kaplan,* not one of the third parties WAMY interacted with were clearly and publicly identified as part of al Qaeda's funding network at the time when WAMY provided it with aid.[112] Further, no well publicized warnings identified any of these other charitable groups as having ties to al Qaeda at the time WAMY provided any assistance before the 9/11 attacks.[113]

Public statements by WAMY officials also do not show that WAMY was generally aware that it played any role in al Qaeda's violent terrorist activities from which the attacks of September 11, 2001, were a foreseeable consequence.[114] Statements by former WAMY Secretary General Johani about the circumstances facing Muslims in Kashmir in 1991 and 1995, the genocide occurring in Bosnia in 1993, and the plight of Chechen's in the face of Russian aggression in 2000 have nothing to do with al Qaeda, terrorism, or attacks against the United States. (SOF ¶¶112-116). The statements played no more role in al Qaeda's violent terrorist activities than would the statements of the late Pope Francis supporting Ukraine's right to defend itself from Russia's violent

---

[111] *In re Terrorist Attacks on September 11, 2001,* 2023 WL 2430381 at * 11 (S.D.N.Y. March 9, 2023)
[112] See *Kaplan,* 999 F.3d at 849-50, 865-66 (discussing the widely publicized information that five bank customers were integral parts of Hezbollah's funding operations).
[113] See *Troell v. Binance Holdings,* supra at * 16 (finding general awareness element met where cryptocurrency exchange platform was aware of widely publicized reports that FTOs who used its exchange did so to evade sanctions and conduct transactions in aid of their violent agendas).
[114] Statements by WAMY public officials are discussed in further detail above at 35-37 to supra.

invasion.[115] There is no evidence that through such statements WAMY was providing any support to al Qaeda through any intermediary; let alone that through such statements WAMY was generally aware that it was playing a role in al Qaeda's violent terrorist activities from which the attacks of September 11, 2001, would be foreseeable.

WAMY's publications also do not establish that it was generally aware that it played any role whatsoever in al Qaeda's terrorist activities. Religious scholars, with expertise in Islam's history, terminology, and variations, confirm that WAMY, an entity created by Royal Decree of the Saudi Arabian King, promulgates views consistent with conservative mainstream Saudi beliefs. (SOF ¶ 569-578, 588, 593-598). WAMY's mainstream Salafist, quietist views, as expressed in its publications, are inconsistent with, indeed antithetical to, the extreme views expressed by Osama Bin Laden and his al Qaeda followers. (SOF ¶¶598-599, 578-582). Plaintiffs' unsupported claims to the contrary notwithstanding, nothing in WAMY's publications "glorifies" the attacking of innocent civilians or prescribes violence or terrorism. (SOF ¶¶75-84). So to with WAMY camps and schools which propagate and espouse conservative Islamic principles; but not at all the violent and extremists views expressed by Osama Bin Laden and al Qaeda. (SOF ¶¶ 61-67, 596).

WAMY's interaction in the United States with Anwar Awlaki, then widely known as a moderate Salafi scholar, both before and immediately after the terrorist attacks of 9/11, also does not show that WAMY was generally aware that it played any role in al Qaeda's terrorist activities. WAMY became aware of Awlaki in 2000 as he was an Imam of the Dar al-Hijrah Mosque in Falls Church, Virgina, which was near WAMY's office in the United States. (SOF ¶¶301-302). WAMY invited Awlaki to speak at a WAMY youth camp in the United States in 2002 and distributed a

---

[115] See "Pope Francis backs Ukraine's defense, says supplying arms 'may be morally acceptable.'" National Catholic Review, September 15, 2022; available at https://www.ncronline.org/vatican/pope-francis-backs-ukraines-defense-says-supplying-arms-may-be-morally-acceptable (last viewed March 15, 2026).

small number of recordings of his sermons as gifts to translators who helped at WAMY events. (SOF ¶¶303, 309-312). Awlaki was one of the most sought-after Muslim speakers in the United States at the time, known for his moderate views, and a speaker at events at the U.S. Capital in July 2001 and at the Pentagon on February 2, 2002. (SOF ¶¶306-307, 311). It was not until years after his interaction with WAMY ended in 2002 that Awlaki began to express radical views and not until 2006-2007 that he called for attacks against the United States. (SOF ¶¶ 308, 313). WAMY had limited interaction with Awlaki and had no idea when it did so that years later he would advocate violence against the United States. (SOF ¶¶302-305, 309-311, 313-314).

Nor is WAMY's association with Abdullah Bin Laden evidence that it was generally aware that it played any role in al Qaeda's violent terrorist activities as there is no evidence that Abdullah Bin Laden had anything to do with al-Qaeda or Osama Bin Ladin's violent plots against the United States. (SOF ¶¶289-294).[116] As discussed above, other than sharing a last name, there is no evidence that Abudllah Bin Laden has anything to do with Osama Bin Laden or al Qaeda.[117]

Viewing the evidence in the light most favorable to the plaintiffs as this Court must, there is still insufficient evidence to create a genuine dispute that WAMY was ever generally aware that it played any role in al Qaeda's illegal terrorist activities from which the terrorist attacks of 9/11 would be a foreseeable consequence. Comparing this case to the Second Circuit's banking cases under JASTA in which a defendant bank actually provided some assistance to an intermediary, it is evident that plaintiffs cannot meet the general awareness standard with respect to WAMY. In *Honickman*, the court dismissed an aiding-and-abetting claim against a bank that provided financial services to customers allegedly connected to Hamas, holding that "the allegations do not

---

[116] See also ¶233, citing to *In re Terrorist Attacks on September 11, 2001*, 718 F. Supp.2d 456, 486 (S.D.N.Y June 17, 2010) dismissing Abdullah Bin Ladin from this litigation.
[117] See pages 40 - 41 supra.

support an inference that BLOM Bank was aware of the Three Customers' ties with Hamas prior to the relevant attacks."[118] Similarly, in *Weiss*, the Second Circuit rejected claims against a bank that transferred funds at the direction of a customer to entities allegedly supporting Hamas, concluding that plaintiffs "could not show . . . that NatWest was generally aware that it was playing a role in Hamas's acts of terrorism."[119] The same result followed in *Siegel v. HSBC N. Am. Holdings, Inc.*, where the court rejected aiding-and-abetting claims because the defendant "had little reason to suspect that it was assuming a role in [al Qaeda's] terrorist activities."[120]

Unlike in these banking cases, WAMY did not provide any assistance to any intermediary that was connected to al Qaeda. To the extent that any third party may have had some connection to al Qaeda, the record does not show that WAMY would have been aware that by working with the intermediary in providing humanitarian relief, it was assuming a role in al Qaeda's terrorist activities.

3. <u>WAMY never knowingly provided any assistance to al Qaeda and certainly never knowingly provided substantial assistance</u>.

"Unlike the general awareness inquiry, the defendant's knowing assistance is 'designed to capture the defendants' state of mind with respect to their actions and the tortious conduct.'"[121] *Halberstam's* six substantial assistance factors "are a tool to identify 'participation in another's wrongdoing that is both significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor'" under JASTA.[122] Applying these factors shows that WAMY did not knowingly participate in al Qaeda's wrongdoing and certainly not to an extent that was so

---

[118] *Honickman,* 6 F.4th at 501–02.
[119] *Weiss,* 993 F.3d at 167.
[120] *Siegel v. HSBC North America Holdings, Inc.,* 933 F.3d 217, 223–25 (2d Cir. 2019).
[121] *Ashley,* 144 F.4th at 438 (citing *Twitter,* 598 U.S. at 504).
[122] *Ashley,* 144 F.4th at 439.

systemic and pervasive  to justify holding WAMY responsible as an aider and abettor for al Qaeda's murderous acts on September 11, 2001.

   1)  The nature of the act encouraged.

 WAMY never took any steps to encourage or solicit al Qaeda to commit any terrorist act. WAMY never encouraged any act of terrorism or violence either by its written publications, the statements of WAMY officials, its youth camps, its schools, or in any other way. (SOF ¶¶24-50,51-67, 68-85, 105-116, 486-531, 547-599).[123] Plaintiffs and their experts attempts to establish otherwise fail and are nothing short of pure conjecture and outright fabrications. As Prof. Blankinship explains well, WAMY officials use of such terms as 'jihad' does not at all mean support for terrorism. (SOF ¶¶581-594). When viewed fairly, objectively, and in context; none of WAMY's publications, statements of its officials, or programs or curriculum at any camp or school in any way encouraged al Qaeda's violent terrorist attacks against the United States. (SOF ¶ 14-15, 24-44, 52-67, 569-599).

(2) The amount of assistance given by the defendant.

As discussed with respect to the first JASTA aiding and abetting element, WAMY never provided any assistance to al Qaeda, directly or indirectly.[124] WAMY never trained or supported any al Qaeda member. WAMY never provided weapons, military equipment, or tangible goods of any kind to al Qaeda. WAMY never provided any funds to al Qaeda and never did anything to launder al Qaeda's money.

(3) The defendant's presence or absence at the time of the tort.

There is no nexus between WAMY, any of its chapters, or any of its personnel and the terrorist attacks of September 11, 2001. While WAMY is an international charity with offices all over the

---

[123] See also pages 17-49 supra.
[124] See pages 17 to 49 supra.

world including the United States, there is no evidence of any connection between WAMY and al-Qaeda, those who carried out the terrorist attacks of September 11, 2001, those who planned the attacks, those who ordered the attacks, or those who financed the attacks.

Beyond a weak connection, there is no evidence of any connection between any knowing conduct by WAMY and any act of terrorism perpetrated by al Qaeda. As this Court has held, to establish the requisite nexus to hold a defendant liable as an aider-and-abettor under JASTA, 'the [defendant's] support of al Qaeda must have a reasonable temporal, geographical or causal connection or proximity to the 9/11 attacks."[125] The record shows that WAMY was subject to oversight, including in Saudi Arabia and Pakistan, in the late 1990s and the years before the 9/11 attacks.[126] WAMY cooperated with these oversight authorities; none of which concluded that WAMY provided any aid to al Qaeda leading up to the 9/11 attacks.[127] As close to the time of the tort as 2000-2001, WAMY sought to educate its staff about fraud and money laundering and took action against those who did not follow its internal rules of conduct.[128] While WAMY certainly provided aid to people in need all over the world including in areas of strife, this was part of WAMY's core mission and what it did regularly every day. There is no evidence that WAMY's mere presence in these areas was contemporaneous with or related to any tort or wrongful act committed by al Qaeda.

(4) The defendant's relation to the principal.

There is no reliable evidence that WAMY has any relation to al Qaeda. Neither the 9/11 Commission, the U.S. Department of Treasury, any U.S. intelligence agency, or any U.S. criminal investigative agency has concluded that WAMY has any relation to al Qaeda as a provider of

---

[125] *In re Terrorist Attacks of September 11, 2001,* 2023 WL 2430381 at * 11.
[126] See pages  17-20, 25, 28 supra.
[127] Id.
[128] See pages 18, 23-25, 43-44 supra.

financial support,  material support, or aid of any kind. (SOF ¶¶465-478, 479-482, 483-485, 486-531).  Any suggestion that WAMY's affiliate LBI knowingly aided and abetted al Qaeda directly or indirectly is based on unreliable evidence and concerns events in the late 1980's to early 1990's. (SOF ¶¶199-202, 510-511). Further, any such "relation" would have been through Adel Batterjee, an individual who WAMY dismissed from LBI in 1993 for failing to follow its reporting requirements. (SOF ¶¶172-174) Indeed, certainly in the years preceding the 9/11 attacks from 1995-1996 onward, Osama Bin Laden and al-Qaeda and Saudi Government sanctioned charities such as WAMY had a hostile and antagonistic relations if they had any relations at all. (SOF ¶¶532-545).

(5) The defendant's state of mind.

As demonstrated above, neither WAMY's publications, the statements of WAMY officials, or the programs and curriculum of its camps and schools, establish that WAMY had a state of mind consistent with knowingly providing substantial assistance to al Qaeda.[129] WAMY's mainstream Saudi beliefs do not at all provide any support for violent acts of terrorism, let alone "the ideological foundations for al Qaeda." (SOF ¶¶ 569--599). Plaintiffs' claims to the contrary lack reliable evidentiary support and evidence a fundamental misunderstanding, if not a deliberate misrepresentation, of the religious views and principals expressed by a conservative mainstream Saudi religious organization such as WAMY.

(6) The period of the defendant's assistance.

WAMY did not provide any assistance to al Qaeda. As discussed above, if there was any assistance to al Qaeda without WAMY's knowledge through Adel Batterjee when he was affiliated with LBI, any such assistance would have ended in 1993. Any conduct occurring in the 1980's and

---

[129] See pages 49-57 supra.

into the early 1990's is simply too remote, and not connected in any meaningful way to the 9/11 attacks.[130]

In *Siegel,* the Second Circuit found it "crucial" that the defendant had ceased its relationship with a terrorism-linked bank ten months before the attacks at issue, concluding that the defendant was not "present" at the time of the attacks and had not knowingly and substantially assisted in the principal violation.[131] Even if one for the sake of argument accepts that Adel Batterjee had links to al Qaeda or its predecessor organizations, any relationship WAMY had with Batterjee ended in 1993. WAMY certainly did not thereby knowingly and substantially assist al Qaeda in the 9/11 attacks.

Here, there is no definable nexus between anything WAMY did and al Qaeda's terrorist attacks of 9/11. Viewing the entire record, the evidence is far from what the law requires for plaintiffs to meet their dramatically increased burden of showing that any alleged assistance WAMY provided to al Qaeda was so pervasive and systemic–such as with Ms. Hamilton in *Halberstam*–to hold WAMY responsible for all of al Qaeda's violent acts.

In consideration of the *Halberstam* factors, the Supreme Court's guidance in *Twitter,* and controlling Second Circuit precedent interpreting JASTA; plaintiffs' cannot produce reliable and admissible evidence creating a genuine dispute that 1) WAMY provided any assistance to al-Qaeda, 2) that WAMY was generally aware that it had any role in al-Qaeda's terrorist activity, and 3) that WAMY knowingly and substantially assisted al Qaeda in committing terrorist attacks against Americans. WAMY is therefore entitled to summary judgment as to Plaintiffs' aiding-and-abetting claims.

---

[130] *In re Terrorist Attacks on September 11, 2001,* 2023 WL 2430381 at * 12
[131] *Siegel.*, 933 F.3d at 224.

### C. JASTA: Conspiracy Liability

A civil conspiracy claim under JASTA has four elements: "1) an agreement between two or more persons; (2) to participate in an unlawful act…; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme."[132] While a JASTA conspiracy claim does not require proof of a direct connection between the defendant and the person who committed the act of international terrorism, to be liable as a co-conspirator a defendant must be shown to have "conspired–*either directly or indirectly*–with the terrorist perpetrators."[133] "Evidence of an agreement may be 'indirect' but must show that the parties share a 'conscious commitment to a common scheme designed to achieve an unlawful objective.'"[134] To establish a defendant is liable as a co-conspirator, "[a] plaintiff must offer 'direct or circumstantial evidence that reasonably tends to prove…a conscious commitment to a common scheme designed to achieve an unlawful objective.'"[135]

In the case at bar, to be liable under a JASTA conspiracy theory, plaintiffs must prove that WAMY, directly or indirectly, entered into an agreement *with al Qaeda* to commit terrorist acts to intimidate civilians and influence United States policy.[136] Civil conspiracy liability under JASTA

---

[132] *Freeman v. HSBC Holdings PLC*, 57 F.4th 66, 78 (2d Cir. 2023) (citing *Halberstam,* 705 F.2d at 477); *Bernhardt*, 47 F.4th at 873.

[133] *Freeman*, 57 F.4th at 79 (emphasis in original)

[134] *In re Terrorist Attacks on Sept. 11, 2001*, No. 03-CV-06978, 2023 WL 2430381, at *13 (S.D.N.Y. Mar. 9, 2023); (citing *Freeman,* 57 F.4th at 79 (quoting *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 39 (2d Cir. 2018)); see also *United States v. Parker*, 554 F.3d 230, 234 (2d Cir. 2009) ("[U]nless at least two persons have a *shared* purpose or stake in the promotion of an illegal objective, there is no conspiracy."); *Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 793 (2d Cir. 1987) ("[C]onspirators [must have] a unity of purpose or a common design and understanding.")

[135] *North American Soccer League,* 883 F.3d at 39 (citing *Monsanto Co. v. Spray-Rite Serv. Corp.,* 465 U.S. 752, 768, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984)).

[136] See ECF 7942 at 51. See also *Ofisi v. BNP Paribas, S.A.*, 77 F.4th 667, 671-72 (D.C.Cir. 2023) (defendant and al-Qaeda must share a common scheme for defendant to be liable under JASTA conspiracy); *Levine v. Cloudfare, Inc.*,____ F.Supp.3d ___ , ___ ,2025 WL 4349272 at * 5 (N.D. Fla. 2025) (JASTA conspiracy liability requires that defendant conspired with terrorists or anyone else) to commit acts of terrorism); *Newman v. Associated Press*, 758

does not reach any coconspirator conduct that foreseeably results from the conspiracy.[137] The requirement that there must be an overt act to further the overall object of the conspiracy "is grounded in the very core of conspiracy liability, which is an *agreement* between the defendant and the primary wrongdoer to commit a wrong."[138] The mere fact that certain conduct may be foreseeable is therefore not enough to meet the in-furtherance-of-requirement at the heart of a conspiracy claim.[139]

*Freeman,* supra, is instructive. There, the Second Circuit found that the plaintiffs did not allege that the defendant banks were "pursuing the same object" as the terrorist groups.[140] While the terrorist groups were "actively engage[d] in planning and perpetrating the murder and maiming of hundreds of Americans in Iraq," there was no allegation that the defendants joined in that agreement and were also engaged in the planning and perpetuating the murder of Americans.[141] The Second Circuit therefore concluded that there was no allegation that the parties were "engaged in a common pursuit" to establish a conspiracy. Id.

1.  <u>WAMY never entered into an agreement with al Qaeda, directly or indirectly, to commit the terrorist attacks.</u>

WAMY never entered into any agreement to plan and perpetrate the killing of Americans in New York, Washington D.C., Pennsylvania, or anywhere else. Clearly, this was al Qaeda's criminal objective. Plaintiffs can offer no reliable evidence showing that WAMY ever shared this goal. Certainly, as the report and testimony of forensic accounting expert Jonathan Marks

---

F.Supp.3d 1357, 1374-75 (S.D. Fla. 2024) (Conspiracy liability under JASTA requires defendant enter into agreement to commit terrorist attacks).

[137] *Freeman,* 57 F.4th at 81.

[138] Id. (emphasis added in original) (citing Restatement (Third) of Torts: Liability for Economic Harm § 27 (Am. L. Inst. 2020).

[139] *Freeman,* 57 F.4th at 82.

[140] *Freeman,* 57 F.4th at 80.

[141] *Id.*

64

confirms, there were no red flags in WAMY's financial practices, procedures, and activities that would show it ever entered into any agreement to further al Qaeda's terrorist activities.[142] As discussed extensively in the discussion of aiding and abetting liability under JASTA, WAMY in no way provided any aid to al Qaeda either through monetary aid or money laundering, furthering its violent ideology, providing training grounds for its fighters, disseminating pro-al Qaeda literature, or otherwise providing support to al Qaeda anywhere in anyway. Conclusory allegations cannot take the place of facts and evidence. Nowhere is there any evidence that WAMY intended to kill or injure Americans or commit acts of terrorism let alone that WAMY entered into an agreement with al Qaeda to achieve these ends.

Because plaintiffs cannot produce reliable and admissible evidence creating a genuine dispute that WAMY ever entered an agreement with al Qaeda to commit an act of international terrorism, summary judgment is warranted in favor of WAMY as to Plaintiffs' JASTA conspiracy claims.

### D. Primary Liability Under the ATA

Plaintiffs seek to impose primary liability on WAMY under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a). The statute provides as follows:

> **(a) Action and jurisdiction.--**Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.[143]

To prevail on a claim for primary liability under the ATA, Plaintiffs must prove three formal elements: (1) an unlawful predicate act; (2) the requisite mental state; and (3) causation.[144]

---

[142] *In re Terrorist Attacks of September 11, 2001,* 2025 WL 2485412 at * 9 (discussing that the absence of glaring indications of terrorist activity, with many possible explanations for activity not involving terrorist activity, was insufficient to show that Dalla Avco entered into an agreement to further al Qaeda's terrorist activity).

[143] 18 U.S.C.A. § 2333(a) (2026)

[144] *Sokolow v. Palestine Liberation Org.*, 60 F. Supp. 3d 509, 514 (S.D.N.Y. 2014) (quoting *Gill v. Arab Bank, PLC* ("Gill II"), 893 F. Supp. 2d 542, 553 (E.D.N.Y. 2012)).

Primary liability under the ATA requires proof that the Defendant itself committed an act of international terrorism.[145] "The Anti-Terrorism Act creates a private cause of action to recover for physical and property damages sustained by United States nationals who are the victims of international terrorism."[146]

As a threshold matter, Plaintiffs must establish that their injuries resulted from an act of "international terrorism," which is "defined as activities that involve violent acts or acts dangerous to human life that are prohibited under federal or state criminal law."[147] "The commission of activities that would be violative of the ATA criminal statutes are deemed to constitute acts of terrorism which can be civilly redressed."[148]

Providing material support to terrorists or providing material support or resources to designated foreign terrorist organizations may be unlawful predicate acts under 18 U.S.C. § 2339A and § 2339B respectively.[149] As of September 11, 2001, "material support" under both statutes meant "currency or other financial securities, financial services, lodging, training, safehouses, false documentation or identification, communications, equipment, facilities, weapons, lethal

---

[145] *Sokolow,* 60 F. Supp. 3d at 514; *Linde,* 882 F.3d at 329; *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 497–501 (2d Cir. 2021).

[146] *In re Terrorist Attacks on September 11, 2001*, 740 F. Supp. 2d 494, 513 (S.D.N.Y. 2010)

[147] *Id.* at 515 (citing 18 U.S.C. § 2331(1)(A)–(C)); see also *Sokolow*, 60 F. Supp. 3d at 514; *Linde,* 882 F.2d at 326 ("to qualify as international terrorism, a defendant's act must *also* involve violence or endanger human life.") (emphasis in original).

[148] *Terrorist Attacks VII*, 740 F. Supp. 2d at 516.

[149] *Linde,* 882 F.3d at 326 ("conduct that violates a material support statute can also satisfy the § 2331(1) definitional requirements of international terrorism in some circumstances").

substances, explosives, personnel, transportation, and other physical assets."[150] "Material support"

does not include "medicine or religious materials."[151]

For each element, plaintiffs must also satisfy the statutory requirements set forth in 18 U.S.C. § 2331. The ATA applies only to acts "intended" to "intimidate or coerce a civilian population," "influence the policy of a government by intimidation or coercion," or "affect the conduct of a government by mass destruction, assassination, or kidnapping."[152]

1.  <u>WAMY may not be held liable under the ATA for any alleged provision of material support prior to the effective date of the statute allegedly violated.</u>

A defendant may not be held liable under the ATA for alleged provision of material support provided before the effective of the statute criminalizing that conduct.[153] 18 U.S.C. § 2339A became effective on September 13, 1994, while 18 U.S.C. § 2339B was adopted on April 24, 1996.[154] Any alleged provision of material support by WAMY that preceded adoption of the statutes cannot be a basis for any violation of the ATA.

2.  <u>WAMY did not commit any unlawful predicate act.</u>

Plaintiffs cannot offer any evidence that WAMY itself engaged in violent acts or acts dangerous to human life as required by 18 U.S.C. § 2331(1). Nor can plaintiffs show that WAMY willfully provided material support under 18 U.S.C. § 2339A or § 2339B. As discussed and

---

[150] *In re Terrorist Attacks on Sept. 11, 2001*, No. 03MD01570GBDSN, 2022 WL 4227151, at *20 (S.D.N.Y. May 3, 2022), *amended on reconsideration in part,* No. 02-CV-06977, 2022 WL 4591496 (S.D.N.Y. Sept. 23, 2022), *report and recommendation adopted in part, rejected in part,* No. 02-CV-06977, 2023 WL 5132138 (S.D.N.Y. Aug. 10, 2023), *decision clarified on reconsideration,* No.02CV6977GBDSN, 2024 WL 809887 (S.D.N.Y. Feb. 27, 2024), and *report and recommendation adopted in part, rejected in part,* No. 02-CV-06977, 2023 WL 5132138 (S.D.N.Y. Aug. 10, 2023), and *decision clarified on reconsideration,* No. 02CV6977GBDSN, 2024 WL 809887 (S.D.N.Y. Feb. 27, 2024) (citing 18 U.S.C. § 2339A (version effective from Oct. 11, 1996 to Oct. 25, 2001)).
[151] 18 U.S.C. § 2339A (version effective from Oct. 11, 1996, to Oct. 25, 2001).
[152] 18 U.S.C. § 2331(1).
[153] *Boim v. Holy Land Foundation,* 549 F.3d 685, 691 (7th Cir. 2008) (to state a § 2333 claim based on a violation of § 2339A, defendant must have provided material support "between the effective date of §2339A and [the terrorist act]"); *Strauss v. Credit Lyonnais, S.A.,* 2017 WL 4481126 at * 5 (E.D.N.Y. 2017)
[154] *See* Pub. L. 103-322, tit. XII, § 120005(a); Pub. L. 104-132, tit. III, § 303(a).

demonstrated above, WAMY did not commit any unlawful predicate act or provided any aid to al Qaeda whatsoever, directly or indirectly.[155] Plaintiffs' misleading and outrageous claim that WAMY is an al Qaeda front is demonstrably false and wholly unsupported by any admissible evidence. As WAMY never provided any aid or assistance to al Qaeda, WAMY necessarily never provided any material support.

3.    WAMY did not have the requisite mental state.

As to the second element, the ATA requires proof that a defendant knowingly committed or materially supported an unlawful predicate act.[156] To be liable under § 2339A, "a donor to terrorism…must have known that the money would be used in preparation for or in carrying out the killing or attempted killing of, conspiring to kill, or inflicting bodily injury on, an American citizen abroad."[157] § 2339B(a)(1)'s scienter requirement, incorporated into § 2333(a), requires that a defendant both knew that it was providing material support to a terror group and knew that the group engaged in terrorist activity.[158]

Discovery conclusively confirms that WAMY did not have the requisite mental state. Plaintiffs fail to show that WAMY expressly aimed intentional tortious conduct at the United States, or that WAMY "specifically intended to aid al Qaeda in the commission of a terrorist attack against the United States and its citizens."[159]  There is simply no evidence that WAMY knowingly provided funds or other material support to al Qaeda or knowingly supported the terrorist group in its efforts to kill or inflict bodily harm on Americans.

---

[155] See pages 17-49 supra.
[156] *Linde,* 384 F. Supp. 2d at 586; *Sokolow*, 60 F. Supp. 3d at 514.
[157] *Boim,* 549 F.3d at 691.
[158] *Weiss*, 768 F.3d at 208.
[159] *In Re Terrorist Attacks on September 11, 2001,* 2023 WL 2430381, at *10 (quoting *Terrorist Attacks IV*, 718 F. Supp. 2d at 487).

4.  <u>WAMY did not cause plaintiffs' injuries.</u>

Causation is an independent and fatal defect in plaintiffs' claims. To satisfy the third element, plaintiffs must show that their injuries "arise out of or relate to" WAMY's conduct, and that WAMY's alleged support had a "reasonable temporal, geographical, or causal connection, or proximity to the 9/11 attacks."[160] § 2333(a) requires proximate cause.[161] "Causation focuses on the relationship between an alleged act of international terrorism and a plaintiff's injury."[162] "The more attenuated the cause and effect, and the more inferential leaps the jury would have to make to find that Defendants' actions resulted in Plaintiffs' injuries, the less likely it is that Plaintiffs can meet their burden with respect to causation."[163]

This Court's decision in *Ashton v. Al Qaeda Islamic Army* is directly on point. There, Plaintiffs alleged nearly identical theories of indirect funding, logistical assistance, travel facilitation, and recruitment. This Court found those allegations "conclusory, largely boilerplate, and concern conduct too temporal and geographically remote from the 9/11 Attacks to have proximately caused Plaintiff's injuries."[164] This Court then noted:

> For instance, the vast majority of Plaintiff's allegations involve alleged acts by Charities to aid and support al Qaeda's efforts in Europe, Africa, the Middle East, and the Far East during the 1980s and 1990s; none bear any definite and specific, articulable connection to the 9/11 Attacks or those who carried them out. Moreover, as the Second Circuit has held, **allegations that the Charities provide funding to entities that are known to support terrorism, that, in turn, provided funding to al Qaeda and other terrorist organizations are insufficient for proximate causation purposes.**[165]

---

[160] *Fed. Ins. Co.*, 2023 WL 2430381, at *11 (quoting *Terrorist Attacks IV*, 718 F. Supp. 2d at 482).

[161] *Rothstein v. UBS AG*, 708 F.3d 82, 95–97 (2d Cir. 2013); *Ahmad*, 600 F. App'x at 801.

[162] *Linde*, 882 F.3d at 331 (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)).

[163] *Sokolow*, 60 F. Supp. 3d at 515 (citing *In re Terrorist Attacks on September 11, 2001,* 714 F.3d 118, 124 (2d Cir.2013) (holding that allegations that defendants "provided funding to purported charity organizations known to support terrorism that, in turn, provided funding to al Qaeda" were insufficient to allege causation and survive a Rule 12(b)(6) motion to dismiss)).

[164] *In re Terrorist Attacks on September 11, 2001*, 298 F. Supp. 3d 631, 659 (S.D.N.Y. 2018).

[165] *In re Terrorist Attacks on September 11, 2001*, 298 F. Supp. 3d at 659 (emphasis added).

The Second Circuit reached the same conclusion in *Rothstein* holding that allegations of funding intermediaries or charities allegedly connected to terrorism are insufficient absent proof that funds actually reached al Qaeda or aided the 9/11 attacks.[166]   The Second Circuit reached a similar result in *In re Terrorist Attacks on September 11, 2001 ("Terrorist Attacks VI")*, 714 F.3d 118 (2d Cir. 2013). The plaintiffs there alleged that defendants "provided funding to purported charity organizations known to support terrorism that, in turn, provided funding to al Qaeda and other terrorist organizations."[167] The court held: "These allegations are insufficient for proximate causation purposes for the same reasons the allegations in *Rothstein* fell short. Simply put, plaintiffs do not allege that the . . . defendants participated in the September 11, 2001 attacks or that they provided money directly to al Qaeda; nor are there factual allegations that the money allegedly donated by the . . . defendants to the purported Charities actually was transferred to al Qaeda and aided in the September 11, 2001 attacks."[168]   That absence of proximate cause foreclosed not only the federal Anti-Terrorism Act claims but also state-law claims as well.[169]

Plaintiffs can offer no reliable evidence WAMY participated in the terrorist attacks of September 11, 2001; that WAMY provided money or other material support directly to al Qaeda; nor that any funds or material support provided by WAMY was transferred to al Qaeda and aided in the terrorist attacks. Causation is lacking and the plaintiffs' claims under the ATA must fail.

### III.    Claims against WAMY under New York law.[170]

Plaintiffs bring state law claims against WAMY for wrongful death, trespass, civil assault and battery, and destruction of property. Plaintiffs' state law claims fail for the same reasons that their

---

[166] *Rothstein*, 708 F.3d at 97; *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 118, 124 (2d Cir. 2013).
[167] *Id.* at 124.
[168] *Id.* (citation omitted).
[169] *Id.* at 126-27.
[170] *In re Terrorist Attacks on September 11, 2001,* 2023 WL 5132138 at * 13 (S.D.N.Y. 2023) (noting previous cases in this multidistrict litigation have applied New York law to plaintiffs' state law claims)

70

claims under the ATA and JASTA are without merit: WAMY did nothing to aid al Qaeda, directly or indirectly, in carrying out any act of terrorism, nor aided and abetted or conspired with al Qaeda in its terrorist activities.

To establish wrongful death under New York law, plaintiffs must prove, inter alia, that WAMY committed a "wrongful act, neglect or fault of the defendant by which the decedent's death was caused."[171] The evidence does not show that WAMY committed any act, wrongful or otherwise, that caused any decedent's death in the 9/11 attacks.

"The elements of a cause of action sounding in trespass are an intentional entry onto the land of another without justification or permission, or a refusal to leave after permission has been granted but there after withdrawn."[172] There is no evidence that WAMY, directly or indirectly, entered on any land at issue in this case with respect to the 9/11 attacks.

Both assault and battery require proof of intentional conduct by WAMY: intent to put another in fear of "imminent apprehension of harmful contact" and intent to make offensive bodily "contact without the plaintiff's consent" respectively.[173] A destruction of property claim also requires that a defendant "intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession"[174] There is no evidence here that WAMY had the requisite intent, that it committed any assault, or that it assumed or exercised control over personal property belonging to any plaintiff.

---

[171] *Proano v. Gutman*, 211 A.D.3d 978, 982–83, 180 N.Y.S.3d 279, 284 (2022).
[172] *Huang v. Fort Greene P'ship Homes Condo.*, 228 A.D.3d 912, 917, 215 N.Y.S.3d 351, 358 (2024).
[173] *Kuznitz v. Funk*, 187 A.D.3d 1006, 1006, 133 N.Y.S.3d 46, 48 (2020)
[174] *Petrone v. Davidoff Hutcher & Citron, LLP*, 150 A.D.3d 776, 777, 54 N.Y.S.3d 25 (2d Dept. 2017 (internal citations and quotation marks omitted).

Plaintiffs have not produced sufficient evidence creating a genuine issue of material fact as to any of the alleged state tort claims. WAMY is therefore entitled to summary judgment on these claims as well.

IV.    *WAMY was never served with the Burnett Complaint.*

Under Fed. R. Civ. P. 12(b)(5), a party may move for dismissal on the grounds of "insufficient service of process."[175]  Fed. R. Civ. P. 4  "governs the content, issuance, and service of a summons."[176] A corporation, such as WAMY, may be served "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process and—if the agent is one authorized by statute and the statute so requires—by also mailing a copy of each to the defendant."[177] Pursuant to Rule 4:

> If a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.[178]

While an affidavit of service creates a presumption of proper service, this presumption may be overcome by a sworn denial of service including specific facts contradicting those in the affidavit of service.[179] The plaintiff ultimately bears the burden of proving adequacy of service and conclusory statements are insufficient to overcome a sworn denial that a defendant was not served.[180]

---

[175] Fed. R. Civ. P. 12(b)(5).
[176] *DeLuca v. AccessIT Group, Inc.*, 695 F.Supp.2d 54, 64 (S.D.N.Y. 2010).
[177] Fed. R. Civ. P. 4(h).
[178] Fed. R. Civ. P. 4(m).
[179] *Goldman v. Weisman*, No. 23-CV-09602 (ER), 2025 WL 448328, at *2 (S.D.N.Y. Feb. 10, 2025)
[180] Id.

On November 22, 2002, Plaintiffs in the Burnett matter filed their third amended complaint in *Burnett et al v. Al Baraka Investment and Development*, et al Case No. 20 cv 1616, against "World Assembly Muslim Youth a/k/a WAMY International, Inc." (ECF No. 29). WAMY and WAMY International filed their answer to the third amended complaint on October 15, 2010 (ECF No. 2370) which includes the affirmative defense that "Plaintiffs failed to sufficiently serve process on Defendants. Defendants preserve this defense and do not waive their right by answering the complaint to the extent that Judge Daniels did not address the Defendants' motion on this issue in his September 13, 2010, Order." (ECF No. 2370).

Burnett Plaintiffs never served any person authorized to accept service for WAMY. (SOF ¶¶615-622). Process server Robert Reynolds's affidavit of service that he personally served a "Summons & Amended Complaint" on "World Assembly of Muslim Youth a/k/a WAMY International., a/k/a World Association of Muslim Youth" identifies the person served as Caroline Sodder at "4:10 pm" at "5134 Leesburg, Alexandria, Virginia, 22302." (SOF ¶616). The sworn declaration of the former director of WAMY International, Ibrahim Abdullah, confirms that Caroline Sodder is not nor ever has been a person authorized to accept service on behalf of WAMY, or indeed, someone who had any association with WAMY at all. (SOF ¶¶620-622). WAMY's registered agent on December 23, 2002, the date of claimed service, was Fadel Soliman (SOF ¶620). Because the Burnett plaintiffs never properly served WAMY or WAMY Int'l, despite the opportunity to cure the defect (SOF ¶¶603-614), the Burnett Complaint must be dismissed.

73

## CONCLUSION

For the foregoing reasons, defendants World Assembly of Muslim Youth and World Assembly of Muslim Youth International ask that their motion for summary judgment be granted in all respects.

Dated: April 15, 2026

**LAW FIRM OF OMAR T. MOHAMMEDI LLC**

/s/ *Omar T. Mohammedi*

Omar T. Mohammedi (OM7234)
Frederick J. Goetz
Goetz & Eckland P.A.
(admitted *pro hac vice*)
233 Broadway, Suite 820
New York, NY 10279
Telephone: (212) 725-3846
Fax: (212) 202-7621
Email: omohammedi@otmlaw.com

*Counsel for Defendants World Assembly of Muslim Youth and World Assembly of Muslim Youth International*