**UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001** | **03-MD-1570 (GBD)(FM)** **ECF Case** |

This document relates to:

*Ashton, et al. v. Al Qaeda Islamic Army, et al.* No. 02-CV-6977
*Burnett, et al. v. Al Baraka Investment & Development Corp., et al.,* No. 03-CV-5738
*Continental Casualty Co., et al. v. Al Qaeda Islamic Army, et al.,* No. 04-CV-05970
*Euro Brokers v. Al Baraka Investment and Development Corp., et al,* No. 04-CV-7279
*Estate of O'Neill, et al. v. Al Baraka Investment and Development Corp., et al,* No. 04-CV-1923
*Federal Insurance Col, et al. v. Al Qaida, et al.,* No. 03-CV-6978

<u>**RULE 56.1 STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANTS WORLD ASSEMBLY OF MUSLIM YOUTH'S AND WORLD ASSEMBLY OF MUSLIM YOUTH INTERNATIONAL'S MOTION FOR SUMMARY JUDGMENT**</u>

In accordance with Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1, Defendants World Assembly of Muslim Youth and World Assembly of Muslim Youth International (collectively "WAMY") submit the following statement of material facts, as to which there is no genuine issue to be tried.

I.     **Conceived From American-born Ideas and Established By Saudi Royal Decree, WAMY Is the Largest Muslim Youth Organization In the World**

1.     The World Assembly of Muslim Youth's ("WAMY") genesis began with Muslim students at mostly United States' colleges and universities who envisioned an international entity to help and guide Muslim youth in the Muslim world to develop themselves and serve their countries through education, social work, understanding their origin, and a better relationship to others. Ex. 1[1], Jamal Barzinji Dep. Transcript (Excerpts) at 18:5-19:7 (discussing WAMY's foundational mission), at 45:1-18 (Barzinji discussing his involvement in creation of WAMY and its purpose); Ex. 2, Saleh Wohaibi 2026 Declaration at ¶9 (discussing WAMY origins).

2.     In 1972, the Kingdom of Saudi Arabia ("KSA" or "Kingdom") formerly established

---

[1] See, the Declaration of Omar T. Mohammedi referencing the numbered exhibits cited herein.

WAMY by Royal decree.   Ex. 3, WAMYSA1248923 (discussing Royal decree establishment); Ex. 4, Saleh Wohaibi Deposition Transcript (Excepts) at 42:16-18 (stating that WAMY was established in 1972); Ex. 5, Abdul Wahab Noorwali Dep. Transcript (Excerpts) at 272:18-24 (confirming that WAMY was established under the Royal Decree in 1972 [1392 AH] as an independent organism).

3.     As set forth in its Constitution, WAMY is an "Independent International Islamic Organization and an Islamic Forum that supports the efforts of the Islamic workers of Muslim Youth organizations in the world, their institutions and associations." Ex. 6, WAMY-SA E001045-052 and 056 at 045 (Constitution of WAMY at Art. 1); Ex. 7, WAMY SA E001104-112 at 104 ("Authorized English Translation of The Constitution of [WAMY]," noting it incorporates amendments made in January 1993).

4.     After initially operating under the Ministry of Higher Education, WAMY operated under the auspices of the Ministry of Islamic Affairs, Endowments, Da'wah and Guidance ("MOIA") from 1993.  Ex. 4 at 91:4-94:12 (discussing transition to MOIA); Ex. 8, WAMYSA051643-654 at 646 (1993 Minutes of General Secretariat explaining the switch from Minister of Higher Education to Minister of Islamic Affairs); Ex. 3 (discussing transfer to MOIA).

5.     Though created by Royal Decree, WAMY is an independent not-for-profit charity. Ex. 5 at 272: 9-273:3 (confirming that WAMY was established as an independent organism under the Royal Decree); Ex. 2 at ¶9 (discussing Royal Decree); Ex. 7 at WAMY SA E001104 (WAMY Constitution Preamble: "WAMY will henceforward be an independent international Islamic forum..."); Ex. 6 at WAMY-SA E001045.

6.     WAMY is not an organ or an instrumentality of the Kingdom nor does the Kingdom oversee the day-to-day activities of WAMY.   Ex. 5 at 273:1-10 (confirms WAMY operates independently of the Saudi government and that the Saudi government did not operate day-to-day control over WAMY); Ex. 6 at WAMY-SA E001045.

7.       WAMY is led by a Secretary General who serves as WAMY's representative to international organizations and associations and manages its affairs. Ex. 6 at WAMY-SA E1050 (Art. 15).

8.       Only the following have served as WAMY's Secretary General:

| Name | Period |
|---|---|
| Dr. Abdel Hameed Abu Soliman | 1973-1978 |
| Dr. Ahmad Bahafidhallah | 1978-1981 |
| Dr. Tawfeeq Ibn Ahmad Al Qusayyer | 1981 – 1986 |
| Dr. Manih ibn Hammad al-Al-Johani | 1986-2002 |
| Dr. Saleh S. Al-Wohaibi | 2002-2024 |
| Dr. Salih Ibn Ibrahim Babaer | 2024 to present |

Ex. 4 at 25:12-14 (Wohaibi confirming he has been the Secretary General since 2002); Ex. 5 at 86:4-9 (Noorwali confirming that Wohaibi served as Secretary General after Dr. Al-Al-Johani passed away); Ex. 9, Saleh Wohaibi November 2005 Declaration at ¶16 (providing a list of all Secretary Generals of WAMY since its inception); Ex. 2 at ¶6 (confirming Babaer as new Secretary General).

9. The Secretary General, along with the Assistant Secretary Generals that report to him, conduct WAMY's day-to-day activities and do so "in accordance with the Constitution and by-laws of WAMY." Ex. 4 at 20:11-18 (Wohaibi confirming the Secretary General is responsible for the day-to-day direction of WAMY organization), at 145:7-146:9 (confirming that the daily operations of WAMY are supervised by its Secretary General); Ex. 6 at WAMY-SA E001050-051 ("The Assistant Secretary General shall assist the Secretary General in discharging his responsibilities. He shall assign to them any work related to WAMY's aims."); see also Ex. 7 at WAMY SA E001111 ("the Assistant Secretaries will help the Secretary General in fulfilling his responsibilities to achieve WAMY's objectives…").

10.       WAMY has never had a "chairman." Ex. 6 at WAMY-SA E001056 (Article 6 outlining the governing bodies but no chairman is mentioned); see also, Ex. 7 at WAMY SA E001107-111 (outlining the governing bodies but no chairman is mentioned).

3

11.     Adel Batterjee has never been WAMY's Secretary General, an Assistant Secretary General, nor held any position let alone a leadership within WAMY.   Ex. 10, Adel Batterjee 2004 Declaration at ¶9 ("Also, I never served as any executive of World Assembly of Muslim Youth let alone Secretary-General"); Ex. 9 at ¶14-16 (Batterjee did not serve as WAMY executive member).

### A.     WAMY's Core Mission: Educating and uplifting Islamic Youth Worldwide

12.     Education is WAMY's core mission both as a forum connecting different groups working in the field of Islamic youth and student organizations, and through uplifting Muslim youth in Saudi Arabia and internationally by raising their moral character and safeguarding them from religious extremism.  Ex. 2 at ¶¶ 11-16; Ex. 11, Mustafa Ismail 2022 Declaration at ¶12 (attesting to WAMY's non-extremist teaching of Islam and that Islam is a human religion); Ex. 3 (discussing WAMY's role gathering student organizations); Ex. 6 at WAMY-SA E001045-46 (WAMY's Constitution discussing WAMY's aims and objectives); Ex. 12, Ibrahim Anwar Dep. Transcript Excerpt at 132:2-16 (discussing WAMY's educational services relating to behavior and morals).

13.     Among its many objectives and goals, WAMY is dedicated to "serv[ing] the Islamic Da'wah[2] (calling to Islam) in matters of Aqeedah [belief], Shariah and social behavior among the Muslim youth of the world;" "explain[ing] the role of the Muslim youth in the construction of the Islamic society and its social, economic and scientific institutions, and to eliminate the causes of backwardness, sectarianism and stagnancy in the Muslim societies;" and "coordinat[ing] and cooperat[ing] with institutions and associations that work for the benefit of the Muslim Youth and students all over the world." Ex. 2 at ¶11; Ex. 6 at WAMY-SA E001045-046 (WAMY's Constitution discussing WAMY's aims and objectives); compare with Ex. 7 at WAMY SA E001104-106 (Article 1 detailing the Objectives of WAMY specific to Muslim youth and the means of obtaining those objectives); Ex. 5 at 58:11-61:22; Ex. 12 at 132:2-133:4 (attesting to the production of educational

---

[2] Accompanying this 56.1 statement is a glossary of terms.

materials, dawah activities and straightening of moral character as an example of WAMY's objectives being fulfilled).

14. WAMY's purpose and basic philosophy is entirely constructive, modernist, and positivist, looking to build a wholesome society in utter contrast with al-Qaeda and Bin Ladinists whose project is entirely destructive. Ex. 6 at WAMY-SA E001045-046 (Article 3 outlines the entirety of WAMY's objectives); Ex. 13, Khalid Blankinship Report at p. 33.

15. For the first 15 years (1972 to about 1989), WAMY operated mainly as an education organization and achieved its objectives and goals by organizing educational events, publishing books, organizing youth camps to uplift the youth, lending material and moral support to the Muslim youth and students' organizations and associations around the world, participating in international assemblies, establishing and funding learning institutions for boys and girls, and giving scholarships and assistance to the Muslim Youth. Ex. 2 at ¶13; Ex. 5 at 61:23-66:24; Ex. 6 at WAMY-SA E001046-047 (WAMY's Constitution discussing the WAMY's aims and objectives for leading the youth); Ex. 14, Abdul Wahab Noorwali 2019 Declaration at ¶15 (attesting to some of WAMY's project areas: education, youth empowerment and community needs); Ex. 15, WAMY Intl E001543 (WAMY International flyer showing WAMY's objectives); Ex. 16, PEC-WAMY014980-982 (Excerpt of PEC-WAMY014980-993 – WAMY Western Europe website highlighting its aims, means and activities).

**B.    WAMY's Chapters and Operations**

16. WAMY operated five domestic offices in Saudi Arabia at Jeddah, Dammam, Riyadh, Taif, and Abha. Ex. 14 at ¶9 (listing the offices in Saudi Arabia).

17. In 2016, WAMY consolidated the domestic offices into the Riyadh office. Ex. 14 at ¶9-10 (stating that all domestic offices were consolidated into the main office in 2016).

18. Prior to the 2016 consolidation, WAMY's five domestic offices presided over twelve

regions:  Central Asia, Southeast Asia, Indo-Pak Subcontinent, Arab World, West Africa, North Africa, Central & South Africa, West Europe, East Europe, North America, South America, and Australia & Pacific.  Ex. 6 at WAMY-SA E001048-049 (1993 Constitution); Ex. 7 at WAMY SA E001110 (1996 Constitution).

19.    The domestic offices fund activities and projects at the international branches; all projects had to be approved by the domestic offices.  Ex. 14 at ¶10 (stating that each branch gets their funds directly from the Saudi offices and had to get approval for all programs from the overseeing office); Ex. 6 at WAMY-SA E001049 (Constitution Article 12 directs the General Council to approve the executive plans of WAMY's work and activities).

20.    WAMY has chapters and charitable projects around the world including the United States (WAMY International), Kashmir, Philippines, Sudan, Pakistan, Kenya, Somalia, Tanzania, South Africa, Malawi, Chad, Cameroon, Nigeria, Niger, Senegal, Gambia, Guinea, Pakistan, Afghanistan, Iraq, Argentina, Australia, Bangladesh, Belgium, Brazil, Germany, Chechnya, Czech Republic, Greece, Hong Kong, India, Kenya, Kosovo, Malaysia, Romania, Russia, Senegal, Thailand, Uganda, and Yemen.  Ex. 14 at ¶10 (listing the branches that the main office in Riyadh oversees); Ex. 2 at ¶21 (discussing chapters).

21.    The international branch offices outside the Kingdom reported to a domestic office in Saudi Arabia; they now report to the consolidated Riyadh headquarters.  Ex. 14 at ¶10 (discussing branch office reporting to domestic offices and the change to the Riyadh office).

22.    Far from a clandestine or "shadowy da'wah entity," WAMY's branch offices operate openly in their host countries complying with all the different procedures and requirements to register with the host governments before opening an office.  Ex. 14 at ¶11 ("WAMY first obtains permission from the government of the host country to open a branch"); see Ex. 17, WAMYSA051692-698 at 694-695 (1998 general secretariat meeting discussing branch office relationship with local

6

authorities); See, ¶¶222-238, *infra* (discussing Rustum Mahmand as a high level Pakistani official during the relevant time period that to his knowledge WAMY operated transparently and clearly and never did anything outside its charter or mission).

23.      WAMY branches are expected to remain "independent from any political or fractional connections" with organizations in their host country and that the projects WAMY supports are "registered as a charitable endowment and that it is not privately owned." Ex. 17 at WAMYSA051694-695 (1998 general secretariat meeting discussing branch office relationship with local authorities)

II.     **WAMY's Work to Educate Young Muslims Does Not Provide Any Ideological Foundation For The al-Qaeda Movement nor Advocate for Young Muslims to Take Up Arms and Engage in Acts of Violence Against the United States Instead, Providing Young Muslims, Including Girls, with a Broad Education, Including Math and Science, to Help Them Become Peaceful Contributing Members of Their Communities.**

A.     **WAMY Schools Provide Broad Education and Do Not Promote al-Qaeda's Extremist Violent Ideology.**

24.      WAMY helps operate two school for girls in Afghanistan. Ex. 18, Ibrahim Anwar Declaration at ¶17 (discussing the two schools); Ex. 14 at ¶27 (discussing school for girls).

25.      Even during the first Taliban rule, the girls' schools matriculated over five thousand students, without interference.  Ex. 14 at ¶40 (WAMY's activities include all-female schools in Kabul Afghanistan operated during the Taliban time).  Ex. 18 at ¶17 (stating the schools are both in existence).

26.      WAMY also provides assistance to building other schools and contributes to educational programs for young women in other countries.  Ex. 19, WAMYSA189661-663 (July 2001 project proposal to sponsor 5 Kurdish students to Sudan, with detailed goals, requirements, travel expenses, housing cost); Ex. 21, WAMYSA175985-6006 ("Ethiopia Al-Mana – Report Trust" – Series of 1994 Ethiopian documents related to a girls sewing program); Ex. 20,  WAMYSA399014-028 (1997 document memorializing assistance in construction of the girls college with 900 attendees

and documents some of their project requirements); Ex. 22, WAMYSA173386-399 (2001 classroom construction at Umme-E-Kulsoom School Indian elementary school with 76 students); Ex. 23, WAMYSA036043 (2000 article on establishment of girl school in Indonesia).

27. WAMY also established 24 primary schools, opened 8 educational and professional institutes, established 11 Quran teaching centers, and funded the Imam Malik School and the Khalid bin Waleed School. Ex. 24, WAMYSA065181-185 (LBI over all dissolution document); Ex. 12 at 322:9-324:5.

28. In addition to the girls' schools, WAMY also runs the Abu Hanifa Teachers Training Institute ("Abu Hanifa") that *Lajnat Al-Bir Al-Islamiya* ("LBI"), a former WAMY affiliate, created in 1987 in Pakistan. Ex. 12 at 132:6-133:5 (discussing Abu Hanifa and WAMY goals) and at 316:8-20; Ex. 18 at ¶12 ("Abu Hanifa Institute was initially established by LBI"); Ex. 25, WAMYSA028403-414, at 412 (January 13, 1997 LBI summary report discussing Abu Hanifa and number of graduate from 87-96); Ex. 26, WAMYSA047326-329 (In or about 1996 letter requesting financial transfer of funds to cover salaries); Ex. 14 at ¶15 (teacher training courses as part of WAMY's objectives).

29. Abu Hanifa, which still exists and is now run under WAMY-Pakistan after LBI was dissolved in 1997, graduated 38 students in 1987, 52 in 1988, 63 in 1989, 52 in 1990, 55 in 1991, 86 in 1993, 80 in 1994, 77 in 1995 and 53 in 1996, all through the Soviet war and the Afghan civil war. Ex. 12 at 115:16-24 (stating that Abu Hanifa is still present in Peshawar); Ex. 25 at WAMYSA028412 (summary sheet detailing number of graduates); at WAMYSA028403 (January 1997 report discussing future change of LBI to ["WAMY]"). Ex. 27, WAMYSA028040-041 (July 1997 government Pakistan approval of name change); Ex. 28, WAMYSA049368-373 at 373 (check to cover payment of 2001 expenses).

30. Afghans who had no access to quality education formed the vast majority of the nearly

220 Abu Hanifa students during that period.  Ex. 18 at ¶12 (explaining a great deal of Abu Hanifa's students were Afghan refugees present in Peshawar who had no other access to education).

31.    Abu Hanifa had a complete and varied curriculum, a diverse student population, and required the passing of an entry exam.  Ex. 29, Ziaul Haq Amarkhil Declaration at ¶¶4-9 (former Abu Hanifa student; Ex. 30, Assadullah Sahil Declaration  at ¶¶13-17, (former student).

32.    Like any other WAMY run school, Abu Hanifa "follow[ed] a standard curriculum focusing on math, science, philosophy, languages in addition to [basic] religious studies provided by the government of Afghanistan…." Ex. 18 at ¶18.

33.    Abu Hanifah's private education curriculum mirrors that of the publicly run Peshawar University under which Abu Hanifah operates.  Id. at ¶11 (though the schools were privately funded, the curriculum was public), at ¶14 (discussing similarities between Peshawar curriculum and Abu Hanifah); Ex. 25 at WAMYSA028412 ("the syllabus comprises of Islamic studies and Sciences. The medium language of teaching is Arabic.").

34.    Abu Hanifa's two-year program curriculum of about 22 subjects includes courses in Islam, computers, math, Quran memorization, Islamic jurisprudence or *fiqh*, English, Arabic, social science, modern Islam, computer studies, newspaper, da'wah, the Quran, hadiths and peace studies. Ex. 29 at ¶6 (explaining Abu Hanifa's curriculum); Ex. 30 at ¶15.

35.    Far from a school indoctrinating youth in pro-al Qaeda or al-Qaeda sympathetic views, Abu Hanifa produces productive and law-abiding members of society like Assadullah Sahil ("Sahil") and Ziaul Haq Amarkhil ("Amarkhil"). Ex. 30 at ¶15 (discussing and comparing Abu Hanifa Institute's complete and varied curriculum that far surpassed the violent biased high schools he previously attended); Ex. 29 at ¶9 (explaining that most of Abu Hanifa's graduates got accepted for higher education in Western Countries).

36.    Abu Hanifa graduate Sahil, a senior program officer at the United States Institute of

Peace ("USIP"), wrote two books, Peaceful Life in Islam and Youth Legal Awareness, and designed and worked on a project for two years in the Naghar Province in Afghanistan furthering these topics. Ex. 30 at ¶¶3-4 (stating he wrote two books in his current occupation as a Senior Program Officer within USIP).

37.     With USIP, Sahil also worked on Counter Violent Extremism ("CVE"), a program funded by the United States Agency for International Development. Ex. 30 at ¶4 (stating his current project on counter violet extremism is being funded by USAID).

38.     Sahil, an Afghan refugee, described Taliban run schools, which he escaped by going to Abu Hanifa, as promoting violence and intolerance rather than education; for example, mathematical equations are explained as "1 bullet + 1 bullet = 2 bullets," or "B is for "baba," as in 'My baba has a gun which he uses to fight." Id. at ¶8 (contrasting the education he received in high schools regulated by the Taliban versus the education received in Abu Hanifa).

39.     In stark contrast with a Taliban school, Abu Hanifa students experienced an affable lifestyle and learned Arabic, math, science computer studies, and much more, had a "complete and varied curriculum that far surpassed the violent, biased high schools" Sahil had previously attended. Ex. 30 at ¶¶13-17; See also Ex. 29 at ¶6 (attesting that the curriculum consists of about 22 subjects); Ex. 2 at ¶16 (discussing curricula).

40.     Like Sahil, Abu Hanifa graduate Amarkhil, was also an Afghan refugee. Ex. 29, at ¶3-4 (explaining that his family immigrated to a Pakistan refugee camp during the Afghanistan war); Ex. 18 at ¶12 (Abu Hanifa "provides a comprehensive secondary education to disadvantaged and poverty-stricken youth").

41.     Amarkhil, like Sahil, found that Abu Hanifa did not teach students "about infidels or fighting for infidels" nor did it urge students to take up arms against the West but instead advocated peace and respect for all. Ex. 29 at ¶7-8, 13 (explaining there was no teaching about fighting for

10

infidels nor any teachings urging students to take arms against the West); see also Ex. 30 at ¶¶18-19 (discussing that political figures and messages were expressly disallowed and no knowledge of terrorist or violent activities); see, Ex. 11 at ¶12 (attesting to WAMY's non-extremist teaching of Islam); Ex. 2 at ¶17 (discussing WAMY's positive views of the United States).

42.      The majority of Abu Hanifa's graduates go on to higher education in Western countries and "hold senior positions in their respective careers" in places like the United Nations, United States embassies and as academicians. Ex. 29 at ¶9-10 (explaining most of Abu Hanifa's graduates got accepted for higher education in western countries and are now working in the United Nation, U.S. embassies or are teachers and academicians).

43.      Upon graduation from Abu Hanifa, Amarkhil worked at the United Nations as a police officer, then he returned home to Afghanistan to engage in politics. Id.

44.      There is no evidence that any person that attended a WAMY school later became a member of al-Qaeda and Plaintiffs cannot show anything to the contrary.  See Ex. 31, Jonathan Winer Dep. Transcript (Excerpts) at 219:2-24.

45.      To the contrary, former Abu Hanifa students confirm that students did not have associations with al-Qaeda and that Abu Hanifa students did not participate in or observe any terrorist or violent activities. See Ex. 30 at ¶ 19; See also Ex. 29 at ¶7 and ¶13.

46.      Beyond operating schools, WAMY furthers its mission to educate, not indoctrinate, Muslim youth by offering educational scholarships to students all over the world.  Ex. 32, Ibrahim Abdullah Dep. Transcript (Excerpts) at 106:9-12 (discussing scholarships); Ex. 33, WAMYSA031622-031623 (1995 agreement re: WAMY and LBI funded scholarships for over 64 students at Al-Azhar with oversight and renewal).

47.      WAMY's worldwide scholarships and assistance program covers such items as tuition, books and cost of living.  Ex. 34, WAMYSA058095 (2001 letter from IIASA requesting scholarship);

Ex. 35, WAMYSA036431-432 (1994 letter re request in Western Europe for scholarships and asking for detailed plans for the program); Ex. 36, WAMYSA036914 (1999 letter from Turki to Wohaibi re Kosovo projects which includes scholarships and school bags).

48.     As with other WAMY projects, the provision of scholarships is monitored to ensure the students receive the funds and are attending the educational programs as intended.  See, e.g.  Ex. 37, WAMYSA051057-059) (2000 letter asking student to confirm attendance at school in order to renew scholarship); Ex. 38, WAMYSA031804 (1996 internal memo with financial statement for the scholarship for orphans); Ex. 33 at WAMYSA031622-623 (1995 agreement re: WAMY and LBI funded scholarships for over 64 students at Al-Azhar with oversight and renewal).

49.     Mustafa Ismail benefited from WAMY's scholarship program. Ex. 11 at ¶4 (WAMY helped fund his Ph.D. studies at Bristol University).

50.     Mr. Ismail, who graduated from Khartoum University with a Doctorate in Medicine in 1978, went on to become a research lecturer at Bristol University in the United Kingdom, served as Secretary General for the International Islamic Federation of Student Organization (IIFSO), was a member of WAMY's General Secretary representing IIFSO, and has been involved with the International University of Africa in Khartoum since 2012.  Id. at ¶¶3-8, 14-17 (explaining his involvement in IIFSO and the International University of Africa in Khartoum).

**B.     WAMY's Summer Camps Encourage Muslim Youth to Be Productive Citizens; Not Engage in Acts of violence or Become Terrorists**

51.     Beyond running schools and offering scholarships, WAMY furthers its educational mission by hosting summer youth camps when students are not in school. Ex. 6 at WAMY-SA E001045-047 (WAMY Constitution, Article 4 on education, youth camps and scholarships).

52.     WAMY Youth Camps are well-known and held all over the world with the first one held in Abha, Saudi Arabia in 1977 and others in places like Jordan (1977), Republic of Mali (1979), United States (1980), Turkey (1980), Morocco (1981), Nigeria (1982), Kenya (1984),  Brazil (1986),

Tanzania (1988), and many more. Ex. 5 at 39:18-40:2 (explaining which countries in Africa he participated in the camps); See, e.g. Ex. 39, WAMY Intl E002177-241 at E002187 (listing Abha year as 1397 Hijri which is 1977), at 237-240 (listing the about 185 successful youth camps from 1976 to 1989).

53.	Most of the camps are temporary but large youth camp gatherings are held at the WAMY owned permanent camps located in Cyprus, Malaysia, Bangladesh, Saudi Arabia, and Morocco. EX. 39 at WAMY Intl E002187 (WAMY Youth Camp Handbook listing location of temporary youth camps).

54.	The three main objectives of a WAMY youth camp, which a host nation can always modify to fit the needs of its community are: "(1) to give students and student leaders a chance to know each other, (2) unify the understanding of Islam, and (3) coordinate experiences together." Ex. 11 at ¶9-10 (listing the three objectives of the camps and stating that he is a product of the aim of those camps). Ex. 39 at WAMY Intl at E002191 (listing, generally, the youth camp objectives).

55.	WAMY's worldwide youth camps are outdoors opportunities for the youth to learn, among other things, the correct understanding of Islam, leadership skills, how to discuss challenges facing Muslims worldwide, how to avoid extremism and tribalism and other values derived from lectures and seminars. Ex. 5 at 65:2-10 (acknowledging that WAMY's constitution, article 4 refers to establishing camps and other youth activities; Ex. 39 at WAMY Intl E002186 – 187 (Islamic Camps, Objectives, Program Outlines, Preparatory Steps – explaining the youth camp structure).

56.	WAMY's youth camps come complete with a standardized manual that includes a program, suggested committees, suggested reading materials, "themes," "topics," and activities. Ex. 2 at ¶15; Ex. 5 at 40:21-23 (acknowledging the existence of a curriculum); Ex. 39 at WAMY Intl at E002180-181 (WAMY Youth Camp Pamphlet listing the contents of the pamphlet) and at 234-237 (describing resources and curriculum at the youth camps).

57.        The youth camps "[have] nothing to do with military training or any indoctrination," students are not trained in the use of weapons, nor are they provided any weapons."  Ex. 11 at ¶10; Ex. 2 at ¶¶15, 23-24 (that WAMY does not call for attacks against the West and discourages terrorism); Ex. 39 at WAMY Intl at E002180-181 (WAMY Youth Camp Pamphlet Contents in which nothing pertains to military training) and at 234-237 (WAMY Youth Camp Pamphlet listing the books read as part of the curriculum).

58.        Instead, the youth camps – where local language speaking scholars are invited to speak - teach against extremism and produce productive citizens.  Ex. 11 at ¶¶10, 12-13 (stating that the camps are used to train the youth to become productive members of their respective society and that WAMY informs students of the real understanding of Islam, that Islam is not an extremist's religion); Ex. 5 at 40:7-18. (attesting that WAMY invites local Islamic scholars to youth camps to give lectures).

59.        Published in 1987 and translated in 1990, *Islamic Camps*: *Objectives, Program Outlines, and Preparatory Steps* ("Islamic Camps") is a curriculum manual used as an instructional booklet for WAMY's worldwide youth camps.  Ex. 39 at WAMY Intl E002178 and at 181 (publishing/translation date and contents of the instructional booklet).

60.        The Islamic Camps booklet is translated into fifty languages; the content includes topics like "definition of camps," "types of camps," "objective of the camps," "camp follow-up", "camp programmes," "camp doctor," "sports committee," "skills and craft" development, and much more.  Id. at WAMY Intl E002180-181 (listing the content of the booklet); Ex. 11 at ¶11 (explaining that WAMY translated its booklets into almost fifty different languages and used them at the camps to teach topics such as salat, zakat, hajj, the Prophet's life and wife, hygiene and fasting).

61.        WAMY achieves its youth camp objectives with a focus on the individual's "spiritual aspect" (reciting the Quran, praying and advising good behavior), "mental and cultural aspect" (lectures, seminars, debates to discuss to guide youth in correct Islamic thought"), "bodily and sporting

14

aspect" (volley, basketball, mountaineering, judo etc.), "behavioral and character aspect" (getting rid of bad habits and encouraging good ones), and "leisure and relaxation aspect" (how to enjoy and maximize value of leisure time without excess).  Ex. 39, WAMY Intl at E002196-200.

62.    A few popular songs are included in the booklet including an older song "Youth of the True Religion."  Id. at WAMY Intl at E002231-232.

63.    The lyrics of this old song in their entirety are:

> Youth of the True Deen are the guided youth
> Come! Come to a final decision:
> The Prophet has called out and so has the Qur'an.
> So blessed is the servant who responds when he is called
> To Allah we supplicate and to Him is the Return
> To Allah Alone the Lord of creation
> To the Deen after which there's none
> To the Chosen (Prophet) whose era we contemplate
> To the Truth whose love we ask for
> To the Most Holy and Sacred we ask for repentance
> Here is Madinah and here is Makkah
>  Here is the Deen that cares and here is honor
> Here is purity, eminence and virtuosity
> Here is strength, resoluteness and invincibility
> So where, where else do we need to go?!
> Bring back the glory to its lions
> And restore the zeal to its soldiers
> Flatten evil in its cradle
> And unsheathe the swords
> And don't be concerned here with difficulties
> Ask the kuffaar: who repelled their tyrants?
> And ask the mushrikeen: who terrified their supporters?
> Ask the world: who shook its monarchs?
> And ask truth who preserved its authority?
> You will find in Badr enough for an answer!
> Ask Uhud and ask Khaibar
> Ask the blood which reddened the face of the earth
> Ask King Kisra and ask Caesar
> Ask Truth for over them both it was all-conquering
> Ask the Desert: how many secrets has it uncovered?!
> Ask ignorance: who has toppled it on this Earth?
> And ask oppression: who has disciplined it on this planet?
> Ask the East of this Dominion (Muslim Empire) or its West
> And ask glorious Baghdad or Cordoba
> You will see that your Dominion is far above the clouds!
> Alas, we have forgotten our position here (now)

> And we've abandoned the shariah and our role
> Error has built in our territory whatever it is
> And it has built nothing but weakness and ruin
> And we nurture nothing but desires and falsehoods!
> Hail! Hail! O sacrificing soldiers!
> To us! To us! So we may defend the flag
> this Day of Jihad, are you miserly with you blood?!
> And has life become dearer to you? And staying behind
> sweeter?
> Is staying in this world of torment more pleasing to us?
> You are amongst those called upon by Destiny
> Come! So we may revive the times of our predecessors
> And establish Truth amongst the successors
> Come! Allah forgives that which has passed
> For Allah never abandons one who supplicates and repents!

Id. at E002231-32.

64.     The song makes no reference and has connection to modern day events, nor does it encourage violence against the U.S. or the West let alone 9/11 terrorist act.  Id.

65.     *Youth of the True (Religion)* mentions ancient medieval battles going back to 622 C.E. Ex. 13 at p. 44 (explaining the context of the songs).

66.     The song, and others in the booklet, has no more meaning other than "trying to get the youth away from self-centeredness." Id. at p. 44.

67.     Youth of the True Religion, the WAMY camp song, is no different than patriotic songs of nationalism like the national anthem, *La Marseillaise* or *Flower of Scotland*, which normally mention past wars and battles. Id. (Dr. Blankinship discussing the context in which the songs must be viewed); Ex. 40, Marc Sageman Report (Excerpts) at p. 110 (discussing the mildness of the song compared to La Marseillaise).

III.   **WAMY Publications and Public Statements by WAMY Officials Do Not Encourage Muslim youth To Join al-Qaeda or Take Up Arms or Engage in Acts of violence Against the United States**

   A.   **WAMY Publications**

68.     Along with schools, camps and lectures, WAMY also furthered its educational

objectives by publishing and reprinting books, conducting research, and producing video and audio recordings that introduce Islam as an ideology and social system to be distributed among the Muslim youth in the important languages of the world.   Ex. 6 at WAMY-SA E001046-047 (Constitution); see also, Ex. 41, WAMYSA1248770 (letter to Prince Fahad asking for publication to be used in research; Ex. 4 at 78:3-17 (explain that the Prince Abdulaziz' Office of Research and Studies was interested in obtaining copies of WAMY publications); Ex. 12 at 132:2-17 (attesting to the production of educational materials as an example of WAMY's objectives being fulfilled).

69.    WAMY produced pamphlets which concern generally accepted religious literatures produced in the form of Dawah (religious propagation) to the Muslims youth of the world.  Ex. 6 at WAMY-SA E001045 (Constitution Art 3(1) and 4[2]); see generally, Ex. 42, WAMYSA1249453 (Letter to Wohaibi re dawah courses and books in South Korea); Ex. 13 at p. 16 ("da'wah is used for missionary activity") and at 37 (WAMY's "literature is meant to promote the religion of Islam and steady adherence to it").

70.    Examples of the topics covered in WAMY's  pamphlets are "Do you Know this Man," "Prophethood in Islam," "A Note on Fasting and Zakat al-Fitr," "The Concept of God in Islam," "What they Say about Islam," "Human Rights in Islam, "the Concept of Worship in Islam," "What They say About Mohammed," "What they Say about the Quran," and "Muslim-Christian Dialogue;" none encourage the youth to pick up arms against the West or America.  See, e.g. Ex. 43, WAMYSA1333-1341 (pamphlet examples).

71.    WAMY's da'wah efforts focus on moderate Islamic views with conservative teachings that eschew extremism.  Ex. 13 at p. 17 (explaining WAMY's balance of preaching moderate views but holding onto conservative teachings without the influence of outside factors).

72.    The WAMY publication "A Handy Encyclopedia of Contemporary Religions and Sects" and "Islamic Camps: Objectives, Programs Outlines, and Preparatory Steps" does not promote

violence and represents a "tiny" sampling of WAMY's much large inventory of publications.  Id. at p. 37.

73.     The fact that WAMY's publications are so many and those the plaintiffs have attacked are so few completely refutes the idea that WAMY primarily existed to promote any hidden agenda. Id.

74.     None of WAMY's publications or reprints call for violence against the United States, the Jews or Christians, nor do they urge the youth to do so.  Id. at p. 50 (discussing absence of promotion of violence in publications); Ex. 2 at ¶23 (discussing WAMY's belief in religious co-existence).

75.     Plaintiffs' claim WAMY publication *A Handy Encyclopedia of Contemporary Religions and Sects* is hate literature against Americans, Christians, and Jews and glorifies the hijacking of buses and the killing of innocent civilians in Israel.  (See e.g. Ashton, Third Amened Consolidated Master Complaint at ¶445).

76.     *A Handy Encyclopedia of Contemporary Religions and Sects* ("Encyclopedia") is "an encyclopedia of world religions," with no connection to Osama bin Ladin, al-Qaeda or the September 11, 2001, attacks. Ex. 44, Khalid Blankinship Dep. Tr. (Excerpts) at 285:13-14.

77.     The Encyclopedia is a compilation of articles written by different authors; primarily the four main authors, Dr. Ibrâhîm ibn Hamad al- Qu'ayyid, Dr. Tawfîq ibn Ahmad al-Qusayr, Dr. Muhammad Sa'd Abû Shitâ, and Hamdî 'Ubayd on mainstream thoughts and ideas, some even mythical. Ex. 13 at p. 45.

78.     Far from a work espousing an ideology supporting terrorism, the *Encyclopedia* is a historical religious work using examples from history, going back to the eighth century, and applying them to issues present in modern times. Id. at p. 46.

79.     As Islamic scholar and professor of religion, Khalid Blankinship, explains, the work includes an ancient trope concerning a mythical character, Abd Allah ibn Saba, who, according to the myth, attempted to undermine Islam by pretending to be a Muslim in the early days and stirring up civil war between factions in the Muslim community. Id. at pp. 45-46.

80.     While most scholars regard Ibn Saba as a myth, "many people in the Arab world, even well-educated ones, take the tale if Ibn Saba' as if it is holy writ… yet it derives from the flagrant early fabricator Safy ibn 'Umar." Id. at p. 46.

81.     The attack on the Jews in general in the *Encyclopedia* must be understood in the context of the view, admittedly anti-Semitic, that at some point Jews corrupted their religion, became enticed by materialism, and sought to undermine other religions and to corrupt the morals of non-Jews. Id.

82.     This view, expressed in tsarist Russia, includes the belief that Freemasons, the Lions Club, the Rotary Club, the Israeli Herut Party, are part of a nefarious plot that contributed to the downfall of the Ottoman Empire.  Id. at p. 46; Ex. 2 at ¶23 (discussing WAMY's belief in religious co-existence).

83.     These views notwithstanding, "this work does not appear anywhere to prescribe violence of terrorism. Its program rather seems to be to keep the Muslims, especially the upcoming generation, free of influences from outside religions by portraying Islam as superior." Ex. 13 at pp. 47-48; Ex. 2 at ¶24 (that WAMY stands against terrorism).

84.     "The idea…that the whole [*Encyclopedia*] is mainly an anti-Jewish work is wrong, for the anti-Jewish polemic, although seriously present in the section on Judaism and scattered in a few other places as well, occupies only a small part of the whole. It cannot be ignored either that the work was produced within the context of the ongoing Palestinian question and occupation of Palestinian land, a problem which seems to exhibit to many Arabs the power of the Israelis, as they have not been

able to do anything about that, hence the resort of some to old, generalizing anti-Jewish tropes, including beliefs in conspiracies that last for centuries." Ex. 13 pp. 47-48.

85.    Contrary to Plaintiffs' misleading claims, there is nothing in the Encyclopedia that is an expression or call for violence against other groups including Americans, Christians, and Jews. Ex. 44 at 285: 7-24; 286: 1-24; 287: 1-14.

**B.    Non-WAMY Publications**

1.  Islamic Views

86.    The publication *Islamic Views,* also known by its English translation as *Islamic Guidelines for Individual and Social Reform,* is not a political text but a scholarly dissertation on Islamic jurisprudence. Ex. 13 at pp. 39-40 (explaining that the book is not about politics and is a Wahhabi jurisprudence compendium about correct practices).

87.    WAMY had nothing to do with the authorship or the early printing of the book but rather came to it very late and only to make a reprint in 1991 or 1992, after many others had already published and reprinted it. Id. at p. 39; Ex. 44 at 204:14-21.

88.    The author of the publication is Muhammad bin Jamil Zino (a/k/a Muhammad ibn Jamil Zaynu), a then employee of the Saudi school Dar al-Hadith. Ex. 13 at p. 39[3].

---

[3] Blankinship explains the various editions of Islamic Views as follows: The earliest reference to it that I found is in WorldCat (meaning World Catalogue), which is a worldwide database subscribed to by most university libraries and others whose ambition is to document all the library holdings in the world, principally of university libraries but also including public libraries. Thus, it is the most complete resource to discover the publication history of any book. While its coverage of editions of popular Arabic books like this one is not absolutely complete, it nonetheless contains a great many items. The earliest publication date for *Tawjîhât islâmiyyah* which it has is 1984 in Cairo, Egypt, by Dâr al-'Ulûm al-Islâmiyyah (417 pp.), which also republished it in 1988. Then it was published by Dâr al-Hadîth at Mecca in 1985 (112 pp.), but this publication is described as its fifth printing. It was also published at Dâr al-Sharq al-'Arabî in Beirut in the 1980s in what is called the 18th printing or edition (tab'ah). In his short preface (p. 3), the author notes that the book has been published in very large numbers of copies at Mecca and Jiddah, has also been published in Algeria, Kuwait, and Jordan, and is to be published in Lebanon and Egypt, and none of these would seem to refer to the WAMY edition, which appears to have been much later than all of these; indeed, the date of the preface would seem necessarily earlier than 1984 because it says the book had not yet then been published in Egypt. The Saudi Armed Forces edition of 1992 (144 pp.) is probably the one which the plaintiffs are referring to, but it is only a reprint. So it might actually be from earlier than 1984, but it is no later than that in date.

89.      There is no evidence that Zino is a WAMY employee. Id. at 38 (citing Zino but not as a WAMY employee).

90.      In the book, Zino describes several types of jihad, with the seventh kind of jihad as a "struggle against the self" and that he is actually trying to de-emphasize "incitement". Ex. 44 at 202:14-205:17.

91.      Zino's reference in *Islamic Views* to jihad is a historical reference to "[t]he call of the Prophet and his jihad" and not to any modern-day warfare. Ex. 13 at p. 40.

92.      Zino distinguishes the various forms of jihad but most importantly notes that even offensive jihad requires permission of a Muslim ruler, like a Saudi state. Id. at pp. 41-42 (describing the various types of meanings ascribed to the word jihad); Ex. 44 at 211:13-23 (Saudi maintains legitimacy by the doctrine not to disobey the leader).

93.      The offensive views about Jews expressed in Islamic Views is a "reference to the question of Palestine" and not "about Jews in general," is "not an exceptional theme in Arabic writing," nor is it "exclusive to any country or particular group." Ex. 13 at 40; Ex. 44 at 208-2-11.

94.      Ultimately, the circa 1984 book has no links to acts of terrorism or the attacks on 9/11; it offers only an academic explanation of jihad in Islam not advocacy to pick up arms and fight the United States or the West. Ex. 13 at p. 41 (explaining Zaynu's book on jihad and then details the seven kinds of jihad); Ex. 2 at ¶26 (discussing that WAMY has never been involved in armed conflict).

   2. *Arab Volunteers/Helpers in Afghanistan* (*"Arab Volunteers"*) is Not a WAMY Publication Nor Does It Promote Terrorism

95.      The book referred to as the Arab Volunteers is not a WAMY publication; WAMY has nothing to do with its authorship, publication, or dissemination. Ex. 45, MR/ARA001079-083 (Exhibit 12 to motion to exclude Kohlmann - copy of cover of Arab Volunteers showing publisher as attached to Kohlmann affidavit in *Burnett v. Al Barak Investment & Development Corp*, et al, 03-CV-9849).

21

96.     The House of Learning Printing Press, not WAMY, published *Al Ansaru'l Arab fi Afghanistan* or Arab Cohorts in Afghanistan (aka "Arab Volunteers") in 1991. Id. at MR/ARA001081 (cover of Arab Volunteers shows "House of Learning printing press Co"); Ex. 40 at 126 (noting that his version of the book states, "Published by House of Learning printing press Co" on the second page).

97.     The Arab Volunteers "is not a biography of Bin Ladin although he figures prominently in the book [;] [i]t is rather a history of the Arab ansar in Pakistan and Afghanistan from its early days in early 1980s to about 1987, when the book ends." Ex. 40 at 125-126.

98.     Basil Muhammad, the author of Arab Volunteers, is a Syrian journalist; Basil Muhammad is not a pseudonym for Adel Batterjee. Id. at 125 (referring to other Soviet-Afghan war experts' familiarity and use of Basil Muhammad's work the Arab Volunteers).

99.     Adel Batterjee did not write Arab Volunteer. Ex. 10 at ¶10.

        3. Anwar Ajaj's Manual

100.    In 1994, the "U.S. Attorney for the Southern District of New York prosecuted and convicted" Ahmed Ajaj in connection with the 1993 World Trade Center bombings. Ex. 46, 9/11 Commission Report (Excerpts) at p. 72 (discussing conviction); Ex. 40 at p. 153 (discussing trial years).

101.    When U.S. officials arrested him, Ajaj's belongings included a manual titled *Military Lessons in Jihad Against Tyrants (a/k/a "Military Lessons"* that was allegedly contained inside a WAMY/LBI envelope. See, Ex. 47, Government Exhibit 2800-A in U.S. v. Salameh (which includes, as shown here, the envelope); Ex. 40 at p. 153 (discussing claim that envelope contained the manual).

102.    There is no evidence on how Ajaj came into possession of the WAMY/LBI envelope.

103.    WAMY never published, distributed or had knowledge of the manual. Ex. 2 at ¶31 (that WAMY never prepared a training manual).

22

104.    Nothing on the manual suggests it is a WAMY document and WAMY was never discussed as having published the manual during the trial in which the evidence was entered. Ex. 48, Excerpt of trial testimony in *U.S. v. Salameh* at PEC-WAMY044883 (trial testimony beginning with short discussion on the envelope); See Ex. 47; Ex. 40 at 155 (discussing *U.S. v. Salameh* exhibit 2800-A).

**C.    Statements By WAMY Officials Do Not Establish That WAMY Has Ever Provided Material Support to Al Qaeda**

1.    <u>Statements by WAMY Secretary General in Muslim World News</u>

105.    According to an article in Muslim World News in 1991, WAMY's then Secretary General Dr. Maneh Al-Johani, in an address to the World Kashmir Freedom Movement, urged that Muslims can support Kashmiri freedom by giving "their moral, physical, and financial support [to] the cause of Jihad."  Ex. 49, FED-PEC0250105 (Muslim World News article).

106.    The undated article does not mention al-Qaeda, Osama Bin Ladin, the United States or the West at all.  Id.

107.    In a 1993 article in the Muslim World League Journal by Mozammel Haque on the history of the Bosnian, the genocide and the Muslim world's response to it, Mr. Haque attributes to Dr. Al-Johani as "strongly support[ing] the resolution of the International Islamic Council for Dawah and Relief for arming the Bosnian Muslims to enable them to defend themselves."  Ex. 50, PEC-WAMY000534-549 at 548 (reference in article to al-Al-Johani and WAMY).

108.    The attribution to Al-Johani supporting Bosnian people's rights to defend themselves against a genocide makes no mention of antagonism against the West or the United States.[4]  Id. (The Muslim World League Journal, Vol 21. No. 2-3, article quoting Dr. Al-Johani as supporting the resolution of the Internal Islamic Council for Dawah and Relief in support of Bosnian Muslim self-

---

[4] Whether Al-Johani made these statements is unknown.

defense).

### 2. Statements by Sec. Gen al-Al-Johani in Riyadh Daily Article

109.    In December 1995, a Riyadh Daily articles reports that Al-Johani met with the Azad Kashmir Council's senator, Chaudhry Mohammad Yaqob, where Yaqob thanked the "Kingdom" for donating "money, blankets, tents and food supplies."[5]   Ex. 51, FED-PEC0236400 Riyadh Daily Article titled "Kashmiri Leader Thanks WAMY for Help," dated December 8, 1995, where Chaudhry Mohammad Yaqub is quoted as thanking WAMY and other charitable organizations for providing money, blankets, tents, and food supplies).

110.    Neither al-Al-Johani nor WAMY ever provided weapons or military equipment to Yaqob nor is Al-Johani reported to have called for violence against the United States in the article. Id.

111.    Al-Johani called for humanitarian aid to Kashmiris, self-determination with the assistance of the U.N. Security Council and implored the use of the U.N. Security Council "plebiscite" to bring about "peace and security in Kashmir as well as the use of the electoral process by Kashmiris living abroad."  Id.; see also, Ex. 2 at ¶26 (discussing that WAMY has never been involved in armed conflict or sent employes to fight).

### 3. Statements by Sec. Gen. al-Al-Johani in Al Jazeera Article

112.    The Chechen war of independence against the Russians from 1994-1996 and from 1999-2009 has been widely "considered by Muslims to constitute a legitimate struggle" to defend Muslim life.  Ex. 13 at p. 14 (Blankinship discusses context of article).

113.    On January 15, 2000, one year into the second Chechen war against Russia, Al Jazeera published al-Al-Johani's article *Chechen Tragedy – The Reality and the Required Role* ("Chechen Tragedy").  Ex. 52, FED-PEC0233836-843 (Al Jazeera Article titled "The Chechen Tragedy – The

---

[5] Whether Al-Johani made these statements is unknown.

24

Reality and the Required Role" by Dr. Al-Johani, where Dr. Al-Johani recounts the "tragedy should not be forgotten").

114.    Addressing the need to liberate Chechnya, the *Chechen Tragedy* article quotes al-Al-Johani as stating:

> The question that arises is: What do the Chechen Muslims need from us today? (1) They need money to buy weapons and gear; (2) They need food, clothing, medicine, and tents; (3) They need propagators and propagation materials for awareness. They are Sunnis who have been alienated from Islam for nearly 70 years and have stuck to it in difficult circumstances, almost like the circumstances of the Inquisition. Today, they show all the love and longing to return to its teachings; (4) They need us to pray for them in praises; (5) They need us to praise their struggle and steadfastness and stop those who try to portray their jihad as national or show that they did not prepare and did not choose the right arrangement; (6) They need a unified Islamic position, starting from the individual and the family to the homeland and the nation as a whole. The young children should know their cause. We should motivate them to donate to them and console them as much as we can. We should reduce the times of entertainment. We should tell our children that this is the lowest emotional participation to this nation which is being annihilated just because they are Muslims. We should boycott any Russian product, and each one should deduct part of their income to support them; (7) The Islamic voice must be raised against the Russian attack at all official and popular levels by urging the Islamic countries and the individuals to protest against the Russian attack at the Russian government, its departments everywhere, and at the international organizations in the world.

Ex. 52 at FED-PEC0233842 (discussing what Chechens needed).

115.    The *Chechen Tragedy* makes no mention that WAMY provide weapons, gear or military aid to Chechen fighters.  Id. at FED-PEC0233841-842 (while the article mentions WAMY provide humanitarian relief, it does not say WAMY provide military relief);  see also, Ex. 2 at ¶¶26, 31 (discussing that WAMY has never been involved in armed conflict or sent employees to fight or help move fighters or provide other logistics to them).

116.    Dr. al-Al-Johani does not ask for any support for the militant or terrorist activities of al-Qaeda anywhere nor does he advocate for any attack against the United States.  Ex. 52 at FED-PEC0233841-842.

**IV**.    **WAMY's Funding and Financial Controls**

117.     As per WAMY's constitution, WAMY receives financial assistance from the following sources "(1) the Government of Saudi Arabia, (2) [a]ny assistance, gifts, donations, endowments and wills that the General Council of WAMY decides to accept; [and] (3) [r]eturns from investments in projects that are in conformity with WAMY's aims." Ex. 6 at WAMY-SA E001052 (The Constitution discussing WAMY's source of financing); Ex. 7 at WAMYSAE001112 (Authorized English Translation of The Constitution of the World Assembly of Muslim Youth [WAMY] [Incorporating amendments made during the Seventh General Assembly in January 1993] at Article V: Finance, describing that WAMY's finance will consist of: 1(A) "the assistance offered to it by the government of Saudi Arabia"; 1(B) "any aid, donation or endowment that the General Secretariat of WAMY decides to accept"; 1(C) "Returns from investments").

118.     The Kingdom of Saudi Arabia ("KSA") gave WAMY an annual grant of 5,250,000 riyals from 1972 to 2002. Ex. 5 at 94:24-95:23 (Noorwali explaining KSA's annual grant); Ex. 53, WAMYSA1249537 (Letter discussing total 109,000,000 SAR in this period);   Ex. 4 at 42:16-22 (Being questioned about WAMYSA1249537), at 30:18-31:8 (discussing the amount); Ex. 54, WAMYSA1249281 (1994 letter concerning meeting to discuss grant); Ex. 55, WAMYSA1235395 (1994 letter concerning reduction of grant to SAR 5,250,000 riyals); Ex. 56, WAMYSA1235988 (1999 donation).

119.     KSA's annual financial grant accounted for only about two to three percent of WAMY's budget.  Ex. 5 at 88:8-17 (Noorwali attesting that KSA grant amounted to approximately two to three percent of WAMY's annual budget), at 90:11-19 (Noorwali explaining limits on Saudi funding); Ex. 4 at 148:19-150:19 (Wohaibi explains that KSA grant constitutes a tiny fraction of the annual budget).

120.     The remainder of WAMY's budget, derives from endowments from the Saudi government, members of the royal family and private donations.   Ex. 6 at WAMY-SA E001052

(Constitution describing WAMY's financing); Ex. 4 at 42:23-45:8 (Wohaibi discussing donations from the government of Saudi Arabia for specific projects); Ex. 57, WAMYSA1248831 (letter enclosing a 500,000 SAR donor check for dawah); Ex. 58, WAMYSA1248777–782 (report highlighting donations from the royal family to WAMY).

### A.    WAMY's Project Based Fundraising and Reporting

121.    As a youth organization and humanitarian relief charity, WAMY uses its funding to support projects around the world that align with its objectives. Ex. 14 at ¶13 (describing his role managing WAMY's financial operations, overseeing scholarships, organizing projects and supervising publications), at ¶¶15-16 (describing WAMY's project objectives).

122.    WAMY prospective projects are often donor initiated. Ex. 14 at ¶¶15-16.  These projects are also supervised for the purpose of reporting on the progress of the project until it is finalized.   See, e.g., Ex. 59, WAMYSA1409-410 at 1409 (discussing mechanism protocol and control).

123.    WAMY supports projects connected to charitable organizations for specific projects and avoids dealing with privately owned entities.  Ex. 17 at WAMYSA051695 (1998 general secretariat minutes recommending work with public charities).

124.    WAMY vets projects and funds it or sends a request to a donor to fund; for instance, the 2001 letter request to Prince Fahd explains WAMY vetting and approval to fund the purchase of a suitable building for an institute. Ex. 4 at 72:3-74:12 (explaining the RTD to Fahd for IICI building for the institution); See, e.g.  Ex. 60, WAMYSA1249556 (October 2001 request to then Prince Abdulazi bin Fahd explaining the reason for the project and the legitimacy of the Chicago based donee); Ex. 61, WAMYSA1248744 (December 2001 request to Fahd explaining the reason for the project and the legitimacy of the donee).

125.    As a second example, WAMY considers funding operations only after receiving

recommendations that such projects are legitimate; for instance, WAMY received recommendation and request for funding a project in Ethiopia.  Ex. 21 at WAMYSA176002-006 (Ethiopian charity providing recommendations to validate the Ethiopia Al-Manar Welfare Association as a trusted organization).

126.   This process of legitimizing a project and host organization/beneficiary usually consists of (1) ensuring that the funds are "disbursed towards specific projects," (2) obtaining video or photo recording of the project, (3) and monitoring and following up with reports supported by "photos, video recordings, and the like." See, e.g.,  Ex. 59 at WAMYSA1409 (WAMY HQ Ltr. to WAMY USA to verify credibility of beneficiaries; Ex. 62, WAMYSA035241 (1999 letter re request for Pakistan office director to verify authenticity of supervisor at mosque building project along with a detailed report of the project, its stages of completion and remaining costs); Ex. 63, WAMYSA030975 (letter to Abdullah Makki Sadiq requesting information on "students and their needs, and your kind opinion regarding their eligibility for support"); Ex. 64, WAMYSA1231266 (1997 report on success of projects and the need for a feasibility study on similar projects before implementation); Ex 65, WAMYSA065359-367 at WAMYSA065361 (discussing Sudan office disbursement of funds to students "following a rigorous review of the student's circumstances and verification that they are continuing their studies"); Ex. 66, WAMYSA189733-734 (after reviewing a proposal, WAMY amends the proposal and then requests a cost estimate).

127.    Project proposals typically contain a detailed expense report on the prospective project by outlining items such as project goals, project cost, living expenses, supplies, travel costs, medical cost, pictures and other matters depending on the project and WAMY does not transfer money unless it is being allocated for a specific approved project or activity.  Ex. 19 (project proposal to sponsor 5 Kurdish students to Sudan, with detailed goals, requirements, travel expenses, housing cost), Ex. 66 at WAMYSA189733 (request for estimated cost to complete project and amendments to proposal);

Ex. 67, WAMYSA036894-895 (letter from SJRC to Noorwali re proposals to establish camp for refugees and provide shelters with help of Albanian government); Ex. 20 at WAMYSA399014-027 (1997 Islamic school buffalo farm project proposal); Ex. 5 at 67:1-68:10 (declaring WAMY's funding process of funding projects, not organizations, which starts with approval, budgeting, fund transfers and financial funding requirements), at 160:9-12 (testifying to the requirement that funds be sent to a specific project); Ex. 14 at ¶17 (discussing WAMY not sending fund unless they are being allocated to a specific project).

128.    The Finance Department maintains continued oversight into projects because it reviews all invoices, financial documents, and requests for funding. Id. at ¶20 (discussing Finance Department's role).

129.    When funds are sent, WAMY oversight monitors spending of its funds through a project-based funding mechanism that tracks (1) requests to fund prospective projects, (2) that the funds reach the target beneficiary, (3) how those funds are spent (ensuring that they are for legitimate charity purposes), (4) evidence to support legitimate use of funds such as pictures and videos, and (5) that WAMY's integrity and transparency is maintained. See, e.g. Ex. 68, WAMYSA584328 (December 1997 letter, one of several sent, outlining key nodes of WAMY's mechanism and oversight of projects); Ex. 69, WAMYSA585072 (WAMY Jeddah 1997 Letter to Burma office encouraging more diligent controls in order to reassure donors and beneficiaries); Ex. 70, WAMYSA585077-78 (similar WAMY Jeddah 997 Letter to Chad and Cameroon office encouraging more diligent controls in order to reassure donors and beneficiaries); Ex. 71, WAMYSA605353 (WAMY Jeddah 1999 Letter to Egypt office encouraging more diligent controls in order to reassure donors and beneficiaries).

130.    As the stages of a project are completed, WAMY typically requires the production of progress reports at every stage before funding the next stage of a project. WAMY's engages in active oversight of its projects. Ex. 14 at ¶¶21-22 (discussing chapters sending reports and Jeddah office

ongoing accounting of incoming funds and deposits; Ex. 5 at 74:23-75:24 (WAMY follows-up with the project to ensure funds transferred are implemented and reports are received until completion of the project); e.g. Ex. 62, (letter from WAMY in Saudi Arabia to the head of WAMY Pakistan stating that request was submitted to the Secretariat General to review and approve the funding to rebuild a Mosque in Pakistan. The letter requested a detailed report including the current stage of the project, the current stage and the remaining cost. The letter also asked the office in Pakistan should make sure that the people handling the project are responsible and credible); Ex. 72, WAMYSA 173786-87 (in response to WAMYSA 035241, the Pakistan office submitted a report addressing these requests. The report included photographs of the project, a summary of the construction progress, the pictures of the mosque, the breakdown of total costs, the amount of funds approved and disbursed, and the remaining balance).

131.     In some instances, as part of the vetting process, WAMY sends a representative to make an in-person assessment of the projects to ensure it complies with WAMY's purpose and mission. Ex. 14 at ¶15 (attesting to the fact that a project must fit WAMY's policies before funding).

132.     In all instances where funds are transferred for a project, WAMY branches are expected to comply with WAMY's reporting requirements. Id. at ¶10 (declaring that branch offices have to report their activities), ¶21 (attesting to WAMY's reporting requirements); see, e.g. Ex. 73, WAMYSA059981-992 (1999 letter from WAMY Kashmir office's Abu Gayth re financial report for years 1995-1997 for Kashmir, outlining achieved activities); Ex. 74, WAMYSA 044943-946 (1998 report from Jakarta office concerning mosque building and documenting first installment payments, request for second installment).

133.     Beyond just maintaining project reports, final or otherwise, it has been WAMY's recordkeeping policy to also send project reports to donors in donor funded projects to substantiate use of funds. Ex. 5 at 160:15-161:10 (testifying to project reports and financial statements); Ex. 75,

WAMYSA0548428-433 at 432 (1997 letter confirming financial transfer of money for dormitories and academic research and requesting deposit confirmation to show donor as proof; includes financial report; Ex. 68 (December 1997 letter emphasizing the need to verify the delivery of donations to the intended parties/bodies in India through photographs, records, details of the beneficiary or beneficiaries).

**B.      WAMY's Reporting System Tracks Project Funding**

134.      To track project funding, as an initial matter, WAMY project administrators send funds using banking transactions from Saudi Arabia to the international branches. Ex. 14 at ¶20 (discussing WAMY sending funds from   Saudi Arabia to branch offices or the projects); Ex. 5 at 67:17-68:1 (testifying that a Saudi branch must approve every transaction and monies are then sent to the branch office).

135.      WAMY produced hundreds of reports, including project reports, from Saudi Offices (Jeddah, Medina, Dammam and Abha) and the major branches in Kashmir, Sudan, Pakistan, WAMY-USA, Philippines and Indonesia) as well as many reports from WAMY branches.  See, Ex. 76, ECF 4240-1: Statistical Report; Ex. 77, Appendix A: WAMY Financial and Project Documents Produced.

136.      Forensic Accountant Jonathan Marks confirms WAMY's reporting requirements and implementations based on his review of voluminous primary source documents. See paragraphs 546-567, *infra*.

137.      WAMY branch office reporting requirements were addressed and summarized including at the meeting of the Members of the General Secretariat in 1998 and included:

      a. The offices should send monthly summary reports about the office's activities as well as other detailed quarterly reports, along with photos and film footage (if possible) to each entity to which the office reports in the Kingdom and to the General Secretariat. These reports should be sent on a consistent basis so they can be used in the

Assembly's media publications and in the annual report.

b. The offices should systematically and consistently send financial reports that are separate from the activity reports, along with invoices and receipts. The office's budget should also be divided into two parts: The first part would pertain to the office's administrative expenses and the second part would pertain to the sums spent on cultural, da'wa and educational activities. Moreover, administrative expenses should be no higher than 25% of the approved budget. Ex. 17 at WAMYSA051693-694 (Minutes of the Eighth Meeting of the Seventh Session of Members of the General Secretariat of WAMY, 9/16-17/1998).

138.    For instance, a 1995 LBI annual report documents several project requests, documents LBI's impending dissolution, and catalogue expenses for salaries, medical needs, and housing allowances for several employees and other expenses.  Ex. 78, WAMYSA062981-997 (1994 LBI annual expense report).

139.    WAMY Saudi Arabia retains local auditors like Abdel Razzak Wali Seit and Mansour Al-Jabrou to examine financial reports of their chapter's donations deposits, financial transfers, expenditures and costs. Ex. 14 at ¶24 (discussing audit reporting); Ex. 5 at 248:8-249:20 (identifying Abdel Razzak Wali Seit as WAMY Jeddah's local accountant); Ex. 79, WAMYSA1233979-984 (letters from Al-Rajhi Bank ("ARB") to Abdel Razzak Wali Seit, WAMY local auditor); Ex. 18 at ¶35 (attesting to internal audits of Pakistan office's financial records).

140.    Though audit reports are not required by law in every country or under international financial system for not-for-profit organizations, WAMY headquarters attempts to improve controls by employing the services of external auditors like Sidrat Hyder Qamar Maqbook & Co (an affiliate of the U.S. accounting firm Arthur Anderson), Ahmed Bajnied (a member of British firm Clarke Kenneth Leventhal International) and BM & W (Indonesian CPA office) to conduct WAMY's audit

reports. Ex. 12 at 246:24-247:9 (noting the name of the external auditor); Ex. 14 at ¶24 (confirming the use of external audits); Ex. 31 at 294:5-10 (attesting that audit report requirements depends on the law of the land); Ex. 18 at ¶35 (attesting to external audits of Pakistan office's financial records); See, e.g. Ex. 80, WAMYSA018575-755 (Sidat Hyder Qamar Brief Information about WAMY/LBI office activities, 1992 to 2002, Pakistan Audit Report); Ex. 81, WAMYSA061716-726 (WAMY Saudi Arabia 1991-92 audit report by Bajneid); Ex. 82, WAMYSA066972-7030 [Mark Ex. 968 – Indonesia external audit report 1994-1997); See also Ex. 83, WAMYSA066752-802 (Bangladesh Audit report by M. Alamgir &Co and S. Huda & Co for period 200-2002); Ex. 84, WAMYSA067482-515 (Haraf Public Accounting 1999-202 for WAMY Somalia).

141.    For instance, LBI Pakistan, WAMY Pakistan, WAMY Saudi Arabia audits provide statistical information on WAMY operations.  See, Ex. 76 (Statistical Report for Documents by Branch Office),  See also Ex. 12 at 138:18-141:7 and 147:22-148:24 (WAMY Pakistan audit report supporting documents were maintained in a warehouse), at 229:14-230:8, 239:2-240:3 (confirming that WAMY Pakistan sent audit reports from 1994-2002); See, Ex. 80.

142.    In the case of WAMY Pakistan, as with many others, the audit report is an analysis of all financial reporting within the custody of the Pakistan office. Ex. 12 at 139:4-141:4 (record turned over to audit are kept in storage).

143.    WAMY's record keeping of project reports, project financing reports, receipts, cash receipts, contracts, communications, and other financial papers allowed external auditors to draft the Pakistan audit reports years after the events audited in the report occurred.  Id. at 139:4-141:4 (record turned over to auditors are kept in storage); at 229:14-231:24 (acknowledging efforts made to assist auditors in getting documents for the report).

### C.    Other Measures Taken by WAMY to Maintain Financial Controls

144.    From 1997-2000, consistent with WAMY's general oversight of financial spending

and at auditors' recommendation, WAMY sought to increase its accounting policy by announcing the centralization of its IT system, updating accounting and financing policies, renewing supervision over accounts, reprimanding policy breaking employees, and hiring of more accountants; WAMY's last accounting updates occurred in the late 1990s. See, e.g., Ex. 86, WAMYSA082520-521 (IT centralization letter); See, also Ex. 87, Jonathan Marks Dep. Transcript (Excerpt) at 257:2-259:17 (discussing improvement in 1999 in the form of more technology, hiring and training); Ex. 88, WAMYSA176925-926 (1999 Ltr from WAMY to W. Europe requesting detailed report on spending).

145.    To preserve sustained excellence in financial reporting compliance and control, in a December 1997 letter, WAMY's then program director (Ahmed Galbat) encouraged even tighter documentation of the use of funds to continue, including the provision financial reports, photos and video evidence of work performed. Ex. 68 (WAMY Jeddah 1997 Letter to India encouraging more diligent controls to reassure donors and beneficiaries).

146.    The Galbat 1997 letter called for the creation of a control committee tasked with securing the swift implementation of due diligence to fulfill WAMY's obligation to donors and project recipients. Id. (WAMY Jeddah 1997 Letter to India encouraging more diligent controls to reassure donors and beneficiaries).

147.    Galbat sent copies of the same 1997 letter to several WAMY offices in both 1997 and 1999.  See, e.g. Ex. 69 (1997); Ex. 70 (1997); and Ex. 71 (1999).

148.    To further control of collections, in May of 2000, WAMY's Assistant Secretary General Noorwali directed WAMY's then regional office in Jeddah to ensure only financial and external affairs officers collected donations and not administrative officers. Ex. 89, WAMYSA529024 (May 2000 Noorwali statement).

149.    To raise employee financial awareness and responsibility, WAMY encouraged employees in 2000 to enroll in courses with the National Commercial Bank on topics like anti-fraud

and money laundering, detecting forgery and counterfeiting, supervisory skills, communication skills, technical skills, and much more.  Ex. 90, WAMYSA528993-997.

## V.    WAMY's Affiliate Lajnat Al-Bir Al-Islamiya ("LBI"), Provided Humanitarian and Disaster Relief and Provided No Support, Directly or Indirectly, to al-Qaeda

150.    While WAMY's educational mission is directed mostly to Muslim youth, its humanitarian aid projects during natural disasters and war-torn areas are directed to society at large. Ex. 2 at ¶22 (discussing humanitarian aid); Ex. 5 at 78:20-79:22.

151.    WAMY's respected humanitarian and charity projects work hand-in-hand with such international organizations like the United Nations High Commissioner for Refugees (UNHCR), the World Health Organization (WHO), the World Food Organization ("WFP"), the United Nations Children's Fund (UNICEF) and the United Nations Relief and Works Agency for Palestine Refugees ("UNRWA") and other state-run initiatives.  Ex. 2 at ¶20 (discussing work with U.N. agencies); Ex. 5 at 79:23-80:5 (attesting to WAMY's humanitarian work primarily originating during the Afghan refugee crises); Ex. 91, Rustum Mahmand Declaration  at ¶3-9 (discussing WAMY's work alongside other NGOs in Pakistan under auspices of the United Nations and Government of Pakistan.).

152.    WAMY's humanitarian relief work includes providing medical aid, temporary shelter, food, youth empowerment and building schools, hospitals, orphanages, wells, mosques and more at the various WAMY branches. Ex. 2, ¶22 (discussing humanitarian aid); Ex. 14 ¶15 (explaining that the policies that WAMY seeks to promote); Ex. 92, WAMYSA038647-655 (Afghanistan agriculture report and polio eradication campaign with the WHO and UNHCR); Ex. 93, WAMYSA035262-282, at 265-266 and 270-271 (Letter from WAMY Pakistan director to Assistant Secretary General Noorwali concerning agreements with World Food Program and WHO, and memo of understanding); Ex. 94, WAMYSA038629-636 at 630 (Chamkani hospital report); Ex. 95, WAMYSA036944 (letter asking to assign WAMY doctors to train Kosovar doctors); Ex. 18 at ¶¶10-11 (discussing U.N. facilitated projects); Ex. 96, WAMYSA038614-620 (WAMY Pakistan projects report, noting relief

35

activities since 1986).

153.    WAMY also maintains a Muslim Doctor/Medical Committee (a/k/a Islamic Medical Association) that publishes a medical bulletin and works in conjunction with the Federation of Islamic Medical Association ("FIMA"). Ex. 97, WAMYSA1235619-621 at 619 (1996 meeting minutes discussing al Balsam bulletin).

154.    The Doctor/Medical Committee held medical camps and ran projects in, for example, Chechnya, Pakistan, and Comoros.   Ex. 98, WAMYSA1235779-782 (2000 meeting minutes discussing FIMA meeting in Pakistan and Chechen medical camps); Ex. 99, WAMYSA1235703-708 (1998 meeting minutes about medical camps in Comoros and a clinic in Jordan for Palestinians); See also, see also Ex. 95 (letter asking to assign WAMY doctors to train Kosovar doctors recognizing WAMY's Doctor's Committee); Ex. 100, WAMYSA1235836-841 (2001 meeting minutes about health center for Afghan refugees, Kosovar doctors, and other works).

    **A.    WAMY's Former Affiliate, *LBI,* a Charity Providing Medical and Humanitarian Aid, Has No Relationship with or Connection to *Benevolence International Foundation ("BIF"),* a United States Based Charity Created and Marketed by Adel Batterjee to Deceive Donors into Believing It Was a WAMY Affiliated Charity.**

155.    In 1987, Adel Batterjee, a merchant, and two other men formed *Lajnat Al-Bir Al-Islamiya* ("LBI") to help Afghan refugees. Ex. 10 at ¶4 (attesting to his profession as a merchant); Ex. 14 at ¶¶ 26-29, 31-42 (discussing Batterjee starting LBI's [at 26] and various humanitarian engagements in Afghanistan/Pakistan as well as in Kosovo); Ex. 5 at 233:2-16 (testifying to LBI's work in Afghanistan that included orphan, healthcare and agricultural projects). Ex. 25 at WAMYSA028405 (Brief information about LBI, memorializing its beginning in 1987); Ex. 101, WAMYSA031288-314 at 031300, 031308 (1989 LBI Organization Achievement discussing LBI objectives).[6]

---

[6] WAMYSA031228-031304 is produced in the form it was received.

156.    LBI is also known in English as Islamic Benevolence Committee ("IBC") or Benevolence Islamic Committee ("BIC"). Ex. 14 at ¶55 (discussing LBI as "Benevolence Islamic Committee"); see e.g., Ex. 78 at WAMYSA062986-987 (1995 salary statements for using "Islamic Benevolence Committee").

157.    LBI's most prominent humanitarian work included the aforementioned Abu Hanifa school, running the Chamkani district hospital and conducting refugee work.  See, *supra* at paragraphs 28-45 (discussing Abu Hanifa school), see *infra* at paragraph 163, 230, 256-60 (discussing refuges work and Chamkani hospital).

158.    Batterjee's LBI consisted of its founders, a general assembly (the highest constitutional body) and its own operational board of directors (the executive body).  Ex. 101 at WAMYSA031306-307 (LBI Organizational bodies).

159.     Unlike WAMY, Batterjee's LBI did not have the ability to raise funds or operate legitimately in Saudi Arabia. Ex. 14 at ¶49 (discussing Batterjee misconduct of raising funds); Ex. 2 at ¶2 (discussing WAMY's legitimate and official status as a charity).

160.    Thus, in 1989, at Batterjee's request, WAMY agreed to cooperate with LBI in joint humanitarian relief efforts.  Ex. 14 at ¶29 (describing how LBI came to partner with WAMY); Ex. 102, WAMYSA018655 (1996 Notes to Accounts with brief history of WAMY/LBI); Ex. 103, WAMYSA029920 (Nov 1994 letter saying LBI is relief/welfare arm of WAMY); Ex. 5 at 228:13-23 (discussing Batterjee's request to work under WAMY's umbrella).

161.    Prior to 1989, WAMY knew Batterjee because of his charitable work.  Ex. 5 at 228:16-229:5 (discussing what WAMY knew about Batterjee).

162.    Beginning in or about 1989, WAMY managed its humanitarian work through its affiliation with LBI in the areas of medical assistance, education, social welfare and agricultural and rural development. Ex. 14 at ¶32-34 (attesting to LBI's charity work); Ex. 102 (1996 Notes to

Accounts with brief history of WAMY/LBI); Ex. 103 (Nov 1994 letter saying LBI is relief being welfare arm of WAMY).

163.    Administratively, LBI and Batterjee agreed to remain independent but work under WAMY's auspices, follow WAMY's project-based funding protocols and guidelines, and be held accountable to and reported its projects to the newly formed WAMY/LBI Saudi supervisory board. Ex. 14 at ¶29 and 36 (Noorwali attesting that LBI would operate as an independent entity under WAMY's auspices and charter, on the condition that LBI would follow WAMY policies and protocols); Ex. 5 at 228:11-229:5 (explaining how LBI came under WAMY's umbrella as an independent organization); Ex. 14 at ¶ 27 (LBI's refugee work); Ex. 105, WAMYSA1235455-459 at 455 (noting LBI's "minutes of the Seventh Meeting of the Charity Committee's Council of Supervisors);  Ex. 18 at ¶7 (noting that LBI had its own name but was part of WAMY).

164.    To fulfill its agreement with WAMY, LBI provided reports to the WAMY/LBI supervisory board. Ex. 14 ¶¶26 (discussing Noorwali membership on the board), 28 (discussing Batterjee compliance with providing operational reports), 46 (discussing Batterjee's later failure to provide reports); Ex. 5 at 226:20-227:14 (serving on the LBI board), and 228:24-229:11 (attesting to the formation of the board).

165.    WAMY's then Assistant Secretary General and Secretary General (Dr. Abdul Wahab Noorwali and Dr. al Al-Johani, respectively) initially served on WAMY/LBI's nine-member Saudi based supervisory board, with al-Al-Johani acting as the chairman of the board. Ex. 5 at 227:15-228:5 (testifying to the formation of the board); Ex. 24 at WAMYSA065181-182 (overall dissolution document).

166.    Batterjee held no executive position with WAMY.  Ex. 9 at ¶15 (confirming that Batterjee did not hold any official position with WAMY); Ex. 10 at ¶9 (confirming that he "never served as any executive of [WAMY]").

**B.      WAMY/LBI Removes Batterjee for Disregarding Its Reporting Policies**

167.      From 1989, when LBI became a WAMY affiliate, to 1992, Batterjee complied with WAMY's reporting policies and provided reports to the supervisory board. Ex. 14 at ¶¶28.

168.      Beginning in 1992, however, Batterjee started to violate the transparent reporting mechanism he was requested to fulfill; see, e.g. Id. at ¶45-50 (discussing how WAMY's relation with Batterjee broke down); Ex. 106, WAMYSA032006 (July 1992 Letter from WAMY Sec. Gen Johani noting Batterjee's failure to deliver a report and a request for one).

169.      For example, Batterjee failed to provide project reports, failed to provide accounting for expenditures, and conducted projects on his own rather than under LBI. Ex. 5 at 238:7-239:6 (testifying about Batterjee's behavior); Ex. 107, WAMYSA061345-346 (May 1993 letter to Prince Salman advising him Batterjee was released due in part to unauthorized work in Sudan and Bosnia and administrative violations).

170.      Batterjee wanted to be a "one-man show" and engaged in behavior that was "inappropriate and that did not comply with …WAMY's activities, [such as] gathering donations in public spaces" and not properly accounting for funds disbursed. Ex. 5 at 238:7-239:6 (testifying about Batterjee's behavior); Ex. 14 at ¶47 (discussing Batterjee's determination to be a one-man show); Ex. 107 (May 1993 letter to Prince Salman advising him Batterjee was released due in part to unauthorized work in Sudan and Bosnia and administrative violations).

171.      Consequently, on July 11, 1992, WAMY's general secretariat met and ratified a three-months pause on LBI funding and, even before Batterjee's suspension, discussed forming a committee to integrate LBI into WAMY. Ex. 108, WAMYSA1235429-434 at 431 (meeting minutes showing that on July 6, 1992 WAMY discussed with Batterjee his accountability issues and agreed to (1) suspend LBI from collecting donations for three months, and (2) create a committee consisting of Ibrahim al-Qaeed, Hamad al-Sulaih and Ahmed al-Tuwaijri to oversee controls of the LBI's funds

until a final determination is made on the accounting issues).

172.    In early 1993, after the LBI board's January 1993 meeting, Adel Batterjee was removed from his position within LBI or WAMY. Ex. 9 at ¶14 (saying Batterjee dealings with WAMY ended in 1993); Ex. 2 at ¶28 (discussing WAMY's policy of terminating official when there appears to be a lack of transparency); Ex. 5 at 236:19-23 (attesting to WAMY Secretary General's council deciding to remove Batterjee); Ex. 105 at WAMYSA1235458 (July 19, 1993 Meeting Minutes of the Seventh Meeting of LBI's Board of Supervisors, confirming extension of new Executive Director's term for another six months).

173.    In a letter dated approximately May 11, 1993, from WAMY secretary general Al-Johani to Prince Salman, WAMY's Secretary General stated the reasons and circumstances of Batterjee's dismissal:

> There have been some developments in the committee that I would like you—May Allah protect you—to be aware of. The former Executive Director of the Committee, Sheikh Adel Batterjee, worked hard and carried out some activities in Sudan and Bosnia and Herzegovina that were not approved by the Board of Supervisors. He also carried out some activities related to fundraising at home, which was questioned by officials in Mecca as well as the Ministry of the Interior. The Assembly's Secretariat Council met and took the decision to review the committee's activity and determine the reasons that led to some administrative abuses. A meeting of the Board of Supervisors followed, in which a decision was taken to appoint a new executive director and to remove Sheikh Adel Batterjee from managing the committee, with a strong focus on the committee's activity to be carried out in coordination with officials in the Kingdom and without conducting any work that goes against the satisfaction of the officials, even if there is an urgent need for it, such as the activity in Sudan or in Bosnia and Herzegovina, except after coordination with the High Authority for Fundraising for Muslims of Bosnia and Herzegovina, which you preside over.
>
> After several meetings, things developed and the current situation is as follows: Sheikh Batterjee no longer has any administrative connection with the Benevolent Committee, but has also resigned from the Board of Supervisors. I recently learned that he has formed a commission that he calls the "International Benevolent Organization. It has offices in several countries abroad, and its logo is close to that of the Benevolent Committee. Its name also suggests this similarity. I wrote to him a letter in which I emphasized that the assembly is not responsible for this organization; and that the similarities in the two names should not be exploited to carry out any activity that the assembly might be considered liable for, as this organization has no legal presence inside the Kingdom. (a copy of the letter is attached).

> A temporary executive director of the Islamic Benevolent Committee has been appointed, Dr. Hassan Bahafez Allah, a Professor at King Abdulaziz University and a collaborator with the Muslim World League.

Ex. 107 (May 1993 letter to Prince Salman); Ex. 5 at 238:7-239:6 (testifying that Batterjee wanted to be a "one man show").

174.    When WAMY terminated Batterjee in 1993, he relinquished all LBI assets including endowments and property deeds to WAMY.  Ex. 105 at WAMYSA1235456 (Noorwali 266- July 8, 1993, meeting minutes discussing turnover of deeds and other items); Ex. 5 at 244:22-245:17 (confirming tension within LBI that required intervention of some people).

## C.    Batterjee Surreptitiously Creates BIF and Falsely Markets It As an LBI Affiliate.

175.    Unknown to WAMY, Batterjee founded Benevolent International Foundation (BIF), also known as "Munathamat El Birr Doualia," in 1992 while he simultaneously headed LBI. Ex. 14 at ¶55 (attesting to Batterjee's bad acts and that WAMY learned on BIF only in 1993); Ex. 109 WAMYSA034224-245 (BIF statutes); Ex. 110, FEDPEC0157372 at FEDPEC015373 ¶ 2 (Enaam Arnaout Corrected Declaration).

176.    Batterjee first filed BIF as "an international charity foundation having Liechtenstein as its country of domicile,…[and] its head office in the city of Chicago…" Ex. 109 at WAMYSA034224 (BIF statutes).

177.    On March 30, 1992, Batterjee incorporated BIF ("BIF-USA") in the State of Illinois, naming himself as one of its officers. Ex. 111, FED-PEC0049416-422 (BIF Illinois registration).

178.    Batterjee did not inform WAMY or the LBI Board of Supervisors about BIF; WAMY learned of BIF in 1993. Ex. 14 at ¶55 (declaring that WAMY did not know about BIF.); also, Ex. 112, WAMYS057782 (1993 BIF Flyer fax); Ex. 10 at ¶9 (declaring that BIF was never a branch of LBI).

179.    Also, without WAMY's knowledge, Batterjee registered his BIF organization in

41

Peshawar, Pakistan using the 77-D/B Park, Road University Town, Peshawar address he had used to register LBI in March of 1991. Ex. 14 at ¶55 (declaring that WAMY did not know about BIF until about February 1993); Ex. 113, WAMYSA034246 (BIF 1993 registration showing D/B Pak address)

180.    WAMY only learned about BIF shortly after dismissing Batterjee from LBI in early 1993. Ex. 14 at ¶55 (Noorwali learned in 1993 that Batterjee started BIF and advised him of the dangers of having an organization with a similar name to LBI).

181.    Through a fax sent in February 1993, WAMY discovered that BIF sought donations using a flyer patterned after an LBI flyer.  Ex. 112 (BIF Flyer fax); Ex. 114, WAMY029936-937 (LBI flyer fax); see also Ex. 14 at ¶55 (discussing letter sent to Batterjee concerning BIF); Ex. 5 at 257:5-22 (discussing when WAMY learned of BIF); 267:3-9 (WAMY knew nothing of BIF).

182.    Aside from using similar type print and depicting orphans in its flyer as LBI did, BIF's flyer used a logo that mimicked WAMY's: a globe with interlocking hands over it. Compare Ex. 112 (BIF Flyer fax) and Ex. 114 (LBI flyer fax).

183.    On February 22, 1993, after learning of Batterjee's deception, WAMY changed LBI's registered Peshawar address from 77-D/B Park Road University Town (the address Batterjee sued) to the new address at 137 J-Z Phase 2 Street-3, Hayat, Abed, Peshawar.  Ex. 115, WAMYSA027707 (LBI address change document).

184.  On February 23, 1993, WAMY's Secretary General Al-Johani, concerned that the similarities in the flyers would confuse donors into thinking there was a relationship between LBI and BIF, sent Batterjee a letter stating:

> It gives me pleasure to inform you that the Assembly has learned that you have formed an organization bearing the name of the International Benevolent Organization. Given the close similarity between this organization and the Assembly's Islamic Benevolent Committee, whether in terms of logo or role and function, I hope that your Excellency will take this into consideration in the future, as it may confuse the clients and donors, despite the absence of links between them from an organizational and administrative aspect.

I hope you will alert those cooperating with your organization to take this into account if the organization's logo and name remain as they are. Both the Assembly and it's Benevolent Committee are not responsible for the Organization's activities or announcements.

Further, please advise those cooperating with the Organization not to confuse the Committee with the Organization in case of fundraising inside the Kingdom, due to the importance of this matter.

Ex. 116, FED-PEC0114420 (cease and desist letter from WAMY to Batterjee); Ex. 5 at 257:23-258:7 (attesting to Al-Johani sending and signing the letter to Batterjee).

185.     On December 22, 2004, eleven years after WAMY terminated him, OFAC designated Batterjee a Special Designated Global Terrorist (SDGT), Ex. 117, OFAC SDN List April 3, 2026.

186.     On January 13, 2013, after having designated him in 2004, the U.N. de-listed Batterjee from the al-Qaida Sanctions List. Ex. 118, Press Release, January 15, 2023, U.N. Security Council; Ex. 119, Press Release, U.N. Security Council, December 28, 2004.

### D.     WAMY Ultimately Dissolves LBI to Avoid Any Confusion Between It and Batterjee's BIF

187.     Because confusion continued to exist about Batterjee's relationship to WAMY even after his exit in early 1993, WAMY wanted to "ensure that [Batterjee's] activities with [his own organization] were not attributed to or affiliated with WAMY." Ex. 14 at ¶55-56 (attesting to dissolution of LBI to "ensure that [Batterjee's] activities with BIF were not attributed to or affiliated with WAMY").

188.     Through a series of steps beginning in 1995, WAMY dissolved LBI and transferred all its funds and assets into WAMY by 1997. Ex. 14 at ¶56 (discussing LBI dissolution); Ex. 120, WAMYSA027804 (May 1996 LBI meeting minutes – Noorwali 267 – where LBI's board decided to merge "with its main institution [WAMY]" and to name it WAMY going forward); Ex. 24 at WAMYSA065184 (overall dissolution document).

189.   The dissolution process included the transferring of employees and the turning over of

endowments and LBI international projects. Ex. 121, WAMYSA032014-020. On or about May 28,

1996, WAMY's executive director made the following final administrative decision:

> Lajnat al Bir al Islamiya is to be merged with its main institution (World Assembly of Muslim Youth; The name to be used is World Assembly of Youth; Correspondence should be in the name of the Assistant Secretary General of the World Assembly in Jeddah; all balance sheets and accounts are to be settled with the World Assembly Office in Jeddah; Work on all projects is to be resumed as per the previously set plan; all abroad assets and properties of Lajnat al Birr al Islamiya offices and projects are to be transferred in favor of the World Assembly into force as of May 28, 1996; all concerned departments are to implement the resolution as relevant to their work.

Ex. 120 (Meeting minutes – Noorwali 267); Ex. 5 at 245:18-247:6; Ex. 31 at 232:13-15.

190.    With all of LBI's assets and expenses accounted for, on or about October 2, 1996, LBI transferred all of its funds, consisting of SAR 8,130,982 approximately $2,166,818, to the account of the Ministry of Islamic Affairs. Ex. 122, WAMY065184 (overall dissolution document citing transfer of funds); Ex. 123, WAMYSA061342 (1996 follow up letter after transfer).

191.    On or about December 17, 1996, LBI submitted an application to change its name from LBI to WAMY. Ex. 124, WAMY029513-514 (1996 Change of LBI name); Ex. 164, WAMYSA028295 (Afghan Refugee Commission letter of renewal); Ex. 125, WAMYSA028285 (1996 document to Al-Johani related to operating as Lajnat and getting a no objection letter);  Ex. 126, WAMYSA031524 (letter from Rustum Mahmand to Pakistani Secretary requesting change of LBI name to WAMY); Ex. 12 at 60:21-61:16 (testifying to starting work in 1996 and working with LBI only for LBI to fold a few months later).

192.    As part of the dissolution process, a report was prepared detailing LBI's founding, its activities, its leadership, the total number of projects, the projects undertaken in the past, the ongoing projects, the future plans for the organization, and the reason for changing the organization's name from LBI to WAMY. Ex. 127, WAMYSA0208403-414; see also Ex. 128, WAMSYSA028040-041 (official name change approval).

193.    On July 16, 1997, LBI officially changed its name from LBI to WAMY. Id. (Pakistan

approves change); Ex. 129, WAMYSA029901-902 (Winer Ex 918); Ex. 130, WAMYSA016310 (letter from WAMY's Assistant Secretary General to the Secretary General that LBI was completely dissolved and LBI name is gone).

194.	WAMY-Pakistan, the successor to LBI, assumed control over and continued LBI projects and charity work including, among others, Abu Hanifa school, New Convert programs in Indonesia, orphanages in Kurdistan, agricultural projects, Islamic Center in West Sumatra, and a health care project. Ex. 131, WAMYSA027758-762 (al-Ghamdi letter re projects taken over); Ex. 121 (June 1996 WAMY meeting minutes describing LBI projects WAMY is taking over); Ex. 130 (letter from WAMY's Assistant Secretary General to the Secretary General that LBI was completely dissolved and LBI name is gone); see also Ex. 132, WAMYSA061651 (LBI's Filali confirming merge of LBI with WAMY); Ex. 133, WAMYSA029787-791 at 788 (1996 letter recognizing activities transferred to WAMY, including Abu Hanifa).

195.	WAMY made sure to segregate all of LBI's funds and transferred them to the MOIA before dissolving LBI into WAMY. Ex. 24 at WAMYSA065184 (overall dissolution document).

196.	 In August 1997, MOIA transferred the segregated LBI funds into WAMY's escrow account.  WAMYSA029901 (letter with a check made out to WAMY in the amount of 7,703,205 riyals); Ex. 132 (LBI's Filali confirming merge of LBI with WAMY and transfer of assets).

197.	WAMY did not transfer any of LBI funds, assets or affects to Batterjee or any organization connected to him, including BIF. Ex. 129 (Winer Ex 918) (letter with a check made out to WAMY in the amount of 7,703,205 SAR, approximately $2,053,819).

198.	WAMY has never intentionally or otherwise carried out illegal activities to cause harm to any person. Ex. 9 at ¶¶10 and 20.

199.	A 1996 document of unknown provenance incorrectly states that LBI is "probably a subsidiary of the Saudi-based Muslim World League." Ex. 134, BUR-PEC-045900-913.

200.     The document notes an "extremist connection" to "Afghan Veterans". Id.

201.     The only support for this claim is that "one Zagreb employee, identified as Syrian-born US citizen Abu Mahmud, was in Pakistan at an unspecified time, according to a foreign government service. He matches the description, provided by a clandestine source, of a man who was allegedly involved in the kidnapping of six westerners in Kashmir in July 1995, and who left Pakistan in early October for Bosnia via the United States. The source said that he worked at various times for LBI, Maktab Al-Khidmat, and Benevolence Foundation International in Pakistan. Lajnat Al-Birr has provided support to a commander of at least one training camp in Afghanistan, according to a clandestine source." Id.

202.     This document includes no facts establishing the veracity of the clandestine source or sources nor their basis of knowledge. Id.

203.     Until its dissolution in 1997, LBI existed contemporaneously with BIF for about five years, but LBI was never a branch of or associated with BIF and vice versa. Ex. 10 at ¶9 (declaring that BIF was never a branch of LBI).

204.     On November 19, 2002, OFAC designated BIF as an SDGT, naming it's also known as *Al Bir Al Dawalia*, BIF, BIF-USA, and Medzhdunarodnyj Blagotvoritel'nyl. Ex. 117, Office of Foreign Assets Control, *Specially Designated Nationals and Blocked Persons List,* U.S. Dept. of Treas. ("OFAC SDN List April 3, 2026").

205.     Likewise, on November 21, 2002, the U.N. designated BIF as an FTO and lists four also knowns as: *Al Bir Al Dawalia*, BIF, BIF-USA, and Medzhdunarodnyj Blagotvoritel'nyl. Ex. 135, U.N. Security Council Consolidated List.

206.     LBI is not named as an "a.k.a." of BIF on either OFAC or the U.N.'s list. Ex. 117; Ex. 135.

207.     No sanction regime or government agency has ever designated LBI.  Ex. 117.

**VI**.    **Facts Specific to Certain WAMY Chapters and Individuals**.

208.    "WAMY never knowingly supported terrorists or terrorist causes anywhere including Bosnia, Kashmir, Philippines, Pakistan, Afghanistan, Kosovo, Sudan, South East Asia, Chechnya or the United States."  Ex. 2 at ¶28-30 (discussing no support for terror intermediaries and no support for any terror groups).

### A.    WAMY Sudan

209.    There is no evidence that WAMY's work in Sudan had nothing to do with BIF. See, infra, ¶¶20, 26, 127, 128, 136. 170, 171, 174.

210.    WAMY's licit work in Sudan consisted of, among other things, providing support for flood victims, sponsoring students, conducting youth camps, providing dawah activities, assisting the Women's committee, operating "caravans" for "war-displaced" people for educational, health and sanitation programs, providing adult education programs, providing female student housing, drilling wells, building mosques and assisting orphanages. Ex. 136, WAMYSA1235460-480 (Report on the main accomplishments of WAMY in Sudan 1993-1994 including relief and educational operations for students and teacher training); Ex. 137, WAMYSA031064 (1999 letter concerning funds for flood victims);  Ex. 65 (December 1995 letter to Al-Johani with summary of Sudan achievements in 1994-1995 including eight youth camps, educational and health programs, teacher training courses, organizing a woman's committee to study the Quran, helping for housing for African female students); Ex. 138, WAMYSA031240 (November 2001 thank you letter from Al-Johani to Zair Bashir for providing seats to WAMY sponsored students in "Sudan's prestigious universities"); Ex. 139, WAMYSA031061-062 (2001 letter from WAMY to Sadiq re transfer of funds for orphanage, drilling wells and others).

211.    WAMY Sudan performed some of its work in collaboration with Sudan's then Minister of Higher Education.  Ex. 138, (November 2001 thank you letter from Al-Johani to Zair

Bashir, Sudan Minister of Higher Education).

212.    WAMY approved and tracked its budgeting for its Sudan office expenditures and project.  See, e.g., Ex. 140, WAMYSA031232 (June 1995 letter from Sudan office to WAMY Secretary General submitting budgets for six months); Ex. 141, WAMYSA031231 (April 1995 office expenditure); Ex. 142, WAMYSA031233-239 (office budget expenditures ranging from December 1994 to May 1995); Ex. 139 (2001 letter from WAMY to Sadiq re transfer of funds for orphanage, drilling wells and others).

### B.    WAMY Pakistan

213.    Before WAMY consolidated its Saudi offices were consolidated into the Riyadh office, the Jeddah office, which Dr. Noorwali headed as Assistant Secretary General from 1996, oversaw the Pakistan and Afghanistan branch office. Ex. 14 at ¶¶10, 12 (discussing the Jeddah offices coverage and his start date); Ex. 5 at 155:4-156:14 (discussing office in Pakistan Kashmir).

214.    WAMY Pakistan's Peshawar branch office, overseen by the Jeddah office, supervised WAMY's activities in Afghanistan and Pakistan. Ex. 14 at ¶10 (discussing Jeddah offices' coverage which includes Pakistan and Afghanistan); Ex. 12 at 317:16-320:24 (discussing WAMY Pakistan's requirement for permission to enter and leave Afghanistan from designated ports); Ex. 91 at ¶8 (discussing WAMY working out of Peshawar).

215.    WAMY Pakistan work from Peshawar "involved in the healthcare sector, water supply sector, and education[,]" orphan programs, rehabilitation, healthcare, human resources, construction and other charity activities. Ex. 91 at ¶8 (discussing WAMY's work); Ex. 18 at ¶4 (attesting to the project divisions); Ex. 96 at WAMYSA038614-616 (documenting some of WAMY Pakistan projects list, including Abu Hanifa school); Ex. 143, WAMYSA038604-613 at WAMYSA038604 (WAMY Pakistan report with picture of WAMY office and list of activities); Ex. 24 at WAMYSA065182-183 (LBI overall dissolution document outlining LBI's activities).

216.    When WAMY registered the Pakistan office in 1987 with the Commissioner of Afghan refugees in Peshawar, Pakistan, most of its refugee work was "facilitated by the United Nation ("UN"), the Pakistan government Ministry, and the Agency Coordinating Body of Afghan Relief (ACBAR)…" Ex. 18 at ¶9 (discussing Anwar's work with refugees while at WAMY-Pakistan as its director); Ex. 96 at WAMYSA038614 and 618 (discussing registration).

217.    WAMY Pakistan's orphan program in Afghanistan, a large part of WAMY's social welfare sector, involved sponsoring thousands of orphans and widows in both Afghanistan and Pakistan. Ex. 80 at WAMYSA018624, WAMYSA018635, WAMYSA018647, WAMYSA018659, WAMYSA018671, and WAMYSA018683 (outlining spending in social welfare); Ex. 12 at 262:2-19 (testifying to the existence of six to ten orphanages in Afghanistan during his term); Ex. 80 at WAMYSA18684-690 (list of WAMY employees- includes list of employees at orphanage); Ex. 91 at ¶8 (LBI/WAMY worked with Save the Children Fund).

218.    In a collaborative effort involving UNICEF and the Afghan government, WAMY fulfilled its education objectives by running a collaborative U.N. approved and funded private boys' and girls' school for orphan refugees from 1996-2017. Ex. 18 at ¶11.

219.    "The bulk of the refugee work was done under the auspices of the United Nations and the Government of Pakistan, [where] the work happened in the tribal areas of Pakistan." Ex. 91 at ¶4; Ex. 18 at ¶9 (discussing Anwar's work with refugees while at WAMY-Pakistan as its director); see also, Ex. 96 at WAMYSA038618.

220.    In addition to its collaborative work with international agencies in Afghanistan, WAMY coordinated its own independent projects with the Islamic Coordination Institute ("ICI"). Ex. 18 at ¶21.

221.    In fulfilling its function, the ICI did not create a joint project but instead coordinated the work of different relief organizations to avoid duplication of relief work in Afghanistan. Ex. 18

at ¶21.

222.     For example, "WAMY placed 2,000 Afghan orphans in various schools, educational projects, religious projects, and week-long camps serving 80-100 student." Ex. 18 at ¶16; see also, Ex. 96 (project list document).

223.     From 1990 to 1996, WAMY Pakistan (at the time WAMY/LBI) provided services in the health service (including running a hospital), social welfare (orphanages), human resources, educational, rural development and emergency relief sectors. Ex. 18 at ¶19 (discussing WAMY Pakistan hospital projects); Ex. 12 at 261:11-264:21 (discussing WAMY orphanage and hospital projects); Ex. 25 at WAMYSA028409-414 (WAMY/LBI summary sheet); Ex. 144, WAMYSA041410-413 at WAMYSA041410-412 (1993 LBI health sector report); Ex. 145, WAMYSA035413-417 (1993 memo referring to attachment of report re hospitals, including Chamkani, in Pakistan and health services carried out in Pakistan in March 1993).

224.     WAMY Pakistan was obligated to abide by, and did abide by, Pakistani law and rules. Ex. 91 at ¶¶9-11 (describing that WAMY's was never alleged to have engaged in wrongdoing); Ex. 146, WAMYSA031831 (1993 letter for example, advising employees to comply with residency requirements).

225.     Rustum Shah Mahmand ("Mahmand"), a former Home Secretary of Pakistan (1989-1991) and former Ambassador of Pakistan to Afghanistan (2002-2005), worked as the Commissioner of Afghan refugees. Ex. 91 at ¶2. (Mahmand declares that he was the Commissioner for Afghan refugees in Pakistan from 1983 to 1985 and from 1992-1996).

226.     In his capacity as Commissioner of Afghan refugees from 1983 to 1985 and 1992-1996, Mahmand "had a lot of interaction with non-governmental organizations ("NGOs") that were providing refugee assistance in Pakistan, including World Assembly Muslim Youth ("WAMY") and Lajnat Al-Birr Al-Islamiyyah ("LBI")." Id at ¶3.

227.    During Mahmand's tenure as Commissioner for Afghan refugees and after, he never heard or received any negative report about WAMY doing anything outside their charter/mission. There were never any allegations of WAMY funding mujahedeen or al-Qaeda or being associated with them in any manner. WAMY was still operating in Pakistan in 2000-2001, providing relief assistance. Id at ¶9.

228.    The Pakistan refugee Commission had officials and intelligence agencies in the field to monitor what was happening and provide daily reports; anything out of the ordinary was reported. Id at ¶5.

229.    WAMY's Peshawar Pakistan offices were never raided nor was a Sudanese employee ever questioned for delivering a Bin Ladin audio tape. Ex. 12 at 291:4-292:19 (rejecting the claim that FBI and Pakistani intelligence "raided" WAMY's Peshawar office and has no knowledge of the claim that a WAMY Sudanese employee was questioned about hand-delivering a Bin Ladin message to local media); Ex. 147, Adel Hamad Declaration, at ¶40 (had nothing to do with the delivery of a tape from Bin Ladin to al Jazeera); Ex. 4 at 123:18-123:22; Ex. 91 at ¶10.

230.    WAMY operated without issues in Pakistan. Id.

231.    WAMY never violated any laws while operating in Pakistan and its records were transparent and clear. Id at ¶11.

232.    Anwar Ibrahim headed WAMY's Peshawar Pakistan office from 1996 to 2002 where he was in charge of WAMY's orphans' program. Ex. 12 at 61:6-62:9 (testifying to working in Peshawar from 1996 to 2002 and Islamabad from 2002 to the present); 85:16-86:15 (explaining his field of work beginning in 1996 to 2002).

233.    From 2002 to onward Ibrahim headed WAMY's Pakistan branch from Islamabad, Pakistan. Id.

234.    When Ibrahim served as a WAMY employee in Pakistan, there were never any media

reports accusing WAMY of funding terrorism, providing logistics for terrorists, sending youth for terror training in Pakistan. Ex. 12 at 290:1-291:3 (Ibrahim testifying that there were no media reports of WAMY funding terrorists or funding training camps).

235.    WAMY-Pakistan's work was government regulated and not clandestine. See, Ex. 146 (1993 letter to LBI office regarding rules for residence permits for foreign workers). Ex. 91 at 9-11 (describing that Pakistani intelligence was aware of WAMY and WAMY was never alleged to engage in wrongdoing).

236.    WAMY Pakistan never provided travel documents, equipment, or monetary aid for anyone not directly affiliated with WAMY, LBI, or their projects; especially not for those with terroristic or militaristic aims. Ex. 18 at ¶30.

237.    WAMY Pakistan was never involved in "jihad training" and "simply involved in the education and relief work for poor civilians." Id. at ¶¶ 9-19, 30.

1.    Financial Reporting and Controls

238.    To comply with WAMY's reporting policies, WAMY Pakistan regularly sent annual budget requests to WAMY headquarter. Id. at ¶31 (discussing annual budget").

239.    WAMY-Pakistan regularly performs a yearly full annual financial audit. Id. at ¶35 ("In order to further ensure sound financial practices, a full financial audit of WAMY Pakistan is performed every year.

240.    WAMY performs internal audits and external audits of donations, deposits, financial transfers, expenditures, and project costs. Ex. 18 at ¶35; Ex. 12 at 137:10-139:16 (describing that audit reports are sent to headquarters); See, e.g. Ex. 148, WAMYSA9760-770 (2001 Pakistan office audit report – Winer 934);  Ex. 149, WAMYSA429154-167 (1993 LBI project and expenditure report for projects in places like Philippines, Gambia, Afghanistan for 1992-1994); see, e.g. Ex. 80 (Brief Information 1992 to 2002 Audit Reports).

241.     WAMY Pakistan's audit report accounts for its budgeting expenses in WAMY's, target areas of social welfare, education, health and agriculture.  Id. at WAMYSA018624, 635, 647, 659, 671, and 683.

242.     The expenses in each target area accounts for, among other things: salaries, utilities, communication, student welfare within that area, ICI membership, orphan allowances, staff welfare and training, vehicle up-keep, and more.  Id.

243.     From 2000 forward, the audit reports provided even greater detail of expenses associated with education and social welfare programs.  Id. at WAMYSA018612, 600, and 588.

244.     WAMY submits a yearly financial report to the Pakistani government and no report has ever resulted in a finding of wrongdoing.  Ex. 18 at ¶30 (attesting that WAMY submits yearly reports in order to continue its status as a charitable organization), ¶38 (acknowledging familiarity to Rustum Shah Mahmand Pakistan's Minister of Internal Affairs, who reviewed WAMY projects), ¶39 (showing that in 2019 WAMY once again received approval to continue operations in Pakistan after receiving a go-ahead from the Pakistan Army, intelligence and police both of which are government by the Ministry of the Interior and the Ministry of Defense).

245.     There is no evidence that any of the funds accounted for in the audit report went to OBL or Al Qaeda.  Ex. 80 at WAMYSA018624, 635, 647, 659, 671, and 683 (LBI audit reports).

2.  WAMY Employee Adel Hamad

246.     WAMY employed Adel Hamad ("Hamad"), a Sudanese national, at its Peshawar Pakistan Office in 2000.   Ex. 147 at ¶13; Ex. 150, WAMYSA E001088-091 (Hamad Employment Contract).

247.     Hamad was never a member of al-Qaeda or its affiliates or a member of any terror group. Ex. 147 at ¶38, 42 (disclaiming involvement with any terror group); Ex. 151, WAMYSA571177-186 at 178 (disavowing membership in terror group); Ex. 2 at ¶¶26, 31 (discussing

that WAMY has never been involved in armed conflict or sent employes to fight help or move fighters or provide other logistics to them); Ex. 151 at WAMYSA571179-180 (Summarized unclassified statement of Adel Hamad referring to self as a "simple employee [] not capable of supporting terrorists financially...").

248.     No sanctions regime or government entity has designated Hamad, before or after WAMY employed him. Ex. 117.

249.     Hamad started work with WAMY in 2000 as a hospital administrative manager, under the supervision of Dr Najib in Chamkani, Afghanistan.  Ex. 18 at ¶19 ("Another WAMY project was a hospital established by LBI in the Paktika [sic] Province in Afghanistan"), at ¶28 (Mr. Hamad was an administrative manager for the WAMY hospital from May 19, 2000 to May 7, 2002"); Ex. 147 at ¶¶13-14 (discussing Najib and his duties as manager of the hospital); Ex. 143 (report on WAMY office and Chamkani hospital); Ex. 150 (Hamad Employment contract); Ex. 152, WAMYSA E001084 (Letter from Ibrahim Anwar recounting Hamad employment and pay).

250.     WAMY renovated this already well-established hospital in 1989 and operated it for ten years to provide healthcare to the people of the Chamkani district and the neighboring Paktia province. Ex. 94 at WAMYSA038629-630 (Chamkani hospital report); Ex. 18 at ¶19 (after ten years of doing so, WAMY stopped operating the hospital due to budgetary restriction).

251.     The Chamkani district hospital ("Al-Nadwah hospital") apparatus includes: two ambulances, staff of 40 including a medical doctor, a surgeon, gynecologist, medical officers, technicians, and administrator that cared after male, female, and pediatric wards. Ex. 94 at WAMYSA038631-632 (Chamkani hospital renamed "Abdul Mohsin bin Abdul Aziz KSA"); Ex. 144 (LBI health sector report); Ex. 145 (report discussing Chamkani); Ex. 152 (Anwar letter noting name as Al-Nadwah).

252.     The Al-Nadwah hospital staffed workers in the outpatient department, internal

department (surgical, Obgyn, pediatric, x-ray, ultrasound, lab, major operations), pharmacy department as well as personnel that worked with UNICEF.   Ex. 147 at ¶18; Ex. 94 at WAMYSA038631-632 (Chamkani hospital report highlighting departments).

253.    As a hospital administrator at Al-Nadwah's surgical hospital, Hamad provided medical and food aid to refugees in Afghanistan, administered a 24-hour medical care facility ran a gynecology, surgical, dental, pediatric, x-ray and ultra sound department, entered into contracts with World Health Organization and World Food Program to obtain medical care and food, followed up with work orders and liaised with UNHCR and WHO personnel that visited the hospital. Ex. 147 at ¶11-18; Ex. 18 at ¶19 (WAMY "provided healthcare for women, surgery, preventive care and general medicine); Ex. 94 at WAMYSA038629 (WAMY Chamkani Report discussing department in hospital); Ex. 4 at 126:2-128:19 (discussing Hamad aid distribution duties and a "normal employee," "a clerk"); Ex. 151 at WAMYSA571179-180 (Summarized unclassified statement of Adel Hamad referring to self as a "simple employee [] not capable of supporting terrorists financially…").

254.    Hamad was known as "humble, peaceful man devoted to his family." Ex. 18 at ¶29.

255.    In 2000, Dr. Najibullah increased Adel Hamad's salary due to a positive performance review.  Ex. 153, WAMYSA056757 (December 2000 letter approving wage increase).

256.    Soon after September 2001, due to insecurity connected to increased violence in the Afghan civil war, Hamad stopped working at WAMY hospital in Chamkani and instead worked at WAMY's office in Peshawar, Pakistan.  Ex. 147 at ¶¶23-25.

257.    Other than the funds allotted to him for monthly allowance, for which Hamad provided receipts, Hamad was an administrative clerk with no access to WAMY funds.  Ex. 4 at 126:2-8; Ex. 147 at ¶22.

258.    There is no evidence Adel Hamd diverted aid under his control to other parties; his tasks "...were very specific, and they were assigned or destined to hospitals, to schools, food supplies,

agricultural programs, and he was committed to these programs. Ex. 4 at 128:20-129:5 (discussing WAMY's findings during an investigating following his detention).

259.    In June 2002, still employed with WAMY, Hamad travelled to Sudan with his family to visit his wife's ailing father.  Ex. 147 at ¶28-29 (discussing his trip to Sudan); Ex. 152.

260.    On July 18, 2002, after his return from Sudan, Pakistani forces, abducted Hamad from the second-floor apartment he rented in Peshawar. Ex. 147 at ¶26, 30-31 (discussing his return to Pakistan and his detention); Ex. 152 (Ibrahim Anwar confirming Hamad's travel to Sudan and employment till July 2002); Ex. 154, Col. Lawrence Wilkerson 2020 Declaration. at ¶10(b) (US forces relied on Pakistani forces to apprehend people).

261.    After his abduction, Hamad would spend the next six and a half months imprisoned in Pakistan, then detained for some time at the U.S. air base in Bagram, Afghanistan.  Ex. 147 at ¶32.

262.    At Bagram, guards tortured Hamad, including by hanging and electric shock, nearly killing him.  Ex. 147 at ¶32.

263.    Hamad was offered release from Bagram if he paid back the ransom agents paid Pakistani authorities for his capture but could not get the money. Ex. 147 at ¶34-35 (discussing his inability to secure his release).

264.    In 2003 Bagram transferred Hamad to the detention facility in Guantanamo Bay, Cuba ("Guantanamo").  Ex. 147 at ¶32.

265.    Hamad spent the next four years (2003 – 2007) at Guantanamo until U.S. authorities finally repatriated him to Sudan in 2007, where he now lives peacefully with his wife and five daughters. Ex. 147 at ¶36; Ex. 155, WAMYSA571217 (repatriation letter from Sudan).

266.    While working for WAMY, Hamad did not knowingly communicate with any al-Qaeda member or terrorist, nor did he know WAMY to do so. Ex. 147 at ¶36 (discussing his and WAMY's non-contact with terror groups).

56

267.    About WAMY, Hamad states: "I never knew WAMY to have any connection with or give any support to Al Qaeda. No one that I ever worked with at the WAMY run hospital was not a legitimate worker. As far as the people that I worked with while with WAMY, no one was using WAMY as a cover to conduct any terrorist activity. Everyone did the jobs they were supposed to and everyone seemed to be a legitimate employee. I knew every single employee at the hospital. There were not a lot of employees. Ther were approximately forty employees. All of the employees had legitimate jobs and positions." Ex. 147 at ¶41.

268.    At all times during his employ with WAMY, Hamad always knew WAMY to be "a charity organization that works to help the Afghan refugees providing them with food, medicine, clothes, and education, building charter schools which is made [for] and orphanage, educational training, and also works in the health department by establishing hospitals, small clinics, and also digging waters wells, building mosques, [for]the Afghan refugees." Ex. 151 at_WAMYSA571178 (Summarized unclassified statement of Adel Hamad).

> i.  *Adel Hamad's wrongful arrest and detention is consistent with the cases of others who were wrongfully detained on unfounded terrorism related allegations*

269.    Lawrence B. Wilkerson, a retired Colonel of the United States Army, has personal knowledge of the circumstances surrounding post-9/11 detention and repatriation of individuals later detained at Guantanamo. Ex. Col. Lawrence Wilkerson 2010 Declaration at ¶4 (discussing employment with US Army), ¶7-9 (discussing knowledge of detention and repatriation). Ex. 154 at ¶¶8-10 (knowledge of detention and repatriation).

270.    Col. Wilkerson had the highest level of access to classified documents and "as a senior official of the State Department from 2002-2005," routinely attended former "Secretary of State Powell's morning briefing" during that period. Ex. 154 at ¶6-7.

271.    At these meetings, where "50 to 55 senior State Department officials" were present,

the Secretary of State discussed Guantanamo detainees and questioned officials on "information about specific progress in negotiating detainee releases. Id. at ¶8.

272.    During these meeting and other official duties – including his investigations into the Abu Ghraib prison - Col. Wilkerson learned the details around detainee capture and treatment. Id. at ¶¶6-13.

273.    In August 2002, just a month after Hamad's capture in Pakistan, Col. Wilkerson learned from his interaction with military and foreign service personnel that many of the detainees in Guantanamo were, in fact, "victims of incompetent battlefield vetting."  Id. at ¶10(a).

274.    Many detainees were turned over for the wrong reasons, particularly for bounties and other incentives. Id. at ¶10(b).

275.    Many of the prisoners in Guantanamo had been taken into custody without regard to whether they were truly enemy combatants, or in fact whether many of them were enemies at all.  Id. at ¶10(a).

276.    There was no meaningful way to determine whether detainees were terrorists, Taliban, or simply innocent civilians picked up on a very confused battlefield or in the territory of another state such as Pakistan.  Id.

277.    The U.S. government deliberately spirited detainees like Hamad away to Guantanamo in order to "place them outside the jurisdiction of the U.S. Legal system," but not because they were in fact guilty of any wrongdoing. Ex. 154 at ¶¶9(c), 11(a-d); Ex. 156, Col. Lawrence Wilkerson 2010 Declaration at ¶¶10(c), 12(a-d) (both references discussing how prisoners whose wrongdoing had never been determined were simply sent to Guantanamo for holding).

278.    Many Guantanamo detainees were innocent, or at a minimum their guilt was impossible to determine let alone prove in any court of law, civilian or military. Ex. 154 at ¶10(d).

279.    While Mr. Hamad was brought to Guantanamo after August 2002, there is no reason

to believe that any more thorough process was used to determine whether his seizure or transfer to Guantanamo was justified.   Id. at ¶11.

280.    Hamad's capture and torture is consistent with the experience of other innocent people Afghan and Pakistani forces abducted at a ransom of "$5000 per head." Id. at ¶9(b), 10, 11(a-c); Ex. 156 at ¶¶10(b), 11, 12(a-c).

ii. *No reliable evidence related to Adel Hamad establishes WAMY provided any support, directly or indirectly, to al-Qaeda*

281.     In Hamad's March 2005 detainee assessment (Joint Task Force Guantanamo Ex. 157, JTF-GTMO Hamad Detainee Assessment; Ex. 158, FED-PEC0197473.

282.     "Tier 1 NGOs are defined as having a demonstrated sustained and active support for terrorist organizations willing to attack US persons or interests." Id. (Hamad June 2005 Assessment).

283.    However, the Tier 1 classification process is not adversarial, does not involve due process and is not challengeable. Ex. 31 at 201:6-203:23 (conceding that a "Tier 1 NGO" classification is the result of a no due process, non-adversarial, and non-challengeable administrative process).

284.    A Tier 1 NGO label is based on a summary of findings with varying "levels of certainty;" no certainty level is given in the assessment for DOD labeling WAMY as a "Tier 1 NGO." Ex. 31 at 199:6-13

285.    No factual basis is given for DOD labeling WAMY as a "Tier 1 NGO." Ex. 158.

286.    Joint Task Force Guantanamo ("JTF-GTMO") detainee assessments are based on (1) the detainee himself provides acknowledgment of a fact; (2) another detainee, document, government, etc. provides an identification of the detainee; and (3) analysis of the detainee's timeline, activities, and association. Ex. 159, FED-PEC0216815 (Matrix of Threat).

287.    The JTF-GTMO assessments often contain "unreliable information" as they are the product of torture and inaccurate information and because "[d]etainees also have a strong motivation

to implicate other prisoners in hopes of better treatment [as] some who provide information received comfort items and preferential treatment"). Ex. 160, Human Rights First (HRF) December 2016 Fact Sheet.

288.     Information obtained through torture is unreliable and should not form the basis of any expert opinion. Ex. 31 at 440:16-18 (Plaintiffs' expert Winer agrees that "...torture is something that the United States government should ever have anything to do with, period nonstop."); at 438-13-439:1 (Winer finds information derived from torture as unreliable and rejects torture "across the board").

### C.     WAMY Int'l and WAMY Canada.

#### 1.     WAY Int'l's First Volunteer, Abdullah Bin Ladin, is Not Evidence of Any Support, Direct or Indirect, of al-Qaeda

289.     In 1991, Abdullah Bin Ladin ("ABL") incorporated WAMY-USA in the Commonwealth of Virginia. Ex. 161, Abdullah Bin Ladin 2005 Declaration at ¶6 (discussing the establishment of WAMY-USA in 1991 in Virginia); Ex. 162, WAMY Intl E00718-720 (WAMY-International Articles of Incorporation – Section Eighth).

290.     ABL worked as a volunteer for WAMY-USA; he had no knowledge about WAMY's offices in Pakistan, the Balkans, Australia or Asia. Ex. 161 at ¶6-7.

291.     ABL left WAMY in 1999 and has lived in Saudi Arabi since then.  Id. at ¶4 (discussing being in Saudi prior to event of 9/11); Ex. 163, Ibrahim Abdullah 2018 Declaration at ¶5 (Abdullah taking over in 1999).

292.     ABL is the half-nephew of Osama Bin Ladin (OBL), whom ABL had not seen since about 1990 and has no other connection to OBL in this matter. Ex. 161 at ¶2.  (in 2005 affidavit discussing not seeing OBL in 15 years).

293.     ABL has never provided material support or any support to al-Qaeda or any terrorist organization, nor does he know WAMY to have done the same. Ex. 161 at ¶¶8, 11.

294.    This court dismissed all claims against ABL in this MDL action; specifically for Plaintiff's failure to "demonstrate that the claimed wrongful acts of the entity were performed with knowledge and consent of the officer and the officer must have exercised control over the corporation in the transaction." *In re Terrorist Attacks on September 11, 2001*, 718 F. Supp.2d 456, 486 (S.D.N.Y June 17, 2010).

> 2.    WAMY Int'l's Work and Activities in The United States Does Not Demonstrate Any Support, Direct or Indirect, for al-Qaeda or the Terrorist Attacks of September 11, 2001

295.    WAMY International's (WAMY-USA) purpose is to (a) support and foster cooperation and understanding among all humanitarian and Islamic entities, (b) educate Muslims about Islamic thought, (c) promote public dialogue about Islam, and (d) maintain funds. Ex. 162 at WAMY Intl E000718 (WAMY International Articles of Incorporation).

296.    WAMY Int'l activities included participating in Islamic conferences, hosting summer youth camps, assisting in the establishment of a Quran society in America, organizing sports and youth activities and publishing a newsletter. Ex. 32 at 61:6-15 (Abdullah testifying to WAMY projects that include publications, printing and distribution of books, Quran and educational audio material), at 119:15-120:12 (Abdullah testifying about WAMY printing pamphlets on Islam to distribute at mosques and Islamic schools); Ex. 165, WAMY Intl E000263 (sample WAMY-USA 2001 activity report showing activities that include sports, prayers, meeting, lectures and location of events); Ex. 166, WAMY Intl E001366-370 (1996 contract with Transcom to print various WAMY-USA pamphlets on Islam); Ex. 167, WAMY Intl E007022 (2000 invoice from Transcom for printing).

297.    Far from supporting al-Qaeda ideology, the message of A Friendly Note from Your Neighbor, one of WAMY's pamphlets, states in parts that "Islam and democracy are compatible and complementary," "Muslims must assume personal responsibility for relatives, neighbors and others in need," Islam eulogizes moderation and abhors *extremism*, *terrorism*, *fanaticism*, *oppression* and

*subjugation*," and "American Muslims love their country."  Ex. PEC-WAMY030080-081 (A Friendly Note From Your Neighbor); see also, Ex. 168, WAMYSA061127 (2002 letter from late Representative Paul Findley to WAMY-USA for providing pamphlet).

298.    Ibrahim Abdullah ("Abdullah) succeeded ABL as director of WAMY International 1999.  Ex. 163 at ¶5 (Abdullah declaring that he took over from ABL in 1999 when ABL resigned).

299.    Abdullah worked for WAMY as a volunteer for five years; having only two paid employees and several volunteers during his time. Id. at ¶¶5, 7; Ex. 32 at 210:20-211:4.

300.    After completing his Ph.D. program in 2004, Abdullah resigned from WAMY-USA. Id. at ¶40.

3.   <u>WAMY Int'l's Limited Association With Anwar Awlaki, Then Known As a Moderate Islamic Scholar, Does Not Demonstrate Any Support for al-Qaeda or Its Terrorist Ideology</u>

301.    Ibrahim Abdullah, WAMY-USA's then deputy director, learned about Anwar Al-Awlaki sometime after he arrived in Virginia and became the Imam of the nearby Dar al-Hijrah Mosque.  Ex. 32 at 64:12-65:2 (identifying Awlaki as the Imam of the mosque in Falls Church)

302.    Abdullah regularly attended the Dar al-Hijrah Mosque and would hear his Friday sermons. Ex. 32 at 64:3-21 (testifying about hearing Al-Awlaki's Friday prayers); at 66:6-67:23 (2000 invitation to Awlaki), at 80:20-22 (Abdullah knew Al-Awlaki from sermons for only a few months), at 84:11-85:15 15 (testifying about first meeting Awlaki at the mosque).

303.    Abdullah, on behalf of WAMY, invited Al-Awlaki, as the Imam of Dar al Hijrah and the chairman of its cultural committee, to attend a WAMY event. Ex. 32 at 65:7-71:7 (testifying about a 2000 letter to Awlaki as head of the cultural committee inviting him to an event); Ex. 169, WAMYSA 1519 (letter inviting Awlaki, as chairman of Dar al Hijrah, to attend and event).

304.    Abdullah was unaware that Al-Awlaki had been an Imam in San Diego and only learned of this fact during the course of this litigation. Ex. 32 at 64:23-65:2, 66:6-13, 82:4-84:10.

305.     WAMY-USA's relationship with the Falls Church Mosque (Dar al Hijrah) was to cooperate and partner in projects, that's all. Ex. 32 at 90:17-24.

306.     Known for his charisma, Anwar Al-Awlaki eventually "became one of the most sought-after Muslim speakers in the country." Ex. 40 at p. 177.

307.     He spoke at the U.S. Capitol in July of 2001 and after the September 11, 2001, attacks, he spoke at the Pentagon in February of 2002. Id. (citing *Scott Shane, "The Lessons of Anwar al-Awlaki" at 91, 101-102*).

308.     When the terrorist attacks of September 11, 2001, occurred, Al-Awlaki condemned them absolutely. Ex. 13 at p. 48.

309.     In or about May 2002, due to his publicly known ability in "storytelling," giving lectures, and "communicating with [the] youth" about Islamic and religious teachings, WAMY invited Al-Awlaki to speak to students at a youth camp.  Ex. 32 at Abdullah Dep at 71:22-73:4 (testimony about Awlaki being invited to speak at youth camps based on his storytelling skills); Ex. 13 at p. 48 (demonstrating that Awlaki appealed to the youth despite having no formal religious training); Ex. 170, WAMYSA030079-081 (Camp information listing Awlaki as speaker).

310.     WAMY invited Al-Awlaki to speak at one or more summer camps due to his story telling ability and as he represented Dar al Hijrah mosque. Ex. 32 at 71:21-72:13; 80:10-19 (inviting Awlaki to program as a Dar al Hijrah representative); Ex. 170 (Camp information listing Awlaki as speaker).

311.     When Al-Awlaki spoke at WAMY summer camps, he was definitely a moderate Salafi. Ex. 13 at p. 49.

312.     WAMY would later gift, not sell, a few copies of recordings of Al-Awlaki's sermons to translators WAMY had used in another project. Ex. 32 at 96:13-18; 98:15-100:15 (testifying about WAMY's gift to Chinese translators); Ex. 171, WAMY Intl E000249 (Abdullah Ex. 286)

(documenting Awlaki's otherwise publicly sold lectures); Ex. 40 at 178.

313.    Al-Awlaki did not begin to show much political radicalism until after 2003 and he did not call for attacks against the U.S. until after his imprisonment in 2006-2007. Ex. 13 at p. 49.

314.    Abdullah had no knowledge of Awlaki's radical views or alleged association with the 9/11 hijackers after the attacks until long after the terrorist attacks of 9/11. Ex. 163 at ¶16 (discussing knowledge of Awlaki's association with hijackers after 9/11).

4. WAMY Int'l's Funding and Relationship With WAMY Canada

315.    WAMY International receives its operation funding from WAMY Saudi Arabia's bi-annual budget for North America: WAMY International and WAMY-Canada. See, Id. at ¶21 (declaring that operation funds come from Saudi Arabia); Ex. 32 at 58:16-59:21 (Abdullah testifying to WAMY-Saudi Arabia funding WAMY International and the need to follow guidelines), and 129:20-130:1 (discussing the bi-annual nature of the operation funds that is then divided with WAMY-USA).

316.    WAMY International supervises WAMY-Canada. Id. at 124:13-16 (Abdullah agreeing that WAMY-USA supervises WAMY-Canada); Ex. 172, WAMYSA 4484 (1999 letter discussing WAMY-USA's supervision over WAMY).

317.    WAMY International divides the operational funding from Saudi Arabia between itself and WAMY-Canada based on allocated budgeting for each chapter. Ex. 163 at ¶21 (declaring that WAMY-USA divides funds between it and WAMY-Canada); Ex. 32 at 126:14-20 (Abdullah testifying that WAMY-Canada gets financing for its office operations as well as funding for projects from WAMY-USA); at 129:20-130:1 (discussing the bi-annual nature of the operation funds that is then divided with WAMY-USA).

318.    WAMY-Canada's annual operating budget is small, between $10,000 and $15,000. Ex. 173, Mohammed Khatib 2018 Declaration at ¶14 (discussing WAMY-Canada's operational

64

budget); Ex. 32 at 147:8-17 (Abdullah testifying to WAMY-Canada's operational budget as about $12,000 during the period he headed WAMY-USA).

319.    As with other chapters, donations and other funding for North American project proposals also came from Saudi Arabia. Ex. 163 at ¶11-12 (declaring that WAMY Saudi Arabia sent funds for projects such as youth camps, sports programs and publication printing and that WAMY USA did no fundraising of its own).

320.    Typically, WAMY International directly funds WAMY-Canada's operational costs and also funds WAMY-Canada's small projects from its North American budget.  Ex. 172 (discussing WAMY-USA's obligation to WAMY-Canada re North American budget); Ex. 32 at 126:14-127:5. (discussing WAMY-Canada general funding process).

321.    If a WAMY-Canada's project is too large for WAMY International to fund it, WAMY International petitions WAMY-Saudi Arabia for additional funding that is sent to WAMY International or WAMY-Canada directly. Id. at 127:6-12.

322.    WAMY International, not WAMY-KSA, fields all proposals to fund WAMY-Canada projects. Id. at 127:13-128:2; Ex. 163 at ¶22 (declaring that WAMY-Canada had to send proposals to WAMY International for funding for WAMY International to determining how to fund a project).

323.    WAMY-Canada reported its project spending to WAMY International. Id. at ¶¶22, 36, 27; Ex. 32 at 125:15-20 (discussing WAMY-Canada's reporting to WAMY International under WAMY's policy).

324.    WAMY International reported its project spending, along with that of WAMY-Canada, to WAMY-Saudi Arabia. Ex. 32 at 60:20-61:5 (Abdullah testifying to requirement that WAMY International report to WAMY-Saudi Arabia and producing financial reports to them), and 125:21-126:7 (Abdullah agreeing that WAMY International reporting both WAMY-Canada and WAMY International 's reports to WAMY-Saudi Arabia).

5. <u>Conflict Between WAMY Canada's Director, Mohammed Khatib, and WAMY Int'l</u>

325.    Beginning in 1997 and ending in 2001, Mohammed Khatib served as WAMY-Canada's director. Ex. 173 at Decl. ¶6 (explaining the terms of his director position with WAMY-Canada).

326.    On November 20, 1997, Khatib incorporated WAMY-Canada and used his 19 Varna Drive, North York, Ontario home address as WAMY-Canada's address.  Ex. 174, WAMYSA057575-579 (November 1997 application and December letters of patent approval); Ex. 32 at 152:13-17 (acknowledging that Khatib used his home address to register WAMY); Ex. 173 at ¶9 (explaining that he used his home address to register WAMY-Canada); Ex. 175, Talha Al-Jarad 2019 Declaration at ¶13 (acknowledging that Khatib ran WAMY-Canada from his home because it did not have an office at the time).

327.    In June 1998, Khatib, on WAMY-Canada's behalf, retained a Canadian Barrister to file an application for tax-exempt status with the Canada Revenue Agency ("CRA"); the application did not get approved until 2000. Ex. 176, WAMYSA057580-81 (tax free registration); Ex. WAMYSA057559 (tax exempt approval letter, finding WAMY-Canada "qualifie[d] for tax exempt status as a registered charity under paragraph 149(1) of the Income Tax Act [] ",..."effective January 1, 1999").

328.    From among his many roles, WAMY tasked Khatib with opening bank accounts and maintaining books, but at no time did WAMY permit him to fundraise. Ex. 173 at ¶¶10-11 (declaring responsibility to fund raise and prohibition from fundraising); Ex. 175 at ¶14 (Khatib's successor confirming that under his leadership WAMY-Canada never received donations).

329.    Khatib however did not follow WAMY's strict finance reporting requirements as he failed to "send regular reports of activities to WAMY USA."  Ex. 173 at Decl. ¶¶16-17 (Khatib discussing lack of reporting).

330.     In 1999, ABL terminated Khatib as WAMY-Canada's director for reporting deficiencies. Ex. 163 at ¶25 (acknowledging ABL fired Khatib in 1999).

331.     After Ibrahim Abdullah took over for ABL in 1999, Abdullah wanted to give al Khatib a second chance and asked Khatib to return as WAMY-Canada's director in spring 2000, believing that despite Khatib's earlier termination, he was an experienced "good person" who would do nothing to harm WAMY.  Ex. 173 at ¶6 (acknowledging his position as director from 1997 to 2001); Ex. 163 at ¶25 (attesting to his belief about Khatib).

332.     Abdullah believed that Khatib's experience would benefit WAMY-Canada's office. Ex. 32 at 148:5-152:12 (discussing Khatib's experience); at 158:13-19 (noting that he retained Khatib back in Spring of 2000).

333.     Not long after Khatib resumed his director role of WAMY-Canada, he fell back into his pattern of not reporting projects and expenditures. Ex. 163 at ¶27 (discussing Khatib's renewed failure in reporting how funds were spent); Ex. 173 at ¶40 (acknowledging WAMY's "displeasure" with his failure to send reports as required).

334.     Because Khatib failed to send operational and financial reports, WAMY International stopped funding to WAMY-Canada at least from in or about September 2000 until April 2001.  Ex. 163 at ¶¶27-29, 37-39 (discussing WAMY International's freezing of WAMY-Canada's funding and Khatib's complaint to WAMY Saudi Arabia and when funding returned); Ex. 32 at 165:4-166:23 (testifying to the freezing of WAMY-Canada lasted for about 8 months until Khatib's termination in March 2001); Ex. 173 at ¶18 (acknowledging that WAMY International stopped funding WAMY-Canada).

335.     With no funds coming to WAMY-Canada from WAMY International, Khatib then set out to secretly work for other organizations without WAMY's permission or knowledge.  Ex. 32 166:24-167:4 (Abdullah testifies to learning Khatib was working for MWL and other organizations

and that Khatib admitted to it).

336.    WAMY forced Khatib to resign from his WAMY-Canada post after Abdullah "learned that Mohammed al Khatib, while representing WAMY Canada, was wearing many hats and was confusing the public [sic] which organization he was representing" as "he was representing the Muslim World League ("MWL") and confusing the two organizations when he spoke to people and conducted activities." Ex. 163 at ¶31 (explaining the reasons for the firing); Ex. 32 at 168:23-169:3, at 213:8-24 (discuss the discovery of Khatib working for four organizations); Ex. 177, WAMYSA9972 (Letter from Ibrahim Suleiman Abdullah to Babaer regarding Muhammad Khatib's resignation because he was running four different Muslim organizations, leading to duplicity, resulting in a bad reputation for WAMY in Canada).

337.    Khatib admits that "WAMY was not happy with me, as Director of WAMY Canada, representing other organizations in general. They felt this may cause confusion in the community about who I represent and for whom I am fundraising. WAMY did not feel comfortable that a director of WAMY would represent different organizations at the same time, as this could create a possible conflict of interest for WAMY." Ex. 173 at ¶42; Ex. 32 at 167:23-168:4 (Abdullah testified that working for WAMY and other charities simultaneously "create[s] a confusion to the people receiving the information or participating in the occasions").

338.    In a March 2001 letter to Abdullah, Khatib explains his resignation as follows: "I thank you for your frankness and submit my resignation from representing the Assembly in Canada, to give space to Brother Talhat Aljarad to achieve the job duties..." Ex. 178 at WAMYSA9976-978 at 78 (March 2001 letter from Khatib to Abdullah resigning); Ex. 173 at ¶43 ("I sent my resignation letter to Ibrahim Abdullah on March 20, 2001"); Ex. 163 at ¶¶33-34 (explaining that WAMY sent a March 17, 2001, letter to Khatib asking him to resign).

339.    Khatib did not "disclose the issue of [his] employment with MWL to WAMY." Ex.

68

173 at ¶¶21 (explaining that he worked for MWL).

340.     Khatib was forced to resign as the director of WAMY Canada due to his representing WAMY and other organizations at the same time, his poor reporting on WAMY Canada's activities, and related performance issues. Ex. 177 (Abdullah letter to WAMY Assistant Secretary General Babaer May 2001 letter to WAMY regarding reasons for Khatib forced resignation).

341.     WAMY dismissed Khatib because he violated WAMY's policies, not because he engaged in illicit activity.   Id. (Abdullah second May 2001 letter to WAMY explaining reasons for dismissal).

342.     Without WAMY's knowledge, Khatib also represented, worked with and formed BIF-Canada at the suggestion of Enaam Arnaout (BIF-USA's head) while he was acting as WAMY Canada's director. Ex. 173 at ¶¶22-25 (explaining how he met BIF head Enaam Arnaout and agreed to work for BIF); Ex. 175 at ¶12 (discussing knowing Khatib as a leader of several organizations).

343.     Khatib did not inform WAMY of his "relationship with Enaam Arnaout or BIF."  Ex. 173 at ¶26 (Khatib explaining that he did not tell WAMY of his work with BIF because he believed it was unnecessary because he was only a volunteer).

344.     Beginning in 1999, Khatib agreed, without WAMY's knowledge, to separately head and establish BIF-Canada to raise funds specifically for orphans in Kashmir, Chechnya and Bosnia. Id. at ¶¶22-27 (attesting to meeting with Arnaout and agreeing to open BIF-Canada to help raise funds for orphans).

345.     On behalf of BIF Khatib registered BIF-USA without WAMY's knowledge, using his domicile, which is also the same address he used to register WAMY-Canada. Id. at ¶25 (acknowledging the use of his home address to register BIF-Canada without WAMY's knowledge); Ex. 175 at ¶13 (noting that Khatib used his home address to register WAMY-Canada because at the time WAMY did not have an office).  Ex. 176 at WAMYSA057580 (1998 WAMY-Canada tax

exemption application using Khatib's 19 Varna Drive address as WAMY-Canada's address).

346.     Khatib registered BIF-Canada as a charity, borrowing WAMY Canada's Canadian registration until he received the new Tax ID for BIF-Canada; all of Al Khatib's actions were unknown to WAMY. Ex. 173 at ¶¶32 and 38 (acknowledging that he allowed BIF-Canada to use WAMY-Canada's tax-exempt status without WAMY's knowledge).

347.     Since BIF did not have not-for-profit status in Canada, Khatib decided on his own, and without WAMY's knowledge, to use WAMY Canada's charitable organization designation for BIF, until BIF received a charitable organization designation from Canadian authorities. Id. at ¶¶32 and 39 (acknowledging that he allowed BIF-Canada to use WAMY-Canada's tax-exempt status without WAMY's knowledge).

348.     Without WAMY's knowledge, Khatib raised funds for BIF-USA using BIF-USA flyers that "...indicated [that] checks should be made out to WAMY/BIF," "so that donors to BIF could get the tax deduction" until BIF got its own tax exemption. Id. at ¶¶37, 39 (attesting to using the BIF flyers with reference to WAMY's name and doing so without WAMY's permission).

349.     After Khatib's forced resignation, Talhah Al-Jarad ("Al-Jarad") agreed to become the director of WAMY Canada as an unpaid volunteer for a maximum of two years. Ex. 175 ¶¶7-8.

350.     Al-Jarad did not know, when he took over from Khatib, what bank accounts Khatib had opened for WAMY or where they were. Ex. 175 at ¶17.

351.     Though unknown to Al-Jarad or WAMY, Khatib had opened a Canada Trust account and a Bank of Montreal account. Ex. PEC-WAMY031300-311 (Canada Trust account); Ex. 179, PEC-WAMY031318-430 (Montreal Bank account).

352.     When Al-Jarad took over as director, he learned that Khatib only had a "few hundred dollars left in the [WAMY-Canada] accounts and [those funds were] used to cover any remaining expenses." Ex. 175 at ¶18.

70

353.     Hoping to start his director position with a clean slate, Al-Jarad asked Khatib to "close all of the existing bank accounts." Id. at ¶17.

354.     The WAMY-Canada's Bank of Montreal account is account # 2422-8094-951. Ex. 179 at PEC-WAMY031328 (WAMY-Canada Bank of Montreal account).

355.     Al-Jarad would later open two new accounts with Bank of Montreal: account #2670 8303-221 and #2670 4600-543. Ex. 179 PEC-WAMY-031332-031430 (PEC-WAMY031337 showing WAMY and Al-Jarad on account #543 and PEC-WAMY31384 showing same on account #221).

356.     Khatib had used the "few hundred" dollars in the account he had opened to pay expenses and therefore "there was no carry over of funds from the accounts [Khatib] maintained for WAMY-Canada and the accounts [Al-Jarad later] opened" for WAMY-Canada. Ex. 175 at ¶18.

357.     WAMY first learned that Khatib opened another account at Bank of Montreal with account number account # 0430 8086-611 under the name "World Assembly of Muslim Youth o/a BIF" during the course of this litigation. Ex. 32 at 169:4-22 (Abdullah testifying that "while preparing this deposition, I learned that" Khatib was raising money for BIF); Ex. 163 at ¶35 (declaring that he learned about the secret accounts "in this litigation").

358.     BIF funds were deposited into this account without WAMY's knowledge or involvement. Ex. 173 at ¶44-45 (Khatib describing how he received large sum of money into the secret account); Ex. 32 at 159:10-160:14, at 211:9-24 (testifying that he did not know about the subaccount nor that Khatib ever approach him about opening the subaccount), at 162:20-163:3 (testifying that he did not know where the money was coming from), at 173:11-174:14 (testifying that he does not know about the $50,246 deposit or what happened to the money deposited in Canada in 2001).

359.     On March 20, 2001, BIF-USA transferred $50,293.13 into the BIF Bank of Montreal

account # 0430 8086-611, not into the WAMY-Canada Bank of Montreal account# 2422-8094-951 or any other WAMY account. Ex. 173 at ¶44 (discussing the receipt of the $50,293.13 from BIF on March 20, 2001 during his stepping down process); Ex. 180, WAMYSA061885 (Montreal Bank account # 0430 8086-611, statement showing transfer of $50,293.13 on March 20, 2001); Ex. 32 at 165:4-166:23 (testifying to the freezing of WAMY-Canada funds from 2001 until after WAMY fired Khatib in March 2001).

360.     During the same period when BIF deposited $50,293.13 in the BIF-Canada account (#0430 8086-611), WAMY-Canada's account (#2422-8094-951) does not reflect a $50,293.13 wire transfer. Compare, Ex. 180 and Ex. 179 at PEC-WAMY031332.

361.     There is no evidence that this wire transfer of $50,293.13 came from WAMY Saudi Arabia, WAMY Int'l/USA, or that it even originated from Saudi Arabia.  See, Ex. 180.

362.     "This $50,200 was not WAMY funds, to be used for WAMY Canada activities and operations." Ex. 173 at ¶45 (attesting that ""); ¶34-35 (declaring that WAMY had no knowledge of Khatib raising funds for BIF or accepting funds for BIF).

363.     Khatib did not comingle the funds from WAMY's account #2422-8094-951 with the BIF Canada funds in account #0430 8086-611.  Id. at ¶¶32-33, 47 (attesting to BIF and WAMY funds never being comingled), at ¶35 (declaring that WAMY did not know Khatib deposited funds into WAMY-Canada's account nor that Khatib was working for BIF).

364.     Khatib had sole control of all WAMY-Canada accounts, including the BIF Canada account and that of another company he also represented. Id. at ¶46 (declaring the closure of the account).

365.     The funds Khatib deposited and received into the BIF Canada account were received or deposited exclusively in connection to his activities with BIF-USA and BIF-Canada's purported orphan projects. Id. at ¶¶32-33, 45, 47 (attesting that he opened the account for BIF purposes, that

BIF and WAMY funds never comingled, and that the $50,293.13 were intended for and orphans project).

366. Khatib's work with BIF was not related to WAMY or his work for WAMY. Id. at ¶21-26 (declaring the work he did exclusively for BIF at Enaam Arnaut's direction without consultation with WAMY).

367. When Talha Al-Jarad became executive director of WAMY Canada in the spring of 2001, he asked that the former executive director, Khatib, to close all of the existing bank accounts as he did not know what accounts Khatib had or where they were. Ex. 175 at ¶ 17.

368. Khatib represented to Al-Jarad he would take care of this and said WAMY only had a few hundred dollars in its accounts. Id. at ¶18.

369. When Khatib left WAMY-Canada in March 2001, he transferred all BIF-Canada funds held in the BIF Canada account to BIF-USA. Ex. 173 at ¶¶33, 36 (attesting to having sent all BIF-Canada funds raised to BIF-USA), at ¶46 ("...all BIF funds, which did not belong to WAMY Canada, were sent to BIF in Chicago").

370. During his time as WAMY Canda's executive director, Al-Jarad confirmed WAMY Canada only received funds from WAMY Saudi Arabia and WAMY USA. Ex. 175 at ¶¶ 14-16.

371. Al-Jarad never heard of BIF during his time heading up WAMY Canada and only heard of this entity in 2004 when advised by the CRA. Al-Jarad directed the CRA to ask Khatib about BIF as he knew nothing about it. Id. at ¶20.

372. Al-Jarad then spoke with Khatib, told him to contact the CRA, and was informed by Khatib that he also was a director of BIF and received funds for a special program for orphans and was going to be used to buy shoes for the needy. Id. at ¶21.

373. WAMY Int'l would never allow a WAMY account to be used by another organization. Ex. 163, ¶36 (attesting that WAMY would never permit their account to be used by BIF nor should

73

Khatib have allowed it to happen).

374.    While neither WAMY Saudi Arabia or WAMY Int'l have any relationship with or connection to BIF or BIF USA, the evidence does not show that BIF provided material support, directly or indirectly, to al-Qaeda.  See *U.S. v. Arnaout*, 282 F.2d 838, 845 (N.D. Ill. 2003) –Kohlmann exhibit  922, ("government has not established that the Bosnian and Chechen recipients of BIF aid were engaged in a federal crime of terrorism, nor that Arnaout intended the donated boots, uniforms, blankets, tents, x-ray machine, ambulances, nylon and walkie-talkies to be used to promote a federal crime of terrorism."); *U.S. v. Arnaout*, 431 F.3d 994, 1002 (7th Cir 2005) (affirming District Court's decision not to apply the terrorism enhancement under U.S.S.G. § ¶3A1.4).

6.    The Canada Revenue Agency's Audit and Revocation of WAMY Canada's Charitable Tax-Exempt Status in 2011 Does Not Establish That WAMY Provided any Material Support, Directly or Indirectly, to al-Qaeda

375.    The Canada Revenue Agency ("CRA") is the Canadian government agency "administers tax, benefits, and related programs for the Government of Canada and for most provinces and territories." Ex. 181, Canadian Revenue Authority Website Homepage; Ex. 182, PEC-WAMY031447-468, at 447-448 (2011 Audit letter to Al-Taher, WAMY Canada president).

376.    CRA's audit of WAMY Canada began in March 2004 with an interview of Khatib and Al-Jarad. Id. at PEC-WAMY031452 (discussing procedures).

377.    In an August 23, 2011, letter to WAMY Canada, CRA communicated that it conducted an "…audit related to the operations of [WAMY-Canada] for the period from January 1, 2000, to December 31, 2003" in connection with alleged "non-compliance with core requirements of the Income Tax Act…" Id. at PEC-WAMY031447 (August 23, 2011, letter to Taher, WAMY-Canada President).

378.    The tax agency's audit concerned whether WAMY-Canada can continue to maintain its charity tax-exempt status pursuant to subsection 168(1) of the tax code. Id. (August 2011 letter to

Al-Taher).

379.     On or about January 5, 2012, the CRA issued a financial audit report that WAMY-Canada "failed to comply with or contravened any sections 230(2) of the Act; ceased to comply with the requirements of the Act for continued registration; and failed to file an information return as required under the Act." Ex. 183, FED-PEC0218170-203 at 170 (excerpt from report).

380.     CRA noticed WAMY Canada of its intent to revoke its tax-exemption registration, the consequences of which include a) the Organization will no longer be tax-exempt as a registered charity and will no longer be permitted to issue official donation receipts; b) by the Organization may be required to pay a tax;  and c) the Organization will no longer qualify as a charity for Canada tax purposes.  Ex. 183 at FED-PEC0218171-72.

381.     The CRA's action was based on WAMY Canada's 1) failure to comply with or contravene any section of 230 to 231.5 of the Tax Act; 2) ceasing to comply with the requirements of the Act for continued registration; and 3) failure to file an information return as and required under the Act.  Ex. 182 at PEC-WAMY031447; see also, Ex. 183 at FED-PEC0218170.

382.     The CRA's Conclusion included the following:

> Our analysis of the Organization's (WAMY Canada's) operations has led the CRA to believe that the Organization, which has been inactive since at least 2005, was established to support the goals and operations of its parent organization located in Saudi Arabia, which has been alleged to support terrorism. Our analysis particularly noted that the Organization shared a common director, contact information, and a bank account with the Benevolence International Fund in Canada (BIF-Canada), and provided $50,246 to the Benevolence International Foundation in the United States (BIF-USA) in 2001. On November 21, 2002, BIF-Canada and BIF-USA were added to the Consolidated List of the United Nations Security Council's Al-Qaida and Taliban and Sanctions Committee, as entities belonging to, or associated with, Al-Qaida.

Id.

383.     The CRA did not make any finding that WAMY Saudi Arabia or WAMY Canada provided any support to Al-Qaida, directly or indirectly. Id. at FED-PEC0218170-172.

384.     The CRA did not make any finding as to the reliability or veracity of the allegations

that WAMY Saudi Arabia supported "terrorism" instead noting the existence of "Adverse Reporting on WAMY and its Affiliates." Id. at FED-PEC0218181-184.

385.    This "Adverse Reporting" includes newspaper and online articles from questionable sources and statements including those by plaintiffs' retained expert Evan Kohlmann, someone who has worked for the plaintiffs' lawyers in this case since 2003. Id. at FED-PEC0218181-183, Ex. 184, Evan Kohlmann Dep. Transcript (Excerpt) at 8:24-25, 9:1-7.

386.    The CRA report is not an intelligence report nor a law enforcement report, it is a tax authority agency. Ex. 31 at 263:25-264:5 (Winer conceding that CRA not a law enforcement or intelligence agency).

387.    The CRA did not freeze WAMY-Canada's bank accounts.  Ex. 31 at 264:4-22 (recounting that CRA only revoke not-for-profit status of WAMY-Canada); 265:14-16 (no reason to believe CRA froze WAMY's bank account); Ex. 185, PEC-WAMY031431-441 (Excerpt from CRA Investigative file, at 436: "A NITR was issued on January 5th, 2011, with a February11, 2012 date to be published in the Canada Gazette revoking the charity status").

388.    The CRA did not revoke WAMY-Canada's corporate registration in Canada.  Ex. 31 at 264:13-22 (Winer conceding that CRA did not revoke WAMY-Canada's corporate registration).

389.    The CRA did not impose any criminal charges against WAMY-Canada arising from its investigation.  Ex. 182 at PEC-WAMY031447 (citing that WAMY-Canada's charitable tax status was revoked for failure to maintain books and records properly, failure to "comply with the requirements of the [Income Tax] Act for continued registrations," and failure to "file and information return as required under the [Income Tax] Act").

390.    The CRA did not recommend WAMY-Canada for any administrative sanctions or penalties.  Ex. 185 at PEC-WAMY031440 (noting that WAMY-Canada was not selected for sanctions) and at PEC-WAMY031435 (indicating that since 2005 WAMY-Canada was inactive).

**D.      WAMY's Provision of Humanitarian Aid to Refugees Under the Coordination of The Saudi Joint Relief Committee Did Not At All Support al-Qaeda**

391.      In 1999, then King Fahad bin Abdul Aziz of KSA issued an order establishing the Saudi Joint Relief Committee (**SJRC**), a multi-organizational relief committee concerned with Saudi Arabian led relief to Albanian refugees of the then ongoing conflict in the former Yugoslavia (now Kosovo and Bosnia).  See Ex. 186, ECF 2775-1, Declarations of Abdul Rahman Al Suwailem and supporting materials,  p. 23, Al Suwailem January 10, 2005 Decl. at ¶2, ¶3 and 5 (Kingdom established SJRC in 1999 in response to humanitarian crisis and civil war in Yugoslavia that affected Albanians in Kosovo), at Exhibit B to Suwailem Decl. (1999 order by King Fahd Abdul Aziz establishing committee for Kosovars and naming members of the committee 1999).

392.      King Fahad's 1999 Order directed SJRC to include representatives from "the National Guard, the Ministry of Defense and Aviation, the Ministry of Interior, the Presidency of Intelligence, the Ministry of Finance and National Economy, the Ministry of Information, and the Ministry of Labor and Social Affairs…."  Id. at p. 24, Al Suwailem January 10, 2005, Decl. at ¶7 and pg. 35.

393.      King Fahad's order structured the SJRC "under the supervision of His Royal Highness the Minister of Interior," and required "a representative from each Saudi society or charitable foundation that participates in relief work, namely, International Islamic Relief Organization, World Assembly of Muslim Youth, al-Haramain Charitable Foundation, Islamic Endowment Foundation.".  Id.

394.       SJRC's aims  to "unify Saudi efforts," "promote and coordinate Saudi aid activities," "highlight Saudi efforts in providing the people of Kosovo with relief and humanitarian aid, generally provide refugees and the displaced with medical care and relief aid," "provide refugees with their basic need, including food, clothes, equipment…etc.," and "comfort[] refugees and guide[] them religiously and culturally."  Id., at p. 25, Al Suwailem January 10, 2005, Decl. at ¶11 and pg. 34-35, 46-47.

395.    KSA paid for the committee's employees, paid for headquarters and branch offices operations, and provided funding for some of the charitable work.  Id., at p. 25, Al Suwailem January 10, 2005, Decl. at.  ¶¶9, 10-12 (describing the role of Saudi in funding SJRC and its staff).

396.    SJRC's functions and responsibilities included healthcare service, dividing into administrating healthcare institutions, supplying medical resources, nutrition, and maintenance and cleaning; social services, including educational and awareness programs for refugees, as well as supplemental services to aid the relief work. Id. at pp. 46-47.

397.    SJRC's mission is incompatible with concepts of extremism and terrorism. Id., at p. 26, Al Suwailem January 10, 2005, Decl.  at ¶16.

398.    SJRC's "operated solely as a charitable and humanitarian entity, and none of the funds or other aid distributed by the SJRC was provided for commercial purposes.  Id. at p. 23, Al Suwailem January 10, 2005, Decl. at ¶4.

399.    WAMY, acting under the auspices of SJRC, engaged in relief efforts consistent with its own objectives. See, e.g., Ex. 187, WAMYSA036741-745 (expense report of relief provided for SJRC relief in Kosovo for clothing, hygiene, mattresses, blankets etc.); Ex. 188, WAMYSA036716 (1999 Letter concerning SJRC being assigned to care for refugees); Ex. 189, PEC-WAMY008110 (Chechnya SJRC flyer with WAMY named asking for help for orphans and refugees); Ex. 67 (1999 letter from Noorwali to SJRC re proposals to establish camp for refugees and provide shelters with help of Albanian government).

400.    WAMY also donated financially to SJRC project efforts and WAMY memorialized spending during its collaboration with SJRC.  Ex. 190, WAMYSA036860-862 (1999 letter indicating WAMY financial assistance); Ex. 191, WAMYSA184530-542 (pages of WAMY letters concerning projects and related costs with SJRC).

401.    No sanctions regime or government entity designated or sanctioned SJRC.  Ex. 117.

78

402.        WAMY's relief work with SJRC did not provide nor was it intended to provide support or aid to Osama Bin Ladin, al-Qaeda or the September 11, 2001, attacks and Plaintiffs provide no evidence to the contrary. Ex. 186, at p. 26, Al Suwailem January 10, 2005, Decl. at. ¶16 (denying that SJRC was involved in terrorist activities).

403.        SJRC assisted Kosovars during the 1990 Eastern European conflicts with the provision of mattresses, food, temporary housing, cultural programs, medical and psychological health care, clothing, and tents for refugees, not fighters. Ex. 14 at ¶42 (speaking generally about WAMY's involvement with SJRC in Kosovo); Ex. at 187 (relief work under SJRC); Ex. 192, WAMYSA036754-759 (preliminary report of Kosovo refugee assistance); Ex. 193, WAMYSA036781-786 (1999 meeting minutes and budget for SJRC projects for projects such as "relief, education and rehabilitation, Islamic and public schools).

404.        The U.N. High Commissioner (UNHCR) assisted SJRC in many of its initiatives, including the building of schools, mosques, and homes. Ex. 194, WAMYSA036765 (List of schools being renovated by UNHCR in Kosovo); Ex. 195, WAMYSA036766 (Statement of completed programs construction programs including with UNHCR assistance).

405.        For its part, WAMY helped house refugees with Albanian families or at SJRC run refugee camps.  Ex. 14 at ¶42 (declaring that in Kosovo WAMY's efforts provided housing at refugee camps); Ex. 196, WAMYSA036746-753 at 747-748 (media center report on families and camps hosting refugees); Ex. 67 (letter from Noorwali to SJRC re proposals to establish camp for refugees and provide shelters with help of Albanian government).

406.        When Kosovars who had fled to Albania returned to their country, WAMY, under SJRC auspices, assisted their repatriation with construction of residential complexes.  Ex. 36 (1999 letter from Turki to Wohaibi re WAMY proposed projects in Kosovo in the Ferizaj region and cost of project); Ex. 197, WAMYSA036812 (list of WAMY related and future SJRC works that include

educational programs, rehabilitation and reconstruction, relief, social in Ferizaj).

407.    WAMY's direct contribution to returning Kosovars also included provision of doctors to train Kosovar doctors at Saudi hospitals.  Ex. 95 (letter asking to assign WAMY doctors to train Kosovar doctors); Ex. 198, WAMYSA036945-46 (letter attaching names of Saudi hospitals to implement the training).

408.    In June of 2000 SJRC ended its relief work in Kosovo.  Ex. 199, WAMYSA036717 (letter discussing closing ceremony).

409.    WAMY's activity in Kosovo in the form of relief work did not support or aid to Osama Bin Ladin, al-Qaeda or the September 11, 2001, attacks and Plaintiffs provide no evidence to the contrary.

410.    WAMY's SJRC work in Chechnya consisted of relief work for Chechen refugees, not Chechen fighters. Ex. 188 (1999 Letter concerning SJRC being assigned to care for refugees); see Ex. 189 (Chechnya SJRC flyer with WAMY named asking for help for orphans and refugees).

411.    Similar to its work in Kosovo, SJRC provided food, blankets, medicines, clothing, tents, emergency assistance, housing camps, and much more.  Ex. 200, WAMYSA036796-797 (proposed work program for Chechen attaching quotes for tents, blankets, food and provisions).

412.    The Russian government accepted and welcomed the Saudi relief aid in Chechnya, as the then Russian Ambassador noted, "this would underline the bright image of Saudi humanitarian relief aid and dismiss attempts in the media to distort the Saudi image and its ties with Russia."  Ex. 186, ECF 2775-1, Declarations of Abdul Rahman Al Swailem and supporting materials at p. 40.

413.    WAMY's activity in Chechnya in the form of relief work did not support nor was it intended to provide support or aid to Osama Bin Ladin, al-Qaeda or the September 11, 2001, attacks and Plaintiffs provide no evidence to the contrary.

414.    In 2005 the House of Representatives passed a resolution to honor the victims of the

1995 Srebenica genocide and condemned the atrocities. Ex. 201, H. Res. 134 of the 109th Congress.

415.    As the atrocities waged, WAMY offered aid to Bosnians during the 1992 to 1995 conflict before SJRC's establishment and later, in collaboration with SJRC, during the Chechen and Kosovar conflicts that began in 1998. Ex. 202, WAMYSA062007 (1993 circular regarding work in Bosnia); Ex. 275, WAMYSA027610-611 (1999 letter from Hamidi to Babaer re transfer of $133K to WAMY in Albania); see also Ex. 203, WAMYSA057615 (1992 letter to ARB from Al-Johani re transferring funds to account for Bosnian conflict).

416.    With the approval of the Saudi government, WAMY also offered humanitarian relief to refugees in Bosnia in 2000. Ex. 204, WAMYSA1248468 (letter from MOIA to WAMY re role and activities in Bosnia and Austria). Ex. 14 at ¶42 (speaking generally about WAMY's involvement with SJRC in Albania).

417.    WAMY's collaborative relief work with local organizations such as the United Muslim Youth of Albania and the League of Islamic Youth in Albania in no way involved support for terrorism, Bin Ladin or al-Qaeda. Ex. 205, WAMYSA175144-196 (1995 annual report projects in Albania. Lists WAMY's collaboration with youth organizations).

418.    During an eastern European visit, WAMY representatives met with SJRC members to discuss building mosques, the refugee situation, da'wah, and also paid a visit to a WAMY school and a center. Ex. 206, WAMYSA524798-807 (Report documenting trip to Poland, Albania, Kosovo and Montenegro in 2001 re SJRC); Ex. 204 (letter from MOIA to WAMY re role and activities in Bosnia and Austria).

E.    **WAMY's Relief Work in Eastern Europe Concerned Charity Work To Benefit War Torn Peoples**

419.    WAMY also engaged in humanitarian work separate from its work with SJRC such as, for example, providing emergency care, establishing schools for Kosovar children in Albania, establishing a refugee camp and setting up prayer areas at refugee camps. See, e.g., Ex. 207,

WAMYSA524838-842 (Kosovo refugees in Albania project report 1999 which cost of project); see also, Ex. 208, WAMYSA488388 (Update letter re WAMY Kosovar refugees for education and summer camps).

420.    WAMY has invested charity efforts to support mosques, Quran learning centers, provision of drinking water, home heating programs, building elementary schools, and providing food baskets for Chechen refugees in Georgia.  Ex. 209, WAMYSA044850-851 (2000 project agreement for Chechen refugees' relief in Georgia).

421.    To monitor WAMY operations in Eastern European countries affected by war, WAMY representatives visited Kosovo, Albania, Poland and Montenegro and to evaluate WAMY's operations and activities in these countries.  Ex. 206 (2001 visit report).

422.    As late as 2000, WAMY continued its efforts in bringing attention to the plight of Kosovars by hosting a United Nations Conference of Non-Governmental Organizations workshop entitled "Psychological Rehabilitation for Girls Who Were Raped in Kosovo."  Ex. 210, WAMYSA061135-140 (request to transfer $5000 to cover expenses of Psychosocial Rehabilitation of Girls who had been raped in Kosovo).

> **F.    WAMY's 1990s Involvement With TWRA, a Charitable Entity That Folded In The 1990s, Concerned Educational and Humanitarian Relief Projects**

423.    The Third World Relief Agency ("TWRA") is a "humanitarian assistance" organization that worked with the Bosnian government and is authorized to receive donations in Bosnia-Herzegovina and to deliver "food stuff, clothes, [blankets], tents, [medicine], medical equipment, and [pocket] money on behalf of refugees.  Ex. 211, FED-PEC028912 (1992 letter from Bosnian Mission certifying that Hassanein is the director of TWRA and is authorized to receive donations and pay for demands of refugees and deliver food clothes, blankets, tents and medicine); Ex. 212, FED-PEC0213792-854 (MR/GER049963 (describing TWRA).

424.    WAMY funded some of TWRA's projects. Ex. 213, WAMYSA042102-105 (1997

request to WAMY to fund Nigerian TWRA project that includes a clinic project, women crafts project, Islamic women project with cost of projects of which WAMY funded a women/visual program and a training course); Ex. 214, WAMYSA586734, 736-737 (1999 letter to support TWRA efforts in Nigeria, includes WAMY checks for 200,000 SRA [$53,000] and payment voucher).

425. In or about 1993, the Office of Munich I State Attorney ("Munich I") commissioned the Bavarian State Office of Criminal Investigation (BLKA) to investigate TWRA. Ex. 212, FED-PEC0213792-0213854 (MR/GER049960-50022 at 963-969 (investigative background)).

426. The investigation was "directed against a Yugoslavian/Albanian group of perpetrators who are suspected of, among other things, having violated the Armaments Act (WaffG) and the Weapons of War Control Act (KWKG). Id. at FED-PEC0213795

427. After seizing "extensive documents" from TWRA in 1996, Munich suspended its investigation in 1998 for failure to "establish sufficient criminal suspicion." Id. at FED-PEC0213796.

428. While investigating alleged violations of humanitarian international law during the Bosnian conflict of the 1990s, the Office of the Prosecutor (OTP) of the International Court of Criminal Justice for the Former Yugoslavia (ICCJ) came across BLKA's investigation and looked into TWRA's activities during this period. Id. at FED-PEC0213795.

429. In 2002, ICCJ produced a report of its investigation into TWRA. Ex. 212.

430. The ICCJ looked extensively into TWRA's bank accounts, its transactions, including "transfers, checks credits and deposits" from 1992 to 1995. Id. at FED-PEC0213801-802. (discussing ICCJ's review of documents, including transactions).

431. The ICCJ found that WAMY transferred 399,067.15 Austrian Shillings ($32,000) to TWRA on March 25, 1992, nearly a decade before the 9/11 Attacks. Id. at FED-PEC0213849 (noting the transfer from WAMY to TWRA).

432. WAMY was described as an "organization active as an aid organization in Bosnia

during the war there."   Id. at FED-PEC0213849 (ICCJ's finding as to WAMY's purpose and relationship with Bosnia).

433.    There is no evidence that the 399,067.15 Austrian Shillings transferred to TWRA went to anything other than the type of projects WAMY routinely supports, namely humanitarian and student youth relief. Id. at FED-PEC0213849 (ICCJ's finding only that WAMY is registered as an aid organization in Bosnia); see, e.g. Ex. 213 (1996 report with detail of Nigerian TWRA project that includes a clinic project, women crafts project, Islamic women project with cost of projects).

434.    TWRA dissolved in the 1990s.   Ex. 31 at 353: 9-11 (conceding to TWRA's dissolution).

435.    The 9/11 Commissions report noted, without details, that between 1988-1992, Bin Laden "made use of the already-established Third World Relief Agency (TWRA)." Ex. 46 at p.58.

436.    No international or U.S. sanction regime ever designated TWRA before or after working with WAMY.  Ex. 117.

1.    <u>WAMY Used Fatih Hassanein to Serve as Its Eastern European Representative</u>

437.    Dr. Fatih Hassanein ("Hassanein") is the director of the Islamic Council of Eastern Europe (ICEE) and served as WAMY's representative in Eastern Europe. Ex. 215, WAMYSA1235382 (1994 correspondence from Al-Johani to Hassanein describing Hassanein as Representative in Austria); Ex. 216, WAMYSA1235383 (1994 letter from Hassanein as ICEE Executive Director).

438.    Dr. Hassanein is also the Director of the TWRA in Vienna, Austria, having formed and registered it in 1987.  Ex. 217, WAMYSA1235384 (Hassanein 1994 communication to WAMY as TWRA head); Ex. 212 at FED-PEC0213795, 798 (TWRA formed in 1987).

439.    Hassanein had strong ties with the Bosnian government that allowed him and other charity coordinators to manage a "Fund for the Assistance of the Muslims of Bosnia and Herzegovina"

with the approval of the Bosnian chairman of the Presidency. Ex. 212, at FED-PEC0213800 (noting that a letter from Alija Izetbegovic authorized the fund).

440.    Dr. Fatih Hassanein was never a WAMY director or employee. Ex. 215 (1994 document re representative of Austria).

441.    WAMY used Hassanein's personal services to act as a WAMY representative in Eastern Europe. Compare, Ex. 215 (1994 document re representative of Austria) and Ex. 217.

442.    No international or U.S. sanction agency ever designated Hassanein.

**G.    WAMY's Providing Support to Taibah-Bosnia for Humanitarian Projects for Bosnian Refugees Did Not Support, Directly or Indirectly, al-Qaeda**

443.    WAMY's Western Europe objectives include publishing dawah material, brochures, publications for libraries, financially supporting pilgrimages, providing scholarships, developing relationship with Islamic organizations, and running youth camps. Ex. 218, WAMYSA036333-337 (2000 seminar symposium outlining WAMY Western Europe's objectives, goals and projects).

444.    WAMY supported the following Taibah-Bosnia projects to assist the needs of Bosnians and Kosovars who were victims or ethnic cleansing: student scholarship, Muslim holiday animal sacrifice, proselytization, Ramadan breakfast, mosque building, pilgrimage visits, and education. Ex. 219, WAMYSA1231298-299 (1997 support for schools (42,000 German Marks) in Bosnia with receipts); Ex. 220, WAMYSA1231313-314 (1997 letter confirming disbursement of 220,450 SAR ($58,740 approx..) for education, youth camps, relief for distressed individual with check from WAMY to Taibah for Muslim of the Balkans); Ex. 64 (1997 WAMY support for refugees and education camps, sponsoring govt and religious schools, printing Islamic books in Bosnia); Ex. 221, WAMYSA1231294 (1997 letter from Taibah International-USA to WAMY Jeddah acknowledging receipt of check 220,450 SAR to help Muslims in Balkans and requesting second installment); Ex. 222,  WAMYSA1232834 (2002 transfer of funds from WAMY to Taibah International Albania Office and list of WAMY funded institutions), Ex. 223, WAMYSA1232830

(2001-2002 transfer of funds to Taibah International Albania office); Ex. 224, WAMYSA1232840 (2001 transfer of funds to Taibah International Aid Albania Office for education).

445.    On or about May 6, 2004, the Department of Treasury designated Taibah's Bosnia Branch under E.O 13224 under the Specially Designated Nationals and Blocked Persons List. Ex. 225, PEC-WAMY014754 (Treasury 2004 press release); Ex. 117.

446.    According to OFAC's press release: "Information shows this entity has significant ties to GRF, which initially operated in Bosnia under the auspices of Taibah. A former employee of Taibah International was a member of Ayadi Chafiq Bin Muhammad's network, who was designated by the Treasury Department on October 12, 2001." Ex. 225 (Treasury 2004 press release).

447.    According to OFAC's designation, Taibah International Bosnia's branch addresses are: Avde Smajlovic, Sarajevo, BiH and 26 Tabhanska Street, Visko, BiH. Ex. 117.

448.    Taibah International USA's 1998 tax form 990-EZ and the 1999 tax form 990 both list Virginia as the address for Taibah International-USA.  Ex. 226, PEC-WAMY014834-841.

449.    There is no reliable evidence that Zayat transferred more than two million dollars on behalf of WAMY to Taibah International or Taiba branches in Bosnia or Albania.

**H.    WAMY's Work in Kashmir Did Not Provide Support, Directly or Indirectly, to al-Qaeda.**

450.    Kashmir is one of WAMY's major branches. Ex. 5 at 154:9-155:3 (discussing location of Kashmir office); see Ex. (Statistical Report).

451.    WAMY's Kashmir branch office's charity activities concern feeding the poor and fasting people, mosque renovations, digging wells, educational camps, social services charitable work and da'wah. Ex. 5 at 128:8-12; 170:16-20; Ex. 12 at 216:3-8; 216:20-24; Ex. 276, WAMYSA037743-744 (2001 letter from WAMY to Kashmir WAMY re report for education and youth camps); Ex. 227, WAMYSA040883-888 (1999 letter re feeding fasting people and charity given); Ex. 73 (1999 letter from Abu Gayth to WAMY re financial report for years 95-97 for Kashmir, outlining achieved

86

activities); Ex. 228, WAMYSA040889 (1999 report from WAMY Kashmir office's Abu Gayth re digging wells for a mosque and school construction project).

452.     WAMY documents its relief work, operations, and education in Kashmir.  See, e.g., Ex. 277, WAMYSA059929-930 (Oct 1995 funding to Kashmir operations); Ex. 229, WAMYSA059993-60000 (Report of funds received and how spent in Kashmir, 1998-1999); Ex. 230, WAMYSA060026-032 (1999 report on stages of well construction); Ex. 228 (1999 report from WAMY Kashmir office's Abu Gayth re financial report for years 95-97 for Kashmir, outlining achieved activities including digging wells).

453.     WAMY Kashmir's 1995, 1996, 1997 and 1998 operational report shows legitimate Kashmir office projects in, for example, restoring mosques, feeding the poor during and outside Ramadan, educational camp outreach, and Quran memorization.  See, Ex. 231, WAMYSA523714-725 (1990s Kashmir operational reports of funds and expenses).

454.     WAMY's activity in the 1990s has no connection to terror groups, al-Qaeda, Bin Ladin or the 9/11 attacks. Ex. 5 at 123:3- 134:10; at 128:3-129:5, 130:19-134:10 (discussing knowledge of Kashmir office activities).

455.     There is no reliable evidence that WAMY provided support to Lashkar-e-Taiba ("LET"). Id. at 125:23-127:9 (discounting association with LET).

456.     WAMY has no connection or ties to the designated group Hizb-ul-Mujahideen.  Id. at 134:11- 22 (denying knowledge of WAMY connection to Hizb-ul Mujahideen).

457.     WAMY does not operate in India and has no connection to the designated Indian group Students Islamic Movement (SIMI). Id. at 134:23-136:2 (denying connection to SIMI).

        1. Nazir Qureshi

458.     WAMY employed Nazir Qureshi ("Qureshi") in the 1990s at WAMY's Jeddah office. Id. at 136:21-137:19 (Qureshi continued to be an employee during Noorwali's time at [WAMY's]

Jeddah office).

459.    Qureshi was a "simple employee" at WAMY's Jeddah office. Ex. 5 at 136:21-138:4.

460.    WAMY transferred funds to WAMY Kashmir "on an official basis through banks;" Nazir Qureshi played no role in these undertakings. Id.  at 138:12-139:8 (explaining that Qureshi had no access to funds).

461.    Qureshi did not review WAMY's proposals, program or project reports from WAMY's international branches. Id. at 138:17-139:8. 9 (WAMY's authorized department reviewed proposals not Qureshi).

462.    Qureshi did not receive any funds from WAMY and did not send any money to Kashmir while employed by WAMY. Id. at 145:13-146:10, 147:14-21 (special investigation was conducted by auditors); 149:6-7 (confirming that Qureshi did not receive any funds that could have been transferred for illicit purposes).

463.    WAMY's audit investigation into an Indian newspaper allegation that Qureshi provided "money to al-Qaida associated groups in Kashmir" found that Qureshi's activities were not "uncompliant with the normal procedures" nor did the audit find any irregularities. Ex. 233, WAMY SA 1488 (referencing initial contact from Saudi Ambassador); Ex. 5 at 139:9-141:11 (discussing letter to the Ambassador and findings); at 142:12-145:23 (WAMY did not dismiss the article but investigated); 149:8-15 (discussing how WAMY discovered the article); Ex. 2 at ¶¶26, 31 (discussing that WAMY has never been involved in armed conflict or sent employes to fight or help move fighters or provide other logistics to them).

464.    After the investigation, WAMY wrote to the Saudi Ambassador in India "that [the allegations] were completely groundless, and that the whole content of the news is fabricated lies that the Indian press has always published and repeated.  Ex. 233, WAMY SA 1488 (2000 the letter from WAMY Assistant Secretary General that the news report is groundless); Ex. 5 at 139:9-141:11

(discussing letter to the Ambassador); at 143:24-144:4 (discussing letter to Ambassador).

**VII.**   **United States Investigations into WAMY Have Not Yielded Any Evidence That WAMY Provided Material Support To al-Qaeda**

      **A.**      **WAMY Has Never Been Designated as a Support of Terrorism By any Entity, Including OFAC**

465.    Following the 911 Attacks, on September 23, 2001, President Bush issued Executive Order 13224 ("E.O. 13224" or "the E.O.") – Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism ("the Order") - to address acts of terrorism. Ex. 234, U.S. Dept. of Treasury, OFAC Memorandum 00001-2 (providing an introduction to E.O 13224 and OFAC's mandate under Director R. Richard Newcomb).

466.    "In general terms, the Order provides a means by which to disrupt the financial support network for terrorists and terrorist organizations by authorizing the U.S. government to designate and block the assets of foreign individuals and entities that commit, or pose a significant risk of committing, acts or terrorism." Ex. 235, United States Department of State Website re: E. O. 13224.

467.    "In addition, because of the pervasiveness and expansiveness of the financial foundations of foreign terrorists, the Order authorizes the U.S. government to block the assets of individuals and entities that provide support, services, or assistance to, or otherwise associate with, terrorists and terrorist organizations designated under the Order, as well as their subsidiaries, front organizations, agents, and associates." Id.

468.    Pursuant to E.O. 13224, the Secretary of Treasury, in consultation with the Secretary of Homeland Security and the Attorney General's Office, may designate an individual or entity (defined to mean partnerships, associations, corporations, or other organizations, groups, or subgroups) determined: (1) to be owned or controlled by, or act for on behalf of, persons subject to the E.O., (2) to "assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of acts of terrorism or individuals or entities designated in

89

or under the Order," or (3) "to be otherwise associated with certain individuals or entities designated in or under the Order." Ex. 235 (describing designation Criteria); Ex. 234 (Describing E.O 13224's authorization for the Secretary of Treasury to designate persons meeting enumerated criteria).

469.    An entity does not have to have committed an act of terrorism to be considered for designation nor does the government have to show that a target individual or entity intended to support terrorism for it to be designated under E.O 13224.  Ex. 236, Jimmy Gurule Dep. Transcript (Excerpt) at 84:8-21 (Gurule confirming requirements for designation pursuant to E.O. 13224).

470.    E.O 13224's scope is broad and is intended to prevent the use of funds to fuel or further terrorist attacks.  Id. at 84:25-85:11 (explaining the scope of the designation process).

471.    Designation is an administrative, not civil, process and therefore it's standard of review for designation is below the preponderance of evidence and can be referred to as "reasonable basis." Id. at 91:23-92:18 (explaining the standard of review of the designation process).

472.    Even under this low designation standard, neither OFAC nor any other sanctions regime has  designated WAMY as an SDGT or a supporter of any SDGT; nor blocked any WAMY assets or otherwise sanctioned WAMY or any of its branches for providing support, services, or assistance to, or otherwise associating with, terrorists and terrorist organizations designated under the Order, including specifically al-Qaeda, or any SDGT subsidiary, front organization, agents, or associates. Ex. 117.

473.    Far from being designated as an SDGT, a supporter of any SDGT, or having any assets blocked for providing any material support to any SDGT, there is no evidence that WAMY was ever even recommended for such designation by OFAC. Ex. 237, Testimony of OFAC Director R. Richard Newcomb, Senate Governmental Affairs Committee hearing on Terrorism Financing, July 31, 2003, at User Clip: Terrorism Financing Hearing 2003 | C-SPAN.org; (https://www.c-span.org/video/?c4938961/user-clip-terrorism-financing-hearing-2003); Ex. 31 at 210:3-215:4

(transcript of relevant portion of the hearing read into the record).

474. On July 31, 2003, nearly two years after the 9/11 attacks, the then-Director of the OFAC, R. Richard Newcomb, appeared before the Senate Governmental Affairs Committee for a hearing on Terrorism Financing ("Newcomb Hearing"). Id. at 210:3-215:4 (transcript of relevant portion of the hearing read into the record).

475. In questioning by the late Senator Arlen Specter, Dir. Newcomb was asked to "amplify" his advice to Congressional staff that "a good many of [his] recommendations for sanctions [were] rejected." Id. at 210:7-11.

476. Sen. Specter asked Director Newcomb to "focus very sharply" on "recommendations which [Newcomb] [had] made for [economic] sanctions as to Saudi organizations which have been rejected" by the administration. Id. at 210:16-211:18

477. Senator Specter then asked Director Newcomb specifically whether WAMY was an entity as to which there had been recommendation for designation which was rejected:

Q: Were there recommendations for sanctions against the World Assembly of Muslim Youth?

A: There, as in others, these are issues that we looked at and examined very carefully. There was no recommendation out of our office on either of those.

Q: Well, what conclusions did you come to on the World Assembly of Muslim Youth?

A: That, along with the whole variety of charitable organizations operating head offices in Saudi or organizations that we're looking at, as well as the whole range of several hundred or so possible organizations that may be funding terrorist activities, rising to the level of a recommendation is a complicated practice.

Q: Well, I'm not concerned about several hundred others. I'd like to know what about the World Assembly of Muslim Youth. Were they funding terrorist organizations subject to economic sanctions without any action being taken?

A: I can't conclude that in this hearing. It is an organization that we—

Q: You say you can't conclude it—

A: Cannot. Cannot.

Q: --at this hearing today?

A: Well, we did not conclude that in our deliberations, so I can't say that that was a recommendation of our office.

Q: Well, when you look at it very carefully, how long have you been looking at it up until now?

A: Certainly since immediately in the aftermath of 9/11.

Q: Well, that's almost two years.  How long will it take you to come to a conclusion?

A: We can recommend and we can designate, but there is a policy process which takes into account all of the variety of—

Q: I've for 16 second left. Have you recommended this to any of the organizations I've mentioned to you, some tough economic sanctions which were turned down by higher officials implicitly because they were Saudi organizations.

A: I can't say it's because they were Saudi organizations.

Id. at 210:3-215:9 (full video transcript).

478.    To date, OFAC has not designated WAMY. Ex. 117.

**B.    Execution of Search Warrant of WAMY's U.S. Office Did Not Result In any Charges or Sanctions**

479.    In May of 2004 the U.S. Customs Service of the Bureau of Immigration & Customs Enforcement executed a search warrant at WAMY International's Virginia office.  Ex. 238, Warrant and search inventory in case no 04-190-MG.

480.    Following the search, no WAMY Int'l, WAMY, or any WAMY employee was ever charged with any offense, let alone any terrorism related offense, as a result of the execution of this search warrant. Ex. 2 at ¶15, 18-19 (that WAMY continues to operate in the US despite the execution of the warrant and WAMY has no connection to al-Qaeda).

481.    No sanction was ever taken against WAMY, WAMY, or any WAMY employee related to the execution of this search warrant. Ex. 2 at ¶15, 18-19 (that WAMY continues to operate in the US, has no connection to al-Qaeda).

482.    WAMY's Virginia office was not closed after execution of the search warrant. To date WAMY maintains its annual registration in Virginia. Ex. 85, Winer Ex 913 (2021 Annual Report, Commonwealth of Virginia, State Corporation Commission, WAMY International, Inc. registration document).

C.    **The 9/11 Commission Did Not Find That WAMY Provided Material Support Leading to The Terrorist Attacks of September 11, 2001, specifically or to al-Qaeda generally**

483.    Congress tasked the National Commission on Terrorist Attacks Upon the United States ("The 9/11 Commission") to: "(1) examine and report on the facts and causes relating to the terrorist attacks of September 11, 2001; (2) ascertain, evaluate, and report on the evidence developed by all relevant governmental agencies regarding the facts and circumstances surrounding the attacks; (3) build upon the investigations of other entities, and avoid unnecessary duplication, by reviewing the findings conclusions, and recommendations of [other government inquiries]; (4) make full and complete accounting of the circumstances surrounding the attacks, and the extent of the United States' preparedness for, and immediate response to, the attacks; and (5) investigate and report to the President and Congress on its findings, conclusions, and recommendations for corrective measures that can be taken to prevent acts of terrorism."  Pub. Law 107-306, Title VI, section 602 (Purpose).

484.    The 9/11 Commission published its 585-page Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Report").  Ex. 46.

485.    The 9/11 Commission Report mentions WAMY only once, in the following context with no connection to 9/11 terrorist attack or any other terrorist activity:

> While Saudi domestic charities are regulated by the Ministry of Labor and Social Welfare, charities and international relief agencies, such as the World Assembly of Muslim Youth (WAMY), are currently regulated by the Ministry of Islamic Affairs. This ministry uses zakat and government funds to spread Wahhabi beliefs throughout the world, including in mosques and schools. Often these schools provide the only education available; even in affluent countries, Saudi-funded Wahhabi schools are often the only Islamic schools. Some Wahhabi-funded organizations have been exploited by extremists to further their goal of violent jihad against non-Muslims. One

such organization has been the al Haramain Islamic Foundation; the assets of some branch offices have been frozen by the U.S. and Saudi governments.

Ex. 46 at 372.

## VIII.  WAMY is Not Part of al-Qaeda's Funding Network

### A.  Al-Qaeda's Funding Source Did Not Include WAMY

486.    The 9/11 Commission found that "Bin Ladin and his aides did not need a very large sum to finance their planned attack on American." Ex. 46 at p. 169.

487.    "The 9/11 plotters eventually spent somewhere between $400,000 and $500,000 to plan and conduct their attack." Id.

488.    The origin of the funds remains unknown though the 9/11 Commission developed a "general idea of how al Qaeda financed itself during the period leading up to 9/11." Id.

489.    "Al Qaeda relied primarily on a fund-raising network developed over time." Id.

490.    However, Bin Laden used multiple funding sources so much so that "it remained difficult [for the CIA] to distinguish al Qaeda's financial transactions among the vast sums moving in the international financial system."  Ex. 46 at 170 and 186 (Describing al-Qaeda's funding sources and difficulty in distinguishing them).

491.    Al-Qaeda had the ability to raise money from different sources, its "financial facilitators raise money from witting and unwitting donors, mosques and sympathetic imams, and nongovernment organizations such as charities". Ex. 241, National Commission on Terrorist Attacks Upon the United States, Monograph on Terrorist Financing, Staff Report to the Commission ("Staff Monograph") at pp. 17-19 (Describing the "elusive network" which al Qaeda developed to support itself and its operations); See also Ex. 242, CIA00377-384, at 379 Central Intelligence Agency, Intelligence Report, DCI Counterterrorist Center, "Pursuing the Bin Ladin Financial Target," April 12, 2001, at p. 3 (noting "Bin Ladin's extensive financial network uses a number of mechanisms to transfer funds necessary to conduct al-Qa'ida's activities. Among these are [REDACTED]

underground bankers known as hawala dealers, money couriers, and financial lieutenants who oversee

financial transfers, open bank accounts, and ensure that funds arrive at their appropriate destination.

In addition, numerous supporters and sympathizers of al-Qa'ida take advantage of their positions with

non-governmental organizations (NGOs) and charitable organizations to secretly divert funds to Bin

Ladin and his associated without the knowledge of senior NGO officials.").

492.    With respect to charities as a source of al-Qaeda funds, the 9/11 Commission found:

> Al Qaeda also collected money from employees of corrupt charities. It took two approaches to using charities for fund-raising. One was to rely on al Qaeda sympathizers in specific foreign branch offices of large, international charities–particularly those with lax external oversight and ineffective internal controls, such as the Saudi-based al Haramain Islamic Foundation. Smaller charities in various parts of the globe were funded by these large Gulf charities and had employees who would siphon the money to al Qaeda.

Ex. 46 at p. 170.

493.    The 9/11 Commission also found that:

> Saudi Arabia has long been considered the primary source of al Qaeda funding, but we have found no evidence that the Saudi government as an institution or senior Saudi officials individually funded the organization. (This conclusion does not exclude the likelihood that charities with significant Saudi government sponsorship diverted funds to al Qaeda.)

Id. at p. 171.

494.    The 9/11 Commission made no finding that WAMY, directly or indirectly through any

other charity or entity, provided funds to al-Qaeda. Id. at pp. 170-71.

495.    The 9/11 Commission made no finding that any WAMY foreign branch office, directly

or indirectly through any other charity, provided funds to al-Qaeda.  Id. at pp. 170-71.

496.    The 9/11 Commission made no finding that there was any likelihood that WAMY or

any WAMY foreign branch, directly or indirectly through any other charity, provided funds to al-

Qaeda.  Id. at pp. 170-71.

497.    The 9/11 Commission cites a CIA analytic report, "Identifying al-Qa'ida's Donors and

Fundraisers: A Status Report," Feb 27, 2002, in support of its findings as to al-Qaeda's funding sources. Id. at p. 170, fn 117, 119.

498.    The unredacted sections of the Feb. 27, 2002, do not include any finding that WAMY specifically or charities supported by the Kingdom of Saudi Arabia generally were a funding source for al-Qaeda. See Ex. 239 (CIA00370-376 Central Intelligence Agency, Directorate of Intelligence, "Identifying al-Qa'ida's Donors and Fundraisers: A Status Report," Feb 27, 2002).

499.    The 9/11 Commission also cites a January 1999 CIA analytic report, "How Bin Ladin Commands a Global Terrorist Network," Ex. 46 at p. 170 fn. 118 [at p. 498].

500.    Though the report notes Bin Ladin's exploitation of some international Islamic nongovernmental organizations for financial and logistical report, the unredacted sections of the CIA analytic report do not include WAMY, any WAMY official, or any WAMY employee, as part of Bin Ladin's terrorist network. See Ex. 240 (CIA00182-00196 Central Intelligence Agency, Directorate of Intelligence, "How Bin Ladin Commands a Global Terrorist Network," 27 January 1999).

501.    The 9/11 Commissions "Terrorist Financing Staff Monograph" recognized the challenges in determining al Qaeda's actual funding sources and urged caution in accepting a funding theory as fact noting "[i]n many cases, one or two threads of information make such theories tantalizing; but after careful review of all of the evidence available to us, including some of the most sensitive information held by the U.S. government, we have judged that such theories cannot be substantiated." Ex. 241, Staff Monograph at p. 19.

502.    The Monograph notes the perils on relying on information provided by detainees of captured al-Qaeda members:

> Detainees may provide misinformation and may misrepresent or mischaracterize their roles or the roles of others. As a result, corroborating their information, through other custodial interviews, documentary evidence, or other intelligence collection, is critical in assessing that we know about al Qaeda financing.

Id.

96

503.    While the 9/11 Commission Staff Monograph notes charities were a source of al-Qaeda's funds, it clarified that:

> Al Qaeda's charities' strategy before 9/11 had two prongs. In some instances, al Qaeda penetrated specific foreign branch offices of large, internationally recognized charities. In many cases, lax oversight and the charities' own ineffective financial controls, particularly over transactions in remote regions of the world, made it easy for al Qaeda operatives to divert money from charitable uses. These large international Gulf charities donated money to end recipients, usually smaller in-country charities, whose employees may have siphoned off money for al Qaeda. In the second class of cases, entire charities from the top down may have known of and even participated in the funneling of money to al Qaeda. In those cases, al Qaeda operatives had control over the entire organization including access to bank accounts.

Id at p. 21; See also Ex. 239, CIA_00370-00376 (Central Intelligence Agency, Directorate of Intelligence, "Identifying Al-Qa'ida's Donors and Fundraisers: A Status Report," February 27, 2002).

504.    While a 1999 CIA Intelligence Report noted that WAMY "personnel often pursue an extremist agenda, support Islamic groups in Afghanistan and Bosnia, and "puts foreigners requesting aid in direct contact with Saudi donors who are looking for worthwhile Islamic causes;" there was no finding, conclusion, or evidence that WAMY provided financial support, directly or indirectly, to al-Qaeda. Ex. 233, CIA_000720-804 at 744 CIA Intelligence Report, Office of Transnational Issues, Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions.

505.    Another CIA Intelligence Report from 1999 did not include WAMY amongst those Saudi NGOs "with the strongest links to Usama (Bin Ladin)" and indeed noted that ties between WAMY and "Usama Bin Ladin" were questionable. Ex. 243, CIA_00807-848 at 809 (Usama Bin Ladin: Some Saudi Financial Ties Probably Intact, January 11, 1999).

506.    The January 11, 1999, report notes that "the Bin Ladin family probably contributes to WAMY;" that Abdallah Bin Ladin, wrongly named as "Usama's half-brother;" "heads the WAMY office in Falls Church, Virginia; and that "WAMY Chairman Abdallah Al-Muhaidib as a supporter

97

of Usama Bin Ladin." Id. at CIA_000826-827.

507.    The Bin Ladin family is a large family with at least 60 members. Id. at CIA000836.

508.    WAMY has never had a chairman position and Abdallah Al-Muhaidib has never held any leadership position within WAMY. See, *supra*, Ex. 6 at WAMYSA E001056 (outlining the governing bodies but no chairman is mentioned); Ex. 7 at WAMY SA E001108 (outlining the governing bodies but no chairman is mentioned).

509.    The unredacted portions of the January 11, 1999, report do not include any facts or information that WAMY has ever provided any financial or other support to al-Qaeda, directly or indirectly. Ex. 243 at CIA_000826-827.

510.    This January 11, 1999, report notes that Lajnat al-Bir al Islamiya (LBI) was founded in 1988; is a "close affiliate" of WAMY; maintains offices in Afghanistan, Pakistan, Russia, Azerbaijan, Tajikistan, Uzbekistan, Kazakhstan, and Turkmenistan; and that "Usama has funded LBI's offices in Afghanistan and probably Pakistan." Id. at CIA_000821.

511.    The unredacted sections of the Report do not include any facts that LBI provided any financial support to al-Qaeda nor further information about the claim that "Usama" funded LBI's Afghanistan or Pakistan offices including the factual basis for the claim, the source of the information, or when and how the information was acquired. Id. at CIA_000820-821

512.    While a July 1, 2002, CIA Report claims that WAMY is one of various NGOs that "appears to" sponsor a paramilitary training camp, no factual support is given for the claim, the source of the information behind the claim is not given, nor is any information provided has to how or when the purported information was received. Ex. 244, CIA_000178-189 at 185 ("Al-Qa'ida Still Well Positioned to Recruit Terrorists," July 1, 2002).

513.    Similarly, while the report states that "local offices of NGOs such as the World Assembly of Muslim Youth, al-Haramayn, Society for the Revival and Islamic Heritage, and al-Waqf

al-Islamiya were actively involved in spotting and assessing suitable terrorist recruits from among young me who seek assistance from humanitarian organizations," no factual support is given for the claim, the source of the information behind the claim is not given, nor is any information provided has to how or when the purported information was received. "Id. at CIA_000185.

514.    SAMA, Saudi Arabia's central bank and chief financial agency, has overseen efforts to freeze and seize terrorist-linked assets. See also Ex. 245, CIA_000143-158, at 145 (Central Intelligence Agency, Directorate of Intelligence, "Saudi-Based Financial Support for Terrorist Organizations," November 14, 2002).

515.    Al Qaida was able to exploit several Saudi-based NGOs by diverting funds from legitimate activities to finance al-Qa'ida. Id. at CIA 000150.

516.    There is no evidence that WAMY was one of these NGOs nor has its assets been frozen or seized by SAMA. See Ex. 246, Mohammad Al-Juhani 2022 Declaration.

517.    Without factual support or attribution of the source of the claim, the November 14, 2002, Report notes that WAMY "is a major subsidiary of the Muslim World League" (which it is not) whose "global reach and influence among Muslim youth has made it an excellent conduit of recruits for many extremist groups." The Report also notes that "this activity is peripheral to WAMY's main purposes_ proselytization through publishing, building schools and mosques, running youth camps, and offering educational course on Islamic issues, [REDCATED] and is probably engaged in by a small number of officials acting without the knowledge or authorization of senior officials." Ex. 245 at CIA_000151.

518.    Mohammad Al-Juhani worked for SAMA for over thirty-seven years, from 1975 to 2013. Starting as an accountant in SAMA's investment department, Al-Juhani eventually became the head of the investment department and then the head of the accounting section at SAMA. Id at ¶¶5-7.

519.    Al-Juhani has personal knowledge of WAMY and its work. He knows WAMY to be

99

a "credible charity and its operations in the Kingdom of Saudi Arabia and abroad are well documented." Id. at ¶25.

520.    While he is aware of organizations being involved in improper financial transactions, including money laundering for the support of terrorists, WAMY was never investigated or suspected of being involved in any improper transfer of funds. Id. at ¶27.

521.    The 9/11 Commission Staff Monographs urged caution in assessing the alleged role of Saudi charities in terrorist financing noting that the context in which Saudi charities exist:

> Much has been made of the role of charities, particularly Saudi charities, in terrorist financing. A little context is necessary here. Charitable giving, known as zakat, is one of the five pillars of Islamic faith. It is broader and more pervasive than Western ideas of charity, in that it also functions as a form of income tax, educational assistance, foreign aid, and political influence. The Western notion of the separation of civic and religious duty does not exist in Islamic cultures. The Saudi government has declared that the Koran and the Sunna (tradition) of Muhammad are the country's constitution, and the clergy within Saudi Arabia wield enormous influence over the cultural and social life of the country.
>
> Funding charitable works is ingrained into Saudi Arabia's culture, and Saudi zakat has long provided much-needed humanitarian relief in the Islamic world. In addition, a major goal of Saudi charities is to spread Wahhabi beliefs and culture throughout the world. Thus Saudi efforts have funded mosques and schools in other parts of the world, including Pakistan, Central Asia, Europe, and even the United States. In some poor areas these schools alone provide education; and even in affluent countries, Saudi-funded Wahhabi schools are often the only Islamic schools available.

Ex. 241 at p. 21

522.    A CIA Intelligence Report from April 9, 1999, noted that "although there are more than 6,000 Islamic NGOs and charities, only a few dozen support terrorists." Ex. 247, CIA_000210-236 at 210, 213 (Central Intelligence Agency, Intelligence Report, DCI Counterterrorist Center, "Islamic Terrorists: Using Nongovernmental Organizations Extensively," April 9, 1999,).

523.    As to large internationally active NGOs based in Saudi Arabia or one of the Persian Gulf states, they may be exploited by individual employees with ties to extremists. "Terrorist abuse of such NGOs takes place at the local branch office rather than at the organizations' headquarters.

Senior NGO leaders usually are unwitting of the activity and willing to take corrective action when apprised of the abuse." Id. at CIA000213.

524.    WAMY is not named in the unredacted portions of this CIA report as an NGO which has provided financial or other support to terrorists including "al Qa'ida" nor is any WAMY official named as an al Qa'ida supporter. Id. at CIA000210-236.

525.    The 9/11 Commission Staff Monograph did not note WAMY as a charity identified as providing funds to al-Qaeda, directly or indirectly, or one suspected of doing so. Ex. 241.

526.    The FBI's investigation into the terrorist attacks of 11 September 2001, internally named PENTTBOM, included the cooperation of local, state, and other federal agencies. Ex. 248, EO14040-000001- EO14040-000014 (FBI Memorandum To Administratively Close Case dated May 27, 2021).

527.    In June 2007, the FBI's New York field office (NYO) opened a subfile under the PENTTBOM investigation file to obtain a greater understanding of 9/11 hijackers Nawaf al-Hazmi's and Khalid al-Midhar's past interaction with and connectivity to the Southern California Muslim community in an attempt to explain how they may have gained assistance after their arrival in Los Angeles in January 2000. Id. at 000002

528.    Under casefile named "Operation Encore," the NYO served as an enterprise counterterrorism investigation into a possible network of individuals who were suspected of providing assistance to the hijackers and as an intelligence gathering operation into AQ's tactics and tradecraft. Id. at 000003.

529.    The investigation spanned from 2007 to 2016 and included the review of financial records, telecommunication records, travel records, hundreds of interviews, and the execution of search warrants of various residences in Southern California. Id at 000008.

530.    "After nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged, which is consistent with the final conclusion of the 9/11 Commission Report which stated that 'no new information to date that would alter the original findings of the 9/11 Commission regarding the individuals responsible for the 9/11 attacks of for supporting those responsible for the attacks.'" Id. at 000011.

531.    Neither WAMY, any WAMY branch or office, any WAMY official, nor any WAMY employee were found to have any responsibility for the 9/11 attacks or for supporting, directly or indirectly, those responsible for the attacks. Id.

B.    <u>Bin Laden's Antagonism Towards the Kingdom of Saudi Arabia and Government Aligned and Supported Charities Such as WAMY and Active Opposition to Using Saudi government Aligned Charities As an Al Qaeda Funding source.</u>

532.    In the years before September 11, 2001, Osama Bin Laden made clear his opposition to the Saudi Royal family, the government of the Kingdom of Saudi Arabia, and government aligned charities such as WAMY. Ex. 249, Winer Deposition Ex 908, West Point's Combatting Terrorism Center's Harmony Database ("Harmony Database").

533.    In April 1994, responding to the Kingdom's request that he return home, Bin Laden wrote to King Fahd that he will not return to the Kingdom because, "we were prevented from travelling, our money was frozen in foreign banks accounts, a defamation campaign was waged against us in the local and international press, and finally, you attempted to cut our ties with the homeland by confiscating our passports [therefore], your actions indicate to us what your intentions are for us." Ex. 249.

534.    In a June 7 1994 letter, Osama Bin Ladin openly criticized King Fahd writing "Enormous crimes and massacres were committed against the Muslim people of Bosnia and Herzegovina [] due to a global crusader conspiracy that is anti-Muslim, they were obstructed from receiving weapons, which prevented them from defending themselves[;] [t]his all occurred through

the sword of the United Nations." Ex. 249, at 7-June 1994.

535.     On July 19, 1994, Bin Ladin stated that "the Saudi government has used all the witchcraft powers it has and the full deception powers of the media to justify its shameless stands against Islam and its preachers while supporting the unbelievers and their guardians." Id. at 14-July 1994.

536.     Bin Ladin criticized what he perceived to be the Saudi government's oppression of scholars called Muslim Youth to action against the government.  Id. at September 12, 16, and 19 and October 15, 1994 letters.

537.     Bin Ladin escalated his condemnation of the Saudi government in subsequent letters; in a December 29, 1994, letter to Sheikh Bin Baz, Saudi's top cleric, Bin Ladin accused the scholar of an abomination by permitting "the crusader and the Jewish alliance" to occupy the country in the name of liberating Kuwait." Id. at 29 December 1994.

538.     In the same December 29, 1994, letter Bin Laden criticized Sheikh Bin Baz, writing "[w]hen the King hung the cross upon his chest and appeared with it before the world, happy and smiling, you justified his action and permitted his abomination, and permitted him although this act is clearly infidelity." Id. at 29 December 1994.

539.     In February 1995, Bin Ladin accused the Saudi government of misappropriating "large amounts of money collected from donations for people in Bosnia," and states "Besides the regime's political and ideological blockade, it also exercised a harsh economic and financial (policy) as well. Part of this policy was dissolving charitable organizations that used to deliver donations directly to needy people inside and outside the country. It replaced them with organizations and foundations subservient to the Royal Family members and particularly, Prince Salman." Ex. 249 at 12 February 1995.

540.      Bin Laden encouraged donors not to give to Saudi affiliated charities when he wrote

that "[i]t is known that these leaders cannot be trusted.  There are other safe ways you that [sic] can assist in delivering funds to those who deserve them. Among them are, benevolence foundations in Kuwait, Jordan, Yemen, Sudan, and others.  To assure that the funds transfer to these foundations' bank accounts, we draw your attention to the importance of transferring these funds outside the peninsula away of the pursuing regime's spies." Ex. 249 at 12 February 1995; Ex. 2 at ¶¶32-33 (discussing WAMY oppositional view to al-Qaeda's ideology and how supporting al-Qaeda amounts to treason).

541.    Bin Ladin prohibited donations to Saudi charities because: "It is no longer hidden that the Saudi regime persistently sought to block all the abilities and capabilities of the ummah by placing control over it. but the regime was not satisfied with its unjust policies; it had to go further by imposing control on the minds and politics of the nation. Moreover, the regime sought to impose economic control. This resulted in the closure of charitable organizations that delivered the contributions of the benefactors from this country to its deserving lawful owners. The regime replaced these charitable organizations with associations and organizations that were supervised by members of the ruling family, such as Prince Sultan and Prince Salman. This revealed a scheme by which they monopolized the charitable contributions in such a way that it prevented Islam and the Muslims from benefiting from them. The regime used the contributions the same way it used the money of the afghani mujahidin. That money was used to pressure the mujahidin and influence their policies in a way that would benefit the interests of the West. Sometimes these contributions were used for private interests of the princes. Ex. 249 at 11 August 1995; Ex. 2 at ¶¶32-33 (discussing WAMY oppositional view to al-Qaeda's ideology and how supporting al-Qaeda amounts to treason).

542.    Bin Ladin thereafter continued to warn donors that: "We are drawing their attention to the risk of forwarding those contributions through the ruling regime and its organizations. We are advising them to deliver their contributions directly to the people through safe hands of individuals,

104

organizations, and societies that are trusted, such as the charitable societies in Qatar, Kuwait, Sudan, Yemen and Jordan. We are advising them to be careful that their contributions stay away from the pursuit of the servant of the two holy mosques and his agents, and to make sure that the money will reach the people it is intended for." Id. at 11 August 1995.

543.     Bin Laden did not issue his first "public fatwa" against the United States until 1996. Ex. 46 at 59.

544.     As a November 2, 2000, Intelligence Report of the DCI Counterterrorist Center noted:

> Bin Ladin's fatwas carry no formal authority outside of his own organization, and many Islamic religious scholars view his justifications for terrorism as simplistic and flawed, failing to address the numerous Islamic injunctions prohibiting violence against innocents-including Christians and Jews, who are traditionally tolerated as "Peoples of the Book." Instead, Bin Ladin attempts to appeal to Muslims who are not familiar with the finer points of Islamic jurisprudence but are convinced that their civilization must fend off an assault of Western military power and cultural values.

Ex. 250, DCI Counterterrorist Center, Intelligence Report, "Bin Ladin's Terrorist Operations: Meticulous and Adaptable," November 2, 2000.

545.     Osama Bin Ladin presented himself as a challenger to the Saudi Arabia's existing government system. Ex. 251, Matthew Levitt Dep. Transcript (Excerpt) at 436:7-438:12 (Levitt explains that Bin Ladin was a challenger to Saudi Arabia's existing form of governance, and that for some within the Saudi system, that made him a pure enemy, requiring that Saudi Arabia take a harder line).

546.     On April 20, 1998, President William J. Clinton added "Usama bin Muhammad Awad bin Ladin" and "Islamic Army (a.k.a. Al-Qaida…)" to the "Terrorists Who Threaten To Disrupt the Middle East Peace Process" List. Ex. 252, Executive Order 13099.

**IX**.     **Expert Review Confirms the Lack of Evidence That WAMY Provided Material Support To or The Ideological Foundation For al-Qaeda.**

     A.     <u>The Opinions and Conclusions of Forensic Accountant Jonathan Marks</u>

547. Jonathan Marks ("Marks") is a certified public accountant with certifications in financial

forensics, information technology, and fraud examination; he also teaches forensic accounting. See Ex. 253, ECF 7351-4 (Jonathan T. Marks, Curriculum Vitae).

548. This court has qualified Marks to "review WAMY's financial records for signs of diversion" and whether based on his review of financial documents he found "any suspect transactions or signs that would be consistent with fraud or misappropriation." Ex. 254, ECF 9060 at 32-34.

549.     Marks and his team reviewed "tens of thousands of primary source documents and information produced in connection with this matter, [and] did "not uncover evidence to support a finding of financial mismanagement or misconduct indicative of terrorist financing activities on behalf of WAMY." Ex. 255, Jonathan Marks Report (Excerpt) at p. 6; Ex. 87 at 78:9-20 ("we reviewed a lot of documents").

550.     Specifically, Mark's team reviewed (1) audit reports, (2) bank statements, (3) bank reports, (4) receipts, (5), financial reports, (6), project reports, (6) operational reports, and (7) communications regarding operations and financial documents." [sic] Ex. 255 at p. 2; Ex. 256, Jonathan Marks Reliance Material.

551.     After review of "hard evidence," Marks is of the opinion that WAMY's financial audit observation do not indicate participation in or support of terrorist activities. Ex. 255 at pp. 9-20.  The basis for this opinion includes that:

552.     WAMY's project-based funding mechanism is a form of "absolute control" over its funding process. Ex. 87 at 157:10-159:19 (Marks opinion after review of "hard evidence"); Ex. 87 at 156:7-14 (attesting to having reviewed a Georgia report as an example of WAMY's reporting mechanism); Ex. 255 at p. 10 (citing to Ex. 209 which is a "..document that includes the relief contract and sets out the agreement of support and amounts for each part, also requires the recipient party (Georgia) to support expenditure with periodic reports"); Ex. 255 at p. 11 (Marks review of the documents produced confirmed WAMY's established funding and reporting processes).

106

553.    WAMY's project reporting requirements allow it to have a level of oversight and control over its branches.  Ex. 87 at 167:11-20 ("The structure and behavior that WAMY put in place are indicative of a control-based group and not a group that ran without control over its local branch).

554.    WAMY's policy of funding projects on a project-by-project basis and requiring that its branches provide project reports reduces the likelihood of excess funds accumulating. Ex. 255 at pp. 11-12 (discussing how WAMY's project-based funding reduces excess funds and that it is a form of control); Ex. 69 (1998 Letter to Burma, Chad and others for stricter financial controls), Ex. 70 (similar WAMY Jeddah 997 Letter to Chad and Cameroon office encouraging more diligent controls in order to reassure donors and beneficiaries), Ex. 71 (WAMY letter to Egypt for stricter controls in 1999).

555.    WAMY Pakistan audits that contained "disclaimers" is "not out of place or a sign of terrorist funding" and "does not equate to guilt."  Ex. 255 at 14 (discussing the reasons behind the disclaimer).

556.    Despite the disclaimer, WAMY Pakistan's audit reports did not contain any "misstatements and faithfully represent the financial performance and position of [WAMY]." Ex. 255. at p. 14 (discussing the soundness of the Pakistan audit reports); Ex. 18 at ¶35, Ex. 12 at 239:8-15 (denying existence of financial irregularities).

557.    Commenting on the same 1992-2002 audit report as well as others, Marks opines that, overall, the auditors would not have given WAMY an unqualified opinion if they distrusted the representations made to them by WAMY's senior leadership. Ex. 87 and 212:5-12 and 218:10-15; see also, Id. at 242:20-245:15 (discussing preparation of reports years after the event is not uncommon and auditors "issu[ing] clean audit opinions" at 24:15-21); Ex. 255 at 7-18 (discussing Marks's review of WAMY audit reports for Pakistan, Saudi and other regions).

558.    Marks reviewed documents related to WAMY Canada, including primary sources

related to the engagement and dismissal of Mohamed Khatib as director, and concluded that the defunding of WAMY Canada and removal of Khatib were in line with "what steps should be taken to prevent terrorists from succeeding, and they are not actions of a problematic organization or one ignoring misconduct." Id. at pp. 20-21.

559.    Marks reviewed primary source documents related to the transfer of $50,293.13 into and out of Bank of Montreal account number 8086-611(the BIF Canada account) and concluded that WAMY Canada did not transmit funds to BIF USA. Id. at pp. 22-30.

560.    Marks opines that WAMY does not have a lack of systematic record keeping issues. Id. at pp. 31.

561.    Marks opines that WAMY's sources and use of funds were sufficiently supported and were not indicative of participating in or supporting terrorist activities. Id. at pp. 32-36.

562.    The basis for this opinion includes that, based on review of tens of thousands of documents produced in the case, Marks found that WAMY's activities and projects had sufficient documentary support such that donor funds were not diverted to fund terrorist activities as claimed but instead spent on legitimate charitable activities. Id. at p. 32.

563.    Marks concludes herein that "[w]hile WAMY has been accused by non-accountants of using charitable activities as a cover-up for terrorist-supporting activities, my analysis determined that 98.8% of the projects reviewed have been supported with a detailed plan and documentation as evidence of their operations and use of funds." Id. at pp. 32-33.

564.    While 1.2% of WAMY funding was not supported, Marks concluded that '[b]ased on the low rate of unsupported funding and the required reports for WAMY funded projects, I did not find evidence of any patterns of funding terrorism, neither hidden nor apparent." Id. at p. 34.

565.    Marks therefore concluded that "I did not observe any financial document indicating material support of terrorist activity, let alone the 9/11 attacks, and the amounts of the expenditures

reviewed were not indicative of material support of terrorism or support to Al-Qaida." Id. at p. 35.

566.    Marks also concluded that as an organization, WAMY did not lack financial controls. Id. at pp.36-37.

567.    The basis for this opinion included the finding that WAMY's methods of control includes "transparency, proactive improvements and controls, increased spend[ing] on Audit, increased IT controls, amplified reporting, robust requirements for Audits and Reports, [a]countability from senior leadership in WAMY, [e]nforced mechanisms of control that were used proactively, [] defund[ing] areas that did not follow control and accounting policies, []funding for good causes, [u]se of top audit firms, [l]eadership and control over rogue individuals, and [a]ccounting practices of well-run corporations."  Id. at p. 37 (outlining all the ways WAMY implemented solid financial control mechanisms).

568.    "An organization seeking to hide illegal contributions to terrorist organizations does not heavily invest in top-flight accounting firms, and costly IT controls."  Id. at p. 8.

   B.    The opinions and Conclusions of Religion Professors and Islamic Scholars

569.    Fluent in Arabic, Dr. Khalid Blankinship (Blankinship) is a professor at Temple University who lived in the Middle East for eleven years and provides expert testimony on Islam and understanding Islamic terminology in a historical context.  Ex. 13 at p. 1; Ex. 44 at 20:13-21:14 (professorship at Temple and scope of his expert testimony), 197:21-198:3 (testifying that some of the documents he reviewed were Arabic documents), 247:16-249:17 (discussing interest in learning Arabic and when he started speaking Arabic).

570.    Sherman Jackson ("Jackson"), an Islamic expert for Defendant MWL whose opinions have not been challenged, is a scholar of Islamic law, legal history, legal theory and theology and the King Faisal Chair in Islamic Thought and Culture at the University of Southern California.  Ex. 257, Sherman Jackson Report (Excerpt)at p. 3 (qualifications).

571.     Far from providing the ideological foundation for al-Qaeda, Prof. Blankinship opines that Mainstream Saudi beliefs, which WAMY espouses are inconsistent with al-Qaeda's beliefs as first, al-Qaeda's call for the overthrow of Al Saud contradicts Wahhabi doctrine and practice; second, al-Qaeda's call for jihad against the West is illegitimate according to Wahhabi doctrine, which maintains that only a sovereign ruler may declare jihad. Ex. 13 at p. 53.

572.     The basis for this opinion includes that WAMY rejects Bin Ladin's statements delegitimizing Saudi rulers.  Ex. 13 at pp. 52-53 (Blankinship, quotes an excerpt from the scholar David Commins stating that the ideology of al-Qaeda is not Wahhabi, as it calls for the overthrow of Al Saud, and that al-Qaeda's call for jihad against the West is illegitimate according to Wahhabi doctrine; Ex. 44 at 211:13-23 (Blankinship confirms that the Saudi government adheres to the Wahhabi teaching that the political ruler must be obeyed as long as he upholds Islam); Ex. 2 at ¶¶32-33 (discussing WAMY oppositional view to al-Qaeda's ideology and how supporting Al Qaeda amounts to treason).

573.     In Wahhabi Islam, the official Saudi interpretation of Islam which WAMY follows, "obedience to the rulers and the order of the state is required." Ex. 46 at p. 52;  Ex. 13 at p. 53 (Blankinship opines on the incompatibility of al-Qaeda's ideology and Wahhabi Islam, as Wahhabi Islam requires obedience to rulers and the order of the state); Ex. 44 at 211:13-23 (Blankinship confirms that the Saudi government adheres to the Wahhabi teaching that the political ruler must be obeyed as long as he upholds Islam); Ex. 2 at ¶¶32-33 (discussing WAMY oppositional view to al-Qaeda's ideology and how supporting Al Qaeda amounts to treason).

574.     Outside of Saudi Arabia, the Wahhabi movement is known as Salaf. Ex. 13 at p. 20 (defining Salafism).

575.     Salafis are closely related to Wahhabis but not identical; what they share in common is that "armed struggle is simply not the major concern of these trends, which are far more concerned

with correct belief [] and practice." Ex. 13 at p. 21 (noting the distinction between Hanbalis, Salafis and Wahhabis).

576.    Salafis who are "committed to doctrinal purification and eschew violence and even oppose involvement in politics" are known as "Quietist Salafis."  Ex. 257 at pp. 20-21 (distinguishing the three types of Salafis: Quietist, Activist and Jihadis).

577.    Blankinship describes religious quietism "within the Wahhabi point of view" as "concentrating on one's own self, one's own self-cultivation, one's own religion and religiosity and [] not bother[ing] others."  Ex. 44 at 175:7-14.

578.    WAMY's Wahhabi beliefs are not extreme but "rather they are representative of a significant and widespread religious orientation inside Islam shared by millions of Muslims who are not doing anything violent nor hatching conspiracies against the United States." Ex. 13 at p. 22.

579.    Bin Ladinsim is quite antithetical to Wahhabism. Id. at p. 36.

580.    Bin Ladin and al-Qaeda believe in the indiscriminate killing of civilians, Muslim or otherwise.  Ex. 46 at 47 (Describing generally the contents of Bin Ladin's proclamation claiming that America has declared war against God, calling for the murder of any American, anywhere on earth); Ex. 258, CIA Intelligence Report titled "Bin Ladin's Terrorist Operations: Meticulous and Adaptable, dated November 2, 2000 CIA_000021 (Describing Bin Ladin's February 1998 fatwa, proclaiming that all Muslims have a religious duty "to kill Americans and their allies, both civilian and military" worldwide); Ex. 13 at p. 55 ("Bin Ladinists" are murderers);  Ex. 2 at ¶¶32-33 (discussing WAMY oppositional view to al-Qaeda's ideology and how supporting al-Qaeda amounts to treason).

581.     Though not a religious figure and his organization is not religious, "Bin Ladin's terrorist operations are grounded in his extreme interpretation of Islamic law, which sanctions attacks against a wide variety of targets worldwide." Ex. 258 (discussing Bin Ladin's extreme interpretations).

582. Bin Ladin's indiscriminate killing, as in the attacks of September 11, 2001, is murderous and a "rebell[ion] against God's command…" Ex. 13 at p. 51 (describing the instances of Islamic warfare and how Bin Ladinists exceed the permissibility of these instances).

583. Jihad linguistically means "striving," with the "greater jihad [being] the internal struggle of a Muslim against the self…" Id. at p. 8 (defining jihad linguistically); Ex. 44 at 151:8-152-17.

584. The aggressive warfare of jihad was truly constrained to the early centuries of the spread of Islam and is not at all prevalent today; in fact, there has been no declaration of jihad by a Muslim state since 1914. Ex. 44 at 151:8-152-17.

585. "Jihad," when used in the sense of a "just war," includes inherent distinctions between combatants and non-combatants in which "non-combatants are not to be harmed;" non-combatants being made up of categories which "cover the entire civilian population." Ex. 13 at p. 9 (articulating the terms and conditions of a just war in Islam); Ex. 44 at 149:8-150:12 (Blankinship confirms that the classical Muslim doctrine of war does not allow for harm to genuine noncombatants).

586. Using "jihad" to mean "holy war" "is inaccurate and misleading because it is a term of abuse used to defame the other and never attributed to the self." Ex. 13 at p. 13.

587. Under Wahhabi doctrine, only the ruler may declare jihad and thus, "from the Saudi government point of view, completely freelancing attacks or campaigns by private individuals cannot be construed as jihad and are not permissible." Id. at p. 20.

588. Wahhabism and Salafism, though quite conservative in religious practice, "are by no means violent or supporters of violence." Id. at p. 21.

589. The U.S. made the term mujahideen (sing. mujahid), a derivative of jihad meaning the struggler, fashionable during the Soviet Afghan war (1979-1989) until it became unfashionable in 1992 when the Afghan communist regime fell. Id. at p. 13 (explaining how mujahideen was not a

heavily used term because of the modern state but regain traction during the Soviet Afghan war).

590.     "Mujahideen" has been conflated with the colloquial usage of terrorists or jihadists. Id. at 13 (mujahedeen today denotes terrorists or jihadists or Muslim terrorists); Ex. 259, Sherman Jackson Dep. Transcript Excerpt  at 83:7-84:16 (noting that Plaintiffs' expert conflates the terms so much so that "jihad, no matter how justified it might be as a defensive mechanism even" [i.e. Afghan mujahideen], ends up associated with wanton violence and terrorism.").

591.     Though terrorism/terrorist, used colloquially and academically, has no universal definition, it is not jihad/mujahideen.; Jihād is a legally sanctioned and legally regulated institution in Islam and is unanimously recognized as neither being equal to nor as sanctioning terrorism.  Ex. 13 at pp. 14-15 (wrestling with the definition of terrorism, even among scholars); Ex. 44 at 124:15-125:10 (explaining that there are differences in the academic definition of terrorism, even among Islamophobes); Ex. 257 at p. 12 (highlighting differences between the words academically as well as how Islam views jihad).

592.      To assuage individual actors from relying on *jihad* as a basis to overthrow the state, Saudi Arabian law, which WAMY obeys, makes it clear that the "ruler must also be obeyed, and rebellion against him is not permissible under any circumstances." Ex. 13 at p. 12 (Blankinship opines that an important feature of Islamic just war doctrine is that jihad may only be declared by a ruler of a state and not by private individuals). Ex. 44 at 104:19-105:1 (Blankinship confirms that one who attempts to co-opt the concept of jihad without authority is acting outside of Islam).

593.     A WAMY official's use of the word jihad is therefore in no way a declaration of support for terrorism but instead an articulation of a just war.  Ex. 13 at 9 (articulating the terms and conditions of a just war in Islam); Ex. 44 at 149:8-150:12 (Blankinship confirms that the classical Muslim doctrine of war does not allow for harm to genuine noncombatants).

594.     Prof. Blankinship concludes that "the charge of 'extremism' made against WAMY

113

…cannot be upheld." Ex. 13 at p. 21.

595.     Prof. Blankinship finds that WAMY's support for schools in Pakistan is not evidence of extremism or promoting extremist views as "religious schools provide an important service educating children" in the region given the weakness and poverty of the public school system and that the Deobandi seminaries "are strongly traditionalist, meaning the support the full practice of traditional Islam, including a moderate form of Sufism and the application of the Shari'ah according to the Hanafi school of law….." Id. at p. 22.

596.     Prof. Blankinship further observes that "[a]s scholars will attest, religious schools in Saudi Arabia and Pakistan are certainly not training camps for 'terrorist' nor for mujahideen. Rather, they provide a curriculum that tries to bridge the spread between medieval Muslim and modern knowledge, by giving a good grounding in the religion, as a Catholic school in the United States will try to do for Catholicism, as well as providing a modern education enabling the student to live in the modern world." Id. at p. 28.

597.     Prof. Blankinship also concludes that "WAMY stands with the traditional Hanbali Wahhabi scholars of Saudi Arabia who universally ruled against suicide bombings in no uncertain terms in a number of religious rulings." Id. at p. 23. WAMY never supported the loss of innocent lives; it believes there is no justification for tragic attacks of September 11, 2001." Ex. 9 at ¶7.

598.     Rather than providing the ideological foundation for al-Qaeda and actively advocating for young Muslims to take up arms and engage in a violent jihad against the United States, Prof. Blankinship concludes that no actions by WAMY "can be reasonably shown or even supposed to have had any influence on furthering the 9/11 attacks whatsoever." Ex. 13 at p. 50.

599.     The writings published and circulated by WAMY do not demonstrate any support for violence against others at all." Id.

## X.    Burnett Complaint Must Separately Be Dismissed Pursuant To Fed. R. Civ. P. 12(b)(5) And

114

**Fed. R. Civ. P. 4(m)**

600.     On November 22, 2002, the Burnett Plaintiffs in *Burnett et al v. Al Baraka Investment and Development*, et al Case No. 20 cv 1616, filed their third amended complaint against "World Assembly Muslim Youth a/k/a WAMY International, Inc."  See, ECF No. 29.

601.     World Assembly Muslim Youth is organized and registered in Saudi Arabia.  See, *supra* at ¶¶2-3.

602.     WAMY International, according to public records, is organized and registered in the Commonwealth of Virginia, USA.  See, e.g. Ex. 274 December 23, 2002, Commonwealth of Virginia, State Corporation Commission, Statement of Registered Agent; see also, supra at ¶ (WAMY International Articles of Incorporation).

603.     Before being substituted by the Law Firm of Omar Mohammedi, LLC, Maher Hanania, a Virginia attorney WAMY had retained, attests to the following a declaration submitted in the Burnett case:

> Counsel for Defendant informed Plaintiff Counsel that he did not serve WAMY and that they have not served the Third Amended Complaint.
>
> Counsel for Plaintiff informed Counsel for Defendant that the Third Amended Complaint will be served.
>
> Counsel for Defendant informed Counsel for Plaintiff that an answer will be filed on time once the Complaint is served.

Ex. 260, Maher Hanania 2004 Declaration at ¶¶6-8.

604.     Following a phone conversation with Burnetts' counsel, WAMY's new counsel, Law Firm of Omar Mohammedi, LLC  (Mohammedi), alerted Burnett Plaintiffs in an April 8, 2004 letter that though "no Plaintiff in this matter has sought to properly serve WAMY either locally or overseas," "WAMY will consent to a thirty-day extension for the purposes of proper service."  See, Ex. 261, April 8, 2004, Omar Mohammedi letter.

605. The Mohammedi April 8, 2004 letter offered Burnett Plaintiffs to serve by giving them 30 days extension to serve. Id.

606. In a letter of June 29, 2004, WAMY's counsel again informed Burnett Plaintiffs that it had yet to serve WAMY. See Ex. 262, June 29, 2004, Omar Mohammedi letter.

607. In a September 7, 2004, purported letter[7], Burnett Plaintiffs' counsel wrote to WAMY's counsel that "[w]e believe your client World Assembly of Muslim Youth was properly served personally on December 23, 2002, and then again via mail on December 24, 2002. Accordingly, we find you in default;" Motely Rice, Burnett Plaintiffs' counsel enclosed in the letter the Reynolds proof of service and affidavit. See, Ex. 263, September 7, 2004 Motley Rice letter; see also, Ex. 264, June 30, 2011 Motley Rice letter at PEC-WAMY001073.

608. In a November 29, 2004 letter addressing "service issues," WAMY's counsel insisted that as to Burnett Plaintiffs it "will not agree to accept service" because, (1) due to their failure contact WAMY counsel after WAMY counsel extended their time to serve WAMY (2) due to their failure to correct the defect in their December 23, 2002 attempted service, (3) due to their attorneys' failure to contact WAMY's counsel about correcting service after personally meeting with WAMY and promising to make contact to resolve service issues, and (4) Burnett Plaintiffs had failed to make a good faith showing that they were entitled to serve by publication as per Judge Casey's September 15, 2005 Order on service by publication. See, Ex. 273, November 29, 2004, Omar Mohammedi letter; Ex. 265, Judge Casey's September 15, 2005 Order for service by publication; see also, *supra,* Ex. 261 and Ex. 262 (April 8 and June 29 2004, Omar Mohammedi letters).

609. In responses to the November 29, 2004 Mohammedi letter, Burnett Plaintiffs' December 1, 2004 letter accused WAMY of never responding to their September 7, 2004 letter, defended the purported December 23, 2002 service of process and, insisted that "it is our intention to

---

[7] As discussed below, WAMY never received this letter.

seek a default judgment against [WAMY];" there is no evidence in the record that Burnett Plaintiffs even opted to serve WAMY by publication. See, Ex. 266, December 1, 2004, Hanly Conroy Bierstein & Sheridan (HCBS) letter.

610. WAMY's counsel's December 6, 2004 response letter denied ever receiving the September 7, 2004 letter but also insisted that WAMY's "documented" history of communications and follow-up indicates WAMY's willingness to address the service issues. See, Ex. 267, December 6, 2004, Omar Mohammedi letter.

611. Following a HCBS's December 30, 2004 letter that memorializes several communications between WAMY and Burnetts Plaintiffs' counsel, Judge Casey endorsed the letter with a January 3, 2005 order directing the parties to "work out a briefing schedule for a motion to dismiss." See, Ex. 268, December 30, 2004 HCBS endorsed letter.

612. By letter dated June 26, 2005, WAMY noticed Burnett Plaintiffs of its intention to move to dismiss for defective service and requested that the parties enter into a briefing schedule; two weeks later Burnett Plaintiffs had still not responded to the briefing schedule request. Ex. 269, June 26, 2005 and July 15, 2005 Omar Mohammedi letters.

613. Hearing nothing from Burnett Plaintiffs as to WAMY's June 26, 2005 and July 15, 2005 letters, WAMY's counsel followed up in a July 28, 2005 letter advising HCBS that WAMY will be compelled to file a "Stipulation and Briefing Schedule with the court, along with a letter explaining why you have not signed it." see, Ex. 270, July 28, 2005 Omar Mohammedi letter.

614. After Burnett Plaintiffs refused to enter into a briefing schedule for WAMY's motion to dismiss, on September 1, 2005, WAMY petitioned this court for approval to file a motion to dismiss without the briefing schedule the court ordinarily requires. See, Ex. 271, September 1, 2005 Omar Mohammedi letter without enclosures.

615. On September 9, 2005, Judge Casey issued the following order:

> In light of the increase in recent correspondence regarding briefing schedules on motions to dismiss by Defendants who claim they have been served improperly, the Court believes these Defendants should include their objections to service in their motions to dismiss so that those Defendants who are not properly in the case are ferreted out.

See, Ex. 265.

616.    In a June 30, 2011 letter to WAMY's counsel, Burnett's counsel attached documents purportedly evidencing service of process: (1) September 7, 2004 Motley Rice letter, (2) December 23, 2002 proof of service from Robert Reynolds, (3) May 27, 2003 letter from Nelson Tucker of Process Service Network, (4) May 23, 2003 affidavit of Robert Reynolds, (5) March 14, 2003 declaration of Nelson Tucker.  See, Ex. 264.

617.    A December 23, 2002 proof of service purports that process server Robert Reynolds served process of a "Summons & Amended Complaint" on "World Assembly of Muslim Youth a/k/a WAMY International., a/k/a World Association of Muslim Youth" by personally serving Caroline Sodder at "4:10 pm" at "5134 Leesburg, Alexandria, Virginia, 22302;"  Sodders is described as "Person in Charge Authorized to Accept Service." See, Ex. 264, that includes PEC-WAMY001073-79 at 1074.

618.    According to the proof of service, on December 23, 2002, Reynolds also mailed a copy of the "Summons & Amended Complaint" to the 5134 Leesburg address from "Los Angeles, CA." See, Id. at PEC-WAMY001074.

619.    On December 24, 2002, Nelson Tucker, the president of Process Service Network, purports to have mailed a copy of the summons and amended Burnett pleadings to the 5134 Leesburg address.   Id. at PEC-WAMY001078-79.

620.    Reynolds would later attest in his 2003 affidavit that,

> On December 23, 2002, I arrived at the above-mentioned address and attempted to enter the premises.  I could not open the front door to the unit since it was locked.  I knocked on the door once and a female employee came to the door.  I advised her that I had legal papers from the above-named defendant and she advised me that she would not accept

118

them and that the documents had to be delivered to their attorney.  Upon inquiry, she identified herself as Caroline Sodder and advised me that she was normally authorized to accept legal documents but not on this case.   She attempted to close the door and I threw the papers inside.  She picked them up and threw them back outside.

Id.  at PEC-WAMY001076.

621.    WAMY International's registered agent on December 23, 2002 at their 5134 Leesburg Pike address was Fadel Soliman; Soliman succeeded Ibrahim Abdullah as WAMY International's registered agent.  See Ex. 272, FED-PEC0217659 (WAMY public registered agent inquiry naming Fadel Soliman); See also, Ex. 274, (December 23, 2002 statement of registered agent showing change of registered agent from Abdullah to Fadel Soliman on December 23, 2002).

622.    Sodder was never a WAMY employee, director, officer or registered agent to accept service of process for any WAMY entity.  See, Ex. 104 Ibrahim Abdullah 2026 Declaration at ¶15.

623.    Sodder is not an officer, director, managing or general agent, or cashier or assistant cashier or any agent authorized by or appointed of law to receive service for any WAMY entity. See, Id. at ¶¶10-15.

Dated:  April 15, 2026

**LAW FIRM OF OMAR T. MOHAMMEDI LLC**

/s/ *Omar T. Mohammedi*

Omar T. Mohammedi (OM7234)
Frederick J. Goetz
Goetz & Eckland P.A.
(admitted *pro hac vice*)
233 Broadway, Suite 820
New York, NY 10279
Telephone: (212) 725-3846
Fax: (212) 202-7621
Email: omohammedi@otmlaw.com

*Counsel for Defendants World Assembly of Muslim Youth
and World Assembly of Muslim Youth International*

119