WHITE & CASE

April 15, 2026

<u>VIA ECF</u>

Honorable Sarah Netburn
United States District Court
Southern District of New York
Thurgood Marshall U.S. Courthouse, Room 430
40 Foley Square
New York, NY 10007

White & Case LLP
701 Thirteenth Street, NW
Washington, DC 20005-3807
**T** +1 202 626 3600

**whitecase.com**

**RE:** ***In re: Terrorist Attacks on September 11, 2001*, 03 MDL 1570 (GBD) (SN)**

Dear Judge Netburn:

The Republic of the Sudan, a foreign sovereign, faces the prospect of liability for one of the most horrific and investigated terrorist attacks in history. The CIA's proposal to produce only a handful of documents in response to Sudan's subpoena is woefully insufficient. The CIA does not contest that it possesses documents highly relevant to Sudan's defenses. *See generally* Opp'n (ECF 11899) to Sudan's Letter-Mot. to Compel (ECF 11854). Nor does the CIA contest that it is likely the *only* source of that evidence. *See* Mot. 4. Under this Court's precedent, the CIA's generalized assertion of burden and its conclusory national-security rationalization fall short of justifying the CIA's withholding of even previously classified information that is now decades old. *See In re Terrorist Attacks on September 11, 2001*, 523 F. Supp. 3d 478 (S.D.N.Y. 2021) ("*FBI Prod. Ord.*") (ordering the FBI to conduct additional searches and produce several categories of documents).

The CIA has not identified any specific national-security risk that would arise from acknowledging or disclosing any requested documents, which date from the 1990s or early 2000s. Particularly unjustified is the CIA's failure to respond to Sudan's request for records concerning the U.S. government's withdrawal of unsubstantiated intelligence reports about Sudan's purported support for terrorism. Already hamstrung by the war-time destruction of its state archives (*see* Mot. 5 (refuting Plaintiffs' spoliation allegations)), Sudan should not be forced to defend against intelligence that the U.S. government itself has deemed unreliable.

### A. The CIA has not established that Sudan's document requests are unduly burdensome.

Because the CIA does not contest the relevance of Sudan's requests, the CIA must "demonstrate an undue burden" to avoid compliance with Sudan's subpoena. *FBI Prod. Ord.*, 523 F. Supp. 3d at 489. But aside from generalized burden allegations (Opp'n 11-12; Williams Decl. ¶¶ 33-42), the CIA does not show with the required specificity the purported burden associated with any particular request or even the nature of the purported burden itself. *See Int'l Code Council, Inc. v. Skidmore, Owings & Merrill, LLP*, 2025 WL 1936704, at *3-4 (S.D.N.Y. July 15, 2025) (holding that nonparty must "show specifically how . . . each discovery request is burdensome," and finding alleged need to search of "thousands of folders" and "interview hundreds of employees" insufficient to show undue burden absent "detail, either in terms of cost or man hours" that the request would impose (cleaned up, citation omitted)).

The Honorable Sarah J. Netburn
April 15, 2026

Regardless, the CIA's generalized allegations of burden (Opp'n 11-13) do not depict an especially burdensome process. The CIA contends that document review and production to comply with both Sudan's *and* Plaintiffs' requests could take "days" and require more than "100 hours" of work by multiple knowledgeable reviewers searching "decentralized and compartmented" systems. *Id.* These alleged efforts—not unreasonable for a complex litigation of this magnitude—are insufficient to justify precluding further searches and production of relevant documents. *See FBI Prod. Ord.*, 523 F. Supp. 3d at 492, 495-96, 508, 513-15, 518-19 (ordering FBI to "attempt to locate" responsive documents and "produce as many as possible" notwithstanding that documents could be in "virtually every field office in the United States and every Legat overseas" and FBI had already spent "thousands" of hours to produce "thousands of pages" of documents).

Any workforce disruption is likely overstated and is not undue: searching for, reviewing, and declassifying documents for litigation are precisely the duties allocated to the "search professionals" in the CIA's Information Review and Release Division. Opp'n 11; Williams Decl. ¶¶ 1, 31-32; *see Flatow v. Islamic Republic of Iran*, 196 F.R.D. 203, 207 (D.D.C. 2000) (deeming insufficient U.S. government's allegations that compliance with subpoena would require "many 'thousands of person hours'" and "substantially impede[]" OFAC's "accomplishment of its mission," and characterizing such allegations as "bare assertions of a burden [that] do not satisfy the specificity requirement of an undue burden objection").

Furthermore, whether Sudan's subpoena is unreasonably burdensome "must be determined according to the facts of the case, such as the party's need for the documents and the nature and importance of the litigation." *Linder v. Dep't of Def.*, 133 F.3d 17, 24 (D.C. Cir. 1998) (citation omitted). The CIA does not argue that its alleged burden supersedes the undisputed importance to Sudan of the records sought, particularly given Sudan's inability—which the CIA also does not contest—to obtain those records from any other source. *See* Mot. 2-3 (explaining prejudice to Sudan if forced to mount a defense without the documents it seeks); *id.* at 5 (recounting the loss of Sudanese government archives during internal armed conflict); *In re Terrorist Attacks on September 11, 2001*, 2020 U.S. Dist. LEXIS 247199, at *350 (S.D.N.Y. Apr. 27, 2020) (ordering FBI to search for and produce additional documents where discovery could "not be obtained from another more convenient source"). Nor does the CIA assess its burden against the significance of this litigation, in which Plaintiffs purport to rely on selected pieces of U.S.-intelligence analysis as if they were admissible evidence of fact. Any ostensible burden on the CIA is far outweighed by the importance of the requested documents and the significance of this litigation. *See FBI Prod. Ord.*, 523 F. Supp. 3d at 494 ("The fact that these are very important cases with large sums of money at stake is relevant in determining the reasonableness of the subpoena." (quoting *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 407 (D.C. Cir. 1984))).

**B. The CIA's unsupported assertion of potential classification conflicts does not preclude the Court from compelling compliance with Sudan's document requests.**

The CIA has not formally invoked the state-secrets privilege (or any other privilege), nor could the CIA do so before "a complete examination of its files" to identify the purportedly privileged documents. *Northrop*, 751 F.2d at 406. Yet, with a misguided two-step argument, the CIA attempts to invoke a blanket national-security exemption from disclosure that, the CIA asserts, allows it to avoid "process[ing]" Sudan's subpoena and conducting a comprehensive search for responsive yet potentially privileged documents. Opp'n 13-16.

The Honorable Sarah J. Netburn
April 15, 2026

The CIA first contends—by analogy to a hypothetical scenario (*see* Opp'n 13-14; Williams Decl. ¶¶ 53-55)—that the existence or non-existence of "certain" records responsive to unspecified requests is itself a classified fact. Opp'n 14. The CIA then reasons that disclosing the existence of records "responsive to certain portions of [Sudan's] requests but not as to other portions" would also reveal classified information, with the result that the CIA "cannot respond" *at all* to Sudan's subpoena. *Id.* at 14, 16. Under this unbounded rationale, the CIA need not conduct a search or respond to *any* subpoena where it is merely possible that some responsive documents could not be acknowledged for national-security reasons. The Court should not allow this workaround to the state-secrets privilege. *See FBI Prod. Ord.*, 523 F. Supp. 3d at 496 ("It is of the utmost importance . . . that the Government comply with the formal requisites for assertion of [a state-secrets privilege] claim." (citation omitted)).

Contrary to the CIA's urging (Opp'n 15), the Court need not defer to the CIA's *ipse dixit* argument-by-analogy, because the Opposition lacks *any* allegations showing how acknowledging or producing any information responsive to Sudan's requests poses a "plausible and substantial" danger to national security. *FBI Prod. Ord.*, 523 F. Supp. 3d at 496 (citation omitted); *see also ACLU v. United States Dep't of Def.*, 901 F.3d at 134 (cited at Opp'n 15) ("Deference to the executive's national security and military judgments is appropriate only where we have sufficient information to evaluate whether those judgments were logical and plausible."); *Zuckerbraun v. Gen. Dynamics Corp.*, 935 F.2d 544, 547 (2d Cir. 1991) (holding that the court must "satisfy[] itself that there is a reasonable danger that disclosure of the particular facts in litigation will jeopardize national security"). As this Court has observed in this MDL, "[s]imply saying 'military secret,' 'national security' or 'terrorist threat' or invoking an ethereal fear that disclosure will threaten our nation is insufficient to support the [state-secrets] privilege." *FBI Prod. Ord.*, 523 F. Supp. 3d at 498 (quoting *Al-Haramain Islamic Found., Inc. v. Bush*, 507 F.3d 1190, 1203 (9th Cir. 2007)). Indeed, the CIA's own proposals (Opp'n 5-7) confirm that it may process and respond to Sudan's document requests without creating a national-security risk.

But the CIA's conduct in this MDL undermines the credibility of the agency's national-security assertions and underscores the need for an order from the Court compelling production. The CIA recently produced to Sudan reports that are now *more* heavily redacted than the previously disclosed versions. *Compare, e.g.*, Ex. L at 1-10 (CIA report as produced by CIA to Sudan on Mar. 20, 2026), *with* Ex. M at 7-10 (same CIA report as produced to other plaintiffs and filed in a separate action in this MDL (ECF No. 9624)). The CIA offers no explanation for its withholding of previously disclosed information. And the CIA cannot complain about the burden of a classification review when it is expending resources to re-process and redact already disclosed information.

The CIA's FOIA authorities (Opp'n 15) only reinforce that the CIA's speculative assertion (*see* Opp'n 13-14; Williams Decl. ¶¶ 53-55) does not justify deference to the agency's determination that it cannot comply with Sudan's subpoena. In *Sims*, the Supreme Court upheld deference to the CIA's denial of a FOIA request for the names of institutions cooperating with the CIA's brainwashing research, but only where the agency specifically explained how that disclosure could facilitate "deduc[ing] the identities of the individual researchers who are protected 'intelligence sources.'" 471 U.S. at 180. Similarly, in *Larson*, the CIA detailed how "[o]nly certain people would have been in a position to know" the information in withheld cables, such that disclosure could reveal the CIA's source. 565 F.3d at 864. And in *ACLU v. United States Department of*

3

The Honorable Sarah J. Netburn
April 15, 2026

*Defense*, the Second Circuit found the U.S. Department of Defense's basis for nondisclosure sufficiently "logical and plausible" where military commanders assessed that extremists would "undoubtedly use the [requested] photographs . . . to encourage threats to U.S. service members and U.S. Government personnel." 901 F.3d at 135 n.12. Here, the CIA has not explained how any of Sudan's particular requests for decades-old information would reveal the identities of currently protected intelligence sources or could be used to incite threats against the United States today.

Other cases cited by the CIA further suggest that, for historical intelligence records to be withheld on national-security grounds, they must pertain to an "active intelligence activity." *ACLU v. Dep't of Just.*, 681 F.3d at 70-71 (cited at Opp'n 15); *see also* Exec. Order No. 13,526, §§ 1.5(c)-(d), 75 Fed. Reg. 714-15 (Jan. 5, 2010) (providing for 25-year duration of classification, subject to specific extension procedures, and that "[n]o information may remain classified indefinitely"). In *ACLU v. Department of Justice*, the Second Circuit concluded that the CIA Directors' "detail[ed]" declarations established that disclosure of a memorandum on the discontinued practice of waterboarding would nevertheless "reveal the existence and scope of a highly classified, active intelligence activity." 681 F.3d at 70-71. In *Wilner v. NSA*, the Second Circuit relied on NSA officials' affidavits explaining "in 'detailed, nonconclusory' fashion" that confirming or denying the existence of requested records would harm national security because the request covered an intelligence program that (albeit subject to the Foreign Intelligence Surveillance Court's oversight) still "[is] critical to the national security of the United States" and disclosure of which would reveal information about "our current capability." 592 F.3d at 66, 74-75 (cited at Opp'n 16-17) (alteration in original). The CIA is silent about how Sudan's requests for information from the 1990s and early 2000s pertain to any active intelligence activity or the CIA's current capability.

### C. The CIA's alternative proposal is unreasonable and inadequate.

The CIA's ultimatum to Sudan (Opp'n 16-17) is unacceptable for several reasons (*see* Mot. 4-5).

1. <u>Failure to encompass searches for records concerning withdrawn intelligence reports (Request No. 12).</u> The CIA does not dispute that the U.S. government withdrew intelligence reports of Sudan's purported support for terrorism or that records on this topic would be highly relevant to Sudan's defense. *See* Ex. I, Carney & Ijaz, *Intelligence Failure* at 1 (ECF 11855-9) (former U.S. ambassador to Sudan recounting that in 1996 the CIA "scrapped more than 100 of its reports on Sudan" after uncovering faulty intelligence). Nor does the CIA justify exclusion of this topic from its proposed search based on any risk of damage to national security. The CIA may not fail to declassify responsive records on this topic to "prevent embarrassment to a person, organization, or agency." Exec. Order No. 13,526, § 1.7. Having failed to raise any specific objection to acknowledging or producing such records, the CIA must produce them.

2. <u>Arbitrary "capping [of] the number of responsive documents" to be produced at 15 (or 20) reports "to limit the volume of time-consuming reviews" (Opp'n 16).</u> The CIA's unilateral limit on production is premature before any search has been done, unfounded without specific detail on the cost and time to review the reports, and—as a cap—operates only to prejudice Sudan. The CIA's condition to cooperation is unreasonable and should not override the Court's authority to manage discovery.

3. <u>Refusal to incorporate 4 additional search terms and other spelling variations.</u> The CIA offered to conduct searches using 12 terms of its choosing in response to Sudan's subpoena—

4

The Honorable Sarah J. Netburn
April 15, 2026

compared to 69 search terms in response to Plaintiffs' subpoena. Ex. F (ECF 11855-6). Despite the disparity, and to progress discovery, Sudan tentatively agreed to the search terms, reserving all rights, while asking the CIA to add 4 names and certain spelling variations. Ex. G (ECF 11855-7). Contrary to the CIA's contention (Williams Decl. ¶ 26, n.13), these additional terms figure prominently in Sudan's subpoena (*see* Ex. A, Reqs. 8 & 10 (ECF 11855-1)). The CIA refused to compromise, and now argues that incorporating Sudan's input "could result in too *few* results or too *narrow* a list of [issues]." Opp'n 17 (emphasis added). The CIA's inflexible position is incoherent, as Sudan's request to *add* 4 search terms could only *expand* (if marginally) the number of responsive documents. The CIA should be compelled to confer with Sudan on mutually satisfactory search terms and a search methodology. *See* Mot. 1.

4. <u>Limitation of search to "reports" only and exclusion of supporting records.</u> Sudan understands the CIA's search proposal to cover only reports and not any underlying records. *See* Ex. G (ECF 11855-7). The CIA offers no rationale for excluding relevant supporting documents, which are critical to assessing the reports' trustworthiness, especially in light of the CIA's withdrawal of numerous reports from the relevant period. The need for more complete records, including underlying documents, to test the reports' conclusions is made evident by the CIA's redactions in the documents produced to Sudan. The CIA has redacted previously disclosed phrases that undermine the agency's conclusions and show the limitations of its sources. For example, in one report, the CIA has now redacted the previously disclosed phrases "Fragmentary information suggests" and "Fragmentary reporting indicates," conspicuously leaving unredacted conclusions that now appear unqualified. *Compare* Ex. L at 3, 4 *with* Ex. M at 3, 4.

5. <u>Expansion of redactions to previously disclosed documents.</u> The CIA's proposal to reprocess previously disclosed reports identified by Sudan (Opp'n 18) has proven unproductive. As discussed above, the CIA has evidently expended unnecessary effort to re-perform its review of previously declassified material and apply broader redactions. *See* Exec. Order No. 13,526, § 1.7(c) (requiring that "[i]nformation may not be reclassified after declassification and release to the public under proper authority").

Sudan attempted to address the deficiencies in the CIA's proposal through the meet-and-confer process, emphasizing its willingness to cooperate to reduce the burden on the CIA. *See* Mot. 5 (summarizing the meet-and-confer process). Yet the CIA refused to modify its proposal. *See* Erb Decl. ¶ 11 (ECF 11855) (summarizing January 2026 call with the CIA).

\* \* \*

For these reasons and those in its letter-motion, Sudan asks the Court to compel the CIA to comply with Sudan's subpoena by June 30, 2026, and afford Sudan the opportunity to seek additional relief as needed in support of its discovery of the United States, including the CIA. Sudan reserves all rights with regard to any objections or disputes that may arise over the course of the CIA's document production. Sudan also preserves and expressly does not waive any of its rights, defenses, privileges, and immunities, including those based on jurisdiction and sovereign immunity.

WHITE & CASE

The Honorable Sarah J. Netburn
April 15, 2026

Respectfully submitted,

**WHITE & CASE**

/s/ *Nicole Erb*
Christopher M. Curran
Nicole Erb
Nicolle Kownacki
Celia McLaughlin
701 Thirteenth Street, NW
Washington, DC 20005
Phone: (202) 626-3600
Fax: (202) 639-9355
ccurran@whitecase.com
nerb@whitecase.com
nkownacki@whitecase.com
cmclaughlin@whitecase.com


*Counsel for the Republic of the Sudan*

cc: Counsel of Record (via ECF)