A Report for the Office of Omar T. Mohammedi, LLC, New York, on the WAMY Case
May 2020
by Khalid Yahya Blankinship, Temple University

I have written this report based on my expertise in the area of Islamic Studies, including proficiency in the Arabic language. I am a tenured faculty member at Temple University, holding the rank of associate professor. I regularly teach courses on Islam as well as Religion in the World, Religion and Science, and Earth Ethics. In addition, I served as Chair of the Department of Religion 1998-2002, Departmental Graduate Director 2003-2013, and Chair again from 2013 to 2017. I have had many years of experience in the Middle East, having lived in Egypt for a total of about eleven years and Saudi Arabia for one year. A copy of my CV is attached as Exhibit 1. This report contains an examination of religious and Islamic terms, and explains how those terms can be understood when viewed through the lens of their historical and religious contexts. The examination of such terms is necessary to provide a proper context to a Western audience unfamiliar with the history and teachings of Islam and to refute certain opinions proffered by Plaintiffs' experts that are based upon Islamic terms.

As a scholar, and in particular a historian, I begin with the classical texts, from which I trace the concepts discussed below by locating them in their contexts and then examining them critically in the light of modern academic scholarship. I do not rely on translations, but rather go back to the original Arabic sources wherever relevant. I use all the relevant information and cite sources wherever source citation is needed.

## A. Definitions:

### 1. Islam.

Islam is a major world religion, not a political movment. It is primarily a devotional system of worship and moral teachings and code leading to salvation. Islam has succeeded historically because its followers have been able to appropriate the religion as a device to achieve order for themselves in this world and individual salvation in the afterlife. Like other religions, Islam has many rules, but its main point is living a moral life pleasing to God to gain salvation. In this, it greatly resembles Christianity; indeed, one could say that, apart from the major point of Muslim rejection of the divinity of Christ, Islam and Christianity in their broad outlines agree on most things. Islam also closely resembles Judaism in most respects.

Followers of Islam are called Muslims. According to the Pew Research Center in 2009,[1] Muslims comprised 23% of the human race. Muslims are found in nearly all countries on earth. Islam was founded by the Prophet Muhammad ibn 'Abd Allâh between the years 609 and 632 AD in western Arabia, so the religion has existed now for over fourteen centuries and indeed constitutes, similar to the other great religions, one of the largest of all human ventures in history. Because Islam is very large in terms of time, space, and numbers, it contains a great plethora of manifestations and views that cover a major part of all the categories of human experience. It is necessary to emphasize this variety of manifestations of Islam to counter the contrary false stereotype that Islam is monolithic and that all Muslims believe and behave in a similar manner. Sometimes this stereotype is contributed to both by Muslims, who want to

---

[1] "Mapping the Global Muslim Population: A Report on the Size and Distribution of the World's Muslim Population," Washington, DC: The Pew Forum on Religion & Public Life and the Pew Research Center, October 2009, p. 1.


EXHIBIT
WAMY EX. 13

present themselves as united, and anti-Muslim people, who want to portray Islam as a monolithic threat, but despite this agreement, the stereotype is not correct and easily refutable.

Islam in general is divided into two distinct groups: Sunnîs and Shî'îs, whose percentages of the total number of Muslims traditionally are about 88% and 12% respectively. Sometimes these two groups themselves are portrayed as monolithic assemblages, each being like a single Protestant church or denomination, but this is not correct, as the Sunnîs and Shî'îs each contain a great variety of tendencies, some of them formalized into sects, others not. Also, another Pew survey from 2012 showed that many people do not identify themselves as belonging to any group, rather calling themselves "just Muslim."[2]

So if the Muslims show such little unity, then who or what is the authority among them to organize them and tell them what to do? Unlike hierarchical Roman Catholicism, which has its pope and an ordained priesthood, there is neither any central religious authority nor any ordination in Islam. After the Prophet Muhammad died in 632 AD, a succession of rulers with the title of caliph (Arabic *khalîfah*) asserted political authority over all Muslims, but this collapsed in 740 AD, never to revive, and eventually the title of caliph itself for the ruler was largely abandoned. With no concept of any absolute or central religious authority, Muslims, particularly Sunnîs, turned to rely on scriptural and quasi-scriptural texts as the sources of their religion. These prescriptive texts for the most part consist of the Qur'ân and the Sunnah, the latter written down as the Hadîth, all being traced back to the Prophet Muhammad (for these, see below under Qur'ân and Hadîth). To interpret these texts, they also developed a kind of informal scholastic authority based on learning and mutual recognition that resembled the authority of the rabbis in Judaism more than it did any Christian paradigm. The scholars were called the *'ulamâ'* (singular *'âlim*), a word literally meaning "knowers;" its usage is derived from Qur'ân 35:28. Many hadiths (traditions traced back to the Prophet Muhammad) also reinforce and validate the position of the *'ulamâ'* in having conclusive interpretive authority.[3] This authority of the *'ulamâ'* was not organized in any formal institutional framework in either Sunnism or Shî'ism until recent times. Rather, students studied with older scholars until the students gradually became recognized as scholars in their own right, both by other scholars and by the people. This arrangement worked particularly well because most of the literate people were a part of the scholarly network, and the literate were few in classical times. The scholars, like the Jewish rabbis, were not organized by or under any state authority, but remained quite independent of and sometimes in opposition to the Muslim rulers, who also frequently sought support from the scholars, who gave it only in limited amounts.[4]

This general background is relevant to the structuring of religious authority in the modern Kingdom of Saudi Arabia as well. While, as a modern state, Saudi Arabia obviously has maintained a close relationship with the religion of Islam, the *'ulamâ'* of the country also enjoy autonomy while acknowledging the legitimacy of the Saudi state. This paradigm goes back to the pact made in 1744 by the founding Saudi amîr of Najd, Muhammad ibn Sa'ûd (c. 1685-1765), with the premier Najdî scholar of his day, Muhammad ibn 'Abd al-Wahhâb (1703-1792), a pact which is still operative in Saudi Arabia even now after 276 years. According to the pact, Ibn

---

[2] "The World's Muslims: Unity and Diversity," Washington, DC: The Pew Forum on Religion & Public Life and the Pew Research Center, 9 August 2012, pp. 27-30.

[3] Muhammad ibn 'Abd Allâh al-Khatîb al-Tabrîzî, *Mishkât al-masâbîh*, edited by Muhammad Nâsir al-Dîn al-Albânî, Beirut: al-Maktab al-Islâmî, 1405/1985, Vol. 1, pp. 74-75.

[4] Claude Gilliot et al., "'Ulamâ'," *Encyclopaedia of Islam*, 2nd ed., Leiden: E. J. Brill, 2000, see especially pp. 803, 805.

Sa'ûd would run the state politically, while Ibn 'Abd al-Wahhâb would make religious decisions according to the texts of the Qur'ân and Sunnah. Under this arrangement, the *'ulamâ'* of Najd have remained loyal to the Saudi dynasty in general, according the ruler the power to govern, while the ruler does not interfere in religious matters. When Saudi Arabia expanded beyond Najd in the twentieth century to encompass the Hijâz (1924-1925), 'Asîr (1930), Jîzân (1934), Hâ'il (1921), al-Jawf (1921), and al-Ahsâ' (1913) as well, the Sunnî *'ulamâ'* of those areas also acknowledged the Saudi ruler and the legitimacy of his rule, but they nevertheless they did not necessarily join the religious tradition of Najd, sometimes denominated "Wahhabism" by outsiders, which remained a main pillar of Saudi dynastic support. This Najdî tradition differed from most other Muslim traditions in following the Hanbalî school of law and placing great emphasis on certain particular beliefs and practices. (For more on these points, see under Wahhabism, below.)

In the recent era in Saudi Arabia, organizations such as Râbitah al-'Âlam al-Islâmî (the Muslim World League) and al-Jam'iyyah al-Âlamiyyah li-l-Shabâb al-Muslim (the World Assembly of Muslim Youth or WAMY) were eventually set up in 1962 and 1972. The causes WAMY supports are: attempting to persuade backsliding Muslim youth to come back to Muslim practice, strengthening the knowledge and practice of Muslim youth of Islam, and the peaceful propagation of the religion. None of these causes are in anything but the religious realm; WAMY has deliberately avoided politics in order not to compromise their status as an NGO. Rather, WAMY basically works on trying to get people to uphold and perform the prescribed practices of Islam for their own salvation. These practices consist of the five pillars of Islam:

1) Bearing witness that there is no deity but God (*Allâh* in Arabic) and Muhammad is God's messenger
2) Performing the formal worship (salâh) five times a day, in a mosque (masjid) whenever possible
3) Paying a charity levy (zakâh), which can be spent under eight categories (for detailing of this, see under Zakat, below)
4) Annually fasting from dawn to sunset during the 29 or 30 days of the month of Ramadân
5) Performing the pilgrimage to Makkah once in one's lifetime if possible[5]

All of these actions help to please God and intercede for a person's soul on Judgement Day so that the person may enter paradise and avoid hellfire. While of course there are also other moral and ethical teachings, these five take precedence. As basic Muslim teachings, they are upheld as the most important practices by WAMY just as they are by almost all other Muslims.

**2. Qur'ân.**

The Qur'ân is the unique scripture of Islam, revealed by God to the Prophet Muhammad gradually over a period of 23 years (609-632 AD) in Makkah and al-Madînah, both of these cities which today are part of Saudi Arabia. Revealed to him by God through the mediacy of the angel Gabriel, Muhammad dictated the words to scribes, producing by the end of his life a modest-sized book in his own language, Arabic. This Arabic text, held to be the very word of God to this day, is utilized liturgically in Muslim worship, listened to, often memorized, cultivated, continuously consulted, studied, commented on, and invoked in conversation by

---

[5] These are all attested in Qur'ân 2:177, 183-187, 196-203. See also Dr. Abdul Wahab Noorwali's explanation of the 'aqîdah or creedal belief system of Islam in his deposition, p. 59.

Muslims. Its role is analogous to the Tanakh in Judaism and the Bible in Christianity. Like the Tanakh in Judaism, where only the Hebrew original is authoritative, so in Islam only the Arabic original of the Qur'ân is authoritative, while translations, which are many, are not, because they are merely interpretations and not the original text itself. This point is important, because it means any particular English translation of the Qur'ân's words cannot be used to exactly define or delimit the meaning of the text.

As for its content, the Qur'ân contains various themes, which might be classified under six general rubrics:

1. God's nature, power, and creation
2. Exhortations to reflect on God's blessings
3. Stories of the former prophets
4. Advice to Muhammad, his Companions, and by implication the later Muslims, including exhortations to do good
5. Legal prescriptions, sometimes stated as commandments, but often appearing as advice (the smallest category); these are the verses taken as a basis for legal dicta
6. Descriptions of the Judgement Day, Heaven, and Hell

Nearly all of the verses of the Qur'ân can be assigned to one or another of these categories.

As God's own word, the Qur'ân is the authority to be obeyed in Islam above all.

### 3. Hadîth.

The Hadîth[6] is the corpus outside of the Qur'ân consisting of traditions traced back to the Prophet Muhammad. While Sunnîs and Shî'îs agree on the same Qur'ân text, they have different collections of Hadîth. The Hadîth is composed of individual traditions traced back to the Prophet Muhammad. Each tradition contains a text (*matn*), ranging in length from a couple of words to several pages, and presenting words, acts, or silent approvals attributed to the Prophet. In addition, every hadîth tradition has a chain (*isnâd*)of transmitters or guarantors of the text's veracity. Individual hadiths have been graded according to whether they are sound, fair, weak, or rejected by various specialist scholars over the centuries.

This complexity is increased by the large size of the Hadîth corpuses of both the Sunnîs and Shî'îs. There are about 200 different original, primary Sunnî collections of Hadîth, all first written down between about 775 and 1150 AD and all different from each other, though sharing much of their content. Many of these collections are huge, multivolume compendia. Thus, *al-Musnad* of Ahmad ibn Hanbal (780-855) contains about 27,000 hadîths, which, because of repetitions, only amount to about 7,000 different hadîths. Other very large collections include *al-Mu'jam al-Kabîr* of al-Tabarânî (874-971), which has some 32,000 hadîths and *al-Sunan al-Kubrâ* of al-Bayhaqî (994-1066), with about 22,000 hadîths. As so many of these hadîths are repetitions, repeated in the same work as well as in different works, the total number of different hadiths in existence is probably not that high, maybe in the neighborhood of 20,000 to 40,000.

Out of all the Sunnî Hadîth collections, however, *al-Jâmi' al-Sahîh* of al-Bukhârî (810-870) and *al-Sahîh* of Muslim (c. 820-875) are considered the most authoritative, with all of their contents being judged by most authorities to be sound, the highest grading. Al-Bukhârî contains about 2,600 different hadîths, while Muslim has about 3,000 different ones, but, as they share

---

[6] For the best overall survey of the Hadîth in English, see Jonathan A. C. Brown, *Hadith: Muhammad's Legacy in the Medieval and Modern World*, 2nd ed., London: Oneworld Publications, 2017.

about 1,900 of these, the two *Sahîh*s together have only about 3,700 different hadîths. In addition, four other collections, those of Abû Dâwûd (818-889), al-Nasâ'î (830-915), al-Tirmidhî (825-892), and Ibn Mâjah (824-887), are also considered a degree above the many others, so that they plus al-Bukhârî and Muslim constitute what are called the Six Books, and sometimes these are described as "canonical." However, that term is misleading, because in the end, each hadîth is judged individually on the merits of its chain of transmitters, and to a lesser extent on its contents, rather than on the rank of the corpus in which it is embedded, with the exception of the two *Sahîh*s of al-Bukhârî and Muslim. One other book of Hadîth and other material that is highly esteemed is *al-Muwatta'* of Mâlik (c. 715-795), a foundational older work that was largely incorporated into later collections.

The Shî'îs have in Hadîth the Four Books, which in effect counter the Six Books of the Sunnîs, and like the Sunnîs they also have other collections outside of the Four Books. Shî'îs and Sunnîs do not accept each other's Hadîth collections, nor do they quote from them, except polemically. The Hadîth do not have as much defining importance for the Shî'îs as they do for the Sunnîs, because the modern Shî'î *'ulamâ'* who are accorded the status of interpreters (*mujtahid*s) have great independent interpretive authority and usually do not seem to regard themselves as bound to the texts of their hadîths to the extent that the Sunnîs are. The Four Books of the Shî'îs are: *al-Kâfî* of al-Kulaynî (864-941), *Man Lâ Yahdaruhu al-Faqîh* of Ibn Bâbawayh (923-991), and *al-Istibsâr* and *Tahdhîb al-Ahkâm* of al-Tûsî (995-1067). It should be noted that these works contain very many of the same individual hadîths that are in the Sunnî collections, but with different chains of transmitters.

**4. Sharî'ah**.

The Sharî'ah is the corpus of Muslim jurisprudence that began to be elaborated in writing in the 8th century with *al-Muwatta'* of Mâlik and continues to be added to to this day. Therefore, it is recorded in an extremely vast literature, which resembles to some extent the huge corpus of orthodox Jewish law or Halakha, whose methodology is very similar. While the Sharî'ah is central to Muslim practice and life, it is not a code of law, in that it does not have particular, single prescriptions for given situations, but rather consists of a large number of commentaries and rulings that are often at variance with one another. The way that this worked classically was that the judge would base his ruling on his selection of these varied writings, extracting from them what seemed best for the case being considered. This led to tremendous regional differences and to the formation of several different schools of law (*madhhab*s) in the Sunnî world, all of which continue to exist in some form or other. Therefore, by no means can one speak of a unified Muslim Sharî'ah.

Of course, in the view of many modern persons, westerners and Muslims alike, the Sharî'ah should be as unified as the Code Napoléon, and Muslim scholars over the centuries have certainly striven to harmonize it as much as they could. But without any central law-issuing authority, such attempts could never be complete. Nevertheless, they laid down their various arguments in books of the principles of jurisprudence (*usûl al-fiqh*), and these tried to settle what the sources of the Sharî'ah should be. The most influential of these *usûl* works was *al-Risâlah* by al-Shâfi'î (767-820), which laid down four sources of the Sharî'ah: the Qur'ân, the Sunnah or the Way of the Prophet embodied in the Hadîth, the consensus (*ijmâ'*) of the community as represented by the scholars, and reasoning by analogy (*qiyâs*) from already-established instances if no text or consensus existed. By this means al-Shâfi'î tried to exclude mere opinion or free reasoning from the formulation of the law in order to preserve its divine basis. The already-

existing Hanafî (attributed to Abû Hanîfah, 699-767) and Mâlikî (attributed to Mâlik, c. 715-795) schools did not accept al-Shâfi'î's list of sources of the Sharî'ah, however, as each had a number of additional sources, the Hanafîs including juristic preference (*istihsân*), which al-Shâfi'î viewed as opening the door to mere opinion, and the Mâlikîs including custom as well as public interest (*maslahah* or *istislâh*), which al-Shâfi'î also believed opened the door to mere opinion. However, later Shâfi'î scholars and jurists had to allow the similar principle of continuity (*istishâb*) and also had to recognize public interest, because the existing source texts, however extensive, were simply not comprehensive enough to cover everything.

Another, different trend starting in the eighth century as well was that of Ahl al-Hadîth, the people of the Hadîth, who rejected jurisprudence as casuistry and tried instead to follow only the Qur'ân and the Sunnah as embodied in the Hadîth, by that means going back directly to the authority of the Prophet and eschewing any intermediaries such as jurists. It was this school, along with the Shâfi'îs, who were largely responsible for imposing the Hadîth on Sunnî Islam, and the other schools gradually accepted the Hadîth too. But the simplicity afforded by the Ahl al-Hadîth position required a complete literalism in interpretation, which, because of the ambiguous nature of language, was ultimately not possible. The upshot was that the Ahl al-Hadîth too had to introduce reasoning into their school, however reluctantly. This especially became the case when they also formed themselves into the fourth school of law, the Hanbalî, tracing themselves back to the Hadîth master, Ahmad ibn Hanbal (780-855). This formation came about after the year 1000. Once the Hanbalîs were a school like the Hanafîs, the Mâlikîs, and the Shâfi'îs, they were constrained also to acknowledge the legitimacy of these others, but they still tended more than the others to view themselves as exclusively correct.

Over time, the four schools mostly became prevalent in particular geographical regions. Thus, the Hanafîs were prevalent in Turkey, Central Asia, and South Asia, the Mâlikîs in North and West Africa as well as in the area of the present-day UAE, and the Shâfi'îs in Lower Egypt, Syria, South Arabia, East Africa, Sri Lanka, and Southeast Asia. Only the Hanbalîs dwindled and did not really prevail anywhere, though they continued to exist as a minority. But with the rise of Muhammad ibn 'Abd al-Wahhâb and the Sa'ûdîs in the 18th century, Hanbalism, which by then mainly existed, barely, in Syria and Egypt, took on a new life as the official school of the new Sa'ûdî state, and so it has remained to this day. The Hanbalî school is otherwise dominant only in Saudi Arabia's small neighbor, Qatar. This means that Saudi scholars tend to see the Hanbalî school as their exclusive preserve, and they have tried to promote its teachings in competition with the other schools.

It should be noted that the Shî'îs also have their own legal schools, the Ja'farî or Imâmî or Twelver school prevalent in Iran, Azerbaijan, Bahrain, Iraq, and Lebanon, but also found elsewhere, the Zaydî prevalent in North Yemen, and the Ismâ'îlî or Sevener found as a minority in India and other places. The 'Alawî and Druze offshoots of Shî'ism found mainly in Turkey, Syria, and Lebanon do not really have legal schools. The Shî'î schools of the Ja'farîs and Zaydîs are very similar to the Sunnîs on most legal points, but have salient differences on a few points.

Despite its many differences, the Sharî'ah set the patterns and limits for the behavior of individual Muslims as well as Muslim communities as collectivities. All possible acts were graded into a number of categories according to how necessary it was for individual Muslims to perform or avoid them. A comprehensive listing of these categories with their Arabic terminology includes:

1). What is required of all individuals (*fard 'ayn*).

2). What needs to be done only by a sufficient number of individuals, which relieves everyone else from having to do it (*fard kifâyah*).

3). Actions whose performance was considered necessary (*wâjib*) but whose omission is not punished in the afterlife by God; this is used especially in the Hanafî school of law.

4). Actions done habitually by the Prophet that one ought to emulate but whose omission is also not punished in the afterlife (*sunnah mu'akkadah*=confirmed sunna); this somewhat overlaps with the third category.

5). Actions done occasionally by the Prophet whose occasional performance was preferable (*sunnah ghayr mu'akkadah*).

6). Actions whose performance is desirable but not required (*mustahabb*).

7). Actions that are merely permissible, with no recommendation either to do or not to do them (*mubâh*).

8). Actions that are disliked or undesirable, but not punishable if done (*makrûh*).

9). Actions which are prohibited and whose doing is consdired punishable by God in the afterlife (*harâm* or *munkar*).[7]

Obviously, several of these categories partially overlap. Frequently, these are collapsed into five categories only, with 1), 2), and 3) being described as obligatory (*fard* or *wâjib*), while 4), 5), and 6) are all combined into a category of *sunnah*=the Prophet's normative practice, also called *mandûb*.[8] Of the nine that I have listed, only the first (*fard 'ayn*) is absolutely required of every Muslim who is able and only the last is absolutely forbidden and to be avoided; the rest are simply a graduated scale of desirability or undesirability without absolutes.[9]

Universal obligations of the first category included the basic forms of worship in the religion. For the most part, compliance with all these categories, even the obligatory ones, has usually been voluntary and only regulated by individuals themselves, although the state of course would intervene with normal police powers to uphold public safety and order and to prevent and punish criminal activity.

Although the Sharî'ah is supposed by many to be a completely comprehensive legal system that was fully applied as the law of the land in classical times, that is, before the intrusion of European colonialism into the Muslim world, in reality it was only ever partially applied and developed. The Sharî'ah covers both Muslim worship practices (*'ibâdât*) and the human relations (*mu'âmalât*) that are the subject of most legal systems. Naturally, the detailing of the practices and rules of worship is the most thoroughly elaborated area, which includes prescriptions for individual comportment as well as the worship itself. Human relations in the Sharî'ah might perhaps be divided into the following categories, in descending order of elaboration:

1). Personal status, including marriage, divorce, custody and guardianship of children, inheritance, and family charitable foundations (*waqf*s)

2). Commerce, business, and trade

---

[7] Ahmad ibn Naqîb al-Misrî, *The Reliance of the Traveller: A Classic Manual of Islamic Sacred Law*, ed. & translated by Noah Ha Mim Keller, Dubai: Modern Printing Press, 1991, pp. 32-37; Wahbah al-Zuhaylî, *Usûl al-fiqh al-islâmî*, Damascus: Dâr al-Fikr, 1406/1986, Vol. 1, pp. 46-93; Muhammad Hashim Kamali, *Principles of Islamic Jurisprudence*, Cambridge, UK: Islamic Texts Society, 2003, pp. 413-431; Abdur Rahim, *The Principles of Muhammadan Jurisprudence According to the Hanafî, Maliki, Shafi'i and Hanbali Schools*, Lahore: Law Publishing Company, 1978, pp. 197-198.

[8] Ibn Naqîb, 30-31; with different namings, Zuhaylî, *Usûl*, 1:44-45.

[9] Ibn Naqîb, 37-46.

3). Criminal punishments
4). Organization of government or administration
5). International relations

Of these categories, the first makes up the bulk of the law and is the part of it that remains in practice in many places with large Muslim populations, even in India. The second was also very important because of the ethical teaching about fairness in trade which is even emphasized in the Qur'ân (6:152; 7:85; 11:84-85; 17:35; 26:182; 55:8-9; 57:25; 83:1-3), but it was never as well developed as the personal status law, because it had to be enforced by the state, and that proved difficult. Thus, for example, the clearly-delineated prohibition of taking or paying interest in transactions (Qur'ân 2:275-276, 278-280; 3:130; 4:161: 30:39) was widely evaded already in premodern times, with two of the four schools of law even acknowledging legal devices to get around the prohibition. The third category, criminal punishments, was even less developed and often not enforced in practice. The rulers often found the Sharî'ah courts to be too lenient because of the severity of the requirements for evidence, so they resorted to a bureaucratic appeals procedure of their own called *mazâlim*, where the rules of the Sharî'ah, particularly the stringent rules of evidence, were not observed.[10] Because of this incomplete elaboration and application of the Sharî'ah even in classical times, the Sharî'ah cannot be said to have declined as much as has been claimed by some Muslims, because the personal status provisions are still applied and much of the rest never was. Saudi Arabia is unique in being the country which claims the Sharî'ah has always been its sole legal system. But even in Saudi Arabia there exists a body of civil law, for example, traffic law, that has grown up alongside of the traditional Sharî'ah and coexists with it, just as attorneys have made their appearance, despite their not being included in the Sharî'ah.

**5. Jihâd**.

Jihad means "striving." It is a word mentioned a few times in the Qur'ân in contexts no one of which is clearly or only military (9:24; 22:78; 25:52; 60:1). Indeed, there is a generally-accepted teaching in Sunnî Islam that the greater jihad is the internal struggle of a Muslim against the self, and Qur'ân 22:78, which states, "And strive for God as He should be striven for," is taken by the commentaries as the starting point for this doctrine of the internal greater jihad.[11] This idea is also elaborated in certain hadîths, such as the one in which the Prophet is reported to have said, "The fighter of jihad is the one who struggles against his own self" (*al-mujâhidu man jâhada nafsahu*).[12] The struggle against the self is only one of several kinds of jihad identified by scholars in different classifications.

However, the most common usage of the term jihad in Hadîth and in jurisprudence (*fiqh*) is in its military sense of "just war." In this way, it parallels the concept of just war which is

---

[10] J. S. Nielsen, "Mazâlim," *Encyclopaedia of Islam*, 2nd ed.

[11] Abû Ishâq Ahmad ibn Ibrâhîm al-Tha'labî, *al-Kashf wa-al-bayân 'an tafsîr al-Qur'ân*, ed. Salâh Bâ 'Uthmân et al., Jiddah: Dâr al-Tafsîr, 1436/2015, Vol. 18, p. 413; Mahmûd Jâr Allâh al-Zamakhsharî, *al-Kashshâf 'an haqâ'iq ghawâmid al-tanzîl*, 3rd ed., Beirut: Dâr al-Kitâb al-'Arabî, 1407/1986, Vol. 3, pp. 172-173; Abul A'la Mawdūdī, *Towards Understanding the Qur'ān: English Version of Tafhīm al-Qur'ān*, translated and edited by Zafar Ishaq Ansari, Leicester: The Islamic Foundation, 1408-1428/1988-2007, Vol. 6, p. 70, esp. fn. 128; Wahbah al-Zuhaylî, *al-Tafsîr al-munîr fî al-'aqîdah wa-al-sharî'ah wa-al-manhaj*, Beirut: Dâr al-Fikr al-Mu'âsir, 1411/1991, Vol. 17, pp. 283, 285.

[12] Abû 'Îsâ Muhammad ibn 'Îsâ al-Tirmidhî, *al-Jâmi' al-kabîr*, ed. by Bashshâr 'Awwâd Ma'rûf, Beirut: Dâr al-Gharb al-Islâmî, 1998, Vol. 3, p. 217, hadîth no. 1621.

found in the other religions, including Christianity and Judaism, and is also considered by early Western European jurists, such as Hugo Grotius (1583-1645). Western and Muslim concepts of just war are strikingly similar.[13] Today, however, because of the growth in the destructiveness of weaponry, both that available to individuals or non-state actors and that possessed by states ranging up to nuclear weapons, the concept of war, including specifically just war, has become rather tarnished, masking the fact that just war has been a doctrine upheld by every state throughout history. Also, modern states continue to try to uphold it, venerating past military actions and celebrating the heroism of participants in current ones. The United States in particular continues to be invested in the concept of just war, and it has many contemporary apologists, such as Michael Walzer.[14] To try to differentiate one's own just war from that of others is an exercise in special pleading, especially if one is only considering the theory of it, which has usually been similar in most times and places.[15]

Indeed, Muslim rules of conduct in warfare closely resemble those set down in the Geneva Conventions and other human rights documents regarding the inviolability of civilians in the time of war. Just War theorists call this point, referred to in Latin as *ius ad bello*, "the principle of discrimination," which means that a war cannot be just if the antagonists do not make a clear distinction or discrimination between combatants and non-combatants and combatants and civilians (since non-combatants and civilians are not necessarily the same thing). This destroys the legitimacy of the "collateral damage" doctrine excusing civilian casualties which was developed in modern total war, particularly in World War II. In classical Muslim doctrine on war, just as in the Geneva Conventions, genuine non-combatants are not to be harmed. These categories of non-combatants not to be harmed in Muslim law specifically include women, minors, servants and slaves who do not take part in the fighting, the blind, monks, hermits, the aged, those physically unable to fight, the insane, the delirious, farmers who do not fight, traders, merchants, and contractors. These categories cover the entire civilian population. The main criterion distinguishing combatants from non-combatants is that the latter do not fight and do not contribute to the war effort.[16] Furthermore, wanton destruction of enemy property not contributing to their war effort is not allowed, and in particular crops and fruit trees are not to damaged.[17] In the early development of western rules of warfare, Hugo Grotius (1583–1645) produces a listing of those not to be harmed in a lawful war that closely parallels

[13] John Kelsay, *Islam and War: A Study in Contemporary Ethics*, Louisville: Westminster/John Knox Press, 1993, p. 36.

[14] Michael Walzer, *Just and Unjust Wars: A Moral Argument with Historical Illustrations*, New York: Basic Books, 1977.

[15] For a detailed survey of just war in theory and in practice in Islam and in the Western world, see Khalid Yahya Blankinship, "Parity of Muslim and Western Concepts of Just War," *The Muslim World*, 101 (2011), No. 3, pp. 412-426.

[16] Wahbah al-Zuhaylî, *al-Fiqh al-islâmî wa-adillatuhu*, 3rd ed., Damascus: Dâr al-Fikr, 1409/1989, Vol. 6, pp. 421-422; Wahbah al-Zuhaylî, *Âthâr al-harb fî al-fiqh al-islâmî: dirâsah muqâranah*, 3rd ed., Damascus: Da̅r al-Fikr, 1419/1998, pp. 494–503; Muhammad Hamidullah. *Muslim Conduct of State, Being a Treatise on Siyar, That Is Islamic Notion of Public International Law, Consisting of the Laws of Peace, War and Neutrality*, 7th ed., Lahore: Shaikh Muhammad Ashraf, 1397/1977, pp. 205, 207, basing himself mainly on al-Shaybânî of 'Abbasid times.

[17] Hamidullah, 205; Abû Hasan 'Alî ibn Muhammad al-Mâwardî, *al-Ahkâm al-sultâniyyah*, Cairo: Mustafâ al-Bâbî al-Halabî, 1393/1973, pp. 52, 54=Abu'l-Hasan al-Mawardi, *al-Ahkam as-Sultaniyyah*, translated by Asadullah Yate, London: Ta-Ha Publishers Ltd., 1416/1996, pp. 79, 81.

the list in the Muslim sources cited above.[18] Muslim rules prohibiting harm to non-combatants specifically outlaw and void any attempts to inflict harm on such persons through terrorist actions or whatever. This accounts for the rage other Muslims have felt against al-Qâ'idah and such movements that ignore the Muslim rules of warfare. Those movements have drawn the inspiration for their reckless depredations from the concept of total war practiced during World War II rather than from any Muslim concepts, however much they may try to appropriate Islamic texts to justify themselves.

A major issue in just war at this time is the question of aggressive versus defensive warfare. Despite the tendency of war gradually to become politically incorrect in our current time, defensive warfare continues to enjoy the support probably of a solid majority of humanity, on the basis that whoever is aggressed against should be allowed to resist and to fight back. Such defensive warfare, perhaps, might only be discountenanced by total pacifists, who clearly would be a tiny minority. On the other hand, aggressive warfare today has become rejected and even prohibited as a criminal act since the Nuremberg trials of German and Japanese leaders in 1946 after the Second World War. This has resulted in an unprecedented decline in interstate warfare since that time.

With regard to Islam, any attempt to identify jihad as aggressive warfare ignores how Muslims themselves have defined it as well as the historical development of the concept. It is true that Muslim states of long ago—500 years before the Christian  Crusades—when in a position of dominance, sometimes summoned others to submit and aggressively subdued them if they did not, and that this view was strongly incorporated into the early tradition. This aggressive and expansionist stance was especially true in the various waves of early expansion under the short-lived Umayyad Caliphate (661-750), which was the paramount power of its day.[19] But later Muslim states established normal relations with others on an egalitarian basis even in medieval times, eventually considering jihad as a defensive measure. This was accomplished because of the sovereign power of the imam or ruler to make war and peace. Although under the Umayyads expansion was considered the normal state of affairs, even they had to make peace occasionally on an equal or even a subordinate basis. As the rulers, the caliphs, who also bore the title imam, could make truces even of years of duration. When the caliphate gradually disintegrated and collapsed under the 'Abbâsids, especially from 861 on, and many independent regional Muslim states emerged, the local rulers used the provision of sovereign power to conclude truces and treaties to make permanent peace and eventually also to establish diplomatic relations with others, including non-Muslim polities. Embassies were exchanged, agreements made, trade established.[20] Non-Muslim foreign sojourners in a Muslim country were given a writ of protection by the Muslim ruler and not to be molested, an early form of visa.[21] By these and other steps, the Muslim world was gradually brought into the realm of normal politics with the Europeans. France and the Ottoman Empire even had an alliance against Austria and sometimes Spain that lasted for nearly three centuries. During all this time, the Muslims generally recognized the exclusive right of the sovereign power, the Muslim ruler, to make war and peace,

---

[18] Hugo Grotius, *The Law of War and Peace: De Jure Belli ac Pacis Libri Tres*, tr. by Francis W. Kelsey *et al.*, Oxford: Clarendon Press, 1925, pp. 723–743 (Bk. III, Ch. XI, Secs, III–XVIII); Blankinship, "Parity of Muslim and Western Concepts of Just War," pp. 416.

[19] Khalid Yahya Blankinship, *The End of the Jihâd State: The Reign of Hishâm Ibn 'Abd al-Malik and the Collapse of the Umayyads*, Albany: State University of New York Press, 1994, pp. 11-35.

[20] Majid Khadduri, *War and Peace in the Law of Islam*, Baltimore: The Johns Hopkins Press, 1955, pp. 239-250.

[21] Khadduri, 162-174.

and did not go out against this either trying to make private warfare or by protesting against the ruler's decisions.

In recent times, since around 1700 in particular, aggressive warfare by Muslims against others has become rare. The Ottoman Empire was permanently on the defensive against its enemies, Austria and Russia, from 1683 on. In India, the Mogul Empire collapsed rapidly after 1707. The only exceptions were the amirates of the Fulani ethnic group in West Africa, all of which also ceased aggressive warfare before 1900, when they were overwhelmed by European colonization.[22] The last time a Muslim state actually formally proclaimed a jihad was in 1914 when Ottoman Turkey, then a client state of Germany, did so at German urging, and the tone of the proclamation was even so very political and clearly couched in very defensive and apologetic language.[23]

In response to the modern interweaving of the world into a single political and economic system, the scholars of Islam have taken steps to define jihad clearly as defensive only.[24] According to many scholars, the only occasions for jihad are responding to aggression and to the need for freedom to preach the religion; any country that is at peace with the Muslims and does not prevent religious preaching may not be fought against.[25] Verses in the Qur'ân prohibiting aggression, such as 2:190, which says baldly, "Do not aggress, for God indeed does not love aggressors," are cited (see also 7:55). Other verses emphasize not attacking or harming people who are peaceful and do not fight or expel Muslims (60:8-9). Verses demanding submission to Islam from the Arabian pagans of the 7th century are explained as limited to those persons of that time and place (Qur'ân 9:1-18) and are not to be taken as general prescriptions to fight all the non-Muslims. On this point, Dr. Abdul Wahab A. Noorwali, the Assistant Secretary General of WAMY stated to *The Saudi Gazette*, in an interview published on 20 November 2001, that Islam strictly limited the concept of jihad:

> "Jihad in Islam has laws and requirements that only Muslim scholars and authorities have the right to apply, for certain causes which are 'pure self-defense.' No Muslim individual can undertake it as a personal decision, for this is not accepted at all by Islam."[26]

While it is true that jihad should always be waged only with pure intentions, in keeping with the doctrine of just war, and that these intentions include "fighting to establish justice, which is a supreme goal,"[27] that does not mean nor imply that it is not subject to many, many other conditions, which include defense, not offense.

---

[22] David Robinson, "Revolutions in the Western Sudan," in Nehemia Levtzion and Randall L. Pouwels, eds., *The History of Islam in Africa*, Athens, OH: Ohio University Press, 2000, pp. 131-152; David Cook, *Understanding Jihad*, Berkeley: University of California Press, 2005, pp. 71, 75-78.

[23] Rudolph Peters, *Jihad in Classical and Modern Islam*, Princeton: Markus Wiener Publications, 1996, pp. 55-57; C. Snouck Hurgronje, "The Holy War 'Made in Germany'," in *Verspreide Geschriften*, Bonn: Kurt Schroeder, 1923, Vol. 3, pp. 272-274; Cook, 92.

[24] Zuhaylî, *Âthâr al-harb*, 124-129; Muhammad Sa'îd Ramadân al-Bûtî, *al-Jihâd fî al-Islâm: Kayfa nafhamuhu? Kayfa numârisuhu?* 4th ed. Damascus: Dâr al-Fikr, 1426/2005, pp. 196-197; Mahmûd Shaltût, *al-Qur'ân wa-al-qitâl*, Cairo: Matba'at al-Nasr, 1948, translated in Peters, 60–101.

[25] Muhammad Khayr Haykal, *al-Jihâd wa-al-qitâl fî al-siyâsah al-shar'iyyah*, 2nd ed., Beirut: Dâr al-Bayâriq, 1417/1996, Vol. 1, pp. 586-597.

[26] See FED-PEC0235728.

[27] Statement attributed to Fadil Soliman, WAMY Executive Director in the US, 23 Oct. 2002, in powerpoint "Islam in Brief;" WAMY Int'l E000682-735 at E000730.

Just as Dr. Noorwali mentioned in his statement, an important feature of just war doctrine in Islam has always been that jihad may only be declared by a ruler of a state and not undertaken by private individuals on their own account.[28] In Islam, this ruler may be titled imam, amir, caliph, or some other title. The ruler is given discretion in choosing to make war or not, because he has the information necessary to make such decisions and because public order requires unity inside the state.[29] The ruler also has the power to make peace.[30] The Muslim idea on this point is similar to that of the modern world state system, in which the state has a monopoly over the authorization and use of violence. In addition to the imam or ruler having control over the waging of war and peace, the ruler must also be obeyed, and rebellion against him is not permissible under any circumstances. Such insistence on obedience to the ruler is displayed in many Saudi fatwâs.[31] This point is salient, because those who want free waging of war, including by private groups, sometimes declare the state to be the enemy and demand that it be overthrown if it disagrees with or tries to curtail their conduct.

However, Muslims in the modern world have naturally been concerned for the fate of their coreligionists facing struggles in other countries, in some of which the Muslims may be a minority. This is aligned with the concept of the right to self-determination and national independence of colonized countries that spread in the 20th century, and the national liberation struggles of those that eventually became independent states have generally been regarded by both the outside world and by Muslims as legitimate. This applies to the Bosnian Muslims' struggle to maintain their state against Serbian opposition in 1991-1995, which resulted in the internationally-recognized state of Bosnia-Herzegovina.

But what about other ongoing or unsuccessful struggles, including secessionist movements in several countries? Opinion is divided over the extent to which each or any of these can be considered cases of "jihad," although participants in those struggles have considered them so, and they have often been considered so in the Muslim world as well.[32]

It should be pointed out too that, in all of these cases, the majority population of a place has been resisting some kind of external intrusion, occupation, colonization, or settlement on its lands, and that such resistance has in general usually been considered legitimate and not been condemned except by the intruders and their allies, so that it will not do simply to condemn liberation struggles for self-determination as "terrorism." Indeed, national self-determination has been declared a right in President Woodrow Wilson's Fourteen Points (1918), in the Allies' Atlantic Charter during the Second World War (1941), and, most importantly, in the Charter of the United Nations (1945), in addition to the Reagan Doctrine (1985). Of course, the details of which liberation movements constitute legitimate struggles for national self-determination may be disputed.

---

[28] Zuhaylî, *Fiqh*, 6:419; Hugronje, 3:261.

[29] Haykal, 2:930.

[30] Natana J. Delong-Bas, *Wahhabi Islam: From Revival and Reform to Global Jihad*, Oxford: Oxford University Press, 2004, p. 211.

[31] 'Abdul-Muhsin Ibn Naasir Aali-'Ubaykaan, *The Khawaarij & Their Recurring Ideologies and the Islaamic Views Concerning: Terrorism, Bombings, Hijackings, & Other Modern-Day Crimes*, translated by Abu az-Zubayr Harrison, Dallas, TX: Tarbiyyah Bookstore Publishing and Distribution, 2005, pp. 164-187.

[32] As by Dr. Manaa Al-Johani, the WAMY secretary general, in his statement of 14 November 2001 (FED-PEC0250105 (Ex. 259 to Noorwali Dep.)); cf. other statements by him so defining the Kashmir struggle (3 June 1991), as reported in the *Muslim World News* of that date, for which see Abdul Wahhab Noorwali's deposition, pp. 163-164, and Cell 770 in 2020-02-20 Topics Index for Experts, and his other statement on the Chechnya struggle (15 January 2000).

Also, it is quite natural that Muslims should tend to sympathize with their suffering coreligionists, especially when the suffering appears to be unjustly caused, and even if doubts exist as to whether a struggle is legitimate or not, there is still a necessary interest in providing relief to the victims of war. This is also featured in Dr. Noorwali's statement of 20 November 2001, which illustrates how WAMY, very concerned for the fate of refugees in Afghanistan, provided relief to give such people sustenance but did not participate in any warlike activities.[33] Likewise, concerning the role of WAMY in Bosnia, it is clear that it acted as a relief and educational organization only and eschewed any participation in any military effort.

Sometimes jihad is labeled "holy war," but this labeling is inaccurate and misleading, because it is a term of abuse used to defame the other and never attributed to the self. Rather, jihad is simply "struggle," and in the context of warfare should be denominated "just war," [34] whether one accepts the concept of just war at all or not, because that is the equivalent term that the upholders of war use about themselves.

### 6. Mujahideen.

The term mujahideen is simply the plural of the active participle of the Arabic verb *jâhada yujâhidu jihâdan*, meaning "to struggle", and jihad is the verbal noun to that verb, meaning "struggle." So mujahideen means "strugglers," or else "those who are engaged in struggle." This term is not new, and the singular Mujâhid was already used as a personal name as early as the 8th century. In modern times, the term tended somewhat to fall into disuse because of the lack of warlike activities defined as jihad, because modern armies belonging to independent states took over most military roles, and because modern liberation movements tended to define themselves as nationalist and thereby deemphasize or completely omit religious terminology.

The term mujahid (pl. mujahideen) appears to have come back most strongly because of the Afghan wars, particularly the war against the Soviet Union during 1979-1989, where from quite early on the rebels against the Soviet-sponsored communist government were described as the mujahideen. In 1989, the collapsing Soviet Union withdrew from Afghanistan, leaving the communist regime there to its own devices. The war of the mujahideen against the communist Najib regime there continued with ebbing US support until that regime's final overthrow in 1992. It was because of this turn that jihad and mujahideen became unfashionable in the US. To be sure, not everyone in the US had welcomed the promotion of jihad in the first place, but it did not really become that politically incorrect until later. As discussed below, statements attributed to Dr. Al-Johani from 1991 or 1992 expressing support for certain Muslim liberation struggles as jihads need to be interpreted in this light.

Since then, various groups emerging originally from the Afghan wars and their activities have become quite problematic from the official US point of view, with many attacks, the most notorious of them obviously being the 11 September 2001 attacks in New York and Washington, DC. Today, the US government and media are almost never officially favorable to mujahideen; however, the term "mujahideen" is normally not used anymore to refer to such groups. Instead, they are denominated "terrorists" or "Muslim terrorists" or "Islamic terrorists" or "Jihadists," for which see below under terrorism. The term "mujahideen" likewise is less used now as well in the

---

[33] Noorwali Dep, Exhibit 258 (FED-PEC0235726-730).

[34] Caner K. Dagli, "Conquest and Conversion, War and Peace in the Quran," in *The Study Quran: A New Translation and Commentary*, ed. by Seyyid Hossein Nasr et al., New York: HarperCollins Publishers, 2015, p. 1805.

internal Afghan context, because most of the parties there would consider themselves mujahideen, or at least descended from mujahideen.

Occasionally, certain other conflicts have been widely considered by Muslims to constitute a legitimate struggle. One of these was the Chechen struggle for independence fought against Russia (1994-1996, 1999-2009). This elicited a statement of verbal support from Dr. Al-Johani in 2000, for example. Yet, even assuming the statement was accurately attributed to him, which cannot be determined or proven, Dr. Al-Johani was not only just giving his own opinion and not speaking on behalf of WAMY, as Dr. Noorwali has stated,[35] but also was only giving an opinion that was very common in the Muslim world, and by no means only among the religious, at the time. Also, the context was that Chechnya had enjoyed a de facto independence from Russia since 1996, and was in effect being reconquered in 1999-2000. So it was easy for Muslims to view the Russian attack as an aggression, even if that was not, of course, the Russian view. The idea that such verbal support for the Chechens has anything to do with "terrorism" is extremely obtuse and unacceptable.

**7. Terrorism**.

"Terrorism" is also an old term that has taken on a new life. Originally, it was borrowed from French and first used in English in 1795 to refer to *la terreur* of the French revolutionaries of the National Convention regime (1792-1795), who were labeled "terrorists," chopping off heads with the guillotine. After that, it was occasionally used, but its real revival started when the Israelis began to use the term to describe and condemn both armed and other forms of opposition to their state by Palestinians and others. From there, it was borrowed into US and other English mass media vocabulary to designate violent, and sometimes non-violent, activity that is politically motivated and is viewed by the one using the term as illegitimate. Although a tendency does exist to use the term particularly with reference to acts by Muslims, it has also been used to describe some others, especially when the political motivation is felt to be absolutely illegitimate, as in the case of Irish Republican Army in Northern Ireland in the view of the British, or the ETA Basque separatists in Spain. Indeed, a tendency also exists for regimes, especially autocratic ones, to label all their opponents "terrorists," and this includes regimes in the Muslim world, where guerilla violence against a regime is automatically labeled "terrorism" by it, but even non-violent opposition is often so designated. Oftentimes, the lopsidedness of the power equation in such cases, where unarmed, peaceful opponents of a regime, even those engaged in no political activities at all, are arrested, tortured, and murdered while being labeled "terrorists" has led to others denouncing the state in such cases as the real terrorist, so the term becomes very contested. Meanwhile, in the United States, "terrorism" has become somewhat of a technical term, with certain countries placed on an official terrorism list.

The upshot of the varied uses of "terrorism" is that the word has no agreed-upon meaning.[36] As Jenny Teichman (1930-2018) states in her article, "How to Define Terrorism,"

> "Thus philosophers for instance disagree about whether or not terrorism is wrong by definition or wrong just as a matter of fact; they disagree about whether terrorism should be defined in terms of its aims, or its methods, or both, or neither; they disagree about

---

[35] Noorwali Dep p. 210 et seq.
[36] Jenny Teichman "How to Define Terrorism," *Philosophy* 64 (1989), 505–517.

whether or not states can perpetrate terrorism; they even disagree about the importance or otherwise of *terror* for a definition of *terrorism*."[37]

Note that one of the most important differences of opinion is whether actions of the state can be deemed terrorism or not: Many say yes; the US government says no. Indeed, because of the polemical and biased way the term has normally been used, C. A. J. Coady (b. 1936), in an article on its definition, has written,

> "The definitional question is essentially irresolvable by appeal to ordinary language alone since terrorism as a concept is not "ordinary" in even the way that intention, guilt, and dishonesty are. Nor is it a technical term belonging to some science; its natural home is in polemical, ideological, and propagandist contexts."[38]

From this it can be seen that any detached use of the term can hardly be envisioned, which calls its validity into question. As used today, it is primarily a term of denunciation and abuse.

Because the term is used so freely, and because it is appropriated by governments in particular to use against their opponents and enemies, it is also now very widely used in Arabic translation as *irhâb*, a development mostly of the last forty or fifty years. Indeed, the current usage of *irhâb*, which in classical Arabic might mean just "to frighten" in general, is a kind of loan translation from English that is now taken as a technical term to mean "terrorism" in the same way the latter is used and abused in English. All governments of Muslim-majority countries without exception denounce terrorism. Indeed, they go far beyond mere denunciation in also pursuing, arresting, imprisoning, and sometimes executing those found guilty of "terrorism," so the appropriation of the term is complete. As is evident in the statements of senior members of the Saudi royal family such as Sa'ûd al-Faysal (1940-2015), the foreign minister 1975-2015, Bandar ibn Sultân (b. 1949), ambassador to the US 1983-2005, and Nâyif ibn 'Abd al-`Azîz (1933-2012), the interior minister 1975-2012,[39] the Saudi government certainly has been in the forefront of this denunciation, not only denouncing the attackers of 11 September 2001 and al-Qâ'idah as terrorists, but also many others, including also what is called Dâ'ish=the so-called Islamic State in Iraq and Syria. Governments in general have very little sympathy in particular for those who attack civilians and try to disrupt normal economic life, for governments' normal position is to cooperate with each other against such non-state attackers, and Saudi Arabia has been and remains no exception to this cooperation.

A particularly egregious use of "terrorism" as an accusation is the description of any incident involving Muslims as "terrorist" if it has a political dimension or agenda, while refusing to call similar incidents involving non-Muslims as terrorist, even if they also have a political agenda. The fact that it is normally used this way by American mainstream media and American and European government spokespersons further deflates any claimed objectivity or neutrality of the term and also defines it as a racist expression of abuse used to denigrate particular Muslim ethnic groups, specifically Arabs, Turko-Iranians, and South Asians.

## 8. Da'wah.

---

[37] Teichman, 506.
[38] C. A. J. Coady, "Terrorism," *Encylopedia of Ethics*, ed. by Lawrence C. & Charlotte B. Becker, 2nd ed., New York: Routledge, 2001.
[39] Michael Scheuer, *Osama Bin Laden*, New York: Oxford University Press, 2011, p. 165.

Da'wah, meaning "invitation," is the Arabic word which represents Muslim missionary activity. Along with Christianity and Buddhism, Islam is the third great "evangelizing" religion in the world, meaning that Muslims from the earliest times, exactly like Christians and Buddhists, have preached their religion to receptive non-Muslims as well as Muslims, and this type of activity has gone on throughout the histories of all three religions. In all three cases, these religions are open to outsiders to join, whereas other great religions, such as Taoism, Hinduism, and Judaism, while each of them also has historically engaged in such activities to some degree, have been much less open to outsiders joining them in general. If a person has found spiritual solace in a religion and wishes to share that with others, provided that the others are willing to give it a hearing, it is very hard to discover anything objectionable about that, yet some seem to want to portray even this innocuous activity as sinister. And of course there are anti-religionists who want to forcibly suppress all religion altogether, such as E. O. Wilson (b. 1929).[40]

On the other hand, each of the religions of Christianity, Buddhism, and Islam has had its own methods of outreach to others. While in Buddhism and Islam, such preaching efforts have only been carried out to this day by some of their adherents who mainly have other occupations, Christianity alone has sent out paid, professional missionaries whose sole occupation is preaching to non-Christians and achieving their conversion. Such Christian missionary activity since the 19th century has been replete with examples of missionaries dedicating themselves to evangelizing the Muslims, literature directed to converting Muslims, promotion of strategies to confront Muslims and to persuade them to become Christians, conferences to discuss such strategies, and so on. What is astonishing is only that it took so long for the Muslims to respond in kind. Thus, Saudi Arabia, at least in theory, began to make some contribution to international da'wah efforts, utilizing some of the greater resources provided to it by the oil boom. Nevertheless, even today, the Muslims have never quite picked up the concept of paid missionaries that the Christians have. At the same time, it should also come as no surprise that Muslims are concerned with Christian evangelization campaigns and desire to counter them with their own information campaign. Of course, nothing in this whatsoever is connected with "terrorism;" rather, it is a matter of trying to persuade others to adopt correct belief and religious practice.

However, although the term da'wah is used for missionary activity to spread Islam to non-Muslims, the overwhelming majority of its effort is actually directed toward persuading backsliding or lackadaisical Muslims to come back to the fold by adopting correct beliefs and practices. This is the practice of the Indian-based Jamâ'at al-Da'wah wa-al-Tablîgh (Missionary and Preaching Group) founded around 1927 by Muhammad Ilyâs Kandhlawî (c. 1885-1944), who state that Muslims' first duty is to call back to Islam the backsliding Muslims. And in particular, this same idea is the main da'wah brief of the WAMY organization, as mentioned in Dr. Noorwali's deposition, where the foundational documents says that the organization's first aim and objective is "To serve the Islamic da'wah (calling to Islam) in matters of aqidah (creed), Sharia and social behavior among the Muslim youth of the world." (p. 58). And as Dr. Noorwali further explains, most Muslims know little about their religion, that they are weak in their faith, and that they may be tempted away from it either by materialism, by Christianity, or by some other religion or cult. Therefore, the priority has to be to preach to backsliding Muslims, not to non-Muslims (p. 60). Nor is Dr. Noorwali's statement exceptional among Saudi Muslims;

---

[40] Hannah Osborne, "E. O. Wilson: I'm Not an Atheist, but Religion Should Be Eliminated," *International Business Times*, 28 January 2015.

Natana DeLong-Bas shows how peaceful da'wah work was also a preferred methodology of Ibn 'Abd al-Wahhâb, Wahhabism's founder.[41]

Furthermore, expressing opposition to all kinds of extremism, WAMY Secretary General Saleh Al-Wohaibi said in an interview with IslamOnline.net of 14 June 2005, "We have to reconsider our da'wah priorities, turn the focus on moderate Islam and eschew extremism, but without bowing to external pressures and give up our values."[42] In this he means to maintain the conservative teachings of Muslim religious belief and practice without engaging in fanaticism or political activities.

Other da'wah activities, such as distributing copies of translations of the Qur'ân in various languages are parallel to Christian groups like the Gideons handing out Bibles. While it is not the job of WAMY, as a part of da'wah Saudi publishing houses such as Darussalam in Riyadh or the King Fahd Qur'an printing complex in Makkah have produced translations of the Qur'an in very many languages, following in the footsteps of Protestant Christian Bible translation enthusiasm. This is quite a change from the original tradition of Islam, where the Qur'ân is only in Arabic and the scholars of every place all study and know Arabic, so that they can convey the message to the people in their vernacular without the need to put a printed vernacular text in the people's hands. This model was because literacy rates were so low until recently. Now, with modern mass education and mass literacy, people are demanding religious resources in their own vernacular languages. This process is called vernacularization and is similar to what happened in the Catholic Church in the Vatican II Council as it moved away from Latin.

As for supporting masjids/mosques in doing da'wah, every masjid does da'wah, because da'wah basically is just preaching. Possibly, like Christian churches, some are more enthusiastic in their outreach than others, but all can be understood as participating in this activity, even if the messages preached may differ in content, obviously.

As for relations with the other religions, Muslims have always been known for religious tolerance, which is why there are religious minorities in nearly all the Muslim-majority countries, including those that have been Muslim for many centuries. As mentioned above, verses demanding the conversion of the pagans in Qur'ân 9:1-18 are interpreted as meaning only the pagans of the Quraysh and their allies,[43] or the pagans in Arabia in general,[44] who all became Muslims in the 7th century. Wahbah al-Zuhaylî adds that the fighting was to be only against those who attacked the Muslims first, citing Qur'ân 2:190, which states, "God does not love aggressors."[45] Beside that, religions of the book are specifically tolerated, including Christianity, Judaism, and Samaritanism (Qur'ân 2:62; 5:69). A hadîth also prescribed including the

---

[41] DeLong-Bas, 194, 198-201, 225.

[42] PEC-WAMY029944-945.

[43] Muqâtil ibn Sulaymân al-Balkhî, *Tafsîr Muqâtil*, edited by Ahmad Farîd, Beirut: Dâr al-Kutub al-'Ilmiyyah, 1424/2003, Vol. 2, pp. 34-36, also p. 46 in relation to 9:36.

[44] Zuhaylî, *Tafsîr*, 9:108-111, 209; Zuhaylî, *Âthâr al-harb*, 99-103; Abul Kalam Azad, *The Tarjumân al-Qur'ân*, translated by Syed Abdul Latif, New Delhi: Kitab Bhavan, 1990, Vol. 3, p. 3; Abul A'lâ Mawdûdî, *Towards Understanding the Qur'ân: English Version of Tafhîm al-Qur'ân*, translated & edited by Zafar Ishaq Ansari, Leicester, UK: The Islamic Foundation, 1411/1990, Vol. 3, pp. 184, 188; Shabbir Ahmad Usmani, *The Noble Qura'an: Tafseer-E-Usmani*, translated by Mohammad Ashfaq Ahmad, New Delhi: Idara Isha'at-e-Diniyat (P) Ltd., 1992, Vol. 1, pp. 815, 819; Shams Pirzada, *Dawatul Quran: Arabic Text, Translation and Commentary*, translated by Abdul Karim Shaikh, 3rd ed., Bombay, India: Idara Dawatul Quran, 1996, Vol. 1, pp. 595-596, 608; Seyyid Hossein Nasr, ed., *The Study Qur'ân: A New Translation and Commentary*, New York: HarperCollins Publishers, 2015, p. 507.

[45] Zuhaylî, *Tafsîr*, 9:178.

Zoroastrians in the protected communities,[46] and that same ruling was later extended to Hindus, Buddhists, and all other religions outside of Arabia as well.[47] This is not to say that occasional fanaticism has not sometimes breached the tolerance, but tolerance has generally remained the rule. In early Islam, non-Muslims, because they were not liable for military service, were expected to pay a head tax, the jizyah, but that ceased to be collected in the Ottoman Empire from 1839 and had already fallen into disuse elsewhere, as in India, before that time.

**9. Wahhabism**.

Wahhabism is a term applied by others to the dominant religious sect or group of Saudi Arabia. Its usage is explained by a prominent Saudi scholar in the following way, "A term most often used by those in opposition to the establishment of pure *Tawheed* (monotheism) to describe those believers who do try to implement *Tawheed* and abstain from Shirk (polytheism or partnering things with God). It is a derogatory term to incorrectly criticize and insult anyone who accepts the scholar Muhammad Ibn 'Abdul-Wahhaab to be a legitimate scholar of true Islaam."[48] Thus, people adhering to this sect call themselves Muwahhidûn, meaning monotheists or unitarians, a self-designation shared by other Muslims. It is worth noting also that the term "Wahhabi" was already in use in the British Empire in the 19th century as a pejorative term to distinguish the bad Muslims from the good ones,[49] just like today we have, in addition, as pejorative designations: political Islam, radical Islam, Islamism, Islamic fundamentalism, Muslim fundamentalism, jihadism, Salafi jihadism, and so on.

The movement designated as Wahhabism arose as a religious reform movement inside Islam in the region of Central Arabia called Najd in the mid-eighteenth century. It was founded by the teachings of the Najdî Hanbalî scholar Muhammad ibn 'Abd al-Wahhâb (1703-1792), who strongly based his teaching on the much earlier and much more prolific Damascene Hanbalî scholar Ibn Taymiyyah (1263-1328), whose teaching is taken as normative by Ibn 'Abd al-Wahhâb's followers. Wahhabism has often been pilloried for its alleged strictness and rigidity, but it is no more so than other conservative groups in Islam, and the same may be said of the Hanbalî school of law and its rulings, which are followed and promoted by Wahhabis. Sometimes the strictness and rigidity attributed to Wahhabism are seen as sources of violence as well, which is why it is necessary to discuss Wahhabism in some detail here.

The particular concerns of Ibn 'Abd al-Wahhâb in the 18th century were to some extent a way of the independence of the Najdî scholars and people from the dominant Turkish Ottoman Empire, which ruled most of the other areas of Arabia at the time, virtually surrounding Najd. Today, many of these concerns, which are still promoted in Saudi Arabia, seem remote from modern issues. Thus, Wahhabi teachings emphasize the prohibition of polytheism, idolatry, amulets, veneration of sacred trees and stones, animal sacrifices made to other than God, worshiping at graves, honoring the tombs of dead saints, seeking intercession from other than God and his Prophet, sorcery, soothsaying, magic, omens, astrology, showing off, exaggerated respect for religious leaders, specific phrases one should not say, denying God's names and

---

[46] Pirzada, 1:608; Michael Morony, "Madjûs," *Encyclopaedia of Islam*, 2nd ed., Vol. 5, p. 1110.

[47] Mawdûdî, 3:202; Nasr, 514.

[48] 'Ubaykaan, 238.

[49] Chandra Mallampalli, *A Muslim Conspiracy in British India? Politics and Paranoia in the Early Nineteenth-Century Deccan*, Cambridge: Cambridge University Press, 2017, p. 4 and *passim* throughout.

attributes, denying the divine decree, making pictures, and wrong kinds of oaths,[50] as well as wearing garments so long that they hang below the ankles or drag on the ground. They also prohibited the mystical trend inside of Islam called Sufism. In general, Wahhabism has always remained, like Hanbalism, very text based, with an attempt to find literalist interpretations when possible. The texts it bases itself on are the Qur'ân and the Sunnah as embodied in the Hadîth, just like the other Sunnîs.

The way that Wahhabism became established politically as the official sect of the state was as a result of a foundational pact between Muhammad ibn 'Abd al-Wahhab and Muhammad ibn Sa'ûd, the ruler of the small town of Dir'iyyah in Najd, in 1744. The agreement basically consisted of Ibn Sa'ûd, the ancestor of the Saudi dynasty and first Saudi ruler, agreeing to follow Ibn 'Abd al-Wahhab in religious matters while the latter agreed to acknowledge and support Ibn Sa'ûd as ruler.[51] Now 276 years old, this pact between the two and their families is still fully in effect,[52] as today's king is the direct descendant in the male line of Ibn Sa'ûd, while the chief religious official of Saudi Arabia, the muftî, is a direct descendant in the male line of Ibn 'Abd al-Wahhâb. Imbued with religious enthusiasm, the Wahhabis under the leadership of Ibn Sa'ûd founded the first Saudi state, the Amirate of Dir'iyyah (1744-1818), which conquered a significant part of Arabia, including the holy pilgrimage cities of Makkah and al-Madînah and also attacked the Shî'î shrines in Iraq. This state was overthrown by the Ottoman viceroy of Egypt but reestablished itself in Najd only as the second Saudi state, the Amirate of Najd (1824-1891). The third Saudi state was founded by the reconquest of Riyadh in 1902 by the founding ruler, amîr and later king, 'Abd al-'Azîz Âl Sa'ûd (c. 1876-1953), the father of the six subsequent kings of Saudi Arabia until now. This state was expanded by 'Abd al-'Azîz in a series of wars of conquest until it reached its present borders in 1934. After that, Saudi Arabia actually engaged in no further wars of expansion.

The reason for the cessation of the wars was the British colonial imposition of the British state system on the Middle East from 1918 on. Well aware of the power of the British, 'Abd al-'Azîz, who had become aligned with them in a friendly way, had no desire to tangle with them. Indeed, it is curious that all three iterations of the Saudi state have never fought any wars nor engaged in any armed conflicts with any non-Muslim countries; all of their wars have been exclusively with other Muslims, and this despite their Wahhabi ideology. This includes their participation in the 1991 Gulf War against Iraq and the current war against the Houthi faction in Yemen. The only exception is their very minimal and completely ineffectual participation in the 1948 and 1967 wars of the Arab states with Israel.[53]

The Saudi state likewise has always engaged in friendly relations with the United States, trying to obtain recognition from 1928, being recognized by the US in 1931, granting the first oil exploration concession to Standard Oil of California (SoCal) in 1933, and receiving the first US ambassador in 1943. In February 1945, the king met with President Franklin Roosevelt on the

---

[50] Khalid Yahya Blankinship, "Muslim 'Fundamentalism,' Salafism, Sufism, and Other Trends," in *Fundamentalism: Perspectives on a Contested History*, ed. by Simon A. Wood and David Harrington Watt, Columbia, SC: University of South Carolina Press, 2014, pp. 154-155.

[51] DeLong-Bas, 34-35.

[52] Joas Wagemakers, "The Enduring Legacy of the Second Saudi State: Quietist and Radical Wahhabi Contestations of al-Walâ' wa-l-Barâ'," *International Journal of Middle East Studies* 44 (2012), p. 94.; David Commins, *The Wahhabi Mission and Saudi Arabia*, London: I. B. Tauris, 2006, p. 19.

[53] Madawi al-Rasheed, "Saudi Arabia and the 1948 Palestine War: Beyond Official History," in Eugene L. Rogan and Avi Shlaim, eds., *The War for Palestine: Rewriting the History of 1948*, 2nd ed., Cambridge: Cambridge University Press, 2007, pp. 228-247, especially pp. 239-242.

USS *Quincy* in the Red Sea, the president promising military support and protection for Saudi Arabia. The alliance of the United States with Saudi Arabia has never ceased since that time. Importantly, Saudi Arabia consistently opposed the Soviet Union and communism along with the United States during the Cold War, has modulated the oil supply to keep prices low, has recycled petrodollars by massive purchases from US arms manufacturers, and even sent aid to the Nicaraguan Contras in furtherance of the aims of President Reagan. The Saudi government clearly has viewed the United States as a major protector, as during the Gulf War of 1991 following the 1990 Iraqi invasion of Kuwait.

However, there has also been an undercurrent of dissatisfaction with the Saudi government policy emanating from some religious circles. As early as 1929, the Ikhwân (not to be confused with al-Ikhwân al-Muslimûn=the Muslim Brotherhood, which is something else completely unrelated and not Saudi), King 'Abd al-'Azîz's early Wahhabi supporters and shock troops, were dismayed by his refusal to invade British-held Iraq and Jordan, so 'Abd al-'Azîz suppressed them by force and executed some of their leaders.[54] Descendants of those Ikhwân were responsible for the occupation of the Inviolable Sanctuary around the Ka'bah in 1979, which led to a two-week-long battle.[55] The Saudi government has managed to retain the upper hand because the Wahhabi tradition has a teaching that the political ruler must be obeyed as long as he upholds Islam, and certainly the Saudi rulers have done that by continuing all the religious rituals and by generous endowments of mosques and other institutions, such as Islamic universities, both inside the country and outside of it. Thus, they have certainly continued to enjoy the active or passive support of the vast majority of the scholars. Also, as with the generality of other Sunnî and Shî'î Muslims, "Wahhabi doctrine maintained that only the ruler may declare jihad."[56] This means that, from the Saudi government point of view, completely freelancing attacks or campaigns by private individuals cannot be construed as jihad and are not permissible.

Beyond Saudi Arabia, Wahhabism has profoundly affected Islam in the world. While this is often attributed to Saudi propagation efforts funded by oil wealth, this stereotype is in the main incorrect. The real reason for the effect of Wahhabism on the Muslim world has been the adoption of its literalist tendencies because of the spread of modern mass education and literacy. This is because modern-educated people tend to be more text-oriented than their illiterate ancestors and also tend to believe that each text can only have one meaning, or one best meaning, similar to Wahhabi literalist ideas. This process had already begun in the 19th century when Wahhabi teachings began to spread among the Sunnîs of Iraq and then Syria. By 1900, these teachings were already widespread in the Muslim world, influencing places from Algeria in the west to Central Asia in the east. Because of the prominence of the Wahhabi-like Ahl al-Hadîth movement in British India, the British found it convenient to denounce any independent-minded Muslims as Wahhabis. In general, the new movement outside of Saudi Arabia called itself Salafî, meaning followers of *al-salaf al-sâlih*, the righteous predecessors, a classical phrase designating the first one, two, or three generations of Muslims in the 7th and 8th centuries. Calling oneself a Salafî, then, suggests that one is following the correct way of the Prophet, his Companions, and his Sunnah or way, while others may not be doing so. Salafî textualism and literalism has become a major theme in Sunnî Islam and has affected everyone; even the

---

[54] Commins, 80-93.
[55] Commins, 163-166.
[56] Commins, 165, 185.

opponents of Salafism have to take it into account and frame their teachings in a way that covers them against Salafî criticisms.

However, it must be stressed that Hanbalism, Wahhabism, and Salafism, which are all closely related though not quite identical, while they are all quite conservative in religious practice, are by no means violent or supporters of violence. Armed struggle is simply not the major concern of these trends, which are far more concerned with correct belief (*'aqîdah*) and practice. Salafis are concerned with the fact that most Muslims don't even keep up the most basic practices of Islam, and they desire to persuade them to do so. Thus, they are religious revivalists. The issue is muddied, however, by the small minority who insist on armed struggle and even make a fetish out of it, because those also often adhere to Salafî teachings in religious practice and thus may appear on the surface to be indistinguishable. But they are very different in fact, and one cannot, of course, blame the majority for the actions of a minority, especially when there are absolutely no hierarchical command structures at all, nor hold them responsible for what that minority may have done. To do so would be like blaming all independent Baptist churches in the US for crimes committed against abortion providers by anti-abortion activists, for example.

In fact, Wahhabi and Salafî scholars have denounced terrorism in no uncertain terms, while emphasizing the need to obey the state and not go out against it by freelancing efforts using the excuse that the state is failing to uphold Islam. These scholars have denounced persons going out on their own against the state as Khawârij, the name of early rebels against the caliphate. The Khawârij are also denounced in canonical hadîths, so this labeling has considerable authority behind it. The shaykhs issuing such anti-terrorism rulings include Muhammad Nâsir al-Dîn al-Albânî (1914-1999), the most authoritative Salafî muhaddith, 'Abd al-'Azîz ibn Bâz (1910-1999), the mufti of Saudi Arabia, and Sâlih al-Fawzân (b. 1933), another important member of the Wahhabi scholarly establishment.[57] Another Saudi shaykh known for his independence, Salmân al-'Awdah (b. 1956), specifically denounced Usâmah ibn Lâdin and the 11 September 2001 attacks.[58]

The charge of "extremism" made against WAMY by the likes of Dore Gold (b. 1953) and Steven Emerson (b. 1954) cannot be upheld. As an Israeli sometime government official, Gold's statements cannot be considered disinterested, and Emerson is a completely-discredited professional Muslim baiter who has been caught in outright lies, the most notorious being his immediate attempt to link Timothy McVeigh's Oklahoma City bombing with Muslims, calling Oklahoma City a hotbed of Muslim radicalism,[59] so that his speculative assertions have zero value by themselves. Emerson was also censured by UK Prime Minister David Cameron for spreading lies about British Muslims and incitement.[60] He is particularly condemned in these and

[57] Muhammad Tahir-ul-Qadri, *Fatwa on Terrorism and Suicide Bombing*, London: Minhaj-ul-Quran International, 2010, pp. 241-249.

[58] Peter Bergen and Paul Cruickshank, "The Unraveling: The Jihadist Revolt against Bin Laden," *The New Republic*, June 11, 2008= https://peterbergen.com/the-unraveling/.

[59] LaVerle Berry, Amanda Jones, and Terence Powers, "Media Interaction with the Public in Emergency Situations: Four Case Studies," Washington, DC: Federal Research Division, Library of Congress, August 1999, p. 47; https://www.thefreelibrary.com/One+man%27s+Jihad.-a016882537; https://www.theguardian.com/media/shortcuts/2015/jan/12/steven-emerson-muslims-birmingham-error-fox-news

[60] Indeed, "Cameron said he 'choked on his porridge' when he heard Emerson's comments" and told ITV that Emerson is "clearly an idiot." Matthew Holehouse, "David Cameron: US terror 'expert' Steve Emerson is a 'complete idiot,'" *The Daily Telegraph*, January 12, 2015=https://www.telegraph.co.uk/news/uknews/terrorism-in-the-uk/11340399/David-Cameron-US-terror-expert-Steve-Emerson-is-a-complete-idiot.html; https://www.itv.com/news/central/update/2015-01-12/prime-minister-steven-emerson-is-clearly-an-idiot/;

other instances for spreading accusations far and wide and overgeneralizing, which is exactly the fault with the plaintiffs' claims in their accusations against WAMY.

In any case, what exactly what is "extremism" here? To be sure, WAMY and Wahhabi teachings sometimes do not agree with mainstream media discourses about the world in the United States, but that disagreement does not render them extreme or extremist. Rather, they are representative of a significant and widespread religious orientation inside Islam shared by millions of Muslims who are not doing anything violent nor hatching conspiracies against the United States.

That WAMY should be described as one of "the main sponsors of Deobandi seminaries in Pakistan," as if that were something shameful or sinister, is also an irrelevant charge, whether it is true or not. Dâr al-'Ulûm Deoband is a school founded in 1866 in Deoband, India, which became the seed of one of the three main trends of Islam in South Asia: the Deobandis, the Ahl-i Sunnat movement of Ahmad Ridâ Khân (1856-1921), and the Ahl-i Hadîth, similar to the Saudi Hanbalî Wahhabis. The Deobandi movement opposed the partition of British India as well as the creation of Pakistan, supporting instead the Congress Party and a shared nationality with the Hindus. Nevertheless, some Deobandis went to Pakistan, which they then began to support, just as the majority stayed in India and supported India. The Deobandis are strongly traditionalist, meaning that they support the full practice of traditional Islam, including a moderate form of Sufism and the application of the Sharî'ah according to the Hanafî school of law, which is prevalent in South Asia, Afghanistan, and Central Asia but is often disparaged by Wahhabis and Salafîs. Also, Deobandis on the whole have always been quietists.[61]

But because of the misery of Afghanistan under various feuding warlords, Afghan students in various schools in Pakistan, most of them Deobandi, banded together to liberate and unite their country. This action should be seen as motivated more by nationalism than by Islam or Deoband, though it certainly was justified by them in religious language. Saudi support of Deobandi schools in Pakistan mostly supported Pakistani, not Afghan students, and those Pakistani students did not go to fight in Afghanistan. Because of the weakness and poverty of the public school system in Pakistan, religious schools provide an important service educating the children.

It is also noted by an Indian work that after 2000, Saudi Arabia switched its support from the Deobandi schools to Ahl-i Hadîth schools,[62] which makes sense, as Ahl-i Hadîth are almost identical to the Wahhabis, both being Hanbalîs, while the Deobandis are not. Previously, support was given to Deobandi schools to counter Iranian Shî'î influence in the region.

## 10. Suicide bombings.

Suicide bombings have been taken to be a particularly gruesome and repulsive form of "terrorism."

In Islam, by the consensus of the scholars, suicide is not allowed at all. Indeed, the Qur'ân itself baldly says, "Do not cast yourselves by your own hands to destruction" (2:195) and

---

https://www.washingtonpost.com/news/worldviews/wp/2015/01/12/9-questions-about-birmingham-that-fox-news-was-too-embarrassed-to-ask/?arc404=true

[61] Consider for example the career of the Pakistani Deobandi Muhammad Taqî 'Uthmânî, described by Muhammad Qasim Zaman, "Tradition and Authority in Deobandi Madrasas in South Asia," in *Schooling Islam: The Culture and Politics of Modern Muslim Education*, ed. by Robert W. Hefner and Muhammad Qasim Zaman, Princeton: Princeton University Press, 2007, pp. 75, 79-81.

[62] Sushant Sareen, *The Jihad Factory: Pakistan's Islamic Revolution in the Making*, New Delhi: Har Anand Publications, 2005, p. 282.

"Do not kill yourselves" (4:29). Also, the one who kills himself or herself with some instrument will be tortured by it on the Day of Judgement (or in another version, in hellfire), according to a canonical hadîth. Another canonical hadîth states,

> "Whoever throws himself off a mountain, thereby killing himself, he will throw himself down a mountain in Hell forever. And whoever drinks poison, thereby killing himself, he will hold poison in his hand, eternally drinking it in Hell. And if someone kills himself with iron [stabbing himself], he will eternally stab himself with it in Hell."

Still another hadîth adds that whoever hangs himself, with likewise hang himself forever in Hell. All of these hadîths are graded as of the highest authenticity, being found in the two Sahîhs of al-Bukhârî and Muslim.[63] Two hadîths also state that one who kills himself to escape from pain will find paradise forbidden to him.[64] Also, the Prophet refused to perform the last rites of the funeral prayer over a man who committed suicide,[65] which leads in the Sharî'ah to the ruling that an imam should not pray over a suicide.

WAMY stands with the traditional Hanbalî Wahhabi scholars of Saudi Arabia who universally ruled against suicide bombings in no uncertain terms in a number of religious rulings (*fatwâ*s). The ruling scholars include: 'Abd al-'Azîz ibn Bâz (1910-1999), the muftî of Saudi Arabia from 1993 to 1999, Muhammad ibn Sâlih al-'Uthaymîn (1925-2001), the premier Saudi scholar of his day after Ibn Bâz, Sâlih al-Fawzân (b. 1933), the most respected leader of the Saudi scholarly establishment still living, 'Abd al-'Azîz al-Râjihî (b. 1941), an important scholar from the ultraconservative region of al-Qasîm, and 'Abd al-Muhsin ibn Nâsir Âl 'Ubaykân (b. 1953), a Hijâzî scholar. The scholars state that persons committing suicide bombing are suicides and murderers and will be punished in hellfire.[66] It should be noted the Ibn Bâz specifically ruled that suicide actions by the Palestinians are wrong.[67]

**11. Shaheed**:

In Arabic, a shaheed is first of all a witness, such as a witness on a contract or debt instrument (Qur'ân 2:282). As a result, Shaheed is even one of the 99 names of God, as God is the Witness of everything (Qur'ân 3:98; 5:117; 6:19, etc.). The derived usage of the term shaheed for a martyr then also comes from witnessing, although al-Zuhaylî offers several other different explanations[68]. Shaheed as martyr is closely connected with jihad, a shaheed as martyr being first of all one who has died in God's path. Thus, the Companions of the Prophet who died in his early battles (624-631) were described as shaheeds, and the Qur'ân contains a number of verses concerning them (2:154; 3:140, 169-171; 4:74; 9:111; 22:58; 47:4) promising them great reward in paradise for their sacrifice, and this theme is further elaborated in the Hadîth. However, the Hadîth also greatly widens the concept of shaheed, adding numerous other categories to it beyond the fighters in God's path. Thus, a very solidly-established, sound hadîth states,

---

[63] Tahir-ul-Qadri, 78-81.
[64] Tahir-ul-Qadri, 84.
[65] Tahir-ul-Qadri, 88.
[66] 'Ubaykaan, 135-143.
[67] 'Ubaykaan, 137-138.
[68] Zuhaylî, *Fiqh*, 2:554.

> "Martyrs are of seven kinds besides the one who is slain in God's path: the plague victim is a martyr, the drowning victim is a martyr, the pneumonia victim is a martyr, the cancer victim is a martyr, the burn victim is a martyr, the one who dies under a collapsing building is a martyr, and the woman who dies in pregnancy or childbirth is a martyr."[69]

While all of these cases are clearly considered martyrs by this hadîth, their bodies are washed, prayed over, and buried in the normal manner, and not like martyrs in battle, who are buried in their clothes without washing and are not prayed over with the funeral prayer, except for the Hanafî school, which still requires that the martyr in battle be prayed over.[70] Martyrs in other than battle are called martyrs in the afterlife only, not martyrs in this life and the afterlife, a double designation reserved for martyrs in battle. For the Hanafîs and Shâfi'îs, the martyrs in the afterlife include whoever is killed wrongfully, the cancer victim, the plague victim, the drowning victim, the one who dies alone, the student who dies seeking (religious) knowledge, the one who dies of unfulfilled romantic passion (*'ishq*), and the one who dies in enemy territory but is not killed. Jalâl al-Dîn al-Suyûtî (1445-1505), the great Egyptian Shâfi'î scholar, provides a long list additional kinds of martyrs, and the Hanbalîs agree with most of them, ranging from victims of disease and natural disaster, to all manner of unfortunate accidental deaths:.[71]

In addition to these numerous categories of unfortunate deaths, in another hadîth, the Prophet states that whoever dies defending his property is likewise a martyr, as in the following hadîth,

> "Whoever is slain defending his property is a martyr, whoever is slain defending his family is a martyr, whoever is slain defending his religion is a martyr, and whoever is slain defending his life is a martyr."[72]

All of these cases emphasize defense, not aggression, and suggest that paradise is the reward for suffering in this world.

The status of martyr in war is governed by rules in the Sharî'ah that vary somewhat in the four schools of law. The most practical aspect is that the martyr on the battlefield does not have his body washed, nor is he prayed over, but he should be buried. Most likely, this arises simply from the exigency that on the battlefield such acts are likely to be impossible.

The concept of martyrdom and its reward becomes relevant in the case of modern mujahideen because such reward is viewed as an incitement to action, and is also considered a manifestation of religious fanaticism. However, some have called this simplistic explanation of motivation of fighters in seemingly hopeless struggles or against hopeless odds into question, in particular denying that religion is the motivation and showing plenty of examples of non-religious or anti-religious suicide bombers,[73] and of course it cannot be certain what the exact

---

[69] Mâlik ibn Anas, *al-Muwatta'*, ed. by Muhammad Fu'âd 'Abd al-Bâqî, Beirut: Dâr Ihyâ' al-Turâth al-'Arabî, 1406/1985, p. 233; Abû Dâwûd Sulaymân ibn al-Ash'ath al-Sijistânî, *Sunan Abî Dâwûd*, ed. by Muhammad Muhyî al-Dîn 'Abd al-Hamîd, Sidon: al-Maktabah al-'Asriyyah, 1995, Vol. 3, p. 188, hadîth no. 3111.

[70] Zuhaylî, *Fiqh*, 2:558.

[71] Zuhaylî, *Fiqh*, 2:560-561.

[72] Abû 'Abd al-Rahmân Ahmad ibn Shu'ayb al-Nasâ'î, *al-Mujtabâ min al-Sunnah*, ed. by 'Abd al-Fattâh Abû Ghuddah, 2nd ed., Aleppo: Maktab al-Matbû'ât al-Islâmiyyah, 1406/1986, Vol. 7, p. 116, hadîth no. 4095. This hadîth is judged sound (sahîh) by al-Albânî, making it canonical for Salafîs. Also in Tirmidhî, 3:82, hadîth no. 1421.

[73] Robert A. Pape, *Dying to Win: The Strategic Logic of Suicide Terrorism*, New York: Random House, 2005, pp. 3-4, and *passim*; Talal Asad, *On Suicide Bombing*, New York: Columbia University Press, 2007.

state of mind is of such people when committing their actions. Indeed, it can be seen that suicide bombers often appear not to be particularly religious.

Nonetheless, proponents of suicide bombings and other warlike methods by private or substate groups as examples of legitimate jihad, such as al-Qâ'idah and Dâ'ish, clearly regard their followers who die in attacks or other battles as martyrs, but this is disputed, with the majority of the scholars in all the Muslim countries rejecting such a designation for such persons. Indeed, the scholars 'Abd al-'Azîz al-Râjihî (b. 1941) and 'Abd al-Muhsin al-'Ubaykân (b. 1953), already cited above, have specifically ruled in their fatwâs that suicide bombers cannot be called martyrs by any means and that they are rather suicides and murderers.[74] Scholars also explain that such persons are either illegitimate rebels (*bughâh*), who cannot be considered martyrs, or else Khawârij, who are considered illegitimate heretics. Indeed, the government of Saudi Arabia and the state-supported religious scholars have developed a considerable polemic denouncing al-Qâ'idah, Dâ'ish, and other, like groups as Khawârij who not only are not martyrs, but should be resisted, fought against, and liable to capital punishment for their crimes.[75]

The scholars' denunciations of such groups as Khawârij has even elicted replies by the violent groups, who in turn have accused the Muslim governments and rulers, particularly those of Saudi Arabia, in their turn, as Khawârij.[76] In this, the notorious fighter Abû Hamzah al-Misrî (b. 1958), who was sentenced to life in prison in the United States in 2015, even tries to appropriate Muhammad ibn 'Abd al-Wahhâb, the icon of the Saudi religious establishment, for his side in the debate.[77] This illustrates how, in this struggle over who gets to speak in the name of conservative Islam, both sides use the same terminology and cite the same historical figures, but interpret and apply them very differently. Therefore, one cannot generalize, using guilt-by-association, to say that anyone who is Hanbalî, Muwahhid, Wahhabi, or Salafî, or follows Ibn Taymiyyah or Ibn 'Abd al-Wahhâb is of the same ilk or is a supporter of terrorism, when actually they may be the strongest opponents of violent groups.

## B. Problems of interpretation:

Language is flexible and ever-changing. While most of the above-discussed concepts are classical terms that have their place in medieval as well as modern Islam, the terms certainly change in meaning somewhat over time. The other problem is that in an ideological battlefield such as the definition of a religion by its practitioners, the terms themselves may change in meaning from one speaker to another, and groups and governments will of course attempt to appropriate terminology for their own uses. Therefore, it is quite useless really to try to insist that terms like "extremist" and "moderate" convey any meaning apart from the prejudices and partisan commitments of the person using them, as these two are just, respectively, a snarl word and a purr word. As pointed out above, "terrorism" likewise suffers from this fault, and I have written a whole article, referred to above in the footnotes, pointing out how "fundamentalism" is another vacuous term that is primarily only used today as a term of abuse hurled at others and never used to describe oneself.

---

[74] 'Ubaykaan, 141-142.

[75] 'Ubaykaan, 62-74 and *passim*; Muhammad al-Yaqoubi, *Refuting ISIS: Destroying Its Religious Foundations and Proving It Has Strayed from Islam and That Fighting It Is an Obligation*, 2nd ed., Herndon, VA: Sacred Knowledge, 2016, pp. 13-21.

[76] Abu-Hamza Al-Misri, *Khawaarij & Jihad*, ed. by Ibn Umar, Birmingham, UK: Makhtabah (sic) al-Ansar, 2000.

[77] Abu-Hamza Al-Misri, 204, 230.

On the other hand, it is quite necessary to study all of the phenomena of history, government, conflict, and so on to try to come to a better understanding and to try to relate things to each other on a sounder and more detached basis. That can only be done by a nuanced study of everything in detail, particularly each of the personages and groups being considered, in order to determine who is really responsible for what, and what kinds of determinations of responsibility might be reasonable.

One has also to note the modalities of the usage of various technical terms. Muslims generally agree on the terms themselves, but their interpretations of them vary, sometimes so much that one group may make a term quite opposite in meaning from how it is used and understood by another group. For example, as just discussed above, the designation "Khawârij," meaning a violent group of rebels against legitimate authority who have gone out against the religion, has been used by both governmental authorities to condemn violent groups and by those groups against the governmental authorities. Another example is the numerous interpretations of jihad, also discussed above. Moreover, different groups will try to appropriate the iconic figures of the past to themselves as their own predecessors, even though the positions of the later groups may be substantially different from their alleged predecessors.

Another example is the attempt to portray supporting the Afghan jihad against the Soviets of 1979-1989 as indicating support for terrorism. This is completely inadmissible on any measure in the United States, for the US government not only endorsed and promoted that jihad but even took a leading role in fomenting it, much as the Germans used the Ottoman Empire in the First World War and pressured the Ottomans into declaring a jihad. Had the US government been aware then what the Afghan jihad would lead to, it might have been more circumspect and less enthusiastic in its support, but its excuse is that it did not know the future. What is sauce for the goose is sauce for the gander, so that no blame in the viewpoint of US officialdom can attach to any of the declared jihad groups and activities in Afghanistan up to the Soviet withdrawal of 1989. After the Soviet withdrawal, the United States soon began to alienate the former mujahideen by trying to install a pro-American liberal regime in Kabul, thereby denying the mujahideen the fruits of their victory.[78]

## C. Terrorism vs. Jihad:

### 1. Comparing definitions:

I have spoken about both terrorism and jihad extensively above, so one should consult those sections. Jihad is just war according to its definition and elaboration in the Sharî'ah. Terrorism, on the other hand, is a pejorative term not generally ascribed to the self, but rather applied to or alleged against others. Inside of Islam, Muslims will describe armed struggles that they approve of as legitimate jihad, while those they do not approve of that are carried out by private or transnational or subnational groups are often branded as terrorism.

There is a very broad agreement of the scholars that jihad needs the leadership of a commander who can only be the sovereign ruler or government, and that the government must be obeyed and cannot legitimately be rebelled against. For if rebellion is allowed, then anarchy would ensue, which would be the worst condition to be in.[79] Therefore, in Muslim states, the Muslim ruler should be obeyed in all matters of public order.[80] However, the ruler should not be

---

[78] Scheuer, 84-85.
[79] 'Ubaykaan, 89-91.
[80] 'Ubaykaan, 31-38, 60-61

followed if he apostatizes from Islam, or if he commands prohibited actions. In such cases, the citizen is justified in not obeying immoral commands.[81] In this ruling, Islam does not differ from western standards, for it was likewise determined in the Nuremberg trials after the Second World War that saying one was merely obeying orders did not exculpate one if one had committed war crimes. Groups that go out against the state on the excuse that they are performing jihad, or groups that violate the international order by doing that on their own are not considered to be performing genuine jihad, but rather are at best rebels (*bughâh*) or else simply bandits and murderers, which is what the ancient Khawârij were judged to be.

One of the primary arguments against the state by the subnational groups seeking to justify their violence as jihad is that the rulers and their supporters, even maybe much or most of the population, are apostates from Islam who have to be fought against. Obviously, no state can support such an idea in any way whatsoever.

While independent groups launching murderous raids, killing civilians, attacking civilian venues or "soft targets" may easily be seen as beyond the realm of legitimate jihad, there are other cases that are not so easily decided. The original source of this entire discourse is, perhaps, the Afghan jihad. Although the Israel-Palestine question is older, it was initially mainly framed in terms of a nationalist struggle, the religious dimension being neglected, especially as Israel early on sought good relations with non-Arab Muslim countries including Turkey, Iran, and various African states. The first place that jihad came greatly to be publicized, and especially in a transnational way, was Afghanistan after 1978-1979. We have seen above, under Mujahideen, how the United States greatly contributed to and orchestrated the origination of this movement, not by colonial invasions, interventions, and oppression, but rather by helping the Afghan people to resist a presumptuous and authoritarian communist regime they did not want. Therefore, most of the US establishment at the time equated the Afghan Mujahideen with freedom fighters and considered the Afghan jihad a legitimate liberation struggle, and no basis existed for branding them as "terrorists" existed until 1992.

Likewise, the context of other struggles that were considered legitimate jihads by many have to be considered. In Bosnia's war of 1991-1995, the newly-independent Bosnia government welcomed help to relieve it from the Serbian onslaught, and Western Europe, with the approval of the United States, also ultimately opposed the Serbian side. In Chechnya's two wars of independence 1994-1996 and 1999-2009, there was likewise some possibility of claiming both self-defense for the Chechens as well as a Chechen government. Other struggles were perhaps less clear on these points, but the long struggle over Kashmir posited an illegitimate Indian rule over a Muslim-majority area, while the Palestinian struggle was over the claimed Israeli usurpation of the Palestinians' lands and homes.

**2. Statements of WAMY officials**:

I have reviewed various statements made by or attributed to WAMY officials and take this opportunity to provide context, consistent with the points raised earlier in this report. Dr. Al-Johani is reported to have made statements supporting the Muslims fighting for self-determination in Kashmir, Bosnia, and Chechnya. Dr. Al-Johani's statement of 16 May 1991 on support for the liberation of Kashmir, cited in the 3 June 1991 issue of *al-'Âlam al-Islâmî* –

---

[81] Muhammad ibn Ismâ'îl al-Bukhârî, *al-Jâmi' al-sahîh*, ed. by Muhammad Zuhayr ibn Nâsir al-Nâsir, Beirut: Dâr Tawq al-Najâh, 1422[/2001-2002], Vol. 9, p. 63, hadîth no. 7144; Muslim ibn al-Hajjâj al-Qushayrî, *Sahîh Muslim*, ed. by Muhammad Fu'âd 'Abd al-Bâqî, Beirut: Dâr Ihyâ' al-Turâth al-'Arabî, 1955, Vol. 3, p. 1469, hadîth no. 1839.

besides being very old and utterly different from the 9/11 attacks – is only his own opinion at the time and not the official position of WAMY.[82] His Arabic article dated 15 January 2000 on the need to support the Chechen struggle for liberation also contains no reference to WAMY and only expresses support for the Chechens who were defending themselves against a Russian onslaught.[83] Remember that Chechnya had won a kind of self-determined autonomy in 1996 that was being suppressed by a renewed Russian invasion. On 14 November 2001, Dr. Al-Johani declared that WAMY rejects terrorism, whether issuing from governments, private groups, or individuals, but validates legitimate self defense, as in the cases of Palestine, Kashmir, and Chechnya. The statements also contain no aggressive content, as they speak only of resistance against aggression. However, even assuming they are true, these statements are not to be taken as indicating any official position of WAMY, but rather only as his personal opinion, as explained by Dr. Noorwali.[84] Also, Dr. Noorwali is on the record defining jihad as defensive only, as shown in the quotation from him under Jihâd, above.[85] Fadel Soliman's statement of 23 Oct. 2002, defining jihad as 1) the struggle against the self (the greater jihad) and 2) the struggle to establish justice also only expresses entirely peaceful religious ideals that is shared or acknowledged generally by other religions as well.[86] Furthermore, it is simply an informational descriptive definition, not a recommendation or a program.

As for Jonathan Winer's reliance on Steven Emerson's testimony of 9 July 2003, the Emerson testimony contains no evidence or proofs, but merely consists of innuendos and sweeping generalizations.[87] Moreover, there is no indication that Winer himself ever reviewed or studied the source materials at issue. Thus, the claim that WAMY offered any support to "terrorism" in general or al-Qâ'idah in particular, or that its educational activities " justified war against those who did not share Wahhabist beliefs"[88] is contrary to the facts.

As scholars will attest, religious schools in Saudi Arabia and Pakistan are certainly not training camps for "terrorists" nor for mujahideen. Rather, they provide a curriculum that tries to bridge the spread between medieval Muslim and modern knowledge, by giving a good grounding in the religion, as any Catholic school in the United States will try to do for Catholicism, as well as providing a modern education enabling the student to live in the modern world. That Steven Emerson is a widely-discredited Muslim-baiter who has been caught out in such lies that he was even denounced by the UK prime minister David Cameron surely matters in judging this accusation. Winer's repetition of the accusation, without any critical examination, is likewise suspect.

**D. Islamic charitable practices**:

**1. Zakat**:

---

[82] FED-PEC0250105.
[83] FED-PEC0233836-843.
[84] Noorwali Dep at p. 166.
[85] Noorwali Dep Exhibit 258 (FED-PEC0235726-730).
[86] WAMY Intl E000730-731. On the struggle to overcome the self, i.e., selfish worldly desires, see Yitzhak Buxbaum, *Jewish Spiritual Practices*, Northvale, NJ: Jason Aronson, Inc., 1990, pp. 117-118, 123-124, 127-128, 131-132, 139-140. On the requirement of the struggle for justice, see in the Bible: Leviticus 19:15; Psalms 82:3; Isaiah 56:1; Amos 5:24. This is a general requirement of religion.
[87] Winer Report at Sections 4.7.2; 6.7.1.1; 12.9.2; and 13.3.
[88] Winer Report at Section 12.10.1.

Zakat (Ar. *zakâh*) is one of the five pillars of Islam (listed above under Islam). It consists of zakât al-mâl and zakât al-fitr.

Zakât al-fitr is a nominal payment made by all except for the poorest at the end of the fast of Ramadân. The head of each household must pay for each member of the household. Originally and traditionally paid in non-perishable food items, today it is generally commuted into cash. In the US today, the amount per person is various prescribed as being between $3 and $10 at the different mosques. Its purpose is to give the poorest enough food so that they too can enjoy the festival of the breaking of the fast (*'îd al-fitr*). This zakat is supposed to be distributed immediately to the poorest of the local community and thus generally stays in the same locale. Sometimes, to distinguish this type of zakat from the main type, it is called *sadaqat al-fitr* instead,[89] referring to voluntary charity. However, it is a *sunnah mu'akkadah* or confirmed sunnah, and most Sunnî Muslim communities regard it as mandatory and refer to it as zakât al-fitr.

Zakât al-mâl, on the other hand, is a potentially more substantial annual payment consisting of a tax on five kinds of property held for a period of one year: 1) limited types of livestock: camels, cattle, sheep, and goats, but excluding poultry, 2) a limited number of non-perishable plant crops, chiefly grains, 3) treasure trove, such as mines for gems and precious minerals, 4) trade merchandise, and 5) gold and silver. Today, for most people, only the fifth category applies, and that one only when paper money, bank accounts, and other financial instruments are added to gold and silver, because otherwise in most cases the payment would be negligible, especially as personal gold and silver jewelry are also excluded for all the legal schools except for the Hanafîs.[90] Real estate owned is not considered. The tax is to pay two and a half percent if the minimum amount of wealth in that category held over a year exceeds about $5,000. On this basis, probably only a minority of Muslims are liable to zakat al-mâl, because most people live hand-to-mouth and have little or no savings. Some contemporary websites have tried to reinterpret the zakat al-mâl as an income tax, but that has no basis at all in classical texts and has been firmly rejected by the scholars.[91] Because zakât al-mâl is the main part of the pillar of zakat, many people work on collecting it and many more receive it, but usually, like the zakât al-fitr, it is collected and distributed locally. Most often, it is collected and distributed by masjid zakat committees, who know or are able to find out who the needy people are in the immediate area. It should be paid annually on the same date, but there is no fixed date when that must be; rather, every individual who owes it should themselves choose a date in the Muslim calendar to pay it and then stick to that date annually.

The disbursement of the zakât al-mâl is governed especially by Qur'ân 9:60, which reads:

"Charity (*sadaqât*) is only for the poor, for the unfortunate, for those who work collecting the charity, for those whose hearts are to be reconciled, for freeing slaves, for freeing debtors, in the way of God, and for the traveler: a duty from God. And God is Knowing, Wise."

Even though the verse speaks of voluntary charity (*sadaqah*) rather than zakat, zakat has been understood here by the 'ulamâ'. Thus, there are eight headings under which the money may be spent:

---

[89] Zuhaylî, *Fiqh*, 2:900-914.
[90] Zuhaylî, *Fiqh*, 2:764-768.
[91] Zuhaylî, *Fiqh*, 2:866.

1). The poor (*al-fuqarâ'*)
2). The unfortunate (*al-masâkîn*)
3). Those responsible for collecting and administering the zakat (*al-'âmilûna 'alayhâ*)
4). Those whose hearts are to be reconciled (*al-mu'allafatu qulûbuhum*)
5). The freeing of slaves (*fî al-riqâb*)
6). Those in debt (*al-ghârimûn*)
7). In the way of God (*fî sabîl Allâh*)
8). The traveler (*ibn al-sabîl*)[92]

The Shâfi'îs alone have the teaching that it should be divided equally eight ways among the eight categories. Others feel there is a built-in priority in the order of the list, so that the poor and unfortunate are the highest priority.[93] The priority of the poor is also supported by a hadîth of the Prophet Muhammad where he tells his emissaries to Yemen,

> "Then teach them that God has imposed on them a charity which is taken from their wealthy ones to be given to their poor ones."

Based on this hadîth, it is the principle of the Mâlikî school of law that the entire amount of the zakat may be given to one category, that is, to the poor, and indeed the Mâlikîs prefer that it be given to the poorest or most needy (*al-mudtarr*).[94] Indeed giving the whole amount to the poor is actually the normal practice in the Muslim world, although al-Zuhaylî notes that today it is largely limited to the four categories of the poor, the unfortunate, those in debt, and travelers (nos. 1, 2, 6, and 8 in the above list). [95]

Of the eight categories listed in the Qur'ânic verse, the poor are usually interpreted to be just those with poverty who are very needy. The unfortunate are sometimes thought rather to be those suffering from an immediate need owing to a disaster or loss. The third category of collectors of the zakat shows the intention to publicly organize the collection and pay the collectors, but today it is largely not observed, and paying the zakat has become voluntary. The fourth category, those whose hearts are to be reconciled, refers to certain tribal chiefs who were granted donations after the Battle of Hunayn in 630 as a reward for their embracing Islam; the Hanafis held that this category only applied during the Prophet's lifetime, and now it is not much observed either. Fifth was to free captives, meaning slaves who were Muslims and desired to be free but could not afford to buy their freedom, and this has also fallen into abeyance because slavery has ended. Sixth is to relieve debtors, which is similar to the relief or the poor and the unfortunate in categories one and two. The seventh category, "in the path of God," is a kind of catchall for doing good. The Hanbalîs and some others include the pilgrimage as being in the path of God and thus eligible for this zakat. Despite these prescriptions, this category has also nearly lapsed. The eighth category consists of support stranded travelers who are engaged in a legitimate activity.[96]

---

[92] Zuhaylî, *Fiqh*, 2:869-875.
[93] Zuhaylî, *Fiqh,* 2:870.
[94] Zuhaylî, *Fiqh*, 2:867-868.
[95] Zuhaylî, *Fiqh*, 2:868.
[96] Zuhaylî, *Fiqh*, 2:869-875.

**2. Sadaqa**:

As contrasted with zakat, which consists of required payments like a tithe or a tax, sadaqa is defined as voluntary charity and thus is less regulated by the sharî'ah prescriptions. Wahbah al-Zuhaylî specifically refers to this form of charity as *sadaqat al-tatawwu'*, or voluntary charity.[97] Unlike the two forms of zakat specified above, which are annual, sadaqa can be given at any time. It is a desirable action (*mustahabb*), but not required. Sadaqa can almost rise to the level of *wâjib*=necessary if someone is truly in need and one has an excess of wealth above which he needs which he can donate. It also can be *harâm*=forbidden should the donor know that it will be used for sinful purposes.[98]

Of course, neither zakat nor sadaqa are to be used for forbidden purposes. But, like charity in general anywhere in the world under any religious or secular system, the individual donors, who only intend to do good by making donations, usually do not have the means to deeply investigate how the recipients are spending their charitable donations, and even if they do investigate that very thoroughly, they may well be mistaken, or the recipients, after receiving the donations, may change their own intentions and spending patterns. A big example of the latter change is how donations given to the Afghan mujahideen were originally used entirely in Afghanistan in the struggle against the Soviets or for poor relief there, but after 1992 some of the mujahideen began to redefine their struggles as elsewhere, which then became formally and officially labeled terrorism. It is difficult to see how donations made before that date could be labeled terrorism by any US governmental or other official designation. Apart from that particular exception, one would also have to own that individual charitable donors usually cannot be held responsible for how their charitable donations are spent by the recipients.

**3. Obligation of zakat vs. charity in Islam**:

While zakat is an individual annual obligation, the same cannot be said of sadaqa, which remains always voluntary. There are never any particular circumstances where a sadaqa donation has to be made as a *fard `ayn* requirement.

A work discussing charity in Islam with particular reference to Saudi Arabia is J. Millard Burr and Robert O. Collins, *Alms for Jihad: Charity and Terrorism in the Islamic World*,[99] a book which needs to be reviewed, as it is mentioned in this case.[100] This work is clearly controversial, as it was withdrawn by the publisher, the Cambridge University Press, which pulped its unsold copies and asked universities to remove it from their collections, because of a threatened libel suit by a Saudi banker named in the book, Khalid bin Mahfouz. The press determined that the book contained unproven assertions and that it would lose if it tried to defend the book in court. Beside the book's withdrawal, it also received unfavorable reviews from several prominent scholars, include Roel Meijer, a Dutch professor who has written much on terrorism, Lawrence Rosen, and Clinton Bennett, all of whom oppose activist Islam. Meijer's review is particularly scathing. The book throws accusations around wildly but proves very little, and the book seriously lacks much documentation of its assertions. Examining the book itself, however, despite the intent of the authors to paint a grim picture and to mobilize western people against Saudi charities, we find that WAMY is given a very mild portrayal, with no connections

---

[97] Zuhaylî, *Fiqh*, 2:915.
[98] Zuhaylî, *Fiqh*, 2:916.
[99] J. Millard Burr and Robert O. Collins, *Alms for Jihad: Charity and Terrorism in the Islamic World*, Cambridge: Cambridge University Press, 2006.
[100] (PEC-WAMY012476-PEC-WAMY012842).

with terrorism being asserted, let alone demonstrated. The book correctly notes that the US government's interagency Operation Green Quest determined by 2003 that the activities of WAMY did not constitute a threat to the USA.[101]

Examples of LBI charities appear in two letters. The first of these, dated 4 September 1990, is from Abdullah al-Sabour and mentions distributing alms "to raise the morale of mujahideen families in the Akoora Camp."[102] This evidently refers to the camp at Akora Khattak, Pakistan, halfway between Peshawar and Islamabad. An article of 2014 discusses how the refugees in this camp, who have never gone back to Afghanistan, are still destitute.[103] It is not surprising that the morale of the families left there would need raising at that time in light of the continuation of the war after the Soviet withdrawal in 1989 and of their continuing refugee status in Pakistan. There is nothing to connect any of the persons there with any "terrorism" or anti-US activities. The second letter addressed to Abdul Saboor, probably the same person as Abdullah al-Sabour mentioned above, dated 1 December 1992, requests the loan of fifteen blankets for orphans![104] Neither of these letters has any military, militant, or militaristic context at all, and it is difficult to know why they were brought up. They do however reflect the normal Muslim concern for the care of destitute families and orphans.

**E. Review of WAMY publications, speakers, and events supposedly encouraging terrorism**:

WAMY is alleged to have supported terrorism by editing and/or distributing anti-American, anti-Semitic, and pro-jihadist messages. A review of the materials relied upon by the plaintiffs and their experts demonstrate that WAMY did no such thing.

**1. WAMY Constitution**

The WAMY Constitution makes clear the purposes of the charitable organization on the basis of Islam. It is particularly important to consider the goals of WAMY enumerated in the eight points of Article 3 and the methods of achieving those goals set out in the six points of Article 4. First, the goals:[105]

> Article 3:
> The World Assembly of Muslim Youth (WAMY) shall try to achieve the following aims and objectives:
> 1. To serve the Islamic Da'wah (calling to Islam) in matters of Aqeedah, Shariah and social behavior among the Muslim youth of the world.
> 2. To deepen a sense of pride in Islam among the Muslim Youth through emphasizing the supremacy of Islamic social system and explaining to them the importance of adherence to Islamic teachings in their personal and social life.

---

[101] Burr and Collins, 51-52 in electronic version.
[102] (PEC-WAMY005905-PEC-WAMY005906).
[103] Khalid Khan, "Victims Of Soviet-Afghan War Live Forgotten In Pakistan Refugee Camp," 14 Feb. 2014, RadioFreeEurope RadioLiberty, at https://www.rferl.org/a/pakistan-soviet-afghan-refugees/25264055.html . The source of this website, RadioFreeEurope RadioLiberty is a non-profit private organization funded by the US Congress. https://pressroom.rferl.org/about-us .
[104] (WAMYSA063617).
[105] Noorwali Exhibit No. 255, WAMY Constitution, pp. 1-2, (WAMY-SA E001045- WAMY-SA E001052).

3. To elucidate the true Islamic ideology which should be followed by the Muslims as mentioned in the holy Qur'an and the Sunnah of the prophet (pbuh) and as was explained and followed by the worthy ancestors (Salaf Salih) of Ummah.

4. To deepen the Islamic culture among the Muslim youth and protect the means of Islamic unity that unite them according to the Qur'an and Sunnah.

5. To explain the role of the Muslim youth in the construction of the Islamic society and its social, economic and scientific institutions, and to eliminate the causes of backwardness, sectarianism and stagnancy in the Muslim societies.

6. To support the scientific, cultural and vocational institutions established for the welfare of the Muslim youth and students all over the world and assist them in the implementation of projects that are in accordance with the objectives of WAMY.

7. To coordinate and cooperate with institutions and associations that work for the benefit of the Muslim Youth and students all over the world.

8. To look after the brilliant Muslim students and care for them economically and culturally.

These points clearly lay down WAMY's purpose as a da'wah organization aimed at Muslim youth. In other words, its purpose is conservative, seeking to keep Muslim youth within the fold of Islam and if possible to bring them closer to correct practice (points 1 & 3). Emphasis on the social system means specifically reinforcing the traditional Muslim focus on family life, meaning marriage and the raising of children, and avoiding illicit relationships that are not conducive to such a social structure (point 2). This is also conservative, in trying to preserve traditional social arrangements. At the same time, WAMY seeks to remove backwardness in Muslim societies by building strong cultural institutions (point 5). In order to achieve these goals, there is a strong emphasis on education, including the integration of modern science into it (points 6 & 8). The whole program is entirely constructive and also rather modernist and positivist, looking to build a wholesome society that can live in the real world. This is in utter contrast with the Bin Ladinists, whose project is on the contrary entirely destructive. At the same time, it is deeply rooted in the classical texts and traditions of Islam.

Note that while relief work and aid is not specifically mentioned in these points, it is implied by point 7, because it is for the benefit of youth and students. As stated elsewhere by Dr. Noorwali, the need for relief arising both from the destruction wrought by wars and that coming from natural disasters has been dire, and of course the youth in such devastated places need aid. Also, aiding their whole families helps the youth as well, so that WAMY became involved in such relief work.

Next, the means of achieving these goals:[106]

Article 4:

The World Assembly of Muslim Youth (WAMY) shall try to achieve its objectives by the proper means; such as the following:

1. Organising conferences, meetings, lectures and religious and cultural competitions for the purpose of introduction and religious and cultural awakening among the Muslim Youth.

---

[106] (WAMY-SAE001045- WAMY-SAE001052), WAMY Constitution, pp. 2-3.

2. Publishing books, conducting researches and producing video & audio cassettes that introduce Islam as an ideology and social system to be distributed among the Muslim youth in the important languages of the world.

3. Organizing camps, courses and Da'wah caravans for the Muslim youth in the Muslim countries or in countries where Muslim minorities and communities live in order to develop youth potentials, polish their abilities and direct their efforts for the service of the Muslim Ummah and their societies.

4. Lending material and moral support to the Muslim youth and students organisations and associations of the world.

5. Participating in international assemblies to represent the Muslim youth and students and express their views and introduce their problems as well as try to find out solutions in the light of Islamic guidance.

6. Giving scholarships and assistance to the Muslim Youth.

How to raise the next generation as Muslims is a problem that confronts every Muslim parent, and there is no easy solution to it, as the contemporary convergence of everything in the world together does not favor any isolationist methods. In the six points of proper means shown above, WAMY has done its best to conceive of what it can do, and one will note that the means adopted are not very different from those used by other religious groups who are confronted with the same question. Points 1 and 3, as well as perhaps 5, involve extracurricular activities outside of normal school time or school terms to try to get the youth together in a way that will reinforce their commitment to Islam as their religion. Points 2 and 4 give material aid to support those activities. Point 6 emphasizes the abiding importance of supporting education. All of these activities are peaceful, and none represent an agenda to support terrorism.

**2. WAMY's commitment to educating Muslim youth**

Education is a basic requirement of Islam, as has been emphasized since the Middle Ages. Indeed, the call to educate is found in the Qur'ân in numerous places. Verses believed to constitute the very first revelation to the Prophet Muhammad in c. 609 AD read (Qur'ân 96:1-5):

"Recite in the name of your Lord Who has created,
Who created the human being from a clot.
Recite, for your Lord is the Most Generous,
Who has taught by the pen,
Taught the human being what he did not know."

This passage already emphasizes teaching through written texts. Elsewhere, Qur'ân 9:122 even prescribes the establishment a cadre of teachers to instruct others in the religion. Study is also mentioned favorably in 3:79. Other relevant verses stressing learning and education include 2:151, 239; 4:110, 113; 18:65-66.

The Hadîth also emphasizes the need for education with great clarity. One famous hadith in this regard is the Prophet Muhammad's saying, "Seeking knowledge is an obligation required of every Muslim."[107] Another very well-known hadîth states in part, "Whoever follows a path

---

[107] Muhammad ibn Yazîd Ibn Mâjah al-Qazwînî, *Sunan Ibn-i-Majah,* translated by Muhammad Tufail Ansari, New Delhi: Kitab Bhavan, 2nd ed., 2003, Vol. 1, pp. 126-127, hadîth no. 224; Tabrîzî, 1:76, hadith no. 218; Abû 'Umar

seeking knowledge, God clears a path for him to paradise."[108] There are many other hadiths with a similar message.

Furthermore, the Muslims put these teaching about education into effect in the Middle Ages. While schooling was first done in the mosques, by the 11th century special school buildings had begun to be set up. Famously, the Seljuk prime minister Nizâm al-Mulk (1018-1092) established a whole group of schools called Nizâmiyyahs in various cities of the Seljuk realm. The emerging Muslim education system also helped to inspire the rise of the colleges in Europe, as demonstrated by Professor George Makdisi.[109]

Schooling in the Muslim world was divided into grades according to the levels of proficiency mastered by the students, including the elementary (called *maktab* or *kuttâb*), the secondary, and the college levels. Education was not universal or compulsory, but it was available and was often a route for advancement in society. As in the medieval Christian world, religion was at the center of the curriculum, but many ancillary fields of knowledge were also taught, including specifically reading, writing, mathematics, geography, foreign languages, poetry, and ethics. Advanced courses, mostly at the college level, included medicine, engineering, astronomy, philosophy, politics, history, and cultural studies.

In modern times, this traditional school system continued, but it was often modified and reformed by the introduction of more modern curriculum and standards. Various new schools were founded on the European model, including Dâr al-'Ulûm Deoband in 1866 in India, established to enable traditional Muslims to keep up with modern knowledge without ceding the stage to secularization. This became the model of modern Muslim religious schools. At the same time, the colonial administrations and their nationalist successors set up public school systems and aspired to make education universally compulsory. Because of inadequate funding for government schools, private religious schools were also welcomed. Also, in some countries, the government established its own religious school system alongside of the ordinary public one, as in Turkey, Egypt, and Pakistan.

So when WAMY funded a number of schools in Afghanistan and Pakistan, as well as other countries, it was following both its own constitution, which emphasizes education,[110] and also the great Muslim tradition and Qur'ânic and prophetic mandate to support and promote education in the Muslim world. It also did so in accord with the prescription in its constitution to modernize education by including modern science,[111] so that students would receive a well-rounded education and be able to function in the modern world as upstanding members of society in their various countries. While of course it also sought to promote its own view of Islam, it nevertheless stressed points that all Muslims could agree on, trying to avoid sectarianism.

The word for school at all its different levels in classical Arabic is *madrasah* (pl. *madâris*). Unfortunately, this word has been taken over in some English-language media to mean religious schools for terrorism/terrorists, especially if the schools in question are in Afghanistan or Pakistan, and this accusation also appears in some of the plaintiffs material. However, the

---

Yûsuf Ibn 'Abd al-Barr, *Jâmi' bayan al-'ilm wa-fadlihi wa-mâ yanbaghî fî riwâyatihi wa-hamlihi*, Cairo: Idârat al-Tibâ'ah al-Munîriyyah, 1928, Vol. 1, p. 7-10.

[108] Muslim, 4:2074, hadîth no. 2699; Ibn Mâjah, 1:126-128, hadiths nos. 223, 225; Tabrîzî, 1: 71, hadîth no. 204, 74, hadith no. 212, 85, hadîth no. 255; Ibn 'Abd al-Barr, 1:35-37.

[109] George Makdisi, *The Rise of the Colleges: Institutions of Learning in Islam and the West*, Edinburgh: Edinburgh University Press, 1981.

[110] In Article 3, points 5-8, and Article 4, points 4 and 6. Noorwali Exhibit No. 255, WAMY Constitution, pp. 1-3.

[111] In Article 3, points 5 and 6. Noorwali Exhibit No. 255, WAMY Constitution, pp. 1-2.

accusation is false and represents a very unnuanced view of education in the Muslim world in general and in those countries in particular. First of all, participants in terrorist acts are very few, whereas the students taught in religious schools in both Afghanistan and Pakistan are exceedingly many, possibly millions. Muslim schools do not have military training as part of their curriculum. Because both countries are poor, the public schools are not sufficient to teach everyone. Therefore, donors have stepped in to set up religious schools, which, while including religion in their curriculum, also include secular subjects, as described above. These schools often improve the lives of poor children. However, they too are underfunded, and their staffs, including their teachers are often underqualified. So it has been a great benefit when WAMY has stepped in with educational assistance. This includes the Abu Hanifa and the Imam Malik Schools, both evidently in Afghanistan, the latter mentioned in Ibrahim Anwar Ibrahim's deposition.[112] This is also the context of the donation sought by Dr. al-Johani for the Shams Islamic Science University in Pakistan.[113]

As for other educational programs, WAMY produced the likes of Malaysian Deputy PM (1993-1998) Anwar Ibrahim (b. 1947) and Turkish President (2007-2014) Abdullah Gül (b. 1950) from the ranks of their youth programs. Many in the Afghan Parliament also went through WAMY youth programs.

(7) WAMY publications were produced in conjunction with Saudi government

For some reason, the plaintiffs seem to think that the fact that the Saudi government provides funds to WAMY is evidence of WAMY's links to terrorism.[114] The Israeli ex-ambassador Dore Gold, who ought to know better, seems particularly anxious to insist on the subordination of WAMY to the Saudi government.[115] This may be a part of his crusade against the whole country of Saudi Arabia.[116] Commenting on Gold's book *Hatred's Kingdom*, Joseph A Kechichian says, "Few would dispute that certain Saudis provided financial support to Al Qaida. However, to conclude that by 1996 the Kingdom of Saudi Arabia had "gone to the dark side" (p. 182) fits better into the screenplay of a science fiction film like Star Wars than into a judicious analysis of the connection between Saudi Arabia and terrorism. Although there are undoubtedly Saudis, including princes and preachers, who support terrorists, the Saudi state does not sanction this."[117] Also addressing this subject, the Middle East scholar David Commins, a professor at Dickinson College in Pennsylvania, shows how Bin Ladinism is quite antithetical to Wahhabism, contrary to Gold's claim, especially because of two points: "First, al-Qaeda's call for the overthrow of Al Saud contradicts Wahhabi doctrine and practice. Second, al-Qaeda's call for jihad against the West is illegitimate according to Wahhabi doctrine, which maintains that only a sovereign ruler may declare jihad."[118] Commins elaborates his point in detail throughout his book.[119]

---

[112] Ibrahim Anwar Ibrahim deposition, pp. 322-324.
[113] Cell 321 in 2020-02-20 Topics Index for Experts.
[114] PEC-WAMY013402 – 13452; Winer Report at 9.4.4.5; Matthew Levitt Report, p. 30.
[115] (PEC-WAMY013402-PEC-WAMY013402) at (PEC-WAMY013430.).
[116] Dore Gold, *Hatred's Kingdom: How Saudi Arabia Supports the New Global Terrorism*, Washington, DC: Regnery Publishing, 2003, xviii + 309 pp.
[117] Joseph A. Kechichian, "Review Article: The Burden of Saudi Arabia," *Middle East Journal* 57, No. 3 (Summer, 2003), p. 496.
[118] Commins, 185.
[119] See especially Commins, 184-190.

Gold's charge, as with many Americans' attitudes toward the subject, is badly misguided. The common view seems to be that if the hijacker attackers of 2001 were mostly Saudis, then the whole country of Saudi Arabia must be involved and guilty. In reality, of course, the whole transnational "jihad"-against-the-West idea is quite impossible to connect with the Saudi rulers because it is diametrically inimical to their interests and therefore to their policies. While individuals might work against such an official policy, it is absolutely impossible for such individuals to do so openly, nor could an organization such as WAMY do so at any time in its history. Therefore WAMY's relationship with the Saudi government actually makes it even more impossible that WAMY as an organization or its leadership ever knowingly enabled, supported, cooperated with, or aided or abetted terrorists. The argument of Gold here ignores these crucial points.

**3. WAMY's Publications**

WAMY has a very large number of publications, most of which are normal religious literature. To be sure, this literature is meant to promote the religion of Islam and steady adherence to it, but in doing so it is not very different from other religious literature in other religons. This means that it presents a particular point of view, but that also is quite normal. At the same time, only a tiny number of which, all discussed below, have been mentioned or criticized by the plaintiffs. If one examines these few items closely, as I do below in detail, it becomes clear that they also do not amount to what the plaintiffs claim.[120] The fact that WAMY's publications are so many and those the plaintiffs have attacked are so few completely refutes the idea that WAMY primarily existed to promote any hidden agenda.

(1) They Said About Islam

One example of WAMY's publications is the substantial Arabic book *Qâlû 'an al-Islâm* (also translated into English as *They Said about Islam*) by Dr. 'Imâd al-Dîn Khalîl (b. 1939), a prolific Iraqi historian from al-Mawsil who worked in Saudi Arabia.[121] This book consists entirely of testimonials about the excellence of Islam, mostly by non-Muslims, including many famous persons. Even Bernard Lewis, the famous orientalist critic of Islam and Muslims, is quoted! The testimonials are all put into Arabic for the book, of course, but an English translation of Khalil's book also exists. This book indicates the interest of WAMY in citing the opinions of non-Muslims and a concern for their views. It is obviously very far removed from any militant contexts at all, let alone terrorism.

(2) Future of Islam

The *Future of Islam* is a monthly WAMY publication.[122] Its actual English-language title is *Islamic Future*. I was able to review issues from 1993-1998 in the discovery materials, which show that it is a typical Muslim magazine covering a variety of topics, ranging from the condition of Muslim minorities in various places to interviews with prominent people. Interestingly, it published in English the entire speech of Samuel P. Huntington at the Janadiriyyah National Folk Festival in Riyadh in 1996,[123] an event I attended and also presented

---

[120] Winer Report at 12.11.1.1, 12.11.1.2, 12.11.2.1, 12.11.2.2, 12.11.2.3, and 12.11.3.1.

[121] WAMYSA023551 - WAMYSA024044.

[122] (PEC-WAMY000074-PEC-WAMY000118.).

[123] Samuel P. Huntington, "The Challenges of Islam and the West to Each Other," *Islamic Future* 11, No. 56 (Dhû al-Hijjah 1416/April 1996), pp. 5-8. For the details of Huntington's thesis, which produced a lot of discussion

a paper at. Publishing Huntington, famous for his "Clash of Civilizations" thesis, certainly indicates a willingness to dialogue. On the other hand, the July 31, 2003 prepared testimony of Steven Emerson and Jonathan Levin before the Senate Committee on Governmental Affairs references a news article describing an interview with Shaykh 'Â'id al-Qarnî containing anti-American statements, both against the US occupation of Iraq and the US or its government in general,[124] but that interview seems to have taken place in 2003 – after the US invaded Iraq. I would think that, even if the translation of al-Qarnî's remark turns out to be accurate, which I do not concede until I see the actual text, the publication cannot be held responsible for the speech of the interviewee, and it also published the Huntington speech, with which it certainly did not agree. At any rate, a 2003 publication of an interview could not have contributed to the 9/11 attacks.

(3) Islam at a Glance (See Cell 1627 of the Topics Index)

This publication is a mere brochure or flier published by WAMY. Its date remains to be established. Its title is identical to a book by Sadruddin Islahi (1916-1998) that is also recommended by another WAMY publication.[125] In the WAMY flier, the offending phrase, which is part of one of the goals of WAMY, is stated to be, "To … arm the Muslim Youth with full confidence in the supremacy of the Islamic system over other systems."[126] This is a kind of restatement of Point 2 in Article 3 of the WAMY constitution, which states more precisely, "To deepen a sense of pride among Muslim youth through emphasizing the supremacy of Islamic social system and explaining to them the importance of adherence to Islamic teachings in their personal and social life."[127] However, there is nothing illegal, illicit, exceptional, or odd about either of these two formulations. Generally, religious organizations of evangelical hue, including especially Christian ones, also stress the superiority of their systems of belief and practice over all others. Also, in this case it clearly constitutes a defensive move from WAMY, in that it is entirely an effort to keep Muslim youth within the fold of the faith, or to bring them back to it if they have already strayed, a type of project also familiar to Christian denominations.

(4) Islamic Views (Arabic: *Tawjîhât islâmiyyah*)

The Arabic book *Tawjîhât islâmiyyah*, usually referred to in English as *Islamic Views*, is claimed by the plaintiffs to be a publication authored by WAMY and published in 1991 at the Saudi Armed Forces Printing Press, [128] yet this is patently untrue, as this book actually was authored by a well-known shaykh and professor at Dâr al-Hadîth al-Khayriyyah in Mecca, Muhammad Jamîl Zaynû, and published at least by 1984 and possibly earlier. Zaynû is not alleged and does not appear to have had any relationship with WAMY at all. Because of its popularity, the work was then reprinted numerous times by a large number of publishers in various countries in many different editions. WAMY only reprinted it in 1991 or 1992, after dozens of printings or editions had already been published elsewhere, and indeed in a number of different countries.

---

outside of the US, see his book: Samuel P. Huntington, *The Clash of Civilizations and the Remaking of the World Order*, New York: Simon & Schuster, 1996.

[124] FED-PEC0099263-FED-PEC0099295.

[125] *Islamic Camps: Objectives, Program Outlines, and Preparatory Steps*, translated by Abu-Bakr M. Asmal, Riyadh: WAMY, 1411/1990, p. 114.

[126] (FED-PEC0099263- FED-PEC0099296) at (FED-PEC0099279.).

[127] Document Noorwali 255; (WAMY-SA E001045- WAMY-SA E001052).

[128] (PEC-WAMY013366-PEC-WAMY013401) at page PEC-WAMY013376; Winer Report at 12.11.2.1.

The actual publication history of *Tawjîhât islâmiyyah* is as follows. The earliest reference to it that I found is in WorldCat (meaning World Catalogue), which is a worldwide database subscribed to by most university libraries and others whose ambition is to document all the library holdings in the world, principally of university libraries but also including public libraries. Thus, it is the most complete resource to discover the publication history of any book. While its coverage of editions of popular Arabic books like this one is not absolutely complete, it nonetheless contains a great many items. The earliest publication date for *Tawjîhât islâmiyyah* which it has is 1984 in Cairo, Egypt, by Dâr al-'Ulûm al-Islâmiyyah (417 pp.), which also republished it in 1988. Then it was published by Dâr al-Hadîth at Mecca in 1985 (112 pp.), but this publication is described as its fifth printing. It was also published at Dâr al-Sharq al-'Arabî in Beirut in the 1980s in what is called the 18th printing or edition (tab'ah). In his short preface (p. 3), the author notes that the book has been published in very large numbers of copies at Mecca and Jiddah, has also been published in Algeria, Kuwait, and Jordan, and is to be published in Lebanon and Egypt, and none of these would seem to refer to the WAMY edition, which appears to have been much later than all of these; indeed, the date of the preface would seem necessarily earlier than 1984 because it says the book had not yet then been published in Egypt. The Saudi Armed Forces edition of 1992 (144 pp.) is probably the one which the plaintiffs are referring to, but it is only a reprint. So it might actually be from earlier than 1984, but it is no later than that in date. The upshot of this publication history is that WAMY had nothing to do with the authorship or the early printing of the book but rather came to it very late and only to make a reprint.

The actual precise title of this book is *Tawjîhât islâmiyyah li-islâh al-fard wa-al-mujtama'*, authored by Muhammad ibn Jamîl Zaynû (1925-2010). Of Kurdish origin, as indicated by the û in his surname, Zaynû was born in Aleppo, Syria, where he studied in a private academy, graduating in 1948 to become a schoolteacher about 1949-1978, then he made the lesser pilgrimage (*'umrah*) to Mecca in 1979, where he met 'Abd al-'Azîz ibn Bâz (1910-1999), who appointed him to teach at Mecca during the pilgrimage that year. Then Ibn Bâz sent him to preach and teach at al-Ramthah in Jordan, but he came back to Mecca in 1980 and was appointed to teach at Dâr al-Hadîth al-Khayriyyah there, where he stayed for the rest of his career. He authored a series of *Tawjîhât* books,[129] of which the book in question is the earliest. Though not originally a Saudi, he became a famous and popular Salafî/Wahhâbî shaykh in Saudi Arabia during his thirty years there, 1980-2010.

Zaynû's book in question, in which I have located the controversial quotations (cited by Winer, relying on Emerson) in the Arabic, is a 144-page work, at least in the pdf copy which I have downloaded.[130] The book is not about politics or the Jews, and it is a distortion to say it is full of anti-Semitism or hostility to non-Muslims, although there are a few offending sentences. Rather, it is a sort of Wahhabi fiqh (jurisprudence) compendium about correct practice and features many of the teachings that are peculiar to the Wahhabis, which is probably why it is popular with Saudis and Salafîs throughout the world and why it was republished and reprinted so many times, by many different publishers, since it appears never to have been in copyright. As

---

[129] For his biography, see https://shamela.ws/index.php/author/1144 , a site of the major on-line classical Muslim Arabic literature resource, al-Maktabah al-Shâmilah.

[130] Muhammad ibn Jamîl Zaynû, *Tawjîhât islâmiyyah fî islâh al-fard wa-al-mujtama'*, Dubayy: Jâm'iyyat Dâr al-Birr, no date. This printing was probably published after 2000, but it is clearly identical to the 144 pp. print editions noted above, which are much earlier, having the same pagination. More important, it has the same pagination and typeface as the pdf of the table of contents provided by WAMY, showing that it is an exact copy of that, or that both are perhaps exact copies of an earlier edition. It also has the same older preface written by Zaynû in 1984 or earlier.

shown above, it was not first published in 1991, but rather in 1984 or earlier, and it was not first published by WAMY. The statement by Steven Emerson cited by Winer that it was authored by WAMY[131] is therefore plainly untrue, and Zaynû was part of the Saudi Wahhabi *'ulamâ'*, an employee of Dâr al-Hadîth in Mecca, a religious school, and not part of WAMY. WAMY often reprinted little books authored by others, and this is probably one of them. Interestingly, the book does exist also in an English translation under a more accurately-rendered title: Muhammad Jamil Zino, *Islamic Guidelines for Individual and Social Reform*, translated by Ibrahim M. Kunna, Riyadh: Darussalam Publishers and Distributors (a major Saudi press), 190 pages. The same book in English translation also seems to have been reprinted by Al-Attique International Islamic Publications of Toronto, Canada.

Even though this book is not from WAMY in origin, so that its contents are not as germane to the case as the plaintiffs have alleged, I am going to discuss each of the passages cited by the plaintiffs to demonstrate their lack of connection with terrorism or support for terrorism. The first reference to jihad[132] in Zaynû's book falls on pp. 60-61 in the electronic edition I am using. The heading here (p. 60) that Emerson has translated as, "The Prophet asks for Jihad" actually means "The call of the Prophet and his jihad" (*da'wat al-rasul wa-jihâduhu*), completely different from what Emerson claimed. Indeed, Emerson's construction of it turns a purely historical heading into an ominous one. In the section, describing the Prophet Muhammad's career, Zaynû says (p. 61), "The messenger fought the polytheists and the Jews and defeated them, and he fought himself in about twenty expeditions, and he sent out tens of raids by his Companions for the jihad, the call to Islam, and the liberation of peoples from oppression and slavery, and he taught them to start with monotheism (*tawhîd*)." After this, Zaynû switches to another subject; that is all he says about the Prophet's wars, which would be rather strange if his book was meant to be warmongering. That the Prophet Muhammad fought both polytheists and Jews in Arabia is a historical fact, mention of which is not reproachable, and Zaynû does not even emphasize it particularly in this short passage.

Another reference cited twice by Winer from Emerson[133] is in a section about the education of children titled "Jihad and Bravery" (p. 70). Here Zaynû states, "That we plant in the children the love of taking revenge on the Jews and the oppressors, and that our youth will liberate Palestine and Jerusalem when they return to the teachings of Islam and the jihad in the path of God, and they will be victorious with God's permission."[134] Now, this is obviously offensive and not politically correct in the American context, and it may be that it should be rooted out of the Arabic context as well. But note that it occurs clearly in the context of the struggle over Palestine, where the Palestinians and other Arab and Muslim peoples normally note the history of the expulsion of 750,000 Palestinians in 1948 and the continuing colonization by Israel after that. And people who believe they are oppressed and wronged, particularly when deprived of the right of self-determination in their own country, usually feel they are justified in resisting and cannot be overly blamed for that when it is a political problem. So this is not an anti-Semitic statement about the Jews in general, but rather is a specific reference to the question of Palestine. Also, while it is a general call for the next generation to be taught not to give up that fight, it also contains no specific program at all for that, and it certainly cannot be taken as a call for indiscriminate violence outside of the rules of warfare. Note also that Zaynû says "when they

---

[131] (PEC-WAMY013366-PEC-WAMY013401); Winer Report at 12.11.2.1.
[132] PEC-WAMY000074-PECWAMY000118..
[133] Winer Report at 10.3.7.3. and 12.11.2.2.
[134] (PEC-WAMY013366-PEC-WAMY013401) at PEC-WAMY013376.

return to the teachings of Islam," by which he means normal, daily Muslim practice, which Wahhabis and Salafis generally put first, as here. The generalization about Jews rather than specifying only Israelis or Zionists could be considered an ethnic slur, and many Arabs and Muslims are not careful to distinguish the religious membership from a particular political attitude, and especially did not do so not long in the past, in 1984 or earlier when Zaynû wrote this. Most of all, how is this terrorism and how has it any connection to 9/11?

The largest section in Zaynû's book on jihad is the three-page section titled "Jihad in God's Path" (pp. 88-90), which defines jihad as including spending of one's wealth and fighting in person and may also be done by tongue or pen, which includes calling people to Islam and defending it. The book then details seven kinds of jihad:

1) Struggle to push back an attacking enemy, which is always an individual obligation (*fard 'ayn*). As an example, Zaynû here mentions the Jews who have occupied Palestine, adding that the Muslims who are able to carry on struggle against them in person or through spending are in a sinful state until they drive them back out.

2) Struggle to spread the call of Islam to the rest of the lands, until Islam rules, which is an obligation only for a sufficient number to carry out (*fard kifâyah*). Whoever surrenders of their peoples will come to it through this, and whoever blocks its path should be fought until the word of God is the highest. This type of jihad, like the first, continues to the day of judgement. When the Muslims gave up the jihad and worldly affairs, agriculture, and commerce deceived them, they became stricken with humiliation. Zaynû then references a hadîth deemed sound by Ahmad ibn Hanbal, "When you have engaged in purchases on credit where the amount paid is different than the original price (*al-'înah*),[135] grasped the tails of cows, become satisfied with agriculture, and abandoned the jihad, God will put you under a humiliation which he will not remove until you come back to your religion."

3) Struggle with the Muslim rulers, which consists of giving them and their supporters advice. Zaynû cites a sound hadîth from Muslim, "Religion is good advice." The Prophet's companions asked, "For whom?" He said, "For God, His book, His prophet, the imams of the Muslims, and the Muslim population generally." Then he adds another, fair hadîth from Abû Dâwûd and al-Tirmidhî, "The best of jihad is a word of truth spoken before a wrongdoing ruler." Zaynû then goes on to explain that the way to get rid of the oppression of the rulers who are from our ethnic group and who speak our language is for the Muslims to repent to their Lord, to correct their creedal beliefs, and to train themselves and their families in correct Islam, as God has said, "God does not change what is with a people until they change what is in themselves" (Qur'ân 13:11). Zaynû then adds that one of the current callers to Islam emphasized this by saying, "Establish the Islamic state in your hearts, then it will appear on the ground." Thus, the foundation must be first established in order to build upon it, and isn't that foundation society (*al-mujtama'*)? He then cites Qur'ân 24:55.

4) Struggle against the unbelievers, communists, and attackers from the people of the book. This is to be carried out by spending, in person, and by tongue according to the ability to do so. Zaynû cites another hadîth from Ahmad considered sound, "Struggle against the polytheists with your wealth, your selves, and your tongues."

---

[135] This type of contract is considered to be a device to get around the prohibition of monetary interest and is prohibited in the Hanbalî school of law, though allowed by the Shâfi'îs and Hanafîs. Zuhaylî, *Fiqh*, 4:468-469. Since this is a type of contract referring to agricultural produce, it in effect means that the effect of settling down and becoming farmers will be debilitating.

5) Struggle against corrupters and sinners, according to the sound hadîth from Muslim, "Whoever among you witnesses a forbidden action, let him change it with his hand, and if he cannot, then with his tongue, and if he cannot, then in his heart, and that is the weakest of faith."

6) Struggle against Satan, which is by opposing him and not following his whispered suggestions. Zaynû cites Qur'ân 35:6 here.

7) Struggle against the self, which is by opposing it, making it obey God, and avoiding sins. This is as Potiphar's wife says in the Qur'ân when admitting to having tried to seduce Joseph, "I do not declare myself innocent, for the self is ever commanding badness, except where my Lord has compassion, and He is the Forgiving, the Merciful" (Qur'ân 12:53). Then Zaynû cites from the medieval poet al-Bûsîrî (1211-1284) a single line of poetry:

"Oppose the self and Satan and rebel against them
        And even if they give you pure advice, accuse them."

Despite 1, 2, and 4 above, this entire section contains no call to aggression or terrorism. No. 1 is stated as defensive. No. 2 is only to preach Islam wherever that is allowed peacefully. No. 4 neither specifically mentions nor requires fighting either. But the most telling of them is no. 3, struggle with the Muslim rulers, because that is only to be done by giving advice; armed resistance to them is not mentioned or even hinted at. This is because, as a part of the Wahhabi clerical establishment, Zaynû was fully supportive of the Saudi state and system, neither of which has ever sanctioned private warfare outside of the command of the ruler. While he mentions the possibility that a ruler may be a wrongdoer, he still allows only correct belief and practice in response, never force. Therefore, armed rebellion against Muslim rulers is not countenanced at all. This also means, of course, no freelancing jihad, as all the Muslim rulers are in fact in agreement with, coordinated with, and at peace with the world system, and this also is why those responsible for non-state violence have come out against all of the Muslim rulers.

Another objectionable statement cited by Emerson is "Damn from Allah to the Jews who made graves of their prophets as Masjid." This is actually not Zaynû's own statement, but rather is a hadîth from al-Bukhârî (810-870 AD) that Zaynû cites (p. 63) without commentary but to emphasize that Islam does not allow tombs to be built in or associated with mosques, a Wahhabi point that Zaynû is emphasizing here. The actual translation of the hadîth is, "God fought against the Jews because they took the tombs of their prophets as place of worship." Its message is simply, "Don't take the tombs of prophets as places of worship." It is also used as a proof text for the religious doctrine that mosques should not contain tombs within them, a doctrine that is upheld by Saudi Arabian Islam but often ignored elsewhere, as tombs within mosques, both of rulers and saints, are very common. The occurrence of the Jews in the text is incidental and in any case refers only to the ancient Jews.

As for the allegation from Emerson that the book contains the statement that jihad "was an answer for the Jews, the liars,"[136] this is false and erroneous, as the passage in question does not mention jihad at all, either directly or by connotation or hinting. Rather, Zaynû's text (p.81) cites two Qur'ânic verses, starting with Zaynû saying, "As for His saying, 'Say, God has spoken the truth; therefore follow the sect of Abraham as an upright person' (Qur'ân 3:85), it is a reply to the lying Jews, as shown by the preceding verse, 'And whoever has fabricated a lie about God…' (Qur'ân 3:84)." The whole purpose of the passage, on which Zaynû spends two pages of

---

[136] Winer Report at 12.11.2.1, citing Emerson; (PEC-WAMY013366- PEC-WAMY013401) at PEC-WAMY013376..

his book, is to prove that the common practice of concluding any Qur'ân recitation chanted or spoken aloud with the words, "Almighty God has spoken the truth," is a reprehensible and sinful innovation that is contrary to the Prophet's way. Thus, the mention of the Jews here is again entirely incidental and refers likewise in this case only to the Jewish opponents of the Prophet mentioned in the Qur'ân and not to modern Jews. Jihad, warfare, or violence are not mentioned. Somehow, the plaintiffs got a badly garbled interpretation of Zaynû's text here from Emerson, if indeed he did not deliberately distort it. It is another indication of Emerson's chronic casting accusations freely but falsely.

As for the statement attributed to Zaynû by the plaintiffs that Islam "is a religion of Jihad,"[137] the correct translation of the passage in its context in Zaynû (p. 7) is, "Islam is the religion of jihad and of life, thus it requires that every Muslim give his property and his soul for support of Islam, and it is the religion of life which seeks from the Muslim that he live a happy life in the shade of Islam, and that he prefer his afterlife to his life of this world." There is no mention of any warlike struggle here, and, in view of what we have cited above of the author's detailed description of all the types of jihad, it would be better here to translate the word jihad in this case simply as "struggle" or "striving," and thus to render the whole sentence, "Islam is the religion of struggle and life."

Another statement alleged by the plaintiffs to come from Zaynû's book is, "You should not back the Jews and the Christians and the Communists against the Muslims; the Communists, the Infidels, the Jews and the Christians, those who do not believe in Mohammed. You should say they are infidels."[138] This statement actually goes back to two separate statements in the book which Emerson or his informant has conflated. These are points in a list of those things which contradict one's being a Muslim (*mubtilât al-islâm*, on p. 24). Number 21 in this list is, "Giving support or aid to the Jews, the Christians, and the communists against the Muslims," while number 22 is "Failing to recognize (or declare, if asked,) that the communists who deny God's existence, and the Jews and the Christians who do not believe in Muhammad (that is, in his prophethood) are not Muslims." In support of 21, Zaynû cites Qur'ân 3:28 and to support 22 he cites Qur'ân 98:6.[139] Now, as far as point 21 is concerned, it is quite obvious that a member of a group should not help the group's opponents to attack its members. That is what Zaynû is prohibiting here. Note how subtly Emerson or his informant, and from them Winer, have changed the import of this text by omitting the part about if these groups attack the Muslims. As for point 22, it is about setting a boundary of belief to identify who belongs to the group; it is not those who deny God's existence, nor those who deny Muhammad's prophethood. Obviously, a religion or a religious group has a right to define who its members are, and setting defining boundaries by religions is even considered the most important, defining feature of what a religion is.[140] There is nothing beyond this implied by these particular texts of Zaynû. As for Emerson's and Winer's use of the word "infidels," that is a very loaded and prejudiced English translation, because western people don't use it to refer to others. More accurate and neutral would be "non-believers." Such use of loaded vocabulary should not be permitted here to color views unfairly.

Finally, it is quite clear from Zaynû's book overall that he was considerably exercised by the catastrophe which had overwhelmed Palestine and the Palestinians, and this is also not so

---

[137] Winer Report at 12.11.2.1, citing Emerson; (PEC-WAMY013366- PEC-WAMY013401) at PEC-WAMY013376.

[138] Winer Report at 12.11.2.3, citing Emerson.

[139] Zaynû, 24.

[140] Catherine L. Albanese, *America: Religions and Religion*, 5th ed., Boston: Wadsworth Cengage Learning, 2012, pp. 2-13 and *passim*.

unusual given his Syrian origin. But that does not mean that his text should be connected with Bin Ladinist terrorism in any way, and he obviously remained loyal to the Saudi state, under which he lived the latter part of his life as an honored professor.

(5) Islamic Camps: Objectives, Program Outlines, and Preparatory Steps

Plaintiffs' experts cite to camp songs to paint a picture of WAMY as a proponent of violence.[141] The WAMY publication *Islamic Camps: Objectives, Program Outlines, and Preparatory Steps* is translated by Abu-Bakr M. Asmal, Riyadh: WAMY, 1411/1990, 124 pp.[142] The Arabic original of the book is *al-Mukhayyamât al-islâmiyyah: ahdâfuhâ, barâmijuhâ, marâhilu i'dâdihâ wa-taqwîmuhâ*, Riyadh, WAMY, 1407/1987, 2nd printing, 1410/1990, 107 pp. The songs quoted[143] from it cite very ancient medieval battles and reference no contemporary conflicts at all. The historical references are to the paradigmatic Battle of Badr of 624 AD and the subsequent defeats of the Romans and Persians in the early expansion of the caliphate (633-651 AD). The references to Baghdad and Cordoba are not to any battles, but rather to the past glories of the 'Abbâsid Caliphate (750-1258) in Iraq centered at Baghdad and the Umayyad Emirate and then Caliphate in Spain (756-1031 AD), whose capital was Cordoba. These songs should be considered in the same category as the patriotic songs of any nationalism, which normally mention past wars and battles. Their celebration of early Muslim expansion is like the American celebration of expansion in the classic Hollywood film *How the West Was Won*. Most national anthems are also full of violent references. Unlike the Muslim camp songs in question here, *La Marseillaise*, the French national anthem, contains explicitly bloody lyrics. If one examines the three Scottish national anthems, *Flower of Scotland*, *Scotland the Brave*, and *Scots Wha Hae*, one finds plenty of militant and hostile references to England drawn from real history, yet Scotland voted down independence and is still part of the UK while still singing these anthems. The songs cited from *Islamic Camps* indeed try to inculcate the idea of belonging to a larger entity than the self and also of being willing to sacrifice for the greater good, but this is all vague and has no more specific intent than trying to get the youth away from self-centeredness. Also, the date of the composition of the book in which the songs are embedded is 1987, during the American-supported phase of the Afghan struggle against the Soviets, which removes it as well from any terrorist context. Beside all of this, the book contains no references to modern military training whatsoever, such that one must see it as completely removed from any such context. It rather is concerned with keeping the youth of Islam in the faith.

As for the book's saying that Islam is superior, so what? Everyone considers their own beliefs superior. An evangelical and salvationist desire to spread and share one's faith cannot be seen as differing in the least from the mission of contemporary evangelical Christianity. This includes point 7 on p. 115 in the English translation, which reads: "Al-Islam: the only solution," which exactly parallels a frequent Christian missionary slogan, "Christ is the only solution,"[144] a concept supported in the very gospel itself, "I am the way, the truth, and the life; no one comes to

---

[141] Kohlmann Report ¶ 160; Winer Report at p. 102.
[142] (WAMY Intl E002177-WAMY Intl E002241.).
[143] (WAMY Intl E002177-WAMY Intl E002241) at (WAMY Intl E002230- WAMY Intl E002232). The songs are on pp. 104-108 of the English translation and pp. 86-89 of the Arabic original.
[144] E. g., https://www.preachingtoday.com/illustrations/2008/november/1111008.html ; https://www.vox.com/identities/2018/3/15/17117298/mike-pompeo-trump-secretary-of-state-politics-battle-evangelical-holy-war-christian ; https://hellochristian.com/5583-trumps-new-cia-director-jesus-christ-is-the-only-solution-for-our-world ; https://www.facebook.com/Onekingsports/videos/570387760542425/ .

the Father but by me" (John 14:6), a famous, even notorious, example of Christian exclusiveness that seems not to exercise anyone much.

(6) WAMY Encyclopedia of Contemporary Religions and Sects, Islamic/patriotic songs

Mr. Winer claims that WAMY provided "ideological support of al Qaeda" through its publications including *The Encyclopedia of Contemporary Religions and Sects*.[145] This text is an Arabic work: *al-Mawsû'ah al-muyassarah fî al-adyân wa-al-madhâhib wa-al-ahzâb al-mu'âsirah*, edited by Mâni' al-Juhanî, 4th ed., Riyadh: Dâr al-Nadwah al-'Âlamiyyah li-al-Shabâb al-Islâmî, 1420[/1999], 1221 pp. in 2 vols. with continuous pagination. Although WAMY Secretary General Dr. Maneh al-Johani was in charge of the editing and production of this work, he did not author any of it except for the initial note of thanks and the introductions to the various editions (pp. 5-12), and it is doubtful whether he really did any editing of it either, as that is a task he likely would have left to others. In his initial acknowledgements, al-Johani describes the work as a collective effort and specifically thanks Dr. Ibrâhîm ibn Hamad al-Qu'ayyid (b. 1953/4), an English-language specialist, Dr. Tawfîq ibn Ahmad al-Qusayr (b. 1949/50), a Saudi nuclear physicist, Dr. Muhammad Sa'd Abû Shitâ, and Hamdî 'Ubayd, among others.[146] Presumably, the writing of this encyclopedia is primarily the work of these four named gentlemen, the first two of whom are Saudis who held important positions in WAMY, despite their lack of specialization in the field of religion. This work is referred to as *A Handy Encyclopedia of Contemporary Religions and Sects*.[147] "Handy" is the translation of the Arabic "*muyassarah*," meaning "simplified." At some point, Salâh al-Sâwî, the Egyptian Azharî Salafî who was a founder of the American Open University, proposed translating the book into English,[148] though it would seem that this was never done. The text is very problematic in certain respects,[149] but it nonetheless cannot be connected with terrorism.

The text is first of all designed as an apology for and a justification of Islam as the true religion in a world where the historic isolation of Najd, the home province of Wahhabism, broke down in the 20th century, leading to a bewildering series of encounters with all kinds of other systems of faith and religious practice, which the Najdî Wahhabis were scarcely prepared for.[150] Their reaction on display in this work is not very nuanced. But their very lack of nuance is informed by their worries of corruption of the youth by invasive outside influences, all of which the writers oppose and find fault with. Unfortunately, the unnamed writers also evidently believe in conspiracy theories about such influences being deliberately plotted with malice aforethought, and this plotting is blamed on the Jews in general, borrowing from and recreating various anti-Semitic tropes, though Emerson's calling the work equivalent to *The Protocols of the Elders of Zion* is stretching matters a bit.[151]

Nevertheless, the work does declare true the story of 'Abd Allâh ibn Saba' from early Muslim history, which is usually considered mythical by modern research, in order to blame Jews for deliberately trying to undermine Islam by pretending to be Muslims in the early days

---

[145] Winer Report at 12.11.1.2.

[146] Mâni' al-Juhanî, ed., *al-Mawsû'ah al-muyassarah fî al-adyân wa-al-madhâhib wa-al-ahzâb al-mu'âsirah*, 4 th ed., Riyadh: Dâr al-Nadwah al-'Âlamiyyah li-al-Shabâb al-Islâmî, 1420[/1999], Vol. 1, p. 5.

[147] PEC-WAMY029860 - PEC-WAMY029885; PEC-WAMY029860 - PEC-WAMY029885.

[148] (WAMYSA3033.).

[149] PEC-WAMY001703 - PEC-WAMY001713; PEC-WAMY029860 - PEC-WAMY029885.

[150] Juhanî, *Mawsû'ah*, 1:6.

[151] Testimony of Steven Emerson before the National Commission on Terrorist Attacks, July 9, 2003.

and stirring up civil war between factions in the Muslim community.[152] This ancient trope from the eighth century, which I have studied,[153] was originally mainly anti-Shî'î, mentioning the Jewish origin of Ibn Saba' merely in passing in order to insult the Shî'îs and demonstrate how their version of Islam was inauthentic, but in modern times, because of the Palestine problem and the modern animosity created by it, the trope has been repurposed to focus mainly on Ibn Saba' as an example of Jewish perfidy, as here. The footnote in the fourth edition here even notes that Shî'îs have written to the editors to deny that Ibn Saba' is a figure of importance to them and hence should not be included, but the book's editors or authors still insist on his historical validity, despite all evidence to the contrary.[154] When I visited the History Department in King Sa'ûd University in Riyadh in 2011, I found that the Saudi historians there were now acknowledging that Ibn Saba' was simply a myth, but probably he is still an article of faith with many, and the first two of the four writers thanked by al-Johani were in fact both associated with King Sa'ûd University. Indeed, it is interesting how many people in the Arab world, even well-educated ones, take the tale of Ibn Saba' as if it is holy writ, becoming enraged when it is denied, yet it derives from the flagrant early fabricator Sayf ibn 'Umar (d. c. 796 AD), who is denounced by all the early Sunnî evaluators of traditionists, so that modern upholders of the Ibn Saba' story who are traditionalists, like most Saudis, are being seriously inconsistent in doing so.

Turning to Judaism, the next section after Islam, the writers immediately attack the Jews in general. As Muslims of course acknowledging Moses and other prophets, they explain that the later Jews corrupted their religion after becoming enticed by materialism. However, they also sought to undermine other religions and to corrupt the morals of the non-Jews.[155] The book cites and validates the notorious anti-Semitic tsarist Russian fabrication of *The Protocols of the Elders of Zion*, which appeared in 1902-1903, as a real work.[156] Normally, for Jews, validating this work is seen as an expression of anti-Semitism, as it describes how Jewish elders have plotted to "take over the world" using sneaky trickery. The authors of the encyclopedia then go on to explain how Zionism, Freemasonry, the Lions Club, and the Rotary Club are all expressions of this nefarious plot, which also contributed to the fall of the Ottoman Empire in 1918.[157] They go on to single out the Israeli Herut Party, the forerunner of the present-day Likud, and the Bnai Brith as further examples of Jewish plotting.[158] The various alleged offshoots of Judaism are further elaborated in sections on the *dönme* (crypto-Jews of Turkey),[159] Freemasonry,[160] Zionism,[161] the Bnai Brith,[162] the Rotary Club and its adjuncts,[163] the Lions Club,[164] and the Herut Party.[165] The Zionism section emphasizes that the Zionist plan is to rule the world from

---

[152] Juhanî, *Mawsû'ah*, 1:52.
[153] Khalid Yahya Blankinship, translator, *The History of al-Tabarî*, Vol. XI, *The Challenge to the Empires*, "Translator's Foreword," Albany: SUNY Press, 1993, p. xx.
[154] Juhanî, *Mawsû'ah*, 1:52.
[155] Juhanî, *Mawsû'ah*, 1:492.
[156] Juhanî, *Mawsû'ah*, 1:493, 520.
[157] Juhanî, *Mawsû'ah*, 1:493.
[158] Juhanî, *Mawsû'ah*, 1:494.
[159] Juhanî, *Mawsû'ah*, 1:507-509.
[160] Juhanî, *Mawsû'ah*, 1:510-517.
[161] Juhanî, *Mawsû'ah*, 1:518-526.
[162] Juhanî, *Mawsû'ah*, 1:527-531.
[163] Juhanî, *Mawsû'ah*, 1:532-538, 550-556.
[164] Juhanî, *Mawsû'ah*, 1:539-543.
[165] Juhanî, *Mawsû'ah*, 1:544-547.

Palestine,[166] then details *The Protocols of the Elders of Zion*'s description of the plot point by point.[167] The section also includes a form of the Blood Libel, saying that the Jews use gentile blood as an ingredient in their matzos,[168] another classical, false, and rather ridiculous anti-Semitic motif. Thus, the description of Zionism is drawn mainly from the *Protocols*. It is interesting, however, that the section also validates the Zionists' own claim of Jewish attachment to Palestine throughout the ages, so that a Zionist would find very little to argue with in the historical description of this attachment.[169] The argument from the *Protocols* and the historical description are poorly integrated with each other. The section shows no interest in Zionism after Theodor Herzl (1860-1904) and discusses neither the displacement of the Palestinians nor the establishment of the State of Israel at all. The book also contains, in other parts, scattered unfavorable references to Jews and Zionism, alleging that they have sought to spread unbelief and materialism, including Marxism, in the world, for example.[170] Certainly, the book's adoption of classic European anti-Semitic tropes greatly undermines any credibility it might have, especially when it presents very little other information about the Jews, especially for the modern period.

No doubt from the viewpoint of the authors, the spread of international institutions, such as the Rotary and Lions Clubs, outside of the traditional Saudi framework would be a most unfortunate development in Saudi Arabia and the Muslim world, and lumping all such institutions together in an external plot seems to be a simple way to deal with the problem, especially when Saudi Arabia lacks any native Jewish community at all for the Saudis to have any correct, firsthand information about the Jews. But this move nevertheless repeats the explanation of and the excuse for European anti-Semitism. Also, the encyclopedia's propensity for describing disliked movements as the result of outside plotting not only blames the Jews; for example, the Ahmadiyyah/Qâdiyâniyyah in India is explained as started by a British imperialist plot.[171]

All of this is unfortunate, because it contradicts the promise to remain objective and merely descriptive and to avoid attacking others that al-Johani made in his introductions to the various editions, as on p. 6. Also, apart from these attacks, the work presents some historical information about the Jews and other religions which is stated much more dispassionately, although peppered with occasional snide remarks. But there is also some historical inaccuracy, such as the statement that the original Torah of Moses was lost in the destruction of the First Temple by Nebuchadnezzar in 586 BC and only rewritten in another form in the reign of one of the Persian kings named Artaxerxes, later than 465 BC,[172] a very unlikely scenario in the view of biblical historians. Still, such an encyclopedia covering all the religions is nearly unprecedented for Muslims and would have been of greater value had it actually aided, instead of impeded, interreligious understanding between Muslims and Jews.

On the other hand, this work does not appear anywhere to prescribe violence or terrorism. Its program rather seems to be to keep the Muslims, especially the upcoming generation, free of influences from outside religions by portraying Islam as superior. The idea advanced by Emerson that the whole encyclopedia is mainly an anti-Jewish work is wrong, for the anti-Jewish polemic,

---

[166] Juhanî, *Mawsûʿah*, 1:518, 520, 525.
[167] Juhanî, *Mawsûʿah*, 1:520-524.
[168] Juhanî, *Mawsûʿah*, 1:524.
[169] Juhanî, *Mawsûʿah*, 1:520-522.
[170] Juhanî, *Mawsûʿah*, 2:803.
[171] Juhanî, *Mawsûʿah*, 1:416. The text also states the year of their founding incorrectly as 1900.
[172] Juhanî, *Mawsûʿah*, 1:500.

although seriously present in the section on Judaism and scattered in a few other places as well, occupies only a small part of the whole. It cannot be ignored either that the work was produced within the context of the ongoing Palestinian question and occupation of Palestinian land, a problem which seems to exhibit to many Arabs the power of the Israelis, as they have not been able to do anything about that, hence the resort of some to old, generalizing anti-Jewish tropes, including beliefs in conspiracies that last for centuries.

(7) Final remarks on publications

Winer states that "…material written, published, and/or disseminated by WAMY prior to the 9/11 attacks, provided religious and ideological justification for jihad and Islamic martyrdom, two concepts that were among the foundations for justifying Al Qaeda's program of suicide bombings and terrorist attacks,"[173] as if these few cited references, or the publications in which they are embedded, provided any necessary urging, incitement, or inspiration for al-Qâ'idah's depredations, and as if al-Qâ'idah needed any such justification. But this is far, far from the truth, and it is most dubious whether the Qâ'idah members, operatives, or supporters even had any cognizance of the existence of these works, much less read them or relied on them. Has a single quotation from any WAMY publications by anyone actively in al-Qâ'idah been demonstrated? Obviously not. When Bin Lâdin went on his long speels explaining and justifying himself, he cited many things, but WAMY publications were not among them.

## 4. Religious speeches, programs, conferences, and events

While the plaintiffs have tried to point to various speakers and programs as evidence of WAMY's support for terrorism, a closer examination of these materials reveals no such thing.

a) Various conferences that WAMY attended/hosted (sometimes with controversial speakers)

While it has always been part of  WAMY's mission to hold conferences, like other bodies, such as learned societies, which hold conferences, the host of such conferences cannot be held responsible for all that is said by the participants. Furthermore, the plaintiffs have named very few persons attending WAMY conferences as objectionable, so it would seem that these conferences, programs, and events on the whole were not the nefarious affairs that the plaintiffs are claiming.

b) WAMY's relationship (albeit attenuated) with speakers (such as Anwar Al Aulaqi and Said Rageah)

(1) Al-Awlaqi.

The plaintiffs allege that WAMY's relationship with al-Awlaqi is evidence of support for terrorism. I am familiar with the history of Anwar Nasser al-Awlaki or al-Awlaqi (1971-2011), who was a native-born US citizen of Yemeni descent. He lived in the US 1971-1978, then Yemen 1978-1991, then the US again 1991-2002, obtaining a BS in civil engineering from Colorado State University in 1994. After that, despite his complete lack of any formal religious training, he became the imam in several mosques because of his excellent speaking ability, which appealed to the youth in particular. When the 11 September 2001 attacks occurred, he condemned them absolutely. During this period, there is no evidence of his engagement in any support for terrorist activities. Though it is true that a couple of the hijackers and others involved

---

[173] Winer Report at 12.11.4.

much later in other attacks came to his mosque or corresponded with him via e-mail, there is no sign that he encouraged any violent activities at this time. Thus, when he was used by WAMY USA through Daar Al Hijrah a few times at WAMY summer camps as a motivational speaker, it was on the understanding that he was definitely a moderate Salafî.

However, US government threats and harassment caused him to leave the US for the UK 2002-2004, where he gradually adopted a harsher tone, though he was careful to avoid any calls for violence, particularly in western countries. The reasons for the harassment were two, as far as one can tell. First, the FBI tried to make him an informer, and he refused. Second, because he was the imam at the Saudi-associated Dâr al-Hijrah Mosque in Falls Church, VA, he was viewed with suspicion by officials, especially because he was articulate. After less than two years in Britain, he moved back to Yemen, where he was held in prison for eighteen months in 2006-2007 at the behest of the US government, which later killed him as well as two of his children. By this time, he was spouting sentiments very hostile to the US while living in his family's ancestral village.

Even if one adopted the position that he was never a moderate, he did not begin to show much political radicalism until 2003 and did not really call for attacks against the US until after his imprisonment in 2006-2007. Because he was a native-born American citizen, there was a considerable complaint in civil rights circles about his killing carried out by drone by the US, and this also caused greater scrutiny in his case than was pursued in other cases, particularly by the journalist Jeremy Scahill, who wrote a whole book based around al-Awlaki which I have used for this synopsis of his life.[174] Even if al-Awlaki held the same views from the first, which is not at all apparent, WAMY is still completely innocent in hosting him as a speaker, because he did not state any such extreme views at the time in 2001-2002, quite the opposite.

(2) Said E. Rageah

Saeed (also often written Said) E. Rageah (b. 1969), of Somali origin, migrated to the US in the late 1980s, obtained a BA in Islamic Studies and an MA in Sharî'ah from the Institute of Islamic and Arabic Studies (IIASA) in Fairfax, VA, then became an imam, at first near Washington, DC, and later in Canada, where he seems to be at Toronto at present. He has a certain on-line presence, and statements attributed to him collected by an organization hostile to Salafî Islam indicate a Salafî orientation, which one would also expect from his list of teachers, one of whom was the Egyptian Azharî Salâh al-Sâwî.[175] His main concerns in his recorded statements seem to be about social issues in the minority Muslim communities living in North America, which is most common for imams, but there is nothing political nor warmongering in those issues.[176] It appears that he is of interest only because his lecturing was supported by WAMY US for a four-month period and because two of the 2001 hijackers left bags in his mosque.[177] No evidence seems to have been adduced that he even saw or met them, nor does the US government seem to have accused him of anything. So here there seems to be an innuendo that someone guilty (the hijackers) may have met someone (Rageah) who knew an employee of WAMY. All that sounds like a very feeble innuendo of guilt by association. It is interesting that

---

[174] Jeremy Scahill, *Dirty Wars: The World Is a Battlefield*, New York: The Nation Books, 2013, pp. 31-47, 68-74, 134-137, 184-190, 231, 233-235, 237-243, 264-269, 285-287, 289, 291-293, 307, 314-316, 318-319, 325-327, 354, 359-366, 369-374, 379-381, 391-392, 398, 400-402, 430-433, 453-457, 495-511, or see index.
[175] http://islamevents.com/speakers/speaker_detail.php?spid=35 .
[176] https://theislamicfarrightinbritain.wordpress.com/said-rageah/ .
[177] Dr. Ibrahim Abdullah Deposition, p. 184.

one of the plaintiffs' attorneys even questioned Dr. Ibrahim Abdullah briefly about whether Rageah ever spoke about jihad! Rather, there is even a video on YouTube of Rageah titled "Killing innocent people IS NOT Islam," in which he denounces such terrorism.[178] While Rageah's conservative Salafî views may not be attractive to most in American society, they still only amount to conservative religious views not dissimilar from conservative Christians and Jews, particularly those interested in maintaining the religious and social cohesion of their communities, but these latter are not therefore under suspicion or scrutiny for their conservatism.

c) Guilt by association; does not necessarily imply terrorist agendas

Much of what the plaintiffs have relied on, especially the statements attributed to Steven Emerson and Dore Gold, have consisted of innuendoes and attempts to establish guilt by association, which is never a legitimate proof without further certain evidence. We have given examples of such innuendoes several times in this report. Of course, the proven terrorists of 11 September, as well as those whom the United States government has calculated and declared were associated with them in the crime, are by this time a fixed and established list. While it is possible that the US government may have made some errors in whom it has assumed to be guilty, we are not making any contention here about any of them and are able to provisionally accept all their guilt as if proven. Such a considerable number of people of course had many casual meetings and chance encounters with many, many others, but those contacts, unless backed by further hard evidence, do nothing whatsoever to prove guilt on the part of those others. Even assuming all of that, the points of contact between anyone in WAMY and any of the 9/11 al-Qâ'idah perpetrators and proven, given supporters, are few almost to the point of non-existence, and one is struck by how the plaintiffs' case with regard to WAMY seems to clutch at weak straws in the hope of finding anything significant when there is nothing at all.

**Conclusion:**

No actions by WAMY, either through conferences or through publications, can be reasonably shown or even supposed to have had any influence on furthering the 9/11 attacks whatsoever. Even farther removed from possibility is supposing or showing that any part of WAMY exhibited any knowing intent to further the 9/11 attacks or even approve of them.

WAMY publications display the promotion of the form of Islam according to the teaching of the Qur'ân and the Sunnah embodied in the Hadîth. This form of Islam is referred to by its followers simply as Islam, Sunnî Islam, or Islam of Ahl al-Sunnah wa-al-Jamâ'ah. This form of Islam is quite distinct from the sect of Usâmah Bin Ladin, the Bin Ladinists, Dâ'ish, and all their ilk, as outlined above and verified by scholars both Muslim and non-Muslim. The writings published and circulated by WAMY do not demonstrate any support for violence against others at all.

WAMY publications have been all carefully vetted to make sure that they do not deviate from the correct interpretation of Islam according to WAMY, which is the same as the mainstream and quasi-official religious establishment in Saudi Arabia. Within this framework, there is some variability, but it is a narrow variability. The overriding concerns of the form of Islam promoted by WAMY are correct belief and correct practice, translated and explained above as 'aqîdah and sharî'ah, as in the first goal of WAMY stated in the WAMY constitution. Belief is keeping one's faith in accordance with the six pillars of belief, while practice means both keeping up the five pillars of Islam and also conforming to the prescribed social propriety in

---

[178] https://www.youtube.com/watch?v=EleQPZU9udc .

one's society, all of these items being found in and validated from the Qur'ân and the Sunnah, the latter embodied in the Hadîth traditions of the Prophet Muhammad. Support for kindness, charitable causes, and relief of the poor and unfortunate is clearly included in this, as outlined in the sections on Zakat and Sadaqa above. Although, as in non-Muslim countries, the government can declare war and must be obeyed on that point if it does so, it is not something that the individual Muslim does.

In any case, WAMY's publications provide no evidence at all for any material support either of terrorism against the United States or others or of malicious or evil intent to foment terrorist violence against anyone.

2. Religious conservatism does not equal terrorism:

Religious conservatism in all of the religions is frequently condemned in liberal circles and in the mainstream media because such conservatives supposedly are always exclusivist and unable to live in harmony with others, but the truth is quite otherwise. Religion is frequently blamed for violence, a trope that has been refuted by William T. Cavanaugh in his book *The Myth of Religious Violence*,[179] which specifically addresses Islam, and also by Richard King in his article "The Association of 'Religion' with Violence; Reflections on a Modern Trope."[180] As for the idea that it is mainly religious persons who are violent or promote violence, that seems to fly in the face of the obvious facts of the twentieth century, where the two persons arguably most responsible for the worst violence and mass murder were Hitler and Stalin. Hitler was completely uninterested in religion, which he regarded as obvious claptrap, while Stalin, whatever his personal belief may have been by the end of his life, relentlessly and aggressively promoted atheism throughout his twenty-five year reign. So shall we then rather blame atheists and atheism for violence because of Stalin? And we could also throw in others blamed for mass death, such as Mao Zedong of China, who was also antireligious.

Furthermore, what is described as violence based on religion often is nothing of the kind. In the former Yugoslavia, the Serbs, the Croats, and eventually the Bosnian Muslims, all of whom spoke the same language and belonged to the same Slavic ethnicity and gene pool, went at it with great ferocity in the two civil wars of 1941-1945 and 1991-1995. Each group was marked off from the other only by religion, right? Yet none of these groups was particularly religious, and the two main ones, the Serbs and the Croats were both Christians, although of different sects. Rather than religion per se, it was national identity that was at work, so the wars were the result of competing nationalisms. If one views nationalism as a religion, then call it wars of religion, but it was not actually about Christianity or Islam, Catholicism or Orthodoxy.

Similarly, in the world of civil wars and upheavals, fighting, and terrorism, it is interesting how the actual religious scholars of Islam rarely get involved in such actions. Thus, for example, al-Qâ'idah at the time of the 2001 attacks had only one single person with any scholarly religious background in its leadership, even though he was not in favor of those attacks. This was Mahfouz Ould al-Waleed; Scott-Clark and Levy describe him saying, "Even though Al Qaeda was seen in the West through an Islamist prism and was commonly portrayed as a ferocious clerical turbine, the Mauritanian was the sole member of the leadership to have

---

[179] William T. Cavanaugh, *The Myth of Religious Violence: Secular Ideology and the Roots of Modern Conflict*. Oxford: Oxford University Press, 2009. ix + 285 pp.

[180] Richard King, "The Association of 'Religion' with Violence; Reflections on a Modern Trope," in *Religion and Violence in South Asia*, edited by John R. Hinnells and Richard King, London: Routledge, 2007, pp. 226-257.

had any genuine religious training."[181] Bin Lâdin himself, of course, was an engineer with no special religious education. Rather, such groups are led by laypeople, usually ones who do not have a background in religious studies. Instead, violent upheavals are most often led and participated in by the modern educated, most often persons with scientific backgrounds. That is because it is science, not religion, that is the ground of the most inescapable conclusions resulting from alleged facts. This is what scientistic reductionism is. The religious scholarship is usually more nuanced.

A very large proportion of the world's population is religious but cause no political problems. The wars in the Muslim world, where they are not the result of actual outside neocolonial aggressions and invasions, arise out of local political conditions. Most Muslim countries have either no or very few violent incidents, and their populations are peaceful. In the Pew survey of religiousness in the Muslim countries, Senegal ranked as the most religious country, 98% religious, all of which might be described as conservative religion, yet no one ever hears anything about that country. Even when one considers the population of Saudi Arabia, the participants in war jihads have been very, very few.

3.Islam, the Qur'ân, and the Hadîth contradict al-Qâ'idah's objectives

While Usâmah bin Lâdin and al-Qâ'idah obviously have adhered to Islam in some respects, in others they have deviated seriously from the Muslim tradition and from the texts of the Qur'ân and the Hadîth.

As outlined above in the section on jihad, Islam has a concept of just war which is usually construed as defensive. Bin Lâdin and al-Qâ'idah follow this position also in principle, but what they consider defensive looks offensive to most other observers, both non-Muslim and Muslim. Offensive warfare would be considered a violation of Qur'ân 2:190, which states, "Fight in God's path those who fight you, but do not aggress; indeed, God does not love aggressors Qur'ân 5:2 states, "Cooperate in benevolence and piety and do not cooperate in committing sins and aggression." In Qur'ân 17:33, it states, "Whoever has been killed wrongfully, his heir has been given a power, so let him not kill excessively, for he will receive divine aid." This means that in cases of murder, the perpetrator may be held responsible after a proper criminal investigation, but the retribution is not to go beyond the perpetrator to innocent individuals. Elsewhere, Qur'ân 5:32 says, "Whoever takes a life except in retribution for another life or for working corruption in the earth, it is as if he has taken the lives of all people, and whoever saves a life, it is as if he has saved the lives of all people." On the other hand, all the verses counselling warfare in the Qur'ân are in the context of the Prophet Muhammad's struggle with the Meccan Quraysh, the people of his own city, who had driven him and his followers out. Since the Bin Lâdinists killed masses of people indiscriminately on 11 Sept. 2001 and on other occasions, it is clear that they must be deemed murderers who have rebelled against God's command in all of these instances.

In his analysis about Bin Lâdin, al-Qâ'idah, and 11 Sept., the scholar David Commins says:

> "But the ideology of Osama bin Laden and al-Qaeda is not Wahhabi. It is instead part of the contemporary jihadist tendency that evolved from the teachings of Sayyid Qutb and took shape in Egyptian militant groups that appeared in the 1970s and spread in the

---

[181] Cathy Scott-Clark and Adrian Levy, *The Exile: The Stunning Inside Story of Osama Bin Laden and Al Qaeda in Flight*, New York: Bloomsbury, 2017, e-book, at 2%.

1980s, thanks in large measure to the Afghan jihad. In other words, al-Qaeda belongs to an offshoot of twentieth-century Muslim revivalist ideology, not Wahhabism. Al-Qaeda contradicts Wahhabi doctrine on two essential points. First, al-Qaeda's call for the overthrow of Al Saud contradicts Wahhabi doctrine and practice. Second, al-Qaeda's call for jihad against the West is illegitimate according to Wahhabi doctrine, which maintains that only a sovereign ruler may declare jihad.[182]

On the first of the two points of difference which Commins has noted here, the overthrow of the Saudi government, Bin Lâdin already called for the abdication of King Fahd in 1995.[183] This was followed by the infamous declaration of war by al-Qâ'idah on 23 August 1996 against the United States, in which Bin Lâdin also declared the Saudi government illegitimate.[184] A short time later, in a CNN interview of 12 May 1997, Bin Lâdin stated:[185]

> "By being loyal to the US regime, the Saudi regime has committed an act against Islam. And this, based on the ruling of the Shari'a, casts the regime outside the religious community. Subsequently, the regime has stopped ruling people according to what God revealed, praise and glory to Him, not to mention many other contradictory acts."

Thus, already by 1997, Bin Lâdin had declared the Saudi government and state illegitimate and fair game to be attacked. Removing any doubts, al-Qaeda also later again called for the overthrow of the ruling Sa'ûdî family, as unambiguously stated in Bin Lâdin's lengthy declaration of 16 Dec. 2004.[186]

In Islam, rebellion against the rulers is not allowed, unless they openly apostatize from the religion or intervene to prevent its practice. In Wahhabi Islam in particular, obedience to the rulers and the order of the state is required. First, there is Qur'ân 4:58, "O you who believe, obey God and obey the messenger and those holding authority among you." The Wahhabi requirement of obedience to the ruler is also demonstrated by a large set of religious opinions (fatwâs) from famous authorities collected by al-'Ubaykân in his book, including 'Abd al-'Azîz Ibn Bâz, the former mufti, 'Abd al-'Azîz Âl al-Shaykh (b 1941), the current mufti, and Muhammad ibn Sâlih al-'Uthaymîn.[187] For example, to prove his point, Ibn Bâz and al-Zuhaylî each quote different parts of a sound hadîth from Muslim:

> "'Your best leaders are the ones whom you love and who love you: They pray for you and you pray for them. And your worst leaders are the ones whom you hate and who hate you: You curse them, and they curse you.' We said, 'O Messenger of God, shouldn't we then fight them at that point?' He answered, 'No, not as long as they hold the congregational worship (salâh). No, not as long as they hold the congregational worship. Shouldn't it be that whoever sees from his ruler something of disobedience to God, let

---

[182] Commins, 185.
[183] Commins, 187.
[184] *Messages to the World: The Statements of Osama bin Laden*, edited by Bruce Lawrence, translated by James Howarth, London: Verso, 2005, p. 28.
[185] *Al Qaeda in Its Own Words*, edited by Gilles Kepel and Jean-Pierre Milelli, translated by Pascale Ghazaleh, Cambridge, USA: Harvard University Press, 2008, pp. 51, 278 fn. 1.
[186] *Messages to the World*, 245-275.
[187] 'Ubaykaan, 164-183.

him dislike what that ruler does of disobedience to God, but let him never remove even a handspan from obeying the ruler.'"[188]

Another hadîth states:

> "Whoever sees from his ruler something which he dislikes, let him be patient, because no one abandons the collectivity (*jamâ'ah*) by a handspan, and then dies, but that he has died a death of the age of ignorance."[189]

This means, if he ceases to follow the ruler and then dies in that state, he dies outside of the fold of Islam. Many other hadiths likewise emphasize obeying the rulers, but none authorize rebellion against them. While some modern scholars have argued that rebellion might be in some instances justified, this is not the view of the Saudi Wahhabis and their scholars, quite the opposite. They are very strict in requiring obedience to the ruler. When Bin Lâdin deviated from this age-old consensus very seriously, he was obviously not deriving his inspiration from Wahhabism; rather, he seems to have been influenced by modern politics and revolutionary trends, the same that had earlier motivated Sayyid Qutb. Of course, Bin Lâdin, Qutb, and others of their way of thinking were loath to admit that anything outside of Islam motivated them, but how could it be otherwise when they came up with an idea that has no basis in Islam, that of religiously-justified revolutionism?

Not only did Bin Lâdin rebel against the Saudi government and its ruling family, but he also violated the trust of the ruler where he took refuge, Muhammad 'Umar (1960-2013), the leader of the Taliban amirate. Even though this was not an internationally recognized, legitimate government, it was very much a legitimate Muslim state in Bin Lâdin's eyes. Yet, while Muhammad 'Umar gave him and al-Qâ'idah a refuge on condition that they not engage in private warfare, Bin Lâdin had no intention of obeying that condition and thus merely used Muhammad 'Umar and the Taliban as well as causing their downfall. Bin Lâdin even said, "It is not the prerogative of Mullah Omar to prevent me from embarking on jihad."[190] This also illustrates Bin Lâdin's going out against the consensus banning private warfare, as he was certainly not a sovereign head of any state, let alone a legitimate one, and also illustrates his recklessness and lack of concern for the consequences of his actions for other Muslims, even his hosts.

As for Commins second point, that Bin Lâdin's declaration of jihad was clearly invalid because he was not a sovereign ruler, that position likewise has the backing of all past Muslim tradition behind it. As al-Zuhaylî observes, "The matter of jihad is entrusted to the ruler and his personal decision, and the ruled must obey what he decides about that," and also, at the beginning of a war, "If the relations become bad between the Muslims and another state, and reasonable causes for war exist, and the Muslim ruler decides to enter war with the enemy, then at that time the enemy must be given warning by a declaration of jihad or be called to embrace Islam."[191] From this it is clear that it is the sovereign ruler who must declare any jihad, not any private or subordinate individual. This covers the interests of the Muslims, because it is only the ruler of a Muslim realm who can take the interests of all his subjects into account, and not

---

[188] Muslim 3:1481, hadîth no. 1855; Zuhaylî, *Fiqh*, 6:706; 'Ubaykaan, 164-165.
[189] Bukhârî, 9:62, hadîth no. 7143; Muslim, 3:1477, hadîth no. 1849; Zuhaylî, *Fiqh*, 6:705.
[190] Scott-Clark and Levy, at 8%.
[191] Zuhaylî, *Fiqh*, 6:419.

merely some of them. Besides declaring war, it is also solely up to the ruler to make peace. This could be on the basis of some form of victory, but it also could take the form of an equitable truce with the non-Muslims with no payments of reparations or tribute, or alternatively either side might pay a tribute, according to the specific agreement made. The prescriptive example from the Prophet here is the Peace of al-Hudaybiyyah, which was agreed to by the Prophet and the Meccan Qurashî polytheists in the year 628 for ten years.[192] While the Shâfi'îs and Shî'îs prescribe that a truce may last for no more than ten years, although it may be renewed, and some Hanbalîs agree, the dominant Hanbalî view, as well as that of the Hanafîs and Mâlikîs, is that a truce may be of any duration, or its duration need not be specified.[193] This is a strong basis for permanent treaties, and is in fact the basis of the coordination of Muslim law with international law today.

Beside al-Qâ'idah's two violations of Wahhabi doctrines noted by Commins, there is also the matter of Bin Lâdin's rejection of the *'ulamâ'*, their advice, and their religious opinions (fatwâs) in favor of his own isolated view. In Islam, the consensus of the *'ulamâ'* has always been a powerful, important principle both in preserving unity of view in the religion and also in preventing internal political disorder and civil strife. Bin Lâdin rejected the *'ulamâ'* entirely. The only qualified scholar with him, Mahfûz ibn al-Walîd, opposed his plans for 9/11 and even resigned from his advisory council because of it. He also condemned those plans with clear arguments. So Bin Lâdin couldn't even keep one of the *'ulamâ'* on his side in that. Because of his bitterness against the *'ulamâ'*, particularly those of Saudi Arabia, he condemned them in various pronouncements, attacking the Saudi mufti Ibn Bâz by name.[194] The shaykhs whose opposition stance he praised in 1994, Safar al-Hawâlî and Salmân al-'Awdah, both condemned the 9/11 attacks,[195] so he did not find support from them either.

Another serious deviance from classical Islam in Bin Lâdin's ideology is his emphasis on war at any cost, completely ignoring the Muslim rules of warfare laid down in the sharî'ah. In Islam, war is not an absolute value, but is only to be invoked given certain conditions, and even when being waged, it must be carried on within its legal limits. Bin Lâdin, however, turned war into an absolute value to which all else had to be subordinated, in effect placing war on a level with God, and therefore violating the most basic principle of monotheism on which Islam is based. His most obvious deviation from the established rules of warfare was the mass killing of anonymous civilians, which he based entirely on a tit-for-tat equivalence in killing, rather than on any Muslim texts. Indeed, he acknowledged that killing civilians was forbidden in Islam, but said, as a practical matter, since they were killing our civilians, we have to kill their civilians until they desist.[196] He also cited Hiroshima and Nagasaki as crimes that justified his similar actions! Such justifications come exactly from the elaboration of the modern doctrines of total war and have nothing to do with Islam, even though, of course, he did also cloak his declarations in Muslim texts and juristic justifications. It is a grave error to see Bin Lâdin's thought as driven entirely by Islam; he was a contemporary man, living in the modern world, and his thought could not help but be influenced by modernity. Thus, while his commitment to Islam as he believed in his own mind was sincere, his Islamic justifications look like special pleading, and especially like the results of a hunt for extenuating proof texts rather than something originally centered in

---

[192] Hamidullah, 269-274.
[193] Zuhaylî, *Fiqh*, 6:440-441.
[194] *Messages to the World*, 3-14.
[195] *Messages to the World*, 8, fn. 19.
[196] *Messages to the World*, 118-119.

Islam. The problem with this methodology of special pleading was that anything whatsoever could be justified by it. His main interest was war and the subordination of all else to it, whatever the cost. In effect, Bin Lâdin's stance was a total negation of the whole religion and history of Islam, because it reduced the religion to nothing but a validation of war. It seemed maniacal to his own family and even to his erstwhile supporters, such as his sole member of the 'ulamâ' and spiritual adviser, Mahfûz ibn al-Walîd the Mauritanian, who completely rejected the 9/11 attack plan as immoral and even resigned from Bin Lâdin's advisory council (*shûrâ*).[197]

It is a serious mistake to see all of Bin Lâdin's project as based on Islam. Indeed, it seems more based on current world politics and political calculations, however erring these may be and however wrapped in a cloak of Islamic rhetoric and proof texts.

Lastly, it is clear that the plaintiffs have not proven their case. They and their experts have misunderstood and distorted the classical positions of Islam, failing to point out the differences between the doctrines of Bin Lâdin and the classical Muslim rules of conduct in war and peace. They have used unfavorable or foreign terms such as "infidels" and "jihad" rather than more neutral terms in their translations in order to create a sense of dread from texts that have usually been cited out of context. They have relied on interested or discredited sources, especially the egregious Steven Emerson, and these have often misconstrued, distorted, or mistranslated the texts they cite. They have wrongly attempted to connect WAMY, through its publications and other activities, with the encouragement and inspiration of terrorism, even though WAMY has always stood against that. Their only evidence has been innuendo and guilt by association; no causation or enabling of terrorism whatsoever has been shown. No evidence has been presented that anyone in al-Qâ'idah was even aware of WAMY's publications, much less inspired by them, and the ilk of al-Qâ'idah have always had plenty of their own writings to go back to should they ever have needed written inspiration, which has not been demonstrated either. But the plaintiffs nevertheless have persisted in trying to criminalize the conservative or separatist practice of religion, never mind that such practice is common in the United States among Christian, Jewish, and other groups and is protected by the US Constitution. Thus, the plaintiffs' case has no merit at all.

August 7, 2020

_____
Khalid Yahya Blankinship

---

[197] Scott-Clark and Levy, EPUB at 8%.