## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| BENEVOLENCE INTERNATIONAL FOUNDATION, INC. | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 02-C-0763<br>Judge Alesia<br>Magistrate Judge Mason |
| JOHN ASHCROFT, in his official capacity as Attorney General of the United States of America; PAUL H. O'NEILL, in his official capacity as Secretary of the Treasury of the United States of America; COLIN L. POWELL, in his official capacity as Secretary of State of the United States of America; ROBERT S. MUELLER, III, in his official capacity as Director, Federal Bureau of Investigation; and R. RICHARD NEWCOMB, in his official capacity as Director, United States Department of the Treasury, Office of Foreign Asset Control, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

### CORRECTED DECLARATION OF ENAAM ARNAOUT

Enaam Arnaout declares as follows:

1.      I am a United States citizen, and a resident of Justice, Illinois. Since 1998, I have served as the Chief Executive Officer of Benevolence International Foundation-USA ("BIF"). Prior to 1998, I served in the positions of General Director of BIF (1996-1998) and Executive Director of BIF (1993-1996). BIF is a religious, charitable organization that provides humanitarian relief in the form of food, clothing, medical services, and other critical assistance to orphans and persons afflicted by wars, natural disasters, and extreme poverty in a dozen countries. It operates both long-term and seasonal charitable projects in some of the neediest

1

01320

GOVERNMENT EXHIBIT 2

EXHIBIT WAMY EX. 110

TDFOIA0000381

FED-PEC0157372

areas of the world, including Afghanistan, Azerbaijan, Bosnia, Chechnya, China, Daghestan, Ingushetia, Pakistan, Russia, and Tajikistan. BIF also has performed charitable work in the United States, including sending volunteer doctors to New York city for post-September 11 relief efforts and raising funds for these efforts. In fulfilling its mission, BIF works with other organizations, including the World Food Programme, the United Nations High Commissioner for Refugees, and the World Health Organization.

2.    BIF was founded in 1992. It opened its first office in Fort Lauderdale, Florida in 1993 and, later that year, moved its office to Illinois. BIF also has an office in Newark, New Jersey, as well as ten offices overseas. BIF is an Illinois not-for-profit corporation and has been accorded section 501(c)(3) status by the Internal Revenue Service. BIF has a sister organization in Canada, Benevolence International Fund-Canada, which has an office in Waterloo.

3.    Since its founding, BIF has spent tens of millions of dollars providing essential humanitarian aid to individuals around the world. BIF's sole source of funding consists of donations from over 17,000 individuals, businesses, and other Islamic organizations. BIF has spent the last ten years developing credibility, goodwill, and a reputation for honesty, reliability, and compassion. Less than 15% percent of the money donated to BIF is used to pay for administrative costs.

4.    BIF is governed by a three-person Board of Directors, consisting of Enaam Arnaout and Jamal Nyrabeah, both United States citizens, and Muzaffar Khan, a Canadian resident.

5.    BIF, its employees, and its donors, support and participate in BIF's work because it fulfills Muslim religious obligations, including *zakat*, which is one of five central religious tenets

2

*01321*

TDFOIA0000382

FED-PEC0157373

of the Muslim faith, known as "the Five Pillars" of Islam. The principle of *zakat* requires Muslims to donate 2.5% of their saved assets to the poor and needy. Approximately seventy percent of the money donated to BIF consists of *zakat*. The remaining thirty percent of BIF's donations consists of *sadaqah*, which is voluntary religious charitable giving. Pursuant to Islamic law, BIF is required to maintain the donations of *zakat* in a non-interest bearing account and to use those funds only to assist the poor and needy. BIF abides strictly by those requirements.

6. With the help of its field staff, BIF ensures that the donations it receives are spent solely for charitable, humanitarian purposes. BIF's overseas employees are responsible for ensuring the delivery of the goods and services BIF provides. In addition, I travel regularly to the countries in which BIF works in order to oversee personally the various projects.

7. BIF has never provided aid or support to people or organizations known to be engaged in violence, terrorist activities, or military operations of any nature. BIF abhors terrorism and all forms of violence against human beings.

8. As of December 14, 2001, BIF had ten part-time and full-time employees in the United States. Seven of those ten employees have since been forced to leave BIF because of BIF's inability to pay their salaries as a result of the government's blocking of BIF's funds.

9. On December 14, 2001, the FBI searched BIF's office in Palos Hills, Illinois, and seized virtually all of BIF's financial and business records and other documents and property, including computers, cellular telephones, and photographs of and files on BIF-sponsored orphans. The FBI also searched my home and seized my family's personal effects, which have nothing to do with BIF, including family photographs, my citizenship papers, and a microphone from my son's Nintendo® game. On that same day, the U.S. Customs Service searched BIF's

3

*01322*

TDFOIA0000383

FED-PEC0157374

office in Newark, New Jersey, and seized BIF's documents and property, including computers, fax and copier machines, and the personal wallet of one of BIF's employees. At the time of the seizure, I was out of the country for personal and professional reasons and immediately made arrangements to return home to the United States, which I did on December 20, 2001.

10.    BIF's attorneys have informed me that on December 14, 2001, the government acted pursuant to an Attorney General Emergency Physical Search Authorization ("AGEPSA"), which purported to authorize the physical search of a person identified as "Samir Abdul Motaleb." I am not and never have been known by that name. I do not know anyone with the name Samir Abdul Motaleb nor do I know anything about such person other than what BIF's attorneys have told me in the past month.

11.    On December 14, 2001, the Office of Foreign Assets Control ("OFAC") served BIF's Illinois and New Jersey offices with a document titled "Blocking Notice and Requirement to Furnish Information," stating that "[t]he United States government has reason to believe that [BIF] may be engaged in activities that violate the International Emergency Economic Powers Act" and that the Department of Treasury "is blocking all funds and accounts and business records in which BIF has any interest, pending further investigation and resolution of this matter." As of that date, the government blocked BIF's access to its two bank accounts at LaSalle Bank in Chicago, Illinois.

12.    The government has never informed me of the basis of its search of BIF's offices and my home or its investigation of BIF. I have no idea or understanding as to why the government has taken these actions against BIF.

13.    Following the government's actions on December 14, 2001, the majority of BIF's

4

01323

TDFOIA0000384

FED-PEC0157375

donors have stopped donating to BIF because (a) they are fearful of being associated with an organization that has been targeted by the government, (b) BIF is not able to use their money for charitable purposes as a result of the blocking, and/or (c) they are concerned for the future of the organization. Since the government blocked BIF's money, I have received hundreds of phone calls, letters, and emails from donors who have expressed concern and communicated their unwillingness to continue donating in light of BIF's situation.

14.    Donations to BIF, which are the only source of BIF's revenue, have dramatically decreased since December 14, 2001. On average, from July 2001 until November 2001, BIF received monthly donations of $170,568 (July: $202,152; August: $112,499; September: $121,377; October: $87,265; November: $329,548). (BIF does not have records of all the donations made to BIF during the month of December because of the government's seizure of BIF's records.) Following the seizure on December 14, 2001, BIF received only $22,791 in January 2002 and only $26,797 in February 2002. As BIF's only source of revenue, donations are essential to sustain BIF's services around the world and to maintain the viability of the organization itself.

15.    In these stark circumstances, BIF's assets, approximately $825,000, will be depleted in fewer than six months and BIF will cease to exist.

16.    BIF's donors make contributions by credit cards, cash, and checks. Prior to December 14, 2001, BIF's donors made approximately $30,000 in monthly contributions to the orphan sponsorship program that were automatically charged to their credit cards or deducted from their checking accounts. Without its computers, BIF has been unable to process these donations and the majority of its donors have not sent BIF cash or checks as a substitute.

5

*01324*

TDFOIA0000385

FED-PEC0157376

17.    From December 18, 2001 to the present, BIF, through its attorneys, has written OFAC approximately fifteen letters requesting OFAC to issue a license or licenses, including licenses permitting use of blocked funds in BIF's bank accounts to pay (1) legal fees and expenses; (2) BIF's outstanding obligations, including payment of the salaries of BIF's employees and past due bills; (3) reimbursement for the payment of certain of BIF's past due bills from my personal funds; (4) BIF's monthly operating expenses; and (5) BIF's monthly charitable donations. BIF has also requested a license permitting it to obtain copies of the records and documents belonging to me and to BIF, a copy of the Evidence Recovery Log for property seized from BIF's Newark office, and return of the personal property taken from my home in Justice, Illinois, and from BIF's New Jersey office. BIF has asked repeatedly to obtain copies of its documents and computer records but the government has repeatedly refused. The chart attached as Exhibit 1 is a true and correct summary of BIF's license applications and the Office of Foreign Assets Control's ("OFAC") responses to date.

18.    Since December 14, 2001, BIF has been unable to pay its basic operating expenses. Although OFAC has granted BIF a license to pay certain expenses incurred prior to December 14, 2001, it has not responded to BIF's outstanding requests for a license to pay outstanding obligations incurred to date. BIF currently owes various vendors approximately $90,000. This amount includes, but is not limited to, amounts owed for phone service, electricity, property taxes, rent for BIF's office, and relief goods that were distributed in Ingushetia and Chechnya. Attached is a list of BIF's outstanding obligations incurred since December 14, 2001. *See* Ex. 2. BIF also owes its overseas programs the monthly contributions it has been unable to wire since December 2001 and owes considerable and mounting legal fees.

6

01325

TDFOIA0000386

FED-PEC0157377

19.     BIF has also asked OFAC to issue a license allowing it to pay for its essential monthly operating expenses of approximately $55,000. This includes payment of BIF's employees in the United States, BIF's employees overseas (including medical staff, education staff, administrative staff, and other relief workers), administrative costs, and costs of running BIF's charitable projects. Attached is a budget of BIF's monthly operating expenses, both domestic and abroad, broken down by country. *See* Ex. 3. On March 22, 2002, OFAC granted BIF's license request in the amount of $16,669.17 per month for domestic operating expenses and denied BIF's request "for a license authorizing the release of blocked funds, during the pendency of the investigation, to fund any operations or ventures (including charitable endeavors) outside the United States." *See* Ex. H at 11.

20.     The blocking of funds that BIF uses to support its ongoing humanitarian activities will have devastating consequences for BIF's projects around the world. The vast majority of BIF's projects will likely cease to exist by the end of April without BIF's funding. Closure of the following programs will cause extensive human suffering, especially because BIF's facilities are unique and critically necessary in the parts of the world where they operate.

a.     BIF funds the Tuberculosis ("TB") Hospital for Children in Tajikistan. TB is a dangerous illness that spreads easily and is often fatal. Since BIF assumed responsibility for running the TB hospital, the hospital's mortality rate has dropped to its lowest point in ten years, and over 300 children have fully recuperated in the hospital. Currently, the hospital is treating approximately 45 children. Aside from the funding from BIF, the hospital receives the remaining 15% of its funding from the government. The governmental funding is insufficient to allow the hospital to function. The last time BIF sent assistance to the hospital was in December

7

01326

TDFOIA0000387

FED-PEC0157378

2001. If BIF stops sending assistance to the hospital, the children will be released into the community, thus endangering their health and their lives, as well as that of a great many others.

b.    Pursuant to an agreement with the government of Daghestan, BIF funds the Charity Women's Hospital in Mahachkala, Daghestan. BIF agreed to assume responsibility for operation of the hospital in 1998 because of the desperate need for free medical services in Daghestan and the dearth of medical services available to women in Daghestan. The hospital offers inpatient and outpatient gynecological and obstetric care, medical testing of various types, treatment of diseases, and administration of medication. The hospital also offers a three-month course to train volunteers to render first aid assistance in emergency situations, including instruction on how to provide basic obstetric and pediatric care. BIF is the hospital's sole source of funding, and there are no other potential sources of income if BIF is no longer able to send money. BIF last sent assistance in December 2001; the hospital will be forced to shut down if it does not receive additional funding by the end of March 2002, which will have a detrimental impact on the health of many women in Daghestan.

c.    BIF funds the Sumgait Orphanage in Azerbaijan where 65 children live and approximately 600 children study. BIF supplies daily meals for the children, provides clothing and education, and supports the staff of 100 employees and teachers. BIF also has distributed blankets, bed sheets, shoes, jackets, and toys for the orphans over the last four years. BIF last sent assistance to the orphanage in December 2001. Without BIF's funding, the orphanage will no longer be able to function and the children will be in severe peril of hunger, disease, and perhaps death. In addition to its support of the Sumgait orphanage in Azerbaijan, BIF supplies food to approximately 185 children who live in three orphanages in Tajikistan.

8

01327

TDFOIA0000388

FED-PEC0159176

Without BIF's funding, the orphanages may not be able to secure an alternative source of food for the orphans.

    d.    BIF provides assistance to 26,000 displaced persons who are living in Ingushetia and will have no other source of assistance without BIF. BIF provides essential medical assistance, supplies food and kitchen items, works to improve the conditions of the refugee camps, and funds an orphanage and school for children living in Ingushetia. BIF's projects in Ingushetia will cease to exist without continued funding from BIF, which will cause thousands of people to be without food and medical care and orphans to be homeless.

    e.    BIF also funds four dental clinics for children in the cities of Zenica and Sarajevo in Bosnia. The dental clinics provide treatment to thousands of children, including basic services, such as cleaning teeth and fixing cavities as well as simple operations for extractions. In addition, BIF sponsors seminars and classes on oral hygiene for both children and adults.

21.    BIF has asked OFAC to issue a license allowing it to continue its charitable donations of approximately $65,000 per month. Through its orphan sponsorship program, BIF provides essential financial assistance to orphans in Afghanistan, Azerbaijan, Bosnia, Chechnya, China, Ingushetia, Pakistan, and Tajikistan. BIF also makes charitable donations to disabled men in Tajikistan who are unable to work, and who have little or no other source of funding. Attached is a budget of BIF's monthly charitable donations, broken down by country. *See* Ex. 4. On March 22, 2002, OFAC denied this license request.

22.    Through BIF's orphan sponsorship program, BIF is able to send money to approximately 2,100 orphans whose nominal monthly stipend is often the only source of income

9

01328

TDFOIA0000389

FED-PEC0159177

for the orphan and his or her guardian. Following an investigation into whether the orphan is in fact in need of assistance, BIF matches donors to orphans, enabling the donor-sponsor to help pay for the child's basic needs, such as food and clothing. Depending on the country, BIF either distributes the sponsorship money by establishing central distribution points where orphans and their guardians collect the money, or by going to each orphan's home. If BIF is no longer able to send money to the orphans, the orphans will be unable to pay for their most basic needs, resulting in serious destitution for the families, and imperiling the lives of the children.

23.    If BIF is not able to resume its charitable work by the end of April, it will likely cease to exist as an organization. At that point, it will not be possible to repair the damage that the government has done to BIF's reputation, to the ability of its donors to rely upon BIF to fulfill their religious obligations, or to the health and well-being of the recipients of its aid. BIF cannot function without access to its funds, records, and other seized property; without BIF's support, many innocent people will suffer greatly and many may lose their lives.

01329

TDFOIA0000390

FED-PEC0159178

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 1, 2002

_____
Enaam Arnaout

11

01330

TDFOIA0000391

FED-PEC0159179

## EXHIBIT 1: LICENSE APPLICATIONS

| Date | License Requested | License No. | Action Taken |
|------|-------------------|-------------|--------------|
| 12/18/01 (supplemented 1/3/02, 1/8/02) | (1) To pay salaries of domestic employees <br> (2) To pay domestic operating expenses <br> (3) To pay attorneys' fees | (1) *See* 2/13/02 License App. #3 <br> (2) *See* 2/13/02 License App. #3 <br> (3) License No. SDGT-21 | (1) *See* 2/13/02 License App. #3 <br> (2) *See* 2/13/02 License App. #3 <br> (3) Granted (1/24/02) |
| 12/21/01 | (1) To pay Cook County property tax bill <br> (2) To pay for recent production of literature | *See* 2/13/02 License App. #1 | *See* 2/13/02 License App. #1 |
| 2/11/02 (supplemented 3/11/02) | (1) To obtain copies of the records and documents belonging to BIF and its CEO, Enaam Arnaout <br> (2) To obtain a copy of the Evidence Recovery Log for the property seized from BIF's Newark, New Jersey office on December 14, 2001 <br> (3) To request the return of the property taken from Mr. Arnaout's home in Justice, Illinois <br> (4) To request the return of any property taken from BIF's New Jersey office | | (1) None <br> (2) OFAC faxed on 2/27/02 <br> (3) None <br> (4) None |
| 2/13/02 (supplemented 2/19/02, 2/20/02, 2/25/02) | (1) To pay BIF's outstanding obligations to date <br> (2) To reimburse reimbursement of Mr. Arnaout for his payment of eight of BIF's past due bills <br> (3) To pay BIF's monthly operating expenses <br> (4) To pay BIF's monthly charitable donations | (1) License Nos. SDGT-33, 39 <br> (2) License No. SDGT-35 <br> (3) License No. SDGT-41 <br> (4) N/A | (1) Granted in part (2/20/02, 2/22/02, 3/1/02) <br> (2) Granted in part (2/21/02) <br> (3) Granted for domestic operating expenses (3/22/02) <br> (4) Denied (3/22/02) |
| 2/20/02 (supplemented 2/22/02, 2/25/02) | To pay five additional bills that pre-dated 12/14/01 | License Nos. SDGT-36, 39 | Granted in part (2/22/02, 3/1/02) |
| 3/6/02 | (1) To pay FICA & state of Illinois income tax <br> (2) To pay outstanding obligations through 3/6/02 <br> (3) To pay outstanding obligations for Newark, NJ office <br> (4) To reimburse Mr. Arnaout for his payment of certain of BIF's past due bills | | (1) None <br> (2) None <br> (3) None <br> (4) None |
| 3/18/02 | To open a separate bank account for a Legal Defense Fund | | None |

TDFOIA0000392

FED-PEC0159180

**EXHIBIT 2**
**BENEVOLENCE INTERNATIONAL FOUNDATION:**
**OUTSTANDING OBLIGATIONS**

| COMPANY | DESCRIPTION | DATE | AMOUNT | LICENSE APPLICATION |
|---|---|---|---|---|
| ADT Security Services | Security System | 2/01/02 | $41.09 | 2/13/02 |
| Al-Jumuah Magazine | Advertisement | 1/02/02 | $785.00 | 2/13/02 |
| Midwest Regional Yellow Pages | Listing in yellow pages | 2/8/02 | $179.00 | 2/13/02 |
| Omar Najib | Past due rent for January and February 2002 | 1/02 & 2/02 | $2,400.00 | 2/13/02 |
| Pitney Bowes Credit Corp. | Office equipment | 1/14/02 | $279.95 | 2/13/02 |
| SBC Ameritech | Telephone service | 1/04/02 | $280.54 | 2/13/02 |
| SBC | Maintenance billing | 1/02/02 | $35.63 | 2/13/02 |
| VoiceStream | Cellular phone service | 2/9/02 | $175.82 | 2/13/02 |
| Avtostorg | food boxes, sanitary boxes, and kitchen supplies for distribution in Ingushetia and Chechnya | 11/20/01 | $74,180 | 2/20/02 |
| Cook County Treasurer | 2001 First Installment Property Tax Bill (BIF's condominium) | 3/1/02 | $903.96 | 3/6/02 |
| Cook County Treasurer | 2001 First Installment Property Tax Bill (Property in Orland Park) | 3/1/02 | $1,463.47 | 3/6/02 |
| Cook County Treasurer | 2001 First Installment Property Tax Bill (Property in Orland Park) | 3/1/02 | $1,463.47 | 3/6/02 |
| ComEd | Electricity (condominium) | 3/5/02 | $102.33 | 3/6/02 |

1

01332

TDFOIA0000393

FED-PEC0159181

| COMPANY | DESCRIPTION | DATE | AMOUNT | LICENSE APPLICATION |
|---|---|---|---|---|
| ComEd | Electricity (office in Palos Hills) | 2/21/02 | $60.55 | 3/6/02 |
| Nicor | Gas bill | 2/27/02 | $211.68 | 3/6/02 |
| Nicor | Energy bill | 2/11/02 | $24.86 | 3/6/02 |
| Pitney Bowes | late fees | 2/14/02 | $16.80 | 3/6/02 |
| Sprint | Long distance | 1/28/02 | $289.95 | 3/6/02 |
| AT&T (New Jersey office) | Telephone Service | | $234.64 | 3/6/02 |
| Verizon (New Jersey office) | Telephone service | | $635.24 | 3/6/02 |
| IRS | FICA (Employee Contribution) | | $153.02 | 3/6/02 |
| IRS | FICA (Employer Contribution) | | $2,138.04 | 3/6/02 |
| State of Illinois | State income tax | | $805.08 | 3/6/02 |
| Total | | | $86,860.12 | |

2

01333

TDFOIA0000394

FED-PEC0159182

## BENEVOLENCE INTERNATIONAL FOUNDATION:
## BILLS PAID BY ENAAM ARNAOUT ON BEHALF OF BIF

| COMPANY | DESCRIPTION | DATE PAID | LICENSE APPLICATION | AMOUNT DUE |
|---|---|---|---|---|
| ADT Security Services | Security System | 1/22/02 | 2/13/02 | $41.09 |
| AT&T Broadband | Internet connection | 1/28/02 | 3/6/02 | $82.44 |
| 8820 Condo Association | Condominium assessments for four months | 12/01, 1/02, 2/02, 3/02 | 3/6/02 | $360.00 |
| Croatia Airlines | Ticket for Enaam Arnaout | 12/19/01 | 3/6/02 | $282.82 |
| Infocom | Web host | 1/5/02 and 2/5/02 | 3/6/02 | $100.00 |
| Sam's Club | Office supply | 2/3/02 | 3/6/02 | $193.69 |
| SBC Ameritech | Phone bill | | 3/6/02 | $376.00 |
| Setup Site | Web host | 2/2/02 | 3/6/02 | $34.31 |
| Shurguard | Storage locker | 3/1/02 | 3/6/02 | $145.00 |
| Shurguard | Storage locker | 2/5/02 | 3/6/02 | $145.00 |
| Shurguard | Storage locker (plus late fee) | 1/14/02 | 3/6/02 | $165.00 |
| Turkish Air | Ticket for Faiz Uddin | 1/17/02 | 3/6/02 | $680.70 |
| TOTAL | | | | $2,606.05 |

3

01334

TDFOIA0000395

FED-PEC0159183

## EXHIBIT 3
## BENEVOLENCE INTERNATIONAL FOUNDATION
## SUMMARY OF MONTHLY OPERATING EXPENSES

| Category | Estimated Monthly Expenses |
|---|---|
| Azerbaijan Office expenses | $2,600 |
| Azerbaijan Salaries | $3,355 |
| Azerbaijan Benevolence International Computer Center | $1,000 |
| Azerbaijan Sumgait Orphanage | $1,000 |
| Bosnia Office Expenses | $675 |
| Bosnia Salaries | $3,788 |
| Bosnia Benevolence Educational Center, Sarajevo | $1,100 |
| Bosnia Ilijas Sewing Center | $150 |
| Bosnia Zenica Dental Clinic | $75 |
| Bosnia Sarajevo Dental Clinics | $225 |
| Bosnia Assistance to Elderly | $50 |
| China Office Expenses | $700 |
| China Salaries | $800 |
| Daghestan Women's Hospital | $3,800 |
| Ingushetia Office Expenses | $3,800 |
| Ingushetia Salaries | $3,915 |
| Ingushetia Medical Relief | $1,285 |
| Ingushetia Sanitary Relief | $220 |
| Ingushetia Children's Projects | $1,560 |
| Pakistan Administrative Expenses | $850 |
| Pakistan Salaries | $650 |
| Russian Office Expenses and Salaries | $2,000 |
| Tajikistan Office Expenses | $255 |

1

01335

TDFOIA0000396

FED-PEC0159184

| Category | Estimated Monthly Expenses |
|---|---|
| Tajikistan Salaries | $1,056 |
| Tajikistan TB Hospital | $2,177 |
| Tajikistan Gharm Orphanages | $672 |
| United States Office and Car Expenses | $7,096.33 |
| United States Salaries | $9,572.84 |
| TOTAL | $54,427.17 |

2

01336

TDFOIA0000397

FED-PEC0159185

**EXHIBIT 4**
**BENEVOLENCE INTERNATIONAL FOUNDATION**
**SUMMARY OF MONTHLY CHARITABLE DONATIONS**

| Category | Estimated Monthly Expenses |
|---|---|
| Afghanistan Orphan Sponsorship Program | $11,178 (414 orphans x $27/month) |
| Azerbaijan Orphan Sponsorship Program | $9,018 (334 orphans x $27/month) |
| Bosnia Orphan Sponsorship Program | $16,164 (449 orphans x $36/month) |
| Chechya Orphan Sponsorship Program | $13,376 (418 orphans x $32/month) |
| China Student Sponsorship | $1,200 |
| China Orphan Sponsorship Program | $891 (33 orphans x $27/month) |
| Ingushetia Orphan Sponsorship Program | $320 (10 orphans x $32/month) |
| Pakistan Orphan Sponsorship Program | $2,727 (101 orphans x $27/month) |
| Tajikistan Handicapped Sponsorship | $1,250 |
| Tajikistan Student Scholarships | $33 |
| Tajikistan Orphan Sponsorship Program | $9,045 (335 orphans x $27/month) |
| | |
| TOTAL | $65,202 |

01337

TDFOIA0000398

FED-PEC0159186