Steven T. Wax, OSB #85012
Federal Public Defender
Steve_wax@fd.org
Stephen R. Sady, OSB #81099
Chief Deputy Federal Public Defender
steve_sady@fd.org
Patrick J. Ehlers, OSB #04118
Assistant Federal Public Defender
patrick_ehlers@fd.org
101 SW Main Street, Suite 1700
Portland, Oregon  97204
Tel:    503-326-2123
Fax:    503-326-5524
Attorneys for Petitioner

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ADEL HASSAN HAMAD, | CV 05-1009 JDB |
| Petitioner,<br>v. | DECLARATION OF COLONEL<br>LAWRENCE B. WILKERSON (RET.) |
| GEORGE W. BUSH, DONALD<br>RUMSFELD, JAY HOOD, and BRICE<br>GYURISKO, | |
| Respondents. | |

I, Colonel Lawrence B. Wilkerson, declare:

1.    I have been asked to provide this declaration by William Teesdale Esq. of the
Federal Public Defender for the District of Oregon, for use in the above captioned habeas case.  I
understand that Mr. Adel Hamad is a Sudanese citizen and was formerly Guantánamo detainee
#940.  I am informed that Mr. Hamad has stated that he was an innocent man wrongfully

1

EXHIBIT

WAMY EX. 156        WAMYSA571229




detained by Pakistani and U.S. forces in Pakistan and later subjected to physical mistreatment at Bagram Airbase in Afghanistan, and that he was then transferred to Guantánamo Bay detention facility. I understand that Mr. Hamad was detained for over five and a half years before finally being transferred to Sudan subject to a conditional transfer agreement.

2.    I am currently employed as the visiting Pamela C. Harriman Professor of Government and Public Policy at the College of William & Mary, as well as Professorial Lecturer in the Honors Program, the George Washington University. From 2001 - 2005, I was employed by the State Department, initially as a member and then Associate Director of the State Department's Policy Planning staff in 2001 and the first part of 2002, and from the latter part of 2002 - 2005, as Chief of Staff to Secretary of State Colin Powell.

3.    I retired from the United States Army in 1997 after 31 years of service, holding such positions as Deputy Executive Officer to then-General Colin Powell when he commanded the U.S. Army Forces Command (1989), Special Assistant to General Powell when he was Chairman of the Joint Chiefs of Staff (1989-93), and as Director and Deputy Director of the U.S. Marine Corps War College at Quantico, Virginia (1993-97).

4.    I received a Bachelor of Arts degree in English from Troy State University and graduate degrees in International Relations (Salve Regina University) and National Security Affairs (the U.S. Naval War College).

5.    The contents of this declaration are based solely on my personal observations and experiences as a senior official of the State Department from 2002-2005. Although I had the highest level access to classified documents up to and including Top Secret/SCI, the observations I make in this declaration are limited to unclassified information. However, nothing I saw in a classified format would cause me to alter what I have recorded in this

2

WAMYSA571230

declaration; in fact, quite the opposite, i.e., what I read there reinforces what I have said in this declaration.

6.      From 21 August 2002, through 17 January 2005, I routinely attended Secretary of State Powell's morning briefing, which took place at 8:30 each morning and was chaired by the Secretary himself or, if he were traveling or absent for some other reason, by the Deputy Secretary of State Richard Armitage.  The briefing involved some 50 to 55 senior State Department officials, including the Under Secretaries of State, Assistant Secretaries of State, office directors, the Director of USAID, certain ambassadors, et al.

7.      Within a month or two of attending these meetings, a regular theme began to emerge during the updates to the Secretary regarding Guantánamo detainees and the work undertaken by the State Department to arrange for the repatriation of eligible individual prisoners.  At the briefing, Secretary Powell would question Ambassador Pierre Prosper (Ambassador-at-Large for War Crimes), Cofer Black (Coordinator for Counter Terrorism), and Beth Jones (Assistant Secretary for Eurasia), or other senior personnel for information about specific progress in negotiating detainee releases.

8.      A number of these conversations arose because Secretary Powell received frequent phone calls from British Foreign Minister Jack Straw, who had consulted with Secretary Powell frequently about repatriating the British Guantánamo detainees.  Mr. Straw would call and remind Secretary Powell that the UK is our closest ally, was fully capable of detaining terrorists, equally capable of trying them in its courts, and that he should push the repatriations ahead.  I also know that several other foreign ministers spoke with Secretary Powell urging him to repatriate their countries' citizens.  During these morning briefings, Secretary Powell would express frustration that more progress had not been made with detainee releases.

3

WAMYSA571231

9.    a.    With respect to the assertions by Mr. Hamad that he was wrongfully seized and detained, it became apparent to me as early as August 2002, and probably earlier to other State Department personnel who were focused on these issues, that many of the prisoners detained at Guantánamo had been taken into custody without regard to whether they were truly enemy combatants, or in fact whether many of them were enemies at all. I soon realized from my conversations with military colleagues as well as foreign service officers in the field that many of the detainees were, in fact, victims of incompetent battlefield vetting. There was no meaningful way to determine whether they were terrorists, Taliban, or simply innocent civilians picked up on a very confused battlefield or in the territory of another state such as Pakistan. The vetting problem, in my opinion, was directly related to the initial decision not to send sufficient regular army troops at the outset of the war in Afghanistan, and instead, to rely on the forces of the Northern Alliance and the extremely few U.S. Special Operations Forces (SOF) who did not have the necessary training or personnel to deal with battlefield detention questions or even the inclination to want to deal with the issue.

b.    A related problem with the initial detention was that predominantly U.S. forces were not the ones who were taking the prisoners in the first place. Instead, we relied upon Afghans, such as General Dostum's forces, and upon Pakistanis, to hand over prisoners whom they had apprehended, or who had been turned over to them for bounties, sometimes as much as $5,000 per head. Such practices meant that the likelihood was high that some of the Guantánamo detainees had been turned in to U.S. forces in order to settle local scores, for tribal reasons, or just as a method of making money. I recall conversations with serving military officers at the time, who told me that many detainees were turned over for the wrong reasons, particularly for bounties and other incentives.

4

WAMYSA571232

c.      In fact, by late August 2002, I found that of the initial 742 detainees that had arrived at Guantánamo, the majority of them had never seen a U.S. soldier in the process of their initial detention and their captivity had not been subjected to any meaningful review.  A separate but related problem was that often absolutely no evidence relating to the detainee was turned over, so there was no real method of knowing why the prisoner had been detained in the first place.  Secretary Powell was also trying to bring pressure to bear regarding a number of specific detentions because children as young as 12 and 13 and elderly as old as 92 or 93 had been shipped to Guantánamo.  By that time, I also understood that the deliberate choice to send detainees to Guantánamo was an attempt to place them outside the jurisdiction of the U.S. legal system.

d.      It was clear to me that, as I learned about how the majority of the Guantánamo prisoners had been detained, the initial group of 742 detainees had not been detained under the processes I was used to as a military officer.  It was also becoming more and more clear that many of the men were innocent, or at a minimum their guilt was impossible to determine let alone prove in any court of law, civilian or military.  If there were any evidence, the chain protecting it had been completely ignored.

10.      While Mr. Hamad was brought to Guantánamo after August 2002, I have no reason to believe that any more thorough process was used to determine whether his seizure or transfer to Guantánamo was justified.  Moreover, Mr. Hamad was at Guantanamo when, during Secretary Powell's morning updates, he often expressed that he was particularly troubled by the lack of a plan regarding final disposition for the detainees, especially if the idea was to keep them in indefinite detention, without trial, forever.  During the morning briefings, Ambassador-at-Large for War Crimes, Pierre Prosper, who was a primary person working on negotiating

5

WAMYSA571233

transfers, would discuss the difficulty he encountered in dealing with the Department of Defense, and specifically Secretary of Defense Rumsfeld, who just refused to let detainees go.

11.     I came to understand that there were several different reasons for the refusal to release detainees in Guantánamo, even those who were likely innocent. These reasons continued to the time of my departure from the Department of State in 2005.

a.     At least part of the problem was that it was politically impossible to release them. The concern expressed was that if they were released to another country, even an ally such as the United Kingdom, the leadership of the Defense Department would be left without any plausible explanation to the American people, whether the released detainee was subsequently found to be innocent by the receiving country, or whether the detainee was truly a terrorist and, upon release were it to then occur, would return to the war against the U.S. Another concern was that the detention efforts at Guantánamo would be revealed as the incredibly confused operation that they were. Such results were not acceptable to the Administration and would have been severely detrimental to the leadership at DOD.

b.     Another part of the political dilemma originated in the Office of Vice President Richard B. Cheney, whose position could be summed up as "the end justifies the means", and who had absolutely no concern that the vast majority of Guantánamo detainees were innocent, or that there was a lack of any useable evidence for the great majority of them. If hundreds of innocent individuals had to suffer in order to detain a handful of hardcore terrorists, so be it. That seemed to be the philosophy that ruled in the Vice President's Office.

c.     I discussed the issue of the Guantánamo detainees with Secretary Powell. From these discussions, I learned that it was his view that it was not just Vice President Cheney and Secretary Rumsfeld, but also President Bush who was involved in all of the Guantánamo

6

WAMYSA571234

decision making. My own view is that it was easy for Vice President Cheney to run circles around President Bush bureaucratically because Cheney had the network within the government to do so. Moreover, by exploiting what Secretary Powell called the President's "cowboy instincts," Vice President Cheney could more often than not gain the President's acquiescence.

      d.     For the Vice President, Secretary Rumsfeld and others, the primary issue was to gain more intelligence as quickly as possible, both on Al Qaeda and its current and future plans and operations but increasingly also, in 2002-2003, on contacts between Al Qaeda and Saddam Hussein's intelligence and secret police forces in Iraq. Their view was that innocent people languishing in Guantánamo for years was justified by the broader war on terror and the capture of the small number of terrorists who were responsible for the September 11 attacks, or other acts of terrorism. Moreover, their detention was deemed acceptable if it led to a more complete and satisfactory intelligence picture with regard to Iraq, thus justifying the Administration's plans for war with that country.

12.    The attitude described above affected the treatment of prisoners such as Mr. Hamad.

      a.     In the Spring of 2004, just after the Abu Ghraib prisoner abuse photos surfaced in the media, Secretary Powell came to me and asked me to help in working out what had happened in Abu Ghraib. Having been a military officer for 30 years, I knew to start at the beginning so I started immediately to investigate our detention policies from the very start of the war in Afghanistan. During my investigation, I discovered that U.S. forces had murdered two Bagram detainees at Bagram airbase, in about December 2002, very close in time to when Mr. Hamad was apparently in custody there. I recalled my service in Vietnam and what a great

WAMYSA571235

challenge it was to stop troops from committing war crimes against captives, or during combat, and how to have such things happening as a matter of policy was very destructive.

b.    As a related matter, my investigation into the Abu Ghraib detentions revealed that some 50-60% of those imprisoned in Abu Ghraib were probably innocent. They were swept up in combat operations and gotten off the battlefield by imprisoning them – an understandable tactic by military forces operating with too few assets to accomplish the mission, always the case in Iraq. No real records existed of evidence or facts that incriminated them, just as had happened at Guantánamo Bay.

c.    I understand that Mr. Hamad has claimed that after being taken from his home and a period of unpleasant detention in Pakistan, he was sent to Bagram Airbase, where he was mistreated, including beatings, stress positions, and little to no food, resulting in his having to be hospitalized. The claims made by Mr. Hamad are consistent with information about other abuses that occurred in Bagram, including, as I said earlier, the murder of two Bagram detainees during the same time frame that Mr. Hamad was in custody there. One of those murdered detainees, an Afghan named Dilawar, has become the subject of an excellent and very accurate documentary by Alex Gibney entitled "Taxi to the Dark Side."

d.    I personally did not know that we had been torturing captives in Iraq, Afghanistan, and elsewhere until I did the research for Secretary Powell on the Abu Ghraib issue. I had known that there had been limited renditions in specific isolated instances in the past, largely as a result of the War on Drugs. I had no idea that the Administration had turned renditions into a counterterrorist policy and apparently conducted hundreds of them. If standard practice was followed, in order for the organized renditions to occur, there would have to be, at minimum, a Presidential finding that would order the Director of Central Intelligence (DCI) to

8

WAMYSA571236

carry them out. Others, such as the aircraft pilots involved in moving those rendered, would of course be in the know. Other high officials within the Administration may have known general information about suspected Al Qaeda terrorists being treated differently but may not have known the specifics.

13.     I have made a personal choice to come forward and discuss the abuses that occurred because knowledge that I served in an Administration that tortured and abused those it detained at the facilities at Guantánamo Bay and elsewhere and indefinitely detained the innocent for political reasons has marked a low point in my professional career and I wish to make the record clear on what occurred. I am also extremely concerned that the Armed Forces of the United States, where I spent 31 years of my professional life, were deeply involved in these tragic mistakes.

14.     I am willing to testify in person regarding the content of this declaration, should that be necessary.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief and that this declaration was executed at Falls Church, Virginia, on March **24**, 2010.

Col. Lawrence B. Wilkerson (Ret.)

9

WAMYSA571237