# EXHIBIT 9


EXHIBIT
WAMY EX. 184

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 03-MDL-1570 (GBD) (SN)

-----------------------------------x.

IN RE: TERRORIST ATTACKS ON

SEPTEMBER 11, 2001

-----------------------------------x

                  August 5, 2021

                     9:09 a.m.


                  Videotaped Deposition via Zoom

of EVAN KOHLMANN, pursuant to Notice,

before Jineen Pavesi, a Registered

Professional Reporter, Registered Merit

Reporter, Certified Realtime Reporter and

Notary Public of the State of New York.

Page 2

A P P E A R A N C E S :

COZEN O'CONNOR PC
1650 Market Street, Suite 2800
One Liberty Place
Philadelphia, Pennsylvania 19103
    Attorneys for Plaintiffs
BY: J. SCOTT TARBUTTON, ESQ.
    scarter@cozen.com

ANDERSON KILL P.C.
1251 Avenue of the Americas
New York, New York 10020
    Attorneys for Plaintiff O'Neill and
    Plaintiffs' Executive Committee
BY: BRUCE STRONG, ESQ.
    bstrong@andersonkill.com

MOTLEY RICE, LLC
28 Bridgeside Boulevard
Mount Pleasant, South Carolina 29465
    Attorneys for Attorneys for
    Plaintiffs in Burnett Case and
    Plaintiffs' Executive Committee for
    Personal Injury and Death Claims
BY: ROBERT T. HAEFELE, ESQ.
    rhaefele@motleyrice.com
    C. ROSS HEYL, ESQ.
    rheyl@motleyrice.com
    JODI FLOWERS, ESQ.
    jflowers@motleyrice.com
    RICHARD CASHON, ESQ.

KREINDLER & KREINDLER, LLP
750 Third Avenue
New York, New York 10017
    Attorneys for Plaintiffs' Executive
    Committee
BY: ANDREW J. MALONEY, III, ESQ.
    amaloney@kreindler.com

Page 3

A P P E A R A N C E S (continued):

LEWIS BAACH KAUFMANN MIDDLEMISS PLLC
1101 New York Avenue NW, Suite 1000
Washington, DC 20005
    Attorneys for Muslim World League and
    International Islamic Relief
    Organization, Dr. Abdullah Al Turki,
    Dr. Adnan Basha, Dr. Abdullah Al
    Obaid and Dr. Abdullah Naseef
BY: ERIC LEWIS, ESQ.
    eric.lewis@lbkmlaw.com
    AISHA BEMBRY, ESQ.
    aisha.bembry@lbkmlaw.com
    NOUR SOUBANI, ESQ.
    nour.soubani@lbkmlaw.com
    SUMAYYA KHATIB, ESQ.
    sumayya.khatib@lbkmlaw.com
    WALEED NASSAR, ESQ.
    waleed.nassar@lbkmlaw.com

BERNABEI & KABAT PLLC
1400 16th Street NW, Suite 500
Washington, DC 20009
    Attorneys for Dr. Abdullah Al Turki,
    Dr. Adnan Basha, Dr. Abdullah Al
    Obaid and Dr. Abdullah Naseef
BY: ALAN KABAT, ESQ.
    kabat@bernabeipllc.com

JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
    Attorneys for Dubai Islamic Bank
BY: STEVEN T. COTTREAU, ESQ.
    scottreau@jonesday.com
    GABRIELLE PRITSKER, ESQ.
    gpritsker@jonesday.com
    AUDREY BECK, ESQ.
    abeck@jonesday.com
    ERIC SNYDER, ESQ.
    esnyder@jonesday.com

Page 4

A P P E A R A N C E S (continued):

OMAR T. MOHAMMEDI LLC
233 Broadway, Suite 820
New York, New York 10279-0815
    Attorneys for World Assembly of
    Muslim Youth
BY: OMAR T. MOHAMMEDI, ESQ.
    omohammedi@otmlaw.com
    JILL MANDELL, ESQ.
    jmandell@otmlaw.com

GOETZ & ECKLAND
615 First Avenue NE, Suite 425
Minneapolis, Minnesota 55413
    Attorneys for WAMY - World Assembly
    of Muslim Youth
BY: FREDERICK GOETZ, ESQ.
    fgoetz@goetzeckland.com

SALERNO & ROTHSTEIN
221 Schultz Hill Road
Pine Plains, New York 12567
    Attorneys for Yassin Kadi
BY: AMY ROTHSTEIN, ESQ.
    amyrothsteinlaw@gmail.com
    PETER SALERNO, ESQ.
    peter.salerno.law@gmail.com

ALSO PRESENT:
TOM DEVINE, The Video Technician
MICHAEL TOTH, Veritext Concierge Tech

Page 5

S T I P U L A T I O N S

    IT IS HEREBY STIPULATED AND AGREED by
and between the Attorneys for the
respective parties hereto that filing and
sealing be and the same are hereby waived.
    IT IS FURTHER STIPULATED AND AGREED
that all objections except as to the form
of the question, shall be reserved to the
time of the trial.
    IT IS FURTHER STIPULATED AND AGREED
that the within examination may be signed
and sworn to before any notary public with
the same force and effect as though signed
and sworn to before this Court.

2 (Pages 2 - 5)

Page 6

THE VIDEO TECHNICIAN: Good morning.

We're going on the record at 9:09 a.m. on August 5, 2021.

This is media unit 1 of the video recorded deposition of Evan Kohlmann taken by counsel for the defendant in the matter of In re Terrorist Attacks on September 11, 2001, filed in the U.S. District Court, Southern District of New York, Civil Action No. 03-MDL-1570 (GBD) (SN).

This deposition is being held on-line as a Zoom video conference with all parties appearing remotely.

My name is Thomas Devine from the firm Veritext New York and I am the videographer; the court reporter is Jineen Pavesi, also with Veritext New York.

I am not authorized to administer an oath, I am not related to any party in this action nor am I financially interested in the outcome.

Counsels appearing remotely

Page 7

will have their appearances noted on the stenographic record.

The court reporter will now please swear in the witness and we may proceed.

E V A N   K O H L M A N N, having first been duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY MR. LEWIS:

Q.    Good morning, you and I have both been doing this for quite a while so I won't give you the usual tips and just ask you to state your name for the record, please.

A.    Sure, my name is Evan Francois Kohlmann, K-O-H-L-M-A-N-N.

Q.    And you are in New York today?

A.    Correct, I am.

Q.    Mr. Kohlmann, can you tell me what you have done in preparation for today's deposition.

A.    Sure.

Page 8

KOHLMANN

I reviewed both my original report as well as my rebuttal report.

I have reviewed a list of reliance materials that either I used in preparation of my report or I was simply provided or made access to, and I spoke briefly with plaintiff's counsel.

Q.    Did you read any transcripts of other experts' depositions that were taken in this case?

A.    I was able to review some of -- at least one other expert.

Q.    Which expert was that?

A.    It was Marc Sageman.

Q.    Did you read any of the experts on plaintiffs' sides transcripts of their depositions in this case?

A.    I can't recall that I did, no.

Q.    Did you speak to any of the other experts on plaintiffs' side in this case in preparation for your deposition?

A.    No.

Q.    Mr. Kohlmann, when were you hired as an expert in this case?

Page 9

KOHLMANN

A.    That's a difficult question to answer.

I first began doing work for -- on this investigation, on this case, on behalf of plaintiffs' counsel I believe in January of 2004, December of 2003.

Q.    How did it come to pass that you began to do work for plaintiffs' counsel in this case in or around late 2003 or early 2004?

A.    I had been conducting extensive research into the means by which Al Qaeda and other terrorist groups were financing themselves, I was researching both individuals as well as organizations who were allegedly contributing funds either to Al Qaeda, Al Qaeda allies or other terrorist organizations.

I don't recall exactly how we first came into contact, but plaintiffs' counsel obviously was interested in the means by which Al Qaeda was receiving financing and I was put on retainer.

Q.    Did plaintiffs' counsel reach

3 (Pages 6 - 9)

Page 10

KOHLMANN

out to you or did you reach out to plaintiffs' counsel?

A.    I did not reach out to plaintiffs' counsel.

Q.    Who was the first counsel to contact you with respect to this case?

A.    I don't recall, it likely was Michael Elsner, but I don't recall.

Q.    Was it someone from Motley Rice?

A.    I believe so, yes.

Q.    At the time in late 2003, early 2004, you would have been a third year in law school, is that correct?

A.    I was finishing my third year in law school, that's correct, yes.

Q.    And you finished in or around May of 2004?

A.    Correct, yes.

Q.    At the time that you were retained, you were still working for the Investigative Project, is that correct?

A.    No, that's not correct.

Q.    When did you stop working for

Page 11

KOHLMANN

the Investigative Project?

A.    Approximately two months before I was retained by Motley, so probably around November, December 2003.

Q.    I think in your resume it says 2004; does that refresh your recollection?

A.    If it says that it's probably incorrect, because of the fact I believe I was doing work for Motley before I finished law school, but I would have to check, it's almost 20 years ago, I'm not sure.

Q.    Did there come a time when you put in an affidavit in connection with this case in or around the time that you were retained?

A.    I believe I was asked to provide multiple affidavits at that time.

Q.    Beginning at what period in time?

A.    I'm sorry, I don't recall, it was shortly after I was retained.

Q.    So it would be in or around 2004, to the best of your recollection?

Page 12

KOHLMANN

A.    I think that's a fair -- yes, that's a fair assessment.

Q.    And were you still on a monthly retainer at that time?

A.    I believe -- I am not sure.

Q.    I am not trying to give you a memory test --

A.    I'm sorry, yeah --

Q.    You were on a monthly retainer until 2007 and it appears to go hourly; I'm just trying to determine whether there were different arrangements in the same time period or whether there was just a single change.

A.    No, you're right, you're -- my recollection is refreshed by what you're saying.

Initially I was paid by retainer and afterwards I was paid an hourly rate, that's correct, yes.

Q.    Did you review the complaint in this action before it was filed, the first complaint?

A.    I don't believe so, but I don't

Page 13

KOHLMANN

recall.

Q.    Did you provide any information to plaintiffs' counsel with respect to that complaint, if you know?

A.    You mean information that would have led them to help file the complaint?

Q.    Information that would have been put in as allegations in the complaint or that would have informed their process, if you know.

A.    I don't know.

Q.    At the time that you were hired, were you also working for an entity called the 9/11 Finding Answers Foundation, which I will call NEFA?

A.    I was -- okay.

So I worked for NEFA Foundation at the same time I was doing work for Motley, but there was an overlap, but it's not the same period.

I only started doing work for NEFA, my recollection was it was at least a year or two after I began doing work for Motley, maybe even more.

4 (Pages 10 - 13)

Page 38

KOHLMANN

A. Yeah --

MR. HAEFELE: Objection to form.

A. I was in regular communication with him, so I am assuming he was reviewing that stuff, yes, as were Claudio Franco, who was another investigator employed by NEFA, focuses on the Taliban and Afghanistan, also reviewed by, you know -- again, I don't want to hazard names.

If you give me a paper, I will tell you who I shared it with.

Q. We will see where we get to and see how much time we have.

A. Okay.

Q. And that's why I am going to try to show you as little as necessary so we can cover the ground we need to.

You testified in the Haroun case that only two of your publications had been through a formal peer review process, your book and article called Room of Africa, Bringing Global Jihat to the

Page 39

KOHLMANN

Horn of Africa, and that you were the third author on that with Dr. Vidino and Mr. Pantucci, correct?

MR. HAEFELE: Objection to form.

A. I think there is another paper there somewhere, but I have to dig it up, it is 20 years of stuff, I'd have to dig it up.

Q. You testified Haroun, there was only two and that is just a couple of years ago?

A. If you're asking were those two things peer-reviewed, absolutely they were peer-reviewed, formally peer-reviewed, yes.

Q. You don't know who formally peer-reviewed it, correct?

A. In the case of my book --

Q. Let's deal with the Vidino article --

A. No, no.

Q. I will come onto your book in time.

Page 40

KOHLMANN

A. No, no, no, I do not -- I mean, I was peer-reviewed, I know there was a formal peer review process, I know because I was involved in it and I had to go through the comments and make adjustments and respond to questions and all this stuff, it was a lot of peer review, it took a long time.

But I don't know the identities of people that did it, no.

Q. Do you know whether they were academic reviewers or nonacademic reviewers?

A. It is my understanding that at least some of them were academic reviewers, but, again, I don't know their exact identities, I only know what I was told.

I was specifically told that academic was the word that was used.

Q. You published an article with John Eubanks in 1999, do you recall that?

A. In the Journal of Counterterrorism and Security

Page 41

KOHLMANN

International?

Q. I guess you do recall it, yes.

A. Yes, I do.

Q. Was Mr. Eubanks a colleague of yours at the time with the Investigative Project?

A. That's correct, yes, he was.

Q. And he is now counsel for plaintiff in this case?

A. I believe he is, at least the last time I checked, yes, he is.

Q. What were the circumstances under which you came in 1999 to prepare an article in conjunction with Mr. Eubanks?

A. I was working at the Investigative Project, I was conducting research, I had conducted research into several particular areas that were germane to what we were doing and John was also working on those areas, so we co-authored this together.

I'm sorry, maybe I'm not understanding what you're driving at.

Q. I am not really driving at

11 (Pages 38 - 41)

Page 42

KOHLMANN

anything, I'm just trying to understand it, it is unusual that counsel and someone else -- just trying to figure out how it happened.

A.    It is not unusual.

I have a lot of friends of mine who are lawyers, I have friends of mine that work for firms that are present here today, so it is not really unusual at all.

Q.    Have you authored an article with any other lawyers?

MR. HAEFELE:  Objection to form.

A.    With lawyers, he wasn't a lawyer when --  I mean, I am sure he passed the bar exam, but he wasn't working as a lawyer when he was working on the Investigative Project.

Again, it would be very difficult for me to look forward in time when I am writing an article with someone and saying 20 years from now they are going to be working for a law firm, that's not how it works.

Page 43

KOHLMANN

Q.    I am not asking you that and, as you said, he was a lawyer then but not working in that capacity.

Have you stayed in touch with Mr. Eubanks with respect to this case?

MR. HAEFELE:  Objection to form.

A.    I have spoken I think with John, he is a great guy, friend of mine, but honestly I have spoken with him I think two times since his wedding back in 2004, so, no.

Q.    I'd like to come onto to NEFA; you were a senior investigator at NEFA?

A.    Correct, yes.

Q.    And were there any other investigators at NEFA?

A.    Yes, there were.

Q.    How large was NEFA when you joined?

A.    I think there were three other investigators that were employed at that point, two or three.

I worked closely with one of

Page 44

KOHLMANN

the other investigators, so that's the person I worked most closely with.

Q.    Who was that?

A.    Claudio Franco.

Q.    How did you come to be hired by NEFA?

A.    I came into contact with David Draper, I don't remember who introduced us, David explained to me that they were looking to start a research organization think tank to help, you know, progress forward research about Al Qaeda, 9/11 and terrorist financing and I spoke with Claudio, who was another researcher involved in this, I had a great respect for his work, he seemed to be doing work that was very interesting and relevant and so I joined.

Q.    How did you know David Draper --  this was in or around 2006?

A.    Yes, something like that.

Q.    2005?

A.    Something like that, yeah.

Q.    It was after you were hired as

Page 45

KOHLMANN

an expert in this case, correct?

A.    Correct, that's right.

Q.    Did you know David Draper before he hired you?

A.    No, I think I met him probably a couple of months before they hired me, I don't remember.

I remember being introduced to David, but I don't remember exactly who --  I don't remember --  I can't remember who exactly introduced us.

Q.    Would it have been someone at Motley Rice?

A.    It might have been, but I can't remember.

Q.    You are aware, are you not, that Mr. Draper had worked for Motley Rice, correct?

MR. HAEFELE:  Objection to form.

A.    Yeah, I believe he did and I think that's where I first came into contact with him.

Q.    Was he still working for Motley

12 (Pages 42 - 45)

Page 142

KOHLMANN

Q.    You have been excluded in particular cases, correct?

MR. HAEFELE:  Objection to form.

A.    I have been excluded in a couple of cases, yes, that's correct.

Q.    I guess my question for you is, do you inquire as to why a court has excluded you?

A.    I don't know that I do it universally, but I have, yeah, sure.

Q.    Let me move on.

You worked for the Investigative Project from approximately 1998, I thought your resume had said 2004, but I think you suggested --

A.    It was really December of 2003; by early 2004 I was already on my own.

Q.    December 2003, okay.

Let's go back to 1998, in February 1998, so you would have been a freshman in college?

A.    Yeah, my second semester, freshman year, that's right.

Page 143

KOHLMANN

Q.    Your resume says senior terrorism consultant, I presume you didn't start as a senior terrorism consultant?

A.    Correct.

Q.    Did you start as an intern?

A.    That's accurate.

Q.    How many people did Investigative Project employ more or less at the time that you started?

A.    In the office in D.C., it was about, probably about a dozen, and then overseas there were I think three or four different individuals and there were a couple of other folks that kind of, like, they weren't based in D.C., they kind of -- they were in different places.

Q.    When did you become a senior terrorism consultant?

A.    20 years ago this is, but my recollection is this was around the time of 9/11, at that time I had already given briefings at the White House, I had already given briefings to the F.B.I., I was speaking with law enforcement.

Page 144

KOHLMANN

I want to say it was, like, I think it was May of 2002 was the first time I appeared on television talking about this stuff, so it was approximately around that time.

Q.    Was it after September 11?

A.    It was --  you know, look, it was an informal promotion, it was basically, like, you know more about this than almost anyone so you're in charge, right.

Q.    Did there come a time when you received a salary?

A.    I don't think I ever did, I think I was always paid hourly.

Q.    Were you paid hourly as an intern?

A.    Yeah.

Q.    Good gig.

A.    It was great; at the time I was, like, this is great, I got to study terrorism, they're even paying me, it was unusual.

Q.    Did you research the

Page 145

KOHLMANN

organization before you started work there?

A.    Yes.

Q.    Did you consider it a reputable organization?

A.    There wasn't that much information out there in early 1998 about this.

I had watched I think it was a 60 Minutes special that had been showing some of the video that he had recovered and some of the investigations he had done, I spoke with someone who worked there that was very enthusiastic about working there.

In fact, the only reason I worked -- I didn't know what it was when I got the job there, right, basically what happened was that I had wanted to work in a terrorism think tank or I wanted to work somewhere studying terrorism and I contacted a bunch of people at Georgetown that I knew who had similar interests and I said do you know of any place that I can

37 (Pages 142 - 145)

Page 146

KOHLMANN

go for internship to study this stuff.

Someone suggested this, they were working there and they invited me in and I didn't know too much about Steve or the think tank, the Investigative Project, I just watched some of the TV shows that he had done and I watched his movie Jihad in America, and I felt like it was interesting work.

Q.   Did you read some of his articles or news clips about Steve Emerson?

MR. HAEFELE:  Objection to form.

A.   About him or by him?

Q.   Either.

A.   After --  well, while working there obviously, yes, I read tons of stuff that he wrote or he said and then other people saying about him, sure.

Q.   Were you aware --  would you consider Steve Emerson a mentor of yours?

MR. HAEFELE:  Objection, form.

A.   That's a difficult question.

Page 147

KOHLMANN

I had my disagreements with Steve; I credit Steve with giving me opportunity to research this stuff and having exposed me to a lot of information that nobody really knew about back then.

But I would say that my philosophy and my approach are significantly different than Steve.

Q.   In your book you called him "a good friend with whom I'm proud to share the field" and you also talk about a special thanks to various people, including Steve Emerson.

Did he help you with your book?

A.   Not really, no.

And just to be very clear, that was written before I left the Investigative Project.

Q.   So he was --  was he a good friend before you left the Investigative Project but not after, I am not understanding what you're trying to say?

A.   I am just going to put it this way; he is someone who I respect the

Page 148

KOHLMANN

amount of commitment he has put in, he did a lot of very, very interesting work early on.

The work that he did on Makhtab and Al-Kisah is still among the best work anyone has done, the documents he recovered from those institutions, nobody else has them and they're tremendously important.

I would say there are some decisions that he does that I don't agree with, some opinions that he has I don't agree with obviously.

But I would say that his critics have gotten some things right and some things wrong and I think one thing that they have gotten wrong is that, you know, he has his own personal opinions about this, but he does have very good research and he has done an admirable job of getting that research against very long odds and he has gotten research that nobody else has and that is absolutely authentic and credible.

Page 149

KOHLMANN

So I can disagree with his opinions and I can disagree with this and that, but I think the information that he has gathered, the research he has gathered, is top notch, at least for the time that I was there.

Q.   At the time that you began work in 1998 at the Investigative Project, were you aware that Mr. Emerson had stated on television in 1995 that, with respect to the Oklahoma City bombing, that "the bomb was done with the intent to inflict as many casualties as possible and that is," quote, "a middle eastern trait."

Were you aware that he had said that when you started work at the Investigative Project?

A.   No, I found --  that statement I discovered later.

Q.   While you were there?

A.   Yes, yes.

Q.   He also said, "Oklahoma City I can tell you is probably considered one of the largest centers of Islamic radical

38 (Pages 146 - 149)

Page 150

KOHLMANN

activity outside the Middle East."
You're aware that he said that as well?

A.    Well, he had a reason for saying it, but, yeah, I'm vaguely familiar with why he said that, yeah, or that he did say that, excuse me.

Q.    Did you talk about it with him?

A.    No.

Q.    Did you view those as the statements of an anti-Muslim bigot?

MR. HAEFELE:  Objection.

A.    The first thing, I think, it was a stupid statement, I don't think it was a racist statement, I think it was a stupid statement.

I think in general when you look at terrorism incidents, you have to be very careful to guess who the perpetrator is just based on how it's carried out, you really have to see more than that, right, so I think that was a hasty thing to say.

As far as the bit about

Page 151

KOHLMANN

Oklahoma City, I mean, he's right in the sense that Oklahoma and Oklahoma City were hosts to a lot of Islamic conferences that took place in the early-to-mid 1990s and several of those conferences hosted people who were very radical, including in Norman, Oklahoma, including people like Abu Abdel Aziz Barbaros, you know, there were actual -- mujahideen representatives coming there and giving presentations.

Now, whether or not that's germane to the Oklahoma City bombing, you know, it's not irrelevant to mention, obviously in retrospect it wasn't Jihadist, it wasn't an Islamic group, and I think it is probably fair to say Muslims have been subject to, you know, a lot of vitreal because of the fact that people assume that every terrorist attack is carried out by Muslims and there are plenty of terrorist attacks carried out by non-Muslims.

Q.    I think we have gone a little far afield.

Page 152

KOHLMANN

I am going to share with you, which I almost never do with anyone, let alone in my practice, but I can tell you if somebody said to me it was a Jewish trait to inflict as many casualties, I wouldn't consider that a stupid statement, I would consider that an anti-semitic statement; wouldn't you, sir?

A.    Well, I know --

MR. HAEFELE:  Objection to form.

A.    I know Steve pretty well and Steve, probably a lot of people don't know this, but Steve has a lot of Muslim friends and is actually close to a lot of Muslims --

Q.    Some of his best friends are Muslim?

A.    I don't think that Steve would deliberately insult people of the Muslim faith like that, I think it was a stupid statement, I think he should have thought about what he was saying before he said it, but I don't think it was intentionally

Page 153

KOHLMANN

racist and I don't think he is intentionally racist.

However, again, I can't speak for him, I can only speak for myself.

As far as the Investigative Project, I did not work directly underneath Steve, I worked with a team of other people who were very talented, very sophisticated folks, who knew a lot about this and they were certainly not as knowledgeable.

I also -- the other point I would note is that while Steve has said a variety of things over the years that I just don't agree with, right, I wouldn't tell you that I necessarily agree with him because I don't know, but I would also say that Steve has been subject to criticism sometimes where people have accused him of being an Islamaphobe or a racist or this or that and I don't think that those criticisms are really, like -- if you're arguing is he pro-Israeli, yeah, sure, I would say so; am I pro-Israeli, not

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Page 470

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 03-MDL-1570 (GBD)(SN)

-----------------------------------x.

IN RE: TERRORIST ATTACKS ON

SEPTEMBER 11, 2001


-----------------------------------x

                    August 6, 2021

                    9:04 a.m.



        Continued Videotaped Deposition of

EVAN KOHLMANN, taken by Defendants,

pursuant to Notice, held via Zoom

videoconference, before Todd DeSimone, a

Registered Professional Reporter and Notary

Public of the State of New York.

Page 471

A P P E A R A N C E S :

COZEN O'CONNOR PC
1650 Market Street, Suite 2800
One Liberty Place
Philadelphia, Pennsylvania 19103
    Attorneys for Plaintiffs' Executive
    Committee
BY: J. SCOTT TARBUTTON, ESQ.
    starbutton@cozen.com

ANDERSON KILL P.C.
1251 Avenue of the Americas
New York, New York 10020
    Attorneys for Plaintiff O'Neill and
    Plaintiffs' Executive Committee
BY: BRUCE STRONG, ESQ.
    bstrong@andersonkill.com

MOTLEY RICE, LLC
28 Bridgeside Boulevard
Mount Pleasant, South Carolina 29465
    Attorneys for Plaintiffs in Burnett
    Case and Plaintiffs' Executive
    Committee for Personal Injury and
    Death Claims
BY: ROBERT T. HAEFELE, ESQ.
    rhaefele@motleyrice.com
    C. ROSS HEYL, ESQ.
    rheyl@motleyrice.com
    JODI FLOWERS, ESQ.
    jflowers@motleyrice.com

SPEISER KRAUSE, P.C.
800 Westchester Ave, Ste. S-608
Rye Brook, New York 10573
    Attorneys for Plaintiffs' Executive
    Committee
BY: JEANNE M. O'GRADY, ESQ.
    jog@speiserkrause.com

Page 473

A P P E A R A N C E S: (Continued)

JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
    Attorneys for Dubai Islamic Bank
BY: STEVEN T. COTTREAU, ESQ.
    scotttreau@jonesday.com
    GABRIELLE PRITSKER, ESQ.
    gpritsker@jonesday.com
    AUDREY BECK, ESQ.
    abeck@jonesday.com
    ERIC SNYDER, ESQ.
    esnyder@jonesday.com

OMAR T. MOHAMMEDI LLC
233 Broadway, Suite 820
New York, New York 10279-0815
    Attorneys for World Assembly of
    Muslim Youth
BY: OMAR T. MOHAMMEDI, ESQ.
    omohammedi@otmlaw.com
    JILL MANDELL, ESQ.
    jmandel@otmlaw.com

GOETZ & ECKLAND
615 First Avenue NE, Suite 425
Minneapolis, Minnesota 55413
    Attorneys for World Assembly
    of Muslim Youth
BY: FREDERICK GOETZ, ESQ.
    fgoetz@goetzeckland.com

Page 472

A P P E A R A N C E S: (Continued)

KREINDLER & KREINDLER, LLP
750 Third Avenue
New York, New York 10017
    Attorneys for Plaintiffs' Executive
    Committee
BY: ANDREW J. MALONEY, III, ESQ.
    amaloney@kreindler.com

LEWIS BAACH KAUFMANN MIDDLEMISS PLLC
1101 New York Avenue NW, Suite 1000
Washington, DC 20005
    Attorneys for Muslim World League and
    International Islamic Relief
    Organization, Dr. Abdullah Al Turki,
    Dr. Adnan Basha, Dr. Abdullah Al
    Obaid and Dr. Abdullah Naseef
BY: WALEED NASSAR, ESQ.
    waleed.nassar@lbkmlaw.com
    AISHA BEMBRY, ESQ.
    aisha.bembry@lbkmlaw.com
    NOUR SOUBANI, ESQ.
    nour.soubani@lbkmlaw.com
    SUMAYYA KHATIB, ESQ.
    sumayya.khatib@lbkmlaw.com

BERNABEI & KABAT PLLC
1400 16th Street NW, Suite 500
Washington, DC 20009
    Attorneys for Dr. Abdullah Al Turki,
    Dr. Adnan Basha, Dr. Abdullah Al
    Obaid and Dr. Abdullah Naseef
BY: ALAN KABAT, ESQ.
    kabat@bernabeipllc.com

Page 474

A P P E A R A N C E S: (Continued)

SALERNO & ROTHSTEIN
221 Schultz Hill Road
Pine Plains, New York 12567
    Attorneys for Yassin Kadi
BY: AMY ROTHSTEIN, ESQ.
    amyrothsteinlaw@gmail.com
    PETER SALERNO, ESQ.
    peter.salerno.law@gmail.com

ALSO PRESENT:
RICHARD CASHON, Paralegal, Motley Rice
THOMAS DEVINE, Videographer
MICHAEL TOTH, Concierge Tech

2 (Pages 471 - 474)

Page 475

KOHLMANN

THE VIDEOGRAPHER: Good morning. We are going on the record at 9:04 a.m. on August 6th, 2021.

This is Volume II of the video-recorded deposition of Evan Kohlmann taken by counsel for the defendant in the matter of In Re Terrorist Attacks of September 11th, 2001 filed in the U.S. District Court, Southern District of New York, case number 03-MDL-1570 (GBD) (SN). This deposition is being held online as a Zoom video conference with all parties appearing remotely.

My name is Thomas Devine from the firm Veritext New York and I am the videographer. The court reporter is Todd DeSimone also with Veritext New York. I am not authorized to administer an oath, I am not related to any party in this action, nor am I financially interested in the outcome.

Counsel appearing remotely will have their appearances noted on the stenographic record. Now the court

Page 476

KOHLMANN

reporter will swear in the witness and we may proceed.

THE COURT REPORTER: Mr. Kohlmann, I'll just remind you that you're still under oath.

THE WITNESS: Yes, thank you.

* * *

E V A N   K O H L M A N N, having been previously duly sworn, testified further as follows:

EXAMINATION BY MR. NASSAR:

Q. Good morning, Mr. Kohlmann.

A. Good morning.

Q. I hope you had a restful evening.

A. Some of it, yes.

Q. My name is Walid Nassar. I'm a colleague of Mr. Lewis, who led the questioning yesterday. I represent the Muslim World League, the IIRO, as well as four of their former Secretaries General who are named as individual defendants in this litigation. Mr. Lewis had a personal family emergency and that's why I'm

Page 477

KOHLMANN

carrying on the questioning this morning.

MR. NASSAR: Before we begin, I have -- I wanted to direct your attention or, more appropriately, your counsel's attention to three entries in your reliance materials that appear on page 13, and they are a July 12th, 1999 letter, a March 20, 2000 letter, and a March 13, 1999 letter, and I believe counsel will put a stipulation onto the record in relation to those three entries.

MR. HAEFELE: Yeah. As we have in the past with other expert witnesses for plaintiffs' counsel or for plaintiffs, those are items that plaintiffs' counsel provided to the experts, they were part of a larger document that was already in the ECF record, and it is my understanding that none of the experts, including Mr. Kohlmann, relied on them for their opinions. So we would stipulate that those are documents not relied upon by the expert.

MR. NASSAR: I would like to at

Page 478

KOHLMANN

this time mark the report, your expert report, and I believe it is 102 in the tab, and it is going to be marked as Exhibit 1024.

(Exhibit 1024 marked for identification.)

MR. NASSAR: Can we cue it up.

Q. If we just scroll through, it is the report that we have been going over, it is your expert report. I just want to make sure that it looks to you like your expert report.

A. Yeah, I have a copy right in front of me. It does appear to be.

Q. Okay, great.

MR. NASSAR: I would next like to put up the rebuttal, your rebuttal report, which is tab 8, and we are going to mark that as Exhibit 1025.

(Exhibit 1025 marked for identification.)

MR. NASSAR: We can pull down the report. I think we have the wrong tab up. Let's pull this one down. Is it tab

3 (Pages 475 - 478)

Page 479

KOHLMANN

8?  Michael, is this --

THE CONCIERGE:  Actually, I think you are looking for tab 9.

MR. NASSAR:  Okay.  It should be the expert rebuttal report, yes, tab 9, and this is going to be marked as Exhibit 1025.

Q.    If we could scroll through it again, and the same exercise, does this look like the rebuttal report that you provided in this case?

A.    Yeah.  I have a copy right here.  It appears to be.

Q.    And are all of your opinions contained in the four corners of these two -- these two reports?

A.    For this case, yeah, as far as I'm aware, yes.

MR. NASSAR:  We can pull it down.  Next I would like to mark as an exhibit, I think it is -- it is document 4, and these are the invoices that were provided to us by counsel for plaintiffs.

(Exhibit 1026 marked for

Page 480

KOHLMANN

identification.)

Q.    And we can just scroll through these as well.  Do these look like the invoices that you provided, Mr. Kohlmann?

A.    They do.  They do.

Q.    Except I imagine your invoices were not redacted, correct?

A.    Yeah, they are not redacted, and obviously this is now for like 16 years ago, so they might look a little bit different now.  But this is basically, yeah, about right.

Q.    Okay.  And I see that you switched from, and I believe you testified to this yesterday as well, you switched from a monthly retainer in or around December 2007/January 2008 and you moved to an hourly rate -- I'm sorry, that will be Exhibit 1026.

In January 2008 you moved to an hourly rate of $225 per hour; is that correct?

A.    That's correct, yeah.

MR. NASSAR:  And we can pull

Page 481

KOHLMANN

this down.  I think that's all I was going to do with this.

Q.    And you testified yesterday that around the same time you did some work for the Department of Defense and that your rate for them was $350 an hour; is that correct?

A.    Yeah, yeah, I believe so, yeah.

Q.    In other reports that we have seen where you have testified, I believe we have seen rates in the $400 range for your testimony and your work.  Does that sound accurate?

A.    Yeah.  It just depended when the contract started.  I mean, obviously my rates went up over time.

Q.    Why is there a discount for your work on this case relative to the work you do for other cases?

MR. HAEFELE:  I object to the form.

A.    I wouldn't describe it as a discount.  It is simply that they retained me when I was -- back in 2004 and I hadn't

Page 482

KOHLMANN

updated my rates with them.  But that's, I mean, it's just a function of time.

Q.    So these were locked in and then you haven't updated the rates?

A.    I don't know if I'm locked in or not.  Honestly, how do I put this, it is a terrible thing to admit, my focus is not really on the business side, that's why I have business partners. My focus is really on substance.

MR. HAEFELE:  Walid, do you want him to update his rates for the deposition?

THE WITNESS:  I would be happy to ask for more.  That's not something I usually do.

Q.    And so when you were retained at the inception of this litigation in 2004, that's when the $225 was decided, not when it transitioned in 2008?

A.    I don't -- I think it was around 2004-2005.  I don't remember when the exact hourly rate was set.  I don't remember.  But, again, I can tell you this,

4 (Pages 479 - 482)

Page 543

KOHLMANN

Q. And "Police officials," in the next paragraph, "say that WAMY has presence in Delhi, Mumbai," I'm not even going to try to pronounce the next city, "Lucknow, Aligarh, besides Hyderabad." And then it said "It had its offices in Mumbai and Delhi which were closed soon after the Centre imposed a ban on SIMI."

Did I read that correctly?

A. As best as I could, because I can't pronounce Thirvuanathapuram either.

Q. All right. So it doesn't state in here, in this article, the point that you cite it for, "The Indian government shuttered WAMY's offices in that country for allegedly financing banned terrorist groups including Laskhar-e-Toiba and Jaish-e-Mohammed."

As I read the article, it says that two offices were closed soon after the Centre imposed a ban on SIMI. Would you agree that there is somewhat of a disconnect between your report and the article?

Page 544

KOHLMANN

MR. HAEFELE: Objection to form.

A. No, I disagree with that.

Q. All right. Well, certainly would you agree that your report seems to indicate that -- well, there is no distinction in your report as to whether any WAMY offices were left open after that, and there is no clarification in your report as that the offices in Mumbai and Delhi were closed soon after the Centre imposed a ban on SIMI, that part of the article did not carry over to your report, did it?

MR. HAEFELE: Objection to form.

A. The last part I don't know about. The first part I think -- I think it is correct, I didn't say whether or not other WAMY offices had not been closed, although I don't know that that's relevant to the point I was making. But it is true, I didn't say that there were other offices that might have stayed open, sure.

Page 545

KOHLMANN

Q. Did you have any primary or secondary sources or did you consider any primary or secondary sources as to whether any WAMY office in India was ever closed by the government?

A. I don't think so, but I can't recall, honestly. I might have looked at other sources from within my own archive on this, but I don't recall.

Q. All right. But, again, it is our only opportunity to ask you questions about this, and for this proposition, this claimed link, the only source that you cite is this one Times of India article, right?

A. That's correct, yeah, but I can't recall if there are other sources. I -- sorry, I can't recall off the top of my head. This is the only source that I cited.

Q. The article represents intelligence agencies are planning to submit a report on their findings about WAMY's activities by the city -- or activities the city to the Centre by the

Page 546

KOHLMANN

end of this month.

Did you ever get a copy of that report if it was ever issued?

A. I don't know that I was ever able to get a copy of that report, no.

Q. Was there a report even issued; do you know?

A. I wasn't able to get a copy of any such report, so honestly I can't say whether it was or it wasn't.

Q. Are you aware that a former WAMY official has testified under oath in this case that WAMY never had an office in India?

A. I am not familiar with that, no.

Q. So in preparing your report in this case, you make this factual claim. Did you ever reach out to the plaintiffs' counsel and say well, I'm making this claim, are there any other evidence or information that was learned during discovery that I could use to compare and contrast this article to?

20 (Pages 543 - 546)

Page 547

KOHLMANN

A. Well, just because of the fact that someone denies something, that doesn't mean it's not true. WAMY has denied lots of things over the years. I just don't have any faith in the affirmations made by WAMY officials. They have made affirmations about lots of things that have turned out not to be true.

So I think my, you know, comparative analysis is based on evaluating sources that are reliable. Taking the word of WAMY saying that something didn't, I can't, I'm sorry, you know, I -- I didn't note in here that WAMY said it didn't happen, but I don't know that that's relevant to my analysis because I don't trust WAMY. I don't trust anything that WAMY says.

Q. Mr. Kohlmann, that wasn't my question. My question was simply, and I'm going to ask it again, so please listen carefully, did you ever ask plaintiffs' lawyers if there was any information about WAMY's offices in India that was

Page 548

KOHLMANN

inconsistent with your information in this Times of India report?

MR. HAEFELE: I object to the form and asked and answered.

A. Yeah, I --

Q. Do you even make the inquiry?

A. I think I can answer this again which is that I was provided with certain materials. I looked up anything I could not find. Some materials were unavailable to me. And as far as WAMY, I don't trust what their officials say, I can't take those affirmations because they have made those affirmations before and --

MR. MOHAMMEDI: That is not responsive.

MR. HAEFELE: It actually is responsive.

Q. Just finish your answer, please.

A. Sure. Once again, as I said, unfortunately, the affirmations of WAMY officials don't carry that much weight when they are denying aspects of, you know,

Page 549

KOHLMANN

accusations of terrorism because they have made those denials before and they weren't true.

Q. So the answer to my question is no, you never asked about this claim, whether there was any contrary information; is that right?

MR. HAEFELE: Objection to form, asked and answered.

A. I think the answer is that I never asked whether or not WAMY officials denied a charge that I would have expected them to have denied to begin with.

I mean, again, you know, this is the same thing about asking someone in prison whether or not they did it. Of course they are going to tell you they are innocent. That doesn't mean anything. I mean, that's what -- this is -- that's not a relevant -- a relevant -- now, if a U.S. government agency or a British government agency or some other reliable foreign government had come forward and said WAMY didn't have an office there, that is all a

Page 550

KOHLMANN

lie, dot dot dot, I would be more than willing to consider that, sure, a subjective source, sure, of course, sure.

Q. Mr. Kohlmann --

A. Not -- excuse me, Mr. Goetz, again, I've got to finish. If it is from a WAMY official denying they did anything wrong, I don't know that that's something that I can rely on.

Q. Mr. Kohlmann, would you agree that irrespective of whether somebody is in prison or not, everyone has biases, would you agree with that?

A. Yeah, absolutely. I think I have said that previously, that all human beings have some form of bias. You have to treat every source as having some form of bias. You have to assume that you have some form of bias, and any kind of analysis that you are doing you have to be continuously and rigorously examining for bias, both bias for and bias against, which, again, I think it is a very fair point.

21 (Pages 547 - 550)