# EXPERT REPORT OF

### JONATHAN T. MARKS, CPA, CFF, CITP, CGMA, CFE
### PARTNER, BAKER TILLY US, LLP

### AUGUST 7, 2020

Jonathan T. Marks, CPA, CFF, CITP, CGMA, CFE
Partner
Baker Tilly US, LLP
1650 Market Street, Suite 4500
Philadelphia, PA 19103
jonathan.marks@bakertilly.com
(267) 261-4947



EXHIBIT

WAMY EX. 255

TABLE OF CONTENTS

I.     Overview ............................................................................................................ 1
     A.  Retention and Scope ................................................................................ 1
     B.  Qualifications ........................................................................................... 1
     C.  Documents Considered............................................................................. 2
     D.  Qualifying Language ................................................................................ 2
II.    Background ....................................................................................................... 4
     A.  INTRODUCTION..................................................................................... 4
     B.  The ALLEGATIONS ............................................................................... 4
III.   Analysis ........................................................................................................... 6
     A.  WAMY's Financial Audit Observations Do Not Indicate Participation In or Support of Terrorist Activities ........................................................................................ 7
          1.   Pakistan ....................................................................................... 11
          2.   Saudi Eastern Province ............................................................... 15
          3.   Other Saudi Regional Offices ..................................................... 16
     B.  WAMY Canada ...................................................................................... 18
     C.  THE CANADA REVENUE AGENCY ................................................... 20
          1.   WAMY Canada did not make a payment to the orphan program of BIF USA. 21
     D.  WAMY Does Not Have a Lack of or Systematic Recordkeeping Issues ................. 29
     E.  WAMY's Sources and Use of Funds Were Sufficiently Supported and Were Not Indicative of Participating Inn or Supporting Terrorist Activities ............................ 30
     F.  WAMY Did Not Lack Controls ................................................................. 34
IV.   Conclusion ....................................................................................................... 36
Appendix A: Curriculum Vitae .................................................................................. 39
Appendix B: Documents Considered ........................................................................... 43

*In Re Terrorist Attacks on September 11, 2001*, 03-MDL-1570 (GBD)
Expert Report of Jonathan T. Marks, CPA, CFF, CITP, CGMA, CFE

## II.    BACKGROUND

### A.    INTRODUCTION

WAMY is a charitable organization founded in 1972 which maintained global satellite offices during the period 1992 through 2002 ("Relevant Period"). WAMY defines itself as "an independent organization and Islamic forum that supports the work of Muslim organizations and needy communities" all over the world. This Report is prepared to rebut the expert reports of Evan Francois Kohlmann ("Kohlmann"), Dr. Matthew Levitt ("Levitt"), and Jonathan M. Winer ("Winer") (together referred to herein as the "Opposing Experts"). The Opposing Experts are not auditors, accountants, financial experts, certified fraud examiners, or CPAs.

### B.    THE ALLEGATIONS

In connection with the matter, the Plaintiffs have accused WAMY of knowingly providing material support to Usama Bin Laden ("Bin Laden") and his organization, Al-Qaeda.

Specifically, the Opposing Experts have argued the following:

1.    WAMY knowingly provided financial support to known terrorist organizations, including Al Qaeda.

2.    During the Relevant Period, the charitable sector was vulnerable to exploitation by terrorists due to lax regulatory requirements.

3.    Financial irregularities were inherent "features" of WAMY and "consistent with typical terrorist financing models".

4.    WAMY showed a recurrent pattern of deficient controls, missing funds, false invoicing, and other schemes to prevent the detection of their provision of material support to Al Qaeda and other terrorist groups prior to 9/11.

My analysis finds that WAMY experienced very few internal control weaknesses, which, when discovered, were addressed with more robust control environments, and did not and do not rise to the level of culpable conduct described by Opposing Experts. Based on the documentation I reviewed, I found WAMY's overall accounting control environment and efforts in correcting control deficiencies to be in line with a well-operated organization, considering the challenges faced by a not-for-profit organization operating in various developing countries where resources are scarce and financial regulations are not anywhere near the sophistication of the U.S. financial and accounting system requirements. I do not concur with the conclusions reached in the Opposing Expert reports.

The bases for my opinions are set forth below.

## A. WAMY'S FINANCIAL AUDIT OBSERVATIONS DO NOT INDICATE PARTICIPATION IN OR SUPPORT OF TERRORIST ACTIVITIES

The Opposing Experts stated that terrorist organizations rely on terrorist sympathizers "in specific foreign branch offices of large, international charities particularly those with lax external oversight and ineffective internal controls," for fundraising purposes.[2] WAMY did not experience lax oversight or ineffective internal controls. Specifically, by addressing limited instances of non-compliant reporting and recordkeeping with proactive internal control actions, WAMY has shown that it does not have lax external oversight and that it addresses internal control issues as they arise. What I found were increased external oversight and increased controls.

I, and others under my direct supervision, reviewed 57 audit reports / audited financial statements from WAMY and its international offices, in both English and Arabic. I will tackle these head-on. Based on my review of the audit reports, I uncovered anodyne financial audit

---

[2] United States District Court Southern District of New York, In re Terrorist Attacks on September 11, 2001, 03 MDL 1570 (GBD) (SN) ECF Case, Expert Report of Evan Francois Kohlmann.

*In Re Terrorist Attacks on September 11, 2001*, 03-MDL-1570 (GBD)
Expert Report of Jonathan T. Marks, CPA, CFF, CITP, CGMA, CFE

observations relating to support surrounding the use of WAMY's funds and controls. The nature of the financial audit observations found in my review does not provide any indication that WAMY intentionally sponsored projects and individuals connected with terrorist activities.

The Opposing Experts simply ignore the fact that as early as 1997, WAMY began the process of implementing a more robust, centralized organizational accounting system and IT control system. This process introduced more strict and centralized controls of its national and foreign offices.[3] An organization seeking to hide illegal contributions to terrorist organizations does not heavily invest in top-flight accounting firms, and costly IT controls.

Implementing central controls is in line with practices of a large international not-for-profit organization and the Financial Action Task Force's ("FATF") *Best Practices Paper On Combatting The Abuse Of Nonprofit Organizations.*[4] Kohlmann's Report states that WAMY's financial irregularities and atypical accounting practices reflect "typical terrorist financing modes and methodologies." I reviewed the controls put in place by WAMY; the institution of centralized controls is not reflective of "typical terrorist financing modes and methodologies,"[5] but of a global organization that is improving its overall risk profile.[6] None of the Opposing Experts are auditors, accountants, financial experts, certified fraud examiners or CPAs; therefore, Kohlmann's use of the term "atypical" or "irregular" would be misleading as he does not have the prerequisite background or experience to understand not only what atypical or irregular would be, but what typical or regular would be.

---

[3] WAMYSA082520

[4] Financial Action Task Force, *Best Practices Paper On Combating The Abuse Of Non-Profit Organizations (Recommendations 8),* June 2015, Date Accessed: July 13, 2020; (https://www.fatf-gafi.org/media/fatf/documents/reports/BPP-combating-abuse-non-profit-organisations.pdf).

[5] Kohlmann Report at , page 4 and 7

[6] Guidance for a Risk-Based Approach, The Bank Sector, Issued: October 2014, pg. 4 (http://www.fatf-gafi.org/media/fatf/documents/reports/Risk-Based-Approach-Banking-Sector.pdf)

*In Re Terrorist Attacks on September 11, 2001*, 03-MDL-1570 (GBD)
Expert Report of Jonathan T. Marks, CPA, CFF, CITP, CGMA, CFE

According to Winer, Bin Laden and other Islamist leaders issued a fatwa[7] calling upon Muslims around the world to kill Americans in 1998.[8] Levitt claims that, by 1999, Al Qaeda had the capacity to conduct major terrorist attacks as it built a worldwide network in about 60 countries.[9] Levitt further claims that Bin Laden allegedly used the resources of international Islamic nongovernmental organizations ("NGO") to finance terrorist activities.[10] According to the Opposing Experts, "Terrorist abuse of such NGOs [took] place at the local branch office rather than at the organizations' headquarters."[11] Winer opines that organizations that supported Al Qaeda showed a recurrent pattern of deficient controls.[12]

Levitt does not show how the NGOs provided this financial support to finance the 9/11 attacks. His contention is vague and conclusory and does not speak to WAMY's operations. Winer states that he has "not found documentary evidence that an audit was conducted by WAMY or LBI to reconstruct the actual uses of the funds"; Winer uses this as the basis for his argument that, due to no audits being performed, the funds must have been used to support al-Qaeda and other terrorist activities.[13] As we have found in our review, WAMY performed numerous audits in Saudi Arabia and across its international offices, all of which do not highlight any concerns that money was being laundered to support al Qaeda. Furthermore, Winer is not a qualified CPA or forensic

---

[7] A fatwa is a legal opinion or decree handed down by an Islamic religious leader. *See* Definition of *fatwa*, Merriam-Webster, Date Accessed: July 24, 2020 (https://www.merriam-webster.com/dictionary/fatwa).

[8] *See* United States District Court For The Southern District of New York, In Re: Terrorist Attacks On September 11, 2001, Expert Report of Jonathan M. Winer, 03-MDL-1570 (GBD) (SN), page 13, paragraph 4.2, and Expert Report of Dr. Matthew Levitt, page 9

[9] Expert Report of Dr. Matthew Levitt, page 10

[10] *See* United States District Court For The Southern District of New York, In Re: Terrorist Attacks On September 11, 2001, Expert Report of Jonathan M. Winer, 03-MIDL-1570 (GBD) (SN), page 13, paragraph 4.2, and Expert Report of Dr. Matthew Levitt, page 19

[11] Islamic Terrorists: Using Nongovernmental Organization Extensively (FED-PEC0290360-85)

[12] *See* United States District Court For The Southern District of New York, In Re: Terrorist Attacks On September 11, 2001, Expert Report of Jonathan M. Winer, 03-MIDL-1570 (GBD) (SN), page 9, paragraph 3.9

[13] Winer report, section 12.12.7 onwards, page 106

accountant, and he has not reviewed the wealth of financial information available to make such broad claims. A review of the primary source documents shows that WAMY supported other charitable organizations and initiatives that were in line with the goals enumerated in WAMY's charter, which includes humanitarian support for refugees and orphans affected by war. Based on our review of the project reports and receipts, WAMY provided financial support for refugee initiatives, which included humanitarian support in the form of clothing, food, and shelter. We reviewed project reports that include, for example, support for Kosovo refugees in Albania (1999),[14] Palestinian refugees in Lebanon (2002),[15] and Chechen refugees in Georgia (2000).[16] When providing funds for refugees, WAMY required the recipients to follow up with reports to ensure the charitable use of funds.[17] Supporting refugees and orphans affected by wars does not equate to terrorism, and is in line with WAMY's stated charitable goals. In addition, the control aspect of requiring reports continues with the transparent nature of its funding.

By beginning to institute more strict and centralized controls in 1997, WAMY became a more transparent and better recordkeeping organization that is not in-line with organizations that supported Al Qaeda. WAMY strived to achieve for best practices when it demanded that its local offices report and be accountable for spending, which is not typical for an organization "hiding" something.  This structure and behavior are indicative of a control-based group, and not a group ran without control of its local branches.

---

[14] WAMYSA524838-WAMYSA524842

[15] WAMYSA525267-WAMYSA525272

[16] WAMYSA044850 - WAMYSA044851

[17] Ibid. The document includes the relief contract and sets out the agreement of support and amounts for each part, also requires the recipient party (in Georgia) to support expenditure with periodic reports.

As demonstrated below, this Report tackles head-on the few audit statements that presented any accounting issues which reveal no so-called "recurrent pattern of deficient control."

### 1. Pakistan

Lajnat al-Birr al-Islamiah ("LBI") was founded by Adel Batterjee[18] ("Batterjee") and registered in Pakistan on October 22, 1989,[19] with the main purpose of providing health services and urgent relief assistance to the poor in Northern Pakistan. LBI was established under the auspices of WAMY.[20]

LBI performed humanitarian works inside Afghanistan during its first two years of operations.[21] Initially, Batterjee kept satisfactory records of LBI's activities.[22] As WAMY's Assistant Secretary General explained, WAMY's policy was not to send funds unless they are allocated for specific projects and activities. Before the start of any project, a needs-assessment was performed, and the development of a budget followed this exercise. WAMY Saudi Arabia would follow up on every project, and if project reports were not received, WAMY would send someone from Jeddah to get the financial records and support[23]. We have found these declarations from Noorwali to be consistent with the supporting primary documents reviewed, and the project reports contained sufficient evidence for these processes, as we discuss in section C of our analysis. WAMY required the following items:

1. Needs Assessments

---

[18] PEC-WAMY040214, pg. 19/50

[19] WAMYSA018655 (BT: see WAMYSA057751, WAMYSA031896) (showing Pakistan registration March 12, 1991)

[20] Dr. Abdul Wahab Noorwali's Deposition Transcript, July 24, 2019, at 228.

[21] WAMYSA031308; WAMY028427; WAMYSA031293–8 and WAMYSA031301; and WAMYSA031289–92, and WAMYSA031302–4 (specific projects and their funding)

[22] April 2, 2018 Noorwali Declaration, at 8, 10; see also WAMYSA031289–92, and WAMYSA031302–4.

[23] Noorwali Declaration, at 17-24.

*In Re Terrorist Attacks on September 11, 2001*, 03-MDL-1570 (GBD)
Expert Report of Jonathan T. Marks, CPA, CFF, CITP, CGMA, CFE

    2. Project Reports

    3. Operational Reports

    4. Transactional Statements

WAMY would only send funds allocated for a specific project and would require reporting and audits on this funding to track the use of this funding.[24] The funding for WAMY's projects was thus done on a project by project basis. This is a version of control because it does not allow for a buildup of excess funds. The funding of LBI on a project by project basis exhibits control over the funding of these projects.

However, by 1992, the relationship between WAMY and Batterjee was deteriorating due to Batterjee's progressive lack of reporting. This lack of reporting led to Batterjee's dismissal in early 1993.[25]

WAMY then became aware that Batterjee was using BIF, a separate charity unrelated to WAMY, to make donors feel as if they were donating to LBI when they were donating to BIF.[26] In response, WAMY immediately sent Batterjee a letter asking him to cease and desist.[27] On May 11, 1993, WAMY's Secretary General, Dr. al-Johani, informed then-Prince Salman bin Abdul Aziz about Batterjee's dismissal from LBI and about the deception.[28] These active actions by WAMY highlight its proactive approach to control and show that WAMY was active in its management and removal of anyone it considered to be a bad actor. An organization that was

---

[24] April 2, 2018 Noorwali Decl. ¶ 15.
[25] April 2, 2018 Noorwali Decl. at Paragraphs 34-39.
[26] WAMYSA034247-248.
[27] FED-PEC0114419
[28] WAMYSA061345

*In Re Terrorist Attacks on September 11, 2001*, 03-MDL-1570 (GBD)
Expert Report of Jonathan T. Marks, CPA, CFF, CITP, CGMA, CFE

actively financing terrorism would not proactively remove an individual and bring to light to any deception.

In July 1995, WAMY decided to dissolve LBI and take it over as a WAMY field office. "This was done in order to cut ties with Adel Batterjee clearly and to ensure that his activities with BIF were not attributed to or affiliated with WAMY."[29] As WAMY's Assistant Secretary General Dr. Noorwali stated, "the relationship with Adel Batterjee was cut, ended, and he used to carry out his activities in Benevolence International Foundation, of which we do not know any details. And our offices in the field, whether in Pakistan or other regions, did not deal with Benevolence International Foundation."[30] On May 28, 1996, that decision took effect, and LBI was dissolved and taken over by WAMY. LBI's name was merged into WAMY after the dissolution of all assets of LBI Pakistan.

Meanwhile, as Dr. Bahafzallah took over as LBI chairman in early 1993 after Batterjee's dismissal, he submitted LBI to annual external auditing by the Pakistani firm of Sidat Hyder Qamar Maqbook & Co., a representative of Arthur Anderson.[31] There was no mention of BIF anywhere in the LBI audit reports. Moreover, from all the audits carried out through 1997, when the organization was still named LBI,[32] it was clear that LBI had its main assets in Pakistan and Afghanistan. None of these assets were shared or transferred to any other organization, contrary to the speculative and unfounded statements in the Plaintiffs' experts' reports[33] when they lump

---

[29] Noorwali declaration II, at 13. See also WAMYSA065181–5.
[30] Noorwali deposition, July 24, 2019, at 267.
[31] WAMYSA018660–83.
[32] WAMYSA018648–83.
[33] E.g. Winer Report section 12.12.

BIF and LBI together without any factual basis as one organization and claim BIF was a continuation of LBI.[34]  Our analysis of this matter is further detailed below.

WAMY funded specific charitable projects for LBI and WAMY Pakistan, and further required them to have audits performed to assure that LBI and WAMY Pakistan complied with WAMY's charitable initiatives in Pakistan from 1992 to 2002[35]. WAMY Pakistan conducted charitable projects in both Pakistan and bordering Afghanistan. While the Pakistani projects were audited and received a fair opinion, meaning that the financial statements are free from material misstatements and faithfully represent the financial performance and position of the entity, the audit reports contained a "disclaimer"[36] for relief projects in Afghanistan. In this case, a disclaimer was issued since the auditors were unable to verify the use of funds in neighboring Afghanistan, likely due to regional instability. However, there was nothing in the audit reports that showed any wrongdoing.  Based on my experience as a CPA and my review of the primary source documents, I conclude that these uses of a disclaimer were not out of place or a sign of terrorist funding. Regional instability and dangerous conditions in the area can lead to the use of a disclaimer.  An audit report containing a "disclaimer" does not equate to guilt.  Afghanistan was essentially an active war zone at the time, which necessitated the need for charitable assistance for those affected. Nevertheless, the auditors mention that assurance based on the close involvement of a regional director was common for the time.

---

[34] See also the report on LBI at WAMYSA065181–5.

[35] WAMYSA018575  & WAMYSA9690 to WAMYSA9738

[36] A disclaimer of opinion are normally a result of significant scope restrictions and when an auditor assesses that other types of opinions may not be warranted. *See*: The CPA Journal, Using Disclaimer in Audit Reports Discerning Between Shades of Opinion, Written By: Robert R. Davis, April 2004 Issue, Date Accessed: July 15, 2020 (http://archives.cpajournal.com/2004/404/essentials/p26.htm).

*In Re Terrorist Attacks on September 11, 2001*, 03-MDL-1570 (GBD)

Expert Report of Jonathan T. Marks, CPA, CFF, CITP, CGMA, CFE

The dissolution of LBI followed proper procedures.[37] The Saudi Ministry of Islamic Affairs oversaw the dissolution by inspecting all assets and accountings of LBI. Based on principles of dissolutions, LBI, under the auspices of WAMY, provided financial documentation of its funds to the Ministry during the process of dissolution. [38] The funds were segregated until all assets were accounted for.[39] When the dissolution process was completed, the funds that had been put in to the Ministry were returned to WAMY after the merger of LBI into WAMY. Based on our financial expertise, LBI followed the right process of dissolution which shows the organization had no connection with any other organization except WAMY, and certainly was not financially connected to BIF. Batterjee was heading BIF which had its own activities, funding and operations and was established in different countries, including the US. LBI had no operations in the US. We have not seen any connection between WAMY and BIF based on our analysis.

### 2. *Saudi Eastern Province*

The regional WAMY offices of Dammam, Ahsa, and Khobor are subject to combined audits under the umbrella of the Saudi Eastern Province chapter of WAMY. Of the fourteen (14) audits performed for the Saudi Eastern Province during the Relevant Period, thirteen (13) received an "unqualified" opinion,[40] and only one, for the year ending December 31, 1999, highlighted control issues.[41]  As a CPA and auditor, the issues are not a concern because of the proactive approach taken by WAMY.

---

[37] WAMYSA032007–13; WAMYSA032014–20;

[38]. WAMYSA057787-WAMYSA057788, and WAMYSA029901-02.

[39] WAMYSA065183–5.

[40] An unqualified opinion is where an auditor has determined that financial statements are presented fairly, in all material respects, and in accordance with the applicable generally accepted accounting principles.

[41] WAMYSA1070344-70599

The auditors also set out practical guidelines to improve accounting performance. The guidelines advocated for a centralized accounting system that would save costs, time, and journal entries between the offices. As discussed below, WAMY promptly acted to set up protocols to adopt the measures recommended by the auditors, including, without limitation, the installation of a unified accounting system in all eastern provinces, the hiring of accountants in all offices, and staff training. In 1997, WAMY improved its IT functionality around accounting, and in 1999 they continued these accounting control improvements with more technology, hiring, and training. From an accounting standpoint, these proactive actions are further examples of an organization improving transparency and reporting.

The issues highlighted in the audits of the Saudi Eastern Province and WAMY Pakistan were exceptions to the other audit opinions found among its global and regional affiliate offices, which found the financial statements to be true and fair. The audit reports reviewed with exceptions represent 1.75% of the total global, and regional affiliated offices audits reviewed.[42]

3.  *Other Saudi Regional Offices*

The following are two instances of accounting exceptions noted in the financial statements:

a.  The 1994 audit of the Dammam office found that the fixed assets had been incorrectly included as expenses.[43]

b.  The Riyadh office 1999 audit report found an issue with the accounting of fixed assets.[44]

---

[42] Bangladesh - WAMYSA066752 - WAMYSA066802, Baku - WAMYSA066717 - WAMYSA066751, Indonesia - WAMYSA066972 - WAMYSA067030, Somalia - WAMYSA067482 - WAMYSA067515,Sri Lanka - WAMYSA067542 - WAMYSA067657, Australia and South Pacific - WAMYSA066224-WAMYSA066240, South Africa- WAMYSA066424-WAMYSA066441, Pakistan - BUR-PEC-077860

[43] WAMYSA1070344-599 (pg. 157-163)

[44] WAMYSA1080588- 745

*In Re Terrorist Attacks on September 11, 2001*, 03-MDL-1570 (GBD)
Expert Report of Jonathan T. Marks, CPA, CFF, CITP, CGMA, CFE

Neither of these issues would be indicative of an attempt to hide illicit activity. The financial audit observations describe the human errors that are common even in the most sophisticated companies in the U.S.  In a study of account errors common in non-profit organizations, *Accounting Errors in Non-profit Organizations. Accounting Horizons, presented by Jeffrey Burks, the Thomas and Therese Grojean Family Associate Professor of Accountancy and the Deloitte Faculty Fellow a professor at Notre Dame*, the presenters state, "[p]ublic charities report errors at a rate that is 60 percent higher than that of publicly traded corporations, and almost twice as high as that of similar-sized corporations. The errors are commonly errors of omission (i.e., failing to recognize items)." The errors in WAMY's accounting/bookkeeping records are common among charities, and WAMY's auditors advised and worked with WAMY to adjust the financial statements for the aforementioned issues.  My observations of the actions taken by WAMY to improve its problems is an act of control.

Increased accounting controls began as early as 1997 when the WAMY Secretary General declared that WAMY would be centralizing its IT systems.[45] Over the course of centralizing recordkeeping, WAMY gradually became aware of issues in their internal controls and made a conscientious effort to improve any control issues. The following actions were taken:

a. A new accounting and financial policy was introduced and implemented with immediate effect on January 1st, 2000.[46] This set out guidance on how to recognize revenue, how to treat expenditures, and how funds are to be prioritized and allocated between projects.  The accounting department in the main office was tasked with increased responsibility, and their role was extended to the following:

---

[45] WAMYSA082521
[46] WAMYSA1070344-70599

      i.     Follow up the application of the accounting system in all offices with supervision and review of financial restrictions in each office,

      ii.     Prepare the final annual accounts of the symposium in the eastern region, and

      iii.     Support the planning of budgets of new offices

    b.    Internal correspondence from the WAMY head office was identified, which reprimanded managers for any employees not following employment procedures.[47]

    c.    Minutes from a meeting held with the accountants from the Saudi regional offices on June 18, 2000, provide evidence of changing accounting protocols in the eastern provinces to rectify the issues. This included the installation of a unified accounting system in all eastern provinces, the hiring of accountants in all offices, and staff training.[48]

I have noted that WAMY updated and centralized its accounting systems in the late 1990s and early 2000s, which is supported by internal correspondence.[49] Moreover, WAMY requires international offices to report on the allocation of installments of funding, following proof of activities on a bi-annually or quarterly basis.[50] These proactive efforts to enhance WAMY's internal controls and financial operations demonstrate the organization's efforts to enhance its control environment.

**B.    WAMY CANADA**

I reviewed documents that highlighted the issues experienced by the Canadian office during the implementation of the new control and budgetary process: Mohammed Khatib

---

[47] WAMYSA528986-WAMYSA529175 pg 21

[48] WAMYSA1070344- 70599

[49] WAMYSA082521 &  WAMYSA082520

[50] WAMY SA 2179- 2180 &  WAMY SA 2100- 2102