UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
IN RE: TERRORIST ATTACKS ON SEPTEMBER 11, 2001

03-MDL-1570 (GBD) (SN)

EXPERT REPORT OF PROFESSOR SHERMAN JACKSON

EXHIBIT

WAMY EX. 257

law is also changing and does not assume the one-size-fits-all logic of the legal systems promulgated by the modern state.

3.  Those who are untrained in Islamic law are not qualified to opine on matters of Sharī'ah. The opinions of such persons are often unreliable and based on understandings that are incomplete and devoid of an appreciation of the variation, subtleties and basic presuppositions of Islamic law.

4.  Islamic law recognizes the preservation of the sanctity of the public space and "public safety" as an inviolable "Right of God". This "public space" includes Muslims and non-Muslims alike.

5.  Violating the public space through acts of publicly directed violence is unanimously condemned as a crime in Islamic law. This is the crime known as *ḥirābah*, which is easily translated into English as "terrorism". It is the most severely punished crime in Islam.

6.  Jihād is a legally sanctioned and legally regulated institution in Islam and is unanimously recognized as neither being equal to nor as sanctioning terrorism. Its primary aim is the preservation of the safety and security of the Muslim Community.

7.  *Da'wah* is "calling" or "inviting" people to Islam, both Muslims and non-Muslims. It is neither "militant preaching" nor inherently "anti-democratic" or "anti-Western". To be so for many Muslims would defeat its purpose, especially for Muslims in the West.

8.  Wahhabism and Salafism must be understood in historical context. Neither movement is a monolith and neither should be seen as inherently or summarily violent or even political, for that matter.

9.  A *shahīd* is a martyr in the sense of one who dies in a legitimate cause. As terrorism is forbidden by Islamic law, one who dies committing a terrorist act would not be considered a *shahīd*. Moreover, there are many others who are recognized as "*shahīd*s" in Islam who are not martyrs in the sense of dying in battle.

10. Zakat is primarily intended to purify the hearts and wealth of Muslims and to support the poor. It is neither a reliable source for funding *jihād* nor for carrying out "economic *jihād*," which is not a part of its original purpose.

III.  **QUALIFICATIONS**

As a whole, "rights of God" are seen as those rights whose preservation is fundamental to maintaining the commonweal, the commonweal itself being seen as belonging to God.

The closest approximation of *ḥirābah* in English is "terrorism".[13]  As will be seen from its description, it would easily apply to the terrorist attacks of al-Qā'idah on September 11th, 2001. In Arabic, *ḥirābah* (also known as *qaṭ' al-ṭarīq*, "cutting off safe passage") is the act of committing publicly directed violence in a manner that: 1) spreads public fear; 2) spreads a sense of public helplessness; and 3) spreads a general sense on the part of the 'reasonable person' that he or she cannot take safe-keeping measures that might enable them to avoid this violence.  It is important to note, however, that *hirābah*, as *publicly directed* violence, is not simply violence that takes place *in* public, such as a businessman's public shooting of his partner in a dispute over finances.  For, in addition to the sanctity of individual human life, *ḥirābah* violates the sanctity of *the public itself*, i.e., a right of God.  In other words, it is violence that is considered to be directed *at* the public.  The motivations behind this violence need not be political.  Rather, it is the *consequences* that count, namely, the spreading of public fear, public helplessness and a general sense of inescapable vulnerability.  It is this public dimension of *ḥirābah* that distinguishes it from simple homicide; for, the latter assumes that the victim was personally targeted, not the public per se.  By "public," however, the reference is not simply to that which is publicly witnessed; even if the crime is done in stealth but exerts a terrorizing *impact* on the public, it may constitute an act of *ḥirābah*.  For example, if a shop owner secretly lures random individuals into his shop and poisons them, this could constitute an act of *ḥirābah*.  For, the impersonal nature of his action is such that no reasonable person could take safe-keeping measures against it, and, as such, it would spread fear and a public sense of helplessness.  It is thus a threat not simply to the individual who was murdered but to the public at large.

Another reason for the severity with which Muslim jurists prohibit *ḥirābah* is its destructive effect on people's ability to earn a living or fulfill their basic duties as family members, neighbors and relatives.  As one jurist summarized the matter: "*Hirābah* is extremely detrimental, because it prevents people from being able to earn a living.  For, indeed, commerce is the greatest and most common means of earning a living; and people must be free to move about in order to engage in commerce… But when the streets are terrorized, people stop traveling and are forced to stay at home.  The doors to commerce are closed and people are unable to earn a living.  Thus, God instituted the severest punishments for *ḥirābah* as a means of humiliating and discouraging the perpetrators thereof and in order to keep the doors of business open."[14]

---

[13] For a basic overview of the law of *hirābah* according to all four schools, see my "Domestic Terrorism in the Islamic Legal Tradition," *The Muslim World* vol. 91 (2001): 293-310.
[14] Al-Qurtubī, *al-Jāmi' li aḥkām al-qur'ān*, 11 vols., ed. K. Mays (Beirut: Dār al-Fikr, 1419/1999), 3: 88.

Plaintiffs' expert reports consistently present Wahhabism and Salafism as inherently violent and their violence as particularly wanton. This is all placed against a backdrop of seeing "*jihād*" and "extremist violence" as one and the same. I have grouped these two groups together, for reasons that will become clear in what I present. At any rate, understanding the role of violence in these movements requires much more nuance than the Plaintiffs' reports allow.

The term Salafīsm (*al-salafīyah*) is actually quite old, going back to Islam's pre-modern tradition. It refers basically to an orientation or approach to scriptural interpretation that sees itself as being modeled on that of the Pious Ancestors, i.e., *salaf*, of the first three generations after the death of the Prophet Muḥammad. This was seen as the best way of insulating Islam from the negative influence of foreign ideas (e.g., Greek, Zoroastrian, etc.) being brought in by new converts and the residual intellectual trends and energies percolating in the conquered territories following the Muslim conquests. The major problem with these influences was that they were seen as steering the Community away from a proper interpretation of what scripture said about God, God's attributes, God's relationship to Creation, and the proper way to worship God, all of which impinged upon the cardinal principle of Islam: *tawḥīd*, or strict monotheism, i.e., There is no god but God. In pre-modern times, perhaps the most important advocate of this approach was the Ḥanbalī jurist and theologian Ibn Taymīyah (d. 728/1328).

In the 18th century, an Arabian scholar, Muḥammad Ibn 'Abd al-Wahhāb (1703-1792) took up this mantle and went on to establish the Wahhābī movement. The early Wahhābīs were aghast at the levels of ignorance and decadence they perceived around them, especially some of the excesses of Sūfī movements, widespread forms of superstition, and the ossified state of the schools of law. All of this, according to the Wahhābīs, compromised the principle of *tawḥīd* as understood by the Salaf. And the early Wahhābīs were extremely violent in their efforts to extinguish these corrupting influences. With fanatic zeal, they did not hesitate to excommunicate anyone who rejected their call to return to pristine monotheism as *they* understood it. And excommunication was a favored pretext used to justify waging violent *jihād* against opponents. Yet, Wahhābism was an entirely intramural affair: they were interested solely in the doctrinal purification of Muslims, and they never raised their swords against the British or any other non-Muslim entities in the region.

A little over a century after the death of Ibn 'Abd al-Wahhāb, an alliance was struck between his descendants and the founder of the modern Saudi state, 'Abd al-'Azīz Ibn Saud, basically establishing the religious identity of the modern Saudi state. By this time, Wahhābism had become much less aggressive and would be further domesticated upon its cooptation by the Saudi state, where it continues to define the religious establishment to this day. In fact, later Wahhābī (and later Salafī) scholars would resort to "re-interpreting" various statements by Ibn 'Abd al-Wahhāb in order to empty them of the strident, exclusivist and violent meanings they carried during his lifetime, as these scholars had decidedly moved away from these

19

understandings, especially summary excommunication. Indeed, students who studied in Saudi Arabia as recently as the 1980s report that major scholars such as Shaykh al-'Uthmaymīn and Shaykh Bin Bāz were still explicitly steering students away from the way that Muḥammad b. Abd al-Wahhāb's legacy had been interpreted and understood in the past.

Meanwhile, sometime around the 1960s, a new crop of scholars emerged with claims to the legacy of Salafism and simply named their movement the "Salafī" movement". They shared with Ibn Taymīyah and Muhammad Ibn 'Abd al-Wahhāb the same basic concerns regarding the purification of *tawḥīd* and clearing away all of the 'accretions' that had disfigured the message of Islam. But there were also differences. Among the most central of these would be their different attitudes towards the traditional schools of law. Ibn 'Abd al-Wahhāb was almost singularly obsessed with theology and the issue of *tawḥīd*; in law, he basically acknowledged the authority of the Ḥanbalī school. A general (but not unanimous) trend among the Salafīs, on the other hand, in addition to their concerns about accretions in the field of theology, saw (and continue to see) the traditional schools of Islamic law themselves as 'accretions'. Thus, they tend to reject the authority of the traditional schools (and some reject the schools outright) and insist that all Muslims should go back to the sources and interpret them afresh, i.e., to perform *ijtihād*, i.e., unmediated interpretation of the sources of Islamic law.

The Salafī movement, however, is not a monolith, and they are especially divided over the issue of politics and violence. Not all Salafīs are violent; in fact, most are not. The movement can basically be divided into three persuasions: 1) Quietist Salafīs, who are committed to doctrinal purification and eschew violence and even oppose involvement in politics, the latter on the idea that it merely divides Muslims; 2) Activist Salafīs (also known as *Sahwah* Salafīs, or "Salafīs of the Awakening"), who are committed to doctrinal purification and *non-violent* political activism; 3) *Jihādī* Salafīs, "who call for violent action against the existing political order and for the establishment of a unitary state in the form of the caliphate."[24]

One must be careful, therefore, about over-inclusive usages of the term "Salafī". While Saudi Arabia and the Gulf in general may constitute what some may consider "Salafi central," not all Salafis are Arabs. The Blackamerican Muslim community in the northeast corridor of the US has a significant Salafi contingent. Their generally low profile might remind us that not all Salafīs are violent; indeed, not all Salafīs are even politically active; indeed, most are not. Thus, many Blackamerican Salafīs, e.g., even refuse to vote. But they have nothing to do with violence. We should also avoid the tendency to assume guilt by association with values, priorities, terms or concepts that *Jihādī* Salafīs maintain: not every Muslim group or individual – even Islamists of various stripes, indeed even numerous Salafīs – who opposes the existing

---

[24] See B. Haykal, "On the Nature of Salafi Thought and Action," in *Global Salafism: Islam's New Religious Movement*, ed. R. Meijer (New York: Columbia University Press, 2009), 48.